PSJ10 Exh 22

10/24/2018          agn-10k_20171231.htm

10-K 1 agn-10k_20171231.htm 10-K

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from      to

| Commission File Number | Exact name of registrant as specified in its charter, principal office and address and telephone number | State of incorporation or organization | I.R.S. Employer Identification No. |
|---|---|---|---|
| 001-36367 | **Allergan plc**<br>Clonshaugh Business and Technology Park<br>Coolock, Dublin, D17 E400, Ireland<br>(862) 261-7000 | Ireland | 98-1114402 |
| 001-36887 | **Warner Chilcott Limited**<br>Canon's Court<br>22 Victoria Street<br>Hamilton HM 12<br>Bermuda<br>(441) 295-2244 | Bermuda | 98-0496358 |

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Allergan plc Ordinary Shares, $0.0001 par value | New York Stock Exchange |
| Allergan plc 5.500% Mandatory Convertible Preferred Shares, Series A, par value of $0.0001 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

| | | |
|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

| | | |
|---|---|---|
| Allergan plc | Yes ☐ | No ☒ |
| Warner Chilcott Limited | Yes ☐ | No ☒ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

| | | |
|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

| | | |
|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| Allergan plc | ☐ |
| Warner Chilcott Limited | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Allergan plc | Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|---|
| | Non-accelerated filer (Do not check if a smaller reporting company) | ☐ | Smaller reporting company | ☐ |
| | Emerging growth company | ☐ | | |
| Warner Chilcott Limited | Large accelerated filer | ☐ | Accelerated filer | ☐ |
| | Non-accelerated filer (Do not check if a smaller reporting company) | ☒ | Smaller reporting company | ☐ |
| | Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

| | | |
|---|---|---|
| Allergan plc | Yes ☐ | No ☒ |
| Warner Chilcott Limited | Yes ☐ | No ☒ |

The aggregate market value of the voting and non-voting stock held by non-affiliates of Allergan plc as of June 30, 2017, based upon the last sale price reported for such date on the New York Stock Exchange, was $81.0 billion. The calculation of the aggregate market value of voting and non-voting stock excludes Class A ordinary shares of Allergan plc held by executive officers, directors, and stockholders that the registrant concluded were affiliates of Allergan plc on that date.

Number of shares of Allergan plc's Ordinary Shares outstanding on February 13, 2018: 330,320,420

This Annual Report on Form 10-K is a combined report being filed separately by two different registrants: Allergan plc and Warner Chilcott Limited. The information in this Annual Report on Form 10-K is equally applicable to Allergan plc and Warner Chilcott Limited, except where otherwise indicated. Warner Chilcott Limited meets the conditions set forth in General Instruction H(1)(a) and (b) of Form 10-K and, to the extent applicable, is therefore filing this form with a reduced disclosure format.

**DOCUMENTS INCORPORATED BY REFERENCE**



EXHIBIT 14
WIT: Allegra Keyful
DATE: 10 24 18
C. Campbell, RDR CRR CSR #13921

agn-10k_20171231.htm

Certain information required by Part III of this Annual Report on Form 10-K ("Annual Report") is incorporated by reference from the Allergan plc proxy statement to be filed pursuant to Regulation 14A with respect to the Registrant's Annual General Meeting of Shareholders to be held on May 2, 2018.

# ALLERGAN PLC

## WARNER CHILCOTT LIMITED

## TABLE OF CONTENTS

## FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2017

|  |  | PAGE |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 23 |
| ITEM 1B. | Unresolved Staff Comments | 45 |
| ITEM 2. | Properties | 45 |
| ITEM 3. | Legal Proceedings | 45 |
| ITEM 4. | Mine Safety Disclosures | 45 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 46 |
| ITEM 6. | Selected Financial Data | 49 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| ITEM 7A. | Quantitative and Qualitative Disclosures About Market Risk | 104 |
| ITEM 8. | Financial Statements and Supplementary Data | 105 |
| ITEM 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 105 |
| ITEM 9A. | Controls and Procedures | 106 |
| ITEM 9B. | Other Information | 107 |
| **PART III** | | |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 108 |
| ITEM 11. | Executive Compensation | 110 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 110 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 110 |
| ITEM 14. | Principal Accounting Fees and Services | 110 |
| **PART IV** | | |
| ITEM 15. | Exhibits, Financial Statement Schedules | 111 |
| ITEM 16. | Form 10-K Summary | 118 |
|  | SIGNATURES | 119 |

2

## PART I

### ITEM 1. *BUSINESS*

**Explanatory Note**

This Annual Report on Form 10-K is a combined annual report being filed separately by two registrants: Allergan plc and its indirect wholly-owned subsidiary, Warner Chilcott Limited. Each registrant hereto is filing on its own behalf all the information contained in this annual report that relates to such registrant. Each registrant hereto is not filing any information that does not relate to such registrant, and therefore makes no representations as to any such information.

**Company History**

Allergan plc (formerly known as Actavis plc) was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Allergan Finance, LLC (formerly known as Actavis, Inc.) and Warner Chilcott plc ("Warner Chilcott"). Following the consummation of the Warner Chilcott acquisition on October 1, 2013 (the "Warner Chilcott Acquisition"), Allergan Finance, LLC and Warner Chilcott became wholly-owned subsidiaries of Allergan plc. Each of Allergan Finance, LLC's common shares was converted into one Company ordinary share. Effective October 1, 2013, through a series of related-party transactions, Allergan plc contributed its indirect subsidiaries, including Allergan Finance, LLC, to its subsidiary Warner Chilcott Limited.

Except where otherwise indicated, and excluding certain insignificant cash and non-cash transactions at the Allergan plc level, the consolidated financial statements and disclosures are for two separate registrants, Allergan plc and Warner Chilcott Limited. The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the deminimis activity between Allergan plc and Warner Chilcott Limited, references throughout this document relate to both Allergan plc and Warner Chilcott Limited. Refer to "Note 3 —Reconciliation of Warner Chilcott Limited results to Allergan plc results" in the accompanying "Notes to the Consolidated Financial Statements" in this document for a summary of the details on the differences between Allergan plc and Warner Chilcott Limited.

On March 17, 2015, the Company acquired Allergan, Inc. ("Legacy Allergan") for approximately $77.0 billion including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion, which included then outstanding equity awards (the "Allergan Acquisition"). Under the terms of the agreement, Legacy Allergan shareholders received 111.2 million of the Company's ordinary shares, 7.0 million of the Company's non-qualified stock options and 0.5 million of the Company's share units. The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complemented the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox®. The transaction expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

In connection with the Allergan Acquisition, the Company changed its name from Actavis plc to Allergan plc. Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the opening of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN." Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Allergan plc is the successor issuer to Actavis plc's ordinary shares and Actavis plc's mandatory convertible preferred shares, both of which are deemed to be registered under Section 12(b) of the Exchange Act, and Allergan plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder.

On August 2, 2016 we completed the divestiture of our global generics business and certain other assets to Teva Pharmaceutical Industries Ltd. ("Teva") (the "Teva Transaction") for $33.3 billion in cash, net of cash acquired by Teva, which included estimated working capital and other contractual adjustments, and 100.3 million unregistered Teva ordinary shares (or American Depositary Shares with respect thereto), which at the time of the closing approximated $5.0 billion in value using the closing date Teva opening stock price discounted at a rate of 5.9 percent due to the lack of marketability ("Teva Shares"). As part of the Teva Transaction, Teva acquired our global generics business, including the United States ("U.S.") and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic research and development ("R&D") unit, our international over-the-counter ("OTC") commercial unit (excluding OTC eye care products) and certain established international brands.

3

On October 3, 2016, the Company completed the divestiture of the Anda Distribution business to Teva for $500.0 million. The Anda Distribution business distributed generic, branded, specialty and OTC pharmaceutical products from more than 300 manufacturers to retail independent and chain pharmacies, nursing homes, mail order pharmacies, hospitals, clinics and physician offices across the U.S.

The Company recognized a combined gain on the sale of the Anda Distribution business and the Teva Transaction of $15,932.2 million in the year ended December 31, 2016, as well as deferred liabilities relating to other elements of our arrangements with Teva of $299.2 million.

As a result of the Teva Transaction and the divestiture of the Company's Anda Distribution business, and in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2014-08 "Presentation of Financial Statements (Topic 205) and Property, Plant and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity," the financial results of the businesses held for sale were reclassified to discontinued operations for all periods presented in our consolidated financial statements. The results of our discontinued operations include the results of our generic product development, manufacturing and distribution of off-patent pharmaceutical products, certain established international brands marketed similarly to generic products and out-licensed generic pharmaceutical products primarily in Europe through our Medis third-party business through August 2, 2016, as well as our Anda Distribution business through October 3, 2016.

References throughout to "we," "our," "us," the "Company" or "Allergan" refer to financial information and transactions of Watson Pharmaceuicals, Inc. prior to January 23, 2013, Allergan Finance, LLC from January 23, 2013 until October 1, 2013 and Allergan plc and Warner Chilcott Limited subsequent to October 1, 2013.

References throughout to "Ordinary Shares" refer to Allergan Finance, LLC's Class A common shares, par value $0.0033 per share, prior to the consummation of the Warner Chilcott transactions and to Allergan plc's ordinary shares, par value $0.0001 per share, since the consummation of the Warner Chilcott transactions.

This discussion contains forward-looking statements that are subject to known and unknown risks, uncertainties and other factors that may cause our actual results to differ materially from those expressed or implied by such forward-looking statements. These risks, uncertainties and other factors include, among others, those identified under "Risk Factors" in this Annual Report and in other reports we have filed with the U.S. Securities and Exchange Commission ("SEC").

## Business Overview

Allergan plc is a global pharmaceutical company focused on developing, manufacturing and commercializing branded pharmaceutical ("brand", "branded" or "specialty brand"), device, biologic, surgical and regenerative medicine products for patients around the world. Allergan markets a portfolio of leading brands and best-in-class products for the central nervous system, eye care, medical aesthetics and dermatology, gastroenterology, women's health, urology and anti-infective therapeutic categories. Allergan is an industry leader in Open Science, a model of research and development, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care.  The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities.

Allergan plc's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, Ireland and our administrative headquarters are located at 5 Giralda Farms, Madison, NJ 07940. Our Internet website address is www.allergan.com. We do not intend this website address to be an active link or to otherwise incorporate by reference the contents of the website into this report. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, are available free of charge on our Internet website. These reports are posted on our website as soon as reasonably practicable after such reports are electronically filed with the SEC. The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549 or electronically through the SEC website (www.sec.gov). The information contained on the SEC's website is not incorporated by reference into this Form 10-K and should not be considered to be part of this Form 10-K. Information may be obtained regarding the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Within the Investors section of our website, we provide information concerning corporate governance, including our Corporate Governance Guidelines, Board Committee Charters and Composition, Code of Conduct and other information. Refer to "ITEM 1A. RISK FACTORS-CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS" in this document.

4

## Business Development

### *2017 Significant Business Developments*

The following are the material transactions that were completed in the year ended December 31, 2017.

### Acquisitions

#### *Keller Medical, Inc.*

On June 23, 2017, the Company acquired Keller Medical, Inc. ("Keller"), a privately held medical device company and developer of the Keller Funnel® (the "Keller Acquisition"). The Keller Acquisition combines the Keller Funnel® with the Company's leading breast implants business.

#### *Zeltiq Aesthetics, Inc.*

On April 28, 2017, the Company acquired Zeltiq Aesthetics, Inc. ("Zeltiq") for an acquisition accounting purchase price of $2,405.4 million (the "Zeltiq Acquisition"). Zeltiq was focused on developing and commercializing products utilizing its proprietary controlled-cooling technology platform (Coolsculpting®). The Zeltiq Acquisition combined Zeltiq's body contouring business with the Company's leading portfolio of medical aesthetics.

#### *LifeCell Corporation*

On February 1, 2017, the Company acquired the LifeCell Corporation ("LifeCell"), a regenerative medicine company, for an acquisition accounting price of $2,883.1 million (the "LifeCell Acquisition"). The LifeCell Acquisition combined LifeCell's novel, regenerative medicines business, including its high-quality and durable portfolio of dermal matrix products, with the Company's leading portfolio of medical aesthetics, breast implants and tissue expanders. The LifeCell Acquisition expanded the Company's marketed product portfolio by adding Alloderm® and Strattice®.

### Licenses and Other Transactions Accounted for as Asset Acquisitions

#### *Lyndra, Inc.*

On July 31, 2017, the Company entered into a collaboration, option and license agreement with Lyndra, Inc. ("Lyndra") to develop orally administered ultra-long-acting (once-weekly) products for the treatment of Alzheimer's disease and an additional, unspecified indication. The total upfront payment of $15.0 million was expensed as a component of R&D expense in the year ended December 31, 2017. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The future option exercise payments, if any, and any future success based milestones relating to the licensed products of up to $85.0 million will be recorded if the corresponding events become probable.

#### *Editas Medicine, Inc.*

On March 14, 2017, the Company entered into a strategic alliance and option agreement with Editas Medicine, Inc. ("Editas") for access to early stage, first-in-class eye care programs. Pursuant to the agreement, Allergan made an upfront payment of $90.0 million for the right to license up to five of Editas' gene-editing programs in eye care, including its lead program for Leber Congenital Amaurosis ("LCA"). Under the terms of the agreement, if an option is exercised, Editas is eligible to receive contingent research and development and commercial milestones plus royalties based on net sales. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The total upfront payment of $90.0 million was expensed as a component of R&D expense in the year ended December 31, 2017. The future option exercise payments, if any, and any future success based milestones relating to the licensed products will be recorded if the corresponding events become probable.

#### *Assembly Biosciences, Inc.*

On January 9, 2017, the Company entered into a licensing agreement with Assembly Biosciences, Inc. ("Assembly") for the worldwide rights to Assembly's microbiome gastrointestinal development programs. Pursuant to the agreement, Allergan made an upfront payment to Assembly of $50.0 million for the exclusive, worldwide rights to develop and commercialize certain development compounds. Additionally, Assembly will be eligible to receive success-based development and commercial milestone payments plus royalties based on net sales. Allergan and Assembly will generally share development costs through proof-of-concept ("POC")

studies, and Allergan will assume all post-POC development costs. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The total upfront payment of $50.0 million was expensed as a component of R&D expense in the year ended December 31, 2017 and the future success based milestone payments of up to $2,771.0 million, including amounts for additional development programs not committed to as of December 31, 2017, will be recorded if the corresponding events become probable.

### *Lysosomal Therapeutics, Inc.*

On January 9, 2017, the Company entered into a definitive agreement for the option to acquire Lysosomal Therapeutics, Inc. ("LTI"). LTI is focused on innovative small-molecule research and development in the field of neurodegeneration, yielding new treatment options for patients with severe neurological diseases. Under the agreement, Allergan acquired an option right directly from LTI shareholders to acquire LTI for $150.0 million plus future milestone payments following completion of a Phase Ib trial for LTI-291 as well as an upfront research and development payment. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The aggregate upfront payment of $145.0 million was recorded as a component of R&D expense in the year ended December 31, 2017.

### Other Transactions

### *Saint Regis Mohawk Tribe*

On September 8, 2017, the Company entered into an agreement with the Saint Regis Mohawk Tribe, under which the Saint Regis Mohawk Tribe obtained the rights to Orange Book-listed patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05%, and the Company was granted exclusive licenses under the patents related to the product. Pursuant to the agreement, the Company paid the Saint Regis Mohawk Tribe an upfront payment of $13.8 million, which was recorded as a component of cost of sales in the year ended December 31, 2017. Additionally, the Saint Regis Mohawk Tribe will be eligible to receive up to $15.0 million in annual royalties starting in 2018, during the period that certain patent claims remain in effect.

### *2016 Significant Business Developments*

The following are the material transactions that were completed in the year ended December 31, 2016.

### Acquisitions

### *Tobira Therapeutics, Inc.*

On November 1, 2016, the Company acquired Tobira Therapeutics, Inc. ("Tobira"), a clinical-stage biopharmaceutical company focused on developing and commercializing therapies for non-alcoholic steatohepatitis ("NASH") and other liver diseases for an acquisition accounting purchase price of $570.1 million, plus contingent consideration of up to $49.84 per share in contingent value rights ("CVR"), or up to $1,101.3 million, that may be payable based on the successful completion of certain development, regulatory and commercial milestones (the "Tobira Acquisition"), of which $303.1 million was paid in the year ended December 31, 2017 for the initiation of Phase III clinical trials. The CVR had an acquisition date fair value of $479.0 million. The Tobira Acquisition added Cenicriviroc, a differentiated, complementary development program for the treatment of the multi-factorial elements of NASH, including inflammation, metabolic syndromes and fibrosis, to Allergan's global gastroenterology R&D pipeline.

### *Vitae Pharmaceuticals, Inc.*

On October 25, 2016, the Company acquired Vitae Pharmaceuticals, Inc. ("Vitae"), a clinical-stage biotechnology company, for an acquisition accounting purchase price of $621.4 million (the "Vitae Acquisition"). The Vitae Acquisition expanded Allergan's dermatology product pipeline with the addition of a Phase II orally active RORγt (retinoic acid receptor-related orphan receptor gamma) inhibitor for the potential treatment of psoriasis and other autoimmune disorders. In addition, as a result of the Vitae Acquisition, the Company expanded its pipeline with the acquisition of a Phase II atopic dermatitis drug candidate.

6

### ForSight VISION5, Inc.

On September 23, 2016, the Company acquired ForSight VISION5, Inc. ("ForSight"), a privately held, clinical-stage biotechnology company focused on eye care, in an all cash transaction of approximately $95.0 million (the "ForSight Acquisition"). Under the terms of the ForSight Acquisition, the Company acquired ForSight for an acquisition accounting purchase price of $74.5 million plus the payment of outstanding indebtedness of $14.8 million and other miscellaneous charges. ForSight shareholders are eligible to receive contingent consideration of up to $125.0 million, which had an initial estimated fair value of $79.8 million, relating to commercialization milestones.  The Company acquired ForSight for its lead development program, a peri-ocular ring designed for extended drug delivery and reducing elevated intraocular pressure ("IOP") in glaucoma patients.

### Licenses and Asset Acquisitions

### Motus Therapeutics, Inc.

On December 15, 2016, the Company acquired Motus Therapeutics, Inc. ("Motus") for an upfront payment of approximately $200.0 million (the "Motus Transaction"). Motus has the worldwide rights to RM-131 (relamorelin), a peptide ghrelin agonist being developed for the treatment of diabetic gastroparesis.  Under the terms of the Motus Transaction, Motus shareholders are eligible to receive contingent consideration in connection with the commercial launch of the product. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the transaction did not qualify as a business. The total upfront net payment of $199.5 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestone will be recorded if the corresponding event becomes probable.

### Chase Pharmaceuticals Corporation

On November 22, 2016, the Company acquired Chase Pharmaceuticals Corporation ("Chase"), a clinical-stage biopharmaceutical company focused on the development of improved treatments for neurodegenerative disorders including Alzheimer's disease, for an upfront payment of approximately $125.0 million plus potential regulatory and commercial milestones of up to $875.0 million related to Chase's lead compound, CPC-201, and certain backup compounds (the "Chase Transaction"). The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Chase Transaction did not qualify as a business. The total upfront net payment of $122.9 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### AstraZeneca plc License

On October 2, 2016, the Company entered into a licensing agreement with MedImmune, AstraZeneca plc's ("AstraZeneca") global biologics research and development arm, for the global rights to brazikumab (the "AstraZeneca Transaction"). Brazikumab is an anti-IL-23 monoclonal antibody that as of the acquisition date was in Phase IIb clinical development for the treatment of patients with moderate-to-severe Crohn's disease and was Phase II ready for ulcerative colitis and other conditions treated with anti-IL-23 monoclonal antibodies.  Under the terms of the AstraZeneca Transaction, AstraZeneca received $250.0 million for the exclusive, worldwide license to develop and commercialize brazikumab and is eligible to receive contingent consideration of up to $1.27 billion, as well as tiered royalties on sales of the product. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the transaction did not qualify as a business. The total upfront payment of $250.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### RetroSense Therapeutics, LLC

On September 6, 2016, the Company acquired certain assets of RetroSense Therapeutics, LLC ("RetroSense"), a private, clinical-stage biotechnology company focused on novel gene therapy approaches to restore vision in patients suffering from blindness (the "RetroSense Transaction"). Under the terms of the RetroSense Transaction, RetroSense received approximately $60.0 million upfront, and is eligible to receive up to $495.0 million in contingent regulatory and commercialization milestone payments related to its lead development program, RST-001, a novel gene therapy for the treatment of retinitis pigmentosa.  The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the RetroSense Transaction did not qualify as a business.  The total upfront net payment of $59.7 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

7

agn-10k_20171231.htm

### Akarna Therapeutics, Ltd

On August 26, 2016, the Company acquired Akarna Therapeutics, Ltd ("Akarna"), a biopharmaceutical company developing novel small molecule therapeutics that target inflammatory and fibrotic diseases (the "Akarna Transaction"). Under the terms of the Akarna Transaction, Akarna shareholders received approximately $50.0 million upfront and were eligible to receive contingent development and commercialization milestones of up to $1,015.0 million. The Company concluded based on the stage of development of the assets as well as a lack of certain other inputs and processes that the Akarna Transaction did not qualify as a business. The total upfront net payment of $48.2 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable. In the year ended December 31, 2017, a milestone of $39.6 million, related to the initiation of a clinical study, was expensed as a component of R&D expense.

### Topokine Therapeutics, Inc.

On April 21, 2016, the Company acquired Topokine Therapeutics, Inc. ("Topokine"), a privately held, clinical-stage biotechnology company focused on development stage topical medicines for fat reduction (the "Topokine Transaction"). Under the terms of the Topokine Transaction, Topokine shareholders received an upfront payment of $85.8 million and are eligible to receive contingent development and commercialization milestones of up to $260.0 million for XAF5, a first-in-class topical agent in development for the treatment of steatoblepharon, also known as undereye bags. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Topokine Transaction did not qualify as a business. The total upfront net payment of approximately $85.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### Heptares Therapeutics, Ltd

On April 6, 2016, the Company entered into an agreement with Heptares Therapeutics, Ltd ("Heptares"), under which the Company licensed exclusive global rights to a portfolio of novel subtype-selective muscarinic receptor agonists in development for the treatment of major neurological disorders, including Alzheimer's disease (the "Heptares Transaction"). Under the terms of the Heptares Transaction, Heptares received an upfront payment of $125.0 million and is eligible to receive contingent milestone payments of up to approximately $665.0 million upon the successful Phase I, II and III clinical development and launch of the first three licensed compounds for multiple indications and up to approximately $2.575 billion associated with achieving certain annual sales thresholds during the several years following launch. In addition, Heptares was eligible to receive contingent tiered royalties on net sales of all products resulting from the partnership. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Heptares Transaction did not qualify as a business. The total upfront payment of $125.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the events become probable. In the year ended December 31, 2017, a milestone of $15.0 million, related to the initiation of a clinical study, was achieved and expensed as a component of R&D expense.

### Anterios, Inc.

On January 6, 2016, the Company acquired Anterios, Inc. ("Anterios"), a clinical stage biopharmaceutical company developing a next generation delivery system and botulinum toxin-based prescription products (the "Anterios Transaction"). Under the terms of the Anterios Transaction, Anterios shareholders received an upfront net payment of approximately $90.0 million and are eligible to receive contingent development and commercialization milestone payments up to $387.5 million related to an investigational topical formulation of botulinum toxin type A in development for the potential treatment of hyperhidrosis, acne, and crow's feet lines and the related NDS™, Anterios' proprietary platform delivery technology that enables local, targeted delivery of neurotoxins through the skin without the need for injections. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Anterios Transaction did not qualify as a business. The total upfront net payment of $89.2 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### 2015 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2015.

8

### Acquisitions

#### AqueSys, Inc.

On October 16, 2015, the Company acquired AqueSys, Inc. ("AqueSys"), a private, clinical-stage medical device company focused on developing ocular implants that reduce IOP associated with glaucoma, in an all-cash transaction (the "AqueSys Acquisition"). Under the terms of the AqueSys Acquisition, the Company acquired AqueSys for an acquisition accounting purchase price of $298.9 million, including $193.5 million for the estimated fair value of contingent consideration relating to the regulatory approval and commercialization milestone payments. The Company acquired AqueSys for the lead development program, including XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector. On November 16, 2016, the Company received approval from the United States Food and Drug Administration ("FDA") for XEN45, which triggered a milestone payment of $100.0 million in the year ended December 31, 2016. In the year ended December 31, 2017, the Company made a $25.0 million milestone payment upon first commercial sale of the product.

#### Kythera Biopharmaceuticals, Inc.

On October 1, 2015, the Company acquired Kythera Biopharmaceuticals, Inc. ("Kythera"), for $75.00 per share, or an acquisition accounting purchase price of $2,089.5 million (the "Kythera Acquisition"), for the discovery, development and commercialization of novel prescription aesthetic products. Kythera's lead product, Kybella® injection, is the first FDA approved, non-surgical treatment for moderate to severe submental fullness, commonly referred to as double chin.

#### Oculeve, Inc.

On August 10, 2015, the Company acquired Oculeve, Inc. ("Oculeve"), a development-stage medical device company focused on developing novel treatments for dry eye disease (the "Oculeve Acquisition"). The Company acquired Oculeve and its lead product TrueTear ™, an intranasal neurostimulation device, as well as other dry eye products in development.  Under the terms of the Oculeve Acquisition, Allergan acquired Oculeve for an acquisition accounting purchase price of $134.5 million, including $90.0 million for the estimated fair value of contingent consideration of which the Company may owe up to $300.0 million in future payments.  In the year ended December 31, 2017, the Company made a $100.0 million milestone payment as a result of the FDA approval of TrueTear ™.

#### Allergan, Inc.

On March 17, 2015, the Company completed the Allergan Acquisition.  The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complemented the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox®.

### Licenses and Asset Acquisitions

#### Mimetogen Pharmaceuticals, Inc.

On November 4, 2015, the Company entered into an exclusive licensing agreement with Mimetogen Pharmaceuticals, Inc. ("Mimetogen"), a clinical stage biotechnology company, to develop and commercialize tavilermide (MIM-D3), a topical formulation of a novel small molecule TrkA agonist for the treatment of dry eye disease, in exchange for an upfront payment of $50.0 million to Mimetogen, which was included as a component of R&D expense in the year ended December 31, 2015 (the "Mimetogen Transaction").  In the year ended December 31, 2017, the Company terminated the Mimetogen Transaction and there are no futher obligations owed by the Company.

#### Almirall, S.A.

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall, S.A. for €60.0 million. The consideration was accounted for as an asset acquisition and included as a component of intangible assets. The Company concluded based on the lack of acquired employees and the lack of certain other inputs and processes that this transaction did not qualify as a business.

9

### *Naurex, Inc.*

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. ("Naurex") in an all-cash transaction of $571.7 million, plus future contingent payments up to $1,150.0 million, which was accounted for as an asset acquisition (the "Naurex Transaction"). The Company recognized the upfront consideration of $571.7 million as a component of R&D expense in the year ended December 31, 2015. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the Naurex Transaction did not qualify as a business. The Naurex Transaction expanded our pipeline with Naurex's two leading product candidates GLYX-13 and NRX-1074, two compounds that utilize NMDA modulation as a potential new approach to the treatment of Major Depressive Disorder, a disease that can lead to suicidality among the most severe patients. As of December 31, 2017, the NRX-1074 development project was terminated. The Company received a purchase price reduction of $20.0 million in the year ended December 31, 2017 based on the settlement of an open contract dispute.

### *Migraine License*

On August 17, 2015, the Company entered into an agreement with Merck & Co. ("Merck") under which the Company acquired the exclusive worldwide rights to Merck's early development stage investigational small molecule oral calcitonin gene-related peptide receptor antagonists, which are being developed for the treatment and prevention of migraines (the "Merck Transaction"). The Merck Transaction was accounted for as an asset acquisition. The Company acquired these rights for an upfront charge of $250.0 million which was recognized as a component of R&D expense in the year ended December 31, 2015. Additionally at the time of the transaction, the Company owed contingent payments based on commercial and development milestones of up to $965.0 million as well as potential future royalties. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the Merck Transaction did not qualify as a business. During the year ended December 31, 2016, the Company incurred $100.0 million of milestones under the agreement, which were included as a component of R&D expense.

### Divestitures

#### *Respiratory Business*

As part of the 2014 acquisition of Forest Laboratories, Inc. (the "Forest Acquisition"), we acquired certain assets that comprised Legacy Forest's branded respiratory business in the U.S. and Canada (the "Respiratory Business"). During the year ended December 31, 2014, we held for sale assets of the Respiratory Business of $734.0 million, including allocated goodwill to this unit of $309.1 million. On March 2, 2015, the Company sold the Respiratory Business to AstraZeneca for consideration of $600.0 million upon closing, additional funds to be received for the sale of certain of our inventory to AstraZeneca and low single-digit royalties above a certain revenue threshold. AstraZeneca also paid Allergan an additional $100.0 million and Allergan has agreed to a number of contractual consents and approvals, including certain amendments to the ongoing collaboration agreements between AstraZeneca and Allergan (the "Respiratory Sale"). As a result of the terms of the Respiratory Sale, in the year ended December 31, 2015, the Company recognized an incremental charge in cost of sales (including the acquisition accounting fair value mark-up of inventory) relating to inventory that will not be sold to AstraZeneca of $35.3 million. The Company recognized a loss in other (expense) / income, net for the sale of the business of $5.3 million in the year ended December 31, 2015.

### Business Description

Prescription pharmaceutical products in the United States generally are marketed as either brand pharmaceuticals or generics. Results in continuing operations in the United States are primarily due to brand pharmaceuticals and medical devices. Brand pharmaceutical products and medical devices, including aesthetic products, are marketed under brand names through programs that are designed to generate physician and consumer loyalty.

As a result of the differences between the types of products we market and/or distribute, we operate and manage our business in three distinct operating segments: US Specialized Therapeutics, US General Medicine and International. The operating segments are organized as follows:

- The US Specialized Therapeutics segment includes sales and expenses relating to branded products within the U.S., including Medical Aesthetics, Medical Dermatology, Eye Care and Neuroscience and Urology therapeutic products.

- The US General Medicine segment includes sales and expenses relating to branded products within the U.S. that do not fall into the US Specialized Therapeutics business units, including Central Nervous System, Gastrointestinal, Women's Health, Anti-Infectives and Diversified Brands.

- The International segment includes sales and expenses relating to products sold outside the U.S.

## Business Strategy

We apply three key strategies to achieve growth for our US Specialized Therapeutics, US General Medicine and International businesses: (i) internal development of differentiated and high-demand products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

Our strategy to achieve growth for our US Specialized Therapeutics, US General Medicine and International businesses also includes: (i) investing behind key marketed brands, (ii) internal development of novel pipeline products that address unmet need, and (iii) establishment of strategic alliances, collaborations and/or acquisition of products and companies that complement our current business.

Based upon business conditions, our financial strength and other factors, we regularly reexamine our business strategies and may change them at any time. Refer to "ITEM 1A. RISK FACTORS —Risks Related to Our Business" in this document.

As of December 31, 2017, our portfolio of products within the US Specialized Therapeutics, US General Medicine and International segments include the following products defined as launch brands and / or products with sales in excess of $200.0 million:

| Product | Therapeutic Area | Active Ingredient | Therapeutic Classification |
| --- | --- | --- | --- |
| Alloderm® | Regenerative Medicine | Tissue | Skin graft |
| Alphagan®/Combigan® | Eye Care | Brimonidine tartrate | Selective alpha₂ agonist |
| Asacol®/Delzicol® | Gastrointestinal (GI) | Mesalamine | Ulcerative colitis |
| Botox® Cosmetics | Facial Aesthetics | Onabotulinumtoxin A | Acetylcholine release inhibitor |
| Botox® Hyperhidrosis | Medical Dermatology | Onabotulinumtoxin A | Acetylcholine release inhibitor |
| Botox® Therapeutics | Neuroscience and Urology | Botulinum toxin | Musculoskeletal agent |
| Breast Implants | Plastic Surgery | Silicone | Reconstructive plastic surgery |
| Bystolic®/Byvalson® | Diversified Brands | Nebivolol | Hypertension |
| Carafate®/Sulcrate® | GI | Sucralfate | Ulcerative colitis |
| Coolsculpting® | Medical Aesthetics | Medical device | Body contouring |
| Estrace® Cream | Women's Health | Estradiol | Hormone therapy |
| Juvederm® Collection | Facial Aesthetics | Hyaluronic acid | Fillers |
| Kybella®/Belkyra® | Facial Aesthetics | Deoxycholic acid | Submental fullness |
| Linzess®/Constella® | GI | Linaclotide | Irritable bowel syndrome |
| Lo Loestrin® | Women's Health | Ethinyl estradiol and norethindrone | Oral contraceptive |
| Lumigan®/Ganfort® | Eye Care | Bimatoprost | Prostaglandin analogue |
| Namenda XR® | Central Nervous System ("CNS") | Memantine HCl | Dementia |
| Namzaric® | CNS | Memantine HCl | Dementia |
| Ozurdex® | Eye Care | Dexamethasone | Intravitreal eye implant |
| Restasis® | Eye Care | Cyclosporine | Topical immunomodulator |
| True Tear ™ | Eye Care | Medical device | Dry eye |
| Viberzi® | GI | Eluxadoline | Irritable bowel syndrome |
| Viibryd®/Fetzima® | CNS | Vilazodone HCl/Levomilnacipran | Major depressive disorders |
| Vraylar™ | CNS | Cariprazine HCl | Schizophrenia, bipolar mania |
| Zenpep® | GI | Pancrelipase | Exocrine pancreatic insufficiency |

Our portfolio of products also includes eye drops including Optive and Refresh.

### US Specialized Therapeutics

Our US Specialized Therapeutics business offers certain of our branded products within the U.S., including Medical Aesthetics, Medical Dermatology, Eye Care and Neuroscience and Urology therapeutic products. Net revenues in our US Specialized Therapeutics segment were $6,803.6 million, $5,811.7 million, and $4,309.8 million or approximately 42.7%, 39.9%, and 34.0% of our total net revenues, in the years ended December 31, 2017, 2016, and 2015, respectively. Revenues within this segment include revenues that were distributed through the Anda Distribution business to third party customers through October 3, 2016.

agn-10k_20171231.htm

11

*US Specialized Therapeutics Strategy*

Our US Specialized Therapeutics business is focused on maintaining a leading position in the therapeutic areas in which we participate within the U.S. market. Our sales and marketing efforts focus on targeted activities, including direct-to-consumer advertising to increase consumer awareness of our products and also to engage specialty physicians and surgeons through our sales professionals and other programs to ensure they are fully informed about our product offerings. For reimbursed products, we also contract with payors to ensure that our products are widely available to patients.

*US General Medicine*

Our US General Medicine business is focused on newly developed pharmaceutical products, which are normally patented or have market exclusivity. These patented and off-patent trademarked products are branded pharmaceutical products, and as a result of patents or other market exclusivity, are generally offered by a single provider when first introduced to the market. We market a number of branded products to physicians, hospitals, and other customers that we serve as well as the end patient.

Net revenues in our US General Medicine segment were $5,796.2 million, $5,923.9 million, and $6,338.4 million, or approximately 36.4%, 40.7%, and 50.0% of our total net revenues, in the years ended December 31, 2017, 2016, and 2015, respectively. Revenues within this segment include revenues that were distributed through the Anda Distribution business to third party customers through October 3, 2016.

*US General Medicine Strategy*

We market our branded products through our active sales professionals in the United States. Our sales and marketing efforts focus on both general practitioners and specialty physicians who specialize in the diagnosis and treatment of particular medical conditions. We also conduct targeted activities, including direct-to-consumer advertising to increase consumer awareness of our products. We believe that our current sales force structure gives us a competitive advantage in launching and promoting products due to our ability to reach a larger target audience of both general practitioners and specialists. For reimbursed products, we also contract with payors to ensure that our products are widely available to patients.

*International*

Our International segment offers a wide array of branded and aesthetics products outside of the United States. Net revenues in our International segment were $3,319.5 million, $2,881.3 million, and $2,187.3 million, or approximately 20.8%, 19.8% and 17.2% of our total net revenues, in the years ended December 31, 2017, 2016, and 2015, respectively.

*International Strategy*

Our International business is focused on maintaining a leading position by offering a consistent and reliable supply of quality branded and aesthetic products in key markets. We have maintained an ongoing effort to enhance efficiencies and reduce costs in our manufacturing operations.

**Research and Development**

We devote significant resources to the R&D of branded products, biosimilars and proprietary drug delivery technologies. R&D activities are expensed as incurred and consist of self-funded R&D costs, the costs associated with work performed under collaborative R&D agreements, regulatory fees, and acquisition and license related milestone payments, if any.

Our R&D strategy focuses on the following product development areas:

- the application of proprietary drug-delivery technology for new product development in specialty areas;

- the acquisition of mid-to-late development-stage brand drugs and biosimilars; and

- the development of sustained-release, semi-solid, liquid, oral transmucosal, transdermal, gel, injectable, and other drug delivery technologies and the application of these technologies to proprietary drug forms.

As of December 31, 2017, we conducted the majority of our branded drug delivery R&D activities in Irvine, California. We are presently developing a number of products through a combination of internal and collaborative programs.

12

As of December 31, 2017, we are developing a number of products, some of which utilize novel drug delivery systems, through a combination of internal and collaborative programs including the following:

| Product | Therapeutic Area | Indication | Expected Launch Year | Phase |
|---------|-----------------|-----------|------------|-------|
| Esmya | Women's Health | Uterine Fibroids | 2018 | Review |
| Cariprazine | CNS | Bipolar Depression | 2019 | III |
| Ubrogepant | CNS | Acute Migraine | 2020 | III |
| Abicipar | Eye Care | Age Related Macular Degeneration | 2020 | III |
| Bimatoprost SR | Eye Care | Glaucoma | 2020 | III |
| Rapastinel | CNS | Depression | 2021 | III |
| Cenicriviroc | Gastrointestinal | NASH | 2021 | III |
| Relamorelin | Gastrointestinal | Gastroparesis | 2023 | III |
| Pilo/Oxy | Eye Care | Presbyopia | 2021 | II |
| RORγT | Medical Aesthetics | Psoriasis | 2022 | II |
| Atogepant | CNS | Migraine Prevention | 2022 | II |
| Abicipar | Eye Care | Diabetic Macular Edema | 2023 | II |
| Brazikumab | Gastrointestinal | Crohn's Disease | 2024 | II |
| Botox | Medical Aesthetics | Platysma/Masseter | 2025/2023 | II |
| Brazikumab | Gastrointestinal | Ulcerative Colitis | 2025 | I |

We also have a number of products in development as part of our life-cycle management strategy for our existing product portfolio.

### Financial Information About Segments and Geographic Areas

The Company evaluates segment performance for its three operating segments based on segment contribution. Segment contribution for our segments represents net revenues less cost of sales (defined below), selling and marketing expenses, and select general and administrative expenses. Included in segment revenues for 2015 and 2016 are product sales that were sold through the Anda Distribution business once the Anda Distribution business had sold the product to a third-party customer. These sales are included in segment results and are reclassified into revenues from discontinued operations through a reduction of Corporate revenues which eliminates the sales made by the Anda Distribution business through October 3, 2016 from results of continuing operations.  Cost of sales for these products in discontinued operations is equal to our average third party cost of sales for third party branded products distributed by Anda Distribution. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales, selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization, In-process Research and Development ("IPR&D") impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

The Company defines segment net revenues as product sales and other revenue derived from branded products or licensing agreements.

Cost of sales within segment contribution includes standard production and packaging costs for the products we manufacture, third-party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements and finished goods inventory reserve charges.  Cost of sales included within segment contribution does not include non-standard production costs, such as non-finished goods inventory obsolescence charges, manufacturing variances and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

13

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation and settlement costs and professional services costs which are general in nature and attributable to the segment.

## Customers

In US Specialized Therapeutics, US General Medicine and International operations, we sell our brand and aesthetic pharmaceutical products primarily to drug wholesalers, retailers and distributors, including national retail drug and food store chains, hospitals, clinics, mail order retailers, government agencies and managed healthcare providers such as health maintenance organizations and other institutions.  Certain medical aesthetic products and devices are also sold directly to physicians.

Sales to certain of our customers within the U.S. and Canada accounted for 10% or more of our annual revenues during the past three years. The following table illustrates customers and the respective percentage of revenues which they comprised in each of the last three years:

| Customer | 2017 | 2016 | 2015 |
|---|---|---|---|
| McKesson Corporation | 23% | 23% | 27% |
| Cardinal Health, Inc. | 19% | 18% | 20% |
| AmerisourceBergen Corporation | 19% | 18% | 19% |

Our significant customers comprise a large part of the distribution network for pharmaceutical products in North America. As a result, a small number of large wholesaler distributors control a significant share of the market for our products. No other countries outside the U.S. and Canada had 10% or more of global sales.

The loss of any of these customers could have a material adverse effect on our business, results of operations, financial condition and cash flows.

## Competition

The pharmaceutical industry is highly competitive. In our US Specialized Therapeutics, US General Medicine and International businesses, we compete with different companies to develop competitive products, in certain product categories, and within each applicable product category, upon dosage strengths and drug delivery systems. Our competitors include the major brand name manufacturers of pharmaceutical products. In addition to product development, other competitive factors in the pharmaceutical industry include product quality, price, reputation, service and access to proprietary and technical information. It is possible that developments by others will make our products or technologies noncompetitive or obsolete.

Competing in the brand and aesthetic product business requires us to identify and successfully bring to market new products embodying technological innovations. Successful marketing of brand and aesthetic products depends primarily on the ability to communicate the effectiveness, safety and value of these products to healthcare professionals in private practice and group practices and to receive formulary status from managed care organizations. We anticipate that our brand and aesthetic product offerings will support our existing areas of therapeutic focus. Based upon business conditions and other factors, we regularly reevaluate our business strategies and may from time to time reallocate our resources from one therapeutic area to another, withdraw from a therapeutic area or add an additional therapeutic area in order to maximize our overall growth opportunities.

Many of our competitors have been in business for a longer period of time, have a greater number of products on the market and have greater financial and other resources than we do. When we directly compete with these companies for certain contracted business or for the same markets and/or products, their financial strength could prevent us from capturing a meaningful share of those markets.

## Social Contract

In September 2016, we introduced our Social Contract with Patients, in which we committed to limit price increases on our products to once per year, and to only increase the list price of a product by single-digits, with the expectation that net price increases, which are price increases after discounts and rebates, would be in the low to mid- single digit range.

For the full-year 2017, our net price increases on U.S. products averaged 1.9 percent (list price increases averaged 7.6 percent).

10/24/2018

agn-10k_20171231.htm

14

**Manufacturing, Suppliers and Materials**

As of December 31, 2017, we manufactured many of our own finished products at our plants. We have major manufacturing sites in:

| Location | State / Country |
|---|---|
| Liege | Belgium |
| Guarulhos | Brazil |
| Dublin | California / USA |
| San Jose | California / USA |
| San Jose | Costa Rica |
| Pringy | France |
| Weiterstadt* | Germany |
| Dublin | Ireland |
| Galway | Ireland |
| Westport | Ireland |
| Branchburg | New Jersey / USA |
| Cincinnati | Ohio / USA |
| Waco | Texas / USA |

*The Weiterstadt facility is expected to close by the end of 2018.

We also have development and manufacturing capabilities for raw material and active pharmaceutical ingredients ("API") and intermediate ingredients to support our R&D internal product development efforts in our California location.

Our manufacturing operations are subject to extensive regulatory oversight and could be interrupted at any time. Refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

In addition, we are dependent on third parties for the supply of the raw materials necessary to develop and manufacture our products, including the API and inactive pharmaceutical ingredients used in many of our products. We are required to identify the supplier(s) of all the raw materials for our products in the drug applications that we file with the FDA. If raw materials for a particular product become unavailable from an approved supplier specified in a drug application, we would be required to qualify a substitute supplier with the FDA, which could interrupt manufacturing of the affected product. To the extent practicable, we attempt to identify more than one supplier in each drug application. However, some raw materials are available only from a single source and, in many of our drug applications, only one supplier of raw materials has been identified, even in instances where multiple sources exist.

Furthermore, we obtain a significant portion of our raw materials from foreign suppliers. Arrangements with international raw material suppliers are subject to, among other things, FDA regulation, customs clearance, various import duties, foreign currency risk and other government clearances. Acts of governments outside the U.S. may affect the price or availability of raw materials needed for the development or manufacture of our products. In addition, any changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to obtain sufficient supplies of raw materials, our ability to deliver our products to the market may be impeded." and — "The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union." in this document.

**Patents and Proprietary Rights**

We believe patent protection of our proprietary products is important to our products. Our success with our branded products will depend, in part, on our ability to obtain, and successfully defend if challenged, patent or other proprietary protection for such products. We currently have a number of U.S. and foreign patents issued or pending. However, the issuance of a patent is not conclusive as to its validity or as to the enforceable scope of the claims of the patent. Accordingly, our patents may not prevent other companies from developing similar or functionally equivalent products or from successfully challenging the validity of our patents. If our patent applications are not allowed or, even if allowed, if such patents are circumvented or not upheld in a court of law or in administrative proceedings, including oppositions, re-examinations or inter partes review ("IPR"), our ability to competitively market our patented products and technologies may be significantly reduced. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by competitors, in which case our ability to commercially market these products may be diminished. For example, in October 2017, the U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering our Restasis® (Cyclosporine Ophthalmic

agn-10k_20171231.htm

15

Emulsion) 0.05% product are invalid. From time to time, we may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market our products. If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially market such products may be inhibited or prevented. In addition, patents covering, for example, Actonel® (certain indications), Aczone® 5%, Androderm®, Botox® (for hyperhidrosis), Carafate®, Estrace® Cream, Femhrt®, INFed® and Namenda® (IR) products have expired and we have no further patent protection on these products. Generic versions of our Minastrin® product entered the market during 2017 pursuant to settlement agreements previously entered into. Generic Aczone® 5% entered the market in October 2017. Generic Estrace® entered the market in January 2018.

We also rely on trade secrets and proprietary know-how that we seek to protect, in part, through confidentiality agreements with our partners, customers, employees and consultants. It is possible that these agreements will be breached or will not be enforceable in every instance, and we will not have adequate remedies for any such breach. It is also possible that our trade secrets will otherwise become known or independently developed by competitors.

We may find it necessary to initiate litigation to enforce our patent and trademark rights, to protect our trade secrets or know-how or to determine the scope and validity of the proprietary rights of others. Litigation concerning patents, trademarks, copyrights and proprietary technologies can often be protracted and expensive and, as with litigation generally, the outcome is inherently uncertain.

Litigation alleging infringement of patents, trademarks, copyrights or other intellectual property rights may be costly and time consuming. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Third parties may claim that we infringe their proprietary rights and may prevent us from manufacturing and selling some of our products." and *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

### Government Regulation and Regulatory Matters

The following discussion focuses on key markets to the Company's overall business.

#### *United States*

All U.S.pharmaceutical manufacturers, including Allergan, are subject to extensive, complex and evolving regulation by the federal government, principally the FDA, and to a lesser extent, by the U.S. Drug Enforcement Administration ("DEA"), Occupational Safety and Health Administration and state government agencies, as well as by various regulatory agencies in foreign countries where our products or product candidates are being manufactured and/or marketed. The Federal Food, Drug and Cosmetic Act ("FFDCA"), the Controlled Substances Act and other federal statutes and regulations govern or influence the testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale and distribution of our products. In our international markets, the approval, manufacture and sale of pharmaceutical products is similar to the United States with some variations dependent upon local market dynamics.

#### *Specialty Pharmaceuticals*

In the United States, FDA approval is required before any dosage form of any new drug, including an off-patent equivalent of a previously approved drug, can be marketed. The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming and costly, and the extent to which it may be affected by legislative and regulatory developments cannot be predicted. We are dependent on receiving FDA and other governmental approvals prior to manufacturing, marketing and shipping new products. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to successfully develop or commercialize new products, our operating results will suffer." and "— Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities." in this document.

All applications for FDA approval must contain information relating to product formulation, raw material suppliers, stability, manufacturing processes, packaging, labeling and quality control. We file a New Drug Application ("NDA") when we seek approval for drugs with active ingredients and/or with dosage strengths, dosage forms, delivery systems or pharmacokinetic profiles that have not been previously approved by the FDA. Generally, NDAs are filed for new chemical entities or for a new dosage form of previously approved drugs.

For innovative or non-generic new drugs, a FDA-approved NDA is required before the drug may be marketed in the United States. The NDA must contain data to demonstrate that the drug is safe and effective for its intended uses and that it will be manufactured to appropriate quality standards. In order to demonstrate safety and effectiveness, a NDA generally must include or reference pre-clinical studies and clinical data from controlled trials in humans. For a new chemical entity, this generally means that

agn-10k_20171231.htm

16

lengthy, uncertain and rigorous pre-clinical and clinical testing must be conducted. For compounds that have a record of prior or current use, it may be possible to utilize existing data or medical literature and limited new testing to support a NDA. Any pre-clinical testing that we wish to rely upon for FDA action must comply with the FDA's good laboratory practice and other requirements. Clinical testing in human subjects must be conducted in accordance with the FDA's good clinical practice and other requirements. In order to initiate a clinical trial, the sponsor must submit an Investigational New Drug Application ("IND") to the FDA or meet one of the narrow exemptions that exist from the IND requirement.

The FDA has the authority to either approve or not approve NDAs, and if an application is not approved, additional data (clinical, non-clinical, manufacturing or quality data, among other types of data) is generally required. In addition, the FDA may approve a NDA subject to post-approval studies or monitoring requirements, or require that other risk management measures be utilized when the product is commercialized. There are also requirements to conduct pediatric trials for all new NDAs and supplements to NDAs for pharmaceutical products that may be used in the pediatric patient population, unless a waiver or deferral applies.

Once approved, the NDA is subject to life-cycle management regulations (for example, annual reports) in order to maintain product registrations. A Supplemental New Drug Application ("sNDA") is required for changes that require FDA evaluation and/or approval prior to implementation, including the transfer of certain products from one manufacturing site to another, a change in API supplier, or a new indication or dosage form. In addition, a change in the manufacturing site for certain products may only be approved once new bioequivalency studies are conducted or other requirements are satisfied. In addition, the FDA may require post-marketing studies.

To obtain FDA approval of NDAs and sNDAs, our manufacturing procedures and operations must conform to FDA quality system and control requirements generally referred to as current Good Manufacturing Practices ("cGMP"), as defined in Title 21 of the U.S. Code of Federal Regulations, and cGMP must be adhered to throughout the life-cycle of a product, as these regulations encompass all aspects of the production process from receipt and qualification of components to distribution procedures for finished products. cGMP standards are evolving standards; thus, we must continue to expend substantial time, money and effort in all production and quality control areas to maintain compliance with these standards. The evolving and complex nature of regulatory requirements, the broad authority and discretion of the FDA, and the generally high level of regulatory oversight results in the continuing possibility that we may be adversely affected by regulatory actions despite our efforts to maintain compliance with regulatory requirements.

We are subject to the periodic inspection of our facilities, procedures and operations and/or the testing of our products by the FDA, the DEA and other health authorities, which conduct periodic inspections to assess compliance with applicable regulations. In addition, in connection with its review of our applications for new products, the FDA conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems and processes comply with cGMP and other FDA regulations. Among other things, the FDA may withhold approval of NDAs, sNDAs, or other product applications of a facility if deficiencies are found at that facility. Vendors that supply finished products or components to us that we use to manufacture, package and label products are subject to similar regulation and periodic inspections.

Following such inspections, the FDA may issue notices on Form 483 and Warning Letters that may require us to modify certain activities identified during the inspection. A Form 483 notice may be issued at the conclusion of a FDA inspection and lists issues the FDA investigators believe may violate cGMP or other FDA regulations. FDA guidelines specify that a Warning Letter be issued only for violations of "regulatory significance" for which the failure to adequately and promptly address the correction to the satisfaction of the FDA may be expected to result in an enforcement action.

Failure to comply with FDA and other governmental regulations can result in fines, unanticipated compliance expenditures, recall or seizure of products, total or partial suspension of production and/or distribution, suspension of the FDA's review of NDAs or other product application enforcement actions, injunctions and criminal prosecution. Under certain circumstances, the FDA also has the authority to revoke previously granted drug approvals. Although we have internal compliance programs, if these programs do not meet regulatory agency standards or if our compliance is deemed deficient in any significant way, it could have a material adverse effect on our business. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities." in this document. The FDA can also significantly delay the approval of any pending NDA or other regulatory submissions under the Fraud, Untrue Statements of Material Facts, Bribery and Illegal Gratuities Policy Act.

17

### Medical Devices

Medical devices are subject to regulation by the FDA, state agencies and foreign government health agencies in the United States. FDA regulations, as well as various U.S. federal and state laws, govern the development, clinical testing, manufacturing, labeling, record keeping and marketing of medical device products. Our medical device product candidates, including our breast implants, must undergo rigorous clinical testing and an extensive government regulatory clearance or approval process prior to sale in the United States and other countries. The lengthy process of clinical development and submissions for approvals, and the continuing need for compliance with applicable laws and regulations, require the expenditure of substantial resources. Regulatory clearance or approval, when and if obtained, may be limited in scope, and may significantly limit the indicated uses for which a product may be marketed. Approved products and their manufacturers are subject to ongoing review, and discovery of previously unknown problems with products may result in restrictions on their manufacture, sale, use or their withdrawal from the market.

Our medical device products are subject to extensive regulation by the FDA in the United States. Unless an exemption applies, each medical device we market in the United States must have a 510(k) clearance or a Premarket Approval Application ("PMA") in accordance with the FFDCA and its implementing regulations. The FDA classifies medical devices into one of three classes, depending on the degree of risk associated with each medical device and the extent of controls that are needed to ensure safety and effectiveness. Devices deemed to pose a lower risk are placed in either Class I or Class II, and devices deemed by the FDA to pose the greatest risk, such as life-sustaining, life-supporting or implantable devices, or a device deemed to be not substantially equivalent to a previously cleared 510(k) device, are placed in Class III. In general, a Class III device cannot be marketed in the United States unless the FDA approves the device after submission of a PMA application, and any changes to the device subsequent to initial FDA approval must also be reviewed and approved by the FDA. The majority of our medical device products, including our breast implants, are regulated as Class III medical devices. A Class III device may have significant additional obligations imposed in its conditions of approval, and the time in which it takes to obtain approval can be long. Compliance with regulatory requirements is assured through periodic, unannounced facility inspections by the FDA and other regulatory authorities, and these inspections may include the manufacturing facilities of our subcontractors or other third party manufacturers. Failure to comply with applicable regulatory requirements can result in enforcement action by the FDA, which may include any of the following sanctions: warning letters or untitled letters; fines, injunctions and civil penalties; recall or seizure of our products; operating restrictions, partial suspension or total shutdown of production; refusing our request for 510(k) clearance or PMA approval of new products; withdrawing 510(k) clearance or PMAs that are already granted; and criminal prosecution.

A clinical trial is almost always required to support a PMA application and is sometimes required for a 510(k) premarket notification. Clinical trials generally require submission of an application for an investigational device exemption, which must be supported by appropriate data, such as animal and laboratory testing results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound, as well as approval by the FDA and the Institutional Review Board ("IRB") overseeing the trial. The results of clinical testing may not be sufficient to obtain approval of the applicable device.

Once a device is approved, the manufacture and distribution of the device remains subject to continuing regulation by the FDA, including Quality System Regulation requirements, which involve design, testing, control, documentation and other quality assurance procedures during the manufacturing process. Medical device manufacturers and their subcontractors are required to register their establishments and list their manufactured devices with the FDA, and are subject to periodic unannounced inspections by the FDA and certain state agencies for compliance with regulatory requirements. Manufacturers must also report to the FDA if their devices may have caused or contributed to a death or serious injury or malfunctioned in a way that could likely cause or contribute to a death or serious injury, or if the manufacturer conducts a field correction or product recall or removal to reduce a risk to health posed by a device or to remedy a violation of the FFDCA that may present a health risk. Further, the FDA continues to regulate device labeling, and prohibits the promotion of products for unapproved or "off-label" uses along with other labeling restrictions. If a manufacturer or distributor fails to comply with any of these regulatory requirements, or if safety concerns with a device arise, the FDA may take legal or regulatory action, including civil or criminal penalties, suspension, withdrawal or delay in the issuance of approvals, or seizure or recall of products, any one or more of which could have a material adverse effect upon us.

### Other Regulatory Requirements Applicable to Our Business

The FDA imposes a number of complex regulatory requirements on entities that advertise and promote pharmaceutical products and medical devices, including, but not limited to, standards and regulations for direct-to-consumer advertising, "off-label" promotion, industry-sponsored scientific and educational activities, and promotional activities including internet marketing. Pharmaceutical products and medical devices can only be marketed for indications approved or cleared by the FDA. Failure to comply with these regulations can result in penalties, the issuance of warning letters directing a company to correct deviations from FDA standards, a requirement that future advertising and promotional materials be pre-cleared by the FDA, and federal and state civil and criminal investigations and prosecutions.

U.S. government reimbursement programs include Medicare, Medicaid, TriCare, and State Pharmaceutical Assistance Programs established according to statute, government regulations and policy. Federal law requires all pharmaceutical manufacturers, as a condition of having their products receive federal reimbursement under Medicaid and Medicare Part B, to pay rebates to state Medicaid programs on units of their pharmaceuticals that are dispensed to Medicaid beneficiaries. With enactment of the Patient Protection and Affordable Care Act ("ACA"), as amended manufacturer rebate liability for brand drugs increased from 15.1% to 23.1% of the Average Manufacturer Price, or the difference between the Average Manufacturer Price and the drug's Best Price (i.e., the lowest net sales price to a non-government customer during a specified period), whichever is greater. In some states, supplemental rebates are required as a condition of including the manufacturer's drug on the state's Preferred Drug List.

The ACA prescribed that the coverage gap phase of the Medicare Part D benefit be closed such that by 2020, beneficiaries will pay co-insurance of 25% (or co-payment equivalents) of the cost of prescription drugs dispensed to them under their applicable Medicare Part D plans, until they reach the catastrophic phase of the Medicare Part D benefit.  As such, the coverage gap or "donut hole" will be effectively closed beginning in the 2020 plan year.  The cost of closing the donut hole is being borne in part by brand drug companies as well as Medicare Part D plan sponsors and the federal government.  Beginning in 2011, brand drug manufacturers were required to provide a 50% discount on their drugs while beneficiaries are in the coverage gap.  Additionally, beginning in 2013, the government/Medicare Part D plan sponsors began providing additional subsidies for brand name drugs bought by seniors who enter the coverage gap. When the government/sponsor share, which started at 2.5%, but increases to 25% by 2020, the combined industry discounts and government subsidies will add up to 75% of brand name drug costs.  On February 9, 2018, Congress enacted a new budget resolution that contains new requirements relating to Medicare and Medicaid that may have financial implications for the Company.  We are currently evaluating the financial impact of these new requirements on our operations.

On January 21, 2016, the Centers for Medicare and Medicaid Services issued final rules on the calculation of AMP, Best Price and Unit Rebate Amounts for the Medicaid program; the final rule took effect in April 2016 (for most provisions).  Allergan has implemented the required changes to its Medicaid rebate calculations, effective with its Q2 2016 submissions.

The ACA also expanded the government's 340B drug discount program by increasing the category of entities qualified to participate in the program and benefit from its deeply discounted drug pricing.  The ACA obligates the Health Resources and Services Administration (HRSA), which administers the 340B program, to update the Pharmaceutical Pricing Agreement, which each manufacturer must sign to participate in the 340B program, to require each manufacturer to offer the 340B price to covered entities if the manufacturer makes the drug product available to any other customer at any price, and to report the ceiling prices for its drugs to the government.  HRSA issued this update in late 2016 and the Company subsequently signed and executed an amendment to our agreement.  In addition, on January 5, 2017, HRSA finalized regulations that, among other things, implement rules regarding civil monetary penalties for knowing and intentional overcharges of 340B covered entities by pharmaceutical manufacturers; these rules currently are scheduled to become effective on July 1, 2018.

In connection with the commercialization of our products, we have obtained authorization to receive reimbursement at varying levels for the cost of certain products and related treatments from government authorities and private health insurers and other organizations, such as Health Maintenance Organizations ("HMOs") and Managed Care Organizations ("MCOs").

Additionally, we may in the future, and have in the past, received requests for information, sometimes in the form of civil investigative demands or subpoenas, from the U.S. Federal Trade Commission ("FTC") and the European Competition Commission, and are subject to ongoing FTC and European Competition Commission investigations.  Any adverse outcome of these types of investigations or actions could have a material adverse effect on our business, results of operations, financial condition and cash flows. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business—Federal regulation of arrangements between manufacturers of branded and generic products could adversely affect our business." Also refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

As part of the Medicare Prescription Drug and Modernization Act of 2003 ("MMA"), companies are required to file with the FTC and the Department of Justice certain types of agreements entered into between brand and generic pharmaceutical companies related to the manufacture, marketing and sale of generic versions of brand drugs. This requirement could affect the manner in which drug manufacturers resolve intellectual property litigation and other disputes with competitor pharmaceutical companies, and could result generally in an increase in private-party litigation against pharmaceutical companies. The impact of this requirement, and the potential private-party lawsuits associated with arrangements between brand name and generic drug manufacturers, is uncertain and could adversely affect our business. For example, in January 2009, the FTC and the State of California filed a lawsuit against us alleging that our settlement with Solvay related to our Abbreviated New Drug Application ("ANDA") for a generic version of Androgel® is unlawful. Beginning in February 2009, several private parties purporting to represent various classes of plaintiffs filed similar lawsuits. Those lawsuits, as well as additional suits challenging the validity of our settlements related to Asacol®, Namenda® and Loestrin® 24 and generic versions of Actos®, Cipro®, and Lidoderm®, remain pending.  Refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

Federal, state, local and foreign laws of general applicability, such as laws regulating working conditions, also govern us. In addition, we are subject, as are all manufacturers generally, to numerous and increasingly stringent federal, state and local environmental laws and regulations concerning, among other things, the generation, handling, storage, transportation, treatment and disposal of toxic and hazardous substances and the discharge of pollutants into the air and water. Environmental permits and controls are required for some of our operations, and these permits are subject to modification, renewal and revocation by the issuing authorities. Our environmental capital expenditures and costs for environmental compliance may increase in the future as a result of changes in environmental laws and regulations or increased manufacturing activities at any of our facilities. We could be adversely affected by any failure to comply with environmental laws, including the costs of undertaking a clean-up at a site to which our wastes were transported.

### European Union

We encounter similar regulatory and legislative issues in most other countries, including countries that are members of the European Union (the "EU"). Pharmaceutical manufacturers are regulated in the EU by the European Medicines Agency (the "EMA") and national health authorities. All manufacturers are required to submit medicinal products, including generic versions of previously approved products and new strengths, dosages and formulations of previously approved products, to the EMA and its member states for review and marketing authorization before such products are placed on the market in the EU.

Marketing authorizations are granted to applicants after the relevant health authority issues a positive assessment of quality, safety and efficacy of the product. In order to receive such assessment, applicants must submit applications, which must contain the results of pre-clinical tests, pharmaceutical tests, and clinical trials with respect to originator products. All of these tests or trials must be conducted in accordance within European regulations and must allow the reviewing body to evaluate the quality, safety and efficacy of the medicinal product.

In addition to obtaining marketing authorization for each product, all member states require that a manufacturer's facilities obtain approval from the national authority. The EU has a code of good manufacturing practices that each manufacturer must follow and comply with. Regulatory authorities in the EU may conduct inspections of the manufacturing facilities to review procedures, operating systems and personnel qualifications. Refer to "ITEM 1A. — RISK FACTORS — Risks Related to Our Business — The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union." in this document.

In the EU, member states regulate the pricing of pharmaceutical products, and in some cases, the formulation and dosing of products. This regulation is handled by individual member state national health services. These individual regulatory bodies can result in considerable price differences and product availability among member states. The implementation of tendering systems for the pricing of pharmaceuticals in several countries generally impacts drug pricing; generally "tendering" refers to a system that requires bids to be submitted to the government by competing manufacturers to be the exclusive, or one of a few, supplier(s) of a product in a particular country.

Further, faced with major budget constraints, many European countries have resorted to price cuts that affect both innovative and generic pharmaceuticals. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business—Global economic conditions could harm us." in this document.

Medical device products that are marketed in the European Union must comply with the requirements of the Medical Device Directive (the "MDD"), as implemented in the national legislation of the European Union member states. The MDD, as implemented, provides for a regulatory regime with respect to the design, manufacture, clinical trials, labeling and adverse event reporting for medical devices to ensure that medical devices marketed in the European Union are safe and effective for their intended uses. Medical devices that comply with the MDD, as implemented, are entitled to bear a Conformité Européenne ("CE') marking evidencing such compliance and may be marketed in the European Union. Failure to comply with these domestic and international regulatory requirements could affect our ability to market and sell our products in these countries.

### Canada

In Canada, pharmaceutical manufacturers are regulated by the Therapeutic Products Directorate (the "TPD") which derives its authority from the Canadian federal government under the Food and Drugs Act and the Controlled Drug and Substances Act. The TPD evaluates and monitors the safety, effectiveness and quality of pharmaceutical products. Products are officially approved for marketing in Canada following receipt of a market authorization, or "Notice of Compliance" (a "NOC"), which is subject to the Food and Drug Regulations. Issuance of a NOC for generic drug products is also subject to the Patented Medicines (Notice of Compliance) Regulations (the "NOC Regulations") under the Patent Act.

20

The NOC Regulations allow branded drug marketers to list patents relating to the medicinal ingredient, formulation, dosage form or the use of the medicinal ingredient in their branded drug on a patent register maintained by Health Canada. In its abbreviated new drug submission, a generic applicant must address each patent listed against the reference product by making at least one statutory allowed allegation (for example, alleging that the patent is invalid or would not be infringed). If the generic applicant alleges invalidity or non-infringement, it must provide the branded manufacturer with an explanation of its allegations. Upon receipt of the explanation, the branded manufacturer may apply to the Federal Court of Canada for an Order prohibiting Health Canada from issuing a NOC for the generic. Health Canada may not issue a NOC until the earlier of the determination of the application by the court after a hearing on the allegations, or the expiration of 24 months from the commencement of the application.

Facilities, procedures, operations and/or testing of products are subject to periodic inspection by Health Canada and the Health Products and Food Branch Inspectorate. In addition, Health Canada conducts pre-approval and post-approval reviews and plant inspections to determine whether our systems are in compliance with the good manufacturing practices in Canada, Drug Establishment Licensing requirements and other provisions of the NOC Regulations. Competitors are subject to similar regulations and inspections.

Each Canadian province also provides a comprehensive public drug program, which controls drug pricing and reimbursement and is responsible for ensuring eligible patients receive drugs through public funding. The provinces and territories in Canada operate drug benefit programs through which eligible recipients receive drugs through public funding; these drugs are listed on provincial or territorial Drug Benefit Formularies ("Formularies"). Eligible recipients include seniors, persons on social assistance, low-income earners, and those with certain specified conditions or diseases. Formulary listings are also used by private payors to reimburse generic products. To be listed in a Formulary, drug products must have been issued a NOC and must comply with each jurisdiction's individual review process. Currently, Canada's provinces are looking at national competitive bidding processes/tendering of drugs, which may affect the sustainability of the industry and the supply of pharmaceuticals.

Finally, Canada has reached a trade agreement with the European Union ("CETA") in which it has implemented a form of patent term extensions and certain procedural amendments to the NOC Regulations. Canada is further involved in trade negotiations with ten Pacific countries (the "Comprehensive and Progressive Agreement for Trans-Pacific Partnership (CPTPP)"), which could lead to further changes to Canada's intellectual property framework and affect our business.

**Environmental Matters**

We are subject to federal, state, and local environmental laws and regulations in the United States and abroad. Our environment, health and safety group monitors our operations around the world, providing us with an overview of regulatory requirements and overseeing the implementation of our standards for compliance. We believe that our operations comply in all material respects with applicable environmental laws and regulations in each jurisdiction where we have a business presence, and we periodically audit our manufacturing and R&D facilities for compliance with all federal, state and local environmental laws and regulations. Although we continue to make capital expenditures for environmental protection, we do not anticipate any significant expenditure in order to comply with such laws and regulations that would have a material impact on our earnings or competitive position. We are not aware of any pending litigation or significant financial obligations arising from current or past environmental practices that are likely to have a material adverse effect on our financial position. We cannot assure, however, that environmental problems relating to facilities owned or operated by us will not develop in the future, and we cannot predict whether any such problems, if they were to develop, could require significant expenditures on our part.

Climate change presents risks to our operations, including the potential for additional regulatory requirements and associated costs, and the potential for more frequent and severe weather events and water availability challenges that may impact our facilities and those of our suppliers. These potential risks are integrated into the Company's business planning including investment in reducing energy, water use and greenhouse gas emissions. We cannot provide assurance that physical risks to our facilities and supply chain due to climate change will not occur in the future; however we do not believe these risks are material to our business at this time.

In addition, we are unable to predict what legislation or regulations may be adopted or enacted in the future with respect to environmental protection and waste disposal. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Our business will continue to expose us to risks of environmental liabilities." in this document.

**Seasonality**

Consistent with the United States pharmaceutical industry, our business experiences seasonality, with the first quarter of each year typically being the lowest revenue quarter for our products.  In addition, our aesthetics products, including our breast aesthetics and Botox® cosmetic indications, have tended to be marginally higher during the second and fourth quarters, presumably in advance of the summer vacation and holiday seasons. Fluctuations of our sales are also impacted by the effect of promotional activity, which cause non-seasonal variability in sales trends.

**Backlog**

As a result of the extent of our supply chain, backlog of orders is not material to our business.

**Employees**

As of December 31, 2017, we had approximately 17,800 employees. Of our employees, approximately 2,200 were engaged to support R&D functions, 4,850 supported Cost of Goods Sold functions, 9,100 supported sales, marketing and distribution functions, and 1,650 supported administrative functions.

22

## ITEM 1A.  RISK FACTORS

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

*Any statements made in this report that are not statements of historical fact or that refer to estimated or anticipated future events are forward-looking statements, as contemplated in the Private Securities Litigation Reform Act of 1995.  We have based our forward-looking statements on management's beliefs and assumptions based on information available to our management at the time these statements are made.  Such forward-looking statements reflect our current perspective of our business, future performance, existing trends and information as of the date of this filing.  These include, but are not limited to, our beliefs about future revenue and expense levels and growth rates, prospects related to our strategic initiatives and business strategies, including the integration of, and synergies associated with, strategic acquisitions, express or implied assumptions about government regulatory action or inaction, anticipated product approvals and launches, business initiatives and product development activities, assessments related to clinical trial results, product performance and competitive environment, and anticipated financial performance.*

*Without limiting the generality of the foregoing, words such as "may," "will," "expect," "believe," "anticipate," "plan," "intend," "could," "would," "should," "estimate," "continue," or "pursue," or the negative or other variations thereof or comparable terminology, are intended to identify forward-looking statements.  The statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict.  We caution the reader that these statements are based on certain assumptions, risks and uncertainties, many of which are beyond our control.*

*In addition, certain important factors may affect our actual operating results and could cause such results to differ materially from those expressed or implied by forward-looking statements.  We believe the risks and uncertainties discussed under the section entitled "Risks Related to Our Business," and other risks and uncertainties detailed herein and from time to time in our SEC filings, may cause our actual results to vary materially from those anticipated in any forward-looking statement.*

We operate in a rapidly changing environment that involves a number of risks and uncertainties, some of which are beyond our control.  The following discussion highlights some of these risks and speaks as of the date of this document, including the assets held for sale.  These and other risks could have a material adverse effect on our business, results of operations, financial condition and cash flows.

### Risks Related to Our Business

#### Global economic conditions could harm us.

While global economic conditions have been fairly stable as a whole in recent years, continued concerns about the systemic impact of potential geopolitical issues and economic policy uncertainty, particularly in areas in which we operate, could potentially cause economic and market instability in the future and could adversely affect the Company's business, including the Company's financial performance.

Challenging economic conditions could result in tighter credit conditions. The cost and availability of credit may be adversely affected by illiquid credit markets and wider credit spreads, which could adversely affect the ability of third-party distributors, partners, manufacturers and suppliers to buy inventory or raw materials and to perform their obligations under agreements with us, which could disrupt our operations, and which could adversely affect the liquidity and financial conditions of our customers.

Global efforts towards health care cost containment continue to exert pressure on product pricing and market access. In many international markets, government-mandated pricing actions have reduced prices of patented drugs. Some countries may be subject to periods of financial instability or may have reduced resources to spend on healthcare or may be or will be in the future subject to economic sanctions, and our business in these countries may be disproportionately affected by these changes. In addition, the currencies of some countries may depreciate against the U.S. Dollar substantially and if the Company is unable to offset the impact of such depreciation, then the Company's financial performance within such countries could be adversely affected.

#### If we are unable to successfully develop or commercialize new products, our operating results will suffer.

Our future results of operations depend to a significant extent upon our ability to successfully develop and commercialize new products in a timely manner.  There are numerous difficulties in developing and commercializing new products, including:

- developing, testing and manufacturing products in compliance with regulatory standards in a timely manner;

- receiving requisite regulatory approvals for such products in a timely manner, or at all;

10/24/2018                                                  agn-10k_20171231.htm
  •      the availability, on commercially reasonable terms, of raw materials, including API and other key ingredients;

23

- preclusion from commercialization by the proprietary rights of others;

- developing products that are economical to manufacture and commercialize;

- time consuming and costly nature of developing and commercializing new products;

- costly legal actions brought by our competitors that may delay or prevent the development and commercialization of new products;

- delays as a result of limited resources at the FDA or other regulatory agencies;

- changing review and approval policies and standards at the FDA and other regulatory agencies; and

- completion of numerous other regulatory approvals in international markets.

As a result of these and other difficulties, products currently in development by us may or may not receive timely regulatory approvals necessary for marketing by us or other third-party partners, or approvals at all. This risk because of the uncertainties, higher costs and lengthy time frames associated with R&D of our proprietary products and the inherent unproven market acceptance of such products. Our operating results and financial condition may fluctuate as the amount we spend to research and develop, promote, acquire or license new products, technologies and businesses changes. If any of our products or any products that we sell pursuant to license, distribution or similar agreements with third-party partners are not approved in a timely manner or, when acquired or developed and approved, cannot be successfully manufactured or commercialized in a timely manner, our operating results could be adversely affected. We cannot guarantee that any investment we make in developing products will be recouped, even if we are successful in commercializing those products. Refer to "Our expenditures may not result in commercially successful products."

***Our expenditures may not result in commercially successful products.***

Developing and commercializing branded pharmaceutical products is generally more costly than developing and commercializing generic products. In order to grow and achieve success in our business, we must continually identify, develop, acquire and license new products that we can ultimately market. In the future, we anticipate continuing and increasing our product development expenditures. There are many difficulties and uncertainties inherent in pharmaceutical research and development, and there is a high rate of failure inherent in new drug discovery and development. Failure can occur at any point in the process, including late in the process after substantial investment. New product candidates that appear promising in development may fail to reach the market or may have only limited commercial success because of efficacy or safety concerns, inability to obtain necessary regulatory approvals and payer reimbursement, limited scope of approved uses, difficulty or excessive costs to manufacture, or infringement of the patents or intellectual property rights of others. Products that do reach the market may ultimately be subject to recalls or other suspensions in sales. Delays and uncertainties in the FDA approval process and the approval processes in other countries can result in delays in product launches and lost market opportunity. Because there is a high rate of failure inherent in the research and development process of new products, there is a significant risk that funds invested by the Company in research and development will not generate financial returns. The Company cannot be certain when or whether any of its products currently under development will be approved or launched or whether, once launched, such products will be commercially successful.

We may be required to spend several years and incur substantial expense in completing certain clinical trials. The length of time, number of trial sites and patients required for clinical trials vary substantially, and we may have difficulty finding a sufficient number of sites and subjects to participate in our trials. Delays in planned clinical trials can result in increased development costs, delays in regulatory approvals and delays in product candidates reaching the market. We rely on independent third-party clinical investigators to recruit subjects and conduct clinical trials in accordance with applicable study protocols and laws and regulations. If regulatory authorities determine that we have not complied with regulations in the R&D of a product candidate, they may refuse to accept trial data from the site and/or not approve the product candidate, and we would not be able to market and sell that product. If we are not able to market and sell our products after significant expenditures to develop and test them, our business and results of operations could be materially and adversely affected.

We currently have products in various stages of development, including new opthamology, women's health and CNS products, among others. Such clinical trials are costly and may not result in successful outcomes. The results of preclinical studies and early clinical studies may not be predictive of the results of later-stage clinical studies. Product candidates that have shown promising results in early-stage clinical studies may still suffer significant setbacks in subsequent clinical studies. There is a high rate of failure for products proceeding through clinical studies, and product candidates in later stages of clinical studies may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and initial clinical studies. Clinical studies may not proceed as planned or be completed on schedule, if at all. The rate of completion of clinical trials is significantly dependent upon a number of factors, including the rate of patient enrollment. We may not be able to attract a sufficient number of sites or enroll a sufficient number of patients in a timely manner in order to complete clinical trials. Moreover, nonclinical and clinical data are often

susceptible to varying interpretations and analyses, and our data may not provide adequate efficacy and safety information to obtain regulatory approval of our candidates.  We cannot be sure that our business expenditures, including but not limited to our expenditures related to internally developed products, our Esmya™ product, products acquired in past acquisitions, or products of our third-party partners, among others, will result in the successful discovery, development or launch of branded products that will prove to be commercially successful or will improve the long-term profitability of our business.  If such business expenditures do not result in successful discovery, development or launch of commercially successful branded products our results of operations and financial condition could be materially adversely affected.

*If any of our major products become subject to problems, our business could be adversely affected.*

We recorded direct product revenues of more than $500 million for the following pharmaceutical products:  Botox®, the Juvederm Collection, Linzess®/Constella®, Lumigan®/Ganfort®, Bystolic®/Byvalson®, and Alphagan®/Combigan® and Restasis®.  Those products and revenues accounted for 51.8% of our total revenues in 2017. These products, as well as our other major products, may become subject to problems such as loss of patent protection (if applicable), changes in prescription growth rates, material product liability litigation, unexpected side effects, regulatory proceedings, publicity affecting doctor or patient confidence, pressure from existing or new competitive products or changes in labeling, our results of operations and financial condition could be materially adversely affected.  For example, in October 2017, the U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% are invalid.  The case is currently on appeal; however, FDA may approve – and generics may attempt to launch – generic versions of Restasis® before the court of appeals has issued its decision in the appeal.

*If generic products that compete with any of our branded pharmaceutical products are approved and sold, sales of our products will be adversely affected.*

Generic equivalents for branded pharmaceutical products are typically sold at lower prices than the branded products. The regulatory approval process in the United States and European Union exempts generic products from costly and time-consuming clinical trials to demonstrate their safety and efficacy and rely instead on the safety and efficacy of prior products, manufacturers of generic products can invest far less in research and development. After the introduction of a competing generic product, a significant percentage of the prescriptions previously written for the branded product are often written for the generic version. In addition, legislation enacted in most U.S. states and Canadian provinces allows or, in some instances mandates, that a pharmacist dispense an available generic equivalent when filling a prescription for a branded product, in the absence of specific instructions from the prescribing physician.  Pursuant to the provisions of the Hatch-Waxman Act, manufacturers of branded products often bring lawsuits to enforce their patent rights against generic products released prior to the expiration of branded products' patents, but it is possible for generic manufacturers to offer generic products while such litigation is pending.  Refer to "If we are unable to adequately protect our technology or enforce our patents, our business could suffer."  As a result, branded products typically experience a significant loss in revenues following the introduction of a competing generic product, even if subject to an existing patent.  Our branded pharmaceutical products are or may become subject to competition from generic equivalents because there is no proprietary protection for some of the branded pharmaceutical products we sell, because our patent protection expires or because our patent protection is not sufficiently broad or enforceable.  In addition, we may not be successful in our efforts to extend the proprietary protection afforded our branded products through the development and commercialization of proprietary product improvements.

In October 2017, the U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% are invalid.

Our Actonel® products no longer have patent protection in Canada or the Western European countries in which we sell these products, and Asacol® is not protected by a patent in the United Kingdom.  Our Actonel® once-a-month product lost U.S. patent protection in June 2014 (including a 6-month pediatric extension of regulatory exclusivity) and generic versions of our Loestrin® 24 Fe product entered the market in January 2014 pursuant to settlement agreements previously entered into.  Generic versions of Namenda® (IR) tablets entered the U.S. market in July 2015 pursuant to settlement agreements previously entered into.  An authorized generic version of Asacol HD® entered the market in July 2016 pursuant to a settlement agreement previously entered into.  In addition, other products such as Estrace® Cream, Asacol® 400 mg, Aczone® 5%, Femhrt®, Latisse®, and Carafate® are not protected by patents in the United States where we sell these products.  Generic equivalents are currently available in Canada and Western Europe for Actonel® and in the United States for certain versions of our Femhrt® products, Femcon® Fe and certain other less significant products.

During the next few years, additional products of ours, including some of our large revenue drivers, like Aczone® 5%, Bystolic®, Canasa®, Delzicol®, Gelnique®, Namenda XR®, Pylera®, Rapaflo®, Saphris® and Viibryd®, will lose patent protection and/or likely

become subject to generic or other competition.  Generic versions of our Canasa® product may enter the market as early as December 2018 or earlier pursuant to an agreement previously entered into.  Some of our products may also become subject to generic

25

competition prior to the expiration of patent protection in the event a generic competitor elects to launch its generic equivalent product "at-risk." For example, before the Court of Appeals for the Federal Circuit has reviewed Allergan's appeal of a district court judgment of patent invalidity, Sandoz launched "at risk" a generic version of Latisse® in December 2016. *Competition from generic equivalents could result in a material impairment of our intangible assets or the acceleration of amortization on our non-impaired intangible assets and may have a material adverse impact on our revenues, financial condition, results of operations and cash flows.*

### *The pharmaceutical industry is highly competitive and our future revenue growth and profitability are dependent on our timely development and launches of new products ahead of our competitors.*

We face strong competition across our business. The intensely competitive environment of the pharmaceutical industry requires an ongoing, extensive search for technological innovations and the ability to market and price products effectively, including the ability to communicate the effectiveness, safety and value of branded products to healthcare professionals in private practice, group practices and Managed Care Organizations. Our competitors vary depending upon product categories, and within each product category, upon dosage strengths and drug-delivery systems. Based on total assets, annual revenues, and market capitalization, we are smaller than certain of our national and international competitors in the brand and distribution product arenas. Most of our competitors have been in business for a longer period of time than we have, have a greater number of products on the market and have greater financial and other resources than we do. Furthermore, recent trends in this industry are toward further market consolidation of large drug companies into a smaller number of very large entities, further concentrating financial, technical and market strength and increasing competitive pressure in the industry. If we directly compete with them for the same markets and/or products, their financial strength could prevent us from capturing a profitable share of those markets. It is possible that developments by our competitors will make our products or technologies noncompetitive or obsolete. In addition, competitive forces may result in changes to the mix of products that we sell during a given time period or lower demand for our products than expected.

Some of our competitors have technical, competitive or other advantages over us for the development of technologies and processes. We face increased competition from new infection prevention, sterile processing, contamination control, surgical support, cleaning consumables, gastrointestinal endoscopy accessories, contract sterilization, and other products and services entering the market. These advantages may make it difficult for us to compete with them to successfully discover, develop and market new products and for our current products to compete with new products that these competitors may bring to market. As a result, our products may compete against products that have lower prices, equivalent or superior performance, a better safety profile, are easier to administer, achieve earlier entry into the market or that are otherwise competitive with our products.

### *If we are unable to adequately protect our technology or enforce our patents, our business could suffer.*

Our success with the branded products that we develop will depend, in part, on our ability to obtain patent protection for these products. We currently have a number of U.S. and foreign patents issued and pending. However, issuance of a patent is not conclusive evidence of its validity or enforceability. We cannot be sure that we will receive patents for any of our pending patent applications or any patent applications we may file in the future, or that our issued patents will be upheld if challenged. If our current and future patent applications are not approved or, if approved, our patents are not upheld in a court of law if challenged, it may reduce our ability to competitively utilize our patented products. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by our competitors, in which case our ability to commercially market these products may be diminished. Patent disputes may be lengthy and a potential violator of our patents may bring a potentially infringing product to market during the dispute, subjecting us to competition and damages due to infringement of the competitor product. Further, patents covering Aczone® 5%, Androderm®, Carafate®, Estrace® Cream, Femhrt®, INFed® and Namenda® (IR) products have expired and we have no further patent protection on these products. As a result, generic versions of our Aczone® 5% product entered the market around October 2017 and generic versions of our Estrace® Cream product entered the market in January 2018. During the next few years, additional products acquired pursuant to the Warner Chilcott Acquisition, the Forest Acquisition, and the Allergan Acquisition will lose patent protection and/or likely become subject to generic or other competition, including Bystolic®, Canasa®, Delzicol®, Gelnique®, Namenda XR®, Pylera®, Rapaflo®, Saphris® and Viibryd®. Therefore, it is possible that a competitor may launch a generic version of any of these products at any time, which would result in a significant decline in that product's revenue and profit.

Generic versions of our Loestrin® 24 Fe product entered the market in January 2014 pursuant to settlement agreements previously entered into; an authorized generic version of our Asacol® HD 800 mg product entered the market in August 2016 pursuant to an agreement previously entered into; our immediate release Namenda® product lost U.S. patent protection in 2015 and generic versions entered the market in July 2015 pursuant to agreements previously entered into; generic versions of our Minastrin® product which entered the market during March 2017 pursuant to settlement agreements previously entered into; and generic versions of our Canasa® product may enter the market as early as December 2018 pursuant to a settlement agreement previously entered into. Some

of our products, e.g., Delzicol®, Restasis®, and Combigan®, may also become subject to generic competition prior to the expiration of patent protection in the event a generic competitor is not enjoined and elects to launch its generic equivalent product "at risk."

26

Generic competitors to our branded products may also challenge the validity or enforceability of the patents protecting our products or otherwise seek to circumvent them. Forest also recently brought actions against certain manufacturers of generic drugs for infringement of several patents covering our Byvalson®, Canasa®, Delzicol®, Linzess®, Fetzima®, Namenda XR®, Namzaric®, Pylera®, Saphris®, Savella®, Teflaro® and Viibryd® products. Allergan recently brought actions against manufacturers of generic drugs in the United States for infringement of several patents covering our Aczone® 7.5%, Combigan®, Lastacaft®, Latisse®, and Restasis® products. While we intend to vigorously defend these and other patents and pursue our legal rights, we can offer no assurance as to when the pending or any future litigation will be decided, whether such lawsuits will be successful or that a generic equivalent of one or more of our products will not be approved and enter the market. In addition, patents covering our branded pharmaceutical products may be challenged in proceedings other than court proceedings, including IPR at the U.S. Patent Office. In 2011, Congress amended the patent laws and created a new way to challenge the validity of patents: the inter partes review. IPR proceedings take place in the U.S. Patent Office and have both advantages and disadvantages when compared to district court proceedings. Although IPR proceedings are limited to certain types of invalidity challenges, the U.S. Patent Office applies different standards that make it easier for challengers to invalidate patents. Moreover, IPR proceedings generally take no more than 18 months, which means it is much faster than challenging a patent's validity in a district court proceeding. In addition, an IPR challenge can be mounted even after a patent has been upheld in court. For example, Mylan has filed IPR challenges against our patents covering our Restasis® and Teoxane® products and recent filed IPR challenges against certain patents covering certain of our Juvederm® product.

In addition to patent protection, our business relies on our protection of other intellectual property rights, trade secrets, and other proprietary technologies. We rely on trademark, copyright, trade-secret protection, and confidentiality and/or license agreements with our employees, customers, partners and others to protect our proprietary rights. The protection of our proprietary technology may require the expenditure of significant financial and managerial resources. For example, in April 2017, Allergan brought an action for unfair competition, false advertising, dilution, conspiracy and infringement of Allergan's JUVÉDERM trademarks in the U.S. District Court for the Central District of California against Dermavita Limited Partnership, Dima Corp. S.A. and KBC Media Relations LLC. However, we may not be able to discover or determine the extent of any unauthorized use of our proprietary rights, and we may not be able to prevent third parties from misappropriating or infringing upon our proprietary rights.

We rely on certain information, processes, and know-how that are not protected by patents or other intellectual property rights. We seek to protect this information through trade secret or confidentiality agreements, as well as through other measures. These measures may not provide adequate protection for our unpatented technology.

If we are unable to adequately protect our technology, trade secrets or proprietary know-how, or enforce our intellectual property rights, our results of operations, financial condition and cash flows could suffer.

### *From time to time we may need to rely on licenses to proprietary technologies, which may be difficult or expensive to obtain.*

We may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market products. If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially market our products may be inhibited or prevented, which could have a material adverse effect on our business, results of operations, financial condition and cash flows. For example, because we license significant intellectual property with respect to certain of our products, including Delzicol®, Namenda XR®, Namzaric®, Linzess®, Teflaro® and Viibryd®, any loss or suspension of our rights to licensed intellectual property could materially adversely affect our business, financial condition, cash flows and results of operations.

### *Third parties may claim that we infringe their proprietary rights and may prevent us from manufacturing and selling some of our products.*

The manufacture, use and sale of new products that are the subject of conflicting patent rights have been the subject of substantial litigation in the pharmaceutical industry. These lawsuits relate to the validity, enforceability and infringement of patents or proprietary rights of third parties. We may have to defend ourselves against charges that we violated patents or proprietary rights of third parties. This is especially true in the case of new branded products where a competitor has obtained patents for similar products. Litigation may be costly, unpredictable, time-consuming, often involves complex legal, scientific and factual questions, and could divert the attention of our management and technical personnel. In addition, if it is determined that we infringe the rights of others, we could lose our right to develop, manufacture or market products, product launches could be delayed or we could be required to pay monetary damages or royalties to license proprietary rights from third parties. Furthermore, we cannot be certain that the necessary licenses would be available to us on commercially reasonable terms, or at all. As a result, an adverse determination in a judicial or administrative proceeding or failure to obtain necessary licenses could result in substantial monetary damage awards and could prevent us from manufacturing and selling a number of our products, which could have a material adverse effect on our business, results of operations, financial condition and cash flows.

*Certain aspects of our operations are highly dependent upon third-party service providers.*

We rely on suppliers, vendors and other third-party service providers to research, develop, manufacture, commercialize, promote and sell our products.  Reliance on third-party manufacturers reduces our oversight and control of the manufacturing process.  Some of these third-party providers are subject to legal and regulatory requirements, privacy and security risks, and market risks of their own.  The failure of a critical third-party service provider to meet its obligations could have a material adverse impact on our operations and results.  If any third-party service providers have violated or are alleged to have violated any laws or regulations during the performance of their obligations to us, it is possible that we could suffer financial and reputation harm or other negative outcomes, including possible legal consequences.

*If we are unable to obtain sufficient supplies of raw materials, our ability to deliver our products to the market may be impeded.*

We are required to identify the supplier(s) of all the raw materials for our products in our applications with the FDA and regulatory agencies outside the United States.  To the extent practicable, we attempt to identify more than one API supplier in each drug application.  However, many raw materials, including API, are available only from a single source and, in many of our drug applications, only one supplier of raw materials has been identified, even in instances where multiple sources exist.  Some of these products have historically or may in the future account for a significant portion of our revenues, such as Botox®, our Juvederm® dermal filler family of products, Namenda®, Linzess® and Bystolic®.  Any failure by us to forecast demand for, or to maintain an adequate supply of, the raw materials could result in an interruption in the supply of certain products and a decline in sales of that product.  In addition, if our suppliers are unable to meet our manufacturing requirements, we may not be able to produce a sufficient amount of product in a timely manner, which could cause a decline in our sales.  From time to time, certain of our suppliers have experienced regulatory or supply-related difficulties that have inhibited their ability to deliver raw materials to us, causing supply delays or interruptions.  The availability and prices of raw materials and supplies are subject to volatility and are influenced by worldwide economic conditions, speculative action, world supply and demand balances, inventory levels, availability of substitute materials, currency exchange rates, anticipated or perceived shortages, product contamination, among other factors.  To the extent any difficulties experienced by our suppliers cannot be resolved or extensions of our key supply agreements cannot be negotiated within a reasonable time and on commercially reasonable terms, or if raw materials for a particular product become unavailable from an approved supplier and we are required to qualify a new supplier with the FDA or other regulatory agency, or if we are unable to do so, our profit margins and market share for the affected product could decrease or be eliminated, as well as delay our development and sales and marketing efforts.  Such outcomes could have a material adverse effect on our business, results of operations, financial condition and cash flows.

Although we are developing and executing a global risk management framework designed to identify, prioritize, mitigate and continuously monitor potential risks to raw material suppliers, including mitigation strategies such as holding safety stock of raw materials and developing additional sources for sole- or single- sourced raw materials, there is no guarantee that these strategies will be successful and we will be able to mitigate any material adverse effect on our business, results of operations, financial condition and cash flows.

In addition, our manufacturing sites outside of the United States and our arrangements with foreign suppliers are subject to certain additional risks, including the availability of government clearances, export duties, political instability, war, acts of terrorism, currency fluctuations and restrictions on the transfer of funds.  Arrangements with international raw material suppliers are subject to, among other things, FDA and foreign regulatory body regulation, customs clearances, various import duties and other government clearances, as well as potential shipping delays due to inclement weather, political instability, strikes or other matters outside of our control.  Acts of governments outside the U.S. may affect the price or availability of raw materials needed for the development or manufacture of our products.  In addition, changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents.

*Disruption in global trade could prevent us from getting our product to market.*

Allergan relies on global trade channels to supply product to the United States and other countries around the world.   For example, manufacturing of Botox®, Bystolic® and Linzess® is exclusively performed in Ireland, and manufacturing of our Juvederm® dermal filler family of products is exclusively performed in France.  Global trade is subject to certain additional risks, including the availability of government clearances, export duties, political instability, war, acts of terrorism, currency fluctuations and restrictions on the transfer of funds.  For example, we obtain a significant portion of our raw materials from suppliers that are not in the same country as the manufacturing plant that uses them.  Arrangements with international raw material suppliers are subject to, among other things, FDA and other regulatory body regulation, customs clearances, various import duties and other government clearances, as well as potential shipping delays due to inclement weather, political instability, strikes or other matters outside of our control.  Acts of

governments may affect the price or availability of raw materials needed for the development or manufacture of our products.  In addition, recent changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents.

28

*The design, development, manufacture and sale of our products involves the risk of product liability claims by consumers and other third parties, and insurance against such potential claims is expensive and may be difficult to obtain.*

The design, development, manufacture and sale of our products involves an inherent risk of product liability claims and the associated adverse publicity. For example, the Company is subject to approximately 160 legal actions asserting product liability claims relating to the use of Celexa® or Lexapro®. These cases include claims that Celexa® or Lexapro® caused various birth defects. While we believe there is no merit to these cases, litigation is inherently subject to uncertainties and we may be required to expend substantial amounts in the defense or resolution of certain of these matters. We regularly monitor the use of our products for trends or increases in reports of adverse events or product complaints, and regularly report such matters to the FDA. In some, but not all cases, an increase in adverse event reports may be an indication that there has been a change in a product's specifications or efficacy. Such changes could lead to a recall of the product in question or, in some cases, increases in product liability claims related to the product in question. If the coverage limits for product liability insurance policies are not adequate or if certain of our products are excluded from coverage, a claim brought against us, whether covered by insurance or not, could have a material adverse effect on our business, results of operations, financial condition and cash flows. We also rely on self-insurance to cover product liability claims, and these claims may exceed amounts we have reserved under our self-insurance program.

We are also subject to a variety of other types of claims, proceedings, investigations and litigation initiated by government agencies or third parties. These include compliance matters, product regulation or safety, taxes, employee benefit plans, employment discrimination, health and safety, environmental, antitrust, customs, import/export, government contract compliance, financial controls or reporting, intellectual property, allegations of misrepresentation, false claims or false statements, commercial claims, claims regarding promotion of our products and services, or other similar matters. For example, consumer groups and certain plaintiffs have alleged that certain uses of Botox®, including "off-label" uses, have caused patient injuries and death and have further failed to adequately warn patients of the risks relating to Botox® use. From time to time reports related to the quality and safety of breast implant devices are published, including reports that have suggested a possible association between anaplastic large cell lymphoma and breast implants, as well as negative reports from regulatory authorities in Europe related to a breast implant manufacturer that is not affiliated with the Company. In addition, government investigations related to the use of products, but not the efficacy themselves, may cause reputational harm to the Company. Negative publicity, whether accurate or inaccurate, about the efficacy, safety or side effects of our products or product categories, whether involving us or a competitor, could materially reduce market acceptance to our products, cause consumers to seek alternatives to our products, result in product withdrawals and cause our stock price to decline. Negative publicity could also result in an increased number of product liability claims, whether or not these claims have a basis in scientific fact. Any such claims, proceedings, investigations or litigation, regardless of the merits, might result in substantial costs, restrictions on product use or sales, or otherwise injure our business.

### Our business could suffer as a result of manufacturing difficulties or delays.

The manufacture of our pharmaceutical products and product candidates requires precise manufacturing process controls, API that conforms to very tight tolerances for specific characteristics and equipment that operates consistently within narrow performance ranges. Manufacturing complexity, testing requirements, and safety processes combine to increase the overall difficulty of manufacturing these products and resolving manufacturing problems that we may encounter.

Our manufacturing and other processes utilize sophisticated equipment, which sometimes require a significant amount of time to obtain and install. Our business could suffer if certain manufacturing or other equipment, or a portion or all of our facilities were to become inoperable for a period of time. This could occur for various reasons, including catastrophic events such as earthquake, monsoon, hurricane or explosion, unexpected equipment failures or delays in obtaining spare parts, contamination by microorganisms or viruses, labor disputes or shortages, contractual disputes with our suppliers and contract manufacturers, as well as construction delays or defects and other events, both within and outside of our control. We manufacture certain products, including Botox®, our Juvederm® dermal filler family of products, Linzess® and Bystolic®, at a single Allergan facility. Additionally, we expect to continue to rely on our third party manufacturing partners, such as Teva for Lo Loestrin® and Patheon for Viberzi®, that utilize single manufacturing facilities. Therefore, a significant disruptive event at certain manufacturing facilities or sites could materially and adversely affect our business and results of operations as noted with our supply interruption with Avycaz® in 2016. In the event of a disruption, we may need to build or locate replacement facilities as well as seek and obtain the necessary regulatory approvals for these facilities. Our inability to timely manufacture any of our significant products could have a material adverse effect on our results of operations, financial condition and cash flows.

29

Manufacturing processes at Allergan-owned facilities and those of our third party contract manufacturers must undergo a potentially lengthy regulatory approval process by the FDA and/or equivalent agencies in other countries. It can take longer than five years to build, validate and license a new manufacturing plant and it can take longer than three years to qualify and license a new contract manufacturer. If regulatory authorities determine that we or our third party contract manufacturers or certain of our third party service providers have violated regulations or if they restrict, suspend or revoke our prior approvals, they could prohibit us from manufacturing our products or conducting clinical trials or selling our marketed products until we or the affected third party contract manufacturers or third party service providers comply, or indefinitely. Because our third party contract manufacturers and certain of our third party service providers are subject to the FDA and foreign regulatory authorities, alternative qualified third party contract manufacturers and third party service providers may not be available on a timely basis or at all. Although we have launched a global manufacturing business continuity program to reduce the potential for manufacturing difficulties or delays and reduce the severity of a disruptive event, under which program manufacturing sites identify and develop temporary workarounds for manufacturing processes that may be disrupted with the aim of reducing the risk and severity of a disruptive event, there is no guarantee that this program will be successful, and if we or our third party contract manufacturers or third party service providers cease or interrupt production or if our third party contract manufacturers and third party service providers fail to supply materials, products or services to us, we may experience delayed shipments, supply constraints, stock outs and/or recalls of our products.

### *Our business could suffer as a result of failure of our R&D program or the failure of our product pipeline to produce successful products.*

The discovery and development of safe, effective new products, as well as the development of additional uses for existing products, are necessary for the continued strength of our businesses. Our product lines must be replenished over time in order to offset revenue losses when products lose their market exclusivity, as well as to provide for earnings growth. Our growth potential depends in large part on our ability to identify and develop new products or new indications for existing products that address unmet medical needs and receive reimbursement from payers, either through internal R&D or through collaborations, acquisitions, joint ventures or licensing or other arrangements with third parties. However, balancing current growth, investment for future growth and the delivery of shareholder return remains a major challenge. The average costs of product development continue to rise, as do the regulatory requirements in many therapeutic areas, which may affect the number of candidates funded as well as the sustainability of the R&D portfolio. Our ongoing investments in new product introductions and in R&D for new products and existing product extensions could exceed corresponding sales growth.

Additionally, our R&D investment plans and resources may not be correctly matched between science and markets, and failure to invest in the right technology platforms, therapeutic segments, product classes, geographic markets and/or in-licensing and out-licensing opportunities in order to deliver a robust pipeline could adversely impact the productivity of our pipeline. Further, even if the areas with the greatest market attractiveness are identified, the science may not work for any given program despite the significant investment required for R&D, and the commercial potential of the product may not be as competitive as expected because of the highly dynamic market environment and the hurdles in terms of access and reimbursement.

### *Investigations of the calculation of average wholesale prices may adversely affect our business.*

Many government and third-party payers, including Medicare, Medicaid, HMOs and MCOs, have historically reimbursed doctors, pharmacies and others for the purchase of certain prescription drugs based on a drug's average wholesale price ("AWP") or wholesale acquisition cost ("WAC"). In the past several years, state and federal government agencies have conducted ongoing investigations of manufacturers' reporting practices with respect to AWP and WAC, in which they have suggested that reporting of inflated AWPs or WACs has led to excessive payments for prescription drugs. For example, the Company and certain of its subsidiaries, as well as numerous other pharmaceutical companies, have been named as defendants in various state and federal court actions alleging improper or fraudulent practices related to the reporting of AWP and/or WAC of certain products, and other improper acts, in order to increase prices and market shares. Similarly, in December 2015, certain subsidiaries of the Company were named as defendants in a private class action litigation in Pennsylvania based on similar allegations. Additional actions are possible. These actions, if successful, could adversely affect us and may have a material adverse effect on our business, results of operations, financial condition and cash flows.

### *We are subject to U.S. federal and state healthcare fraud and abuse and health information privacy and security laws, and the failure to comply with such laws may adversely affect our business.*

In the United States, many of our products are reimbursed under federal and state health care programs such as Medicaid, Medicare, TriCare, and/or state pharmaceutical assistance programs, and as a result, certain federal and state healthcare laws and regulations pertaining to fraud and abuse and patients' rights are and will be applicable to our business. We could be subject to

healthcare fraud and abuse and patient privacy regulation by both the federal government and the states in which we conduct our business.  The laws that may affect our ability to operate include, but are not limited to:  (i) the U.S. Anti-Kickback Statute, which

30

applies to our marketing and research practices, educational programs, pricing policies and relationships with healthcare providers or other entities, by prohibiting, among other things, soliciting, receiving, offering or paying remuneration, directly or indirectly, to induce, or in return for, either the referral of an individual or the purchase or recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs; (ii) federal civil and criminal false claims laws and civil monetary penalty laws, which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid or other third-party payers that are false or fraudulent; (iii) the U.S. Health Insurance Portability and Accountability Act of 1996, ("HIPAA"), which among other things created new federal criminal statutes that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters, and HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, and its implementing regulations, which imposes certain requirements relating to the privacy, security and transmission of individually identifiable health information and places restrictions on the use of such information for marketing communications; (iv) the U.S. Physician Payments Sunshine Act, which among other things, requires manufacturers of drugs, devices, biologics and medical supplies for which payment is available under a federal healthcare program to report annually information related to "payments or other transfers of value" made to physicians and teaching hospitals, and ownership and investment interests held by certain healthcare professionals and their immediate family members and similar state laws; (v) the government pricing rules applicable to the Medicaid, Medicare Part B, 340B Drug Pricing Program, the U.S. Department of Veterans Affairs program, the TriCare program, and state price reporting laws; and (vi) state and foreign law equivalents of each of the above U.S. laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payer, including commercial insurers, and state and foreign laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways and often are not preempted by HIPAA, thus complicating compliance efforts.  Violations of the fraud and abuse laws may result in severe penalties against Allergan and/or its responsible employees, including jail sentences, large fines, and the exclusion of our products from reimbursement under federal and state programs.  Defense of litigation claims and government investigations can be costly, time-consuming, and distract management, and it is possible that Allergan could incur judgments or enter into settlements that would require us to change the way we operate our business.  We are committed to conducting the sales and marketing of our products in compliance with the healthcare fraud and abuse laws, but certain applicable laws may impose liability even in the absence of specific intent to defraud.  Furthermore, should there be ambiguity, a governmental authority may take a position contrary to a position we have taken, or should an employee violate these laws without our knowledge, a governmental authority may impose civil and/or criminal sanctions.

Any adverse outcome in these types of actions, or the imposition of penalties or sanctions for failing to comply with the fraud and abuse laws, could adversely affect us and may have a material adverse effect on our business, results of operations, financial condition and cash flows.  Some of the statutes and regulations that govern our activities, such as federal and state anti-kickback and false claims laws, are broad in scope, and while exemptions and safe harbors protecting certain common activities exist, they are often narrowly drawn.  While we manage our business activities to comply with these statutory provisions, due to their breadth, complexity and, in certain cases, uncertainty of application, it is possible that our activities could be subject to challenge by various government agencies.  In particular, the FDA, the U.S. Department of Justice and other agencies are engaged in enforcement activities with respect to the sales, marketing, research and similar activities of pharmaceutical companies, and many pharmaceutical companies have been subject to government investigations related to these practices.  A determination that we are in violation of these and/or other government regulations and legal requirements may result in civil damages and penalties, criminal fines and prosecution, administrative remedies, the recall of products, the total or partial suspension of manufacture and/or distribution, seizure of products, injunctions, whistleblower lawsuits, failure to obtain approval of pending product applications, withdrawal of existing product approvals, exclusion from participation in government healthcare programs and other sanctions.

Allergan is also currently responding to subpoenas seeking information relating to its sales and marketing activities, including payments to people who are in a position to recommend drugs and "off-label" promotion and the Company is defending litigations based on similar allegations.  Refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" for more information.  We cannot predict or determine the impact of these inquiries on our future financial condition or results of operations.  These investigations and any other threatened or actual government enforcement action could also generate adverse publicity and require that we devote substantial resources that could be used productively on other aspects of our business.

Additionally, the Company has been named as a defendant in approximately 290 matters relating to the promotion and sale of prescription opioid pain relievers and additional suits may be filed. Refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" for more information.  We cannot predict or determine the impact of these suits on our future financial condition or results of operations.  These suits and any other threatened or actual suits could also generate adverse publicity and require that we devote substantial resources that could be used productively on other aspects of our business.

10/24/2018

agn-10k_20171231.htm

31

Any of these types of investigations, suits, or enforcement actions could affect our ability to commercially distribute our products and could materially and adversely affect our business, financial condition, results of operations and cash flows.

***Changes in data privacy and protection laws and regulations, particularly in Europe, or any failure to comply with such laws and regulations, could adversely affect our business and financial results.***

We are subject to a variety of continuously evolving and developing laws and regulations globally regarding privacy, data protection, and data security, including those related to the collection, storage, handling, use, disclosure, transfer, and security of personal data. Significant uncertainty exists as privacy and data protection laws may be interpreted and applied differently from country to country and may create inconsistent or conflicting requirements. These laws apply to transfers of information among our affiliates, as well as to transactions we enter into with third party vendors. For example, the European Union adopted a comprehensive General Data Privacy Regulation (GDPR) in May 2016 that will replace the current EU Data Protection Directive and related country-specific legislation. The GDPR will become fully effective in May 2018, and requires companies to satisfy new requirements regarding the handling of personal and sensitive data, including its use, protection and the ability of persons whose data is stored to correct or delete such data about themselves. Failure to comply with GDPR requirements could result in penalties of up to 4% of worldwide revenue. Complying with the enhanced obligations imposed by the GDPR may result in significant costs to our business and require us to revise certain of our business practices. In addition, legislators and regulators in the U.S. are proposing new and more robust cybersecurity rules in light of the recent broad-based cyberattacks at a number of companies.

These and similar initiatives around the world could increase the cost of developing, implementing or securing our servers and require us to allocate more resources to improved technologies, adding to our IT and compliance costs. In addition, enforcement actions and investigations by regulatory authorities related to data security incidents and privacy violations continue to increase. The enactment of more restrictive laws, rules, regulations, or future enforcement actions or investigations could impact us through increased costs or restrictions on our business, and noncompliance could result in regulatory penalties and significant legal liability.

***Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities.***

All pharmaceutical companies, including Allergan, are subject to extensive, complex, costly and evolving government regulation. For the U.S., this is principally administered by the FDA, but is also administered by the DEA and state government agencies, as well as by varying regulatory agencies in foreign countries where products or product candidates are being manufactured and/or marketed. The Federal Food, Drug and Cosmetic Act, the Controlled Substances Act and other federal statutes and regulations, and similar foreign statutes and regulations, govern or influence the development, testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale, distribution and import/ export of our products. Foreign regulatory authorities impose similar requirements focused on drug safety and effectiveness. Obtaining and maintaining regulatory approval has been and will continue to be increasingly difficult, time-consuming and costly. In addition, changes in applicable federal, state and foreign laws and regulations or the implementation of new laws and regulations could affect our ability to obtain or maintain approval of our products and could have a material adverse effect on the Company's business. There is currently the potential for regulatory changes adverse to our business due to recent uncertainty related to the direction of U.S. regulatory policy related to the pharmaceutical industry.

Once regulatory approval has been obtained, agencies continue to have substantial authority to require additional testing, perform inspections, change product labeling based on post-marketing safety information or mandate withdrawals of our products. Failure to comply with applicable regulatory requirements may subject us to administrative or judicially-imposed sanctions. These sanctions may include, among others, untitled letters, warning letters, fines, civil penalties, criminal penalties, injunctions, debarment, product seizure or detention, product recalls and total or partial suspension of production, sale and promotion. In addition, we may voluntarily elect to recall or restrict the use of a product. Any recall or restriction could divert managerial and financial resources and might harm our reputation.

Under these statutes and regulations, we are subject to periodic inspection of our facilities, procedures and operations and/or the testing of our products by the FDA and similar ex-U.S. authorities, the DEA and other authorities, which conduct periodic inspections to confirm that we are in compliance with all applicable requirements. In addition, the FDA and foreign regulatory agencies conduct pre-approval and post-approval reviews and plant inspections to determine whether our systems and processes are in compliance with cGMP and other regulations. Following such inspections, the FDA or other agency may issue observations, notices, citations and/or warning letters that could cause us to modify certain activities identified during the inspection. FDA guidelines specify that a warning letter is issued only for violations of "regulatory significance" for which the failure to adequately and promptly achieve correction may be expected to result in an enforcement action. We are also required to report adverse events associated with our products to the FDA

agn-10k_20171231.htm

and other regulatory authorities. Unexpected or serious health or safety concerns could result in product liability claims, labeling changes, recalls, market withdrawals or other regulatory actions, including withdrawal of product approvals. Adverse events and

32

safety concerns can arise as our product candidates are evaluated in clinical trials or as our marketed products are used in clinical practice. We are required to communicate to regulatory agencies adverse events reported to us regarding our products.

We cannot assure that the FDA inspections at any of our manufacturing sites will not result in inspectional observations at such sites, that approval of any of the pending or subsequently submitted NDAs or supplements to such applications by Allergan plc or our subsidiaries will be granted or that the FDA will not seek to impose additional sanctions against Allergan plc or any of its subsidiaries. The range of possible sanctions includes, among others, FDA issuance of product recalls or seizures, fines, total or partial suspension of production and/or distribution, suspension of the FDA's review of product applications, enforcement actions, injunctions, and civil or criminal prosecution. Any such sanctions, if imposed, could have a material adverse effect on our business, operating results, financial condition and cash flows. Under certain circumstances, the FDA also has the authority to revoke previously granted drug approvals. Similar sanctions as detailed above may be available to the FDA under a consent decree, depending upon the actual terms of such decree. Although we have instituted internal compliance programs, if these programs do not meet regulatory agency standards or if compliance is deemed deficient in any significant way, it could materially harm our business. Certain of our vendors are subject to similar regulation and periodic inspections and may be operating under consent decrees.

In order to market our products in the United States and other jurisdictions, we must obtain separate regulatory approvals and comply with numerous and varying regulatory requirements required for approval as well as maintaining registrations post-approval in every country where our products are approved. The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming, uncertain and costly, and we cannot predict the extent to which we may be affected by legislative and regulatory requirement changes. We are dependent on receiving FDA and other governmental or third-party approvals prior to manufacturing, marketing and distributing our products. There is always the chance that we will not obtain FDA or other necessary approvals, or that the rate, timing and cost of obtaining such approvals, will adversely affect our product introduction plans or impactoperations. Additionally, any regulatory approvals we receive may be subject to limitations on the approved indicated uses for which the product may be marketed or the conditions of approval may require costly additional studies and additional safety surveillance of the product. We may only market or promote our products for their approved indications, and our labeling, promotional activities and advertising are subject to extensive regulation and oversight. We carry inventories of certain product(s) in anticipation of launch, and if such product(s) are not subsequently launched, we may be required to write-off the related inventory.

Our customers are subject to various regulatory requirements, including requirements of the DEA, FDA, state boards of pharmacy and city and county health regulators, among others. These include licensing, registration, recordkeeping, security and reporting requirements. Additionally, although physicians may prescribe FDA approved products for an "off label" indication, we are permitted to market our products only for the indications for which they have been approved. Some of our products are prescribed "off label" and the FDA, the U.S. Department of Justice, the U.S. Attorney or other regulatory authorities could take enforcement actions if they conclude that we or our distributors have engaged in "off label" marketing. In addition, historically a number of states and the federal government have enforced licensing and anti-counterfeit drug pedigree laws which require the tracking of all transactions involving prescription drugs beginning with the manufacturer, through the supply chain, and down to the pharmacy or other health care provider dispensing or administering prescription drug products. Therefore, manufacturers and wholesale distributors have been required to maintain records documenting the chain of custody on distribution of prescription drugs. On November 27, 2013, the federal government enacted the Drug Quality and Security Act ("DQSA") amending federal requirements in regard to the licensing and tracking of prescription drugs. Certain provisions in the law related to licensing and tracking and tracing specifically preempted prior state laws related to drug pedigrees that are inconsistent, more stringent, or in addition to the federal law. Specifically, Title II of the DQSA, also known as the Drug Supply Chain Security Act ("DSCSA"), provides for creation of an electronic, interoperable system to identify and trace certain prescription drugs as they are distributed in the United States. These amendments include requirements on licensing, tracking and tracing and other operations applicable to manufacturers and wholesale distributors of prescription drug products. The full requirements of the DSCSA are being phased in over a ten-year period; however, in January 2015, specific product tracing requirements for manufacturers, wholesalers, repackagers and dispensers (e.g., pharmacies) of prescription drugs became effective. Also, as of January 2015, the DSCSA required manufacturers and wholesale distributors to implement systems to identify potential "suspect" or "illegitimate" product, and take appropriate action. The DSCSA also addresses product tracing using unique product identifiers on packaging, and requirements for standardized numerical identifiers which will take effect in the future.

In addition to government agencies that promulgate regulations and guidelines directly applicable to us, other professional societies, practice management groups, insurance carriers, physicians, private health or science foundations and organizations involved in various diseases from time to time may also publish guidelines or recommendations to healthcare providers, administrators and payers, and patient communities. For example, the treatment practices of physicians that currently prescribe our products may change. Recommendations by government agencies or other groups and organizations may relate to such matters as usage, dosage, route of administration and use of related therapies, as well as reimbursement of our products by government and private payers. Any

33

recommendations or guidelines that result in decreased use, dosage or reimbursement of our products could materially and adversely affect our product sales, business and operating results.

### *The supply of APIs into Europe may be negatively affected by recent regulations promulgated by the European Union.*

All APIs imported into the EU must be certified as complying with the good manufacturing practice standards established by the EU, as stipulated by the International Conference for Harmonization. These regulations place the certification requirement on the regulatory bodies of the exporting countries. Accordingly, the national regulatory authorities of each exporting country must: (i) ensure that all manufacturing plants within their borders that export API into the EU comply with EU manufacturing standards and; (ii) for each API exported, present a written document confirming that the exporting plant conforms to EU manufacturing standards. The imposition of this responsibility on the governments of the nations exporting API may cause a shortage of API necessary to manufacture our products, as certain governments may not be willing or able to comply with the requirement in a timely fashion, or at all. A shortage in API may cause us to have to cease manufacture of certain products, or to incur costs and delays to qualify other suppliers to substitute for those API manufacturers unable to export. This could adversely affect the Company and could have a material adverse effect on our business, results of operations, financial condition and cash flow.

### *Federal regulation of arrangements between manufacturers of branded and generic products could adversely affect our business.*

As part of the Medicare Prescription Drug and Modernization Act of 2003, companies are required to file with the FTC and the Department of Justice certain types of agreements entered into between branded and generic pharmaceutical companies related to the manufacture, marketing and sale of generic versions of branded drugs. This requirement, as well as legislation pending in the U.S. Congress related to settlements between brand and generic drug manufacturers, could affect the manner in which brand drug manufacturers resolve intellectual property litigation and other disputes with generic pharmaceutical companies and could result generally in an increase or lengthening of litigation against pharmaceutical companies or additional investigations or proceedings by the FTC or other governmental authorities. The impact of this requirement, the pending legislation and the potential private-party lawsuits associated with arrangements between brand and generic drug manufacturers, is uncertain and could adversely affect our business. For example, on April 5, 2013, class actions were filed against Warner Chilcott plc and certain affiliates alleging that its 2009 patent lawsuit settlements with Watson Laboratories, Inc. and Lupin Pharmaceuticals, Inc. related to Loestrin® 24 Fe (norethindrone acetate/ethinyl estradiol tablets and ferrous fumarate tablets, "Loestrin® 24") are unlawful. The complaints generally allege that Watson and Lupin improperly delayed launching generic versions of Loestrin® 24 in exchange for substantial payments from Warner Chilcott in violation of federal and state antitrust and consumer protection laws. Similar lawsuits have been filed against the Company challenging the lawfulness of patent litigation settlements related to Asacol® and Namenda®. We have also received requests for information and Statements of Objection in connection with investigations into settlements and other arrangements between competing pharmaceutical companies by the Federal Trade Commission and the European Competition Commission. For example, in May 2014, Forest received a Civil Investigatory Demand from the FTC requesting information about Forest's agreements with ANDA filers for Bystolic®. Any adverse outcome of these actions or investigations, or actions or investigations related to other settlements we have entered into, could have a material adverse effect on our business, results of operations, financial condition and cash flows. Refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements."

### *Healthcare reform and a reduction in the coverage and reimbursement levels by governmental authorities, HMOs, MCOs or other third-party payers may adversely affect our business.*

Demand for our products depends in part on the extent to which coverage and reimbursement is available from third-party payers, such as the Medicare and Medicaid programs and private payers. In order to commercialize our products, we have obtained from government authorities and private health insurers and other organizations, such as HMOs and MCOs, recognition for coverage and reimbursement at varying levels for the cost of certain of our products and related treatments. Third-party payers increasingly challenge pricing of pharmaceutical products. Further, the trend toward managed healthcare in the U.S., the growth of organizations such as HMOs and MCOs and legislative proposals to reform healthcare and government insurance programs create uncertainties regarding the future levels of coverage and reimbursement for pharmaceutical products. Such cost containment measures and healthcare reform could reduce reimbursement of our pharmaceutical products, resulting in lower prices and a reduction in the product demand. This could affect our ability to sell our products and could have a material adverse effect on our business, results of operations, financial condition and cash flows.

There have been changes in reimbursement for pharmaceuticals under various government programs, including Medicaid, and there is uncertainty surrounding implementation of legislation and regulatory changes relating to reimbursement for pharmaceuticals under Medicaid and other government programs such as Medicare and TriCare. Reimbursement changes under such government

agn-10k_20171231.htm

programs may impact demand for our products and may negatively affect the price. In addition, any reimbursement granted may not be maintained or limits on reimbursement available from third-party payers may reduce demand for, or negatively affect the price of,

34

those products.  Additionally, various legislative and regulatory initiatives in states, including proposed modifications to reimbursements and rebates, price transparency laws, product pedigree and tracking, pharmaceutical waste "take back" initiatives, restrictions on co-pay assistance programs and therapeutic category generic substitution carve out legislation may also have a negative impact on the Company.  We maintain a full-time government affairs department in Washington, D.C., which is responsible for coordinating state and federal legislative activities, and places a major emphasis in terms of management time and resources to ensure a fair and balanced legislative and regulatory arena.

Although the ACA reforms have significantly impacted our business, in the coming years, it is likely that additional changes  will be made to governmental healthcare and insurance reimbursement programs. On January 20, 2017, President Donald Trump signed an executive order, which stated that it is the policy of his Administration to seek the prompt repeal of the ACA and directed executive departments and federal agencies to waive, defer, grant exemptions from, or delay the implementation of the provisions of the ACA to the maximum extent permitted by law. The Trump Administration has also issued numerous executive orders, including a "regulatory freeze" order issued on January 20, 2017 that temporarily postpones by 60 days the effective date of regulations that have not yet taken effect (subject to certain limitations) and a "one in, two out" executive order issued on January 30, 2017 that requires two rules be "identified for elimination" for every new one proposed. There is uncertainty with respect to the timing of any potential changes, to coverage and reimbursement for healthcare items and services covered by plans that were authorized by the ACA. We cannot predict the ultimate content, timing or effect of any such reform on our business. Additionally, the pricing and reimbursement of pharmaceutical products have recently received the attention of U.S. policymakers, the Trump Administration, and others. At this time, we cannot predict the impact of this increased scrutiny on the pricing or reimbursement of our products or pharmaceutical products generally.

***Sales of our products may continue to be adversely affected by the continuing consolidation of our distribution network and the concentration of our customer base.***

Our principal customers are wholesale drug distributors and major retail drug store chains.  These customers comprise a significant part of the distribution network for pharmaceutical products in the United States.  This distribution network is continuing to undergo significant consolidation marked by mergers and acquisitions among wholesale distributors and the growth of large retail drug store chains.  As a result, a small number of large wholesale distributors and large chain drug stores control a significant share of the market.  We expect that consolidation of drug wholesalers and retailers will increase pricing and other competitive pressures on drug manufacturers, including the Company.

The loss of any of these customers could have a material adverse effect on our business, results of operations, financial condition and cash flows.  In addition, none of our customers are party to any long-term supply agreements with us, and thus are able to change suppliers freely should they wish to do so.

***Developments after a product reaches the market may adversely affect sales of our products.***

Even after regulatory approval, certain developments may decrease demand for our products, including the following:

*   the re-review of products that are already marketed;
*   new scientific information and evolution of scientific theories;
*   the recall or loss of marketing approval of products that are already marketed;
*   changing government standards or public expectations regarding safety, efficacy or labeling changes; and
*   greater scrutiny in advertising and promotion.

In the past, clinical trials and post-marketing surveillance of certain marketed drugs of the Company and of competitors within the industry have raised concerns that have led to recalls, withdrawals or adverse labeling of marketed products.  If previously unknown side effects are discovered or if there is an increase in negative publicity regarding known side effects of any of our products, it could significantly reduce demand for the product or require us to take actions that could negatively affect sales, including removing the product from the market, restricting its distribution or applying for labeling changes.

In addition, certain health authorities, regulators and agencies have increased their focus on safety when assessing the balance of benefits and risks of drugs.  Some health authorities appear to have become more cautious when making decisions about approvability of new products and are re-reviewing select products that are already marketed, adding further to the uncertainties in the regulatory processes.  There is also greater regulatory scrutiny, especially in the U.S., on advertising, and promotion (in particular, direct-to-consumer advertising) and pricing of pharmaceutical products.  Certain regulatory changes or decisions could make it more

difficult for us to sell our products and could have a material adverse effect on our business, results of operations, financial condition and cash flows.

*If we do not successfully integrate newly acquired businesses into our business operations, our business could be adversely affected.*

We will need to successfully integrate the operations of recently and pending acquired businesses, including LifeCell and Zeltiq, with our business operations. As a result of these and other recent and any other future or pending acquisitions, we have undergone substantial changes in a short period of time and our business has changed and broadened in size and the scope of products we offer. Integrating the operations of multiple new businesses with that of our own is a complex, costly and time-consuming process, which requires significant management attention and resources to integrate the business practice and operations. The integration process may disrupt the businesses and, if implemented ineffectively, would preclude realization of the full benefits expected by us. Our failure to meet the challenges involved in integrating the businesses in order to realize the anticipated benefits of the acquisitions could cause an interruption of, or a loss of momentum in, our activities and could adversely affect our results of operations. Prior to each acquisition, the acquired business operated independently, with its own business, corporate culture, locations, employees and systems. There may be substantial difficulties, costs and delays involved in any integration of other businesses with that of our own.

These may include:

- distracting management from day-to-day operations;
- potential incompatibility of corporate cultures;
- an inability to achieve synergies as planned;
- risks associated with the assumption of contingent or other liabilities of acquisition targets;
- adverse effects on existing business relationships with suppliers or customers;
- inheriting and uncovering previously unknown issues, problems and costs from the acquired company;
- delays between our expenditures to acquire new products, technologies or businesses and the generation of revenues from those acquired products, technologies or businesses;
- realization of assets and settlement of liabilities at amounts equal to estimated fair value as of the acquisition date of any acquisition or disposition;
- revenue recognition related to licensing agreements and/or strategic collaborations;
- costs and delays in implementing common systems and procedures (including technology, compliance programs, financial systems, distribution and general business operations, among others); and
- increased difficulties in managing our business due to the addition of international locations.

These risks may be heightened in cases where the majority of the former businesses' operations, employees and customers are located outside of the United States. Any one or all of these factors may increase operating costs or lower anticipated financial performance. Many of these factors are also outside of our control. In addition, dispositions of certain key products, technologies and other rights may affect our business operations.

In addition, even if the operations of the businesses are integrated successfully, we may not realize the full benefits of the acquisitions, including the synergies, cost savings or sales or growth opportunities that we expect. These benefits may not be achieved within the anticipated time frames, or at all. Additional unanticipated costs may be incurred in the integration of the businesses. All of these factors could cause a reduction to our earnings, decrease or delay the expected accretive effect of the transactions, and negatively impact the price of our ordinary shares.

The failure to integrate the business operations of the acquired businesses successfully would have a material adverse effect on our business, financial condition and results of operations.

*Any acquisitions of businesses, technologies, or products or other significant transactions could adversely affect our relationships with employees, vendors or key customers.*

We regularly review potential acquisitions of technologies, products and businesses complementary to our business. Acquisitions typically entail many risks and could result in difficulties in integrating operations, personnel, technologies and products.

Refer to "If we do not successfully integrate newly acquired businesses into our business operations, our business could be adversely affected." In connection with acquisitions, we could experience disruption in our business, technology and information systems, financial systems, vendors customer or employee base, including diversion of management's attention from our continuing operations, among others. Refer to "Certain aspects of our operations are highly dependent upon third-party service providers." There is also a risk that key employees of companies that we acquire or key employees necessary to successfully commercialize technologies and products that we acquire may seek employment elsewhere, including with our competitors. Furthermore, there may be overlap between our products or customers and the companies that we acquire that may create conflicts in relationships or other commitments detrimental to the integrated businesses.

*If we are unsuccessful in our joint ventures and other collaborations, our operating results could suffer.*

We have made substantial investments in joint ventures and other collaborations, and may use these and other methods to develop or commercialize products in the future. These arrangements typically involve other pharmaceutical companies as partners that may be competitors of ours in certain markets. In many instances, we will not control these joint ventures or collaborations or the commercial exploitation of the licensed products, and cannot assure you that these ventures will be profitable. Joint venture agreements may place limitations or restrictions on marketing our products. Any such marketing restrictions could affect future revenues and have a material adverse effect on our operations. Our results of operations may suffer if existing joint venture or collaboration partners withdraw, or if these products are not timely developed, approved or successfully commercialized and we cannot guarantee the successful outcome of such efforts, nor that they will result in any intellectual property rights or products that inure to our benefit.

*We have incurred and will continue to incur significant transaction, integration and restructuring costs in connection with recent transactions, including our acquisitions of Zeltiq, LifeCell, and the sale of our generics business and certain other assets to Teva.*

We have incurred significant transaction costs related to our acquisitions such as Zeltiq, LifeCell, and the sale of our generics business and certain other assets to Teva and may continue to incur significant transaction costs related to past acquisitions. In addition, we may incur integration costs and restructuring costs as we integrate new businesses. While Allergan has assumed that a certain level of transaction and coordination expenses will be incurred, there are a number of factors beyond Allergan's control that could affect the total amount or the timing of these transaction and coordination expenses. Many of the expenses that will be incurred, by their nature, are difficult to estimate accurately. Although we expect that the realization of benefits and efficiencies related to the integration of the businesses may offset these transaction costs, integration costs and restructuring costs over time, no assurances can be made that this net benefit will be achieved in the near term, or at all. The failure to realize the expected benefits and efficiencies related to the integration of the businesses could adversely affect our financial condition and results of operations.

In addition, as a result of acquiring businesses, technologies or products, or entering into other significant transactions, we may experience significant charges to earnings for merger and related expenses. These costs may include substantial fees for investment bankers, attorneys, accountants, advisors, consultants and severance and other closure costs associated with regulator-mandated divestitures and the elimination of duplicate or discontinued products, operations and facilities. Charges that we may incur in connection with acquisitions could adversely affect our results of operations for particular quarterly or annual periods.

*Our operating results and financial condition may fluctuate.*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons. As a result, we believe that period-to-period comparisons of our results of operations are not necessarily meaningful, and these comparisons should not be relied upon as an indication of future performance. Our operating results and financial condition are also subject to fluctuation from all of the risks described throughout this section. These fluctuations may adversely affect our results of operations and financial conditions.

*Our debt and other financial obligations could impair our financial condition and our ability to fulfill our debt obligations. Any refinancing of this debt could be at significantly higher interest rates.*

Our indebtedness and other financial obligations could:

- impair our ability to obtain financing or additional debt in the future for working capital, capital expenditures, acquisitions or general corporate purposes;

- impair our ability to access capital and credit markets on terms that are favorable to us;

- have a material adverse effect on us if we fail to comply with financial and affirmative and restrictive covenants in our debt agreements and an event of default occurs as a result of a failure that is not cured or waived;

- require us to dedicate a substantial portion of our cash flow for interest payments on our indebtedness and other financial obligations, thereby reducing the availability of our cash flow to fund working capital and capital expenditures;

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate; and

- place us at a competitive disadvantage compared to our competitors that have proportionally less debt.

Additionally, certain of our financing agreements may contain cross-default or other similar provisions whereby a default under one financing agreement could result in a default under our other financing agreements.

If we are unable to meet our debt service obligations and other financial obligations such as planned dividends, we could be forced to restructure or refinance our indebtedness and other financial transactions, seek additional equity capital or sell our assets. We might then be unable to obtain such financing or capital or sell our assets on satisfactory terms, if at all. Any refinancing of our indebtedness could be at significantly higher interest rates, and/or incur significant transaction fees. Refer to "NOTE 16 — Long-Term Debt and Capital Leases" for a detailed discussion of our outstanding indebtedness.

### *Significant balances of intangible assets, including product rights and goodwill acquired, are subject to impairment testing and may result in impairment charges, which will adversely affect our results of operations and financial condition.*

A significant amount of our total assets is related to acquired intangibles and goodwill. As of December 31, 2017, the carrying value of our product rights and other intangible assets was $54,648.3 million and the carrying value of our goodwill was $49,862.9 million.

Our product rights are stated at cost, less accumulated amortization. We determine original fair value and amortization periods for product rights based on our assessment of various factors impacting estimated useful lives and cash flows of the acquired products. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues and contractual terms. Significant adverse changes to any of these factors require us to perform an impairment test on the affected asset and, if evidence of impairment exists, require us to take an impairment charge with respect to the asset. For assets that are not impaired, we may adjust the remaining useful lives. Such a charge could have a material adverse effect on our results of operations and financial condition.

Our other significant intangible assets include acquired core technology and customer relationships, which are intangible assets with definite lives, and our acquired IPR&D intangible products, acquired in recent business acquisitions, which are intangible assets with indefinite lives.

Our acquired core technology and customer relationship intangible assets are stated at cost, less accumulated amortization. We determined the original fair value of our other intangible assets by performing a discounted cash flow analysis, which is based on our assessment of various factors. Such factors include existing operating margins, the number of existing and potential competitors, product pricing patterns, product market share analysis, product approval and launch dates, the effects of competition, customer attrition rates, consolidation within the industry and generic product lifecycle estimates. Our other intangible assets with definite lives are tested for impairment when there are significant changes to any of these factors. If evidence of impairment exists, we are required to take an impairment charge with respect to the impaired asset. Such a charge could have a material adverse effect on our results of operations and financial condition.

Goodwill and our IPR&D intangible assets are tested for impairment annually, or when events occur or circumstances change that could potentially reduce the fair value of the reporting unit or intangible asset. Impairment testing compares the fair value of the reporting unit or intangible asset to its carrying amount. A goodwill or IPR&D impairment, if any, would be recorded in operating income and could have a material adverse effect on our results of operations and financial condition.

### *We may need to raise additional funds in the future which may not be available on acceptable terms or at all.*

We may consider issuing additional debt or equity securities in the future to fund potential acquisitions or investments, to refinance existing debt, or for general corporate purposes. If we issue equity, convertible preferred equity or convertible debt securities to raise additional funds, our existing shareholders may experience dilution, and the new equity or debt securities may have rights, preferences and privileges senior to those of our existing shareholders. If we incur additional debt, it may increase our leverage relative to our earnings or to our equity capitalization, requiring us to pay additional interest expenses and potentially lowering our credit ratings. We may not be able to market such issuances on favorable terms, or at all, in which case, we may not be able to develop or enhance our products, execute our business plan, take advantage of future opportunities, or respond to competitive pressures or unanticipated customer requirements.

*The loss of our key personnel could cause our business to suffer.*

The success of our present and future operations will depend, to a significant extent, upon the experience, abilities and continued services of key personnel. For example, although we have other senior management personnel, a significant loss of the services of Brent Saunders, our Chief Executive Officer, or other senior executive officers without having or hiring a suitable successor, could cause our business to suffer. We cannot assure you that we will be able to attract and retain key personnel. We have entered into employment agreements with certain of our senior executive officers but such agreements do not guarantee that our senior executive officers will remain employed by us for a significant period of time, or at all. We do not carry key-employee life insurance on any of our officers.

*Substantial amounts of our information concerning our products, customers, employees and ongoing business are stored digitally and are subject to threats of theft, exposure, tampering, or other intrusions.*

We collect and maintain information in digital form that is necessary to conduct our business, and we are increasingly dependent upon information technology systems, devices, infrastructure and data. This digital information includes, but is not limited to, confidential and proprietary information as well as personal information regarding our customers and employees. We also rely to a large extent upon sophisticated information technology systems to operate our businesses. Data maintained in digital form is subject to the risk of intrusion, exposure, tampering and theft. Cyber attacks are increasing in frequency, sophistication and intensity. Such attacks are made by groups and individuals with a wide range of motives (including, but not limited to, industrial espionage) and expertise, including organized criminal groups, "hacktivists," nation-states and others. Cyber attacks could include the deployment of harmful malware, denial of service attacks, worms, social engineering and other means to affect service reliability and threaten data confidentiality, integrity and availability. We have established physical, electronic, and organizational measures to safeguard and secure our systems to prevent a data compromise, and rely on commercially available systems, software, tools, and monitoring to provide security for the processing, transmission and storage of digital information. However, the development and maintenance of these systems is costly and requires ongoing monitoring and updating as technologies change and efforts to overcome security measures become increasingly more sophisticated. Despite our efforts, the possibility of a future data compromise cannot be eliminated entirely, and risks associated with intrusion, exposure, tampering, and theft remain. We maintain cyber liability insurance; however, this insurance may not be sufficient to cover the financial, legal, business or reputational losses that may result from an interruption or breach of our systems. Data privacy or security breaches by employees or others may pose a risk that data, including intellectual property or personal information, may be exposed to unauthorized individuals or to the public. In addition, we provide confidential, proprietary and personal information to third parties when it is necessary to pursue our business objectives. While we obtain assurances that these third parties will protect this information and, where appropriate, monitor the protections employed by these third parties, there is a risk the confidentiality of data held by third parties may be compromised. If our data systems are compromised, our business operations may be impaired, we may lose profitable opportunities or the value of those opportunities may be diminished, and we may lose revenue because of unlicensed use of our intellectual property. If personal information of our customers or employees is misappropriated, our reputation with our customers and employees may be injured resulting in loss of business and/or morale, and we may incur costs to remediate possible injury to our customers and employees or be required to pay fines or take other action with respect to judicial or regulatory actions arising out of such incidents.

*Our business will continue to expose us to risks of environmental liabilities.*

Our product and API development programs, manufacturing processes and distribution logistics involve the controlled use of hazardous materials, chemicals and toxic compounds in our owned and leased facilities. As a result, we are subject to numerous and increasingly stringent federal, state and local environmental laws and regulations concerning, among other things, the generation, handling, storage, transportation, treatment and disposal of toxic and hazardous materials and the discharge of pollutants into the air and water. Our programs and processes expose us to risks that an accidental contamination could result in (i) our noncompliance with such environmental laws and regulations and (ii) regulatory enforcement actions or claims for personal injury and property damage against us. If an accident or environmental discharge occurs, or if we discover contamination caused by prior operations, including by prior owners and operators of properties we acquire, we could be liable for cleanup obligations, damages and fines. The substantial unexpected costs we may incur could have a material and adverse effect on our business, results of operations, financial condition, and cash flows. In addition, environmental permits and controls are required for some of our operations, and these permits are subject to modification, renewal and revocation by the issuing authorities. Any modification, revocation or non-renewal of our environmental permits could have a material adverse effect on our ongoing operations, business and financial condition. Our environmental capital expenditures and costs for environmental compliance may increase in the future as a result of changes in environmental laws and regulations or increased development or manufacturing activities at any of our facilities.

39

*Our foreign operations may become less attractive if political and diplomatic relations between the United States and any country where we conduct business operations deteriorates.*

The relationship between the United States and the foreign countries where we conduct business operations may weaken over time. Changes in the state of the relations between any such country and the United States are difficult to predict and could adversely affect our future operations. This could lead to a decline in our profitability. Any meaningful deterioration of the political, economic and diplomatic relations between the United States and the relevant country could have a material adverse effect on our operations.

*Our global operations expose us to risks and challenges associated with conducting business internationally.*

We operate on a global basis with offices or activities in Europe, Africa, Asia, South America, Australia and North America. We face several risks inherent in conducting business internationally, including compliance with international and U.S. laws and regulations that apply to our international operations. These laws and regulations include data privacy requirements; labor relations laws; tax laws; competition regulations; import and trade restrictions; economic sanctions; export requirements; U.S. laws such as the Foreign Corrupt Practices Act; the UK Bribery Act 2010; and other local laws that prohibit corrupt payments to governmental officials or certain payments or remunerations to customers. Given the high level of complexity of these laws there is a risk that some provisions may be breached by us, for example through fraudulent or negligent behavior of individual employees, our failure to comply with certain formal documentation requirements, or otherwise. Violations of these laws and regulations could result in fines, criminal sanctions against us, our officers or our employees, requirements to obtain export licenses, cessation of business activities in sanctioned countries, implementation of compliance programs, and prohibitions on the conduct of our business. Any such violations could include prohibitions on our ability to offer our products in one or more countries and could materially damage our reputation, our brand, our international expansion efforts, our ability to attract and retain employees, our business and our operating results. Our success depends, in part, on our ability to anticipate these risks and manage these challenges. Further, certain of our employees, including employees located in certain jurisdictions in Canada, Europe and Asia, are represented by collective bargaining or other labor agreements or arrangements that provide bargaining or other rights to employees. Such employment rights require us to expend greater time and expense in making changes to employees' terms of employment or carrying out staff reductions. In addition, any national or other labor disputes in these regions could result in a work stoppage or strike by our employees that could delay or interrupt our ability to supply products and conduct operations. Due to the nature of these collective bargaining agreements, we will have no control over such work stoppages or strikes by such employees, and a strike may occur even if the employees do not have any grievances against us. Any interruption in manufacturing or operations could interfere with our business and could have a material adverse effect on our revenues.

In addition to the foregoing, engaging in international business inherently involves a number of other difficulties and risks, including:

- longer payment cycles and difficulties in enforcing agreements and collecting receivables through certain foreign legal systems;

- political and economic instability or sanctions in areas in which we operate;

- potentially adverse tax consequences, tariffs, customs charges, bureaucratic requirements and other trade barriers;

- regulations related to customs and import/export matters (including sanctions);

- tax issues, such as tax law changes and variations in tax laws;

- challenges in collecting accounts receivable from customers in the jurisdictions in which we operate;

- complying with laws, rules and regulations relating to the manufacturing, marketing, distribution and sale of pharmaceutical products in the jurisdictions in which we do or will operate;

- operating under regulations in jurisdictions related to obtaining eligibility for government or private payor reimbursement for our products at the wholesale/retail level;

- competition from local, regional and international competitors;

- difficulties and costs of staffing and managing foreign operations, including cultural and language differences and additional employment regulations, union workforce negotiations and potential disputes in the jurisdictions in which we operate;

- difficulties associated with compliance with a variety of laws and regulations governing international trade, including the Foreign Corrupt Practices Act;

40

- difficulties protecting or procuring intellectual property rights; and
- fluctuations in foreign currency exchange rates.

These factors or any combination of these factors could have a material adverse effect on our results of operations and financial condition.

### *Our ordinary share dividend policy is subject to change and could adversely affect the price of our ordinary shares.*

Our ordinary share dividend policy is based upon our Board of Directors' current assessment of our business and the environment in which we operate.  That assessment could change based on competitive or commercial developments (which could, for example, increase our need for capital expenditures), new growth opportunities, the terms of future debt instruments, legal risks, changes in Irish corporate or tax or federal tax law and challenges to our business model. Our Board of Directors may, in its discretion, amend or repeal our dividend policy to decrease the level of dividends on our ordinary shares or entirely discontinue the payment of dividends on our ordinary shares.  The reduction or elimination of our cash dividend could adversely affect the market price of our ordinary shares.

### *Our share repurchase program may not enhance shareholder value.*

Repurchases by the Company of our ordinary shares reduce the number of outstanding shares of our ordinary shares. There can be no assurance that any share repurchases will enhance shareholder value because the market price of our ordinary shares may decline below the levels at which we repurchased ordinary shares. Although the Company's repurchases of its shares are intended to enhance long-term shareholder value, short-term stock price fluctuations could reduce the effectiveness of these repurchases.

### *The value of our Teva Shares could go down.*

As part of the Teva Transaction we received 100.3 million Teva ordinary shares, which at the time of the closing approximated $5.0 billion in value.  Pursuant to an agreement with Teva, we were not permitted to sell the Teva Shares before August 2017.  The price of Teva ordinary shares has decreased significantly since the closing of the Teva Transaction, and also from August 2017: from $53.39 at the closing of the Teva Transaction, to $18.95 at December 29, 2017, and reaching a low of $11.23 in November of 2017. Since November 2017, we have been engaged in sales of the Teva Shares through a variety of transactions.  As of February 13, 2018, we continue to hold approximately 40 million Teva ordinary shares.  We cannot predict the price of Teva ordinary shares and the total proceeds from the sale of the Teva Shares is likely to be less than anticipated at the closing of the Teva Transaction and may be less than the proceeds we would have received had we sold the shares at earlier or later date.

### *We have exposure to tax liabilities.*

As a multinational corporation, we are subject to income taxes as well as non-income based taxes in various jurisdictions. Significant judgment is required in determining our worldwide provision for income taxes and other tax liabilities. We are subject to costs and other potential outcomes from tax audits. The Company believes that its accrual for tax contingencies is adequate for all open years based on past experience, interpretations of tax law and judgments about potential actions by tax authorities; however, due to the complexity of tax contingencies, the ultimate resolution of any tax matters may result in payments greater or less than amounts accrued.

### *Changes in tax laws or tax rulings in the U.S. and abroad could have a significant adverse impact on our effective tax rate.*

On December 22, 2017, the Tax Cuts and Jobs Act ("TCJA"), was enacted into law by President Trump. The TCJA makes significant changes to the U.S. taxation of our domestic and international operations. The TCJA contains a number of provisions that may adversely impact our effective tax rate or operating cash flows going forward, including:

- The limitation on the amount of interest expense deduction available to our U.S. subsidiaries to the extent we are unable to absorb any unused interest deductions over time;
- The "Base Erosion Anti-Abuse Tax", which requires our U.S. subsidiaries to make an alternative determination of taxable income without regard to tax deductions for certain payments to affiliates;
- Provisions that may deny deductions for certain payments made by our U.S. subsidiaries to non-U.S. affiliates to the extent such payments are classified as "hybrid payments"; and

41

- The one-time transition tax (i.e. toll charge) on the pre-2018 earnings of certain non-U.S. subsidiaries. The tax is payable over eight years, but is not dependent on our future earnings and therefore may have an adverse impact on our future operating cash flow.

Many countries in Europe, as well as a number of other countries and organizations, have recently proposed or recommended changes to existing tax laws which could impact our effective tax rate or future tax obligations. The Organization for Economic Cooperation and Development has been working on a Base Erosion and Profit Sharing Project, and is expected to continue to issue guidelines and proposals that may change various aspects of the existing framework under which our tax obligations are determined in many of the countries in which we do business. The European Commission has conducted investigations in multiple countries focusing on whether local country tax rulings or tax legislation provides preferential tax treatment that violates European Union state aid rules. If the Company's effective tax rates were to increase, or if the ultimate determination of the Company's taxes owed is for an amount in excess of amounts previously accrued, the Company's operating results, cash flows, and financial condition could be adversely affected.

*We would be adversely affected if, either based on current law or in the event of a change in law, the Internal Revenue Service ("IRS") did not agree that Allergan is a foreign corporation for U.S. federal tax purposes. In addition, future changes to international tax laws not specifically related to inversions could adversely affect us.*

Allergan believes that, under current law, it is treated as a foreign corporation for U.S. federal tax purposes, because it is an Irish incorporated entity. However, the IRS may assert that Allergan should be treated as a U.S. corporation for U.S. federal tax purposes pursuant to Section 7874 of the U.S. Internal Revenue Code. Under Section 7874, a corporation created or organized outside the United States (i.e., a foreign corporation) will be treated as a U.S. corporation for U.S. federal tax purposes when (i) the foreign corporation directly or indirectly acquires substantially all of the assets held directly or indirectly by a U.S. corporation (including the indirect acquisition of assets of the U.S. corporation by acquiring all the outstanding shares of the U.S. corporation), (ii) the shareholders of the acquired U.S. corporation hold at least 80% (by either vote or value) of the shares of the foreign acquiring corporation after the acquisition by reason of holding shares in the U.S. acquired corporation (including the receipt of the foreign corporation's shares in exchange for the U.S. corporation's shares) and (iii) the foreign corporation's "expanded affiliated group" does not have substantial business activities in the foreign corporation's country of organization or incorporation relative to such expanded affiliated group's worldwide activities. For purposes of Section 7874, multiple acquisitions of U.S. corporations by a foreign corporation, if treated as part of a plan or series of related transactions, may be treated as a single acquisition. If multiple acquisitions of U.S. corporations are treated as a single acquisition, all shareholders of the acquired U.S. corporations would be aggregated for purposes of the test set forth above concerning such shareholders holding at least 80% (by either vote or value) of the shares of the foreign acquiring corporation after the acquisitions by reason of holding shares in the acquired U.S. corporations.

Allergan believes that the test set forth above to treat Allergan as a foreign corporation was satisfied in connection with the Warner Chilcott Acquisition, the Forest Acquisition and the Allergan Acquisition. However, the law and Treasury regulations promulgated under Section 7874 are somewhat unclear, and thus it cannot be assured that the IRS will agree that the ownership requirements to treat Allergan as a foreign corporation were met in the Warner Chilcott Acquisition, the Forest Acquisition and/or the Allergan Acquisition, and the IRS may assert that, even though the Allergan Acquisition is a separate transaction from the Warner Chilcott Acquisition and the Forest Acquisition, the Allergan Acquisition should be integrated with the Warner Chilcott Acquisition and the Forest Acquisition as a single transaction. In the event the IRS were to prevail with such assertion, Allergan would be treated as a U.S. corporation for U.S. federal tax purposes and significant adverse tax consequences would result for Allergan.

Even if Allergan is respected as a foreign corporation for U.S. federal tax purposes, Allergan might be adversely impacted by recent proposals that have aimed to make other changes in the taxation of multinational corporations. For example, the Organization for Economic Cooperation and Development has created an agreed set of international rules for fighting base erosion and profit shifting. As a result, the tax laws in the United States, Ireland and other countries in which we and our affiliates do business could change on a prospective or retroactive basis, and any such changes could adversely affect Allergan and its affiliates (including Legacy Allergan and its affiliates).

*Foreign currency fluctuations could adversely affect our business and financial results.*

We do business and generate sales in numerous countries outside the United States. The Company has also entered and will from time to time enter into acquisition, licensing, borrowing, hedging or other financial transactions that may give rise to currency and interest rate exposure. As such, foreign currency fluctuations may affect the costs that we incur in such international operations. Some of our operating expenses are incurred in non-U.S. dollar currencies. The appreciation of non-U.S. dollar currencies in those countries where we have operations against the U.S. dollar could increase our costs and could harm our results of operations and financial condition.

42

agn-10k_20171231.htm

*A failure of our internal control over financial reporting could materially impact our business or share price.*

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting.  An internal control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met.  Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs.  Because of the inherent limitations in all internal control systems, internal control over financial reporting may not prevent or detect misstatements.  Any failure to maintain an effective system of internal control over financial reporting could limit our ability to report our financial results accurately and timely or to detect and prevent fraud, and could expose us to litigation or adversely affect the market price of the Allergan plc Ordinary Shares.

For example, in the year ended December 31, 2016, management concluded that there was a material weakness in internal controls over financial reporting as it did not maintain effective controls to appropriately assess the tax implications of certain transactions between our subsidiaries. This control deficiency did not result in a material misstatement of our current or prior period consolidated financial statements. However, this control deficiency could have resulted in a misstatement to the income tax accounts and disclosures, which would have resulted in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, management previously concluded that this control deficiency constituted a material weakness, which has since been remediated. See Item 9A—*CONTROLS AND PROCEDURES.*

*We are incorporated in Ireland, and Irish law differs from the laws in effect in the United States and may afford less protection to, or otherwise adversely affect, our shareholders.*

Our shareholders may have more difficulty protecting their interests than would shareholders of a corporation incorporated in a jurisdiction of the United States. As an Irish company, we are governed by the Irish Companies Act 2014 (the "Companies Act").  The Companies Act and other relevant aspects of Irish law differ in some material respects from laws generally applicable to U.S. corporations and shareholders, including the provisions relating to interested directors, mergers, amalgamations and acquisitions, takeovers, shareholder lawsuits and indemnification of directors.  For example, under Irish law, the duties of directors and officers of a company are generally owed to the company only.  As a result, shareholders of Irish companies do not have the right to bring an action against the directors or officers of a company, except in limited circumstances.  In addition, depending on the circumstances, you may be subject to different or additional tax consequences under Irish law as a result of your acquisition, ownership and/or disposition of our ordinary shares, including, but not limited to, Irish stamp duty, dividend withholding tax and capital acquisitions tax.

*As a result of different shareholder voting requirements in Ireland relative to laws in effect in certain states in the United States, we may have less flexibility with respect to certain aspects of capital management than companies organized in the United States.*

Under Irish law, our authorized share capital can be increased by an ordinary resolution of our shareholders and the directors may issue new ordinary or preferred shares up to a maximum amount equal to the authorized but unissued share capital, without shareholder approval, once authorized to do so by our articles of association or by an ordinary resolution of our shareholders. Additionally, subject to specified exceptions, Irish law grants statutory preemption rights to existing shareholders where shares are being issued for cash consideration but allows shareholders to disapply such statutory preemption rights either in our articles of association or by way of special resolution. Such disapplication can either be generally applicable or be in respect of a particular allotment of shares.  Accordingly, our articles of association contain, as permitted by Irish company law, provisions authorizing the board to issue new shares, and to disapply statutory preemption rights.  The authorization of the directors to issue shares and the disapplication of statutory preemption rights must both be renewed by the shareholders at least every five years, and we cannot provide any assurance that these authorizations will always be approved, which could limit our ability to issue equity and thereby adversely affect the holders of our securities.

*We are an Irish company and it may be difficult for you to enforce judgments against us or certain of our officers and directors.*

We are incorporated in Ireland and a substantial portion of our assets are located in jurisdictions outside the United States.  In addition, some of our officers and directors reside outside the United States, and some or all of their respective assets are or may be located in jurisdictions outside of the United States.  Therefore, it may be difficult for investors to effect service of process against us or such officers or directors or to enforce against us or them judgments of U.S. courts predicated upon civil liability provisions of the U.S. federal securities laws.

43

There is no treaty between Ireland and the United States providing for the reciprocal enforcement of foreign judgments. The following requirements must be met before the foreign judgment will be recognized and deemed enforceable in Ireland:

- the judgment must be for a definite monetary sum;

- the judgment must be final and conclusive and the decree final and unalterable in the court which pronounces it; and

- the judgment must be provided by a court of competent jurisdiction.

An Irish court will also refuse to recognize or enforce a foreign judgment obtained by fraud, or if to enforce the judgment would violate Irish public policy or breach natural or constitutional justice. Further, an Irish court may not recognize or enforce a judgment that is irreconcilable with an earlier judgment, and may stay recognition and enforcement proceedings, if concurrent proceedings are in being elsewhere. Further, as a matter of public policy, an Irish Court will not recognize or enforce foreign revenue, penal or other public laws, either directly or through the recognition and enforcement of a foreign judgment. Judgments of U.S. courts of liabilities predicated upon U.S. federal securities laws may not be recognized or enforced by Irish courts if deemed to be contrary to public policy in Ireland.

*A transfer of our ordinary shares, other than by means of the transfer of book-entry interests in the Depository Trust Company ("DTC"), may be subject to Irish stamp duty, as may a transfer of preference shares.*

Transfers of our ordinary shares effected by means of the transfer of book entry interests in the DTC will not be subject to Irish stamp duty. However, if you hold your ordinary shares directly rather than beneficially through the DTC, any transfer of your ordinary shares could be subject to Irish stamp duty (currently at the rate of 1% of the higher of the price paid or the market value of the shares acquired). Payment of Irish stamp duty is generally a legal obligation of the transferee. Transfers of preference shares, including our mandatory convertible preferred shares, may also be subject to Irish stamp duty at the same rate. The potential for stamp duty could adversely affect the price of your shares.

*In certain limited circumstances, dividends we pay may be subject to Irish dividend withholding tax.*

In certain limited circumstances, dividend withholding tax (currently at a rate of 20%) may arise in respect of any dividends paid on our ordinary shares or our preference shares. A number of exemptions from dividend withholding tax exist such that shareholders resident in the U.S. and shareholders resident in certain countries may be entitled to exemptions from dividend withholding tax.

Shareholders resident in the U.S. that hold their shares through the DTC will not be subject to dividend withholding tax provided the addresses of the beneficial owners of such shares in the records of the brokers holding such shares are recorded as being in the U.S. (and such brokers have further transmitted the relevant information to a qualifying intermediary appointed by us). U.S. resident shareholders in Allergan that hold their shares outside of the DTC and shareholders resident in certain other countries (irrespective of whether they hold their shares through the DTC or outside the DTC) will not be subject to dividend withholding tax provided the beneficial owners of such shares have furnished completed and valid dividend withholding tax forms or an IRS Form 6166, as appropriate, to our transfer agent or their brokers (and such brokers have further transmitted the relevant information to our transfer agent). However, other shareholders may be subject to dividend withholding tax, which could adversely affect the price of your shares.

*Dividends received by Irish residents and certain other shareholders may be subject to Irish income tax.*

Shareholders entitled to an exemption from Irish dividend withholding tax on dividends received from us will not be subject to Irish income tax in respect of those dividends, unless they have some connection with Ireland other than their shareholding in us (for example, they are resident in Ireland). Shareholders who are not resident nor ordinarily resident in Ireland but who are not entitled to an exemption from Irish dividend withholding tax will generally have no further liability to Irish income tax on those dividends which suffer dividend withholding tax.

*Allergan's Ordinary Shares received by means of a gift or inheritance could be subject to Irish capital acquisitions tax.*

Irish capital acquisitions tax ("CAT") could apply to a gift or inheritance of ordinary shares or our preference shares, including our mandatory convertible preferred shares, irrespective of the place of residence, ordinary residence or domicile of the parties. This is because Company Ordinary Shares and preference shares are regarded as property situated in Ireland. The person who receives the gift or inheritance has primary liability for CAT. Gifts and inheritances passing between spouses are exempt from CAT. Children

have a tax-free threshold of €310,000 in respect of taxable gifts or inheritances received from their parents. Certain other tax-free thresholds may also apply.

### ITEM 1B.  *UNRESOLVED STAFF COMMENTS*

There are no unresolved staff comments.

### ITEM 2.  *PROPERTIES*

We conduct our operations using a combination of owned and leased properties.

Our owned and leased properties consist of facilities used for R&D, manufacturing, distribution (including warehousing and storage), sales and marketing and administrative functions and relate to our US Specialized Therapeutics, US General Medicine and International segments. The following table provides a summary of locations for our significant owned and leased properties as of December 31, 2017:

| Location | Primary Use | Leased / Owned |
| --- | --- | --- |
| Austin, TX, USA | Administration | Leased |
| Branchburg, NJ, USA | Manufacturing | Leased |
| Bridgewater, NJ, USA | R&D, Administration | Leased |
| Cincinnati, OH, USA | Manufacturing | Owned |
| Dublin, CA, USA | Manufacturing | Leased |
| Dublin, Ireland | Manufacturing, R&D, Administration | Owned |
| Galway, Ireland | Manufacturing | Leased |
| Guarulhos, Brazil | Manufacturing | Owned |
| Houston, TX, USA | Manufacturing | Owned |
| Irvine, California, USA | R&D, Administration | Both |
| Liege, Belgium | Manufacturing | Leased |
| Madison, NJ, USA | Administration | Leased |
| Marlow, UK | Administration | Leased |
| Pleasanton, CA, USA | Administration | Leased |
| Pringy, France | Manufacturing | Owned |
| San Jose, CA, USA | Manufacturing | Owned |
| San Jose, Costa Rica | Manufacturing | Owned |
| Waco, TX, USA | Manufacturing | Owned |
| Weiterstadt, Germany | Manufacturing | Owned |
| Weston, FL, USA | Administration, R&D | Leased |
| Westport, Ireland | Manufacturing, Administration, R&D | Owned |

Our leased properties are subject to various lease terms and expirations.

We believe that we have sufficient facilities to conduct our operations during 2018. However, we continue to evaluate the purchase or lease of additional properties, or the consolidation of existing properties, as our business requires.

### ITEM 3.  *LEGAL PROCEEDINGS*

For information regarding legal proceedings, refer to *Legal Matters* in "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this Annual Report.

### ITEM 4.  *MINE SAFETY DISCLOSURES*

Not applicable.

45

## PART II

**ITEM 5.**    *MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES*

**Market for Registrant's Common Equity**

Allergan plc Ordinary Shares are traded on the New York Stock Exchange under the symbol "AGN." The following table sets forth the quarterly high and low closing share trading price information for the periods indicated:

| Year ended December 31, 2017: | High | | Low | |
|---|---|---|---|---|
| First | $ | 249.32 | $ | 210.80 |
| Second | $ | 248.91 | $ | 218.73 |
| Third | $ | 256.15 | $ | 202.66 |
| Fourth | $ | 210.98 | $ | 163.58 |

| Year ended December 31, 2016: | High | | Low | |
|---|---|---|---|---|
| First | $ | 310.83 | $ | 261.60 |
| Second | $ | 277.96 | $ | 195.50 |
| Third | $ | 261.27 | $ | 228.68 |
| Fourth | $ | 244.66 | $ | 184.50 |

As of February 13, 2018, there were approximately 3,332 registered holders of Allergan plc's Ordinary Shares.

We have paid cash dividends on ordinary shares quarterly beginning with the 2017 fiscal year.

The Company pays a quarterly dividend on shares of its mandatory convertible preferred shares.

Warner Chilcott is a wholly-owned subsidiary of Allergan and has no publicly traded equity securities.

**Issuer Purchases of Equity Securities**

During the quarter ended December 31, 2017, we repurchased 31,968 of Allergan plc's Ordinary Shares to satisfy tax withholding obligations in connection with the vesting of restricted stock issued to employees. On September 25, 2017, the Company's Board of Directors approved a $2.0 billion share repurchase program, of which we repurchased $450.0 million in the year ended December 31, 2017.

| Period | Total Number of Shares Purchased | | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Share Repurchase Program | Average Price Paid per Share as Part of Share Repurchase Program | | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Share Repurchase Program ($ in millions) | |
|---|---|---|---|---|---|---|---|---|---|
| October 1 - 31, 2017 | 409 | $ | 182.21 | | – | $ | – | $ | 2,000.0 |
| November 1 - 30, 2017 | 11 | $ | 228.16 | | 1,718,558 | $ | 174.72 | $ | 1,700.0 |
| December 1 - 31, 2017 | 31,548 | $ | 164.13 | | 899,999 | $ | 166.67 | $ | 1,550.0 |
| October 1 – December 31, 2017 | 31,968 | $ | 164.38 | | 2,618,557 | $ | 171.95 | $ | 1,550.0 |

46

**Securities Authorized for Issuance Under Equity Compensation Plans**

For information regarding securities authorized for issuance under equity compensation plans, refer to "ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS" and "NOTE 19 — Shareholders' Equity" in the accompanying "Notes to the Consolidated Financial Statements" in this Annual Report.

**Performance Graph**

*The information in this section of the Annual Report pertaining to Allergan plc's performance relative to our peers is being furnished but not filed with the SEC, and as such, the information is neither subject to Regulation 14A or 14C or to the liabilities of Section 18 of the Securities Exchange Act of 1934, as amended.*

47

The following graph compares the cumulative 5-year total return of holders of Allergan plc's Ordinary Shares (formerly Class A common shares of Actavis plc) with the cumulative total returns of the S&P 500 index and the Dow Jones U.S. Pharmaceuticals index. The graph tracks the performance of a $100 investment in our Ordinary Shares and in each of the indexes (with reinvestment of all dividends, if any) on December 31, 2012 with relative performance tracked through December 31, 2017.

Notwithstanding anything to the contrary set forth in our previous filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, which might incorporate future filings made by us under those statutes, the following graph will not be deemed incorporated by reference into any future filings made by us under those statutes.

### COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Allergan plc, the S&P 500 Index
and the Dow Jones US Pharmaceuticals Index



──── Allergan, plc        ──── S&P 500        ──── Dow Jones US Pharmaceuticals

*$100 invested on 12/31/12 in stock or index, including reinvestment of dividends.
Fiscal year ending December 31.

Copyright© 2018 Standard & Poor's, a division of S&P Global. All rights reserved.
Copyright© 2018 S&P Dow Jones Indices LLC, a division of S&P Global. All rights reserved.

|  | 12/12 | 12/13 | 12/14 | 12/15 | 12/16 | 12/17 |
|---|---|---|---|---|---|---|
| Allergan plc | 100.00 | 195.35 | 299.31 | 363.37 | 244.20 | 192.70 |
| S&P 500 | 100.00 | 132.39 | 150.51 | 152.59 | 170.84 | 208.14 |
| Dow Jones US Pharmaceuticals | 100.00 | 133.92 | 162.59 | 172.69 | 168.93 | 189.27 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

48

**ITEM 6.**    *SELECTED FINANCIAL DATA*

    The following table sets forth our selected historical consolidated financial data. The selected consolidated financial data as of December 31, 2017 and 2016 and for the years ended December 31, 2017, 2016, and 2015 presented in this table have been derived from our audited consolidated financial statements and related notes included elsewhere in this Annual Report. The selected consolidated financial data as of December 31, 2015, 2014, and 2013 and for the years ended December 31, 2014 and 2013 presented in this table are derived from our audited consolidated financial statements, as revised for discontinued operations accounting, and related notes which are not included in this Annual Report.

    The selected consolidated financial data set forth below should be read in conjunction with, and is qualified by reference to, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the Notes to the Consolidated Financial Statements included elsewhere in this Annual Report and in our previously filed Annual Reports on Form 10-K, as amended by Form 8-K, where applicable.

**ALLERGAN PLC**
**FINANCIAL HIGHLIGHTS**
**($ in millions, except per share amounts)**

|  | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 2017(1)(2) (3)(4) | 2016(7)(8) (9) | 2015(8)(9) (11) | 2014(8)(9) (14) | 2013(8)(9) (15) |
| *Operating Highlights:* |  |  |  |  |  |
| Net revenues | $ 15,940.7 | $ 14,570.6 | $ 12,688.1 | $ 4,676.5 | $ 1,025.7 |
| Net (loss) from continuing operations, net of tax | (3,716.0) | (935.0) | (2,941.6) | (2,484.6) | (569.1) |
| Net (loss) / income attributable to ordinary shareholders | (4,403.9) | 14,695.0 | 3,683.2 | (1,630.5) | (750.4) |
| Basic (loss) / earnings per share from continuing operations | $ (11.99) $ | (3.17) $ | (8.64) $ | (11.31) $ | (4.00) |
| Diluted (loss) / earnings per share from continuing operations | $ (11.99) $ | (3.17) $ | (8.64) $ | (11.31) $ | (4.00) |
| Basic (loss) / earnings per share | $ (13.19) $ | 38.18 $ | 10.01 $ | (7.42) $ | (5.27) |
| Diluted (loss) / earnings per share | $ (13.19) $ | 38.18 $ | 10.01 $ | (7.42) $ | (5.27) |
| Weighted average ordinary shares outstanding: |  |  |  |  |  |
|    Basic | 333.8 | 384.9 | 367.8 | 219.7 | 142.3 |
|    Diluted | 333.8 | 384.9 | 367.8 | 219.7 | 142.3 |

|  | At December 31, | | | | |
|---|---|---|---|---|---|
|  | 2017(1)(2) (3)(4) | 2016(5)(6) (7)(8)(9) | 2015(8)(9) (10)(11) | 2014(8)(9) (12)(13)(14) | 2013(8)(9) (15) |
| *Balance Sheet Highlights:* |  |  |  |  |  |
| Total assets | $118,341.9 | $128,986.3 | $135,583.3 | $ 52,758.0 | $ 22,725.9 |
| Total debt and capital leases | 30,075.3 | 32,768.7 | 42,530.4 | 15,531.1 | 9,052.0 |
| Total equity | 73,837.1 | 76,200.5 | 76,589.3 | 28,335.5 | 9,537.1 |

(1)    On April 28, 2017, Allergan plc completed the Zeltiq Acquisition for $2.4 billion. The Zeltiq Acquisition increased the Company's intangible assets and goodwill while lowering working capital, and contributed to operating results post acquisition.

(2)    On February 1, 2017, Allergan plc completed the LifeCell Acquisition for $2.9 billion. The LifeCell Acquisition increased the Company's intangible assets and goodwill while lowering working capital, and contributed to operating results post acquisition.

(3)    In 2017, the Company recognized intangible impairments including, but not limited to, $3,230.0 million related to Restasis®, $170.0 million related to Dry Eye IPR&D assets, and $646.0 million related to Aczone®.

(4)    In the year ended December 31, 2017, the Company retired 6,822,394 shares as a result of the Company's share buyback programs.

(5)    On November 1, 2016, Allergan plc completed the Tobira Acquisition. The acquisition increased the Company's intangible assets and lowered working capital.

(6)    On October 25, 2016, Allergan plc completed the Vitae Acquisition. The acquisition increased the Company's intangible assets and lowered working capital.

agn-10k_20171231.htm

49

(7)   In the year ended December 31, 2016, the Company retired 61,620,459 shares as a result of the Company's $15.0 billion share buyback programs.

(8)   On October 3, 2016, we completed the divestiture of the Anda Distribution business to Teva for $0.5 billion.

(9)   On August 2, 2016, Teva acquired our global generics business for $38.3 billion of cash and Teva shares.

(10)  On October 1, 2015, Allergan plc completed the Kythera Acquisition. The acquisition increased the Company's intangible assets.

(11)  On March 17, 2015, Allergan plc completed the acquisition of Legacy Allergan for approximately $77.0 billion after which the following items were included in our operating results:

- total revenues and related cost of sales for Legacy Allergan products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired;

- impairment losses on select assets; and

- increased interest expense from the senior secured notes assumed and the indebtedness incurred.

(12)  On November 17, 2014, Allergan plc acquired Durata Therapeutics, Inc for $0.7 billion. The acquisition increased the Company's intangible assets and lowered working capital.

(13)  On July 2, 2014, the Company acquired Furiex Pharmaceuticals, Inc for $1.2 billion. The acquisition increased the Company's intangible assets and lowered working capital.

(14)  On July 1, 2014, the Company completed the acquisition of Forest Laboratories, Inc. ("Legacy Forest") for $30.9 billion including outstanding indebtedness assumed of $3.3 billion, equity consideration of $20.6 billion, and cash consideration of $7.1 billion (the "Forest Acquisition"). Beginning July 1, 2014, the following items were included in our operating results:

- total revenues and related cost of sales for Forest products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired;

- impairment losses on select assets; and

- increased interest expense from the senior secured notes assumed and the indebtedness incurred.

(15)  On October 1, 2013, we completed the Warner Chilcott Acquisition for $5.8 billion after which the following items were included in our operating results:

- total revenues and related cost of sales for Warner Chilcott products;

- selling, general and administrative expenses and research and development expenses;

- amortization expense for intangible assets acquired; and

- increased interest expense from the senior secured notes assumed and the $2.0 billion aggregate term loan indebtedness assumed, and subsequently refinanced, in connection with the Warner Chilcott Acquisition.

50

## ITEM 7.    *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The following discussion contains forward-looking statements that are subject to known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those expressed or implied by such forward-looking statements. We discuss such risks, uncertainties and other factors throughout this report and specifically under the caption "Cautionary Note Regarding Forward-Looking Statements" under "ITEM 1A. RISK FACTORS" in this document. In addition, the following discussion of financial condition and results of operations should be read in conjunction with the Consolidated Financial Statements and Notes thereto included elsewhere in this document.*

*The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the de minimis activity between Allergan plc and Warner Chilcott Limited, references throughout this section relate to both Allergan and Warner Chilcott Limited.*

### EXECUTIVE SUMMARY

#### Overview

Allergan plc is a global pharmaceutical company focused on developing, manufacturing and commercializing branded pharmaceutical ("brand", "branded" or "specialty brand"), device, biologic, surgical and regenerative medicine products for patients around the world. Allergan markets a portfolio of leading brands and best-in-class products for the central nervous system, eye care, medical aesthetics and dermatology, gastroenterology, women's health, urology and anti-infective therapeutic categories. Allergan is an industry leader in Open Science, a model of research and development, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care. The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities.

On August 2, 2016 we completed the Teva Transaction for $38.3 billion of cash and Teva shares. On October 3, 2016, the Company completed the divestiture of the Anda Distribution business to Teva for $500.0 million.

The Company recognized a combined gain on the sale of the Anda Distribution business and the Teva Transaction of $15,932.2 million in the year ended December 31, 2016, as well as deferred liabilities relating to other elements of our arrangements with Teva of $299.2 million.

In October 2016, pursuant to our agreement with Teva, Teva provided the Company with its proposed estimated adjustment to the closing date working capital balance. The Company disagreed with Teva's proposed adjustment, and, pursuant to our agreement with Teva, each of the Company's and Teva's proposed adjustments were submitted to arbitration (the "Working Capital Arbitration") to determine the working capital amount in accordance with GAAP as applied by the Company consistent with past practice. Teva initially proposed an adjustment of approximately $1.4 billion and subsequently submitted a revised adjustment of approximately $1.5 billion to the arbitrator. In addition, on October 30, 2017, Teva submitted a Notice of Direct and Third Party Claims seeking indemnification for virtually all of the same items for which Teva sought a proposed adjustment in the Working Capital Arbitration as well as several new items as to which no quantity of damages had been asserted.

On January 31, 2018, Allergan plc and Teva entered into the Agreement. The Agreement provides that the Company will make a one-time payment of $700.0 million to Teva; the Company and Teva will jointly dismiss their working capital dispute arbitration, and the Company and Teva will release all actual or potential claims under the Master Purchase Agreement, dated July 26, 2015, by and between the Company and Teva (the "Teva Master Purchase Agreement"), that are known as of the date of the Agreement. The Company recorded a pre-tax charge of $466.0 million as a component of other (expense) / income, net from discontinued operations relating to the settlement in the year ended December 31, 2017. When paid in the first quarter of 2018, the payment, which represents a refund of purchase price, will be reflected in investing ($466.0 million) and financing ($234.0 million) cash flows.

As a result of the Teva Transaction and the divestiture of the Company's Anda Distribution business, and in accordance with FASB ASU No. 2014-08 "Presentation of Financial Statements (Topic 205) and Property, Plant and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity", the financial results of the businesses held for sale were reclassified to discontinued operations for all periods presented in our consolidated financial statements. The results of our discontinued operations include the results of our generic product development, manufacturing and distribution of off-patent pharmaceutical products, certain established international brands marketed similarly to generic products and out-licensed generic pharmaceutical products primarily in Europe through our Medis third-party business through August 2, 2016, as well as our Anda Distribution business through October 3, 2016.

51

*2017 Significant Business Developments*

The following are the material transactions that were completed in the year ended December 31, 2017.

**Acquisitions**

*Keller Medical, Inc.*

On June 23, 2017, the Company completed the Keller Acquisition.  The Keller Acquisition combines the Keller Funnel® with the Company's leading breast implants business.

*Zeltiq Aesthetics, Inc.*

On April 28, 2017, the Company completed the Zeltiq Acquisition. Zeltiq was focused on developing and commercializing products utilizing its proprietary controlled-cooling technology platform (Coolsculpting®). The Zeltiq Acquisition combined Zeltiq's body contouring business with the Company's leading portfolio of medical aesthetics.

As a result of the Zeltiq Acquisition, the Company incurred the following transaction and integration costs in the year ended December 31, 2017 ($ in millions):

|  | Amount |
|---|---:|
| **Cost of sales** |  |
| Stock-based compensation acquired for legacy Zeltiq employees | $ 2.3 |
| **Research and development** |  |
| Stock-based compensation acquired for legacy Zeltiq employees | 3.0 |
| Acquisition, integration and restructuring related charges | 1.1 |
| **Selling and marketing** |  |
| Stock-based compensation acquired for legacy Zeltiq employees | 11.3 |
| Acquisition, integration and restructuring related charges | 13.2 |
| **General and administrative** |  |
| Stock-based compensation acquired for legacy Zeltiq employees | 37.4 |
| Acquisition, integration and restructuring related charges | 48.5 |
| **Total Integration Costs** | $ 116.8 |

*LifeCell Corporation*

On February 1, 2017, the Company completed the LifeCell Acquisition. The LifeCell Acquisition combined LifeCell's novel, regenerative medicines business, including its high-quality and durable portfolio of dermal matrix products with the Company's leading portfolio of medical aesthetics, breast implants and tissue expanders. The LifeCell Acquisition expanded the Company's marketed product portfolio by adding Alloderm® and Strattice®.

As a result of the LifeCell Acquisition, the Company incurred $47.3 million of acquisition, integration and restructuring related charges in the year ended December 31, 2017, of which $43.2 million is reflected in general and administrative expenses.

**Licenses and Asset Acquisitions**

The following table presents the R&D milestone expenses incurred for Licenses and Asset Acquisitions that were entered into during the year ended December 31, 2017 ($ in millions):

| Date | Licenses / Asset Acquisition | Amount |
|---|---|---:|
| July 31, 2017 | Lyndra, Inc. | $ 15.0 |
| March 14, 2017 | Editas Medicine, Inc. | 90.0 |
| January 9, 2017 | Assembly Biosciences, Inc. | 50.0 |
| January 9, 2017 | Lysosomal Therapeutics, Inc. | 145.0 |

52

**Other Transactions**

*Saint Regis Mohawk Tribe*

On September 8, 2017, the Company entered into an agreement with the Saint Regis Mohawk Tribe, under which the Saint Regis Mohawk Tribe obtained the rights to Orange Book-listed patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05%, and the Company was granted exclusive licenses under the patents related to the product. Pursuant to the agreement, the Company paid the Saint Regis Mohawk Tribe an upfront payment of $13.8 million, which was recorded as a component of cost of sales in the year ended December 31, 2017.  Additionally, the Saint Regis Mohawk Tribe will be eligible to receive up to $15.0 million in annual royalties starting in 2018, during the period that certain patent claims remain in effect.

**2016 Significant Business Developments**

The following are the material transactions that were completed in the year ended December 31, 2016.

**Acquisitions**

*Tobira Therapeutics, Inc.*

On November 1, 2016, the Company completed the Tobira Acquisition. The Company included the results of Tobira in its Consolidated Statement of Operations beginning November 1, 2016, including $27.0 million in stock compensation expense in the year ended December 31, 2016. In the year ended December 31, 2017, the Company achieved a milestone requiring a payment of $303.1 million for the initiation of Phase III clinical trials.

*Vitae Pharmaceuticals, Inc.*

On October 25, 2016, the Company completed the Vitae Acquisition. During the year ended December 31, 2016, subsequent to the acquisition of Vitae, the Company impaired its acquired intangible asset relating to Atopic Dermatitis by $46.0 million as the Company anticipated a delay in potential launch timing, if any, resulting from revised clinical data.

*ForSight VISION5, Inc.*

On September 23, 2016, the Company completed the ForSight Acquisition. During the year ended December 31, 2016, subsequent to the acquisition of ForSight, the Company impaired its acquired intangible asset by $33.0 million as the Company anticipated a delay in potential launch timing.  Offsetting this impairment was a corresponding reduction of acquired contingent consideration of $15.0 million, which reduced overall R&D expenses.

**Licenses and Asset Acquisitions**

The following table presents the R&D milestone expenses incurred for Licenses and Asset Acquisitions that were entered into during the year ended December 31, 2016 ($ in millions):

| Date | Licenses / Asset Acquisition | Amount | |
|---|---|---|---|
| December 15, 2016 | Motus Therapeutics, Inc. | $ | 199.5 |
| November 22, 2016 | Chase Pharmaceuticals Corporation | | 122.9 |
| October 2, 2016 | AstraZeneca plc License | | 250.0 |
| September 6, 2016 | RetroSense Therapeutics, LLC | | 59.7 |
| August 26, 2016 | Akarna Therapeutics, Ltd | | 48.2 |
| April 21, 2016 | Topokine Therapeutics, Inc. | | 85.8 |
| April 6, 2016 | Heptares Therapeutics, Ltd | | 125.0 |
| January 6, 2016 | Anterios, Inc. | | 89.2 |

53

10/24/2018                                              agn-10k_20171231.htm

### 2015 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2015.

### Acquisitions

#### AqueSys, Inc.

On October 16, 2015, the Company completed the AqueSys Acquisition.  Under the terms of the agreement, the Company acquired XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector. On November 16, 2016, the Company received approval from the FDA for XEN45, which triggered a CVR payment of $100.0 million in the year ended December 31, 2016.  In the year ended December 31, 2017, the Company made a $25.0 million CVR payment upon first commercial sale of the product.

#### Kythera Biopharmaceuticals, Inc.

On October 1, 2015, the Company completed the Kythera Acquisition. The Company included the results of Kythera in its Consolidated Statement of Operations beginning October 1, 2015, including $9.0 million and $77.2 million in stock compensation expense in the years ended December 31, 2016 and 2015, respectively.

#### Oculeve, Inc.

On August 10, 2015, the Company completed the Oculeve Acquisition. The Company acquired Oculeve and its lead product TrueTear ™, an intranasal neurostimulation device, as well as other dry eye products in development.  In the year ended December 31, 2017, the Company made a $100.0 million payment for the approval of True Tear™.

#### Auden Mckenzie Holdings Limited

On May 29, 2015, the Company acquired Auden Mckenzie Holdings Limited ("Auden"), a company specializing in the development, licensing and marketing of niche generic medicines and proprietary brands in the United Kingdom ("UK") and across Europe for approximately 323.7 million British Pounds, or $495.9 million (the "Auden Acquisition").  The assets and liabilities acquired, as well as the results of operations for the acquired Auden business are part of the assets divested in the Teva Transaction and are included as a component of income from discontinued operations.

#### Allergan, Inc.

On March 17, 2015, the Company completed the Allergan Acquisition. The contribution from the acquisition of Legacy Allergan for the year of acquisition (year ended December 31, 2015) and the comparable first full year (year ended December 31, 2016) is as follows ($ in millions):

|  | Years Ended December 31, | |
| --- | --- | --- |
|  | 2016 | 2015 |
| Net revenues | $ 8,436.8 | $ 6,164.6 |
| Operating expenses: |  |  |
| Cost of sales[1] | 813.5 | 1,471.7 |
| Selling and marketing | 1,850.2 | 1,450.2 |
| General and administrative | 555.6 | 909.6 |
| **Contribution** | **$ 5,217.5** | **$ 2,333.1** |

(1)   Excludes amortization and impairment of acquired intangibles including product rights.

54

As a result of the acquisition, the Company incurred the following transaction and integration costs in the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | |
| | 2016 | 2015 |
|---|---|---|
| **Cost of sales** | | |
| Stock-based compensation acquired for Legacy Allergan employees | $        9.6 | $        22.5 |
| Acquisition, integration and restructuring related charges | 18.1 | 14.9 |
| **Research and development** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 43.0 | 124.8 |
| Acquisition, integration and restructuring related charges | 11.8 | 83.5 |
| **Selling and marketing** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 65.3 | 110.0 |
| Acquisition, integration and restructuring related charges | 24.7 | 75.7 |
| **General and administrative** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 33.6 | 258.9 |
| Acquisition, integration and restructuring related charges | 197.4 | 364.1 |
| **Other (expense) / income** | | |
| Bridge loan facilities expense | - | (264.9) |
| Interest rate locks | - | 30.9 |
| **Total transaction and integration costs** | $      403.5 | $    1,288.4 |

**Licenses and Asset Acquisitions**

The following table presents the R&D milestone expenses incurred for Licenses and Asset Acquisitions that were entered into during the year ended December 31, 2015 ($ in millions):

| Date | Licenses / Asset Acquisition | Amount |
|---|---|---|
| November 4, 2015 | Mimetogen Pharmaceuticals, Inc. | $        50.0 |
| August 28, 2015 | Naurex, Inc. | 571.7 |

*Almirall, S.A.*

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall, S.A. for €60.0 million. The consideration was accounted for as an asset acquisition and included as a component of intangible assets.

**Segments**

The Company's businesses are organized into the following segments: US Specialized Therapeutics, US General Medicine and International. In addition, certain revenues and shared costs, and the results of corporate initiatives, are managed outside of the three segments.

The operating segments are organized as follows:

· The US Specialized Therapeutics segment includes sales and expenses relating to certain branded products within the U.S., including Medical Aesthetics, Medical Dermatology, Eye Care, Neuroscience and Urology therapeutic products.

· The US General Medicine segment includes sales and expenses relating to branded products within the U.S. that do not fall into the US Specialized Therapeutics business units, including Central Nervous System, Gastrointestinal, Women's Health, Anti-Infectives and Diversified Brands.

· The International segment includes sales and expenses relating to products sold outside the U.S.

The Company evaluates segment performance based on segment contribution. Segment contribution for our segments represents net revenues less cost of sales (defined below), selling and marketing expenses, and select general and administrative expenses. Included in segment revenues for 2015 and 2016 are product sales that were sold through our former Anda Distribution

agn-10k_20171231.htm

55

business once the Anda Distribution business had sold the product to a third party customer. These sales are included in segment results and are reclassified into revenues from discontinued operations through a reduction of Corporate revenues which eliminates the sales made by our former Anda Distribution business from results of continuing operations prior to October 3, 2016.  Cost of sales for these products in discontinued operations is equal to our average third party cost of sales for third party branded products distributed by our former Anda Distribution. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales, selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization,  IPR&D impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

The Company defines segment net revenues as product sales and other revenue derived from branded products or licensing agreements.

Cost of sales within segment contribution includes standard production and packaging costs for the products we manufacture, third party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements and finished goods inventory reserve charges.  Cost of sales included within segment contribution does not include non-standard production costs, such as non-finished goods inventory obsolescence charges, manufacturing variances and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation costs and professional services costs which are general in nature and attributable to the segment.

56

## YEAR ENDED DECEMBER 31, 2017 COMPARED TO 2016

Results of operations, including segment net revenues, segment operating expenses and segment contribution consisted of the following for the years ended December 31, 2017 and 2016 ($ in millions):

| | Year Ended December 31, 2017 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 6,803.6 | $ 5,796.2 | $ 3,319.5 | $ 15,919.3 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales[1] | 495.4 | 843.9 | 478.7 | 1,818.0 |
| Selling and marketing | 1,369.5 | 1,084.1 | 913.8 | 3,367.4 |
| General and administrative | 208.2 | 177.3 | 120.6 | 506.1 |
| Segment contribution | $ 4,730.5 | $ 3,690.9 | $ 1,806.4 | $ 10,227.8 |
| Contribution margin | 69.5% | 63.7% | 54.4% | 64.2% |
| Corporate | | | | 1,471.8 |
| Research and development | | | | 2,100.1 |
| Amortization | | | | 7,197.1 |
| In-process research and development impairments | | | | 1,452.3 |
| Asset sales and impairments, net | | | | 3,927.7 |
| Operating (loss) | | | | $ (5,921.2) |
| Operating margin | | | | (37.2)% |

(1)    Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

| | Year Ended December 31, 2016 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 5,811.7 | $ 5,923.9 | $ 2,881.3 | $ 14,616.9 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales[1] | 290.9 | 879.8 | 418.2 | 1,588.9 |
| Selling and marketing | 1,137.0 | 1,185.7 | 788.2 | 3,110.9 |
| General and administrative | 174.2 | 174.9 | 117.2 | 466.3 |
| Segment contribution | $ 4,209.6 | $ 3,683.5 | $ 1,557.7 | $ 9,450.8 |
| Contribution margin | 72.4% | 62.2% | 54.1% | 64.7% |
| Corporate | | | | 1,481.3 |
| Research and development | | | | 2,575.7 |
| Amortization | | | | 6,470.4 |
| In-process research and development impairments | | | | 743.9 |
| Asset sales and impairments, net | | | | 5.0 |
| Operating (loss) | | | | $ (1,825.5) |
| Operating margin | | | | (12.5)% |

(1)    Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2017 and 2016 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
|---|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | Dollars | | % |
| Segment net revenues | $ | 15,919.3 | $ | 14,616.9 | $ | 1,302.4 | 8.9% |
| Corporate revenues | | 21.4 | | (46.3) | | 67.7 | (146.2)% |
| Net revenues | $ | 15,940.7 | $ | 14,570.6 | $ | 1,370.1 | 9.4% |

Corporate revenues for the year ended December 31, 2016 were reduced by $80.0 million for revenues which were included in the segment results and reclassified into revenues from discontinued operations as a reduction of Corporate revenues.

No country outside of the United States represents ten percent or more of net revenues. The US Specialized Therapeutics and US General Medicine segments are comprised solely of sales within the United States.

The following table presents global net revenues for the top products of the Company for the years ended December 31, 2017 and 2016 ($ in millions):

| | Year Ended December 31, 2017 | | | | | Year Ended December 31, 2016 | | | | | Change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | Dollars | Percentage |
| Botox® | $ 2,254.4 | $ - | $ 914.5 | $ - | $ 3,168.9 | $ 1,983.2 | $ - | $ 803.0 | $ - | $ 2,786.2 | $ 382.7 | 13.7% |
| Restasis® | 1,412.3 | - | 61.3 | - | 1,473.6 | 1,419.5 | - | 68.0 | - | 1,487.5 | (13.9) | (0.9)% |
| Juvederm® Collection ** | 501.1 | - | 540.7 | - | 1,041.8 | 446.9 | - | 420.4 | - | 867.3 | 174.5 | 20.1% |
| Linzess®/Constella® | - | 701.1 | 21.9 | - | 723.0 | - | 625.6 | 17.3 | - | 642.9 | 80.1 | 12.5% |
| Lumigan®/Ganfort® | 317.5 | - | 371.5 | - | 689.0 | 326.4 | - | 361.7 | - | 688.1 | 0.9 | 0.1% |
| Bystolic® / Byvalson® | - | 612.2 | 2.2 | - | 614.4 | - | 638.8 | 1.7 | - | 640.5 | (26.1) | (4.1)% |
| Alphagan®/Combigan® | 377.3 | - | 175.1 | - | 552.4 | 376.6 | - | 169.3 | - | 545.9 | 6.5 | 1.2% |
| Eye Drops | 199.5 | - | 281.0 | - | 480.5 | 186.5 | - | 276.2 | - | 462.7 | 17.8 | 3.8% |
| Lo Loestrin® | - | 459.3 | - | - | 459.3 | - | 403.5 | - | - | 403.5 | 55.8 | 13.8% |
| Namenda XR® | - | 452.8 | - | - | 452.8 | - | 627.6 | - | - | 627.6 | (174.8) | (27.9)% |
| Breast Implants | 242.6 | - | 156.9 | - | 399.5 | 206.0 | - | 149.9 | - | 355.9 | 43.6 | 12.3% |
| Estrace® Cream | - | 366.6 | - | - | 366.6 | - | 379.4 | - | - | 379.4 | (12.8) | (3.4)% |
| Viibryd®/Fetzima® | - | 333.2 | 3.1 | - | 336.3 | - | 342.3 | - | - | 342.3 | (6.0) | (1.8)% |
| Alloderm® | 321.2 | - | 7.5 | - | 328.7 | - | - | - | - | - | 328.7 | n.a. |
| Ozurdex ® | 98.4 | - | 213.4 | - | 311.8 | 84.4 | - | 179.0 | - | 263.4 | 48.4 | 18.4% |
| Vraylar™ | - | 287.8 | - | - | 287.8 | - | 94.3 | - | - | 94.3 | 193.5 | n.m. |
| Asacol®/Delzicol® | - | 195.5 | 50.2 | - | 245.7 | - | 360.8 | 53.7 | - | 414.5 | (168.8) | (40.7)% |
| Carafate ® / Sulcrate ® | - | 235.8 | 2.9 | - | 238.7 | - | 229.0 | 2.4 | - | 231.4 | 7.3 | 3.2% |
| Zenpep® | - | 212.3 | - | - | 212.3 | - | 200.7 | - | - | 200.7 | 11.6 | 5.8% |
| Coolsculpting® Consumables | 150.1 | - | 41.6 | - | 191.7 | - | - | - | - | - | 191.7 | n.a. |
| Canasa®/Salofalk® | - | 162.7 | 18.3 | - | 181.0 | - | 178.7 | 17.7 | - | 196.4 | (15.4) | (7.8)% |
| Armour Thyroid | - | 169.1 | - | - | 169.1 | - | 166.5 | - | - | 166.5 | 2.6 | 1.6% |
| Aczone® | 166.3 | - | 0.5 | - | 166.8 | 217.3 | - | - | - | 217.3 | (50.5) | (23.2)% |
| Viberzi® | - | 156.6 | 0.5 | - | 157.1 | - | 93.3 | - | - | 93.3 | 63.8 | 68.4% |
| Saphris® | - | 155.2 | - | - | 155.2 | - | 166.8 | - | - | 166.8 | (11.6) | (7.0)% |
| Coolsculpting ® Systems & Add On Applicators | 106.6 | - | 32.1 | - | 138.7 | - | - | - | - | - | 138.7 | n.a. |
| Namzaric® | - | 130.8 | - | - | 130.8 | - | 57.5 | - | - | 57.5 | 73.3 | 127.5% |
| Teflaro® | - | 121.9 | - | - | 121.9 | - | 133.6 | - | - | 133.6 | (11.7) | (8.8)% |
| Rapaflo® | 108.1 | - | 7.3 | - | 115.4 | 116.6 | - | 5.8 | - | 122.4 | (7.0) | (5.7)% |
| SkinMedica® | 96.8 | - | 3.7 | - | 100.5 | 108.3 | - | - | - | 108.3 | (7.8) | (7.2)% |
| Savella® | - | 98.2 | - | - | 98.2 | - | 103.2 | - | - | 103.2 | (5.0) | (4.8)% |
| Tazorac® | 65.4 | - | 0.7 | - | 66.1 | 95.5 | - | 0.8 | - | 96.3 | (30.2) | (31.4)% |
| Latisse® | 56.4 | - | 8.3 | - | 64.7 | 77.9 | - | 8.5 | - | 86.4 | (21.7) | (25.1)% |
| Minastrin® 24 | - | 61.4 | - | - | 61.4 | - | 325.9 | 1.4 | - | 327.3 | (265.9) | (81.2)% |
| Avycaz® | - | 61.2 | - | - | 61.2 | - | 36.1 | - | - | 36.1 | 25.1 | 69.5% |
| Kybella® / Belkyra® | 49.5 | - | 6.8 | - | 56.3 | 50.2 | - | 2.3 | - | 52.5 | 3.8 | 7.2% |
| Dalvance® | - | 53.9 | 2.4 | - | 56.3 | - | 39.3 | - | - | 39.3 | 17.0 | 43.3% |
| Lexapro® | - | 51.8 | - | - | 51.8 | - | 66.6 | - | - | 66.6 | (14.8) | (22.2)% |
| Lileta® | - | 37.6 | - | - | 37.6 | - | 23.3 | - | - | 23.3 | 14.3 | 61.4% |
| Enablex® | - | 3.6 | - | - | 3.6 | - | 17.1 | - | - | 17.1 | (13.5) | (78.9)% |
| Namenda® IR | - | 0.1 | - | - | 0.1 | - | 15.1 | - | - | 15.1 | (15.0) | (99.3)% |
| Other | 280.1 | 675.5 | 395.1 | 21.4 | 1,372.1 | 116.4 | 598.9 | 342.2 | 33.7 | 1,091.2 | 280.9 | 25.7% |
| Less product sold through our former Anda Distribution business | n.a. | n.a. | n.a. | - | - | n.a. | n.a. | n.a. | (80.0) | (80.0) | 80.0 | (100.0)% |
| Total net revenues | $ 6,803.6 | $ 5,796.2 | $ 3,319.5 | $ 21.4 | $ 15,940.7 | $ 5,811.7 | $ 5,923.9 | $ 2,881.3 | $ (46.3) | $ 14,570.6 | $ 1,370.1 | 9.4% |

** Sales of fillers including Juvederm, Voluma and other fillers are referred to herein as the "Juvederm® Collection".

59

### US Specialized Therapeutics Segment

The following table presents top product sales and net contribution for the US Specialized Therapeutics segment for the years ended December 31, 2017 and 2016 ($ in millions):

| | Years Ended December 31, | | Change | |
| | 2017 | 2016 (1) | Dollars | % |
|---|---|---|---|---|
| **Total Eye Care** | $ 2,460.2 | $ 2,437.7 | $ 22.5 | 0.9% |
| Restasis® | 1,412.3 | 1,419.5 | (7.2) | (0.5)% |
| Alphagan®/Combigan® | 377.3 | 376.6 | 0.7 | 0.2% |
| Lumigan®/Ganfort® | 317.5 | 326.4 | (8.9) | (2.7)% |
| Ozurdex® | 98.4 | 84.4 | 14.0 | 16.6% |
| Eye Drops | 199.5 | 186.5 | 13.0 | 7.0% |
| Other Eye Care | 55.2 | 44.3 | 10.9 | 24.6% |
| **Total Medical Aesthetics** | **2,449.2** | **1,622.9** | **826.3** | **50.9%** |
| **Facial Aesthetics** | **1,362.8** | **1,226.3** | **136.5** | **11.1%** |
| Botox® Cosmetics | 812.2 | 729.2 | 83.0 | 11.4% |
| Juvederm® Collection | 501.1 | 446.9 | 54.2 | 12.1% |
| Kybella® | 49.5 | 50.2 | (0.7) | (1.4)% |
| **Plastic Surgery** | **242.6** | **210.4** | **32.2** | **15.3%** |
| Breast Implants | 242.6 | 206.0 | 36.6 | 17.8% |
| Other Plastic Surgery | - | 4.4 | (4.4) | (100.0)% |
| **Regenerative Medicine** | **433.9** | **-** | **433.9** | **n.a.** |
| Alloderm® | 321.2 | - | 321.2 | n.a. |
| Other Regenerative Medicine | 112.7 | - | 112.7 | n.a. |
| **Body Contouring** | **256.7** | **-** | **256.7** | **n.a.** |
| Coolsculpting ® Systems & Add On Applicators | 106.6 | - | 106.6 | n.a. |
| Coolsculpting ® Consumables | 150.1 | - | 150.1 | n.a. |
| **Skin Care** | **153.2** | **186.2** | **(33.0)** | **(17.7)%** |
| SkinMedica® | 96.8 | 108.3 | (11.5) | (10.6)% |
| Latisse® | 56.4 | 77.9 | (21.5) | (27.6)% |
| **Total Medical Dermatology** | **340.8** | **396.5** | **(55.7)** | **(14.0)%** |
| Aczone® | 166.3 | 217.3 | (51.0) | (23.5)% |
| Tazorac® | 65.4 | 95.5 | (30.1) | (31.5)% |
| Botox® Hyperhidrosis | 67.2 | 65.2 | 2.0 | 3.1% |
| Other Medical Dermatology | 41.9 | 18.5 | 23.4 | 126.5% |
| **Total Neuroscience and Urology** | **1,483.1** | **1,306.3** | **176.8** | **13.5%** |
| Botox® Therapeutics | 1,375.0 | 1,188.8 | 186.2 | 15.7% |
| Rapaflo® | 108.1 | 116.6 | (8.5) | (7.3)% |
| Other Neuroscience and Urology | - | 0.9 | (0.9) | (100.0)% |
| **Other revenues** | **70.3** | **48.3** | **22.0** | **45.5%** |
| **Net revenues** | **$ 6,803.6** | **$ 5,811.7** | **$ 991.9** | **17.1%** |
| Operating expenses: | | | | |
| Cost of sales(2) | 495.4 | 290.9 | 204.5 | 70.3% |
| Selling and marketing | 1,369.5 | 1,137.0 | 232.5 | 20.4% |
| General and administrative | 208.2 | 174.2 | 34.0 | 19.5% |
| **Segment contribution** | **$ 4,730.5** | **$ 4,209.6** | **$ 520.9** | **12.4%** |
| Segment margin | 69.5% | 72.4% | | (2.9)% |
| Segment gross margin(3) | 92.7% | 95.0% | | (2.3)% |

(1) Includes revenues earned that were distributed through our former Anda Distribution business to third party customers.
(2) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.
(3) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

Zeltiq and LifeCell contributed the following to the segment in the year ended December 31, 2017 ($ in millions):

|  | Zeltiq | LifeCell | Combined Contribution |
|---|---|---|---|
| Net revenues | $       256.8 | $       436.0 | $       692.8 |
| Operating expenses: |  |  |  |
| Cost of sales | 70.7 | 107.5 | 178.2 |
| Selling and marketing | 96.1 | 97.8 | 193.9 |
| General and administrative | 10.7 | 11.4 | 22.1 |

*Net Revenues*

The increase in net revenues in the year ended December 31, 2017 over the prior period was primarily driven by growth in Botox® Therapeutics, Facial Aesthetics and the LifeCell and Zeltiq acquisitions.

Botox® Therapeutics increased $186.2 million, or 15.7%, versus the prior year period driven by demand.

The increase in Facial Aesthetics revenues was driven in part by Botox® Cosmetics which increased $83.0 million, or 11.4%, versus the prior year period primarily due to demand growth.  Also contributing was an increase in Juvederm® Collection revenues of $54.2 million, or 12.1% versus the prior year period driven primarily by demand and an increase in market share, offset, in part, by an increase in discounts.

The decline in Azzone revenues of $51.0 million, or 23.5%, was due to genericization of the branded acne market, increased discounts to maintain formulary access and  a generic launch of Aczone 5%.

As a result of the U.S. District Court for the Eastern District of Texas issuing an adverse trial decision finding that the four asserted patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% are invalid, there is a potential risk for future declines in Restasis® revenues.

*Cost of Sales*

The decrease in segment gross margin was primarily the result of the LifeCell Acquisition and the Zeltiq Acquisition, which contributed lower margin products to the segment.  Excluding the LifeCell Acquisition and the Zeltiq Acquisition, segment gross margin was 94.8% in the year ended December 31, 2017, in line with 95.0% in the prior year period.

*Selling and Marketing Expenses*

The increase in selling and marketing expenses primarily relates to increased costs from the LifeCell Acquisition and Zeltiq Acquisition of $193.9 million as well as increased promotional costs for new products Rhofade® and Xen.  As part of the December 2017 restructuring, the resources dedicated to promoting Medical Dermatology were reduced.

*General and Administrative Expenses*

The increase in general and administrative expenses is primarily due to the acquisitions of LifeCell and Zeltiq and additional bad debt writeoffs of $7.9 million.

61

## US General Medicine Segment

The following table presents top product sales and net contribution for the US General Medicine segment for the years ended December 31, 2017 and 2016 ($ in millions):

| | Years Ended December 31, | | Change | |
| | 2017 | 2016 (1) | Dollars | % |
|---|---|---|---|---|
| **Total Central Nervous System (CNS)** | $ 1,359.9 | $ 1,303.6 | $ 56.3 | 4.3% |
| Namenda XR® | 452.8 | 627.6 | (174.8) | (27.9)% |
| Namzaric® | 130.8 | 57.5 | 73.3 | 127.5% |
| Viibryd®/Fetzima® | 333.2 | 342.3 | (9.1) | (2.7)% |
| Saphris® | 155.2 | 166.8 | (11.6) | (7.0)% |
| Vraylar™ | 287.8 | 94.3 | 193.5 | n.m. |
| Namenda® IR | 0.1 | 15.1 | (15.0) | (99.3)% |
| **Total Gastrointestinal (GI)** | **1,695.0** | **1,721.0** | **(26.0)** | **(1.5)%** |
| Linzess® | 701.1 | 625.6 | 75.5 | 12.1% |
| Asacol®/Delzicol® | 195.5 | 360.8 | (165.3) | (45.8)% |
| Carafate®/Sulcrate® | 235.8 | 229.0 | 6.8 | 3.0% |
| Zenpep® | 212.3 | 200.7 | 11.6 | 5.8% |
| Canasa®/Salofalk® | 162.7 | 178.7 | (16.0) | (9.0)% |
| Viberzi® | 156.6 | 93.3 | 63.3 | 67.8% |
| Other GI | 31.0 | 32.9 | (1.9) | (5.8)% |
| **Total Women's Health** | **1,044.2** | **1,179.6** | **(135.4)** | **(11.5)%** |
| Lo Loestrin® | 459.3 | 403.5 | 55.8 | 13.8% |
| Estrace® Cream | 366.6 | 379.4 | (12.8) | (3.4)% |
| Minastrin® 24 | 61.4 | 325.9 | (264.5) | (81.2)% |
| Liletta® | 37.6 | 23.3 | 14.3 | 61.4% |
| Other Women's Health | 119.3 | 47.5 | 71.8 | 151.2% |
| **Total Anti-Infectives** | **257.3** | **225.1** | **32.2** | **14.3%** |
| Teflaro® | 121.9 | 133.6 | (11.7) | (8.8)% |
| Dalvance® | 53.9 | 39.3 | 14.6 | 37.2% |
| Avycaz® | 61.2 | 36.1 | 25.1 | 69.5% |
| Other Anti-Infectives | 20.3 | 16.1 | 4.2 | 26.1% |
| **Diversified Brands** | **1,242.6** | **1,366.6** | **(124.0)** | **(9.1)%** |
| Bystolic® / Byvalson® | 612.2 | 638.8 | (26.6) | (4.2)% |
| Armour Thyroid | 169.1 | 166.5 | 2.6 | 1.6% |
| Savella® | 98.2 | 103.2 | (5.0) | (4.8)% |
| Lexapro® | 51.8 | 66.6 | (14.8) | (22.2)% |
| Enablex® | 3.6 | 17.1 | (13.5) | (78.9)% |
| PacPharma | 14.0 | 52.0 | (38.0) | (73.1)% |
| Other Diversified Brands | 293.7 | 322.4 | (28.7) | (8.9)% |
| **Other revenues** | **197.2** | **128.0** | **69.2** | **54.1%** |
| **Net revenues** | $ **5,796.2** | $ **5,923.9** | $ **(127.7)** | **(2.2)%** |
| Operating expenses: | | | | |
| Cost of sales(2) | 843.9 | 879.8 | (35.9) | (4.1)% |
| Selling and marketing | 1,084.1 | 1,185.7 | (101.6) | (8.6)% |
| General and administrative | 177.3 | 174.9 | 2.4 | 1.4% |
| **Segment contribution** | $ **3,690.9** | $ **3,683.5** | $ **7.4** | **0.2%** |
| Segment margin | 63.7% | 62.2% | | 1.5% |
| Segment gross margin(3) | 85.4% | 85.1% | | 0.3% |

(1) Includes revenues earned that were distributed through our former Anda Distribution business to third party customers.

(2) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(3) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

*Net Revenues*

The decrease in net revenues in the year ended December 31, 2017 over the prior period is primarily due to a decline in Diversified Brand revenues, Women's Health revenues, and Gastrointestinal revenues versus the prior year period, offset, in part, by increases in Other Revenues and CNS revenues.

Diversified Brand revenues declined $124.0 million, or 9.1% versus the prior year period, due in part to a decline of $38.0 million in PacPharma revenues as the Company out licensed these product rights.  Included within "Other Revenues" for the year ended December 31, 2017 is an increase in royalty revenues related to these products of $30.3 million.  Also contributing to the decline in Diversified Brands is a decline in Bystolic® / Byvalson® revenues of $26.6 million, or 4.2% as a result of decreased demand, and the impact of loss of exclusivity on certain products including Enablex®. Other Diversified Brands declined $28.7 million or 8.9% due to demand declines.

Women's Health revenues declined $135.4 million, or 11.5%, primarily due to the loss of exclusivity on Minastrin® 24.  Offsetting this decline, in part, are an increase in revenues on our new product, Taytulla® of $72.4 million and increased sales of Lo Loestrin® of 13.8% due primarily to strong demand growth and higher average selling prices.

Declines within our Gastrointestinal franchise of $26.0 million, or 1.5%, were primarily driven by a reduction in demand for Asacol® HD following the launch of an authorized generic in August 2016. Offsetting this decline, in part, is an increase in royalty revenue of $34.8 million relating to our authorized generic version of Asacol® HD, which is included within "Other Revenues".  Further offsetting this decline was growth in Linzess® and newly launched Viberzi®.  Linzess® revenues increased $75.5 million, or 12.1%, versus the prior year period primarily due to strong demand growth.

The increase in Central Nervous System revenues of $56.3 million, or 4.3%, was driven by the launch of Vraylar™ and Namzaric® offset, in part, by the continued decline in Namenda XR® due to decreased demand and conversion to Namzaric®.

*Cost of Sales*

The decrease in cost of sales was the result of lower product revenues and the impact of the Company reacquiring rights on select licensed products in the year ended December 31, 2017 offset, in part by, unfavorable product mix. As part of the rights reacquired, the Company is no longer obligated to pay royalties on the specific products, which increases the Company's segment gross margin percentage.  In the year ended December 31, 2016, royalties incurred relating to the reacquired product rights were $71.3 million.

*Selling and Marketing Expenses*

The decrease in selling and marketing expenses relates to headcount reductions and lower promotional costs.

*General and Administrative Expenses*

General and administrative expenses are in line period-over-period.

63

## International Segment

The following table presents top product sales and net contribution for the International segment for the years ended December 31, 2017 and 2016 ($ in millions):

| | Years Ended December 31, | | Change | | | | | |
| | 2017 | 2016 | $ Overall Change | $ Operational Change | $ Currency Change | % Overall Change | % Operational Change | % Currency Change |
|---|---|---|---|---|---|---|---|---|
| **Total Eye Care** | $1,282.1 | $1,219.4 | $ 62.7 | $ 48.0 | $ 14.7 | 5.1% | 3.9% | 1.2% |
| Lumigan®/Ganfort® | 371.5 | 361.7 | 9.8 | 4.9 | 4.9 | 2.7% | 1.3% | 1.4% |
| Alphagan®/Combigan® | 175.1 | 169.3 | 5.8 | 4.0 | 1.8 | 3.4% | 2.3% | 1.1% |
| Ozurdex® | 213.4 | 179.0 | 34.4 | 32.4 | 2.0 | 19.2% | 18.1% | 1.1% |
| Optive® | 114.1 | 101.9 | 12.2 | 9.5 | 2.7 | 12.0% | 9.4% | 2.6% |
| Other Eye Drops | 166.9 | 174.3 | (7.4) | (8.4) | 1.0 | (4.2)% | (4.8)% | 0.6% |
| Restasis® | 61.3 | 68.0 | (6.7) | (5.9) | (0.8) | (9.9)% | (8.7)% | (1.2)% |
| Other Eye Care | 179.8 | 165.2 | 14.6 | 11.5 | 3.1 | 8.8% | 6.9% | 1.9% |
| **Total Medical Aesthetics** | 1,366.6 | 1,064.6 | 302.0 | 301.3 | 0.7 | 28.4% | 28.3% | 0.1% |
| **Facial Aesthetics** | 1,104.5 | 902.7 | 201.8 | 202.1 | (0.3) | 22.4% | 22.4% | 0.0% |
| Botox® Cosmetics | 557.0 | 480.0 | 77.0 | 83.5 | (6.5) | 16.0% | 17.4% | (1.4)% |
| Juvederm® Collection | 540.7 | 420.4 | 120.3 | 114.2 | 6.1 | 28.6% | 27.1% | 1.5% |
| Belkyra® (Kybella®) | 6.8 | 2.3 | 4.5 | 4.4 | 0.1 | 195.7% | 191.4% | 4.3% |
| **Plastic Surgery** | 158.6 | 150.7 | 7.9 | 7.3 | 0.6 | 5.2% | 4.8% | 0.4% |
| Breast Implants | 156.9 | 149.9 | 7.0 | 6.4 | 0.6 | 4.7% | 4.3% | 0.4% |
| Earfold™ | 1.7 | 0.8 | 0.9 | 0.9 | - | 112.5% | 112.5% | n.a. |
| **Regenerative Medicine** | 16.5 | - | 16.5 | 16.5 | - | n.a. | n.a. | n.a. |
| Alloderm® | 7.5 | - | 7.5 | 7.5 | - | n.a. | n.a. | n.a. |
| Other Regenerative Medicine | 9.0 | - | 9.0 | 9.0 | - | n.a. | n.a. | n.a. |
| **Body Contouring** | 73.7 | - | 73.7 | 73.7 | - | n.a. | n.a. | n.a. |
| Coolsculpting ® Systems & Add On Applicators | 32.1 | - | 32.1 | 32.1 | - | n.a. | n.a. | n.a. |
| Coolsculpting ® Consumables | 41.6 | - | 41.6 | 41.6 | - | n.a. | n.a. | n.a. |
| **Skin Care** | 13.3 | 11.2 | 2.1 | 1.7 | 0.4 | 18.8% | 15.2% | 3.6% |
| **Botox® Therapeutics and Other** | 587.4 | 537.3 | 50.1 | 43.6 | 6.5 | 9.3% | 8.1% | 1.2% |
| Botox® Therapeutics | 357.5 | 323.0 | 34.5 | 30.1 | 4.4 | 10.7% | 9.3% | 1.4% |
| Asacol®/Delzicol® | 50.2 | 53.7 | (3.5) | (2.3) | (1.2) | (6.5)% | (4.3)% | (2.2)% |
| Constella® | 21.9 | 17.3 | 4.6 | 4.5 | 0.1 | 26.6% | 26.0% | 0.6% |
| Other Products | 157.8 | 143.3 | 14.5 | 11.3 | 3.2 | 10.1% | 7.9% | 2.2% |
| Other revenues | 83.4 | 60.0 | 23.4 | 22.4 | 1.0 | 39.0% | 37.3% | 1.7% |
| Net revenues | $3,319.5 | $2,881.3 | $ 438.2 | $ 415.3 | $ 22.9 | 15.2% | 14.4% | 0.8% |
| Operating expenses: | | | | | | | | |
| Cost of sales(1) | 478.7 | 418.2 | 60.5 | 55.4 | 5.1 | 14.5% | 13.3% | 1.2% |
| Selling and marketing | 913.8 | 788.2 | 125.6 | 114.7 | 10.9 | 15.9% | 14.5% | 1.4% |
| General and administrative | 120.6 | 117.2 | 3.4 | 2.3 | 1.1 | 2.9% | 2.0% | 0.9% |
| **Segment contribution** | $1,806.4 | $1,557.7 | $ 248.7 | $ 242.9 | $ 5.8 | 16.0% | 15.6% | 0.4% |
| Segment margin | 54.4% | 54.1% | | | | 0.3% | | |
| Segment gross margin(2) | 85.6% | 85.5% | | | | 0.1% | | |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

64

*Net Revenues*

The increase in net revenues in the year ended December 31, 2017 over the prior period is primarily due to the operational growth of total Facial Aesthetics, Eye Care and Botox® Therapeutics, as well as the acquisition of Zeltiq, which contributed $73.7 million of net revenues during the year ended December 31, 2017.  Within Total Eye Care, Ozurdex® increased $34.4 million, or 19.2% versus the prior year period, primarily driven by demand growth.  Within Facial Aesthetics, Juvederm® Collection revenues increased $120.3 million, or 28.6% versus the prior year period, primarily resulting from demand growth.  Botox® Cosmetics sales grew 16.0% driven by demand growth.  Botox® Therapeutics sales also grew 10.7% driven by demand growth.  International operational growth came from all regions primarily driven by Facial Aesthetics.

In the first quarter of 2017, the Company announced a realignment of its International Commercial organization. As a result of this realignment, future promotional priorities among the International portfolio as compared to the results for the year ended December 31, 2017, may shift and as such revenues by product may be impacted.

*Cost of Sales*

The increase in cost of sales was primarily due to the increase in net revenues.  Segment gross margins of 85.6% for the year ended December 31, 2017 remained consistent with the prior year.

*Selling and Marketing Expenses*

The increase in selling and marketing expenses relates to the addition of Zeltiq, which contributed spending of $39.0 million, as well as increased promotional spending associated with Ozurdex®, Botox® Cosmetics and the Juvederm® Collection and recent product launches.

*General and Administrative Expenses*

General and administrative expenses are in line period-over-period.

65

*Corporate*

Corporate represents the results of corporate initiatives as well as the impact of select revenues and shared costs. The following represents the corporate amounts for the years ended December 31, 2017 and 2016 ($ in millions):

| | Integration | Non-Acquisition Related Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Other | Revenues and Shared Costs | Total |
|---|---|---|---|---|---|---|---|
| | | | | **Year Ended December 31, 2017** | | | |
| Net revenues | $ - $ | - $ | - $ | - $ | - $ | 21.4 $ | 21.4 |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 8.0 | 61.5 | (183.2) | 136.3 | 12.5 | 314.9 | 350.0 |
| Selling and marketing | 29.5 | 80.8 | - | 33.1 | 0.5 | 3.5 | 147.4 |
| General and administrative | 138.8 | 32.8 | - | 49.0 | 97.4 | 677.8 | 995.8 |
| Contribution | $ (176.3) $ | (175.1) $ | 183.2 $ | (218.4) $ | (110.4) $ | (974.8) $ | (1,471.8) |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Reclassification of Sales Distributed Through Anda to Discontinued Operations | Other | Revenues and Shared Costs | Total |
|---|---|---|---|---|---|---|---|
| | | | | **Year Ended December 31, 2016** | | | |
| Net revenues | $ - $ | - $ | - $ | (80.0) $ | - $ | 33.7 $ | (46.3) |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 23.0 | (17.4) | 50.5 | (78.2) | - | 294.0 | 271.9 |
| Selling and marketing | 82.5 | - | 65.4 | - | - | 7.6 | 155.5 |
| General and administrative | 269.6 | 24.3 | 80.5 | - | 136.3 | 496.9 | 1,007.6 |
| Contribution | $ (375.1) $ | (6.9) $ | (196.4) $ | (1.8) $ | (136.3) $ | (764.8) $ | (1,481.3) |

[1]  Excludes amortization and impairment of acquired intangibles including product rights.

*Integration*

In the year ended December 31, 2017, integration and restructuring charges included costs related to the integration of LifeCell and Zeltiq. In the year ended December 31, 2016, integration and restructuring charges primarily related to the integration of the Legacy Allergan business as well as charges incurred with the terminated merger with Pfizer, Inc. of $124.9 million.

*Non-Acquisition Related Restructuring*

In the year ended December 31, 2017, the Company incurred restructuring charges of its internal infrastructure. The restructuring programs included a mid-year commercial initiative as well as the December 2017 program. As part of these initiatives, the Company has reduced its employee headcount within selling and marketing by approximately 350 as of December 31, 2017 and is reducing its employee headcount within cost of sales, selling and marketing and general and administrative by approximately 900 employees in the year ended December 31, 2018.

*Fair Value Adjustments*

Fair value adjustments primarily relate to changes in estimated contingent liabilities which is based on future amounts to be paid based on achievement of sales levels for the respective products. The income recorded in the year ended December 31, 2017 primarily relates to reduced or delayed revenue forecasts for select products including Rhofade® and Liletta®.

66

*Effect of Purchase Accounting*

In the year ended December 31, 2017, the Company incurred purchase accounting effects of $131.7 million in cost of sales related to the fair value inventory step-up from the LifeCell and Zeltiq acquisitions as products were sold to the Company's third-party customers.  In the year ended December 31, 2016, the Company incurred purchase accounting effects of $42.4 million in cost of sales primarily related to the fair value inventory step-up from the Allergan and Forest acquisitions as products were sold to the Company's third party customers.

In the year ended December 31, 2017, the Company incurred charges related to the purchase accounting impact on stock-based compensation related to the Allergan, Forest and Zeltiq acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses, including a cash stock-based compensation charge of $31.5 million associated with the Zeltiq Acquisition.  In the year ended December 31, 2016, the Company incurred charges related to the purchase accounting impact on stock-based compensation related to the Allergan and Forest acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses.

*Other*

In the year ended December 31, 2017, general and administrative costs included legal settlement charges of $96.5 million.  In the year ended December 31, 2016, general and administrative costs included legal settlement charges of $117.3 million.

*Revenues and Shared Costs*

Shared costs primarily include above site and unallocated costs associated with running our global manufacturing facilities and corporate general and administrative expenses.  In the year ended December 31, 2017, the Company incurred transactional foreign exchange losses of $97.5 million versus transactional foreign exchange gains of $52.8 million, excluding mark-to-market unrealized losses for foreign currency option contracts, in the year ended December 31, 2016.

### Research and Development Expenses

R&D expenses consist predominantly of personnel-related costs, active pharmaceutical ingredient costs, contract research, license and milestone fees, biostudy and facilities costs associated with product development.

R&D expenses consisted of the following components in the years ended December 31, 2017 and 2016 ($ in millions):

67

agn-10k_20171231.htm

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | Dollars | % |
| Ongoing operating expenses | $ 1,598.8 | $ 1,433.8 | $ 165.0 | 11.5% |
| Brand related milestone payments and upfront license payments | 391.8 | 1,134.7 | (742.9) | (65.5)% |
| Contingent consideration adjustments, net | 50.0 | (71.1) | 121.1 | (170.3)% |
| Acquisition, integration, and restructuring charges | 41.2 | 24.5 | 16.7 | 68.2% |
| Acquisition accounting fair market value adjustments to stock-based compensation | 18.3 | 53.8 | (35.5) | (66.0)% |
| **Total R&D Expenses** | **$ 2,100.1** | **$ 2,575.7** | **$ (475.6)** | **(18.5)%** |

The increase in ongoing operating expenses in the year ended December 31, 2017 versus the prior year period is primarily due to increased product development spending primarily in the Central Nervous System and Gastrointestinal therapeutic areas coupled with higher personnel costs.

The following represents brand related milestone payments and upfront license payments in the years ended December 31, 2017 and 2016, respectively ($ in millions):

| | Years Ended December 31, | |
|---|---|---|
| | 2017 | 2016 |
| AstraZeneca plc | $ - | $ 250.0 |
| Lysosomal Therapeutics, Inc. | 145.0 | - |
| Editas Medicine, Inc. | 90.0 | - |
| Assembly Biosciences, Inc. | 50.0 | - |
| Lyndra, Inc. | 15.0 | - |
| Motus Therapeutics, Inc. | - | 199.5 |
| Chase Pharmaceuticals Corporation | - | 122.9 |
| Heptares Therapeutics, Ltd | 15.0 | 125.0 |
| Merck & Co. | - | 100.0 |
| Anterios, Inc. | - | 89.2 |
| Topokine Therapeutics, Inc. | - | 85.8 |
| RetroSense Therapeutics, LLC | - | 59.7 |
| Akarna Therapeutics, Ltd | 39.6 | 48.2 |
| Other | 37.2 | 54.4 |
| **Total** | **$ 391.8** | **$ 1,134.7** |

In the year ended December 31, 2017, the adjustment to contingent consideration primarily related to the advancement of the Company's True Tear™ product and products acquired as part of the Tobira Acquisition. In the year ended December 31, 2016, the Company had net contingent consideration income of $71.1 million primarily driven by ongoing R&D projects that were terminated based on clinical data acquired in the Allergan Acquisition, which was offset by additional contingent consideration expense relating to milestones achieved in connection with the AqueSys and Allergan Acquisitions.

Acquisition, integration and restructuring charges in the year ended December 31, 2017 includes $37.1 million of severance and restructuring costs related to a planned internal reduction of approximately 200 R&D employees and reduction of headcount due to the integration of acquired businesses.

*Amortization*

Amortization in the years ended December 31, 2017 and 2016 was as follows:

| ($ in millions) | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | Dollars | % |
| Amortization | $ 7,197.1 | $ 6,470.4 | $ 726.7 | 11.2% |

68

Amortization for the year ended December 31, 2017 increased as compared to the prior period primarily as a result of amortization related to the acquired LifeCell and Zeltiq products of $172.0 million, an increase in amortization for Restasis® based on a revised estimated useful life subsequent to the impairment charge taken in the quarter ended September 30, 2017, as well as amortization from approved products during the year ended December 31, 2016 and the year ended December 31, 2017.

### IPR&D Impairments and Asset Sales and Impairments, Net

IPR&D impairments and Asset sales and impairments, net consisted of the following components in the years ended December 31, 2017 and 2016:

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | Dollars | % |
| Asset sales and impairments, net | $ 3,927.7 | $ 5.0 | $ 3,922.7 | n.m. |
| IPR&D impairments | 1,452.3 | 743.9 | 708.4 | 95.2% |

In the year ended December 31, 2017 the Company recorded the following significant impairments:

- The U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% are invalid.  As a result of our review of all potential scenarios relating to these assets and our assessment of the decreased likelihood of revenue extending through the full patent term of 2024, the Company recognized an impairment of $3,230.0 million related to Restasis® as well as $170.0 million related to other Dry Eye IPR&D assets obtained in the Allergan acquisition;

- The Company impaired the intangible asset related to Aczone® by $646.0 million as a result of recent market dynamics, including erosion in the brand acne market, an anticipated decline in the market outlook, and recent generic entrants;

- The Company impaired a CNS IPR&D project obtained as part of the Allergan acquisition by $486.0 million related to an anticipated approval delay due to certain product specifications;

- The Company impaired an IPR&D asset acquired as part of the Warner Chilcott acquisition by $278.0 million, due to a termination of a launch of a women's healthcare project due to a decrease in product demand;

- The Company impaired an IPR&D eye care project obtained as part of the Allergan acquisition by $209.0 million due to an anticipated delay in launch;

- The Company terminated its License, Transfer and Development Agreement for SER-120 (nocturia) with Serenity Pharmaceuticals, LLC. As a result of this termination, the Company recorded an impairment of $140.0 million on the IPR&D intangible asset obtained as part of the Allergan acquisition;

- The Company impaired a women's healthcare IPR&D project by $91.3 million based on the Company's intention to divest the non-strategic asset; and

- The Company impaired an IPR&D medical aesthetics project obtained as part of the Allergan acquisition by $29.0 million.

In the year ended December 31, 2016 the Company recorded the following significant impairments:

- The Company recognized approximately $210.0 million in impairments relating to a urology product acquired in the Allergan Acquisition due to clinical data not supporting continuation of the R&D study.  This impairment was offset, in part, by a reduction of the contingent liability of $186.0 million which reduced overall R&D expenses;

- The Company recognized approximately $106 million in impairments relating to a migraine treatment acquired in the Allergan Acquisition based on a decrease in projected cash flows due to a delay in potential launch;

- The Company recognized approximately $46.0 million in impairments relating to the atopic dermatitis pipeline candidate acquired in the Vitae Acquisition;

- The Company recognized approximately $33.0 million in impairments of the acquired ForSight IPR&D asset as the Company anticipates a delay in potential launch timing.  Offsetting this impairment was a corresponding reduction of acquired contingent consideration of $15.0 million, which reduced overall R&D expenses;

- The Company recognized approximately $42.0 million in IPR&D impairments on a gastroenterology project based on the lack of future availability of active pharmaceutical ingredients;

69

- The Company recognized approximately $190.0 million in IPR&D impairments due to the termination of an osteoarthritis R&D project due to clinical results;

- The Company impaired IPR&D assets relating to an international eye care pipeline project of $35.0 million based on a decrease in projected cash flows due to market conditions;

- The Company impaired IPR&D assets of $40.0 million for a Botox® premature ejaculation product based on a decrease in projected cash flows; and

- The Company recognized $24.0 million in IPR&D impairments relating to the termination of a women's healthcare R&D project due to clinical results.

Asset sales and impairments, net in the year ended December 31, 2016, included the gain on the sale of certain investments, offset in part by the impairment of intellectual property for Nuvessa® based on revised cash flow forecasts.

*Interest Income*

Interest income in the years ended December 31, 2017 and 2016 was as follows:

| ($ in millions) | Years Ended December 31, | | Change | |
| | 2017 | 2016 | Dollars | % |
| --- | --- | --- | --- | --- |
| Interest income | $ 67.7 | $ 69.9 | $ (2.2) | (3.1)% |

Interest income represents interest earned on cash and cash equivalents and marketable securities held during the respective periods.

*Interest Expense*

Interest expense consisted of the following components in the years ended December 31, 2017 and 2016:

| ($ in millions) | Years Ended December 31, | | Change | |
| | 2017 | 2016 | Dollars | % |
| --- | --- | --- | --- | --- |
| Fixed Rate Notes | $ 1,030.5 | $ 1,140.0 | $ (109.5) | (9.6)% |
| Floating Rate Notes | 25.9 | 21.7 | 4.2 | 19.4% |
| Euro Denominated Notes | 19.8 | - | 19.8 | n.a. |
| Term Loan Indebtedness | - | 116.2 | (116.2) | (100.0)% |
| Revolving Credit Facility | - | 2.6 | (2.6) | (100.0)% |
| Other | 19.4 | 15.1 | 4.3 | 28.5% |
| Interest expense | $ 1,095.6 | $ 1,295.6 | $ (200.0) | (15.4)% |

Interest expense in the year ended December 31, 2017 decreased versus the year ended December 31, 2016 due to the pay down of term loan indebtedness with use of proceeds received in the Teva Transaction as well as scheduled maturities and early debt extinguishment of senior secured notes.

70

### Other (Expense) / Income, Net

Other (expense) / income, net consisted of the following components in the years ended December 31, 2017 and 2016:

| | Years Ended December 31, | | | | Change | |
|---|---|---|---|---|---|---|
| ($ in millions) | 2017 | | 2016 | | Dollars | % |
| Teva Share Activity | $ (3,269.3) | $ | - | $ | (3,269.3) | n.a. |
| Debt extinguishment costs as part of the debt tender offer | (161.6) | | - | | (161.6) | n.a. |
| Debt extinguishment other | (27.6) | | - | | (27.6) | n.a. |
| Other-than-temporary impairments | (26.1) | | - | | (26.1) | n.a. |
| Dividend income | 85.2 | | 68.2 | | 17.0 | 24.9% |
| Naurex recovery | 20.0 | | - | | 20.0 | n.a. |
| Forward sale of Teva shares | (62.9) | | - | | (62.9) | n.a. |
| Pfizer termination fee (Allergan plc only) | - | | 150.0 | | (150.0) | (100.0)% |
| Other (expense) / income, net | 5.0 | | 1.0 | | 4.0 | 400.0% |
| Other (expense) / income, net | $ (3,437.3) | $ | 219.2 | $ | (3,656.5) | (1,668.1)% |

#### Teva Share Activity

During the year ended December 31, 2017, the Company recorded the following movements in its investment in Teva securities (defined herein as "Teva Share Activity") as follows ($ in millions except per share information):

| in million except per share amounts | Shares | Cost Basis | Market Price | Discount | Movement in the Value of Marketable Securities | Unrealized Gain / (Loss) as a Component of Other Comprehensive Income | Gain / (Loss) Recognized in Other Income (Expense), Net |
|---|---|---|---|---|---|---|---|
| Teva securities as of December 31, 2016 | 100.3 | $53.39 | $ 36.25 | 5.4% | $ 3,439.2 | $ (1,599.4) | $ - |
| Other-than-temporary impairment recognized at March 31, 2017 | 100.3 | $32.09 | $ 32.09 | 4.9% | $ (378.6) | $ 1,599.4 | $ (1,978.0) |
| Other-than-temporary impairment recognized at September 30, 2017 | 100.3 | $17.60 | $ 17.60 | 0.0% | $ (1,295.5) | $ - | $ (1,295.5) |
| Sales during the twelve months ended December 31, 2017 | (4.4) | n.a. | n.a. | 0.0% | $ (76.7) | $ - | $ 4.2 |
| Other fair value movements in the twelve months ended December 31, 2017 | 95.9 | $17.60 | $ 18.95 | 0.0% | $ 129.3 | $ 129.3 | $ - |
| Teva securities as of and for the twelve months ended December 31, 2017 | 95.9 | $17.60 | $ 18.95 | 0.0% | $ 1,817.7 | $ 129.3 | $ (3,269.3) |

As of December 31, 2017, the Company owned 95.9 million Teva ordinary shares, which are subject to changes in value based on the price of Teva shares.  Subsequent to December 31, 2017, the Company has sold an additional 6.3 million Teva ordinary shares for $127.9 million.

#### Forward Sale of Teva Shares

In the year ended December 31, 2017, the Company recorded a $62.9 million loss on the fair value of the derivative for the forward sale of 25.0 million Teva securities.  The ASR was settled on January 12, 2018 for $413.3 million.

On February 13, 2018, the Company entered into additional forward sale transactions under which we sold approximately 25.0 million Teva shares.  The value of the shares will be based on the volume weighted average price of Teva shares plus a premium and is expected to settle during the second quarter of 2018. As a result of the transaction, the Company received 80% of the proceeds, or approximately $372.0 million, with the remainder of the proceeds being delivered upon settlement.

#### Debt Extinguishment Costs as Part of the Debt Tender Offer

In the year ended December 31, 2017, the Company repaid $2,843.3 million of senior notes.  As a result of the extinguishment, the Company recognized a loss of $161.6 million, within "Other (expense) / income" for the early tender payment and non-cash write-

off of premiums and debt fees related to the repurchased notes, including $170.5 million of a make-whole premium.

71

### Debt Extinguishment Other

In the year ended December 31, 2017, the Company repaid $750.0 million of senior notes due in the year ending December 31, 2019.  As a result of the extinguishment, the Company recognized a loss of $27.6 million, within "Other (expense) / income" for the early payment and non-cash write-off of premiums and debt fees related to the repaid notes, including $35.1 million of a make-whole premium.

### Other-than-temporary Impairments

The Company recorded other-than-temporary impairment charges on other equity investments and cost method investments of $26.1 million in the year ended December 31, 2017.

### Dividend Income

As a result of the Teva Transaction, the Company acquired 100.3 million Teva ordinary shares.  During the years ended December 31, 2017 and 2016, the Company received dividend income of $85.2 million and $68.2 million, respectively.

### Naurex Recovery

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. in an all-cash transaction, which was accounted for as an asset acquisition.  The Company received a purchase price reduction of $20.0 million in the year ended December 31, 2017 based on the settlement of an open contract dispute.

### Pfizer Termination Fee

In the year ended December 31, 2016, the Company received a payment of $150.0 million from Pfizer Inc. ("Pfizer") for reimbursement of expenses associated with the termination of a merger agreement between the Company and Pfizer which is reported as other income.

### (Benefit) for Income Taxes

(Benefit) for income taxes in the years ended December 31, 2017 and 2016 was as follows:

| ($ in millions) | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2017 | 2016 | Dollars | % |
| (Benefit) for income taxes | $ (6,670.4) | $ (1,897.0) | $ (4,773.4) | 251.6% |
| Effective tax rate | (64.2)% | (67.0)% | | |

The Company's effective tax rate for the twelve months ended December 31, 2017 was a benefit of (64.2%) compared to a benefit of (67.0%) for the twelve months ended December 31, 2016. The reconciliations between the statutory Irish tax rates for Allergan plc and the effective income tax rates were as follows:

| | Allergan plc | |
| --- | --- | --- |
| | Years Ended December 31, | |
| | 2017 | 2016 |
| Statutory rate | (12.5)% | (12.5)% |
| Earnings subject to U.S. taxes [1][2] | (17.8)% | (37.5)% |
| Earnings subject to rates different than the statutory rate [1][2] | 2.5% | (18.3)% |
| Impact of tax reform [3] | (27.2)% | 0.0% |
| Tax reserves and audit outcomes | 0.4% | (0.7)% |
| Non-deductible expenses | 0.2% | 3.1% |
| Impact of acquisitions and reorganizations [4] | (9.3)% | 3.1% |
| Tax credits and U.S. manufacturing deduction | (1.5)% | (3.1)% |
| Rate changes [5] | (1.2)% | (7.4)% |
| Valuation allowances [6] | 2.2% | 6.5% |
| Other | 0.0% | (0.2)% |

| | | |
|---|---|---|
| Effective income tax rate | (64.2)% | (67.0)% |

72

The material drivers of the period-over-period tax rate movements are as follows:

(1) The benefit to the 2017 effective tax rate was lower as compared to 2016 due to proportionately fewer losses in jurisdictions with tax rates higher than the Irish statutory rate.

(2) In 2017, the Company recorded amortization expense of $7.20 billion and impairment charges of $8.65 billion, including Teva Share Activity. A significant portion of these amounts were incurred in jurisdictions with tax rates higher than the Irish statutory rate resulting in a net $1,262.2 million favorable impact on the 2017 effective tax rate.

(3) As part of the enactment of the TCJA, the Company recorded a provisional net deferred tax benefit of $2.8 billion related to the change in tax rates applicable to our deferred tax liabilities, the net reversal of amounts previously accrued for taxes on unremitted earnings of certain non-U.S. subsidiaries and the tax on the deemed repatriation of the Deferred Foreign Earnings of certain non-U.S. subsidiaries (toll charge). These provisional amounts will be finalized in 2018 or upon the finalization of the 2018 financial results. See Note 18 to the Consolidated Financial Statements for additional details on the TCJA.

(4) In 2017, the Company recorded a tax benefit of $895.3 million for deferred taxes related to basis differences in investments expected to reverse at tax rates different than were initially recorded. This resulted in a more favorable impact on the effective tax rate as compared to 2016.

(5) As a result of changes in tax rates applied to the Company's deferred tax liabilities in France and U.S. states, the Company recorded a benefit of $128.1 million.

(6) In 2017, the Company recorded a valuation allowance of $230.1 million related to capital losses and foreign tax credit carryforwards not expected to be realized. The amount was mostly offset by benefits recorded in 2017 for these capital losses and foreign tax credits.

## YEAR ENDED DECEMBER 31, 2016 COMPARED TO 2015

Results of operations, including segment net revenues, segment operating expenses and segment contribution consisted of the following for the years ended December 31, 2016 and 2015 ($ in millions):

|  | Year Ended December 31, 2016 | | | |
|---|---|---|---|---|
|  | US Specialized Therapeutics | US General Medicine | International | Total |
| Net revenues | $     5,811.7 | $     5,923.9 | $     2,881.3 | $     14,616.9 |
| Operating expenses: |  |  |  |  |
| Cost of sales[1] | 290.9 | 879.8 | 418.2 | 1,588.9 |
| Selling and marketing | 1,137.0 | 1,185.7 | 788.2 | 3,110.9 |
| General and administrative | 174.2 | 174.9 | 117.2 | 466.3 |
| **Segment contribution** | $     4,209.6 | $     3,683.5 | $     1,557.7 | $     9,450.8 |
| **Contribution margin** | *72.4%* | *62.2%* | *54.1%* | *64.7%* |
| Corporate |  |  |  | 1,481.3 |
| Research and development |  |  |  | 2,575.7 |
| Amortization |  |  |  | 6,470.4 |
| In-process research and development impairments |  |  |  | 743.9 |
| Asset sales and impairments, net |  |  |  | 5.0 |
| Operating (loss) |  |  |  | $     (1,825.5) |
| Operating margin |  |  |  | (12.5)% |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

73

| | Year Ended December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | US Specialized Therapeutics | US General Medicine | International | Total |
| Net revenues | $ 4,309.8 | $ 6,338.4 | $ 2,187.3 | $ 12,835.5 |
| Operating expenses: | | | | |
| Cost of sales(1) | 235.8 | 909.5 | 350.9 | 1,496.2 |
| Selling and marketing | 772.8 | 1,194.7 | 569.2 | 2,536.7 |
| General and administrative | 68.3 | 105.3 | 107.6 | 281.2 |
| **Segment contribution** | $ **3,232.9** | $ **4,128.9** | $ **1,159.6** | $ **8,521.4** |
| **Contribution margin** | *75.0%* | *65.1%* | *53.0%* | *66.4%* |
| Corporate | | | | 3,066.6 |
| Research and development | | | | 2,358.5 |
| Amortization | | | | 5,443.7 |
| In-process research and development impairments | | | | 511.6 |
| Asset sales and impairments, net | | | | 272.0 |
| Operating (loss) | | | | $ (3,131.0) |
| Operating margin | | | | (24.4)% |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | Change | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | Dollars | % |
| Segment net revenues | $ 14,616.9 | $ 12,835.5 | $ 1,781.4 | 13.9% |
| Corporate revenues | (46.3) | (147.4) | 101.1 | (68.6)% |
| **Net revenues** | $ **14,570.6** | $ **12,688.1** | $ **1,882.5** | **14.8%** |

No country outside of the United States represented ten percent or more of net revenues. The US Specialized Therapeutics and US General Medicine segments were comprised solely of sales within the United States.

74

The following table presents global net revenues for the top products of the Company for the years ended December 31, 2016 and 2015 ($ in millions):

| | Year Ended December 31, 2016 | | | | | Year Ended December 31, 2015 | | | | | Change | |
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | US Specialized Therapeutics | US General Medicine | International | Corporate | Total | Dollars | Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Botox® | $ 1,933.2 | $ - | $ 803.0 | $ - | $ 2,786.2 | $ 1,386.4 | $ - | $ 584.4 | $ - | $ 1,970.8 | $ 815.4 | 41.4% |
| Restasis® | 1,419.5 | - | 68.0 | - | 1,487.5 | 999.6 | - | 48.2 | - | 1,047.8 | 439.7 | 42.0% |
| Juvéderm® Collection ** | 446.9 | - | 420.4 | - | 867.3 | 304.4 | - | 269.5 | - | 573.9 | 293.4 | 51.1% |
| Lumigan®/Ganfort® | 326.4 | - | 361.7 | - | 688.1 | 260.7 | - | 283.4 | - | 544.1 | 144.0 | 26.5% |
| Linzess®/Constella® | - | 625.6 | 17.3 | - | 642.9 | - | 454.8 | 4.5 | - | 459.3 | 183.6 | 40.0% |
| Bystolic® / Byvalson® | - | 638.8 | 1.7 | - | 640.5 | - | 644.8 | 1.3 | - | 646.1 | (5.6) | (0.9)% |
| Namenda XR® | - | 627.6 | - | - | 627.6 | - | 759.3 | - | - | 759.3 | (131.7) | (17.3)% |
| Alphagan®/Combigan® | 376.6 | - | 169.3 | - | 545.9 | 285.0 | - | 126.1 | - | 411.1 | 134.8 | 32.8% |
| Asacol®/Delzicol® | - | 360.8 | 53.7 | - | 414.5 | - | 552.9 | 65.5 | - | 618.4 | (203.9) | (33.0)% |
| Lo Loestrin® | - | 403.5 | - | - | 403.5 | - | 346.5 | 3.1 | - | 349.6 | 53.9 | 15.4% |
| Estrace® Cream | - | 379.4 | - | - | 379.4 | - | 326.2 | - | - | 326.2 | 53.2 | 16.3% |
| Eye Drops | 186.5 | - | 276.2 | - | 462.7 | 177.0 | - | 220.6 | - | 397.6 | 65.1 | 16.4% |
| Breast Implants | 206.0 | - | 149.9 | - | 355.9 | 175.0 | - | 125.5 | - | 300.5 | 55.4 | 18.4% |
| Vibryd®/Fetzima® | - | 342.3 | - | - | 342.3 | - | 327.6 | - | - | 327.6 | 14.7 | 4.5% |
| Minastrin® 24 | - | 325.9 | 1.4 | - | 327.3 | - | 272.4 | 0.6 | - | 273.0 | 54.3 | 19.9% |
| Ozurdex ® | 84.4 | - | 179.0 | - | 263.4 | 56.1 | - | 112.3 | - | 168.4 | 95.0 | 56.4% |
| Carafate ® / Sulcrate ® | - | 229.0 | 2.4 | - | 231.4 | - | 213.1 | - | - | 213.1 | 18.3 | 8.6% |
| Aczone® | 217.3 | - | - | - | 217.3 | 170.8 | - | - | - | 170.8 | 46.5 | 27.2% |
| Zenpep® | - | 200.7 | - | - | 200.7 | - | 167.4 | - | - | 167.4 | 33.3 | 19.9% |
| Canasa®/Salofalk® | - | 178.7 | 17.7 | - | 196.4 | - | 137.1 | 18.5 | - | 155.6 | 40.8 | 26.2% |
| Saphris® | - | 166.8 | - | - | 166.8 | - | 186.7 | - | - | 186.7 | (19.9) | (10.7)% |
| Armour Thyroid | - | 166.5 | - | - | 166.5 | - | 130.8 | - | - | 130.8 | 35.7 | 27.3% |
| Teflaro® | - | 133.6 | - | - | 133.6 | - | 137.6 | - | - | 137.6 | (4.0) | (2.9)% |
| Rapaflo® | 116.6 | - | 5.8 | - | 122.4 | 115.2 | - | 10.9 | - | 126.1 | (3.7) | (2.9)% |
| SkinMedica® | 108.3 | - | - | - | 108.3 | 76.6 | - | - | - | 76.6 | 31.7 | 41.4% |
| Savella® | - | 103.2 | - | - | 103.2 | - | 106.4 | - | - | 106.4 | (3.2) | (3.0)% |
| Tazorac® | 95.5 | - | 0.8 | - | 96.3 | 92.3 | - | 1.4 | - | 93.7 | 2.6 | 2.8% |
| Vraylar™ | - | 94.3 | - | - | 94.3 | - | - | - | - | - | 94.3 | n.a. |
| Viberzi® | - | 93.3 | - | - | 93.3 | - | 12.3 | - | - | 12.3 | 81.0 | n.m. |
| Latisse® | 77.9 | - | 8.5 | - | 86.4 | 63.2 | - | 10.0 | - | 73.2 | 13.2 | 18.0% |
| Lexapro® | - | 66.6 | - | - | 66.6 | - | 71.6 | - | - | 71.6 | (5.0) | (7.0)% |
| Namzaric® | - | 57.5 | - | - | 57.5 | - | 11.2 | - | - | 11.2 | 46.3 | n.m. |
| Kybella® / Belkyra® | 50.2 | - | 2.3 | - | 52.5 | 3.2 | - | - | - | 3.2 | 49.3 | n.m. |
| Dalvance® | - | 39.3 | - | - | 39.3 | - | 16.8 | - | - | 16.8 | 22.5 | 133.9% |
| Avycaz® | - | 36.1 | - | - | 36.1 | - | 22.6 | - | - | 22.6 | 13.5 | 59.7% |
| Liletta® | - | 23.3 | - | - | 23.3 | - | 14.8 | - | - | 14.8 | 8.5 | 57.4% |
| Enablex® | - | 17.1 | - | - | 17.1 | - | 69.2 | - | - | 69.2 | (52.1) | (75.3)% |
| Namenda® IR | - | 15.1 | - | - | 15.1 | - | 556.3 | - | - | 556.3 | (541.2) | (97.3)% |
| Other | 116.4 | 598.9 | 342.2 | 33.7 | 1,091.2 | 144.3 | 800.0 | 301.5 | 10.0 | 1,255.8 | (164.6) | (13.1)% |
| Less product sold through our former Anda Distribution business | n.a. | n.a. | n.a. | (80.0) | (80.0) | n.a. | n.a. | n.a. | (157.4) | (157.4) | 77.4 | (49.2)% |
| Total net revenues | $ 5,811.7 | $ 5,923.9 | $ 2,881.5 | $ (46.3) | $ 14,570.6 | $ 4,309.8 | $ 6,338.4 | $ 2,187.3 | $ (147.4) | $ 12,688.1 | $ 1,882.5 | 14.8% |

** Sales of fillers including Juvederm, Voluma and other fillers are referred to herein as the "Juvéderm® Collection".

*US Specialized Therapeutics Segment*

The following table presents top product sales and net contribution for the US Specialized Therapeutics segment for the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | | | Change | |
| | 2016 (1) | | 2015 (1) | | Dollars | % |
|---|---|---|---|---|---|---|
| **Total Eye Care** | $ | **2,437.7** | $ | **1,831.3** | $ 606.4 | **33.1%** |
| Restasis® | | 1,419.5 | | 999.6 | 419.9 | 42.0% |
| Alphagan®/Combigan® | | 376.6 | | 285.0 | 91.6 | 32.1% |
| Lumigan®/Ganfort® | | 326.4 | | 260.7 | 65.7 | 25.2% |
| Ozurdex® | | 84.4 | | 56.1 | 28.3 | 50.4% |
| Eye Drops | | 186.5 | | 177.0 | 9.5 | 5.4% |
| Other Eye Care | | 44.3 | | 52.9 | (8.6) | (16.3)% |
| **Total Medical Aesthetics** | | **1,622.9** | | **1,145.0** | 477.9 | **41.7%** |
| **Facial Aesthetics** | | **1,226.3** | | **817.8** | 408.5 | **50.0%** |
| Botox® Cosmetics | | 729.2 | | 510.2 | 219.0 | 42.9% |
| Juvederm® Collection | | 446.9 | | 304.4 | 142.5 | 46.8% |
| Kybella® | | 50.2 | | 3.2 | 47.0 | n.m. |
| **Plastic Surgery** | | **210.4** | | **187.4** | 23.0 | **12.3%** |
| Breast Implants | | 206.0 | | 175.0 | 31.0 | 17.7% |
| Other Plastic Surgery | | 4.4 | | 12.4 | (8.0) | (64.5)% |
| **Skin Care** | | **186.2** | | **139.8** | 46.4 | **33.2%** |
| SkinMedica® | | 108.3 | | 76.6 | 31.7 | 41.4% |
| Latisse® | | 77.9 | | 63.2 | 14.7 | 23.3% |
| **Total Medical Dermatology** | | **396.5** | | **355.9** | 40.6 | **11.4%** |
| Aczone® | | 217.3 | | 170.8 | 46.5 | 27.2% |
| Tazorac® | | 95.5 | | 92.3 | 3.2 | 3.5% |
| Botox® Hyperhidrosis | | 65.2 | | 52.5 | 12.7 | 24.2% |
| Other Medical Dermatology | | 18.5 | | 40.3 | (21.8) | (54.1)% |
| **Total Neuroscience and Urology** | | **1,306.3** | | **938.9** | 367.4 | **39.1%** |
| Botox® Therapeutics | | 1,188.8 | | 823.7 | 365.1 | 44.3% |
| Rapaflo® | | 116.6 | | 115.2 | 1.4 | 1.2% |
| Other Neuroscience and Urology | | 0.9 | | - | 0.9 | n.a. |
| **Other revenues** | | **48.3** | | **38.7** | 9.6 | **24.8%** |
| **Net revenues** | $ | **5,811.7** | $ | **4,309.8** | $ 1,501.9 | **34.8%** |
| Operating expenses: | | | | | | |
| Cost of sales(2) | | 290.9 | | 235.8 | 55.1 | 23.4% |
| Selling and marketing | | 1,137.0 | | 772.8 | 364.2 | 47.1% |
| General and administrative | | 174.2 | | 68.3 | 105.9 | 155.1% |
| **Segment contribution** | $ | **4,209.6** | $ | **3,232.9** | $ 976.7 | **30.2%** |
| Segment margin | | 72.4% | | 75.0% | | (2.6)% |
| Segment gross margin(3) | | 95.0% | | 94.5% | | 0.5% |

(1)  Includes revenues earned that were distributed through our former Anda Distribution business prior to October 3, 2016 to third party customers.

(2)  Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(3)  Defined as net revenues less segment related cost of sales as a percentage of net revenues.

76

*Net Revenues*

The increase in net revenues is primarily due to a full year contribution from the Allergan Acquisition versus nine and a half months in the prior year. In addition, the Company acquired the rights to Kybella®, a facial aesthetic product indicated for submental fullness, in 2015, and launched the product in the fourth quarter of that year. The Company has continued to realize strong organic growth from these products acquired from Allergan, including Restasis®, Ozurdex®, Botox®, our Juvederm® Collection and the SkinMedica® line.

*Cost of Sales*

The increase in cost of sales was due to a full year contribution from the Allergan Acquisition versus nine and a half months in the prior year.

*Selling and Marketing Expenses*

The increase in selling and marketing expenses was primarily due to a full year contribution from the Allergan Acquisition versus nine and a half months in the prior year, as well as increases in selling and marketing efforts for Kybella®, Restasis®, Botox® Cosmetics, our Juvederm® Collection, and Botox® Therapeutics.

*General and Administrative Expenses*

The increase in general and administrative expenses was primarily due to a full year contribution from the Allergan Acquisition versus nine and a half months in the prior year and an increase due to the Company's then new operating management structure wherein more costs are directly supporting the operating segments versus corporate functions. Consequently, general and administrative expenses increased as a result of this change.  In addition, there was also a period over period increase in compensation costs.

77

## US General Medicine Segment

The following table presents top product sales and net contribution for the US General Medicine segment for the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | Change | |
| | 2016 (1) | 2015 (1) | Dollars | % |
|---|---|---|---|---|
| **Total Central Nervous System (CNS)** | $ 1,303.6 | $ 1,841.1 | $ (537.5) | (29.2)% |
| Namenda XR® | 627.6 | 759.3 | (131.7) | (17.3)% |
| Namzaric® | 57.5 | 11.2 | 46.3 | n.m. |
| Viibryd®/Fetzima® | 342.3 | 327.6 | 14.7 | 4.5% |
| Saphris® | 166.8 | 186.7 | (19.9) | (10.7)% |
| Vraylar™ | 94.3 | - | 94.3 | n.a. |
| Namenda® IR | 15.1 | 556.3 | (541.2) | (97.3)% |
| **Total Gastrointestinal (GI)** | 1,721.0 | 1,575.3 | 145.7 | 9.2% |
| Linzess® | 625.6 | 454.8 | 170.8 | 37.6% |
| Asacol®/Delzicol® | 360.8 | 552.9 | (192.1) | (34.7)% |
| Carafate®/Sulcrate® | 229.0 | 213.1 | 15.9 | 7.5% |
| Zenpep® | 200.7 | 167.4 | 33.3 | 19.9% |
| Canasa®/Salofalk® | 178.7 | 137.1 | 41.6 | 30.3% |
| Viberzi® | 93.3 | 12.3 | 81.0 | n.m. |
| Other GI | 32.9 | 37.7 | (4.8) | (12.7)% |
| **Total Women's Health** | 1,179.6 | 998.0 | 181.6 | 18.2% |
| Lo Loestrin® | 403.5 | 346.5 | 57.0 | 16.5% |
| Estrace® Cream | 379.4 | 326.2 | 53.2 | 16.3% |
| Minastrin® 24 | 325.9 | 272.4 | 53.5 | 19.6% |
| Liletta® | 23.3 | 14.8 | 8.5 | 57.4% |
| Other Women's Health | 47.5 | 38.1 | 9.4 | 24.7% |
| **Total Anti-Infectives** | 225.1 | 188.8 | 36.3 | 19.2% |
| Teflaro® | 133.6 | 137.6 | (4.0) | (2.9)% |
| Dalvance® | 39.3 | 16.8 | 22.5 | 133.9% |
| Avycaz® | 36.1 | 22.6 | 13.5 | 59.7% |
| Other Anti-Infectives | 16.1 | 11.8 | 4.3 | 36.4% |
| **Diversified Brands** | 1,366.6 | 1,649.2 | (282.6) | (17.1)% |
| Bystolic® / Byvalson® | 638.8 | 644.8 | (6.0) | (0.9)% |
| Armour Thyroid | 166.5 | 130.8 | 35.7 | 27.3% |
| Savella® | 103.2 | 106.4 | (3.2) | (3.0)% |
| Lexapro® | 66.6 | 71.6 | (5.0) | (7.0)% |
| Enablex® | 17.1 | 69.2 | (52.1) | (75.3)% |
| PacPharma | 52.0 | 82.1 | (30.1) | (36.7)% |
| Other Diversified Brands | 322.4 | 544.3 | (221.9) | (40.8)% |
| **Other revenues** | 128.0 | 86.0 | 42.0 | 48.8% |
| **Net revenues** | $ 5,923.9 | $ 6,338.4 | $ (414.5) | (6.5)% |
| Operating expenses: | | | | |
| Cost of sales(2) | 879.8 | 909.5 | (29.7) | (3.3)% |
| Selling and marketing | 1,185.7 | 1,194.7 | (9.0) | (0.8)% |
| General and administrative | 174.9 | 105.3 | 69.6 | 66.1% |
| **Segment contribution** | $ 3,683.5 | $ 4,128.9 | $ (445.4) | (10.8)% |
| Segment margin | 62.2% | 65.1% | | (2.9)% |
| Segment gross margin(3) | 85.1% | 85.7% | | (0.6)% |

(1)   Includes revenues earned that were distributed through our former Anda Distribution business prior to October 3, 2016 to third party customers.

(2)   Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(3)   Defined as net revenues less segment related cost of sales as a percentage of net revenues.

*Net Revenues*

  The decrease in net revenues was primarily driven by the loss of exclusivity on Namenda® IR, which declined $541.2 million, or 97.3%, versus the prior year period. Namenda XR® contributed revenues of $627.6 million in the year ended December 31, 2016, a decline of $131.7 million, or 17.3%, versus the prior year period due to a decline in average net selling price to maintain strong formulary coverage, coupled with a decline in demand. The launches of Namzaric® and Vraylar™ partially offset the impact of the decline of Namenda® IR and Namenda XR®.

  Growth within our Gastrointestinal franchise was primarily driven by Linzess® and newly launched Viberzi®. Linzess® revenues increased $170.8 million, or 37.6%, versus the prior year period primarily due to strong demand growth and price appreciation. The Asacol® / Delzicol® franchise revenues decreased $192.1 million, or 34.7%, due in part to a reduction in demand as a result of lower promotion and some loss in formulary coverage. In addition, an authorized generic of Asacol® HD was launched in August of 2016. Offsetting this decline, in part, is royalty revenue of $45.5 million relating to our authorized generic version of Asacol® HD, which is included in "Other Revenues".

  Our Women's Healthcare franchise increased $181.6 million, or 18.2%, versus the prior year period. Lo Loestrin® increased 16.5% due to strong demand growth and modest net price appreciation. Estrace® Cream increased 16.3% as a result of net price appreciation and demand growth. Minastrin® 24 increased 19.6% primarily as a result of net price appreciation.

  The decline in Diversified Brands revenues was primarily due to loss of exclusivity on certain products and to product divestitures.

*Cost of Sales*

  The decrease in cost of sales was primarily due to a decline in product revenues as well as an unfavorable product mix, including increased sales of products that are royalty bearing. Segment gross margins declined to 85.1% for the year ended December 31, 2016 compared to 85.7% for the year ended December 31, 2015.

*Selling and Marketing Expenses*

  A modest decrease in selling and marketing expenses was attributable to the overall decline in revenues offset, in part, by redeployment of promotional efforts to key growth brands, including newly launched products Viberzi® and Vraylar™.

*General and Administrative Expenses*

  The increase in general and administrative expenses was a result of the Company's then new operating management structure wherein more costs were directly supporting the operating segments versus corporate functions. Consequently, general and administrative expenses increased as a result of this change. In addition, there was also a period over period increase in compensation costs.

79

### International Segment

The following table presents top product sales and net contribution for the International segment for the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | Change | | | | | |
| | 2016 | 2015 | $ Overall Change | $ Operational Change | $ Currency Change | % Overall Change | % Operational Change | % Currency Change |
|---|---|---|---|---|---|---|---|---|
| **Total Eye Care** | $1,219.4 | $ 918.7 | $ 300.7 | $ 329.3 | $ (28.6) | 32.7% | 35.8% | (3.1)% |
| Lumigan®/Ganfort® | 361.7 | 283.4 | 78.3 | 86.0 | (7.7) | 27.6% | 30.3% | (2.7)% |
| Alphagan®/Combigan® | 169.3 | 126.1 | 43.2 | 46.8 | (3.6) | 34.3% | 37.1% | (2.9)% |
| Ozurdex® | 179.0 | 112.3 | 66.7 | 69.1 | (2.4) | 59.4% | 61.5% | (2.1)% |
| Optive® | 101.9 | 76.9 | 25.0 | 26.9 | (1.9) | 32.5% | 35.0% | (2.5)% |
| Other Eye Drops | 174.3 | 143.7 | 30.6 | 35.8 | (5.2) | 21.3% | 24.9% | (3.6)% |
| Restasis® | 68.0 | 48.2 | 19.8 | 21.9 | (2.1) | 41.1% | 45.4% | (4.4)% |
| Other Eye Care | 165.2 | 128.1 | 37.1 | 42.8 | (5.7) | 29.0% | 33.4% | (4.4)% |
| **Total Medical Aesthetics** | 1,064.6 | 756.3 | 308.3 | 331.3 | (23.0) | 40.8% | 43.8% | (3.0)% |
| **Facial Aesthetics** | 902.7 | 619.8 | 282.9 | 303.7 | (20.8) | 45.6% | 49.0% | (3.4)% |
| Botox® Cosmetics | 480.0 | 350.3 | 129.7 | 141.2 | (11.5) | 37.0% | 40.3% | (3.3)% |
| Juvederm® Collection | 420.4 | 269.5 | 150.9 | 160.2 | (9.3) | 56.0% | 59.4% | (3.5)% |
| Belkyra®(Kybella®) | 2.3 | - | 2.3 | 2.3 | - | n.a. | n.a. | n.a. |
| **Plastic Surgery** | 150.7 | 125.6 | 25.1 | 27.2 | (2.1) | 20.0% | 21.7% | (1.7)% |
| Breast Implants | 149.9 | 125.5 | 24.4 | 26.5 | (2.1) | 19.4% | 21.1% | (1.7)% |
| Earfold™ | 0.8 | 0.1 | 0.7 | 0.7 | - | n.m. | n.a. | n.a. |
| **Skin Care** | 11.2 | 10.9 | 0.3 | 0.4 | (0.1) | 2.8% | 3.7% | (0.9)% |
| **Botox® Therapeutics and Other** | 537.3 | 453.7 | 83.6 | 100.0 | (16.4) | 18.4% | 22.0% | (3.6)% |
| Botox® Therapeutics | 323.0 | 234.1 | 88.9 | 96.6 | (7.7) | 38.0% | 41.3% | (3.3)% |
| Asacol®/Delzicol® | 53.7 | 65.5 | (11.8) | (7.5) | (4.3) | (18.0)% | (11.5)% | (6.6)% |
| Constella® | 17.3 | 4.5 | 12.8 | 13.4 | (0.6) | n.m. | n.m. | (13.3)% |
| Other Products | 143.3 | 149.6 | (6.3) | (2.5) | (3.8) | (4.2)% | (1.7)% | (2.5)% |
| Other revenues | 60.0 | 58.6 | 1.4 | 1.4 | - | 2.4% | n.a. | n.a. |
| **Net revenues** | $2,881.3 | $2,187.3 | $ 694.0 | $ 762.0 | $ (68.0) | 31.7% | 34.8% | (3.1)% |
| Operating expenses: | | | | | | | | |
| Cost of sales(1) | 418.2 | 350.9 | 67.3 | 77.2 | (9.9) | 19.2% | 22.0% | (2.8)% |
| Selling and marketing | 788.2 | 569.2 | 219.0 | 236.8 | (17.8) | 38.5% | 41.6% | (3.1)% |
| General and administrative | 117.2 | 107.6 | 9.6 | 13.6 | (4.0) | 8.9% | 12.6% | (3.7)% |
| **Segment contribution** | $1,557.7 | $1,159.6 | $ 398.1 | $ 434.4 | $ (36.3) | 34.3% | 37.5% | (3.1)% |
| Segment margin | 54.1% | 53.0% | | | | 1.1% | | |
| Segment gross margin(2) | 85.5% | 84.0% | | | | 1.5% | | |

(1) Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

(2) Defined as net revenues less segment related cost of sales as a percentage of net revenues.

### Net Revenues

The increase in net revenues was primarily due to the contribution from the Allergan Acquisition, which contributed a full year in 2016 as opposed to nine and a half months in 2015. The Company has continued to experience strong organic growth in the Facial Aesthetics, Botox Therapeutics and Eye Care franchises.

### Cost of Sales

The increase in cost of sales was primarily due to the contribution from the Allergan Acquisition, which contributed a full year in 2016 as opposed to nine and a half months in 2015, which was offset by a favorable product mix.

80

*Selling and Marketing Expenses*

The increase in selling and marketing expenses was primarily due to the contribution from the Allergan Acquisition, which contributed a full year in 2016 as opposed to nine and a half months in 2015.

*General and Administrative Expenses*

The increase in general and administrative expenses was primarily due to the contribution from the Allergan Acquisition, which contributed a full year in 2016 as opposed to nine and a half months in 2015, offset, in part, by cost savings due to corporate initiatives.

### Corporate

Corporate represents the results of corporate initiatives as well as the impact of select revenues and shared costs. The following represents the corporate amounts for the years ended December 31, 2016 and 2015 ($ in millions):

| | Year Ended December 31, 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Reclassification of Sales Distributed Through Anda to Discontinued Operations | Other | Revenues and Shared Costs | Total |
| Net revenues | $ - | $ - | $ - | $ (80.0) | $ - | $ 33.7 | $ (46.3) |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 23.0 | (17.4) | 50.5 | (78.2) | - | 294.0 | 271.9 |
| Selling and marketing | 82.5 | - | 65.4 | - | - | 7.6 | 155.5 |
| General and administrative | 269.6 | 24.3 | 80.5 | - | 136.3 | 496.9 | 1,007.6 |
| Contribution | $ (375.1) | $ (6.9) | $ (196.4) | $ (1.8) | $ (136.3) | $ (764.8) | $ (1,481.3) |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

| | Year Ended December 31, 2015 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Integration and Restructuring | Fair Value Adjustments | Effect of Purchase Accounting | Reclassification of Sales Distributed Through Anda to Discontinued Operations | Other | Revenues and Shared Costs | Total |
| Net revenues | $ - | $ - | $ - | $ (157.4) | $ 3.8 | $ 6.2 | $ (147.4) |
| Operating expenses: | | | | | | | |
| Cost of sales[1] | 53.0 | 58.5 | 1,180.0 | (146.9) | 0.1 | 110.9 | 1,255.6 |
| Selling and marketing | 96.9 | - | 130.3 | - | (1.7) | 2.9 | 228.4 |
| General and administrative | 517.0 | (0.5) | 322.4 | - | 93.1 | 503.2 | 1,435.2 |
| Contribution | $ (666.9) | $ (58.0) | $ (1,632.7) | $ (10.5) | $ (87.7) | $ (610.8) | $ (3,066.6) |

[1] Excludes amortization and impairment of acquired intangibles including product rights.

In the year ended December 31, 2016, integration and restructuring charges primarily related to the integration of the Legacy Allergan business as well as charges incurred with the terminated merger with Pfizer, Inc. of $124.9 million. In the year ended December 31, 2016, the Company incurred purchase accounting effects of $42.4 million in cost of sales primarily related to the fair value inventory step-up from the Allergan and Forest acquisitions as products were sold to the Company's third-party customers. The Company also incurred charges related to the purchase accounting impact on stock-based compensation related to the Allergan and Forest acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses. In the year ended December 31, 2016 general and administrative costs included legal settlement charges of $117.3 million.

Shared costs primarily include above site and unallocated costs associated with running our global manufacturing facilities and corporate general and administrative expenses. The increase in shared cost of sales is primarily due to higher operating costs supporting our global operations including higher costs for inventory obsolescence, product validations and capacity expansions. The increase in "Revenues and Shared Costs" versus the prior year were also due to the Allergan Acquisition, which contributed a full twelve months in 2016 as opposed to nine and a half months in 2015.

In the year ended December 31, 2015, integration and restructuring charges were primarily related to the integration of the Legacy Allergan business, as well as the Forest Acquisition. In the year ended December 31, 2015, the Company incurred $1,151.4 million in cost of sales primarily related to the fair value inventory step-up from the Allergan Acquisition and the Forest Acquisition as products were sold to the Company's third-party customers. The Company also incurred charges related to the purchase accounting impact on stock-based compensation related to the Allergan, Kythera, and Forest acquisitions, which increased cost of sales, selling and marketing and general and administrative expenses. In the year ended December 31, 2015, other expenses included the impact of legal settlement reserves. In addition, in the year ended December 31, 2015, the Company incurred mark-to-market unrealized losses for foreign currency option contracts that were entered into to offset future exposure to movements in currencies.

*Research and Development Expenses*

R&D expenses consist predominantly of personnel-related costs, active pharmaceutical ingredient costs, contract research, license and milestone fees, biostudy and facilities costs associated with product development.

R&D expenses consisted of the following components in the years ended December 31, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | | | Change | | |
| | 2016 | | 2015 | | Dollars | | % |
|---|---|---|---|---|---|---|---|
| Ongoing operating expenses | $ | 1,433.8 | $ | 1,116.8 | $ | 317.0 | 28.4% |
| Brand related milestone payments and upfront license payments | | 1,134.7 | | 950.4 | | 184.3 | 19.4% |
| Acquisition accounting fair market value adjustments to stock-based compensation | | 53.8 | | 150.9 | | (97.1) | (64.3)% |
| Acquisition, integration, and restructuring charges | | 24.5 | | 102.7 | | (78.2) | (76.1)% |
| Contingent consideration adjustments, net | | (71.1) | | 37.7 | | (108.8) | (288.6)% |
| **Total R&D Expenses** | $ | **2,575.7** | $ | **2,358.5** | $ | **217.2** | **9.2%** |

The increase in ongoing operating expenses in the year ended December 31, 2016 versus the prior year period is primarily due to the impact of the Allergan Acquisition which contributed twelve months in 2016 versus nine and a half months in 2015 coupled with an increase in clinical trial activity.

82

The following represents brand related milestone payments and upfront license payments in the years ended December 31, 2016 and 2015, respectively (S in millions):

| | Years Ended December 31, | |
| | 2016 | 2015 |
| --- | --- | --- |
| AstraZeneca plc | $ 250.0 | $ - |
| Motus Therapeutics, Inc. | 199.5 | - |
| Chase Pharmaceuticals Corporation | 122.9 | - |
| Heptares Therapeutics, Ltd | 125.0 | - |
| Merck & Co. | 100.0 | 250.0 |
| Anterios, Inc. | 89.2 | - |
| Topokine Therapeutics, Inc. | 85.8 | - |
| RetroSense Therapeutics, LLC | 59.7 | - |
| Akarna Therapeutics, Ltd | 48.2 | - |
| Naurex, Inc. | - | 571.7 |
| Mimetogen Pharmaceuticals, Inc. | - | 50.0 |
| Other | 54.4 | 78.7 |
| **Total** | $ 1,134.7 | $ 950.4 |

In the year ended December 31, 2016, the Company had net contingent consideration income of $71.1 million primarily driven by ongoing R&D projects that were terminated based on clinical data acquired in the Allergan Acquisition, which was offset by additional contingent consideration expense relating to milestones achieved in connection with the AqueSys and Allergan Acquisitions.

*Amortization*

Amortization in the years ended December 31, 2016 and 2015 was as follows:

| | Years Ended December 31, | | Change | |
| (S in millions) | 2016 | 2015 | Dollars | % |
| --- | --- | --- | --- | --- |
| Amortization | $ 6,470.4 | $ 5,443.7 | $ 1,026.7 | 18.9% |

Amortization for the year ended December 31, 2016 increased as compared to the prior year period primarily as a result of twelve months of amortization related to identifiable assets acquired in the Allergan Acquisition, compared to nine months of amortization in the year ended December 31, 2015, as well as amortization related to products acquired as part of the Kythera Acquisition and recently launched products.

*IPR&D Impairments and Asset Sales and Impairments, Net*

IPR&D impairments and Asset sales and impairments, net consisted of the following components in the years ended December 31, 2016 and 2015:

| | Years Ended December 31, | | Change | |
| (S in millions) | 2016 | 2015 | Dollars | % |
| --- | --- | --- | --- | --- |
| IPR&D impairments | $ 743.9 | $ 511.6 | $ 232.3 | 45.4% |
| Asset sales and impairments, net | 5.0 | 272.0 | (267.0) | (98.2)% |

For significant impairments recorded in the year ended December 31, 2016, refer to the Year Ended December 31, 2017 compared to 2016 — IPR&D Impairments and Asset Sales and Impairments, Net section within Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.

83

In the year ended December 31, 2015, the Company made the decision to abandon a select IPR&D asset (acquired in connection with the Allergan Acquisition) based on the review of research studies, resulting in an impairment of the full asset value of $300.0 million. The Company also recorded an impairment of $192.1 million due to a reduction in cash flows for women's healthcare portfolio products acquired in the Warner Chilcott Acquisition as planned promotional initiatives on these future products has been reduced.  Asset sales and impairments, net primarily related to the abandonment of a surgical product line of $229.6 million acquired in the Allergan Acquisition and a $32.2 million impairment charge as a result of a change in projected cash flows relating to an acquired product, Tretin-X.

*Interest Income*

Interest income in the years ended December 31, 2016 and 2015 was as follows:

| ($ in millions) | Years Ended December 31, | | Change | |
| | 2016 | 2015 | Dollars | % |
| --- | --- | --- | --- | --- |
| Interest income | $ 69.9 | $ 10.6 | $ 59.3 | 559.4% |

Interest income in the year ended December 31, 2016 increased as a result of the Company investing the cash proceeds from the Teva Transaction in Marketable Securities and Cash and Cash Equivalents.

*Interest Expense*

Interest expense consisted of the following components in the years ended December 31, 2016 and 2015:

| ($ in millions) | Years Ended December 31, | | Change | |
| | 2016 | 2015 | Dollars | % |
| --- | --- | --- | --- | --- |
| Fixed Rate Notes | $ 1,140.0 | $ 1,003.1 | $ 136.9 | 13.6% |
| Floating Rate Notes | 21.7 | 18.8 | 2.9 | 15.4% |
| Term Loan Indebtedness | 116.2 | 147.3 | (31.1) | (21.1)% |
| Revolving Credit Facility | 2.6 | 4.8 | (2.2) | (45.8)% |
| Other | 15.1 | 19.3 | (4.2) | (21.8)% |
| **Interest expense** | **$ 1,295.6** | **$ 1,193.3** | **$ 102.3** | **8.6%** |

Interest expense increased for the year ended December 31, 2016 over the prior year primarily due to a full year's interest from the senior notes indebtedness incurred as part of the Allergan Acquisition, offset, in part, by interest savings due to the repayment of term loan indebtedness on August 2, 2016 in connection with the Teva Transaction.

*Other Income / (Expense), Net*

Other income / (expense), net consisted of the following components in the years ended December 31, 2016 and 2015:

| ($ in millions) | Years Ended December 31, | | Change | |
| | 2016 | 2015 | Dollars | % |
| --- | --- | --- | --- | --- |
| Pfizer termination fee  (Allergan plc only) | $ 150.0 | $ - | $ 150.0 | n.a. |
| Dividend income | 68.2 | - | 68.2 | n.a. |
| Bridge loan commitment fee | - | (264.9) | 264.9 | (100.0)% |
| Interest rate locks | - | 31.0 | (31.0) | (100.0)% |
| Other income / (expense), net | 1.0 | 0.1 | 0.9 | n.m. |
| **Other income / (expense), net** | **$ 219.2** | **$ (233.8)** | **$ 453.0** | **n.m.** |

*Pfizer termination fee*

On November 23, 2015, the Company announced that it entered into a definitive merger agreement under which Pfizer, a global innovative biopharmaceutical company, and Allergan plc would merge in a stock and cash transaction. On April 6, 2016, the Company announced that its merger agreement with Pfizer was terminated by mutual agreement. In connection with the termination of the merger agreement, Pfizer paid Allergan plc $150.0 million for expenses associated with the transaction which was included as a component of other income during the year ended December 31, 2016.

10/24/2018

agn-10k_20171231.htm

84

*Dividend income*

Dividend income in the year ended December 31, 2016 was a result of the Company's investment in Teva ordinary shares received in the Teva Transaction.

*Bridge loan commitment fee*

During the year ended December 31, 2015, the Company incurred costs associated with bridge loan commitments in connection with the Allergan Acquisition of $264.9 million.

*Interest rate locks*

During the year ended December 31, 2015, the Company entered into interest rate locks on a portion of the $21.0 billion of debt issued as part of the Allergan Acquisition. As a result of the interest rate locks, the Company recorded income of $31.0 million.

**(Benefit) for Income Taxes**

(Benefit) for income taxes in the years ended December 31, 2016 and 2015 was as follows:

| | Years Ended December 31, | | Change | |
|---|---|---|---|---|
| ($ in millions) | 2016 | 2015 | Dollars | % |
| (Benefit) for income taxes | $    (1,897.0) | $    (1,605.9) | $    (291.1) | 18.1% |
| *Effective tax rate* | *(67.0)%* | *(35.3)%* | | |

The Company's effective tax rate for the twelve months ended December 31, 2016 was a benefit of (67.0%) compared to a benefit of (35.3%) for the twelve months ended December 31, 2015. The reconciliations between the statutory Irish tax rates for Allergan plc and the effective tax rates were as follows:

| | Allergan plc | |
|---|---|---|
| | Years Ended December 31, | |
| | 2016 | 2015 |
| Statutory rate | (12.5)% | (12.5)% |
| Earnings subject to U.S. taxes (1) (3) | (37.5)% | (18.6)% |
| Earnings subject to rates different than the statutory rate (2)(3) | (18.3)% | (2.2)% |
| Tax reserves and audit outcomes | (0.7)% | 0.3% |
| Non-deductible expenses | 3.1% | 1.3% |
| Impact of acquisitions and reorganizations | 3.1% | 4.0% |
| Tax credits and U.S. manufacturing deduction | (3.1)% | (0.5)% |
| Rate changes (4) | (7.4)% | 0.0% |
| Valuation allowances (5) | 6.5% | (6.5)% |
| Other | (0.2)% | (0.6)% |
| Effective income tax rate | (67.0)% | (35.3)% |

The material drivers of the period-over-period tax rate movements were as follows:

(1)    Earnings subject to U.S. federal and state tax had a larger impact on the effective tax rate for the period ended December 31, 2016 compared to the period ended December 31, 2015 due to an increase in expenses in 2016. These expenses included a full year of amortization expense related to intangibles acquired as part of the Allergan Acquisition and incremental costs associated with the acquisition related financing.

(2)    Earnings subject to tax rates different than the statutory rate had a larger impact on the effective tax rate for the period ended December 31, 2016 compared to the period ended December 31, 2015. This was primarily driven by the inclusion of a full year of Allergan post-acquisition operating income earned in jurisdictions with tax rates lower than the Irish statutory rate and changes to the earnings mix resulting from restructuring associated with the sale of the global generics business.

(3)    In 2016, the Company recorded $6.5 billion of amortization expense. A significant portion of this amount was incurred in jurisdictions with tax rates higher than the statutory rate resulting in a $482.3 million favorable impact on the effective tax rate.

agn-10k_20171231.htm

85

(4)   In the fourth quarter of 2016, a tax rate change was enacted in France resulting in a $209.0 million tax benefit.

(5)   In 2016, the Company recorded a tax expense of $183.8 million predominately related to a change in the valuation allowance on U.S. capital loss carryforwards resulting from restructuring associated with the sale of the global generics business.

**Discontinued Operations**

On July 27, 2015, the Company announced that it entered into the Teva Transaction, which closed on August 2, 2016.  On October 3, 2016, the Company completed the divestiture of the Anda Distribution business to Teva for $500.0 million. The Company recognized a combined gain on the sale of the Anda Distribution business and the sale of the global generics business of $15,932.2 million.

The Company notes the following reconciliation of the proceeds received in the combined transaction to the gain recognized in income from discontinued operations in 2016 ($ in millions):

| | | |
|---|---|---:|
| Net cash proceeds received | $ | 33,804.2 |
| August 2, 2016 fair value of Teva shares | | 5,038.6 |
| **Total Proceeds** | $ | 38,842.8 |
| Net assets sold to Teva, excluding cash | | (12,487.7) |
| Other comprehensive income disposed | | (1,544.8) |
| Deferral of proceeds relating to additional elements of agreements with Teva | | (299.2) |
| Pre-tax gain on sale of generics business and Anda Distribution business | $ | 24,511.1 |
| Income taxes | | (8,578.9) |
| Net gain on sale of generics business and Anda Distribution business | $ | 15,932.2 |

October 2016, pursuant to our agreement with Teva, Teva provided the Company with its proposed estimated adjustment to the closing date working capital balance.  The Company disagreed with Teva's proposed adjustment, and, pursuant to our agreement with Teva, each of the Company's and Teva's proposed adjustments were submitted to arbitration  to determine the working capital amount in accordance with GAAP as applied by the Company consistent with past practice. Teva initially proposed an adjustment of approximately $1.4 billion and subsequently submitted a revised adjustment of approximately $1.5 billion to the arbitrator.  In addition, on October 30, 2017, Teva submitted a Notice of Direct and Third Party Claims seeking indemnification for virtually all of the same items for which Teva sought a proposed adjustment in the Working Capital Arbitration as well as several new items as to which no quantity of damages had been asserted.

On January 31, 2018, Allergan plc and Teva entered into the Agreement.  The Agreement provides that the Company will make a one-time payment of $700.0 million to Teva; the Company and Teva will jointly dismiss their working capital dispute arbitration, and the Company and Teva will release all actual or potential claims under the Teva Master Purchase Agreement that are known as of the date of the Agreement. The Company recorded a pre-tax charge of $466.0 million as a component of other (expense) / income, net from discontinued operations relating to the settlement in the year ended December 31, 2017.

Financial results of the global generics business and the Anda Distribution business are presented as "(Loss) / income from discontinued operations, net of tax" on the Consolidated Statements of Operations for the years ended December 31, 2017, 2016 and 2015.

86

The following table presents key financial results of the global generics business and the Anda Distribution business included in "(Loss) / income from discontinued operations, net of tax" for the years ended December 31, 2017, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Net revenues | $ - | $ 4,504.3 | $ 8,499.0 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | - | 2,798.3 | 4,847.5 |
| Research and development | - | 269.4 | 422.2 |
| Selling and marketing | - | 352.9 | 706.6 |
| General and administrative | 18.8 | 425.8 | 702.2 |
| Amortization | - | 4.8 | 333.3 |
| Asset sales and impairments, net | 1.2 | - | 62.4 |
| Total operating expenses | 20.0 | 3,851.2 | 7,074.2 |
| Operating (loss) / income | (20.0) | 653.1 | 1,424.8 |
| Other (expense) / income, net | (470.4) | 15,932.2 | (7.1) |
| (Benefit) / provision for income taxes | (87.5) | 670.8 | (5,443.3) |
| (Loss) / income from discontinued operations, net of tax | $ (402.9) | $ 15,914.5 | $ 6,861.0 |

The operating income reflects approximately seven months of operating activity of the Company's former generics business in the year ended December 31, 2016 versus twelve months activity in the year ended December 31, 2015 and approximately nine months of operating activity of the Anda Distribution business in the year ended December 31, 2016 versus twelve months activity in the year ended December 31, 2015. "Other (expense) / income, net" included the gain on sale of the businesses to Teva.

For the year ended December 31, 2015, the Company recorded a deferred tax benefit of $5,738.8 million related to investments in certain subsidiaries. The recognition of this benefit has been reflected in "(Loss) / income from discontinued operations, net of tax". For the year ended December 31, 2016, the Company recorded a deferred tax expense of $462.2 million to adjust its deferred tax assets related to investments in certain subsidiaries. The recognition of this expense has been reflected in "(Loss) / income from discontinued operations, net of tax." Upon the closing of the Teva Transaction, the Company recorded the reversal of the corresponding deferred tax assets of $5,276.6 million against the current income taxes payable in continuing operations.

## LIQUIDITY AND CAPITAL RESOURCES

### Working Capital Position

Working capital at December 31, 2017 and 2016 is summarized as follows:

| ($ in millions): | December 31, 2017 | December 31, 2016 | Increase (Decrease) |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $ 1,817.2 | $ 1,724.0 | $ 93.2 |
| Marketable securities | 4,632.1 | 11,501.5 | (6,869.4) |
| Accounts receivable, net | 2,899.0 | 2,531.0 | 368.0 |
| Inventories | 904.5 | 718.0 | 186.5 |
| Prepaid expenses and other current assets | 1,123.9 | 1,383.4 | (259.5) |
| Total current assets | 11,376.7 | 17,857.9 | (6,481.2) |
| Current liabilities: | | | |
| Accounts payable and accrued expenses | 5,541.4 | 5,019.0 | 522.4 |
| Income taxes payable | 74.9 | 57.8 | 17.1 |
| Current portion of long-term debt and capital leases | 4,231.8 | 2,797.9 | 1,433.9 |
| Total current liabilities | 9,848.1 | 7,874.7 | 1,973.4 |
| Working Capital | $ 1,528.6 | $ 9,983.2 | $ (8,454.6) |
| Current Ratio | 1.16 | 2.27 | |

Working capital decreased $8,454.6 million primarily due to the following uses of working capital:

- The Company acquired LifeCell for $2,874.4 million, net of cash acquired, in the year ended December 31, 2017, which primarily is reflected in long-term assets and liabilities;

- The Company acquired Zeltiq for $2,368.7 million, net of cash acquired, in the year ended December 31, 2017, which primarily is reflected in long-term assets and liabilities;

- The Company repaid $2,700.0 million of indebtedness which were maturing during 2017 and held new current borrowings of $459.0 million in the year ended December 31, 2017 and reclassified $3,750.0 million of indebtedness maturing in the year ending December 31, 2018 from long-term liabilities to current liabilities;

- A decrease in the value of Teva securities of $1,621.5 million;

- The Company utilized cash and cash equivalents to pay dividends in the year ended December 31, 2017 of $1,218.2 million and to purchase intangible assets of $614.3 million; and

- On September 25, 2017, the Company's Board of Directors approved a $2.0 billion share repurchase program, of which we repurchased $450.0 million in the year ended December 31, 2017.

### Cash Flows from Operations

Our cash flows from operations are summarized as follows:

| | Years Ended December 31, | |
|---|---|---|
| ($ in millions) | 2017 | 2016 |
| Net cash provided by operating activities | $ 5,873.4 | $ 1,445.7 |

Cash flows from operations represent net income adjusted for certain non-cash items and changes in assets and liabilities. Cash provided by operating activities increased $4,427.7 million in the year ended December 31, 2017 versus the prior year period, due primarily to $3,293.7 million in cash tax payments made in connection with the sale of the generics business in the year ended December 31, 2016 and period-over-period movements in other tax payments.  The year ended December 31, 2017 also had favorable non-income tax working capital movements versus the prior-year-period.  In addition, the Company notes that prior year cash flows from operations were impacted by cash flows generated by our discontinued operations.

Management expects that available cash balances will provide sufficient resources to fund our operating liquidity needs and expected 2018 capital expenditure funding requirements.

### Investing Cash Flows

Our cash flows from investing activities are summarized as follows:

| | Years Ended December 31, | |
|---|---|---|
| ($ in millions) | 2017 | 2016 |
| Net cash (used in) / provided by investing activities | $ (878.0) | $ 24,333.3 |

Investing cash flows consist primarily of cash used in acquisitions of businesses and intangible assets (primarily product rights), capital expenditures and purchases of investments and marketable securities partially offset by proceeds from the sale of a business, investments and marketable securities. Included in the year ended December 31, 2017 was the net cash provided by the net sale of marketable securities of $5,369.5 million offset, in part, by the cash purchases of LifeCell for $2,874.4 million and Zeltiq of $2,346.7 million, net of cash acquired, and the purchase of intangible assets of $614.3 million.

Included in the year ended December 31, 2016 were cash proceeds received from the sale of the global generics and Anda Distribution businesses to Teva of $33,804.2 million offset, in part, by purchases of marketable securities and other assets, net of $7,971.9 million, cash used for capital expenditures of $331.4 million and cash used in connection with acquisitions of $1,198.9 million, primarily related to the Tobira Acquisition, the Vitae Acquisition and the ForSight Acquisition.

88

*Financing Cash Flows*

Our cash flows from financing activities are summarized as follows:

| ($ in millions) | Years Ended December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Net cash (used in) financing activities | $       (4,923.6)    $ | (25,142.5) |

Financing cash flows consist primarily of borrowings and repayments of debt, repurchases of ordinary shares, dividend payments and proceeds from the exercise of stock options. Cash used in financing activities in the year ended December 31, 2017 primarily related to the repayment of indebtedness of $6,413.6 million, which included debt repurchased under the tender offer completed on May 30, 2017 and the early redemption of certain debt securities, the payment of dividends of $1,218.2 million and payments relating to contingent consideration and other financing of $511.6 million, and $493.0 million repurchases of ordinary shares, offset, in part by the long-term borrowings of $3,550.0 million.

Cash provided by financing activities in the year ended December 31, 2016 primarily included payments of debt of $10,848.7 million, contingent consideration of $161.1 million, dividends on preferred stock of $278.4 million and the repurchase of ordinary shares of $15,076.4 million, including $15,000.0 million repurchased under the Company's share repurchase programs, offset by borrowings under the credit facility of $1,050.0 million.

89

10/24/2018    agn-10k_20171231.htm

### Debt and Borrowing Capacity

Debt consisted of the following ($ in millions):

| | Issuance Date / Acquisition Date | Interest Payments | Balance As of December 31, 2017 | Balance As of December 31, 2016 | Fair Market Value As of December 31, 2017 | Fair Market Value As of December 31, 2016 |
|---|---|---|---|---|---|---|
| **Senior Notes:** | | | | | | |
| Floating Rate Notes | | | | | | |
| $500.0 million 1.850% floating rate notes due March 12, 2018 * | March 4, 2015 | Quarterly | $ 500.0 | $ 500.0 | $ 500.6 | $ 502.5 |
| $500.0 million floating rate notes due March 12, 2020 ** | March 4, 2015 | Quarterly | 500.0 | 500.0 | 508.1 | 509.4 |
| | | | 1,000.0 | 1,000.0 | 1,008.7 | 1,011.9 |
| Fixed Rate Notes | | | | | | |
| $1,000.0 million 1.850% notes due March 1, 2017 | March 4, 2015 | Semi-annually | - | 1,000.0 | - | 1,001.1 |
| $500.0 million 1.300% notes due June 15, 2017 | June 10, 2014 | Semi-annually | - | 500.0 | - | 499.7 |
| $1,200.0 million 1.875% notes due October 1, 2017 | October 2, 2012 | Semi-annually | - | 1,200.0 | - | 1,202.5 |
| $3,000.0 million 2.350% notes due March 12, 2018 | March 4, 2015 | Semi-annually | 3,000.0 | 3,000.0 | 3,001.9 | 3,018.0 |
| $250.0 million 1.350% notes due March 15, 2018 | March 17, 2015 | Semi-annually | 250.0 | 250.0 | 249.7 | 248.4 |
| $1,050.0 million 4.375% notes due February 1, 2019 | July 1, 2014 | Semi-annually | - | 1,050.0 | - | 1,090.0 |
| $500.0 million 2.450% notes due June 15, 2019 | June 10, 2014 | Semi-annually | 500.0 | 500.0 | 499.7 | 501.2 |
| $400.0 million 6.125% notes due August 15, 2019 | August 24, 2009 | Semi-annually | - | 400.0 | - | 437.7 |
| $3,500.0 million 3.000% notes due March 12, 2020 | March 4, 2015 | Semi-annually | 3,500.0 | 3,500.0 | 3,528.4 | 3,541.8 |
| $650.0 million 3.375% notes due September 15, 2020 | March 17, 2015 | Semi-annually | 650.0 | 650.0 | 661.3 | 663.6 |
| $750.0 million 4.875% notes due February 15, 2021 | July 1, 2014 | Semi-annually | 450.0 | 750.0 | 474.3 | 803.3 |
| $1,200.0 million 5.000% notes due December 15, 2021 | July 1, 2014 | Semi-annually | 1,200.0 | 1,200.0 | 1,282.6 | 1,297.7 |
| $3,000.0 million 3.450% notes due March 15, 2022 | March 4, 2015 | Semi-annually | 3,000.0 | 3,000.0 | 3,044.5 | 3,030.7 |
| $1,700.0 million 3.250% notes due October 1, 2022 | October 2, 2012 | Semi-annually | 1,700.0 | 1,700.0 | 1,703.0 | 1,693.1 |
| $350.0 million 2.800% notes due March 15, 2023 | March 17, 2015 | Semi-annually | 350.0 | 350.0 | 341.6 | 335.6 |
| $1,200.0 million 3.850% notes due June 15, 2024 | June 10, 2014 | Semi-annually | 1,200.0 | 1,200.0 | 1,232.3 | 1,211.7 |
| $4,000.0 million 3.800% notes due March 15, 2025 | March 4, 2015 | Semi-annually | 4,000.0 | 4,000.0 | 4,067.1 | 3,995.6 |
| $2,500.0 million 4.550% notes due March 15, 2035 | March 4, 2015 | Semi-annually | 2,500.0 | 2,500.0 | 2,631.9 | 2,458.5 |
| $1,000.0 million 4.625% notes due October 1, 2042 | October 2, 2012 | Semi-annually | 456.7 | 1,000.0 | 471.2 | 967.6 |
| $1,500.0 million 4.850% notes due June 15, 2044 | June 10, 2014 | Semi-annually | 1,500.0 | 1,500.0 | 1,606.2 | 1,496.4 |
| $2,500.0 million 4.750% notes due March 15, 2045 | March 4, 2015 | Semi-annually | 1,200.0 | 2,500.0 | 1,277.3 | 2,466.9 |
| | | | 25,456.7 | 31,750.0 | 26,073.0 | 31,961.1 |
| Euro Denominated Notes | | | | | | |
| €750.0 million 0.500% notes due June 1, 2021 | May 26, 2017 | Annually | 900.4 | - | 895.8 | - |
| €700.0 million 1.250% notes due June 1, 2024 | May 26, 2017 | Annually | 840.4 | - | 831.1 | - |
| €550.0 million 2.125% notes due June 1, 2029 | May 26, 2017 | Annually | 660.3 | - | 657.8 | - |
| €700.0 million floating rate notes due June 1, 2019*** | May 26, 2017 | Quarterly | 840.4 | - | 837.2 | - |
| | | | 3,241.5 | - | 3,221.9 | - |
| **Total Senior Notes Gross** | | | 29,698.2 | 32,750.0 | 30,303.6 | 32,973.0 |
| Unamortized premium | | | 88.9 | 171.2 | - | - |
| Unamortized discount | | | (81.7) | (95.8) | - | - |
| **Total Senior Notes Net** | | | 29,705.4 | 32,825.4 | 30,303.6 | 32,973.0 |
| Other Indebtedness | | | | | | |
| Debt Issuance Costs | | | (121.5) | (144.6) | | |
| Margin Loan | | | 459.0 | - | | |
| Other | | | 29.7 | 85.5 | | |
| **Total Other Borrowings** | | | 367.2 | (59.1) | | |
| Capital Leases | | | 2.7 | 2.4 | | |
| **Total Indebtedness** | | | $ 30,075.3 | $ 32,768.7 | | |

\* Interest on the 2018 floating rate note is three month USD LIBOR plus 1.080% per annum

\*\* Interest on the 2020 floating rate note is three month USD LIBOR plus 1.255% per annum

\*\*\* Interest on the €700.0 million floating rate notes is the three month EURIBOR plus 0.350% per annum

Fair market value in the table above is determined in accordance with Accounting Standards Codification ("ASC") Topic 820 "Fair Value Measurement" ("ASC 820") under Level 2 based upon quoted prices for similar items in active markets.

90

**Senior Notes**

**Borrowings**

*Euro Denominated Notes*

On May 26, 2017, Allergan Funding SCS, a limited partnership (société en commandite simple) organized under the laws of the Grand Duchy of Luxembourg and an indirect wholly-owned subsidiary of Allergan plc, issued the euro denominated notes. The notes are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital S.a.r.l. ("Allergan Capital"), and by Allergan Finance, LLC, a subsidiary of Allergan Capital, on an unsecured and unsubordinated basis.

These notes were issued to fund, in part, the payment of the tender offers described below.

**Floating Rate Notes**

On March 4, 2015, Allergan Funding SCS, issued floating rate notes which are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital, and by Allergan Finance LLC on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

The previously outstanding 2016 floating rate notes were paid in full at maturity on September 1, 2016 and bore interest at the three-month LIBOR plus 0.875%.

**Fixed Rate Notes**

*Acquired Allergan Notes*

On March 17, 2015 in connection with the Allergan Acquisition, the Company acquired, and subsequently guaranteed, along with Warner Chilcott Limited, the indebtedness of Allergan, Inc., including $800.0 million 5.750% senior notes due and redeemed in 2016 not shown in the table above. The fair value of the acquired senior notes was determined to be $2,087.5 million as of March 17, 2015. As such, as part of acquisition accounting, the Company recorded a premium of $37.5 million to be amortized as contra interest over the life of the notes.

The notes acquired in the Allergan Acquisition are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption.

*2015 Notes Issuance*

On March 4, 2015, Allergan Funding SCS, issued indebtedness, in part, to fund the Allergan Acquisition. The notes are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital, and by Allergan Finance LLC on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

*Acquired Forest Notes*

On July 1, 2014 in connection with the Forest acquisition, the Company acquired the indebtedness of Forest. As a result of acquisition accounting, the notes were fair valued with a premium of $260.3 million as of July 1, 2014, which will be amortized as contra-interest over the life of the notes. The guarantor of the debt is Allergan plc.

*2014 Notes Issuance*

On June 10, 2014, Allergan Funding SCS issued indebtedness, in part, to fund the Forest Acquisition. The guarantors of the debt are Warner Chilcott Limited, Allergan Capital, and Allergan Finance, LLC.

*2012 Notes Issuance*

On October 2, 2012, Allergan Finance, LLC issued indebtedness which were used for the acquisition of the Actavis Group. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

91

### *2009 Notes Issuance*

On August 24, 2009, Allergan Finance, LLC issued senior notes which were used to repay certain debt with the remaining net proceeds being used to fund a portion of the cash consideration for the Arrow Group acquisition. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

### Credit Facility Indebtedness

On August 2, 2016, the Company repaid the remaining balances of all outstanding term-loan indebtedness and terminated its then existing revolving credit facility with proceeds from the Teva Transaction. The interest expense on the then-outstanding indebtedness in the years ended December 31, 2016 and 2015 was $116.2 million and $147.3 million, respectively.

### *Margin Loan*

On November 10, 2017, Allergan W.C. Holding Inc., Allergan Finance, LLC and Allergan Holding B1 Inc. and JP Morgan Chase Bank executed a margin loan agreement for an aggregate principal amount not exceeding $550.0 million which was available as a single draw from the signing date to December 22, 2017 (the "Loan" or "Margin Loan Agreement"). In Q4 2017, the Company drew down $525.0 million and repaid $66.0 million. The remaining portion of this outstanding indebtedness is due in the year ending December 31, 2018. The outstanding indebtedness under this facility at any time is collateralized by the Company's investment in Teva securities.

### *Revolving Credit Facility*

On June 14, 2017, Allergan plc and certain of its subsidiaries entered into a revolving credit and guaranty agreement (the "Revolver Agreement") among Allergan Capital, as borrower, Allergan plc, as Ultimate Parent; Warner Chilcott Limited, Allergan Finance LLC, and Allergan Funding SCS, as guarantors; the lenders from time to time party thereto (the "Revolving Lenders"); J.P. Morgan Chase Bank as Administrative Agent; J.P. Morgan Europe Limited, as London Agent; and the other financial institutions party thereto. Under the Revolver Agreement, the Revolving Lenders have committed to provide an unsecured five-year revolving credit facility in an aggregate principal amount of up to $1.5 billion, with the ability to increase the revolving credit facility by $500.0 million to an aggregate principal amount of up to $2.0 billion.

The Revolver Agreement provides that loans thereunder would bear interest, at our choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 2.00% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, the Company pays an unused commitment fee varying from 0.070% to 0.250% per annum, depending on the Debt Rating on the unused portion of the revolver.

The obligations under the Revolver Agreement are guaranteed by Warner Chilcott Limited, Allergan Finance, LLC and Allergan Funding SCS.

The Revolver Agreement contains customary affirmative covenants for facilities of this type, including, among others, covenants pertaining to the delivery of financial statements, notices of default, maintenance of corporate existence and compliance with laws, as well as customary negative covenants for facilities of this type, including, among others, limitations on secured indebtedness, non-guarantor subsidiary indebtedness, mergers and certain other fundamental changes and passive holding company status. The Revolver Agreement also contains a financial covenant requiring maintenance of a maximum consolidated leverage ratio.

In addition, the Revolver Agreement also contains customary events of default (with customary grace periods and materiality thresholds) .

The Company was subject to, and as of December 31, 2017 was in compliance with all, financial and operational covenants under the terms of the Revolver Agreement. At December 31, 2017, there were $28.6 million of outstanding borrowings or letters of credit outstanding under the Revolver Agreement.

### *Cash Bridge Loan Facility*

On April 9, 2015, the Company repaid the outstanding balance under a 60-day senior unsecured bridge credit facility, of which $2.8 billion was drawn to finance the Allergan Acquisition.

92

### 2017 Repayments

The Company redeemed all senior notes during the year ended December 31, 2017 that matured within that period.

### *Tender Offer*

On May 30, 2017, the Company's wholly owned subsidiaries Allergan Funding SCS, Allergan Finance LLC, Forest Laboratories, LLC and Allergan, Inc., each as co-offeror with Warner Chilcott Limited, completed the repurchase of certain debt securities issued by the entities for cash under a previously announced tender offer. As a result of the offering, the Company repurchased $300.0 million of the $750.0 million 4.875% notes due February 15, 2021, $543.3 million of the $1,000.0 million 4.625% notes due October 1, 1042, $700.0 million of the $1,050.0 million 4.375% notes due February 1, 2019, and $1,300.0 million of the $2,500.0 million 4.750% notes due March 15, 2045. The Company paid a total of $3,013.8 million, which included an early tender penalty to repurchase the notes of $170.5 million in cash. The Company recognized a net expense of $161.6 million within "Other (expense) / income" for the early tender payment and non-cash write-off of premiums and debt fees related to the repurchased notes.

93

### Other Prepayments

On November 30, 2017, the Company repaid its $400.0 million 6.125% notes due August 15, 2019 in full. The Company paid a total of $426.8 million, which included an early tender payment, to repurchase the notes of $26.8 million in cash, which was recognized as a component of "Other (expense) / income".

On December 13, 2017, the Company repaid its remaining $350.0 million obligation under its 4.375% notes due February 1, 2019. The Company recognized a deminimis net P&L charge as a result of the debt termination.

### Long-term Obligations

The following table lists our enforceable and legally binding obligations as of December 31, 2017. Certain amounts included herein are based on management's estimates and assumptions about these obligations, including their duration, the possibility of renewal, anticipated actions by third parties and other factors. Because these estimates and assumptions are necessarily subjective, the enforceable and legally binding obligation we will actually pay in future periods may vary from those reflected in the table:

| ($ in millions): | Payments Due by Period (Including Interest on Debt) | | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | 2018 | 2019-2020 | 2021-2022 | Thereafter |
| Long-term debt[1] | $ 30,186.9 | $ 4,209.0 | $ 5,990.4 | $ 7,250.4 | $ 12,737.1 |
| Cash interest[1] | 9,246.8 | 932.0 | 1,707.8 | 1,337.7 | 5,269.3 |
| Operating lease obligations[2] | 453.0 | 53.5 | 105.6 | 87.8 | 206.1 |
| Capital lease obligations[3] | 2.7 | 2.7 | - | - | - |
| Sales based and other milestone obligations[4][5] | 9,809.9 | - | 135.0 | 165.0 | 9,509.9 |
| R&D / approval milestone obligations[4][5] | 5,809.1 | 409.5 | 709.2 | 866.6 | 3,823.8 |
| Other obligations and commitments | 1,596.8 | 205.1 | 863.8 | 191.2 | 336.7 |
| **Total** | **$ 57,105.2** | **$ 5,811.8** | **$ 9,511.8** | **$ 9,898.7** | **$ 31,882.9** |

[1] Amounts represent total minimum cash payments and anticipated interest payments, as applicable, assuming scheduled repayments under the Company's existing notes. Amounts exclude fair value adjustments, discounts or premiums on outstanding debt obligations.

[2] Amount represents operating leases for our global business. There are no contingent rental amounts or sublease rentals.

(3)   Amount represents capital leases for our global business, including interest. Leases are for property, plant and equipment, vehicles and furniture and fixtures.

(4)   Amount includes contingent consideration obligations, including accretion resulting from various acquisitions.

(5)   The table above reflects the anticipated timing of R&D and approval related milestones with sales based milestones included in the period "Thereafter" as the achievement of sales targets is variable.  Certain agreements also include royalties based on commercial sales.

The following are contractual commitments relating to the R&D and approval related milestones and sales based milestones ($ in millions):

| Transaction | Product | Maximum Milestones | R&D / Approval Milestones | Sales Based and Other Milestones |
|---|---|---|---|---|
| Heptares Therapeutics, Ltd | Neurological disorders | $ 3,224.5 | $ 649.5 | $ 2,575.0 |
| Assembly Biosciences, Inc. | Gastrointestinal products | 2,459.0 | 1,069.0 | 1,390.0 |
| AstraZeneca plc License | Brazikumab | 1,265.0 | 225.0 | 1,040.0 |
| Akarna Therapeutics, Ltd | Inflammatory and fibrotic diseases | 975.0 | 600.0 | 375.0 |
| Tobira Therapeutics, Inc. | Cenicriviroc | 800.1 | 400.1 | 400.0 |
| Chase Pharmaceuticals Corporation | Neurodegenerative disorders | 875.0 | 325.0 | 550.0 |
| Merck & Co. | Ubrogepant & Atogepant | 865.0 | 425.0 | 440.0 |
| Retrosense Therapeutics, LLC | RST-001 | 495.0 | 245.0 | 250.0 |
| Naurex, Inc. | GLYX-13 | 475.0 | 75.0 | 400.0 |
| AqueSys, Inc. | Xen Gel Stent | 300.0 | - | 300.0 |
| Topokine Therapeutics, Inc. | XAF5 | 260.0 | 110.0 | 150.0 |
| Oculeve, Inc. | TrueTear ™ | 200.0 | 100.0 | 100.0 |
| Forsight VISION5, Inc. | Bimatoprost Ring | 125.0 | 125.0 | - |
| All Other | | 3,300.4 | 1,460.5 | 1,839.9 |
| Total | | $ 15,619.0 | $ 5,809.1 | $ 9,809.9 |

*Off-Balance Sheet Arrangements*

We do not have any material off-balance sheet arrangements that have, or are reasonably likely to have, a current or future effect on our financial condition, changes in financial condition, net revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

## CRITICAL ACCOUNTING ESTIMATES

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions are reasonable based upon information available to us at the time that these estimates, judgments and assumptions are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the financial statements, as well as the reported amounts of revenues and expenses during the periods presented. To the extent there are material differences between these estimates, judgments or assumptions and actual results, our financial statements will be affected. The significant accounting estimates that we believe are important to aid in fully understanding and evaluating our reported financial results include the following:

- · Revenue Recognition

- · Inventory Valuation

- · Product Rights and Other Definite-Lived Intangible Assets

- · Goodwill and Intangible Assets with Indefinite-Lives

- · Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed

- · Income Taxes

95

- Defined Benefit Plans

- Contingent Consideration and Other Commitments

In many cases, the accounting treatment of a particular transaction is specifically dictated by GAAP and requires management's best estimates of the underlying data in its application. There are also areas in which management's judgment in selecting among available GAAP alternatives would not produce a materially different result.

### Revenue Recognition

#### General

During the years ended December 31, 2017, 2016 and 2015, revenue from product sales was recognized when title and risk of loss to the product transfers to the customer, which is based on the transaction shipping terms. Recognition of revenue also requires reasonable assurance of collection of sales proceeds, the seller's price to the buyer to be fixed or determinable and the completion of all performance obligations. The Company warrants products against defects and for specific quality standards, permitting the return of products under certain circumstances. Product sales are recorded net of all sales-related deductions including, but not limited to: chargebacks, trade discounts, sales returns and allowances, commercial and government rebates, customer loyalty programs and fee-for-service arrangements with certain distributors, which we refer to in the aggregate as "SRA" allowances.

Royalty and commission revenue is recognized as a component of net revenues in accordance with the terms of their respective contractual agreements when collectability is reasonably assured and when revenue can be reasonably measured.

#### Provisions for SRAs

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. When the Company recognizes gross revenue from the sale of products, an estimate of SRA is recorded, which reduces the product revenues. Accounts receivable and/or accrued liabilities are also reduced and/or increased by the SRA amount depending on whether we have the right of offset with the customer. These provisions are estimated based on historical payment experience, historical relationship of the deductions to gross product revenues, government regulations, estimated utilization or redemption rates, estimated customer inventory levels and current contract sales terms. The estimation process used to determine our SRA provision has been applied on a consistent basis and no material revenue adjustments have been necessary to increase or decrease our reserves for SRA as a result of a significant change in underlying estimates. The Company uses a variety of methods to assess the adequacy of the SRA reserves to ensure that our financial statements are fairly stated.

*Chargebacks* — A chargeback represents an amount payable in the future to a wholesaler for the difference between the invoice price paid by our wholesale customer for a particular product and the negotiated contract price that the wholesaler's customer pays for that product. The chargeback provision and related reserve varies with changes in product mix, changes in customer pricing and changes to estimated wholesaler inventories. The provision for chargebacks also takes into account an estimate of the expected wholesaler sell-through levels to indirect customers at certain contract prices. The Company validates the chargeback accrual quarterly through a review of the inventory reports obtained from our largest wholesale customers. This customer inventory information is used to verify the estimated liability for future chargeback claims based on historical chargeback and contract rates. These large wholesalers represent the vast majority of the recipients of the Company's chargeback payments. We continually monitor current pricing trends and wholesaler inventory levels to ensure the liability for future chargebacks is fairly stated.

*Rebates* — Rebates include volume related incentives to direct and indirect customers, third-party managed care and Medicare Part D rebates, Medicaid rebates and other government rebates. Rebates are accrued based on an estimate of claims to be paid for product sold into trade by the Company. Volume rebates are generally offered to customers as an incentive to use the Company's products and to encourage greater product sales. These rebate programs include contracted rebates based on customers' purchases made during an applicable monthly, quarterly or annual period. The provision for third-party rebates is estimated based on our customers' contracted rebate programs and the Company's historical experience of rebates paid. Any significant changes to our customer rebate programs are considered in establishing the provision for rebates. The provisions for government rebates are based, in part, upon historical experience of claims submitted by the various states / authorities, contractual terms and government regulations. We monitor legislative changes to determine what impact such legislation may have on our provision.

*Cash Discounts* — Cash discounts are provided to customers that pay within a specific period. The provision for cash discounts is estimated based upon invoice billings and historical customer payment experience. The Company's experience of payment history is fairly consistent and most customer payments qualify for the cash discount.

96

*Returns and Other Allowances* — The Company's provision for returns and other allowances include returns, promotional allowances, and loyalty cards.

Consistent with industry practice, the Company maintains a returns policy that allows customers to return product for a credit. In accordance with the Company's policy, credits for customer returns of products are applied against outstanding account activity or are settled in cash. Product exchanges are not permitted. Customer returns of product are generally not resalable. The Company's estimate of the provision for returns is based upon historical experience and current trends of actual customer returns. Additionally, we consider other factors when estimating the current period returns provision, including levels of inventory in the distribution channel, as well as significant market changes which may impact future expected returns.

Promotional allowances are credits that are issued in connection with a product launch or as an incentive for customers to carry our product. The Company establishes a reserve for promotional allowances based upon contractual terms.

Loyalty cards allow the end user patients a discount per prescription and are accrued based on historical experience, contract terms and the volume of product and cards in the distribution channel.

The following table summarizes the activity from continuing operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | | Rebates | | Returns and Other Allowances | | Cash Discounts | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2014 | $ | 28.0 | $ | 995.8 | $ | 255.2 | $ | 16.3 | $ | 1,295.3 |
| Add: Allergan Acquisition | | 14.1 | | 306.4 | | 100.4 | | 8.6 | | 429.5 |
| Provision related to sales in 2015 | | 649.9 | | 4,035.7 | | 659.9 | | 275.6 | | 5,621.1 |
| Credits and payments | | (613.8) | | (3,993.5) | | (648.0) | | (275.4) | | (5,530.7) |
| Balance at December 31, 2015 | $ | 78.2 | $ | 1,344.4 | $ | 367.5 | $ | 25.1 | $ | 1,815.2 |
| Provision related to sales in 2016 | | 1,003.2 | | 4,338.7 | | 1,390.1 | | 306.5 | | 7,038.5 |
| Credits and payments | | (967.2) | | (4,069.1) | | (1,341.7) | | (296.9) | | (6,674.9) |
| Balance at December 31, 2016 | $ | 114.2 | $ | 1,614.0 | $ | 415.9 | $ | 34.7 | $ | 2,178.8 |
| Provision related to sales in 2017 | | 1,098.7 | | 4,891.4 | | 1,799.3 | | 330.6 | | 8,120.0 |
| Credits and payments | | (1,135.7) | | (4,710.4) | | (1,734.7) | | (328.8) | | (7,909.6) |
| Add: LifeCell and Zeltiq Acquisitions | | – | | 4.2 | | 37.1 | | – | | 41.3 |
| Balance at December 31, 2017 | $ | 77.2 | $ | 1,799.2 | $ | 517.6 | $ | 36.5 | $ | 2,430.5 |

The following table summarizes the balance sheet classification of our SRA reserves ($ in millions):

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2016 | |
| Accounts receivable | $ | 250.6 | $ | 287.4 |
| Accounts payable and accrued expenses | | 2,179.9 | | 1,891.4 |
| | $ | 2,430.5 | $ | 2,178.8 |

The provisions recorded to reduce gross product sales to net product sales, excluding discontinued operations, were as follows ($ in millions):

| Years Ended December 31, | Gross Product Sales | | Chargebacks | Rebates | Returns and Other Allowances | | Cash Discounts | | Net Product Sales | | Percentage of Gross Product Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | $ | 18,125.1 | $ 649.9 | $ 4,035.7 | $ | 659.9 | $ | 275.6 | $ | 12,504.0 | 69.0% |
| 2016 | $ | 21,398.6 | $ 1,003.2 | $ 4,338.7 | $ | 1,390.1 | $ | 306.5 | $ | 14,360.1 | 67.1% |
| 2017 | $ | 23,688.4 | $ 1,098.7 | $ 4,891.4 | $ | 1,799.3 | $ | 330.6 | $ | 15,568.4 | 65.7% |

The following table summarizes the activity from discontinued operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Returns and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2014 | $ 536.9 | $ 750.8 | $ 356.9 | $ 44.4 | $ 1,689.0 |
| Provision related to sales in 2015 | 5,907.2 | 1,991.9 | 729.4 | 277.3 | 8,905.8 |
| Credits and payments | (5,825.1) | (2,011.7) | (757.7) | (261.6) | (8,856.1) |
| Balance at December 31, 2015 | $ 619.0 | $ 731.0 | $ 328.6 | $ 60.1 | $ 1,738.7 |
| Provision related to sales in 2016 | 3,525.4 | 1,290.4 | 583.0 | 159.1 | 5,557.9 |
| Credits and payments | (3,655.0) | (1,350.0) | (496.3) | (155.4) | (5,656.7) |
| Disposal of businesses | (489.4) | (671.4) | (415.3) | (63.8) | (1,639.9) |
| Balance at December 31, 2016 | $ - | $ - | $ - | $ - | $ - |

The Company's divested generics business also had the following type of SRAs:

- Pricing adjustments, included shelf stock adjustments which are credits issued to reflect price decreases in selling prices charged to the Company's direct customers. Shelf stock adjustments are based upon the amount of product our customers have in their inventory at the time of an agreed-upon price reduction. The provision for shelf stock adjustments was based upon specific terms with the Company's customers and includes estimates of existing customer inventory levels based upon their historical purchasing patterns.

- Billback adjustments are credits that are issued to certain customers who purchase directly from us as well as indirectly through a wholesaler. These credits are issued in the event there was a difference between the customer's direct and indirect contract price. The provision for billbacks was estimated based upon historical purchasing patterns of qualified customers who purchase product directly from us and supplement their purchases indirectly through our wholesale customers.

### *Inventory Valuation*

Inventories consist of finished goods held for sale and distribution, raw materials and work in process. Inventory includes brand pharmaceutical and medical aesthetic products which represents FDA approved or likely to be approved indications. Inventory valuation reserves are established based on a number of factors/situations including, but not limited to, raw materials, work in process or finished goods not meeting product specifications, product obsolescence, or application of the lower of cost (first-in, first-out method) or market (net realizable value) concepts. The determination of events requiring the establishment of inventory valuation reserves, together with the calculation of the amount of such reserves may require judgment. Assumptions utilized in our quantification of inventory reserves include, but are not limited to, estimates of future product demand, consideration of current and future market conditions, product net selling price, anticipated product launch dates, potential product obsolescence and other events relating to special circumstances surrounding certain products. No material adjustments have been required to our inventory reserve estimates for the periods presented. Adverse changes in assumptions utilized in our inventory reserve calculations could result in an increase to our inventory valuation reserves and higher cost of sales.

### *Product Rights and Other Definite-Lived Intangible Assets*

Our product rights and other definite-lived intangible assets are stated at cost, less accumulated amortization, and are amortized using the economic benefit model or the straight-line method, if results are materially aligned, over their estimated useful lives. We determine amortization periods for product rights and other definite-lived intangible assets based on our assessment of various factors impacting estimated useful lives and cash flows. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues, and contractual terms. Significant changes to any of these factors may result in an impairment, a reduction in the intangibles useful life and an acceleration of related amortization expense, which could cause our net results to decline.

Product rights and other definite-lived intangible assets are tested periodically for impairment when events or changes in circumstances indicate that an asset's carrying value may not be recoverable. The impairment testing involves comparing the carrying amount of the asset to the forecasted undiscounted future cash flows. In the event the carrying value of the asset exceeds the

98

undiscounted future cash flows, the carrying value is considered not recoverable and an impairment exists. An impairment loss is measured as the excess of the asset's carrying value over its fair value, calculated using discounted future cash flows. The computed impairment loss is recognized in net (loss) / income in the period that the impairment occurs. Assets which are not impaired may require an adjustment to the remaining useful lives for which to amortize the asset. Our projections of discounted cash flows use a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of future cash flows attributable to our other definite-lived intangible assets require significant judgment based on our historical and anticipated results and are subject to many factors. Different assumptions and judgments could materially affect the calculation of the fair value of the other definite-lived intangible assets which could trigger impairment.

### Goodwill and Intangible Assets with Indefinite-Lives

#### General

The Company tests goodwill and intangible assets with indefinite-lives for impairment annually in the second quarter. Additionally, the Company may perform interim tests if an event occurs or circumstances change that could potentially reduce the fair value of a reporting unit below its carrying amount. The carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units.

Goodwill is considered impaired if the carrying amount of the net assets exceeds the fair value of the reporting unit. Impairment, if any, would be recorded in operating income and this could result in a material impact to net income / (loss) and income / (loss) per share.

Acquired IPR&D intangible assets represent the value assigned to acquired research and development projects that, as of the date acquired, represent the right to develop, use, sell and/or offer for sale a product or other intellectual property that the Company has acquired with respect to products and/or processes that have not been completed or approved. The IPR&D intangible assets are subject to impairment testing until completion or abandonment of each project. Upon abandonment, the assets are impaired, if there is no future alternative use or ability to sell the asset. Impairment testing requires the development of significant estimates and assumptions involving the determination of estimated net cash flows for each year for each project or product (including net revenues, cost of sales, R&D costs, selling and marketing costs and other costs which may be allocated), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, and competitive trends impacting the asset and each cash flow stream as well as other factors. The major risks and uncertainties associated with the timely and successful completion of the IPR&D projects include legal risk, market risk and regulatory risk. Changes in these assumptions could result in future impairment charges. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change or the timely completion of each project and commercial success will occur. For these and other reasons, actual results may vary significantly from estimated results.

Upon successful completion of each project and approval of the product, we will make a separate determination of the useful life of the intangible, transfer the amount to currently marketed products ("CMP") and amortization expense will be recorded over the estimated useful life.

#### Annual Testing

#### 2017

The Company evaluated goodwill for five reporting units during the second quarter of 2017. The Company performed its annual impairment test utilizing long-term growth rates for its reporting units ranging from 0.0% to 2.0% in its estimation of fair value and discount rates ranging from 7.5% to 8.5%. The factors used in evaluating goodwill for impairment are subject to change and are tracked against historical results by management. Changes in the key assumptions by management can change the results of testing. The Company determined there was no impairment associated with goodwill.

As part of the annual IPR&D impairment test performed by the Company during 2017, the Company recorded impairment charges. In addition to the Company's annual IPR&D impairment test, the Company noted IPR&D impairments based on triggering events during the year ended December 31, 2017. Refer to the Year Ended December 31, 2017 compared to 2016 — IPR&D Impairments and Asset Sales and Impairments, Net section within Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for the details of the impairments taken in the year ended December 31, 2017.

99

*2016*

In connection with the realignment of the Company's operating segments in the second quarter of 2016, goodwill was reallocated to reporting units under the then new segment structure. The Company evaluated goodwill for six reporting units during the second quarter of 2016. The Company performed its annual impairment test utilizing long-term growth rates for its reporting units ranging from 0% to 2.5% in its estimation of fair value and discount rates ranging from 8.0% to 9.5%. The factors used in evaluating goodwill for impairment are subject to change and are tracked against historical results by management. Changes in the key assumptions by management can change the results of testing. The Company determined there was no impairment associated with goodwill.

As part of the annual IPR&D impairment test performed by the Company during 2016, the Company recorded impairment charges. In addition to the Company's annual IPR&D impairment test, the Company noted IPR&D impairments based on triggering events during the year ended December 31, 2016. Refer to the Year Ended December 31, 2017 compared to 2016 — IPR&D Impairments and Asset Sales and Impairments, Net section within Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for the details of the impairments taken in the year ended December 31, 2016.

*Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed*

We account for acquired businesses using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recorded as of the date of acquisition at their respective fair values. The consolidated financial statements and results of operations reflect an acquired business after the completion of the acquisition. The fair value of the consideration paid, including contingent consideration, is assigned to the underlying net assets of the acquired business based on their respective fair values as determined using a market participant concept. Any excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill.

The most material line items impacted by the allocation of acquisition fair values are:

- Intangible assets (including IPR&D assets upon successful completion of the project and approval of the product) which are amortized to amortization expense over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the assets acquired and liabilities assumed and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of expected future net cash flows, estimates of appropriate discount rates used to present value expected future net cash flow streams, the timing of approvals and the probability of success for IPR&D projects and the timing of related product launch dates, the assessment of each asset's life cycle, the impact of competitive trends on each asset's life cycle and other factors. These judgments can materially impact the estimates used to allocate acquisition date fair values to assets acquired and liabilities assumed and the future useful lives. For these and other reasons, actual results may vary significantly from estimated results.

- Inventory is recorded at fair market value factoring in selling price and costs to dispose. Inventory acquired is typically valued higher than replacement cost.

*Income Taxes*

Income taxes are accounted for using an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial statement and tax basis of assets and liabilities at the applicable tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The Company evaluates the realizability of its deferred tax assets by assessing its valuation allowance and by adjusting the amount of such allowance, if necessary. The factors used to assess the likelihood of realization include the Company's forecast of future taxable income and available tax planning strategies that could be implemented to realize the net deferred tax assets. Failure to achieve forecasted taxable income in applicable tax jurisdictions could affect the ultimate realization of deferred tax assets and could result in an increase in the Company's effective tax rate on future earnings.

Income tax positions must meet a more-likely-than-not recognition threshold to be recognized. Income tax positions that previously failed to meet the more-likely-than-not threshold are recognized in the first financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not threshold are derecognized in the first financial reporting period in which that threshold is no longer met. The Company recognizes potential accrued interest and penalties related to unrecognized tax benefits within the consolidated statements of operations as income tax expense.

100

The income tax effects of the TCJA have been initially accounted for on a provisional basis pursuant to the guidance in Staff Accounting Bulletin ("SAB") 118. Reasonable estimates for all material tax effects of the TCJA (other than amounts related to accounting policy elections) have been provided and adjustments to provisional amounts will be made in subsequent reporting periods as information becomes available to complete provisional computations. The provisional impact of the TCJA for the Federal tax rate change and the resulting deferred tax liability for unremitted earnings will be completed in subsequent measurement periods when the required computations for the 2017 tax year and the related tax returns for the relevant entities have been completed.  The final amount for the toll charge is dependent on amounts that cannot be determined until the 2018 financial results of certain non-U.S. subsidiaries are completed.  In addition, the IRS continues to issue interpretive guidance on the computation of the tax on deferred foreign earnings and therefore the computations cannot be finalized until all relevant IRS guidance has been promulgated and its impact assessed.

The TCJA introduced an additional U.S. tax on certain non-U.S. subsidiaries' earnings which are considered to be Global Intangible Low Taxed Income (referred to as "GILTI"). Under this provision, the amount of GILTI included by a U.S. shareholder will be taxed at a rate of 10.5% for tax years beginning after December 31, 2017 (increasing to 13.125% for tax years beginning after December 31, 2025) with a partial offset for foreign tax credits.

Due to the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the TCJA and the application of ASC 740 and are considering if deferred tax amounts should be recorded for this provision. Our accounting policies depend, in part, on analyzing our global income to determine whether we expect material tax liabilities resulting from the application of this provision and, if so, whether and when to record related current and deferred income taxes and whether such amounts can be reasonably estimated. Anticipated further guidance from the IRS will also clarify the manner in which the GILTI tax is computed. For these reasons, we have not recorded a deferred tax expense or benefit relating to potential GILTI tax in our 2017 consolidated financial statements and have not made a policy election regarding whether to record deferred taxes on GILTI or account for the GILTI entirely as a period cost.

### Defined Benefit Plans

The Company recognizes the overfunded or underfunded status of each of its defined benefit plans as an asset or liability on its consolidated balance sheets. The obligations are generally measured at the actuarial present value of all benefits attributable to employee service rendered, as provided by the applicable benefit formula. The estimates of the obligation and related expense of these plans recorded in the financial statements are based on certain assumptions. The most significant assumptions relate to discount rate and expected return on plan assets. Other assumptions used may include employee demographic factors such as compensation rate increases, retirement patterns, expected employee turnover and participant mortality rates. The difference between these assumptions and actual experience results in the recognition of an asset or liability based upon a net actuarial (gain) / loss. If the total net actuarial (gain) / loss included in accumulated other comprehensive income / (loss) exceeds a threshold of 10% of the greater of the projected benefit obligation or the market related value of plan assets, it is subject to amortization and recorded as a component of net periodic pension cost over the average remaining service lives of the employees participating in the pension plan. Net periodic benefit costs are recognized in the consolidated statement of operations.

### Contingent Consideration and Other Commitments

We determine the acquisition date fair value of contingent consideration obligations based on a probability-weighted income approach derived from revenue estimates, post-tax gross profit levels and a probability assessment with respect to the likelihood of achieving contingent obligations including contingent payments such as milestone obligations, royalty obligations and contract earn-out criteria, where applicable. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined using the fair value concepts defined in ASC 820. The resultant probability-weighted cash flows are discounted using an appropriate effective annual interest rate. At each reporting date, the contingent consideration obligation will be revalued to estimated fair value and changes in fair value will be reflected as income or expense in our consolidated statement of operations. Changes in the fair value of the contingent consideration obligations may result from changes in discount periods and rates, changes in the timing and amount of future revenue estimates and changes in probability assumptions with respect to the likelihood of achieving the various contingent payment obligations. Changes in assumptions utilized in our contingent consideration fair value estimates could result in an increase or decrease in our contingent consideration obligation and a corresponding charge or reduction to operating results.

We are involved in various legal proceedings in the normal course of our business, including product liability litigation, intellectual property litigation, employment litigation and other litigation. We record reserves related to these legal matters when losses related to such litigation or contingencies are both probable and reasonably estimable. Refer to "NOTE 24 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document for a description of our significant current legal proceedings.

## RECENT ACCOUNTING PRONOUNCEMENTS

In May 2014, the FASB issued Accounting Standards Update No. 2014-09 (Topic 606) "Revenue from Contracts with Customers." Topic 606 supersedes the revenue recognition requirements in Accounting Standards Codification Topic 605, "Revenue Recognition", and requires entities to recognize revenue when they transfer control of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company will adopt Topic 606 as of January 1, 2018, using the modified retrospective transition method applied to those contracts which were not completed as of that date. Upon adoption, the Company will recognize the cumulative effect of adopting this guidance as an adjustment to our opening balance of retained earnings, the impact of which is not significant. Prior periods will not be retrospectively adjusted. The Company has assessed our revenue recognition practices with respect to the agreements for which the Company currently recognizes revenues and has concluded that there is no material impact from the new revenue recognition standard.

Under Topic 606, the Company will apply the practical expedient to recognize the incremental costs of obtaining contracts as an expense when incurred if the amortization period of the assets that the Company otherwise would have recognized is one year or less. These costs will be included in selling, general, and administrative expenses which are consistent with current accounting prior to the adoption of Topic 606. The Company will also elect to use the practical expedient to not adjust the promised amount of consideration for the effects of the time value of money for contracts in which the anticipated period between when the Company transfers the goods or services to the customer and when the customer pays is equal to one year or less.

In January 2016, the FASB issued ASU No. 2016-01, which changes the requirement to require equity securities (including other ownership interests, such as partnerships, unincorporated joint ventures, and limited liability companies) to be measured at fair value with changes in the fair value recognized through net income. This update is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The adoption of this guidance on January 1, 2018 resulted in a reduction of other comprehensive income, net of tax, of approximately $63.0 million with a corresponding increase to retained earnings.

In February 2016, the FASB issued ASU No. 2016-02, which states that a lessee should recognize the assets and liabilities that arise from leases. This update is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company is evaluating the impact that this pronouncement will have on our financial position and results of operations.

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments. The ASU is intended to improve financial reporting by requiring timelier recording of credit losses on loans and other financial instruments held by financial institutions and other organizations. The ASU requires the measurement of all expected credit losses for financial assets including trade receivables held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. Financial institutions and other organizations will now use forward-looking information to better inform their credit loss estimates. The ASU is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early application will be permitted for all organizations for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. The Company is evaluating the impact, if any, that this pronouncement will have on our financial position and results of operations.

In October 2016, the FASB issued ASU No. 2016-16, Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory. Current GAAP prohibits the recognition of current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes in GAAP. The amendment to the guidance eliminates the exception for an intra-entity transfer of an asset other than inventory and requires an entity to recognize the income tax consequences when the transfer occurs. Two common examples of assets included in the scope of the amendment are intellectual property and property, plant, and equipment. The amendment is effective for annual reporting periods beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. The amendment should be applied on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The adoption of the guidance on January 1, 2018 resulted in an increase to retained earnings of $356.2 million and a corresponding reduction in net tax liabilities.

102

In January 2017, the FASB issued ASU No. 2017-01, Business Combinations (Topic 805): Clarifying the Definition of a Business. The amendments to the guidance are intended to help companies evaluate whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. When substantially all of the fair value of gross assets acquired is concentrated in a single asset (or a group of similar assets), the assets acquired would not represent a business. This amendment introduces an initial required screening that, if met, eliminates the need for further assessment. To be considered a business, an acquisition would have to include an input and a substantive process that together significantly contribute to the ability to create outputs. To be a business without outputs, there will need to be an organized workforce. The ASU also narrows the definition of the term "outputs" to be consistent with how it is described in Topic 606, Revenue from Contracts with Customers.  These amendments are effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The changes to the definition of a business may result in more acquisitions being accounted for as asset acquisitions.

In January 2017, the FASB issued ASU No. 2017-04, Intangibles - Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment. The amendments to the guidance eliminate Step 2 from the goodwill impairment test. The goodwill impairment test is performed by comparing the fair value of a reporting unit with its carrying amount. An impairment charge should be recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. In addition, income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit should be considered when measuring the goodwill impairment loss, if applicable. These amendments also eliminate the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment. These amendments should be applied on a prospective basis. The nature of and reason for the change in accounting principle should be disclosed upon transition. These amendments are effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The adoption of these amendments are not anticipated to have a material impact on the Company's financial position or results of operations.

In March 2017, the FASB issued ASU No. 2017-07, Compensation — Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost. The amendments to the guidance require that an employer report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. The other components of net benefit cost are required to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. If a separate line item or items are used to present the other components of net benefit cost, that line item or items must be appropriately described. If a separate line item or items are not used, the line item or items used in the income statement to present the other components of net benefit cost must be disclosed.  In addition, the amendments also allow only the service cost component to be eligible for capitalization when applicable. The amendments are effective for annual periods beginning after December 15, 2017, including interim periods within those annual periods. The Company does not anticipate the standard having a material impact on our financial position and results of operations.

In March 2017, The FASB issued ASU No. 2017-08, Receivables—Nonrefundable Fees and Other Costs (Subtopic 310-20), Premium Amortization on Purchased Callable Debt Securities. The ASU shortens the amortization period for certain callable debt securities held at a premium and requires the premium to be amortized to the earliest call date, but does not require an accounting change for securities held at a discount; the discount continues to be amortized to maturity.  The amendments are effective for annual periods beginning after December 15, 2018, including interim periods within those annual periods. Entities are required to apply the amendments on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The entity is required to provide disclosures about a change in accounting principle in the period of adoption. The Company is evaluating the impact these amendments will have on our financial position and results of operations.

In May 2017, the FASB issued ASU No. 2017-09, Compensation—Stock Compensation (Topic 718) — Scope of Modification Accounting. ASU No. 2017-09 applies to entities that change the terms or conditions of a share-based payment award. The amendments to the guidance in ASU No. 2017-09 include guidance on determining changes to the terms and conditions of share-based payment awards and require an entity to apply modification accounting under Topic 718 unless all of the following conditions are met: (1) the fair value of the modified award is the same as the fair value of the original award immediately before the original award is modified. If the modification does not affect any of the inputs to the valuation technique that the entity uses to value the award, the entity is not required to estimate the value immediately before and after the modification; (2) the vesting conditions of the modified award are the same as the vesting conditions of the original award immediately before the original award is modified; and (3) the classification of the modified award as an equity instrument or a liability instrument is the same as the classification of the original award immediately before the original award is modified. The amendments are effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2017 and should be applied prospectively to an award modified on or after the adoption date. The adoption of these amendments are not anticipated to have a material impact on the Company's financial position or results of operations.

In August 2017, the FASB issued ASU No. 2017-12, Derivatives and Hedging (Topic 815) — Targeted Improvements to Accounting for Hedging Activities. The amendments to the guidance will better align an entity's risk management activities and financial reporting for hedging relationships through changes to both the designation and measurement guidance for qualifying hedging relationships and the presentation of hedge results. To meet that objective, the amendments expand and refine hedge accounting for both nonfinancial and financial risk components and align the recognition and presentation of the effects of the hedging instrument and the hedged item in the financial statements. The amendments also make certain targeted improvements to simplify the application of hedge accounting guidance and ease the administrative burden of hedge documentation requirements and assessing hedge effectiveness. The amendments are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. Early adoption is permitted in any interim period or fiscal years before the effective date of the amendments. For cash flow and net investment hedges existing at the date of adoption, an entity should apply a cumulative-effect adjustment related to eliminating the separate measurement of ineffectiveness to accumulated other comprehensive income with a corresponding adjustment to the opening balance of retained earnings as of the beginning of the fiscal year that an entity adopts the amendments. The amended presentation and disclosure guidance is required only prospectively. The guidance may have an impact on the Company's future financial positions and results of operations.

## ITEM 7A.  *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

The following discussion provides forward-looking quantitative and qualitative information about our potential exposure to market risk. Market risk represents the potential loss arising from adverse changes in the value of financial instruments. The risk of loss is assessed based on the likelihood of adverse changes in fair values, cash flows or future earnings. We are exposed to market risk for changes in the market values of our investments (Investment Risk), the impact of interest rate changes (Interest Rate Risk) and the impact of foreign currency exchange changes (Foreign Currency Exchange Risk).

We maintain our portfolio of cash equivalents and short-term investments in a variety of securities, including both government and government agency obligations with ratings of A or better and money market funds. Our investments in marketable securities are governed by our investment policy which seeks to preserve the value of our principal, provide liquidity and maximize return on the Company's investment against minimal interest rate risk. Consequently, our interest rate and principal risk are minimal on our non-equity investment portfolio. The quantitative and qualitative disclosures about market risk are set forth below.

### Investment Risk

As of December 31, 2017, our total investments in marketable and equity securities of other companies, including equity method investments, but excluding securities considered cash and cash equivalents were $4,704.4 million (included in marketable securities and investments and other assets). The fair values of these investments are subject to significant fluctuations due to volatility of the stock market and changes in general economic conditions.

As of December 31, 2017, the Company owned 95.9 million Teva ordinary shares, which are subject to changes in value based on the price of Teva shares. As of February 13, 2018, the Company owned approximately 40.0 million Teva ordinary shares.

We regularly review the carrying value of our investments and identify and recognize losses, for income statement purposes, when events and circumstances indicate that any declines in the fair values of such investments below our accounting basis are other-than-temporary, including the other-than-temporary impairment of Teva securities in the year ended December 31, 2017 of $3,273.5 million.

### Interest Rate Risk

Our exposure to interest rate risk relates primarily to our non-equity investment portfolio. Our cash is invested in money market securities.

Our portfolio of marketable securities includes highly liquid money market securities classified as available-for-sale securities, with no security having a maturity in excess of one year. These include floating rate securities that are exposed to interest rate fluctuations. Because of the short-term nature of these investments, we are subject to minimal interest rate risk and do not believe that an increase in market rates would have a significant negative impact on the realized value of our portfolio.

104

*Floating Rate Debt*

At December 31, 2017, borrowings outstanding under the floating rate notes were $1,840.4 million. Assuming a one percent increase in the applicable interest rate on the Company's floating rates notes, annual interest expense would increase by approximately $18.4 million over the next twelve months.

*Fixed Rate Debt*

The Company has outstanding borrowings under its fixed rate notes. Changes in market interest rates generally affect the fair value of fixed rate debt, but do not impact earnings or cash flows.

**Foreign Currency Exchange Risk**

Overall, we are a net recipient of currencies other than the U.S. dollar and, as such, benefit from a weaker dollar and are adversely affected by a stronger dollar relative to major currencies worldwide. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, may negatively affect our consolidated revenues or operating costs and expenses as expressed in U.S. dollars.

From time to time, we have entered into foreign currency option and forward contracts. Accordingly, we have entered into various contracts which change in value as foreign exchange rates change to allow the Company at its option to economically offset the effect of changes in the value of foreign currency assets and liabilities, commitments and anticipated foreign currency denominated sales and operating expenses. We have entered into foreign currency option and forward contracts in amounts between minimum and maximum anticipated foreign exchange exposures.

From time to time, we have used foreign currency option contracts, which provide for the sale or purchase of foreign currencies, if exercised, to economically hedge the currency exchange risks associated with probable but not firmly committed transactions that arise in the normal course of our business. Probable but not firmly committed transactions are comprised primarily of sales of products and purchases of raw material in currencies other than the U.S. dollar. While these instruments were subject to fluctuations in value, such fluctuations were anticipated to offset changes in the value of the underlying exposures.

While the Company does not believe it has significant exposure to foreign exchange, we are subject to transactional items which may impact the results of operations.  Net foreign currency (gains) and losses on the results of operations were $97.5 million, ($52.8) million and ($82.1) million for the years ended December 31, 2017, 2016 and 2015, respectively.

The Company is exposed to foreign exchange risk in its international operations from foreign currency purchases, net investments in foreign subsidiaries, and foreign currency assets and liabilities created in the normal course of business, including the Euro Denominated Notes. In the year ended December 31, 2017, we used effective net investment hedges to partially offset the effects of foreign currency on our investments in certain of our foreign subsidiaries. The total notional amount of our instruments designated as net investment hedges was $3.6 billion as of December 31, 2017.  During the year ended December 31, 2017, the impact of the net investment hedges on other comprehensive income was a loss of $191.8 million.

**Other**

We do not believe that inflation has had a significant impact on our revenues or operations, nor do we have any material commodity price risks.

**ITEM 8.  *FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA***

The information required by this Item is contained in the financial statements set forth in Item 15 (a) under the caption "*Consolidated Financial Statements and Supplementary Data*" as a part of this Annual Report on Form 10-K.

**ITEM 9.  *CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE***

There have been no changes in or disagreements with accountants on accounting or financial disclosure matters.

## ITEM 9A.  CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Allergan plc maintains "disclosure controls and procedures," as such term is defined under Rule 13a-15(e) of the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed in the Allergan plc's Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to Allergan plc's management, including its Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective.

As required by SEC Rule 13a-15(b), the Allergan plc carried out an evaluation, under the supervision and with the participation of Allergan plc's management, including Allergan plc's Principal Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of Allergan plc's disclosure controls and procedures as of the end of the period covered by this annual report. Based on this evaluation Allergan plc's Principal Executive Officer and Principal Financial Officer concluded that Allergan plc's disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2017.

Warner Chilcott Limited maintains "disclosure controls and procedures," as such term is defined under Rule 13a-15(e) of the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed in the Company's Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to Warner Chilcott Limited's management, including its Principal Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective.

As required by SEC Rule 13a-15(b), Warner Chilcott Limited carried out an evaluation, under the supervision and with the participation of Warner Chilcott Limited's management, including Warner Chilcott Limited's Principal Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of Warner Chilcott Limited's disclosure controls and procedures as of the end of the period covered by this annual report. Based on this evaluation Warner Chilcott Limited's Principal Executive Officer and Principal Financial Officer concluded that Warner Chilcott Limited's disclosure controls and procedures were effective at the reasonable assurance level  as of December 31, 2017.

**Management's Reports on Internal Control over Financial Reporting of Allergan plc and Warner Chilcott Limited**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined under Rule 13a-15(f) of the Exchange Act. We maintain internal control over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management of Allergan plc and Warner Chilcott Limited has assessed the effectiveness of Allergan plc and Warner Chilcott Limited's internal control over financial reporting as of December 31, 2017, based on criteria set forth in "Internal Control — Integrated Framework" (2013) issued by Committee of Sponsoring Organizations of the Treadway Commission. Based on its assessment of internal control over financial reporting, management concluded that Allergan plc and Warner Chilcott Limited internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles as of December 31, 2017.

On February 1, 2017, the Company completed the LifeCell Acquisition.  We excluded LifeCell Corporation from our assessment of internal control over financial reporting as of December 31, 2017 because it was acquired by the Company in a business purchase combination during 2017. LifeCell, Inc. is a wholly owned subsidiary of the Company, whose total assets represent approximately 0.3% of total assets and whose net revenues represent approximately 2.8% of net revenues as of and for the year ended December 31, 2017.

106

On April 28, 2017, the Company completed the Zeltiq Aesthetics Acquisition. We excluded Zeltiq Aesthetics, Inc. from our assessment of internal control over financial reporting as of December 31, 2017 because it was acquired by the Company in a business purchase combination during 2017. Zeltiq Aesthetics, Inc. is a wholly owned subsidiary of the Company, whose total assets represent approximately 1.1% of total assets and whose net revenues represent approximately 2.1% of net revenues as of and for the year ended December 31, 2017.

The effectiveness of Allergan plc's internal control over financial reporting as of December 31, 2017, has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein. The effectiveness of Warner Chilcott Limited's internal control over financial reporting as of December 31, 2017, has not been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm.

**Remediation of Prior Material Weakness in Internal Control Over Financial Reporting**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of Allergan plc and Warner Chilcott Limited's annual or interim financial statements will not be prevented or detected on a timely basis.

Management previously identified and disclosed a material weakness in our internal control over financial reporting processes over the assessment of tax implications of certain transactions between our subsidiaries. This control deficiency did not result in a material misstatement of our current or prior period consolidated financial statements. However, this control deficiency could have resulted in a misstatement to the income tax accounts and disclosures, which would have resulted in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, management previously concluded that this control deficiency constituted a material weakness.

In response to this material weakness, changes were made to the Company's internal control over financial reporting, including identifying personnel with responsibility for assessing the tax implications of certain transactions between our subsidiaries, in addition to enhancing certain reports, refining our internal reporting structure, hiring additional resources and redesigning existing controls and income tax reporting policies and procedures to ensure the implications of certain transactions between our subsidiaries are fully analyzed.

The Company has completed the documentation and testing of the corrective actions described above and, as of December 31, 2017, has concluded that the remediation activities completed are sufficient to allow us to conclude that the previously disclosed material weakness has been remediated as of December 31, 2017.

**Changes in Internal Control Over Financial Reporting of Allergan plc and Warner Chilcott Limited**

During the quarter ended December 31, 2017, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, Allergan plc and Warner Chilcott Limited's internal control over financial reporting.

**ITEM 9B.  *OTHER INFORMATION***

None.

107

## PART III

### ITEM 10.  *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

#### Directors

The information concerning directors of Allergan required under this Item is incorporated herein by reference to the "Director Nominees For Election at the Annual Meeting" section of our definitive proxy statement, to be filed pursuant to Regulation 14A, related to our 2018 Annual General Meeting of Shareholders to be held on May 2, 2018 (our "2018 Proxy Statement").

The information concerning our Audit Committee and the independence of its members required by this Item, along with information about the financial expert(s) serving on the Audit Committee, is incorporated by reference to "Audit and Compliance Committee" section of our 2018 Proxy Statement.

#### Executive Officers of the Registrant

Below are our executive officers as of February 16, 2018:

| Name | Age | Principal Position with Registrant |
|------|-----|-----------------------------------|
| Brenton L. Saunders | 48 | Chairman, Chief Executive Officer and President |
| William Meury | 50 | Chief Commercial Officer |
| Maria Teresa Hilado | 53 | Chief Financial Officer |
| A. Robert D. Bailey | 54 | Chief Legal Officer and Corporate Secretary |
| Karen L. Ling | 54 | Chief Human Resources Officer |
| Dr. C. David Nicholson | 63 | Chief R&D Officer |
| Wayne R. Swanton | 50 | Executive Vice President, Global Operations |
| James C. D'Arecca | 47 | Chief Accounting Officer |

#### Brenton L. Saunders

Mr. Saunders is Chairman, President and Chief Executive Officer of Allergan and has served in the role of President and Chief Executive Officer since July 2014 and of Chairman since October 2016, having previously served as Chief Executive Officer and President of Forest Laboratories, Inc. ("*Forest*"), and as a director of Forest, prior to its acquisition by Allergan (then known as Actavis plc ("*Actavis*"). Prior to that, he served as Chief Executive Officer of Bausch + Lomb Incorporated, a leading global eye health company, serving in this capacity from March 2010 until August 2013. Mr. Saunders also held a number of leadership positions at Schering-Plough, including the position of President of Global Consumer Health Care and was named head of integration for the company's merger with Merck & Co. and for Schering-Plough's acquisition of Organon BioSciences. Before joining Schering-Plough, Mr. Saunders was a Partner and Head of Compliance Business Advisory at PricewaterhouseCoopers LLP. Prior to that, he was Chief Risk Officer at Coventry Health Care and Senior Vice President, Compliance, Legal and Regulatory at Home Care Corporation of America. Mr. Saunders began his career as Chief Compliance Officer for the Thomas Jefferson University Health System. Mr. Saunders serves on the Board of Directors of Cisco Systems, Inc. and RWJBarnabas Health, and is a member of the Business Council and PhRMA.

#### William Meury

Mr. Meury is the Chief Commercial Officer of Allergan and has served in this role since May 2016, having previously served as President, Branded Pharma from March 2015 and Executive Vice President, Commercial, North American Brands from July 2014. Mr. Meury served as Executive Vice President, Sales and Marketing at Forest prior to its acquisition by Allergan (then known as Actavis). He joined Forest in 1993 and held multiple roles of increasing responsibility in Marketing, New Products, Business Development, and Sales. Before joining Forest, Mr. Meury worked in public accounting for Reznick Fedder & Silverman and in financial reporting for MCI Communications. He received a B.S. in Economics from the University of Maryland. Mr. Meury serves on the Board of Directors of several organizations, including The Jed Foundation, International Council of Ophthalmology Foundation, and The Allergan Foundation.

#### Maria Teresa Hilado

Ms. Hilado is the Chief Financial Officer of Allergan and has served in this role since December 2014. Prior to joining Allergan (then known as Actavis), she served as Senior Vice President, Finance and Treasurer of PepsiCo, Inc. from 2009 to 2014. Before joining PepsiCo, Ms. Hilado served as Vice President and Treasurer for Schering-Plough Corporation from 2008 to 2009. Before

joining Schering-Plough, she spent more than 17 years with General Motors Corporation in leadership roles of increasing responsibility, including as Assistant Treasurer from 2006 to 2008 and CFO, GMAC Commercial Finance LLC from 2001 to 2005. Ms. Hilado began her career with Far East Bank and Trust Company, Manila, Philippines. Ms. Hilado received a B.S. in Management Engineering from Ateneo de Manila University in the Philippines, and an MBA from the University of Virginia's Darden School of Business Administration.

### A. Robert D. Bailey

Mr. Bailey is the Chief Legal Officer and Corporate Secretary of Allergan, and has served in this role since July 2014, having served as Senior Vice President, Chief Legal Officer, General Counsel and Corporate Secretary of Forest prior to its acquisition by Allergan, from November 2013 to June 2014. Prior to that, Mr. Bailey served as Executive Vice President, Law, Policy and Communications at Bausch + Lomb from 2007 to 2013. Before joining Bausch + Lomb in 1994, he was an attorney at Nixon Peabody (formerly Nixon, Hargrave, Devans & Doyle). Mr. Bailey received his J.D. from the University of Minnesota and his B.A. from St. Olaf College in Northfield, MN.

### Karen Ling

Ms. Ling is the Chief Human Resources Officer of Allergan, and has served in this role since July 2014, having served as Senior Vice President and Chief Human Resources Officer at Forest from January 2014 to July 2014, prior to its acquisition by Allergan (then known as Actavis). Ms. Ling joined Forest from Merck & Co., where she served as Senior Vice President, Human Resources for the company's Global Human Health and Consumer Care businesses worldwide beginning in November 2011. Previously, she served as Vice President, Compensation and Benefits at Merck and Group Vice President, Global Compensation & Benefits at Schering-Plough (which was acquired by Merck). Prior to joining Schering-Plough in 2008, Ms. Ling spent 14 years at Wyeth Pharmaceuticals in various positions of responsibility in human resources and in Wyeth's Labour and Employment Department. Before joining Wyeth, Ms. Ling was an attorney at Goldstein and Manello, P.C. in Boston. She is currently a member of the Board of Directors of the Glaucoma Foundation, Inc. and The Jed Foundation. Ms. Ling received her J.D. from Boston University School of Law and a B.A. from Yale University.

### Dr. C. David Nicholson

Dr. Nicholson is the Chief R&D Officer of Allergan and has served in this role since March 2015. He joined Allergan (then known as Actavis) as Senior Vice President, Global Brands R&D in August 2014. Previously, he served as Chief Technology Officer and EVP, R&D for Bayer CropScience from March 2012 to August 2014; Vice President of Licensing and Knowledge Management at Merck from 2009 to December 2011; and Senior Vice President, responsible for Global Project Management and Drug Safety at Schering-Plough from 2007 to 2009. From 1988 to 2007, Dr. Nicholson held various leadership positions at Organon, where he most recently served as Executive Vice President, Research & Development and was a member of the company's Executive Management Committee. He received a B.Sc. from the University of Manchester and his Ph.D. from the University of Wales.

### Wayne R. Swanton

Mr. Swanton is Executive Vice President, Global Operations of Allergan plc. Prior to his current appointment, Mr. Swanton served as Senior Vice President Global Operations of Allergan. He joined the Company (then Watson) in March 2012 as Vice President, Global Supply Chain. Mr. Swanton brings expertise to all aspects of the end-to-end supply chain, including procurement, planning, manufacturing, external supply, quality and distribution.  He has extensive leadership experience in global pharmaceutical operations and managing significant business transformations. Prior to joining Allergan, Mr. Swanton held various roles at Abbott Laboratories in finance, supply chain, project management and manufacturing operations in both local and global capacities. Mr. Swanton is a Fellow of the Chartered Association of Certified Accountants, UK.

### James C. D'Arecca

Mr. D'Arecca is the Chief Accounting Officer of Allergan, and has served in this role since August 2013. Prior to joining Allergan (then known as Actavis), he held a similar position at Bausch + Lomb. Prior to joining Bausch + Lomb, Mr. D'Arecca worked for Merck & Co. and Schering-Plough. He also spent 13 years with PricewaterhouseCoopers as a Certified Public Accountant. Mr. D'Arecca received his MBA from Columbia University and his B.S. in Accounting from Rutgers University.

Our executive officers are appointed annually by the Board of Directors, hold office until their successors are chosen and qualified and may be removed at any time by the affirmative vote of a majority of the Board of Directors. We have employment agreements with most of our executive officers. There are no family relationships between any director and executive officer of Allergan.

*Section 16(a) Compliance*

The information concerning compliance with Section 16(a) of the Securities Exchange Act of 1934 required by this Item is incorporated by reference to the "Section 16(a) Beneficial Ownership Reporting Compliance" section of our 2018 Proxy Statement.

### Code of Ethics

We have adopted a Code of Conduct that applies to our employees, including our Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer. The Code of Conduct is posted on our Internet website at www.Allergan.com. Any person may request a copy of our Code of Conduct by contacting us at our administrative address: 5 Giralda Farms, Madison, NJ 07940, Attn: Secretary. Any amendments to or waivers from the Code of Conduct will be posted on our website at www.Allergan.com under the caption "Corporate Governance" within the Investors section of our website.

## ITEM 11.  *EXECUTIVE COMPENSATION*

The information concerning executive and director compensation, and concerning our compensation committee and the compensation committee report for Allergan required under this Item is incorporated herein by reference to the "Compensation Discussion and Analysis" section of our 2018 Proxy Statement.

## ITEM 12.  *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS*

The information concerning security ownership of certain beneficial owners and management and related stockholder matters and the equity compensation plan information required under this Item is incorporated herein by reference to the "Stock Ownership of Directors and Executive Officers" and "Equity Compensation Plan Information as of December 31, 2017" sections of our 2018 Proxy Statement.

## ITEM 13.  *CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE*

The information concerning certain relationships and related transactions, and director independence required under this Item is incorporated herein by reference to the "Certain Relationships and Related Transactions" and "Director Independence" sections of our 2018 Proxy Statement.

## ITEM 14.  *PRINCIPAL ACCOUNTING FEES AND SERVICES*

The information concerning principal accounting fees and services required under this Item is incorporated herein by reference to the "Audit Fees" section of our 2018 Proxy Statement.

110

# PART IV

**ITEM 15.** *Exhibits, Financial Statement Schedules*

    (a)    The following documents are filed as part of the Annual Report on Form 10-K:

           1.    *Consolidated Financial Statements and Supplementary Data*

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets of Allergan plc as of December 31, 2017 and 2016 | F-5 |
| Consolidated Statements of Operations of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-6 |
| Consolidated Statements of Comprehensive (Loss) / Income of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-7 |
| Consolidated Statements of Cash Flows of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-8 |
| Consolidated Statements of Shareholders' Equity of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-9 |
| Consolidated Balance Sheets of Warner Chilcott Limited as of December 31, 2017 and 2016 | F-10 |
| Consolidated Statements of Operations of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-11 |
| Consolidated Statements of Comprehensive (Loss) / Income of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-12 |
| Consolidated Statements of Cash Flows of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-13 |
| Consolidated Statements of Members' Equity of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-14 |
| Notes to the Consolidated Financial Statements | F-15 |

           2.    *Financial Statement Schedules*

| | |
|---|---|
| Schedule II — Valuation and Qualifying Accounts for the years ended December 31, 2017, 2016 and 2015 | F-118 |

        All other financial statement schedules have been omitted because they are not applicable or the required information is included in the Consolidated Financial Statements or Notes thereto.

           3.    *Exhibits*

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 2.1 | Master Purchase Agreement, dated July 26, 2015, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc (incorporated by reference to Exhibit 2.2 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 6, 2015). |
| 2.2 | First Amendment to the Master Purchase Agreement, dated as of June 9, 2016, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc. (incorporated by reference to Exhibit 2.1 to Allergan plc's Current Report on Form 8-K filed on July 13, 2016). |
| 2.3 | Second Amendment to the Master Purchase Agreement, dated as of July 5, 2016, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc. (incorporated by reference to Exhibit 2.2 to Allergan plc's Current Report on Form 8-K filed on July 13, 2016). |
| 2.4 | Third Amendment to the Master Purchase Agreement, dated as of July 11, 2016, by and between Teva Pharmaceutical Industries Ltd. and Allergan plc. (incorporated by reference to Exhibit 2.3 to Allergan plc's Current Report on Form 8-K filed on July 13, 2016). |
| 3.1 | Certificate of Incorporation of Allergan plc (incorporated by reference to Exhibit 3.1 to Allergan plc's Registration Statement on Form S-4, filed with the SEC on July 17, 2015). |
| 3.2 | Amended and Restated Memorandum and Articles of Association of Allergan plc (incorporated by reference to Exhibit 3.2 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on November 4, 2016). |
| 4.1 | Indenture, dated as of April 12, 2006, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.2 | First Supplemental Indenture, dated as of April 16, 2015, among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.3 | Form of 5.75% Senior Note due 2016 (incorporated by reference to (and included in) the Indenture dated as of April 12, 2006 among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee, at Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.4 | Registration Rights Agreement, dated as of April 12, 2006, among Allergan, Inc. and Morgan Stanley & Co. Incorporated, as representative of the Initial Purchasers named therein, relating to the $800,000,000 5.75% Senior Notes due 2016 (incorporated by reference to Exhibit 4.4 to Allergan, Inc's Current Report on Form 8-K, filed with the SEC on April 12, 2006). |
| 4.5 | Indenture between Watson Pharmaceuticals, Inc. (now known as Allergan Finance, LLC) and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009 (incorporated by reference to Exhibit 4.1 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.6 | First Supplemental Indenture between Watson Pharmaceuticals, Inc. (now known as Allergan Finance, LLC) and Wells Fargo Bank, N.A., as trustee, dated as of August 24, 2009, including the forms of Watson Pharmaceuticals, Inc.'s 5.000% Senior Notes due 2014 and 6.125% Senior Notes due 2019 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Form 8-K, filed with the SEC on August 24, 2009). |
| 4.7 | Second Supplemental Indenture between Watson Pharmaceuticals, Inc. (now known as Allergan Finance, LLC) and Wells Fargo Bank, N.A., as trustee, dated as of May 7, 2010 (incorporated by reference to Exhibit 10.2 to Watson Pharmaceuticals, Inc.'s Quarterly Report on Form 10-Q, filed with the SEC on May 10, 2010). |
| 4.8 | Third Supplemental Indenture between Watson Pharmaceuticals, Inc. (now known as Allergan Finance, LLC) and Wells Fargo Bank, N. A., as trustee, dated as of October 2, 2012, including the forms of Watson Pharmaceuticals, Inc.'s 1.875% Notes due 2017, 3.250% Notes due 2022 and 4.625% Notes due 2042 (incorporated by reference to Exhibit 4.2 to Watson Pharmaceuticals, Inc.'s Current Report on Form 8-K, filed with the SEC on October 2, 2012). |
| 4.9 | Fourth Supplemental Indenture, dated as of October 1, 2013, by and among Actavis, Inc. (now known as Allergan Finance, LLC), Actavis plc (now known as Allergan plc), and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |

| Exhibit No. | Description |
| --- | --- |
| 4.10 | Fifth Supplemental Indenture, dated as of April 16, 2015, by and among Actavis, Inc. (now known as Allergan Finance, LLC), Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.4 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.11 | Indenture, dated as of August 20, 2010, between Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, the guarantors named therein, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Warner Chilcott plc's Current Report on Form 8-K, filed with the SEC on August 24, 2010). |
| 4.12 | Indenture, dated as of September 14, 2010, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on September 14, 2010). |
| 4.13 | First Supplemental Indenture, dated as of September 14, 2010, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on September 14, 2010). |
| 4.14 | Second Supplemental Indenture, dated as of April 16, 2015, by and among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.15 | Form of 3.375% Note due 2020 (incorporated by reference to (and included in) the Supplemental Indenture dated as of September 14, 2010 among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee, at Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K, filed with the SEC on September 14, 2010). |
| 4.16 | Third Supplemental Indenture, dated as of October 1, 2013, by and among Warner Chilcott Company, LLC, Warner Chilcott Finance LLC, Actavis plc (now known as Allergan plc), and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 4.17 | Indenture, dated as of March 12, 2013, among Allergan, Inc. and Wells Fargo, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on March 12, 2013). |
| 4.18 | First Supplemental Indenture, dated as of March 12, 2013, among Allergan, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan, Inc.'s Current Report on Form 8-K filed with the SEC on March 12, 2013). |
| 4.19 | Second Supplemental Indenture, dated as of April 16, 2015, by and among Allergan, Inc., Actavis plc (now known as Allergan plc), Warner Chilcott Limited and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.3 to Allergan plc's Current Report on Form 8-K, filed with the SEC on April 22, 2015). |
| 4.20 | Indenture, dated as of January 31, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on February 3, 2014). |
| 4.21 | Indenture, dated as of January 31, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on February 3, 2014). |
| 4.22 | Indenture, dated as of December 10, 2013, by and among Forest Laboratories, Inc. and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on December 11, 2013). |
| 4.23 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |
| 4.24 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |

113

| Exhibit No. | Description |
|---|---|
| 4.25 | First Supplemental Indenture, dated as of June 12, 2014, between Forest Laboratories, Inc., as issuer, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.3 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on June 13, 2014). |
| 4.26 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.27 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.2 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.28 | Second Supplemental Indenture, between Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.3 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014. |
| 4.29 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.4 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.30 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.5 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.31 | Third Supplemental Indenture, among Actavis plc (now known as Allergan plc), Tango Merger Sub 2 LLC and Wells Fargo Bank, National Association, as trustee, dated January 1, 2018 (incorporated by reference to Exhibit 4.6 of Allergan plc's Current Report on Form 8-K filed with the SEC on July 3, 2014). |
| 4.32 | Fourth Supplemental Indenture, among Allergan Slaes, LLC, Allergan plc and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on January 2, 2018). |
| 4.33 | Fourth Supplemental Indenture, among Allergan Slaes, LLC, Allergan plc and Wells Fargo Bank, National Association, as trustee, dated July 1, 2014 (incorporated by reference to Exhibit 4.2 of Allergan plc's Current Report on Form 8-K filed with the SEC on January 2, 2018). |
| 4.34 | Indenture, dated June 19, 2014, by and among Actavis Funding SCS (now known as Allergan Funding SCS), the guarantors named therein, and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 of Allergan plc's Current Report on Form 8-K filed with the SEC on June 20, 2014). |
| 4.35 | Indenture, dated as of March 12, 2015, among Actavis Funding SCS (now known as Allergan Funding SCS) Warner Chilcott Limited, Actavis Capital S.à r.l. (now known as Allergan Capital S.à r.l.) and Actavis, Inc. (now known as Allergan Finance, LLC), as guarantors and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 12, 2015). |
| 4.36 | First Supplemental Indenture, dated as of March 12, 2015, among Actavis Funding SCS (now known as Allergan Funding SCS) Warner Chilcott Limited, Actavis Capital S.à r.l. (now known as Allergan Capital S.à r.l.) and Actavis, Inc. (now known as Allergan Finance, LLC), as guarantors and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 12, 2015). |
| 4.37 | Second Supplemental Indenture, dated as of May 7, 2015, among Actavis Funding SCS (now known as Allergan Funding SCS) and Wells Fargo Bank, National Association, as trustee (incorporated by reference to Exhibit 4.20 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.1 | Form of Director and Executive Officer Indemnity Agreement (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2006). |
| 10.2 | Allergan, Inc. Change in Control Policy (Effective April 2010) (incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2010). |
| 10.3# | Allergan, Inc. Deferred Directors' Fee Program (Restated December 2010) (incorporated by reference to Exhibit 10.11 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2010). |

10/24/2018                                                agn-10k_20171231.htm

114

| Exhibit No. | Description |
|---|---|
| 10.4 | Allergan, Inc. Pension Plan (Restated 2013) (incorporated by reference to Exhibit 10.15 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2012). |
| 10.5 | First Amendment to the Allergan, Inc. Pension Plan (Restated 2013) (Incorporated by reference to Exhibit 10.14 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year Ended December 31, 2013). |
| 10.6 | Second Amendment to the Allergan, Inc. Pension Plan (Restated 2013 (Incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2014). |
| 10.7 | Third Amendment to Allergan, Inc. Pension Plan (Restated 2013) (Incorporated by reference to Exhibit 10.2 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2014. |
| 10.8# | Allergan, Inc. Supplemental Executive Benefit Plan and Supplemental Retirement Income Plan (Restated 2011) (incorporated by reference to Exhibit 10.3 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended September 30, 2011). |
| 10.9# | First Amendment to Allergan, Inc. Supplemental Executive Benefit Plan (incorporated by reference to Exhibit 10.18 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2011). |
| 10.10# | Allergan, Inc. Executive Deferred Compensation Plan (Restated 2009) (incorporated by reference to Exhibit 10.23 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2008). |
| 10.11# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2008 Incentive Award Plan (incorporated by reference to Exhibit 10.5 to Allergan, Inc.'s Current Report on Form 8-K filed on May 6, 2008). |
| 10.12# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2008 Incentive Award Plan (Amended February 2010) (incorporated by reference to Exhibit 10.32 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2009). |
| 10.13# | Amended and Restated Allergan plc 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.1 to Allergan, plc's Quarterly Report on Form 10-Q for the Quarter ended June 30, 2016). |
| 10.14# | Form of Non-Qualified Stock Option Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.6 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.15# | Form of Restricted Stock Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.7 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.16# | Form of Restricted Stock Unit Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.9 to Allergan, Inc.'s Report on Form 10-Q for the Quarter ended March 31, 2011). |
| 10.17# | Form of Performance-Based Restricted Stock Unit Award Grant Notice for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.40 to Allergan, Inc.'s Report on Form 10-K for the Fiscal Year ended December 31, 2011). |
| 10.18# | Form of 2014 Performance-Based Restricted Stock Unit Award Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (incorporated by reference to Exhibit 10.1 to Allergan, Inc.'s Report on Form 10-Q for the Quarter Ended September 30, 2014). |
| 10.19# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2014) (incorporated by reference to Exhibit 10.40 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2013). |
| 10.20# | Form of Restricted Stock Unit Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2014) (incorporated by reference to Exhibit 10.41 to Allergan, Inc.'s Annual Report on form 10-K for the Fiscal Year ended December 31, 2013). |
| 10.21# | Form of Restricted Stock Unit Award Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2015) (incorporated by reference to Exhibit 10.48 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |

115

| Exhibit No. | Description |
|---|---|
| 10.22# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Allergan, Inc. 2011 Incentive Award Plan (Amended February 2015) (incorporated by reference to Exhibit 10.50 to Allergan, Inc.'s Annual Report on Form 10-K for the Fiscal Year ended December 31, 2014). |
| 10.23# | Form of Non-Qualified Stock Option Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015) (incorporated by reference to Exhibit 10.35 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.24# | Form of Performance-Based Restricted Stock Unit Award Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015) (incorporated by reference to Exhibit 10.36 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.25# | Form of Restricted Stock Unit Award Grant Agreement for Employees under the Amended and Restated Allergan, Inc. 2011 Incentive Award Plan (March 2015)  (incorporated by reference to Exhibit 10.37 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on May 11, 2015). |
| 10.26 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 18, 2015). |
| 10.27 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (now known as Allergan W.C. Holding Inc.) (incorporated by reference to Exhibit 10.2 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 18, 2015). |
| 10.28 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.6 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.29 | Form of Deed of Indemnification, Actavis plc (now known as Allergan plc) (incorporated by reference to Exhibit 10.4 of Allergan plc's Current Report on Form 8-K, filed with the SEC on July 3, 2014). |
| 10.30 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (now known as Allergan W.C. Holding Inc.) (incorporated by reference to Exhibit 10.7 of Allergan plc's Current Report on Form 8-K, filed with the SEC on October 2, 2013). |
| 10.31 | Form of Indemnification Agreement, Actavis W.C. Holding Inc. (now known as Allergan W.C. Holding Inc.) (incorporated by reference to Exhibit 10.5 of Allergan plc's Current Report on Form 8-K, filed with the SEC on July 3, 2014). |
| 10.32# | Form of Transformation Incentive Award Agreement (incorporated by reference to Exhibit 10.3 to Allergan plc's Current Report on Form 8-K filed on March 18, 2015). |
| 10.33# | Form of retention bonus letter (one payment) (incorporated by reference to Exhibit 10.26 to Allergan plc's Annual Report on Form 10-K, filed with the SEC for the year ended December 31, 2013). |
| 10.34# | Form of retention bonus letter (two payments) (incorporated by reference to Exhibit 10.27 to Allergan plc's Annual Report on Form 10-K, filed with the SEC for the year ended December 31, 2013). |
| 10.35# | The Amended and Restated 2013 Incentive Award Plan of Allergan plc (incorporated by reference to Exhibit 10.2 to Allergan plc's Report on Form 10-Q filed with the SEC for the Quarter ended June 30, 2016). |
| 10.36# | Employee Severance Pay Plan for Employees of Actavis Inc. (now known as Allergan Finance, LLC) and Certain of Its U.S. Subsidiaries (incorporated by reference to Exhibit 10.1 of Allergan plc's Quarterly Report on Form 10-Q for the period ending March 31, 2014). |
| 10.37# | 2004 Stock Option Plan of Forest Laboratories, Inc. (incorporated by reference to Appendix C of Forest Laboratories, Inc.'s Proxy Statement for the fiscal year ended March 31, 2004 filed with the SEC on June 28, 2004). |
| 10.38# | 2007 Equity Incentive Plan of Forest Laboratories, Inc., as amended (incorporated by reference to Exhibit 10.1 of Forest Laboratories, Inc.'s Current Report on Form 8-K filed with the SEC on August 21, 2013). |
| 10.39# | Amendment to 2007 Equity Incentive Plan of Forest Laboratories, Inc., as amended (Amended Forest Plan) (incorporated by reference to Exhibit 99.7 of the Actavis July 1, 2014 S-8). |
| 10.40# | Form of Notice of Grant and Signature Page and Form of Option Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 99.5 of the Actavis July 1, 2014 S-8). |

| Exhibit No. | Description |
|---|---|
| 10.41# | Form of Notice of Grant and Signature Page and Form of Restricted Stock Unit Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 99.6 of the Actavis July 1, 2014 S-8). |
| 10.42# | Form of Notice of Grant and Signature Page and Form of Other Cash-Based Award Agreement (Actavis Plan) (incorporated by reference to Exhibit 10.44 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 5, 2014). |
| 10.43# | Form of Amended and Restated Other Cash-Based Award Agreement (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on August 8, 2016). |
| 10.44# | Form Employee Stock Unit Agreement (Performance-Based Conditions) (Forest Plan) (incorporated by reference to Exhibit 99.8 of the Actavis July 1, 2014 S-8). |
| 10.45 | Amended and Restated Stockholder Voting Agreement, dated as of August 4, 2015, by and between Allergan plc and the individuals listed therein (incorporated by reference to Exhibit 10.1 to Allergan plc's Current Report on Form 8-K, filed with the SEC on August 5, 2015). |
| 10.46# | Form of Notice of Grant and Signature Page and Form of Other Cash-Based Award Agreement (The Amended and Restated 2013 Incentive Award Plan of Actavis plc) (incorporated by reference to Exhibit 10.3 to Allergan plc's Current Report on Form 8-K, filed with the SEC on March 18, 2015). |
| 10.47# | Allergan plc 2017 Executive Severance Plan (Effective July 20, 2017) (incorporated by reference to Exhibit 10.1 to Allergan plc's Quarterly Report on Form 10-Q, filed with the SEC on August 9, 2017). |
| 10.48#* | Separation Agreement and Release between Maria Teresa Hilado and Allergan, Inc. dated February 6, 2018 |
| 10.49#* | Consulting Agreement by and between Allergan plc and Maria Teresa Hilado dated as of February 6, 2018. |
| 21.1* | Subsidiaries of the Company. |
| 23.1* | Allergan plc Consent of PricewaterhouseCoopers LLP. |
| 23.2* | Warner Chilcott Limited Consent of PricewaterhouseCoopers LLP. |
| 24.1* | Power of Attorney |
| 31.1* | Certification of Chief Executive Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rule 13a-14a of the Securities Exchange Act of 1934. |
| 32.1** | Certification of Chief Executive Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Chief Financial Officer pursuant to 18 U.S.C. of Section 1350, as adopted pursuant to by Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | XBRL Taxonomy Extension Label Definition Document. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document. |

\#    Indicates a management contract or compensatory plan or arrangement.

\*    Filed herewith.

\*\*    Furnished herewith and not "filed" for purposes of Section 18 of the Exchange Act.

117

**ITEM 16.**  *Form 10-K Summary*

Not applicable.

118

## SIGNATURES Registrant

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized on the 16th day of February, 2018.

ALLERGAN plc

By:                    /s/ Brenton L. Saunders
                       **Brenton L. Saunders**
                       **Chief Executive Officer and President**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed below by the following persons and in the capacities indicated on the 16th day of February, 2018.

| Signature | Title |
| --- | --- |
| /s/ Brenton L. Saunders<br>**Brenton L. Saunders** | Chairman, Chief Executive Officer, President, Director |
| /s/ Maria Teresa Hilado<br>**Maria Teresa Hilado** | Chief Financial Officer |
| /s/ James C. D'Arecca<br>**James C. D'Arecca** | Chief Accounting Officer |
| *<br>**Nesli Basgoz, M.D.** | Director |
| *<br>**Paul M. Bisaro** | Director |
| *<br>**James H. Bloem** | Director |
| *<br>**Joseph H. Boccuzi** | Director |
| *<br>**Christopher W. Bodine** | Director |
| *<br>**Adriane M. Brown** | Director |
| *<br>**Christopher J. Coughlin** | Director |
| *<br>**Catherine M. Klema** | Director |
| *<br>**Peter J. McDonnell, M.D.** | Director |
| *<br>**Patrick J. O'Sullivan** | Director |
| *<br>**Ronald R. Taylor** | Director |
| *<br>**Fred G. Weiss** | Director |

*By:  /s/ A. Robert D. Bailey
      **A. Robert D. Bailey**
      Attorney-in-fact

10/24/2018                                                      agn-10k_20171231.htm
119

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized on the 16th day of February, 2018.

WARNER CHILCOTT LIMITED

By:                                      /s/ A. Robert D. Bailey
                                      **A. Robert D. Bailey**
                                      **Secretary**

Pursuant to the requirements of the Securities Exchange Act of 1934, this Annual Report has been signed below by the following persons and in the capacities indicated on the 16th day of February, 2018.

| Signature | Title |
| --- | --- |
| /s/ Robert Whiteford<br>**Robert Whiteford** | Vice President, Director of Finance and Assistant Corporate Secretary (Principal Financial Officer and Principal Accounting Officer) |
| /s/ A. Robert D. Bailey<br>**A. Robert D. Bailey** | Authorized Representative in the United States |
| /s/ Robert Whiteford<br>**Robert Whiteford** | Director |
| /s/ Donnan Hurst<br>**Donnan Hurst** | Director |

120

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

The following Consolidated Financial Statements of the Registrants and their subsidiaries are required to be included in Item 15:

| | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets of Allergan plc as of December 31, 2017 and 2016 | F-5 |
| Consolidated Statements of Operations of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-6 |
| Consolidated Statements of Comprehensive (Loss) / Income of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-7 |
| Consolidated Statements of Cash Flows of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-8 |
| Consolidated Statements of Shareholders' Equity of Allergan plc for the years ended December 31, 2017, 2016 and 2015 | F-9 |
| Consolidated Balance Sheets of Warner Chilcott Limited as of December 31, 2017 and 2016 | F-10 |
| Consolidated Statements of Operations of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-11 |
| Consolidated Statements of Comprehensive (Loss) / Income of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-12 |
| Consolidated Statements of Cash Flows of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-13 |
| Consolidated Statements of Members' Equity of Warner Chilcott Limited for the years ended December 31, 2017, 2016 and 2015 | F-14 |
| Notes to the Consolidated Financial Statements | F-15 |
| Schedule II — Valuation and Qualifying Accounts for the years ended December 31, 2017, 2016 and 2015 | F-118 |
| Supplementary Data (Unaudited) | F-119 |

Exhibits

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Allergan plc:

### Opinions on the Financial Statements and Internal Control over Financial Reporting

We have audited the accompanying consolidated balance sheets of Allergan plc and its subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive (loss)/income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2017, including the related notes and financial statement schedule listed in the index appearing under Item 15 (a) (2) (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

### Basis for Opinions

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting of Allergan plc appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

As described in Management's Report on Internal Control over Financial Reporting of Allergan plc, management has excluded Lifecell Corporation and Zeltiq Aesthetics, Inc. from its assessment of internal control over financial reporting as of December 31, 2017 because they were acquired by the Company in purchase business combinations during 2017. We have also excluded Lifecell Corporation and Zeltiq Aesthetics, Inc. from our audit of internal control over financial reporting. Lifecell Corporation and Zeltiq Aesthetics, Inc. are wholly-owned subsidiaries whose total assets and total revenues excluded from management's assessment and our audit of internal control over financial reporting collectively represent approximately 1.4% and 4.9%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2017.

F-2

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ PricewaterhouseCoopers LLP
Florham Park, New Jersey
February 16, 2018

We have served as the Company's auditor since at least 1994. We have not determined the specific year we began serving as the auditor of the Company.

F-3

### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Members of Warner Chilcott Limited:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Warner Chilcott Limited and its subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive (loss)/income, member's equity and cash flows for each of the three years in the period ended December 31, 2017, including the related notes and financial statement schedule listed in the index appearing under Item 15 (a)(2) (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP
Florham Park, New Jersey
February 16, 2018

We have served as the Company's auditor since 2014.

F-4

## ALLERGAN PLC
## CONSOLIDATED BALANCE SHEETS
### (In millions, except par value and share data)

| | December 31, 2017 | | December 31, 2016 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 1,817.2 | $ | 1,724.0 |
| Marketable securities | | 4,632.1 | | 11,501.5 |
| Accounts receivable, net | | 2,899.0 | | 2,531.0 |
| Inventories | | 904.5 | | 718.0 |
| Prepaid expenses and other current assets | | 1,123.9 | | 1,383.4 |
| Total current assets | | 11,376.7 | | 17,857.9 |
| Property, plant and equipment, net | | 1,785.4 | | 1,611.3 |
| Investments and other assets | | 267.9 | | 282.1 |
| Non current assets held for sale | | 81.6 | | 27.0 |
| Deferred tax assets | | 319.1 | | 233.3 |
| Product rights and other intangibles | | 54,648.3 | | 62,618.6 |
| Goodwill | | 49,862.9 | | 46,356.1 |
| Total assets | $ | 118,341.9 | $ | 128,986.3 |
| **LIABILITIES AND EQUITY** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued expenses | $ | 5,541.4 | $ | 5,019.0 |
| Income taxes payable | | 74.9 | | 57.8 |
| Current portion of long-term debt and capital leases | | 4,231.8 | | 2,797.9 |
| Total current liabilities | | 9,848.1 | | 7,874.7 |
| Long-term debt and capital leases | | 25,843.5 | | 29,970.8 |
| Other long-term liabilities | | 886.9 | | 1,085.0 |
| Other taxes payable | | 1,573.9 | | 886.2 |
| Deferred tax liabilities | | 6,352.4 | | 12,969.1 |
| Total liabilities | | 44,504.8 | | 52,785.8 |
| Commitments and contingencies (Refer to Note 24) | | | | |
| Equity: | | | | |
| Preferred shares, $0.0001 par value per share, 5.1 million shares authorized, 5.1 million and 5.1 million shares issued and outstanding, respectively | | 4,929.7 | | 4,929.7 |
| Ordinary shares; $0.0001 par value per share; 1,000.0 million shares authorized, 330.2 million and 334.9 million shares issued and outstanding, respectively | | - | | - |
| Additional paid-in capital | | 54,013.5 | | 53,958.9 |
| Retained earnings | | 12,957.2 | | 18,342.5 |
| Accumulated other comprehensive income / (loss) | | 1,920.7 | | (1,038.4) |
| Total shareholders' equity | | 73,821.1 | | 76,192.7 |
| Noncontrolling interest | | 16.0 | | 7.8 |
| Total equity | | 73,837.1 | | 76,200.5 |
| Total liabilities and equity | $ | 118,341.9 | $ | 128,986.3 |

See accompanying Notes to the Consolidated Financial Statements.

F-5

agn-10k_20171231.htm

## ALLERGAN PLC
### CONSOLIDATED STATEMENTS OF OPERATIONS
(In millions, except per share amounts)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Net revenues | $ 15,940.7 | $ 14,570.6 | $ 12,688.1 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 2,168.0 | 1,860.8 | 2,751.8 |
| Research and development | 2,100.1 | 2,575.7 | 2,358.5 |
| Selling and marketing | 3,514.8 | 3,266.4 | 2,765.1 |
| General and administrative | 1,501.9 | 1,473.9 | 1,716.4 |
| Amortization | 7,197.1 | 6,470.4 | 5,443.7 |
| In-process research and development impairments | 1,452.3 | 743.9 | 511.6 |
| Asset sales and impairments, net | 3,927.7 | 5.0 | 272.0 |
| Total operating expenses | 21,861.9 | 16,396.1 | 15,819.1 |
| Operating (loss) | (5,921.2) | (1,825.5) | (3,131.0) |
| | | | |
| Interest income | 67.7 | 69.9 | 10.6 |
| Interest (expense) | (1,095.6) | (1,295.6) | (1,193.3) |
| Other (expense) / income , net | (3,437.3) | 219.2 | (233.8) |
| Total other (expense), net | (4,465.2) | (1,006.5) | (1,416.5) |
| (Loss) before income taxes and noncontrolling interest | (10,386.4) | (2,832.0) | (4,547.5) |
| (Benefit) for income taxes | (6,670.4) | (1,897.0) | (1,605.9) |
| Net (loss) from continuing operations, net of tax | (3,716.0) | (935.0) | (2,941.6) |
| (Loss) / income from discontinued operations, net of tax | (402.9) | 15,914.5 | 6,861.0 |
| Net (loss) / income | (4,118.9) | 14,979.5 | 3,919.4 |
| (Income) attributable to noncontrolling interest | (6.6) | (6.1) | (4.2) |
| Net (loss) / income attributable to shareholders | (4,125.5) | 14,973.4 | 3,915.2 |
| Dividends on preferred shares | 278.4 | 278.4 | 232.0 |
| Net (loss) / income attributable to ordinary shareholders | $ (4,403.9) | $ 14,695.0 | $ 3,683.2 |
| | | | |
| (Loss) / income per share attributable to ordinary shareholders - basic: | | | |
| Continuing operations | $ (11.99) | $ (3.17) | $ (8.64) |
| Discontinued operations | (1.20) | 41.35 | 18.65 |
| Net (loss) / income per share - basic | $ (13.19) | $ 38.18 | $ 10.01 |
| (Loss) / income per share attributable to ordinary shareholders - diluted: | | | |
| Continuing operations | $ (11.99) | $ (3.17) | $ (8.64) |
| Discontinued operations | (1.20) | 41.35 | 18.65 |
| Net (loss) / income per share - diluted | $ (13.19) | $ 38.18 | $ 10.01 |
| | | | |
| Dividends per ordinary share | $ 2.80 | $ - | $ - |
| | | | |
| Weighted average ordinary shares outstanding: | | | |
| Basic | 333.8 | 384.9 | 367.8 |
| Diluted | 333.8 | 384.9 | 367.8 |

See accompanying Notes to the Consolidated Financial Statements.

F-6

### ALLERGAN PLC
### CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) / INCOME
#### (In millions)

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Net (loss) / income | $ (4,118.9) | $ 14,979.5 | $ 3,919.4 |
| Other comprehensive income / (loss) | | | |
| Foreign currency translation gains / (losses) | 1,248.0 | (441.6) | (129.9) |
| Net impact of other-than-temporary loss on investment in Teva securities | 1,599.4 | - | - |
| Impact of Teva Transaction | - | 1,544.8 | - |
| Unrealized gains / (losses), net of tax | 111.7 | (1,647.5) | 101.2 |
| Total other comprehensive income / (loss), net of tax | 2,959.1 | (544.3) | (28.7) |
| Comprehensive (loss) / income | (1,159.8) | 14,435.2 | 3,890.7 |
| Comprehensive (income) attributable to noncontrolling interest | (6.6) | (6.1) | (4.2) |
| Comprehensive (loss) / income attributable to ordinary shareholders | $ (1,166.4) | $ 14,429.1 | $ 3,886.5 |

See accompanying Notes to the Consolidated Financial Statements

F-7

ALLERGAN PLC
CONSOLIDATED STATEMENTS OF CASH FLOWS
(In millions)

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| **Cash Flows From Operating Activities:** | | | |
| Net (loss) / income | $ (4,118.9) | $ 14,979.5 | $ 3,919.4 |
| Reconciliation to net cash provided by operating activities: | | | |
| Depreciation | 171.5 | 155.8 | 218.3 |
| Amortization | 7,197.1 | 6,475.2 | 5,777.0 |
| Provision for inventory reserve | 102.2 | 181.4 | 140.9 |
| Share-based compensation | 293.3 | 334.5 | 690.4 |
| Deferred income tax benefit | (7,783.1) | (1,443.9) | (7,380.1) |
| Pre-tax gain on sale of businesses to Teva | – | (24,511.1) | – |
| Non-cash tax effect of gain on sale of businesses to Teva | – | 5,285.2 | – |
| In-process research and development impairments | 1,452.3 | 743.9 | 511.6 |
| Loss on asset sales and impairments, net | 3,927.7 | 5.0 | 334.4 |
| Net income impact of other-than-temporary loss on investment in Teva securities | 3,273.5 | – | – |
| Charge to settle Teva related matters | 387.4 | – | – |
| Loss on forward sale of Teva shares | 62.9 | – | – |
| Amortization of inventory step-up | 131.7 | 42.4 | 1,192.9 |
| Non-cash extinguishment of debt | (15.7) | – | – |
| Amortization of deferred financing costs | 27.8 | 51.0 | 298.3 |
| Contingent consideration adjustments, including accretion | (133.2) | (66.8) | 108.8 |
| Other, net | (37.0) | (59.9) | 66.4 |
| Changes in assets and liabilities (net of effects of acquisitions): | | | |
| Decrease / (increase) in accounts receivable, net | (188.3) | (191.0) | (1,034.3) |
| Decrease / (increase) in inventories | (144.8) | (268.4) | (226.2) |
| Decrease / (increase) in prepaid expenses and other current assets | 27.9 | 29.9 | 70.9 |
| Increase / (decrease) in accounts payable and accrued expenses | 95.9 | 313.5 | 142.5 |
| Increase / (decrease) in income and other taxes payable | 1,114.1 | (326.6) | (87.8) |
| Increase / (decrease) in other assets and liabilities | 29.1 | (283.9) | (137.3) |
| Net cash provided by operating activities | 5,873.4 | 1,445.7 | 4,606.1 |
| **Cash Flows From Investing Activities:** | | | |
| Additions to property, plant and equipment | (349.9) | (331.4) | (454.9) |
| Additions to product rights and other intangibles | (614.3) | (2.0) | (154.7) |
| Sale of businesses to Teva | – | 33,804.2 | – |
| Additions to investments | (9,783.8) | (15,743.5) | (24.3) |
| Proceeds from sale of investments and other assets | 15,153.3 | 7,771.6 | 883.0 |
| Proceeds from sales of property, plant and equipment | 7.1 | 33.3 | 140.1 |
| Acquisitions of businesses, net of cash acquired | (5,290.4) | (1,198.9) | (37,510.1) |
| Net cash (used in) / provided by investing activities | (878.0) | 24,333.3 | (37,120.9) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from borrowings of long-term indebtedness, including credit facility | 3,550.0 | 1,050.0 | 30,137.7 |
| Debt issuance and other financing costs | (20.6) | – | (310.8) |
| Payments on debt, including capital lease obligations and credit facility | (6,413.6) | (10,848.7) | (5,134.2) |
| Proceeds from issuance of preferred shares | – | – | 4,929.7 |
| Proceeds from issuance of ordinary shares | – | – | 4,071.1 |
| Proceeds from stock plans | 183.4 | 172.1 | 230.0 |
| Other financing, including contingent consideration | (511.6) | (161.1) | (230.1) |
| Repurchase of ordinary shares | (493.0) | (15,076.4) | (118.0) |
| Dividends paid | (1,218.2) | (278.4) | (208.1) |
| Net cash (used in) / provided by financing activities | (4,923.6) | (25,142.5) | 33,367.3 |
| Effect of currency exchange rate changes on cash and cash equivalents | 21.4 | (8.5) | (6.5) |
| Net (decrease) / increase in cash and cash equivalents | 93.2 | 628.0 | 846.0 |
| Cash and cash equivalents at beginning of period | 1,724.0 | 1,096.0 | 250.0 |
| Cash and cash equivalents at end of period | $ 1,817.2 | $ 1,724.0 | $ 1,096.0 |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Cash paid during the year for: | | | |
| Income taxes other, net of refunds | $ (5.1) | $ 3,692.7 | $ 377.6 |
| Interest | $ 1,144.4 | $ 1,277.9 | $ 689.9 |
| **Schedule of Non-Cash Investing and Financing Activities:** | | | |
| Receipt of Teva Pharmaceuticals Industries Ltd. ordinary shares in connection with the sale of the generics business | $ – | $ 5,038.6 | $ – |
| Dividends accrued | $ 24.6 | $ 23.2 | $ 24.0 |
| Non-cash equity issuance for the Acquisition of Zeltiq net assets | $ 8.5 | $ – | $ – |
| Non-cash equity issuance for the Acquisition of Allergan net assets | $ – | $ – | $ 34,687.2 |
| Non-cash equity issuance for the Acquisition of Kythera net assets | $ – | $ – | $ 40.0 |

See accompanying Notes to the Consolidated Financial Statements.

F-8

## ALLERGAN PLC

### CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
#### (In millions)

| | Ordinary Shares | | Preferred Shares | | Additional Paid-in Capital | Retained Earnings/ (Accumulated Deficit) | Accumulated Other Comprehensive Income / (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| BALANCE, January 1, 2015 | 265.9 | $ - | - | $ - | $ 28,994.7 | $ (198.2) | $ (465.4) | $ 28,331.1 |
| Comprehensive income: | | | | | | | | |
| Net income attributable to shareholders | - | - | - | - | - | 3,915.2 | - | 3,915.2 |
| Other comprehensive (loss), net of tax | - | - | - | - | - | - | (28.7) | (28.7) |
| Total comprehensive income | | | | | | | | 3,886.5 |
| Share-based compensation | - | - | - | - | 690.4 | - | - | 690.4 |
| Issuance for the Allergan Acquisition | 126.3 | - | - | - | 38,757.6 | - | - | 38,757.6 |
| Issuance of Mandatory Convertible Preferred Shares | - | - | 5.1 | 4,929.7 | - | - | - | 4,929.7 |
| Issuance for the Kythera Acquisition | - | - | - | - | 40.0 | - | - | 40.0 |
| Ordinary shares issued under employee stock plans | 2.7 | - | - | - | 230.0 | - | - | 230.0 |
| Tax benefits from exercise of options | - | - | - | - | 76.1 | - | - | 76.1 |
| Dividends declared | - | - | - | - | (162.5) | (69.5) | - | (232.0) |
| Repurchase of ordinary shares | (0.4) | - | - | - | (118.0) | - | - | (118.0) |
| BALANCE, December 31, 2015 | 394.5 | $ - | 5.1 | $ 4,929.7 | $ 68,508.3 | $ 3,647.5 | $ (494.1) | $ 76,591.4 |
| Comprehensive income: | | | | | | | | |
| Net income attributable to shareholders | - | - | - | - | - | 14,973.4 | - | 14,973.4 |
| Other comprehensive (loss), net of tax | - | - | - | - | - | - | (2,089.1) | (2,089.1) |
| Other comprehensive income resulting from the Teva Transaction | - | - | - | - | - | - | 1,544.8 | 1,544.8 |
| Total comprehensive income | | | | | | | | 14,429.1 |
| Share-based compensation | - | - | - | - | 334.5 | - | - | 334.5 |
| Ordinary shares issued under employee stock plans | 2.3 | - | - | - | 172.1 | - | - | 172.1 |
| Tax benefits from exercise of options | - | - | - | - | 20.4 | - | - | 20.4 |
| Dividends declared | - | - | - | - | - | (278.4) | - | (278.4) |
| Repurchase of ordinary shares under the share repurchase programs | (61.6) | - | - | - | (15,000.0) | - | - | (15,000.0) |
| Repurchase of ordinary shares | (0.3) | - | - | - | (76.4) | - | - | (76.4) |
| BALANCE, December 31, 2016 | 334.9 | $ - | 5.1 | $ 4,929.7 | $ 53,958.9 | $ 18,342.5 | $ (1,038.4) | $ 76,192.7 |
| Comprehensive income: | | | | | | | | |
| Net income attributable to shareholders | - | - | - | - | - | (4,125.5) | - | (4,125.5) |
| Other comprehensive (loss), net of tax | - | - | - | - | - | - | 1,359.7 | 1,359.7 |
| Net impact of other-than-temporary loss on investment in Teva securities | - | - | - | - | - | - | 1,599.4 | 1,599.4 |
| Total comprehensive income | | | | | | | | (1,166.4) |
| Share-based compensation | - | - | - | - | 293.3 | - | - | 293.3 |
| Issuance for the Zeltiq acquisition | - | - | - | - | 8.5 | - | - | 8.5 |
| Ordinary shares issued under employee stock plans | 2.2 | - | - | - | 183.4 | - | - | 183.4 |
| Impact of change in accounting for share-based compensation plans | - | - | - | - | 62.4 | (41.6) | - | 20.8 |
| Dividends declared | - | - | - | - | - | (1,218.2) | - | (1,218.2) |
| Repurchase of ordinary shares under the share repurchase programs, including non-cash settlement of ASR program | (6.8) | - | - | - | (450.0) | - | - | (450.0) |
| Repurchase of ordinary shares | (0.1) | - | - | - | (43.0) | - | - | (43.0) |
| BALANCE, December 31, 2017 | 330.2 | $ - | 5.1 | $ 4,929.7 | $ 54,013.5 | $ 12,957.2 | $ 1,920.7 | $ 73,821.1 |

See accompanying Notes to the Consolidated Financial Statements.

F-9

## WARNER CHILCOTT LIMITED
## CONSOLIDATED BALANCE SHEETS
### (In millions)

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,816.3 | $ 1,713.2 |
| Marketable securities | 4,632.1 | 11,501.5 |
| Accounts receivable, net | 2,899.0 | 2,531.0 |
| Receivables from Parents | 5,797.4 | 9,289.2 |
| Inventories | 904.5 | 718.0 |
| Prepaid expenses and other current assets | 1,123.0 | 1,382.1 |
|     Total current assets | 17,172.3 | 27,135.0 |
| Property, plant and equipment, net | 1,785.4 | 1,611.3 |
| Investments and other assets | 267.9 | 282.1 |
| Non current receivables from Parents | 3,964.0 | 3,964.0 |
| Non current assets held for sale | 81.6 | 27.0 |
| Deferred tax assets | 316.0 | 233.3 |
| Product rights and other intangibles | 54,648.3 | 62,618.6 |
| Goodwill | 49,862.9 | 46,356.1 |
|     Total assets | $ 128,098.4 | $ 142,227.4 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 5,515.6 | $ 4,993.3 |
| Payables to Parents | 2,340.6 | 1,372.8 |
| Income taxes payable | 74.9 | 57.8 |
| Current portion of long-term debt and capital leases | 4,231.8 | 2,797.9 |
|     Total current liabilities | 12,162.9 | 9,221.8 |
| Long-term debt and capital leases | 25,843.5 | 29,970.8 |
| Other long-term liabilities | 886.9 | 1,086.0 |
| Other taxes payable | 1,573.5 | 886.2 |
| Deferred tax liabilities | 6,349.4 | 12,969.1 |
|     Total liabilities | 46,816.2 | 54,133.9 |
| Commitments and contingencies (Refer to Note 24) | | |
| Equity: | | |
| Members' capital | 72,935.1 | 72,935.1 |
| Retained earnings | 6,410.4 | 16,189.0 |
| Accumulated other comprehensive income / (loss) | 1,920.7 | (1,038.4) |
|     Total members' equity | 81,266.2 | 88,085.7 |
| Noncontrolling interest | 16.0 | 7.8 |
|     Total equity | 81,282.2 | 88,093.5 |
|     Total liabilities and equity | $ 128,098.4 | $ 142,227.4 |

See accompanying Notes to the Consolidated Financial Statements.

F-10

10/24/2018            agn-10k_20171231.htm

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Net revenues | $ 15,940.7 | $ 14,570.6 | $ 12,688.1 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 2,168.0 | 1,860.8 | 2,751.8 |
| Research and development | 2,100.1 | 2,575.7 | 2,358.5 |
| Selling and marketing | 3,514.8 | 3,266.4 | 2,765.1 |
| General and administrative | 1,402.3 | 1,350.4 | 1,581.0 |
| Amortization | 7,197.1 | 6,470.4 | 5,443.7 |
| In-process research and development impairments | 1,452.3 | 743.9 | 511.6 |
| Asset sales and impairments, net | 3,927.7 | 5.0 | 272.0 |
| Total operating expenses | 21,762.3 | 16,272.6 | 15,683.7 |
| Operating (loss) | (5,821.6) | (1,702.0) | (2,995.6) |
| | | | |
| Interest income | 166.3 | 111.1 | 10.6 |
| Interest (expense) | (1,095.6) | (1,295.6) | (1,193.3) |
| Other (expense) / income, net | (3,437.3) | 172.2 | (233.8) |
| Total other expense, net | (4,366.6) | (1,012.3) | (1,416.5) |
| (Loss) before income taxes and noncontrolling interest | (10,188.2) | (2,714.3) | (4,412.1) |
| (Benefit) for income taxes | (6,670.4) | (1,897.0) | (1,605.9) |
| Net (loss) from continuing operations, net of tax | (3,517.8) | (817.3) | (2,806.2) |
| (Loss) / income from discontinued operations, net of tax | (402.9) | 15,914.5 | 6,861.0 |
| Net (loss)/ income | (3,920.7) | 15,097.2 | 4,054.8 |
| (Income) attributable to noncontrolling interest | (6.6) | (6.1) | (4.2) |
| Net (loss) / income attributable to members | $ (3,927.3) | $ 15,091.1 | $ 4,050.6 |

See accompanying Notes to the Consolidated Financial Statements.

F-11

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) / INCOME**
**(In millions)**

| | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net (loss) / income | $ (3,920.7) | $ 15,097.2 | $ 4,054.8 |
| Other comprehensive income / (loss) | | | |
| Foreign currency translation gains / (losses) | 1,248.0 | (441.6) | (129.9) |
| Net impact of other-than-temporary loss on investment in Teva securities | 1,599.4 | - | - |
| Impact of Teva Transaction | - | 1,544.8 | - |
| Unrealized gains / (losses), net of tax | 111.7 | (1,647.5) | 101.2 |
| Total other comprehensive income / (loss), net of tax | 2,959.1 | (544.3) | (28.7) |
| Comprehensive (loss) / income | (961.6) | 14,552.9 | 4,026.1 |
| Comprehensive (income) attributable to noncontrolling interest | (6.6) | (6.1) | (4.2) |
| Comprehensive (loss) / income attributable to members | $ (968.2) | $ 14,546.8 | $ 4,021.9 |

See accompanying Notes to the Consolidated Financial Statements.

F-12

10/24/2018                                agn-10k_20171231.htm

## WARNER CHILCOTT LIMITED
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (In millions)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Cash Flows From Operating Activities:** | | | |
| Net (loss) / income | $ (3,920.7) | $ 15,097.2 | $ 4,054.8 |
| Reconciliation to net cash provided by operating activities: | | | |
| Depreciation | 171.5 | 155.8 | 218.3 |
| Amortization | 7,197.1 | 6,475.2 | 5,777.0 |
| Provision for inventory reserve | 102.2 | 181.4 | 140.9 |
| Share-based compensation | 293.3 | 334.5 | 690.4 |
| Deferred income tax benefit | (7,783.1) | (1,443.9) | (7,380.1) |
| Pre-tax gain on sale of businesses to Teva | - | (24,511.1) | - |
| Non-cash tax effect of gain on sale of businesses to Teva | - | 5,285.2 | - |
| In-process research and development impairments | 1,452.3 | 743.9 | 511.6 |
| Loss on asset sales and impairments, net | 3,927.7 | 5.0 | 334.4 |
| Net income impact of other-than-temporary loss on investment in Teva securities | 3,273.5 | - | - |
| Charge to settle Teva related matters | 387.4 | - | - |
| Loss on forward sale of Teva shares | 62.9 | - | - |
| Amortization of inventory step-up | 131.7 | 42.4 | 1,192.9 |
| Non-cash extinguishment of debt | (15.7) | - | - |
| Amortization of deferred financing costs | 27.8 | 51.0 | 298.3 |
| Contingent consideration adjustments, including accretion | (133.2) | (66.8) | 108.8 |
| Other, net | (37.0) | (59.9) | 66.4 |
| Changes in assets and liabilities (net of effects of acquisitions): | | | |
| Decrease / (increase) in accounts receivable, net | (188.3) | (191.0) | (1,033.6) |
| Decrease / (increase) in inventories | (144.8) | (268.4) | (226.2) |
| Decrease / (increase) in prepaid expenses and other current assets | 28.8 | 28.6 | 71.3 |
| Increase / (decrease) in accounts payable and accrued expenses | 121.7 | 339.2 | 193.5 |
| Increase / (decrease) in income and other taxes payable | 1,114.1 | (326.6) | (87.8) |
| Increase / (decrease) in other assets and liabilities, including receivable / payable with Parents | (45.5) | (292.7) | (266.9) |
| Net cash provided by operating activities | 6,023.7 | 1,579.0 | 4,664.0 |
| **Cash Flows From Investing Activities:** | | | |
| Additions to property, plant and equipment | (349.9) | (331.4) | (454.9) |
| Additions to product rights and other intangibles | (614.3) | (2.0) | (154.7) |
| Sale of businesses to Teva | - | 33,804.2 | - |
| Additions to investments | (9,783.8) | (15,743.5) | (24.3) |
| Proceeds from the sale of investments and other assets | 15,153.3 | 7,771.6 | 883.0 |
| Loans to Parents | - | (13,232.2) | - |
| Proceeds from sales of property, plant and equipment | 7.1 | 33.3 | 140.1 |
| Acquisitions of businesses, net of cash acquired | (5,290.4) | (1,198.9) | (37,510.1) |
| Net cash (used in) / provided by investing activities | (878.0) | 11,101.1 | (37,120.9) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from borrowings of long-term indebtedness, including credit facility | 3,550.0 | 1,500.0 | 30,137.7 |
| Debt issuance and other financing costs | (20.6) | - | (310.8) |
| Payments on debt, including capital lease obligations and credit facility | (6,413.6) | (10,848.7) | (5,134.2) |
| Other financing, including contingent consideration | (511.6) | (161.1) | (230.1) |
| Dividends to Parents | (1,668.2) | (2,034.8) | (208.1) |
| Contributions from Parents | - | - | 9,000.8 |
| Net cash (used in) / provided by financing activities | (5,064.0) | (11,994.6) | 33,255.3 |
| Effect of currency exchange rate changes on cash and cash equivalents | 21.4 | (8.5) | (8.5) |
| Net (decrease) / increase in cash and cash equivalents | 103.1 | 677.0 | 791.9 |
| Cash and cash equivalents at beginning of period | 1,713.2 | 1,036.2 | 244.3 |
| Cash and cash equivalents at end of period | $ 1,816.3 | $ 1,713.2 | $ 1,036.2 |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Cash paid during the year for: | | | |
| Income taxes other, net of refunds | $ (5.1) | $ 3,692.7 | $ 377.6 |
| Interest | $ 1,144.4 | $ 1,277.9 | $ 689.9 |
| **Schedule of Non-Cash Investing and Financing Activities:** | | | |
| Non-cash receipt of Teva shares | $ - | $ 5,038.6 | $ - |
| Non-cash dividends to Parents | $ 4,203.9 | $ - | $ - |

See accompanying Notes to the Consolidated Financial Statements.

F-13

**WARNER CHILCOTT LIMITED**
**CONSOLIDATED STATEMENTS OF MEMBERS' EQUITY**
**(In millions, except share data)**

| | Members' Capital | | Retained Earnings | Accumulated Other Comprehensive Income / (Loss) | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **BALANCE, January 1, 2015** | 100.0 | $ 29,455.9 | $ (917.9) | $ (465.4) | $ 28,072.6 |
| Comprehensive income: | | | | | |
| Net income attributable to members | - | - | 4,050.6 | - | 4,050.6 |
| Other comprehensive (loss), net of tax | - | - | - | (28.7) | (28.7) |
| Total comprehensive income | | | | | 4,021.9 |
| Contributions from Parents | - | 43,687.3 | - | - | 43,687.3 |
| Dividends to Parents | - | (208.1) | - | - | (208.1) |
| **BALANCE, December 31, 2015** | 100.0 | $ 72,935.1 | $ 3,132.7 | $ (494.1) | $ 75,573.7 |
| Comprehensive income: | | | | | |
| Net income attributable to members | - | - | 15,091.1 | - | 15,091.1 |
| Other comprehensive (loss), net of tax | - | - | - | (2,089.1) | (2,089.1) |
| Other comprehensive income resulting from the Teva Transaction | - | - | - | 1,544.8 | 1,544.8 |
| Total comprehensive income | | | | | 14,546.8 |
| Dividends to Parents | - | - | (2,034.8) | - | (2,034.8) |
| **BALANCE, December 31, 2016** | 100.0 | $ 72,935.1 | $ 16,189.0 | $ (1,038.4) | $ 88,085.7 |
| Comprehensive income: | | | | | |
| Net income attributable to members | - | - | (3,927.3) | - | (3,927.3) |
| Other comprehensive (loss), net of tax | - | - | - | 1,359.7 | 1,359.7 |
| Net impact of other-than-temporary loss on investment in Teva securities | - | - | - | 1,599.4 | 1,599.4 |
| Total comprehensive income | | | | | (968.2) |
| Impact of change in accounting for share-based compensation plans | - | - | 20.8 | - | 20.8 |
| Dividends to Parents | - | - | (5,872.1) | - | (5,872.1) |
| **BALANCE, December 31, 2017** | 100.0 | $ 72,935.1 | $ 6,410.4 | $ 1,920.7 | $ 81,266.2 |

See accompanying Notes to the Consolidated Financial Statements.

F-14

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1 — Description of Business

Allergan plc is a global pharmaceutical company focused on developing, manufacturing and commercializing branded pharmaceutical ("brand", "branded" or "specialty brand"), device, biologic, surgical and regenerative medicine products for patients around the world. Allergan markets a portfolio of leading brands and best-in-class products for the central nervous system, eye care, medical aesthetics and dermatology, gastroenterology, women's health, urology and anti-infective therapeutic categories. Allergan is an industry leader in Open Science, a model of research and development, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care. The Company has operations in more than 100 countries. Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities.

On August 2, 2016 we completed the divestiture of our global generics business and certain other assets to Teva Pharmaceutical Industries Ltd. ("Teva") (the "Teva Transaction") for $33.3 billion in cash, net of cash acquired by Teva, which included estimated working capital and other contractual adjustments, and 100.3 million unregistered Teva ordinary shares (or American Depository Shares with respect thereto), which at the time of the closing approximated $5.0 billion in value using the closing date Teva opening stock price discounted at a rate of 5.9 percent due to the lack of marketability ("Teva Shares"). As part of the Teva Transaction, Teva acquired our global generics business, including the United States ("U.S.") and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic research and development ("R&D") unit, our international over-the-counter ("OTC") commercial unit (excluding OTC eye care products) and certain established international brands.

On October 3, 2016, the Company completed the divestiture of the Anda Distribution business to Teva for $500.0 million. The Anda Distribution business distributed generic, branded, specialty and OTC pharmaceutical products from more than 300 manufacturers to retail independent and chain pharmacies, nursing homes, mail order pharmacies, hospitals, clinics and physician offices across the U.S.

The Company recognized a combined gain on the sale of the Anda Distribution business and the Teva Transaction of $15,932.2 million in the year ended December 31, 2016, as well as deferred liabilities relating to other elements of our arrangements with Teva of $299.2 million.

In October 2016, pursuant to our agreement with Teva, Teva provided the Company with its proposed estimated adjustment to the closing date working capital balance. The Company disagreed with Teva's proposed adjustment, and, pursuant to our agreement with Teva, each of the Company's and Teva's proposed adjustments were submitted to arbitration ("Working Capital Arbitration") to determine the working capital amount in accordance with GAAP as applied by the Company consistent with past practice. Teva initially proposed an adjustment of approximately $1.4 billion and subsequently submitted a revised adjustment of approximately $1.5 billion to the arbitrator. In addition, on October 30, 2017, Teva submitted a Notice of Direct and Third Party Claims seeking indemnification for virtually all of the same items for which Teva sought a proposed adjustment in the Working Capital Arbitration as well as several new items as to which no quantity of damages had been asserted. On January 31, 2018, Allergan plc and Teva entered into a Settlement Agreement and Mutual Releases (the "Agreement"). The Agreement provides that the Company will make a one-time payment of $700.0 million to Teva; the Company and Teva will jointly dismiss their working capital dispute arbitration, and the Company and Teva will release all actual or potential claims under the Master Purchase Agreement, dated July 26, 2015, by and between the Company and Teva, for breach of any representation, warranty, or covenant (other than any breach of a post-closing covenant not known as of the date of the Agreement). The Company recorded a pre-tax charge of $466.0 million as a component of other (expense) / income, net from discontinued operations relating to the settlement in the year ended December 31, 2017.

As a result of the Teva Transaction and the divestiture of the Company's Anda Distribution business, and in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Update ("ASU") No. 2014-08 "Presentation of Financial Statements (Topic 205) and Property, Plant and Equipment (Topic 360): Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity," the financial results of the businesses held for sale were reclassified to discontinued operations for all periods presented in our consolidated financial statements. The results of our discontinued operations include the results of our generic product development, manufacturing and distribution of off-patent pharmaceutical products, certain established international brands marketed similarly to generic products and out-licensed generic pharmaceutical products primarily in Europe through our Medis third-party business through August 2, 2016, as well as our Anda Distribution business through October 3, 2016.

F-15

**NOTE 2 — Formation of the Company**

Allergan plc (formerly known as Actavis plc) was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Allergan Finance, LLC (formerly known as Actavis, Inc.) and Warner Chilcott plc ("Warner Chilcott"). Following the consummation of the Warner Chilcott acquisition on October 1, 2013 (the "Warner Chilcott Acquisition"), Allergan Finance, LLC and Warner Chilcott became wholly-owned subsidiaries of Allergan plc. Each of Allergan Finance, LLC's common shares was converted into one Company ordinary share. Effective October 1, 2013, through a series of related-party transactions, Allergan plc contributed its indirect subsidiaries, including Allergan Finance, LLC, to its subsidiary Warner Chilcott Limited.

Except where otherwise indicated, and excluding certain insignificant cash and non-cash transactions at the Allergan plc level, the consolidated financial statements and disclosures are for two separate registrants, Allergan plc and Warner Chilcott Limited. The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the deminimis activity between Allergan plc and Warner Chilcott Limited, references throughout this document relate to both Allergan plc and Warner Chilcott Limited. Refer to "Note 3 —Reconciliation of Warner Chilcott Limited results to Allergan plc results" in the accompanying "Notes to the Consolidated Financial Statements" in this document for a summary of the details on the differences between Allergan plc and Warner Chilcott Limited.

On March 17, 2015, the Company acquired Allergan, Inc. ("Legacy Allergan") for approximately $77.0 billion including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion, which included then outstanding equity awards (the "Allergan Acquisition"). Under the terms of the agreement, Legacy Allergan shareholders received 111.2 million of the Company's ordinary shares, 7.0 million of the Company's non-qualified stock options and 0.5 million of the Company's share units. The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complemented the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox®. The transaction expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

In connection with the Allergan Acquisition, the Company changed its name from Actavis plc to Allergan plc. Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the opening of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN." Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Allergan plc is the successor issuer to Actavis plc's ordinary shares and Actavis plc's mandatory convertible preferred shares, both of which are deemed to be registered under Section 12(b) of the Exchange Act, and Allergan plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder.

References throughout to "we," "our," "us," the "Company" or "Allergan" refer to financial information and transactions of Allergan plc. References to "Warner Chilcott Limited" refer to Warner Chilcott Limited, the Company's indirect wholly-owned subsidiary, and, unless the context otherwise requires, its subsidiaries.

References throughout to "Ordinary Shares" refer to Allergan Finance, LLC's Class A common shares, par value $0.0033 per share, prior to the consummation of the Warner Chilcott transactions and to Allergan plc's ordinary shares, par value $0.0001 per share, since the consummation of the Warner Chilcott transactions.

F-16

## NOTE 3 — Reconciliation of Warner Chilcott Limited results to Allergan plc results

Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc, the ultimate parent of the group, (together with other Allergan Chilcott Limited parents, the "Parents"). The results of Warner Chilcott Limited are consolidated into the results of Allergan plc. Due to the deminimis activity between Warner Chilcott Limited and the Parents (including Allergan plc), content throughout this filing relates to both Allergan plc and Warner Chilcott Limited. Warner Chilcott Limited representations relate only to itself and not to any other company. Except where otherwise indicated, and excluding certain insignificant cash and non-cash transactions at the Allergan plc level, these notes relate to the consolidated financial statements for both separate registrants, Allergan plc and Warner Chilcott Limited. In addition to certain inter-company payable and receivable amounts between the entities, the following is a reconciliation of the financial position and results of operations of Warner Chilcott Limited to Allergan plc ($ in millions):

| | December 31, 2017 | | | December 31, 2016 | | |
|---|---|---|---|---|---|---|
| | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference |
| Cash and cash equivalents | $ 1,817.2 | $ 1,816.3 | $ 0.9 | $ 1,724.0 | $ 1,713.2 | $ 10.8 |
| Prepaid expenses and other current assets | 1,123.9 | 1,123.0 | 0.9 | 1,383.4 | 1,382.1 | 1.3 |
| Deferred tax assets | 319.1 | 316.0 | 3.1 | 233.3 | 233.3 | - |
| Accounts payable and accrued liabilities | 5,541.4 | 5,515.6 | 25.8 | 5,019.0 | 4,993.3 | 25.7 |
| Other long-term liabilities | 886.9 | 886.9 | - | 1,085.0 | 1,086.0 | (1.0) |
| Other taxes payables | 1,573.9 | 1,573.5 | 0.4 | 886.2 | 886.2 | - |
| Deferred tax liabilities | 6,352.4 | 6,349.4 | 3.0 | 12,969.1 | 12,969.1 | - |

| | Year Ended December 31, 2017 | | | Year Ended December 31, 2016 | | | Year Ended December 31, 2015 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference | Allergan plc | Warner Chilcott Limited | Difference |
| General and administrative expenses | $ 1,501.9 | $ 1,402.3 | $ 99.6 | $ 1,473.9 | $ 1,350.4 | $ 123.5 | $ 1,716.4 | $ 1,581.0 | $ 135.4 |
| Operating (loss) | (5,921.2) | (5,821.6) | (99.6) | (1,825.5) | (1,702.0) | (123.5) | (3,131.0) | (2,995.6) | (135.4) |
| Interest Income | 67.7 | 166.3 | (98.6) | 69.9 | 111.1 | (41.2) | 10.6 | 10.6 | - |
| Other income / (expense), net | (3,437.3) | (3,437.3) | - | 219.2 | 172.2 | 47.0 | (233.8) | (233.8) | - |
| (Loss) before income taxes and noncontrolling interest | (10,386.4) | (10,188.2) | (198.2) | (2,832.0) | (2,714.3) | (117.7) | (4,547.5) | (4,412.1) | (135.4) |
| Net (loss) from continuing operations, net of tax | (3,716.0) | (3,517.8) | (198.2) | (935.0) | (817.3) | (117.7) | (2,941.6) | (2,806.2) | (135.4) |
| Net (loss) / income | (4,118.9) | (3,920.7) | (198.2) | 14,979.5 | 15,097.2 | (117.7) | 3,919.4 | 4,054.8 | (135.4) |
| Dividends on preferred shares | 278.4 | - | 278.4 | 278.4 | - | 278.4 | 232.0 | - | 232.0 |
| Net (loss) / income attributable to ordinary shareholders/members | (4,403.9) | (3,927.3) | (476.6) | 14,695.0 | 15,091.1 | (396.1) | 3,683.2 | 4,050.6 | (367.4) |

The difference between general and administrative expenses in the years ending December 31, 2017, 2016 and 2015 were due to corporate related expenses incurred at Allergan plc as well as non-recurring transaction costs incurred as part of the acquisitions of the Company, including Allergan, Forest and the terminated transaction with Pfizer Inc. Movements in equity are due to historical differences in the results of operations of the companies and differences in equity awards.

As of December 31, 2017 and December 31, 2016, Warner Chilcott Limited had $5.8 billion and $9.3 billion in Receivables from Parents, respectively. As of December 31, 2017 and December 31, 2016 Warner Chilcott Limited had $4.0 billion and $4.0 billion in Non current Receivables from Parents, respectively. These receivables related to intercompany loans between Allergan plc and each of the Allergan Capital, S.a.r.l (formerly known as Actavis Capital, S.a.r.l) and Forest Finance B.V., subsidiaries of Warner Chilcott Limited. These loans are interest-bearing loans with varying term dates. Total interest income recognized during the years ended December 31, 2017 and December 31, 2016 was $98.6 million and $41.2 million, respectively.

## NOTE 4 — Summary of Significant Accounting Policies

### Basis of Presentation

The Company's consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("U.S.") ("GAAP"). The consolidated financial statements include the accounts of wholly owned subsidiaries, after elimination of intercompany accounts and transactions. The consolidated financial information presented herein reflects all financial information that, in the opinion of management, is necessary for a fair statement of financial position, results of operations and cash flows for the periods presented.

10/24/2018                                                agn-10k_20171231.htm

F-17

The Company's consolidated financial statements include the financial results of all acquired companies subsequent to the acquisition date.

### Reclassifications

In March 2016, the FASB issued ASU No. 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting. The amendments are intended to improve the accounting for employee share-based payments and affect all organizations that issue share-based payment awards to their employees. Several aspects of the accounting for share-based payment award transactions are simplified, including: (a) income tax consequences; (b) classification of awards as either equity or liabilities; and (c) classification on the statement of cash flows. The amendments are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. Effective January 1, 2017, the Company prospectively adopted the guidance and as a result of implementation, the Company reduced previously reported Retained Earnings by $62.4 million and increased previously reported Additional-Paid-In-Capital by $62.4 million. In addition, the Company decreased its net Deferred Tax Liabilities and increased Retained Earnings by $20.8 million for the tax impact of this change. The Company also revised its presentation of previously reported cash flows by eliminating the presentation of "Excess tax benefit from stock-based compensation" which raised operating cash flows and reduced financing cash flows for the year ended December 31, 2016 by $20.4 million.

### Use of Estimates

Management is required to make certain estimates and assumptions in order to prepare consolidated financial statements in conformity with GAAP. Such estimates and assumptions affect the reported financial statements. The Company's most significant estimates relate to the determination of SRAs (defined below) included within either accounts receivable or accrued liabilities, the valuation of inventory balances, the determination of useful lives for intangible assets, pension and other post-retirement benefit plan assumptions, the assessment of expected cash flows used in evaluating goodwill and other long-lived assets for impairment and recognition and measurement of assets acquired and liabilities assumed in business combinations at fair value. The estimation process required to prepare the Company's consolidated financial statements requires assumptions to be made about future events and conditions, and as such, is inherently subjective and uncertain. The Company's actual results could differ materially from those estimates.

### Foreign Currency Translation

For most of the Company's international operations, the local currency has been determined to be the functional currency. The results of its non-U.S. dollar based operations are translated to U.S. dollars at the average exchange rates during the period. Assets and liabilities are translated at the rate of exchange prevailing on the balance sheet date. Equity is translated at the prevailing rate of exchange at the date of the equity transaction. Translation adjustments are reflected in shareholders' equity and are included as a component of other comprehensive (loss) / income. The effects of revaluing non-functional currency assets and liabilities into the functional currency are recorded as general and administrative expenses in the consolidated statements of operations.

The Company realizes foreign currency gains / (losses) in the normal course of business based on movement in the applicable exchange rates. These transactional gains / (losses) are included as a component of general and administrative expenses.

### Cash and Cash Equivalents

The Company considers cash and cash equivalents to include cash in banks, commercial paper and deposits with financial institutions that can be liquidated without prior notice or penalty. The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents.

### Fair Value of Other Financial Instruments

The Company's financial instruments consist primarily of cash and cash equivalents, marketable securities, accounts and other receivables, investments, trade accounts payable, and long-term debt, including the current portion. The carrying amounts of cash and cash equivalents, marketable securities, accounts and other receivables and trade accounts payable are representative of their respective fair values due to their relatively short maturities. The fair values of investments in companies that are publicly traded and not accounted for under the equity method are based on quoted market prices. The Company estimates the fair value of its fixed rate long-term obligations based on quoted market rates.

F-18

*Inventories*

Inventories consist of finished goods held for sale and distribution, raw materials and work in process. Inventory includes brand pharmaceutical and medical aesthetic products which represent Food and Drug Administration ("FDA") approved or likely to be approved indications. Inventory valuation reserves are established based on a number of factors/situations including, but not limited to, raw materials, work in process or finished goods not meeting product specifications, product obsolescence, or application of the lower of cost (first-in, first-out method) or market (net realizable value) concepts. The determination of events requiring the establishment of inventory valuation reserves, together with the calculation of the amount of such reserves may require judgment. Assumptions utilized in our quantification of inventory reserves include, but are not limited to, estimates of future product demand, consideration of current and future market conditions, product net selling price, anticipated product launch dates, potential product obsolescence and other events relating to special circumstances surrounding certain products. No material adjustments have been required to our inventory reserve estimates for the periods presented. Adverse changes in assumptions utilized in our inventory reserve calculations could result in an increase to our inventory valuation reserves and higher cost of sales.

*Property, Plant and Equipment*

Property, plant and equipment are stated at cost, less accumulated depreciation. Major renewals and improvements are capitalized, while routine maintenance and repairs are expensed as incurred. The Company capitalizes interest on qualified construction projects. At the time property, plant and equipment are retired from service, the cost and accumulated depreciation is removed from the respective accounts.

Depreciation expense is computed principally on the straight-line method, over the estimated useful lives of the related assets. The following table provides the range of estimated useful lives used for each asset type:

| | |
|---|---|
| Computer software/hardware (including internally developed) | 3-10 years |
| Machinery and equipment | 3-15 years |
| Research and laboratory equipment | 3-10 years |
| Furniture and fixtures | 3-10 years |
| Buildings, improvements, leasehold improvements and other | 4-50 years |
| Transportation equipment | 3-20 years |

The Company assesses property, plant and equipment for impairment whenever events or changes in circumstances indicate that an asset's carrying amount may not be recoverable.

*Investments*

The Company's equity investments are accounted for under the equity method of accounting when the Company can exert significant influence and the Company's ownership interest does not exceed 50%. The Company records equity method investments at cost and adjusts for the appropriate share of investee net earnings or losses. Investments in which the Company owns less than a 20% interest and cannot exert significant influence are accounted for using the cost method if the fair value of such investments is not readily determinable.

*Marketable Securities*

The Company's marketable securities consist of U.S. treasury and agency securities and debt and equity securities of publicly-held companies. The Company's marketable securities are classified as available-for-sale and are recorded at fair value, based upon quoted market prices. Unrealized temporary adjustments to fair value were included on the balance sheet in a separate component of shareholders' equity as unrealized gains and losses and are reported as a component of accumulated other comprehensive income / (loss) as of December 31, 2017. No gains or losses on marketable securities are realized until shares are sold or a decline in fair value is determined to be other-than-temporary. If a decline in fair value is determined to be other-than-temporary, an impairment charge is recorded and a new cost basis in the investment is established.

F-19

### Product Rights and Other Definite-Lived Intangible Assets

Our product rights and other definite-lived intangible assets are stated at cost, less accumulated amortization, and are amortized using the economic benefit model or the straight-line method, if results are materially aligned, over their estimated useful lives. We determine amortization periods for product rights and other definite-lived intangible assets based on our assessment of various factors impacting estimated useful lives and cash flows. Such factors include the product's position in its life cycle, the existence or absence of like products in the market, various other competitive and regulatory issues, and contractual terms. Significant changes to any of these factors may result in a reduction in the intangibles useful life and an acceleration of related amortization expense, which could cause our net results to decline.

Product rights and other definite-lived intangible assets are tested periodically for impairment when events or changes in circumstances indicate that an asset's carrying value may not be recoverable. The impairment testing involves comparing the carrying amount of the asset to the forecasted undiscounted future cash flows. In the event the carrying value of the asset exceeds the undiscounted future cash flows, the carrying value is considered not recoverable and an impairment exists. An impairment loss is measured as the excess of the asset's carrying value over its fair value, calculated using discounted future cash flows. The computed impairment loss is recognized in net (loss) / income in the period that the impairment occurs. Assets which are not impaired may require an adjustment to the remaining useful lives for which to amortize the asset. Our projections of discounted cash flows use a discount rate determined by our management to be commensurate with the risk inherent in our business model. Our estimates of future cash flows attributable to our other definite-lived intangible assets require significant judgment based on our historical and anticipated results and are subject to many factors. Different assumptions and judgments could materially affect the calculation of the fair value of the other definite-lived intangible assets which could trigger impairment.

### Goodwill and Intangible Assets with Indefinite-Lives

The Company tests goodwill and intangible assets with indefinite-lives for impairment annually in the second quarter. Additionally, the Company may perform interim tests if an event occurs or circumstances change that could potentially reduce the fair value of a reporting unit below its carrying amount. The carrying value of each reporting unit is determined by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units.

Goodwill is considered impaired if the carrying amount of the net assets exceeds the fair value of the reporting unit. Impairment, if any, would be recorded in operating income and this could result in a material impact to net income / (loss) and income / (loss) per share.

Acquired in-process research and development ("IPR&D") intangible assets represent the value assigned to acquired research and development projects that, as of the date acquired, represent the right to develop, use, sell and/or offer for sale a product or other intellectual property that the Company has acquired with respect to products and/or processes that have not been completed or approved. The IPR&D intangible assets are subject to impairment testing until completion or abandonment of each project. Upon abandonment, the assets are impaired, if there is no future alternative use or no market for which to sell the asset. Impairment testing requires the development of significant estimates and assumptions involving the determination of estimated net cash flows for each year for each project or product (including net revenues, cost of sales, R&D costs, selling and marketing costs and other costs which may be allocated), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, and competitive trends impacting the asset and each cash flow stream as well as other factors. The major risks and uncertainties associated with the timely and successful completion of the IPR&D projects include legal risk, market risk and regulatory risk. Changes in these assumptions could result in future impairment charges. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change or the timely completion of each project and commercial success will occur. For these and other reasons, actual results may vary significantly from estimated results.

Upon successful completion of each project and approval of the product, we will make a separate determination of the useful life of the intangible, transfer the amount to currently marketed products ("CMP") and amortization expense will be recorded over the estimated useful life.

### Contingent Consideration

Contingent consideration is recorded at the acquisition date estimated fair value of the contingent payment for all applicable acquisitions. The fair value of the contingent consideration is remeasured at each reporting period with any adjustments in fair value included in our consolidated statements of operations. (Refer to "NOTE 23 — Fair Value Measurement" for additional details regarding the fair value of contingent consideration.)

*Revenue Recognition*

*General*

During the years ended December 31, 2017, 2016 and 2015, revenue from product sales was recognized when title and risk of loss to the product transfers to the customer, which is based on the transaction shipping terms. Recognition of revenue also requires reasonable assurance of collection of sales proceeds, the seller's price to the buyer to be fixed or determinable and the completion of all performance obligations. The Company warrants products against defects and for specific quality standards, permitting the return of products under certain circumstances. Product sales are recorded net of all sales-related deductions including, but not limited to: chargebacks, trade discounts, sales returns and allowances, commercial and government rebates, customer loyalty programs and fee-for-service arrangements with certain distributors, which we refer to in the aggregate as "SRA".

Royalty and commission revenue is recognized as a component of net revenues in accordance with the terms of their respective contractual agreements when collectability is reasonably assured and when revenue can be reasonably measured.

*Provisions for SRAs*

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. When the Company recognizes gross revenue from the sale of products, an estimate of SRA is recorded, which reduces the product revenues. Accounts receivable and/or accrued liabilities are also reduced and/or increased by the SRA amount depending on whether we have the right of offset with the customer. These provisions are estimated based on historical payment experience, historical relationship of the deductions to gross product revenues, government regulations, estimated utilization or redemption rates, estimated customer inventory levels and current contract sales terms. The estimation process used to determine our SRA provision has been applied on a consistent basis and no material revenue adjustments have been necessary to increase or decrease our reserves for SRA as a result of a significant change in underlying estimates. The Company uses a variety of methods to assess the adequacy of the SRA reserves to ensure that our financial statements are fairly stated.

*Chargebacks* — A chargeback represents an amount payable in the future to a wholesaler for the difference between the invoice price paid by our wholesale customer for a particular product and the negotiated contract price that the wholesaler's customer pays for that product. The chargeback provision and related reserve varies with changes in product mix, changes in customer pricing and changes to estimated wholesaler inventories. The provision for chargebacks also takes into account an estimate of the expected wholesaler sell-through levels to indirect customers at certain contract prices. The Company validates the chargeback accrual quarterly through a review of the inventory reports obtained from our largest wholesale customers. This customer inventory information is used to verify the estimated liability for future chargeback claims based on historical chargeback and contract rates. These large wholesalers represent the vast majority of the recipients of the Company's chargeback payments. We continually monitor current pricing trends and wholesaler inventory levels to ensure the liability for future chargebacks is fairly stated.

*Rebates* — Rebates include volume related incentives to direct and indirect customers, third-party managed care and Medicare Part D rebates, Medicaid rebates and other government rebates. Rebates are accrued based on an estimate of claims to be paid for product sold into trade by the Company. Volume rebates are generally offered to customers as an incentive to use the Company's products and to encourage greater product sales. These rebate programs include contracted rebates based on customers' purchases made during an applicable monthly, quarterly or annual period. The provision for third-party rebates is estimated based on our customers' contracted rebate programs and the Company's historical experience of rebates paid. Any significant changes to our customer rebate programs are considered in establishing the provision for rebates. The provisions for government rebates are based, in part, upon historical experience of claims submitted by the various states / authorities, contractual terms and government regulations. We monitor legislative changes to determine what impact such legislation may have on our provision.

*Cash Discounts* — Cash discounts are provided to customers that pay within a specific period. The provision for cash discounts is estimated based upon invoice billings and historical customer payment experience. The Company's experience of payment history is fairly consistent and most customer payments qualify for the cash discount.

*Returns and Other Allowances* — The Company's provision for returns and other allowances include returns, promotional allowances, and loyalty cards.

Consistent with industry practice, the Company maintains a returns policy that allows customers to return product for a credit. In accordance with the Company's policy, credits for customer returns of products are applied against outstanding account activity or are settled in cash. Product exchanges are not permitted. Customer returns of product are generally not resalable. The Company's estimate of the provision for returns is based upon historical experience and current trends of actual customer returns. Additionally, we consider

other factors when estimating the current period returns provision, including levels of inventory in the distribution channel, as well as significant market changes which may impact future expected returns.

F-21

Promotional allowances are credits that are issued in connection with a product launch or as an incentive for customers to carry our product. The Company establishes a reserve for promotional allowances based upon contractual terms.

Loyalty cards allow the end user patients a discount per prescription and are accrued based on historical experience, contract terms and the volume of product and cards in the distribution channel.

The following table summarizes the activity from continuing operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | | Rebates | | Returns and Other Allowances | | Cash Discounts | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2014 | $ | 28.0 | $ | 995.8 | $ | 255.2 | $ | 16.3 | $ | 1,295.3 |
| Add: Allergan Acquisition | | 14.1 | | 306.4 | | 100.4 | | 8.6 | | 429.5 |
| Provision related to sales in 2015 | | 649.9 | | 4,035.7 | | 659.9 | | 275.6 | | 5,621.1 |
| Credits and payments | | (613.8) | | (3,993.5) | | (648.0) | | (275.4) | | (5,530.7) |
| Balance at December 31, 2015 | $ | 78.2 | $ | 1,344.4 | $ | 367.5 | $ | 25.1 | $ | 1,815.2 |
| Provision related to sales in 2016 | | 1,003.2 | | 4,338.7 | | 1,390.1 | | 306.5 | | 7,038.5 |
| Credits and payments | | (967.2) | | (4,069.1) | | (1,341.7) | | (296.9) | | (6,674.9) |
| Balance at December 31, 2016 | $ | 114.2 | $ | 1,614.0 | $ | 415.9 | $ | 34.7 | $ | 2,178.8 |
| Provision related to sales in 2017 | | 1,098.7 | | 4,891.4 | | 1,799.3 | | 330.6 | | 8,120.0 |
| Credits and payments | | (1,135.7) | | (4,710.4) | | (1,734.7) | | (328.8) | | (7,909.6) |
| Add: LifeCell and Zeltiq Acquisitions | | - | | 4.2 | | 37.1 | | - | | 41.3 |
| Balance at December 31, 2017 | $ | 77.2 | $ | 1,799.2 | $ | 517.6 | $ | 36.5 | $ | 2,430.5 |

The following table summarizes the balance sheet classification of our SRA reserves ($ in millions):

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2016 | |
| Accounts receivable | $ | 250.6 | $ | 287.4 |
| Accounts payable and accrued expenses | | 2,179.9 | | 1,891.4 |
| | $ | 2,430.5 | $ | 2,178.8 |

The provisions recorded to reduce gross product sales to net product sales, excluding discontinued operations, were as follows ($ in millions):

| Years Ended December 31, | Gross Product Sales | | Chargebacks | Rebates | Returns and Other Allowances | | Cash Discounts | | Net Product Sales | | Percentage of Gross Product Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | $ | 18,125.1 | $ 649.9 | $ 4,035.7 | $ | 659.9 | $ | 275.6 | $ | 12,504.0 | 69.0% |
| 2016 | $ | 21,398.6 | $ 1,003.2 | $ 4,338.7 | $ | 1,390.1 | $ | 306.5 | $ | 14,360.1 | 67.1% |
| 2017 | $ | 23,688.4 | $ 1,098.7 | $ 4,891.4 | $ | 1,799.3 | $ | 330.6 | $ | 15,568.4 | 65.7% |

F-22

The following table summarizes the activity from discontinued operations in the Company's major categories of SRA ($ in millions):

| | Chargebacks | Rebates | Returns and Other Allowances | Cash Discounts | Total |
|---|---|---|---|---|---|
| Balance at December 31, 2014 | $ 536.9 | $ 750.8 | $ 356.9 | $ 44.4 | $ 1,689.0 |
| Provision related to sales in 2015 | 5,907.2 | 1,991.9 | 729.4 | 277.3 | 8,905.8 |
| Credits and payments | (5,825.1) | (2,011.7) | (757.7) | (261.6) | (8,856.1) |
| Balance at December 31, 2015 | $ 619.0 | $ 731.0 | $ 328.6 | $ 60.1 | $ 1,738.7 |
| Provision related to sales in 2016 | 3,525.4 | 1,290.4 | 583.0 | 159.1 | 5,557.9 |
| Credits and payments | (3,655.0) | (1,350.0) | (496.3) | (155.4) | (5,656.7) |
| Disposal of businesses | (489.4) | (671.4) | (415.3) | (63.8) | (1,639.9) |
| Balance at December 31, 2016 | $ — | $ — | $ — | $ — | $ — |

The Company's divested generics business also had the following type of SRAs:

- Pricing adjustments, included shelf stock adjustments which are credits issued to reflect price decreases in selling prices charged to the Company's direct customers. Shelf stock adjustments are based upon the amount of product our customers have in their inventory at the time of an agreed-upon price reduction. The provision for shelf stock adjustments was based upon specific terms with the Company's customers and includes estimates of existing customer inventory levels based upon their historical purchasing patterns.

- Billback adjustments are credits that are issued to certain customers who purchase directly from us as well as indirectly through a wholesaler. These credits are issued in the event there was a difference between the customer's direct and indirect contract price. The provision for billbacks was estimated based upon historical purchasing patterns of qualified customers who purchase product directly from us and supplement their purchases indirectly through our wholesale customers.

### Litigation and Contingencies

The Company is involved in various legal proceedings in the normal course of its business, including product liability litigation, intellectual property litigation, employment litigation and other litigation. Additionally, the Company, in consultation with its counsel, assesses the need to record a liability for contingencies on a case-by-case basis in accordance with FASB Accounting Standards Codification ("ASC") Topic 450 "Contingencies" ("ASC 450"). Accruals are recorded when the Company determines that a loss related to a matter is both probable and reasonably estimable. These accruals are adjusted periodically as assessment efforts progress or as additional information becomes available. Acquired contingencies in business combinations are recorded at fair value to the extent determinable, otherwise in accordance with ASC 450. Refer to "NOTE 24 — Commitments and Contingencies" for more information.

### R&D Activities

R&D activities are expensed as incurred and consist of self-funded R&D costs, the costs associated with work performed under collaborative R&D agreements, regulatory fees, and acquisition and license related milestone payments, if any.

F-23

As of December 31, 2017, we are developing a number of products, some of which utilize novel drug delivery systems, through a combination of internal and collaborative programs including the following:

| Product | Therapeutic Area | Indication | Expected Launch Year | Phase |
|---|---|---|---|---|
| Esmya | Women's Health | Uterine Fibroids | 2018 | Review |
| Cariprazine | CNS | Bipolar Depression | 2019 | III |
| Ubrogepant | CNS | Acute Migraine | 2020 | III |
| Abicipar | Eye Care | Age Related Macular Degeneration | 2020 | III |
| Bimatoprost SR | Eye Care | Glaucoma | 2020 | III |
| Rapastinel | CNS | Depression | 2021 | III |
| Cenicriviroc | Gastrointestinal | NASH | 2021 | III |
| Relamorelin | Gastrointestinal | Gastroparesis | 2023 | III |
| Pilo/Oxy | Eye Care | Presbyopia | 2021 | II |
| RORγT | Medical Aesthetics | Psoriasis | 2022 | II |
| Atogepant | CNS | Migraine Prevention | 2022 | II |
| Abicipar | Eye Care | Diabetic Macular Edema | 2023 | II |
| Brazikumab | Gastrointestinal | Crohn's Disease | 2024 | II |
| Botox | Medical Aesthetics | Platysma/Masseter | 2025/2023 | II |
| Brazikumab | Gastrointestinal | Ulcerative Colitis | 2025 | I |

We also have a number of products in development as part of our life-cycle management strategy for our existing product portfolio.

*Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed*

We account for acquired businesses using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recorded as of the date of acquisition at their respective fair values. The consolidated financial statements and results of operations reflect an acquired business after the completion of the acquisition. The fair value of the consideration paid, including contingent consideration, is assigned to the underlying net assets of the acquired business based on their respective fair values as determined using a market participant concept. Any excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill.

The most material line items impacted by the allocation of acquisition fair values are:

- Intangible assets (including IPR&D assets upon successful completion of the project and approval of the product) which are amortized to amortization expense over the expected life of the asset. Significant judgments are used in determining the estimated fair values assigned to the assets acquired and liabilities assumed and in determining estimates of useful lives of long-lived assets. Fair value determinations and useful life estimates are based on, among other factors, estimates of expected future net cash flows, estimates of appropriate discount rates used to present value expected future net cash flow streams, the timing of approvals and the probability of success for IPR&D projects and the timing of related product launch dates, the assessment of each asset's life cycle, the impact of competitive trends on each asset's life cycle and other factors. These judgments can materially impact the estimates used to allocate acquisition date fair values to assets acquired and liabilities assumed and the future useful lives. For these and other reasons, actual results may vary significantly from estimated results.

- Inventory is recorded at fair market value factoring in selling price and costs to dispose. Inventory acquired is typically valued higher than replacement cost.

*Income Taxes*

Income taxes are accounted for using an asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of temporary differences between the financial statement and tax basis of assets and liabilities at the applicable tax rates. A valuation allowance is provided when it is more likely than not that some portion or all of the deferred tax assets will not be realized. The Company evaluates the realizability of its deferred tax assets by assessing its valuation allowance and by adjusting the amount of such allowance, if necessary. The factors used to assess the likelihood of realization include the Company's forecast of future taxable income and available tax planning strategies that could be implemented to realize the net

deferred tax assets. Failure to achieve forecasted taxable income in applicable tax jurisdictions could affect the ultimate realization of deferred tax assets and could result in an increase in the Company's effective tax rate on future earnings.

F-24

Income tax positions must meet a more-likely-than-not recognition threshold to be recognized. Income tax positions that previously failed to meet the more-likely-than-not threshold are recognized in the first financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not threshold are derecognized in the first financial reporting period in which that threshold is no longer met. The Company recognizes potential accrued interest and penalties related to unrecognized tax benefits within the consolidated statements of operations as income tax expense.

The income tax effects of the TCJA have been initially accounted for on a provisional basis pursuant to the guidance in Staff Accounting Bulletin ("SAB") 118. Reasonable estimates for all material tax effects of the TCJA (other than amounts related to accounting policy elections) have been provided and adjustments to provisional amounts will be made in subsequent reporting periods as information becomes available to complete provisional computations. The provisional impact of the TCJA for the Federal tax rate change and the resulting deferred tax liability for unremitted earnings will be completed in subsequent measurement periods when the required computations for the 2017 tax year and the related tax returns for the relevant entities have been completed. The final amount for the toll charge is dependent on amounts that cannot be determined until the 2018 financial results of certain non-US subsidiaries are completed.  In addition, the IRS continues to issue interpretive guidance on the computation of the tax on deferred foreign earnings and therefore the computations cannot be finalized until all relevant IRS guidance has been promulgated and its impact assessed.

The TCJA introduced an additional U.S. tax on certain non-U.S. subsidiaries' earnings which are considered to be Global Intangible Low Taxed Income (referred to as "GILTI"). Under this provision, the amount of GILTI included by a U.S. shareholder will be taxed at a rate of 10.5% for tax years beginning after December 31, 2017 (increasing to 13.125% for tax years beginning after December 31, 2025) with a partial offset for foreign tax credits.

Due to the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the TCJA and the application of ASC 740 and are considering if deferred tax amounts should be recorded for this provision. Our accounting policies depend, in part, on analyzing our global income to determine whether we expect material tax liabilities resulting from the application of this provision, and, if so, whether and when to record related current and deferred income taxes and whether such amounts can be reasonably estimated. Anticipated further guidance from the IRS will also clarify the manner in which the GILTI tax is computed. For these reasons, we have not recorded a deferred tax expense or benefit relating to potential GILTI tax in our 2017 consolidated financial statements and have not made a policy election regarding whether to record deferred taxes on GILTI or account for the GILTI entirely as a period cost.

### Comprehensive Income / (Loss)

Comprehensive income / (loss) includes all changes in equity during a period except those that resulted from investments by or distributions to the Company's stockholders. Other comprehensive income / (loss) refers to revenues, expenses, gains and losses that are included in comprehensive income / (loss), but excluded from net income / (loss) as these amounts are recorded directly as an adjustment to shareholders' equity. The Company's other comprehensive income / (loss) is comprised of unrealized gains / (losses) on certain holdings of publicly traded equity and debt securities, investments in U.S. treasury and agency securities and actuarial gains / (losses), and foreign currency translation adjustments.

### Earnings Per Share ("EPS")

The Company computes EPS in accordance with ASC Topic 260, "Earnings Per Share" ("ASC 260") and related guidance, which requires two calculations of EPS to be disclosed: basic and diluted. Basic EPS is computed by dividing net (loss) / income by the weighted average ordinary shares outstanding during a period. Diluted EPS is based on the treasury stock method and includes the effect from potential issuance of ordinary shares, such as shares issuable pursuant to the exercise of stock options and restricted stock units. Diluted EPS also includes the impact of ordinary share equivalents to be issued upon the mandatory conversion of the Company's preferred shares. Ordinary share equivalents have been excluded where their inclusion would be anti-dilutive to continuing operations.

F-25

A reconciliation of the numerators and denominators of basic and diluted EPS consisted of the following ($ in millions, except per share amounts):

| | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2015 | |
| **Net (loss) / income:** | | | | | | |
| Net (loss) attributable to ordinary shareholders | | | | | | |
| excluding (loss) / income from discontinued operations, net of tax | $ | (4,001.0) | $ | (1,219.5) | $ | (3,177.8) |
| (Loss) / income from discontinued operations, net of tax | | (402.9) | | 15,914.5 | | 6,861.0 |
| Net (loss) / income attributable to ordinary shareholders | $ | (4,403.9) | $ | 14,695.0 | $ | 3,683.2 |
| **Basic weighted average ordinary shares outstanding** | | 333.8 | | 384.9 | | 367.8 |
| **Basic EPS:** | | | | | | |
| Continuing operations | $ | (11.99) | $ | (3.17) | $ | (8.64) |
| Discontinued operations | $ | (1.20) | $ | 41.35 | $ | 18.65 |
| Net (loss) / income per share | $ | (13.19) | $ | 38.18 | $ | 10.01 |
| Dividends per ordinary share | $ | 2.80 | $ | - | $ | - |
| **Diluted weighted average ordinary shares outstanding** | | 333.8 | | 384.9 | | 367.8 |
| **Diluted EPS:** | | | | | | |
| Continuing operations | $ | (11.99) | $ | (3.17) | $ | (8.64) |
| Discontinued operations | $ | (1.20) | $ | 41.35 | $ | 18.65 |
| Net (loss) / income per share | $ | (13.19) | $ | 38.18 | $ | 10.01 |

Stock awards to purchase 3.8 million, 4.7 million, and 5.2 million ordinary shares for the years ended December 31, 2017, 2016 and 2015, respectively, were outstanding, but not included in the computation of diluted EPS, because the awards were anti-dilutive for continuing operations and as such the treatment for discontinued operations was also anti-dilutive.

The weighted average impact of ordinary share equivalents of 17.8 million, 17.6 million and 13.6 million for years ended December 31, 2017, 2016 and 2015, respectively, which are anticipated to result from the mandatory conversion of the Company's preferred shares were not included in the calculation of diluted EPS as their impact would be anti-dilutive.

### Employee Benefits

#### Defined Contribution Plans

The Company has defined contribution plans that are post-employment benefit plans under which the Company pays fixed contributions to a separate entity and has no legal or constructive obligation to pay further amounts. Obligations for contributions to the defined contribution plans are recognized as an employee benefit expense in the consolidated statement of operations in the periods during which the related services were rendered.

#### Defined Benefit Plans

The Company recognizes the overfunded or underfunded status of each of its defined benefit plans as an asset or liability on its consolidated balance sheets. The obligations are generally measured at the actuarial present value of all benefits attributable to employee service rendered, as provided by the applicable benefit formula. The estimates of the obligation and related expense of these plans recorded in the financial statements are based on certain assumptions. The most significant assumptions relate to discount rate and expected return on plan assets. Other assumptions used may include employee demographic factors such as compensation rate increases, retirement patterns, expected employee turnover and participant mortality rates. The difference between these assumptions and actual experience results in the recognition of an asset or liability based upon a net actuarial (gain) / loss. If the total net actuarial (gain) / loss included in accumulated other comprehensive income / (loss) exceeds a threshold of 10% of the greater of the projected benefit obligation or the market related value of plan assets, it is subject to amortization and recorded as a component of net periodic pension cost over the average remaining service lives of the employees participating in the pension plan. Net periodic benefit costs are recognized in the consolidated statement of operations.

*Share-based Compensation*

The Company has adopted several equity award plans which authorize the granting of options, restricted shares, restricted stock units and other forms of equity awards of the Company's ordinary shares, subject to certain conditions.

The Company grants awards with the following features:

- Time-based vesting restricted stock and restricted stock units awards;

- Performance-based restricted stock unit awards measured to performance-based targets defined by the Company, including, but not limited to, total shareholder return metrics, R&D milestones and EBITDA, as defined by the Company;

- Non-qualified options to purchase outstanding shares; and

- Cash-settled awards recorded as a liability. These cash settled awards are based on pre-established total shareholder returns metrics.

The Company recognizes share-based compensation expense for the granted awards over the applicable vesting period.

### Restructuring Costs

The Company records liabilities for costs associated with exit or disposal activities in the period in which the liability is incurred. In accordance with existing benefit arrangements, employee severance costs are accrued when the restructuring actions are probable and estimable. Costs for one-time termination benefits in which the employee is required to render service until termination in order to receive the benefits are recognized ratably over the future service period. The Company also incurs costs with contract terminations and costs of transferring products as part of restructuring activities. Refer to "NOTE 21 — Business Restructuring Charges" for more information.

### Recent Accounting Pronouncements

In May 2014, the FASB issued Accounting Standards Update No. 2014-09 (Topic 606) "Revenue from Contracts with Customers." Topic 606 supersedes the revenue recognition requirements in Accounting Standards Codification Topic 605, "Revenue Recognition", and requires entities to recognize revenue when they transfer control of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. The Company will adopt Topic 606 as of January 1, 2018, using the modified retrospective transition method applied to those contracts which were not completed as of that date. Upon adoption, the Company will recognize the cumulative effect of adopting this guidance as an adjustment to our opening balance of retained earnings, the impact of which is not significant. Prior periods will not be retrospectively adjusted. The Company has assessed our revenue recognition practices with respect to the agreements for which the Company currently recognizes revenues and has concluded that there is no material impact from the new revenue recognition standard.

Under Topic 606, the Company will apply the practical expedient to recognize the incremental costs of obtaining contracts as an expense when incurred if the amortization period of the assets that the Company otherwise would have recognized is one year or less. These costs will be included in selling, general, and administrative expenses which are consistent with current accounting prior to the adoption of Topic 606. The Company will also elect to use the practical expedient to not adjust the promised amount of consideration for the effects of the time value of money for contracts in which the anticipated period between when the Company transfers the goods or services to the customer and when the customer pays is equal to one year or less.

In January 2016, the FASB issued ASU No. 2016-01, which changes the requirement to require equity securities (including other ownership interests, such as partnerships, unincorporated joint ventures, and limited liability companies) to be measured at fair value with changes in the fair value recognized through net income. This update is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. The adoption of this guidance on January 1, 2018 resulted in a reduction of other comprehensive income, net of tax, of approximately $63.0 million with a corresponding increase to retained earnings.

In February 2016, the FASB issued ASU No. 2016-02, which states that a lessee should recognize the assets and liabilities that arise from leases. This update is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company is evaluating the impact that this pronouncement will have on our financial position and results of operations.

F-27

In June 2016, the FASB issued ASU No. 2016-13, Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments. The ASU is intended to improve financial reporting by requiring timelier recording of credit losses on loans and other financial instruments held by financial institutions and other organizations. The ASU requires the measurement of all expected credit losses for financial assets including trade receivables held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. Financial institutions and other organizations will now use forward-looking information to better inform their credit loss estimates. The ASU is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early application will be permitted for all organizations for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. The Company is evaluating the impact, if any, that this pronouncement will have on our financial position and results of operations.

In October 2016, the FASB issued ASU No. 2016-16, Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory. Current GAAP prohibits the recognition of current and deferred income taxes for an intra-entity asset transfer until the asset has been sold to an outside party. This prohibition on recognition is an exception to the principle of comprehensive recognition of current and deferred income taxes in GAAP. The amendment to the guidance eliminates the exception for an intra-entity transfer of an asset other than inventory and requires an entity to recognize the income tax consequences when the transfer occurs. Two common examples of assets included in the scope of the amendment are intellectual property and property, plant, and equipment. The amendment is effective for annual reporting periods beginning after December 15, 2017, including interim reporting periods within those annual reporting periods. The amendment should be applied on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The adoption of the guidance on January 1, 2018 resulted in an increase to retained earnings of $356.2 million and a corresponding reduction in net tax liabilities.

In January 2017, the FASB issued ASU No. 2017-01, Business Combinations (Topic 805): Clarifying the Definition of a Business. The amendments to the guidance are intended to help companies evaluate whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. When substantially all of the fair value of gross assets acquired is concentrated in a single asset (or a group of similar assets), the assets acquired would not represent a business. This amendment introduces an initial required screening that, if met, eliminates the need for further assessment. To be considered a business, an acquisition would have to include an input and a substantive process that together significantly contribute to the ability to create outputs. To be a business without outputs, there will need to be an organized workforce. The ASU also narrows the definition of the term "outputs" to be consistent with how it is described in Topic 606, Revenue from Contracts with Customers.  These amendments are effective for annual periods beginning after December 15, 2017, including interim periods within those periods. The changes to the definition of a business may result in more acquisitions being accounted for as asset acquisitions.

In January 2017, the FASB issued ASU No. 2017-04, Intangibles - Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment. The amendments to the guidance eliminate Step 2 from the goodwill impairment test. The goodwill impairment test is performed by comparing the fair value of a reporting unit with its carrying amount. An impairment charge should be recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. In addition, income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit should be considered when measuring the goodwill impairment loss, if applicable. These amendments also eliminate the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment. These amendments should be applied on a prospective basis. The nature of and reason for the change in accounting principle should be disclosed upon transition. These amendments are effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The adoption of these amendments are not anticipated to have a material impact on the Company's financial position or results of operations.

In March 2017, the FASB issued ASU No. 2017-07, Compensation — Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost. The amendments to the guidance require that an employer report the service cost component in the same line item or items as other compensation costs arising from services rendered by the pertinent employees during the period. The other components of net benefit cost are required to be presented in the income statement separately from the service cost component and outside a subtotal of income from operations, if one is presented. If a separate line item or items are used to present the other components of net benefit cost, that line item or items must be appropriately described. If a separate line item or items are not used, the line item or items used in the income statement to present the other components of net benefit cost must be disclosed.  In addition, the amendments also allow only the service cost component to be eligible for capitalization when applicable. The amendments are effective for annual periods beginning after December 15, 2017, including interim periods within those annual periods. The Company does not anticipate the standard having a material impact on our financial position and results of operations.

F-28

In March 2017, The FASB issued Accounting Standards Update (ASU) No. 2017-08, Receivables—Nonrefundable Fees and Other Costs (Subtopic 310-20), Premium Amortization on Purchased Callable Debt Securities. The ASU shortens the amortization period for certain callable debt securities held at a premium and requires the premium to be amortized to the earliest call date, but does not require an accounting change for securities held at a discount; the discount continues to be amortized to maturity. The amendments are effective for annual periods beginning after December 15, 2018, including interim periods within those annual periods. Entities are required to apply the amendments on a modified retrospective basis through a cumulative-effect adjustment directly to retained earnings as of the beginning of the period of adoption. The entity is required to provide disclosures about a change in accounting principle in the period of adoption. The Company is evaluating the impact these amendments will have on our financial position and results of operations.

In May 2017, the FASB issued ASU No. 2017-09, Compensation—Stock Compensation (Topic 718) — Scope of Modification Accounting. ASU No. 2017-09 applies to entities that change the terms or conditions of a share-based payment award. The amendments to the guidance in ASU No. 2017-09 include guidance on determining changes to the terms and conditions of share-based payment awards and require an entity to apply modification accounting under Topic 718 unless all of the following conditions are met: (1) the fair value of the modified award is the same as the fair value of the original award immediately before the original award is modified. If the modification does not affect any of the inputs to the valuation technique that the entity uses to value the award, the entity is not required to estimate the value immediately before and after the modification; (2) the vesting conditions of the modified award are the same as the vesting conditions of the original award immediately before the original award is modified; and (3) the classification of the modified award as an equity instrument or a liability instrument is the same as the classification of the original award immediately before the original award is modified. The amendments are effective for annual periods, and interim periods within those annual periods, beginning after December 15, 2017 and should be applied prospectively to an award modified on or after the adoption date. The adoption of these amendments are not anticipated to have a material impact on the Company's financial position or results of operations.

In August 2017, the FASB issued ASU No. 2017-12, Derivatives and Hedging (Topic 815) — Targeted Improvements to Accounting for Hedging Activities. The amendments to the guidance will better align an entity's risk management activities and financial reporting for hedging relationships through changes to both the designation and measurement guidance for qualifying hedging relationships and the presentation of hedge results. To meet that objective, the amendments expand and refine hedge accounting for both nonfinancial and financial risk components and align the recognition and presentation of the effects of the hedging instrument and the hedged item in the financial statements. The amendments also make certain targeted improvements to simplify the application of hedge accounting guidance and ease the administrative burden of hedge documentation requirements and assessing hedge effectiveness. The amendments are effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2018. Early adoption is permitted in any interim period or fiscal years before the effective date of the amendments. For cash flow and net investment hedges existing at the date of adoption, an entity should apply a cumulative-effect adjustment related to eliminating the separate measurement of ineffectiveness to accumulated other comprehensive income with a corresponding adjustment to the opening balance of retained earnings as of the beginning of the fiscal year that an entity adopts the amendments. The amended presentation and disclosure guidance is required only prospectively. The guidance may have an impact on the Company's future financial positions and results of operations.

## NOTE 5 — Business Development

During the year ended December 31, 2015, the Company acquired material assets and businesses. The unaudited pro forma results of the businesses acquired that materially impacted the reported results of the Company are as follows ($ in millions except per share information):

| | Year Ended December 31, 2015 (unaudited) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As reported | | Allergan Acquisition | | Pro Forma | |
| Net revenues | $ | 12,688.1 | $ | 1,523.0 | $ | 14,211.1 |
| Net income attributable to ordinary shareholders | $ | 3,683.2 | $ | 377.7 | $ | 4,060.9 |
| Net income per share | | | | | | |
| Basic | $ | 10.01 | | | $ | 10.32 |
| Diluted | $ | 10.01 | | | $ | 10.32 |

F-29

### 2017 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2017.

### Acquisitions

#### Keller Medical, Inc.

On June 23, 2017, the Company acquired Keller Medical, Inc. ("Keller"), a privately held medical device company and developer of the Keller Funnel® (the "Keller Acquisition"). The Keller Acquisition combines the Keller Funnel®, a surgical device used in conjunction with breast implants, with the Company's leading breast implants business.

#### Zeltiq Aesthetics, Inc.

On April 28, 2017, the Company acquired Zeltiq Aesthetics, Inc. ("Zeltiq") for an acquisition accounting purchase price of $2,405.4 million (the "Zeltiq Acquisition"). Zeltiq was focused on developing and commercializing products utilizing its proprietary controlled-cooling technology platform (Coolsculpting®). The Zeltiq Acquisition combined Zeltiq's body contouring business with the Company's leading portfolio of medical aesthetics.

##### Assets Acquired and Liabilities Assumed at Fair Value

The Zeltiq Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date. As of December 31, 2017, certain amounts relating to the valuation of tax related matters and intangible assets have not been finalized. The finalization of these matters may result in changes to goodwill.

The following table summarizes the preliminary fair values of the assets acquired and liabilities assumed at the acquisition date and reflects purchase accounting adjustments subsequent to the acquisition date ($ in millions):

|  | Preliminary Valuation as of December 31, 2017 |
|---|---|
| Cash and cash equivalents | $ 36.7 |
| Accounts receivable | 47.0 |
| Inventories | 59.3 |
| Property, plant and equipment | 12.4 |
| Intangible assets | 1,185.0 |
| Goodwill | 1,200.6 |
| Other assets | 17.1 |
| Accounts payable and accrued expenses | (93.6) |
| Deferred revenue | (10.6) |
| Deferred taxes, net | (47.2) |
| Other liabilities | (1.3) |
| Net assets acquired | $ 2,405.4 |

##### IPR&D and Intangible Assets

The estimated fair value of the intangible assets, including customer relationships, was determined using the "income approach," which is a valuation technique that provides an estimate of the fair value of an asset based on market participant expectations of the cash flows an asset would generate over its remaining useful life. Some of the more significant assumptions inherent in the development of those asset valuations include the estimated net cash flows for each year for each asset or product (including net revenues, cost of sales, R&D costs, selling and marketing costs, other allocated costs, and working capital/contributory asset charges), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, the assessment of each asset's life cycle, the potential regulatory and commercial success risks, competitive trends impacting the asset and each cash flow stream. This technique is referred to herein as the "IPR&D and Intangible Asset Valuation Technique."

The fair value of the intangible assets acquired in the Zeltiq Acquisition was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for these acquired intangible assets ranged from 10.0% to 11.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the Zeltiq Acquisition was driven by the life-cycle stage of the products and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives using the economic benefit of intangible assets ($ in millions):

| | Amount recognized as of the acquisition date | Weighted average useful lives (years) |
|---|---|---|
| **Definite-lived assets** | | |
| Consumables | $ 985.0 | 6.7 |
| System | 43.0 | 3.7 |
| **Total CMP** | 1,028.0 | |
| Customer Relationships | 157.0 | 6.6 |
| **Total definite-lived assets** | $ 1,185.0 | |

*Goodwill*

Among the reasons the Company acquired Zeltiq and the factors that contributed to the preliminary recognition of goodwill was the expansion of the Company's leading medical aesthetics portfolio. Goodwill from the Zeltiq Acquisition of $954.7 million was assigned to the US Specialized Therapeutic segment and goodwill of $245.9 million was assigned to the International segment and is non-deductible for tax purposes.

*Inventories*

The fair value of inventories acquired included an acquisition accounting fair market value step-up of $22.9 million which was recognized as a component of cost of sales as the inventory acquired was sold to the Company's customers in the year ended December 31, 2017.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

**LifeCell Corporation**

On February 1, 2017, the Company acquired LifeCell Corporation ("LifeCell"), a regenerative medicine company, for an acquisition accounting price of $2,883.1 million (the "LifeCell Acquisition"). The LifeCell Acquisition combines LifeCell's novel, regenerative medicines business, including its high-quality and durable portfolio of dermal matrix products with Allergan's leading portfolio of medical aesthetic products, breast implants and tissue expanders. The LifeCell Acquisition expanded the Company's medical aesthetics portfolio by adding Alloderm® and Strattice®.

*Assets Acquired and Liabilities Assumed at Fair Value*

The LifeCell Acquisition has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

F-31

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date and reflects purchase accounting adjustments subsequent to the acquisition date ($ in millions):

|  | Valuation as of December 31, 2017 |
| --- | --- |
| Cash and cash equivalents | $ 8.7 |
| Accounts receivable | 50.8 |
| Inventories | 175.4 |
| Property, plant and equipment, net | 53.7 |
| Currently marketed products ("CMP") intangible assets | 2,010.0 |
| In-process research and development ("IPR&D") intangible assets | 10.0 |
| Goodwill | 1,449.1 |
| Accounts payable and accrued expenses | (149.6) |
| Deferred tax liabilities, net | (746.2) |
| Other | 21.2 |
| **Net assets acquired** | $ 2,883.1 |

*IPR&D and Intangible Assets*

The fair value of the acquired intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for these acquired intangible assets was 7.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections in the LifeCell Acquisition. The discount rate of the LifeCell Acquisition was driven by the life-cycle stage of the products, the advanced nature of IPR&D projects, and IPR&D assets acquired and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives using the economic benefit of intangible assets ($ in millions):

|  | Amount recognized as of the acquisition date | Weighted average useful lives (years) |
| --- | --- | --- |
| *Definite-lived assets* |  |  |
| Alloderm® | $ 1,385.0 | 6.9 |
| Revolve® | 80.0 | 7.1 |
| Strattice® | 320.0 | 5.1 |
| Artia® | 115.0 | 8.8 |
| Other | 10.0 | 2.8 |
| **Total CMP** | 1,910.0 |  |
| Customer Relationships | 100.0 | 6.3 |
| **Total definite-lived assets** | 2,010.0 |  |
| *In-process research and development* |  |  |
| Other | 10.0 |  |
| **Total IPR&D** | 10.0 |  |
| **Total intangible assets** | $ 2,020.0 |  |

*Goodwill*

Among the reasons the Company acquired LifeCell and the factors that contributed to the recognition of goodwill was the expansion of the Company's leading medical aesthetic portfolio.  Goodwill from the LifeCell Acquisition of $1,449.1 million was assigned to the US Specialized Therapeutic segment and is non-deductible for tax purposes.

F-32

*Inventories*

The fair value of inventories acquired included an acquisition accounting fair market value step-up of $108.4 million which was recognized as a component of cost of sales as the inventory acquired was sold to the Company's customers in the year ended December 31, 2017, excluding currency impact.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

**Licenses and Other Transactions Accounted for as Asset Acquisitions**

*Lyndra, Inc.*

On July 31, 2017, the Company entered into a collaboration, option and license agreement with Lyndra, Inc. ("Lyndra") to develop orally administered ultra-long-acting (once-weekly) products for the treatment of Alzheimer's disease and an additional, unspecified indication. The total upfront payment of $15.0 million was expensed as a component of R&D expense in the year ended December 31, 2017. The future option exercise payments, if any, and any future success based milestones relating to the licensed products of up to $85.0 million will be recorded if the corresponding events become probable.

*Editas Medicine, Inc.*

On March 14, 2017, the Company entered into a strategic alliance and option agreement with Editas Medicine, Inc. ("Editas") for access to early stage, first-in-class eye care programs. Pursuant to the agreement, Allergan made an upfront payment of $90.0 million for the right to license up to five of Editas' gene-editing programs in eye care, including its lead program for Leber Congenital Amaurosis ("LCA"). Under the terms of the agreement, if an option is exercised, Editas is eligible to receive contingent research and development and commercial milestones plus royalties based on net sales. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The total upfront payment of $90.0 million was expensed as a component of R&D expense in the year ended December 31, 2017. The future option exercise payments, if any, and any future success based milestones relating to the licensed products will be recorded if the corresponding events become probable.

*Assembly Biosciences, Inc.*

On January 9, 2017, the Company entered into a licensing agreement with Assembly Biosciences, Inc. ("Assembly") for the worldwide rights to Assembly's microbiome gastrointestinal development programs. Under the terms of the agreement, the Company made an upfront payment to Assembly of $50.0 million for the exclusive, worldwide rights to develop and commercialize certain development compounds. Additionally, Assembly will be eligible to receive success-based development and commercial milestone payments plus royalties based on net sales. The Company and Assembly will generally share development costs through proof-of-concept ("POC") studies, and Allergan will assume all post-POC development costs. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as the lack of certain other inputs and processes that the transaction did not qualify as a business. The total upfront payment of $50.0 million was expensed as a component of R&D expense in the year ended December 31, 2017 and the future success based milestone payments of up to $2,771.0 million, including amounts for additional development programs not committed to as of December 31, 2017, will be recorded if the corresponding events become probable.

*Lysosomal Therapeutics, Inc.*

On January 9, 2017, the Company entered into a definitive agreement for the option to acquire Lysosomal Therapeutics, Inc. ("LTI"). LTI is focused on innovative small-molecule research and development in the field of neurodegeneration, yielding new treatment options for patients with severe neurological diseases. Pursuant to the agreement, Allergan acquired an option right directly from LTI shareholders to acquire LTI for $150.0 million plus future milestone payments following completion of a Phase Ib trial for LTI-291 as well as an upfront research and development payment. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing, as well as the lack of certain other inputs and processes, that the transaction did not qualify as a business. The aggregate upfront payment of $145.0 million was recorded as a component of R&D expense in the year ended December 31, 2017.

F-33

### Other Transactions

#### *Saint Regis Mohawk Tribe*

On September 8, 2017, the Company entered into an agreement with the Saint Regis Mohawk Tribe, under which the Saint Regis Mohawk Tribe obtained the rights to Orange Book-listed patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05%, and the Company was granted exclusive licenses under the patents related to the product. Pursuant to the agreement, the Company paid the Saint Regis Mohawk Tribe an upfront payment of $13.8 million, which was recorded as a component of cost of sales in the year ended December 31, 2017. Additionally, the Saint Regis Mohawk Tribe will be eligible to receive up to $15.0 million in annual royalties starting in 2018, during the period that certain patent claims remain in effect.

#### *2016 Significant Business Developments*

The following are the material transactions that were completed in the year ended December 31, 2016. Refer to "NOTE 7 — Discontinued Operations" for material divestitures that were completed / entered into during the year ended December 31, 2016.

### Acquisitions

#### *Tobira Therapeutics, Inc.*

On November 1, 2016, the Company acquired Tobira Therapeutics, Inc. ("Tobira"), a clinical-stage biopharmaceutical company focused on developing and commercializing therapies for non-alcoholic steatohepatitis ("NASH") and other liver diseases for an acquisition accounting purchase price of $570.1 million, plus contingent consideration of up to $49.84 per share in contingent value rights ("CVR"), or up to $1,101.3 million, that may be payable based on the successful completion of certain development, regulatory and commercial milestones (the "Tobira Acquisition"), of which $303.1 million was paid in the year ended December 31, 2017 for the initiation of Phase III clinical trials. The CVR had an acquisition date fair value of $479.0 million. The Tobira Acquisition added Cenicriviroc, a differentiated, complementary development program for the treatment of the multi-factorial elements of NASH, including inflammation, metabolic syndromes and fibrosis, to Allergan's global gastroenterology R&D pipeline.

#### *Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | December 31, 2016 Preliminary Valuation | Measurement Period Adjustments | December 31, 2017 Final Valuation |
|---|---|---|---|
| Cash and cash equivalents | $ 21.3 | $ - | $ 21.3 |
| IPR&D intangible assets | 1,357.0 | - | 1,357.0 |
| Goodwill | 112.7 | (14.1) | 98.6 |
| Indebtedness | (15.9) | - | (15.9) |
| Contingent consideration | (479.0) | - | (479.0) |
| Deferred tax liabilities, net | (395.9) | 14.1 | (381.8) |
| Other assets and liabilities | (30.1) | - | (30.1) |
| Net assets acquired | $ 570.1 | $ - | $ 570.1 |

#### *IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for IPR&D intangible assets was 11.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the acquisition was driven by the stage of the product and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

F-34

*Goodwill*

Among the reasons the Company acquired Tobira and the factors that contributed to the preliminary recognition of goodwill was the expansion of the Company's pipeline of NASH products. Goodwill from the Tobira Acquisition of $98.6 million was assigned to the US General Medicine segment and is non-deductible for tax purposes.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay the former shareholders of Tobira up to $1,101.3 million, of which $303.1 million was paid in the year ended December 31, 2017, based on the timing of the certain development, regulatory and commercial milestones, if any. The Company estimated the fair value of the contingent consideration to be $479.0 million using a probability weighted average approach that considered the possible outcomes of scenarios related to the specified product.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

**Vitae Pharmaceuticals, Inc.**

On October 25, 2016, the Company acquired Vitae Pharmaceuticals, Inc. ("Vitae"), a clinical-stage biotechnology company, for an acquisition accounting purchase price of $621.4 million (the "Vitae Acquisition"). The Vitae Acquisition expanded Allergan's dermatology product pipeline with the addition of a Phase II orally active RORγt (retinoic acid receptor-related orphan receptor gamma) inhibitor for the potential treatment of psoriasis and other autoimmune disorders. In addition, the Company expanded its pipeline with the acquisition of a Phase II atopic dermatitis drug candidate.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

| | December 31, 2016 Preliminary Valuation | | Measurement Period Adjustments | | December 31, 2017 Final Valuation | |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ | 44.7 | $ | - | $ | 44.7 |
| Marketable securities | | 20.2 | | - | | 20.2 |
| Property, plant and equipment, net | | 5.0 | | - | | 5.0 |
| IPR&D intangible assets | | 686.0 | | - | | 686.0 |
| Assets held for sale | | 22.5 | | - | | 22.5 |
| Goodwill | | 34.4 | | (3.8) | | 30.6 |
| Other assets and liabilities | | (20.7) | | - | | (20.7) |
| Deferred tax liabilities, net | | (170.7) | | 3.8 | | (166.9) |
| **Net assets acquired** | $ | **621.4** | $ | **-** | $ | **621.4** |

*IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for IPR&D intangible assets was 9.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the acquisition was driven by the stage of the product and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

F-35

*Goodwill*

Among the reasons the Company acquired Vitae and the factors that contributed to the preliminary recognition of goodwill was the expansion of the Company's pipeline of dermatology products. Goodwill from the Vitae Acquisition of $30.6 million was assigned to the US Specialized Therapeutic segment and is non-deductible for tax purposes.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

*Assets Held for Sale*

The Company held for sale certain intangible assets acquired as part of the Vitae Acquisition. These assets had an acquisition accounting value of $22.5 million. In the year ended December 31, 2017, the Company sold these assets for $22.5 million.

**ForSight VISION5, Inc.**

On September 23, 2016, the Company acquired ForSight VISION5, Inc. ("ForSight"), a privately held, clinical-stage biotechnology company focused on eye care, in an all cash transaction of approximately $95.0 million (the "ForSight Acquisition"). Under the terms of the ForSight Acquisition, the Company acquired ForSight for an acquisition accounting purchase price of $74.5 million plus the payment of outstanding indebtedness of $14.8 million and other miscellaneous charges. ForSight shareholders are eligible to receive contingent consideration of up to $125.0 million, which had an initial estimated fair value of $79.8 million, relating to commercialization milestones. The Company acquired ForSight for its lead development program, a peri-ocular ring designed for extended drug delivery and reducing elevated intraocular pressure ("IOP") in glaucoma patients.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

| | December 31, 2016 Preliminary Valuation | Measurement Period Adjustments | December 31, 2017 Final Valuation |
|---|---|---|---|
| Cash and cash equivalents | $ 1.0 | $ - | $ 1.0 |
| IPR&D intangible assets | 158.0 | - | 158.0 |
| Goodwill | 51.6 | (1.1) | 50.5 |
| Current liabilities | (14.8) | - | (14.8) |
| Contingent consideration | (79.8) | - | (79.8) |
| Deferred tax liabilities, net | (38.3) | 1.1 | (37.2) |
| Other assets and liabilities | (3.2) | - | (3.2) |
| **Net assets acquired** | $ 74.5 | $ - | $ 74.5 |

*IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for IPR&D intangible assets was 13.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the acquisition was driven by the early stage of the product and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

F-36

*Goodwill*

Among the reasons the Company acquired ForSight and the factors that contributed to the recognition of goodwill was the expansion of the Company's pipeline of eye care products.  Goodwill from the ForSight Acquisition of $50.5 million was assigned to the US Specialized Therapeutics segment and is non-deductible for tax purposes.

*Contingent Consideration*

As part of the acquisition, the Company is required to pay the former shareholders of ForSight up to $125.0 million based on the timing of the first commercial sale, if any.  The Company estimated the fair value of the contingent consideration to be $79.8 million using a probability weighted average approach that considered the possible outcomes of scenarios related to the specified product. In the year ended December 31, 2016, the Company recognized approximately $33.0 million in impairments of the acquired ForSight IPR&D asset as the Company anticipates a delay in potential launch timing, if any.  Offsetting this impairment was a corresponding reduction of acquired contingent consideration of $15.0 million, which reduced overall R&D expenses.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

**Licenses and Asset Acquisitions**

*Motus Therapeutics, Inc.*

On December 15, 2016, the Company acquired Motus Therapeutics, Inc. ("Motus") for an upfront payment of approximately $200.0 million (the "Motus Transaction").  Motus has the worldwide rights to RM-131 (relamorelin), a peptide ghrelin agonist being developed for the treatment of diabetic gastroparesis.  Under the terms of the Motus Transaction, Motus shareholders are eligible to receive contingent consideration in connection with the commercial launch of the product. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the transaction did not qualify as a business. The total upfront net payment of $199.5 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestone will be recorded if the corresponding event becomes probable.

*Chase Pharmaceuticals Corporation*

On November 22, 2016, the Company acquired Chase Pharmaceuticals Corporation ("Chase"), a clinical-stage biopharmaceutical company focused on the development of improved treatments for neurodegenerative disorders including Alzheimer's disease, for an upfront payment of approximately $125.0 million plus potential regulatory and commercial milestones of up to $875.0 million related to Chase's lead compound, CPC-201, and certain backup compounds (the "Chase Transaction"). The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Chase transaction did not qualify as a business. The total upfront net payment of $122.9 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

*AstraZeneca plc License*

On October 2, 2016, the Company entered into a licensing agreement with MedImmune, AstraZeneca plc's ("AstraZeneca") global biologics research and development arm, for the global rights to brazikumab (the "AstraZeneca Transaction"). Brazikumab is an anti-IL-23 monoclonal antibody for the treatment of patients with moderate-to-severe Crohn's disease and is Phase II ready for ulcerative colitis and other conditions treated with anti-IL23 monoclonal antibodies.  Under the terms of the agreement, AstraZeneca received $250.0 million for the exclusive, worldwide license to develop and commercialize brazikumab and is eligible to receive contingent consideration of up to $1.27 billion, as well as tiered royalties on sales of the product. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the transaction did not qualify as a business. The total upfront payment of $250.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

F-37

### RetroSense Therapeutics, LLC

On September 6, 2016, the Company acquired certain assets of RetroSense Therapeutics LLC ("RetroSense"), a private, clinical-stage biotechnology company focused on novel gene therapy approaches to restore vision in patients suffering from blindness (the "RetroSense Transaction"). Under the terms of the RetroSense Transaction, RetroSense received approximately $60.0 million upfront, and is eligible to receive up to $495.0 million in contingent regulatory and commercialization milestone payments related to its lead development program, RST-001, a novel gene therapy for the treatment of retinitis pigmentosa. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the RetroSense Transaction did not qualify as a business. The total upfront net payment of $59.7 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### Akarna Therapeutics, Ltd

On August 26, 2016, the Company acquired Akarna Therapeutics, Ltd ("Akarna"), a biopharmaceutical company developing novel small molecule therapeutics that target inflammatory and fibrotic diseases (the "Akarna Transaction"). Under the terms of the Akarna Transaction, Akarna shareholders received approximately $50.0 million upfront and were eligible to receive contingent development and commercialization milestones of up to $1,015.0 million. The Company concluded based on the stage of development of the assets as well as a lack of certain other inputs and processes that the Akarna Transaction did not qualify as a business. The total upfront net payment of $48.2 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable. In the year ended December 31, 2017, a milestone of $39.6 million, related to the initiation of a clinical study, was expensed as a component of R&D expense.

### Topokine Therapeutics, Inc.

On April 21, 2016, the Company acquired Topokine Therapeutics, Inc. ("Topokine"), a privately held, clinical-stage biotechnology company focused on development stage topical medicines for fat reduction (the "Topokine Transaction"). Under the terms of the Topokine Transaction, Topokine shareholders received an upfront payment of $85.8 million and are eligible to receive contingent development and commercialization milestones of up to $260.0 million for XAF5, a first-in-class topical agent in development for the treatment of steatoblepharon, also known as undereye bags. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Topokine Transaction did not qualify as a business. The total upfront net payment of approximately $85.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

### Heptares Therapeutics Ltd

On April 6, 2016, the Company entered into an agreement with Heptares Therapeutics Ltd. ("Heptares"), under which the Company licensed exclusive global rights to a portfolio of novel subtype-selective muscarinic receptor agonists in development for the treatment of major neurological disorders, including Alzheimer's disease (the "Heptares Transaction"). Under the terms of the Heptares Transaction, Heptares received an upfront payment of $125.0 million and is eligible to receive contingent milestone payments of up to approximately $665.0 million upon the successful Phase I, II and III clinical development and launch of the first three licensed compounds for multiple indications and up to approximately $2.575 billion associated with achieving certain annual sales thresholds during the several years following launch. In addition, Heptares was eligible to receive contingent tiered royalties on net sales of all products resulting from the partnership. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Heptares Transaction did not qualify as a business. The total upfront payment of $125.0 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the events become probable. In the year ended December 31, 2017, a milestone of $15.0 million, related to the initiation of a clinical study, was achieved and expensed as a component of R&D expense.

### Anterios, Inc.

On January 6, 2016, the Company acquired Anterios, Inc. ("Anterios"), a clinical stage biopharmaceutical company developing a next generation delivery system and botulinum toxin-based prescription products ("the Anterios Transaction"). Under the terms of the Anterios Transaction, Anterios shareholders received an upfront net payment of approximately $90.0 million and are eligible to receive contingent development and commercialization milestone payments up to $387.5 million related to an investigational topical formulation of botulinum toxin type A in development for the potential treatment of hyperhidrosis, acne, and crow's feet lines and the related NDS™, Anterios' proprietary platform delivery technology that enables local, targeted delivery of neurotoxins through the skin without the need for injections. The Company concluded based on the stage of development of the assets, the lack of acquired employees as well as certain other inputs and processes that the Anterios Transaction did not qualify as a business. The total upfront

net payment of $89.2 million was expensed as a component of R&D expense in the year ended December 31, 2016 and the future milestones will be recorded if the corresponding events become probable.

F-38

### 2015 Significant Business Developments

The following are the material transactions that were completed in the year ended December 31, 2015.

### Acquisitions

#### AqueSys, Inc.

On October 16, 2015, the Company acquired AqueSys, Inc. ("AqueSys"), a private, clinical-stage medical device company focused on developing ocular implants that reduce IOP associated with glaucoma, in an all-cash transaction (the "AqueSys Acquisition"). Under the terms of the AqueSys Acquisition, the Company acquired AqueSys for an acquisition accounting purchase price of $298.9 million, including $193.5 million for the estimated fair value of contingent consideration relating to the regulatory approval and commercialization milestone payments. The Company acquired AqueSys for the lead development program, including XEN45, a soft shunt that is implanted in the sub conjunctival space in the eye through a minimally invasive procedure with a single use, pre-loaded proprietary injector.

#### Assets Acquired and Liabilities Assumed at Fair Value

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 6.2 |
| Current assets | 1.2 |
| IPR&D intangible assets | 302.0 |
| Intangible assets | 221.0 |
| Goodwill | 138.5 |
| Current liabilities | (6.9) |
| Contingent consideration | (193.5) |
| Deferred tax liabilities, net | (169.6) |
| Net assets acquired | $ 298.9 |

#### IPR&D and Intangible Assets

The fair value of the CMP and IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for CMP and IPR&D intangible assets was 21.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. The discount rate of the acquisition was driven by the early stage of the product and the therapeutic indication. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results. The CMP intangible asset will be amortized over a period of 12.2 years.

#### Goodwill

Goodwill from the AqueSys Acquisition was $138.5 million, of which $50.5 million was assigned to the US Specialized Therapeutic segment and $88.0 million was assigned to the International segment. The goodwill arose in part, due to anticipated efficiencies in marketing the CMP asset in our International and US Specialized Therapeutics segments where we have an established infrastructure.

F-39

### Contingent Consideration

As part of the acquisition, the Company was required to pay the former shareholders of AqueSys amounts based on the launch, labeling, and sales of the product. The Company estimated the acquisition accounting fair value of the contingent consideration to be $193.5 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product. On November 16, 2016, the Company received approval from the United States Food and Drug Administration ("FDA") for XEN45, which triggered a milestone payment of $100.0 million in the year ended December 31, 2016. In the year ended December 31, 2017, the Company made a $25.0 million milestone payment upon first commercial sale of the product.

### Deferred Tax Liabilities

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

### Kythera Biopharmaceuticals, Inc.

On October 1, 2015, the Company acquired Kythera Biopharmaceuticals, Inc. ("Kythera"), for $75.00 per share, or an acquisition accounting purchase price of $2,089.5 million (the "Kythera Acquisition"), which is being accounted for as a business acquisition. Kythera was focused on the discovery, development and commercialization of novel prescription aesthetic products. Kythera's lead product, Kybella® injection, is the first FDA approved, non-surgical treatment for moderate to severe submental fullness, commonly referred to as double chin.

### Assets Acquired and Liabilities Assumed at Fair Value

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 78.1 |
| Marketable securities | 79.9 |
| Inventories | 18.2 |
| Other current assets | 14.5 |
| IPR&D intangible assets | 320.0 |
| Intangible assets | 2,120.0 |
| Goodwill | 328.7 |
| Other current liabilities | (48.6) |
| Deferred tax, net | (766.7) |
| Outstanding indebtedness | (54.6) |
| **Net assets acquired** | $ **2,089.5** |

### IPR&D and Intangible Assets

The fair value of the CMP and IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for CMP was 8.5% and for IPR&D intangible assets was 9.5% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results. The CMP intangible asset will be amortized over a period of 17.3 years.

### Goodwill

Goodwill from the Kythera Acquisition of $208.7 million was assigned to the US Specialized Therapeutics segment and $120.0 million assigned to the International segment. The goodwill arose in part, due to anticipated efficiencies in marketing the CMP asset where we have an established infrastructure and is not deductible for tax purposes.

F-40

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

### Oculeve, Inc.

On August 10, 2015, the Company acquired Oculeve, Inc. ("Oculeve"), a development-stage medical device company focused on developing novel treatments for dry eye disease (the "Oculeve Acquisition"). The Company acquired Oculeve and its lead product TrueTear ™, an intranasal neurostimulation device, as well as other dry eye products in development. Under the terms of the Oculeve Acquisition, Allergan acquired Oculeve for an acquisition accounting purchase price of $134.5 million, including $90.0 million for the estimated fair value of contingent consideration of which the Company may owe up to $300.0 million in future payments. In the year ended December 31, 2017, the Company made a $100.0 million milestone payment as a result of the FDA approval of TrueTear ™.

*Assets Acquired and Liabilities Assumed at Fair Value*

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date ($ in millions):

|  | Amount |
|---|---|
| Cash and cash equivalents | $ 1.6 |
| IPR&D intangible assets | 286.0 |
| Goodwill | 33.3 |
| Other assets and liabilities | (1.9) |
| Contingent consideration | (90.0) |
| Deferred tax liabilities, net | (94.5) |
| **Net assets acquired** | **$ 134.5** |

*IPR&D and Intangible Assets*

The fair value of the IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value for IPR&D intangible assets was 11.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

*Goodwill*

Among the primary reasons the Company acquired Oculeve and factors that contributed to the recognition of goodwill were to expand the Company's pipeline of eye care products. Goodwill from the Oculeve Acquisition of $33.3 million was assigned to the US Specialized Therapeutic segment and is not deductible for tax purposes.

*Contingent Consideration*

As part of the Oculeve Acquisition, the Company is required to pay the former shareholders of Oculeve amounts based on the launch, labeling, and sales of the product. The Company estimated the acquisition accounting fair value of the contingent consideration to be $90.0 million using a probability weighted approach that considered the possible outcomes of the scenarios relating to the specified product. In the year ended December 31, 2017, the Company made a $100.0 million payment for the approval of True Tear™.

*Deferred Tax Liabilities*

Deferred tax liabilities result from identifiable intangible assets' fair value adjustments. These adjustments create excess book basis over tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

10/24/2018                                                     agn-10k_20171231.htm

F-41

### Auden Mckenzie Holdings Limited

On May 29, 2015, the Company acquired Auden Mckenzie Holdings Limited ("Auden"), a company specializing in the development, licensing and marketing of niche generic medicines and proprietary brands in the United Kingdom ("UK") and across Europe for approximately 323.7 million British Pounds, or $495.9 million (the "Auden Acquisition"). The assets and liabilities acquired, as well as the results of operations for the acquired Auden business are part of the assets divested in the Teva Transaction and are included as a component of income from discontinued operations.

### Allergan, Inc.

On March 17, 2015, the Company completed the Allergan Acquisition. The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complemented the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefited from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox®. The transaction also expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

#### Assets Acquired and Liabilities Assumed at Fair Value

The transaction has been accounted for using the acquisition method of accounting. This method requires that assets acquired and liabilities assumed in a business combination be recognized at their fair values as of the acquisition date.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date and reflects purchase accounting adjustments subsequent to the acquisition date ($ in millions):

|                                       |    | Amount     |
|---------------------------------------|----|------------|
| Cash and cash equivalents             | $  | 5,424.5    |
| Accounts receivable                   |    | 948.7      |
| Inventories                           |    | 1,218.6    |
| Other current assets                  |    | 318.8      |
| Property, plant and equipment, net    |    | 1,214.5    |
| Other long-term assets                |    | 196.1      |
| IPR&D intangible assets               |    | 9,700.0    |
| Intangible assets                     |    | 45,050.5   |
| Goodwill                              |    | 27,088.9   |
| Current liabilities                   |    | (1,222.1)  |
| Contingent consideration              |    | (383.7)    |
| Deferred tax liabilities, net         |    | (11,880.1) |
| Other taxes payable                   |    | (111.3)    |
| Other long-term liabilities           |    | (622.0)    |
| Outstanding indebtedness              |    | (2,183.5)  |
| **Net assets acquired**               | $  | **74,757.9** |

#### Consideration

The total consideration for the Allergan Acquisition of $74.8 billion is comprised of the equity value of shares that were outstanding and vested prior to March 17, 2015 of $33.9 billion, the portion of outstanding equity awards deemed to have been earned as of March 17, 2015 of $0.8 billion and cash of $40.1 billion. The portion of outstanding equity awards deemed not to have been earned of $843.1 million as of March 17, 2015 will be expensed over the remaining future vesting period, including $77.2 million,  $151.5 million and $516.2 million in the years ended December 31, 2017, 2016 and 2015, respectively.

#### Inventories

The fair value of inventories acquired included an acquisition accounting fair market value step-up of $923.9 million. In the years ended December 31, 2016 and 2015, the Company recognized $21.6 million and $902.3 million, respectively, as a component of cost of sales as the inventory acquired was sold to the Company's customers.

F-42

*IPR&D and Intangible Assets*

The fair value of the CMP and IPR&D intangible assets was determined using the IPR&D and Intangible Asset Valuation Technique. The discount rate used to arrive at the present value at the acquisition date of CMPs was 10.0% and for IPR&D intangibles ranged from 10.0% to 11.0% to reflect the internal rate of return and incremental commercial uncertainty in the cash flow projections. No assurances can be given that the underlying assumptions used to prepare the discounted cash flow analysis will not change. For these and other reasons, actual results may vary significantly from estimated results.

The following table identifies the summarized amounts recognized and the weighted average useful lives using the economic benefit of intangible assets ($ in millions):

| | Amount recognized as of the acquisition date | Weighted average useful lives (years) |
|---|---|---|
| **Definite-lived assets** | | |
| Restasis® | $ 3,970.0 | 4.0 |
| Refresh® / Optive® | 2,720.0 | 7.6 |
| Other Eye Care Products | 6,690.0 | 4.2 |
| Botox® | 22,600.0 | 8.0 |
| Aczone® | 160.0 | 1.3 |
| Other Skin Products | 820.0 | 5.0 |
| Other Aesthetics | 6,350.0 | 6.0 |
| **Total CMP** | 43,310.0 | 6.7 |
| Trade name | 690.0 | 4.5 |
| Customer relationships | 1,050.5 | 3.4 |
| **Total definite-lived assets** | 45,050.5 | 6.6 |
| **In-process research and development** | | |
| Eye Care | 5,500.0 | |
| Botox® | 810.0 | |
| Aesthetics | 2,270.0 | |
| Other | 1,120.0 | |
| **Total IPR&D** | 9,700.0 | |
| **Total intangible assets** | $ 54,750.5 | |

*Goodwill*

Among the primary reasons the Company acquired Allergan and factors that contributed to the preliminary recognition of goodwill were to expand the Company's product portfolio, and to acquire certain benefits from the Legacy Allergan pipeline and the expectation of certain synergies. The goodwill recognized from the Allergan Acquisition, which includes the increase in the purchase price resulting from the movement in Allergan plc's share price from the date of announcing the deal, until the date of acquisition, is not deductible for tax purposes.

*Contingent Consideration*

The Company acquired certain contingent obligations classified as contingent consideration related to historical business combinations. Additional consideration is conditionally due upon the achievement of certain milestones in respect to the development and commercialization of the products as well as reaching certain sales targets. The Company estimated the fair value of the contingent consideration acquired to be $383.7 million using a probability weighted approach that considered the possible outcomes based on assumptions related to the timing and probability of the product launch date, discount rates matched to the timing of first payment, and probability of success rates and discount adjustments on the related cash flows.

F-43