### Retirement Plans

The Company acquired post-retirement plans as part of the Allergan Acquisition including defined benefit pension plans in the United States and Europe which had a net liability balance of $302.6 million. As of March 17, 2015, the Allergan Inc. defined benefit pension plans had assets with a fair value of $1,042.0 million, which included cash and cash equivalents of $13.6 million, equity securities of $480.1 million, and fixed income securities of $548.3 million. The Company assumed other post-retirement benefit obligations with defined benefits of $60.2 million. In addition, the Company acquired other benefit obligations which had an acquisition date fair value of assets of $117.1 million and an acquisition date fair value of liabilities of $120.0 million. Prior to the Allergan Acquisition, Legacy Allergan froze most of their defined benefit plans. As a result, the company anticipates deminimis service costs in its statement of operations.

### Deferred Tax Liabilities, Net

Deferred tax liabilities, net, result from identifiable intangible assets and inventory fair value adjustments. These adjustments create excess book basis over the tax basis which is tax-effected by the statutory tax rates of applicable jurisdictions.

### Acquisition-Related Expenses

As a result of the acquisition, the Company incurred the following transaction and integration costs for the year of acquisition (year ended December 31, 2015) and the comparable first full year (year ended December 31, 2016) ($ in millions):

| | Years Ended December 31, | |
| | 2016 | 2015 |
| --- | --- | --- |
| **Cost of sales** | | |
| Stock-based compensation acquired for Legacy Allergan employees | $ 9.6 | $ 22.5 |
| Acquisition, integration and restructuring related charges | 18.1 | 14.9 |
| **Research and development** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 43.0 | 124.8 |
| Acquisition, integration and restructuring related charges | 11.8 | 83.5 |
| **Selling and marketing** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 65.3 | 110.0 |
| Acquisition, integration and restructuring related charges | 24.7 | 75.7 |
| **General and administrative** | | |
| Stock-based compensation acquired for Legacy Allergan employees | 33.6 | 258.9 |
| Acquisition, integration and restructuring related charges | 197.4 | 364.1 |
| **Other (expense) / income** | | |
| Bridge loan facilities expense | - | (264.9) |
| Interest rate locks | - | 30.9 |
| **Total transaction and integration costs** | $ 403.5 | $ 1,288.4 |

### Licenses and Asset Acquisitions

#### Mimetogen Pharmaceuticals, Inc.

On November 4, 2015, the Company entered into an exclusive licensing agreement with Mimetogen Pharmaceuticals, Inc. ("Mimetogen"), a clinical stage biotechnology company, to develop and commercialize tavilermide (MIM-D3), a topical formulation of a novel small molecule TrkA agonist for the treatment of dry eye disease, in exchange for an upfront payment of $50.0 million to Mimetogen, which was included as a component of R&D expense in the year ended December 31, 2015 (the "Mimetogen Transaction"). In the year ended December 31, 2017, the Company terminated the Mimetogen Transaction and there are no futher obligations owed by the Company.

#### Almirall, S.A.

On October 27, 2015, the Company and Ironwood Pharmaceuticals, Inc. announced that Allergan acquired rights to Constella® (linaclotide) in the European Union, Switzerland, Turkey and the Commonwealth of Independent States from Almirall, S.A. and also reacquired rights to Linzess® (linaclotide) in Mexico from Almirall, S.A. for €60.0 million. The consideration was accounted for as an asset acquisition and included as a component of intangible assets. The Company concluded based on the lack of acquired employees and the lack of certain other inputs and processes that the transaction did not qualify as a business.

10/24/2018                                                       agn-10k_20171231.htm

F-44

### Naurex, Inc.

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. ("Naurex") in an all-cash transaction of $571.7 million, plus future contingent payments up to $1,150.0 million, which was accounted for as an asset acquisition (the "Naurex Transaction"). The Company recognized the upfront consideration of $571.7 million as a component of R&D expense in the year ended December 31, 2015. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the Naurex Transaction did not qualify as a business. The Naurex Transaction expanded our pipeline with Naurex's two leading product candidates GLYX-13 and NRX-1074, two compounds that utilize NMDA modulation as a potential new approach to the treatment of Major Depressive Disorder, a disease that can lead to suicidality among the most severe patients. As of December 31, 2017, the NRX-1074 development project was terminated. The Company received a purchase price reduction of $20.0 million in the year ended December 31, 2017 based on the settlement of an open contract dispute.

### Migraine License

On August 17, 2015, the Company entered into an agreement with Merck & Co. ("Merck") under which the Company acquired the exclusive worldwide rights to Merck's early development stage investigational small molecule oral calcitonin gene-related peptide receptor antagonists, which are being developed for the treatment and prevention of migraines (the "Merck Transaction"). The Merck Transaction was accounted for as an asset acquisition. The Company acquired these rights for an upfront charge of $250.0 million which was recognized as a component of R&D expense in the year ended December 31, 2015. Additionally, at the time of the transaction, the Company owed contingent payments based on commercial and development milestones of up to $965.0 million as well as potential future royalties. The Company concluded based on the stage of development of the assets, the lack of acquired employees and manufacturing as well as certain other inputs and processes that the Merck Transaction did not qualify as a business. During the year ended December 31, 2016, the Company incurred $100.0 million of milestones under the agreement, which were included as a component of R&D expense.

### Divestitures

#### Respiratory Business

As part of the 2014 acquisition of Forest Laboratories, Inc. Acquisition (the "Forest Acquisition"), we acquired certain assets that comprised Legacy Forest's branded respiratory business in the U.S. and Canada (the "Respiratory Business"). During the year ended December 31, 2014, we held for sale assets of the Respiratory Business of $734.0 million, including allocated goodwill to this unit of $309.1 million. On March 2, 2015, the Company sold the Respiratory Business to AstraZeneca for consideration of $600.0 million upon closing, additional funds to be received for the sale of certain of our inventory to AstraZeneca and low single-digit royalties above a certain revenue threshold. AstraZeneca also paid Allergan an additional $100.0 million and Allergan has agreed to a number of contractual consents and approvals, including certain amendments to the ongoing collaboration agreements between AstraZeneca and Allergan (the "Respiratory Sale"). As a result of the terms of the Respitory Sale, in the year ended December 31, 2015, the Company recognized an incremental charge in cost of sales (including the acquisition accounting fair value mark-up of inventory) relating to inventory that will not be sold to AstraZeneca of $35.3 million. The Company recognized a loss in other (expense) / income, net for the sale of the business of $5.3 million in the year ended December 31, 2015.

### NOTE 6 — Collaborations

The Company has ongoing transactions with other entities through collaboration agreements. The following represent the material collaboration agreements impacting the years ended December 31, 2017, 2016 and 2015.

#### Acquired agreements from the Allergan Acquisition

##### Apollo EndoSurgery, Inc.

On December 2, 2013, Legacy Allergan completed the sale of the obesity intervention business to Apollo Endosurgery, Inc. ("Apollo") for cash consideration of $75.0 million, subject to certain adjustments, and certain additional consideration, including a minority equity interest in Apollo with an estimated fair value of $15.0 million as of the date of the Allergan Acquisition. In the year ended December 31, 2017, the Company recorded an other-than-temporary impairment in the investment in Apollo of $15.0 million.

*LiRIS*

On August 13, 2014, Legacy Allergan completed the acquisition of LiRIS Biomedical, Inc. ("LiRIS"), a clinical-stage specialty pharmaceutical company based in the United States focused on developing a pipeline of innovative treatments for bladder diseases, for an upfront payment of $67.5 million, plus up to an aggregate of $295.0 million in payments contingent upon achieving certain future development milestones and up to an aggregate of $225.0 million in payments contingent upon achieving certain commercial milestones. The Company accounted for the contingent consideration in the Allergan Acquisition with an initial acquisition date fair value of $169.6 million. In the year ended December 31, 2016, the Company recognized approximately $210.0 million of impairments due to clinical data not supporting continuation of the R&D study offset, in part, by a reduction of contingent liability of $186.0 million recorded in R&D. In the year ended December 31, 2017, the Company terminated its collaboration with LiRIS.

### Acquired agreements from the Forest Acquisition

*Trevena*

On May 9, 2013, in connection with entering into an agreement with Trevena, Inc. to acquire the option to license one of Trevena, Inc.'s products (which option has since lapsed), the Company purchased $30.0 million of Trevena preferred stock in a round of private placement financing. Trevena filed an initial public offering ("IPO"), at which time the Company's preferred stock was converted to common stock traded on the NASDAQ stock market. In conjunction with the IPO, the Company purchased an additional $3.0 million of common stock of Trevena. In the year ended December 31, 2017, the Company recorded an other-than-temporary impairment of the Trevena investment of $11.2 million. At December 31, 2017 and 2016, the fair value of the Trevena common stock held by the Company was $5.4 million and $20.0 million, respectively and is included as a component of "investments and other assets".

*Ironwood collaboration agreement*

In September 2007, Forest entered into a collaboration agreement with Ironwood Pharmaceuticals ("Ironwood") to jointly develop and commercialize Linzess® (linaclotide) for the treatment of irritable bowel syndrome with constipation (IBS-C) and chronic idiopathic constipation (CIC). Under the terms of the agreement, the Company shares equally with Ironwood all profits and losses (as defined) from the development and commercialization of Linzess in the U.S. In addition, the Company expanded this agreement to cover the acquired Constella rights internationally.

The agreement included contingent milestone payments as well as a contingent equity investment based on the achievement of specific clinical and commercial milestones. The Company may be obligated to pay up to an additional $100.0 million if certain sales milestones are achieved.

Based on the nature of the arrangement (including its contractual terms), the nature of the payments and applicable guidance, the Company records receipts from and payments to Ironwood in two pools: the "Development pool" which consists of R&D expenses, and the "Commercialization pool," which consists of revenue, cost of sales and other operating expenses. The net payment to or receipt from Ironwood for the Development pool is recorded in R&D expense and the net payment to or receipt from Ironwood for the Commercialization pool is recorded in cost of goods sold.

### Amgen Collaboration

In December 2011, we entered into a collaboration agreement with Amgen Inc. ("Amgen") to develop and commercialize, on a worldwide basis, biosimilar versions of Herceptin®, Avastin®, Rituxan/Mab Thera®, and Erbitux® (the "Amgen Collaboration Agreement"). Amgen has assumed primary responsibility for developing, manufacturing and initially commercializing the oncology antibody products. As of December 31, 2017, the Company will contribute up to $107.2 million in co-development costs over the remaining course of development, including the provision of development support, and will share product development risks. In addition, we will contribute our significant expertise in the commercialization and marketing of products in highly competitive specialty markets, including helping effectively manage the lifecycle of the biosimilar products. The collaboration products are expected to be sold under a joint Amgen/Allergan label. We will initially receive royalties and sales milestones from product revenues. The collaboration will not pursue biosimilars of Amgen's proprietary products. In the year ended December 31, 2017, the FDA approved MVASI ™, a biosimilar of Avastin, for the treatment of five types of cancer. As a result of the approval, the Company can achieve certain commercial and sales based milestones and receive royalties based on the net sales of the product.

F-46

### NOTE 7 — Discontinued Operations

#### *Global Generics Business*

On July 27, 2015, the Company announced that it entered into the Teva Transaction, which closed on August 2, 2016. On October 3, 2016, the Company completed the divestiture of the Anda Distribution business to Teva for $500.0 million. The Company recognized a combined gain on the sale of the Anda Distribution business and the sale of the global generics business of $15,932.2 million.

The Company notes the following reconciliation of the proceeds received in the combined transaction to the gain recognized in income from discontinued operations in 2016 ($ in millions):

| | | |
|---|---|---:|
| Net cash proceeds received | $ | 33,804.2 |
| August 2, 2016 fair value of Teva shares | | 5,038.6 |
| **Total Proceeds** | $ | **38,842.8** |
| Net assets sold to Teva, excluding cash | | (12,487.7) |
| Other comprehensive income disposed | | (1,544.8) |
| Deferral of proceeds relating to additional elements of agreements with Teva | | (299.2) |
| **Pre-tax gain on sale of generics business and Anda Distribution business** | $ | **24,511.1** |
| Income taxes | | (8,578.9) |
| **Net gain on sale of generics business and Anda Distribution business** | $ | **15,932.2** |

In October 2016, pursuant to our agreement with Teva, Teva provided the Company with its proposed estimated adjustment to the closing date working capital balance. The Company disagreed with Teva's proposed adjustment, and, pursuant to our agreement with Teva, each of the Company's and Teva's proposed adjustments were submitted to arbitration to determine the working capital amount in accordance with GAAP as applied by the Company consistent with past practice. Teva initially proposed an adjustment of approximately $1.4 billion and subsequently submitted a revised adjustment of approximately $1.5 billion to the arbitrator. In addition, on October 30, 2017, Teva submitted a Notice of Direct and Third Party Claims seeking indemnification for virtually all of the same items for which Teva sought a proposed adjustment in the Working Capital Arbitration as well as several new items as to which no quantity of damages had been asserted.

On January 31, 2018, Allergan plc and Teva entered into the Agreement. The Agreement provides that the Company will make a one-time payment of $700.0 million to Teva; the Company and Teva will jointly dismiss their working capital dispute arbitration, and the Company and Teva will release all actual or potential claims under the Master Purchase Agreement, dated July 26, 2015, by and between the Company and Teva, that are known as of the date of the Agreement. The Company recorded a pre-tax charge of $466.0 million as a component of other (expense) / income, net from discontinued operations relating to the settlement in the year ended December 31, 2017.

The fair value of Teva Shares owned are recorded within "Marketable securities" on the Company's Consolidated Balance Sheet. The closing August 2, 2016 Teva stock price discounted at a rate of 5.9 percent due to the lack of marketability was used to initially value the shares.

During the year ended December 31, 2017, the Company recorded the following movements in its investment in Teva securities (defined herein as "Teva Share Activity") as follows ($ in millions except per share information):

F-47

| in million except per share amounts | Shares | Cost Basis | Market Price | Discount | Movement in the Value of Marketable Securities | Unrealized Gain / (Loss) as a Component of Other Comprehensive Income | Gain / (Loss) Recognized in Other Income (Expense), Net |
|---|---|---|---|---|---|---|---|
| Teva securities as of December 31, 2016 | 100.3 | $53.39 | $ 36.25 | 5.4% | $ 3,439.2 | $ (1,599.4) | $ – |
| Other-than-temporary impairment recognized at March 31, 2017 | 100.3 | $32.09 | $ 32.09 | 4.9% | $ (378.6) | $ 1,599.4 | $ (1,978.0) |
| Other-than-temporary impairment recognized at September 30, 2017 | 100.3 | $17.60 | $ 17.60 | 0.0% | $ (1,295.5) | $ – | $ (1,295.5) |
| Sales during the twelve months ended December 31, 2017 | (4.4) | n.a. | n.a. | 0.0% | $ (76.7) | $ – | $ 4.2 |
| Other fair value movements in the twelve months ended December 31, 2017 | 95.9 | $17.60 | $ 18.95 | 0.0% | $ 129.3 | $ 129.3 | $ – |
| Teva securities as of and for the twelve months ended December 31, 2017 | 95.9 | $17.60 | $ 18.95 | 0.0% | $ 1,817.7 | $ 129.3 | $ (3,269.3) |

Financial results of the global generics business and the Anda Distribution business are presented as "(Loss) / income from discontinued operations, net of tax" on the Consolidated Statements of Operations for the years ended December 31, 2017, 2016 and 2015.

The following table presents key financial results of the global generics business and the Anda Distribution business included in "(Loss) / income from discontinued operations, net of tax" for the years ended December 31, 2017, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Net revenues | $ – | $ 4,504.3 | $ 8,499.0 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | – | 2,798.3 | 4,847.5 |
| Research and development | – | 269.4 | 422.2 |
| Selling and marketing | – | 352.9 | 706.6 |
| General and administrative | 18.8 | 425.8 | 702.2 |
| Amortization | – | 4.8 | 333.3 |
| Asset sales and impairments, net | 1.2 | – | 62.4 |
| Total operating expenses | 20.0 | 3,851.2 | 7,074.2 |
| Operating (loss) / income | (20.0) | 653.1 | 1,424.8 |
| Other (expense) / income, net | (470.4) | 15,932.2 | (7.1) |
| (Benefit) / provision for income taxes | (87.5) | 670.8 | (5,443.3) |
| (Loss) / income from discontinued operations, net of tax | $ (402.9) | $ 15,914.5 | $ 6,861.0 |

The operating income reflects approximately seven months of operating activity of the Company's former generics business in the year ended December 31, 2016 versus twelve months activity in the year ended December 31, 2015, and approximately nine months of operating activity of the Anda Distribution business in the year ended December 31, 2016 versus twelve months activity in the year ended December 31, 2015. "Other (expense) / income, net" included the gain on sale of the businesses to Teva.

For the year ended December 31, 2015, the Company recorded a deferred tax benefit of $5,738.8 million related to investments in certain subsidiaries. The recognition of this benefit has been reflected in "Income from discontinued operations, net of tax" with the deferred tax asset reflected in non-current "Deferred tax liabilities" on the December 31, 2015 balance sheet as adjusted for activity in the fourth quarter of 2015. For the year ended December 31, 2016, the Company recorded a deferred tax expense of $462.2 million to adjust its deferred tax asset related to investments in certain subsidiaries. The recognition of this expense has been reflected in "Income from discontinued operations, net of tax". Upon the closing of the Teva Transaction, the Company recorded the reversal of the corresponding deferred tax asset of $5,276.6 million against the current income taxes payable in continuing operations.

Depreciation and amortization was ceased upon the determination that the held for sale criteria were met, which were the announcement dates of the Teva Transaction and the divestiture of the Anda Distribution business. The depreciation, amortization and significant operating and investing non-cash items of the discontinued operations were as follows ($ in millions):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
| Depreciation from discontinued operations | $         - | $        2.1 | $         93.7 |
| Amortization from discontinued operations | - | 4.8 | 333.3 |
| Capital expenditures | - | 85.3 | 234.5 |
| Deferred income tax expense | - | 6,038.5 | (5,568.8) |

**NOTE 8 — Share-Based Compensation**

The Company recognizes compensation expense for all share-based compensation awards made to employees and directors based on the fair value of the awards on the date of grant. A summary of the Company's share-based compensation plans is presented below.

*Equity Award Plans*

The Company has adopted several equity award plans which authorize the granting of options, restricted shares, restricted stock units and other forms of equity awards of the Company's ordinary shares, subject to certain conditions.

The Company grants awards with the following features:

- Time-based vesting restricted stock and restricted stock units awards;

- Performance-based restricted stock unit awards measured to performance-based targets defined by the Company, including, but not limited to, total shareholder return metrics, R&D milestones and EBITDA, as defined by the Company;

- Non-qualified options to purchase outstanding shares; and

- Cash-settled awards recorded as a liability. These cash settled awards are based on pre-established total shareholder returns metrics.

Option award plans require options to be granted at the fair market value of the shares underlying the options at the date of the grant and generally become exercisable over periods ranging from three to five years. Each option granted expires ten years from the date of the grant. Restricted stock awards are grants that entitle the holder to ordinary shares, subject to certain terms. Restricted stock unit awards are grants that entitle the holder the right to receive an ordinary share, subject to certain terms. Restricted stock and restricted stock unit awards (both time-based vesting and performance-based vesting) generally have restrictions that lapse over a one to four year vesting period. Restrictions generally lapse for non-employee directors after one year. Certain restricted stock units are performance-based awards issued at a target number with the actual number of ordinary shares issued ranging based on achievement of the performance criteria. All restricted stock and restricted stock units which remain active under the Company's equity award plans are eligible to receive cash dividend equivalent payments upon vesting.

*Fair Value Assumptions*

All restricted stock and restricted stock units (whether time-based vesting or performance-based vesting), are granted and expensed, using the fair value per share on the applicable grant date, over the applicable vesting period. Non-qualified options to purchase ordinary shares are granted to employees at exercise prices per share equal to the closing market price per share on the date of grant. The fair value of non-qualified options is determined on the applicable grant dates using the Black-Scholes method of valuation and that amount is recognized as an expense over the vesting period. Using the Black-Scholes valuation model, the fair value of options is based on the following assumptions:

|  | 2017 Grants | 2016 Grants | 2015 Grants | 2015 Acquired Awards |
|---|---|---|---|---|
| Dividend yield | 1.2% | 0% | 0% | 0% |
| Expected volatility | 27.0% | 27.0% | 26.0 - 29.0% | 26.0 - 27.0% |
| Risk-free interest rate | 2.0-2.3% | 1.3 - 2.4% | 1.9 - 2.1% | 0.1 - 2.1% |
| Expected term (years) | 7.0 | 7.0 - 7.5 | 7.0 - 7.5 | up to 6.9 |

F-49

*Share-Based Compensation Expense*

Share-based compensation expense recognized in the Company's results of operations, including discontinued operations, for the years ended December 31, 2017, 2016 and 2015 was as follows ($ in millions):

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2016 | | 2015 | |
| Equity-based compensation awards | $ | 293.3 | $ | 334.5 | $ | 690.4 |
| Cash-settled awards in connection with the Zeltiq Acquisition | | 31.5 | | - | | - |
| Cash-settled awards in connection with the Tobira Acquisition | | - | | 27.0 | | - |
| Cash-settled awards in connection with the Vitae Acquisition | | - | | 18.6 | | - |
| Cash-settled awards in connection with the ForSight Acquisition | | - | | 3.1 | | - |
| Cash-settled awards in connection with the Allergan Acquisition | | - | | - | | 127.1 |
| Cash-settled awards in connection with the Kythera Acquisition | | - | | - | | 9.6 |
| Non equity-settled awards other | | (16.8) | | - | | 98.6 |
| **Total stock-based compensation expense** | $ | **308.0** | $ | **383.2** | $ | **925.7** |

In the years ended December 31, 2016 and 2015, share-based compensation expense included as discontinued operations was $12.9 million and $36.4 million, respectively.

In the years ended December 31, 2017, 2016, and 2015, the related tax benefits were $105.0 million, $131.8 million and $285.9 million, respectively, relating to share-based compensation.

The "non-equity settled awards other" are cash-settled awards which are fair valued based on a pre-determined total shareholder return metric. The income in "non-equity settled awards other" was due to an actuarial reversal based on the total shareholder return metrics declining in the year ended December 31, 2017 of $16.8 million.

Included in the stock-based compensation awards for the years ended December 31, 2017, 2016 and 2015 is the impact of accelerations and step-ups relating to the acquisition accounting treatment of outstanding awards acquired in the Zeltiq, Allergan, Forest and Kythera Acquisitions ($ in millions)

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2016 | | 2015 | |
| Zeltiq Acquisition | $ | 47.8 | $ | - | $ | - |
| Allergan Acquisition | | 47.1 | | 108.9 | | 314.8 |
| Forest Acquisition | | 10.1 | | 45.2 | | 109.7 |
| Kythera Acquisition | | - | | - | | 64.4 |
| **Total** | $ | **105.0** | $ | **154.1** | $ | **488.9** |

Unrecognized future share-based compensation expense was $404.7 million as of December 31, 2017, including $25.2 million from the Zeltiq Acquisition and $28.7 million from the Allergan acquisition. This amount will be recognized as an expense over a remaining weighted average period of 1.5 years. Share-based compensation is being amortized and charged to operations over the same period as the restrictions are eliminated for the participants, which is generally on a straight-line basis.

F-50

### Share Activity

The following is a summary of equity award activity for unvested restricted stock and stock units in the period from December 31, 2016 through December 31, 2017:

| (in millions, except per share data) | Shares | | Weighted Average Grant Date Fair Value | Weighted Average Remaining Contractual Term (Years) | | Aggregate Grant Date Fair Value |
|---|---|---|---|---|---|---|
| Restricted shares / units outstanding at December 31, 2016 | 1.5 | $ | 251.88 | 1.6 | $ | 388.0 |
| Granted | 1.2 | | 232.18 | | | 278.6 |
| Assumed as part of the Zeltiq Acquisition* | 0.2 | | 213.15 | | | 41.8 |
| Vested | (0.5) | | (238.39) | | | (127.0) |
| Forfeited | (0.4) | | (265.26) | | | (97.3) |
| Restricted shares / units outstanding at December 31, 2017 | 2.0 | $ | 237.72 | 1.8 | $ | 484.1 |

The following is a summary of equity award activity for non-qualified options to purchase ordinary shares in the period from December 31, 2016 through December 31, 2017:

| (in millions, except per share data) | Options | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2016 | 9.0 | $ | 113.77 | 5.9 | $ | 861.7 |
| Granted | 0.3 | | 239.33 | | | |
| Exercised | (1.8) | | (92.71) | | | |
| Cancelled | (0.2) | | (137.80) | | | |
| Outstanding, vested and expected to vest at December 31, 2017 | 7.3 | $ | 120.94 | 5.2 | $ | 312.7 |

### NOTE 9 — Pension and Other Postretirement Benefit Plans

#### Defined Benefit Plan Obligations

The Company has numerous defined benefit plans offered to employees around the world. For these plans, retirement benefits are generally based on an employee's years of service and compensation. Funding requirements are determined on an individual country and plan basis and are subject to local country practices and market circumstances. As of December 31, 2017, a majority of the Company's plans were frozen for future enrollment.

The net periodic benefit (income) cost of the defined benefit plans for continuing operations for the years ended December 31, 2017, 2016 and 2015 was as follows ($ in millions):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | 2015 | |
| Service cost | $ | 5.5 | $ | 5.0 | $ | 5.0 |
| Interest cost | | 40.7 | | 44.5 | | 35.0 |
| Expected Return on plan assets | | (54.5) | | (53.0) | | (46.4) |
| Settlement | | (0.1) | | (1.8) | | (4.3) |
| Net periodic benefit (income) cost | $ | (8.4) | $ | (5.3) | $ | (10.7) |

F-51

*Obligations and Funded Status*

Benefit obligation and asset data for the defined benefit plans for continuing operations, were as follows ($ in millions):

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2016 |
| **Change in Plan Assets** | | | | |
| Fair value of plan assets at beginning of year | $ | 1,093.9 | $ | 1,051.1 |
| Employer contribution | | 15.2 | | 37.4 |
| Return on plan assets | | 117.2 | | 116.8 |
| Benefits paid | | (36.0) | | (32.5) |
| Settlements | | (5.3) | | (47.7) |
| Effects of exchange rate changes and other | | 50.2 | | (31.2) |
| **Fair value of plan assets at end of year** | $ | 1,235.2 | $ | 1,093.9 |

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2016 |
| **Change in Benefit Obligation** | | | | |
| Benefit obligation at beginning of the year | $ | 1,234.1 | $ | 1,188.5 |
| Service cost | | 5.5 | | 5.0 |
| Interest cost | | 40.7 | | 44.5 |
| Actuarial loss / (gain) | | 36.9 | | 108.0 |
| Curtailments | | (8.1) | | - |
| Settlements and other | | (5.3) | | (46.9) |
| Benefits paid | | (36.0) | | (32.5) |
| Effects of exchange rate changes and other | | 62.2 | | (32.5) |
| **Benefit obligation at end of year** | $ | 1,330.0 | $ | 1,234.1 |
| **Funded status at end of year** | $ | (94.8) | $ | (140.2) |

The following table outlines the funded actuarial amounts recognized ($ in millions):

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2016 |
| Noncurrent assets | $ | 21.9 | $ | 9.4 |
| Current liabilities | | (0.8) | | (0.7) |
| Noncurrent liabilities | | (115.9) | | (148.9) |
| | $ | (94.8) | $ | (140.2) |

The underfunding of pension benefits is primarily a function of the different funding incentives that exist outside of the United States. In certain countries, there are no legal requirements or financial incentives provided to companies to pre-fund pension obligations. In these instances, benefit payments are typically paid directly by the Company as they become due.

F-52

*Plan Assets*

Companies are required to use a fair value hierarchy as defined in ASC Topic 820 "Fair Value Measurement," ("ASC 820") which maximizes the use of observable inputs and minimizes the use of unobservable inputs when measuring fair value ("Fair Value Leveling"). There are three levels of inputs used to measure fair value with Level 1 having the highest priority and Level 3 having the lowest:

Level 1 — Quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2 — Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 — Unobservable inputs that are supported by little or no market activity. The Level 3 assets are those whose values are determined using pricing models, discounted cash flow methodologies, or similar techniques with significant unobservable inputs, as well as instruments for which the determination of fair value requires significant judgment or estimation.

If the inputs used to measure the financial assets fall within more than one level described above, the categorization is based on the lowest level input that is significant to the fair value measurement of the instrument.

The fair values of the Company's pension plan assets at December 31, 2017 by asset category are as follows ($ in millions):

| Assets | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| *Investment funds* | | | | | | | | |
| U.S. equities | $ | 33.5 | $ | – | $ | – | $ | 33.5 |
| International equities | | 265.5 | | – | | – | | 265.5 |
| Other equity securities | | 70.5 | | – | | – | | 70.5 |
| **Equity securities** | $ | 369.5 | $ | – | $ | – | $ | 369.5 |
| | | | | | | | | |
| U.S. Treasury bonds | $ | – | $ | 96.9 | $ | – | $ | 96.9 |
| Bonds and bond funds | | – | | 745.7 | | – | | 745.7 |
| Other debt securities | | – | | 21.2 | | – | | 21.2 |
| **Debt securities** | $ | – | $ | 863.8 | $ | – | $ | 863.8 |
| *Other investments* | | | | | | | | |
| Other | | – | | 1.9 | | – | | 1.9 |
| **Total assets** | $ | 369.5 | $ | 865.7 | $ | – | $ | 1,235.2 |

F-53

The fair values of the Company's pension plan assets at December 31, 2016 by asset category are as follows ($ in millions):

| Assets | Quoted Prices in Active Markets for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | | Total | |
|---|---|---|---|---|---|---|---|---|
| *Investment funds* | | | | | | | | |
| U.S. equities | $ | 41.5 | $ | - | $ | - | $ | 41.5 |
| International equities | | 244.4 | | - | | - | | 244.4 |
| Other equity securities | | 87.4 | | - | | - | | 87.4 |
| **Equity securities** | $ | 373.3 | $ | - | $ | - | $ | 373.3 |
| U.S. Treasury bonds | $ | - | $ | 23.6 | $ | - | $ | 23.6 |
| Bonds and bond funds | | - | | 684.8 | | - | | 684.8 |
| Other debt securities | | - | | 8.3 | | - | | 8.3 |
| **Debt securities** | $ | - | $ | 716.7 | $ | - | $ | 716.7 |
| *Other investments* | | | | | | | | |
| Other | | - | | 3.9 | | - | | 3.9 |
| **Total assets** | $ | 373.3 | $ | 720.6 | $ | - | $ | 1,093.9 |

The assets of the pension plan are held in separately administered trusts. The investment guidelines for the Company's pension plans is to create an asset allocation that is expected to deliver a rate of return sufficient to meet the long-term obligation of the plan, given an acceptable level of risk. The target investment portfolio of the Company's continuing operations pension plans is allocated as follows:

| | Target Allocation as of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Bonds | 68.8% | 68.3% |
| Equity securities | 31.2% | 31.5% |
| Other investments | 0.0% | 0.2% |

### *Expected Contributions*

Employer contributions to the pension plan during the year ending December 31, 2018 are expected to be $11.7 million for continuing operations.

### *Expected Benefit Payments*

Total expected benefit payments for the Company's pension plans are as follows ($ in millions):

| | Expected Benefit Payments | |
|---|---|---|
| 2018 | $ | 34.6 |
| 2019 | | 36.7 |
| 2020 | | 38.9 |
| 2021 | | 41.3 |
| 2022 | | 43.4 |
| Thereafter | | 1,135.1 |
| **Total liability** | $ | 1,330.0 |

Expected benefit payments are based on the same assumptions used to measure the benefit obligations and include estimated future employee service. The majority of the payments will be paid from plan assets and not Company assets.

Information for defined benefit plans with an accumulated benefit obligation in excess of plan assets is presented below ($ in millions):

| | Defined Benefit as of December 31, | | | |
| | 2017 | | 2016 | |
|---|---|---|---|---|
| Projected benefit obligations | $ | 1,330.0 | $ | 1,234.1 |
| Accumulated benefit obligations | $ | 1,324.7 | $ | 1,220.1 |
| Plan assets | $ | 1,235.2 | $ | 1,093.9 |

### Amounts Recognized in Other Comprehensive Income / (Loss)

Net (loss) / gain amounts reflect experience differentials primarily relating to differences between expected and actual returns on plan assets as well as the effects of changes in actuarial assumptions. Net loss amounts in excess of certain thresholds are amortized into net pension cost over the average remaining service life of employees. Balances recognized within accumulated other comprehensive income/(loss) excluding the impact of taxes that have not been recognized as components of net periodic benefit costs are as follows ($ in millions):

| | Defined Benefit | |
|---|---|---|
| Balance as of December 31, 2015 | $ | 70.4 |
| Net actuarial loss | | (46.0) |
| Balance as of December 31, 2016 | $ | 24.4 |
| Net actuarial loss | | 33.8 |
| **Balance as of December 31, 2017** | $ | **58.2** |

### Actuarial Assumptions

The weighted average assumptions used to calculate the projected benefit obligations of the Company's defined benefit plans, including assets and liabilities held for sale, are as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Discount rate | 2.9% | 3.3% |
| Salary growth rate | 3.0% | 3.0% |

The weighted average assumptions used to calculate the net periodic benefit cost of the Company's defined benefit plans, including assets and liabilities held for sale, are as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2016 |
| Discount rate | 3.3% | 3.8% |
| Expected rate of return on plan assets | 5.0% | 5.1% |
| Salary growth rate | 3.0% | 3.0% |

In order to select a discount rate for purposes of valuing the plan obligations the Company uses market returns and adjusts them as needed to fit the estimated duration of the plan liabilities.

The expected rate of return represents the average rate of return to be earned on plan assets over the period the benefits included in the benefit obligation are to be paid. In developing the expected rate of return, long-term historical returns data are considered as well as actual returns on the plan assets and other capital markets experience. Using this reference information, the long-term return expectations for each asset category and a weighted average expected return was developed, according to the allocation among those investment categories.

F-55

*Other Post-Employment Benefit Plans*

The Company has post-employment benefit plans. Accumulated benefit obligation for the defined benefit plans, were as follows ($ in millions):

|  | Accumulated Benefit Obligation |
|---|---|
| Accumulated benefit obligation as of December 31, 2015 | $ 50.1 |
| Service cost | 0.3 |
| Interest cost | 2.1 |
| Actuarial charge | 3.6 |
| Benefits paid | (3.4) |
| Accumulated benefit obligation as of December 31, 2016 | $ 52.7 |
| Service cost | - |
| Interest cost | 2.0 |
| Actuarial charge | (5.0) |
| Benefits paid | (2.9) |
| Accumulated benefit obligation as of December 31, 2017 | $ 46.8 |

*Savings Plans*

The Company also maintains certain defined contribution savings plans covering substantially all U.S.-based employees. The Company contributes to the plans based upon the employee contributions. The Company's expense for contributions to these retirement plans for amounts included in continuing operations was $89.1 million, $75.6 million and $26.6 million in the years ended December 31, 2017, 2016 and 2015, respectively. The Company's contributions to these retirement plans for amounts included in income from discontinued operations were $23.6 million in the year ended 2015.

### NOTE 10 — Other Income / (Expense), Net

Other income / (expense), net consisted of the following ($ in millions):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2017 | 2016 | 2015 |
| Teva Share Activity | (3,269.3) | - | - |
| Debt extinguishment costs as part of the debt tender offer | (161.6) | - | - |
| Debt extinguishment other | (27.6) | - | - |
| Other-than-temporary impairments | (26.1) | - | - |
| Dividend income | 85.2 | 68.2 | - |
| Naurex recovery | 20.0 | - | - |
| Forward sale of Teva shares | (62.9) | - | - |
| Pfizer termination fee (Allergan plc only) | - | 150.0 | - |
| Bridge loan commitment fee | - | - | (264.9) |
| Interest rate locks | - | - | 31.0 |
| Other (expense) / income, net | 5.0 | 1.0 | 0.1 |
| Other (expense) / income , net | $ (3,437.3) | $ 219.2 | $ (233.8) |

*Teva Share Activity*

As described in "Note 7 — Discontinued Operations", the Company recognized an other-than-temporary impairment on its investment in Teva securities of $3,273.5 million in the year ended December 31, 2017 as well as other share activity.

F-56

### Debt Extinguishment Costs as Part of the Debt Tender Offer

In the year ended December 31, 2017, the Company repaid $2,843.3 million of senior notes.  As a result of the extinguishment, the Company recognized a loss of $161.6 million, within "Other (expense) / income" for the early tender payment and non-cash write-off of premiums and debt fees related to the repurchased notes, including $170.5 million of a make-whole premium.

### Debt Extinguishment Other

In the year ended December 31, 2017, the Company repaid $750 million of senior notes due in the year ending December 31, 2019.  As a result of the extinguishment, the Company recognized a loss of $27.6 million, within "Other (expense) / income" for the early payment and non-cash write-off of premiums and debt fees related to the repaid notes, including $35.1 million of a make-whole premium.

### Other-than-temporary Impairments

The Company recorded other-than-temporary impairment charges on other equity investments and cost method investments of $26.1 million in the year ended December 31, 2017, respectively.

### Dividend Income

As a result of the Teva Transaction, the Company acquired 100.3 million Teva ordinary shares.  During the years ended December 31, 2017 and 2016, the Company received dividend income of $85.2 million and $68.2 million, respectively.

### Naurex Recovery

On August 28, 2015, the Company acquired certain products in early stage development of Naurex, Inc. ("Naurex") in an all-cash transaction, which was accounted for as an asset acquisition (the "Naurex Transaction").  The Company received a purchase price reduction of $20.0 million in the year ended December 31, 2017 based on the settlement of an open contract dispute.

### Forward Sale of Teva Shares

In the year ended December 31, 2017, the Company recorded a $62.9 million loss on the fair value of the derivative for the forward sale of 25.0 million of Teva securities.  The ASR was settled on January 12, 2018 for $413.3 million.

On February 13, 2018, the Company entered into additional forward sale transactions under which we sold approximately 25.0 million Teva shares.  The value of the shares will be based on the volume weighted average price of Teva shares plus a premium and is expected to settle during the second quarter of 2018. As a result of the transaction, the Company received 80% of the proceeds, or approximately $372.0 million, with the remainder of the proceeds being delivered upon settlement.

### Pfizer Termination Fee

On November 23, 2015, the Company announced that it entered into a definitive merger agreement (the "Pfizer Agreement") under which Pfizer Inc. ("Pfizer"), a global innovative biopharmaceutical company, and Allergan plc would merge in a stock and cash transaction.  On April 6, 2016, the Company announced that its merger agreement with Pfizer was terminated by mutual agreement. In connection with the termination of the merger agreement, Pfizer paid Allergan plc $150.0 million for expenses associated with the transaction which was included as a component of other income during the year ended December 31, 2016.

### Bridge Loan Commitment Fee

During the year ended December 31, 2015, we incurred costs associated with bridge loan commitments with the Allergan Acquisition of $264.9 million.

### Interest Rate Locks

During the year ended December 31, 2015, the Company entered into interest rate locks on a portion of the $21.0 billion of debt issued as part of the Allergan Acquisition. As a result of the interest rate locks, the Company recorded income of $31.0 million.

agn-10k_20171231.htm

F-57

**NOTE 11 — Inventories**

Inventories consist of finished goods held for sale and distribution, raw materials and work-in-process. Inventories are stated at the lower of cost (first-in, first-out method) or market (net realizable value). The Company writes down inventories to net realizable value based on forecasted demand, market conditions or other factors, which may differ from actual results.

Inventories consisted of the following ($ in millions):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Raw materials | $ 326.9 | $ 297.1 |
| Work-in-process | 158.1 | 145.4 |
| Finished goods | 527.8 | 357.7 |
|  | 1,012.8 | 800.2 |
| Less: inventory reserves | 108.3 | 82.2 |
| **Total Inventories** | $ 904.5 | $ 718.0 |

**NOTE 12 — Accounts payable and accrued expenses**

Accounts payable and accrued expenses consisted of the following ($ in millions):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Accrued expenses: |  |  |
| Accrued third-party rebates | $ 1,804.1 | $ 1,595.5 |
| Contractual commitments (including amount due to Teva) | 705.4 | 264.9 |
| Accrued payroll and related benefits | 635.6 | 581.1 |
| Accrued returns | 375.8 | 295.9 |
| Interest payable | 245.9 | 294.2 |
| Royalties payable | 189.2 | 146.6 |
| Accrued pharmaceutical fees | 186.4 | 221.3 |
| Accrued R&D expenditures | 165.9 | 154.0 |
| Accrued severance, retention and other shutdown costs | 132.8 | 86.2 |
| Litigation-related reserves and legal fees | 78.3 | 101.1 |
| Accrued non-provision taxes | 76.5 | 55.0 |
| Current portion of contingent consideration obligations | 56.2 | 511.0 |
| Accrued selling and marketing expenditures | 53.0 | 95.9 |
| Dividends payable | 24.6 | 23.2 |
| Other accrued expenses | 487.2 | 368.2 |
| Total accrued expenses | $ 5,216.9 | $ 4,794.1 |
| Accounts payable | 324.5 | 224.9 |
| **Total accounts payable and accrued expenses** | $ 5,541.4 | $ 5,019.0 |

F-58

10/24/2018                                          agn-10k_20171231.htm

## NOTE 13 — Property, plant and equipment, net

Property, plant and equipment, net consisted of the following as of December 31, 2017 and 2016 ($ in millions):

| | Machinery and Equipment | Research and Laboratory Equipment | Transportation / Other | Land, Buildings and Leasehold Improvements | Construction in Progress | Total |
|---|---|---|---|---|---|---|
| At December 31, 2016 | $ 437.1 | $ 48.8 | $ 381.4 | $ 705.3 | $ 446.1 | $ 2,018.7 |
| Additions | 20.7 | 8.3 | 34.1 | 14.6 | 280.6 | 358.3 |
| Additions due to acquisitions | 14.3 | 0.7 | 18.6 | 31.2 | 1.3 | 66.1 |
| Disposals/transfers/other | 64.8 | (1.2) | 38.1 | 104.1 | (224.3) | (18.5) |
| Assets held for sale | - | - | - | (49.7) | - | (49.7) |
| Currency translation | 8.4 | 2.4 | 3.1 | 9.4 | 3.3 | 26.6 |
| At December 31, 2017 | $ 545.3 | $ 59.0 | $ 475.3 | $ 814.9 | $ 507.0 | $ 2,401.5 |
| **Accumulated depreciation** | | | | | | |
| At December 31, 2016 | $ 148.4 | $ 24.0 | $ 164.5 | $ 70.5 | $ - | $ 407.4 |
| Additions | 61.5 | 7.8 | 65.0 | 37.2 | - | 171.5 |
| Disposals/transfers/impairments/other | 7.2 | 5.3 | - | 18.0 | - | 30.5 |
| Assets held for sale | - | - | - | (0.7) | - | (0.7) |
| Currency translation | 2.2 | 1.4 | 2.9 | 0.9 | - | 7.4 |
| At December 31, 2017 | $ 219.3 | $ 38.5 | $ 232.4 | $ 125.9 | $ - | $ 616.1 |
| **Property, plant and equipment, net** | | | | | | |
| At December 31, 2017 | $ 326.0 | $ 20.5 | $ 242.9 | $ 689.0 | $ 507.0 | $ 1,785.4 |

Depreciation expense for continuing operations was $171.5 million, $153.7 million and $124.6 million in the years ended December 31, 2017, 2016 and 2015, respectively.

## NOTE 14 — Prepaid Expenses, Investments and Other Assets

Prepaid expenses and other current assets consisted of the following ($ in millions):

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Prepaid taxes | $ 690.9 | $ 957.4 |
| Prepaid insurance | 20.9 | 25.7 |
| Royalty receivables | 80.1 | 94.3 |
| Sales and marketing | 31.9 | 42.5 |
| Other | 300.1 | 263.5 |
| Total prepaid expenses and other current assets | $ 1,123.9 | $ 1,383.4 |

F-59

Investments in marketable securities, including those classified in cash and cash equivalents due to the maturity term of the instrument, other investments and other assets consisted of the following ($ in millions):

| | | December 31, 2017 | | December 31, 2016 |
|---|---|---|---|---|
| Marketable securities: | | | | |
| Short-term investments | $ | 2,814.4 | $ | 8,062.3 |
| Teva shares | | 1,817.7 | | 3,439.2 |
| **Total marketable securities** | $ | **4,632.1** | $ | **11,501.5** |
| Investments and other assets: | | | | |
| Legacy Allergan Deferred executive compensation investments | $ | 112.4 | $ | 111.7 |
| Equity method investments | | 11.5 | | 12.8 |
| Cost method investments | | - | | 15.0 |
| Other long-term investments | | 60.8 | | 67.2 |
| Taxes receivable | | 32.1 | | 36.0 |
| Other assets | | 51.1 | | 39.4 |
| **Total investments and other assets** | $ | **267.9** | $ | **282.1** |

As of December 31, 2017, the Company owned 95.9 million Teva ordinary shares, which are subject to changes in value based on the price of Teva shares.  Subsequent to December 31, 2017, the Company has sold an additional 6.3 million Teva ordinary shares for $127.9 million.  As of February 13, 2018, the Company owned approximately 40.0 million Teva ordinary shares.

The Company's marketable securities and other long-term investments are classified as available-for-sale and are recorded at fair value based on quoted market prices using the specific identification method. These investments are classified as either current or non current, as appropriate, in the Company's consolidated balance sheets.

Investments in securities as of December 31, 2017 and 2016 included the following ($ in millions):

| | Investments in Securities as of December 31, 2017: | | | | | |
|---|---|---|---|---|---|---|
| Level 1 | Carrying amount | Unrecognized gain | Unrecognized loss | Estimated fair value | Cash & cash equivalents | Marketable securities |
| Money market funds | $ 1,328.1 | $ - | $ - | $ 1,328.1 | $ 1,328.1 | $ - |
| Investment in Teva ordinary shares | 1,688.0 | 129.3 | - | 1,817.7 | - | 1,817.7 |
| Total | $ 3,016.1 | $ 129.3 | $ - | $ 3,145.8 | $ 1,328.1 | $ 1,817.7 |

| | Carrying amount | Unrecognized gain | Unrecognized loss | Estimated fair value | Cash & cash equivalents | Marketable securities |
|---|---|---|---|---|---|---|
| Level 2 | | | | | | |
| Commercial paper and other | $ 1,248.9 | $ - | $ (0.7) | $ 1,248.2 | $ - | $ 1,248.2 |
| Certificates of deposit | 1,566.2 | - | - | 1,566.2 | - | 1,566.2 |
| Total | $ 2,815.1 | $ - | $ (0.7) | $ 2,814.4 | $ - | $ 2,814.4 |

| | Investments in Securities as of December 31, 2016: | | | | | |
|---|---|---|---|---|---|---|
| Level 1 | Carrying amount | Unrecognized gain | Unrecognized loss | Estimated fair value | Cash & cash equivalents | Marketable securities |
| Money market funds | $ 1,238.9 | $ - | $ - | $ 1,238.9 | $ 1,238.9 | $ - |
| Total | $ 1,238.9 | $ - | $ - | $ 1,238.9 | $ 1,238.9 | $ - |

| | Carrying amount | Unrecognized gain | Unrecognized loss | Estimated fair value | Cash & cash equivalents | Marketable securities |
|---|---|---|---|---|---|---|
| Level 2 | | | | | | |
| Commercial paper and other | $ 3,909.7 | $ 0.2 | $ - | $ 3,909.9 | $ - | $ 3,909.9 |
| Investment in Teva ordinary shares | 5,038.6 | - | (1,599.4) | 3,439.2 | - | 3,439.2 |
| Certificates of deposit | 4,152.4 | - | - | 4,152.4 | - | 4,152.4 |

10/24/2018                                    agn-10k_20171231.htm

| | | | | | | |
|---|---|---|---|---|---|---|
| Total | $ 13,100.7 | $ 0.2 | $ (1,599.4) | $ 11,501.5 | $ - | $ 11,501.5 |

F-60

Fair value is the price that would be received to sell an asset or paid to transfer a liability (an exit price) in an orderly transaction between market participants. Fair values are determined based on Fair Value Leveling.

During the year ended December 31, 2017, the Company transferred the Investment in Teva ordinary shares from Level 2 to Level 1 as the lock-up period on these shares expired.

Marketable securities and investments consist of available-for-sale investments in money market securities, U.S. treasury and agency securities, and equity and debt securities of publicly traded companies for which market prices are readily available. Unrealized gains or losses on marketable securities and investments are recorded in accumulated other comprehensive (loss) / income as of December 31, 2017. Realized gains or losses on marketable securities and investments are recorded in interest income. The Company's marketable securities and other long-term investments are classified as available-for-sale and are recorded at fair value based on quoted market prices using the specific identification method. These investments are classified as either current or non-current, as appropriate, in the Company's consolidated balance sheets. The Company may sell certain of its marketable securities prior to their stated maturities for strategic reasons including, but not limited to, anticipation of credit deterioration and maturity management.

Excluding the Company's investment in Teva securities, the Company generally considers the declines in market value of its marketable securities investment portfolio to be temporary in nature. The Company typically invests in highly-rated securities, and its investment policy generally limits the amount of credit exposure to any one issuer. The Company's policy requires investments to be investment grade with the primary objective of minimizing the potential risk of principal loss. Fair values were determined for each individual security in the investment portfolio.

The movements in long-term investments were as follows ($ in millions):

|  | Equity Method Investments | Cost Method and Other Long-term Investments |
|---|---|---|
| Balance at December 31, 2016 | $ 12.8 | $ 82.2 |
| Additions | - | - |
| Other-than-temporary impairments | - | (26.1) |
| Other | (1.3) | 4.7 |
| Balance at December 31, 2017 | $ 11.5 | $ 60.8 |

### Other Assets

Other assets include security and equipment deposits and long-term receivables.

## NOTE 15 — Goodwill, Product Rights and Other Intangible Assets

### Goodwill

Goodwill for the Company's reporting segments consisted of the following ($ in millions):

|  | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Balance as of December 31, 2016 | $ 18,433.2 | $ 21,426.6 | $ 6,496.3 | $ 46,356.1 |
| Additions through acquisitions | 2,456.0 | - | 245.9 | 2,701.9 |
| Measurement period adjustments | (29.6) | (14.1) | - | (43.7) |
| Held for sale | - | (12.8) | - | (12.8) |
| Foreign exchange and other adjustments | - | - | 861.4 | 861.4 |
| Balance as of December 31, 2017 | $ 20,859.6 | $ 21,399.7 | $ 7,603.6 | $ 49,862.9 |

As of December 31, 2017 and 2016, the gross balance of goodwill, pre-impairments, was $49,880.2 million and $46,373.4 million, respectively.

F-61

agn-10k_20171231.htm

The following items had a significant impact on goodwill in the year ended December 31, 2017:

- An increase in goodwill of $1,449.1 million, including measurement period adjustments, resulting from the LifeCell Acquisition; and

- An increase in goodwill of $1,200.6 million, including measurement period adjustments, resulting from the Zeltiq Acquisition.

### Product Rights and Other Intangible Assets

Product rights and other intangible assets consisted of the following for the years ended December 31, 2017 and 2016 ($ in millions):

| Cost Basis | Balance as of December 31, 2016 | Acquisitions | Impairments | IPR&D to CMP Transfers | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2017 |
|---|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | | |
| Product rights and other intangibles | $ 67,801.4 | $ 3,876.9 | $ - | $ 1,444.0 | $ (34.0) | $ 804.2 | $ 73,892.5 |
| Trade name | 690.0 | - | - | - | - | - | 690.0 |
| **Total definite-lived intangible assets** | $ 68,491.4 | $ 3,876.9 | $ - | $ 1,444.0 | $ (34.0) | $ 804.2 | $ 74,582.5 |
| **Intangibles with indefinite lives:** | | | | | | | |
| IPR&D | $ 8,758.3 | $ 10.0 | $ (1,452.3) | $ (1,444.0) | $ (6.6) | $ 8.7 | $ 5,874.1 |
| **Total indefinite-lived intangible assets** | $ 8,758.3 | $ 10.0 | $ (1,452.3) | $ (1,444.0) | $ (6.6) | $ 8.7 | $ 5,874.1 |
| **Total product rights and other intangibles** | $ 77,249.7 | $ 3,886.9 | $ (1,452.3) | $ - | $ (40.6) | $ 812.9 | $ 80,456.6 |

| Accumulated Amortization | Balance as of December 31, 2016 | Amortization | Impairments | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2017 |
|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | |
| Product rights and other intangibles | $ (14,493.9) | $ (7,119.6) | $ (3,879.1) | $ 24.8 | $ (125.8) | $ (25,593.6) |
| Trade name | (137.2) | (77.5) | - | - | - | (214.7) |
| **Total definite-lived intangible assets** | $ (14,631.1) | $ (7,197.1) | $ (3,879.1) | $ 24.8 | $ (125.8) | $ (25,808.3) |
| **Total product rights and other intangibles** | $ (14,631.1) | $ (7,197.1) | $ (3,879.1) | $ 24.8 | $ (125.8) | $ (25,808.3) |
| **Net Product Rights and Other Intangibles** | $ 62,618.6 | | | | | $ 54,648.3 |

The following items had a significant impact on net product rights and other intangibles in the year ended December 31, 2017:

- The Company acquired $2,020.0 million of intangible assets in connection with the LifeCell Acquisition;

- The Company acquired $1,185.0 million of intangible assets in connection with the Zeltiq Acquisition;

agn-10k_20171231.htm

- The Company reacquired rights on select licensed products promoted in the Company's US General Medicine segment in an aggregate value of $574.0 million.  As part of the rights reacquired, the Company is no longer obligated to pay royalties on the specific products, which increases the Company's segment gross margin percentage;

F-62

- The U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% are invalid.  As a result of our review of all potential scenarios relating to these assets and our assessment of the decreased likelihood of revenue extending through the full patent term of 2024, the Company recognized an impairment of $3,230.0 million related to Restasis® as well as $170.0 million related to other Dry Eye IPR&D assets obtained in the Allergan acquisition;

- The Company impaired the intangible asset, including amounts that were acquired IPR&D as part of the Allergan Acquisition, related to Aczone® by $646.0 million as a result of recent market dynamics, including erosion in the brand acne market, an anticipated decline in the market outlook, and recent generic entrants;

- The Company impaired a CNS IPR&D project obtained as part of the Allergan acquisition by $486.0 million related to an anticipated approval delay due to certain product specifications;

- The Company impaired an IPR&D asset acquired as part of the Warner Chilcott acquisition by $278.0 million, due to a termination of a launch of a women's healthcare project due to a decrease in product demand;

- The Company impaired an IPR&D eye care project obtained as part of the Allergan acquisition by $209.0 million due to an anticipated delay in launch;

- The Company terminated its License, Transfer and Development Agreement for SER-120 (nocturia) with Serenity Pharmaceuticals, LLC. As a result of this termination, the Company recorded an impairment of $140.0 million on the IPR&D intangible asset obtained as part of the Allergan acquisition;

- The Company impaired a women's healthcare IPR&D project by $91.3 million based on the Company's intention to divest the non-strategic asset;

- The Company impaired an IPR&D medical aesthetics project obtained as part of the Allergan acquisition by $29.0 million; and

- The Company reclassified certain intangible assets from IPR&D to CMP primarily related to Juvederm®, Rhofade®, Botox® for forehead lines and TrueTear™ upon approval of the products.

Product rights and other intangible assets consisted of the following for the years ended December 31, 2016 and 2015 ($ in millions):

| Cost Basis | Balance as of December 31, 2015 | Acquisitions | Impairments | IPR&D to CMP Transfers | Disposals/ Held for Sale/ Other | Foreign Currency Translation | Balance as of December 31, 2016 |
|---|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | | |
| Product rights and other intangibles | $ 64,366.0 | $ 43.6 | $ - | $ 3,809.9 | $ (194.6) | $ (223.5) | $ 67,801.4 |
| Trade name | 690 | - | - | - | - | - | 690.0 |
| **Total definite-lived intangible assets** | $ 65,056.0 | $ 43.6 | $ - | $ 3,809.9 | $ (194.6) | $ (223.5) | $ 68,491.4 |
| **Intangibles with indefinite lives:** | | | | | | | |
| IPR&D | $ 11,128.2 | $ 2,223.5 | $ (743.9) | $ (3,809.9) | $ (22.5) | $ (17.1) | $ 8,758.3 |
| **Total indefinite-lived intangible assets** | $ 11,128.2 | $ 2,223.5 | $ (743.9) | $ (3,809.9) | $ (22.5) | $ (17.1) | $ 8,758.3 |
| **Total product rights and other intangibles** | $ 76,184.2 | $ 2,267.1 | $ (743.9) | $ - | $ (217.1) | $ (240.6) | $ 77,249.7 |

| Accumulated Amortization | Balance as of December 31, 2015 | | Amortization | | Impairments | | Disposals/ Held for Sale/ Other | | Foreign Currency Translation | | Balance as of December 31, 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Intangibles with definite lives:** | | | | | | | | | | | | |
| Product rights and other intangibles | $ | (8,288.5) | $ | (6,392.7) | $ | (28.9) | $ | 176.8 | $ | 39.4 | $ | (14,493.9) |
| Trade name | | (59.5) | | (77.7) | | - | | - | | - | | (137.2) |
| **Total definite-lived intangible assets** | $ | (8,348.0) | $ | (6,470.4) | $ | (28.9) | $ | 176.8 | $ | 39.4 | $ | (14,631.1) |
| **Total product rights and other intangibles** | $ | (8,348.0) | $ | (6,470.4) | $ | (28.9) | $ | 176.8 | $ | 39.4 | $ | (14,631.1) |
| **Net Product Rights and Other Intangibles** | $ | 67,836.2 | | | | | | | | | $ | 62,618.6 |

The following items had a significant impact on net product rights and other intangibles in the year ended December 31, 2016:

- The Company acquired $1,357.0 million in IPR&D assets in connection with the Tobira Acquisition;

- The Company acquired $686.0 million in IPR&D assets in connection with the Vitae Acquisition;

- The Company acquired $158.0 million in IPR&D assets in connection with the ForSight Acquisition;

- The Company recognized approximately $210.0 million in impairments relating to a urology product acquired in the Allergan Acquisition due to clinical data not supporting continuation of the R&D study. This impairment was offset, in part, by a reduction of the contingent liability of $186.0 million which reduced overall R&D expenses;

- The Company recognized approximately $106 million in impairments relating to a migraine treatment acquired in the Allergan Acquisition based on a decrease in projected cash flows due to a delay in potential launch;

- The Company recognized approximately $46.0 million in impairments relating to the atopic dermatitis pipeline candidate acquired in the Vitae Acquisition;

- The Company recognized approximately $33.0 million in impairments of the acquired ForSight IPR&D asset as the Company anticipates a delay in potential launch timing. Offsetting this impairment was a corresponding reduction of acquired contingent consideration of $15.0 million, which reduced overall R&D expenses;

- The Company recognized approximately $42.0 million in IPR&D impairments on a gastroenterology project based on the lack of future availability of active pharmaceutical ingredients;

- The Company recognized approximately $190.0 million in IPR&D impairments due to the termination of an osteoarthritis R&D project due to clinical results;

- The Company impaired IPR&D assets relating to an international eye care pipeline project of $35.0 million based on a decrease in projected cash flows due to market conditions;

- The Company impaired IPR&D assets of $40.0 million for a Botox® premature ejaculation product based on a decrease in projected cash flows;

- The Company recognized $24.0 million in IPR&D impairments relating to the termination of a women's healthcare R&D project due to clinical results; and

- The Company reclassified certain intangible assets from IPR&D to CMP primarily related to Restasis®, Belkyra® (Kybella®), XEN45, Optive®,Taytulla™, Aczone®, Juvederm®, Dalvance® and Botox®.

F-64

Assuming no additions, disposals or adjustments are made to the carrying values and/or useful lives of the intangible assets, continuing operations related to annual amortization expense on product rights and other related intangibles as of December 31, 2017 over each of the next five years is estimated to be as follows ($ in millions):

|      | Amortization Expense | |
| --- | --- | --- |
| 2018 | $ | 6,438.3 |
| 2019 | $ | 6,039.4 |
| 2020 | $ | 5,717.4 |
| 2021 | $ | 4,778.2 |
| 2022 | $ | 4,414.8 |

The above amortization expense is an estimate. Actual amounts may change from such estimated amounts due to fluctuations in foreign currency exchange rates, additional intangible asset acquisitions, finalization of preliminary fair value estimates, potential impairments, accelerated amortization or other events.  In addition, the Company has certain currently marketed products for which operating contribution performance has been below that which was originally assumed in the products' initial valuations and IPR&D projects which are subject to delays in timing or other events which may negatively impact the asset's value.  The Company, on a quarterly basis, monitors the related intangible assets for these products for potential impairments.  It is reasonably possible that impairments may occur in future periods, which may have a material adverse effect on the Company's results of operations and financial position.

F-65

10/24/2018                                                                                  agn-10k_20171231.htm

## NOTE 16 — Long-Term Debt and Capital Leases

Debt consisted of the following ($ in millions):

| | Issuance Date / Acquisition Date | Interest Payments | Balance As of | | Fair Market Value As of | |
|---|---|---|---|---|---|---|
| | | | December 31, 2017 | December 31, 2016 | December 31, 2017 | December 31, 2016 |
| **Senior Notes:** | | | | | | |
| *Floating Rate Notes* | | | | | | |
| $500.0 million floating rate notes due March 12, 2018 * | March 4, 2015 | Quarterly | $ 500.0 | $ 500.0 | $ 500.6 | $ 502.5 |
| $500.0 million floating rate notes due March 12, 2020 ** | March 4, 2015 | Quarterly | 500.0 | 500.0 | 508.1 | 509.4 |
| | | | 1,000.0 | 1,000.0 | 1,008.7 | 1,011.9 |
| *Fixed Rate Notes* | | | | | | |
| $1,000.0 million 1.850% notes due March 1, 2017 | March 4, 2015 | Semi-annually | - | 1,000.0 | - | 1,001.1 |
| $500.0 million 1.300% notes due June 15, 2017 | June 10, 2014 | Semi-annually | - | 500.0 | - | 499.7 |
| $1,200.0 million 1.875% notes due October 1, 2017 | October 2, 2012 | Semi-annually | - | 1,200.0 | - | 1,202.5 |
| $3,000.0 million 2.350% notes due March 12, 2018 | March 4, 2015 | Semi-annually | 3,000.0 | 3,000.0 | 3,001.9 | 3,018.0 |
| $250.0 million 1.350% notes due March 15, 2018 | March 17, 2015 | Semi-annually | 250.0 | 250.0 | 249.7 | 248.4 |
| $1,050.0 million 4.375% notes due February 1, 2019 | July 1, 2014 | Semi-annually | - | 1,050.0 | - | 1,090.0 |
| $500.0 million 2.450% notes due June 15, 2019 | June 10, 2014 | Semi-annually | 500.0 | 500.0 | 499.7 | 501.2 |
| $400.0 million 6.125% notes due August 15, 2019 | August 24, 2009 | Semi-annually | - | 400.0 | - | 437.7 |
| $3,500.0 million 3.000% notes due March 12, 2020 | March 4, 2015 | Semi-annually | 3,500.0 | 3,500.0 | 3,528.4 | 3,541.8 |
| $650.0 million 3.375% notes due September 15, 2020 | March 17, 2015 | Semi-annually | 650.0 | 650.0 | 661.3 | 663.6 |
| $750.0 million 4.875% notes due February 15, 2021 | July 1, 2014 | Semi-annually | 450.0 | 750.0 | 474.3 | 803.3 |
| $1,200.0 million 5.000% notes due December 15, 2021 | July 1, 2014 | Semi-annually | 1,200.0 | 1,200.0 | 1,282.6 | 1,297.7 |
| $3,000.0 million 3.450% notes due March 15, 2022 | March 4, 2015 | Semi-annually | 3,000.0 | 3,000.0 | 3,044.5 | 3,030.7 |
| $1,700.0 million 3.250% notes due October 1, 2022 | October 2, 2012 | Semi-annually | 1,700.0 | 1,700.0 | 1,703.0 | 1,693.1 |
| $350.0 million 2.800% notes due March 15, 2023 | March 17, 2015 | Semi-annually | 350.0 | 350.0 | 341.6 | 335.6 |
| $1,200.0 million 3.850% notes due June 15, 2024 | June 10, 2014 | Semi-annually | 1,200.0 | 1,200.0 | 1,232.3 | 1,211.7 |
| $4,000.0 million 3.800% notes due March 15, 2025 | March 4, 2015 | Semi-annually | 4,000.0 | 4,000.0 | 4,067.1 | 3,995.6 |
| $2,500.0 million 4.550% notes due March 15, 2035 | March 4, 2015 | Semi-annually | 2,500.0 | 2,500.0 | 2,631.9 | 2,458.5 |
| $1,000.0 million 4.625% notes due October 1, 2042 | October 2, 2012 | Semi-annually | 456.7 | 1,000.0 | 471.2 | 967.6 |
| $1,500.0 million 4.850% notes due June 15, 2044 | June 10, 2014 | Semi-annually | 1,500.0 | 1,500.0 | 1,606.2 | 1,496.4 |
| $2,500.0 million 4.750% notes due March 15, 2045 | March 4, 2015 | Semi-annually | 1,200.0 | 2,500.0 | 1,277.3 | 2,466.9 |
| | | | 25,456.7 | 31,750.0 | 26,073.0 | 31,961.1 |
| **Euro Denominated Notes** | | | | | | |
| €750.0 million 0.500% notes due June 1, 2021 | May 26, 2017 | Annually | 900.4 | - | 895.8 | - |
| €700.0 million 1.250% notes due June 1, 2024 | May 26, 2017 | Annually | 840.4 | - | 831.1 | - |
| €550.0 million 2.125% notes due June 1, 2029 | May 26, 2017 | Annually | 660.3 | - | 657.8 | - |
| €700.0 million floating rate notes due June 1, 2019*** | May 26, 2017 | Quarterly | 840.4 | - | 837.2 | - |
| | | | 3,241.5 | - | 3,221.9 | - |
| **Total Senior Notes Gross** | | | 29,698.2 | 32,750.0 | 30,303.6 | 32,973.0 |
| Unamortized premium | | | 88.9 | 171.2 | | |
| Unamortized discount | | | (81.7) | (95.8) | | |
| **Total Senior Notes Net** | | | 29,705.4 | 32,825.4 | 30,303.6 | 32,973.0 |
| **Other Indebtedness** | | | | | | |
| Debt Issuance Costs | | | (121.5) | (144.6) | | |
| Margin Loan | | | 459.0 | - | | |
| Other | | | 29.7 | 85.5 | | |
| **Total Other Borrowings** | | | 367.2 | (59.1) | | |
| **Capital Leases** | | | 2.7 | 2.4 | | |
| **Total Indebtedness** | | | $ 30,075.3 | $ 32,768.7 | | |

\*    Interest on the 2018 floating rate note is three month USD LIBOR plus 1.080% per annum

\*\*    Interest on the 2020 floating rate note is three month USD LIBOR plus 1.255% per annum

\*\*\*    Interest on the €700.0 million floating rate notes is the three month EURIBOR plus 0.350% per annum

Fair market value in the table above is determined in accordance with Accounting Standards Codification ("ASC") Topic 820 "Fair Value Measurement" ("ASC 820") under Level 2 based upon quoted prices for similar items in active markets.

F-66

### Senior Notes

#### Borrowings

##### *Euro Denominated Notes*

On May 26, 2017, Allergan Funding SCS, a limited partnership (société en commandite simple) organized under the laws of the Grand Duchy of Luxembourg and an indirect wholly-owned subsidiary of Allergan plc, issued the euro denominated notes. The notes are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital S.a.r.l. ("Allergan Capital"), and by Allergan Finance, LLC, a subsidiary of Allergan Capital, on an unsecured and unsubordinated basis.

These notes were issued to fund, in part, the payment of the tender offers described below.

#### Floating Rate Notes

On March 4, 2015, Allergan Funding SCS, issued floating rate notes which are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital, and by Allergan Finance LLC on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

The previously outstanding 2016 floating rate notes were paid in full at maturity on September 1, 2016 and bore interest at the three-month LIBOR plus 0.875%.

#### Fixed Rate Notes

##### *Acquired Allergan Notes*

On March 17, 2015 in connection with the Allergan Acquisition, the Company acquired, and subsequently guaranteed, along with Warner Chilcott Limited, the indebtedness of Allergan, Inc., including $800.0 million 5.750% senior notes due and redeemed in 2016 not shown in the table above. The fair value of the acquired senior notes was determined to be $2,087.5 million as of March 17, 2015. As such, as part of acquisition accounting, the Company recorded a premium of $37.5 million to be amortized as contra interest over the life of the notes.

The notes acquired in the Allergan Acquisition are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption.

##### *2015 Notes Issuance*

On March 4, 2015, Allergan Funding SCS, issued indebetedness, in part, to fund the Allergan Acquisition. The notes are fully and unconditionally guaranteed by Allergan Funding SCS's indirect parents, Warner Chilcott Limited and Allergan Capital, and by Allergan Finance LLC on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

##### *Acquired Forest Notes*

On July 1, 2014 in connection with the Forest acquisition, the Company acquired the indebtedness of Forest. As a result of acquisition accounting, the notes were fair valued with a premium of $260.3 million as of July 1, 2014, which will be amortized as contra-interest over the life of the notes. The guarantor of the debt is Allergan plc.

##### *2014 Notes Issuance*

On June 10, 2014, Allergan Funding SCS issued indebtedness, in part, to fund the Forest Acquisition. The guarantors of the debt are Warner Chilcott Limited, Allergan Capital, and Allergan Finance, LLC.

##### *2012 Notes Issuance*

On October 2, 2012, Allergan Finance, LLC issued indebtedness which were used for the acquisition of the Actavis Group. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

F-67

*2009 Notes Issuance*

On August 24, 2009, Allergan Finance, LLC issued senior notes which were used to repay certain debt with the remaining net proceeds being used to fund a portion of the cash consideration for the Arrow Group acquisition. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

**Credit Facility Indebtedness**

On August 2, 2016, the Company repaid the remaining balances of all outstanding term-loan indebtedness and terminated its then existing revolving credit facility with proceeds from the Teva Transaction. The interest expense on the then-outstanding indebtedness in the years ended December 31, 2016 and 2015 was $116.2 million and $147.3 million, respectively.

*Margin Loan*

On November 10, 2017, Allergan W.C. Holding Inc., Allergan Finance, LLC and Allergan Holding B1 Inc. and JP Morgan Chase Bank executed a margin loan agreement for an aggregate principal amount not exceeding $550.0 million which was available as a single draw from the signing date to December 22, 2017 (the "Loan" or "Margin Loan Agreement"). In Q4 2017, the Company drew down $525.0 million and repaid $66.0 million. The remaining portion of this outstanding indebtedness is due in the year ending December 31, 2018. The outstanding indebtedness under this facility at any time is collateralized by the Company's investment in Teva securities.

*Revolving Credit Facility*

On June 14, 2017, Allergan plc and certain of its subsidiaries entered into a revolving credit and guaranty agreement (the "Revolver Agreement") among Allergan Capital, as borrower, Allergan plc, as Ultimate Parent; Warner Chilcott Limited, Allergan Finance LLC, and Allergan Funding SCS, as guarantors; the lenders from time to time party thereto (the "Revolving Lenders"); J.P. Morgan Chase Bank as Administrative Agent; J.P. Morgan Europe Limited, as London Agent; and the other financial institutions party thereto. Under the Revolver Agreement, the Revolving Lenders have committed to provide an unsecured five-year revolving credit facility in an aggregate principal amount of up to $1.5 billion, with the ability to increase the revolving credit facility by $500.0 million to an aggregate principal amount of up to $2.0 billion.

The Revolver Agreement provides that loans thereunder would bear interest, at our choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 2.00% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, the Company pays an unused commitment fee varying from 0.070% to 0.250% per annum, depending on the Debt Rating, of the unused portion of the revolver.

The obligations under the Revolver Agreement are guaranteed by Warner Chilcott Limited, Allergan Finance, LLC and Allergan Funding SCS.

The Revolver Agreement contains customary affirmative covenants for facilities of this type, including, among others, covenants pertaining to the delivery of financial statements, notices of default, maintenance of corporate existence and compliance with laws, as well as customary negative covenants for facilities of this type, including, among others, limitations on secured indebtedness, non-guarantor subsidiary indebtedness, mergers and certain other fundamental changes and passive holding company status. The Revolver Agreement also contains a financial covenant requiring maintenance of a maximum consolidated leverage ratio.

In addition, the Revolver Agreement also contains customary events of default (with customary grace periods and materiality thresholds).

The Company was subject to, and as of December 31, 2017 was in compliance with all, financial and operational covenants under the terms of the Revolver Agreement. At December 31, 2017, there were $28.6 million of outstanding borrowings or letters of credit outstanding under the Revolver Agreement.

*Cash Bridge Loan Facility*

On April 9, 2015, the Company repaid the outstanding balance under a 60-day senior unsecured bridge credit facility, of which $2.8 billion was drawn to finance the Allergan Acquisition.

agn-10k_20171231.htm

**2017 Repayments**

The Company redeemed all senior notes during the year ended December 31, 2017 that matured within that period.

*Tender Offer*

On May 30, 2017, the Company's wholly owned subsidiaries Allergan Funding SCS, Allergan Finance LLC, Forest Laboratories, LLC and Allergan, Inc., each as co-offeror with Warner Chilcott Limited, completed the repurchase of certain debt securities issued by the entities for cash under a previously announced tender offer. As a result of the offering, the Company repurchased $300.0 million of the $750.0 million 4.875% notes due February 15, 2021, $543.3 million of the $1,000.0 million 4.625% notes due October 1, 2042, $700.0 million of the $1,050.0 million 4.375% notes due February 1, 2019, and $1,300.0 million of the $2,500.0 million 4.750% notes due March 15, 2045. The Company paid a total of $3,013.8 million, which included an early tender penalty to repurchase the notes of $170.5 million in cash. The Company recognized a net expense of $161.6 million within "Other (expense) / income" for the early tender payment and non-cash write-off of premiums and debt fees related to the repurchased notes.

*Other Prepayments*

On November 30, 2017, the Company repaid its $400.0 million 6.125% notes due August 15, 2019 in full. The Company paid a total of $426.8 million, which included an early tender payment, to repurchase the notes of $26.8 million in cash, which was recognized as a component of "Other (expense) / income".

On December 13, 2017, the Company repaid its remaining $350.0 million obligation under its 4.375% notes due February 1, 2019. The Company recognized a deminimis net P&L charge as a result of the debt termination.

*Annual Debt Maturities*

As of December 31, 2017, annual debt maturities were as follows ($ in millions):

|  | Total Payments |
| --- | --- |
| 2018 | $            3,750.0 |
| 2019 | 1,340.4 |
| 2020 | 4,650.0 |
| 2021 | 2,550.4 |
| 2022 | 4,700.0 |
| 2023 and after | 12,707.4 |
| Total senior notes gross | $          29,698.2 |
| Capital leases | 2.7 |
| Debt issuance costs | (121.5) |
| Other short-term borrowings | 488.7 |
| Unamortized premium | 88.9 |
| Unamortized discount | (81.7) |
| **Total Indebtedness** | $          30,075.3 |

Amounts represent total anticipated cash payments assuming scheduled repayments.

F-69

*Lease Commitments*

The Company has operating leases for certain facilities and equipment. The terms of the operating leases for the Company's facility leases may require the Company to pay property taxes, normal maintenance expense and maintain minimum insurance coverage. Total rental expense for operating leases for the years ended December 31, 2016, 2016, and 2015 was $72.0 million, $47.7 million and $49.9 million, respectively. The Company also has deminimis capital leases for certain facilities and equipment. The future minimum lease payments under both capital and operating leases that have remaining terms in excess of one year are ($ in millions):

|  | Total Payments |
|---|---|
| 2018 | $ 53.5 |
| 2019 | 59.1 |
| 2020 | 46.5 |
| 2021 | 44.9 |
| 2022 | 42.9 |
| Thereafter | 206.1 |
| Total minimum lease payments | $ 453.0 |

The Company has entered into certain sub-lease agreements which will offset future lease commitments.

## NOTE 17 — Other Long-Term Liabilities

Other long-term liabilities consisted of the following ($ in millions):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Acquisition related contingent consideration liabilities | $ 420.7 | $ 661.1 |
| Long-term pension and post retirement liability | 162.7 | 201.6 |
| Legacy Allergan deferred executive compensation | 113.8 | 111.7 |
| Long-term severance and restructuring liabilities | 53.1 | 22.0 |
| Deferred revenue | 37.9 | 15.7 |
| Product warranties | 28.7 | 28.1 |
| Long-term contractual obligations | 45.2 | 25.3 |
| Other long-term liabilities | 24.8 | 19.5 |
| **Total other long-term liabilities** | $ 886.9 | $ 1,085.0 |

## NOTE 18 — Income Taxes

The TCJA makes significant changes to the U.S. taxation of our domestic and international operations. Our 2017 consolidated financial statements reflect a provisional estimate of the impacts of the TCJA, as changes in tax law should be accounted for in the period of enactment. The TCJA enacted many significant changes including, but not limited to:

- A mandatory deemed repatriation tax on the accumulated, untaxed post-1986 earnings and profits of certain non-U.S. subsidiaries ("toll charge"), payable over eight years;

- A decrease in the U.S. Federal Corporate income tax rate from 35% to 21% beginning in years after December 31, 2017;

- An additional U.S. tax on the earnings of certain non-U.S. subsidiaries which are considered Global Intangible Low Taxed Income ("GILTI") at a tax rate of 10.5% for tax years beginning after December 31, 2017 (increasing to 13.125% for tax years beginning after December 31, 2025) with a partial offset for foreign tax credits;

- A limitation on the deduction of interest expense to 30% of adjusted taxable income (EBITDA equivalent) for our U.S. subsidiaries for years beginning after December 31, 2017; and

- The introduction of a 5% (10% post 2018) minimum tax referred to as the "Base Erosion Anti-Abuse Tax" which requires our U.S. subsidiaries to determine taxable income without regard to tax deductions for payments to affiliates beginning in years after December 31, 2017.

F-70

As part of the enactment of the TCJA, the Company recorded in the fourth quarter of 2017 a provisional deferred tax benefit of $2,340.4 million related to the change in Federal Corporate tax rates applicable to our deferred tax liabilities, and $1,260.0 million related to the net reversal of prior amounts accrued for taxes on unremitted earnings of certain subsidiaries. The Company also recorded a provisional income tax expense of $728.1 million related to the tax on the deemed repatriation of the deferred foreign earnings of certain non-U.S. subsidiaries (toll charge). The toll charge is payable over eight years and therefore we recorded $58.2 million in current and $669.8 million in non-current tax liabilities.

The provisional estimates recorded in the 2017 consolidated financial statements are based on all available information and the Company's initial analysis and current interpretation of the legislation under the TCJA as of the time of the filing of the Company's Form 10-K. These estimates represent amounts for which our accounting is incomplete, but a reasonable estimate could be determined. Given the complexity of the TCJA, the proximity of the enactment date to the Company's year end, anticipated guidance from the U.S. Treasury, and the potential for additional guidance from the Securities and Exchange Commission or the Financial Accounting Standards Board, the amounts recorded in the December 31, 2017 consolidated financial statements related to the TCJA are provisional in nature and may be adjusted during 2018. Recent Securities and Exchange Commission ("SEC") guidance provides for a measurement period for up to one year from the enactment date of the TCJA for which adjustments to provisional amounts may be recorded as a component of tax expense or benefit in the period the adjustment is determined.

The Company recorded a provisional tax expense for its toll charge based on a reasonable estimate of the tax due on the mandatory deemed repatriation of untaxed post-1986 Earnings and Profits ("E&P") of certain non-U.S. subsidiaries. Calculating this liability involved the consideration of multiple impacting factors. Those factors include estimating the December 31, 2017 ending E&P balances of certain of the Company's non-U.S. subsidiaries, determining which portion of that E&P was held in cash and non-cash equivalents or other assets at different prescribed measurement dates, reviewing and confirming non- U.S. taxes that would have been previously paid on those earnings, estimating other U.S. income inclusions to be considered in the E&P balances and assessing the potential impact of currently recorded uncertain tax positions. The estimated nature of these factors and their potentially significant impact on the toll charge led to the liability being recorded as a provisional amount. The final toll charge liability amount cannot be determined until the 2018 financial results of certain non-U.S. subsidiaries are finalized, the review of historical E&P and related tax data is complete and all current and future guidance from the IRS, U.S. Treasury, SEC or FASB is issued and evaluated.

The Company recorded a provisional deferred tax benefit related to the net reversal of prior amounts accrued for taxes on unremitted earnings of certain non-U.S. subsidiaries. The Company had a previously recorded deferred tax liability balance for non-U.S. earnings that were not permanently reinvested. As a result of the TCJA and specifically the accrual of mandatory tax on the deemed repatriation of the same non-U.S. earnings (toll charge), the previously recorded deferred tax liability was no longer necessary and was reversed in the fourth quarter of 2017. Additionally, a deferred tax liability was recorded for the estimated taxes that would become due on the repatriation of those earnings. The calculation of this deferred tax liability is dependent on the finalization of the December 31, 2017 ending E&P balances of certain subsidiaries.

The Company recorded a provisional deferred tax benefit related to the change in Federal Corporate income tax rate applicable to our deferred tax liabilities. We remeasured the net deferred tax liabilities based on the rates at which they are expected to reverse in the future, which is generally 21%. However, we are still analyzing certain aspects of the TCJA and refining our calculations, which could potentially affect the remeasurement of these balances or potentially give rise to new deferred tax amounts. The Company also recognizes that some of these balances are based on reasonable estimates and assumptions and could be adjusted as a result of refining our estimates upon the filing of the 2017 U.S. Federal income tax return.

Due to the complexity of the new GILTI tax rules, we are continuing to evaluate this provision of the TCJA and the application of ASC 740 and are considering if deferred tax amounts should be recorded for this provision. Our accounting policies depend, in part, on analyzing our global income to determine whether we expect material tax liabilities resulting from the application of this provision, and, if so, whether and when to record related current and deferred income taxes and whether such amounts can be reasonably estimated. Anticipated further guidance from the IRS will also clarify the manner in which the GILTI tax is computed. For these reasons, we have not recorded a deferred tax expense or benefit relating to potential GILTI tax in our 2017 consolidated financial statements and have not made a policy election regarding whether to record deferred taxes on GILTI or account for the GILTI entirely as a period cost.

For the years ended December 31, 2017, 2016 and 2015, foreign losses before taxes were $9,247.4 million, $1,502.8 million and $4,291.7 million, respectively.

F-71

The Company's (benefit)/provision for income taxes consisted of the following ($ in millions):

| | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Current (benefit) / provision: | | | |
| U.S. federal | $ 763.1 | $ (17.5) | $ 14.4 |
| U.S. state | (54.8) | - | 9.7 |
| Non-U.S. | 410.0 | 166.2 | 225.6 |
| Total current (benefit) / provision | 1,118.3 | 148.7 | 249.7 |
| Deferred (benefit) / provision: | | | |
| U.S. federal | (6,911.9) | (1,218.5) | (1,370.2) |
| U.S. state | (252.3) | (132.1) | (58.7) |
| Non-U.S. | (624.5) | (695.1) | (426.7) |
| Total deferred (benefit) / provision | (7,788.7) | (2,045.7) | (1,855.6) |
| Total (benefit) / provision for income taxes | $ (6,670.4) | $ (1,897.0) | $ (1,605.9) |

The reconciliations for the years ended December 31, 2017, 2016 and 2015 between the statutory Irish income tax rate for Allergan plc and the effective income tax rates were as follows:

| | Allergan plc | | |
| | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Statutory rate | (12.5)% | (12.5)% | (12.5)% |
| Earnings subject to U.S. taxes [1][2] | (17.8)% | (37.5)% | (18.6)% |
| Earnings subject to rates different than the statutory rate [1][2] | 2.5% | (18.3)% | (2.2)% |
| Impact of tax reform [3] | (27.2)% | 0.0% | 0.0% |
| Tax reserves and audit outcomes | 0.4% | (0.7)% | 0.3% |
| Non-deductible expenses | 0.2% | 3.1% | 1.3% |
| Impact of acquisitions and reorganizations [4] | (9.3)% | 3.1% | 4.0% |
| Tax credits and U.S. manufacturing deduction | (1.5)% | (3.1)% | (0.5)% |
| Rate changes [5] | (1.2)% | (7.4)% | 0.0% |
| Valuation allowances [6] | 2.2% | 6.5% | (6.5)% |
| Other | 0.0% | (0.2)% | (0.6)% |
| Effective income tax rate | (64.2)% | (67.0)% | (35.3)% |

(1)  The benefit to the 2017 effective tax rate was lower as compared to 2016 due to proportionately fewer losses in jurisdictions with tax rates higher than the Irish statutory rate.

(2)  In 2017, the Company recorded amortization expense of $7.20 billion and impairment charges of $8.65 billion, including Teva Share Activity. A significant portion of these amounts were incurred in jurisdictions with tax rates higher than the Irish statutory rate resulting in a net $1,262.2 million favorable impact on the 2017 effective tax rate.

(3)  As part of the enactment of the TCJA, the Company recorded a provisional net deferred tax benefit of $2.8 billion related to the change in tax rates applicable to our deferred tax liabilities, the net reversal of amounts previously accrued for taxes on unremitted earnings of certain non-U.S. subsidiaries and the tax on the deemed repatriation of the Deferred Foreign Earnings of certain non-U.S. subsidiaries (toll charge). These provisional amounts will be finalized in 2018 or upon the finalization of the 2018 financial results.

(4)  In 2017, the Company recorded a tax benefit of $895.3 million for deferred taxes related to basis differences in investments expected to reverse at tax rates different than were initially recorded. This resulted in a more favorable impact on the effective tax rate as compared to 2016.

(5)  As a result of changes in tax rates applied to the Company's deferred tax liabilities in France and U.S. states, the Company recorded a benefit of $128.1 million.

10/24/2018                                        agn-10k_20171231.htm

F-72

(6)   In 2017, the Company recorded a valuation allowance of $230.1 million related to capital losses and foreign tax credit carryforwards not expected to be realized. The amount was mostly offset by benefits recorded in 2017 for these capital losses and foreign tax credits.

The reconciliations for the years ended December 31, 2017, 2016 and 2015 between the statutory Bermuda income tax rate for Warner Chilcott Limited and the effective income tax rates were as follows:

| | Warner Chilcott Limited [1] | | |
| | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Statutory rate | 0.0% | 0.0% | 0.0% |
| Earnings subject to U.S. taxes | (27.9)% | (58.4)% | (29.5)% |
| Earnings subject to rates different than the statutory rate | (0.4)% | (11.9)% | (5.0)% |
| Impact of tax reform | (27.7)% | 0.0% | 0.0% |
| Tax reserves and audit outcomes | 0.5% | (0.7)% | 0.3% |
| Non-deductible expenses | 0.2% | 3.2% | 1.3% |
| Impact of acquisitions and reorganizations | (9.5)% | 3.2% | 4.1% |
| Tax credits and U.S. manufacturing deduction | (1.5)% | (3.2)% | (0.5)% |
| Rate changes | (1.3)% | (7.6)% | 0.0% |
| Valuation allowances | 2.3% | 6.7% | (6.7)% |
| Other | (0.2)% | (0.1)% | (0.4)% |
| Effective income tax rate | (65.5)% | (68.8)% | (36.4)% |

(1)   The rate reconciliation for Bermuda is largely consistent with the Irish effective tax rate reconciliations presented above.

Deferred tax assets and liabilities are measured based on the difference between the financial statement and tax basis of assets and liabilities at the applicable tax rates. The significant components of the Company's net deferred tax assets and liabilities consisted of the following (in millions):

| | Years Ended December 31, | | | |
| | 2017 | | 2016 | |
|---|---|---|---|---|
| Benefits from net operating and capital losses and tax credit carryforwards | $ | 1,005.3 | $ | 702.0 |
| Differences in financial statement and tax accounting for: | | | | |
| Inventories, receivables and accruals | | 263.5 | | 433.6 |
| Basis differences in investments | | 1,088.7 | | - |
| Share-based and other compensation | | 315.4 | | 530.1 |
| Other | | 20.4 | | 64.0 |
| Total deferred tax asset, gross | $ | 2,693.3 | $ | 1,729.7 |
| Less: Valuation allowance | | (403.8) | | (183.9) |
| Total deferred tax asset, net | $ | 2,289.5 | $ | 1,545.8 |
| Differences in financial statement and tax accounting for: | | | | |
| Property, equipment and intangible assets | | (7,519.1) | | (12,419.6) |
| Outside basis differences | | (731.4) | | (1,793.7) |
| Other | | (72.3) | | (68.3) |
| Total deferred tax liabilities | $ | (8,322.8) | $ | (14,281.6) |
| Total deferred taxes | $ | (6,033.3) | $ | (12,735.8) |

During the years ended December 31, 2017 and 2016, respectively, the Company recorded deferred tax liabilities of approximately $799.4 million and $604.9 million related to acquired entities.

During the year ended December 31, 2017, the Company's net deferred tax liability decreased by $6,702.5 million. This was predominately the result of intangible amortization and impairments and the provisional impact of the TCJA.

F-73

The Company had the following carryforward tax attributes at December 31, 2017:

- $824.4 million of U.S. federal net operating losses ("NOL") and other tax attributes which begin to expire in 2019;
- $368.3 million of U.S. tax credits which begin to expire in 2018;
- $3,205.0 million of U.S. state NOLs which begin to expire in 2018;
- $27.4 million non-U.S. NOLs which begin to expire in 2018 and $1,910.4 million non-U.S. NOLs which are not subject to expiration.

Net operating loss and tax credit carryforwards of $824.4 million and $253.4 million, respectively, are subject to an annual limitation under Internal Revenue Code Section 382. The U.S. state NOLs increased by $2,146.0 million due to the expected utilization of previously unrecognized state loss carryforwards as a result of the TCJA. This was fully offset by a corresponding increase in the deferred tax liabilities for unremitted earnings.

During the year ended December 31, 2017, the Company established a valuation allowance of $230.1 million related to U.S. foreign tax credit carryforwards and capital losses. As of December 31, 2017, a valuation allowance balance of $403.8 million is recorded due to the uncertainty of realizing tax credits ($223.3 million), net operating losses ($118.7 million), capital loss carryforwards ($58.2 million) and other deferred tax assets ($3.6 million).

At December 31, 2017, Allergan plc (the Irish parent) is permanently reinvested in $9,358.1 million of earnings of its non-Irish subsidiaries and therefore has not provided deferred income taxes on these undistributed earnings. These amounts are intended to be indefinitely reinvested in non-Irish operations and would not be subject to significant taxes if amounts were distributed to Allergan plc.

The Company has previously recorded deferred tax liabilities for specific pre-acquisition earnings of certain subsidiaries owned by entities incorporated in the U.S. As a result of the TCJA, these previously recorded deferred tax liabilities were no longer necessary and were reversed in the fourth quarter of 2017. Provisionally, the Company has recorded deferred tax liabilities of $345.5 million related to earnings of subsidiaries owned by entities incorporated in the U.S. This deferred tax liability represents the provisional estimated tax cost of a full repatriation of these earnings. The U.S. subsidiaries of Allergan plc are no longer permanently reinvested in the earnings of their non-U.S. subsidiaries as the provisions of the TCJA will allow these earnings to be remitted to the U.S. without any significant incremental tax cost. The calculation of the deferred tax liability is dependent on the finalization of the E&P balances of certain subsidiaries.

### Accounting for Uncertainty in Income Taxes

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows (in millions):

|                                             | Years Ended December 31,             |           |           |
|---------------------------------------------|----------|-----------|-----------|
|                                             | 2017     | 2016      | 2015      |
| Balance at the beginning of the year        | $  811.2 | $  781.7  | $  712.2  |
| Increases for current year tax positions    | 10.1     | 100.7     | 41.2      |
| Increases for prior year tax positions      | 69.2     | 40.5      | 19.7      |
| Increases due to acquisitions               | 19.8     | 0.0       | 115.5     |
| Decreases for prior year tax positions      | (38.7)   | (77.9)    | (41.4)    |
| Settlements                                 | (21.7)   | (30.8)    | (60.6)    |
| Lapse of applicable statute of limitations  | (2.9)    | (2.9)     | (3.2)     |
| Foreign exchange                            | 3.3      | (0.1)     | (1.7)     |
| Balance at the end of the year              | $  850.3 | $  811.2  | $  781.7  |

If these benefits were subsequently recognized, $754.0 million would favorably impact the Company's effective tax rate.

The Company's continuing policy is to recognize interest and penalties related to uncertain tax positions in tax expense. During the years ended December 31, 2017, 2016 and 2015, the company recognized approximately $45.8 million, $2.0 million and $(0.5) million in interest and penalties, respectively. At December 31, 2017, 2016 and 2015, the Company had accrued $113.7 million (net of tax benefit of $25.9 million), $65.3 million (net of tax benefit of $35.4 million) and $63.3 million (net of tax benefit of $34.2 million) of interest and penalties related to uncertain tax positions, respectively. Although the company cannot determine the impact with

F-74

certainty based on specific factors, it is reasonably possible that the unrecognized tax benefits may change by up to approximately $150.0 million within the next twelve months due to the resolution of certain tax examinations.

The Company conducts business globally and, as a result, it files federal, state and foreign tax returns. The Company strives to resolve open matters with each tax authority at the examination level and could reach agreement with a tax authority at any time. While the Company has accrued for amounts it believes are in accordance with the accounting standard, the final outcome with a tax authority may result in a tax liability that is more or less than that reflected in the consolidated financial statements. Furthermore, the Company may later decide to challenge any assessments, if made, and may exercise its right to appeal. The uncertain tax positions are reviewed quarterly and adjusted as events occur that affect potential liabilities for additional taxes, such as lapsing of applicable statutes of limitations, proposed assessments by tax authorities, negotiations with tax authorities, identification of new issues and issuance of new legislation, regulations or case law.

The Company has several concurrent audits open and pending with the Internal Revenue Service ("IRS") as set forth below:

| IRS Audits | Taxable Years |
|---|---|
| Allergan W.C. Holding Inc. f/k/a Actavis W.C. Holding Inc. | 2013 and 2014 |
| Warner Chilcott Corporation | 2010, 2011, 2012 and 2013 |
| Forest Laboratories, Inc. | 2010, 2011, 2012, 2013 and 2014 |
| Allergan, Inc. | 2009, 2010, 2011, 2012, 2013, 2014 and 3/7/2015 |
| LifeCell Corporation | 2014 |

## NOTE 19 — Shareholders' Equity

### *Share Repurchase Program*

On September 25, 2017, the Company's Board of Directors approved a $2.0 billion share repurchase program.  As of December 31, 2017, the Company has repurchased $450.0 million, or 2.6 million shares under the program.

During the year ended December 31, 2016, the Company's Board of Directors approved a $5.0 billion share repurchase program which was completed in October 2016.  Additionally, the Company's Board of Directors approved a $10.0 billion accelerated share repurchase ("ASR") program, which was initiated in November 2016.  In the year ended December 31, 2017, the Company completed the ASR.  As a result of the ASR, the Company repurchased 4.2 million and 61.6 million ordinary shares in the years ended December 31, 2017 and 2016, respectively.

### *Quarterly Dividend*

During the year ended December 31, 2017 the Company paid a quarterly cash dividend of $0.70 per share for holders of the Company's ordinary shares in March, June, September and December of 2017.  The total amount paid in the year ended December 31, 2017 was $939.8 million.  The Company also announced that its Board of Directors has approved an increase to its quarterly cash dividend for 2018 to $0.72 per ordinary share.

### *Preferred Shares*

On February 24, 2015, the Company completed an offering of 5,060,000 of our 5.500% mandatorily convertible preferred shares, Series A, par value $0.0001 per share (the "Mandatory Convertible Preferred Shares").  Dividends on the Mandatory Convertible Preferred Shares will be payable on a cumulative basis when, as and if declared by our board of directors, or an authorized committee thereof, at an annual rate of 5.500% on the liquidation preference of $1,000.00 per Mandatory Convertible Preferred Share.  The Company may pay declared dividends in cash, by delivery of our ordinary shares or by delivery of any combination of cash and our ordinary shares, as determined by us in our sole discretion, subject to certain limitations, on March 1, June 1, September 1 and December 1 of each year commencing June 1, 2015, to and including March 1, 2018.  The net proceeds from the Mandatory Convertible Preferred Share issuance of $4,929.7 million were used to fund the Allergan Acquisition.

Each Mandatory Convertible Preferred Share will automatically convert on March 1, 2018, into between 2.8345 and 3.4722 ordinary shares, subject to anti-dilution adjustments, including adjustments related to our new quarterly dividend.  The number of our ordinary shares issuable on conversion of the Mandatory Convertible Preferred Shares will be determined based on the volume weighted average price per ordinary share over the 20 consecutive trading day period beginning on and including the 22nd scheduled trading day immediately preceding March 1, 2018, the mandatory conversion date.  At any time prior to March 1, 2018, other than during a

10/24/2018                                agn-10k_20171231.htm

F-75

fundamental change conversion period as defined, holders of the Mandatory Convertible Preferred Shares may elect to convert each Mandatory Convertible Preferred Share into our ordinary shares at the minimum conversion rate of 2.8345 ordinary shares per Mandatory Convertible Preferred Share, subject to anti-dilution adjustments. In addition, holders may elect to convert any Mandatory Convertible Preferred Shares during a specified period beginning on the fundamental change effective date, in which case such Mandatory Convertible Preferred Shares will be converted into our ordinary shares at the fundamental change conversion rate and converting holders will also be entitled to receive a fundamental change dividend make-whole amount and accumulated dividend amount.

In the year ended December 31, 2017, 2016 and 2015, the Company paid $278.4 million, $278.4 million and $208.1 million of dividends on preferred shares, respectively. Each preferred share will automatically convert to ordinary shares on March 1, 2018.

### *2015 Ordinary Shares Offering*

On March 2, 2015, in connection with the Allergan Acquisition, the Company issued 14,513,889 of its ordinary shares for an actual public offering price of $288.00 per share. The net proceeds of $4,071.1 million were used, in part, to finance the Allergan Acquisition.

### *Accumulated Other Comprehensive Income / (Loss)*

For most of the Company's international operations, the local currency has been determined to be the functional currency. The results of its non-U.S. dollar based operations are translated to U.S. dollars at the average exchange rates during the period. Assets and liabilities are translated at the rate of exchange prevailing on the balance sheet date. Equity is translated at the prevailing rate of exchange at the date of the equity transaction. Translation adjustments are reflected in shareholders' equity and are included as a component of other comprehensive income / (loss). The effects of converting non-functional currency assets and liabilities into the functional currency are recorded as transaction gains / (losses) in general and administrative expenses in the consolidated statements of operations.

Unrealized gain / (losses) net of tax primarily represent experience differentials and other actuarial charges related to the Company's defined benefit plans as well as the mark-to-market impact of our holdings in Teva securities. The movements in accumulated other comprehensive income / (loss) for the years ended December, 2017 and 2016 were as follows ($ in millions):

| | Foreign Currency Translation Items | Unrealized gain / (loss) net of tax | Total Accumulated Other Comprehensive Income / (Loss) |
|---|---|---|---|
| **Balance as of December 31, 2015** | $ (564.3) | $ 70.2 | $ (494.1) |
| Other comprehensive gain / (loss) before reclassifications into general and administrative | (441.6) | (48.1) | (489.7) |
| Impact of Teva Transaction | 1,540.6 | 4.2 | 1,544.8 |
| Investment in Teva ordinary shares fair value movement | - | (1,599.4) | (1,599.4) |
| Total other comprehensive income / (loss) | 1,099.0 | (1,643.3) | (544.3) |
| **Balance as of December 31, 2016** | $ 534.7 | $ (1,573.1) | $ (1,038.4) |
| Other comprehensive gain / (loss) before reclassifications into general and administrative | 1,248.0 | 111.7 | 1,359.7 |
| Net impact of other-than-temporary loss on investment in Teva securities | - | 1,599.4 | 1,599.4 |
| Total other comprehensive income / (loss) | 1,248.0 | 1,711.1 | 2,959.1 |
| **Balance as of December 31, 2017** | $ 1,782.7 | $ 138.0 | $ 1,920.7 |

As of December 31, 2017, amounts included $75.0 million related to the Company's pension and other post retirement plans, which was included in unrealized gain / (loss) net of tax. The remaining $63.0 million will be subject to the implementation of ASU No. 2016-01 and reclassified into Retained Earnings as a result of the implementation.

### NOTE 20 — Segments

The Company's businesses are organized into the following segments: US Specialized Therapeutics, US General Medicine and International. In addition, certain revenues and shared costs, and the results of corporate initiatives, are managed outside of the three segments.

F-76

The operating segments are organized as follows:

- The US Specialized Therapeutics segment includes sales and expenses relating to branded products within the U.S., including Medical Aesthetics, Medical Dermatology, Eye Care and Neuroscience and Urology therapeutic products.

- The US General Medicine segment includes sales and expenses relating to branded products within the U.S. that do not fall into the US Specialized Therapeutics business units, including Central Nervous System, Gastrointestinal, Women's Health, Anti-Infectives and Diversified Brands.

- The International segment includes sales and expenses relating to products sold outside the U.S.

The Company evaluates segment performance based on segment contribution. Segment contribution for our segments represents net revenues less cost of sales (defined below), selling and marketing expenses, and select general and administrative expenses. Included in segment revenues for 2015 and 2016 are product sales that were sold through the Anda Distribution business once the Anda Distribution business had sold the product to a third-party customer. These sales are included in segment results and are reclassified into revenues from discontinued operations through a reduction of Corporate revenues which eliminates the sales made by the Anda Distribution business through October 3, 2016 from results of continuing operations.  Cost of sales for these products in discontinued operations is equal to our average third party cost of sales for third party branded products distributed by Anda Distribution. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales, selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, acquisition and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Total assets including capital expenditures.

- Other select revenues and operating expenses including R&D expenses, amortization, In-process Reseach and Development ("IPR&D") impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

The Company defines segment net revenues as product sales and other revenue derived from branded products or licensing agreements.

Cost of sales within segment contribution includes standard production and packaging costs for the products we manufacture, third party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements and finished goods inventory reserve charges.  Cost of sales included within segment contribution does not include non-standard production costs, such as non-finished goods inventory obsolescence charges, manufacturing variances and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation and settlement costs and professional services costs which are general in nature and attributable to the segment.

F-77

Segment net revenues, segment operating expenses and segment contribution information consisted of the following for the years ended December 31, 2017, 2016 and 2015 ($ in millions):

| | Year Ended December 31, 2017 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 6,803.6 | $ 5,796.2 | $ 3,319.5 | $ 15,919.3 |
| Operating expenses: | | | | |
| Cost of sales(1) | 495.4 | 843.9 | 478.7 | 1,818.0 |
| Selling and marketing | 1,369.5 | 1,084.1 | 913.8 | 3,367.4 |
| General and administrative | 208.2 | 177.3 | 120.6 | 506.1 |
| Segment contribution | $ 4,730.5 | $ 3,690.9 | $ 1,806.4 | $ 10,227.8 |
| Contribution margin | 69.5% | 63.7% | 54.4% | 64.2% |
| Corporate | | | | 1,471.8 |
| Research and development | | | | 2,100.1 |
| Amortization | | | | 7,197.1 |
| In-process research and development impairments | | | | 1,452.3 |
| Asset sales and impairments, net | | | | 3,927.7 |
| Operating (loss) | | | | $ (5,921.2) |
| Operating margin | | | | (37.2)% |

(1)  Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

| | Year Ended December 31, 2016 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 5,811.7 | $ 5,923.9 | $ 2,881.3 | $ 14,616.9 |
| Operating expenses: | | | | |
| Cost of sales(1) | 290.9 | 879.8 | 418.2 | 1,588.9 |
| Selling and marketing | 1,137.0 | 1,185.7 | 788.2 | 3,110.9 |
| General and administrative | 174.2 | 174.9 | 117.2 | 466.3 |
| Segment contribution | $ 4,209.6 | $ 3,683.5 | $ 1,557.7 | $ 9,450.8 |
| Contribution margin | 72.4% | 62.2% | 54.1% | 64.7% |
| Corporate | | | | 1,481.3 |
| Research and development | | | | 2,575.7 |
| Amortization | | | | 6,470.4 |
| In-process research and development impairments | | | | 743.9 |
| Asset sales and impairments, net | | | | 5.0 |
| Operating (loss) | | | | $ (1,825.5) |
| Operating margin | | | | (12.5)% |

(1)  Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

F-78

| | Year Ended December 31, 2015 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 4,309.8 | $ 6,338.4 | $ 2,187.3 | $ 12,835.5 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 235.8 | 909.5 | 350.9 | 1,496.2 |
| Selling and marketing | 772.8 | 1,194.7 | 569.2 | 2,536.7 |
| General and administrative | 68.3 | 105.3 | 107.6 | 281.2 |
| Segment contribution | $ 3,232.9 | $ 4,128.9 | $ 1,159.6 | $ 8,521.4 |
| Contribution margin | 75.0% | 65.1% | 53.0% | 66.4% |
| Corporate | | | | 3,066.6 |
| Research and development | | | | 2,358.5 |
| Amortization | | | | 5,443.7 |
| In-process research and development impairments | | | | 511.6 |
| Asset sales and impairments, net | | | | 272.0 |
| Operating (loss) | | | | $ (3,131.0) |
| Operating margin | | | | (24.4)% |

(1)   Excludes amortization and impairment of acquired intangibles including product rights, as well as indirect cost of sales not attributable to segment results.

The following is a reconciliation of net revenues for the operating segments to the Company's net revenues for the years ended December 31, 2017, 2016 and 2015 ($ in millions):

| | Years Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Segment net revenues | $ 15,919.3 | $ 14,616.9 | $ 12,835.5 |
| Corporate revenues | 21.4 | (46.3) | (147.4) |
| Net revenues | $ 15,940.7 | $ 14,570.6 | $ 12,688.1 |

No country outside of the United States represents ten percent or more of net revenues. The US Specialized Therapeutics and US General Medicine segments are comprised solely of sales within the United States.

F-79

10/24/2018 agn-10k_20171231.htm

The following tables present global net revenues for the top products of the Company for the years ended December 31, 2017, 2016 and 2015 ($ in millions):

| | Year Ended December 31, 2017 | | | | |
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total |
|---|---|---|---|---|---|
| Botox® | $ 2,254.4 | $ - | $ 914.5 | $ - | $ 3,168.9 |
| Restasis® | 1,412.3 | - | 61.3 | - | 1,473.6 |
| Juvederm® Collection ** | 501.1 | - | 540.7 | - | 1,041.8 |
| Linzess®/Constella® | - | 701.1 | 21.9 | - | 723.0 |
| Lumigan®/Ganfort® | 317.5 | - | 371.5 | - | 689.0 |
| Bystolic® / Byvalson® | - | 612.2 | 2.2 | - | 614.4 |
| Alphagan®/Combigan® | 377.3 | - | 175.1 | - | 552.4 |
| Eye Drops | 199.5 | - | 281.0 | - | 480.5 |
| Lo Loestrin® | - | 459.3 | - | - | 459.3 |
| Namenda XR® | - | 452.8 | - | - | 452.8 |
| Breast Implants | 242.6 | - | 156.9 | - | 399.5 |
| Estrace® Cream | - | 366.6 | - | - | 366.6 |
| Viibryd®/Fetzima® | - | 333.2 | 3.1 | - | 336.3 |
| Alloderm ® | 321.2 | - | 7.5 | - | 328.7 |
| Ozurdex ® | 98.4 | - | 213.4 | - | 311.8 |
| Vraylar™ | - | 287.8 | - | - | 287.8 |
| Asacol®/Delzicol® | - | 195.5 | 50.2 | - | 245.7 |
| Carafate ® / Sulcrate ® | - | 235.8 | 2.9 | - | 238.7 |
| Zenpep® | - | 212.3 | - | - | 212.3 |
| Coolsculpting ® Consumables | 150.1 | - | 41.6 | - | 191.7 |
| Canasa®/Salofalk® | - | 162.7 | 18.3 | - | 181.0 |
| Armour Thyroid | - | 169.1 | - | - | 169.1 |
| Aczone® | 166.3 | - | 0.5 | - | 166.8 |
| Viberzi® | - | 156.6 | 0.5 | - | 157.1 |
| Saphris® | - | 155.2 | - | - | 155.2 |
| Coolsculpting ® Systems & Add On Applicators | 106.6 | - | 32.1 | - | 138.7 |
| Namzaric® | - | 130.8 | - | - | 130.8 |
| Teflaro® | - | 121.9 | - | - | 121.9 |
| Rapaflo® | 108.1 | - | 7.3 | - | 115.4 |
| SkinMedica® | 96.8 | - | 3.7 | - | 100.5 |
| Savella® | - | 98.2 | - | - | 98.2 |
| Tazorac® | 65.4 | - | 0.7 | - | 66.1 |
| Latisse® | 56.4 | - | 8.3 | - | 64.7 |
| Minastrin® 24 | - | 61.4 | - | - | 61.4 |
| Avycaz® | - | 61.2 | - | - | 61.2 |
| Kybella® / Belkyra® | 49.5 | - | 6.8 | - | 56.3 |
| Dalvance® | - | 53.9 | 2.4 | - | 56.3 |
| Lexapro® | - | 51.8 | - | - | 51.8 |
| Liletta® | - | 37.6 | - | - | 37.6 |
| Enablex® | - | 3.6 | - | - | 3.6 |
| Namenda® IR | - | 0.1 | - | - | 0.1 |
| Other | 280.1 | 675.5 | 395.1 | 21.4 | 1,372.1 |
| **Total net revenues** | $ 6,803.6 | $ 5,796.2 | $ 3,319.5 | $ 21.4 | $ 15,940.7 |

** Sales of fillers including Juvederm, Voluma and other fillers are referred to herein as the "Juvederm® Collection".

F-80

10/24/2018     agn-10k_20171231.htm

| | Year Ended December 31, 2016 | | | | |
| --- | --- | --- | --- | --- | --- |
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total |
| Botox® | $ 1,983.2 | $ - | $ 803.0 | $ - | $ 2,786.2 |
| Restasis® | 1,419.5 | - | 68.0 | - | 1,487.5 |
| Juvederm® Collection ** | 446.9 | - | 420.4 | - | 867.3 |
| Lumigan®/Ganfort® | 326.4 | - | 361.7 | - | 688.1 |
| Linzess®/Constella® | - | 625.6 | 17.3 | - | 642.9 |
| Bystolic® / Byvalson® | - | 638.8 | 1.7 | - | 640.5 |
| Namenda XR® | - | 627.6 | - | - | 627.6 |
| Alphagan®/Combigan® | 376.0 | - | 169.3 | - | 545.9 |
| Asacol®/Delzicol® | - | 360.8 | 53.7 | - | 414.5 |
| Lo Loestrin® | - | 403.5 | - | - | 403.5 |
| Estrace® Cream | - | 379.4 | - | - | 379.4 |
| Eye Drops | 186.5 | - | 276.2 | - | 462.7 |
| Breast Implants | 200.0 | - | 149.9 | - | 355.9 |
| Viibryd®/Fetzima® | - | 342.3 | - | - | 342.3 |
| Minastrin® 24 | - | 325.9 | 1.4 | - | 327.3 |
| Ozurdex ® | 84.4 | - | 179.0 | - | 263.4 |
| Carafate ® / Sulcrate ® | - | 229.0 | 2.4 | - | 231.4 |
| Aczone® | 217.3 | - | - | - | 217.3 |
| Zenpep® | - | 200.7 | - | - | 200.7 |
| Canasa®/Salofalk® | - | 178.7 | 17.7 | - | 196.4 |
| Saphris® | - | 166.8 | - | - | 166.8 |
| Armour Thyroid | - | 166.5 | - | - | 166.5 |
| Teflaro® | - | 133.6 | - | - | 133.6 |
| Rapaflo® | 116.6 | - | 5.8 | - | 122.4 |
| SkinMedica® | 108.3 | - | - | - | 108.3 |
| Savella® | - | 103.2 | - | - | 103.2 |
| Tazorac® | 95.5 | - | 0.8 | - | 96.3 |
| Viraylar™ | - | 94.3 | - | - | 94.3 |
| Vibereri® | - | 93.3 | - | - | 93.3 |
| Latisse® | 77.9 | - | 8.5 | - | 86.4 |
| Lexapro® | - | 66.6 | - | - | 66.6 |
| Namzaric® | - | 57.5 | - | - | 57.5 |
| Kybella® / Belkyra® | 50.2 | - | 2.3 | - | 52.5 |
| Dalvance® | - | 39.3 | - | - | 39.3 |
| Avycaz® | - | 36.1 | - | - | 36.1 |
| Liletta® | - | 23.3 | - | - | 23.3 |
| Enablex® | - | 17.1 | - | - | 17.1 |
| Namenda® IR | - | 15.1 | - | - | 15.1 |
| Other | 116.4 | 598.9 | 342.2 | 33.7 | 1,091.2 |
| Less product sold through our former Anda Distribution business. | n.a. | n.a. | n.a. | (80.0) | (80.0) |
| **Total net revenues** | $ 5,811.7 | $ 5,923.9 | $ 2,881.3 | $ (46.3) | $ 14,570.6 |

** Sales of fillers including Juvederm, Voluma and other fillers are referred to herein as the "Juvederm® Collection".

F-81

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | US Specialized Therapeutics | US General Medicine | International | Corporate | Total |
| Botox® | $ 1,386.4 | $ - | $ 584.4 | $ - | $ 1,970.8 |
| Restasis® | 999.6 | - | 48.2 | - | 1,047.8 |
| Juvederm® Collection ** | 304.4 | - | 269.5 | - | 573.9 |
| Lumigan®/Ganfort® | 260.7 | - | 283.4 | - | 544.1 |
| Linzess®/Constella® | - | 454.8 | 4.5 | - | 459.3 |
| Bystolic® / Byvalson® | - | 644.8 | 1.3 | - | 646.1 |
| Namenda XR® | - | 759.3 | - | - | 759.3 |
| Alphagan®/Combigan® | 285.0 | - | 126.1 | - | 411.1 |
| Asacol®/Delzicol® | - | 552.9 | 65.5 | - | 618.4 |
| Lo Loestrin® | - | 346.5 | 3.1 | - | 349.6 |
| Estrace® Cream | - | 326.2 | - | - | 326.2 |
| Eye Drops | 177.0 | - | 220.6 | - | 397.6 |
| Breast Implants | 175.0 | - | 125.5 | - | 300.5 |
| Viibryd®/Fetzima® | - | 327.6 | - | - | 327.6 |
| Minastrin® 24 | - | 272.4 | 0.6 | - | 273.0 |
| Ozurdex ® | 56.1 | - | 112.3 | - | 168.4 |
| Carafate ® / Sulcrate ® | - | 213.1 | - | - | 213.1 |
| Aczone® | 170.8 | - | - | - | 170.8 |
| Zenpep® | - | 167.4 | - | - | 167.4 |
| Canasa®/Salofalk® | - | 137.1 | 18.5 | - | 155.6 |
| Saphris® | - | 186.7 | - | - | 186.7 |
| Armour Thyroid | - | 130.8 | - | - | 130.8 |
| Teflaro® | - | 137.6 | - | - | 137.6 |
| Rapaflo® | 115.2 | - | 10.9 | - | 126.1 |
| SkinMedica® | 76.6 | - | - | - | 76.6 |
| Savella® | - | 106.4 | - | - | 106.4 |
| Tazorac® | 92.3 | - | 1.4 | - | 93.7 |
| Vraylar™ | - | - | - | - | - |
| Viberzi® | - | 12.3 | - | - | 12.3 |
| Latisse® | 63.2 | - | 10.0 | - | 73.2 |
| Lexapro® | - | 71.6 | - | - | 71.6 |
| Namzaric® | - | 11.2 | - | - | 11.2 |
| Kybella® / Belkyra® | 3.2 | - | - | - | 3.2 |
| Dalvance® | - | 16.8 | - | - | 16.8 |
| Avycaz® | - | 22.6 | - | - | 22.6 |
| Liletta® | - | 14.8 | - | - | 14.8 |
| Enablex® | - | 69.2 | - | - | 69.2 |
| Namenda® IR | - | 556.3 | - | - | 556.3 |
| Other | 144.3 | 800.0 | 301.5 | 10.0 | 1,255.8 |
| Less product sold through our former Anda Distribution business | n.a. | n.a. | n.a. | (157.4) | (157.4) |
| Total net revenues | $ 4,309.8 | $ 6,338.4 | $ 2,187.3 | $ (147.4) | $ 12,688.1 |

** Sales of fillers including Juvederm, Voluma and other fillers are referred to herein as the "Juvederm® Collection".

Unless included above, no product represents ten percent or more of total net revenues.

F-82

**NOTE 21 — Business Restructuring Charges**

Restructuring activities for the year ended December 31, 2017 are as follows ($ in millions):

| | Severance and Retention | | Share-Based Compensation | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Reserve balance at December 31, 2016** | $ | 68.5 | $ | - | $ | 39.7 | $ | 108.2 |
| Charged to expense | | | | | | | | |
| Cost of sales | | 50.4 | | - | | - | | 50.4 |
| Research and development | | 37.1 | | - | | - | | 37.1 |
| Selling and marketing | | 92.5 | | - | | - | | 92.5 |
| General and administrative | | 37.5 | | 38.8 | | 16.3 | | 92.6 |
| Total expense | | 217.5 | | 38.8 | | 16.3 | | 272.6 |
| Cash payments | | (110.4) | | (31.5) | | (36.1) | | (178.0) |
| Other reserve impact | | (9.6) | | (7.3) | | - | | (16.9) |
| **Reserve balance at December 31, 2017** | $ | 166.0 | $ | - | $ | 19.9 | $ | 185.9 |

In December 2017, the Company approved a new restructuring program intended to optimize and restructure its operations, while reducing costs and global headcount in anticipation of loss of exclusivity of several key revenue-generating products in 2018.  As a result of this program, the Company intends to eliminate over 1,000 currently filled positions, impacting employees in commercial and other functions. Commercial reductions will primarily focus on products and categories subject to loss of exclusivity. In addition, the Company eliminated approximately 400 open positions.  In the year ended December 31, 2017, the Company recorded severance and other employee related charges of $91.3 million, which includes $4.0 million of share based compensation related to this program.  The Company expects that the majority of the severance costs will be paid during the 2018 fiscal year. During the year ended December 31, the Company also recorded $14.6 million of other charges relating to the program and impairments of $17.7 million primarily related to fixed assets and facilities which the Company intends to exit during the 2018 fiscal year.

During the year ended December 31, 2017, the Company also initiated other restructuring programs which impacted the commercial, research and development, and global operations organizations.  As a result of the commercial organization restructuring program, the Company recorded severance and other employee related charges of $16.9 million and eliminated approximately 200 filled positions and approximately 150 open positions.  This initiative reduced costs in the commercial organization and primarily impacted the General Medicine sales force.  As a result of the research and development restructuring program, the Company recorded severance and other employee related charges of $12.4 million and eliminated approximately 100 filled positions.  This initiative intended to reduce costs as a result of prioritizing the Company's pipeline.  The majority of these severance costs were paid during the year ended December 31, 2017 and the Company does not anticipate any additional costs under these programs.  As a result of the global operations restructuring program, the Company will close a manufacturing facility in December 2018 and reduce the Company's headcount by approximately 250 employees.  This program resulted in the Company recording $41.5 million of severance employee related charges and $4.2 million of accelerated depreciation.  The majority of the severance costs will be paid during the year ended December 31, 2019.  The Company also recorded other restructuring charges $91.7 million related to various other initiatives and the integration of acquired businesses during the year ended December 31, 2017.

During 2016, activity related to our business restructuring and facility rationalization activities primarily related to the cost optimization initiatives in conjunction with the Allergan Acquisition. Restructuring activities for the year ended December 31, 2016 is as follows ($ in millions):

| | Severance and Retention | | Share-Based Compensation | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Reserve balance at December 31, 2015** | $ | 94.8 | $ | - | $ | 48.6 | $ | 143.4 |
| Charged to expense | | | | | | | | |
| Cost of sales | | 3.9 | | 0.5 | | 4.9 | | 9.3 |
| Research and development | | 11.1 | | 1.0 | | 0.7 | | 12.8 |
| Selling and marketing | | 19.8 | | 9.7 | | 1.7 | | 31.2 |
| General and administrative | | 27.9 | | 9.8 | | 15.1 | | 52.8 |
| Total expense | | 62.7 | | 21.0 | | 22.4 | | 106.1 |
| Cash payments | | (81.9) | | - | | (33.3) | | (115.2) |
| Other reserve impact | | (7.1) | | (21.0) | | 2.0 | | (26.1) |
| **Reserve balance at December 31, 2016** | $ | 68.5 | $ | - | $ | 39.7 | $ | 108.2 |

During the years ended December 31, 2017, 2016 and 2015, the Company recognized restructuring charges related to continuing operations of $272.6 million, $106.1 million and $817.6 million, respectively.

### NOTE 22 — Derivative Instruments and Hedging Activities

The Company's revenue, earnings, cash flows and fair value of its assets and liabilities can be impacted by fluctuations in foreign exchange risks and interest rates, as applicable. The Company manages the impact of foreign exchange risk and interest rate movements through operational means and through the use of various financial instruments, including derivative instruments such as foreign currency derivatives. As of December 31, 2017 and December 31, 2016, there were no material outstanding foreign currency instruments.

Overall, the Company is a net recipient of currencies other than the U.S. dollar and, as such, benefits from a weaker dollar and is adversely affected by a stronger dollar relative to major currencies worldwide. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, may negatively affect the Company's consolidated revenues and favorably impact operating expenses in U.S. dollars.

#### Net Investment Hedge

In the normal course of business, we manage certain foreign exchange risks through a variety of strategies, including hedging. Our hedging strategies include the use of derivatives, including net investment hedges.

For net investment hedges, the effective portion of the gains and losses on the instruments arising from the effects of foreign exchange are recorded in the currency translation adjustment component of accumulated other comprehensive income / (loss), consistent with the underlying hedged item. Hedging transactions are limited to an underlying exposure. As a result, any change in the value of our hedging instruments would be substantially offset by an opposite change in the value of the underlying hedged items. We do not use derivative instruments for trading or speculative purposes.

The Company is exposed to foreign exchange risk in its international operations from foreign currency purchases, net investments in foreign subsidiaries, and foreign currency assets and liabilities created in the normal course of business, including the Euro Denominated Notes. In the year ended December 31, 2017, we used effective net investment hedges to partially offset the effects of foreign currency on our investments in certain of our foreign subsidiaries. The total notional amount of our instruments designated as net investment hedges was $3.6 billion as of December 31, 2017. During the year ended December 31, 2017, the impact of the net investment hedges on other comprehensive income was a loss of $208.2 million.

#### Forward Sale of Teva Shares

On November 10, 2017, the Company entered into forward sale transactions for the purpose of selling approximately 25.0 million Teva shares into the market over time, which settled on January 12, 2018 for $413.3 million. The value of the shares were based on the volume-weighted average price of Teva shares plus a premium. The movement in these shares were marked to market for a loss of $62.9 million in the year ended December 31, 2017.

On February 13, 2018, the Company entered into additional forward sale transactions under which we sold approximately 25.0 million Teva shares. The value of the shares will be based on the volume weighted average price of Teva shares plus a premium and is expected to settle during the second quarter of 2018. As a result of the transaction, the Company received 80% of the proceeds, or approximately $372.0 million, with the remainder of the proceeds being delivered upon settlement.

F-84

## NOTE 23 — Fair Value Measurement

Assets and liabilities measured at fair value using Fair Value Leveling or disclosed at fair value on a recurring basis as of December 31, 2017 and 2016 consisted of the following ($ in millions):

| | Fair Value Measurements as of December 31, 2017 Using: | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash equivalents* | $ 1,328.1 | $ 1,328.1 | $ - | $ - |
| Short-term investments | 2,814.4 | - | 2,814.4 | - |
| Deferred executive compensation investments | 112.4 | 92.9 | 19.5 | - |
| Foreign currency derivatives | - | - | - | - |
| Investment in Teva ordinary shares | 1,817.7 | 1,817.7 | - | - |
| Investments and other | 72.3 | 72.3 | - | - |
| **Total assets** | $ 6,144.9 | $ 3,311.0 | $ 2,833.9 | $ - |
| **Liabilities:** | | | | |
| Deferred executive compensation liabilities | 113.8 | 94.3 | 19.5 | - |
| Contingent consideration obligations | 476.9 | - | - | 476.9 |
| **Total liabilities** | $ 590.7 | $ 94.3 | $ 19.5 | $ 476.9 |

\* Marketable securities with less than 90 days remaining until maturity are classified as cash equivalents.

| | Fair Value Measurements as of December 31, 2016 Using: | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Cash equivalents* | $ 1,238.9 | $ 1,238.9 | $ - | $ - |
| Short-term investments | 8,062.3 | - | 8,062.3 | - |
| Deferred executive compensation investments | 111.7 | 90.5 | 21.2 | - |
| Foreign currency derivatives | 0.1 | - | 0.1 | - |
| Investment in Teva ordinary shares | 3,439.2 | - | 3,439.2 | - |
| Investments and other | 95.0 | 95.0 | - | - |
| **Total assets** | $ 12,947.2 | $ 1,424.4 | $ 11,522.8 | $ - |
| **Liabilities:** | | | | |
| Deferred executive compensation liabilities | 111.7 | 90.5 | 21.2 | - |
| Contingent consideration obligations | 1,172.1 | - | - | 1,172.1 |
| **Total liabilities** | $ 1,283.8 | $ 90.5 | $ 21.2 | $ 1,172.1 |

\* Marketable securities with less than 90 days remaining until maturity are classified as cash equivalents.

Marketable securities and investments consist of available-for-sale investments in U.S. treasury and agency securities and publicly traded equity securities for which market prices are readily available. Unrealized gains or losses on marketable securities and investments are recorded in accumulated other comprehensive (loss) / income as of December 31, 2017. Realized gains or losses on marketable securities and investments are recorded in interest income. The Company's marketable securities and other long-term investments are classified as available-for-sale and are recorded at fair value based on quoted market prices using the specific identification method. These investments are classified as either current or non-current, as appropriate, in the Company's consolidated balance sheets. The Company may sell certain of its marketable securities prior to their stated maturities for strategic reasons including, but not limited to, anticipation of credit deterioration and maturity management.

F-85

### Contingent Consideration Obligations

The fair value measurement of the contingent consideration obligations is determined using Level 3 inputs and is based on a probability-weighted income approach. The measurement is based upon unobservable inputs supported by little or no market activity based on our own assumptions. Changes in the fair value of the contingent consideration obligations, including accretion, are recorded in our consolidated statements of operations as follows ($ in millions):

| Expense / (income) | Years Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| Cost of sales | $ (183.2) | $ (17.4) | $ 58.5 |
| Research and development | 50.0 | (71.1) | 37.7 |
| General and administrative | - | 24.3 | (0.5) |
| Total | $ (133.2) | $ (64.2) | $ 95.7 |

During the year ended December 31, 2017, the Company had net contingent consideration income in cost of sales of $183.2 million due to declines in forecasted revenues for select products.  The Company had net contingent consideration expense in R&D of $50.0 million due to the advancement of the Company's pipeline.

During the year ended December 31, 2016, the Company had net contingent consideration income of $64.2 million primarily driven by ongoing R&D projects that were terminated based on clinical data acquired in the Allergan Acquisition, which was offset by additional contingent consideration expense relating to milestones achieved in connection with the AqueSys and Allergan Acquisitions.

During the year ended December 31, 2015, the Company recorded additional contingent consideration of $29.8 million in connection with the approval of Viberzi™, $81.4 million in connection with the approval of Liletta® and $6.4 million in connection with the approval of Dalvance®.  Offsetting these amounts were gains from fair value of adjustments related to the Forest Acquisition of $32.3 million and the Allergan Acquisition of $8.2 million.

The table below provides a summary of the changes in fair value, including net transfers in and/or out, of all financial assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the years ended December 31, 2017 and 2016 ($ in millions):

| | Balance as of December 31, 2016 | Net transfers in to (out of) Level 3 | Purchases, settlements, and other net | Net accretion and fair value adjustments | Balance as of December 31, 2017 |
|---|---|---|---|---|---|
| **Liabilities:** | | | | | |
| Contingent consideration obligations | $ 1,172.1 | $ - | $ (562.0) | $ (133.2) | $ 476.9 |

| | Balance at December 31, 2015 | Net transfers in to (out of) Level 3 | Purchases, settlements, and other net | Net accretion and fair value adjustments | Balance at December 31, 2016 |
|---|---|---|---|---|---|
| **Liabilities:** | | | | | |
| Contingent consideration obligations | $ 868.0 | $ - | $ 368.3 | $ (64.2) | $ 1,172.1 |

The Company determines the acquisition date fair value of contingent consideration obligations based on a probability-weighted income approach derived from revenue estimates and a probability assessment with respect to the likelihood of achieving contingent obligations including contingent payments such as milestone obligations, royalty obligations and contract earn-out criteria, where applicable. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in ASC 820. The resultant probability-weighted cash flows are discounted using an appropriate effective annual interest rate to reflect the internal rate of return and incremental commercial uncertainty, major risks and uncertainties associated with the successful completion of the events triggering the contingent obligation. At each reporting date, the Company revalues the contingent consideration obligation to estimated fair value and records changes in fair value as income or expense in our

consolidated statement of operntions. Changes in the fair value of the contingent consideration obligations may result from changes in discount periods and rates, changes in the timing and amount of revenue estimates and changes in probability assumptions with

F-86

respect to the likelihood of achieving the various contingent consideration obligations. Accretion expense related to the increase in the net present value of the contingent liability is included in operating income for the period.

During the year ended December 31, 2017, the following activity in contingent consideration obligations by acquisition was incurred ($ in millions):

| Business Acquisition | Balance as of December 31, 2016 | Fair Value Adjustments and Accretion | Payments and Other | Balance as of December 31, 2017 |
|---|---|---|---|---|
| Tobira Acquisition | $ 514.4 | $ 14.6 | $ (301.2) | $ 227.8 |
| Allergan Acquisition | 199.6 | (70.9) | (110.0) | 18.7 |
| Medicines 360 acquisition | 127.5 | (67.0) | (16.1) | 44.4 |
| AqueSys Acquisition | 103.9 | (50.4) | (25.0) | 28.5 |
| Oculeve Acquisition | 99.5 | 90.6 | (100.0) | 90.1 |
| ForSight Acquisition | 65.4 | (19.1) | - | 46.3 |
| Metrogel acquisition | 15.0 | - | (7.5) | 7.5 |
| Forest Acquisition | 11.0 | 3.7 | (2.0) | 12.7 |
| Uteron acquisition | 8.2 | (8.2) | - | - |
| Other | 27.6 | (26.5) | (0.2) | 0.9 |
| Total | $ 1,172.1 | $ (133.2) | $ (562.0) | $ 476.9 |

### NOTE 24 — Commitments & Contingencies

The Company and its affiliates are involved in various disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings, and litigation matters that arise from time to time in the ordinary course of business. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows. The Company's general practice is to expense legal fees as services are rendered in connection with legal matters, and to accrue for liabilities when losses are probable and reasonably estimable.

The Company evaluates, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that is accrued. As of December 31, 2017, the Company's consolidated balance sheet includes accrued loss contingencies of approximately $55.0 million.

The Company's legal proceedings range from cases brought by a single plaintiff to mass tort actions and class actions with thousands of putative class members. These legal proceedings, as well as other matters, involve various aspects of our business and a variety of claims (including, but not limited to, *qui tam* actions, antitrust, product liability, breach of contract, securities, patent infringement and trade practices), some of which present novel factual allegations and/or unique legal theories. In addition, a number of the matters pending against us are at very early stages of the legal process (which in complex proceedings of the sort faced by us often extend for several years). As a result, some matters have not yet progressed sufficiently through discovery and/or development of important factual information and legal issues to enable us to estimate a range of possible loss. In those proceedings in which plaintiffs do request publicly quantified amounts of relief, the Company does not believe that the quantified amounts are meaningful because they are merely stated jurisdictional limits, exaggerated and/or unsupported by the evidence or applicable burdens of proof.

In matters involving the assertion or defense of the Company's intellectual property, the Company believes it has meritorious claims and intends to vigorously assert or defend the patents or other intellectual property at issue in such litigation. Similarly, in matters where the Company is a defendant, the Company believes it has meritorious defenses and intends to defend itself vigorously. However, the Company can offer no assurances that it will be successful in a litigation or, in the case of patent enforcement matters, that a generic version of the product at issue will not be launched or enjoined. Failing to prevail in a litigation could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

F-87

### Antitrust Litigation

*Asacol® Litigation.* Two class action complaints were filed on June 22, 2015, and three more on September 21, 2015, in federal court in Massachusetts on behalf of a putative class of indirect purchasers. In each complaint plaintiffs allege that they paid higher prices for Warner Chilcott's Asacol® HD and Delzicol® products as a result of Warner Chilcott's alleged actions preventing or delaying generic competition in the market for Warner Chilcott's older Asacol® product in violation of U.S. federal antitrust laws and/or state laws. Plaintiffs seek unspecified injunctive relief, treble damages and/or attorneys' fees. Defendants moved to dismiss the indirect purchasers' complaint. A hearing was held on the motion to dismiss on May 11, 2016. On July 20, 2016, the court issued a decision granting the motion in part, dismissing the indirect purchaser plaintiffs' claims based on purported reverse payments and dismissing several of indirect purchaser plaintiffs' claims based on state laws. On August 15, 2016, the indirect purchaser plaintiffs filed a second amended complaint. The Company filed an answer to the second amended complaint on October 4, 2016.  Complaints were also filed on behalf of a putative class of direct purchasers of Asacol® in federal court in New York on April 26, 2016, and on June 29, 2016, in each case making similar allegations to the complaints filed by the indirect purchaser plaintiffs.  Those matters have been consolidated with the indirect purchaser cases in the federal court in Massachusetts.   On October 11, 2016, the Company filed a motion to dismiss the direct purchasers' consolidated complaint and oral argument on the motion was held on December 16, 2016.  On February 10, 2017, the court issued an order granting in part and denying in part the Company's motion to dismiss. The Company has reached a tentative agreement with the direct purchaser plaintiffs to settle their claims.  The Company has filed a motion for summary judgment seeking dismissal of the indirect purchaser plaintiffs' claims.  On November 9, 2017, the court issued a decision denying the Company's summary judgment motion and granting plaintiff's motion for class certification.  Trial was set to begin on January 22, 2018.  However, on January 17, 2018, the Court of Appeals for the First Circuit issued an order granting the Company's motion under Fed.R.Civ.P. 23(f) to appeal the district court's decision to certify the proposed class.  The appellate court thereafter issued a decision staying the trial in the district court.  The appeal will be fully briefed by the end of March 2018.

*Botox® Litigation.* A class action complaint was filed in federal court in California on February 24, 2015, and amended May 29, 2015, alleging unlawful market allocation in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, agreement in restraint of trade in violation of 15 U.S.C. §1 of the Sherman Act, unlawful maintenance of monopoly market power in violation of Section 2 of the Sherman Act, 15 U.S.C. §2 of the Sherman Act, violations of California's Cartwright Act, Section 16700 et seq. of Calif. Bus. and Prof. Code, and violations of California's unfair competition law, Section 17200 et seq. of Calif. Bus. and Prof. Code. In the complaint, plaintiffs seek an unspecified amount of treble damages.  On July 19, 2016, plaintiffs filed a motion for class certification.  On October 14, 2016, the Company filed an opposition to plaintiffs' motion for class certification.  Oral argument on the class certification motion was heard on January 13, 2017.  On June 13, 2017, the court granted plaintiff's motion for class certification.  In September 2017, the parties filed cross motions for summary judgement, which were heard by the court on October 27, 2017.  On November 30, 2017, the parties reached a tentative settlement.

*Loestrin® 24 Litigation.* On April 5, 2013, two putative class actions were filed in the federal district court against Warner Chilcott and certain affiliates alleging that Warner Chilcott's 2009 patent lawsuit settlements with Watson Laboratories and Lupin related to Loestrin® 24 Fe were unlawful. The complaints, both asserted on behalf of putative classes of end-payors, generally allege that Watson and Lupin improperly delayed launching generic versions of Loestrin® 24 in exchange for substantial payments from Warner Chilcott in violation of federal and state antitrust and consumer protection laws. The complaints each seek declaratory and injunctive relief and damages. Additional complaints have been filed by different plaintiffs seeking to represent the same putative class of end-payors. In addition to the end-payor suits, two lawsuits have been filed on behalf of a class of direct payors and by direct purchasers in their individual capacities. After a hearing on September 26, 2013, the JPML issued an order transferring all related Loestrin® 24 cases to the federal court for the District of Rhode Island. On September 4, 2014, the court granted the defendants' motion to dismiss the complaint. The plaintiffs appealed the district court's decision to the First Circuit Court of Appeals and oral argument was held on December 7, 2015. On February 22, 2016, the First Circuit issued its decision vacating the decision of, and remanding the matter to, the district court. On June 11, 2016, defendants filed an omnibus motion to dismiss the claims of the direct purchaser class plaintiffs, end-payor class plaintiffs and individual direct purchaser plaintiffs. Oral argument on the motion to dismiss was held on January 13, 2017.  On July 24, 2017, the court issued its decision denying the motion to dismiss.

*Namenda® Litigation.* On September 15, 2014, the State of New York, through the Office of the Attorney General of the State of New York, filed a lawsuit in the United States District Court for the Southern District of New York alleging that Forest was acting to prevent or delay generic competition to Forest's immediate-release product Namenda® in violation of federal and New York antitrust laws and committed other fraudulent acts in connection with its commercial plans for Namenda® XR. On December 11, 2014, the district court issued a ruling granting the state's preliminary injunction motion and issued an injunction on December 15, 2014 which the Court of Appeals for the Second Circuit affirmed on May 22, 2015. Forest and the New York Attorney General reached a settlement on November 24, 2015. On May 29, 2015, a putative class action was filed on behalf of a class of direct purchasers and on June 8, 2015 a similar putative class action was filed on behalf of a class of indirect purchasers. Since that time, additional complaints have been filed on behalf of putative classes of direct and indirect purchasers. The class action complaints make claims similar to those asserted by the New York Attorney General and also include claims that Namenda® patent litigation settlements between Forest

10/24/2018                                agn-10k_20171231.htm

F-88

and generic companies also violated the antitrust laws. On December 22, 2015, Forest and its co-defendants filed motions to dismiss the pending complaints. On September 13, 2016, the court issued a decision denying the Company's motion to dismiss. On September 27, 2016, the Company filed an answer to the amended complaint. On February 16, 2017 and February 23, 2017, plaintiffs filed motions for summary judgment on two of the counts of their complaint. On March 16, 2017, the Company filed oppositions to the plaintiffs' summary judgment motions and a cross motion for summary judgment on one count. The motions were argued before the court on May 5, 2017. On May 23, 2017, the Court issued its decision on the parties'.summary judgment motions. The Court granted plaintiffs' motion in part as to the collateral estoppel effect of a prior finding of anti-competitive conduct, and denied the cross-motions on whether the Company's obtaining pediatric exclusivity was anti-competitive conduct.

*Restasis® Competitor Litigation.* On October 2, 2017, Shire, which offers the dry-eye disease drug Xiidra®, sued Allergan in federal district court alleging that Allergan unlawfully harmed competition by foreclosing Xiidra® from sales to Medicare Part D plans (and the members of such plans) through the use of discounts (a) contingent on Restasis® receiving preferential formulary treatment; and/or (b) across a bundle of Allergan's products, including Restasis®, Lumigan®, Combigan®, and Alphagan P®. The complaint seeks injunctive relief under federal and New Jersey antitrust law and New Jersey common law. On December 5, 2017, Allergan filed a motion to dismiss the complaint, which is currently being briefed. A date for oral argument has not been set.

*Restasis® Class Action Litigation.* Between November 7, 2017, and January 17, 2018, fourteen putative class actions were filed in federal district courts against Allergan alleging that the company unlawfully harmed competition by engaging in conduct to delay the market entry of generic versions of Restasis®. Nine of the complaints were filed on behalf of putative classes of end-payors, and five were filed on behalf of putative classes of direct purchasers. One direct purchaser subsequently voluntarily dismissed its suit. The complaints challenge Allergan's conduct in prosecuting and obtaining patents covering Restasis®, listing those patents in the FDA's Orange Book, asserting those patents against potential generic competitors in patent-infringement litigation, filing citizens petitions with the FDA concerning generic companies' drug applications for generic Restasis®, and transferring patents to the sovereign Native American Saint Regis Mohawk Tribe. Both the end-payors and the direct purchasers allege that these actions violated federal antitrust laws, and the end-payors further allege violations of state antitrust and consumer-protection laws and unjust enrichment. All plaintiffs seek damages, declaratory relief, and injunctive relief. After a hearing on January 25, 2018, the Judicial Panel on Multidistrict Litigation (JPML) transferred all related Restasis® cases to the federal court for the Eastern District of New York. After the JPML issued the transfer order, another plaintiff asserting the same allegations filed suit on behalf of a putative class of end-payors. Allergan has not yet answered the complaints or filed motions to dismiss.

*Zymar®/Zymaxid® Litigation.* On February 16, 2012, Apotex Inc. and Apotex Corp. filed a complaint in the federal district court in Delaware against Senju Pharmaceuticals Co., Ltd. ("Senju"), Kyorin Pharmaceutical Co., Ltd. ("Kyorin"), and Allergan, Inc. alleging monopolization in violation of Section 2 of the Sherman Act, conspiracy to monopolize, and unreasonable restraint of trade in the market for gatifloxacin ophthalmic formulations, which includes Allergan, Inc.'s ZYMAR® gatifloxacin ophthalmic solution 0.3% and ZYMAXID® gatifloxacin ophthalmic solution 0.5% products. In the complaint, Plaintiffs seek an unspecified amount of treble damages and disgorgement of profits. Following the court's denial of Allergan Inc.'s motions to dismiss, Allergan Inc. filed an answer to Apotex's complaint on June 1, 2015. On March 27, 2017, the Company and Apotex settled this matter. On April 26, 2017, this matter was dismissed.

On June 6, 2014, a separate antitrust class action complaint was filed in the federal district court in Delaware against the same defendants as in the Apotex case. The complaint alleges that defendants unlawfully excluded or delayed generic competition in the gatifloxacin ophthalmic formulations market (generic versions of ZYMAR® and ZYMAXID®). On September 18, 2014, Allergan, Inc. filed a motion to dismiss for lack of subject matter jurisdiction and joined in co-defendants' motion to dismiss for failure to state a claim. On August 19, 2015, the court granted Allergan, Inc.'s motion to dismiss. On September 18, 2015, plaintiff filed a notice of appeal with the U.S. Court of Appeals for the Third Circuit. The Third Circuit oral argument was held on June 13, 2016. On September 7, 2016, the U.S. Court of Appeals for the Third Circuit vacated the District Court's granting of Allergan, Inc.'s motion to dismiss and remanded to the District Court for further proceedings. The Third Circuit denied the Company's petition for a rehearing on October 4, 2016. On October 18, 2017, the parties reached a tentative settlement.

## Commercial Litigation

*Celexa®/Lexapro® Class Actions.* Forest and certain of its affiliates have been named as defendants in multiple federal court actions relating to the promotion of Celexa® and/or Lexapro® all of which have been consolidated in the Celexa®/Lexapro® MDL proceeding in the federal district court in Massachusetts. On November 13, 2013, an action was filed in federal court in Minnesota which sought to certify a nationwide class of third-party payor entities that purchased Celexa® and Lexapro® for pediatric use. The complaint asserts claims under the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, alleging that Forest engaged in an off-label marketing scheme and paid illegal kickbacks to physicians to induce prescriptions of Celexa® and Lexapro®. Forest moved to dismiss the complaint on December 12, 2014, and the court thereafter issued a ruling dismissing plaintiff's claims under Minnesota's Deceptive Trade Practices Act, but denying the remaining portions of the motion. A motion for

F-89

class certification was filed in February 2016, and denied on June 2, 2016. Thereafter, plaintiffs filed a 23(f) petition requesting leave to appeal the denial of class certification which the First Circuit denied on December 7, 2016. On January 19, 2017, plaintiff filed a motion for summary judgment on the Company's statute of limitation affirmative defense and the Company filed a cross motion for summary judgment on February 23, 2017. In addition, plaintiff in the action filed a second motion for class certification on February 28, 2017. Forest filed a motion for summary judgment on all counts of the complaint which was granted in full on January 30, 2018. Plaintiffs have not yet indicated whether they will appeal the court's decision.

On August 28, 2014, an action was filed in the federal district court in Washington seeking to certify a nationwide class of consumers and subclasses of Washington and Massachusetts consumers that purchased Celexa® and Lexapro® for pediatric use. The complaint asserts claims under the federal RICO statute, alleging that Forest engaged in an off-label marketing scheme and paid illegal kickbacks to physicians to induce prescriptions of Celexa® and Lexapro®. Forest moved to dismiss the complaint on December 19, 2014. On June 16, 2015, the court issued a ruling on the motion to dismiss, granting it in part and denying it in part. Plaintiffs thereafter filed an amended complaint. Forest moved to dismiss the amended complaint. On June 9, 2016, the court denied Forest's motion. On March 3, 2017, plaintiffs in this action filed a motion for class certification, which motion was denied by the court. On September 15, 2017, Forest filed a motion for summary judgment on all counts of the complaint which was granted in full on January 30, 2018. Plaintiffs have not yet indicated whether they will appeal the court's decision.

*Generic Drug Pricing Securities and ERISA Litigation.* On November 4, 2016, a class action was filed by a putative class of Allergan shareholders in federal court in California against the Company and certain of its current and former officers alleging that the Company and certain of its current and former officers made materially false and misleading statements. The complaint alleges generally that between February 2014 and November 2016, Allergan and certain of its officers made materially false and misleading statements regarding the Company's internal controls over its financial reporting and failed to disclose that its Actavis generics unit had engaged in illegal, anticompetitive price-fixing with its generic industry peers. The complaint seeks unspecified monetary damages. On February 2, 2017, the actions were consolidated in the federal district court in New Jersey. Plaintiffs filed a consolidated amended complaint on May 1, 2017. The Company filed a motion to dismiss plaintiffs' consolidated amended complaint on July 17, 2107. Plaintiffs filed their opposition on September 15 and the Company filed its reply on October 6, 2107. Plaintiffs filed a second amended consolidated complaint on November 28, 2017. The Company filed a motion to dismiss the second amended complaint on January 22, 2018. A complaint was filed in California state court, premised on the same alleged underlying allegations, by an individual opt-out plaintiff on February 2, 2018. The Company has not yet responded to the California state court complaint. On February 14, 2017, a separate complaint was filed in the federal district court in California that is premised on the same alleged underlying conduct that is at issue in the securities litigation but that asserts claims under the Employee Retirement Income Security Act of 1974 ("ERISA). A similar lawsuit was filed in the federal district court in New Jersey on March 7, 2017. The ERISA complaints assert claims on behalf of a putative class of individuals who participated in the Company's retirement plans and seek an unspecified amount of damages and other injunctive relief. On June 26, 2017, the Company filed a motion to stay or transfer venue in the California ERISA matter to the District of New Jersey, after which time plaintiffs agreed to stipulate to the transfer. The Company's motion to consolidate the matters was granted on August 21, 2017, and a consent discovery order entered. On October 23, 2017, Plaintiffs filed an amended consolidated complaint which the Company moved to dismiss on February 2, 2018.

*Telephone Consumer Protection Act Litigation.* In October 2012, Forest and certain of its affiliates were named as defendants in a putative class action in federal court in Missouri. This suit alleges that Forest and another defendant violated the Telephone Consumer Protection Act (the "TCPA") and was filed on behalf of a proposed class that includes all persons who, from four years prior to the filing of the action, were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of defendants, which did not display an opt-out notice compliant with a certain regulation promulgated by the FCC. On July 17, 2013, the district court granted Forest's motion to stay the action pending the administrative proceeding initiated by the pending FCC Petition and a separate petition Forest filed. On October 31, 2015, another class action complaint was filed in Missouri state court against Allergan USA, Inc., Warner Chilcott Corporation and Actavis, Inc., now known as Allergan Finance LLC, alleging violations of the Telephone Consumer Protection Act, the Missouri Consumer Fraud and Protection Act and conversion on behalf of a putative nationwide class of plaintiffs to who defendant Warner Chilcott Corporation sent unsolicited facsimile advertisements. Defendants removed this action to the federal district court for the Western District of Missouri on December 10, 2015 and responded to the complaint on February 8, 2016. On February 17, 2016, plaintiffs voluntarily dismissed defendants Allergan USA, Inc. and Actavis, Inc. from the litigation. In the wake of the Court of Appeals decision on the Petition discussed below, the parties reached an agreement to settle the action against Warner Chilcott.

In a related matter, on June 27, 2013, Forest filed a Petition for Declaratory Ruling with the FCC requesting that the FCC find that (1) the faxes at issue in the action complied, or substantially complied with the FCC regulation, and thus did not violate it, or (2) the FCC regulation was not properly promulgated under the TCPA. Warner Chilcott filed a similar petition with the FCC. On January 31, 2014, the FCC issued a Public Notice seeking comment on Forest's and several other similar petitions. On October 30, 2014, the FCC issued a final order on the FCC Petition granting Forest and several other petitioners a retroactive waiver of the opt-out notice requirement for all faxes sent with express consent. The litigation plaintiffs, who had filed comments on the January 2014

F-90

Public Notice, have appealed the final order to the Court of Appeals for the District of Columbia. Forest and other petitioners intervened in the appeal seeking review of that portion of the FCC final order addressing the statutory basis for the opt out/express consent portion of the regulation. Oral argument before the appellate court took place on November 8, 2016. On March 31, 2017, the Court of Appeals issued a decision which held that the FCC regulation at issue was not properly promulgated under the TCPA. Plaintiffs have filed a petition for certiorari with the United States Supreme Court.

*Prescription Opioid Drug Abuse Litigation.* The Company has been named as a defendant in approximately 290 matters relating to the promotion and sale of prescription opioid pain relievers and additional suits may be filed.

On May 21, 2014, the California counties Santa Clara and Orange filed a lawsuit in California state court on behalf of the State of California against several pharmaceutical manufacturers. Plaintiffs named Actavis plc (now known as Allergan plc) in the suit. The California plaintiffs filed an amended complaint on June 9, 2014. The California complaint alleges that the manufacturer defendants engaged in a deceptive campaign to promote their products in violation of state laws. The complaint seeks an unspecified amount of monetary damages, penalties and injunctive relief. On August 27, 2015, the court stayed the action based on primary jurisdiction arguments raised in the motions to dismiss. On June 3, 2016, the California plaintiffs filed a motion to lift the stay and a motion for leave to file a third amended complaint. On July 1, 2016, the Company and co-defendants filed joint oppositions to the California plaintiffs' motion to lift the stay and motion for leave to file a third amended complaint. On July 27, 2016, the court ordered the California plaintiffs to file another motion for leave to file an amended complaint along with a proposed amended complaint. On October 19, 2016, the court in the California litigation lifted the stay in part permitting defendants to challenge the third amended complaint and for the parties to discuss settlement and maintaining the stay in all other respects. On July 6, 2017, Santa Clara and Orange Counties filed a fourth amended complaint.

On June 2, 2014, the City of Chicago also filed a complaint in Illinois state court against the same set of defendants, including Actavis plc, that were sued in the California Action. Co-defendants in the action removed the matter to the federal court in Illinois. The Chicago complaint contains similar allegations as the California complaint and also seeks unspecified monetary damages, penalties and injunctive relief. Defendants have moved to dismiss the complaints in each action. On May 8, 2015, the court granted the Company's motion to dismiss the complaint. On August 26, 2015, the City of Chicago filed a second amended complaint. On September 29, 2016, the court in the Chicago litigation granted in part and denied in part defendants' motion to dismiss the second amended complaint. On October 25, 2016, Chicago filed a third amended complaint. On December 15, 2016, the Company moved to dismiss the third amended complaint and filed an answer to the complaint.

On December 15, 2015, the State of Mississippi filed a lawsuit in Mississippi state court against several pharmaceutical manufacturers. The Mississippi action parallels the allegations in the California and Chicago matters and seeks monetary and equitable relief. In March and April 2016, the defendants filed motions to dismiss, stay, and transfer venue in the Mississippi action. On February 13, 2017, the defendants' motion to transfer venue was denied. On March 6, 2017, the defendants filed a petition for permission to appeal interlocutory order denying defendants' motion to transfer venue with the Mississippi Supreme Court.

On May 31, 2017, the State of Ohio filed a lawsuit in Ohio state court against several pharmaceutical manufacturers. The Ohio action parallels the allegations in the Chicago matter and seeks monetary and equitable relief. Since the filing of the complaint by the State of Ohio, additional cases have been filed, including cases filed by the States of Oklahoma and New Mexico, but mainly by political subdivisions of states (ie., counties and municipalities) in state and federal courts across the country. In addition, a putative class action was filed in the United States District Court for the Western District of Arkansas on behalf of Arkansas residents who were prescribed an opioid product or were prescribed an opioid product and were treated for an overdose or addiction against several pharmaceutical manufacturers. The claims in the additional cases largely parallel the claims in the California, Chicago, Mississippi and Ohio matters. The Company is aware that other states and political subdivisions are considering filing comparable actions against, among others, manufacturers and parties that promoted prescription opioid pain relievers.

*Testosterone Replacement Therapy Class Action.* On November 24, 2014, the Company was served with a putative class action complaint filed on behalf a class of third party payers in federal court in Illinois. The suit alleges that the Company and other named pharmaceutical defendants violated various laws including the federal RICO statute and state consumer protection laws in connection with the sale and marketing of certain testosterone replacement therapy pharmaceutical products ("TRT Products"), including the Company's Androderm® product. This matter was filed in the TRT Products Liability MDL, described in more detail below, notwithstanding that it is not a product liability matter. Plaintiff alleges that it reimbursed third parties for dispensing TRT Products to beneficiaries of its insurance policies. Plaintiff seeks to obtain certain equitable relief, including injunctive relief and an order requiring restitution and/or disgorgement, and to recover damages and multiple damages in an unspecified amount. Defendants filed a joint motion to dismiss the complaint, after which plaintiff amended its complaint. Defendants jointly filed a motion to dismiss the amended complaint, which was granted in part and denied in part on February 3, 2016. The Court dismissed plaintiff's substantive RICO claims against the Company for mail and wire fraud for failure to plead with particularity under Rule 9(b) but granted plaintiff leave to replead. The court also dismissed plaintiff's state law statutory claims and common law claims for fraud and unjust enrichment. The Court

10/24/2018                                   agn-10k_20171231.htm

F-91

declined to dismiss plaintiff's conspiracy claims pursuant to 18 U.S.C. § 1962(d) and its claims for negligent misrepresentation.  Plaintiff filed a third amended complaint on April 7, 2016.  Defendants jointly filed a motion to dismiss the third amended complaint on May 5, 2016.  On August 2, 2016, the court dismissed all claims in the Third Amended Complaint against the Company except plaintiff's RICO conspiracy claim.  On August 29, 2016, the Company filed a Motion for Reconsideration or, in the alternative, Motion to Certify for Interlocutory Appeal, which the court denied on September 8, 2016.  Discovery is in the early stages.  Plaintiffs filed a motion for class certification on November 6, 2017.

*TNS Products Litigation.*  On March 19, 2014, a class action complaint was filed in the federal district court in California on behalf of a putative class of consumers.  The complaint alleges violations of the California Unfair Competition Law, the Consumers Legal Remedies Act, and the False Advertising Law, and deceit.  On June 2, 2014, plaintiff filed a first amended complaint.  On June 23, 2014, Allergan filed a motion to dismiss the first amended complaint.  On September 5, 2014, the court granted-in-part and denied-in-part Allergan's motion to dismiss.  On September 8, 2014, the court set trial for September 1, 2015.  On November 4, 2014, Allergan and SkinMedica filed a motion to dismiss.  On January 7, 2015, Allergan and SkinMedica's motion to dismiss was denied.  On February 19, 2015 plaintiff filed a third amended complaint.  On May 27, 2015, the case was stayed pending the decision of the Ninth Circuit Court of Appeals in another matter involving similar legal issues.  On January 12, 2018, the parties reached a settlement.  On January 16, 2018, the matter was dismissed.

*Xaleron Dispute.*  On February 5, 2016, Xaleron Pharmaceuticals, Inc. filed a lawsuit against Allergan, Inc. and Actavis, Inc., now known as Allergan Finance, LLC, in state court in New York.  The complaint, filed on February 26, 2016, alleges the defendants misappropriated Xaleron's confidential business information and asserts claims for unfair competition, tortious interference with prospective economic advantage and unjust enrichment.  The Company filed a motion to dismiss the complaint on April 15, 2016.  On September 13, 2016, the court issued a decision denying the Company's motion.  Defendants filed an answer to the complaint and the parties are now engaged in discovery.

*Zeltiq Shareholder Litigation.*  On March 14, 2017, a putative shareholder class action lawsuit was filed against Zeltiq Aesthetics, Inc. ("Zeltiq") and various directors as well as Allergan entities in Delaware federal court.  Plaintiffs allege that the proxy statement filed in connection with the Company's acquisition of Zeltiq Aesthetics, Inc. misrepresented material information that prevented Zeltiq's shareholders from making a fully informed decision on the proposed sale to Allergan, including failure to disclose GAAP reconciliation of Zeltiq's non-GAAP projections.  The Allergan entities were named under a supervisory role theory.  On March 29, 2017, a similar putative shareholder class action lawsuit was filed in California federal court against Zeltiq Aesthetics, Inc. and various directors seeking a preliminary injunction.  Allergan was not named as a defendant.  Zeltiq filed an amendment to its Definitive Proxy Statement on April 11, 2017, which includes supplemental disclosures that address plaintiffs' claims.  On the same date, plaintiffs in the California action withdrew their motion for a preliminary injunction.  On May 23, 2017, plaintiffs in the California action voluntarily dismissed their complaint, with prejudice as to the named plaintiff and without prejudice as to the class members.  The parties reached an agreement to settle this dispute and plaintiffs voluntarily dismissed this action.

*Zeltiq Advertising Litigation.*  On April 26, 2017, a putative class action lawsuit was filed against Zeltiq in state court in California alleging that Zeltiq misled customers regarding the promotion of its CoolSculpting product and the product's premarket notification clearance status.  On May 30, 2017, the case was removed to the United States District Court for the Central District of California.  On July 20, 2017, Plaintiffs filed an amended complaint.  In August 2017, Zeltiq filed a motion to dismiss the amended complaint.

### Employment Litigation

In July 2012, Forest was named as defendants in an action brought by certain former Company sales representatives and specialty sales representatives in the federal district court in New York.  The action is a putative class and collective action, and alleges class claims under Title VII for gender discrimination with respect to pay and promotions, as well as discrimination on the basis of pregnancy, and a collective action claim under the Equal Pay Act.  The proposed Title VII gender class includes all current and former female sales representatives employed by the Company throughout the U.S. from 2008 to the date of judgment, and the proposed Title VII pregnancy sub-class includes all current and former female sales representatives who have been, are, or will become pregnant while employed by the Company throughout the U.S. from 2008 to the date of judgment.  The proposed Equal Pay Act collective action class includes current, former, and future female sales representatives who were not compensated equally to similarly-situated male employees during the applicable liability period.  The second amended complaint also includes non-class claims on behalf of certain of the named Plaintiffs for sexual harassment and retaliation under Title VII, and for violations of the Family and Medical Leave Act.  On August 14, 2014, the court issued a decision on the Company's motion to dismiss, granting it in part and denying it in part, striking the plaintiffs' proposed class definition and instead limiting the proposed class to a smaller set of potential class members and dismissing certain of the individual plaintiffs' claims.  Plaintiffs filed a motion for conditional certification of an Equal Pay Act collective action on May 22, 2015 which the Company has opposed.  On September 2, 2015, the court granted plaintiffs motion to

agn-10k_20171231.htm

conditionally certify a collective action. On April 3, 2017, the parties agreed to settle this matter. On February 1, 2018, the court granted preliminary approval of the settlement and set a fairness hearing for May 4, 2018.

F-92

### Patent Litigation

*Patent Enforcement Matters*

*Aczone® Gel, 7.5%.* In June and July 2017, Allergan, Inc. brought actions for infringement of U.S. Patent No. 9,517,219 (the "'219 patent") in the U.S. District Court for the District of Delaware against Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals, Inc. (collectively, "Taro"). Taro had notified Allergan in April and July 2017, that it filed an ANDA with the FDA seeking to obtain approval to market a generic version of Aczone® Gel, 7.5% before the '219 patent expires in November 2033. These lawsuits triggered automatic stays of approval of Taro's ANDA that expire no earlier than October 2019 and January 2020, respectively (unless there is a final court decision adverse to Plaintiff sooner). Trial has been scheduled for February 4, 2019, assuming the parties consent to Magistrate Judge Fallon conducting all proceedings in the case. Otherwise, when the case is ready for trial the court will assign a district judge and the pre-trial and trial dates will be set depending on the district judge's schedule.

*Amrix®.* In August 2014, Aptalis Pharmatech, Inc. ("Aptalis") and Ivax International GmbH ("Ivax"), Aptalis's licensee for Amrix, brought an action for infringement of U.S. Patent No. 7,790,199 (the "'199 patent"), and 7,829,121 (the "'121 patent") in the U.S. District Court for the District of Delaware against Apotex Inc. and Apotex Corp. (collectively "Apotex"). Apotex has notified Aptalis that it has filed an ANDA with the FDA seeking to obtain approval to market a generic version of Amrix before these patents expire. (The '199 and '121 patents expire in November 2023.) This lawsuit triggered an automatic stay of approval of Apotex's ANDA until no earlier than December 27, 2016 (unless there is a final court decision adverse to Plaintiffs sooner), and subject to any other exclusivities, such as a first filer 180 day market exclusivity). A bench trial concluded on November 17, 2015. On December 8, 2016, the court entered an order, opinion and judgment in favor of Plaintiffs and against Apotex, that Apotex infringes the asserted claims of the '199 and '121 patents. On December 8, 2016, Apotex filed a notice of appeal. The Federal Circuit heard oral arguments on December 5, 2017. On January 4, 2018, the Federal Circuit issued a decision reversing the district court's claim construction, vacating the district court's infringement finding, and remanding for further proceedings. Aptalis and Ivax's deadline to file a petition for rehearing was extended to February 26, 2018. On September 29, 2016, Adare Pharmaceuticals, Inc., and Ivax filed suit in U.S. District Court for the District of Delaware against Apotex asserting that Apotex's generic product will infringe U.S. Patent No. 9,399,025 (the "'025 patent"). (The '025 patent expires in November 2023.). On March 17, 2017, the district court granted the parties' joint stipulation to stay the action concerning the '025 patent.

*Bystolic®.* On January 19, 2018, Allergan Sales, LLC, Allergan USA, Inc., and Forest Laboratories Holdings, Ltd. brought an action for infringement of U.S. Patent No. 6,545,040 in the United States District Court for the District of Delaware against Aurobindo Pharma USA, Inc. and Aurobindo Pharma Ltd. (collectively, "Aurobindo"). Aurobindo had notified Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity) that Aurobindo had filed an ANDA with FDA seeking to obtain approval to market generic versions of Bystolic® 2.5 mg, 5 mg, 10 mg, and 20 mg nebivolol hydrochloride tablet products before the '040 Patent expires in December 17, 2021. This lawsuit triggered an automatic stay of approval of Aurobindo's ANDA that expires no earlier than June 2020 (unless there is a final court decision adverse to Plaintiffs sooner). No trial date or case schedule has been set.

Previously, the Company had asserted the '040 patent in actions against Actavis, Alkem, Amerigen, Glenmark, Hetero, Indchemie and Torrent, and related subsidiaries and affiliates thereof (collectively, "the Original Defendants"), and reached settlements terminating those actions. As previously announced, under the terms of the settlement agreements, the Company will provide licenses to each of the Original Defendants that will permit them to launch their generic versions of Bystolic as of the date that is the later of (a) three calendar months prior to the expiration of the '040 patent, including any extensions and/or pediatric exclusivities, or (b) the date each company receives final FDA approval of its ANDA, or earlier in certain circumstances.

*Byvalson®.* On September 18, 2017, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity) and Forest Laboratories Holdings, Ltd. (collectively, "Forest") brought an action for infringement of U.S. Patent Nos. 7,803,838 (the "'838 patent") and 7,838,552 (the "'552 patent") in the U.S. District Court for the District of New Jersey against Prinston Pharmaceutical Inc., Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai US Inc. and Solco Healthcare US, LLC (collectively, "Prinston"). Prinston notified Forest that it filed an ANDA with the FDA seeking to obtain approval to market a generic version of Byvalson® before the '838 and '552 patents expire. The '838 patent expires in August 2026, and the '552 patent expires in October 2027. This lawsuit triggered an automatic stay of approval of the Prinston ANDA until February 2020 (unless a court issues a decision adverse to Forest sooner). On February 5, 2018, Prinston Pharmaceutical Inc. filed its answer and counterclaims. No trial date or schedule has been set.

*Combigan® II-III.* In 2012, Allergan filed a complaint against Sandoz, Alcon, Apotex and Watson in the U.S. District Court for the Eastern District of Texas, Marshall Division, alleging that their proposed products infringe U.S. Patent Number 8,133,890 (the "890 Patent"), and subsequently amended their complaint to assert infringement of U.S. Patent Number 8,354,409. In March 2013, Allergan received a Paragraph IV certification from Sandoz, contending that the '890 Patent is invalid and not infringed by the

10/24/2018
agn-10k_20171231.htm
F-93

proposed generic product. In October 2013, Allergan filed a motion to stay and administratively close the Combigan II matter, which was granted. In April 2015, Allergan filed a stipulation of dismissal and the U.S. District Court granted the Order with respect to the Watson defendants. In October 2015, the U.S. District Court entered an order consolidating the *Combigan® III* matter *C.A. 2:15-cv-00347-JRG* into this matter *C.A. 2:12-cv-00207-JRG*, as lead case. A Markman Hearing was held on March 2, 2016.

On May 19, 2016, Sandoz filed an opposed motion for leave to amend its answer and counterclaim seeking to add a count for declaratory judgment of invalidity of the '149 Patent. On July 20, 2016, Alcon and Sandoz filed motions for summary judgment of invalidity and non-infringement of claim 4 of the '149 Patent, and Allergan filed a motion for summary judgment of infringement of claim 4 of the '149 Patent and to preclude Sandoz from re-challenging the validity of that claim. On September 30, 2016, the court denied the parties' motions for summary judgment. A bench trial concluded on October 27, 2016. On December 30, 2016, the court entered an opinion and final judgment in favor of Allergan and against Sandoz, that the asserted claims of the '149 Patent, and U.S. Patent Numbers 7,320,976 ("'976 Patent") and 8,748,425 (the "'425 Patent"), were not invalid, and that Sandoz infringes the asserted claims of the '425 Patent. The court also held in favor of Sandoz and against Allergan, that Sandoz does not infringe the asserted claims of the '149 and '976 Patents. Sandoz filed a notice of appeal to the U.S. Court of Appeals for the Federal Circuit on January 17, 2017, and Allergan filed a notice of cross appeal on January 27, 2017. The Federal Circuit heard oral arguments on October 2, 2017. On December 22, 2017, the Federal Circuit issued a decision affirming the district court's finding of no invalidity of the asserted claims and non-infringement of the claims of the '149 and '976 Patents, and reversing the district court's finding of infringement of claim 1 of the '425 Patent. On January 22, 2018, Allergan filed a combined petition for panel rehearing or rehearing *en banc*. The petitions are currently pending.

*Combigan® IV.* On October 30, 2017, Allergan Sales, LLC and Allergan, Inc. filed a complaint against Sandoz, Inc. and Alcon Laboratories, Inc. ("Sandoz") in the U.S. District Court for the District of New Jersey, alleging that their proposed generic versions of Combigan® infringe U.S. Patent Number 9,770,453 (the "'453 Patent"), which expires on April 19, 2022. The '453 Patent is listed in the Orange Book for Combigan®. No trial date or case schedule has been set.

*Delzicol®.* On August 28, 2015, Warner Chilcott Company, LLC, Warner Chilcott (US), LLC, and Qualicaps Co., Ltd. (collectively, "Plaintiffs") brought an action for infringement of U.S. Patent No. 6,649,180 (the "'180 patent") in the United States District Court for the Eastern District of Texas against Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. (collectively, "Teva"). Teva notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Delzicol® before the '180 patent expires in April 2020. This lawsuit triggered an automatic stay of approval of Teva's ANDA that expires no earlier than January 2018 (unless there is a final court decision adverse to Plaintiffs sooner). Trial was scheduled for October 2017. On November 9, 2015, Plaintiffs also brought an action for infringement of '180 patent in the United States District Court for the Eastern District of Texas against Mylan Pharmaceuticals, Inc., Mylan Laboratories Limited and Mylan, Inc. (collectively, "Mylan"). Mylan notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Delzicol® before the '180 patent expires in April 2020. This lawsuit triggered an automatic stay of approval of Mylan's ANDA that expires no earlier than March 2018 (unless a court issues a decision adverse to Plaintiffs sooner). Trial was scheduled for October 2017. In March 2016, the court entered an order consolidating the Mylan litigation (*C.A. 2:15-cv-01740*) with the Teva litigation (*C.A. 2:15-cv-01471*) matter as the lead case.

On April 1, 2016, Warner Chilcott Company, LLC, Warner Chilcott (US), LLC, Allergan Pharmaceuticals International Ltd., Allergan USA, LLC and Qualicaps Co., Ltd. (collectively, "Plaintiffs") brought an action for infringement of the '180 patent in the United States District Court for the Eastern District of Texas against Zydus International Pvt. Ltd., Zydus Pharmaceuticals (USA) Inc. and Cadila Healthcare Ltd. (collectively, "Zydus"). Zydus notified the Company that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Delzicol® before the '180 patent expires. On November 28, 2016, Plaintiffs entered into a settlement agreement with Zydus. Under the terms of the settlement agreement, Zydus may launch its generic version of Delzicol® on March 1, 2020, or earlier under certain circumstances.

On March 31, 2017, Plaintiffs filed a motion to stay the litigation against Teva, and, on April 11, 2017, Plaintiffs filed a motion to dismiss the originally-filed action against Teva for lack of subject matter jurisdiction. On April 21, 2017, Plaintiffs brought an action for infringement of the '180 patent in the United States District Court for the Eastern District of Texas against Teva Pharmaceuticals USA, Inc., which had notified Plaintiffs that, on or before March 9, 2017, it had amended its ANDA seeking to obtain approval to market generic versions of Delzicol®. Teva also notified Plaintiffs that it had submitted to FDA a new paragraph IV certification for the '180 patent in connection with its ANDA. On July 25, 2017, the Magistrate Judge denied Plaintiffs' motion to stay the originally-filed action against Teva and also issued a Report and Recommendation denying Plaintiffs' motion to dismiss the same action. On August 7, 2017, Teva and Mylan filed motions for summary judgment of non-infringement, and Teva filed a motion for summary judgment for alleged improper Orange Book listing. On September 28, 2017, the Magistrate Judge issued a Report and Recommendation granting Teva's and Mylan's motions for summary on non-infringement and denying, as moot, Teva's summary judgment motion concerning Orange Book listing. On October 13, 2017, Plaintiffs and Defendants filed objections to the Magistrate Judge's Report and Recommendation on non-infringement. On October 24, 2017, the District Court adopted the Magistrate Judge's

agn-10k_20171231.htm

F-94

recommendation as to non-infringement and issued final judgment on that issue. The District Court also ruled that defendants' counterclaims be taken up after finality is achieved with respect to the non-infringement issue. On November 21, 2017, Plaintiffs filed a notice of appeal with the U.S. Court of Appeals for the Federal Circuit.

On December 18, 2017, Plaintiffs Allergan Sales, LLC and Qualicaps Co., Ltd. entered into a settlement agreement with Mylan and the actions with respect to Mylan were subsequently dismissed. Under the terms of the settlement agreement, Mylan may launch its generic version of Delzicol® on July 1, 2019, or earlier under certain circumstances. Plaintiffs' opening appeal brief with respect to Teva, the remaining defendant, is due March 1, 2018.

*Delzicol® IPR.* On November 4, 2016, Mylan Pharmaceuticals Inc. ("Mylan") filed a petition for *Inter Partes* Review ("IPR") with the USPTO regarding U.S. Patent No. 6,649,180 (the "'180 patent"). Qualicaps Co., Ltd.'s filed a patent owner preliminary response on February 17, 2017. On May 17, 2017, the USPTO granted Mylan's petition to institute an IPR on certain grounds with respect to claims 1 and 4 of the '180 patent. On July 21, 2017, Qualicaps filed a patent owner response. September 15, 2017, Mylan filed a reply. A hearing is scheduled for January 25, 2018. On December 18, 2017, Allergan Sales, LLC and Qualicaps Co., Ltd. entered into a settlement agreement with Mylan and certain Mylan affiliates. On December 19, 2017, the USPTO granted the parties' joint motion to terminate the IPR proceedings.

*Fetzima®.* In September and October 2017, certain Allergan subsidiaries and Pierre Fabre Medicament received Paragraph IV certification notice letters from Amneal Pharmaceuticals LLC, Aurobindo Pharma USA, Inc., MSN Laboratories Private Limited, Prinston Pharmaceutical Inc., Torrent Pharmaceuticals Limited, West-Ward Pharmaceuticals International Limited, and Zydus Pharmaceuticals (USA) Inc. indicating that they had submitted to FDA ANDAs seeking approval to manufacture and sell generic versions of FETZIMA® 20 mg, 40 mg, 80 mg, and 120 mg extended release capsules ("FETZIMA") before the expiration of the three patents listed in the Orange Book, including U.S. Patent Nos. RE43,879 (the "'879 Patent"); 8,481,598 (the "'598 Patent"); and 8,865,937 (the "'937 Patent"). The '879 Patent expires in June 2023 (not including a pending application for patent term extension ("PTE")), the '598 Patent expires in March 2031, and the '937 Patent expires in May 2032. These generic ANDA filers claim in their respective notice letters that the '879 Patent, the '598 Patent and the '937 Patent are invalid and/or would not be infringed.

On October 30, 2017, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity) and Forest Laboratories Holdings Limited, Allergan USA, Inc., and Pierre Fabre Medicament S.A.S. (collectively, "Forest") brought an action for infringement of the '879 Patent, the '598 Patent and the '937 Patent against MSN Laboratories Private Limited and MSN Pharmaceuticals Inc. (collectively, "MSN"). On October 31, 2017, Forest brought actions for infringement of the '879 Patent, the '598 Patent, and the '937 Patent against Prinston Pharmaceutical Inc. and Solco Healthcare U.S., LLC (collectively, "Prinston"), Torrent Pharmaceuticals Limited and Torrent Pharma Inc. (collectively, "Torrent"), West-Ward Pharmaceuticals International Limited and West-Ward Pharmaceuticals Corp. (collectively, "West-Ward"), and Zydus Pharmaceuticals (USA) Inc. ("Zydus"). On November 15, 2017, Forest brought actions for infringement of the '879 Patent, the '598 Patent and the '937 Patent against Aurobindo Pharma USA, Inc. and Aurobindo Pharma Limited (collectively, "Aurobindo"), and Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals Private Limited (collectively, "Amneal"). each of these lawsuits were brought in the U.S. District Court for the District of New Jersey and triggered automatic stays of approval of the ANDAs until January 2021 (unless a court issues a decision adverse to Forest sooner).

In December 2017 and January 2018 MSN, Torrent, West-Ward, Zydus, and Amneal filed answers and counterclaims, and Prinston and Aurobindo filed answers, in their respective actions. In January 2018 Forest filed answers to MSN, Torrent, West-Ward and Zydus's counterclaims. No trial dates or case schedules have been set.

*Juvéderm® XC IPRs.* On August 2, 2017, Teoxane S.A. ("Teoxane") filed a petition for *Inter Partes* Review (Trial number IPR2017-01906) with the USPTO regarding U.S. Patent No. 8,357,795, which was accorded a filing date of September 13, 2017. And on August 24, 2017, Teoxane filed a petition for *Inter Partes* Review (Trial Number IPR2017-02002) with the USPTO regarding U.S. Patent Number 8,450,475, which was accorded a filing date of September 13, 2017. On December 13, 2017, Allergan filed Patent Owner Preliminary Responses. On January 9, 2018, the USPTO granted Teoxane's opposed request to file a reply brief and Allergan's request to file a sur-reply brief. Teoxane filed its reply on January 15, 2018, and Allergan filed its sur-reply on January 22, 2018. An institution decision is expected by March 13, 2018.

*Lastacaft®.* In July 2017, the Company and Vistakon Pharmaceuticals, LLC received a Paragraph IV certification notice letter from Aurobindo Pharma USA Inc. ("Aurobindo") indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell a generic version of LASTACAFT® ("LASTACAFT") before the expiration of U.S. Patent No. 8,664,215 (the "'215 Patent) listed in the Orange Book. The '215 Patent expires December 2027. Aurobindo claims that the patent listed in its notice letter is invalid, unenforceable and/or would not be infringed. On September 8, 2017, Allergan, Inc. and Vistakon Pharmaceuticals, LLC (collectively, "Plaintiffs"), brought an action for infringement of the '215 Patent in the U.S. District Court for the District of Delaware against Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc. and Auromedics Pharma LLC (collectively, "Defendants"). This

10/24/2018                                      agn-10k_20171231.htm

F-95

lawsuit triggered an automatic stay of approval of the applicable ANDA that expires no earlier than January 2020 (unless there is a final court decision adverse to Plaintiffs sooner). On October 10, 2017 Aurobindo filed an answer and counterclaims. On October 31, 2017 Plaintiffs filed an answer to Aurobindo's counterclaims.   Trial has been scheduled for July 2019.

*Latisse® IV.* In December 2016, Sandoz announced the U.S. market launch of Defendants' generic copy of LATISSE®.  In July 2017, Plaintiffs Allergan and Duke University (collectively, "Plaintiffs") filed a complaint for infringement of U.S. Patent Number 9,579,270 ("'270 Patent") against Defendants Sandoz Inc. ("Sandoz") and Alcon Laboratories, Inc. ("Alcon") in the U.S. District Court for the Eastern District of Texas.  (The '270 patent expires in January 2021.)  In their complaint, Plaintiffs seek, among other things, a judgment that Defendants have infringed the '270 patent by making, selling, and offering to sell, and/or importing, their generic copy of LATISSE® within the United States.  Plaintiffs seek injunctive relief and damages for Defendants' infringement.  On September 14, 2017, Defendants filed a joint motion to transfer venue to the Middle District of North Carolina ("MDNC").  On September 14, 2017, Defendants also filed a complaint in the MDNC for declaratory judgment seeking, among other things, a declaration of invalidity, unenforceability and non-infringement of the '270 patent, a declaration precluding Allergan and Duke University from asserting the '270 based on collateral estoppel and a declaratory judgment that assertion of the '270 patent constitutes patent misuse, sham litigation and a violation of the Sherman Act.  In the MDNC complaint Sandoz and Alcon seek an unspecified amount of treble damages.

On October 31, 2017, Plaintiffs in the federal court action in Texas filed their opposition to Defendants' motion to transfer venue to the MDNC and filed an opposed motion to transfer venue to the District of New Jersey ("DNJ").  Briefing was completed on November 21, 2017.  In November 2017, Plaintiffs filed a motion to dismiss Defendants' counterclaims, or alternatively, to bifurcate and stay Defendants' antitrust and misuse counterclaims.  Briefing was completed on November 30, 2017.  In November 2017, Defendants filed an opposed motion to stay all proceedings in the EDTX action pending the Court's resolution of the Parties' pending motions to transfer venue.  Briefing was completed on December 13, 2017.  In November 2017, Defendants filed an opposed motion to dismiss or transfer pursuant to 28 U.S.C. §1400(b) and §1406(a).  Briefing was completed on December 14, 2017.  Each of the above motions is currently pending, and jury selection in the EDTX action has been scheduled for December 2018.

On September 14, 2017, Sandoz and Alcon filed a joint motion for summary judgment in the North Carolina federal court action based on collateral estoppel. In November 2017, Allergan filed an opposed motion to dismiss for lack of jurisdiction, which is still pending. In November 2017, Allergan filed an opposed motion to stay summary judgment proceedings, which was denied on December 12, 2017.  On January 8, 2018, Allergan filed its response in opposition to Sandoz and Alcon's motion for summary judgment, and on January 22, 2018, Sandoz and Alcon filed their reply.   On February 1, 2018, the North Carolina federal court action was stayed pending resolution of the motions to transfer venue in the Texas federal court action.

In addition, in August 2017, the Company and Duke University received a Paragraph IV certification notice letter from Alembic Pharmaceuticals, Ltd. ("Alembic") indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell a generic version of LATISSE® ("LATISSE") before the expiration of U.S. Patent Nos. 8,038,988 (the "'988 Patent"), 8,101,161 (the "'161 Patent"), 8,263,054 (the "'054 Patent"), 8,541,466 (the "'466 Patent"), 8,632,760 (the "'760 Patent"), 8,758,733 (the "'733 Patent"), 8,906,962 (the "'962 Patent"), 8,986,715 (the "'715 Patent"), 9,216,183 (the "'183" Patent), 9,226,931 (the "'931 Patent) and 9,579,270 (the "'270 Patent").  (The '466, '962 and '270 Patents expire in January 2021; the '054, '760, '733, '715, '183, and '931 Patents expire in January 2023; the '988 Patent expires in August 2023; and the '161 Patent expires in May 2024). Alembic claims that the patents listed in its notice letter are invalid, unenforceable and/or would not be infringed.  On September 25, 2017, Allergan, Inc., Allergan Sales, LLC and Duke University (collectively, "Plaintiffs"), brought an action for infringement of the '270 Patent in the U.S. District Court for the District of New Jersey against Alembic Pharmaceuticals, Ltd., Alembic Global Holding SA, and Alembic Pharmaceuticals, Inc. (collectively, "Alembic").  This lawsuit triggered an automatic stay of approval of the applicable ANDA that expires no earlier than February 2020 (unless there is a final court decision adverse to Plaintiffs sooner). On December 26, 2017, Alembic filed its answer and counterclaims. On January 5, 2018, defendant Alembic Global Holding SA was dismissed without prejudice. No trial date or case schedule has been set.

*Linzess®.* In October and November 2016, the Company and Ironwood received Paragraph IV certification notice letters from Teva Pharmaceuticals USA, Inc. ("Teva") , Aurobindo Pharma Ltd., Mylan Pharmaceuticals, Inc. ("Mylan"), and Sandoz Inc. ("Sandoz") indicating that they had submitted to FDA ANDAs seeking approval to manufacture and sell generics version of LINZESS® 145 mcg and 290 mcg capsules ("LINZESS") before the expiration of some or all of the nine patents then listed in the Orange Book, including U.S. Patent Nos. 7,304,036 (the "'036 Patent"); 7,371,727 (the "'727 Patent"); 7,704,947 (the "'947 Patent"); 7,745,409 (the "'409 Patent"); 8,080,526 (the "'526 Patent"); 8,110,553 (the "'553 Patent"); 8,748,573 (the "'573 Patent"); 8,802,628 (the "'628 Patent"); and 8,933,030 (the "'030 Patent"). (The '727, '947, '409, '526 and '553 Patents expire in January 2026; the '036 Patent expires in August 2026; and the '573, '628 and '030 Patents expire in 2031.) Teva, Aurobindo Pharma Ltd., Mylan and Sandoz claim that the patents discussed in their respective notice letters are invalid, unenforceable and/or would not be infringed.  On November 30, 2016, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity), Forest Laboratories Holdings, Ltd., Allergan USA, Inc. and Ironwood Pharmaceuticals, Inc. (collectively,

agn-10k_20171231.htm

F-96

"Plaintiffs"), brought an action for infringement of some or all of the '036, '727, '947, '409, '526, '553, '573, '628 and '030 Patents in the U.S. District Court for the District of Delaware against Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc. (collectively, "Aurobindo"), Teva, Mylan and Sandoz.  This lawsuit triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than February 2020 (unless there is a final court decision adverse to Plaintiffs sooner).  Mylan filed its answer on December 22, 2016.  Teva and Sandoz filed their respective answers and counterclaims on January 20 and January 30, 2017.  Aurobindo filed its answer and counterclaims on April 6, 2017.   On May 19, 2017, the district court entered a scheduling order.  Trial is scheduled for June 2019.  On July 13, 2017, Mylan filed a motion to dismiss for improper venue.

In May 2017, the Company and Ironwood also received a Paragraph IV certification notice letter from Sun Pharma Global FZE indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell a generic version of LINZESS before the expiration of the '573, '628 and '030 Patents. Sun Pharma Global FZE claims that the patents are invalid and/or would not be infringed.  On June 30, 2017, Plaintiffs brought an action for infringement of the '573, '628 and '030 Patents in the U.S. District Court for the District of Delaware against Sun Pharma Global FZE and Sun Pharmaceutical Industries Inc. (collectively, "Sun"). This lawsuit triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than February 2020 (unless there is a final court decision adverse to Plaintiffs sooner).  In January 2018, Allergan and Ironwood entered into a settlement agreement with Sun and certain Sun affiliates. Under the terms of the settlement agreement, Plaintiffs will provide a license to Sun to market a generic version of LINZESS in the United States beginning on February 1, 2031 (subject to U.S. FDA approval), or earlier in certain circumstances. The Sun action was dismissed on January 18, 2018.

In July 2017, the Company and Ironwood received a second Notice Letter relating to the ANDA submitted to the FDA by Aurobindo. Aurobindo claims that the '036, '727, '947, '409, '526, '553 Patents, as well as the '573, '628 and '030 Patents, are invalid and/or would not be infringed.  On August 25, 2017, Plaintiffs brought an action for infringement of these patents in the U.S. District Court for the District of Delaware against Aurobindo. On September 28, 2017, this action was consolidated with the first action filed against Aurobindo.

In September 2017, October 2017 and January 2018, the Company and Ironwood received a second Notice Letter relating to the ANDA submitted to the FDA by Teva, Mylan and Sandoz, respectively. Teva, Mylan and Sandoz claim that U.S. Patent No. 9,708,371 (the "'371 Patent") is invalid and/or would not be infringed by their respective ANDAs.  (The '371 Patent expires in 2033.) On October 20, 2017, November 30, 2017 and January 20, 2018, Plaintiffs brought actions for infringement of the '371 patent in the U.S. District Court for the District of Delaware against Teva, Mylan and Sandoz, respectively.  In November 2017, Teva filed an answer and counterclaims seeking a declaratory judgment of invalidity and non-infringement with respect to the '371 patent. In December 2017, Mylan filed an answer in the '371 patent action. The actions filed in October and November 2017 against Teva and Mylan have been consolidated with the lawsuit filed in November 2016.

In December 2017, the Company and Ironwood received a Paragraph IV certification notice letter from Teva indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell generic versions of LINZESS® 72 mcg capsules ("Teva's 72 mcg ANDA") before the expiration of the '036, '727, '947, '409, '526, '553, '030 and '371 Patents. Teva claims that these patents are invalid, unenforceable and/or would not be infringed. On February 2, 2018, Forest Laboratories Holdings, Ltd., Allergan USA, Inc., Allergan Sales, LLC and Ironwood Pharmaceuticals, Inc. (collectively, "Plaintiffs"), brought an action for infringement of the '036, '727, '947, '409, '526, '553, '030 and '371 Patents in the U.S. District Court for the District of Delaware against Teva. This lawsuit triggered an automatic stay of approval of Teva's 72 mcg ANDA that expires no earlier than June 2020 (unless there is a final court decision adverse to Plaintiffs sooner). No schedule has been set.

*Namenda XR®.* Between January and October 2014, Forest Laboratories, Inc., Forest Laboratories Holdings, Ltd. (collectively, "Forest") and Merz Pharma and Adamas Pharmaceuticals, Forest's licensors for Namenda XR® (all collectively, "Plaintiffs"), brought actions for infringement of some or all of U.S. Patent Nos. 5,061,703 (the "'703 patent"), 8,039,009 (the "'009 patent"), 8,168,209 (the "'209 patent"), 8,173,708 (the "'708 patent"), 8,283,379 (the "'379 patent"), 8,329,752 (the "'752 patent"), 8,362,085 (the "'085 patent"), and 8,598,233 (the "'233 patent") in the U.S. District Court for the District of Delaware against Wockhardt, Teva, Sun, Apotex, Anchen, Zydus, Watson, Par, Mylan, Amneal, Ranbaxy, and Amerigen, and related subsidiaries and affiliates thereof. These companies have notified Plaintiffs that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Namenda XR® before these certain patents expire. Including a 6-month pediatric extension of regulatory exclusivity, the '703 patent expires in October 2015, the '009 patent expires in September 2029, and the '209, '708, '379, '752, '085, and '233 patents expire in May 2026. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than June 2016 (unless there is a final court decision adverse to Plaintiffs sooner). On June 11, 2014, Mylan filed a motion to dismiss for lack of personal jurisdiction, which the district court denied on March 30, 2015. On December 18, 2014, Ranbaxy filed an IPR before the Patent Trial and Appeal Board, U.S. Patent and Trademark Office, with respect to the '085 patent. Adamas filed a preliminary response on April 14, 2015. On May 1, 2015, Forest entered into a settlement agreement with Ranbaxy. On May 15, 2015, the Patent Trial and Appeal Board granted Adamas and Ranbaxy's joint motion to terminate the case. On October 17, 2014, Forest and Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc. - Florida) filed a stipulation dismissing their respective claims without

prejudice. On November 3, 2014, Plaintiffs entered into a settlement agreement with Wockhardt. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Wockhardt that will permit it to launch its generic version of Namenda XR® as of the date that is the later of (a) two (2) calendar months prior to the expiration date of the last to expire of the '703 patent, the '209 patent, the '708 patent, the '379 patent, the '752 patent, the '085 patent, and the '233 patent, including any extensions and/or pediatric exclusivities; or (b) the date that Wockhardt obtains final FDA approval of its ANDA, or earlier in certain circumstances.

On January 13, 2015, Plaintiffs entered into settlement agreements with Anchen and Par. Under the terms of the settlement agreements, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide licenses to Anchen and Par that will permit them to launch their generic versions of Namenda XR® as of the date that is the later of (a) two (2) calendar months prior to the expiration date of the last to expire of the '209 patent, the '708 patent, the '379 patent, the '752 patent, the '085 patent, and the '233 patent, as well as the '009 patent for Par only, including any extensions and/or pediatric exclusivities; or (b) the dates that Anchen and Par obtain final FDA approval of their respective ANDAs, or earlier in certain circumstances. On May 11, 2015, Forest entered into a settlement agreement with Sun. On August 18, 2015, Forest entered into a settlement agreement with Zydus. On September 9, 2015, Forest entered into a settlement agreement with Amneal. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Amneal that will permit it to launch its generic version of Namenda XR® beginning January 31, 2020, following receipt by Amneal of final approval from the FDA on its ANDA for generic Namenda XR®; or (b) under certain circumstances, Amneal has an option to launch an authorized generic version of Namenda XR® beginning on January 31, 2021. The Company entered into a settlement agreement with Amerigen on October 20, 2015. The Company entered into a settlement agreement with Mylan on November 16, 2015. The Company entered into a settlement agreement with Lupin on December 22, 2015. On October 9, 2015, the Company also brought an action for infringement of the '009, '209, '708, '379, '752, '085, and '233 patents in the U.S. District Court for the District of Delaware against Accord Healthcare, Inc. and Intas Pharmaceuticals Limited (collectively, "Accord"). The Accord defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namenda XR® before these patents expire. On January 14, 2016, Forest entered into a settlement agreement with Accord. On December 8, 2015, the Company also brought an action for infringement of the '209, '708, '379, '752, '085, and '233 patents in the U.S. District Court for the District of Delaware against Panacea Biotec, Ltd. ("Panacea"). Panacea has notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namenda XR® before these patents expire. On May 17, 2016, the Company entered into a settlement agreement with Panacea.

On January 5, 2016, the district court issued a claim construction ruling that included findings of indefiniteness as to certain claim terms in the asserted patents. On February 11, 2016, the Company settled with Apotex. Trial began on February 16, 2016 with the remaining defendant Teva with respect to the '009 patent. Post-trial briefing concluded on April 29, 2016.  The Parties have reached agreement on settlement with Teva subject to Court approval.

In June 2016, after reaching an agreement to settle, the parties filed and the court entered a judgment of infringement in favor of Plaintiffs and against Teva regarding the '009 patent. On July 26, 2016, the court entered a final judgment of invalidity of claim 1 of the '209 patent, claims 1, 6, 10 and 15 of the '708 patent, claims 1 and 9 of the '752 patent, claims 1 and 7 of the '085 patent and claim 1 of the '233 patent in favor of Teva. On August 23, 2016, the Company filed a Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit in the actions involving Teva with respect to the district court's January 5, 2016 claim construction opinion and order, and the July 26, 2016 final judgment of invalidity. The Federal Circuit heard oral arguments on November 9, 2017. On December 11, 2017, the Federal Circuit issued a decision affirming the district court's judgment of invalidity with respect to certain claims of the '209, '708, '379, '752 and '085 patents. On January 10, 2018, Plaintiffs filed a petition for panel rehearing or rehearing *en banc*.  On February 12, 2018, the Federal Circuit denied Plaintiffs petitions for panel rehearing and rehearing en banc and ordered that the mandate of the court will issue on February 20, 2018.

Previously, on September 29, 2016, the Company issued a press release following announcement of ANDA approvals, including FDA final approval by Lupin.  If the district court ruling is upheld on appeal to the U.S. Court of Appeals for the Federal Circuit, there is a possibility that generic entry for Namenda XR could occur following an adverse decision.

F-98

In April 2017, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity) received a Paragraph IV certification notice letter from Macleods Pharmaceuticals, Ltd. indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell a generic version of Namenda XR® before the expiration of the '009, '209, '708, '379, '752, '085, and '233 patents. Macleods Pharmaceuticals, Ltd. claims that these patents are invalid, unenforceable and/or would not be infringed. On June 2, 2017, the Company and Adamas Pharma, LLC brought an action for infringement of the '009, '209, '708 and '379 patents in the U.S. District Court for the District of Delaware against Macleods Pharmaceuticals, Ltd. and Macleods Pharma USA, Inc. (collectively, "Macleods"). This lawsuit triggered an automatic stay of approval of the Macleods ANDA that expires no earlier than October 2019 (unless there is a final court decision adverse to Plaintiffs sooner). On September 6, 2017, Macleods filed an answer and counterclaims. On September 27, 2017, Plaintiffs filed an answer to Macleods' counterclaims. On January 24, 2018, the district court consolidated the actions filed against Macleods with respect to Macleods' ANDAs seeking approval to manufacture and sell a generic versions of Namenda XR® and Namzaric®. Trial is scheduled for May 2019.

*Namzaric®.* On August 27, 2015, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity), Forest Laboratories Holdings, Ltd. and Adamas Pharmaceuticals, Inc. (all collectively, "Plaintiffs"), brought an action for infringement of some or all of U.S. Patent Nos. 8,039,009 (the "'009 patent"), 8,058,291 (the "'291 patent"), 8,168,209 (the "'209 patent"), 8,173,708 (the "'708 patent"), 8,283,379 (the "'379 patent"), 8,293,794 (the "'794 patent"), 8,329,752 (the "'752 patent"), 8,338,485 (the "'485 patent"), 8,338,486 (the "'486 patent"), 8,362,085 (the "'085 patent"), 8,580,858 (the "'858 patent") and 8,598,233 (the "'233 patent") in the U.S. District Court for the District of Delaware against Amneal Pharmaceuticals LLC and Par Pharmaceutical, Inc., and related subsidiaries and affiliates thereof. These companies have notified Plaintiffs that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Namzaric® before these patents expire. Including a 6-month pediatric extension of regulatory exclusivity, the '009 patent expires in September 2029, and the '209, '708, '379, '752, '085, and '233 patents expire in May 2026. The '291 patent expires in December 2029, and the '794, '485, '486, and '858 patents expire in November 2025. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than January 2018 (unless there is a final court decision adverse to Plaintiffs sooner). On October 23, 2015, the Company also brought an action for infringement of the '009, '291, '209, '708, '379, '794, '752, '485, '486, '085, '858 and '233 patents in the U.S. District Court for the District of Delaware against Amerigen Pharmaceuticals, Inc. and Amerigen Pharmaceuticals Ltd. (collectively, "Amerigen"). The Amerigen defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namzaric® before these certain patents expire. On January 5, 2016, the district court in the Namenda XR® patent litigations issued a claim construction ruling that included findings of indefiniteness as to certain claim terms in certain of the patents also asserted in the pending Namzaric® patent litigations. The Company entered into a settlement agreement with Par on April 29, 2016. Under the terms of the settlement agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Par that will permit it to launch its generic version of Namzaric® as of June 5, 2029, or earlier in certain circumstances. Trial is scheduled for October 2017. In June 2016, Forest filed a motion for leave to file an amended complaint to add the '009 patent against Amneal, which the District Court granted on July 19, 2016. On May 20, 2016, the Company also brought an action for infringement of the '009, '291, '209, '708, '379, '794, '752, '485, '486, '085, '858 and '233 patents in the U.S. District Court for the District of Delaware against Accord Healthcare Inc. USA and Intas Pharmaceuticals Limited (collectively, "Accord"). The Accord defendants have notified Plaintiffs that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namzaric® before these certain patents expire. The Company entered into a settlement agreement with Accord on July 20, 2016. On August 30, 2016, Plaintiffs entered into a settlement agreement with Amneal, who is believed to be a first applicant with respect to certain dosage strengths (memantine hydrochloride extended-release and donepezil hydrochloride, 14 mg/10 mg and 28 mg/10 mg) of Namzaric®. Under the terms of the agreement, and subject to review of the settlement terms by the U.S. Federal Trade Commission, Plaintiffs will provide a license to Amneal that will permit it to launch its generic version of Namzaric® as of January 1, 2025, or earlier in certain circumstances. Alternatively, under certain circumstances, Amneal has an option to launch an authorized generic version of Namzaric® beginning on January 1, 2026. On October 21, 2016, Plaintiffs entered into a settlement agreement with Amerigen, and the case was dismissed.

On November 10, 2016, the Company also brought an action for infringement of the '009, '291, '485, '486, and '858 patents in the U.S. District Court for the District of Delaware against Apotex Corp and Apotex Inc. ("Apotex"). Apotex has notified Plaintiffs that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Namzaric® before these patents expire. This lawsuit triggered an automatic stay of approval of Apotex's ANDA that expires no earlier than March 2019 (unless there is a final court decision adverse to Plaintiffs sooner). On April 10, 2017, Plaintiffs entered into a settlement agreement with Apotex, and the case was dismissed.

In April 2017, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity) received a Paragraph IV certification notice letter from Macleods Pharmaceuticals, Ltd. ("Macleods") indicating that it had submitted to FDA an ANDA seeking approval to manufacture and sell generic versions of Namzaric® donepezil and memantine hydrochloride extended release capsules (10 mg/14 mg and 10 mg/28 mg) before the expiration of the '009, '291, '209, '708, '379,

agn-10k_20171231.htm

'794, '752, '485, '486, '085, '858 and '233 patents. Macleods claims that these patents are invalid, unenforceable and/or would not be infringed. On June 2, 2017, the Company and Adamas Pharma, LLC brought an action for infringement of the '009,

F-99

'291, '485, '486, and '858 patents in the U.S. District Court for the District of Delaware against Macleods Pharmaceuticals, Ltd. and Macleods Pharma USA, Inc. (collectively, "Macleods"). This lawsuit triggered an automatic stay of approval of the Macleods ANDA that expires no earlier than October 2019 (unless there is a final court decision adverse to Plaintiffs sooner).  ANDA that expires no earlier than October 2019 (unless there is a final court decision adverse to Plaintiffs sooner).  On September 6, 2017, Macleods filed an answer and counterclaims.  On September 27, 2017, Plaintiffs filed an answer to Macleods' counterclaims. On January 24, 2018, the district court consolidated the actions filed against Macleods with respect to Macleods' ANDAs seeking approval to manufacture and sell a generic versions of Namenda XR® and Namzaric®. Trial is scheduled for May 2019.

*Rapaflo®*. On June 17, 2013, Actavis, Inc., now known as Allergan Finance, LLC., Watson Laboratories, Inc., (collectively, "Actavis") and Kissei Pharmaceutical Co., Ltd. ("Kissei") sued Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited, Unit 3 (collectively, "Hetero") in the United States District Court for the District of Delaware, alleging that sales of silodosin tablets, a generic version of Actavis' Rapaflo® tablets, would infringe U.S. Patent No. 5,387,603 (the "'603 patent"). On June 17, 2013 Actavis and Kissei sued Sandoz Inc. ("Sandoz") in the United States District Court for the District of Delaware, alleging that sales of Sandoz's generic version of Rapaflo® would infringe the '603 patent. The complaint seeks injunctive relief.  On December 22, 2014, the Parties completed a settlement agreement with Hetero. Actavis and Kissei's lawsuit against Sandoz have been consolidated. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants prior to April 8, 2016.  On April 13, 2017, the Sandoz action was dismissed pursuant to a settlement agreement.

In July 2017, the Company and Kissei received a notice letter from Aurobindo indicating that it had filed a Paragraph IV certification and had submitted to FDA an ANDA seeking approval to manufacture and sell a generic version of RAPAFLO® ("RAPAFLO") before the expiration of U.S. Patent No. 5,387,603 (the "'603 Patent") listed in the Orange Book. (The '603 Patent expires in December 2018). Alembic claims that the patent listed in its notice letter is invalid, unenforceable and/or would not be infringed. On August 18, 2017, Allergan, Finance, LLC, Allergan Sales, LLC and Kissei Pharmaceutical Co., Ltd. (collectively, "Plaintiffs"), brought an action for infringement of the '603 Patent in the U.S. District Court for the District of Delaware against Aurobindo Pharma Ltd., Aurobindo Pharma U.S.A., Inc., and Aurobindo Pharma USA LLC (collectively, "Aurobindo"). This lawsuit triggered an automatic stay of approval of the applicable ANDA through to patent expiration (unless there is a final court decision adverse to Plaintiffs sooner). On September 13, 2017, Aurobindo filed an answer, affirmative defenses and counterclaims. On October 4, 2017 Plaintiffs filed an answer to Aurobindo's counterclaims. Trial has been scheduled for September 2019.

*Restasis®*. Between August and September 2015, Allergan brought actions for infringement of U.S. Patent Nos. 8,629,111 (the "'111 patent"), 8,633,162 (the "'162 patent"), 8,642,556 (the "'556 patent"), 8,648,048 (the "'048 patent"), and 8,685,930 (the "'930 patent") in the U.S. District Court for the Eastern District of Texas against Akorn, Inc., Apotex, Inc., Mylan Pharmaceuticals, Inc., Teva Pharmaceuticals USA, Inc., InnoPharma, Inc., and Pfizer, Inc., and related subsidiaries and affiliates thereof. On September 14, 2015, Allergan brought an action for infringement of these patents in the U.S. District Court for the District of Delaware against InnoPharma, Inc. and Pfizer, Inc. These companies have notified Allergan that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Restasis® before these patents expire in August 2024. In the Texas actions the District Court granted joint motions to dismiss without prejudice Teva Pharmaceutical Industries Ltd. and Pfizer, Inc., on October 12 and October 22, 2015, respectively. Teva Pharmaceuticals USA, Inc. ("Teva") and InnoPharma, Inc. ("InnoPharma") remain defendants in the respective actions. In October 2015, Mylan Pharmaceuticals, Inc. and Mylan, Inc. ("Mylan") filed a motion to dismiss for lack of personal jurisdiction and improper venue, and for failure to state a claim as to Mylan, Inc.; Teva filed a motion to dismiss for lack of personal jurisdiction and improper venue; Apotex, Inc. and Apotex Corp. ("Apotex") filed an answer, affirmative defenses and counterclaim; Akorn, Inc. ("Akorn") filed an answer and counterclaim; and Teva filed an answer, counterclaim and motion to dismiss. Allergan entered into a settlement agreement with Apotex on December 15, 2015. In December 2015, Allergan and Apotex filed a joint stipulation of dismissal and the U.S. District Court granted the Order with respect to the Apotex defendants. In January 2016, the court scheduled a bench trial for August 28, 2017.

In February 2016, Allergan filed an amended complaint to include U.S. Patent Number 9,248,191 (the "'191 patent"). In February and March 2016, Allergan received Paragraph IV letters from Apotex, Mylan and Teva notifying Allergan that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Restasis® before the patents expire in August 2024, contending that the '191 patent is invalid and not infringed by their respective proposed generic products.

On March 1, 2016, Allergan received a Paragraph IV letter from Famy Care Limited ("Famy Care") notifying Allergan that they have filed an ANDA with the FDA seeking to obtain approval to market generic versions of Restasis® before the patents expire in August 2024, contending that the '111 patent, the '162 patent, the '556 patent, the '048 patent, and the '191 patent are invalid and not infringed by their respective proposed generic products. In March 2016, the court entered an order requesting supplemental briefs on the effect of the Federal Circuit's *Acorda* decision (No. 2014-1456) on Teva's and Mylan's pending motions to dismiss. In their supplemental briefs, Teva acknowledged that, under the *Acorda* decision, it is subject to specific personal jurisdiction in the Eastern District of Texas and that venue is proper, and Mylan requested that the District Court refrain from taking action on its pending motion until after Mylan has sought panel and *en banc* rehearing in the *Acorda* action. In April 2016, the court issued a

memorandum and opinion denying Mylan's and Teva's motions to dismiss. On April 12, 2016, Allergan filed a complaint for infringement of the '111 patent, '162 patent, '556 patent, '048 patent, '930 patent, and the '191 patent in the U.S. District Court for the Eastern District of Texas against Famy Care. In March and April 2016, Allergan filed answers to Teva, Akorn and InnoPharma's counterclaims. On June 6, 2016, Famy Care filed an answer, affirmative defenses and counterclaims. In June 2016, Allergan filed a motion for consolidation and the court entered an order consolidating the Famy Care matter, *C.A. 2:16-cv-00401-WCB*, into *C.A. 2:15-cv-01455-WCB*, (the "Lead" case).

On May 30, 2017, Defendants filed motions for summary judgment for noninfringement, lack of enablement, and for lack of standing, or in the alternative for invalidity under 35 U.S.C. § 102(f). Allergan opposed these summary judgment motions, and briefing was completed on June 27, 2017.

On August 1, 2017, the Court conducted a pre-trial conference and motion hearing.  During the conference, (i) Mylan waived its venue objection; and (ii) the court issued oral rulings denying each of Defendants' three motions for summary judgment and stated that written opinions on those motions would follow.  Trial began on August 28, 2017, in Marshall, Texas and concluded on September 1, 2017.

On July 20, 2016, Allergan filed a complaint for infringement of the '111 patent, '162 patent, '556 patent, '048 patent, '930 patent, and the '191 patent in the U.S. District Court for the District of Delaware and, on July 21, 2016, a complaint in the U.S. District Court for the Eastern District of Texas against TWi Pharmaceuticals, Inc. and TWi Pharmaceuticals USA, Inc. ("TWi"). TWi notified Allergan that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Restasis® before these certain patents expire. Allergan entered into a settlement agreement with TWi on January 11, 2017.  Allergan entered into a settlement agreement with Famy Care on August 28, 2017. Under the terms of the settlement, Allergan will provide a license to Famy Care that will permit it to launch its generic version of Restasis beginning on February 27, 2024, or earlier in certain circumstances. Allergan entered into a settlement agreement with Innopharma on October 12, 2017. Under the terms of the settlement, Allergan will provide a license to Innopharma that will permit it to launch its generic version of Restasis® beginning on February 27, 2024, or earlier in certain circumstances. Additionally, under certain circumstances, Allergan will supply and authorize InnoPharma to launch an authorized generic version of Restasis® on August 28, 2024.

On September 8, 2017, Allergan assigned all Orange Book-listed patents for Restasis® to the Saint Regis Mohawk Tribe ("the Tribe"), a recognized sovereign tribal government, and concurrently was granted an exclusive field-of-use license to practice the patents in the United States for all FDA-approved uses of the products under the Restasis® NDAs. On October 13, 2017, Allergan filed an opposed motion to join the Tribe as a co-plaintiff in the pending action against Teva, Mylan and Akorn. On October 16, 2017, the District Court issued a decision and final judgment finding that the asserted claims of the '111 patent, the '048 patent, the '930 patent and the '191 patent were infringed, but invalid on the ground of obviousness. The District Court also held that the asserted claims were not invalid as anticipated, for lack of enablement, or for improper inventorship, and denied Akorn's counterclaims for attorney fees on the grounds that this was not an exceptional case. In a separate Order, the District Court joined the Tribe as a co-plaintiff under Federal Rule of Civil Procedure 25(c) and declined to rule on the validity of the patent assignment to the Tribe.

On October 27, 2017, Plaintiffs filed a notice of appeal to the U.S. Court of Appeals for the Federal Circuit. On December 1, 2017, Plaintiffs filed a motion seeking Defendants' production of FDA correspondence and notice of FDA approval, which the Federal Circuit denied on January 3, 2018. On January 9, 2018, Plaintiffs filed their opening appeal brief.

On December 22, 2016, Allergan filed a complaint for infringement of the '111 patent, '162 patent, '556 patent, '048 patent, '930 patent, and the '191 patent in the U.S. District Court for the Eastern District of Texas against Deva Holding A.S. ("Deva"). Deva notified Allergan that it has filed an ANDA with the FDA seeking to obtain approval to market generic versions of Restasis® before these certain patents expire.  On February 20, 2017, Deva filed an answer, affirmative defenses and counterclaims. On March 28, 2017, Deva filed a motion to stay pending either the USPTO's final written decision in the pending IPR proceedings, or the district court's issuance of a trial opinion in the consolidated actions originally brought in 2015. On July 28, 2017, Deva's stay motion was denied without prejudice.  Trial in the Deva matter is scheduled in October 2018.

*Restasis® IPR.* On June 6, 2016, Allergan, Inc. received notification letters that Inter Partes Review of the USPTO ("IPR") petitions were filed by Mylan Pharmaceuticals Inc. ("Mylan") regarding U.S. Patent Nos. 8,629,111 (the "'111 patent"), 8,633,162 (the "'162 patent"), 8,642,556 (the "'556 patent"), 8,648,048 (the "'048 patent"), 8,685,930 (the "'930 patent"), and 9,248,191 (the "'191 patent"), which patents expire on August 27, 2024. Mylan filed the IPR petition on June 3, 2016. On June 23, 2016, Allergan received a notification letter that a IPR petition and motion for joinder was filed by Argentum Pharmaceuticals LLC ("Argentum") regarding the '111 patent.  On December 7, 2016, Allergan entered into a settlement agreement with Argentum and Argentum's petition was withdrawn. On December 8, 2016, the USPTO granted Mylan's petitions to institute IPRs with respect to these patents. On January 6, 2017, each of Akorn, Famy Care and Teva filed, and on January 9, 2017 the USPTO received, IPR petitions with respect to these patents and motions for joinder with the Mylan IPR. On February 6, 2017, Allergan opposed joinder.  On March 20,

2017, Allergan filed patent owner responses.  The USPTO granted Teva's and Akorn's joinder motions on March 31, 2017.    On April 27, 2017, the USPTO decided not to join Famy Care as a petitioner to the earlier-filed IPR petitions.  On July 10, 2017, the USPTO denied Famy Care's motion for joinder with the IPRs instituted in December 2016, and on July 10 and 12, 2017, granted Famy Care's petitions to institute IPRs with respect to these same patents.  On May 31, 2017, the USPTO granted-in part a motion by Mylan for additional discovery.  On July 14, 2017, Allergan filed a patent owner sur-reply.  On July 20, Allergan and Mylan filed requests for oral argument.  On July 28, 2017, the USPTO rescheduled the hearing for September 13, 2017.

On September 8, 2017, Allergan assigned all Orange Book-listed patents for Restasis® to the Saint Regis Mohawk Tribe ("the Tribe"), a recognized sovereign tribal government, and concurrently was granted an exclusive field-of-use license to practice the patents in the United States for all FDA-approved uses of the products under the Restasis® NDAs.  That same day, the Tribe filed an updated Mandatory Notice with the USPTO to reflect that the Tribe is the patent owner, and sought permission to file a motion to dismiss based on tribal sovereign immunity.  During a September 11, 2017 teleconference, the USPTO postponed the September 13, 2017 hearing and set a briefing schedule on the Tribe's motion to dismiss.  The Tribe filed its opening brief on September 22, 2017, Petitioners filed their opposition brief on October 13, 2017, and the Tribe filed its reply brief on October 20, 2017.  On October 4, 2017, the USPTO denied Mylan's request for authorization to file a motion for additional discovery, and denied without prejudice Allergan's counsel's request to withdraw from the IPR proceedings.  On November 3, 2017, the USPTO issued an order that (a) granted a motion by High Tech Inventors Alliance requesting authorization to file a brief as *amicus curiae* on the issues presented in the Tribe's motion to terminate, (b) permitted any other *amicus curiae* wishing to file a brief related to the Tribe's motion to terminate to do so, (c) permitted the parties to file a single response to any amicus briefs, (d) denied without prejudice Allergan's counsel's renewed request for authorization to file a motion to withdraw as counsel, and (e) adjusted the time to enter a final written decision in these proceedings to April 6, 2018. On November 29, 2017, the USPTO granted Patent Owner's motions to seal certain portions of certain exhibits. Between December 1 and December 4, 2017, amicus briefs were submitted on behalf of Petitioners and Patent Owner, which both filed responses on December 15, 2017.

On December 21, 2017, Allergan's counsel renewed its request to file a motion to withdraw on the ground that, as of September 8, 2017, Allergan ceased to be an owner of the six patents involved in the IPR proceedings. On January 2, 2018, the USPTO authorized Allergan to file a motion to withdraw. Allergan filed its motion on January 9, 2018, and Petitioners filed its opposition on January 17, 2018. On December 22, 2017, the USPTO granted Petitioners' request to file supplemental briefing limited to addressing the issue of litigation waiver discussed in the USPTO's recent *LSI* and *Ericsson* decisions. Petitioners and Patent Owner filed their supplemental briefs on January 5, and January 12, 2018, respectively.

On January 2, 2018, the Tribe filed a Request for Oral Hearing pursuant to 37 C.F.R. § 42.70(a) seeking certain discovery concerning the identity and impartiality of the merits panel assigned to this IPR. On January 4, 2018, the USPTO issued an order (a) denying the Tribe's request for oral hearing, (b) denying the Tribe's request for authorization to file a motion for additional discovery, (c) ordering the Tribe not to make any further requests for additional discovery directed to the Board in the IPR proceedings, and (d) ordering the Tribe not to file any further papers in the IPR proceedings without prior authorization from the Board. A rescheduled hearing date has not been set.

*Saphris®.* Between September 2014 and May 2015, Forest Laboratories, LLC (which later merged with and into Allergan Sales, LLC, with Allergan Sales, LLC as the surviving entity), and Forest Laboratories Holdings Ltd. (collectively, "Forest") brought actions for infringement of some or all of U.S. Patent Nos. 5,763,476 (the "'476 patent"), 7,741,358 (the "'358 patent") and 8,022,228 (the "'228 patent") in the U.S. District Court for the District of Delaware against Sigmapharm Laboratories, LLC, Hikma Pharmaceuticals, LLC, Breckenridge Pharmaceutical, Inc., Alembic Pharmaceuticals, Ltd. and Amneal Pharmaceuticals, LLC, and related subsidiaries and affiliates thereof. Including a 6-month pediatric extension of regulatory exclusivity, the '476 patent expires in December 2020, and the '358 and '228 patents expire in October 2026. These lawsuits triggered an automatic stay of approval of the applicable ANDAs that expires no earlier than August 13, 2017 (unless a court issues a decision adverse to Forest sooner). On February 3, 2015, the District Court consolidated the then-pending actions for all purposes. On September 30, 2015, the District Court consolidated all pending actions. On March 28, 2016, the court entered Forest and Hikma's proposed joint stipulation and order of adverse judgment and dismissal of claims related to the '358 and '228 patents. In April 2016, the court granted the proposed consent judgment of non-infringement and order of dismissal of counterclaims related to the '358 and '228 patents, as well as a stipulation and order with respect to infringement of Claims 1, 2, and 6 of the '476 patent, between Plaintiffs and Breckenridge. The Court also granted the proposed stipulation of entry and proposed order of adverse judgment and dismissal of counterclaims related to the '358 and '228 patents between Plaintiffs and Sigmapharm. Trial is scheduled to begin in October 2016 with respect to the '476 patent, the only remaining patent-in-suit. In April, May and July 2016, the court granted the proposed stipulations and orders of infringement of certain claims of the '476 patent as to Hikma, Breckenridge and Alembic. On October 13, 2016, the court stayed trial as to Sigmapharm and extended the 30-month stay as to Sigmapharm.  Trial concluded on November 3, 2016.  The parties filed their opening post-trial briefs on January 23, 2017 and their responsive briefs on March 17, 2017.  On June 30, 2017, the district court issued an opinion and order finding all asserted claims of the '476 patent valid, and that claims 4, 9 and 10 were not infringed by Alembic and Breckenridge.  On July 11, 2017, the district court entered a final judgment that ordered, among other things, that

Alembic's, Amneal's, Breckenridge's and Hikma's respective ANDAs not be granted final approval by FDA earlier than the date of expiration of the '476 patent inclusive of any applicable adjustments, extensions or exclusivities. On July 28, 2017, Alembic, Amneal, Breckenridge and Hikma (the "Appeal Defendants") filed notices of appeal. On August 9, 2017, Plaintiffs filed a notice of cross appeal. The issue of infringement as to Sigmapharm remains stayed.  On November 2, 2017, the Appeal Defendants filed their opening appeal brief. On January 26, 2018, Plaintiffs filed their principal and response appeal brief.

On July 25, 2017, the District Court actions were reassigned to Judge Mitchel S. Goldberg of the U.S. District Court for the Eastern District of Pennsylvania. On September 15, 2017, Sigmapharm filed a motion to lift the stay and proceed to trial on the issue of infringement.  Plaintiffs filed an opposition on September 29, 2017, and Simapharm filed a reply on October 6, 2017.  A hearing on Sigmapharm's motion was held on November 7, 2017, and Sigmapharm's motion was denied by order entered November 8, 2017. On January 25, 2018, Sigmapharm submitted a letter to the district court regarding Sigmapharm's request to lift the stay. Plaintiffs filed a response on January 29, 2018.

*Savella®*. On October 5 and 6, 2017, Forest Laboratories Holdings, Ltd., Allergan Sales, LLC and Allergan USA, Inc. (collectively, "Allergan and Forest") brought actions for infringement of U.S. Patent Nos. 6,602,911 (the "'911 patent"), 7,888,342 (the "'342 patent"), and 7,994,220 (the "'220 patent") in the U.S. District Court for the District of Delaware and the District of New Jersey, respectively, against Strides Pharma Global Pte Limited and Strides Pharma Inc. (collectively, Strides").  Strides notified Forest that it filed an ANDA with the FDA seeking to obtain approval to market a generic version of Savella® before the '911, '342 and '220 patents expire. (The '342 patent expires in November 2021, the '911 patent expires in January 2023, and the '220 patent expires in September 2029.)  Strides claims in its notice letter that the '911 Patent, the '342 Patent, and the '220 Patent are invalid and/or would not be infringed. These lawsuits triggered an automatic stay of approval of the Strides ANDA until February 2020 (unless a court issues a decision adverse to Forest sooner). On October 30, 2017, Strides filed an answer.  No trial date or case schedule has been set.

Previously, the Company, along with Royalty Pharma Collection Trust ("Royalty Pharma"), asserted these patents in actions against Amneal, Apotex, First Time US Generics, Glenmark, Hetero, Lupin, Par, and Ranbaxy, and related subsidiaries and affiliates thereof, and reached settlements terminating those actions. The Company and Royalty Pharma voluntarily dismissed, without prejudice, its claims against Sandoz. The Company and Royalty Pharma also asserted these patents against Mylan and, on July 11, 2016, the U.S. District Court for the District of Delaware entered an order, opinion and judgment in favor of plaintiffs and against Mylan, that Mylan infringes the asserted claims of the '911, '342 and '220 patents, and that the asserted claims of the '911, '342 and '220 patents are valid. On September 30, 2016, Forest and Royalty entered into a settlement agreement with Mylan. Pursuant to the settlement agreement, Mylan may enter the market as of March 19, 2026, or earlier under certain circumstances.

*Viibryd®*. In March 2015, Forest Laboratories, LLC, Forest Laboratories Holdings Ltd., (collectively, "Forest") and Merck KGaA and Merck Patent Gesellschaft Mit Beschränkter Haftung (collectively, "Merck"), Forest's licensor for Viibryd®, brought actions for infringement of U.S. Patent Nos. 7,834,020 (the "'020 patent"), 8,193,195 (the "'195 patent"), 8,236,804 (the "'804 patent") and 8,673,921 (the "'921 patent") in the U.S. District Court for the District of Delaware against Accord Healthcare Inc. ("Accord"), Alembic Pharmaceuticals, Ltd. ("Alembic"), Apotex, Inc. ("Apotex"), InvaGen Pharmaceuticals, Inc. ("InvaGen"), and Teva Pharmaceuticals USA, Inc. ("Teva"), and related subsidiaries and affiliates thereof. These companies have notified Forest and/or Merck that they have filed ANDAs with the FDA seeking to obtain approval to market generic versions of Viibryd® before the '020, '195, '804 and '921 patents expire in June 2022. These lawsuits triggered an automatic stay of approval of the applicable ANDAs until July 21, 2018 (unless a court issues a decision adverse to Forest and Merck sooner). On August 24, 2015, the District Court consolidated the actions for all purposes and issued a scheduling order setting a trial date in January 2018. On November 23, 2015, Forest and Merck brought an action for infringement of the '020, '195, '804 and '921 patents in the U.S. District Court for the District of Delaware against InvaGen, which matter was consolidated with the earlier-filed action against InvaGen. On March 29, 2017, the District Court granted plaintiffs and Teva's joint stipulation to stay the action as to Teva until May 11, 2017, due to the parties' settlement discussions. On April 20, 2017, plaintiffs entered into a settlement agreement with Alembic, and the case was dismissed.  On May 15, 2017, plaintiffs entered into a settlement agreement with Accord, and the case was dismissed.  On June 29, 2017, plaintiffs entered into a settlement agreement with Teva, and the case was dismissed. On July 28, 2017, plaintiffs entered into a settlement agreement with Apotex, and the case was dismissed. Under the terms of the settlement with Apotex, Allergan will provide a license to Apotex that will permit it to launch its generic version of Viibryd® beginning six months and one day prior to the expiration of the last to expire of the '020, '195, '804 and '921 patents, including any extensions or pediatric exclusivities, or earlier in certain circumstances. On October 23, 2017, plaintiffs entered into a settlement agreement with InvaGen, and the case was dismissed on October 24, 2017.

*Viibryd® IPR*. On January 5, 2018, Argentum Pharmaceuticals LLC submitted to the USPTO a petition for Inter Partes Review ("IPR") seeking cancellation of certain claims of U.S. Patent No. 8,673,921 (the "'921 patent"). The '921 patent is listed in the Orange Book for Viibryd® and expires in June 2022. On January 26, 2018, Merck Patentgesellschaft Mit Beschränkter Haftung ("Merck") submitted Mandatory Notices.

agn-10k_20171231.htm

F-103

*Trademark Enforcement Matters*

*Juvéderm®.*   On April 5, 2017, Allergan, Inc. ("Allergan") brought an action for unfair competition, false advertising, dilution, conspiracy and infringement of Allergan's JUVÉDERM trademarks in the U.S. District Court for the Central District of California against Dermavita Limited Partnership ("Dermavita"), Dima Corp. S.A. ("Dima Corp.") and KBC Media Relations LLC ("KBC"). Dima Corp. had previously announced its acquisition of a license from Dermavita to develop and market in the U.S. cosmetic products under the Juvederm trademark. During June 2017, Allergan entered into a settlement agreement with KBC. During July 2017, the Court preliminarily enjoined Dima Corp. from, *inter alia*, promoting or selling within the United States any product bearing the trademark JUVÉDERM or any other trademark confusingly similar to it. During January 2018, the Court granted Dermavita's renewed motion to dismiss Allergan's complaint based on purported lack of personal jurisdiction.

Allergan Holdings France SAS and Allergan France SAS requested a preliminary injunction against Dermavita, Dima Corp, Aesthetic Services, Jacqueline Sillam and Dimitri Sillam in the High Court of Paris, France. During June 2017, the Paris Court preliminarily enjoined the defendants from, *inter alia*, promoting or selling in France its Juvederm products, requiring the transfer of various domain names and payment of provisional damages to Allergan, on the basis that such use would infringe Allergan's EU and French JUVÉDERM trademarks and would amount to unfair competition. This injunction has been appealed. Allergan France has also filed against Dermavita, Dima Corp. and others a full action of trademark infringement in the Paris court. Dermavita has requested that the full action be stayed pending the outcome of the Nanterre action and the EUIPO trademark proceedings, both mentioned below.  On March 13, 2018, the Paris court will hear arguments on Dermavita's stay request.  Dermavita has filed an action against Allergan in the Nanterre, France court alleging that Allergan has not used its JUVÉDERM trademark and requesting the court to revoke Allergan's trademark based on its purported lack of use.

Furthermore, more than 150 trademark opposition and cancellation actions between Allergan and Dermavita have been filed in front of the USPTO, EUIPO and various other national and regional trademark offices around the world.

*Product Liability Litigation*

*Actonel® Litigation.* Warner Chilcott is a defendant in approximately 165 cases and a potential defendant with respect to approximately 379 unfiled claims involving a total of approximately 545 claimants relating to Warner Chilcott's bisphosphonate prescription drug Actonel®. The claimants allege, among other things, that Actonel® caused them to suffer osteonecrosis of the jaw ("ONJ"), a rare but serious condition that involves severe loss or destruction of the jawbone, and/or atypical fractures of the femur. Warner Chilcott is in the initial stages of discovery in these litigations.  All of the filed cases are in either federal or state courts in the United States, with the exception of two cases filed in provincial courts in Canada.  One Canadian case involves a single plaintiff, and the other is a purported product liability class action involving two named plaintiffs. The Canadian action alleges, among other things, that Actonel® caused the plaintiffs and the proposed class members who ingested Actonel® to suffer ONJ or other side effects. It is expected that the plaintiffs in the purported class action will seek class certification. Plaintiffs have typically asked for unspecified monetary and injunctive relief, as well as attorneys' fees. Warner Chilcott is indemnified by Sanofi for certain Actonel claims pursuant to a collaboration agreement relating to the two parties' co-promotion of the product in the United States and other countries. In addition, Warner Chilcott is also partially indemnified by the Procter & Gamble Company ("P&G") for ONJ claims that were pending at the time Warner Chilcott acquired P&G's global pharmaceutical business in October 2009. In May and September 2013, Warner Chilcott entered into two settlement agreements that resolved a majority of the then-existing ONJ-related claims.

*AlloDerm Litigation.* LifeCell Corporation is named as a defendant in approximately 335 lawsuits alleging that its biologic mesh product AlloDerm did not perform as intended and caused various injuries.  Plaintiffs allege the product was defectively designed or manufactured and/or did not have proper warnings.  These cases are consolidated in Superior Court of New Jersey, Middlesex County.  Prior to the close of its sale to Allergan, LifeCell mediated the New Jersey cases in December 2016 and negotiated a settlement of its pending New Jersey cases, which was paid by LifeCell on April 19, 2017.  Approximately 332 of the cases have been dismissed, with the balance anticipated to be dismissed pending estate filings.  LifeCell's insurers participated in the settlement.  One other case is pending in Oklahoma but the Company has not yet been served.

*Benicar® Litigation.* Forest is named in approximately 1,759 actions involving allegations that Benicar®, a treatment for hypertension that Forest co-promoted with Daiichi Sankyo between 2002 and 2008, caused certain gastrointestinal injuries. Under Forest's Co-Promotion Agreement, Daiichi Sankyo is defending Forest in these lawsuits. On August 1, 2017, Daiichi announced that  it has agreed to enter into a program to settle, on behalf of all defendants, this pending product liability litigation against various Daiichi Sankyo and Forest entities.

*Celexa®/Lexapro® Litigation.*  Certain Forest entities are defendants in approximately 166 actions alleging that Celexa® or Lexapro® caused various birth defects. Several of the cases involve multiple minor-plaintiffs. The majority of these actions have been

agn-10k_20171231.htm

F-104

consolidated in state court in Missouri. The Company has reached an agreement with plaintiffs to settle five of the pending cases. There are birth defect cases pending in other jurisdictions, none of which are set for trial.

*RepliForm Litigation.* LifeCell Corporation is named as a defendant in approximately 250 cases alleging that its biologic mesh product RepliForm did not perform as intended and caused various injuries. Plaintiffs allege the product was defectively designed or manufactured and/or did not have proper warnings. In all of those cases Boston Scientific Corporation, LifeCell's distributor, has been named as a co-defendant. In addition, a significant portion of those cases also name another manufacturer as a defendant whose product was implanted at the same time. All but a few of the cases have been consolidated for centralized management in the Superior Court of Massachusetts, Middlesex County. The other cases are venued in federal court in West Virginia, and state courts in Delaware and Minnesota. The cases are still in the early stages of pleadings and discovery has not yet begun.

*Testosterone Litigation.* Beginning in 2014, a number of product liability suits were filed against Actavis, Inc., now known as Allergan Finance, LLC, and one or more of its former subsidiaries as well as other manufacturers and distributors of testosterone products, for personal injuries including but not limited to cardiovascular events allegedly arising out of the use of Androderm.® There are approximately 546 currently pending actions which have been consolidated in an MDL in federal court in Illinois. The defendants have responded to the plaintiffs' master complaint in the MDL and discovery is ongoing. The Company anticipates that additional suits will be filed.

### Government Investigations, Government Litigation and Qui Tam Litigation

*Forest.* Forest received a subpoena, dated April 29, 2015, from the U.S. Department of Health and Human Services, Office of Inspector General ("OIG"). The subpoena requests documents relating to Average Manufacturer ("AMP") and Best Price calculations for several of its products. Subsequently, Forest received a Civil Investigative Demand ("CID") from the OIG, dated August 16, 2016 primarily related to the calculation of Best Price. The Company is cooperating fully with the OIG's requests.

Forest and certain of its affiliates are defendants in three state court actions pending in Illinois, Utah and Wisconsin involving *qui tam* actions alleging generally that the plaintiffs (all government agencies) were overcharged for their share of Medicaid drug reimbursement costs. Forest and the other defendants filed a motion to dismiss Utah's amended complaint. This motion to dismiss was denied in part. On October 30, 2017, the Company reached an agreement to settle the Utah action. On February 17, 2014, the Wisconsin state court granted defendants' motion to dismiss plaintiff's second amended complaint. However, the relator filed a separate action making the same basic allegations as in its amended complaint in the original action. On May 17, 2017, the Wisconsin state court granted defendants' motion to dismiss the amended complaint.

On December 28, 2015, a putative class action complaint was filed in state court in Pennsylvania on behalf of a putative class of private payers. Defendants removed the complaint to the federal court in Pennsylvania. The complaint alleges that manufacturers of generic drugs, including a subsidiary of Forest Laboratories, Inc. that in the past had marketed generic products, caused plaintiffs to overpay for prescription drug products through the use of inflated AWPs. The complaint alleges violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, negligent misrepresentation/fraud, unjust enrichment, civil conspiracy and aiding and abetting. Plaintiffs filed an amended complaint on March 29, 2016. On June 26, 2017, the Company filed a motion to dismiss the complaint which the court granted on September 25, 2016. An additional complaint was filed in state court in Pennsylvania on behalf an individual indirect purchaser containing similar allegations to the class complaint. On January 18, 2017, defendants filed a motion to dismiss the state court complaint. On July 24, 2017, the state court issued a decision on the Company's individual motion to dismiss, granting it in part and denying it in part.

*Allergan.* On April 18, 2017, the Company received a CID, dated April 12, 2017, from the Department of Justice. The CID seeks information relating to the Company's sales and marketing practices of Botox to urology practices. The Company is cooperating fully with DOJ requests.

On October 3, 2017, the Company received a letter from the House of Representatives Committee on Oversight and Government Reform. The letter seeks information relating to the Saint Regis Mohawk Tribe's acquisition of six Restasis® patents and the granting of exclusive licenses to the Restasis® product to the Company. The Company has received other information requests from regulatory agencies concerning the transaction and is cooperating fully with these requests.

*Actavis/Watson.* On October 16, 2017, the Company received a CID from the State of North Carolina Department of Justice. The CID seeks information relating to the legacy Watson company's reporting of AMP calculations. The Company is cooperating fully with the state's requests. On January 26, 2018, a *qui tam* complaint that was filed in federal district court in Illinois was unsealed which includes claims against Actavis LLC, a former subsidiary of the Company. The State of North Carolina reserved its right to intervene in this proceeding pending an ongoing investigation. The complaint asserts claims that Actavis LLC violated the federal and state false claims acts based on its reporting of AMP prices.

10/24/2018

agn-10k_20171231.htm

F-105

The Company has received subpoenas from multiple states relating to the legacy Actavis and Watson companies' promotional efforts relating to opioid products, none of which are currently promoted and many of which the Company no longer sells. The Company is cooperating fully with the states' requests.

The Company and its affiliates are involved in various other disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings that could result in litigation, and other litigation matters that arise from time to time.

*Matters Relating to the Company's Divested Generics Business*

The following matters relate to the former generics business of the Company or the transaction pursuant to which that business was sold to Teva, effective August 2, 2016. In October 2016, pursuant to the Master Purchase Agreement by and between the Company and Teva (the "Master Purchase Agreement"), Teva provided the Company with its proposed estimated adjustment to the closing date working capital balance. The Company disagreed with Teva's proposed adjustment, and, pursuant to the Master Purchase Agreement, each of the Company's and Teva's proposed adjustments were submitted to arbitration ("Working Capital Arbitration") to determine the working capital amount in accordance with GAAP as applied by the Company consistent with past practice. Teva initially proposed an adjustment of approximately $1.4 billion and subsequently submitted a revised adjustment of approximately $1.5 billion to the arbitrator. In addition, on October 30, 2017, Teva submitted a Notice of Direct and Third Party Claims seeking indemnification for virtually all of the same items for which Teva was seeking a proposed adjustment in the Working Capital Arbitration as well as several new items as to which no quantity of damages were asserted. On January 31, 2018, the Company and Teva entered into a Settlement Agreement and Mutual Releases (the "Teva Settlement Agreement"). The Teva Settlement Agreement provides that the Company will make a one-time payment of $700.0 million to Teva, that the Company and Teva will jointly dismiss their Working Capital Arbitration, and that the Company and Teva will release all actual or potential claims brought by Teva in the Working Capital Arbitration as well as any claim either party has or can assert under the Master Purchase Agreement, for breach of any representation, warranty or covenant (other than any breach of a post-closing covenant not known as of the date of the Teva Settlement Agreement). The actions for which Teva has agreed to provide indemnification to the Company include, but are not limited to, the actions described below.

*Lidoderm® Litigation.* On March 30, 2016, the U.S. Federal Trade Commission filed a lawsuit in federal district court in the Eastern District of Pennsylvania against the Company and one of its global generics business subsidiaries, Watson Laboratories, Inc., Endo Pharmaceuticals Inc. and others arising out of patent settlements relating to Lidoderm and Opana ER. The Lidoderm settlement was reached by Endo Pharmaceuticals Inc. and Watson Laboratories, Inc. in May 2012, prior to it's being affiliated with the Company, and all allegations against the Company and Watson Laboratories, Inc. related to the Lidoderm settlement only. On October 25, 2016, the FTC voluntarily withdrew its complaint in federal court in Pennsylvania. Similar lawsuits filed by private plaintiffs were already pending in the federal district court in California. On January 23, 2017, both the FTC and State of California filed complaints against the Watson Laboratories, Endo Pharmaceuticals as well as the Company and its subsidiary Allergan Finance LLC in the same federal court in California alleging violations of federal and state antitrust laws. The FTC and California complaints contain allegations relating to the Lidoderm settlement only and seek injunctive relief, restitution or disgorgement of profits and, in the California action, statutory penalties. On January 27, 2017, Allergan Finance LLC filed a declaratory judgment action against the FTC in the same federal district court in the Eastern District of Pennsylvania where the FTC's original action had been pending. The court consolidated Allergan Finance's action with declaratory judgment actions that had already been filed by other parties that were named as defendants in the original FTC action in Pennsylvania and the plaintiffs filed a consolidated, amended complaint on February 14, 2017. On March 2, 2017, the FTC filed a motion to dismiss the amended complaint. In April 2017, the FTC and State of California's actions were stayed pending the declaratory judgment action in the Eastern District of Pennsylvania. On May 9, 2017, plaintiffs filed a motion for summary judgment in the Eastern District of Pennsylvania.

*Hydrocortisone Investigation.* On November 10, 2016, the Company received notice from the UK Competition and Markets Authority ("CMA") that it would be included within the scope of the CMA's formal investigation under Section 25 of the Competition Act of 1998 ("CA98") into suspected abuse of dominance by a former generics business subsidiary of the Company in relation to the supply of 10mg and 20mg hydrocortisone tablets. The CMA is investigating alleged excessive and unfair prices with respect to hydrocortisone tablets and whether the former generics business subsidiary entered into anti-competitive agreements with a potential competitor relating to the hydrocortisone product. The CMA is investigating whether the conduct infringes the Chapter II prohibition of the CA98 and/or Article 102 of the Treaty on the Functioning of the European Union. The CMA issued a statement of objection with respect to the alleged excessive and unfair pricing in December 2016 and a separate statement of objection with respect to the alleged anti-competitive agreements in March 2017. The CMA may pursue additional similar investigations relating to this former generic subsidiary of the Company in relation to the hydrocortisone tablet products. The Company intends to cooperate fully with the investigation.

F-106

*Teva Shareholder Derivative Litigation.*  On or about February 26, 2017, Allergan plc was named as defendant in a proposed Teva shareholder derivative litigation filed in the Economic Division of the Tel Aviv District Court in Israel.  In order to proceed with the lawsuit, plaintiffs have to secure court approval and have filed a motion seeking such approval.  The lawsuit contains allegations directed at Teva's board of directors and the approval process needed by Teva to approve the Master Purchase Agreement and also includes claims regarding the amount and form of consideration Teva paid in connection with the Master Purchase Agreement.  The Israeli court recently granted a procedural motion to consolidate a separate action that was filed against Teva only with the action that was filed on February 26, 2017.  Pursuant to the court's order, plaintiffs have filed a consolidated motion seeking approval from the court to commence the shareholder derivative suit. The Company submitted a written response to plaintiffs' motion on December 5, 2017.

*Florida Subpoena Related to Oxymorphone Products.*  In January 2018, the Company received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of Florida seeking information related to oxymorphone products which were sold by the divested generics business.  This subpoena appears to be related to a similar inquiry disclosed by Endo International plc on January 11, 2018.  It is not clear whether the subpoena was directed to the Company as a source of information or as a target of an investigation along with others.

**NOTE 25 — Warner Chilcott Limited ("WCL") Guarantor and Non-Guarantor Condensed Consolidating Financial Information**

The following financial information is presented to segregate the financial results of WCL, Allergan Funding SCS, and Allergan Finance, LLC (the issuers of the long-term notes), the guarantor subsidiaries for the long-term notes and the non-guarantor subsidiaries. The guarantors jointly and severally, and fully and unconditionally, guarantee the Company's obligation under the long-term notes.

The information includes elimination entries necessary to consolidate the guarantor and the non-guarantor subsidiaries. Investments in subsidiaries are accounted for using the equity method of accounting. The principal elimination entries eliminate investments in subsidiaries, equity and intercompany balances and transactions.

WCL, Allergan Capital S.a.r.l. and Allergan Finance, LLC are guarantors of the long-term notes.  The Company anticipates future legal entity structure changes which may impact the presentation of this footnote in the near future.

Warner Chilcott Limited has revised its consolidating financial statements as previously presented in its balance sheet in Footnote 25 of the 2016 Annual Report on Form 10-K due to a change in the Company's legal entity structure and other reclassifications that occurred during the year ended December 31, 2017.  As a result, prior period information has been recast to conform to the current period presentation.

The following financial information presents the consolidating balance sheets as of December 31, 2017 and 2016, the related statements of operations and comprehensive income / loss for the years ended December 31, 2017, 2016 and 2015 and the statements of cash flows for the years ended December 31, 2017, 2016 and 2015.

F-107

**Warner Chilcott Limited**
**Consolidating Balance Sheets**
**As of December 31, 2017**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 0.1 | $ 593.1 | $ 0.1 | $ - | $ 1,223.0 | $ - | $ 1,816.3 |
| Marketable securities | - | 400.2 | - | - | 4,231.9 | - | 4,632.1 |
| Accounts receivable, net | - | - | - | - | 2,899.0 | - | 2,899.0 |
| Receivables from Parents | - | 4,223.5 | - | - | 1,573.9 | - | 5,797.4 |
| Inventories | - | - | - | - | 904.5 | - | 904.5 |
| Intercompany receivables | - | 8,118.7 | 5,507.6 | 19.6 | 25,417.0 | (39,062.9) | - |
| Prepaid expenses and other current assets | - | - | - | 85.0 | 1,038.0 | - | 1,123.0 |
| Total current assets | 0.1 | 13,335.5 | 5,507.7 | 104.6 | 37,287.3 | (39,062.9) | 17,172.3 |
| Property, plant and equipment, net | - | - | - | - | 1,785.4 | - | 1,785.4 |
| Investments and other assets | - | - | - | - | 267.9 | - | 267.9 |
| Investment in subsidiaries | 81,282.1 | 87,530.6 | - | 110,114.8 | - | (278,927.5) | - |
| Non current intercompany receivables | - | 27,518.7 | 20,985.0 | - | 30,544.0 | (79,047.7) | - |
| Non current receivables from Parents | - | - | - | - | 3,964.0 | - | 3,964.0 |
| Non current assets held for sale | - | - | - | - | 81.6 | - | 81.6 |
| Deferred tax assets | - | - | - | - | 316.0 | - | 316.0 |
| Product rights and other intangibles | - | - | - | - | 54,648.3 | - | 54,648.3 |
| Goodwill | - | - | - | - | 49,862.9 | - | 49,862.9 |
| Total assets | $ 81,282.2 | $ 128,384.8 | $ 26,492.7 | $ 110,219.4 | $ 178,757.4 | $ (397,038.1) | $ 128,098.4 |
| **LIABILITIES AND EQUITY** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued expenses | - | 0.6 | 202.9 | 89.3 | 5,222.8 | - | 5,515.6 |
| Intercompany payables | - | 12,186.2 | 1,828.5 | 11,402.3 | 13,645.9 | (39,062.9) | - |
| Payables to Parents | - | - | - | - | 2,340.6 | - | 2,340.6 |
| Income taxes payable | - | - | - | - | 74.9 | - | 74.9 |
| Current portion of long-term debt and capital leases | - | - | 3,475.4 | - | 756.4 | - | 4,231.8 |
| Total current liabilities | - | 12,186.8 | 5,506.8 | 11,491.6 | 22,040.6 | (39,062.9) | 12,162.9 |
| Long-term debt and capital leases | - | - | 20,985.0 | 2,130.1 | 2,728.4 | - | 25,843.5 |
| Other long-term liabilities | - | 0.2 | - | - | 886.7 | - | 886.9 |
| Long-term intercompany payables | - | 30,395.0 | - | 149.0 | 48,503.7 | (79,047.7) | - |
| Other taxes payable | - | - | - | - | 1,573.5 | - | 1,573.5 |
| Deferred tax liabilities | - | 0.2 | - | - | 6,349.2 | - | 6,349.4 |
| Total liabilities | - | 42,582.2 | 26,491.8 | 13,770.7 | 82,082.1 | (118,110.6) | 46,816.2 |
| Total equity / (deficit) | 81,282.2 | 85,802.6 | 0.9 | 96,448.7 | 96,675.3 | (278,927.5) | 81,282.2 |
| Total liabilities and equity | $ 81,282.2 | $ 128,384.8 | $ 26,492.7 | $ 110,219.4 | $ 178,757.4 | $ (397,038.1) | $ 128,098.4 |

F-108

**Warner Chilcott Limited**
**Consolidating Balance Sheets**
**As of December 31, 2016**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ 0.1 | $ 513.9 | $ - | $ - | $ 1,199.2 | $ - | $ 1,713.2 |
| Marketable securities | - | 6,351.8 | - | - | 5,149.7 | - | 11,501.5 |
| Accounts receivable, net | - | - | - | - | 2,531.0 | - | 2,531.0 |
| Receivables from Parents | - | 4,196.9 | - | - | 5,092.3 | - | 9,289.2 |
| Inventories | - | - | - | - | 718.0 | - | 718.0 |
| Intercompany receivables | - | 24,348.6 | 3,343.5 | 81.6 | 66,840.8 | (94,614.5) | - |
| Prepaid expenses and other current assets | - | 14.2 | - | 42.7 | 1,325.2 | - | 1,382.1 |
| Total current assets | 0.1 | 35,425.4 | 3,343.5 | 124.3 | 82,856.2 | (94,614.5) | 27,135.0 |
| Property, plant and equipment, net | - | - | - | - | 1,611.3 | - | 1,611.3 |
| Investments and other assets | - | - | - | 15.8 | 266.3 | - | 282.1 |
| Investment in subsidiaries | 88,093.4 | 89,219.0 | - | 108,902.4 | - | (286,214.8) | - |
| Non current intercompany receivables | - | 27,706.6 | 22,540.1 | - | 9,686.6 | (59,933.3) | - |
| Non current receivables from Parents | - | - | - | - | 3,964.0 | - | 3,964.0 |
| Non current assets held for sale | - | - | - | - | 27.0 | - | 27.0 |
| Deferred tax assets | - | - | - | - | 233.3 | - | 233.3 |
| Product rights and other intangibles | - | - | - | - | 62,618.6 | - | 62,618.6 |
| Goodwill | - | - | - | - | 46,356.1 | - | 46,356.1 |
| Total assets | $ 88,093.5 | $ 152,351.0 | $ 25,883.6 | $ 109,042.5 | $ 207,619.4 | $ (440,762.6) | $ 142,227.4 |
| **LIABILITIES AND EQUITY** | | | | | | | |
| Current liabilities: | | | | | | | |
| Accounts payable and accrued expenses | - | - | 208.9 | - | 4,784.4 | - | 4,993.3 |
| Intercompany payables | - | 55,828.8 | 1,652.9 | 9,359.1 | 27,773.7 | (94,614.5) | - |
| Payables to Parents | - | 334.1 | - | - | 1,038.7 | - | 1,372.8 |
| Income taxes payable | - | - | - | - | 57.8 | - | 57.8 |
| Current portion of long-term debt and capital leases | - | - | 1,478.1 | 1,197.4 | 122.4 | - | 2,797.9 |
| Total current liabilities | - | 56,162.9 | 3,339.9 | 10,556.5 | 33,777.0 | (94,614.5) | 9,221.8 |
| Long-term debt and capital leases | - | - | 22,540.1 | 3,079.0 | 4,351.7 | - | 29,970.8 |
| Other long-term liabilities | - | - | - | - | 1,086.0 | - | 1,086.0 |
| Long-term intercompany payables | - | 9,537.6 | - | 149.0 | 50,246.7 | (59,933.3) | - |
| Other taxes payable | - | - | - | - | 886.2 | - | 886.2 |
| Deferred tax liabilities | - | - | - | - | 12,969.1 | - | 12,969.1 |
| Total liabilities | - | 65,700.5 | 25,880.0 | 13,784.5 | 103,316.7 | (154,547.8) | 54,133.9 |
| Total equity / (deficit) | 88,093.5 | 86,650.5 | 3.6 | 95,258.0 | 104,302.7 | (286,214.8) | 88,093.5 |
| Total liabilities and equity | $ 88,093.5 | $ 152,351.0 | $ 25,883.6 | $ 109,042.5 | $ 207,619.4 | $ (440,762.6) | $ 142,227.4 |

F-109

**Warner Chilcott Limited**
**Consolidating Statements of Operations and Comprehensive Income / (Loss)**
**For the Year Ended December 31, 2017**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues | $ - | $ - | $ - | $ - | $ 15,940.7 | $ - | $ 15,940.7 |
| Operating expenses: | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | - | - | - | - | 2,168.0 | - | 2,168.0 |
| Research and development | - | - | - | - | 2,100.1 | - | 2,100.1 |
| Selling and marketing | - | - | - | - | 3,514.8 | - | 3,514.8 |
| General and administrative | - | - | 8.6 | 1.1 | 1,392.6 | - | 1,402.3 |
| Amortization | - | - | - | - | 7,197.1 | - | 7,197.1 |
| In-process research and development impairments | - | - | - | - | 1,452.3 | - | 1,452.3 |
| Asset sales and impairments, net | - | - | - | - | 3,927.7 | - | 3,927.7 |
| Total operating expenses | - | - | 8.6 | 1.1 | 21,752.6 | - | 21,762.3 |
| Operating income / (loss) | - | - | (8.6) | (1.1) | (5,811.9) | - | (5,821.6) |
| Non-operating income / (expense): | | | | | | | |
| Interest income / (expense), net | - | 845.5 | 116.6 | (131.2) | (1,760.2) | - | (929.3) |
| Other income / (expense), net | - | - | (110.4) | (66.7) | (3,260.2) | - | (3,437.3) |
| Total other income / (expense), net | - | 845.5 | 6.2 | (197.9) | (5,020.4) | - | (4,366.6) |
| Income / (loss) before income taxes and noncontrolling interest | - | 845.5 | (2.4) | (199.0) | (10,832.3) | - | (10,188.2) |
| Provision / (benefit) for income taxes | - | 5.0 | 0.3 | (177.3) | (6,498.4) | - | (6,670.4) |
| (Earnings) / losses of equity interest subsidiaries | 3,927.3 | 4,841.4 | - | 610.6 | - | (9,379.3) | - |
| Net income / (loss) from continuing operations, net of tax | (3,927.3) | (4,000.9) | (2.7) | (632.3) | (4,333.9) | 9,379.3 | (3,517.8) |
| (Loss) from discontinued operations, net of tax | - | - | - | - | (402.9) | - | (402.9) |
| Net income / (loss) | (3,927.3) | (4,000.9) | (2.7) | (632.3) | (4,736.8) | 9,379.3 | (3,920.7) |
| (Income) attributable to noncontrolling interest | - | - | - | - | (6.6) | - | (6.6) |
| Net income / (loss) attributable to members | (3,927.3) | (4,000.9) | (2.7) | (632.3) | (4,743.4) | 9,379.3 | (3,927.3) |
| Other comprehensive (loss) / income, net of tax | 2,959.1 | 3,153.0 | - | 1,823.0 | 2,959.1 | (7,935.1) | 2,959.1 |
| Comprehensive income / (loss) attributable to members | $ (968.2) | $ (847.9) | $ (2.7) | $ 1,190.7 | $ (1,784.3) | $ 1,444.2 | $ (968.2) |

F-110

**Warner Chilcott Limited**
**Consolidating Statements of Operations and Comprehensive Income / (Loss)**
**For the Year Ended December 31, 2016**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues | $ - | $ - | $ - | $ - | $14,570.6 | $ - | $ 14,570.6 |
| **Operating expenses:** | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | - | - | - | - | 1,860.8 | - | 1,860.8 |
| Research and development | - | - | - | - | 2,575.7 | - | 2,575.7 |
| Selling and marketing | - | - | - | - | 3,266.4 | - | 3,266.4 |
| General and administrative | - | - | - | 19.8 | 1,330.6 | - | 1,350.4 |
| Amortization | - | - | - | - | 6,470.4 | - | 6,470.4 |
| In-process research and development impairments | - | - | - | - | 743.9 | - | 743.9 |
| Asset sales and impairments, net | - | - | - | - | 5.0 | - | 5.0 |
| Total operating expenses | - | - | - | 19.8 | 16,252.8 | - | 16,272.6 |
| Operating income / (loss) | - | - | - | (19.8) | (1,682.2) | - | (1,702.0) |
| **Non-operating income / (expense):** | | | | | | | |
| Interest income / (expense), net | - | 2,255.3 | 3.4 | (157.1) | (3,286.1) | - | (1,184.5) |
| Other income / (expense), net | - | - | - | - | 172.2 | - | 172.2 |
| Total other income / (expense), net | - | 2,255.3 | 3.4 | (157.1) | (3,113.9) | - | (1,012.3) |
| Income / (loss) before income taxes and noncontrolling interest | - | 2,255.3 | 3.4 | (176.9) | (4,796.1) | - | (2,714.3) |
| Provision / (benefit) for income taxes | - | - | 0.1 | 66.3 | (1,963.4) | - | (1,897.0) |
| (Earnings) / losses of equity interest subsidiaries | (15,091.1) | (9,342.8) | - | (18,837.8) | - | 43,271.7 | - |
| Net income / (loss) from continuing operations, net of tax | 15,091.1 | 11,598.1 | 3.3 | 18,594.6 | (2,832.7) | (43,271.7) | (817.3) |
| Income from discontinued operations, net of tax | - | - | - | - | 15,914.5 | - | 15,914.5 |
| Net income / (loss) | 15,091.1 | 11,598.1 | 3.3 | 18,594.6 | 13,081.8 | (43,271.7) | 15,097.2 |
| (Income) attributable to noncontrolling interest | - | - | - | - | (6.1) | - | (6.1) |
| Net income / (loss) attributable to members | 15,091.1 | 11,598.1 | 3.3 | 18,594.6 | 13,075.7 | (43,271.7) | 15,091.1 |
| Other comprehensive (loss) / income, net of tax | (544.3) | (419.9) | - | (2,822.2) | (544.3) | 3,786.4 | (544.3) |
| Comprehensive income / (loss) attributable to members | $ 14,546.8 | $11,178.2 | $ 3.3 | $ 15,772.4 | $12,531.4 | $(39,485.3) | $ 14,546.8 |

F-111

**Warner Chilcott Limited**
**Consolidating Statements of Operations and Comprehensive Income / (Loss)**
**For the Year Ended December 31, 2015**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| Net revenues | - | - | - | - | 12,688.1 | - | 12,688.1 |
| | | | | | | | |
| Operating expenses: | | | | | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | - | - | - | - | 2,751.8 | - | 2,751.8 |
| Research and development | - | - | - | - | 2,358.5 | - | 2,358.5 |
| Selling and marketing | - | - | - | - | 2,765.1 | - | 2,765.1 |
| General and administrative | - | 212.1 | 16.1 | - | 1,352.8 | - | 1,581.0 |
| Amortization | - | - | - | - | 5,443.7 | - | 5,443.7 |
| In-process research and development impairments | - | - | - | - | 511.6 | - | 511.6 |
| Asset sales and impairments, net | - | - | - | - | 272.0 | - | 272.0 |
| Total operating expenses | - | 212.1 | 16.1 | - | 15,455.5 | - | 15,683.7 |
| Operating income / (loss) | - | (212.1) | (16.1) | - | (2,767.4) | - | (2,995.6) |
| | | | | | | | |
| Non-operating income / (expense): | | | | | | | |
| Interest income / (expense), net | - | 1,572.4 | (14.6) | (168.5) | (2,572.0) | - | (1,182.7) |
| Other income / (expense), net | - | (265.4) | 31.0 | - | 0.6 | - | (233.8) |
| Total other income / (expense), net | - | 1,307.0 | 16.4 | (168.5) | (2,571.4) | - | (1,416.5) |
| Income / (loss) before income taxes and noncontrolling interest | - | 1,094.9 | 0.3 | (168.5) | (5,338.8) | - | (4,412.1) |
| Provision / (benefit) for income taxes | - | - | - | (58.3) | (1,547.6) | - | (1,605.9) |
| (Earnings) / losses of equity interest subsidiaries | (4,050.6) | (4,336.5) | - | (3,412.3) | - | 11,799.4 | - |
| Net income / (loss) from continuing operations, net of tax | 4,050.6 | 5,431.4 | 0.3 | 3,302.1 | (3,791.2) | (11,799.4) | (2,806.2) |
| Income from discontinued operations, net of tax | - | - | - | - | 6,861.0 | - | 6,861.0 |
| Net income / (loss) | 4,050.6 | 5,431.4 | 0.3 | 3,302.1 | 3,069.8 | (11,799.4) | 4,054.8 |
| (Income) attributable to noncontrolling interest | - | - | - | - | (4.2) | - | (4.2) |
| Net income / (loss) attributable to members | 4,050.6 | 5,431.4 | 0.3 | 3,302.1 | 3,065.6 | (11,799.4) | 4,050.6 |
| Other comprehensive (loss) / income, net of tax | (28.7) | 24.5 | - | (28.7) | (28.7) | 32.9 | (28.7) |
| Comprehensive income / (loss) attributable to members | $ 4,021.9 | $ 5,455.9 | $ 0.3 | $ 3,273.4 | $ 3,036.9 | $(11,766.5) | $ 4,021.9 |

F-112

## Warner Chilcott Limited
### Consolidating Statements of Cash Flows
### For the Year Ended December 31, 2017
### ($ in millions)

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net income / (loss) | $ (3,927.3) | $ (4,000.9) | $ (2.7) | $ (632.3) | $ (4,736.6) | $ 9,379.3 | $ (3,920.7) |
| Reconciliation to net cash provided by / (used in) operating activities: | | | | | | | |
| (Earnings) / losses of equity interest subsidiaries | 3,927.3 | 4,841.4 | – | 610.6 | – | (9,379.3) | – |
| Depreciation | – | – | – | – | 171.5 | – | 171.5 |
| Amortization | – | – | – | – | 7,197.1 | – | 7,197.1 |
| Provision for inventory reserve | – | – | – | – | 102.2 | – | 102.2 |
| Share-based compensation | – | – | – | – | 293.3 | – | 293.3 |
| Deferred income tax benefit | – | – | – | – | (7,783.1) | – | (7,783.1) |
| In-process research and development impairments | – | – | – | – | 1,452.3 | – | 1,452.3 |
| Loss / (gain) on asset sales and impairments, net | – | – | – | – | 3,927.7 | – | 3,927.7 |
| Net income impact of other-than-temporary loss on investment in Teva securities | – | – | – | – | 3,273.5 | – | 3,273.5 |
| Charge to settle Teva related matters | – | – | – | – | 387.4 | – | 387.4 |
| Loss on forward sale of Teva shares | – | – | – | – | 62.9 | – | 62.9 |
| Amortization of inventory step-up | – | – | – | – | 131.7 | – | 131.7 |
| Non-cash extinguishment of debt | – | – | 17.6 | 12.2 | (45.5) | – | (15.7) |
| Amortization of deferred financing costs | – | – | 23.3 | 4.5 | – | – | 27.8 |
| Contingent consideration adjustments, including accretion | – | – | – | – | (133.2) | – | (133.2) |
| Dividends from subsidiaries | 1,668.2 | – | – | – | – | (1,668.2) | – |
| Other, net | – | (100.0) | – | – | (27.0) | – | (37.0) |
| Changes in assets and liabilities (net of effects of acquisitions) | – | (4,228.1) | (241.5) | 2,148.3 | 3,207.3 | – | 886.0 |
| Net cash provided by / (used in) operating activities | 1,668.2 | (3,397.6) | (203.3) | 2,143.3 | 7,461.3 | (1,668.2) | 6,023.7 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property, plant and equipment | – | – | – | – | (349.9) | – | (349.9) |
| Additions to product rights and other intangibles | – | – | – | – | (614.3) | – | (614.3) |
| Additions to investments | – | (4,389.6) | – | – | (5,394.2) | – | (9,783.8) |
| Proceeds from sale of investments and other assets | – | 7,866.4 | – | – | 7,286.9 | – | 15,153.3 |
| Proceeds from sales of property, plant and equipment | – | – | – | – | 7.1 | – | 7.1 |
| Acquisitions of businesses, net of cash acquired | – | – | – | – | (5,290.4) | – | (5,290.4) |
| Net cash (used in) / provided by investing activities | – | 3,476.8 | – | – | (4,354.8) | – | (878.0) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness, including credit facility | – | – | 3,020.9 | – | 529.1 | – | 3,550.0 |
| Debt issuance and other financing costs | – | – | (17.5) | – | (3.1) | – | (20.6) |
| Payments on debt, including capital lease obligations and credit facility | – | – | (2,800.0) | (2,143.3) | (1,470.3) | – | (6,413.6) |
| Payments of contingent consideration and other financing | – | – | – | – | (511.6) | – | (511.6) |
| Dividends to Parents | (1,668.2) | – | – | – | (1,668.2) | 1,668.2 | (1,668.2) |
| Net cash (used in) / provided by financing activities | (1,668.2) | – | 203.4 | (2,143.3) | (3,124.1) | 1,668.2 | (5,064.0) |
| Effect of currency exchange rate changes on cash and cash equivalents | – | – | – | – | 21.4 | – | 21.4 |
| Net increase / (decrease) in cash and cash equivalents | – | 79.2 | 0.1 | – | 23.8 | – | 103.1 |
| Cash and cash equivalents at beginning of period | 0.1 | 513.9 | – | – | 1,199.2 | – | 1,713.2 |
| Cash and cash equivalents at end of period | $ 0.1 | $ 593.1 | $ 0.1 | $ – | $ 1,223.0 | $ – | $ 1,816.3 |

F-113

**Warner Chilcott Limited**
**Consolidating Statements of Cash Flows**
**For the Year Ended December 31, 2016**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net income / (loss) | $ 15,091.1 | $ 11,598.1 | $ 3.3 | $ 18,594.6 | $ 13,081.8 | $ (43,271.7) | $ 15,097.2 |
| Reconciliation to net cash provided by / (used in) operating activities: | | | | | | | |
| (Earnings) / losses of equity interest subsidiaries | (15,091.1) | (9,342.8) | - | (18,837.8) | - | 43,271.7 | - |
| Depreciation | - | - | - | - | 155.8 | - | 155.8 |
| Amortization | - | - | - | - | 6,475.2 | - | 6,475.2 |
| Provision for inventory reserve | - | - | - | - | 181.4 | - | 181.4 |
| Share-based compensation | - | - | - | - | 334.5 | - | 334.5 |
| Deferred income tax benefit | - | - | - | - | (1,443.9) | - | (1,443.9) |
| Pre-tax gain on sale of businesses to Teva | - | - | - | - | (24,511.1) | - | (24,511.1) |
| Non-cash tax effect of gain on sale of businesses to Teva | - | - | - | - | 5,285.2 | - | 5,285.2 |
| In-process research and development impairments | - | - | - | - | 743.9 | - | 743.9 |
| Loss / (gain) on asset sales and impairments, net | - | - | - | - | 5.0 | - | 5.0 |
| Amortization of inventory step-up | - | - | - | - | 42.4 | - | 42.4 |
| Amortization of deferred financing costs | - | 23.5 | 23.3 | 4.2 | - | - | 51.0 |
| Contingent consideration adjustments, including accretion | - | - | - | - | (66.8) | - | (66.8) |
| Dividends from subsidiaries | 2,034.8 | - | - | - | - | (2,034.8) | - |
| Other, net | - | - | - | - | (59.9) | - | (59.9) |
| Changes in assets and liabilities (net of effects of acquisitions) | 0.1 | 16,536.2 | 473.4 | 237.0 | (17,957.6) | - | (710.9) |
| Net cash provided by / (used in) operating activities | 2,034.9 | 18,815.0 | 500.0 | (2.0) | (17,734.1) | (2,034.8) | 1,579.0 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property, plant and equipment | - | - | - | - | (331.4) | - | (331.4) |
| Additions to product rights and other intangibles | - | - | - | - | (2.0) | - | (2.0) |
| Sale of businesses to Teva | - | - | - | - | 33,804.2 | - | 33,804.2 |
| Additions to investments | - | (6,351.8) | - | - | (9,391.7) | - | (15,743.5) |
| Proceeds from sale of investments and other assets | - | - | - | - | 7,771.6 | - | 7,771.6 |
| Loans to Parents | - | (4,196.9) | - | - | (9,035.3) | - | (13,232.2) |
| Proceeds from sales of property, plant and equipment | - | - | - | - | 33.3 | - | 33.3 |
| Acquisitions of businesses, net of cash acquired | - | - | - | - | (1,198.9) | - | (1,198.9) |
| Net cash (used in) / provided by investing activities | - | (10,548.7) | - | - | 21,649.8 | - | 11,101.1 |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness, including credit facility | - | 1,050.0 | - | - | - | - | 1,050.0 |
| Payments on debt, including capital lease obligations and credit facility | - | (8,815.9) | (500.0) | - | (1,532.8) | - | (10,848.7) |
| Payments of contingent consideration and other financing | - | - | - | - | (161.1) | - | (161.1) |
| Dividends to Parents | (2,034.8) | - | - | - | (2,034.8) | 2,034.8 | (2,034.8) |
| Net cash (used in) / provided by financing activities | (2,034.8) | (7,765.9) | (500.0) | - | (3,728.7) | 2,034.8 | (11,994.6) |
| Effect of currency exchange rate changes on cash and cash equivalents | - | - | - | - | (8.5) | - | (8.5) |
| Net increase / (decrease) in cash and cash equivalents | 0.1 | 500.4 | - | (2.0) | 178.5 | - | 677.0 |
| Cash and cash equivalents at beginning of period | - | 13.5 | - | 2.0 | 1,020.7 | - | 1,036.2 |
| Cash and cash equivalents at end of period | $ 0.1 | $ 513.9 | $ - | $ - | $ 1,199.2 | $ - | $ 1,713.2 |

F-114

**Warner Chilcott Limited**
**Consolidating Statements of Cash Flows**
**For the Year Ended December 31, 2015**
**($ in millions)**

| | Warner Chilcott Limited (Parent Guarantor) | Allergan Capital S.a.r.l. (Guarantor) | Allergan Funding SCS (Issuer) | Allergan Finance LLC (Issuer and Guarantor) | Non-guarantors | Eliminations | Consolidated Warner Chilcott Limited |
|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | |
| Net income / (loss) | $ 4,050.6 | $ 5,431.4 | $ 0.3 | $ 3,302.1 | $ 3,069.8 | $ (11,799.4) | $ 4,054.8 |
| Reconciliation to net cash provided by / (used in) operating activities: | | | | | | | |
| (Earnings) / losses of equity interest subsidiaries | (4,050.6) | (4,336.5) | – | (3,412.3) | – | 11,799.4 | – |
| Depreciation | – | – | – | 0.2 | 218.1 | – | 218.3 |
| Amortization | – | – | – | – | 5,777.0 | – | 5,777.0 |
| Provision for inventory reserve | – | – | – | – | 140.9 | – | 140.9 |
| Share-based compensation | – | – | – | 51.6 | 638.8 | – | 690.4 |
| Deferred income tax benefit | – | – | – | – | (7,380.1) | – | (7,380.1) |
| In-process research and development impairments | – | – | – | – | 511.6 | – | 511.6 |
| Loss / (gain) on asset sales and impairments, net | – | – | – | – | 334.4 | – | 334.4 |
| Amortization of inventory step-up | – | – | – | – | 1,192.9 | – | 1,192.9 |
| Amortization of deferred financing costs | – | 272.5 | 20.9 | 4.1 | 0.8 | – | 298.3 |
| Contingent consideration adjustments, including accretion | – | – | – | – | 108.8 | – | 108.8 |
| Dividends from subsidiaries | 208.1 | 208.1 | – | – | – | (416.2) | – |
| Other, net | – | – | – | – | 66.4 | – | 66.4 |
| Changes in assets and liabilities (net of effects of acquisitions) | (0.1) | (370.6) | 122.5 | 97.7 | (1,199.2) | – | (1,349.7) |
| Net cash provided by / (used in) operating activities | 208.0 | 1,204.9 | 143.7 | 43.4 | 3,460.2 | (416.2) | 4,664.0 |
| **Cash Flows From Investing Activities:** | | | | | | | |
| Additions to property, plant and equipment | – | – | – | (42.9) | (412.0) | – | (454.9) |
| Additions to product rights and other intangibles | – | – | – | – | (154.7) | – | (154.7) |
| Additions to investments | (9,000.8) | (9,000.8) | – | – | (24.3) | 18,001.6 | (24.3) |
| Proceeds from sale of investments and other assets | – | – | – | – | 883.0 | – | 883.0 |
| Proceeds from sales of property, plant and equipment | – | – | – | – | 140.1 | – | 140.1 |
| Acquisitions of businesses, net of cash acquired | – | – | – | – | (37,510.1) | – | (37,510.1) |
| Net cash (used in) / provided by investing activities | (9,000.8) | (9,000.8) | – | (42.9) | (37,078.0) | 18,001.6 | (37,120.9) |
| **Cash Flows From Financing Activities:** | | | | | | | |
| Proceeds from borrowings of long-term indebtedness, including credit facility | – | 9,110.0 | 20,955.6 | – | 72.1 | – | 30,137.7 |
| Financing structure and other activity with affiliates | – | (5,500.0) | (20,955.6) | – | 26,455.6 | – | – |
| Debt issuance and other financing costs | – | (167.1) | (143.7) | – | – | – | (310.8) |
| Payments on debt, including capital lease obligations and credit facility | – | (4,431.7) | – | – | (702.5) | – | (5,134.2) |
| Payments of contingent consideration and other financing | – | – | – | – | (230.1) | – | (230.1) |
| Dividends to Parents | (208.1) | (208.1) | – | – | (208.1) | 416.2 | (208.1) |
| Contributions from Parents | 9,000.8 | 9,000.8 | – | – | 9,000.8 | (18,001.6) | 9,000.8 |
| Net cash provided by / (used in) financing activities | 8,792.7 | 7,803.9 | (143.7) | – | 34,387.8 | (17,585.4) | 33,255.3 |
| Effect of currency exchange rate changes on cash and cash equivalents | – | – | – | – | (6.5) | – | (6.5) |
| Net increase / (decrease) in cash and cash equivalents | (0.1) | 8.0 | – | 0.5 | 783.5 | – | 791.9 |
| Cash and cash equivalents at beginning of period | 0.1 | 5.5 | – | 1.5 | 237.2 | – | 244.3 |
| Cash and cash equivalents at end of period | $ – | $ 13.5 | $ – | $ 2.0 | $ 1,020.7 | $ – | $ 1,036.2 |

F-115

### NOTE 26 — Compensation

The following table represents compensation costs for the years ended December 31, 2017, 2016 and 2015 (\$ in millions):

| | Year Ended December 31, | | |
| | 2017 | 2016 | 2015 |
|---|---|---|---|
| Wages and salaries | \$ 1,892.8 | \$ 2,108.7 | \$ 2,252.3 |
| Stock-based compensation | 308.0 | 396.1 | 925.7 |
| Pensions | 82.7 | 156.8 | 99.9 |
| Social welfare | 150.4 | 165.0 | 185.1 |
| Other benefits | 265.1 | 321.0 | 271.6 |
| Total | \$ 2,699.0 | \$ 3,147.6 | \$ 3,734.6 |
| Amount included in continuing operations | \$ 2,699.0 | \$ 2,578.4 | \$ 2,597.7 |
| Amount included in discontinued operations | \$ - | \$ 569.2 | \$ 1,136.9 |

### NOTE 27 — Concentration

The Company considers there to be a concentration risk for customers that account for 10% or more of their third party revenues. The following table illustrates any customer which accounted for 10% or more of our annual revenues within the U.S. and Canada in any of the past three fiscal years and the respective percentage of our revenues for which they account for each of the last three years:

| Customer | 2017 | 2016 | 2015 |
|---|---|---|---|
| McKesson Corporation | 23% | 23% | 27% |
| Cardinal Health, Inc. | 19% | 18% | 20% |
| AmerisourceBergen Corporation | 19% | 18% | 19% |

Changes in the mix of concentration amongst the Company's largest customers are due, in part, to the impact of acquisitions as well as changes in the supply chain of our indirect customers. No other country outside the U.S. and Canada had 10% or more of global sales.

The Company's accounts receivable primarily arise from product sales in North America and Europe and primarily represent amounts due from wholesalers, distributors, drug store chains and service providers in the health care and pharmaceutical industries, public hospitals and other government entities. Approximately 58% and 59% of the gross accounts receivable balance are concentrated among the Company's three largest customers as of December 31, 2017 and 2016, respectively. The Company performs ongoing credit evaluations of its customers and maintains an allowance for potential uncollectible accounts. Actual losses from uncollectible accounts have been minimal.

Outside of the U.S., concentrations of credit risk with respect to accounts receivable are limited due to the wide variety of customers and markets using the Company's products, as well as their dispersion across many different geographic areas. The Company monitors economic conditions, including volatility associated with international economies, and related impacts on the relevant financial markets and its business, especially in light of sovereign credit issues. The Company does not expect to have write-offs or adjustments to accounts receivable which would have a material adverse effect on its financial position, liquidity or results of operations.

Certain of the Company's finished products and raw materials are obtained from single source suppliers. Although the Company seeks to identify more than one source for its various finished products and raw materials, loss of a single source supplier could have an adverse effect on the Company's results of operations, financial condition and cash flows. Further, a second source supplier may not be able to produce the same volumes of inventory as the Company's primary supplier. No third party manufacturer accounted for 10% or more of the Company's products sold based on third-party revenues for the year ended December 31, 2017.

F-116

**NOTE 28 — Subsequent Events**

*Elastagen Pty Ltd*

On February 6, 2018, the Company completed the acquisition of Elastagen Pty Ltd for approximately $95.0 million, which was accounted for as an asset acquisition and expensed as a component of R&D during the first quarter of 2018.  Under the terms of the agreement, Elastagen Pty Ltd is eligible to receive additional consideration of up to $165.0 million.

*Repros Therapeutics, Inc.*

On January 31, 2018, the Company completed the acquisition of Repros Therapeutics, Inc. for approximately $31.0 million, which was accounted for as an asset acquisition and expensed as a component of R&D during the first quarter of 2018.

F-117

Schedule II
Allergan plc
Warner Chilcott Limited

Valuation and Qualifying Accounts
Years Ended December 31, 2017, 2016 and 2015
($ in millions)

| | Balance at Beginning of Period | | Charged to Costs and Expenses | | Deductions/ Write-offs | | Other* | | Balance at End of Period |
|---|---|---|---|---|---|---|---|---|---|
| **Allowance for doubtful accounts:** | | | | | | | | | |
| Year ended December 31, 2017 | $ | 75.7 | $ | 11.6 | $ | (1.7) | $ | 7.4 | $ | 93.0 |
| Year ended December 31, 2016 | $ | 80.6 | $ | 3.5 | $ | (8.4) | $ | - | $ | 75.7 |
| Year ended December 31, 2015 | $ | 4.8 | $ | 8.4 | $ | (7.3) | $ | 74.7 | $ | 80.6 |
| **Tax valuation allowance:** | | | | | | | | | |
| Year ended December 31, 2017 | $ | 183.9 | $ | 230.1 | $ | - | $ | (10.2) | $ | 403.8 |
| Year ended December 31, 2016 | $ | 196.2 | $ | 183.8 | $ | - | $ | (196.1) | $ | 183.9 |
| Year ended December 31, 2015 | $ | 474.0 | $ | (335.6) | $ | - | $ | 57.8 | $ | 196.2 |

*Includes opening balances of businesses acquired in the period and reclasses to assets held for sale.

F-118

## SUPPLEMENTARY DATA (UNAUDITED)

Selected unaudited quarterly consolidated financial data and market price information are shown below ($ in millions, except per share data):

|  | Year Ended 12/31/2017 | For Three Month Periods Ended | | | |
|---|---|---|---|---|---|
|  |  | Dec. 31, 2017 | Sept. 30, 2017 | June 30, 2017 | Mar. 31, 2017 |
| Net revenues | $ 15,940.7 | $ 4,326.1 | $ 4,034.3 | $ 4,007.4 | $ 3,572.9 |
| Net income/(loss) | $ (4,118.9) | $ 3,123.2 | $ (3,954.0) | $ (723.9) | $ (2,564.2) |
| Basic earnings per share | (13.19) | 9.21 | (12.07) | (2.37) | (7.86) |
| Diluted earnings per share | (13.19) | 8.88 | (12.07) | (2.37) | (7.86) |
| Market price per share: |  |  |  |  |  |
| High |  | $ 210.98 | $ 256.15 | $ 248.91 | $ 249.32 |
| Low |  | $ 163.58 | $ 202.66 | $ 218.73 | $ 210.80 |

|  | Year Ended 12/31/2016 | For Three Month Periods Ended | | | |
|---|---|---|---|---|---|
|  |  | Dec. 31, 2016 | Sept. 30, 2016 | June 30, 2016 | Mar. 31, 2016 |
| Net revenues | $ 14,570.6 | $ 3,864.3 | $ 3,622.2 | $ 3,684.8 | $ 3,399.3 |
| Net income/(loss) | $ 14,979.5 | $ 1.2 | $ 15,221.8 | $ (499.9) | $ 256.4 |
| Basic earnings per share | 38.18 | (0.20) | 38.58 | (1.44) | 0.47 |
| Diluted earnings per share | 38.18 | (0.20) | 38.58 | (1.44) | 0.47 |
| Market price per share: |  |  |  |  |  |
| High |  | $ 244.66 | $ 261.27 | $ 277.96 | $ 310.83 |
| Low |  | $ 184.50 | $ 228.68 | $ 195.50 | $ 261.60 |

F-119