PSJ10 Exh 31a

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    UNITED STATES DISTRICT COURT

 2                      NORTHERN DISTRICT OF OHIO

 3                          EASTERN DIVISION

 4

 5    ----------------------------) MDL No. 2804

 6    IN RE NATIONAL PRESCRIPTION  )

 7    OPIATE LITIGATION            )

 8                                 ) Case No. 17-md-2804

 9    This document relates to:    )

10    All Cases                    )

11    ----------------------------) Hon Dan A. Polster

12

13                      HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The 30(b)(6) videotaped deposition of

17    ALLERGAN by and through MARY WOODS, called for

18    examination, taken pursuant to the Federal Rules of

19    Civil Procedure of the United States District Courts

20    pertaining to the taking of depositions, taken before

21    JULIANA F. ZAJICEK, a Registered Professional Reporter

22    and a Certified Shorthand Reporter, at Lieff Cabraser

23    Heimann & Bernstein, 8th Floor, 250 Hudson Street, New

24    York, New York, on January 9, 2019, at 9:10 a.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         ROBBINS GELLER RUDMAN & DOWD LLP
           655 West Broadway, Suite 1900
 4         San Diego, California 92101
           619-231-1058
 5         BY:  THOMAS E. EGLER, ESQ.
                tegler@rgrdlaw.com;
 6              HENRY ROSEN, ESQ.
                hrosen@rgrdlaw.com
 7
                     -and-
 8
           ROBBINS GELLER RUDMAN & DOWD LLP
 9         Post-Montgomery Center
           One Montgomery Street, Suite 1800
10         San Francisco, California 94104
           415-288-4545
11         BY:  KELLI BLACK, ESQ.
                kblack@rgrdlaw.com
12
13    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
      AMERISOURCEBERGEN DRUG CORPORATION:
14
           REED SMITH LLP
15         Three Logan Square
           1717 Arch Street, Suite 3100
16         Philadelphia, Pennsylvania 19103
           215-851-8100
17         BY:  CHRISTIAN SAUCEDO, ESQ. (Telephonically)
                csaucedo@reedsmith.com
18
                     -and-
19
           REED SMITH LLP
20         811 Main Street, Suite 1700
           Houston, Texas 77002
21         713-469-3842
           BY:  MARY BALASTER, ESQ. (Telephonically)
22              MBalaster@reedsmith.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF CEPHALON, INC., TEVA PHARMACEUTICALS USA,
     INC., ACTAVIS LLC, ACTAVIS PHARMA, INC., AND WATSON
 3   LABORATORIES, INC.:
 4         MORGAN LEWIS & BOCKIUS LLP
           1701 Market Street
 5         Philadelphia, Pennsylvania 19103-2921
           215-963-5000
 6         BY:  ADAM HAMMOUD, ESQ.
                adam.hammoud@morganlewis.com
 7
 8   ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
 9         ROPES & GRAY LLP
           Prudential Tower
10         800 Boylston Street
           Boston, Massachusetts 02199-3600
11         617-951-7910
           BY:  ELISSA REIDY, ESQ. (Telephonically)
12              elissa.reidy@ropesgray.com
13
     ON BEHALF OF CARDINAL HEALTH, INC.:
14
           FARRELL FRITZ P.C.
15         400 RXR Plaza
           Uniondale, New York 11556
16         516-227-0620
           BY:  KEVIN P. MULRY, ESQ.
17              kmulry@farrellfritz.com
18
     ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
19   PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
     INC.:
20
           BAKER HOSTETLER
21         Key Tower
           127 Public Square, Suite 2000
22         Cleveland, OH 44114-1214
           216-861-6486
23         BY:  DOUG SHIVELY, ESQ. (Telephonically)
                dshively@bakerlaw.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF WALMART INC.:
 3         JONES DAY
           150 West Jefferson, Suite 2100
 4         Detroit, Michigan 48226-4438
           313-733-3939
 5         BY:  LOUIS P. GABEL, ESQ.
                lpgabel@jonesday.com
 6
 7    ON BEHALF OF ALLERGAN:
 8         KIRKLAND & ELLIS LLP
           655 Fifteenth Street, N.W.
 9         Washington, D.C. 20005-5793
           202-879-5211
10         BY:  JENNIFER LEVY, ESQ.
                jennifer.levy@kirkland.com
11
                    -and-
12
           KIRKLAND & ELLIS LLP
13         300 North LaSalle Street
           Chicago, Illinois 60654
14         312-862-3429
           BY:  KAITLYN COVERSTONE, ESQ.
15              kaitlyn.coverstone@kirkland.com
16
      ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
17    NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:
18         CLARK MICHIE LLP
           220 Alexander Street
19         Princeton, NJ 08540
           609-423-2143
20         BY:  BRUCE CLARK, ESQ.
                (Telephonically)
21              bruce.clark@clarkmichie.com
22
      THE VIDEOGRAPHER:
23
           MR. ERIC DAVIDSON,
24         Golkow Litigation Services.
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    And a non-warehousing chain has the

2    wholesalers purchase for them and then the wholesaler

3    sends them out to their locations.

4        Q.    All right.

5              Do you remember whether, when you were

6    working at Watson Pharmaceuticals, Inc., there was

7    ever an effort to identify and understand the

8    customers of your customers as they were ordering

9    controlled substances?

10       A.    At some point we did.  I don't remember if

11   it was under Watson Pharmaceuticals or Actavis, Inc.

12   It wasn't really much of a guidance from DEA in the

13   early years.  It was in the later point in time.

14       Q.    Do you remember when that shift took

15   place, about?

16       A.    I think it was probably more around 2011,

17   2012.

18       Q.    Do you remember what the reason for the

19   shift was?

20       A.    Well, of course, obviously I think it's --

21   it's apparent that when opioids were becoming more

22   prevalent they wanted you to understand more about who

23   your customer was selling the product to.

24       Q.    All right.  So the next line down there,

Highly Confidential - Subject to Further Confidentiality Review

 1   Actavis Inc., with the understanding that you never

 2   worked for Actavis Inc., do you have an understanding

 3   of who Rachelle Galant was or Rachelle Galant?

 4        A.    Yes.  Rachelle Galant worked in marketing

 5   at Actavis Inc.

 6        Q.    How about Nancy Baran?

 7        A.    Nancy Baran worked in customer service.

 8   She was the director of customer service at Actavis

 9   Inc.

10        Q.    And then Jinping McCormick?

11        A.    She was director of the marketing

12   department and I believe Rachelle reported in to

13   Jinping.

14        Q.    Have you ever met Dr. McCormick?

15        A.    No, not at all.

16        Q.    Do you have an understanding of who

17   Ms. Galant, Ms. Baran and Dr. McCormick were

18   responsible for training at Actavis Inc.?

19        A.    So, I do know Nancy and I do know Rachelle

20   and I believe Nancy had an active role to train her

21   customer service team at Actavis Inc.  She was

22   familiar with the CSA and was instrumental in

23   assisting to -- with their systems.

24              And -- and I believe Rachel was also --

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I -- I can't say who Rachelle actually trained, but I

 2   know she was very -- very involved in helping create

 3   some of the policies on how SOMS was going to be

 4   handled, especially around 2012 when they made some

 5   changes in their process and she was very instrumental

 6   in that process.

 7        Q.    Do you know about how many people were on

 8   the customer service team that you referred to at

 9   Actavis Inc.?

10        A.    I think when the acquisition happened and

11   we worked with Nancy, I would say maybe five, six.

12        Q.    Do you know what their various roles were?

13        A.    I can't say directly what all of their

14   roles were.  I'm not that familiar if they had

15   different roles from one another.  I -- I really

16   can't.

17        Q.    Now, since we are talking about it in this

18   context, I'm going to take kind of a sidestep.

19              At some point Watson Pharmaceuticals, Inc.

20   merged with or bought Actavis Inc., is that right?

21        A.    We -- yes, Watson Pharmaceuticals did

22   acquire Actavis Inc., that is correct.

23        Q.    And when that happened, what took place

24   with regard to the SOM and diversion people and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   substances?

 2        A.    I would not have a number of customers.

 3        Q.    As you think about now in 2018, 2019,

 4   about how many customers does Watson have across the

 5   board for controlled substances?

 6        A.    Allergan Finance, LLC?

 7        Q.    I'm sorry.  Allergan Finance, LLC.

 8        A.    Maybe ten.

 9        Q.    All right.

10        A.    I'm just -- I'm just thinking about the

11   number of customers that we have set up at UPS.

12   I'm -- don't quote me on the exact number, but it

13   is -- it is not a significant amount.

14        Q.    Do you think it was substantially more or

15   less back in 2004?

16        A.    It was more in 2004.

17        Q.    Okay.

18        A.    Because there was retail -- warehousing

19   retail chains.

20        Q.    Okay.  So are warehousing retail chains

21   not Allergan's customers anymore?

22        A.    They purchase through the wholesalers.

23        Q.    Okay.  Is that for all controlled

24   substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    All right.

 3              All right.  So let's move on to Exhibit

 4   No. 8.  Could you pick that up inside the compendium

 5   Exhibit 25, and look through it, and as you are

 6   looking through it, I'll note it is a

 7   four-page document, Allergan_MDL_03641386 through

 8   1389.

 9              When you are ready, can you tell me what

10   this appears to you to be?

11        A.    Yes.  This is a corporate standard

12   operating procedure.  So this is filed with the entire

13   corporation.  It is a high-level procedure regarding

14   suspicious orders of controlled drugs.

15        Q.    All right.  And with regard to this

16   document, you say it's filed with the corporation.

17              What is the difference between this and

18   what we were talking about before, Exhibit 3?

19        A.    Sure.

20              The ones under Exhibit 3 -- and the ones

21   that are identified as operational procedure documents

22   are typically a derivative of a corporate standard

23   operating procedure.  So the corporate standard

24   operating procedures are actually come -- are -- are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    designed and are required by our regulatory and

 2    compliance teams.  And after these are developed, then

 3    our department would take this and come up with a very

 4    high-level standard operating procedure that mimics

 5    this, has a little bit more detail on it because it's

 6    more operational in nature.  We are operational teams.

 7         Q.    Okay.

 8         A.    So we then would design an operational

 9    procedure off of this.

10         Q.    All right.  So with regard to the document

11    that's marked as Exhibit 8, can you tell what -- what

12    would cause an order to pend inside the system as you

13    read through this policy?

14         A.    So this policy does -- explains that there

15    is a requirement --

16         Q.    Uh-huh.

17         A.    -- to have a system in place.  So it tells

18    you that there is a process and it tells you what

19    documents to review for that process and it tells you

20    that the customer, that the system compiled past

21    history, it tells you that it's to -- each customer is

22    to establish normal size and frequency, and it tells

23    you -- so under 1.1 it explains a little bit about

24    what the normal size and frequency is and then it
```

Highly Confidential - Subject to Further Confidentiality Review

1  well where they would contact physicians for

2  specialty, like, dermatology.  I think that was the

3  only group that we had, dermatology.  We may have had

4  women's healthcare, which was contracted out.  They

5  did not report directly to me, but I had some

6  assistance there.  And we had a small telesales

7  organization that contacted hospitals, like

8  institutional accounts.  And they may have contacted,

9  I believe there was a dental program at one point.

10      Q.    As you think of it, while you were at

11  Watson, were you aware whether Watson Pharmaceuticals,

12  Inc. detailed the drug Norco to anybody?

13      A.    Not -- not through my team.

14      Q.    Okay.  And did they detail any of the

15  other opioid prescription drugs that they sold?

16      A.    No, not that I can recall then.

17      Q.    All right.  All right.

18          And then let's keep going with the

19  exhibits.  And I'm going to hand you an exhibit that

20  we'll mark as Exhibit 28.

21              (WHEREUPON, a certain document was

22               marked Allergan 30(b)(6) - Woods

23               Deposition Exhibit No. 28, for

24               identification, as of 01/09/2019.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. EGLER:

 2        Q.    We went through and checked for Exhibit 28

 3    and didn't see it in the compendium of exhibits that

 4    you gave us this morning, and I was wondering if you

 5    could look at it and just read through it generally,

 6    and as you are doing that, I will read into the

 7    record, it is Bates numbers Allergan_MDL_02176551

 8    through 553.

 9              And when you are ready, can you tell me

10    what this appears to you to be?

11        A.    Yes.  The first thing I can tell you is

12    that this is a document created by DEA Affairs or DEA

13    compliance team regarding our suspicious order

14    monitoring procedure --

15        Q.    All right.

16        A.    -- that follows the CSA.

17        Q.    So before we get too far into this

18    document, based on your ex -- your own personal

19    experience at Watson and Actavis and Allergan, can you

20    tell whether this was created before or after the

21    Aller- -- Actavis Watson merger?

22        A.    This was created after.  I can tell you

23    that because of the logo.

24        Q.    All right.  So with regard to this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document, do you remember ever seeing this document

 2    before?

 3         A.    Yes, I do.

 4         Q.    Okay.  When was the last time you saw this

 5    document?

 6         A.    It would have been when I worked for

 7    Actavis, Inc.

 8         Q.    All right.  So, can you tell from the

 9    context of this document that -- that -- any

10    particular timeframe from the time of the merger to

11    today that this would cover, just because I don't see

12    any dates on it to get a -- a hook that -- in that

13    manner?

14         A.    I -- I wasn't the creator of the

15    document --

16         Q.    Right.

17         A.    -- so I wouldn't want to tell you a date

18    because I didn't create this.

19         Q.    Okay.

20         A.    This would have been created by, most

21    likely, Tom Napoli.

22         Q.    Okay.

23         MS. LEVY:  And, Tom, just for the record, I

24    think it is in the binder.
```