# PSJ10 Exh 31b

```
 1                UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5    -----------------------------)  MDL No. 2804

 6    IN RE NATIONAL PRESCRIPTION   )

 7    OPIATE LITIGATION             )

 8                                  )  Case No. 17-md-2804

 9    This document relates to:     )

10    All Cases                     )

11    -----------------------------)  Hon. Dan A. Polster

12

13                     HIGHLY CONFIDENTIAL

14         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16             The videotaped deposition of MARY WOODS,

17    called for examination, taken pursuant to the Federal

18    Rules of Civil Procedure of the United States District

19    Courts pertaining to the taking of depositions, taken

20    before JULIANA F. ZAJICEK, a Registered Professional

21    Reporter and a Certified Shorthand Reporter, at Lieff

22    Cabraser Heimann & Bernstein, 8th Floor, 250 Hudson

23    Street, New York, New York, on January 10, 2019, at

24    9:10 a.m.
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         ROBBINS GELLER RUDMAN & DOWD LLP
           655 West Broadway, Suite 1900
 4         San Diego, California 92101
           619-231-1058
 5         BY:  THOMAS E. EGLER, ESQ.
                tegler@rgrdlaw.com
 6
                    -and-
 7
           ROBBINS GELLER RUDMAN & DOWD LLP
 8         Post-Montgomery Center
           One Montgomery Street, Suite 1800
 9         San Francisco, California 94104
           415-288-4545
10         BY:  KELLI BLACK, ESQ.
                kblack@rgrdlaw.com
11
12    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
      AMERISOURCEBERGEN DRUG CORPORATION:
13
           REED SMITH LLP
14         Three Logan Square
           1717 Arch Street, Suite 3100
15         Philadelphia, Pennsylvania 19103
           215-851-8100
16         BY:  CHRISTIAN SAUCEDO, ESQ. (Telephonically)
                csaucedo@reedsmith.com
17
18    ON BEHALF OF CEPHALON, INC., TEVA PHARMACEUTICALS USA,
      INC., ACTAVIS LLC, ACTAVIS PHARMA, INC., AND WATSON
19    LABORATORIES, INC.:
20         MORGAN LEWIS & BOCKIUS LLP
           1701 Market Street
21         Philadelphia, Pennsylvania 19103-2921
           215-963-5000
22         BY:  ADAM HAMMOUD, ESQ.
                adam.hammoud@morganlewis.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2    ON BEHALF OF CARDINAL HEALTH, INC.:
 3         FARRELL FRITZ P.C.
           400 RXR Plaza
 4         Uniondale, New York 11556
           516-227-0620
 5         BY:  KEVIN P. MULRY, ESQ.
                kmulry@farrellfritz.com
 6
 7    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
 8    INC.:
 9         BAKER HOSTETLER
           Key Tower
10         127 Public Square, Suite 2000
           Cleveland, OH 44114-1214
11         216-861-6486
           BY:  DOUG SHIVELY, ESQ. (Telephonically)
12              dshively@bakerlaw.com
13
      ON BEHALF OF WALMART INC.:
14
           JONES DAY
15         150 West Jefferson, Suite 2100
           Detroit, Michigan 48226-4438
16         313-733-3939
           BY:  LOUIS P. GABEL, ESQ.
17              lpgabel@jonesday.com
18
      ON BEHALF OF ALLERGAN:
19
           KIRKLAND & ELLIS LLP
20         655 Fifteenth Street, N.W.
           Washington, D.C. 20005-5793
21         202-879-5211
           BY:  JENNIFER LEVY, ESQ.
22              jennifer.levy@kirkland.com
23                  -and-
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES: (Continued)
 2   ON BEHALF OF ALLERGAN:
 3        KIRKLAND & ELLIS LLP
          300 North LaSalle Street
 4        Chicago, Illinois 60654
          312-862-3429
 5        BY:  KAITLYN COVERSTONE, ESQ.
               kaitlyn.coverstone@kirkland.com
 6
 7
 8
 9   ALSO PRESENT:
10        MS. LYNNE FISCHMAN UNIMAN (Telephonically).
11
12
13
14   THE VIDEOGRAPHER:
15        MR. ERIC DAVIDSON,
          Golkow Litigation Services.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Do you remember the first time the --
 2   okay.
 3              Do you remember the first time the level
 4   at which an order pended on the suspicious order
 5   monitoring system was modified based on the drug's
 6   placement on a -- a Controlled Substance Act schedule?
 7        A.    I -- I really couldn't remember the first
 8   time.
 9        Q.    All right.
10              All right.  So we are going to go through
11   some documents, as we did yesterday.
12        A.    Okay.
13        Q.    Oh, so, all right.  You had mentioned
14   earlier that there is a -- this order management
15   group --
16        A.    Uh-huh.
17        Q.    -- as well, right?
18        A.    Correct.
19        Q.    And you had mentioned that -- the term
20   "VMI"?
21        A.    Vendor managed inventory.
22        Q.    Yeah.
23              What does vendor managed inventory mean to
24   you?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.    So, vendor managed inventory is a process
 2   in which you have the ability to work with a vendor to
 3   help them manage their inventory.  Most of the time
 4   you are using their systems.  In the case of Walmart,
 5   we used their systems and we helped to review their
 6   inventory with them and they would make us go into
 7   Retail Link and review their systems, make sure they
 8   didn't have outs and things like that.
 9      Q.    With regard to any -- any shipments or
10   orders that were made through any VMI system at
11   Actavis or Watson, do you know whether those orders
12   would have been monitored by the suspicious order
13   monitoring program at Actavis or Watson?
14      A.    Every single order would have gone
15   through --
16      Q.    All right.
17      A.    -- our system.
18      Q.    All right.  I'm going to hand you what
19   we'll mark as Exhibit 30 for this deposition.
20              (WHEREUPON, a certain document was
21                 marked Allergan - Woods Deposition
22                 Exhibit No. 30, for identification,
23                 as of 01/10/2019.)
24   BY MR. EGLER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Because of the physical setup, I'm going

 2    to hand you two copies, one for your counsel.

 3         A.    Okay.  Sure.

 4         Q.    And, Ms. Woods, could you look at what

 5    I've marked as Exhibit 30, and as you are looking at

 6    it, I'll read into the record its Bates stamps are

 7    Allergan_MDL_02166476 and 477.

 8               And when you are ready, can you tell me

 9    what this appears to you to be?

10         A.    Sure.  Let me just read this.

11         Q.    Yeah.

12         A.    Okay.  I've read it.

13         Q.    All right.  What does this appear to you

14    to be?

15         A.    So Tracey Hernandez headed up the DEA

16    compliance team.  This appears to me that she is

17    stating filings for the DEA suspicious orders should

18    go through her team.

19         Q.    Does this seem to be a -- an e-mail chain

20    among you and other people at Watson Pharma, Inc.?

21         A.    Correct.

22         Q.    And the date on the e-mails is January and

23    February of 2004, is that right?

24         A.    Yes, that is correct.
```

```
 1      Q.    So about 15 years ago at this point, is
 2   that right?
 3      A.    Yes, correct.
 4      Q.    So for the e-mails that appear on here,
 5   there is a name Tracey Hernandez who we have discussed
 6   a little bit earlier and a woman named Christine
 7   Marino.
 8            Do you see her name right there?
 9      A.    Yes, I do.
10      Q.    Who is Christine Marino?
11      A.    Christine Marino was a supervisor of
12   customer service and she was also a representative.  I
13   don't know which position at this time.
14      Q.    When you say "representative," what does
15   that mean?
16      A.    A customer service representative.
17      Q.    All right.  And then there is another name
18   there, Eileen Mesis, M-e-s-i-s?
19      A.    Correct.  She was a manager of customer
20   service.
21      Q.    All right.  And then Judy Callahan.  Who
22   is Judy Callahan?
23      A.    Judy Callahan was a -- a manager of
24   customer service at this time.
```

```
 1        Q.    And in the first e-mail in time on this
 2   exhibit, which is at the bottom of the second page,
 3   it's a Ms. Marino -- or Ms. Hernandez writing to
 4   Ms. Marino and Ms. Callahan:
 5              "Chris/Judy, Can you please tell me who at
 6   DEA you have on record to send these reports to if you
 7   ever need to?"
 8              And Ms. Hernandez replies:  "I have not
 9   had to forward suspicious reports.  You may want to
10   cover this with Mary Woods."
11              And then you respond on the first page --
12        A.    Uh-huh.
13        Q.    "We have never needed to file a report.
14   Any time there was a question during the order process
15   of a suspicious order quantity, we went," and then in
16   parentheses, "(and still follow the same
17   procedure)," and then close parentheses, "back to a
18   customer to let them know we would need to notify the
19   DEA due to the quantity they wanted to order.  In
20   response, they either reduced the quantity or
21   cancelled the order."
22              Do you see that there?
23        A.    Yes, I do.
24        Q.    And then you -- you go on:
```

```
 1                "Most all customers understand the issues
 2     and do not want to bring attention to these large
 3     purchases."
 4                So at this time in January of 2004, do you
 5     remember whether it was an official policy of Watson
 6     Pharma to allow customers to reduce quantities in
 7     order to avoid having to file a -- a DEA suspicious
 8     order report?
 9         A.     I absolutely do not remember from 2004.
10         Q.     All right.  So with regard to this
11     response that you give on this e-mail, do you
12     remember -- as you sit here today, do you remember
13     writing this e-mail?
14         A.     Not from 2004.
15         Q.     Right.  With that understanding, it's
16     15 years ago.
17                Do you have an understanding about whether
18     it was the case that you and people you worked with
19     would allow customers to reduce the quantity of orders
20     that had pended in a system in order to avoid filing a
21     suspicious order report with the DEA?
22         A.     Nobody would have ever done it with any
23     intention to avoid filing a report with the DEA.  If
24     the customer would have come to us and said, you know,
```

```
 1   reduce the quantity, I don't -- I can't recollect

 2   from, you know, 15 years ago --

 3        Q.    Right.

 4        A.    -- what the policy would have been or the

 5   justification from 15 years ago.

 6        Q.    But in the e-mail you wrote, they either

 7   cancelled the order or reduced the amount --

 8        A.    Yes, I did.

 9        Q.    -- is that right?

10              So do you have any reason to believe it

11   wasn't a regular process to allow customers to reduce

12   their orders at that time?

13        A.    I -- I can't respond to what happened

14   15 years ago.  I'd have to have more information.

15        Q.    As you sit here today, you don't have any

16   reason to believe that that wasn't the case, right?

17        A.    I don't have any be -- reason to believe

18   it was or wasn't.  I don't know.

19        Q.    Well, you -- you wrote it at the time,

20   right, in 2004?

21        A.    I probably wrote a lot of things at the

22   time that I probably can't recollect.

23        Q.    Would you have written something that you

24   didn't believe was true at the time in 2004?
```

```
 1        A.    I wouldn't write something I didn't
 2   believe was true at that point in time for that
 3   e-mail.
 4        Q.    So you must have believed that that was
 5   actually the case, that customers would have
 6   reduced --
 7        A.    For this incident.
 8        MS. LEVY:  Hang on a second.  Let him finish his
 9   question.
10   BY MR. EGLER:
11        Q.    Customers would have been able to reduce
12   their order in order to avoid a DEA report being
13   filed, is that right?
14        A.    I'm reading what's in the e-mail.  That's
15   the best I can respond to it.
16        Q.    All right.
17              All right.  You can set this document
18   aside.
19              (WHEREUPON, a certain document was
20               marked Allergan - Woods Deposition
21               Exhibit No. 31, for identification,
22               as of 01/10/2019.)
23   BY MR. EGLER:
24        Q.    So I'll hand you what we'll mark as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Exhibit 31.
 2              Again, there is two -- two copies there.
 3        A.    Sure.
 4        Q.    And can you look through what I've marked
 5     as Exhibit 31?  And as you are looking through it,
 6     I'll read on the record, it's Bates numbered
 7     Allergan_MDL_02187196 through 87199.
 8              And when you are ready, can you tell me
 9     what this appears to you to be?
10        A.    Okay.
11        Q.    All right.  Ms. Woods, what does this
12     appear to you to be?
13        A.    This was an e-mail that we were -- that I
14     sent to Andy Boyer, who is the VP of our sales and
15     marketing team.
16        Q.    The e-mail is dated October 4th, 2011, is
17     this right?
18        A.    That is correct.
19        Q.    And at this point you were still working
20     in Corona, California, is that right?
21        A.    That is correct.
22        Q.    And still working for Watson still?
23        A.    Correct.
24        Q.    I don't know if we've raised his name
```