PSJ10 Exh 33

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF OHIO

 3                         EASTERN DIVISION

 4      -----------------------------X

        IN RE: NATIONAL PRESCRIPTION     MDL No. 2804

 5      OPIATE LITIGATION,

                                         Case No. 17-MD-2804

 6      This document relates to:

 7      All Cases                        Hon. Dan A. Polster

 8      -----------------------------X

 9

10       * * HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER * *

11               * * CONFIDENTIALITY REVIEW * *

12                    VIDEOTAPED DEPOSITION

13                            OF

14                      THOMAS P. NAPOLI

15                      New York, New York

16                  Thursday, January 17, 2019

17

18

19

20

21

22

        Reported by:

23      ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    January 17, 2019

 2                    9:06 a.m.

 3

 4          Videotaped deposition of PURDUE PHARMA,

 5     through its representative, THOMAS P.

 6     NAPOLI, held at the offices of LIEFF

 7     CABRASER HEIMANN & BERNSTEIN LLP, 250

 8     Hudson Street, New York, New York, pursuant

 9     to Notice, before Annette Arlequin, a

10     Certified Court Reporter, a Registered

11     Professional Reporter, a Realtime Systems

12     Administrator, a Certified Realtime

13     Reporter, and a Notary Public of the State

14     of New York and New Jersey.

15

16

17

18

19

20

21

22

23

24
```

```
 1   A P P E A R A N C E S:

 2

 3        ROBBINS GELLER RUDMAN & DOWD LLP

 4        Attorneys for Plaintiffs

 5             655 West Broadway - Suite 1900

 6             San Diego, California  92101

 7        BY: THOMAS E. EGLER, ESQ.

 8             Tegler@rgrdlaw.com

 9        BY: KELLI BLACK, ESQ.

10             Kblack@rgrdlaw.com

11

12        MORGAN, LEWIS & BOCKIUS LLP

13        Attorneys for Teva Pharmaceuticals

14             1111 Pennsylvania Avenue NW

15             Washington, D.C.  20004-2541

16        BY: STEVEN A. LUXTON, ESQ.

17             steven.luxton@morganlewis.com

18        BY: MARYANN B. ZAKI, ESQ.

19             Maryann.zaki@morganlewis.com

20             (Teleconferenced)

21        BY: ARCANGELO CELLA, ESQ.

22             Arcangelo.cella@morganlewis.com

23             (Teleconferenced)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S(CONT'D.):

 2

 3           JONES DAY

 4           Attorneys for Walmart

 5               North Point

 6               901 Lakeside Avenue

 7               Cleveland, Ohio 44114-1190

 8           BY: ADAM HOLLINGSWORTH, ESQ.

 9               Ahollingsworth@jonesday.com

10

11           KIRKLAND & ELLIS LLP

12           Attorneys for Allergan Finance LLC

13               300 North LaSalle

14               Chicago, Illinois 60654

15           BY: TIMOTHY KNAPP, ESQ.

16               Timothy.knapp@kirkland.com

17

18           FARRELL FRITZ P.C.

19           Attorneys for Cardinal Health

20               400 RXR Plaza

21               Uniondale, New York  11556

22           BY: KEVIN P. MULRY, ESQ.

23               Kmulry@farrellfritz.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S(CONT'D.):

 2

 3         ARNOLD & PORTER KAYE SCHOLER, LLP

 4         Attorneys for Endo Pharmaceuticals, Inc.

 5            and Endo Health Solutions, Inc.

 6            601 Massachusetts Ave., NW

 7            Washington, D.C., 20001-3743

 8         BY: SEAN HENNESSY, ESQ.

 9             Sean.Hennessy@arnoldporter.com

10             (Teleconferenced/Internet realtime))

11

12         GIBBONS, P.C.

13         Attorneys for AmerisourceBergen Drug Corporation

14             One Pennsylvania Plaza - 37th Floor

15             New York, NY 10119-3701

16         BY: PAUL E. ASFENDIS, ESQ.

17             Pasfendis@gibbonslaw.com

18             (Teleconferenced/Internet realtime)

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S(CONT'D.):

 2

 3          O'MELVENY & MYERS LLP

 4          Attorneys for Janssen Pharmaceuticals

 5              Two Embarcadero Center, 28th Floor

 6              San Francisco, CA  94111

 7          BY: TRISHA PARIKH, ESQ.

 8              Tparikh@omm.com

 9              (Teleconferenced/internet realtime)

10

11          ROPES & GRAY LLP

12          Attorneys for Mallinckrodt

13              1211 Avenue of the Americas

14              New York, New York  10036-8704

15          BY: JUSTIN MANN, Law Clerk

16              Justin.Mann@ropesgray.com

17              (Via internet realtime)

18

19   ALSO PRESENT:

20

21          ERIK DAVIDSON, Videographer

22

23

24
```

 1   during my time with those facilities, I
 2   eventually took on the responsibility for
 3   controlled substance compliance within an
 4   operational setting.  So, so we did manufacture
 5   controlled substances at the manufacturing site.
 6           And then eventually -- after seven
 7   years in that position, there was a
 8   consolidation within the organization, so we
 9   were transitioning, closing the facilities that
10   I was supporting, moving some of our easier to
11   replicate products and Schedule III through V
12   substances to a facility in India and also some
13   Schedule II products to our Corona facility in
14   California.  And our distribution center was
15   folded into our distribution center in the
16   Chicago area based -- after the consolidation, I
17   took a position in Morristown, New Jersey, at
18   our corporate headquarters, where I was a -- the
19   -- had made an organizational decision to fold
20   the DEA compliance function from -- transition
21   that from quality into the operations group
22   because of the synergies of -- with security --
23   with security and the DEA regulations, because
24   of my background with DEA compliance and really

```
 1    doing a good job, a very good job with the
 2    program and having a good relationship with DEA
 3    and having a high-functioning program, they
 4    asked me to take on responsibility for a larger
 5    role of DEA compliance at their headquarters
 6    location.
 7         Q.   All right.  So as we're going through
 8    today, the court reporter is going to type down
 9    everything that you say.
10         A.   Sure.
11         Q.   And so if we have a complicated word
12    or if we have a long statement, I want you to
13    speak freely, but if you can pace yourself just
14    so we make sure we get a good record.
15         A.   Sure, sure.
16         Q.   So as you think about the time where
17    you moved to New Jersey, about what time frame
18    was that?
19         A.   2009.
20         Q.   And when you moved to New Jersey, as
21    you think of it, what was -- do you remember
22    what your job title was?
23         A.   Manager of security and controlled
24    substance compliance, I believe, or something to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      that --
 2           Q.    Okay.  And you had mentioned that the
 3      Schedule III through V drugs that Watson made
 4      had been -- let me start over.
 5                 You had mentioned that the
 6      manufacturing center for the Schedule III
 7      through V controlled substance drugs that Watson
 8      made had been moved to India.
 9           A.    Some of the easier to replicate, like
10      single-entity products, immediate-release
11      products.  Some of the more technological, you
12      know, controlled, sustained-release products,
13      those probably wouldn't go over, but...
14           Q.    Do you remember whether -- well, let
15      me start over.
16                 Do you remember where Watson's
17      Schedule II controlled substances were
18      manufactured, if anywhere?
19           A.    Corona, California, would have been
20      one of the prime locations.
21           Q.    As part of your job, did you -- let
22      me start over.
23                 In 2009, as part of your job, were
24      you the head of security group for or did you
```

```
 1     management for the United States region.
 2          Q.    Is Boehringer-Ingelheim based in the
 3     United States?
 4          A.    We have a U.S. headquarters in
 5     Ridgefield, Connecticut, but our corporate
 6     headquarters is Ingelheim, Germany.
 7          Q.    With regard to Boehringer-Ingelheim,
 8     do they manufacture or market any Schedule II
 9     controlled substance?
10          A.    No, sir, no controlled drugs in the
11     portfolio.
12          Q.    So as we move on today, we're going
13     to be talking about some terms and names.  I
14     just want to go through them with you initially
15     so we can get a common understanding.
16          A.    Sure.
17          Q.    One of the terms that's going to come
18     up today is "Suspicious Order Monitoring" or
19     "SOM" or "SOMS."
20                What does that mean to you?
21          A.    Suspicious Order Monitoring is a, to
22     me, it's a holistic program that is mandated
23     through DEA requirements to ensure that you're
24     ensuring that your products are not winding up
```

| | |
|---|---|
| 1 | in illicit channels; that you have safeguards in |
| 2 | place to ensure that you know your customer and |
| 3 | that you are monitoring ordering behavior of |
| 4 | your customers to prevent illegal diversion. |
| 5 | Q.    And then another term that we're |
| 6 | going to talk about a little bit is N-J-P-I-G, |
| 7 | the New Jersey Pharmaceutical Industry Group. |
| 8 | Have you ever heard of that? |
| 9 | A.    I have. |
| 10 | Q.    What is -- |
| 11 | A.    I'm part of it. |
| 12 | Q.    What is that? |
| 13 | A.    That was a group of New Jersey-based, |
| 14 | for the most part, controlled substance |
| 15 | manufacturers that we met on a regular basis to, |
| 16 | you know -- because something, you know, like |
| 17 | DEA compliance or controlled substance |
| 18 | compliance is not something that is a |
| 19 | proprietary thing; it's something that we, you |
| 20 | know, collaborate on as an industry as much as |
| 21 | we can.  So it was a forum in which we could |
| 22 | exchange ideas and share best practices, as well |
| 23 | as identify opportunities to partner with our |
| 24 | local DEA and find opportunities where we could |

```
 1      work together to, to prevent diversion.
 2             Q.    So could you pronounce the acronym
 3      NJPIG, how you would say it?
 4             A.    NJPIG.  It's kind of an awkward
 5      acronym so, yeah.
 6             Q.    Right.
 7                   So -- and then the next one that we
 8      are going to talking about is a thing called
 9      chargebacks, chargebacks data.
10                   Do you know what that is?
11             A.    I do have an understanding of what
12      chargeback is, yeah.
13             Q.    Okay.  What is a chargeback?
14             A.    Chargeback is a -- and I'm -- and
15      this is more layman's terms because I'm not a
16      commercial side of the house kind of person, but
17      to my understanding, chargeback is when a
18      customer or -- has a negotiated price with you,
19      and if they were to purchase your product from
20      someone at a higher price, they would submit a
21      chargeback for a rebate for the difference in
22      that cost.
23             Q.    All right.  And then the next one is
24      a -- it's actually two, because I think it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      changes through time.  It's IMS and IQVIA data.
 2              Are you familiar with that?
 3         A.   I'm familiar with IMS.
 4         Q.   What is IMS, as you think of it?
 5         A.   IMS is an organization that deals in
 6      data and gathering industry data and providing
 7      that data to industry.  Largely used by our
 8      sales and marketing groups.
 9         Q.   All right.  So today --
10              MR. EGLER:  Can we go off the record
11         for one second?
12              THE VIDEOGRAPHER:  The time is
13         approximately 9:21 a.m.  We are going off
14         the record.
15              (Off the record.)
16              THE VIDEOGRAPHER:  We are back on the
17         record.  The time is approximately
18         9:22 a.m.
19      BY MR. EGLER:
20         Q.   Mr. Napoli, as we move through today,
21      I'm going to be handing you documents.  To the
22      extent -- well, every document that I'm going to
23      hand to you has been produced in this
24      litigation.
```

```
 1            identification, as of this date.)
 2       BY MR. EGLER:
 3            Q.    Mr. Napoli, I've just handed you what
 4       we will mark as Exhibit 7.
 5                  Can you look through it?  And as
 6       you're looking through it, I'll read into the
 7       record the Bates numbers.  ALLERGAN_MDL_01236097
 8       and 6098.
 9                  And when you're ready, can you tell
10       me what this appears to you to be?
11            A.    It looks like it's a document in
12       reference to a DEA request for a placebo product
13       and setting them up within our distribution
14       system as a customer to receive a no charge.
15            Q.    Right.
16                  As you think about that, an entity
17       that is being set up as a customer, is that the
18       DEA?
19            A.    Yes.
20            Q.    So at the earliest email in time on
21       this exhibit, and it's at the bottom of the
22       first page, you write to Scott Soltis.
23            A.    Um-hmm.
24            Q.    I think we've talked about him
```

1      before.

2          A.    Um-hmm.

3          Q.    Who is Scott Soltis?

4          A.    Scott was our executive director of

5      securities and DEA affairs.

6          Q.    So was he on an organizational chart

7      above you or below you.

8          A.    Above me.  He was responsible for

9      security and DEA compliance for the

10     organization.

11         Q.    And then you cc Gary Stewart?

12         A.    Yes.

13         Q.    Who is Gary Stewart?

14         A.    Gary Stewart was our supply chain

15     security manager based out of Gurnee, Illinois,

16     distribution center.

17         Q.    And then Ed J. Grover?

18         A.    Yes.

19         Q.    Who is Mr. Grover?

20         A.    Ed Grover was our head of

21     distribution in Gurnee, Illinois.

22         Q.    And you write, "Scott, in regards to

23     the recent DEA request for product, I would

24     suggest the following course of action:  Special

```
 1      Agent Warpness should provide the request for
 2      product on official letterhead," and then in
 3      parentheses, "include reg number," close
 4      parentheses, "and fax to Watson DEA affairs.
 5      But if time is of the essence, I would suggest
 6      fax going to Gary at the DC since most of us
 7      will be at the DEA conference this week."
 8              Do you remember going to a DEA
 9      conference in April of 2010?
10          A.  Yeah.  I've been to many of them.
11          Q.  And you say, "Faxing to Gary at the
12      DC."
13              What does that mean?
14          A.  If I'm going to be out of the office,
15      it probably would make sense, if this DEA agent
16      wants the placebo as soon as practical, send it
17      directly to our security manager in the
18      distribution center so the process can be, the
19      request can be processed without delay.
20          Q.  All right.  And then Scott Soltis
21      writes back on the same day, April 12, 2010, and
22      that is the email above.
23          A.  Um-hmm.
24          Q.  He says, "FYI, I just talked to
```