PSJ10 Exh 44



T 862 261 7000
F 862 261 7001

Morris Corporate Center III
400 Interpace Parkway
Parsippany, NJ 07054

**January 14, 2016**

**Paul Spanel**
**Manager, Strategic Sourcing**
**Branded Pharmaceuticals**
**Cardinal Health, Inc.**
**7000 Cardinal Place**
**Dublin, OH 43017**

Dear Paul Spanel:

In conjunction with their audit of our financial statements for the year ending December 31, 2015, our auditors, PricewaterhouseCoopers LLP, have requested that you provide them with certain information pertaining to Allergan plc's sales terms related to products purchased by you during 2015.

Please note Actavis plc changed its name to Allergan plc as a result of the acquisition of Allergan, Inc., effective March 17, 2015.

As such, please confirm the following with respect to all purchases of Allergan plc's pharmaceutical products during 2015. If the statements below are not in agreement with your understanding of the relationship between Cardinal Health, Inc. and Allergan plc, please indicate any differences in the space provided below:

1.  The general sales terms and all amendments between Actavis Pharma and Cardinal Health Inc, (included as Attachment #1 for purchases made between January 1, 2015 and December 31, 2015) set forth Actavis Pharma's terms of sale with respect to purchases of pharmaceutical products during 2015 by Cardinal Health Inc, excluding offer letters for new products launched.

2.  The general sales terms and all amendments between Allergan Sales LLC and Cardinal Health Inc, (included as Attachment #2 for purchases made between January 1, 2015 and June 30, 2015) set forth Allergan Sales LLC's terms of sale with respect to purchases of pharmaceutical products during that period in 2015 by Cardinal Health Inc, excluding offer letters for new products launched.

3.  Cardinal Health Inc has no right to return products to Allergan plc other than in accordance with Allergan plc's Return Policies, (included as Attachment #3), except for certain purchase orders related to the Phase 1.B order, which include special return provisions. The return provisions specific to the Phase 1.B order are included as Attachment #4.

4.  There are no terms and conditions, whether written or oral, which supersede or are not contained in the agreements and policies contained in (1), (2), and (3) mentioned above, outside of the offer letters.

Please mail your reply directly to our auditors, PricewaterhouseCoopers LLP, Attn: Cameron Baher 400 Campus Drive Florham Park, NJ 07932, in the enclosed return envelope, fax to the following number 678-529-5501, or email the completed confirmation to cameron.baher@us.pwc.com.

We would appreciate it if you could mail and fax back your response to be received by our auditors no later than **January 22, 2016.**

Sincerely,

Branden Miller,

Executive Director, Trade Accounts

**EXCEPTIONS (IF ANY)**

**(Please attach additional sheets if more space is needed)**

The above confirmation was completed by:

Cardinal Health, Inc.

_____

Name

_____

Title

_____

Date

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_04242039

# ATTACHMENT #1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242040

# ACTAVIS PHARMA, INC.
## BRANDED INVENTORY MANAGEMENT AGREEMENT

This Agreement ("Agreement") is entered into between Actavis Pharma, Inc., a Delaware corporation having its principal offices at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054 ("ACTAVIS") and Cardinal Health*, having its principal offices at 7000 Cardinal Place, Dublin, Ohio 43017 ("CUSTOMER").

ACTAVIS and CUSTOMER agree to a non-exclusive arrangement where ACTAVIS agrees to sell or cause to sell (as contemplated by Schedule D-3 hereto) Products (as defined herein) to CUSTOMER, as ordered by CUSTOMER from time to time, on the terms and conditions set forth in this Agreement so that CUSTOMER may distribute the Products to its customers within the United States and its territories (Puerto Rico, Guam and the Virgin Island of the United States). ACTAVIS hereby appoints CUSTOMER (and all of its distribution centers) as an authorized distributor of record for all ACTAVIS brand Products ordered directly from ACTAVIS. This Agreement allows ACTAVIS and CUSTOMER to exchange information, which ensures consistent inventory levels for both organizations. ACTAVIS and CUSTOMER agree as follows:

## I.     Obligations of CUSTOMER.

A.     **CUSTOMER agrees not to engage in forward buying of ACTAVIS products directly or indirectly, through its subsidiaries**. CUSTOMER further agrees not to exceed twenty-eight (28) calendar days of inventory of all Products (except where affected by minimum order quantities on slow moving non-promoted products and unforeseen, mutually agreed upon market conditions), including all safety stock and calculated on the basis of all of CUSTOMER's distribution centers, and not to carry less than twenty-one (21) calendar days of inventory. Additionally, CUSTOMER will work in good faith with ACTAVIS to keep a minimum of seven (7) days of inventory on hand at all forward distribution centers. Calendar days of inventory will be defined by ACTAVIS as the number of saleable units of inventory on-hand and inventory on order divided by Average Daily Sales. Average Daily Sales represents the total unit sales during the preceding thirteen (13) weeks divided by 91. In the event CUSTOMER maintains inventory outside the required parameters, CUSTOMER will provide a reasonably detailed explanation in writing. In the event that true customer demand is less than ACTAVIS' minimum order quantity on any product, an exception may be made on a Product-by-Product basis. If it is reasonably determined that CUSTOMER has intentionally violated the Agreement, ACTAVIS will have no obligation to pay the Service Fee under Section II for any affected quarter. Additionally, ACTAVIS will deduct any price appreciation on product exceeding twenty-eight (28) calendar days of inventory unless overage is mutually agreed upon.

B.     During the term of this Agreement and subject to CUSTOMER's obligations to its customers, CUSTOMER agrees not to take any unauthorized deductions for returns, shortages, and other credit requests. ACTAVIS agrees to review and process within fifteen (15) business days of ACTAVIS' actual receipt of standard documentation. If after fifteen (15) business days CUSTOMER does not receive a credit memo or a communication stating the reason the transaction has been denied, CUSTOMER may deduct the transaction in good faith. In the event ACTAVIS denies the claim, both ACTAVIS and CUSTOMER agree to resolve any discrepancies within sixty (60) days of the deduction date. Notwithstanding anything to the contrary, any request for credit must be received by ACTAVIS within one (1) year of the original CUSTOMER invoice. Claims beyond one (1) year will not be honored by ACTAVIS.

---

* "Cardinal Health" means the following affiliated operating companies: Cardinal Health 3, LLC; Cardinal Health 104 LP; Cardinal Health 107, LLC; Cardinal Health 108, LLC (f/k/a Cardinal Health 108, Inc.); Cardinal Health 110, LLC; Cardinal Health 112, LLC; Cardinal Health P.R. 120, Inc.; Cardinal Health 411, Inc.; Kinray, LLC (f/k/a Kinray, Inc.); Parmed Pharmaceuticals, LLC; and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("Cardinal Health Parent Company"), as may be designated from time to time by Cardinal Health Parent Company.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_04242041

C.    During the term of this Agreement, CUSTOMER agrees to submit chargeback requests in accordance with ACTAVIS' Chargeback Policy attached as Exhibit A.

D.    CUSTOMER agrees to the following regarding ACTAVIS product inventory and demand information:

1.    Data from each authorized CUSTOMER distribution center will be provided electronically (via the 852 and 867 EDI transaction sets) on a daily basis for EDI 852 and a weekly basis for EDI 867 following the signing of this Agreement (see reporting requirements for 852 and 867 transaction sets listed on Exhibit B).

2.    Inventory and demand data will be made available by NDC number.

3.    Data provided will include each authorized distribution center.

In addition, attached hereto as Exhibit C, is a list of distribution centers that are authorized to purchase under this Agreement. ACTAVIS shall provide CUSTOMER with a list of authorized distribution centers with a signed copy of this Agreement. For each distribution center CUSTOMER would like added, CUSTOMER shall furnish ACTAVIS with the following:

(a) Name of distribution center
(b) Address, City, State and Zip Code
(c) Phone number
(d) DEA number

A new authorized distribution center may be added only upon the approval of ACTAVIS which will not be unreasonably withheld or delayed. CUSTOMER will send updates to:

Paul Reed
Sr. Director, Trade Sales
ACTAVIS
13600 Shoreline Drive
St. Louis, MO 63045
(800) 678-1605- Phone
(314) 493-7460 - Fax
paul.reed@frx.com.com

E.    Direct orders placed by CUSTOMER with ACTAVIS via EDI shall be shipped in accordance with ACTAVIS' Policies, Terms and Conditions of Sale available on ACTAVIS' website. Whenever possible, ACTAVIS shall provide CUSTOMER with fifteen (15) days advance written notice of any changes to such terms and conditions. Irrespective of ACTAVIS' Policies, Terms and Conditions of Sale as published on ACTAVIS' website, CUSTOMER's payment terms shall be allowed a 2% discount when payment is received by ACTAVIS via Automated Clearing House (ACH) at ACTAVIS' bank within thirty-six (36) days from the date of invoice; net amount of the invoice due thirty-seven (37) days after the invoice date. If a payment date falls on a Saturday, Sunday or a federal holiday, CUSTOMER may make payment on the next business day and still be in compliance with the applicable payment terms, including those required to be eligible for cash discount.

ALLERGAN_MDL_04242042

F. CUSTOMER agrees that inventory of Products will be maintained only at ACTAVIS-authorized distribution centers. CUSTOMER further agrees to purchase ACTAVIS products only from ACTAVIS with the exception of the Legacy Warner Chilcott products purchased for Puerto Rico as detailed in Exhibit D-3. Additionally, in the event that ACTAVIS determines that CUSTOMER is in violation of this requirement ACTAVIS may, in its sole discretion, decide to restrict the sale of Products to CUSTOMER.

G. Following a price increase, if CUSTOMER's average weekly unit purchases of the affected product decline more than ten (10) percent below the previous thirteen week (13) rolling average purchases, CUSTOMER will be required to provide a detailed explanation in writing as to the reason for the deviation. ACTAVIS shall not be obligated to pay any Service Fee for any affected quarter unless ACTAVIS has accepted CUSTOMER's explanation. ACTAVIS will monitor CUSTOMER's purchases both weekly and on a thirteen (13) week rolling average.

II. <u>Services</u>. CUSTOMER agrees to provide the following core distribution services, consistent with current industry practices:

a) Pick, pack, and shipment of Products to customers
b) Credit and billing processing; Accounts Receivables management
c) Provide reverse logistics and recall management functions in accordance with ACTAVIS' Return Goods Policy available on ACTAVIS' website; provided, however, ACTAVIS will reimburse CUSTOMER, consistent with Healthcare Distribution Management Association (HDMA) guidelines, for the full amount of all reasonable costs and expenses incurred by CUSTOMER in connection with CUSTOMER's performance of any recall services or assistance relating to the Products.
d) Maintain and transport Products in properly licensed environmentally controlled, PDMA compliant, secure facilities
e) Sophisticated ordering technology and order management; Customer service support
f) Emergency shipments to customers

II. **Obligations of ACTAVIS.**

A. <u>Service Fee</u>. For Services provided in Section I.H., of this Agreement, ACTAVIS will pay CUSTOMER a "Service Fee" in accordance with the following table based on CUSTOMER's Net Purchases. For purposes of this Service Fee, Net Purchases shall be defined as the total dollar amount of all Product purchases made by CUSTOMER during the applicable quarter, less the dollar amount of CUSTOMER'S processed sales returns, including rejected goods, damaged goods and recalls.

### PRODUCTS

| SERVICE FEE FOR ALL PRODUCTS OTHER THAN LEGACY FOREST PRODUCTS | |
| --- | --- |
| PERIOD | BASIS POINTS |
| November 1, 2014 - December 31, 2014 | 200 |
| January 1, 2015 - March 31, 2015 | 175 |
| | |
| SERVICE FEE FOR LEGACY FOREST PRODUCTS ONLY | |
| PERIOD | BASIS POINTS |
| November 1, 2014 - March 31, 2015 | 146 |
| | |
| SERVICE FEE FOR ALL PRODUCTS | |

ALLERGAN_MDL_04242043

| PERIOD | BASIS POINTS |
|---|---|
| April 1, 2015 - December 31, 2015 | 150 |
| January 1, 2016 - December 31 2016 | 154 |
| January 1, 2017 - December 31, 2017 | 158 |

ACTAVIS agrees to process the Service Fee as a credit memo within thirty days (30) following the close of each month.

For the avoidance of doubt, "Products" means, collectively, all of ACTAVIS's current branded pharmaceutical products, including the following "legacy" products resulting from acquisitions by ACTAVIS or its affiliates: (v) the "Actavis Branded Pharmaceutical Products", which are listed in Exhibit D-1, (w) the "Legacy Forest Products", which are listed in Exhibit D-2, (x) the "Legacy Warner Chilcott Products", which are listed by product family in Exhibit D-3, (y) the "Legacy Aptalis Products", which are listed by product in Exhibit D-4, and (z) the "Legacy Durata Products", which are listed by product family in Exhibit D-5. For the avoidance of doubt, branded pharmaceutical products resulting from acquisitions by ACTAVIS following the effective date of this Agreement will not be included in the definition of Products without CUSTOMER's consent.

ACTAVIS and CUSTOMER agree that the amount of compensation payable to CUSTOMER for the performance of Services reflects the fair market value of the services being performed by CUSTOMER.

B.     ACTAVIS represents and warrants that it will, at all times, provide CUSTOMER with the most favorable terms and conditions with respect to all material terms and conditions set forth in this Agreement or any applicable policy that it offers any other customer of Products. In the event that ACTAVIS has entered into an agreement with another customer of Products which provides to that customer more favorable material terms and conditions, ACTAVIS will provide such more favorable terms to CUSTOMER within ten (10) days.

C. ACTAVIS shall immediately remit any monies due to CUSTOMER in the event of a credit balance situation that persists for more than fourteen (14) days. Credit balance is defined as the sum of all payments owed by ACTAVIS to CUSTOMER exceeds the sum of all payments owed by CUSTOMER to ACTAVIS.

III.     **Confidentiality and Disclosure.**

During the term of this Agreement, each party and its affiliates, and their respective agents, employees and representatives (collectively, the "receiving party") may receive or have access to proprietary and confidential materials and information of the other party (the "disclosing party"). All such materials and information (including, but not limited to, this Agreement and its terms, Products information, operations, methods, strategies, formulas, price lists, discount programs, incentives, rebates, records of unit movement for Products, shipping and warehousing, and confidential proprietary information from third parties), are collectively referred to herein as "Confidential Information".

The receiving party shall:

(i)     use the disclosing party's Confidential Information solely to perform the Services or to exercise its rights or perform its obligations under this Agreement;

(ii)     not disclose the disclosing party's Confidential Information to any third party without obtaining the prior written consent of the disclosing party, except as otherwise expressly permitted herein; and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242044

(iii)    protect the confidentiality of the disclosing party's Confidential Information with at least the same degree of care used to protect its own Confidential Information from unauthorized use or disclosure, but in no event with less than reasonable care.

In addition, ACTAVIS and CUSTOMER agree that they shall not disclose to any third party the terms and conditions of this Agreement, nor shall they disclose to any third party the existence of this Agreement through a press release.

The receiving party may disclose the disclosing party's Confidential Information to its directors, officers, employees, agents, subcontractors, advisors and consultants who need to know such Confidential Information in connection with the performance of the Services and the parties' performance under this Agreement, provided that such persons or entities are bound to the receiving party by obligations of confidentiality and non-use with respect to such Confidential Information at least as stringent as those contained herein. The receiving party shall be liable for any unauthorized use or disclosure of the disclosing party's Confidential Information. The receiving party shall notify the disclosing party in writing immediately upon learning of any such unauthorized use or disclosure of the disclosing party's Confidential Information and shall use all reasonable efforts to mitigate such unauthorized use or disclosure and prevent any further unauthorized use or disclosure of the disclosing party's Confidential Information.

Exceptions to Confidential Information. The following information shall not be deemed the disclosing party's Confidential Information:

(i)    information that was already known to the receiving party at the time of disclosure by the disclosing party;

(ii)    information that was generally available to the public or otherwise part of the public domain at the time of its disclosure by the disclosing party;

(iii)    information that becomes part of the public domain after disclosure by the disclosing party, other than as a result of a breach of this Agreement by the receiving party;

(iv)    information that was disclosed to the receiving party by a third party without an obligation of confidentiality to the disclosing party with respect to such information; or

(v)    information that was independently developed by or on behalf of the receiving party without use of or reference to the disclosing party's Confidential Information.

Required Disclosures. Notwithstanding anything to the contrary contained herein, the receiving party may disclose the disclosing party's Confidential Information to the extent that such disclosure is (a) required by a valid order of a court or other governmental or regulatory body of competent jurisdiction, or (b) required by applicable law or regulation including, without limitation, the rules of any national stock exchange; provided that the receiving party furnishes the disclosing party with reasonable prior written notice of such contemplated disclosure (to the extent permitted by applicable law or regulation) and makes a reasonable effort to assist the disclosing party, at the disclosing party expense, in obtaining a protective order or other appropriate remedy preventing or limiting such disclosure. If the disclosing party is unable to obtain such protective order or other appropriate relief, the receiving party shall limit its disclosure to that which is required by law and shall use reasonable efforts to obtain, at the disclosing party's expense, confidential treatment thereof.

Upon termination of this Agreement (for any reason) each party will promptly at the request of the other party either: (i) return to the other party all documentation and other materials (including copies of the original documentation or other materials) containing Confidential Information of the other party (except that such party may retain one (1) copy for archival purposes, with appropriate confidential safeguards); or (ii) certify to the other party, pursuant to a certificate in form and substance reasonably satisfactory to the other party, as to the destruction of all such documentation and materials.

    ALLERGAN_MDL_04242045

The provisions of this Article III shall remain in effect for a period of three (3) years following the date of expiration or termination of this Agreement.

IV.    **Term and Termination.**

A. **Term.** This Agreement is effective November 1, 2014 and shall remain in full force and effect until December 31, 2017, unless earlier terminated according to the terms of Section B below.

B. **Termination.** This Agreement may be terminated as follows:

1.1    **Convenience.** This Agreement may be terminated, in whole or in part by either party, with or without cause, (including, but not limited to, termination with respect to any Product), upon ninety (90) days' prior written notice to the other party.

1.2    **Bankruptcy/Insolvency.** By either party immediately on notice to the other, if such other party makes an assignment for the benefit of creditors, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, if a receiver or trustee is appointed with respect to a substantial part of such other party's property or a proceeding is commenced against it which will substantially impair its ability to perform hereunder.

1.3    **Termination Upon Change of Law.** Upon thirty (30) days' prior written notice, either party may terminate this Agreement in the event that any federal, state or local law, legislation, regulation, rule, guidance, order or other pronouncement having the force of law, a court or governmental authority having jurisdiction (collectively, "Law") is promulgated, issued or enacted, or a change or interpretation of an existing Law is promulgated, issued or made, which, in the reasonable opinion of the party giving such notice, could result in this Agreement, or the transactions contemplated hereby, being found to violate applicable Law or would otherwise have a material adverse effect on such party which was unforeseen at the time this Agreement was entered into if this Agreement remains in effect; provided, however, that so long as the affected party uses its reasonable commercial efforts to give notice of such event within such thirty (30) day period, such notice shall be effective immediately prior to such Law or interpretation becoming effective.

1.4. **Termination With Cause.** Either party may terminate this Agreement with cause if the breaching party fails to cure such breach within thirty (30) days of receipt written notice thereof by the non-breaching party.

C. **Effect of Termination.** In the event of termination, all obligations arising or accrued prior to termination shall not be affected. In addition, the provisions of Sections II.C, III and VI.E shall survive termination.

V.    **Notices.** All notices under this Agreement shall be directed as follows:

*To CUSTOMER:*

> Cardinal Health
> 7000 Cardinal Place
> Dublin, Ohio 43017
> Attention:     Vice President
>                Strategic Sourcing and Product Management
>                Branded Pharmaceuticals
> Fax No. 614.757.8337

With copy to:

> Cardinal Health
> 7000 Cardinal Place
> Dublin, Ohio 43017
> Attention:     General Counsel
> Fax No.: 614.652.7325

*To ACTAVIS:*

> Paul Reed
> Sr. Director, Trade Sales
> ACTAVIS
> 13600 Shoreline Drive
> St. Louis, MO 63045
> (800) 678-1605- Phone
> (314) 493-7460 - Fax
> paul.reed@frx.com.com

VI.  **Miscellaneous**

A. <u>Amendment.</u> This Agreement may not be amended or modified without the mutual consent of the parties and signatures of duly authorized representatives.

B. <u>ACTAVIS's Decision to Manufacture, Sell and Distribute.</u> Nothing in this Agreement shall be construed to limit or restrict ACTAVIS's right, in its sole discretion, to discontinue the manufacture, sale or distribution of any of its products at any time without penalty. ACTAVIS shall have no liability for product unavailability for any reason.

C. <u>Assignment.</u> Neither party shall have the right to assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. This Agreement shall inure to the benefit of and be binding upon each party, its successors and its permitted assigns.

D. <u>Enforceability.</u> In the event any term or provision of this Agreement is declared illegal or unenforceable or in conflict with any law or regulation, the validity of any other term or provision of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

this Agreement shall not be affected thereby.

E. Governing Law. The laws of the State of New Jersey shall govern the validity and interpretation of this Agreement.

F. Independent Contractors. The parties hereto are independent contractors engaged in the operation of their own respective businesses. Nothing herein shall be deemed or construed to create any other relationship between the parties.

G. Third Parties. Except as otherwise provided herein, nothing in this Agreement shall confer any benefits or rights on any person or entity other than the parties to this Agreement.

H. Force Majeure. No failure or omission by CUSTOMER or ACTAVIS to satisfy any of its obligations under this Agreement shall be deemed a breach thereof or create any liability if the same shall arise from any cause or causes beyond the reasonable control of such party.

I. No Waiver of Rights. The failure of either party to insist upon the strict observation of performance of any provision of this Agreement or to exercise any right given by this Agreement to the parties may be exercised from time to time and as often as appropriate.

J. Entire Agreement. This Agreement, including its exhibits, lists and, schedules, constitutes the entire understanding by and between CUSTOMER and ACTAVIS regarding the matters contained herein and supercedes all other prior agreements regarding the Products.

K. Audits. Upon prior written notice of not less than thirty (30) days, Actavis reserves the right, at its own expense, to physically audit Customer's purchasing and chargeback records as they relate to this Agreement. Each audit must be performed by any of: (1) bona fide, permanent employees of the party conducting such audit or inspection; (2) auditors from independent accounting firms of national recognition; or (3) such other representatives as the parties may mutually agree. ACTAVIS is responsible for compliance by those persons performing the audit on its behalf for compliance with all confidentiality agreements that would apply if ACTAVIS were to perform the audit itself. Audits must be performed during normal offices hours at the CUSTOMER site that is being audited, or such alternate sites where appropriate records are located as CUSTOMER may designate. Such review shall not occur more than once during a twelve-month period, unless such audit is for cause.

L. Compliance with Laws. Both parties represent, warrant and covenant that they are and will continue to be, during all times relevant to this Agreement, in compliance with all applicable federal, state and local laws and regulations.

ALLERGAN_MDL_04242048

IN WITNESS WHEREOF, CUSTOMER and ACTAVIS have caused this instrument to be executed by their duly authorized representatives, as of the day and year written below.

**For CUSTOMER**

Date: 2/6/15

**For ACTAVIS**

Mark Devlin
Senior Vice President, Managed Markets

Date: 2/13/15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242049

## EXHIBIT A

## CHARGEBACK PROCEDURES

### A.    Chargeback Processing

1.      Chargeback payments shall be calculated based on the difference between the (i) acquisition cost of the Product purchased directly from Actavis in effect as of the date of sale of such Product by Wholesaler to a Actavis contract customer that utilizes such Wholesaler as its prime vendor and (ii) the contract price to such contract customer.  Actavis will provide Wholesaler with Actavis customers' contract pricing.

2.      Chargebacks may only be claimed for quantities of product purchased directly from Actavis.

3.      Wholesaler shall submit chargeback claims to Actavis, on a weekly basis, via EDI 844 in HDMA Format.

4.      Wholesaler shall submit to Actavis, on a quarterly basis and in a mutually acceptable format, inventory levels by SKU in support of Wholesaler's chargeback submissions.

5.      Actavis must receive chargeback claims within six (6) months of Wholesaler's invoice date to a contract customer.

6.      Actavis shall issue chargeback credits to Wholesaler via EDI 849, or regular mail if Wholesaler not capable of receiving EDI 849 transmissions, accompanied by the appropriate documentation reconciling the chargeback credit with the chargeback claim, within fifteen (15) days after the chargeback data is verified and approved by Actavis.

7.      Wholesaler shall have ninety (90) days after receipt of chargeback credit to resubmit supporting data for any disputed or denied claims.  Actavis will review and respond to resubmissions within sixty (60) days of receipt.  Outstanding disputed or denied claims will be considered closed if Wholesaler does not submit proper documentation within ninety (90) days, unless both parties agree to review a submission outside of the approved period.

### B.    Chargeback Reversals

If Wholesaler issues a credit to a contract customer related to a prior sale of a Actavis product under contract, for which Wholesaler previously billed and collected a chargeback, Wholesaler must immediately submit a chargeback reversal to Actavis via EDI 844 and the chargeback will be reversed and remitted to Actavis.

### C.    Chargeback Monitoring and Audits

Actavis or Actavis' authorized representative will monitor and shall have the right to audit Wholesaler's chargeback submissions subject to the following terms and conditions:

1.      Actavis may request supporting documentation of chargeback submissions from time to time.  The Wholesaler shall maintain books and records, including inventory records for Actavis products, and documents which support the chargeback claims submitted to Actavis for a period of three (3) years.

2.      The Wholesaler agrees to make available, for the required retention period as set forth in #1 above and at the office of the Wholesaler during normal business hours, any books and records, including inventory records for Actavis products and documents for inspection, audit, or reproduction by Actavis or its authorized representative upon thirty (30) days prior notice.

3.      Audits shall be performed at the Wholesaler site that is being audited or such alternate sites where appropriate records are located as designated by Wholesaler.

4.      Any Actavis claims arising from an audit shall be submitted to Wholesaler within thirty (30) days of completing the audit.  Wholesaler shall have sixty (60) days to review and respond to the claim.

5.      Actavis shall bear the costs incurred in conjunction with any chargeback audit, unless such audit reflects discrepancies ("Discrepancy Amount") between Wholesaler's chargeback claims and Actavis' procedures, in which case Wholesaler will bear the cost of the audit and Actavis will be entitled to payment in full of such Discrepancy Amount.

*Procedure covers chargebacks for Actavis Pharma, Inc. and its affiliates*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit B

*852s (Limited to fields listed below)*

| Total Orders | Quantity ordered – sales + omits | QX |
|---|---|---|
| Sales Quantity | Aggregate of sales including:<br>- customer end sales<br>- dock to dock sales<br>- drop ship sales<br>- repacked sales | QS |
| Lost Sales Quantity | Unfiltered omitted units | QO |
| On-hand | Actual quantity currently stocked in the warehouse available for sale<br>Note: Pending customer orders not filled are not subtracted out (see QC – Committed quantity) | QA |
| On-order | Total on-order quantity | QP |
| Quantity received | All receipt quantities, including direct orders and transfers | QR |
| SKU Forecast | SKU weekly customer demand forecast | QD |
| Lines sold | Unfiltered lines sold, no adjustments | WQ |
| Lines lost | Lines Lost is defined as Lines Ordered – Lines Sold | LS |
| Inter-DC Transfers Out | Quantity transferred out | QW |
| Inter-DC Transfers In | Quantity transferred received | QZ |
| SKU Quantity Returned into Inventory | Saleable customer returns | Q2 |
| SKU Quantity Returned to Morgue | Un-saleable customer returns | Q3 |
| SKU Reserved Quantity | Additional quantity maintained in the buying system, typically used for new business and holiday builds | QH |
| SKU Committed Quantity | Customer orders to be filled | QC |

ALLERGAN_MDL_04242051

| Customer End Sales | Regular sales to customers | RE |
| Repacked Sales | Repack finished goods sales | OP |
| Order Projections 13 weeks out | Based on current information, projected unit order quantities (to the vendor) by week for 13 weeks.  (First instance = one week out, second instance = two weeks out, etc.) | OQ |
| Dock-to-dock Sales | Dock-to-dock sales | QI |
| Drop Ship Sales | Drop ship sales | OF |
| SKU Standard Deviation | SKU customer forecast standard deviation percent | PA |
| Planned Inventory Qty | Planned inventory quantity buy, typically manually calculated special quantities | QN |
| SKU Reorder Point | Buying system reorder point | PO |
| SKU Lead Time | Buying system SKU lead time | BS |
| SKU Lead Time Variability | Lead time standard deviation percent | MS |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242052

*867s (Limited to fields listed below)*

| | |
|---|---|
| Invoice# | Invoice number |
| Invoice Date | Invoice date |
| Vender DEA# / HIN# | Vender Drug Enforcement Administration number |
| Vendor Name | Vendor name |
| DC DEA# / HIN# | Drug Enforcement Administration Distributor Number |
| DC Name | DC name |
| NDC | National Drug Code |
| UPC | Universal Product Code |
| UOM | Selling unit of measure |
| Quantity Purchased | Quantity filled, excludes transfers, includes:<br>- customer end sales<br>- dock to dock sales<br>- drop ship sales<br>- repacked sales |
| Cost | Wholesale acquisition cost (WAC) |
| Sales Type Code | 1 = Customer end sales<br>2 = Dock to dock<br>3 = Drop ship<br>4 = Rx Pak<br>5 = Returns, saleable<br>6 = Returns, un-saleable |
| Customer Returns | Saleable and un-saleable returns |
| Contract# | Customer contract ID |
| Customer DEA# / HIN# | Customer DEA / HIN # |
| Customer Name | Customer name<br>For blocked customer, the name will be "XX" |
| Customer Address | Customer street address<br>For blocked customer, the address will be "XX" |
| City | Customer city<br>For blocked customer, the city will be "XX" |
| State | Customer state<br>For blocked customer, the state will be "XX" |
| Zip | Customer zip<br>For blocked customer, only the first 3 digits of the zip code will be populated |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242053

# Exhibit C

## AUTHORIZED DISTRIBUTION CENTERS

| DC Name | DC Street Address | City | State | Zip | Contact # | DEA # |
|---|---|---|---|---|---|---|
| Cardinal Health - Syracuse | 6012 Molloy Road | Syracuse | NY | 13211 | 1-800-627-6666 | PC0003044 |
| Cardinal Health - Peabody | 11 Centennial Drive | Peabody | MA | 01960 | 1-800-388-9000 | RD0108200 |
| Cardinal Health - Wheeling | 71 Mil-Acres Drive | Wheeling | WV | 26003 | 1-800-777-6978 | RO0153609 |
| Cardinal Health - Knoxville | 2512 Westcott Blvd. | Knoxville | TN | 37931 | 1-877-692-4500 | RC0238104 |
| Cardinal Health - Jackson | 1240 Gluckstadt Road | Jackson | MS | 39110 | 1-800-365-6085 | RC0221236 |
| Cardinal Health - Lakeland | 2045 Interstate Dr. | Lakeland | FL | 33805 | 1-800-637-8587 | RC0182080 |
| Cardinal Health - Aurora | 2353 Prospect Drive | Aurora | IL | 60502 | 1-888-999-6032 | RW0231908 |
| Cardinal Health - Roanoke | 851 Henrietta Creek Road | Roanoke | TX | 76262 | 1-800-567-5832 | RW0279996 |
| Cardinal Health - St Charles | 2840 Elm Point Industrial Drive | St Charles | MO | 63301 | 1-877-899-8381 | RW0283452 |
| Cardinal Health - Tolleson | 600 North 83rd Avenue | Tolleson | AZ | 85353 | 1-800-284-5844 | RW0263056 |
| Cardinal Health - Hudson | 2901 Enloe Street | Hudson | WI | 54016 | 1-800-670-7566 | RW0243725 |
| Cardinal Health - Greensboro | 4 Cardinal Health Court | Greensboro | NC | 27407 | 1-800-645-0641 | RW0243903 |
| Cardinal Health - Kansas City | 7601 NE Gardner Ave. | Kansas City | MO | 64120 | 1-866-760-4071 | RW0191926 |
| Cardinal Health - Stafford | 13661 Dublin Court | Stafford | TX | 77477 | 1-800-558-0770 | RC0333524 |
| Cardinal Health - Denver | 4875 Florence Street | Denver | CO | 80238 | 1-800-554-9093 | RW0263549 |
| Cardinal Health - Valencia | 27680 Avenue Mentry | Valencia | CA | 91355 | 1-888-565-4002 | RW0216449 |
| Cardinal Health - Elk Grove | 3238 Dwight Road | Elk Grove | CA | 95758 | 1-800-554-5135 | RW0236009 |
| Cardinal Health - Salt Lake City | 955 West 3100 South | Salt Lake City | UT | 84119 | 1-800-258-5180 | RW0191419 |
| Cardinal Health - Seattle | 801 C. Street | Seattle | WA | 98001 | 1-800-456-5550 | RW0191813 |
| Cardinal Health - Swedesboro | 1120 Commerce Boulevard | Swedesboro | NJ | 08085 | 1-877-860-2439 | RW0289654 |
| Cardinal Health - Kinray | 152-35 10th Avenue | Whitestone | NY | 11357 | 1-718-767-4225 | RK0416900 |
| Cardinal Health - Puerto Rico | Centro Internacional de Distribucion, Edificio #10 Carr. 869 KM 4.2 | Guaynabo | PR | 00962 | 1-800-981-2301 | RB0374683 |
| Parmed | 4220 Hyde Park Blvd. | Niagra Falls | NY | 14305 | 1-800-727-6331 | RP0337370 |
| Ambulatory Care | 2840 Elm Point Industrial Drive | St Charles | MO | 63301 | 1-877-899-8381 | RW0283452A |
| Zanesville Pedigree | 850 Airport Distribution Drive | Zanesville | OH | 43701 | 1-800-299-2462 | RC0346658 |
| Cardinal Health - NLC | 5995 Commerce Center Drive | Groveport | OH | 43125 | 1-866-853-8576 | RC0314891 |
| Brokerage - Knoxville | 2512 Westcott Blvd. | Knoxville | TN | 37931 | 1-877-692-4500 | RC0238104B |
| Brokerage - BLC | 5995 Commerce Center Drive | Groveport | OH | 43125 | 1-866-853-8576 | RC0314891B |
| Brokerage - Syracuse | 6012 Molloy Road | Syracuse | NY | 13211 | 1-800-627-6666 | PC0003044B |
| Brokerage - Lakeland | 2045 Interstate Dr. | Lakeland | FL | 33805 | 1-800-637-8587 | RC0182080B |
| Brokerage - Tolleson | 600 North 83rd Avenue | Tolleson | AZ | 85353 | 1-800-284-5844 | RW0263056B |
| Brokerage - Aurora | 2353 Prospect Drive | Aurora | IL | 60502 | 1-888-999-8032 | RW0231908B |
| Brokerage - Roanoke | 851 Henrietta Creek Road | Roanoke | TX | 76262 | 1-800-567-5832 | RW0279996B |
| Cardinal Health - Repack | 3540 East Pike | Zanesville | OH | 43701 | 1-800-299-2462 | RN0209583 |
| Cardinal Health - Repack | 850 Airport Distribution Drive | Zanesville | OH | 43701 | 1-800-299-2462 | RC0346658P |
| Cardinal Health - Repack | 850 Airport Distribution Drive | Zanesville | OH | 43701 | 1-800-299-2462 | RN0231427 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242054

# Exhibit D-1

## ACTAVIS BRANDED PHARMACEUTICAL PRODUCTS

| NDC | PRODUCT | S.K.U. UNIT |
|---|---|---|
| 00472-0882-82 | ACETASOL HC 1%/2% OTIC SOLUTION | 10 mL |
| 00591-0149-87 | SOD FERRIC GLUC 62.5MG INJ 10X5 ML | 10 Vials |
| 16781-0376-35 | TRETIN-X ª CREAM 0.0375% 35g | Tube |
| 46987-0410-11 | KADIAN ER 10MG CAPSULES | 100 |
| 46987-0322-11 | KADIAN ER 20MG CAPSULES | 100 |
| 46987-0325-11 | KADIAN ER 30MG CAPSULES | 100 |
| 46987-0327-11 | KADIAN ER 40MG CAPSULES | 100 |
| 46987-0323-11 | KADIAN ER 50MG CAPSULES | 100 |
| 46987-0326-11 | KADIAN ER 60MG CAPSULES | 100 |
| 46987-0328-11 | KADIAN ER 70MG CAPSULES | 100 |
| 46987-0412-11 | KADIAN ER 80MG CAPSULES | 100 |
| 46987-0324-11 | KADIAN ER 100MG CAPSULES | 100 |
| 46987-0329-11 | KADIAN ER 130MG CAPSULES | 100 |
| 46987-0330-11 | KADIAN ER 150MG CAPSULES | 100 |
| 46987-0377-11 | KADIAN ER 200MG CAPSULES | 100 |
| 52544-0930-01 | ACTIGALL 300MG CAPSULES | 100 |
| 52544-0884-08 | ALORA TS 0.025MG/DAY | Box of 8 |
| 52544-0471-08 | ALORA TS 0.05MG/DAY | Box of 8 |
| 52544-0472-08 | ALORA TS 0.075MG/DAY | Box of 8 |
| 52544-0473-08 | ALORA TS 0.1MG/DAY | Box of 8 |
| 52544-0076-60 | ANDRODERM 2MG/DAY | Carton of 60 |
| 52544-0077-30 | ANDRODERM 4MG/DAY | Carton of 30 |
| 52544-0254-28 | BREVICON WALLETTE 0.5/0.035MG T | 3 x 28 |
| 52544-0045-13 | CONDYLOX GEL 0.5% | 3.5 g tube |
| 52544-0046-13 | CONDYLOX SOLUTION 0.5% | 3.5mL |
| 52544-0044-24 | CORDRAN TAPE 4MCG/CM2 ROLL 24"X3" | 1 EA |
| 52544-0044-80 | CORDRAN TAPE 4MCG/CM2 ROLL 80"X3" | 1 EA |
| 52544-0255-24 | CRINONE 4% GEL APPLICATOR | 6 X 1.3 g |
| 52544-0256-12 | CRINONE 8% GEL APPLICATOR | 15 X 1.3 g |
| 52544-0080-01 | FIORICET 50/300/40MG CAPSULES | 100 |
| 52544-0092-01 | FIORICET/CODEINE 50/300/40/30MG CAPSULES | 100 |
| 52544-0555-01 | FIORINAL 50/325/40MG CAPSULES | 100 |
| 52544-0956-01 | FIORINAL/COD 50/325/40/30MG CAPSULES | 100 |
| 52544-0084-30 | GELNIQUE 10% TGEL SACHET | Carton of 30 |
| 52544-0041-54 | GELNIQUE 3.0% GEL 92G 30MD | 1 Pump |
| 52544-0204-31 | GENERESS FE .8MG/25MCG TABLETS | 3 x 28 |
| 52544-0931-02 | INFED (IRON DEXTRAN INJ) 50MG 2 mL | Carton of 10 |
| 52544-0011-60 | KADIAN ER 10MG CAPSULES | 60 |
| 52544-0211-60 | KADIAN ER 20MG CAPSULES | 60 |
| 52544-0032-60 | KADIAN ER 30MG CAPSULES | 60 |
| 52544-0039-60 | KADIAN ER 40MG CAPSULES | 60 |
| 52544-0052-60 | KADIAN ER 50MG CAPSULES | 60 |
| 52544-0063-60 | KADIAN ER 60MG CAPSULES | 60 |
| 52544-0896-60 | KADIAN ER 80MG CAPSULES | 60 |
| 52544-0164-60 | KADIAN ER 100MG CAPSULES | 60 |
| 52544-0220-60 | KADIAN ER 200MG CAPSULES | 60 |

ALLERGAN_MDL_04242055

| | | |
|---|---|---|
| 52544-0494-01 | LOXITANE 5MG CAPSULES | 100 |
| 52544-0622-01 | MICROZIDE 12.5MG CAPSULES | 100 |
| 52544-0977-01 | NEPHRO-VITE RX TABLETS | 100 |
| 52544-0161-01 | NORCO 10/325MG TABLETS | 100 |
| 52544-0161-05 | NORCO 10/325MG TABLETS | 500 |
| 52544-0313-01 | NORCO 5/325MG TABLETS | 100 |
| 52544-0162-01 | NORCO 7.5/325MG TABLETS | 100 |
| 52544-0259-28 | NORINYL 1+35 1/0.035MG TABLETS | 6 X 28 |
| 52544-0265-31 | NORINYL 1+50 1/0.05MG TABLETS | 3 X 28 |
| 52544-0235-28 | NOR-QD 0.35MG TABLETS | 6 X 28 |
| 52544-0920-08 | OXYTROL OXYBUT TS(US) 3.9MG/D | 8 patches |
| 52544-0079-60 | PREQUE 10 TABLETS | 60 |
| 52544-0151-30 | RAPAFLO 4MG CAPSULES | 30 |
| 52544-0152-19 | RAPAFLO 8MG CAPSULES | 90 |
| 52544-0152-30 | RAPAFLO 8MG CAPSULES | 30 |
| 52544-0188-76 | TRELSTAR 11.25MG MIXJECT | 1 vial |
| 52544-0189-76 | TRELSTAR 3.75MG MIXJECT | 1 vial |
| 52544-0092-76 | TRELSTAR 6 MONTH 22.5MG MIXJECT | 1 vial |
| 52544-0274-28 | TRI-NORINYL .5;1;.5/.035MG TABLETS | 6 x 28 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit D-2

## LEGACY FOREST PRODUCTS

| NDC | PRODUCT | S.K.U. UNIT |
|---|---|---|
| 00456-3154-67 | AEROCHAMBER® PLUS FLOW-VU® | 1 EA |
| 00456-0745-13 | AEROCHAMBER® PLUS FLOW-VU® WITH MASK | 1 EA |
| 00456-0746-13 | AEROCHAMBER® PLUS FLOW-VU® WITH MASK-LARGE | 1 EA |
| 00456-0744-13 | AEROCHAMBER® PLUS FLOW-VU® WITH MASK-SMALL | 1 EA |
| 00456-0460-01 | ARMOUR® THYROID TABLETS 1 1/2 GR | 100 |
| 00456-0459-01 | ARMOUR® THYROID TABLETS 1 GR | 100 |
| 00456-0458-01 | ARMOUR® THYROID TABLETS 1/2 GR | 100 |
| 00456-0457-01 | ARMOUR® THYROID TABLETS 1/4 GR | 100 |
| 00456-0461-01 | ARMOUR® THYROID TABLETS 2 GR | 100 |
| 00456-0462-01 | ARMOUR® THYROID TABLETS 3 GR | 100 |
| 00456-0463-01 | ARMOUR® THYROID TABLETS 4 GR | 100 |
| 00456-0464-01 | ARMOUR® THYROID TABLETS 5 GR | 100 |
| 00456-1410-30 | BYSTOLIC® 10 MG TABLETS | 30 |
| 00456-1410-90 | BYSTOLIC® 10 MG TABLETS | 90 |
| 00456-1410-63 | BYSTOLIC® 10 MG TABLETS | 10 X 10 UD |
| 00456-1402-30 | BYSTOLIC® 2.5 MG TABLETS | 30 |
| 00456-1402-01 | BYSTOLIC® 2.5 MG TABLETS | 100 |
| 00456-1402-63 | BYSTOLIC® 2.5 MG TABLETS | 10 X 10 UD |
| 00456-1420-30 | BYSTOLIC® 20 MG TABLETS | 30 |
| 00456-1420-90 | BYSTOLIC® 20 MG TABLETS | 90 |
| 00456-1405-30 | BYSTOLIC® 5 MG TABLETS | 30 |
| 00456-1405-90 | BYSTOLIC® 5 MG TABLETS | 90 |
| 00456-1405-63 | BYSTOLIC® 5 MG TABLETS | 10 X 10 UD |
| 00456-3330-01 | CAMPRAL® 333 MG TABLETS | 180 |
| 00456-4010-01 | CELEXA® 10 MG TABLETS | 100 |
| 00456-4020-01 | CELEXA® 20 MG TABLETS | 100 |
| 00456-4040-01 | CELEXA® 40 MG TABLETS | 100 |
| 00456-4123-63 | CERVIDIL® | EACH |
| 00456-0095-30 | DALIRESP® 500 MCG TABLETS | 30 |
| 00456-0095-90 | DALIRESP® 500 MCG TABLETS | 90 |
| 00456-0095-63 | DALIRESP® 500 MCG TABLETS | 10 X 10 UD |
| 00456-2212-30 | FETZIMA® 120 MG CAPSULES | 30 |
| 00456-2220-30 | FETZIMA® 20 MG CAPSULES | 30 |
| 00456-2240-30 | FETZIMA® 40 MG CAPSULES | 30 |
| 00456-2280-30 | FETZIMA® 80 MG CAPSULES | 30 |
| 00456-2202-28 | FETZIMA® TITRATION PACK | 1 EA |
| 00456-2010-01 | LEXAPRO® 10 MG TABLETS | 100 |
| 00456-2010-63 | LEXAPRO® 10 MG TABLETS | 10 X 10 UD |
| 00456-2020-01 | LEXAPRO® 20 MG TABLETS | 100 |
| 00456-2020-63 | LEXAPRO® 20 MG TABLETS | 10 X 10 UD |
| 00456-2005-01 | LEXAPRO® 5 MG TABLETS | 100 |
| 00456-2101-08 | LEXAPRO® ORAL SOLUTION | 240 mL |
| 00456-1201-30 | LINZESS® 145 MCG CAPSULES | 30 |
| 00456-1202-30 | LINZESS® 290 MCG CAPSULES | 30 |
| 00456-4300-08 | MONUROL® | 1 X 3 |
| 00456-3414-33 | NAMENDA XR® 14 MG CAPSULES | 30 |
| 00456-3414-90 | NAMENDA XR® 14 MG CAPSULES | 90 |
| 00456-3414-63 | NAMENDA XR® 14 MG CAPSULES | 10 X 10 UD |

ALLERGAN_MDL_04242057

| | | |
|---|---|---|
| 00456-3421-33 | NAMENDA XR® 21 MG CAPSULES | 30 |
| 00456-3428-33 | NAMENDA XR® 28 MG CAPSULES | 30 |
| 00456-3428-90 | NAMENDA XR® 28 MG CAPSULES | 90 |
| 00456-3428-63 | NAMENDA XR® 28 MG CAPSULES | 10 X 10 UD |
| 00456-3407-33 | NAMENDA XR® 7 MG CAPSULES | 30 |
| 00456-3400-29 | NAMENDA XR® TITRATION PAK | 1 EA |
| 00456-3210-60 | NAMENDA® 10 MG TABLETS | 60 |
| 00456-3210-63 | NAMENDA® 10 MG TABLETS | 10 X 10 UD |
| 00456-3205-60 | NAMENDA® 5 MG TABLETS | 60 |
| 00456-3205-63 | NAMENDA® 5 MG TABLETS | 10 X 10 UD |
| 00456-3202-12 | NAMENDA® ORAL SOLUTION | 360 ml. |
| 00456-3200-14 | NAMENDA® TITRATION PAK | 1 EA |
| 00456-2410-60 | SAPHRIS® BLACK CHERRY 10 mg | 6 x 10 |
| 00456-2410-63 | SAPHRIS® BLACK CHERRY 10 mg | 10 x 10 |
| 00456-2405-60 | SAPHRIS® BLACK CHERRY 5 mg | 6 x 10 |
| 00456-2405-63 | SAPHRIS® BLACK CHERRY 5 mg | 10 x 10 |
| 00456-1510-60 | SAVELLA® 100 MG TABLETS | 60 |
| 00456-1512-60 | SAVELLA® 12.5 MG TABLETS | 60 |
| 00456-1525-60 | SAVELLA® 25 MG TABLETS | 60 |
| 00456-1550-60 | SAVELLA® 50 MG TABLETS | 60 |
| 00456-1500-55 | SAVELLA® TITRATION PACK | 1 EA |
| 00456-0400-10 | TEFLARO® INJECTABLE 400 MG VIALS | CARTON OF 10 |
| 00456-0600-10 | TEFLARO® INJECTABLE 600 MG VIALS | CARTON OF 10 |
| 00456-0050-01 | THYROLAR® - 1 TABLETS | 100 |
| 00456-0045-01 | THYROLAR® - 1/2 TABLETS | 100 |
| 00456-0040-01 | THYROLAR® - 1/4 TABLETS | 100 |
| 00456-0055-01 | THYROLAR® - 2 TABLETS | 100 |
| 00456-0060-01 | THYROLAR® - 3 TABLETS | 100 |
| 00456-0800-31 | TUDORZA® PRESSAIR INHALER 15 Day | 1 EA |
| 00456-0800-60 | TUDORZA® PRESSAIR INHALER 30 Day | 1 EA |
| 00456-1110-30 | VIIBRYD® 10 MG TABLETS | 30 |
| 00456-1120-30 | VIIBRYD® 20 MG TABLETS | 30 |
| 00456-1140-30 | VIIBRYD® 40 MG TABLETS | 30 |
| 00456-1100-31 | VIIBRYD® TITRATION PACK | 1 EA |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242058

# Exhibit D-3

## LEGACY WARNER CHILCOTT PRODUCTS

| NDC | PRODUCT | S.K.U. UNIT |
|---|---|---|
| 00430-0478-01 | ACTONEL 150MG TABLETS | Dose Pack 1 |
| 00430-0478-02 | ACTONEL 150MG TABLETS | Dose Pack 3 |
| 00430-0470-15 | ACTONEL 30MG TABLETS | 30 |
| 00430-0472-03 | ACTONEL 35MG TABLETS | Dose Pack 4 |
| 00430-0472-07 | ACTONEL 35MG TABLETS | Dose Pack 12 |
| 00430-0471-15 | ACTONEL 5MG TABLETS | 30 |
| 00430-0783-27 | ASACOL HD 800MG TABLETS | 180 |
| 00430-0979-03 | ATELVIA 35MG TABLETS | 1 x 4 UD |
| 00430-0753-27 | DELZICOL 400MG CAPSULES | 180 |
| 00430-0114-20 | DORYX DR 200MG TABLETS | 60 |
| 00430-0171-15 | ENABLEX 15MG TABLETS | 30 |
| 00430-0171-23 | ENABLEX 15MG TABLETS | 90 |
| 00430-0170-15 | ENABLEX 7.5MG TABLETS | 30 |
| 00430-0170-23 | ENABLEX 7.5MG TABLETS | 90 |
| 00430-3754-14 | ESTRACE 0.1MG VAG CRM 42.5GM | 42.5 g tube (1 1/2 oz) |
| 00430-0720-24 | ESTRACE 0.5MG TABLETS | 100 |
| 00430-0721-24 | ESTRACE 1MG TABLETS | 100 |
| 00430-0722-24 | ESTRACE 2MG TABLETS | 100 |
| 00430-0570-45 | ESTROSTEP FE 20/30/35MCG+75MG TABLETS | 3 x 28 |
| 00430-0010-05 | FEMCON FE 0.4MG/35MCG+75MG TABLETS | 5 x 28 |
| 00430-0145-14 | FEMHRT 0.5/2.5MG TABLETS | 5 x 28 |
| 00430-6201-40 | FEMRING 0.05MG/DAY VAGINAL RING | 1 EA |
| 00430-6202-40 | FEMRING 0.10MG/DAY VAGINAL RING | 1 EA |
| 00430-0420-14 | LO LOESTRIN FE 1MG/10/10MCG TABLETS | 5 x 28 |
| 00430-0420-60 | LO LOESTRIN FE 1MG/10/10MCG TABLETS | 30 X 28 |
| 00430-0535-50 | MINASTRIN 24 FE 1/20 TABLETS | 5 x 28 |
| 00430-0580-45 | OVCON 35 TABLETS | 3 X 28 |
| 00430-0210-14 | SARAFEM 10MG TABLETS | 4 x 7 |
| 00430-0220-14 | SARAFEM 20MG TABLETS | 4 x 7 |

Products that must be purchased from Actavis' authorized Puerto Distributor for distribution in Puerto Rico.

| NDC | Product Description |
|---|---|
| 00430-0478-01 | ACTONEL 150MG TAB 1 |
| 00430-0478-02 | ACTONEL 150MG TAB 3 |
| 00430-0470-15 | ACTONEL 30MG TAB 30 |
| 00430-0472-07 | ACTONEL 35MG TAB 12 |
| 00430-0472-03 | ACTONEL 35MG TAB 4 |
| 00430-0471-15 | ACTONEL 5MG TAB 30 |
| 00430-0783-27 | ASACOL HD 800MG TAB 180 |
| 00430-0979-03 | ATELVIA 35MG TAB IX4UD |
| 00430-0753-27 | DELZICOL DR 400MG CAP 180 |
| 00430-0420-14 | LO LOESTRIN FE 1MG/10/10MCG T 5X28 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242059

# Exhibit D-4

## LEGACY APTALIS PRODUCTS

| NDC | PRODUCT | S.K.U. UNIT |
|---|---|---|
| 58914-0012-10 | BENTYL® 10 MG CAPSULES | 100 |
| 58914-0013-10 | BENTYL® 20 MG TABLETS | 100 |
| 58914-0080-52 | BENTYL® INJECTABLE 20 MG/2mL | 5 - 2mL Ampules |
| 58914-0501-18 | CANASA® 1000 MG SUPPOSITORY | 1,080 |
| 58914-0501-56 | CANASA® 1000 MG SUPPOSITORY | 30 |
| 58914-0301-42 | CANASA® PAC 1000 MG SUPPOSITORY | 42 |
| 58914-0171-10 | CARAFATE® 1 G TABLET | 100 |
| 58914-0170-14 | CARAFATE® 1 G/10mL SUSPENSION | 14 fl. oz. |
| 58914-0930-99 | FLUTTER® MUCUS CLEARING DEVICE | 1 EA |
| 58914-0601-20 | PYLERA® CAPSULES 10 Day Therapy Pack | 10 X 12 |
| 58914-0301-80 | RECTIV® OINTMENT 0.4% | 30 g Tube |
| 58914-0003-10 | ULTRESA™ 13,800 CAPSULES | 100 |
| 58914-0019-10 | ULTRESA™ 20,700 CAPSULES | 100 |
| 58914-0005-10 | ULTRESA™ 23,000 CAPSULES | 100 |
| 58914-0785-10 | URSO 250® TABLETS | 100 |
| 58914-0790-10 | URSO Forte® 500 MG TABLETS | 100 |
| 58914-0112-10 | VIOKACE™ 10 TABLETS | 100 |
| 58914-0117-10 | VIOKACE™ 20 TABLETS | 100 |
| 42865-0101-02 | ZENPEP® 10000 CAPSULES | 100 |
| 42865-0102-02 | ZENPEP® 15000 CAPSULES | 100 |
| 42865-0103-02 | ZENPEP® 20000 CAPSULES | 100 |
| 42865-0305-02 | ZENPEP® 25000 CAPSULES | 100 |
| 42865-0104-02 | ZENPEP® 3000 CAPSULES | 100 |
| 42865-0307-02 | ZENPEP® 40000 CAPSULES | 100 |
| 42865-0100-02 | ZENPEP® 5000 CAPSULES | 100 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242060

# Exhibit D-5

## LEGACY DURATA PRODUCTS

| NDC | PRODUCT | S.K.U. UNIT |
| --- | --- | --- |
| 57970-100-01 | Dalvance 500 mg / Vial | 1 Vial |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242061

### FIRST AMENDMENT TO
### BRANDED INVENTORY MANAGEMENT AGREEMENT

This FIRST AMENDMENT TO BRANDED INVENTORY MANAGEMENT AGREEMENT (this "AMENDMENT"), dated this 1st day of July 2015 ("AMENDMENT EFFECTIVE DATE"), by and between Actavis Pharma, Inc., with offices at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054 ("ACTAVIS") and Cardinal Health, with offices at 7000 Cardinal Place, Dublin, OH 43017 ("CUSTOMER") amends that certain Branded Inventory Management Agreement dated effective November 1, 2014 (the "AGREEMENT").

WHEREAS, the parties wish to amend the AGREEMENT to add additional products to the AGREEMENT and to include service fees for drop shipments in the AGREEMENT; and

WHEREAS, pursuant to Section VI. A. of the AGREEMENT, all modifications and amendments to the AGREEMENT must be in writing and approved by the parties.

NOW, THEREFORE, in consideration of the mutual promises and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree to the terms and conditions hereinafter set forth:

1. Definitions. Capitalized terms herein used which are not herein defined shall have the respective meanings ascribed to them in the AGREEMENT. All references to the term "AGREEMENT" shall be deemed to include all the terms and conditions of this AMENDMENT.

2. Amendment to Agreement. The parties wish to amend the AGREEMENT effective July 1, 2015. A new Exhibit D-6 is hereby added to the AGREEMENT. A copy of the new Exhibit D-6 is attached hereto and incorporated by reference herein. Additionally, Section II.A. of the AGREEMENT shall be deleted in its entirety and replaced with the following:

A. Service Fee. For Services provided in Section I.H. of this AGREEMENT, ACTAVIS will pay CUSTOMER a "Service Fee" in accordance with the following table based on CUSTOMER's Net Purchases. For purposes of this Service Fee, Net Purchases shall be defined as the total dollar amount of all Product purchases made by CUSTOMER during the applicable quarter, less the dollar amount of CUSTOMER's processed sales returns, including rejected good, damaged goods and recalls.

### PRODUCTS

| SERVICE FEE FOR ALL PRODUCTS | |
| --- | --- |
| PERIOD | BASIS POINTS |
| July 1, 2015 – December 31, 2015 | 150 |
| January 1, 2016 – December 31, 2016 | 154 |
| January 1, 2017 – December 31, 2017 | 158 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DocuSign Envelope ID: 8CEF4EC8-6DC2-4566-9111-40AF6621039D

Additionally, ACTAVIS shall pay a "Drop Ship Service Fee" to CUSTOMER equal to 0.5% of the Net Purchases of Botox®, Botox® Cosmetic, Ozurdex® and Liletta® products drop shipped to customers and billed through CUSTOMER.

ACTAVIS agrees to process the Service Fee as a credit memo within thirty (30) following the close of each month.

For the avoidance of doubt, "Products" means, collectively, all of ACTAVIS's branded pharmaceutical products listed in Exhibit D-1 and the following: (v) the "Legacy Forest Products', which are listed in Exhibit D-2, (w) the "Legacy Warner Chilcott Products", which are listed in Exhibit D-3, (x) the "Legacy Aptalis Products," which are listed in Exhibit D-4, (y) the "Legacy Durata Products", which are listed in Exhibit D-5, and (z) the "Allergan Products", which are listed in Exhibit D-6.

ACTAVIS and CUSTOMER agree that the amount of compensation payable to CUSTOMER for the performance of the Services reflects the fair market value of the services being performed by CUSTOMER.

3. No other Amendment. Except as set forth herein, the AGREEMENT has not been modified and remains in full force and effect. To the extent there are any inconsistencies or ambiguities between the specific subject matter of this AMENDMENT and the AGREEMENT, the terms of this AMENDMENT shall control.

4. Counterparts. This AMENDMENT may be executed in counterparts by each party and delivered by electronic transmission and such execution and delivery shall be legally binding on the parties to the same extent as if original signatures in ink were delivered in person.

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this AMENDMENT effective as of the AMENDMENT EFFECTIVE DATE.

ACTAVIS PHARMA, INC.

By: _____
DocuSigned by:
D81F58D9146B489...

Name: Mark Devlin

Title: SVP Managed HealthCare & Acct Management

Date: 06-Jul-2015

CARDINAL HEALTH

By: _____

Name: Melissa Laber

Title: VP Strategic Sourcing

Date: 7/1/15

## EXHIBIT D-6

## ALLERGAN PRODUCTS

| DESCRIPTION | STRENGTH | SIZE | MFG # | NDC# | CASE |
|---|---|---|---|---|---|
| *Prescription Ophthalmics (Rx)* | | | | | |
| Acular | 0.5% | 5 ml | 2181 | 0023-2181-05 | 72 |
| Acular LS | 0.4% | 5 ml | 92773 | 0023-9277-05 | 72 |
| Acuvail | 0.45% | 30's | 94781 | 0023-3507-30 | 24 |
| Alocril | 2% | 5 ml | 8842 | 0023-8842-05 | 72 |
| Alphagan 'P' | 0.15% | 5 ml | 91773 | 0023-9177-05 | 72 |
| Alphagan 'P' | 0.15% | 10 ml | 91772 | 0023-9177-10 | 72 |
| Alphagan 'P' | 0.15% | 15 ml | 91771 | 0023-9177-15 | 72 |
| Alphagan 'P' | 0.1% | 5 ml | 93211 | 0023-9321-05 | 72 |
| Alphagan 'P' | 0.1% | 10 ml | 93212 | 0023-9321-10 | 72 |
| Alphagan 'P' | 0.1% | 15 ml | 93213 | 0023-9321-15 | 72 |
| Betagan | 0.5% | 5 ml | 4385 | 0023-4385-05 | 72 |
| Betagan | 0.5% | 10 ml | 4386 | 0023-4385-10 | 72 |
| Betagan | 0.5% | 15 ml | 4387 | 0023-4385-15 | 72 |
| Bleph-10 | 10% | 5 ml | 0018 | 11980-011-05 | 72 |
| Blephamide | 10% | 5 ml | 0022 | 11980-022-05 | 72 |
| Blephamide | 10% | 10 ml | 0023 | 11980-022-10 | 72 |
| Blephamide SOP | 10% | 3.5 gr | 0313 | 0023-0313-04 | 72 |
| Combigan | 0.2%/0.5% | 5 ml | 92110 | 0023-9211-05 | 72 |
| Combigan | 0.2%/0.5% | 10 ml | 92112 | 0023-9211-10 | 72 |
| Elestat | 0.05% | 5 ml | 92017 | 0023-9201-05 | 72 |
| FML | 0.1% | 5 ml | 0211 | 11980-211-05 | 72 |
| FML | 0.1% | 10 ml | 0212 | 11980-211-10 | 72 |
| FML Forte | 0.25% | 5 ml | 0227 | 11980-228-05 | 72 |
| FML Forte | 0.25% | 10 ml | 0228 | 11980-228-10 | 72 |
| FML SOP | 0.1% | 3.5 gr | 0316 | 0023-0316-04 | 72 |
| Lastacaft | 0.25% | 3 ml | 94290 | 0023-4290-03 | 72 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DocuSign Envelope ID: 8CEF4EC8-6DC2-4566-9111-40AF6621039D

| | | | | | |
|---|---|---|---|---|---|
| *Latisse 70 br (WAC)* | 0.03% | 3ml | 94847 | 0023-3616-70 | 12 |
| *Latisse 70 br (PD)* | 0.03% | 3ml | 94847 | 0023-3616-70 | 12 |
| *Latisse 140 br (WAC)* | 0.03% | 5ml | 94511 | 0023-3616-05 | 12 |
| *Latisse 140 br(PD)* | 0.03% | 5ml | 94511 | 0023-3616-05 | 12 |
| *Lumigan* | 0.01% | 2.5 ml | 93205 | 0023-3205-03 | 72 |
| *Lumigan* | 0.01% | 5 ml | 93207 | 0023-3205-05 | 72 |
| *Lumigan* | 0.01% | 7.5 ml | 93208 | 0023-3205-08 | 72 |
| *Lumigan* | 0.03% | 2.5 ml | 91873 | 0023-9187-03 | 72 |
| *Lumigan* | 0.03% | 5 ml | 91874 | 0023-9187-05 | 72 |
| *Lumigan* | 0.03% | 7.5 ml | 91875 | 0023-9187-07 | 72 |
| *Ocufen* | .03% | 2.5 ml | 4772 | 11980-801-03 | 72 |
| *Ocuflox* | 0.3% | 5 ml | 7797 | 11980-779-05 | 72 |
| *Polytrim* | 0.1% | 10 ml | 7824 | 0023-7824-10 | 72 |
| *Pred Forte* | 1% | 1 ml | 0578 | 11980-180-01 | 72 |
| *Pred Forte* | 1% | 5 ml | 0068 | 11980-180-05 | 72 |
| *Pred Forte* | 1% | 10 ml | 0069 | 11980-180-10 | 72 |
| *Pred Forte* | 1% | 15 ml | 0251 | 11980-180-15 | 72 |
| *Pred-G* | 1% | 5 ml | 0230 | 0023-0106-05 | 72 |
| *Pred-G SOP* | 0.6% | 3.5 gr | 0066 | 0023-0066-04 | 72 |
| *Pred Mild* | 0.12% | 5 ml | 0065 | 11980-174-05 | 72 |
| *Pred Mild* | 0.12% | 10 ml | 0064 | 11980-174-10 | 72 |
| *Restasis* | 0.05% | 30's | 93346 | 0023-9163-30 | 24 |
| *Restasis* | 0.05% | 60's | 94529 | 0023-9163-60 | 16 |
| *Zymar* | 0.3% | 5 ml | 92186 | 0023-9218-05 | 72 |
| *Zymaxid* | 0.5% | 2.5ml | 93614 | 0023-3615-25 | 72 |

**Prescription Dermatologics (Rx)**

| | | | | | |
|---|---|---|---|---|---|
| *Aczone* | 5% | 30 gm | 93670 | 0023-3670-30 | 24 |
| *Aczone* | 5% | 60 gm | 93671 | 0023-3670-60 | 24 |
| *Aczone* | 5% | 90gm | 94297 | 0023-3670-90 | 24 |
| *Avage Crm.* | 0.1% | 30 gm | 92367 | 0023-9236-30 | 24 |
| *Azelex* | 20% | 30 gm | 8694 | 0023-8694-30 | 40 |
| *Azelex* | 20% | 50 gm | 90971 | 0023-8694-50 | 30 |

ALLERGAN_MDL_04242065

| | | | | | |
|---|---|---|---|---|---|
| *Fluoroplex Cream* | 1% | 30 gm | 0811 | 0023-0812-30 | 288 |
| *Tazorac Gel* | .05% | 30 gm | 8335 | 0023-8335-03 | 24 |
| *Tazorac Gel* | .05% | 100 gm | 90039 | 0023-8335-10 | 12 |
| *Tazorac Gel* | .1% | 30 gm | 90042 | 0023-0042-03 | 24 |
| *Tazorac Gel* | .1% | 100 gm | 90043 | 0023-0042-10 | 12 |
| *Tazorac Cream* | .05% | 30 gm | 91556US | 0023-9155-30 | 24 |
| *Tazorac Cream* | .05% | 60 gm | 91555US | 0023-9155-60 | 12 |
| *Tazorac Cream* | .1% | 30 gm | 91561US | 0023-9156-30 | 24 |
| *Tazorac Cream* | .1% | 60 gm | 91560US | 0023-9155-60 | 12 |
| *Vaniqa* | 13.9% | 45 gm | 94857 | 0023-4857-45 | 12 |
| **Urologics (Rx)** | | | | | |
| *Sanctura* | | 60 x 20mg | 93513 | 0023-3513-60 | 96 |
| *Sanctura XR* | | 30 x 60mg | 93500 | 0023-9350-30 | 96 |

| *Over The Counter Ophthalmic Tears:* | | | NDC #/UPC # | |
|---|---|---|---|---|
| *Refresh Celluvisc* | 30's | 4554 | 0023-4554-30<br>3-0023-4554-30-1 | 24 |
| *Refresh Lacri-lube* | 3.5 gm | 93445 | 0023-0312-04<br>3-0023-0312-04-2 | 24 |
| *Refresh Lacri-lube* | 7 gm | 93446 | 0023-0312-07<br>3-0023-0312-07-3 | 72 |
| *Refresh Optive* | 15 ml | 93241 | 0023-3240-15<br>3-0023-3240-15-1 | 24 |
| *Refresh Optive* | 15ml x 2 | 94183 | 0023-3240-01<br>3-0023-3240-30-4 | 24 |
| *Refresh Optive Pocket Pack* | 2x5ml | 93496 | 0023-3240-10<br>3-0023-3240-10-6 | 24 |
| *Refresh Optive Advanced* | 10ml | 94307 | 0023-4307-10<br>3-0023-4307-10-5 | 24 |
| *Refresh Optive Advanced* | 10ml x 2 | 94771 | 0023-4304-20<br>3-0023-4307-20-4 | 24 |
| *Refresh Optive Advanced PF* | 30s | 94491 | 0023-4491-30<br>3-0023-4491-30-9 | 24 |
| *Refresh Optive Sensitive* | 30's | 93416 | 0023-3416-30<br>3-0023-3416-30-3 | 24 |
| *Refresh Optive Sensitive* | 60s | 93715 | 0023-3416-60<br>3-0023-3416-60-0 | 24 |
| *Refresh Classic* | 30's | 0506 | 0023-0506-01<br>3-0023-0506-01-4<br>00023-0506-50 | 24 |

ALLERGAN_MDL_04242066

| Refresh Classic | 50's | 4889 | 3-0023-0506-50-2 | 24 |
|---|---|---|---|---|
| | | | 0023-1822-12 | |
| Refresh Contacts | 12 ml | 91822US | 3-0023-1822-12-0 | 24 |
| | | | 0023-3468-05 | |
| Refresh Eye Itch Relief | 5 ml | 93468 | 3-0023-3468-05-0 | 24 |
| | | | 0023-9205-15 | |
| Refresh Liquigel | 15 ml | 92056 | 3-0023-9205-15-4 | 24 |
| | | | 0023-9205-02 | |
| Refresh Liquigel | 15ml x 2 | 94171 | 3-0023-9205-30-7 | 24 |
| | | | 0023-0403-30 | |
| Refresh Plus | 30's | 5487 | 3-0023-5487-30-1 | 24 |
| | | | 0023-0403-50 | |
| Refresh Plus | 50's | 5783 | 3-0023-5487-50-9 | 24 |
| | | | 0023-0403-70 | |
| Refresh Plus | 70's | 91863US | 3-0023-0403-70-2 | 24 |
| | | | 0023-0240-04 | |
| Refresh PM Oint. | 3.5 gm | 4667 | 3-0023-0667-04-3 | 24 |
| | | | 0023-3414-15 | |
| Refresh Redness Relief | .5 oz | 93414 | 3-0023-3414-15-6 | 24 |
| | | | 0023-0798-15 | |
| Refresh Tears | .5 oz | 90798 | 3-0023-0798-15-0 | 24 |
| | | | 0023-0798-01 | |
| Refresh Tears | 15ml x 2 | 94170 | 3-0023-0798-30-3 | 24 |
| | | | 0023-0798-02 | |
| Refresh Tears 4x15ml | 15ml x 4 | 94184 | 3-0023-0798-60-0 | 24 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# ATTACHMENT #2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242068

## DISTRIBUTION SERVICES AGREEMENT

This Distribution Services Agreement ("Agreement") is entered into as of January 1, 2006, by and between Allergan Sales, LLC, a Delaware limited liability company with its principal place of business located at 2525 Dupont Drive, Irvine, California 92612 ("Customer"), and Cardinal Health, with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017 ("Service Supplier").

### RECITALS:

WHEREAS, Service Supplier provides certain services, including but not limited to, distribution services, logistics and inventory management services, data reporting services, administrative services and financial services; and Customer wishes to purchase such services from Service Supplier;

WHEREAS, Service Supplier is willing to provide to Customer and Customer desires to purchase from Service Supplier certain additional services as may be agreed upon by both parties; and

WHEREAS, Customer and Service Supplier desire, among other things, to assure adequate availability of supply and inventory management of Products (as defined below).

NOW THEREFORE, in consideration of the foregoing, the mutual representations, warranties and covenants contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

### ARTICLE I
### Definitions

1.1. **"Products"** means all current and future ethical pharmaceutical and OTC products bearing Customer's label and packaging that Customer sells to wholesale customers in the United States.

1.2. **"Aggregate Inventory - DSD"** means, at any given time, the total quantity of Products in units that Service Supplier has on hand at all of its storage and/or distribution facilities to service Providers' (as defined below) direct store delivery (non-brokerage) demand and that Service Supplier has on order from Customer.

1.3. **"Aggregate Inventory – Brokerage"** means, at any given time, the total quantity of Products in units that Service Supplier has on hand at all of its storage and/or distribution facilities to service Providers' brokerage (bulk) demand and that Service Supplier has on order from Customer.

1.4. **"Confidential Information"** means the confidential information described in Section 4.2.

1.5. **"Providers"** means bona fide purchaser(s) of Products from Service Supplier in the United States.

1.6 **"Average Weekly Movement - DSD"** means, at any given time, the total quantity of Products

Allergan - Cardinal DS \ 12-07-05 (red).DOC                    1

ALLERGAN_MDL_04242069

in units (by NDC number) sold by Service Supplier to non-brokerage Providers over the immediately preceding eight (8) weeks divided by eight (8).

1.7. **"Average Weekly Movement – Brokerage"** means, at any given time, the total quantity of Products in units (by NDC number) sold by Service Supplier to brokerage Providers over the immediately preceding eight (8) weeks divided by eight (8).

1.8. **"Inventory and Sales Reports"** means the reports described in <u>Section 2.3</u>.

1.9. **"WAC"** means Wholesale Acquisition Cost charged by Customer to Service Supplier. WAC may also be referred to as "List Price."

1.10. **"New Price"** means the WAC charged by Customer after the effective date and time of a price change instituted by Customer at any time following the effective date of this Agreement, January 1, 2006.

1.11. **"Old Price"** means the WAC charged by Customer immediately preceding the institution of a New Price.

## ARTICLE 2
### Services

<u>General</u> – Customer agrees to compensate Service Supplier in accordance with the fee structure set forth on <u>Schedule A</u> for each of the services described below and provided by Service Supplier to Customer.

2.1. <u>Base Distribution Services.</u>
1. Sophisticated ordering technology;
2. Daily consolidated deliveries to providers;
3. Emergency shipments to providers 24/7/365;
4. Contract and Chargeback administration;
5. Returns processing;
6. Customer Service support;
7. Adequate working inventories to meet customer needs and service levels; and
8. Licensed, environmentally controlled, PDMA compliant, secure facilities.

2.2 <u>Inventory Management Services.</u>
1. <u>Inventory Levels.</u> During the term of this Agreement, Service Supplier will use its best efforts to maintain Aggregate Inventory - DSD levels of twenty-one (21) days or less on all Products. In addition, Service Supplier may, in its discretion, maintain Aggregate Inventory - Brokerage levels of fourteen (14) days or less on all Products.

2. <u>Purchase Limits and Terms.</u> All purchase orders for Products from Service Supplier filled by Customer during the term of this Agreement shall be made subject to the terms and conditions of Customer's invoice issued to Service Supplier to the extent not directly inconsistent with the terms and conditions of this Agreement. Anything in this Agreement to the contrary notwithstanding, Customer retains the right in its sole and absolute discretion to accept or reject any purchase order for Products from

Allergan - Cardinal DSA 12-07-05 (red).DOC                    2

Service Supplier or to fill any purchase order for Products from Service Supplier in whole or in part.

Product Availability. Service Supplier and Customer will jointly use their best efforts to minimize product shortages and maximize product availability by agreeing to the following:

- Service Supplier will institute an automated balancing system on Products in order to optimize the use of existing inventories across Service Supplier's entire network, including brokerage.
- During Product backorder situations and limited Product availability and upon Customer's request, Service Supplier will promptly implement more frequent order and receiving cycles to reduce Product backorder situations and limited Product availability, as the case may be.

2.3  Data / Reporting Services. Service Supplier shall prepare inventory reports detailing the status of its aggregate inventory of Products ("Inventory Reports"), and movement of Products ("Sales Reports") by NDC number for the duration of this Agreement. Service Supplier shall provide Customer with such Inventory Reports on a daily basis and Sales Reports on a weekly basis. All such Inventory and Sales Reports shall be transmitted in EDI 852 and EDI 867 formats, respectively, and shall include such information as reasonably requested by Customer, including but not limited to the following:

(a) On hand inventory level by distribution center;
(b) On order inventory level by distribution center;
(c) Products received by distribution center; and
(d) Sales to Providers by distribution center.

Service Supplier may, due to contractual terms and conditions with non-affiliated Providers, be required to block certain data in the EDI 867's that discloses the applicable Provider's identity. This may include the applicable Provider's name and DEA number, and any other data that would identify such Provider.

Within thirty (30) days after entering into this Agreement, the parties shall examine and test the capability of their respective EDI systems and complete implementation of a mutually agreeable system whereby transfers of information can be made effectively on a consistent basis. At any time thereafter, in the event that critical internal support systems and electronic communication links, including EDI, are not available for five (5) business days, the parties will cooperate to promptly implement substitute procedures to document the information customarily sent by EDI and prevent interruptions to each other's business.

2.4  Service Level. Service Supplier agrees to use its best efforts to service Provider orders for Products at a minimum 98% service level. Service Level will be calculated according to Service Supplier's then current, standard adjusted service level report, which adjustments will include any purchase orders rejected by Customer pursuant to Section 2.2.2.

2.5  New Product Launch Support. Service Supplier will provide guaranteed support for future Product launches. Guaranteed support for future Product launches will consist of the following:

Allergan  Cardinal DSA 12-07-05 (red).DOC                3

    a. Stocking each distribution center with quantities of any launched Product as are mutually agreed upon by Customer and Service Supplier, but in no event shall such Product quantities exceed thirty (30) days of anticipated demand.

    b. Providing daily sales out reports for the first sixty (60) days following the applicable Product launch.

**2.6** <u>Purchase Requirement</u>. Service Supplier agrees to purchase 100% of its Aggregate Inventory DSD directly from Customer. Service Supplier further agrees to make no transfers of Products to its affiliate Cardinal Trading Company unless agreed upon in advance by Customer in Customer's sole and absolute discretion.

**2.7** <u>Audit Rights.</u> During the term of this Agreement and for two (2) years thereafter (the "Audit Period"), each party hereto will keep complete and accurate records in sufficient detail relating to each party's and its respective affiliates' obligations hereunder, as the case may be, to verify amounts paid hereunder and to enable any recall of Products. During the Audit Period, upon reasonable prior notice and during normal business hours, each party or its third-party designee, which shall be in good faith reasonably acceptable to the audited party (the "Auditor"), shall be entitled to audit the relevant books and records of the other party and its respective affiliates; provided, however, that such audit right shall be limited to no more than once during any twelve (12) month period (unless necessary to resolve issues raised during the audit). Further, Customer (itself or through its Auditor) shall have the right, during such term (a) to inspect Service Supplier's, its affiliates' or any of their vendor's facilities used in relation to the Products or the services performed hereunder during normal business hours, upon reasonable prior notice, and (b) to be present when such services are being performed by Service Supplier, its affiliate or its vendor.

## ARTICLE 3
### Term and Termination; Remedies

**3.1** <u>Term and Termination.</u> This Agreement shall be effective as of January 1, 2006 and shall remain in effect up through and including December 31, 2009 unless terminated by either Customer and/or Service Supplier, as the case may be, by (a) the mutual written agreement of Customer and Service Supplier; or (b) a breach by Customer or Service Supplier of any of the terms of this Agreement that is not cured within thirty (30) days of written notification thereof by the non-breaching party; or (c) the institution (whether voluntarily or involuntarily) of bankruptcy, insolvency, liquidation or similar proceedings by or against Customer or Service Supplier, or the assignment of Customer's or Service Supplier's assets for the benefit of creditors. The provisions of this Agreement that by their nature are meant to survive the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement.

## ARTICLE 4
### Miscellaneous

**4.1.** <u>Nature of Relationship</u>. The relationship between Customer and Service Supplier is that of service and product buyer-seller, and no agency, franchise, partnership, joint venture or other

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

relationship shall be construed to exist between the parties. Nothing contained in this Agreement shall be construed as giving Service Supplier any exclusive rights as a wholesaler of Products, whether in any territory or with respect to any class of customers for Products. Customer reserves the right to appoint additional distribution service suppliers and to sell directly to customers, including without limitation, the U.S. Government (including any agencies, departments or services thereof), qualifying tax-supported and non-profit institutions, mail service, Internet and other wholesale or retail providers, and any other accounts as Customer deems appropriate in its sole and absolute discretion.

4.2. <u>Confidentiality</u>. During the term of this Agreement, each party, its respective agents, employees and representatives (collectively, the "<u>receiving party</u>") may receive or have access to confidential materials and information of the other party (the "<u>disclosing party</u>"). All such materials and information (including, but not limited to the terms of this Agreement, Product information, operations, methods, strategies, formulas, price lists, discount programs, incentives, rebates, records of unit movement for Products, shipping and warehousing, and confidential proprietary information from third parties), are collectively referred to herein as "<u>Confidential Information</u>" and constitute the property of the disclosing party. During the term hereof and for a period of three (3) years thereafter the receiving party shall not use or disclose to third persons any such Confidential Information without the disclosing party's prior written consent, excepting those (a) disclosures made on a confidential basis to and use by the directors, officers, employees, and agents of the receiving party who have a reasonable need to know such information in connection with the receiving party's performance of this Agreement, (b) disclosures which are required by law, as reasonably determined by the receiving party or its legal counsel, or are made on a confidential basis to the receiving party's attorneys, accountants, and other professional advisors in connection with matters relating to this Agreement, and (c) routine disclosures in the normal course of business, including to IMS/DDD or similar organizations.

Upon termination of this Agreement (for any reason) each party will promptly: (i) return to the other party all documentation and other materials (including copies of original documentation or other materials) containing any Confidential Information of the other party; or (ii) upon request, promptly certify to the other party, pursuant to a certificate in form and substance reasonably satisfactory to the other party, as to the destruction of all such documentation and other materials.

4.3. <u>Assignment and Delegation</u>. Neither party may assign this Agreement without the prior written consent of the other party; <u>provided</u>, <u>however</u>, that either party may assign this Agreement without such consent to an Affiliate. For the purpose of this <u>Section 4.3</u>, an Affiliate shall be defined to include any company controlling, controlled by, or under common control with Service Supplier or Customer, as the case may be, through direct or indirect equity ownership. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the parties. Notwithstanding anything contained herein to the contrary, Service Supplier acknowledges that Customer is currently in discussions regarding a possible acquisition of Inamed Corp. Service Supplier hereby agrees that any such acquisition by Customer shall have no affect on this Agreement. Service Supplier further acknowledges and agrees that the products of Inamed Corp., as such products may be integrated into Customer's business (the "Inamed Products"), are not covered by this Agreement or considered Products hereunder. In the event the parties wish to have the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242073

Inamed Products covered by this Agreement, the parties will negotiate an amendment to this Agreement or enter into a separate written agreement with respect thereto.

4.4. <u>Governing Law</u>. Agreement shall be interpreted in accordance with, and governed by, the laws of the State of Ohio, without regard to any conflicts of laws' rules.

4.5. <u>Severability; Waiver</u>. The invalidity of all or part of any provision of this Agreement shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision. Either party's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement.

4.6. <u>Statute of Frauds</u>. All EDI transmissions made pursuant to this Agreement shall be deemed by the parties to be the same as written communication for all purposes, and for all applications of law and statutes, including but not limited to, the Statue of Frauds under the State of the Ohio Uniform Commercial Code.

4.7. <u>Force Majeure</u>. Neither party shall be liable for delay in delivery or nonperformance in whole or in part nor shall the other party have the right to terminate this Agreement where delivery or performance has been affected by a condition of force majeure. For purposes of this Agreement, force majeure means a condition which results from causes beyond a party's reasonable control, including, but not limited to, acts of God, acts of the other party, shortages, fires, labor disputes, strikes, floods, epidemics, quarantines, war, riot, delay in transportation, compliance with any applicable governmental regulation or order, whether or not it later proves to be invalid, or inability to obtain labor, materials or manufacturing facilities. If either party is affected by a force majeure event, such party shall, within ten (10) days of its occurrence, give notice to the other party stating the nature of the event, its anticipated duration and any action being taken to avoid or minimize its effect. The suspension of performance shall be of no greater scope and no longer duration than is reasonably required and the non-performing party shall use its best efforts to remedy its inability to perform.

4.8. <u>Notices</u>. All notices to either party (each, a "<u>Notice</u>") shall be in writing, shall refer specifically to this Agreement and shall be hand delivered or sent by express courier service, costs prepaid, or by facsimile to the respective addresses specified below (or to such other address as may be specified by Notice to the other party):

If to Service Supplier, to:    Cardinal Health, Inc
7000 Cardinal Place
Dublin, OH 43017
Attention: General Counsel
Telecopier No.: 614-757-6948

If to Customer, to:    Allergan Sales, LLC
2525 Dupont Drive
Irvine, CA 92612
Attention: General Counsel
Telecopier No.: 714-246-6987

Allergan - Cardinal DSA 12-07-05 (red).DOC    6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    ALLERGAN_MDL_04242074

4.9. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes all prior contracts, agreements and understandings between the parties whether written or oral with regard to the subject matter hereof which is distribution services. This Agreement may not be amended except in writing signed by authorized representatives of the parties hereto.

[signature page follows]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                ALLERGAN_MDL_04242075

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day first above written.

**Allergan Sales, LLC**                                        **Cardinal Health***

By: _____                    By: _____

Name: David Pyott                                        Name: _____

Title: Chairman of the Board, President, and CEO    Title: _____

EDI Contact Person:                                    EDI Contact Person:
Name: Emil Schultz                                    Name:    Debbie Lake
E-mail:schultz_emil@Allergan.com                      E-Mail:  debbie.lake@cardinal.com
Phone: (714) 246-4500                                 Phone:   614-757-3532

*The term "Cardinal Health" shall include the following affiliated operating companies: Cardinal Health 110, Inc., (f/k/a Whitmire Distribution Corporation), a Delaware corporation (Folsom, California); Cardinal Health 3, LLC, a Delaware Limited Liability Company; Cardinal Health 104 LP (f/k/a Cardinal Distribution LP), an Ohio limited partnership (Dublin, Ohio); Cardinal Health 107, Inc., (f/k/a National Pharmpak Services, Inc.), an Ohio corporation, Cardinal Health 108, Inc, (formerly known as National Specialty Services , Inc.) a Tennessee Corporation, and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          ALLERGAN_MDL_04242076

# SCHEDULE A

Value Guarantee and Credits:

During each year of this Agreement, Service Supplier will receive a total of 320 Basis Points of value on a Service Supplier's total Net Product Purchases, excluding Botox® or Botox® Cosmetic (which are handled separately as set forth below) (the "Value Guarantee"). For purposes of this Schedule A, "Net Product Purchases" are defined as gross purchases less shortage claims, product refusals, product damaged in transit and refused by Service Supplier, and product returns. Customer will receive credit towards the Value Guarantee for all margins earned by Service Supplier on Aggregate Inventory, DSD and Aggregate Inventory. Brokerage resulting from a pricing action by Customer, quarterly promotions, deals, off-invoice allowances, discounts, incremental service opportunities, or any other promotional undertaking or method, excluding those that are intended for Providers (collectively "Value Credits"). Within thirty (30) days of the end of each year during the term of this Agreement, Customer will perform a true-up and make payment of the remuneration payable to Service Supplier under this paragraph, and in event the amount of the Value Guarantee exceeds the amount of the Value Credits, then Customer shall pay to Service Supplier such difference within sixty (60) days of the end of such year.

**Botox® and Botox® Cosmetic Fee:** Customer shall pay Service Supplier a Service Fee equal to 1% of the total net Botox® and Botox® Cosmetic products drop shipped to Providers and billed through Service Supplier. Net Product Purchases are defined as gross purchases less shortage claims, product refusals, product damaged in transit and refused by service supplier, and product returns. Such Service Fee shall be paid within thirty (30) days following the end of each calendar quarter of this Agreement.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_04242077

## SECOND AMENDMENT TO
## DISTRIBUTION SERVICES AGREEMENT

This Second Amendment to Distribution Services Agreement (this "Amendment") is
dated as of this 22nd day of December, 2009 by and between Allergan USA, Inc. (formerly
Allergan Sales, LLC), a Delaware corporation with its principal place of business located at 2525
Dupont Drive, Irvine, California 92612 ("Customer"), and Cardinal Health*, with its principal
place of business located at 7000 Cardinal Place, Dublin, Ohio 43017 ("Service Supplier").

### RECITALS:

WHEREAS, Customer and Service Supplier entered into that certain Distribution
Services Agreement, dated as of January 1, 2006 (the "Original Agreement"), whereby, among
other things, Service Supplier agreed to provide certain services to Customer, including but not
limited to, distribution services, logistics and inventory management services, data reporting
services, administrative services and financial services;

WHEREAS, Customer acquired, on or about October 16, 2007, Esprit Pharma Holding
Company, Inc. and its subsidiaries, including Esprit Pharma, Inc. ("Esprit");

WHEREAS, Customer and Service Supplier amended the Original Agreement pursuant
to that certain First Amendment to Distribution Services Agreement, dated as of November 20,
2007 (the "First Amendment"; the Original Agreement as amended by the First Amendment
shall be referred to hereinafter as the "Agreement").

WHEREAS, Customer and Service Supplier mutually desire to amend the Agreement on
the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of these premises and of the mutual covenants and
agreements contained herein, the parties hereto mutually agree as follows:

1.      Capitalized Terms. Capitalized terms used herein without definition shall have the
respective meanings ascribed thereto in the Agreement.

2.      Term. The parties desire to extend the term of the Agreement. Accordingly, Section 3.1
of the Agreement is hereby deleted and replaced in its entirety with the following language:

"3.1. Term and Termination. This Agreement shall be effective as of January 1, 2006
and shall remain in effect up through and including December 31, 2014 unless terminated
by either Customer and/or Service Supplier, as the case may be, by (a) the mutual written
agreement of Customer and Service Supplier; or (b) Customer or Service Supplier
following a breach by the other party of any of the terms of this Agreement that is not
cured within thirty (30) days of written notification thereof by the non-breaching party; or
(c) the institution (whether voluntarily or involuntarily) of bankruptcy, insolvency,
liquidation or similar proceedings by or against Customer or Service Supplier, or the
assignment of Customer's or Service Supplier's assets for the benefit of creditors. The

1

ALLERGAN_MDL_04242078

provisions of this Agreement that by their nature are meant to survive the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement."

3.      Schedule A. Schedule A of the Agreement is hereby deleted and replaced in its entirety with the new Schedule A attached hereto.

4.      Borschow Hospital & Medical Supplies, Inc. The designation of Borschow Hospital & Medical Supplies, Inc., a subsidiary of Cardinal Health, Inc., as an affiliated operating company to be included in the definition of "Cardinal Health" in the Agreement is hereby ratified.

5.      Governing Law. This Amendment shall be interpreted in accordance with, and governed by, the laws of the State of Ohio, without regard to any conflicts of laws' principles.

6.      Severability; Waiver. The invalidity of all or part of any provision of this Amendment shall not affect the validity of any other provision of this Amendment or the remaining portion of the applicable provision. Either party's failure to insist on compliance or enforcement of any provision of this Amendment shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Amendment.

7.      Affirmation of Agreement; Effect of Modifications. The Agreement, except as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. The execution, delivery and performance of this Amendment shall not, except as expressly set forth herein, operate as an amendment of any right, power or remedy under the Agreement, as in effect prior to the effective date hereof. The modifications herein are limited to the specifics hereof. Upon and after the effective date of this Amendment, each reference in the Agreement to "this Agreement", "hereunder", "herein", "hereof" or words of like import referring to the Agreement shall mean and be a reference to the Agreement as amended hereby. To the extent that any terms and conditions in the Agreement shall contradict or be in conflict with any terms or conditions of this Amendment, such terms and conditions are hereby deemed amended accordingly to reflect the terms and conditions of the Agreement as amended hereby.

8.      Entire Agreement. This Amendment constitutes the entire agreement between the parties and supersedes all prior contracts, agreements and understandings between the parties, whether written or oral with regard to the subject matter hereof. This Amendment may not be amended except in writing signed by authorized representatives of the parties hereto.

9.      Counterparts. This Amendment may by executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original and all of which together shall constitute one and the same document. Signatures to this Amendment transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

[SIGNATURES ON FOLLOWING PAGE]

2

                                                   ALLERGAN_MDL_04242079

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment effective as of the day first above written.

**Allergan Sales, LLC**

By: _____

Name: David E.I. Pyott

Title: Chief Executive Officer

Approved
Law Department

**Cardinal Health\***

By: _____

Name: _____

Title: _____

\*The term "Cardinal Health" shall include the following affiliated operating companies: Cardinal Health 3, LLC; Cardinal Health 104 LP; Cardinal Health 107, Inc.; Cardinal Health 110, Inc.; Cardinal Health 112, LLC; Cardinal Health 113, LLC; Cardinal Health 411, Inc.; Borschow Hospital & Medical Supplies, Inc.; and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242080

Case: 1:17-md-02804-DAP  Doc #: 2287-14  Filed: 08/13/19  45 of 63.  PageID #: 360835

# SCHEDULE A

**General Products Fee:**  During each year of this Agreement, Service Supplier will receive a total of 322 Basis Points (3.22%) of value on Service Supplier's total Net Product Purchases, excluding (i) Botox® and Botox® Cosmetic (which are handled separately as set forth below) (the "General Value Guarantee").  For purposes of this Schedule A, "Net Product Purchases" are defined as gross purchases less shortage claims, product refusals, product damaged in transit and refused by Service Supplier, and product returns.  Customer will receive credit towards the General Value Guarantee for all margins earned by Service Supplier on Aggregate Inventory – DSD and Aggregate Inventory – Brokerage resulting from a pricing action by Customer, quarterly promotions, deals, off-invoice allowances, discounts, incremental service opportunities, or any other promotional undertaking or method, excluding those that are intended for Providers (collectively "General Value Credits").  Within thirty (30) days of the end of each year during the term of this Agreement, Customer will perform a true-up and make payment of the remuneration payable to Service Supplier under this paragraph, and in the event the amount of the General Value Guarantee exceeds the amount of the General Value Credits, then Customer shall pay to Service Supplier such difference within sixty (60) days of the end of such year.  For the avoidance of doubt, the parties acknowledge and agree that the General Value Guarantee shall be applicable to Net Product Purchases of Estrasorb® (NDC #66500-325-17) and Sanctura® (NDC#s 15456-980-04 and 0023-3513-60).

**Botox® and Botox® Cosmetic Fee:**  During each year of this Agreement, Customer shall pay Service Supplier a Service Fee equal to 100 Basis Points (1.00%) of the total value of Net Product Purchases of Botox® and Botox® Cosmetic products drop shipped to Providers and billed through Service Supplier.  Such Service Fee shall be paid within thirty (30) days' following the end of each calendar quarter of this Agreement.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                ALLERGAN_MDL_04242081

## THIRD AMENDMENT TO
## DISTRIBUTION SERVICES AGREEMENT

This Third Amendment (this "Amendment") is dated as of this 1st day of December, 2014, by and between Allergan USA, Inc., a Delaware corporation with its principal place of business located at 2525 Dupont Drive, Irvine, California 92612 ("Customer") and Cardinal Health*, with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017 ("Service Supplier").

### RECITALS

WHEREAS, Customer and Service Supplier entered into that certain Distribution Services Agreement dated as of January 1, 2006 (including all subsequent addenda and amendments thereto, the "Agreement"), whereby, among other things, Service Supplier agreed to provide certain services to Customer, including but not limited to, distribution services, logistics and inventory management services, data reporting services, administrative services and financial services.

WHEREAS, Customer and Service Supplier desire to amend the Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of these premises and of the mutual covenants and agreements contained herein, the parties hereto mutually agree as follows:

1.     Capitalized Terms. Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Agreement.

2.     Ratification of Cardinal Health Subsidiaries. The designation of those subsidiaries of Cardinal Health, Inc. included in the definition of "Cardinal Health" hereunder is hereby ratified and, as such, those subsidiaries will be included in the definition of "Cardinal Health" for purposes of the Agreement.

3.     Term. Section 3.1 (Term and Termination) of the Agreement is hereby removed in its entirety and replaced with the following:

"3.1     Term and Termination. This Agreement shall be effective as of January 1, 2006 and shall remain in effect up through and including December 31, 2015 unless terminated by either Customer and/or Service Supplier, as the case may be, by (a) either party, with or without cause, upon not less than ninety (90) days' prior written notice to the other party; or (b) immediately by the non-breaching party if the breach is not cured within thirty (30) days following written notification to the breaching party; or (c) by either party in the event of the institution (whether voluntary or involuntary) of bankruptcy, insolvency, liquidation or similar proceedings by or against the other party or the assignment of the other party's assets for the benefit of creditors. The provisions of this Agreement that by their nature are meant to survive the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement."

1

                                                  ALLERGAN_MDL_04242082

4.      Governing Law.  This Amendment shall be interpreted in accordance with, and governed by, the laws of the State of Ohio, without regard to any conflicts of laws principles.

5.      Severability; Waiver.  The invalidity of all or part of any provision of this Amendment shall not affect the validity of any other provision of this Amendment or the remaining portion of the applicable provision. Either party's failure to insist on compliance or enforcement of any provision of this Amendment shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Amendment.

6.      Affirmation of Agreement; Effect of Modifications.  The Agreement, except as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. The execution, delivery and performance of this Amendment shall not, except as expressly set forth herein, operate as an amendment of any right, power or remedy under the Agreement, as in effect prior to the effective date hereof. The modifications herein are limited to the specifics hereof. Upon and after the effective date of this Amendment, each reference in the Agreement to "this Agreement", "hereunder", "herein", "hereof" or words of like import referring to the Agreement shall mean and be a reference to the Agreement as amended hereby. To the extent that any terms and conditions in the Agreement contradict or are in conflict with any terms or conditions of this Amendment, such terms and conditions are hereby deemed amended accordingly to reflect the terms and conditions of the Agreement as amended hereby.

7.      Entire Agreement.  This Amendment constitutes the entire agreement between the parties and supersedes all prior contracts, agreements and understandings between the parties, whether written or oral with regard to the subject matter hereof. This Amendment may not be amended except in writing signed by authorized representatives of the parties hereto.

8.      Counterparts.  This Amendment may be executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original and all of which together shall constitute one and the same document. Signatures to this Amendment transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

[SIGNATURES ON THE FOLLOWING PAGE]

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ALLERGAN_MDL_04242083

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment to be effective as of the date set forth above.

Allergan USA, Inc.

By: _____

Name: _David Riott_

Title: _CEO_

Cardinal Health

By: _____

Name: _Melissa Laber_

Title: _VP, Strategic Purchasing_

---

* "Cardinal Health" means the following affiliated operating companies: Cardinal Health 3, LLC; Cardinal Health 104 LP; Cardinal Health 107, LLC; Cardinal Health 108, LLC (f/k/a Cardinal Health 108, Inc.); Cardinal Health 110, LLC (f/k/a Cardinal Health 110, Inc.); Cardinal Health 112, LLC; Cardinal Health 411, Inc.; Cardinal Health P.R. 120, Inc.; Kinray, LLC (f/k/a Kinray, Inc.); Parmed Pharmaceuticals, LLC (f/k/a Parmed Pharmaceuticals, Inc.); and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("Cardinal Health Parent Company"), as may be designated from time to time by Cardinal Health Parent Company.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242084

**CARDINAL HEALTH**
National Logistics Center

**AGREEMENT**

"Company":     Allergan

Company and Cardinal Health*, intending to be legally bound, agree as follows:

1.     Company will utilize Cardinal Health's National Logistics Center located in Groveport, OH for its full product line, including Schedule II controlled substances but excluding chain dock-to-dock business until Cardinal Health includes such chain dock-to-dock business upon mutual agreement between Cardinal and Allergan.

2.     Company will pay Cardinal Health a Redistribution Fee of 17 basis points on the total volume of all products purchased by Cardinal Health for redistribution at the NLC from Company at the WAC in effect at the time of purchase.

3.     The Redistribution Fee shall be paid quarterly.

4.     The Effective Date of this Agreement shall be 1/1/2006. The Term of this Agreement shall be 4 years from the Effective Date. After the Initial Term, this Agreement shall be renewed annually for additional one year terms unless either party notifies the other in writing 90 days prior to the expiration of the then current term. Notwithstanding the foregoing, Company may terminate this Agreement without liability, at any time for its convenience and without cause, by providing thirty (30) days' advance written notice to Cardinal Health.

5.     All terms and conditions of any prior agreement(s) between the parties remain in full force and effect.

For Company:                 For Cardinal Health:

Signed: _Gary M. Kenzie_          Signed: _____

Name: GERARD McKENZIE      Name: _____ R Ke''e r

Date: 11/21/05                Date: _____

* The term "Cardinal Health" shall include the following affiliated operating companies: Cardinal Health 110, Inc. (f'k a Whitmire Distribution Corporation), a Delaware corporation (Folsom, California); Cardinal Health 5, LLC, a Delaware Limited Liability Company; Cardinal Health 104 LP (f'k a Cardinal Distribution LP), an Ohio limited partnership (Dublin, Ohio), Cardinal Health 107, Inc. (f'k a National Pharmpak Services, Inc.), an Ohio corporation, and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242085

## SECOND AMENDMENT TO
## NATIONAL LOGISTICS CENTER AGREEMENT

This Second Amendment to National Logistics Center Agreement (this "Amendment") is dated as of this 22nd day of December, 2009, by and between Allergan USA, Inc. (formerly Allergan Sales, LLC), a Delaware corporation with its principal place of business located at 2525 Dupont Drive, Irvine, California 92612 ("Company"), and Cardinal Health*, with its principal place of business located at 7000 Cardinal Place, Dublin, Ohio 43017 ("Cardinal Health").

### RECITALS:

WHEREAS, Company and Cardinal Health entered into that certain National Logistics Center Agreement, effective as of January 1, 2006 (the "Original Agreement"), whereby, Cardinal Health agreed to provide redistribution services at its National Logistics Center;

WHEREAS, Company and Cardinal Health amended the Original Agreement pursuant to that certain First Amendment to National Logistics Center Agreement, dated as of November 20, 2007 (the "First Amendment"; the Original Agreement as amended by the First Amendment shall be referred to hereinafter as the "Agreement"); and

WHEREAS, Company and Cardinal Health mutually desire to amend the Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of these premises and of the mutual covenants and agreements contained herein, the parties hereto mutually agree as follows:

1.     Capitalized Terms. Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Agreement.

2.     Term. The parties desire to extend the term of the Agreement. Accordingly, Section 4 of the Agreement is hereby deleted and replaced in its entirety with the following language:

"4.     The Effective Date of this Agreement shall be January 1, 2006 and shall remain in effect up through and including December 31, 2014. Notwithstanding the foregoing, either party may terminate this Agreement without liability, at any time for its convenience and without cause, by providing thirty (30) days' advance written notice to the other party."

3.     Borschow Hospital & Medical Supplies, Inc. The designation of Borschow Hospital & Medical Supplies, Inc. ("Borschow"), a subsidiary of Cardinal Health, Inc., as an affiliated operating company to be included in the definition of "Cardinal Health" in the Agreement is hereby ratified; provided, however, the parties acknowledge and agree that Company is not obligated to utilize Cardinal Health's National Logistics Center for distribution of products to Borschow, and Cardinal Health is not entitled to any compensation under the Agreement for distribution of Company products that do not go through Cardinal Health's National Logistics Center.

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242086

4.     Governing Law. This Amendment shall be interpreted in accordance with, and governed by, the laws of the State of Ohio, without regard to any conflicts of laws' principles.

5.     Severability; Waiver. The invalidity of all or part of any provision of this Amendment shall not affect the validity of any other provision of this Amendment or the remaining portion of the applicable provision. Either party's failure to insist on compliance or enforcement of any provision of this Amendment shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Amendment.

6.     Affirmation of Agreement; Effect of Modifications. The Agreement, except as amended hereby, shall be and remain in full force and effect in accordance with its respective terms and hereby is ratified and confirmed in all respects. The execution, delivery and performance of this Amendment shall not, except as expressly set forth herein, operate as an amendment of any right, power or remedy under the Agreement, as in effect prior to the effective date hereof. The modifications herein are limited to the specifics hereof. Upon and after the effective date of this Amendment, each reference in the Agreement to "this Agreement", "hereunder", "herein", "hereof" or words of like import referring to the Agreement shall mean and be a reference to the Agreement as amended hereby. To the extent that any terms and conditions in the Agreement shall contradict or be in conflict with any terms or conditions of this Amendment, such terms and conditions are hereby deemed amended accordingly to reflect the terms and conditions of the Agreement as amended hereby.

7.     Entire Agreement. This Amendment constitutes the entire agreement between the parties and supersedes all prior contracts, agreements and understandings between the parties, whether written or oral with regard to the subject matter hereof. This Amendment may not be amended except in writing signed by authorized representatives of the parties hereto.

8.     Counterparts. This Amendment may by executed in counterparts, each of which, when executed and delivered, shall be deemed to be an original and all of which together shall constitute one and the same document. Signatures to this Amendment transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day first above written.

**Allergan Sales, LLC**

By: _____

Name:  David E.I. Pyott

Title:  Chief Executive Officer

**Cardinal Health***

By: _____

Name: Melissa Laber

Title: VP, Strategic Purchasing

* The term "Cardinal Health" shall include the following affiliated operating companies: Cardinal Health

approved
Law Department

2

3, LLC; Cardinal Health 104 LP; Cardinal Health 107, Inc.; Cardinal Health 110, Inc.; Cardinal Health 112, LLC; Cardinal Health 113, LLC; Cardinal Health 411, Inc.; Borschow Hospital & Medical Supplies, Inc.; and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242088

# ATTACHMENT #3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_MDL_04242089


**Actavis**

# U.S. Brand Return Goods Policy

### September 2014

This U. S. Brand Return Goods Policy of Actavis Pharma, Inc. ("Actavis") applies to any Brand product sold in the U.S. by a subsidiary of Actavis' proprietary (brand) and diagnostic product (sometimes collectively referred to herein as "Product"). Actavis reserves the right to deny credit for returns sent to other reverse distribution vendors other than GENCO Pharmaceutical Services. Actavis will only accept the return of product for consideration of credit or refund, if applicable, under the following conditions and limitations:

## RETURN DESIGNEE

All eligible Actavis returns should be sent to GENCO Pharmaceutical Services. To ensure reimbursement, all returned product must be accompanied by invoice/debit memo and shipped pre-paid to:

GENCO Pharmaceutical Services
Actavis Pharma, Inc.
6101 North 64th St.
Milwaukee, WI 53218
P: 800-950-5479 (Customer Service Related Issues)
E-mail: 222 form request: MFGR222Requests@gencoatc.com
(or at such other address as Actavis may designate in writing from time to time).

Submission of the return product does not constitute Actavis' acceptance for credit. The package size, lot number and lot expiration date will be obtained and verified after receipt of Product at GENCO Pharmaceutical Services. In the event the package expiration date is stated in a month/year format, expiration date will default to the last day of the month.

## TERMS OF RETURN POLICY

All products purchased direct and indirect must be returned directly to GENCO Pharmaceutical Services. Accordingly, Products purchased indirect and returned to wholesalers or distributors will not be eligible for return credit or refund. <u>Actavis reserves the right to refuse credit when returned through alternate channels.</u>

Actavis reserves the sole right to determine whether items qualify for return, credit or refund. Actavis' determination of the physical count of the returned Products will be final. By returning Products, you authorize Actavis and its designee as your agent to destroy, without payment or other recourse, any returned Product.

Actavis will only consider Product that is purchased directly from Actavis or through an agent authorized by Actavis to sell Actavis Product. Product that has been purchased from sources outside of the United States, through unauthorized agents will not be considered for credit or refund.

Direct customers are only eligible for credit to be applied against outstanding account activity. Indirect customers (i.e. customers who buy through a wholesaler) will receive refunds, via check. The refund or credit value of remaining product will be based on the following calculations:

> Authorized Product – Credit value will be calculated at Actavis' selling price prevailing at the time of the return, less 10%. For contracted purchases offered by Actavis or an authorized Actavis Wholesaler or Distributor, credit will be calculated at the lowest contract price in the last 2 years.

> Expired Product – Credit value will be calculated at Actavis' selling price prevailing at the time of the return, less 10%. For contracted purchases offered by Actavis or an authorized Actavis Wholesaler or Distributor, credit will be calculated at the lowest contract price in the last 2 years.

Any and all credits provided pursuant to this Policy are only valid if redeemed within one year of issuance. Any and all credits that are not redeemed within one year of issuance shall be null and void.

Credit or refund will be issued directly to the customer within sixty (60) days after receipt of an approved return. Unauthorized deductions for returned merchandise will not be accepted.

Transportation charges, including prepaid freight and insurance are the responsibility of the customer.

Actavis reserves the right to require proof-of-purchase on any item returned for credit or refund.

## RETURNABLE ITEMS

For purpose of this Policy, returns will be accepted for credit or refund only if it constitutes Authorized Product or Expired Product as defined herein below:

A return will be considered Authorized Product if it meets all of the following requirements:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



# U.S. Brand Return Goods Policy (cont'd)    September 2014

RETURNABLE ITEMS (cont'd)

• A Product is recalled. The recalled Product must be returned separately from expired Product as stated on the recall notice, and returned through Actavis' approved Recall Processing Service.

• An incorrect/damaged shipment of RX and/or OTC product that has been identified by the customer and reported to, and authorized by Actavis Customer Relations (800-272-5525) within fifteen (15) business days of receipt.

• An incorrect/damaged shipment of a Controlled Substance product that has been identified by the customer and reported to, and authorized by Actavis Customer Relations (800-272-5525) within one (1) business day of receipt.

A return will be considered Expired Product if it meets all of the following requirements:

• Returned in the original labeled package; and

• Lot number and expiration date are legible; and

• Product is returned no more than three (3) months prior to the expiration date; or

• Product is returned no more than twelve (12) months after the expiration date.

Except where applicable or state law requires otherwise, Actavis will credit partial returns prorated, according to the following formula (i) partial credit will be issued for opened bottles containing 50% or more of capsules or tablets returned in the original Actavis bottle; and (ii) no credit will be issued for partial returns of less than 50% of opened bottles.

## NON-RETURNABLE ITEMS

Actavis will not accept for credit or refund Product which:

• Does not meet the Expired Product or Authorized Product requirements;

• Is unlabeled or partially labeled;

• Has been purchased at sacrifice, fire or bankruptcy sales;

• Was sold on a non-returnable basis;

• Is overstock items;

• Has been donated;

• Has been returned to an Actavis Distribution Center without prior approval including a Return Goods Authorization (RGA) number;

• Is Private Labeled; or

• Has been repackaged;

• Is non Actavis Product(s);

• Was dispensed to a patient;

• Is foreign product

Except where required by applicable state law, no return payment will be made for partial liquids, powders, suspensions, creams, lotions, ointments and gel.

Non-Actavis product returned with Actavis product will not be the responsibility of Actavis. Actavis reserves the right to charge customers for cost incurred to process, and destroy this Non-Actavis product. Product will not be returned to the customer.

Products not eligible for return and reimbursement can be sent to GENCO Pharmaceutical Services for disposal and destruction; however, no reimbursement will be issued for said product unless state or local law requires otherwise. Additionally, the processing of non-returnable product or non-approved customer returns may subject customers to processing fees. Product will not be returned to sender.

## THIRD PARTY DESTRUCTION / RECLAMATION STATEMENT

Actavis does not participate in customer-initiated third party reclamation and destruction programs.

Actavis Authorized or Expired Products include Products marketed under the following labels, and must be returned pursuant to the U. S. Brand Return Goods Policy: Watson Laboratories, Inc., Actavis Pharma, Inc., Actavis, Inc., Warner Chilcott (US), LLC, Warner Chilcott Company, LLC, Procter & Gamble Pharmaceuticals, Forest Laboratories, LLC, Forest Pharmaceuticals, Inc., Aptalis Pharma US, Inc., Aptalis Pharma US (Eurand) and the following Novartis NDC's: Enablex; 7.5MG  X 30 - 0078-0419-15, 7.5MG  X 90 - 0078-0419-34, 15MG X 30 – 0078-0420-15, 15MG X 90 - 0078-0420-34.

If you wish to utilize a third party to sort your Actavis Products you will assume any and all expenses for this service. In order for Product to be considered for credit, third parties must follow Actavis' U. S. Brand Return Goods Policy. Product must be shipped to Actavis' Return Vendor for processing.

This policy supersedes all prior U.S. Brand Return Goods Policies.                                                                    11218

 **Allergan**

## US BRAND Rx RETURN GOODS POLICY

**January 2016**

This U.S. Brand Return Goods Policy of Allergan USA, Inc. and its affiliates (referred to herein as "Allergan") applies to any Brand Rx product (proprietary brand and diagnostic product) sold in the U.S. by Allergan or an Allergan affiliate (sometimes collectively referred to herein as "Product") (the "Policy"). Product that is part of Medical Aesthetics, and certain specialty, may be subject to different terms and conditions. Allergan reserves the right to deny credit for returns sent to other reverse distribution vendors other than GENCO Pharmaceutical Services (referred to herein as "GENCO"). Allergan will only accept the return of product for consideration of credit or refund, if applicable, under the following conditions and limitations:

### RETURN DESIGNEE

All eligible Allergan returns should be sent to GENCO. Submission of the return product does not constitute Allergan's acceptance for credit. To ensure reimbursement, all returned product must be accompanied by invoice/debit memo and shipped pre-paid to:

GENCO Pharmaceutical Services
Ref: Allergan USA, Inc.
6101 North 64th St.
Milwaukee, WI 53218
P: 800-950-5479 (Customer Service Related Issues)
E-mail: 222 form request: MFGR222Requests@gencoatc.com
(or at such other address as Allergan may designate in writing from time to time)

### RECALLS

In the event of a recall, credit will be issued at original acquisition price and all reimbursement for expenses to distributor or direct customer will be based on HDMA guidelines published at the time of the recall. The recalled Product must be returned separately from expired Product. Instructions for returning recalled product will be referenced on the official recall notification at the time of the event.

### TERMS OF RETURN POLICY

All products purchased direct and indirect must be returned directly to GENCO. It is the shipper's responsibility to securely package **all** returned products to prevent breakage during transit. Product must be returned prepaid with tracking capabilities in the event a package is lost in transit. Controlled substances are to be packaged separately from other returns.

- Products purchased indirect and returned to wholesalers or distributors will not be eligible for return credit or refund. Allergan reserves the right to refuse credit when returned through alternate channels.
- Allergan reserves the sole right to determine whether items qualify for return, credit or refund. Returned quantities will be audited by GENCO, and final credit will be based on GENCO's count. By returning Products, you authorize Allergan and its designee as your agent to destroy, without payment or other recourse, any returned Product.
- Allergan will only consider for credit or refund Product that is purchased from authorized trading partners or through an agent authorized by Allergan to sell Allergan Product. Product that has been purchased from sources outside of the United States or through unauthorized agents will not be considered for credit or refund.
- Direct customers are only eligible for credit to be applied against outstanding account activity. Indirect customers (i.e. customers who buy through a wholesaler) will receive refunds, via check. For Authorized Product (defined below) and Expired Product (defined below), the refund or credit will be issued at the original acquisition price.
- Any and all credits provided pursuant to this Policy are only valid if redeemed within one year of issuance.
- Credit or refund will be issued directly to the customer within sixty (60) days after receipt of an approved return.
- Unauthorized deductions for returned merchandise will not be accepted.
- Allergan reserves the right to require proof-of-purchase of any item returned for credit or refund.
- Sales Representatives are not authorized to accept merchandise or to approve the return of merchandise.

### RETURNABLE ITEMS/REIMBURSEMENT

Returns will be accepted for credit or refund only if it constitutes Authorized Product or Expired Product, defined as follows:

A return will be considered Authorized Product if it meets all of the following requirements:

- An incorrect/damaged shipment of RX product, or a product complaint related to a shipment, which has been identified by the customer and reported to and authorized by Allergan Customer Relations at 866-320-9753 within three (3) business days of product receipt.
- A shipment of a concealed damaged product must be reported within thirty (30) business days of product receipt.
- An incorrect/damaged shipment of a Controlled Substance product that has been identified by the customer and reported to and authorized by Allergan Customer Relations at 866-320-9753 within one (1) business day of product receipt.

This policy supersedes the prior US Brand Rx Return Goods Policies of Allergan USA, Inc. and its affiliates. By returning Product under this Policy, customers agree to the terms of this Policy and to receive all communications from Allergan in connection with this Policy.

ALLERGAN_MDL_04242092

 **Allergan**

## US BRAND Rx RETURN GOODS POLICY (cont'd)                                           January 2016

A return will be considered Expired Product if it meets all of the following requirements:

- Returned in the original labeled package; and
- Package size, lot number and expiration date (last day of the month stated) are legible.
- Product is returned no more than six (6) months prior or twelve (12) months after the expiration date.

Allergan will credit **partial returns** as follows except where applicable or state law requires:

- Tablets/Capsules – will be determined based on the exact count returned.
- Solutions – will be determined based on the numbers of full vials remaining within the pack.

## NON-RETURNABLE ITEMS

Allergan will not accept for credit or refund Product which:

- Does not meet the Expired Product or Authorized Product requirements
- Is unlabeled, partially labeled or lot & expiration date are not legible
- Has been purchased at liquidation, sacrifice, fire or bankruptcy sales
- Was short-dated and purchased at a special price
- Was handled and stored contrary to applicable prescribing information
- Was involved in a salvage, flood or earthquake
- Is deteriorated or damaged due to conditions beyond the control of the manufacturer, such as improper storage, heat, cold, water, smoke, fire, etc.
- Was sold on a non-returnable basis
- Is overstock items
- Has been donated
- Is private-labeled
- Has been repackaged (including prescription bottles with readable customer labels)
- Was dispensed to a patient
- Is foreign product
- Is in an over-filled container – trade pack containing a quantity greater than the actual package size

Except where required by applicable state law, no return payment will be made for partial liquids, powders, suspensions, creams, lotions, ointments and gel.

Non-Allergan product returned with Allergan product will not be the responsibility of Allergan. Allergan reserves the right to charge customers for cost incurred to process, and to destroy this Non-Allergan product. Such non-Allergan product will not be returned to the sender.

Products not eligible for return and reimbursement can be sent to GENCO for disposal and destruction; however, no reimbursement will be issued for said product unless state or local law requires otherwise. Additionally, the processing of non-returnable product or non-approved customer returns may subject customers to processing fees. Non-returnable product and non-approved customer returns will not be returned to sender.

## THIRD PARTY DESTRUCTION / RECLAMATION STATEMENT

Allergan does not participate in customer-initiated third party reclamation and destruction programs. Allergan Authorized or Expired Products include Products marketed under the following labels, and must be returned pursuant to the U. S. Brand Return Goods Policy: Watson Laboratories, Inc., Actavis, Allergan, Inc., Warner Chilcott (US), LLC, Warner Chilcott Company, LLC, Procter & Gamble Pharmaceuticals, Forest Laboratories, LLC, Forest Pharmaceuticals, Inc., Durata Therapeutics, Inc. Eurand and the following Novartis NDC's: Enablex: 7.5MG X 30 - 0078-0419-15, 7.5MG X 90 - 0078-0419-34, 15MG X 30 – 0078-0420-15, 15MG X 90 - 0078-0420-34. If you wish to utilize a third party to sort your Allergan Products you will assume any and all expenses for this service. In order for Product to be considered for credit, third parties must follow Allergan's U. S. Brand Return Goods Policy. Product must be shipped to GENCO for processing.

This policy supersedes the prior US Brand Rx Return Goods Policies of Allergan USA, Inc. and its affiliates.  By returning Product under this Policy, customers agree to the terms of this Policy and to receive all communications from Allergan in connection with this Policy.

# ATTACHMENT #4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



November 04, 2015

Dear Valued Customer,

Allergan will be consolidating all Legacy Actavis branded products into the Kuehne+Nagel distribution center in Lewisville, Texas.

We are asking you to place two special pre-consolidation orders to cover your inventory needs during this transition.

➢ **Phase 1** will happen during the month of December 2015 and will affect only the products listed on Exhibit A.
➢ **Phase 2** will affect all scheduled/controlled products and will be announced in January 2016.

In order to ensure a smooth transition for our customers, pharmacies and patients, we are asking you to execute the following inventory plan:

- **Phase 1.A – After 5pm (EST) Tuesday, December 1 and before 12pm (EST) Wednesday, December 2, 2015.** Place orders, only for the products listed on Exhibit A, to cover your business supply needs up to December 31, 2015.
  - ○ Important reminder: As per the Allergan DSA inventory requirements, please target orders to ensure 21 days of inventory on December 31, 2015. Please place one purchase order per DC and submit a listing of PO's to sulinda.george@actavis.com.
  - ○ All orders placed for the products listed on Exhibit A will receive an additional 15 days payment terms.

- **Phase 1.B – After 5pm (EST) Tuesday, December 8 and before 12pm (EST) Wednesday, December 9, 2015.** Place orders, only for the products listed on Exhibit A, to cover your business supply needs between January 1, 2016 and January 15, 2016.
  - ○ All orders placed for the products listed on Exhibit A will receive an additional 30 days payment terms.
  - ○ This order must not exceed a total of 14 days of inventory.
  - ○ This order is for safety stock needs only and is solely intended to cover your sales during our transition. This additional inventory will be excluded from DSA inventory requirements, as long as Phase 1.A inventory levels are targeted to be at 21 days, and will have no impact on your September through December 2015 DSA payment.
  - ○ Inventory ordered for the Phase 1.B transition can be returned by the wholesaler directly to Allergan for any reason prior to February 15, 2016. Credit will be issued at acquisition price.

A more detailed transition plan, covering all impacted business functions, will be sent out shortly.

Thank you for your cooperation as we continue to transition into the New Allergan.

Should you have any questions or concerns, please contact your Allergan account manager or myself.

Sincerely,

Paul D. Reed
Senior Director, Trade Sales and Development
Phone 314-493-7060
Paul.Reed@Actavis.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ALLERGAN_MDL_04242095

# EXHIBIT A

## BRAND PRODUCTS

| NDC | STATUS SCHEDULE | PRODUCT | S.K.U. PRICING UNIT |
|---|---|---|---|
| 00472-0882-82 | Rx | ACETASOL HC 1%/2% OTIC SOLUTION | 10 mL |
| 52544-0930-01 | Rx | ACTIGALL® 300 MG CAPSULES | 100 |
| 00430-0471-15 | Rx | ACTONEL® 5 MG TABLETS | 30 |
| 00430-0470-15 | Rx | ACTONEL® 30 MG TABLETS | 30 |
| 00430-0472-03 | Rx | ACTONEL® 35 MG TABLETS | Dose Pack 4 |
| 00430-0472-07 | Rx | ACTONEL® 35 MG TABLETS | Dose Pack 12 |
| 00430-0478-01 | Rx | ACTONEL® 150 MG TABLETS | Dose Pack 1 |
| 00430-0478-02 | Rx | ACTONEL® 150 MG TABLETS | Dose Pack 3 |
| 00456-3154-67 | Rx | AEROCHAMBER® PLUS FLOW-VU® | 1 EA |
| 00456-0744-13 | Rx | AEROCHAMBER® PLUS FLOW-VU® WITH MASK-SMALL | 1 EA |
| 00456-0745-13 | Rx | AEROCHAMBER® PLUS FLOW-VU® WITH MASK-MEDIUM | 1 EA |
| 00456-0746-13 | Rx | AEROCHAMBER® PLUS FLOW-VU® WITH MASK-LARGE | 1 EA |
| 52544-0884-08 | Rx | ALORA® TS 0.025 MG/DAY | Box of 8 |
| 52544-0471-08 | Rx | ALORA® TS 0.05 MG/DAY | Box of 8 |
| 52544-0472-08 | Rx | ALORA® TS 0.075 MG/DAY | Box of 8 |
| 52544-0473-08 | Rx | ALORA® TS 0.1 MG/DAY | Box of 8 |
| 58914-0011-06 | OTC | AquADEKs® Softgels | 60 |
| 58914-0014-60 | OTC | AquADEKs® Chewable Tablets | 60 |
| 58914-0214-60 | OTC | AquADEKs® Pediatric Drops | 60 ml |
| 00456-0457-01 | Rx | ARMOUR® THYROID TABLETS 1/4 GR | 100 |
| 00456-0458-01 | Rx | ARMOUR® THYROID TABLETS 1/2 GR | 100 |
| 00456-0459-01 | Rx | ARMOUR® THYROID TABLETS 1 GR | 100 |
| 00456-0460-01 | Rx | ARMOUR® THYROID TABLETS 1 1/2 GR | 100 |
| 00456-0461-01 | Rx | ARMOUR® THYROID TABLETS 2 GR | 100 |
| 00456-0462-01 | Rx | ARMOUR® THYROID TABLETS 3 GR | 100 |
| 00456-0463-01 | Rx | ARMOUR® THYROID TABLETS 4 GR | 100 |
| 00456-0464-01 | Rx | ARMOUR® THYROID TABLETS 5 GR | 100 |
| 00430-0783-27 | Rx | ASACOL® HD 800MG TABLETS | 180 |
| 00430-0979-03 | Rx | ATELVIA® 35 MG TABLETS | 1 x 4 UD |
| 00456-2700-10 | Rx | AVYCAZ™ 2g/0.5 g per vial | Carton of 10 |
| 58914-0012-10 | Rx | BENTYL® 10 MG CAPSULES | 100 |
| 58914-0013-10 | Rx | BENTYL® 20 MG TABLETS | 100 |
| 58914-0080-52 | Rx | BENTYL® INJECTABLE 20 MG/2mL | 5 - 2mL Ampules |
| 52544-0254-28 | Rx | BREVICON® WALLETTE 0.5/0.035MG T | 3 x 28 |
| 00456-1402-30 | Rx | BYSTOLIC® 2.5 MG TABLETS | 30 |
| 00456-1405-30 | Rx | BYSTOLIC® 5 MG TABLETS | 30 |
| 00456-1410-30 | Rx | BYSTOLIC® 10 MG TABLETS | 30 |
| 00456-1420-30 | Rx | BYSTOLIC® 20 MG TABLETS | 30 |
| 00456-1405-90 | Rx | BYSTOLIC® 5 MG TABLETS | 90 |
| 00456-1410-90 | Rx | BYSTOLIC® 10 MG TABLETS | 90 |
| 00456-1420-90 | Rx | BYSTOLIC® 20 MG TABLETS | 90 |
| 00456-1402-63 | Rx | BYSTOLIC® 2.5 MG TABLETS | 10 X 10 UD |
| 00456-1405-63 | Rx | BYSTOLIC® 5 MG TABLETS | 10 X 10 UD |
| 58914-0501-56 | Rx | CANASA® 1000 MG SUPPOSITORY | 30 |
| 58914-0501-42 | Rx | CANASA® PAC 1000 MG SUPPOSITORY | 42 |
| 58914-0171-10 | Rx | CARAFATE® 1 G TABLET | 100 |
| 58914-0170-14 | Rx | CARAFATE® 1 G/10mL SUSPENSION | 14 fl. oz. |

ALLERGAN_MDL_04242096

EXHIBIT A CONTINUED

| NDC | STATUS SCHEDULE | PRODUCT | S.K.U. PRICING UNIT |
|---|---|---|---|
| 00456-4010-01 | Rx | CELEXA® 10 MG TABLETS | 100 |
| 00456-4020-01 | Rx | CELEXA® 20 MG TABLETS | 100 |
| 00456-4040-01 | Rx | CELEXA® 40 MG TABLETS | 100 |
| 52544-0045-13 | Rx | CONDYLOX® GEL 0.5% | 3.5 g tube |
| 52544-0046-13 | Rx | CONDYLOX® SOLUTION 0.5% | 3.5mL |
| 52544-0044-24 | Rx | CORDRAN® TAPE 4MCG/CM2 ROLL 24"X3" | 1 EA |
| 52544-0044-80 | Rx | CORDRAN® TAPE 4MCG/CM2 ROLL 80"X3" | 1 EA |
| 52544-0255-24 | Rx | CRINONE® 4% GEL APPLICATOR | 6 X 1.3 g |
| 52544-0256-12 | Rx | CRINONE® 8% GEL APPLICATOR | 15 X 1.3 g |
| 57970-0100-01 | Rx | DALVANCE® 500 MG | 1 vial |
| 00430-0753-27 | Rx | DELZICOL® 400 MG CAPSULES | 180 |
| 76478-0289-30 | Rx | EMLA® (Cream) Lidocaine 2.5% and Prilocaine 2.5% Cream, USP | 30 gm |
| 76478-0289-55 | Rx | EMLA® (Cream) Lidocaine 2.5% and Prilocaine 2.5% Cream, USP | 5 x 5 gm |
| 00430-0170-15 | Rx | ENABLEX® 7.5 MG TABLETS | 30 |
| 00430-0171-15 | Rx | ENABLEX® 15 MG TABLETS | 30 |
| 00430-0170-23 | Rx | ENABLEX® 7.5 MG TABLETS | 90 |
| 00430-0171-23 | Rx | ENABLEX® 15 MG TABLETS | 90 |
| 00430-3754-14 | Rx | ESTRACE® 0.1 MG VAG CRM 42.5GM | 42.5 g tube (1 1/2 oz) |
| 00430-0720-24 | Rx | ESTRACE® 0.5 MG TABLETS | 100 |
| 00430-0721-24 | Rx | ESTRACE® 1 MG TABLETS | 100 |
| 00430-0722-24 | Rx | ESTRACE® 2 MG TABLETS | 100 |
| 00430-0005-31 | Rx | ESTROSTEP® FE 20/30/35MCG++75MG TABLETS | 3 x 28 |
| 00430-0010-05 | Rx | FEMCON® FE 0.4 MG/35MCG++75 MG TABLETS | 5 x 28 |
| 00430-0145-14 | Rx | FEMHRT® 0.5/2.5 MG TABLETS | 5 x 28 |
| 00430-6201-40 | Rx | FEMRING® 0.05 MG/DAY VAGINAL RING | 1 EA |
| 00430-6202-40 | Rx | FEMRING® 0.10 MG/DAY VAGINAL RING | 1 EA |
| 00456-2220-30 | Rx | FETZIMA® 20 MG CAPSULES | 30 |
| 00456-2240-30 | Rx | FETZIMA® 40 MG CAPSULES | 30 |
| 00456-2280-30 | Rx | FETZIMA® 80 MG CAPSULES | 30 |
| 00456-2212-30 | Rx | FETZIMA® 120 MG CAPSULES | 30 |
| 00456-2202-28 | Rx | FETZIMA® TITRATION PACK | 1 EA |
| 52544-0080-01 | Rx | FIORICET® 50/300/40 MG CAPSULES | 100 |
| 58914-0930-99 | Rx | FLUTTER® MUCUS CLEARING DEVICE | 1 EA |
| 52544-0041-54 | Rx | GELNIQUE® 3% GEL 92G 30MD | 1 Pump |
| 52544-0084-30 | Rx | GELNIQUE® 10% TGEL SACHET | Carton of 30 |
| 52544-0204-31 | Rx | GENERESS® FE .8MG/25MCG TABLETS | 3 x 28 |
| 52544-0931-02 | Rx | INFED® (IRON DEXTRAN INJ) 50MG 2 mL | Carton of 10 |
| 00456-2005-01 | Rx | LEXAPRO® 5 MG TABLETS | 100 |
| 00456-2010-01 | Rx | LEXAPRO® 10 MG TABLETS | 100 |
| 00456-2020-01 | Rx | LEXAPRO® 20 MG TABLETS | 100 |
| 00456-2010-63 | Rx | LEXAPRO® 10 MG TABLETS | 10 X 10 UD |
| 00456-2020-63 | Rx | LEXAPRO® 20 MG TABLETS | 10 X 10 UD |
| 00456-2101-08 | Rx | LEXAPRO® ORAL SOLUTION | 240 mL |
| 00456-1201-30 | Rx | LINZESS® 145 MCG CAPSULES | 30 |
| 00456-1202-30 | Rx | LINZESS® 290 MCG CAPSULES | 30 |
| 00430-0420-14 | Rx | LO LOESTRIN® FE 1MG/10/10MCG TABLETS | 5 x 28 |
| 52544-0622-01 | Rx | MICROZIDE®12.5 MG CAPSULES | 100 |
| 00430-0540-50 | Rx | MINASTRIN® 24 FE 1/20 TABLETS | 5 x 28 |
| 00456-4300-01 | Rx | MONUROL® Single Unit Sachet | 1 |
| 00456-3407-33 | Rx | NAMENDA XR® 7 MG CAPSULES | 30 |
| 00456-3414-33 | Rx | NAMENDA XR® 14 MG CAPSULES | 30 |

ALLERGAN_MDL_04242097

| NDC | STATUS SCHEDULE | PRODUCT | S.K.U. PRICING UNIT |
|---|---|---|---|
| 00456-3421-33 | Rx | NAMENDA XR® 21 MG CAPSULES | 30 |
| 00456-3428-33 | Rx | NAMENDA XR® 28 MG CAPSULES | 30 |
| 00456-3414-90 | Rx | NAMENDA XR® 14 MG CAPSULES | 90 |
| 00456-3428-90 | Rx | NAMENDA XR® 28 MG CAPSULES | 90 |
| 00456-3414-63 | Rx | NAMENDA XR® 14 MG CAPSULES | 10 X 10 UD |
| 00456-3428-63 | Rx | NAMENDA XR® 28 MG CAPSULES | 10 X 10 UD |
| 00456-3400-29 | Rx | NAMENDA XR® TITRATION PAK | 1 EA |
| 00456-3205-60 | Rx | NAMENDA® 5 MG TABLETS | 60 |
| 00456-3210-60 | Rx | NAMENDA® 10 MG TABLETS | 60 |
| 00456-3205-63 | Rx | NAMENDA® 5 MG TABLETS | 10 X 10 UD |
| 00456-3210-63 | Rx | NAMENDA® 10 MG TABLETS | 10 X 10 UD |
| 00456-3202-12 | Rx | NAMENDA® ORAL SOLUTION | 360 mL |
| 00456-3200-14 | Rx | NAMENDA® TITRATION PAK | 1 EA |
| 00456-1214-30 | Rx | NAMZARIC™ 14mg/10mg | 30 |
| 00456-1228-30 | Rx | NAMZARIC™ 28mg/10mg | 30 |
| 52544-0977-01 | Rx | NEPHRO-VITE® RX TABLETS | 100 |
| 52544-0259-28 | Rx | NORINYL® 1+35 1/0.035 MG TABLETS | 6 X 28 |
| 52544-0265-31 | Rx | NORINYL® 1+50 1/0.05 MG TABLETS | 3 X 28 |
| 52544-0235-28 | Rx | NOR-QD® 0.35 MG TABLETS | 6 X 28 |
| 52544-0157-26 | Rx | NUVESSA™ | 1 Unit |
| 00430-0580-45 | Rx | OVCON 35 TABLETS | 3 X 28 |
| 52544-0920-08 | Rx | OXYTROL® OXYBUT TS(US) 3.9MG/D | 8 patches |
| 52544-0079-60 | Rx | PREQUE 10® TABLETS | 60 |
| 58914-0601-20 | Rx | PYLERA® CAPSULES 10 Day Therapy Pack | 10 X 12 |
| 52544-0151-30 | Rx | RAPAFLO® 4 MG CAPSULES | 30 |
| 52544-0152-30 | Rx | RAPAFLO® 8 MG CAPSULES | 30 |
| 52544-0152-19 | Rx | RAPAFLO® 8 MG CAPSULES | 90 |
| 58914-0301-80 | Rx | RECTIV® OINTMENT 0.4% | 30 g Tube |
| 00456-2402-60 | Rx | SAPHRIS® BLACK CHERRY 2.5 MG | 6 x 10 |
| 00456-2405-60 | Rx | SAPHRIS® BLACK CHERRY 5 MG | 6 x 10 |
| 00456-2410-60 | Rx | SAPHRIS® BLACK CHERRY 10 MG | 6 x 10 |
| 00456-2405-63 | Rx | SAPHRIS® BLACK CHERRY 5 MG | 10 x 10 |
| 00456-2410-63 | Rx | SAPHRIS® BLACK CHERRY 10 MG | 10 x 10 |
| 00430-0210-14 | Rx | SARAFEM® 10 MG TABLETS | 4 x 7 |
| 00430-0220-14 | Rx | SARAFEM® 20 MG TABLETS | 4 x 7 |
| 00456-1512-60 | Rx | SAVELLA® 12.5 MG TABLETS | 60 |
| 00456-1525-60 | Rx | SAVELLA® 25 MG TABLETS | 60 |
| 00456-1550-60 | Rx | SAVELLA® 50 MG TABLETS | 60 |
| 00456-1510-60 | Rx | SAVELLA® 100 MG TABLETS | 60 |
| 00456-1500-55 | Rx | SAVELLA® TITRATION PACK | 1 EA |
| 58914-0830-08 | OTC | SCANDICAL® Calorie Booster | 8 oz. Can |
| 58914-0800-44 | OTC | SCANDISHAKE® Vanilla | 4 Env per Box |
| 58914-0800-84 | OTC | SCANDISHAKE® Vanilla | 24 Env per Box |
| 58914-0802-44 | OTC | SCANDISHAKE® Strawberry | 4 Env per Box |
| 58914-0802-84 | OTC | SCANDISHAKE® Strawberry | 24 Env per Box |
| 58914-0803-44 | OTC | SCANDISHAKE® Banana Cream | 4 Env per Box |
| 58914-0803-84 | OTC | SCANDISHAKE® Banana Cream | 24 Env per Box |
| 58914-0804-44 | OTC | SCANDISHAKE® Caramel | 4 Env per Box |
| 58914-0804-84 | OTC | SCANDISHAKE® Caramel | 24 Env per Box |
| 58914-0810-44 | OTC | SCANDISHAKE® Lactose-Free Vanilla | 4 Env per Box |
| 58914-0810-84 | OTC | SCANDISHAKE® Lactose-Free Vanilla | 24 Env per Box |
| 58914-0820-18 | OTC | SCANDISHAKE® Sweetened with Aspartame Vanilla | 18 oz. Can |

| NDC | STATUS SCHEDULE | PRODUCT | S.K.U. PRICING UNIT |
|---|---|---|---|
| 00456-0400-10 | Rx | TEFLARO® INJECTABLE 400 MG VIALS | CARTON OF 10 |
| 00456-0600-10 | Rx | TEFLARO® INJECTABLE 600 MG VIALS | CARTON OF 10 |
| 00456-0040-01 | Rx | THYROLAR® – 1/4 TABLETS | 100 |
| 00456-0045-01 | Rx | THYROLAR® – 1/2 TABLETS | 100 |
| 00456-0050-01 | Rx | THYROLAR® – 1 TABLETS | 100 |
| 00456-0055-01 | Rx | THYROLAR® – 2 TABLETS | 100 |
| 00456-0060-01 | Rx | THYROLAR® – 3 TABLETS | 100 |
| 52544-0189-76 | Rx | TRELSTAR® 3.75 MG MIXJECT | 1 vial |
| 52544-0188-76 | Rx | TRELSTAR® 11.25 MG MIXJECT | 1 vial |
| 52544-0092-76 | Rx | TRELSTAR® 6 MONTH 22.5 MG MIXJECT | 1 vial |
| 16781-0376-35 | Rx | TRETIN-X ® CREAM 0.0375% 35g | Tube |
| 52544-0274-28 | Rx | TRI-NORINYL® .5;1;.5/.035 MG TABLETS | 6 x 28 |
| 58914-0003-10 | Rx | ULTRESA™ 13,800 CAPSULES | 100 |
| 58914-0019-10 | Rx | ULTRESA™ 20,700 CAPSULES | 100 |
| 58914-0005-10 | Rx | ULTRESA™ 23,000 CAPSULES | 100 |
| 58914-0785-10 | Rx | URSO 250® TABLETS | 100 |
| 58914-0790-10 | Rx | URSO Forte® 500 MG TABLETS | 100 |
| 00456-1110-30 | Rx | VIIBRYD® 10 MG TABLETS | 30 |
| 00456-1120-30 | Rx | VIIBRYD® 20 MG TABLETS | 30 |
| 00456-1140-30 | Rx | VIIBRYD® 40 MG TABLETS | 30 |
| 00456-1101-30 | Rx | VIIBRYD® Patient Starter Kit | 1 Ea |
| 58914-0112-10 | Rx | VIOKACE™ 10 TABLETS | 100 |
| 58914-0117-10 | Rx | VIOKACE™ 20 TABLETS | 100 |
| 42865-0304-02 | Rx | ZENPEP® 3000 CAPSULES | 100 |
| 42865-0300-02 | Rx | ZENPEP® 5000 CAPSULES | 100 |
| 42865-0306-02 | Rx | ZENPEP® 10000 CAPSULES | 100 |
| 42865-0302-02 | Rx | ZENPEP® 15000 CAPSULES | 100 |
| 42865-0303-02 | Rx | ZENPEP® 20000 CAPSULES | 100 |
| 42865-0305-02 | Rx | ZENPEP® 25000 CAPSULES | 100 |
| 42865-0307-02 | Rx | ZENPEP® 40000 CAPSULES | 100 |