PSJ10 Exh 47

Highly Confidential - Subject to Further Confidentiality Review

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
                        -  -  -
 3

     IN RE:  NATIONAL        : HON. DAN A. POLSTER
 4   PRESCRIPTION OPIATE     :
     LITIGATION              :
 5                           :
     APPLIES TO ALL CASES    :NO.
 6                           :1:17-MD-2804
 7             - HIGHLY CONFIDENTIAL -
 8      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9                    -  -  -
                 December 13, 2018
10                    -  -  -
11           Videotaped sworn deposition of
12        DAVID A. MYERS, JR., taken pursuant to
13        notice, was held at LIEFF CABRASER
14        HEIMANN & BERNSTEIN, LLP, 250 Hudson
15        Street, 8th Floor, New York, New York,
16        beginning at 9:15 a.m., on the above
17        date, before Margaret M. Reihl, a
18        Registered Professional Reporter,
19        Certified Shorthand Reporter, Certified
20        Realtime Reporter, and Notary Public.
21
                        -  -  -
22

              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

```
 1   A P P E A R A N C E S:
 2
     ROBBINS GELLER RUDMAN & DOWD LLP
 3   BY:  MATTHEW S. MELAMED, ESQUIRE
          KELLI BLACK, ESQUIRE
 4   Post-Montgomery Center
     One Montgomery Street, Suite 1800
 5   San Francisco, California  94104
     (415) 288-4545
 6   mmelamed@rgrdlaw.com
     kblack@rgrdlaw.com
 7   Representing the Plaintiffs
 8
     WAGSTAFF & CARTMELL LLP
 9   BY:  JONATHAN P. KIEFFER, ESQUIRE
          SARAH RUANE, ESQUIRE
10   4740 Grand Avenue, Suite 300
     Kansas City, Missouri  64112
11   (816) 701-1100
     jpkieffer@wcllp.com
12   Representing the Plaintiffs
13
     MORGAN LEWIS & BOCKIUS, LLP
14   BY:  STACEY ANNE MAHONEY, ESQUIRE
     101 Park Avenue
15   New York, New York  10178-0060
     (212) 309-6930
16   stacey.mahoney@morganlewis.com
             - AND -
17   BY:  LIZA B. FLEMING, ESQUIRE
     1701 Market St.
18   Philadelphia, Pennsylvania 19103-2921
     (215) 963-4610
19   liza.fleming@morganlewis.com
     Representing the Defendant Teva
20
     KIRKLAND & ELLIS LLP
21   BY:  ERICA B. ZOLNER, ESQUIRE
          PRATIK GHOSH, ESQUIRE
22   300 North LaSalle Street
     Chicago, Illinois  60654
23   (312) 862-3247
     erica.zolner@kirkland.com
24   Representing the Defendant Allergan
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S: (cont'd)

 2

     WILLIAMS & CONNOLLY LLP
 3   BY:  JOEL S. JOHNSON, ESQUIRE
     725 Twelfth Street, N.W.
 4   Washington, D.C.  20005
     (202) 434-5091
 5   jjohnson@wc.com
     Representing the Defendant,
 6   Cardinal Health

 7

     JONES DAY
 8   BY:  CHRISTOPHER J. LOVRIEN, ESQUIRE
     555 South Flower Street
 9   Fiftieth Floor
     Los Angeles, California  90071-2452
10   (213) 489-3939
     cjlovrien@jonesday.com
11   Representing the Defendant, Walmart

12

13

14   ALSO PRESENT:  HENRY MARTE, VIDEOGRAPHER

15

16                          – – –

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC APPEARANCES:
 2
     ARNOLD & PORTER KAYE SCHOLER LLP
 3   BY:  DAVID FAUVRE, ESQUIRE
     601 Massachusetts Ave, NW
 4   Washington, DC  20001-3743
     (202) 942-5041
 5   david.fauvre@arnoldporter.com
     Representing the Defendants, Endo
 6   Health Solutions; Endo
     Pharmaceuticals, Inc.; Par
 7   Pharmaceutical Companies, Inc. f/k/a
     Par Pharmaceutical Holdings, Inc.
 8
 9
     REED SMITH LLP
10   BY:  CHRISTIAN W. SAUCEDO, ESQUIRE
     Three Logan Square
11   1717 Arch Street
     Philadelphia, Pennsylvania  19103
12   (215) 851-8262
     csaucedo@reedsmith.com
13   Representing the Defendant,
     AmerisourceBergen Drug Corp.
14
15   COVINGTON & BURLING LLP
     BY:  CLAYTON BAILEY, ESQUIRE
16   The New York Times Building
     620 Eighth Avenue
17   New York, New York 10018-1405
     (212) 841-1285
18   cbailey@cov.com
     Representing the Defendant,
19   McKesson Corporation
20
     BARON BUDD, P.C.
21   BY:  GRETCHEN KEARNEY, Paralegal
     600 New Hampshire Avenue, NW
22   Suite 10A
     Washington, D.C.  20037
23   (202) 333-4562
     gkearney@baronbudd.com
24   Representing the Plaintiffs
```

```
1              interrupt you, but we've been going for

2              a while, if now is a good time for a

3              break.

4                   MR. MELAMED:  If it's okay with

5              you -- with everybody in the room, if we

6              do one more document, pretty quick set

7              of documents.  Is that okay?

8                   THE WITNESS:  I'm okay.

9                   MS. MAHONEY:  Is that good with

10             you?

11                  THE WITNESS:  Okay.

12                  MR. MELAMED:  Then we'll take a

13             break.

14                  MS. MAHONEY:  Thank you.

15                  (Document marked for

16             identification as Myers Deposition

17             Exhibit No. 4.)

18   BY MR. MELAMED:

19             Q.   Handing you what's been marked as

20   Exhibit 4.  Exhibit 4 is a spreadsheet, several

21   pages printed, it's all at the same Bates number

22   which is Acquired_Actavis_00661681.  And the

23   title of the document has been recorded on the

24   bottom of the printed spreadsheet which is
```

 1    "Special Recognition Recipients."

 2              Do you recognize this document?

 3         A.    No.

 4         Q.    Okay.  I just want to draw your

 5    attention to page 2, and the page numbers on

 6    this is in the center of the bottom of the page,

 7    still the same Bates number, 1681.

 8              And the top line it says in 2011

 9    in the month of August, there's a column for

10    Recipient #2 and you are listed.

11              Do you see your name under

12    Recipient #2?

13         A.    I do.

14         Q.    And you see that there's an award

15    summary, and it refers to you and others.  It

16    says, "For their effort in support of NACDS"?

17         A.    Yes.

18         Q.    And NACDS stands for National

19    Association of Chain Drug Stores, correct?

20         A.    Yes.

21         Q.    Can you explain this -- do you

22    recall why you received this award?

23              MS. MAHONEY:  Objection.

24              THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. MELAMED:

2          Q.     You do recall receiving the

3    award, correct?

4          A.     Not specifically.

5          Q.     Do you understand the reason this

6    -- that you received this award?

7          A.     Based on the summary, yes, I

8    would understand.

9          Q.     Okay.  And what is your

10   understanding of the reason you received this

11   award?

12         A.     Once a year we would -- National

13   Association of Chain Drug Stores is another

14   national organization that the company

15   participated and belonged to, and we would go to

16   a -- they call it a trade show, but it's really

17   a meeting driven trade show, where participants,

18   like, for instance, Actavis or Teva would have a

19   trade show booth and you would have appointments

20   with most of your largest customers just to

21   review business.

22         Q.     More generally, do you understand

23   the reason for the National Association of Chain

24   Drug Stores existence?

Highly Confidential - Subject to Further Confidentiality Review

```
1                MS. MAHONEY:  Objection.

2                THE WITNESS:  I don't know what

3           their mission statement is, but I assume

4           that they are same thing to -- an

5           organization to deal with, you know,

6           business things that might impact

7           national chain drug stores.

8    BY MR. MELAMED:

9           Q.    Do you have an understanding of

10   why Actavis was a member of -- and I'll refer to

11   it as the document does, as the NACDS, is that

12   okay?  Do you have any understanding of why

13   Actavis was a member of the NACDS?

14                MS. MAHONEY:  Objection.

15                THE WITNESS:  Not specifically to

16           NACDS, but we supported the industry.

17           It was customary for all drug companies

18           to support their customers.

19   BY MR. MELAMED:

20          Q.    And so the NACDS was made up, at

21   least in part of -- let me withdraw that.

22                The membership of NACDS was made

23   up, at least in part, of Actavis' customers,

24   correct?
```

```
 1                    MS. ZOLNER:  Objection, form.

 2                    THE WITNESS:  Let me take a

 3           moment to read the --

 4    BY MR. MELAMED:

 5           Q.    Yes.

 6           A.    (Witness reviews document.)

 7                    Okay. I'm sorry.  Can you repeat

 8    your question.

 9           Q.    Sure.

10                    Is it your understanding that the

11    e-mail string, as it moves forward in time, so

12    back to -- towards page 1 of the exhibit,

13    concerns formatting of an ad for fentanyl using

14    the binoculars, in quotes, for Drug Store News?

15                    MS. MAHONEY:  Objection.

16                    THE WITNESS:  I believe so.

17    BY MR. MELAMED:

18           Q.    Do you know whether that

19    advertisement was ever placed in Drug Store

20    News?

21           A.    I don't recall.

22           Q.    As you sit here today, do you

23    have any reason to believe that it was not

24    placed in Drug Store News?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MS. MAHONEY:  Objection.

 2                  THE WITNESS:  I have no reason to

 3            believe that it was not, but, as you've

 4            seen in the other documents, sometimes

 5            we put projects on hold.

 6   BY MR. MELAMED:

 7            Q.    Understood.

 8                  You can put that document aside.

 9                  Actavis also marketed and sold

10   generic buprenorphine; is that correct?

11                  MS. MAHONEY:  Objection.

12                  THE WITNESS:  Yes.

13   BY MR. MELAMED:

14            Q.    And how do you know that?

15            A.    I believe that I was either the

16   product manager or involved in perhaps the

17   advertising of that product.

18            Q.    Are you aware of any market

19   research Actavis conducted regarding

20   buprenorphine before Actavis launched its

21   generic version of the drug?

22                  MS. ZOLNER:  Objection.

23                  MS. MAHONEY:  Objection.

24                  THE WITNESS:  Can you define
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "market research"?  That's a broad term.

 2   BY MR. MELAMED:

 3         Q.     Sure.  Do you know whether

 4   Actavis conducted any analysis to consider the

 5   potential revenues to be gained from selling

 6   generic version of buprenorphine before

 7   launching the drug?

 8         A.     Yes.

 9         Q.     Do you know who performed that?

10                MS. MAHONEY:  Objection.

11                THE WITNESS:  I do not.

12   BY MR. MELAMED:

13         Q.     You know that buprenorphine is a

14   drug used to treat opioid addiction, correct?

15         A.     I believe so.

16         Q.     So it is true that at the time

17   Actavis was marketing and selling opioids,

18   including Kadian, fentanyl patch we've

19   discussed, oxycodone, it was also marketing and

20   selling a drug used to treat opioid addiction,

21   correct?

22                MS. MAHONEY:  Objection.

23                THE WITNESS:  I believe so.

24                (Document marked for
```

Highly Confidential - Subject to Further Confidentiality Review

1          identification as Myers Deposition

2          Exhibit No. 12.)

3     BY MR. MELAMED:

4          Q.     I'm handing you what's been

5     marked Myers Exhibit 12.  Myers Exhibit 12

6     starts with an e-mail from Steve Kane to David

7     Myers and Dorothy -- cc'ing Dorothy McEntee on

8     September 13th, 2010, subject is Re:

9     "buprenorphine advertisement."  It contains a

10    series of attachments, and then within the

11    document on page Bates number ending 3147

12    contains another e-mail from David Myers to --

13    addressed to Dorothy and a series of

14    attachments.  The entire Bates range of the

15    document is Acquired_Actavis_01373136 through

16    3160.

17          Do you recall this document?

18          A.     No.

19          Q.     If you turn to -- I want to start

20    with your e-mail, which is on the page with the

21    Bates number ending 3147.

22          A.     Okay.

23          Q.     And you write that "we'd like to

24    begin development on a new drug we expect to be

Highly Confidential - Subject to Further Confidentiality Review

1    approved in October", and then you provide

2    details.

3                    Do you see that?

4          A.      Yes, sir.

5          Q.      And the drug was buprenorphine

6    hydrochloride sublingual tablets, correct?

7          A.      Yes.

8          Q.      Do you recall whether you

9    received approval on or around October 2010 to

10   sell that drug?

11         A.      I know we received approval.  I

12   don't recall the date.

13         Q.      Okay.  And you provide other

14   specific information about the drug in the

15   bullets?

16         A.      Mm-hmm.

17         Q.      And then if you turn to the next

18   page, the paragraph that begins, as usual,

19   provides some guidance about the type of

20   advertisement you would like to see, correct?

21         A.      Yes.

22                 MS. MAHONEY:  Objection.

23                 THE WITNESS:  Yes.

24   BY MR. MELAMED:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    In the last sentence you say it,

2    referring to the ad or the imagery -- what does

3    "it" refer to in the last sentence?

4    A.    Let me read.  (Witness reviews

5    document.)

6          What does "it" refer to is your

7    question?

8    Q.    Yes.

9    A.    "It" is the advertising concept.

10   Q.    Okay.  So you write that the

11   concept, the advertising concepts can be

12   indication adjacent and reference the use of the

13   moon in the Zolpidem ad.

14   A.    Yes.

15         MS. MAHONEY:  Objection.

16   BY MR. MELAMED:

17   Q.    Correct?

18   A.    Yes.

19   Q.    Zolpidem is a sleeping aid; is

20   that correct?

21   A.    Yes.

22   Q.    And so you note that that ad for

23   zolpidem did not say anything about making you

24   sleep, correct?

```
 1                    MS. MAHONEY:  Objection.

 2                    THE WITNESS:  I believe it did

 3           not.

 4    BY MR. MELAMED:

 5           Q.     According to what you write, you

 6    use the moon to be indication adjacent as

 7    suggestive of sleep, without saying anything of

 8    sleep; is that an accurate summary?

 9                    MS. ZOLNER:  Objection to form.

10                    MS. MAHONEY:  Objection.

11                    THE WITNESS:  I think that's an

12           assumption.

13    BY MR. MELAMED:

14           Q.     Does that reflect accurately the

15    assumption you think is expressed in your

16    sentence that starts with can be indication

17    adjacent?

18                    MS. ZOLNER:  Objection, form.

19                    THE WITNESS:  Possibly, yes.

20    BY MR. MELAMED:

21           Q.     Is there any reason for the

22    hesitation, the possibly in that response?

23           A.     Only because I know that we've

24    used images and imagery that had nothing to do
```

```
1    with what the drug did.

2            Q.    But in zolpidem --

3            A.    In zolpidem it does say it was

4    indication adjacent.

5            Q.    And the moon was used as adjacent

6    to sleep --

7            A.    Yes.

8            Q.    -- is that correct?

9            A.    Yes.

10                 MS. MAHONEY:  Objection.  Please

11           give me an opportunity to object, David.

12                 THE WITNESS:  Thank you.  I'm

13           sorry.

14   BY MR. MELAMED:

15           Q.    So the guidance that you were

16   providing to Dorothy was that you could -- she

17   could use an analogy similar to the moon for a

18   sleeping aid for a drug used to treat opioid

19   addiction.

20                 Is that your understanding of

21   what you wrote?

22                 MS. ZOLNER:  Objection to form.

23                 MS. MAHONEY:  Objection.

24                 THE WITNESS:  That was my opinion
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              at the time, not a legal or regulatory

2              approved guidance.

3    BY MR. MELAMED:

4              Q.     Fair enough.  I'm not asking you

5    to speak for legal or regulatory approved,

6    unless I specifically ask you that question.

7              A.     Okay.

8              Q.     All right.  If you could turn

9    back to the second page now.  I just want to

10   look at some of these concepts, so the page

11   ending in 3137.

12             The text says "leave the past

13   behind."

14             Do you see that?

15             A.     Yes, sir.

16             Q.     Do you understand what is meant

17   by "the past" in this sentence?

18             A.     I can infer what it means.

19             Q.     What is your inference?

20             A.     Since this is a drug to help

21   people get off of drug dependence, it's starting

22   anew.

23             Q.     Getting off the drug?

24             A.     That's what they're proposing,
```

Highly Confidential - Subject to Further Confidentiality Review

1    what this ad agency is proposing.

2          Q.     Right.

3                 And so the proposal is the past

4    is leaving that drug dependence behind?

5          A.     That's inferred, yes.

6          Q.     Okay.  And the sketch appears to

7    be bars of a jail cell, correct?

8          A.     Mm-hmm.

9          Q.     And those bars have been bent so

10   that somebody has -- the implication being that

11   somebody has escaped; is that right?

12         A.     Yes.

13         Q.     So the jail cell represented

14   opioid addiction in this drawing; is that

15   correct?

16                MS. ZOLNER:  Objection form.

17                MS. MAHONEY:  Objection.

18   BY MR. MELAMED:

19         Q.     Let me restate that.

20                How do you understand what the

21   jail cell represents in this drawing?

22                MS. ZOLNER:  Objection,

23        foundation.

24                THE WITNESS:  I believe it could

Highly Confidential - Subject to Further Confidentiality Review

1          be interpreted that had way, but I did

2          not create the creative.

3    BY MR. MELAMED:

4          Q.    I'm asking you for -- to be

5    clear, and your answer was clear on this, I'm

6    asking for your interpretation.

7               So your interpretation is that

8    this drawing, the drawing of the bars represents

9    the addiction and that the fact that the bars

10   are broken and bent in the middle represents an

11   escape from addiction?

12              MS. ZOLNER:  Objection to form.

13              MS. MAHONEY:  Objection, asked

14         and answered, mischaracterizes the

15         testimony.

16   BY MR. MELAMED:

17         Q.    Is that accurate?  And if it's

18   not, please tell me.

19         A.    That would be my personal

20   impression.

21         Q.    If you turn to the next page,

22   3138.  It says "Independence day".

23              Do you agree that that appears to

24   be a firework?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, sir.

 2              Q.    Okay.  And to what do you

 3    understand the word independence to be referring

 4    to?

 5                    MS. ZOLNER:  Objection,

 6              foundation.

 7                    THE WITNESS:  The word

 8              independence or Independence day?

 9    BY MR. MELAMED:

10              Q.    The word independence.

11              A.    As it relates to this ad?

12              Q.    Yes.

13                    MS. MAHONEY:  Objection.

14    BY MR. MELAMED:

15              Q.    Let me put that differently.

16    Independence from what?

17                    MS. MAHONEY:  Objection.

18                    THE WITNESS:  Independence from

19              habits that the user would have, in this

20              case possibly drug addiction.

21    BY MR. MELAMED:

22              Q.    This drug was approved for --

23    to -- as a treatment for opioid addiction,

24    correct?
```

```
1                A.      Yes.

2                Q.      So independence from opioid

3       addiction?

4                A.      Yes.

5                MS. ZOLNER:  Objection to form.

6                MS. MAHONEY:  Objection.  You

7           really have to give us an opportunity to

8           object, please, David.

9                THE WITNESS:  Could you restate

10          your question, please.

11      BY MR. MELAMED:

12               Q.      Sure.  So your understanding is

13      that independence here meant independence from

14      opioid addiction; is that correct?

15               MS. ZOLNER:  Objection,

16          foundation.

17               MS. MAHONEY:  Objection.

18               THE WITNESS:  I'm assuming so.

19      BY MR. MELAMED:

20               Q.      Do you recall discussing any of

21      these ad concepts after they were sent to you?

22               A.      No.

23               Q.      Turn to the next page, which ends

24      3139.
```

Highly Confidential - Subject to Further Confidentiality Review

1           You see the header says "A new

2    start"?

3           A.     Yes.

4           Q.     Do you have any understanding of

5    what is -- let me withdraw that.

6                  Do you have an understanding of

7    what is meant by "A new start"?

8           A.     I believe in conjunction with the

9    imagery of a butterfly that it means a rebirth.

10          Q.     And does it follow that that

11   rebirth is after leaving opioid addiction

12   behind?

13                 MS. ZOLNER:  Objection, form.

14                 MS. MAHONEY:  Objection.

15                 THE WITNESS:  It's possible,

16        since that was the subject of this ad.

17   BY MR. MELAMED:

18          Q.     Is that your interpretation of

19   the drawing?

20                 MS. MAHONEY:  Objection.

21                 THE WITNESS:  My personal

22         interpretation.

23   BY MR. MELAMED:

24          Q.     Turn to the next page, which ends

Highly Confidential - Subject to Further Confidentiality Review

1    3140.  And it says "Break the ties that bind."

2              And do you agree with me that

3    that appears to be a drawing of a broken chain?

4         A.    Yes, sir.

5         Q.    Okay.  What is your understanding

6    of what "the ties that bind" refer to?

7              MS. MAHONEY:  Objection.

8              THE WITNESS:  My personal opinion

9         in relationship to this topic is

10        breaking drug addiction.

11   BY MR. MELAMED:

12        Q.    And because of this specific

13   product we're talking about, would it be fair to

14   say that it was breaking opioid addiction?

15             MS. ZOLNER:  Objection to form.

16             MS. MAHONEY:  Objection.

17             THE WITNESS:  I believe so.

18   BY MR. MELAMED:

19        Q.    And do you understand the

20   drawing, the chain in the drawing to represent

21   opioid addiction?

22             MS. ZOLNER:  Objection to form.

23             THE WITNESS:  I believe not based

24        on the drawing of the chain, I believe

Highly Confidential - Subject to Further Confidentiality Review

1          based on the indication for the drug

2          that's being proposed here.

3     BY MR. MELAMED:

4          Q.    So based on the indication of the

5     drug, combined with the drawing, your

6     understanding is that the -- that chain

7     represents opioid addiction?

8               MS. ZOLNER:  Objection.

9     BY MR. MELAMED:

10         Q.    Is that accurate?

11              MS. ZOLNER:  Objection, form.

12              MS. MAHONEY:  Objection.

13              THE WITNESS:  Yes, I believe so.

14    BY MR. MELAMED:

15         Q.    And that the drug being

16    advertised will help break that chain of

17    addiction?

18              MS. ZOLNER:  Objection, form.

19              THE WITNESS:  I believe that is

20         what the artist is proposing.

21    BY MR. MELAMED:

22         Q.    If you turn the page to the

23    drawing on 3141.  This says "A bright new path."

24              And it appears to be either a

```
 1   sunrise or a sunset in front of a road and

 2   rolling hills.

 3                 Does that reflect what you see as

 4   well?

 5                 MS. ZOLNER:  Objection to form.

 6                 MS. MAHONEY:  Objection.

 7                 THE WITNESS:  Yes.

 8   BY MR. MELAMED:

 9        Q.    How would you describe that

10   drawing?

11                 MS. MAHONEY:  Objection.

12                 THE WITNESS:  It looks like a

13          sunrise or sunset towards the horizon.

14   BY MR. MELAMED:

15        Q.    And the header says "A bright new

16   path."

17                 You see that, correct?

18        A.    Yes.

19        Q.    Is your understanding of that

20   bright new path that it leaves a dark, old path

21   behind?

22                 MS. ZOLNER:  Objection, form.

23                 MS. MAHONEY:  Objection.

24                 THE WITNESS:  I believe it means
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              a new direction in your life.

 2   BY MR. MELAMED:

 3         Q.    And you mean -- your

 4   understanding that it means a new direction in

 5   one's life, what is the -- do you have any

 6   understanding of the reason that a new direction

 7   was being promoted here?

 8                   MS. MAHONEY:  Objection.

 9                   THE WITNESS:  You can assume,

10         based on -- that this is a proposed

11         advertisement for buprenorphine that it

12         might be to change your life if you

13         happen to be a person who has become

14         addicted.

15   BY MR. MELAMED:

16         Q.    And, again, addicted to opioids,

17   correct?

18                   MS. MAHONEY:  Objection.

19                   MS. ZOLNER:  Objection.

20                   THE WITNESS:  I believe that's

21         what the drug is indicated for.  I'm not

22         entirely sure.

23   BY MR. MELAMED:

24         Q.    Let's skip ahead to the one --
```

Highly Confidential - Subject to Further Confidentiality Review

1    the drawing on 3143.  You see it says "Finding

2    the way home"?

3            A.     Yes.

4            Q.     And how would you describe the

5    scene being depicted in that drawing?

6            A.     It looks as --

7                   MS. MAHONEY:  Objection.

8                   THE WITNESS:  It looks as if a

9            bird has been released from a cage.

10   BY MR. MELAMED:

11           Q.     And how would you interpret,

12   given the indication of the drug being

13   advertised, how would you interpret the phrase

14   "finding the way home"?  What is meant by that?

15                  MS. ZOLNER:  Objection, form.

16                  THE WITNESS:  Being set free from

17           possibly drug addiction, since this is a

18           drug -- a drug that is indicated to help

19           you with addiction.

20   BY MR. MELAMED:

21           Q.     And in the drawing, is it your

22   understanding that the bird represents the

23   person being set free from that addiction?

24                  MS. MAHONEY:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. ZOLNER:  Objection.

 2                    THE WITNESS:  Potentially.

 3   BY MR. MELAMED:

 4         Q.     And do you have any understanding

 5   of what the cage represents in this -- how would

 6   you interpret what the cage represents in this

 7   drawing?

 8         A.     Well, that's my personal opinion.

 9   The cage in this might be the cage of addiction,

10   being trapped in addiction.

11         Q.     Can you think of any other

12   interpretations, as you sit here?

13                    MS. MAHONEY:  Objection.

14                    MS. ZOLNER:  Objection.

15                    THE WITNESS:  Not necessarily.

16   BY MR. MELAMED:

17         Q.     If you turn to the next page,

18   ends 3144, it's the same drawing that we were

19   just looking at, correct?

20         A.     Yes.

21         Q.     The only difference is the tag

22   line at the top, correct?

23         A.     Yes.

24         Q.     And it says "Free at last."
```

```
 1              A.     Yes.

 2              Q.     Do you have any understanding of

 3    what was meant by "Free at last"?

 4                     MS. ZOLNER:  Objection.

 5                     MS. MAHONEY:  Objection.

 6                     THE WITNESS:  Similar to the

 7              other ads, I would think it would denote

 8              a new beginning or a different path.

 9    BY MR. MELAMED:

10              Q.     Do you understand -- let me

11    withdraw that.

12                     Free from what?

13                     MS. ZOLNER:  Objection.

14                     MS. MAHONEY:  Objection.

15                     MS. ZOLNER:  Foundation.

16                     THE WITNESS:  The inference might

17              be free from drug addiction.

18    BY MR. MELAMED:

19              Q.     And you're developing that

20    inference based on the indication of the drug

21    being advertised?

22              A.     And the image.

23                     MS. ZOLNER:  Objection to form.

24                     MS. MAHONEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  And the image.

 2   BY MR. MELAMED:

 3        Q.    To just be clear, I know there

 4   were objections, I'm not trying to get over

 5   those.

 6                    The -- it was the -- I'll reask

 7   my question and I'll state what I think your

 8   answer is, and then you guys can object, I'll

 9   give you time.

10                    The question was you were

11   developing that inference based on the

12   indication of the drug being advertised, and

13   there were objections.

14                    And you said "and the image."

15                    So your answer was you developed

16   that inference based on the indication of the

17   drug being advertised and the image being

18   represented on this page?

19        A.    Yes.

20                    MS. MAHONEY:  Objection.

21                    MS. ZOLNER:  Objection to form.

22                    THE WITNESS:  Yes.

23   BY MR. MELAMED:

24        Q.    Turn the page to 3145, and,
```

```
 1    again, we've seen this drawing before, correct?

 2           A.     Yes.

 3           Q.     Okay.  The difference is the tag

 4    line, which says "Toward a brighter tomorrow,"

 5    correct?

 6           A.     Yes.

 7           Q.     Given your understanding of the

 8    indication for which the drug being

 9    advertised -- withdrawn.

10                  Given your understanding of the

11    indication of the drug being advertised, how do

12    you interpret "Toward a brighter tomorrow"?

13                  MS. ZOLNER:  Objection.

14                  MS. MAHONEY:  Objection.

15                  THE WITNESS:  A new path away

16           from drug addiction.

17    BY MR. MELAMED:

18           Q.     If you turn the page to 3146.

19    Again, we see the same drawing, correct?

20           A.     Yes.

21           Q.     Okay.  And this time it says "A

22    road to freedom."

23                  Do you see that?

24           A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Based on your understanding of

 2      the indication of the drug being advertised and

 3      the drawing, do you understand "A road to

 4      freedom" to mean freedom from opioid addiction?

 5                     MS. MAHONEY:  Objection.

 6                     THE WITNESS:  That is my personal

 7              opinion.

 8      BY MR. MELAMED:

 9              Q.     Do you understand buprenorphine

10      to be the road as reflected in this drawing?

11                     MS. ZOLNER:  Objection.

12                     MS. MAHONEY:  Objection.

13                     THE WITNESS:  I don't know that I

14              necessarily see it that way.

15      BY MR. MELAMED:

16              Q.     So you don't agree with that one,

17      in contrast to many of the others we've talked

18      about?

19                     MS. ZOLNER:  Objection to form.

20                     MS. MAHONEY:  Objection.

21                     THE WITNESS:  I agree that

22              artwork is subject to the person who is

23              looking at it --

24
```

```
 1   BY MR. MELAMED:

 2          Q.     What about in the --

 3          A.     -- and interpreting it.

 4          Q.     What about in the text?  The text

 5   says "A road to freedom."  Do you have any

 6   understanding of what is meant by the word

 7   "road" in that given the context of

 8   advertisement -- this potential advertisement?

 9                 MS. ZOLNER:  Objection.

10                 MS. MAHONEY:  Objection.

11                 THE WITNESS:  I believe they mean

12          it to be -- to imply that the drug could

13          help you do freedom from -- from drug

14          addiction.

15   BY MR. MELAMED:

16          Q.     And then there's I believe one

17   more drawing on 3147.  And you see the tag line

18   says "Breaking free"?

19          A.     Yes, sir.

20          Q.     And then you see that it's

21   accompanied by a drawing, correct?

22          A.     Yes.

23          Q.     What do you understand that

24   drawing to be depicting?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     It looks as if someone has broken

2     out of a jail and is heading towards a new

3     horizon.

4          Q.     Given the context of this

5     advertisement, do you agree that the jail cell

6     represents addiction?

7                    MS. ZOLNER:  Objection.

8                    MS. MAHONEY:  Objection.

9                    THE WITNESS:  I interpret the

10          artist representation to mean it that

11          way, yes.

12    BY MR. MELAMED:

13         Q.     And concerning the tag line,

14    "Breaking free," do you understand that to imply

15    that this buprenorphine would help an opioid

16    addicted person break free from their addiction?

17                    MS. MAHONEY:  Objection.

18                    THE WITNESS:  Could you please

19          repeat that again.

20    BY MR. MELAMED:

21         Q.     Sure.

22                 Do you understand the tag line

23    "Breaking free" to imply that buprenorphine

24    would help an opioid addicted person break free

Highly Confidential - Subject to Further Confidentiality Review

```
1    from their addiction?

2                 MS. ZOLNER:  Objection to form.

3                 MS. MAHONEY:  Objection.

4                 THE WITNESS:  I believe that is

5          what the artist creative person was

6          trying to make that association.

7    BY MR. MELAMED:

8          Q.    And I asked this before, I don't

9    recall your answer, so I apologize for asking

10   again, do you know if any -- if any of these

11   ads -- let me withdraw that.

12                Do you know in any ads based on

13   the concepts reflected in this exhibit, Exhibit

14   12, were ever used in any advertisements put out

15   by Actavis?

16                MS. ZOLNER:  Objection, form.

17                THE WITNESS:  I believe -- I

18         believe that one of the concepts was

19         used, probably not as is.

20   BY MR. MELAMED:

21         Q.    Do you recall which concept was

22   used?

23         A.    I don't remember the tag line or

24   the headline.  I remember the sun, the horizon
```

Highly Confidential - Subject to Further Confidentiality Review

1    --

2          Q.      So something like --

3          A.      -- being developed.

4          Q.      -- the horizon on 3145?

5          A.      Yes.

6          Q.      Do you recall whether the tag

7    lines were similar to any of the tag lines we

8    just reviewed?

9                  MS. MAHONEY:  Objection.

10                 MS. ZOLNER:  Objection, form.

11                 THE WITNESS:  I don't recall what

12         the tag line was.

13   BY MR. MELAMED:

14         Q.      Do you recall where

15   advertisements that used the picture of the sun,

16   horizon were placed?

17                 MS. ZOLNER:  Objection, form.

18                 THE WITNESS:  I don't remember a

19         full, comprehensive list.

20   BY MR. MELAMED:

21         Q.      Do you recall whether they were

22   targeted towards pharmacies?

23                 MS. MAHONEY:  Objection.

24                 THE WITNESS:  Possibly, but I

Highly Confidential - Subject to Further Confidentiality Review

1          don't recall.

2   BY MR. MELAMED:

3          Q.    Do you recall whether they were

4   targeted towards distributors?

5                    MS. MAHONEY:  Objection.

6                    MS. ZOLNER:  Objection.

7                    THE WITNESS:  Possibly.

8   BY MR. MELAMED:

9          Q.    By "they" in those questions, you

10  understand I'm talking about ads, correct?

11         A.    Yeah.

12         Q.    Okay.  Do you recall whether they

13  were targeted towards doctors?

14                   MS. ZOLNER:  Objection.

15                   MS. MAHONEY:  Objection.

16                   THE WITNESS:  I don't remember

17         them going to doctors.  It is possible.

18  BY MR. MELAMED:

19         Q.    Do you recall whether they were

20  placed in publications likely to be read by

21  patients?

22                   MS. ZOLNER:  Objection.

23                   THE WITNESS:  That's highly

24         unlikely.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MELAMED:  Let's go off the

 2           record.

 3                    THE VIDEOGRAPHER:  The time is

 4           12:19 p.m.  We're going off the record.

 5                    (Luncheon recess.)

 6                    THE VIDEOGRAPHER:  The time is

 7           1:07 p.m., and we're back on the record.

 8    BY MR. MELAMED:

 9           Q.     Welcome back.  Just looking to

10    see if the doors were closed.

11           A.     Thank you.

12           Q.     Can you pull back out Exhibit 9,

13    should be in your pile.  It starts with an

14    e-mail from Rachelle Galant to you.

15                    And we talked about this earlier.

16    Do you recall you testifying that you had

17    received an award for June CY, which was current

18    year or calendar year, 2010?

19           A.     Yes.

20           Q.     Was there a monetary award

21    associated with that?

22           A.     I don't recall.

23           Q.     Do you recall whether you ever

24    received monetary rewards -- let me withdraw
```