PSJ10 Exh 50

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF OHIO

 3                 EASTERN DIVISION

 4                   -  -  -

 5   IN RE: NATIONAL PRESCRIPTION

 6   OPIATE LITIGATION          Case No.

 7                              1:17-MD-2804

 8   APPLIES TO ALL CASES       Hon. Dan A.

 9                              Polster

10   Case No. 1:17-MD-2804

11                   -  -  -

12              January 17, 2019

13      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14            CONFIDENTIALITY REVIEW

15            Videotaped deposition of

16   DOUGLAS BOOTHE, held at 250 Hudson Street,

17   New York, New York, commencing at 9:00 a.m.,

18   on the above date, before Marie Foley, a

19   Registered Merit Reporter, Certified

20   Realtime Reporter and Notary Public.

21                   -  -  -

22          GOLKOW LITIGATION SERVICES, INC.

23       877.370.3377 ph | 917.591.5672 fax

24              Deps@golkow.com
```

```
 1    A P P E A R A N C E S:

 2

 3    ROBBINS GELLER RUDMAN & DOWD LLP

 4    BY: AELISH M. BAIG, ESQUIRE

 5        DOREY ANTULLIS, ESQUIRE

 6        Post-Montgomery Center

 7        One Montgomery Street, Suite 1800

 8        San Francisco, California  94104

 9        415.288.4545

10        aelishb@rgrdlaw.com

11        Representing Plaintiff

12

13

14    MORGAN LEWIS & BOCKIUS, LLP

15    BY: DONNA WELCH, ESQUIRE

16        TINOS DIAMANTATOS, ESQUIRE

17        LIZA B. FLEMING, ESQUIRE

18        77 West Wacker Drive

19        Chicago, Illinois  60601-5094

20        312.324.1145

21        donna.welch@morganlewis.com

22        Representing Rite Aid and the Witness

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S: (Cont.)

 2

 3

 4   FARRELL FRITZ, LLP

 5   BY: MATTHEW D. DONOVAN, ESQUIRE

 6       Grand Central Plaza

 7       622 Third Avenue, Suite 37200

 8       New York New York  10017

 9       646.237.1803

10       mdonovan@farrellfritz.com

11       Representing Cardinal Health

12

13

14   COVINGTON & BURLING, LLP

15   BY: CLAYTON L. BAILEY, ESQUIRE

16       One CityCenter

17       850 Tenth Street NW

18       Washington, DC  20001

19       202.662.6000

20       cbailey@cov.com

21       Representing McKesson

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S: (Cont.)

 2

 3   JONES DAY

 4   BY: SARAH G. CONWAY, ESQUIRE

 5       555 South Flower Street

 6       Fiftieth Floor

 7       Los Angeles, California  90071

 8       213.489.3939

 9       sgconway@jonesday.com

10       Representing Walmart

11

12

13   KIRKLAND & ELLIS LLP

14   BY: ZACHARY A. CIULLO, ESQUIRE

15       300 North LaSalle

16       Chicago, Illinois  60654

17       312.862.2000

18       zac.ciullo@kirkland.com

19       Representing Allergan Finance

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A P P E A R A N C E S: (Cont.)

 2

 3   ULMER BERNE LLP

 4   BY: PAUL J. COSGROVE, ESQUIRE

 5       600 Vine Street

 6       Suite 2800

 7       Cincinnati Ohio  45202-2409

 8       513.698.5000

 9       pcosgrove@ulmer.com

10       Representing Amneal Pharmaceuticals

11

12

13   APPEARANCES VIA TELEPHONE AND STREAMING:

14

15   ARNOLD & PORTER, LLP

16   BY: WREDE SMITH, ESQUIRE

17       601 Massachusetts Avenue, NW

18       Washington, DC  20001

19       202-942-5000

20       Wrede.Smith@arnoldporter.com

21       Representing Par and Endo

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAMING:

 2    (Continued)

 3

 4    JACKSON KELLY PLLC

 5    BY: JON L. ANDERSON, ESQUIRE

 6         500 Lee Street East

 7         Suite 1600

 8         Charleston West Virginia   25301-2302

 9         304.340.1000

10         jlanderson@jacksonkelly.com

11         Representing AmerisourceBergen

12

13

14    ROPES & GRAY

15    BY: GREGORY F. MALLOY, ESQUIRE

16         Prudential Tower

17         800 Boylston Street

18         Boston, Massachusetts   02199

19         617.951.7000

20         gregory.malloy@ropesgray.com

21

22    ALSO PRESENT:

23         Tyler Crotty, videographer

24         Jeff Sayres, trial tech
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        foundation.

 2   A.    Not that I'm aware of.

 3        (Pause.)

 4   Q.    Do you recall that Kadian sales

 5   reps were used to market oxymorphone ER at

 6   all?

 7        MS. WELCH:  Objection to form.

 8   A.    Oxymorphone ER, I believe there

 9   was a period of time when we asked the

10   Kadian sales team to send a message, or to

11   deliver a message of availability that

12   that product was still available.  I don't

13   think that would be -- in my world,

14   constitute as marketing or promotion.  It

15   was a availability reminder.

16        We had a situation where the

17   brand company, which was Endo, had removed

18   the -- certain strengths of their branded

19   oxycodone ER.  They had multiple other

20   strengths.  And we were the only generic

21   selling, or one of a few generics selling

22   those other strengths.  We wanted to make

23   certain that the physician community was

24   made aware that that approved available
```

Highly Confidential - Subject to Further Confidentiality Review

1    generic drug was still available for

2    medically necessary patients, because the

3    Endo team was out.  They had discontinued

4    and said it was no longer available.

5        Q.    And you were doing that so as to

6    maximize the company's results, correct?

7            MS. WELCH:  Objection to form.

8        A.    We were doing that to let

9    physicians know that that product was

10   still available because others were saying

11   that it had been discontinued, it was no

12   longer available.

13           And, again, it was an

14   FDA-approved medicine for medical

15   necessity.

16       Q.    And, was the sales team -- did

17   the sales team receive compensation that

18   was tied to increasing scripts for

19   oxymorphone ER?

20           MS. WELCH:  Objection to form;

21       foundation.

22       A.    Not that I'm aware of.

23           It was, again, it was a reminder

24   as part of visiting a physician's office

1    with a primary focus on Kadian.  Then it

2    was a reminder of -- there may have been a

3    leave-behind, I don't know, to say the

4    product was still available.

5            MS. BAIG:  Let's have the next

6        document marked as Exhibit 14.

7            It's Bates stamped

8        ACTAVIS0506794 through '814.  It

9        starts as an email from you to Michael

10       Perfetto dated July 15th, 2011.  The

11       subject is "Sales rep training

12       material draft."

13           (Boothe Exhibit 14, email chain

14       ending July 15, 2011, with attachment,

15       Bates No. ACTAVIS0506794 to 0506814,

16       was marked for identification, as of

17       this date.)

18           THE WITNESS:  (Perusing document.)

19           Okay.  Yeah.

20   BY MS. BAIG:

21       Q.   If you look at the fifth page

22   in, you see an email from Jinping

23   McCormick to Nathalie Leitch and Terrence

24   Fullem.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You don't recall whether it

 2    happened or not?

 3        A.    I don't have any specific

 4    recollection, but --

 5        Q.    And, do you see on the second

 6    page of the entire document at the very

 7    bottom it says:  Nathalie suggested a

 8    regional TEAL contest.

 9        A.    Where is that?

10        Q.    At the very bottom of the second

11    page.

12        A.    Okay.  Yep.

13        Q.    And it goes on to state:  There

14    are four teams.

15              Do you see that?

16        A.    Yes.

17        Q.    Does that -- does that give you

18    any indication as to which teams are being

19    involved in this promotion of oxymorphone?

20              MR. DIAMANTATOS:  Objection to

21        form --

22              MS. WELCH:  Objection to form.

23              MR. DIAMANTATOS:  -- foundation;

24        assumes facts.
```

```
 1      A.    Yeah, I mean, I read this and

 2   this here are all ideas being generated.

 3   Look at the first chart, you see:  Meeting

 4   is with the 25th.  The piece will need to

 5   send through regulatory and legal for

 6   review and approval.

 7           So, the extent to which we did

 8   or didn't ever do this was subject, again,

 9   to regulatory and compliance approval as

10   well.  We may have done it.  We may not

11   have done it.  I don't specifically

12   remember.

13      Q.    So, if you go back to the top of

14   page 2 in the email from Michael Perfetto,

15   do you see where he states:  Fine.  I

16   don't want to think -- I don't want to

17   overthink this.  I approve.  Just do it.

18           Does that suggest to you that

19   this was put into place?

20      A.    No.

21      Q.    And, do you see at the beginning

22   of the very first page in your email to

23   Michael Perfetto it says:  FYI only, but I

24   think it's good.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Does that suggest to you that it

 2      was put into place?

 3         A.    That's not from me.  That's from

 4      Mike to me.

 5         Q.    Yes.

 6              Does that suggest to you that

 7      this program was put into place?

 8         A.    It may have been.  It may not

 9      have been.

10              I -- if you had the agenda from

11      that sales meeting, maybe we could both

12      know the truth.

13         Q.    So you don't recall one way or

14      another whether the Kadian sales force was

15      tasked with promoting oxymorphone ER?

16              MS. WELCH:  Objection to form;

17         misstates testimony.

18         A.    I mean, as I said earlier,

19      there -- I do have a recollection at some

20      point we -- we leveraged or utilized the

21      Kadian sales team to provide information

22      that it was available, our FDA-approved

23      first-in-market generic for these

24      strengths because the Endo product had --
```

Highly Confidential - Subject to Further Confidentiality Review

1    Endo discontinued those two strengths.  So

2    if there's no -- physicians aren't aware

3    that the strengths are available, they

4    won't write the script, and therefore

5    there will be no prescriptions coming to

6    the generic side of the business.

7         Q.    And a little further down on the

8    first page, do you see from Jinping

9    McCormick to Perfetto and others it

10   states:  Attached please find a draft

11   oxymorphone training material for sales

12   reps?

13        A.    Yeah.

14        Q.    And, if you flip through three

15   or four pages, do you see an attachment

16   that appears to be a Power Point entitled

17   "Introduction of Oxymorphone Hydrochloride

18   Extended Release Tablets CII Sales

19   Training Class"?

20        A.    Again, if this is connected with

21   that email, I think it's clearly says this

22   is a draft.  We'll need to go through

23   regulatory and legal for review and

24   approval.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Again, none of the generic products would

 2    be detailed to physicians with, you know,

 3    some exception.  This may have been a

 4    limited exception.  But generally, the

 5    generic products are not -- there's no

 6    activity calling on physicians.  It's

 7    purely a key account sale to the major

 8    chains or wholesalers and then reminder

 9    notices or communications to pharmacists.

10       Q.    Did Actavis also use pricing and

11    incentive programs to try to maximize

12    sales?

13       A.    Pricing and incentives programs

14    with whom?

15       Q.    With its key clients.

16             MS. WELCH:  Objection to form.

17       A.    What do you mean by key clients?

18       Q.    Well, do you have an

19    understanding of who some of the key

20    clients were, let's say, in the generics

21    division?

22             MS. WELCH:  Objection to form.

23       A.    So, our customers in the generic

24    division, people who bought our
```

```
 1    FDA-approved generics, would be either the

 2    large direct chains, like a CVS, a

 3    Walgreens, a Rite Aid, a large wholesaler

 4    like a McKesson, a Cardinal,

 5    AmerisourceBergen, mail orders, Express

 6    Scripts, Medco, things like that, those

 7    are our customers.  And yes, there would

 8    be -- we would put programs in place

 9    potentially to incentivize them through

10    additional rebates to take a bigger basket

11    of our available offerings.  You know, at

12    any given time, we may have had 200, 250

13    or 300 SKUs available, and at a given

14    time, we may have 50 of those or 60 of

15    those or a hundred of those on contract at

16    those different accounts.

17            So, part of, you know, Mike and

18    the team's opportunity and challenge was

19    to maybe get additional distribution on

20    our FDA-approved generic products and

21    somehow or potentially, like you said,

22    incentive programs and such would be an

23    incentive providing an additional discount

24    to our customers to take more of our
```

Highly Confidential - Subject to Further Confidentiality Review

1    products.

2         Q.    And those were typically

3    reflected in the customer agreements.

4              Is that right?

5         A.    Yes.  There would be customer

6    contracts and then basically you contract

7    on a product-by-product basis and those

8    individual products would have the key

9    terms and conditions.  And there may be

10   quarter end rebates or annual rebates

11   based on volume incentive tiers, so that

12   would be tracked throughout the course of

13   the year.  Our finance organization would

14   track those.  They would accrue

15   potentially for them if they were reached,

16   and then we would make those payments 30

17   or 90 days after the time period had

18   elapsed if the -- if the account achieved

19   the threshold.

20        Q.    Did Actavis attend certain trade

21   shows to promote its drugs?

22             MR. DIAMANTATOS:  Objection to

23        form.

24             MS. WELCH:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Could you be specific?  What do
 2   you mean by trade shows and promote its
 3   product?
 4        Q.    Well, by promote its product, I
 5   mean maximize sales.
 6              By trade shows, my question is
 7   to you.
 8              Do you know whether Actavis
 9   participated in certain trade shows, or
10   that the marketing and sales departments
11   participated in certain trade shows?
12              MS. WELCH:  Objection to form.
13        A.    Yes, the generic sales team did
14   attend trade shows, customer events.  Yes.
15        Q.    What types of trade shows?
16              MS. WELCH:  Objection to form.
17        A.    There were multiple organization
18   who would organize they would call them
19   vendor events.  They would call them
20   technical exchanges.  One was the NACDS,
21   which is the National Association of Chain
22   Drug Stores.  They would have two events,
23   one in the spring, which was the annual
24   meeting; one in the fall, or late summer,
```

```
 1     Support Advertising."

 2             Do you see that?

 3     A.      Yes.

 4     Q.      And there's one that has a tree

 5     on it.

 6             Do you see that?

 7             MS. WELCH:  Which Bates number?

 8             MS. BAIG:  It ends in '577.

 9     A.      Is that what that thing is to

10     the right?  That thing?

11     Q.      Well, I could tell you --

12             MS. WELCH:  It's a different

13     number, '577.

14     A.      This page.

15     Q.      Ending '577.

16     A.      Sorry.  Yeah.

17     Q.      Was this what was referred to

18     internally as your tree ad?

19     A.      I don't know.

20             Was there an internal ad --

21     thing called tree ad?

22     Q.      I can just tell you that Jinping

23     told me about a tree ad, but I didn't have

24     a picture of it.  But now I'm looking at
```

Highly Confidential - Subject to Further Confidentiality Review

1    this and I'm wondering if this is the tree

2    ad.

3         A.    It's got a tree in it.

4         Q.    Did you ever contract with your

5    distributor customers for marketing

6    services?

7               MS. WELCH:  Objection to form.

8         A.    I think the answer is yes, but

9    I'd be happy to comment to a document.

10        Q.    Do you recall entering into

11   negotiations with big distributors like

12   McKesson such that you would pay marketing

13   fees to them?

14              MS. WELCH:  Objection to form.

15        A.    I think it's the other way

16   around.  I mean, the way the McKesson

17   contracts were is they charged you

18   marketing fees for the privilege of

19   selling product to them.

20        Q.    They were charging Actavis

21   marketing fees?

22        A.    Mm-hm.

23        Q.    So you would pay marketing fees

24   to --

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Right, but it wasn't like we

 2    negotiated.  We didn't really get much

 3    marketing.  They -- that was part of

 4    their -- McKesson if it was Progen

 5    generics in their fee structure, they

 6    charged you for marketing fees, they

 7    charged you for data fees, they charged

 8    you for warehousing fees.  That was all

 9    part of the program.  And that was pretty

10    typical for the large wholesalers.

11             On occasion we would contract,

12    for example, to utilize their network of

13    pharmacists as part of their awareness ads

14    for new product launches, we would pay

15    them so they could, through their network,

16    share our information.  That was when you

17    asked the first question about did I

18    contract for services, that's what I was

19    referring to, is my understanding.

20             MS. BAIG:  Let's have this

21        document marked as Exhibit 16.

22             It's Bates stamped

23        ACTAVIS0811957 through '959.  It's an

24        email from you to Mike Perfetto on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        October 12th, 2011.

 2              MS. WELCH:  Where are you?

 3              THE WITNESS:  What's that?

 4              MS. BAIG:  I was just stating

 5        what it is.

 6              THE WITNESS:  That's not the one

 7        I have.

 8              MS. WELCH:  That's not the one I

 9        have either.

10              (Pause.)

11              MS. WELCH:  This has a 1969

12        bottom Bates number.

13              MS. BAIG:  No, I think you've

14        got the wrong one.

15              THE WITNESS:  Here you go

16        (handing.)

17              MS. BAIG:  Thank you.

18              (Pause.)

19              MR. DIAMANTATOS:  I wrote

20        Exhibit 16 on my copy, counsel.  In

21        case you want to switch it out with an

22        exhibit sticker.

23              MS. BAIG:  Okay.

24              MS. WELCH:  So did I.
```

1    again, these regional wholesalers, they

2    have pharmacies who buy off of their

3    program.  So, to the extent of which we

4    got a product award of Morris Dixon,

5    Morris Dixon may send a notice to its

6    pharmacies with here's the Actavis

7    product, it's available.  Here's the

8    transfer price.  That's the information

9    that they would provide to their

10   pharmacies.  If that constitutes marketing

11   on behalf of Actavis, that answer would be

12   yes, but that's not something that Actavis

13   would have done or paid for.

14       Q.   But you would have marketing --

15   so, how is that different from the

16   marketing agreements we talked about just

17   a few moments ago if you had -- where

18   you're paying a marketing fee to somebody

19   like McKesson?

20       A.   So, again, McKesson, one of the

21   largest big three wholesalers.  Again,

22   quite frankly, they set the terms.  So, in

23   their contract, they charged us fees.

24   Cardinal would do the same thing, a

```
 1   percentage of WAC, percentage of AWP.  It

 2   was sort of in their contract for the

 3   privilege of doing business with them.

 4             Some of these smaller accounts

 5   are much smaller.  They didn't have the

 6   ability to push their fees on to the

 7   suppliers.  But if we wanted to

 8   potentially communicate product

 9   availability or when we got a product

10   award to the one of these accounts and we

11   wanted to communicate to their members or

12   their affiliates, we may have paid a -- a

13   fee.  It could have been $5,000 or some

14   number.  I don't know specifically.  But

15   that's my recollection of how it worked

16   with the smaller accounts versus the

17   larger accounts.

18       Q.    I'm not talking about fees in

19   general though.  I'm talking about

20   something called marketing fees.

21             Are you familiar with paying

22   marketing fees to someone like McKesson?

23             MR. BAILEY:  Objection to form.

24       A.    Again, that's what I described.
```

```
 1      Q.    Okay.

 2      A.    So, in the contract, they

 3   charged a marketing fee as a percentage of

 4   the total business.  So if we're doing $10

 5   million with them, they charge you one

 6   percent, you're paying a hundred thousand

 7   dollars for marketing fees.  You know, we

 8   didn't really have a choice.  It's like a

 9   franchise fee at like McDonald's or

10   something.

11      Q.    So they didn't charge additional

12   marketing fees for doing things like

13   telephone campaigns or things like that?

14      A.    Yes, we did.  If we opted --

15            MR. BAILEY:  Objection.

16      A.    Yes.  If we engaged with -- to

17   get access to their accounts that were on

18   their programs, we would pay additional

19   fees, and they call them marketing fees.

20      Q.    Okay.

21            MS. BAIG:  Let's have this

22        document marked as Allergan -- as

23        Exhibit Number 16, and this is Bates

24        stamped ACTAVIS0851197 through '11960.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Boothe Exhibit 16, email chain

 2           ending October 12, 2011, Bates No.

 3           ACTAVIS0811957 to 0811960, was marked

 4           for identification, as of this date.)

 5   BY MS. BAIG:

 6           Q.    It's an email from you to Mike

 7   Perfetto dated October 12th, 2011, or it

 8   starts that way.

 9           A.    (Perusing document.)

10           Q.    Do you see on the last page at

11   the top there's a reference to "a new

12   sales slick out by week's end" and then it

13   says "Costco add"?

14           A.    Yeah.

15           Q.    What's your understanding of

16   what a sales slick is?

17           A.    I'm not sure.

18           Q.    And, was Costco a place where --

19   where there were direct ads?

20                    MS. WELCH:  Objection;

21           foundation; form.

22           A.    Costco was one of our customers.

23   They would -- they would purchase -- they

24   had a generic formulary.  So yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    So, if you entered into a

 2    contract with one of your customers, like

 3    McKesson, to do telemarketing of one of

 4    your products, would you personally have

 5    reviewed the scripts that they were using

 6    as --

 7        A.    No.

 8        Q.    -- part of that telemarketing?

 9        A.    Me personally, no.

10        Q.    Okay.  Would your marketing

11    department have reviewed those scripts, if

12    you know?

13            MS. WELCH:  Objection;

14        foundation.

15        A.    I don't know.  Possibly, but I'm

16    not sure.

17        Q.    Can you identify all the

18    organizations that Actavis would have used

19    to market or promote its drugs, that you

20    can think of right now?

21            MR. DIAMANTATOS:  Objection to

22        form.

23            MS. WELCH:  Objection to form.

24            MR. DIAMANTATOS:  Time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Can you repeat the question,

 2    please?

 3       Q.    Can you identify all the

 4    organizations that Actavis would have used

 5    to market or promote its drugs, that you

 6    can think of right now, its opioid drugs?

 7            MS. WELCH:  Objection to form.

 8       A.    The -- the -- sorry.  One more

 9    time.

10            Just the firms that --

11       Q.    The organizations that Actavis

12    would have used, perhaps contracted with,

13    to do marketing for its opioids.

14            MR. DIAMANTATOS:  Objection.

15            MS. WELCH:  Same objection.

16       A.    Again, we didn't market our

17    generic products.  I think these questions

18    are all about when we would enter into a

19    contract for distribution of our

20    FDA-approved medicines with DEA and

21    FDA-approved supply -- distributors, such

22    as McKesson, there would be a contract

23    price that determined the transfer price.

24    We may have also then contracted for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    marketing services that McKesson -- we pay

 2    McKesson for them to communicate to its

 3    member affiliate companies that our

 4    product was available.

 5       Q.    And that would have come out of

 6    your --

 7       A.    And that's --

 8       Q.    Sorry.  Go ahead.

 9       A.    No.  If that's what you mean by

10    marketing, that would be yes.

11            So, if you look at all the

12    available licensed DEA-approved

13    distributors and wholesalers, Cardinal,

14    McKesson, AmerisourceBergen, there's many,

15    many smaller ones, direct chains like

16    Wal-Mart, Walgreens, Rite Aid, CVS,

17    Express Scripts, Medco, those are the

18    firms that we contracted with for

19    distribution of our FDA-approved

20    medicines.

21       Q.    But I'm not asking specifically

22    about distribution.  I'm asking more about

23    marketing.

24            So, I've seen, for example,
```

1    marketing agreements that you had with

2    McKesson.  They're separate.  They're

3    separate or they might be a component of

4    the overall agreement with McKesson, but

5    it's specific to marketing.

6            I'm just wondering what other

7    types of organizations, apart from perhaps

8    big distributors, you engaged to help with

9    promotion or marketing.  We've talked

10   already about, on the brand name side,

11   we've talked about inVentiv.

12           Are there any others that you

13   can think of as you sit here right now?

14           MS. WELCH:  Objection to form.

15           MR. DIAMANTATOS:  Objection to

16       form.

17       A.   It would certainly be helpful if

18   you provide me a document, something to

19   review.

20       Q.   Sure.

21           I'm just asking for your best

22   recollection right now as to --

23       A.   And my best recollection --

24       Q.   You can't think of any?

Highly Confidential - Subject to Further Confidentiality Review

```
 1    system, that would be identified as a --

 2    an order to investigate, not a fraudulent

 3    order, just a -- and then with that, we

 4    would go back to the customer service team

 5    and/or the commercial rep would call the

 6    purchaser at that and say, you know, why

 7    did you order 1500.  A place like

 8    AmerisourceBergen, which by the way, I

 9    think they had 62 distribution centers at

10    one point.  So they were also managing

11    their inventory within the dist -- so,

12    once we shipped it to AmerisourceBergen in

13    the past, one of their locations, if they

14    opted to move it from one of their

15    locations to one of the other locations in

16    their network and then because of that it

17    triggered a reply order from when they

18    moved it from one to there and the

19    distribution center back to us, we didn't

20    have that information.  So when that order

21    came in, if it potentially raised a

22    signal, then we would go and investigate

23    it and if that's what the rationale, that

24    was the basis for the customer describing
```

```
 1    why they moved product around, why they

 2    needed to order it back for our -- for

 3    their distribution center and we believe

 4    that that was appropriate, we would have

 5    then released the order.

 6        Q.    And, what if you got a rationale

 7    that you did not believe it was

 8    appropriate, did you halt shipment?

 9            MR. DIAMANTATOS:  Objection to

10        form.

11        A.    Yeah, we would not -- we would

12    halt shipment.  We would not accept the

13    order.

14            And many times we would get

15    orders in, and based on the information,

16    we would say there's no justification for

17    ordering 10,000 bottles.  Your model --

18    our say 1500, 2,000.  We would then adjust

19    the order.  They would submit a new DEA

20    222 form, and if the order was within that

21    threshold, we would accept it and we would

22    ship it.  And I believe that that happened

23    frequently.

24        Q.    And, to the extent that that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    happened, that would be saved in the

 2    files.

 3             Is that right?

 4             MS. WELCH:  Objection to form;

 5       foundation.

 6       A.    The files.

 7       Q.    There was a record that was kept

 8    of orders that was -- that were flagged as

 9    being of interest or suspicious, and the

10    justifications received or not received

11    and whether they were shipped or not

12    shipped.

13             Is that right?

14             MS. WELCH:  Objection to form;

15       foundation.

16       A.    That would be my understanding,

17    some sort of, yes, some sort of record

18    because, again, from a compliance

19    perspective, we operate also under a DEA

20    license, and the DEA had the right and the

21    authority to come in to inspect and

22    validate, which they did, you know, on a

23    frequent basis.  So that would likely be

24    something that they would want to monitor
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        that's hundreds of pages, so.

 2             MS. BAIG:  I'm talking about the

 3        letter.

 4             This document was produced

 5        together by Actavis.

 6        A.   So, in answer to your question,

 7   do I remember receiving a warning letter,

 8   I'm looking at the fax machine.

 9             If I didn't -- I mean, it came

10   to my attention, my address.  So, yes, I

11   received it.  I reviewed it.

12        Q.   And, in response to this letter,

13   were there changes that were made with

14   respect to the Kadian promotional

15   materials?

16             MS. WELCH:  Objection to form.

17        A.   Yes.

18        Q.   And some of those we talked

19   about earlier, correct?

20             MS. WELCH:  Objection to form.

21        A.   Could you be more specific?

22        Q.   Did you serve on a generic

23   manufacturers advisory board?

24        A.   No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    You never did?

2        A.    Are you referring to the GPHA?

3        Q.    Were you on a -- did you serve

4   on the board of GPHA?

5        A.    Yes.

6        Q.    What does GPHA stand for again?

7        A.    Generic Pharmaceutical

8   Manufacturing Association.

9        Q.    Yes, that's right.

10             How long did you serve on that

11  board?

12       A.    2006 til 2014 or '15 with maybe

13  some breaks in between subject to my

14  employment at certain places.

15       Q.    Okay.

16       A.    That's not an advisory board

17  though.

18       Q.    What is the GPHA?

19       A.    It's the -- it's the lobbying

20  association for generic manufacturers.

21  It's an organization based in Washington,

22  D.C. that generic companies have the

23  option to be members of, and then the GPHA

24  advocates on behalf of generic
```

```
 1    manufacturers both federally and at state

 2    level on issues that are pertinent to

 3    generic manufacturers.  It's the generic

 4    equivalent of what everybody's more

 5    familiar with called PhRMA, which is the

 6    branded pharmaceutical lobbying advocacy

 7    organization.

 8        Q.    And, did you serve on the PhRMA

 9    board as well?

10        A.    No.  We were never members of

11    PhRMA.

12        Q.    Okay.  And, what about NACDS?

13        A.    No.

14        Q.    Did you attend NACDS meetings?

15        A.    Yes.

16        Q.    And, with respect to the

17    lobbying, GPHA, do you recall working on

18    any lobbying that would have impacted

19    opioids?

20            MR. DIAMANTATOS:  Objection to

21      form; foundation; assumes facts.

22            MS. WELCH:  Objection to form.

23        A.    No.

24            And, again, I'm not a
```