PSJ10 Exh 53

```
 1          THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      - - -
 5
    IN RE:  NATIONAL           :   HON. DAN A.
 6  PRESCRIPTION OPIATE        :   POLSTER
    LITIGATION                 :
 7                             :
    APPLIES TO ALL CASES       :   NO.
 8                             :   1:17-MD-2804
                               :
 9
              - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      - - -
12
                 January 9, 2019
13
                      - - -
14
15          Videotaped deposition of
    JINPING McCORMICK, taken pursuant to
16  notice, was held at the offices of
    Kessler Topaz Meltzer & Check, 280 King
17  of Prussia Road, Radnor, Pennsylvania,
    beginning at 9:13 a.m., on the above
18  date, before Michelle L. Gray, a
    Registered Professional Reporter,
19  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
20
                      - - -
21
22       GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

```
 1    APPEARANCES:
 2
      ROBBINS GELLER RUDMAN & DOWD, LLP
 3    BY:  AELISH M. BAIG, ESQ.
      Post-Montgomery Center
 4    One Montgomery Street, Suite 1800
      San Francisco, California 94104
 5    (415) 288-4545
      aelishb@rgrdlaw.com
 6
              - and -
 7
      ROBBINS GELLER RUDMAN & DOWD, LLP
 8    BY: CARISSA J. DOLAN, ESQ.
      655 West Broadway, Suite 1900
 9    San Diego, California 92101
      (619) 231-1058
10    cdolan@rgrdlaw.com
      Representing the Plaintiffs
11
12    GERMANO LAW, LLC
      BY:  JUDITH H. GERMANO, ESQ.
13    460 Bloomfield Avenue, Suite 200
      Montclair, New Jersey 07042
14    (201) 247-7970
      jgermano@germanolaw.com
15    Representing the Witness
16
      MORGAN LEWIS & BOCKIUS, LLP
17    BY:  JONATHAN E. MAIER, ESQ.
      1111 Pennsylvania Avenue, NW
18    Washington, DC 20004
      (202) 739-5806
19    Jonathan.maier@morganlewis.com
      Representing the Defendant, Teva
20    Pharmaceuticals
21
22
23
24
```

```
 1   APPEARANCES:  (Cont'd.)
 2
 3   KIRKLAND & ELLIS, LLP
     BY:  TIMOTHY W. KNAPP, ESQ.
 4   300 North LaSalle Street
     Chicago, Illinois 60654
 5   (312) 862-2595
     Timothy.knapp@kirkland.com
 6
             - and -
 7
     KIRKLAND & ELLIS, LLP
 8   BY:  CATIE VENTURA, ESQ.
     655 15th Street, NW
 9   Washington, D.C. 20005
     (202) 879-5907
10   catie.ventura@kirkland.com
     Representing the Defendant, Allergan
11   Finance
12
     JONES DAY
13   BY:  SARAH G. CONWAY, ESQ.
     555 South Flower Street,
14   50th Floor
     Los Angeles, California 90071
15   (213) 489-3939
     Sgconway@jonesday.com
16   Representing the Defendant, Walmart
17
     COVINGTON & BURLING, LLP
18   BY:  CLAYTON BAILEY, ESQ.
     850 Tenth Street, NW
19   Suite 586N
     Washington, D.C.  20001
20   (202) 662-5769
     Cbailey@cov.com
21   Representing the Defendant, McKesson
     Corporation
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC APPEARANCES:
 2
 3   ALLEGAERT, BERGER & VOGEL, LLP
     BY:  LAUREN J. PINCUS, ESQ.
 4   BY:  DAVID A. SHAIMAN, ESQ.
     111 Broadway, 20th Floor
 5   New York, New York 10006
     (212) 616-7060
 6   lpincus@abv.com
     dshaiman@abv.com
 7   Representing the Defendant, Rochester
     Drug Co-Op
 8
 9   BAKER HOSTETLER, LLP
     BY:  MELISSA D. BERTKE, ESQ.
10   127 Public Square, Suite 2000
     Cleveland, Ohio 44114
11   (216) 861-7309
     mbertke@bakerlaw.com
12   Representing the Defendants, Endo Health
     Solutions; Endo Pharmaceuticals, Inc.;
13   Par Pharmaceutical Companies, Inc. f/k/a
     Par Pharmaceutical Holdings, Inc.
14
15   REED SMITH LLP
     BY:  SHANA E. RUSSO, ESQ.
16   Princeton Forrestal Village
     136 Main Street, Suite 250
17   Princeton, New Jersey 08540
     (609) 987-0050
18   srusso@reedsmith.com
     Representing the Defendant,
19   AmerisourceBergen Drug Corporation
20
     ALSO PRESENT:
21
     VIDEO TECHNICIAN:
22   Dan Lawlor
23   LITIGATION TECHNICIAN
     Zach Hone
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Like a chargeback?
 2        A.    No.
 3        Q.    Something different?
 4        A.    It's, just from logistic
 5   point of view, you could also give
 6   them -- just give them credit, for
 7   example.
 8        Q.    And what would that be
 9   called if it was given as credit?  Is it
10   called a coupon or a rebate or a
11   chargeback, or what it's called?
12        A.    It wouldn't be called a
13   coupon.  It wouldn't be called a
14   chargeback.  It would either be off
15   invoice or a credit.
16        Q.    Okay.  And do you see a
17   little further down, there's an e-mail
18   from Ara to you and Mike Perfetto and it
19   says, "Think we are on the same page.
20   Like the limited focus of calls to only
21   those stores that have purchased brand in
22   the past nine months (or do we refine to
23   six months?)  Let's ratchet it down with
24   what we pay them to make the calls and
```

Highly Confidential - Subject to Further Confidentiality Review

1   potentially give them an opportunity to
2   earn five times or six times the number
3   (25K to 30K) based on providing proof of
4   store stocking in a period of 30 days.
5   With the 25K to 30K, we should get some
6   to the retailer to incentivize them to
7   order and fast."
8           Do you see that?
9       A.  Yes.
10      Q.  Okay.  Is this -- first of
11  all, what is the -- what are the calls
12  that he's talking about, "We pay them to
13  make the calls"?
14      A.  So McKesson, that was --
15  what's Ara is referring to is to have
16  McKesson call the pharmacies to stock the
17  product to get it started, because the
18  brand had initially discontinued the
19  product and the pharmacies may not be
20  aware that a generic product equivalent
21  to the brand Opana is avail -- was
22  available at that time.
23      Q.  So you're paying McKesson to
24  call the pharmacies regarding the

```
 1   product; is that right?
 2              MR. BAILEY:  Object to form.
 3              THE WITNESS:  It's for the
 4       stocking the store.
 5   BY MS. BAIG:
 6       Q.    And it says here, "And
 7   potentially give them an opportunity to
 8   earn five times or six times the number."
 9   What does that mean?  Who's earning five
10   times or six times the number?
11       A.    I wouldn't know what he
12   meant.  I would think it's McKesson.
13       Q.    So McKesson has the
14   opportunity to earn money if they make
15   these calls?
16              MR. BAILEY:  Object to form.
17   BY MS. BAIG:
18       Q.    Is that how you read this?
19       A.    Yes, because for them to
20   sell more product and they have
21   opportunity to make more profit.  I mean,
22   that's their business model.  They're
23   distributors.  They're in the --
24   wholesaler/distributor.
```

1    Q.   And they would then have
2    that opportunity to make more profit
3    based on providing proof of store
4    stocking.  Who do they have to provide
5    proof of store stocking to?  To you?
6        A.   To us, to get the -- say,
7    the $25 credit.
8        Q.   I see.  "With the 25 to
9    30,000 we should get some of the retailer
10   to incentivize them to order and fast."
11             So the purpose behind this
12   was to drive sales by incentivizing the
13   retailers to order fast; is that right?
14             MR. MAIER:  Object to form.
15             MS. VENTURA:  Objection to
16        form.
17             THE WITNESS:  So oxymorphone
18        is a very low volume product, and
19        the brand discontinued.
20             Actavis was the first
21        generic to launch this product.
22        Therefore, the retailer, meaning
23        the pharmacies, did not know we
24        actually had this generic

```
 1        Q.    Next page.
 2        A.    Oh, I see.  Yes, I saw that.
 3   Mm-hmm.
 4        Q.    Okay.  And do you see he
 5   goes on to state, "I understand that you
 6   are looking to target this to the
 7   approximately 500 accounts with
 8   significant brand purchase history and
 9   have accounted for that in the proposal.
10   Please note, however, that many of our
11   communications vehicles can reach a
12   larger population at no additional
13   charge."
14              Do you see that?
15        A.    Yes, I saw that.
16        Q.    Do you know what
17   communications vehicles he's talking
18   about?
19              MS. GERMANO:  Objection.
20              THE WITNESS:  I would think
21        that's referring to the phone, the
22        fax, and the store -- and the
23        mailer.
24   BY MS. BAIG:
```

```
 1          Q.    Okay.  And on the next page,
 2   do you see an e-mail from Ara Aprahamian?
 3          A.    Okay.
 4          Q.    What was his position again?
 5          A.    Ara?
 6          Q.    Mm-hmm.
 7          A.    He was the director of
 8   pricing and contract.
 9          Q.    And do you see that he's
10   reached -- he's reaching out to Amber
11   Kehoe at McKesson stating, "As you know,
12   we have recently launched oxymorphone ER
13   7.5 milligrams and 15 milligrams,
14   (attached launch notice), and need your
15   assistance with the following:  One, run
16   a query of brand Opana ER 7.5 milligrams
17   and 15-milligram sales within McKesson
18   for the past nine months to identify high
19   purchasing pharmacies."
20                Do you see that?
21          A.    Yes.
22          Q.    So you're relying on
23   McKesson to identify the high purchasing
24   pharmacies that you can then target for
```

```
 1    generics marketing; is that right?
 2               MR. BAILEY:  Objection to
 3        form.
 4               MR. MAIER:  Objection to
 5        form.
 6               THE WITNESS:  We're relying
 7        on them to know these pharmacies.
 8    BY MS. BAIG:
 9        Q.    That you can then have them
10    contact about generic oxymorphone,
11    correct?
12        A.    Yes.  Awareness.  As you see
13    John wrote back saying to promote
14    awareness of the recently launched
15    oxymorphone ER tablets.
16        Q.    And he goes on to state --
17    Ara goes on to state, "Coordinate a
18    stocking promotion/offer to those target
19    stores."
20              Do you see that?
21        A.    Yes.
22        Q.    Are there other types of
23    stocking promotion offers that you can
24    recall being used to promote generic
```

```
 1   opioids?
 2              MR. MAIER:  Objection to
 3       form.
 4              THE WITNESS:  See,
 5       oxymorphone was a special case,
 6       because the brand discontinued and
 7       it was a very small volume
 8       product.
 9   BY MS. BAIG:
10       Q.   My question to you is, are
11   there other types of stocking promotion
12   offers that you can recall being used to
13   promote generic opioids?
14              MR. MAIER:  Object to form.
15              THE WITNESS:  I do not
16       remember at this time.
17   BY MS. BAIG:
18       Q.   Okay.  And then he goes on
19   to state, "Item 3, ship product to those
20   target stores, based on receiving
21   pharmacy order inhouse."  And then he
22   goes on to state, "We are promoting
23   awareness direct to physicians on the
24   availability of Actavis generic
```

1  Q. Did you have a general
2 understanding that sales were increasing
3 in a significant amount at that time?
4  MR. MAIER: Objection to
5  form.
6  THE WITNESS: It should be,
7  because July was launching. When
8  you launch, this is four-month,
9  six-month after launch, it should
10  be increasing.
11 BY MS. BAIG:
12  Q. Okay. And you see a little
13 bit further down, it states that "the
14 marketing group is once again utilizing
15 the Kadian sales force to promote
16 oxymorphone to pain doctors, as well as
17 running both direct mail and e-mail
18 promotional programs in January and
19 February."
20  Do you see that?
21  A. Yes.
22  Q. And he states, "Our goal is
23 to continue the growth trend through
24 2012."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Do you see that?
 2         A.    Yes.
 3         Q.    And was it your
 4   understanding that the marketing group
 5   was utilizing the Kadian sales force to
 6   promote oxymorphone to pain doctors?
 7                  MR. MAIER:  Objection to
 8         form.
 9                  THE WITNESS:  Yes.  I was
10         aware to promote.  I think we want
11         to clarify that promote, really
12         just to make it aware of the
13         availability of this product, as
14         those marketing material we had
15         reviewed earlier.
16   BY MS. BAIG:
17         Q.    And that -- and you are also
18   running both direct mail and e-mail
19   promotional programs, correct?
20         A.    Yes.  So all of these
21   programs were just awareness program.  It
22   wasn't promoting the product on any of
23   the benefits or anything.
24         Q.    Did you have an
```

Highly Confidential - Subject to Further Confidentiality Review

1  understanding of the addictive qualities
2  of the product at the time?
3           MR. MAIER:  Objection to
4      form.
5           THE WITNESS:  So product
6      being Schedule II has addictive
7      potential.
8  BY MS. BAIG:
9      Q.    And do you know whether the
10 Kadian sales force was promoting the
11 awareness of the addictive qualities of
12 oxymorphone to pain doctors?
13          MR. MAIER:  Object to form
14     and foundation.
15          MS. VENTURA:  Join in the
16     objection.
17          THE WITNESS:  What we asked
18     Kadian sales force was just
19     awareness campaign to the doctors,
20     so they are aware, so they -- the
21     doctors were aware of the ability
22     of the generic because the --
23     because Opana ER was discontinued.
24 BY MS. BAIG:

1    Q.    Do you remember -- do you
2 know why Opana ER was discontinued?
3    A.    I do not remember why it was
4 discontinued.  At that time, what we knew
5 is was not because of safety reason.
6    Q.    You never heard that Opana
7 ER was discontinued because of safety
8 reasons?
9    A.    It was not -- it was not
10 because of safety reasons.
11    Q.    You know that?
12    A.    That's how we understood at
13 the time.
14    Q.    Have you come to a different
15 understanding since then?
16         MR. MAIER:  Objection to
17      form.
18         MS. VENTURA:  Objection to
19      form.
20         THE WITNESS:  I have not --
21      I have not worked with this
22      product since I left Actavis.
23 BY MS. BAIG:
24    Q.    Okay.  But you still work

```
 1          A.    No, I did not.
 2          Q.    Did you have any interaction
 3    with any of the following organizations,
 4    the American Pain Society?
 5          A.    No, I did not.
 6          Q.    The HDA Research Foundation?
 7          A.    No, I did not.
 8          Q.    Center For Healthcare Supply
 9    Chain Research?
10          A.    No.
11          Q.    National Wholesale Druggists
12    Association?
13          A.    National Wholesale Drug
14    Association, is that the HDA?
15          Q.    The National Wholesale
16    Druggist Association.  So I think it's --
17    I don't know if it's the same.
18          A.    Well --
19          Q.    You've had a -- you've had
20    interaction with HDA, is that what you're
21    saying?
22          A.    HDMA, yeah.
23          Q.    HDMA.
24                How about the American Pain
```

```
 1   Foundation?
 2        A.    I did not.
 3        Q.    American Academy of Pain
 4   Medicine?
 5        A.    No, I did not.
 6        Q.    U.S. Pain Foundation?
 7        A.    No.
 8        Q.    And what was the extent of
 9   your involvement with the HDMA?
10        A.    I attended sometimes the
11   HDMA's annual conference.
12        Q.    Did you ever work with key
13   opinion leaders?
14        A.    No, I did not.
15        Q.    Who worked with the key
16   opinion leaders at Actavis?
17              MR. KNAPP:  Foundation.
18              MS. VENTURA:  Objection to
19        form.
20              THE WITNESS:  I don't know.
21   BY MS. BAIG:
22        Q.    You never heard of Actavis
23   working with key opinion leaders before?
24        A.    I think brand company
```

Highly Confidential - Subject to Further Confidentiality Review

1  typically work with key opinion leaders,
2  but I don't know any specifics about
3  Actavis' involvement with the key opinion
4  leaders.
5      Q.  Okay.  Do you know who any
6  of the key opinion leaders were with
7  respect to opioids?
8      A.  No, I do not.
9      Q.  Okay.
10          MS. BAIG:  I don't have any
11     further questions.  Thank you.
12          THE WITNESS:  Thank you.
13          MR. MAIER:  We'll take a
14     couple minutes and come back.
15     We'll very, very quick.
16          THE VIDEOGRAPHER:  Going off
17     the record.  The time is 5:02.
18          (Short break.)
19          THE VIDEOGRAPHER:  We are
20     going back on record.  Beginning
21     of Media File 10.  The time is
22     5:12.
23                  -  -  -
24              EXAMINATION