PSJ10 Exh 56

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                       - - -
 5   IN RE:  NATIONAL        :  MDL NO. 2804
     PRESCRIPTION OPIATE     :
 6   LITIGATION              :
     -------------------------------------------
 7                           :  CASE NO.
     THIS DOCUMENT           :  1:17-MD-2804
 8   RELATES TO ALL CASES    :
                             :  Hon. Dan A.
 9                           :  Polster
     _____

      SUPREME COURT OF THE STATE OF NEW YORK
11              COUNTY OF NEW YORK
12   IN RE OPIOID            :  Index No. 400000/2017
     LITIGATION              :  Suffolk County
13   _____
            CIRCUIT COURT OF COOK COUNTY
14              COOK COUNTY, ILLINOIS
15   THE PEOPLE OF THE       :  Case No. 2017L 013180
     STATE OF ILLINOIS,      :  Consolidated with
16   AND COOK COUNTY         :  2018L 3908(JERSEY COUNTY)
     ILLINOIS                :  2018L 2943(KANE COUNTY)
17                           :  2018L 2916(MACON COUNTY)
              V.             :  2018L 2948(MCHENRY
18                           :  COUNTY)
                             :  2018L 3728(LAKE COUNTY)
19   PURDUE PHARMA, L.P.     :  2018L 3909(UNION COUNTY)
     ET AL.                  :
20
                       - - -
21             JENNIFER ALTIER
           Thursday, August 2, 2018
22                     - - -
23   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
24
```

```
 1                    - - -
 2              Videotaped deposition of
 3    JENNIFER ALTIER, taken pursuant to
 4    notice, was held at the law offices of
 5    Carella Byrne Cecchi Olstein Brody & Agnello,
 6    PC, 5 Becker Farm Road, Roseland, New Jersey
 7    07068, beginning at 9:05 a.m., on the above
 8    date, before Amanda Dee Maslynsky-Miller, a
 9    Certified Realtime Reporter.
10
11                    - - -
12
13
14
15
              GOLKOW LITIGATION SERVICES
16       877.370.3377 ph| 917.591.5672 fax
                  deps@golkow.com
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
 3         ROBBINS GELLER RUDMAN & DOWD LLP
           BY:  AELISH MARIE BAIG, ESQUIRE
 4         BY:  MATTHEW S. MELAMED, ESQUIRE
           Post Montgomery Center
 5         One Montgomery Street
           Suite 1800
 6         San Francisco, California 94104
           (415) 288-4545
 7         aelishb@rgrdlaw.com
           Mmelamed@rgrdlaw.com
 8         Representing the Plaintiffs
 9
10
           KIRKLAND & ELLIS LLP
11         BY:  MARTIN L. ROTH, ESQUIRE
           BY:  ZACHARY A. CUILLO, ESQUIRE
12         300 North LaSalle
           Chicago, Illinois 60654
13         (312) 862-2000
           martin.roth@kirkland.com
14         Zac.ciullo@kirkland.com
           Representing Allergan Finance, LLC
15
16
17         JONES DAY
           BY: BRANDY HUTTON RANJAN, ESQUIRE
18         325 John H. McConnell Boulevard
           Suite 600
19         Columbus, Ohio 43215
           (614) 469-3939
20         branjan@jonesday.com
           Representing Walmart, Inc.
21
22
23
24
```

```
 1   APPEARANCES:  (Continued)
 2
 3          WILLIAMS & CONNOLLY LLP
            BY:  ANDREW C. MCBRIDE, ESQUIRE
 4          725 Twelfth Street NW
            Washington, D.C. 20005
 5          (202) 434-5000
            amcbride@wc.com
 6          Representing Cardinal Health
 7
 8          ALLEGAERT BERGER & VOGEL
            BY: LAUREN J. PINCUS, ESQUIRE
 9          111 Broadway
            20th Floor
10          New York, New York  10006
            (212) 616-7057
11          lpincus@abv.com
            Representing Rochester Drug Cooperative
12
13   VIA TELECONFERENCE:
14
            REED SMITH LLP
15          BY: ANNE E. ROLLINS, ESQUIRE
            Three Logan Square, 1717 Arch Street
16          Suite 3100
            Philadelphia, Pennsylvania  19103
17          (215) 851-8100
            arollins@reedsmith.com
18          Representing AmerisourceBergen
19
20          MARCUS & SHAPIRA LLP
            BY: ZACHARY FENSTEMAKER, ESQUIRE
21          One Oxford Centre
            35th Floor
22          Pittsburgh, Pennsylvania  15219
            (412) 338-3345
23          Fenstemaker@marcus-shapira.com
            Representing HBC Service Company
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES:  (Continued)
 2
 3           SIMMONS HANLY CONROY LLC
             BY: JAYNE CONROY, ESQUIRE
 4           112 Madison Avenue
             7th Floor
 5           New York, New York  10016
             (212) 784-6400
 6           JConroy@simmonsfirm.com
             Representing Plaintiffs
 7
 8
 9           JACKSON KELLY PLLC
             BY: DOUGLAS J. CROUSE, ESQUIRE
10           500 Lee Street East
             Suite 1600
11           Charleston, West Virginia  25301
             (304) 340-1347
12           dcrouse@jacksonkelly.com
             Representing Miami-Luken
13
14
15
             ARNOLD & PORTER KAYE SCHOLER LLP
16           BY: JOANNA PERSIO, ESQUIRE
             601 Massachusetts Ave, NW
17           Washington, D.C.  20001
             (202) 942-5000
18           joanna.persio@arnoldporter.com
             Representing Endo Pharmaceuticals
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES: (Continued)
 2
 3           MORGAN, LEWIS & BOCKIUS LLP
             BY: TINOS DIAMANTATOS, ESQUIRE
 4           77 West Wacker Drive
             Chicago, Illinois  60601
 5           (312) 324-1000
             tinos.diamantatos@morganlewis.com
 6           Representing Teva Pharmaceuticals, Inc.,
             Cephalon, Inc., Watson Laboratories,
 7           Actavis LLC, and Actavis Pharma, Inc.
 8
 9
10
11   ALSO PRESENT:
     David Lane, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services                                Page: 6

Highly Confidential - Subject to Further Confidentiality Review

```
 1    marketing of generics?
 2         A.    I did not.  Other than when
 3    Kadian went generic.  And I may have
 4    advised on some other generic.
 5               But my responsibilities and
 6    my expertise is in branded marketing.  I
 7    don't have any expertise in generic
 8    marketing.
 9         Q.    But you may have advised, I
10    think you said, on certain generic
11    issues?
12               MR. ROTH:  Object to the
13         form.  Mischaracterizes testimony.
14               THE WITNESS:  No, if I said
15         that, that's not what I meant.
16               I may have been in meetings
17         for generic products, but that was
18         not my area of expertise.
19    BY MS. BAIG:
20         Q.    Were you in meetings for
21    generic opioids?
22               MR. ROTH:  Same objection.
23               THE WITNESS:  Perhaps.
24    BY MS. BAIG:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    You don't recall any?
 2          A.    Not off the top of my head,
 3   no.
 4          Q.    Do you recall being in
 5   meetings or having discussions about
 6   oxymorphone?
 7          A.    I recall that for a short
 8   period of time our sales force may have
 9   helped promote the availability of that.
10          Q.    The Kadian sales force
11   helped promote the availability of
12   oxymorphone?
13          A.    I believe so.
14          Q.    Do you remember being
15   involved with any other generic opioids?
16          A.    Just generic Kadian.
17          Q.    So your understanding is
18   that Nathalie Leitch reported to Terry
19   Fullem?
20          A.    Correct.
21          Q.    And Terry Fullem worked in
22   what department?
23          A.    Sort of headed up commercial
24   operations, if I'm not mistaken.
```

```
 1           Q.    Commercial operations for
 2   Actavis?
 3           A.    Yes, that was the company.
 4   But, again, I don't want to say don't
 5   quote me on his title, but I don't recall
 6   what his title is.
 7           Q.    And Terry Fullem reported to
 8   who?
 9           A.    I believe he reported to
10   Doug Boothe.
11           Q.    And Doug Boothe, do you know
12   what his position was?
13           A.    I believe he was CEO.
14           Q.    And he was the CEO of what
15   company?
16           A.    Actavis.
17           Q.    And who did he report to?
18           A.    I don't know, whoever the
19   chairman of the board was, I guess.
20           Q.    Did you ever work on a drug
21   called Norco?
22           A.    No, not that I recall.
23           Q.    Do you know who did work on
24   the drug called Norco?
```

Highly Confidential - Subject to Further Confidentiality Review

1   Watson terminated them at the end of
2   2012.
3       Q.   Did the sales force report
4   to you?
5       A.   No.
6       Q.   Who did they report to?
7       A.   They were a contract sales
8   force that reported up through inVentiv.
9       Q.   And who at inVentiv oversaw
10  that sales force?
11      A.   I don't know.  I just know
12  the people I worked with.
13      Q.   Who did you work with at
14  inVentiv?
15      A.   The primary contacts, the
16  heads of sales were Mike Shepherd, Mark
17  Killion, and then later on Chris Hepp and
18  Patrick Lanahan.
19      Q.   And what was inVentiv?
20      A.   A contract sales force
21  organization.
22      Q.   So was your entire sales
23  force, were they all inVentiv employees?
24      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And that team was
 2   responsible for marketing Kadian as well
 3   as generic opioids?
 4             MR. ROTH:  Object to the
 5        form.  Lacks foundation.
 6        Mischaracterizes the record.
 7             MS. BAIG:  It's a question.
 8        No speaking objections, counsel.
 9             MR. ROTH:  It's not a
10        speaking objection.
11             MS. BAIG:  It's in the
12        deposition protocol.
13             MR. ROTH:  It's the basis
14        for my objection.
15   BY MS. BAIG:
16        Q.   Did the sales team that we.
17             We're -- that we been
18   talking about, the inVentiv sales team,
19   were they responsible for marketing
20   Kadian and generic opioids?
21             MR. ROTH:  Object to the
22        form.
23             THE WITNESS:  They were
24        responsible for promoting.  I was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            responsible for marketing, they
 2            were responsible for promoting
 3            Kadian almost exclusively; except
 4            when Kadian went generic, they
 5            were responsible for the promotion
 6            of Kadian generic, and as I
 7            mentioned, for a short time
 8            period, the generic oxymorphone.
 9    BY MS. BAIG:
10        Q.    And that team, I believe you
11    said, grew from 18 to about what, do you
12    know?
13        A.    I mentioned I don't remember
14    the ceiling number.
15        Q.    Do you know if it doubled in
16    size or tripled in size, or if it just
17    grew slightly from 18?
18        A.    My best guess, recollection,
19    is about 48.
20        Q.    48?
21        A.    Uh-huh.
22        Q.    And what time frame was it
23    about 48 employees?
24        A.    That, I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Some time in the 2010 to
 2   2014 time frame?
 3            A.    Oh, no.  They were
 4   terminated by 2012.  So some time between
 5   2010 and 2012.
 6            Q.    And what happened with the
 7   marketing of Kadian in 2012 when the
 8   sales force was terminated?
 9            A.    Right.  Watson debated what
10   to do with it for a while.  But,
11   basically, no longer promoted it, the
12   promotion wound down.
13            Q.    And how about, what happened
14   with marketing of the generic as of 2012,
15   when that sales force was terminated?
16            A.    Well, they weren't marketing
17   the generic, so there was no marketing,
18   as far as I'm aware.
19            Q.    Well, the promotion of the
20   generics?
21            A.    That's what I mean.  I don't
22   know.  There was no more sales force.
23            Q.    Were there any mergers --
24   were there any other mergers, other than
```