PSJ10 Exh 61

1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4                    -   -   -
5

IN RE:  NATIONAL          :   HON. DAN A.
6    PRESCRIPTION OPIATE       :   POLSTER
     LITIGATION               :   MDL NO. 2804
7                             :
     APPLIES TO ALL CASES     :   NO.
8                             :   1:17-MD-2804
                              :
9

           - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                     -   -   -
12
               December 11, 2018
13
                     -   -   -
14
15          Videotaped deposition of
     NANCY BARAN, taken pursuant to notice,
16   was held at the offices of Carella Byrne,
     P.C., 5 Becker Farm Road, Roseland, New
17   Jersey, beginning at 9:02 a.m., on the
     above date, before Michelle L. Gray, a
18   Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
19   Realtime Reporter, and Notary Public.
20                   -   -   -
21
           GOLKOW LITIGATION SERVICES
22    877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2
      ROBBINS GELLER RUDMAN & DOWD, LLP
 3    BY:  DORY P. ANTULLIS, ESQ.
           MARK J. DEARMAN, ESQ.
 4    120 East Palmetto Park Road
      Boca Raton, Florida 33432
 5    (561) 750-3000
      dantullis@rgrdlaw.com
 6    mdearman@rgrdlaw.com
      Representing the Plaintiffs
 7
 8    KIRKLAND & ELLIS, LLP
      BY:  JENNIFER G. LEVY, ESQ.
 9         KAITLYN COVERSTONE, ESQ.
      300 North LaSalle Street
10    Chicago, Illinois 60654
      (312) 862-7184
11    jennifer.levy@kirkland.com
      kaitlyn.coverstone@kirkland.com
12    Representing the Defendant, Allergan
      Finance and the Witness
13
14    MORGAN LEWIS & BOCKIUS, LLP
      BY:  STEVEN A. LUXTON, ESQ.
15    1111 Pennsylvania Avenue NW
      Washington, D.C. 20004
16    (202) 739-5452
      steven.luxton@morganlewis.com
17    Representing the Defendant, Teva
      Pharmaceuticals
18
19    ALLEGAERT, BERGER & VOGEL, LLP
      BY:  CHRISTOPHER ALLEGAERT, ESQ.
20    111 Broadway, 20th Floor
      New York, New York 10006
21    (212) 616-7060
      callegaert@abv.com
22    Representing the Defendant, Rochester
      Drug Co-Op
23
24
```

```
 1   APPEARANCES:  (Cont'd.)

 2

 3   JONES DAY
     BY:  CHRISTOPHER LOVRIEN, ESQ.
 4   555 South Flower Street, 50th Floor
     Los Angeles, California 90071
 5   (213) 489-3939
     cjlovrien@jonesday.com
 6   Representing the Defendant, Walmart

 7

     WILLIAMS & CONNOLLY, LLP
 8   BY:  JOEL S. JOHNSON, ESQ.
     725 12th Street, NW
 9   Washington, D.C. 20005
     (202) 434-5148
10   jjohnson@wc.com
     Representing the Defendant, Cardinal
11   Health

12

13   TELEPHONIC APPEARANCES:

14

     CLARK MICHIE, LLP
15   BY:  BRUCE W. CLARK, ESQ.
     220 Alexander Street
16   Princeton, New Jersey 08540
     (609) 423-2144
17   bruce.clark@clarkmichie.com
     Representing the Defendant, Pernix

18

19   REED SMITH, LLP
     BY:  SARAH B. JOHANSEN, ESQ.
20   355 South Grand Avenue, Suite 2900
     Los Angeles, California 90071
21   (213) 457-8135
     sjohansen@reedsmith.com
22   Representing the Defendant,
     AmerisourceBergen Drug Corporation

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   TELEPHONIC APPEARANCES:  (Cont'd.)
 2
     ARNOLD & PORTER KAYE SCHOLER, LLP
 3   BY:  SEAN A. McCORMICK, ESQ.
     777 South Figueroa Street, 44th Floor
 4   Los Angeles, California 90017
     (213) 243-4000
 5   Sean.mccormick@arnoldporter.com
     Representing the Defendants, Endo
 6   Health Solutions; Endo
     Pharmaceuticals, Inc.; Par
 7   Pharmaceutical Companies, Inc. f/k/a
     Par Pharmaceutical Holdings, Inc.
 8
 9   COVINGTON & BURLING, LLP
     BY:  DEVON MOBLEY-RITTER, ESQ.
10   3000 El Camino Real
     Palo Alto, California 94306
11   (650) 632-4739
     Dmobleyritter@cov.com
12   Representing the Defendant, McKesson
     Corporation
13
14   ALSO PRESENT:
15
     VIDEOTAPE TECHNICIAN
16   Henry Marte
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1   security access to release a credit hold,

2   much like the same, no other groups had

3   access to those holds.

4        Q.     Understood.  So you can put

5   that exhibit aside for -- for now, we may

6   come back to it later.

7        A.     Okay.

8        Q.     But I want to return to

9   Exhibit 2.

10       A.     Oh.

11       Q.     And just discuss.  So you've

12  listed three different, one, two, three.

13  You've listed your -- your time at

14  Actavis, Allergan, and Teva as three

15  different entries.  It says Actavis 2008

16  to 2013, Allergan 2008 to 2017, and Teva

17  2008 to 2017; is that correct?

18       A.     It's probably a little

19  confusing the way it reads.  I had a

20  resumé writer take my resumé, and -- and

21  they did my LinkedIn profile.  And I

22  guess this is the way they thought it

23  should appear.

24       Q.     Understood.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    But it's -- it's all one

2  company.

3      Q.    Do you remember when you --

4  when you began your employment at -- at

5  Actavis in 2008, which company hired you?

6      A.    When I began my employment

7  with Actavis, which company hired me?

8  Actavis.

9      Q.    Okay.  Is that -- do you

10  remember which Actavis?  Can you be more

11  specific?  Actavis Inc.?

12      A.    I don't know the -- the

13  legal entity name, Actavis Inc., LLC, I

14  don't know.

15      Q.    Okay.

16      A.    So, you know.

17      Q.    So at some point during your

18  employment at Actavis, Watson came in and

19  acquired the company.

20      A.    Correct.

21      Q.    Is that correct?

22      A.    Yes.

23      Q.    Did your job duties change

24  at that point?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.   The -- the role not so

2    much but the -- the magnitude did.   I

3    mean the volume obviously.   So to explain

4    that, Watson had its customer service

5    group headquartered in California,

6    Irvine, California.   And the decision was

7    made that they wanted to have customer

8    service in a corporate location, which

9    the decision was Parsippany, New Jersey.

10              So I was given the

11   opportunity to build the new combined

12   team.   And when I say build, we had to

13   build it virtually from the ground up.

14   Actavis was a much smaller company at the

15   time and the customer service group for

16   Watson, I'm just going to take a guess,

17   maybe they had 15, 20 employees.   I

18   don't -- I don't remember the number

19   exactly.   Very seasoned.   I mean their

20   average years of service were probably

21   like 20 years, so a very seasoned team.

22   So it was my job to build a team in

23   Parsippany, New Jersey, to ensure that we

24   didn't skip a beat, that there was never

1    Q.    Okay.  And do you recognize

2    the attachment?

3    A.    Yes.

4    Q.    Okay.  So please go ahead

5    and read through the e-mail exchange.

6    A.    Okay.  So I haven't read the

7    entire letter in the back.  But I get the

8    gist of what it was doing at the time.

9    Q.    And I don't have specific

10   questions about the letter.

11   A.    Okay.

12   Q.    What I would like to know is

13   whether or not -- do you know whether or

14   not this campaign was ever implemented?

15   A.    Yes.

16   Q.    Okay.  Was this campaign

17   ever implemented?

18   A.    Yes, it was.

19   Q.    And how was it implemented?

20   A.    I wasn't involved with the

21   implementation, so I don't have the

22   details.  But I recall some aspects of

23   it.

24   Q.    Okay.  So I'm just going to

Highly Confidential - Subject to Further Confidentiality Review

1    ask you a few questions, and then we're

2    going to take a break and then we might

3    be close to finishing.

4              So do you know whether or

5    not Actavis belonged to the -- certain

6    trade organizations, any trade

7    organizations?

8         A.    It depends.  Do you define

9    that trade organization like HDMA or

10   NACDS?  That's a trade organization.

11        Q.    So do you know if Actavis

12   ever belonged to the Healthcare

13   Distribution Alliance?

14        A.    I'm not familiar with that.

15   So I don't know.

16        Q.    Okay.  If I called it the

17   HDA, would that make more sense?  Do you

18   know if Actavis ever --

19        A.    HDMA, but not HDA.

20        Q.    So we'll go with the

21   Healthcare Distribution Management

22   Association.  Do you know if Allergan

23   ever belonged to the HDMA?

24        A.    I don't know how HDMA works,

Highly Confidential - Subject to Further Confidentiality Review

1   if it's -- a corporation belongs to it or

2   if individuals belong to it.  I know that

3   I was not a personal member.  But I know

4   that there were employees who were.

5          Q.    Do you recall ever

6   participating in any webinars or any

7   other meetings related to the HDMA?

8          A.    We had a conference, like an

9   HDMA conference.

10          Q.    Do you recall a specific

11   conference that you attended?

12          A.    No, it was just like a

13   meeting where you meet with your

14   customers.  And from what I remember, I

15   think that was the one I mentioned

16   earlier.  I think I only went once.  It

17   was kind of like speed dating.

18              You know, it's just a chance

19   where all your customers are in one place

20   at the same time, and you have many

21   meetings.  It's not like you're there to

22   achieve any major objectives.  It's more

23   like get together, hey, what are the big

24   subjects, how are things going.

1    They -- they joked and they

2    referred to it as speed dating.  I don't

3    know much more about HDMA than that.

4    Sorry.

5        Q.    You don't have to apologize.

6             Did you ever give a

7    presentation regarding suspicious order

8    monitoring issues to a conference?

9        A.    To a conference?  No, I

10   don't believe so.  I've only been to a

11   few conferences and they wouldn't have

12   been something that I presented.

13       Q.    Have you ever authored any

14   articles regarding suspicious order

15   monitoring?

16       A.    Articles, no.

17       Q.    Have you ever participated

18   on any panels regarding suspicious order

19   monitoring?

20       A.    No.

21       Q.    As part of your meetings

22   with AmerisourceBergen, Cardinal and

23   McKesson, following the September 2012

24   DEA conference, did you enter into any

Highly Confidential - Subject to Further Confidentiality Review

1    agreements with them regarding the duty

2    to prevent diversion?

3          A.    There were no agreements on

4    that topic that I'm aware of, no.

5                MS. ANTULLIS:  I think we're

6          going to go off the record now and

7          take a break.

8                THE VIDEOGRAPHER:  The time

9          is 4:28 p.m.  Off the record.

10               (Short break.)

11               THE VIDEOGRAPHER:  We are

12         back on the record.  The time is

13         4:40 p.m.

14   BY MS. ANTULLIS:

15         Q.    All right.  So I just have a

16   couple of follow-up questions for you,

17   and I will be done.

18               First question is, during

19   any of the breaks that we've taken today

20   have you discussed your testimony that

21   you've given with your attorneys?

22         A.    Not more than, you know,

23   you're doing a great job, you know, very

24   basic like that.  This is my first