# PSJ9 Exh 30

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF OHIO

3      EASTERN DIVISION

4       - - -

5

  IN RE:  NATIONAL   : HON. DAN A.

6 PRESCRIPTION OPIATE  : POLSTER

  LITIGATION     :

7           :

  APPLIES TO ALL CASES : NO.

8           : 1:17-MD-2804

           :

9

10    - HIGHLY CONFIDENTIAL -

 SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12      - - -

      April 2, 2019

13

14      - - -

15     Videotaped deposition of

 SERGIO TEJEDA taken pursuant to notice,

16 was held at the offices of Locke Lord,

 LLP, 200 Vesey Street, New York, New

17 York, beginning at 9:01 a.m., on the

 above date, before Michelle L. Gray, a

18 Registered Professional Reporter,

 Certified Shorthand Reporter, Certified

19 Realtime Reporter, and Notary Public.

20      - - -

21

   GOLKOW LITIGATION SERVICES

22  877.370.3377 ph| 917.591.5672

    deps@golkow.com

23

24

Highly Confidential - Subject to Further Confidentiality Review

1   diligence documents the way the title

2   reads, correct?

3           MR. McDONALD:  Object to the

4       form.

5           THE WITNESS:  Yeah, I

6       don't -- I don't think these are

7       due diligence documents.

8   BY MR. MIGLIORI:

9       Q.    Okay.  And so you'll see

10  that the information is organized the

11  same for Exhibit Number 7.  And again,

12  there are a couple more entries on Page 2

13  for Dr. Harper.

14          Here he got a total of nine

15  more bottles, 500 pills in each bottle,

16  of the same dosage that we just discussed

17  7.5/750 milligrams.

18          Do you see that?

19      A.    Yes, I see it.

20      Q.    And were you aware that he

21  was, by dosage, the largest customer of

22  Henry Schein in Summit County?

23      A.    Right now?

24      Q.    Ever.

1    A.    At the time?

2    Q.    Were you ever made aware of

3  that?

4    A.    No.

5    Q.    And I showed you Exhibit 6,

6  which I believe was the printout of his

7  due diligence file, or at least the

8  inventory of the computer screen shots of

9  his due diligence file.  Is there

10  anything on there that pops out at you to

11  suggest that he might be the largest

12  customer of Henry Schein in Summit County

13  based on dosage units?

14    A.    Do you want me to go over

15  the whole report to see who is the

16  largest?  Oh.

17    Q.    No, I'm asking you whether

18  by looking at this particular due

19  diligence printout, if there's anything

20  that pops out at you.

21         You can see it's the

22  verifications group that produced this

23  document.

24         But I'm asking, by looking

1    at it as director of regulatory affairs,

2    whether anything pops out at you that

3    this is a large volume customer of Henry

4    Schein or --

5              MR. McDONALD:  Object to the

6         form.

7              THE WITNESS:  Again, we

8         don't work with this.

9    BY MR. MIGLIORI:

10        Q.    I'm sorry, I didn't hear

11   you.

12        A.    So no, we don't work with

13   this.

14        Q.    Okay.  So if there were

15   government inquiries about this doctor in

16   2010, would those records be the

17   verifications department or the

18   regulatory department's obligation to

19   produce?

20             MR. McDONALD:  Object to the

21        form.

22             THE WITNESS:  I don't

23        remember.

24   BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Would it be a joint

2  responsibility by 2010?

3    A.    I'm sorry?

4    Q.    Would it be a joint

5  responsibility by 2010?

6    A.    I know it is a joint

7  responsibility now.

8    Q.    It is now?

9    A.    Yes.

10   Q.    So that -- those documents

11  would exist somewhere still if the --

12  there was such an inquiry?

13   A.    Dr. Harper, if it was

14  inquiry when?

15   Q.    In 2010?  Would you still

16  have those records?

17   A.    I don't know.  But if I go

18  by the record retention, I wouldn't think

19  so.

20   Q.    Were you aware of the fact

21  that Dr. Harper was sentenced to ten

22  years in prison for illegal

23  prescription --

24   A.    No.

1    Q.    -- of opioids and controlled

2    substances?

3    A.    No.

4    Q.    Were you aware that

5    prosecutors connect him to eight deaths

6    of opioid-addicted users?

7    A.    No.

8    Q.    The second largest volume by

9    dosage in this county is a Dr. Name Brian

10   Heim.  Are you familiar with Dr. Heim?

11   A.    No.  I have heard the name,

12   but not familiar with his file.

13   Q.    Have you ever seen any

14   documentation of the DOJ and the DEA

15   asking Henry Schein for his transactional

16   information?

17   A.    I may have seen a copy of

18   it.

19   Q.    What's that?

20   A.    I may have seen a copy of

21   it.

22   Q.    What did you see to your

23   recollection?

24   A.    A copy of a request.

Highly Confidential - Subject to Further Confidentiality Review



11          MR. MIGLIORI:  This is the

12      last document and we'll take a

13      break.

14          (Document marked for

15      identification as Exhibit

16      Henry Schein-Tejeda-9.)

17  BY MR. MIGLIORI:

18      Q.    Did you see this document in

19  your preparation for today, the letter

20  that you wrote to the field office of DEA

21  about the reporting --

22      A.    This was in --

23      Q.    Let me finish.  I'm sorry.

24      A.    Okay.

1    Q.    Did you review this document

2  in preparation for today, which was your

3  letter to Danna Droz of the Ohio State

4  Board of Pharmacy regarding Schein

5  reporting practices in the state of Ohio?

6    A.    I did review this slide.

7    Q.    It's a November 9, 2012,

8  letter, which is over your name, correct?

9    A.    Correct.

10    Q.    This version that I have is

11  not signed.  Did you believe that in fact

12  you sent this to the Ohio Board of

13  Pharmacy?

14    A.    The letter was sent to the

15  Ohio Board of Pharmacy.

16    Q.    And in this letter you tell

17  the Ohio Board of Pharmacy in November of

18  2012 that Henry Schein was writing for --

19  quote, "The purpose of this letter is to

20  notify the Ohio Board of Pharmacy of an

21  issue that was recently discovered while

22  conducting a routine internal review of

23  operations.  During the course of our

24  internal review, we realized that Henry

Highly Confidential - Subject to Further Confidentiality Review

1    Schein Incorporated has been

2    underreporting sales of controlled

3    substances to Ohio Board of Pharmacy as

4    required by the state's prescription

5    monitoring program (PMP)."

6              Do you recall sending that

7    letter to the Ohio Board of Pharmacy?

8         A.    Yes.

9         Q.    And do you recall the

10   realization that Henry Schein had been

11   underreporting controlled substances as

12   to Ohio as required by Ohio law?

13        A.    Yes.

14        Q.    Who was the person that

15   discovered this?

16        A.    It was one of our regulatory

17   specialists.

18        Q.    Who was that?

19        A.    I don't remember exactly who

20   it was.  I can tell you who I think it

21   was.

22        Q.    What's your best educated

23   guess?

24              MR. McDONALD:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2               Go ahead.

3               THE WITNESS:  Peter Schmidt.

4     BY MR. MIGLIORI:

5          Q.    Who?

6          A.    Peter Schmidt.

7          Q.    And did Peter Schmidt -- is

8     he the one that discovered that the

9     reports that you had been sending to Ohio

10    for sales of products that contained

11    tramadol and carisoprodol didn't -- but

12    did not include any other controlled

13    substances, is he the one that made that

14    realization?

15              MR. McDONALD:  Object to the

16         form.

17              THE WITNESS:  So one of our

18         specialists brought it up to our

19         attention.

20    BY MR. MIGLIORI:

21         Q.    And how many controlled

22    substances were missing from the list of

23    what was required in 2012?

24         A.    I can't tell you that.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    Is it dozens?

2     A.    I don't know.

3     Q.    Do you know how many -- how

4  significant in numbers the underreporting

5  was as of November of 2012?

6     A.    I don't remember.

7     Q.    Isn't it true that this

8  underreporting continued for two years

9  before it was discovered?

10    A.    I'm sorry.  Say that again?

11    Q.    Isn't it true that this

12 underreporting of controlled substances

13 to the Ohio State Board of Pharmacy had

14 been going on for two years?

15    A.    I'm not sure about the time

16 frame, if it's in the letter.

17    Q.    I'll show you.  On the third

18 paragraph, it says, "Please be reassured

19 that there was never any intent to avoid

20 or circumvent the company's obligation

21 under Ohio state law, and as an act of

22 good faith, Henry Schein is providing all

23 controlled substances sales information

24 which was mistakenly omitted for the

1    previous two years.  See enclosures."

2          A.    Okay.

3          Q.    Isn't it true that Henry

4    Schein, for two years, underreported the

5    sale of controlled substances within the

6    state of Ohio, from at least 2010 to

7    2012?

8                MR. McDONALD:  Object to the

9          form.

10                THE WITNESS:  So I don't

11          know if it was two years that we

12          underreported.  I know that we

13          were providing two years of

14          information.

15    BY MR. MIGLIORI:

16          Q.    Your letter says,

17    unequivocally, "Information which was

18    mistakenly omitted for the previous two

19    years."

20                Those are your words,

21    correct?

22          A.    Those are my words.

23          Q.    That would include Summit

24    County, Ohio, my client, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.       The state of Ohio.

2        Q.       So at this point in 2010,

3   the oxycodone would have been a

4   controlled substance that would not be

5   reported here, correct?

6        A.       From what the letter says,

7   we only were reporting a couple of drugs.

8        Q.       Hydrocodone would not have

9   been reported, correct?

10        A.       According to the letter.

11        Q.       And you understand that in

12   Ohio, hydrocodone was almost 99 percent

13   of the orders filled from 2006 to 2014 in

14   Summit County?  Were you aware of that?

15            MR. McDONALD:  Object to the

16        form.

17   BY MR. MIGLIORI:

18        Q.       From Henry Schein?

19            MR. McDONALD:  Object to the

20        form.

21   BY MR. MIGLIORI:

22        Q.       Were you aware of that?

23        A.       No, sir, I wasn't.

24        Q.       Were you aware that

Highly Confidential - Subject to Further Confidentiality Review

1  correctly, you would agree with me that

2  based on your letter to the Ohio board on

3  November 9, 2012, Exhibit Number 9, that

4  none of those 11,500 hydrocodone orders

5  to Dr. Heim would have been reported to

6  the Ohio Board of Pharmacy based on your

7  letter, correct?

8           MR. McDONALD:  Object to the

9      form.

10          THE WITNESS:  So is the

11     record showing that we were in

12     communication with the DEA and

13     this is a record to the board of

14     pharmacy?  I'm just confused how

15     you can -- and what --

16  BY MR. MIGLIORI:

17     Q.   I -- I can show you several

18  different ways.  We can start with the

19  exhibit, I believe it's Exhibit 8.

20          But if you look at the Henry

21  Schein transactional records from post

22  January 2009 and you turn to Page 3.

23     A.   Okay.

24     Q.   You see all of these orders

Highly Confidential - Subject to Further Confidentiality Review

1    for Dr. Heim?

2           A.    Yes.

3           Q.    And you see these are all

4    hydrocodone orders?

5           A.    Yes.

6           Q.    For Dr. Heim?

7           A.    Mm-hmm, yes.

8           Q.    And these are all in the

9    transactional records of Henry Schein,

10   correct?

11          A.    That is correct.

12          Q.    And they say he is

13   getting -- according to this chart, he is

14   getting, on the first line of his, one

15   bottle of 500 pills, at

16   10/500 milligrams.  And goes down the

17   list.  Then he increases to two bottles

18   of 500 pills at 10/500 milligrams.

19                You see all of those

20   entries, correct?

21          A.    Yes.

22          Q.    These are records maintained

23   by Henry Schein, correct?

24          A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And those records were also

2    reported to ARCOS, the federal DEA,

3    correct?

4    A.    Yes, they were.

5    Q.    And the DEA, by looking at

6    those very same records, contacted Henry

7    Schein and said to Henry Schein, there's

8    something unusual about this doctor's

9    ordering, correct?

10           MR. McDONALD:  Object to the

11      form.

12           THE WITNESS:  I don't know.

13           MR. McDONALD:  Form and

14      foundation.  Mischaracterizes the

15      evidence.

16   BY MR. MIGLIORI:

17   Q.    Do you recall the inquiry

18   about the transactional records from DEA

19   that you read?

20   A.    No.

21   Q.    You don't recall the

22   substance of it?

23   A.    No.

24   Q.    When the DEA contacted Henry

Highly Confidential - Subject to Further Confidentiality Review

1  Schein, was the DEA -- did Henry Schein

2  have an appreciation that the DEA, when

3  they asked for transactional record, is

4  looking for suspicious order practices,

5  would that be a reasonable assumption at

6  Henry Schein?

7          MR. McDONALD:  Object to the

8      form.

9          THE WITNESS:  Not really.

10     Henry Schein has had a very good

11     relationship with all the local

12     DEA offices and also the

13     Washington office.  The fact that

14     they asked for records doesn't

15     necessarily mean that they are

16     looking for something on the

17     customer.

18 BY MR. MIGLIORI:

19     Q.    In that month, he was

20 indicted in August, based on the

21 transactional records Henry Schein

22 provided.  Were you aware of that?

23         MR. McDONALD:  Object to the

24     form.

 1                THE WITNESS:  No, I wasn't.

 2   BY MR. MIGLIORI:

 3        Q.    In August of 2012, these

 4   records that you have here, in this

 5   exhibit that we're looking at, were

 6   never, ever reported to the Ohio Board of

 7   Pharmacy as required by Ohio law,

 8   correct?

 9        A.    They were reported at the

10   time of this letter.

11        Q.    Right.  They weren't

12   reported until November of 2012 with two

13   years of unreported transactions,

14   correct?

15        A.    Again, I don't know -- I

16   cannot tell you the time frame of the

17   underreporting.

18        Q.    You -- you write it out and

19   you put a number in.  It says,

20   "Mistakenly omitted for the previous two

21   years, see enclosures."

22                Did you ever look at these

23   enclosures when you reviewed this

24   document?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I would have.

2        Q.    When you prepared for this

3   deposition and you saw this Exhibit

4   Number 9, where you wrote to the Ohio

5   Board of Pharmacy and said we have

6   mistakenly omitted two years of

7   controlled substance reporting to you,

8   did it have attached to it the enclosures

9   that's referenced in your letter to the

10  board of pharmacy?

11       A.    Did I have the enclosures?

12  No, I didn't read the enclosures.

13       Q.    Those two years of -- of

14  omitted reporting to the Ohio Board of

15  Pharmacy, do you know if they still exist

16  somewhere at Henry Schein?

17       A.    I don't know.  But, however,

18  I think my point is that we are offering

19  two years of records to the board.

20       Q.    Which --

21       A.    I don't think we're

22  necessarily saying that we omitted two

23  years of records.

24       Q.    Let's go through it

Highly Confidential - Subject to Further Confidentiality Review

1  together.  Because the jury can actually

2  see this as we print it.  So I -- I don't

3  want there to be any confusion.  Or if

4  I've mistaken, you can show me how I'm

5  mistaken.

6              Do you see where I am where

7  it says in the third paragraph, please?

8       A.    Right.

9       Q.    And we'll read this

10  altogether for the jury's benefit.

11              "Please be reassured that

12  there was never any intent to avoid or

13  circumvent the company's obligation under

14  Ohio state law, and as an act of good

15  faith, Henry Schein Incorporated is

16  providing all controlled substance sales

17  information which was mistakenly omitted

18  for the previous two years, see

19  enclosures."

20              Those are your words,

21  correct?

22       A.    Correct.

23       Q.    You haven't seen the

24  enclosures in preparation for today,

1  correct, just this letter?

2         A.    Correct.

3         Q.    But at least based on this

4  letter, you provided two years of

5  mistakenly omitted reporting to the Ohio

6  Board of Pharmacy, correct?

7         A.    So we provided two years of

8  information.  I can see -- you can read

9  it that way.  I can read it a little

10  different too.

11         Q.    Did I read it properly?

12               MR. McDONALD:  Object to the

13         form.

14  BY MR. MIGLIORI:

15         Q.    Did I read it properly?

16  Whatever the information is, did I read

17  it properly?

18         A.    I think the fact that I can

19  say over here is that the information

20  that we produced at this time was two

21  years of information.

22         Q.    Okay.  Those are -- those

23  are some of the words of the sentence.

24  If you put them all together, it

Highly Confidential - Subject to Further Confidentiality Review

1  references, "All controlled substance

2  sales information which was mistakenly

3  omitted."

4          That's what you provided,

5  for the previous two years?

6      A.    Right.

7      Q.    You provided all of the

8  controlled substance sales information

9  which was mistakenly omitted for the

10  previous two years.

11          Do you see that?

12      A.    I see that.

13      Q.    Those are your words?

14      A.    Those are my words.

15      Q.    And that would include,

16  because it's November 2012, all of the

17  hydrocodone that Dr. Heim ordered from

18  Henry Schein, which led to his conviction

19  in federal court, in this federal court

20  in Ohio, correct?

21          MR. McDONALD:  Object to the

22      form.

23          THE WITNESS:  That would

24      include all the information of

Highly Confidential - Subject to Further Confidentiality Review

1    controlled substances that was

2    distributed to Ohio customers for

3    the prior two years.

4  BY MR. MIGLIORI:

5    Q.    And in those prior two

6  years, as we just saw, hydrocodone was

7  the order -- the only thing that Dr. Heim

8  ordered from Henry Schein in Summit

9  County, correct?

10    MR. McDONALD:  Object to the

11    form.

12    You've totally

13    mischaracterized this record.

14    MR. MIGLIORI:  I have your

15    objection.

16    MR. McDONALD:  It only --

17    only as to controlled substance.

18    Be careful.

19    MR. MIGLIORI:  This is a

20    controlled substance letter.

21    MR. McDONALD:  Correct.  But

22    you're saying that is all we sold

23    to him.  I don't know if we sold

24    him all other kinds of stuff.

Highly Confidential - Subject to Further Confidentiality Review

1    MR. MIGLIORI:  With all due

2    respect, that is all I have.  And

3    it's all you -- it's what you've

4    given me.  So everything that

5    Dr. Heim --

6    MR. McDONALD:  This is -- if

7    you want to ask him if that's all

8    the controlled substances that we

9    sold to him, that's fine.  But

10   there's no evidence that that's

11   all we sold to him.

12   MR. MIGLIORI:  All right.

13   In fact that's the only evidence,

14   because that's what you've

15   provided me.

16   MR. McDONALD:  You only

17   asked for evidence of controlled

18   substance.

19   MR. MIGLIORI:  Listen, we

20   don't need to debate this.  We

21   don't need to -- I get to ask the

22   questions.  And if you have a

23   problem, you state your objection.

24   MR. McDONALD:  You do.

1    BY MR. MIGLIORI:

2        Q.    In this exhibit of

3    Dr. Heim's transactions as we've gone

4    through, they are all related to

5    hydrocodone tablets, correct?

6        A.    The report?

7        Q.    Take as much time as you

8    want to look at it.

9        A.    What report are you looking

10   at?

11            MR. McDONALD:  The exhibit.

12   BY MR. MIGLIORI:

13       Q.    The opioid orders post

14   January 2009.

15            MR. McDONALD:  Tell him what

16       exhibit, Don.

17            MR. MIGLIORI:  He's going to

18       have to tell me because he's got

19       it.

20   BY MR. MIGLIORI:

21       Q.    What number is that exhibit?

22       A.    That is Tejeda Number 7.

23       Q.    Exhibit Number 7, if you

24   start on Page 3, and you look at all of

1    the Brian Heim orders listed there, every

2    one of them on Page 3 and Page 4, is

3    hydrocodone tablets, correct?

4            A.    Yes.

5            Q.    If you go to the order date,

6    every one of them is in 2011 or 2012,

7    correct?

8            A.    Yes.

9            Q.    And they are all before

10   November 9, 2012, correct?

11           A.    That is correct.

12           Q.    And in your letter to Danna

13   Droz from the Ohio State Board of

14   Pharmacy, you specifically inform the

15   Board of Pharmacy in November of 2012

16   that you did not report any hydrocodone

17   orders from Summit County from -- for the

18   prior two years from November of 2012,

19   correct?

20           A.    I didn't specifically

21   mention hydrocodone in my letter.

22           Q.    You specifically referenced

23   that it was not the two controlled

24   substances that you did report, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    You only reported two controlled

2    substances in those two years.

3            A.    Right.

4            Q.    And neither were

5    hydrocodone, correct?

6            A.    Correct.

7            Q.    So every single pill that

8    you sold to Dr. Heim in Summit County in

9    2011 and 2012 went unreported to the Ohio

10   Board of Pharmacy, correct?

11               MR. McDONALD:  Object to the

12        form.

13               THE WITNESS:  Up to this

14        point, yes.

15               MR. MIGLIORI:  Thank you.

16               I want to take a break.

17               THE VIDEOGRAPHER:  Going off

18        the record at 12:04 p.m.

19                   -   -   -

20               (Lunch break.)

21                   -   -   -

22               THE VIDEOGRAPHER:  Back on

23        the record at 12:49 p.m.

24               (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1   system, correct?

2          A.    Say that again.

3                MR. McDONALD:   Object to

4          form.

5   BY MR. MIGLIORI:

6          Q.    Tiffany Steffanie-Oak

7   reported to you in 2013, that 60 percent

8   of your customers had no due diligence,

9   and the other 40 percent had varying

10  degrees of due diligence in their files,

11  based on Henry Schein's "know your

12  customer" system, correct?

13         A.    Again, I already told you

14  that it was a process.  It was over

15  20,000 customers that needed to be worked

16  on, and it took some time to get there.

17         Q.    Maybe you can answer my

18  question.  My question to you was, more

19  than 60 percent of your customers in 2013

20  had no due diligence in their files based

21  on the due diligence system that Henry

22  Schein had in place, correct?

23         A.    I couldn't tell you what we

24  had, what we had in file in 2013.  I can

Highly Confidential - Subject to Further Confidentiality Review

1    From to those, an appropriate 4 to

2    5 percent will place an order for

3    controlled substances.  Using the

4    4 percent that equates to 1,560 new

5    accounts ordering controlled substances

6    each year."

7                    Do you recall performing

8    that analysis?

9        A.    I don't recall, but I

10   certainly did.

11       Q.    "Tina based her analysis on

12   2012 numbers.  I learned from a recent

13   conversation with Shaun Abreu,

14   verifications manager, that the number of

15   active accounts ordering controlled

16   substances products is now closer to

17   40,000 and that we have completed due

18   diligence for about 13,000 accounts."

19                    Do you recall that 27,000

20   accounts, as of the writing of this

21   document in August of 2013, had no due

22   diligence in them?

23       A.    They didn't have a complete

24   due diligence file, yeah.

1         Q.    27,000 accounts for

2 customers that were expected to order

3 controlled substance had no due

4 diligence, correct?

5         A.    Correct.

6         Q.    And based on the estimates

7 then, you didn't expect to be caught up

8 in this process for another three years,

9 correct?

10       A.    That's what it says, yes.

11       Q.    Do you think you may have

12 gotten it done in 2015, instead of 2016,

13 correct?

14       A.    Yeah, the -- the completion

15 of due diligence file for all accounts

16 was done around that time.  However, we

17 put the process in place to ensure that

18 if an account doesn't have a due

19 diligence on file and places an order,

20 then we will be required to complete one.

21       Q.    But that --

22       A.    That was on or about 2015.

23       Q.    Let's explore that.

24             So there are -- through

1  2013, there are 27,000 doctors and

2  prescriber -- and -- and facilities

3  ordering controlled substances from Henry

4  Schein without the due diligence required

5  from DEA to know your customer, correct?

6              MR. McDONALD:  Object to the

7        form.

8              THE WITNESS:  Without the

9        complete due diligence file.

10 BY MR. MIGLIORI:

11       Q.    No.  The 27,000 represents

12 those that had no due diligence.  The

13 13,000 represents due diligence of

14 varying degrees, correct?

15             MR. McDONALD:  Object to

16       form.

17 BY MR. MIGLIORI:

18       Q.    Do you remember that from

19 Tina?

20             MR. McDONALD:  Object to the

21       form.

22 BY MR. MIGLIORI:

23       Q.    Do you remember Tina telling

24 you that?

Highly Confidential - Subject to Further Confidentiality Review

1    completed due diligence files for

2    all the accounts that we have.

3  BY MR. MIGLIORI:

4        Q.    This report and

5  recommendation is dated December 16,

6  2009.

7        A.    Okay.

8        Q.    You said you promptly

9  responded to this recommendation?

10       A.    Yes, we did.

11       Q.    In 2013, according to your

12  employee, 60 percent of those files had

13  nothing in them for due diligence,

14  correct?

15       A.    Correct.

16       Q.    Is that prompt response to

17  the new onboarding due diligence "know

18  your customer" process at Henry Schein?

19            MR. McDONALD:  Object to the

20       form.

21            THE WITNESS:  Yeah.  We set

22       processes to look at the accounts

23       based on risk level.  We

24       prioritize it that way.  We

1   dealt with -- that had a bearing on

2   wholesale distributors' obligations as

3   DEA registrants to prevent diversion?

4        A.   Yes, sir.

5        Q.   "As a result of the Masters

6   decision, distributors must review the

7   way we evaluate and process orders of

8   controlled substances to assure

9   compliance with the new interpretation of

10  articulate" -- "articulated in Masters."

11            That's what you were now

12  recommending to Henry Schein the company,

13  is that they had to look at how you had

14  been doing things with respect to the

15  shipping of pended orders, correct?

16       A.   That was --

17            MR. McDONALD:  Object to

18       form.  Go ahead.

19            THE WITNESS:  I'm sorry.

20            That was more the reporting

21       of suspicious orders.

22  BY MR. MIGLIORI:

23       Q.   Well, the reporting in

24  the -- okay.  And what's highlighted

Highly Confidential - Subject to Further Confidentiality Review

1    here, it says, "Based on the decision,

2    there is consensus that when a suspicious

3    order monitoring system designed to

4    evaluate orders based on frequency,

5    volume or pattern flags an order, that

6    order is suspicious and must be reported

7    to the DEA."

8              Is that the takeaway that --

9    that you were reporting to Henry Schein

10   of the -- of the import of the Masters

11   decision?

12        A.   Yeah, the Masters decision

13   actually clarified that.

14        Q.   Okay.  What it clarified was

15   that what you were calling pended orders

16   that whole time, Masters clarified to be,

17   in fact, suspicious orders, correct?

18              MR. McDONALD:  Object to the

19        form.

20   BY MR. MIGLIORI:

21        Q.   That was a clarification?

22        A.   Yeah, that was our read of

23   the -- of the opinion from the judge.

24        Q.   So if, in fact, your system

Highly Confidential - Subject to Further Confidentiality Review

1    flagged an order because of a deviation

2    based on frequency, volume, or pattern,

3    that the order, in all caps, is

4    suspicious and must be reported to the

5    DEA at that time, correct?

6          A.    Yes, that's what the -- the

7    judge interpretation was.

8          Q.    It's also what the

9    Controlled Substances Act says, doesn't

10   it?

11               MR. McDONALD:  Object to the

12         form.

13               THE WITNESS:  The Controlled

14         Substances Act?

15   BY MR. MIGLIORI:

16         Q.    Have you ever read the

17   Controlled Substances Act?

18         A.    Could you help me with what

19   section you are referring to?

20         Q.    I'm referring to the section

21   that says suspicious orders include.  Do

22   you recall that section?

23         A.    From the C.F.R.?

24         Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. MIGLIORI:

 2         Q.    All right.  And prior to the

 3    Masters decision, that is not what Henry

 4    Schein was doing, correct?  That is,

 5    prior to the Masters decision, prior to

 6    June 30th of 2017, Henry Schein was not

 7    reporting any flagged order that had a

 8    deviation of size, frequency, or pattern

 9    in the Henry Schein suspicious order

10    monitoring program, they were not

11    reporting it to the DEA's field office,

12    correct?

13              MR. McDONALD:  Object to the

14         form.

15              THE WITNESS:  Prior to

16         Masters decision, we were

17         complying with the regulation --

18         with the regulation by notifying

19         the DEA, by reporting to the DEA,

20         orders that were deemed

21         suspicious, which were an accepted

22         practice.

23    BY MR. MIGLIORI:

24         Q.    Not my question.  My

1   question to you is, prior to the Masters

2   decision in June of 2017, Henry Schein

3   did not deem an order that was a

4   deviation in frequency, volume, or

5   pattern a suspicious order and report it

6   to the DEA when discovered, correct?

7                   MR. McDONALD:  Object to the

8           form.

9                   THE WITNESS:  We didn't

10          report orders that were flagged by

11          our system until we deem it

12          suspicious.

13  BY MR. MIGLIORI:

14          Q.    So Henry Schein, prior to

15  the Masters decision would pend an order

16  that was a deviation of frequency,

17  volume, or pattern and not report it to

18  the DEA unless and until it later

19  determined it to be suspicious, correct?

20          A.    Which was what was compliant

21  with the regulation.

22          Q.    No.  My question to you, is

23  that correct?  Is that what you did?

24          A.    We would pend an order,