PSJ3

Exhibit 54B

1   cell patients seem to have to sign contracts but

2   cancer patients at elite institutions don't.

3           So I have a great concern about the

4   discrimination that goes on about contracts that

5   needs to be sorted out.  So, that's one example.

6           I think that we are not saying everyone

7   should have a contract but only some people

8   should have a contract.  And I have a concern

9   that that could be misused for patients.

10   Q.   When you say some people -- and I

11   appreciate your concern for the poorer people and

12   discrimination.  Where you say some people have

13   to have it, I am trying to understand how that

14   fits in the context of your concern?

15   A.   That we are identifying some groups at

16   greater risk or at greater chances of misusing

17   drugs.  And we already know in this country that

18   minorities are discriminated, they are

19   inadequately treated for their pain.  We know

20   that they have less access to prescriptions,

21   filling their prescriptions in New York

22   pharmacies.  That's been published.

23           We have evidence that their pain is

24   untreated in a variety of settings.  And I have a

25   concern that these contracts might be used to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1  limit access to these treatments for certain

2  populations of patients.  So, I have a concern

3  about that.

4      Q.   I see.  But this contract that Tennant &

5  Olman are proposing I don't think is limited to a

6  white or black issue, poor or rich.

7      A.   No, I am broadly responding to the

8  construct of do I agree with contracts or not

9  contracts.  So you are asking me do I agree with

10  what they did, I am describing what they did.

11  And I describe things that people say they say

12  simply to be fair, to have that in the literature

13  as a discussion.  And that was the purpose of

14  placing it here.

15      Q.   I understand but I am trying to

16  understand the answer you just gave in the

17  context of how this would discriminate somehow.

18  Are you saying that the people that would

19  typically sign the contracts would fit into the

20  category of the poorer class or --

21      A.   That institutions would demand that

22  certain people sign contracts and others would

23  not.

24      Q.   So, they wouldn't use them the way they

25  are supposed to be used?

PKY183381138

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 92

```
 1        A.    They might disuse -- there may be
 2   significant discriminatory practice associated
 3   with the use of contracts which might limit
 4   access to patients being adequately treated for
 5   their pain.
 6        Q.    The next sentence talks about, it says,
 7   they suggest -- is that referring to Tennant &
 8   Olman?
 9        A.    That is correct.
10        Q.    The consent discussion includes risk of
11   using alcohol, other drugs while taking opioids,
12   the likelihood that a newborn will be physically
13   dependent on opioids if these drugs are taken by
14   a female patient during pregnancy and the
15   possibility which the current data cannot refute
16   absolutely that the psychological dependence to
17   opioids can occur and may last a lifetime.  Is
18   that still true today?
19        A.    Yes.
20        Q.    Now, when you talk about psychological
21   dependence, you are talking about addiction; is
22   that correct?
23        A.    I am quoting that but I am talking about
24   addiction.
25        Q.    You understand that the psychological
```

PKY183381139

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    dependence to your way of thinking means

2    addiction; is that right?

3        A.    That is correct.

4        Q.    And, do you agree with the statement

5    that if somebody has psychological dependence or

6    addiction that it may last a lifetime?

7        A.    It's not my opinion.  That's been an

8    opinion that has been put forth by a variety of

9    experts in addiction.

10       Q.    And, you agree with that?

11       A.    They are the experts and that's what

12   they say.

13       Q.    Well, you feel you are not qualified to

14   comment on that?

15       A.    No, I mean, I agree with it.

16       Q.    You agree that addiction lasts a

17   lifetime?

18       A.    Yes.

19       Q.    Addiction is something -- if you have

20   addiction, if a patient has addiction, is it

21   something that you have to treat?

22       A.    No.

23       Q.    Is it something that you have to tell

24   the patient something about the condition so they

25   can monitor it or --

PKY183381140

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    A.   I guess I think -- may I ask a

2  question?  I don't think I understand your

3  question.

4    Q.   You can ask that question.  That's

5  actually more of a statement than a question but

6  --

7    A.   Sorry about that.  Could you repeat the

8  question?

9    Q.   Sure.  If a person has addiction to

10  opioids, do you agree that that condition lasts

11  throughout the rest of their life?

12    A.   Do you mean if a patient actually is

13  addicted to opioids at that time?

14    Q.   Yes.

15    A.   Or has a history of addiction?

16    Q.   Either one.

17    A.   If the patient is actually addicted at a

18  point in time, then that patient needs

19  treatment.  That patient needs to be tapered off

20  their drugs and may need a treatment program.

21    Q.   And, the treatment program can include

22  what?

23    A.   There are a variety of treatment

24  programs.  There are abstinence programs and

25  there are drug free communities.  There are

PKY183381141

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   methadone maintenance programs.  There is

2   buprenorphine treatment.  There are a variety of

3   treatments for someone who has -- is actively

4   abusing opioids and needs to be treated for that.

5       Q.   And, again, you have used the word

6   abusing?

7       A.   Is actively abusing and is considered on

8   a DSM four diagnosis to be substance dependent

9   and addicted and meets all the criteria of that.

10      Q.   Do you utilize the DSM four criteria

11  when you would consider somebody to be addicted?

12      A.   There are a variety of criteria that one

13  might use but that's one of them.

14      Q.   Is that in your opinion an acceptable

15  criteria, DSM four?

16      A.   In identifying addicts, yes.  But it's a

17  very complicated one to use in patients who have

18  taken opioids in the setting of chronic pain.

19      Q.   In terms of assessing a patient who has,

20  potentially, addiction as defined by DSM four,

21  would you agree -- you just used the word

22  complicated, that that can involve a pretty

23  thorough evaluation of the patient in order to

24  make that diagnosis?

25      A.   It involves a detailed history taking

PKY183381142

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    from the patient.

2        Q.    And, would you think that -- have you

3    ever done that yourself?

4        A.    Um-uh.

5        Q.    Have you ever diagnosed someone with

6    addiction to opioid medication?

7        A.    Yeah.

8        Q.    And, have you used the DSM four criteria

9    to make that diagnosis?

10       A.    Yeah, um-uh.

11       Q.    And, you feel you are qualified to do

12   that; correct?

13       A.    That's right, um-uh.

14       Q.    And, would you agree that psychologists

15   and psychiatrists might be someone who would be

16   qualified to make that type of determination?

17       A.    Yes, um-uh.

18       Q.    Now, on the next paragraph here, this is

19   like towards the middle of the page, maybe going

20   towards the bottom, it says here in a sentence --

21   and I will let you find it before I ask a

22   question about it.  If dose escalation continues

23   to rise over several weeks or if a rapid rise in

24   the absence of a documented change in disease

25   occurs, it is recommended that the patient be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    hospitalized in order to facilitate evaluation of

2    the medical requirement -- medication requirement

3    and if possible return to base line dose?

4         A.    Um-uh.

5         Q.    And, was that something that you agreed

6    with in 1985?

7         A.    I did.  I agree with that.

8         Q.    Is that still true today?

9         A.    It would not be possible to admit the

10   patient to a hospital any longer.  The way that

11   health care financing has changed, you would not

12   be able to admit the patient to the hospital.

13   That would not be possible.

14        Q.    Well, would you agree that in lieu of

15   admitting the patient to the hospital, the

16   patient should be reevaluated?

17        A.    Yes, and what the sentence is really

18   suggesting is the reevaluation.

19        Q.    And, possible return to base line dose?

20        A.    Correct.

21        Q.    Is the import of this that you just

22   don't escalate the dosage of the drug without

23   having a good reason to do it?

24        A.    That is correct.

25        Q.    And, that's still true today; right?

PKY183381144

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 98

1          A.    That is correct.

2          Q.    It says, the next sentence, most

3     patients in the surveys of opioid maintenance

4     therapy published thus far have required modest

5     doses of drugs.  The need for relatively high

6     doses must be especially scrutinized to insure

7     that the drug is appropriately used and

8     specifically the pain is the symptom being

9     treated.  Is that still true today?

10         A.    Yes, it is.

11         Q.    And, when you say that the pain is a

12    symptom being treated, are you referring back to

13    the possibility that there might be other factors

14    involved in the patient's perception of pain?

15         A.    Again, I would not say in the perception

16    of pain but in their pain behaviors.

17         Q.    Okay; I apologize but I am having

18    trouble understanding that.  If a patient comes

19    into the office and says -- doctor says, do you

20    hurt?  And the patient says yes.  And the doctor

21    says, do you hurt on a scale of one to ten, one

22    or ten, and the patient says ten.  Is it -- in

23    this sentence, are you saying that there is a

24    concern that maybe when the patient says ten,

25    there might be other things besides a

PKY183381145

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   physiological reason for the pain that the

2   patient says ten instead of three?

3        A.   Yes, I agree with that.

4        Q.   And, those factors might be social,

5   economic, the things we talked about before; is

6   that true?

7        A.   They may be psychological, they may be

8   social.

9        Q.   Or economic; true?

10       A.   Again, the economic, they could be

11  economic but I continue to argue that economic

12  indirectly impacts on psychological and social.

13  And so I don't have -- I don't want to make a

14  direct line of economic to --

15       Q.   It's an indirect relationship, that is,

16  the person -- if the person is in bankruptcy and

17  they might be -- I am sorry, did you finish your

18  answer?

19       A.   Go ahead.

20       MR. HOFFMANN:  I was trying to stop her

21       from answering before you finished your

22       question.  That's why I put up my hand.

23       MR. COLANTONIO:  So, you were trying to

24       tell her not to continue the answer, that's a

25       change.

PKY183381146

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1           MR. HOFFMANN:  No, I was trying to tell

2      her to let you finish your question.

3           MR. COLANTONIO:  All right; thanks.

4           THE WITNESS:  Sorry.

5    BY MR. COLANTONIO:

6      Q.   So, the inferential relationship is if a

7    person has bankruptcy or they have bad financial

8    condition, they might be depressed.  It might

9    effect their psyche and therefore they might say

10   I hurt ten instead of three as a factor; is that

11   fair?

12     A.   I agree with what you just said.

13     Q.   The next sentence says, evidence of

14   inappropriate use such as opioid intake to treat

15   the depression or anxiety of such abuse behaviors

16   as diversion or hoarding should be pursued and

17   managed firmly.  If control cannot be maintained,

18   opiate therapy should be discontinued.  That's

19   true today; correct?

20     A.   Yes, although, again, there is an

21   evolving science now to recognize that opioid

22   therapy may not be able to be discontinued

23   because the patient is in severe pain and one has

24   to provide them with better pain relief.  So then

25   the ethical responsibility of the physician to

PKY183381147

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   take care of a patient, let's say, with, you

2   know, advanced AIDS and severe chronic pain in

3   the setting of drug abuse and so I think we have

4   a more sophisticated and more organized approach

5   to caring for patients that may end up in that

6   situation.

7        Q.   These guidelines we have been talking

8   about, these concepts we have been talking about,

9   you agree they apply not just to chronic pain but

10  also to treatment of acute pain as well; right?

11       A.   Well, I don't think I would want to say

12  -- there is sort of a general conceptualization

13  that you evaluate the patient, that you pay

14  attention to all these issues, that pain can have

15  many factors.  But I think the distinction is

16  patients with acute pain usually have an

17  immediate cause for their pain, usually have a --

18  respond typically to the agents that are

19  available and will taper off their drug.  So they

20  are different.

21       Q.   So, they are different?

22       A.   They are quite different.  They are not

23  taking the drug for this long period of time.

24       Q.   They are different but the principles we

25  have just gone through would still apply.  For

PKY183381148

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1  example, you need to watch dose escalation, there

2  should be a reason for it.  You need to have

3  fully informed consent and other things we have

4  talked about would also apply to opioid treatment

5  in an acute pain situation; right?

6      A.   Well, I am not -- if patients are going

7  to take an analgesic for an acute pain, a post

8  operative pain, I am not sure that as general

9  practice we fully inform them of every aspect of

10 treatment since they are going to be on it for

11 three days or five days and discontinue their

12 drug.  So I guess I am making a little bit of a

13 distinction in the management.

14          And acute post-operative pain would be

15 the best and most common model in this country.

16 The patients are fully informed that they are

17 going to receive a drug, it may be an opiate,

18 those are the side effects.  Those are pieces of

19 information that they are provided with.

20      Q.   Are you saying the informed consent

21 given for patients on opioids more than three

22 months should be different than that for acute

23 situations?

24      A.   Well, that's why we are talking about

25 these guidelines for chronic pain.

PKY183381149

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1      Q.    Well --

 2      A.    But, the general framework and

 3   principles are very similar.

 4      Q.    I think that was my point.

 5      A.    Okay.

 6      Q.    That the general framework and

 7   principles are similar.  There may be some slight

 8   nuances that might apply to a chronic situation

 9   versus acute, but you still want to give the

10   acute treatment informed consent; right?  Or am I

11   wrong?

12      A.    Well, if by informed consent is that you

13   want the patient to be knowledgeable about the

14   treatment that they are receiving, then yes.

15      Q.    Isn't that the purpose of informed

16   consent?

17      A.    Yes.

18      Q.    And, in acute situations, you want to

19   make sure you are treating a condition that can

20   be described by physiological reasons, not social

21   or economic or psychological reasons, correct?

22      A.    That would be correct.

23      Q.    I mean, those all apply across the

24   board, whether acute or chronic?

25      A.    Yes, but the risk of a patient taking a

PKY183381150

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    drug for three to five days is different

2    potentially than it is for taking it for 20

3    months or so.

4         Q.   How so?

5         A.   Because of the fact that the patient's

6    pain will be diminishing rather than increasing

7    and their dose requirements will be diminishing.

8    So it is a different pattern of how they would

9    take it.

10        Q.   How about in terms of the potential for

11   abuse and addiction, the risks of those?

12        A.   Again, it is related to the duration of

13   taking the drug.  It is related to the dose.

14   It's related to the setting and then of all the

15   other factors that we talked about.

16        Q.   So, you agree that addiction -- there is

17   a relationship between dose and the risk of

18   addiction?

19        A.   Yes.

20        Q.   You agree that there is a relationship

21   between a person's social economic factors and

22   potential for addiction?

23        A.   That's described in the literature.

24        Q.   You agree with that?

25        A.   Sure.

PKY183381151

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    And, you agree that there is a

2   relationship between the length of time on opiate

3   medication and the potential for addiction?

4      A.    Yes.

5      Q.    Would you agree then that the rates of

6   expected addiction for people in groups would be

7   different based upon their social, economic,

8   psychological factors, the dosing and the length

9   of time that they are taking the drug?

10     A.    I think that the development of

11  addiction is individual.  So I don't want to

12  limit it to groups.  It's an individual aspect.

13  It depends on who the patient is.

14     Q.    I suppose we could say that about -- I

15  am sorry.

16         MR. HOFFMANN:  Go ahead and finish your

17      answer.

18         MR. COLANTONIO:  That was mine.

19         THE WITNESS:  It depends on who the

20      patient is.  This is probably the most

21      important factor.  And so -- and I would

22      argue it depends much more on who the patient

23      is than the drug.

24  BY MR. COLANTONIO:

25     Q.    But, who the patient is includes social

PKY183381152

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   setting, economic setting, psychological setting,

2   those kinds of things; true?

3        A.   Yes.  Yes, it does.

4        Q.   And, those all play a role --

5        A.   Yes.

6        Q.   I am sorry, you have to let me finish my

7   question.  Those all play a role to your way of

8   thinking in the expected rate of addiction?

9        A.   Yes.

10       Q.   And, when you say it's individual in

11  terms of expected rate of addiction to opioid

12  medication, I mean, that's true for pretty much

13  every disease and medication.  I mean, how that

14  effects a person is individual because each

15  person probably isn't exactly alike chemically

16  and makeup wise but that's true generally across

17  the board for medicine; right?

18       A.   Well, it may well be different and I

19  think we have a lot of reasons to think it may be

20  different for this concept of addiction because

21  we have this extraordinary experience of treating

22  large numbers of patients with opioids for long

23  periods of time who don't become addicted.

24       Q.   Okay.

25       A.   And, so the use of opioids in the

PKY183381153

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    setting of treating patients with chronic pain

2    seems to be different than the misuse of opioids

3    for recreational purposes in an addict

4    population.  So, we -- and that begins to say

5    that there must be very powerful individual

6    differences among these groups and these

7    individuals within these groups that allow

8    someone to take opioids for months on end, to

9    have successful treatment of their pain and then

10   to be tapered off their drug and that's the

11   clinical experience.

12       Q.   The clinical experience you are

13   referring to is in cancer pain patients?

14       A.   And in chronic non-malignant pain

15   patients.

16       Q.   And the chronic non-malignant pain

17   patients you are talking about, the experience,

18   the documented experience, that is what?

19       A.   In groups of patients who develop an

20   acute herpes zoster that go on to develop post

21   herpetic neuralgia and then improve, in patients

22   who have post surgical pain syndromes that are

23   not related to their cancer but occur in the

24   cancer setting that go on for six months or nine

25   months and then improve and they taper off their

PKY183381154

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 108

1    drug.

2        Q.   I am talking about -- I am sorry, are

3    you finished?

4            MR. HOFFMANN:  Go ahead and finish your

5        answer.

6            THE WITNESS:  I am talking about

7        patients who have a variety of surgical

8        procedures on their knee or hip or have

9        traumatic pain who take opioid analgesics

10       during their rehabilitation and then recovery

11       and then go off their drugs.

12   BY MR. COLANTONIO:

13       Q.   And, what I would like -- can you define

14   for me the published studies you are talking

15   about that embody that?

16       A.   Of those patients, those I am speaking

17   of from my own clinical experience.

18       Q.   I understand that.  What I am trying to

19   ask you is where could I look at, what body of

20   published literature can I look to to find this,

21   any published experience besides your clinical

22   experience?

23       A.   Right.

24       Q.   If you can define that for me?

25       A.   Yeah, I think we published a paper on

PKY183381155

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    the types of patients that we saw in our pain

2    clinic.  And we defined them in like three

3    categories, a group of patients who escalated

4    their drugs, there are a group that remained

5    stable and there was a group that decreased their

6    drugs.  So that would be one population that I

7    could identify.

8         Q.   I am sorry, where was that published?

9         A.   I need to look at my --

10            MR. HOFFMANN:   Go ahead.

11            MR. COLANTONIO:  Sure.

12            THE WITNESS:  And, it would be early on.

13       It's number 23 on my bibliography.  It's

14       Canner Foley, patterns of narcotic drug use

15       in a cancer pain clinic.

16   BY MR. COLANTONIO:

17       Q.   And that was published in what year?

18       A.   It was published in 1981.

19       Q.   So, that would have been published at

20   the time you published this article that we are

21   looking at?

22       A.   No, this article was 1985.

23       Q.   I thought you said 1981?

24       A.   I said 1981 and this article is 1985.

25       Q.   That's my point.  The article that you

PKY183381156

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    referred to in your bibliography just now was

2    already published at the time you published this

3    article in 1985?

4         A.    That is correct.

5         Q.    True?

6         A.    Yes.

7         Q.    Any others?

8         A.    I think I really would need to think

9    about that for you.

10        Q.    There are none others that you can think

11   of right now if I was to ask you for --

12        A.    Other published studies of that

13   particular point?

14        Q.    Yes.

15        A.    No, not that I can think of at the

16   moment.

17        Q.    In your -- on page 184 at the bottom

18   here, it is like the second to the last

19   sentence --

20        A.    Okay.

21        Q.    You say, given the paucity of data,

22   however, this course must be pursued cautiously?

23        A.    Yes.

24        Q.    I would like to ask you what you meant

25   by the paucity of data, what paucity of data are

PKY183381157

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    you referring to?

2        A.    Well, let me read what I said in this.

3        Q.    Sure.

4        A.    Okay, the paucity of data that we were

5    referring to was the limited studies of patients

6    with chronic non-malignant pain who had been

7    treated with opioids in the literature, the

8    published studies.

9        Q.    In terms of their --

10       A.    The experience of clinicians with it.

11   So we cited the article by Tennant.  We cited an

12   article by Taub and we researched the literature

13   to find other examples.  And so by paucity, we

14   were concerned about the paucity of patients.

15   So, Taub was an example.

16       Q.    I think you also cited --

17       A.    Sternbacks, Taub, Tennant.

18       Q.    You cited also --

19       A.    Turner, so those are people that had

20   published.

21       Q.    You cited Porter & Jek, footnote 38, do

22   you see that?

23       A.    Yes.

24       Q.    And, you cited that as one of the I

25   guess pieces of data out there?

PKY183381158

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Right.

2      Q.    But, even in citing that and some

3   others, you agreed at the time that you wrote

4   this, that that still constituted a paucity of

5   data at that time --

6      A.    Yes.

7      Q.    -- on these issues; is that correct?

8      A.    Yes.

9      Q.    Now, it says here in the next sentence,

10  long term prospective studies of pain patients on

11  opioid maintenance therapy are needed.  And were

12  you suggesting that the long term studies were

13  needed to correct the paucity of data that you

14  were referring to in the previous sentence?

15     A.    Well, they were needed for many

16  different reasons, not just to correct paucity of

17  data.  They were needed to help us understand the

18  issues.

19     Q.    Is that one of the reasons?

20     A.    Yes.

21     Q.    And, it says here these will better

22  assess the efficacy and risks of the treatment

23  itself and may provide insight into the salient

24  features which predispose to and perpetuate drug

25  abuse?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    That is correct.

2      Q.    And, when you use the word drug abuse

3    there, does that include sort of as a subset of

4    that, drug addiction?

5      A.    It would, yeah.

6      Q.    Do you believe that the terms addiction

7    and substance dependence are synonymous?

8      A.    The substance dependence is the language

9    used in the DSM four TR and it is used to

10   describe addiction.  So for that group, substance

11   dependence and addiction are used --

12     Q.    And, you have indicated --

13     A.    -- interchangeably.

14     Q.    I am sorry, are you finished?

15     A.    They are used interchangeably.

16     Q.    And, I think you have indicated you have

17   used the DSM four in your practice before --

18     A.    That's correct.

19     Q.    -- in terms of diagnosing addiction;

20   true?

21     A.    Correct.

22     Q.    And, would you also agree that

23   psychological dependence is also synonymous with

24   substance dependence and addiction?

25     A.    Well, I don't want to -- people use --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 114

1   every time you use each of these words, you have

2   to define it.  And so, therefore, I don't want to

3   say that because I don't know how a person is

4   using it.  Some person may use it one way and

5   some person may use it another way.

6          So every time when someone identifies

7   and uses the word psychological dependence, I

8   want them to tell me what they mean.  When they

9   say addiction, I want them to tell me what they

10  mean, and when they say substance dependence.

11         Sadly, it would be good in the field if

12  we all sat down and agreed on these definitions.

13  So I think I can't answer that in that kind of

14  general sense.  It is the content, how is it

15  being used, what are you trying to define and

16  that's the best answer I can give you.

17     Q.    Would you agree that even today there is

18  some disagreement among experts and clinicians as

19  to how each uses the terms addiction, substance

20  dependence, psychological dependence?

21     A.    I think there is and that's why you have

22  to start the conversation with are we all at the

23  same place.

24     Q.    While you believe that patients should

25  be individually assessed when they are treated

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    with OxyContin or opioids, don't you agree with

2    me that individual assessment is true in every

3    case when a medication is prescribed to a

4    patient?

5         A.   I guess, yes, they need to be

6    individually assessed no matter when they receive

7    a medication.

8         Q.   And, you believe that there are certain

9    things in the assessment, especially with opioid

10   medication, that are important including a

11   person's background -- we talked about social

12   factors, economic factors, psychological factors

13   that might play a role in the person's pain and

14   potential for addiction; true?

15        A.   But, I would think that if you were

16   using anti hypertensives or anti depressants or

17   anti anxiety drugs or antibiotics, I would need

18   to know those pieces of information.

19        Q.   So pretty much the kinds of things you

20   would assess in terms of looking at somebody,

21   whether you are going to prescribe them OxyContin

22   or anti -- or a hypertensive drug, you would

23   pretty much do the same kind of assessment?

24        A.   Yes.

25        Q.   So, you would do that for a hypertensive

PKY183381162

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    drug, antibiotic, opioid, pretty much across the

2    board; is that true?

3         A.    That is correct.

4         Q.    So, while there is individual assessment

5    you believe for patients being prescribed

6    medications, the commonality in all of that is

7    that when a physician considers a prescription

8    for a patient, they have to do that assessment

9    for every medication they write; correct?

10             MR. HOFFMANN:  Object to the form of the

11        question.

12   BY MR. COLANTONIO:

13        Q.    Do you understand my question?  In other

14   words, the assessment is common with any drug?

15             MR. HOFFMANN:  I am going to object to

16        the form of that question too, but if you can

17        answer it, go ahead.

18             THE WITNESS:  Well, you need to measure

19        the blood pressure if the patient is -- if

20        you are using anti hypertensives.  You need

21        to measure the blood sugar if you are using

22        insulin.  I mean, there are very specific

23        assessments that go with each of the drugs as

24        well that are specific.  So there is a

25        general and then there is a specific.  So for

PKY183381163

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1        each class of drugs, there would be a

 2        specific assessment as well.

 3   BY MR. COLANTONIO:

 4        Q.   But, it is common to all patients that

 5   there is an assessment done for a drug before it

 6   is prescribed?

 7        A.   There is an assessment made that is

 8   directly influenced by that drug.  So you would

 9   ask a series of factors about food intake and

10   glucose intake for someone you are prescribing

11   insulin to.

12        Q.   But, my question is, you agree that is

13   common to all --

14        A.   I would not ask every patient about

15   their food intake if I was not prescribing

16   insulin.

17        Q.   I understand that but what I am saying

18   is I know there are specific nuances to each

19   different medication because there may be

20   different conditions you are treating.  My

21   question I am asking you is, the assessment

22   itself, that the physician does the assessment,

23   it is common to any medication, the fact that you

24   do an assessment?

25        A.   It's not so much common to every

PKY183381164

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 118

1   medication, it is common to the doctor patient

2   relationship and the setting in which you are

3   caring for the patient.

4        Q.   All right; now, is it your belief today

5   on August 28th or something like that, 2004 --

6             MR. HOFFMANN:  27.

7             MR. COLANTONIO:  Thank you, 27, 2004

8        that the use of opioid analgesics such as

9        OxyContin by physicians for the treatment of

10       patients with acute pain is inadequate?

11            THE WITNESS:  Would you repeat that for

12       me?

13   BY MR. COLANTONIO:

14       Q.   Sure.  Is it your belief today, August

15   27, 2004, that the use of opioid analgesics like

16   OxyContin by physicians for the treatment of

17   patients with acute pain is inadequate at best?

18            MR. HOFFMANN:  I am going to object to

19       the form of the question.  But if you can

20       understand it, you can answer it.

21   BY MR. COLANTONIO:

22       Q.   Do you understand that?

23       A.   Could you say it one more time and I am

24   not trying to be difficult.

25            MR. HOFFMANN:  Say it one more time.

PKY183381165

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1           THE WITNESS:  But, I am just --

2   BY MR. COLANTONIO:

3       Q.   It's going to be easier if I just show

4   you your expert disclosure and ask you to take a

5   look at this phrase that was used in it.  This

6   way there is no -- I won't botch the sentence and

7   I will just show it to you.  There is a sentence

8   right here on the third bullet point.

9       A.   Okay.  Yes, okay.

10      Q.   If you could take a look at that, I will

11  pass it over to you.

12      A.   Thank you.

13      Q.   You can read that.

14      A.   The use of opiate analgesics by

15  physicians for the treatment of patients with

16  acute or chronic pain remains inadequate at best,

17  yes.

18      Q.   And, you believe that is true even as of

19  today?

20      A.   I do, yes.

21      Q.   So, I am going to rephrase it a little

22  bit differently but I think it is the same

23  question.  So it is your belief that the use of

24  opioid analgesics such as OxyContin by physicians

25   for the treatment of patients with acute pain is

PKY183381166

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    inadequate at best?

2        A.    Well, I would drop out OxyContin because

3    in acute -- OxyContin is not a drug that is

4    commonly used for acute pain.

5        Q.    Do you believe OxyContin is appropriate

6    for use by physicians for patients with acute

7    pain?

8        A.    The indications are for patients who

9    have pain that is going to last more than several

10   days and that requires continuous dosing and

11   acute pain may not require that.

12       Q.    Well, in fact, it says extended period

13   of time, I think now, doesn't it?  Do you know

14   what the package insert says for OxyContin?

15       A.    I don't know, I would have to look at

16   it.

17       Q.    OxyContin when it was first promoted,

18   first came out, as I understand it, had in the

19   package insert, the indication of pain lasting

20   more than a few days.  Do you recall that at all?

21       A.    I have heard that, yes.

22       Q.    Do you know whether that has been

23   changed?

24       A.    I think it was changed to be for

25   continuous use of a controlled release, need for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1  continuous administration but I would need to

2  look at it.

3      Q.   If I were to say to you --

4      A.   To be fair to you, I would need to look

5  at it.

6      Q.   If I were to say to you that the

7  indication for a drug was that the pain had to be

8  for an extended period of time, what would that

9  mean to you, an extended period of time?

10     A.   More than -- several days or more.

11     Q.   Would you associate that more with

12  chronic pain than acute?

13     A.   I would.

14     Q.   The phraseology, extended period of

15  time, you would associate more with chronic pain

16  than acute pain; is that right?

17     A.   That is correct.  However, there are

18  patients that have -- this gets into the

19  definition.  If you say chronic pain is greater

20  than three months, then there are patients with

21  acute pain that have it for three months, and

22  OxyContin would be appropriate if a patient was

23  requiring medication for three months.  So again

24  it depends on the definition of acute and chronic

25  pain.

PKY183381168

Page 122

1      Q.    A lot of definitions?

2      A.    Yeah.  No, it does.

3      Q.    And, the next thing here, we talked

4   about this already, there is confusion among

5   physicians and patients about what is meant by

6   physical dependence and addiction in that you

7   believe it attributes or causes some fear among

8   people --

9      A.    Yes.

10      Q.    -- for using opioid drugs; right?

11      A.    Yeah, um-uh.

12      Q.    Now, physical dependence, is it your

13   belief that something happens physiologically to

14   the body to cause the body to need and become

15   physically dependent on the drug?

16          MR. HOFFMANN:  I object to the form of

17      the question, you may answer it.

18   BY MR. COLANTONIO:

19      Q.    Do you understand my question?

20      A.    It's not a matter of opinion.  There are

21   a variety of scientific studies that it

22   demonstrated that exposure of receptors to

23   opioids lead to changes in their cyclic AMP which

24   lead them to then cause a variety of effects when

25   the drug is withdrawn.

PKY183381169

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.   So, when I take the drug, if I develop

2   physical dependence, then something happens

3   chemically to my body that makes my --

4      A.   Well --

5      Q.   Sorry.

6          MR. HOFFMANN:  Go ahead and finish your

7      question.

8          MR. COLANTONIO:  Thank you.

9          MR. HOFFMANN:  I was cautioning her not

10     to answer your question before you finish it.

11         MR. COLANTONIO:  I probably lost my

12     train of thought.

13         MR. HOFFMANN:  I am sorry, maybe I

14     should just sit on my hands, but --

15         MR. COLANTONIO:  I don't want you to sit

16     on your hands.

17         THE WITNESS:  Sorry.

18  BY MR. COLANTONIO:

19     Q.   It's your belief that the person who

20  becomes physically dependent, takes a drug, there

21  are physiological changes to their body that make

22  it such that if the drug is withdrawn that the

23  body will react adversely or in a way that comes

24  about because of these physiological changes?

25     A.   Yes.

PKY183381170

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 124

1     Q.    Now, do you believe that there are

2   physiological changes that happen to the body

3   upon ingestion of a drug that are a contributing

4   factor to the development of psychological

5   dependence or addiction?

6     A.    There is no clear correlation between

7   physical dependence and addiction.

8     Q.    Is what you mean by that that people who

9   are physically dependent, just because they are

10  physically dependent does not mean they are

11  addicted?

12    A.    That is correct.

13    Q.    But, my question is a little bit

14  different, I think, and that is do you believe

15  that in terms of psychological dependence or

16  addiction, that there is something, that there is

17  a physiological mechanism to that, to addiction

18  and psychological dependence?

19    A.    The evidence would suggest that there

20  are a series of neuro pharmacologic changes that

21  occur within the brain with exposure to opioids

22  that are associated with psychological

23  dependence.

24    Q.    So, that would also, I think, mean that

25  in terms of psychological dependence and

PKY183381171

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

```
 1    addiction, there are something physiological
 2    going on that --
 3        A.   I am attempting to be specific by
 4    calling them neuro pharmacologic because they
 5    happen in the brain predominantly.
 6        Q.   A person who has addiction can have
 7    physical dependence as well; is that right?
 8        A.   Can you say that again?
 9        Q.   A person who has psychological
10    dependence or addiction to opioids can also have
11    physical dependence, right?
12        A.   Yes, correct.
13        Q.   A person who abuses opioid medication,
14    prescription or otherwise, that can be an
15    indication of potential addiction; is that true?
16        A.   Potential, yes.
17        Q.   And, in terms of differentiating whether
18    somebody has true physical dependence, true
19    psychological dependence or addiction or just
20    drug abuse problems, would you agree that to sort
21    those things out, that one should evaluate the
22    patient and try to figure out which one or a
23    combination of those might be at issue in a
24    patient?
25        A.   That is correct.
```

PKY183381172

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    Would you expect to see a higher rate of

2   addiction in a pool of patients that have both

3   higher dose of opioids such as OxyContin and

4   longer use of the drug?

5      A.    You know, I think that's the million

6   dollar question.  We don't know the answer to

7   that.

8      Q.    Would you expect to see a higher rate of

9   addiction in a pool of patients who have certain,

10   a certain subset of socioeconomic psychological

11   factors than another subset?

12      A.    Again, that's been looked at and not

13   clearly well defined.  I think that one of the

14   important issues in all of this is that merely

15   exposure to opioids does not produce addiction.

16   And so trying to sort out what those factors are

17   is the -- is an important aspect.

18          There is evidence to suggest that

19   patients who have a history of alcohol abuse or

20   have a history of drug abuse may be at greater

21   risk.  But, these are very limited information.

22      Q.    That's the $2,000,000 question?

23      A.    Yeah.

24      Q.    All right; in terms of history of

25   alcohol abuse, let's say that you have a patient,

PKY183381173

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   comes into your offices, and they want to -- you

2   are considering OxyContin as a potential drug,

3   and you take a history of a patient.  If a

4   patient had gotten drunk socially, let's say, I

5   don't know, once every three weeks or something

6   like that in the past year, would you consider

7   that a history of alcohol abuse?

8       A.   There are different criteria that you

9   can use to assess a patient.  And, you know, this

10  has been well described as to whether they binge

11  or whether they take five drinks a week,

12  etcetera.  So there is an assessment that one can

13  do of a patient.  But there are a couple of

14  studies out there that begin to look at this.

15          Nat Katz looked at a group of patients

16  with chronic opioid therapy and demonstrated that

17  those patients that had a history of alcohol

18  abuse did fine in his clinic and did not develop

19  any risk of addiction.  And, Edwardo Bruera in a

20  large population of cancer patients used alcohol

21  abuse as one of the factors that you might

22  evaluate the success of pain treatment in a

23  cancer population and he eventually threw out

24  alcohol abuse because it became a variable that

25  wasn't helpful.

PKY183381174

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    But this Katz and is it Bruera, are they

2    recent studies or --

3      A.    Katz is a recent study.  It's a really

4    nice piece and I can get you the reference.  I

5    don't have it with me, but it's really -- I

6    forget who wrote it with him, but it's a nice

7    piece.

8      Q.    Now, we're going to get into definitions

9    again.  What is recent?

10     A.    In my world, recent is like the last

11   three years or four years.  And Edwardo, I would

12   have to see where he published that but the Katz

13   papers were recently published.

14     Q.    Now, let's talk about history of drug

15   abuse.

16     A.    Yes.

17     Q.    If somebody had smoked, let's say,

18   marijuana in college or something like that,

19   would you consider that a history of drug abuse

20   in your evaluation?

21     A.    Yeah.  It would be written down as a

22   history of drug abuse, yeah.

23     Q.    And, would you think that kind of a

24   person would be -- fall into that category of

25   maybe the higher risk of potential addiction to

PKY183381175

Page 129

1    some others?

2        A.    I don't think we have any information on

3    that.

4        Q.    That falls into the paucity of data --

5        A.    That alone, you know.

6        Q.    That would fall into the paucity of data

7    column?

8        A.    You know, I don't think I know the

9    answer to that because I don't -- there may be

10   research that has looked at marijuana and its

11   implications, I just don't know it.

12       Q.    Do you in your own practice consider a

13   history of drug abuse like somebody who smoked

14   marijuana in their past or maybe abused a drug,

15   prescription medication, took it more than was

16   prescribed, do you consider that an additional

17   risk factor for development of addiction when you

18   are considering prescribing an opiate?

19       A.    I consider it as an important piece of

20   information.  And, you know, again, I don't want

21   to discriminate against the patient who may in

22   the past have misused drugs.  And so in that

23   setting, it's a piece of information that you

24   want to have information about the patient on and

25   information to what the causes of why they did

PKY183381176

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    it, how they did it, whether they continued to do

2    it, what they think about it.  And also the very

3    fact that the patient is open and willing to tell

4    you that in an interview suggests that it may not

5    be at all an issue.

6            And, when you have to weigh the risks

7    and benefits of treating a patient, it is a

8    dilemma that you face, a very real dilemma.  So,

9    yes, it's a piece of the history that you put,

10   it's the piece that you pay attention to and in

11   that patient, it might represent a greater

12   concern or a red flag.

13      Q.   It could be something that would make

14   you consider not prescribing OxyContin for

15   somebody, depending on how you felt about it;

16   correct?

17      A.   Well, I think, again, I don't -- it

18   could make some people make that decision.  But I

19   would hope that they had more information and

20   weighed the benefits to the patient of treating

21   their pain than the risk of the drug.

22      Q.   That's pretty much true every time a

23   physician writes a prescription, that's kind of a

24   risk benefit, you want to make sure that the drug

25   is not going to cause more damage than --

PKY183381177

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    More harm to the patient.

2      Q.    In fact, that's kind of the concept of

3   physician practice, don't cause harm and don't --

4   isn't that true?

5      A.    Yes, it would be that.

6      Q.    Do no harm, I think I have heard that

7   before?

8      A.    But, I think particularly when you see a

9   patient writhing in pain who is profoundly

10  suffering, that is rather compelling than simply

11  looking at a blood pressure number or looking at

12  a cholesterol level, it's quite profound.

13     Q.    Especially in cancer pain patients?

14     A.    No, I think it's even sadder in patients

15  that don't have cancer because they may not die

16  and they may have to live with it.

17     Q.    If a patient has terminated opioid

18  medication and they have developed addiction,

19  there could be a reason for continued management

20  of that patient, is that correct?

21     A.    Well, could you say that again?

22     Q.    Sure.  If a patient has stopped opioid

23  medication but the patient has developed

24  psychological dependence or addiction, there

25  could be a potential reason to continue to treat

PKY183381178

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   that patient?

2        MR. HOFFMANN:  I am going to object to

3        the form of the question but you may answer

4        if you can.

5   BY MR. COLANTONIO:

6        Q.   Due to the risk associated with

7   addiction --

8        MR. HOFFMANN:  I still object to the

9        form of the question.

10       THE WITNESS:  Well, if a patient is an

11       addict, they are an addict and they are

12       abusing the drug.  If a patient has a history

13       of drug addiction, they don't need treatment

14       so I don't --

15   BY MR. COLANTONIO:

16       Q.   Well, I think you indicated before that

17  if a patient does develop addiction, they could

18  need treatment to treat that condition,

19  addiction, correct?

20       A.   I did and that would be a patient who

21  has, let's say, actively been misusing opioids,

22  is physically dependent on them so they need the

23  opportunity to be detoxified from their drug.

24  They need to be put into any one of a series of

25  programs like a drug abstinence program, a drug

PKY183381179

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    free program, a narcotics anonymous program, a

2    methadone maintenance program or buprenorphine

3    program, okay, for a period of time.

4         But once they have done that and once

5    they are no longer on the opioids and once they

6    are discharged from those programs which lasts

7    periods of time, they don't need to -- they don't

8    need more treatment.

9        Q.   Don't those programs also often times

10   have periods where patients come back?  There can

11   be relapses, there can be additional support

12   provided for the person to deal with this

13   lifelong problem?

14       A.   Well, if the patient has a relapse, then

15   they need treatment for the relapse.  But they

16   don't -- if they don't have a relapse, they don't

17   -- they don't have anything they need a treatment

18   for.

19            MR. COLANTONIO:  Let's take five

20       minutes.

21            THE VIDEOGRAPHER:  Going off the record,

22       10:46.

23            (Whereupon, a brief recess was taken.)

24            THE VIDEOGRAPHER:  Returning to the

25       record 11:04.

PKY183381180

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    BY MR. COLANTONIO:

2        Q.    Do you agree with this statement, drug

3    addiction is a treatable disease utilizing a

4    multi disciplinary approach but relapse is

5    common?

6        A.    Yeah.

7            MR. COLANTONIO:  Those are all the

8        questions I have.

9            MR. HOFFMANN:  Why don't we see if the

10       people on the phone have questions.

11           MS. SEAMON:  I don't have any.

12           MR. FARRELL:  Bob Farrell, I have none.

13           MS. DOBBINS:  This is Stephanie Dobbins,

14       I have no questions.

15           MR. HOFFMANN:  It is our hope that

16       Dr. Foley will testify live.  But in case

17       that turns out not to be possible, I am going

18       to ask some questions on direct.

19           MS. LYONS:  Are you going to be doing

20       that from there, Bill?

21           MR. HOFFMANN:  No, I was going to

22       suggest that I switch seats so that she is

23       looking into the camera when she is

24       responding to me.

25           THE VIDEOGRAPHER:  Going off the record,

PKY183381181

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1     11:05.

2                    DIRECT EXAMINATION

3  BY MR. HOFFMANN:

4      Q.   Dr. Foley, I just have a few questions

5  for you.  First, when did you receive your

6  medical degree?

7      A.   In 1969.

8           THE VIDEOGRAPHER:  Returning to the

9      record, it's 11:09, beginning of tape number

10     three.

11          MR. HOFFMANN:  I'm sorry, I beg your

12     pardon.

13 BY MR. HOFFMANN:

14     Q.   Dr. Foley, when did you receive your

15 medical degree?

16     A.   1969.

17     Q.   And, do you hold any board

18 certifications?

19     A.   I am board certified in neurology and

20 psychiatry.

21     Q.   And, when did you become board certified

22 in neurology and psychiatry?

23     A.   1975.

24     Q.   How would you describe your specialty in

25 the field of medicine?

PKY183381182

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1          A.    I was trained as a neurologist and then

2     as a neuro oncologist and then as a clinical

3     pharmacologist.  And I work at Memorial Sloane-

4     Kettering Cancer Center and my focus has been on

5     the clinical pharmacology of opiate analgesics in

6     patients with pain.

7          Q.    How long have you been focusing on the

8     clinical pharmacology of opioid analgesics in the

9     treatment of pain?

10         A.    Really, since I finished my residency

11    since 1974, when I went to Memorial.

12         Q.    Have you prescribed opioids to patients

13    since 1974?

14         A.    Yes, I have and before that as well as

15    an intern and resident.

16         Q.    And, over the course of your practice,

17    can you give me any kind of estimate as to how

18    many patients you have prescribed opioids to?

19         A.    Thousands of patients.

20         Q.    And, do you continue prescribing opioids

21    to patients today?

22         A.    Yes.

23         Q.    Have you -- in prescribing opioids to

24    patients, do you see any advantages to long

25    acting or sustained released opioids compared

PKY183381183

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   to on the one hand, compared to short acting or

2   immediate release opioids on the other hand?

3       A.    Well, for patient's convenience, it has

4   had a very important impact because instead of

5   having to take a medication every three hours or

6   four hours, they can take it every eight hours or

7   12 hours or in some cases every 24 hours because

8   there is a series of preparations out there that

9   allow them that kind of variability.

10      Q.    Did you have anything to do with the

11  development of sustained release opioids?

12      A.    In the late seventies and early

13  eighties, there was an increase in attention to

14  the role of oral morphine in patients with pain

15  and cancer.  And after there was available oral

16  morphine in an immediate release, there was an

17  increasing interest by a variety of companies to

18  develop slow release or controlled release

19  preparations.  And so we worked with a variety of

20  companies in developing slow release and

21  controlled release preparations for Morphine.

22      Q.    When you say we worked with a variety of

23  companies, just what did you do?

24      A.    My particular role was in advising the

25  companies about who had cancer pain, who would be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    appropriate for studies, what the study designs

2    might be, those particular aspects.

3         Q.   Did you have anything to do with the

4    encouragement of the pharmaceutical industry to

5    develop a sustained release morphine?

6         A.   Yes, because we felt that patients would

7    benefit from drugs that would facilitate their

8    ability to have continuous pain relief.  So, we

9    were encouraging to the pharmaceutical companies

10   I guess would be the best.

11        Q.   Now, I want to understand a little bit

12   about your patients because, as I understand it,

13   you work at a facility that specializes in the

14   treatment of cancer.  Would it be fair for us to

15   assume that all the patients you treat have pain

16   from cancer and will be on opioids until they die

17   from that cancer pain?

18        A.   No.  Again, when we started, since we

19   were clearly -- the clinic was called the Medical

20   Pain Clinic.  It was initially developed by Gray

21   Hood and it became -- in it we saw a wide variety

22   of patients with both cancer pain and non-cancer

23   pain.

24        Q.   Have you in your professional experience

25   ever prescribed opioids to patients for pain and

PKY183381185

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    then had that pain, the pain -- the cause of the

2    pain resolve and you wean the patients off of

3    opioids?

4         A.    In our setting, it has been a very

5    common phenomenon to see that, both in the group

6    of patients who have prolonged post surgical pain

7    syndromes that last weeks or months, patients who

8    have prolonged orthopedic procedures and patients

9    who have, for example, neurologic pain syndromes

10   like brachial avulsions of the brachial plexus or

11   have post -- acute herpes zoster that then goes

12   on to post herpetic neuralgia.  And there are

13   groups of patients who for a period of time take

14   opioids and then are tapered off the drug because

15   they are rehabilitated, they are improved, their

16   pain dissipates and they are no longer taking

17   them.

18        Q.    I asked you about patients that you had

19   prescribed opioids to but are you also familiar

20   with patients that fellows in your program

21   provide opioids to?

22        A.    Since 1975, we have had a training

23   program and, you know, Dr. Portenoy, Dr. Paine, a

24   whole variety of individuals who now are experts

25   in this area have trained in our program.

PKY183381186

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    Now, of the patients that you are

2    familiar with through your treating them

3    personally and supervising your fellows in

4    treating them, what percentage of patients do you

5    find are successfully weaned off of opioids when

6    their pain issue resolves and then subsequently

7    become opioid addicts?

8          MR. COLANTONIO:  I am just going to

9       object to the form of the question and also

10      object on lack of foundation.

11   BY MR. HOFFMANN:

12     Q.    Doctor, go ahead and answer it.

13     A.    Could you repeat the question?

14     Q.    Yes.  Of the patients to whom you

15   prescribe opioids and to whom your fellows

16   prescribe opioids, what has been your experience

17   in terms of patients who have been prescribed

18   opioids, then weaned off of the opioids when

19   their pain issue resolves and then at some

20   subsequent time become opioid addicts?

21         MR. COLANTONIO:  Same objection.

22         THE WITNESS:  That has not been part of

23      our experience.  We haven't seen that occur

24      in our patients.  The patients have been

25      tapered off their drug successfully and

PKY183381187

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    unless they have a recurring pain problem

2    which they may go back on their drug, that

3    may occur, but we haven't seen them develop

4    any problems with just having been exposed to

5    the drug as part of a surgical procedure or

6    prolonged post surgical procedure or as part

7    of any other cancer illness or non-cancer

8    illness.

9  BY MR. HOFFMANN:

10    Q.   Well, would you know if they did?

11    A.   Well, again, because these patients

12  often are in a setting of a cancer institution,

13  we would see them because they may come back to

14  our institution if they had a relapse and might

15  have abhorrent behaviors.  They would typically

16  come back to us because, and we would know about

17  them because the physicians who may be treating

18  them would want their records for what had

19  happened to them in the past.  And those records

20  requests would come directly to our program.  So,

21  we would tend to have a sense of who they were.

22        MR. HOFFMANN:  I want to mark this as an

23    exhibit.

24        (Whereupon, Defendant's Exhibit 1 was

25    marked for identification.)

PKY183381188

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    BY MR. HOFFMANN:

2        Q.    Dr. Foley, we have handed you what has

3    been marked as Defendant's Exhibit No. 1 and I

4    will represent to you that that is an exhibit to

5    the deposition of Edon Nelson that has been taken

6    in this case.  Is that a document that you have

7    reviewed previously?

8        A.    Yes, I think I have.

9        Q.    I want to ask you a few questions about

10   that.  Specifically looking at paragraph one and

11   the last sentence of paragraph one, it states,

12   however, it is standard medical practice to avoid

13   the use of opioids for persons suffering long

14   term non-traumatic moderate levels of pain

15   because continued pain management can only be

16   achieved over time by increasing the dose of the

17   opioid prescribed.  Do you agree with that

18   statement, Dr. Foley?

19       A.    No, I don't agree with that statement.

20       Q.    Why not?

21       A.    Well, again, it would be helpful to take

22   it in different pieces or parts.  First of all,

23   now, it's been recognized that there are -- there

24   is a sub group of patients who may respond

25   effectively to opioid analgesics on a chronic

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1    long term basis and they would be potential

 2    candidates.  And, again, there have been a

 3    variety of studies that have demonstrated the

 4    efficacy of opioid analgesics in patients with

 5    neuropathic pain and different types of arthritis

 6    pain and in patients with low back pain and

 7    patients with post herpetic neuralgia and

 8    patients with peripheral neuropathy.  So there

 9    have been now guidelines written by the American

10    Pain Society and the Academy of Pain Medicine to

11    identify that such patients may benefit and

12    should be considered for treatment.  So, that's

13    my sort of first part.

14           I disagree with that the construct that

15    continued pain management can only be achieved

16    over time by increasing the dose of opioids

17    prescribed and I disagree with that statement

18    because even our very small study of the 38

19    patients that we talked about previously

20    demonstrated that those patients did not

21    necessarily escalate their drug.

22           And, again, there is increasing evidence

23    that patients can stay stable for long periods of

24    time on chronic opioid therapy.

25       Q.   Let me ask you a little bit more about

PKY183381190

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    that because it is my understanding that

2    Dr. Nelson has opined that because of the

3    development of tolerance, there is no plateau

4    that patients reach and a patient prescribing

5    opioids will continue to need escalating doses of

6    opioids as the tolerance to the opioid

7    increases.  Has that been true in your

8    experience?

9        A.    It's not been true in our experience or

10   in others in which this conceptualization of

11   tolerance which does develop in some patients,

12   the development of tolerance per se has been

13   hypothesized to be the driving force for why

14   patients require higher doses of drugs.  And yet

15   when one looks at it in a population of patients,

16   one sees that it's typically the change in the

17   pain stimulus that is driving the requirement for

18   an increase in the drug.

19            And so the animal studies that are the

20   basis for this whole understanding of this

21   phenomenon were done in which the stimulus was

22   kept the same.  When you change the stimulus as

23   occurred in patients, the reason for them

24   increasing their dose of drug is then escalating

25   pain or progression of disease.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1            So, the bottom line to all of this is
2    that tolerance occurs to different effects of the
3    drug at different rates, that many patients can
4    take a stable dose of drug for a long period of
5    time and there is literature to support that and
6    so that they don't just increase their drug
7    continuously but rather stay at a stable dose.
8        Q.   Can you recall any examples of patients
9    that you have had that have been on a continuing
10   non-escalating dose of a particular opioid for
11   over a year, for example?
12       A.   I mean, I have a series of patients like
13   that.  I have a woman who is an 85 year old
14   patient who takes oxycodone and has been taking
15   exactly the same dose for relatively -- has been
16   taking -- she has been taking 240 milligrams of
17   oxycodone for now five or six years for
18   neuropathic pain syndromes.  And she lives
19   independently and lives here in the city and her
20   daughter lives in the same building.  And I see
21   her on a regular basis and she has not escalated
22   her dose of drug, as an example.
23       Q.   Has this impaired her cognitive
24   function?
25       A.   No, she is fully independent, has been

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    able to live independently.

2        Q.   In your experience, does being on a

3    continuous high dose of opioids such as you

4    described for this patient, impair a person's

5    cognitive functioning?

6        A.   It potentially could but our experience,

7    again, is that patients become quite tolerant to

8    the side effects that impair cognitive function

9    so that they are tolerant to the sedative effects

10   and they are tolerant to the somnolent effects

11   and they are tolerant to the confusion effects of

12   the drug so they remain stable.

13       Q.   And, you mentioned with regard to this

14   patient that she was on oxycodone, any particular

15   -- well, was this particular patient on

16   OxyContin?

17       A.   She was not on OxyContin because her

18   insurance company refused to pay for OxyContin.

19       Q.   Do you prescribe OxyContin to some of

20   your patients?

21       A.   Yes, I do.

22       Q.   I would like you to look now at

23   paragraph three of Defendant's Exhibit 1 where it

24   states that it is a well established medical fact

25   that seven percent of all persons chronically

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    exposed to opioid analgesics will become addicted

2    to the narcotic.  Do you agree with that?

3        A.   No, I don't.

4        Q.   Do you know -- do you as part of your

5    practice keep up with the literature on opioid

6    addiction?

7        A.   Yes, I do.

8        Q.   Are you aware of any support in the

9    literature on opioid addiction that would support

10   that statement in paragraph three?

11       A.   I don't know of any data that would

12   support that.  I mean, all the data that I know

13   of says that we don't know this number.

14       Q.   What if we change that number to three

15   and a half percent, what would your answer be

16   then?

17       A.   I would still say that we don't know the

18   number.

19       Q.   There is a statement in the package

20   insert that says in effect that addiction to

21   opioids when prescribed for pain is rare.  Do you

22   agree with that or disagree with that?

23       A.   Yes, I agree with that.

24       Q.   What is the basis for your agreement

25   with that?

PKY183381194

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    First of all, it is my only clinical

2  experience in treating patients with pain.  And,

3  again, this has been the evolution of having the

4  opportunity to be able to provide chronic opioid

5  therapy for patients for years at a time and to

6  see how rare this phenomenon is in that patient

7  population.  So, that's one basis.  And,

8  increasingly, that of my colleagues who have also

9  observed this.

10         And then when Dave Durrenson looked at

11  the relationship between increasing prescriptions

12  of opioid analgesics and increasing the abuse

13  from like 1990 to 1996, he demonstrated that

14  there was no evidence of abuse.  And this is

15  again looking at that same period.

16         So there is a series of suggestions that

17  have identified and an increasing number of

18  patients who are being treated with opioids that

19  have begin to question whether anyone in the

20  setting of receiving opioids in the setting of

21  pain becomes addicted.  And it is really I think

22  such a critically important question because the

23  experience of caring for patients and treating

24  pain in a medical setting is just totally

25  different than what we see happens in addicts who

PKY183381195

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    take this drug and misuse it.

2        Q.    Let me ask you to turn over to paragraph

3    12 on page 4 of Defendant's Exhibit 1, if you

4    would, please?  In looking at the first sentence

5    there, it states, the duration of analgesia from

6    OxyContin falls short of the 12 hours published

7    in the package insert.  Do you agree or disagree

8    with that?

9        A.    I haven't reviewed all of the

10   pharmacokinetic data so I don't think I could

11   even agree with that statement because I don't

12   know that that statement is true.  So --

13       Q.    In your experience as a treating

14   physician, has the duration of analgesia from

15   OxyContin fallen short of the 12 hours published

16   in the package insert?

17       A.    Again, in treating patients, you have to

18   choose the appropriate dose.  So, if you -- the

19   time action of a drug will be directly related to

20   the dose you give the patient.  So, if you end up

21   under dosing the patient, then they may have

22   inadequate analgesia and look like the drug

23   doesn't work for 12 hours.

24            So, I have a lot of respect for how the

25   FDA reviews this pharmacokinetic data in deciding

PKY183381196

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 150

1   whether a drug works for what period of time

2   because they are very very stringent about that.

3   So, my sense is that typically you have to give

4   the patient the appropriate dose.

5       Q.   If a patient is on active opioid

6   therapy, is there any obligation on behalf of the

7   treating physician to monitor that patient to

8   determine if symptoms of addiction begin to

9   occur?

10      A.   Yes, of course.

11      Q.   If a patient has been on opioid therapy

12  and has successfully weaned off of the opioid, is

13  there any reason to continue to medically monitor

14  that patient for the rest of his or her life to

15  determine if that patient will become an opioid

16  addict?

17      A.   I mean, there is no, no indication to do

18  that and there is a lot of clinical data to

19  suggest that we would not do that.

20      Q.   Let me ask you now to turn to paragraph

21  13 beginning on page 4 and continuing on page 5

22  of this, the Exhibit 1, Defendant's Exhibit 1.

23  And it's fairly long so I am going to ask you

24  just to read that paragraph to yourself and then

25  I would like to ask you what you agree with and

PKY183381197

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    disagree with in that paragraph?

2       A.   So to start with reading paragraph 13?

3       Q.   Yes, just read paragraph 13.

4       A.   I don't agree with what it says.

5       Q.   Well, why don't you go through the

6    paragraph and take it any way you want, sentence

7    by sentence, if you would prefer, and explain

8    why, tell us where you don't agree and why you

9    don't agree?

10      A.   Well, patients have used OxyContin and

11   have then discontinued the OxyContin and then

12   their pain has improved.  They no longer require

13   taking the drug.  There would be no reason to

14   monitor them for anything other than general

15   medical care.  So it would not seem to me that

16   you would monitor them for anything related to

17   OxyContin.

18          Then this issue, exposure to large dose,

19   i.e., more than 30 milligrams per day, I don't

20   know of any evidence that, first that someone

21   would call 30 milligrams large doses.  Second of

22   all, that that dose would produce these

23   particular effects.  It may have some effects

24   that would be the foundation for addiction.

25          30 milligrams per day at least in the

PKY183381198

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    published studies and I think it's up to -- I am

2    not quite sure, it's up to 60 milligrams,

3    patients could be abruptly stopped from their

4    drug and not even go into withdrawal.  And this

5    was noted in a chronic long term study that was

6    published in patients receiving opioids for

7    osteoarthritis.  So we have evidence that even up

8    to 60 milligrams when a patient was stopped, they

9    didn't even show signs of physical dependence.

10           So I don't know the basis, any

11   scientific basis for that dose of 30 milligrams.

12   So, to suggest that all persons have been exposed

13   to sufficient doses for a sufficient time to

14   produce a basis for addiction, I don't know of

15   any understanding or any basis and it clearly is

16   not within my clinical experience.

17           Then this sentence, euphoria is

18   produced from relief of pain.  Well, every bit of

19   data shows that euphoria occurs independent of an

20   analgesic effect if it occurs.  And again in the

21   oxycodone, OxyContin studies, euphoria was

22   reported to occur in somewhere between one to

23   five percent of patients as a side effect.  So a

24   very rare complication compared to the

25   complications, the side effects that we have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    reported.

2            So this construct of euphoria having --

3    the idea that euphoria is related to pain is

4    incorrect, number one.  And that it occurs as a

5    result of oxycodone is a rare phenomena.

6            Oxycodone is metabolized to oxymorphone

7    but the data demonstrates that there is the major

8    active ingredient is oxycodone in producing the

9    analgesic effects.  Then this idea that it is

10   remembered and leads to a desire to repeat the

11   drug administration, well, it is not even

12   remembered enough to produce physical dependence

13   which is often closely associated with drug

14   addiction.

15           So, it would seem to me unlikely that

16   there would be any clear relationship there.  I

17   agree with the statement that intense drug

18   craving is a hallmark of opioid addiction.

19           So, in short, I don't know of any

20   evidence to suggest that if somebody has been

21   exposed to 30 milligrams of oxycodone that they

22   should be followed -- OxyContin, that they should

23   be followed for the rest of their life.  And

24   there are a lot of patients in a post operative

25   setting who receive oxycodone which is the active

PKY183381200

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    ingredient of OxyContin who sure are not being

2    followed for the rest of their life and have no

3    problems with addiction.  So I don't think there

4    is a basis scientifically or in clinical

5    practice.

6         Q.   You were asked some questions about your

7    CV or articles in your CV earlier this morning

8    and just for the record, I would like to mark and

9    include as an exhibit the CV that you were asked

10   about.

11             And let me just ask you, it appears that

12   the most recent publication on this, if these are

13   in fact in chronological order, is 2001 --

14        A.   Yeah, that's wrong.

15        Q.   And, we can substitute another CV at a

16   later date.  But my question is, as of August,

17   2001, is this an accurate curriculum vitae for

18   you?

19        A.   Do you want me to look at every page?

20        Q.   No, just see if you recognize it as your

21   CV.

22        A.   I do recognize it as my CV but we keep

23   addressing -- it may not be fully updated.

24             MR. HOFFMANN:  Okay; then let's mark it

25        as Defendant's Exhibit 2 and make it part of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 155

1       the record, then?

2           (Whereupon, Defendant's Exhibit 2 was

3       marked for identification.)

4           THE WITNESS:  Okay; and it clearly isn't

5       updated since it's 2001.

6           MR. HOFFMANN:  Let's take a break for

7       just a minute of minutes.

8           THE VIDEOGRAPHER:  Going off the record

9       11:36.

10          (Whereupon, a brief recess was taken.)

11          THE VIDEOGRAPHER:  Returning to the

12      record 11:40.

13  BY MR. HOFFMANN:

14      Q.   Dr. Foley, I just want to try to clarify

15  one more thing from your testimony this morning

16  and that is the distinction between a weak opioid

17  and I guess a strong opioid.

18      A.   That is correct.

19      Q.   And, in the case of some opioids, does

20  the distinction between strong and weak depend on

21  dose?

22      A.   Yes and no, but in drugs that are pure

23  agonist like oxycodone it is an issue of dose.

24      Q.   Okay, well, let's stick with oxycodone.

25  Is it a hard and fast distinction or is it a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   continuum between strong and weak.

2       A.   It's been traditionally a way in which

3   drugs as they came on the market from about the

4   1950s on were categorized as to what was thought

5   to be their spectrum for analgesia.  So, let's

6   say codeine has been considered sort of the

7   prototic drug so doses of 30 or 60 milligrams of

8   codeine were identified as weak opioids and then

9   were studied in patients with mild to moderate

10  pain.

11      Q.   Is OxyContin identified generally as a

12  weak opioid or a strong opioid?

13      A.   Well, I think -- OxyContin, it is a

14  brand name.  The agent is oxycodone and so I

15  think we just have to talk about oxycodone.  And

16  oxycodone at low dose like five milligrams, ten

17  milligrams is considered a weak opioid.  And

18  because of that consideration is why it was

19  placed in the WHO step two analgesic ladder at

20  step two and then it was placed in step three at

21  higher doses.

22      Q.   And, is there a hard and fast line where

23  you draw the distinction between higher doses and

24  lower doses when you are talking about oxycodone?

25      A.   Again, it's not a hard and fast line but

PKY183381203

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    it's clearly doses of five milligrams or ten

2    milligrams have been considered low dose and at a

3    step two ladder.

4        Q.   And, doses above that have been

5    considered strong opioids?

6        A.   No, I am identifying those for sure and

7    above that again is quite individual.  So, to be

8    fair -- and I think I would have to go back and

9    look this up -- but I think it would go up to

10   about 30 milligrams would consider it still in a

11   weak opioid class.

12       Q.   30 milligrams daily?

13       A.   Yes.

14       MR. HOFFMANN:  Those are all my

15   questions, thank you very much.

16            Now, Mr. Colantonio may have some

17   more or may not.

18       MR. COLANTONIO:  I do have a few

19   questions, doctor.

20                    REDIRECT EXAMINATION

21   BY MR. COLANTONIO:

22       Q.   Doctor, in terms of the dosing of

23   OxyContin at Q 12 and the issue of the efficacy

24   of OxyContin over Q 12 over versus Q eight, are

25   you aware of any statistics that would indicate

PKY183381204

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   the number of physicians who prescribe OxyContin

2   who actually write it at Q 8 versus Q 12?

3       A.   I think in one of the many depositions

4   that I read, I read that there was IMS data that

5   suggested that some percentage, 14 percent or

6   something like that, I really would need to look

7   at exactly what they said, wrote the drug Q eight

8   hours.

9       Q.   And, would you consider, if that's true,

10  12 to 14 percent of physicians write OxyContin at

11  Q eight and not Q 12, would you consider that

12  statistically a significant number of

13  physicians?

14          MR. HOFFMANN:  I object to the form of

15      the question.

16  BY MR. COLANTONIO:

17      Q.   Do you understand what that means?

18      A.   I don't understand what that means.

19      Q.   Do you understand what the term

20  statistically significant means?

21      A.   As compared to what?

22      Q.   As compared to -- in your profession, do

23  you understand what the term statistically

24  significant means?

25      A.   Well, I would have to have all the data

PKY183381205

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    to make that -- I don't know what the P value is

2    so what P value are we talking about.

3         Q.    What do you mean by P value?

4         A.    That's the degree of significance.  So

5    you would have to have all the data to call that

6    significant.

7         Q.    So, if you're trying to assess how many

8    physicians write a drug at Q 8 versus Q 12 and

9    you find out that 12 to 14 percent do that, would

10   you consider that a significant number of

11   physicians?

12        A.    I would consider that a relatively small

13   number.

14        Q.    Do you know the reason why physicians

15   would write OxyContin at Q eight versus Q 12?

16   Have you ever researched that at all?

17        A.    No, and even if they write it, it

18   doesn't mean that that's how the patient takes

19   it.

20        Q.    Well, we hope that a patient takes it

21   how we write it, isn't that right?

22        A.    But writing it doesn't mean that's how

23   the patient is taking it.

24        Q.    Are you aware of any information

25   indicating that patients had related to their

PKY183381206

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    doctors that OxyContin after Q 8 was not working?

2        A.    Um-uh.

3        Q.    Versus Q 12?

4        A.    Yeah, and I think this may be an example

5    of under treated pain of an inadequate initial

6    dose.  And so one of the choices would be that

7    you would go up on the dose, you would increase

8    the dose and then expand the time interval.  And,

9    we know when you study -- well, there are sort of

10   several aspects of this.

11           Some patients find that taking a drug on

12   a Q 8 hour basis provides them with adequate

13   analgesia and less side effects.  So, they take

14   let's say they take 40 milligrams of OxyContin in

15   the morning and they can get relief for 12

16   hours.  But they notice that for the first three

17   hours they are a litter bit more sleepy than they

18   would like to be and then they are fine.

19           But if they take 20 milligrams every

20   eight hours, they don't feel so sleepy in those

21   first three hours and their side effects spectrum

22   is less.  And so it is more acceptable to them to

23   function at the way that they need to function to

24   take it on a Q eight hour basis.  And this

25   reflects the individual variations of patients as

PKY183381207

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   they take drugs.

2           And we have learned this with

3   transdermal fentanyl, we have learned this with

4   slow release morphine preparations, that you may

5   have to adjust it for some patients, the time

6   frame of using controlled release preparation

7   because it is the best way to minimize their side

8   effects.

9           So, there is a need to be that type of

10  flexibility and to prescribe that for some

11  patients.

12      Q.   If you were to learn that a significant

13  number of patients reported that OxyContin was

14  not working for them relieving their pain beyond

15  Q eight, would that be a potential indication for

16  you that OxyContin was not being effective after

17  Q eight?

18      A.   It's very possible but not being

19  effective would not be the information I would

20  need.  I would need a lot more.  I would need to

21  know what their side effects were.  I would need

22  their dose.  I would need to know whether their

23  dose was matched to their prior narcotic

24  exposure.  So you would need to know all of those

25  pieces.  But, in my experience, we often have to

PKY183381208

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 162

1    change the interval on how we manage the

2    patient's pain based on the individual needs of

3    the patient.

4           And we have done pharmacokinetic studies

5    with all of these drugs which show some patients

6    half-life is four hours and some patients is

7    eight hours and some is 12 hours.  So I would

8    have to know the half-life of the drug in that

9    particular patient.

10    Q.   It would be a piece of the information

11    you would consider in terms of determining

12    whether or not the drug is effective?

13    A.   If the patient has reported that, sure.

14    Q.   As far as you were commenting on

15    Dr. Nelson's opinions and one related to

16    tolerance --

17    A.   Yes.

18    Q.   You agree that tolerance is a

19    predictable pharmacologic effect of opioid

20    treatment?

21    A.   I wish it were predictable, it is not

22    predictable.

23    Q.   Let me, if I could, step down the table

24    a minute and I want to show you what was provided

25    to us as your opinions in this case and ask you

PKY183381209

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 163

1   to look at the bullet point towards the bottom of

2   the page.  And it says here tolerance and

3   physical dependence are predictable pharmacologic

4   effects seen in response to repeated

5   administration of an opioid in both man and

6   laboratory animals.  Do you agree with that

7   statement?

8        A.   Yes and no.  I think -- I wish I could

9   predict it but I will say yes, fine, I will agree

10  with it.

11       Q.   Do you want to change your answer, what

12  you said?

13       A.   No, it's fine, I will agree with it.

14       Q.   So, are you saying that the answer you

15  just gave me a minute ago was incorrect and now

16  it is yes?

17       A.   No, the answer I gave before is that I

18  can't answer it with yes it is predictable, no it

19  is not predictable.  It has a series of other

20  paragraphs that would go with it.

21       Q.   Let me ask you this question.  Is that

22  statement on that piece of paper correct or

23  incorrect?

24       A.   It is correct.

25       Q.   And, you do agree that tolerance can

PKY183381210

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   develop in patients who are --

2        A.   Absolutely.

3        Q.   And, if tolerance develops, then there

4   is a need to increase the dosage?

5        A.   Well, tolerance to what?

6        Q.   Well, how do you define tolerance?

7        A.   Well, tolerance develops to a wide range

8   of the side effects of the drug.  And what again

9   we have observed is that, for example, patients

10  develop tolerance to the respiratory depressant

11  effects of the drug.

12       Q.   I guess what I am referring to is

13  tolerance to the effect of the drug on pain?

14       A.   So tolerance to analgesia.

15       Q.   Yes.

16       A.   So, if a patient has tolerance to

17  analgesia, one would have to increase the dose.

18       Q.   And, tolerance to analgesia is something

19  that occurs to patients on opioid medication like

20  OxyContin; is that true?

21       A.   That's true.

22       Q.   Now, you did indicate that you believed

23  that psychological dependence or addiction to

24  opioids is rare; is that your feeling?

25       A.   That is correct -- is rare in patients

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    who are medically treated with opioids in the

2    setting of having a chronic pain syndrome.

3        Q.    Do you believe that that

4    characterization rare is dependent upon, could be

5    dependent upon some of the factors we talked

6    about before such as the socioeconomic factors,

7    psychological factors, that it may be for a

8    particular sub group that the potential for

9    psychological dependence or addiction could be

10   greater than rare depending on those factors?

11       A.    Yeah.  Yeah.

12       Q.    You also indicated that part of your

13   opinion is based on your own clinical experience

14   and then you mentioned you have treated a number

15   of patients.  But have you ever gone back and

16   actually precisely quantified the exact number of

17   patients that you have treated?

18       A.    I mean, I could do that because we kept

19   records of all the patients we saw.

20       Q.    I understand you can do it.  I am just

21   asking you if you ever actually have ever done

22   that.

23       A.    At the annual reports at the end of the

24   year we said how many patients we saw.

25       Q.    As you sit here today, do you know how

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1   many exactly you saw?

 2        A.   No, I don't think I could give you an

 3   exact number.

 4        Q.   As far as the number of those patients

 5   that were treated with mild opioids versus strong

 6   opioids, I presume as you sit here today you

 7   can't tell me that exact number?

 8        A.   No, but the predominant number of

 9   patients would be treated with opioids.

10        Q.   I think my question was strong opioids

11   versus weak opioids, could you tell me --

12        A.   No, I could not tell you that today.

13        Q.   And, would you agree that as of today,

14   you believe the data is not available to

15   establish a true incidence of addiction to

16   opioids.  Do you agree with that statement?

17        A.   I agree with it.

18        Q.   I think you indicated that your belief

19   about the rarity of psychological dependence or

20   addiction is based upon some published studies;

21   is that true?

22        A.   There are published studies.

23        Q.   Well, is your belief -- is your

24   statement that you believe psychological

25   dependence or addiction to opioids is rare, is

PKY183381213

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    that based in any way on a study?

2         A.    It is based really quite profoundly on

3    my clinical experience and then it is supported

4    by these clinical studies.

5         Q.    So, your opinion that you have that

6    addiction or psychological dependence to opioids

7    is rare is based upon your clinical experience;

8    is that true?

9         A.    That's correct.

10        Q.    It is not based upon or in forming that

11   opinion, you are not relying upon the published

12   studies concerning addiction rates and opioid

13   treatments; is that true?

14        A.    That's true, simply for the fact that we

15   probably have one of the largest populations of

16   patients who have been treated with opioids in

17   the country so it's a pretty large population.

18        Q.    Now, when you talk about your own

19   clinical experience, you do have patients as you

20   indicate that would come back to you for

21   treatment because they might have cancer disease

22   or some other disease that requires retreatment;

23   is that correct?

24        A.    Retreatment for their pain.

25        Q.    Yes?

PKY183381214

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1     A.    Um-uh.

2     Q.    Or some physical problem?

3     A.    I guess I don't know what you are asking

4  me.

5     Q.    You are saying that the reason why a

6  patient would come back to you is retreatment for

7  pain; is that right?

8     A.    That is correct.

9     Q.    And, that's one way you indicated that

10  you could gauge whether or not that person was

11  addicted or psychologically dependent upon the

12  drug because you had a chance to reexamine that

13  person in the future after they stopped their

14  medication?

15     A.    I guess so.  But the patient wasn't

16  addicted when they left us so -- and, I don't

17  have any evidence that when they are not addicted

18  when they left us, that they come back to us

19  addicted unless they are abusing drugs on the

20  street.

21     Q.    Well, is it possible that a person could

22  have opioid medication, stop that opioid

23  medication and a physician based upon how that

24  occurred believed that the person is not addicted

25  and that person could actually be addicted and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   later on manifest the signs of that addiction?

2        MR. HOFFMANN:  I object to the form of

3     the question.

4   BY MR. COLANTONIO:

5        Q.   Do you understand my question?

6        A.   It's a little complicated.

7        Q.   Is the question complicated or the

8   issue?

9        A.   Well, the issue is complicated but the

10  question is a little complicated so if I could

11  take it in pieces, like the first --

12       Q.   Let me try to rephrase it for you.  Is

13  it possible that a person could be on opioid

14  treatment like OxyContin --

15       A.   So it could be -- can I interrupt you?

16  Is this all right?

17       Q.   We will set up the circumstances.

18       A.   So, go ahead.  The patient is receiving

19  pain therapy for their pain.

20       Q.   Yes.

21       A.   And is taking OxyContin.

22       Q.   Yes, they are then weaned off

23  OxyContin.

24       A.   So their pain goes away and they are

25     taken off the drug.

Page 170

1      Q.   Yes, and at that time you believe that
2  they are not addicted to the drug, at the time
3  that their medication is stopped?
4      A.   They have no abuse behaviors, they have
5  no abhorrent behaviors, they have no signs of
6  physical dependence, they have no signs of
7  psychological dependence, they haven't been
8  selling their drugs, I have no evidence of any of
9  that behavior, okay.
10     Q.   Or you have some evidence but not enough
11 to convince you?
12     A.   Say I have no evidence.
13     Q.   Say you have no evidence.  Is it
14 possible that that person could still have
15 addiction but it doesn't manifest itself until
16 later on?
17     A.   No.
18     Q.   That is not a possibility?
19     A.   Well, addiction -- if we agree with the
20 definition of what addiction is, they don't have
21 it.  They don't have what is addiction.
22     Q.   But, is it possible that -- I mean,
23 addiction is based on to a large extent what a
24 person does?
25     A.   Right, they are not doing it so they

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 171

1    don't have it.

2        Q.   Is it possible that they can do it later

3    on after they leave that treatment and they can

4    be addicted to the drug?

5        A.   But, everything is possible, you know.

6        Q.   I am just asking you if this is

7    possible.

8        A.   No, I would say it's highly impossible

9    but who am I to say.  But since everything in the

10   world is possible but then you wouldn't call them

11   addicted, it's -- it doesn't make sense.

12       Q.   What would you call them?

13       A.   Well, if they are addicted, then they

14   have all of the patterns of the behavior.  I

15   don't know what to call them.  I wouldn't even

16   ever think that this was an issue.

17       Q.   So, to your way of thinking, a person,

18   if they stopped a medication and they don't have

19   the signs of addiction at that point, they can

20   never never be addicted to that drug?

21       A.   Ever in the future?

22           MR. HOFFMANN:  Object to the form of the

23       question.

24           MR. COLANTONIO:  That's fine.

25           THE WITNESS:  They could be addicted to

PKY183381218

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 172

1        the drug if they took it another time and

2        something else happened, that could happen.

3        But pure exposure to the drug in the setting

4        of pain is not any reason to say that they

5        could be addicted.

6   BY MR. COLANTONIO:

7        Q.   But, exposure is a prerequisite for

8   addiction; true?

9        A.   You can't be addicted to the drug if you

10  don't take it.  You can't be addicted at the time

11  if you haven't and are not taking it.

12       Q.   So, you need exposure to the drug --

13       A.   At the --

14       Q.   I am sorry, to have addiction?

15       A.   You need exposure to the drug at the

16  time that you are being called an addict.

17       Q.   And, you agree that there is or physical

18  dependence is often associated with addiction; is

19  that true?

20       A.   It is often associated but it is not

21  necessarily has to be part of the definition.

22       Q.   But, it is often associated with

23  addiction; is that true?

24       A.   It's associated.

25       Q.   Now, as far as the WHO step two ladder

PKY183381219

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 173

1      --

2          A.    Yes.

3          Q.    You indicated that that -- you said

4      something like that's why OxyContin is on step

5      two, I think.  I just want to make sure I am

6      clear about this.  You stated in testimony here

7      before we broke before that the WHO step ladder,

8      step one, is mild pain; true?

9          A.    Yes.

10         Q.    And, you stated --

11         A.    Mild, yes.

12         Q.    And, you stated that step two was

13     moderate pain; is that true?

14         A.    Um-uh.

15         Q.    You have to say yes.

16         A.    Yes.

17         Q.    And, step three is severe pain.  True?

18         A.    Right.

19         Q.    It would be incorrect to suggest that

20     step two is mild pain; true?

21         A.    No, I wouldn't say that because again as

22     it has been described, no one could tightly

23     categorize and just say mild pain and moderate

24     and severe.  So, it was said mild to moderate,

25     moderate to severe.  And so if you look at it,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   it's this continuum and where does the end of

2   high mild pain enter into the early parts of

3   moderate pain.  And that's the dilemma.

4         So the important aspect is that these

5   drugs were categorized.  And that's why we went

6   even further to categorize them as weak opioids

7   versus strong opioids, to recognize that there is

8   this continuum and we can't say that the person

9   at the high end of mild pain reporting it at a

10  four and five isn't really moderate pain and the

11  person who reports a seven isn't severe pain.

12        So simply that language of mild,

13  moderate and severe is forcing us into a box that

14  is arbitrary.

15     Q.   But, it is a step ladder and it does

16  have labeling to it?

17     A.   It does have labeling to it, right.

18     Q.   Is the labeling step one is mild, step

19  two is moderate, step three is severe or is it

20  that step two is mild to moderate and step three

21  is moderate to severe, which labeling is correct?

22     A.   I think all of the labeling is correct

23  because it's a continuum.  It's a continuum.

24     Q.   So --

25     A.   So that when we talk about mild,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 175

1    moderate and severe, we are talking about

2    intensity of pain.  When we talk about the drugs

3    used, okay, then we are talking about

4    non-opioids, weak opioids and strong opioids.

5    And the problem here is I think you are asking me

6    to compare apples and oranges.

7        Q.   I don't want to ask you to compare

8    apples and oranges.  I want to stick to oranges

9    and oranges.

10       A.   Okay, me too.

11       Q.   So, is it your testimony then that step

12   two includes mild pain?

13       A.   It could include mild pain.

14       Q.   OxyContin is not indicated for mild

15   pain; true?

16       A.   Again, oxycodone.

17       Q.   My question is OxyContin.

18       A.   But, the WHO ladder never talks about

19   OxyContin, it only talks about oxycodone.  It

20   never uses brand names.

21       Q.   I accept that.  I am just asking you a

22   question.  If you know whether or not OxyContin,

23   the drug OxyContin --

24       A.   It wouldn't, we don't include it in the

25   list because it is not a generic drug.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 176

1    Oxycodone, we don't use any of those.  We don't

2    use any label to a name and that's the name of a

3    drug.  So I am going with oxycodone because

4    that's where the data is.

5        Q.   Do you know whether OxyContin is

6    indicated for mild pain?

7        A.   I think that it is not.  I think it's

8    indicated for moderate to severe pain.

9        Q.   In your clinical practice, do you know

10   how many patients had been prescribed OxyContin

11   versus other opioids?

12       A.   In our clinical setting?

13       Q.   In your clinical setting.

14       A.   On an outpatient setting, oxycodone has

15   been a commonly used drug and then those patients

16   take OxyContin.  I would have to look to tell you

17   the number.  I don't think I know that offhand.

18       Q.   And, certainly in 1985 -- you started

19   practicing medicine at Sloan-Kettering in what,

20   19 --

21       A.   I was at Memorial appointed in 1974.

22       Q.   And, so you had been practicing medicine

23   in cancer pain for some years before 1985; is

24   that correct?

25       A.   From 1974 to 1985.

PKY183381223

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 177

1       Q.   And, you had a significant experience

2   with treating patients with cancer pain as of

3   1985; isn't that correct?

4       A.   And non-malignant pain.

5       Q.   And that was at the time you wrote the

6   articles we talked about earlier today; is that

7   correct?

8       A.   That is correct.

9            MR. COLANTONIO:  Those are all the

10           questions I have.

11           MR. HOFFMANN:  I just have one question

12           and I am not going to move, if you could look

13           at the camera when you respond.

14                          RECROSS EXAMINATION

15   BY MR. HOFFMANN:

16       Q.   Your expert disclosure that

17   Mr. Colantonio talked about contains this

18   sentence.  Tolerance varies enormously among

19   patients, do you agree with that?

20       A.   Yes, I do.

21       Q.   And, to the extent that there is

22   individual patient variation, is tolerance

23   predictable or unpredictable on a patient by

24   patient basis?

25       A.   In the individual patient, the

PKY183381224

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 178

1    development of tolerance is very unpredictable.

2         Q.    But, if opioids are taken at a

3    sufficiently high dose in general, is it

4    predictable that some degree of tolerance will

5    occur?

6         A.    Yes.

7              MR. HOFFMANN:  That's all I have.

8                         REDIRECT EXAMINATION

9    BY MR. COLANTONIO:

10        Q.    Sufficiently high dose being more than

11   what, the 30 milligrams you talked about earlier,

12   a day?

13        A.    Yes.

14             MR. COLANTONIO:  Thank you. That's all

15        the questions I have.

16             THE VIDEOGRAPHER:  Going off the record,

17        12:05 p.m.

18             MR. HOFFMANN:  Unless anyone on the

19        phone wants to chime in.

20             (Whereupon, Ms. Lyons ordered a dirty

21        disc, regular copy and minuscript expedited.

22        Mr. Hoffmann ordered a dirty disc only.

23        Mr. Colantonio ordered the transcript regular

24        delivery with a minuscript and Mr. Farrell

25        ordered a minuscript and ASKII.)

PKY183381225

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 179



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PKY183381226

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 180

```
 1

 2

 3              C E R T I F I C A T E

 4

 5        I, Susan Wandzilak, Registered

 6   Professional Reporter and Notary Public in and

 7   for the State of Connecticut do hereby certify

 8   that the foregoing pages are a true and accurate

 9   transcription of my stenographic notes taken of

10   these proceedings.

11        I further certify that I am not related

12   nor in any way interested in the outcome of this

13   case.

14

15

16                    _____

17                         SUSAN WANDZILAK

18

19

20

21

22

23

24

25
```

PKY183381227

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)