PSJ3

Exhibit 57D



University Hospital and
Manhattan Campus for
the Albert Einstein College
of Medicine

**Continuum** Health Partners, Inc.

# Expense Reimbursement Form

**Event:** Emerging Practices in Pain & Chemical Dependency: 2010 Update on Opioid Therapy
**Location:** Marriott Marquis Hotel, New York, NY
**Date:** March 19 - 20, 2010

NAME: _R. Portenoy MD_

ADDRESS: _DPMPC, BIMC, First Ave at 16th ST_
_New York, N.Y. 10003_

E-MAIL: _rportenoy@chpnet.org_

PHONE: _212-844-1505_

EXPENSES: Please indicate all expenses you personally incurred, including transportation, tips, etc.

**IMPORTANT:** Receipts are required for all expenses. *Send original receipts and retain copies for your own tax purposes.* Once itemized, please return this form with the appropriate receipts. Thank you.

| | |
|---|---|
| Airline Tickets (least expensive coach fare at time of travel) | $ |
| Hotel | $ |
| Car Rental | $ |
| Taxis/Transportation | $ 19 50 |
| Meals (not to exceed $60 per day) | $ |
| Tips | $ |
| Standard Mileage Rate for Drivers ($0.55/mile) | $ |
| Other (please explain) _Parking (receipt not available)_ | $ 30 00 |
| TOTAL AMOUNT DUE | $ 49 50 |

SIGNATURE: _[signature]_   DATE: _3/22/10_

Please return this form signed with receipts within 10 days to:
**Kiersten Smith-Gaston**
**Beth Israel Medical Center**
**Office of CME**
**First Avenue at 16th Street**
**New York, NY 10003**

E-mail: ksgaston@chpnet.org

# CONFIDENTIAL

RP_000400

```
Metro-North Railroad

 Station # 22    HASTINGS

Sold Tickets          Amount
RT Adult: PK / PK     $19.50
                      --------
 Total Amount         $19.50
                      --------
 Payment: Cash        $19.50


      Thank You for Riding
        Metro North !
TSM ID #                  528
Transaction #          244364
Date / Time   03/19/10 05:22
```

CONFIDENTIAL

## Donna Reid

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Tuesday, October 27, 2009 11:38 AM |
| **To:** | Donna Reid |
| **Subject:** | FW: Purdue Analgesic Advisory Board |

---

**From:** Kaiko, Dr Robert [mailto:Dr.Robert.Kaiko@pharma.com]
**Sent:** Tuesday, October 27, 2009 11:30 AM
**To:** Russell Portenoy, MD; Knox Todd
**Subject:** Purdue Analgesic Advisory Board

Gentlemen

I've delayed getting in touch with you for some time because I was hopeful that things could be worked out without our interventions.

Russ
We haven't been able to efficiently process the agreement because, as I've been told, the Beth Israel attorney assigned to the task of processing the agree has not been sufficiently responsive to  proceed in a timely manner.  Might you be able to facilitate this by contacting Debbie within your law department?

Todd
When we raised the issue of proceeding with your agreement, we were told, as I understand it, that we would encounter the same delays and we might as well first proceed with the above agreement and then process yours.

There's always two sides to a story and I've only been privy to one side so please pardon us if we don't have the entire picture and would appreciate knowing what we might do to help move things along.

Thanks,
bk


Robert F Kaiko PhD

VP R & D Portfolio Development

Purdue Pharma L.P.

One Stamford Forum

Stamford, CT 06901

Phone: (203) 588-7210

Email: dr.robert.kaiko@pharma.com

*This communication (including any attachments) is intended only for the person or entity to which it is addressed and may contain information that is confidential, proprietary or otherwise protected from disclosure.  If you are not the intended recipient, you are hereby notified that dissemination, distribution (electronic or otherwise) or copying of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this message and deleting the message.*

CONFIDENTIAL

RP_000402

Donna Reid

| | |
|---|---|
| From: | Silva, Laura [Laura.Silva@pharma.com] |
| Sent: | Monday, November 09, 2009 11:41 AM |
| To: | Silva, Laura |
| Subject: | FW: Potential Dates for Purdue Analgesic Advisory Board Meeting |

Dear Purdue Analgesic Advisory Board Members,

The first face to face meeting of the Purdue Analgesic Advisory Board will be held on Friday January 29th.  Information regarding meeting logistics will be sent under separate cover.  We appreciate everyone's assistance in scheduling this important meeting.

Kind regards,

Laura

---

**From:** Silva, Laura
**Sent:** Tuesday, October 06, 2009 3:47 PM
**To:** Silva, Laura
**Subject:** FW: Potential Dates for Purdue Analgesic Advisory Board Meeting

Dear Purdue Analgesic Advisory Board Members,

Based on the feedback I have received to date, the meeting will be scheduled for either the 22nd or the 29th.  I am awaiting feedback from a few members to confirm which of these two dates will be utilized.  I would appreciate it if you would hold these two dates until the date can be confirmed.

Thank you

Laura

---

**From:** Silva, Laura
**Sent:** Friday, September 25, 2009 1:48 PM
**To:** Silva, Laura
**Subject:** Potential Dates for Purdue Analgesic Advisory Board Meeting

Dear Purdue Analgesic Advisory Board Members,

As you know, we have been working to identify a date for a Face-to-Face meeting of the Board.  Based on feedback from many of you, we are targeting January for a one day meeting.

We would appreciate it if you would share your availability for the following dates to attend.  Please mark as many dates as applicable:

- Tuesday January 12th                    _____
- Wednesday January 13th              _____
- Thursday January 14th                  _____
- Friday January 15th                        _____

1

# CONFIDENTIAL

RP_000403

- Tuesday January 19th ························
- Wednesday January 20th ·················
- Thursday January 21st ···················
- Friday January 22nd ·······················

- Thursday January 28th ··················
- Friday January 29th ·······················

Thank you for assisting us in scheduling this important meeting.  Your response is appreciated by October 2nd.

Kind regards,

Laura Silva
Purdue Pharma

2

CONFIDENTIAL

RP_000404

**Donna Reid**

| | |
|---|---|
| **From:** | Silva, Laura [Laura.Silva@pharma.com] |
| **Sent:** | Tuesday, December 08, 2009 12:59 PM |
| **Cc:** | Kaiko, Dr Robert |
| **Subject:** | January 29th Purdue Advisory Board Meeting |

Dear Purdue Advisory Board members,

As we confirmed early last month, the first face to face meeting of the Purdue Advisory Board will be held on Friday January 29th.  The meeting will be held at Purdue's corporate headquarters in Stamford CT from 9:00AM to 4:00PM.  A detailed agenda for the meeting will be sent under separate cover.  Let me know if there is any additional information you need.

We look forward to a very productive meeting.

Kind regards,

Laura

CONFIDENTIAL

RP_000405

**Donna Reid**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Friday, December 11, 2009 11:18 AM |
| **To:** | Donna Reid |
| **Subject:** | FW: Portfolio Advisory Board: Portenoy and Todd / Beth Israel |

Donna, can you follow up with this?

---

**From:** Kaiko, Dr Robert [mailto:Dr.Robert.Kaiko@pharma.com]
**Sent:** Friday, December 11, 2009 11:16 AM
**To:** Russell Portenoy, MD
**Subject:** FW: Portfolio Advisory Board: Portenoy and Todd / Beth Israel

Russ
Fyi
bk

---

**From:** George, Cassandra
**Sent:** Friday, December 11, 2009 10:03 AM
**To:** Kaiko, Dr Robert
**Cc:** Harding, Lisa
**Subject:** RE: Portfolio Advisory Board: Portenoy and Todd / Beth Israel

I've called and emailed multiple times and have gotten a response.  I will try again to see if today is our lucky day.

**From:** Kaiko, Dr Robert
**Sent:** Friday, December 11, 2009 10:00 AM
**To:** George, Cassandra
**Subject:** RE: Portfolio Advisory Board: Portenoy and Todd / Beth Israel

Cassandra
Might  you call her first?
bk

---

**From:** George, Cassandra
**Sent:** Friday, December 11, 2009 9:37 AM
**To:** Kaiko, Dr Robert; Harding, Lisa
**Cc:** Silva, Laura
**Subject:** RE: Portfolio Advisory Board: Portenoy and Todd / Beth Israel

I revised Portenoy's agreement, in accordance with Beth Israel's attorney's comments, and sent it to her on November 9. I have not heard back from her since, so I do not know if she has any further changes, if the agreement is approved, if it's in the execution stage, etc.  The idea is/was that once Portenoy's agreement was approved by Beth Israel we would use that template for Dr. Knox's agreement.

I don't know what else we can do on our end to move this along, except perhaps a call to Portenoy asking him to inquire of the status on Beth Israel's end.  My follow up efforts have been unsuccessful.

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901

1

# CONFIDENTIAL

RP_000406

Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

**From:** Kaiko, Dr Robert
**Sent:** Friday, December 11, 2009 8:59 AM
**To:** Harding, Lisa; George, Cassandra
**Cc:** Silva, Laura
**Subject:** Portfolio Advisory Board: Portenoy and Todd / Beth Israel

Lisa / George

What's the status of the agreements with Portenoy and Todd?  Is there anything we can do to help?
Next month we have a major meeting of this Board here and we really need to do what we can to bring these two consultants on board.

Thanks,
bk

Robert F Kaiko PhD

VP R & D Portfolio Development

Purdue Pharma L.P.

One Stamford Forum

Stamford, CT 06901

Phone: (203) 588-7210

Email: dr.robert.kaiko@pharma.com

*This communication (including any attachments) is intended only for the person or entity to which it is addressed and may contain information that is confidential, proprietary or otherwise protected from disclosure.  If you are not the intended recipient, you are hereby notified that dissemination, distribution (electronic or otherwise) or copying of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this message and deleting the message.*

CONFIDENTIAL

RP_000407

Donna Reid

| | |
|---|---|
| **From:** | Deborah Korzenik |
| **Sent:** | Friday, December 18, 2009 3:17 PM |
| **To:** | 'Harding, Lisa' |
| **Cc:** | Silva, Laura; Kaiko, Dr Robert; Miller, Shana; George, Cassandra; Russell Portenoy, MD; Donna Reid |
| **Subject:** | RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised |

Lisa;

Dr. Portenoy's agreement is ready to be signed subject to his own final review of the changes to the Agreement and to his Work Order.

Has Dr. Todd seen his agreement yet?  I have not yet reviewed it with him.

Debi

---

**From:** Harding, Lisa [mailto:Lisa.Harding@pharma.com]
**Sent:** Friday, December 18, 2009 12:27 PM
**To:** Deborah Korzenik
**Cc:** Silva, Laura; Kaiko, Dr Robert; Miller, Shana; George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi,

Please copy me on the emails you send (or if already sent, please send me electronic copies) to Drs. Todd and Portenoy, so that I can follow up with them & ensure they send me 2 signed originals of each document.

Once fully executed, do you want to receive originals, or are they to be sent to Drs. Todd and Portenoy?

Regards,

Lisa Harding, Sc.D.
Corporate Procurement
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
phone: 203-588-8693

---

**From:** George, Cassandra
**Sent:** Wednesday, December 16, 2009 3:38 PM
**To:** 'Deborah Korzenik'
**Cc:** Harding, Lisa; Steiner, LaDonna; Silva, Laura; Kaiko, Dr Robert; Ambrogio, Donna
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Hi Debi-

As per our discussion yesterday, I've attached hereto the following documents:

1.  Red lined version of Dr. Portenoy's Master Agreement, which incorporates the changes we discussed yesterday (Portenoy MCSA Revised 121609.doc)
2.  A clean version of the same agreement for Dr. Portenoy (Portenoy MCSA Revised 121609-Clean Version.doc)

1

CONFIDENTIAL

RP_000408

3.  Master Agreement for Dr. Todd (Todd MCSA 121609)
4.  Statement of Work #1 for Dr. Portenoy (Portenoy SOW #1 121609.doc)-I believe you've already reviewed and
    accepted this document.  The only change since is the date.
5.  Statement of Work #1 for Dr. Todd (Todd SOW #1 121609.doc)

If all meets your approval, please forward to Drs. Portenoy and Todd for execution.  Lisa Harding, from Purdue's
Corporate Procurement Department, will likely be following up on obtaining the executed documents.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-
CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** George, Cassandra
**Sent:** Friday, December 11, 2009 5:32 PM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Attached, please find a revised version of this agreement without the indemnification section.

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-
CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Friday, November 06, 2009 2:26 PM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Hello;

I just left you a voicemail.  Beth Israel is fine taking out the indemnity language both ways as to Purdue.
However, Dr. Portenoy will need to work out with Purdue his own situation.
Can you send me another version of the agreement without the indemnity and insurance language we have agreed to
delete as well as the insurance amounts as to Beth Israel.

I am out of the office next week, but will be available toward the beginning of the week by email.
Thanks.
Debi

CONFIDENTIAL

RP_000409

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Tuesday, November 03, 2009 3:57 PM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

I discussed the indemnification issue with our Risk Management group and my supervisor, and we have two options-(1) Purdue indemnifies Portenoy and he indemnifies Purdue; or (ii) the entire indemnification section can be removed.  Dr. Portenoy will be performing his services under this Agreement outside the scope of his employment with Beth Israel. Despite that, and the fact that Beth Israel is not a party to the agreement, we initially agreed to indemnify Beth Israel with the proviso that the indemnification was mutual.  Absent this mutual indemnification, we cannot indemnify Beth Israel.

Also, I reviewed the HIPPA language you've proposed.  If Dr. Portenoy is performing services outside the scope of his employment with Beth Israel (therefore no PHI of Beth Israel would be shared), and Beth Israel is not a party to the agreement, I don't see how the HIPPA section you've proposed is applicable.  Finally, sections 12 and 13 have open questions for you.

I am out of the office tomorrow and Friday, but I'm available on Thursday to discuss if needed.  In the interim, could you please provide your comments via email and propose a time on Thursday when you're available to discuss?  As of now, the only time I'm not available is between 1-2pm and after 4pm.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

---

**From:** George, Cassandra
**Sent:** Wednesday, October 28, 2009 4:50 PM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Ok, you can call my office when you are available.

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

---

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 2:58 PM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

CONFIDENTIAL

RP_000410

I have a 10:00 am meeting Friday.  Should be over between 11:00 and 11:30.
Let's speak after that.

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Wednesday, October 28, 2009 2:46 PM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

I just heard your voicemail.  I'm about to go into a meeting that will last until 5pm, then I need to leave for the day.  I understand you're out tomorrow, so let's talk on Friday.  My day is open after 10am, so let me know what time works for you.  Thanks.

---

**From:** George, Cassandra
**Sent:** Wednesday, October 28, 2009 11:36 AM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Here you go.

---

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 11:35 AM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Could you please the Statement of Work.
Thank you.

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Wednesday, October 28, 2009 10:15 AM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Please see the attached in a different format.  We will not be able to agree to the indemnification language without the additional language I've inserted, so please advise if this is a deal breaker.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

4

CONFIDENTIAL

RP_000411

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 10:00 AM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Cassandra;

As in the past, we can't open the revised draft.  Please resend as you have before.
We need the three paragraphs as is in the agreement.
The HIPAA language is on its way.

Debi

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Tuesday, October 27, 2009 12:57 PM
**To:** Deborah Korzenik
**Subject:** Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Attached, please find a revised draft of Dr. Portenoy's Master Agreement with Purdue.  With respect to the addendum language forwarded to me by your assistant, sections (a) and (c) were already in the agreement and I've made some revisions/comments to the indemnification section in the agreement (section b in the addendum).  Also, I'm not sure where or how you want the HIPPA language incorporated into the agreement.  Please advise.

Thanks,


Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-
CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** Adriene Lucas [mailto:ALucas@chpnet.org]
**Sent:** Thursday, October 22, 2009 2:43 PM
**To:** George, Cassandra
**Subject:** Document9


These are the attachments that you requested from Debi

This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.
This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.

CONFIDENTIAL

RP_000412

**Donna Reid**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Monday, December 21, 2009 6:23 AM |
| **To:** | Deborah Korzenik |
| **Cc:** | Knox Todd; Donna Reid |
| **Subject:** | RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised |

REDACTED

**From:** Deborah Korzenik
**Sent:** Friday, December 18, 2009 3:50 PM
**To:** Russell Portenoy, MD
**Subject:** FW: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

FYI
They made a lot of the changes I asked for.
Take another look.
Thanks.

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Wednesday, December 16, 2009 3:38 PM
**To:** Deborah Korzenik
**Cc:** Harding, Lisa; Steiner, LaDonna; Silva, Laura; Kaiko, Dr Robert; Ambrogio, Donna
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Hi Debi-

CONFIDENTIAL

RP_000413

As per our discussion yesterday, I've attached hereto the following documents:

1. Red lined version of Dr. Portenoy's Master Agreement, which incorporates the changes we discussed yesterday (Portenoy MCSA Revised 121609.doc)
2. A clean version of the same agreement for Dr. Portenoy (Portenoy MCSA Revised 121609-Clean Version.doc)
3. Master Agreement for Dr. Todd (Todd MCSA 121609)
4. Statement of Work #1 for Dr. Portenoy (Portenoy SOW #1 121609.doc)-I believe you've already reviewed and accepted this document.  The only change since is the date.
5. Statement of Work #1 for Dr. Todd (Todd SOW #1 121609.doc)

If all meets your approval, please forward to Drs. Portenoy and Todd for execution.  Lisa Harding, from Purdue's Corporate Procurement Department, will likely be following up on obtaining the executed documents.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** George, Cassandra
**Sent:** Friday, December 11, 2009 5:32 PM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Attached, please find a revised version of this agreement without the indemnification section.

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Friday, November 06, 2009 2:26 PM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Hello;

I just left you a voicemail.  Beth Israel is fine taking out the indemnity language both ways as to Purdue.
However, Dr. Portenoy will need to work out with Purdue his own situation.
Can you send me another version of the agreement without the indemnity and insurance language we have agreed to delete as well as the insurance amounts as to Beth Israel.

CONFIDENTIAL

RP_000414

I am out of the office next week, but will be available toward the beginning of the week by email.
Thanks.
Debi

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Tuesday, November 03, 2009 3:57 PM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

I discussed the indemnification issue with our Risk Management group and my supervisor, and we have two options-(1) Purdue indemnifies Portenoy and he indemnifies Purdue; or (ii) the entire indemnification section can be removed.  Dr. Portenoy will be performing his services under this Agreement outside the scope of his employment with Beth Israel. Despite that, and the fact that Beth Israel is not a party to the agreement, we initially agreed to indemnify Beth Israel with the proviso that the indemnification was mutual.  Absent this mutual indemnification, we cannot indemnify Beth Israel.

Also, I reviewed the HIPPA language you've proposed.  If Dr. Portenoy is performing services outside the scope of his employment with Beth Israel (therefore no PHI of Beth Israel would be shared), and Beth Israel is not a party to the agreement, I don't see how the HIPPA section you've proposed is applicable.  Finally, sections 12 and 13 have open questions for you.

I am out of the office tomorrow and Friday, but I'm available on Thursday to discuss if needed.  In the interim, could you please provide your comments via email and propose a time on Thursday when you're available to discuss?  As of now, the only time I'm not available is between 1-2pm and after 4pm.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

---

**From:** George, Cassandra
**Sent:** Wednesday, October 28, 2009 4:50 PM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Ok, you can call my office when you are available.

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

CONFIDENTIAL

RP_000415

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 2:58 PM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

I have a 10:00 am meeting Friday.  Should be over between 11:00 and 11:30.
Let's speak after that.

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Wednesday, October 28, 2009 2:46 PM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

I just heard your voicemail.  I'm about to go into a meeting that will last until 5pm, then I need to leave for the day.  I understand you're out tomorrow, so let's talk on Friday.  My day is open after 10am, so let me know what time works for you.  Thanks.

---

**From:** George, Cassandra
**Sent:** Wednesday, October 28, 2009 11:36 AM
**To:** 'Deborah Korzenik'
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Here you go.

---

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 11:35 AM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Could you please the Statement of Work.
Thank you.

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Wednesday, October 28, 2009 10:15 AM
**To:** Deborah Korzenik
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Please see the attached in a different format.  We will not be able to agree to the indemnification language without the additional language I've inserted, so please advise if this is a deal breaker.

Thanks,

Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

4

# CONFIDENTIAL

RP_000416

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** Deborah Korzenik [mailto:DKorzeni@chpnet.org]
**Sent:** Wednesday, October 28, 2009 10:00 AM
**To:** George, Cassandra
**Subject:** RE: Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Cassandra;

As in the past, we can't open the revised draft.  Please resend as you have before.
We need the three paragraphs as is in the agreement.
The HIPAA language is on its way.

Debi

---

**From:** George, Cassandra [mailto:Cassandra.George@pharma.com]
**Sent:** Tuesday, October 27, 2009 12:57 PM
**To:** Deborah Korzenik
**Subject:** Dr. Portenoy Master Agreement with Purdue Pharma L.P.-Revised

Debi-

Attached, please find a revised draft of Dr. Portenoy's Master Agreement with Purdue.  With respect to the addendum language forwarded to me by your assistant, sections (a) and (c) were already in the agreement and I've made some revisions/comments to the indemnification section in the agreement (section b in the addendum).  Also, I'm not sure where or how you want the HIPPA language incorporated into the agreement.  Please advise.

Thanks,


Cassandra George
Counsel
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
Phone: (203) 588-8191
Email: cassandra.george@pharma.com
*Admitted to practice in New Jersey only*

THIS COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL AND PROTECTED AS ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

**From:** Adriene Lucas [mailto:ALucas@chpnet.org]
**Sent:** Thursday, October 22, 2009 2:43 PM
**To:** George, Cassandra
**Subject:** Document9

These are the attachments that you requested from Debi
This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.
This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,

5

CONFIDENTIAL

RP_000417

**Donna Reid**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Monday, January 18, 2010 2:03 PM |
| **To:** | Marilynn Herleth; Donna Reid |
| **Subject:** | FW: Purdue Portfolio Advisory Board Meeting - 1/29 |

Would you be able to confirm this?

**From:** Agro, Erica [mailto:Erica.Agro@pharma.com]
**Sent:** Wednesday, January 13, 2010 1:37 PM
**To:** Russell Portenoy, MD
**Subject:** Purdue Portfolio Advisory Board Meeting - 1/29

Dr. Portenoy,

I hope this message finds you well.  I am writing regarding the upcoming Purdue Portfolio Advisory Board Meeting scheduled for Friday, January 29.

Please confirm that you will be in attendance and let me know if I can provide any additional information regarding the meeting.

Regards,

Erica

Erica Agro
Medical Research
(203) 588-7530
erica.agro@pharma.com

1

CONFIDENTIAL

RP_000418



www.cephalon.com

Cephalon, Inc.
41 Moores Road
P.O. Box 4011
Frazer, PA 19355
Phone 610-344-0200
Fax    610-344-0065

April 12, 2009

Dear Dr. Portenoy,

I would like to thank you for your significant contributions to the recent FENTORA®
Medical Scientific Advisory Board Meeting held in New York City. Your active
participation made the meeting very productive and your candid feedback will enable us
to effectively address important issues facing the further development of FENTORA®. In
the next few weeks, we will be sending you an Executive summary from the meeting.

If you have any questions, please contact me at 610-738-6502 or via e-mail at
anarayan@cephalon.com.  We look forward to working with you again in the near future.

Very best regards,

Arvind Narayana, MD, MBA
Medical Director, Pain Franchise
Department of Medical Services
Cephalon, Inc

CONFIDENTIAL



June 13, 2009

Russell K. Portenoy, MD
15 Glenn Place
Hastings on Hudson, NY 10706

Dear Dr Portenoy:

On behalf of Asante Communications, LLC, we would like to thank you for participating in **Persistent and Breakthrough Pain in Cancer Survivors: Multidimensional Assessment and Opioid-Based Multimodal Treatment**, held on June 13, 2009, in New York City. We sincerely appreciate your contribution to this educational program and look forward to working with you again very soon.

Please find enclosed your honorarium in the amount of $2,500.00.

If you have any out-of-pocket expenses, please submit the enclosed reimbursement form to:

Philip Compton
Asante Communications
800 3rd Avenue, 9th Floor
New York, NY 10022
(646) 253-0887

Should you have any questions, please feel free to contact me at 646-253-0887 or at pcompton@asanteglobal.com.

Best regards,

Philip Compton
Account Executive
Asante Communications

CONFIDENTIAL

RP_000420

Donna Reid

| | |
|---|---|
| **From:** | Rastogi, Maalika [Maalika.Rastogi@pfizer.com] |
| **Sent:** | Friday, October 16, 2009 2:17 PM |
| **To:** | Donna Reid |
| **Cc:** | Scheer, Linda B |
| **Subject:** | Follow-up on consulting meeting with Dr. Portenoy |

Hello Donna,
A colleague and I met with Dr. Portenoy about 1 month ago on Sept 11th, 2009  for about 1.5 hours.
I am trying to complete and process the paperwork for this meeting to ensure that he receives payment.
For this I need to know the following in order to fill out the attached and send it over to you guys for signature:
- Provider: Full name, Address (i.e. to whom the check should be made and where it should be sent)
- Once completed, who should I send paperwork to for signature?

Just FYI - when Pfizer worked with Dr. Portenoy in 2005, we used the following information, and Dr. Portenoy signed
the agreement
Beth Israel Medical Center
Dept. of Pain Medicine and Pallative Care
First Avenue at 16th St
New  York, NY  10003

Please let me know at your earliest convenience.

Thank you and regards,
Maalika Rastogi

---
Maalika Rastogi
Worldwide Strategy & Innovation
Pfizer, Inc.
235 East 42nd Street
New York, NY  10017
P: 212.733.3351
E: maalika.rastogi@pfizer.com

CONFIDENTIAL

RP_000421

## ORDER FOR SERVICES

| COMPANY: | PROVIDER: |
|---|---|
| Pfizer Inc.<br>Worldwide Strategy & Innovation | Dr. Russell K. Portenoy, MD<br>Beth Israel Medical Center - Dept. of Pain Medicine and Palliative Care |
| 235 East 42nd Street | First Avenue at 16th St |
| New York, NY 10017 | New York, NY 10003 |

**Parties:** Provider's affiliates and subcontractors, together with the employees, individuals, subcontractors and agents of Provider and of such affiliates and subcontractors shall be collectively referred to herein as "Personnel" and, unless expressly referred to separately, shall be included in the term "Provider". Provider and Company may be referred to herein individually as a "Party" or together as the "Parties".

**Terms of Agreement:** This Order for Services, together with the Standard Terms and Conditions attached hereto as Exhibit A ("Standard Terms"), the Statement of Work attached hereto as Exhibit B ("SOW") and any other attachments mutually agreed upon by the Parties and attached hereto as of the Effective Date (collectively the "Agreement"), and any amendments thereto, constitutes the entire and exclusive agreement between Company and Provider with respect to the subject matter addressed herein. It is expressly agreed that any terms and conditions in any document, acceptance, acknowledgement, purchase order or invoice provided by Provider, including, without limitation, any document attached to the SOW or otherwise to this Agreement, that are not expressly agreed to in writing by Company with an express reference to this section in this Order for Services, shall be superseded by the terms and conditions of this Agreement. In the event of a conflict between any term provided in this Order for Services and in the Standard Terms, the SOW or any other attachments, this Order for Services shall prevail. In the event of a conflict between any term provided in the Standard Terms and in the SOW or any other attachments, the terms of the Standard Terms shall prevail. In accordance with Section 12.6 of the Standard Terms, modifications or amendments may be made in a writing signed by a duly authorized representative of each party.

**Scope of Work:** During the term of this Agreement, Provider shall provide to Company the services (the "Services") described in the SOW. Such SOW sets forth, as applicable, the project scope, specifications, schedule, project activities and tasks, deliverables and milestones and fees.

**Term:** Effective as of 9/1/2009 (the "Effective Date"). This Agreement shall remain in effect until the earlier of 10/31/2009 or the anniversary of the Effective Date; provided that, with respect to any Services in progress as of the expiration date, the Agreement shall survive until such Services have been satisfactorily completed.

**Fees:** Please see the fee schedule set forth in the SOW. If the fee schedule expressly provides for Company to reimburse Provider for out-of-pocket costs incurred by Provider in performance of the Services, such reimbursement shall be at Provider's cost and shall be subject to Provider including all copies of receipts supporting such request for reimbursement. Such schedule includes all taxes including, without limitation, all sales and use taxes and value-added taxes that Provider is required to collect from Company.

The following exhibits (collectively, the "Exhibits") are attached hereto and incorporated herein:
- Exhibit A:    Standard Terms and Conditions
- Exhibit B:    Statement of Work

Dr. Russell K. Portenoy, MD
Beth Israel Medical Center - Dept. of Pain Medicine
and Palliative Care

By: _____

Name: _____

Title: _____

Pfizer Inc.
Worldwide Strategy & Innovation

By: _____

Name: _____

Title: _____

CONFIDENTIAL LDM-PFT023998-802d5285

Exhibit A

Standard Terms and Conditions

1. **Provider Responsibilities.** Provider shall be responsible for the quality, validity, accuracy, timeliness, and reliability of the Services and Work Product (defined in Section 5.2). All key personnel provided by Provider shall be designated in the SOW and shall not be reassigned, removed or replaced without Company's consent, unless such key personnel should sever its employment with Provider. Provider shall comply with all policies, regulations and directives of Company, relating to, without limitation, required compliance with laws and regulations, health and safety, security (including data security), sanitation and maintenance of good order, as those policies may be revised from time-to-time and either provided to Provider or listed on the Pfizer Policy Source website (http://audit.pfizer.com/Category.asp?categoryid=1000402). Provider shall provide information reasonably requested by Company regarding Provider and its operations in order to assist Company's compliance efforts. Provider's obligation to perform in strict compliance with the requirements of this Agreement shall survive any acceptance of approval of the Services or Work Product and termination or expiration of the Agreement.

2. **Payments.** In no event shall Company be responsible for any costs beyond the agreed fees and expenses set forth in the SOW, without the prior written approval of Company. All undisputed amounts shall be paid within forty-five (45) days following receipt of invoice. Company may set off any amount Provider owes Company against amounts payable under this or any other Agreement. Payment by Company shall not result in a waiver of any of its rights under this Agreement.

3. **Scope Changes.** Company may, from time to time, without invalidating this Agreement any portion thereof, make changes to the SOW. If applicable, the Parties shall mutually agree to an equitable adjustment to the price and/or time to perform the Services. Any changes to the SOW shall be in writing and signed by the Parties. No additional work by the Provider shall be paid for unless authorized in advance, in writing, by Company.

4. **Representations and Warranties.** Provider represents and warrants to Company that:

(a) Provider shall perform all of its obligations under this Agreement in strict accordance with the terms of this Agreement in a professional, commercially diligent manner, in accordance with generally accepted industry and professional standards, procedures and practices, to the reasonable satisfaction of Company.

(b) All Personnel shall be well qualified to perform such Services and shall have all professional licenses, permits, certificates and registrations required for their performance of the Services.

(c) Provider shall comply with all applicable laws, ordinances, codes, rules and regulations, and shall have all professional licenses, permits, certificates and registrations required for its performance of the Services.

(d) All Work Product shall be in strict accordance with the specifications set forth in the SOW and shall not infringe upon the intellectual property rights of any third party.

(e) Provider is organized, validly existing and in good standing under the laws of the United States and the State of its organization. Provider's execution, delivery and performance of this Agreement does not, and will not, conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

(f) Provider is not debarred by any applicable authority, including, without limitation, under subsections 306(a) or (b) of the Federal Food, Drug, and Cosmetic Act and Provider has not and will not use in any capacity the services of any person or entity who has been debarred by any applicable authority.

(g) There is no action, suit or proceeding before or by any court or governmental authority, pending or, to Provider's knowledge, threatened, which could materially affect Provider's performance hereunder or the enforceability hereof. Provider shall immediately notify Company should this representation no longer be true.

5. **Proprietary Rights.**

5.1 All drawings, materials, specification, designs and other data of any nature furnished by Company to Provider for the performance of the Services may be used by Provider only in connection with its performance of the Services. Company shall retain all rights, title and interest in such materials, including, without limitation, patents, copyrights and other intellectual property rights in any ideas, concepts, designs, inventions, and expressions embodied in such materials.

5.2 "Work Product" shall mean any designs, design analyses, diagrams, plans, devices, techniques, developments, inventions, information, object or source code, drawings, estimates, specifications, calculations, field notes, manuals, reports, renderings, documentation and any other deliverable conceived, developed, authored, produced or acquired by Provider, either alone or in connection with others, for Company pursuant to this Agreement. All Work Product shall be considered "Work Made For Hire" as defined in §101 (1) of the 1976 Copyright Act, and all rights, title and interest in and to such Work Product shall be transferred to and vested in Company without additional compensation to Provider, and Provider shall render reasonable assistance to give effect to such transfer. Provider hereby irrevocably transfers, assigns and conveys all rights, title and interest in and to such Work Product to Company free and clear of any encumbrances, and Provider agrees to execute all documents necessary to do so. Provider shall promptly notify Company of any intellectual property developed or otherwise included as Work Product, and provide reasonable assistance to procure and enforce the same.

5.3 Unless otherwise agreed, Provider shall not incorporate into Work Product any materials in which Provider or any third party has pre-existing proprietary rights ("Pre-Existing Materials"). With respect to Pre-Existing Materials incorporated into Work Product, Provider hereby grants to Company, or shall obtain for Company, as applicable, an unrestricted, royalty-free, irrevocable, world-wide, non-exclusive right to use, disclose, reproduce, modify, license or distribute such Pre-Existing Materials.

6. **Insurance Requirements.** Provider shall maintain insurance coverage with minimum "A" A.M. Best rated carriers in the minimum types and amounts set forth below or as required by law, whichever is greater:

(a) Statutory coverage under the state Workers' Compensation Act or Acts ("Workers' Comp"), and if applicable, the U.S. Longshoreman's Act, Jones Act and Federal Employer's Liability Act; (ii) Employer's Liability Insurance with a limit not less than $1,000,000 and (iii) Voluntary Compensation insurance covering all employees not subject to the applicable state Workers' Compensation Act or Acts;

(b) Commercial General Liability insurance with a limit not less than $2,000,000, for (i) each occurrence, including, without limitation, coverage for premises and operations, products & completed operations, broad form property damage, independent contractors, personal injury, blanket contractual liability, explosion, collapse and, underground and if applicable, watercraft liability, (ii) Products & Completed Operations, $2,000,000 in the aggregate, and (iii) ISO Endorsement C02010 1935 including Company and its affiliates as additional insureds with respect to any legal liability of Company or its affiliates arising out of the Services;

(c) Automobile and Truck Liability insurance with a combined single limit for bodily injury and property damage arising out of all owned, non-owned and hired vehicles of not less than $2,000,000;

(d) Professional Liability or Errors & Omissions insurance with a limit not less than $5,000,000 per occurrence;

(e) Umbrella (Excess) Liability Coverage (follow form) with a limit not less than $3,000,000 per occurrence;

(f) All risk Property Coverage covering any Company property or inventory in the care, custody or control of Provider at full replacement cost.

Products & Completed Operations and Professional Liability coverage shall be maintained for a period of (3) years following termination of the Agreement. Consultants or subcontractors may not enter the jobsite or perform any Services unless such consultant or subcontractor is and remains insured, as outlined above. Provider shall, prior to commencement of the Agreement, furnish Buyer with a certificate of insurance evidencing such coverage and naming Company and its affiliates as additional insureds for each policy. Such certificates shall provide that not less than thirty (30) days' prior written notice of any policy cancellation, or material change shall be given to Company. All such policies shall provide a waiver of subrogation in favor of Company and its affiliates. All deductibles for such insurance policies shall be assumed by, for the account of, and at Provider's sole risk. Such insurance policies shall be primary and non-contributing with respect to any other similar insurance policies available to Company or its affiliates.

7. **Records and Audits.** Provider will maintain complete and accurate records of all matters relating to Services to demonstrate compliance with its obligations under this Agreement, including, without limitation, compliance with applicable laws and regulations. Financial records shall be maintained in accordance with generally accepted accounting principles. As used in this Section, records include books, documents, accounting procedures and practices and other data regardless of type or form. Provider shall maintain such records for a period of six (6) years after the expiration or termination of this Agreement. Company or its representatives may audit such records during normal business hours and upon reasonable notice, and may copy any and all such records.

8. **Termination and Survival.**

8.1 Company may terminate all or any part of this Agreement at any time without cause and in its sole discretion upon five (5) days' prior notice. Company shall pay Provider in accordance with the terms of this Agreement for all Services satisfactorily performed in conformance with the terms of this Agreement prior to the effective date of such termination.

CONFIDENTIAL LDM-PFT023998-802d5285

8.2    Either Party may terminate all or any part of the Agreement immediately upon notice to the other Party: (a) upon a material breach by the other Party, which breach remains uncured for thirty (30) days following notice thereof or (b) upon the other Party's insolvency, dissolution or general assignment for the benefit of its creditors, where such insolvent Party fails to provide assurances acceptable to the other Party within ten (10) days' notice of such insolvency. Company shall pay Provider in accordance with the terms of this Agreement for all Services satisfactorily performed in conformance with the terms of this Agreement prior to the effective date of such termination; provided that Provider shall be responsible for any damages incurred by Company as a result of the cause of such termination; it being agreed that Company shall not be required to make any further payments until Company has had a reasonable opportunity to adequately assess the extent of such damages. In the event of Provider's non-performance, payments to Company in accordance with the SOW ("Company Credits") shall not prejudice or in any way limit Company's ability to recover damages that exceed the Company Credits.

8.3    Upon termination or expiration of this Agreement by either Party, Provider shall immediately (i) make such assignments of, and provide access to, contracts, licenses, permits, bills, computer data, and other documents, including any cost control system implemented by Provider, related to the performance of the Services, (ii) deliver all documents and materials developed by Provider in the performance of the Services, whether completed or in progress, (iii) at Company's option, return and/or destroy all Company-related information and materials in Provider's possession (except for such information that Provider is to retain pursuant to Section 9 hereof) and provide written certification to Company of such return and or destruction within sixty (60) days of such termination or expiration and (iv) take such further action that Company may reasonably request to minimize delay and expense arising from such termination.

8.4    Articles 2, 5, 6, 7, 8, 9, 10, 11, and 12 shall survive the termination or expiration of this Agreement.

9.    Confidentiality.  Provider shall keep strictly confidential, not disclose to any third party and not use for any other purpose except performance of this Agreement any confidential or proprietary information of Company ("Confidential Information"), including, without limitation, the terms and conditions of this Agreement. Provider shall disclose Confidential Information to Personnel on a need to know basis only; provided, such Personnel are bound by a written agreement of confidentiality and non-use at least as restrictive as this Agreement. Provider shall promptly notify Company of any breach of this Section 9 of which Provider becomes aware. Upon the later of Company's request and termination or expiration of this Agreement, Provider shall promptly return to Company Confidential Information; provided, Provider may retain one copy in its confidential files for the sole purpose of determining its continuing obligations under this Agreement. Notwithstanding the return and destruction of Confidential Information, Provider will continue to be bound by its obligation under this Section 9 for five (5) years after the termination or expiration of this Agreement. The foregoing obligations shall not apply to information that Provider can demonstrate: (i) at the time of disclosure, is known publicly or thereafter becomes known publicly through no fault of Provider, (ii) becomes available to Provider from a third party which is not legally prohibited from disclosing such information, (iii) was developed by Provider independently of information obtained from Company as evidenced by written records or (iv) is required by law to be disclosed, provided that Provider promptly notifies Company of such requirement, cooperates with Pfizer if Pfizer seeks a protective order or other remedy to protect such Confidential Information, and furnishes only that portion of the Confidential Information which Provider is legally required to disclose.

10.    Indemnification; Limitation of Liability

10.1    To the fullest extent permitted by law, Provider shall defend, indemnify and hold harmless Company from and against any losses, damages, settlements, costs, charges or other expenses (including reasonable attorney's fees) or liabilities of every kind ("Losses") arising out of or related to (a) a breach by Provider of this Agreement or any representation or warranty contained herein, (b) Provider's failure to pay its Personnel, (c) injury to or death of any person or damage to any property resulting from and/or caused by the Provider's performance or non-performance of its obligations under this Agreement, (d) claims made by Personnel (i) based on employment contract or under employment or worker's compensation or similar laws or (e) the negligence, recklessness, willful misconduct, fraud or bad faith of Provider. Notwithstanding the foregoing, Provider shall not be liable for Losses to the extent such Losses are caused solely by the negligence, recklessness or willful misconduct of Company.

10.2    EXCEPT AS EXPRESSLY PROVIDED HEREIN, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF USE, LOSS OF PROFITS, LOST GOODWILL AND LOST OPPORTUNITY) ARISING HEREUNDER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing limitation and exclusion shall apply notwithstanding any failure of essential purpose of any limited remedy herein. Notwithstanding the foregoing, Provider shall be liable for indirect, incidental or consequential damages: (i) arising out of a breach of Section 9, (ii) arising under Section 10.1, (iii) arising in connection with the injury to or death of any person or damage to any property of Company or any third party, (iv) covered by Provider's insurance or (v) resulting from Provider's gross negligence or willful misconduct.

11.    Remedies

11.1    Provider shall, at its own cost and expense and in addition to any other remedies available to Company at law or in equity, promptly correct or revise any errors, omissions or other deficiencies in the Services and/or Work Product.

11.2    The Parties understand and agree that money damages may not be a sufficient remedy for breach of Section 9 and that, in addition to any and all other remedies available at law or in equity, Company shall be entitled to seek equitable relief, including injunction and specific performance, as a remedy for any actual or threatened breach of such Section.

12.    Miscellaneous

12.1    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of conflicts of law.

12.2    Notices and invoices shall be in writing and delivered to the applicable address set forth in the Agreement above.

12.3    The relationship between Provider and Company hereunder is that of an independent contractor. No employee or agent engaged by Provider shall be, or shall be deemed to be, an employee or agent of Company and shall not be entitled to any benefits that the Company provides to its own employees.

12.4    Provider shall not use Company's name, trade name, service marks, trademarks, or logos in publicity releases, advertising or any other publications without Company's prior written consent.

12.5    Provider shall not assign or subcontract its interest hereunder without Company's prior written consent, which may be withheld in its sole discretion. No assignment shall relieve Provider of its obligations hereunder.

12.6    No modification, alteration of this Agreement shall be binding upon the Parties unless contained in a writing signed by the Parties. No waiver of any provision of this Agreement shall constitute a waiver of any other breach of such provision or the breach of any other provision.

12.7    No Party shall be liable for failure or delay in performance by reason beyond its reasonable control and not to its acts or omissions; provided that the Party prevented from or delayed in performing uses commercially reasonable efforts to avoid or minimize the delay. The Party so affected may: (a) extend the time for performance or (b) cancel all or any part of the unperformed part of this Agreement.

12.8    If any provision of this Agreement shall be found to be invalid or unenforceable in a final non-appealable order, such unenforceable provision shall be stricken and the remainder of this Agreement shall not be affected thereby. Company and Provider shall in good faith attempt to replace such provision with a provision that comes as close as possible to expressing the intention of the original provision.

12.9    All headings are for convenience of reference only and shall not affect the interpretation of this Agreement.

12.10    This Agreement shall apply to, inure to the benefit of and be binding upon the Parties hereto and upon their respective successors and permitted assigns. No person who is not a party hereto shall be entitled to enforce or take the benefit of any of its terms, whether as a result of applicable legislation, custom or otherwise.

12.11    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and all of which shall together constitute one and the same agreement. The Parties agree that either an original or an electronically stored, full-executed copy of this Agreement can be used for all purposes, including in any proceeding to enforce the rights and/or obligations of the Parties.

* * * * * * *

CONFIDENTIAL    LDM-PFT023998-802d5285

TOTAL P.05

## EXHIBIT B

### Statement of Work

**Key Personnel:** Dr. Russell K. Portenoy

**Description of Services:** ~ 2 hours of consulting on business model of a Pain department nested in a larger institution as well as on broader opportunities in Pain disease area

**Timing/Schedule:** September 11, 2009 (11.30am – 1.30pm)

**Deliverables/Milestones:**

*Compensation: $900*

*Taxes: N/A*

*Reimbursable Expenses: `N/A*

Dr. Russell K. Portenoy, MD
Beth Israel Medical Center - Dept. of Pain Medicine
and Palliative Care

By:

Name:

Title: Chairman, DPmPC, B/MC

Pfizer Inc.
Worldwide Strategy & Innovation

By: Joseph Papamarcos

Name:

Title: Senior Director

CONFIDENTIAL  LDM-PFT023998-802d5285

## Donna Reid

| | |
|---|---|
| **From:** | Coraci, Darlene [Darlene.Coraci@pfizer.com] |
| **Sent:** | Tuesday, November 24, 2009 3:53 PM |
| **To:** | Donna Reid |
| **Subject:** | FW: Dr. Portnoy Invoice to Pfizer |
| **Attachments:** | Dr. Portnoy Statement of work.pdf; New Image.TIF |

Sorry, I forgot to include SOW. I have also attached a sample invoice. Also, if you would like me to call you to explain in better detail please let me know.

Thank you!

Darlene Coraci

Administrative Assistant

Worldwide Strategy & Innovation

212-733-7455 - Telephone

212-973-7340 - Fax

235/15/5

---

**From:** Coraci, Darlene
**Sent:** Tuesday, November 24, 2009 3:43 PM
**To:** doreid@chpnet.org
**Cc:** Rastogi, Maalika
**Subject:** Dr. Portnoy Invoice to Pfizer

Hi Donna:

I am Maalika Rastogi's assistant from Pfizer. Sometime ago Dr. Portnoy met with Maalika regarding a Pain project we are working on here. Dr. Portnoy's statement of work is attached. In any case, in order for him to get paid he needs to submit an invoice that has his letterhead, description of work, his fees incurred, etc. On the attached you will also see a purchase order number, when submitting his invoice he needs to put the purchase order number on the invoice as well. Please mail the invoice directly to:

Pfizer

North American Shared Services (Accounting)

6730 Lenox Center Court, Suite 300

Memphis, TN 38115

CONFIDENTIAL

RP_000426

If you have any questions, please do not hesitate to contact me. Thank you!

Darlene Coraci

Administrative Assistant

Worldwide Strategy & Innovation

212-733-7455 - Telephone

212-973-7340 - Fax

235/15/5

2

CONFIDENTIAL

RP_000427

### *Roundtable Discussion Guide*

## Therapeutic Targets for Emerging Biologic Therapies in IBD

### January 21, 2009

A roundtable teleconference meeting to be held Wednesday, January 21, 2009, with proceedings subsequently submitted for peer review and publication as a CME supplement to *Gastroenterology & Hepatology*™. This CME activity is sponsored by Curatio CME Institute and is supported by an educational grant from Millennium Pharmaceuticals, Inc.

## Faculty

### Program Chair
Stephen B. Hanauer, MD

### Program Faculty
Scott E. Plevy, MD
Bruce E. Sands, MD
Stephan R. Targan, MD

## Target Audience

These activities will be developed to meet the current educational needs of gastroenterologists and other clinicians who manage patients with IBD

## Educational Objectives

We have formulated the following learning objectives for the activity, and these will be used as a benchmark for judging its success. After reviewing the published CME supplement, readers should be able to:

1. Describe the mechanism of action of both existing and novel biologic agents for the treatment of IBD
2. Compare how different biologics may target unique aspects of the inflammatory cascade
3. Evaluate the clinical efficacy and safety of current biologic therapeutic options for the management and/or treatment of IBD
4. Summarize the therapeutic need for, potential efficacy, conceptual risks, and positioning of novel biologic therapeutic options in development

# CONFIDENTIAL

Dear Will,

I am honored to accept.

Russ

---

**From:** Will Rowe [mailto:wrowe@painfoundation.org]
**Sent:** Monday, November 23, 2009 3:52 PM
**To:** Russell Portenoy, MD
**Cc:** Micke Brown, BSN, RN
**Subject:** KOL Roundtable

Hello Russ:

APF has been developing numerous plans to follow-up on the recommendations developed in our November 2007 Roundtable that you and I chaired in Baltimore.  I've attached a proposal that we've co-developed with a Med Ed Company, Curatio, along with the Friends Research Institute in Baltimore and consultation with leadership in NIDA.  This is an education project targeting primary care physicians and patients.  The first step is to convene a Roundtable of leaders (suggestions contained in the proposal) to be followed by a variety of educational events.  The proposal was recently funded by Endo and J & J.
I would like to invite you to Chair the Roundtable event which we would like to have in NYC for your convenience.  We are very pleased to be able to advance the recommendations that came out of our Roundtable meeting in Baltimore. Please let me know your interest/availability.

Happy Thanksgiving!

Will

Will Rowe
CEO
American Pain Foundation
201 N. Charles Street, Suite 710
Baltimore, MD 21201

Tel # Office: 410 783 7292, ext. 225
        REDACTED

*A United Voice of Hope and Power over Pain*

This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.
This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.
This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in

CONFIDENTIAL

RP_000429

## Donna Reid

| | |
|---|---|
| **From:** | Matthew Horn [Matthew.Horn@curatiocme.com] |
| **Sent:** | Thursday, December 03, 2009 1:03 PM |
| **To:** | Russell Portenoy, MD |
| **Cc:** | Donna Reid ; Kristen Petro; Lauren Lewis |
| **Subject:** | FW: Pain KOL roundtable invitation |
| **Attachments:** | Balancing Chronic Pain Management intiative info.doc |

Dear Russ,

Below (and attached) is an example of the email I will use to invite the faculty.

I wanted you to have a copy for your records rather than cram your inbox with all the communications. I drafted the information in the attached document based on the original grant proposals and your questions about the initiative. I will update you on the steering committee members and the date of the teleconference once I receive the responses.

As always, I would be happy to provide additional information or assistance.

Best,
Matt

---

Dear Dr. ,

On behalf of the chair, Dr. Russell Portenoy, I would like to invite you to participate in an educational initiative titled *Balancing Chronic Pain Management and Rational Opioid Use for Primary Care Providers*. The initiative is a collaborative effort between the American Pain Foundation, Friends Research Institute, NIDA, Penn State, Curatio CME Institute, University of Tennessee College of Pharmacy and others. The funding for this initiative is being provided by Endo Pharmaceuticals and Ortho-McNeil Jannsen.

Attached is some supporting information for the education being developed. The initiative will include the following components:
1.   **Editorial Board/Steering Committee Teleconference**
2.   **Primary Care Survey**
3.   **Development and maintenance of *ChronicPainTx.com* landing page**
4.   **CME/CE supplement to *The Journal of Family Practice***
5.   **Case-based Web activity and podcast**

A discussion guideline is currently being developed for the teleconference (TC). Steering committee members will be asked to review the guideline and provide any needed feedback/reference info prior to the TC.  At the time of the steering committee TC, we will discuss the survey questions for the primary care survey as well as the educational content that should be included in the initiative activities. The survey results will be provided to all the RT participants. The discussion will be recorded and the recording will be used to develop the CME supplement. We will ask Dr. Portenoy and the other members of the steering committee to determine which members or others should be invited to participate in editing and revising the CME supplement and who should develop the case-based internet activity. We hope to garner additional funding in 2010 for additional educational activities and will seek your input/participation in those activities as well.

We hope to hold the roundtable teleconference in January (January 19th is our tentative date). If you can participate, we would ask you to provide your dates of availability for Jan. Please let me know if you can participate at your earliest convenience. I look forward to the opportunity to work with you.

Warmest regards,
Matt

1

CONFIDENTIAL

Donna Reid

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Thursday, December 03, 2009 7:29 AM |
| **To:** | Matthew Horn |
| **Cc:** | Donna Reid ; Kristen Petro |
| **Subject:** | RE: KOL Roundtable |

Dear Matt,

My suggestions for the roundtable are as follows:
Scott Fishman
Perry Fine
Bill McCarberg
Steven Passik
Paul Arnstein

For the PharmD, the most prominent person is
Arthur G. Lipman, PharmD, FASHP
Professor of Pharmacotherapy, College of Pharmacy
Adjunct Professor of Anesthesiology, School of Medicine
Director of Clinical Pharmacology, Pain Management Center
University of Utah Health Sciences Center
Editor, Journal of Pain & Palliative Care Pharmacotherapy
30 S 2000 E RM 258
Salt Lake City UT 84112-5820
(801) 581-5986
arthur.lipman@pharm.utah.edu

I don't know the other PharmD's on your list. Dr. McPherson is involved in palliative care. Dr. Barkin would be OK if someone recommended him or the others would be Lori Reisner or Ken Jackson.

If this deliverable is about safe and effective opioid prescribing, perhaps the panel should also include a lawyer, e.g Jennifer Bolen.

---

**From:** Matthew Horn [mailto:Matthew.Horn@curatiocme.com]
**Sent:** Wednesday, December 02, 2009 9:34 AM
**To:** Russell Portenoy, MD
**Cc:** Donna Reid ; Kristen Petro
**Subject:** RE: KOL Roundtable

Dear Russ,

I am following up to see if you have any questions about the response sent to you on Monday.

I would like to invite the other KOL members as soon as possible as I imagine it may take some time to coordinate a date for the roundtable. Please respond with faculty recommendations when you can.

Here are the potential faculty members listed in the proposal (we intend on inviting 6 more):

MDs
Scott Fishman, MD (Anesth)
Perry Fine, MD (Anesth)
Bill McCarberg, MD (FP/Pain)
Len Fromer (FP)

1



## Donna Reid

| | |
|---|---|
| **From:** | Matthew Horn [Matthew.Horn@curatiocme.com] |
| **Sent:** | Monday, November 30, 2009 12:44 PM |
| **To:** | Russell Portenoy, MD |
| **Cc:** | Will Rowe; Micke Brown, BSN, RN; Donna Reid ; Kristen Petro; Donna Calvani; Tracy Allgier-Baker |
| **Subject:** | RE: KOL Roundtable |
| **Attachments:** | RT discussion guide sample.pdf |

Dear Russ,

I hope you had a nice Thanksgiving!

I am sorry for not responding to your query sooner. The general idea is to discuss both the gaps/needs (particularly when discussing the questions that will go into the PCP survey) as well as how to fill those needs (which will go toward the development of the CME supplement). The idea behind the discussion guide is that it will insure we cover all the salient points without missing anything important. Its purpose is not tying the hands of the discussion group. I believe the discussion should be more free form amongst you, the experts. The guide will be based on the proposal and our familiarity with what is already out there.  I will include reference material suggestions in the guide. My hope is to send the guide out for faculty review and input prior to the actual discussion, requesting reference material suggestions at that time. This will allow me to incorporate everyone's feedback and gather the recommended references. I will then make the suggested references and the updated guide available to everyone involved prior to the discussion (in case anyone isn't familiar or needs a copy of a particular reference). Our writer will draft an outline for the supplement based on the discussion and the recommended references. This will be revised by those members of the committee that agree to work on the supplement (or the committee's designees) prior to any work being done to develop the draft of the supplement. Of course, the faculty will also have ample opportunity to revise the supplement draft as they see fit, with the chair/guest editor of the supplement having final say on the content.

We have a lot of experience with executing roundtable meetings in this format. We developed this method after seeing too many RT discussions consisting of the members presenting their pre-existing slide decks to one another (which the other members had often already seen before). This usually doesn't lead to anything new or different. The idea here is to have an open discussion of what is needed and what the education should be about. We would then work with individual members, those wishing to work on the individual activities. My hope is that those who work on the internet activity will develop slide presentations based on everyone's input from the discussion and we will develop the outline and written drafts with those faculty members involved on the same basis.

Attached is a sample guide from a previous roundtable on inflammatory bowel disease. I hope this information is helpful. I'd be happy to discuss if you have any questions.

As a reminder, I'm hoping to get your recommendations on the other participants.

Thanks,
Matt

---

**From:** Russell Portenoy, MD [mailto:RPorteno@chpnet.org]
**Sent:** Wednesday, November 25, 2009 10:49 AM
**To:** Matthew Horn; Will Rowe
**Cc:** Micke Brown, BSN, RN; Donna Reid ; Kristen Petro; Donna Calvani; Tracy Allgier-Baker; Donna Reid
**Subject:** RE: KOL Roundtable

Dear Matt,

A question:  How can a discussion guide about gaps/needs be turned into a CME supplement?  I need clarity on this.  If the RT is a discussion to generate a specific deliverable, then the participants need to be able to contribute.  If the RT is to discuss unmet need, the participants may better be people who feel the need directly.  What is a discussion guide for this project?



CONFIDENTIAL

RP_000432

You are probably aware that this committee's work is in a line of similar activities that have been going on at a pretty high pace for years.  I have been involved in many projects like this, and have participated in the creation of similar deliverables, many already on the web.  If you have not scanned the material already out there, on the educational websites that are sole-supported by Cephalon, Endo, and Purdue, and by the meded company Asante and others, this would be good background.

---

**From:** Matthew Horn [mailto:Matthew.Horn@curatiocme.com]
**Sent:** Wednesday, November 25, 2009 9:45 AM
**To:** Russell Portenoy, MD; Will Rowe
**Cc:** Micke Brown, BSN, RN; Donna Reid ; Kristen Petro; Donna Calvani; Tracy Allgier-Baker; Donna Reid
**Subject:** RE: KOL Roundtable

Hi Russ,

I'd be happy to clarify!

The goal of the roundtable teleconference is to discuss the educational needs of primary care providers in identifying and managing chronic pain and the rational use of opioids in that management. Specifically what are the gaps/needs of PCPs in this area? As I stated previously, I am working on a detailed discussion guide to insure we discuss all of the salient points. This guide will be shared with all participants in advance to allow for edits and redistribution prior to the teleconference. We will record the entire teleconference. Our writer, Thomas Finnegan, PhD, whose background is in pain, will use this recording to draft an outline for a CME supplement to the Journal of Family Practice. After faculty revision of the outline he will draft the supplement, which faculty will also review.

We will also discuss the development of a PCP and patient survey. I will include in the discussion guide a section on developing the survey. The survey will go out to PCPs via medpage and to patients via APF's site. Curatio will compile the data and share it with everyone in the group to use in developing education. I'd like to also discuss the possibility of publishing the survey results in some fashion.

Also, at the time of the RT, I'd like to decide on faculty for the internet activity. The plan here is to recruit 3 members to work on an internet activity. The 3 faculty members would be asked to create 20-30 min case-based slide presentations based on the key points of the roundtable discussion. We will then audio record those faculty members giving their presentations to develop the internet activity.

All activities will be housed on www.ChronicPainTx.com, an internet landing page that we are developing for this education.

I think that covers the major points. The original proposal had more educational activities but the funding just wasn't available. Ideally, I'd like to obtain additional funding to add more activities in 2010.

Please let me know if you have any further questions.

Otherwise have a Happy Thanksgiving!

Matt

**Matthew Horn, MD**  Medical Director
matthew.horn@curatiocme.com  |  +1.908.707.1480  x206

2

# CONFIDENTIAL

RP_000433

**Donna Reid**

**From:** Matthew Horn [Matthew.Horn@curatiocme.com]
**Sent:** Tuesday, December 22, 2009 4:08 PM
**To:** Russell Portenoy, MD
**Cc:** Donna Reid ; Kristen Petro
**Subject:** Pain KOL discussion guide
**Attachments:** APF-NIDA outline 1a_mh.doc

Dear Dr. Portenoy,

I hope you are well!

Attached is the discussion guide that I created to assist with the roundtable teleconference organization. Please take a look and let me know if you would like me to make any changes.

I am also sending this to our colleagues at APF, FRI, and NIDA as well as our accrediting partners (Penn State, UTCOP, etc.) for their review and input. Once I receive feedback from all of you, I will make the requested changes before forwarding you and the other faculty members the final draft.

Please send me any changes you wish to make **by Tuesday, January 5th**, so I will have time to make updates and forward to everyone in advance of our 1/19 teleconference.

Let me know if you have any questions. I would be more than happy to discuss.

Happy Holidays!

Best,
Matt

**Matthew Horn, MD**  Medical Director
matthew.horn@curatiocme.com  |  +1.908.707.1480  x206

Curatio CME Institute
1200 Route 22 East,  First Floor, Bridgewater, NJ  08807
Cell:+1.908.547.7565  |  Fax:+1.908.707.1483  |  curatiocme.com

 *Consider the environment. Please print this email only if absolutely necessary*

1

CONFIDENTIAL

RP_000434

## *Roundtable Discussion Guide*

## Balancing Chronic Pain Management and Rational Opioid Use for Primary Care Providers

### January 19, 2010

A roundtable teleconference meeting will be held Tuesday, January 19, 2010, to develop educational activities on chronic pain management for PCPs. This CME activity is sponsored by Penn State College of Medicine, The University of Tennessee College of Pharmacy (UTCOP), the American Academy of Nurse Practitioners (AANP), the American academy of Physician Assistants (AAPA), Curatio CME Institute (Curatio) and EduPro Resources (RN accreditors). The American Pain Foundation (APF) and Friends Research Institutes (FRI) will also participate in the development of these initiatives with the National Institute on Drug Abuse (NIDA) providing consultation. This initiative is supported by educational grants from Endo Pharmaceuticals and Ortho-McNeil Janssen.

### Faculty

**Program Chair**
Russel Portenoy, MD

**Program Faculty**
Paul Arnstein, RN, PhD, FNP-C
Perry Fine, MD
Scott Fishman, MD
Arthur Lipman, PharmD
Bill McCarberg, MD
Steven Passik, PhD

**Other RT Participants**
Will Rowe (APF)
Micke Brown, RN (APF)
Frank Vocci, PhD (FRI)
Cathrine Sasek, PhD (NIDA)
Richard Denisco, PhD (NIDA)
David Thomas, PhD (NIDA)
Tracy Algiers Baker (Penn State)
Matthew Horn, MD (Curatio)

CONFIDENTIAL

Discussion Guide: _____ December 22, 2009

## Target Audience

The educational activities will be developed to meet the current educational needs of primary care physicians (PCPs), registered nurses (RNs), nurse practitioners (NPs), physician assistants (PAs) and pharmacists.

## Educational Objectives

At the conclusion of these activities, participants should have an improved ability to:

- Select the most appropriate analgesic agents for each patient based on the patient's medical condition, personal characteristics, medical history, drug abuse history, and any other information that has bearing on how their pain can be best treated
- Educate patients on the proper use of analgesic agents, the use of self-assessment tools to track pain relief, and other pain reducing strategies
- Assess patients for the risk of drug abuse, addiction, and diversion and develop strategies to mitigate those risks
- Formulate treatment plans to select, dose, monitor, and exit from opioid therapy
- List the legal, legislative and addiction factors affecting provider prescribing habits and recognize the need to eliminate prescribing practices that are not based on scientific evidence and established practice guidelines

## Statement of Need

Chronic pain is a significant public health problem in the United States that is both common and costly. One quarter of people 20 years of age or older report experiencing pain that lasted longer than 24 hours within the last month.[1] Of those people who reported pain lasting at least 24 hours, the largest proportion of people (41%) stated that they experienced pain for at least one year.[1] The consequences of chronic pain are detrimental to the general public and to the individual. It is estimated that the total expenditure for back and neck pain was $85.9 billion dollars in 2005 and the total expenditure for arthritis was $128 billion in 2003.[2,3] These figures suggest that the total cost of all chronic pain conditions in the United States is far in excess of $200 billion per year. Chronic pain also adversely effects work productivity. Headache, back pain, arthritis, and musculoskeletal conditions are the most common causes of a decline in productivity at work.[4] The cumulative cost of lost productivity at work due to pain conditions is estimated to be $61.2 billion per year.[4] In addition, 33% of people who report having chronic pain state that the pain is disabling.[5] Identification and treatment are required for the proper management of chronic pain conditions. As will be explained in the following sections, many patients are not receiving appropriate treatment due to the improper use of analgesic therapies, especially opioids.

In most instances, primary care physicians do recognize and treat chronic pain conditions.[6,7] The underlying issue is that clinicians are not always using the appropriate therapies to treat chronic pain patients. A database analysis of 10 million primary care office visits for low back pain indicated that primary care physicians are not properly using pharmacologic therapies, as defined by the Agency for

CONFIDENTIAL

RP_000436

Health Research and Quality, for the treatment of low back pain.[8] Another database analysis of 362,693 patients found that in patients with chronic neuropathic pain the most common treatment administered was an NSAID, instead of recommended therapies like pregabalin, tricyclic antidepressants, or opioids.[6,9] Opioid therapy may be appropriate and necessary alone or in addition to other therapies or treatment modalities in order to appropriately manage certain chronic pain conditions.[10] Unfortunately, many primary care physicians are reluctant to prescribe opioids for the treatment of chronic pain, largely due to fears of abuse and addiction.[11] Research has shown that patients who receive prescription opioids are at an increased risk for abuse.[12] The risk of addiction however is not universal and requires that the clinicians determine the risk level for a given patient. A number of studies have shown that prescription opioid abuse is more prevalent in patients with concurrent mood or personality disorders.[12-15] Other predictors of opioid abuse were toxicologic detection of non-opioid drugs (cocaine and amphetamines specifically), young age, male sex, past alcohol abuse, and previous convictions for drug-related or DUI offenses.[16] Other barriers to the prescription of opioids among clinicians are concerns about adverse events, tolerance, and drug interactions.[11] A potential barrier for the use of opioid medications in the future may center around the requirement to develop a Risk Evaluation and Mitigation Strategy (REMS) for certain opioid medications as recently announced by the United States Food and Drug Administration (FDA).[17] According to the statement released by the FDA, the purpose of REMS is to prevent the misuse, abuse, or accidental overdose related to opioids, while promoting the beneficial use of this class of agents for the treatment of pain.[17] It is unclear at this time exactly how a REMS program will impact the future prescribing practices of opioid medications for patients with chronic pain. This new level of regulation is currently being developed and deployed by the FDA, creating a new gap and need for medical education.

A significant hurdle for ensuring the safe use of opioids and other analgesic therapies is that clinicians are not adequately trained in the management of chronic pain. There is a general belief among primary care physicians that they lack the training to appropriately manage the assessment and treatment of chronic pain.[18] This viewpoint is supported by the results of a survey of internal medicine residents which revealed that this group of clinicians did not feel prepared to manage chronic pain patients.[19] Despite the publication of a multitude of review articles and practice guidelines on the management of chronic pain, primary care clinicians still lack the training and knowledge to properly manage chronic pain patients.[10,20-22] Contributing to the inability of review and guideline articles on chronic pain management to impact the behaviors of primary care physicians is that most of these articles are published in specialist journals that this group of physicians may not be aware of or are not able to access. In a survey of 569 primary care physicians, 81% of respondents felt that chronic pain patients received suboptimal care.[23] In order to address this deficiency in knowledge, another study of primary care physicians revealed that the creation of a "physician practice guideline toolkit" that included information on the use of opioids for the treatment of chronic pain would be among the best ways to dramatically improve the care of chronic pain patients.[24] In support of the previous study, a separate survey of 100 primary care physicians found that pain management education would be an effective way of improving the current deficiencies in managing chronic pain patients.[25]

Patient education is an additional mechanism for improving the management of chronic pain. A survey of primary care physicians indicated that patient education, in addition to physician education, was important to optimizing the effectiveness and patient experience associated with the treatment of chronic pain.[24] Specifically, results of the survey indicated that patient self management education through group sessions and take-home materials was important.[24] Physicians in this survey also felt that patients should also be educated about the disease process related to chronic pain as well as the limitations of treatment.[24]

CONFIDENTIAL

RP_000437

The literature suggests that while chronic pain is a common condition, it is often not treated properly. The lack of proper treatment stems largely from a lack of proper training during residency. Unfortunately, this lack of education leaves clinicians unprepared and unable to adequately develop an appropriate treatment plan. The availability of review articles and treatment guidelines are often not a sufficient means of educating a primary care physician on how to assess and manage a chronic pain patient, specifically with regard to opioid administration. As a result of a lack of knowledge and concerns about safety, the appropriate analgesic therapies are either underused or improperly used.[6,26] Educational programs that specifically target primary care physicians and focus on the proper use of opioids in the management of chronic pain, including risk factor assessment, have been proposed as one of the most important ways to improve care.[21,24]  Patient education should also be used as another tool for improving the management of chronic pain.

As the population ages, there will be an increased number of patients with chronic pain-related medical conditions; therefore it is likely that primary care clinicians and pain specialists will be seeing increased numbers of patients with chronic pain. The management of chronic pain is also a complex undertaking as clinicians need to consider a multitude of patient-related issues such as age, abuse and addiction potential, comorbid disease, and polypharmacy as well as social, financial and medicolegal issues when making treatment recommendations. There are many therapies available for the treatment of chronic pain conditions. It is crucial to outline which therapies should be considered and how the administration of analgesia should proceed in a logical, step-wise progression. The proposed activities will focus on the latest considerations in the assessment of pain; the proper use of assessment tools and treatment algorithms; assessment of newer therapeutic approaches to pain management; safety and drug interaction considerations; factors impeding the proper utilization of analgesic therapies and strategies for reducing them; assessment of risk for abuse or misuse of opioid analgesics in determining who should and should not receive this type of analgesic therapy; and how to best manage opioid prescribing in drug users.

## Identified Need

### Identified Gaps in Practice
Based on our assessment, the gaps in practice for our target audience are: (1) underuse of analgesic agents and the basic tenets of pain management; (2) inability to assess patient risk for abuse, addiction and diversion; (3) underutilization of available treatment guidelines; (4) underuse of the FDA's new REMS requirements; and (5) inadequate patient counseling and education aimed at empowering patients to actively participate in their care. Ultimately, the consequence of these gaps in pain management is that chronic pain patients are often undertreated or improperly treated.

### Identified Educational Needs
Based on our assessment of gaps in practice and patient care, education on pain management should address: (1) basic pain management training including instruction on the risks, benefits and clinical indications of analgesic agents, the use of treatment guidelines and a logical, step-wise progression in the use of analgesic agents; (2) methods to assess for the risk of abuse and addiction as well as strategies to minimize these risks and counter effect the growing epidemic of prescription drug abuse; (3) improving patient counseling and education to remove the stigma of opioid use and increase patient-directed care; (4) expanding knowledge of the legal and legislative aspects of opioid prescribing (including the

CONFIDENTIAL

RP_000438

new REMS requirements) to decrease fear based prescribing practices; and (5) individualizing care to ensure that patients get the most appropriate treatment (opioid or non-opioid) to avoid both under and over-prescribing that will provide optimal pain relief while reducing adverse events.

**Note to Faculty Members:**

The outline on the following pages will be used to guide our roundtable discussion. Some of these questions address facts, while others are intended to solicit your opinions. Some of the questions are intended merely as "food for thought" as you formulate your responses. You may agree or disagree with any of the statements. If you intend to refer to research data in any of your responses, we would very much appreciate it if you could provide the reference itself or the full reference citation at the time of the roundtable meeting. We would be happy to obtain any references in advance as requested.

**ACCME Standards for Commercial Support**

Penn State College of Medicine and Curatio CME Institute LLC (Curatio) are both accredited by the Accreditation Council for Continuing Medical Education (ACCME) and will be responsible for the overall planning of the activity. Through co-sponsorship/co-providership with Penn State College of Medicine, The University of Tennessee College of Pharmacy (UTCOP), the American Academy of Nurse Practitioners (AANP), the American Academy of Physician Assistants (AAPA), and EduPro Resources these educational activities will be certified for continuing education (CE) for physicians, pharmacists, NPs, PAs, and RNs respectively.

We will be disclosing that these CME activities have been supported by educational grants from Endo Pharmaceuticals and Ortho-McNeil Janssen. As accredited providers, Penn State and Curatio require that speakers/faculty comply with the ACCME Essential Areas, Policies, and Standards for Commercial Support of CME. As a faculty member, you must have completed a disclosure form. The Standards for Commercial Support require that your discussion/presentation be free of commercial bias, that any information regarding commercial products/services be based on scientific methods generally accepted by the

CONFIDENTIAL

medical community, and that any therapeutic recommendations carry a high weight of evidence. When discussing therapeutic options, it is our preference that you use only generic names. Further, should your discussion include reference to any unlabeled/investigational use of a commercial product, you are required to disclose this.

**Teleconference goals:**

1. Develop primary care and companion patient surveys
2. Select faculty to develop internet activity and faculty to develop journal supplement
3. Discuss the content for the educational activities (the discussion to be the starting point for the journal supplement)
4. Discuss additional ideas for disseminating the education (i.e. additional educational offerings)

**1. Develop primary care and companion patient surveys**

The purpose is to develop a targeted, scientifically valid survey to confirm previously identified barriers to practice/educational gaps that exist for primary care providers and identify additional ones. As education is a continuing process, it is important to get a current view of the educational needs as seen by the providers themselves. The education to be offered in this initiative should address current gaps for primary care clinicians. The information gathered from this survey will be distributed to all committee members to aid you in developing the educational content for this initiative. The survey will be distributed to the target audiences via MedPage for clinicians and via the APF website for the general public. Survey results may be used as educational content or can be considered for separate publication based on the input of the committee.

Questions to ask ourselves about the survey:

- What do we hope to learn about PCP educational needs/gaps?
- How do we best ask the questions? Mult. Choice, open ended, case-based, etc.
- Brief patient histories followed by clinical decision questions
- Are we trying to elicit treatment selection choices, other clinical decision making skills, clinician perceptions, etc?

Sample questions for the survey:

- What areas of chronic pain management are most difficult for you?
- What additional training/education do you feel is needed to improve your skills in this area?

CONFIDENTIAL

Discussion Guide: _____  December 22, 2009

- What percentage of patients prescribed opioids will develop an abuse/addiction problem?
- Are you aware of recent pain management guidelines such as the guidelines for the use of chronic opioid therapy in chronic noncancer pain and the pharmacological management of persistent pain in older adults?

## 2. Select faculty to develop internet activity and faculty to develop journal supplement

### 2.1 CME/CE Supplement to *The Journal of Family Practice*

The supplement will be a 12-page publication that will be within the journal. It will be based on the discussions of the steering committee. After the committee meeting our medical writer, Thomas Finnegan, PhD, whose background is in pain, will develop a detailed outline based on the transcripts of the meeting. This will be reviewed and edited by the members of the committee selected to develop the supplement. Once the final outline is approved by the committee members/faculty involved, Tom will create a first draft of the supplement. The involved committee members with then review and revise the supplement content and/or advise us as to what types of changes are needed. The final draft of the supplement will be the version that is approved by the committee members. 2 committee members (or their designees) are needed as official faculty for the supplement. Non-faculty members of the steering committee (e.g. APF, NIDA, FRI) will also review the outline and supplement drafts.

Faculty : _____

_____

### 2.2 Internet Activity

The internet activity will be a combination of didactics and case-based learning. 3 steering committee members (or their designees) will be asked to develop 20-30 minute slide presentations that incorporate the key issues in chronic pain management (based on the steering committee's discussions) using clinical cases to emphasize relevant practice points.

Based on our initial assessment, possible cases for consideration (pending steering committee input) include:

- Elderly patient with post-herpetic neuralgia causing chronic pain. Patient also has liver and/or kidney disease limiting the use of systemic therapies
- Obese patient with osteoarthritis of the hip who is at high risk for needing hip replacement surgery but has cardiac compromise, making surgery a risk
- Patient with long-standing history of chronic pain, who also has a history of drug dependence and is not receiving adequate control of pain with current regimen

CONFIDENTIAL

RP_000441

- Elderly patient that fell while caring for ailing spouse. Spouse subsequently dies, leading to depression and social isolation. Treatment of patient with unresolved chronic hip and back pain as well as depression

- Elderly patient with late stage Alzheimer's and several other comorbidities currently living in a nursing home facility. Patient has limited verbal abilities and has recently been experiencing falls. Patient has been showing changes in personality (combative, withdrawn) and activity (weight loss, grimacing) consistent with severe pain

A separate planning call can be scheduled with the participating faculty members to decide on the cases and patient management decision points. Once the slide sets are finalized, we will audio record the faculty members giving their presentations. The slides and audio will be synced to provide a seamless educational experience for the learner. The activity will also be developed into a podcast with downloadable PDFs of the slides for education on the go.

Faculty will be asked to prepare cases with patient management decision point questions to be used for learner polling. They will also be asked to assist in writing 3-4 questions with multiple answer choices, that each has an explanation as to why the answer is right or wrong.

Faculty : _____

              _____

              _____

Preliminary case ideas:

_____

_____

_____

_____

## 3. Discuss the content for the educational activities

(The discussion is to be the starting point for the journal supplement content)

Background: There have been many reports on the need for pain education, particularly among primary care providers, including recommendations from multiple pain guidelines, the National Pain Care Policy Act of 2009, The Let's Talk Pain initiative, the Mayday Pain Report and the APF roundtable titled, *Provider Prescribing Patterns and Perceptions: Indentifying Solutions to Build Consensus on Opioid Use in Pain Management- A Roundtable Discussion,* to name a few. These documents have done an excellent job of identifying the need for pain management education amongst primary care providers. They have not, however, discussed

CONFIDENTIAL

in detail the specific education that these providers require and how this educational content should be provided. At this roundtable, we hope to discuss the specific educational components needed and how to provide this information to the target audience. Overall questions to consider:

- What are the basic tenets of pain management that these providers need to understand better and how is this information best taught?

- What info should these practitioners know about each of the analgesic agents in their armamentarium?

- With little background training and experience in managing chronic pain, how do these clinicians decide between agents and what info can we provide to make those decisions easier?

## 1. Scope of the Problem

### 1.1 Awareness and Perceptions of Pain Prevalence

One quarter of people 20 years of age or older report experiencing pain that lasted longer than 24 hours within the last month.[1] Of those people who reported pain lasting at least 24 hours, the largest proportion of people (41%) stated that they experienced pain for at least one year.[1]

- What is the perception of chronic pain prevalence in the PCP community?

- How does this differ from the actual prevalence and how much is that affecting diagnosis and management?

- How can we improve PCPs' ability to maintain open lines of communication with their chronic pain patients?

### 1.2 Awareness and Perceptions of Abuse Potential

According to the Substance Abuse and Mental Health Services Administration, a majority (70%) of those using pain relievers for non-medical purposes gets the medications from friends and family members.[27] Only 2% of those taking prescription opioids legitimately will develop some kind of dependence problem.[28]

- How much higher is the perception of the risk of developing dependence from legitimate opioid prescribing in the PCP community and how much impact does this perception have on their prescribing practices?

- What education is needed to get PCPs to have a clearer perception of these risks?

- What education is needed to assist PCPs in teaching patients to decrease the drug diversion that is responsible for so much of the illicit use of these agents?

## 2. Assessment

### 2.1 Assessment of Chronic Pain

- Aside from increasing awareness of the prevalence of chronic pain, what else is needed to assist PCPs in the diagnosis and assessment of chronic pain?

CONFIDENTIAL

RP_000443

- Which assessment tools are recommended?

- Which tools are recommended for use with cognitively impaired patients?

- Which patient self assessment tools are recommended and how should PCPs use them for maximal effectiveness?

- What is recommended in terms of diagnostic tools and tests?

## 2.2 Assessment of Abuse Potential

The risk of addiction is not universal and requires that the clinicians determine the risk level for a given patient. A number of studies have shown that prescription opioid abuse is more prevalent in patients with concurrent mood or personality disorders.[12-15] Other predictors of opioid abuse were toxicologic detection of non-opioid drugs (cocaine and amphetamines specifically), young age, male sex, past alcohol abuse, and previous convictions for drug-related or DUI offenses.[16]

- Which elements of the patient's history can alert PCPs to a higher risk of abuse potential?

- Are there recommended assessment tools to assist PCPs in assessing risk?

## 3. Management
## 3.1 Treatment Guidelines

Despite the publication of a multitude of review articles and practice guidelines on the management of chronic pain, primary care clinicians still lack the training and knowledge to properly manage chronic pain patients.[10,20-22] Contributing to the inability of review and guideline articles on chronic pain management to impact the behaviors of primary care physicians is that most of these articles are published in specialist journals that this group of physicians may not be aware of or are not able to access.

- With a multitude of guidelines available, how do PCPs decide which guidelines to use?

What are the gaps in recommendations provided in current guidelines?

- Has any new evidence become available since the latest guidelines were published that can fill these gaps?

## 3.2 Non-Pharmacologic Therapy

Patient education is an additional mechanism for improving the management of chronic pain. A survey of primary care physicians indicated that patient education, in addition to physician education, was important to optimizing the effectiveness and patient experience associated with the treatment of chronic pain.[24] Specifically, results of the survey indicated that patient self management education through group sessions and take-home materials was important.[24] Physicians in this survey also felt that patients should also be educated about the disease process related to chronic pain as well as the limitations of treatment.[24]

- Which self management tools does the committee recommend?

- What training do PCPs require to incorporate these tools into their management protocols?

- How can PCPs empower their patients to be more involved in their care?

CONFIDENTIAL

RP_000444

- What do PCPs need to know about other non-pharmacologic therapies?
- What steps are needed to increase the use of interdisciplinary care amongst PCPs?
- At what point should PCPs be referring their chronic pain patients to pain specialists?

## 3.3 Pharmacologic Management

Doctors and other health professionals don't have enough knowledge about the biology of chronic pain and they don't know enough about drugs and other treatments that can offer effective pain relief, especially for people in chronic pain.[29]

- What are the basic tenets of chronic pain management that all PCPs should know and how do we convey this information?
- How should PCPs go about selecting the best initial pharmacologic therapy?
- What do PCPs need to know about bioequivalence and agent substitution?
- What strategies can we provide PCPs in order to reduce adverse effects?

## 4. Additional Considerations in Pain Management

### 4.1 Abuse/Addiction Management and Prevention

Research has shown that patients who receive prescription opioids are at an increased risk for abuse.[12] The risk of addiction however is not universal and requires that the clinicians determine the risk level for a given patient. A number of studies have shown that prescription opioid abuse is more prevalent in patients with concurrent mood or personality disorders.[12-15] Other predictors of opioid abuse were toxicologic detection of non-opioid drugs (cocaine and amphetamines specifically), young age, male sex, past alcohol abuse, and previous convictions for drug-related or DUI offenses.[16]

- What training is needed to enable PCPs to do a better job of evaluating abuse potential?
- What strategies and tools are recommended to continually evaluate patients for signs of abuse and addiction? Opioid agreements? Toxicology screening?
- How often should chronic pain patients (who are prescribed opioids) be screened for abuse?
- What are the recommendations for handling difficult situations such as exiting from opioid therapy in someone who has developed dependence?

### 4.2 Legal and Legislative Concerns

There is a real need to shift the focus from a reactive, "fear-based" prescribing strategy to a proactive "risk-based" strategy for opioid medications.[30] According to a recent chronic pain survey, one-third of physicians reported that regulatory scrutiny is often or always a barrier to prescribing patterns and reaching optimal pain treatment.[31] Fifty-four percent reduced the quantity of opioids prescribed due to regulatory concerns with 25% of them ceasing to prescribe opioids completely due to these concerns.

- Where can PCPs turn to for information on legal and legislative concerns?
- How does this information vary by state and what resources can PCPs use to learn about their individual state regulations?
- Can we give learners an idea of the real legal/legislative risks involved?
- Is the legal risk greater for over- or under-treating or are the risks the same?

CONFIDENTIAL

RP_000445

- What steps can PCPs take to lessen these risks?

## 4.3 Risk Evaluation and Mitigation Strategy (REMS)

A potential barrier for the use of opioid medications in the future may center around the requirement to develop a Risk Evaluation and Mitigation Strategy (REMS) for certain opioid medications as recently announced by the United States Food and Drug Administration (FDA).[17] According to the statement released by the FDA, the purpose of REMS is to prevent the misuse, abuse, or accidental overdose related to opioids, while promoting the beneficial use of this class of agents for the treatment of pain.[17]

- Where are we currently with the development of REMS in opioids?
- What do PCPs need to know about REMS?
- Are there any tools now or in development to assist non pain specialists with managing REMS?
- What can we tell PCPs at this point to alleviate fears and increase acceptance of the RES program to prevent further decreases in rational pain management?


## CONCLUSIONS


## 4. Discuss additional ideas for disseminating the education (i.e. additional educational offerings)

Please offer your opinions on the following educational tactics (and feel free to suggest others):

- Primary Care Network series and accompanying enduring activity
- Practicing Clinician's Exchange series and accompanying enduring activity
- Other select meetings (ACP, AANP, AAPA, etc.)
- Path of the Patient Web activity & CD-ROM
- Real CME patient cases
- Development and maintenance of *www.ChronicPainTx.com* website
  - o Ask the Expert activities
  - o Point of Care CME/CE
- Other activity ideas


## 5.    Selected References

1. National Center for Health Statistics. Health, United States, 2006 with chartbook on trends in the health of Americans. Available at: http://www.cdc.gov/nchs/data/hus/hus06.pdf. Accessed September 12, 2007.
2. Martin BI, Deyo RA, Mirza SK, et al. Expenditures and health status among adults with back and neck problems. *JAMA.* 2008;299:656-664.
3. National Center for Chronic Disease Prevention and Health Promotion. *Arthritis: meeting the challenge.* Atlanta, GA: Centers for Disease Control and Prevention; 2009. At a Glance 2009.
4. Stewart WF, Ricci JA, Chee E, et al. Lost productive time and cost due to common pain conditions in the US workforce. *JAMA.* 2003;290:2443-2454.
5. Portenoy RK, Ugarte C, Fuller I, et al. Population-based survey of pain in the United States: differences among white, African American, and Hispanic subjects. *J Pain.* 2004;5:317-328.
6. Dieleman JP, Kerklaan J, Huygen FJ, et al. Incidence rates and treatment of neuropathic pain conditions in the general population. *Pain.* 2008;137:681-688.

CONFIDENTIAL

7. Clark JD. Chronic pain prevalence and analgesic prescribing in a general medical population. *J Pain Symptom Manage*. 2002;23:131-137.

8. Jackson JL, Browning R. Impact of national low back pain guidelines on clinical practice. *South Med J*. 2005;98:139-143.

9. Dworkin RH, O'Connor AB, Backonja M, et al. Pharmacologic management of neuropathic pain: evidence-based recommendations. *Pain*. 2007;132:237-251.

10. Chou R, Fanciullo GJ, Fine PG, et al. Clinical guidelines for the use of chronic opioid therapy in chronic noncancer pain. *J Pain*. 2009;10:113-130.

11. Bhamb B, Brown D, Hariharan J, et al. Survey of select practice behaviors by primary care physicians on the use of opioids for chronic pain. *Curr Med Res Opin*. 2006;22:1859-1865.

12. Edlund MJ, Sullivan M, Steffick D, et al. Do users of regularly prescribed opioids have higher rates of substance use problems than nonusers? *Pain Med*. 2007;8:647-656.

13. Hudson TJ, Edlund MJ, Steffick DE, et al. Epidemiology of regular prescribed opioid use: results from a national, population-based survey. *J Pain Symptom Manage*. 2008;36:280-288.

14. Wilsey BL, Fishman SM, Tsodikov A, et al. Psychological comorbidities predicting prescription opioid abuse among patients in chronic pain presenting to the emergency department. *Pain Med*. 2008;9:1107-1117.

15. Becker WC, Sullivan LE, Tetrault JM, et al. Non-medical use, abuse and dependence on prescription opioids among U.S. adults: psychiatric, medical and substance use correlates. *Drug Alcohol Depend*. 2008;94:38-47.

16. Ives TJ, Chelminski PR, Hammett-Stabler CA, et al. Predictors of opioid misuse in patients with chronic pain: a prospective cohort study. *BMC Health Serv Res*. 2006;6:46.:46.

17. United States Food and Drug Administration. FDA to meet with drug companies about REMS for certain opioid drugs. Silver Spring, MD. February 9, 2009.

18. Olsen Y, Daumit GL. Opioid prescribing for chronic nonmalignant pain in primary care: challenges and solutions. *Adv Psychosom Med*. 2004;25:138-50.:138-150.

19. Yanni LM, Weaver MF, Johnson BA, et al. Management of chronic nonmalignant pain: a needs assessment in an internal medicine resident continuity clinic. *J Opioid Manag*. 2008;4:201-211.

20. Gardner-Nix J. Principles of opioid use in chronic noncancer pain. *CMAJ*. 2003;169:38-43.

21. Cohen SP, Raja SN. The middle way: a practical approach to prescribing opioids for chronic pain. *Nat Clin Pract Neurol*. 2006;2:580-581.

22. Trescot AM, Helm S, Hansen H, et al. Opioids in the management of chronic non-cancer pain: an update of American Society of the Interventional Pain Physicians' (ASIPP) Guidelines. *Pain Physician*. 2008;11:S5-S62.

23. Stannard C, Johnson M. Chronic pain management--can we do better? An interview-based survey in primary care. *Curr Med Res Opin*. 2003;19:703-706.

24. Clark LG, Upshur CC. Family medicine physicians' views of how to improve chronic pain management. *J Am Board Fam Med*. 2007;20:479-482.

25. Morley-Forster PK, Clark AJ, Speechley M, et al. Attitudes toward opioid use for chronic pain: a Canadian physician survey. *Pain Res Manag*. 2003;8:189-194.

26. Di Iorio D., Henley E, Doughty A. A survey of primary care physician practice patterns and adherence to acute low back problem guidelines. *Arch Fam Med*. 2000;9:1015-1021.

27. Substance Abuse and Mental Health Services Administration. 2006 National Survey on Drug Use and Health. Available at: http://www.oas.samhsa.gov/nsduh.htm

28. Glabman M. Multiple therapies help curb opioid dependence. *Opioids in the Workplace*. Winter 2008-2009;1(1):14-20.

29. The Mayday Fund. A call to revolutionize chronic pain care in America: An opportunity in health care reform. Available at: www.maydaypainreport.org.

30. American Pain Foundation. Provider prescribing patterns and perceptions: Identifying solutions to build consensus on opioid use in pain management – a roundtable discussion. Published April 2008. Available at: http://www.painfoundation.org/learn/publications/apf-report-provider.html.

31. Let's Talk Pain. Findings from the *Let's Talk About Pain* survey highlight need for improved communication about pain treatment and management. Published September 2008. Available at: http://www.letstalkpain.org/.

CONFIDENTIAL

RP_000447

Curatio CME Institute
1200 Route 22 East, First Floor, Bridgewater, NJ 08807
Cell:+1.908.547.565 | Fax:+1.908.707.1483 | curatiocme.com

 *Consider the environment.Please print this email only if absolutely necessary*

**From:** Russell Portenoy, MD [mailto:RPortenoy@chpnet.org]
**Sent:** Tuesday, November 24, 2009 6:07 PM
**To:** Matthew Horn; Will Rowe
**Cc:** Micke Brown, BSN, RN; Donna Reid ; Kristen Petro; Donna Calvani; Tracy Allgier-Baker; Donna Reid
**Subject:** RE: KOL Roundtable

Thank you.  I will ask Donna Reid in my office to suggest some times in January.

To make a recommendation about participants, it would be helpful to understand what the work product of this group would be.  Can you clarify?

Russ Portenoy

**From:** Matthew Horn [mailto:Matthew.Horn@curatiocme.com]
**Sent:** Tuesday, November 24, 2009 10:33 AM
**To:** Russell Portenoy, MD; Will Rowe
**Cc:** Micke Brown, BSN, RN; Donna Reid ; Kristen Petro; Donna Calvani; Tracy Allgier-Baker
**Subject:** RE: KOL Roundtable

Will, Thanks for getting the ball rolling and introducing me!

Dr. Portenoy,

Thank you for accepting the role of RT Chair. We, at Curatio, are very excited to work with you on this project.

As Will stated, I am following up to obtain your available dates in January and your faculty recommendations for the RT. In order to make the meeting convenient for all and to ease scheduling difficulties, we plan on holding the meeting via teleconference. I am located in Northern NJ and can meet with you in person in NYC as needed. We are hoping to hold the RT teleconference sometime in January. It will probably be about 3-4 hours in length. When you get a chance **please, let me know what your availability is in January**.

I would also like to get your input on who you would like to invite to join you on the RT steering committee. I hope to begin inviting the other faculty members next week. We plan on inviting 6 additional faculty members (in addition to the APF/FRI/NIDA participants). You can recommend members from the list provided in the proposal as well as others not on the list that you would recommend. For pharmacy accreditation purposes, we must include one PharmD on the steering committee. Micke Brown, RN, at APF, provides the RN representation allowing us to accredit the activity for RNs and NPs. PAs can receive credit for any activity accredited by an ACCME provider. Penn State College of Medicine will be providing the ACCME accreditation for the education developed from this RT. You can, however, recommend any combination of specialists that you feel will provide the most useful information for our primary care audience. **Please respond with your recommendations**, here are the potential faculty members listed in the proposal:

MDs
Scott Fishman, MD (Anesth)
Perry Fine, MD (Anesth)
Bill McCarberg, MD (FP/Pain)
Len Fromer (FP)
Knox Todd, MD, MPH (ER)
Roger Chou, MD (IM/Abuse expert) – recommended by NIDA
Howard Heit, MD (IM/GI/Addiction)
Steven Passick, PhD (Psych) – recommended by NIDA

3

CONFIDENTIAL

RP_000448

NPs/PAs
Paul Arnstein, RN, PhD (NP)
Thomas Quinn, APRN, MSN (NP/Oncology)
Allan Platt, PA-C (PA)
Barbara St. Marie, PhDc (NP/Geriatrics/Pain & Palliative Care)

PharmDs (min. of 1 required)
Mary Lynn McPherson, PharmD
Robert Barkin, MBA, PharmD

I am currently drafting a detailed discussion guide that I will send out for everyone's review and input prior to the RT. I would be more than happy to discuss any aspect of the educational initiative with you. Please do not hesitate in contacting me if you have any questions or need any assistance. Kristen Petro, Sr. Program Manager at Curatio, will be working with me in managing the project. She can also be contacted for assistance as needed.

Thank you again for your participation!

Best regards,
Matt


**Matthew Horn, MD**  Medical Director
matthew.horn@curatiocme.com  |  +1.908.707.1480  x206


Curatio CME Institute
1200 Route 22 East,  First Floor, Bridgewater, NJ  08807
Cell:+1.908.547.565 |  Fax:+1.908.707.1483 |  curatiocme.com


 *Consider the environment.Please print this email only if absolutely necessary*

---

**From:** Will Rowe [mailto:wrowe@painfoundation.org]
**Sent:** Tuesday, November 24, 2009 9:11 AM
**To:** Russell Portenoy, MD
**Cc:** Micke Brown, BSN, RN; Donna Reid ; Matthew Horn
**Subject:** RE: KOL Roundtable

Terrific Russ, and thank you very much.  We are very pleased to be able to enact some of the recommendations that we produced at the Baltimore Roundtable.  Dr. Matt Horn from Curatio will be following-up with you sort through names and dates for the Roundtable.

Thanks again Russ......enjoy your Thanksgiving.


Will

---

**From:** Russell Portenoy, MD [mailto:RPorteno@chpnet.org]
**Sent:** Tuesday, November 24, 2009 6:25 AM
**To:** Will Rowe
**Cc:** Micke Brown, BSN, RN; Donna Reid
**Subject:** RE: KOL Roundtable

# CONFIDENTIAL

RP_000449

# Reimbursement Form
### Breakthrough Pain Curriculum Development Workshop
### March 3-4, 2006
### Mandarin Oriental, Washington DC

*File Reimbursements*

Please complete and return this form along with **original receipts** to Advanced Strategies in Medicine **within 30 days** of program completion. Please allow 6 to 8 weeks for check disbursement.

Per IRS guidelines, if the Social Security number and original receipts and/or original airline ticket stubs (if applicable) are not included with this form, reimbursements will be treated as taxable income.

Reimbursements will be made payable to:

First Name, Last Name, Degree:_____*Russell Portenoy  mo*_____

Social Security # or Tax ID#: *(Tax ID required if issued to a company):*___    REDACTED    _____

REDACTED    _____

Telephone: *212 - 844 - 1505*  Fax: *212 - 844 - 1503*

| Description | Amount |
|---|---|
| **Air Travel:** | $_____ |
| **Mileage:** (*Number of round-trip miles driven _____ x 0.485 per mile*) | $_____ |
| **Tolls:** (*Attach receipts totaling more than $5.00*) | $_____ |
| **Parking:** (*Home city airport only*) | $ *30* |
| **Transfers:** (*Taxis to and/or from home city airport*) | $ *14* |
| **Meals:** | $_____ |
| **Other** (*Please list*): _____ | $_____ |
| **TOTAL EXPENSES:** | $ *44* |

Job #: CEPN-0-001
Date Received Reimbursement Form:_____

Advanced Strategies in Medicine • A McMahon Group company • 545 West 45th Street • 8th Floor • New York NY 10036

CONFIDENTIAL



## Taxi Cab Receipts

DATE: 3/4/06  TIME:

TRIP ORIGIN:

DESTINATION:

FARE: $

SIGNATURE

---

LaGuardia Airport

Cashier : 366   Seq # 39179
License Plate : NY 4TH701
Ent : 18:16 03/03/06 Lane 12
Exit: 17:32 03/04/06 Lane 50

E-ZPASS      $   30.00
CHANGE CALC $    0.00
PAID AT CT  $   30.00
   Taxes Included
*** Thank You ***

---

CONFIDENTIAL

RP_000451



*Billed to McMahon*

| PORTENOY/RUSSELL | CEPN-0-001 | **Attention:** | 01-Mar-2006  1:55 pm |
| --- | --- | --- | --- |
| | | Booking locator: KZISZU | Page 1 of 1 |

| | | | |
| --- | --- | --- | --- |
| 03-Mar-2006 07:30pm Friday | **Air** Delta Airlines | Flight# 1967  Class:  Y | |
| | From: New York La Guardia NY, USA | To: Washington Natl DC, USA | |
| | Meal: Snack/brunch | | |
| | Equip: McDonnell Douglas MD | Status: Confirmed | |
| | Depart: 03-Mar-2006  Friday   07:30pm | Stops: 0 | |
| | Arrival: 03-Mar-2006  Friday   08:41pm | | |
| | DEP-MARINE AIR TERMINAL | ARR-TERMINAL B | |
| | Delta Airlines locator: CAEFNB | | |

| | | | |
| --- | --- | --- | --- |
| 04-Mar-2006 07:30pm Saturday | **Air** Delta Airlines | Flight# 1966  Class:  H | |
| | From: Washington Natl DC, USA | To: New York La Guardia NY, USA | |
| | Meal: Snack/brunch | | |
| | Equip: McDonnell Douglas MD | Status: Confirmed | |
| | Depart: 04-Mar-2006  Saturday   07:30pm | Stops: 0 | |
| | Arrival: 04-Mar-2006  Saturday   08:41pm | | |
| | DEP-TERMINAL B | ARR-MARINE AIR TERMINAL | |
| | Delta Airlines locator: CAEFNB | | |

**Other**

| | |
| --- | --- |
| 31-Aug-2006 Thursday | New York City Area NY, USA THANK YOU FOR USING MCVEIGH TRAVEL |

FOR SECURITY REASONS PRESENT OFFICIAL PHOTO I.D. ISSUED
BY A GOVERNMENT AUTHORITY SUCH AS A DRIVERS LICENSE,
OR 2 FORMS OF I.D. -ONE MUST BE GOVERNMENT ISSUED
ANY INQUIRES CALL 800-726-5655 OR 631-789-8883
PLEASE ALLOW 2 HOURS FOR DOMESTIC CHECK-IN
-------------------------------------------------------

IMPORTANT INFORMATION REGARDING YOUR AIRLINE TICKET
NON-REFUNDABLE TICKETS DOMESTIC, CARIBBEAN, US
TO/FROM CANADA AND US TO EUROPE DESTINATIONS MUST BE
USED SPECIFICALLY FOR THE TICKETED ITINERARY ABOVE
AND WILL HAVE NO VALUE ONCE THE FLIGHT HAS DEPARTED.
CHANGES MAY BE MADE TO THE ITINERARY BEFORE YOUR
SCHEDULED DEPARTURE, SUBJECT TO CERTAIN RESTRICTIONS
AND FEES.
-------------------------------------------------------
-------------------------------------------------------

THIS TICKET IS NONREFUNDABLE. ANY CHANGES ARE SUBJECT
TO A FEE PLUS ANY FARE DIFFERENCE
-------------------------------------------------------

YOUR RESERVATION HAS BEEN ELECTRONIC TICKETED
PLEASE SHOW PHOTO I.D. AT CHECK-IN FOR A BOARDING PASS
-------------------------------------------------------
---------------SHUTTLE SEAT RMKS------------------
PLEASE BE ADVISED SHUTTLE FLIGHTS DO NOT OFFER
PRE-ASSIGNED SEATING

*ResFAX® Copyright© 2006 Cornerstone Information Systems, Inc., Bloomington, IN*

CONFIDENTIAL



**FENTORA® Medical Scientific Advisory Board**
**April 1, 2009**
**W New York Hotel**
**New York City, New York**

**PROGRAM EVALUATION**

We would greatly appreciate your candid feedback and recommendations to help us improve future meetings. Please complete the following:

| Meeting Logistics | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| Destination:  New York City, NY | ✓ | | | |
| Hotel:  W New York Hotel | ✓ | | | |
| Quality of food and beverage on property | ✓ | | | |
| Overall service received during the meeting | ✓ | | | |
| Ground transportation | ✓ | | | |

**Please share any topic areas you feel would be beneficial to be covered in future FENTORA®**

**Medical Scientific programs.**

_____

_____

_____

_____

_____

**How could we improve future advisory board meetings (eg, content, venue, meeting format)?**

_____

_____

_____

_____

_____

**Other comments:**

_____

_____

_____

_____

**Thank you!**

CONFIDENTIAL

## Donna Reid

| | |
|---|---|
| **From:** | Shiva Noorchashm [snoorchashm@medicacommunications.com] |
| **Sent:** | Sunday, March 29, 2009 8:26 PM |
| **To:** | Russell K Portenoy MD |
| **Cc:** | Donna Reid |
| **Subject:** | FENTORA Medical Scientific Advisory Board- Logistical Details |
| **Importance:** | High |

Dear Dr. Portenoy,

We are pleased you will be attending the upcoming **FENTORA® Medical Scientific Advisory Board Meeting** on April 1, 2009 at the W New York Hotel in New York City.

A summary of scheduled events and logistical details follows:

SCHEDULE OF EVENTS

Tuesday, March 31, 2009

| | |
|---|---|
| 2:00 PM – 5:00 PM | Slide Review Meeting |
| | Earth Room, 2nd Floor |
| 6:30 PM – 9:00 PM | Welcome Dinner at the W New York Hotel |
| | Sea & Ocean Room, 2nd Floor |

Wednesday, April 1, 2009

| | |
|---|---|
| 7:00 AM – 8:00 AM | Breakfast |
| | Canyon, 2nd Floor |
| 8:00 AM – 12:00 PM | Meeting |
| | Forest I, 2nd Floor |
| 12:00 pm – 1:00 pm | Lunch |
| | Canyon, 2nd Floor |
| 1:00 pm – 5:00 pm | Meeting |
| | Forest I, 2nd Floor |
| 5:00 pm | Departures |
| | Main Lobby |

PROGRAM VENUE

**W New York**

CONFIDENTIAL

3/30/2009



King Pharmaceuticals

Research and Development
4000 CentreGreen Way, Suite 300
Cary, North Carolina 27513
Telephone: (919) 653-7001

December 9, 2009

*Via Federal Express*

> Re:   *Addendum #1 to Consulting Agreement*

Dear Dr. Portenoy:

Please find one fully executed Addendum #1 to the Consulting Agreement for your records. If you have any questions or need any additional assistance, please feel free to contact me directly.  I appreciate your time and assistance in this matter and look forward to working with you again. Thank you.

Sincerely,

Priscilla L. Evans
Contract Administrator

Enclosures

G:/Contract/ClinSrvc/KP0051_WO33_34Term.doc

# CONFIDENTIAL

**RUSSELL K. PORTENOY, MD**
**ADDENDUM #1**
**TO CONSULTING AGREEMENT**

This addendum #1 to consulting agreement ("Addendum #1") is made and entered into as of November 19, 2009 ("Addendum #1 Effective Date") by and between **KING PHARMACEUTICALS, INC.**, a Tennessee corporation with its corporate headquarters located at 501 Fifth Street, Bristol, Tennessee 37260, U.S.A. ("Company") and **RUSSELL K. PORTENOY, MD**, an individual with an address of 15 Glenn Place, Hastings on Hudson, New York, New York 10706 ("Consultant").

This Addendum #1 is being issued pursuant to, incorporated into and annexed as an attachment to the existing consulting agreement dated April 24, 2009 by and between Company and Consultant ("Agreement"); and

Pursuant to Section I(A) of the Agreement, the parties now desire to include additional Services and pursuant to Section II(A) of the Agreement, the parties now desire to state a Compensation for those additional Services.

The parties therefore agree as follows:

| | |
|---|---|
| **SERVICES:** | Consultant agrees to render, upon Company's reasonable request, the services that are set forth on **Exhibit 1-A** attached and incorporated by reference ("Addendum #1 Services"). |
| **COMPENSATION:** | Company or its designee shall pay Consultant, and Consultant shall accept as payment in full, the compensation that is set forth on **Exhibit 1-B** attached and incorporated by reference ("Addendum #1 Compensation"). |

Unless amended or first defined by this Addendum #1, all capitalized terms have the meanings ascribed to them in the Agreement. Unless expressly modified by this Addendum #1, all terms of the Agreement remain in full force and effect. If an express conflict or inconsistency exists between this Addendum #1 and the Agreement, this Addendum #1 controls.

**COMPANY HEREBY REJECTS ANY PROPOSED CHANGE TO THE TERMS OF THIS ADDENDUM#1. ANY PROPOSED CHANGE TO THE TERMS OF THIS ADDENDUM#1 IS VOID.**

The parties are signing as of the Addendum #1 Effective Date.

KING PHARMACEUTICALS, INC.

By: _____
／ Authorized Representative

Name: __Susan Gordon__

Title: ___Senior Vice President___

RUSSELL K. PORTENOY, MD

By: _____

Name: Russell K. Portenoy, MD

**CONFIDENTIAL**

## EXHIBIT 1-A

### ADDENDUM #1 SERVICES

Consultant shall actively participate as an advisor in a 2-hour teleconference scheduled for the 1st quarter of 2010 convened for Company to obtain input related to the AVINZA Risk Management Plan ("RMP") and continued risk plan and during which the final data from the AVINZA 2008 Phase IV trial will be presented. For the teleconference, Consultant shall be prepared to identify other initiatives, trends or factors that Company should consider in the further prevention and management of risk associated with the use of AVINZA and also be prepared to provide responses to any questions related to risk management.

Prior to the teleconference, Consultant shall review the components of the AVINZA RMP and reports from 2009. It is anticipated that preparation for the teleconference will require at least 2 hours of Consultant's time.

*[The remainder of this page is intentionally left blank.]*

2

CONFIDENTIAL

### EXHIBIT 1-B

### ADDENDUM #1 COMPENSATION

As consideration for the completion of the Addendum #1 Services in accordance with the terms of this Addendum #1 and the Agreement, Consultant shall receive an honorarium of Two Hundred Fifty Dollars (US$250) per hour, *provided, however*, that the Addendum #1 Compensation shall not exceed One Thousand Dollars (US$1,000). Compensation also includes any modest and occasional meals provided to Consultant in connection with the rendition of the Services.

Consultant's expenses that are actually incurred in connection with the Addendum #1 Services shall also be reimbursed, if such expenses are of the types described in Article II of the Agreement, and if Consultant provides Company or Company's designee with invoices and supporting documentation for such expenses in accordance with Article II of the Agreement.

*[The remainder of this page is intentionally left blank.]*

3

CONFIDENTIAL

## RUSSELL K. PORTENOY, MD
## CONSULTING AGREEMENT

This consulting agreement (this "Agreement") is made and entered into as of April 24, 2009 (the "Effective Date") by and between **KING PHARMACEUTICALS, INC.**, with an office located at 501 Fifth Street, Bristol, Tennessee 37260, USA ("Company") and **RUSSELL K. PORTENOY, MD**, an individual with an address of 15 Glenn Place, Hastings on Hudson, New York 10706 ("Consultant").

Consultant is an individual who has extensive knowledge, experience and insight related to pain management; and

Company desires to obtain, and Consultant desires to provide, professional consulting services of the type described below.

The parties therefore agree as follows:

I.    **DUTIES OF CONSULTANT**

A.    <u>Services</u>.  Consultant agrees to render, upon Company's reasonable request, the services that are set forth on **Exhibit A** attached and incorporated by reference (the "Services"). Company may in its sole discretion request that Consultant render services in addition to those that are set forth on **Exhibit A.** For each set of additional services, an individual, sequentially numbered addendum ("Addendum" or "Addenda") (*e.g.*, Addendum #1, Addendum #2, etc.) will be added to this Agreement as an attachment. Upon execution by both parties, each Addendum will be subject to the terms of, incorporated in and made an integral part of this Agreement. Services that are set forth on any Addendum will be incorporated into the Services under this Agreement as though fully set forth herein.

B.    <u>Representations, Warranties and Covenants</u>.    Consultant represents, warrants and covenants that:

1.    Consultant has extensive knowledge, experience and insight related to pain management;

2.    Consultant is not (a) subject to debarment pursuant to the United States Federal Food, Drug and Cosmetic Act, (b) subject to exclusion from any United States federal or state health care program or United States federal procurement or non-procurement program or (c) excluded from contracting with the United States federal government;

3.    Consultant is not subject to any pending or final adverse action, suspension, revocation, termination or other similar action by any medical board, medical society, medical association or accrediting body;

4.    Consultant has not been charged with, convicted of or pleaded guilty or no contest to any criminal offense, whether related to the practice of Consultant's healthcare profession or to this Agreement;

5.    Consultant is not subject to any pending or final decision or judgment by a court or administrative or governmental agency that alleges that Consultant failed to comply with any legal requirements that apply to the practice of Consultant's healthcare profession or to the rendition of services to patients;

CONFIDENTIAL

RP_000459

6.      Consultant is not a party to an existing agreement or arrangement that would (a) prevent Consultant from entering into this Agreement, (b) conflict with the terms hereof or (c) adversely affect Consultant's performance under this Agreement;

7.      Consultant does and shall continue to observe and comply, at Consultant's sole cost and expense, with all United States federal, state and local laws, regulations, rules, customs and ordinances now in force or which may hereafter be in force, pertaining to Consultant's performance under this Agreement;

8.      Consultant does and shall continue to observe and comply, at Consultant's sole cost and expense, with all applicable rules, regulations, policies and procedures of Consultant's employer including, but not limited to, the governing ethics rules regarding (a) the rendition of the Services under this Agreement, (b) acceptance of Compensation from Company or its designee for such Services, (c) receipt from Company or its designee of reimbursement for expenses incurred pursuant to this Agreement and (d) conflicts of interest;

9.      Consultant has obtained any necessary approvals of any appropriate ethics officer or supervisor to enter into this Agreement. On or before the first date that Services are rendered to Company, Consultant shall sign and provide to Company a Healthcare Provider Committee Disclosure Acknowledgement in the form or substantially similar form as **Exhibit C** attached and incorporated by reference;

10.      Consultant has and shall continue to have the unrestricted right to disclose any information that Consultant submits to Company free of all claims of third parties, including Consultant's employer;

11.      Consultant is duly licensed and in good standing as a healthcare professional in the following states:

| States Where Licensed | Licensure (e.g., MD, DO, R.Ph., Pharm.D, NP, PA, RN) | State License Numbers | National Provider Identification (NPI) Number |
| --- | --- | --- | --- |
| New York | MD | 60 146475-1 | A97575 |
| | | | |
| | | | |
| | | | |

and

12.      Consultant shall immediately notify Company in writing if Consultant becomes aware of any events or circumstances that are reasonably likely to cause any of the foregoing statements in this Section 1(B) to be untrue.

C.      Materials Under this Agreement.   Consultant agrees that all materials produced by Consultant for or at the request of Company under this Agreement are "works made for hire" for Company and will remain the property of Company. If for any reason any such materials are not considered works made for hire under applicable law, Consultant hereby assigns to Company and its successors and assigns all right, title and interest in perpetuity throughout the world in and to all

CONFIDENTIAL