# PSJ3

# Exhibit 57E

intellectual property rights in such materials. All materials provided to Consultant by or on behalf of Company are and will remain the property of Company whether or not such materials are registered. If Company provides Consultant with any materials, Consultant agrees not to alter them in any way without the prior written approval of Company.

D.     Compliance with Applicable Laws and Guidelines.  In rendering the Services under this Agreement, Consultant agrees to abide by the letter and spirit of all applicable laws, statutes, regulations, industry codes and guidelines. If Consultant performs presentations for Company, Consultant agrees that such presentations will be objective, balanced, scientifically rigorous and consistent with approved prescribing information for any Company products discussed. Consultant agrees not to initiate or encourage discussions regarding unapproved uses of Company's products. However, during a presentation Consultant may respond in a fair and balanced manner to unsolicited questions from the audience regarding such unapproved uses *provided that* (1) Consultant mentions in the answer that the use is not endorsed by Company and has not been reviewed or approved by the United States Food and Drug Administration, (2) Consultant keeps the answer focused on the specific question asked and does not expand into a larger discussion of off-label uses in general and (3) once Consultant has addressed the question, Consultant returns to the general, on-label discussion contained in the approved slide deck. Consultant shall ensure the meaningful, clear and conspicuous disclosure of any relationship with Company. In all presentations made in respect of Company's products, whether such presentations are directly sponsored or funded by Company, Consultant specifically agrees to disclose that Consultant is a paid speaker for Company. For states that require lobbyist registration or disclosure requirements (e.g., Louisiana and Florida), Consultant shall (1) appropriately, accurately and timely complete and file the necessary documents with the applicable authorities or agencies and (2) cooperate with Company or its designee to perform all necessary tasks to ensure the appropriate, accurate and timely completion and filing of all such documents.

E.     Videotaping.  Consultant understands, agrees and acknowledges that Company may record the rendition of Services under this Agreement by any means including, without limitation, audio, video, audiovisual and photographical, and may memorialize such recording in any medium or form, whether now known or hereafter developed. Consultant understands, agrees, acknowledges and consents to such recording and memorialization and hereby waives all publicity and privacy rights in connection with such recording and memorialization. Consultant understands, agrees and acknowledges that Consultant will not receive any fee, royalty, payment or compensation, monetary or otherwise, now or in the future for such recording or memorialization. Consultant understands, agrees and acknowledges that Company owns all intellectual property rights to any such memorializations.

## II.     COMPENSATION

A.     Compensation.  Company or its designee shall pay Consultant, and Consultant shall accept as payment in full, the compensation that is set forth on **Exhibit B** attached and incorporated by reference (the "Compensation") for Services actually rendered by Consultant, and invoiced to Company or its designee, in accordance with this Agreement. Company shall not pay Consultant for any services rendered by Consultant before the Effective Date unless such services are set forth in a separate writing signed by both parties. Compensation that is set forth on any Addendum will be incorporated into the Compensation under this Agreement as though fully set forth herein.

B.     Reasonable and Fair Market Value.  The parties agree and acknowledge that the Compensation is reasonable and fair market value and

1.     has not been determined in a manner that takes into account (a) the volume or value of any potential or actual orders of, purchases of or referrals for the products of Company or its affiliates made by Consultant, others under Consultant's direction or control or any institution with which Consultant is affiliated or (b) any potential or actual business generated for Company or its affiliates by

3

CONFIDENTIAL

Consultant, others under Consultant's direction or control or any institution with which Consultant is affiliated, and

        2.    is not being given in exchange for any explicit or implicit agreement by Consultant, others under Consultant's direction or control or any institution with which Consultant is affiliated to provide a favorable formulary or procurement decision for the products of Company or its affiliates.

      C.    <u>Expenses.</u>  Company or its designee shall reimburse Consultant for all of Consultant's reasonable transportation, lodging and customary out-of-pocket expenses actually incurred by Consultant in connection with the Services rendered by Consultant under this Agreement, *provided that* such costs have been pre-approved by Company in writing. Neither Company nor its designee shall reimburse for expenses (1) considered by Company, in its sole discretion, to be lavish, excessive or otherwise not normal or customary or (2) for spouses or guests of Consultant.

      D.    <u>Invoices; Supporting Documentation</u>. Upon completion of the Services, Consultant shall submit to Company or its designee (1) an invoice that describes the Services actually rendered, the time actually spent rendering those Services and any pre-approved expenses for which Consultant seeks reimbursement from Company or its designee and (2) any documentation necessary to support such Services and expenses.

      E.    <u>Maximum</u>.  During the Term, Compensation excluding reimbursable expenses will not exceed Fifty Thousand United States Dollars (US$50,000).

**III.**    **TAXES.**  Consultant understands that neither federal, state nor local income tax, nor any other payroll tax of any kind, shall be withheld or paid by Company or its designee on behalf of Consultant. Consultant understands that Consultant (A) is responsible for and covenants to pay the federal, state and local income tax of Consultant and (B) may be responsible for and in that event covenants to pay the Social Security tax of Consultant. Consultant shall not be treated as an employee of Company for any tax purposes.

**IV.**    **TERM AND TERMINATION**

      A.    <u>Term</u>.  This Agreement commences on the Effective Date and will expire one (1) year thereafter, unless earlier terminated as provided in this Article IV (the "<u>Term</u>").

      B.    <u>Termination</u>.  Either party may terminate this Agreement at any time, for any reason, upon providing thirty (30) days' prior written notice to the other; *provided, however* that Company may terminate this Agreement at any time upon notice if any of the statements in Section I(B) ceases to be true.

      C.    <u>Effect of Expiration or Termination</u>.  Upon expiration or termination of this Agreement, Consultant shall promptly return to Company all materials described in Section I(C), all Confidential Information (defined in Article V) and any equipment provided to Consultant. Articles III, V and VI, Sections I(C), I(D) and I(E) and any other provisions that by their intent or meaning are so intended, will survive any expiration or termination of this Agreement.

**V.**    **CONFIDENTIAL INFORMATION**

      A.    <u>Confidential Information</u>.  Consultant acknowledges that during the Term, Consultant may obtain access to Confidential Information. As used herein, "<u>Confidential Information</u>" means all information that relates in any way to the actual or potential business operations and/or research and development activities (including, but not limited to, new pharmaceutical products) of Company or its affiliates, whether disclosed to Consultant by or on behalf of Company or otherwise learned by

**CONFIDENTIAL**

Consultant, including pursuant to the rendition of the Services under this Agreement. Confidential Information also includes all materials described in Section I(C) and all reports prepared by Consultant for or on behalf of Company. Confidential Information is and will remain the property of Company.

       B.    <u>Obligation of Confidentiality</u>.  Except with the prior written consent of Company, Consultant shall retain Confidential Information in confidence, not disclose any Confidential Information to any third party and shall only use Confidential Information for the purposes of rendering the Services under this Agreement.

       C.    <u>Return of Confidential Information</u>.  Upon completion of the Services hereunder and in any event as set forth in Section IV(C), Consultant shall promptly return to Company all documents (including all copies), and all tapes and other embodiments of information or data disclosed to or generated by Consultant in connection with this Agreement.

## VI.    RELATIONSHIP OF THE PARTIES

       A.    <u>Independent Contractors</u>.  Consultant understands and agrees that in rendering any and all Services, Consultant and its employees, independent contractors, agents and representatives (collectively, "Consultant Resources") shall be acting solely as independent contractors maintaining a separate business. Nothing contained herein shall be construed to create a relationship of employer and employee between Company (including any of its affiliates, officers, directors and employees) and either Consultant or any Consultant Resources, whether or not any such persons render Services under this Agreement.

       B.    <u>Fringe Benefits</u>.  Consultant understands that because Consultant and all Consultant Resources are independent contractors, neither Consultant nor any Consultant Resources are eligible for or entitled to, and shall not participate in, any of Company's pension, health or other fringe benefit plans, if such plans exist. Participation in these plans is limited solely to Company's employees.

## VII.    NOTICES.  All notices or other communications which shall or may be given pursuant to this Agreement shall be in writing and shall be deemed to be effective (A) when delivered, if sent by registered or certified mail return receipt requested or (B) on the next business day, if sent by overnight courier, in each case to Consultant at the address stated in the introductory clause and to Company at the following address (or at such other addresses as shall be specified by like notice) with postage or delivery charges prepaid:

King Pharmaceuticals, Inc.
400 Crossing Boulevard
Bridgewater, New Jersey 08807, USA.
Attention: General Counsel

## VIII.    MISCELLANEOUS

       A.    <u>Waiver</u>. No waiver by either party of any provision or of any breach of this Agreement will constitute a waiver by such party of any other provision or breach. No such waiver will be effective unless made in writing and signed by an authorized representative of the party against whom waiver is sought. Either party's consent to or approval of any act of the other party will not be deemed to render unnecessary the obtaining of that party's consent to or approval of any subsequent act by the other party.

       B.    <u>Binding Effect; Assignment</u>. This Agreement binds and inures to the benefit of the parties and their respective successors, heirs, executors, administrators and permitted assigns. This Agreement shall not be assigned by Consultant without the prior written consent of Company.

       C.    <u>Governing Law; Venue</u>. This Agreement will be construed under and governed in all respects by the laws of the State of New York, USA without regard to the application of principles of

**CONFIDENTIAL**

RP_000463

conflicts of laws. The parties agree that any dispute arising out of this Agreement will be brought before a court of competent jurisdiction in the State of New York, USA. Each party consents to the jurisdiction and venue of such court.

D.    <u>Severability</u>. If any provision of this Agreement is found by a proper authority to be unenforceable, that provision will be severed and the remainder of this Agreement will continue in full force and effect.

E.    <u>Headings</u>.  All headings and captions contained in this Agreement are for convenience only and will not affect the construction or interpretation of any provision herein.

F.    <u>Entire Agreement</u>. This Agreement and all of its attachments constitute the final, complete and exclusive agreement between the parties relating to the subject matter hereof and supersede all prior conversations, understandings, promises and agreements relating to the subject matter hereof. Neither party has relied upon any communications, representations, terms or promises, verbal or written, not set forth herein.

G.    <u>Amendment; Modification</u>. This Agreement may not be amended, modified, altered or supplemented except by a writing signed by both parties.

H.    <u>Counterparts</u>.  This Agreement may be signed in counterparts, each and every one of which will be deemed an original. Facsimile signatures will be treated as original signatures.

I.    <u>Indemnification</u>. The following provisions run to the benefit, and are enforceable by Consultant and Consultant's employer, Beth Israel Medical Center ("Beth Israel"):

1. The Company agrees that it will not use the name Beth Israel Medical Center, or any abbreviation, contraction or simulation thereof, in any publicity, advertising or promotional material of any nature, without the express prior written consent of Beth Israel.

2. The Company agrees to indemnify, defend and hold harmless Consultant and Beth Israel, and Beth Israel's directors, officers, employees and agents (hereinafter the "Indemnified Parties"), from and against any and all claims, losses, damages, liabilities, suits, judgments, settlements and expenses howsoever arising (including but not limited to settlement costs and reasonable legal fees) asserted against any of the Indemnified Parties relating directly or indirectly to the services performed by Consultant under or in connection with this Agreement.  This provision shall survive the termination of this Agreement.

3. The Company shall provide and maintain at its own expense during this Agreement programs of insurance or self-insurance as it deems appropriate to protect its liabilities and contractual obligations hereunder.

6

CONFIDENTIAL

The parties are signing as of the Effective Date. However, if either (1) Consultant has not signed this Agreement on or before the first date that the Services are rendered to Company or (2) both parties have not signed this Agreement within fourteen (14) calendar days after the first date that the Services are rendered to Company, then **Exhibit A** and **Exhibit B** of this Agreement will immediately be null and void as of the Effective Date and the remainder of this Agreement will remain in full force and effect.

**KING PHARMACEUTICALS, INC.**                **RUSSELL K. PORTENOY, MD**

By: _____          By: _____
     Authorized Representative

Name: _____          Name:  Russell K. Portenoy, MD

Title: _____          Date: _____4/24/09_____

Date: _____

7

**CONFIDENTIAL**

RP_000465

## EXHIBIT A

### SERVICES

Consultant will spend two hours in preparation for and participate in a two-hour teleconference on Monday, April 6, 2009 from 3:00 to 5:00 pm, which will include a presentation of preliminary data from ACCESS 2008 Phase IV trial.

In connection with the teleconference, Consultant shall do the following:

1.      review the components of the AVINZA RMP and reports from 2008 and 2009,

2.      identify other initiatives, trends or factors that King should consider in the further prevention and management of AVINZA risk; and

3.      obtain responses to questions related to risk management.

In addition to the services set forth above, Consultant or Practitioner may be asked by company to provide additional services to Company or on behalf of Company during the term of the agreement.  Each additional service/project shall be subject to written addenda between the parties.

*[The remainder of this page is intentionally left blank.]*

8

CONFIDENTIAL

RP_000466

## EXHIBIT B

COMPENSATION

In consideration of Consultant's participation in the teleconference set forth on **Exhibit A**, Consultant shall receive an honorarium of One Thousand Dollars ($1,000) for such participation and time preparing for the teleconference.

Additionally, Consultant shall also be reimbursed for any pre-approved expenses in accordance with Article II of this Agreement.

In addition to the compensation set forth above, in the event that Company elects to further use the services of Consultant, consideration for Consultant's provision of additional services (other than those set forth in **Exhibit A** above) shall be set in advance, subject to a fair market value assessment.

*[The remainder of this page is intentionally left blank.]*

9

CONFIDENTIAL

RP_000467

**EXHIBIT C**

FORM OF HEALTHCARE PROVIDER COMMITTEE DISCLOSURE ACKNOWLEDGEMENT

[See attached]

CONFIDENTIAL

## RUSSELL K. PORTENOY, MD
## HEALTHCARE PROVIDER COMMITTEE DISCLOSURE ACKNOWLEDGEMENT

I, **RUSSELL K. PORTENOY, MD**, hereby agree that in accordance with industry standards if I am or become a member of a committee or committees charged with setting formularies or developing clinical guidelines, I shall disclose to such committees the existence and nature of my relationship with King Pharmaceuticals, Inc. and its affiliate and subsidiary companies (collectively, "King").

Upon disclosure of my relationship with King, I agree to follow all relative procedures set forth by those committees of which I am a member.

I understand that this disclosure requirement begins on the date set forth below and ends two (2) years after the termination of my relationship with King.

_____

Signature

Name: Russell K. Portenoy, MD

Date: April 24, 2009

11

CONFIDENTIAL

RP_000469

November 17, 2009

Russell K. Portenoy
Chairman
Beth Israel Medical Center
Dept. of Pain Medicine and Palliative Care,
Beth Israel Medical Center
First Avenue at 16th St.
New York, NY, USA, 10003

Re:     Consultant Agreement – Portenoy Russell

We are writing to confirm the terms of Portenoy Russell (the "**Consultant**") Contract with ProStrakan Pharmaceuticals Inc. ("**ProStrakan**").

1.     **Term**

    (a)     This Agreement shall be effective as of the date first written above and shall continue in effect for one (1) year from the date of signature by Consultant, and can be extended by mutual agreement of the parties.

    (b)     This Agreement shall be immediately terminable at any time by either party upon written notice, with or without cause.

2.     **Objectives**

The **Consultant's** objective under this Contract shall be to provide assistance and guidance to ProStrakan at a ProStrakan Breakthrough Cancer Pain Steering Committee meeting on January 14 and 15, 2010.

**Additional services** during the **Term** may be agreed upon by the parties and incorporated via addendum.

3.     **Fees**

The fee for the services performed under this contract shall be $3,500 US.

The **Consultant** will invoice the fee payable by **ProStrakan** with any expenses incurred in attending the ProStrakan Breakthrough Cancer Pain Steering Committee meeting.

4.     **Expenses**

Expenses incurred by the **Consultant** in connection with the performance of this Contract will be individually itemized in the **Consultant's** invoices and supported by vouchers and receipts. No mark-up or handling charge will be added to claimed expenses.

CONFIDENTIAL

- 2 -

Consulting Contract

P.03

CONFIDENTIAL

## 5.    Independent Consultant

The **Consultant** shall provide all services under this Contract as an independent contractor, and nothing in this Contract shall be construed so as to constitute the **Consultant** as an agent, employee or representative of **ProStrakan**.

## 6.    Confidentiality

The **Consultant** has a duty to maintain in strict confidence all information known or used by **ProStrakan** or any of its affiliates, including without limitation, all information known or used by ProStrakan Pharmaceuticals Inc. (collectively, the "**ProStrakan Group**").  Specifically, the **Consultant** will during the course of this Contract and afterward, keep confidential and refrain from using, directly or indirectly, all information known or used by the **ProStrakan Group** in its activities, including, but not limited to:

(a)    The **ProStrakan Group's** experimental techniques, proprietary assays, screening strategies and technologies, targets for drug discovery and chemical formulae;

(b)    commercial and financial information concerning the corporate, scientific, and pharmaceutical research activities and plans of the **ProStrakan Group** including any information regarding the **ProStrakan Group's** costs, sales, income, salaries, customers, and all business opportunities or joint ventures considered by the **ProStrakan Group**, whether or not pursued;

(c)    any and all confidential know-how, trade secrets, and any and all oral, written, electronic or other confidential communications regarding the biomedical research and development activities conducted by the **ProStrakan Group** including but not limited to the discovery and development of novel calcium channel blockers for the purpose of treating neurological diseases;

(d)    all of the **ProStrakan Group's** confidential and proprietary information, including, concepts, techniques, processes, designs, cost data, software programs, formulas, development or experimental work, work in process, and other financial, or other know-how or trade secrets;

(the "**Confidential Information**").

Confidential Information shall not include information that:

(i)    is publicly available (other than as a result of a breach of this Contract); or

(ii)    is known by the **Consultant** prior to entering into this or any prior contract or agreement with **ProStrakan**.

The **Consultant** shall keep all of the Confidential Information in confidence and will use the Confidential Information solely for the purposes of performing the services set out in this Contract, and will not without **ProStrakan's** prior written consent, disclose any Confidential Information to any person or entity, except those of the **Consultant's** officers, employees or consultants who require the Confidential Information in performing

CONFIDENTIAL

Consulting Contract

their obligations under this Contract.  The **Consultant** agrees that it will initiate and maintain an appropriate program limiting the internal distribution of the Confidential Information to only those officers, employees or consultants which have signed confidentiality and non-disclosure agreements in a form approved by **ProStrakan**.

Further, the **Consultant** acknowledges that **ProStrakan** receives confidential or proprietary information from third parties for certain limited purposes in the ordinary course of its business.  The **Consultant** agrees to hold such information in the strictest confidence and not to use such information for the benefit of anyone other than **ProStrakan** or such third party, without the express authorization in writing from **ProStrakan**.

This section shall survive the termination of this Agreement.


## 7.    Return of Materials

The **Consultant** agrees to return to **ProStrakan**, immediately upon termination or expiry of this Contract, all designs, devices, data, documents, specifications, business documents, computer software, lists, records files and all other material containing or disclosing Confidential Information including copies of these items, however made or obtained and will delete any electronic copies or files of any such information.

The **Consultant** also agrees at any time following termination of this Contract, that it will not use **ProStrakan's** name or any Confidential Information to promote directly or indirectly the business of the **Consultant** or any third party, and will not disclose any Confidential Information to any third party.


## 8.    Assignment of Inventions

The **Consultant** agrees that all inventions, discoveries, improvements, software, copyright, know-how or other intellectual property, whether or not patentable or copyrightable, created by the **Consultant**, or the **Consultant's** officers, employees or consultants:

> (a)    during the course of this Contract pertaining to any matter, thing, process or method related to this Contract, or that may be useful or of benefit to **ProStrakan**, (the "**Works**"), and

> (b)    such Works created during a one (1) year period after termination or expiry of this Contract (regardless of the circumstances for such termination or expiry), directly related to this Contract,

shall be the sole and absolute property of **ProStrakan**.  Without limiting the foregoing, the **Consultant** hereby irrevocably waives all moral rights in the Works and assigns and transfers to **ProStrakan** the **Consultant's** entire right, title and interest, domestic and foreign, in such Works, or, at the option of **ProStrakan**, a lesser interest therein and shall cause the **Consultant's** officers, employees or consultants to waive such moral rights and to assign and transfer to **ProStrakan** their entire right, title and interest in such Works.

The **Consultant** further agree to keep and maintain adequate and current written records of all Works made, which records shall be available at all times to **ProStrakan** and shall remain the sole property of **ProStrakan**.

CONFIDENTIAL

- 5 -

The **Consultant** further agrees to assist **ProStrakan** in obtaining and enforcing, for **ProStrakan's** own benefit, patents, copyrights and any other protections in any and all countries for any and all Works made by the **Consultant** or its officers, employees or consultants (in whole or in part) the rights to which belong to or have been assigned to **ProStrakan**. The **Consultant** agrees, upon request, to execute, and to cause its officers, employees or consultants to execute, all applications, assignments, instruments and papers and perform all acts that **ProStrakan** or its counsel may deem necessary or desirable to obtain any and all patents, copyrights or other protection in such Works and otherwise to protect the interests of **ProStrakan** therein and which it would be appropriate for the **Consultant** to do.

This section shall survive the termination of this Agreement.

## 9.    Termination of Contract

It is agreed that early termination of this Contract prior to January 14, 2010 shall be possible on the following basis:

(a)    at any time with the mutual written consent of both parties, or

(b)    without prior notice if at any time there has been a material breach of the terms of this Contract by either party, or

(c)    by either party on providing two (2) weeks written notice.  On such termination payment will be made for work completed by the **Consultant** to the date of termination.

## 10.    Use of Name and Indemnification

The following provisions run to the benefit, and are enforceable by Russell K. Portenoy, MD ("Consultant") and Beth Israel Medical Center ("Beth Israel"):

a.    **ProStrakan** agrees that it will not use the name Beth Israel Medical Center, or any abbreviation, contraction or simulation thereof, in any publicity, advertising or promotional material of any nature, without the express prior written consent of Beth Israel.

b.    **ProStrakan** agrees to indemnify, defend and hold harmless Consultant and Beth Israel, and Beth Israel's directors, officers, employees and agents (hereinafter the "Indemnified Parties"), from and against any and all claims, losses, damages, liabilities, suits, judgments, settlements and expenses howsoever arising (including but not limited to settlement costs and reasonable legal fees) asserted against any of the Indemnified Parties relating directly or indirectly to the services performed by Consultant under or in connection with this Agreement. This provision shall survive the termination of this Agreement.

c.    ProStrakan shall provide and maintain at its own expense during this Agreement the following insurance coverages with such insurers as shall be acceptable to Beth Israel in minimum limits of $1 million per occurrence and $3 million in the aggregate: comprehensive general liability, including contractual liability and errors and omissions.  The Company shall give Beth Israel thirty (30) days prior written notice of any changes in or cancellation of such insurance.

CONFIDENTIAL

TOTAL P.07

## 11. General

It is specifically agreed that this Contract, shall not be construed as an agreement by **ProStrakan** to directly engage as an employee any officer, employee or consultant of the **Consultant.**

The **Consultant** agrees to abide, and cause its officers, employees and consultants to abide, by all of **ProStrakan's** Policies, Security and Safety regulations in effect while on the property of **ProStrakan.**

This Agreement may not be assigned by either party, except with the written consent of the other party.

This Contract will be governed by the laws of USA.

Any amendment to this Contract shall be in writing signed by **ProStrakan** and the **Consultant.**

## 12. Acceptance

By signing below the **Consultant** acknowledges and accepts the terms and conditions of this Contract

**PROSTRAKAN PHARMACEUTICALS INC.**

ACCEPTED AND AGREED TO THIS _18_ DAY OF _December_, 20_09_. THE CONSULTANT HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS SET OUT IN THIS CONTRACT:

Signature of Consultant or Consultant's Authorized Signatory

CONFIDENTIAL

P.07

DEC-21-2009 12:02

RP_000475

## MASTER HEALTH CARE PROFESSIONAL (HCP) CONSULTANT SERVICES AGREEMENT

This **MASTER HCP CONSULTANT SERVICES AGREEMENT** (the "Agreement") is made and entered into as of December 16, 2009 ("Effective Date") by and between **Purdue Pharma L.P.** ("Purdue") with principal offices at One Stamford Forum, Stamford, Connecticut 06901-3431 and **Russell K. Portenoy M.D.**, with principal place of employment at Department of Pain Medicine and Palliative Care, Beth Israel Medical Center, First Avenue at 16th Street, New York, NY 10003 ("Consultant").

1.     Engagement. Consultant is engaged by Purdue to provide consulting services ("services"), in each case as agreed upon by the parties in Statement(s) of Work, each of which will be in writing signed by both parties, will be made a part hereof and will include detailed information concerning the services to be performed. The primary contact at Purdue relating to the performance of services hereunder will be specified in each Statement of Work.

2.     Outside Employment. Purdue acknowledges that Consultant is an employee of Beth Israel Medical Center (the "Medical Center") and member of the faculty of Albert Einstein College of Medicine (the "University"), and as such may be subject to certain policies relating to faculty or employee independent consulting. However, subject to such Medical Center and University policies, Consultant is being engaged hereunder, and will perform the services, in his individual capacity and outside the scope of his employment as a faculty member, employee, or otherwise related to his affiliation with the Medical Center or University. In performing the services hereunder, Consultant shall not use the funds, facilities, equipment and/or materials owned or paid for by or through the Medical Center or University or as a result of his employment or participation in research at the Medical Center or University.

3.     Term and Termination.
    - 3.1  Term. The term of this Agreement will begin on the Effective Date and continue for two (2) years expiring December 31, 2011, and may be extended upon the written agreement of both parties pursuant to Section 17 hereof.
    - 3.2  Termination. This Agreement and any Statement of Work hereunder may be terminated by either party for any reason upon fourteen (14) days prior written notice to the other.. All undisputed invoices for work that has been performed by Consultant up to the time of termination shall be paid by Purdue as provided in Section 6 hereof.

4.     Compensation. Consultant's fees for services will be detailed in each Statement of Work.

5.     Expenses. Purdue will reimburse Consultant for reasonable travel, lodging and reasonable out-of-pocket expenses incurred in accordance with Exhibit A "Consultant Travel and Expenses" attached hereto and made a part hereof and any applicable Statement of Work, subject to the limitations set forth in each Statement of Work. Consultant will obtain approval from Purdue prior to incurring any expenses associated with the performance of services hereunder. Consultant will provide receipts and any other back-up documentation reasonably requested by Purdue ("Expense Documentation") for any expenses for which it seeks reimbursement hereunder and Consultant acknowledges and agrees Purdue will have no obligation to reimburse for expenses for which no Expense Documentation is provided.

6.     Payment Terms. Purdue will pay Consultant's fees for services and will reimburse Consultant for authorized expenses within forty five (45) days of receipt by Purdue of a correct and undisputed invoice from Consultant. Invoices will state in detail the deliverables and amounts due, including the Consultant's name, the work performed, the dates of performance, and when applicable, the time worked for each task. Invoices for allowable expenses incurred by Consultant will be itemized. All invoices submitted by Consultant will state amounts due in U.S. dollars and all payments made by Purdue will be in U.S. dollars and will be sent to the address set forth above, or to such other address as Purdue may subsequently designate by notice.

CONFIDENTIAL

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

7.   Confidentiality.

7.1 During the term of this Agreement, Consultant may receive, learn or have access to confidential information of Purdue, or third parties to whom Purdue has an obligation of confidentiality, including but not limited to Purdue's products or business plans.  Consultant may also receive, learn or have access to additional confidential information of Purdue that is generated during the course of or as a result of performance of services hereunder.  All such information will be deemed "Confidential Information".  Such Confidential Information will not be subject to obligations of non-disclosure and non-use if it:

7.1.1   was already known to Consultant at the time of disclosure by or on behalf of Purdue as shown by prior written records; or

7.1.2   is already available or becomes available in print or other tangible form, to the public through no fault of Consultant; or

7.1.3   was received by Consultant from a third party who has the right to disclose it; and who did not receive it, directly or indirectly, from or on behalf of Purdue.

7.2 For a period of ten (10) years from the date of disclosure, Consultant will keep all Confidential Information in confidence, and will not disclose the Confidential Information to anyone (including through lecture, presentation, manuscript, abstract, poster or any other publication).

7.3 Further, Consultant will use the Confidential Information solely for the purpose of performing his obligations under this Agreement.

7.4 Consultant agrees to not make copies of any Confidential Information, aside from those copies required by Consultant for performing his obligations under this Agreement.  At any time upon Purdue's demand or upon termination of this Agreement, Consultant will return to Purdue all such information, including any copies.  It is also understood that any work product produced by Consultant pursuant to its engagement by Purdue will be the property of Purdue.

7.5 In the event that any Confidential Information is required to be disclosed pursuant to any judicial or government request, requirement or order, Consultant shall take reasonable steps to provide Purdue with sufficient prior notice in order to allow Purdue to contest such request, requirement or order.  In such event, Consultant shall cooperate reasonably with Purdue, at Purdue's expense, in seeking confidential treatment of such requested or compelled disclosure.

The obligations and restrictions set forth in this Section 7 will survive the termination or expiration of this Agreement.

8.   Protection of Personal Information.  Performance under the Agreement may involve the exchange of certain information about individual persons including, without limitation, individually identifiable health information, employment information, insurance information, and family information ("Personal Information").  The parties will transmit, handle, store, maintain, use and destroy Personal Information in a manner that will preserve its confidentiality and will not use or disclose it for any purposes other then the performance of this Agreement.  The obligations and restrictions set forth in this Section 8 will survive the termination or expiration of this Agreement.

9.   Inventions & Patents.

9.1 Any and all inventions, discoveries, trade secrets, know-how, improvements, copyrights or work product or other intellectual property which are conceived of or made as a result of any

CG-PORTENOY-HCP MCSA 121609

2

CONFIDENTIAL

RP_000477

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

work provided under this Agreement by Consultant, Purdue or a combination thereof, will be owned entirely and exclusively by Purdue ("Intellectual Property").  At Purdue's request and expense, Consultant shall immediately assign, and shall arrange for their employees to immediately assign, to Purdue, its designees, successors, legal representatives or assigns, Consultant's entire right, title and interest, if any, in and to the Intellectual Property.

9.2  Consultant agrees to assist in all necessary filings in the appropriate assertion of Purdue's interest in the Intellectual Property and will be compensated at fair market value for such activities.

9.3  Nothing in this Section 9 will be construed to grant either party any right of license under any patent or other intellectual property of the other party that existed prior to the Effective Date of this Agreement.

9.4  Pursuant to 21 U.S.C. Section 355 (b) and equivalent provisions of any other applicable jurisdiction, Consultant hereby grants to Purdue, and Purdue hereby retains, the exclusive right of reference and use of any information, including data or results there from, in support of new drug applications submitted by or on behalf of Purdue to the United States Food and Drug Administration ("FDA") or to any other competent authority in any other jurisdiction to which drug applications may be submitted.  Further, it is Purdue's exclusive right to grant third parties authorization to reference or use any information.

9.5  Purdue acknowledges that Consultant may have an obligation to report to the Medical Center or University certain intellectual property created in whole or in part by Consultant pursuant to this Agreement.  Notwithstanding this obligation, Consultant agrees to provide written notice to Purdue if such a required reporting is made.

The rights and obligations set forth in this Section 9 will survive the termination or expiration of this Agreement.

10.  <u>Liability Insurance</u>. The Company shall provide and maintain at its own expense during this Agreement the following insurance coverage, with such insurers as shall be acceptable to the Medical Center and Consultant in minimum limits of $1 million per occurrence and $2 million in the aggregate ($1.75 million plus $250,000 in self insured retention): comprehensive general liability and products liability. The Company shall give the Medical Center thirty (30) days prior written notice of any changes in or cancellation of such insurance.  The Medical Center shall provide and maintain at its own expense during this Agreement the following insurance coverage, with such insurers as shall be acceptable to Company, in minimum limits of $1 million per occurrence and $2 million in the aggregate: comprehensive general liability and professional liability. Each party shall give the other thirty (30) days prior written notice of any changes in or cancellation of such insurance.

11.  <u>Publications</u>. The Consultant shall not use any results generated pursuant to the performance of services for teaching, research, education, clinical or publication purposes without the prior written consent of Purdue. The obligations of this Section 11 will survive the termination or expiration of this Agreement.

12.  <u>Standard of Performance and Adverse Event Reporting</u>.  Consultant represents and warrants that he has the legal right and authority to enter into and perform his obligations under this Agreement. Consultant represents and warrants that all services will be performed in conformance with all applicable laws, regulations and rules governing the performance of services hereunder.  Consultant will perform all services in accordance with this Agreement and with a high degree of care, skill, diligence, professional knowledge, judgment and expertise according to generally accepted professional and industry standards,

P.04

JAN-21-2010  14:15

CONFIDENTIAL

RP_000478

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

in a well-managed, organized, efficient and workmanlike manner and to the reasonable satisfaction of Purdue.

In addition, during the term of this Agreement, Consultant agrees to report to Purdue any Adverse Event (any unintended medical or physical condition that is evidenced during the use of a Purdue product) or any complaint about a Purdue product that comes to Consultant's attention. The requirements and procedures for the Consultant to report Adverse Events or Product Complaints are set forth in Exhibit B attached hereto.

13.    Notices.  All legal notices or demands provided for by this Agreement will be in writing and will be deemed to have been given when delivered by certified mail, return receipt requested, or by overnight courier. All such communications should be addressed to the address of the respective party stated below or to such changed address as the party may have provided by notice:

To Purdue:                       Purdue Pharma L.P.
                                 201 Tresser Boulevard
                                 One Stamford Forum
                                 Stamford, CT 06901
                                 Attention: General Counsel

To Consultant:                   Dr. Russell K. Portenoy
                                 Department of Pain Medicine and Palliative Care
                                 Beth Israel Medical Center
                                 First Avenue at 16th Street
                                 New York, NY 10003

14.    Assignment.  Neither party may subcontract or assign the services and/or his obligations under this Agreement in whole or in part without the other's prior written consent. No assignment will relieve either party of the performance of any accrued obligation that such party may have under this Agreement.

15.    Government Employment Status.  Purdue is not permitted to retain individuals who work for, or provide services to, the federal government of the United States of America if such retention presents a real or apparent conflict of interest or if an honorarium or other compensation would constitute an unlawful gift or compensation to an employee of the federal government.  If Consultant works for or provides services to the federal government of the United States of America, whether as full- or part-time employee or special employee or consultant, Consultant represents by signing this Agreement that no real or apparent conflict of interest exists by entering into this Agreement with Purdue.

16.    Applicable Law.  This Agreement will in all respects be governed by, interpreted, construed and enforced in accordance with the laws of the State of New York, USA, applicable to contracts executed and to be fully performed therein.  Except for actions seeking injunctive relief initiated by Purdue to protect Purdue Confidential Information which may be brought in any court of competent jurisdiction in the continental U.S., the parties agree that any action or proceeding arising out of or in connection with this Agreement will be in a federal or state court of appropriate venue and subject matter jurisdiction located in the State of New York, USA.

17.    Entire Agreement.  This Agreement, together with appendices, attachments and/or exhibits, constitutes the entire agreement between the parties with respect to the subject matter contained herein, and this Agreement supersedes all prior understandings and agreements between the parties with respect to the subject matter contained herein.  This Agreement and the rights and obligations hereunder may not be modified, amended or waived, whether in whole or in part, except by a writing signed by both parties.

CONFIDENTIAL

RP_000479

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

18. **Independent Contractor/Subcontractor.** Consultant is and will be treated as an independent contractor and not an agent, employee, joint venturer or partner of Purdue. Consultant represents and warrants that he will pay, when due, all applicable taxes in connection with the fees received for the provision of services hereunder. No life, casualty, or disability insurance, or health, retirement or any other employment benefits will be paid by Purdue to or for the benefit of Consultant, and Consultant waives any right to such insurance benefits.

19. **Waiver.** No waiver of any term, provision or condition of this Agreement whether by conduct or otherwise in any one or more instances will be deemed to be or construed as a further or continuing waiver of any such term, provision or condition, or of any other term, provision or condition of this Agreement.

20. **Modification.** This Agreement and the rights and obligations hereunder may not be modified, amended or waived, whether in whole or in part, except by a writing signed by authorized representatives of both parties.

21. **Invalidity.** The terms of this Agreement will be severable so that if any term, clause, or provision hereof is deemed invalid or unenforceable for any reason, such invalidity or unenforceability will not affect the remaining terms, clauses and provisions hereof, which will continue with full force and effect to the maximum allowable extent under applicable law.

22. **Use of Name.** Under no circumstances may one party use the name of the other party, or any of its personnel, in any publicity, promotional literature or advertising without the prior written permission and approval of the other party.

23. **Debarment.** Consultant represents that he is not and has never been (i) debarred under Section 306(a) or 306(b) of the United States Federal Food, Drug and Cosmetic Act, as may be amended and supplemented from time to time ("FDCA"); (ii) charged with, or convicted of, any felony or misdemeanor within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or proposed for exclusion during the screened person's employment or contract term; or (iii) excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal or State health care programs (including convicted of a criminal offense that falls within the scope of 42 U.S.C. §1320a-7 but not yet excluded, debarred, suspended, or otherwise declared ineligible), or excluded, suspended or debarred from participation, or otherwise ineligible to participate, in any U.S. Federal procurement or nonprocurement programs. Notwithstanding any provision in this Agreement to the contrary, Purdue may immediately terminate this Agreement if Consultant violates this Section. Consultant will notify Purdue immediately, but in no event later than five (5) business days, after knowledge of any such exclusion, debarment, suspension or otherwise ineligibility occurring during the term of this Agreement, or if any action or investigation is pending.

24. **Force Majeure.** Neither party will be liable for any delay or failure to perform as required by this Agreement to the extent that such delay or failure to perform is caused by circumstances reasonably beyond either party's control, such as labor disputes, accidents, any law, order or requirement of any governmental agency or authority, civil disorders or commotions, acts of aggression, fire or other casualty, strikes, acts of God, explosions, or material shortages. Performance time will be considered extended for a period of time equivalent to the time lost because of any such delay or failure to perform; however, in any event, this extension of time will not exceed 15 days unless the parties otherwise agree in writing.

25. **Behavior of Consultant.** During the performance of services hereunder, neither party will commit any act of sexual harassment nor discriminate on the basis of sex, race, religion, national origin, disability, marital status, Veteran's status, age, and/or any other status protected by law.

P.06

JAN-21-2010 14:16

CONFIDENTIAL

RP_000480

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

26.  Non-Exclusivity. Consultant maintains the right, during or after the term of this Agreement and at Consultant's sole discretion, to render similar services and/or otherwise seek employment with other companies, so long as doing so does not create a conflict of interest with the services being performed by Consultant hereunder, and so long as Consultant does not breach his obligations under this Agreement, including without limitation those set forth in Sections 7, 8 and 9 of this Agreement.

27.  Transmission of Deliverables.  In the event that Consultant intends to transmit Confidential Information or Personal Information (as defined in Sections 7 and 8 hereof, respectively) to Purdue from a remote location by means of the Internet, Consultant will first obtain the permission of the Purdue Contact so identified in the applicable Statement of Work, and thereafter will transmit such Confidential Information or Personal Information (including, without limitation, draft and final documents) through Purdue's secure server or validated secure server, in accordance with instructions to be provided by Purdue at the request of Consultant. If Consultant is unable to access the server required for a particular transmission, Consultant will send the Confidential Information or Personal Information to Purdue on compact disks or by other electronic media approved by Purdue.

28.  Conflicts of Interest.  If Consultant is a member of a formulary-setting or clinical practice guideline development committee, Consultant agrees to disclose the committee(s) the existence and nature of this Agreement prior to the execution of this Agreement and for a two (2) year period subsequent to the termination of this Agreement.

29.  Compliance with FDA Regulations. Under the FDA Guidance on Industry-Supported Scientific and Educational Activities, if you are selected to speak in an independent educational program, you must disclose during the program any significant relationship between you and Purdue. In accordance with this Agreement you agree to disclose to any program provider your relationship to Purdue so that a determination can be made as to whether a disclosure is necessary.

AGREED AND ACCEPTED as of the Effective Date set forth above.

PURDUE PHARMA L.P.

By: _____

Name: Robert Kaiko

Title: VP R&D Portfolio Dev.

CONSULTANT

By: _____
Russell K. Portenoy M.D.

CONFIDENTIAL

RP_000481

RUSSELL PORTENOY MD/ PURDUE PHARMA L.P.

## EXHIBIT A
## CONSULTANT TRAVEL AND EXPENSES

### GENERAL

It is the policy of Purdue to reimburse only those approved expenses that are identified in this document. Purdue's travel agency (the "Travel Office") arranges for airline, car rental, hotel, and rail and must be used for all travel of this type unless otherwise approved by the Purdue in writing and in advance. Selection of all vendors is at the discretion of the Travel Office.

The Travel Office is open Monday through Friday from 8:00 a.m. – 6:00 p.m. Eastern Standard Time, and may be reached at (800) 253-2415. Calls to the Travel Office's Global services Center (after-hours service) is billable to the Purdue and will be the responsibility of the Consultant, unless traveler is stranded *en route* or unless otherwise approved by the Purdue.

A completed, approved "Non-Employee Notification of Travel" form must be submitted by a Purdue representative for each Consultant traveler who will be submitting expenses, prior to travel arrangements being made. The Consultant traveler must provide their credit card information for the billing of travel arrangements. Consultant traveler may also complete a traveler profile form for their convenience.

Original receipts for all expenses of $25 or greater must be submitted to the Purdue with expense submissions. Receipts for multiple persons must identify the name(s) of all persons in attendance, and the business purpose.

### AIR TRAVEL

All domestic and international air travel will be arranged in Coach Class, utilizing the lowest applicable airfare, unless otherwise authorized. E-tickets will be issued for domestic and international travel as applicable. Both the e-ticket/passenger receipt and travel agency itinerary/invoice must be submitted with expense submission. It is the Consultant's responsibility to notify the Travel Office of any cancellations. Any fees associated with cancellations that are not at the Purdue's request will be the responsibility of the Consultant. Reservations should be made 14 days in advance unless Purdue request is less than that time period. Air phone charges will not be reimbursed.

### AIRPORT PARKING

Parking on site at the airport will be reimbursed when travel is limited to two days or less. When travel exceeds two days the use of discount or offsite parking must be utilized.

### LODGING

Business Class and Limited Service hotel accommodations must be used when making hotel arrangements. Deluxe hotels will not be utilized. Deluxe chains include Four Seasons, JW Marriott Hotels & Resorts, Luxury Collection Starwood Hotels & Resorts, Mandarin Oriental, Orient Express and Ritz Carlton Hotels & Resorts. Additional charges for upgraded rooms to executive floors, concierge levels or suites will not be reimbursed.

Reasonable and necessary laundry and dry cleaning services will be reimbursed for trips of more than five business days. Charges for mini-bar, in-room movies and health club charges will not be reimbursed.

### GROUND TRANSPORTATION

7

P.08

JAN-21-2010 14:17

CONFIDENTIAL

RP_000482

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

Travelers should use the most economical mode of transportation to and from airports, rail terminals, hotels and business destinations.

Mileage for personal car use will be reimbursed at the standard IRS rate that is in effect at the time of travel.

If approved by Purdue, travelers will have use of a rental automobile at their destination. Use of a rental automobile is in Purdue's sole discretion and is only approved when other forms of transportation are impractical, more expensive or not available, or if the destination is more than 200 miles round trip. Individuals will receive a mid-size car. Full size will be used if there are four (4) or more travelers riding together. Travelers are to return the rental car with a full tank of gas. Purdue does not reimburse for refueling charges by the car rental company. Purdue does not reimburse Consultant for Rental Car insurance coverage, and does not provide to Consultant or reimburse Consultant for any personal insurance coverage. Notwithstanding the foregoing, LDW (Loss Damage Waiver) and Accident Liability Insurance (minimum statutory limit) Rental Car insurance covering third party bodily injury and third party property damage will be provided if the Travel Office is able to utilize Purdue's preferred rental car vendor and receive Purdue's corporate rate. It is the Consultant's sole responsibility to (1) verify if the rental car vendor is Purdue's preferred vendor and if so, that the car been reserved using the corporate rate, (2) decide the adequacy of any minimum statutory limit of LDW and Accident Liability Insurance provided and to pay for additional limits if deemed necessary in the Consultant's sole discretion. For all other occasions, it is recommended that Consultant purchase through the rental car vendor or otherwise arrange for, through a personal auto insurance policy, adequate limits of Accident Liability Insurance, as well as Collision, Comprehensive, Fire and Theft insurance coverage when renting a vehicle.

## MEALS

Purdue will reimburse for meal expenses (breakfast, lunch, and dinner) actually incurred during business travel. Meals should not exceed $50 per day, including gratuity. Room service may be used within these cost guidelines.

## CELLULAR PHONES

Reasonable and customary calls for Purdue business purposes will be reimbursed with submission of a cellular phone bill that shows both the account owner and the call detail.

CG-PORTENOY-HCP MCSA 121609

P.09    JAN-21-2010  14:18

CONFIDENTIAL

RP_000483

RUSSELL PORTENOY MD / PURDUE PHARMA L.P.

## EXHIBIT B
## ADVERSE EVENTS AND PRODUCT COMPLAINTS FOR PURDUE PRODUCTS

As part of doing business with Purdue, we require our vendors to assist us in ensuring that Adverse Events (AEs) and Product Complaints (PCs) involving our products are appropriately captured. Therefore, **we expect you to notify each of your employees who provide services to Purdue of this policy.** You are free to reproduce this document for the notification process.

It is Purdue's policy, as well as a legal obligation for Purdue, to report Adverse Events (AEs) that occur in anyone that is taking any of our medications or Product Complaints (PCs) involving our products.

* An Adverse Event (AE) is any unintended event associated with the use of the marketed product, whether or not considered related to that particular product.  Unintended means any event which is not a purpose of the product (i.e., respiratory depression, nausea, constipation etc...)

* A Product Complaint (PC) is any complaint about the physical characteristics of a product.

* Reporting:  **Any person who is engaged in any type of work for Purdue** who  hears about an Adverse Event (AE) involving a person receiving a Purdue product or a product (brand name is not known) with the same active ingredient as the Purdue product or becomes aware of a Product Complaint (PC), must report the incident immediately (within 48 hours) to the Drug Safety and Pharmacovigilance Group (DSP), via

> Fax:      (203) 588-6395
> Phone:    888-726-7535 prompt 2 (to report an illness) or prompt 3 (to report a product issue)
> E-mail:   "Drug Safety and Pharmacovigilance" or "AE Report" address in Outlook (or drugsafetyandpharmacovigilance@pharma.com) to report an illness, or "Product Complaints" address in Outlook (or productcomplaints@pharma.com) to report a product issue

You must report this information within 48 hours even if you are unsure whether the Adverse Event was caused by, or related to, the Purdue product or whether the Product Complaint concerned a Purdue brand product (brand name unknown).

Thank you for your attention to this matter.  If you have any questions about this policy, please contact the Drug Safety Product Monitor at 888-726-7535 prompt 2.

CG-PORTENOY-HCP MCSA 121609

P.10                                                             JAN-21-2010  14:18

CONFIDENTIAL

RP_000484

<u>STATEMENT OF WORK #1 DATED DECEMBER 16, 2009</u>

TO MASTER HCP CONSULTANT SERVICES AGREEMENT DATED DECEMBER 16, 2009
BETWEEN PURDUE PHARMA L.P. AND RUSSELL K. PORTENOY, M.D.

This **STATEMENT OF WORK #1** is made and entered into as of December 16, 2009
("Effective Date") by and between **Purdue Pharma L.P.** ("Purdue") with principal offices at
One Stamford Forum, Stamford, Connecticut 06901-3431 and **Russell K. Portenoy M.D.**, with
principal place of employment at Department of Pain Medicine and Palliative Care, Beth Israel
Medical Center, First Avenue at 16th Street, New York, NY 10003 ("Consultant").

**WHEREAS,** Purdue and Consultant have entered into a certain Master HCP Consultant Services
Agreement dated December 16, 2009 (the "Master Agreement"); and

**WHEREAS,** pursuant to the Master Agreement, Consultant has agreed to provide to Purdue
certain services in accordance with Statements of Work from time to time entered into by the
parties, and Purdue and Consultant now desire to enter into such a Statement of Work.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and intending
to be legally bound, the parties hereby agree as follows:

1. <u>Scope of Services</u>. Under this Statement of Work #1, Consultant shall provide to
   Purdue the following services related to Purdue's Analgesic Advisory Board
   ("Project"):

   * Provide expert opinion regarding:

       o New product opportunities that Purdue is in the process of
         evaluating;
       o Products currently under development by Purdue, as well as those
         already marketed by Purdue;
       o Areas of unmet medical need for which new treatments might be
         acquired and/or developed and applied;
       o The clinical application/implications of new Purdue products/agents.

   * Participate in teleconferences and onsite meetings as requested by Purdue, to
     discuss and/or perform the Project.

   * Perform other tasks as requested by Purdue, in order to satisfactorily complete
     the Project.

2. <u>Compensation</u>. Consultant's fees for performance of the Project will be Five
   Hundred Dollars (US $500.00) per hour, with time spent traveling in connection with
   performance of the Project billed at Two Hundred and Fifty Dollars ($250.00) per
   hour, subject to a maximum daily rate of Four Thousand Dollars (US $4,000.00)
   ("Maximum Daily Rate"). Purdue will not be liable for payment of any fees incurred
   in excess of the Maximum Daily Rate without Company's prior written approval.
   All figures are in United States dollars.

CG/PORTENOY-SOW #1 TO MCSA 121609

CONFIDENTIAL

RP_000485

TOTAL P.12

3. **Expenses.** Consistent with Purdue's policies and applicable state law, Purdue will cover/reimburse Consultant for reasonable travel, lodging and out-of-pocket expenses incurred in connection with performance of the Project in accordance with the terms of the Master Agreement.

4. **Term and Termination.** The term of this Statement of Work #1 shall commence on the Effective Date and shall continue through December 31, 2011; provided that this Statement of Work #1 may be terminated or extended in accordance with the terms of the Master Agreement.

5. **Consultant Primary Contact.** Consultant's primary contact with respect to this Project shall be Dr. Robert Kaiko, Vice President, Research and Development and Portfolio Development.

6. **Incorporation by Reference; Conflict.** The provisions of the Master Agreement are hereby expressly incorporated by reference into and made a part of this Statement of Work #1. In the event of a conflict between the terms and conditions of this Statement of Work #1 and those of the Master Agreement, the terms of the Master Agreement will take precedence and control over those in this Statement of Work #1.

**ACCEPTED AND AGREED,** the parties have caused this Statement of Work #1 to be duly executed as of the Effective Date written above.

**PURDUE PHARMA L.P.**

By:

Name: Robert Kaiko

Title: VP R+D Portfolio Dev.

**CONSULTANT**

By:

Russell K. Portenoy M.D.

CG/PORTENOY-SOW #1 TO MCSA 121609

P.12

JAN-21-2010 14:19

# CONFIDENTIAL

RP_000486

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Camp-Font, Nancy [Nancy.Camp-Font@pharma.com] |
| **Sent:** | Wednesday, June 23, 2010 3:07 PM |
| **To:** | Dr. Candiotti; Dr. Kehlet; Dr. Kryger; Dr. Moskowitz; Russell Portenoy, MD; Knox Todd; Fine, Perry; Gudin, Jeffery; Katz, Nathaniel; Kelley, John; McCarberg, WIlliam; Miaskowski, Christine; Panchal, Sunil; Passik, Steven; Sinatra, Raymond |
| **Subject:** | PAB Meeting - August 28, 2010 |

Dear PAB Members,

The August 28th, 2010 meeting will take place at the Hilton Montreal Bonaventure from 10AM to 4PM with an early dinner scheduled at the conclusion of the meeting.  Please let me know the following:

IASP – Are you attending?
Flight Arrival and Departure information – please forward to me as soon as possible
Hotel – please let me know if you have secured a hotel room for PAB and/or IASP

If you have any questions, please contact me directly at the number below or my email.  Thank you.

*Nancy Camp-Font*
Assistant to Craig Landau, MD
Vice President & Chief Medical Officer
and
Assistant to Bob Kaiko, PhD
Vice President R&D Portfolio Development
Purdue Pharma
One Stamford Forum
Stamford, CT  06901
203-588-7240
203-588-6106
nancy.camp-font@pharma.com

CONFIDENTIAL

RP_000487

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Camp-Font, Nancy [Nancy.Camp-Font@pharma.com] |
| **Sent:** | Thursday, July 01, 2010 3:17 PM |
| **To:** | Dr. Candiotti; Dr. Kehlet; Dr. Kryger; Dr. Moskowitz; Russell Portenoy, MD; Knox Todd; Fine, Perry; Gudin, Jeffery; Katz, Nathaniel; Kelley, John; McCarberg, WIlliam; Miaskowski, Christine; Panchal, Sunil; Passik, Steven; Sinatra, Raymond |
| **Cc:** | Kaiko, Dr Robert |
| **Subject:** | CONSULTANTS WITH ACADEMIC OR INSTITUTIONAL AFFILIATIONS |

Dear PAB Members,

Please be advised that we will need a personal email address going forward.  Many times we contract with a HCP who is associated with an academic or other institution and the agreement is with the individual only.  Therefore,  the confidentiality requirements/obligations extend to the HCP, not to the institution, yet often email exchanges that contain confidential and proprietary information occur using the institution's email system.

Please send me a personal email that you would like to be contacted at and I will update my distribution list.  Thank you.  Nancy

*Nancy Camp-Font*
Assistant to Craig Landau, MD
Vice President & Chief Medical Officer
and
Assistant to Bob Kaiko, PhD
Vice President R&D Portfolio Development
Purdue Pharma
One Stamford Forum
Stamford, CT  06901
203-588-7240
203-588-6106
nancy.camp-font@pharma.com

1

CONFIDENTIAL

RP_000488

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Donna Reid |
| **Sent:** | Thursday, August 26, 2010 10:10 AM |
| **To:** | Russell Portenoy, MD |
| **Cc:** | Marilynn Herleth |
| **Subject:** | FW: PAB Hotel & Meeting Information |
| **Attachments:** | Hotel Fact Sheet Hilton Bonaventure Montreal August 2010.pdf; hotel information for pab august 2010.pdf; directions from hilton bonaventure to restaurant julien august 2010.pdf |

Dr. Portenoy,

Please see below.

---

**From:** Camp-Font, Nancy
**Sent:** Friday, August 20, 2010 11:49 AM
**To:** 'Adam Gorelick'; 'Dr. Candiotti'; 'Dr. Fine'; 'Dr. Gudin'; 'Dr. Katz'; 'Dr. Kehlet'; 'Dr. Kelley'; 'Dr. Kryger'; 'Dr. McCarberg'; 'Dr. Miaskowski'; 'Dr. Moskowitz'; 'Dr. Panchal'; 'Dr. Passik'; 'Dr. Portenoy'; 'Dr. Sinatra'; 'Dr. Todd'; 'Lars Arendt-Nielsen'
**Cc:** Kaiko, Dr Robert; Silva, Laura
**Subject:** PAB Hotel & Meeting Information

Hello,

I look forward to our upcoming PAB meeting, Saturday, August 28th, which will be held at:

The Hilton Bonaventure
900 de La Gauchetiere W.
Montreal, QC H5A 1E4
(514) 878-2332

The meeting will begin at 9 AM and is expected to continue through 5 PM, with a continental breakfast directly preceding at 8:30 AM.

A PAB Dinner has been scheduled for Saturday, August 28th at 6:30PM at:

Restaurant Julien
1191 Union Street, Montreal
Directions from the Hilton Bonaventure to Restaurant Julien are attached.

The Hilton Bonaventure is conveniently located 11 miles from the Trudeau International Airport and 3 Blocks away from the Montreal Convention Center where the IASP conference will be held.

I have attached a Hilton Bonaventure Hotel Fact Sheet as well as a small map illustrating the distance between the Convention Center, Hilton Bonaventure and Embassy Suites.

Please note that *only* PAB members will be staying at the Hilton Bonaventure and all Purdue attendees will be staying at the Embassy Suites.

1

# CONFIDENTIAL

RP_000489

I will be on location Friday, August 27th through Sunday, August 29th.  Please contact me via email or cell with any questions.

I look forward to seeing everyone in Montreal.

Warm regards,

*Nancy Camp-Font*
Assistant to Craig Landau, MD
Vice President & Chief Medical Officer
and
Assistant to Bob Kaiko, PhD
Vice President R&D Portfolio Development
Purdue Pharma
One Stamford Forum
Stamford, CT  06901
203-588-7240
203-588-6106(fax)
203-820-6851(cell)
nancy.camp-font@pharma.com

CONFIDENTIAL

RP_000490

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Camp-Font, Nancy [Nancy.Camp-Font@pharma.com] |
| **Sent:** | Wednesday, September 08, 2010 2:38 PM |
| **To:** | Adam Gorelick; Dr. Candiotti; Dr. Fine; Gudin, Jeffery; Katz, Nathaniel; Dr. Kehlet; Kelley, John; Dr. Kryger; Dr. McCarberg; Miaskowski, Christine; Dr. Moskowitz; Panchal, Sunil; Dr. Passik; Russell Portenoy, MD; Dr. Sinatra; Dr. Todd; Lars Arendt-Nielsen |
| **Subject:** | License Information |

Please provide the states you are currently licensed in .. I will need to keep track of this for future meetings.  Thanks.
Nancy

*Nancy Camp-Font*
Assistant to Craig Landau, MD
Vice President & Chief Medical Officer
and
Assistant to Bob Kaiko, PhD
Vice President R&D Portfolio Development
Purdue Pharma
One Stamford Forum
Stamford, CT  06901
203-588-7240
203-588-6106
nancy.camp-font@pharma.com

1

CONFIDENTIAL

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Thursday, July 29, 2010 9:01 AM |
| **To:** | Haddox, Dr. J. David |
| **Subject:** | RE: [RxNews] Washington State moves to restrict use of high-dose opioids |

Thanks, David.  Have you noticed that there are many who cannot think critically—it is exhausting to hear them.  You take much more of this than I, and I do not know how you've done it.

**From:** Haddox, Dr. J. David [mailto:Dr.J.David.Haddox@pharma.com]
**Sent:** Thursday, July 29, 2010 8:31 AM
**To:** Russell Portenoy, MD
**Subject:** Fw: [RxNews] Washington State moves to restrict use of high-dose opioids

Russ,

As one who is also lambasted from time to time, I felt obligated to share this with you, as I don't recall that you are a NADDI member.

I hope you are well.

Things here remain very busy and intellectually engaging.

I'd like to catch up sometime.

I'm in the City from time to time. Perhaps, if your schedule allows, we could grab lunch sometime.

Take good care,

Dave

J. David Haddox, DDS, MD
VP, Health Policy
Purdue Pharma L.P.
203.588.7667 W
203.588.6242 F

**From:** Michael S. Gorback, M.D. <gorback@comcast.net>
**Cc:** rxnews naddi <rxnews@listserve.com>
**Sent:** Wed Jul 28 19:35:40 2010
**Subject:** Re: [RxNews] Washington State moves to restrict use of high-dose opioids

"For his part, Dr. Franklin, whose department oversees the state's workers' compensation program, said he had long seen the problem play out among claimants. "Injured workers were coming into the system with low back pain and dying two or three years later" from drug overdoses, he said."

Maybe Dr. Franklin should look in the mirror when he seeks solutions to this problem, since it is practically impossible to get approval for an intra-thecal pump or a spinal cord stimulator for injured workers in his state.

1

CONFIDENTIAL

RP_000492

"The regulations would not affect how narcotics are used to treat patients with cancer or those at the end of life because experts agree that such patients should receive as much pain medication as necessary."

I guess I'm not an expert because I disagree with this. Most cancer patients would prefer NOT to be drenched in narcotics at the end of life. They want to be alert and interact with their loved ones during their final days. Yet this attitude about unlimited narcotics at the end of life is so prevalent that a referral to a pain specialist for non-narcotic relief is rarely considered. And guess what else the geniuses have come up with? Insurance won't cover pain management procedures done on a patient in hospice. If you develop cancer try to die really fast if you don't want to be in a semi-coma for the last few weeks.

It was ivory tower cancer doctors like Russell Portenoy who helped create this mess in the first place. Heaven preserve us from "experts".

Speaking of bureaucrats and cancer, do any of you have any idea of the hoops you have to jump through to get thalidomide for a patient?

Ivory tower doctors, politicians, and bureaucrats are going to save the State of Washington from its prescription drug epidemic. Right. Pull the other one.

Michael S. Gorback, M.D.
Houston, TX

Arthur Thexton wrote:



•

---

July 28, 2010

# Move to Restrict Pain Killers Puts Onus on Doctors

By BARRY MEIER

In an unusual move, a state government is developing regulations meant to stop doctors from prescribing higher doses of powerful — and often dangerous — pain killers for patients who are not benefiting from them.
The effort, in Washington State, represents the most sweeping attempt yet to stem what some experts see as the excessive use of prescribed narcotics, and it is being closely watched by medical professionals elsewhere.
Among other things, Washington would apparently become the first state that would require a doctor to refer patients on escalating doses of pain killers for evaluation if they were not improving.
Experts in pain treatment and drug abuse prevention say the growing use of long-acting pain killers like OxyContin, fentanyl and methadone has been a crucial factor in a nationwide epidemic of overdose deaths, largely from the abuse of such drugs.
Nationwide, fatalities from prescription drug overdoses are the second-leading cause of accidental death behind car accidents and, in some states, are the leading cause, according to the Centers for Disease Control and Prevention.
Last year, narcotic pain killers accounted for 7 percent of all prescribed drugs, and the number of patients

2

CONFIDENTIAL

annually taking long-acting versions of these medications has increased about 30 percent over the last decade. But a long-running debate has thwarted efforts to address the problem both at the federal and state level.

Drug makers and patient groups have complained that new restrictions would unfairly punish pain sufferers who rely on the drugs, while others, including some doctors and regulators, have argued that the drugs are potentially so dangerous that they need to be even more tightly controlled.

However, the Washington State initiative appears to reflect a growing view that the status-quo is no longer acceptable. Last Friday, an advisory panel to the Food and Drug Administration overwhelmingly rejected an agency proposal to better control drugs like OxyContin as too weak because it did not mandate special training for doctors who prescribe such medications.

The effort in Washington is also directed at controlling how doctors use narcotics to treat legitimate pain patients, not at people who illegally obtain the drugs for recreational use. While many patients benefit from pain killers, there is growing evidence from studies, including one in Washington State, that others suffer significant side effects, including lethargy, increased sensitivity to pain and, in the most severe instances, potentially fatal overdoses.

"This is not just about addicts but little old ladies with arthritis starting to die because of this kind of medical practice," said Dr. Alex Cahana, a pain specialist involved in devising the regulations in Washington State. Washington State adopted voluntary narcotics use guidelines three years ago, but a statewide survey last year indicated that many doctors were not following them and about half were not even aware of them.

At the direction of the Washington State Legislature, a panel of doctors, nurses, regulators and others are compiling a set of medical practices that physicians and other prescribers would be legally expected to follow when treating patients with long-term pain from causes other than cancer.

The regulations would not affect how narcotics are used to treat patients with cancer or those at the end of life because experts agree that such patients should receive as much pain medication as necessary.

The panel is expected to require that, among other things, doctors refer patients to a pain specialist for review when their daily medication increases to a specified dosage level and they do not show improvement. The specialist can then determine whether to continue the drug, reduce it or use other treatments like physical therapy.

Recently, the Centers for Disease Control issued a similar recommendation to doctors.

Pain specialists and regulators in Washington State said they believed that the requirements were essential because doctors were giving high daily dosages of powerful drugs for ailments like back pain for far too long without evidence that the medications worked.

The law that created the new regulatory effort in Washington State did not propose specific sanctions or penalties. However, officials there said that a doctor who chose to ignore the new rules could face sanctions from state licensing boards, including potentially losing the right to practice. The company that makes OxyContin, Purdue Pharma, lobbied against the law, saying the new regulations could deprive patients of appropriate treatment.

The initiative sprang out of the efforts of Dr. Cahana and two other people, including a Washington State representative, James C. Moeller, who is also a substance abuse counselor.

Mr. Moeller, who works at a facility in Vancouver, Wash., run by Kaiser Permanente, said he had treated a steady procession of patients in recent years, nearly all of them young and physically dependent or psychologically addicted to high dosages of pain killers.

In the process, Mr. Moeller said, he realized that many doctors who prescribed such drugs had little training in either pain management or substance abuse. So, wearing his legislator's hat, he drafted a bill to require doctors to take a training course to prescribe narcotics.

He said he quickly encountered opposition to the idea from a professional group that represented doctors. At that point, Dr. Cahana and the third man, Dr. Gary M. Franklin, the medical director of the state's Department of Labor and Industries, stepped in.

The two doctors, through different routes, had arrived at the same conclusion — that too many pain patients were getting drugs at dosages that were too high for too long.

"There is a dissonance in not recognizing the nexus between poor pain management and the hyperconsumption of opioids," said Dr. Cahana, who works at the University of Washington Medical Center in Seattle, using a

3

# CONFIDENTIAL

medical term for narcotic pain killers like OxyContin.

For his part, Dr. Franklin, whose department oversees the state's workers' compensation program, said he had long seen the problem play out among claimants. "Injured workers were coming into the system with low back pain and dying two or three years later" from drug overdoses, he said.

This year, Dr. Cahana and Dr. Franklin testified during a legislative hearing on the proposed training requirement, suggesting that legislation should instead require a set of medical practices based on the best available evidence. Dr. Franklin said that a draft of rules would probably be finished by this fall and that the new regulations would be in place by next year.

A major hurdle to making the program work is the lack of pain management specialists, particularly in rural areas of the state, where patients on the narcotics could be referred for evaluation. Dr. Franklin said the state hoped to increase the use of telephone consultations as well as help to finance the training of doctors in pain treatment.

Arthur Thexton
President, WI chapter of NADDI
Prosecuting Attorney, Wis. Dept. of Reg. & Lic.

athexton@alum.beloit.edu
608-249-2702, fax 206-666-5671
work 608-266-9814
2142 E. Johnson St.
Madison, WI 53704-4710

RxNews mailing list
Unsubscribe: RxNews-unsubscribe@listserve.com
List Info: http://mailman.listserve.com/listmanager/listinfo/rxnews

CONFIDENTIAL

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Monday, May 24, 2010 5:35 AM |
| **To:** | Kaiko, Dr Robert |
| **Cc:** | rss9@email.med.yale.edu; Nyilas, Margaretta; Reilly, Leif-Ann |
| **Subject:** | RE: Availability June 1, 2, or 3 / Endocannabinoid/Anandamide/FAAH and other analgesic targets |

Dear Bob,

I have checked the calendar and unfortunately the dates 6/1-6/3 do not work for me. I am sorry about my lack of availability.

Russ

---

**From:** Kaiko, Dr Robert [mailto:Dr.Robert.Kaiko@pharma.com]
**Sent:** Friday, May 21, 2010 12:46 PM
**To:** Russell Portenoy, MD
**Cc:** rss9@email.med.yale.edu; Nyilas, Margaretta; Reilly, Leif-Ann
**Subject:** Availability June 1, 2, or 3 / Endocannabinoid/Anandamide/FAAH and other analgesic targets

Russ

Might you be available for one full day's meeting during the Tuesday June 1st through June 3rd timeframe that might or might not involve travel?

This involves our evaluation of the endocannabinoid/anandamide/FAAH analgesic target and comparisons with other targets from both preclinical and clinical perspectives. In advance of the meeting you would be sent some "light" reading; at the meeting you would not present formally (unless you wished to) but would be among a small group of consultant experts who would listen, question, and discuss; after the meeting you might be asked to review a short draft white paper summarizing the outcomes of the evaluation.

Might you be interested?

Thanks,
bk

Robert F. Kaiko, Ph.D.
Vice President R&D Portfolio Development
Purdue Pharma
One Stamford Forum
Stamford, CT 06901-3431
203-588-7210
203-588-6106 (fax)
dr.robert.kaiko@pharma.com

IMPORTANT NOTICE: This message is intended only for the use of the individual or entity to which it is addressed. The message may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited.

CONFIDENTIAL



RP_000496

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Silva, Laura [Laura.Silva@pharma.com] |
| **Sent:** | Thursday, December 09, 2010 2:38 PM |
| **To:** | Adam Gorelick MD (agorelick@ctgastro.com); Bill McCarberg MD (rundrbillrun@cox.net); Miaskowski, Christine; Henrik Kehlet MD PhD; Kelley, John; Gudin, Jeffery; Keith Candiotti MD (medsight@gmail.com); Knox H. Todd MD MPH (ktodd@empainline.org); Lars Arendt-Nielsen (LAN@C4Pain.com); Meir Kryger (mhkryger@yahoo.com); Katz, Nathaniel; Perry Fine MD (perry.fine@gmail.com); Raymond S. Sinatra(raymond.sinatra@yahoo.com); Roland W. Moskowitz MD (rolliemoskowitz@aol.com); Russell Portenoy, MD; Steven Passik MD (Sdplex@aol.com); Panchal, Sunil; For Dr Katz; Donna Reid |
| **Cc:** | Kaiko, Dr Robert |
| **Subject:** | FW: Next  Face to Face meeting of the Purdue PAB |

Dear PAB Members,

Based on the feedback we have received to date, we are leaning towards holding the meeting on the afternoon of the 18th.  Before we set the final date, we would like to confirm each members availability for both dates. Please provide your availability by December 23rd.

Thank you for your assistance in scheduling this important meeting.

Kind regards,

Laura

---

**From:** Silva, Laura [mailto:Laura.Silva@pharma.com]
**Sent:** Monday, November 01, 2010 1:27 PM
**To:** Adam Gorelick MD (agorelick@ctgastro.com); Bill McCarberg MD (rundrbillrun@cox.net); Miaskowski, Christine; Henrik Kehlet MD PhD; Kelley, John; Gudin, Jeffery; Keith Candiotti MD (medsight@gmail.com); Knox H. Todd MD MPH (ktodd@empainline.org); Lars Arendt-Nielsen (LAN@C4Pain.com); Meir Kryger (mhkryger@yahoo.com); Katz, Nathaniel; Perry Fine MD (perry.fine@gmail.com); Raymond S. Sinatra(raymond.sinatra@yahoo.com); Roland W. Moskowitz MD (rolliemoskowitz@aol.com); Russell K. Portenoy MD (ssussmann@aol.com); Steven Passik MD (Sdplex@aol.com); Panchal, Sunil
**Cc:** For Dr Katz; Donna Reid ; Kaiko, Dr Robert
**Subject:** Next Face to Face meeting of the Purdue PAB

Dear Purdue Portfolio Advisory Board Members,

The next face to face meeting of the PAB is tentatively scheduled for either May 18th or May 21st in Austin, Texas.  As many of you know, the American Pain Society's 30th Annual Scientific Meeting is being held in Austin from May 19th through May 21st (http://www.ampainsoc.org/meeting/annual_11/).

We would appreciate it if you would confirm your availability for the meeting by November 12th.

Thank you for assisting us in scheduling this important meeting.

Kind regards,

Laura Silva
Purdue Pharma

This message and any attachments are confidential and intended solely

1

CONFIDENTIAL

RP_000497

for the use of the individual or entity to which they are addressed.  If you are not the intended recipient, you are prohibited from printing, copying, forwarding, saving, or otherwise using or relying upon them in any manner.  Please notify the sender immediately if you have received this message by mistake and delete it from your system.

2

CONFIDENTIAL

RP_000498

**Russell Portenoy, MD**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Thursday, April 29, 2010 6:20 PM |
| **To:** | Nathaniel Katz; Kevin Flynn |
| **Subject:** | RE: CME Invitation from Nat Katz |

Nat and Kevin,
If there is no travel planned, I can fit it in, I am sure, and would be pleased to participate.

Russ

---

**From:** Nathaniel Katz [mailto:NKatz@analgesicsolutions.com]
**Sent:** Thursday, April 29, 2010 12:42 PM
**To:** Kevin Flynn; Russell Portenoy, MD
**Subject:** RE: CME Invitation from Nat Katz

**Russ, we are trying to change opioid prescribing training and show it works.  Would love to have you on board if possible.  Nat**

**Nathaniel Katz, MD, MS**
**President & CEO**
**Analgesic Solutions**
**232 Pond Street**
**Natick, MA  01760**
**(T) 781.444.9605 x124**
**www.analgesicsolutions.com**

Please Note:  As of January 1, 2010, our name has been changed to Analgesic Solutions.  Please also note our address change.

---

**From:** Kevin Flynn
**Sent:** Thursday, April 29, 2010 12:39 PM
**To:** Russell Portenoy, MD
**Cc:** Nathaniel Katz
**Subject:** CME Invitation from Nat Katz

Dear  Dr. Portenoy:

We would like to invite you to serve as an advisory board member to an online CME program, *Safe and Effective Opioid Prescribing*. The program will focus on training prescribers on specific behaviors that promote safe use. The program will be light on theory, heavy on "how to" and include video modeling to show clinicians exactly what to do (e.g., how to do SBIRT).

The honorarium is $7500 per year for 3 teleconferences/year to review content. We are still in budget stage so if you feel this honorarium does not reflect the effort involved, please let us know and we can adjust. This grant is being submitted to Endo and Covidien, both of whom have expressed general interest in the program.

We look forward to hearing from you.

1

# CONFIDENTIAL

RP_000499

Best regards,

Kevin

**Kevin Flynn**
**Director, Scientific Communications**
**Analgesic Solutions**
**232 Pond Street**
**Natick, MA 01760**
**781.444.9605 x236 (T) | 508.652.9099 (F)**
**www.analgesicsolutions.com**

***We've moved! Please note our contact information.***

CONFIDENTIAL

RP_000500



University Hospital and
Manhattan Campus for
the Albert Einstein College
of Medicine

Beth Israel Medical Center
First Avenue at 16th Street
New York, NY 10003
Tel: 212 844 1505
Fax: 212 844 1503
E-mail: rportenoy@chpnet.org
(For Patient Appts 212 844 8930)

**Russell K. Portenoy, M.D.**
Chairman
Department of Pain Medicine and Palliative Care
Chief Medical Officer Continuum Hospice Care
Professor of Neurology and Anesthesiology
Albert Einstein College of Medicine

TO:         Harris Nagler, MD

FROM:       Russell Portenoy, MD

DATE:       September 15, 2010

RE:         Signature on Agreement

I've agreed to consult on an educational project that will conclude with publication of a resource guide for reducing opioid risk. The company is insisting on a signature from someone in the institution documenting the institution's agreement that I can do this. The agreement has been reviewed by Deborah Korzenik who agrees that there is essentially no risk.

Would you please sign the two copies and return them to me?

Thank you much.

Cc: Deborah Korzenik

**Continuum** Health Partners, Inc.

   

CONFIDENTIAL

RP_000501

**Refusal or failure to respond to a request for completion of a financial disclosure form, as well as a potential conflict of interest that cannot be resolved, will disqualify the potential faculty from participating in the planning and delivery of the activity.**

**Please return by fax to Meagan Carey at 212.301.6711.**

# MedscapeCME

*370 Seventh Avenue, Suite 1101, New York, NY 10001 212.301.6700 t 212.301.6711 f www.medscape.com*

## AUTHOR INFORMATION UPDATE FORM

### CONTACT INFORMATION

DATE: _____

FIRST NAME: **Russell**     INITIAL: **K**     LAST NAME: **Portenoy**

DEGREE(S): **MD**     MEMBERSHIPS: _____

PRIMARY PHONE : **212-844-1505**     PRIMARY FAX: **212-844-1503**

PRIMARY EMAIL: **rporteno@chpnet.org**     SECONDARY EMAIL: _____

### AFFILIATIONS

ACADEMIC TITLE/DEPT : **PROFESSOR OF NEUROLOGY AND ANESTHESIOLOGY**
*(Indicate Professor, Assistant or Associate Professor, Chairman, etc., and Department)*

FULL NAME OF MEDICAL SCHOOL: **ALBERT EINSTEIN COLLEGE OF MEDICINE**
*(Institution where above academic title is held)*

ADDRESS: **1300 MORRIS PARK AVE**

CITY: Bronx     STATE: NY     POSTAL CODE: 10461

COUNTRY:

CLINICAL TITLE/DEPT: **CHAIR, DEPARTMENT OF PAIN MEDICINE AND PALLIATIVE CARE**
*(Director, Chief of department in a clinic or hospital, or staff physician and Department)*

HOSPITAL: **BETH ISRAEL MEDICAL CENTER**
*(Hospital, Medical Center, or Private Practice Name)*

ADDRESS: **FIRST AVE AT 16TH ST.**

CITY: New York     STATE: NY     POSTAL CODE: 10003

COUNTRY:

HOME ADDRESS: _____

CITY: _____     STATE: _____     POSTAL CODE: _____
COUNTRY:

### HONORARIUM INFORMATION

PREFERRED ADDRESS FOR CORRESPONDENCE: **Hospital**

# CONFIDENTIAL

RP_000502

*(Please Indicate one of the Following: Home, Academic Institution, or Hospital)*

**PREFERRED ADDRESS FOR HONORARIUM:** _Hospital_ ( Beth Israel )

*(Please Indicate one of the Following: Home, Academic Institution, or Hospital)*

**SOCIAL SECURITY # :** ~~REDACTED~~ _____ **OR TAX ID NUMBER:** REDACTED

**IF HONORARIUM IS TO GO TO A THIRD PARTY, PLEASE INDICATE BELOW:**

**NAME:** _____

**ADDRESS:** _____

**CITY:** _____ **STATE:** _____ **ZIP:** _____

**COUNTRY:** _____

**SOCIAL SECURITY #:** _____ **OR TAX ID NUMBER:** _____

# CONFIDENTIAL



*370 Seventh Avenue, Suite 1101, New York, NY 10001 212.301.6700 t 212.301.6711 f <u>www.medscape.com</u>*

**Russell Portenoy, MD**
**rporteno@chpnet.org**

Dear Dr. Portenoy:

Thank you for consenting to become a member of the Medscape, LLC ("Medscape) Professional Pain Collaborative Editorial Advisory Board.  I am sure that you will find it an exciting and challenging experience.  Below are some guidelines that Medscape has devised for editorial board members. This letter serves to confirm the commitment of the Editorial Advisory Board member to the success of Medscape Professional Pain Collaborative and signifies acceptance of the Board member's responsibilities as outlined below.

## *1) Responsibilities*

To serve as a member of the Medscape Professional Pain Collaborative Editorial Advisory Board, providing specific and general advice regarding the development of quality clinical programs, including interactive features, database resources, and other content that will be relevant and clinically useful to Medscape Professional Pain Collaborative audience of imagers, primary care and specialty physicians, and patients.

Medscape Professional Pain Collaborative Editorial Advisory Board member agrees to:

- Allow name and affiliation to be listed on Medscape Professional Pain Collaborative.
- Serve as a clinical resource, critic, and advisor to the scientific director on issues relevant to pain management.
- Serve as a consultant for the development of editorial content and features for the Professional Pain Collaborative site.
- Review manuscripts and other material as agreed upon in advance with the Medscape Professional Pain Collaborative site editor.
- Assist in recruiting authors, manuscripts, and reviewers for editorial content.
- Serve as an author as agreed upon in advance with the Professional Pain Collaborative scientific director.
- Represent Medscape Professional Pain Collaborative to colleagues and seek their feedback, relaying these comments to the site editor.
- Work with the site editor and Medscape's editorial staff to make the site the best it can be.
- Serve for a one-year term, renewable upon joint agreement between the scientific director and the individual Editorial Advisory Board member.
- Meet with the site editor and other Editorial Advisory Board members at mutually agreeable times. These Editorial Advisory Board sessions can be convened as telephone conference calls for the convenience of Editorial Advisory Board members and will be contingent on the schedule of availability of Editorial Advisory Board members.
- Perform other duties as negotiated.

## *2) Term Limits*

This Agreement shall have a term of one year, beginning <u>November 1, 2010</u>. This term is renewable for a period of one (1) year and may be terminated by either party by providing the other 14 days notice.

CONFIDENTIAL

### *3) Ethical Issues (Confidentiality/Disclosures)*

**The Editorial Advisory Board member agrees to disclose the information requested on the attached form and agrees to keep all information learned or discussed through their work with Medscape completely confidential. The Editorial Advisory Board member understands that a breech of this Agreement may cause Medscape harm.**

Please review this letter and sign below if you agree with its terms.  Fill out the disclosure information requested below, and fax the letter and form back to **Meagan Carey at 212-301-6711.**

Signature _____     Date __11/2/10__

Printed Name _____

CONFIDENTIAL

RP_000505



Russell K. Portenoy, MD
Gerald J. and Dorothy R. Friedman
Chair in Pain Medicine and Palliative Care
Chairman, Department of Pain Medicine and Palliative Care
Beth Israel Medical Center
New York, New York

April 16, 2010

Dear Dr. Portenoy:

Thank you for agreeing to serve as Moderator for the upcoming continuing education activity entitled *The Pain View*. The details including learning objectives of this educational activity, which should be taken into consideration during your preparation, are outlined on the following Faculty Agreement form.

- As an accredited educational provider, MediCom Worldwide, Inc. requires that its speakers comply with the ACCME Standards for Commercial Support of CME *(copy attached)* as well as the California Board of Nursing and ACPE criteria for continuing education. We will be disclosing to our participants that this CE activity has been supported by an educational grant from Cephalon, Inc., Endo Pharmaceuticals, and Purdue Pharma L.P.

As our Moderator, you are required to do the following:

- Disclose any significant financial interest or relationship that you or your significant other may have with a commercial company or the manufacturer(s) of any commercial product/service that may influence this educational activity.
- Should it be determined that a conflict of interest exists as a result of a financial relationship you have disclosed, this conflict must be resolved prior to confirming your participation in the CE activity. *An explanation of a financial relationship is detailed in the faculty disclosure form.*
- Advise the audience of unlabeled or unapproved uses of drugs and/or devices that may be addressed in the activity.
- Develop content that is evidenced based, scientifically rigorous and free from commercial bias.
- We ask that you contact MediCom Worldwide, Inc. immediately if you are contacted by a representative of Cephalon, Inc., Endo Pharmaceuticals, and Purdue Pharma L.P. regarding this presentation.

In order to accomplish the above requirements, we ask that you complete and sign both the Faculty Disclosure Statement and Faculty Agreement, which are attached, and return them along with a copy of your CV to our office no later than **4/23/10**.

Finally, please know that it is the policy of MediCom Worldwide, Inc. to conduct post-session evaluations at each of its CE activities. These evaluations ask participants to indicate the applicability of the content to their specific practices, if the material satisfied the stated learning objectives, if they were satisfied with the faculty presentations, and if there was any evidence of commercial bias in the presented content. The results of these evaluations are used to plan future CE activities and will be shared with you.

CONFIDENTIAL

Please provide your contact information on the accompanying Faculty Contact Information form. This information will NOT be released outside of MediCom Worldwide, Inc., and will be used to contact you for issues relating to the speaking engagement outlined in this agreement.

Once again, thank you for agreeing to serve as the Moderator for this CE activity! We consider you, our faculty, to be one of the program's greatest assets and look forward to working with you. If we can be of any additional assistance, or can clarify any of the items included in the following agreement, please contact me. Our phone number is 800-408-4242, and our fax is 215-337-0959. You may return your information via the above fax or mail to:

> Joan Meyer
> MediCom Worldwide, Inc.
> 101 Washington Street
> Morrisville, PA 19067
> Email: jmeyer@medicaled.com

Sincerely yours,



Joan Meyer
Executive Director,
Continuing Professional Education

Enclosures:
  Faculty Agreement
  Faculty Disclosure Form
  W-9 Form
  Standards for Commercial Support

CONFIDENTIAL



**Faculty Agreement**

This Agreement between Russell K. Portenoy, MD., hereinafter referred to as "Moderator", and MediCom Worldwide, Inc. hereinafter referred to as "Educational Provider", and dated this April 16, 2010, shall reflect the terms and conditions of the engagement of the Speaker by the Educational Provider and is set forth as follows:

- Speaker agrees to serve on our faculty as **Moderator** for the upcoming Online program entitled The Pain View.  The topics being addressed are: **Medico-legal issues, clinical guidelines and opioid dose conversions.**

- Proposed Release date:   **May 2010**

- Method of Distribution: **Via the Web on EmergingSolutionsinPain.com**

- Overall activity learning objectives:

  1.  Prepare a checklist of key directives, from recent regulatory actions by DEA and FDA, to integrate into daily clinical practice

  2.  Improve documentation in the practice setting, as it relates to regulatory responsibilities to demonstrate compliance with federal and state requirements.

  3.  Summarize the grading system for quality of clinical evidence.

  4.  Describe the key recommendations in the opioid clinical guidelines.

  5.  Describe the reasons for requiring opioid rotation

  6.  Learn the steps to calculate a new dose when converting between one opioid and another or route of administration at equianalgesic doses.

- The target audience for this activity is: Clinicians in the field of pain management.

- The commercial supporters for this activity are: Cephalon, Inc., Endo Pharmaceuticals, and Purdue Pharma L.P.
- Your honorarium for this presentation is: **$2000.00.**

CONFIDENTIAL

RP_000508

Under the terms and conditions of this Agreement, the Moderator assumes the following responsibilities:

Your role on the Pain View is as a moderator. Your main responsibilities are:

- To open and close the session
- To introduce each speaker
- To ensure prompt timekeeping at all stages of the session
- To make any necessary housekeeping announcement(s)
- To encourage audience interaction
- To keep a positive and lively pace to the session

It would be helpful if you could prepare some slides for the opening and closing of the session. For example it would be helpful to delegates if you could cover the following:

- Set out the learning objectives for the session
- Give an overview of the agenda
- Summarize key points from the presentations

Presentation Content:

- Conclude the outcomes of the session Review the following Expert Commentary's on Emerging Solutions in Pain:

    1. Jennifer Bolen presenting Medico-Legal Issues Confronting Pain Practitioners

    2. Gilbert Fanciullo presenting A Closer Look at Practice Guidelines: A Focus on Evidence

    3. Mary Lynn McPherson presenting Demystifying Opioid Conversion Calculations

- Develop and briefly document some key clinical pearls and practical implications for your discipline

- Review the questions submitted by ESP members prior to the webcast to be answered during the webcast

- Clinical Content Review and Validation: To comply with more intense scrutiny required by accreditation agencies, MediCom Worldwide, Inc. requires that a "Clinical Content Review and Validation" is conducted for each presentation.

    Your materials will be reviewed by three metrics: (1) fair balance, (2) the scientific objectivity of studies mentioned in the materials or used as the basis for content, and (3) appropriateness of patient care recommendations made to learners.  If there are concerns identified you will be contacted with these concerns for potential revisions.

    As outlined, in order for presentation material to be reviewed, it is necessary for us to receive your presentation slides/content no later than **April 30, 2010**.

CONFIDENTIAL

- ■ Attendee Syllabus:  Uniform syllabus and slide materials for this CE activity will be made available to participants.  In order to meet our broadcasting deadlines it will be necessary for us to receive your final slide presentation/content, with all requested edits incorporated or addressed, no later than **May 7, 2010**.

Required Forms:

Moderator is required to sign this agreement, as well as to complete and sign the following Faculty Disclosure form, Faculty Agreement, Contact Information Form and W-9, and then return signed forms by facsimile or mail to MediCom Worldwide, Inc. no later than one week of receipt by the Speaker.  Please provide your most recent CV and bio (If not currently on file). We can write a bio for you based on your CV if you do not have a recent one available.

Other:

- ■ Moderator agrees to notify MediCom Worldwide, Inc. no later than one month prior to a scheduled CE activity of his or her inability to fulfill the obligations of this Agreement.

- ■ Moderator agrees to obtain all consents, authorizations, approvals, and releases which may be necessary for the production by MediCom Worldwide, Inc. and any written materials related to the program.  Speaker agrees to indemnify MediCom Worldwide, Inc. with respect to any claims, actions or demands, including reasonable attorney's fees that may arise in any manner out of Speaker's failure to secure such consents, authorizations, approvals or releases.

**I have read this Agreement and I agree to its terms and conditions.**

_____        4/2(/10
Signature of Speaker                                          Date

Please print name: _____

Please keep a copy of this document for your records.

CONFIDENTIAL

# FACULTY DISCLOSURE FORM



As a CE provider accredited by the Accreditation Council for Continuing Medical Education (ACCME) and approved by the Accreditation Council for Pharmacy Education (ACPE), and the California Board of Registered Nursing, MediCom Worldwide, Inc. must ensure balance, independence, transparency, objectivity, and scientific rigor in all sponsored educational activities. Faculty participating in a sponsored activity are expected to **(1)** disclose to the audience any financial relationship with the manufacturer(s) of any commercial product(s) and/or provider(s) of commercial services, and/or with any commercial supporters of the activity and **(2)** assist in resolving any conflict of interest that may arise from the relationship. The intent of this disclosure is not to prevent a presenter with a financial or other relationship from making a presentation, but rather to provide learners with information on which they can make their own judgments.  It remains for the audience to determine whether the speakers' interests or relationships may influence the presentation.   In addition, MediCom Worldwide, Inc. presenters must make a meaningful disclosure to the audience of their discussions of unlabeled or unapproved drugs or devices. All MediCom Worldwide, Inc. faculty are required to provide disclosures as a condition of participation.

**Title of Presentation:**  ESP Pain View Webinar Series

**Faculty Member's Name:**  Russell K. Portenoy, MD

*Check all that apply:*

- ☑ I have no relationship(s) to disclose
- ☐ I, the undersigned, have a financial arrangement or affiliation with a corporate organization offering financial support or grant monies for, or related to, this activity
- ☐ I, the undersigned, have a financial relationship with a manufacturer of a product or device discussed in my presentation at this continuing education activity
- ☐ I have a spouse or partner who has a financial relationship with a corporate organization offering financial support or grant monies, and/or with a manufacturer of a product or device

*\* It is not a requirement to disclose honoraria received for a participation in a CE activity \**

| Type of Personal Financial Relationship | Name of Company(s) Whose Products Will Be Addressed | Relationship Status | |
|---|---|---|---|
| | | Ended | Current |
| Consultant | | ☐ ☐ | ☐ ☐ |
| Speaker's Bureau | | ☐ ☐ | ☐ ☐ |
| Grant/Research Support (Principal Investigator or working directly for company/company's agent) | | ☐ | ☐ |
| Stock Shareholder (self managed) | | ☐ | ☐ |
| Other, e.g., royalty, employee (describe): _____ | | ☐ ☐ | ☐ ☐ |

(Please attach a separate sheet of necessary. See next page for terminology examples)

- ☐ I intend to reference **unlabeled** uses of drugs or products in my presentation, and will disclose this to the audience (specify drug(s) or product(s)): _____
- ☐ I intend to reference **investigational/unapproved** drugs or products in my presentation, and will disclose this to the audience (specify drug(s) or product(s)): _____
- ☑ I agree to the Terms and Conditions

Signature _____     Date  4/20/10

CONFIDENTIAL

1

RP_000511

*Example terminology:*

**What was received:** Salary, royalty, intellectual property rights, consulting fee, non-CE activity honoraria, ownership interest (e.g., stocks, stock options or other ownership interest, excluding diversified mutual funds), or other financial benefit.

**Role(s):** Employment, management position, independent contractor (including contracted research), consulting, speaking and teaching, membership on advisory committees or review panels, board membership, and other activities (please specify).

**Suggestions for resolving conflicts of interest (COI):** In addition to the MediCom Worldwide, Inc. peer review process for resolving COI, other examples include altering the control of the content of a CE activity by (1) choosing someone else to control that part of the content; (2) change the focus of the CE activity; (3) change the content of the person's assignment; (4) limit the content to a report without recommendations; and (5) limit the source for recommendations. *There is no set dollar amount for a financial relationship to be significant. Inherent in any amount received is the incentive to maintain or increase the value of the relationship with a commercial entity or manufacturer of a product or devise. Therefore, **any** amount received within the past 12 months must be disclosed.

## TERMS AND CONDITIONS

By signing this form, the undersigned speaker/author understands and accepts the following rules as required by MediCom Worldwide, Inc., the *Essential Areas and Policies* of the ACCME, and the rules of the American Medical Association:

1. **Disclosure.** Speakers/authors must complete and submit a Faculty Disclosure Form prior to the presentation, and that Faculty Disclosure Form shall be complete and truthful to the best of the speakers' knowledge.  Speakers/authors are required to disclose any financial relationship they may have with any product or class of products they discuss in an educational activity. The resolution of conflict of interest will assist the learners in assessing the potential for influence in information that is presented.

2. **Fair-Balance.** Speakers/authors are required to prepare fair and balanced presentations, which are objective and scientifically rigorous.

3. **Transparency.** Speakers/authors are required to disclosure any financial relationship that will assist the learners in assessing the potential for influence in information that is presented.

4. **Unlabeled and Unapproved Uses.**  Presentations that provide information in whole or in part related to non-FDA approved uses for drug products and/or devices must clearly acknowledge the unlabeled indications or the investigative nature of their proposed uses to the audience.  Speakers who plan to discuss non-FDA approved uses for commercial products and/or devices must advise MediCom Worldwide, Inc. of their intent.

5. **Use of Generic versus Trade Names.** Presenters should use scientific or generic names in referring to products in their lectures or enduring materials.  Should it be necessary to use a trade name, then the trade names of all similar products or those within a class should be used.

6. **Commercial Supporter Influence.** Faculty are not permitted to receive any direct remuneration or gifts from the commercial supporter(s) of this activity, nor should they be subject to direct input from a commercial supporter regarding the content of their presentation.

CONFIDENTIAL

RP_000512

# DISCLOSURE

Please indicate your understanding of and willingness to comply with each statement below. If you have any questions regarding your ability to comply, please contact the activity coordinator as soon as possible.

| Agree | Disagree | |
|---|---|---|
| ☐ | ☐ | I have disclosed to MediCom Worldwide, Inc. all relevant financial relationships, and I will disclose this information to learners verbally (for live activities) and in print. |
| ☐ | ☐ | The content and/or presentation of the information with which I am involved will promote quality or improvements in health care and will not promote a specific proprietary business interest or a commercial interest. Content for this activity, including any presentation of therapeutic options, will be well-balanced, evidence-based and unbiased. |
| ☐ | ☐ | I have not and will not accept any honoraria, additional payments or reimbursements beyond that which has been agreed upon directly with MediCom Worldwide, Inc. |
| ☐ | ☐ | I understand that MediCom Worldwide, Inc. will need to review my presentation and/or content prior to the activity, and I will provide educational content and resources in advance as requested. |

| Agree | Disagree | N/A | |
|---|---|---|---|
| ☐ | ☐ | ☐ | If I am presenting at a live event, I understand that a CE monitor will be attending the event to ensure that my presentation is educational, and not promotional, in nature. |
| ☐ | ☐ | ☐ | If I am providing recommendations involving clinical medicine, they will be based on evidence that is accepted within the profession of medicine as adequate justification for their indications and contraindications in the care of patients. All scientific research referred to, reported or used in CE in support of justification of a patient care recommendation will conform to the generally accepted standards of experimental design, data collection and analysis. |
| ☐ | ☐ | ☐ | If I am discussing specific health care products or services, I will use generic names to the extent possible. If I need to use trade names, I will use trade names from several companies when available, and not just trade names from any single company. |
| ☐ | ☐ | ☐ | If I am discussing any product use that is off label, I will disclose that the use or indication in question is not currently approved by the FDA for labeling or advertising. |
| ☐ | ☐ | ☐ | If I have been trained or utilized by a commercial entity or its agent as a speaker (e.g., speaker's bureau) for any commercial interest, the promotional aspects of that presentation will not be included in any way with this activity. |
| ☐ | ☐ | ☐ | If I am presenting research funded by a commercial company, the information presented will be based on generally accepted scientific principles and methods, and will not promote the commercial interest of the funding company. |

**I have carefully read and considered each item in this form, and have completed it to the best of my ability.**

Signature _____ Date _____

Please return to Christine Mettille via fax at 215-337-0959, or mail to: MediCom Worldwide, Inc., 101 Washington Street, Morrisville, PA 19067. Please call Christine with any questions at 215-337-9991 or via email at cmettille@medicaled.com.

**MediCom use only**
\* Resolution: If current conflicts of interest are present, the person overseeing CME content completes this section.
To assure independence and balance of content, current conflicts of interest were resolved by the following process (check one):
☐ Peer review ☐ Omitting recommendations for specific products
☐ Individual ended relationship ☐ Recommendations based on structured review for best evidence
☐ Selected an alternative person ☐ Other (describe): _____

Signature (no relevant relationship): _____ Role: _____ Date: _____

If disclosure to participants was verbal, written documentation of the occurrence can be provided by completing this section.
The above disclosure (relationships or their absence) was communicated to participants prior to the beginning of the activity.

Signature: _____ Date: _____

Revised 09/2009

CONFIDENTIAL

RP_000513


COVIDIEN
Mallinckrodt

## EDUCATIONAL PRECEPTORSHIP AGREEMENT

This PRECEPTORSHIP AGREEMENT (the "Agreement") is made as of November 15, 2010 ("Effective Date") by and between Department of Pain Medicine and Palliative Care, Beth Israel Medical Center with an address at First Avenue at 16th Street, New York, New York, 10003 ("Preceptor") and Mallinckrodt Inc., a Delaware corporation and a Covidien company with offices located at 675 McDonnell Boulevard, Hazelwood, MO 63042 ("Mallinckrodt").

WHEREAS, Preceptor possesses expertise in the areas of Pain Management and Palliative Care ("Consulting Field"), and wishes to make its expertise and efforts in the Consulting Field available to Mallinckrodt, and

WHEREAS, Mallinckrodt desires to engage the services of Preceptor to provide a Preceptorship, as defined herein, within the Consulting Field to its employee(s) on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of these premises and the promises set forth herein, Mallinckrodt and Preceptor hereby agree as follows:

1. Engagement of Preceptor.

   1.1. Mallinckrodt hereby engages Preceptor, and Preceptor hereby agrees to provide a Preceptorship, as requested by Mallinckrodt, concerning the Consulting Field as further outlined in Attachment A to this Agreement.

   1.2. The parties agree that the compensation provided hereunder has been established pursuant to arms length negotiations between the parties and is consistent with the fair market value of the services provided by Preceptor under this Agreement and will not be based upon the volume or value of any business generated between Preceptor and Mallinckrodt with respect to Mallinckrodt products.

   1.3. Nothing herein shall be construed to require Preceptor to purchase, order, prescribe or arrange for the purchase, order, recommendation or prescription of any products manufactured and/or marketed by Mallinckrodt.

2. Time, Materials and Facilities.

   2.1. The Preceptorship will be conducted at a mutually agreed upon time at the clinical location of the Preceptor.

   2.2. Preceptor represents and warrants that Preceptor will:

       a. perform its obligations hereunder solely through Preceptor's employees, and
       b. perform work at Preceptor's facilities (but not at any third party facilities unless the Preceptor obtains the written consent to the use of such facilities).

Preceptorship Beth Israel BDE
1-06-11

CONFIDENTIAL



COVIDIEN
Mallinckrodt

3. Term and Termination.

    3.1.    Term. This Agreement shall only last until the completion of the work outlined in Attachment A though the terms of this Agreement may be adopted by subsequent agreement of the parties but for no reason shall this be longer than one year from the date of execution

    3.2.    Termination. Either party may cancel this Agreement with written notice to the other within three days of the scheduled activity.

4. Compensation.

    4.1.    In return for the performance of the Consulting Tasks during the Term, Mallinckrodt will pay Preceptor as specifically outlined in Attachment A herein. Preceptor shall invoice Mallinckrodt promptly upon completion of the work. Payment shall be due within 45 days of the presentation of an invoice by Preceptor or the completion of the work, whichever is later.

    4.2.    Mallinckrodt shall make all checks payable to Preceptor at the address provided in Section 8. Mallinckrodt reserves the right to review Preceptor's billing and withhold payments for services rendered and expenses incurred outside the scope of this Agreement.

5. Representations and Warranties; Debarment and Exclusion.

    5.1.    Preceptor represents and warrants that Preceptor's execution of and performance under this Agreement and such related agreements do not require consent or approval of any person that has not already been obtained.

    5.2.    Mallinckrodt represents and warrants that the following provisions run to the benefit of, and are enforceable by Consultant and Beth Israel Medical Center ("Beth Israel"):

        a.    Mallinckrodt agrees that it will not use the name Beth Israel Medical Center, or any abbreviation, contraction or simulation thereof, in any publicity, advertising or promotional material of any nature, without the express prior written consent of Beth Israel.

        b.    Mallinckrodt agrees to indemnify, defend and hold harmless Consultant and Beth Israel, and Beth Israel's directors, officers, employees and agents (hereinafter the "Indemnified Parties"), from and against any and all claims, losses, damages, liabilities, suits, judgments, settlements and expenses howsoever arising (including but not limited to settlement costs and reasonable legal fees) asserted against any of the Indemnified Parties relating directly or indirectly to the services performed by Consultant under or in connection with this Agreement. This provision shall survive the termination of this Agreement.

        c.    Mallinckrodt shall provide and maintain at its own expense during this Agreement the following insurance coverages with such insurers as shall be acceptable to Beth Israel in minimum limits of $1 million per occurrence and $3 million in the aggregate: professional liability, comprehensive general liability, including products liability, contractual liability

Preceptorship Beth Israel BDE
1-06-11

CONFIDENTIAL

RP_000515



COVIDIEN
Mallinckrodt

and errors and omissions.  Mallinckrodt shall give Beth Israel thirty (30) days prior written notice of any changes in or cancellation of such insurance.

5.3.   Debarment and Exclusion.

a.   Preceptor hereby certifies that Preceptor has not been debarred under the Generic Drug Enforcement Act of 1992, 21 U.S.C. § 335a, or sanctioned by a Federal Health Care Program, as defined in 42 U.S.C. § 1320 a-7b(f), including, but not limited to, the federal Medicare or a state Medicaid program, or debarred, suspended, or excluded from any Federal agency or program.

b.   During the term of this Agreement, if Preceptor becomes debarred, suspended, excluded, or otherwise sanctioned, or receives notice of such action prior to the conduct of any agreed-upon speaker presentation, then Preceptor shall notify Mallinckrodt immediately, and all agreements and commitments regarding any future presentations shall terminate immediately whether or not Mallinckrodt received timely notice.

6.   Treatment of Protected Information.

6.1.   "Protected Information" consists of "Protected Health Information" or PHI, as that term is defined in the Health Insurance Portability and Accountability Act (HIPAA) and its implementing regulations.  At all times, Mallinckrodt represents that its employees have been trained on how to handle PHI and to safeguard all PHI from release or disclosure.

6.2.   Mallinckrodt agrees to review and make any written commitments necessary to accommodate the handling and protection of PHI as long as the Preceptor provides those written commitments for review by Mallinckrodt's Legal staff at least seven days prior to the scheduled date of a preceptorship.  In the event that the written commitments requested are determined by Mallinckrodt to be unacceptable, then the Agreement can be terminated prior to the Preceptorship by either party.

7.   Notices.

7.1.   Any notice required or permitted to be given under this Agreement shall be in writing, and shall be deemed to have been given when delivered personally or sent by registered or certified mail, postage prepaid to the following addresses:

7.2.   If to Mallinckrodt:

Brian Elsbernd
Senior Compliance Counsel
Covidien
675 McDonnell Boulevard, 10-4-S
Hazelwood, MO 63042

Preceptorship Beth Israel BDE
1-06-11

CONFIDENTIAL



**COVIDIEN**
Mallinckrodt

(314) 654-3168

7.3.    If to Preceptor:

Department of Pain Medicine and Palliative Care
Beth Israel Medical Center
First Avenue at 16th Street
New York, NY 10003
Attn: Russell K. Portenoy, MD
212-844-1505

Miscellaneous.

7.4.    Independent Contractor. Preceptor shall at all times act as an independent contractor and not as an employee of Mallinckrodt.  Accordingly, Preceptor understands that Mallinckrodt will not pay or withhold from payments to Preceptor under this Consulting Agreement any social security, state unemployment or disability insurance premiums, state or federal income taxes, or other taxes.

7.5.    Taxpayer Identification Number. The Preceptor agrees to provide a signed and complete IRS Form W-9 upon request and prior to any payments being issued.

7.6.    Compliance with Laws. Preceptor will at all times during the Term comply with all statutes, rules and regulations that may be applicable to Preceptor's performance hereunder.

7.7.    Entire Agreement; Amendments. This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof, and supersedes any and all prior agreements, discussions or courses of dealing.  Except as expressly provided herein, this Agreement shall not be amended except by written agreement executed by authorized representatives of both the parties.

7.8.    Severability. If any term, covenant or condition of this Agreement shall for any reason be held unenforceable by a court of competent jurisdiction, then the rest of this Agreement shall remain in full force and shall in no way be affected or impaired and, if and to the extent it is possible, the parties shall replace the unenforceable or invalid provision with one that is valid and enforceable and that is as close in its intent and effect as possible to the original provision.

7.9.    Assignment. This Agreement is not assignable by either party without the written consent of the other party, except that, without the consent of Preceptor, Mallinckrodt may assign this Agreement to any affiliate of Mallinckrodt, now or hereafter existing, or to a purchaser of all or substantially all of Mallinckrodt's business to which this Agreement relates.

7.10.   No Waiver. Either party's failure to require the other party to comply with any provision of this Agreement shall not be deemed a waiver of such provision or any other provision of this Agreement.

Preceptorship Beth Israel BDE
1-06-11

# CONFIDENTIAL

RP_000517



**COVIDIEN**
Mallinckrodt

7.11.  <u>Governing Law</u>. This Agreement shall be governed and construed under Missouri law, excluding its choice of law rules. WITH RESPECT TO ANY DISPUTES ARISING UNDER THIS AGREEMENT, THE PARTIES IRREVOCABLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI AND AGREE THAT SUCH DISPUTES SHALL BE ADDRESSED ONLY BY THAT COURT.

7.12.  <u>Disclosure of Payments</u>. Preceptor understands, and acknowledges, that Covidien may, when required by law, provide reports of payments and activities covered by this Agreement to governmental agencies and that those reports may subsequently be made a part of the public record or otherwise published.

7.13.  <u>Limitation of Liability</u>. In no event shall Mallinckrodt be liable to Preceptor for punitive, indirect, incidental or consequential damages, including without limitation, liability for loss of use, loss of profits, loss of product or business interruption.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

PRECEPTOR

By: _____

_____
Name:  Russell Portenoy, MD
Title:  Chair, Department of Pain Medicine and Palliative Care

MALLINCKRODT, INC.

By: _____
Name:  Herbert R. Neuman, M.D., M.B.A.
Title:  Chief Medical Officer

Preceptorship Beth Israel BDE
1-06-11

# CONFIDENTIAL



## Attachment A

This Attachment A to the Consulting Agreement (the "Agreement") of November 15, 2010 ("Effective Date") by and between Department of Pain Medicine and Palliative Care, Beth Israel Medical Center with an address at First Avenue at 16th Street, New York, New York, 10003  ("Preceptor") and Mallinckrodt Inc., a Delaware corporation with offices located at 675 McDonnell Boulevard, Hazelwood, Missouri 63042 ("Mallinckrodt") is intended to further outline the mutual agreement of the parties concerning the Preceptorship to be performed by the Preceptor at the request of Mallinckrodt, specifically:

1. On a date mutually agreed upon by Mallinckrodt and Preceptor in writing during January 2011, Preceptor will conduct a one day preceptorship with Covidien Medical Science Liaisions (MSLs) or other Medical Affairs representatives at it facilities in New York City, New York.  The preceptorship will last for at least six hours, and no more than eight hours, during which the Preceptor will provide advanced clinical education to the MSL by educating them on all aspects of clinical practice including, but not limited to: 1) Patient assessment/evaluation, 2) Diagnosis and supportive testing/imaging, 3) Patient and Disease Management, 4) Treatment Options, 5) Health outcomes, 6) Formulary and Access discussions, 7) Other aspects of patient care.

2. For the work outlined in item 1., above, the Preceptor shall be paid a total of $8,000 (eight thousand dollars) for the anticipated up to 8 Covidien MSLs attending.  Such payment will be made upon presentation of an invoice by the Preceptor to Mallinckrodt in accordance with the terms of this Agreement.

Preceptorship Beth Israel BDE
1-06-11

CONFIDENTIAL

RP_000519

## CONFIDENTIALITY AGREEMENT – PFIZER AS DISCLOSER

This Confidentiality Agreement ("Agreement"), dated as of ▓▓▓▓▓▓, is made by and between Pfizer Inc. ("Pfizer"), organized and existing under the laws of Delaware and doing business at 235 East 42nd Street, New York, NY 10017, Beth Israel medical Center, (Institution) organized and existing under the laws of the State of New York, and doing business at ▓▓▓▓▓ at 16th Street New York, NY 10003, and ▓▓▓▓▓▓▓▓ ("Dr. Portenoy"), a ▓▓▓▓▓▓ practitioner employed by Institution ("Recipient").

Pfizer , Institution and ▓▓▓▓▓▓ are sometimes individually referred to herein as "Party" and collectively referred to herein as the "Parties".

In order to protect from disclosure the Confidential Information (as defined below) which Pfizer may make available to Recipient in connection with providing ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ and such other projects as the Parties might contemplate from time to time during the Disclosure Period, as that term is defined below, (the "Project(s)"), and in consideration of the mutual covenants contained in this Agreement, the Parties agree as follows:

1.  **Definitions**

1.1  "Affiliates" means, with respect to each Party, any corporation, firm, partnership or other entity or person which directly or indirectly controls or is controlled by, or is under common control with that Party. For purposes of this definition, "control" (including with correlative meaning, the terms "controlled by" and "under common control with") shall be presumed to exist if one of the following conditions is met: (a) in the case of corporate entities, direct or indirect ownership of at least fifty percent (50%) of the stock or shares having the right to vote for the election of directors of such Party or any direct or indirect parent of such Party; and (b) in the case of non-corporate entities, direct or indirect ownership of at least fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities.

1.2  "Confidential Information" means, other than Exempt Information (as defined below), all business and technical information of Pfizer and/or its Affiliates, in whatever form or manner presented, which is: (a) disclosed to Recipient by or on behalf of Pfizer or learned or observed by Recipient during the Disclosure Period (as defined below); (b) information of any third parties; and (c) any discussions and proceedings relating to any of the foregoing information, whether disclosed in oral, electronic, visual, written or any other form. "Confidential Information" shall include information of Pfizer and/or its Affiliates that Pfizer or its Affiliates would consider confidential or proprietary under the circumstances. The fact that Pfizer may have marked or identified as confidential or proprietary any specific information shall be indicative that Pfizer believes such information to be confidential or proprietary, but the failure to so mark information shall not conclusively determine that such information is or is not considered confidential information by Pfizer or its Affiliates.

1.3  "Disclosure Period" means the period during which Pfizer may disclose Confidential Information to Recipient. The Disclosure Period shall commence on the Effective Date (as defined below), and shall expire one year after such date, unless the Disclosure Period is either extended or terminated earlier in writing by the Parties, in which case the Disclosure Period shall expire on the date agreed by the Parties in such writing.

1.4  "Effective Date" ▓▓▓▓▓▓

1.5  "Exempt Information" means that Confidential Information shall not include information which Recipient can demonstrate: (a) was lawfully in its possession and reduced to

CONFIDENTIAL

RP_000520

writing prior to the time of disclosure by or on behalf of Pfizer and which is not subject to another obligation of confidentiality; (b) is or becomes generally available to the public through no fault, omission, or other act of Recipient or any of its Affiliates; (c) is obtained from a third party lawfully entitled to possession of such Confidential Information and under no obligation of confidentiality to Pfizer; or (d) was independently developed by or for the Recipient without reference to, aid from or reliance upon the Confidential Information of Pfizer and/or its Affiliates.

1.6    "Permitted User" means an individual who:  (a) is a director, officer, consultant, contractor, agent or employee of Recipient or any of its Affiliates; (b) is bound by obligations of confidentiality  which would protect the Confidential Information in a manner consistent with the terms of this Agreement; and (c) has a need to know the Confidential Information in connection with the Project.

1.7    "Person" means any natural person, corporation, general or limited partnership, joint venture, proprietorship, trust, union, association, governmental authority or other entity.

## 2.    Treatment of Confidential Information

2.1    Recipient shall treat the Confidential Information as strictly confidential and proprietary.  Recipient shall safeguard the confidential and proprietary nature of the Confidential Information with at least the same degree of care as it holds its own confidential or proprietary information, but in no event shall the degree of care for the Confidential Information be less than a reasonable degree of care.

2.2    Recipient may use the Confidential Information only in connection with the applicable Project, and for no other purpose whatsoever.   Recipient shall not use the Confidential Information for the personal benefit of itself or a Permitted User, or for the benefit of any third party.

2.3    Recipient shall not disclose (directly or indirectly) any Confidential Information to, or permit it to be accessed by, any Person except a Permitted User.  Recipient shall cause any Permitted User to whom Confidential Information is disclosed to abide by the confidentiality provisions of this Agreement.   In the event Recipient becomes aware of any breach of the confidentiality and non-use obligations contained in this Section by it or any Permitted User, Recipient shall promptly notify Pfizer of such breach and all facts known to Recipient regarding same.

2.4    If Recipient is requested to disclose the Confidential Information or the substance of this Agreement in connection with a legal or administrative proceeding or otherwise to comply with a requirement under applicable law, Recipient shall give Pfizer prompt notice of such request so that Pfizer may seek an appropriate protective order or other remedy, or waive compliance with the relevant provisions of this Agreement.  If Pfizer seeks a protective order or other remedy, Recipient shall promptly cooperate with and reasonably assist Pfizer in such efforts.  If Pfizer fails to obtain a protective order or waives compliance with the relevant provisions of this Agreement, Recipient shall disclose only that portion of Confidential Information which its legal counsel determines it is required to disclose.

2.5    Upon the written request of Pfizer, Recipient shall promptly return or destroy, at Pfizer's option, all Confidential Information of Pfizer and/or its Affiliates (including all copies in whatever medium provided to, or made by, any Permitted User); provided, however, that, subject to the terms of this Agreement, Recipient shall be entitled to retain one archival copy of such Confidential Information for so long as necessary and for the sole purpose of determining its obligations under this Agreement.  Notwithstanding anything to the contrary in this Agreement, Recipient shall not be required to destroy any computer files stored securely by Recipient that are

CONFIDENTIAL

created during automatic system back-up.  Subject to Recipient's return or destruction of Confidential Information, Recipient shall continue to be bound by its obligations of confidentiality and non-use under this Agreement for a period of five (5) years from the end of the Disclosure Period.

## 3.  General Provisions

3.1     Each Party represents and warrants to the other Party that it has the legal power and authority to enter into this Agreement.

3.2     Neither this Agreement, nor either Party's performance under it, will: (a) transfer to the Recipient, or create in the Recipient, any proprietary right, title, interest or claim in or to any of Pfizer's Confidential Information; (b) obligate either Party to enter into any other agreement or undertaking of any nature whatsoever with the other Party; (c) prohibit either Party from entering into any other agreement with any other party, if doing so will not violate such Party's obligations hereunder; or (d) be construed as granting a license to its Confidential Information to the Recipient.

3.3     This Agreement sets forth the entire understanding between the parties as to its subject matter, and supersedes all prior agreements and understanding relating to such subject matter.  This Agreement may only be modified in a writing signed by a duly authorized agent for each respective Party and specifically referring hereto.

3.4     This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of New York, excluding its conflict of law rules.

3.5     The Parties acknowledge that, except as expressly set forth herein: (a) neither Party has made any representation, warranty or promise to the other, express or implied, upon which either is entitled to rely in any way; and (b) the Parties specifically waive and disclaim any reliance, dependence or action based on any written or verbal statement or promise made by either Party to the other.

3.6     Neither the rights nor the obligations of either Party hereunder may be assigned or delegated, in whole or in part, without the prior written consent of the other Party.   Any such assignment or delegation without the prior written consent of the other Party shall be null and void and of no effect.

3.7     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

3.8     If any term of this Agreement or the application thereof shall be deemed invalid or unenforceable, the remainder of this Agreement shall be unaffected thereby and each remaining term of this Agreement shall be valid and enforced to the fullest extent permitted by law.

3.9     The failure of either Party to insist upon the strict observation or performance of any provision of this Agreement, or to exercise any right or remedy shall not impair or waive any such right or remedy in the future. Every right and remedy given by this Agreement to the Parties may be exercised from time to time as often as appropriate.

3.10    All notices given hereunder shall be in writing and shall be sent to the Parties hereto at the addresses set forth above or to such other address as a Party may provide.

CONFIDENTIAL



RP_000522

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the Effective Date.

PFIZER

By: _____

Name: _Peter W. Park  Ph.D._

Title: _Senior Director_


Beth Israel Medical Center

By: _____

Name: Don Des Jarlais, PhD

Title:  Administrative Director, OGARA



Russell Portenoy, MD
_____

CONFIDENTIAL