PSJ3

Exhibit 57I

Donna Reid

**From:** Jorga, Anamaria [Anamaria.Jorga@pfizer.com]
**Sent:** Saturday, January 28, 2012 5:19 PM
**To:** Donna Reid
**Subject:** RE: save the date:  Risk Management Advisory Committee Meeting Avinza

Dear Donna,
That is excellent, thanks so much. Please reserve then  22nd of march 10-12  am in  his calendar and I will proceed with the paper work ASAP. I will be sending you the agenda of the meeting closer to the date.

Kind regards

Anamaria Jorga

**From:** Donna Reid [mailto:DoReid@chpnet.org]
**Sent:** Wednesday, January 25, 2012 11:24 AM
**To:** Jorga, Anamaria
**Subject:** RE: save the date: Risk Management Advisory Committee Meeting Avinza

March 22 at 10:00 works for Dr. Portenoy

**Donna Reid**
**Administrative Assistant II**
**Beth Israel Medical Center**
**First Ave at 16th St**
**New York, NY 10003**
**P: 212-844-1505**
**F: 212-844-1503**
doreid@chpnet.org

**From:** Russell Portenoy, MD
**Sent:** Wednesday, January 25, 2012 11:19 AM
**To:** Donna Reid
**Subject:** Fw: save the date: Risk Management Advisory Committee Meeting Avinza
**Importance:** High

Donna would you please reply?

**From:** Jorga, Anamaria [mailto:Anamaria.Jorga@pfizer.com]
**Sent:** Wednesday, January 25, 2012 10:58 AM
**To:** Russell Portenoy, MD
**Subject:** save the date: Risk Management Advisory Committee Meeting Avinza

Dear Professor Portnenoy,

On behalf of Pfizer, I would like to invite to be a co-chair of the Avinza Risk Management Advisory Committee Meeting. **The meeting will be 2 hours in duration in total and will be done as a teleconference.**  The format of the meeting will be very similar to the one held last year.
Our safety medical lead will present relevant data and we shall ask your advice on the following questions:  if the risks of misuse, abuse and diversion observed with AVINZA® are acceptable and whether the Avinza Risk Management Program is appropriate.

1



CONFIDENTIAL

**Donna Reid**

| | |
|---|---|
| **From:** | Russell Portenoy, MD |
| **Sent:** | Monday, March 05, 2012 12:45 PM |
| **To:** | 'Jorga, Anamaria'; 'rporteno@chpnet.org' |
| **Cc:** | Donna Reid; Keslick, Christy |
| **Subject:** | RE: Risk Management Advisory Committee Meeting Avinza |
| **Attachments:** | RUSSPORT.doc |

Dear Ms. Jorga,

I received the materials which are undergoing review by my institution's attorney. This is required.  I do not anticipate a problem but it will take a little time.

If you would like to schedule a call before the agreement is signed, that would be fine with me, and Donna Reid in my office could suggest a time for this.

**From:** Jorga, Anamaria [mailto:Anamaria.Jorga@pfizer.com]
**Sent:** Monday, March 05, 2012 11:01 AM
**To:** 'rporteno@chpnet.org'
**Cc:** Donna Reid; Keslick, Christy
**Subject:** Risk Management Advisory Committee Meeting Avinza

Dear Prof Portenoy,

Could you please confirm if you have received a consultant agreement for this meeting and if you still agree to chair this meeting.
 I would like to talk to you before the meeting if at all possible in order to introduce our new Safety Medical Lead and myself properly. Also, I would like to  talk briefly  about the agenda and the reports that we have prepared.  This will be the last meeting that we will have before REMS and I would really appreciate if you could chair this meeting once more.

In addition , Ms Read  if you would be so kind to send us the Professor's Portenoy CV as I do need it for administrative purposes.


Kind regards

Anamaria Jorga

Anamaria Jorga, MD MSc PhD
*Medical Director - Pain*
*Pfizer Inc - Medical Affairs, PCBU*
*235 E. 42nd St, NYC 10017*
*Mailstop 235-7-23*
*Phone: (001)212-733-5210*
*Cell: 1(718) 664 3491*


**From:** Jorga, Anamaria
**Sent:** Wednesday, January 25, 2012 5:37 PM
**To:** 'Donna Reid'
**Cc:** 'rporteno@chpnet.org'
**Subject:** RE: save the date: Risk Management Advisory Committee Meeting Avinza

CONFIDENTIAL

RP_000711

If not, please give me a few available dates and times during second half of March.
I will coordinate all the logistic details with Prof Gharibo, Prof Passik and Dr Sellers as well our regulatory and safety colleagues.
Should you have any questions please do not hesitate to contact me.


Kind Regards

Anamaria


 Primary Care

**Dr Anamaria Jorga, MD, MSc, PhD**
*Medical Director - Pain*
*Pfizer Inc - Medical Affairs, PCBU*
*235 E. 42nd St, NYC 10017*
*Mailstop 235-7-23*
*Phone: (001)212-733-5210*
*Cell: 1(718) 664 3491*

This message and any attachments are confidential and intended solely for the use of the individual or entity to which they are addressed.  If you are not the intended recipient, you are prohibited from printing, copying, forwarding, saving, or otherwise using or relying upon them in any manner.  Please notify the sender immediately if you have received this message by mistake and delete it from your system.

CONFIDENTIAL

RP_000712

Dear Ms Reid , Prof Portenoy,

Thank you for your prompt reply; I will organize the meeting accordingly and send you more details  within the next two weeks.

Kind regards

Anamaria  Jorga

**From:** Donna Reid [mailto:DoReid@chpnet.org]
**Sent:** Wednesday, January 25, 2012 11:24 AM
**To:** Jorga, Anamaria
**Subject:** RE: save the date: Risk Management Advisory Committee Meeting Avinza

March 22 at 10:00 works for Dr. Portenoy

**Donna Reid**
**Administrative Assistant II**
**Beth Israel Medical Center**
**First Ave at 16th St**
**New York, NY 10003**
**P: 212-844-1505**
**F: 212-844-1503**
doreid@chpnet.org

**From:** Russell Portenoy, MD
**Sent:** Wednesday, January 25, 2012 11:19 AM
**To:** Donna Rpeid
**Subject:** Fw: save the date: Risk Management Advisory Committee Meeting Avinza
**Importance:** High

Donna would you please reply?

**From:** Jorga, Anamaria [mailto:Anamaria.Jorga@pfizer.com]
**Sent:** Wednesday, January 25, 2012 10:58 AM
**To:** Russell Portenoy, MD
**Subject:** save the date: Risk Management Advisory Committee Meeting Avinza

Dear Professor Portenoy,

On behalf of Pfizer, I would like to invite to be a co-chair of the Avinza Risk Management Advisory Committee Meeting. **The meeting will be 2 hours in duration in total and will be done as a teleconference.** The format of the meeting will be very similar to the one held last year.
Our safety medical lead will present relevant data and we shall ask your advice on the following questions:  if the risks of misuse, abuse and diversion observed with AVINZA® are acceptable and whether the Avinza Risk Management Program is appropriate.
This meeting is our regulatory commitment and we are obliged to have it by the end of March.
Could you please let me know if any of the following dates and time is convenient for you and also your preference?

1) 16th **of March from 12 to 2 pm**
2) 22nd **of March from 10 to 12 am**
3) 26th **of March from 1 to 3 pm.**

# CONFIDENTIAL

RP_000713

This meeting is our regulatory commitment and we are obliged to have it by the end of March.
Could you please let me know if any of the following dates and time is convenient for you and also your preference?

1) 16th of March from 12 to 2 pm
2) 22nd of March from 10 to 12 am
3) 26th of March from 1 to 3 pm.

If not, please give me a few available dates and times during second half of March.
I will coordinate all the logistic details with Prof Gharibo, Prof Passik and Dr Sellers as well our regulatory and safety colleagues.
Should you have any questions please do not hesitate to contact me.


Kind Regards

Anamaria


 *Primary Care*

**Dr Anamaria Jorga, MD, MSc, PhD**
*Medical Director - Pain*
*Pfizer Inc - Medical Affairs, PCBU*
*235 E. 42nd St, NYC 10017*
*Mailstop 235-7-23*
*Phone: (001)212-733-5210*
*Cell: 1(718) 664 3491*


This message and any attachments are confidential and intended solely for the use of the individual or entity to which they are addressed.  If you are not the intended recipient, you are prohibited from printing, copying, forwarding, saving, or otherwise using or relying upon them in any manner.  Please notify the sender immediately if you have received this message by mistake and delete it from your system.

CONFIDENTIAL

RP_000714

**To:** Donna Reid
**Subject:** FW: AVINZA Webex Consulting Agreement

Donna, please tell them that I cannot attend. thanks

---

**From:** christy.keslick@pfizer.com [mailto:christy.keslick@pfizer.com]
**Sent:** Tuesday, February 28, 2012 12:51 PM
**To:** Russell Portenoy, MD
**Cc:** christy.keslick@pfizer.com
**Subject:** AVINZA Webex Consulting Agreement

Dear RUSSELL KEITH PORTENOY,

On behalf of Pfizer Inc., we are pleased to invite you to participate in the Azinza Ad Board to be held on 03/22/2012 via webex.

The objectives of this meeting are: to review AVINZA Risk Management Program and the results achieved to date.

Attached, please find a more formal, detailed invitation along with a Consultant Agreement that outlines the terms of this engagement as well as confidentiality obligations.

To accept this invitation, please send the following by March 9, 2012, to my attention, either via fax at **484-323-7967,** or e-mail at christy.keslick@pfizer.com :

1.  Signed Consultant Agreement (**all pages, including Exhibit A, are required**)
2.  Curriculum Vitae (CV)
3.  W-9

If you are unable to attend, please notify us so that we may update our records.

A signed Consultant Agreement must be received prior to your participation in the meeting. Within one business day of receipt of your paperwork, you will be emailed a link to the registration site for the program which will provide you with further information regarding logistical arrangements, including guest room accommodations, air/rail travel, and ground transportation. Please do NOT book flights on your own. Hotel and airfare will be covered by Pfizer.

We look forward to your participation at the meeting.

Sincerely,

Anamaria Jorga

Director, US Medical Affairs

2

CONFIDENTIAL

Donna Reid

From:           Russell Portenoy, MD
Sent:           Saturday, March 03, 2012 3:31 PM
To:             Deborah Korzenik
Cc:             Donna Reid
Subject:        FW: AVINZA Webex Consulting Agreement
Attachments:    PORTENOY_RUSSELL_14661.pdf

Debi,

Thank you very much for the Trancept review. I got you email about the meeting on Friday (I am sorry I could not attend this) and will reply separately.

I do have one more question.

For what I think has been about 5 years, I have been participating in one teleconference per year as a member of an outside experts committee that a company called Ligand put together to provide input into the risk management program that they promised FDA when their drug Avinza was approved. Avinza is long-acting morphine. Each year, 4 or 5 people would get on the phone and via Webex conferences at which data were presented about the risk program. We'd provide feedback. I do not believe that there was ever a consulting agreement for this, even though it was a consulting role and the company compensated each of us with $1000.

Recently, Pfizer acquired the drug and the new people involved have requested our group come together on 3/22 via Webex again to review the risk program. They want a formal consulting agreement signed, which they just sent me.

As always, let me ask you whether this is something that you should review? I hate to burden you with this, but I didn't think that I should take the call without asking, notwithstanding the long history of doing so.

Let me know your thoughts.. Thank you.

Russ

---

From: Donna Reid
Sent: Thursday, March 01, 2012 11:29 AM
To: Russell Portenoy, MD
Subject: FW: AVINZA Webex Consulting Agreement


Donna Reid
Administrative Assistant II
Beth Israel Medical Center
First Ave at 16th St
New York, NY 10003
P: 212-844-1505
F: 212-844-1503
doreid@chpnet.org

---

From: Russell Portenoy, MD
Sent: Wednesday, February 29, 2012 6:37 AM

1

CONFIDENTIAL

RP_000716

**Beth Israel**

University Hospital and
Manhattan Campus for
the Albert Einstein College
of Medicine

Department of Pain Medicine
and Palliative Care
Beth Israel Medical Center
Milton and Carroll Petrie Division
First Avenue at 16th Street
New York, NY  10003
Tel: 212 844 1505
Fax: 212 844 1503
E-mail: RPorteno@chpnet.org

www.StopPain.org

**Russell K. Portenoy, MD**
Chairman and
Gerald J. Friedman Chair in
Pain Medicine and Palliative Care

Professor of Neurology and Anesthesiology
Albert Einstein College of Medicine

Chief Medical Officer
MJHS Hospice and Palliative Care

TO:         Transcept Pharma's Accounts Payable Department
            FAX 510-215-3535

FROM:       Russell Portenoy MD

DATE:       April 6, 2012

RE:         Consulting Agreement Fee

Invoice

    For consulting 1 hour @ $500/hr                    $500

Please remit to:

Russell K. Portenoy MD
Department of Pain Medicine and Palliative Care
Beth Israel Medical Center
First Avenue at 16th Street
New York, N.Y.  10003

Continuum Health Partners, Inc.




CONFIDENTIAL

RP_000717

Donna Reid

| | |
|---|---|
| **From:** | Jennifer Lucas [jlucas@transcept.com] |
| **Sent:** | Wednesday, February 22, 2012 12:54 PM |
| **To:** | Donna Reid |
| **Cc:** | Susan Dube (GMAIL) |
| **Subject:** | RE: Meeting request |

Hi Donna: March 6th at 11am is perfect! I'll send calendar invites shortly. I'm assuming I can use the address in your signature line below as the meeting location. Is there a room number and on which floor?

Thanks for the contractual info. I've sent the documents to legal for approval and will get back to you soon.

- Jen

*Jennifer Lucas*
510.215.3558 direct

**From:** Donna Reid [mailto:DoReid@chpnet.org]
**Sent:** Wednesday, February 22, 2012 8:26 AM
**To:** Jennifer Lucas
**Subject:** RE: Meeting request

Hi Jennifer,

Attached are the 3 BI paragraphs that Dr. Portenoy mentioned below. Please have your legal department review them as they will need to be added to the consulting agreement.

March 6 at 11:00 for an hour works for Dr. Portenoy. If you need more time, he could meet as early as 9:00 but he is already booked from 12:00 onwards. Please let me know.

Donna Reid
Administrative Assistant II
Beth Israel Medical Center
First Ave at 16th St
New York, NY 10003
P: 212-844-1505
F: 212-844-1503
doreid@chpnet.org

**From:** Jennifer Lucas [mailto:jlucas@transcept.com]
**Sent:** Tuesday, February 21, 2012 5:22 PM
**To:** Donna Reid
**Cc:** Russell Portenoy, MD; Susan Dube (GMAIL)
**Subject:** RE: Meeting request

Hi Donna,

At the request of Susan Dube', please find the following documents attached (with track changes activated should you need to make any modifications).

1

CONFIDENTIAL

RP_000718

1. CDA – please complete and return an electronic copy if possible.
2. Consulting agreement - please complete any highlighted areas and let me know when you are ready to proceed to signatures. At that point, I will send two hard copies for execution.

We will be in NY on March 6th and can meet as early as 11am ET (perhaps an early lunch or anytime thereafter). What time works best for Dr. Portenoy's schedule?

Thanks for your time!

- Jen

*Jennifer Lucas*
510.215.3558 direct

---

**From:** Susan Dube [mailto:susanedube@gmail.com]
**Sent:** Saturday, February 18, 2012 3:48 PM
**To:** Russell Portenoy, MD
**Cc:** Nikhilesh Singh; Donna Reid; Jennifer Lucas; John Kollins
**Subject:** Re: Meeting request

Dear Dr. Portenoy:

Thanks so much for getting back to me. We need only a couple hours of your time for an interview. We will come to your office and schedule the visit at a time that works for you.

I will ask Jennifer Lucas to be in touch with Donna on the agreements and meeting logistics.

We look forward to meeting with you.

Best,
Susan


Sent from my iPhone

On Feb 18, 2012, at 10:02 AM, "Russell Portenoy, MD" <RPorteno@chpnet.org> wrote:

> Dear Susan,
>
> Thank you for the invitation.  I am interested in the concept of course, but am challenged in finding time. If you are considering a visit to my place and a meeting of a couple of hours, or a teleconference, I am sure that I can work this out.  A greater commitment would be difficult given the work commitments I have now.
>
> A CDA and a consulting agreement would be reviewed by my institution's counsel.  She is usually quick unless there are issues.  The institution always requires three paragraphs, and I will ask Donna Reid in my office to both email you these paragraphs to expedite the review of the agreement.
>
> Donna would also be able to help schedule a time.
>
> Russ Portenoy MD

CONFIDENTIAL

RP_000719

**From:** Susan Dube [mailto:susanedube@gmail.com]
**Sent:** Thursday, February 16, 2012 3:22 PM
**To:** Russell Portenoy, MD
**Subject:** Meeting request

Dear Dr. Portenoy:

I am following up at the suggestion of Nik Singh from Transcept Pharmaceuticals to see if you might be available to meet with a few members of the Transcept team to discuss addiction medicine and a new product that we are evaluating, Probuphine.  Probuphine is a continuous buprenorphine implant system that has been studied in a number of Phse 3 clinical trials and is being readied for submission to the FDA. The product was developed by Titan Pharmaceuticals and Titan is seeking a partner to commercialize the product.

As you may know, Transcept Pharmaceuticals is a specialty pharmaceutical company focused on the development and commercialization of proprietary products in the field of neuroscience. Intermezzo® (zolpidem tartrate) sublingual tablet C-IV is the first FDA approved Transcept product. Transcept and Purdue are parties to a collaboration agreement for the development and commercialization of Intermezzo in the United States. Transcept holds all commercialization and development rights to Intermezzo outside North America and has co-promotion rights to Intermezzo in the United States.  We plan to build a commercial infrastructure to market CNS products and Probuphine could be an excellent fit for us.  Additionally, as part of our product pipeline activities, Transcept is currently conducting a Phase 2 study of an investigational product, TO-2061, in patients with obsessive-compulsive disorder.

We would very much appreciate the opportunity to meet with you to further educate ourselves on the treatment of addiction and to seek your opinion on Probuphine as a potential new treatment model.  We would be pleased to enter into a Consulting Agreement to compensate you for your time and will also need to execute a Confidentiality Agreement to protect Titan's confidential information.  If you are available to help us with this project, I will ask Jennifer Lucas to coordinate directly with your assistant so that we can find a mutually acceptable time for a meeting.

I look forward to hearing from you.


Best,
Susan

--

Susan E. Dube'
619-733-3852 cell
susanedube@gmail.com


This message and any attachments are confidential and intended solely for the use of the individual or entity to which they are addressed.  If you are not the intended recipient, you are prohibited from printing,

3

CONFIDENTIAL

copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.

This message and any attachments are confidential and intended solely
for the use of the individual or entity to which they are addressed.  If
you are not the intended recipient, you are prohibited from printing,
copying, forwarding, saving, or otherwise using or relying upon them in
any manner.  Please notify the sender immediately if you have received
this message by mistake and delete it from your system.

4

CONFIDENTIAL

RP_000721

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Confidentiality and Nondisclosure Agreement ("Agreement") is entered into between Russell K. Portenoy, M.D., a resident of the State of New York ("Discloser" or "Recipient") and TransOral Pharmaceuticals, Inc., a Corporation, registered in the State of California to conduct business ("Discloser" or "Recipient").

1. <u>Purpose</u>. The parties wish to explore a business opportunity of mutual interest and, in connection with this opportunity and the resulting business relationship, if any, each party ("Discloser") may disclose to the other ("Recipient") certain confidential technical and business information which Discloser desires Recipient to treat as confidential.

2. <u>Proprietary Information</u>. "Proprietary Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including, without limitation, documents, business, financial and marketing plans, technology and product roadmaps, present and future product integration plans, information on strategic partnerships and alliances and customer relationships, and other technical and business information. Proprietary Information shall not, however, include any information which Recipient can establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure by Discloser; (ii) becomes publicly known and made generally available after disclosure by Discloser to Recipient through no action or inaction of Recipient; (iii) is already in the possession of Recipient without restriction on use or disclosure at the time of disclosure by Discloser as shown by Recipient's files and records immediately prior to the time of disclosure; (iv) is obtained by Recipient without restriction on use or disclosure from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by Recipient without use of or reference to Discloser's Proprietary Information, as shown by Recipient's files and records immediately prior to the time of disclosure.

3. <u>Non-use and Non-disclosure</u>. Recipient agrees (i) to hold the Proprietary Information of Discloser in strict confidence and to take reasonable precautions to protect such Proprietary Information (which precautions shall be no less than those employed by Recipient to preserve the secrecy of its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third party, except to those of Recipient's employees, officers and directors who have a legitimate "need to know" and agree to be bound by the restrictions herein, (iii) not to make any use whatsoever at any time of any such Proprietary Information, except (a) to evaluate and engage in discussions with Discloser concerning a potential business relationship between the parties and, (b) to the extent the parties enter into a business relationship, as provided in the definitive agreement executed in connection with such relationship, and (iv) not to copy, except photo and electronic copies made for the purpose of collaboration, such Proprietary Information, or reverse engineer or disassemble any products, technology or tangible objects that utilize such Proprietary Information.

4. <u>Court Ordered Disclosure</u>. Recipient may disclose such parts of Proprietary Information as may be required by law or court order; provided, that Discloser (i) provides Discloser prompt written notice of such requirement, (ii) uses diligent extrajudicial efforts to limit disclosure and obtain confidential treatment or a protective order, and (iii) provides Discloser with such other cooperation that is reasonably requested.

5. <u>Return of Information</u>. Immediately upon the decision by either party not to enter into the contemplated relationship or transaction, or upon request by Discloser made at any time, Recipient will turn over to Discloser all manifestations of its Proprietary Information, and all documents or media containing such Proprietary Information, and all copies or extracts thereof.

6. <u>No Obligation</u>. Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning this business opportunity.

7. <u>No Warranty</u>. UNLESS OTHERWISE AGREED UPON BY THE PARTIES, ALL PROPRIETARY INFORMATION IS PROVIDED "AS IS." NEITHER PARTY MAKES ANY WARRANTY, EXPRESS, IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF ITS PROPRIETARY INFORMATION.

8. <u>No License</u>. Nothing in this Agreement is intended to grant any rights to either party under any patent, copyright or other intellectual property of the other party, nor shall this Agreement grant any party any rights in or to the Proprietary Information of the other party, except for the use of Proprietary Information that is expressly permitted herein.

9. <u>Term</u>. The obligations of the Recipient set forth herein shall continue for a period of five (5) years from the effective date of disclosure of the Proprietary Information. The remainder of the terms of this Agreement shall survive in perpetuity.

10. <u>General</u>. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect. This Agreement shall be governed by the law of the State of California without regard to the conflicts of law provisions thereof. Notices hereunder shall be effective only if in writing and upon receipt if delivered personally or by overnight mail carrier, or three (3) days after deposit in the U.S. mail, first-class postage prepaid. The prevailing party in any action to enforce this Agreement shall be entitled to its costs and fees (including attorneys' fees and expert witness fees) incurred in connection with such action if a court of competent jurisdiction finds bad faith has been exercised by the non-prevailing party in its prosecution or defense of the action. No waiver or modification of this Agreement will be binding upon either party unless made in writing and signed by a duly authorized representative of such party and no failure or delay in enforcing any right will be deemed a waiver. This Agreement supersedes all prior discussions and writings and constitutes the entire agreement between the parties with respect to the subject matter hereof.

11. <u>Equitable Relief</u>. Recipient acknowledges that any unauthorized disclosure or unauthorized use of Proprietary Information will constitute a material breach of this Agreement and may cause substantial harm to Discloser for which damages may not be a fully adequate remedy. In the event of any such breach, in addition to other available remedies, Discloser shall have the right to seek injunctive relief (without being required to post any bond or other security).

Russell K. Portenoy, M.D.

By: _____   Date: 3/14/03

Name: Russell K. Portenoy, M.D.

Title:

Address:

TransOral Pharmaceuticals, Inc.

By: _____   Date: 3/19/03

Name: Nikhilesh N. Singh

Title: President

Address: 180 E. Main Street, #135 Tustin, California 92780 USA

CONFIDENTIAL

Donna Reid

| | |
|---|---|
| **From:** | Bethany Seabolt [bseabolt@transcept.com] |
| **Sent:** | Wednesday, April 07, 2010 5:56 PM |
| **To:** | Russell Portenoy, MD |
| **Cc:** | Donna Reid |
| **Subject:** | RE: Request for call with Nik Singh/Transcept Pharmaceuticals |

Thank you Dr. Portenoy,

I will mention this to Nik and contact Ms. Reid to set it up.

Safe travels,
Bethany

**From:** Russell Portenoy, MD [mailto:RPorteno@chpnet.org]
**Sent:** Wednesday, April 07, 2010 2:54 PM
**To:** Bethany Seabolt
**Cc:** Donna Reid
**Subject:** RE: Request for call with Nik Singh/Transcept Pharmaceuticals

I am afraid that I am going abroad imminently and will not be back till the week of the 19th. If a call after my return makes sense, I would ask Donna Reid in my office to set it up.

Russ Portenoy MD

**From:** Bethany Seabolt [mailto:bseabolt@transcept.com]
**Sent:** Wednesday, April 07, 2010 5:49 PM
**To:** Russell Portenoy, MD
**Cc:** Donna Reid
**Subject:** Request for call with Nik Singh/Transcept Pharmaceuticals

Dear Dr. Portenoy,

I hope this email finds you well. I am writing on behalf of Nik Singh to request a brief call with you regarding a new project idea at Transcept. Would have 30 minutes free this week or next?

With best regards,
Bethany

**Bethany Seabolt**
Scientific Liaisons Manager
Transcept Pharmaceuticals, Inc.
1003 W. Cutting Blvd., Suite 110
Pt. Richmond, CA 94804
(510) 215-3526 direct
(510) 323-3920 mobile
(510) 215-3535 fax
bseabolt@transcept.com
www.transcept.com

1

CONFIDENTIAL



*825 Eighth Avenue, 11ᵗʰ floor, New York, NY 10019*    *212.301.6700 t*        *212.301.6711 f*

### Statement of Work – Audio/Video Media Activity

This Statement of Work ("SOW"), effective as of May 15ᵗʰ 2012, is entered into pursuant to the Independent Contractor Agreement between Medscape, LLC ("Medscape") and Russell Portenoy, MD, dated June 27ᵗʰ 2011 ("Agreement"), the terms of which are incorporated herein by reference. In the event of any conflict between the terms of the Agreement and the terms of this SOW, the terms of the Agreement shall control unless expressly stated otherwise herein. All capitalized terms used herein that are not otherwise defined shall have the meanings assigned to them in the Agreement.

**Services/Materials:** Faculty for a video Media activity (CME TV) entitled, "Episode 8: Chronic Pain in America - -Safe Use of Pain Medications" (84725.1) for Medscape Family Medicine.

Medscape intends to use the Materials provided hereunder in connection with an educational activity ("Activity") to be hosted and distributed by Medscape within the WebMD Health Professional Network, as determined by Medscape at its sole discretion. The WebMD Health Professional Network means any website, print publication, mobile application or other media on which Medscape is authorized to distribute content. Further, Medscape may promote the Activity (and the Materials included therein) through any media to users of the WebMD Health Professional Network.

As a faculty, you may be responsible for the following services:
* Attending a 30- to 60-minute project kick-off call with Medscape staff to help plan the content of the activity.
* Assisting Medscape staff in developing a discussion guide and/or slide deck for use during audio- or videotaping.
* Participating in an audio- or videotaped panel discussion or presentation (time determined by scope of project), and answering audience interactive questions as applicable.
* Reviewing and providing feedback on the activity as it is developed.
* Providing input into participant responses to interactive/post-test or outcomes questions approximately two to three months following the launch of the activity, if applicable.

**Activity Supporter:** Lilly

**Service Term:** May 15ᵗʰ 2012 – May 15ᵗʰ 2013.

**Content Development Standards:** You agree that all Materials that you provide to Medscape hereunder shall be developed in compliance with the Content Development Standards described in <u>Exhibit A</u>, attached hereto and incorporated herein by reference.

**Financial Disclosures:** You agree to identify any financial or other relevant relationships that you have with commercial organizations on the enclosed "Author Disclosure Form." Medscape will publish any relevant disclosures in conjunction with the Materials. Failure to provide the Disclosure to Medscape shall result in your disqualification from providing the Services and shall relieve Medscape in full of all payment obligations hereunder.

**Public Disclosure of Payments:** You acknowledge and agree that the financial supporter of the Activity described above may publicly disclose certain details of its educational funding activities, including the identity of the faculty involved in the activities that it supports, the nature of the activities performed by such faculty, and the amount of any honoraria received by such faculty in consideration of these activities.

**Fee/Invoicing:** Medscape will pay to **you a total honorarium of** $4000 upon Medscape's final approval of the Services and related Materials. Payment will be processed within thirty (30) days of Medscape's receipt of the undisputed invoice. **Please be advised that all paperwork must be signed and returned to Medscape before any payments can be processed. Medscape is unable to process payments without a signed Statement of Work, signed disclosure form, current Independent Contract Agreement, current W9, and updated Author Information form.**

# CONFIDENTIAL

RP_000724

**Itemized Fees/Expenses:** Non-reimbursable unless approved in advance by Medscape management and complete receipts are provided.

**Government Affiliations:** If you are affiliated with any U.S. government institution, you will obtain, if necessary, before accepting any honorarium amount hereunder, the approval from an authorized person at your institution certifying that the acceptance of such amount is not a violation of your institution's policies or any laws or regulations covering your institution.

**Materials:** All Materials that you provide to Medscape in connection with the Services, including, but not limited to written manuscripts, recordings (audio and visual), images, and tables, shall be considered works for hire, and are and shall at all times remain the sole property of Medscape, and you hereby assign any intellectual property rights in such Materials to Medscape.

**Personally Identifiable Information:** You hereby represent and warrant that if any of the materials that you provide to Medscape under this Statement of Work contain any personally identifiable information of any third party, ie, information that can be traced back to such an individual (eg, name, address, social security number, image, likeness, voice, etc.) including, but not limited to, personal health information as such term is defined in the Health Insurance Portability and Accountability Act of 1996 and implementing regulations, you have, prior to your provision of such information to Medscape, obtained a written release from such individual that: (a) authorizes the use of such information in a manner consistent with its intended use under this Statement of Work and (b) releases Medscape from any liability related to its use of such information in a manner consistent with its intended use under this SOW. Prior to execution of such release, you hereby agree to provide Medscape with a copy, which Medscape may modify at its discretion. You further agree to provide Medscape with a copy of such release, upon request.

By executing this Statement of Work, you agree to be bound by its terms.

Medscape, LLC

Name: Ronald Viggiani, MD

Signature:
Title: Director, Scientific Affairs and Editorial Services

Date: May 15th, 2012

Independent Contractor:

Name: Russell Portenoy, MD
Signature:
Title: Chairman, DPMPC, BIMC
Date: 5/23/12

<u>Please fax to 212-301-6711 to Shoshana Davis and retain a copy for your records.</u>

CONFIDENTIAL

## Exhibit A
### Addendum to Faculty Statement of Work

As an organization accredited by the Accreditation Council for Continuing Medical Education (ACCME), the American Nurses Credentialing Center (ANCC), and the Accreditation Council for Pharmacy Education (ACPE) to provide continuing education to physicians, nurses, and pharmacists, respectively, Medscape strives to create continuing educational activities that reflect the highest standards of academic credibility and balance.

Identifying Conflicts of Interest
Medscape requires that every individual who is in a position to control the content of an educational activity developed and/or distributed by Medscape (each, an "Activity") complete a disclosure form listing all relevant financial relationships so that Medscape may provide this disclosure to learners prior to their participation in any such Activity.  If such an individual has no relevant financial relationships, he/she is required to disclose that as well. Medscape will not publish any educational materials until those individuals involved in their development have provided Medscape completed disclosure forms.  Refusal or failure to provide a completed disclosure form will disqualify the individual from contributing to the activity in any capacity.

Resolving Conflicts of Interest
Medscape has implemented mechanisms to resolve conflicts of interest prior to the related educational activity being delivered to learners, including:
* Arranging an independent peer review of content provided by an author with a conflict of interest to ensure that such content is evidence-based;
* Requiring that the author provide "best available evidence" support from the medical literature;
* Assigning a different topic to the author; and/or
* Reviewing the author's previous publications for content validation and evidence of fair balance.

Additional Guidelines
Authors shall identify investigational therapies and off-label indications whenever mentioned in manuscripts and/or presentations provided to Medscape pursuant to a Statement of Work ("Submitted Content").  Medscape discourages the use of brand names in Submitted Content.  Authors should use generic names at all times; however, if a situation arises where it would be beneficial to the audience to reference the brand name, as determined by the author and the Medscape Scientific Director in their professional judgment, an author may do so at first mention of the drug in the activity, provided that the generic name is also referenced and used for the remainder of the Activity. Further, if a brand name is referenced, author shall attempt to reference brand names from several companies, if applicable.

Medscape requires that all Activity content be fair, balanced, and compliant with the respective guidelines of the ACCME, ACPE, and ANCC. Any recommendations involving clinical medicine must be based on the best available evidence that is generally accepted within the medical profession as adequate justification for the care of patients.  All scientific research referred to, reported, or used in support or as justification of patient care recommendations in the Activity must conform to the generally accepted standards of experimental design, data collection, and analysis.

All parties involved in the planning and development of the Activity shall consider the target audience and their identified educational needs when developing specific and measurable learning objectives, education methods, content, measurement of learning (e.g., exams) and evaluations.  Medscape expects that active learning techniques be used when appropriate (e.g., interactive questions, case studies). Evaluation data on each activity and its authors will be compiled and used to assist Medscape in continuously improving its educational activities.

CONFIDENTIAL

# Medscape

*825 Eighth Avenue, 11ᵗʰ Floor, New York, NY 10019 212.301.6700 t 212.301.6711 f www.medscape.com*

## AUTHOR INFORMATION UPDATE FORM

### CONTACT INFORMATION
### PLEASE LIST NAME EXACTLY AS YOU WISH IT TO APPEAR ON MEDSCAPE

DATE: 5/29/12

FIRST NAME: Russell        INITIAL:        LAST NAME: Portenoy

DEGREE(S): M.D.        MEMBERSHIPS:

PRIMARY PHONE: 212-844-1505        PRIMARY FAX:

PRIMARY EMAIL: rporteno@chpnet.org        SECONDARY EMAIL:

### AFFILIATIONS
### PLEASE LIST AFFILIATION EXACTLY AS YOU WISH IT TO APPEAR ON MEDSCAPE

ACADEMIC TITLE/DEPT : Professor of Neurology and Anesthesiology
*(Indicate Professor, Assistant or Associate Professor, Chairman, etc., and Department)*

FULL NAME OF MEDICAL SCHOOL: Albert Einstein College of Medicine
*(Institution where above academic title is held)*

ADDRESS: 1300 Morris Park Ave

CITY: Bronx        STATE: NY        POSTAL CODE: 10451

COUNTRY:

CLINICAL TITLE/DEPT: Chair, Department of Pain Medicine and Palliative Care
*(Director, Chief of department in a clinic or hospital, or staff physician and Department)*

HOSPITAL: Beth Israel Medical Center
*(Hospital, Medical Center, or Private Practice Name)*

ADDRESS: First Ave at 16th St

CITY: New York        STATE: NY        POSTAL CODE: 10003

COUNTRY:

### HONORARIUM INFORMATION
### GIVE EXACT ADDRESS BELOW WHERE PAYMENT SHOULD BE SENT

ADDRESS: First Ave at 16th St

CITY: New York        STATE: NY        POSTAL CODE: 10003

COUNTRY:

SOCIAL SECURITY #        REDACTED        OR TAX ID NUMBER:

IF HONORARIUM IS TO GO TO A THIRD PARTY, PLEASE INDICATE BELOW:

NAME:

ADDRESS:

CITY:        STATE:        ZIP:

COUNTRY:

SOCIAL SECURITY #:        OR TAX ID NUMBER:

# CONFIDENTIAL



# Medscape

*825 Eighth Avenue, 11th floor, New York, NY 10019  212.301.6700 t 212.301.6711 f*

## *Author/Writer/Reviewer Disclosure Form*

**Author:** Russell Portenoy, MD    **Email:** rportenoy@chpnet.org    **Project #:** 84725.1

**Title:**  Episode 8: Chronic Pain in America - -Safe Use of Pain Medications

As an organization accredited by the ACCME, Medscape, LLC ("Medscape") requires everyone who is in a position to control the content of an educational activity to disclose all financial relationships with any commercial interest (eg, a pharmaceutical, medical device, biologics, or diagnostics company that manufactures products regulated by the US Food and Drug Administration [FDA]). The ACCME defines "financial relationships" as "*financial relationships in any amount, occurring within the past 12 months for you and your spouse or partner that could create a conflict of interest.*" Should Medscape determine that you have a conflict of interest based on a financial relationship that you disclose below, Medscape will need to resolve this conflict of interest prior to the launch of the CME activity.

Financial Relationships
Please check "None" if you have no financial relationships to disclose or name the companies with whom you have a financial relationship and describe the nature of such relationships in the chart below.  The information that you provide in the chart will be posted under "Authors and Disclosures" within the CME activity.

☐ None (Check here if you have no financial relationships to disclose.)

| Affiliation/Financial Interest | Commercial Interest/Manufacturer or Service Provider |
|---|---|
| Served as an advisor or consultant for: | *Please see attached* |
| Served as a speaker or a member of a speakers bureau for: | |
| Received grants for clinical research from: | *Please see attached* |
| Owns stock, stock options, or bonds from: | |
| Employed by a commercial interest: | |
| Other (please specify): | |

☐ Check here if including additional pages.

**Additional Information:**

I intend to discuss **off-label** uses of drugs, mechanical devices, biologics, or diagnostics *approved* by the FDA for use in the United States.
Yes ☐ No ☑

I intend to discuss **investigational** drugs, mechanical devices, biologics, or diagnostics *not approved* by the FDA for use in the United States.
Yes ☐ No ☑

Have you violated or received notice of violation of any laws or ACCME policy or other relevant accreditation body or standards in the last two (2) years?

☐ Yes (please provide details) _____
☑ No

Signature _____    Date  5/29/1_

**Refusal or failure to respond to a request for completion of a financial disclosure form, as well as a potential conflict of interest that cannot be resolved, will disqualify the potential faculty from participating in the planning and delivery of the activity.**

Please return by fax to Shoshana Davis  at 212.301.6711.

# CONFIDENTIAL

RP_000728

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

In discussions between Transcept Pharmaceuticals, Inc., a Corporation registered in the State of Delaware to conduct business ("Discloser"). And beth Israel Medical Center (recipient) related to a **buprenorphine implant product**, Discloser wishes to protect certain confidential and proprietary information, including but not limited to written, oral or visually presented information. . Therefore Discloser and recipient, intending to be legally bound, agree that:

1.  Proprietary Information. "Proprietary Information" means any information disclosed by Discloser to Recipient either directly or indirectly, in writing, orally or by inspection, review or analysis of tangible objects, including, without limitation: (i) information relating to pharmaceuticals; processes for developing pharmaceuticals; the development status of pharmaceuticals; synthetic and manufacturing processes; compounds; compositions of matter; formulations, medicaments and modes of their administration; source materials and fragments thereof; technical information, such as clinical, biological pharmaceutical and characterizing data; clinical trial protocols; drawings; designs; plans; and know-how; and (ii) business information, such as documents; business; financial and marketing plans; technology and product roadmaps; information on strategic partnerships and alliances and customer relationships; and other business information. Proprietary Information shall not, however, include any information which Recipient can establish (i) was publicly known and made generally available in the public domain prior to the time of disclosure by Discloser; (ii) becomes publicly known and made generally available after disclosure by Discloser to Recipient through no action or inaction of Recipient; (iii) is already in the possession of Recipient without restriction on use or disclosure at the time of disclosure by Discloser as shown by Recipient's files and records immediately prior to the time of disclosure; (iv) is obtained by Recipient without restriction on use or disclosure from a third party without a breach of such third party's obligations of confidentiality; or (v) is independently developed by Recipient without use of or reference to Discloser's Proprietary Information, as shown by Recipient's files and records immediately prior to the time of disclosure.

2.  Non-use and Non-disclosure. Recipient agrees (i) to hold the Proprietary Information of Discloser in strict confidence and to take reasonable precautions to protect such Proprietary Information (which precautions shall be no less than those employed by Recipient to preserve the secrecy of its own confidential materials, including, without limitation, all precautions the receiving party employs with respect to its confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third party, except to those of Recipient's employees, officers and directors who are required to have the information in order to evaluate or engage in discussions concerning the business opportunity and agree to be bound by the restrictions herein prior to such disclosure, (iii) not to make any use whatsoever at any time of any such Proprietary Information, except (a) to evaluate and engage in discussions with Discloser concerning a potential business relationship between the parties and, (b) to the extent the parties enter into a business relationship, as provided in the definitive agreement executed in connection with such relationship, and (iv) not to copy, except photo and electronic copies made for the purpose of collaboration, such Proprietary Information, or reverse engineer or disassemble any products, technology or tangible objects that utilize such Proprietary Information.

3.  Court Ordered Disclosure. Recipient may disclose such parts of Proprietary Information as may be required by law or court order; provided, that Recipient (i) provides Discloser prompt written notice of such requirement, (ii) uses diligent extrajudicial efforts to limit disclosure and obtain confidential treatment or a protective order, and (iii) provides Discloser with such other cooperation that is reasonably requested.

4.  Return of Information. Immediately upon the decision by either party not to enter into the contemplated relationship or transaction, or upon request by Discloser made at any time, Recipient will turn over to Discloser all manifestations of its Proprietary Information, and all documents or media containing such Proprietary Information, and all copies or extracts thereof.

5.  No Obligation. Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity.

6.  No Warranty. UNLESS OTHERWISE AGREED UPON BY THE PARTIES, ALL PROPRIETARY INFORMATION IS PROVIDED "AS IS." NEITHER PARTY MAKES ANY WARRANTY, EXPRESS, IMPLIED, REGARDING THE ACCURACY OR COMPLETENESS OF ITS PROPRIETARY INFORMATION.

7.  No License. Nothing in this Agreement is intended to grant any rights to either party under any patent, copyright or other intellectual property of the other party, nor shall this Agreement grant any party any rights in or to the Proprietary Information of the other party, except for the use of Proprietary Information that is expressly permitted herein.

8.  Term. The obligations of the Recipient set forth herein shall continue for a period of seven (7) years from the effective date of the disclosure. This Agreement shall cover disclosures of Proprietary Information made within three (3) years of the effective date of this Agreement. The remainder of the terms of this Agreement shall survive in perpetuity.

9.  General. This Agreement shall benefit and bind the parties and their respective successors, heirs, legal representatives and permitted assigns. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect. This Agreement shall be governed by the law of the State of New York without regard to the conflicts of law provisions thereof. The parties consent to the exclusive jurisdiction and venue of the state and federal courts located in New York, NY. Notices hereunder will be effective only if in writing and upon receipt if delivered personally or by overnight mail carrier, or three (3) days after deposit in the U.S. mail, first-class postage prepaid. No waiver or modification of this Agreement will be binding upon either party unless made in writing and signed by a duly authorized representative of such party and no failure or delay in enforcing any right will be deemed a waiver. This Agreement supersedes all prior discussions and writings and constitutes the entire agreement between the parties with respect to the subject matter hereof. The parties may execute this Agreement in counterparts, each of which is deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by facsimile transmission, and facsimile copies of executed signature pages shall be binding as originals.

10.  Insider Trading Laws. The parties will advise recipients of the Proprietary Information of the legal restrictions against tipping and trading while aware of material, non-public information affecting a publicly traded company and agree not to tip or trade on the basis of the Proprietary Information or violate such laws.

11.  Equitable Relief. Recipient acknowledges that any unauthorized disclosure or unauthorized use of Proprietary Information will constitute a material breach of this Agreement and may cause substantial harm to Discloser for which damages may not be a fully adequate remedy. In the event of any such breach, in addition to other available remedies, Discloser shall have the right to seek injunctive relief (without being required to post any bond or other security).

By: _Don G de Jarlais_ Date: _3/2/2012_

Name: Don Des Jarlais, PhD Administrative Director, OGARA

Address: Beth Israel Medical Center: 160 Water Street, New York, NY 10038

Transcept Pharmaceuticals, Inc.

By: _[signature]_ Date: _3/2/2012_

Name: Dennie Dyer, VP, Operations

Address: 1003 W. Cutting Blvd., Suite 110, Pt. Richmond, CA 94804

# CONFIDENTIAL

# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (the "Agreement") is made by and between Aclaris Medical, LLC (the "Company"), and Third Party identified below ("Third Party").

**1.    Purpose.**  The Company and Third Party wish to explore a possible opportunity of mutual interest regarding:

**Grant proposal, company technology, and clinical application.**

(the "Relationship") in connection with which the Company has disclosed and/or may further disclose its Confidential Information (as defined below) to Third Party.

**2.    Definition of Confidential Information.** "Confidential Information" or "CI" means any oral, written, graphic or machine-readable information including, but not limited to, that which relates to patents, patent applications, research, product plans, products, developments, inventions, processes, designs, drawings, engineering, formulae, markets, software (including source and object code), hardware configuration, computer programs, algorithms, business plans, agreements with third parties, services, customers, marketing or finances of the Company.

**3.    Nondisclosure of Confidential Information.**

(a)    Third Party agrees not to use any CI disclosed to it by the Company for its own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Third Party shall not disclose or permit disclosure of any CI of the Company to third parties or to employees of Third Party receiving CI, other than directors, officers, employees, consultants and agents who are required to have the information in order to carry out the discussions regarding the Relationship. Third Party has had its directors, officers, employees, consultants and agents who have access to CI of the Company sign a nondisclosure agreement (or will have such individual sign prior to granting such individual access to CI) that requires such individual to protect CI in substantially the same manner required by this Agreement. Third Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure or use of CI of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. Such measures shall include, but not be limited to, the highest degree of care that Third Party utilizes to protect its own CI of a similar nature, which shall be no less than reasonable care. Third Party agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of CI of the Company which may come to Third Party's attention.

(b)    Notwithstanding the above, Third Party shall not have liability to the Company with regard to any CI of the Company which Third Party can prove: (i) was in the public domain at the time it was disclosed or has entered the public domain through no fault of Third Party; (ii) was known to Third Party, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure; (iii) is disclosed with the prior written approval of the Company; (iv) was independently developed by Third Party without any use of the CI of the Company and by employees of Third Party who have not had access to the CI, as demonstrated by files created at the time of such independent development; (v) becomes known to Third Party, without restriction, from a source other than the Company without breach of this Agreement by Third Party and otherwise not in violation of the Company's rights; (vi) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that Third Party shall provide prompt notice of such court order or requirement to the Company to enable the Company to seek a protective order or otherwise prevent or restrict such disclosure.

**4.    No Modification.**  All CI is delivered "AS IS," with no warranties. Third Party agrees that it shall not modify, reverse engineer, decompile, create other works from or disassemble any software programs or any other materials contained in the CI of the Company unless permitted in writing by the Company.

**5.    Return of Materials.**  Any materials or documents that have been furnished by the Company to Third Party in connection with the Relationship shall be promptly returned by Third Party, accompanied by all copies of such documentation, within ten (10) days after (a) the Relationship has been rejected or concluded or (b) the written request of the Company.

**6.    No Rights Granted.**  Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of either party, nor shall this Agreement grant either party any rights in or to the Company's CI other than the limited right to review such CI solely for the purpose of determining whether to enter into the Relationship.

**7.    Term.**  The foregoing commitments of each party shall survive any termination of the Relationship between the parties.

**8.    Remedies; Indemnification.**  The Company and Third Party each agree that its obligations set forth in this Agreement are necessary and reasonable in order to protect the Company and its business. Third Party expressly agrees that due to the

unique nature of the Company's CI, monetary damages would be inadequate to compensate the Company for any breach by Third Party of its covenants and agreements set forth in this Agreement. Accordingly, Third Party agrees and acknowledges that any such violation or threatened violation shall cause irreparable injury to the Company and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the Company shall be entitled (a) to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Third Party, without the necessity of proving actual damages, and (b) to be indemnified by Third Party from any loss or harm, including but not limited to attorney's fees, arising out of or in connection with any breach or enforcement of Third Party's obligations under this Agreement or the unauthorized use or disclosure of the Company's CI.

**9.    General.**  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, provided that CI of the Company may not be assigned without the prior written consent of the Company unless the assignee shall be the successor entity to the assignor upon the dissolution of the assignor in its present form.  The Company and Third Party are independent contractors, and nothing contained in this Agreement shall be construed to constitute the Company and Third Party as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking. If one or more provisions of this Agreement are held to be unenforceable under applicable law, then such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.  This Agreement and all acts pursuant hereto shall be governed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law.  Any term of this Agreement may be amended with the written consent of the Company and Third Party.  This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and merges all prior negotiations and drafts of the parties with regard to the transactions contemplated herein.

The parties have executed this Nondisclosure Agreement as of the latest date set forth below.

**ACLARIS MEDICAL, LLC.:**                          **THIRD PARTY:**

By: Mark Bly                                        By:  Dr. Russell Portenoy

Signature: _____                          Signature: _____

Title: _____                              Title: _____

Date: _____                               Date: _____

Address: 1367 California Ave W                       Address:
          Falcon Heights, MN 55108

CONFIDENTIAL

# ACLARIS MEDICAL
## NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (the "Agreement") is made by and between Aclaris Medical, LLC (the "Company"), and Third Party identified below ("Third Party").

**1.** **Purpose.** The Company and Third Party wish to explore a possible opportunity of mutual interest regarding:

**Grant proposal, company technology, and clinical application.**

(the "Relationship") in connection with which the Company has disclosed and/or may further disclose its Confidential Information (as defined below) to Third Party.

**2.** **Definition of Confidential Information.** "Confidential Information" or "CI" means any oral, written, graphic or machine-readable information including, but not limited to, that which relates to patents, patent applications, research, product plans, products, developments, inventions, processes, designs, drawings, engineering, formulae, markets, software (including source and object code), hardware configuration, computer programs, algorithms, business plans, agreements with third parties, services, customers, marketing or finances of the Company.

**3.** **Nondisclosure of Confidential Information.**

(a) Third Party agrees not to use any CI disclosed to it by the Company for its own use or for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship. Third Party shall not disclose or permit disclosure of any CI of the Company to third parties or to employees of Third Party receiving CI, other than directors, officers, employees, consultants and agents who are required to have the information in order to carry out the discussions regarding the Relationship. Third Party has had its directors, officers, employees, consultants and agents who have access to CI of the Company sign a nondisclosure agreement (or will have such individual sign prior to granting such individual access to CI) that requires such individual to protect CI in substantially the same manner required by this Agreement. Third Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure or use of CI of the Company in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information. Such measures shall include, but not be limited to, the highest degree of care that Third Party utilizes to protect its own CI of a similar nature, which shall be no less than reasonable care. Third Party agrees to notify the Company in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of CI of the Company which may come to Third Party's attention.

(b) Notwithstanding the above, Third Party shall not have liability to the Company with regard to any CI of the Company which Third Party can prove: (i) was in the public domain at the time it was disclosed or has entered the public domain through no fault of Third Party; (ii) was known to Third Party, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure; (iii) is disclosed with the prior written approval of the Company; (iv) was independently developed by Third Party without any use of the CI of the Company and by employees of Third Party who have not had access to the CI, as demonstrated by files created at the time of such independent development; (v) becomes known to Third Party, without restriction, from a source other than the Company without breach of this Agreement by Third Party and otherwise not in violation of the Company's rights; (vi) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that Third Party shall provide prompt notice of such court order or requirement to the Company to enable the Company to seek a protective order or otherwise prevent or restrict such disclosure.

**4.** **No Modification.** All CI is delivered "AS IS," with no warranties. Third Party agrees that it shall not modify, reverse engineer, decompile, create other works from or disassemble any software programs or any other materials contained in the CI of the Company unless permitted in writing by the Company.

**5.** **Return of Materials.** Any materials or documents that have been furnished by the Company to Third Party in connection with the Relationship shall be promptly returned by Third Party, accompanied by all copies of such documentation, within ten (10) days after (a) the Relationship has been rejected or concluded or (b) the written request of the Company.

**6.** **No Rights Granted.** Nothing in this Agreement shall be construed as granting any rights under any patent, copyright or other intellectual property right of either party, nor shall this Agreement grant either party any rights in or to the Company's CI other than the limited right to review such CI solely for the purpose of determining whether to enter into the Relationship.

**7.** **Term.** The foregoing commitments of each party shall survive any termination of the Relationship between the parties.

**8.** **Remedies; Indemnification.** The Company and Third Party each agree that its obligations set forth in this Agreement are necessary and reasonable in order to protect the Company and its business. Third Party expressly agrees that due to the unique nature of the Company's CI, monetary damages would be inadequate to compensate the Company for any breach by Third Party of its covenants and agreements set forth in this Agreement. Accordingly, Third Party agrees and acknowledges that any such violation or threatened violation shall cause irreparable injury to the Company and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the Company shall be entitled (a) to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by Third Party, without the necessity of proving actual damages, and (b) to be indemnified by Third Party from any loss or harm, including but not limited to attorney's fees, arising out of or in connection with any breach or enforcement of Third Party's obligations under this Agreement or the unauthorized use or disclosure of the Company's CI.

**9.** **General.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties, provided that CI of the Company may not be assigned without the prior written consent of the Company unless the assignee shall be the successor entity to the assignor upon the dissolution of the assignor in its present form. The Company and Third Party are independent contractors, and nothing contained in this Agreement shall be construed to constitute the Company and Third Party as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking. If one or more provisions of this Agreement are held to be unenforceable under applicable law, then such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. This Agreement and all acts pursuant hereto shall be governed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law. Any term of this Agreement may be amended with the written consent of the Company and Third Party. This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, and merges all prior negotiations and drafts of the parties with regard to the transactions contemplated herein.

The parties have executed this Nondisclosure Agreement as of the latest date set forth below.

**ACLARIS MEDICAL, LLC.:**          **THIRD PARTY:**


By: Mark Bly                       By: Dr. Russell Portenoy

Signature: _Mark W Bly_            Signature: _____

Title: _PRESIDENT_                 Title: _Chairman DPMC_

Date: _11-MAY-2012_                Date: _5/11/12_

Address: 1367 California Ave W      Address:
Falcon Heights, MN 55108

# CONFIDENTIAL

MAR-20-2012  09:34                                                              P.02

## HEALTHCARE PROFESSIONAL CONSULTANT AGREEMENT

### AVINZA Advisory Board

This Agreement (the "Agreement") is made and entered by and between Pfizer Inc ("Pfizer")  and Dr Russell Keith Portenoy, MD ("CONSULTANT"), a health care professional with offices at First Ave. at 16th Street, New York, NY 10003, and is effective as of the date of last signature below ("Effective Date").

WHEREAS, there are emerging trends in the treatment of diseases associated with the use of Pfizer products to review the components of AVINZA Risk Management Program (RMP) and the results achieved to date; and WHEREAS, CONSULTANT is a healthcare professional generally familiar with the patient care benefits associated with AVINZA  whose expertise would be valuable to Pfizer in the review of  the components of AVINZA Risk Management Program (RMP) and the results achieved , subject to the terms and conditions herein;

WHEREAS, Pfizer wishes to engage CONSULTANT to provide the services described herein, and CONSULTANT agrees to accept such engagement;

NOW, THEREFORE, in consideration of the above recitals, the terms and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **TERM.**  The term of this Agreement shall begin on the Effective Date and shall continue until the later of the date on which all services hereunder have been fully performed or for a period of one (1) year ("Term").

2.  **CONSULTING SERVICES.**
CONSULTANT shall provide advice to Pfizer regarding the review of the components of AVINZA Risk Management Program (RMP) and the results achieved to date, in conjunction with the AVINZA Risk Management Committee WebEx Meeting held in New York, NY via WebEx on March 22, 2012. Consulting Services shall include active participation in the meeting. The sole purpose of this meeting is to review the components of AVINZA Risk Management Program (RMP) and the results achieved to date.
Consulting Services shall include the following pre- or post-meeting services: review slides. Pfizer, in its discretion, may issue separate or combined payment(s) for those portions of the Consulting Fee (defined in Section 4(a) below) attributable to event participation and to any authorized pre- or post-meeting services, upon confirmation of completion of services. In no event shall the total Consulting Fee exceed the sum set forth in Section 4(a).

3.  **INDEPENDENT CONTRACTOR.**  In the performance of Consulting Services pursuant to this Agreement, it is mutually understood and agreed that CONSULTANT is at all times acting and performing as an independent contractor for Pfizer and this Agreement shall not create any relationship of principal-agent, employer-employee, joint venture, co-partners or any other such relationship. CONSULTANT is further responsible for the payment of any taxes and the filing of any documents required by applicable law for independent contractors.  Pfizer will not withhold any federal, state, or local income tax or payroll tax of any kind on behalf of CONSULTANT.

Portenoy Revision.doc

1

CONFIDENTIAL

MAR-20-2012  09:34                                                                                            P.03

4.    COMPENSATION.

(a)    Consulting Fee

As consideration for CONSULTANT'S full provision of the Consulting Services described above, Pfizer shall pay CONSULTANT the sum of $1,000 USD ("Consulting Fee"). To the extent Consultant Services involve participation at a meeting or event, the Consulting Fee includes compensation for reasonable pre- and post-meeting activities required to conduct Consulting Services

(b)    Travel Expenses

If travel is required for the performance of the Consulting Services, shall provide CONSULTANT with associated travel and lodging accommodations in accordance with Pfizer's Travel and Expense Policy, attached hereto as Exhibit A. In no event shall Pfizer be obligated to pay CONSULTANT for expenses incurred outside of Pfizer's Travel and Expense Policy, without prior written consent of Pfizer. CONSULTANT may not seek compensation for time spent traveling in connection with Consulting Services.

(c)    Documents Required for Payment

CONSULTANT must provide any documentation required by Pfizer to process the Consulting Fee (or any portion thereof) within thirty (30) days of completion of Consulting Services. In addition, any Pfizer-approved reimbursable travel expenses must be submitted to Pfizer with supporting documentation within one (1) year of performance of Consulting Services. Pfizer shall not be obligated to pay invoices submitted by CONSULTANT more than one (1) year after completion of the applicable Consultant Services or the date that a reimbursable expense was incurred by CONSULTANT.

5.    MEALS. Consistent with Pfizer policy and state laws, Pfizer may cover and/or reimburse reasonable meal expenses that are necessarily incurred in the course of bona fide Consulting Services provided under this Agreement.

6.    CONFIDENTIALITY.    In connection with CONSULTANT's performance of Consulting Services, CONSULTANT acknowledges that certain Confidential Information (as defined below) of Pfizer that is valuable and proprietary to Pfizer and its affiliates has been or may be disclosed to CONSULTANT. CONSULTANT agrees not to, directly or indirectly, use, publish, disseminate or disclose any Confidential Information of Pfizer without prior written consent of Pfizer. As used in the Agreement, the term "Confidential Information" shall mean all confidential and proprietary information of Pfizer and its affiliates, not otherwise publicly disclosed or generally available, including information entrusted to such party by others. Without limiting the foregoing, Confidential Information shall include information relating to Pfizer marketing or research and development plans or strategies. CONSULTANT shall not record any part or portion of any meeting in which CONSULTANT participates, unless specifically authorized to do so by Pfizer. CONSULTANT shall not duplicate any material containing Confidential Information and shall return all such information to Pfizer upon

Portenoy Revision.doc                                                                                            2

CONFIDENTIAL

RP_000733

CONSULTANT's completion of services under this Agreement or upon any earlier termination of this Agreement for any reason whatsoever. The provisions of this Section shall survive termination of this Agreement. Neither this Agreement, nor CONSULTANT's or Pfizer's performance under it, will transfer to CONSULTANT, or create in CONSULTANT, any proprietary right, title, interest or claim in or to any Confidential Information.

7. **INTELLECTUAL PROPERTY.** CONSULTANT will promptly disclose to Pfizer any invention, trademark, copyrightable material, or commercial idea or plan, arising from Consulting Services under this Agreement. Pfizer will be or will be made the exclusive owner all inventions, developments, designs, processes, techniques, reports, documentation and other work product developed, authored or produced or acquired by CONSULTANT for Pfizer pursuant to this Agreement (the "Deliverables") which shall be considered works made for hire, and CONSULTANT hereby irrevocably assigns to Pfizer all rights, title and interest in an to the Deliverables, including, without limitation, all copyrights, patents, and any other intellectual property rights; no rights are reserved by CONSULTANT. CONSULTANT will execute such documents and take such other action, at Pfizer's expense, as may be necessary or appropriate to establish, register, record or otherwise document Pfizer's ownership therein in the United States and/or foreign countries. CONSULTANT will also secure assignments of such rights from any freelance non-employee it may engage with respect to Consulting Services under this Agreement, and shall reassign same to Pfizer. CONSULTANT agrees to obtain Pfizer's prior written approval for any presentation or publication relating to Consulting Services provided to Pfizer hereunder or to information disclosed to CONSULTANT by Pfizer in connection with this Agreement, both as to content and time of publication or presentation. Pfizer, in its sole discretion, reserves the right to withhold or deny such approval of any presentation or publication relating to Consulting Services provided to Pfizer pursuant to this Agreement or to confidential information disclosed to CONSULTANT by Pfizer in connection with this Agreement.

a. The Company agrees that it will not use the name Beth Israel Medical Center, or any abbreviation, contraction or simulation thereof, in any publicity, advertising or promotional material of any nature, without the express prior written consent of Beth Israel.

8. **REPRESENTATIONS AND WARRANTIES.**

CONSULTANT represents and warrants to Pfizer that:

(a) CONSULTANT will perform all services hereunder in a professional manner consistent with industry standards; in accordance with all applicable laws, regulations and other legal requirements; and in compliance with Pfizer policies provided to CONSULTANT;

(b) CONSULTANT has not agreed to accept or receive any money or anything of value directly or indirectly from Pfizer as an improper inducement for CONSULTANT to (i) approve, reimburse, prescribe, or purchase a Pfizer product, (ii) influence the outcome of a

Portenoy Revision.doc

3

CONFIDENTIAL

RP_000734

MAR-20-2012  09:35                                                         P.05

clinical trial, (iii) improperly influence any government, government official or governmental entity, or (iv) otherwise improperly benefit Pfizer's business;

(c) CONSULTANT is a U.S. citizen or is authorized to work in the U.S., is not acting and will not act during the Term of this Agreement in violation of the Immigration Reform and Control Act of 1986, its amendments, and the regulations thereunder;

(d) CONSULTANT has been approved by CONSULTANT's employer to provide Consulting Services and, and where one is provided under Section 4, to accept a payment for those services;

(e) CONSULTANT is not excluded from participating in Federally-funded health care programs by the Office of the Inspector General of the Department of Health and Human Services and has not been debarred from providing services in any capacity to a person that has an approved or pending drug product application by the Food and Drug Administration or any other applicable governmental authority;

(f) CONSULTANT has not been and is not currently (i) subject to any pending or final adverse action, suspension, revocation, termination or other similar action by any medical board, medical society, medical association or licensing or accrediting body; (ii) subject to any pending or final decision or judgment by a court or administrative or governmental agency that alleges that CONSULTANT failed to comply with any law, regulation, rule, ordinance, order, or directive related to the practice of health care; or (iii) charged with, convicted of or pleaded guilty or no contest to any criminal offense whatsoever;

(g) CONSULTANT Deliverables will not infringe upon any patent, copyright, or other intellectual property rights of any third party; and

(h) CONSULTANT has the full power and authority to enter into this Agreement and to perform the obligations set forth herein.

CONSULTANT shall immediately notify Pfizer in writing at HCPConfirm@pfizer.com if any official actions are initiated or other events occur which affect the accuracy of CONSULTANT's representations and warranties in subsections (e) or (f) above.

Pfizer represents and warrants to CONSULTANT that its payment of any Consulting Fee set forth in Section 4 is made solely for the purposes set forth in Section 2 and not as an improper inducement for the CONSULTANT to (i) approve, reimburse, prescribe, or purchase a Pfizer product, (ii) influence the outcome of a clinical trial sponsored by Pfizer, (iii) improperly influence any government, government official or governmental entity, or (iv) otherwise improperly benefit Pfizer's business.

In addition to the parties' other rights to terminate this Agreement, each party may terminate this Agreement immediately by written notice if the other party breaches any of the representations, warranties and covenants set forth in this Section.

Portenoy Revision.doc                                                         4

CONFIDENTIAL

9. **TERMINATION WITHOUT CAUSE.** Pfizer may terminate this Agreement at any time by giving CONSULTANT written notice of termination. In the event of such early termination, Pfizer will reimburse CONSULTANT for any reasonable business expenses related to the Consulting Services incurred or irrevocably committed as of the date notice of termination is received by CONSULTANT. Pfizer will not reimburse CONSULTANT for any personal expenses incurred that are unrelated to the Consulting Services described in Section 2.

In the event this Agreement is terminated by Pfizer on at least five (5) days' notice to CONSULTANT, Pfizer shall not pay the Consulting Fee outlined in Section 4. In the event this Agreement is terminated by Pfizer with less than five (5) days' notice to CONSULTANT, or in the event the CONSULTANT cannot attend the meeting described in Section 2 due to travel delays outside the control of the CONSULTANT or Pfizer, Pfizer shall pay to CONSULTANT one-half of the Consulting Fee outlined in Section 4.

10. **TERMINATION FOR CAUSE.** In addition to any other rights or remedies available, Pfizer may terminate this Agreement immediately upon written notice if CONSULTANT breaches any of the Representations and Warranties in Section 8 or other material provisions of the Agreement or if Pfizer learns that improper payments are being or have been made to Government Officials by CONSULTANT with respect to Consulting Services performed on behalf of Pfizer or any other company. Further, in the event of such termination, CONSULTANT shall not be entitled to any payment, regardless of any activities undertaken or agreements with additional third parties entered into prior to termination, and the CONSULTANT shall be liable for damages or remedies as provided by law. For purposes of this Agreement, a "Government Official" includes: (i) any elected or appointed government official (e.g., a member of a ministry of health); (ii) any employee or person acting for or on behalf of a government official, agency, or enterprise performing a governmental function; (iii) any political party, office, employee, or person acting for or on behalf of a political party or candidate for public office; or (iv) an employee or person acting for or on behalf of a public international organization; where "government" is meant to include all levels and subdivisions of US or non-US governments.

11. **DISCLOSURE BY CONSULTANT.** CONSULTANT represents and warrants to Pfizer that if CONSULTANT is a member of any committee(s) that set formularies of covered medicines or develop clinical practice guidelines that may influence the prescribing of medicines, then CONSULTANT shall disclose to such committee(s) the existence and nature of his or her relationship(s) with Pfizer. CONSULTANT also agrees to comply with any applicable disclosure requirements and disclose CONSULTANT'S relationship with Pfizer as required pursuant to any affiliation that CONSULTANT has with any health care institution, medical committee or other medical or scientific organization. The provisions of this Section shall extend for two years beyond the termination of this Agreement.

12. **DISCLOSURE BY PFIZER.** CONSULTANT gives Pfizer permission to publicly disclose in its discretion, and in accordance with the information maintained in Pfizer's

Portenoy Revision.doc    5

TOTAL  P.01

CONFIDENTIAL

RP_000736

MAR-20-2012  09:36                                                            P.07

internal business records, CONSULTANT'S name and certain information relating to this Agreement including, but not limited to, any financial and in-kind payments or items of value received under this Agreement, the nature of the engagement and any other payment or service related information as may be deemed appropriate by Pfizer or as may be dictated by law, regulation or regulatory guidance. Payments to institutions for work done by specified individuals may reference both the institution and the individual.

13.  **NO ASSIGNMENT.** CONSULTANT acknowledges that this Agreement is for his/her personal services and CONSULTANT may not be assign, transfer or subcontract, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of Pfizer, which may be withheld at Pfizer's discretion. Any attempted assignment of this Agreement without such prior written consent of Pfizer shall be void and ineffective.

14.  **GOVERNING LAW.** This Agreement shall, in all respects, be construed and governed by and under the laws of the State of New York, without giving effect to its conflict of laws provisions.

15.  **ENTIRE AGREEMENT, AMENDMENTS.** This Agreement constitutes the entire agreement of the parties with respect to its subject matter and merges and supersedes any previous agreements or understandings, written or oral between the parties with respect thereto. This Agreement shall not be modified or amended except by a written document executed by both parties to this Agreement, and such written modification shall be attached hereto.

16.  **COUNTERPARTS AND ELECTONIC SIGNATURES.** This Agreement and any amendments may be executed in counterparts which, taken together, shall be deemed to constitute one and the same instrument. Any counterpart signature delivered by facsimile or electronic format, including digital signatures captured through a Pfizer contract management system or portal, shall be given the same legal effect as an original signature.

By signing below, the parties attest to understanding and agreeing to the conditions listed above.

CONSULTANT: Dr Russell Keith Portenoy, MD

Signature: _____

Date: _____3/19/12_____

PFIZER INC

Signature: _AnaMaria Jorga_

Name (printed): _ANA MARIA JORGA_

Title: _medical Director_

Date: _3 | 19 | 12_

Portenoy Revision.doc                                                           6

# CONFIDENTIAL

EXHIBIT A

## Consultant Travel & Expense Policy

### General Guidelines

It is recognized that Consultants occasionally need to travel for the performance of their work for Pfizer. Consultants are responsible for arriving at a scheduled engagement on time, and Consultants are responsible for ensuring that all required travel arrangements are made in a timely manner and in accordance with this Policy. All travel must be consistent with the needs of the business and in compliance with applicable laws.  Consultants will be reimbursed for all reasonable expenses actually incurred that are consistent with this Policy and necessary to perform services for Pfizer. Pfizer reserves the right to deny reimbursement for expenses incurred which are not reimbursable or deemed unreasonable by Pfizer pursuant to this Policy.

This Policy is intended to provide a clear understanding of acceptable reimbursable expenses. Overall, the application of sound business judgment should ensure that each person acts responsibly.  Additionally, Pfizer requires that Consultants use the most economical service available.

### Receipts

It is company policy to ensure that travel and entertainment expenses are subject to proper financial controls and that the incurring and reporting of such expenses are in compliance with applicable Internal Revenue Service regulations. All original receipts for incidental expenses must be submitted for reimbursement.

### Travel Agent

World Travel Partners (WTP/BCD Travel) is the designated company travel agent which Pfizer utilizes. Pfizer has negotiated rates through WTP with various airlines, hotels, and car rental agencies and, as such, to ensure that Pfizer receives the benefit of these discounts, Consultants must use a Pfizer authorized program coordinator for all Consultant travel reservations and ticketing, including airline, hotel, and car service reservations, unless otherwise instructed by Pfizer in writing. The program coordinator will book arrangements through WTP if possible.

### Airline/Train Tickets

All airline reservations for Pfizer business must be arranged through a Pfizer authorized program coordinator unless otherwise instructed by Pfizer in writing.  The Pfizer program coordinator will utilize WTP for booking airline tickets when possible. Pfizer, in conjunction with WTP, has specifically negotiated discounts on several major U.S. airlines. Therefore, Consultants are required to utilize these Pfizer-approved airlines (United Airlines, Delta Air Lines, and Continental Airlines) for their travel if available. In most cases, the rates on these airlines will be more competitive than the rates on other carriers. It is important to note that in some cases, although the ticket price may appear higher, Pfizer receives a periodic rebate from these airlines based on our volume of business. Unless unreasonable circumstances can be demonstrated (e.g., lowest-cost approved airline makes a connection with a lengthy stopover), the lowest-cost approved airline will be used by the Pfizer

Portenoy Revision.doc                                                                    7

# CONFIDENTIAL

RP_000738

authorized program coordinator. WTP provides Pfizer with a monthly report detailing the instances in which the lowest-rate approved airlines were not used and why. Tickets should be purchased through the Pfizer authorized program coordinator well in advance of the speaking engagement to take advantage of normal airline discounts. All air travel booked through the program coordinator will be billed directly to Pfizer.

WTP will furnish a full ticket package including a receipt for any flight reserved through their travel desk, which the Consultant will receive either directly from WTP or from the Pfizer authorized program coordinator. In the event any portion of a ticket is unused, it should be securely returned to the issuing agent as soon as possible.

## Private or Charter Aircraft

The use of private or charter aircraft to perform services for Pfizer is discouraged. If you decide to use your own or a charter aircraft against Pfizer's advice you do so at your own risk. By signing the Consultant Agreement to which this Policy is attached you thereby, freely and voluntarily, on behalf of yourself and your estate, release Pfizer, its affiliates, officers, directors, employees and agents from any and all liability in connection with your decision to use your own or a charter aircraft. In the event that you use your private aircraft or a charter aircraft, Pfizer will only reimburse you the cost of a coach class ticket on the lowest-cost approved airline.

## Air Class

Coach class is required for all flights less than five hours. Pfizer will not reimburse business and first-class upgrades. Business class is only permitted for travel on flights having a continuous duration over five hours. Any exceptions to the authorized class of service must be approved in advance by Pfizer senior management.

## Car Rental

Car rentals should be arranged through the Pfizer authorized program coordinator unless otherwise instructed by Pfizer in writing. The Pfizer authorized coordinator will make arrangements through the designated company travel agent, WTP, when possible. Pfizer has negotiated corporate rates with Avis and, unless there is a specific need for a larger car, a midsized car should be utilized. If at all possible, before returning a rental car, the gasoline tank should be filled to avoid a premium refueling charge on the rental. Car rental services arranged through a Pfizer program coordinator will NOT be billed directly to Pfizer. Please be prepared to provide your credit card information to secure a car rental reservation.

CONFIDENTIAL

RP_000739

Personal Vehicle Use/Car Service/Taxi

Use of your personal vehicle is encouraged and will be reimbursed as described below. Repair or maintenance expenses of any kind, however, are not reimbursable while driving your personal vehicle in connection with performing services for Pfizer. Use of reasonable and appropriate car service, defined as a standard four-door sedan, will be reimbursed and should be ordered through a Pfizer authorized program coordinator unless otherwise instructed by Pfizer in writing. Car service should not involve all day service or extended wait periods, unless traveling to a rural location where no alternate and more economical travel arrangements can be made. Use of taxis, where practical, is expected and will be reimbursed. Pfizer reserves the right to review all such expenses and deny those that Pfizer deems unreasonable or excessive.

Mileage/Gas/Tolls

Consultants using a personal automobile for business purposes may expense the current rate determined by the IRS per mile for mileage incurred, which includes the cost of gas consumed on business-related travel. Consultants will not be reimbursed for any depreciation, repairs or maintenance of their personal car (i.e. gas, oils or flat tire etc.) even if these costs result from business travel. These costs are included in the mileage reimbursement. Damage to a personal automobile will not be reimbursed when it is used to perform services for Pfizer.

Consultants using a rental car may expense the cost of the rental car plus any gas used for business purposes. All tolls incurred during business travel are reimbursable. Consultants must submit receipts for reimbursement of automobile expenses.

Personal Meals

Individual meals incurred while traveling overnight should be reasonable and in line with what the Consultant would normally incur on his or her own and should exceed not $75. The $75 limit is an appropriate level in major metropolitan areas such as Los Angeles, Chicago, New York, etc. Pfizer will only reimburse for Consultants' meals, and not for the meals of guests traveling or accompanying Consultants.

Lodging

Hotel arrangements should be made through the Pfizer authorized program coordinator, unless otherwise instructed by Pfizer in writing. The Pfizer authorized program coordinator will book hotel accommodations through WTP. Larger chain hotels, such as Marriott or Sheraton, will be utilized when geographically permissible. Pfizer and WTP have negotiated rates with numerous hotel chains and independent establishments. Hotel accommodations arranged through the Pfizer authorized program coordinator will NOT be billed directly to Pfizer. For engagements involving a meeting, Pfizer will not cover the cost for extra nights in the meeting hotel before or after the meeting, with the exceptions of forced stopovers (attendees that are unable to return home on the day of the meeting close) when Pfizer permits and will pay for one extra night stay and instances in which Consultants are performing services for Pfizer before or after the meeting.

CONFIDENTIAL

RP_000740

## Personal & Other Travel Expenses

- Pfizer will reimburse the cost of procuring a required visa for international travel
- Pfizer will reimburse the airline baggage fee for up to one checked bag.

## Non-reimbursable Expenses

Listed below are examples of business travel and entertainment expense that are not reimbursable
- Without exception, individual personal expenses for any reason will not be reimbursed including, but not limited to:
  - Dependent care expenses
  - Pet care
  - Traffic fines
  - Optional travel life/accident insurance
  - In-room movies
  - Photocopies
  - Candy
  - Dry Cleaning
  - Passport fees including expedited passport services
  - Toiletries

CONFIDENTIAL

RP_000741