# PSJ3
# Exhibit 82A

Page 1

1            IN THE CIRCUIT COURT OF PUTNAM COUNTY
                        WEST VIRGINIA
2      ---------------------------------x
       MICHAEL MC CALLISTER,
3      WILLIAM DUFFIELD, and
       WILLIAM PETE JONES, II, on behalf
4      of themselves and all others
       similarly situated,
5
                    Plaintiffs,
6
       vs.                      Civil Action No. 01-C-238
7                               Date: August 27, 2004
       PURDUE PHARMA L.P., a Delaware
8      corporation, et al.,
9                    Defendants.
       ---------------------------------x
10
11
                DEPOSITION OF KATHLEEN FOLEY, M.D.
12
13         The deposition of Kathleen Foley, M.D. was
14     taken on August 27, 2004, at the law offices of
15     Chadbourne & Parke, LLP, 30 Rockefeller Plaza,
16     New York, New York before Susan Wandzilak,
17     Registered Professional Reporter and Notary
18     Public in the State of Connecticut.
19
20
21
                    DEL VECCHIO REPORTING SERVICES, LLC
22                 PROFESSIONAL SHORTHAND REPORTERS
                        117 RANDI DRIVE
23                 MADISON, CONNECTICUT 06443
24     MADISON, CT 06443        HARTFORD, CT 06106
       203-245-9583                800-839-6867
25

PKY183381048

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

```
 1   A P P E A R A N C E S
 2   MARK A. COLANTONIO, ESQUIRE
            Frankovitch, Anetakis, Colantonio & Simon
 3         337 Penco Road
            Weirton, West Virginia 06062-3828
 4                   Attorney for Plaintiff
 5   WILLIAM HOFFMANN, ESQUIRE
            King & Spalding
 6         191 Peachtree Street
            Atlanta, Georgia 30303
 7                   Attorney for Defendants
                           Purdue Companies
 8
     PAUL T. FARRELL, ESQUIRE (via conference call)
 9         Farrell, Farrell & Farrell, L.C.
            Post Office Box 6457
10         Huntington, West Virginia 25772-6457
                     Attorney for Defendant Jimmy
11                        Adams, D.O. And James R.
                           Toothman, D.O.
12
     DOREEN SEAMON, ESQUIRE   (via conference call)
13         Colombo & Stuhr
            1054 Maple Drive
14         Morgantown, West Virginia 26505
                     Attorney for Defendant
15                    Dr. Louis Ortenzio
16   RAMONDA LYONS, ESQUIRE
            Dinsmore & Stohl, LLP
17         Huntington Square, Suite 600
            900 Lee Street
18         Charleston, West Virginia 25301
                     Attorney for Defendants Purdue
19                        Pharma, LP, The Purdue
                           Frederick Company, Purdue
20                        Pharmaceuticals, LP, The P.F.
                           Laboratories, Inc., and PRA
21                        Holdings, Inc.
22   STEPHANIE DOBBINS, ESQUIRE
            Goodwin & Goodwin, LLP
23         300 Summers Street, Suite 1500
            Charleston, West Virginia 25301
24                   Attorney for Defendants, Abbott
                           Laboratories and Abbott
25                        Laboratories, Inc.
```

PKY183381049

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

```
 1                S T I P U L A T I O N S

 2          IT IS HEREBY STIPULATED AND AGREED by

 3     and between counsel representing the parties that

 4     each party reserves the right to make specific

 5     objections at the trial of the case to each and

 6     every question asked and of answers given

 7     thereto by the deponent, reserving the right to

 8     move to strike out where applicable, except as to

 9     such objections as are directed to the form of

10     the question.

11          IT IS HEREBY STIPULATED AND AGREED by

12     and between counsel representing the respective

13     parties that proof of the official authority of

14     the Notary Public before whom this deposition is

15     taken is waived.

16          IT IS FURTHER STIPULATED AND AGREED by

17     and between counsel representing the respective

18     parties that the reading and signing of the

19     deposition by the deponent is not waived.

20          IT IS FURTHER STIPULATED AND AGREED by

21     and between counsel representing parties that all

22     defects, if any, as to the notice of the taking

23     of the deposition are waived.

24          Filing of the Notice of Deposition with

25     the original transcript is waived.
```

PKY183381050

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 4

```
 1
 2                        I N D E X
 3   TESTIMONY OF KATHLEEN FOLEY, M.D.
 4          Direct Examination by Mr. Colantonio    5
 5          Direct Examination by Mr. Hoffmann      135
 6          Redirect Examination by Mr. Colantonio  157
 7          Recross Examination by Mr. Hoffman      177
 8   CERTIFICATE OF REPORTER                        180
 9
10
11
                        E X H I B I T S
12
     Plaintiff's Exhibit 1                          73
13   Plaintiff's Exhibit 2                          73
     Defendant's Exhibit 1                          141
14   Defendant's Exhibit 2                          155
15
16
17
18
19
20
21
22
23
24
25
```

PKY183381051

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1        THE VIDEOGRAPHER: This is the videotape

2      deposition of Kathleen Foley, M.D, taken in

3      the case of Michael McCallister, et al versus

4      Purdue Pharma filed in the Circuit Court,

5      August 27, 2004. The time on the videotape

6      record is 8:11 a.m.

7           This deposition is being held at

8      Chadbourne & Parke, LLP, 30 Rockefeller

9      Plaza, New York, New York. My name is

10     J.D. Martinez on behalf of Hamilton

11     Communications of 60 Pine Lake Road,

12     Westbrook, Connecticut.

13          Would everyone please introduce

14     yourselves for the record.

15      MR. COLANTONIO: Mark Colantonio

16     representing plaintiffs.

17      MR. HOFFMANN: William Hoffmann

18     representing the Purdue defendants.

19      MS. LYONS: Ramonda Lyons representing

20     the Purdue defendants.

21      MR. FARRELL: Paul Farrell representing

22     Dr. Adams and Dr. Toothman.

23      MS. DOBBINS: Stephanie Dobbins

24     representing the Abbott Laboratories

25     defendants.

PKY183381052

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1           KATHLEEN FOLEY, M.D.,

2      Having been first duly sworn, testified as

3      follows:

4                DIRECT EXAMINATION

5   BY MR. COLANTONIO:

6      Q.   Can I have your full name and address

7   for the record.

8      A.   Kathleen M. Foley, ████████████

9   ███████████████████.

10     Q.   Good morning.

11     A.   Good morning.

12     Q.   Are you currently employed or are you

13  self employed?

14     A.   I am currently employed.

15     Q.   Employed by whom?

16     A.   By Memorial Sloane-Kettering Cancer

17  Center.

18     Q.   And, what is your position there?

19     A.   I am an attending neurologist in the

20  Department of Neurology.

21     Q.   You are actually employed by the

22  hospital itself?

23     A.   That is correct.

24     Q.   Have you ever been employed by any of

25  the Purdue pharmaceutical companies?

PKY183381053

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    No, never.

2      Q.    Have you ever been employed by any

3  pharmaceutical company in any capacity?

4      A.    No, I have not.

5      Q.    Have you ever testified by way of

6  deposition or trial testimony prior to today?

7      A.    I think I did and I can't remember the

8  exact details.  It was in the eighties and it was

9  a case related to the drug hydromorphone and a

10  discussion of whether it should be available for

11  any company to make.  But I don't, you know, I

12  don't remember all the details of it.  I am not

13  sure if it was a deposition or just I appeared in

14  court once.  And that's all that I can say about

15  it.

16      Q.    And, that was back in the eighties?

17      A.    It was in the eighties, yeah.

18      Q.    Since that time, you can't recall any

19  time when you have actually testified in court or

20  in deposition for any reason?

21      A.    No.

22      Q.    Have you ever been provided any monetary

23  grants or funding from any drug company to do

24  research work or any other work?

25      A.    Yes, I have.  I have been on the

PKY183381054

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    speakers bureaus of various drug companies over

2    the years including Purdue and Abbott and Noel

3    and Janssen.  And I have -- I have not directly

4    received grants from these companies but my

5    institution has.

6        Q.   Sloan-Kettering?

7        A.   Yes.

8        Q.   And, can you give me an idea of some of

9    the types of grants Sloan-Kettering might receive

10   from drug companies?

11       A.   In the, again, in the early eighties, we

12   were involved in extending a slow release

13   morphine preparation.  Subsequent to that, I have

14   not been involved in studying any of their drugs

15   so I have not received them.

16       Q.   You say in the early eighties there was

17   some involvement with slow release morphine?

18       A.   Right.

19       Q.   And, tell me more about that?

20       A.   The -- our particular analgesic group is

21   well-known for studying opiate analgesics and we

22   care for a large number of patients with pain and

23   cancer.  And we had a large national cancer

24   institute grant to study these drugs.  And so

25   within that framework of a large study group, we

PKY183381055

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    did study the oral morphine preparation MS Contin

2    but we did not simply study it for Purdue.  We

3    studied it for a variety of other companies.

4         Q.    But, the study was limited to MS Contin?

5         A.    It was limited to slow release or

6    morphine preparation.

7         Q.    You mentioned MS Contin, was there

8    another?

9         A.    Yes, there was a product that Roxanne

10    also had.

11        Q.    And, was that study published?

12        A.    Parts of it were published.

13        Q.    When was it published?

14        A.    I would have to specifically look at it.

15        Q.    But, it would be in the eighties, is

16    that correct?

17        A.    In the eighties, yeah.

18        Q.    Any others that you can recall, besides

19    that?

20        A.    No.  No other studies, no.

21        Q.    The speaker bureaus you mentioned, you

22    mentioned speaking for Purdue, Abbott, Noel and

23    Janssen?

24        A.    Um-uh.

25        Q.    Is that something that occurred in the

PKY183381056

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    eighties and the nineties or eighties --

2         A.    Yes, both.  I would say in the eighties

3    and nineties.  It no longer exists so it is not

4    an issue and it predominantly was speaking at

5    medical grand rounds where the grand rounds,

6    people were given the money, I wasn't.  Then they

7    paid me whatever they paid me.

8         Q.    Let's talk about Purdue, specifically.

9    Have you ever given any talks to Purdue

10   employees, for example?

11        A.    I think probably, again, in the eighties

12   that would have related to oral morphine perhaps

13   once.

14        Q.    And, do you recall how many talks that

15   would be or a time frame?

16        A.    Oh, perhaps one.

17        Q.    And, was that something where you would

18   speak about something like MS Contin or --

19        A.    No, in fact it was speaking about cancer

20   pain in general.

21        Q.    And, in your, I reviewed your resume,

22   your curriculum vitae, and is it true that your

23   primary practice has been devoted towards the

24   treatment of cancer and cancer related pain?

25        A.    I think -- I think it's better

PKY183381057

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    characterized by the use of opioids in pain

2    management of which the cancer patient has been

3    the predominant patient.

4        Q.    But, your predominant work has been

5    treating, using opioids in the management of

6    cancer pain; true?

7        A.    The majority of our patients have had

8    cancer pain.

9        Q.    Do you currently treat patients who have

10   non-cancer pain?

11       A.    Yes, I do.

12       Q.    And, what part of the practice of that

13   is yours now?

14       A.    Again, it is quite variable.  In the

15   beginning, when I first started in the 1970s and

16   80s, I would say perhaps half of our patient

17   population had non-cancer related pain.  At the

18   present time, I still follow many of those

19   patients but probably it's maybe about 30 percent

20   of our patient population have non-cancer pain.

21       Q.    Do you treat things like back pain?

22       A.    Yes.

23       Q.    Non-cancer back pain?

24       A.    Um-uh.

25       Q.    How about non-cancer arthritis pain?

PKY183381058

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Yes.

2      Q.    Non-cancer muscular skeletal pain?

3      A.    Right.

4      Q.    Broken bones, pain related to that?

5      A.    Usually not.  But, I think, again, it's

6   important to recognize that because cancer

7   patients are living longer and longer, they have

8   a variety of chronic pain syndromes that are not

9   directly related to their cancer.  But because

10  they are cared for in a cancer center, we see

11  them.  So we are seeing a larger number of those

12  survivors who have these other disorders.

13     Q.    But, with you seeing these patients

14  related to or in connection with you seeing them

15  for cancer pain as opposed to having a practice

16  where people come in for back pain, solely back

17  pain as opposed to cancer pain?

18     A.    I am trying to make the distinction that

19  cancer patients have pain other than cancer.  So

20  in the cancer center, the pain clinic is seeing a

21  much more broader -- initially it was a smaller

22  percentage and now it is a much broader

23  percentage.

24     Q.    Maybe it's a distinction without a

25  distinction but I am trying to understand whether

PKY183381059

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

```
 1    somebody would -- I presume most people go to
 2    Sloan-Kettering to see your group primarily for
 3    cancer related issues; is that correct?
 4         A.   That's true, right.
 5         Q.   And, those patients may have other
 6    issues in their life besides cancer caused pain?
 7         A.   Right.
 8         Q.   Maybe they have had a long standing
 9    problem with a back or whatever and you might
10    treat them for that as well; is that true?
11         A.   That is correct, yes.
12         Q.   As opposed to for somebody who might
13    come in for back pain who doesn't have cancer?
14         A.   That is correct, sure.
15         Q.   Have you ever given talks to Purdue
16    employees about OxyContin?
17         A.   No, I have not.
18         Q.   Have you ever given any talks at all,
19    lectures, seminars, ever appeared anywhere
20    concerning the drug OxyContin?
21         A.   No, I have not.
22         Q.   You do have privileges at New York
23    Hospital; is that correct?
24         A.   That's correct.
25         Q.   Are those active staff privileges?
```

PKY183381060

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Yeah.

2      Q.    And Manhattan Eye & Ear Hospital, are

3  those active staff privileges?

4      A.    No longer, no.

5      Q.    Do you have any staff privileges there

6  at Eye & ear?

7      A.    No.

8      Q.    How about Rockefeller University?

9      A.    No, not at the present time.

10     Q.    How about Calvary?

11     A.    Not at the present time.  We have a

12  fellowship rotation but we are not required --

13     Q.    So, primarily, right now -- well, in

14  fact, the two hospitals you have staff

15  privileges, active staff privileges, would be

16  Sloan-Kettering and New York Hospital; is that

17  correct?

18     A.    That is correct, um-uh.

19     Q.    Just as an aside, when we take this

20  deposition, if you could let me finish my

21  question before you start to answer.  And I will

22  try to let you finish your answer before I ask my

23  next question so that the transcription will come

24  out better.

25     A.    It will be faster.

PKY183381061

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    I noticed in your CV, you had for 1988

2   to 1992, Bristol Meyers unrestricted grant

3   program for pain research?

4      A.    Right.

5      Q.    Is that what you were referring to

6   before or is that something else?

7      A.    It was a grant from a pharmaceutical

8   company.  It was an unrestricted grant.

9      Q.    And, what was that grant given for?

10     A.    It was one of the awards that Bristol

11  Meyers gives out for pain research and they

12  typically would give out five a year over about a

13  five or seven year period.  And so we were chosen

14  as one of the recipients of it.  And it was for

15  $50,000 a year for five years that we could do

16  with as we wished to support any aspect of our

17  pain research.

18     Q.    I also noticed you served on a committee

19  of the National Institute on Drug Abuse and that

20  was from 1986 to 1988; do you recall that?

21     A.    Yes, I do.

22     Q.    And, you served on the committee of

23  problems of drug dependence; do you remember

24  that?

25     A.    Yeah, the committee of problems of drug

PKY183381062

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   dependence is an association that focuses on the

2   pharmacology of opioid drugs.

3        Q.   Does it deal with issues of drug

4   addiction?

5        A.   It deals with drug use and drug misuse.

6        Q.   Maybe that answered my question, maybe

7   it didn't, I don't know.  I mean, it says here

8   committee of problems on drug dependence.  What

9   does -- in the context of that committee, what

10  does drug dependence mean?

11       A.   Well, the -- well, I said drug use and

12  misuse.  And so what I mean, the whole gamut of

13  the appropriate use of drugs and the

14  inappropriate use of drugs and drug addiction

15  would be included in that.

16       Q.   So, in the context of this Committee on

17  Problems of Drug Dependence, the word drug

18  dependence in that context would include drug

19  addiction?

20       A.   Yes, it will.  Yes.

21       Q.   And we are going to talk about this a

22  little bit but do you believe there is some

23  potential confusion and commingling of terms like

24  addiction, dependence, abuse in terms of drug

25  use?

PKY183381063

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 17

1      A.    Could you repeat the question?

2      Q.    Sure.  We will talk about this a little

3   bit later, but generally do you believe that in

4   the treatment of pain that there is often

5   confusion among physicians and patients,

6   definitional confusion, with the terms drug

7   addiction, drug dependence, drug abuse?

8      A.    I do.

9      Q.    And that's still true today; is that

10  correct?

11     A.    Yes.

12     Q.    What was it -- in terms of drug

13  addiction, what was it this Committee on Problems

14  of Drug Dependence studied or did?

15     A.    I think what I am attempting to say is

16  that it's called a committee but it is really an

17  association.

18     Q.    Okay.

19     A.    So, it has an annual meeting.  Papers

20  are proffered at that annual meeting.  It has

21  annual discussions.  It is not --

22     Q.    Everybody goes to dinner and exchanges

23  information and --

24     A.    It's usually not dinner but clearly

25  everybody meets for several days and it's an

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   academic -- it's an academic society at this

2   point in time.  So it is still called by this

3   name committee.

4        Q.   But, there was no actual research done

5   by that committee or reporting by that committee,

6   it was more of an exchange of information?

7        A.   It was an exchange of information.

8        Q.   Was it a committee that would come up

9   with any kind of conclusions after the exchange

10  of information or was it merely just an exchange

11  of information?

12       A.   Again, it's -- it's a meeting of a group

13  of individuals who have an interest in studying

14  these drugs.  So the language of committee, it

15  doesn't have a task to issue conclusions.  That's

16  not the purpose of it.  It is a society at this

17  point in time.  You pay membership dues.  You

18  participate in the meetings and it does issue

19  reports.

20       Q.   That was my -- that was the intent of my

21  question.  When you say it issues reports, what

22  type of reports would it issue?

23       A.   I don't think I fully know that because

24  I have only been involved with one report that is

25  issued, so --

PKY183381065

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 19

1       Q.    I am sorry, one report?

2       A.    Yes.

3       Q.    What report was that?

4       A.    This is an issue that was to focus on

5   the use and abuse of opioid analgesics.

6       Q.    And, when was that report issued?

7       A.    I forget.  In the last two years or so.

8       Q.    You say within --

9       A.    It's on my CV.  I would have to look at

10   the exact date.

11       Q.    And, that's 2002 to 2004?

12       A.    Yeah, I don't remember the exact date of

13   it.

14       Q.    I am just asking you, like when you say

15   the last two years, you meant the last two years

16   prior to today?

17       A.    I would have to look at my CV because --

18   I mean, I am glad to give you the exact date.

19       Q.    Let me give you a copy of your CV.

20       A.    Okay, great.  Thanks.

21       Q.    Take a look at that and take a copy

22   there.

23       A.    Well, I wouldn't say this is -- well,

24   this is not my updated CV, I guess.

25       Q.    There was something I believe in the

PKY183381066

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   back that said in press and there was maybe three

2   or four different things, although I think that

3   related to your own materials.  I don't know if

4   that -- here, the last page has --

5       A.   Well, it's someplace after 2001 so this

6   is not my updated CV.

7           MS. LYONS:  Is your updated CV over

8       here?

9           MR. COLANTONIO:  That's fine, we can

10      work through it.

11  BY MR. COLANTONIO:

12      Q.   You recall sometime after 2001 there was

13  a report issued --

14      A.   Right.

15      Q.   -- by the National Institute on Drug

16  Abuse?

17      A.   No, it is not the national.  No, it was

18  the Committee on Problems of Drug Dependence.

19      Q.   And, you were involved in that?

20      A.   Correct.

21      Q.   And, what was your involvement?

22      A.   I was one of the task force members.

23      Q.   And, do you recall what the findings of

24  that particular report were?

25      A.   Yeah, but I would need the report to

PKY183381067

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    tell you the findings.

2        Q.    Sure.  You also have worked with the

3    World Health Organization, I see?

4        A.    That is correct.

5        Q.    That's also known as WHO, W-H-O?

6        A.    That is correct.

7        Q.    And, we have seen that W-H-O or WHO had

8    developed a step ladder approach to the treatment

9    of cancer pain.  Do you recall that?

10       A.    Yes, I was the chair of the committee

11   that developed the WHO analgesic ladder.

12       Q.    And, it has step one, step two and step

13   three, is that --

14       A.    That is correct.

15       Q.    Is that still used today?

16       A.    The WHO ladder was initially developed

17   in guidelines in 1982 and then field tested from

18   about 1984 to '86 and then put forth as

19   guidelines in 1986.  And it has now been expanded

20   to focus not only on cancer pain but on patients

21   with chronic non-malignant pain, patients with

22   AIDS pain, pain care for children and pain for

23   the elderly.

24            So, the WHO has robustly expanded the

25   importance of this three step analgesic ladder.

PKY183381068

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 22

1    Q.   So, as far as non-cancer pain, it has

2    been expanded to include chronic non-malignant

3    pain?

4    A.   That is correct.

5    Q.   And, what is meant by the word chronic?

6    A.   The International Association for the

7    Study of Pain has defined chronic pain as pain

8    lasting greater than three months.

9    Q.   And, do you use that definition of

10   chronic in your practice?

11   A.   I think using the IASP terminology is

12   important so then it makes sure that everybody

13   agrees that we are talking about the same kind of

14   pain.  However, not everyone follows that

15   terminology.

16   Q.   But, as far as those in the know, in the

17   treatment of cancer pain or --

18   A.   Well, this is for all types of pain.

19   This is unrelated to cancer pain.

20   Q.   So, as far as those in the know in the

21   treatment of pain, chronic, the accepted

22   definition of chronic is more than three months?

23       MR. HOFFMANN:  I object to the form of

24       the question.

25   BY MR. COLANTONIO:

PKY183381069

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1       Q.   Do you understand my question?

2            MR. HOFFMANN:  You can answer it, if

3       you're able to.

4            THE WITNESS:  Could you ask me the

5       question again?

6    BY MR. COLANTONIO:

7       Q.   Sure.  Is it true that the accepted

8    definition of chronic pain in the pain management

9    field, as far as you are aware, is greater than

10   three months?

11      A.   Well, the IASP terminology says three

12   months but people use six months, people use nine

13   months.

14      Q.   But it's something greater than three

15   months, generally accepted; is that right?

16      A.   The IASP terminology is three months.

17      Q.   And, that's the definitional time frame

18   that you would use in your practice of treatment

19   of pain for the term chronic?

20      A.   Yes.

21      Q.   The WHO step ladder, I have seen a

22   couple of different I guess charts with this?

23      A.   Right.

24      Q.   It has a little step ladder and it has

25   step one and then step two and step three.  And,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    step one is what type of pain?  Is that --

2         A.    Step one is for mild pain.

3         Q.    And, is step two mild to moderate?

4         A.    And then step two is moderate pain.

5         Q.    And, step three?

6         A.    Is severe pain.

7         Q.    Now, I have seen different step ladders

8    that have step two being mild to moderate.  Is

9    that an accurate way of portraying it?

10        A.    Well, I think the -- any of the kinds of

11   schematics that you have seen always try to over

12   simplify the issue.  So, the step one is thought

13   to be for patients with mild to moderate pain.

14   Step two is for patients with the end of mild to

15   moderate to severe and then severe at the end.

16             And so the difficulties, we have chosen

17   and used those three words in focusing on that

18   and the principle of the ladder is that one would

19   treat pain based on the intensity of the pain.

20   So if a patient has mild pain, you would use a

21   certain class of drugs.  If they had moderate

22   pain, you would use another class of drugs.  And

23   if they had severe pain, you would use a third

24   class of drugs.

25        Q.    And, for mild pain, what class of drugs

PKY183381071

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    would you use?

2       A.   Typically, it has been the non-opioid

3    analgesics.

4       Q.   So, as far as the WHO step ladder is

5    concerned, the WHO step ladder does not advocate

6    using opioid medication for mild pain; is that

7    fair?

8       A.   Again, the ladder is very flexible

9    because it identifies that there may be some

10   patients who are just unable to take a non-opioid

11   and who might require taking a what we would call

12   a weak opioid.

13      Q.   What is a weak opioid?

14      A.   Well, the classes of drugs that the WHO

15   defined as weak opioids were codeine,

16   hydrocodone, oxycodone, tramadol and those are

17   what are listed now on the essential drug list.

18      Q.   As far as oxycodone, would that be

19   oxycodone in combination with an aspirin product?

20      A.   No, the WHO made a very strong statement

21   that it was addressing specifically the opioid

22   and not a combination drug.

23      Q.   So, if I see a step ladder that has step

24   two being mild to moderate, you don't think

25   that's an accurate portrayal of the step two?

PKY183381072

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Can you --

2      Q.    Sure.  If I see a picture of the WHO

3    step ladder and it has step two --

4      A.    Um-uh.

5      Q.    -- at the beginning including mild, at

6    the end including moderate pain, so step two is

7    portrayed as including mild to moderate pain,

8    would that be an inaccurate way of portraying it?

9      A.    No, I don't think it would be.  I mean,

10   I would have to see it to answer the question.  I

11   don't know even seeing it would help me.  I think

12   the point I am making is there is this

13   continuum.  There are patients who could report

14   mild pain but could report it as a four.  There

15   are patients that have moderate pain that might

16   report it as a four.  So, because of this

17   overlapping aspect, the ladder was thought to be

18   a flexible approach and that you needed really to

19   individualize the treatment of patients.

20          And, so, therefore, I would be somewhat

21   -- how people have demonstrated the ladder is not

22   how we thought it should be used and how we

23   described it.

24     Q.    Pain is subjective, of course; is that

25   correct?

PKY183381073

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    It's a subjective experience, right.

2      Q.    And, often difficult for physicians to

3    assess in terms of the quantity of pain; is that

4    correct?

5      A.    Well, again, we ask physicians to

6    believe the patient's pain and then to do a very

7    thorough assessment so that they can try to

8    assess the intensity of the pain and the impact

9    of the pain on the patient and the patient's

10   functional status and try to use all of that.  So

11   simply a report of pain isn't enough for the

12   doctor to be able to make a decision about the

13   patient.

14     Q.    You indicated that physicians should do

15   individual assessments.  That's true in every

16   type of physician patient treatment, physicians

17   must evaluate their patients on an individual

18   basis; correct?

19     A.    That is correct.

20     Q.    And, that would be true for every

21   medication that a physician ever writes for a

22   patient, they should evaluate the appropriateness

23   of that medication for that particular patient;

24   true?

25     A.    Well, I think -- yes, that's true.

PKY183381074

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 28

```
 1        Q.    Now, in your bibliography here, I

 2   noticed that you have written quite a few

 3   articles with Dr. Kaiko; is that correct?

 4        A.    Dr. Kaiko, um-uh.

 5        Q.    And, Dr. Kaiko, is that the same

 6   Dr. Kaiko that works for Purdue?

 7        A.    Right, that was before he went to

 8   Purdue.

 9        Q.    And, was he at Sloan-Kettering at that

10   time when you worked with him on these pictures?

11        A.    When I came to Memorial, Dr. Kaiko was

12   already there.

13        Q.    And, do you still -- you know of

14   Dr. Kaiko; correct?

15        A.    I know Dr. Kaiko.

16        Q.    Do you still maintain contact with

17   Dr. Kaiko?

18        A.    Not that frequently.

19        Q.    Have you ever gone out socially with

20   Dr. Kaiko, let's say, in the last five years?

21        A.    No, I haven't.

22        Q.    You do on occasion maintain professional

23   contact with Dr. Kaiko?

24        A.    Yes, I do.

25        Q.    And, what's the reasoning for that or
```

PKY183381075

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    what is the --

2         A.    Well, about a year ago he came to our

3    conference that we had on opioid analgesics.  So

4    that would be about the last time I saw him.

5         Q.    Have you maintained any other

6    professional contacts with any other people that

7    work at Purdue, let's say, in the last five

8    years?

9         A.    Could you tell me what you mean by that?

10        Q.    Sure.  Well, I mean, have you ever had

11   meetings with or spoken to people from Purdue and

12   that's for any reason in the last five years.

13   You have indicated that Dr. Kaiko might have seen

14   you at a meeting and you might have --

15        A.    Right, and I would see other people from

16   Purdue at various meetings.

17        Q.    How was it that you became involved in

18   this particular case, did somebody contact you

19   and ask you?

20        A.    Yes, I am not sure who contacted me.  I

21   know that the lawyers called me up and asked me

22   do this.  So that's what I remember and I don't

23   specifically remember who asked, who the person

24   was that asked me first or --

25        Q.    And, when you say do this, you mean --

PKY183381076

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 30

1     A.    To participate in this case, sorry.

2     Q.    And, what was your assignment; do you

3   recall that?

4     A.    I am sorry?

5     Q.    Do you recall what your assignment was,

6   your assignment was, what they told you they

7   wanted you to do?

8     A.    I need my piece of paper.  That's what I

9   said I would do -- was to be an expert witness, I

10  am sorry.

11    Q.    I want to show you an article here.

12  Take a look at that.  I think that's something

13  that you authored in 1985.  Do you recall that?

14    A.    Yes, I do, um-uh.

15    Q.    Now, you won't know this but in this

16  case, there were documents produced by Purdue and

17  I believe that came from you; is that correct,

18  the source?

19        MS. LYONS:    Yes.

20  BY MR. COLANTONIO:

21    Q.    The bottom of this article has these

22  numbers on it.  Do you see the bottom right, they

23  are called Bates numbers.  Do you know what that

24  is?

25    A.    No, I don't.  I have seen --

PKY183381077

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.   It just has numbers.  Do you see the

2   numbers?

3      A.   I see the numbers there, yeah.

4      Q.   And, I think if you look at this, the

5   top of this says opioid studies written by Purdue

6   employees and then I believe where the source is

7   Susan Nick?

8           MS. LYONS:  Yes, I see.

9           MR. COLANTONIO:  These Bates numbers

10          correspond on this article to that.

11  BY MR. COLANTONIO:

12     Q.   Do you know a Susan Nick?

13          MR. HOFFMANN:  Just, the Bates numbers

14          don't correspond precisely.  The end Bates

15          number is two numbers higher on the source

16          log that you handed me than on the --

17          MR. COLANTONIO:  What is your last Bates

18          number?

19          MR. HOFFMANN:  On 47.

20          MS. LYONS:   On the article is 47.

21          MR. HOFFMANN:  Rather than 49.

22          MR. COLANTONIO:  I have 49 including the

23          --

24          MS. LYONS:  The copy you gave us doesn't

25          --

PKY183381078

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1        MR. HOFFMANN:   What is your last --

 2        MR. COLANTONIO:  My last page is 49 on

 3     the footnotes.

 4        MR. HOFFMANN:  Well, you only included

 5     the first page.  You didn't include all the

 6     pages of the footnotes in the copy you gave

 7     us.

 8        MR. COLANTONIO:  I apologize for that.

 9     Why don't you take a look at mine.  Without

10     the source log, I think --

11        MR. HOFFMANN:   Yes, the Bates numbers

12     do in fact correspond with the second copy

13     that you handed me.

14  BY MR. COLANTONIO:

15     Q.   Okay, well, let me show you this

16  document and I know you have never seen this

17  before but that is a log, a source log, of

18  materials produced by Purdue in this case.  And

19  at the top, it says their accounts, their source

20  log, opiate studies written by Purdue employees.

21  Do you see that?

22     A.   I see that.

23     Q.   And, then down, there is a source that

24  says Nick, Susan, do you see that?

25     A.   I see that.

PKY183381079

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1        Q.    And, to the left of that, there is a

2   Bates, begin Bates and end Bates; do you see

3   those numbers?

4        A.    I see those numbers.

5        Q.    Can you compare those begin and end

6   numbers to the numbers on the article that I

7   handed you?

8        A.    Yes.

9        Q.    And, does it appear that those numbers

10  coincide with that?

11       A.    Yes, those numbers coincide with -- no,

12  that says 49 and that says 47.

13            MR. HOFFMANN:  With the exception that I

14       stated on the record, that two of the pages

15       of the footnotes are missing from the copy

16       that you have handed the witnesses -- the

17       witness.

18  BY MR. COLANTONIO:

19       Q.    And, you have indicated you don't know a

20  Susan Nick; is that correct?

21       A.    No, I don't know a Susan Nick.

22       Q.    And, you have testified you have never

23  been an employee of Purdue, is that correct?

24       A.    I have never been an employee of it.

25       Q.    But, you did author this article; is

PKY183381080

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   that true?

2       A.    I wrote this article by myself and I

3   have never heard or seen it.

4       Q.    These are your words in this article?

5       A.    These are all my words.  These were

6   never seen by any external writer.  I find this

7   very insulting, I want you to know.  I mean, this

8   is like an out-and-out lie.  So, I am very

9   bothered by that.

10          MR. HOFFMANN:  It's possible -- of

11      course, there are a number of possibilities.

12      One is the document was misfiled and came

13      from an inappropriate file.  But obviously --

14          THE WITNESS:  I mean, that is so

15      serious.

16          MR. HOFFMANN:  Let me finish.  Obviously

17      to the extent that the implication of your

18      question might be this document was authored

19      by someone at Purdue rather than the witness,

20      I think the witness's testimony on that point

21      is clear.  And we all know that when we deal

22      with cases with thousands and thousands of

23      documents, occasionally documents are

24      misfiled or they are mis-labeled concerning

25      the file that they originate from.

PKY183381081

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1          MR. COLANTONIO:  And that's fine.  I

2     mean, look, I didn't ask the question to try

3     to upset you in any way.  You have to

4     understand that what happens in these cases

5     is I get materials from Purdue and that's

6     what it says.  And I am merely asking a

7     question trying to clarify it.

8          THE WITNESS:  I understand.

9          MR. COLANTONIO:  So, there is no -- I

10     mean, I am not trying to mislead you in any

11     way.  I was produced materials that had that

12     source log which we didn't prepare and it had

13     that information on it.  So I am merely

14     asking the question to clarify it and I think

15     you have clarified it, okay.

16          THE WITNESS:  All right; and, I have a

17     series of people who would be glad to clarify

18     it for you.

19          MR. COLANTONIO:  And, I am sure you do

20     but I just want you to understand that I am

21     just asking the question to try to clarify

22     the issue, that's all.  And that was produced

23     to me.

24          THE WITNESS:  Okay.

25          MR. HOFFMANN:  And I will state on the

PKY183381082

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

```
 1          record that I will ask our people who produce

 2          documents to go back and check and determine

 3          what the source of the error on the source

 4          log was --

 5               THE WITNESS:  Thank you.

 6               MR. HOFFMANN:  -- and provide you with

 7          that information.

 8     BY MR. COLANTONIO:

 9          Q.   Getting back to the question, which was

10     this is your article?

11          A.   That is correct.

12          Q.   And, the title of the article is,

13     medical progress, the treatment of cancer pain;

14     is that correct?

15          A.   That is correct.

16          Q.   And, this was published in the New

17     England Journal of Medicine in July of 1985; is

18     that true?

19          A.   That is correct.

20          Q.   And, do you recall this particular

21     article, writing it and --

22          A.   I recall it in great detail.

23          Q.   And, do you believe that the information

24     and your thought process and your thoughts in

25     this article are as true today as they were back
```

PKY183381083

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    in 1985?

2        A.    I think there has been an evolution of

3    what we know.  So I think it was the state-of-

4    the-art for 1985.

5        Q.    And, we will go through that.  Are there

6    some things in here that you believed in 1985

7    that you don't believe are true today?

8        A.    I would have to go practically line by

9    line to answer that question.

10       Q.    Let's do some of that in here.  If you

11   go to the second page -- well, it's page,

12   actually page 85 of the article.

13       A.    Okay.

14       Q.    It's in the top right, do you see that?

15       A.    Right.

16       Q.    There is a part of this article that

17   says types of pain?

18       A.    That's right.

19       Q.    And, I think you have indicated this

20   article was written for cancer pain, is that

21   correct?

22       A.    It's called the treatment of cancer

23   pain.

24       Q.    But, you do make some statements that

25   apply to the treatment of pain in general in this

PKY183381084

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 38

1    article; is that true?

2        A.   That is correct.

3        Q.   Now, on types of pain, on the first

4    column, if you look down, the first paragraph for

5    types of pain --

6        A.   Um-uh.

7        Q.   And we talked about this very briefly

8    before.  It says here pain is a subjective

9    experience, and you agree with that statement?

10       A.   That is correct.

11       Q.   And, that's as true today as it was in

12   1985; right?

13       A.   Yes, um-uh.

14       Q.   And, it says here evaluation of it is

15   difficult?

16           MR. HOFFMANN:  I am sorry, you are on

17       the first column on page 85?

18           MR. COLANTONIO:  Yes, right here

19       (indicating).

20           MR. HOFFMANN:  Because pain is a

21       subjective experience, evaluation is

22       difficult, all right.

23   BY MR. COLANTONIO:

24       Q.   Do you see that?

25       A.   Yes, I do, um-uh.

PKY183381085

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    And, do you agree that that is as true

2    today as it was in 1985?

3      A.    No, things are much better now.

4      Q.    Well, which part of it do you think is

5    different now than --

6      A.    Well, pain remains a subjective

7    experience but the evaluation of it is much more

8    sophisticated.

9      Q.    Evaluation of pain is much more

10   sophisticated by physicians in general or by

11   specialists or by --

12     A.    By physicians in general because they

13   have now available a wide variety of techniques

14   that they didn't have at that time.  In 1985,

15   they didn't have MRI scans.  In 1985, they didn't

16   have sophisticated qualitative sensory testing

17   devices.  In 1985, they didn't have PET scans.  I

18   mean, there is some technological advances that

19   have really influenced how one evaluates the

20   patient.

21     Q.    But, those technological advances you

22   are talking about are ways physicians can

23   objectively verify a complaint of pain; is that

24   correct?

25     A.    Yes, but that's the necessary step to

PKY183381086

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 40

1    treating the pain.

2        Q.    That's treating the cause of the pain;

3    true?

4        A.    Treating the pain as well, because often

5    treating the cause treats the pain.

6        Q.    But, there are sometimes when you can

7    treat the cause of the pain and the pain doesn't

8    go away for a patient?

9        A.    That's true.

10       Q.    But, as far as verifying a patient's

11   subjective complaint of pain, do you agree that

12   that's still today sometimes a difficult task for

13   physicians?

14       A.    It can be a difficult task.

15       Q.    Especially for physicians such as

16   primary care physicians who may not be pain

17   specialists?

18       A.    Again, since the whole development of

19   sort of the progression of evaluating pain where

20   physicians are in a much better position now to

21   evaluate pain because they are being increasingly

22   more educated about how to assess pain.

23           So that in 1985, the Academy of Family

24   Physicians didn't address pain issues.  2004, the

25   Academy of Family Physicians has written

PKY183381087

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    educational materials for how physicians should

2    assess pain.  So, it's really a much better world

3    that we are in now than we were then.

4        Q.    And, I think you have included some of

5    those materials and you brought some of those

6    today, is that correct?  There are a few articles

7    from --

8        A.    There is a -- their web site has a lot

9    of material that they have.

10       Q.    Written in the last couple of years?

11       A.    In the last couple of years, yeah.

12       Q.    And, it says here, the patient -- the

13   next sentence down, the patient and physician are

14   best served if the physician believes the

15   patient's report?

16       A.    That is correct.

17       Q.    And that's as true today as it was in

18   1985?

19       A.    Absolutely.

20       Q.    Now, the next paragraph down, you sort

21   of define acute pain and chronic pain.  And you

22   say that chronic pain is pain that persists

23   longer than six months --

24       A.    Right.

25       Q.    -- in which adaptation of the autonomic

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   nervous system occurs.  That's a little different

2   than the definition you gave before of three

3   months.

4       A.   That's correct because the --

5           MR. HOFFMANN:  Wait a minute, I want to

6       object to the form of the question just

7       because you misread one word.  I think you

8       misread autonomic, but I could be mistaken.

9           MR. COLANTONIO:  If I misspoke, I didn't

10      mean to leave that word out.  I thought I

11      said it but let's read it again so we are

12      sure.

13          THE WITNESS:  Okay.

14  BY MR. COLANTONIO:

15      Q.   It says here, in contrast chronic pain

16  is pain that exists longer than six months -- and

17  that's really the phrase I am focusing on.  That

18  six months, it's a little different time frame

19  than you indicated you use today which is three

20  months; is that true?

21      A.   That's correct, because, again, the

22  ISP has adapted their terminology.  They didn't

23  have a clear terminology for chronic pain and

24  moved to adapt a three month terminology.

25      Q.   Was chronic pain generally considered

PKY183381089

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    six months or longer back at the time when you

2    wrote this article, in your practice?

3        A.    You know, I think -- well, if I said it,

4    I said it.  But, I would have to be -- it was

5    sort of a common belief perhaps at that time.

6        Q.    It was your belief at that time.

7        A.    I guess so, it was my belief at that

8    time.

9        Q.    That's why you said it, I assume?

10       A.    I think what I am not sure is I would

11   have to look at the ISP terminology to see how it

12   was being defined.  And it's possible I didn't

13   reference it so I would have to go back to my

14   references.  It is possible that I was

15   referencing John Benika's (ph) work on the topic

16   and he used six months.  So I just don't remember

17   that.

18       Q.    On the next column, it talks about --

19   and this is sort of at the mid to the bottom of

20   the page.  It talks about psychological factors

21   play an important part --

22       A.    Right.

23       Q.    Would you agree that psychological

24   factors can play an important part in pain for a

25   patient?

PKY183381090

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 44

1      A.   Well, the sentence I have there is they

2   play an important part in this group of patients.

3      Q.   I understand.  I asked a different

4   question.

5      A.   Okay, so tell me what the question is

6   then.  I am sorry.

7      Q.   The question was, do you agree that

8   psychological factors can play an important part

9   in a patient's pain?

10     A.   Yes.

11     Q.   And, would those psychological factors

12  include things like emotional factors that may be

13  present in a patient's life?

14     A.   Yes.

15     Q.   Would those psychological factors

16  include social issues that may be present in a

17  patient's life?

18     A.   Yes.

19     Q.   Would those psychological factors

20  include financial issues that may be present in

21  the patient's life?

22     A.   Well, I wouldn't call them psychological

23  factors.  I would call them financial factors.

24     Q.   Would financial -- do you believe the

25  financial factors can play a role in a patient's

PKY183381091

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 45

1    pain?

2         A.    They can.  Sure, yes.

3         Q.    And, if you look down here, you talk

4    about, in the middle of the paragraph, Saunders,

5    you cite, using the phrase total pain, do you see

6    that?

7         A.    Saunders has used the phrase total pain.

8         Q.    And, do you agree with that concept?

9         A.    Of total pain?

10        Q.    Yes.

11        A.    Yes, I agree with that concept.

12        Q.    And, does that mean that in addition to

13   some physiological ideology of pain like a broken

14   bone, that somebody could have emotional, social,

15   bureaucratic or financial factors that might

16   effect how that patient perceives their pain?

17        A.    Yes, and I would like to use your

18   language of factors rather than call them pain.

19   I don't think there is such a thing as financial

20   pain or spiritual pain.  So I don't agree with

21   Saunders by using the word pain in that context.

22        Q.    So, you agree with me?

23        A.    I agree that there are financial

24   factors, psychological factors, social factors,

25   yes.

PKY183381092

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1     Q.    What does he mean by spiritual pain?

2     A.    What does Dr. Saunders mean by spiritual

3   pain?

4     Q.    When you wrote this, you cited him but

5   you used the word spiritual --

6     A.    It's not a him, it's a she.

7     Q.    I'm sorry, you used the word spiritual

8   pain.  What did she mean or what did you mean?

9     A.    She means existential distress.

10     Q.    What is existential distress?

11     A.    The sense of meaning, sense of hope,

12   sense of hopelessness that patients might

13   experience that can influence their --

14     Q.    So, in your experience, a patient who

15   might have some sort of even spiritual

16   hopelessness or hopelessness that might be

17   brought about by other factors in their life,

18   that might tend to exacerbate their feeling of

19   pain or have a factor in their perception of

20   pain?

21     A.    It is a factor in their life and it may

22   have an impact on their pain.

23     Q.    And, these factors we talked about, the

24   financial, the spiritual, the emotional, could

25   they cause a patient to exacerbate their

PKY183381093

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    perception of pain they are experiencing?

2        A.    They may.

3        Q.    And, these are things I presume that you

4    believe that should be taken into consideration

5    when one evaluates a patient with pain; is that

6    true?

7        A.    That is correct.

8        Q.    And, that's done through history?

9        A.    It's done in a variety of ways but

10   taking a history is one way.

11       Q.    The financial factor we just mentioned,

12   would that tend to mean that if a person is in a

13   worse financial state or in a poor financial

14   state, that that person may have an increased

15   perception of their pain?

16       MR. HOFFMANN:  Object to the form of the

17       question.  If you can answer it, go ahead.

18       THE WITNESS:  Could you say the question

19       again?

20       MR. COLANTONIO:  Sure.

21   BY MR. COLANTONIO:

22       Q.    If a person is in poor financial

23   condition, would you agree that that poor

24   financial condition may be a factor in how that

25   person perceives the pain they may be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 48

1    experiencing?

2        A.   No, I don't think I would like to

3    describe it that way.  It could influence how --

4    it clearly could influence the treatment they

5    receive.  It can clearly influence their ability

6    to obtain treatment because they can't pay for

7    it.  I don't think I have any clear data to say

8    that it could influence their perception of pain.

9        Q.   Well, when you say it's a factor, I

10   think you just told me before it was a factor?

11       A.   It is a factor, yeah.

12       Q.   But, how is it a factor?

13       A.   Well, if you can't -- a very classic

14   example is a patient can't afford to buy their

15   pain medication so they end up in significant

16   pain all the time because they can't afford to

17   buy it.  It's a very real factor because the fact

18   that they can't buy their drugs means they stay

19   in pain all the time.

20       Q.   But, that's a factor in the treatment of

21   pain.  What I am talking about is whether or not

22   a financial condition or emotional condition,

23   somebody is depressed, somebody is ready to file

24   bankruptcy --

25       A.   Right.

PKY183381095

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 49

1    Q.   Isn't it true that that can actually

2  cause the patient to feel as though they are in

3  more pain than they otherwise might feel?

4        MR. HOFFMANN:  I object to the form of

5     the question.

6  BY MR. COLANTONIO:

7    Q.   Do you understand my question?  It's not

8  that they can't pay for the prescription.  It is

9  that the financial condition or the emotional

10  distress they have, they are going through

11  divorce or something like that, that might cause

12  them to perceive more pain than they otherwise

13  would?

14        MR. HOFFMANN:  I object to the form of

15     the question.

16  BY MR. COLANTONIO:

17    Q.   You can answer if you can.

18        MR. HOFFMANN:  You can answer.

19  BY MR. COLANTONIO:

20    Q.   Do you understand what I am asking?

21    A.   Yes, I mean, I will try to answer but I

22  am not sure I can answer it in this construct.  I

23  don't separate out the treatment aspect from an

24  assessment aspect.  In a sense, they are very

25  very closely tied.  And so if a patient has

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    financial difficulties, that may influence their

2    mood.  That may influence their social

3    interactions.

4         So, I don't think that we have evidence

5    that it directly effects their perception of

6    pain.  I think we have evidence that it

7    indirectly effects the experience of pain.  And

8    so I would rather describe it as an indirect

9    experience of pain rather than a specific

10   demonstration that it makes them have more pain

11   or less pain.

12       Q.   Now, on page 87 of the article, there is

13   a discussion about drug therapy.  Do you see

14   that, the second column?

15       A.   I am sorry, which column?

16       Q.   The second column on page 87.

17       A.   Okay.

18       Q.   And, it says non-narcotic agents?

19       A.   Yes.

20       Q.   And those would be non-opioid agents, is

21   that correct?

22           MR. HOFFMANN:  No objection, go ahead.

23           MR. COLANTONIO:  I am sorry, I didn't

24       know if you answered the question or not.

25           THE WITNESS:  So ask me the question.

PKY183381097

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1    BY MR. COLANTONIO:

 2        Q.    Would non-narcotic agents be non-opioid

 3    agents?

 4        A.    Yes.

 5        Q.    Thank you.  It says here non-narcotic

 6    analgesics are the first line agents for the

 7    management of mild to moderate cancer pain?

 8        A.    That is correct, um-uh.

 9        Q.    And, back at the time you wrote this,

10    would you agree that that would be true for

11    non-cancer pain as well, that non-narcotic

12    analgesics were the first line agents for the

13    management of mild to moderate non-cancer pain?

14        A.    Yeah.

15        Q.    Is that true today?

16        A.    Again, as I describe, there are some

17    patients who are unable to take these drugs.  And

18    these are patients who have -- who are elderly,

19    who have renal failure or who have a variety of

20    medical indications for why they cannot take it.

21        Q.    To the extent that a patient does not

22    have a contraindication for renal failure or

23    something else for non-narcotic analgesics, would

24    you agree that even today non-narcotic analgesics

25    should be the first line agents for the

PKY183381098

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    management of mild to moderate non-cancer pain?

2        A.   I think that because of the evolution of

3    our thinking about the distinctions between mild

4    to moderate pain, I probably would say that

5    across the board that non-opioids are the first

6    line of agents for mild pain.

7        Q.   Okay; and, what about moderate pain?

8        A.   I think that we have, again, since 1985,

9    evolved a series of agents, drugs like tramadol,

10   drugs like buprenorphine that are being used and

11   one might consider they could be the first line

12   agents as well and even low dose oxycodone.  And

13   so I think there is an evolution of our thinking

14   about that, specifically for moderate pain.

15       Q.   And, what's low dose oxy -- when you say

16   low dose, what do you mean?

17       A.   Five milligrams four times a day.

18       Q.   Do you believe that in terms of the

19   progression of treatment that someone, if they

20   have moderate non-cancer pain, that it's best to

21   try a non-narcotic analgesic before you go to a

22   low dose opioid?

23       A.   Again, you know, I can't make a blanket

24   statement about that.  My sense would be that if

25   a patient has moderate pain, we should start them

PKY183381099

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    on a drug that treats moderate pain.

2         And one of the difficulties that happens

3    to patients who have moderate pain is they are

4    given large doses of non-opioids that are

5    ineffective.  So, one of the clinical problems we

6    see is extraordinary side effects from high doses

7    of non-opioids that are useful for mild pain but

8    don't really fit the moderate pain category.  And

9    so the patient then is exposed to high doses of

10   drugs like I.B. Profen or a variety of

11   non-steroidal anti inflammatory drugs that have a

12   very significant impact on the patient.

13        So that in a patient with moderate pain,

14   the WHO and various other guidelines would say

15   that those patients could be started on a weak

16   opioid.

17        Q.   A weak opioid being?

18        A.   Codeine, oxycodone, hydrocodone,

19   tramadol, buprenorphine.

20        Q.   Do you consider OxyContin to be a weak

21   opioid?

22        A.   Everything is related to dose.  So

23   oxycodone in doses of five milligrams four times

24   a day is considered a weak opioid by the WHO.

25        Q.   So, OxyContin at what, ten milligram

PKY183381100

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 54

1    dosage per 12 hours?

2        A.    Right, would be considered within the

3    weak opioid categories.

4        Q.    Would you consider OxyContin at 20

5    milligram dosage every 12 hours to be a weak

6    opioid?

7        A.    Again, I think that would still fit

8    within that category.  But I would have to look

9    that up, I am not sure.  I think it would fit,

10   though.

11       Q.    Where would you look it up?

12       A.    I would have to see whether -- in the

13   studies of comparisons to morphine, since the

14   doses of morphine that we use for severe pain

15   were 60 milligrams of oral morphine a day, I just

16   have to look at the comparisons there.

17       Q.    So, back in 1985, though, you believe

18   this statement was true, that non-narcotic

19   analgesics were the first line agents for the

20   management of mild to moderate non-cancer pain?

21       A.    In 1985?

22       Q.    Yes.

23       A.    That's what I said.

24       Q.    Was it true then?

25       A.    Yes.  But, it's, again, it's a general

PKY183381101

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    statement with lots of exceptions to it.

2        Q.   I am just asking you if it was true?

3        A.   And I think my evolution of thinking

4    about this is if patients have moderate pain, we

5    should be treating them for moderate pain and not

6    ask them to go through other drugs that are

7    inappropriate.

8        Q.   And, I don't know if you answered my

9    question and I don't mean to keep asking the

10   question --

11       A.   Okay.

12       Q.   But, do you agree with me that the

13   statement, the general statement that

14   non-narcotic analgesics were the first line

15   agents for the management of mild to moderate

16   non-cancer pain, that was true in 1985?

17       A.   I think that I would -- that was what I

18   said in 1985.  I think my evolution of thinking

19   about this is that I would change that sentence

20   and it would read non-narcotic analgesics are the

21   first line agents for the management of mild

22   cancer pain.

23       Q.   And, the last part of that paragraph

24   says, in contrast to narcotic analgesics,

25   non-narcotic agents do not cause tolerance or

PKY183381102

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    physical dependence?

2        A.    That is correct.

3        Q.    That's as true today as it was in 1985?

4        A.    That's -- yeah.  Yes.

5        Q.    Narcotic analgesics can cause physical

6    dependence, correct?

7        A.    I am sorry?

8        Q.    Narcotic analgesics can cause physical

9    dependence?

10       A.    Yes.

11       Q.    And, would you agree with me that there

12   are many patients who might consider physical

13   dependence to be addiction?

14            MR. HOFFMANN:  Object to the form of the

15       question.  Answer it, if you can.

16   BY MR. COLANTONIO:

17       Q.    Do you understand my question?

18       A.    Well, most patients don't know what

19   physical dependence is so --

20       Q.    That's another way of me asking the

21   question, I guess.  Do you agree with me that

22   most patients don't have a good understanding of

23   what physical dependence is, the way you would

24   explain it?

25       A.    Well, first of all, every patient that I

PKY183381103

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 57

1    start on a narcotic, I explain to them what

2    physical dependence is.  So --

3       Q.   Well, and that's fair enough.  If your

4    understanding of what patients might perceive

5    would be limited to just your practice, that's

6    fine.  We have talked a little about this and I

7    think you would agree with me that there is

8    confusion out there among even physicians about

9    the terms physical dependence, addiction,

10   psychological dependence, things like that, is

11   that true?

12      A.   Yes, there is.

13      Q.   Would you agree with me that if

14   physicians are confused about that, it might be

15   fair to assume that patients would also be

16   confused about those terms?

17      A.   That's true, yes.

18      Q.   And, wouldn't you -- you have dealt with

19   a lot of patients in your practice; haven't you?

20      A.   Yes.

21      Q.   And, you have perceived how patients

22   perceive their disease process and medications

23   and things like that.  You have had a lot of

24   experience doing that; haven't you?

25      A.   That is correct.

PKY183381104

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.   And, wouldn't you agree with me that

2   based upon your own experience with patients that

3   most patients would equate the kinds of things

4   that happen when you have physical dependence,

5   withdrawal, they would equate those kinds of

6   things with the concept of addiction?

7      A.   You know, I don't think I would agree

8   with that part.  I think patients don't know what

9   is happening when, let's say, they are in

10  withdrawal so they report the phenomenon of

11  withdrawal.  So, in that setting, again --

12     Q.   Then you explain it to them -- I am

13  sorry, I didn't mean to interrupt you.

14        MR. HOFFMANN:  You can go ahead and

15     finish your answer, if you haven't.

16        THE WITNESS:  In that setting, that we

17     tell patients that if they take and are

18     placed on a narcotic on a chronic basis, that

19     they can't simply stop the drug, that they

20     have to be tapered off it because they

21     develop what's called a physical dependency.

22     And so that's part, again, of explaining that

23     to the patient.

24  BY MR. COLANTONIO:

25     Q.   And, you would agree that physical

PKY183381105

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1  dependence can be an adverse consequence to a

2  patient taking an opioid?

3      A.    I don't think -- if patients are taking

4  their medication as prescribed and have effective

5  treatment for their pain and tapered off their

6  drug, they never even know what physical

7  dependence is.  So it's not an adverse effect for

8  them.

9      Q.    Do you know any patients who have ever

10  reported physical dependence?

11      A.    They have -- I have had patients who for

12  some reason or other stopped taking their drug

13  and developed signs and symptoms of withdrawal.

14  And they report the nervousness and irritability

15  but -- they report those symptoms, yes.

16      Q.    And, you know what physical dependence

17  can cause in a patient as far as withdrawal?

18        MR. HOFFMANN:  Object to the form of the

19      question.

20  BY MR. COLANTONIO:

21      Q.    I mean, do you understand what types of

22  things withdrawal can cause in a patient?

23      A.    There is a characteristic syndrome of

24  withdrawal that depends on the drug that the

25  patient is taking.  And so in that setting, the

PKY183381106

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 60

1    patient can experience a variety of symptoms.

2        Q.   Like what?

3        A.   Nausea, increased pain, sweating,

4    increased blood pressure.

5        Q.   Vomiting?

6        A.   Some can vomit.

7        Q.   If that occurs to a patient, those are

8    --

9        A.   Those would be discomforting to the

10   patient.

11       Q.   I will use the word discomforting.

12   Would you agree that the possibility of physical

13   dependence might be a reason for a physician to

14   try non-narcotic analgesics as a first line agent

15   in the management of mild to moderate non-cancer

16   pain?

17       A.   Again, I think that the -- how a

18   physician chooses an analgesic regimen should be

19   first dependent on the intensity of pain.  So,

20   the first rule and the guidelines that every

21   group has written, from the WHO to the American

22   Pain Society, is that in the choice of an

23   analgesic regimen for a patient, one starts with

24   the intensity of pain.

25       Q.   And, that's the patient's report of

PKY183381107

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   pain?

2       A.    That's the patient's report of pain and

3   then the physician's assessment of the validity

4   of that and the association of that with a

5   variety of other factors.

6       Q.    Okay; getting back to this article, you

7   wrote here at the end that paragraph where it

8   says, non-narcotic agents, in contrast to

9   narcotic analgesics, non-narcotic agents do not

10  cause tolerance or physical dependence?

11      A.    That is correct.

12      Q.    Why were you writing that in the same

13  paragraph that you wrote non-narcotic analgesics

14  are the first line of defense in the management

15  of mild to moderate --

16      A.    It's just an important piece of

17  information that doctors would want to know.

18  It's obvious too, it's well-known.

19      Q.    It's well-known but in writing that in

20  the same paragraph that you wrote non-narcotic

21  analgesics are the first line agents, wasn't that

22  intending to say, one of the reasons why they are

23  the first line agents is because in contrast to

24  narcotic analgesics, non-narcotic analgesics do

25  not cause physical tolerance, dependency?

PKY183381108

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 62

1      A.   No, it had nothing to do with that.

2      Q.   It's in the same paragraph?

3      A.   Yeah, it's a very vital important piece

4  of information that doctors would want to know

5  about the drug and it's unrelated to the first

6  sentence.

7      Q.   If you go to the next page which is page

8  88, on the bottom of the left column, the last

9  paragraph there, it starts out, traditionally the

10  narcotic analgesics have been used to manage

11  acute pain.  Long term use has been discouraged

12  because of development of tolerance, physical

13  dependence and psychological dependence and that

14  was true in 1985; is that correct?

15      A.   That was very true in 1985.

16      Q.   Is that very true today?

17      A.   No, that is not.  That's where the

18  really major difference has occurred in the whole

19  field of pain management.

20      Q.   Because what is happening today is

21  people were using narcotic analgesics more than

22  they did in 1985 to treat chronic long term pain;

23  is that correct?

24      A.   I don't -- could you say that again for

25  me?

PKY183381109

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.   Well, it says here long term use has

2  been discouraged.  This is in 1985?

3      A.   Right.

4      Q.   And, is long term use being encouraged

5  today, is that the difference?

6      A.   Long term use has been discouraged

7  because of the development of tolerance, physical

8  dependence and psychological dependence.  What

9  has happened since 1985 is rather extraordinary.

10  We have had this opportunity for what one might

11  call a natural experiment where in the setting of

12  patients with cancer pain, we have had this

13  opportunity to use chronic opioid therapy.

14          And what we have seen is that tolerance

15  is not a significant problem.  Physical

16  dependence was not a significant problem nor was

17  psychological dependence.  So we have now this,

18  let's say, 19 year experience of large doses of

19  opioids being given to large populations of

20  patients, many of whom are still alive today, in

21  which tolerance was not a problem, physical

22  dependence was not a problem and psychological

23  dependence.

24          So that's the first opportunity in

25  medicine that we have ever had to give chronic

PKY183381110

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    opiate therapy to a large population around the

2    world and show that these kinds of phenomenon

3    that were attributed to opioids and described in

4    an addict population didn't happen in a chronic

5    medically ill population.

6         Q.   Are there studies that you are referring

7    to?

8         A.   These are published studies, yes.

9         Q.   What published studies are you referring

10   to?

11        A.   I have written a series of papers on the

12   constructive tolerance and on the -- so there are

13   studies that we have written on and given case

14   demonstrations of patients who remained on stable

15   doses of opioids for long periods of time without

16   dose escalation.  So that's one study.

17        Q.   Is that the 38 case study?

18        A.   No, it was not that study.  That was in

19   non-cancer pain but it is in a series of books

20   and I can read it off my CV for you.

21             From the psychological dependence which

22   is the language that I was using to describe

23   addiction because that's how the WHO uses that

24   language, Charles Cleland has demonstrated that

25   between 1990 and 1996, with a dramatic increase

PKY183381111

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    of availability of Morphine around the world and

2    specifically in the United States, there was no

3    increased incidence of abuse of the drug.  So

4    that was another very very strong association

5    with demonstrating that abuse did not occur.

6        Q.    Now, you just used, in terms of talking

7    about psychological dependence, the word abuse.

8    Is there a relationship between abuse and

9    addiction?

10       A.    Yes, there is.

11       Q.    And, that relationship is what?

12       A.    Unclear, no one fully understands what

13   the relationship is.  There appears to be a

14   relationship.

15       Q.    But, you do believe, as you sit here

16   today, based upon your background, training and

17   experience, there is some relationship, yet

18   undefined, between abuse and addiction?

19       A.    I guess to answer that question, I would

20   have to know what you mean by abuse.

21       Q.    Well, I will ask you.

22       A.    What I mean by abuse?

23       Q.    What do you mean by abuse?  I would

24   think that abuse would be using a drug in a way

25   that is not prescribed.  Is that too simplistic?

PKY183381112

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Well, that talks about a patient issue.

2   If we talk about it as a societal issue, it means

3   that the drug is being sold in an elicit market.

4   So, Dr. Cleland looked at the issue of the drug

5   being sold in an elicit market and demonstrated

6   that there was not.

7      Q.    But, do you agree that abuse can also

8   occur in the context of a prescription in that

9   patient?

10      A.    Yes, it can.

11      Q.    Again, getting back to my question,

12   would you agree that there is some relationship

13   between drug abuse and drug addiction or drug

14   psychological dependence?

15      A.    Well, some people -- I mean, yes.

16      Q.    And, do you equate psychological

17   dependence with addiction?

18      A.    I do.

19      Q.    They are synonymous in your mind?

20      A.    For me they are synonymous.

21      Q.    In the next paragraph, this is on the

22   right column --

23      A.    Um-uh.

24      Q.    First full paragraph down the page, it

25   says because of the misconception by both

PKY183381113

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    clinicians and patients, the physical dependence

2    and addiction are interchangeable terms.  I think

3    that's what we were talking about a little bit

4    here before, that both clinicians or physicians

5    and patients often confuse physical dependence

6    and addiction.

7             Was that -- when you wrote that

8    statement, was that something you believed in

9    1985?

10   A.    Yeah, it was very common in 1985.  I

11   think it's again much improved now because there

12   has been such an extraordinary amount of

13   education related to this whole discussion.

14   Q.    I am not trying to interrupt.  I will

15   let her finish and if I ever try to interrupt,

16   please tell me to stop.  That's not my intention.

17   A.    It's not my intention to tell you what

18   to do.

19             MR. HOFFMANN:  It is mine.

20             MR. COLANTONIO:  You can suggest it.

21   BY MR. COLANTONIO:

22   Q.    But, are there any -- are you aware of

23   any studies that have looked at the issue of how

24   patients confuse or don't confuse physical

25   dependence and addiction?

PKY183381114

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      A.    Well, there are studies that demonstrate

2   that one of the barriers to patients taking

3   opioid analgesics is their concern that they will

4   become an addict, okay.

5      Q.    And, that's true today, right, as far as

6   you are aware?

7      A.    Except, again, since the studies were

8   done in the eighties and have subsequently been

9   repeated, the concern about addiction seems to be

10  dropping down specifically.  When it was one or

11  two in patient's minds, it is now moving down to

12  four or five as patients become more

13  understanding and have greater expectations for

14  treatment of their pain.

15     Q.    And, where do you believe the patients

16  have gotten this, have gotten the information

17  that has caused this change?  Would it be from

18  physicians?

19     A.    If you look at the field of pain

20  research from 1974 to the present time, the

21  International Association for the Study of Pain

22  which had, you know, 300 members in 1974 and now

23  has 8,000 members, the number of pain services

24  throughout the country has dramatically

25  expanded.  Research in pain has dramatically

PKY183381115

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    expanded.   Attention to pain as a serious public

2    health issue has dramatically expanded.

3           The World Health Organization has

4    promulgated very strongly the need for better

5    treatment for pain and for the distinction.   The

6    International Narcotics Control Board has put out

7    a variety of guidelines.   The American Medical

8    Association, the American Academy of Neurology,

9    the Academy of Family Physicians, have all done

10   elaborate educational programs because pain is

11   seen as a serious issue.

12          And, most importantly now, the JCAH has

13   demanded that as part of an accredited hospital

14   system, the pain must be assessed and these

15   educational materials are now in all hospitals.

16   Institutional quality improvement programs are

17   occurring in hospitals or around the country as

18   we speak.

19          So, there has just been this

20   extraordinary explosion of a pain science and

21   pain research and pain experts who are focusing

22   on trying to develop better treatment.   So that's

23   where it has come from.

24      Q.   But, most patients don't go around

25   reading World Health Organization statements and

PKY183381116

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    these kinds of papers.  Would you agree that the

2    information that the patients are getting to

3    change their perceptions would come from

4    physicians or drug companies when they get

5    prescriptions?

6         A.   Well, they come, also, I think

7    importantly, they come from the American Cancer

8    Society.  They come from the American Pain

9    Foundation.  They come from a variety of sources

10   that are not from the pharmaceutical industry as

11   well.

12        Q.   But, the pharmaceutical industry would

13   be one source?

14        A.   No question, the pharmaceutical industry

15   is a source of that, sure.

16        Q.   To the extent that the pharmaceutical

17   industry conveys information to physicians and

18   then physicians convey that information to

19   patients, that would be another source of

20   information about these issues?

21        A.   That's potentially another source.  But

22   I think I must say that really the JCOAH, as an

23   example, every patient who enters the hospital or

24   every patient who is in a nursing home or seen in

25   an outpatient facility has to have their pain

PKY183381117

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    measured.  And that institution has to tell the

2    patient that they have a right to pain management

3    and that institution has to tell the patient what

4    their options for treatment are.

5              So that kind of material is coming very

6    much out of an institutional health care system

7    approach.  The agency for health care quality and

8    research has developed guidelines that have been

9    widely disseminated to patients.  So there is an

10   extraordinary amount of government and

11   non-partisan, non-biased information available.

12       Q.   If you look at page 88, on the right

13   hand column -- this is about mid page.

14       A.   Um-uh.

15       Q.   And, the paragraph that starts, the long

16   term use of narcotic analgesics --

17       A.   Um-uh.

18       Q.   -- administered orally, down about ten

19   or 12 lines or so, there is a sentence there that

20   says drug use is not the sole factor in the

21   development of psychological dependence.  Do you

22   see that?

23       A.   Yes.

24       Q.   And, you believed that in 1985, is that

25   correct?

PKY183381118

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1     A.    Yes, I do.  I still believe it now.

2     Q.    Then it says psychological, social and

3     economic factors also play a part.  Do you see

4     that?

5     A.    Yes.

6     Q.    And, you believed that in 1985; is that

7     correct?

8     A.    That is correct.

9     Q.    And, you believe that today, is that

10    correct?

11    A.    I do, yes.

12    Q.    And, psychological dependence as used in

13    that sentence is synonymous with addiction; is

14    that correct?

15    A.    Yes, that is correct.

16    Q.    I would like to show you another article

17    or paper that I believe that you authored with

18    Russ Portenoy, if you could take a look at that?

19    A.    Um-uh.

20    Q.    This article looks to be around 1985.

21    Is that true?

22    A.    Yes, um-uh.

23    Q.    And, this article is titled chronic use

24    of opioid analgesics in non-malignant pain, a

25    report of 38 cases?

PKY183381119

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 73

1      A.   Right.

2           MR. HOFFMANN:  Excuse me, Mark, you

3      haven't been marking any of these exhibits to

4      the deposition.

5           MR. COLANTONIO:  I haven't.

6           MR. HOFFMANN:  I would like to have them

7      marked.  So can we go back and mark the

8      article that she talked to just a minute ago

9      as Exhibit 1 and then this one as 2?

10          MR. COLANTONIO:  We will mark a clean

11     copy up to 47, how's that?

12          MR. HOFFMANN:  That's fine.

13          (Whereupon, Plaintiff's Exhibits 1 and 2

14     were marked for identification.)

15          MR. COLANTONIO:  He has about three

16     minutes left on the tape.

17          MR. HOFFMANN:  So why don't we take a

18     break.

19          MR. COLANTONIO:  Yeah, let's do that.

20          THE VIDEOGRAPHER:  Going off the record,

21     9:25, end of tape number one.

22          (Whereupon, a brief recess was taken.)

23          THE VIDEOGRAPHER:  Returning to the

24     record, 9:40 a.m., beginning of tape number

25     two.

PKY183381120

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 74

1    BY MR. COLANTONIO:

2        Q.   If you can look at the article in front

3    of you now, we will mark that as Exhibit 2.

4    That's the -- the title is chronic use of opiate

5    analgesics in non-malignant pain, report of 38

6    cases.  Do you see that?

7        A.   Yes.

8        Q.   And, you were a co-author of that

9    article; is that correct?

10       A.   That is correct.

11       Q.   And, this was back in 1985; is that

12   true?

13       A.   Yes.

14       Q.   This is while you were at Sloan-

15   Kettering; is that right?

16       A.   Right.  I have only been at Sloan-

17   Kettering.

18       Q.   That's probably a poor way to phrase the

19   question.  If you would look back at page 183,

20   there is a section that talks about guidelines.

21   Do you see that?

22       A.   Yes.  Well, guidelines, okay.

23       Q.   Do you see that?

24       A.   Yes.

25       Q.   As I read this, this appears to me to be

PKY183381121

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    sort of a summary of guidelines that were

2    proposed by you for the use of opioid maintenance

3    therapy at that time.  Is that a fair reading of

4    that or --

5        A.   Well, this is a paper of individual

6    cases in which we then said we were proposing how

7    you might think about developing guidelines, you

8    know.  I don't think two doctors can develop

9    guidelines, necessarily.

10       Q.   But, you were proposing some guidelines,

11   I presume?

12       A.   That is correct, yes.

13       Q.   Based upon your experience with

14   patients?

15       A.   That is correct.

16       Q.   All right; the first sentence under

17   guidelines says, opioid maintenance therapy

18   should be considered only after all reasonable

19   attempts at pain control have failed and

20   persistent pain is the major impediment to

21   improve function?

22       A.   Um-uh.

23       Q.   And, that was true in 1985.  That was

24   your thought in 1985; is that true?

25       A.   That was what we thought in 1985.

PKY183381122

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.   And, do you still think that today?

2      A.   Again, this is all evolving because, as

3  I said in 1985, we didn't have treatments we have

4  now for patients with pain.  So we didn't have in

5  1985 spinal cord stimulators.  We didn't have

6  interphecal (ph) opioids.  We didn't have

7  documented drugs like Neurontin.  We didn't have

8  a variety of other approaches.  So the sort of

9  technology of treating pain has changed.

10          And at the same time, we still didn't

11  have the experience that we have now with opioids

12  in 1985.  So, what's evolved is that, all

13  reasonable attempts at pain control have failed

14  would imply that the patient had to have every

15  one of them.

16          And I think we are coming to recognize

17  that patients should not have nerve blocks unless

18  they need them.  Whereas in 1985 it was believed

19  that they should be sent off for nerve blocks,

20  that they shouldn't have surgery -- that they

21  should try surgery or cordotomy before you tried

22  opioids.

23          And what has evolved now is that those

24  procedures such as cordotomy which one of these

25  patients had or nerve blocks that some of these

PKY183381123

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    patients had would not necessarily have to be

2    tried because they weren't really indicated.  So

3    the state of the science of pain management is so

4    evolving and so different that I think we are

5    focusing on saying that patients -- that opioid

6    maintenance therapy should be instituted but not

7    as a last resort.

8              And, this has now been taken into the

9    intractable pain laws and why intractable pain

10   laws now as well as in the State of West Virginia

11   say that the patient doesn't have to have all

12   attempts, they have to be reasonable attempts.

13   And so I think I might take out the word all.

14        Q.   But, if you take out the word all, that

15   statement would be true today, that is, opioid

16   maintenance therapy should be considered only

17   after reasonable attempts at pain control have

18   failed and persistent pain is the major

19   impediment to improved function?

20        A.   I think I would add more to that and

21   that is that the cause of the pain can't be

22   treated because that's how the intractable pain

23   laws have been written.  So, I think the language

24   in the intractable pain laws, which I think West

25   Virginia has adapted a good one, would fit.

PKY183381124

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1      Q.    But, certainly a reasonable attempt at

2   controlling pain would be the use of non-opioid

3   medication?

4      A.    Absolutely not.

5      Q.    Absolutely not?

6      A.    Absolutely not.

7      Q.    You think that the use of a non-opioid

8   medication is an inappropriate, unreasonable way

9   to attempt to control pain?

10     A.    I do because if a patient has severe

11   pain, you would not give them a non-opioid.  That

12   would be an inappropriate choice.

13     Q.    What if they have mild pain?

14     A.    If they have mild pain, it would be an

15   appropriate choice.  If they have mild to

16   moderate pain, it would not necessarily be an

17   appropriate choice.

18          And, if they took non-opioids and it

19   failed -- but this is a misconception that is of

20   great concern to me.  There is a belief that

21   every patient has to start with a non-opioid and

22   then go to an opioid.  And the WHO ladder was not

23   conceived like that.  It was identify the patient

24   on the intensity of pain and treat them with the

25   drug for that intensity of pain, so --

PKY183381125

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 79

1      Q.   I am sorry, are you finished?

2      A.   No, I am not finished.  So that if a

3  patient has severe pain, it would be

4  inappropriate therapy to give them a non-opioid.

5      Q.   So, this statement you made in 1985

6  simply just doesn't fit in today's --

7      A.   That's not what I said.  My statement

8  here is I would say that I would take out the

9  word all reasonable.  I would just say reasonable

10  attempts.  And that I would, again, because of

11  the evolution, I would go more strongly with how

12  the intractable pain laws have thought about

13  this, is the sense of that you have -- that you

14  are unable to treat the cause and that reasonable

15  attempts at treatments have failed.

16      Q.   You are talking about intractable pain.

17  Let's talk about mild to moderate pain, do you

18  think it --

19      A.   Intractable pain can be mild, moderate

20  or severe.

21      Q.   I am sorry, I didn't finish my

22  question.  If you would let me finish my

23  question, give me that courtesy.  I will give you

24  the same courtesy to finish your answer.

25      A.   I am sorry.

PKY183381126

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 80

1     Q.   In terms of mild to moderate pain, would

2  you agree that a reasonable attempt at

3  controlling that pain would be using a

4  non-opioid?

5     A.   For mild pain, yes.

6     Q.   There is another sentence here under

7  guidelines on the next paragraph, it says the

8  committed involvement of a single physician who

9  will evaluate ongoing medical and psychological

10  problems as well as pain related issues should be

11  available before institution of opioid

12  maintenance therapy is considered.  Do you see

13  that?

14     A.   Yes.

15     Q.   And, that was true in 1985; right?

16     A.   Um-uh.

17     Q.   Is that true today?

18     A.   Yes, it is, except that because so many

19  people practice in a group practice or in a pain

20  clinic, I could say the committed involvement of

21  a pain treatment program, of a physician group

22  would be -- who knew the patient and followed the

23  patient, would be it.  So it wouldn't have to be

24  a single physician, it could be a group of

25  physicians.

PKY183381127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

 1      Q.   You would agree it is kind of difficult

 2   for an emergency room physician to follow a

 3   patient because they see them in an emergency

 4   room setting?

 5      A.   I would agree with that.

 6      Q.   And, that's also true sometimes for

 7   primary care physicians, like family doctors,

 8   because often times they might see a patient once

 9   or twice and they might refer them to somebody

10   else?

11      A.   I don't think I could comment on that.

12   It seems if they are a family doctor, then they

13   are the family doctor and they see them all the

14   time.

15      Q.   If you go to the next page, page 184,

16   still under guidelines, the top of the page,

17   first full sentence says, since many patients

18   with non-malignant pain can achieve only partial

19   relief from opioid drugs, while others obtain

20   none, a physician must be able to make the

21   clinical judgment that higher doses will not be

22   solitary or the treatment should be stopped all

23   together.  Now, what did you mean by that?

24      A.   Again, this was sort of an evolving

25   construct.  This paper was written -- do you want

PKY183381128

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE CIRCUIT COURT)

1    to hear all this?

2        Q.    I actually just want to know what you

3    meant by it and then I could ask you -- and if

4    you need to explain the whole history of it to

5    answer my question, I suppose you can do that.

6        A.    I think I do, okay.  This paper was

7    written at a time that it was believed that there

8    were certain types of pain that were resistant to

9    opioid drugs and that was an evolving belief.

10   And patients in this population were patients

11   that would be then categorized as resistant to

12   opioids.

13            And that we then went on, Dr. Portenoy

14   and I, and Dr. Teresi (ph) to write a paper and

15   do studies looking at a concept of opioid

16   responsiveness.  And so what we promulgated was a

17   concept that there is a continuum of opioid

18   response.  So, if you just give a set dose of

19   drug to a patient, they may not respond.  But if

20   you increase the dose, the patient would obtain

21   analgesia.

22            This sentence is describing these

23   patients in this paper who only had partial

24   relief and we had to make a decision should we

25   try a higher dose to see if they obtain more

PKY183381129

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   relief or should we stop their drug because it is

2   ineffective.  That was what this is bringing up,

3   a real clinical issue.

4           And, so, we have gone on to give higher

5   doses of drugs to patients in a study paradigm

6   and show that they did in fact respond.  And that

7   this concept of opioid responsiveness is a

8   continuum and the limiting factor is the

9   patient's ability to not only obtain analgesia

10  but to have significant side effects.

11      Q.   One of those side effects might be

12  physical dependence?

13      A.   No, the side effects would be sedation.

14  The side effects would be nausea and vomiting,

15  confusion, delirium, those kinds of side effects.

16      Q.   The next sentence, one of the next

17  sentences down here in the paragraph says, the

18  appropriate management of opioid maintenance

19  requires the patient be given fully informed

20  consent.  Do you see that?

21      A.   Yes, that the patient gives fully

22  informed consent.

23      Q.   And that's true today; correct?

24      A.   Again, there are some state guidelines

25  that say patients should have a fully informed

PKY183381130

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    consent and there are others that do not.  I

2    think all of the guidelines that are now being

3    written for the management of patients with

4    non-malignant pain suggest that the patient be

5    fully informed.  Whether the patient actually

6    signs a consent form or has a contract with the

7    physician is still very debatable.

8        Q.    And, this sentence doesn't talk about a

9    contract, the next one, does it.  I am just

10   asking you if you believe today and would agree

11   that a patient should be given fully informed

12   consent before being placed on an opioid?

13       A.    But, I think the sentence says that the

14   patient gives fully informed consent.  You are

15   using given, I am just --

16       Q.    Doesn't the patient have to be given it

17   to actually give it, I mean --

18       A.    Then the doctor gives the information so

19   I am just reading what we wrote.

20       Q.    Let's look --

21       A.    So, this is what I wrote.

22       Q.    I am not trying to complicate it.

23       A.    Fine, but I am just --

24       Q.    And, sometimes I guess my questions

25   might sound simplistic.  I am just trying to

PKY183381131

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1  understand what you meant by this.

2  　　　　The sentence says, the appropriate

3  management of opioid maintenance requires that

4  the patient gives fully informed consent.  And

5  you agree that that's also true today.  Whether

6  it is required by some state law or not, you

7  agree that the patient should still today give

8  fully informed consent?

9  　　A.　Yes.

10  　　Q.　And, would you agree that part of giving

11  fully informed consent means the patient has to

12  have enough information given to them to give

13  fully informed consent?

14  　　A.　Yes.

15  　　Q.　And, part of the obligation of doing

16  that rests on the part of the drug manufacturer;

17  true?

18  　　A.　It would seem to me that it only rests

19  on the physician who prescribes the drug.

20  　　Q.　Well, isn't it an obligation though --

21  the physician is the one who is there treating

22  the patient, giving information to the patient.

23  But don't you agree that the drug manufacturer

24  has an obligation to provide the physician with

25  the information that will enable the physician to

PKY183381132

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

Page 86

1    give the patient informed consent?

2        A.    I think I see it residing with the

3    physician, however the physician gets this

4    because he could get it from the government.  He

5    could get it from JCOAH.  He doesn't have to get

6    it from the drug company.  I would hope he didn't

7    get it from the drug company.  I hope he got it

8    from a lot of other sources.

9        Q.    So, you don't believe that the drug

10   manufacturer plays any role or has any

11   responsibility to provide physicians with

12   information in this process of insuring that

13   patients give fully informed consent for opioid

14   treatment?

15       A.    I think the physician is the person who

16   is responsible when he writes the prescription.

17       Q.    I understand what you are saying but

18   that's not really my question.

19       A.    Okay.

20       Q.    My question is don't you agree that the

21   manufacturer has an obligation to provide the

22   physician with the information so the physician

23   can then give it to the patient?

24       A.    Well, I think that's -- I don't want to

25   say that it's a responsibility.  It's the

PKY183381133

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1   responsibility of the physician to know about the

2   drug that they prescribe and they can use a

3   variety of sources.

4        Q.   Well, I understand that.  A physician

5   can read.  A physician can get different sources

6   but don't you think the manufacturer plays a part

7   in that?

8        A.    The manufacturer plays a part in making

9   sure that the information that is appropriate has

10  been approved by the FDA so that the physician

11  can rely on what the FDA has said about the drug.

12       Q.   Do you believe the manufacturer should

13  provide the physician with fairly balanced

14  information about a drug?

15       A.   I do, yes.

16       Q.   And, a manufacturer shouldn't misstate

17  or misrepresent information about a drug to a

18  physician.  Do you agree with that?

19       A.   I agree with that.

20       Q.   Now, the next sentence in your page 184

21  of your article talks about this article from

22  Tennant & Olman?

23       A.   Yes.

24       Q.   And, they recommend written, formal

25  written consent be obtained or a detailed

PKY183381134

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1    notation made in the patient's chart which

2    documents that the patient has failed

3    non-narcotic therapy and enters knowingly into a

4    trial opioid maintenance?

5        A.    Right.

6        Q.    Did you cite that because you cited that

7    with approval at that time in 1985?

8        A.    I am sorry, I cited it because it was in

9    the literature and I cite things that are in the

10   literature whether I agree with them or not.

11       Q.    There were a lot of things in the

12   literature in 1985.  I presume there were lots of

13   journals out there but you picked this particular

14   citation and this sentence to put in your article

15   which is only, I don't know, 15 pages long.  You

16   didn't pick out other citations.

17            So, I presume that means that you agreed

18   with that.  Is that wrong?  And this is in the

19   guidelines section.

20       A.    That's incorrect.  It is not anything

21   about agreeing with it.  We were in a very

22   unbiased way writing about what was in the

23   literature and there weren't ten or 15 or 40

24   other articles.  There were very few and you can

25   see why there were very few referenced.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)

1       So these were people who had the

2  experience of treating patients with chronic

3  non-malignant pain and this was their suggestion.

4       Q.   Did you disagree with that in 1985?

5       A.   We are just -- I was not in a position

6  to agree or disagree.  We were telling -- we were

7  giving suggestions of what people had suggested.

8       Q.   And I understand that.

9       A.   So that's all I can say.

10      Q.   I fully understand that but I am asking

11 you a different question, now.  I am asking you

12 if you agree or disagreed with that in 1985;

13 that's all?

14      A.   I didn't have to agree or disagree with

15 that.  I was just describing it.

16      Q.   I understand you were describing it and

17 writing it.  I am just asking you if you

18 disagreed with that?

19      A.    I think that I have concerns about the

20 use of contracts with patients.

21      Q.   And, your concerns are what?

22      A.    And they are very serious, is that it

23 seems that we are wanting to make contracts for

24 poor people and minorities and not for white

25 people at major academic centers.  So that sickle

PKY183381136

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
IN COMMONWEALTH OF KENTUCKY, EX REL. JACK CONWAY, ATTORNEY GENERAL v. PURDUE PHARMA L.P., ET AL.,
CIVIL ACTION NO. 07-CI-OI 303 (PIKE COUNTY CIRCUIT COURT)