PSJ3

Exhibit 222

UNITED STATES DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

|  |  |
|---|---|
| IN THE MATTER OF )<br>CARDINAL HEALTH, INC. ) | Docket No. 12-32<br><br>Administrative Law Judge<br>Gail A. Randall |

### DECLARATION OF ROBERT M. PARRADO, R.Ph., PURSUANT TO 28 U.S.C. § 1746

I, Robert M. Parrado, declare as follows:

1. I am the President of Parrado Pharmacy Consultants, Inc., a pharmacy consulting firm located in Tampa, Florida. I hereby submit this Declaration setting forth my direct testimony in this matter on behalf of Cardinal Health, Inc. ("Cardinal Health"). I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience as a pharmacist, pharmacy consultant, and member of the Florida Board of Pharmacy, or upon information provided to me by others.

### I. Background and Experience

2. I have been a licensed pharmacist in Florida since 1971, and I worked as a pharmacist or pharmacy department manager in hospitals, independent retail pharmacies, and chain stores from then until August 2011. For eight or nine months during this period, I also served as a regional acquisitions specialist for CVS pharmacies, reviewing many independent pharmacies in Florida to determine whether they were candidates for acquisition by CVS. I served as a member, vice chairman, or chairman of the Florida Board of Pharmacy, the state

agency responsible for the regulation of the practice of pharmacy in Florida, from January 2001 through February 2009. I am currently the President of the Florida Pharmacy Association, the professional organization for licensed pharmacists in Florida. I received my Bachelor of Science in Pharmacy from the University of Florida in 1970. I attach to this Declaration a true and correct copy of my curriculum vitae, with more details about my employment history. Respondent's Exhibit ("Resp. Exh.") 82.

3. I have served on several occasions as an expert qualified to testify in the field of pharmacy in federal and state courts. I testified on behalf of the United States Department of Justice against the owner of an internet pharmacy in Fort Lauderdale in February 2009. Although not listed in my curriculum vitae, I also served as a consultant for the U.S. Department of Justice in a case relating to oxycodone that was brought against the owner of five pharmacies in Miami, Florida. I was prepared to testify against the defendant in that case, but I have recently been informed that the defendant has decided to plead guilty. I was prepared to testify in that case about the appropriate standards that pharmacists should apply in determining the validity of prescriptions for oxycodone, pursuant to the "corresponding responsibility" that pharmacists are required to exercise before dispensing controlled substances pursuant to 21 C.F.R. § 1306.04(a).

4. My curriculum vitae also lists presentations or articles I have authored, including presentations about so-called Internet Pharmacies and pharmacies that service patients from pain clinics, highlighting the growing problem of abuse of oxycodone in Florida.

## II. Difficulty of Detecting and Preventing Diversion

5. I am very familiar with the initiative launched by the United States Drug Enforcement Administration ("DEA") about five years ago against so-called "internet

CONFIDENTIAL

CAH_MDL_PRIORPROD_DEA12_00000489

pharmacies," because I lectured and trained pharmacists on the subject. The focus of that initiative, which I fully supported as a member of the Florida Board of Pharmacy, was to identify and prevent diversion by pharmacists that was occurring because the pharmacists (frequently owners of small retail pharmacies) filled prescriptions for dangerous narcotic drugs that were issued by unscrupulous physicians based frequently on nothing more than a patient questionnaire that was submitted over the internet. These questionnaires were provided to internet website operators who collected money from individuals seeking the drugs and then paid physicians to write prescriptions. Prescriptions were frequently written by the physicians, who were registered with the DEA, without conducting physical examinations or even taking medical histories from the "patients." The pharmacies – which were frequently referred to as "internet pharmacies" even though they may not have operated the websites used to market to purchasers of drugs – would fill the prescriptions and mail the drugs to the "patients." Accordingly, many of the internet pharmacies were clearly not engaged in the legitimate practice of retail pharmacy. Visits to the pharmacy premises would disclose that the pharmacies stocked and dispensed an alarmingly high quantity of frequently abused drugs, and that the pharmacies had no or minimal retail sales other than mail orders for these drugs. The signs of diversion at such a pharmacy were clear: the pharmacy usually stocked few other products on its shelves (in fact, the title of several presentations I made to pharmacists was "Do you sell 9 volt batteries?"), ran numerous fax machines and computers to accept the faulty prescriptions, filled prescriptions almost entirely for one or two physicians who contracted with the internet operator to write the prescriptions, filled hundreds of controlled substance prescriptions per month for patients that predominantly lacked health insurance or other third-party coverage, and had large quantities of shipping

3

CONFIDENTIAL CAH_MDL_PRIORPROD_DEA12_00000490

materials (such as Federal Express boxes) ready to ship the drugs. In addition, many of these pharmacies ordered (and dispensed) almost nothing but controlled substances. I have reviewed the February 7, 2007 letter sent by DEA to Cardinal Health (Resp. Exh. 11), and many of the factors listed above are indicative of the factors that were listed by DEA as warning signs of likely diversion (percentage of pharmacy's business that dispensing controlled substances constitutes, pharmacy compliance with laws of states into which it dispenses controlled substances, whether purchasers of controlled substances were solicited by internet sites that were owned or associated with pharmacy, whether pharmacy offers to facilitate prescriptions for controlled substances from practitioners who haven't seen the patient before, whether pharmacy fills controlled substance prescriptions issued without medical examination, whether prescribers are licensed in states where pharmacy sends controlled substances, whether one or a few practitioners write a disproportionate share of controlled substance prescriptions filled by pharmacy, whether pharmacy offers to sell controlled substances without a prescription, whether pharmacy's prices for controlled substances are reasonable, and whether the pharmacy accepts insurance payment for controlled substance purchases over the internet).

6. More recently, due to the success of federal and state authorities (including the Florida Board of Pharmacy) in shutting down these internet pharmacies and the wholesalers which supplied them, drug abusers and their facilitators have shifted to a different channel of diversion. These drug abusers visit unscrupulous, or, in some cases, unsuspecting physicians (all DEA-registered to write prescriptions for controlled substances) and complain of non-existent or exaggerated pain that cannot be verified through medical testing. They often present the physician with abnormal radiology reports objectively showing injury. After the physician

4

writes the prescription for pain-killing drugs (including oxycodone), the "patients" take the prescriptions to traditional retail pharmacies to request that these prescriptions be filled. Then the "patients" either abuse the drugs themselves or sell them into channels where they can be sold to drug abusers. I am aware that the focus of DEA's enforcement efforts has shifted to this type of diversion.

7. The current form of diversion is much more difficult to detect than that presented by the internet pharmacies. The actual diversion – the use of the controlled substances (in Florida, frequently oxycodone) – occurs where the purchaser either sells the drugs or takes the drug to satisfy an addiction or to achieve a euphoric high, rather than to address pain. The DEA registrant with the best opportunity to detect this type of diversion is the physician. The patient often presents to the physician complaining of pain that cannot always be verified through medical testing. It can be very difficult for a physician to determine whether a patient is presenting with actual symptoms of acute or chronic pain. Twice removed from the actual abuse of the drug is the pharmacy, which is tasked with a corresponding responsibility under DEA regulations, but which, to some extent, needs to defer to the medical expertise of the prescribing physician. Still, by examining the patient's history of taking the drug, by reviewing the patient's information for warning signs of diversion (patient's address, location of the prescribing physician, any signs indicative of drug abuse), a pharmacist can in some instances detect this form of diversion, refuse to fill the prescription, and report the patient's attempt to fill the prescription to appropriate law enforcement authorities.

8. The wholesaler who supplies the pharmacist is even one step further removed from the diversion, and it is extremely difficult for a wholesaler to detect diversion of the type

5

CONFIDENTIAL CAH_MDL_PRIORPROD_DEA12_00000492

described above, because the wholesaler cannot access the records of the patient due to privacy concerns. Indeed, in the days in which I worked as a pharmacist, I never was asked by a wholesaler to provide this type of patient-identifiable information. If I had been asked to do so, I would have refused.

9. Many of the red flags identified by DEA in its 2007 communication relate to internet pharmacies and are not present with this newer form of diversion. As such, it is exceptionally difficult for a wholesaler to discern downstream diversion of this type just by inspecting a pharmacy and its readily available records that do not contain patient-identifiable information.

10. I understand that DEA is claiming that the sheer quantity of controlled substances shipped to certain pharmacies by Cardinal Health's Lakeland facility indicated that diversion was occurring at those pharmacies. However, I have repeatedly stated in lectures and other presentations that it is the quality of prescriptions for controlled substances that matters, not the quantity. There can be numerous reasons that a given pharmacy would dispense comparatively large quantities of controlled substances and yet not be violating its corresponding responsibility. The pharmacy may fill a much larger number of prescriptions for all drugs than a typical pharmacy, and the quantity of controlled substance prescriptions simply rises to a level above average because the proportion of controlled substance prescriptions remains similar to that of the typical store. Or the pharmacy may be located within an area that has a larger than normal number of individuals who are suffering from severe or moderate chronic or acute pain. Or the pharmacy may be located near medical practices that generate significant numbers of patients

6

CONFIDENTIAL
CAH_MDL_PRIORPROD_DEA12_00000493

with legitimate needs for pain medication. These and other factors can support higher than average levels of legitimate prescriptions for controlled substances, including oxycodone.

### III. 2010 Changes to Oxycodone Distribution in Florida

11. Moreover, at every pharmacy in Florida (except for the handful of pharmacies that refuse to carry oxycodone at all), there are undoubtedly at least some legitimate pain patients that fill prescriptions for oxycodone, and, at nearly every one of these pharmacies in Florida, there are undoubtedly some individuals engaged in diversion who successfully fill prescriptions for oxycodone. The number of patients, including legitimate patients, seeking to fill oxycodone prescriptions to treat acute and chronic pain at community pharmacies (especially at chain pharmacies) increased dramatically in 2010. There was a shortage of oxycodone in Florida at the time, and some small independent pharmacies that exhausted their supplies early in a month sent their patients to large chain pharmacies, such as CVS stores, so their prescriptions could be filled. Furthermore, efforts by DEA to investigate and shut down physicians who were dispensing oxycodone out of their offices led to other physicians, even those with legitimate pain practices, to opt instead to write prescriptions for patients and instruct them to purchase oxycodone at pharmacies.

12. Specifically, I know from press reports that, as of February 2010, Palm Beach County and Broward County set up task forces to work with DEA and investigate pain clinics, and that raids were conducted on three pain clinics in Broward and Palm Beach counties on March 3, 2010, resulting in charges against dozens of individuals for illegal distribution of oxycodone. Resp. Exhs. 89, 90. Furthermore, I am aware that, on June 10, 2010, DEA issued Immediate Suspension Orders and Orders to Show Cause against two distributors of controlled

7

substances, Harvard Drug Group and Sunrise Wholesale, Inc., because of their sales to Florida pain clinics. Resp. Exhs. 91, 92, 93. In July 2010, according to press reports, DEA suspended registrations for at least three Jacksonville, Florida, pain clinics. Resp. Exh. 94. And on May 20, 2010, DEA raided at least three Tampa Bay area pain clinics. Resp. Exh. 95.

13. Also, some independent pharmacies refused to accept insurance reimbursement for oxycodone prescriptions in 2010 because the reimbursement rates offered by insurance companies were quite low, which forced patients who wanted to use insurance to fill their prescriptions at chain stores like CVS, which did accept insurance. A Florida law effective January 4, 2010, required pain management clinics to register as such with the Florida Department of Health. Resp. Exh. 96. Then, a Florida law effective October 1, 2010, prohibited practitioners from dispensing more than a three-day supply of certain controlled substances from their offices if the patient was paying for the controlled substances with check, cash, or credit card, driving even more patients to pharmacies. Resp. Exh. 97. The law was amended effective July 1, 2011, to enforce an outright prohibition on practitioners dispensing oxycodone and certain other drugs from their offices (with few exceptions not relevant here). Finally, I am aware that some pharmacies stopped selling oxycodone altogether in 2010 and 2011, driving legitimate pain patients from their pharmacies to stores like CVS that did stock and dispense oxycodone.

14. I am familiar with reliable statistics that show between 70 and 80 percent of patients presenting to hospital emergency rooms complain of acute or chronic pain, and many of these legitimate patients will be prescribed oxycodone or another potent narcotic to treat the pain.

8

CONFIDENTIAL
CAH_MDL_PRIORPROD_DEA12_00000495

## IV. Difference in Incentives for Chain and Independent Retail Pharmacies

15. Having worked at independent retail pharmacies and at chain stores, I can testify from personal experience and from my extensive knowledge of the pharmacy industry, especially in Florida, that pharmacists working at chain stores have almost no incentive to fill prescriptions that they know or should know were issued for other than a legitimate medical purpose, whereas pharmacists in independent pharmacies have a much greater financial incentive to fill such prescriptions.

16. The oxycodone epidemic in Florida is dollar-driven, therefore the financial incentives for professionals at each stage of the prescription and distribution process are vital to understand where diversion is likely to occur, and where signs of diversion are likely to be intentionally or cavalierly overlooked.

17. First, most independent pharmacies are owned by the pharmacist-in-charge. Because some independent pharmacies do not accept insurance for oxycodone products, those pharmacies are able to charge cash-paying customers higher prices for oxycodone (insurance companies generally require pharmacies to accept the reimbursement they offer as full payment for the prescription drugs dispensed). The incentive for the independent pharmacy owner to sell oxycodone is direct. I saw many cases where the pharmacist was purchasing oxycodone from a distributor for 33 to 60 cents per tablet and then charging the pharmacy customer as much as $7 to $8 per tablet. During this time period, CVS generally charged cash-paying customers about $1.46 per 30 mg dose of oxycodone, which I consider to be a normal markup. The owner of an independent pharmacy can therefore obtain significant profits by filling illegitimate oxycodone prescriptions that are paid for in cash at substantially higher prices. Those profits tend to directly

9

CONFIDENTIAL
CAH_MDL_PRIORPROD_DEA12_00000496

or indirectly benefit the owner by increasing dividends, distributions, bonuses, or salary to the pharmacy owner. Therefore, the pharmacy owner has a financial incentive to increase cash sales of oxycodone.

18. The situation is dramatically different for a pharmacist in a chain pharmacy, such as CVS. Again, I know this from direct personal experience. I was one of the first pharmacists hired by CVS in Florida, in October 2000. Pharmacists at chain pharmacies are nearly universally compensated on fixed salaries, with small bonuses based on total volumes of prescriptions filled, and perhaps on volumes of prescriptions filled with generic drugs. The maximum bonus amount that I could have earned as a Pharmacy Department Manager for CVS was about $4,000 to $6,000 per year, which would only happen if my pharmacy met all the metrics set by CVS (including overall sales of prescription drugs and sales of generic drugs, number of customer complaints, keeping hours worked by pharmacy technicians below certain thresholds, and other factors). Staff CVS pharmacists, who make the decisions about whether to fill certain prescriptions, were offered maximum bonuses of $500 to $600, hardly enough to risk losing their licenses. I have never experienced or heard of any incentive in a chain pharmacy for selling certain targeted levels of a controlled substance, or a group of controlled substances. The small percentage of these bonuses compared to the average annual salary of about $110,000 for a full-time pharmacist creates very little, if any, financial incentive for a chain pharmacist to fill illegitimate prescriptions for oxycodone, which could subject a pharmacist to loss of his or her pharmacist license, thus threatening his or her livelihood.

19. In addition, while an independent retail pharmacy would not be expected to have systems or personnel to monitor filling of controlled substances prescriptions, or programs to

10

CONFIDENTIAL
CAH_MDL_PRIORPROD_DEA12_00000497

train pharmacy personnel to detect diversion, large chain pharmacies generally do maintain policies and procedures relating to controlled substances, internal theft/loss controls, and other corporate compliance mechanisms.

20. The Florida state legislature has recognized that large chain pharmacies are much less likely to engage in diversion, as well. In a statute effective July 1, 2011 (Resp. Exh. __), the Florida legislature required pharmacies, in order to be permitted to operate in the state, to submit applications and fingerprints of an individual who owns more than five percent of the pharmacy, or who "directly or indirectly, manages, oversees, or controls the operation" of the pharmacy, "including officers and members of the board of directors" of a corporation that owns a pharmacy. Fla. Stat. §465.022(3)(a) (2011). However, the requirements are much less onerous for pharmacies owned by corporations "having more than $100 million of business taxable assets in this state," which would typically be chain pharmacies. Fla. Stat. §465.022(3)(a)(1) (2011). The only logical explanation for the reduced requirements for such large corporations is that the Florida legislature recognized that chain pharmacies have much less incentive to dispense narcotics that are likely to be diverted.

## V. Enforcement Experience Relating to Diversion

21. The difference between financial incentives for chain pharmacies and independent retail pharmacies has also been demonstrated through my experience on the Florida Board of Pharmacy. During my eight years on the Florida Board of Pharmacy, out of the hundreds of cases in which the Board considered enforcement actions against pharmacists related to diversion of controlled substances for profit, only two cases, to my recollection, involved pharmacists at chain pharmacies, and neither involved pharmacists who were engaged in filling prescriptions

11

CONFIDENTIAL

CAH_MDL_PRIORPROD_DEA12_00000498

for illegitimate uses. In one case, the chain pharmacist was creating forged prescriptions and diverting the controlled substances to being sold on the street. In another, the pharmacist was simply handing the controlled substances to a relative, without even the pretense of a prescription for the drugs. All of the other retail pharmacy cases that came before the Florida Board of Pharmacy involving diversion of controlled substances for profit involved retail independent pharmacies.

22. Based on this knowledge, it is my firm conviction that a wholesaler would be perfectly justified in applying a different level of due diligence to a chain pharmacy than to an independent retail pharmacy.

## VI. Characteristics of Oxycodone

23. I recognize the importance of oxycodone in the treatment of pain. Although I understand and am alarmed by the oxycodone abuse epidemic in Florida, as a pharmacist, I understand that oxycodone is at times necessary to combat severe pain in numerous situations. I have taken oxycodone myself (pursuant to a legitimate prescription, of course) to treat pain I suffered, in connection with two total knee replacements and my history of kidney stones.

24. I am also aware that legitimate chronic pain patients can develop a tolerance to oxycodone that can lead to their legitimate treatment with dosage levels of oxycodone that would be higher than the amount typically prescribed to an opioid-naïve patient.

25. It is my opinion, to a reasonable degree of professional certainty, that some of DEA's overzealous enforcement effects have had a "chilling effect" on wholesalers, pharmacies, and physicians. Wholesalers have discontinued sales of controlled substances to legitimate pharmacies that are taking reasonable steps to detect and prevent diversion, and physicians have

CONFIDENTIAL CAH_MDL_PRIORPROD_DEA12_00000499

shied away from prescribing needed pain medications to legitimate patients, simply because they fear that they may be targeted by DEA for making inappropriate decisions about prescribing or dispensing powerful pain-killing medications. While I fully support – and have participated in – DEA enforcement actions against rogue pharmacies, I believe that the harsh sanction of discontinuing a DEA registration to distribute controlled substances should be used sparingly, inasmuch as suspension or revocation of a DEA license generally results in termination of practice for a physician, and the death knell for a pharmacy or a wholesaler that needs to dispense or distribute a full line of prescription drug products.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2012.

_____
Robert M. Parrado

13

CONFIDENTIAL

CAH_MDL_PRIORPROD_DEA12_00000500