PSJ3

Exhibit 237

**To:**  Lowne, Jon[/O=PURDUE/OU=PURDUE US/CN=RECIPIENTS/CN=DC999509]; Watson, Laura[/O=PURDUE/OU=PURDUE US/CN=RECIPIENTS/CN=WATSONL]
**From:**  Colucci, Dan
**Sent:**  Fri 10/12/2007 8:08:59 PM
**Subject:**  FW:  Follow-up on Suspicious Order Reporting

Jon based on Jack's comments below Laura and I will continue to do what we have been doing regarding suspicious orders.  The extra ~ $1.0mm would give sales additional insight but Jack feels this is not worth it.  Let us know if you would like us to do anything additional.

---

**From:** Crowley, Jack
**Sent:** Thursday, October 11, 2007 1:39 PM
**To:** Colucci, Dan
**Cc:** Watson, Laura
**Subject:** RE: Follow-up on Suspicious Order Reporting

Hello Dan:

Thanks very much for researching this.

I don't believe we have the proper risk/reward ratio on that.

I DO NOT think it is worth it ($1.0 mm annually) to get the rest of the ADR's onto that system that checks our customers customers.

Let's abort any further discussion of that  -  we already have something like 95% of the picture.

Best regards,

Jack

---

**From:** Colucci, Dan
**Sent:** Thursday, October 11, 2007 1:30 PM
**To:** Crowley, Jack
**Cc:** Watson, Laura
**Subject:** RE: Follow-up on Suspicious Order Reporting

The cost to add the other wholesalers would likely be about $1.0mm annually.   This is as a followup to our conversation whether it is worth it to get the rest of the ADR's onto that system that checks our customers customers.   Let me know if you have any comment.  Thanks.

---

**From:** Crowley, Jack
**Sent:** Wednesday, October 03, 2007 3:55 PM
**To:** Colucci, Dan; Seid, Stephen; Watson, Laura; McGrath, Pat
**Cc:** Lowne, Jon; Christensen, Kris; Gasdia, Russell; Abrams, Robin; Fogel, David
**Subject:** RE: Follow-up on Suspicious Order Reporting

Dear All:

As a follow up to our email and telephone conversations regarding the latest DEA thinking (from the 13th DEA Pharmaceutical Industry Conference in Houston) in the area of Suspicious Order reporting, Dan, Steve, Laura and I met last Wednesday at Stamford Forum to discuss the matter.

I think we all felt that we were handling our responsibilities properly, but that it was worthwhile to revisit our policy and system, etc. We tried to keep the conversation geared towards process rather than accounts, but sometimes using a particular situation as an example provided talking points. As far as I can determine, and in my experience, colleagues are certainly not doing anything wrong in this regard - we are trying to stay ahead of the curve.

Recap - DEA requires the registrant to 1. design a system to disclose, 2. report to DEA, and 3. prevent diversion.

The standards for reporting Suspicious Orders are covered in 21 CFR § 1301.74(b). The registrant is required to design and operate a system to disclose suspicious orders of controlled substances to DEA. Our system is described in Finance and Accounting SOP 7.7, System to Disclose Suspicious Orders of Controlled Substances. I feel that this is a cross-functional responsibility, however - and it involves the participants in the meeting and Robin's Office as well.



| **Redacted** |
|---|
| **Redacted** |

Others in the Finance organization are involved as well.

The requirement is to report ***suspicious orders***, not ***suspicious sales*** after the fact. In terms of regulatory responsibility, reporting suspicious orders to DEA does NOT relieve a distributor (or manufacturer) of the responsibility to maintain effective controls against diversion. The registrant must make the <u>business decision</u> whether or not to ship the order. The responsibility for making the decision to ship rests with the supplier. The Office of Diversion Control is looking for less information and more quality in these types of reports.

Historically, it has been difficult for a manufacturer to gauge what might be a suspicious order from a wholesaler.

It seemed natural then that we would extend the discussion to the question of "knowing our customer's customers". Dan requested that we develop some additional guidance, such as questions to ask our customer to better help us evaluate their customers. Both Steve and I suggested that it is very difficult to ask such questions, and in fact we could be told to mind our own business, etc. This is a

touchy area  -  yet DEA is pressuring industry to go the extra mile, so to speak and forcing manufacturers like Purdue to take another look at this, as well as wholesalers and distributors.  It was and remains a very good question on Dan's part.

I have been giving this a lot of thought since last Wednesday, which is one of the reasons I am a little late sending out this summary.  I believe that we can make intelligent decisions in this area by involving our authorized distributors in an "as needed, collaborative effort."

The very best way for us to protect ourselves and our registrations regarding suspicious order discovery and reporting is to pledge to remain in close contact with each other whenever there may be a questionable order.  Sometimes we may notice a change in pattern in the way a particular authorized distributor is ordering  -  which would trigger a conversation and some additional due diligence on our part  -  or sometimes we may alert to something through retail data.

Steve described the fee for service data that we get from several of the major wholesalers as part of the FFS contracts that have been negotiated  -  Steve is now  analyzing that data and discussing orders that appear to be suspicious (analyzing patterns of ordering and looking for patterns that are out of the ordinary.)   10 regionals are under contract. The system sends alerts if their business is out of line.  As Steve has mentioned, our goal is to assure availability to appropriate patients while we do our best due diligence to assure appropriate channels of distribution.

Please bear with me because I'm afraid that I am going to revert to an example here  -   but this example is very pertinent to this discussion:

Steve's system alerted us to one account in Florida where orders appear to have increased substantially.  I spoke with Robin about this retail pharmacy account last Thursday.  I soon realized that this account was related to a physician who I had reported to the DEA last October at Robin's direction (due to IMS data that Robin monitors.)

The pharmacy's distributor is ABC/Orlando.  There is no way we would have noticed anything suspicious in their ordering that I could see  -  that account is too large.  When ABC got into a problem with DEA last April, the pharmacy also picked up HD Smith.  When putting "2 + 2 together", the data revealed a potentially alarming pattern of ordering on the part of the pharmacy, and prescription writing on the part of the 86 year old doctor. The doctor's recent monthly Rx data for OxyContin in May '07 totaled 507.  In June '07 it totaled 545 and the pharmacy's 80mg strength totaled 553.  In July '07, the doctor's Oxy Rx's totaled 221 and the pharmacy's 80mg strength totaled 302.

Field colleagues noted that the 86 year old doctor's office is in the same area as the

drug store. It was noted that at the Drug Store, 1 out of 100 prescriptions receive generic, so 99% are filled brand.

Now we begin to see the entire picture. Our own system to disclose Suspicious Orders really didn't alert us to ABC's ordering patters, or HD Smith's. How then are we supposed to evaluate and perform our due diligence? My advice is that we continue to regularly put our collective heads together and "stay on it". **Redacted**

**Redacted**

What to do in this situation? At Robin's direction I immediately contacted the DEA Office in Miami last Thursday and asked for a follow up. I left a message with the Group Supervisor and the Investigator that I needed to speak with them in conjunction with this matter, and that I had timely information for them - I had pharmacy data now that I never had before. I would explain when we spoke. (As far as I know, DEA Miami initiated a case against the doctor last fall). So far we have not connected, although I have left several messages as well as an email with each official at DEA Miami. As soon as I speak with them, I will file an official report memo.

I apologize for not communicating back with you sooner - so this is a good learning tool for each of us. I also contacted Chris Zimmerman, Vice President, Corporate Security and Regulatory Affairs at ABC, who I have known for many years. I gave him a courtesy call about this matter, so that he could take a fresh look at it. ABC has also reported this retail Pharmacy to the DEA as suspicious. In retrospect, I should have spoken with Steve, Dan and Laura prior to that conversation - and perhaps Robin, but I feel that the call to ABC was proper. At that point, I fully expected to hear back from DEA Miami that day at any moment.

This is the example to which I was referring earlier - The manufacturer engaging in a collaborative, as needed effort with the distributor utilizing our data as well as theirs to the benefit and protection of each. (In this instance we could see that the pharmacy was utilizing 2 wholesalers, while each wholesaler didn't necessarily know that).

In my opinion - in this instance - ABC and HD Smith must make the <u>business decision</u> whether or not to ship orders in the future. The responsibility for making the decision to ship rests with the supplier. I also think that it is unbalanced to expect the wholesaler "to prevent diversion" when the DEA Miami Office itself has been investigating this since last fall. If this is what I think it is, DEA should have taken action long ago.

That is why we must collaborate.

We noted in the meeting last Wednesday that our internal deliberations concerning questionable orders or data must be conducted "in real time without delay".  We are not about to hold orders while we take our time deliberating.  We want no interruption in the supply chain.

As mentioned above, Dan asked if I could provide questions that we may ask our authorized distributors in the rare instances where we have been alerted to a suspicious or new pattern of ordering on their part.  I'm still thinking about that, Dan.  But one thing comes to mind  -  I can certainly speak with my counterpart at those businesses, and I don't feel as though those individuals would be insulted or tell me to mind my own business, etc.  That approach is something for us to consider.  Going forward, I would not do that without group concurrence.

We closed the meeting by agreeing to convene from time to time.  We will always consider improving this process and further developing best practices.  I invite comments in this regard.

Thanks very much  -  I appreciate our efforts in this matter.

Best regards,

Jack

Jack Crowley
Executive Director
CSA Compliance
Purdue Pharma L.P.
One Stamford Forum
Stamford, CT 06901
203-588-8613 (w)
203-273-2656 (c)

---

**From:** Colucci, Dan
**Sent:** Tuesday, September 25, 2007 4:15 PM
**To:** Seid, Stephen; Crowley, Jack; Watson, Laura; McGrath, Pat
**Cc:** Lowne, Jon; Christensen, Kris; Gasdia, Russell
**Subject:** RE: Executive Audit Committee Follow-up

Steve, Laura and I are not always 100% comfortable with the process from our side.  As Jack points out the responsibility for this process lies with Finance.  Based on the comments from the conference that you may need to know your customers customers Laura and I thought it best to sit with Jack.  We also both thought it was best as a courtesy to invite you a) in case Jack said we were doing something wrong and you could hear and reply to the ramifications, and b) so you could bring your expertise to the meeting as you did below.   Jack raised LWD.....I was looking to discuss process more than accounts.

CONFIDENTIAL

PPLPC053000021259

We maybe doing this 100% right but I in particular thought it best to hear from an expert on the subject.   I hope to see you there.

---

**From:** Seid, Stephen
**Sent:** Tuesday, September 25, 2007 3:57 PM
**To:** Crowley, Jack; Colucci, Dan; Watson, Laura; McGrath, Pat
**Cc:** Lowne, Jon; Christensen, Kris; Gasdia, Russell
**Subject:** RE: Executive Audit Committee Follow-up

Folks,

   Let's make sure we take a step back and look at the entire picture. Our goal is to assure availability to appropriate patients while do our best due diligence to assure appropriate channels of distribution.

   First, we have already taken action, that I initiated, to utilize available FFS data to help what <u>might be</u> suspect channels of sale. 10 regionals are under contract. The system sends alerts if their business is out of line. True, Louisiana is not one of them

   We have a listing of ADR's.

   I have met with Southwood in March of 2007. Their CEO is Bob Schwarz. They wanted to open up. I turned them down.

   Louisiana Wholesale is up 16% YTD in OxyContin. McKesson is up 64%, Cardinal over 90%. Is it appropriate to assume it is a regional that is distributing inappropriately?  The biggest account to be hit on internet pharmacies  was the AmerisourceBergen Orlando DC. We never held their orders. We are shipping them again.

   If the issue here is credit limits that is a different story. Then we hold due to that not based on suspicious orders.

   I have no vested interest in assuring shipments to LW. If they didn't exist the impact on our business would be insignificant. Since they do exist they are serving independents in a rural base. Holding orders has the potential to create situations where appropriate patients don't have access.

*Steve Seid*
*National Accounts*
 *Trade Relations*

---

**From:** Crowley, Jack
**Sent:** Tuesday, September 25, 2007 2:06 PM
**To:** Colucci, Dan; Watson, Laura; McGrath, Pat; Seid, Stephen
**Cc:** Lowne, Jon; Christensen, Kris
**Subject:** RE: Executive Audit Committee Follow-up

Hello Dan:

This is a very good question, and one reason we posed a hypothetical to DEA.

We have an edge at this point, in that our (Schedule II) product is not available on the internet  -  like hydrocodone is.  In the Southwood matter, the customers in this instance were certain pharmacies  -   Southwood's sales to pharmacies of hydrocodone products "increased from approximately 7,000 dosage units per month to approximately 3,000,000 dosage units per month," and that the increase was "directly attributable to [its] supplying controlled substances to pharmacies that it knew or should have known were engaged in the widespread diversion of controlled substances.

I can see where the wording is confusing, but DEA is referring to Southwood's customers -  certain pharmacies.

You can get a better feel for it if you read the entire Federal Register Notice.

 http://www.deadiversion.usdoj.gov/fed_regs/actions/2007/fr07032.htm

Our hypothetical question was not really answered – but let's take the situation with Louisiana Wholesale from a couple of weeks ago.

#1.  Was their order suspicious?  It was at least questionable initially, based on our criteria.

#2  What responsibility do we, as the manufacturer have, if any, to evaluate the wholesaler's customers  -  in essence the customers of our customer (Louisiana Wholesale)?

I think that the emerging standard is that we have to take all information available in totality, and make a wise and defendable business decision on whether or not to fill the order.  This would also include maintaining a record of our discussion, and what was considered before rendering our "business decision" to fill the order  -  and not report it as suspicious.

As I recall, LWD's explanation made sense to me at the time, and under those circumstances a wholesaler ordering 216 X 100s 80 mg (plus 24 x 100 20 mg and 72 x 100 40mg) was not suspicious.  One of the explanations provided was that they had picked up several pain clinics and hospices from ABC recently, etc.  We took that information and included it with other information provided i.e. their demand for branded product had tripled in most cases over the last 4 months  -  they were having trouble getting Teva product thus they were shipping branded  - they are now the secondary for ABC…… and in totality, it appeared to us that the order <u>was not suspicious</u>.

What did we find out about the "pain clinics"?  We didn't find out anything that I know of.  So, again, what is our responsibility in knowing LWD's customers?  I don't

know if these pain clinics are associated with particular pharmacies and I don't know whether or not "drug seeking individuals" (looking to scam doctors into providing our product for other than legitimate medical purposes) frequent these new pain clinics. These types of determinations are better left to the wholesaler  -  but since Purdue is held to a seemingly higher standard, we were trying to find out about DEA's latest thinking.

Just for the sake of discussion and in retrospect, if the new pain clinics established by LWD turned out to be – in the future  -  anything like the infamous clinic in Myrtle Beach 5 years ago or so, I believe that DEA would take the position that we, the manufacturer should have been aware of those suspicious orders (whether or not the wholesalers were also reporting them as suspicious) and we would have some potential exposure.  But in this case, we have no history with the pain clinics in question, and therefore how could we make a judgment other than that they are legitimate?

**Redacted**

Redacted  In that light, does the explanation still make sense? (That LWD was having trouble getting the generic)  Steve had made the comment previously that it would seem that LWD's orders would return to normal  -  go back to historical levels once Dava reenters the market for the last quarter this year.  Howard wanted to make sure that everyone knew that Dava shouldn't be back on the market under the terms of our agreement until November 27, 2007.  He left it to me and my judgment and those of our other experts to say whether LWD's explanation is consistent with this fact.  He noted though that notwithstanding our agreement, we don't have a way of knowing just what Dava is telling its customers as to when it expects to return.

With all this as background, I believe that we judged the order to be valid and not suspicious.

I know that Russ has studied this issue and there may have been some presentations.  But it is good to keep discussing this so that we have absolutely no exposure.

I will be happy to meet with you tomorrow (I'm in Totowa right now) and we can continue our dialogue.  I'm at the office of James Gardner right now – ext 5085, or you can reach me on the cell  -  203-273-2656.

Best regards,

Jack

**From:** Colucci, Dan
**Sent:** Tuesday, September 25, 2007 10:34 AM
**To:** Watson, Laura; McGrath, Pat; Seid, Stephen
**Cc:** Lowne, Jon; Crowley, Jack; Christensen, Kris
**Subject:** FW: Executive Audit Committee Follow-up

Laura, Pat & Steve please see pages 3 through 5 on suspicious orders.  This is always an area of concern to me and of more so now as we move from generic to brand.  Jack personally I would like to sit and discuss this section the next time you are here in Ct.   I would think others would too.  I'd be gald to set something up.

Also Jack in Southwood it clearly shows that they were shipping significant amounts to pharmacies.   In the paragraph at the top of page 5 it says; "several of respondents customers were distributing large amounts...."   To me does this mean the wholesaler?   My confusion lies with the wording mentioned several times that Southwood was selling to pharmacies but this latter sentence seems to say know who your wholesalers customers are.   Can you clarify?   Thanks.

---

**From:** Lowne, Jon
**Sent:** Tuesday, September 25, 2007 9:47 AM
**To:** Mahony, Edward; Fogel, David; Louros, Evan; Colucci, Dan
**Cc:** Crowley, Jack
**Subject:** FW: Executive Audit Committee Follow-up

Please read section IV (pages 3-5). This section reiterates our need to be aware of our customers buying patterns, and ensure that unusual increases are explainable and caused by legitimate business.

---

**From:** Crowley, Jack
**Sent:** Monday, September 24, 2007 10:06 AM
**To:** Lowne, Jon
**Subject:** RE: Executive Audit Committee Follow-up

Hello Jon:

Here is my report from the 13th DEA Pharmaceutical Industry Conference in Houston.

Please note item IV Suspicious Orders  - for our records.  Also, would you kindly forward this to Ed.  I know he is very busy (as usual).

Thanks,

Jack

Jack Crowley
Executive Director
CSA Compliance
Purdue Pharma L.P.
One Stamford Forum

Stamford, CT 06901
203-588-8613 (w)
203-273-2656 (c)

CONFIDENTIAL

PPLPC053000021264