PSJ3

Exhibit 288

Message

| | |
|---|---|
| **From:** | Hilliard, Gary [Gary.Hilliard@McKesson.com] |
| **Sent:** | 3/6/2012 7:16:06 PM |
| **To:** | Reardon, Steve [/O=CAH/OU=Cardinal Health/cn=Recipients/cn=Steve.Reardon]; Steve Mays (smays@amerisourcebergen.com) (smays@amerisourcebergen.com) [smays@amerisourcebergen.com]; George Euson [geuson@hdsmith.com] |
| **Subject:** | FW: [RxNews] |

**From:** MLW [mailto:algosdoc@yahoo.com]
**Sent:** Saturday, March 03, 2012 10:12 AM
**To:** rxnews@listserve.com <rxnews@listserve.com>
**Subject:** [RxNews] (no subject)

**False Presumptions in Press Releases Regarding Physician Prescribing Behaviors**

Some of the prevailing trends in law enforcement press releases regarding physicians or pharmacy activities are the focus on the number of pills prescribed, the number of prescriptions written, and the failure to employ complete physical exams before prescribing opioids for each visit. The sensationalism regarding these press releases may seem quite disturbing to the public and to law enforcement, but many of the practices being heralded as evidence of wrongdoing often fall within the normal limits for physicians treating pain. For instance, it was reported in this newsletter that a physician had written 27,000 prescriptions for opioids over a 3 year period. This sounds astronomical unless one realizes a physician in a comprehensive pain practice typically sees 30-35 patients per day. Writing 25 prescriptions per day (as the accused physician did) is completely normal under these circumstances. On the other hand, if a physician is seeing 100 patients per day, most physicians feel that would constitute a pill mill given the limited amount of time for meaningful follow-up evaluation. But many orthopedic surgeons will see 60-90 patients per day, may write opioids for half of these, and never raise any alarm bells in state medical boards or from the DEA even though they are actually seeing far more patients than most pain clinics and may write more opioid prescriptions (or call them into a pharmacy). The cumulative total of number of prescriptions written as reported in the press may not reflect anything other than a normal prescribing practice for a wide array of physician specialties.

  Similarly, the numbers of pills written over a 1 year to 3 year period is frequently reported by press releases as being in the millions.  The number of pills written by physicians per patient depends on many factors, some of which includes insurance coverage, dosages available, pharmacokinetics of the drugs, etc. For instance, a patient long term receiving Oxycontin 30mg three times a day has a change in their insurance that will no longer cover this medication without cost shifting to the patient to the tune of over $400 per month. Other long acting opioids may be contraindicated on medical basis, having failed other long acting opioids, or due to cost constraints as a result of insurance companies cost shifting to patients. Writing a script for 3 tablets of 30mg a day short acting oxycodone instant release (eg. Roxicodone) is much less expensive, but would cause the patient to develop potential overdose due to the much higher peak values seen compared to Oxycontin, and would potentially cause the patient to have mini-withdrawals and inadequate pain relief given that the short acting medication lasts only 4 hours. Therefore the physician elects to prescribe smaller doses more frequently, ie. 15mg tablets 6 times a day to achieve the same level of pain control that was seen with Oxycontin 30mg three times a day. Then there are drug shortages (increasingly frequent) and oxycodone 15mg may not be available for several months, therefore the physician prescribes 10mg tablets, 9 per day to achieve the same dosage as was achieved with 3 tablets of Oxycontin per day. A high number of tablets per patient does not necessarily imply increased proclivity for substance abuse or drug diversion, not does it implicate a physician as prescribing outside the bounds of good medical practices. There are no scientific studies linking increased substance abuse to the number of pills prescribed and the anecdotal and retrospective studies show mixed results.  Other factors that have resulted in increased numbers of prescribed pills (as opposed to fewer prescribed long acting drugs) include restriction of certain high dose drug availability (eg. methadone, oxycontin), drug shortages, drug recalls by manufacturers,  reluctance of physicians to prescribe long acting opioids due to regional foci of drug abuse and diversion with certain drugs (eg Opana, Oxycontin),  and

CONFIDENTIAL

CAH_MDL2804_01310643

enforcement actions by the justice department (appropriately stopped the use of long acting medications for acute pain).  So how much is a million pills a year?  A physician seeing 33 patients a day for 264 days a year prescribing each patient 4 pills of a controlled substance per day.   That's it.  That is a million pills in a year.  This is absolutely not excessive in most pain practices or family practices.  The number of prescribed pills touted in press releases may well be completely within the usual range as prescribed by pain physicians nationwide.

     Finally, the presumption of the lack of a complete physical exam on initial evaluation or on follow-up visit is used by law enforcement as evidence of prescribing without a legitimate medical purpose.  It also presumes there is an anatomical source of pain.  Chronic pain is a neurological disease that results in changes in both the brain (as evidenced by PET scans and fNMR scans) and spinal cord.  These changes are frequently permanent.  The disease is more akin to other chronic neurological diseases such as Alzheimers disease than a broken bone.  A physician frequently cannot see chronic pain on physical exam, nor are there any reliable and clinically available tests that can be used to validate the existence of any particular degree of pain due to psychological, behavioral, and cultural overlays.  There may be some initial pain generators in some patients, but after 6 months of chronic pain, eradication of the pain generators may not make any difference given the changes that have occurred in the central nervous system, perpetuating pain partially independent of such pain generators.  Psychiatrists rarely perform physical exams on follow-up visits but frequently prescribe controlled substances.  Yet, law enforcement and medical boards do not question the lack of a physical exam in this circumstance because it is presumed the exam will be of low yield and is therefore unnecessary.  On the contrary, the requirement to repeatedly perform physical exams for a chronic neurological disease (chronic pain)  that has few or no findings on physical exam and in the absence of any history of change of pain pattern, intensity, or reduction in physical function seems duplicitous.  Certainly a targeted  physical exam should be employed initially, but it is questionable whether follow-up physical exams in the absence of any changes in pain, medical history, or functionality would be medically indicated.

     The Indiana Pain Society has developed standards of practice for pain medicine and these include the requirements for opioid monitoring and documentation.  These may be viewed at http://www.indianapainsociety.org/index.php/ips-standards    It is the hope of our board that these standards will be adopted by other states in their quest to contain substance and abuse, eliminate drug diversion, and provide adequate pain control to the tens of millions that suffer with chronic intractable pain every day.

  Michael L. Whitworth, MD
  Chairman of the Board Indiana Pain Society
  Reviewer for Pain Medicine Journal and Journal of Pain and Symptom Management
  Former Education Director and Board of Director member of the International Spine Intervention Society
  Former Board of Director of the American Board of Pain Medicine