# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3

     IN RE: NATIONAL         )
 4   PRESCRIPTION            )   MDL No. 2804
     OPIATE LITIGATION        )
 5   _____ )   Case No.
                             )   1:17-MD-2804
 6                           )
     THIS DOCUMENT RELATES )     Hon. Dan A.
 7   TO ALL CASES            )   Polster

 8
                 THURSDAY, JULY 11, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                    - - -
12             Videotaped deposition of Michael
13   Mapes, held at the offices of The Mining
14   Exchange, A Wyndham Grand Hotel & Spa,
15   8 South Nevada Avenue, Colorado Springs,
16   Colorado, commencing at 9:41 a.m., on the
17   above date, before Carrie A. Campbell,
18   Registered Diplomate Reporter and Certified
19   Realtime Reporter.
20

21

22                    - - -

23

            GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      It is.

 2        Q.      And then what -- did you have

 3   any jobs or positions between 1974 and 1977?

 4        A.      I did.

 5        Q.      What were those?

 6        A.      I was a deputy sheriff for

 7   about two and a half years in Michigan, and

 8   after that I worked for the -- as a civilian

 9   for the Department of the Army as a budget

10   analyst for about a year.

11        Q.      And then you applied for a

12   position at DEA?

13        A.      Yes.

14        Q.      What is a diversion

15   investigator?

16        A.      Someone that investigates

17   registrants or potential registrants that

18   handle controlled substances, investigates

19   the movement of controlled substances and

20   diversion of controlled substances from

21   legitimate channels.

22        Q.      In the course of your duties as

23   a diversion investigator, did you conduct

24   audits or cyclic investigations of

25   registrants?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did.

2    Q.    Including wholesalers?

3    A.    Yes.

4    Q.    In connection with those cyclic

5    audits -- am I using the correct phrase?

6    A.    Yes.

7    Q.    Okay.  In connection with those

8    cyclic audits, would you review suspicious

9    order monitoring systems?

10   A.    Yes.

11   Q.    Was that a standard part in

12   your experience of a diversion investigator's

13   role?

14   A.    It was.

15   Q.    And so it was a responsibility

16   that diversion investigators needed to carry

17   out with respect to registrants for the field

18   office to which they were assigned?

19   A.    That's correct.

20   Q.    The results of those audits

21   would be reported on a DEA 6 report?

22   A.    They would.

23   Q.    If a diversion investigator

24   determines that a registrant was not

25   complying with the regulations, would the

```
 1    investigator tell the registrant what that

 2    registrant was doing wrong?

 3                 MR. BENNETT:  Objection.

 4         Incomplete hypothetical.

 5    QUESTIONS BY MS. MCCLURE:

 6         Q.     You can answer.

 7         A.     Yes, they would.

 8         Q.     And that's in your experience

 9    at DEA?

10         A.     Yes.

11         Q.     As a diversion investigator?

12         A.     Yes.

13         Q.     And later as a group

14    supervisor, you expected your diversion

15    investigators to communicate with registrants

16    about what they were doing wrong?

17         A.     Yes.

18         Q.     So that they could correct it?

19         A.     That's right.

20         Q.     Was it an expectation in your

21    experience that a diversion investigator in

22    such a circumstance would follow up to see if

23    that issue had been corrected?

24                 MR. BENNETT:  Objection.  Form.

25                 THE WITNESS:  It would be
```

1       followed up, whether it was by that

2       diversion investigator or another one.

3  QUESTIONS BY MS. MCCLURE:

4       Q.    Okay.  Audits can also be

5  conducted outside of the cyclic process if

6  there was a particular reason or something

7  came up that suggested that an audit might be

8  appropriate; is that accurate?

9       A.    It is.

10      Q.    What was your next position at

11 DEA after diversion investigator in

12 Cleveland?

13      A.    I was a staff coordinator at

14 headquarters in Washington, DC.

15      Q.    And was that for -- for how

16 long a period of time?

17      A.    A little less than a year.

18      Q.    What is the job of a staff

19 coordinator?

20      A.    To review the reports from a

21 field office and the requests from the field

22 office for assistance with investigative

23 matters.

24      Q.    So do I have it correct that a

25 field office, one of DEA's field offices, may

1    prescription-level data?

2        A.    Correct.

3        Q.    During your time at DEA, you

4    became familiar with the regulation regarding

5    the identification and reporting of

6    suspicious orders?

7        A.    Yes.

8        Q.    To your knowledge, has that

9    regulation changed since it was issued or

10   promulgated?

11       A.    Not that I'm aware of.

12       Q.    Is that something that you

13   believe you would have been aware of in your

14   course of employment at DEA and your

15   subsequent employment?

16       A.    Probably.

17            (Mapes Exhibit 3 marked for

18       identification.)

19   QUESTIONS BY MS. MCCLURE:

20       Q.    Okay.  I'll hand you what's

21   been marked as 3.

22            If you could take a look at

23   that and let me know when you've had a chance

24   to look through it.

25       A.    I've reviewed it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.     So when we're talking about the

2  regulation regarding to the identification

3  and reporting of suspicious orders, which

4  section of this Exhibit 3 are we talking

5  about?

6    A.     Suspicious orders ends in

7  1301.74(b).

8    Q.     And 1301.74(b) defines a

9  suspicious order to include orders of unusual

10 size, orders deviating substantially from a

11 normal pattern and orders of unusual

12 frequency, right?

13   A.     Yes.

14   Q.     Does the regulation explain to

15 a registrant how to identify an order of

16 unusual size?

17          MR. BENNETT:  Objection.  Form.

18          THE WITNESS:  It does not.

19 QUESTIONS BY MS. MCCLURE:

20   Q.     Does the regulation explain to

21 a registrant how to identify an order of

22 unusual frequency?

23          MR. BENNETT:  Objection.  Form.

24          THE WITNESS:  It does not.

25

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.    Does the regulation explain to

 3    a registrant how to identify an order that

 4    deviates substantially from a normal pattern?

 5              MR. BENNETT:  Objection.  Form.

 6              THE WITNESS:  It does not.

 7    QUESTIONS BY MS. MCCLURE:

 8         Q.    Registrants are responsible for

 9    designing their own suspicious order

10    monitoring systems; is that correct?

11         A.    It is.

12         Q.    Is a registrant to take into

13    account considerations that are unique to

14    them in designing such a system, for example,

15    their customer base?

16         A.    Yes.

17         Q.    So would one registrant

18    potentially have a different-looking or

19    different nature of a customer base than

20    another registrant?

21         A.    Yes.

22         Q.    Is it possible that those

23    registrants would then have designed

24    different suspicious order monitoring

25    systems?
```

1    A.    It's possible.

2    Q.    Is there a holy grail or

3 articulated DEA model standard for what

4 constitutes a suspicious order?

5         MR. BENNETT:  Objection.  Form.

6         THE WITNESS:  Not that I'm

7    aware of.

8 QUESTIONS BY MS. MCCLURE:

9    Q.    And you've spent your 30-year

10 career in DEA in diversion-related roles?

11   A.    Yes.

12   Q.    Does DEA define for registrants

13 what essential features are that every

14 suspicious order monitoring system must have

15 to be compliant?

16        MR. BENNETT:  You can answer.

17        THE WITNESS:  They may talk

18   with industry or with industry

19   associations about those kind of

20   things or answer specific questions

21   from a registrant.

22 QUESTIONS BY MS. MCCLURE:

23   Q.    So in your experience, DEA may

24 answer a specific question from a registrant

25 about a possible feature that that registrant

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    You can answer.

 2                    THE WITNESS:  Yes.

 3     QUESTIONS BY MS. MCCLURE:

 4          Q.     Meaning that the individual or

 5     entity reviewing that order takes into

 6     account the totality of the circumstances and

 7     makes a determination as to whether that

 8     order is or is not a suspicious order; is

 9     that right?

10          A.     Yes.

11          Q.     Have you heard the phrase

12     "totality of circumstances" previously in the

13     course of your tenure at DEA?

14          A.     I have.

15          Q.     Do you recall in what context

16     you've heard that?

17          A.     Discussing suspicious orders.

18          Q.     And is that a phrase that's

19     used commonly within DEA or the industry

20     regarding reporting suspicious orders?

21          A.     I don't know that it's common.

22          Q.     Regardless -- okay.

23                 You've heard the term "totality

24     of the circumstances" before?

25          A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.      Okay.  And as we discussed

 2     previously, each customer -- or I'm sorry,

 3     each registrant has a different customer

 4     base, right?

 5          A.      Correct.

 6          Q.      No customer -- or no

 7     registrant's customer base will exactly match

 8     that of another registrant?

 9          A.      Correct.

10          Q.      And so the information

11     available to one registrant regarding whether

12     an order -- let me strike that and start

13     over.

14               The information available to

15     one registrant about a particular order and

16     the customer placing it might be different

17     than the information available to another

18     registrant?

19          A.      And you're using -- I don't

20     quite understand the question yet.

21          Q.      Okay.  We've talked about how

22     registrants have different customer bases,

23     right?

24          A.      Yes.

25          Q.      And so when a registrant or a

```
 1    wholesaler in this case is evaluating an

 2    order and trying to determine whether it's

 3    suspicious or not --

 4              Are you with me?

 5    A.    Uh-huh.  Yes.

 6    Q.    -- the information that

 7    Registrant A may have about that order or

 8    that customer may be different than the

 9    information that is available to

10    Registrant B?

11              MR. BENNETT:  Objection.

12    Vague.  Incomplete hypothetical.

13              THE WITNESS:  Yes, they may be

14    different.

15    QUESTIONS BY MS. MCCLURE:

16    Q.    Each registrant conducts its

17    own due diligence?

18    A.    They should.

19    Q.    To your knowledge, they should,

20    right?

21    A.    Yes.

22    Q.    So do registrants, in your

23    experience, share due diligence files?

24    A.    No.

25    Q.    Does the regulation -- I'm
```

Highly Confidential - Subject to Further Confidentiality Review

1    looking back at Mapes Exhibit 3 -- define the

2    form or format that a suspicious order report

3    must take?

4         A.    It does not.

5         Q.    Does it say what information is

6    supposed to be provided to DEA?

7         A.    No, it doesn't.

8         Q.    Does the regulation in Mapes

9    Exhibit 3 say anything about whether a

10   registrant can ship a suspicious order?

11              MR. BENNETT:  Objection.  Form.

12              THE WITNESS:  No, it doesn't.

13   QUESTIONS BY MS. MCCLURE:

14        Q.    And this section of the

15   regulation, 1301.74(b), it has not changed

16   since 1971?

17        A.    I'm not aware of any changes.

18        Q.    Are you familiar with excessive

19   purchase reports?

20        A.    Yes.

21        Q.    What are they?

22        A.    Reports that are sent by

23   wholesalers of purchases of controlled

24   substances that they, after the fact, think

25   may be excessive.

1     Q.     Was the submission of excessive

2  purchase reports, in your experience,

3  standard practice in the industry?

4     A.     It was.

5     Q.     Was there a particular time

6  that you believe, in your experience, it was

7  standard practice in the industry to submit

8  those?

9     A.     From the time I started with

10  DEA in 1977 until we had the meetings with

11  the individual wholesalers, that was the --

12  the standard practice, to submit those.

13     Q.     And in your experience, DEA

14  reviewed those reports as compliant with the

15  Controlled Substances Act?

16          MR. BENNETT:  Objection.

17     Scope.

18          This is not a 30(b)(6) witness

19     who can speak on behalf of DEA.

20          You may answer in your personal

21     capacity within the limits of the

22     scope letter.

23          THE WITNESS:  Yeah, I viewed

24     those as compliant with the regulation

25     for suspicious orders.

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.      And in your experience of

 3    conducting audits of distribution centers,

 4    that was one of your roles as a diversion

 5    investigator, right?

 6         A.      Yes.

 7         Q.      Conducting audits?

 8         A.      Yes.

 9         Q.      And as a group supervisor, you

10    would oversee diversion investigators who

11    were conducting audits?

12         A.      That's correct.

13         Q.      And that would include a review

14    of their suspicious order monitoring systems?

15         A.      That's correct.

16         Q.      Including the formats that they

17    were using to submit and how they were

18    identifying and reporting suspicious orders

19    to DEA?

20         A.      Correct.

21         Q.      And in the course of your role

22    as a diversion investigator and a group

23    supervisor, you accepted these excessive

24    purchase reports as compliant with the

25    Controlled Substances Act?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. BENNETT:  You can answer
 2        that.
 3                  THE WITNESS:  Yes.
 4   QUESTIONS BY MS. MCCLURE:
 5        Q.     You don't recall saying to
 6   anyone, "Hey, you can't submit these kinds of
 7   documents" in the course of your roles as a
 8   diversion investigator or a group supervisor?
 9                  MR. BENNETT:  Objection.
10        Scope.
11                  You are not authorized to
12        disclose information regarding any
13        specific DEA investigations or
14        activities.
15                  You may answer this question
16        yes or no on whether you remember
17        saying that.
18                  THE WITNESS:  Can you repeat
19        the question?
20   QUESTIONS BY MS. MCCLURE:
21        Q.     I can.
22                  You don't recall saying to
23   anyone, a registrant, for example, "You can't
24   submit these kinds of excessive purchase
25   reports and still be compliant with the
```

1    Controlled Substances Act" in your role as a

2    diversion investigator or a group supervisor?

3              MR. BENNETT:  Same objection.

4              You can answer.

5              THE WITNESS:  No, I don't

6         remember saying that.

7    QUESTIONS BY MS. MCCLURE:

8         Q.    And we've been talking about

9    excessive purchase reports, but sometimes

10   people -- registrants would call them by

11   different names.

12             Do you recall that, or in your

13   experience were they all called excessive

14   purchase reports?

15        A.    Generally referred to as

16   excessive purchase reports.  Could be called

17   suspicious order reports.

18        Q.    And were they generally in a

19   similar format across the industry?

20             MR. BENNETT:  Objection.  Form.

21        Vague.

22             You can answer it.

23   QUESTIONS BY MS. MCCLURE:

24        Q.    Do you understand my question?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    They were in different formats

 2      depending on the company that was sending

 3      them.  Some would send computer printouts.

 4      Some would send copies of invoices.  So there

 5      are different ways that they were sent.

 6          Q.     They generally provided the

 7      same kind of information?

 8          A.     Yes.

 9          Q.     About purchases and sales that

10      had already happened?

11          A.     Correct.

12          Q.     And DEA accepted those?

13                 MR. BENNETT:  Objection.

14      QUESTIONS BY MS. MCCLURE:

15          Q.     In your personal experience?

16                 MR. BENNETT:  Scope.

17                 You're not here as a 30(b)(6)

18          witness to answer on behalf of DEA.

19                 You may answer in your personal

20          capacity of what you did.

21                 THE WITNESS:  Yes, we accepted

22          those.

23                 MR. LANIER:  Did he say -- I'm

24          trying to be careful -- "we" after you

25          told him not to speak for the DEA but
```

```
 1        himself?

 2               MS. MCCLURE:  Mark --

 3               MR. BENNETT:  I believe that

 4        was his testimony, yes.

 5               MS. MCCLURE:  That is his

 6        testimony.

 7               MR. LANIER:  Okay.

 8   QUESTIONS BY MS. MCCLURE:

 9        Q.     So in your personal experience,

10   were you the only one who accepted these?

11               MR. BENNETT:  You can answer.

12               THE WITNESS:  No other groups

13        accepted the same type of reports.

14   QUESTIONS BY MS. MCCLURE:

15        Q.     So saying "we" is referring to

16   you and those other groups, right?

17        A.     The others that I was

18   supervising at the time.

19        Q.     So in the course of your role

20   as a diversion investigator, as well as the

21   time when you acted as a group supervisor and

22   had diversion investigators reporting to you,

23   yes?

24        A.     Yes.

25        Q.     Are you aware of DEA
```

1    headquarters approving particular suspicious

2    order monitoring systems submitted by a

3    registrant at any time in your experience at

4    DEA?

5              MR. BENNETT:  Objection.  Form.

6              You can answer.

7              THE WITNESS:  I do recall one

8         time that I was in headquarters and we

9         received a letter from a wholesaler

10        about their suspicious order

11        monitoring program, and we told them

12        that it did comply with the

13        requirements in the regulation.

14   QUESTIONS BY MS. MCCLURE:

15        Q.    What role were you in when you

16   received that letter?

17        A.    The deputy chief of liaison and

18   policy.

19        Q.    And when you say "we" received

20   that letter, were you personally involved

21   with the approval of that suspicious order

22   monitoring system?

23              MR. BENNETT:  You can answer.

24              THE WITNESS:  Yes.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MS. MCCLURE:
 2        Q.     Who else is encompassed within
 3   that "we" that you've provided?
 4        A.     A staff coordinator that
 5   reviewed the incoming correspondence from the
 6   company, drafted the response to the company
 7   and then sent it to me for approval, or in
 8   this case signature, to send it to the
 9   company.
10        Q.     Did you sign that?
11        A.     Yes.
12        Q.     And what company was that?
13        A.     AmerisourceBergen.
14        Q.     Can you think of any other
15   instances in which you have a personal
16   recollection of DEA's approval of a
17   suspicious order monitoring system?
18        A.     No, I cannot.
19               (Mapes Exhibit 4 marked for
20        identification.)
21   QUESTIONS BY MS. MCCLURE:
22        Q.     I'm going to mark an exhibit as
23   4.  This is a series of letters exchanged,
24   and they're all going to be amalgamated as
25   one exhibit for today.
```

1           If you could take a look

2    through those letters and let me know when

3    you've had a chance to review them.

4         A.    Okay.  I've generally reviewed

5    them.

6         Q.    Now, when I was previously

7    asking you about approvals, you recalled a

8    situation in which you had signed a letter to

9    AmerisourceBergen.

10          Is that a different set of

11   letters or a letter that is not this set

12   that's marked as Exhibit 4?

13        A.    Yes, it's not included in here.

14        Q.    Okay.  So let me back up.

15          This set of letters is dated in

16   the '96 to '98 time period, right?  Over a

17   time span through '96, '97, and then ending

18   in June 23rd -- I'm sorry, July 23, '98,

19   right?

20        A.    Correct.

21        Q.    And these are exchanged between

22   the Department of Justice, DEA Enforcement

23   Administration -- I'm sorry, the Drug

24   Enforcement Administration and Chris

25   Zimmerman at Bergen, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Correct.

 2          Q.      So not AmerisourceBergen

 3    because this predated the merger with

 4    Amerisource.

 5                  Are you aware of that?

 6                  MR. BENNETT:  Objection.  Form.

 7                  THE WITNESS:  Could you restate

 8        the question?

 9    QUESTIONS BY MS. MCCLURE:

10          Q.      Yes, I can.

11                  As of 1998, Bergen was a

12    separate company from Amerisource.

13                  Do you know that, or am I

14    telling you --

15          A.      Yes.

16          Q.      You are aware of that?

17          A.      Yes, I am.

18          Q.      Okay.  You previously told me

19    you had signed a letter approving a system

20    that AmerisourceBergen had.

21                  Was that a later letter that

22    was subsequent to the 2001 merger between

23    Amerisource and Bergen, or was that a letter

24    that you recall being part of this exchange

25    with Bergen?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.     It was subsequent to this.   It

2   was after the merger of Amerisource and

3   Bergen.

4     Q.     Do you recall the approximate

5   time period of the approval letter that you

6   recall signing regarding AmerisourceBergen's

7   suspicious order monitoring program that had

8   to have been after 2001, which was the merger

9   of those two companies?

10          MR. BENNETT:  Objection.  Form.

11          THE WITNESS:  No, I don't

12      recall the time frame.

13   QUESTIONS BY MS. MCCLURE:

14     Q.     Can we agree it would have --

15   you recall it being AmerisourceBergen, so

16   after the merger in 2001, if I'm telling you

17   the correct date of the merger, right?

18     A.     Yes.

19     Q.     Would it have been prior to

20   2007, which is when there was a settlement

21   and release agreement executed between DEA

22   and AmerisourceBergen?

23     A.     Yes.

24     Q.     So sometime in between 2001 and

25   2007, you recall a different exchange of

1    letters that is not reflected here in Mapes

2    Exhibit 4 in which you signed a document, a

3    letter, approving AmerisourceBergen's

4    suspicious order monitoring system?

5         A.     That's correct.

6         Q.     In your experience at DEA,

7    would letters approving suspicious order

8    monitoring systems be things that were

9    retained, kept by DEA?

10             MR. BENNETT:  Objection.

11        Scope.  Calls for speculation.

12             You can answer.

13             THE WITNESS:  Generally all

14        correspondence was retained.

15   QUESTIONS BY MS. MCCLURE:

16        Q.     Okay.  So is it reasonable to

17   think that a letter approving a suspicious

18   order monitoring system, of which you can

19   only recall one instance of it happening,

20   would be something that would be retained by

21   DEA?

22             MR. BENNETT:  Objection.

23        Scope.  Calls for speculation.

24             You can answer.

25             THE WITNESS:  Yes.

```
 1   QUESTIONS BY MS. MCCLURE:

 2        Q.    So you don't recall when in

 3   between '01 and '07 this would have been?

 4        A.     It would have been while I was

 5   deputy chief of the liaison and policy

 6   section, so it would have been during that

 7   time frame.

 8        Q.    And would you be so kind as to

 9   remind me to the best of your recollection

10   when that time frame was?

11              MR. BENNETT:  Objection.  Asked

12        and answered.

13              MS. MCCLURE:  Yeah, it is asked

14        and answered.

15              MR. BENNETT:  You can answer.

16              MS. MCCLURE:  I just don't

17        remember.

18              MR. BENNETT:  You can answer

19        again.

20   QUESTIONS BY MS. MCCLURE:

21        Q.    Was that approximate --

22              MR. BENNETT:  Wait a second.

23              MS. MCCLURE:  Okay.

24              MR. BENNETT:  You have a

25        question pending.
```

 1          MS. MCCLURE:  Yeah, I have a

 2      question pending, you're right.

 3          THE WITNESS:  I can't recall

 4      the exact dates of that.

 5  QUESTIONS BY MS. MCCLURE:

 6      Q.    But that was immediately prior

 7  to you becoming chief of the E-Commerce

 8  section in 2004?

 9      A.    No, it was immediately prior to

10  me becoming chief of the administrative

11  section.

12      Q.    Planning and resources?

13      A.    The planning and resources

14  section.

15      Q.    And you did that from

16  approximately 2003 to 2004 as to your prior

17  testimony?

18      A.    Correct.

19      Q.    So can we limit the time period

20  for when this letter would have been as

21  sometime between 2001 and then 2003 when you

22  took over the chief of the planning and

23  resources section?

24      A.    Yes.

25      Q.    Division?  Section?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Section.

 2          Q.      Section.

 3                  Okay.  So between '01 and '03.

 4                  Understanding you've been gone

 5     from DEA since 2007, do you have a copy of

 6     this letter in your personal possession?

 7          A.      No.

 8          Q.      Do you recall to whom you sent

 9     this letter approving of AmerisourceBergen's

10     suspicious order monitoring system sometime

11     between 2001 and 2003?

12          A.      To Chris Zimmerman at

13     AmerisourceBergen.

14          Q.      How did that letter come about?

15     What led to you -- strike that.

16                  What led to you issuing that

17     letter?

18                  MR. BENNETT:  Objection.

19          Scope.

20                  You are not authorized to

21          disclose the internal deliberative

22          process of the Department of Justice

23          or any attorney-client communication

24          or privileged conversations.

25                  To the extent you can answer
```

1          the question without disclosing that

2          information, you may answer.

3                    THE WITNESS:  It was in

4          response to a letter from

5          AmerisourceBergen.

6     QUESTIONS BY MS. MCCLURE:

7          Q.     Was that letter from

8     AmerisourceBergen from Chris Zimmerman?

9          A.     It was.

10         Q.     Did you know Chris Zimmerman at

11    the time -- in this 2001 to 2003 time period?

12         A.     No.

13         Q.     And you said you recall a staff

14    coordinator passing that letter on to you for

15    evaluation?

16         A.     To review, yes.

17         Q.     What do you recall, if

18    anything, doing to evaluate the request?

19         A.     I don't --

20                MR. BENNETT:  Objection.  Same

21         instruction regarding the internal

22         deliberative process.

23                You can answer.

24                THE WITNESS:  I don't recall.

25

```
 1          A.      No, I've seen it other times

 2     between the time I retired and yesterday.

 3          Q.      Do you recall how you saw it

 4     those other times?

 5          A.      It was from a registrant, I

 6     can't remember which one, but a registrant

 7     that sent it to me that had received it from

 8     DEA.

 9          Q.      Do you recall whether it would

10     have been shortly after this letter was sent

11     in the early course of your consulting work,

12     or was it later than that, if you can --

13          A.      It was later than that.

14          Q.      So it's fair to say from your

15     answers that you, it seems, did not review

16     this letter prior to it being issued, say, in

17     the last months of your tenure at DEA?

18               MR. BENNETT:  Objection.

19          Scope.

20               You're not authorized to

21          disclose the internal deliberations of

22          DEA.

23               You may answer that question

24          yes or no only, whether you saw it

25          prior to leaving DEA, a draft.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  No, I did not.
 2   QUESTIONS BY MS. MCCLURE:
 3        Q.     If we look at paragraph 3 of
 4   this letter, the second sentence says,
 5   "Filing a monthly report of completed
 6   transactions, e.g., excessive purchase report
 7   or high unit purchases, end parens, does not
 8   meet the regulatory requirement to report
 9   suspicious orders."
10                 Based on your experience at
11   DEA, was this a change in how DEA handled
12   suspicious order reporting?
13                 MR. BENNETT:  Objection.
14        Scope.
15                 You're not here as a 30(b)(6)
16        witness to talk on behalf of DEA.
17                 You may disclose your personal
18        knowledge regarding this topic from
19        your time at DEA, what you personally
20        did.
21                 THE WITNESS:  I believe from my
22        experience it was a change.
23   QUESTIONS BY MS. MCCLURE:
24        Q.     Because previously in your
25   experience at DEA excessive purchase reports
```

Highly Confidential - Subject to Further Confidentiality Review

1   had been accepted by DEA for suspicious order

2   reporting as you previously testified,

3   correct?

4            MR. BENNETT:  Objection.

5       Scope.  This is not a 30(b)(6) witness

6       that can answer on behalf of DEA.

7            You may answer what you

8       personally did while at DEA in

9       response to that question.

10           THE WITNESS:  It was a change

11      that was started, from my experience,

12      when we had the meetings with

13      individual wholesalers, individual

14      distributors, starting in 2005.

15  QUESTIONS BY MS. MCCLURE:

16      Q.    So in 2005, which you've just

17  referenced, you began talking with

18  distributors on something called the

19  Distributor Initiative?

20      A.    That's correct.

21      Q.    Whose idea was the Distributor

22  Initiative?

23           MR. BENNETT:  Objection.

24      Scope.  Objection.

25           You're not to disclose internal

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  They may know

2          about that.  If their salespeople were

3          in the pharmacy and talked to the

4          pharmacist, they may know those

5          things.

6    QUESTIONS BY MS. MCCLURE:

7          Q.     Okay.  Do you recall whether

8    you or others with whom you worked, to the

9    extent you know, sent this kind of

10   information out frequently or whether it was

11   uncommon?

12                   MR. BENNETT:  Objection.

13         Vague.  Compound.

14                   THE WITNESS:  Uncommon.

15   QUESTIONS BY MS. MCCLURE:

16         Q.     In the course of your

17   employment at DEA, you were aware that

18   registrants were shipping orders that had

19   been reported to DEA as suspicious, right?

20                   MR. BENNETT:  Objection.

21         Scope.

22                   This is beyond the scope that

23         this witness has been authorized.

24                   You may answer based on your

25         personal recollection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  After having the
 2           distributor briefings with individual
 3           wholesalers, I don't recall instances
 4           where products that were reported as
 5           suspicious were shipped.
 6    QUESTIONS BY MS. MCCLURE:
 7           Q.      Does the Controlled Substances
 8    Act say that registrants should not ship
 9    suspicious orders?
10                    MR. BENNETT:  Objection.  Form.
11           Calls for a legal conclusion.
12                    You can answer based on your
13           personal capacity, not on behalf of
14           DEA.
15                    If you know.
16                    THE WITNESS:  Not specifically,
17           no.
18    QUESTIONS BY MS. MCCLURE:
19           Q.      And if an order is unusual in
20    size, frequency or pattern, do you agree that
21    that does not necessarily mean that that
22    order is going to be diverted?
23                    MR. BENNETT:  Objection.
24           Vague.  Objection.  Incomplete
25           hypothetical.
```

1          You can answer it.

2          THE WITNESS:  I agree.

3  QUESTIONS BY MS. MCCLURE:

4     Q.    And so the fact that an order

5  or a portion of an order is diverted after a

6  distributor ships it, would you agree that

7  that does not make that order that has

8  already been shipped now suspicious, if it

9  was not suspicious at the time it was

10 shipped?

11          MR. BENNETT:  Objection.

12     Vague.  Objection.  Calls for

13     speculation.  Legal conclusion.

14          You may answer in your personal

15     capacity but not on behalf of DEA.

16          THE WITNESS:  I don't really

17     understand the nuances there.

18 QUESTIONS BY MS. MCCLURE:

19     Q.    Okay.  If an order is not

20 suspicious and is therefore filled and

21 shipped and later downstream is diverted,

22 that fact of that diversion does not now

23 render the order suspicious; do you agree

24 with that?

25          MR. BENNETT:  Objection.  Same

1        objections.

2                You can answer in your personal

3        capacity.

4                THE WITNESS:  Yes.

5    QUESTIONS BY MS. MCCLURE:

6        Q.      Similarly, if an order is

7    regarded as suspicious but is shipped, would

8    you agree that that order is not necessarily,

9    in fact, going to be diverted?

10               MR. BENNETT:  Objection.  Calls

11       for speculation.  Vague.  Incomplete

12       hypothetical.  Outside the scope.

13               You may answer in your personal

14       capacity but not on behalf of DEA.

15               THE WITNESS:  Yes.

16               MS. MCCLURE:  It's 1:06.  I'm

17       going to suggest we go ahead and take

18       a lunch break.  That may allow us to

19       streamline.

20               MR. BENNETT:  Okay.  That's

21       fine.

22               VIDEOGRAPHER:  We're going off

23       record.  The time is 1:06.

24        (Off the record at 1:06 p.m.)

25               VIDEOGRAPHER:  We're going back

```
 1    pharmacies."

 2             Do you see that language there?

 3        A.      I do.

 4        Q.      Can you explain the exception

 5    for retail chain pharmacies?

 6        A.      No, I didn't discuss that

 7    particular exception with him, so I don't

 8    know why he included that.

 9        Q.      Did you review Mr. Zimmerman's

10    PowerPoint prior to co-presenting with him at

11    this DEA-sponsored industry conference?

12        A.      I'm not sure he had a

13    PowerPoint.

14             (Mapes Exhibit 17 marked for

15        identification.)

16    QUESTIONS BY MS. MCCLURE:

17        Q.      Show you a document that is

18    marked Mapes 17.

19        A.      I've reviewed this.

20        Q.      So does this refresh your

21    recollection that Chris Zimmerman had a

22    PowerPoint that he presented at the

23    September 11, 2007 industry conference?

24        A.      No, I still don't remember the

25    presentation details.
```

1    Q.    Okay.  I'm not asking if you

2    remember the presentation details.  I'm just

3    asking if you recall that Chris Zimmerman

4    stood on stage with you and made a

5    presentation and that it had a PowerPoint

6    attached in connection with it.

7    A.    We were both --

8              MR. BENNETT:  Objection.

9    Compound.

10             You can answer.

11             THE WITNESS:  We were both on

12        stage for a presentation, but I don't

13        remember the PowerPoint.

14   QUESTIONS BY MS. MCCLURE:

15   Q.    Okay.  Was there anyone else

16   from DEA who presented on this changed

17   AmerisourceBergen program along with

18   Mr. Zimmerman, or was it only you?

19   A.    It was just Mr. Zimmerman and

20   myself.

21   Q.    Do you recall referring to this

22   changed program as the new industry standard?

23   A.    No, I don't recall that.

24   Q.    Do you believe that -- was it

25   your understanding that it was expected by

1   DEA, to your understanding, to serve as a new

2   standard?

3                    MR. BENNETT:  Objection.

4            Scope.

5                    You're not authorized as a

6            30(b)(6) witness to speak on behalf of

7            DEA.  You may answer based on your

8            personal understanding at the time.

9                    THE WITNESS:  It's my

10           understanding that the

11           AmerisourceBergen system was an

12           example of a system that contained the

13           type of information that we were

14           looking for.

15   QUESTIONS BY MS. MCCLURE:

16           Q.     And was compliant with the

17   Controlled Substances Act?

18           A.     Yes.

19           Q.     And was being carried out in

20   connection with the program that you had

21   reviewed based on your personal, on-site

22   reviews of those distribution centers?

23           A.     Yes.

24           Q.     If you turn to page 9 of

25   whatever this PowerPoint exhibit is --

Highly Confidential - Subject to Further Confidentiality Review

1          MR. BENNETT:  Mapes 17.

2          MS. MCCLURE:  Thank you.  Yes,

3     Mapes 17.

4     QUESTIONS BY MS. MCCLURE:

5          Q.    -- which has little Bates

6     numbers on it that end in 1786.

7          It says, "Historically,

8     controlled substance" -- I'm looking at the

9     second and third bullet -- "slash, listed

10    chemical order monitoring has been based on a

11    ship and report process."

12         And the next bullet, "ABC's OMP

13    process is now based on identify, capture,

14    investigate and report suspicious orders, all

15    prior to shipment."

16         Do you see that language?

17         A.    Yes, I do.

18         Q.    And was it your understanding

19    that this was one of the new features of the

20    changed program that AmerisourceBergen had

21    developed?

22         A.    Yes.

23         Q.    And this was new not just to

24    AmerisourceBergen but to the wholesale

25    industry?

1   that.

2              Do you recall actually visiting

3   pharmacies on behalf of ABDC?

4        A.    Yes.

5        Q.    Do you recall how often?

6        A.    Generally it would be two or

7   three times a year for a week, but seeing

8   several pharmacies in that week's time in a

9   part of the country.

10       Q.    What kind of activities would

11  you perform at the pharmacy?

12       A.    Looking at the pharmacies,

13  seeing what kind of customers they had, what

14  kind of drugs they were selling, the

15  relationship between the pharmacy and the

16  physicians, discussing issues with the

17  pharmacist.

18       Q.    Did anyone from ABDC accompany

19  you on these visits to pharmacies?

20       A.    Yes, every time.

21       Q.    And do you know whether ABDC

22  was also performing other on-site visits at

23  pharmacies that you were not personally

24  involved with?

25       A.    Yes, they were.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Did you also perform audits of

2  AmerisourceBergen Drug Corporation's

3  suspicious order monitoring program?

4      A.      Yes, I did.

5      Q.      How many times did you audit

6  the order monitoring program?

7      A.      Annually for five or six years.

8      Q.      And do you recall concluding

9  that ABDC's suspicious order monitoring

10 program for those audits that you conducted

11 was in compliance with the Controlled

12 Substances Act?

13     A.      That's not the review that I

14 was conducting.

15     Q.      Tell me about the review that

16 you were conducting.

17     A.      I was looking at it to

18 determine if it was in compliance with the

19 ABC policies and procedures.

20     Q.      Okay.  And those ABC policies

21 and procedures were the policies and

22 procedures that were developed in connection

23 with the changed program in 2007, correct?

24     A.      In conjunction with that and

25 changes that were made subsequent to that.

1        Q.      Okay.  So it would have been

2    the policies and procedures that were enacted

3    that you would have reviewed back in 2007

4    during your time at DEA, as well as any

5    updates or improvements that had been made to

6    them subsequent?

7        A.      Yes.

8        Q.      And did you determine that ABDC

9    was in compliance with its policies and

10   procedures for these annual audits?

11       A.      There were generally issues to

12   discuss, improvements to be made, but

13   generally in compliance, yes.

14       Q.      Going back to excessive

15   purchase reports.

16               DEA's acceptance of excessive

17   purchase reports changed at some point,

18   correct?

19               MR. BENNETT:  Objection.

20        Scope.

21               You're not authorized to speak

22        on behalf of DEA.  You may speak on

23        your personal knowledge of what you

24        observed while working at DEA.

25               THE WITNESS:  The nature of the

1        reports that I was involved with that

2        were accepted did change, yes.

3    QUESTIONS BY MS. MCCLURE:

4        Q.      And what was the change?

5        A.      It was change from a report

6    that was called an excessive purchase report

7    after the fact to a report that was of

8    specific suspicious orders before they were

9    shipped.

10       Q.      And that's the change that

11   we've talked about that AmerisourceBergen had

12   in the April, May, June 2007 time period that

13   you reviewed, correct?

14       A.      Yes.

15       Q.      Were you aware of any industry

16   participants making that change prior to that

17   program that you reviewed in April, May and

18   June of 2007?

19       A.      I don't recall the exact dates

20   when other companies were making the changes,

21   but it was a change that happened routinely

22   after we had the Distributor Initiative

23   meeting with companies.

24       Q.      And was this -- do you know if

25   this was viewed by industry, based on your

Highly Confidential - Subject to Further Confidentiality Review

1    registration fees?

2          A.      The majority is registration

3    fees.  There are also a few positions that

4    are from appropriated funds, but very few.

5          Q.      Earlier today you testified

6    about the emergence of Internet pharmacies in

7    the early 2000s.

8                  Do you recall that testimony?

9          A.      Yes, I do.

10         Q.      Internet pharmacies represented

11   a significant shift in pharmaceutical

12   diversion, correct?

13                 MR. BENNETT:  Objection.

14         Vague.

15                 You can answer.

16                 THE WITNESS:  They did

17         represent a shift.

18   QUESTIONS BY MR. EPPICH:

19         Q.      There were concerns that DEA's

20   anti-diversion group was understaffed to

21   address the Internet pharmacy issue?

22         A.      I don't recall those concerns,

23   no.

24         Q.      DEA decided that one way to

25   help combat the Internet pharmacies would be

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to establish this Internet Distributor

 2    Initiative, correct?

 3              Excuse me, the Internet -- let

 4    me strike that.

 5              One way that -- and DEA decided

 6    that one way to combat the Internet pharmacy

 7    issue would be to establish the Distributor

 8    Initiative, correct?

 9              MR. BENNETT:  You can answer.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. EPPICH:

12        Q.    And these Distributor

13    Initiative meetings were meant to educate

14    distributors about Internet pharmacies?

15        A.    Yes.

16        Q.    And during the Distributor

17    Initiative meetings, you introduced

18    additional diligence, guidance and

19    instructions to distributors to confirm that

20    a distributor is not servicing a rogue

21    Internet pharmacy, correct?

22              MR. BENNETT:  Objection.

23        Vague.

24              THE WITNESS:  To help them

25        understand what to look at to
```

1        determine if a customer is a rogue

2        Internet pharmacy.

3    QUESTIONS BY MR. EPPICH:

4        Q.    The objective of this

5    additional diligence that you were requesting

6    out of distributors was for the distributors

7    to be able to identify those rogue Internet

8    pharmacy customers of theirs, correct?

9        A.    Yes.

10        Q.    You were not intending the

11    additional diligence to require distributors

12    to investigate the inner workings of every

13    independent pharmacy across America that they

14    may service, correct?

15            MR. BENNETT:  Objection.

16        Vague.  Objection.  Scope.

17            You may speak on your personal

18        capacity but not on behalf of DEA in

19        response to this question.

20            THE WITNESS:  I was expecting

21        that over time they would use the same

22        procedures for all the pharmacies that

23        they were dealing with to be certain

24        that there wasn't a problem that they

25        wouldn't see without the extra due

Highly Confidential - Subject to Further Confidentiality Review

1     diligence.

2     QUESTIONS BY MR. EPPICH:

3          Q.     And the problem that they were

4     to be looking for was whether or not they

5     were an Internet pharmacy?

6          A.     An Internet pharmacy or any

7     pharmacy that was selling drugs for other

8     than legitimate medical purpose.

9          Q.     Such as a pill mill, correct?

10         A.     Yes.

11         Q.     Now, during the distributor

12    briefings, you told distributors that you

13    were not concerned with large retail chain

14    pharmacies at the time, correct?

15         A.     No.

16         Q.     That's not correct?

17         A.     I don't believe so.

18         Q.     Do you recall instructing

19    distributors at the distributor briefings to

20    conduct due diligence on retail chain

21    pharmacies?

22         A.     I don't recall that we made a

23    distinction between retail chain pharmacies

24    and independent pharmacies.

25         Q.     In asking the distributors to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EPPICH:

 2         Q.    But it's not always, is it,

 3    sir?

 4         A.    I don't think so.

 5         Q.    You'd agree with me the

 6    distributors have no insight into determining

 7    whether a doctor has overprescribed opioids

 8    to her patient?

 9              MR. BENNETT:  Objection.  Form.

10         Calls for speculation.  Incomplete

11         hypothetical.

12              THE WITNESS:  Generally not.

13    QUESTIONS BY MR. EPPICH:

14         Q.    Are you familiar with the term

15    "illegal prescribing"?

16         A.    Yes.

17         Q.    What is illegal prescribing?

18         A.    Prescribing controlled

19    substances for other than a legitimate

20    medical purpose.

21         Q.    Is illegal prescribing a form

22    of diversion?

23         A.    Yes.

24         Q.    You'd agree with me that

25    illegal prescribing contributes to the opioid
```

1    crisis?

2         A.      Yes.

3         Q.      Earlier today you testified

4    about meetings that you had with the

5    plaintiffs' counsel in 2018.

6              Do you remember that testimony?

7         A.      Yes.

8         Q.      I believe you said you had two

9    meetings, one in the summer and one in the

10   fall of 2018, correct?

11        A.      Yes.

12        Q.      Now, did you -- during those

13   meetings with the plaintiffs' counsel in

14   2018, did you tell plaintiffs' counsel that

15   the DEA had approved the distributors'

16   submission of excessive purchase reports

17   after orders had been shipped?

18        A.      I believe that was discussed,

19   yes.

20        Q.      Did you tell plaintiffs'

21   counsel during those meetings that in your

22   experience excessive purchase reports

23   complied with the requirements of the

24   Controlled Substances Act and its

25   regulations, at least for your time at DEA

1    between 1977 and the distributor briefings?

2         A.     Yes.

3         Q.     Did you tell plaintiffs'

4    counsel during these meetings in 2018 that

5    the Controlled Substances Act and its

6    regulations do not include a no shipping

7    requirement?

8         A.     I don't believe so.

9         Q.     You didn't discuss the no

10   shipping requirement?

11        A.     I don't recall that

12   specifically.

13        Q.     During these meetings with the

14   plaintiffs' counsel in 2018, did you tell

15   plaintiffs' counsel the distributor briefings

16   focused on Internet pharmacy issues?

17        A.     Yes.

18        Q.     Did you tell plaintiffs'

19   counsel that the additional diligence you

20   requested of distributors at these

21   distributor briefings was to help identify

22   Internet pharmacies?

23        A.     I don't recall specifically

24   that was how it was worded.

25        Q.     But something similar?

```
 1          A.      Yes.

 2          Q.      At these meetings with

 3   plaintiffs' counsel in 2018, did you tell

 4   plaintiffs' counsel that distributors had no

 5   access to the ARCOS data submitted by other

 6   distributors?

 7          A.      I don't believe so.

 8          Q.      Did you discuss ARCOS data with

 9   the plaintiffs' counsel in 2018?

10          A.      There was a discussion of ARCOS

11   data, what it consists of and what's

12   available.

13          Q.      Did you discuss who had access

14   to ARCOS data during your meetings with

15   plaintiffs' counsel?

16          A.      I don't recall if we did.

17          Q.      After your discussions with the

18   plaintiffs' counsel, the plaintiffs did not

19   contact you to ask you to serve as an expert

20   for plaintiffs in this case, correct?

21          A.      That's correct.

22          Q.      Do you recall what other topics

23   you discussed with plaintiffs' counsel during

24   these meetings in 2018?

25          A.      Not really.  It was just a
```

1    record.  The time is 4:20.

2        (Off the record at 4:20 p.m.)

3            VIDEOGRAPHER:  We're going on

4        the record.  Beginning of Media

5        File 10.  The time is 4:34.

6            EXAMINATION

7    QUESTIONS BY MR. STEPHENS:

8        Q.    Mr. Mapes, good afternoon.  My

9    name's Neal Stephens.  I'm from the Jones Day

10   law firm, and I represent Walmart.

11            We met earlier today, but you

12   and I have never spoken before?

13       A.    That's correct.

14       Q.    Okay.  I'll also be asking you

15   some questions, not just on Walmart's behalf

16   but also on behalf of retail chain

17   pharmacies.  And for your benefit, that will

18   include CVS, Rite Aid, Walgreens and HBC and

19   Giant Eagle.

20            Okay?

21       A.    Yes.

22       Q.    Okay.  All right.

23            And since I'm going last, I've

24   carved out a lot of material out of my

25   outline, but I do have a couple follow-up

1  questions on some of the topics that you've

2  already testified to today.

3           Okay?

4    A.     Okay.

5    Q.     And the first one is, there was

6  a series of questions from a couple of my

7  colleagues that related to shipping orders

8  that had been flagged as suspicious.

9           Do you recall that line of

10  questions?

11   A.     Yes.

12   Q.     And you had indicated that at

13  some point you were aware that registrants

14  had a practice of shipping orders that had

15  been reported as suspicious.

16          Do you recall that?

17   A.     That had been reported before

18  2005 in excess -- in suspicious or excessive,

19  that they had shipped those.

20   Q.     I'm just -- right.

21          So my point is that you were

22  just aware that there had been a practice at

23  some point in time that orders that had been

24  flagged as potentially suspicious had still

25  been shipped.  I'm just trying to reorient

1    you --

2        A.    Yes.

3        Q.    -- to that testimony.  Okay?

4            Now, is it fair --

5            MR. BENNETT:  Objection.

6        Mischaracterizes his testimony.  He

7        said suspicious or excessive, not just

8        suspicious.

9    QUESTIONS BY MR. STEPHENS:

10        Q.    Okay.  Is it fair to say that

11    you're not aware of any deadline that DEA set

12    that changed this practice related to the

13    shipping of suspicious orders?

14        A.    I'm aware that the practice was

15    changed as we had meetings with wholesalers

16    in 2005 and beyond; that then they changed

17    from sending the excessive or suspicious

18    orders after the fact, and they started doing

19    it ahead of the fact and then resolving that

20    suspicion before they shipped.

21        Q.    Okay.  Mr. Mapes, but are you

22    aware of any deadline that was set, any date

23    certain set by DEA sent out to the

24    registrants, as to what date that practice

25    had to change?

Highly Confidential - Subject to Further Confidentiality Review

1            MR. BENNETT:  Objection.  Asked

2       and answered.

3            THE WITNESS:  I'm not aware of

4       a specific deadline.

5  QUESTIONS BY MR. STEPHENS:

6       Q.    Okay.  All right.  Another

7  topic that you addressed earlier today in the

8  first session of questioning related to what

9  DEA's expectations were of various

10 registrants about how they designed their SOM

11 system.

12            Do you recall that line of

13 questions?

14      A.    Yes.

15      Q.    And just to reorient you, it

16 was basically along the lines of your

17 expectation was that a SOMs system for a

18 registrant was not a one-size-fits-all

19 proposition, correct?

20      A.    Correct.

21      Q.    It would depend on the

22 registrant's business model, right?

23      A.    Yes.

24      Q.    Okay.  And it's a situation

25 where, for example, some distributors supply

1    them about the issues presented by rogue

2    Internet pharmacies?

3         A.    That's correct.

4         Q.    Can you recall how many

5    meetings you personally attended?

6         A.    No.

7         Q.    Can you estimate?

8               Was it more than ten?

9         A.    My estimate is 10 or 12.

10        Q.    Okay.  But it wouldn't have

11   been more than 15?

12        A.    I'm not really certain.

13        Q.    Okay.  How about this:  It

14   wouldn't have been more than 20?

15        A.    Probably not.

16        Q.    Okay.  Were there others?  Did

17   you have other colleagues at DEA during this

18   time frame that you're aware of who were also

19   meeting with wholesale distributors on this

20   distributor briefing?

21        A.    There were others after I

22   retired from DEA who were doing it.  I think

23   I was involved in every one of the

24   distributor briefings while I was still

25   there.

1     Q.     Okay.  And can you refresh me

2   on when these briefings started?

3            Was it 2005?

4     A.     Yes.

5     Q.     Okay.  And you retire in

6   mid-2007?

7     A.     October of 2007, yes.

8     Q.     You remember that date, right?

9     A.     Yes.

10    Q.     Okay.  After 30 years, you can

11  remember that date, right?

12           Okay.  Fair enough.

13           All right.  So in between 2005

14  and October of 2007, your recollection is, is

15  that there were about 12 or so Internet

16  distributor briefings that you conducted with

17  wholesale distributors?

18    A.     Yes.

19    Q.     Okay.  And was each of those

20  like a one-on-one meeting between DEA and one

21  wholesale distributor?

22    A.     One distributor, several people

23  from the distributor at times, sometimes an

24  individual, and sometimes with counsel,

25  sometimes without.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  So my point, Mr. Mapes,

2    is your recollection of the entirety of the

3    number of wholesale distributors who received

4    this briefing during your career at DEA is

5    about 12?

6        A.      About that.

7        Q.      Okay.  How did DEA -- or how

8    did you select which wholesale distributor

9    was going to receive the briefing?

10       A.      We started at first with

11   Amerisource, Cardinal and McKesson because

12   they're obviously those with the largest

13   volume, and then we went to lower volume

14   distributors such as HD Smith and others that

15   were maybe regional distributors, not

16   nationwide distributors, that kind of thing.

17       Q.      Okay.  So you've identified

18   four.

19              Can you recall any of the other

20   eight or so that you met with during your

21   career?

22       A.      Not right now, I can't.

23       Q.      You did not meet with Walmart

24   to provide an Internet distributor briefing

25   between 2005 and 2007, correct?

1    A.    That's correct.

2    Q.    Do you agree that during this

3    time frame DEA acknowledged in presentations

4    that it made that no chain pharmacies were

5    rogue pharmacies?

6         MR. BENNETT:  You can answer.

7         THE WITNESS:  I don't believe

8    that was in DEA presentations.

9    QUESTIONS BY MR. STEPHENS:

10   Q.    Okay.  Let me see if I can

11   refresh your recollection.

12   A.    Okay.

13        (Mapes Exhibit 19 marked for

14   identification.)

15   QUESTIONS BY MR. STEPHENS:

16   Q.    So I'm going to show you what's

17   been marked as Deposition Exhibit Number 19.

18   It's a document that is Bates-numbered

19   US-DEA-00002413.

20        And if you look at the very

21   first slide, it says "Internet Pharmacies."

22   It's got Mr. Rannazzisi's name there, and

23   it's a slide deck.

24        Do you see that?

25   A.    Yes.

1    Q.    And I'd ask you to turn to

2  Slide 50 in the presentation.  It's almost

3  all the way at the back, Mr. Mapes.

4            Do you see that?

5    A.    I do.

6    Q.    And Slide 50 details -- the

7  title is "The Rogue Pharmacy."

8            Do you see that?

9    A.    Yes.

10    Q.    Do you see the second bullet?

11    A.    Yes.

12    Q.    What does the second bullet

13  say?

14    A.    "No chain pharmacies."

15    Q.    Okay.  And does this appear to

16  you to be a presentation that DEA provided on

17  the topic of Internet pharmacies?

18            MR. BENNETT:  Objection.

19        Foundation.

20            And I also object that the

21        witness did not have a chance to

22        review the entire document or

23        understand the context of the

24        particular slide that you pointed him

25        out to.

1          Scope.  Vague.  Incomplete

2          hypothetical.  Calls for speculation

3          and calls for a legal conclusion.

4                    THE WITNESS:  I believe the DEA

5          should take some appropriate action,

6          and that should be expected.

7     QUESTIONS BY MR. STEPHENS:

8          Q.    Okay.  Let me switch gears here

9     a little bit.

10                    And what I'd like to do is ask

11    you some questions about some of -- some of

12    the investigative techniques that DEA has

13    that may be different than what a registrant

14    might be able to do as it's setting up its

15    SOM program.

16                    Okay?

17         A.    Okay.

18         Q.    During your tenure as a DEA

19    investigator, were there occasions where you

20    were able to identify a potential diverter

21    based on information that DEA developed as

22    opposed to information that was provided to

23    DEA by a registrant in a suspicious order

24    report?

25                    MR. BENNETT:  Objection.

1       Scope.

2               You may answer that question

3       yes or no only.

4               THE WITNESS:  Yes.

5    QUESTIONS BY MR. STEPHENS:

6       Q.      Okay.  Would you agree that DEA

7    has unique law enforcement investigative

8    powers that are available to DEA to identify

9    potential diverters that are not available to

10   a registrant like Walmart?

11              MR. BENNETT:  Objection.

12      Vague.

13              THE WITNESS:  Yes.

14   QUESTIONS BY MR. STEPHENS:

15      Q.      Okay.  DEA has subpoena power,

16   for example, correct?

17      A.      That's correct.

18      Q.      Walmart does not have subpoena

19   power to subpoena a doctor, correct?

20      A.      Not that I'm aware of.

21      Q.      Okay.  Now, DEA can issue

22   subpoenas to help investigate potential

23   diversion, right?

24              MR. BENNETT:  Objection.  Form.

25

1   QUESTIONS BY MR. STEPHENS:

2       Q.    Based on your experience, do

3   you agree that DEA can issue a subpoena to

4   help investigate potential diverters?

5               MR. BENNETT:  You can answer,

6       if you know.

7               THE WITNESS:  Yes.

8   QUESTIONS BY MR. STEPHENS:

9       Q.    Okay.  And during your time at

10  DEA, DEA collected information in diversion

11  investigation through subpoenas?

12              MR. BENNETT:  Objection.

13      Scope.

14              You may answer that question

15      yes or no only.

16              THE WITNESS:  Yes.

17  QUESTIONS BY MR. STEPHENS:

18      Q.    To your knowledge, did Joe

19  Rannazzisi ever authorize you or anyone else

20  to share information with any registrant the

21  DEA had obtained through subpoenas?

22              MR. BENNETT:  Objection.

23      Scope.

24              You may answer that question

25      yes or no only.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  No.
 2   QUESTIONS BY MR. STEPHENS:
 3        Q.     Would you agree that search
 4   warrants are a second vehicle that provide
 5   DEA an investigative tool that registrants
 6   like Walmart do not have?
 7                MR. BENNETT:  You can answer.
 8                THE WITNESS:  Yes.
 9   QUESTIONS BY MR. STEPHENS:
10        Q.     Okay.  DEA can apply to a
11   magistrate judge to obtain a search warrant,
12   right?
13        A.     Yes.
14        Q.     And a search warrant would give
15   DEA the ability to potentially search rogue
16   pain clinics to obtain documents that might
17   advance a diversion investigation the DEA is
18   conducting?
19        A.     That's correct.
20                MR. BENNETT:  Objection.
21          Objection.  Scope.
22                You can answer that yes or no
23          only based on your personal
24          experiences.
25                THE WITNESS:  Yes.
```

```
 1    QUESTIONS BY MR. STEPHENS:

 2         Q.    Okay.  Based on your personal

 3    experience, Mr. Mapes, DEA also can obtain

 4    what is known as an ISP search warrant, an

 5    Internet service provider search warrant,

 6    which allows DEA to intercept e-mail

 7    communications which would include

 8    conversations between a doctor and the

 9    doctor's patients that might relate to

10    diversion, true?

11              MR. BENNETT:  Objection.

12         Scope.

13              You are authorized to answer

14         whether you know of a document

15         entitled an "ISP search warrant" in

16         your personal experience, yes or no

17         only.

18              THE WITNESS:  No.

19    QUESTIONS BY MR. STEPHENS:

20         Q.    You've never heard of an ISP

21    search warrant?

22         A.    No.

23         Q.    Okay.  All right.

24              But just on the topic of search

25    warrants generally, we'll go to premises
```

1    search warrant, which is the first example I

2    gave you where you go to a magistrate, the

3    magistrate authorizes DEA to go to address X

4    and DEA conducts a search there.

5              You're familiar with those,

6    right?

7         A.    Yes.

8         Q.    Okay.  Now, did Joe Rannazzisi

9    ever authorize, to your knowledge, anyone at

10   DEA to disclose to any registrant any

11   information obtained from a search warrant so

12   that that registrant could help DEA in a

13   diversion investigation?

14             MR. BENNETT:  Objection.

15        Scope.

16             You may answer that question.

17             THE WITNESS:  Not that I'm

18        aware of.

19             MR. BENNETT:  Well --

20   QUESTIONS BY MR. STEPHENS:

21        Q.    Okay.

22             MR. BENNETT:  He's answered

23        your question.

24             I do object to the scope of

25        that.  I was going to authorize him to

Highly Confidential - Subject to Further Confidentiality Review

1              answer that yes or no only.

2                     He has said not to his

3              knowledge, so we can move on.

4    QUESTIONS BY MR. STEPHENS:

5              Q.     And just to reconfirm, Walmart

6    has no ability to go to a magistrate judge to

7    obtain a search warrant, right?

8              A.     That's correct.

9              Q.     No registrant can go to a

10   magistrate judge and seek a search warrant,

11   right?

12             A.     I wouldn't say that, because

13   DEA is a registrant, so...

14             Q.     Okay.  Other than law

15   enforcement agencies, no private sector

16   registrant can go to a magistrate and seek a

17   search warrant; is that fair?

18             A.     Yes.

19             Q.     All right.  The use of the

20   grand jury is a third example of an

21   investigative technique that is unique to law

22   enforcement and something that is not

23   available to private sector registrants,

24   fair?

25                    MR. BENNETT:  Objection.

 1          Scope.  Objection.  Form.  Calls for a

 2          legal conclusion.

 3                  You can answer, if you know, in

 4          your personal knowledge.

 5                  THE WITNESS:  Yes.

 6                  MR. BENNETT:  I'm sorry, I'm

 7          not sure I understand his answer to

 8          your question on whether somebody in

 9          the private sector can go to the grand

10          jury or not.

11     QUESTIONS BY MR. STEPHENS:

12          Q.     Okay.  So let me restate it.

13                 Based on your experience at

14     DEA, can anyone other than law enforcement

15     use the grand jury as a tool to conduct due

16     diligence on a customer?

17          A.     No.

18          Q.     Okay.  Would you agree that the

19     grand jury is an investigative technique that

20     is available to law enforcement and law

21     enforcement only?

22                 MR. BENNETT:  Objection.

23          Vague.  Objection.  Calls for a legal

24          conclusion.

25                  You can answer in your personal

```
 1              knowledge, if you know.

 2                   THE WITNESS:  Yes, it is a

 3              tool.

 4    QUESTIONS BY MR. STEPHENS:

 5         Q.     Okay.  And DEA can subpoena a

 6    suspected diverter to the grand jury and ask

 7    him questions under the penalty of perjury

 8    related to whether that individual has

 9    diverted any controlled substances?

10                   MR. BENNETT:  Objection.

11              Vague.  Objection.  Calls for a legal

12              conclusion.  Objection.  Foundation.

13                   If you have any personal

14              knowledge whether DEA can subpoena a

15              suspected diverter -- oh, and

16              objection.  Scope.

17                   You may answer in your personal

18              knowledge.

19                   THE WITNESS:  My personal

20              opinion is that DEA can serve a

21              subpoena that was issued, but DEA

22              doesn't issue subpoenas.

23    QUESTIONS BY MR. STEPHENS:

24         Q.     Okay.  The subpoena would be

25    issued by either a federal prosecutor's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    office, a US Attorney's office, or a state
 2    prosecutor's office?
 3         A.     Yes.
 4         Q.     A district attorney's office,
 5    right?
 6         A.     Yes.
 7         Q.     Okay.  If DEA and the
 8    prosecutors believe that a witness has lied
 9    in providing testimony to a grand jury, that
10    individual could be prosecuted for perjury,
11    right?
12              MR. BENNETT:  Objection.
13         Incomplete hypothetical.  Calls for a
14         legal conclusion.  Scope.
15              You can answer based on your
16         personal experience, if you know.
17              THE WITNESS:  I haven't had the
18         personal experience of that happening,
19         no.
20    QUESTIONS BY MR. STEPHENS:
21         Q.     Okay.  Would you agree that
22    being able to compel witnesses to the grand
23    jury and answer questions under the penalty
24    of perjury is a very valuable tool to DEA in
25    building diversion cases?
```

1          MR. BENNETT:  Objection.

2     Vague.  Scope.  Calls for a legal

3     conclusion.

4          You can answer.

5          THE WITNESS:  Yes.

6  QUESTIONS BY MR. STEPHENS:

7     Q.    And Walmart cannot compel

8  witnesses to testify in front a grand jury,

9  correct?

10     A.    That's correct.

11     Q.    And the other companies who

12  you've met today at your deposition, none of

13  them have the ability to compel any witnesses

14  to go to a grand jury; is that fair?

15     A.    That's correct.

16     Q.    Okay.  Would you agree that

17  conducting undercover operations present a

18  fourth example where DEA has unique

19  investigative tools to conduct diversion

20  investigations?

21          MR. BENNETT:  Objection.

22     Vague.  Objection.  Scope.

23          If you have an opinion, you may

24     answer that question yes or no only.

25          THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. STEPHENS:
 2        Q.    Okay.  For example, based on
 3   your experience conducting diversion
 4   investigations, DEA can use undercover
 5   officers to purchase controlled substances
 6   from diverting Internet pharmacies and pain
 7   clinics?
 8             MR. BENNETT:  Objection.
 9        Scope.
10             You are not authorized to
11        disclose confidential law enforcement
12        investigative or intelligence-
13        gathering and dissemination techniques
14        whose effectiveness would thereby be
15        impaired.
16             To the extent that you can
17        answer the question without disclosing
18        confidential law enforcement
19        investigative techniques, you can
20        answer.  Otherwise, you are instructed
21        not to answer.
22             THE WITNESS:  Yes, they can.
23   QUESTIONS BY MR. STEPHENS:
24        Q.    Okay.  The undercover officers
25   in a DEA operation, for example, in a
```

1    diversion investigation, are allowed to

2    legally tape record the conversations that

3    they have with the operator of the business

4    that's under investigation?

5                     MR. BENNETT:  Objection.

6         Scope.

7                     You are not authorized to

8         disclose confidential law enforcement

9         techniques or how undercover

10        investigations are done.  Also, you

11        are not authorized to draw legal

12        conclusions.

13                    I'm instructing you not to

14        answer that question.

15                    MR. STEPHENS:  On what --

16                    MR. FARRELL:  Sustained.

17                    MR. STEPHENS:  On what basis?

18                    MR. BENNETT:  That it's a

19        confidential law enforcement

20        investigative technique on how they do

21        investigations and what evidence they

22        gather.

23   QUESTIONS BY MR. STEPHENS:

24        Q.    Are you aware, Mr. Mapes, that

25   there had been literally thousands of

1  investigations that have played out in

2  courtrooms across the United States of

3  America where United States Attorneys have

4  put DEA agents on the stand and have played

5  tapes of undercover operations to convince

6  juries to convict drug traffickers under

7  Title 21?

8          MR. BENNETT:  You may answer

9     that question, based on your personal

10    knowledge, yes or no only.

11         THE WITNESS:  Yes.

12  QUESTIONS BY MR. STEPHENS:

13    Q.    Okay.  So then undercover

14  officers can legally tape record

15  conversations that they have with the

16  operators of the businesses that DEA is

17  investigating; is that fair?

18         MR. BENNETT:  Objection.  Calls

19     for a legal conclusion.  Scope.

20         I don't think this witness can

21    draw a legal conclusion in this

22    deposition.

23         You're asking whether he can

24    legally tape.  I don't think he's both

25    authorized to do that or qualified to

1          make a conclusion.  Plus, I think it's

2          an incomplete hypothetical.

3               So I'm going to instruct him

4          that he's not authorized on behalf of

5          DEA or use any DEA information in

6          answering that question.

7               MR. STEPHENS:  Okay.  I will

8          move on to conserve time.

9     QUESTIONS BY MR. STEPHENS:

10         Q.     Would you agree that Walmart

11    and CVS, Walgreens, Rite Aid, do not have the

12    ability to use law enforcement agents to

13    conduct undercover operations of businesses?

14              MR. BENNETT:  Objection.

15         Vague.  Incomplete hypothetical.

16         Calls for a legal conclusion.

17              You can answer if you have an

18         opinion.

19              THE WITNESS:  No, I'm not

20         really certain about that.

21    QUESTIONS BY MR. STEPHENS:

22         Q.     Okay.  Are you aware that it

23    might be illegal in certain states for a

24    private actor, private company, to secretly

25    tape record conversations with other people?

```
 1              MR. BENNETT:  Objection.

 2         Scope.

 3              To the extent you have personal

 4         information, you can answer that --

 5         you can give your personal opinion.

 6              Calls for a legal conclusion.

 7              THE WITNESS:  I don't know

 8         which states may have which laws, so I

 9         can't really answer that.

10    QUESTIONS BY MR. STEPHENS:

11         Q.    So you don't know one way or

12    the other.  Okay.

13              To your knowledge, did Joe

14    Rannazzisi ever authorize you or anyone else

15    that you know of at DEA to disclose to

16    registrants who could help DEA in diversion

17    investigations information that DEA had

18    obtained in undercover operations?

19              MR. BENNETT:  Objection.

20         Scope.

21              You are not authorized to

22         disclose information regarding

23         specific DEA investigations or

24         activities.  You may answer this

25         question yes or no only.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  No.

 2    QUESTIONS BY MR. STEPHENS:

 3         Q.     Okay.  As a fifth example of an

 4    investigative technique that is unique to DEA

 5    and federal law enforcement, would you agree

 6    that DEA, in a local US Attorney's Office,

 7    has the ability to apply to a judge for an

 8    order that would allow DEA to record

 9    telephone calls made by the subject of DEA's

10    investigation, a Title 3 wiretap?

11                 MR. BENNETT:  You can answer

12         that question.

13                 THE WITNESS:  Yes.

14    QUESTIONS BY MR. STEPHENS:

15         Q.     And would you agree that a

16    Title 3 wiretap allows DEA to listen in to

17    every discussion over the target's telephone?

18                 MR. BENNETT:  Objection.

19         Scope.  Calls for a legal conclusion.

20         Incomplete hypothetical.

21                 You can answer, if you know.

22                 THE WITNESS:  Every call except

23         for those that are required to be

24         minimized.

25
```

```
 1    QUESTIONS BY MR. STEPHENS:
 2         Q.    Okay.  Very good.
 3               And that's spelled out in the
 4    order that the judge -- the DEA and the
 5    US Attorney's Office present to the judge and
 6    the judge signs, right?
 7         A.    Yes.
 8         Q.    Okay.  All right.  Another form
 9    of electronic surveillance is a room bug.
10               Are you familiar with a room
11    bug?
12               MR. BENNETT:  Objection.
13          Scope.
14               He's not authorized to disclose
15          confidential law enforcement
16          investigative or intelligence-
17          gathering techniques, the
18          effectiveness of which would be
19          impaired.
20               You may answer this question
21          yes or no only whether you are
22          familiar with the term "a room bug."
23               THE WITNESS:  Yes.
24    QUESTIONS BY MR. STEPHENS:
25         Q.    Okay.  A room bug is like a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You can answer in your personal
 2       capacity if you have an opinion.
 3              THE WITNESS:  Yes, it could be.
 4   QUESTIONS BY MR. STEPHENS:
 5       Q.    Okay.  And based on your
 6   30 years at DEA, are you aware of any
 7   situation where Joe Rannazzisi or anyone else
 8   who was running the Office of Diversion
 9   Control ever authorized you or anyone else at
10   DEA to disclose to a registrant who could
11   help DEA in a diversion investigation the
12   information that DEA had obtained through
13   electronic surveillance?
14              MR. BENNETT:  Objection.  Form.
15       Scope.  Compound.
16              You're not authorized to
17       disclose any information regarding
18       specific DEA investigations or
19       activities.
20              You may answer this question
21       yes or no only, if you understand.
22              THE WITNESS:  Could you restate
23       the question?
24   QUESTIONS BY MR. STEPHENS:
25       Q.    Sure.
```

1           Based on your 30 years at DEA,

2    are you aware of any situation where anyone

3    who is running the Office of Diversion

4    Control ever authorized you or anyone else at

5    DEA to disclose to a registrant who could

6    help DEA in a diversion investigation with

7    information that DEA had obtained through

8    electronic surveillance?

9           MR. BENNETT:  Same objections

10       and instruction.

11          THE WITNESS:  No, I'm not.

12   QUESTIONS BY MR. STEPHENS:

13       Q.    All right.  Let's talk about

14   number 6, and that will be information from

15   state medical boards or state local law

16   enforcement.  Okay?

17          DEA, during your tenure and on

18   investigations you worked, obtained

19   information from state and local law

20   enforcement regarding diversion

21   investigations the DEA was conducting; is

22   that accurate?

23          MR. BENNETT:  Objection.

24       Scope.

25          You can answer yes or no only.

```
 1                    THE WITNESS:  Yes.
 2    QUESTIONS BY MR. STEPHENS:
 3        Q.    Okay.  Would you agree that
 4    private sector registrants like the companies
 5    that you've met here today do not have the
 6    ability to obtain information from state and
 7    local law enforcement investi -- state and
 8    local law enforcement regarding
 9    investigations that state and local law
10    enforcement is conducting on suspected
11    diverters?
12                    MR. BENNETT:  Objection.  Form.
13            Incomplete hypothetical.  Calls for
14            speculation.
15                    You can answer, if you have an
16            opinion.
17    QUESTIONS BY MR. STEPHENS:
18        Q.    Let me strike the question and
19    ask a better question.
20        A.    Okay.
21        Q.    That question wasn't so
22    artfully crafted, Mr. Mapes.
23                    Are you aware of any situation
24    during your tenure at DEA where state and
25    local law enforcement shared information with
```

1    a registrant related to an investigation that

2    state and local law enforcement was doing of

3    a suspected diverter?

4              MR. BENNETT:  Objection.

5        Scope.

6              You can answer that question

7        yes or no only.

8              THE WITNESS:  Yes.

9    QUESTIONS BY MR. STEPHENS:

10       Q.    Okay.  Would you agree that DEA

11   can obtain information from state medical

12   boards regarding investigations that the

13   state medical board is conducting?

14             MR. BENNETT:  You can answer

15       that question.

16             THE WITNESS:  Yes.

17   QUESTIONS BY MR. STEPHENS:

18       Q.    Okay.  Are you aware of any

19   situation where a state medical board

20   provided information to a non-law enforcement

21   registrant related to investigation --

22   pending investigations that the state medical

23   board was conducting?

24             MR. BENNETT:  You can answer

25       that question yes or no only.

1          for a legal conclusion.

2                    You may answer based on your

3          personal experience and personal

4          knowledge while you were at DEA.

5                    THE WITNESS:  They have not

6          provided that that I'm aware of.

7     QUESTIONS BY MR. STEPHENS:

8          Q.    Okay.  So information from

9     NADDIS would be a seventh example where DEA

10    agents can use that information, but private

11    sector companies cannot obtain that

12    information related to pending investigations

13    where the registrant might be able to help

14    DEA with its diversion investigation?

15                   MR. BENNETT:  Objection.

16         Vague.  Form.

17                   You can answer.

18                   THE WITNESS:  That's correct.

19    QUESTIONS BY MR. STEPHENS:

20         Q.    Okay.  So let's talk about

21    ARCOS here briefly.

22                   You testified a little bit

23    about ARCOS earlier.

24                   Do you recall that?

25         A.    Yes.

1      Q.      Okay.  Now, DEA could analyze

2   ARCOS information from all registrants to

3   develop leads on potential diverters during

4   your tenure at DEA; is that fair?

5              MR. BENNETT:  You can answer

6       it.

7              THE WITNESS:  Yes, it is.

8   QUESTIONS BY MR. STEPHENS:

9      Q.      Okay.  And was that information

10  helpful in advancing DEA diversion

11  investigations?

12             MR. BENNETT:  Objection.

13      Vague.

14             You can answer.

15             THE WITNESS:  Yes, it was.

16  QUESTIONS BY MR. STEPHENS:

17      Q.      Okay.  During your tenure at

18  DEA, did DEA share ARCOS information it

19  received from one distributor with all other

20  distributors?

21             MR. BENNETT:  You can answer

22      that question.

23             THE WITNESS:  No.

24  QUESTIONS BY MR. STEPHENS:

25      Q.      So did Mr. Rannazzisi, when he

1    ran the Office of Diversion Control, ever

2    authorize you or anyone else, to your

3    knowledge, at DEA to disclose to a registrant

4    who could help advance DEA's investigation of

5    a suspected diverter with information from

6    ARCOS that related to information that had

7    been supplied to DEA from other registrants?

8              MR. BENNETT:  Objection.

9        Scope.  Vague.  Form.

10             You can answer that question

11       yes or no only.

12             THE WITNESS:  No.

13   QUESTIONS BY MR. STEPHENS:

14       Q.    To your knowledge, did anyone

15   who ran the Office of Diversion Control at

16   DEA during your tenure there ever authorize

17   you or anyone else at DEA to disclose to a

18   registrant who could help advance DEA's

19   investigation of a suspected diverter with

20   information from ARCOS that related to

21   information that had been supplied to DEA

22   from other registrants?

23             MR. BENNETT:  Objection.  Form.

24       Scope.  Vague.

25             You can answer that question

```
 1            yes or no only.

 2                  THE WITNESS:  No.

 3      QUESTIONS BY MR. STEPHENS:

 4            Q.    Okay.  Move on to my next

 5      topic.

 6                  You testified a little bit

 7      earlier about your background and how you had

 8      worked in field divisions and then had gone

 9      to headquarters, right?

10            A.    Yes.

11            Q.    And you also provided some

12      information about how DEA is structured and

13      how certain squads have DEA enforcement

14      agents and other squads have DEA diversion

15      investigators.

16                  Do you recall that testimony?

17            A.    Yes.

18                  MR. BENNETT:  Objection.

19      Mischaracterizes testimony.

20                  MR. STEPHENS:  I don't think

21      so, but...

22      QUESTIONS BY MR. STEPHENS:

23            Q.    You also -- during your tenure

24      at DEA, when you were retiring, is it fair

25      that there were about 20 field divisions or
```

1    so throughout the country at DEA?

2                MR. BENNETT:  You can answer.

3                THE WITNESS:  Yes.

4    QUESTIONS BY MR. STEPHENS:

5         Q.     And each division is run by a

6    special agent in charge?

7         A.     It is.

8         Q.     And the special agent in charge

9    is known as the SAC, the S-A-C?

10        A.     Yes.

11        Q.     Okay.  And that's the highest

12   level at a field division, right?

13        A.     Yes.

14        Q.     Okay.  And there are a couple

15   other high-level positions, one of which

16   would be the assistant special agent in

17   charge, the ASAC; is that fair?

18        A.     Fair.

19        Q.     And another high-level position

20   in the field is what they call a RAC, a

21   resident agent in charge, fair?

22        A.     Yes.

23        Q.     Okay.  Now, based on your

24   experience at DEA, how many of -- how many

25   SACs can you identify that came up through

Highly Confidential - Subject to Further Confidentiality Review

```
  1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
  2                   EASTERN DIVISION
  3
      IN RE: NATIONAL         )
  4   PRESCRIPTION            )  MDL No. 2804
      OPIATE LITIGATION       )
  5   _____ )  Case No.
                              )  1:17-MD-2804
  6                           )
      THIS DOCUMENT RELATES   )  Hon. Dan A.
  7   TO ALL CASES            )  Polster
  8
                   FRIDAY, JULY 12, 2019
  9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 10              CONFIDENTIALITY REVIEW
 11                     VOLUME II
                         - - -
 12
 13          Videotaped deposition of Michael
 14   Mapes, held at the offices of The Mining
 15   Exchange, A Wyndham Grand Hotel & Spa, 8
 16   South Nevada Avenue, Colorado Springs,
 17   Colorado, commencing at 8:01 a.m., on the
 18   above date, before Carrie A. Campbell,
 19   Registered Diplomate Reporter and Certified
 20   Realtime Reporter.
 21
 22
 23                     - - -
          GOLKOW LITIGATION SERVICES
 24     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
 25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     That would be the Sudafed.

 2          Q.     Okay.  So this system, this

 3   approval, is for the entire diversion control

 4   program and suspicious order monitoring

 5   system, based on what you've seen in these

 6   letters?

 7          A.     For the entire suspicious order

 8   monitoring system, yes.

 9          Q.     Okay.  Thank you.

10                 And so looking again at a

11   demonstrative document that Mr. Lanier had

12   shown you, I want to make sure I have this

13   right, that this approved not only the method

14   of providing information but the system that

15   was used to identify suspicious orders as

16   well, correct?

17          A.     Yes.

18          Q.     And that this was not just

19   related to methamphetamines, it was related

20   to all controlled substances, whether it's

21   methamphetamine, opioids or anything else

22   that's regulated under 1301.74(b), correct?

23          A.     Yes.

24                 (Mapes Exhibit 33 marked for

25          identification.)
```

```
 1     QUESTIONS BY MS. MCCLURE:

 2          Q.     I'm going to hand you a

 3     document that's been marked Exhibit 33.

 4                 Let me know when you've had a

 5     chance to review that.

 6          A.     Okay.

 7          Q.     And so you testified in a

 8     lawsuit in West Virginia in 2016, correct?

 9          A.     Yes.

10          Q.     And in that you testified that

11     the shift from ship and then report to

12     instead halt and investigate was a gradual

13     change, right?

14          A.     Yes, it was.

15          Q.     And that the regulations did

16     not change, but the DEA's interpretation of

17     them did, right?

18          A.     Yes.

19          Q.     And that companies were

20     responding to DEA's changed interpretation

21     and then coming up with programs to handle

22     that new different expectation, right?

23          A.     That's correct.

24          Q.     And there was not a date

25     certain by which companies were expected or
```

Highly Confidential - Subject to Further Confidentiality Review

1    anticipated to implement the changes to DEA's

2    new interpretation of 1301.74(b)?

3         A.     That's correct.

4         Q.     And so here Mr. Lanier had

5    excerpted a statement you had made to me

6    yesterday when I was originally talking to

7    you, right, and that you had accepted these

8    excessive purchase reports as compliant with

9    the Controlled Substances Act, right?

10                That's what you testified to

11   yesterday?

12        A.     Yes.

13        Q.     And then Mr. Lanier presented

14   you with this document that said that

15   essentially after-the-fact reporting of

16   suspicious orders has never been in

17   compliance with federal law according to the

18   DEA's guidance.

19                That testimony, to the extent

20   that this actually reflects your testimony,

21   which I don't believe it does, is not

22   actually consistent with the testimony you

23   gave earlier yesterday or with the testimony

24   you gave in 2016 when you were under oath in

25   that proceeding, correct?

```
 1                   MR. BENNETT:  Objection.  Form.

 2                   MR. LANIER:  Objection.  Form.

 3                   MR. BENNETT:  Misstates

 4        testimony.

 5                   THE WITNESS:  The regulation

 6        didn't change.  So the regulation was

 7        still there, but the practice was to

 8        allow them to send the excessive

 9        purchase reports and that that was

10        considered to be in compliance, even

11        though the regulation hadn't changed

12        to allow that or to not allow that.

13   QUESTIONS BY MS. MCCLURE:

14        Q.    And so that was -- the

15   submission of excessive purchase reports was

16   considered, in your experience at DEA, to be

17   in compliance with the Controlled Substances

18   Act for the period of time that those reports

19   were accepted, correct?

20        A.    Yes.

21        Q.    Just one moment.

22              And in addition, I just asked

23   you a question as to whether they were in

24   compliance with the Controlled Substances

25   Act.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    They were also then in

2    compliance -- I just asked you a question

3    that stated that they were in compliance --

4    the acceptance of the excessive purchase

5    reports is being compliant -- was compliant

6    with the Controlled Substances Act.

7                    They were also compliant with

8    the regulations that underscored and

9    implemented that act, correct?

10              MR. BENNETT:  Objection.

11         Scope.

12              You may answer based on your

13         personal understanding, but you may

14         not speak on behalf of DEA.

15              THE WITNESS:  Personally we

16         accepted them, the excessive purchase

17         reports, as compliant for the

18         suspicious order monitoring, yes.

19              MS. MCCLURE:  Okay.  Thank you,

20         Mr. Mapes.

21              I have no further questions,

22         and at this time I turn my time over

23         to counsel for additional defendants.

24              Thank you very much.

25              MR. LANIER:  Make sure there's
```

```
1            no fuss.  I'm going to have one of the

2            other lawyers do our recross.

3                   Nobody's got any problem with

4            that, do they?

5                   Thank you.

6                   (Mapes Exhibit 34 marked for

7            identification.)

8                      RE-EXAMINATION

9     QUESTIONS BY MR. EPPICH:

10           Q.    Good afternoon, Mr. Mapes.  My

11    name is Chris Eppich.  Once again, I'm from

12    the McKesson company.

13           A.    Good afternoon.

14           Q.    I'm going to hand you what I've

15    marked as Exhibit Number 34 in this

16    litigation.

17                  Exhibit 34, Mr. Mapes, is a

18    partial list of the attorneys in this case.

19                  Do you see at the top of the

20    page it says, "1:17-md-02804-DAP, In Re:

21    National Prescription Opiate Litigation, Dan

22    Aaron Polster presiding"?

23                  Do you see that, sir?

24           A.    I do.

25           Q.    And then it says "attorneys."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    Do you see that, sir?

2          A.     Yes.

3          Q.     If we could turn to page 2 of

4    Exhibit 34, the third name down, sir, Richard

5    W. Fields, do you recognize that name?

6          A.     Yes.

7          Q.     Is Mr. Fields the attorney that

8    you met with during the summer and the fall

9    2018?

10         A.     Yes, he's one of them.

11         Q.     And do you see under

12   Mr. Fields' name he has his firm name,

13   Fields, PLLC?

14                 Do you see that?

15         A.     Yes.

16         Q.     And then the address of his

17   firm?

18                 Do you see that?

19         A.     Yes.

20         Q.     Did you have your meetings at

21   the Fields law firm in 2018 at that address,

22   if you recall?

23         A.     I don't believe it was.

24         Q.     Do you see under Mr. Fields'

25   address and e-mail it says the words "lead
```

```
 1    attorney, attorney to be noticed"?

 2             Do you see that, sir?

 3    A.    Yes.

 4    Q.    Earlier today, plaintiffs'

 5    counsel asked you questions about two of its

 6    expert witnesses, Mr. Jim Geldhof and Mr. Jim

 7    Rafalski.

 8             Do you remember that

 9    discussion?

10    A.    Yes, I do.

11    Q.    Now, in your time at DEA, did

12    you have an opportunity to work on projects

13    with Mr. Geldhof?

14             MR. BENNETT:  Objection.

15         Scope.

16             You can answer that question

17         yes or no only.

18             THE WITNESS:  Yes.

19    QUESTIONS BY MR. EPPICH:

20    Q.    You had the opportunity to

21    evaluate his work product?

22    A.    No.

23    Q.    Do you have any personal

24    knowledge as to his experience,

25    qualifications or effectiveness with DEA
```

```
 1          say.

 2     QUESTIONS BY MR. EPPICH:

 3          Q.     You don't recall?

 4          A.     I just don't recall.

 5          Q.     Now, earlier today the

 6     plaintiffs' counsel asked you and showed you

 7     a slide.  He asked you some questions about

 8     other causes of the opioid crisis, e.g.,

 9     illegal prescribing.

10               Do you remember this

11     conversation?

12          A.     Yes.

13          Q.     And he asked you whether or not

14     a good suspicious order monitoring system can

15     help catch that.

16               Do you remember that testimony,

17     sir?

18          A.     Yes.

19          Q.     Are you familiar with HIPAA?

20          A.     Yes.

21          Q.     What is HIPAA?

22          A.     The Health Insurance Privacy

23     Act or something like that.

24          Q.     Now, pursuant to that Act,

25     distributors don't have access to a patient's
```

1    medical records, correct?

2         A.    Generally, no.

3         Q.    And distributors are not in the

4    doctor's office when the doctor and the

5    patient are talking, are they?

6         A.    Not in my experience, no.

7         Q.    Now, you'll recall that

8    plaintiffs' counsel asked you -- he presented

9    the following question to you earlier today

10   in a slide titled "Diversion Control 101."

11            He asked you:  "If a company

12   sees a suspicious order, the company has a

13   choice to make, ship/sell or hold and

14   investigate."

15            Do you remember this slide?

16        A.    Yes.

17        Q.    But this question isn't found

18   in the Controlled Substances Act, is it?

19        A.    It doesn't say that

20   specifically in the Controlled Substances

21   Act, no.

22        Q.    And it doesn't say this

23   specifically in the regulations, correct?

24        A.    No.

25        Q.    You started to ask distributors

Highly Confidential - Subject to Further Confidentiality Review

```
 1      to ask themselves this question as a part of

 2      the distributor briefings, correct?

 3           A.    We did.

 4                 MR. EPPICH:  Thank you,

 5           Mr. Mapes.  I have no further

 6           questions.

 7                 We can go off the record.

 8                 VIDEOGRAPHER:  We're going off

 9           the record.  The time is 1:33.

10            (Off the record at 1:33 p.m.)

11                 VIDEOGRAPHER:  Going back on

12           the record.  Beginning of Media

13           File 7.  Time, 1:39.

14                 MR. EPPICH:  Just a quick

15           housekeeping issue.

16                 For the record, let's go ahead

17           and mark as Exhibit 4A, document

18           bearing Bates number ABDCMDL00269347

19           through 358.

20                 And let's mark as Exhibit 35

21           three pages from the demonstratives

22           that plaintiffs presented this

23           morning, further marked up by

24           defendants.

25                 We can go off.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               (Mapes Exhibit 35 marked for
 2          identification.)
 3               VIDEOGRAPHER:  Going off record
 4          at 1:40.
 5           (Off the record at 1:40 p.m.)
 6               VIDEOGRAPHER:  We're going back
 7          on record.  Beginning Media File 8.
 8          The time is 1:59.
 9               RE-EXAMINATION
10   QUESTIONS BY MS. FITZPATRICK:
11          Q.     Good afternoon, Mr. Mapes.  We
12   met briefly yesterday, but my name is Laura
13   Fitzpatrick, and I'm here on behalf of the
14   plaintiffs, and I'm going to take over for
15   Mr. Lanier for a little bit.
16               I want to just kind of reorient
17   you and the jury here.  I'd like to talk --
18   just a second.
19               I'd like to kind of redirect
20   us, call this my redirect roadmap that
21   Ms. Lanier made for me here.
22               I'd like to take us from the
23   muddy waters that you were brought into over
24   the last, I think, 45 minutes or so, back on
25   to what I'm going to call clarity road.
```