# EXHIBIT 25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF OHIO

 2                     EASTERN DIVISION

 3                        - - -

 4   IN RE:  NATIONAL         )

     PRESCRIPTION OPIATE      )  MDL No. 2804

 5   LITIGATION               )

     _____)  Case No. 1:17-MD-2804

 6                            )

     THIS DOCUMENT RELATES    )

 7   TO ALL CASES             )  Hon. Dan A. Polster

 8

 9

10                        - - -

11             Tuesday, November 27, 2018

12        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13                 CONFIDENTIALITY REVIEW

14                        - - -

15

16          Videotaped deposition of Eric Brantley,

17   held at the Durham Hotel, 315 East Chapel Hill

18   Street, Durham, North Carolina, commencing

19   at 9:01 a.m., on the above date, before Karen

20   Kidwell, Registered Merit Reporter and Notary Public.

21                        - - -

22

23

24             GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    yourself received identical ingredient limit reports

2    from the various distribution centers of Cardinal

3    Health?

4         A.    The distribution centers generate their

5    report.  Someone there reviewed the report.  The

6    report was sent to the DEA from the distribution

7    center, and then I reviewed the reports along with

8    members of the team.

9         Q.    So the ingredient limit reports that you

10   would be reviewing, DEA would have that full report;

11   is that fair?

12        A.    Yes.

13             MR. PAPANTONIO:  Objection.  Form.

14        Leading.

15   BY MR. PYSER:

16        Q.    Do you know whether anyone at DEA also

17   received ingredient limit reports?

18        A.    The ingredient limit reports were sent to

19   the DEA on a monthly basis.

20        Q.    You talked a little bit about site visits

21   and additional work you did beyond just reviewing the

22   ingredient limit reports.  It -- were there times

23   when you made decisions as a result of site visits?

24        A.    Yes.  If -- if during a site visit it was

25   deemed that they were doing, for instance,

Highly Confidential - Subject to Further Confidentiality Review

1    Internet -- they were associated with an Internet

2    pharmacy, then I would make a recommendation to

3    discontinue business with that -- or discontinue

4    controlled substance shipments with that pharmacy and

5    then report that pharmacy to Kyle Wright at the DEA.

6         Q.   And to your knowledge, when you made a

7    decision to discontinue business with a pharmacy, did

8    Cardinal Health follow that recommendation?

9         A.   Yes.

10        Q.   And when you reported a pharmacy to the

11   DEA, who did you send that information to?

12        A.   I sent the -- an e-mail to Kyle Wright at

13   DEA headquarters.

14        Q.   Who -- who is Kyle Wright?

15        A.   I don't remember his exact title, but I

16   believe he may have been over the e-commerce section.

17   But he was where registrants submitted such reports

18   to the DEA.

19        Q.   Was it your understanding that the purpose

20   of sending ingredient limit reports to DEA was to

21   comply with the DEA regulations for suspicious-order

22   reporting?

23        A.   Yes.

24        Q.   So why did you conduct site visits and

25   investigations of customers on top of the ingredient

```
 1   limit reports?

 2        A.   That was over and above the requirement.

 3   The requirement was to report the suspicious orders,

 4   and then based on the report I saw, I would actually

 5   go out and investigate the pharmacies to actually

 6   report those pharmacies to the DEA as well, in

 7   addition to orders.

 8        Q.   Let's take a look at a document.

 9             I'm showing you a document that's been

10   marked Exhibit 34 in this deposition.  It's a new

11   exhibit.

12        (Cardinal-Brantley 34 was marked for

13   identification.)

14   BY MR. PYSER:

15        Q.   Just so we can see it, I'll put it in

16   front of Exhibit 34, up on the Elmo.

17             What is Exhibit 34?

18        A.   This is the Cardinal Health DEA compliance

19   manual.

20        Q.   And if you look at the -- the table of

21   contents, does it cover several different areas of

22   DEA compliance?  It's a thick document, a couple

23   hundred pages.

24        A.   Yes.

25        Q.   And if you look at Section 7 of the DEA
```

```
 1   compliance manual, is that section titled "Required

 2   Reports to DEA"?

 3        A.   Section 7?

 4        Q.   If you turn to Bates page ending 898 --

 5        A.   Oh, yes.

 6        Q.   -- of the table of contents.

 7        A.   I see it.  I see it.

 8        Q.   So let's go together to Section 7.

 9             And I'll give you the Bates number, which

10   is going to be the number in the bottom right corner.

11   It's going to be Bates ending 937.

12             And to your recollection, was this DEA

13   compliance manual in effect during the time that you

14   worked at Cardinal Health?

15        A.   Yes.

16        Q.   Okay.  And specifically during the time

17   period 2005 through '07 or '08, when you were working

18   the anti-diversion area?

19        A.   Yes.

20        Q.   So if you look at Section 7-1, the

21   required reports to DEA, the first report mentioned

22   is ARCOS.

23             Can you tell me what an ARCOS report is?

24        A.   Yes.  The ARCOS report is -- is a report

25   of all movement of ARCOS-reportable controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1   substances, the Schedule II controlled substances,

2   all movement.  Those reports were sent to the DEA

3   every month.

4        Q.   So it's a report received by DEA about

5   every movement of every controlled substance; is that

6   a fair kind of shorthand for ARCOS?

7        A.   Yes, of all the ARCOS reportable

8   controlled substances, yes.

9        Q.   Now, if you -- were there any other

10  reports that went to DEA?

11       A.   Yes.  The ARCOS report, the biannual

12  report, there was end-of-year inventory taken, the

13  ingredient limit reports every month.

14       Q.   Pausing on the ARCOS reports for a minute,

15  in a situation where a hospital or a pharmacy ordered

16  controlled substances from more than one distributor,

17  would the distributors necessarily know that that

18  hospital or that pharmacy received controlled

19  substances from multiple sources?

20            MR. PAPANTONIO:  Objection to form.

21       Speculation as to what they would know.

22  BY MR. PYSER:

23       Q.   You can answer the question.

24       A.   No.

25       Q.   When you were at Cardinal Health, were you

```
 1    aware of what distributions a hospital or a pharmacy

 2    might have received from other distributors, not

 3    Cardinal Health?

 4         A.   No.

 5         Q.   To your knowledge, were ARCOS reports

 6    submitted by all distributors?

 7         A.   Yes.  All registrants.

 8         Q.   So in your understanding, by looking at

 9    ARCOS reports, would DEA be able to see the full

10    picture of what a particular hospital or pharmacy

11    received from all distributors?

12              MR. PAPANTONIO:  Objection as to form.

13         Speculating on what -- what DEA might know.

14              THE WITNESS:  Yes, the DEA through the

15         ARCOS data has visibility into all transactions

16         of controlled substances from all registrants.

17    BY MR. PYSER:

18         Q.   Let me ask it a -- a slightly different

19    way, in response to the objection.

20              What's your understanding of what ARCOS

21    contains when you put together all of the ARCOS

22    submissions from all the distributors?

23              MR. PAPANTONIO:  Objection as to form.

24              THE WITNESS:  It would have data from all

25         of the DEA registrants; for instance, the
```

Highly Confidential - Subject to Further Confidentiality Review

1          wholesalers and all of the purchases and the

2          shipments of those controlled substances to

3          other DEA registrants.  The complete picture.

4          You could see all of the drugs that a pharmacy,

5          for instance, was purchasing from every source

6          and all of the sales from the wholesaler to

7          pharmacies.  It was a complete picture of all

8          the transactions of those controlled substances.

9     BY MR. PYSER:

10         Q.   Just to be clear, did Cardinal Health have

11    access to that information?

12         A.   No.

13         Q.   Did DEA have access to that?

14         A.   Yes.

15         Q.   Turning the page to 7-3, there's a section

16    titled "Suspicious Orders."

17              Do you see that?

18         A.   Yes.

19         Q.   And under it is listed 21 CFR 1301.74(b).

20    Do you see that?

21         A.   Yes.

22         Q.   What is that, 21 CFR 1301.74(b)?

23         A.   That's the regulation for suspicious

24    orders.  It's -- states that registrant is

25    responsible for implementing, designing a -- a system

Highly Confidential - Subject to Further Confidentiality Review

1    to identify suspicious orders and report those to the

2    DEA.  And further goes on to say that a suspicious

3    order is an order of unusual size, frequency, that

4    deviates substantially from a normal order pattern.

5         Q.   And Cardinal Health has a description

6    of -- underneath, in its compliance manual, of --

7    strike that.

8              In the compliance manual for Cardinal

9    Health, under "Suspicious Orders," can you read the

10   first sentence?

11        A.   "Wholesalers are" -- are you meaning the

12   first sentence under "Suspicious Orders"?

13        Q.   Correct, yes.

14        A.   "Wholesalers are responsible for designing

15   and operating a system that would disclose to the

16   wholesaler suspicious orders."

17        Q.   Did Cardinal Health have such a system in

18   2005, when you began your work in anti-diversion?

19        A.   Yes.

20        Q.   When you came into your role in 2005, was

21   that system already up and running?

22        A.   Yes.

23        Q.   In fact, if you look at the date of this

24   document, in the bottom left, you see that it's

25   April 5th, 2000?

Highly Confidential - Subject to Further Confidentiality Review

1          A.   Yes.

2          Q.   The next bold heading is "Establishing

3     Suspicious Order Criteria."

4               Do you see that?

5          A.   Yes.

6          Q.   And if you turn the page to page 7-4, you

7     see at the top of that page, it states, quote:

8     "Complying with 21 CFR 1301.74(b) is a two-step

9     process"?

10         A.   Yes.

11         Q.   Can you describe for me in your own words

12    what the two-step process that's discussed in

13    Cardinal Health's compliance manual are?

14         A.   Yes.  The ingredient limit reports that

15    are done are sent to the DEA every month, as well as

16    the cage vault personnel had the ability to identify

17    anything that they deemed to be suspicious and

18    reported that as well.

19         Q.   The -- the first description in the manual

20    says, "First, each Cardinal division submits to DEA

21    on a monthly basis an ingredient limit report,

22    Exhibit M."

23              I'd like to direct your attention to

24    Exhibit M in this document, which is Bates page

25    ending 4157, if you turn there with me.

Highly Confidential - Subject to Further Confidentiality Review

1          Is this an example of an ingredient limit

2   report?

3       A.   Yes.

4       Q.   It's a little bit hard to read on the

5   screen, but if you could help us out a little bit,

6   can you tell us what's in this document; what's in

7   this report that's sent to DEA?

8       A.   This is a report of the customers, along

9   with the date -- date of the transactions and the

10  drug, and the amount in -- in grams, what was ordered

11  of that controlled substance for the month.  And it

12  lists what the ingredient limit was and what the

13  total was for that drug.

14      Q.   Zooming in a little bit here, it gives the

15  customer name at the top, you mentioned, correct?

16      A.   Yes.

17      Q.   And then it provides the ingredient you

18  mentioned, right?

19      A.   Yes.

20      Q.   And then it speaks to specific orders

21  underneath, and those are sent to the DEA, right?

22      A.   Yes.

23      Q.   And then all the way on the right side of

24  the page gives some additional information, a

25  customer total and ingredient limit.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Can you explain for us what those are?

 2       A.   Yes.  The ingredient limit is the -- the

 3  limit that was calculated using a formula received

 4  from DEA, and then the customer total is what that

 5  customer ordered that month.

 6       Q.   I recognize this is just an example from

 7  Cardinal Health's compliance manual, but was similar

 8  information provided in each ingredient limit report

 9  sent to the DEA during the time you were reviewing

10  ingredient limit reports?

11       A.   Yes.

12       Q.   You can go back to page 7-4.  And 7-4,

13  after it discusses Exhibit M, goes on to state:

14  "This report is based on a computer program which

15  monitors controlled substance purchases for a month

16  and compares these purchases to predetermined

17  averages or limits, and if a customer's purchase

18  quantities exceed the established parameters, the

19  customer's activity is printed on the report."

20              Is this an accurate description of the

21  ingredient limit report as you understood it?

22       A.   Yes.

23       Q.   Fair description of how it worked during

24  your time?

25       A.   Yes.
```

1      Q.   And these parameters that are used for the

2    computer program, the established parameters that are

3    discussed, where did they come from?

4      A.   They came from DEA.

5      Q.   A little bit further down, it discusses

6    the second piece of Cardinal Health's two-step

7    process to comply with 1301.74(b).

8           And can you read for me in the next

9    paragraph the sentence beginning "Second"?

10     A.   "Second, on a daily basis, cage and vault

11   personnel should be policing and identifying

12   individual orders that appear excessive in relation

13   to what other customers are buying and/or the

14   customer's purchase history."

15     Q.   All right.

16     A.   Read the entire paragraph, or just that?

17     Q.   That's good.

18     A.   Okay.

19     Q.   Earlier in the day, when you were being

20   asked questions by plaintiff's counsel, they played

21   you a video of someone by the name of Mr. Baranski

22   talking about pickers and packers.

23           Do you recall that?

24     A.   I do.

25     Q.   In your experience, are there pickers and

Highly Confidential - Subject to Further Confidentiality Review

1    packers in Cardinal facilities for items other than

2    controlled substances?

3         A.   Yes.  So there are pickers and packers in

4    the general warehouse, and then there are separate

5    pickers and packers in the controlled substance cage,

6    and then separate packers in the vault -- separate

7    pickers and packers in a vault.

8         Q.   Is it true that the vast majority of

9    products that Cardinal ships have nothing to do with

10   controlled substances or opioids?

11        A.   That is correct.

12        Q.   In your experience, the folks who get

13   selected to work in the cage area or the vault area,

14   where Cardinal Health stores opioid medications, are

15   they the best of the best of Cardinal's warehouse

16   employees?

17        A.   Yes.  They are the crème de la crème, as I

18   call them.  The -- the best ones are selected to work

19   in the cage and vault area.

20        Q.   So in your experience, would a reference

21   to pickers and packers just putting things in totes,

22   would that necessarily apply to cage and vault

23   employees, or would that be something different?

24        A.   No, the cage and vault pick process was --

25   was different.  There were other -- there were

Highly Confidential - Subject to Further Confidentiality Review

 1    additional checks and balances on picking orders in

 2    the -- the cage and vault.  It was -- it was

 3    different than how it was done in the general

 4    warehouse.

 5         Q.   In the event that through this second

 6    process, someone in the distribution center

 7    identified an issue, whose responsibility was it to

 8    alert DEA of such an issue?

 9         A.   That person would notify their supervisor,

10    and then someone at the division would notify DEA of

11    the suspicious order.

12         Q.   So -- so would that potentially come

13    straight from a distribution center, not necessarily

14    through corporate?

15         A.   That would come straight from the

16    distribution center.

17         Q.   Have you ever heard of the DEA's Internet

18    pharmacy initiative?

19         A.   Yes.

20         Q.   Okay.  What is it?

21         A.   It's guidance that they issued in relation

22    to identifying potential suspicious orders through

23    Internet pharmacies.

24         Q.   And who asked you to undertake the

25    Internet pharmacy initiative?

Highly Confidential - Subject to Further Confidentiality Review

1            A.    My boss, Steve Reardon.

2            Q.    What was Mr. Reardon's role at Cardinal

3    Health?

4            A.    At the time, I believe he was director of

5    quality and regulatory affairs.

6            Q.    And we're in kind of the 2005-2006 time

7    frame, right?

8            A.    Yes.

9            Q.    Do you know Mr. Reardon's background

10   before he came to work at Cardinal Health as director

11   of quality and regulatory affairs?

12           A.    I actually believe he was a police

13   officer.

14           Q.    Do you know where he was a police officer?

15           A.    I believe the Boston area.

16           Q.    As part of the Internet pharmacy

17   initiative, what -- what did you do to help comply

18   with the Internet pharmacy initiative?

19           A.    My role was, in addition to the

20   distribution centers submitting the report to DEA

21   every month, I would also review the reports, and I

22   would identify pharmacies that would need further

23   investigation, and I would conduct an investigation

24   and a site visit.  And based on those findings, I

25   would recommend -- make a recommendation to

Highly Confidential - Subject to Further Confidentiality Review

1   discontinue shipment of controlled substances to

2   those pharmacies and report those pharmacies to the

3   DEA.

4       Q.   I'd like to direct your attention to an

5   exhibit you looked at earlier; it should be right in

6   front of you.  It's marked as Brantley Exhibit 4.

7           Do you have that one?

8       A.   Yes.

9       Q.   And this was a settlement release

10  agreement and administrative memorandum of agreement.

11          Do you remember discussing that document

12  earlier today?

13      A.   Yes.

14      Q.   Is it true that on the first page of

15  Exhibit 4, it states that Cardinal has 27 separate

16  distribution facilities?

17      A.   Yes.

18      Q.   And are the distribution facilities --

19  generally; I know there's some unique ones -- but

20  generally speaking, do the distribution facilities

21  cover particular geographic areas?

22      A.   Yes.

23      Q.   To your knowledge, was there ever a

24  suspension order of any of the facilities that

25  shipped to the Northern Ohio area?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No.

 2        Q.   A little bit more on Exhibit 4.  You spent

 3   a fair bit of time talking about allegations that the

 4   DEA -- the DEA had made.

 5             To your knowledge, did DEA ever prove its

 6   allegations?

 7        A.   No.

 8        Q.   In fact, there -- there was a piece that

 9   was skipped over earlier when you were discussing

10   this document with counsel.  On page 2, there's a

11   section that counsel for the Plaintiffs didn't read

12   that begins, "No admission or concession."

13             Do you see that section?

14        A.   Yes.

15        Q.   And does it say:  "This agreement is

16   neither an admission by Cardinal of liability or of

17   the veracity of any allegation made by DEA in the

18   orders to show cause."

19             See that?

20        A.   Yes.

21        Q.   Did I read it correctly?

22        A.   Yes.

23        Q.   Is that consistent with your understanding

24   of this document?

25        A.   Yes.
```

 1          Q.   I believe you also have in front of you

 2    Exhibit 8.

 3               Do you see Exhibit 8?

 4          A.   Yes.

 5          Q.   Okay.  And is this document from January

 6    of 2005?  Correct?

 7          A.   Yes.

 8          Q.   Okay.  You were asked whether you

 9    recognize some of the names in that exhibit.

10               Do you recall that?

11          A.   Yes.

12          Q.   And the Plaintiffs pointed out some

13    criticisms or critiques that were part of the audit

14    in Exhibit 8.

15               Do you recall that?

16          A.   Yes.

17          Q.   And those were related to the -- the QRA

18    department, fair?

19          A.   Yes.

20          Q.   Okay.  Is the QRA department broader than

21    just anti-diversion work?

22          A.   Yes.

23          Q.   Do you have any reason to believe that the

24    document that counsel spent time talking to you about

25    has anything at all to do with anti-diversion work

```
 1   related to opioids?

 2        A.   No.

 3        Q.   You were also asked some questions about

 4   an e-mail -- this is Exhibit 12 now; do you have

 5   Exhibit 12 in front of you?

 6        A.   Yes.

 7        Q.   And Exhibit 12 was an e-mail from Mark

 8   Mitchell.

 9             Do you recall this document now?

10        A.   Yes.

11        Q.   And this e-mail was not to you, was it?

12        A.   No.

13        Q.   In the copy you were given, it has no

14   response from Steve Reardon to Exhibit 12, does it?

15        A.   No.

16        Q.   Exhibit 12 has statements from Mark

17   Mitchell about his knowledge of whether Cardinal

18   Health monitors purchases from hospitals or

19   pharmacies.

20             Do you recall that?

21        A.   Yes.

22        Q.   You were asked questions about

23   Mr. Mitchell's understanding.  Is Mr. Mitchell the

24   author of this e-mail in Exhibit 12?

25             Is he part of the QRA or anti-diversion
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   team?

 2        A.   No.

 3        Q.   Was Mr. Mitchell's understanding of how

 4   Cardinal Health monitored possible diversion correct?

 5             MR. PAPANTONIO:  Objection as to what

 6        Mr. Mitchell -- form.  Just form.  Just object

 7        to form.  Let you figure it out.

 8             THE WITNESS:  No.

 9             MR. PAPANTONIO:  Objection as to form.

10   BY MR. PYSER:

11        Q.   Do you recall counsel for the Plaintiffs

12   asking you questions in which Mr. Mitchell made

13   statements about Cardinal Health's process for

14   anti-diversion steps?

15        A.   Yes.

16        Q.   Do you believe Mr. Mitchell's

17   understanding of how Cardinal Health monitored for

18   possible diversion and took anti-diversion steps is

19   correct?

20             MR. PAPANTONIO:  Objection to form.

21        Objection to form.

22             THE WITNESS:  No.

23   BY MR. PYSER:

24        Q.   What do you think is wrong about

25   Mr. Mitchell's understanding in Exhibit 12?
```

```
 1                    MR. PAPANTONIO:  Objection as to form.

 2                    THE WITNESS:  We had a system in place.

 3   BY MR. PYSER:

 4         Q.   Let me rephrase that question.

 5                    What do you disagree with from the

 6   statements Mr. Mitchell makes in the e-mail at

 7   Exhibit 12?

 8         A.   I disagree with the statement that he made

 9   that we do not monitor what they purchase or -- or

10   track.

11         Q.   Why do you disagree with that?

12         A.   Because we monitor purchases of all of

13   our -- all of our customers.

14         Q.   Is it the case that every entity that

15   receives any controlled substance from Cardinal

16   Health has to have a DEA license?

17                    MR. PAPANTONIO:  Objection as to form.

18                    THE WITNESS:  Yes.

19   BY MR. PYSER:

20         Q.   Does Cardinal Health ship to anyone who

21   does not have a DEA license?

22         A.   Not a controlled substance, no.

23         Q.   When Plaintiffs' counsel was asking you

24   questions, they asked whether Cardinal Health

25   distributed to drug cartels.
```

1          To your knowledge, has Cardinal Health

2   ever distributed to a drug cartel?

3          A.   No.

4          Q.   I believe you also have in front of you

5   Exhibit 13, which talks about a facility assessment

6   in Birmingham, Alabama.

7          You recall that document?

8          A.   Yes.

9          Q.   This was an e-mail that I believe you

10   received, along with others, about this facility

11   assessment in Birmingham.

12          Did this document, when you reviewed it,

13   cover all of the different parts of anti-diversion

14   reporting within Cardinal Health?

15          A.   No.

16          Q.   So, for example, did it cover Cardinal

17   Health's corporate anti-diversion work?

18          A.   No.

19          Q.   So is it fair to say that in addition to

20   whatever activity was happening at local distribution

21   centers, there was also other work being done at the

22   corporate level by people like yourself?

23          MR. PAPANTONIO:  Objection as to form.

24          THE WITNESS:  Yes.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PYSER:

 2        Q.   What other work was being done for

 3   Cardinal Health -- rephrase the question.

 4             What other work was being done for

 5   Cardinal Health beyond the work that was being done

 6   just at the distribution centers like the Birmingham,

 7   Alabama, site?

 8        A.   I was reviewing the ingredient limit

 9   reports, and I was conducting site visits and

10   investigations and reporting those customers to the

11   DEA.

12        Q.   Were there times when you reported a

13   customer to DEA because you believed they might be

14   involved in Internet pharmacy activity?

15        A.   Yes.

16        Q.   And what did Cardinal Health do when it

17   came to believe that a customer might be involved in

18   Internet activity?

19        A.   We discontinued shipments of controlled

20   substances to that customer and reported that

21   customer to the DEA.

22        Q.   You were asked earlier today questions

23   about Exhibit 6.

24             Do you have Exhibit 6 in front of you?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And in particular, you were asked about an

2    e-mail in Exhibit 6 from Steve Reardon, on which you

3    were one of the recipients.

4              You see that e-mail from August 30th,

5    2005?

6              It's on the second page of the document.

7    It's the bottom e-mail.

8        A.    Yes.

9        Q.    Okay.  So we've got an August 30th, 2005,

10   e-mail from Steve Reardon.  And in it, Mr. Reardon

11   states:  "Your excessive purchase report should be

12   reviewed to see if you have customers that are

13   purchasing over 3,000 dosage units of phentermine or

14   5,000 dosage units of hydrocodone a month."

15             Do you see that language?

16       A.    Yes.

17       Q.    I just want to be clear about the reports

18   that we're talking about.  These excessive purchase

19   reports that are referenced here, of having more than

20   3,000 or 5,000 dosage units, are those reports that

21   would have already been sent to the DEA?

22             MR. PAPANTONIO:  Objection as to form.

23             THE WITNESS:  Yes.

24   BY MR. PYSER:

25       Q.    Who else would have received, in addition

Highly Confidential - Subject to Further Confidentiality Review

1    to yourself, these reports that are referenced at

2    3,000 dosage units or 5,000 dosage units, to your

3    knowledge?

4         A.   They were received at the distribution

5    level at the distribution centers, as well as my team

6    at -- at corporate as well as the DEA.

7         Q.   So in its normal practice, would Cardinal

8    Health have reported all of these orders that are

9    referenced here to the DEA?

10             MR. PAPANTONIO:  Objection.  Form.

11             THE WITNESS:  Yes.

12   BY MR. PYSER:

13        Q.   Were there ever times when you personally

14   had to call a customer and tell them they would no

15   longer be eligible to receive controlled substances

16   from Cardinal Health?

17        A.   Yes.

18        Q.   To the extent that you can remember now,

19   ten years later, can you describe a little bit about

20   those phone calls?

21        A.   I don't remember the exact --

22             MR. PAPANTONIO:  Objection.  Hearsay.

23             THE WITNESS:  I don't remember the exact

24        details, but they would be -- I would call the

25        customer and let them know that they were being

Highly Confidential - Subject to Further Confidentiality Review

```
 1        shut off from receiving controlled substances.

 2   BY MR. PYSER:

 3        Q.   And when you made those calls, were the

 4   pharmacists sometimes angry with you?

 5             MR. PAPANTONIO:  Objection.  Hearsay.

 6             THE WITNESS:  Yes.

 7   BY MR. PYSER:

 8        Q.   Why?  Did they tell you?

 9        A.   Because they would not be --

10             MR. PAPANTONIO:  Objection.  Hearsay.

11             THE WITNESS:  Because they would not be

12        receiving controlled substances from Cardinal

13        Health any longer.

14   BY MR. PYSER:

15        Q.   And these pharmacies that we're talking

16   about that Cardinal Health was refusing to ship to,

17   do you know, typically, did they still have a valid

18   DEA license?

19        A.   Yes.

20        Q.   In addition to your work in

21   anti-diversion, did you also do training of other

22   Cardinal Health employees?

23        A.   Yes.

24        Q.   Can you tell me a little bit about what

25   types of training you did?
```

```
1          A.   I did training with members of senior

2    management, and I did training with the sales force,

3    and I did training with members of my team.

4          Q.   And just generally speaking, what was the

5    subject matter that you would train other people at

6    Cardinal Health on?

7          A.   On our Internet or anti-diversion policy.

8          Q.   And were those policies, talking about the

9    2005, '6, '7 time period, were those policies during

10   that time period consistent with what you understood

11   DEA wanted?

12              MR. PAPANTONIO:  Objection as to what DEA

13        wanted.  Form.

14              THE WITNESS:  Yes.

15   BY MR. PYSER:

16        Q.   Were the policies that Cardinal Health had

17   back in 2006 consistent with the guidance that you

18   received from DEA?

19        A.   Yes.

20        Q.   How did you come to the conclusion that

21   Cardinal's policies back in this time period were

22   consistent with the guidance you received from DEA?

23        A.   Kyle Wright with DEA told us.

24              MR. PAPANTONIO:  Objection.  Move to

25        strike.  Hearsay, what they told this witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PYSER:

 2        Q.   What did Mr. Wright tell you about

 3   Cardinal Health's policies?

 4             MR. PAPANTONIO:  Objection as to form

 5        about anything Mr. Wright told this witness.

 6        Hearsay.

 7             THE WITNESS:  He said --

 8   BY MR. PYSER:

 9        Q.   You can answer.

10        A.   He said that we're doing the right things,

11   and we're going in the right directions, and that we

12   had a -- a good program.

13             MR. PAPANTONIO:  Objection.  Move to

14        strike.  Just rank hearsay.

15   BY MR. PYSER:

16        Q.   Did you have a -- a strong working

17   relationship with Mr. Wright in DEA?

18        A.   Yes.

19        Q.   Did Kyle Wright from DEA ever tell you

20   that Cardinal Health's anti-diversion program was

21   deficient in any way?

22             MR. PAPANTONIO:  Objection as to form.

23        Anything Mr. Wright told this witness, hearsay.

24             MR. PYSER:  Counsel, you can object to

25        form and keep it at that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. PAPANTONIO:  Okay.  Form.  I'll let

 2        you figure it out for yourself.  Okay.

 3                  THE WITNESS:  No.

 4  BY MR. PYSER:

 5        Q.   Did Mr. Wright ever tell you that Cardinal

 6  Health's suspicious -- strike that.

 7             Did you receive any suggestions or

 8  critiques from DEA, from Mr. Wright in particular, on

 9  Cardinal Health's system?

10        A.   No.

11        Q.   If back in 2006 or '7, Mr. Wright or

12  someone else at DEA had offered suggestions to

13  Cardinal Health on its suspicious-order monitoring or

14  reporting system, what would you have done?

15        A.   We would have --

16                  MR. PAPANTONIO:  Objection.  Speculation.

17        Speculation as to what was offered and what his

18        reaction would be.

19  BY MR. PYSER:

20        Q.   You can answer.

21        A.   We would have implemented those

22  suggestions.

23        Q.   I'm showing you a document entitled

24  Exhibit 35.

25             (Cardinal-Brantley 35 was marked for
```