PSJ3

Exhibit 672

```
 1                 UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4      ---------------------------) MDL No. 2804

 5      IN RE:  NATIONAL            )

 6      PRESCRIPTION OPIATE         )

 7      LITIGATION                  )

 8      ---------------------------) No. 1:17-MD-2804

 9      THIS DOCUMENT RELATES TO:   )

10      ALL CASES                   )

11      ---------------------------) Hon. Dan A. Polster

12

13                   HIGHLY CONFIDENTIAL

14         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16             The videotaped deposition of MICHAEL M.

17      MILLER, M.D., called by the Plaintiffs for

18      examination, taken pursuant to the Federal Rules of

19      Civil Procedure of the United States District Courts

20      pertaining to the taking of depositions, taken before

21      JULIANA F. ZAJICEK, a Registered Professional Reporter

22      and a Certified Shorthand Reporter, at the offices of

23      Foley & Lardner, Suite 400, 150 East Gilman Street,

24      Madison, Wisconsin, on June 4, 2019, at 10:00 a.m.
```

1      Q.    Dr. Miller, we are back on the record

2   after a short break.

3           We were just discussing the last

4   pharmaceutical company that you worked for that's on

5   your CV, US WorldMeds.

6           Do you recall that?

7      A.    Yes, ma'am.

8      Q.    Okay.  We had briefly started talking

9   about the first entry for US WorldMeds which was an

10  advisory group.

11          Is -- am I correct that in that advisory

12  group one of the things you were advising on was the

13  slide deck for later speakers bureaus for a drug for

14  US WorldMeds?

15     A.    Yes.

16     MS. HIBBERT:  Objection to form.

17     THE WITNESS:  Oh, sorry.

18  BY MS. DICKINSON:

19     Q.    Okay.  And what was the drug?

20     MS. HIBBERT:  Objection to form.

21  BY THE WITNESS:

22     A.    The tradename is L-u-c-e-m-y-r-a.

23  BY MS. DICKINSON:

24     Q.    And from your experience with

```
 1    pharmaceutical company speakers bureaus, I think you

 2    testified, but I just want to make sure, that the way

 3    that the speakers bureau systems works is that

 4    speakers are handed a slide deck drafted by the

 5    pharmaceutical company, is that true?

 6        A.    That's the way I understand it to be.

 7        Q.    In your experience, are speakers that are

 8    paid speakers in a speakers bureau for pharmaceutical

 9    companies allowed to make revisions to that slide

10    deck?

11        MS. HIBBERT:  Objection to form, calls for

12    speculation.

13    BY THE WITNESS:

14        A.    Speakers are instructed that they should

15    not go off script, but if they want to put in their

16    own slides, they have to identify them as their own

17    slides and not the company's slides.

18    BY MS. DICKINSON:

19        Q.    And the script, the original script comes

20    from whichever pharmaceutical company is sponsoring

21    the speakers, correct?

22        A.    Yes.

23        MS. HIBBERT:  Objection to form.

24    BY MS. DICKINSON:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.

 2        MS. HIBBERT:  Dr. Miller --

 3        THE WITNESS:  Sorry.

 4        MS. HIBBERT:  -- give me a pause, please.

 5        THE WITNESS:  Sorry.

 6   BY MS. DICKINSON:

 7        Q.    Which pharmaceutical companies have you

 8   served on the speakers bureau for, could you give me a

 9   list of those?

10        A.    BDSI and US WorldMeds.

11        Q.    You mentioned Ammon Labs.

12              Did you serve on the speakers bureau for

13   Ammon Labs?

14        A.    That's a different deal, but, in fact,

15   yes.  They -- they don't really have it well formed,

16   but I've given talks on their behalf and been

17   compensated for them.

18        Q.    Okay.  You mentioned an additional company

19   that makes Vivitrol, I believe.

20              What is the name of that company?

21        A.    A-l-k-e-r-m-e-s.

22        Q.    Have you ever served on the speakers

23   bureau for Alkermes?

24        A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    presented an agenda to react to, and back then the

 2    PTACs met either four to six times a year.  I think

 3    they met less and less during the time and they've

 4    become less and less influential since 1998, but the

 5    PTACs were a big deal back in the '90s.

 6         Q.    Your experience as the chair of the -- can

 7    we call it the PTAC committee, is that fair?

 8         A.    The PTAC, yes.

 9         Q.    Okay.  Was Joint Commission hospital

10    accreditation important to the hospitals?

11         A.    Oh, yes.

12         Q.    Why?

13         A.    It has to do with stature and prestige.

14    You don't want to be unaccredited.  So it's like a

15    Good Housekeeping seal or a Consumer Reports seal.

16    That's extremely important.  But there was a bottom

17    line consideration as well, and that is something that

18    I will call "deemed status."  And this was set up by

19    the Federal Government.

20              The Centers for Medicare and Medicaid

21    Services are the branch of the Federal Department of

22    Health & Human Services that oversees the Medicare and

23    Medicaid program and how they pay inpatient,

24    outpatient, nursing home, healthcare providers for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    healthcare services, okay.

 2              To be a hospital that receives Medicare

 3    payments, you have to be surveyed by CMS.  The CMS

 4    gave deemed status to the Joint Commission years ago,

 5    and by that they mean if you have been surveyed by the

 6    Joint Commission, you are deemed to be surveyed by

 7    CMS.  And so the Joint Commission surveys serve in

 8    lieu of a government survey to determine if you are

 9    eligible to receive Medicare services.  Therefore, if

10    you lose Joint Commission accreditation, you lose your

11    ability to get paid by Medicare and Medicaid.  You

12    might imagine the impact that would have on a

13    hospital.

14         Q.    It's a huge financial impact, correct?

15         MS. HIBBERT:  Objection to form.

16    BY THE WITNESS:

17         A.    Exactly, that's the point I was trying to

18    make.

19    BY MS. DICKINSON:

20         Q.    You made -- you actually made it very

21    clear, in an area that is really complicated.  I

22    appreciate it.  I used to defend hospitals years ago

23    and I'm not sure I ever heard someone put it that

24    succinctly.
```

 1   other courses with her ever at UW?

 2        A.    You know, I don't even know if it's in my

 3   CV, but it might be.  Over the years I have been asked

 4   to present to classes in the law school, in the social

 5   works school, in the pharmacy school, maybe even the

 6   physical therapy school, maybe even the vet school,

 7   I -- you know, but people just call up and say, We've

 8   heard you are a good speaker or we need an expert.

 9   And so I've probably taught in one of June's courses

10   where I'd come in for one session and teach a session.

11        Q.    Okay.  We talked about your work on the

12   PTAC for the Joint Commission back in 1998.

13            Did you ever come into contact with either

14   Dr. Dahl or Dr. Joranson during your time working on

15   that committee?

16        A.    Yes.

17        Q.    Okay.  When?

18        A.    My last year.

19        Q.    Okay.  And then is -- was that 1998?

20        A.    I believe so.

21        Q.    Okay.  What was the substance of that

22   contact?

23        A.    A presentation was made to the PTAC about

24   the idea of a new standard to put in -- in the manual.

1    Q.    Okay.  And when you say "the manual," we

2    are talking about this CAMH?

3    A.    CAMH, yes, ma'am.

4    Q.    Okay.  And was -- that presentation was

5    made by Dr. Dahl and Dr. Joranson?

6    MS. HIBBERT:  Object to form.

7    BY THE WITNESS:

8    A.    No.

9    BY MS. DICKINSON:

10   Q.    Okay.  I'm sorry.  Who made that

11   presentation?

12   A.    Dr. Joran- -- Dr. Dahl and another person

13   whose name I don't recall.

14   Q.    Was that other person someone at the UW

15   pain and policy group?

16   MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18   A.    To the best of my recollection, it was

19   not.

20   BY MS. DICKINSON:

21   Q.    Okay.  Was that other person someone from

22   the University of Wisconsin?

23   A.    To the best of my knowledge, it was not.

24   Q.    Okay.  Do you know what entity that other

1    person was affiliated with?

2        MS. HIBBERT:  Objection to form.

3    BY THE WITNESS:

4        A.    No.

5    BY MS. DICKINSON:

6        Q.    Were there more than just Dr. Dahl and

7    this other person that you don't recall making that

8    presentation to the PTAC regarding the CM -- CAMH

9    standards?

10        A.    Yes.

11        Q.    Okay.  Who else was making the

12    presentation?

13        A.    The Joint Commission staff.

14        Q.    Okay.  Which Joint Commission staff?

15        A.    I have no idea what their name was.  I

16    don't remember if they worked for what was called

17    the -- the SSP, the Standards and Survey Processes

18    committee, which was one level up, if I can digress

19    for a second --

20        Q.    Yes.

21        A.    -- the Joint Commission has a Board of

22    Commissioners which is like the board of directors.

23    The SSP reports to them and oversees standards and

24    survey procedures across all of the accreditation

Highly Confidential - Subject to Further Confidentiality Review

1    programs for the Joint Commission.  And then each of

2    the accreditation programs, as I mentioned, ambulatory

3    care, behavioral care, hospitals, long-term care, each

4    of those had a PTAC.

5            So the SSP was in between the PTACs and

6    the -- and the Board of Commissioners.  So to get a

7    new standard, staff has to conceptualize it, you have

8    to present it to the PTAC and the PTAC has to approve

9    it.  It goes to the SSP, this is the way it was then,

10   the SSP has to review it and approve it.  If they

11   approve it, it goes to the Board of Commissioners and

12   the Board of Commissioners has to approve it and it

13   gets put in the book.  That was the process.

14           And I don't remember if it was formally

15   somebody that worked for SSP or of it was just a staff

16   member, pardon the phrase, in the bowels of the Joint

17   Commission, who came, but it was a proposal of a new

18   standard.

19       Q.   Okay.  And what was the content of the

20   proposal of the new standard that Dr. Dahl and the

21   others were --

22       MS. HIBBERT:  Objection.

23   BY MS. DICKINSON:

24       Q.   -- presenting on?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      MS. HIBBERT:  Sorry.  Same objection.

 2  BY MS. DICKINSON:

 3      Q.    Go ahead.

 4      A.    The proposal was that there be a standard

 5  in the manual that would address how the accredited

 6  organization addresses pain complaints.

 7      Q.    And what were they proposing the

 8  accredited organization would do to address pain

 9  complaints?

10      MS. HIBBERT:  Objection to form.

11  BY THE WITNESS:

12      A.    To shorten our dialogue, they were

13  proposing what became known as the Joint Commission

14  pain standard.

15  BY MS. DICKINSON:

16      Q.    Okay.  The Joint Commission pain standard,

17  what was the general substance of the content of that?

18      MS. HIBBERT:  Objection to form.

19  BY THE WITNESS:

20      A.    Again, I don't have any opinions about

21  this.  I have facts because I was there at the time.

22  BY MS. DICKINSON:

23      Q.    Okay.

24      A.    The Joint Commission pain standard says
```

1   that an accredited organization will be able to

2   demonstrate to the surveyors that it assesses patients

3   regularly regarding the status of any pain that they

4   may have.

5       Q.    Did that standard that they were adav --

6   advocating for require that every patient who came

7   into the hospital be assessed for pain?

8           Is that a short way of saying it?

9       MS. HIBBERT:  Objection to form.

10  BY THE WITNESS:

11      A.    That's fair.

12  BY MS. DICKINSON:

13      Q.    Okay.  Is this -- was the standards

14  summarizing what has been often called as the pain is

15  the vi -- fifth vital sign concept?

16      MS. HIBBERT:  Objection to form.

17  BY THE WITNESS:

18      A.    I will answer your question by saying that

19  that is an extraordinarily commonplace and inaccurate

20  conflation of two different concepts.

21  BY MS. DICKINSON:

22      Q.    Okay.  I -- I want to stick with what the

23  actual standard they were advocating for was.

24      A.    That's good.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And so the standard, you said, I think,

2    and I just want to be clear, the standard that they --

3    Dahl and the others were advocating for was that each

4    patient that came into the hospital setting would be

5    assessed for pain.

6          Is that accurate?

7    A.    Yes.

8    Q.    Okay.

9    A.    To be -- to be clear, the fifth vital sign

10   language was never used by the Joint at that time.

11   Other people at the same time were developing the

12   concept of fifth vital sign.  That was not the Joint

13   Commission.

14   Q.    Okay.  Do you know who else was developing

15   that concept, the fifth vital sign?

16   MS. HIBBERT:  Objection to form.

17   BY THE WITNESS:

18   A.    It came from some people, some clinicians,

19   some whatevers, some in California, and some in the

20   VA, both -- both California through some bureaucratic

21   arm of the state government and maybe the health

22   department, whatever.  Somebody in California adopted

23   that term and some -- and the VA hospital system

24   developed that term, but they were never Joint

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Commission terms.

 2    BY MS. DICKINSON:

 3         Q.    Okay.  Is pain a vital sign?

 4         A.    No.

 5         MS. HIBBERT:  Objection to form.

 6    BY MS. DICKINSON:

 7         Q.    Do you --

 8         MS. HIBBERT:  Please.

 9    BY MS. DICKINSON:

10         Q.    -- the standard that we talked about with

11    respect to Dr. -- that Dr. Dahl was advocating for,

12    okay, so the Joint -- Joint Commission pain standard

13    change that she was advocating for, did you agree with

14    the change that she and others were advocating for?

15         MS. HIBBERT:  Objection to form.

16              Again, this is far afield from the expert

17    opinions that Dr. Miller has offered in this case.

18    Are you asking his personal opinion in this question,

19    because he is clearly not offering an expert opinion

20    about anything that you have been asking about pretty

21    much this entire deposition since we haven't talked

22    about his substantive opinions once.

23         MS. DICKINSON:  I am entitled to ask him about

24    his background.  This is his background.
```

 1      MS. HIBBERT:  This is not background.

 2  BY MS. DICKINSON:

 3      Q.    Doctor, please answer the question.

 4      MS. HIBBERT:  This is a -- this is a opinion

 5  about a -- this is a question about an opinion that he

 6  has not offered in this case.

 7  MS. DICKINSON:

 8      Q.    Doctor, please answer the question.

 9      A.    May I?

10      Q.    Did you agree with the -- with the change

11  in the standard that Dr. Dahl and others were

12  proposing?

13      MS. HIBBERT:  Objection for the same reasons I

14  just stated.

15  BY MS. DICKINSON:

16      Q.    Go ahead, Doctor.

17      THE WITNESS:  May I proceed with the objection

18  on -- on the table?

19      MS. HIBBERT:  You can proceed if you can answer

20  the question.

21  BY THE WITNESS:

22      A.    I can answer the question.

23  BY MS. DICKINSON:

24      Q.    I thought so.  Go ahead.

```
 1        MS. HIBBERT:  Same objection.

 2   BY THE WITNESS:

 3        A.    The PTAC advised that the standard not be

 4   adopted.

 5   BY MS. DICKINSON:

 6        Q.    And did you agree with the PTAC committee

 7   that the standard should not be adopted?

 8        MS. HIBBERT:  Objection to form.

 9   BY MS. DICKINSON:

10        Q.    Go ahead.

11        A.    I did.

12        Q.    When you were on the PTAC committee, did

13   the standard get adopted?

14        A.    It did not.

15        Q.    Okay.  Do you know if after you left the

16   committee that standard was adopted?

17        A.    It was.

18        Q.    Okay.  When?

19        A.    The following year.

20        Q.    Do you know if Dr. Dahl had renewed her

21   request to the committee the following year when it

22   was adopted?

23        MS. HIBBERT:  Objection to form, calls for

24   speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2        A.    It -- it does call for speculation.  I --

 3   I -- I believe that it was the exact same process

 4   presented to a differently composed PTAC, possibly

 5   with more forceful arguments, but I believe the

 6   process of presenting it was staff with these

 7   excise -- ex -- external people with them and it was

 8   adopted.

 9   BY MS. DICKINSON:

10        Q.    Okay.  And was one of the external people

11   to your understanding when the process happened the

12   next year Dr. Dahl?

13        MS. HIBBERT:  Objection to form.

14   BY THE WITNESS:

15        A.    You asked me only to my understanding, and

16   I would say to my understanding, but I could be wrong.

17   BY MS. DICKINSON:

18        Q.    Is it -- to your understanding is the

19   answer yes?

20        MS. HIBBERT:  Objection to form, asked and

21   answered.  He told you what he knew.  He said he

22   doesn't know is his understanding.

23   BY THE WITNESS:

24        A.    Yeah, I -- I don't --
```

1        Q.     And so the standard, you said, I think,

2   and I just want to be clear, the standard that they --

3   Dahl and the others were advocating for was that each

4   patient that came into the hospital setting would be

5   assessed for pain.

6               Is that accurate?

7        A.     Yes.

8        Q.     Okay.

9        A.     To be -- to be clear, the fifth vital sign

10  language was never used by the Joint at that time.

11  Other people at the same time were developing the

12  concept of fifth vital sign.  That was not the Joint

13  Commission.

14       Q.     Okay.  Do you know who else was developing

15  that concept, the fifth vital sign?

16       MS. HIBBERT:  Objection to form.

17  BY THE WITNESS:

18       A.     It came from some people, some clinicians,

19  some whatevers, some in California, and some in the

20  VA, both -- both California through some bureaucratic

21  arm of the state government and maybe the health

22  department, whatever.  Somebody in California adopted

23  that term and some -- and the VA hospital system

24  developed that term, but they were never Joint

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Commission terms.

 2    BY MS. DICKINSON:

 3         Q.    Okay.  Is pain a vital sign?

 4         A.    No.

 5         MS. HIBBERT:  Objection to form.

 6    BY MS. DICKINSON:

 7         Q.    Do you --

 8         MS. HIBBERT:  Please.

 9    BY MS. DICKINSON:

10         Q.    -- the standard that we talked about with

11    respect to Dr. -- that Dr. Dahl was advocating for,

12    okay, so the Joint -- Joint Commission pain standard

13    change that she was advocating for, did you agree with

14    the change that she and others were advocating for?

15         MS. HIBBERT:  Objection to form.

16              Again, this is far afield from the expert

17    opinions that Dr. Miller has offered in this case.

18    Are you asking his personal opinion in this question,

19    because he is clearly not offering an expert opinion

20    about anything that you have been asking about pretty

21    much this entire deposition since we haven't talked

22    about his substantive opinions once.

23         MS. DICKINSON:  I am entitled to ask him about

24    his background.  This is his background.
```

```
 1        MS. HIBBERT:  This is not background.

 2   BY MS. DICKINSON:

 3        Q.    Doctor, please answer the question.

 4        MS. HIBBERT:  This is a -- this is a opinion

 5   about a -- this is a question about an opinion that he

 6   has not offered in this case.

 7   MS. DICKINSON:

 8        Q.    Doctor, please answer the question.

 9        A.    May I?

10        Q.    Did you agree with the -- with the change

11   in the standard that Dr. Dahl and others were

12   proposing?

13        MS. HIBBERT:  Objection for the same reasons I

14   just stated.

15   BY MS. DICKINSON:

16        Q.    Go ahead, Doctor.

17        THE WITNESS:  May I proceed with the objection

18   on -- on the table?

19        MS. HIBBERT:  You can proceed if you can answer

20   the question.

21   BY THE WITNESS:

22        A.    I can answer the question.

23   BY MS. DICKINSON:

24        Q.    I thought so.  Go ahead.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       MS. HIBBERT:  Same objection.

 2  BY THE WITNESS:

 3       A.    The PTAC advised that the standard not be

 4  adopted.

 5  BY MS. DICKINSON:

 6       Q.    And did you agree with the PTAC committee

 7  that the standard should not be adopted?

 8       MS. HIBBERT:  Objection to form.

 9  BY MS. DICKINSON:

10       Q.    Go ahead.

11       A.    I did.

12       Q.    When you were on the PTAC committee, did

13  the standard get adopted?

14       A.    It did not.

15       Q.    Okay.  Do you know if after you left the

16  committee that standard was adopted?

17       A.    It was.

18       Q.    Okay.  When?

19       A.    The following year.

20       Q.    Do you know if Dr. Dahl had renewed her

21  request to the committee the following year when it

22  was adopted?

23       MS. HIBBERT:  Objection to form, calls for

24  speculation.
```