PSJ3

Exhibit 675

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      -  -  -
 5
      IN RE:  NATIONAL         :  HON. DAN A.
 6    PRESCRIPTION OPIATE      :  POLSTER
      LITIGATION               :
 7                             :
      APPLIES TO ALL CASES     :  NO.
 8                             :  1:17-MD-2804
                               :
 9
                - HIGHLY CONFIDENTIAL -
10
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                        -  -  -
12
                    October 25, 2018
13
                        -  -  -
14
15            Videotaped deposition of
      EDWARD HAZEWSKI, taken pursuant to
16    notice, was held at the law offices of
      Reed Smith, LLP, 1717 Arch Street,
17    Philadelphia, Pennsylvania, beginning at
      9:36 a.m., on the above date, before
18    Michelle L. Gray, a Registered
      Professional Reporter, Certified
19    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
20
                        -  -  -
21
22         GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23               deps@golkow.com
24
```

```
 1    thresholds."  Do you see that?
 2         A.    Yes.
 3         Q.    Okay.  He then says, "Since
 4    ABC's position can't get any worse."  Do
 5    you see that?
 6         A.    Yes.
 7         Q.    Do you have any
 8    understanding when he said this to you,
 9    what he meant by that?
10         A.    I have no idea.
11         Q.    Okay.  He says, "My
12    recommendation would be to send a formal
13    letter to DEA outlining the issue and
14    requesting a formal opinion."
15               Do you see that?
16         A.    Yes.
17         Q.    Do you have any recollection
18    about whether a formal letter was ever
19    sent to the DEA about disclosing
20    threshold levels?
21         A.    I do not.
22         Q.    Okay.  It's your
23    understanding that the policy at ABDC has
24    always been not to divulge threshold
```

1 levels?
2     A.   Yes.
3     Q.   You are not aware of any
4 change after this where they then said
5 you could divulge threshold levels to
6 customers?
7     A.   I am not aware of such a
8 change.
9     Q.   If there was a change, given
10 your role in the company, it's something
11 you would have been aware of, correct?
12     MR. NICHOLAS:  Object to the
13 form.  Go ahead.
14     THE WITNESS:  Yes.
15 BY MR. PIFKO:
16     Q.   Are you aware -- from time
17 to time was it the company's practice to
18 send formal letters to DEA asking for
19 their position on -- on certain issues?
20     A.   I wasn't involved in
21 composing letters of that kind.  I -- I
22 don't know if they communicated.  I'm
23 sure there's been questions asked but
24 beyond that I couldn't say.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Okay.  Are you aware, other
 2   than the discussion here about doing that
 3   in this context, are you aware of any
 4   discussion about doing that kind of thing
 5   in any other context?
 6          A.   No.
 7               (Document marked for
 8          identification as Exhibit
 9          ABDC-Hazewski-6.)
10               (Document marked for
11          identification as Exhibit
12          ABDC-Hazewski-7.)
13   BY MR. PIFKO:
14          Q.   I'm going to hand you two
15   exhibits, what's marked as Exhibit 6 and
16   Exhibit 7.
17               For the record, Exhibit 6 is
18   a one-page e-mail Bates labeled
19   ABDCMDL00282490.
20               And Exhibit 7 is a document
21   that was attached to that, was produced
22   in native, Bates labeled ABDCMDL00282491.
23               Take a minute to review
24   those and let me know when you're done.
```

Highly Confidential - Subject to Further Confidentiality Review

```
  1            A.    I've reviewed.
  2            Q.    Okay.  Do you recall sending
  3    e-mails to Walgreens people?
  4            A.    Yes.
  5            Q.    Okay.  This is an e-mail
  6    dated April 8, 2014, from you to a whole
  7    host of people at Walgreens.  Do you see
  8    that?
  9            A.    Yes.
 10            Q.    Okay.  And you say, "Team
 11    WAG, find attached some data that I
 12    believe could be the basis for part of
 13    our discussion.  Briefly, the first tab
 14    is all Walgreens locations that had
 15    Schedule II controlled substance order
 16    lines flagged by the order monitoring
 17    program, sorted largest (most lines) to
 18    smallest.  We can discuss further
 19    tomorrow."
 20                  Do you see that?
 21            A.    Yes.
 22            Q.    Do you agree that you sent
 23    them the attached spreadsheet?
 24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    If you look at that
 2   spreadsheet, among, in addition to
 3   disclosing the information that you
 4   discuss in your e-mail.  If you look, one
 5   of the columns is the threshold.
 6                Do you see that?
 7          A.    Yes.
 8          Q.    And then it lists the
 9   threshold for each location.  Do you see
10   that?
11          A.    Yes.
12          Q.    Is that correct?
13          A.    That's correct.
14          Q.    If it was against the
15   company's policy and the DEA told you not
16   to share thresholds, why were you sending
17   them to Walgreens?
18          A.    Well, the information that
19   was sent, and I believe the basis for
20   this message, was a request received from
21   Walgreens' pharmacy integrity unit, which
22   that unit are the people who are listed
23   on this e-mail.
24                Their pharmacy integrity
```

Highly Confidential - Subject to Further Confidentiality Review

1  group are their version of our diversion
2  control team.  So they monitored their
3  internal customer orders.  And we worked
4  on a regular basis hand in hand with that
5  group with the -- obviously, the goal
6  jointly to help monitor the customer
7  orders generated by their stores.
8           They had made a request at
9  some point that orders submitted by their
10 stores that breach a threshold just be
11 canceled and not reviewed any further,
12 that they would not like those orders to
13 be filled.
14          So this -- I can't say this
15 for certain.  But I believe the sending
16 of this information was in furtherance of
17 their request and our joint efforts to
18 work together to try to, you know,
19 achieve our goals.
20     Q.   Was it a regular occurrence
21 for you to send data that included the
22 thresholds and order monitoring program
23 details to Walgreens?
24     A.   A regular occurrence, no.