# EXHIBIT 118

# WALGREEN CO. CONTROLLED SUBSTANCE ANTI-DIVERSION AND COMPLIANCE PROGRAM

## July 17, 2012

**CONFIDENTIAL**
**Protected by Fed. R. Evid. 408**

Introduction of attendees

Thanks for taking the time.

Messages:
We want to work with you.  We want to cooperate and avoid litigation.
This has very high level attention from the Company and they understand the significance of this investigation.

At the same time, as we will show you, the Company has been taking significant steps to combat the pain clinic/oxycodone issue.  We believe that there were specifically designed programs and policies to address this issue, particularly in Florida.

Also, as we will show you, the data, which now takes into account recent months, shows that the issues are being addressed.  The policies and procedures are working.
And the layered approach--from the front lines at the pharmacists level, to the DC, to corporate HQ--(started well before your investigation) is working and is being enhanced now.  We believe that the new changes will  have a significant impact on the likelihood of us seeing similar issues with oxycodone or other controlled substances in the future.

HIGHLY CONFIDENTIAL

# Walgreens

- Founded in 1901 as a neighborhood drugstore
- Headquartered in Deerfield, Illinois
- 247,000 employees
- Operates 7,900 retail pharmacies
- Over 800 million prescriptions filled in 2011
- Over 6 million customers served daily

2

HIGHLY CONFIDENTIAL

WAGMDL00659829

## Anti-Diversion Commitment

- Walgreens has established and implemented a comprehensive anti-diversion program
- Compliance with federal, state and local laws as well as 2011 Memorandum of Agreement with DEA
- Walgreens works side by side with DEA and local law enforcement to prevent diversion at the state and local level across the country
- Walgreens has consistently enhanced policies and procedures relating to anti-diversion efforts

3

Compliance program is designed to detect and prevent diversion of controlled substances as required under CSA and DEA regs. as well as state laws

Policies applicable at all levels of the Company
This includes policies directed toward controlled substance dispensing and ordering

Walgreens has continuously attempted to enhance compliance and prevent diversion and is always listening for ideas where more can be reasonably done.

# Redacted – Attorney Client Privileged

HIGHLY CONFIDENTIAL

## Walgreens Has Invested in Compliance

- Pharmacy Operations
  - Training at pharmacy level
  - Targeted policies and procedures
- Loss Prevention
- Corporate-level Resources
  - Pharmacy Purchasing and Supply Chain
  - Regulatory Law Department
  - Dedicated team to oversee controlled substance distribution and dispensing (in progress)
- Distribution Centers

4

Loss Prevention

Walgreens is divided into 30 Markets, which are then further divided into 233 regional Districts.  Each district has a District Manager, a Pharmacy Supervisor, a District Loss Prevention Manager ("DLPM"), and an Operations Trainer.  Pharmacy Supervisors supervise pharmacists and are responsible for practice of pharmacy issues.   DLPMs conducts store site visits and handles loss prevention issues and investigations.

Florida: three Markets that cover 23 Districts.

DLPMs report to Market Loss Prevention Directors ("MLPDs").

MLPDs report to one of four Divisional Loss Prevention Operations Directors.

All Florida MLPDs report to Doug Lemmons, a divisional Loss Prevention Operations Director.  The Divisional Loss Prevention Operations Directors report to Ken Amos, Divisional Vice President, Loss Prevention.

Pharmacy Supervisors report to District Managers

"Current Solutions" (source: 7/9/2012 report from Ed Svihra re: role of Loss Prevention within company)

HealthCare Loss Prevention includes three pharmacists and a registered nurse focused on pharmaceutical diversion and healthcare regulatory compliance through education, subject matter expert assistance and targeted solutions throughout the enterprise

Loss Prevention Operations includes 250 corporate and field personnel responsible for the investigative steps required to address pharmaceutical diversion in our pharmacies

Loss Prevention Systems, Planning and Analytics has a team that uses analytic software to proactively and reactively mine data used to identify and assist diversion investigations

## Redacted – Attorney Client Privileged and Attorney Work Product

HIGHLY CONFIDENTIAL

**Redacted – Attorney Client Privileged and Attorney Work Product**

HIGHLY CONFIDENTIAL

## Walgreens Has Targeted Policies and Procedures to Combat Diversion

- Code of Conduct
- Pharmacy-level
  - Controlled Substance Prescriptions & Good Faith Dispensing Policy (updated in 2011 and 2012)
  - Controlled Substance Pick Up and Inventory Policies and Procedures
- Distribution Center-level
  - Customer Authentication Policy
  - Handling Suspicious Drug Orders Policy

5

Code of Conduct

All employees with access to controlled substances are required to abide by the Code of Conduct, sign it and confirm understanding of compliance once per year.

Requires compliance with all controlled substances laws, regulations and policies; requires reporting of theft, loss or diversion and cooperation with law enforcement; violations of policy result in discipline.

Policy was updated numerous times over the years in response to the changing regulatory and enforcement landscape.

# Redacted – Attorney Client Privileged

HIGHLY CONFIDENTIAL

## Pharmacists are the Front Lines

- Pharmacists have legal and professional obligations to dispense valid prescriptions and to adhere to state and federal requirements for dispensing controlled substances
- Addressing Controlled Substances Prescriptions
  - DEA has recognized that "there are no definitive criteria" and "one cannot provide an exhaustive and foolproof list of 'dos and don'ts'" for prescribing and dispensing controlled substances for the treatment of pain.  (DEA Policy Statement, "Dispensing Controlled Substances for the Treatment of Pain," 71 Fed. Reg. 52716, 52719 (Sept. 6, 2006).)

6

Legal standard:

Valid CS prescriptions are those "issued for a legitimate medical purpose  in the usual course of professional practice."  21 U.S.C. § 829(e)(2)(A) (Controlled Substances Act); 21 C.F.R.  § 1306.04.

HIGHLY CONFIDENTIAL

WAGMDL00659834

## Walgreens Efforts to Combat Diversion at the Pharmacy Level

- Policies
    - Good Faith Dispensing Policy (updated in 2011 and 2012)
        - Attention to red flags
        - Patient ID—asking the patient for identification if no prior relationship
        - Verification procedures if appropriate
        - Use of prescription drug monitoring programs
        - Documentation efforts
        - Notification to DEA
    - Controlled Substance Pick Up and Inventory Policies
- Training
- Good Faith Dispensing interactive training (2011)

7

Good Faith Dispensing Policy (2011; updated 2012): The Controlled Substance Prescriptions and Good Faith Dispensing Policy directs pharmacists to follow state and federal law and regulatory requirements.  It also alerts pharmacists to particular questionable circumstances and provides explicit prescription validation procedures.

Policy lists factors that should alert a pharmacist to questionable circumstances, including: numerous CS prescriptions written by same prescriber or several different prescribers; numerous CS prescriptions presented by same patient; increased frequency of prescriptions for the same/similar CS by one prescriber for large numbers of patients for beyond-normal quantities; unusual dosages or directions in conflict with approved labeling; consistent requests for early refills; persons picking up CS prescriptions for multiple patients who do not reside at same address; unusual geographic distances between patient, prescriber, and pharmacist; consistent prescriptions for habit-forming drugs; prescriptions that appear to be issued pursuant to an online diagnosis questionnaire; unusual presentation (e.g. prescriber's handwriting too legible, written in different color inks, different handwriting or erasure marks).

Validation procedures if the pharmacist receives a questionable prescription: verify patient's ID; confirm prescriber's authorization to prescribe CS (including state license number and DEA number); contact prescriber to verify prescription (if prescriber verifies, then document the call and dispense; if prescriber cannot be reached, do not dispense; if prescriber says prescription is not valid, notify DEA); fax any refusal to fill to DEA within two days; maintain a folder of fraudulent/denied prescriptions; contact local law enforcement as required by the state.

Policy was updated in June 2011 (by Al Carter and Cheryl Creek) to reflect MOA requirement to report refusals to fill to DEA within two business days.

Policy was updated in June 2012 to provide pharmacists with additional tools to validate a prescription.

Controlled Substance Pick Up Policy and Controlled Substances Inventory Policies

Walgreens has company-wide and state-specific identification ("ID") procedures on its internal StoreNet intranet site for all

HIGHLY CONFIDENTIAL

states with ID requirements relating to the dispensing of controlled substances. The policies emphasize that the pharmacist shall use sound professional judgment and good faith practices when dispensing all prescriptions and shall follow state laws and regulations regarding the pick-up of controlled substances. These practices may include requesting a valid, government-issued photo ID if the pharmacy staff does not know the person picking up or dropping off the prescription, or if there are doubts as to the authenticity of the prescription.

Controlled Substance Pick Up Policy was updated in January 2012.

Controlled Substances Inventory policies and procedures provide requirements for handling controlled substances, including conducting the annual inventory

Training: Pharmacists are trained on a regular basis

E.g., Walgreens has held numerous meetings for pharmacy managers to discuss issues surrounding the influx of oxycodone prescriptions. (e.g. August 2010 RXM meetings).

In addition to Walgreens resources, pharmacists must complete continuing education ("CE") courses as part of their state license requirements. E.g., beginning in July 2010 in response to growing problems with pain management prescriptions in Florida, it was recommended that pharmacists in Markets 3 and 28 complete CEs entitled "The Pharmacist's Role in Pain Management: A Legal Perspective" from RxSchool.com and "Navigating the Management of Chronic Pain: A Pharmacist's Guide" from PowerPak.com.

Good faith dispensing training module (2011):

On October 27, 2011, Walgreens assigned the updated Good Faith Dispensing training to all of its pharmacists. This training module, or PPL, must be reviewed by all pharmacists annually and must be reviewed by all new hire pharmacists within 60 days of hire. The training focuses on three pillars: identifying suspicious prescriptions and customers, validating the legitimacy of prescriptions, and reporting questionable prescriptions to law enforcement when appropriate. The training slides include examples of tell-tale signs of suspicious prescriptions and customers, as well as hypothetical practice scenarios. The training slides also direct pharmacists to notify DEA within two business days if they determine that a prescription is forged, altered, or issued for other than a legitimate medical purpose.

HIGHLY CONFIDENTIAL

WAGMDL00659836

## Walgreens Efforts to Combat Diversion at the Pharmacy Level

- Use of Electronic Tools
  - Prescription Drug Monitoring Program ("PDMP")
  - Intercom Plus
  - Drug Utilization Review ("DUR")

8

Electronic Tools

Use of State Prescription Drug Monitoring Programs

Walgreen posts links to each state's PDMP website on Storenet when the PDMP becomes operational.  Between September 2011 and January 2012, Walgreens delivered a communication to all of its pharmacies located in states with operational PDMPs.  The communication explained where these database websites were available and how to gain access, as well as explained that these databases could be effective guides when making decisions about dispensing controlled substances.

Intercom Plus: computer application used by pharmacists to process prescriptions, review patient profile history, insurance information, health conditions and drug interactions.

The application contains a Physician Inquiry function allowing pharmacists to search, locate, update, and register prescriber information.  (On occasion, pharmacists use this function to leave warning "notes" on the profiles of physicians with questionable prescribing practices.)

"Drug Utilization Review" ("DUR") computer warnings automatically inform pharmacists of some kinds of potentially questionable activity.

E.g. if a patient presents a new prescription to a Walgreens pharmacy before his existing prescription is completed based on days of supply, a DUR warning appears on the pharmacist's in-store computer (early refill).

E.g. if a patient attempts to fill two prescriptions for the same or similar drug, a DUR warning appears (duplicate therapy).

Recent/current program enhancements.

Florida only: new computer prompt (effective (12/1/2011) asks the pharmacist to "Check ID" whenever he scans a prescription at check out for a controlled substance. (The pharmacist can press "clear" and move on because Florida does

HIGHLY CONFIDENTIAL

WAGMDL00659837

not require pharmacists to check IDs of known patients.)

IC+ R54 – May 2009 - (Change in Early Refill Settings for Controls): early refill setting changed to flag certain prescriptions with low utilization rate based on days of supply.

IC+ R60 – (Documentation Details for Early Controlled Substance Refill): beginning in December 2010, documentation/input of comments required to override an early DUR warning when a CS is paid for with cash, or when a CS has a third party time out when it reaches DUR review; early refill setting changed to flag prescriptions that have less than 77% utilization rate based on days of supply.

# Redacted – Attorney Client Privileged

IC+ R65 – May 2012 - (Quantity Remaining Project): new window on the pharmacist's computer monitor will display a complete dispensing history for a given prescription over its lifetime, including dispensing locations, quantities dispensed, and type of dispensing activities.  Also, restrictions prevent opening of closed prescriptions.

HIGHLY CONFIDENTIAL

WAGMDL00659838

## Walgreens Efforts to Combat Diversion at the Pharmacy Level

- Refusals to Fill

- Notices of Refusals to Fill to DEA

- Pharmacist Best Practices Guidance

9

Refusals to Fill

Walgreens stores have routinely refused to fill suspicious prescriptions, and this practice has frequently resulted in threats of legal action against Walgreens by physicians and patients.

One store in Florida had to hire security guards due to threats of physical violence.

Stores in Florida: Walgreens retail pharmacies in Florida have refused to fill thousands of prescriptions based on its DUR warning system.  The Florida Pharmacies alone: tens of thousands refusals to fill.

Notices of refusals to fill to DEA

Walgreens pharmacies nationwide sent notifications pursuant to III(4)(b) of the MOA.

There are examples of DEA informing Walgreens to stop sending notices (FL, CO, etc.).  (E.g., Walgreens #03099 (Fort Myers, FL) submitted thousands of such notices to DEA since 2011.)

Walgreens Undergoes Continuing Efforts to Enhance Compliance and Best Practices

CII dispensing protocols first strengthened in fall 2010 (by Terry Gubbins and Georgia Lehoczky).

Pharmacist "Best Practices" drafted and circulated at the Market level among MLPDs, Market VPs, and MPDs for all three Florida markets (Markets 3, 6, and 28) in March 2011.

Bryon Wheeldon (MLPD, Market 3), Ed Lanzetti (MLPD, Market 28), Ed Forbes (MLPD, Market 6), Terry Gubbins (MPD, Market 28), and Georgia Lehoczky (MPD, Market 6) first discussed "Best Practices" for filling CIIs in Florida during a March 25, 2011 conference call.  The discussion took place at the direction of Ed Svihra (and possibly Doug Lemmons).

Proposals were also circulated to Ed Svihra, Doug Lemmons, Marlin Hutchens (Market VP, Market 28) and Scott Corley (Market VP, Market 3).

Proposed best practices were largely based on the language of Fla. Admin. Code r. 64B16-27.831 and Fla. Stat. §

WAGMDL00659839

893.055(14).

Proposals also included Walgreens-specific measures that exceeded what was required by federal and Florida laws/regulations.

Corporate would develop a "PPL" training for pharmacists.

Pharmacists must scan the driver's license of the person dropping off/picking up prescription.

If no prescriber-pharmacist relationship exists, the pharmacist must contact the prescriber to verify the prescription.

All verification calls to prescribers must be documented in InterCom.

Pharmacists should check the "profile" during the verification process.

If a pharmacist reports a prescriber to the Florida Department of Health (pursuant to Fla. Admin. Code r. 64B16-27.831(5)), he must record this information.

Instruct pharmacists not to manipulate on-hand quantities in SIMS.

HIGHLY CONFIDENTIAL

WAGMDL00659840

## Serious Efforts by Walgreens to Respond to Changes in Regulations in Florida

- A flood of new pain clinics began operating in Florida in 2009-10 which, at that time, were allowed to prescribe and dispense controlled substances directly
- Some of these "pill mills" were illegitimate enterprises
- In 2010-11, Florida statutory changes in the ability of pain clinics and doctors to dispense drugs caused a marked increase of patients seeking to fill prescription pain drugs at retail pharmacies
- The Florida Governor and Legislature acknowledged the problem
- Walgreens worked with State and Local officials to confront the issues

10

The head of the Florida Pharmacy Association acknowledges "pharmacies are struggling to deal with the influx of customers who used to rely on pain clinics to get controlled drugs"  (WSJ, March 2012)

Walgreens developed a reputation for being tough on diversion.  An undercover law enforcement agent "overheard nurses coaching pill seeking patients to avoid bringing their prescriptions to Walgreens stores:  "Do not go to Walgreens.  I can't say this enough.  They are not your friend.  They are the enemy".  (Miami Herald April 6, 2012)  Redacted – Attorney Client Privileged

**Redacted – Attorney Client Privileged**

Walgreens has refused to fill thousands of prescriptions for oxycodone and other controlled substances.

Walgreens pharmacists who have refused to fill have been physically threatened, followed, and threatened with media attention and legal action.

HIGHLY CONFIDENTIAL

## Additional Florida Measures

- Florida-specific controlled dispensing policy
- Focus on Compliance (June 2011 and June 2012)
- Florida CII and Oxycodone Action Plan Examples
  - Specific Market Plan Examples
  - Specific District Plan Examples

11

Florida Controlled Substance Dispensing Policy

Policy applies to all pharmacy staff in Florida stores.  Policy was first posted to StoreNet on 10/15/2010.

Policy tracks the requirements of Fla. Stat. § 893.055(14) and Fla. Admin. Code r. 64B16-27.831.

Policy requires the pharmacist to ask for identification of patient/patient's agent who is unknown to the pharmacist. Further, if the pharmacist has reason to question the legitimacy of the prescription, he must request ID, scan it, and verify the validity of the prescription with the prescriber.  It also directs the pharmacist on specific procedures for controlled substances.

Policy lists criteria that may cause a pharmacist to question whether a prescription was issued for a legitimate medical purpose, including: frequent loss of CS medications; only CS medications are prescribed for a patient; one person presents CS prescriptions with different patient names; same/similar CS medication is prescribed by two or more prescribers at same time; patient always pays cash and always insists on brand name product 3/25/2011 email from Terry Gubbins to Bryon Wheeldon.

Focus on Compliance in Florida (June 2011)

In June 2011, Walgreens launched Focus on Compliance ("FOC") for the Florida markets.  FOC was launched after the October 2010 change in Florida law restricting dispensing from pain clinics.  Thus, FOC was a response to the increase in CII prescriptions in stores caused (at least in large part) by the change to the law.

FOC focused on filling pain management prescriptions, including policies, practices and compliance.  All DLPMs were required to visit a minimum of 5 stores in their districts.  In total, 123 stores in 22 districts were surveyed.

DLPMs specifically reviewed the Good Faith Dispensing Policy and Fla. Admin. Code r. 64B16-27.831 with store managers and pharmacy managers.

Guidance given to DLPMs to use at stores included the pharmacist Best Practices discussed in March 2011 (i.e.

HIGHLY CONFIDENTIAL

pharmacist must review patient profile, scan driver's license, call prescriber to verify and record such calls in Intercom, etc.).

Guidance for when a pharmacist has reason to believe a prescriber is involved in diversion: pharmacist must contact the RXS and DLPM; RXS and DLPM will discuss with Regulatory Law to determine whether Florida Department of Health ("DOH") must be contacted; if DOH is contacted, file the contact details in the RXM binder.

During store visits, DLPMs reviewed the LPxRx report and documented drugs with both negative adjustments and positive overbuys.

Results of FOC

MPLDs concluded that many stores were experiencing an increase in oxycodone sales due to receiving an increased number of prescriptions, which in turn was due to the change in Florida law, stores being located near pain management clinics, and neighboring pharmacies refusing to fill oxycodone prescriptions.

Focus on Compliance nationwide (June 2012)

Analysis of controlled substance dispensing, including total volume and trends, proportionality to total business, and tender used, identified the top 500 stores in the chain that were at potentially higher risk related to pain management prescription activity.

Pharmacy Supervisors and DLPMs were required to visit stores in their districts that were identified on the list.  The purpose of these visits was to renew focus on the prescription drug abuse problem and to raise awareness of the pertinent points on the revised Good Faith Dispensing policy.

Florida CII and Oxycodone Action Plan Examples

In January-February 2012, Corporate requested Market Pharmacy Directors (MPDs) create district-specific CII dispensing plans.  In February 2012, Georgia Lehoczky (Market 6) compiled a number of individual District plans for dealing with oxycodone prescriptions.

Specific Market Plans: e.g. Market 6

Market CII dispensing guidelines/protocol implemented in January-February 2011.

Market Action Plan/Guidelines for CII Dispensing and Best Practices disseminated in October 2011.   The measures included: patient location restriction (only in-state patients with proper ID); stores cannot send patients to other stores because they refuse to fill certain CII prescriptions; patients can only fill medications three days early; training by store manager and RXM; pharmacists encouraged to complete continuing education course ("CE") "The Pharmacist's Role in Pain Management: A Legal Perspective" from RXSchool.com; routine store checks by District staff; review doctor's profile as well as patient's profile before dispensing; scrutinize non-driver's license IDs; observe patient behavior; be wary of being targeted by abusers during busy times at pharmacy; scrutinize phone-in prescriptions from CPO.

Specific District Plans for the Florida Pharmacies: e.g. D 112 (Palm Beach North)

RXS and DLPM developed an Action Plan for CII Dispensing in June 2011.  The measures included: patient location restriction (only residents of the county); patients must show valid ID; pharmacists required to complete continuing education course ("CE") "The Pharmacist's Role in Pain Management: A Legal Perspective" from RXSchool.com; random store checks by RXS or DLPM at 30, 60, 90 days, which included audits of all oxycodone prescriptions; random store checks every 30-60 days thereafter; stores required to notify DEA and law enforcement of any fraudulent prescriptions. Wesley Rohn distributed DEA best practices recommendations from 8/19/2011 meeting to District 112 management and stores.

In January 2012, RXS and DLPM identified the top five oxycodone-dispensing stores and instructed these stores to cut oxycodone orders to zero and aggressively reduce the number of oxycodone prescriptions filled.  They also mandated that these stores attach the PDMP profile to all oxycodone prescriptions.

HIGHLY CONFIDENTIAL

# Corporate and Distribution Center Efforts

- Distribution Center Policies and Processes
  - Customer Authentication Policy
  - Handling Suspicious Drug Orders Policy
  - Suspicious Order Monitoring Process
    - Ongoing evolution from 2009 – present
    - Line limits/thresholds
  - Personnel are given background checks and trained
  - Controlled drug cage is counted daily for controlled substances
- Full Audits

12

Role Of Distribution Centers

Jupiter is one of 13 DCs in US that handles controlled substances; it is one of only 3 DCs that handles CIIs

Jupiter now serves 1200 stores.  (Used to be 2400 but 1200 were moved to Perrysburg.)

Jupiter currently does not have CIII-V and PSE, which are now at Orlando

Distribution Centers distribute only to Walgreens pharmacies, but they never see patients and do not have the ability to detect trends in local markets related to physician practices.

Stores order CIIs, and the order goes directly to the DC.  CII forms are printed for the DC for those items

Distribution Centers are not designed to be a backstop to the pharmacists who are the front lines; rather, Distribution Centers are more akin to supply warehouses.  The stores, on the one hand, and corporate headquarters , on the other hand, are best equipped to ensure compliance and assist in combatting controlled substance abuse.


Policies

Code of Conduct

Customer Authentication order processing using "AS/400" computer system

AS/400 confirms valid state permit and valid DEA registration before shipping CS to that Walgreens store.

New Walgreens stores: before shipping CS to a new store, appropriate inventory levels are determined based on the store's projected prescription volumes, its operating area, and its prospective patient population.

Subsequent orders are reviewed for consistency with that store's book of business.  Orders falling outside the normal range are automatically reduced, identified via an exception report, and subject to additional review.  (NOW UPDATED)

Handling Suspicious Drug Orders: CS orders that are of unusual size, unusual frequency, or that otherwise deviate from a normal pattern for a store in its category, are flagged as suspicious and generate a Suspicious Control Drug Order Report. Prior to 2012, Jupiter's computer system flagged suspicious orders based on volume numbers and generated Monthly

HIGHLY CONFIDENTIAL

Suspicious Control Drug Order Reports.  Each month, the Rx Purchasing team reviewed a percentage of these orders and made reports to District Supervision.  While SOMP did not automatically halt suspicious orders upon identifying them, it did systematically decrease CS order quantities if the quantity ordered exceeded certain thresholds of order quantity without supporting sales increases.

SAIL (Store Action Inquiry Line) CII Claims

Instances of shortages or overages in shipments to stores are reported to the SAIL Coordinator at the distribution center.  Suspected thefts are referred to Asset Protection and Loss Prevention.

Suspicious Order Reporting

The Suspicious Order Monitoring Process ("SOMP") was instituted to prevent DCs from filling any suspicious store order and to capture data to identify stores with potentially suspicious activity for Loss Prevention team to investigate.  Walgreens team (consisting of Rx Purchasing, Logistics, Legal, Loss Prevention, & Store Order System IT) began updating SOMP in March 2008.  The enhanced SOMP system went operational in August 2009.

v1:  SOMP flags suspicious orders.

CS orders that are of unusual size, unusual frequency, or that otherwise deviate from a normal pattern for a store in its category, are flagged as potentially suspicious.

Criteria for flagging orders as suspicious **Redacted – Attorney Client Privileged**

size of order (based on last 26 weeks of sales data with some standard deviation allowed for growth)

order frequency:  tested whether, based on 26 weeks of sales, an item had a normal number of orders per store.  Used probability statistics to determine order frequency periods.  The systems looks at how many times an item has been ordered over a specific time period to determine an acceptable number of times a product can be ordered over a 13-week time period.

manual inventory adjustments at the store level.

The theory behind how a suspicious order was defined was based on a 2008 action against Cardinal related to internet pharmacies.

v2:  SOMP begins cutting suspicious orders.

As originally designed, the system looked at the past 13 weeks of sales data and would recalibrate the thresholds if there was an increase in sales.  Therefore, a gradual increase in sales did not result in orders getting cut.

Orders in excess of the thresholds would be cut.

If a store wanted to override the limit, they could call the DC to get a manual work around.  Stores also had the ability to call Cardinal for CIII-V drugs.

v3: "Dashboard" computer interface

Tracks trends by store, market, or drug--new format facilitates tracking and targeting of investigations for DLPMs.

Draft designs circulated in December 2011 and piloted in May 2012.

**Redacted – Attorney Client Privileged**

v4: vendor orders will be included in order monitoring (pilot July 18, 2012)

v5: create store-specific CS order limits ("ceilings"); better dashboard (pilot October 2012)

LINE LIMITS:  In place at all stores nationwide for 8 problem drugs.  If the store tries to order more, the order is cut and there is an absolute stop.  If the store has a legitimate need, the order goes through a level of review that includes an online form that lists the reason, and is signed off on by the Pharmacy Supervisor District Manager.

Other procedural changes:

Walgreens DCs no longer accept verbal or email orders for controlled substances.  Cardinal has been instructed not to accept online or phone orders for any items with line limits.  Everything for 8 drugs subject to line limits must be funneled through Walgreens' systems.

 Audit program

Mini Audits: distribution centers conduct "Mini Audits" in order to ensure that the handling of Schedule II-V controlled substances complies with DEA regulations.  The audit reviews registration, security, employee screening, inventory requirements, recordkeeping, and reporting.

HIGHLY CONFIDENTIAL

Internal Audits: distribution centers undergo more thorough audits every 3-5 years in order to ensure that the handling of Schedule II-V controlled substances complies with DEA regulations (21 C.F.R. Part 1300 et seq.).  Internal audits include interviews with DC management, documenting the movement of CS from receiving dock to shipping dock, and using an audit testing program that tracks DEA regulations.

Internal Audit of Jupiter DC conducted November 15-19, 2010.  The audit concluded that internal controls at the DC were operating effectively but identified some areas for improvement.  DC management acted upon the recommendations for improvement.

HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

WAGMDL00659847

# 8 Florida Stores: No Pattern of Non-cocktail Drug Diversion

- 8 selected stores, all C2, C3-5, and non-controlled drugs except cocktail drugs



14

HIGHLY CONFIDENTIAL

WAGMDL00659848

# Jupiter: Downward Trend for Selected Drugs

- Shipments of 8 selected drugs from Jupiter to top 100 Florida stores



HIGHLY CONFIDENTIAL

WAGMDL00659849

# Jupiter: No Pattern of Non-cocktail Drug Diversion

- Dosage units shipped for all C2, C3-5, and non-controlled drugs excluding cocktail drugs.



HIGHLY CONFIDENTIAL

WAGMDL00659850

# Recent Additional Compliance Measures

- Removed CIIs, Alprazolam, and Carisoprodol at 8 Pharmacies identified by DEA
- Pharmacists Retrained
- Nationwide Focus on Compliance Program
- New Line Limits for orders to Distribution Centers
- No orders to the Distribution Centers by phone or email
  - Only system orders which go through analysis are accepted unless Pharmacy Purchasing grants specific exception

17

Line limits for all 8 CII drugs and Soma/Xanax
Oxy 15 and 30mg; Alprazolam 2mg; Hydromorphone 2 and 4 mg; Methadone 5 and 10 mg; Carisoprodol 350mg

Override form created and implemented; RXS must personally approve after consulting with District Manager

HIGHLY CONFIDENTIAL

WAGMDL00659851

Override form created and implemented and must be approved by RXS, DM and LPM and then form is sent to RX Purchasing Inventory management team for review and then to DC

Continuing enhancements for suspicious ordering ongoing

# Redacted – Attorney Client Privileged

HIGHLY CONFIDENTIAL

WAGMDL00659852

## Recent Additional Compliance Measures

- High Level Corporate Task Force
- Continued enhancements to Suspicious Order Monitoring Process
  - "Dashboard" interface being piloted
  - Review and Analysis of Data for Outliers
- InterCom Plus / "DUR" Enhancements

18

Task Force: note Cardinal settlement creates a "Large Volume tactical and Analytical Committee to review and make decisions regarding higher volume retail and chain pharmacy customers."

Good Faith Dispensing Policy updated (see prior slide)
GFD Training updated on June 11, 2012
GFD PPL Acknowledgement updated and went out July 5

DUR Enhancement: alerts the pharmacist to review a patients profile and utilize GFD procedures when dispensing select controlled substances
Implemented June 6, 2012

Other Intercom Plus Enhancements
Change in early refill settings for controlled substances (flag prescriptions that have been less than 77% utilized based on day of supply)
Documentation for early refills of controlled substances , including requiring documentation when cash payment or a "third party time out"

Cardinal settlement also includes due diligence, DEA monthly reporting requirements of all sales transactions on controlled substances; suspicious order reporting and ongoing cooperation.

Indexing
Store indexing

HIGHLY CONFIDENTIAL

WAGMDL00659853

Pharmacist Indexing
Prescriber indexing
Patient indexing

HIGHLY CONFIDENTIAL

WAGMDL00659854

## Continued Cooperation with DEA, and Federal and State Agencies

- Multiple interactions with State and Local law enforcement and associations

- Cooperation and joint activity with DEA

  *Desire to continue to cooperate to enhance efforts and combat problems*

19

Walgreens has met with state and local law enforcement to discuss strategies for stemming the diversion of controlled substances.  For example:

May 2011: Walgreens was the only retailer requested to make best practices presentation to Central Florida law enforcement officials at meeting supported by Central Florida Drug Enforcement Strike Force.

October 2011: representative from Florida DOH and local sheriff's office spoke to meeting of RXMs from districts 112 and 22 (Market 6).

At January 2012 meeting, DOH representative told DLPM Amy Spiehs and RXS Terry Collins that he had no concerns about Walgreens' practices.


Cooperation with DEA: Walgreens has met with DEA to discuss strategies for stemming the diversion of controlled substances.

Market 3 DLPMs attended quarterly meetings with DEA, local law enforcement, state health agencies, and drug retailers (January 2011, April 2011, July 2011, October 2011, and January 2012).

August 2011: Ed Forbes, Georgia Lehoczky, the RXSs and DLPMs from Market 6, and Dwayne Pinon met with Susan Langston and Gayle Lane from DEA.

DEA made best practices recommendations-- including having pharmacists check both the patient profile and doctor profile before dispensing—which were then distributed to Florida stores.

Broward Sheriff's Office ("BSO") drug diversion investigators also attended the meeting and commented that Walgreens pharmacists were very supportive in assisting with investigations.

October 2011: Ed Forbes, Georgia Lehoczky, and RXSs from Market 6 (including Wesley Rohn) met with DEA to discuss identifying fraudulent patients more effectively.

December 7, 2011: local DEA agent, Amber Baginski, hosted videoconference meeting with leadership staff from Markets

HIGHLY CONFIDENTIAL

3 and 28, as well as all Pharmacy Supervisors in these Markets.

March/April 2012: Market 6 RXMs, store managers, RXSs, and MPD attended DEA diversion conference in Palm Beach.

HIGHLY CONFIDENTIAL

WAGMDL00659856