# EXHIBIT 139

1        UNITED STATES COURT OF APPEALS
      FOR THE DISTRICT OF COLUMBIA CIRCUIT
2

3

4   - - - - - - - - - - - - - - - -

5   WALGREEN COMPANY,

6        Petitioner,

7        v.                            No. 12-1397

8   DRUG ENFORCEMENT

9   ADMINISTRATION,

10       Respondent.

11  - - - - - - - - - - - - - - - -

                              Thursday, March 21, 2013
12

                              Washington, D.C.
13

14       The above-entitled matter came on for oral
    argument pursuant to notice.
15

    BEFORE:
16

          CIRCUIT JUDGES ROGERS AND TATEL, AND SENIOR
17        CIRCUIT JUDGE SENTELLE

18  APPEARANCES:

19        ON BEHALF OF THE PETITIONER:

20        GREGORY G. GARRE, ESQ.

21        ON BEHALF OF THE RESPONDENT:

22        SAMANTHA L. CHAIFETZ, ESQ.

23

24

25

*Deposition Services, Inc.*
*12321 Middlebrook Road, Suite 210*
*Germantown, MD 20874*
*Tel: (301) 881-3344 Fax: (301) 881-3338*
*info@DepositionServices.com  www.DepositionServices.com*

PLU                                                                                     2

# C O N T E N T S

ORAL ARGUMENT OF:                                                        PAGE

    Gregory G. Garre, Esq.
    On Behalf of the Petitioner                                  3; 34

    Samantha L. Chaifetz, Esq.
    On Behalf of the Respondent                                     13

1                              P R O C E E D I N G S

2                THE CLERK:  Case number 12-1397, Walgreen Company,

3      Petitioner v. Drug Enforcement Administration.  Mr. Garre for

4      the Petitioner; Ms. Chaifetz for the Respondent.

5                JUDGE ROGERS:  Good morning.  I would just mention

6      generally that in these cases there are sealed documents, so

7      we would urge Counsel to avoid reference to them unless some

8      other agreement has been reached with the parties, and if the

9      Court's questions veer in that area to just stop us.  Thank

10     you.

11               ORAL ARGUMENT OF GREGORY G. GARRE, ESQ.

12                  ON BEHALF OF THE PETITIONER

13               MR. GARRE:  Thank you, Judge Rogers, and may it

14     please the Court.  The immediate suspension order in this case

15     should be set aside because it is based on a significant

16     change in Agency policy that is invalid, both because it

17     represents an unreasonable interpretation of the Agency's own

18     rules, and because it was unaccompanied by notice and comment

19     rule-making, or even the reasoned explanation that the Supreme

20     Court has held is required for an Agency policy change.

21     For --

22               JUDGE SENTELLE:  Do you have to win on the merits of

23     this case to win on the ISO?  All we have before us today is

24     the ISO, right?

25               MR. GARRE:  That's absolutely right, Your Honor.

PLU

1       JUDGE SENTELLE:  And you seem to be plunging right

2    into -- aren't you biting off more than you have to chew?

3       MR. GARRE:  Well, Your Honor, if there's an easier

4    route for us to prevail we certainly wouldn't want to

5    discourage the Court from taking it.  What I would say is the

6    ISO is grounded on a finding of the violation of legal duties,

7    one of which we think is absolutely invalid, but the duty to

8    halt, to investigate and halt shipment pending investigation,

9    and we think that that is a sufficient basis for this Court to

10   set aside the ISO, the immediate suspension order which has

11   been in effect for some seven months, and in effect puts a

12   padlock around a major distribution center for all Schedule II

13   drugs.  Now, this was an extraordinary administrative action

14   taken without prior notice or an opportunity --

15       JUDGE SENTELLE:  Yes.  And what's the normal basis

16   for taking it without prior notice?  It's not the validity of

17   the regulation, it's the immense of harm to the public, isn't

18   it?

19       MR. GARRE:  That's absolutely right, Your Honor.

20       JUDGE SENTELLE:  Right.

21       MR. GARRE:  Now, we think that --

22       JUDGE SENTELLE:  So, when you said a while ago if

23   there's an easier way to win wouldn't that be the normal way

24   one would approach an ISO argument?

25       MR. GARRE:  Well, and Your Honor, certainly one of

PLU                                                                          5

1   our positions is, is that there is no imminent danger set

2   forth in the ISO.  I think in order to understand the Agency's

3   thinking of what was an imminent danger, it did base that on a

4   finding of the statutory violations, and I think that that was

5   necessary under 824(d), the provision of the statute that

6   gives the Administrator this extraordinary power.  Now, the

7   Court could disagree with that and still --

8           JUDGE SENTELLE:  Well, that might be something they

9   could find after notice and hearing, but isn't your best

10  argument on the ISO just it's a due process problem, that

11  you're entitled to a notice and hearing unless the imminent

12  element is made?

13          MR. GARRE:  That's absolutely right.  And our

14  central --

15          JUDGE SENTELLE:  You seem to be coming in here

16  asking us to invalidate the whole proceeding against you.

17          MR. GARRE:  Well, no, Your Honor, because the

18  revocation proceeding would, presumably could go forward,

19  although there's no reason why this Court couldn't recognize,

20  and we think it should recognize that this legal duty that has

21  been asserted that is a principle basis for the ISO is

22  invalid.  Now, Your Honor is quite right that you could find

23  other grounds for why the imminency finding is not sufficient.

24          JUDGE SENTELLE:  Why should the Court go all the way

25  to that issue if you could prevail on the other?

1          MR. GARRE:  Well, if we could prevail on the other

2    ground, Your Honor, the Court would not need to.  What I would

3    respectfully submit is this is an invalid legal duty, it's

4    clear that it's invalid on the record before you, and for that

5    reason alone the Court should say that this duty doesn't

6    exist.  There's no reason to have Walgreens or the DEA go

7    through this extensive proceeding on the basis of a violation

8    that is improper, and this Court, I think, is well positioned

9    to say that.  You know, having said that we wouldn't

10   discourage this Court from invaliding the ISO on any ground,

11   that's the basis we're here today, the ISO.

12          JUDGE TATEL:  Well, isn't -- I understood your brief

13   as saying that the question of notice and comment was an

14   antecedent question we had to get to because it was, the due

15   diligence requirement was one of the two elements DEA relied

16   on for the imminent danger finding, right?

17          MR. GARRE:  That's right, Your Honor, we do think

18   it's --

19          JUDGE TATEL:  So --

20          MR. GARRE:  We do think it's one of --

21          JUDGE TATEL:  Right.

22          MR. GARRE:  -- the two.  Now, I think --

23          JUDGE TATEL:  So, we could say, I suppose we could

24   say well, even assuming the due diligence requirement is valid

25   it together with the other finding that is affiliated report,

PLU                                                                          7

 1    isn't sufficient for imminent danger finding, we could do

 2    that, right?

 3              MR. GARRE:  The Court could do that, Your Honor.

 4              JUDGE TATEL:  But --

 5              MR. GARRE:  But I think that the --

 6              JUDGE TATEL:  But -- yes.  I see.  Right.

 7              MR. GARRE:  But I think that the Court is still

 8    presented before it with an ISO which is grounded in principle

 9    part on the violation of a legal duty that unquestionably

10    represents a significant change in the law.  There are many

11    cases in which the Court may have to speculate on that, but

12    here it has the sworn testimony of a senior DEA official that

13    this was, quote, a significant change in DEA policy, DEA --

14              JUDGE TATEL:  Who was that official, by the way?

15              MR. GARRE:  Your Honor, it was Kyle Wright, he was

16    an office in the Office of Diversion Control.  He was the

17    Agent that the DEA put forward in this other case to testify

18    about its regulatory policies.

19              JUDGE ROGERS:  He was like the number two supervisor

20    because he reported to somebody named Marx (phonetic sp.), I

21    think.

22              MR. GARRE:  He was within, there are several leading

23    officials within the Office of Diversion Control, he

24    ultimately reported to the Deputy Director of --

25              JUDGE ROGERS:  All right.

1              MR. GARRE:   -- the DEA, and he was the person that

2    the DEA put forth in that case to testify about it.   And the

3    District Court in that case made findings that this was a

4    significant change, and about his testimony that were not

5    challenged on appeal, in fact, the Government abandoned appeal

6    in that case.   So, certainly we think that -- and with respect

7    to this issue of the change, again, to be clear we have two

8    arguments on this, one is we don't think that this

9    interpretation is reasonable at all under the Agency's

10   regulations because the Agency's regulations specifically

11   establish a reporting requirement, but not this additional

12   investigate and halt shipment requirement, and we think that

13   follows from the analysis that this Court set forth in the

14   *Ethyl Corp.* case.   But the second argument is, is even if they

15   could convince the Court that this was somehow a plausible

16   interpretation, an agency can't undertake this sort of

17   significant policy change without going through notice and

18   comment rule-makings required by cases like *Paralyzed*

19   *Veterans*, the *Alaska Professional Hunters* case, so that in

20   itself is independent defect.   And it gets even worse for the

21   Agency because under the Supreme Court's recent decision in

22   *FCC v. Fox Television* we know that at the bare minimum the

23   Agency has to both recognize the change and provide reasoned

24   explanation for that change.   The Agency has never attempted

25   that here, its position before this Court is --

 1          JUDGE TATEL:  But that would only, that would only,

 2   that principle would only come into play if notice and comment

 3   weren't required, right?

 4          MR. GARRE:  Yes.

 5          JUDGE TATEL:  Okay.  So, again, let's go back to the

 6   antecedent --

 7          JUDGE ROGERS:  Right.

 8          JUDGE TATEL:  -- issue here, or to use that word

 9   again.  So, the way to think about this, I take it, is first,

10   see if you think I have this right, the first question is was

11   it a change that required notice and comment, right?  Second,

12   even if it didn't was it an unexplained change, right?  Are

13   those separate?

14          MR. GARRE:  I think they are separate --

15          JUDGE TATEL:  Yes.

16          MR. GARRE:  -- ground, either would be sufficient to

17   say that --

18          JUDGE TATEL:  Right.

19          MR. GARRE:  -- the manner they went about this --

20          JUDGE TATEL:  Yes.

21          MR. GARRE:  -- was invalid under the APA.  But we

22   think that there's a threshold issue, Your Honor, which is

23   that there's no room for this interpretation at all under

24   their own regulations given the way that the regulations are

25   set up, which is to say in 1301.71(a) that the Administrator

PLU
                                                                    10

1    shall use these specific requirements to determine whether or

2    not there had been --

3            JUDGE TATEL:  But isn't that the notice and comment

4    point?  In other words, they could add this due diligence,

5    they would just have to do it through notice and comment rule-

6    making, right?

7            MR. GARRE:  No, Your Honor --

8            JUDGE TATEL:  No?

9            MR. GARRE:  -- it's not.  It's the argument that the

10   regulations preclude this all together.  And you can sort of

11   stop there without getting --

12           JUDGE TATEL:  Well, can't they change their

13   regulation?

14           MR. GARRE:  They can, Your Honor, they can going

15   through notice and comment.

16           JUDGE TATEL:  Right.

17           MR. GARRE:  And it goes to their point that they can

18   do this without notice and comment.  And our point on that is

19   they can't because it's precluded by the regulations, the text

20   of their own regulations, it's an unreasonable interpretation.

21           JUDGE TATEL:  But they can change their regulations.

22           MR. GARRE:  But they can change it through notice

23   and comment.

24           JUDGE TATEL:  Through notice and comment, so they

25   could --

1              JUDGE ROGERS:  So, we're back to notice and comment.

2              JUDGE TATEL:  Right.  They could if they had

3    authority under the statute to add this due diligence

4    requirement.  They could do it through notice and comment.

5              MR. GARRE:  Ultimately they could, Your Honor.

6    Obviously, they have not undertaken that, and what they have

7    here is an administrative order grounded on the violation of a

8    duty that is quite simply --

9              JUDGE TATEL:  And from your perspective --

10             MR. GARRE:  -- unlawful.

11             JUDGE TATEL:  Yes, from your perspective the reason

12   for us to address that question first, notice and comment, as

13   opposed to the merits of the imminent danger finding I think

14   is that you have the merits hearing ahead of you, right?

15             MR. GARRE:  No, that's --

16             JUDGE TATEL:  And --

17             MR. GARRE:  Your Honor, we think it's a sufficient

18   ground to say that this order was contrary to law.  Now, once

19   you got into the merits, if by that you refer to the findings,

20   and we think that there are several flaws with the order on

21   its own.  It's based on a broad assumption that all orders

22   which may have originated from pain clinics were illegitimate;

23   it's based -- if you look at the order very carefully, all of

24   the allegations of wrongdoing take place in 2010 and 2011, yet

25   this order is issued in September of 2012.  And then if you

1    look at paragraphs 20 and 21 of the order you find that the

2    only basis that they actually identify in 2012 for believing

3    that there's a harm is that Walgreens is the biggest

4    distributor in the state, and that the average sales from

5    Walgreens stores are slightly, are higher than the average

6    sales, national sales for pharmacies, which of course include

7    many mom and pop pharmacies, so those figures are absolutely

8    meaningless in establishing an imminent danger in September,

9    2012.

10         The other thing that they pointed to was the failure

11   to comply with the reporting requirement.  Now, we do

12   recognize that that is a requirement in the regulations,

13   that's not a sufficient basis to uphold this order because the

14   order was based on so many other invalid reasons under

15   *Chenery*, this Court has to send it back and have the Agency

16   consider it.  But even with respect to the reporting

17   violations I want this Court to understand that the reason why

18   Walgreens stopped making those reports in 2012 is because its

19   changed its reporting system so that orders were automatically

20   cut off at the pharmacy level before they even got to the

21   distribution level.  During the same period, moreover,

22   Walgreens was making the so-called ARCOS reports to the DEA on

23   a monthly basis, that's acknowledged, of all its inventory and

24   all its orders during this period.  And during this period

25   it's undisputed I think, and the ISO recognized Walgreens had

1    made substantial reductions in the amount of orders going to

2    these pharmacies, some 75 percent.  And if you look at the

3    chart on page 23 of our brief it shows a dramatic drop off in

4    the distribution, so we think it's simply unfounded even if

5    this Court goes to the merits that there was an imminent

6    danger in September of 2012 when this order was issued, and

7    for any of those basis this extraordinary administrative act

8    should be set aside.  If I could reserve the remainder of my

9    time.

10                   JUDGE ROGERS:  Thank you.

11                   MR. GARRE:  Thank you.  Good morning.

12                   ORAL ARGUMENT OF SAMANTHA L. CHAIFETZ, ESQ.

13                        ON BEHALF OF THE RESPONDENT

14                   MS. CHAIFETZ:  Good morning, Your Honors, may it

15    please the Court, Samantha Chaifetz for the Department of

16    Justice and the Drug Enforcement Administration.

17                   Plaintiff's case challenges, concedes to begin with

18    the reporting failures that the DEA Administrator --

19                   JUDGE TATEL:  Would you mind starting with the

20    notice and comment --

21                   MS. CHAIFETZ:  Sure.

22                   JUDGE TATEL:  -- questions?  And focus on that.  And

23    specifically, Walgreen's argument that this new requirement,

24    that the due diligence requirement is new and required notice

25    and comment rule-making, that it's not covered by existing

1    regulation.  Not included in it.

2              MS. CHAIFETZ:  Right.  So, to take the first

3    point --

4              JUDGE TATEL:  Yes.

5              MS. CHAIFETZ:  -- the suggestion that this is a new

6    requirement.

7              JUDGE TATEL:  Yes.

8              MS. CHAIFETZ:  The conduct at issue in the case,

9    we're talking about distributing practices beginning really in

10   2009 through 2012.  Now, back in 2006 there's no dispute that

11   letters were issued by DEA, guidance letters, that went out to

12   all the distributors, Walgreens included, explaining that they

13   were, DEA was in these letters reiterating responsibilities

14   incumbent upon distributors, and sorry, the first of these

15   letters was September, 2006, okay, telling distributors saying

16   we think you're already well aware, that's a quote from the

17   letter, of these responsibilities, but we are reiterating

18   them.

19             JUDGE TATEL:  But the question is whether those

20   notices, whether --

21             JUDGE ROGERS:  Guidance.

22             JUDGE TATEL:  -- notice and comment rule-making was

23   required to authorize those notices.

24             MS. CHAIFETZ:  Well, notice and comment rule-making

25   would only be required --

1              JUDGE TATEL:  Yes.

2              MS. CHAIFETZ:  -- if we were marking an amendment, a

3      change from a pre-existing regulation.

4              JUDGE TATEL:  Well, the argument is --

5              MS. CHAIFETZ:  The regulation --

6              JUDGE TATEL:  The argument is that that's exactly

7      what happened here, that this regulation says the Agency shall

8      consider, and it lists a bunch of things, and it doesn't list

9      anything else, and unlike other regulations it doesn't say it

10     shall consider these and such other factors.

11             MS. CHAIFETZ:  Right.  Your Honor --

12             JUDGE TATEL:  Right?  So --

13             MS. CHAIFETZ:  -- it certainly says that the DEA

14     shall consider a variety --

15             JUDGE TATEL:  Right.

16             MS. CHAIFETZ:  -- of factors, and those factors are

17     things like the size of the vault in which substances are

18     held, et cetera.  Those factors must be considered, there's no

19     dispute about that.

20             JUDGE ROGERS:  But let me just --

21             MS. CHAIFETZ:  What the regulation --

22             JUDGE ROGERS:  Let me just --

23             MS. CHAIFETZ:  -- does not say -- sorry, Your Honor.

24             JUDGE TATEL:  No, but --

25             JUDGE ROGERS:  Please, go ahead.

PLU                                                                          16

1              MS. CHAIFETZ:  What the regulation does not say is

2     that that is in any sense an exclusive list, it simply says

3     that those things shall be considered.

4              JUDGE ROGERS:  So, if --

5              MS. CHAIFETZ:  DEA never interpreted -- yes, Your

6     Honor?

7              JUDGE ROGERS:  Go ahead.

8              MS. CHAIFETZ:  DEA never interpreted that regulation

9     to be exclusive.  There is no point in history, not even in

10    the Kyle Wright testimony cited by opposing counsel, where DEA

11    has ever suggested that that list was exclusive.  Now, in --

12             JUDGE TATEL:  But you see, in the same regulation,

13    in exactly the same regulation, subsection 34 it says in

14    determining whether an importer, et cetera, et cetera, against

15    diversion the Administrator shall consider among other

16    factors, and then it lists them.  So, in the same regulation

17    you have the Agency saying for one standard you shall consider

18    in this case specific things, and in this other one specific

19    items among other factors.

20             MS. CHAIFETZ:  That's right.  There are --

21             JUDGE TATEL:  Isn't that a pretty clear indication

22    that at least for, with respect to --

23             MS. CHAIFETZ:  No, Your Honor --

24             JUDGE TATEL:  No?

25             MS. CHAIFETZ:  -- because here what we're dealing

1    with is not a statute that lists a bunch of broad --

2                    JUDGE TATEL:  You mean a regulation.

3                    MS. CHAIFETZ:  A regulation, rather, a regulation

4    that lists a broad set of factors to be considered.  We're

5    talking about a regulation that identifies some very specific

6    physical security controls that need to be looked at.  To step

7    back for a moment, what we're talking about here on DEA's part

8    is not an expectation of some obscure responsibility on the

9    part of the distributors, we are talking about distributors

10   who have in front of them a suspicious order, an order they

11   themselves have recognized as suspicious, and the question is

12   what does the distributor need to then do?  Should they simply

13   distribute --

14                   JUDGE TATEL:  You're missing --

15                   JUDGE SENTELLE:  No, what the regulations require --

16                   JUDGE TATEL:  Yes, you're --

17                   JUDGE SENTELLE:  -- them to do?

18                   JUDGE ROGERS:  To do.

19                   JUDGE TATEL:  You're not responding --

20                   MS. CHAIFETZ:  Well, we have a statute here --

21                   JUDGE TATEL:  You're not responding --

22                   MS. CHAIFETZ:  We have a -- sorry?

23                   JUDGE TATEL:  You're not responding to my question.

24   I would agree with you about the word shall, if that's all we

25   had.  If it said you shall do this, that doesn't mean you

1    can't do other things.  But the question I'm asking you is

2    that in the same regulation another provision says shall

3    consider among other factors, and the question I was asking

4    you was doesn't the inclusion of among other factors in the

5    same regulation for another provision suggest that among other

6    factors was not included in this one?  That's my only

7    question.

8              MS. CHAIFETZ:  Well, my point, Your Honor, is

9    that --

10             JUDGE TATEL:  Yes.

11             MS. CHAIFETZ:  -- those other regulations are in

12   many cases looking at then broad factors.

13             JUDGE TATEL:  I see.

14             MS. CHAIFETZ:  And what we're talking about here,

15   what the DEA is instructed to look at are not broad factors,

16   but very specific requirements that would not be in any sense

17   apparent from the face of the statute, such as the number of

18   inches thick a container for controlled substances must be to

19   pass muster.  Whereas, what we're talking about here in this

20   case is the very self-evident expectation that if you have in

21   front of you an order that sends up red flags for diversion

22   controls, and you have a statutory responsibility as a

23   registered distributor to maintain effective controls against

24   diversion, and as DEA explained in the 2007 *Southwood*

25   decision, you have a responsibility to ensure that you're not

1  willy-nilly sending out orders without regard to the red flags

2  you yourself have observed, well then, you know, this --

3             JUDGE TATEL:  Well, that's --

4             MS. CHAIFETZ:  -- is something that's flowing

5  directly from the statute, and --

6             JUDGE TATEL:  From the statute, but the question

7  here is whether the regulation has been written in a way that

8  confines the Agency to the specified standards.  In other

9  words, you may well be right that the regulation can be

10  lawfully amended to include this, but the argument that the

11  Petitioner is making is that the way the regulation is written

12  is that it confines the Agency to the specified factors.

13             MS. CHAIFETZ:  And that has never been DEA's

14  interpretation of its own regulation, and they cite no

15  evidence to the contrary.  The only times that DEA has spoken

16  it has loud and clear explained that it did expect -- now,

17  prior to 2006 we simply have no comment from DEA, there's no

18  established Agency regulation, no formal statement, but in

19  2006 we have the first guidance letter putting in writing what

20  DEA had thought was evident, reiterating these

21  responsibilities, and talking about this expectation.  Then in

22  2007, though, we have the *Southwood* decision, and we have the

23  *Novelty* decision, both formal adjudications which both

24  expressly recognize this responsibility.  The *Novelty*

25  decision, DEA says a distributor has an affirmative duty to

PLU                                                                              20

 1   forego a transaction if upon investigation it's unable to

 2   determine that the transaction is for legitimate purposes.

 3   The *Southwood* decision we, of course, discuss at length in our

 4   brief.  Later that year you have another letter going out

 5   reiterating these responsibilities, emphasizing in that one

 6   the need for timely reporting of suspicious orders, something

 7   else that Walgreens here, the Jupiter Center, failed to do.

 8             Now, you know, the only evidence that they point to

 9   to suggest that this is a change of policy is this testimony

10   during a civil asset forfeiture proceeding, a bankruptcy case

11   where the question presented to the Court was not one about

12   interpreting the CSA, but about looking at whether a

13   distributor should have known certain things.  And Kyle

14   Wright's testimony speaks to what had before 2006 in his

15   opinion been the enforcement policies and practices of DEA --

16             JUDGE SENTELLE:  Before we let you sit down --

17             MS. CHAIFETZ:  -- but it was not an official --

18             JUDGE SENTELLE:  Before we let you sit down, I think

19   you've been over this part, I would like to know what your

20   best argument is for the truncating of the proceeding.  That

21   is to say the ISO.  The imminent danger.

22             MS. CHAIFETZ:  Yes.  Yes.

23             JUDGE SENTELLE:  You can't just go out and act

24   without due process.

25             MS. CHAIFETZ:  That's right.  This Court has

1    concluded that when proceedings are done in accord with the

2    statutory provision at 824(d)(4) immediate suspension orders,

3    there is not a due process problem.

4              JUDGE SENTELLE:  You understand my question is what

5    your basis is for imminent danger in this case?  Not what this

6    Court has held as a general proposition.

7              MS. CHAIFETZ:  Absolutely.  Your Honor, in this case

8    we have the Jupiter Center, the largest distributor of

9    Oxycodone in Florida.

10             JUDGE SENTELLE:  I know they're big.  I know they've

11   done --

12             MS. CHAIFETZ:  Okay.

13             JUDGE SENTELLE:  -- bad things in the past, but now

14   there are two stages to litigation, or I know you allege

15   they've done bad things.  Normally --

16             MS. CHAIFETZ:  Absolutely.

17             JUDGE SENTELLE:  -- you would have to prove that

18   after notice and hearing.

19             MS. CHAIFETZ:  Well, we have --

20             JUDGE SENTELLE:  If you can show an imminent danger

21   then you can proceed with an ISO.  Now, as I read the charts

22   and the numbers in the record, the massive distribution had

23   dropped off dramatically.  The best response I got from the

24   Government was well, they only did that after they were

25   charged.  I don't know why that would matter in determining

PLU                                                                      22

1   imminent danger, that might go to the ultimate resolution, but

2   so far as determining imminent danger I don't see what the

3   imminent danger is that you're relying on for the use of the

4   ISO without the *Mathews v. Eldridge* process.

5               MS. CHAIFETZ:  As the ISO acknowledges there was a

6   drop off in numbers among, you know, for example, the top

7   eight stores where Walgreens cut off completely --

8               JUDGE SENTELLE:  That goes to a reason not --

9               MS. CHAIFETZ:  No.

10              JUDGE SENTELLE:  -- to use the ISO, there was a drop

11  off.

12              MS. CHAIFETZ:  Well --

13              JUDGE SENTELLE:  Now, give me the reason why you do

14  use the ISO, how you do justify it.

15              MS. CHAIFETZ:  So, what I'm saying, Your Honor, is

16  that the reason for the ISO, to step back the numbers here

17  were a huge red flag for DEA, and frankly, for Walgreens, as

18  well.  The record --

19              JUDGE SENTELLE:  You're jumping the subject, again.

20  They were a huge red flag, all right, this goes to merit, that

21  goes to merit, but normally you would have to establish those

22  merits with *Mathews v. Eldridge* process.

23              MS. CHAIFETZ:  So, I just wanted to lay out the

24  chronology, but --

25              JUDGE SENTELLE:  We know that.

 1              MS. CHAIFETZ:  -- to move forward --

 2              JUDGE SENTELLE:  Yes.

 3              MS. CHAIFETZ:  -- Your Honor, after this notation of

 4    this huge red flag of the numbers began the DEA investigation.

 5    Okay.  So, now DEA issues the warrants, goes in, interviews

 6    staff, subpoenas documents, the findings --

 7              JUDGE SENTELLE:  Do any of those things --

 8              MS. CHAIFETZ:  -- of that investigation --

 9              JUDGE SENTELLE:  -- justify an ISO?

10              MS. CHAIFETZ:  Absolutely, Your Honor.  Absolutely.

11              JUDGE SENTELLE:  The fact that you issue --

12              MS. CHAIFETZ:  It's that --

13              JUDGE SENTELLE:  Excuse me.

14              MS. CHAIFETZ:  -- yes.

15              JUDGE SENTELLE:  Counsel, whoa.  The fact that the

16    Agency issues a subpoena can't possibly justify an ISO.

17              MS. CHAIFETZ:  Oh, no, Your Honor.

18              JUDGE SENTELLE:  The fact that the --

19              MS. CHAIFETZ:  I apologize, that's not --

20              JUDGE SENTELLE:  -- conducts an investigation --

21    will you please quit interrupting us?  The fact that the

22    Agency conducts an investigation can't possibly justify an

23    ISO.  What I want to know is what is the imminent danger that

24    gets you past the requirement for due process?

25              MS. CHAIFETZ:  You have a facility here that DEA

PLU                                                                24

1    found had none of the essential protective systems to control

2    against diversion.  The statute places a great emphasis for

3    good reason the need to prevent diversion.  You didn't have

4    here staff that were trained in how to identify orders, you

5    had a schedule two manager at the Jupiter facility who said it

6    wasn't her job to do any kind of due diligence when it came to

7    suspicious orders.  You have a center that abdicates its

8    responsibility to report suspicious orders, which DEA has

9    repeatedly noted is crucial to preventing harm to the public.

10   So, Your Honor, I do apologize for my meandering narrative,

11   but what I was trying to highlight for you is that the numbers

12   are only a small part of the story, they're the trigger here,

13   they raise significant concerns because they are so high, and

14   they remain high, and though they come down for certain stores

15   where Jupiter imposes this blunt approach of simply cutting

16   off schedule two operations, that's not the same as remedying

17   the systematic shortcomings that were so worrisome to DEA, and

18   those systematic shortcomings are in part undisputed here,

19   there's no dispute about the shortcomings with regard to

20   reporting or detecting suspicious orders, and then there's no

21   dispute --

22           JUDGE TATEL:  This is a distribution center, right,

23   not a pharmacy, correct?

24           MS. CHAIFETZ:  It's a distributor.

25           JUDGE TATEL:  Yes.

1            MS. CHAIFETZ:  It's a distributor, yes.

2            JUDGE TATEL:  So, I hear what you're saying in

3    response to Judge Sentelle's question, namely that the problem

4    here is the failure to perform due diligence, and to do the

5    reporting, right?  What's the difference between that and the

6    ultimate decision about suspension?  In other words, is what

7    the Agency is saying is that any failure to report, and any

8    due diligence defects are in addition to being a ground for

9    revocation, a ground for an imminent danger finding, is that

10   your point?  Because --

11           MS. CHAIFETZ:  No, Your Honor.

12           JUDGE TATEL:  Well, what is the difference?

13           JUDGE SENTELLE:  Yes.

14           MS. CHAIFETZ:  Our point here --

15           JUDGE TATEL:  I don't see in this any difference.  I

16   see a potentially solid basis for an ultimate revocation, but

17   what I don't see in the record, and the only thing you have,

18   the Agency has are the due diligence and reporting failures

19   for a distribution center.  What in that adds to the imminent

20   danger finding?  That's what I don't understand.

21           MS. CHAIFETZ:  If you had these failures, these same

22   failures occurring --

23           JUDGE TATEL:  Right.

24           MS. CHAIFETZ:  -- at a tiny distributor with a very

25   small distribution, a mom and pop distributor of sorts,

1    perhaps that wouldn't rise to the level of imminent danger.

2              JUDGE SENTELLE:  So, you're saying that any time

3    there's --

4              MS. CHAIFETZ:  But here --

5              JUDGE SENTELLE:  -- a violation by a large

6    distributor you get an ISO?

7              MS. CHAIFETZ:  No, I'm saying that where you have a

8    distributor who's distributing the kinds of quantities of

9    dangerous schedule two through five controlled substances, but

10   specifically Oxycodone, that Jupiter was distributing you

11   really do have a very serious concern for public safety.  I

12   mean --

13             JUDGE TATEL:  But they closed --

14             MS. CHAIFETZ:  -- to put this in perspective --

15             JUDGE TATEL:  -- they suspended the eight stores

16   with the most serious problems, and they say, and you don't

17   disagree in your, they say in the blue brief that DEA has no

18   evidence about diversion at any other store, and in your brief

19   you didn't challenge that.

20             MS. CHAIFETZ:  I'm not sure, when you talk about

21   evidence of diversion, DEA did not have the resources --

22             JUDGE TATEL:  I mean, isn't that what an imminent

23   danger is?

24             MS. CHAIFETZ:  Well, DEA did not do the kind of in

25   depth investigation at all 800 and, nearly 850 Florida

PLU
                                                                                     27

1   pharmacies that the Jupiter Center distributes to.  Where DEA

2   focused its investigation it found tremendous indicators of

3   diversion.  I mean, we're talking about a company that --

4                JUDGE TATEL:  And the company suspended those

5   stores.

6                MS. CHAIFETZ:  Well, it suspended them in May, 2012

7   after the administrative inspection warrants were served.

8                JUDGE TATEL:  Then why should that make a

9   difference?  I mean --

10                MS. CHAIFETZ:  Well --

11                JUDGE TATEL:  -- the question is is there or is

12   there not an imminent danger?

13                JUDGE SENTELLE:  Yes.

14                MS. CHAIFETZ:  One of the, the concern here about

15   imminent danger is do we have --

16                JUDGE TATEL:  What could reduce the imminent danger

17   more than suspending the stores?

18                MS. CHAIFETZ:  Do we have a distributor, the

19   question here for DEA was are we dealing with a distributor

20   who can be trusted as a registrant to protect the public

21   interests, or do we think that their continued registration is

22   causing imminent danger?  And the conclusion was this was a

23   threat to the public safety, an imminent threat because this

24   was a distributor that was not taking any of its

25   responsibilities to protect the public safety serious, and the

1    time line confirms that.

2            JUDGE SENTELLE:  Normally those things would be

3    determined in a due process hearing, and you seem to be

4    establishing a line that says any time we charge a major

5    violation we get an ISO, and I don't see any other line you're

6    going for.

7            MS. CHAIFETZ:  No, Your Honor, there have been,

8    there are many instances in which we don't charge ISOs in

9    conjunction with orders to show cause, and some of the

10   Walgreens pharmacies are examples of that.  But here just to

11   put these things in perspective, right, this is a company that

12   asserted in letters to DEA back in January, back in May, 2012

13   saying look, we're vertically integrated, we may not have, you

14   know, whether or not, they've essentially asserted whether or

15   not things happened at the distributor there was due diligence

16   adequately occurring at the pharmacies, or perhaps at

17   headquarters.  But then when we turned to look at the things

18   that were happening at the pharmacies we find that due

19   diligence wasn't happening.  Instead what we find are some of

20   the examples cited in the ISO, you have pharmacies with, you

21   know, arrests going on in the parking lot, you have people

22   being, seeing drugs passed inside the pharmacy, people being

23   arrested on the premises.  The police chief of Oviedo sending

24   letters to everyone at Walgreens up the chain to the CEO and

25   chairman begging for help, and what is the Jupiter Center

1    doing, continuing to distribute large amounts, ever increasing

2    amounts.

3              The point of these narratives is that we do have

4    large numbers going out to lots of stores outside of the top

5    six, even in 2012 when they claim that their numbers have come

6    down so much.  If you look, for example --

7              JUDGE SENTELLE:  Well, you don't contend --

8              MS. CHAIFETZ:  -- at the top 25 --

9              JUDGE SENTELLE:  -- that they're wrong about that.

10             MS. CHAIFETZ:  Sorry?

11             JUDGE SENTELLE:  You concede that their numbers have

12   come down, you said.

13             MS. CHAIFETZ:  Well, we concede that they cut off

14   the --

15             JUDGE SENTELLE:  You concede their numbers have come

16   down considerably, right or wrong?

17             MS. CHAIFETZ:  It's really -- we do acknowledge --

18             JUDGE SENTELLE:  Okay.

19             MS. CHAIFETZ:  -- that they were able to bring down

20   the numbers by taking certain measures.  But it's important to

21   recognize the huge increase that we saw, at one point 20

22   percent of that increase, 19 percent, was a result of the top

23   six stores.  So, what do they do, they cut off those stores

24   completely, that doesn't tell us anything about whether or not

25   they have the kind of controls needed to prevent diversion

PLU                                                                     30

1   going to all the other stores where we still see distributions

2   happening in 2012 to those stores that are more than a

3   standard deviation away from the mean.  You've got --

4           JUDGE ROGERS:  So, can I just be --

5           MS. CHAIFETZ:  -- a national average --

6           JUDGE ROGERS:  May I just be clear, the controls

7   you're talking about is the due diligence and stop shipments?

8           MS. CHAIFETZ:  The due diligence and the stop

9   shipments certainly speak to the important controls, but

10  suspicious order reporting is another terrifically important

11  part of this that they don't dispute they weren't doing

12  because that's what facilitate DEA field officials being able

13  to carry out the kinds of investigations necessary to stop

14  diversion.  This is a closed regulatory scheme in which DEA

15  allows people to participate, registers them to make these

16  distributions with the understanding that everyone as

17  explained in the letters, in the *Southwood* decision, and in

18  *Novelty* that everyone's going to contribute to monitoring the

19  system.  And here what we had was a distribution center that

20  because this is an integrated company tried to say well, look

21  to the pharmacies to do it, or look to headquarters to do it,

22  and then when DEA looks to those places and finds that the

23  controls aren't in place they turn around and say well, that's

24  a problem at the pharmacy, that's not a problem with us.  I

25  mean --

1              JUDGE ROGERS:  All right.

2              MS. CHAIFETZ:  -- they're to hide the ball --

3              JUDGE ROGERS:  All right.

4              MS. CHAIFETZ:  -- here I think in a critical way.

5              JUDGE ROGERS:  Anything further?  New argument?

6              MS. CHAIFETZ:  New arguments?

7              JUDGE ROGERS:  No, I mean in terms of we're sort of

8    repeating ourselves here.

9              MS. CHAIFETZ:  Well --

10             JUDGE TATEL:  Can I, I have one question.

11             JUDGE ROGERS:  And you're way over time.

12             JUDGE SENTELLE:  Way over.

13             JUDGE TATEL:  I have one question, is that okay?

14             JUDGE ROGERS:  All right.

15             JUDGE TATEL:  It's a procedural, it's a new

16   question.

17             JUDGE ROGERS:  Good.

18             JUDGE TATEL:  New subject.  I'm already getting into

19   the next case, right?  So, if we agree with Petitioner that

20   the adoption of the due diligence requirement was the fact

21   that either because it needed notice and comment, or because

22   it was an unacknowledged change, just assume that we think

23   that, do you agree then that this has to be vacated because

24   there's no indication in the Agency's decision that the other

25   basis for the imminent danger finding, namely the affiliated

PLU                                                                              32

1    report, was an independent one, do you agree with that?

2    That's what they say in their reply brief.

3              MS. CHAIFETZ:  Your Honor, they do assert that.  No,

4    Your Honor, the --

5              JUDGE TATEL:  They don't?

6              MS. CHAIFETZ:  -- suspicious order, the failures

7    there they try in their brief to suggest that this is a mere

8    technicality --

9              JUDGE TATEL:  No, no, no, that wasn't my question.

10             MS. CHAIFETZ:  -- and should be set aside.

11             JUDGE TATEL:  No.

12             MS. CHAIFETZ:  No, I understand.

13             JUDGE TATEL:  That isn't my question.

14             MS. CHAIFETZ:  But I think those are connected.

15             JUDGE TATEL:  But --

16             JUDGE ROGERS:  No, do you understand his question?

17             JUDGE TATEL:  -- just focus on my specific question.

18   In *Novelty* where we did sustain it because it was other, the

19   Agency had said that the other factor was, quote, reason alone

20   for the order.  Whereas, here as I read the order it looks to

21   me like the two factors are a combined analysis.  I didn't see

22   any indication, and you can correct me about this if you want,

23   that the Agency was telling us that there are independent

24   basis for an imminent danger finding.

25             MS. CHAIFETZ:  The Agency certainly, the ISO

1     certainly explains why the suspicious order requirement is a

2     tremendously important one.

3                  JUDGE TATEL:  Right.

4                  MS. CHAIFETZ:  And so, though there is not a line in

5     the ISO that --

6                  JUDGE TATEL:  Right.

7                  MS. CHAIFETZ:  -- expressly states that that alone

8     would be significant enough to justify an imminent danger

9     there's not that text.  What there is is an explanation of the

10    fact that the worry here is that we have a distributor --

11                 JUDGE TATEL:  I agree with all that.  But you, I

12    hear you conceding --

13                 MS. CHAIFETZ:  And that worry --

14                 JUDGE TATEL:  -- I hear you conceding --

15                 JUDGE ROGERS:  Conceding.

16                 JUDGE TATEL:  -- that they are not, there's nothing

17    in this that says these are two --

18                 JUDGE ROGERS:  We would have done it anyway.

19                 JUDGE TATEL:  -- independent basis, right?

20                 MS. CHAIFETZ:  There is not that line, but I think

21    it's --

22                 JUDGE TATEL:  I haven't missed something?

23                 MS. CHAIFETZ:  -- a fair reading of the decision to

24    understand, and worth understanding that the suspicious order

25    requirement --

1          JUDGE TATEL:  Okay.  That's all I have.

2          MS. CHAIFETZ:  -- speaks to the broader concern, and

3    therefore --

4          JUDGE TATEL:  That's my only question.

5          JUDGE ROGERS:  All right.

6          JUDGE TATEL:  Thank you.

7          JUDGE ROGERS:  Thank you.

8          MS. CHAIFETZ:  Thanks very much.

9          JUDGE ROGERS:  Thank you.  All right.  Counsel for

10   Appellant here, or --

11            ORAL ARGUMENT OF GREGORY G. GARRE, ESQ.

12                ON BEHALF OF THE PETITIONER

13         MR. GARRE:  Thank you, Your Honors.  Just a few

14   brief points.  On the last point, Judge Tatel, not only does

15   the order not provide anything like for this reason alone, as

16   was true in *Novelty*, it says at the very end on page J.A. 28

17   in view of the foregoing.

18         JUDGE ROGERS:  Right.

19         MR. GARRE:  And that underscores that this order was

20   based on everything, the violation of the completely new and

21   invalid investigate and halt shipment duty is all throughout

22   those paragraphs, six, 10, 11, 12, 22 and 24 all rely on that

23   explicitly.  So, this order would have to be set aside if this

24   Court agrees with us that that was an invalid change of

25   interpretation.

1            JUDGE ROGERS:  So, from your point of view, just so

2    I'm clear, the change, or the new requirements that you say

3    required notice and comment, that alone would be grounds for

4    setting aside the ISO since your client was not required to do

5    those things under law?

6            MR. GARRE:  Absolutely, Your Honor, under *Chenery*

7    and other decisions of this Court the Court would have to send

8    the order back because --

9            JUDGE ROGERS:  And so, we need not venture into an

10   examination of what must be shown for imminent danger?  I just

11   want to be clear about that.

12           MR. GARRE:  That's right, Your Honor, the Court

13   would be saying that you cannot base an ISO on a violation of,

14   alleged violation of invalid legal duty.

15           With respect to what I think Your Honors have

16   referred to the merits today, I would just close by saying

17   that the critical paragraphs in the ISO are paragraphs 20 and

18   21, and in those paragraphs the Administrator first recognizes

19   that Walgreens had made substantial reductions in the

20   distributions to the key stores that the DEA itself had

21   focused on.  It's never provided evidence of any diversion

22   with respect to other stores.  That reduction is shown

23   markedly on the chart that appears on page 196 of the Joint

24   Appendix and this brief.  And then it goes on to the next

25   paragraph 21 to try to explain the harm that's existing today,

PLU                                                                          36

1    and all it points to is the fact that the Walgreens is the

2    biggest distributor in the state, and has distribution above

3    the national average.  It's not a violation of the Controlled

4    Substances Act to be big, and it's not enough to base this

5    kind of extraordinary action on a finding of past harm,

6    Congress required a finding of imminent danger, and this order

7    is completely lacking in establishing that necessary

8    predicate.

9              JUDGE ROGERS:  Thank you.

10             MR. GARRE:  If there are no further questions we

11   would urge this Court to act quickly.  Thank you.

12             JUDGE ROGERS:  Thank you.

13             (Recess.)

14

15

16

17

18

19

20

21

22

23

24

25

## DIGITALLY SIGNED CERTIFICATE

       I certify that the foregoing is a correct

transcription of the electronic sound recording of the

proceedings in the above-entitled matter.


_____          _____

Paula Underwood                            March 26, 2013

DEPOSITION SERVICES, INC.