# EXHIBIT 142

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| IN RE: ADMINISTRATIVE SUBPOENA ) | |
| ) | |
| ) | Miscellaneous Action No. 1:12-MC-43 |
| ) | (JCC/IDD) |
| ) | |
| ) | |
| ) | |

## DECLARATION OF SCOTT LAWSON

I, Scott Lawson, declare the following to be a true and correct statement of facts:

1.      I am a Senior Attorney in the Office of the Chief Counsel of the Drug Enforcement Administration ("DEA").  I am currently assigned to the Diversion and Regulatory Litigation Section.  I have worked at DEA since March 2011.  Before working at DEA, I worked for approximately eight years as a Trial Attorney in the Tax Division, and for five years in the Criminal Division, of the U.S. Department of Justice.  I also served on active duty in the U.S. Army during 2005-2006.  I am a member of the Bar of the Commonwealth of Massachusetts.

2.      My responsibilities at the Diversion and Regulatory Litigation Section include investigating distributors of controlled substances regulated by DEA to ensure compliance with their obligation to prevent the diversion of controlled substances into illegitimate uses.  Entities distributing controlled substances must obtain a registration from DEA.  *See* 21 U.S.C. § 822. Currently, there are approximately 1.4 million DEA registrants.  When DEA determines that a particular registrant is not fulfilling its obligations under applicable statutes and regulations, it may issue an Order to Show Cause as to why the registration should not be revoked and in cases

Case 1:12-mc-00043-JCC-IDD Document 34-2 Filed 11/16/12 Page 2 of 9 PageID# 433

where the DEA Administrator finds that the Registrant's continued operation poses an imminent danger to the public health or safety,  an Immediate Suspension of Registration ("ISO") issued along with the Order to Show Cause.  When an OSC is issued, the registrant can request an administrative hearing to explain why the registration should not be revoked and to challenge the OSC.  My responsibilities include representing DEA in these administrative proceedings.

3.        Due to the nature of my official duties, I am familiar with the particular issues in this litigation.  Specifically, I am the lead attorney involved in the investigation of Walgreen Co.'s ("Movant" or "Walgreens") practices regarding its distribution of controlled substances out of its distribution center in Jupiter, Florida ("Walgreens Jupiter").  ██████████████████ ██████████████████████████████████████  The statements that follow are made on the basis of my review of DEA's official files and records, my personal knowledge, and information I acquired in performing my official duties.

## WALGREENS' DISTRIBUTION OF CONTROLLED SUBSTANCES

4.        Walgreens is a company headquartered in Deerfield, Illinois, which operates the largest network of retail pharmacies in the United States.  Through its multiple distribution centers around the nation, including Walgreens Jupiter, Walgreens distributes controlled substances to its retail pharmacy customers.  As a distributor of controlled substances, Walgreens is required under 21 U.S.C. § 822 to obtain a registration certificate from DEA.  Walgreens is also required to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels.  *See* 21 U.S.C. §§ 823(b)(1) and (e)(1).  In addition, Walgreens is required to report to DEA suspicious orders for controlled substances from its retail pharmacy customers.  *See* 21 C.F.R. § 1301.74(b).  Since Walgreens

operates in Florida, it must also comply with state requirements for the importation and distribution of controlled substances, commonly known as "pedigree requirements."

5.      Since 2009, the State of Florida has been the epicenter of a notorious prescription drug abuse epidemic.  Walgreens Jupiter ███████████ distributor of oxycodone — a highly addictive controlled substance — in Florida.  In addition, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

## DEA'S INVESTIGATION AND WALGREENS' PRODUCTION OF DOCUMENTS

6.      Concerned that Walgreens Jupiter was not fulfilling its duties as a DEA registrant, on March 19, 2012, DEA issued an administrative subpoena requiring Walgreens Jupiter to produce certain documents and information related to its distribution of controlled substances in Florida.  *See* Exhibit 1.  This subpoena was served on April 4, 2012, contemporaneously with the execution of an administrative inspection warrant.  Inspection warrants were also served on six Florida Walgreens retail pharmacies in connection with this investigation.  Although the subpoena requested the production of documents by April 18, 2012, this deadline was extended to May 4, 2012, at Walgreens' request.

7.      Walgreens began producing documents to DEA on or about May 4, 2012.  By May 10, 2012, Walgreens had produced dispensing records from individual pharmacies and internal policies and manuals concerning aspects of their distribution and pharmacy operations.  Between May 10 and May 24, 2012, Walgreens produced 4 CDs containing e-mails and one CD containing policies/manuals.

8.      Walgreens completed its production of documents on June 8, 2012.  *See* Exhibit

2.  This production included files regarding company policies and e-mails.  It also included a

"Document Production Statement" certifying that the materials produced were collected and

examined by two members of Walgreens' Litigation and Regulatory Law Department "to make

certain that the materials were non-privileged and responsive …."  *Id.* at 3, ¶ 5.  In addition,

outside counsel "conducted a final review to verify that the materials were non-privileged …."

*Id.* at 3, ¶ 6.  Walgreens did not include a privilege log, although it promised one "in due course."

*Id.* at 1.

9.      In general, the documents that Walgreens produced in response to the subpoena,

particularly the 5 CD's of emails, were not organized or Bates-stamped, which made the review

difficult.  Some of the documents were e-mails in their original format (not in .pdf format),

which required me to view them within my own e-mail program.  In addition, Walgreens did not

produce a large amount of documents.  Leaving aside corporate policies and procedures, it

produced approximately 465 files.  Most of these files were short e-mail strings of a handful of

pages.  And many of these files are duplicative.

10.     A number of the documents produced by Walgreens, particularly in the last

production on June 8, 2012, included emails sent to or from Dwayne Pinon, one of Walgreens in-

house attorneys.  Amongst these documents was an e-mail chain including communications

between Mr. Pinon and other Walgreens employees, with a subject line of ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮   This string of e-mails discussed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   In October

2010, Florida passed legislation severely restricting the ability of pain clinics to dispense

controlled substances. The purpose of this legislation was to combat the severe abuse of prescription drugs dispensed directly from these clinics. After the law was enacted, pharmacies in Florida experienced a substantial increase in requests to dispense controlled substances. Many of the new requests were from pain clinic "patients," who could no longer get the drugs from the clinics and therefore submitted their prescriptions to pharmacies. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████ ████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████ *See* Exhibit

3; Exhibit 6 ¶ 18. In DEA's view, ██████████████████████████████

constituted an attempt by Walgreens to avoid gathering information about diversion, in clear violation of its duties to maintain effective controls against diversion.

## WALGREENS' FAILURE TO CLAIM PRIVILEGE OVER MR. PINON'S E-MAIL

11.     On or about August 9, 2012, I wrote a letter to Walgreens' counsel requesting a privilege log of Walgreens' production of documents, which they had originally promised would be forthcoming on June 8, 2012. Since Walgreens had certified that it had conducted an extensive privilege review by at least 3 attorneys, I informed counsel that I assumed Walgreens was not asserting privilege over this material, including e-mails sent to or from Mr. Pinon. *See* Exhibit 4.

12.     On or about August 10, 2012, I received by e-mail a letter from Walgreens'
counsel acknowledging receipt of my August 9 letter.  Among other things, counsel stated that
they were "currently processing" the "privilege issues" that I raised in my letter and that they
would send me a privilege log "as soon as possible."  *See* Exhibit 5.

13.     Over the ensuing month, Walgreens did not contact me to address the privilege
issues that I raised in my August 9 letter, nor did it send me a privilege log.  Walgreens' failure
to claim privilege over Mr. Pinon's e-mails, and the fact that Walgreens stated that it had
conducted an extensive privilege review before producing documents to DEA, led me to
conclude that Walgreens was not claiming privilege over the e-mails from Mr. Pinon that were
produced.  Accordingly, in late August 2012, I relied on Mr. Pinon's e-mails in preparing an ISO
for Walgreens Jupiter.  I submitted a final version of the ISO to the DEA Administrator, Michele
M. Leonhart, on September 12, 2012.

**IMMEDIATE SUSPENSION ORDER AND WALGREENS' CLAIM OF PRIVILEGE**

14.     On September 13, 2012, Administrator Leonhart signed the ISO against
Walgreens Jupiter.  *See* Exhibit 6.

*Id.* ¶ 18.

*Id.* ¶ 23.  The ISO explained that
Walgreens had the opportunity to request a hearing within 30 days, and that pending their
request, the hearing would be tentatively scheduled for November 13, 2012, in which it could
challenge the OSC and explain why its registration should not be revoked.

15.     The ISO was served on Walgreens Jupiter on September 14, 2012.  That morning, I also e-mailed a copy of the ISO to Walgreens counsel.  Later that day, one of Walgreens counsel, Alice Fisher, called me and stated that Walgreens had sent me a letter claiming the attorney-client privilege over Mr. Pinon's e-mail described in the ISO.  I told Ms. Fisher that I had not received the letter, which Ms. Fisher then sent to me by e-mail at approximately 2pm on September 14, 2012.   The letter was dated September 10, 2012.  In this letter, written by another of Walgreens' outside counsel, David Weinstein, Walgreens asserted the attorney-client privilege over two documents included in its production of June 8, 2012, one of which Walgreens later explained was the e-mail from Mr. Pinon described in the ISO.  Mr. Weinstein requested that the two documents "be removed from the documents that are being reviewed by the DEA in connection with this matter and returned to me."  *See* Exhibit 7.  By this time, however, DEA had already relied on this e-mail for issuing the ISO.

16.     At no time before service of the ISO on the morning of September 14, 2012, did Walgreens inform DEA of its claim of privilege over Mr. Pinon's e-mail.  Notably, although the letter in which Walgreens claims privilege over Mr. Pinon's e-mail is dated September 10, 2012, on that date Walgreens did not e-mail or send that letter to me by expedited carrier, as they had done with every previous letter.   Insofar as the parties have exchanged letters in connection with this investigation, both DEA and Walgreens have communicated in every instance by e-mail or expedited carrier.  To my knowledge, this was the first and only time that Walgreens had communicated with DEA exclusively via U.S. Mail.  *See* Exhibit 8.

17.     On September 17, 2012, I received in the mail the letter dated September 10, 2012, that Walgreens e-mailed to me on September 14, 2012.  This letter was postmarked September 12, 2012.  *See* Exhibit 9.

18.     On September 27, 2012, Walgreens produced the privilege log corresponding to the production of documents in response to the DEA subpoena, which it finalized on June 8, 2012.   Although this privilege log contains Bates-stamped references, Walgreens did not produce Bates-stamped documents to DEA.   *See* Exhibit 10.

19.     I have conducted an electronic search of the documents received by DEA from Walgreens for the word "pinon".  This search yields 19 .pdf files and 23 Outlook emails, for a total of 42 documents.  Using nothing other than standard features routinely supplied with  basic Microsoft operating systems and the Adobe Reader used to view .pdf files, identifying the documents in which Mr. Pinon is mentioned in any way takes no more than 5 minutes.  A substantial number of the documents that Walgreens produced were company policies and manuals, which do not require privilege review.

20.     On October 3, 2012, after Walgreens counsel informed me of its intent to file an action in federal court for the return of Mr. Pinon's e-mail, I explained to Walgreens counsel that, while in our view Fed. R. Civ. P. 26 does not apply in this context, DEA would effectively sequester the e-mail, would not voluntarily publicly release the ISO, and would safeguard the e-mail and the ISO as it does for all evidence collected during an investigation.  *See* Exhibit 11.

21.     On October 12, 2012, Walgreens requested a hearing to challenge the ISO.  *See* Exhibit 12.  However, Walgreens requested that this hearing be moved from November 13 until at least December 4, 2012.  *See* Exhibit 13.

**WALGREENS' FAILURE TO CLAIM PRIVILEGE OVER OTHER
E-MAILS FROM MR. PINON PROVIDING LEGAL ADVICE**

22.     ████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



_See_ Exhibit 14.

23.                                                                    _See_ Exhibit 15.  On October

15, 2012, I sent a letter to Walgreens informing it of this communication.  _See_ Exhibit 16.


       I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of October, 2012.

Scott Lawson