# EXHIBIT 164

Highly Confidential - Subject to Further Confidentiality Review

```
  1                UNITED STATES DISTRICT COURT
  2           FOR THE NORTHERN DISTRICT OF OHIO
  3                     EASTERN DIVISION
  4                         - - -
  5   IN RE:  NATIONAL              :
      PRESCRIPTION                  :   MDL No. 2804
  6   OPIATE LITIGATION             :
      _____ :   Case No.
  7                                 :   1:17-MD-2804
      THIS DOCUMENT RELATES         :
  8   TO ALL CASES                  :   Hon. Dan A. Polster
  9                         - - -
 10                    HIGHLY CONFIDENTIAL
 11      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 12
                              - - -
 13
 14         Videotaped deposition of LAURIE A. ZACCARO,
 15   held at the offices of Buckley King, 1400 Fifth
 16   Third Center, 600 Superior Avenue East, Cleveland,
 17   Ohio  44114, on Wednesday, January 16, 2019,
 18   commencing at 8:58 a.m., before Carol A. Kirk,
 19   Registered Merit Reporter and Notary Public.
 20
 21                         - - -
 22
 23              GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
 24                   deps@golkow.com
```

Golkow Litigation Services                                Page 1

Highly Confidential - Subject to Further Confidentiality Review

 1          anyone on the phone?
 2                  THE VIDEOGRAPHER:  And the court
 3          reporter is Carol Kirk and will now
 4          swear in the witness.
 5                         - - -
 6                  LAURIE A. ZACCARO
 7   being by me first duly sworn, as hereinafter
 8   certified, deposes and says as follows:
 9                  CROSS-EXAMINATION
10   BY MR. GADDY:
11          Q.    Good morning, Ms. Zaccaro.
12          A.    Good morning.
13          Q.    Could you state your name for us,
14   please.
15          A.    Laurie Zaccaro.
16          Q.    And you work at Walgreens,
17   correct?
18          A.    Yes, I do.
19          Q.    Okay.  How long have you been with
20   Walgreens?
21          A.    Twelve years.
22          Q.    As a function of your job with
23   Walgreens, have you ever had to give testimony
24   like this before?

```
 1          A.    Yes.
 2          Q.    Okay.  In a deposition context or
 3    trial or both?
 4          A.    Deposition.
 5          Q.    Okay.  In what context was that?
 6          A.    It was with regards to safety and
 7    security concerns in an outside parking lot of
 8    one of our inner city stores.
 9          Q.    Okay.  Did it involve some lawsuit
10    that was filed against Walgreens?
11          A.    Yes.
12          Q.    Okay.  Did that case ever go to
13    trial that you know of?
14          A.    I'm unaware.
15          Q.    Okay.  Outside of that, have there
16    been any other occasions in which you've given a
17    deposition before?
18          A.    No.
19          Q.    Okay.  In the course of your work
20    with Walgreens, have you ever had the occasion
21    to testify at trial?
22          A.    No, I have not.
23          Q.    Okay.  In the course of your work
24    with Walgreens, have you ever had the
```

```
 1    opportunity to meet with or work with any law
 2    enforcement?
 3            A.    Yes.
 4            Q.    Okay.  Can you kind of describe
 5    for me the circumstances generally in which that
 6    would have occurred, and then maybe we can
 7    follow up with some specifics.
 8            A.    With law enforcement, I support
 9    external investigations that they may be working
10    on.  And I also do ex- -- I'm -- like support
11    with DEA drug backs and take-backs and law
12    enforcement in community events.
13            Q.    Okay.  So I guess one thing I
14    should make clear is, you work in loss
15    prevention, correct?
16            A.    Correct.  I'm an asset protection
17    manager.
18            Q.    Okay.  And has that been your
19    title the entire 12 years you've been at
20    Walgreens?
21            A.    Yes, it has.
22            Q.    Okay.  I see references within
23    some of the documents that I've looked at to
24    district loss prevention managers or regional
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   loss prevention managers.
 2              How does -- where does asset
 3   protection manager fall within there?
 4        A.   Since my position with the
 5   company, our titles have changed --
 6        Q.   Okay.
 7        A.   -- a handful of times from loss
 8   prevention supervisor, district loss prevention
 9   manager, asset protection managers.  All of our
10   responsibilities have always stayed the same.
11   Our titles have changed more than once, though.
12        Q.   Okay.  During your 12 years at
13   Walgreens, has the amount of responsibilities
14   that you have changed, as far as the number of
15   stores or the number of people that you're in
16   charge of?
17        A.   Yes.
18        Q.   Okay.  Kind of walk me through
19   that progression, if you don't mind.
20        A.   When I first started with the
21   company, we were in larger districts where I had
22   one district of -- if I remember correctly, 26
23   or 27 stores.  In the last few years, there have
24   been some realigning with districts and sizes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    manager, five, six, seven, eight, nine -- ten or
 2    eleven of us.
 3          Q.    Is it primarily loss prevention
 4    folks in that office?
 5          A.    No, sir, it is not.
 6          Q.    Okay.  Okay.  So your current
 7    territory includes Cleveland, it also includes
 8    some areas of Columbus?
 9          A.    Correct.
10          Q.    And was there another city that I
11    missed?
12          A.    Cities down through between --
13    there's Mansfield is -- I go to Mansfield
14    locations and the suburbs, a lot of suburb
15    municipalities.
16          Q.    Okay.  Let me see if I can go back
17    to where I started originally and then I got
18    sidetracked.  But I was asking you about meeting
19    with law enforcement.
20          A.    Yes.
21          Q.    Tell me what agencies -- and let
22    me first focus on the -- more the enforcement
23    side.
24          A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

 1         Q.    And then we can talk about the
 2    community involvement side.
 3         A.    Okay.
 4         Q.    So as it relates to enforcement,
 5    what agencies have you had the occasion to work
 6    with during the course of your time at
 7    Walgreens?
 8         A.    Ohio Board of Pharmacy primarily.
 9    And then I -- with matters with external law
10    enforcement support, it varies.  It depends on
11    what they might reach out to us for.  It could
12    be identity theft.  It could be prescription
13    doctor shopping with customers.  It could be
14    with doctors and prescriptions, and I'm -- my
15    involvement with that is primarily getting them
16    the evidence that is subpoenaed for matters that
17    they're investigating.
18         Q.    Okay. So --
19         A.    It could be video.  It could be
20    documents.
21         Q.    -- is that primarily -- is that
22    generally with local law enforcement or is that
23    federal agencies or both?
24         A.    Primarily that's with Ohio Board

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of Pharmacy, with their investigators.
 2         Q.    Okay.  Well, does the Ohio Board
 3    of Pharmacy investigate the identity theft type
 4    crimes that you were talking about?
 5         A.    No.  That's more your local law
 6    enforcement, but I don't have as many of those
 7    as I do with the Board of Pharmacy.
 8         Q.    What's your typical case with the
 9    Board of Pharmacy?
10         A.    Theft.
11         Q.    Of what?
12         A.    Drugs.
13         Q.    Okay.
14         A.    They work with our pharmacy.  I do
15    investigations on the front end merchandise of
16    the stores with cash, cigarettes, merchandise.
17    I conduct those investigations myself.  But when
18    it's matters with anything with the pharmacy, we
19    notify the board and we work with the
20    investigators for pharmacy.
21         Q.    Okay.  So -- excuse me.  Okay.  So
22    just so we're clear, front end of the store is
23    everything that's not prescription drugs?
24         A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Is that fair?
 2            A.    Correct.
 3            Q.    Okay.  And so anything that's
 4   behind the counter that requires a prescription
 5   would be something that's investigated by the
 6   Board of Pharmacy?
 7            A.    Yes.
 8            Q.    Okay.  And do you work with the
 9   Board of Pharmacy, or is it more you supplying
10   them information?  Do they have their own
11   investigators?
12            A.    It varies.  I work with them, with
13   the internal things that they can't do that's
14   there, like once we put -- once we alert them,
15   notify them, we talk about where our confirmed
16   losses are, and then they will either do what
17   camera and video they need to put in place or I
18   may shift around -- if it's Walgreens cameras
19   that are being used, I will review that video.
20   They will review their own video.  It's in
21   connection together, really, the investigations
22   are.
23            Q.    Okay.  Have you worked with the
24   Board of Pharmacy on these types of issues your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   entire 12 years at Walgreens?
 2       A.   Yes, I have.
 3       Q.   Okay.  Okay.  I want -- and then
 4   the other issue that you brought up was your
 5   work with law enforcement in the community
 6   setting, correct?
 7       A.   Correct.
 8       Q.   Okay.  And I know you've been
 9   in -- I think you've told us you've been
10   involved in some of the drug take-back days that
11   the DEA puts on?
12       A.   Yes.
13       Q.   Okay.  Anything else in that
14   regard?
15       A.   No.
16       Q.   Okay.  Have you had any other
17   occasion other than those community events to
18   work with the DEA?
19       A.   I believe in the past there was a
20   meeting that they've done with Walgreens, with
21   compliance and making sure proper processes are
22   followed and procedures are followed with the
23   reporting and just making sure that we're all
24   working together on that.  There has -- I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   going back and I'm vaguely remembering, but I've
 2   had interactions with them for meetings, but
 3   nothing with investigations --
 4        Q.    Okay.  Do you recall --
 5        A.    -- that I can recall.
 6        Q.    Excuse me.  And I'm sorry for
 7   interrupting you.
 8        A.    That's okay.
 9        Q.    Do you recall attending any
10   meetings with the DEA?
11        A.    I believe there was at least one
12   that I can recall that they were at our office,
13   and it was more about the processes of
14   reporting, more informative.
15        Q.    Processes of reporting what?
16        A.    Reporting losses, reporting if
17   there is fraudulent prescriptions and a process
18   they wanted us to follow, which I wouldn't be
19   involved in that.  That would have been with
20   pharmacists to follow, but they give the
21   information to us, and our pharmacy supervisors
22   would have been there to then inform our
23   pharmacy managers and cascade that, making sure
24   that they're aware of the processes and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    following the processes.
 2         Q.    Okay.  And this kind of segues
 3    into what I'm wanting to get into next, because
 4    I want to make sure I kind of have an
 5    understanding of exactly what your role is and
 6    what your duties are.
 7              Do you recall approximately when
 8    that DEA meeting was?
 9         A.    No, I don't.  It's been several
10    years.
11         Q.    Okay.  More than three years ago?
12         A.    Yes.
13         Q.    Okay.  More than five years ago?
14         A.    Maybe.
15         Q.    Okay.
16         A.    I don't know.
17         Q.    Okay.  And what I think I heard
18    you just say is that some of the topics that you
19    remember from that meeting involved reporting
20    thefts of prescription drugs to the DEA,
21    correct?
22         A.    That is my area of work.  I do
23    theft and losses.
24         Q.    Okay.  And -- okay.  And the other
```

Highly Confidential - Subject to Further Confidentiality Review

 1    area that I think I heard you say was covered in
 2    that meeting would have been identifying
 3    fraudulent prescriptions?
 4            A.    I believe.  I can't remember what
 5    the agenda was.  I know it was an informative
 6    meeting of the DEA outlining processes for -- if
 7    I recall correctly.  It had a lot to do with --
 8    there was a time I believe -- and I'm vaguely
 9    remembering -- of how they wanted us to -- or
10    how they wanted the pharmacists, rather, to
11    report suspicion with fraudulent prescriptions
12    and notifications.
13            Q.    That issue that you just said, the
14    pharmacists reporting suspicion with fraudulent
15    prescriptions, does that fall under your
16    purview?
17            A.    No, it does not.
18                        - - -
19        (Walgreens-Zaccaro Exhibit 1 marked.)
20                        - - -
21            Q.    Okay.  I'm going to show you what
22    I've marked as Exhibit Number 1.  This is a
23    resumé and a partial personnel file that was
24    provided to me.

```
 1          Q.    Okay.  Are you seeing more
 2    investigations because you have more stores?
 3          A.    No.
 4          Q.    Still about five to six a year?
 5          A.    Yes.
 6          Q.    Are you still reviewing exception
 7    reports on a regular basis?
 8          A.    I do review them, but it is the
 9    expectation of our pharmacy managers to review
10    those.
11          Q.    Okay.  Who has the primary
12    responsibility for reviewing the exception
13    reports?
14          A.    The pharmacy manager and store
15    manager.
16          Q.    Okay.  And if the pharmacy manager
17    sees something like what you flagged here at
18    this particular store with the negative
19    adjustment of 488 on the controlled substance
20    hydrocodone, what is the pharmacy manager
21    supposed to do?
22          A.    It varies.  It depends on the
23    person.  Some pharmacy managers will reach out
24    and say, "Hey, just so you know, if you see
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this, this is what it was.  This is what I was
 2   able to determine."
 3              Some pharmacy managers, unless it
 4   is a loss, a confirmed, like, "I don't know
 5   where it's at," then they'll call me.  But if
 6   they can account for it, I may not hear anything
 7   from -- it just -- it depends on that pharmacy
 8   manager and how they do their job.
 9        Q.   When you get involved into these
10   investigations, like you -- you know, you ask
11   for -- it looks like you ask the store
12   manager -- either the pharmacy manager or the
13   store manager to look into this, correct?
14        A.   Yes.
15        Q.   And I guess there's the
16   possibility they can write you back with an
17   explanation that would put it to rest; is that
18   fair?
19        A.   Yes.
20        Q.   Okay.  And there's other times
21   where maybe the explanation isn't fully
22   sufficient or they're not able to give you a
23   good answer; is that fair?
24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   In those situations -- I think
2  I've heard you mention an interview.  Do you
3  take charge -- are you still in charge at this
4  point and are you doing follow-up or is it
5  turned over to the Board of Pharmacy?
6        A.   So once a loss, a true loss, is
7  confirmed, I immediately notify our Board of
8  Pharmacy, an investigator.  We then will plan
9  how to go forward.  I will communicate next
10  steps and directives to the pharmacy manager on
11  how to go forward, which typically is counting
12  the drugs every day and doing it manually so we
13  know and confirm the loss.  And then --
14          I lost my train of thought, the
15  question that you were trying to get to.  What
16  was your question again?
17       Q.   Sure.  So -- I think you answered
18  it, but what I was asking about was where -- how
19  long you stay involved.  And what I heard you
20  just say is, as soon as you confirm a theft,
21  it's turned over to the Board of Pharmacy?
22       A.   No.  I stay involved until the
23  end.
24       Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   And I will do the interview with
 2   the board investigator.  The board investigator
 3   will always lead the interviews, and if I need
 4   to interject or ask questions, I will -- I'm
 5   always given the opportunity at the end or I
 6   will interject during the course of that
 7   interview.
 8      Q.   Okay.  Other than using these
 9   exception reports for the purpose that we just
10   went over to identify loss or potential theft,
11   is there any other reason for which you utilize
12   the exception reports?
13      A.   Compliance, making sure that --
14      Q.   What do you mean by "compliance"?
15   Compliance with what?
16      A.   Making sure that they're following
17   the right processes, posting or something like
18   that.  Like if I'm identifying large overbuys.
19   I'll start looking into some of their receiving
20   and posting and then I'll challenge them on if
21   I'm noticing unposted receipts or receipts that
22   were posted weeks after the product was arrived.
23   So ...
24      Q.   Okay.  So that would be compliance