**PSJ14 Janssen Opp Exh 27 – Lin Dep (dep not cited in appendices)**

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                       -   -   -
 5
      IN RE:  NATIONAL       :   HON. DAN A.
 6    PRESCRIPTION OPIATE     :   POLSTER
      LITIGATION              :   MDL NO. 2804
 7                            :
      APPLIES TO ALL CASES    :   NO.
 8                            :   1:17-MD-2804
                              :
 9
10            - HIGHLY CONFIDENTIAL -

11    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12
                          -   -   -
13
                   December 20, 2018
14
                          -   -   -
15
16            Videotaped deposition of
      DAVID LIN, taken pursuant to notice, was
17    held at the law offices of Drinker Biddle
      & Reath, 105 College Road East,
18    Princeton, New Jersey, beginning at 9:18
      a.m., on the above date, before Michelle
19    L. Gray, a Registered Professional
      Reporter, Certified Shorthand Reporter,
20    Certified Realtime Reporter, and Notary
      Public.
21
                          -   -   -
22
            GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah, I'm reading what

2  you're showing me, yes.

3    Q.    Okay.  And you're seeking to

4  gain insight into current attitudes

5  towards and treatments of, nociceptive,

6  neuropathic and mixed pain, right?

7    A.    That's right.

8    Q.    Did Janssen routinely engage

9  third parties to study and obtain

10  feedback from healthcare practitioners in

11  terms of the most compelling ways to

12  communicate efficacy, safety,

13  tolerability and mechanism of action

14  messages?

15    A.    As a general concept,

16  getting the voice of the customer

17  typically entailed hiring a third-party

18  market research firm to engage outside

19  customers to understand their points of

20  view on a particular topic.

21    Q.    And did Janssen routinely

22  engage third parties to go out and

23  perform market research to identify the

24  most clear and compelling ways to

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I can acknowledge that it

2   was part of the selling message.  It was

3   a key communication point at one period

4   in time.

5        Q.    And what period of time in

6   time was that?

7        A.    My recollection is that was

8   at the early launch days of Nucynta and

9   shortly thereafter.  One of my first

10  actions was that that was deemed to be

11  ineffective in terms of helping customers

12  really solve the problems they needed to

13  solve, which is does it work and can my

14  patients afford it.

15       Q.    So when -- by the time that

16  Nucynta -- let's pin this down.

17            By the time that Nucynta ER

18  launched and you were the head of the

19  launch team, as well as the head of sales

20  and marketing and the head of the pain

21  force team, is it your testimony that

22  when ER launched, your brand team would

23  have stopped utilizing the dual mechanism

24  of action as a selling feature of Nucynta

1    ER?

2          A.    Without the exact

3    promotional materials that were used at

4    the launch of Nucynta ER, I can't tell

5    you exactly how it was worded.

6                My recollection is, even if

7    it was mentioned as part of a broader set

8    of messages, it was only an

9    acknowledgment to the fact that it was

10   mentioned before, but it was not the key

11   selling feature of Nucynta ER.

12         Q.    What, what became the key

13   selling feature of Nucynta ER?

14         A.    My recollection, this is

15   strategically, is that the key messages

16   for differentiating Nucynta ER in the

17   eyes of customers, or in the minds of

18   customers, was really around its

19   efficacy, its tolerability.

20               So does it work was the

21   question that we tried to answer, because

22   that's the most common question asked by

23   physicians in my recollection of market

24   research.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And the first line item is,

2   "Live speaker programs (including

3   regional hot spots) with a $4.5 million

4   budget," it looks like, but then I

5   won't -- I'll go directly to the actual

6   to see what that is.

7           "Invoiced 4 million."  Do

8   you see that?

9    A.    Yes.

10    Q.    Okay.  So this would tend to

11   reflect that $4 million had been

12   invoiced, and according to your earlier

13   testimony, should be paid for live

14   speaker programs that had thus far been

15   billed as of this point in time in 2012,

16   right?

17    A.    That would be my conclusion.

18    Q.    Okay.  And the vendor for

19   these live speaker programs is a company

20   by the name of MedForce.  Do you see

21   that, it's right in the line D?

22    A.    Yes, I see that.

23    Q.    Who is MedForce, what did

24   they do?  Did you work with them

Highly Confidential - Subject to Further Confidentiality Review

1  personally?

2        A.    I did not work with MedForce

3  personally.  MedForce is a third-party

4  agency that manages speaker programs for,

5  fair to say a good number, if not a large

6  number, of pharmaceutical manufacturers.

7              They essentially handle

8  logistics for setting up a speaker

9  program.

10       Q.    What does that mean, to

11 handle logistics?  Would -- would the

12 speakers be paid through MedForce?

13       A.    The part about logistics

14 that I can -- that I'm familiar with is

15 if, for example, I was a sales rep, and I

16 was going to hold a speaker program, I

17 would choose the speaker from the

18 available list of speakers.  I would call

19 up MedForce and say, Dr. Speaker and I

20 have agreed to do a program on

21 February 25th here in Princeton,

22 New Jersey.  MedForce would help secure a

23 location or a venue that was appropriate

24 for a speaker program that was within

Highly Confidential - Subject to Further Confidentiality Review

1    healthcare compliance guidelines and they

2    would set it up.

3            And then once it was set up,

4    the representative could distribute or

5    communicate through e-mail invitations or

6    verbal invitations to the customers that

7    he or she wished to invite.  MedForce

8    would take care of the travel

9    arrangements of the speaker.  Typically

10   they are more local, but it would ensure

11   that the program was -- all the

12   logistics, from the speaker getting there

13   to the AV equipment being there, to the

14   restaurant menu.

15       Q.    And just under that live

16   speaker program, budget number for

17   MedForce, there is full service for

18   meeting direct?

19       A.    Yes.

20       Q.    Then there's Nucynta 2011

21   speakers bureau execution credit.  Do you

22   know what an execution credit is?

23       A.    Well, typically if -- if the

24   speaker bureau, you know, the -- the

Highly Confidential - Subject to Further Confidentiality Review

1   vendor might invoice -- they may invoice

2   too much, because it was an anticipated

3   number of programs to execute.  And if

4   you don't use it -- if they don't

5   actually hit it, then there's a credit.

6        Q.    Okay.  And then it gets to

7   KOL stakeholder database and decile.ten

8   is the vendor.  What is the KOL

9   stakeholder database?

10       A.    I'm not -- it -- it doesn't

11  ring a bell right now.  But part of

12  the -- the desire of a brand is to make

13  sure that you -- that the brand is able

14  to categorize all the different folks

15  that are influential in a particular

16  area.  So a typical KOL database may have

17  a person listed as very good for the

18  neurology community, or very good for

19  let's say surgeons.  Just to give a

20  little bit of structure.

21       Q.    And in this instance, at

22  least for Line 9 in the 2012 brand

23  investment summary, decile.ten is listed

24  as the vendor who managed this KOL

1    line item in the entire brand investment

2    strategy appears to be the live speaker

3    programs at $4 million.  And the next two

4    items that are above $2 million are the

5    McKesson rebate program or coupon program

6    and this comparison with oxy.

7                 Fair to say that, number

8    one, funding your speaker program was

9    pretty important to Janssen's overall

10   brand investment strategy to promote

11   Nucynta?

12         A.    Peer-to-peer education was a

13   critical part of the marketing mix for

14   driving awareness and adoption for

15   Nucynta and Nucynta ER.

16         Q.    Fair to say that funding the

17   rebate program in order to get better

18   access for patients to be prescribed or

19   to want to pick up and pay for at the

20   co-pay level Nucynta was important to

21   Janssen's brand strategy to promote

22   Nucynta?

23                 MR. GALIN:  Objection to

24         form.

1          THE WITNESS:  I think

2       supporting -- it was important to

3       the brand as a newcomer to the

4       category to support good access

5       for patients and provide customers

6       with the ability to help their --

7       their patients get started on a

8       brand that didn't have the best

9       coverage at the time of launch.

10   BY MR. JANUSH:

11       Q.   Is it also fair to say that

12   it was really important for Janssen to

13   compete against oxy and that's why, in

14   2012, it permitted the brand to be

15   invoiced $2,882,433 to advance those

16   endeavors?

17          MR. GALIN:  Objection to

18       form.

19          THE WITNESS:  I think -- I

20       think it's really fair to say that

21       when launching a new entrant in a

22       very crowded and complacent

23       market, that working -- seeking

24       the help of an advertising agency

Highly Confidential - Subject to Further Confidentiality Review

1    and the pain product, to a standalone of

2    a sales force that just focused on pain.

3         Q.    Going back -- thank you for

4    that clarification, but going back to my

5    question.

6              That other sales force,

7    notwithstanding how many other products

8    they covered, numbered into the hundreds

9    of sales folks that were detailing

10   Nucynta; is that right?

11        A.    That's generally accurate,

12   yes.

13        Q.    Do you remember how many

14   hundreds?

15        A.    I don't remember the exact

16   number.  My -- my recollection is it's

17   somewhere north of 500.  Probably shy of

18   somewhere under a thousand.

19        Q.    Okay.  Fair to say that

20   77 salespeople, no matter how skilled

21   they may be, can't cover the entire

22   country?

23        A.    These 77 were deployed

24   nationally in all major metropolitan

1  areas where there was a concentration of

2  relevant prescribers.

3         Q.    I appreciate that.  That's

4  another way of saying that these 77

5  weren't allocated to cover the entire

6  country, right?

7         A.    For purposes of that

8  product, they were covering, in my

9  estimation, most of the country.

10        Q.    Because they were covering

11 areas where prescribers were prescribing

12 Nucynta?

13        A.    They were covering areas

14 where prescribers were covering -- they

15 were writing Nucynta and Nucynta ER.  And

16 because there was a population of

17 treaters of pain.

18        Q.    We're going to get back to

19 this very topic in just a short bit of

20 time.  Okay?

21        A.    All right.

22        Q.    Before I move on to the next

23 exhibit, I want to ask some questions

24 about this Quintiles, this transition to

Highly Confidential - Subject to Further Confidentiality Review

1   there's a vetting process for how the

2   actual customer targets are derived.  The

3   actual number of physicians that wrote

4   long-acting opioids, as I'm speaking to

5   Nucynta ER, was far greater than the

6   number that we could actually reach with

7   the resources we had.

8            But in general, if you asked

9   me for characterizing the targets that we

10  would seek to engage, writers of

11  long-acting opioids, specifically branded

12  ones.

13       Q.    Do you recall being involved

14  in communications about setting up a

15  meeting with a high prescribing physician

16  who was very specifically writing

17  prescriptions of your competitor's

18  product and not writing Nucynta ER

19  prescriptions?

20            MR. GALIN:  Objection to

21       form.

22            THE WITNESS:  During my time

23       as a brand leader, I met with

24       customers when I was out with the

Highly Confidential - Subject to Further Confidentiality Review

1       sales representatives.  I met --

2       when I would go out on a day with

3       a rep.  So I would meet with

4       customers as -- as a tagalong to

5       the normal course of their day.

6             Whether or not they fit the

7       exact criteria that you're

8       describing is -- I can't speak yes

9       or no to that with any accuracy.

10  BY MR. JANUSH:

11       Q.    So during your tenure as the

12  national sales and marketing director,

13  you -- you actually went and did

14  ride-alongs with sales reps?

15       A.    Occasionally.  I -- I made

16  it a point to go out once or twice.  Most

17  folks in those roles do, to ensure that

18  we didn't lose touch with reality.

19             (Document marked for

20       identification as Exhibit

21       Janssen-Lin-12.)

22  BY MR. JANUSH:

23       Q.    I'm going to mark as Exhibit

24  Number 12 an e-mail chain that's Bates

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So there's David Lin,

2    Patricia Yap, and Kanitha Burns with a

3    number of other employees on that

4    third -- on that third tier.  Fair?

5    A.    Fair.

6    Q.    Okay.  "Lisa, I should be

7    able to do it, especially if it's in and

8    out same day.  Let's talk tomorrow.

9    Kanitha."

10         Now, I deposed Kanitha Burns

11   not that long ago.  I didn't get any

12   testimony from her that she assisted in

13   sales and went out and met with high

14   prescribers of long-acting opioids.

15         How common is that practice

16   to send out a marketing executive from

17   Janssen's headquarters in New Jersey out

18   to Cleveland, Ohio to meet with a high

19   prescriber?

20         MR. GALIN:  Objection to

21         form.

22         THE WITNESS:  Well, first

23         let's talk about the role.  So I

24         would say Kanitha and others like

Highly Confidential - Subject to Further Confidentiality Review

1      Kanitha are definitely people --

2      those are -- those are roles that

3      are primarily based on marketing.

4      But marketing and sales have a

5      very close collaboration.

6          And I would characterize it

7      as, it is true that occasionally

8      someone from home office may visit

9      a customer for the purpose of

10     learning about the customer's

11     practice, their -- the area,

12     hearing about things like managed

13     care.

14  BY MR. JANUSH:

15     Q.    He hadn't written a

16  prescription in 13 weeks.  He wasn't

17  really a customer right then, right?

18     A.    No.

19     Q.    In fact, it's because he was

20  writing a competitor's -- script for --

21  prescriptions for Opana ER that he was

22  specifically targeted for a visit; isn't

23  that right?

24     A.    Based on the

Highly Confidential - Subject to Further Confidentiality Review

1   carved out for the pain specialty Nucynta

2   pain force group; is that right?

3          A.    That's right.

4          Q.    Okay.  So earlier I talked

5   about the difference between sales reps

6   detailing across the country versus in

7   targeted locations, right?

8          A.    Yes.

9          Q.    This map, to use a Janssen

10  line from an earlier PowerPoint, a

11  picture is worth a thousand words, right?

12         A.    Yes.

13         Q.    This map identifies the --

14  the areas of greater intensity of focus

15  where Janssen was dedicating its Nucynta

16  pain force sales representatives; is that

17  right?

18         A.    That's correct.  This is

19  the -- this is meant to depict the

20  deployment of the sales team.

21         Q.    Okay.  If the colors of each

22  region are not observed in any of the

23  states that are listed, that are set

24  forth as blank or white, does that mean