PSJ6 NPS Opp Exh 7

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF OHIO

3                     EASTERN DIVISION

4

                     ~~~~~~~~~~~~~~~~~~~~

5

6     IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
      OPIATE LITIGATION

7                                     Case No. 17-md-2804

8                                     Judge Dan Aaron
      This document relates to:      Polster

9

      The County of Cuyahoga v. Purdue

10    Pharma L.P., et al.
      Case No. 18-OP-45090

11

12                   ~~~~~~~~~~~~~~~~~~~~

13                Videotaped deposition of
                      DONALD GEROME

14

15                    November 14, 2018

16                       9:01 a.m.

17

18

19                      Taken at:

20                 Kelley & Ferraro, LLP

21              950 Main Avenue, Suite 1300

22                   Cleveland, Ohio

23

24

25          Renee L. Pellegrino, RPR, CLR

```
                                                    Page 2
1    APPEARANCES:
2    On behalf of Cuyahoga County:
         Napoli Shkolnik PLLC
3        SALVATORE C. BADALA, ESQ.
         360 Lexington Avenue
4        New York, New York  10017
         (844) 230-7676
5        sbadala@napolilaw.com
              - and -
6        Plevin & Gallucci
         FRANK GALLUCCI, III, ESQ.
7        ROBIN WILSON, ESQ.
         55 Public Square
8        Suite 2222
         Cleveland, Ohio  44113-1901
9        (216) 861-0804
         fgallucci@pglawyer.com
10       rwilson@pglawyer.com
11   On behalf of Walmart, Inc.:
         Jones Day
12       CHRISTOPHER M. McLAUGHLIN, ESQ.
         North Point, 901 Lakeside Avenue
13       Cleveland, Ohio  44114-1190
         (216) 586-3939
14       cmmclaughlin@jonesday.com
15   On behalf of Endo Pharmaceuticals, Inc., Endo
     Health Solutions, Inc., Par Pharmaceuticals,
16   Inc. and Par Pharmaceutical Companies, Inc.:
         Arnold & Porter, Kaye Scholer LLP
17       SAMUEL LONERGAN, ESQ.
         250 West 55th Street
18       New York, New York  10019-9710
         (212) 836-8000
19       samuel.lonergan@arnoldporter.com
20
                         ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES, CONT'D:
 2    On behalf of AmerisourceBergen Drug Corporation:
          (Via Veritext Virtual Stream)
 3        Reed Smith LLP
          JAMES A. PETKUN, ESQ.
 4        Three Logan Square
          1717 Arch Street - Suite 3100
 5        Philadelphia, Pennsylvania  19103
          (215) 851-8100
 6        jpetkun@reedsmith.com
 7    On behalf of Cardinal Health:
          Williams & Connolly
 8        WILL HAWKINS, ESQ.
          725 Twelfth Street, N.W.
 9        Washington, D.C.  20005
          (202) 434-5421
10        whawkins@wc.com
11    On behalf of McKesson Corporation:
          Covington & Burling LLP
12        BENJAMIN C. BLOCK, ESQ.
          JOHN W. ZIPP, ESQ.
13        One CityCenter
          850 Tenth Street, NW
14        Washington, D.C.  20001-4956
          (202) 662-2000
15        bblock@cov.com
          jzipp@cov.com
16
      On behalf of Mallinckrodt:
17        (Via Telephone and Veritext Virtual Stream)
          Ropes & Gray
18        HAYDEN MILLER, ESQ.
          1211 Avenue of the Americas
19        New York, New York  10036-8704
          (212) 695-9000
20        hayden.miller@ropesgray.com
21
22
                        ~ ~ ~ ~ ~
23
24
25
```

```
                                              Page 4
 1   APPEARANCES, CONT'D:

 2   On behalf of Teva Pharmaceuticals:
         (Via Telephone and Veritext Virtual Stream)
 3       Morgan, Lewis & Bockius LLP
         LIZA B. FLEMING, ESQ.
 4       1701 Market Street
         Philadelphia, Pennsylvania  19103-2921
 5       (215) 963-5000
         liza.fleming@morganlewis.com
 6

 7   ALSO PRESENT:  Kurt Henschel, Videographer

 8
                        ~ ~ ~ ~ ~
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          TRANSCRIPT INDEX

2

3   APPEARANCES ....................................2

4   INDEX OF EXHIBITS ..............................6

5   INDEX OF OBJECTIONS ............................7

6

7   EXAMINATION OF DONALD GEROME:

8   BY MR. BLOCK ..................................12

9   BY MR. LONERGAN ..............................219

10  BY MR. MCLAUGHLIN ............................231

11

12  AFTERNOON SESSION ............................164

13

14  REPORTER'S CERTIFICATE .......................238

15

16  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

Page 6

1                    INDEX OF EXHIBITS
2
3     Number              Description              Marked
4
5     Exhibit 1     Cuyahoga County Sheriff's        61
                    Department Organizational Chart
6
      Exhibit 2     E-Mail String Beginning Bates    150
7                   Number CUYAH_00018717
8     Exhibit 3     Cuyahoga County Sheriff's        164
                    Department 2015 Annual Report
9
      Exhibit 4     Cuyahoga County Sheriff's        168
10                  Department 2016 Annual Report
11    Exhibit 5     Cuyahoga County Sheriff's        171
                    Department Newsletter dated
12                  April 2017 Beginning Bates
                    Number CUYAH_000118584
13
      Exhibit 6     E-Mail String Beginning Bates    185
14                  Number CUYAH_000118362
15    Exhibit 7     2017-2018 Cuyahoga County        217
                    Strategic Plan Project List -
16                  Community Safety and Protection
17
18
19
20
21
22
23
24
25

Page 63

1        A.    I'm overseeing that right now.

2        Q.    Sort of directly?

3        A.    Yes.

4        Q.    Okay.  Within the responsibilities

5    that ordinarily would fall under Lieutenant

6    Sharpe, what is -- what is encompassed within

7    narcotics -- is it narcotics and K9 or is it

8    narcotics K9, one separate unit?

9        A.    It's narcotics and K9.  We have a

10   couple of K9 dogs assigned to narcotics.

11       Q.    All right.  And what's the -- what

12   are the principal responsibilities of the

13   narcotics K9 unit?

14       A.    We have one assigned to the post

15   office task force.  It's basically drug

16   detection with K9s.  The other one is assigned

17   not only with us but with homeland security.

18       Q.    I think we've talked about the

19   narcotics division.  I'm trying to get a sense

20   of which, if any, of these other units within

21   the sheriff's department also touches on

22   narcotics-related issues.  So SWAT, I think I

23   know what SWAT is.  It's probably not quite like

24   the show on TV.

25       A.    I've never seen the show.

Page 64

1      Q.    I haven't either.  They advertise it

2   during football games.

3            Does the SWAT unit have any

4   responsibilities related to drug issues?

5            MR. BADALA:  Objection to form.

6      A.    I guess they do.  If there's a

7   search warrant, they'll conduct the initial, I

8   guess, entering the home, make sure it's secure

9   before our detectives go in.

10     Q.    How big is the SWAT unit?

11     A.    I think we have 15, 16 members.

12     Q.    Then next, under Lieutenant Sharpe,

13  is task forces.

14     A.    Yes.

15     Q.    What's encompassed within task

16  forces?

17     A.    We have, as we mentioned, two

18  officers assigned to DEA.  We have a deputy

19  assigned to HIDTA, which is another drug task

20  force.  High Intensity Drug Trafficking Area I

21  believe is the correct title of it.  We have

22  another detective, a deputy, assigned to NOLETF,

23  which is the Northeast Ohio Law Enforcement Task

24  Force.  I mentioned the two K9s.  And let me see

25  if -- and we do have a deputy assigned to --

Page 65

1   with homeland security, and they do some

2   narcotics investigations.

3          Q.    Who is -- I'm sorry.

4          A.    No.

5          Q.    Anything else within task force?

6          A.    No.  I believe that's it as far as

7   that falls under narcotics task forces.

8          Q.    You told us who was the two assigned

9   to DEA.  Who's assigned to HIDTA?

10         A.    HIDTA.

11         Q.    H-I-D-T-A, is that right?

12         A.    Yes.  Ben Meder.

13         Q.    And how long has he been there?

14         A.    When I became a lieutenant, he was

15  there, so I don't know how long before then he

16  was assigned.  So it's been a couple years.

17         Q.    Do you know -- how, if at all, do

18  you know what he's doing over there?

19         A.    As of right now, I don't have daily

20  contact with him, so I don't know.

21         Q.    Okay.  Is there any -- is there any

22  sort of strategic communication between the

23  sheriff's department and that task force in

24  terms of making sure you aren't duplicating

25  efforts or getting in each other's way or

Page 66

1    anything like that?
2             MR. BADALA:   Objection to form.
3        A.    There's constant communication with
4    our -- the supervisor sergeant from narcotics
5    and the detectives assigned to each area or each
6    task force.  There's also -- HIDTA created a
7    deconfliction database, so if you are looking at
8    a suspect or investigating something, you can
9    look in that database, see if anyone else is
10   looking into the same thing.
11       Q.    That's something that you have
12   access to at the sheriff's department, that
13   database?
14       A.    If I wanted to, yes, I could have
15   access to it.
16       Q.    Or folks within the narcotics
17   division have access to it?
18       A.    Yes.
19       Q.    Who's assigned to the NOLETF?
20       A.    Mark Batone.
21       Q.    How long has he been there?
22       A.    The same deal.  He was there before
23   I even became a lieutenant in the division.
24       Q.    Okay.  And who's assigned to
25   homeland security?

Page 67

1          A.     Anthony Edelman.

2          Q.     And going back to -- is it Deputy

3    Batone?

4          A.     Deputy, yes.

5          Q.     Okay.  How do you know what he's

6    doing with that task force?

7          A.     It's the same thing with the deputy

8    from HIDTA.  The supervisor, the sergeant of the

9    unit has contact with him and their supervisors

10   over there.

11         Q.     Okay.  And who's the sergeant in

12   your unit that you're referring to?

13         A.     Currently right now, Sergeant Hirko.

14         Q.     Okay.  Same sergeant, Hirko --

15   Deputy Meder and Deputy Batone would report

16   occasionally to Sergeant Hirko as to what

17   they're doing?

18         A.     Yes.

19         Q.     All right.  How about for Deputy

20   Edelman at homeland security?  How, if at all,

21   do you know what he's up to over there?

22         A.     Same thing.  He reports to Sergeant

23   Hirko as well.

24         Q.     Okay.  Are there any of the other

25   units underneath -- well, starting with under

1   your block as captain -- that have involvement

2   with narcotics-related issues, besides -- we

3   talked about SWAT, we talked about task force

4   and we talked about narcotics K9.

5         A.    Our impact unit, which is a vice

6   unit, does come in contact with drug activity, I

7   guess you could say.

8         Q.    Who is in charge of the impact unit?

9         A.    Sergeant Kozub is the immediate

10  supervisor.

11        Q.    Okay.  What's the primary mission of

12  the impact unit?

13        A.    They're, I guess you can call it, a

14  catchall for the department.  Like I said

15  before, they can do anything from assisting --

16  if you have a festival in your hometown, they'll

17  help with security for that, all the way up to

18  prostitution stings.  They've done traffic

19  enforcement.  They have assisted other agencies

20  with whatever they need.  They're kind of -- if

21  you call the county and want some assistance or

22  resources, we ask those guys -- we task those

23  guys with doing it.

24        Q.    Who within the sheriff's department

25  sets the priorities for the impact unit?

Page 69

1           MR. BADALA:  Objection to form.

2       A.    I think it's a discussion between

3   the sergeant and it used to be Lieutenant

4   Sharpe.

5       Q.    Okay.  Any other of these units that

6   have involvement with narcotics-related issues?

7           MR. BADALA:  Objection to form.

8       A.    Well, the drop box, which is

9   incorrect.  It falls under Lieutenant Sharpe,

10  too.  But you see that under Lieutenant Smith.

11  They have involvement.

12      Q.    Could you briefly describe for us

13  what the drop box unit -- is it a unit or --

14      A.    We have -- it falls under the

15  evidence sergeant, but we have guys that are

16  assigned to our evidence that do what we call

17  the pill pickup program, so the drop box program

18  throughout the county.  We have what looks like

19  a little mailbox called a drop box for

20  prescription pills, unwanted, people can drop

21  off.  They're located at the -- usually the

22  police stations, so they're monitored.  And we

23  have deputies assigned to go pick up the pills

24  from these drop boxes on a daily basis.

25      Q.    Where do the pills go when they're

Page 70

1   collected?
2        A.    We store them in our evidence room
3   and then we destroy them.
4        Q.    What kind of pills get dropped off?
5        A.    All types of pills.  I don't know.
6   I mean, exactly the type?
7        Q.    Yes.
8        A.    Mostly prescription bottles.
9        Q.    But all kinds of prescriptions --
10            MR. BADALA:  Objection to form.
11       Q.    -- or what kinds of prescriptions?
12       A.    I have not gone through them.
13       Q.    When did the drop box program start,
14   if you know?
15       A.    I don't know.  It was there when I
16   became lieutenant.
17       Q.    Okay.  Outside of -- are there other
18   units within the sheriff's department that have
19   involvement with narcotics-related issues?
20            MR. BADALA:  Objection to form.
21       A.    I mean, I think any law enforcement
22   has come across narcotics issues, whether it be
23   somebody having something on them, either
24   entering a courthouse or, you know, a traffic
25   stop, something like that, but the people that

Page 71

1    specifically investigate it are the ones we

2    covered.

3         Q.    Okay.  There's also medical director

4    on here.  What does the medical director for the

5    sheriff's department do?

6         A.    That's the jail medical director.

7    He oversees the medical dispensary stuff inside

8    the jail.

9         Q.    Okay.  And the director of nursing,

10   that's also for the jail?

11        A.    Correct.  And Marcus is no longer

12   there.

13        Q.    Okay.  All right.  Great.

14             MR. BLOCK:  Why don't we take a

15   break, if that's all right.

16             MR. BADALA:  Sure.

17             THE VIDEOGRAPHER:  Off the record,

18   10:02.

19                  (Recess had.)

20             THE VIDEOGRAPHER:  On the record,

21   10:16.

22   BY MR. BLOCK:

23        Q.    Captain Gerome, I want to go back to

24   when you were promoted to lieutenant and then

25   assigned -- assignments were switched and you

Page 72

1  were going to be going back to the narcotics
2  division as one of your responsibilities, so
3  that's 2014 at some point; is that right?
4       A.    Yes.
5       Q.    Okay.  Did you get a -- did you get
6  any sort of briefing from anyone when you
7  were -- now the narcotics division was falling
8  under your supervision, as to what the narcotics
9  division was doing and how it was operating?
10      A.    Yes.
11      Q.    From whom?
12      A.    Lieutenant Caraballo, who I was
13 switching places with.
14      Q.    All right.  How did that -- did you
15 get anything in writing in terms of what was
16 going on?
17      A.    No.
18      Q.    Just a face to face.  How long did
19 that take?
20      A.    I don't -- I think he probably
21 updated me on what was going on and, I mean, we
22 keep in contact.  It's not like he was assigned,
23 you know, somewhere I couldn't get a hold of
24 him, but the meeting, I don't remember how long
25 that lasted.

Page 73

1      Q.    Does the sheriff's department have

2  any manuals of any sort that relate to how to

3  conduct a narcotic-related investigation?

4      A.    No, not that I'm aware of.

5      Q.    If I replace the word "manual" with

6  document, any piece of paper whatsoever that

7  relates to how to conduct a narcotics-related

8  investigation?

9            MR. BADALA:  Objection to form.

10     A.    Okay.  I'm -- I'm not sure I

11 understand that.

12     Q.    Sure.

13           Are there any documents at all

14 within the sheriff's department that deal with

15 how to conduct a narcotics-related

16 investigation?

17           MR. BADALA:  Objection to form.

18     A.    Not that I'm aware of, no.

19     Q.    Do you know how many employees there

20 are within the sheriff's department?

21     A.    No, I don't.

22     Q.    Okay.  We were talking about the

23 number of folks in the narcotics division and

24 you also testified a little earlier about your

25 thoughts that there should be more detectives

Page 74

1   assigned to the narcotics division.

2              Do you remember that?

3        A.    Yes.

4        Q.    When you were talking about the

5   number of people within the narcotics division,

6   were you including within that count folks like

7   Detective Batone, who's assigned somewhere else?

8        A.    No.  I was specifically talking

9   about the detectives assigned in our division,

10  not task force officers, correct.

11       Q.    I'm sorry?

12       A.    Not the task force officers.

13       Q.    You would count them separately?

14       A.    I do.

15       Q.    Okay.  Does your department -- with

16  respect to narcotics-related investigations,

17  does the sheriff's department interact at all

18  with the Cleveland Police Department?

19       A.    Yes.

20       Q.    How so?

21       A.    Again, deconflicting is what we call

22  it, and I guess if they need resources, we

23  provide them with the resources.  If we need

24  something, they'll help us out.

25       Q.    Deconflicting, how do you do that?

Page 75

1      A.    I mentioned the database that was

2  set up by HIDTA.  Also, you know, detectives can

3  call each other.

4      Q.    Do you have -- is there a

5  counterpart of yours at the Cleveland Police

6  Department in terms of having oversight for

7  narcotics-related investigations?

8      A.    Counterpart, yeah.  I have -- I talk

9  to Commander Gary Gingell, who oversees a lot of

10 their units as well.

11     Q.    What do you and Commander Gingell --

12     A.    It's pronounced -- everyone says it

13 different.  It's G-i-n-g-e-l-l.  So Gingell.

14 I've heard him be called jingles before.

15     Q.    To his face?

16     A.    Well, I haven't, but -- no.

17     Q.    What do you and he talk about?

18     A.    He's also in charge of SWAT over

19 there, so we go over resources for SWAT, and

20 then we also discuss, you know, how they're

21 handling their overdoses and stuff as well.

22     Q.    Is that all -- do you guys ever

23 trade e-mails on these subjects?

24     A.    I've -- he's part of an e-mail chain

25 with the medical examiner, so I've seen some of

Page 76

1   his responses.

2        Q.    Outside of that, do you guys e-mail

3   ever directly, one on one, you to Commander G?

4        A.    We might have, probably just either

5   helping them out with an event or SWAT or

6   something like that.  Yeah, I'm sure there's

7   e-mails in there with me and him.

8        Q.    Are there any other local law

9   enforcement agencies that you, at the sheriff's

10  department, interact with as it relates to

11  narcotics investigations?

12       A.    Me personally or our -- our

13  narcotics unit?

14       Q.    Both.

15       A.    Okay.

16       Q.    Or either, I guess.

17       A.    I've had a phone call or e-mail

18  conversations with some chiefs about our

19  overdose responses.  Our detectives that respond

20  to the overdoses, they have a rapport with

21  agencies because they're responding to their

22  jurisdictions in conducting an investigation for

23  them or assisting with it, too.

24       Q.    What chiefs do you recall having

25  conversations with, communications with?

Page 77

1          A.    Geez.  The recent one I can remember
2     is Chief -- don't ask me how to spell this
3     either -- Scharschmidt from Parma Heights.  We
4     talked about the investigations in his city.
5               There -- I can't remember the name.
6     There was a Parma -- I believe it was a captain
7     for Parma Police Department.  We discussed their
8     role and our role in the investigations.
9               I think those are the most -- the
10    ones I can remember.
11         Q.    What was being investigated in Parma
12    Heights?
13         A.    We -- he -- I think he just became
14    chief.  I think he was a captain.  He had called
15    and asked, you know, how it all works as far as
16    us coming out and conducting an investigation if
17    there was a suspected drug overdose.  I just
18    explained to him the procedure that we use as
19    far as calling out and detectives arriving on
20    scene and what they should do as a local
21    department to secure the scene.
22               And then I think we had one there,
23    and we did respond, but he -- he advised me at a
24    later time, I think on the phone, that they're
25    going to handle their investigations themselves,

1   just keep it within their jurisdiction.  And I

2   think that was the last conversation I had with

3   him.

4          Q.    Meaning that he didn't want the

5   sheriff's department coming to any future

6   overdose scenes in the City of Parma Heights?

7          A.    He said his detectives were going to

8   handle the scenes.

9          Q.    Okay.  Well, let's talk about --

10  let's talk about those -- this would be "the

11  scene" being the scene of an overdose?

12         A.    Yes.

13         Q.    Do you remember specifically, this

14  one in Parma Heights, what the person had

15  overdosed on?

16         A.    No, I do not.

17         Q.    Okay.  I guess, does it -- is it the

18  same general procedure that's followed

19  regardless of the type of overdose?  You don't

20  know when you get the call what someone has

21  overdosed on, I assume, generally, usually?

22         A.    The only -- there might be some

23  limited information in the alerts that are sent

24  out, but no.  The detectives won't know until

25  they actually get there and survey the scene and

Page 79

1  see what's going on.

2         Q.    So let's walk through that process.

3               First of all, how does the sheriff's

4  department know -- how are you made aware that

5  there's an overdose or a potential overdose that

6  needs investigating?

7         A.    So within Cuyahoga County, we

8  respond to certain municipalities, townships,

9  not all of them.  Some like to do their own.  So

10 if there is a suspected drug overdose, the local

11 police department will notify the medical

12 examiner.  If it's -- a medical examiner will

13 put out an alert to -- there's a list of people

14 on the e-mail chain -- advising them that we

15 have a possible drug overdose.  They'll give the

16 location, usually the age, gender of the person

17 involved, and then maybe a brief thing if there

18 is suspected drugs on scene or anything like

19 that.

20              Our detectives are all on that alert

21 as well as the supervisors.  So in certain

22 jurisdictions, we are responsible for going and

23 helping out.  We have detectives that are on

24 call for that, and they are assigned, you know,

25 vehicles to respond to that scene.

Page 80

1              The locals are -- we kind of treat
2    it as a homicide scene now.  So they secure the
3    scene like a normal homicide, with the tape and
4    everything like that, and our detectives will
5    show up and take over from there.
6         Q.    Let me ask you a few follow-ups on
7    that.
8              First of all, how long has this been
9    something that the sheriff's department has been
10   responding to?
11        A.    It was before I came -- became a
12   lieutenant, so I don't know the exact date it
13   started, but --
14        Q.    And are we talking responding only
15   if there's been a -- I'm sorry.  Is an
16   overdose -- is this always a fatality that
17   you're describing?
18        A.    Lately, yes.  Those are the ones we
19   respond to, yes.  They're deceased.
20        Q.    Okay.  Are there ever times where
21   you respond to an overdose where the person is
22   not -- ends up not dying from the overdose?
23        A.    Yeah.  It has happened in the past.
24   We call it non-fatal.  And with that, it's
25   usually the agency will probably request our

Page 81

1   assistance.  If it's a smaller agency that

2   doesn't have the resources, they'll reach out to

3   us for assistance.  But yes, it has happened.

4       Q.    And then you said a detective from

5   the narcotics division, I suppose, goes to the

6   scene?

7       A.    We assign two detectives to go.

8       Q.    Two.  Okay.  Why two?

9       A.    There's multiple things to be done.

10  Sometimes even the supervisor will show up if

11  needed.  There are certain responsibilities they

12  have at the scene.

13      Q.    And what are the detectives supposed

14  to do at the scene?  What's their mission

15  basically?

16      A.    Collect evidence, photograph the

17  scene, interview any witnesses, gain whatever

18  intelligence they can from whatever neighbors,

19  family members, friends, whoever they -- you

20  know, whatever information they can get on the

21  scene, and they'll start their investigation

22  from there.

23      Q.    What are they investigating?

24      A.    Our main objective is to find out

25  who was -- sold the drugs to this individual and

Case: 1:17-md-02804-DAP  Doc #: 2425-7  Filed:  08/15/19  27 of 27.  PageID #: 402837

1   try to go after them.

2          Q.    Is there -- is there a standard --

3   is there some sort of -- is there a checklist

4   that the detectives have for when they're on

5   scene, here are the -- here's what we need to

6   look for or the questions we need to ask?

7                MR. BADALA:  Objection to form.

8          A.    I'm not aware of a document or a

9   checklist that -- they may have one of their

10  own.  I don't think there's an official one that

11  was put out, but I think, like I said, they may

12  have something on their own they go off of.

13         Q.    Is there any reporting obligation

14  that the detectives who respond on the scene

15  have?  Do they have to write a report of what

16  they observed?

17         A.    Yes, absolutely.  Yes.

18         Q.    Okay.  Is that report -- is that on

19  a form or they can write it on a cocktail napkin

20  if they want?

21         A.    No.  We have a report management

22  system now, so everything is documented on that.

23         Q.    What's the name of the management

24  system?

25         A.    TAC, T-A-C.