# PSJ2 Exh 164

## DECLARATION OF SHELBY SHERMAN

I, Shelby Sherman, declare as follows:

1. My name is Shelby Sherman. I am over the age of 18 and competent to make this Declaration. The information contained herein is based upon my personal knowledge gained during the time that I worked for Purdue Pharma ("Purdue").

2. I worked as a sales representative for Purdue Pharma in Memphis, Tennessee from 1974 to 1998. During my early years at Purdue, I promoted various products including antiseptics and laxatives. After the launch of MS Contin in 1985, I primarily promoted that drug for the next ten years. Starting in the mid-1990s when OxyContin was launched, I promoted OxyContin until I left Purdue in 1998.

3. There was a certain stigma with morphine (the opioid in MS Contin) as the drug was widely associated with late stage cancer pain. With OxyContin, Purdue was able to capitalize on the fact that physicians were already comfortable with oxycodone because Percocet (a drug that combines a relatively low dose oxycodone with acetaminophen) was widely prescribed by internists and general practitioners.

4. When Purdue launched OxyContin, the priorities of the company changed and sales pressure increased dramatically. Before, when we promoted MS Contin, we promoted the drug to oncologists and pain specialists. Purdue was one of the most highly regarded pharmaceutical companies in the country. Sales representatives were proud to work for Purdue and they were widely respected by health care providers. When OxyContin was launched, everything changed. It became all about the money.

5. With OxyContin, Purdue pushed the sales force to market to any prescriber who could be convinced to prescribe opioids. Sales representatives were directed to abandon their

1

marketing of MS Contin, which was losing its patent protection, in favor of OxyContin. Additionally, we were encouraged to market to any type of physician, including primary care physicians. Sales representatives targeted any physicians in their territory who, based on prescription data Purdue purchased, were high prescribers of short-acting opioids like Percocet.

6. As profits from the sale of OxyContin skyrocketed after the drug's launch, so did pressure from management to perform. Successful sales representatives were rewarded with extremely large bonuses, as there were no caps on bonuses at the time. I heard that some sales representatives earned well over a hundred thousand dollars in bonuses annually. On the other hand, representatives who did not meet the high sales quotas were constantly browbeaten by their managers for their poor numbers, and they were often put on probation and threatened with termination.

7. There were three main selling points that I stressed when I met with doctors. The first was Q12 dosing. Purdue taught us to tell doctors that OxyContin lasted for twelve hours. We promoted it as a steady-state drug that provided smooth blood levels and fewer spikes or peaks and valleys than short-acting drugs like Percocet. The problem with this message was that OxyContin often did not last twelve hours. I regularly heard feedback from doctors that the drug did not control their patients' pain for twelve hours. These doctors often prescribed the drug every eight hours instead, but sales representatives were directed to continue promoting the drug as Q12. Purdue had previously faced this issue with MS Contin, as we were instructed to promote that drug at Q12, but it usually did not last 12 hours. Purdue was concerned that insurance companies would not be willing to pay a high price for OxyContin, a drug that claimed to last 12 hours but did not live up to that claim. There was also a financial incentive to encourage doctors to titrate their patients' doses up instead of increasing the frequency of the

dosing: Purdue made more money from higher doses of OxyContin. Sales representatives' bonuses were based on dollar growth in their territories, as opposed to prescription growth, so sales representatives also made more money if doctors prescribed higher doses.

8. I am certain that upper management at Purdue knew that doctors often prescribed OxyContin more than twice daily because it was regularly discussed in district meetings and company-wide sales conferences.

9. The second main selling point that I emphasized with prescribers was safety. Purdue had conducted pilot studies of OxyContin before its launch; the studies showed that the greatest concern among doctors was the drug's potential for abuse. Purdue trained its sales force and developed marketing materials to specifically counter that concern by emphasizing that the extended release properties of the drug were believed to reduce its abuse potential. I and other Purdue sales representatives told prescribers that OxyContin was safer and less likely to be abused than short-acting opioids like Percocet. I am not aware of any clinical data Purdue had to support these safety claims. In reality, OxyContin had much more oxycodone per pill than Percocet, which actually increased its abuse potential.

10. Doctors often told me that they were concerned about the potential for abuse. I was trained to respond to these concerns by distinguishing addiction from physical dependence. I explained that all patients who took opioids for a long time would become physically dependent, but that true addiction was different in that it involved a psychological craving to get high. Purdue trained me to tell physicians that the chance of true addiction was low with genuine pain patients. I also discussed pseudoaddiction with doctors, explaining that certain signs of addiction could be an indication that a patient was not receiving sufficient pain treatment. In

3

these cases, I suggested that doctors should consider increasing the patient's dose or adding a short-acting opioid for breakthrough pain.

11. The third main selling point that I emphasized with prescribers was that OxyContin was a "single entity drug," meaning that it contained oxycodone but no acetaminophen, unlike Percocet and Vicodin. I promoted OxyContin as being safer than short-acting combination drugs because it did not carry the same risk of liver toxicity as did drugs that contained acetaminophen.

12. Purdue never trained me to identify or report suspicious doctors or cases of overprescribing. I faced huge pressure to sell large amounts of OxyContin. Under those conditions, I wasn't thinking about the implications of promoting to high prescribers. Doctors who were high prescribers were cherished and cultivated by the company, not scrutinized.

13. I often bought lunches for doctors and their staff, and I also regularly invited doctors to evening dinner programs at different restaurants. The speakers at these events were also doctors from the area, and they were paid about $500 for each event. Speaker programs were one of our tools to increase prescriptions, because some doctors were more likely to be influenced to prescribe OxyContin by a thought leader or a peer than by a sales representative.

14. Sales representatives were allowed to sign up doctors on their call list to be speakers. If I had a problem selling OxyContin to a particular doctor, I could sign up that doctor to be a speaker. Physicians were more likely to prescribe OxyContin if they were paid by Purdue to be speakers. Signing up high priority physicians to be speakers was one of the tools we used to influence their prescribing habits and increase sales.

4

15. I also invited my high-priority doctors to "seminars" that Purdue hosted at resorts in destination locations. While there was a short educational component to the trip, they were really just glorified golf trips designed to get doctors to write Purdue prescriptions.

16. Purdue Pharma was owned and controlled by the Sackler family. Raymond Sackler was in charge until the mid-1980s, when his son Richard took over. Richard Sackler was a micromanager who placed a lot of pressure on the sales force to perform. As an example, Richard Sackler once mailed a sales bulletin to representatives and put a "secret password" in the body of the text. Representatives who read the password were supposed to call Richard's secretary and give her the password. Richard Sackler wanted to make sure the sales representatives were reading everything he sent them.

17. I was quoted in an article in *Esquire* regarding the Sackler family. I am quoted as saying: "Sales reps were encouraged to downplay addiction risks. It was sell, sell, sell." And "We were directed to lie. Why mince words about it? Greed took hold and overruled everything. They saw that potential for billions of dollars and just went after it." The remarks attributed to me are accurate except that: (a) I did not recall any specific locations for Purdue's seminars; and (b) I do not believe that most sales representatives were intentionally deceiving doctors. Rather, I think sales representatives generally believed the messages they were promoting, but the company had lied to the sales representatives. It was only after I left Purdue that I realized I had been telling lies to doctors.

18. I declare under penalty of perjury that the foregoing is true and correct. This Declaration was executed in _LOVELAND CO._ on _03/21/2019_, 2019.

Shelby Sherman

5