# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL NO. 2804** |
| | |
| **This document relates to:** | **Case No. 17-md-2804** |
| ***County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*** | |
| **Case No. 1:18-OP-45090** | **Hon. Dan Aaron Polster** |
| | |
| ***The County of Cuyahoga v. Purdue Pharma L.P., et al.*** | |
| **Case No. 17-OP-45004** | |

## REPLY IN SUPPORT OF MANUFACTURERS' JOINT MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' RICO, OCPA, AND CONSPIRACY CLAIMS

# TABLE OF CONTENTS

**Page**

I.  THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A MARKETING ENTERPRISE. ........................................................................................ 2

II.  THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A SUPPLY-CHAIN ENTERPRISE. ...................................................................................... 8

III.  THERE IS NO GENUINE ISSUE AS TO CAUSATION. ................................................ 9

IV.  THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A CONSPIRACY. ......................................................................................................... 13

CONCLUSION ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**CASES**

*Almanza v. United Airlines, Inc.*,
  851 F.3d 1060 (11th Cir. 2017) .................................................................................4

*Boyle v. United States*,
  556 U.S. 938 (2009).................................................................................................3, 4

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008).....................................................................................................9

*Browning v. Flexsteel Indust., Inc.*,
  955 F. Supp. 2d 900 (N.D. Ind. 2013) .....................................................................4

*Crichton v. Golden Rule Ins. Co.*,
  576 F.3d 392 (7th Cir. 2009) .....................................................................................3

*Gomez v. Guthy-Renker, LLC*,
  No. 14-1425, 2015 WL 4270042 (C.D. Cal. July 13, 2015)...................................3

*Gov't Empls. Ins. Co. v. Analgesic Healthcare, Inc.*,
  No. 16-11970, 2017 WL 1164496 (D. Mass. Mar. 28, 2017) .................................4

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*,
  No. 15-3784, 2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)....................................3, 5

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
  668 F.3d 393 (6th Cir. 2012) ...................................................................................14

*In re Basic Foods Grp., LLC*,
  No. 15-10892, 2016 WL 3677673 (S.D.N.Y. July 1, 2016)...................................5

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..................................................................................3, 4, 5

*Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*,
  610 F.3d 382 (7th Cir. 2010) ..................................................................................3, 9

*Libertad v. Welch*,
  53 F.3d 428 (1st Cir. 1995)........................................................................................4

*Lockheed Martin Corp. v. Boeing Co.*,
  357 F. Supp. 2d 1350 (M.D. Fla. 2005)..................................................................4, 9

*McDonough v. First Am. Title Ins. Co.*,
  No. 10-106, 2011 WL 285685 (D.N.H. Jan 28, 2011) ...........................................5

*Menzies v. Seyfarth Shaw LLP*,
   197 F. Supp. 3d 1076 (N.D. Ill. 2016) ...................................................................9

*Miranda v. Ponce Fed. Bank*,
   948 F.2d 41 (1st Cir. 1991) ...................................................................................9

*Nestle Purina Petcare Co. v. Blue Buffalo Co., Ltd.*,
   181 F. Supp. 3d 618 (E.D. Mo. 2016) ...................................................................4

*Robins v. Glob. Fitness Holdings, LLC*,
   838 F. Supp. 2d 631 (N.D. Ohio 2012) (Polster, J.) ...........................................3, 9

*Sebrite Agency, Inc. v. Platt*,
   884 F. Supp. 2d 912 (D. Minn. 2012) ...................................................................3

*Sedmina, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985) ..............................................................................................9

*Steinhauser v. City of St. Paul*,
   595 F. Supp. 2d 987 (D. Minn. 2008) ...................................................................9

*United States v. Fowler*,
   535 F.3d 408 (6th Cir. 2008) ...............................................................................14

*United States v. Patel*,
   579 F. App'x 449 (6th Cir. 2014) .........................................................................14

*United States v. Turkette*,
   452 U.S. 576 (1981) ..............................................................................................11

**STATUTES**

18 U.S.C. § 1964(c) ......................................................................................................9

28 U.S.C. §§ 1962(c) ....................................................................................................9

**OTHER AUTHORITIES**

U.S. CONST. amend. I....................................................................................................9

Painting with a broad brush, Plaintiffs have evaded dismissal until now by insinuating that there is some conspiracy amongst the Manufacturing Defendants, while refusing to define or explain it.  Why?  Because when anyone looks too close or tries to pin down Plaintiffs' theory of the case, their allegations evaporate.  Even now, Plaintiffs' brief leaves Defendants at a loss for who, according to Plaintiffs, is or is not a member of the alleged enterprises, or what alleged conduct constitutes the "racketeering."  The answers to these critical questions vary from page to page depending on which RICO element Plaintiffs are trying (unsuccessfully) to satisfy.  Rather than specifying in their argument which evidence supports each challenged element of their claims, Plaintiffs often cite *twenty-page swaths* of their "factual background" section, without any explanation.  Moreover, to support their ever-shifting racketeering claims, Plaintiffs have even abandoned the Marketing Enterprise they repeatedly alleged in their pleadings, now insisting that KOLs and healthcare organizations are not associates of any enterprise, while simultaneously asserting that those third parties' conduct is part of the enterprise's conduct.

The time for painting in broad strokes is over.  Nowhere in their sixty-plus pages of "factual background" do Plaintiffs set out any evidence of (1) an enterprise through which Defendants racketeered, or (2) that specific racketeering conduct caused their injuries.  Rather, Plaintiffs' "evidence" shows that Defendants are, in fact, members of the pharmaceutical industry.  As such, it is hardly shocking that certain Defendants have participated in trade organizations, engaged the services of leading experts, and occasionally communicated, contracted, and had business relationships with other individual competitors.  In a futile attempt to portray Defendants' marketing activities and interactions with KOLs as something more than mere parallel conduct and bilateral communications, Plaintiffs offer nothing but fifteen-year-old soundbites by individual members of the pain-management industry.  These soundbites are no more than a

1

distraction and should be treated as such.  Indeed, Plaintiffs think that if they fill enough pages with conclusory phrases like "shared KOLs" or "coordinated marketing," the Court will not realize they offered no **evidence** that these KOLs were "shared," or that any marketing was "coordinated." And relying on this vague fraud-in-the-air theory, Plaintiffs then try to shoehorn in their one-size-fits-all causation theories without any regard to the elements of RICO or the OCPA.

Plaintiffs cannot survive summary judgment based merely on trade organization membership and bare speculation.  Otherwise, the required enterprise element will cease to exist in pharmaceutical cases.  This Court should reject Plaintiffs' unprecedented distortion of RICO, the OCPA, and civil conspiracy,[1] and grant Defendants' Motion for Summary Judgment.[2]

## I. THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A MARKETING ENTERPRISE.

In their Third Amended Complaints, Plaintiffs alleged a RICO Marketing Enterprise "consist[ing] of" very specific associates:  "the RICO Marketing Defendants," "APF, AAPM, APS, FSMB, USPF, and AGS," and "Dr. Portenoy, Dr. Webster, Dr. Fine, and Dr. Fishman[]." (Summit Cty. 3AC ¶ 881; *accord id.* ¶ 816.)  Plaintiffs now concede that no such enterprise exists. (Pls.' Resp. at 82 n.475.)   Instead, despite their repeated, unambiguous allegations, three amendments to their Complaints, and two years of discovery, Plaintiffs argue for the first time that Defendants "misunderstood," and that Plaintiffs intend to prove a different enterprise consisting only of the RICO Marketing Defendants.  Why?  Because Plaintiffs cannot show that the KOLs and healthcare organizations shared a common purpose.  Nonetheless, Plaintiffs continue to insist the conduct of these third parties constitutes the affairs of the alleged Marketing Enterprise—

---

[1]     Unless otherwise stated, Defendants' arguments all apply to Counts I, II, III, IV, and XI.
[2]     Contrary to Plaintiffs' arguments, Defendants do not concede that there was racketeering or fraud.  Unlike Plaintiffs, Defendants focused their briefs on specific legal challenges and uncontested facts, not lengthy narrative mischaracterization of disputed facts.

further confirming that the basis of their claims is, once more, a moving target. In any event, as early as the motion-to-dismiss stage, courts have forbidden plaintiffs from relying on an enterprise not alleged in their complaint.[3] This Court should likewise reject Plaintiffs' eleventh-hour reversal, and enter judgment against Plaintiffs on their RICO Marketing Enterprise claim.

Even if the Court were to allow Plaintiffs' belated shift in their theory, Plaintiffs also have not proven their new alleged RICO Marketing Enterprise either. *First*, as this Court has specifically held, an association-in-fact enterprise must have an ***unlawful*** common purpose. *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 653 (N.D. Ohio 2012) (Polster, J.); *Gomez v. Guthy-Renker, LLC*, No. 14-1425, 2015 WL 4270042, at *8–9 (C.D. Cal. July 13, 2015). Indeed, in *Boyle v. United States*, 556 U.S. 938 (2009), the associates coordinated for the specific (and exclusive) purpose of committing burglaries. Plaintiffs' argument to the contrary, (Pls.' Resp. at 80), is part of their impermissible effort to turn the entire pharmaceutical industry (or at least the entire pain-management industry) into an "enterprise." The Court should reject that argument, which is simply unsupported by any precedent and would undermine the very crux of RICO's requirements. Although Plaintiffs alternatively insinuate that Defendants' alleged goal of "expanding the market" for long-term opioid use is somehow unlawful, they cite no authority for that insinuation either, instead relying on soundbites about a "Pain Mafia." Without actual evidence of a common fraudulent or unlawful purpose, Plaintiffs' claims fail.

---

[3]     *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010) (holding that plaintiffs could not rely on "alternative bilateral or single-entity enterprises" where the complaint identified a larger enterprise composed of those alternative enterprises); *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010); *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No. 15-3784, 2016 WL 6110565, at *9 (S.D.N.Y. Aug. 4, 2016); *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 920 (D. Minn. 2012); *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) ("[A] RICO complaint must identify the enterprise.").

*Second*, contrary to Plaintiffs' assertions, (Pls.' Resp. at 75), even if a ***lawful*** common purpose were sufficient, Plaintiffs must produce evidence of actual ***coordination*** to achieve that common purpose, not merely that Defendants were "aware of each other's [similar] behavior." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017).[4]  Indeed, in *Boyle*, the enterprise's associates met before each burglary to plan the crime and divvy up specific roles to carry it out. *Browning v. Flexsteel Indust., Inc.*, 955 F. Supp. 2d 900, 910 (N.D. Ind. 2013) (holding that *Boyle* did not "significantly (or completely) dissolve the distinction between an enterprise and a pattern, [as] can be seen from the underlying facts of the case").  Plaintiffs cannot just speculate that because Defendants used "common strategies" and did business with similar KOLs, their "strategies" were "coordinated."  (Pls.' Resp. at 77.)  That is the definition of parallel conduct, and does not establish an enterprise.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 375 (holding that "competitors who independently engaged in similar types of transactions with the same firm" are not an enterprise); *Gov't Empls. Ins. Co. v. Analgesic Healthcare, Inc.*, No. 16-11970, 2017 WL 1164496, at *3 (D. Mass. Mar. 28, 2017); *cf. Nestle Purina Petcare Co. v. Blue Buffalo Co., Ltd.*, 181 F. Supp. 3d 618, 632 (E.D. Mo. 2016) ("Diversified merely alleges the existence of a commercial partnership that would benefit each defendant's own self-interests," not "that officials from either company inserted themselves in the affairs of the other.").

---

[4]    *See also Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1363 (M.D. Fla. 2005) (rejecting theory that, "as a matter of logic," would establish an enterprise whenever "competitors in a given market seek to produce a certain product or satisfy a common class of consumers. . . . Requiring instead that there be a joining together of alleged associated-in-fact entities comports with the plain definition of 'associate' [and] guards against overreaching by creative plaintiffs."); *Libertad v. Welch*, 53 F.3d 428, 443 (1st Cir. 1995); *Gov't Empls. Ins. Co. v. Analgesic Healthcare, Inc.*, No. 16-11970, 2017 WL 1164496, at *3 (D. Mass. Mar. 28, 2017) (quoting *In re Lupron Mktg. & Sales Practices Litig.*, 395 F. Supp. 2d 148, 173 (D. Mass. 2003)).

Plaintiffs' only evidence of "coordination" consists of bare speculation and documents from various organizations (meeting minutes, internal business documents, and emails) dating back to *2000*, *2001*, and *2003*.  (Pls. Resp. at 77–78.)  Even if these stale documents could show that Defendants coordinated in 2003 (they cannot), a jury could not infer that an alleged Marketing Enterprise continued to exist beyond that time, let alone during the statutory period.  (*See* Mfrs. Br. re: Statute of Limitations.)   For that reason alone, Defendants are entitled to summary judgment.

But these documents also cannot establish that the alleged Marketing Enterprise existed in 2003.  Rather, they show (at most) only a series of discrete bilateral communications—certainly not coordination among Purdue, Cephalon, Janssen, Endo, and Mallinckrodt.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 375 (bilateral agreements do not establish a larger enterprise); *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, No. 15-3784, 2016 WL 6110565, at *7 (S.D.N.Y. Aug. 4, 2016); *McDonough v. First Am. Title Ins. Co.*, No. 10-106, 2011 WL 285685, at *6 (D.N.H. Jan 28, 2011); *cf. In re Basic Foods Grp., LLC*, No. 15-10892, 2016 WL 3677673, at *14 (S.D.N.Y. July 1, 2016) (holding that plaintiffs failed to establish an enterprise in part because "[n]one of the alleged crimes alleged in the Other Acts involve an enterprise member other than Noah and Shin").  The emails from 2000 and 2001 involved only ***Purdue and Janssen***.  (Pls.' Rep. Ex. 30–36.)  One 2001 email was to ***Purdue alone*** from Dr. Kathleen Foley (who is not even alleged to be part of a Marketing Enterprise), and Plaintiffs do not point to evidence of Purdue's response or that any other alleged associates were privy to the email.  (*Id.* Ex. 41.)  Another 2001 email to ***Purdue alone*** from Dr. Portenoy says that "Janssen called [Portenoy] and has called others to . . . protect the pain movement," but Janssen notably did ***not*** call Purdue, its alleged "associate." (*Id.* Ex. 23.)  Instead, Purdue heard about Janssen's efforts through a third party, who Plaintiffs

now maintain was not part of the purported Marketing Enterprise. In the 2003 emails, ***Purdue and Cephalon*** discussed a luncheon, and although Endo was invited (along with several ***non-opioid*** companies), Endo, Janssen, and Mallinckrodt did not attend. (*Id.* Exs. 42–44.) Nor did Endo or Mallinckrodt attend the October 2003 APF meeting. (*Id.* Ex. 47.) In fact, Mallinckrodt is not mentioned in ***any*** of these documents. So how can these documents establish that ***all five*** of these entities were a "continuing unit" for over fifteen years? If such scattered exchanges between competitors suffice to create a jury question on coordination, virtually every industry in America would qualify as an enterprise.

*Third*, these documents do not show that ***any*** Defendant, let alone all five Marketing Defendants, wanted to "expand" any "market" for long-term opioid use—the Marketing Enterprise's alleged common purpose. In her 2001 email, Dr. Foley advised Purdue ***not*** to "tak[e] on the ***whole chronic pain world***," but to focus on "the cancer piece . . . and a ***selected group*** of patients with chronic pain." (*Id.* Ex. 41 (emphases added).) Dr. Foley suggested that Purdue respond to "misstatements" in news articles via a "letter to the editor with simple facts," and seek support from the ***entire pain management industry*** (including ***non-opioid*** analgesic manufacturers and the American Association of Medical Colleges) to "educat[e] medical students . . . to ***prevent any misuse of these medications on the part of physicians***" and to ensure patients "receiv[e] the appropriate treatment." (*Id.* (emphasis added).) Plaintiffs allege that Dr. Foley recommended speaking "with ONE VOICE," quoting ***Janssen's*** notes from a 2001 "experts meeting," but Janssen's notes make clear that Dr. Foley was recommending that ***Janssen's*** marketing needs to be ***internally*** consistent—***contrasting*** Janssen's "detailing message variability" to the internally consistent messaging of Purdue. (*Id.* Ex. 40.) The documents from 2000 relate to a ***potential*** "co-promotion" arrangement, "Project Pearl," which was limited to

6

specific medications manufactured by Purdue and Janssen. Plaintiffs set out no evidence that the potential arrangement was ever carried out. Similarly, the "coalition" proposed by the 2003 emails was explicitly limited to "get[ting] to know who is interested in pain issues" and "the American Pain Foundation's legislative agenda."

In short, Plaintiffs have not connected the dots between each alleged associate of a Marketing Enterprise. At most, their "evidence" shows only a handful of bilateral business communications in the early 2000s, not a five-Defendant, fifteen-year effort to "expand the market" for long-term opioid use.

Nor have Plaintiffs connected those bilateral arrangements to each Marketing Defendant's grants and contributions to third parties over the following fifteen years. Despite asserting that "Defendants shared responsibility for financially supporting the front groups," (Pls.' Resp. at 16), Plaintiffs cite no evidence that Defendants coordinated that "responsibility," or how it was divvied up. To the contrary, the unrefuted evidence shows that certain third parties sought funding from each Marketing Defendant through independent grant processes, (Defs.' Br. Ex. 38), and that the amount of funding from each Defendant to these third parties (collectively and individually) varied from year to year and was often not proportional (or otherwise tied) to funding from other Defendants.

Plaintiffs point to the PCF, (Pls.' Resp. at 79), but Plaintiffs have not produced any evidence that the PCF was a patsy for Purdue, Cephalon, Janssen, Endo, and Mallinckrodt. To the contrary, several members of the PCF (such as The Partnership at Drugfree.org) would have staunchly opposed the alleged Marketing Enterprise's "market-expanding" goals. Nor is there evidence that the Marketing Defendants ever used or broke off from the PCF to discuss marketing or third-party grants. In sum, Plaintiffs merely *speculate* that Defendants' marketing was

7

coordinated, relying solely on soundbites, parallel conduct, and membership in a trade association. Accordingly, the Court should enter judgment for Defendants on Plaintiffs' RICO marketing claims.

## II. THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A SUPPLY-CHAIN ENTERPRISE.

Plaintiffs' RICO Supply-Chain Enterprise fares no better.  Plaintiffs allege that "the RICO Supply Chain Defendants used their direct relationships and membership in groups like the HDA to coordinate their activities in relation to diversion and suspicious order monitoring." (Pls.' Resp. at 83.)  But again, Plaintiffs rely on a series of long-ago bilateral communications between Distributors and some individual Manufacturers, without showing that all these entities formed one "continuing unit" for the common purpose of "protecting the supply chain."

For example, Plaintiffs repeatedly cite to an October 2007 internal Purdue email recapping an internal Purdue meeting about potential "collaboration."  In that email, a Purdue employee discussed a limited, "'as needed, collaborative effort'" with *Distributors*, not other Manufacturers. Significantly, that email had nothing to do with "protecting the supply chain."  Rather, the employee stated that "[h]istorically, it has been difficult for a manufacturer to gauge what might be a suspicious order from a wholesaler."  To better *comply* with the "*DEA['s] pressuring [of] industry to go the extra mile*," however, another Purdue employee suggested "that [Purdue] develop some extra guidance" by asking wholesalers "questions . . . to better help [Purdue] evaluate their [pharmacy] customers."  Although "it is very difficult to ask such questions, and in fact we could be told to mine our own business," Purdue could not "make intelligent decisions in this area" without "involving distributors in an '*as needed*, collaborative effort.'"  In other words, even the Manufacturers' bilateral relationships with Distributors were limited to communicating "as needed" to *comply* with *the DEA's* requests.  That cannot be illegal coordination.

8

Plaintiffs' only other "evidence" of coordination among the Manufacturers is that at various times certain members of the pain-management industry lobbied for or against legislation and regulations affecting that industry.  That "purpose" is not ***unlawful***.  *See Robins*, 838 F. Supp. 2d at 653; *see also* U.S. CONST. amend. I.  As explained below, however, even assuming that lobbying could suggest the existence of an enterprise, it cannot be a basis for liability.

## III.  THERE IS NO GENUINE ISSUE AS TO CAUSATION.

Plaintiffs fail to produce sufficient evidence to create a genuine issue that they were "injured . . . by reason of" a RICO or OCPA violation.  18 U.S.C. § 1964(c).  *First*, Plaintiffs fail to connect their alleged injuries to the alleged RICO Marketing Enterprise.  Even where a racketeering pattern can "be established, it does not follow that every malefaction a defendant commits will give rise to civil RICO liability."  *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 48 (1st Cir. 1991).  Rather, Plaintiffs concede that Defendants could be held liable only for racketeering conduct that constitutes conducting or participating in the alleged ***enterprise's affairs***.  (Pls.' Resp. at 101); 28 U.S.C. §§ 1962(c); *Robins*, 838 F. Supp. 2d at 651 (plaintiff must show "that the enterprise is the instrument ***through which*** illegal activity is conducted" (emphasis added)).[5]  As to any other conduct, "liability will not obtain."  *Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1097 n.4 (N.D. Ill. 2016); *accord Sedmina, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496

---

[5]     *Accord Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) ("RICO provides a private right of action . . . to any person injured in his business or property by reason of ***the conduct of a qualifying enterprise's affairs*** through a pattern of [racketeering]." (emphasis added)); *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) ("[T]he RICO offense is *using* an enterprise to engage in a pattern of racketeering activity."); *Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1014 (D. Minn. 2008) ("Magner was [not] doing anything more than conducting his own affairs. . . . 'Mere participation in the predicate offenses listed in RICO, even in conjunction with a RICO enterprise, may be insufficient to support a RICO cause of action.'" (quoting *Bennett v. Berg*, 710 F.2d 1361 (8th Cir. 1983))), *rev'd in part on other grounds*, *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010); *cf. Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1363 (M.D. Fla. 2005).

(1985) ("Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses. In addition, the plaintiff only has standing if, and **_can only recover to the extent that_**, he has been injured in his business or property by the **_conduct constituting the violation_**." (emphases added)).

Plaintiffs refuse to specify what exactly constituted the "racketeering" conduct, instead flip-flopping between Defendants' branded marketing (*i.e.*, detailing) and unbranded third-party materials. But Plaintiffs have connected neither to the alleged Marketing Enterprise. Plaintiffs cite **_no evidence_** suggesting that each Defendant engaged in branded marketing **_through a Marketing Enterprise itself_**, directly or indirectly. The competitive nature of Defendants' branded marketing suggests they did not,[6] and Plaintiffs' fanciful inference to the contrary is untethered to any actual evidence. Significantly, Plaintiffs' proffered expert, Meredith Rosenthal, does not even attempt to connect Plaintiffs' alleged injuries to an alleged Marketing Enterprise. Instead, she explicitly states that she has merely **_assumed_** that Defendants' **_detailing_** activities were unlawful—*i.e.*, that they were fraudulent and occurred through a Marketing Enterprise. She did not test that assumption, attempt to differentiate between branded and unbranded detailing, or ascertain whether funding of KOLs or healthcare organizations had any impact whatsoever on her causation model. Plaintiffs' reference to their general causation opposition brief is thus unavailing. (Pls.' Resp. at 92.) As a fallback, Plaintiffs argue only that Defendants' branded marketing furthered the Marketing Enterprise's goals to "expand[] the prescription opioid market," (Pls.' Resp. at 101), but they cite no authority for their argument that independent conduct by separate entities is actionable merely because it happens to further the goals of a RICO enterprise—the conduct must

---

[6]   Defendants do not argue that conduct is never actionable **_merely_** because it is competitive or "furthers the individual participant's affairs." (Pls.' Resp. at 102.) Rather, competitive conduct indicates that it did not occur through a collective enterprise.

occur *through* the enterprise.[7]  Accordingly, Plaintiffs cannot recover for injuries caused by branded marketing.

Moreover, Plaintiffs no longer allege that the healthcare organizations and KOLs are associates of a Marketing Enterprise, and have produced no evidence that the third-party non-branded activities were nonetheless conducted *through* a Marketing Enterprise.  Plaintiffs cannot impute third-party conduct to a Marketing Enterprise, on one hand, while on the other hand simultaneously claim that they do not have to show that those third parties were either associates or agents of that Marketing Enterprise.  Plaintiffs are trying to have their cake and eat it too:  either these third parties are associates of the alleged Marketing Enterprise, or they are not.  Again, the evidence shows only that individual Defendants *independently* funded similar third parties, and there is no evidence that the Marketing Defendants collectively (or even independently) controlled the contents of third-party statements.  In any event, Dr. Rosenthal never attempts to measure or isolate the impact of third-party conduct in the aggregate causation model she chose to use.  Accordingly, the alleged third-party conduct is not actionable either.

Plaintiffs argue that Defendants had the burden to show that their independent marketing conduct did not occur through a Marketing Enterprise.  (Pls.' Resp. at 95.)  That is wrong.  ***Plaintiffs*** have the burden to show their alleged injuries were caused by reason of a violation of § 1962—*i.e.*, by conduct occurring *through* a Marketing Enterprise, not ***independent*** conduct.  They have not done so.  Because Plaintiffs have not shown that the alleged racketeering conduct (Defendants' branded or unbranded marketing) occurred through a Marketing Enterprise and

---

[7]     Plaintiffs cite *United States v. Turkette*, 452 U.S. 576 (1981), but the *Turkette* Court addressed the definition of an "enterprise," not §1964(c)'s "by reason of" requirement or whether independent racketeering is actionable merely because it furthered the goals of an enterprise.

caused the alleged damages, Defendants are entitled to summary judgment on all Plaintiffs' RICO marketing claims.

*Second*, and similarly, Plaintiffs cannot connect their alleged injuries to the alleged RICO Supply-Chain Enterprise.  Plaintiffs have not created a genuine issue that Defendants' alleged failure to report suspicious orders occurred ***through*** the conduct of the supposed RICO Supply-Chain Enterprise's affairs.  Indeed, none of Plaintiffs' experts on diversion-related issues even attempts to parcel out which conduct did or did not occur through the alleged Supply-Chain Enterprise.

Moreover, Plaintiffs concede they cannot hold Defendants liable for lobbying efforts. (Pls.' Resp. at 86.)  That is true for both alleged Enterprises.  Plaintiffs argue, however, that the lobbying efforts mentioned in their brief are evidence that the Enterprises exist.  Even if that were true (it is not), Plaintiffs have not pointed to any evidence that Manufacturer Defendants participated in the affairs of the alleged Supply-Chain Enterprise other than through lobbying efforts.  Because Manufacturer Defendants (1) can be liable only for harms resulting from their participation in the alleged Supply-Chain Enterprise's affairs, (2) only participated through lobbying (if at all), and (3) cannot be held liable for lobbying, Plaintiffs have not shown any actionable harm relating to a Supply-Chain Enterprise.  Accordingly, Defendants are entitled to summary judgment as to Plaintiffs' RICO supply-chain claims as well.

*Third*, as to Plaintiffs' more general standing and causation arguments, Defendants stand on their opening RICO and General Causation briefs, to which Plaintiffs have not meaningfully responded, as well as their General Causation reply brief.  Plaintiffs cannot satisfy factual or proximate causation, and Defendants are entitled to judgment.  Nor can Plaintiffs recover under RICO for indirect injuries, especially third-party personal injuries.  Plaintiffs point to cases stating

that monetary expenses can be "property" under RICO, but the money spent by the Counties on medical expenses is no different from the money spent by the allegedly injured third parties (who Plaintiffs concede lack standing),   With the benefit of a complete record, Defendants urge the Court to follow the more restrictive reading of *Jackson* identified in its Order on Defendants' Motion to Dismiss (Dkt. #1203, at 15-17) and bar recovery of personal-injury damages.

## IV.   THERE IS NO GENUINE ISSUE AS TO THE EXISTENCE OF A CONSPIRACY.

Plaintiffs concede that, to establish a conspiracy under state or federal law, they must show an explicit or implicit agreement to achieve an unlawful purpose.  (Pls.' Resp. at 103).  To support their conspiracy claims against the Manufacturers, Plaintiffs cite their own arguments supporting the existence of an enterprise.  (*Id.* at 89–90, 104–05.)  Those arguments were premised on the theory that an enterprise need not have an unlawful purpose—but an unlawful purpose undeniably *is* an essential element of a conspiracy.  There is no evidence of an overarching marketing-related agreement (within the statutory period or otherwise), let alone an unlawful one.  Although Plaintiffs argue "the evidentiary record reflects that Defendants 'directed, solicited, and knew' of each other's actions and the actions of the KOLs and front groups," (Pls.' Resp. at 105), they provide no citations to the record.  This is yet another attempt by Plaintiffs vaguely to assert fraud in the air, without pointing to specific evidence to support each element of their claims, as they are required to do to survive summary judgment.  As explained above, Plaintiffs have shown (at most) parallel conduct and lawful bilateral agreements, which are insufficient to establish a conspiracy.

Similarly, Plaintiffs argue that each Manufacturer formed separate conspiracies with Distributors and Pharmacies "to reroute [the] supply of opioids after regulatory actions."  (Pls.' Resp. at 105.)  But the evidence shows (at most) only that individual Manufacturers "coordinated" with their Distributor customers to help **comply** with the DEA's regulatory requirements—another

13

indisputably *lawful* purpose.[8] Nor can Defendants be liable for "conspiring" to engage in lobbying protected by the First Amendment.

Plaintiffs argue that Defendants' "participation in the actions of a RICO enterprise or the predicate acts of an enterprise supports an inference of a RICO conspiracy." (Pls.' Resp. at 90.) The argument rests on a false premise—as explained above, Plaintiffs have not produced evidence of any enterprise or racketeering. In any event, the cases cited by Plaintiffs require specific evidence that the predicate acts were committed *because of* Defendants' association with an enterprise. For example, in *United States v. Fowler*, 535 F.3d 408 (6th Cir. 2008), the government produced specific evidence to rebut the defendant's argument that his predicate acts were "isolated events that had no relation to his . . . membership" in the enterprise.[9] Plaintiffs have produced no such evidence.

Because Plaintiffs have not produced evidence of an unlawful agreement, Defendants are entitled to summary judgment on Plaintiffs' conspiracy claims.

## CONCLUSION

Plaintiffs have failed to create a genuine issue of fact as to their RICO and conspiracy claims. The Court should enter judgment for the Manufacturers on Counts I, II, III, IV, and XI.

---

[8]     Plaintiffs argue that Mallinckrodt "reroute[d] Walgreens opioid shipments through Cardinal and Anda" when "the DEA [allegedly] was about to shut down [a] Walgreens distribution center for breaching CSA duties." (Pls.' Resp. at 105 n.489.) But Plaintiffs do not explain why it is unlawful to reroute opioid shipments through *CSA-compliant* distribution centers. There is no evidence that the *rerouted orders* were improper, and even if they were, those CSA-compliant distributions centers could flag the orders. Was Mallinckrodt supposed to prevent the Walgreens distribution center's legitimate customers from obtaining necessary medications?

[9]     *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393 (6th Cir. 2012), was decided at the motion-to-dismiss stage, not summary judgment. *United States v. Patel*, 579 F. App'x 449 (6th Cir. 2014), stands for the uncontroversial proposition that each coconspirator does not have to agree to complete the entire crime itself, but still "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." It had nothing to do with what evidence was required to defeat summary judgment.

Dated: August 16, 2019                      Respectfully Submitted,

By: /s/ *Mark S. Cheffo*
Mark S. Cheffo
Sheila L. Birnbaum
Hayden A. Coleman
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Mark.Cheffo@dechert.com
Sheila.Birnbaum@dechert.com
Hayden.Coleman@dechert.com

*Attorneys for Purdue Pharma L.P.,*
*Purdue Pharma Inc., and The Purdue Frederick*
*Company*


By: /s/ *Donna M. Welch* (consent)
Donna M. Welch, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle, Chicago, IL 60654
Tel: (312) 862-2000
donna.welch@kirkland.com

*Attorney for Allergan Finance, LLC*
*f/k/a/ Actavis, Inc. f/k/a Watson Pharmaceuticals,*
*Inc.*

By: /s/ *Brien T. O'Connor* (consent)
Brien T. O'Connor
Andrew J. O'Connor
ROPES & GRAY LLP
Prudential Tower
800 Boylston St.
Boston, MA 02199-3600
Tel: (617) 235-4650
Brien.O'Connor@ropesgray.com
Andrew.O'Connor@ropesgray.com

*Attorneys for Defendants Mallinckrodt LLC and*
*SpecGx LLC and specially appearing for*
*Mallinckrodt plc*

15

By: */s/ Carole S. Rendon* (consent)
Carole S. Rendon
BAKER HOSTETLER
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Tel: (216) 621-0200
crendon@bakerlaw.com

Jonathan L. Stern
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 942-5000
jonathan.stern@arnoldporter.com

Sean O. Morris
ARNOLD & PORTER KAYE SCHOLER LLP
777 S. Figueroa St., Suite 4400
Los Angeles, CA 90017
Tel: (213) 243-4000
sean.morris@arnoldporter.com

*Attorneys for Endo Health Solutions*
*Inc., Endo Pharmaceuticals Inc., Par*
*Pharmaceutical, Inc. and Par Pharmaceutical*
*Companies, Inc.*

By: */s/ Steven A. Reed* (consent)
Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
Tel: (215) 963-5603
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

16

*Attorneys for Teva Pharmaceuticals, USA, Inc.,*
*Cephalon, Inc., Watson Laboratories, Inc., Actavis*
*LLC, and Actavis Pharma, Inc. f/k/a Watson*
*Pharma, Inc.*

By: /s/ *Charles C. Lifland* (consent)
Charles C. Lifland
Sabrina H. Strong
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
clifland@omm.com
sstrong@omm.com

Daniel M. Petrocelli
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
dpetrocelli@omm.com

*Attorneys for Janssen Pharmaceuticals, Inc.,*
*Johnson & Johnson, Janssen Pharmaceutica, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc., and Ortho-*
*McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen*
*Pharmaceuticals, Inc.*

By: /s/ *Daniel G. Jarcho* (consent)
Daniel G. Jarcho
ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004
Tel: (202) 239-3254
daniel.jarcho@alston.com

Cari K. Dawson
Jenny A. Mendelsohn
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, GA 30309
Tel: (404) 881-7000
cari.dawson@alston.com
jenny.mendelsohn@alston.com

*Attorneys for Noramco, Inc.*

17

**CERTIFICATE OF SERVICE**

I, Lindsey B. Cohan, hereby certify that the foregoing document as served via the Court's

ECF system to all counsel of record.

/s/ Lindsey B. Cohan_____
Lindsey B. Cohan