**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*,<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*,<br>Case No. 1:18-op-45004 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT
TESTIMONY PURPORTING TO RELATE TO ABATEMENT COSTS AND EFFORTS**

i

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.  Liebman's and Alexander's Abatement Opinions Are Irrelevant and Unreliable............. 2

    A.  Liebman's and Alexander's Opinions Are Irrelevant. ........................................... 3

        1.  Liebman and Alexander fail to account for other sources of funding. ................................................................................. 3

        2.  Liebman and Alexander improperly rely on nationwide data. ................... 5

        3.  Liebman and Alexander failed to limit their opinions to the alleged nuisance resulting from alleged over-prescription of opioids.................... 6

    B.  Liebman's and Alexander's Abatement Opinions Are Not Based On Reliable Methodology............................................................................ 8

        1.  Liebman and Alexander rely on insufficient facts and data. ..................... 8

            a)  Liebman ................................................................................. 8

            b)  Alexander .............................................................................. 10

        2.  Liebman's and Alexander's methods cannot be tested............................. 12

II.  The Testimony of Plaintiffs' Other Experts Opining about Abatement Also Should Be Excluded........................................................................................ 14

    A.  Keyes........................................................................................... 14

    B.  Wexelblatt and Young ..................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bowman v. Corrections Corp. of Am.*,
　350 F.3d 537 (6th Cir. 2003) ...............................................................................14

*Cincinnati v. Beretta U.S.A. Corp.*,
　768 N.E.2d 1136 (Ohio 2002) ..........................................................................7, 16

*Daubert v. Merrell Dow Pharmaceuticals*,
　509 U.S. 579 (1993)............................................................................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
　43 F.3d 1311 (9th Cir. 1995) .............................................................................11

*Deutsch v. Novartis Pharmaceuticals Corp.*,
　768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...............................................................15

*General Elec. Co. v. Joiner*,
　522 U.S. 136 (1997)......................................................................................7, 8, 11

*Henderson v. Spring Run Allotment*,
　651 N.E. 2d 489 (Ohio Ct. App. 1994)................................................................4

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products*
　*Liability Litigation*,
　174 F. Supp. 3d 911 (D.S.C. 2016).................................................................9, 10

*In re Polypropylene Carpet Antitrust Litig.*,
　93 F. Supp. 2d 1348 (S.D. Fla. 2000) ..................................................................9

*In re TMI Litig.*,
　193 F.3d 613 (3d Cir. 1999)..................................................................................9

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
　45 F. Supp. 3d 724 (N.D. Ohio 2014)...................................................................9

*Kahn v. CVS Pharmacy, Inc.*,
　846 N.E.2d 904 (Ohio Ct. App. 2006)................................................................16

*KW Plastics v. U.S. Can Co.*,
　131 F. Supp. 2d 1289 (M.D. Ala. 2001) .............................................................12

*Malletier v. Dooney & Bourke, Inc.*,
　525 F. Supp. 2d 558 (S.D.N.Y. 2007).................................................................12

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
    676 F.3d 521 (6th Cir. 2012) ..........................................................................................11, 16

*Pride v. BIC Corp.*,
    218 F.3d 566 (6th Cir. 2000) ............................................................................................7, 16

*Turpin v. Merrell Dow Pharmaceuticals, Inc.*,
    959 F.2d 1349 (6th Cir. 1992) ...............................................................................................11

*United States v. Geiger*,
    303 F. App'x 327 (6th Cir. 2008) ..........................................................................................17

*Vincent v. United Techs. Corp.*,
    854 F.2d 1318 (4th Cir. 1988) ..............................................................................................15

**Rules**

Fed. R. Evid. 403 ............................................................................................................14, 17

Fed. R. Evid. 702 ..............................................................................................................3, 12

## INTRODUCTION

Plaintiffs' opposition to Defendants' motion to exclude Plaintiffs' "abatement" experts is an exercise in deflection and distraction.  Plaintiffs largely concede the problems Defendants identified in their motion, but then simply say they do not matter.

Defendants' motion identified specific problems with the opinions of Plaintiffs' proposed abatement experts.  Their two primary experts, Jeffrey Liebman and Caleb Alexander, both offer opinions that have little, if anything, to do with Cuyahoga and Summit Counties (the "Counties") or the Defendants' alleged conduct.  Instead, Liebman and Alexander engage in a largely academic exercise focused on what it might take to abate the entirety of the "opioid crisis" based on nationwide data unmoored to the Counties or the facts of this case.  This approach results in opinions that neither are reliable nor relevant to the issues before the Court.  Katherine Keyes, engaging in a similar academic exercise, cherry-picks only certain programs or policies to be a part of a larger abatement plan, and without even a proposal related to cost.  Scott Wexelblatt and Nancy Young's opinions are similarly disconnected from the facts and issues.

In addition, Plaintiffs continue to misconceive the nature of the remedy available in this case.  First, Plaintiffs assume that the Court could require (as an "equitable" remedy) the payment of money into a fund to cover costs of programs that their experts identify as components of their wish-list "abatement" program.  This is not correct.  Plaintiffs' conception of an abatement remedy is flawed from the start.  As a matter of law, abatement involves stopping the nuisance-producing conduct—not addressing injuries purportedly suffered by individuals as a result of the nuisance.[1]  Here, the alleged nuisance (as this Court has recognized)

---

[1] Equitable abatement relief could not, for example, encompass the payment of costs to treat individual patients who were addicted.  And, to the extent that Plaintiffs seek as an "abatement" remedy a fund to treat or prevent addiction-related harms to its citizens, Plaintiffs lack *parens patriae* authority to sue on behalf of harms to their citizens.

at most is the purported over-supply of prescription opioids—not the amorphous "opioid crisis." Ruling on Tribes R&R at 19-20.  "Abatement," therefore, would be stopping the alleged oversupply (*i.e.*, reducing the number of prescription pills) and would not include the policies and programs (and, in some instances, associated costs) Plaintiffs' experts urge.  Assuming (as it appears) that Plaintiffs seek the payment of money into a fund for use by government jurisdictions, they seek the equivalent of an award of *damages*, which would be a jury question.

Second, Plaintiffs say that their experts should be allowed to opine about whatever they want (even if based on wild assumptions about future events), and that the Court should sort out the specifics.  That too is wrong.  An expert must pass the *Daubert* tests, even when (*particularly* when) opining about highly speculative events.  As such, Plaintiffs' abatement expert's opinions should not be considered by a judge or a jury because they are neither relevant nor reliable.

Ultimately, Plaintiffs' ignore the controlling legal standard, which provides that expert testimony may not be admitted unless it is helpful to the trier of fact and bars expert "opinions" that are, by turn, based on improper assumptions and unmoored to the circumstances of the case.

**ARGUMENT**

**I.    Liebman's and Alexander's Abatement Opinions Are Irrelevant and Unreliable.**

Plaintiffs' arguments in support of Liebman's and Alexander's proposed opinions reflect the same flawed premise as the opinions themselves—that Defendants should be required to "abate" all harms related in any way to the "opioid crisis."  Thus, according to Plaintiffs, it does not matter that their experts failed to account for the fact that many components of the broadly-defined opioid crisis they are trying to abate have nothing to do with Defendants' alleged conduct or that many of the policies and programs the experts claim are needed would be (or in some instances already are) funded by sources other than county governments.  The loosely-defined "opioid crisis" Plaintiffs reference is multifaceted:  it includes, for example, the

deliberate misuse and abuse of prescription opioids by those who never had legitimate prescriptions, as well as the activities of criminal gangs peddling deadly street drugs.  Because of this complexity, myriad actors, including federal, state, and local governments, and private entities, participate by covering various costs of treating and preventing opioid addiction, based upon particular needs in particular areas (like the Counties).  Plaintiffs ignore this, and assume that Defendants should abate the harms stemming from *all opioids*, not only those manufactured, distributed, or sold by Defendants, *and* that Defendants should be responsible for "costs borne by third parties."  Opp. 6, 8.  This is incorrect.  Plaintiffs' experts do not account for these variables that make up the so-called "crisis" and thus their opinions are neither reliable nor relevant.

## A.    Liebman's and Alexander's Opinions Are Irrelevant.

Plaintiffs suggest that their experts' expansive abatement plans are relevant because they need not be limited to addressing harms directly caused by Defendants' alleged misconduct.[2] That is wrong as a matter of law—Plaintiffs' experts must address remedies for the County-specific injuries caused by Defendants' alleged wrongdoing.  In any event, Plaintiffs' assertion has nothing to do with whether the plans are reliable, nor do they address the fact that the opinions are subjective determinations based on unreliable methodology.  Rule 702 requires that an expert's opinion must be based on "sufficient facts or data" that make the opinion more than a mere academic exercise.  Fed. R. Evid. 702.  Alexander and Liebman have failed to do so.

### 1.    Liebman and Alexander fail to account for other sources of funding.

Liebman and Alexander purport to estimate certain costs that they claim Defendants should bear going forward, yet they admittedly do not account for other sources of funding.

---

[2] As pointed out elsewhere, including in the Defendants' summary judgment motions regarding causation, Plaintiffs have not provided sufficient evidence that any wrongful conduct caused a public nuisance or otherwise gives rise to

*Continued on following page*

Opp. 7 (recognizing that "the abatement plan or remedies they propose are intended to present a complete picture of the effort necessary to abate the entire epidemic").  Plaintiffs readily concede that Liebman and Alexander knew of these other funding sources, Opp. 7-8, but argue that (1) abatement remedies are not like damages, and (2) other sources of funding are uncertain.

The problem with Plaintiffs' first argument is that the abatement remedies Plaintiffs seek are not "like" damages; they *are* damages under Ohio law.  *See* Defendants' Opposition to Motion for Partial Summary Judgment on Track One Plaintiffs' Public Nuisance Claim, Dkt. 2163, at § II.B.  Even if the costs described by Liebman and Alexander could be considered equitable in nature; there is nothing equitable about permitting Plaintiffs to recover costs that are being paid by others, nor would it be equitable to base such a remedy on an expert opinion that does not account for key facts (like other independent funding sources).  Yet, it is black-letter law that abatement should not provide a "windfall" to the party seeking relief, nor should it "place the injured party in a better position than that party would have enjoyed had the wrongful conduct not occurred."  *Henderson v. Spring Run Allotment*, 651 N.E. 2d 489, 497 (Ohio Ct. App. 1994) (considering appropriateness of remedies in case involving abatement of a nuisance).  To avoid such a "windfall" here, Liebman and Alexander had to account for other funding sources.  Their admitted failure to do so renders their opinions unreliable.

Plaintiffs' second argument—that other sources of funding are "not guaranteed in the future"—is irrelevant.  Opp. 8.  The same could be said about their experts' cost projections themselves, which involve a huge amount of guesswork and are thus unreliable.  In any event, to the extent that Liebman and Alexander are guessing about the level of funding it will take to

---

*Continued from previous page*

liability for any abatement remedy.  But, even if one assumed that Plaintiffs had met their burden of causation, their experts' opinions regarding abatement do not satisfy *Daubert*.

administer the government programs they say should be a part of the abatement plan, then they should also at least attempt to estimate (and account for) the level of funding from sources other than the Counties.  Moreover, to the extent that Plaintiffs argue that Defendants should be liable for costs borne by third parties, this is simply wrong.  The Counties have no *parens patriae* authority to sue on their citizens' behalf, nor can they seek relief for damages that they have not incurred.  In sum, Liebman's and Alexander's opinions fail to account for significant other sources of funding, thus rendering their opinions entirely unhelpful.

### 2.      Liebman and Alexander improperly rely on nationwide data.

Plaintiffs argue that Liebman and Alexander can rely on nationwide data rather than data specific to the Counties because they talked to and consulted with individuals in the Counties as part of their research.  But that does not answer the question of how those conversations at the local level informed the experts' conclusions.  Instead, Plaintiffs merely assure the Court that they "learn[ed] about the local situation" and talked to the individuals on the ground to get the "local perspective" on the crisis.  Opp. 10.  Yet they provide no facts or details about what they learned—and, thus, no reason to conclude that these opinions are anything more than national data in County garb.  The testimony about the bases for their opinions also undercuts the Plaintiffs' characterization.  Liebman merely "'assume[d] that the national numbers [of OUD] applied to the [Counties],'" Def. Mot. 17 (quoting Ex. E. (Liebman Dep.) at 240:1-12), and Alexander ultimately did not even apportion the nationwide costs he calculated to the Counties. *Id.* (citing Ex. C (Alexander Dep.) at 58:11-18; 59:12-20; Ex. B (Alexander 4/17/2019 Rep.). Given that neither expert truly based their analyses on local data, their opinions will not help the fact-finder to craft a remedy that will meet the Counties' needs.

With respect to Alexander, Plaintiffs essentially concede the irrelevance of his nationwide model, except to note that it provides "an underlying framework" for determining the

abatement remedy, particularly as it relates to "determining the appropriate amount of abatement costs to be awarded to the Counties."  Opp. 12-13.  But his reliance on nationwide data creates a mismatch between his opinions on the appropriate remedy for the actual injury alleged by the Counties and the Defendants' alleged injurious conduct in the Counties.  No amount of scaling down will assist the trier of fact in determining the Counties' actual needs.

With respect to Liebman, Plaintiffs try to minimize the importance of the Pitt, *et al.* study (on which he based his assumption about the population with OUD) to his abatement plan by suggesting that it is the "*only* specific example" Defendants identified of reliance on nationwide data.  Opp. 11 (emphasis in original).  This understates the importance of that study to Liebman's opinion.  The biggest driver of costs—by far—in Liebman's report is his estimate of the number of people who will receive treatment for addiction.  That number is based on information from the Pitt study, which in turn is based on nationwide/non-County data.  *See* Ex. D (Liebman 4/3/2019 Rep.) App'x D, Tables C.0; S.0; C.1; S.1; C.2; S.2; C.8; S.8.  This kind of non-jurisdiction based analysis is not relevant to the questions in this case, and should be disregarded.  As such, Plaintiffs cannot carry their burden to establish that Liebman's methodology is reliable.

### 3.  Liebman and Alexander failed to limit their opinions to the alleged nuisance resulting from alleged over-prescription of opioids.

Plaintiffs gloss over their experts' failure to distinguish between the consequences of the alleged wrongful conduct at issue in this case and other factors that unquestionably contribute to the opioid crisis.  Plaintiffs' experts even fail to distinguish between addiction to prescription-opioids, on the one hand, and addiction to illegal opioids, on the other.  They contend that such a distinction is unnecessary because "Defendants are responsible for the costs of abating them all."  Opp. 6.  Notably, however, Plaintiffs cite no legal authority for this bold assertion.  To the contrary, an abatement remedy must have a "'direct relation'" to the defendant's injurious

conduct.  *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148 (Ohio 2002) (quoting

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)).[3]

Plaintiffs further suggest that the need to distinguish between legal and illegal opioids

relates to "causation" rather than reliability.  Opp. 5-6.  Not so.  Expert opinions that are not

tethered to Defendants' conduct do not fit the facts of the case and are inadmissible.  *See Pride v.*

*BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) ("[T]here must be a connection between [the

expert's proposed testimony] and the disputed factual issues in the case."); *General Elec. Co. v.*

*Joiner*, 522 U.S. 136, 144 (1997) (rejecting expert testimony that was based on studies that were

too "dissimilar to the facts presented").  Opinions that bear on remedying harms (e.g., illicit drug

use) outside the scope of Defendants' allegedly wrongful conduct will not assist the trier of fact

because they do not bear a "direct relation" to the alleged harm to be abated in this case.

Plaintiffs never meaningfully respond to Defendants' point that the experts' testimony is

irrelevant because it focuses on the wrong question:  how to abate the "opioid crisis," rather than

how to abate Defendants' alleged wrongful conduct.  Specifically, Alexander conceded that "in

general, I'm probably referring to both prescription and nonprescription opioids," and Liebman

has "not thought about" whether he could account for individuals who were never prescribed

opioids by a physician, or whether the costs of his abatement plan would decrease if  such

individuals were included.   Def. Mot. 12-13.   By including costs for individuals whose

addictions resulted from forces other than Defendants' alleged conduct, such as those who

---

[3] Plaintiffs try to distinguish *Beretta* by suggesting that the relationship between Defendants' alleged conduct and the Plaintiffs' alleged harm is "sufficiently direct."  Opp. 13 (citing Dkt. 1203).  But this argument, which is based on the Court's motion to dismiss ruling, improperly equates surviving a motion to dismiss with a final ruling on the merits of an issue.  It also improperly conflates the question of proximate cause in the liability context with the question of the permissible scope of a remedy.  Finally, it ignores the Court's observation (in a ruling in the "Tribes" cases) taking a narrow view of the alleged public nuisance, comparing:  "the condition of having more [prescription] opioids free in circulation than are medically necessary (e.g. an illicit, secondary, or 'black' market)," with

*Continued on following page*

7

exclusively used illegal, non-prescription opioids like heroin or fentanyl in their proposed plans and cost estimates (and failing to provide any method to determine what portion of their abatement plans are based on those kinds of issues), Liebman's and Alexander's opinions do not fit the facts of the case.

> **B.    Liebman's and Alexander's Abatement Opinions Are Not Based On Reliable Methodology.**

In addition to fit and relevance problems, Liebman and Alexanders' opinions also suffer from myriad reliability problems which mandate their exclusion.

> **1.    Liebman and Alexander rely on insufficient facts and data.**

> **a)    Liebman**

Plaintiffs try to rehabilitate Liebman's (1) assumptions about the prevalence of OUD within the Counties; (2) projections about the future OUD population; (3) *ad hoc* literature search; and (4) failure to use generally accepted best practices in cost estimating.  Each of these arguments glosses over the fundamental problems with Liebman's analysis.

*First*, as discussed above, nearly all of Liebman's conclusions stem from the haphazard and "assumed" values for the prevalence of OUD within the Counties.  Liebman acknowledged that the NSDUH data used in the Pitt study "has some limitations," which he attempted to overcome by increasing the estimates by "roughly 70 percent" to account for what he considered to be under-represented populations.  Ex. E (Liebman Dep.) at 153:7-21.  These types of speculative and *ad hoc* adjustments to data that was already an admitted "assumption" renders the entire foundation of his opinion unreliable.  *See Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence

---

*Continued from previous page*
"defendants' conduct in carrying out their business activities [as] the instrumentality by which the nuisance was

*Continued on following page*

8

which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

**Second**, regarding Liebman's projections of the size of the opioid population for future years, which he estimates will increase sharply and then remain constant for over a decade (despite assumed efforts to reduce the number of addicted individuals), Plaintiffs avoid the real issue.  They list Liebman's sources, but fail to show how these sources are reliable, or how they supported Liebman's ultimate (and counter-intuitive) assumptions.  Opp. 16-17.  Indeed, these other sources merely "contemplated" (i.e., assumed) that the future might bring "a much higher level of treatment than we're currently doing;" in other words, Liebman's opinion that it is necessary to "ramp up" available programs and services is itself based on mere "assumptions" or hoped-for results.[4]  Ex. E (Liebman Dep.) at 182:11-183:1.  This does not carry Plaintiffs' burden to establish reliability.

**Third**, Plaintiffs' assertion that Liebman's *ad hoc* literature search was "systematic" is not supported by the facts.  Opp. 19.  Apparently recognizing this, Plaintiffs instead argue that the requirements for literature review set forth in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation*, 174 F. Supp. 3d 911 (D.S.C. 2016), are inapplicable.  This argument misses the mark, however, because the fundamental legal principle in *In re Lipitor*—the need for a literature review that is "'formal, transparent, and

---

*Continued from previous page*

created and fueled." Ruling on Tribes R&R at 19-20.

[4] To the extent that Liebman attempts to bolster these assumptions with those from "other medical experts" in the case, *id.* at 183:15-19, that too is inappropriate. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 724, 741 n.6 (N.D. Ohio 2014) (recognizing that part of performing the gatekeeping function is to ensure that purported experts are "not merely parroting the opinions of others"); *see also In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (recognizing that Rules 702 and 703 do not permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon"); *In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999) (blind reliance on other experts in same litigation is "analogous to the last domino in the line that begins to fall when the first domino is toppled").

reproducible'"—applies with equal force here.  174 F. Supp. 3d at 929 (quoting *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, No. 11 C 5468, 2015 WL 5050214, at *3 (N.D. Ill. Aug. 25, 2015)).  Liebman's "methodology" offers no basis for determining or testing how he chose certain literature, i.e., it is neither transparent nor reproducible.  *See In re Lipitor*, 174 F. Supp. 3d at 934-35.  Nor is there any way to determine whether, or the extent to which, Liebman simply "cherry-pick[ed]" the articles that supported his theories.  *See* Ex. E (Liebman Dep.) 93:17-94:5 (discussing the lack of structure in Liebman's literature search, involving "ask[ing] experts if there are other sources," and directing those working for him to do other literature searches).  Plaintiffs simply indicate that he used "relevant" keywords, and "expand[ed] the universe of literature to include relevant articles" cited and recommended by unnamed "specialists."  Opp. 19.  Put simply, the black box that was Liebman's literature search is insufficiently reliable to pass muster under *Daubert.*

*Fourth*, Plaintiffs try to brush off Defendants' arguments about Liebman's failure to follow many generally accepted practices in government cost estimating by suggesting that "not every tool is applicable in every situation."  Opp. 21.  They cannot have it both ways.  They cannot insist that the government model is a "best practice," while at the same time arguing that Liebman was right to cherry-pick only those practices that did not highlight the shortcomings in his analysis.  *See* Def. Mot. 24-25.  Put another way, Liebman offers a quantitative assessment of the costs associated with his plan, yet he "do[esn't] have a quantitative measure of the degree of certainty" for those conclusions.  Ex. E (Liebman Dep.) at 134:10-18.  This is classic *ipse dixit*.

### b)   Alexander

Plaintiffs open their discussion of Alexander's use of the Markov model by making several concessions, including that (1) he "ha[s] not personally used the model prior to this case," Opp. 22, (2) the model is a "simplification of reality," and (3) it "has some limitations."

10

Opp. 24.  These concessions, which largely confirm Defendants' arguments, underscore why the Markov model is "dependent upon assumptions" and thus not reliable.  Ex. C. (Alexander Dep.) at 109:6-110:6; *see also* Def. Mot. 25-29.  Moreover, Alexander's attempt to use it in the context of litigation counsels in favor of exclusion.  *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).  And, because Alexander created the model for this litigation, it was never tested in the crucible of peer review—as would be needed in order to assure its reliability.  Ex. C (Alexander Dep.) at 105:22-106:3.  Plaintiffs' efforts to defend Alexander's Markov model also fall short.

*First*, with respect to "transitions," Plaintiffs claim that "Alexander actually *disagreed* with Defendants' assertion" that his model does not account for those individuals who bought, were given, or stole opioids from individuals who had been prescribed those drugs by a licensed prescriber—*i.e.* the "secondary market."  *See* Def. Mot. 27.  Not so.  Plaintiffs cherry-pick testimony from earlier in Alexander's deposition (Ex. C (Alexander Dep. at 123:14-125:19)), before he ultimately conceded that this omission "represents either a decision regarding a *simplification* or a data point that wasn't readily available."  *Id.* at 129:7-25.  Plaintiffs' selective quoting does not fill the "analytical gap" that renders expert testimony unreliable and therefore inadmissible.  *See Joiner*, 522 U.S. at 146.

*Second*, with respect to the lack of a confidence interval, Plaintiffs again make an off-target response, distinguishing the facts of *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir. 1992), but failing to address the unremarkable proposition adopted in *Turpin* that experts in the field of statistics use confidence intervals as part of their analysis.  Plaintiffs

do not dispute that Alexander failed to calculate a confidence interval as it related to any of his calculations.  *See* Ex. C (Alexander Dep.) at 214:25-215:4.

*Third*, with respect to Alexander's use of various unreliable data, including from the National Survey of Drug Use and Health ("NSDUH"), Plaintiffs miss the forest for the trees.  As an initial matter, they completely ignore Defendants' argument that the CDC data Alexander relied upon often contains inaccurate causes of death, which can result in inaccurate data and make it difficult to count opioid-related deaths accurately.  *Id.* at 164:14-23; *see also* Def. Mot. 28.  The larger point is that Alexander acknowledged the shortcomings in the data that underlie a significant portion of his model, and that those admitted shortcomings included unsupported assumptions.  *See generally* Def. Mot. 28-29.  With so much of his data resting on conjecture, Alexander's abatement opinion should be excluded as unreliable.

As a final matter, Plaintiffs suggest that these undisputed shortcomings go to the weight, not the admissibility, of Alexander's testimony.  Opp. 28-29.  But this overlooks the broad scope and pervasiveness of the assumptions and guesses that underlie his analysis.  Even if any one would be excusable in isolation, the cumulative effect of these unreliable methodologies renders Alexander's testimony excludable in its entirety.  *Cf. Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 563, 568-69 (S.D.N.Y. 2007) (recognizing that cumulative methodological errors can be the basis for excluding expert survey evidence under Rule 702); *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) ("Quite simply … the cumulative effect of [an expert's] methodological errors renders the lost profits calculation speculative ….").

## 2.    Liebman's and Alexander's methods cannot be tested.

Plaintiffs acknowledge that there are problems with the testability of both Liebman's and Alexander's methodologies, but fail to respond directly to Defendants' arguments.

With respect to Alexander, Plaintiffs concede that "more precise tests of the effectiveness of an abatement program are not feasible."  Opp. 31.  While they argue that "scientific consensus" supports Alexander's proposed abatement programs, this is only half of the story.  Although the programs and policies Alexander proposes may work in theory, he readily admits that his proposal is incomplete:  "I think communities need to develop these programs and their evaluation metrics as well."  Ex. C (Alexander Dep.) at 353:9-11.  This is entirely consistent with Alexander's testimony and report, both of which concede that his conclusions are merely a "preliminary analysis of the national costs of 15 types of remedies."  *Id.* at 134:19-23; Ex. A (Alexander 4/3/2019 Rep.) at 55.  Given these factors, Alexander agreed that "the exact costs of abatement are difficult to estimate" and exact costs "will depend upon the population requiring services and the programs in existence in each jurisdiction."  *Id.* at 134:2-11; Ex. A (Alexander 4/3/2019 Rep.) at 54.  Thus, Plaintiffs' focus on the *policies and programs* employed in Alexander's proposed plan omits testability of the *outcomes* and the *costs* of those policies and programs.  Without testing the accuracy of those two factors as they relate to the Counties, Alexander's opinion is nothing more than an academic exercise with little real-world utility.

Liebman similarly identifies no metric that could accurately predict, let alone test, the success of any of the abatement activities outlined in his report; instead, he testified that "[t]he goal is to make as much progress as one can make."[5]  Ex. E (Liebman Dep.) at 271:1-2.  Even before implementation, Liebman admitted that he has not tried to measure any impact that implementing any one or more of the actions in his abatement plan might have going forward.

---

[5] Plaintiffs contend that Defendants did not distinguish between testability and progress monitoring.  To that end, they note that "Liebman built into the abatement plan tracking and 're-engineering' systems, so that the Counties will be able to monitor progress …."  Opp. 32.  But this is just a fancy way of saying that he increased the costs so that such monitoring could be shifted to the Counties, and says nothing about whether his plan is effective or working as promised.

*Id.* at 110:8-14.  To that end, Liebman's opinions leave little room for testability short of the "wait-and-see" approach he suggested during his deposition.

## II.     The Testimony of Plaintiffs' Other Experts Opining about Abatement Also Should Be Excluded.[6]

### A.     Keyes

Plaintiffs' arguments regarding the relevance and reliability of Keyes's opinions largely ignore the shortcomings identified in Defendants' motion.

With respect to relevance, Plaintiffs admit that Keyes cherry-picked three possible abatement programs, yet contend that it was unnecessary to identify "the best" among the available options.  Opp. 34-35.  This begs the question of how three random programs, with no assigned costs, can possibly be helpful to the trier of fact.  Notably, the programs Keyes identifies were already identified by Liebman and Alexander.  *See* Ex. D (Liebman 4/3/2019 Rep.) at 16-17, 20-21; Ex. A (Alexander 4/3/2019 Rep.) at 29-33, 35-37, 39.  Courts recognize that "[a] district court is 'free to exclude any expert testimony, including testimony of an announced expert, if the testimony is cumulative or redundant under Fed. R. Evid. 403.'" *Bowman v. Corrections Corp. of Am.*, 350 F.3d 537, 547 (6th Cir. 2003) (quoting *In re Air Crash Disaster*, 86 F.3d 498, 527 (6th Cir. 1996)).

With respect to reliability, Plaintiffs essentially recite Keyes's credentials and argue that her "application of accepted methodology and her special expertise bolster the reliability of her estimations."  Opp. 38.  But Keyes's opinions regarding the number of individuals in need of MAT are still *estimates*.  And those estimates are based largely on unreliable data, i.e., an estimation of the number of individuals living with OUD, which in turn was based on an

---

[6] Plaintiffs say that McGuire has not offered an opinion on abatement. Opp. 1.  As such, he should be precluded from purporting to do so at trial.

extrapolation from the overall "number of overdose deaths." Ex. F. (Keyes Rep.) at 32; Ex. G (Keyes Dep.) at 400:5-19; 407:18-408:1. Plaintiffs attempt to justify this by explaining Keyes's methodology and by citing to *Deutsch v. Novartis Pharmaceuticals Corp.*, 768 F. Supp. 2d 420, 457 (E.D.N.Y. 2011), for the proposition that an epidemiologist's "experience with designing and analyzing epidemiologic studies, and evaluating their sufficiency, supports the plausibility and reliability of his conclusions." *See* Opp. 38. This reliance is misplaced. The expert in *Deutsch* did not employ the "multiple layers of assumptions" that have been criticized by other courts, and which render Keyes's opinion unreliable. *Vincent v. United Techs. Corp.*, 854 F.2d 1318, Table at *1 (4th Cir. 1988) (*per curiam*). Keyes cherry-picked a single reported statistic from the paper she cited and used it for a purpose that was entirely divorced from the one for which it was developed and cited in the paper, relying on multiple unsupported assumptions about the significance of the figure she used and the data on which it was based.

In sum, Plaintiffs cannot hide behind Keyes's credentials as a smokescreen for the reliability problems with her analysis. Her redundant and unreliable opinions on abatement should be excluded.

### B. Wexelblatt and Young

Wexelblatt and Young offer opinions built on data that have no bearing on the question to be answered in this case. Wexelblatt makes recommendations on actions to remedy the alleged public nuisance, but admits that he has "no idea" how any specific Defendants or groups of Defendants caused the Counties' claimed harm. Ex. I (Wexelblatt Dep.) at 151:19–152:3; 152:25–153:6. He had no opinion about the cause of the "opioid crisis" other than his understanding that the levels of prescriptions in Ohio and the country increased. *Id.* at 182:14–20. He also testified that he would not offer any opinions about the cost of implementing his plan or the Counties' expenses. *Id.* at 138:6–10; 187:25–188:5. In addition, he has no

15

knowledge as to how his proposals relate to what the Counties and other government entities are already doing.  *Id.* at 158:23–159:9.

Young also makes recommendations, but similarly has no opinion on any Defendant's alleged injurious conduct and how it relates to her recommendations, Ex. K (Young Dep.) at 92:7–12; how much her recommendations would cost, *id.* at 94:4–21; whether the Counties' previous actions to address the opioid epidemic were reasonable and timely, *id.* at 164:17–165:12 (objection omitted); the extent to which her recommendations pertain to the effects of opioid substance abuse versus non-opioid substance abuse, *id.* at 362:6–14 (objection omitted); or which proposals involve actions that the Counties (as opposed to some other body) could take to address the opioid epidemic, *id.* at 423:15–424:4 (objection omitted).

Plaintiffs argue in response that these critiques are unfounded because they pertain "almost exclusively on the opinions they did *not* provide."  Opp. 41.  That's right—Wexelblatt and Young have not provided any opinion that fits the issue in this case.  Expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  *Newell Rubbermaid*, 676 F.3d at 527.  To assist, the testimony "must 'fit' the facts of the case, that is, there must be a connection between the … research or test result being offered and the disputed factual issues in the case in which the expert will testify."  *Pride*, 218 F.3d at 578.  Here, the issue is abatement of an alleged public nuisance.  Relief for a public nuisance violation must be limited to that which has a "'direct relation'" to the defendant's injurious conduct.  *Beretta*, 768 N.E.2d at 1148 (quoting *Holmes*, 503 U.S. 258).  The proposed relief "must be shown with reasonable certainty, and cannot be based upon mere speculation or conjecture."  *Kahn v. CVS Pharmacy, Inc.*, 846 N.E.2d 904, 909 (Ohio Ct. App. 2006).

Wexelblatt and Young's opinions do not "fit" the facts because they admittedly offer opinions on abatement measures that lack any "direct relation" to Defendants' alleged injurious conduct.

Plaintiffs insist that these opinions are relevant because they go to "what abatement measures are reasonable and necessary to abate the opioid epidemic."  Opp. 42.  But opinions on measures that would abate the amorphous "opioid epidemic"—untethered to the conduct of the Defendants or what is going on in the Counties—do not fit the abatement issue in this case. Allowing Wexelblatt and Young to recommend abatement remedies, without any basis to conclude that those remedies are reasonable and necessary, would be highly and unfairly prejudicial to Defendants. *See United States v. Geiger*, 303 F. App'x 327, 329 (6th Cir. 2008) ("Like all evidence, the admissibility of expert testimony is also subject to a … balancing of probative value against likely prejudice under Rule 403."); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 595 (1993) (explaining that expert testimony can "be both powerful and quite misleading because of the difficulty in evaluating it," thus courts should exercise more control over it than with lay witnesses) (citation omitted).  Accordingly, Wexelblatt and Young do not offer relevant opinions on abatement that fit the case, and this Court should exclude their testimony.

## CONCLUSION

For the foregoing reasons, this Court should exclude the testimony of Dr. Caleb Alexander and Dr. Jeffrey Liebman in their entirety and the abatement-related testimony of Dr. Katherine Keyes, Dr. Scott Wexelblatt, and Dr. Nancy Young.

Dated:  August 16, 2019

Respectfully submitted,

/s/ Mark S. Cheffo

Mark S. Cheffo
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Mark.Cheffo@dechert.com

*Counsel for Defendants Purdue Pharma L.P.,*
*Purdue Pharma Inc., and The Purdue Frederick Company*

*Co-Liaison Counsel for the Manufacturer Defendants*[7]

/s/ Carole S. Rendon

Carole S. Rendon
BAKER & HOSTETLER LLP
Key Tower 127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: (216) 621- 0200
Fax: (216) 696-0740
crendon@bakerlaw.com

*Counsel for Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc.*

*Co-Liaison Counsel for the Manufacturer Defendants*

---

[7] Teva Pharmaceutical Industries Ltd., Allergan plc, and Mallinckrodt plc are respectively an Israeli corporation, Irish holding company, and an Irish company that are not subject to and contest personal jurisdiction for the reasons explained in their motions to dismiss for lack of personal jurisdiction, they are specially appearing to join this motion, and, thus, they do not waive and expressly preserve their personal jurisdiction challenges.

_/s/ Enu Mainigi_
Enu Mainigi
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

_Counsel for Defendant Cardinal Health, Inc._

_Co-Liaison Counsel for the Distributor
Defendants_

_/s/ Shannon E. McClure_
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone:  (215) 851-8100
Fax: (215) 851-1420
smcclure@reedsmith.com

_Counsel for Distributor Defendant
AmerisourceBergen Drug Corporation_

_Co-Liaison Counsel for the Distributor
Defendants_

_/s/ Geoffrey Hobart_
Geoffrey Hobart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone: (202) 662-5281
ghobart@cov.com

_Counsel for Distributor Defendant
McKesson Corporation_

_Co-Liaison Counsel for the Distributor
Defendants_

*/s/ Kaspar Stoffelmayr*
Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Telephone: (312) 494-4434
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com

*Counsel for the Walgreens Defendants*

*Liaison Counsel for the Chain Pharmacy Defendants*

3

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to the Court's Order Regarding Pretrial Motions for "Track One" Trial, ECF # 1653, *Daubert* replies may be filed with a limit of 7 pages per expert. This memorandum in support adheres to the limits set forth in that order, as it addresses 6 experts, and totals 17 pages.

/s/ *Shannon E. McClure*
Shannon E. McClure

## CERTIFICATE OF SERVICE

I hereby certify that Distributors have served the foregoing on the Parties, the Court, and the Special Masters in accordance with the Court's directions at Doc. No. 1719.

/s/ *Shannon E. McClure*
Shannon E. McClure