# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45004 | MDL No. 2804<br><br>Hon. Judge Dan A. Polster |

## COMBINED REPLY OF DISTRIBUTORS AND MANUFACTURERS IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS GROUNDS

### INTRODUCTION

Plaintiffs' Opposition is striking for the evidence it does not dispute and the evidence it does not present.

Plaintiffs allege injury with two aspects. They allege injury from the opioid addiction crisis itself and seek equitable relief. And they also allege injury from the increased costs of providing public services and seek relief in the form of compensatory damages. As to that aspect of their injury for which Plaintiffs seek equitable relief, they make no effort whatsoever to dispute the abundant evidence that officials at every level and in every office of county government knew beginning in the 1990s of that injury—the crisis of opioid addiction in its many manifestations. And, as to the injury for which they seek compensatory damages, Plaintiffs cannot deny that, if they incurred excessive out-of-pocket costs, they had to know it—

just as, if they incurred "lost opportunity" costs because employees were overwhelmed with opioid-related work (as Plaintiffs claim), they and their supervisors had to know that, too.

Plaintiffs offer no counter-evidence, nor even nakedly dispute, that before October 2012 they (1) knew about scores of DEA enforcement actions against, as well as DEA settlements with, certain Defendants based on allegedly inadequate suspicious-order monitoring; (2) had access to and cited ARCOS data showing that the volume of pills distributed to Cuyahoga and Summit Counties increased every year from 2003 onward; (3) knew that the State of Ohio publicly blamed the epidemic, in part, on allegedly improper marketing by Manufacturers; and (4) and knew, too, that West Virginia had filed lawsuits against 14 distributors in mid-2012 for inadequate reporting of suspicious orders.  This undisputed evidence (and more) shows that, before October 27, 2012, Plaintiffs knew the facts allegedly supporting their present legal theories that Defendants' conduct was the cause of their alleged injury.

In opposition, Plaintiffs offer a rag-bag of flawed arguments.  (1) They say they could not have sued earlier because they did not have the ARCOS transactional data until 2018.  But Plaintiffs did sue nine Manufacturer groups and three Distributors before they had access to transaction-level ARCOS data (and roughly 600 other plaintiffs sued similar line-ups of these defendants).  (2) Plaintiffs say they could not have sued earlier because Defendants denied any wrongdoing.  Defendants continue to deny wrongdoing to this day, of course, yet Plaintiffs sued in 2017.  Mere assertion, unsupported by any evidence, that Plaintiffs were lulled by two defendants' settlements with DEA into believing that all manufacturers and distributors were adequately monitoring suspicious orders cannot overcome the uncontroverted evidence that Plaintiffs knew from 2003 on the volume of pills distributed to Cuyahoga and Summit pharmacies—an amount they claim raised high a "red flag" regarding diversion.  (3) Plaintiffs also claim they could not have sued earlier because they did not know the full extent of the

opioid abuse crisis until 2016, when deaths from illicit drug overdose deaths spiked.  But the overwhelming evidence—undisputed in the Opposition—shows that Plaintiffs knew about their alleged injuries giving rise both to their equitable claims and compensatory damages long before 2012.  Governing law is clear, however:  Plaintiffs need have known only that they were injured in some respect; they need not have known every aspect and the full dimension of that injury.  (4) Plaintiffs invoke tolling doctrines to excuse their failure to sue earlier.  But neither equitable tolling nor fraudulent concealment can be invoked unless Plaintiffs present evidence of their due diligence.  The Opposition offers no evidence of their diligence.  (5) As for Plaintiffs' arguments that special accrual rules apply to the public nuisance, unjust enrichment, RICO-injunctive relief, and OCPA claims, Plaintiffs disregard or misread the applicable case law.

For these reasons, Plaintiffs' pre-October 27, 2012 claims are time-barred, and the Court should enter partial summary judgment to Defendants on those claims.[1]  This result is compelled by the law.  It also will have the salutary effect of streamlining the trial, precluding Plaintiffs from recovering substantial damages based on stale claims, and facilitating a resolution of these matters.

## I.  THE OPPOSITION CONFIRMS THAT PLAINTIFFS KNEW THEY HAD BEEN INJURED BEFORE OCTOBER 27, 2012.

Plaintiffs do not dispute that allegedly wrongful conduct occurred before October 27, 2012, as did a substantial portion of their alleged injury.  What they dispute is that they knew of

---

[1] This Reply, as did Defendants' opening brief, frames the arguments with respect to the earliest limitations date at issue (October 27, 2012, for Cuyahoga's OCPA claim).  But each claim has its own limitations period, and Plaintiffs sued different defendants at different times.  *See* Opening Combined Brief ("Br.") [Dkt. 1892] at 6–8, Tables 1–4.

Teva Pharmaceutical Industries Ltd., Allergan plc, and Mallinckrodt plc are respectively an Israeli corporation, Irish holding company, and an Irish company that are not subject to and contest personal jurisdiction for the reasons explained in their motions to dismiss for lack of personal jurisdiction; they are specially appearing to join this motion, and, thus, they do not waive and expressly preserve their personal jurisdiction challenges.

any damages before that date.  Indeed, Plaintiffs go so far as to assert that they did not know and could not reasonably have known of their allegedly increased costs before 2016.

In every count of the Complaints, however, Plaintiffs seek equitable relief related to the opioid crisis itself—relief to abate the crisis and to enjoin conduct that allegedly caused it—*as well as* damages for increased costs.  Plaintiffs allege that the Counties suffered a "staggering increase in opioid abuse [and] addiction" and the "creation and fostering of an illegal, secondary market for prescription opioids,"[2] and there is a mountain of evidence—evidence unmentioned and undisputed in the Opposition, and therefore conceded by Plaintiffs—that they knew of this aspect of their injury long before October 2012.  Part A, *infra*. That knowledge alone bars Plaintiffs' claims.

There also is abundant evidence that Plaintiffs knew of the alleged increased costs for which they seek compensatory damages long before 2016—obvious and indisputable evidence that Plaintiffs (1) knew they were incurring actual "excessive costs" because they paid them and (2) knew also that their employees were focused on  problems related to opioid abuse (indeed, "overwhelmed")[3] and, as a result, could not do their jobs in the usual way.  Part B, *infra*.

### A.     Plaintiffs Knew of Their Injury:  Opioid Abuse and Addiction.

Plaintiffs argue that the opioid-related costs allegedly caused by Defendants constituted a "relatively small percentage' of the county budget from 2006 to 2013, Opp. 28—as Plaintiffs tell it, so small they never even noticed them.  But Plaintiffs do not seek just compensatory damages for increased public costs; they also seek equitable and injunctive relief[4] for what they variously describe as the "staggering increase in opioid abuse, addiction, overdose, injuries, and deaths,"

---

[2] Cuyahoga Third Amended Compl. ("TAC") ¶ 1048; Summit TAC ¶ 1007.

[3] Plaintiffs' Combined Opposition ("Opp.") [Dkt. 2179] 9.

[4] Cuyahoga TAC ¶ 1081; *id*. ¶¶ 949, 981, 992, 1016, 1037, 1115, 1133. Summit TAC ¶¶ 1039; *id*. ¶¶ 906, 939, 950, 974, 996, 1072, 1090, 1137.  Regardless of the way Plaintiffs characterize their claims for relief, Defendants reserve the right to contend that any relief characterized as "equitable" is in fact compensatory relief.

"widespread" opioid use, the "enormous public health hazard of prescription opioid and heroin overuse, abuse and addiction," "the creation … of an illegal, secondary market for prescription opioids," and "the scourge of opioid addiction."[5]  Plaintiffs indisputably knew about *that* alleged injury by October 2012, as Defendants' opening brief detailed.  Br. at 15–21.

Every agency, office, bureau, commission, department, division, task force, and other component of county government knew before 2012 that they were dealing with a large and growing opioid problem.  The opening brief quotes the chief of police and police officers, the county prosecutor, the administrative captain in the sheriff's office, the director of public health, the chief toxicologist, the county health commissioner, the director of MetroHealth's office of opioid safety, and the chair of the Cuyahoga County Opiate Task Force (among others).  All testified that they knew before October 27, 2012, that opioid abuse and addiction constituted a serious problem for the Counties.  Asked directly when he thought the "prescription opioid epidemic" began, the Akron Chief of Police answered that it started "in the late 90s."  Br. 15. The Cuyahoga Assistant Prosecutor testified that the problem of prescription opioids "just exploded" in the 1990s.  *Id*. 16.  Other witnesses came to that realization in the early 2000s.  *Id.* Even Summit's 30(b)(6) witness testified that the County was "very aware" in 2005 that prescription opioids were "flood[ing] our community," so much so that the County submitted a grant application that same year that justified the request for grant money by explaining that opioid prescribing had "increased sharply over the past four years, thereby making more of the drugs available to criminal diversion and abuse."  *Id*. 16–17.  That is a succinct statement of Plaintiffs' theory of their injuries—made 12 years before they sued.

---

[5] Cuyahoga TAC ¶¶ 1048, 1064, 1102; Summit TAC ¶¶ 1007, 1055, 1059.  *See also* Motion of Pl. For Partial Summary Adjudication of Their *Equitable* Claims For Abatement of An Absolute Public Nuisance [Doc. 1788] at 4.

Plaintiffs ignore all of this evidence.  They gloss over it with two arguments.  First, they assert that it is "unwarranted" to impute to them the perceptions of specific employees.  Opp. 29. Plaintiffs do not say why this is so, and the argument is specious:  these employees include supervisory officials like the director of public health, the chief of police, the chief toxicologist, the county prosecutor, the county health commissioner, and the chair of the Cuyahoga County Opiate Task Force.  The scope of these employees' duties clearly included the identification, prosecution, treatment, and study of citizens who were addicted to opioids and who were overdosing and dying from their addiction.  Their knowledge therefore is Plaintiffs' knowledge.[6] The testimony of these county supervisors, moreover, supports that of ***Summit's Rule 30(b)(6) witness***, whose admissions are, by definition, Plaintiffs' own.  No testimony could have more relevance to Plaintiffs' awareness of their injury.  If the admissions of a host of senior officials and Summit's 30(b)(6) representative cannot establish knowledge, it is not clear what could.

But there is no need to ***impute*** these many employees' testimony to Plaintiffs.  If the director of public health, the chief toxicologist, the county health commissioner, the chair of the Cuyahoga County Opiate Task Force, etc., knew there was a crisis of opioid addiction before 2012—and they did—then every county official, including the county executives, could and should have known, too.  Plaintiffs have come forward with no evidence that the county executives did not know and could not have known what their fellow county officials knew.[7]

---

[6] *See* Restatement (Third) of Agency § 5.03 ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal."); 39 O.Jur.3d § 402 (2002), *Knowledge of Employee as Chargeable to Employer*; *In re Fair Finance Co.*, 834 F.3d 651, 676 (6th Cir. 2016) ("A principal is generally charged with the knowledge of and conduct undertaken by its agent acting within the scope of his employment."); *Town of Nantucket v. Beinecke*, 398 N.E.2d 458, 461 (Mass. 1979) ("[W]hen those disinterested persons who are capable of acting on behalf of the town knew or should have known of the wrong, . . . the town [should] be charged with such knowledge.").

[7] Plaintiffs resisted discovery from the highest county executives—those who actually made the decision to sue—and claimed that they had no "relevant information."  *See* Reply Ex. 173 (Letter from Track One Plaintiffs to Special Master David R. Cohen, 3 (Sept. 13, 2018)).  Plaintiffs later agreed, in exchange for Defendants' agreement not to pursue the depositions of those witnesses, that Plaintiffs would "not seek to

Second, Plaintiffs point to one quote from the director of operations in the Cuyahoga Medical Examiner's office, Hugh Shannon, that "2016 changed everything" because heroin deaths doubled.  Opp. 3, 27.  But Plaintiffs do not dispute the evidence cited in Defendants' opening brief that almost a decade earlier there was a general awareness that ***prescription opioid*** abuse was widespread and had deadly consequences.  And Shannon's full answer makes clear that what changed in 2016 was that his office completed an analysis that purported to show that heroin overdose deaths could be linked to prescription opioid abuse.[8]  The pertinent question for purposes of this motion, however, is not when Plaintiffs knew there was a heroin problem, but when they knew there was a prescription-opioid abuse problem that was injuring them.

The answer to that question is clear from the following undisputed facts (and more):

- In *2005*, Summit labeled the threat level from prescription opioids as "Very High" because the volume of pills "has increased sharply over the past four years, thereby making more of the drugs available to criminal diversion and abuse."  Opp. Ex. 13 at 62–63.

- In *2009*, Cuyahoga Health Commissioner shared statistics showing that drug poisoning "driven largely by opioid related overdoses" had become the leading cause of injury and death in Cuyahoga County two years earlier.  Br. Ex. 96.

- And in *2011* the ADAMHS CEO told the Cuyahoga City Council that "[l]ast year, there were enough prescriptions written for pain killers to provide 67 prescriptions for every resident in Cuyahoga County.  And, 4 people die each day because of an opiate overdose. ***It is one of the leading killers in our community***."  Br. Ex. 150 at 4.[9]

---

call any of them as trial witnesses" and stated that they "d[id] not anticipate offering sworn testimony or affidavits [from the county executives] in opposition to Defendants' Motions for Summary Judgment." Reply Ex. 174 (Letter from Track One Plaintiffs to P. Boehm (Jan. 30, 2019)).  Plaintiffs cannot have it both ways:  they cannot resist discovery into the knowledge of the county officials who made the decision to sue when they did and then also argue that the knowledge of the county officials whom Plaintiffs did present for deposition does not count.

[8] Dep. of Hugh Shannon (Jan. 15, 2019) (Dkt. 1970-21) at 50 (stating that the work his office "did was one of the first concrete studies of linking heroin deaths to previous prescribed opioids"); *id*. at 52 ("[B]y 2016, we had had an analysis of data that we had not previously had to be able to make those links back to prescription opioids and heroin use, ….").

[9] All emphases in this Reply are added unless otherwise indicated.

7

*See also* Opp. Ex. 13 at 42.  Plaintiffs do not dispute these facts.  Indeed, Plaintiffs' interrogatory answers reflect their knowledge, based on public information, that "[f]rom 2000 to 2012, the State experienced a more than 366% increase in drug overdose deaths, ***a startling statistic*** driven largely by overdoses from prescription drugs."  Opp. Ex. 24 at 25.  The Medical Examiner's 2016 analysis may have added to Plaintiffs' understanding of the opioid problem, but Plaintiffs cannot dispute that they knew before 2012 about the alleged link between that problem and heroin addiction and overdoses.

The evidentiary record is clear:  Plaintiffs knew before 2012 about that aspect of their injury for which they seek abatement and injunctive relief, and the limitations period began to run once they had that knowledge.

### B.  Plaintiffs Knew of Their Injury:  Increased Public Costs.

Ohio and RICO law is clear that the statute of limitations began to run once Plaintiffs knew or reasonably should have known they had been injured, whether or not they knew the full extent of their injury.  *See, e.g., Zimmie v. Caffee, Halter & Griswold*, 538 N.E.2d 398, 402 (Ohio 1989) ("[W]e stated we did not believe that an injured person must be aware of the full extent of the injury before there is a cognizable event"); *Campbell v. Grand Trunk W. R. Co.*, 238 F.3d 772, 777 (6th Cir. 2001) ("[T]hat an injury 'has not reached its maximum severity ... but continues to progress' does not relieve the plaintiff of the duty to use reasonable diligence to discover the original injury and its cause." (quoting *Fries v. Northwestern Transp. Co.*, 909 F.2d 1092, 1096 (7th Cir. 1990))); *Ass'n of Commonwealth Claimants v. Moylan*, 71 F.3d 1398, 1403–04 (8th Cir. 1995) (RICO limitations period "begins to run even though the injured party, knowing he has suffered an injury, may not yet know the full extent of his injuries"); Br. 9 & nn. 21–22.  Thus, because Plaintiffs knew before October 27, 2012, that they had been injured by the crisis of opioid abuse and addiction, it does not matter whether they also knew they had incurred increased public costs, much less whether they knew the full extent of such costs.

8

There is undisputed evidence, however, that they did know.  Plaintiffs allege that they incurred "staggering," "excessive," and "massive" costs as a result of opioid addiction.  Defendants' opening brief pointed out that, were that true, Plaintiffs would have known it when they paid the costs.  Plaintiffs do not contest that proposition.  They have now backtracked, contending that instead of "staggering" out-of-pocket costs, they incurred opportunity costs,[10] such that, if the police spent $1 million worth of time responding to overdoses and that much less time investigating robberies, the county suffered $1 million in damages.  Even if such imputed opportunity costs constitute compensable damages,[11] Plaintiffs knew contemporaneously how employees were spending their time.  Cuyahoga's budget director, Margaret Keenan, may not have not performed an analysis "connecting the dots" until 2016, Opp. 15, but there is no evidence that anything prevented her from doing so earlier.  The policeman, the social worker, the public health official, and the prosecutor immersed in opioid-related matters (and their supervisors) all knew their work had a new "focus[]."  *Id.* 9.  That is self-evident, and, indeed, the Opposition quotes the Cuyahoga Assistant Prosecutor, who testified that ***before 2012***, his office was "overwhelmed … all the time"—according to Plaintiffs, pursuing "prolific and unlawful prescribers" of opioids.  *Id*.

Opportunity costs aside, Plaintiffs admittedly did know at the time that they were "spending money because of an opioid epidemic."  *Id.* 14.  Plaintiffs quote Keenan's testimony that "the county knew it was spending money because people weren't taking care of their children, people were dying, people were coming into the jail and we have to cart them off to hospitals every other day."  *Id*.  Keenan denied that Cuyahoga knew this spending was because

---

[10] As the Opposition notes, quoting the Cuyahoga Director of Office and Budget Management, "[T]his $36 million [of alleged damages for 2007], it wasn't necessarily $36 million more than the previous year."  Opp. 15.

[11] *See* Brief ISO Defendant's Motion to Exclude Testimony of Thomas McGuire Concerning Damages, Dkt. 1777-1 at 4–9.

of an "epidemic" ("you don't know without analyzing all the data … whether it is, in fact, an epidemic or it is a blip or it is this"), but Plaintiffs cannot deny—and Keenan did not deny—that Plaintiffs knew that they were spending more money *because of* "rising caseloads" of opioid-related matters.  *Id.*  Plaintiffs certainly had constructive knowledge that the spending was because of the opioid crisis.

Arguing that the limitations period did not begin to run until 2016, Plaintiffs assert that the "large volume of [opiate-related] deaths" that year caused the budget office to "focus on … their economic injuries attributable to opioids" for the first time.  *Id.*  But if more overdose deaths was reason for Plaintiffs to focus on rising opioid-related costs, then Plaintiffs knew that (or should have known that) *in 2010*, when the Opioid Task Force published its report explaining that "[p]rescription opioids are largely responsible for this alarming increase in drug overdose death rates," Br. Ex. 35 at 20, or no later than *2011*, when *The Plain Dealer* ran a front-page story reporting that opioid-related deaths in Cuyahoga had more than quadrupled since 1999.  Br. Ex. 71.

Under Ohio and RICO law, the limitation period began to run when the Plaintiffs knew they had suffered injury, regardless of whether the Plaintiffs had "analyz[ed] all the data" and knew the full extent of their injury.  Br. 9–10 & nn. 21 & 22.  They had that knowledge well before October 2012.  Defendants therefore are entitled to partial summary judgment on Plaintiffs' negligence, injury through criminal acts,[12] civil conspiracy, and RICO claims.

---

[12] On August 15, 2019, Plaintiffs informed Defendants' counsel that they do not intend to pursue their negligence, injury through criminal acts, and unjust enrichment claims in the October 21, 2019 trial.

10

II.    **PLAINTIFFS KNEW ABOUT *DISTRIBUTORS'* ROLE IN THE SUPPLY CHAIN AND THEIR ALLEGED MISCONDUCT BEFORE OCTOBER 27, 2012.**

To the extent other causes of action did not accrue until Plaintiffs had knowledge of possible wrongdoing,[13] Defendants' opening brief demonstrated that Plaintiffs also knew or should have known before October 27, 2012, about (1) Distributors' role in the supply the chain; (2) the volume of pills shipped to Cuyahoga and Summit year by year (i.e., the alleged "red flag" demonstrating that distributors were not reporting suspicious orders); (3) scores of DEA enforcement actions against distributors between 2008 and 2012 (including settlements with Cardinal Health and McKesson); and (4) West Virginia's 2012 lawsuits against 14 distributors. Plaintiffs do not deny this knowledge.  Instead, they offer empty excuses why their undeniable knowledge should not matter.

**Knowledge of Distributors' Role**.  Plaintiffs do not dispute that they knew long before October 27, 2012, about the role that wholesale distributors like Cardinal Health, McKesson, and AmerisourceBergen played in the supply chain.  After all, the Complaints allege that Distributors are at fault for failing to report and block shipments of suspicious pharmacy orders and that the "sheer volume" of orders from Cuyahoga and Summit was a "red flag" that orders were suspicious.  *See* Br. 26.  And Plaintiffs do not dispute that they had access to, and made use of, the ARCOS data reflecting the volume of orders delivered to the counties.

**Knowledge of Distributors' Alleged Wrongdoing**.  Plaintiffs concede that they knew before October 27, 2012, that: (1) DEA had launched 178 enforcement actions against distributors and other registrants between 2008 and 2012 (actions that identified distributors' role and faulted compliance with their regulatory reporting obligations); (2) DEA had entered into settlement agreements with Cardinal Health in 2008 and again in 2012, and with McKesson in

---

[13] This Section II concerns only the claims for nuisance, unjust enrichment, and violation of the OCPA, to the extent Plaintiffs contend those other claims did not accrue until Plaintiffs knew about the alleged wrongdoing.

2008, having alleged their failures to report suspicious orders at various distribution centers; and (3) media coverage of these regulatory actions revealed the distributors' role, like the *Columbus Dispatch* report in 2008 about a joint federal and state investigation ***in Ohio*** of Cardinal Health and "the nation's other big drug wholesalers" for "lack of oversight when customers … suddenly began ordering controlled substances at much higher rates."  *See* Br. 28–29.

This knowledge was more than sufficient to trigger the statute of limitations, but it is undisputed that Plaintiffs had even more telling knowledge:  they knew from the publicly-available ARCOS data that the volume of prescription opioids being distributed to Cuyahoga and Summit continued to increase year after year from 2006 to 2011.  *See* Br. 14–15, 19.  The Opposition even quotes a Cuyahoga Assistant Prosecutor, who testified that he knew about the ARCOS database before 2012, but just did not have the time to ask for it and make use of it.[14]

**Plaintiffs' Excuses**.  Plaintiffs offer four excuses as to why their knowledge—both of DEA allegations of wrongdoing and of the "sheer volume" of opioid distributions to Cuyahoga and Summit—should not trigger the statute of limitations.

**1**.    Plaintiffs first contend that the DEA enforcement actions and settlement agreements concerned "distribution facilities ***in other states***," so that any complaint based on a "'if it happened there, it must be happening here'" premise "likely would have been dismissed."  Opp. 9, 30 (emphasis in original).  Plaintiffs did sue on a "if it happened there, it must be happening here" premise,[15] however, and the same is true of every complaint filed in the opioid

---

[14] Dkt. 1962-16 at 281–82 ("All I know is maybe in the right circumstances that I would be able to get that information from the DEA if I needed it, if we were on a joint investigation on something and it was appropriate and relevant."); *id*. at 282 (explaining that he had not "[p]roactively use[d] either ARCOS data or OARRS data to determine if there were pockets within [Cuyahoga] … getting a disproportionate number of prescription opioids" because "we don't need to look for work.  Work will come to us, okay.").

[15] *See* Cuyahoga Compl. ¶¶ 715, 718–19, 721, 739; Summit Compl. ¶¶ 212–13, 292.  Plaintiffs relied on this argument in their opposition to Distributors' motions to dismiss, citing DEA settlements involving conduct in *other* states and saying:  "These allegations [about conduct outside Ohio] satisfy the 'who, what, when, where and why' for a group of Defendants whose specific wrongful conduct has been amply documented in *other* litigation, including with the DEA."  Plaintiffs' Opp'n to Mot. to Dismiss, Dkt. 654

litigation in other courts, including the complaints filed by the West Virginia Attorney General against 14 distributors in 2012.  Not one has been dismissed because it relied on such allegations.[16]

    **2**.    Plaintiffs next seek extenuation on the ground that the DEA settlement agreements with Cardinal Health and McKesson contained provisions to improve compliance and that "Defendants … publicly trumpet[ed] the new compliance initiatives."  Opp. 9.  First, had Plaintiffs known about the assurances of future compliance, that would not explain their failure to sue immediately for ***pre***-2008, ***pre***-settlement agreement conduct.  If anything, this "trumpeting" alerted Plaintiffs that they may well have been injured by pre-settlement wrongdoing—yet they did nothing.  The "trumpeting" did not prevent Plaintiffs from learning of their ***post***-2008 claims, either, as they knew straightaway from the publicly-available ARCOS data that the volume of prescription opioids distributed to their communities did not decrease after the settlements, but continued to ***increase***—a "red flag" (according to Plaintiffs' allegations) that Defendants still were not reporting and blocking shipment of suspicious orders.  The West Virginia lawsuits filed against 14 distributors in 2012 only underscore that Plaintiffs knew or should have known of their potential claims, despite any assurances Distributors might have given in 2008 or 2012.[17]

---

at 32, 35.  Plaintiffs also assert they are entitled to summary judgment on "if it happened there, it must be happening here" grounds.  *See* Pls.' Mem. of Law ISO Mot. for Partial Summary Adjudication that Defendants Did Not Comply With Their Duties Under the Federal Controlled Substances Act, Dkt. 1910-1 at 1, 13 n. 30, 69–71, 74–75, 81–82, 92–93.

[16] Faulty as it is, this excuse does not cover the facts here in any event.  Plaintiffs' knowledge before 2012 was not confined to allegations about "distribution facilities *in other states*."  Opp. 9*; see* Br. 29 (citing reporting by the *Columbus Dispatch* in 2008 on an investigation by the DEA *and state authorities* of Cardinal Health and the nation's "Big Three" drug wholesalers for "lack of oversight").

[17] Br. Ex. 94.  The Opposition does not deny that Plaintiffs knew before October 27, 2012, about the 14 West Virginia lawsuits against distributors.

A potential defendant's protestation that it did nothing wrong does not toll the statute of limitations; if it did, the statute would never run, except when a defendant confessed judgment.[18] Even if Ohio law supported such a tolling rule, however, Plaintiffs gained knowledge between 2009 and 2012 of facts that, according to Plaintiffs' own allegations, constituted smoking-gun evidence that Distributors were not reporting and blocking shipment of suspicious orders— namely, the rising volume of prescription opioids delivered to Cuyahoga and Summit pharmacies and the resulting "startling" increases in addiction and overdose deaths.

**3**.      Plaintiffs' third excuse is that they were busy focusing on other causes of the opioid epidemic, including "street level diversion" and "prolific and unlawful prescribers."  Opp. 6–9, 32.  This excuse boomerangs:  for Plaintiffs to argue that they had their hands full before 2012 addressing the "root causes" of the opioid problem is to acknowledge, citing yet more evidence,[19] that they recognized their injuries as early as 2000.  Opp. 6 (citing efforts "[d]uring the period 2000–2014"); *id*. 9 (identifying the focus of law enforcement's efforts "before 2012").  The fact that Plaintiffs identified some causes of their injury and took steps to address those causes does not toll the statutes of limitations as to additional wrongdoers that Plaintiffs now contend are the "real" causes of their injury.  This failure of due diligence is even less excusable given (i) Plaintiffs' asserted focus before 2012 on prolific prescribers and (ii) Plaintiffs' failure to dispute that they knew before 2012 about Manufacturers' alleged marketing practices.  *See* Br. 23–25.[20]  The Complaints allege, after all, that it was Manufacturers' marketing that caused

---

[18] Such protestations toll the statute only where they are part of a fraudulent concealment scheme—a protection not available to Plaintiffs in this case.  *See infra* IV.B.

[19] Opp. 6–8 (citing efforts of the Summit Drug Unit and Cuyahoga Prosecutor's office); *see supra* I.B.

[20] Plaintiffs' argument that the limitations periods did not run because Defendants' "external communications" caused Plaintiffs to focus on other "root causes of the opioid problems," Opp. 6, are empty words.  First, Plaintiffs present *no evidence* (i) that anyone in county government knew about these communications or (ii) focused their efforts on, for example, "prolific" prescribers, *because* of such communications.  *Id*. 9.  Second, Plaintiffs present *no evidence* that Defendants' external communications constituted "calculated misdirection," *id*. 9; on the contrary, Plaintiffs acknowledge that they "do *not*

prolific prescribing—prescribing in such volume that the amount of pills being ordered by pharmacies raised a "red flag" to distributors to report and block shipment of the orders.  With knowledge of (1) Manufacturers' alleged marketing practices, (2) prolific prescribing, and (3) the sheer volume of distributions to Cuyahoga and Summit, Plaintiffs had ample notice, not merely of their claims against Manufacturers and Distributors, but even of their current theory of the case.

**4**.      Plaintiffs' final plea in extenuation is that without the "ARCOS granular data" they could not have sued earlier—the ARCOS data allegedly being "the Key" to knowledge that Defendants failed to identify, report, and suspend suspicious orders.  Opp. 34, 36.  This is nonsense all around:  Nonsense as to the Manufacturers because Plaintiffs' primary theory of liability against them is fraudulent marketing, and ARCOS has no bearing on that theory; nonsense also as to Cardinal Health, McKesson and AmerisourceBergen because Plaintiffs ***did*** sue them without having the data.

As for those defendants that Plaintiffs did not sue until after receipt of transaction-level ARCOS data, Plaintiffs never explain why they could not have sued them sooner.  Plaintiffs admit that some are among "the largest corporations in the world," Opp. 41, and several are household names.  Fourteen distributors were sued by the West Virginia Attorney General before October 27, 2012.[21]  Plaintiffs do not claim that ARCOS is the only way to identify which distributors supplied pharmacies in the two counties; indeed, they know it is not, for the Ohio

---

contend that Defendants' messaging [about root causes] … was false, only that it was incomplete."  *Id.* 6 n. 23.

[21] West Virginia sued Cardinal Health, Complaint, *West Virginia ex rel. McGraw v. Cardinal Health, Inc.*, Civ. No. 12-C-140, (W. Va. Cir. Jun. 26, 2012), Dkt. No. 1, and also AmerisourceBergen; Miami-Luken, Inc.; J.M. Smith Corp.; The Harvard Drug Group, LLC; Anda Inc.; Associated Pharmacies, Inc.; Auburn Pharmaceutical Co.; H.D. Smith Wholesale Drug Co.; Keysource Medical Inc.; Masters Pharmaceuticals, Inc.; Quest Pharmaceuticals; Richie Pharmacal Co., Inc.; Top RX, Inc.; Complaint, *West Virginia ex rel. McGraw v. AmerisourceBergen Drug Corp.*, Civ. No. 12-C-141 (W. Va. Cir. Jun. 26, 2012), Dkt. No. 1.

Board of Pharmacy 30(b)(6) witness testified that wholesale distributors must be licensed by the Board, and information about which companies are licensed is publicly available on the Board's website.[22]  Plaintiffs do not identify what due diligence they undertook to identify distributors, much less present *evidence* of their due diligence.[23]  "To know you've been injured and make no effort to find out by whom is laxity that must be penalized in order to secure the object of the statute of limitations."  *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000).

## III.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS KNEW ABOUT *MANUFACTURERS'* ROLE IN THE SUPPLY CHAIN AND THEIR ALLEGED MISCONDUCT BEFORE OCTOBER 27, 2012.

Plaintiffs simply *ignore* Manufacturers' evidence and arguments showing that Plaintiffs were *aware* of Manufacturers' *alleged misconduct* well before October 2012.[24]  Plaintiffs' failure to respond entitles Manufacturers to partial summary judgment for all claims based upon conduct before October 2012.  *See, e.g.*, *Rugiero v. Nationstar Mortg., LLC*, 580 F. App'x 376, 378 (6th Cir. 2014) (holding failure to respond to factual and legal arguments raised in motion for summary judgment was sufficient basis for granting summary judgment).

**Plaintiffs' Knowledge of Their Alleged False Marketing Claims Before October 2012**.  Plaintiffs effectively concede that their false marketing claims against Manufacturers that

---

[22] Dkt. 1962-14 (Dep. of Eric Griffin) at 62:15–63:5.  *See infra* IV.A for a full explanation why Plaintiffs' lack of access to the data does not bring into play the equitable tolling doctrine.

[23] *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (If a defendant meets its burden to show that the statute of limitations has run, "'then the burden shifts to the plaintiff to establish an exception to the statute of limitations.'" (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001))); *Jones v. City of Akron*, No. 5:16-cv-2587, 2019 WL 1024280, at *3 (N.D. Ohio Mar. 4, 2019) (unpublished) (same).

[24] Plaintiffs' claims that accrued before at least October 2012 are time-barred for the reasons expressed above.  Nonetheless, to the extent the Court finds that any of Plaintiffs' claims did not accrue until Plaintiffs knew about the alleged wrongdoing, Plaintiffs had such knowledge prior to October 2012 as to each of its legal theories against the Manufacturers—(1) false marketing and (2) failure to report and halt suspicious orders of opioid medicines.  Thus, this section further shows why all claims based upon Manufacturers' conduct before at least October 2012 are time-barred.

accrued prior to October 2012 are time-barred.  Plaintiffs never address the arguments and

evidence submitted by Manufacturers that:

- The alleged branded and unbranded marketing was public;
- The public studies on which Plaintiffs base their claims were available before October 27, 2012;
- Plaintiffs were or should have been aware of government and private actions against certain Manufacturers based on their alleged marketing of opioids dating back to 2001;
- The Ohio Attorney General put Plaintiffs on notice of the alleged importance of opioid-related marketing as of 2007;
- Plaintiffs were aware by 2010 that the State of Ohio publicly blamed the opioid abuse crisis in part, upon alleged improper marketing by Manufacturers; and
- Plaintiffs were or should have been aware of government and private actions against Manufacturers based on alleged marketing of opioids dating back to 2001.

*See* Br. 23–25, 32–39; Opp. 6 & n.23, 39, 45.  Given this undisputed and unaddressed evidence,

summary judgment is appropriate on all false marketing claims that accrued before October

2012.  *See, e.g.*, *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ("failure to present any

evidence to counter a well-supported motion for summary judgment alone is grounds for

granting the motion").

**Plaintiffs' Knowledge of Manufacturers' Alleged Failure To Report and Halt Suspicious Orders Placed with Them Before October 2012**.  Plaintiffs do not dispute that

they had actual (and certainly constructive) knowledge of enforcement actions against

distributors prior to October 2012; that their communities were allegedly "flooded" with

prescription opioids prior to October 2012; and that they were aware of the identity of the

manufacturers who made the opioid medicines shipped into each County well before the

limitations period.  Br. 12–23.  They gained this knowledge in several ways, including through

government websites, manufacturer websites, and Plaintiffs' own claims data showing opioid

prescriptions for which Plaintiffs reimbursed (and continue to reimburse) their employees.  *Id.*

33–34.  But rather than sue Manufacturers or, if necessary, conduct any further inquiry to understand their specific role within the highly-regulated system for producing controlled substances, Plaintiffs slept on their rights.  Because Plaintiffs dispute none of this, their remaining claims—based upon allegedly improper shipments—also accrued before October 2012.  *See Rugiero, LLC*, 580 F. App'x at 379.

**Plaintiffs' Excuses**.  Plaintiffs dispute none of the Manufacturers' evidence in their Opposition.  Rather, they make a few cursory arguments that ignore the law and logic.

First, while Plaintiffs argue that equitable tolling, fraudulent concealment, or the continuing tort doctrine applies, they have not even attempted to provide any evidence to meet this burden as to Manufacturers.  Opp. 23–55.  Regarding fraudulent concealment, for instance, Plaintiffs offer no evidence of fraudulent concealment by any Manufacturer, discussing only the acts of four distributors and two pharmacies.[25]  *Id.* 45–51.  They likewise offer no evidence of any equitable tolling claim against any Manufacturer.  *Id.* 33–44.

Second, Plaintiffs say they could not timely identify certain defendants without access to ARCOS, but they do not make this point expressly against Manufacturers.  Nor could they.  Plaintiffs had access to publicly-available ARCOS data, just not the granular set (which they never asked for).  Br. 14–15, 19.  Moreover, access to any ARCOS data set was not necessary to learn the identity of any defendant, including the Manufacturers.  Indeed, Plaintiffs filed this lawsuit against Manufacturers before they had access to such ARCOS data.  That is dispositive.

---

[25] Plaintiffs cannot satisfy their burden as to one defendant by providing evidence only as to a separate defendant.  *See Sindelir v. R.J. Corman Const.*, 14 F.3d 602 (6th Cir. 1993) (affirming summary judgment for defendants where plaintiff failed to present evidence on the part of each defendant).  Moreover, although Plaintiffs purport to include additional "examples" of fraudulent concealment in their Appendix A, Opp. 51, the few documents related to Manufacturers show only internal discussions or general conduct related to suspicious order monitoring, rather than active concealment from Plaintiffs of any cause of action stemming from such conduct.  Nor does such evidence even attempt to satisfy any of the other elements of this standard.  *See infra* IV.B (discussing fraudulent concealment standard).

Notably, Plaintiffs do not dispute that they had access to claims data (including for their own employees) and other sources of information associated with prescription opioids that would have revealed who manufactured the medicines allegedly being overprescribed or leading to overdoses.  Opp. 32.  Plaintiffs instead argue that such data would not have disclosed the "extent of the Manufacturers' drugs in their communities as a whole, or which products were the most widely prescribed by the physicians upon whom the Manufacturers' sales representatives showered the most attention, or deceptively marketed at all."  *Id.*  But claims data, on its own, certainly provided constructive notice.  And it is just one piece.  Coupled with the mountains of other undisputed evidence discussed above, including the Court's finding that Plaintiffs "inarguably knew" of the alleged false marketing by Manufacturers at least as of 2007, Dkt. 1203 at 4 (Opinion and Order), this information certainly put Plaintiffs on notice of who manufactured the prescription opioid medicines purportedly driving what the Task Force deemed in 2010 to be a "prescription drug epidemic."  Br. Ex. 35 at 20 (noting overdoses from prescription medicines).

Finally, regarding the 2016 CDC Guidelines (Opp. 53), they were not necessary to inform Plaintiffs of any cause of action against Manufacturers.  As established above, Plaintiffs had ample evidence of the grounds of their claims without the CDC Guidelines.  And those guidelines are based on publicly-available studies, many of which were published prior to October 27, 2012.  Moreover, the CDC Guidelines do not address the identity of manufacturers, the prevalence of their prescription opioids in the Counties, or any of the content or focus of their marketing.  Plaintiffs have long known of the alleged false marketing by Manufacturers, yet they simply chose not to sue until well after the limitations periods.

## IV.  THE DOCTRINES OF EQUITABLE TOLLING, FRAUDULENT CONCEALMENT, AND CONTINUING TORT DO NOT APPLY.

### A.  The Equitable Tolling Doctrine Does Not Apply.

Plaintiffs contend that, despite the abundant evidence described in Defendants' opening brief—evidence that largely is ignored and undisputed—they are entitled to "equitable tolling" of their claims.  Opp. 34–44.  The sole reason given is that they did not have access to transaction-level ARCOS data until April 2018.  Plaintiffs bear the burden of showing that they are entitled to equitable tolling, as they do for any tolling doctrine.  *Billups v. Scholl*, 2016 WL 3959062, at *6 (S.D. Ohio July 22, 2016).  And to meet that burden, they must come forward with evidence that they "diligently pursued [their] rights, but some ***extraordinary circumstance*** stood in [their] way and prevented timely action."  *G.G. Marck & Assoc., Inc. v. Peng*, 762 Fed. App'x 303, 312 (6th Cir. 2019) (cited at Opp. 34–35); *Jackson v. United States*, 751 F.3d 712, 718 (6th Cir. 2014).  Plaintiffs have not met that burden—and cannot—for three reasons.

First, nowhere in the ten pages Plaintiffs devote to this argument do they claim that they could not have filed suit before they had ARCOS access.  While Plaintiffs assert that they ***would*** have brought their lawsuits "sooner" had they obtained the ARCOS transaction-level data sooner, Opp. 41, they never say that they ***could not have*** brought their case sooner without it.  There is a good reason for this:  Plaintiffs did file their lawsuits ***before*** they received the data— six months before.[26]

Second, Plaintiffs cite no ***evidence*** showing they exercised due diligence to identify the manufacturers and distributors that allegedly caused them harm.  They do not and cannot credibly contend that the identities of opioid distributors and manufacturers were hidden from

---

[26] Other plaintiffs in the MDL, also represented by members of the PEC, filed suit more than a year before they had access to transaction-level ARCOS data.  *See McDowell County v. McKesson Corp., et al.*, 1:17-op-45066-DAP (filed Dec. 26, 2016).  And even more opioid-related cases were brought against Manufacturers years before.  *See People of the State of Cal. v. Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BN-CXC, (Cal. Super. Ct. filed May 21, 2014); *City of Chi. v. Purdue Pharma L.P.*, No. 2014-L-005854 (Cook Cty. Cir. Ct. filed June 2, 2014).

them until they received transaction-level ARCOS data.  It is plain why:  all distributors must be licensed by the Ohio Board of Pharmacy, and the names of all licensed distributors are publicly available on the Board website.[27]  And manufacturer information is available from FDA and other websites.  Even as to the ARCOS data, Plaintiffs may have aggressively sought access to ARCOS data *after* they filed suit, Opp. 37, but they offer no evidence that they ever sought access to it before filing the lawsuits and were refused.[28]  The purpose of the limitations period is to give a plaintiff time to ask who wronged him.  *Ruiz-Bueno v. Maxim Health Care Services,* 659 Fed. Appx. 830, 836 (6th Cir. 2016) (statute of limitations barred claim where "the plaintiffs *would have* known of the involvement of the defendants if the plaintiffs had requested Peterson's medical records and jail file," because "under Ohio law a plaintiff 'must investigate, and discover,' the identity of an alleged wrongdoer 'once [the plaintiff] has reason to believe' she has been wronged.") (citing *Akers v. Alonzo,* 65 Ohio St. 3d 422, 605 N.E.2d 1 (Ohio 1992)); *see Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992).  But Plaintiffs have not presented any evidence that they asked, much less that they asked and confronted an insurmountable obstacle. This alone defeats their argument.  Even had Plaintiffs asked DEA for the transactional data and been refused, they have not demonstrated an "extraordinary" circumstance.  After all, lack of

---

[27] *See supra* at 14 & n.23.  Plaintiffs never dispute that they had reason, and ample factual basis *to ask*, for Plaintiffs had the following data: (1) quarterly ARCOS data from 2003 forward, showing by 3-digit zip code the volume of pills delivered; (2) quarterly Ohio Board of Pharmacy reports showing the volume of pills delivered to each county; (3) the number of doses dispensed per capita (as published in *The Plain Dealer*); and (4) related facts known to and published by the Cuyahoga County Opiate Task Force and the Summit ADM Board.

[28] Plaintiffs say they "satisfied that [due] diligence obligation by … bringing the multiple criminal prosecutions directed at street level opioid crime and local doctors."  Opp. 32.  Prosecuting crime is the government's job.  Doing one's job is not the same thing as performing due diligence when put on inquiry notice of a potential claim.  *E.g.*, *JPMorgan Chase Bank, NA v. Carroll*, 2013 WL 6228305, at *7 (Ohio Ct. App. Dec. 2, 2013) (plaintiff must show that he "exercised due diligence *to discover* [*his*] *cause of action* prior to the running of the statute").

access did not prevent Plaintiffs' counsel and others from filing **more than 600** lawsuits by March 19, 2018.[29]

The nine cases cited by Plaintiffs cannot substitute for evidence that Plaintiffs faced extraordinary circumstances, and, in any event, provide no legal support for Plaintiffs' position. Of the nine, only two found that the plaintiffs proved exceptional circumstances, and those two cases are not remotely similar to this one.  In *Betts v. Central Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072, 1077–78 (S.D. Ohio 2019), the court itself caused the plaintiff's late filing by its unreasonable delay in ruling on the class certification motion (where, under the Fair Labor Standards Act, the filing of the complaint did not toll the statute of limitations, but each plaintiff had to opt in).  And, in *Billups*, the court permitted the issue of equitable tolling to go to the jury because the plaintiff, in trying to identify the police officers who assaulted her, had "made several records requests and diligently followed up to obtain them," and "was dealing with mental-health challenges during this period and may have lacked a sophisticated understanding of how to file a records request."  2016 WL 3959062, at *7.

Plaintiffs have to prove that they confronted an exceptional obstacle, exercised due diligence to overcome it, and were thwarted.  But they have not come forward with any evidence of their own due diligence, let alone an extraordinary obstacle to their filing suit earlier.

### B.      The Fraudulent Concealment Doctrine Does Not Apply.

Next, Plaintiffs argue that they are entitled to tolling because Defendants fraudulently concealed Plaintiffs' claims from them.  Plaintiffs acknowledge that *Dayco v. Goodyear Tire & Rubber Co.* sets the standard for fraudulent concealment tolling.  Opp. 44, 52, 54.  That concession is fatal.  As *Dayco* establishes, Plaintiffs must satisfy **each** of the three requirements for **each** Defendant.  *Dayco*, 523 F.2d at 394; *City of Cuyahoga Falls v. Johnson Controls, Inc.*,

---

[29] The first production of transaction-level data to Plaintiffs was made on March 20, 2018.

2019 WL 1116006, at *4 (N.D. Ohio Mar. 11, 2019) (holding a plaintiff must make particularized allegations of fraudulent concealment as to each specific defendant). Plaintiffs apparently would have the trial devolve into mini-trials on fraudulent concealment, including what each Defendant supposedly concealed and what Plaintiffs should have known as to each Defendant. But they offer no evidence to meet their burden. Even if Plaintiffs could show that Defendants fraudulently concealed their wrongdoing (the first requirement), they have not carried their burden to show that they could not have discovered it (the second requirement) and that they diligently inquired (the third).

Regarding whether any of Defendants prevented Plaintiffs from discovering the facts necessary to bring their claims, none of the alleged acts of concealment involves communications directed to Plaintiffs. As detailed in Defendants' opening brief (and not disputed in the Opposition), Plaintiffs (i) knew and spoke about the opioid crisis that constitutes the injury for which they seek abatement and other equitable relief; (ii) necessarily knew about their increased costs/damages; (iii) knew and referred to the ARCOS data that informed them about steadily increasing distributions of opioid medications; (iv) knew about the settlement agreements, public articles, and state-wide reports (like the Task Force) regarding the Manufacturers' alleged marketing practices; (v) knew about scores of DEA enforcement actions and about settlement agreements based on allegedly inadequate suspicious-order reporting, (vi) knew about the West Virginia lawsuits against 14 distributors, and more. *See supra* I–II.

Likewise, regarding whether Plaintiffs diligently investigated their claims once they knew of their injury, the only "diligence" Plaintiffs assert relates to their prosecution of street level diversion, pill mills, and the like. Opp. 6–9. But the test is not whether Plaintiffs were diligent with regard to *other* alleged wrongdoers; it is whether Plaintiffs were diligent in investigating their potential claims *against the Defendants they sued in this case*. *Pinney Dock*

*& Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988) (cited at Opp. 44)

(requiring that "plaintiff exercised due diligence in trying to find out about the cause of action").

The Opposition presents no evidence that Plaintiffs investigated at all, much less with diligence,

the upstream source of those opioid medicines—that is, the pharmacies, distributors, and

manufacturers they finally sued in 2017.  As explained *supra* at 15, Plaintiffs did not take even

the most basic step of asking the Board of Pharmacy to identify its registrants—the

manufacturers and distributors that report to it—even though Plaintiffs boast of  "work[ing]

closely with the Ohio Board of Pharmacy" and "[*u*]*sing OARRS*" data (which identifies specific

overprescribing doctors).  Opp. 6–8.  Nor have Plaintiffs presented any evidence that they asked

DEA which distributors were supplying the ever-increasing volume of pills or which

manufacturers' pills were being distributed, even though Plaintiffs talk of engaging in a "joint

investigation with the DEA."  Opp. 8.  And Plaintiffs offer no facts whatsoever to support this

doctrine in connection with their false marketing claims against any Manufacturer.  As the cases

relied on by Plaintiffs makes clear, "[t]o know you've been injured and to make no effort to find

out by whom is laxity that must be penalized"—not rewarded through tolling—"in order to

secure the objectives of the statute of limitations."  *Duke*, 229 F.3d at 630 (cited at Opp. 33).

Tolling applies, in any event, only until the discovery rule is triggered, which was before

October 2012.  *Birkett Williams Ford, Inc. v. East Woodworking Co.*, 456 N.E.2d 1304, 1307–08

(Ohio Ct. App. 1982) (holding that tolling based on fraudulent concealment "never continues

beyond the time that a plaintiff, by exercising reasonable diligence, should have discovered the

facts at issue); *see also Au Rustproofing*, 755 F.2d at 1237 ("Once sufficient indicia of fraud are

shown, a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false

sense of security to toll the statute.").  Here, the discovery rule would have been triggered no

later than October 27, 2012.   Accordingly, even if Plaintiffs could satisfy all three prerequisites

for application of the fraudulent concealment doctrine, the undisputed evidence identified in Defendants' motion means that any right to tolling ended, and the statutes of limitations began to run, before October 27, 2012.

### C.     The Continuing Tort Doctrine Does Not Apply.

The continuing tort doctrine is inapplicable.  The alleged failure by dozens of defendants to report and block suspicious orders over a period of more than 20 years, each employing unique suspicious-ordering systems of its own design, which changed over time, do not constitute a single "continuing violation," but "repetitive discrete violations."  *Nat'l Credit Union Admin. Bd. v. Ciuni & Panichi, Inc.*, 2019 WL 188472, at *10 (N.D. Ohio Jan. 11, 2019) (holding that series of negligent annual audits were "repetitive and discrete, not continuing," despite allegation that "defendants' negligence was continuous from 2006 through late 2012"); *see also Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth*., 480 F.3d 410, 417 (6th Cir. 2007) (distinguishing a series of discrete violation from a single continuing violation).  Nor do the different marketing messages, communicated in different ways for different products during different time periods by more than twenty Manufacturers constitute a single "continuing tort." Tellingly, while Plaintiffs invoke the continuing tort doctrine, they do not actually argue that any of Plaintiffs' claims satisfy the doctrine, Opp. 55–57, and the Sixth Circuit opinion on which they rely, *Gandy v. Sullivan County*, 24 F.3d 861, 864 (6th Cir. 1994) (cited at Opp. 56–57), held that the doctrine did not apply.

Even if the doctrine applied, Plaintiffs do not quarrel with the consistent holdings that a plaintiff has a claim for (i) only those acts that are part of the continuing tort and (ii) that took place *within* the limitations period.  Br. 41–42.  This was the rule applied in *Gandy v. Sullivan Co.*, where the court noted that Gandy was not attempting to recover for "conduct *outside* the limitations period."  24 F.3d at 864.  This motion does not seek to bar claims that accrued within the applicable limitations periods, as set forth in Tables 1–4 of the opening brief.  Br. 6–8.

25

## V.  PLAINTIFFS APPLY THE WRONG ACCRUAL STANDARD FOR THE NUISANCE, UNJUST ENRICHMENT, AND OCPA CLAIMS.

Plaintiffs mistakenly argue that their public nuisance, unjust enrichment, and OCPA claims are subject to special accrual principles that spare those claims.  Opp. 16–22.

**The Public Nuisance Claims.**  Plaintiffs are incorrect that "there is no statute of limitations applicable to an equitable claim to abate a public nuisance."  Opp. 18.  Defendants' opening brief explained why the 140-year old decision in *The Little Miami R.R. Co.* is inapposite, Br. 43 n.67, and Plaintiffs do not reckon with that explanation.  Claims for both public and private nuisances are governed by a four-year statute of limitations under Ohio law, as Judge Gaughan held in *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F. Supp. 2d 981 (N.D. Ohio 2008) (citing *Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612 (Ohio Ct. App. 1999) and *Gibson v. Park Poultry, Inc.*, 2007 WL 2358589 (Ohio Ct. App. Aug. 13, 2007)).[30]  Plaintiffs overlook that holding.[31]

**The OCPA Claim**.  Plaintiffs' reliance on the OCPA's formulation of the five-year limitations period in the alternative—"within five years after the unlawful conduct terminates *or* the cause of action accrues"—rests on a misreading of the OCPA.  The Ohio Supreme Court ruled in *Doe v. Archdiocese of Cincinnati* that the termination test does not extend the five-year limitations period beyond the five-year period following accrual.  849 N.E.2d 268 (Ohio 2006).  In *Doe*, the Supreme Court applied RICO's accrual rule and held that discovery of the injury

---

[30] Plaintiffs claim that *Haas* and *Brown v. Scioto County Board of Commissioners*, 622 N.E.2d 1153 (Ohio Ct. App. 1993), are distinguishable because they are private nuisance cases and a different statute of limitations applies to private than public nuisance cases.  Opp. 18 n. 74.  The Ohio Court of Appeals made no such distinction in either *Haas*, *Gibson*, or *Brown*, and in *Brown*, analyzed the plaintiff's claims as both private and public nuisance claims.  *Brown*, 622 N.E.2d at 1158–61, 1162–63.  The *Gibson* court did not assign either a "private" or "public" label to the plaintiff's nuisance claim.  2007 WL 2358589; *see also Haas*, 726 N.E.2d at 614.  Nor did this Court make any such distinction in *Ashtabula*.

[31] *Ashtabula* addressed whether the plaintiffs had alleged a permanent or continuing nuisance.  Here, the Opposition does not argue that the alleged nuisance is "continuing" for purposes of the limitation period.  Opp. 17–19.  Even if it were "continuing," the four-year statute of limitations would apply to limit the recovery to damages within the four years preceding the filing of the complaint.  Br. 43; *see supra* IV.C.

triggered the limitations period for the OCPA claim.  And because that discovery occurred more than five years before the plaintiff filed suit, the OCPA claim was time-barred.  *Id.* at 278.  It did not matter that the plaintiff alleged that the unlawful conduct terminated only two years before he filed suit, *id.* at 284.  The Ohio Supreme Court rejected the view, set forth in the dissent, that the OCPA limitations period should run from the termination, not the discovery, of the wrongful conduct, instead holding that the OCPA and RICO should be interpreted consistently.  Under the accrual rule adopted in *Doe* (RICO's discovery rule), as Defendants' undisputed evidence shows, Plaintiffs discovered their injury by October 27, 2012.

Consistent interpretation of the OCPA and the RICO statute means that the termination-of-conduct provision does not extend OCPA's limitation period for a second reason.  Federal RICO precedent rejects the use of acts within the limitations period "as a bootstrap to recover for injuries caused by other predicate acts outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997).  Thus, Plaintiffs may not rely on acts within the limitations period (i.e., after October 27, 2012) to reach back in time and sue for conduct that occurred outside the period (before October 27, 2012).

As for the Attorney General's May 31, 2017 lawsuit, Plaintiffs argue that his filing "suspended" the statute of limitations.  Opp. 22; R.C. 2923.34.  That does not mean that Plaintiffs' OCPA claim only accrued then; based on the undisputed evidence cited above. Plaintiffs knew or should have known of their claims long before the Attorney General's action. Moreover, the Attorney General's action could only suspend the running of the statute of limitations; not revive already time-barred claims; at most, that action could only shift the time-bar from October 27, 2012, to May 31, 2012.

**The RICO Claims**.  Plaintiffs attempt to avert the RICO discovery-of-injury accrual rule in two ways.  First, Plaintiffs assert that their RICO claim for injunctive relief is not subject to

27

any limitations at all because the Supreme Court fixed the RICO limitations period at four years by analogy to the Clayton Act, and that Act expressly exempts injunctive claims from its limitations period.  But the Sixth Circuit has found "persuasive" the decisions of other Circuits holding that private litigants, such as Plaintiffs, may not seek injunctive relief under RICO. *Ganey v. Raffone*, 91 F.3d 143, 1996 U.S. App. LEXIS 19148, at *15 n.6 (6th Cir. 1996) (limited publication) (discussing *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986)). Even if Plaintiffs could seek injunctive relief, that claim clearly would be subject to RICO's four-year period because in adopting the Clayton Act's four-year limitations period for RICO claims, the Supreme Court explained: "[W]e do not ordinarily assume that Congress intended that there be no limit on actions at all; rather, our task is to 'borrow' the most suitable statute or other rule of timeliness from some other source."  *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 146 , 152 (1987) (referencing actions under § 15(a) of the Clayton Act), which are subject to a four-year limitation period).  The Clayton Act expressly exempts injunctive claims from the statute of limitations, while RICO does not contain any such exemption.  Had Congress wanted to provide such an exemption, it would have said so.  *Agency Holding* said nothing about "borrowing" a no-limitations rule.

Moreover, where, as here, a plaintiff can seek relief for the same facts at law (through damages) and in equity (through an injunction), the general rule is that the statute of limitations applies to both remedies:  "if an action at law for damages would be barred, so too is the action in equity."  *Nemkov v. O'Hare Chicago Corp.*, 592 F.2d 351, 355 (7th Cir. 1979); *see also Cope v. Anderson*, 331 U.S. 461, 464 (1947) ("[E]quity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy.").

Second, Plaintiffs argue that accrual under RICO depends on discovery of the injury ***and*** the alleged wrongdoer.  Not so.  *See* Br. 9–10.  Plaintiffs simply misread *Barry Aviation, Inc. v.*

*Land O'Lakes Mun. Airport Com'n*, 377 F.3d 682, 688 (7th Cir. 2004) (cited at Opp. 33), which

follows settled law in holding that under RICO "a cause of action accrues when the plaintiff

knew or should have known ***that it sustained an injury***."  377 F.3d at 688.[32]  Plaintiffs' reliance

on the Supreme Court's decision in *Rotella v. Wood* is even further afield; the language Plaintiffs

quote is not from *Rotella*, but from *United States v. Kubrick*, 444 U.S. 111, 122 (1979).  *Rotella*

said that the Supreme Court had been "at pains to explain that ***discovery of the injury***, ***not***

discovery of the other elements of the claim, is what starts the clock."  528 U.S. at 555.  And the

Supreme Court held in *Kubrick* that the claim accrues when the plaintiff has knowledge of his

injury, and when he has that knowledge, "he is no longer at the mercy of the [defendant].  There

are others who can tell him if he has been wronged, ***and he need only ask***."  444 U.S. at 122.

Plaintiffs have not come forward with any evidence that they ever asked.

   **The Unjust Enrichment Claims.**  Because Plaintiffs have withdrawn their unjust

enrichment claim, *see supra* n.15, any reply is moot at this time.

## CONCLUSION

   For the foregoing reasons, and the ones set forth in Defendants' opening brief, Plaintiffs

may not recover for claims accruing outside of the applicable limitations periods.


Dated:  August 16, 2019      Respectfully submitted,

           */s/ Mark S. Cheffo*
           Mark S. Cheffo
           DECHERT LLP
           Three Bryant Park
           1095 Avenue of the Americas
           New York, NY 10036
           Tel: (212) 698-3500

---

[32] The reference to "who caused the injury"—quoted by Plaintiffs—was dictum, and was not tied to RICO accrual, but to fraudulent concealment.  *Id.* (discussing accrual rule where "defendants in a fraud case concealed the fraud").  *Barry Aviation* cited with approval the same court's earlier decision in *United States v. Duke,* cited *supra,* at 15, 23, which is clear that the claim accrues when the plaintiff knows of his injury.

Mark.Cheffo@dechert.com

*Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company*

*Co-Liaison Counsel for the Manufacturer Defendants*[33]

/s/ Carole S. Rendon
Carole S. Rendon
BAKER & HOSTETLER LLP
Key Tower 127 Public Square, Suite 2000
Cleveland, OH 44114-1214
Telephone: (216) 621- 0200
Fax: (216) 696-0740
crendon@bakerlaw.com

*Counsel for Defendants Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Par Pharmaceutical, Inc., and Par Pharmaceutical Companies, Inc.*

*Co-Liaison Counsel for the Manufacturer Defendants*

/s/ Enu Mainigi
WILLIAMS & CONNOLLY LLP
Enu Mainigi
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Defendant Cardinal Health, Inc.*

*Co-Liaison Counsel for the Distributor Defendants*

---

[33] Teva Pharmaceutical Industries Ltd., Allergan plc, and Mallinckrodt plc are respectively an Israeli corporation, Irish holding company, and an Irish company that are not subject to and contest personal jurisdiction for the reasons explained in their motions to dismiss for lack of personal jurisdiction; they are specially appearing to join this motion, and, thus, they do not waive and expressly preserve their personal jurisdiction challenges.

/s/ Shannon E. McClure
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone:  (215) 851-8100
Fax: (215) 851-1420
smcclure@reedsmith.com

*Counsel for Distributor Defendant*
*AmerisourceBergen Drug Corporation*

*Co-Liaison Counsel for the Distributor Defendants*


/s/ Geoffrey Hobart
Geoffrey Hobart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Telephone: (202) 662-5281
ghobart@cov.com

*Counsel for Distributor Defendant*
*McKesson Corporation*

*Co-Liaison Counsel for the Distributor Defendants*

**CERTIFICATE OF SERVICE**

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

> */s/ Ashley W. Hardin*_____
> Ashley W. Hardin