# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 1:17-md-2804 |
| *Track One Cases* | Judge Dan Aaron Polster |
| | **ORDER DENYING MOTION TO EXCLUDE CUTLER** |

Before the Court is Defendants' Motion to Exclude David Cutler's Opinions and Proposed Testimony. For the reason stated below, the Motion is **DENIED**.

**I.**

The Court hereby incorporates the legal standards set forth in the Court's Opinion and Order regarding Defendants' motion to exclude the opinion and testimony of Prof. Meredith Rosenthal. (Doc. #: 2495).

**II.  Introduction**

David Cutler is the Otto Eckstein Professor of Applied Economics and the Harvard College Professor at Harvard University. He received a Ph. D. in Economics from the Massachusetts Institute of Technology in 1991. Cutler specializes in health economics and public economics and has published more than 200 journal articles and written two books on the economics of health care. He is a former editor of the Journal of Health Economics and a former Associate Editor of the Journal of Economic Perspectives, the Journal of Public Economics, and the World health Organization Bulletin. Cutler has received numerous major awards, including the Griliches Prize

in 1999, the Ken Arrow Award from the International Health Economics Association for best paper in health economics in 2000, and, with Jonathan Gruber, the ASHEcon award for best health economist age 40 and under in 2006. He is a member of the American Academy of Arts and Sciences and the National Academy of Medicine.

In his Report, Cutler delivers the following opinions:

> 1. The increase in prescription opioid shipments since 1995 has contributed to harms that the relevant divisions of the Bellwether governments provide services to address;
>
> 2. The percentage of harms attributable to prescription opioid shipments can be economically estimated;
>
> 3. My analysis of the percentage of harms attributable to prescription opioid shipments, together with analysis of the percentage of prescription opioid shipments that are due to the defendants' misconduct reported in the Rosenthal Report, yields annual estimates of the percentage of harms due to defendants' misconduct for each Bellwether division affected by the opioid crisis;
>
> 4. My analysis of the percentage of costs attributable to prescription opioid shipments is confirmed by a supplementary analysis of the direct effect of prescription opioid shipments on crime;
>
> 5. My methodology for computing annual estimates of the percentage of harms due to the defendants' misconduct would not be modified if the inputs are varied, so that if different percentages are assigned to the shipments attributable to the defendants' misconduct, the methodology can still be applied in estimating damages based on the modified calculations.

Cutler Report at ¶ 11 (Doc. # 1901-4)

III.   Discussion

Defendants ask the Court to bar Cutler from testifying because his opinions, rooted in an aggregate methodology, are irrelevant to Plaintiffs' case and exhibit numerous methodological flaws.

**A.   Fit – Cutler's Aggregate Analysis**

2

Defendants first argue Cutler's opinions, founded upon an aggregate methodology partly relying on national data, "are not tied to Plaintiffs' burden of proof. Despite specific allegations of unlawful marketing and distribution conduct, Cutler does not attempt to link any such conduct to any specific harms in the Track One Counties." Motion at 4 (Doc. #: 1901) (citation omitted). Specifically, Defendants note Cutler:

- Does not isolate what percentage of opioid prescriptions or shipments in the Track One Counties are linked to any alleged unlawful conduct by Defendants.
- Does not attempt to attribute any "harms" in the Track 1 Counties to any particular Defendant, any particular alleged misstatement(s), any "particular prescription," any "particular shipment" or group of particular shipments, or even any particular opioid or (legal or illegal) group of opioids.
- Can't say whether any of the increase in mortality [*i.e.*, the harms] that [he] attribute[s] to Defendants resulted from individuals who actually got a prescription for one of the opioids that was manufactured or distributed by any defendant.
- Makes no effort to disentangle the effect of Defendants' conduct from that of non-defendants.
- Does not even try to separate the impact from illicit drugs like illegal fentanyl – instead opting to include all opioid-related harms, including from illegal drugs, in his models.

Motion at 4-5 (Doc. #: 1901).

Defendants also offer a second argument concerning fit, asserting Cutler's decision to aggregate all shipments in his analysis, including shipments made by non-defendants, renders his opinions irrelevant. Defendants fault the analysis for not attempting to assess the impact of any actual shipment "by any particular Defendant (or all shipments by any Defendant, or even all shipments by all Defendants) on mortality in the [Bellwether] Counties." Motion at 7-8 (Doc. #: 1901); Reply at 3-5 (Doc. #: 2460).

Plaintiffs respond to Defendants' first argument by asserting Cutler did, in fact, tie his analysis to local harms in the Bellwether Counties. Plaintiffs explain that Cutler structured his

3

analysis in a three-phase framework, the initial phase of which analyzed data quantifying various harms in the Bellwether Counties.  In phase two, Cutler performed a multiple regression analysis based on national data showing opioid shipments throughout the country caused the types of harms identified in phase one.  Then, by combining the results of these two steps, Cutler arrived at "an estimate of the share of various harms that are attributable to prescription opioid shipments" in the Bellwether Counties.  Opp. at 19-20 (Doc. #: 2209); Report at ¶¶ 26-27, 119-133 (Doc. # 1901-4).  Plaintiffs assert this is a reliable methodology, an issue the Court takes up in Section B below.

Plaintiffs also deny Defendants' second fit argument, pointing out that "evaluating the effect of Defendant's misconduct is an *explicit* step in Prof. Cutler's analysis."  Opp. at 20 (Doc. #: 2209); Report at ¶¶ 119-133 (Doc. #: 1901-4).  Plaintiffs also note Cutler "need not link particular shipments by particular Defendants to particular harms in order to establish that gross over-supply of opioids resulted in the harms of the opioid epidemic."  Opp. at 20 (Doc. #: 2209).

The Court does not agree with Defendants that Cutler's reliance on aggregate data undermines his opinions' fit with Plaintiff's theory.  This is true both with respect to the use of national data and with respect to the aggregation of all Defendants' shipments, and even including those shipments made by actors who are not parties in this case.  The Sixth Circuit has explained "there must be a fit between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful."  *United States v. Bonds*, 12 F.3d 540 at 555 (6th Cir. 1993).  Defendants have not persuaded the Court that Cutler's testimony "does not relate to any issue in the case."  *Id*.

Cutler's analysis used large national samples, an approach Cutler explains improves the reliability of the data to identify trends and correlations and generate regression coefficients, which he applied to harms in Bellwether Counties derived from local data to generate local conclusions.

4

Report at ¶ 90, 119-133 (Doc. #: 1901-4); Federal Judicial Center's *Reference Manual on Scientific Evidence* at 246 (3d ed. 2011) ("Generally, increasing the size of the sample will reduce the level of random error . . . ."). Moreover, throughout the course of this MDL, Plaintiffs have made clear they are pursuing an approach to proving harm in the Bellwether Counties through aggregate, rather than individualized evidence. Opp. at 19 (Doc. # 2209). Neither Cutler's partial reliance on national samples to establish reliable applicable trends and generate regression coefficients, nor his grouping together of numerous Defendants and other sellers of prescription opioids, renders his analysis irrelevant to Plaintiffs' case. In Cutler's exposition of his methodology, he explains how his tripartite framework ties reliable national statistical observations to local data on harms. Report at 17-18, 21-17, 47, 65, 68, 73-77, 80-90 (Doc. # 1901-4). Cutler's choice of an aggregate approach goes to the weight of his testimony, not its admissibility.

The Court agrees with Plaintiffs that most of what Defendants argue are problems with fit are actually attacks on Cutler's methodology. The Court addresses those arguments in the next section.

### B. Other Methodological Issues

Defendants maintain Cutler's analysis amounts to no more than "junk science," Motion at 8 (Doc. #: 1901), arguing its reliance upon various estimates renders his opinions mere "guesswork." *Id.* Defendants also level a raft of methodological criticisms at Cutler's report, challenging details of both his direct and indirect regression models.

The Court addresses in this Order just a sampling of these criticisms (but has reviewed all of them). One example criticism is that Defendants attack Cutler for failing to include "deaths of

despair" as a control variable in his analysis of deaths from illicit opioids.[1] Defendants deride Cutler for explaining he was "hoping" other variables in his model would suffice to address this variable: "'hoping,' however, does not satisfy the standard for expert testimony under Rule 702." Motion at 14 (Doc. #: 1901). But Defendants omit the portion of Cutler's deposition testimony where he explains his well-informed belief that the data needed to control for "deaths of despair" are simply not available. Cutler Dep. at 486-489 (1901-5). The absence of this variable is not a reason to exclude Cutler's testimony. "The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof." *United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1179 (2018) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 at 596 (1993)).

Defendants also claim Cutler's use of opioid mortality as a proxy for all opioid-related harms renders his analysis unreliable. Motion at 15 (Doc. #: 1901); Reply at 10-11 (Doc. #: 2460). Plaintiffs respond by pointing to Cutler's report, in which he explains "[d]ata on opioid-related mortality provide the most comprehensive information available for identifying the impact of shipments on harms and these data are used to develop an estimate of the share of opioid related harms attributable to shipments of prescription opioids for all [categories of harms]." Report at ¶ 47 (Doc. #: 1901-4). Cutler further notes that "[u]nlike crime or foster care placements, which are harms that one would expect would exist at some level even without opioids, there is no reason to expect there would be opioid-related deaths in the absence of supplies of prescription opioids and illegal substitutes." *Id.* Cutler's choice to use mortality as a proxy for all opioid-related harms is a fit subject for cross-examination, but it does not offend *Daubert's* standards of reliability. It is

---

[1] "Deaths of despair" are "a result of the cumulative disadvantage resulting from economic and social breakdown that has plagued certain segments of the population." Motion at 13 (Doc. #: 1901) (internal quotation marks omitted).

understood and accepted that "[t]rained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

As a final example, Defendants take issue with Cutler's reliance on the findings and estimates of Plaintiffs' expert Dr. Meredith Rosenthal for certain inputs in his analysis. Motion at 8-9 (Doc. #: 1901); Reply at 8-9 (Doc. #: 2460). Defendants argue Rosenthal's opinions are unreliable in themselves and thus taint his analysis as well. The Court has ruled on Rosenthal's opinions and found they are not unreliable. (Doc. #: 2495). Cutler's use of Rosenthal's findings, and Defendants' other challenges to Cutler's methodology, assumptions, and estimates, may provide fodder for Defendants' cross-examination, but do not render his analysis unreliable. *Daubert*, 509 U.S. at 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

The Court has carefully pored over Cutler's report, and reviewed and considered all of Defendants' submissions, as well as Plaintiffs' opposition brief. The Court declines to address each criticism here, but notes that Cutler's report is a model of transparency, explaining every choice he made in designing his analysis. There, and in deposition testimony, Cutler explained the strengths *and weaknesses* of his choices, and the consequences of its flaws. The Court concludes that Cutler's opinions, though clearly not perfect, are the product of a reliable methodology and their assumptions and estimates rest upon rational bases, well-explained by Cutler.

7

### IV. Conclusion

For these reasons, Defendants' Motion is **DENIED.**

       **IT IS SO ORDERED.**

                         /s/ Dan Aaron Polster  *August 26, 2019*
                         **DAN AARON POLSTER**
                         **UNITED STATES DISTRICT JUDGE**