# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:14-CR-096 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| ADOLPH HARPER, JR., | ) | <u>GOVERNMENT'S SENTENCING</u> |
| | ) | <u>MEMORANDUM</u> |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Steven M. Dettelbach, United States Attorney, and Margaret A. Sweeney, Edward F. Feran, and Rebecca Lutzko, Assistant United States Attorneys, hereby files this memorandum to assist the Court in determining the appropriate sentence for defendant Adolph Harper.

## I.     Factual Background

Defendant Adolph Harper, Jr., was a licensed medical practitioner who decided to use his medical license to run a drug trafficking organization out of his medical offices in Akron, Ohio. During the course of Harper's leadership of this organization, Harper and his staff distributed hundreds of thousands of doses of highly addictive narcotic pain medication to his customers, who he described as "patients." These customers flocked to Harper, who distributed drugs to them using his DEA registration number and disguised these distributions as prescriptions.

Many of Harper's patients became visibly addicted to the narcotics Harper gave them, and
several of them died from overdose-related deaths. In addition to his drug trafficking, Harper
also fraudulently billed his customers' health insurance providers and collected hundreds of
thousands of dollars from those providers.

      A.    <u>Adolph Harper's Drug Trafficking</u>

Prior to September 2009, Harper operated a medical practice that primarily served
obstetric and gynecological patients. Beginning in September 2009, Harper began to operate his
"medical practice" as a "pain management" facility, despite not having any certification in pain
management or any training in the field. During this time, Harper prescribed highly addictive
pain medication, as well as other frequently abused prescription drugs, to his customers. Harper
prescribed these medications without any medical purpose; instead, he prescribed these
medications to feed his customers' addictions. Harper distributed these prescriptions to his
customers just as a street-level drug trafficker—based on his customers' demands rather than on
any legitimate medical need. When these customers came to Harper's office, Harper typically
conducted cursory physical examinations, but Harper often issued prescriptions to his customers
without seeing them at all. To facilitate his drug trafficking, Harper pre-signed prescription
pads, gave them to members of his staff, including his daughter Adria Harper, and had those staff
members meet with the customers and fill in the prescription information. Harper and his staff,
at his direction, issued prescriptions based on the medications that Harper had prescribed the
customer the month before or, in some instances, the medications that the customer requested.

Harper ensured that his organization could still function even when he was out of the
office. For example, Harper did not go to his office on November 11, 2010, November 12, 2010,
or December 28, 2010. Nevertheless, Harper arranged to have customers come to his office, and

he directed his staff members to give prescriptions out to those customers when they arrived.
Harper pre-signed prescription forms and directed his staff to fill in the medication and other
information on the form when the customer arrived. Harper also directed members of his staff to
fill out the "patient notes" in the customer's files, indicating that a visit had occurred even
though Harper had not seen the customer.

Additionally, Harper's staff occasionally screened the urine of his customers. However,
Harper repeatedly issued prescriptions to customers who did not test positive for the controlled
substances he had prescribed, indicating that the customer was not ingesting the medication. In
addition, members of Harper's staff regularly informed Harper that his customers often tried to
cheat the urine drug screen tests by sneaking in "clean" urine rather than providing their own for
the test. Harper did not adjust his practice or his prescribing habits and continued to prescribe
highly addictive pain medication to these customers.

Moreover, in several instances, Harper's customers' urine screens indicated that the
customer had also taken illicit drugs such as cocaine, methamphetamine, heroin, and marijuana.
Harper often continued to prescribe narcotics and other addictive drugs to these customers
despite their positive tests for other illicit drugs. For example, one of Harper's customers with
the initials Y.Z. came to Harper's office on July 5, 2011, and a member of Harper's staff
conducted a urine screen on Y.Z. The month prior, Harper had prescribed Y.Z. a prescription for
90 15mg oxycodone pills; however, Y.Z.'s urine screen on July 5, 2011, did not test positive for
oxycodone. Moreover, Y.Z.'s urine screen showed that Y.Z. tested positive for cocaine, and
members of Harper's staff remember seeing Y.Z. with a white powder resembling cocaine on her
nose during her visit that day. A member of Harper's staff made him aware that Y.Z.'s urine
screen tested positive for cocaine when Harper met with Y.Z. that day. Nevertheless, Harper

proceeded to issue Y.Z. prescriptions for 90 2 mg alprazolam pills, 180 10 mg methadone pills, and 90 15 mg oxycodone pills. Three days later, on July 8, 2011, Y.Z. died from the combined drug effects of cocaine, alprazolam, methadone, and oxycodone.

The atmosphere of Harper's office, like his prescribing practices, was also more akin to street-level drug trafficking operation rather than a medical office. Harper's customers often waited for hours to see Harper, and many of these customers exhibited behavior consistent with drug abuse. Witnesses reported seeing customers passed out in the hallway and office while waiting to see Harper, or vomiting or urinating on the floor in the waiting room. Customers were also combative and aggressive with Harper's staff members if there was any delay in receiving their drugs.

According to medical experts, Harper distributed drugs to his customers in combinations and quantities that were dangerous for the customers to consume and that were combinations of medications that drug seekers often abuse. For example, Harper frequently prescribed his customers a narcotic painkiller, in combination with a stimulant, anti-anxiety, or sleep-aid medicine. Because of the dangerous combinations and quantities that Harper was prescribing his customers, several area pharmacies began refusing to fill Harper's prescriptions. Harper became aware of this but did not change his prescribing practices. Instead, Harper and other members of his DTO posted a list in Harper's office of pharmacies that were likely to fill Harper's prescriptions, in an effort to ensure that Harper's customers could get the controlled substances he prescribed.

Harper not only prescribed cocktails of prescription medications to customers who Harper knew were addicted. He also knowingly continued to distribute narcotics to customers who had previously overdosed on the controlled substances that he had earlier prescribed. For

example, Harper's customer, K.C., was hospitalized several times after overdosing on drugs prescribed by Harper. The hospital and/or others notified Harper of the same. Harper, however, continued to prescribe narcotics and other controlled substances to K.C. even though he knew about these hospitalizations. K.C. eventually died from an overdose of oxycodone less than a week after Harper prescribed even more oxycodone and alprazolam to her.

Harper was aware that several of his customers, including K.C., had died from overdose-related deaths. Nevertheless, Harper continued to give prescriptions to his other customers without modifying his prescribing practices. During the course of the conspiracy, Harper regularly prescribed narcotics to at least eight customers who died of overdose-related deaths. Some of these customers died within weeks, some even within days, of receiving a prescription from Harper. Although Harper's prescriptions may not have been the but-for cause of these customers' deaths, *see Burrage v. United States*, --- U.S. ---, 134 S. Ct. 881 (2014), the government submits that these deaths are relevant conduct for the purpose of determining the appropriate sentence for Harper Those deaths are summarized below, and the earlier prescriptions for each are listed in the Indictment:

- K.C.'s last prescriptions from Harper were on January 12, 2012, for alprazolam and oxycodone. K.C. died on January 17, 2012 from an "oxycodone overdose," according to the county medical examiner. K.C. was 44 years old.

- J.C.'s last prescriptions from Harper were June 29, 2011, for alprazolam and oxycodone. J.C. filled those prescriptions at 8:11 p.m. that day. At approximately 2:00 a.m. on June 30, 2011, J.C. died from an oxycodone overdose. The medical examiner who conducted the autopsy of J.C. concluded that but for the oxycodone in J.C.'s system, J.C. would not have died. J.C. was 28 years old.

- M.F.'s last prescriptions from Harper were on April 1, 2011, for alprazolam, amphetamines, and oxycodone. M.F. died on April 7, 2011, from "combined drug effects," according to the medical examiner. M.F. was 29 years old.

- C.J.'s last prescriptions from Harper were on April 2, 2011, for diazepam and hydrocodone/APAP. C.J. died on April 4, 2011, from "acute intoxication by the combined effects of diazepam, hydrocodone, and methadone," according to the medical examiner. C.J. was 30 years old.

- T.L.'s last prescriptions from Harper were on October 28, 2011, and October 29, 2011, for oxycodone/APAP, alprazolam, and oxymorphone. T.L. had also received a prescription from another doctor on October 27, 2011, for oxycodone. T.L. died November 7, 2011 from "combined drug overdose," according to the medical examiner. T.L. was 42 years old.

- R.P.'s last prescription from Harper was February 23, 2010, for alprazolam and oxycodone/APAP. According to the medical examiner, R.P. died on March 13, 2010, from "acute methadone toxicity,"; R.P. had methadone, oxycodone, cocaine and benzodiazepines in his/her system. R.P. was 52 years old.

- J.W.'s last prescriptions from Harper were on December 22, 2010, for alprazolam and oxycodone. J.W. died on December 22, 2010, from "combined drug effects," according to the medical examiner. J.W. had oxycodone, morphine, THC, and benzodiazepines in his/her system. J.W. was 35 years old.

- Y.Z.'s last prescriptions from Harper were on July 5, 2011, for alprazolam, methadone, and oxycodone. The same day, Y.Z. had tested positive for cocaine during a urine screen at Harper's office. Y.Z. died on July 8, 2011, from "combined drug effects" including

methadone, cocaine, and alprazolam, according to the medical examiner. Y.Z. was 44
years old.

During the course of the conspiracy, Harper used his position as a licensed medical
professional to distribute prescriptions with no legitimate purpose and outside the usual course of
professional conduct to hundreds of customers. Prescriptions for twelve of these customers are
listed in the indictment in Count 1. Accounting for only the controlled substances that Harper
prescribed to these twelve customers, the amount of drugs distributed by Harper during the
course of the conspiracy and/or directly attributable to his actions and reasonably foreseeable
within the conspiracy was at least 469.57 grams of oxycodone, 143.28 grams of oxymorphone,
25.776 grams of alprazolam, 30.48 grams of methadone, 9 grams of amphetamines, and 0.85
grams of zolpidem. Under the guidelines, this is the equivalent of 4,057.76 kilograms of
marijuana. *See* U.S.S.G. § 2D1.1(a)(5) & cmt. 8.

B.     Adolph Harper's Health Care Fraud Schemes

In addition to using his medical license to distribute drugs to his addicted customers,
Adolph Harper also engaged in multiple schemes to defraud his customers' health insurance
providers. For example, on November 11, 2010, November 12, 2010, and December 28, 2010,
despite being out of the office, not seeing any "patients," and not even attempting to perform any
medical services, Harper submitted billing statements for these "visits" to his customers'
insurance providers. During this three-day period, Harper billed eight patient claims to
Medicare, totaling $752 for services that he had not performed, resulting in $601 in payment
from Medicare. During this same period, Defendant billed Medicaid and Medicaid HMOs for
seventy-five patient claims, totaling $6,668, resulting in $3,813 payment from Medicaid and

Medicaid HMOs. Medicare and Medicaid/Medicaid HMOs are federal health care benefit programs.

Even when Harper was in the office and had seen customers, Harper routinely billed those customers' health insurance providers using billing codes that reflected a service that was more sophisticated and costly than the service that Harper actually performed. Consequently, Harper collected a higher payment from the health insurance providers. In addition, on the three days that Harper was out of the office, Harper billed the customers' insurance providers using code 99214, the second highest billing code for an office visit. Harper then received payment from the customers' health insurance providers based on the submission of these claims with inflated billing codes.

In preparation of its case against Harper, the government retained Sonda Kunzi, a certified professional medical auditor, to analyze Harper's files and evaluate the rate of error associated with Harper's billing practices. In her review, Kunzi found a 97% error rate in Harper's billings.[1] Kunzi found that Harper consistently overbilled or "upcoded" his services to his customers' health insurance providers. For example, Harper had 17 billings for one of his customers with the initials C.C. that he submitted to C.C.'s Medicaid HMO. For each of these 17 billings, Harper billed the highest office visit code—99215. Harper's files and notes of his services did not support billing at that level. According to his staff, Harper also often had members of his DTO complete his customers' "patient visit notes" in their files *before the customers had arrived to the office for their appointments*. Harper and his staff consistently

---

[1] Kunzi used a statistical sample of 30 Medicare billings and 30 Medicaid/Medicaid HMO billings.

wrote generic patient notes that did not, in fact, support the high billing codes that Harper submitted to his customers' health insurance providers.

In addition to fraudulently coding his services and over-collecting payments from his customers' health insurance providers, Harper further illegally required and collected cash payments from his customers for services that he also billed to and collected from those customers' health insurance providers. For example, as part of his "medical practice," Harper offered Suboxone treatments, which was a covered service through Medicaid and Medicaid HMOs. Although Harper had agreed, as part of his contracts with Medicaid and the Medicaid HMOs, to accept the insurance payment as payment in full, with no co-pay, Harper required and collected cash payments from his customers for these services and further billed those customers' health insurance providers for the same service and collected payment from those insurance providers. A cash receipt log from Harper's office showed that Harper collected $2,550 from a customer with the initials C.C. for services that he also billed to and collected from C.C.'s Medicaid HMO. The same cash log also showed that Harper collected $1,350 from a customer with the initials Co.C. for services which Harper also billed to and collected from Co.C.'s Medicaid HMO.

## II.     Law and Argument

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Appellate courts must review a district court's sentence for procedural and substantive reasonableness. *Id.* at 51. Although the Guidelines are advisory, appellate courts may apply a presumption of reasonableness to a sentence that falls within the Guideline range. *Id.*

A.    Advisory Guidelines Calculation of Defendant's Offense Level

The government objects to the guideline calculation set forth in the presentence

investigation report.  The report does not account for a two-level special skill enhancement,

which Harper agreed was applicable as part of his plea agreement.  (R. 54:  Plea Agreement,

PageID 273).  Accordingly, the government submits that the following represents the correct

guideline calculation:

Counts 1, 2, 13-14, 25-26, 33, 38-39, 48-49, 58-59, 70-71, 76-77
21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(E), (b)(2) & 846 (Grouped per § 3D1.1):

| | | |
|---|---|---|
| Base Offense Level | 32[2] | § 2D1.1(a)(5) |
| Leader/Organizer Adjustment | +2 | § 3B1.1(c) |
| Use of Special Skill | +2 | § 3B1.3 |
| *Adjusted Offense Level* | *36* | |

Counts 131-134 (18 U.S.C. § 1347) (Grouped per § 3D1.1):

| | | |
|---|---|---|
| Base Offense Level | 6 | § 2B1.1(a)(2) |
| Loss Adjustment ($400,000-$1,000,000) | +14 | § 2B1.1(b)(1)(H) |
| Use of Special Skill | +2 | § 3B1.3 |
| *Adjusted Offense Level* | *22* | |

Multiple Count Adjustment § 3D1.4

| | | |
|---|---|---|
| Highest Offense Level | 36 | § 3D1.4 |
| Increase for Multiple Count Adjustment | 0 | § 3D1.4(c) |
| | | |
| Acceptance of Responsibility Reduction | -3 | § 3E1.1(a) & (b) |
| **Total Offense Level** | **33** | |

---

[2] Harper's plea agreement accounted for a two-level reduction based on the anticipated reduction
in the base offense levels for drug offenses in the 2014 United States Sentencing Guidelines,
which were not yet effective when Harper pleaded guilty.  (R. 54:  Plea Agreement, PageID
273).  As the presentence report indicates, the 2014 Guidelines, which have the reduced base
offense levels for drug quantities, apply to Harper's sentencing because he is being sentenced
after November 1, 2014.  Therefore, Harper's base offense level for his drug offenses in this case
is 32.

1.      *Stipulated Drug Quantity*

As part of his plea agreement, Harper agreed that the amount of drugs that he conspired to distribute as part of the Conspiracy exceeded 3,000 kilograms of marijuana after using the U.S.S.G. § 2D1.1 drug equivalency tables.  (R. 54: Plea Agreement, PageID 273).[3]  This number accounts for the total number of pills that Harper "prescribed" to the customers listed in Count 1 of the indictment.  Accordingly, this amount of controlled substances corresponds to a base offense level 32 pursuant to U.S.S.G. § 2D1.1(a)(5).

2.      *Leader/Organizer Adjustment*

Adolph Harper held a managerial or supervisory role over at least three people as part of his conspiracy to illegally distribute prescription pills.  Accordingly, as Harper stipulated in his plea agreement, a two-level enhancement applies to his base offense level.  (R.54: Plea Agreement, PageID 273).  In determining whether this enhancement applies, the Sixth Circuit has instructed that courts should consider "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007).

As the leader of this conspiracy, Harper exercised the most decision-making authority over the other members of the organization.  Harper ran the office that he, and the employees he managed, operated as the functional equivalent of street-level drug traffickers doling out drugs to

---

[3] Harper's plea agreement miscalculated the conversion of pills to their marijuana equivalency and therefore incorrectly states that the total amount of drugs Harper conspired to distribute totaled 4,070.65 kilograms of marijuana.   The miscalculation related to the alprazolam involved in Harper's conspiracy.  The correct number is 4,057.76 kilograms.  This does not change, Harper's base offense level, which is 32.

paying customers.  Harper hired his daughter Adria Harper, Patricia Laughman, and Tequilla Berry, among others, to assist him in operating his office, and Harper instructed them on how to handle his customers and distribute their drug orders, which they characterized as "prescriptions."  Even when Harper was out of the office, his employees kept the drug trafficking operation running—seeing customers in Harper's office and distributing hundreds of "prescriptions" on Harper's pre-signed prescription forms—all at Harper's direction.  Indeed, Harper was the catalyst for the entire operation, because it was Harper who decided to change the focus of his medical practice from obstetrics to "pain management," which allowed Harper and his co-conspirators access to paying drug customers to whom they repeatedly sold dangerous and addictive painkillers.  Without Harper's leadership, management, and decision-making, the entire conspiracy and the organization's distribution network would not have been possible. Accordingly, the two-level enhancement applies to Defendant's base offense level.

### 3.  Use of a Special Skill

U.S.S.G. § 3B1.3 provides for a two-level enhancement if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  The Guidelines define "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."  U.S.S.G. § 3B1.2 cmt 4.  The commentary to the Guidelines list doctors as an example of persons possessing a special skill.  *Id.*  Generally, if a two-level enhancement is based solely on the use of a special skill, it will not apply where there is also an enhancement based on defendant's aggravating role in the offense.  U.S.S.G. § 3B1.3.  However, as Harper agreed in his plea agreement, the facts and circumstances of this case are such that this limitation does not apply here.  (*See* R. 54:  Plea Agreement, PageID 273).

First, the purpose of the limitation is to avoid a type of of double enhancement for a defendant's role in the offense because of his use of a professional skill to commit his crime.  In the instant case, however, application of the special-skill enhancement does not result in a double enhancement for the same conduct; rather it addresses two separate types of conduct.  Harper used a special skill, i.e., his position as a doctor and the limited authority granted to him by the Drug Enforcement Administration to fill his customers' drug orders for controlled substances in a manner that significantly facilitated the commission of the offense.  As a result, an additional two-level enhancement applies pursuant to U.S.S.G. § 3B1.3.  Separately, Harper was as an organizer, leader, and manager of the conspiracy and recruited others to the conspiracy, whom he instructed to distribute drug orders on his behalf.  Harper's use of his special skill as a licensed medical doctor was distinct from his choice to enlist others whom he managed to help operate his DTO.  Harper did not simply use his medical license to manage the other members of his conspiracy.  Accordingly, the enhancement for Harper's use of a special skill to facilitate the offense and the enhancement for his management of others in the conspiracy address different aspects of Harper's conduct, as well as different harms that Harper's conduct caused.  Accordingly, as Harper agreed in his plea agreement, both enhancements should apply, and the Court should impose a two-level enhancement under U.S.S.G. § 3.B1.3 in addition to the two-level enhancement under U.S.S.G. §3.B1.1(c) .

This enhancement applies for a second reason, apart from Harper's use of a special skill; Harper also abused a position of trust in a way that significantly facilitated his crime.  If the two-level enhancement is based upon an abuse of a position of trust, it may be employed in addition to an enhancement for the defendant's role in the offense.  U.S.S.G. § 3B1.3.  Courts of appeal have routinely upheld the application of this enhancement in the context of a physician illegally

distributing prescription medication.  *United States v. Hsia*, 527 F. App'x 176, 181 (3d Cir. 2013); *United States v. Feingold*, 454 F.3d 1001, 1013 (9th Cir. 2006); *United States v. Hoffer*, 129 F.3d 1196, 1204 (11th Cir. 1997).  Accordingly, this Court may find that this enhancement applies along with the role enhancement based on Harper's abuse of a position of trust as a licensed medical professional.

4.      *Health Care Fraud Loss Adjustment*

Between September 1, 2009, and May 31, 2012, Adolph Harper caused health care benefit providers to pay him $430,253.77 based on fraudulent claims that he submitted.  As described above, certified professional medical auditor Sondra Kunzi analyzed Harper's patient files and concluded that there was a 97% error rate in Harper's billings to health care benefit providers.  This error rate results in a finding that Harper was paid $417,346.14 for fraudulent billings.  Accordingly, the loss attributable to Harper's offense exceeds $400,000.  Under U.S.S.G. § 2B1.1(b)(1)(H), a fourteen-level enhancement applies to the calculation of Harper's base offense level for the Health Care Fraud counts in Counts 131 through 134.

B.      Calculation of Defendant's Criminal History

The government does not have any objections to the PSR's calculation that Defendant has zero criminal history points, which places him in a Criminal History Category of I.

C.      Title 18, United States Code, Section 3553(a) Factors

Based on the calculations described herein, which includes the recommended calculation from the presentence investigation report, as well as the additional two-level enhancement for Harper's use of a special skill (or, alternatively, abuse of a position of trust), the government submits that the correct guideline range is 135-168 months—the range that Harper likewise agreed was accurate in his plea agreement.

The government further submits that a sentence at the highest end of this range is sufficient but not greater than necessary to comply with the factors listed in 18 U.S.C. § 3553(a).

As the Court is well aware, in determining the particular sentence to be imposed, the Court must consider:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

  (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B)  to afford adequate deterrence to criminal conduct;

  (C)   to protect the public from further crimes of the defendant; and

  (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence, and the sentencing range . . . ;

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

First the nature and circumstances of Harper's offense warrant a sentence at the highest end of the advisory guideline range outlined in this memorandum.  This case not only involved a multi-year drug trafficking organization, but Harper, the leader of the organization, ran this organization under the guise of a medical office, using his medical license as a criminal tool to facilitate his drug trafficking.  Harper ran his medical office just like any typical drug trafficking organization.  He sought out and made himself available to addicts, and Harper fed their addictions by prescribing hundreds of thousands of doses of highly addictive narcotics.  Often, Harper doled out prescriptions to his addicted customers in dangerous combinations that included a narcotic painkiller, in combination with a stimulant, anti-anxiety, or sleep-aid

medicine. These types of prescription cocktails are favored by drug addicts, and Harper continued with these cocktails to supply his customers to meet their demand.

Harper continued his drug trafficking operation even though he knew that area pharmacists opposed his prescribing practices and refused to fill his prescriptions. Harper could have changed his behavior and adjusted his prescribing practices each time he learned that his prescriptions were being questioned by professionals who have a corresponding duty to make sure that prescriptions are legitimate. He did not. Instead, Harper continued to supply his customers with their drugs. Harper even went as far as directing his customers to other pharmacies by posting a list of pharmacies that were likely to fill his prescriptions. The continued brazenness of Harper's drug trafficking warrants a sentence at the highest end of the guideline range.

Perhaps more importantly, Harper's actions show a complete disregard for the lives of his customers. Harper chose to continue to prescribe his customers these highly addictive drugs in quantities and combinations that were dangerous to his customers' lives. He continued to do so even when they vomited and urinated in his office, cheated on their drug screens, were hospitalized for drug overdoses and, on several occasions, died shortly after he gave them the drugs that they sought. This blatant disregard for human life—from a doctor, who swore to uphold the Hippocratic Oath—warrants a sentence at the highest end of the guideline range.

Second, Harper's background and characteristics support a sentence at the highest end of the guideline range. Harper is a highly educated man who practiced medicine for more than two decades after graduating from high school, earning a bachelor's degree in chemistry, and receiving an M.D. (R. 66: Presentence Report, PageID 394). Despite what Harper describes as a "perfect upbringing" (*Id.* at PageID 392), a commendable education, and a successful career in

medicine, Harper chose to turn away from all of it. Instead, Harper chose to use his skills to feed the addictions of his customers and defraud them and their health insurance providers during the sale of those prescriptions. His decision to turn his medical license into a criminal tool to facilitate his drug trafficking warrants a sentence at the highest end of the guideline range. So too does his choice to continue trafficking to his addicted customers even when he was faced with customers who were incapacitated in his presence, repeatedly overdosed on his prescription medication, and even those customers who died from overdose-related deaths. Harper's decision to use his medical license to feed those customers' addictions, and make hundreds of thousands of dollars doing so, rather than to help and heal those customers warrants a sentence at the highest end of the range.

Third, a sentence at the highest end of the guideline range would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Prescription drug and opiate abuse has reached epidemic proportions in the Northern District of Ohio and in many other areas of the country. Drug traffickers disguised as doctors, such as Harper, fuel this epidemic and cause the rapid rates of addictions and fatalities that have reached record levels in recent years. A sentence at the highest end of the guideline range would not only provide just punishment to a doctor who chose to feed the addictions of his customers, it would reflect the seriousness of Harper's offense. Harper's decision to capitalize on the addictions of his customers not only affected their lives, it also affected the lives of the countless friends and family members of those customers. In some instances, Harper's repeated decision to continue his drug trafficking had fatal consequences, further justifying a sentence at the highest end of the guideline range.

Fourth, a sentence at the highest end of the advisory guideline range would provide adequate deterrence to Harper and other doctors who have the opportunity to turn their patients into drug customers. Such a lengthy sentence would show that a white coat and a medical degree will not disguise a drug trafficker who is using that medical degree to do more harm than good, and it will not protect someone from facing the type of punishment that this type of wide-spread drug trafficking deserves.

Finally, a sentence at the highest end of the guideline range would serve to protect the public, which has already been severely harmed by Harper's conduct. A lengthy prison sentence at the highest end of the guideline range would remove Harper from society for a significant period of time. Harper has surrendered his medical license; but given his blatant disregard for the law during the course of this conspiracy, a sentence at the highest end of the guideline range is necessary to protect the public.

## III.    CONCLUSION

For the foregoing reasons, the government requests that this Court impose a sentence of

168 months at the highest end of the advisory guidelines range as outlined in this memorandum.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney

By:    /s/ Margaret A. Sweeney
       Margaret A. Sweeney (OH: 0086591)
       Edward Feran (OH: 0039083)
       Assistant United States Attorneys
       United States Court House
       801 West Superior Avenue, Suite 400
       Cleveland, Ohio 44113
       (216) 622-3990
       (216) 522-7499 (facsimile)
       Margaret.Sweeney@usdoj.gov
       Edward.Feran@usdoj.gov

       Rebecca Lutzko (OH: 0069288)
       Assistant U.S. Attorney
       United States Court House
       2 South Main Street
       Suite 208
       Akron, Ohio 44308
       (330) 761-0530
       (330) 330-375-5492 (facsimile)
       Rebecca.Lutzko@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January 2015, a copy of the foregoing

Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.  All other parties will be

served by regular U.S. Mail.  Parties may access this filing through the Court's system.

/s/ Margaret A. Sweeney
Margaret A. Sweeney
Assistant U.S. Attorney