**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45004 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 2804<br><br>Hon. Judge Dan A. Polster |

**DISTRIBUTORS' CONSOLIDATED REPLY IN SUPPORT OF
MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS'
CIVIL CONSPIRACY, RICO, AND OCPA CLAIMS**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

I.      THE NOERR-PENNINGTON DOCTRINE BARS PLAINTIFFS' CLAIMS...................3

II.     THERE IS NO EVIDENCE OF ANY AGREEMENT TO ACHIEVE AN
        UNLAWFUL OBJECTIVE.....................................................................................5

        A.      Plaintiffs' Evidence, to the Extent Not Barred by *Noerr-Pennington*,
                Shows Only Communication To Understand and Comply with Legal
                Requirements. ........................................................................................6

        B.      There Is No Evidence of Any Agreement To Violate the CSA or
                Accomplish Any Other Unlawful Objective...........................................11

III.    PLAINTIFFS FAIL TO ALLEGE THE EXISTENCE OF A RICO ENTERPRISE
        INVOLVING DISTRIBUTORS. ..................................................................................12

IV.     PLAINTIFFS' RICO AND OCPA CLAIMS FAIL FOR ADDITIONAL
        REASONS. ..................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Al-Rayes v. Willingham*, 914 F.3d 1302 (11th Cir. 2019)..............................................................13

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ........................................................17

*Almanza v. United Airlines, Inc.*, 851 F.3d 1060 (11th Cir. 2017) ....................................15, 18, 19

*Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127 (S.D.N.Y. 2014*), aff'd in part, rev'd in part sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x 66 (2d Cir. 2015) ....................13

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)................................................................23

*Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888 (6th Cir. 2003) ................................................24

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000), *cert. denied*, 532 U.S. 1037 (2001)................................................................................14

*Boyle v. United States*, 556 U.S. 938 (2009) ..............................................................13, 17, 19

*Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394 (6th Cir. 2007)..................................21

*Brune and Ashing v. Basf Corp.*, 234 F.3d 1267 (6th Cir. 2000) ..................................................23

*Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ........................................4

*City of Cleveland v. Ameriquest Mort. Securities, Inc.*, 615 F.3d 496 (6th Cir. 2010) ......................................................................................................................................23

*Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir. 1990)............................................19

*Crest Const. II, Inc. v. Doe*, 660 F.3d 346 (8th Cir. 2011) ............................................................17

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019) ..................................................................23

*Dakota Personal Injury Asbestos Litig. No. 1*, 737 F. Supp. 1087, 1096–1098 (D.N.D. 1990) ..............................................................................................................................4

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)........................................................................................................................................3

*Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018)....................23

*Feinstein v. ADR Tr. Corp.*, 942 F.2d 34 (1st Cir. 1991) ..............................................................21

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2nd Cir. 2004) ......................13

*Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. July 13, 2015) ..............................13

*Grange Mut. Cas. Co. v. Mack*, 290 F. App'x 832 (6th Cir. 2008)...............................................19

*Green v. Morningstar Inv. Mgmt. LLC*, 2019 WL 216538 (N.D. Ill. Jan. 16, 2019) ...................16

*Harris v. St. Vincent Med. Ctr.*, 205 F.3d 1340 (6th Cir. 2000) ...................................................23

*Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010) ..................................................23

*Hensely v. Gassman*, 693 F.3d 681 (6th Cir. 2012)......................................................................12

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).........................................22

*Horsemen's Benev. & Protective Ass'n v. Penn. Horse Racing Comm'n*, 530 F.
Supp. 1098 (E.D. Pa. 1982) .......................................................................................................4

*Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694 (3d Cir. 2018)...............................................17

*Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310 (6th Cir. 2014) ...........................................11

*In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980 (D.N.J. Apr. 5, 2007) ..........................19

*In re Welding Fume Products Liability Litig.*, 2010 WL 7699456 (N.D. Ohio June
4, 2010) .......................................................................................................................................5

*In re Welding Fume Products Liability Litig.*, 526 F. Supp. 2d 775 (N.D. Ohio
2007) ..........................................................................................................................................11

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris
Inc.*, 196 F.3d 818 (7th Cir. 1999) ...........................................................................................14

*Javitch v. Capwill*, 284 F. Supp. 2d 848 (N.D. Ohio 2003)..........................................................16

*Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580 (E.D. Mich. 2015)..............................................19

*Mutschelknaus v. Zeglen*, 2018 WL 6248530 (N.D. Ohio Nov. 29, 2018) ..................................24

*New York v. United Parcel Serv., Inc.*, 2016 WL 4203547 (S.D.N.Y. Aug. 9,
2016) ..........................................................................................................................................13

*Perry v. Am. Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003)............................................................23

*Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481 (6th Cir. 1989).....................................................22

*Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389 (7th Cir. 2009).......................................................17

*Ray v. Spirit Airlines*, 836 F.3d 1340 (11th Cir. 2016).................................................................16

*Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 631 (N.D. Ohio 2012) ...................2, 12, 15

*Ryan v. Clemente*, 901 F.2d 177 (1st Cir. 1990)...........................................................................13

*Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76 (2d Cir. 2017)......................................................14

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006)..................................................................14

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) .....................................................21

*Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784 (6th Cir. 2005) ....................................................................................................................................21

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) ...............................17

*United Mine Works of America v. Pennington*, 381 U.S. 657 (1965).............................................5

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012).....................................................................17

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003) ................................................................20

*United States v. Turkette*, 452 U.S. 576 (1981) ...........................................................................17

*VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)...............................................................................................................15

## STATE CASES

*City of Milwaukee v. NL Industries, Inc.*, 691 N.W.2d 888 (Wis. Ct. App. 2004) .........................4

*Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013).............................................................................................................22

*Garofolo v. Fairview Park*, 2009 WL 4694877 (Ohio Ct. App. Dec. 10, 2009)............................5

*Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145 (Ohio Ct. App. Nov. 10, 2005) ................................................................................................................22

*James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119 (Ohio Ct. App. 2006)..........................................5

*Magnum Steel & Trading, L.L.C. v. Roderick Linton Belfance, L.L.P.*, 41 N.E.3d 204 (Ohio Ct. App. 2015) ................................................................................................5

*Transition Healthcare Assoc., Inc. v. New London Healthcare*, 2012 WL 3061861 (Ohio Ct. App. July 27, 2012).................................................................................5

*Woodward Const., Inc. v. For 1031 Summit Woods, L.L.C.*, 30 N.E.3d 237 (Ohio
Ct. App. 2015)..................................................................................................................5, 12

## OTHER AUTHORITIES

21 C.F.R. § 1301.74 ........................................................................................................21, 22

26 C.F.R. § 1.501(c)(6)-1.....................................................................................................15

18 U.S.C. § 1962(c) ...............................................................................................................19

21 U.S.C. § 823(b) ............................................................................................................21, 22

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
and Procedure § 2723 (3d ed. Supp. 2005) ............................................................8

Fed. R. Civ. P. 56(a) ..............................................................................................................1

Fed. R. Civ. P. 56(c)(3)........................................................................................................21

## INTRODUCTION

Plaintiffs' Opposition to Distributors'[1] motions for summary judgment on the civil conspiracy, RICO, and the OCPA (Dkt. 2183) ("Opp.") concedes the major points of those motions.  Most significantly, Plaintiffs concede that Distributors were not involved in the alleged conspiracy by Manufacturers to disseminate false information about opioid medications.  Opp. 82.  Plaintiffs also concede that Distributors did nothing to influence DEA's setting of escalating production quotas for those medications.  *Id.* 87.  It thus is now established that Distributors had nothing to do with the alleged conduct at the heart of Plaintiffs' case—that Manufacturers fraudulently caused a change in the prevailing standard of care for the treatment of pain, leading to massive overuse of opioids by well-meaning doctors.  As a consequence, the Court should, at the very least, enter summary judgment dismissing the parts of these claims that alleged otherwise.  *See* Fed. R. Civ. P. 56(a) (summary judgment may be entered on "part" of a claim).

But the Court should go farther and enter judgment for Distributors on the entirety of Plaintiffs' civil conspiracy, RICO, and OPCA claims.

**Civil Conspiracy.**  The bulk of the conduct Plaintiffs use to support their conspiracy claim is constitutionally protected activity that is not actionable as a matter of law under the *Noerr-Pennington* doctrine.  Moreover, despite submitting hundreds of exhibits, Plaintiffs admit that they have not identified any evidence of an explicit agreement, *see* Opp. 2; and they have failed to identify any evidence of an implicit or tacit agreement to achieve any unlawful objective.  To be sure, the Opposition shows there was communication and sometimes coordination between Distributors, but Plaintiffs' own exhibits show that those efforts were

---

[1] Distributors other than AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation are not named Defendants in the RICO and OCPA claims and therefore join this Reply solely with respect to the civil conspiracy claim.

either aimed at persuading legislators and regulators, which is constitutionally protected, or were well-intentioned attempts to understand and comply with often unclear expectations from DEA, which is not unlawful.  Plaintiffs argue that Distributors did not report certain "suspicious orders" to DEA, but they do not offer any evidence that Distributors agreed with one another not to do so.

**RICO and OCPA.**  Plaintiffs' RICO and OCPA claims fail for two reasons.  First, for many of the same reasons that the civil conspiracy claim fails, Plaintiffs' effort to demonstrate the existence of a racketeering "enterprise" fails.  The communications and conduct that Plaintiffs point to demonstrate, at most, that (1) Distributors coordinated among themselves and with Manufacturers to engage in constitutionally protected petitioning activity, and (2) Distributors and Manufacturers engaged in the sort of routine business communications that one would expect from participants in a supply chain.  Plaintiffs do not point to any evidence suggesting that Distributors shared among themselves or with Manufacturers a "common purpose of engaging in a course of *unlawful* conduct."  *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 631, 651 (N.D. Ohio 2012) (Polster, J.).[2]  That failure, contrary to Plaintiffs' unsupported argument, is fatal to their claims.

Second, Plaintiffs have not come forward with any evidence of a direct causal link connecting Distributors' alleged "predicate acts" to their asserted injuries.  Indeed, the Opposition abandons any effort to connect Distributors' alleged mail fraud, wire fraud, or DEA reporting violations to their harm.  Instead, they rely solely on the undisclosed theory that Distributors' failure to halt "suspicious orders" caused their injury.  That argument fails, among other reasons, because that alleged failure is not a felony and thus is not a RICO predicate act.

---

[2] Unless otherwise noted, all emphases are added.

## I.    THE *NOERR-PENNINGTON* DOCTRINE BARS PLAINTIFFS' CLAIMS.

Under the *Noerr-Pennington* doctrine, liability may not be imposed based on individuals'

or groups' efforts to join together and engage in activity protected by the First Amendment.  *See*

Conspiracy Brief (Dkt. 1905-1) ("Consp. Br.") 7–9.  This doctrine eviscerates the basis for

Plaintiffs' conspiracy, RICO, and OCPA claims.

Plaintiffs' complaints built their RICO enterprise and conspiracy claims on Defendants'

participation in HDA and other trade organizations.[3]  Their Opposition confirms that this is the

basis of their liability theory, giving pride of place to allegations that Defendants "Used the HDA

and NACDS To Protect the Supply Chain."  Opp. 42–58.  Setting aside that "protect[ing] the

supply chain" is a good thing, Plaintiffs' evidence only confirms that Defendants' efforts to

"protect the supply chain" comprised constitutionally protected conduct.

Plaintiffs' arguments do not salvage their claims from the First Amendment's legal bar.

They insinuate that Defendants engaged in wrongful conduct by supporting the so-called

"Marino Bill," engaging and "retain[ing] multiple public relations consultants," filing amicus

briefs, challenging regulations, and opposing aggressive DEA actions.  *See id.*  Plaintiffs also

make much of a Purdue employee's emails to certain distributors suggesting that they "gang up"

on DEA at an industry conference, as if this were an invitation to do physical harm rather than

what it obviously was: a proposal to attempt to persuade DEA of the industry's perspective.[4]

Efforts like these to promote the industry point of view in legislative, executive, and judicial

contexts, as well as efforts to engage in "publicity campaign[s] to influence governmental

action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140

---

[3] *E.g.*, Summit TAC ¶ 531–546, 763–764, 854, 910; Cuyahoga TAC ¶ 514–530, 809–810, 897, 953.

[4] Opp. Ex. 252; Opp. Ex. 253.

(1961), are fully protected by the First Amendment. Plaintiffs' disagreement with the industry's objectives does not make this conduct unlawful. *See Horsemen's Benev. & Protective Ass'n v. Penn. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment).

Plaintiffs ultimately concede these legal principles, albeit only grudgingly and after having spent page after page recounting many examples of Defendants exercising their First Amendment rights. Given this concession, Plaintiffs are left to try to avoid this settled law. They contend that they "do not attempt to impose liability … for [Defendants'] lobbying activities," Opp. 116, but suggest that the evidence of Defendants' coordination through groups like HDA is relevant "to show the purpose and character of Defendants' wrongful activities." Opp. 87 n.478. This argument makes no sense; the "purpose and character" of Defendants' individual suspicious order monitoring programs can be assessed without reference to any lobbying conduct.[5]

Plaintiffs' contention that evidence of lobbying shows "relationships and coordinated behavior," Opp. 86, only highlights that they want to use protected activity to prove an essential element of their conspiracy claim (the existence of an agreement). The Constitution forbids that. *See Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972) ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal

---

[5] Neither *City of Milwaukee v. NL Industries, Inc.*, 691 N.W.2d 888, 896 (Wis. Ct. App. 2004), nor *Dakota Personal Injury Asbestos Litigation No. 1*, 737 F. Supp. 1087, 1096–1098 (D.N.D. 1990), even addresses the *Noerr-Pennington* doctrine, and these unreasoned, outlier opinions do not call into question the Supreme Court's clear directive that protected activity cannot form the basis for liability.

4

agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a -vis their competitors.").

*United Mine Works of America v. Pennington*, 381 U.S. 657, 671 (1965), is not to the contrary. *Pennington* notes only that, in a particular case, evidence of petitioning activity might—if otherwise "probative and not unduly prejudicial" on a disputed issue—be admissible. But the decision is clear that First Amendment petitioning activity may not be used—as Plaintiffs seek to do here—as a basis for imposing liability. *See id.* at 671 n.3 (petitioning activity is "barred from forming the basis for a suit").[6]

## II. THERE IS NO EVIDENCE OF ANY AGREEMENT TO ACHIEVE AN UNLAWFUL OBJECTIVE.

To withstand summary judgment, Plaintiffs must show that an issue of material fact exists as to their conspiracy claim as to each defendant.[7] To do that, for each defendant allegedly involved in the conspiracy, Plaintiffs must point to *evidence* of an agreement do to something unlawful. As Ohio law confirms, civil conspiracy claims may not be based on "[s]upposition alone," *Woodward Const., Inc. v. For 1031 Summit Woods, L.L.C.*, 30 N.E.3d 237, 244 (Ohio CT. App. 2015), or on "vague and conclusory assertions," *Garofolo v. Fairview Park*, 2009 WL 4694877, at *4 (Ohio Ct. App. Dec. 10, 2009). And Plaintiffs must do more than merely point to

---

[6] *In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 (N.D. Ohio June 4, 2010), illustrates the point. There, the defendants' written lobbying materials were admitted *not* to suggest that lobbying was evidence of any wrongdoing, but instead because they contained admissions against interest about defendants' knowledge of the adverse medical effects of their products. *Id.* at *93. Indeed, the court made sure to admonish that the plaintiffs "may not suggest to the jury that defendants were engaged in any improper activity by lobbying." *Id.*; *see also Pennington*, 381 U.S. at 671 (reversing trial court instruction that lobbying activity could be considered for "whatever bearing it may have on the overall picture").

[7] Plaintiffs' assertion that "[s]ummary judgment is rarely appropriate in civil conspiracy claims," Opp. 103, is incorrect. Summary judgment is appropriate for Ohio law civil conspiracy claims under the same circumstances as any other claim, and courts regularly grant it. *See, e.g.*, *Magnum Steel & Trading, L.L.C. v. Roderick Linton Belfance, L.L.P.*, 41 N.E.3d 204, 208 (Ohio Ct. App. 2015); *Transition Healthcare Assoc., Inc. v. New London Healthcare*, 2012 WL 3061861, at *8 (Ohio Ct. App. July 27, 2012); *James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119, 125 (Ohio Ct. App. 2006).

evidence that Distributors had the same relationships among themselves that participants in every industry have with one another.

> **A.  Plaintiffs' Evidence, to the Extent Not Barred by *Noerr-Pennington*, Shows Only Communication To Understand and Comply with Legal Requirements.**

Apparently believing that volume will mask the legal shortcoming of their claims, Plaintiffs point to evidence detailing the unremarkable fact that there were interactions among and between Distributors, Manufacturers, and Pharmacies.  But the existence of such interactions was never in dispute, and they do not prove a conspiracy.  As already explained, many of these documents show communications about lobbying or attempting to persuade DEA on issues of policy, which are protected by the *Noerr-Pennington* doctrine.  *See supra* Part I.  Beyond that, Plaintiffs' arguments are based entirely on innuendo, not evidence.  To conclude that the documents mean what Plaintiffs say requires, in most cases, ignoring the plain language on the face of the cited evidence.  There is no way Distributors can address every exhibit in this Reply, but we invite the Court to review every one of Plaintiffs' proffered exhibits for any evidence of an unlawful objective on the part of any Distributor.  It will find there is none.  These are not disputed facts—they are failures of evidence.

For example, as to interactions between Manufacturers and Distributors, Plaintiffs assert that "[c]ollaboration was about filling orders, not stopping them."  Opp. 32.  Not so.  Most of the documents Plaintiffs cite are internal to ***Manufacturers*** and do not support Plaintiffs' claim that Distributors joined any conspiracy.[8]  For example, Plaintiffs cite Exhibit 238 to show that Purdue was not concerned with a report on the amount of oxycodone sold in Florida in 2008.  At most,

---

[8] Plaintiffs cite an inflammatory email exchange in which opioid medications are likened to Doritos (Opp. Ex. 241), but none of the Distributors participated in that exchange, and it is therefore irrelevant to establishing their membership in any conspiracy.

this document shows Purdue's ***unilateral*** response to that information.  Even presuming this document is evidence of some sort of wrongdoing by Purdue, it is not evidence of any conspiracy involving Distributors.  Similarly, Plaintiffs cite an internal Purdue email which discusses Purdue's internal belief that registrants should collaborate and share information in order to ***report and identify*** suspicious pharmacies to the DEA—"***That is why we must collaborate***."  Opp. Ex. 237.  That is the opposite of what Plaintiffs suggest the document means. The other cited documents are to similar effect.[9]

Nor do the documents that evidence interactions between Manufacturers and Distributors support Plaintiffs' claim.  For example, Plaintiffs make much of emails from a Purdue employee to certain distributors proposing that they "gang up on DEA" at a conference, but in addition to being protected by *Noerr-Pennington*, *see* Part I above, these interactions, too, show exactly the opposite of Plaintiffs' assertion.  As illustrated by Exhibit 253, the Purdue employee wanted to draw attention to a "crook" pharmacist who had recently been indicted for CSA violations.

As to interactions between Distributors, the cited evidence is equally benign.[10]  Plaintiffs devote substantial attention to the HDA's adoption of Industry Compliance Guidelines ("ICGs")

---

[9] *See, e.g.*, Opp. Ex. 239 (Purdue statement of support for a non-party distributor noting that it is "appreciative of [that distributor's]] work in assuring that our medicine reaches our patients in an appropriate manner and in a timely fashion"); Opp. Ex. 247 (ABDC discussing meeting with Purdue and other Distributors to "explore option with preventing diversion"); Opp. Ex. 248 (Cardinal Health email to Purdue sharing information about "review and vigilance in the area of suspicious order monitoring"); Opp. Ex. 249 (meeting agenda for Purdue and McKesson identifying the "[p]urpose of the [m]eeting" to be a discussion of "[m]eet[ing] our DEA responsibilities"); Opp. Ex. 251 (discussing protocols "for …. [t]he identification of patterns of interest"); Opp. Ex. 254 (informing ABDC of certain "[n]o [c]all" physicians against whom Purdue has "received 'complaints'"); Opp. Ex. 255 (ABDC informing of a "strict threshold" on a customer that it reported to the DEA); Opp. Ex. 259 (meeting agenda focused on "[p]revent[ing] diversion," "[m]eet[ing] "DEA responsibilities, and "[d]o[ing] the right thing"); Opp. Ex. 260 (email from McKesson informing Purdue of "15 prescribers" it may wish to monitor due to potentially suspicious activity).

[10] For example, Plaintiffs quote Exhibit 281 to show that Distributors were working to "collectively address due diligence efforts," but they conveniently omit the rest of the sentence, which reads: "and effective strategies in *identifying and combating pharmaceutical diversion*."  Likewise, Plaintiffs cite Exhibit 282 to show that Distributors "met face-to-face at the HDA . . . to discuss DEA regulations and order monitoring," but Plaintiffs leave out that the purpose of the meeting was to "develop a thorough list of questions, to be submitted to DEA, about *how to comply*."  Plaintiff points out that Exhibit 286 shows that Distributors discussed a customer that "had been cut off

in 2008 and assert that the guidelines were a "ruse" designed to deceive DEA into believing that all distributors would adopt the guidelines.  But there is no evidence that anyone told DEA that the guidelines were mandatory or that all distributors had agreed to follow them.  To the contrary, DEA understood the ICGs to represent an "effort . . . to identify and articulate the responsibilities and obligations" of distributors under the CSA, and it acknowledged that "diversion control is not a 'one size fits all' effort."[11]  Accordingly, DEA has described the ICGs in court filings merely as "recommended steps."[12]  Not surprisingly, no DEA official has testified that they were misled by the ICGs.[13]

Plaintiffs fare no better with the evidence of Distributors' interactions with pharmacies (Opp. Section II.F.1–7[14]).  As a threshold matter, there is no allegation of a distributor-pharmacy conspiracy in the TACs, which assert claims against the Pharmacy Defendants solely in their capacity as distributors, not as dispensers.[15]  *See* 10A Charles Alan Wright, Arthur R. Miller &

---

by one distributor [H.D. Smith] and picked up by other distributors," Opp. 36–37, but they fail to mention that H.D. Smith proposed sharing more information about such accounts precisely to avoid this situation in the future.

[11] Ex. 11 (US-DEA-00266697).

[12] Brief for Respondents, *Walgreen Co. v. DEA*, 12-1397 (D.C. Cir. 2013), at 24 (arguing that the guidelines rebutted Walgreen's argument that suspicious-order monitoring was impossible but not arguing that the ICGs were mandatory).

[13] Plaintiffs' suggestion that DEA was fooled into thinking that McKesson and Cardinal Health would adopt the guidelines is particularly fatuous.  DEA entered into explicit agreements with McKesson and Cardinal Health about the programs that they would implement, complete with DEA review.  Plaintiffs' speculation that DEA might have been confused or duped into thinking that the ICGs would control, rather than those express agreements, is illogical, contradicted by DEA's own witnesses, and unsupported by any evidence.

[14] One subsection of section II.F is entitled only "H.D. Smith," and it cites only documents internal to H.D. Smith that contain no evidence that H. D. Smith coordinated with any other party in furtherance of an agreement to do anything at all, let alone anything illegal.  Other Distributors, including non-severed Defendant Henry Schein, Prescription Supply, and Drug Discount Mart, are not addressed in Section II.F and hardly mentioned in Plaintiffs' Opposition at all, and therefore Plaintiffs have not shown that an issue of material fact exists as to the conspiracy claims against them.

[15] Summit TAC ¶ 101; Cuyahoga TAC ¶ 95.

Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.").  That fundamental flaw aside, there is no evidence of an agreement to achieve any unlawful objective.

Indeed, many of the distributor-pharmacy interactions can be explained by registrants' efforts to comply with the DEA's request that they "Know Your Customer."  For example, Plaintiffs' Exhibit 536 contains Cardinal Health talking points for a pharmacy conference in 2008, when Cardinal Health was rolling out its newly-enhanced Know Your Customer procedures.  It states that Cardinal Health "is aligned with the DEA in ensuring that controlled substances are only getting to those with a legitimate prescription."  It advises pharmacies that Cardinal Health was required to apply its suspicious-order monitoring program to retail pharmacy chains, and that it sought to do so "in a way that minimizes the disruption to the *legitimate need* for medicines."  It asked that pharmacies "work with us in determining how Cardinal Health can meet its obligation to implement Suspicious Order Monitoring without disrupting the *legitimate supply chain*."

Plaintiffs criticize some Distributors' policy of providing an alert to pharmacies that were nearing their ordering thresholds.  But that policy is no evidence of conspiracy.  As Plaintiffs' own exhibits show, when Cardinal Health learned that another distributor was giving such alerts, it wrote the DEA and asked for guidance on whether the practice was consistent with DEA's expectations—a step that is obviously inconsistent with any agreement among Distributors to hide the practice from DEA or to violate the law.  Opp. Ex. 557.  And contrary to Plaintiffs' insinuations, they have pointed to no evidence that DEA ever indicated the practice was

9

categorically improper or inconsistent with the CSA or that DEA has ever based any enforcement action on such alerts.[16]

In the absence of any evidence that these notifications violated the CSA or its regulations, Plaintiffs are left with mere innuendo that the purpose of the notifications was to permit pharmacies to "manipulate ordering patterns."  Opp. 61.  Suppositions like that are not evidence. Plaintiffs have not identified any instance of a pharmacy actually using one of these alerts to obtain an order that was at risk of diversion.[17]

The aim of these systems, including pre-notifications to pharmacies, was to prevent the legitimate supply chain from being disrupted by surprise.  Although Plaintiffs try to paint "protecting the supply chain" as an unlawful objective, there is nothing nefarious about doing so for legal, FDA-approved medicines that many patients legitimately need—in fact, that is exactly what DEA expects of licensed wholesale distributors.

---

[16] Plaintiffs assert that McKesson provided "automatic increases," Opp. 69, but their own evidence belies this assertion.  *See* Opp. Ex. 614 (mandating "advance validation from CVS" prior to any threshold increase); Opp. Ex. 629 (informing Rite Aid that it may submit a request for an increase for McKesson's regulatory review); *see also* Opp. Ex. 607 ("under no circumstances will we be taking these [CVS] stores off of the [McKesson SOMs] program").

[17] Plaintiffs contend that "Cardinal Health readily granted threshold increases and overrides for CVS without appropriate due diligence," but the cited documents tell a different story.  Opp. 66.  Cardinal Health contacted CVS's loss prevention department after already having spoken directly to the pharmacies at issue and identified a reason for the increased oxycodone purchases.  Cardinal Health asked CVS's loss prevention department to independently "look into the ordering habits" of those pharmacies as an additional aspect of due diligence.  Opp. Ex. 583; *see also* Opp. Ex. 584 (CVS response to another Cardinal Health inquiry as part of due diligence efforts).  The same is true for McKesson, which conducted a review "anytime [CVS stores] exceed[ed] their threshold" and "work[ed] with their headquarters" to "determin[e] if the store should be allowed an increase.  *See* Opp. Ex. 613; *see also* Opp. Ex. 611 (McKesson Director of Regulatory Affairs William Mahoney refusing to increase a CVS threshold for oxycodone).

10

**B.    There Is No Evidence of Any Agreement To Violate the CSA or Accomplish Any Other Unlawful Objective.**

Although Plaintiffs have alleged that Distributors violated the CSA and thereby committed a variety of torts (a proposition that is wrong, as Distributors explain elsewhere[18]), Plaintiffs have identified no evidence that Distributors reached any ***agreement*** to do so.  The evidence Plaintiffs cite shows only that Distributors coordinated to "share information and discuss ongoing DEA issues and suspicious order monitoring," Opp. 37—which is not an agreement to do something unlawful.  Plaintiffs point to an email in which a McKesson employee stated as "gossip" that Cardinal Health was "not reporting suspicious orders to DEA on the advice of outside counsel,"  Opp. Ex. 291 (cited at Opp. 37), but as Distributors already have pointed out, the author of the email testified under oath that he was mistaken, and Cardinal Health in fact reported thousands of suspicious orders in the same quarter in which the alleged conversation took place.  Consp. Br. 15.  In any case, the email is not evidence of ***agreement***; on the contrary, it demonstrates that Cardinal Health and McKesson did ***not*** conspire not to report orders, and the suggestion that Cardinal Health allegedly was not reporting came as a surprise to McKesson.  Plaintiffs have no response to these points.

Plaintiffs are left with the assertion that, because (they contend) every Defendant's anti-diversion system was inadequate, there must have been a conspiracy.  This argument fails because allegations and evidence that are consistent with parallel or independent conduct do not give rise to any suggestion of conspiracy.  *See Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318–20 (6th Cir. 2014); *In re Welding Fume Products Liability Litig.*, 526 F. Supp. 2d 775, 805 (N.D. Ohio 2007) ("Circumstances that are just as consistent with a lawful purpose as with

---

[18] *See* Distributors' Reply in Support of Motion for Summary Judgment on Negligence Per Se.

11

an unlawful undertaking are insufficient to establish a conspiracy."). Contrary to Plaintiffs' suggestion, this legal principle is not limited to antitrust claims. *See Hensely v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (applying principle to § 1983 conspiracy claim).

In circumstances like these—where Defendants independently operate proprietary anti-diversion systems—it is nothing more than "supposition alone," *Woodward Const.*, 30 N.E.3d at 244, to assert that a conspiracy must be afoot on the basis of mundane inter-business contacts that would occur in any industry. In the absence of any evidence of an agreement between Distributors and other defendants, or among Distributors, to do anything unlawful, Plaintiffs have no evidence that Distributors conspired to violate the CSA, create a public nuisance, or commit any other tort.

## III. PLAINTIFFS FAIL TO ALLEGE THE EXISTENCE OF A RICO ENTERPRISE INVOLVING DISTRIBUTORS.

Plaintiffs' argument that Distributors were part of a RICO enterprise rests entirely on an erroneous legal premise. According to Plaintiff, any group of individuals who associate together for a "common purpose of engaging in a course of conduct" constitutes a racketeering enterprise. Opp. 85. By that logic, the Girl Scouts, synagogues, and every trade association in America are all RICO enterprises. That is not the law.

As this Court has recognized, a RICO enterprise consists of a "group of individuals associated together for a common purpose of engaging in a course of ***unlawful*** conduct." *Robins*, 838 F. Supp. 2d at 651. Indeed, the overwhelming weight of authority aligns with the common-sense notion that, in order for "an association of individuals to constitute a RICO enterprise, the individuals must share a ***common purpose to engage in a particular fraudulent course of***

*conduct*." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2nd Cir. 2004).[19] The Supreme Court's decisions in *Boyle v. United States*, 556 U.S. 938, 941 (2009), is not to the contrary: the undisputed common purpose of the enterprise there was to rob banks.

Viewed in light of the proper legal framework, Plaintiffs' arguments quickly fall apart. There is no evidence that Distributors joined with one another or with Manufacturers for the common purpose of doing anything unlawful. Rather, as explained above, the evidence at most shows (1) lawful coordination among certain Defendants either for routine business purposes or for the purpose of engaging in First Amendment protected petitioning activity, and (2) supposed "predicate acts" of failing to report "suspicious orders" to DEA for which there is absolutely no evidence of coordination.

**Petitioning Activity.** The vast majority of the conduct that Plaintiffs point to as evidence of a common purpose consists of coordinated activities to influence Congress, the judiciary, and DEA. Plaintiffs recite at length various actions taken by Distributors (either directly or through trade associations) to: (1) engage with DEA regarding their regulatory compliance efforts, Opp. 44–46, (2) lobby Congress regarding legislation, *id.* 47–50, 53–55; (3) submit *amicus* briefs or otherwise participate in litigation concerning industry issues, *id.* at 53; and (4) develop public

---

[19] *See, e.g.*, *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) ("[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in illegal activity."); *Ryan v. Clemente*, 901 F.2d 177, 180–81 (1st Cir. 1990) ("[I]nsofar as the complaint accuses the state defendants of sharing the enterprise's improper objective … it sets forth a proper legal theory."); *New York v. United Parcel Serv., Inc.*, 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) ("To satisfy the first 'purpose' feature, the individuals that comprise the enterprise 'must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'"); *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *9 (C.D. Cal. July 13, 2015); ("Many courts have found the 'common purpose' element unmet by requiring that the common purpose of an association be fraudulent in order for it to constitute a RICO enterprise."); *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 141 (S.D.N.Y. 2014) ("[T]he Complaint merely alleges the roles each entity played in the legitimate mortgage industry … not coordinated activity to jointly achieve a common fraudulent purpose.") , *aff'd in part, rev'd in part sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x 66 (2d Cir. 2015).

relations strategies relating to these efforts, *id.* at 51–53.[20]  For the reasons explained above, all of this conduct is legal—indeed immunized—under the First Amendment.  *See supra* Part I.[21]

Plaintiffs pay lip service to this bedrock constitutional principle, asserting that they "do not attempt to impose liability upon the RICO Supply Chain Defendants for their lobbying activities, or argue that the lobbying was unlawful conduct."  Opp. 86.  But if, as Plaintiffs purport to acknowledge, Distributors' petitioning activities were legal, then all Plaintiffs have shown is that Distributors joined together for a common purpose of engaging in a course of ***lawful*** conduct.  The fact that Distributors collectively sought to influence the government on topics relevant to the wholesale distribution industry thus provides no basis for imposing RICO liability on Distributors.

**Trade Association Activity.**  Plaintiffs also rely heavily on Distributors' participation in trade associations to establish the existence of a RICO enterprise.  As discussed above, those allegations relate principally to Distributors' efforts to petition the government and thus are immunized by the First Amendment.  None of the other trade-association activities identified by Plaintiffs supports the conclusion that Distributors joined with one another (or with Manufacturers) for the purpose of achieving any unlawful objective.  *See supra* Part I.

Plaintiffs observe that Defendants' trade associations "created a private network where representatives of the Manufacturers and Distributors could form relationships and create alliances and hold strategic discussions," Opp. 88, but that is what all trade association do.  It likewise is

---

[20] Plaintiffs disavowed reliance on Distributors' alleged (but unproven) effort to influence DEA production quotas for opioids as forming any part of their RICO claim.  *See* Opp. 87.

[21] *See also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (finding that although the *Noerr-Pennington* doctrine originated in antitrust law it "is equally applicable to RICO suits"); *see also Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 77 (2d Cir. 2017) (affirming dismissal of RICO claim based on *Noerr-Pennington* doctrine); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("[T]he *Noerr–Pennington* doctrine … [applies] to any statutory interpretation that could implicate the rights protected by the Petition Clause"); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000), *cert. denied*, 532 U.S. 1037 (2001) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference.").

14

unsurprising that HDA pursued the "common interest" of its distributor members—trade associations are required by law to do exactly that.  *See* 26 C.F.R. § 1.501(c)(6)-1.  Accordingly, the evidence cited by Plaintiffs shows nothing more than that Distributors were members of a trade association that did precisely the sort of things that all trade associations lawfully do[22]—a fact which, without more, "does not make [them] part of an enterprise."  *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1072 (11th Cir. 2017); *see supra* Part I; *see also* RICO Brief (Dkt. 1921-1) ("RICO Br.") at 3.

In short, Plaintiffs conspicuously fail to identify even a shred of evidence suggesting that Distributors joined together, through their trade association, for a common purpose of engaging in a course of unlawful conduct.  Absent such evidence, trade association activity cannot establish the existence of a RICO enterprise.

**Manufacturer Communications.**  Plaintiffs point to evidence of communications between Manufacturers' and Distributors' regulatory affairs departments regarding "suspicious orders."  Opp. 31–36.  As shown above, however, to credit Plaintiffs' insinuations about what these documents means is to ignore entirely what they actually say.  *See supra* pp. 6-8. The communications do nothing to demonstrate that Manufacturers and Distributors joined together "for a common purpose of engaging in a course of ***unlawful*** conduct."  *Robins*, 838 F. Supp. 2d at 651.  They are evidence only of the sort of "routine business relationships" that cannot form the basis for a RICO claim.  *Id.* at 651–53 ("routine business relationships, without more, are insufficient to establish a RICO claim"); *see also VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir. 2000) (affirming dismissal of RICO claim because legal business

---

[22] *See, e.g.*, Opp. Ex. 351 (trade association email regarding potential amicus brief); Opp. Ex. 357 (discussing work of communications firm); Opp. Ex. 377 (HDA Executive Board approval of compliance guidelines).

relationship cannot establish a RICO enterprise) , *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Javitch v. Capwill*, 284 F. Supp. 2d 848, 857 (N.D. Ohio 2003) (same).[23]

**Distributor Communications.**  Most of the evidence of coordination between Distributors identified in the Opposition relates to First Amendment petitioning activity and thus cannot serve as a basis for finding that Distributors shared an unlawful common purpose.  *See supra* Part I. None point in any way to a common purpose of engaging in a course of unlawful conduct.  *See supra* pp. 11-12.

**"Expanding the Market."**  Plaintiffs seek to impose RICO liability on Defendants in part because they sought to "expand the market" for prescription opioids.  Opp. 80–81.  As a threshold matter, there is no evidence that ***Distributors*** sought to "expand the market" for opioids.  *See* RICO Br. at 10.  Moreover, there is nothing inherently unlawful about seeking to "expand the market" for the products one sells.  *See, e.g.*, *Ray v. Spirit Airlines*, 836 F.3d 1340, 1352 n.3 (11th Cir. 2016) ("[S]ince making money is the purpose of every for-profit corporation … this purpose is wholly insufficient to establish an association-in-fact enterprise."); *Green v. Morningstar Inv. Mgmt. LLC*, 2019 WL 216538, at *3 (N.D. Ill. Jan. 16, 2019) ("Green failed to distinguish between the illicit purpose of the enterprise and the lawful purpose of the defendant businesses. There is nothing inherently nefarious about the defendants wanting … to maximize their profits.").

Plaintiffs counter that "Defendants are not relieved from RICO liability if they engaged in unlawful conduct to achieve" the end of expanding the market.  Opp. 80.  But the only "unlawful conduct" they point to is ***Manufacturers'*** purported efforts "to expand the market for prescription

---

[23] Plaintiffs' Opposition also discusses at length routine business communications between Distributors and Pharmacies.  *See* Opp. 59–73; *supra* pp. 8-10  Because the Pharmacies are not members of the alleged RICO Supply Chain Enterprise, that evidence is not relevant to the RICO claims.

opioids by engaging in fraudulent marketing."  Opp. 81; *see id.* 89.  As Plaintiffs admit, Distributors played no role in Manufacturers' purportedly fraudulent marketing campaign.  Opp. 82.  Thus, even assuming *arguendo* that the RICO Marketing Enterprise shared a common purpose to engage in fraud, that common purpose does nothing to establish an unlawful, common purpose of the so-called RICO Supply Chain Enterprise.

**Suspicious Order Reporting.**  Plaintiffs point, finally, to Distributors' alleged failures "to report suspicious orders"—from which, they argue, a jury could "infer" the existence of a "tacit agreement" not to report suspicious orders.  Opp. 88.  In other words, they seek to prove the existence of an enterprise by pointing to each Defendants' alleged RICO "predicate acts."  But "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'"  *Boyle v. United States*, 556 U.S. 938, 947 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).[24]  Accordingly, the Court should reject Plaintiffs' attempt to "bootstrap its allegations of illegal conduct into allegations that [Distributors] conducted the affairs of an enterprise by asking [the Court] to infer that because the activities were [supposedly] illegal, they therefore must also have been coordinated."  *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013).

---

[24]  *See Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 699 (3d Cir. 2018) (noting that a RICO enterprise plaintiff "must establish the existence of an enterprise that exists "separate and apart from the pattern of activity in which [the enterprise] engages."); *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015) ("A pattern of racketeering activity does not, by itself, necessarily show that an enterprise exists."); *United States v. Cain*, 671 F.3d 271, 289 n.7 (2d Cir. 2012) ("[T]he enterprise is an entity separate and apart from the pattern of activity in which it engages, and at all times remains a separate element which must be proved by the Government."); *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011) ("[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other."); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 399 (7th Cir. 2009) ("A [RICO enterprise] claim also requires that there be a 'pattern' of racketeering activity, which is an element distinct from the enterprise requirement.").

The Eleventh Circuit's decision in *Almanza v. United Airlines* is instructive.  There, plaintiffs alleged the existence of a RICO enterprise consisting of U.S. airlines that collected from Mexican nationals, and retained for themselves, a tax from which Mexican nations are exempt. *See.* 851 F.3d at 1064–65.  The court accepted as true the plaintiffs' allegation that each defendant violated the law in the same way, but rejected the plaintiffs' attempt to bootstrap that allegation of "parallel conduct" into evidence of a RICO enterprise.  *Id.* at 1068–69.  As the Eleventh Circuit explained, even "conscious parallelism"—*i.e.*, where defendants knowingly engage in a similar course of conduct—is itself insufficient to allege (let alone prove) the existence of a RICO enterprise.  *Id.* at 1069.

The Eleventh Circuit also rejected the plaintiffs' argument that they alleged more than mere parallel conduct—arguments that echo those made by Plaintiffs here.  For instance, the court rejected Plaintiffs' assertion that an enterprise could be inferred based on the fact that the defendants' parallel conduct was "unlawful."  *Id.* at 1069–71.  It also rejected the argument that facially lawful commercial relationships among the defendants demonstrated the existence of a RICO enterprise.  *Id.* at 1074 ("[T]he Contract in no way evidences a meeting of the minds beyond the meeting of the minds expressed in the Contract's terms, which in and of themselves had nothing to do with the alleged enterprise").  Finally, the court rejected the argument that the defendants' shared membership in a trade association—an entity created expressly for the purpose of "coordinating Mexico-related airline matters [among the defendants] and with Mexican authorities," *id.* at 1064—established the existence of an enterprise, *id.* at 1072.  The same conclusions are warranted here.  Plaintiffs point only to (1) lawful business relationships among Defendants and the fact that they shared trade associations, on the one hand, and (2) alleged predicate acts of failing to report suspicious orders, on the other.  That evidence does not provide

18

a sufficient basis for a jury to infer the existence of an "illicit side agreement" to violate the CSA. *See id.* at 1073.

In short, Plaintiffs have not come forward with any evidence that Defendants agreed with one another not to report suspicious orders—or formed an on-going organization for the purpose of not reporting suspicious orders. That is fatal to their RICO and OCPA claims. *See Boyle*, 556 U.S. at 947 n.4 (RICO enterprise claim fails where defendants operated "independently and without coordination"); *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980, at *29 (D.N.J. Apr. 5, 2007) ("Plaintiffs' allegations based on the mere similarity of … operation models fail in the same way a claim alleging that all armed robbers in the nation comprise a RICO enterprise would fail.").

## IV. PLAINTIFFS' RICO AND OCPA CLAIMS FAIL FOR ADDITIONAL REASONS.

RICO and OCPA liability may be imposed based ***only*** on the commission by defendants of enumerated "predicate acts"—not simply for conduct that might otherwise be characterized as wrongful or tortious. *See* RICO Br. at 11-12.[25] During the course of this litigation, Plaintiffs identified only two categories of RICO/OCPA predicate acts: (1) mail and wire fraud and (2) "knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the DEA." *E.g.*, Ex. 2 (Plaintiffs' Supp.

---

[25] Plaintiffs suggest that they do not need to prove that each Distributor committed RICO predicate acts because Distributors were "part of the RICO conspiracy." Opp. 97. This passing suggestion cannot save their RICO claim against Distributors for three reasons. First, the Complaints do not plead a RICO conspiracy involving Distributors. *See Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 495 (6th Cir. 1990) (dismissing RICO conspiracy claim where plaintiffs "ple[d] the conclusory allegation that the defendants 'conspired,' [but] failed to plead the elements of a conspiracy"). Second, Plaintiffs have not come forward with any evidence that they were "injured by reason of a conspiracy to violate § 1962(c)'s substantive provision." *Grange Mut. Cas. Co. v. Mack*, 290 F. App'x 832, 835 (6th Cir. 2008) (emphasis omitted). Third, for the reasons explained in Part II above, Plaintiffs have not come forward with sufficient evidence of a conspiracy to survive summary judgment. Fourth, there is no dispute that Plaintiffs' failure to demonstrate at least two acts committed by any Distributor required dismissal of at least their substantive RICO claim under 18 U.S.C. § 1962(c). *See, e.g., Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015) (explaining that a plaintiff must establish "that *each defendant* individually committed at least two predicate acts").

Responses to Distributor Defendants' Interrogatories 24, 25, 26, and 27) at 4.  Now, at the summary judgment stage, Plaintiffs entirely abandon both categories of predicate acts:

1.  As Distributors explained in their opening brief, ***no evidence*** supports Plaintiffs' allegation that Distributors engaged in mail or wire fraud.  *See* RICO Br. 11 n.15 ("there is no evidence that Distributors intended to defraud Plaintiffs in any way"); *see also United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (mail and wire fraud require an "intent to deprive a victim of money or property").  The Opposition makes no effort to argue either that (1) any Distributor committed mail or wire fraud or (2) a Distributor's mail or wire fraud caused Plaintiffs any injury.  Accordingly, Plaintiffs' mail and wire fraud allegations cannot save their RICO and OCPA claims from dismissal.

2.  Distributors' summary judgment motion assumed *arguendo* that a failure to report "suspicious orders" to DEA could constitute a violation of the CSA and, in turn, qualify as a RICO predicate act.[26]  Proceeding from that assumption, Distributors demonstrated that their alleged failure to report "suspicious orders" to DEA did not proximately cause Plaintiffs' injury.[27] Plaintiffs do not offer any evidence, or even any argument, that Distributors' failure to report "suspicious orders" was the proximate cause of their alleged injuries.  *See* Opp. 96–98.  Their

---

[26] In fact, both of those assumptions are incorrect.  *See* Dkt. 2159, at 5-6; Dkt. 2149, at 14-19.

[27] As Distributors explained, Plaintiffs' causal chain depended on the unfounded (and erroneous) premise that if Distributors had submitted more suspicious order reports, DEA and BOP would have taken action in response and thereby prevented Plaintiffs' harms.  But this chain—punctuated by intervening conduct by the DEA and BOP—is based entirely on speculation, is wholly unsupported by the record, and is insufficient as a matter of law.  *See* RICO Br. Part II.

wholesale abandonment of the claim that they were harmed as a result of Distributors' alleged *reporting* violations requires that summary judgment be granted for Distributors.[28]

In an eleventh-hour attempt to rescue their concededly deficient RICO and OCPA claims, Plaintiffs pivot to the previously undisclosed theory that Distributors' alleged violations of a purported duty under the CSA "*not to ship* suspicious orders" constitute predicate acts. Opp. 97 (emphasis in original). This argument fails for five independently dispositive reasons.

First, the only purported predicate acts previously identified by Plaintiffs are (i) mail and wire fraud and (ii) purported false or fraudulent statements to DEA. *E.g.*, Ex. 2 at 4; *see also* Cuyahoga TAC ¶ 960; Summit TAC ¶ 917. The law bars Plaintiffs from asserting a new RICO theory based on shipping for the first time in their summary judgment opposition. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [plaintiff] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment"); *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005) (similar); *see also Feinstein v. ADR Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991) ("It is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial.").

Second, Plaintiffs cite 21 U.S.C. § 823(b) and 21 C.F.R. § 1301.74 as the source of Distributors' purported duty to halt or not ship "suspicious orders." Opp. 97. But even if those provisions imposed such a duty on Distributors, any violation of that "duty" would not constitute a RICO predicate act. RICO's enumerated predicate acts include "the *felonious* manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled

---

[28] *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only" the materials cited in the parties' briefs); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

substance." But supposed "violations" of 21 U.S.C. § 823(b) and 21 C.F.R. § 1301.74 are not punishable under the criminal code—much less as felonies. *See* Dkt. 2149, at 16-17. Accordingly, Distributors' alleged violations of these provisions do not qualify as predicate acts.

Third, neither 21 U.S.C. § 823(b) nor 21 C.F.R. § 1301.74 in fact impose a "no ship" duty on Distributors. Rather, those provisions merely set forth sets forth factors that DEA should consider in deciding whether to grant or revoke a registration. *See* Dkt. 2159, Part II.

Fourth, even if Plaintiffs were correct that Distributors' failure to stop shipment of allegedly suspicious orders constitute predicate act under RICO and the OCPA, Plaintiffs cannot establish—as they must—that such conduct ***directly caused*** their injuries. *See, e.g.*, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).[29] The presence of at least four independent actors and two criminal acts standing between Distributors' shipments of opioids to DEA-registered pharmacies and Plaintiffs' harm is too attenuated and indirect as a matter of settled Sixth Circuit law. *See* RICO Br. Parts I-III; Distributor Defendants' Reply in Support of Motion for Summary Judgment on Causation.

In arguing otherwise, Plaintiffs baldly assert—without citing any evidence—that "their injuries are and were the foreseeable result of the Defendants' conduct" and that Distributors "intentionally caused the allegedly intervening acts." Opp. 92, 97(emphasis omitted). This argument is flawed as a matter of both law and fact. As a factual matter, there simply is no

---

[29] Plaintiffs assert that, unlike RICO, the OCPA "does not require a direct injury." Opp. 92 n. 485. That is not the law. In 2005, the Ohio Court of Appeals held that, because the OCPA "is patterned after the federal RICO law, *we adopt the same position as that in* Holmes*[], which requires proof of proximate cause in an OPCA claim*." *Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145, at *5 (Ohio Ct. App. Nov. 10, 2005) (footnote omitted). The Court of Appeals reiterated this rule in 2013, holding that "[t]he same proximate cause requirements"—*i.e.*, "the 'direct relation' test set forth in *Holmes*"—apply to both RICO and OCPA claims. *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *5 (Ohio Ct. App. Mar. 21, 2013). Absent circumstances not present here, "a federal court may not disregard a decision of the state appellate court on point." *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989).

evidence that Distributors' "intentionally caused" the intervening conduct of the doctors, pharmacists, patients, drug dealers, thieves, and/or illicit end-users responsible for the diversion and abuse of controlled substances.

As a legal matter, Plaintiffs' argument fails because "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to [harm him]." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006). Nor does "RICO's proximate cause requirement turn on foreseeability." *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010); *accord Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury."). Instead, as the Supreme Court has repeatedly instructed, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461; *see City of Cleveland v. Ameriquest Mort. Securities, Inc.*, 615 F.3d 496, 502–03 (6th Cir. 2010) (holding under Ohio law that the directness requirement "is distinct from foreseeability and applies even if the Defendants intentionally caused the alleged course of events"); *see also Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 144–45 (2d Cir. 2018) (recognizing that "foreseeability and intention have little to no import for RICO's proximate cause test"). Thus, Plaintiffs' unsupported assertion that "their injuries are and were the foreseeable result of the Defendants' conduct" is legally irrelevant.[30]

---

[30] In urging this Court to disregard the "directness" test and focus instead on the alleged foreseeability of their harms, *see* Opp. 92, Plaintiffs do not even cite—let alone distinguish—*Anza* and *Hemi*; instead, they rely on inapposite cases involving only non-RICO claims. *See, e.g., Crosby v. Twitter*, Inc., 921 F.3d 617 (6th Cir. 2019); *Brune and Ashing v. Basf Corp.*, 234 F.3d 1267 (6th Cir. 2000); *Harris v. St. Vincent Med. Ctr.*, 205 F.3d 1340 (6th Cir. 2000).

Fifth, and finally, Plaintiffs fall back on the allegations from their Complaints, asserting that "this Court has already determined that Plaintiffs sufficiently alleged RICO proximate causation."  Opp. 91.  But the law is clear that a party opposing summary judgment "may not rely solely on the pleadings," *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003), but instead must present "affirmative evidence" supporting its claims, *Mutschelknaus v. Zeglen*, 2018 WL 6248530, at *2 (N.D. Ohio Nov. 29, 2018).  Because Plaintiffs have not satisfied their evidentiary burden, *see* Distributor Defendants' Reply in Support of Motion for Summary Judgment on Causation, the Court should grant Distributors' motion for summary judgment on the RICO and OCPA claims.

Dated: August 16, 2019              Respectfully submitted,

*/s/ Enu Mainigi*
WILLIAMS & CONNOLLY LLP
Enu Mainigi
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Defendant Cardinal Health, Inc.*

*Co-Liaison Counsel for the Distributor Defendants*

*/s/ Shannon E. McClure*
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone: (215) 851-8100
Fax: (215) 851-1420
smcclure@reedsmith.com

*Counsel for Distributor Defendant*
*AmerisourceBergen Drug Corporation*

*Co-Liaison Counsel for the Distributor Defendants*

*/s/ Geoffrey Hobart*
Geoffrey Hobart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5281
ghobart@cov.com

*Counsel for Distributor Defendant*
*McKesson Corporation*

*Co-Liaison Counsel for the Distributor Defendants*

25

**CERTIFICATE OF SERVICE**

I, Ashley W. Hardin, hereby certify that the foregoing document as served via the Court's

ECF system to all counsel of record.


/s/ Ashley W. Hardin_____
Ashley W. Hardin