# DSJ1&2-PR Exh 526

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**SUMMIT COUNTY AND CITY OF AKRON, OHIO PLAINTIFF'S
SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
NATIONAL RETAIL PHARMACY DEFENDANTS'
<u>INTERROGATORY NUMBERS 4, 7, 15, 16 & 19</u>**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Case Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232), the County of Summit, Ohio and the City of Akron, Ohio (collectively "Plaintiff") hereby responds to National Retail Pharmacy Defendants'[1] Interrogatory Nos. 4, 7, 15, 16 & 19 (the "Interrogatories" and, each individually, an "Interrogatory"), as follows:

<u>**OBJECTIONS**</u>

The following objections apply to each Interrogatory. To the extent that certain specific objections are cited in response to an individual Interrogatory, those specific objections are provided because they are applicable to that specific Interrogatory and are not a waiver of the other objections applicable to information falling within the scope of such Interrogatory.

1.      Plaintiff objects to each Interrogatory to the extent they are overly broad, vague, unduly burdensome, seek information that is not relevant to any party's claim or defense, or seek

---

[1] The National Retail Pharmacy Defendants include the following defendants: CVS Indiana, LLC, CVS Rx Services, Inc., Rite Aid of Maryland, dba Mid-Atlantic Customer Service Center, Walgreens Boots Alliance, Inc., and Walmart Inc. fka Wal-Mart Stores, Inc. (collectively "Pharmacies").

| Bates | Date | Summary |
|---|---|---|
| AKRON_001247770, AKRON_001247771 | 3/24/2010 | Email and attached flyer re: two individuals, Philip Whited who met officers to sell Oxycodone and was found with pills on his person, and Troy Edgehouse, suspected in connection with Highland Square Pharmacy B&E. |
| AKRON_001252089 | 10/23/2014 | Email about fraudulent prescription orders for Phenergan with Codeine called into a CVS pharmacy in Copley, Ohio on several occasions using three different doctors' names and DEA tracking numbers. |
| AKRON_001818328 | 4/9/2012 | Email from Norton Police Dept. with Patrick Leonard copied re: Report from CVS Pharmacy about Robyn Swenson calling in a Norco order for Jason Baylor by Dr. Adolph who says he did not order the script. |
| AKRON_001312626, AKRON_001312627, AKRON_001312629 | 2/17/2010 | Email from Tom Miksch to Patrick Leonard re: Doctor Shopper, Thomas Eckel with attached Ohio State Board of Pharmacy report showing his multiple prescriptions for various prescription opioids, drug report. |
| AKRON_001312637 | 11/5/2010 | Email from Hugh Schuckman to Patrick Leonard re: Joseph Michael, patient with 44 scripts from 16 providers with 8 pharmacies. Doctor/script shopping. |
| SUMMIT_000074835 SUMMIT_001444018 | 4/5/17 | Email- update on cases. "[C]ase with KNR is still being worked. There is currently a civil suit against KNR in the Summit County Courts. We are in contact with an Attorney out of Columbus with info from a current doctor working at office. FBI is also involved in this case. Working case looking to take that to grand jury shortly. Just opened a new case on it's a mental health Suboxone clinic. They have 5 locations. Main doctor is Dr. Ranjan." |

Finally, hundreds of depositions of fact witnesses have been taken of defense witnesses and bellwether Plaintiffs utilizing hundreds of exhibits. The discovery performed to date, including depositions and document productions, provides details of statements and omissions made or disseminated that were false, misleading, unfair and deceptive. It is not practicable to specifically identify each and every instance of opioid diversion or every responsive document. Plaintiffs reserve the right to rely upon and introduce as evidence any and all deposition testimony and exhibits addressing this topic.

**Interrogatory No. 7 (Re-Written):**

29

Identify each Suspicious Order for Prescription Opioids that you contend was shipped to Your geographic area by any National Retail Pharmacy Defendant or Distributor Defendant during the Relevant Time Period. For each order, identify the date the order was shipped, the manufacturer, name, and amount of the medication that was shipped, the name of the defendant that shipped the order, and the name and location of the person or entity that placed the order. Furthermore, explain the criteria you used to identify these Suspicious Orders.

**Response:**

Plaintiff repeats and reasserts its prior objections and adopts its prior responses to this Interrogatory. Plaintiff reserves the right to supplement this answer through expert witnesses pursuant to the Scheduling Order entered by the Court.  Plaintiff intends to disclose through expert testimony: (a) orders previously designated by each distributor as suspicious; (b) orders which should have been designated as suspicious using the system designed and operated by each distributor; and (c) orders which should have been designated as suspicious using a "common sense" approach.

Plaintiff incorporates by reference its "Responses to the Amended and Clarified Discovery Ruling 12 Supplemental Interrogatory Issued to Plaintiffs" dated January 25, 2019 (Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23); "Responses to Supplemental Interrogatory Issued in Discovery Ruling 12 to Plaintiffs" dated January 11, 2019 (Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23); "Supplemental Amended Responses and Objections to the Manufacturer Defendants' First Set of Interrogatories, Submitted Pursuant to Discover Ruling No. 13" dated December 31, 2018 (Manufacturer Interrogatory No. 6); "Supplemental Objections and Responses to Manufacturer Defendants' Interrogatory Nos. 27/28" dated December 21, 2018; "Fourth Amended Responses and Objections to Manufacturer Defendants' First Set of Interrogatories" dated December 14, 2018

(Manufacturer Interrogatory Nos. 6 & 10); "Supplemental Responses & Objections to Reformulated Suspicious Order Interrogatory Served by Manufacturer Defendants" dated November 27, 2018 (Manufacturer Interrogatory No. 27); "Amended Responses and Objections to the Manufacturer Defendants' First Set of Interrogatories and the National Retail Pharmacy Defendants' First Set of Interrogatories" dated November 2, 2018 (Manufacturer Interrogatory No. 10 and Pharmacy Interrogatory Nos. 2 & 3); "Amended Responses and Objections to the National Retail Pharmacy Defendants First Set of Interrogatories and Distributor Defendants' Fourth Set of Interrogatories" dated October 31, 2018 (Distributor Interrogatory No. 23 and Pharmacy Interrogatory No. 7); "Responses and Objections to Distributor Defendants' Fourth Set of Interrogatories" dated August 31, 2018 (Distributor Interrogatory Nos. 23 & 29); "First Amended Responses and Objections to Distributor Defendants' Third Set of Interrogatories" dated August 13, 2018 (Distributor Interrogatory Nos. 16 & 17); and "Initial Responses and Objections to Manufacturer Defendants' Second Set of Interrogatories" dated July 5, 2018 (Manufacturer Interrogatory No. 27).

In addition, Plaintiff responds as follows:

This discovery request is a contention interrogatory. "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims. *Starcher v. Corr. Med. Sys., Inc*., 144 F.3d 418, fn. 2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999).

To be clear it is the position of the Plaintiff answering herein, that the answer to this contention interrogatory "does not limit [our] experts from using different criteria to identify suspicious orders, and therefore from concluding that there exist suspicious orders in addition to those identified [herein]." Discovery Ruling No. 7, p. 6.

31

Plaintiff objects to this Interrogatory to the extent that it seeks identification of suspicious orders shipped to pharmacies outside of their geographic answer. Discovery in the current phase of the MDL has been largely limited to the jurisdictions comprising the Track One cases and, in connection with the analogous Interrogatory posed by Distributor and Pharmacy Defendants, Special Master Cohen reformulated the Interrogatory to seek only identification of suspicious orders "shipped to Your geographic area." *See, e.g.*, Discovery Ruling No. 7, Dkt. 1051 at 5. Plaintiff contends that the same limitation should apply to the current interrogatory.

Plaintiff further objects to this interrogatory to the extent that responsive information is at least as available to Defendants as to Plaintiff. Indeed, information necessary to respond fully to this Interrogatory is more readily available to Defendants. Specifically, discovery to date has revealed that such information is readily available to Defendants from one or more of the following sources: chargeback data provided to Manufacturers by Distributors, data provided by Distributors pursuant to Fee For Service (FFS) Agreements with Manufacturers, EDI data, 867 data, and/or sophisticated prescriber/patient-level data Manufacturers obtained from data vendors like IMS as part of their sales/marketing strategies. Thus, Defendants had and currently have it within their ability to identify all transactions from the produced list that involve their own opioid products. Nevertheless, Plaintiff herein will provide Defendants with sufficient information about the methodology by which they have identified suspicious orders to permit Defendants to duplicate the analysis with their own particular orders.

Although Defendants have objected to Plaintiff's prior responses to this Interrogatory as listing only transactions between distributors and pharmacies, Plaintiff contends that those are suspicious orders as to which Defendants had duties to report and to (attempt to) stop shipment. The duty under federal law to report suspicious orders is not limited to orders actually shipped by the Manufacturer. Indeed, upon recommending the denial of Manufacturer Defendants' Motion

32

to Dismiss, the Court held that the text of 21 U.S.C. § 823 and 21 C.F.R. § 1301.74 are not so limiting as to exempt the Manufacturer Defendants from the requirement to identify and report orders beyond their direct customers – i.e. downstream orders. *See* Report & Recommendation, Dkt. 1025 at 74. Moreover, discovery has revealed that most distributor agreements between Manufacturers and Distributors expressly define the retail level customers (pharmacies) that receive shipments from the Distributor Defendants as "customers" of the Manufacturer, not the Distributor. They are therefore suspicious orders attributable to the Manufacturer of that product. Furthermore, although the Manufacturer Defendants have taken the position that they were not in a position to halt orders between Distributors and customers, discovery to date has revealed that Manufacturers were able (and sometimes threatened) to use their refusal to process chargebacks for sales between Distributors and customers identified as having placed suspicious orders to effectively terminate the processing of suspicious orders, and Plaintiff reserve its right to identify additional orders based on this information. Finally, although Manufacturers have taken the position that they could not halt orders between Distributors and customers, this position ignores the ability of Manufacturers to halt orders from Distributors whom they knew were filling suspicious orders by customers, aloof which could have been deemed suspicious and for which Plaintiff reserves its right to identify additional orders based on this information.

Plaintiff contends each Manufacturer and Distributor Defendant, as a registrant, owes a duty under federal law and implementing regulations to maintain "effective controls against diversion of particular controlled substances and any controlled substance in schedule I or II compounded therefrom into other than legitimate medical, scientific, and industrial channels." 21 U.S.C.A. § 823(a)(1). This duty, which is identical to the duty applied to distributors pursuant to 21 U.S.C.A. § 823(b)(1), has been defined to include certain "security requirements" identified

33

in 21 C.F.R. § 1301.72-1307.76 which the DEA has imposed on all registrants and deemed "necessary to prevent diversion," including:

> The "security requirement" at the heart of this case mandates that distributors "design and operate a system" to identify "suspicious orders of controlled substances" and report those orders to DEA (the Reporting Requirement). 21 C.F.R. § 1301.74(b). The Reporting Requirement is a relatively modest one: It requires only that a distributor provide basic information about certain orders to DEA, so that DEA "investigators in the field" can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out "potential illegal activity." Southwood Pharm., Inc., 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007). Once a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some "due diligence" and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order (the Shipping Requirement).

*Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017); *see also* 21 C.F.R. §§ 1301.11, 1301.71, 1301.74.

Plaintiff contends that the Defendants failed to maintain effective controls against diversion by designing and operating a system to identify suspicious orders into Summit County between 1996 and the present, or if they implemented such a system, it was not legally compliant and/or followed in practice, in violation of federal law thereby causing and/or contributing to the opioid epidemic. Specifically, the Defendants did not report suspicious orders that they were aware of and/or failed to stop shipments of suspicious orders.

Plaintiff contends it is facially evident that an unusually large and exponentially increasing volume of prescription opioids were shipped into Summit County, as evidenced by ARCOS data.

In order to determine which of the individual transactions is "suspicious" under federal law, the DEA would apply the system "designed and operated" by the registrant on a transaction-by-transaction basis. *See, e.g.*, *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017) (applying the SOM adopted by Masters Pharmaceutical). Consequently, Plaintiff has

34

sought discovery from each Defendant of its Suspicious Order Monitoring System (SOMS) policies and procedures since January 1, 2006, as well as discovery of all orders identified as suspicious pursuant to these SOMS. Defendants have objected to these discovery requests and, to date, none have provided fully complete and transparent responses sufficient to allow Plaintiff to accurately apply each Defendants' own SOMS algorithm to their own transactional data. Despite repeated requests, Plaintiff does not have sufficient documents or data to identify each suspicious order that was or should have been detected by each Defendant. Thus, the answer to this contention interrogatory is premised upon the current status of the record which has the following limitations:

> a. One or more the Defendants have yet to fully disclose transactional data for the relevant timeframe;
> b. One or more of the Defendants have yet to fully disclose the "system" (or algorithm) utilized to detect suspicious orders for the relevant timeframe;
> c. One or more of the Defendants have yet to fully disclose each suspicious order detected by the Defendants for the relevant timeframe;
> d. One or more of the Defendants have yet to fully disclose the suspicious orders reported to the DEA for the relevant timeframe; and
> e. One or more of the Defendants have yet to fully disclose the due diligence performed for each suspicious order which was ultimately shipped for the relevant timeframe.

Defendants demand Plaintiff disclose which orders it contends are suspicious without a full evidentiary record of: their policies and procedures; transactional data, including the chargeback data, EDI data, FFS data, and IMS data which Defendants were in possession of the systems and/or algorithms used by the Defendants to detect suspicious orders; the orders each of the Defendants' systems detected as suspicious; the orders reported to the DEA as suspicious; the due diligence performed before shipping a suspicious order; and expert witness discovery and testimony.

In a good faith effort to meet their discovery obligations, Plaintiff takes note of the following instructive analysis from the *Masters* Court:

35

> More fundamentally, the key question in this case is not whether held orders qualified as "suspicious" under Masters' policies; the question is whether they qualified as "suspicious" under 21 C.F.R. § 1301.74(b). Thus, while Masters frames its challenge on this point in substantial-evidence terms, the relevant inquiry is more legal than factual: It asks how far the language of the regulation reaches. Undertaking that legal exercise, the Administrator reasonably determined that all held orders were "suspicious" within the meaning of the regulation. Section 1301.74(b) provides that "[s]uspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Apparently tracking that regulatory language, the Computer Program held an order if: (a) that order—combined with other orders placed in the same 30-day period—requested more doses of a controlled medication than the pharmacy had requested in any of the previous six calendar months; (b) the pharmacy ordered a controlled medication more frequently in a 30-day period than it had in any of the previous six calendar months; or (c) the pharmacy's ordering pattern for a controlled medication deviated in some other notable way from its ordering pattern over the previous six months. As a matter of common sense and ordinary language, orders that deviate from a six-month trend are an "unusual" and not "normal" occurrence. It was therefore entirely reasonable for the Administrator to hold that orders held by the Computer Program met the regulatory definition of "suspicious orders" unless Masters' staff dispelled the suspicion.

*Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 216–17 (D.C. Cir. 2017) (internal citations omitted).

Bellwether Plaintiffs have previously identified multiple suspicious orders based on one or more of the following criteria: (a) met the criteria ratified in *Masters Pharm., Inc. v. Drug Enf't Administration*, 861 F.3d 206, 216–17 (D.C. Cir. 2017);[5] (b) was shipped within thirty days of an order of the same national drug code ("NDC") that was deemed suspicious and reported to

---

[5] Method 1 ("Exceeding Threshold of Any of the Previous Six Months and Assuming Due Diligence"): All monthly order(s) exceeding the largest total order of any of the previous six months is considered suspicious. Method 1 assumes due diligence on the suspicious order(s), it is cleared and shipped.

Method 2 ("Exceeding Threshold of Initial 6 Months and Assuming No Due Diligence"): All monthly order(s) exceeding the largest order in any of the initial six months of the applicable dataset is considered suspicious. Method 2 assumes no due diligence on the suspicious order(s), but it is cleared and shipped. The threshold does not increase after the initial six months because each and every order shipped thereafter in excess of any of the initial six month threshold is unlawful.

Method 3 ("Previous 6 Months Threshold is Triggered and Assuming No Due Diligence"): Once an order(s) exceeds the largest order(s) in any of the previous six months of the applicable dataset all subsequent orders are considered suspicious. Method 3 assumes no due diligence on the suspicious order(s) and as a result, each and every order shipped thereafter to that individual buyer is unlawful.

DEA; (c) included the same drug family ordered by the same customer in the same month from multiple distributors; (d) was in top 10% for percentage increases for the same drug family or for total orders for the month or year; and/or (e) was of excessive size for the drug family for a customer whose prescribing significantly exceeded other similar pharmacies in the jurisdictions. Depending on the particular methodology employed, Bellwether Plaintiffs identified somewhere between 52,554 (Method 1) and 875,055 (Method 3) suspicious orders shipped into Summit between January 1996 and May 2018.

For the purposes of responding to these premature contention interrogatories, Plaintiff has not attempted to identify every possible suspicious order, nor applied every reasonable method for identifying suspicious orders. Plaintiff reserves the right to supplement or amend this answer as expert discovery commences.

ANSWER: In a good faith effort to meet its discovery obligations, consistent with the requirements set forth by Special Master Cohen in his Discovery Rulings 7 and 12, Plaintiff hereby identifies the orders identified in Bellwether Plaintiffs' prior responses as suspicious orders.

Further answering, Mallinckrodt has produced consolidated unusual order reports at MNK-T1_0007730452, MNK-T1_0007730468; MNK-T1_0001810733; MNK-T1_0002079926; and MNK-T1_ MNK-T1_0001810813. In addition, Mallinckrodt has produced peculiar order spreadsheets (*see* Mallinckrodt's Supplemental Responses and Objections to Interrogatory No. 32 Ex. A); unusual order reports (*see* Mallinckrodt's Supplemental Responses and Objections to Interrogatory No. 32 Ex. B); and DEA suspicious order reports (*see* Mallinckrodt's Supplemental Responses and Objections to Interrogatory No. 32 Exs. C & D). Plaintiff contends that many of the orders identified in these documents were suspicious and were improperly shipped by Mallinckrodt.

37

Mallinckrodt has also identified 24 orders prior to 2009 that it determined were suspicious and were not shipped.  *See* MNK-T1_0007026342, MNK-T1_000269049, MNK-T1_000301983, MNK-T1_0006805898, MNK-T1_0004268059, MNK-T1_0004267998, MNK-T1_000301986, MNK-T1_000277496, MNK-T1_000274675, MNK-T1_000269046, MNK-T1_000275736, MNK-T1_000275748, MNK-T1_000562325, MNK-T1_000259231, MNK-T1_0000259220, MNK-T1_0000475208, MNK-T1_0000475126, MNK-T1_0000296226, MNK-T1_0008590891, MNK-T1_0007202509, MNK-T1_0002363592, MNK-T1_0006442328, MNK-T1_0007730869, and MNK-T1_0007202115.  In addition to these orders, Mallinckrodt has identified thousands of orders that have the same or similar identifying information as the above orders but were nevertheless shipped.  *See* Mallinckrodt's Supplemental Responses and Objections to Interrogatory No. 32 at 53 and MNK-T1_0008592409.  Plaintiff contends that many of these orders were suspicious and were improperly shipped by Mallinckrodt.

Plaintiff has also identified numerous documents and obtained testimony demonstrating that Mallinckrodt failed to adequately review and scrutinize suspicious orders prior to shipping them, including the deposition transcripts, deposition exhibits and custodial files of:  Karen Harper, Eileen Spaulding, John Gillies, Bill Ratliff, Victor Borelli, Steven Becker, Ginger Collier, Kate Muhlenkamp, Lisa Cardetti, James Rausch, Cathy Stewart, George Saffold, and Tiffany Rowley-Kilper.  The custodial files for the above individuals also contain additional documents supporting Plaintiff's claims regarding the lack of adequate due diligence.

In addition, Mallinckrodt has identified the following prescribers and "other individuals" that it believes engaged in "inappropriate prescribing practices or other illegal acts concerning the diversion of Opioids into the illegal supply chain":  Dr. Adolp Harper, Dr. Brian Heim, Dr. Ronald Celeste, Dr. Michael Tricaso, Dr. Gregory Gerber, Louis Eppinger, Patricia Arnold, Anthony H. Perry, Elizabeth Davis, James Byrge, Judy Barrows, Brittany Glass, Patricia

38

Laughman, Adria Harper, and Tequilla Berry. *See* Mallinckrodt's Supplemental Responses and Objections to Interrogatory No. 21 at 21. A review of Mallinckrodt's documents indicates that these individuals obtained Mallinckrodt products, and that many of these individuals were well known to Mallinckrodt prior to their arrests were on Mallinckrodt "target" lists of high-prescribing doctors that it actively solicited to prescribe their products. *See, e.g.*, MNK-T1_0002159629, MNK-T1_0002282670, MNK-T1_0004814570, MNK-T1_0002719188, MNK-T1_0007068789.

Plaintiff reserves the right to supplement or amend its response as expert discovery commences, and this issue may be the subject of fully-supported and detailed expert witness opinion(s).

**Interrogatory No. 15:**

Identify each instance during the Relevant Time Period in which You or anyone acting on Your behalf, including but not limited to Your health care and law enforcement agencies, communicated with any pharmacy in Your geographic area about Prescription Opioids. This includes without limitation each instance You or anyone acting on Your behalf notified any pharmacy in Your geographic area that You suspected or believed Prescription Opioids were being diverted from it. For each such communication, identify the pharmacy with which You had the communication, the substance of the communication, the date of the communication, and the persons who were party to it.

**Response:**

Plaintiff repeats and reasserts its prior objections and adopts its prior responses to this Interrogatory. Plaintiff objects to this Interrogatory as vague, ambiguous, overly broad, and unduly burdensome as to "identify each instance," "including but not limited to," "health care and law enforcement agencies," "anyone," "communicated with any pharmacy" regarding

39

| | | | |
|---|---|---|---|
| AKRON_001327557 | SUMMIT_000094582 | AKRON_001336952 | SUMMIT_000076552 |
| SUMMIT_000085344 | SUMMIT_000092230 | SUMMIT_000108727 | SUMMIT_000108287 |
| SUMMIT_000137160 | AKRON_000206830 | AKRON_000230930 | AKRON_000244266 |
| AKRON_000368819 | AKRON_000206987 | AKRON_000206993 | AKRON_000207010 |
| AKRON_000895731 | SUMMIT_000074566 | SUMMIT_000074741 | SUMMIT_000074839 |
| SUMMIT_000072191 | AKRON_001114375 | SUMMIT_001962906 | AKRON_001114375 |
| AKRON_001117288 | AKRON_001204498 | SUMMIT_000102517 | SUMMIT_000133756 |
| SUMMIT_000134224 | SUMMIT_000134288 | SUMMIT_000134352 | SUMMIT_000134417 |
| SUMMIT_000134483 | SUMMIT_000134579 | SUMMIT_000134712 | |

As discovery is ongoing, this information will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with the scheduling orders in this case and the Federal Rules of Civil Procedure. Plaintiff reserves the right to supplement, modify, amend or substitute this answer with non-privileged information responsive to this Interrogatory once the information is available to Plaintiff.

Dated:  March 4, 2019                                         Respectfully submitted,

                                                              By: /s/ Linda Singer
                                                              Linda Singer
                                                              Joseph F. Rice
                                                              Jodi Westbrook Flowers
                                                              Anne McGinness Kearse
                                                              David I. Ackerman
                                                              Jeffrey C. Nelson
                                                              MOTLEY RICE LLC
                                                              401 9th Street NW, Suite 1001
                                                              Washington, DC 20004
                                                              Tel: (202) 232-5504