**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | ) ) ) | **MDL 2804** |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) ) | **Judge Dan Aaron Polster** |
| *Track One Cases* | ) ) ) ) ) | **ORDER REGARDING DEFENDANTS' SUMMARY JUDGMENT MOTIONS ON CIVIL CONSPIRACY CLAIMS** |

Before the Court are three related Motions for Summary Judgment filed by Defendants: Manufacturers' Joint Motion for Summary Judgment on RICO, OCPA and Conspiracy Claim, (**Doc. #: 1930-1**); Distributor Defendants' Motion for Summary Judgment on Civil Conspiracy Claim, (**Doc. #: 1908-1**); and Pharmacy Defendants' Motion for Summary Judgment on Civil Conspiracy Claim. (**Doc. #: 1875-3**). For the reasons stated below, the Court **DENIES** these Motions for Summary Judgment on the Civil Conspiracy Claims. The Court will issue a separate Order regarding Manufacturer's motion for summary judgment on RICO and OCPA claims.

### I.      Analysis.

Plaintiffs' Complaint alleges Defendants "engaged in a civil conspiracy" (1) "in their unlawful marketing and/or distribution of opioids into Ohio and Plaintiffs' communities;" and (2) "to commit fraud and misrepresentation in conjunction with their unlawful marketing and/or distribution of opioids." Third Amended Complaint ("TAC"), Doc. #: 1466 at ¶¶ 1124-25).

Plaintiffs allege the Defendants acted purposely, with a common understanding or design, to commit unlawful acts that directly caused injury to Plaintiffs.  TAC at ¶¶ 1128-29.[1]

### A.  Civil Conspiracy – Legal Standards.

In order to prove a civil conspiracy claim, Plaintiffs must show four necessary elements: "(1) a malicious combination; (2) of two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy."  *In re National Opiate Litig.,* 2018 WL 6628898, at *11 (N.D. Ohio Dec. 19, 2018) (citation omitted).  Failure to establish any one of these elements would entitle the Defendants to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### 1.  Malicious Combination.

All Defendants argue Plaintiffs have not produced evidence to prove a malicious combination, i.e. "an agreement to achieve an unlawful objective."  See Doc. ##: 1930-1 at 20-21; 1875-3 at 6-7; 1908-1 at 1-2, 5.  Under Ohio law, the "malicious combination" element requires only a showing of a common understanding or design, even if tacit, to commit an unlawful act.  *Lee v. Countrywide Home Loans, Inc*., 692 F.3d 442, 446 (6th Cir. 2012) (citing *Gosden v. Louis*, 116 Ohio App.3d 195, 687 N.E.2d 481, 497 (1996).  With respect to the level of agreement that must be established, all that must be shown is that the alleged coconspirator shared in the "general conspiratorial objective." *Aetna Cas. & Sur. Co. v. Leahey Constr. Co., Inc.,* 219 F.3d 519, 538 (6th Cir. 2000) (citation and internal quotation marks omitted).  *See also Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (finding "direct evidence of an express agreement to undertake unlawful activity is rare and not required; a party may rely on

---

[1]     Plaintiffs further allege "Defendants' actions demonstrated both malice and also aggravated and egregious fraud."  TAC at ¶ 1133.

circumstantial evidence to prove the claim."). "The ultimate fact of conspiracy is solely a question for the jury, unless the court can say, as a matter of law, that there is **no proof** tending to establish a conspiracy." *Source Associates, Inc. v. Mitsui Chems. America*, 2017 WL 2620656, at *18 (N.D. Ohio June 16, 2017) (emphasis added) (*citing LeFort v. Century 21-Maitland Realty & Co.,* 32 Ohio St.3d 121, 512 N.E.2d 640, 645 (1987).

The Court examines the evidence of a malicious combination in subsection B, below.

### 2.  Two or More Persons.

No Defendant argues that Plaintiffs have not proven the element "of two or more persons."

### 3.  Injuries.

Pivotal to a finding of civil conspiracy is some damage caused by the conspiracy, and a plaintiff is required to show actual damages caused by the underlying unlawful act. *See Peltz v. Moretti*, 292 Fed.Appx. 475, 481 (6th Cir. 2008) (citations omitted). Pharmacy Defendants argue Plaintiffs cannot show the alleged conspiracy caused them to suffer injury, and refer the Court to the Pharmacy Defendants' Motion for Summary Judgment on Causation. (Doc. #: 1885).[2] The Court has already denied this motion, *see* docket no. 2561. As stated in that opinion, Plaintiffs have put forth sufficient (but disputed) evidence of actual damages caused by allegedly unlawful acts underlying their conspiracy theory to withstand summary judgment.

---

[2]      Manufacturer and Distributor Defendants do not specifically argue lack of injury as it relates to civil conspiracy, but they also did file separate Motions for Summary Judgment Regarding Causation, which the Court also denied.  (Doc. ## 1894 and 1920, respectively). Manufacturers did set forth arguments relating to injury and damages under RICO, which this Court will rule upon in a separate Order.

### 3.  Unlawful Act.

Defendants also argue Plaintiffs have not presented evidence of an unlawful act.  *See, e.g.,* Manufacturer Defendants MSJ at 19 (Doc. #: 2182).  This element requires existence of an underlying unlawful act that is actionable in the absence of a conspiracy.  *Hale v. Enerco Group, Inc.,* 2011 WL 49545, at \*5 (N.D. Ohio Jan. 5, 2011) (*citing Gosden*, 687 N.E.2d at 497).  The alleged unlawful act need not be committed by each of the alleged co-conspirators acting jointly; rather, the unlawful acts of any one member of the conspiracy will satisfy the "underlying unlawful act" requirement.  *Id*. (citations omitted).

Plaintiffs' conspiracy claims against Defendants allege unlawful acts of fraudulent marketing and Defendants' "near uniform CSA noncompliance."[3]  This Court has already ruled that issues regarding fraudulent marketing are for a jury to determine at trial.  Doc. #: 2561. This Court has also previously analyzed Defendants' duties under the CSA, and incorporates that analysis herein.  Doc. #: 2483.  The CSA Order ruled that determining whether Defendants failed to comply with their duties under the CSA presents factual disputes that must be evaluated by a jury.  *Id*. at 31.  Therefore, this Order will not address further the element of whether any Defendant committed an unlawful act, as the Court has ruled that remains a genuine issue of material fact for trial.

Based upon the foregoing, the Court limits its analysis below to the single element of proving civil conspiracy it has not yet discussed – whether there is evidence to show a conspiratorial agreement or malicious combination between the Defendants.

---

[3]     See P's Opp. at 108 (Doc. #: 2182) (referring to the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 *et seq*.).

4

### B.  Conspiratorial Agreement or Malicious Combination.

#### 1.  Factual Assertions Regarding Manufacturer Defendants.

The Manufacturer Defendants ask this Court to find as a matter of law that there is no evidence of an agreement or combination between competing manufacturers. *See* Man. MSJ on RICO & Civil Conspiracy at 20 (Doc. #: 1930-1).  Manufacturer Defendants argue Plaintiffs cannot show a "malicious combination," and "[a]t most, they can show only independent decisions by certain Manufacturers to sponsor third parties or to market their own prescription opioid medication." *Id.* at 21.

Plaintiffs, citing to numerous sources of evidence, argue the record demonstrates "that the Manufacturer Defendants, including generic manufacturers, all worked together to increase and maintain the opioid market through the common practice of disseminating false marketing representations about opioids in general and about their own branded products."  Opp. at 104-05 (Doc. #: 2182).  As one example, Plaintiffs present evidence that in 2003, Purdue, Janssen, and Teva started a collaborative marketing strategy, using various medical professionals, front groups,[4] and Key Opinion Leaders ("KOLs") to help "coalesce a key [message]" and "exploit [a] decade of pain." *Id*. at 10-11.

Plaintiffs also present evidence to show that, in 2003, Manufacturer Defendants worked with Distributor and Pharmacy Defendants to "reroute [the] supply of opioids after regulatory actions, despite indicators of diversion."[5]  Additionally, Plaintiffs offer evidence showing that, in

---

[4]      Plaintiffs list the relevant front groups as the American Pain Society ("APS"), American Association for Pain Medicine ("AAPM"), the American Geriatric Society ("AGS") and the American Pain Foundation ("APF").  Opp. at 11 (Doc. #: 2182).

[5]      See Doc. #: 2261-61, Ex. 663 (internal Mallinckrodt email stating Walgreens' largest opioid distribution center was served with subpoenas by the DEA and asking whether Mallinckrodt can transfer opioid orders to another Distributor.

2008, Manufacturers "worked with the distributors and pharmacies to turn a blind eye to regulatory violations and keep opioids flowing." *Id*. at 105.[6]

A determination on whether these examples, and the others Plaintiffs present, show the Manufacturer Defendants undertook coordinated efforts and entered tacit agreements to commit unlawful acts requires an in-depth review of the facts by a jury.  There is a genuine issue of material fact as to whether the Manufacturer Defendants had an agreement to commit an unlawful act, *Gosden*, 687 N.E.2d at 497, among themselves or with other Defendants, in order to expand the market for prescription opioids.  The Court cannot conclude that no reasonable jury could find for Plaintiffs on the question of whether the Manufacturer Defendants entered into a conspiratorial agreement or malicious combination.  Accordingly, the Manufacturer Defendants are not entitled to judgment as a matter of law.

### 2.  Factual Assertions Regarding Distributor Defendants.

The Distributor Defendants also ask this Court to find as a matter of law there is no evidence of an agreement to achieve an unlawful objective.  Specifically, Distributor Defendants argue Plaintiffs cannot prove they conspired with Manufacturer Defendants, through their lobbying efforts, to increase the opioid-production quotas set by the DEA.[7]  *See* Dist. MSJ at 6-

---

[6]      See, e.g., Doc. #: 2350-90 (internal Mallinckrodt email noting that half of the flagged orders on its "Peculiar Order Report" were from McKesson, ABDC and Cardinal, and a significant amount were from large retail pharmacies, yet concluding it was not necessary to elevate "peculiar" order to "suspicious."); Doc. #: 2242-101, Ex. 299 (internal McKesson email reminding employees about fines the DEA had recently imposed relating to its suspicious order monitoring system ("SOMS"), and asking employees to refrain from using the word "suspicious" regarding future opioid orders in order to avoid the requirement to conduct due diligence by contacting pharmacies, halt the orders, or report them to the DEA).

[7]      Distributor Defendants argue that liability cannot be imposed for lobbying efforts to persuade legislators and regulators, because such efforts are constitutionally protected.  Doc. #: 2533, pp. 3-5.  However, Plaintiffs "do not attempt to impose liability" on Defendants "or argue that the lobbying was unlawful conduct." Doc. #: 2090-1, p. 116.

10 (Doc. #: 1908-1).  Distributor Defendants also argue there is no evidence they conspired with Manufacturers to fraudulently market opioids, nor is there evidence they conspired with each other to agree not to report or ship suspicious orders.  *Id.* at 10-20.

Plaintiffs argue the record evidence shows "over twenty years of coordinated efforts" that furthered an illegal purpose of the Distributor Defendants, through their relationships with a variety of forums and health care alliances,[8] and by carrying out decisions on behalf of Manufacturer Defendants.  Opp. at 84-86 (Doc. #: 2182).  Plaintiffs contend this same coordinated conduct occurred among Distributor and Pharmacy Defendants to disregard their legal duties under the CSA and its regulations, which allowed Defendants to "increase and maintain the opioid market."  *Id.* at 84, 106.  Therefore, Plaintiffs argue there is enough evidence presented "from which a jury could reasonably infer that there was at least a tacit agreement" among the Defendants.  *Id.* at 88.

For example, Plaintiffs present evidence of coordination among Distributor Defendants and with other Defendants to avoid their duties under the CSA:

> -between 2012 and 2016, Cardinal and Walgreens agreed to manipulate the timing and delivery of opioid orders, shared threshold information with each other, and Cardinal provided advance notice to Walgreens of due diligence site visits, in order to avoid reporting suspicious orders to the DEA,  *Id.* at 64;[9]

> -in 2013, ABDC and Walgreens entered into an exclusive distribution agreement that, over the next few years, led to increased revenue to ABDC, and allowed Walgreens to gain seats on ABDC's Board of Directors and purchase more than 10% of ABDC's outstanding common stock.  *Id.* at 67.  Despite 8,000 new Walgreen's retail locations entering ABDC's distribution network, and a 200% increase in Schedule II controlled substances orders, ABDC "only added

---

[8]     Plaintiffs allege that Distributor Defendants had direct interaction and coordination with the Health Care Alliance ("HCA") and Pain Care Forum ("PCF").

[9]     See Doc. ##: 2371-54, Ex. 598; 2371-26, Ex. 570; 2371-27, Ex. 571.

three additional full-time employees to its 'Diversion Control Program.'"  *Id.*[10] Plaintiffs further contend that Walgreens and ABDC conspired to avoid reporting these increased opioid orders to the DEA by manipulating threshold limits, or used "soft holds" to clear orders that were "outside the expected usage."  *Id.* at 67-68;[11]

-in 2013, when Walgreen's received notice that its Perrysburg, Ohio distribution center could be shut down by the DEA, Mallinckrodt and Walgreens worked together to reroute Walgreens's opioid supply through other distributors, including Cardinal, "so that the pills would keep flowing."  *Id.* at 73.[12]

Whether these three examples, and the many others proffered by Plaintiffs, of coordinated efforts among Defendants amounts to a tacit agreement to commit an unlawful act requires an in-depth review of the facts surrounding the actions of Defendants.  A reasonable jury could review the record evidence and find that Distributor Defendants shared a general conspiratorial objective, with themselves and with other Defendants, to expand the opioid market and disregard regulatory obligations in order to achieve that goal.

Accordingly, Distributor Defendants are not entitled to judgment as a matter of law.

### 3.  Factual Assertions Regarding Pharmacy Defendants.[13]

Pharmacy Defendants ask this Court to find as a matter of law there is no evidence they were part of any alleged conspiracy and there is no evidence that any purported conspiracy resulted in an unlawful act that caused damages to Plaintiffs. See Pharm. MSJ at 7-18 (Doc. #: 1875-3).  Pharmacy Defendants also argue their participation in legitimate trade associations does not prove a malicious combination or conspiracy.  *Id.* at 12-14.  Finally, Pharmacy Defendants argue that any evidence they fell short of various obligations under the CSA in the course of distributing prescription opioids does not prove a conspiracy.  *Id.* at 14-16.

---

[10]      See Doc. #: 2371-47, Ex. 591.
[11]      See Doc. #: 2371-55, Ex. 599.
[12]      See Doc. #: 2371-119, Ex. 663.
[13]      Plaintiffs' claims against Pharmacy Defendants relate to their role as "self-distributors," or distributors of prescription opioids to their own pharmacies.

Pharmacy Defendants do not dispute that they distributed and sold prescription opioids, but argue that the "distribution and sale of a lawful product is not evidence of an agreement to engage in intentional wrongdoing." *Id*. at 10.  To support this argument, Pharmacy Defendants cite to cases they argue show that "[c]ourts have repeatedly rejected the idea that pharmacies or others in the drug distribution chain 'conspire' with drug manufacturers simply by distributing their products." *Id*.  This statement is inapposite and unpersuasive.[14]

Plaintiffs present evidence that, '[t]hrough membership and leadership positions in the National Association of Chain Drug Stores ("NACDS") and their relationship with Distributor Defendants, the Pharmacy Defendants coordinated to grow and protect the Opioid Supply Chain."  Opp. at 106 (Doc. #: 2182).  Plaintiffs provide evidence that Pharmacy Defendants coordinated with Distributor Defendants by forming a "coalition" on controlled substances to ensure that any imposed restrictions regarding the distribution of controlled substances were not overly broad, and worked "in partnership" with the HDA to develop "solutions to the [DEA] enforcement issues" and "develop strategies" concerning "ongoing problems that NACDS members are having with DEA enforcement actions."  *Id*. at 107.  These activities could be entirely innocent; or not.

This evidence, along with the specific evidence outlined herein regarding Walgreens' interactions with various Manufacturers and Distributors (see Section B.2. of this Order), is sufficient to create a triable issue of fact. *Williamson*, 481 F.3d at 379-80.  A jury could review the record evidence and find that Pharmacy Defendants shared a general conspiratorial objective,

---

[14]     In the cases cited by Pharmacy Defendant, which addressed *motions to dismiss*, the courts found that the allegations within the complaint failed to allege the proper elements of conspiracy, and the conspiracy claims were dismissed.  These cases contained no legal analysis of facts or evidence, nor in any way support Pharmacy Defendant's assertion that courts have ruled pharmacies cannot conspire with manufacturers by distributing opioids as a matter of law or undisputed fact.  *See* Pharm. MSJ at 19.

with themselves and with other Defendants, to expand the opioid market using false information and disregard regulatory obligations in order to achieve that goal.  There is a genuine issue of material fact as to whether the Pharmacy Defendants had "a common understanding or design, even if tacit, to commit an unlawful act," *Gosden*, 687 N.E.2d at 497, among themselves or with other Defendants, in order to grow and protect the Opioid Supply Chain.  Therefore, Pharmacy Defendants are not entitled to judgment as a matter of law.

## II.    Conclusion

For the reasons stated above, the Court **DENIES** Defendants' Motions for Summary Judgment on claims of civil conspiracy.  Doc. #: 1930-1; Doc. #: 1908-1; Doc. #: 1875-3.  In so ruling, the Court notes that, at trial, it will have an opportunity to reevaluate the sufficiency of the evidence as to each Defendant and nothing in this Order prevents it from granting judgment as a matter of law, if warranted.  *See* Fed. R. Civ. P. 50.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  *September 3, 2018***
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

10