UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Track One Cases* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MDL 2804**<br><br>**Case No. 1:17-md-2804**<br><br>**Judge Dan Aaron Polster**<br><br>**OPINION AND ORDER DENYING<br>MOTION TO EXCLUDE MCGUIRE** |

Before the Court is Defendants' Motion to Exclude the Testimony of Thomas G. McGuire **(Doc. #: 1911)**. The Court has carefully considered the Motion, Plaintiffs' Response **(Doc. #: 2191)**, and Defendants' Reply **(Doc. #: 2532)** and now **DENIES** the Motion.

I.      **Legal Standards.**

The Court incorporates the general legal standards set forth in the Court's Opinion and Order regarding Defendants' motion to exclude the opinion and testimony of Prof. Meredith Rosenthal. *See* Doc. #: 2495.

II.      **Introduction.**

McGuire, an economist, was engaged by Plaintiffs to opine about Plaintiffs' alleged damages. *See* Plaintiffs' Memorandum in Opposition Defendants' Motion to Exclude Testimony of Thomas McGuire Concerning Damages ("Pls. Op. Resp. to McGuire") at 1 (Doc. #: 2191). Relying, in part, on the analysis of Plaintiffs' experts Meredith Rosenthal and David Cutler,

McGuire calculates the "backward-looking" damages allegedly incurred by Plaintiffs between 2006 and 2018.[1]  *Id*.  In McGuire's opinion, during this 12-year period, Plaintiffs suffered total damages of between $194.4 million and $223.4 million.  *See* March 25, 2019 Expert Report of Thomas McGuire Damages to Bellwethers ("McGuire Report") at 7 (Doc. #: 1911-5).

One of the primary elements of McGuire's analysis are the purported "opportunity costs" incurred by Plaintiffs as a result of diversion of their resources to matters attributable to the opioid crisis.  Defendants complain that, because McGuire cannot show Defendants spent additional money as a result of these "opportunity costs," these costs are not damages.  Defendants  argue McGuire's analysis does not "fit" the facts of the case, is not reliable, and should be excluded pursuant to *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).  For the reasons detailed below, the Court denies the McGuire Motion.

## III.     Credentials and Experience.

McGuire is a Professor of Health Economics in the Department of Health Care Policy at Harvard Medical School.  He received his B.A. in economics from Princeton University in 1971, and his Ph.D. in economics from Yale University in 1976.  *See* McGuire Report at 2; App'x IV.A (Doc. #: 1911-5).  McGuire has received numerous honors for his work in the area of health economics.  In 2018, he was awarded a lifetime achievement award from the American Society of Health Economics.  *See id*.  McGuire has also authored books, monographs, and articles pertaining to health economics, including a recent article addressing reverse payment settlements in the drug industry.  *See id*.  Defendants do not challenge McGuire's qualifications.

---

[1]     McGuire also submitted a report addressing Plaintiffs' alleged public nuisance. Neither McGuire's public nuisance report nor his public nuisance opinions are at issue in the instant Motion.

## IV.    Opinions.

McGuire sets out to quantify how increased demand for county services caused by the opioid crisis translates into damages.  *See* McGuire Report at 10 (Doc. #: 1911-5).  Underlying his opinions are the opinions of Plaintiffs' experts, Meredith Rosenthal and David Cutler.  *See id*. McGuire relies on Rosenthal's analysis connecting Defendants' alleged misconduct to an increase in opioid shipments to Plaintiffs.  He relies on Cutler's opinions assessing the share of harm attributable to the increase in opioid shipments.  *See id*.  McGuire explains his damage analysis as follows:

> Damages = Total costs incurred in Bellwether divisions affected by the opioid crisis
>       x Share of total costs in relevant divisions that address harms
>       x Share of harm attributable to defendants' misconduct.
>
> So, for example, damage relating to the increased costs faced by the Cuyahoga Sheriff's division due to defendants' misconduct can be expressed as the product of: (i) the total cost faced by the [Sheriff's] division; (ii) the share of the [Sheriff's] division's costs that are spent in addressing crime (as opposed to activities such as traffic enforcement or administrative overhead); and (iii) the share of crime in the Cuyahoga jurisdiction that is attributable to defendants' misconduct (as estimated in the Cutler Report).

*Id*. at 11.  McGuire explains why this economic framework is appropriate.  *See id*. at 6.  He also states he applied "[s]tandard methods from microeconomics," permitting him to reliably estimate Plaintiffs' past costs attributable to the opioid crisis.  *Id*. at 6-7.

McGuire begins his report with a discussion of the particular nuances of municipal funding, budgeting, and spending.  *Id*. at 12-15.  Citing several public policy, public finance, and economics sources, he opines, *inter alia*, that government resources are limited; therefore, municipalities, like Plaintiffs, must allocate services to "maximize the welfare of [their] citizens subject to the constraints imposed by tax revenue and funds available through intergovernmental transfers."  *Id*. at 14.  According to McGuire, "the cost to a government of spending on one service is measured

3

by the spending on that service, since that spending could have been devoted to other uses."[2]  *Id.*
at 15.  Even if spending does not increase as a result of this re-allocation of resources, the
reallocation itself amounts to an opportunity cost.  *See id.*

Opportunity costs, in the context of McGuire's analysis, are costs attributable to Plaintiffs'
reduced abilities to provide non-opioid related services and/or the reduced quality of services
provided by Plaintiffs as a result of the opioid crisis.[3]  *See id.* at 9 (Doc. #: 1911-5).  McGuire
explains the concept as follows:

> If a sheriff's deputy spends an hour responding to an opioid
> overdose, that is an hour ***not*** spent on investigating other crimes or
> patrolling streets (which deters crime activity).  The value of that
> deputy's time is (at least) the deputy's compensation (including
> wages and benefits) spent on the opioid related activity.
>
> As another example, consider the Department of Children and
> Family Services, which investigates cases of neglect and abuse and
> places children in foster care.  If opioid-related activity increases the
> number of investigations and placements that must be investigated
> by a given staff, the time and effort going into each case necessarily
> decreases.  If opioid-related activities occupy 20 percent of staff
> time, for example, then the amount of time available for other
> activities falls by 20 percent.  The decrease in the quality of services
> is an economic cost of the opioid crisis.

McGuire Report at 16-17 (Doc. #: 1911-5) (emphasis added).  McGuire relies on "opportunity
costs" as his measure of damages because Plaintiffs face budget constraints that prevent them from
raising additional revenue in response to the opioid crisis, so a damage calculation based on actual
increases in Plaintiffs' spending is not possible.  *See id.* at 18.  It is McGuire's opinion that, even

---

[2]  As support for this statement, McGuire cites to Mikesell, John, Fiscal
Administration, 10th Edition, Cengage Learning, 2018, at pp. 45, 259.  For further discussion on
this, *see infra* at 13.

[3]  More generally, "opportunity costs" reflect "whatever must be given up to obtain
some item."  McGuire Report at 16, n. 26 (Doc. #: 1911-5) (citations omitted).

if the Sheriff's office, the Department of Children and Family Services, or some other division is operating below full utilization, and the allocation of services to opioid-related matters does not result in an increase in staff or the inability to provide services elsewhere, there has still been an economic cost to the Plaintiffs.  *See id*. at 19-20.

McGuire next determines that nine Cuyahoga County divisions[4] and ten Summit County divisions[5] were affected by the opioid epidemic. *See id*. at 22-33.  He then identifies what he terms "affected costs" within each of the impacted divisions.  *See id*. at 34-40.[6]  McGuire describes "affected costs" to be: "all costs that were incurred in providing the services that were affected by the community's use and abuse of opioids (although not all such costs are appropriately attributed to opioid use)."  *Id.* at 34.

Finally, applying Cutler's two alternative approaches to estimating the share of harms from the Defendants' alleged misconduct, McGuire assesses what he alleges are the costs to each of Plaintiff's impacted divisions.  McGuire concludes that, between 2006 and 2018: (i) Cuyahoga County sustained a total of $125.5 million or $145 million in damages, depending on which of Cutler's approaches is applied; and (ii) Summit County sustained a total of $68.8 million or $78.4 million, depending on which of Cutler's approaches is applied.  *See id.* at 41-46.

---

[4]     The affected divisions in Cuyahoga County are: (i) Alcohol, Drug Addiction, and Mental Health Services Board; (ii) Division of Children and Family Services; (iii) Office of the Prosecutor; (iv) Office of Public Defender; (v) Court of Common Pleas; (vi) Juvenile Court; (vii) Office of the Medical Examiner; (viii) Sheriff's Office; and (ix) County Jail.  *See id.* at 31.

[5]     The affected divisions in Summit County are: (i) Alcohol, Drug Addiction, and Mental Health Services Board; (ii) Children Services Board; (iii) Prosecutor; (iv) Court of Common Pleas; (v) Juvenile Court; (vi) Sheriff's Office; (vii) County Jail; (viii) Alternative Corrections; (ix) Adult Probation; and (x) Medical Examiner.  *See id*. at 33.

[6]     Plaintiff's Opposition to Defendants' Motion to Exclude references McGuire's "Reply Declaration" (Doc. #: 200-117). However, as indicated in the August 13, 2019 email ruling of Special Master Cohen, this document was struck from the record and is not considered here.

## V.      Analysis.

### A.      Relevance/Fit.

Defendants take the position that McGuire should be excluded from offering his damage opinions because they do not "'fit' the issue of damages because he does not measure damages." Brief in Support of Defendants' Motion to Exclude Testimony of Thomas McGuire Concerning Damages ("Defs. Mot. to Excl. McGuire") at 4 (Doc. #: 1911-1).  Defendants raise four specific fit objections.

Defendants first argue McGuire's "opportunity cost" analysis improperly includes expenses Plaintiffs would have incurred even absent Defendants' allegedly wrongful conduct.  *See id*. at 6.  Relying on *City of Youngstown v. Cities Serv. Oil Co*., 31 N.E.2d 876 (Ohio Ct. App. 1940), where the court employed the "firefighter's rule" (discussed below), Defendants contend Ohio law prohibits counties, like Plaintiffs, from recovering these types of damages.  *See id*. at 7. Defendants further argue that, even if Plaintiffs *had* incurred expenses as a result of Defendants' misconduct, McGuire cannot specify them and the damages he does identify are inflated.  *See id.* at 7-8.

Next, relying on the same case law, Defendants assert that "opportunity costs" are not cognizable injuries as a matter of law.  *See* Defs. Mot. to Excl. McGuire at 8 (Doc. #: 1911-1). Alternatively, Defendants argue that, in cases where courts have allowed opportunity costs as a measure of damages, a plaintiff must establish: (1) it "'gave up' something as a result of defendants' wrongful conduct and (2) what it gave up 'was something of value.'"  *Id*. (citing *Chronister Oil Co. v. Unocal Ref. & Mktg*., 34 F.3d 462, 465 (7th Cir. 1994)).  Defendants argue Plaintiffs did not "give up" anything because McGuire failed to identify the services Plaintiffs

were not able to provide, or whether the quality of Plaintiffs' services was impaired.  And, even if Plaintiffs gave up something by virtue of abandoned or diminished services, Defendants assert this has no value.  *See* Defs. Mot. to Excl. McGuire at 8-9.

Plaintiffs respond to these arguments by distinguishing the cases on which Defendants' rely and emphasizing that Ohio law allows recovery of indirect costs,[7] which they liken to "opportunity costs."  *See* Pls. Op. Resp. to McGuire at 9-10 (Doc. #: 2191).  Plaintiffs also criticize Defendants' arguments as "an indirect attempt to resurrect [their failed arguments that relied upon the] municipal services doctrine."[8]  *Id.*  For the reasons stated below, the Court agrees with Plaintiffs.

The cases on which Defendants rely do not preclude a claim for recovery of costs for municipal services attributable to Defendants' wrongdoing.  Defendants' cases are distinguishable not only because they actually do allow indirect costs, but also because they involve single-incident claims.  In contrast, in *Cincinnati v. Berretta U.S.A., Corp.*, 768 N.E. 1136 (Ohio 2002), the Ohio Supreme Court rejected the argument that the municipal services doctrine barred the City of Cincinnati's recovery of municipal expenses for police, emergency, health, corrections, and other related public services in an action alleging negligence, product liability, and public nuisance.  The

---

[7]     Indirect Costs are described as: "the expenses involved in running a business and are not attributable to any one project.  Indirect costs may include salaries or executive or administrative personnel, general insurance, rent, utilities, telephone, professional fees, legal and accounting expenses, advertising and interest on loans."  *Illuminating Co. v. Wiser*, 114 N.E.3d 240, 246 (Ohio Ct. App. 2018).

[8]     "The 'municipal cost recovery rule,' also called the 'free public services doctrine,' is a common-law rule which provides that, absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services."  Oct. 5, 2018 Report & Recommendation at 19-21 (Doc. #: 1025) (quoting 32 A.L.R. 6th 261 (Originally published in 2008) (emphasis added)).

court held:

> Although a municipality cannot reasonably expect to recover the costs of city services whenever a tortfeasor causes harm to the public, it should be allowed to argue that it may recover such damages in this type of case.  Unlike the train derailment that occurred in the *Flagstaff* case, which was a single, discrete incident requiring a single emergency response, ***the misconduct alleged in this case is ongoing and persistent***.  The continuing nature of the misconduct may justify the recoupment of such governmental costs.  Therefore, if appellant can prove all the elements of the alleged torts, ***it should be able to recover the damages flowing from*** appellees' misconduct.

*Id*. at 1149 (emphasis added).[9]  *See also City of Boston v. Smith & Wesson Corp*., 2000 WL 1473568, at *8 (Mass. Super Ct. 2000) (holding the municipal services doctrine did not bar the city's claim for costs of law enforcement and emergency services costs, emphasizing that defendants' repeated course of conduct caused recurring costs to the city.)

*White v. Smith & Wesson Corp.*, 97 F.Supp 2d. 816 (N.D. Ohio 2000) is also instructive.  In *White*, the City of Cleveland brought claims for negligence, product liability, unjust enrichment, and nuisance.  Defendants filed a motion to dismiss, urging the court to amplify the "firefighter's rule"[10] and prohibit the plaintiff from "recovery for all governmental functions, such as police, medical, fire and emergency services, and other related expenditures, because these are the kinds of traditional services and functions that a municipality is expected to provide and which "are most efficiently and fairly spread among the public." *Id*. at 822.  The court rejected this argument:

> Far from a firefighter attempting to recover for an injury received while on duty on private property, the City of Cleveland is attempting to recover for the costs of the

---

[9]    *City of Flagstaff v. Atchison Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983) applied the municipal cost recovery rule, but noted it does not stand for the proposition that "a governmental entity may never recover the cost of its services."  To the contrary, "[r]ecovery *is permitted* where it is authorized by statute or regulation ... or required to effect the intent of federal legislation [or] ... *where the acts of a private party create a public nuisance which the government seeks to abate*." *Id*. (emphasis added).

[10]    The "firefighter's rule" generally provides that an owner or occupier of private property is not liable to firefighters or police officers who enter the premises and are injured while performing their official job duties.  *White.*, 97 F.Supp 2d. at 822.

services of police officers, firefighters, doctors, nurses, ambulance attendants, judges, prosecutors, jailors, social workers, and others, imposed on the City by an alleged unreasonably dangerous product and public nuisance.  The Defendants here are not landowners or occupiers of private property, but rather manufacturers and promoters of a product concerning which Plaintiffs have filed suit under Ohio's product liability, public nuisance, and unjust enrichment laws.  The Plaintiffs here cannot turn to a workers compensation scheme or other means for obtaining compensation for their alleged injuries.

*Id.  See also In re Opioid Litigation*, 2018 WL 3115102  (N.Y. Sup. Ct., Jun. 18, 2018) ("The Manufacturers' argument that, despite allegations they designed and implemented materially deceptive marketing campaigns to mislead the public and prescribers about the risks and benefit of prescription opioids, the municipal cost recovery rule forecloses the plaintiffs from recovering the costs for services to treat residents suffering from prescription opioid abuse, addiction or overdose, or for the increased costs of programs implemented to stem prescription opioid-related criminal activities, if accepted, would distort the doctrine beyond recognition.").

In sum, the Court does not agree that there is a general prohibition precluding the recovery of the type of costs allegedly incurred by Plaintiffs' as a result of the opioid crisis.

In their third "fit" argument, Defendants assert that McGuire's "opportunity cost" analysis does not comport with the recovery of RICO damages articulated by this Court in its December 19, 2018 Opinion and Order (Doc. #: 1203).  Defendants contend this Court has already held that Plaintiffs may recover only those costs that "go beyond the ordinary cost of providing [government] services and are attributable to the alleged injurious conduct of Defendants."  *Id.* at 19 (Doc. #: 1203).  According to Defendants, because McGuire failed to identify any amount Plaintiffs spent in excess of their budgets as a result of Defendants' conduct, and failed to determine the ordinary costs incurred by Plaintiffs, his opinions must be excluded.  *See id.* at 9.

The Court is not persuaded by this argument.  Although the Court's December 19, 2018 opinion mentioned Plaintiffs' expenditure of money as one basis to assess damages, the Court did

not preclude other means of assessment. For example, in its Opinion and Order, the Court also stated:

> Therefore, under the broadest reading of Sixth Circuit precedent, the Court finds that Plaintiffs may recover damages based on the provision of governmental services in their capacity as a sovereign to the extent they can prove *the asserted costs go beyond the ordinary cost* of providing those services and are attributable to the alleged injurious conduct of Defendants.

Doc. #: 1203 at 20 (emphasis added). McGuire's "opportunity cost" methodology is one way to determine the amount of costs Plaintiffs incurred because of the opioid epidemic *that would not have arisen but for the epidemic* – that is, that go beyond the "ordinary cost" of providing municipal services absent Defendants' alleged wrongdoing.

Defendants can challenge McGuire's methodology throughcross-examination and opposing opinion testimony from Defendants' experts. Plaintiffs' approach does not run afoul of the Court's earlier Order. *See Daubert*, 509 U.S. at 596. ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Finally, emphasizing McGuire's reliance on Meredith Rosenthal's analysis, Defendants contend McGuire's calculations do not fit the facts because they do not relate to the alleged misconduct of any particular Defendant. *See id.* at 10. As it did in its Orders Denying Motions to Exclude Rosenthal and Cutler, the Court rejects Defendants' argument that McGuire's calculations do not "fit" the facts because they aggregate the evidence and do not focus upon the alleged misconduct of any particular Defendant. *See* Order Denying Motion to Exclude Rosenthal at 13 (Doc. #: 2495), Order Denying Motion to Exclude Cutler at 4-5 (Doc. #: 2542), Order Regarding Discovery Ruling No. 5 (Doc. #: 1047). McGuire's reliance on the opinions of Rosenthal (and Cutler) may provide fodder for cross-examination; however, it does do not render McGuire's opinions inadmissible.

10

*Daubert's* relevancy requirement calls for the expert's opinion to "fit" the facts of the case into the principles and methodologies used to render his or her opinion.  *Daubert*, 509 U.S. at 591; *U.S. v. Smithers*, 212 F.3d 306, 313, 325 (6th Cir. 2000).  In assessing "fit," a Court must perform a case-by-case assessment to determine whether a particular expert's testimony will truly help the jury understand the evidence.  *See Daubert*, 509 U.S. at 591.  *Daubert's* fit requirement is intended to weed out testimony that is not helpful to the jury.  Rule 702's "helpfulness" standard requires only a valid connection to the pertinent inquiry as a precondition of admissibility. *See Daubert*, 509 U.S. at 591-92.  Here, the issue of past damages is a pertinent inquiry for which McGuire's testimony will aid the jury, and the methodology he uses remains sufficiently tailored to the facts of the case.

### B.    Reliability.

Defendants advance two theories supporting their assertion that McGuire's damage calculations are not reliable.  First, they complain that McGuire's methodology for identifying "affected costs" relies on McGuire's subjective judgment, cannot be objectively tested, and is not subject to any specific standards.  *See* Defs. Mot. to Excl. McGuire at 11, 13 (Doc. #: 1911-1).  Second, Defendants argue McGuire's "opportunity cost" approach rests on unjustified assumptions and, therefore, is unreliable.  *See id.* at 13.  For example, Defendants take issue with McGuire's assumptions that Plaintiffs allocate their resources efficiently and reasonably, and that costs attributable to one service are measured by spending on that service, since that spending could have been devoted to other uses.  *See id*. at 13-14.  In this regard, Defendants challenge McGuire's reliance on the work of John Mikesell as support for his underlying premise that opportunity costs are a proper measure of damage.  *See supra* at 4, n. 2.

11

The Court is not persuaded by these arguments.  As Plaintiffs point out, economics does not qualify completely as scientific knowledge.  *See* Pls. Op. Resp. to McGuire at 14 (Doc. #: 2191) (quoting *State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc*., 925 F.Supp. 1247, 1252 (S.D. Ohio 1996)).  Although *Daubert's* "reliability standard" for determining the admissibility of scientific evidence has been used to analyze nonscientific expert testimony, "the *Daubert* factors … were devised specifically for scientific testimony [and, therefore,] the *Daubert* analysis should be modified in the case of social science or other non-scientific expertise." *Id.*  As the Sixth Circuit has made clear:

> [T]he fact that [an expert's] opinions may not have been subjected to the crucible of peer review, or that their validity has not been confirmed through empirical analysis, does not render them unreliable and inadmissible. In *United States v. Jones*, this court recognized that the four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony. We noted that 'if [the *Daubert*] framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony--that derived substantially from practical experience--would be excluded.  Such a result truly would turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific evidence, on its head.'  Indeed, even the *Berry* court itself recognized that 'the distinction between scientific and nonscientific expert testimony is a critical one[,]' and that *Daubert* is 'only of limited help' in assessing technical or experiential expertise.  Consequently, in *Jones* we declined the appellant's invitation to apply the factors outlined in *Daubert* to testimony involving a non-scientific field.

*Vinel v. Union Twp*., No. 1:16-CV-930, 2018 WL 7080037, *6-7 (S.D. Ohio Apr. 13, 2018) (quoting *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) (internal citations omitted)).

This is not to say that nonscientific expert testimony need not pass muster.  The expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702, advisory committee note, 2000 amend.  The Court must also analyze whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

The Court finds McGuire's report sets forth: (i) an adequate explanation of his methodology; and (ii) how it is similar to methodology used in his regular work, apart from his role as an expert in this case. McGuire explains the basis for his "opportunity cost" analysis and how he applied the analysis to the facts before him, particularly as it relates to Plaintiffs' status as municipal governments. His report refers to outside, neutral, authoritative sources showing the bases for his methodology. And, he testified that application of his judgment was based on his training as an economist. For example, McGuire testified as follows:

> Q.     Okay. And how did you bring your judgment to bear to determine for any particular cost whether it was fixed or not?

> A.     Well, economists deal in costs of different types, there's marginal costs, there's variable costs, there's fixed costs, so as just general training one is oriented to this kind of distinction. And I went through the budget, in many cases job title by job title, to make a determination of, with respect to the compensation costs, where people belonged in one or the other.

April 23, 2019 Deposition of Thomas G. McGuire, Ph.D. at 119:3-14.

Moreover, if Defendants' experts disagree with McGuire's application of an authoritative source, or if Defendants disagree with McGuire's assumptions about the efficiency or reasonableness of local governments, Defendants will have the opportunity to identify and develop these matters through cross examination and the proffer of their own experts. "The *Daubert* standard is liberal, and does not require expert opinions to be bulletproof." *U.S. v. Lang*, 7717 Fed. Appx. 523, 534 (6th Cir. 2017). Instead, the Supreme Court prefers that litigants rely upon "the capabilities of the jury and of the adversary system generally," rather than "wholesale exclusion" by the Court of fairly supported, relevant testimony. *In re Welding Fume Products Liab. Litig.*, 2005 WL 1868046, at *5 (N.D. Ohio Aug. 8, 2005) (quoting *Daubert*, 509 U.S. at 596).

**VI.**     **Conclusion.**

In sum, for the foregoing reasons, Defendants' Motion to Exclude the Testimony of Thomas G. McGuire is **DENIED.**

**IT IS SO ORDERED.**

 /s/ Dan Aaron Polster, *Sept. 9, 2019*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**