UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATED TO:<br><br>All Cases<br><br>   and<br><br>*The County of Summit, Ohio, et al., v. Purdue Pharma L.P. et al.,*<br>Case No. 18-op-45090 | Case No. 1:17-md-2804<br>Case No. 18-op-45090<br><br>**Judge Dan Aaron Polster** |

# REPORT OF SPECIAL MASTER CATHY YANNI

By Order dated August 26, 2019 (Doc. #: 2529), the Court directed the undersigned to file a report on or before September 11, 2019, addressing:

a. whether the proposed class action allocation method, allotting up to 10% of all recoveries to litigating entities' attorney's fees and up to another 15% to litigating entities' expenses is, from the perspective of the non-litigating entities, consistent with Rule 23(e)(2)(D)'s requirement that a settlement be distributed equitably among the class members;

b. whether the proposed voting schemes, with three sets of votes counted separately among litigating entities and non-litigating entities, treats the latter group fairly; and,

c. whether the proposed Class Representatives and Class Counsel can adequately represent the entire class, including non-litigating entities, as required by Rule 23(a)(4) and Rule 23(g), respectively.

This assignment relates to a pending motion that asks the Court to certify a "negotiation class." (Doc. #: 1820). In support of that motion, its proponents have developed a plan for allocating a lump sum settlement among the putative class, Doc. #1820-1 at 55-62, and a related

1

plan for enabling class members to vote on the acceptability of any lump sum settlement achieved for the class, *id*. at 53-55.  The class consists of all counties and cities in the United States.  Both the allocation and voting plans draw a distinction between those class members that had filed opioid-related lawsuits before June 14, 2019 ("litigating entities"), *id* at 52, and those that had not ("non-litigating entities"), *id.*  Since the litigating entities primarily developed the allocation and voting plans, the Court seeks to ensure that the plans treat the non-litigating class members equitably, as Rule 23(e)(2)(D) will require it to determine at the conclusion of the lawsuit, if any settlement is reached.  Fed. R. Civ. P. 23(e)(2)(D).

After review of all of the filings concerning the proposed class, the proposed notice, and the class website, and based as well on the Special Master's knowledge of the parties and issues in the case gained since appointment in January 2018, Doc. #: 69, and extensive prior experience overseeing allocation issues in complex litigations, the Special Master concludes that the allocation and voting plans treat the litigating and non-litigating class members "equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D), and thus that a single set of class representatives and counsel can adequately represent the entire class.

The Allocation Plan

The Court has directed the Special Master to review the allocation plan according to Rule 23(e)(2)(D)'s command that a settlement "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).  This requirement only went into effect in December 2018, so there is little case law interpreting the command.  However, the new rule codifies old practices.  *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018 amendment (disclaiming intent of "displac[ing]" existing law, aiming instead to focus courts on key factors).  Thus, prior to the codification, the Sixth Circuit had held that a settlement may be unfair if "the named plaintiffs

receive preferential treatment, while the relief provided to the unnamed class members is perfunctory." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (citation and internal quotation marks omitted).  More pertinent to these facts, courts in this and other Circuits have held that "there is no rule that settlements benefit all class members equally . . . as long as the settlement terms are rationally based on legitimate considerations."  *Int'l Union v. Ford Motor Co.*, No. 05-74730, 2006 WL 1984363, at *37 (E.D. Mich. July 13, 2006) (citation and internal quotation marks omitted), *aff'd sub nom. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007); *see also In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 979 (N.D. Ill. 2011) (same); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997) (same).  Thus:

> The inference that differential treatment is the sign of an unfair settlement can be rebutted by evidence that the class members should be treated differently because they are situated differently . . . Put simply, the court's goal is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated.

William B. Rubenstein, 4 *Newberg on Class Actions* § 13:56 (5th ed. 2019) [hereafter "*Newberg on Class Actions*"] (footnotes omitted).

Applying these principles, this Report next (1) identifies the ways that the proposed allocation plan treats litigating and non-litigating class members differently and then (2) examines whether the differential treatment is justified.

The allocation plan consists of three components.  The heart of the plan, responsible for allocating the bulk of any settlement (75%), is based on three objective public health factors and seeks to ensure that money is distributed to those counties and cities hardest hit by the opioid epidemic, regardless of size.  Doc. #1820-1 at 55-60.  The next largest tranche (15%) is set aside

3

in a "Class Members' Special Needs Fund," to serve two purposes: (1) to adjust any unfairness that results from the initial allocation and/or (2) to reimburse "litigating entities," *id.* at 96, for "out-of-pocket costs in prosecuting the litigation . . . such as the time and costs of their law departments or legal staffs." *Id.* Any unused amounts revert to the recovery pool and are allocated according to the same public health criteria governing the 75% distribution. *Id.* at 97. The final tranche (10%) is set aside to create a "Private Attorneys Fees Fund," from which "private attorneys" may recover fees instead of enforcing private contingency fee contracts with their clients, *id.* at 49-50. The term "private attorneys" is defined "as any counsel with representation agreements with one or more Class members executed as of June 14, 2019." *Id.* at 50.[1] Any unused amounts again revert to the recovery pool and are allocated according to the same public health criteria governing the 75% distribution. *Id.* at 95-96.

These facts show that up to 25% of the settlement fund might go solely to litigating class members, over and above their initial allocations. However, as the 15% in the Class Members Special Needs Fund serves two purposes, only one of which is directed to reimbursing litigating class members, it is likely that a far smaller amount of the settlement proceeds will be allocated – in the first instance – solely to litigating entities. From the non-litigating class members' perspective, the question arises why *any amount* of their settlement may be made available only to other class members and not to them. Is the allocation plan skewed in a manner that unfairly advantages those who generated it?

---

[1] "Litigating entities" are defined as "those that had filed suit by June 14, 2019," Doc. #1820-1 at 52, but "private attorneys" are defined as those "with representation agreements . . . executed as of June 14, 2019," *id.* at 50, regardless of whether or not they have filed a complaint for those clients. What this means is that the Private Attorneys Fees Fund could be used to pay legal fees for some class members that are defined as non-litigating class members (because they had not filed suit by June 14, 2019) if those class members had executed a retainer agreement by June 14, 2019. The Special Master finds this distinction immaterial for purposes of this opinion.

The Special Master concludes that the allocation plan treats all class members equitably, reaching that conclusion in several steps.

1.  *Presumption of good faith.*  As a starting point, the Special Master notes that the plan for allocating 75% of the settlement fund is objective, transparent, and fair.  Settlement proceeds are allocated according to an algorithm based on three sets of objective public health data directly at the heart of this case: opioid-related overdoses, opioid-related deaths, and the distribution of opioid-related pills per capita in a given jurisdiction.  Doc. #1820-1 at 55-60.  The results are made transparent to the entire class, as any class member (or member of the public) can utilize an on-line allocation tool to see precisely what share of any settlement will go to each and every county in the country.  This allocation model reflects a serious effort on the part of the litigating entities that devised it to distribute the class's recovery according to the driving force at the heart of the lawsuit – the devastation caused by this horrific epidemic.  The legitimacy of the main allocation model supports an initial assumption that the litigating entities operated in good faith in developing the allocation plan.

2.  *Legal standard for recovery of fees and costs.*  Next, before turning to the specific percentages set aside for the litigating entities, the Special Master finds that reimbursement of litigation costs and counsel's fees are legitimate uses of a class's recovery.  In a normal common fund class action, it is class counsel's fee and expenses, as well as any expenses paid by the class representative, that are spread across the entire class at the end of the case.  Here, too, class counsel will surely seek such fees and expenses from the common fund.  But fee and cost awards from a common fund are not limited to the class's formal counsel.  The general rule is that a court may award fees and costs to any party or attorney whose "efforts did in fact create, enhance, preserve, or protect the fund under the court's supervision." 5 *Newberg on Class*

5

*Actions* § 15:60.  Moreover, in many class action cases, class representatives – or other plaintiffs who have "meaningfully participated in the litigation and conferred a benefit on the class," *id.* at § 17:6 – can be reimbursed for their service to the class, as the litigating entities recovering costs would be here.  *See* 5 *Newberg on Class Actions* §§ 17:1-17:21.  Courts refer to such payments as "service awards," or "case contribution awards," or "incentive awards."  *Id.* at § 17:2.  In some cases, it may be appropriate to "compensate each Class Representative in proportion to his or her time and effort in prosecuting the claims . . ."  *Swigart v. Fifth Third Bank*, No. 1:11-CV-88, 2014 WL 3447947, at *7 (S.D. Ohio July 11, 2014).  Courts have found that reasonable service awards conform to the Rule 23(e)(2)(D) requirement of equitable treatment.  *See, e.g.*, *O'Dowd v. Anthem, Inc.*, No. 14-CV-02787-KLM-NYW, 2019 WL 2248548, at *14 (D. Colo. May 24, 2019); *Hays v. Eaton Grp. Attorneys, LLC*, No. CV 17-88-JWD-RLB, 2019 WL 427331, at *13 (M.D. La. Feb. 4, 2019).  Indeed, "incentive awards may be necessary to ensure that class representatives are treated equally to other class members, rewarded both for the value of their claims (like all other class members) but also for their unique service to the class."  5 *Newberg on Class Actions* § 17:3.  Similarly, in cases litigated under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4, Congress sought to encourage large institutional investors to step forward as lead plaintiffs.  Although that law bars these lead plaintiffs from recovering differently than the class, 15 U.S.C. § 78u-4(a)(4), it simultaneously states that it does *not* "limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  *Id.*  Thus, a class's recovery may be used to pay the fees of lawyers and/or costs of litigants whose efforts are shown to have benefited the class – including especially important public plaintiffs like institutional investors and/or states, cities, and counties.  *See, e.g.*, *Dep't of*

6

*the Treasury of the State of New Jersey v. Cliffs Nat. Res. Inc.*, No. 1:14-CV-1031, 2016 WL 6915873, at *3 (N.D. Ohio June 30, 2016) (Polster, J.) (approving award to New Jersey of $50,697.45 "as reimbursement for its reasonable costs and expenses directly related to its representation of the Settlement Class").

3.  *Facts of this case.*  Any classwide settlement in this matter will likely be attributable in part to the litigating class members' early efforts.  The litigating class members are responsible for, *inter alia*, launching this litigation in state and federal courts, generating the establishment of this MDL, pursuing bellwether cases, uncovering critical facts through the discovery process, and creating significant negotiating leverage.  It is fair to assume in advance that, if a settlement is reached, litigating class members will likely be able to meet the legal standard set forth in the prior paragraph by demonstrating that their efforts contributed to the creation of that common fund.

4.  *Protection against freeriding.*  If the litigating class members were limited to using their own individual recoveries to repay their legal fees and costs, that limitation could create a problematic unfairness in the opposite direction.  The litigating class members' recoveries alone would be diminished by these costs and fees, leaving those early champions of the class in a worse position than the rest of the class.  Put differently, the non-litigating class members would essentially be freeriding on the efforts of the litigating class members.  Indeed, in a somewhat analogous situation, a court characterized the possibility that some class members would not share in costs burdening other class members as creating a "windfall" for the free riders.  *In re Ampicillin Antitrust Litigation*, 526 F. Supp. 494, 503 n.20 (D.D.C. 1981).  From this perspective, the allocation mechanism simply aims to spread the fees and expenses of these

7

early litigants across the whole class to ensure against such freeriding and to distribute the true costs of the litigation evenly.

   5. *Safeguards against excessiveness.* For the reasons just articulated, it is plausible that litigating class members will be able to demonstrate their entitlement to the recovery of *some* fees and costs. The question remains whether setting aside 10% for fees and up to 15% for costs (though likely far less, given the multiple purposes of the Special Needs Fund from which costs are extracted) is appropriate. The Special Master concludes that several factors support the approach proposed, while simultaneously buttressing concerns about excessiveness.

   a. Identifying these amounts in the allocation plan puts the whole class on notice that the litigating entities will seek to recoup some of their fees and expenses at the conclusion of the case. This provides important transparency, but does not lock the Court into later approving these specific amounts.

   b. All requests for fees and costs from a class's recovery in a class action lawsuit require judicial approval under Rule 23(h). Fed. R. Civ. P. 23(h).

   c. Rule 23(h) requires that the class be given notice of the fee and cost requests and have an opportunity to object to them. Fed. R. Civ. P. 23(h)(2)("A class member, or a party from whom payment is sought, may object to the motion.").

   d. As noted above, fees (and costs) may be paid out of a class's recovery only to attorneys (and litigants) whose efforts benefited the class and contributed to creation of the fund.

   e. The Court will have the capacity to ensure that the cumulative fees paid in the case – to litigating entities' lawyers, class counsel, the MDL lawyers, objectors' lawyers, etc. – are not excessive.

f.       Any of the 10% pool not used for litigating members' fees and/or any of the 15% not used for litigating class members' costs (or its other purpose) will revert to the benefit of the whole class, ensuring that the whole class's interests remain paramount.

* * *

To summarize:  (1) the litigating entities have demonstrated good faith in generating a core allocation plan worthy of praise; (2) the law allows the recovery of fees and costs from a common fund to the extent that the underlying work contributed to the creation of the a common fund; (3) reimbursement here is quite plausible given the value produced by the litigating class members' early cases; (4) to not create a process for the litigating entities to seek fees and costs runs the risk of permitting the non-litigating class members to freeride; (5) judicial oversight is required and ensures that no fees and costs will be reimbursed other than for work that benefited the class as a whole, Rule 23 provides the non-litigating class members a voice in that process, the judicial approval process guards against fees and costs for all counsel being excessive, and unused funds revert to whole class.

For all of these reasons, the Special Master concludes that the proposed allocation plan facially complies with Rule 23(e)(2)(D)'s requirement that a settlement be distributed equitably among the class members.

### The Voting Plan

Under movants' proposal for a "negotiation class," class members will vote on the acceptability of any lump sum settlement amount negotiated by their counsel and representatives. As this form of class certification is novel, there is no existing law on what constitutes an adequate voting procedure.  The Special Master has accordingly started from the benchmark "one person, one vote" principle that permeates much of American law (here "one class member,

one vote"), *see Evenwel v. Abbott*, 136 S. Ct. 1120, 1123 (2016) (recounting the history of this principle), and considered the extent to which the proposed mechanism deviates from this principle to ensure no unfairness has resulted.

1. As a formal matter – but only as a formal matter – the voting scheme strictly comports with a "one class member, one vote" approach. Specifically, if a lump sum settlement is reached, each class member will be entitled to precisely one vote on one question: whether the lump sum settlement amount is sufficient. Doc. #: 1820-1 at 52 ("Each class member will be asked to vote *one* time on *one* question: 'Do you approve the total amount of the settlement?'") (emphasis in original). As a starting point, then, the voting scheme enfranchises all class members in precisely the same manner.

2. What differentiates among class members (all of which are counties and cities), and in complex ways, is how the votes are counted. The voting plan makes four distinctions among class members in counting votes, only one of which is at issue for purposes of this opinion. Specifically, after the votes are cast, they are tabulated along three distinct axes: (1) on a simple one-class member/one-vote basis; (2) on a basis that weighs the votes by the population of the voting class member; and (3) on a basis that weighs the votes by the effect the opioid epidemic has had on the class member's county or city, as measured by the allocation model discussed above. Doc. #: 1820-1 at 53-55. Because there are more than 34,000 class members, the population-weighted vote ensures that the vast number of small counties and cities cannot foist a settlement on the smaller number of large counties and cities that may contain much of the nation's population. Similarly, the impact-weighted vote ensures that the vast number of less-impacted counties and cities cannot foist a settlement on the smaller number of counties and cities that suffered the most harm from the epidemic. While those checks are not the subject of

this opinion, the Special Master notes that it is understandable why these different vote-counts are part of the voting plan and observes that their inclusion only heightens the sense of fairness in the plan.

   3. The additional wrinkle to the voting plan is that the three sets of votes described in the prior paragraph are undertaken twice: once among the litigating class members and once among the non-litigating class members, meaning that six sets of supermajority counts must be satisfied before the class is said to have accepted a proposed settlement. *Id.* This dual count has the same effect noted in the prior paragraph: it ensures that the 32,000 or so non-litigating class members cannot cram a settlement down on the 2,000 or so litigating class members. More specifically, the plan effectively bars the non-litigating class members from settling for too little, from the litigating class members' perspective.

   4. This raises a question: Why do the litigating class members need assurance that they will not be bound to a settlement they deem too low?

    a. The most generous answer to that question is captured by the very names employed: the *litigating* class members have been active in opioid-related litigation for several years. They have accordingly gained significant insight into the strengths and weaknesses of the plaintiffs' claims generally and as against different defendants specifically. Their experience in the field makes them best situated to make an informed decision about whether a proposed settlement is acceptable. For similar reasons, the Sixth Circuit has held that a court reviewing a proposed class action settlement "should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs," with "the deference afforded counsel . . . correspond[ing] to the amount of discovery completed and the character of the evidence uncovered." *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983). In this light, the

check that the litigating entities have reserved for themselves ensures that no class settlement will be approved unless those most familiar with the legal claims at issue in the litigation, as well as the negotiation process in this large complex MDL situation, support it.

   b.  The somewhat less generous answer to why the litigating class members have given themselves a check against a low settlement is that they have the most at stake.  Not only do they have their own allocations (like any other class member), but they have uniquely expended large sums of money in pursuit of these cases and accordingly enshrined recovery of their fees and costs into the settlement structure.  As discussed at length above, there is nothing untoward about those default allocations.  As such, it should not doom the voting structure to note that the litigating class members' veto ability not only defers to their expertise but also protects their financial interests.  As noted above, those financial interests will only be recognized if and when the Court approves the payment of requested costs and fees.

   5.  Interestingly, the voting structure not only protects the litigating class members from being sold out by the non-litigating class members, it simultaneously protects against the opposite occurrence by ensuring that the non-litigating class members, too, must approve any settlement.  Why would the non-litigating class members need such protection?  The prior point suggested that the litigating class members, who have invested the most time and money in the case, are not likely to settle cheap, lest they not recover all of their sunk costs.  Yet, the class action literature worries about the opposite result as well: precisely because the litigating entities alone are out of pocket, they might prefer to settle when it would be in the class's best interest to keep litigating.  *See, e.g.*, John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 391 (2000) (explaining that because of their extraordinary investments in class action cases, "[a]cross a broad range of

12

cases, plaintiffs' attorneys will be more risk averse than class members in considering settlement offers and will wish to accept many offers that the class will rationally wish to reject"). Importantly, the voting structure does not enable the litigating class members to settle too low. It requires a separate supermajority approval of the non-litigating class members for a settlement to be approved. The dual voting structure is not, therefore, purely to the benefit of the litigating entities, but a structure that provides protection for both groups against different risks.

In sum: (1) all class members have the same franchise (one vote); (2) the vote-counting mechanism understandably ensures that any settlement is approved by a majority of the class, counted by head, by population, and by impact; (3) the vote-counting mechanism further ensures against the non-litigating class members approving a low settlement unacceptable to the litigating class members; (4) that assurance is defensible on the grounds that the litigating entities are the most knowledgeable about the value of the class's claims; and (5) the fact that non-litigating entities must separately approve the settlement tempers concerns that the litigating entities will settle low to recover their costs, as does the fact that the litigating entities are likely to be able to spread their costs across the whole class as described above.

For these reasons, the Special Master concludes that the proposed voting plan facially complies with the "one class member, one vote" principle and, to the extent that the vote-counting mechanism deviates from that principle, it does not do so in ways that systematically or unfairly disadvantage the non-litigating class members to the benefit of the litigating class members, or vice versa. Indeed, it gives each group a check on the other settling too low.

## Adequate Representation

The movants have proposed: (1) a singular class consisting of all counties and cities; (2) a group of 51 class representatives, all of which, they assert, are litigating entities, Doc. #1820-1 at 19; and (3) a set of six class counsel, all of whom, they assert, represent litigating entities, *id.* at

13

52. The Court has appointed two of these lawyers – Jayne Conroy and Christopher Seeger – as Interim Co-Lead Negotiation Class Counsel, Doc. #: 2490.  Although the allocation and voting plans distinguish between litigating and non-litigating class members, the movants do not propose sub-classes, nor separate class representatives and class counsel for each group.  Looking backward, the Special Master has concluded that the distinctions between litigating and non-litigating class members in the allocation and voting plans are not unfair to the non-litigating class members.  Looking forward, the adequacy question focuses on whether one set of agents – all drawn from the litigating entities and their counsel – can simultaneously provide adequate representation to both groups in any negotiations with defendants that might take place.  The Special Master finds that they can.

*The Class Representatives*

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Supreme Court has explained that "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (citation and internal quotation marks omitted).  Yet:

> [N]ot every potential distinction between the proposed representative and other class members will render the representative inadequate.  Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.  Adequacy does not require complete identity of claims or interests between the proposed representative and the class. All that is required—as the phrase "absence of conflict" suggests—is sufficient similarity of interest such that there is no affirmative antagonism between the representative and the class.

1 *Newberg on Class Actions* § 3:58 (footnotes omitted).  *See also* 3 *Newberg on Class Actions* § 7:31.

14

Here, there are no conflicts of interest, much less fundamental ones, between litigating and non-litigating class members as to negotiating settlements with defendants. All of the class members have an equal interest in maximizing the recovery from the negotiation. To the extent each might have a different definition of what amount constitutes a fair settlement, that is not a "conflict" of the type Rule 23 polices. *See* 1 *Newberg on Class Actions*, at § 3:60. Moreover, while there may be differences of opinion across the class about whether a proposed settlement is adequate, the litigating class members, as a group, do not have settlement value preferences different than those of non-litigating class members, as a group. As discussed above, some litigating class members might want to settle fast to recover their outlay of costs, while others might want to negotiate longer in the hopes of settling higher precisely to recoup those same costs and more; similarly, some non-litigating class members might want to settle fast and cheap, while others might not want to settle until certain amounts are reached. This is true of class members in all class actions and, standing alone, does not create any meaningful, much less fundamental, intra-class conflict. Thus, the fact that all of the proposed class representatives are litigating entities does not render them unable to represent the interests of the non-litigating class members in settlement negotiations.

While this conclusion would be true in any case, it is even more apt here, in that two unique aspects of this "negotiation class action" temper any intra-class conflict concerns. *First*, intra-class allocations sometimes threaten to raise intra-class conflicts, but all intra-class allocation issues have been resolved up front, are transparent to all putative class members who choose to remain in the class, and appear, to this Special Master, fair to all class members for the reasons explained above. *Second*, every class member will ultimately get to vote on whether a particular settlement is acceptable from its point of view. One of the class representatives' key

15

functions – to assist class counsel in determining what constitutes a fair settlement amount – accordingly recedes in importance here.

*Class Counsel*

The same principles that render the proposed class representatives adequate to represent the entire class, notwithstanding the fact that all are litigating entities, similarly render the proposed class counsel adequate. Like the class representatives, class counsel "must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). The Advisory Committee notes accompanying the enactment of the Rule 23(g) requirements identified a larger ambition behind this "duty" section, stating:

> [Rule 23(g)(4)'s Duty of Class Counsel requirement] recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to fire class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

Fed. R. Civ. P. 23(g) advisory committee's notes to 2003 amendment.

These standards, as applied here, will require Class Counsel to adequately represent both the litigating and non-litigating class members. Given the absence of any meaningful conflict between the two groups in terms of negotiating a settlement with defendants – or along any other axes – Class Counsel should face no obstacles in representing the entire class adequately. That conclusion is bolstered by Class Counsel's significant experience representing classes and other groups of plaintiffs, as already found by the Court. Doc. #: 2490 at 4 ("Applying Rule 23(g)'s four factor test, the Court finds that these lawyers are well-situated to represent the Class.").

Further, given the absence of conflicts across the class, the fact that the proposed counsel all represent litigating entities is only an asset: it attests to the depth of their knowledge of the issues in the case and provides further support for the conclusion that the class is well represented.

For these reasons, the Special Master concludes that the proposed Class Representatives and Class Counsel can adequately represent the entire class, including non-litigating entities, as required by Rule 23(a)(4) and Rule 23(g), respectively.

* * *

The Special Master's Report is hereby

RESPECTFULLY SUBMITTED,

/s/ *Cathy Yanni*
**Cathy Yanni**
**Special Master**

**Dated:  September 10, 2019**