# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| ) | **Case No. 1:17-MD-2804** |
| **IN RE: NATIONAL PRESCRIPTION** ) | |
| **OPIATE LITIGATION** ) | **Judge Dan Aaron Polster** |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | **MEMORANDUM OPINION** |
| ) | **CERTIFYING NEGOTIATION** |
| **All Cases** ) | **CLASS** |
| ) | |
| **and** ) | |
| ) | |
| *The County of Summit, Ohio, et al., v.* ) | |
| *Purdue Pharma L.P. et al.,* ) | |
| Case No. 18-op-45090 ) | |
| ) | |

Before the Court is Plaintiffs' Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class. Doc. #: 1820. Various Defendants and a handful of putative class members oppose the motion, as do 37 State Attorneys General and the Attorneys General of Guam and the District of Columbia. After consideration of all of the briefing on this motion, and oral argument held on August 6, 2019, and all of the prior proceedings herein, the Plaintiffs' Motion is **GRANTED-IN-PART**. This Memorandum opinion explains the Court's reasoning. An Order will issue separately.

## I.     THE NEGOTIATION CLASS CERTIFICATION MOTION

### A.     Background

On December 12, 2017, the Judicial Panel on Multidistrict Litigation (JPML) transferred all opioid-related litigation pending in federal courts throughout the United States to this forum for consolidated pretrial proceedings. Doc. #: 1. At present, this multidistrict litigation (MDL) encompasses more than 2,000 individual actions. Most of these constituent cases have been filed

by cities and counties throughout the United States seeking, *inter alia,* reimbursement for monies they have expended – and continue to spend – addressing the opioid crisis.  The Defendants include numerous manufacturers, distributors, and pharmacies.  Beyond the thousands of cases pending here, many other municipalities are litigating similar opioid-related lawsuits in state courts throughout the United States.

From the outset of this MDL, the Court has encouraged the parties to settle the case. Settlement is important in any case.  Here, a settlement is especially important as it would expedite relief to communities so they can better address this devastating national health crisis.  A Court-appointed Special Master (Professor Francis McGovern) has overseen extensive settlement negotiations.  The Defendants have insisted throughout on the need for a "global settlement," that is, a settlement structure that resolves most, if not all, lawsuits against them arising out of the opioid epidemic.  This has created an obstacle to settlement.  In a standard settlement class action, the class members can opt out of the class after the settlement is reached.  With thousands of counties and cities already litigating, the Defendants in this MDL are concerned that many of these Plaintiffs could opt out.  The Defendants would then have paid a lot of money to settle non-litigating claims but would still have to litigate a host of potentially significant claims.  This situation required creative thinking.  The Special Master, in conjunction with experts and the parties in the case, developed an innovative solution:  a new form of class action entitled "negotiation class certification."[1]

---

[1] The Special Master and Professor Rubenstein, the Court's expert in this matter, have produced a scholarly version of the idea.  *See* Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Class Actions Involving Large Stakeholders* (Duke Law Sch. Pub. Law & Legal Theory Series, Paper No. 2019-41, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3403834.

The idea is to undertake the class certification and opt-out process prior to a settlement being reached, as is done in a normal class action geared toward trial.  This will fix a class size and provide the Defendants a sense of the precise scope of the group with whom they are negotiating.  The class members' rights are protected in several critical ways.  At the front end, before having to make the opt-out decision, the class members can calculate their share of any future settlement; here, groups of Plaintiffs and Plaintiffs' attorneys have worked together to establish a public health-based settlement allocation plan, the details of which are all made available to the Class and public at a case website, www.opioidsnegotiationclass.info.  At the back end, each class member will be entitled to vote (yes or no) on whether a proposed settlement amount is sufficient, and no settlement will be deemed accepted unless it garners a supermajority (75%) of those voting; here, a proposal will need to secure approval from six separate supermajority vote counts, reflecting different slices of the class.  Additionally, of course, the Court protects the absent class members:   Rule 23 requires that the Court make specific determinations before permitting a class action to go forward, Fed. R. Civ. P. 23(a), (b)(3), (c), (g), and similarly requires that the Court – independent of the class's vote – approve any proposed settlement and attorney's fees,  Fed. R. Civ. P. 23(e), (h).

As discussed more fully below, the Court is mindful of the fact that this is a novel procedure and one opposed by the vast majority of State Attorneys General, who themselves are actively pursuing important State opioid litigation.  The Court has determined that the procedure is a legitimate one, that certification is warranted based on the facts of the case, and that the whole process is more likely to promote global settlement than it is, as the Attorneys General argue, to impede it.  Regardless, there is nothing coercive about this process:  no Defendant has to employ it.  There is nothing exclusive about this process:  it does not interfere with the States settling their

own cases any way they want, and it does not stop parties in the MDL from settling in other ways. And there is nothing intrusive about this process:  it does not stop any litigation from continuing and in no way interferes with the upcoming bellwether trials in this MDL.  This process simply provides an option – and in the Court's opinion, it is a powerful, creative, and helpful one.  The Court therefore grants certification of the negotiation class but, mindful of the objections that have been mounted against it, upon terms more carefully prescribed and delimited than those proposed by the Plaintiffs.

B.    The Motion

By motion dated June 14, 2019, the Plaintiffs' leadership team in this MDL filed a motion on behalf of 51 cities and counties entitled, Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, Doc. #: 1683; Doc. #: 1690 (corrected version).  A variety of parties responded to this motion, including a group of Distributor Defendants, Doc. #: 1720, and a group of Pharmacy Defendants, Doc. #: 1723, but no Manufacturer Defendants.  Moreover, two sets of State Attorneys General – representing 30 States, the District of Columbia, and Guam – sent letters to the Court registering their disapproval of the proposed motion.  Doc. ##: 1726, 1727. The Court held a hearing on the initial motion on June 25, 2019, and at that time adopted a briefing schedule enabling the Plaintiffs to re-brief the motion in light of the filed oppositions. Accordingly, on July 9, 2019, the Plaintiffs filed a Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class.  Doc. #: 1820; *see also* Doc. #: 2135 (Statement of City of Manchester, New Hampshire Supplementing Plaintiffs' Renewed Motion). On July 23, a set of nine Distributor and Pharmacy Defendants filed a brief opposing the motion, Doc. #: 1949, while a group of Manufacturing Defendants filed a brief asking the Court to clarify

the relationship of negotiation class certification to *American Pipe* tolling, Doc. #: 1952;[2] other

Defendants subsequently noted their joinder in these responses, Doc. ##: 1954, 2057.  A group of

six (6) Ohio cities filed a brief in opposition, Doc. #: 1958, later joined by a seventh city, Doc. #:

2064, while another putative class member (City of Fargo, North Dakota) filed a brief asking the

Court to clarify the end date for inclusion in a particular sub-group of the proposed negotiation

class, Doc. #: 1953.  A letter to the Court joined by 37 State Attorneys General, as well as the

Attorneys General of the District of Columbia and Guam, strongly urged the Court to reject the

motion.  Doc. ##: 1951, 1955.  The Ohio Attorney General, who signed that letter, also filed a

separate letter of his own registering further opposition.  Doc. #: 1973.  On July 30, 2019, the

Plaintiffs filed a reply to these oppositions.  Doc. #: 2076.  On August 6, 2019, this Court held a

hearing on the motion.

C.      The Proposed Process

        The negotiation class certification process unfolds in five stages:

        1.      *Allocation/Voting*.  Class members first develop a plan for allocating a lump sum

settlement among the class and a plan for voting on the reasonableness of any lump sum settlement

that is achieved.  This enables each class member to know its settlement share and franchise prior

to the opt-out deadline.  Here, the MDL Plaintiffs' leadership has met with numerous groups of

Plaintiffs and public health experts to create the allocation plan.  Doc. #: 1820-1 at 49.  The plan

proposes distributing 75% of the lump sum to counties, with each county's share calculated

according to three equally-weighted public health factors. *Id.* at 48–49, 55–60.  The county's share

is then divided among the county and its constituent cities, ideally through negotiated agreement.

---

[2] Movants disclaim any tolling effect of their motion, Doc. #: 2076 at 19, so the Court need not
address this issue at this time.

*Id.* at 60.  Of the remaining 25%, 10% is set aside for a "Private Attorneys' Fee Fund," from which private attorneys – defined as any counsel with representation agreements with one or more Class members executed as of June 14, 2019 – could seek fees in lieu of enforcement of private contingency fee contracts with their clients.  *Id.* at 49–50.  Finally, 15% is set aside for a "Class Members' Special Needs Fund," to cover the special needs and expenditures of any Class member that are not addressed by the class-wide allocation formula, including expenses associated with litigation.  *Id.* at 96.  All of these amounts are subject to Court approval and any of this 25% (the Private Attorneys' Fee Fund and the Class Members' Special Needs Fund) not so distributed is then re-distributed across the class according to the allocation plan.  *Id.* at 95, 97.

The voting model is both simple and complex.  Doc. #: 1820 at 8–9.  If a lump sum settlement is reached with a Defendant, each class member will be given the opportunity to cast a single, simple, yes/no vote as to whether the size of the lump sum settlement is sufficient.  The votes will then be counted to ensure the settlement is accepted by 75% of all voting entities by number, 75% of all voting entities by population, and 75% of all voting entities by allocation; each of those three types of votes will be counted twice, once among jurisdictions that had filed lawsuits as of June 14, 2019 ("litigating entities") and once among jurisdictions that had not ("non-litigating entities").  The various counts ensure that: (1) the plethora of smaller counties cannot alone control an outcome (the population vote guards against that); (2) the plethora of small-recovery counties cannot alone control an outcome (the allocation vote guards against that); and that (3) neither the litigating nor non-litigating entities alone can control an outcome.

Part IV of this Memorandum analyzes the equities of the allocation and voting plans.

2.    *Class Certification.*  With the allocation and voting plans in place, plaintiffs move for certification of the negotiation class, as have the present movants.

3.     *Notice and Opt-Out Period.*  If the Court approves the motion, the class members are given notice of class certification and an opportunity to opt out.  Here, movants propose a 60-day opt-out period.  During that time, class members can assess their share of a lump sum settlement and the proposed voting structure at the class website to determine whether they want to be part of this negotiating group.

4.     *Lump Sum Settlement Negotiation.*  At the conclusion of the opt-out period, with the size of the class set, the class is ready to negotiate a settlement with one or more defendants.  No defendant is required to negotiate with the class and the underlying litigation activities continue unabated.

5.     *Judicial Approval, Including Class Vote.*  If a settlement is reached, the parties move for judicial approval, as required by Rule 23(e).  That process encompasses three parts:  (a) the Court must preliminarily approve the settlement, Fed. R. Civ. P. 23(e)(1); (b) class members are then given their opportunity to vote on the settlement, and they may file objections with the Court, Fed. R. Civ. P. 23(e)(5); and (c) if the Class votes to accept the settlement, class counsel moves for final approval.  The Court would then make the same determination as to the settlement's reasonableness as Rule 23 requires it to do in any class action.  Fed. R. Civ. P. 23(e)(2).

## II.     RULE 23 AUTHORIZES NEGOTATION CLASS CERTIFICATION

Rule 23 authorizes a court to certify a case, or issues within a case, for class treatment if certain requirements are met.  Since adoption of the current version of Rule 23 in 1966, courts have generally certified two types of class actions:  trial class actions and settlement class actions.  The present motion asks this Court to certify a "negotiation class action."  The concept and

procedure are set forth above. The question addressed here is whether Rule 23 authorizes this procedure. The Court finds that it does.

An important starting point is that the text of Rule 23 does not dictate, nor therefore limit, the uses to which the class action mechanism can be applied. Rule 23(a) and (b) set forth the requirements that must be met before a court can certify a class, but neither specifies that the class to be certified is for "trial" or "settlement" purposes. Defendants point to the fact that several passages in Rule 23 specifically reference settlement, as opposed to trial, classes. Doc. #: 1949 at 7. They argue that these passages demonstrate that the Rule authorizes only trial and settlement classes. *Id.* Their argument is not convincing. The passages they reference were not added to Rule 23 until December 2018, yet 21 years before that – when Rule 23 contained no explicit reference to settlement class actions – the Supreme Court affirmed courts' use of the settlement class action device. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 618 (1997). Moreover, the passages that were added in 2018 do not authorize settlement classes but simply identify certain procedures relevant to those types of class actions.

The history of class action law provides further support for this new use of the class action procedure. Soon after Rule 23's adoption in 1966, parties began asking courts to certify settlement class actions, that is, cases that had already been settled prior to the court's certification of a class. *See, e.g.*, *Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp*., 323 F. Supp. 364 (E.D. Pa. 1970), *aff'd and modified sub nom. Ace Heating & Plumbing Co. v. Crane Co*., 453 F.2d 30 (3d Cir. 1971). This development was deemed novel and had its share of detractors. *See Manual for Complex Litigation* § 1:46 (4th ed. 1977) ("There is, to say the least, serious doubt that this practice is authorized by Rule 23 as amended, even if it is conceded that the courts are expected to develop new methods of employing the amended Rule 23."). Many critics made the same

argument then that detractors of the proposed negotiation class make now:  that the use is not authorized by the rule.  The lower courts rejected this argument, and in its 1997 decision in the *Amchem* case, the Supreme Court affirmed that Rule 23 authorized settlement class actions. *Amchem*, 521 U.S. at 618 (noting that "all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes" and approving use of the device).  The Defendants' reliance on *Amchem* for the proposition that "in recent years [the Supreme Court has] repeatedly warned that new innovations that go beyond the express scope of Rule 23 are prohibited," Doc. #: 1949 at 8 n.8, is therefore unpersuasive and inapposite.

Finally, it is not surprising that the history of Rule 23 supports different uses of the class action device, and the text does not prohibit these, because Rule 23 is equitable in nature and its purpose is to provide practical means for addressing complex litigation problems.  Myriad judicial decisions have accordingly supported liberal application of Rule 23.  *See, e.g.*, *Schneider v. Elec. Auto-Lite Co*., 456 F.2d 366, 370 (6th Cir. 1972) ("[T]he District Court was correct in liberally interpreting Rule 23 in order to avoid burdensome litigation and to give efficient disposition to this action.").

One aspect of the negotiation class action process that differs from a settlement class action is that class members must make their decision whether to opt out before knowing the size of the settlement.  Some argue this violates the Due Process Clause.  Doc. #: 1958 at 8–12.  It does not. In a normal trial class action, class members must make their opt-out decision at the outset of the suit, before the result is known, and no one argues that process is unconstitutional.  Moreover, in that process, if their trial attorneys later settle the case, Rule 23 enables a Court to offer a second opt-out opportunity but does not require it to do so.  Fed. R. Civ. P. 23(e)(4).  If there were a constitutional right to opt out once the outcome was known, Rule 23 would require a second opt-

9

out opportunity, not just authorize it.  Here, class members are given sufficient information to make an informed decision about whether they want to bind themselves to a negotiation process, from which they will receive a known portion of the outcome and in which they will get a right to vote on the settlement.  Moreover, the Court always retains the option of enabling a second opt-out opportunity if circumstances require.

The Defendants also note that a few courts have rejected the 75% voting idea when employed outside the class action context, Doc. #: 1949 at 25–26 (citing *Tax Auth., Inc. v. Jackson Hewitt, Inc.*, 898 A.2d 512, 521 (N.J. 2006); *Hayes v. Eagle-Picher Indus., Inc.*, 513 F.2d 892, 894–95 (10th Cir. 1975)), and argue that the voting process therefore cannot be employed within the class action context.  But the two contexts are distinct:  class members in class actions, unlike individual mass tort plaintiffs, are not given individualized settlement approval rights.  All class members are automatically bound unless they can and do opt out.  Moreover, in a normal settlement class action, class members may either object or opt out, but if they object and lose their objection, they cannot then opt out:  they are instead bound to a settlement with which they disagree.  The voting process is therefore consistent with the class action mechanism.

More generally, the Defendants argue that a negotiation class violates Article III because it is somehow unrelated to a judicial function.  Doc. #: 1949 at 7–8.  They concede, as they must, that a settlement class is legitimate, noting that it assists a court in its judicial function of "entering a judgment of approval on a class settlement."  *Id.* at 8.  But negotiation class certification serves an even more important judicial function at an even more important juncture in the litigation:  in certifying a negotiation class, the Court undertakes the familiar judicial function of ensuring that the class certification requirements are met and the absent class members' interests are protected by those who purport to represent them, *prior to those agents negotiating a settlement for the*

10

*absent class members*.  Negotiation class certification therefore corrects one of the long-standing concerns of settlement class actions:  that un-approved agents have settled un-certified claims.  *See, e.g.*, *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3d Cir. 1971) (examining argument that lawyer, "having bargained the settlement terms with defendants prior to his official designation by the court as class representative . . . may be under strong pressure to conform to the defendants' wishes").  Moreover, assisting parties in creating a settlement, particularly in a large case of this type with contested liability and adversarial litigation, is itself a meaningful judicial function.  *See, e.g., In re Nat'l Prescription Opiate Litig*., 927 F.3d 919, 923 (6th Cir. 2019) (noting, without censure, that "[t]he district court presiding over this potentially momentous MDL has repeatedly expressed a desire to settle the litigation before it proceeds to trial").

## III.   THE REQUIREMENTS OF CLASS CERTIFICATION ARE MET

A.    <u>The Claims and Issues</u>

Rule 23(c)(1)(B) states that: "An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."  Fed. R. Civ. P. 23(c)(1)(B).  The Defendants argue that the movants have failed to proffer sufficient evidence in support of their motion and/or that the motion is not tethered to a particular complaint.  Doc. #: 1949 at 9–13.  (Defendants also complain about a lack of discovery concerning the class representatives.  *Id*. at 12 n.13.  They filed two briefs in response to movants' original proposal, Doc. ##: 1720, 1723, and appeared at the June 25, 2019 hearing on the motion, yet never asked for or filed a motion seeking discovery).

The current motion does not arise in a factual vacuum.  This MDL has been pending for nearly two years.  The Court has undertaken extensive review of the factual and legal issues in the case.  Several bellwether trials will commence shortly and the Court has ruled on critical motions

to dismiss, myriad discovery matters, and a variety of complex and voluminous summary judgment motions.  The Court and parties are deeply steeped in the legal and factual issues in the case, and the extensive record of the case – now over 2,500 entries on the MDL docket alone – provides more than sufficient factual and legal context for a decision on class certification.  The Defendants' concern that the present motion is not tethered to a specific complaint implies that there is an absence of relevant pleading in this matter.  If there is a problem in this case, however, it is one of glut, not famine:  there are more than 2,000 complaints pending here, many of which exceed 300 pages in length.  Although parties sometimes make class allegations in their complaint, Defendants point to no precedent holding that class allegations in a complaint are a necessary prerequisite to a class certification motion under Rule 23; similarly, although in MDLs of this type there are sometimes master complaints, there is no MDL-specific (or any other) rule requiring such a complaint and, absent specific agreement to the contrary, such complaints are typically purely administrative in nature.  *See* William B. Rubenstein, 3 *Newberg on Class Actions* § 10:15 (5th ed. 2019) [hereinafter *Newberg on Class Actions*].

Contrary to the Defendants' assertions, the movants specifically point the Court to the allegations contained in Cuyahoga County, Ohio's pleadings.  Doc. #: 1820-1 at 78 n.40.  Given the Court's extensive knowledge of the heavily-developed legal and factual record in this matter, and the discretion Rule 23 delegates to it, the Court adopts movants' approach but utilizes as its reference the allegations in substantially similar complaints filed by Summit County, Ohio (Doc. ##: 513, 1466).  The Court references the Summit County pleadings for several inter-related reasons:  (1) Summit County is one of two bellwether cases set for trial in the coming month, with its facts and legal allegations well-known to the Court and litigants; (2) Summit County's complaint was extensively tested through motions to dismiss covering thousands of pages of

documents and nearly a year of litigation, Doc. #: 1203; (3) Summit County's complaint was the basis of a "short form complaint" process that enabled all plaintiffs in this MDL to incorporate by reference certain of the legal and factual allegations therein, Doc. #: 1282; (4) the vast bulk of the 49 putative class representatives – and numerous other plaintiffs – have accordingly adopted the Summit County pleadings.[3]

The Summit County complaint and related short-form complaint enabled MDL plaintiffs – by checking a few boxes – to adopt two federal RICO claims and a set of factual allegations encompassing, *inter alia*, issues arising out of the federal Controlled Substances Act.  The first RICO claim, levelled against manufacturers labelled "RICO Marketing Defendants," alleges the manufacturers engaged in a variety of activities that misled physicians and the public about the need for and addictiveness of prescription opioids, all in an effort to increase sales.  *See* Summit County Pleadings, Doc. #: 513, ¶¶ 814–48 (facts), ¶¶ 878–905 (law), Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶3, at 3–4, ¶5.  The second RICO claim, levelled against manufacturers and distributors labelled "RICO Supply Chain Defendants," alleges these defendants ignored their responsibilities to report and halt suspicious opioid sales, all in an effort to artificially sustain and increase federally-set limits (quotas) on opioid sales.  *See* Summit County Pleadings, Doc. #: 513, ¶¶ 849–77 (facts) ¶¶ 906–38 (law), Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶3, at 3–4, ¶5.  The complaints also allege that the Controlled Substances Act required the manufacturers,

---

[3] The Court is aware that as Summit County's bellwether trial has approached, the County has settled with some defendants and that the County is no longer proposed as a class representative. Doc. #: 2583 at 5.  However, using its complaints as the reference for analysis of the claims and issues suitable for class certification remains appropriate given that so many other plaintiffs here have adopted those same claims and issues through the short-form process and/or have filed complaints that are substantially identical in relevant passages to the Summit County complaint. *See, e.g.*, Second Amended Complaint of Cabell County Commission (W.Va.), Doc. #: 518; Second Amended Complaint of County of Monroe, Michigan, Doc. #: 522; Second Amended Complaint of Broward County, Florida, Doc. #: 525.

distributors, and pharmacies to create internal systems to identify, report, and suspend unlawful opioid sales, and that defendants failed to meet those obligations; these factual allegations underlie the second RICO claim above and are also pertinent to adjudication of myriad state-based legal claims, from public nuisance to negligence. *See* Summit County Pleadings, Doc. #: 513, ¶¶ 504, 506–659, Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶ 3.

Based on these pleadings, which are common across many, if not most, of the MDL litigants and putative Class Representatives, the Court will analyze the movants' request to certify for class treatment:[4]

1. a RICO <u>claim</u> arising out of the alleged Opioid Marketing Enterprise, as against five (5) named Defendants – Purdue, Cephalon, Janssen, Endo, and Mallinckrodt – under Rule 23(b)(3) (Doc. #: 1820-1 at 83);

2. a RICO <u>claim</u> arising out of the alleged Opioid Supply Chain Enterprise, as against eight (8) named Defendants – Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen – under Rule 23(b)(3) (Doc. #: 1820-1 at 84); and,

3. two <u>issues</u> related to Defendants' obligations under the Controlled Substances Act, against thirteen (13) named Defendants – Purdue, Cephalon, Endo, Mallinckrodt, Actavis, Janssen, McKesson, Cardinal, AmerisourceBergen, CVS Rx Services, Inc., Rite-Aid Corporation, Walgreens, and Wal-Mart – under Rule 23(c)(4) (Doc. #: 1820-1 at 91 n.46 & at 84–86):

   a. What are the specific obligations of each defendant under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations, 21 C.F.R. § 1301 *et seq.*, arising out of the requirement that registrants "provide effective controls and procedures to guard against theft and diversion of controlled substances," 21 C.F.R. § 1307.71(a)?

   b. Did each defendant's action satisfy these obligations with respect to prescription opioids?

---

[4] The Court uses simple names for the 13 Defendants listed in the following numbered paragraphs, but adopts the definitions of the related Defendant entities set out in the Summit County Complaint, Doc. #1466 at 13–35.

B.     The Class Certification Standard

The Sixth Circuit has held that: "Any class certification must satisfy Rule 23(a)'s requirement of numerosity, commonality, typicality, and adequate representation [and] fit under at least one of the categories identified in Rule 23(b)." *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 278 (6th Cir. 2018).  Under Rule 23(b)(3), class certification is appropriate if (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Additionally, Rule 23(c)(4) states that "[w]hen appropriate, an action may be . . . maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).  The Sixth Circuit recently affirmed the utility of such "issue certification," explaining that Rule 23(c)(4) "contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution." *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 413 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019).  After confirming existence of a cognizable class, this Court will accordingly consider all of the factors of Rule 23(a) and 23(b)(3) as they apply to both the RICO claims and the CSA issues, as against each relevant Defendant.

C.     The Class is Ascertainable

Rule 23(b)(3) classes must be ascertainable.  *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016).  For a class to be ascertainable, the "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co*., 693 F.3d 532, 537–38 (6th Cir. 2012) (citation omitted).  It is administratively feasible for the Court to determine class

membership if the class is defined by reference to objective criteria, and with reasonable accuracy.

*See id.* at 538–39; *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015).

> The present motion seeks certification of a single national class, defined as:
>
> all counties, parishes, and boroughs (collectively, "counties"); and all incorporated places, including without limitation cities, towns, villages, townships, and municipalities, as defined by the United States Census Bureau (collectively "cities") as listed on the Opioids Negotiation Class website, opioidsnegotiationclass.com.

Doc. #: 1820 at 3. The class definition is based on purely objective criteria and is accompanied by an Excel spreadsheet at the website that lists the names of each of the proposed class members in 34,458 rows.  The class is therefore not only ascertain***able***, its membership has been ascertain***ed***. Defendants argue that the complexity of governmental structures across the country creates some ambiguous situations and they provide a single such example.  Doc. #: 1949 at 3 n.3.  Such minor technical issues can be worked out going forward.  For purposes of class certification, the Court finds that the class is adequately defined.

D.    Rule 23(a)(1):  The Class is So Numerous That Joinder is Impracticable

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The Sixth Circuit has held that "no strict numerical test exists to define numerosity," *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013), but that "'substantial' numbers . . . are sufficient to satisfy this requirement."  *Id.*  The proposed class consists of 34,458 public entities dispersed throughout the entire United States.  Defendants explicitly concede that "numerosity is self-evident here."  Doc. #: 1949 at 13.  The Court finds that the class is so numerous that joinder of all members would be impracticable and thus that this requirement has been satisfied.

E.     Rule 23(a)(2):  There are Common Questions of Law or Fact

Rule 23(a)(2) requires plaintiffs to prove that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Despite the Rule's use of the plural "questions," the Supreme Court has held that a single common question will suffice.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  Yet, "because the commonality requirement is qualitative, not quantitative," 1 *Newberg on Class Actions* § 3:22, at least one common issue must be central to the litigation, *see Wal-Mart*, 564 U.S. at 350 ("That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

This putative class action occurs within a multi-district litigation (MDL).  In creating this MDL, the Judicial Panel on Multidistrict Litigation (JPML) has steered thousands of individual actions pending throughout the nation to this Court.  Its authority to do so turns on the presence of common questions.  28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.").  In initiating this MDL, the JPML held:

> All actions involve common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs.  Both manufacturers and distributors are under an obligation under the Controlled Substances Act and similar state laws to prevent diversion of opiates and other controlled substances into illicit channels.  Plaintiffs assert that defendants have failed to adhere to those standards, which caused the diversion of opiates into their communities.

Doc. #: 1 at 3.  Rejecting the argument that uncommon issues would generate inefficiencies if an MDL were formed, the JPML concluded: "All of the actions can be expected to implicate common

fact questions as to the allegedly improper marketing and widespread diversion of prescription opiates into states, counties and cities across the nation . . . ."  *Id.*

While commonality for pre-trial centralization purposes under § 1407 may not be precisely the same test as commonality for class certification purposes under Rule 23, it is close[5] and, regardless, the JPML's recitation, like the movants' papers, Doc. #: 1820-1 at 64–66, 81, identifies common issues that are qualitatively decisive for Rule 23 purposes.  Moreover, there is direct evidence of the commonality of the claims and issues in this matter given that the short-form complaint process enabled MDL plaintiffs to adopt these specific claims and issues, and many did so.  The Court finds that there are questions of both law and fact, as to the specified claims and issues, common to the class with respect to each relevant Defendant; the discussion in sub-section I, below, concerning whether these common questions predominate, sets forth with more particularity the specific common RICO and CSA issues.

F.  <u>Rule 23(a)(3):  The Class Representatives' Claims are Typical of Those of the Class</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims'" such that "by pursuing their own interests, the class representatives also advocate the interests of the class members."  *In re Whirlpool Corp.*, 722 F.3d at 852–53 (6th Cir. 2013) (quoting *Sprague v. Gen. Motors Corp.*,

---

[5] Defendants rely on *In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, No. 8:07CV298, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008) to argue that "[c]lass certification thus cannot be bootstrapped from the existence of an MDL."  Doc. #: 1949 at 27.  But the footnote that they reference distinguished the JPML's finding of *commonality* from Rule 23's finding of *predominance*.  Moreover, in referencing the JPML's commonality finding as a good description of the common issues in this case, the Court is not "bootstrapping" on those findings; it is making its own independent determination of the presence of these findings and using the JPML's recitation as a descriptor.

133 F.3d 388, 399 (6th Cir. 1998)).  "The test for typicality is not demanding . . . . [T]he plaintiffs' claims need not be identical to those of the class; typicality will be satisfied so long as the named representatives' claims share the same essential characteristics as the claims of the class at large." 1 *Newberg on Class Actions* § 3:29 (internal quotation marks and footnotes omitted).

As to the claims and issues identified for class treatment, the Court finds that the Class Representatives' claims are typical of those of the Class.  The movants propose a total of 49 different counties and cities – from 30 states – to serve as Class Representatives.[6]  The Court has reviewed the complaints (and where filed, short-form complaints) of each of the 49 proposed Class Representatives.  These complaints demonstrate that the Class Representatives and the absent Class Members share an identity of interests.  All are cities or counties, and are all generally interested in the same end: recouping money they have been forced to pay to address the opioid epidemic and ameliorating that epidemic.  If the Class Representatives pursue their own interests identified in these complaints, they will necessarily be pursuing the interests of the absent class members.  There is nothing unique about any of the proposed Class Representatives that would set them apart in meaningful ways from the absent class members.

The Defendants set forth a list of contentions to the contrary, Doc. #: 1949 at 38–39, but most are either irrelevant, recede in importance given the Court's adoption of the short-form complaint claims and issues for certification ("Differences in the causes of action asserted in the complaints . . . Differences in the identities of the defendants . . . Differences in the nature and quality of evidence available . . . ."), or are differences that do not defeat typicality ("Differences in the . . . scope of opioid-related harms . . . ."), *see Daffin v. Ford Motor Co.*, 458 F.3d 549, 553

---

[6] The movants initially proposed 51 class representatives, Doc. #: 1820 at 2, but later withdrew two (Cuyahoga County, Ohio and Summit County, Ohio).  Doc. #: 2583 at 5.

(6th Cir. 2006) (finding typicality requirement met where class representative's and "other class members' claims arise from the same practice . . . [and] the same defect . . . and are based on the same legal theory. Typicality is satisfied despite the different factual circumstances regarding the manifestation of the [defect] . . ."); 1 *Newberg on Class Actions* § 3:43 ("Courts routinely find that the proposed class representative's claims are typical even if the amount of damages sought differ from those of the class or if there are differences among class members in the amount of damages each is claiming.").

As to the RICO claims and CSA issues, the proposed Representatives' claims align with those of the class.  The Court therefore finds that the claims of the 49 proposed Class Representatives are typical of those of the Class, as to the specified claims and issues, with respect to each relevant Defendant.

G.    Rule 23(a)(4):  The Class Representatives Will Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Court looks to two criteria in determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir. 1996)).

Movants propose 49 Class Representatives.  In their moving brief, movants describe each entity and briefly summarize how the opioid epidemic has impacted it.  Doc. #: 1820-1 at 19–46. As above, the Court has also reviewed all of the relevant complaints and short-form complaints. Those documents demonstrate that each of the proposed Class Representatives is a member of the Class and each shares the same overriding interests as the other members of the Class in addressing

the consequences of the opioid epidemic.  Moreover, as each of these entities is a governmental unit – some, like Chicago, enormous – the Court is confident that the representatives have the capacity to perform the functions of being actively engaged in the litigation, assisting Class Counsel with settlement negotiations, and, importantly, monitoring Class Counsel to ensure that the Class's interests remain paramount.

Most, if not all, of the proposed Class Representatives are entities that have been active in opioid litigation prior to the filing of the class action motion ("litigating entities").  This of course is of great value to the class:  the litigating entities understand the case best and have been expending their own resources for years in a way that may now benefit the whole class.  Many are large counties or cities with significant resources, skilled counsel, and enormous expertise as to the opioid epidemic.  Who better to serve as representatives of a class?  Defendants latch on to the fact that the allocation mechanism favors class representatives that primarily seek monetary relief for past damages over non-litigating entities that may be more interested in non-monetary relief, Doc. #: 1949 at 21–22, and that the voting scheme requires separate sets of approval from litigating and non-litigating entities, Doc. #: 1949 at 23–25.  Below, the Court addresses the fairness of the allocation mechanism and finds no immediate fault.  For present purposes, it reveals no fundamental conflict between litigating and non-litigating entities as to pursuit of this case against the Defendants that would render the list of 49 proposed representatives inadequate.  *See* 1 *Newberg on Class Actions* § 3:58 ("Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.").  Similarly, the Court rejects the Defendants' contention that there is a fundamental conflict between counties as a group and cities as a group that would require separate counsel and sub-classing.  Doc. #: 1949 at 19–21, 25.  It is true that if a settlement is reached, each county and

21

its constituent cities will need to work together – or, arguably, negotiate against one another – to divide the county-level allocation amongst themselves.  But these negotiations are local in nature, will vary county to county, and, contrary to the Defendants' assertions, there is not one set of interests shared by all counties that fundamentally conflicts with one set of interests shared by all cities.

Lesser concerns are as easily dismissed.  The State Attorneys General suggest that the range of Class Representatives is incomplete because it does not encompass representatives from each of the 50 states nor, they allege, from "smaller counties and cities."  Doc. #: 1951 at 7; *see also* Doc. #: 1973 at 5.  Here, the Court has considered for certification two federal (RICO) claims and several issues related to federal law (CSA) that are similar across the country and class.  This is not a situation requiring class representatives from each of the 50 states.  Moreover, the list of Class Representatives encompasses smaller areas such as Cass County, North Dakota; City of Concord, New Hampshire; County of Fannin, Georgia; and County of Gooding, Idaho.  Doc. #: 1820 at 1.  Importantly, as discussed more fully below, the allocation formula rebuts any concerns that hard-hit small counties are disadvantaged in some way by the movants' proposal.  Finally, some of the Class Representatives are individually represented by lawyers who simultaneously represent States that are objecting to certification of this Class.  Doc. ##: 1949 at 17; 1949-2 at 16–17.  The Court finds that this situation does not disqualify these entities from serving as Class Representatives.[7]  The Class Representatives themselves have no conflict and, as generally large governmental units, they have the capacity to balance advice they might get from their individual

---

[7] Defendants' citation to the Seventh Circuit decision in *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002), on this point is inapposite.  Doc. #: 1949 at 18.  That case did not deal with the question of a class representative's separate lawyer, but rather with the class representative's lawyer as (former) class counsel.  *Culver*, 277 F.3d at 913.

lawyers against their responsibilities to the whole Class.  The Court's conclusion is buttressed by the fact that there are both dozens of other Class Representatives and a set of experienced Class Counsel, each of whom represents only counties and cities, not States.

Like the putative Class Members, the 49 proposed Class Representatives have allegedly been adversely impacted by the Defendants' actions with regard to the manufacturing and distribution of opioids and they seek to be compensated for their losses.  The Court finds that the Class Representatives, individually and as a group, will adequately represent the interests of the class members, as to the specified claims and issues, with respect to each Defendant.

H.      Rule 23(g):  Class Counsel Are Adequate

Rule 23(g) states that "a court that certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g).  In undertaking this appointment, the Rule directs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  *Id.*

Movants propose the "the appointment of Jayne Conroy and Christopher Seeger as Co-Lead Negotiation Class Counsel and Gerard Stranch, Louise Renne, Zachary Carter, and Mark Flessner as Negotiation Class counsel," Doc. #: 1820 at 2, and have submitted Declarations from five of these lawyers, and a letter from one other, attesting to their experience, knowledge of the case, and willingness to commit resources.  Doc. ##: 1820-1, Ex. A; 1821.  As this Court has already held in appointing Interim Class Counsel:

> These documents demonstrate that Seeger is a very experienced and successful class action attorney, fully qualified to represent the Class. Two of the remaining five (Conroy and Stranch) have significant and impressive experience in leadership roles in mass tort MDLs in particular, Doc. #: 1820-1, Ex. A, while the remaining

23

> three are or were legal counsel for large cities (Renne/San Francisco; Carter/New York; and Flessner/Chicago), Doc. #: 1820-1 at 52. All have been involved in opioid-related litigation. Applying Rule 23(g)'s four factor test, the Court finds that these lawyers are well-situated to represent the Class.

Doc. #: 2490 at 3.

In its Orders regarding appointment of Interim Class Counsel, Doc. ##: 2490, 2493, the Court acknowledged the significant contributions to date of the MDL Negotiation Committee, the members of which are identified in Doc. #: 118. While most of these lawyers will not serve as Class Counsel for the Negotiation Class, their depth of knowledge about this case and their general expertise can continue to provide significant benefit for the Class. Accordingly, the Court's Order will clarify that there is no bar to Class Counsel working with the MDL Negotiation Committee members in negotiating with Defendants, nor is there any bar to these MDL lawyers applying to share Class Counsel duties in the future should their representational situations change. However, as the Court's order appointing interim Class Counsel clarified, only Class Counsel will "(a) represent the Class in settlement negotiations with Defendants; (b) sign any filings with this or any other Court made on behalf of the Class; (c) assist the Court with functions relevant to a class action, such as but not limited to maintaining the Class website and executing a satisfactory notice program; and (d) speak on behalf of the Class in Court." Doc. #: 2490 at 5. Thus, only Class Counsel can bind the Class and Class Counsel must independently approve all final decisions concerning any Class-based settlement and be the sole signatories on behalf of the Class of all Class-based term sheets, settlement agreements, or similar documents.

With these clarifications in the final certification order, the Court finds that the proposed Class Counsel will alone act for the Class and will fairly and adequately represent the interests of the class.

I.     <u>Rule 23(b)(3):  Common Questions of Law or Fact Predominate</u>

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry consists of two steps: "[a] court must first characterize the issues in the case as common or individual and then weigh which predominate." *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 413 (6th Cir. 2018) (alteration in original) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2010)).  Common questions are those where "the same evidence will suffice for each member to make a prima facie showing." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (citation and internal quotation marks omitted).

1.     *RICO Claims*

To prevail on their federal civil RICO claims, the Plaintiffs will have to establish that (1) the defendants committed a RICO violation, (2) there was an injury to the Plaintiffs' businesses or properties, and (3) said injury occurred "by reason of" the RICO violation. *See Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 453 (6th Cir. 2019).  In turn, the elements of a RICO violation are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013) (citation omitted).  Each of these prongs then breaks down into various elements.  In the diagram below, the Court sets forth these elements and sub-elements and characterizes each as either common (blue) or individual (orange).

**RICO ELEMENTS: COMMON (BLUE) vs INDIVIDUAL (ORANGE)**



As is visually evident, there are a host of issues and sub-issues within the RICO claims. As applied to Plaintiffs' allegations concerning the existence of two national enterprises that disseminated a set of standard falsehoods in marketing and distributing opioids, all of the elements except injuries are common, not individual. Many courts have so held in similar circumstances. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 n.3 (9th Cir. 2017) (noting that the issues involved in proving a RICO violation "are appropriate for classwide litigation because they focus on" the defendants' conduct); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) ("[F]raud claims based on uniform misrepresentations . . . are appropriate subjects for class certification.") (citation and internal quotation marks omitted); *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 39 (E.D. Pa. 1985).

Defendants argue that causation should be characterized as an individual issue, Doc. #: 1949 at 37, but in this case – as to these RICO claims – the characterization of causation as common, not individualized, is supported by law and fact. Legally, plaintiffs alleging RICO claims predicated on mail and wire fraud may show third-party reliance and "need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that [*__they__*] relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008); *see also Brown v. Cassens Transp. Co.*, 546 F.3d 347, 357 (6th Cir. 2008). Factually, this Court has already held that the "[p]laintiffs have alleged sufficient facts to support a . . . direct chain of causation" involving third-party reliance. Doc. #: 1203 at 9–10 (listing steps in chain). Specifically, the Plaintiffs argue they suffered injuries because others (doctors, patients, etc.) relied on the Defendants' misrepresentations, enabling the Defendants to sell more opioids than the legitimate medical market could support. Whether there was such third-party reliance is a question susceptible to class-wide proof, justifying characterization of this issue as common.

The numerous common issues obviously predominate. The fact that the "injury" prong alone is plausibly individualized does not alter this conclusion. Predominance does not require that *every* element can be established by class-wide proof, *see Sandusky*, 863 F.3d at 468, and the predominance requirement is satisfied "when liability can be determined on a class-wide basis, even when there are some individualized damage issues," *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (citation and internal quotation marks omitted). Similarly, the fact that affirmative defenses may arise, and apply only to some class members, "does not compel a finding that individual issues predominate over common ones." *Bridging Communities Inc. v. Top Flite Fin. Inc*., 843 F.3d 1119, 1125 (6th Cir. 2016) (citations and internal quotation marks omitted).

Given this analysis, it is not surprising that many courts within this Circuit have found that common issues predominate in the adjudication of specific RICO claims. *See Williams v. Duke Energy Corp.*, No. 1:08-CV-46, 2014 WL 12652315 at *14 (S.D. Ohio Mar. 13, 2014); *Lauber v. Belford High Sch.*, No. 09-CV-14345, 2012 WL 5822243 at *9 (E.D. Mich. Jan. 23, 2012) (bifurcating issues of liability and damages); *Gokare v. Fed. Express Corp.*, No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094870 at *14 (W.D. Tenn. Nov. 22, 2013) (for settlement purposes). This Court also so concludes.

2.    *CSA Issues*

The pleadings in this case, as discussed above, raise several specific issues arising out of the Controlled Substance Act for which movants seek certification: the nature of each Defendant's obligations under the Act and the question of whether each Defendant complied with those obligations. Doc. #: 1820-1 at 84. These issues may arise in the adjudication of a federal (RICO) claim and of various state-law claims. The Court finds that common issues predominate in the resolution of these two specific issues, standing alone. Applying the Sixth Circuit's holding in

*Martin*, the Court finds that both issues are "capable of resolution with generalized, class-wide proof" and "need only be answered once because the answers apply in the same way" across the Class.  *Martin*, 896 F.3d at 414.  The fact that these issues may be relevant to the pursuit of state-based legal claims that vary across the class, or to legal claims that entail the resolution of individualized issues of causation or damages, "does not mean that [these] individualized inquiries taint the certified issues."  *Id.*  On the contrary, the certified issues can be addressed without overlapping with other issues that may or may not be common.  For example, the Summit County complaint sets forth that the CSA issues are relevant to, *inter alia*, its common law absolute public nuisance claim, Doc. #: 513 at ¶ 1010, and its negligence claim, *id.* at ¶¶ 1042, 1045, 1060.  Resolution of the certified issues would speak to the duty and breach elements of a negligence claim, for example, without pretermitting non-class resolution of the causation and damage elements.  Moreover, since the Court is certifying for classwide treatment only the specific issues identified, there are no "individualized inquiries that outweigh the common questions prevalent *within each issue.*" *Martin*, 896 F.3d. at 414 (emphasis added).[8]

In sum, the Court finds that common issues predominate over individualized issues with respect to both the RICO claims and the CSA issues, with respect to each specifically-identified Defendant.

---

[8] Heeding the Sixth Circuit's guidance, the Court is aware of the potential Seventh Amendment concerns raised by issue class certification and "will take care to conduct any subsequent proceedings in accordance with the Reexamination Clause."  *Id.* at 416–17.  Of course, since the Court is certifying the class solely for purposes of negotiation, these concerns are not present.  Nonetheless, the Court notes the Sixth Circuit's conclusion that, "if done properly, bifurcation will not raise any constitutional issues."  *Id.* at 417 (citations and internal quotation marks omitted).

J.     Rule 23(b)(3):  A Class Action is a Superior Method of Adjudication

For a class action to be maintained, Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement "is designed to achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).  Rule 23(b)(3) itself further enumerates four specific factors speaking to the desirability of a class suit.  Fed. R. Civ. P. 23(b)(3)(A)–(D).  Here, all cut in favor of certification of both the two RICO claims and two CSA issues as against all Defendants:

1.      *The class members' interests in individually controlling the prosecution or defense of separate actions*.  This MDL consists of nearly 2,000 individual actions by class members.  That would appear to cut against class certification, as it seems that many class members are capable of, and are, litigating individually.  However, the proposed class consists of more than 34,000 entities, meaning that a small fraction of them (fewer than 6% here in federal court) are litigating individually.  The vast bulk of class members are not actively involved in opioid litigation.  This factor cuts in favor of certifying a nationwide class.  This is particularly true in the negotiation class certification context for two reasons:  (a) any litigant interested in individually controlling its action can opt out and the proposed procedure will in no way interfere with that individual litigation, yet (b) negotiation class certification simultaneously engages absent class members in the negotiation and voting process.  To the extent this factor favors individual control and involvement, the Court finds that the negotiation class will further that end, not impede it.

30

2.      *The extent and nature of any litigation concerning the controversy already begun by or against class members*.  As just noted, there are about 2,000 individual cases within this federal MDL and many more filed in state courts.  Among those in coordinated pre-trial proceedings in this forum, a few have advanced toward bellwether trials, but all others are at earlier litigation phases.  The proposed negotiation class will not displace or interfere with any of this on-going litigation.  At the same time, this on-going litigation will resolve only a small quantity of the class's claims, as noted above, meaning that the extent of the on-going litigation is limited compared to the size of the class.  This factor cuts in favor of certifying a nationwide negotiation class.

3.      *The desirability or undesirability of concentrating the litigation of the claims in the particular forum*.  The JPML has already coordinated the many pending cases in this forum.  This factor therefore cuts in favor of certifying a negotiation class, as a class approach is an efficient means of handling the 2,000 individual matters that are here.

4.      *The likely difficulties in managing a class action*.  This prong is inapplicable to the proposed negotiation class, as the proposal is not for litigation or trial, but simply for settlement negotiations.  *Amchem*, 521 U.S. at 620 (holding that where the plaintiffs' class certification "proposal is that there be no trial," it is unnecessary to "inquire whether the case, if tried, would present intractable management problems").

The Attorney General of the State of Ohio argues that a class action is not a superior form of adjudication because the claims are more properly the province of the States, not the cities and counties.  Doc. #: 1973 at 4.   The letter joined by roughly 40 Attorneys General implies the same point without explicitly saying so.  Doc. #: 1951 at 3–4.  If the Attorneys General believe they control their local governments' litigation, then they can attempt to foreclose it directly.  To date,

they have made no effort in this Court to shut down their constituent entities' cases.  Until they do

so, this Court remains vested with more than 2,000 separate actions by cities and counties from

throughout the United States.  The Court cannot pretend these cases do not exist.  The Judicial

Panel on Multidistrict Litigation has ordered it to coordinate pretrial litigation in most of these

cases and Article III requires it to resolve those directly filed here.

* * *

For the foregoing reasons, the Court finds that all of the class certification requirements

are met with respect to the two RICO claims and two CSA issues, as to each relevant Defendant

on each claim or issue.  In reaching these conclusions, the Court makes clear that it has not certified

these claims or issues for trial.  Because of the limited nature of negotiation class certification,

including the fact that no defendant is required to utilize this process, many Defendants in this

MDL did not even file opposition briefs.  The analysis in this Memorandum Opinion is in no way

meant to foreclose any Defendant from making any argument in opposition to a later motion for

class certification, if such a motion is ever made here or in another forum.  The Court's Order will

so hold.

IV.     **THE COURT WILL LIKELY BE ABLE TO FIND THAT THE ALLOCATION AND VOTING PLAN TREAT CLASS MEMBERS EQUITABLY RELATIVE TO EACH OTHER**

Rule 23 requires judicial approval of any proposed class action settlement.  Fed. R. Civ. P. 23(e).  The Rule sets forth a two-step process whereby the Court first ascertains whether the settlement is sufficiently likely to be approved as to warrant sending notice of it to the class, Fed. R. Civ. P. 23(e)(1)(B)(i), and then, after a notice and objection period, the Court makes a final determination of whether the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2).  One of the factors the Court must consider in making these assessments is whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).  This means that if a monetary settlement is reached, this Court will be required to find that the money is being allocated fairly among the class members.

At this stage in the case, no settlement has been reached.  However, with the negotiation class certification proposal, the movants have identified the settlement allocation and voting plans up front.  They have done so to provide information to each class member about its relative share of any settlements reached and its relative enfranchisement under this proposal, so as to make the class member's current opt-out opportunity as meaningful as possible.  The allocation and voting plans are therefore fixed – class members will make opt-out decisions based on them – and they will not change if a settlement is reached.  Given that this class certification order could set in motion an elaborate negotiation and settlement process, the Court has stated that it should make a preliminary determination of the equity of these plans, given that it "would be perverse – and an enormous waste of judicial and social resources – to launch this whole negotiation class only to later hold that the allocation scheme, identified at the outset, was inequitable *ab initio*."  Doc. #: 2529 at 3.

33

The Court specifically focused on the fact that both the voting and allocation plans distinguish between: (1) putative class members that filed litigation arising out of the opioid epidemic by June 14, 2019 ("litigating entities"), Doc. #: 1820-1 at 52, and (2) those class members that had not filed such litigation ("non-litigating entities").  As noted above, 10% of any settlement achieved for the Class will be set aside to help defray the legal fees of the litigating entities alone, with any unused portion flowing back into the full class's recovery fund, Doc. #: 1820-1 at 95–96; another 15% of any settlement is set aside for two purposes, one of which is to help defray the litigation expenses of the litigating entities alone, with, again, any unused portion flowing back into the full class's recovery fund, *id*. at 96; the proposed voting structure requires separate supermajority approvals from different sets of litigating class members and non-litigating class members, *id*. at 53-55; and litigating entities primarily drafted the proposal.  To assist the Court in evaluating these distinctions, and in lieu of sending notice to and seeking reactions from the whole class at this stage in the proceedings, the Court asked Special Master Cathy Yanni to file a report analyzing whether the proposed allocation and voting plans treat the non-litigating class members equitably.  Doc. #: 2529.

On September 10, 2019, Special Master Yanni filed a 17-page report in response to the Court's request.  Doc. #: 2579.  The Court has carefully reviewed Special Master Yanni's thoughtful and thorough report and adopts her findings.  As to the allocation plan, the Court agrees with Special Master Yanni's conclusion that the method for allocating the core class recovery (75% of the fund) reflects a lot of hard work and is a significant and eminently fair step toward resolution of these many cases.  Nothing in the allocation model appears to skew toward any group other than those hardest hit by the opioid epidemic.  The Attorney General of Ohio argues that the model favors large cities (many of which serve as Class Representatives), as opposed to smaller

hard-hit counties he identifies by name, Doc. #: 1973 at 5, but his understanding is incorrect.  A review of the allocations to the counties he identifies demonstrates that the smaller, hard-hit counties appropriately receive more recovery per capita than larger counties that have been less-severely impacted.[9]  Similarly, a handful of counties filed an objection to the plan, arguing that the counties hardest hit by the epidemic, as measured by the allocation tool, are not necessarily the same counties that have been forced to expend the most resources combatting the epidemic.  Doc. #: 1958 at 6–7.  The model sets aside 15% of the class's recovery in its Special Needs Fund to, *inter alia,* address precisely these sorts of possible problems.  There are a variety of intricacies of the model – how counties and cities will divide their county's recovery; how to deal with cities with recoveries so small as to be impractical to distribute; how the model works when a county opts out but its cities do not, etc. – but despite opponents' contentions, Doc. #: 1949 at 19–23, none of these is fatal and the movants' approach to each – as reflected in the updated notice and FAQ documents – is thoughtful and defensible.

Separate from the fairness of the allocation tool governing 75% of the class's recovery, the Court agrees with Special Master Yanni's conclusions that there is no inequity created by setting aside funds to address the litigation costs and legal fees of the parties that filed the early cases.  As she notes, the "litigating class members are responsible for, *inter alia*, launching this litigation in state and federal courts, generating the establishment of this MDL, pursuing bellwether cases, uncovering critical facts through the discovery process, and creating significant negotiating

---

[9] Application of the allocation tool at the case website shows that the large counties the Ohio Attorney General identifies have per capita settlement values of $2.79 (Cuyahoga); $4.46 (Franklin); and $3.43 (Summit), for an average of $3.56; the smaller counties on whose behalf the Attorney General protests have settlement values of $4.64 (Adams); $6.08 (Jackson); $2.65 (Perry); $6.15 (Ross); $5.68 (Scioto) and $3.01 (Vinton), for an average of $4.70, or 32% greater than the large counties.

leverage." Doc. #: 2579 at 7. Given these facts, if a settlement is reached, these early champions of the class will likely be able to demonstrate that they are eligible for fees and costs from a common fund and, indeed, it may be unfair to them to force them to bear these costs alone. *Id.* at 7–8. Additionally, as Special Master Yanni notes, all fees and costs in a class action must be adjudicated according to the procedures set forth in Rule 23(h) and this Court will carefully scrutinize each fee request, as well as the total amount of fees paid from the class's recovery to all of the many attorneys involved here – Class Counsel, the MDL leadership, litigating-entity lawyers, etc. – to ensure that the Class is not unduly taxed. *Id.* at 8. Importantly, the model clarifies that any monies in these separate pools that are not distributed to litigating entities would revert to the entire class.

The Court also accepts Special Master Yanni's conclusion that the voting plan – requiring separate sets of votes from litigating entities and non-litigating entities – does not treat the non-litigating counties unfairly. As she concluded:

> (1) all class members have the same franchise (one vote); (2) the vote-counting mechanism understandably ensures that any settlement is approved by a majority of the class, counted by head, by population, and by impact; (3) the vote-counting mechanism further ensures against the non-litigating class members approving a low settlement unacceptable to the litigating class members; (4) that assurance is defensible on the grounds that the litigating entities are the most knowledgeable about the value of the class's claims; and (5) the fact that nonlitigating entities must separately approve the settlement tempers concerns that the litigating entities will settle low to recover their costs, as does the fact that the litigating entities are likely to be able to spread their costs across the whole class as described above.

*Id.* at 13.

Finally, having found that neither the allocation nor voting mechanisms enshrine any fundamental intra-class conflict between litigating and non-litigating entities, Special Master Yanni concluded that a single set of class representatives and class counsel could represent the whole class, without the need for sub-classes. *Id.* at 13–17. The Court agrees.

36

## V. THE NOTICE AND EXCLUSION PLANS ARE SUFFCENT

A. <u>Notice</u>

The moving parties submitted proposed notices and a notice plan, Doc. #: 1820-2, Ex. A, and Interim Class Counsel subsequently submitted updated versions of these documents. Doc. ##: 2583, 2583-1, 2583-2. The Court has carefully reviewed these documents and finds that they comply with the requirements of Rule 23 and that, as due process requires, they are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections [or otherwise safeguard their interests]." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 759 (6th Cir. 2013) (citation and internal quotation marks omitted).

Rule 23(c) requires the Court in a class action under Rule 23(b)(3) to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," and notes that such notice may be "by one or more of the following: United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). Here the notice will be sent by first-class United States mail to all class members. Doc. #: 2583 at 3–4. It will also be posted at the class website. *Id.* at 4. The notice will also be emailed to that sub-set of the class for which the notice administrator has email addresses. *Id.* at 4 n.1. The *method* requirements of Rule 23(c)(2)(B) are met.

The Rule further requires that the notice "clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect

of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii).  The

notice packet contains a two-page notice along with a 13-page set of Frequently Asked Questions

(FAQs), Doc. #: 2583-1, in a format recommended by the Federal Judicial Center, *see* Fed. Judicial

Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 8–9

(2010),  https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf.   The  two-page  notice  alone

contains each of the seven pieces of information required by Rule 23 and the FAQs provide even

more detailed information as to most.  The *content* requirements of Rule 23(c)(2)(B) are met.

Beyond the basics, the Court notes, as discussed above, that the moving parties have gone

to great lengths to make transparent the various aspects of this unique procedure – the allocation

formula and its underlying components, the voting plans, etc.  A class website, active since June,

has provided a wealth of information to the putative class members and will continue to do so

following certification.  The moving parties have done a commendable job making transparent all

of the moving parts of this novel procedure.  The Court finds that the class members have been

provided a wealth of pertinent information that will enable them to make informed decisions about

whether to remain in or opt out of this Negotiation Class.

B.      Exclusion

Rule 23(c)(2)(B) requires, for any class certified under Rule 23(b)(3), that the district court

send notice to class members informing them "that the court will exclude from the class any

member who requests exclusion," Fed. R. Civ. P. 23(c)(2)(B)(v), and specifying "the time and

manner for requesting exclusion," Fed. R. Civ. P. 23(c)(2)(B)(vi).  The Federal Judicial Center

recommends that a form be provided to class members, *see Manual for Complex Litigation*

(*Fourth*) §§ 21.311–21.312 (2004) [hereinafter *Manual for Complex Litigation*], and instructs that

the form should "clearly and concisely explain the available alternatives and their consequences,"

*id.* at § 21.321.  Exclusion notices should require "that class members (1) mail a letter or post card; (2) by a date certain; (3) to a specific address; (4) clearly identifying themselves and/or some information demonstrating their membership in the class" but "[c]lass members are not required to give reasons for opting out."  3 *Newberg on Class Actions* § 9:46.  Rule 23 does not mandate a time period within which class members must exercise their exclusion right, but the *Manual for Complex Litigation* suggests that class members be given a "reasonable time" and states that courts "usually establish a period of thirty to sixty days (or longer if appropriate) following mailing or publication of the notice for class members to opt out."  *Manual for Complex Litigation* § 21.321.

The movants propose that Class Members be required to fill out a designated Exclusion Request Form, Doc. #: 2583-2, and be given 60 days (until a date certain – November 22, 2019) to do so.  Doc. #: 2583 at 5. The movants explain that the "form can be submitted to the Notice Administrator via either first-class mail or email."  Doc. #: 2583 at 3.  The Exclusion Request Form is part of the Notice packet and will be posted and distributed in the same manner as the Notice packet.  *Id.*  The movants further explain that:

> Exclusion Request Forms would not have to be notarized but, instead, would have to be executed with an averment, pursuant to 28 U.S.C. § 1746, that the city or county official has the authority to submit the exclusion request.  Also, the form would contain an express acknowledgment of the consequences of opting out (including that the city or county will not share in any recovery achieved by the Class and that it may not be afforded an opportunity at a later date to revoke its opt-out request).  Mandating use of a specific form for opting out should sharply reduce, if not eliminate altogether, both disputes as to whether opt-out requests comported Court-directed requirements as well as potential arguments about whether optouts genuinely understood the ramifications of their exclusion requests.

*Id.*

The Court has reviewed the Exclusion Request Form and finds that it meets the requirements of Rule 23.  It clearly explains the ramifications of exclusion, and it provides exact

instructions about how and when to execute and return the form. The plan sufficiently protects the absent-class members' right to exclude themselves from this Class.

## CONCLUSION

For the foregoing reasons, the Court certifies a Negotiation Class on the claims and issues identified, against the Defendants identified, and appoints Class Counsel. The Negotiation Class is authorized to negotiate settlements with any of the 13 sets of Defendants identified herein, on any of the claims or issues identified here, or those arising out of a common factual predicate. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009) ("The question [of whether a subsequent claim is barred] is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a 'factual predicate' with 'the claims pled in the complaint.'" (quoting *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008))). *See generally* 6 *Newberg on Class Actions* § 18:19. If Class Counsel seek to utilize the Negotiation Class to negotiate against any other Defendants, they may later make a formal motion to amend the class certification order accordingly. As set forth in an accompanying Order, this Court does ***not*** authorize the Negotiation Class to negotiate on behalf of cities and counties against their State governments, as its proponents suggested. Doc. #: 1820-1 at 53. This puts to rest a concern raised by the Attorneys General. Doc. #: 1951 at 3.

As noted throughout, an Order accompanies this Memorandum Opinion.

*/s/ Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 11, 2019**