**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>**ALL CASES** | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

**MEMORANDUM IN SUPPORT OF
MOTION TO DISQUALIFY PURSUANT TO 28 U.S.C. § 455(a)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

THE MATERIAL FACTS........................................................................................................6

    A.    The Court's Judicial Statements .........................................................6

    B.    The Court's Extrajudicial Statements ................................................12

    C.    The Court's Heavy Involvement in Settlement and Subsequent
        Adjudication of the Merits ...............................................................16

THE CONTROLLING LEGAL STANDARD FOR DISQUALIFICATION ...........................18

ARGUMENT .........................................................................................................................20

I.    The Court's Declared Objective of Abating the Opioid Crisis Creates a
    Reasonable Question About the Court's Impartiality.......................................20

II.    The Court's Public Comments and Appearances Create a Reasonable Question
    About the Court's Impartiality..........................................................................27

III.    The Court's Significant Involvement in Attempting to Settle the Litigation
    Creates a Reasonable Question About the Court's Impartiality, Especially Since
    the Court Will Act As a Factfinder ...................................................................32

CONCLUSION.......................................................................................................................35

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3rd Cir. 1993) ............................................35

*Allergan Finance, LLC v. State of Florida*, COURT No. 2D19-1834 (July 25, 2019) ...................................................................................................................................27

*Antar v. S.E.C.*, 71 F.3d 97 (3d Cir. 1995) (*Antar II*), *overruled in part on other grounds*, *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001).........................................................22, 23

*Becker v. Tidewater, Inc.*, 405 F.3d 257 (5th Cir. 2005) ........................................................33, 34

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)...............................................................20

*Chicago Ins. Co. v. Capwill*, 2010 U.S. Dist. LEXIS 68228 (N.D. Ohio July 8, 2010) ..............................................................................................................................35

*Colon-Cabrera v. Esso Standard Oil Co. (Puerto Rico), Inc.*, 723 F.3d 82 (1st Cir. 2013) ..............................................................................................................................34

*In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136 (6th Cir. 1990) (en banc) .......................................20

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) ................................................. *passim*

*In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919 (6th Cir. 2019) ........................................1, 24

*In re Reassignment of Cases*, 736 F.3d 118 (2d Cir. 2013)...........................................................29

*In re Royal Manor Management, Inc.*, 525 B.R. 338 (6th Cir. 2015) ....................................34, 35

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988)..........................................19

*Liteky v. United States*, 510 U.S. 540 (1994).........................................................................20, 21

*Reed v. Rhodes*, 179 F.3d 453 (6th Cir. 1999)........................................................................1, 20

*Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495 (6th Cir. 1998)...............................34, 35

*Union Planters Bank v. L&J Development Company, Inc.*, 115 F.3d 378 (6th Cir. 1997) ..............................................................................................................................20

*United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993)............................................................28, 30

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)......................................19, 31, 32

*United States v. Whitman*, 209 F.3d 619 (6th Cir. 2000).....................................................2, 5, 21

## STATUTES

28 U.S.C. § 455(a) ............................................................................................ *passim*

Fed. R. App. P. 10(c) .................................................................................................12

Fed. R. Civ. P. 23 .......................................................................................................18

## OTHER AUTHORITIES

A Cooperative Approach To Class Actions Involving Large Stakeholders, Duke
   Law School Public Law ......................................................................................18

Feeley & J. Hopkins, *Opioid Crisis Point Man Is Cleveland Judge in Midst of
   Epidemic* .............................................................................................................13

J. Hoffman, *Can This Judge Solve the Opioid Crisis?*, N.Y. Times (Mar. 5, 2018)
   (published on page 1 of the print copy on March 6, 2018) ...................... 13, 15, 31

C. Bryant, *An unprecedented effort to stem opioid crisis – and the judge behind it* ....................14

A. Koehn, *National spotlight shines on Judge Polster again in opioid fight* ................................14

E. Carroll, *Civic Leadership Award: Judge Dan Aaron Polster* ...................................................15

E. Carroll, *Opioid panel seeks more answers to epidemic* ...........................................................15

E. Field & J. Overley, *Meet The Judge Who's Steering The Epic Opioid MDL*
   (Jan. 30, 2018) ...................................................................................................15

J. Kaufman, *Judaism provides direction for Polster in landmark opioid case* ...........................16

J. Nathan-Kazis, *A Court Hearing This Week Could Be a Step Toward a National
   Opioid Settlement* .............................................................................................25

D. Fisher, *Judge Sees Litigation As Only An `Aid In Settlement Discussions' For
   Opioid Lawsuits* ...............................................................................................33

H. Erichson, *MDL and the Allure of Sidestepping Litigation*, Forthcoming, 53 Ga.
   L. Rev. __ (2019),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3371209 ................................26

The New York Times .......................................................................................... *passim*

*Trial. Here's Why the Stakes Are Getting Uglier*, N.Y. Times (Jan. 30, 2019) ...............13, 16, 30

*Opioid Crisis*, The Cleveland Scene (March 14, 2018) ................................................................14

*Cleveland, Ohio*, Cover 2 Podcast (Oct. 12, 2018), https://cover2.org/ep-210-
    what-you-dont-know-about-the-opioid-multidistrict-litigation-in-cleveland-
    ohio/ ......................................................................................................................16

AP, *Federal judge invites states to discuss opioid crisis* (Jan. 11, 2018)......................................16

**INTRODUCTION**

The Judicial Code provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[1]  The duty is mandatory, and a judge must recuse himself, whether or not a motion to disqualify has been filed, whenever it is that he comes to that realization that his impartiality can reasonably be questioned.  The test is objective and depends, not on the presence of ***actual*** prejudice or bias, but on the ***appearance*** of prejudice or bias—i.e., whether "a reasonable person knowing all the relevant facts [would] question the impartiality of the judge."[2]  Here, reasonable people would do just that—and, indeed, have already done that.  Two judges of the Sixth Circuit (on June 19, 2019) and the Ohio Attorney General (on August 30, 2019) have questioned, respectively, whether the Court's "unusual level of commitment" to a settlement has affected the Court's rulings, even its willingness to make rulings and conduct trials,[3] and whether the Court has "[t]urned a blind eye to the law because it believes doing so will result in a better or fairer result."[4]

Defendants do not bring this motion lightly.  Taken as a whole and viewed objectively, the record clearly demonstrates that recusal is necessary.  The record includes the Court's (1) judicial and extra-judicial statements evidencing a personal objective to do something meaningful to abate the opioid crisis, with the funding to be provided through Defendants' settlements; (2) numerous improper comments to the media and in public forums about the

---

[1]   28 U.S.C. § 455(a).

[2]   *Reed v. Rhodes*, 179 F.3d 453, 467 (6th Cir. 1999).

[3]   *In re Nat'l Prescription Opiate Litig*., 927 F.3d 919, 933 (6th Cir. 2019).

[4]   Petition for a Writ of Mandamus of State of Ohio, No. 19-3827, at 26 (6th Cir.) (internal citations omitted).

litigation; (3 ) apparent prejudgment of the merits and outcome of the litigation; and (4) singular focus on, and substantial involvement in, settlement discussions.

The role of a federal judge is to "administer justice without respect to persons" based on the evidence presented by the parties in the proceedings before the court.[5]  Yet at the first hearing in this MDL proceeding—*before* discovery had commenced, *before* any party had submitted evidence in any form, *before* the full array of parties even had an opportunity to address the Court—the Court took the bench and declared that the country is experiencing an ongoing "opioid crisis" in which "we're losing more than 50,000 of our citizens every year" and, according to the Court's own math, "150 Americans are going to die today, just today, while we're meeting."  Next, the Court assigned fault for the "crisis" it had just described: "[E]veryone shares some of the responsibility, and no one has done enough to abate it."  This condemnation was directed to "the manufacturers, the distributors, the pharmacies, the doctors, the federal government and state government, local governments, hospitals, third-party payors, and individuals."  Finally, the Court announced a personal goal:  "My objective is to do something meaningful to abate this crisis and to do it in 2018," where doing "something meaningful" [6] meant "dramatically reduc[ing] the number of opioids that are being disseminated, manufactured and distributed … and [assuring] that we get some amount of money to the government agencies for treatment"—money, needless to say, that would come from Defendants. Summing up, the Court emphatically declared:  "So that's what I am interested in doing."  And the Court made clear that its goal was not to accomplish these objectives by supervising

---

[5]  *United States* v. *Whitman*, 209 F.3d 619, 625-26 (6th Cir. 2000).

[6]  ECF 58 at 4-5.

discovery, making legal rulings, and conducting trials—saying "we don't need a lot of briefs and we don't need trials ... none of those are going to solve what we've got."[7]

"So that's what I want to accomplish," the Court concluded on January 9, 2018, at the first MDL hearing.[8]  And now, with its August 26, 2019 ruling, the Court has put itself in position to do just that.  With Plaintiffs seeking $8 billion in cash for so-called "abatement," the Court has determined that it, not a jury, has the discretion to decide how much money Defendants may pay to government agencies for medical treatment and other addiction-related services and initiatives, saying:  "[T[he Court, exercising its equitable powers, has the discretion to craft a remedy that will require Defendants, if they are found liable, to pay the prospective costs that will allow Plaintiffs to abate the opioid crisis."[9]

The Court's declaration at the very start of this litigation (1) relied on extrajudicial information, (2) defined a personal mission, (3) disparaged the federal court's conventional role as irrelevant to the accomplishment of that mission, (4) described what it believed should be the components of a remedy, (5) prejudged the responsibility of all the Defendants for "the opioid crisis," and (6) foresaw the outcome of this process as "get[ing] some money to the government agencies for treatment."  Troubling as that was, the Court, in unprecedented fashion, then continued to make such statements in media interviews and public appearances.

Under settled law, any one of these statements would be enough to cause a reasonable person to question a judge's impartiality.  Even putting aside what was actually said, the law is clear that the very fact of giving multiple interviews and making multiple public appearances to

---

[7]    *Id.* at 9.

[8]    *Id.* at 9.

[9]    ECF 2519 at 3.

talk about the litigation would be enough to cause a reasonable person to question a judge's impartiality.  If, in addition, the judge (1) used these interviews and public appearances to say that the litigation affords a unique opportunity to "do something meaningful," (2) discussed disputed issues of fact, and (3) identified the necessary components of a settlement, including that (4) the Defendants would have to pay money for addiction treatment, a reasonable person certainly would question the judge's impartiality.  All of these things are true here, and taken together, there can be no doubt that a reasonable person would question whether the Court can fairly and impartially conduct this MDL litigation.

One Court of Appeals' decision in particular makes clear that the Court is now obligated to recuse itself.  In *United States v. Antar*, the Third Circuit reversed the criminal convictions of two defendants because the district judge failed to recuse himself *sua sponte*, pursuant to Section 455(a) where he had, at the sentencing hearing, declared a personal objective untethered to an adjudication based on an application of the law to the facts:

> ***My object in this case from day one has always been to get back to the public that which has been taken from it as a result of the fraudulent activities of this defendant and others***.  We will work the best possible formula we can to be as fair as possible to the public.  If we can get the 120 million back, we would have accomplished a great deal in this case.[10]

The Court explained that, in so stating, "the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper."  *Id.* at 576.  The Court then said it was "difficult to imagine a starker example of when opinions formed during the course of

---

[10]   53 F.3d 568, 573-74 (3d Cir. 1995) (*Antar I*), *overruled in part on other grounds*, *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) . All emphases in this memorandum are added unless otherwise indicated.

judicial proceedings display a high degree of antagonism against a criminal defendant."[11]  But

the court did offer a starker example:

> [W]e consider what the situation would have been *if, instead of revealing his goal at the end of trial, the judge made the same statement <u>at the beginning of the trial</u>*.  In that scenario, the judge would have said:  "My goal in this case will be to get back to the public that which has been taken from it as a result of the fraudulent activities of this defendant and others."  *There would be very little question that such a statement would give rise to a duty to recuse*.  The fortuitous fact that the judge made his goal clear at the end rather than at the beginning of trial is of no principled consequence.[12]

That is *precisely* what happened on January 9, 2018, when the Court declared its personal

objective.

Those comments cannot be explained or excused as a dramatic flourish at the opening

hearing, in a jammed courtroom, with an overflow audience of parties and press.  The Court has

since made similar judicial and extra-judicial statements.  Objective observers have recently

questioned the Court's impartiality in rulings, filings, and the press.  Two weeks ago, it became

clear that the Court intends to function as a factfinder as to the billions of dollars Plaintiffs seek

in equitable relief.  Just two days ago, the Court said in certifying an unprecedented settlement

class that, in this litigation, "settlement is especially important as it would expedite relief to

communities so they can better address this devastating national health crisis."[13] And only

yesterday, the Court issued an order that will give each of the eight defendants in the Track 1

---

[11]  *Id.*

[12]  *Id.* at 576.

[13]  ECF 2590 at 2.

trial a mere 12.5 hours to present its defense[14]—this in a bellwether case seeking a multi-billion of dollar judgment.

The upcoming Track 1 trial involves just two Plaintiffs and eight Defendants.  Activity in the other 2000-plus cases has been stayed, with a moratorium on filings.  The two Plaintiffs involved in Track 1 represent 0.1 percent of the MDL cases.  Although a new phase in the MDL proceedings is opening, even Track 2 involves only two counties.  Thus, the MDL proceedings as a whole are in their infancy.

Considering the complete record, Section 455(a) imposes a duty to recuse.  The appearance of partiality, once it emerges, cannot be undone or forgotten.  The time for recusal is now, before any trial and the opening of new tracks in the MDL proceedings.

## THE MATERIAL FACTS

### A.    The Court's Judicial Statements

The first in-court hearing in this MDL proceeding took place on January 9, 2018.  At that time, no discovery had been conducted in any of the transferred cases, and the parties had not filed any substantive motions or made evidentiary submissions of any kind.  Without inviting comments from counsel, the Court thanked the parties for their submissions concerning "how a judge should manage this MDL," but stated his view that "this is not a traditional MDL."[15]  The Court then described what it perceived as the problem, necessarily relying either on extrajudicial information, on Plaintiffs' allegations, or both:

> What's happening in our country with the opioid crisis is present and ongoing.  I did a little math.  Since we're losing more than

---

[14]   ECF 2594.

[15]   ECF 58 at 3-4.

50,000 of our citizens every year, about 150 Americans are going to die today, just today, while we're meeting.[16]

I mean, I read recently that we've managed in the last two years, because of the opioid problem, to do what our country has not done in 50 years, which is to – for two consecutive years, reduce, lower the average life expectancy of Americans.  And if we don't do something in 2018, we'll have accomplished it for three years in a row ….  And this is 100 percent manmade.  Now, I'm pretty ashamed that this has occurred while I've been around.  So I think we all should be.[17]

The Court then assigned responsibility for the crisis:

And in my humble opinion, ***everyone shares some of the responsibility, and no one has done enough to abate it***.  That includes the manufacturers, the distributors, the pharmacies, the doctors, the federal government and state government, local governments, hospitals, third-party payors, and individuals.  Just about everyone we've got on both sides of the equation in this case.[18]

The Court declared that its personal objective was "to do something meaningful to abate this crisis and to do it in 2018."  And the Court told the assembled parties and their counsel what form that abatement should take:

I'm confident that we can do something to ***dramatically reduce the number of opioids that are being disseminated, manufactured, and distributed***. … [and] make sure that the ***pills that are manufactured and distributed go to the right people*** and no one else ….  and that we ***get some amount of money to the government agencies for treatment***.  Because sadly, every day more and more people are being addicted, and they need treatment.[19]

But the resolution I'm talking about is really – what I'm interested in doing is not just moving money around, because this is an ongoing crisis.  What we've got to do is ***dramatically reduce the number of the pills that are out there and make sure that the pills***

---

[16]   *Id.* at 4.

[17]   *Id.* at 13-14.

[18]   *Id.* at 4-5.

[19]   *Id.* at 5.

> *that are out there are being used properly*.  Because we all know that a whole lot of them have gone walking and with devastating results.
>
> So *that's what I want to accomplish*.  And then we'll deal with the money.  *We can deal with the money also and the treatment*.…[W]e need a whole lot -- some *new systems in place, and we need some treatment*.[20]

The Court left no doubt that these were its avowed goals, declaring, "So that's what I am interested in doing."[21]

The Court recognized that achieving its stated objective was not the federal court's constitutional function:  "The federal court is probably the least likely branch of government to try and tackle this, but candidly, the other branches of government, federal and state, have punted.  So it's here."[22]  Nonetheless, the Court made clear that fulfilling its policy objective was its first priority and that performing the customary judicial role would be secondary, if not a waste of time:

> I don't think anyone in the country is interested in a whole lot of finger-pointing at this point, and I'm not either. *People aren't interested in depositions, and discovery, and trials*. *People aren't interested in figuring out the answer to interesting legal questions* like preemption and learned intermediary, or unravelling complicated conspiracy theories.[23]
>
> [*I*]f *I've got to do it in a traditional way*, and--I guess I'll have no choice. *I'll admit failure* and I'll say, All right. We've just got to plow through this.[24]

---

[20]    *Id*. at 9.

[21]    *Id*. at 4.

[22]    *Id*. at 4.

[23]    *Id*.

[24]    *Id*. at 5.

> We don't need -- *we don't need a lot of briefs and we don't need trials*. They're not going to -- none of them are -- *none of those are going to solve what we've got*.[25]

Since then, the Court's judicial and extrajudicial statements confirm that it has not deviated from these views. It has repeated them again and again, saying that conducting discovery, resolving legal issues, and trying cases would be a waste of time and money; that abating the opioid crisis is the Court's first priority and should be the parties' as well; and that all Defendants, regardless of their role in the supply chain and the particulars of their conduct (i.e., culpability), should pay money in settlement.

At the second MDL hearing, which addressed access to the ARCOS data, the Court again expressed its goal—"[h]opefully there will be no trials"[26]—and expressed its view that, where large numbers of opioid pills had been prescribed and supplied, liability is a given and the only question is the identity of the supplier—"[*e*]*veryone knows that was wrong*, it shouldn't have happened. *That question is, whose pills*."[27] When the Court issued its discovery order permitting access to the ARCOS data, it again prejudged the question of causation, saying that "the vast oversupply of opioid drugs in the United States has caused a plague on its citizens and their local and State governments."[28] And the Court justified disclosure of the data, in part, because it could be used "for purposes of allocation of settlement funds."[29]

---

[25] *Id*. at 9.

[26] ECF 156 at 42.

[27] *Id*. at 11.

[28] ECF 233 at 21.

[29] *Id*. at 15 n.8; *see also* ECF 397 at 2 (the ARCOS data "will prove essential in settlement discussions regarding apportionment of any obligation amongst defendants, and allocation of any settlement funds to plaintiffs.").

When the Court reluctantly authorized a litigation track, it imposed an unprecedentedly short schedule—nine months from the commencement of discovery until trial, in two cases, with four Plaintiffs and more than 20 Defendants, involving a number of opioid medications and alleged wrongful conduct over a 25-year period—with the transparent purpose of pressuring the parties to settle.  And when the Court scheduled the trial, it allowed only seven weeks, although both Plaintiffs and Defendants had advised the Court that much more time was needed to present their cases.[30]  This determination in 2019 came against the backdrop of the Court's statement in 2018 that litigation activity would be only a means to secure the settlement the Court envisioned: "We of course have a litigating track ….  But I absolutely see it as an aid in settlement discussions.  It's not a substitute or replacement …."[31]  This approach served the Court's personal goal "to be the catalyst … to take some steps this year to turn the trajectory of this epidemic down rather than up, up, up."[32]  Accordingly, the Court devoted its efforts to settling the litigation, delegating to the Magistrate Judge the resolution of Defendants' motions to dismiss, and to a Special Master the day-to-day supervision of discovery and the resolution of discovery disputes.

In August 2018, after only three months of discovery, the Court remained adamant that litigating would frustrate his personal objective to do something "meaningful" right away to ameliorate the crisis:

> I didn't want this litigating track.  The defendants insisted they
> wanted to file all these motions.  I said, All right. …  [*A]ll this*

---

[30]  ECF 1673.

[31]  ECF 418 at 9.

[32]  *Id*.

> *discovery and depositions and whatever, and a trial, will accomplish zero*.[33]
>
> I don't want to be essentially encouraging the parties to spend all their efforts on this litigating track, because that … not only isn't going to solve anything, I think it's going to make resolution virtually impossible.[34]

At the time of those comments in August 2018, the Magistrate Judge had not yet issued Reports and Recommendations on the motions to dismiss, document discovery had not yet been completed, and depositions had not even commenced. Nevertheless, the Court expressed its view that "of course, we need to come up with some amount of money--it's not going to solve it or provide--we're not talking about all the money necessary for drug treatment, but some meaningful amount to help treat the people who are addicted so that they don't die."[35]

In November 2018, the Court held an off-the-record discovery hearing. In introductory remarks to a full courtroom, the Court said that it was the litigants, not he, who had wanted a litigation track and that he had favored, and still favored, focusing on settlement because opiate-plagued communities needed money to remedy the situation now. At the hearing's close, the Court again returned to the subject of settlement, saying that while legal culpability might not be sorted out for many years, the Defendants must consider their "moral responsibility" for the opioid crisis.[36]

---

[33] ECF 854 at 24-25.

[34] *Id*. at 29.

[35] *Id*. at 25.

[36] On November 8, 2018, the Court heard argument and ruled on several disputed issues at an off-the-record status conference. *See* ECF 1108 (memorializing orders). Accordingly, in advance of the November 20 conference, several Defendants filed a motion to "request that all telephonic and in-person status and discovery conferences or hearings, including the upcoming November 20, 2018 status conference, be held on the record, with a court reporter present," citing 28 U.S.C. § 753(b) (3). ECF 1141 at 1. The Court denied the motion at the outset of the November 20 hearing, and no transcript is available.

As of August 2019, the Court's focus admittedly had not changed:  "my attention and my time, candidly, is going to be on facilitating the settlement track."[37]  And just this week, in its decision certifying an unprecedented "negotiation class" comprised of all cities and counties throughout the entire country, the Court clearly stated its overriding personal objective in these proceedings:  "From the outset of this MDL, the Court has encouraged the parties to settle the case."[38]  Settlement is "especially important," the Court said, because "it would expedite relief to communities so they can better address this devastating national health crisis."  *Id.*  Were there any doubt, these most recent statements confirm that the Court has conducted these proceedings in pursuit of its personal goal to have Defendants pay Plaintiffs as quickly as possible.

**B.     The Court's Extrajudicial Statements**

The Court has granted at least seven interviews to the press about the litigation, participated in multiple seminars or panel discussions, spoken to state attorneys general at a closed session of their annual conference, had ex parte meetings with the United States and "representatives of several federal agencies,"[39] and made public comments on several other occasions.  The Court even permitted one reporter to shadow him for a day while engaged in activities related to this proceeding.  The reporting of these interviews and events reflects and suggests the following:

---

Where a transcript is not available, parties "may prepare a statement of the evidence or proceedings from the best available means, including the [parties'] recollection."  Fed. R. App. P. 10(c).

[37]   ECF 1643 at 15.  To date, the Court has not heard oral argument on any of the dozens of motions to dismiss, summary judgment motions, or *Daubert* motions.

[38]   ECF 2590 at 2.

[39]   ECF 418 at 3-4.

- ***The Court has expressed a strong personal conviction that his role is to strong-arm the parties into a settlement that will abate an ongoing opioid crisis, not just resolve the legal issues presented by the cases***.  In an interview with Bloomberg News, the Court said, "The problem is urgent, life-threatening and ongoing.  I took this step [summoning pharmaceutical executives, law enforcement, government officials, and lawyers to try to forge a settlement] because I thought it would be the most effective path."[40]  Speaking to The New York Times reporter who shadowed him, the Court was quoted as saying:  "The judicial branch typically doesn't fix social problems, which is why I'm somewhat uncomfortable doing this, [b]ut it seems the most human thing to do."[41]  In a public interview for the Harvard Law School "HLS in the Community" series, available on YouTube,[42] the Court described success in the litigation as Defendants' taking significant steps to reduce the number of diverted pills, putting together resources to help the addicted, and turning the curve of addiction down.  The Court acknowledged to the Harvard Law School audience that his comments at the January 9, 2018 hearing had "shocked" some observers, but said that "[i]t's on us to do something about it."  Or as the

---

[40]  Ex. A, Feeley & J. Hopkins, *Opioid Crisis Point Man Is Cleveland Judge in Midst of Epidemic*, Bloomberg (Jan. 31, 2018).

[41]  Ex. B, J. Hoffman, *Can This Judge Solve the Opioid Crisis?*, N.Y. Times (Mar. 5, 2018) (published on page 1 of the print copy on March 6, 2018).  The New York Times reported a second interview in January 2019 in which the Court said that the litigation was more "complex and challenging" than he had first envisioned. The reporter commented that "[i]f the bellwether ends in a victory for plaintiffs," conservative judges on the Court of Appeals "would be unlikely to uphold all of Judge Polster's rulings on these untested legal questions" and that his "biggest stick that could drive defendants to the bargaining table is the bellwether trial, with its looming date."  Ex. C, J. Hoffman, *Opioid Lawsuits Are Headed to Trial.  Here's Why the Stakes Are Getting Uglier*, N.Y. Times (Jan. 30, 2019).

[42]  "HLS in the Community | The National Opioid Litigation: The Role of Federal Judge as Problem Solver" available at https://www.youtube.com/watch?v=SjNGgswTo0c

Court put it in another interview, "This is my time to do something significant.  I'm not going to take a pass.  Usually people take a pass."[43]  The Christian Science Monitor entitled its article, which included an interview with the Court, *An unprecedented effort to stem opioid crisis – and the judge behind it*, and began the article with this impression: "More people died from drug overdoses in Ohio in 2016 alone than were killed in the 9/11 terrorist attacks ….  Now a federal judge in Cleveland sees an opportunity to do something about it, and he is seizing it with gusto."  It quoted the Court as saying, "Ordinary people can do extraordinary things if they step up."[44]  The Court told the Cleveland Jewish News that he had "requested that everyone try and work together to come up with some steps that we can take this year, in 2018, to begin to abate the crisis, because we are losing 50,000 people or more a year"[45] and had urged the parties "that at the same time they're fighting over the lawsuit, to see if they can take some steps to turn the trajectory of [addiction] and death down, rather than it going up, up, up"—an effort on his part, he told the paper, that arose from trying "to approach these cases through the lens of" his religious training and upbringing—"one should try to alleviate suffering."[46]  The Court delivered the same message at a wellness seminar presented by KeyBank, where he reportedly "lamented" press reports that he would solve the opioid crisis and

---

[43]  Ex. D, D. McGraw, *Can Judge Dan Polster Get Big Pharma to Pony Up Billions for its Role in the Opioid Crisis*, The Cleveland Scene (March 14, 2018).

[44]  Ex. E, C. Bryant, *An unprecedented effort to stem opioid crisis – and the judge behind it*, Christ. Sci. Mon. (May 9, 2018).

[45]  Ex. F, A. Koehn, *National spotlight shines on Judge Polster again in opioid fight*, Cleveland Jewish News (Mar. 7, 2018).

[46]  Ex. G, E. Carroll, *Civic Leadership Award: Judge Dan Aaron Polster*, Cleveland Jewish News (Nov. 16, 2018).

explained that his hope was "in 2018 that collectively we could do a few things to turn the [curve] down, not up, up and up."[47]

- ***The Court believes most persons have a family member or friend who has been personally affected by the opioid crisis, and that others believe the Court is one of them.***  Law360 reported that the Court told it, "I doubt there's anyone in Ohio who doesn't have a family member, a friend, a child of a friend or the parent of a friend who hasn't been somehow impacted."[48]  And The New York Times reported that the Court had been personally touched by the opioid crisis, because a friend's daughter died from an overdose.[49]

- ***The Court has predetermined that Defendants must pay substantial sums in settlement.***  The Cleveland Jewish News, reporting in October 2018 on a panel discussion about the opioid crisis in which the Court participated, attributed to the Court the comment that it "would look for both financial and systemic, or behavioral, change on the part of Defendants in any settlement" and that "'[i]n any settlement, … there is a monetary component, and there will be a behavioral component.'"  And the monetary component would be substantial:  "'I've made it clear that all of the money is going to go to this

---

[47]  Ex. H, E. Carroll, *Opioid panel seeks more answers to epidemic*, Cleveland Jewish News (Oct. 4, 2018).  Defendants had the opportunity to, and in fact did, object in advance to the Court's participation in this panel discussion, titled "Defining the Epidemic—Human and Economic Costs," noting that the Court would be speaking publicly about the pending case and subject matter directly related to the plaintiffs' claims for damages."  Ex. I, Email from Kaspar Stoffelmayr to Special Masters Cohen and McGovern (Sept. 19, 2018).

[48]  Ex. K, E. Field & J. Overley, *Meet The Judge Who's Steering The Epic Opioid MDL*, Law360 (Jan. 30, 2018).

[49]  Ex. B, J. Hoffman, *Can This Judge Solve the Opioid Crisis?*, N.Y. Times Mar. 5, 2018 (published on page 1 of the print copy on March 6, 2018).

crisis … [t]he big bucket is recovery.'"[50] The Court told the Associated Press that the resolution "has to be a global one."[51]

Apart from what the Court has said to interviewers and at public events, the fact of giving the interviews and participating in public discussions of the litigation have put the Court in a position where others have made it appear that the Court is aligned with Plaintiffs.  A New York Times interviewer placed the Court's answers in a context in which the Court's rulings were contrasted with what a court of appeals "filled with conservative judges" would do.[52]  At a panel discussion, the Court was asked to comment on a statement by one of Plaintiffs' experts that credited him with bringing "overwhelming" settlement pressure to bear on one of the Defendants.[53]  A recording of that forum is available as a podcast, which provides commentary on the Court's remarks.  The host who provided that commentary, Greg McNeil, has been listed by Plaintiffs as a possible witness about the personal impact of the opioid crisis.[54]

### C.  The Court's Heavy Involvement in Settlement and Subsequent Adjudication of the Merits

The Court has met in person with groups of Defendants to discuss settlement on more than a dozen occasions,[55] and has spoken with representatives of individual Defendants on

---

[50]  Ex. L, J. Kaufman, *Judaism provides direction for Polster in landmark opioid case*, Cleveland Jewish News (Oct. 5, 2018).

[51]  Ex. M, AP, *Federal judge invites states to discuss opioid crisis* (Jan. 11, 2018).

[52]  Ex. C, J. Hoffman, *Opioid Lawsuits Are Headed to Trial.  Here's Why the Statkes Are Getting Uglier*, N.Y. Times (Jan. 30, 2019)

[53]  *Ep. 210 - What You Don't Know About the Opioid Multidistrict Litigation in Cleveland, Ohio*, Cover 2 Podcast (Oct. 12, 2018), https://cover2.org/ep-210-what-you-dont-know-about-the-opioid-multidistrict-litigation-in-cleveland-ohio/

[54]  Ex. N, Excerpt of Summit County and City of Akron, Ohio Plaintiff's Supplemental Responses and Objections (Mar. 4, 2019)

[55]  In addition to meetings conducted by the Special Masters, and any meetings the Court has engaged in with Plaintiffs, the Court has met with various Defendants individually or

additional occasions.  These meetings began on January 9, 2018, at the time of the first MDL

hearing, and occurred as recently as last week.  The Court's emissary for settlement, Special

Master Francis McGovern, has met with one or more of the Defendants on a frequent basis, and

discussed the subject with them by telephone on countless other occasions.  We assume the

Court and Special Master have communicated with Plaintiffs about settlement a comparable

number of times.  The Court also has met and discussed the subject of settlements with third

parties, including state attorneys general.[56]  In their exchanges with certain of the Defendants,

the Court and Special Master have engaged in detailed discussions about settlement, including

those Defendants' positions about settlement.

We understand that, apart from their meetings and conversations with the parties, the

Court and Special Masters have met among themselves to strategize about settlement.  At the

direction and/or with the blessing of the Court, Special Master McGovern has retained

consultants to consider how a global settlement might be achieved.  Professor William

Rubenstein of the Harvard Law School is one such consultant.  He and Special Master

McGovern have co-authored for publication in the Duke Law School Public Law & Legal

Theory Research Series an article that proposes an unprecedented use of Rule 23 to certify a

---

collectively to discuss settlement on numerous occasions, including on at least the following
dates: January 31 and August 23-24, 2018, and on February 13, April 23, May 1, May 21,
June 18-19, July 16, August 28, and September 5, 2019.

[56]  ECF 1732 at 8-9 ("I asked for their help at the beginning, and to a man and woman, each of
them has pledged their assistance. And I've met with many of them, and I've met with many
of their first assistants and their able colleagues in their offices, and they are working very
hard because they recognize that no one can settle these cases without everyone's
assistance.").  At the National Association of Attorneys General symposium, the Court
addressed a closed session of attorneys general.  Defendants' representatives were not
included.

"negotiating class."[57]  The Court, acting through the Special Master, prompted Plaintiffs to file a

motion to certify just such a class, in reliance on the arguments advanced by the Rubenstein and

McGovern article, and dismissed the objections raised by Defendants and state attorneys general,

saying, "We need novel solutions to a novel problem."[58]  On September 11, 2019 the Court

certified this class, noting that it was adopting a "novel" proposal that is a "new form of class

action"[59] and asserting that this "creative" solution is necessary because a settlement "would

expedite relief to communities so they can better address this devastating national health

crisis."[60]  The Court explained that it was certifying an unprecedented type of class in order to

remove "an obstacle to settlement."[61]

### THE CONTROLLING LEGAL STANDARD FOR DISQUALIFICATION

Section 455 of the Judicial Code provides:

> (a) Any justice, judge, or magistrate judge of the United States
> ***shall*** disqualify himself in any proceeding in which his impartiality
> might reasonably be questioned.

28 U.S.C. § 455(a).[62]  Violations of Canon 3A (6) may provide a basis for disqualification under

§ 455(a).  *E.g.*, *United States* v. *Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001); *In re Boston's*

*Children First*, 244 F.3d 164, 168 (1st Cir. 2001).  That Canon provides:

---

[57]  Francis E. McGovern and William B. Rubenstein, The Negotiation Class: A Cooperative
Approach To Class Actions Involving Large Stakeholders, Duke Law School Public Law &
Legal Theory Series No. 2019-41 (Aug. 5, 2019).

[58]  ECF 1732 at 7.

[59]  ECF 2590 at 2-3, 8.

[60]  *Id*. at 2.

[61]  *Id.*

[62]  In most states and in the federal system, statutes and ethical rules provide additional
assurances of impartiality. For instance, Canon 3C(1) of the Code of Conduct for U.S. Judges
provides: "A judge shall disqualify himself or herself in a proceeding in which the judge's
impartiality might reasonably be questioned, including but not limited to instances in which

> A judge should not make public comment on the merits of a matter pending or impending in any court…. The prohibition on public comment on the merits does not extend to public statements made in the course of the judge's official duties, to explanations of court procedures, or to scholarly presentations made for purposes of legal education.

Section 455(a) clearly warrants disqualification here.  Avoiding even the appearance of judicial partiality is of paramount importance in our judicial system.  "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847, 865 (1988).  Congress enacted subsection 455(a) to "promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible," *id*. at 864-65, and in Section 455(a) "broaden[ed] and clarif[ied] the grounds for judicial disqualification.'" *Id.* at 849 (quoting 88 Stat. 1609).  Avoiding the appearance of partiality is so important that it does not matter "whether or not the judge actually knew of facts creating an appearance of impropriety." *Id.* at 859-60.

Nor does it matter if the judge actually harbors bias or prejudice.  Judicial disqualification is "evaluated on an objective basis, and so what matters is not the reality of bias or prejudice, but its ***appearance***." *Liteky* v. *United States*, 510 U.S. 540, 548 (1994); *see Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009) ("the Due Process clause has been implemented by objective standards that do not require proof of actual bias").  Therefore, recusal is required "whenever 'impartiality might reasonably be questioned.'" *Id.* at 888 (quoting 28 U.S.C. § 455(a)).  As the Sixth Circuit succinctly put it, the dispositive question is:  "Would a reasonable person knowing

---

… (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

all the relevant facts question the impartiality of the judge?"  *Reed v. Rhodes*, 179 F.3d 453, 467

(6th Cir. 1999).[63]

Courts have answered that question in the affirmative where a judge has an improper

objective, apparently prejudges issues of liability and remedy, seeks out media attention and

comments about the litigation in the press and other public fora, and, having been personally

involved in efforts to broker a settlement, sets himself up as a factfinder at trial.   As explained

below, the answer to the question in this case also is "Yes."

## ARGUMENT

## I.     The Court's Declared Objective of Abating the Opioid Crisis Creates A Reasonable Question About the Court's Impartiality

At the first hearing in this litigation—before the Court had heard any evidence or

argument—the Court told the parties "what I want to accomplish" which was, he explained, "to

do something meaningful to abate this crisis and to do it in 2018."   The Court went on to say, in

specific terms, how it wanted to see that stated "objective" accomplished: (1) "dramatically

reduce the number of the pills that are out there," (2) make sure that the pills "go to the right

people and no one else," and (3) "get some amount of money to the government agencies for

treatment [b]ecause, sadly, every day more and more people are being addicted, and they need

treatment."[64]   In short, the Court declared from the start—before the parties had made any

substantive submissions—"[s]o that's what I am interested in doing."[65]

---

[63]   *See also In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1143 (6th Cir. 1990) (en banc) ("Under § 455(a) a recusal is required when a reasonable person would harbor doubts about the judge's impartiality."); *Union Planters Bank v. L&J Development Company, Inc.*, 115 F.3d 378, 383 (6th Cir. 1997) (same)

[64]   ECF 71 at 4-6, 9-10.

[65]   *Id.* at 4.  Section 455(a) does not require that the judge's stated views have an extrajudicial source.  *Liteky*, 510 U.S. at 551-52 (an "'extrajudicial source' is [not] the only basis for establishing disqualifying bias or prejudice.  It is the only *common* basis, but not the

The Court's statements have made clear that these objectives—to abate what the Court described as a pressing social crisis—are personal.  These statements reflect, too, that the Court believes it has a responsibility to act outside the role of an Article III judge because the other two branches of government have abdicated their duties.  The Court acknowledged that the crisis it described "should be handled by the legislative and executive branches, our federal and state governments," and the Court described its personal objectives in terms that expressly distinguished them from the judicial responsibilities of an Article III judge:  "[W]e don't need a lot of briefs and we don't need trials. …  [N]one of those are going to solve what we've got."  Doing something meaningful to abate the crisis marked success; deciding legal issues and conducting trials, the Court said, marked failure.  "[I]f I've got to do it in a traditional way, … I'll admit failure and … say ... [w]e've just got just got to plow through this."[66]

The Court's comments about what it personally wanted to accomplish necessarily create a question about the Court's impartiality—particularly where those goals involve prejudging questions of liability and relief.  The Sixth Circuit has recognized the impropriety of declaring extrajudicial intentions.  *United States* v. *Whitman*, 209 F.3d 619, 625-26 (6th Cir. 2000) (reassignment on remand required in part because judge announced his goal was to "educate[e] the bar" and "improve the practice of law" rather than to "'administer justice without respect to persons, and … faithfully and impartially discharge and perform all the duties incumbent upon [him] … under the Constitution and laws of the United States'" (quoting 28 U.S.C. § 453)).  And six judges of the Third Circuit, in two opinions, held that a judge had a duty to recuse when it

---

exclusive one, since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate.").  The Court's opening statements on January 9, 2018, clearly had an extrajudicial source, however, since they were made at the initial MDL hearing.

[66]  ECF 71 at 9-10.

announced—at sentencing at the end of the case—that its "object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." *Antar I*, 53 F.3d at 573-74.  The Third Circuit held that these comments were improper because they indicated that the judge's goal in the criminal case was something other than, or in addition to, fairly trying the defendant's guilt or innocence—to "enforce a repatriation order and final judgment issued during a concurrent [SEC] civil proceeding and giv[ing] back the proceeds recovered to the public." *Id*. at 576; *Antar II*, 71 F.3d at 102 ("This indicates that the judge's purpose was at odds with his judicially mandated responsibility to provide a fair trial and impartial forum for the litigants before him.").  The judge's statement about his goal unavoidably raised questions about his impartiality, the Third Circuit explained, because "[a]fter all, the best way to effectuate [his] goal would have been to ensure that the government got as free a road as possible towards a conviction, which then would give the judge the requisite leverage to order a large amount of restitution." *Antar I*, 53 F.3d at 576.  Although the judge's stated goal of recovering monies for the investing public was laudable, it "created the appearance that he had allied himself with the SEC in the civil action," *Antar v. S.E.C.*, 71 F.3d 97 (3d Cir. 1995) (*Antar II*), *overruled in part on other grounds*, *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001), and also "'display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible," *id.* (quoting *Liteky*, 510 U.S. at 541).

Similarly, this Court's declared goal of "do[ing] something meaningful to abate this crisis" both (1) defined an objective that goes beyond the MDL judge's role of coordinating pretrial proceedings for the hundreds of transferred cases and trying bellwether cases and (2) aligned the Court with Plaintiffs, who allege nuisance and seek a broad abatement remedy— to be funded by Defendants—that would limit the number of pills distributed to the Track 1

jurisdictions, educate doctors so that the pills go to the right persons and no one else, and provide

funds for addiction treatment and prevention.  And, also as in *Antar*, the surest way to

accomplish the Court's stated objective would be to impose tremendous discovery costs on

Defendants, unreasonably accelerate the path to bellwether trials, deny certification of novel and

dispositive legal issues to the Ohio Supreme Court and Sixth Circuit (lest they delay trials), and

all along the way insistently press the Defendants to settle—just as the Court has done.

The Court's own repeated statements of its goal—both on and off the record and in

public remarks—are sufficient to raise a question as to the Court's impartiality.  *Antar I*, 53 F.3d

at 577 ("a reasonable observer is entitled to take the judge at his word" and "we must be careful

not to rewrite what the judge has said and render unreasonable the clearest and most obvious

reading of the language").  It is not necessary to show that reasonable persons have, in fact,

questioned the judge's impartiality, although here they have.

In June 2019, the Sixth Circuit vacated the Court's protective order, holding that it had

abused its discretion in not releasing the ARCOS data to the media.  Given that the Court had

compelled DEA to disclose the data to Plaintiffs, the Sixth Circuit called the Court's

characterization of the data as confidential vis-à-vis the media "bizarre."  In attempting to

account for this "about-face," the Sixth Circuit questioned whether this Court's desire to settle

the litigation had affected its impartiality:

> The district court repeatedly expressed its desire that the
> underlying litigation settle before proceeding to trial.  The court
> also warned the parties … that if the case went to trial, the ARCOS
> data would likely become public.  (*See* R. 156, Page ID# 861
> ("Nothing is going to be revealed to the media unless there's a
> trial. … Hopefully there will be no trials.").)  ***These statements***
> ***suggest that at least part of the reason for the district court's***
> ***about-face on what interests Defendants and the DEA have in***
> ***nondisclosure of the ARCOS data might have been a desire to***
> ***use the threat of publicly disclosing the data as a bargaining chip***

> *in settlement discussions.  If this was the motivation for its*
> *holding, then the district court abused its discretion by*
> *considering an improper factor*. … And even if this was not part
> of the district court's motivation, it appears that the court abused
> its discretion by acting irrationally.[67]

In short, given this Court's openly-declared desire to settle the litigation and avoid trials, the

Sixth Circuit concluded that it was confronted with the choice of explaining this Court's decision

as irrational or as based on improper consideration of how the decision might influence

achieving a settlement.

On August 30, the Ohio Attorney General filed a Petition for a Writ of Mandamus asking

the Sixth Circuit to dismiss the bellwether Plaintiffs' claims for "societal harms" and to delay the

bellwether trial because the MDL proceedings threaten the State's sovereign rights.  Regarding

the Court's efforts to settle the litigation, including by certifying a "negotiation class," the

Attorney General said:

> The District Court's statement regarding the potential class
> certification again shows its willingness to brush aside the law to
> facilitate a settlement, just as it does here. "I'm not worried about
> the Supreme Court. The issue is what will I do." *A court cannot*
> *turn a blind eye to the law because it believes doing so will result*
> *in a better or fairer result*.[68]

The doubts about the Court's impartiality expressed by the Sixth Circuit and the Ohio

Attorney General are the most recent, and most striking, expressions of concern that the Court's

focus on settlement has influenced its rulings, but they are not alone.  The media and various

commentators have made such observations as well:

---

[67]  *In re National Prescription Opiate Litig.*, 927 F.3d 919, 933 (6th Cir. 2019).

[68]  Petition for a Writ of Mandamus of State of Ohio, No. 19-3827, at 26 (6th Cir.) (internal
citations omitted).

- The New York Times reporter who shadowed the Court for a day quoted the Court's statement that "[t]he stakes in this case are incredibly high" and linked it with the reporter's observation that the daughter of the Court's friend died of an overdose.

- The Cleveland Scene called it "a pretty amazing thing" that the Court told the parties that "everyone's to blame" and "any settlement had to go beyond dollars and cents to address real, viable solutions to a problem that is decimating the American population."  "That," the paper said, "was not a traffic cop speaking."

- One lawyer quoted in the same article described the Court's goal as "trying to balance settlement money with public policy changes."

- As recently as August 2019, Barron's quoted a law professor as observing, "Judge Polster has always from the outset had settlement on his mind. … We have seen indications from Judge Polster that his desire to settle this case is often more of a priority for him than some of the niceties you might normally see play out in ordinary one-off litigation that does not carry with it the same level of magnitude or burden."[69]

- Even more striking, a forthcoming article in the Georgia Law Review authored by another law professor studies this MDL proceeding in an article titled, "MDL and the Allure of Sidestepping Litigation," and remarks on the Court's "unusually aggressive pro-settlement stance from the start"; the Court's forthright statement of "his moral duty" to "reduce the flow of opioids into the wrong hands; and his "stunning statement" that "'we don't need a lot of briefs and we don't need trials.'"  About that last statement the

---

[69]  Ex. O, J. Nathan-Kazis, *A Court Hearing This Week Could Be a Step Toward a National Opioid Settlement*, Barron's (Aug. 4, 2019).

article comments acerbically, "What motions and trials accomplish, the lawyers in his courtroom might have thought, is adjudication of disputes on the merits."[70]

As *Antar I & II* instruct, the Court's declaration of a non-judicial, personal, and, therefore, improper goal mandates disqualification under Section 455(a).  The Court's public comments about the nature and causes of the opioid crisis, *see supra* at 6-7—matters that very much are disputed issues of fact—and the Court's stated belief that all the Defendants share responsibility for the opioid crisis only add to a reasonable perception that the Court is partial.  The Court's inclusion of local governments and non-parties in the list of responsible persons does not mitigate the effect of his statement.  When the Court spoke of remedies that included dramatically reducing the number of pills being "disseminated, manufactured, and distributed," of "get[ting] some money to the government agencies for treatment," and of "a monetary component" to any settlement, it was speaking of remedies secured from the ***Defendants***.[71]  A reasonable person could rightly question whether a judge who states outright that the Defendants "share responsibility" for the problem and suggests that a settlement will include behavioral/systemic changes as well as the payment of monies to Plaintiffs has prejudged defendants' liability.[72]

---

[70]  H. Erichson, *MDL and the Allure of Sidestepping Litigation*, Forthcoming, 53 Ga. L. Rev. __ (2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3371209.

[71]  Compare these facts with the judge's public statement *In re Boston's Children First,* 244 F.3d 164, 170 (1st Cir. 2001) (discussed *infra* at 28), that the pending case was "more complex" than a previous case.  The First Circuit said: "Judge Gertner's comments can be understood as a reflection of language in her prior orders, i.e., that class certification could not yet issue because the standing questions were more difficult ("more complex") than those in *Mack*.  Still, … the comments were sufficiently open to misinterpretation so as to create the appearance of partiality.…"

[72]  These remarks are not different in kind from those made by the circuit court judge assigned to hear the Florida Attorney General's action against various opioid manufacturers and distributors.  At the motion to dismiss hearing, before hearing argument, he said:

II.     **The Court's Public Comments and Appearances Create a Reasonable Question About the Court's Impartiality**

The Court has elected to give multiple interviews about the litigation and to appear on a number of panels and discussions—occasions on which the Court has made factual assertions about disputed issues in the litigation and has said that his personal mission is to abate the crisis of opioid addiction, to do so by obtaining "behavioral" change as well as substantial monetary contributions, and to accomplish this quickly and without trials.

These activities appear to violate Canon 3A(6), which states that a "judge should not make public comment on the merits of a matter pending or impending in any court." While a judge may comment on his official duties and court procedures, the Court's statements to The New York Times, Bloomberg News, Law 360, the Christian Science Monitor, and the Cleveland Jewish News went beyond such textbook information, as did the Court's participation in various panel discussions. And, while a judge may make scholarly presentations for purpose of legal education, neither the Court's public interview for Harvard's "HLS in the Community" series nor the Court's half-hour overview of the litigation at the "Addicted: Opioids, Judge, & Jewish Wisdom" even purported to be scholarly presentations.

When a judge publicly comments on a case, the appearance of partiality arises not simply from the actual words spoken, but also from the very fact that the judge has elected to speak to

---

We do have a crisis on our hands. I mean it … is contained in the complaint about our community of Hudson of prescribing in one year 2.2 million pills. That doesn't surprise me, because if you had lived here, you would have seen the caravan of buses coming down from other states and getting prescriptions filled at an alarming rate and the State legislature was not handling it properly initially…. It was manufactured because I feel there was, insofar as the actions of these corporations, a concerted effort based on all the material that was provided to me.

The Florida Court of Appeals granted the writ to disqualify the circuit court judge. *See* Ex. P, Order, *Allergan Finance, LLC v. State of Florida*, No. 2D19-1834 (July 25, 2019)

27

the press about the case at all.  In *United States v. Cooley*, 1 F.3d 985 (10th Cir. 1993), the Tenth

Circuit held that § 455(a) required the disqualification of a judge who spoke to the press only

once, appearing on "Nightline" to state firmly that he would enforce his injunction barring

protesters from blocking access to abortion clinics.  The Court of Appeals explained that:

> *Two messages were conveyed by the judge's appearance on national television in the midst of these events*.  One message consisted of the words actually spoken regarding the protesters' apparent plan to bar access to the clinics, and the judge's resolve to see his order prohibiting such actions enforced.  *The other was the judge's expressive conduct in deliberately making the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him*.

*Id.* at 995.  It was this combination that "unmistakenly conveyed an uncommon interest and

degree of personal involvement in the subject matter."  *Id.*  The very fact of publicly commenting

about the ongoing protests and his injunction—what the Court of Appeals called "his volunteer

appearance on national television"—"was an unusual thing for a judge to do, and it unavoidably

created the appearance that the judge had become an active participant in bringing law and order

to bear on the protesters, rather than remaining as a detached adjudicator."  *Id.*

Likewise, in *In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001), the First Circuit

held that a judge's letter to the newspaper correcting inaccuracies about the procedural posture of

the case, in conjunction with a follow-up interview in which the judge called the pending

proceeding "more complex" than a previous case, required her recusal.  *Id*. at 167.  The Court of

Appeals was dubious that the judge had commented on the merits of plaintiffs' motion for class

certification, and it understood that her letter was in response to plaintiffs' counsel's

"provocative attempts to influence public opinion" in a matter "of significant local concern."  *Id*.

at 168, 169.  But, still, the Court of Appeals observed that "[j]udges are generally loathe to

discuss pending proceedings with the media" and that "when a judge makes public comments to

28

the press regarding a pending case, he or she invites trouble …." *Id*. at169, 171.  And the fact

that the Boston school assignment program was a matter of significant public interest was a

reason for the judge to have been "particularly cautious about commenting on pending

litigation," because the public might consider the very fact of responding to express "an undue

degree of interest in the case."  *Id*. at 169-70.  "In fact," the Court of Appeals reasoned, "the very

rarity of such public statements, and the ease with which they may be avoided, make it more

likely that a reasonable person will interpret such statements as evidence of bias."  *Id*. at 170.

In *In re Reassignment of Cases*, 736 F.3d 118 (2d Cir. 2013), the judge gave three

interviews, none of which even mentioned the litigation by name.  But one article quoted her as

saying about the government, "I know I'm not their favorite judge," and the reporter implied that

the judge was aligned with the Plaintiffs.  736 F.3d 118, 127 (2d Cir. 2013), *vacated in part on*

*other grounds*, 743 F.3d 362 (2d Cir. 2014).  "While nothing prohibits a judge from giving an

interview to the media, and while one who gives an interview cannot predict with certainty what

the writer will say," the Second Circuit explained, "judges who affiliate themselves with news

stories by participating in interviews run the risk that the resulting stories may contribute to the

appearance of partiality."  736 F.3d at 127.

For these same reasons, this Court's public comments require recusal under §455(a).

Indeed, the case for recusal is more compelling here.  When The New York Times interviewed

the Court for a second time in January 2019, the Court did not say that its rulings were pro-

Plaintiff or pro-Defendant, but the reporter contrasted "Judge Polster's rulings on untested legal

questions" with what a court of appeals "increasingly filled with conservative judges" would do,

suggesting that the Court was aligned with the Plaintiffs.[73]  And when the Court appeared at the Siegal Lifelong Learning discussion, he was confronted with statements by one of Plaintiffs' experts and asked to comment.

The case for recusal is also more compelling here because the Court's comments were not limited to one television appearance (as in *Cooley*) or one letter-to-the-editor with a follow-up interview (as in *Boston's Children's First*), and they did not avoid mention of the litigation. Rather, the Court commented on the litigation in multiple interviews and public appearances over a period of months.  Moreover, the comments were not limited to explanations of court procedures and enforcement of the judge's injunction (as in *Cooley*) or, the procedural posture of the class certification motion (as in *Boston's Children First*).  The comments concerned disputed factual issues, what this Court personally wants to accomplish, and what Defendants must be prepared to do in settlement. The comments were not made about one case, but about the hundreds of cases in the MDL proceeding—cases that are not just of significant local concern, but of national media interest and public debate.

The Court's decision to grant a number of interviews and to make a number of public appearances, plus the fact that one interview involved the reporter's shadowing the Court, heighten the concern that a reasonable person would question the Court's impartiality.  In *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), the district judge gave secret interviews to reporters for The New Yorker and The New York Times during the course of the trial and indisputably discussed the merits of the case—likely a unique set of facts.  But there were two particular matters of concern to the D.C. Circuit that are also present here.

---

[73]  Ex. C, J. Hoffman, *Opioid Lawsuits Are Headed for Trial.  Here's Why the Stakes Are Getting Uglier*, N.Y. Times (Jan. 30, 2019).

First, the Court of Appeals believed it safe to assume that interviews are conversations, not monologues.  Because reporters may furnish information to the judge that reflects their personal views of the case, the *Microsoft* Court asked, "[w]hat did the reporters convey to the District Judge during their secret sessions?"  *Id*. at 113.  The same question may be asked about The New York Times reporter who shadowed the Court for a day.  Indeed, we know the reporter solicited the Court's response to "disparaging comments" made by lawyers in the case that the Court was "arrogant" and "[u]nrealistically ambitious."[74]

Similarly, in the case of the Court's participation in the discussion sponsored by the Siegal Lifelong Learning Program, the Court was asked to comment on a public statement by one of Plaintiffs' experts (Dr. Anna Lembke)—a statement that credited the Court's "overwhelming" settlement pressure with bringing about Purdue's decision to halt marketing to doctors—and asked to comment.  The mere fact that the Court was confronted with this "praise," even apart from the Court's choice to deflect rather than disclaim it, created a circumstance that appeared to align the Court with Plaintiffs.  And it occurred only because the Court elected, as on so many other occasions, to discuss the litigation in public.  The Court may or may not have known that the event was recorded.  But this meant that, although the Court had previously declined to appear on a podcast hosted by one Greg McNeil, a Cleveland-area resident whose son died of a heroin overdose, Mr. McNeil was able to incorporate the recording in his podcast, accompanied by his commentary.  In interrogatory answers, Plaintiffs identified Mr. McNeil as a witness on whom they may rely.

---

[74]  Ex. B, J. Hoffman, *Can This Judge Solve the Opioid Crisis?*, N.Y. Times (Mar. 5, 2018) (published on page 1 of the print copy on March 6, 2018).

Second, the D.C. Circuit expressed concern about "[j]udges who covet publicity, or convey the appearance that they do," and recognized that "[m]embers of the public may reasonably question whether the District Judge's desire for press coverage influenced his judgments, indeed whether a publicity-seeking judge might consciously or subconsciously seek the publicity-maximizing outcome." *Id*. at 115.  Members of the public may reasonably have the same question here, given (1) how many interviews the Court has given and how many public appearances it has made, and (2) the nature of a number of the Court's comments in those interviews, which reflect the Court's personal investment in ameliorating the larger social problem (*e.g.*, "[t]he judicial branch typically doesn't fix social problems, which is why I'm somewhat uncomfortable doing this[,][b]ut it seems the most human thing to do" and, regarding "turning the curve of addiction down," stating, "it's on us to do something about it" and"[t]his is my time to do something significant.  I'm not going to take a pass.  Usually people take a pass.").

For all of these reasons, the Court's interviews and public appearances constitute independent ground for disqualification under 28 U.S.C. § 455(a).

## III.  The Court's Significant Involvement in Attempting to Settle the Litigation Creates a Reasonable Question About the Court's Impartiality, Especially Since the Court Will Act As a Factfinder

From day one, the Court has been personally involved in efforts to settle the litigation. The Court has met repeatedly with the parties—individually and in industry groupings—as well as with interested third parties.  The Court has invited proposals and made proposals of his own. On the Court's behalf, Special Master McGovern has had countless additional meetings and conversations to explore settlement, and himself has discussed details of settlement discussions with the media.[75]  In short, settlement has been, and remains, the Court's focus—as both the

---

[75]  Ex. Q, D. Fisher, *Judge Sees Litigation As Only An `Aid In Settlement Discussions' For Opioid Lawsuits*, Forbes (May 10, 2018) ("The parties have 'explored a variety of

Ohio Attorney General and a panel of the Sixth Circuit have observed—and it has actively

participated in the settlement discussions.  As the Court reminded the parties in May 2019, as

they were about to file dispositive and *Daubert* motions, "[M]y attention and my time, candidly,

is going to be on facilitating the settlement track."[76]

Setting aside the other indicia of partiality detailed above, and whether or not the Court's

focus on settlement has been appropriate, the Court's deep and detailed involvement in

settlement—personally and through the Special Master—precludes his being a factfinder.  The

law is clear that where a judge has engaged in settlement discussions, as this Court has done on

many levels with parties and non-parties alike for more than a year, that judge cannot conduct a

bench trial.  In *Becker v. Tidewater, Inc.*, 405 F.3d 257, 260 (5th Cir. 2005), "the district judge

appear[ed] to have mediated the settlement conference," and when the settlement negotiations

failed, "was faced with the possibility of also becoming the trier of fact" in a non-jury, admiralty

trial.  "This role," the Court of Appeals held, "would have been inappropriate given his discrete

knowledge of the parties' evaluation of their respective financial positions on settlement" and

required recusal.[77]  *See In re Royal Manor Management, Inc.*, 525 B.R. 338, 380-81 (6th Cir.

2015) (bankruptcy judge who encouraged settlement, but "did not mediate the dispute or engage

in settlement discussions between the parties" was not required to recuse); *Tucker v. Calloway*

---

compromises and have had what I consider to be in my experience very fruitful, very open,
very cooperative discussions," said Francis McGovern, another special master.  Plaintiffs and
defendants are 'discussing prospective injunctive relief,' he said, to resolve some aspects of
the opioid epidemic. Further negotiating meetings are scheduled later this month, June, July
and August, and the July meeting will include representatives of the healthcare industry to
discuss 'the opioid crisis in a non-litigation context.").

[76]  ECF 1643 at 15.

[77]  The *Becker* court affirmed the decision of the district court because the defendant failed to
raise the issue of disqualification below.

*County Bd. of Educ.*, 136 F.3d 495, 503 (6th Cir. 1998) (judge voluntarily recused because he had been involved in settlement discussions and could not conduct bench trial).[78]

Apart from that rule, one of Plaintiffs' four remaining claims in the Track 1 cases is a nuisance claim. Plaintiffs assert that they no longer seek damages, and the Court has held that, exercising its equitable powers, "[it] has the discretion to craft a remedy that will require Defendants, if they are found liable, to pay the prospective costs that will allow Plaintiffs to abate the opioid crisis." ECF 2519 at 3. To that end, it has held that Plaintiffs' abatement experts "provide context that the Court believes will be helpful in ultimately crafting an abatement remedy should it become necessary." And "[t]o the extent Defendants contend the Challenged Experts' assumptions and conclusions are wrong," the Court has said, "the appropriate place to challenge them is on cross-examination," where the Court may be the factfinder who assesses the credibility of the experts and determines what weight to give their testimony. In its September 4, 2019 ruling on Plaintiffs' summary judgment motion regarding their nuisance claims, the Court stressed that abatement is an equitable remedy, no matter what relief is sought under the "abatement" rubric.[79] A reasonable person would question whether a court that has repeatedly spoken to what it believes to be the scope of the problem and whose stated goal is to provide money to government agencies to resolve that problem as quickly as possible can do so impartially.[80]

---

[78] *Cf. Colon-Cabrera v. Esso Standard Oil Co. (Puerto Rico), Inc.*, 723 F.3d 82 (1st Cir. 2013) (commending the district judge's desire to aid the settlement process, but noting "potential pitfalls," including that "[s]uch involvement could result in the judge obtaining information about the parties' respective positions that might unduly influence the judge's rulings in the case.").

[79] ECF 2572 at 4-5.

[80] "When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 166 (3rd Cir. 1993); *see also Tucker ex rel. Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 503

Accordingly, the Court must recuse itself from determining what equitable relief is appropriate, should Plaintiffs prove their nuisance claim.  The judge who determines the remedy, however, should be the same judge who heard the evidence of liability.  Recusal for one necessitates recusal for both.

## CONCLUSION

Both the Court's declaration of a personal objective to do something meaningful to abate the opioid crisis and its many public comments about the litigation in interviews and public appearances independently warrant disqualification pursuant to 28 U.S.C. § 455(a). The Court's deep involvement in settlement discussions requires its disqualification from any bench trial of equitable remedies. Together, these factors more than raise a reasonable question about the Court's impartiality.  In cases like these of such national significance and of such magnitude for Plaintiffs and Defendants alike, any reasonable question about the Court's impartiality cannot be tolerated.  Allowing such questions to exist would contravene Section 445's paramount purpose of preserving the public's perception of the integrity of the judicial system.  Given the record, the Court should recuse itself from the entire MDL proceeding.

 Dated:  September 14, 2019                    Respectfully submitted,

---

(6th Cir. 1998) (observing that trial judge recused himself because he had been involved in settlement discussions and matter would be a bench trial); *In re Royal Manor Mgmt.*, 525 B.R. 338 (Bankr. App. 6th Cir. 2015), aff'd 652 Fed. Appx. 330 (6th Cir. 2016) ("judge should recuse himself from being a fact finder when he mediated a settlement conference") (citing *Becker*, 405 F.3d at 260); *Chicago Ins. Co. v. Capwill*, 2010 U.S. Dist. LEXIS 68228 (N.D. Ohio July 8, 2010) (granting motion to disqualify after determining that case would be tried to the court).

/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug
Corporation and AmerisourceBergen
Corporation*

/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC  20005
Tel:  (202) 434-5000
Fax:  (202) 434-5029
emainigi@wc.com
lheard @wc.com

*Counsel for Defendant Cardinal Health*

/s/ Geoffrey Hobart
Geoffrey E. Hobart
Mark H. Lynch
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com

*Counsel for Defendant McKesson
Corporation*

 /s/   Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
**ZUCKERMAN SPAEDER LLP**
1800 M Street, NW
Suite 1000
Washington, DC  20036
Tel.: (202) 778-1800
Fax: (202) 822-8106
edelinsky@zuckerman.com
smiller@zuckerman.com

*Counsel for CVS Rx Services, Inc., CVS Indiana, L.L.C., CVS Tennessee Distribution, L.L.C., CVS Pharmacy, Inc., West Virginia CVS Pharmacy, L.L.C., Caremark Rx, L.L.C.*

*/s/ Kelly A. Moore*
Kelly A. Moore
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6612
Fax: (212) 309-6001
kelly.moore@morganlewis.com

Elisa P. McEnroe
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5917
Fax: (215) 963-5001
elisa.mcenroe@morganlewis.com

*Counsel for Rite Aid of Maryland, Inc., d/b/a Rite Aid Mid-Atlantic Customer Support Center*

 /s/ John P. McDonald
John P. McDonald
C. Scott Jones
**LOCKE LORD LLP**
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel:  (214) 740-8445
Fax:  (214) 756-8110
jpmcdonald@lockelord.com
sjones@lockelord.com

*Counsel for Defendants Henry Schein, Inc. and Henry Schein Medical Systems, Inc.*

 /s/ Kaspar J. Stoffelmayr
Kaspar J. Stoffelmayr
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel.: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com

*Counsel for Walgreen Co. and Walgreen Eastern Co.*

  /s/ Tina M. Tabacchi
Tina M. Tabacchi
Tara A. Fumerton
**JONES DAY**
77 West Wacker
Chicago, IL 60601
Tel.: (312) 269-4335
Fax: (312) 782-8585
tmtabacchi@jonesday.com
tfumerton@jonesday.com

*Counsel for Walmart Inc.*

**CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

_/s/ Geoffrey E. Hobart_____
GEOFFREY E. HOBART
