# **EXHIBIT B**

*The New York Times*

# Can This Judge Solve the Opioid Crisis?

By Jan Hoffman

March 5, 2018

CLEVELAND — Here are a few choice mutterings from the scrum of lawyers outside Courtroom 18B, about the federal judge who summoned them to a closed-door conference on hundreds of opioid lawsuits:

"Grandstander."

"Pollyanna."

"Over his head."

And the chorus: "This is *not* how we do things!"

Judge Dan Aaron Polster of the Northern District of Ohio has perhaps the most daunting legal challenge in the country: resolving more than 400 federal lawsuits brought by cities, counties and Native American tribes against central figures in the national opioid tragedy, including makers of the prescription painkillers, companies that distribute them, and pharmacy chains that sell them. And he has made it clear that he will not be doing business as usual.

During the first hearing in the case, in early January, the judge informed lawyers that he intended to dispense with legal norms like discovery and would not preside over years of "unraveling complicated conspiracy theories." Then he ordered them to prepare for settlement discussions immediately.

Not a settlement that would be "just moving money around," he added, but one that would provide meaningful solutions to a national crisis — by the end of this year.

"I did a little math," he said, alluding to the rising number of overdoses. "About 150 Americans are going to die today, just today, while we're meeting."

The transcript from that hearing has created a ruckus in legal circles. Adam S. Zimmerman, a professor at Loyola Law School in Los Angeles, has begun teaching it in his classes.

"We say we want judges to be umpires," Mr. Zimmerman said. "But when there's a large social problem at stake, judges can be umpires for only so long, before they decide it has to be solved."

Lawyers on both sides would not speak on the record, noting that to criticize the judge presiding over their case would be professional suicide. But in private conversations, many were scathing, questioning his grasp of the issues and predicting that a stepped-up timetable was bound to collapse.

Can Judge Polster pull this off?

"These are bold things for a judge to say and it's exciting and intriguing to follow," said Abbe R. Gluck, a professor at Yale Law School who directs the Solomon Center for Health Policy and Law. "But to say that his goals are ambitious would be an enormous understatement."

## Legal Finger-Pointing

In December, a judicial panel gathered all the prescription opioid cases filed in federal court across the country and plopped them into Judge Polster's lap. The consolidation of large numbers of similar cases is called a multidistrict litigation, or MDL; it's usually done to enhance efficiency and reduce costs.

The panel cited several reasons for selecting Judge Polster. Ohio has been hard-hit by the crisis and is also centrally located to the defendants. And Judge Polster has MDL experience. He mediated settlements in some 700 cases involving a medical contrast dye.

This type of litigation is inherently unconventional, but the consolidated opioid lawsuits may be even more complex than most.



The Carl B. Stokes United States Court House in Cleveland, Ohio, where the nation's federal opioid lawsuits have been consolidated.  Maddie McGarvey for The New York Times

Rather than just one kind of industry defendant, this litigation has several, each playing a different role — not only drug makers but also distributors and retailers. That makes the apportionment of liability even more contentious, with defendants blaming one another.

All the defendants say the drugs were approved by the Food and Drug Administration and prescribed by doctors.

Plaintiffs claim that manufacturers, like Purdue Pharma and Johnson & Johnson, aggressively marketed the pills for years, despite knowing about addictive properties; that distributors, like McKesson and Cardinal Health, shipped alarming quantities without reporting to the authorities; that pharmacy chains, like Walgreens and CVS Health, looked away while selling flag-raising amounts to individuals.

Adding weight to the plaintiffs' case, the Justice Department filed a so-called statement of interest in the litigation last week, to emphasize the government's "substantial costs and significant interest in addressing the opioid epidemic."

The theories under which parties are suing make for a legal cacophony: public nuisance laws; fraud, racketeering and corruption; violations of federal and state laws on controlled substances. With the judge pushing for settlement, legal experts worry that these arguments may not get full consideration.

"Courts are hard-wired for litigation," through which facts can come to light, said Elizabeth C. Burch, a law professor at the University of Georgia who writes about multidistrict litigation. "Here, there's a short-circuiting of that process. So how do you know if it's the right settlement if you don't have all the information in front of you?"

Judge Polster has reminded both sides that if they resist settling swiftly in favor of litigation, they could be setting themselves on a path toward unpredictable jury trials.

The night before the conference, many lawyers, expert witnesses and clients stayed in the same hotel. They gathered in rooms and the restaurant lounge, strategizing, trying to second-guess the judge. On occasion, their voices could be overheard, rising in exasperation.

Earlier that day, Judge Polster, 66, ate a hasty lunch of a hard-boiled egg and tangerine unpacked from sandwich baggies, having just returned to his chambers from tutoring reading to a third-grader at a school near the courthouse. He glanced at his wristwatch, its fraying band wrapped in duct tape.

Before his day was over, the judge, shadowed by a reporter, would oversee a half-dozen legal matters, help teach a class on mediation at Cleveland-Marshall College of Law, dine with the opioid litigation's special masters — court-appointed intermediaries who expedite negotiations — and then lug home a nearly foot-thick binder of materials to study.

Judge Polster, who is married to an arbitration lawyer, grew up in a middle-class Cleveland neighborhood that his parents fought to integrate. Their activism taught him "ordinary people can do extraordinary things if they don't take a pass." His Jewish faith has also shaped his outlook on justice and compassion, he said; he teaches a confirmation class about ethical decision-making.

After graduating from Harvard Law School, he began a lifelong career in public service, working for the Justice Department's Antitrust Division in Cleveland and then the United States attorney's office there, prosecuting economic crimes. In 1998, President Bill Clinton appointed him to the federal bench.



Judge Polster co-teaches a course at Cleveland-Marshall College of Law on mediation, which he uses regularly to resolve cases.  Maddie McGarvey for The New York Times

# The Most Human Thing

Like so many Ohioans, Judge Polster has been personally touched by the opioids crisis. A friend's daughter died from an overdose.

"The stakes, in this case, are incredibly high," he said. "Any thinking person should feel terrible about the situation we're in."

He was keenly aware that steering the process away from traditional litigation is unorthodox. "The judicial branch typically doesn't fix social problems, which is why I'm somewhat uncomfortable doing this," he said. "But it seems the most human thing to do."

Upon hearing of the disparaging comments from some lawyers, Judge Polster stared into deep space to retrieve his words before making eye contact, a habit that some find unnerving.

They called him arrogant? Unrealistically ambitious?

"I think that's a fair assessment," he said. "But I won't fault myself for attempting this."

He would not address specific issues in the opioid litigation. But he opened a window into his thinking, generally, about why he prefers rapid settlement rather than trying cases. He believes that when parties have gotten this far down the road in a lawsuit, they already have at least 80 percent of the information they need to negotiate; the longer litigation continues, he said he has found, the more entrenched each side can become.

Later that day, he told law students: "It's almost never productive to get the other side angry. They lash out and hurt you and themselves. I try to get the sides to think it through as a problem to solve, not a fight to be won or lost."

The following morning, a mash-up of small-town mayors, big-city lawyers, addiction doctors, pharmacy industry executives and a police chief trooped into Judge Polster's mahogany-lined federal courtroom, a crowd of nearly 170. Lawyers hoisted folding chairs for overflow seating.

Confusion was ubiquitous. Even the most optimistic admitted to low expectations, predicting that the day would amount to sword-rattling and throat-clearing.

The judge had ordered a closed-door session that morning with tiers of lead lawyers, their experts and clients, to educate him on the issues. Immediately after, he would begin settlement discussions.

To that end, he had also invited representatives from two groups of state attorneys general, neither in his official purview. One group of about 10, which included Mike DeWine from Ohio, had already filed lawsuits in their home state courts. Another group of 41 attorneys general, who are cooperating in their own prescription opioid investigation, have not yet filed.

But though the attorneys general are not parties in this litigation, legal experts say their input is essential to its success: The defendants will most likely insist on a settlement that would resolve most, if not all, the state lawsuits as well as the federal ones.



A street in Cleveland. Ohio is among the states hardest hit by the opioid onslaught.
Maddie McGarvey for The New York Times

After the morning session, Judge Polster summoned the attorneys general into the courthouse auditorium to air grievances. Other lawyers repaired to the cafeteria, waiting their turn.

Tides of earlier skepticism about Judge Polster began receding.

Some noted that he seemed pretty smart and asked some good results-driven questions.

"Classic Polster," said Pete Weinberger, a Cleveland plaintiffs' lawyer who has appeared before the judge in other cases, saying he seemed to listen intently and probe with pragmatism. "His questioning focused on reducing the number of pills in the chain of distribution."

Plaintiffs' lawyers and addiction specialists began floating trial balloon solutions, all the more remarkable given that, as one lawyer said, "we're just at the beginning of the beginning." Take the strongest doses off the market? Fund addiction treatment and public education?

The judge had also insisted that front-line victims, not just the lawyers, bear witness that day: A Camden County, N.J., police chief whose force was worn down by the opioid-related crimes. Steve Williams, the mayor of Huntington, W.Va., which was featured in an Oscar-nominated short documentary, "Heroin(e)," as the epicenter of the epidemic. One recent week, Huntington, with a population of 48,000, recorded 29 overdoses.

"I'm fighting drug dealers in white coats," Mr. Williams said. "We need the resources to clean up this mess and make sure it never happens again."

The day ended with Judge Polster issuing brisk orders for the next steps.

Leaving the courthouse, Mark S. Cheffo, who represents Purdue Pharma, the makers of OxyContin, tersely characterized the mood as "cautiously optimistic."

Just 10 days later, Purdue announced it would no longer market OxyContin to prescribers. "This is a stunning about-face by Purdue, which has long contended that it has not influenced physician education with its drug reps," said Dr. Anna Lembke, a Stanford addiction specialist who spoke at the Cleveland session. "I think the overwhelming pressure from Judge Polster, not to mention the court of public opinion, led to this radical reversal."

Purdue issued a statement last week saying the company was "fully engaged in the process that Judge Polster has set in action to explore meaningful solutions" to the opioid crisis.

On Tuesday, delegations of all-star litigators and representatives of the attorneys general are to return to Courtroom 18B to begin negotiating "economic and noneconomic issues."

With countless lives and billions of dollars at stake and both sides arguing their cases in the news media, the obstacles to resolution seem staggering.

Yet on numerous occasions, Allen L. Bohnert, a former law clerk, has watched Judge Polster take on the intractable.

"At the end of a long day where it looked like there wouldn't be a settlement, he'd walk out with one," said Mr. Bohnert, now an assistant federal public defender. "And he'd wink and say, 'Sometimes it takes a federal judge.'"

Follow @NYTHealth on Twitter. | Sign up for the Science Times newsletter.

A version of this article appears in print on March 6, 2018, on Page A1 of the New York edition with the headline: Judge Wants to Solve the Opioid Crisis, and Fast