# **EXHIBIT C**

**The New York Times**

## *Opioid Lawsuits Are Headed to Trial. Here's Why the Stakes Are Getting Uglier.*

The judge presiding over all the federal cases had hoped to settle them by now. But the behemoth litigation is only becoming more bloated, contentious and difficult to resolve.

By Jan Hoffman

Jan. 30, 2019

**Uncontested**: The devastation from prescription opioids has been deadly and inordinately expensive.

**Contested**: Who should foot the bill?

Just over a year ago, opioid lawsuits against makers and distributors of the painkillers were proliferating so rapidly that a judicial panel bundled all the federal cases under the stewardship of a single judge. On a January morning, Judge Dan Aaron Polster of the Northern District of Ohio made his opening remarks to lawyers for nearly 200 municipal governments gathered in his Cleveland courtroom. He wanted the national opioid crisis resolved with a meaningful settlement within a year, proclaiming, "We don't need briefs and we don't need trials."

That year is up.

Far from being settled, the litigation has ballooned to 1,548 federal court cases, brought on behalf of cities and counties, 77 tribes, hospitals, union benefit funds, infants with neonatal abstinence syndrome and others — in total, millions of people. With a potential payday amounting to tens of billions of dollars, it has become one of the most complicated and gargantuan legal battles in American history.

With settlement talks sputtering, the judge has signed off on a parallel track involving, yes, briefs, focused on, yes, trial. He will preside over three consolidated Ohio lawsuits in what is known as a "bellwether," or test case. The array of defendants include Purdue Pharma, Mallinckrodt PLC, CVS RX Services Inc. and Cardinal Health, Inc. That jury's verdict could determine whether the parties will then negotiate in earnest or keep fighting.

*[Like the Science Times page on Facebook. | Sign up for the Science Times newsletter.]*

The trial date has already been postponed twice. It is now scheduled for Oct. 21.

"I knew this would be complex and challenging," Judge Polster said in an interview, "but it turned out to be far more so than I envisioned."

Unlock more free articles.
Create an account or log in

To help sort through the complexity, here are some important developments and what they mean:

## Stunning evidence from D.E.A. records

Manufacturers, distributors and pharmacies are supposed to track and report prescription opioids to the Drug Enforcement Administration and raise alarms when orders seem suspicious.

After considerable legal skirmishing, the D.E.A. complied with orders from Judge Polster and turned over more than 400 million lines of data. It's a detailed history, from 2006 through 2014, showing how many opioids were made by each manufacturer, trucked by each distributor and sold in pharmacies across the country.

The plaintiffs have long said that the companies deliberately looked the other way at the improbable quantities. But the lawyers did not have the hard numbers in hand to bolster their claims.

Now they do.

For the time being, the judge will not release the data to the public. But a passage from a congressional report gives a sense of the granular information in the data: during 10 months in 2007, one distributor, McKesson, shipped three million prescription opioids to a single pharmacy in a West Virginia town with 400 residents.

The data has turned out to be a modest help to some of the defendant companies, too: because the D.E.A. reports show that certain medications were not sold in large quantities in some communities, companies that make and distribute them have been dropped from a few cases. In the Cuyahoga County, Ohio lawsuit, for example, the Kroger Company, which owns grocery stores that include pharmacies, was dropped because they turned out not to have a location in the area.

## Going to trial is a win for plaintiffs

In a 39-page decision last month, Judge Polster shot down the drug industry's efforts to dismiss the Ohio trial. Instead, he gave the lawyers the go-ahead to test just about every legal theory the plaintiffs raised.

They include: that the companies conspired; committed fraud; were negligent; violated public nuisance laws — this last being a relatively recent, novel way for communities to redress health crises.

Of course, legal theory is one thing. Next comes the hard part: the plaintiffs will actually have to prove those allegations to a jury.

## The companies demand personal medical records

Typically, patients who sue for medical malpractice or product liability must turn over their own medical records as proof. They forfeit conventional privacy rights.

Here, the overwhelming majority of plaintiffs are government entities, not individuals. They are seeking to be reimbursed for the accumulated costs of drug addiction and its collateral damage. The defendants want them to produce precise evidence showing how those costs are calculated, including the chain of events — for example, from a drug's development, to its delivery, to a pharmacy-filled prescription to, eventually, bills from hospitals and others.

That means the drug industry is asking for patients' records and for every prescription the plaintiffs deemed medically "suspicious." The plaintiffs are pushing back, saying that the depleted municipal budgets for health, social services and law enforcement paint a more telling picture.

But they are giving ground.

The plaintiffs have now turned over millions of coded insurance claims connected to opioids. The fight has moved to the scope and quantity of patients' medical records.

## Meanwhile, the plaintiffs pursue their own paper chase

At the same time, plaintiffs are seeking the internal documents from the pharmaceutical industry pertaining to development, marketing and sales strategies.

They are also looking for documents showing what efforts the companies made to prevent their drugs from being illegally diverted. Years ago, some companies settled cases with promises to take such steps. The plaintiffs want to know whether they actually did so.

Defense lawyers say they have already handed over roughly 67 million documents.

## Drugstores could be held responsible for black-market fentanyl

A knee-surgery patient goes home with opioids. His teenage son finds the pills in the bathroom medicine cabinet and starts down a jagged road that ends in heroin addiction.

Should the companies that made, distributed and sold the prescription painkillers be liable?

What if the son sold them to a friend who turned to street drugs and overdosed? Are the drug companies responsible then?

Multiply these examples by many years and generations of analogous scenarios. Now tabulate the accumulating drain on civic budgets for emergency responders; hospitals; incarceration; drug courts; rehab; mental health services; child welfare.

Whether the companies should have foreseen the growth of an illicit second market — including pills, heroin and fentanyl — is among the knotty questions being addressed.

Right now, Judge Polster, who is only ruling on the Ohio bellwether cases, says yes.

But to make matters even more twisty: if more bellwethers go to trial, the answers to these and numerous other questions may differ, depending on the jurisdiction.

## Why drug companies could have an upper hand

Lawyers on both sides agree: This litigation presents a slew of novel legal issues.

If the bellwether ends in a victory for plaintiffs, appeals courts, increasingly filled with conservative judges, would be unlikely to uphold all of Judge Polster's rulings on these untested legal questions, much less a whopping, emotional jury award. Complexity favors the defense.

And in settlement negotiations, the long game is the defense's best friend: they can afford to drag this out. Typically, the longer it slogs on, the more the final tab gets driven down.

## But don't count out the plaintiffs

According to Andrew S. Pollis, a litigation expert who teaches at Case Western Reserve Law School in Ohio, the plaintiffs have advantages, too.

"Judge Polster's unusual level of commitment to settlement" is potent, he said. The judge is still pushing for a relatively swift resolution, replete with directed funds to help remedy the crisis and establish prevention measures.

The judge's biggest stick that could drive defendants to the bargaining table is the bellwether trial, with its looming date. A trial could not only unleash far more money than a settlement would, but the companies' documents currently under seal would become glaringly public, telling a more complete story of the relationship of the defendants to the crisis.

And, to that point, Mr. Pollis added: Don't discount the leveraging power of public perception and pressure, which does bear down on the defense — "especially since the plaintiffs are, in effect, all of us."

## But wait! There's more!

The defendants want a global settlement — a comprehensive agreement that will indemnify them against further lawsuits. The multidistrict litigation, with all the federal cases, is positioned for that goal.

But to achieve it, Judge Polster needs cooperation from state courts. There are about 332 other cases that have been filed in state courts. Coordinating data sharing between the state and federal cases is a feat unto itself. Indeed with Purdue documents from the federal litigation, Massachusetts has moved ahead with its own case; over Purdue's objections, the Massachusetts judge has made public far more than Judge Polster has.

So there's an ongoing baroque court dance between Judge Polster and the states. He cannot be perceived as a big-footer. The state judges must be seen as independent. And yet Judge Polster needs cooperation from the states to achieve that global settlement.

In a recent interview, Judge Polster repeatedly emphasized, "I don't control the state court judges or the attorneys general but I very much appreciate their participation. They are indispensable."

Eyes will be on the first trial in another state, scheduled to start before Judge Polster's: The State of Oklahoma v. Purdue Pharma, currently set for May 28.

Jan Hoffman is a health behaviors reporter for Science, covering law, opioids, doctor-patient communication and other topics. She previously wrote about young adolescence and family dynamics for Style and was the legal affairs correspondent for Metro.  @JanHoffmanNYT

A version of this article appears in print on Feb. 1, 2019, Section A, Page 21 of the New York edition with the headline: Looking for Someone To Clean Opioid Mess