# EXHIBIT E

The Christian Science Monitor

# An unprecedented effort to stem opioid crisis – and the judge behind it

**WHY WE WROTE THIS**

*Should courts be "a problem-solving institution," as the judge at the heart of the largest opioid litigation in the United States maintains? With a complex problem like the opioid epidemic, Judge Daniel Polster says, the danger is that waiting to come up with a perfect solution can become an excuse to do nothing.*



Christa Case Bryant/The Christian Science Monitor | Caption

*May 9, 2018*

## TWO WAYS TO READ THE STORY

**QUICK READ**     **DEEP READ** ( 9 MIN. )

By **Christa Case Bryant**, Staff writer
**Henry Gass**, Staff writer

CLEVELAND AND SAN ANTONIO, TEXAS

More people died from drug overdoses in Ohio in 2016 alone than were killed in the 9/11 terrorist attacks. Last year, the opioid-driven trajectory continued, with Ohio seeing a nearly 40 percent increase in overdoses.

Now a federal judge in Cleveland sees an opportunity to do something about it, and he is seizing it with gusto.

"Ordinary people can do extraordinary things if they step up," says Judge Daniel A. Polster in an interview in his 18th-floor Federal Court House office overlooking Cleveland. "It's not a failure if you don't succeed; it's a failure if you don't try."

Judge Polster has found himself at the helm of an unprecedented legal battle over prescription opioids that pits hundreds of American communities against drug companies. He doesn't see his role as referee in a judicial match between archenemies, but rather as a mediator. He views federal court as "a problem-solving institution" and is encouraging all sides to come together to stem the tide of addiction and overdoses, which have led to the deaths of more than 350,000 Americans and cost the country an estimated $1 trillion.

"The one thing that I think everyone can agree upon is no one wanted or intended millions to get addicted and no one wanted or intended 50,000 to 60,000 to die every year," says the judge, who was appointed by former President Bill Clinton. "We all benefit if you can turn the trajectory down."

On Thursday, the key players will reconvene for a settlement conference, which could indicate how much progress has been made.

Some 700 opioid lawsuits filed in federal courts across the country have been consolidated into one legal behemoth known as a multi-district litigation (MDL). This is one of the most complicated MDLs in the history of the legal tool, introduced more than 50 years ago by Congress.

The approach could save a great deal of money and time in litigating the opioid crisis, in which roughly 150 Americans are dying per day. But it does not satisfy everyone's sense of justice. MDLs, which overwhelmingly favor settlements, lack the transparency and public accountability of a trial, for one, and there are ethical concerns over the small community of lawyers who work the cases. There are also questions over whether tackling complicated and far-reaching social issues should be left to elected representatives.

The judiciary, after all, is not designed to be a proactive institution. The limited accountability of federal judges, who are not elected but rather appointed for life, is supposed to be balanced by a narrow remit of enforcing existing laws, not crafting or revising policies.

"There's always a lingering question about: Is this a job for the courts to do, or is it something the legislature should be doing?" says Elizabeth Burch, a mass litigation expert at the University of Georgia Law School.

On the other hand, the courts have to deal with cases brought before them – sometimes because of gaps left by the legislative and executive branches.

"The court system, I would say, is the default system when Congress and the administrative agencies have failed to act," says Judge Jack B. Weinstein, a Lyndon Johnson appointee who has presided over some of the most high-profile MDLs in American legal history including one involving Agent Orange and Vietnam War veterans.

## To make an MDL

MDLs have existed as a legal instrument since the 1960s, when an antitrust scandal in the American electrical industry saw more than 1,900 separate civil actions filed in federal courts.

That prompted Congress to pass a law creating the MDL process, which allows for similar lawsuits filed in federal courts nationwide to be brought together before a single judge. A special panel of seven federal judges who specialize in mass litigation meet bimonthly to decide which cases to consolidate, and then ask a federal judge whether he or she would be willing to take it on.

MDLs have become increasingly common since 2002, jumping from 16 percent of the federal courts' civil caseload to 39 percent. Notable MDLs include the Volkswagen emissions scandal, former football players suing the National Football League over brain injuries, and US military veterans citing health problems linked to the use of Agent Orange in Vietnam.

Polster, a Harvard-educated lawyer with 20 years' experience as a federal judge, was a natural pick for the opioids MDL. Not only has he presided over two other such cases in the past, but he's also located in one of the worst-hit areas of the nation. It's hit close to home for him, too; his friend's daughter died of an overdose.

"I don't think we could have a better judge in the opioid litigation than Judge Polster," says Jayne Conroy of Simmons Hanly Conroy, one of the plaintiff law firms leading the MDL. "He is so cognizant of the epidemic."

Every MDL is complex, but this one is particularly so. The plaintiffs range from individuals to whole towns, counties, and states. Defendants span the opioids supply chain, from major drug manufacturers like Purdue Pharma and drug distributors like McKesson, to drug retailers like CVS and Walgreens. Even individual doctors are defendants.

These plaintiffs are also making a variety of claims against the defendants, from falsely marketing drugs to

foisting excessive costs on jurisdictions for law enforcement and emergency services.

This complexity is likely to make settlements that much harder to achieve, which demands more of Polster – but also gives him more influence over the outcome of the case than normal.

"The court has no specific rules," says Adam Zimmerman, an associate professor at Loyola Law School in Los Angeles. "It just has to kind of go on instinct of how to manage all these players with different interests in a settlement."

## Go to settle, or go to trial?

At the first settlement hearing for the opioids MDL, Polster came out swinging.

"My objective is to do something meaningful to abate this crisis, and to do it in 2018," he said.

"You often don't see judges talking so frankly and so early," says Professor Zimmerman, who is now drawing on Polster's comments from that hearing to teach his students. "I think there are good reasons to allow the litigation to play out a little bit before the parties really know how to talk settlements."

While it is unusual for an MDL to judge to want to settle the litigation that quickly, that was not how MDLs were originally intended to go.

The MDL process was supposed to streamline only the pretrial phases before sending each case back to the court it had originally been filed in. Over the decades, however, it has become routine for cases sent to an MDL judge to never return. On average, more than 90 percent of cases in an MDL end in a settlement.

That has raised the question that MDL judges may be exceeding their authority by pressing for settlements. MDL judges tend to disagree. Judge Weinstein, the Johnson appointee, is one of the most prominent.

Talking with all the parties and examining all the evidence is a years-long process, and over the course of those years the judge becomes familiar not only with the details of the case but also with the people involved.

"If I'm the judge who has these cases, I should try to settle them," says Weinstein, who serves in the Eastern District of New York.

Since Polster's January hearing, he has walked back his demands for settlements this year. Last month he picked three Ohio-based cases to serve as bellwether trials: the city of Cleveland, the surrounding Cuyahoga County, and Summit County, home to Akron. That combined trial is set for March 2019.

Other plaintiffs in the MDL are anxious to get a trial, too.

Mayor Steve Williams of Huntington, W.Va., after hearing the drug distributors and manufacturers explain the flow of parties involved in the crisis, came away with a sense of resolve.

"In the midst of all that, there was not a single mention of those of us who are left to clean up their crap," says Mayor Williams. He cited the strain on first responders and the economic toll the opioid crisis has taken on cities like Huntington, which is one of the hundreds of plaintiffs in the MDL and has estimated the crisis's annual toll on the city at more than $100 million. "And that just said to me very clearly, that we have to have our day in court."

Paul T. Farrell, Jr., one of the co-leads in the opioid MDL, whose coalition of law firms represents hundreds of the plaintiffs, says he is hopeful that the county surrounding Huntington will be included in a second round of bellwether trials announced in August.

But some are eschewing the MDL altogether. Oklahoma Attorney General Mike Hunter, who had secured the first trial date in the opioid crisis before Polster came along, wants Purdue Pharma and the other drugmakers named in the suit to be tried before a jury of Oklahomans. The lawsuit accuses drugmakers of deliberately misrepresenting the risk of addiction to dramatically increase sales of prescription opioids, causing "catastrophic" damage to the state.

"We intend to hold the companies accountable, and the recovery that our state needs to make from this epidemic needs to be expensed to the companies that caused the damage," he said in a phone interview.

Thanks to an order from Polster, Mr. Farrell has obtained closely held records from the Drug Enforcement Agency's ARCOS database detailing every opioid pill transaction from 2006-14, tracing the chain of distribution from drug manufacturer to drug distributor to pharmacy for six states: Ohio, West Virginia, Michigan, Illinois, Alabama, and Florida. This week the judge expanded that order to include every state, says Farrell, who adds that the DEA is to comply by May 30.

## Problem areas

Some mass litigation experts are concerned that attorneys in MDLs may not always have the best possible outcome for their client as their main objective.

Professor Burch has studied the appearance of "repeat players" in multidistrict litigation – where a small group of law firms representing plaintiffs and defendants often hold outsize influence over settlement negotiations. In every MDL a handful of attorneys are chosen to "lead" – act as coordinators for the hundreds of litigants. In analyzing 73 MDLs, she found that 50 attorneys occupied 30 percent of all plaintiff-side leadership positions, and that 16 percent of the law firms involved held nearly 54 percent of all leadership positions. On the defense side, repeat player firms held 82.3 percent of the available leadership roles.

Judges often appoint these attorneys to leadership positions because of their previous experience in MDLs, but that creates a snowballing effect whereby a small group of attorneys gain disproportionate experience – and thus disproportionate influence.

With the same groups of attorneys often working with each other on different MDLs, conflicts of interest could arise.

"If I am consistently part of a working group with the same attorneys on the defense side, that becomes my primary community of interest, so the clients become sort of secondary," says Burch.

But Habib Nasrullah, a partner at Wheeler Trigg O'Donnell LLP in Denver who has represented defendants in several MDLs, says having a small community of expert attorneys fosters a positive element of collaboration.

In the mass litigation context, this close relationship can help defense lawyers by keeping frivolous claims out of the MDL. The more sophisticated plaintiffs lawyers "want to get the money to the people who deserve it, [and] if we're going to pay money we only want to pay it to people who deserve it," says Mr. Nasrullah. And when it comes to dealing with the many claims that aren't frivolous, he adds, "there's almost a necessity to work together to create a structure for the settlement."

Burch also has some concerns about the long-term implications of these settlements, however.

The 1998 settlement between 46 states and four of America's biggest tobacco companies, for example, included substantive policy changes. Cartoons marketing cigarettes to children are now a thing of the past, but the protracted payments for damages means "states have been beholden to this stream of income ... so now they have a stake in long-term viability of the tobacco industry."

"That's the worry," she adds. "What problems are we trying to solve today, and what problems could we be creating for tomorrow?"

## Avoiding 'an excuse to do nothing'

Polster won't speak about the details of the national prescription opioid litigation, but says his general philosophy on mediation was sparked by observations his commercial litigator wife, Deborah Coleman, shared with him about the value of a judge sitting down with parties.

"A trial is a fairly crude, blunt-edged instrument," he says – good for moving money from one side to another, but not much else.

Polster, whose Jewish faith teaches *tikkun olam* – partnering with God to repair the world – says that while many disputes are framed in terms of money, it's often more about feelings. A mediator who is an empathetic listener can help parties air those feelings – and then move past them.

"I sometimes feel like a rabbi or priest or therapist," says the judge, recounting how clients have cried or yelled while discussing their case with him. It's a different sort of day in court, but often more cathartic, he says, than sitting through a trial, where the lawyers do most of the talking. And having a mediator hear them out often frees them to move forward, he says, rather than remaining "a prisoner of the past."

Nobody thinks MDLs are a perfect tool for solving mass litigation cases, let alone solving urgent social issues like the opioid crisis. But, says Polster, waiting to come up with a perfect solution to a complex problem is an excuse to do nothing.

"So if you have a complex problem, you say, 'Well, I think there are some steps that we can take to move forward,' " he says. "And then you try and take those steps.... That's what I think I've challenged people to do."

  

 

About these ads

© The Christian Science Monitor.All Rights Reserved. Terms.Privacy Policy.

1 of 5 stories this month   >   Get unlimited stories