Highly Confidential - Subject to Further Confidentiality Review

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
                         -  -  -

  IN RE:  NATIONAL           :   HON. DAN A.
  PRESCRIPTION OPIATE        :   POLSTER
  LITIGATION                 :
                             :
  APPLIES TO ALL CASES       :   NO.
                             :   1:17-MD-2804
                             :

                   - HIGHLY CONFIDENTIAL -

      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                         VOLUME I

                         -  -  -

                    January 23, 2019

                         -  -  -

                     Videotaped deposition
  of RON R. KUNTZ, taken pursuant to
  notice, was held at the law offices of
  Drinker Biddle & Reath, 105 College Road
  East, Princeton, New Jersey, beginning at
  9:24 a.m., on the above date, before
  Michelle L. Gray, a Registered
  Professional Reporter, Certified
  Shorthand Reporter, Certified Realtime
  Reporter, and Notary Public.

                         -  -  -

            GOLKOW LITIGATION SERVICES
       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
```

1    development director; is that correct?
2         A.    That's correct.
3         Q.    And you were new product
4    development director between
5    February 1997 and January 2000?
6         A.    Yes, that's correct.
7         Q.    This document here in front
8    of us is dated July 28, 2000?
9         A.    Yes.
10        Q.    You can set that document
11   aside.
12        A.    Okay.
13               (Document marked for
14           identification as Exhibit
15           Janssen-Kuntz-4.)
16   BY MS. BURNS:
17        Q.    I'm now handing you what's
18   been marked as Exhibit 4.  This document
19   is Bates-labeled JAN-MS-00456196.
20               This document is dated,
21   easily.  It's August 28, 2000.  So about
22   a month after -- exactly a month after
23   that initial e-mail went out from Michael
24   Grissinger.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Mm-hmm.

2        Q.    And this has a Project Pearl
3   call plan.  And it appears to be joint
4   JNJ/Purdue.

5            Does this ring a bell?

6        A.    Yes, I do remember this now.

7        Q.    You do remember this?

8        A.    Yes.

9        Q.    Excellent.  Do you need a
10   moment to take a closer look at it?

11        A.    Yeah, just one minute.

12        Q.    Sure.

13        A.    Just to refresh.

14        Q.    Ready?

15        A.    Yes.

16        Q.    Okay.  So is this -- this
17   looks to me like a summary sheet of a
18   call.  Is that an accurate understanding?

19        A.     I don't know if it's a
20   summary sheet of a call, but I would
21   describe it more as a summary sheet of
22   someone's ideas of what Project Pearl
23   could look like.

24        Q.    Do you know who prepared

```
 1   this document?
 2        A.    I don't.  I don't know
 3   whether, you know, someone in Mike's
 4   group or, you know, in our conversations
 5   with him.
 6        Q.    When you say our
 7   conversations with him, who are you
 8   referring to when you say "our"?
 9        A.    Other members within
10   business development with the individuals
11   that were listed here.  Lou Ferrari.
12   We -- You know, I'm not sure about Barry
13   Fitzsimons.  I'm not sure what role Barry
14   played back then.
15        Q.    You are referring to the
16   names listed on Exhibit 4?
17        A.    The original e-mail.  But
18   I -- after seeing this, I do remember
19   having discussions about this idea.
20        Q.    Do you understand this to be
21   an internal J&J document that was not
22   shared with Purdue?
23        A.    I don't know if it was
24   shared with Purdue or not.  That part I
```

Highly Confidential - Subject to Further Confidentiality Review

1    don't remember.
2              What I remember is having
3    the conversation about the likelihood of
4    having a joint call plan that each
5    company would work with and sell their
6    products.
7         Q.   I see.  I was -- I was
8    thinking of call being like a phone call.
9    But now I recognize that call is
10   referring to sales rep calls.
11        A.   Yes.
12        Q.   All right.  There, we got my
13   blond moment over for the day, hopefully.
14             All right.  So the Project
15   Pearl call plan is -- is set forth in
16   these bullet points below where it says,
17   "Mirror Purdue and Janssen sales force."
18             Do you have any
19   understanding of what "mirror Purdue and
20   Janssen sales force" means?
21        A.   Yes.  They were looking at,
22   you know, is there a possibility of
23   Janssen and Purdue working together and
24   taking their sales forces and looking at

1  how each sales force, the territories
2  that the sales representative covers, and
3  is there a way to match those up to where
4  there might be a Janssen and a -- and a
5  Purdue salesperson in the same
6  geographical territory.  That's what they
7  mean by mirror.
8         Q.   I see.  So that they --
9  there would be like a combination
10 territory where there would be a Purdue
11 and Janssen reps in each territory,
12 that -- that would be combo territory?
13        A.   That was their theory.
14        Q.   Okay.  And -- and one of the
15 benefits of this to Janssen or Johnson &
16 Johnson would be that fewer Johnson &
17 Johnson reps would be needed?
18        A.   It looks that way, yes.
19        Q.   Okay.  It says in the next
20 bullet points that "all five pain
21 products carried by all representatives."
22             Can you tell me what you
23 understand that to mean?
24        A.   That -- the idea that this

Highly Confidential - Subject to Further Confidentiality Review

1 individual had was that both Purdue and
2 Janssen sales representatives would
3 educate physicians about OxyContin,
4 Palladone, Ultracet, Ultram SR and
5 Duragesic.
6     Q.   And in your experience are
7 sales reps generally capable of
8 transitioning between different products
9 within a franchise?
10         MR. LIFLAND:  Object to the
11     form of the question.
12         THE WITNESS:  In theory,
13     because it is a similar
14     therapeutic area, they would have
15     the skills and -- and the -- the
16     ability to talk about multiple
17     products with a particular
18     customer.
19         Or if the customer -- you
20     know, whatever customer they were
21     talking to, they might rotate and
22     talk about these two products this
23     trip.  Then next trip they might
24     talk about two other products.

```
 1            And another trip would be the
 2       fifth and the first.  And it would
 3       rotate.  That was the theory
 4       behind this idea.
 5   BY MS. BURNS:
 6       Q.   Are all of these drugs
 7   opioids?
 8       A.   Yes, they are.
 9       Q.   Which of these drugs are --
10   you listed OxyContin.  That's a Purdue
11   drug, correct?
12       A.   Correct.
13       Q.   Palladone?
14       A.   That's a Purdue drug.
15       Q.   Ultram SR?
16       A.   Yes.
17       Q.   Purdue?
18       A.   No, that's us.
19       Q.   Sorry.  Sorry.  And
20   Duragesic is J&J?
21       A.   J&J and Janssen.  And
22   Ultracet is J&J.
23       Q.   What does it mean here when
24   it says, "Rotation of products would
```

Highly Confidential - Subject to Further Confidentiality Review

1  develop on three to four-month cycles
2  according to need?
3        A.   That's where, depending on
4  the customer, the physician, the nurse
5  practitioner, that -- whoever the
6  customer was -- not nurse practitioner so
7  much.  Whoever the physician was, you --
8  they might be educating them about, as an
9  example, OxyContin and Palladone first.
10 And then the next trip they may come in
11 and -- and talk about Duragesic and
12 Ultram SR.  And then the third, you know,
13 trip they -- they might just talk about
14 acute pain where they would talk about
15 Ultracet.
16            So the conversation and the
17 product mix would -- would change,
18 because I believe that this was around
19 the same time that we were thinking of,
20 or we were in the process of developing
21 Ultram SR product together, and so the
22 idea was if we developed Ultram SR
23 together, would there be an interest by
24 both companies to develop such a plan

1    that we would have our sales forces be
2    educated about each other's products and
3    sell them.  I can tell you, it never
4    happened.
5           Q.    Let's go to the next page.
6           A.    Mm-hmm.
7           Q.    So here there is a
8    breakdown, it looks like of sales --
9    sales force numbers targeting different
10   types of practitioners?
11          A.    Mm-hmm, yes.
12          Q.    This one doesn't really
13   break down where the sales force numbers
14   would come from, whether it's from Purdue
15   or J&J.  It's just gives N equals 350 or
16   100, correct?
17          A.    Correct.
18          Q.    Can you give me an idea of,
19   if you know, of the types of materials
20   that a sales representative might provide
21   to a primary care practitioner about
22   Duragesic in 2000?
23          A.    I don't know what they would
24   be sharing with a primary care.

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2                    CERTIFICATE
 3
 4
 5           I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
             It was requested before
 8   completion of the deposition that the
     witness, RON R. KUNTZ, have the
 9   opportunity to read and sign the
     deposition transcript.
10
11
12      _____
        MICHELLE L. GRAY,
13      A Registered Professional
        Reporter, Certified Shorthand
14      Reporter, Certified Realtime
        Reporter and Notary Public
15      Dated:  January 28, 2019
16
17
18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```