# EXHIBIT A

EXECUTION COPY

**FRAMEWORK AGREEMENT**
Dated March 18, 2013
by and among
**AMERISOURCEBERGEN CORPORATION,**
**WALGREEN CO.**
and
**ALLIANCE BOOTS GMBH**

[[3397517]]

# TABLE OF CONTENTS

**Page**

Article I

Warrants Issuance; Closing

1.1    Warrants Issuance ...................................................................................2
1.2    Closing ....................................................................................................2
1.3    Interpretation ..........................................................................................3

Article II

Representations and Warranties

2.1    Disclosure ...............................................................................................4
2.2    Representations and Warranties of the Company ....................................6
2.3    Representations and Warranties of Walgreens and Alliance Boots.......11

Article III

Covenants

3.1    Efforts ...................................................................................................13
3.2    Public Announcements ..........................................................................17
3.3    Expenses ................................................................................................17
3.4    Sufficiency of Authorized Common Stock ...........................................18
3.5    Pursuit of Other Opportunities .............................................................18
3.6    Non-Solicit ............................................................................................18
3.7    Financing Cooperation ..........................................................................19

Article IV

Additional Agreements

4.1    Additional Equity Purchases.................................................................21
4.2    Acquisition for Investment ...................................................................24
4.3    Legend....................................................................................................24
4.4    Anti-takeover Provisions and Rights Plan ............................................25

Article V

Miscellaneous

5.1    Termination of This Agreement; Other Triggers...................................25
5.2    Amendment............................................................................................30

[[3397517]]

| | | |
|---|---|---|
| 5.3 | Waiver of Conditions | 30 |
| 5.4 | Counterparts and Facsimile | 31 |
| **5.5** | **Governing Law; Submission to Jurisdiction; WAIVER OF JURY TRIAL** | **31** |
| 5.6 | Notices | 31 |
| 5.7 | Entire Agreement, Etc | 33 |
| 5.8 | Definitions of "subsidiary" and "Affiliate" | 33 |
| 5.9 | Assignment | 34 |
| 5.10 | Severability | 34 |
| 5.11 | No Third Party Beneficiaries | 34 |
| 5.12 | Specific Performance | 34 |

## LIST OF ANNEXES

ANNEX A:          Shareholders Agreement

ANNEX B-1:      Form of Warrant 1

ANNEX B-2:      Form of Warrant 2

[[3397517]]

## INDEX OF DEFINED TERMS

| Term | Page |
|---|---|
| Additional Open Market Shares | 21 |
| Additional Opportunity | 18 |
| Affiliate | 31 |
| Aggregate Additional Open Market Shares | 21 |
| Agreement | 1 |
| Alliance Boots | 1 |
| AmerisourceBergen Drug | 1 |
| Anti-takeover Provisions | 10 |
| Antitrust Laws | 8 |
| Bankruptcy Exceptions | 8 |
| Beneficial Owner | 13 |
| Beneficial Ownership | 12 |
| Beneficially Own | 13 |
| Business Day | 4 |
| Closing | 2 |
| Commission | 5 |
| Common Stock | 1 |
| Company | 1 |
| Company Benefit Plan | 11 |
| Company Disclosure Letter | 6 |
| Company Stock Plans | 6 |
| Confidentiality Agreements | 30 |
| Control | 31 |
| Controlled | 31 |
| Controlling | 31 |
| conversion | 22 |
| convertible securities | 22 |
| Debt Financing | 20 |
| Designees | 21 |
| Effect | 4 |
| Exchange Act | 5 |
| FW JV | 1 |
| GAAP | 4 |
| Generic Pharmaceuticals Purchasing Services Agreement | 1 |
| Governmental Entity | 8 |
| HSR Act | 8 |
| HSR Filing Date | 13, 14 |
| Initial Antitrust Clearance | 15 |
| Initial Antitrust Filings | 14 |
| Initial Communications Materials | 17 |
| Initial Equity Transaction | 4 |
| Initial Filing Transaction | 14 |
| Initial Number | 22 |
| Initial Open Market Shares | 21 |

[[3397517]]

Investors ...................................................................................................................... 4
IOMS Rights Holder ................................................................................................... 21
Key Company Employee ............................................................................................ 18
Key Walgreens/Alliance Boots Employee ................................................................ 19
Material Adverse Effect ................................................................................................ 4
Other Antitrust Clearance .......................................................................................... 15
Other Antitrust Filings ............................................................................................... 14
Other Equity Transactions ......................................................................................... 14
Permitted Transactions ............................................................................................... 22
Post-Issuance Adjustment ........................................................................................... 22
Potential Repurchase Increase of Equity Percentage ................................................. 4
Preferred Stock .............................................................................................................. 6
Previously Disclosed ..................................................................................................... 5
Purchase Approvals ..................................................................................................... 12
Rx Distribution Agreement .......................................................................................... 1
SEC Reports ................................................................................................................... 5
Second Equity Transaction ........................................................................................... 4
Securities Act ................................................................................................................. 6
Shareholders Agreement ............................................................................................... 1
SOX .............................................................................................................................. 10
Subject Issuance .......................................................................................................... 22
subsidiary .................................................................................................................... 30
Threshold Notice ......................................................................................................... 23
Threshold Period ......................................................................................................... 23
Transaction Documents ................................................................................................ 5
Transaction Litigation ................................................................................................ 16
Transaction Rights Agreement ..................................................................................... 1
Ultimate Standstill Level .............................................................................................. 4
Walgreens ...................................................................................................................... 1
Walgreens/Alliance Boots Material Adverse Effect .................................................. 12
Warrant 1 ....................................................................................................................... 2
Warrant 1 Shares ........................................................................................................... 2
Warrant 2 ....................................................................................................................... 2
Warrant 2 Shares ........................................................................................................... 2
Warrant 2 Transferability Event ................................................................................. 26
Warrant 2 Transferable Portion .................................................................................. 26
Warrant Shares .............................................................................................................. 2
Warrants ......................................................................................................................... 2
Warrants Issuance .......................................................................................................... 2
WBAD ............................................................................................................................ 1

[[3397517]]

**FRAMEWORK AGREEMENT**, dated March 18, 2013 (this "Agreement"), by and among AmerisourceBergen Corporation, a Delaware corporation (the "Company"), Walgreen Co., an Illinois corporation ("Walgreens"), and Alliance Boots GmbH, a private limited liability company incorporated under the laws of Switzerland, having its registered office at Baarerstrasse 94, CH 6300 Zug, Switzerland and registered in the Register of Commerce and Companies of the Canton of Zug under No.CH-170.4.007.953.1 ("Alliance Boots").

**RECITALS:**

**WHEREAS**, subject to the terms and conditions hereof, each of the Company, Walgreens and Alliance Boots have determined it to be advisable and in the best interests of their respective companies and stockholders to enter into certain commercial and collaboration arrangements as further set forth herein, including by entering into, at the Closing, that certain (a) Pharmaceutical Purchase and Distribution Agreement, by and between AmerisourceBergen Drug Corporation, a Delaware corporation and wholly owned subsidiary of the Company ("AmerisourceBergen Drug") and Walgreens, in the form previously agreed by the Company and Walgreens (the "Rx Distribution Agreement"), and (b) Generic Pharmaceuticals Purchasing Services Agreement, by and between AmerisourceBergen Drug and Walgreens Boots Alliance Development GmbH, a private limited liability company incorporated under the laws of Switzerland, having its registered office at Untermattweg 8, CH3027 Bern, Switzerland and registered in the Register of Commerce and Companies of the Canton of Bern under No CH-036.4.054.841-8, jointly owned by Walgreens and Alliance Boots ("WBAD"), in the form previously agreed by the parties thereto (the "Generic Pharmaceuticals Purchasing Services Agreement").

**WHEREAS**, the respective boards of directors of each of the parties hereto has unanimously approved this Agreement, each of the other Transaction Documents and the transactions contemplated hereby and thereby.

**WHEREAS**, in connection with the transactions contemplated hereby, and subject to the terms and conditions hereof, (a) the Company desires to issue to Permitted Transferees (as defined in the Shareholders Agreement) of Walgreens and Alliance Boots, and such Permitted Transferees desire to acquire from the Company, at the Closing, certain warrants to purchase shares of the Company's common stock, $0.01 par value per share (the "Common Stock"), and (b) the parties desire to agree upon certain rights of Walgreens and/or Alliance Boots to acquire additional shares of Common Stock.

**WHEREAS**, the parties hereto will, at the Closing, enter into a shareholders agreement, in the form attached hereto as Annex A (the "Shareholders Agreement"), providing for certain corporate governance and other matters with respect to the Company and certain other agreements between the Company, Walgreens and Alliance Boots.

**WHEREAS**, on the date hereof, Walgreens, Alliance Boots, Walgreens Pharmacy Strategies, LLC, an Illinois limited liability company and wholly owned Subsidiary of Walgreens, Alliance Boots Luxembourg S.à r.l., a private limited liability company (société à responsabilité limitée) incorporated under the laws of the Grand Duchy of Luxembourg and wholly owned Subsidiary of Alliance Boots, and WAB Holdings LLC, a Delaware limited liability company, jointly owned, directly or indirectly, by Walgreens and Alliance Boots (the

"FW JV"), entered into that certain Transaction Rights Agreement (the "Transaction Rights Agreement"), providing for certain rights and obligations of each of Walgreens and Alliance Boots with respect to the transactions contemplated herein and in the other Transaction Documents.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

**Article I**
**WARRANTS ISSUANCE; CLOSING**

1.1    Warrants Issuance.  On the terms and subject to the conditions set forth in this Agreement, the Company shall issue to such Permitted Transferee(s) (as defined in the Shareholders Agreement) of Walgreens or Alliance Boots as Walgreens and Alliance Boots shall jointly designate, and such designated Permitted Transferee(s) shall acquire from the Company, at the Closing, (a) a warrant to purchase 22,696,912 shares, subject to adjustment in accordance with its terms (the "Warrant 1 Shares"), of Common Stock in the form attached hereto as Annex B-1 ("Warrant 1"), and (b) a warrant to purchase 22,696,912 shares, subject to adjustment in accordance with its terms (the "Warrant 2 Shares" and, together with the Warrant 1 Shares, the "Warrant Shares")), of Common Stock in the form attached hereto as Annex B-2 ("Warrant 2" and, together with Warrant 1, the "Warrants")) (the issuance of the Warrants by the Company and the acquisition of the Warrants by Walgreens (or such designated Permitted Transferee(s)), the "Warrants Issuance"); provided, that 50% of each of Warrant 1 and Warrant 2 will be issued to and acquired by Alliance Boots Luxembourg S.à r.l., a wholly-owned subsidiary of Alliance Boots, and 50% of each of Warrant 1 and Warrant 2 will be issued to and acquired by Walgreens Pharmacy Strategies, LLC , a wholly-owned subsidiary of Walgreens.

1.2    Closing.

(a)    The closing of the Warrants Issuance (the "Closing") will take place at the offices of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, immediately following the execution and delivery of this Agreement.

(b)    At the Closing, the Company shall deliver:

(i)    to Walgreens (or such Permitted Transferee(s) of Walgreens or Alliance Boots as Walgreens and Alliance Boots shall jointly designate), Warrant 1 and Warrant 2, in each case as evidenced by a duly and validly executed warrant certificate dated as of the date hereof and bearing appropriate legends as hereinafter provided for;

(ii)    to Walgreens, the Rx Distribution Agreement, duly executed by the Company;

(iii)    to WBAD, the Generic Pharmaceuticals Purchasing Services Agreement, duly executed by AmerisourceBergen Drug; and

(iv)    to Walgreens and Alliance Boots, the Shareholders Agreement, duly executed by the Company.

(c)     At the Closing, Walgreens shall deliver:

(i)     to the Company, the Rx Distribution Agreement, duly executed by Walgreens; and

(ii)     to the Company and Alliance Boots, the Shareholders Agreement, duly executed by Walgreens.

(d)     At the Closing, Alliance Boots shall deliver to the Company and Walgreens the Shareholders Agreement, duly executed by Alliance Boots.

(e)     At the Closing, Walgreens and Alliance Boots shall cause WBAD to deliver to AmerisourceBergen Drug the Generic Pharmaceuticals Purchasing Services Agreement, duly executed by WBAD.

1.3     <u>Interpretation</u>.  When a reference is made in this Agreement to "Recitals," "Articles," "Sections," "Annexes," "Schedules" or "Exhibits" such reference shall be to a Recital, Article or Section of, or Annex, Schedule or Exhibit to, this Agreement unless otherwise indicated.  The terms defined in the singular have a comparable meaning when used in the plural, and vice versa.  References to "herein," "hereof," "hereunder" and the like refer to this Agreement as a whole and not to any particular section or provision, unless the context requires otherwise.  The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation."  Except as otherwise set forth therein, any references to the transactions contemplated by or in this Agreement and/or any of the other Transaction Documents, or similar references, shall be deemed to include, among other things, the Equity Transactions and the Potential Repurchase Increase of Equity Percentage; *provided* that the reference to the Potential Repurchase Increase of Equity Percentage shall not include or refer to any particular action(s) by the Company, that cause the Potential Repurchase Increase of Equity Percentage to occur and neither the foregoing nor any other provision of this Agreement or any of the other Transaction Documents shall be interpreted to require the Company, to engage in any repurchase (whether through self-tender, open market transactions or otherwise) of any shares of Common Stock or other securities, the decision with respect to which will be made by the Company in its sole discretion at the time of any such repurchase and, in any event, may require further board of director approvals or authorizations on the part of the Company; and *provided further* that nothing in this Agreement or any of the other Transaction Documents shall be interpreted to require either Walgreens or Alliance Boots, or any of their respective Affiliates, to exercise any Warrants or to purchase any Initial Open Market Shares, Additional Open Market Shares or any other shares of Common Stock or other securities, the decision with respect to which will be made by each of Walgreens and/or Alliance Boots, as applicable, in its sole discretion at the time of any such exercise, purchase or other acquisition and, in any event, may require further board of director approvals or authorizations on the part of Walgreens and/or Alliance Boots, as applicable.  No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel.  Any reference to a wholly-owned subsidiary of a person shall mean such subsidiary is directly or indirectly wholly-owned by such

person.  All references to "$" or "dollars" mean the lawful currency of the United States of America.  Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section.  The term (a) "Initial Equity Transaction" means, with respect to the Investors (as defined in the Shareholder Agreement), the acquisition in full (in one or more transactions) of the Initial Open Market Shares and the exercise in full (in one or more transactions) of Warrant 1 (as adjusted, if applicable, for the purchase of any Additional Open Market Shares pursuant to the terms of Warrant 1) and, relatedly, the issuance in full (in one or more transactions) of the Warrant 1 Shares (as adjusted, if applicable, for the purchase of any Additional Open Market Shares pursuant to the terms of Warrant 1), and/or the purchase of any and/or all (in one or more transactions) Additional Open Market Shares, (b) "Second Equity Transaction" means, with respect to the Investors, the exercise in full (in one or more transactions) of Warrant 2 and, relatedly, the issuance in full of the Warrant 2 Shares, (c) the "Equity Transactions" mean the Initial Equity Transaction and Second Equity Transaction, and (d) "Business Day" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York generally are authorized or required by law or other governmental actions to close. The term "Potential Repurchase Increase of Equity Percentage"means the increase in the aggregate Beneficial Ownership of the Investors up to the Ultimate Standstill Level (as defined in the Shareholders Agreement) as a result of share repurchases (whether through self-tender, open market transactions or otherwise) by the Company or any of its Affiliates.

## Article II
### REPRESENTATIONS AND WARRANTIES

2.1     Disclosure.

(a)     "Material Adverse Effect" means any change, effect, event, development, circumstance or occurrence (each, an "Effect") that, taken individually or when taken together with all other applicable Effects, has been, is or would reasonably be expected to be materially adverse to (i) the business, financial condition or results of operations of the Company and its subsidiaries, taken as a whole, or (ii) the ability of the Company to complete the transactions contemplated the Transaction Documents or to perform its obligations under the Transaction Documents; provided, however, that in no event shall any of the following Effects, alone or in combination, be deemed to constitute, or be taken into account in determining whether there has been, is or would be, a Material Adverse Effect: (A) any change in general economic, market or political conditions; (B) conditions generally affecting the industry in which the Company operates; (C) any change in generally accepted accounting principles in the United States ("GAAP") or applicable law; (D) any act of war (whether or not declared), armed hostilities, sabotage or terrorism, or any material escalation or worsening of any such events, national disaster or any national or international calamity; (E) any failure, in and of itself, to meet internal or published projections, forecasts, targets or revenue or earnings predictions for any period, as well as any change, in and of itself, by the Company in any projections, forecasts, targets or revenue or earnings predictions for any period (provided that the underlying causes of such failures (to the extent not otherwise falling within one of the other exceptions in this proviso)

-4-

may constitute or be taken into account in determining whether there has been, is, or would be, a Material Adverse Effect); (F) any change in the price or trading volume of the Common Stock (provided that the underlying causes of such change (to the extent not otherwise falling within one of the other exceptions in this proviso) may constitute or be taken into account in determining whether there has been, is or would be, a Material Adverse Effect); or (G) the announcement of this Agreement or the other Transaction Documents, including, to the extent attributable to such announcement, any loss of or adverse change in the relationship, contractual or otherwise, of the Company and its subsidiaries with their respective employees, customers, distributors, licensors, licensees, vendors, lenders, investors, partners or suppliers; provided, further, however, that any Effect referred to in clauses (A) through (D) may be taken into account in determining whether or not there has been a Material Adverse Effect to the extent such Effect has a disproportionate adverse effect on the Company and its subsidiaries, taken as a whole, as compared to other participants in the industry in which the Company and its subsidiaries operate (in which case any adverse effect(s) to the extent disproportionate may be taken into account in determining whether or not there has been, is or would be a Material Adverse Effect).

(b)     "Previously Disclosed" means information set forth or incorporated in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2012 or its other reports, statements and forms (including exhibits and other information incorporated therein) filed with or furnished to the Securities and Exchange Commission (the "Commission") under Sections 13(a), 14(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or under the Securities Act, in each case on or after September 30, 2012 (the "SEC Reports") (in each case excluding any disclosures set forth in any risk factor section and in any section relating to forward-looking or safe harbor statements), to the extent such SEC Reports are filed or furnished prior to the execution and delivery of this Agreement.

Each party acknowledges that it is not relying upon any representation or warranty, express or implied, not set forth in the Transaction Documents.  Each of Walgreens and Alliance Boots acknowledges, on behalf of itself and not the other, that it has had an opportunity to conduct such review and analysis of the business, assets, condition, operations and prospects of the Company and its subsidiaries, including an opportunity to ask such questions of management and to review such information maintained by the Company and its subsidiaries, in each case as it considers sufficient for the purpose of consummating the Equity Transactions and the other transactions contemplated by the Transaction Documents.  Each of Walgreens and Alliance Boots further acknowledges, on behalf of itself and not the other, that it has had such an opportunity to consult with its own counsel, financial and tax advisers and other professional advisers as it believes is sufficient for purposes of the Equity Transactions and the other transactions contemplated by the other Transaction Documents.  For purposes of this Agreement, the term "Transaction Documents" refers collectively to this Agreement, the Rx Distribution Agreement, the Generic Pharmaceuticals Purchasing Services Agreement, the Shareholders Agreement, Warrant 1, Warrant 2, and any other agreement entered into by and among the parties and/or their Affiliates on the date hereof in connection with the transactions contemplated hereby or thereby (but expressly excluding the Transaction Rights Agreement, the Limited Liability Company Agreement of the FW JV, and any other agreement solely by and among Alliance Boots, Walgreens and their respective Affiliates), in each case, as amended, modified or supplemented from time to time in accordance with their respective terms.

2.2    Representations and Warranties of the Company.  Except as Previously Disclosed or as disclosed in the disclosure letter (the "Company Disclosure Letter") delivered by the Company to Walgreens and Alliance Boots prior to the execution of this Agreement, the Company represents and warrants as of the date of this Agreement to each of Walgreens and Alliance Boots that:

(a)    Organization, Authority and Significant Subsidiaries.  The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware, with the corporate power and authority to own its properties and conduct its business in all material respects as currently conducted, and, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, has been duly qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties, or conducts any business so as to require such qualification.  Each subsidiary of the Company that is a "significant subsidiary" within the meaning of Rule 1-02(w) of Regulation S-X under the Securities Act of 1933, as amended (the "Securities Act"), and each subsidiary of the Company that is not such a "significant subsidiary" but is a party to any other Transaction Document, has been duly organized and is validly existing in good standing under the laws of its jurisdiction of organization, with the corporate or analogous power and authority to own its properties and conduct its business in all material respects as currently conducted, and, except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, has been duly qualified as a foreign corporation, limited liability company or partnership, as applicable, for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties, or conducts any business so as to require such qualification.

(b)    Capitalization.  The authorized capital stock of the Company consists of 600,000,000 shares of Common Stock of which, as of the close of business on March 15, 2013, 265,830,219 shares were issued and outstanding (including, for the avoidance of doubt, shares held in treasury and shares of restricted stock issued pursuant to compensatory equity plans of the Company or a subsidiary of the Company in effect as of the date hereof and set forth in Section 2.2(b) of the Company Disclosure Letter (the "Company Stock Plans")), and 10,000,000 shares of Preferred Stock, par value $0.01 per share (the "Preferred Stock"), of which, as of the date hereof, no shares are either designated or issued and outstanding.  As of the close of business on March 15, 2013, the Company held 34,193,830 shares of Common Stock in its treasury.  As of the close of business on March 15, 2013, no shares of Common Stock or Preferred Stock were reserved for issuance, except for 49,246,234 shares of Common Stock reserved for issuance under the Company Stock Plans (including (i) 17,350,679 shares of Common Stock reserved for issuance upon the exercise of stock options outstanding as of such date and granted under the Company Stock Plans, with a weighted average exercise price of $31.28 per share, (ii) 433,161 shares of Common Stock reserved for issuance upon the settlement of restricted stock units and performance awards outstanding as of such date and granted under the Company Stock Plans (assuming, in the case of performance awards, that applicable goals are attained at maximum level), and (iii) 4,000,000 shares of Common Stock reserved and available for issuance under the Company 2011 Employee Stock Purchase Plan).  The outstanding shares of Common Stock have been duly authorized and are validly issued and outstanding, fully paid and nonassessable, and subject to no preemptive rights (and were not

-6-

issued in violation of any preemptive rights, the Company's certificate of incorporation or by-laws, or any applicable laws).  Except as set forth above or pursuant to the Transaction Documents, there are no (A) shares of capital stock or other equity interests or voting securities of the Company authorized, reserved for issuance, issued or outstanding, (B) options, warrants, calls, preemptive rights, subscription or other rights, instruments, agreements, arrangements or commitments of any character, obligating the Company or any of its subsidiaries to issue, transfer or sell or cause to be issued, transferred or sold any shares of capital stock or other equity interest or voting security in the Company or any securities or instruments convertible into or exchangeable for such shares of capital stock or other equity interests or voting securities, or obligating the Company or any of its subsidiaries to grant, extend or enter into any such option, warrant, call, preemptive right, subscription or other right, instrument, agreement, arrangement or commitment, (C) outstanding contractual obligations of the Company or any of its subsidiaries to repurchase, redeem or otherwise acquire any capital stock or other equity interest or voting securities of the Company or (D) issued or outstanding performance awards, units, rights to receive any capital stock or other equity interest or voting securities of the Company on a deferred basis, or rights to purchase or receive any capital stock or equity interest or voting securities issued or granted by the Company to any current or former director, officer, employee or consultant of the Company.  No subsidiary of the Company owns any shares of capital stock or other equity interest or voting securities of the Company.  There are no voting trusts or other agreements or understandings to which the Company or any of its subsidiaries is a party with respect to the voting of the capital stock or other equity interest or voting securities of the Company.

(c)  <u>The Warrants and Warrant Shares</u>.  Each Warrant has been duly authorized by the Company and constitutes a valid and legally binding obligation of the Company in accordance with its terms, except as the same may be limited by the Bankruptcy Exceptions, and the Warrant Shares have been duly authorized and reserved for issuance upon exercise of the applicable Warrant and when so issued will be validly issued, fully paid and non-assessable, and free and clear of any liens or encumbrances, other than liens or encumbrances created by the Transaction Documents, arising as a matter of applicable law or created by or at the direction of Walgreens, Alliance Boots or any of their respective Affiliates.

(d)  <u>Authorization, Enforceability</u>.

(i)  Each of the Company, and each subsidiary of the Company that is a party to any other Transaction Document, has the power and authority to execute and deliver this Agreement and the other Transaction Documents, as applicable, to consummate the transactions contemplated hereby and thereby, and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance by the Company, and by each subsidiary of the Company that is a party to any other Transaction Document, of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate (or analogous) action on the part of the Company and its stockholders, or such subsidiary and its equityholders, as applicable, and no further approval or authorization is required on the part of the Company or its stockholders, or such subsidiary or its equityholders, as applicable.  This Agreement and the other Transaction Documents, assuming the due authorization, execution and delivery by the other parties hereto and thereto, are valid and binding obligations of the Company and each such

-7-

subsidiary, as applicable, enforceable against the Company and such subsidiary, respectively, in accordance with their respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity ("Bankruptcy Exceptions").

(ii)     The execution, delivery and performance by the Company, and each subsidiary of the Company that is a party to any other Transaction Document, of this Agreement and the other Transaction Documents, as applicable, and the consummation of the transactions contemplated hereby and thereby and compliance by the Company or such subsidiary, as applicable, with any of the provisions hereof and thereof, will not (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company or any of its subsidiaries under any of the terms, conditions or provisions of (x) its certificate of incorporation or by-laws (or analogous organizational documents), or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any of its subsidiaries is a party or by which it or any of its subsidiaries may be bound, or to which the Company or any of its subsidiaries or any of the properties or assets of the Company or any of its subsidiaries is subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Company or any of its subsidiaries or any of their respective properties or assets except, in the case of clauses (A)(y) and (B), for those occurrences that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(iii)     Other than (A) such notices, filings, exemptions, reviews, authorizations, consents or approvals as have been made or obtained as of the date hereof, and (B) notices, filings, exemptions, reviews, authorizations, consents or approvals as may be required under, and other applicable requirements of (1) the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), (2) any other Antitrust Laws, (3) the Exchange Act, (4) the Securities Act and (5) listing applications with the New York Stock Exchange, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any federal, state, local, domestic, foreign or supranational court, administrative or regulatory agency or commission or other federal, state, local, domestic, foreign or supranational governmental authority or instrumentality (each, a "Governmental Entity") is required to be made or obtained by the Company or any of its subsidiaries in connection with the consummation by the Company or any of its subsidiaries of the Warrants Issuance and the other transactions contemplated hereby and by the other Transaction Documents, except for any such notices, filings, exemptions, reviews, authorizations, consents and approvals the failure of which to make or obtain have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For purposes of this Agreement, "Antitrust Laws" means the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, the German Act against Restraints of Competition (Gesetz gegen Wettbewerbsbeschränkungen), as amended, and any other federal, state, local, domestic, foreign

-8-

or supranational laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or that provide for review of foreign investment.

      (e)    <u>Company Financial Statements; Internal Controls</u>.

      (i)    Each of the consolidated financial statements included in the SEC Reports (A) complied as to form, as of their respective dates of filing with the Commission, in all material respects with the applicable accounting requirements and with the rules and regulations of the Commission, (B) were prepared in accordance with GAAP, in all material respects, applied on a consistent basis during the periods involved (except as may be indicated in such financial statements or in the notes thereto and subject, in the case of unaudited statements, to normal year-end audit adjustments and the absence of footnote disclosure), and (C) fairly presents, in all material respects, the consolidated financial position and the consolidated results of operations and cash flows (and changes in financial position, if any) of the Company and its subsidiaries as of the date and for the periods referred to in such financial statements.

      (ii)    Neither the Company nor any of the Company's subsidiaries is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar agreement or arrangement, where the result, purpose or effect of such agreement or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company or any of its subsidiaries in the SEC Reports (including the financial statements contained therein).

      (iii)    The Company has designed and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) sufficient to provide reasonable assurances regarding the reliability of financial reporting. The Company (A) has designed and maintains disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits with the Commission is recorded, processed, summarized and reported within the time periods specified in the Commission's rules, regulations and forms, and is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure, and (B) has disclosed, based on its most recent evaluation of internal control over financial reporting, to the Company's outside auditors and the Audit Committee of the Company's Board of Directors (x) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that would reasonably be expected to adversely affect the Company's ability to record, process, summarize and report financial information and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting, all of which information described in clauses (x) and (y) above has been disclosed by the Company to Walgreens prior to the date hereof.  Any material change in internal control over financial reporting required to be disclosed in any SEC Report has been so disclosed.

      (iv)    Since September 30, 2010, to the knowledge of the Company, neither the Company nor any of its subsidiaries has received any complaint, allegation, assertion or claim regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any of its subsidiaries or their respective internal accounting controls relating to

periods after September 30, 2010, except for any complaints, allegations, assertions or claims that have not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(v)     Each of the principal executive officer of the Company and the principal financial officer of the Company (or each former principal executive officer of the Company and each former principal financial officer of the Company, as applicable) has made all certifications required by Rules 13a-14 and 15d-14 under the Exchange Act and Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, as amended ("SOX"), with respect to the SEC Reports, and the statements contained in such certifications were true and complete on the date such certifications were made.  For purposes of this Agreement, "principal executive officer" and "principal financial officer" shall have the meanings given to such terms in SOX.

(f)     No Material Adverse Effect.  Since September 30, 2012, no Effect has occurred that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(g)     Reports.

(i)     Since September 30, 2010, the Company has complied in all material respects with the filing requirements of Sections 13(a), 14(a) and 15(d) of the Exchange Act, and of the Securities Act.

(ii)     The SEC Reports, when they became effective or were filed with the Commission, as the case may be, complied in all material respects with the requirements of the Securities Act, the Exchange Act and SOX, as applicable, and none of such documents, when they became effective or were filed with the Commission, as the case may be, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

(h)     Anti-takeover Provisions and No Rights Plan.

(i)     The actions taken by the Board of Directors of the Company to approve this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby, assuming the accuracy of the representations and warranties of Walgreens and Alliance Boots set forth in Section 2.3(c), constitute all the action necessary to render inapplicable to this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby the provisions of any potentially applicable anti-takeover, control share, fair price, moratorium, interested shareholder or similar law (including, for the avoidance of doubt, Section 203 of the Delaware General Corporation Law) and any potentially applicable provision of the Company's certificate of incorporation or bylaws (collectively, the "Anti-takeover Provisions").

(ii)     The Company does not have any "poison pill" or similar shareholder rights plan or agreement in effect.

(i)     No Change in Control.  Except as set forth in Section 2.2(i) of the Company Disclosure Letter, neither the execution and delivery of this Agreement or any of the other

Transaction Documents, nor the consummation of the transactions contemplated hereby and thereby will (i) result in any payment (including severance, unemployment compensation, forgiveness of indebtedness or otherwise) becoming due to any director or any employee of the Company or any of its subsidiaries under any employment, compensation or benefit plan, program, policy, agreement or arrangement that is sponsored, maintained or contributed to by the Company or any of its subsidiaries (each, a "Company Benefit Plan") or otherwise; (ii) increase any benefits otherwise payable under any Company Benefit Plan; (iii) result in any acceleration of the time of payment or vesting of any such benefits; (iv) require the funding or acceleration of funding of any trust or other funding vehicle; or (v) constitute a "change in control," "change of control" or other similar term under any Company Benefit Plan.

(j)      Brokers; Fees and Expenses.  No broker, investment banker, financial advisor or other person, other than Morgan Stanley (the fees and expenses of which will be paid by the Company), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of the Company.

2.3      Representations and Warranties of Walgreens and Alliance Boots.  Each of Walgreens and Alliance Boots, severally, on behalf of itself, and not jointly, hereby represents and warrants as of the date of this Agreement to the Company that:

(a)      Status.  It and WBAD have been duly organized and are validly existing under the laws of their respective jurisdiction of incorporation or organization, as applicable.

(b)      Authorization, Enforceability.

(i)      It, each of its subsidiaries that is a party to any other Transaction Document and WBAD have the corporate or analogous power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to consummate the transactions contemplated hereby and thereby, and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance by it, by each of its subsidiaries that is a party to any other Transaction Document and WBAD, as applicable, of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or analogous action on its, such subsidiary's or WBAD's part, as applicable, and no further approval or authorization is required on its, such subsidiary's or WBAD's part, as applicable.  This Agreement and the other Transaction Documents, assuming the due authorization, execution and delivery by the other parties hereto and thereto, are valid and binding obligations of it, such subsidiary and WBAD, as applicable, enforceable against it, such subsidiary and WBAD, as applicable, in accordance with their respective terms, except as the same may be limited by Bankruptcy Exceptions.  Notwithstanding anything to the contrary contained herein, the exercise of the Warrants and/or the purchase of any Initial Open Market Shares, Additional Open Market Shares and/or any other shares of Common Stock, as applicable, may require further board of director (or analogous) approvals or authorizations on the part of Alliance Boots and/or Walgreens (the "Purchase Approvals").

-11-

(ii)     The execution, delivery and performance by it, any such subsidiary or WBAD, as applicable, of this Agreement and the other Transaction Documents to which it, any such subsidiary or WBAD is a party and the consummation of the transactions contemplated hereby and thereby and compliance by it, such subsidiary and WBAD, as applicable, with any of the provisions hereof and thereof, will not (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of its properties or assets under any of the terms, conditions or provisions of (x) subject to Purchase Approvals, its, such subsidiary's or WBAD's, as applicable, organizational documents or (y) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which it, such subsidiary or WBAD, as applicable, is a party or by which it, such subsidiary or WBAD, as applicable, may be bound, or to which it, such subsidiary or WBAD, as applicable, or any of its, such subsidiary's or WBAD's, as applicable, properties or assets is subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to it, such subsidiary or WBAD, as applicable, or any of its, such subsidiary's or WBAD's, as applicable, properties or assets except, in the case of clauses (A)(y) and (B), for those occurrences that, individually or in the aggregate, have not had and would not reasonably be expected to have, with respect to it, a Walgreens/Alliance Boots Material Adverse Effect.  "<u>Walgreens/Alliance Boots Material Adverse Effect</u>" means a material adverse effect on the ability of Walgreens, Alliance Boots or WBAD, as applicable, to complete the transactions contemplated by the Transaction Documents or to perform its obligations under the Transaction Documents.

(iii)     Other than (A) such notices, filings, exemptions, reviews, authorizations, consents or approvals as have been made or obtained as of the date hereof, and (B) notices, filings, exemptions, reviews, authorizations, consents or approvals as may be required under, and other applicable requirements of (1) the HSR Act, (2) any other Antitrust Laws, (3) the Exchange Act and (4) the Securities Act, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Entity is required to be made or obtained by it or any of its subsidiaries in connection with the consummation by it or any of its subsidiaries of the Warrants Issuance and the other transactions contemplated hereby and by the other Transaction Documents, except for any such notices, filings, exemptions, reviews, authorizations, consent and approvals the failure of which to make or obtain have not had and would not reasonably be expected to have, individually or in the aggregate, a Walgreens/Alliance Boots Material Adverse Effect.

(c)     <u>Ownership</u>.  Other than pursuant to this Agreement and the other Transaction Documents, it is not the Beneficial Owner of (i) any Common Stock or (ii) any securities or other instruments representing the right to acquire Common Stock.  Other than with Alliance Boots and its Affiliates (in the case of Walgreens) or with Walgreens and its Affiliates (in the case of Alliance Boots), including the Transaction Rights Agreement, it does not have an agreement, arrangement or understanding with any person (other than the Company and its Affiliates) to acquire, dispose of or vote any securities of the Company.  "<u>Beneficial Ownership</u>" shall have the meaning assigned to such term in the Shareholders Agreement.  "<u>Beneficial Owner</u>" and "<u>Beneficially Own</u>" shall have conforming definitions.

-12-

(d)      Brokers; Fees and Expenses.  With respect to Walgreens, no broker, investment banker, financial advisor or other person, other than Goldman, Sachs & Co. (the fees and expenses of which will be paid by Walgreens), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of Walgreens or WBAD.  With respect to Alliance Boots, no broker, investment banker, financial advisor or other person, other than Centerview Partners (the fees and expenses of which will be paid by Alliance Boots), is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement or the other Transaction Documents based upon arrangements made by or on behalf of Alliance Boots or WBAD.

### Article III
### Covenants

3.1      Efforts.

(a)      Subject to the terms and conditions hereof (including the remainder of this Section 3.1) and the other Transaction Documents, each party hereto will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or desirable under applicable law to carry out the provisions hereof and thereof and give effect to the transactions contemplated hereby and thereby.  In furtherance and not in limitation of the foregoing, the parties hereto will (i) subject to the provisions of this Section 3.1, including Section 3.1(b) and Section 3.1(d), use their reasonable best efforts to obtain as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)) all exemptions, authorizations, consents or approvals from, and to make all filings with and to give all notices to, all third parties, including any Governmental Entities, required in connection with the transactions contemplated by this Agreement and the other Transaction Documents, which, for the avoidance of doubt, shall include providing, as promptly as practicable and advisable, such information to any Governmental Entity as such Governmental Entity may request in connection therewith, and (ii) cooperate fully with the other parties hereto in promptly seeking to obtain all such exemptions, authorizations, consents or approvals and to make all such filings and give such notices.

(b)      Without limiting the generality of the foregoing, (1) as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d), but in any event within ten (10) Business Days of the date of this Agreement, unless a later date is mutually agreed between the parties), the parties will file the Notification and Report Forms required under the HSR Act with the Federal Trade Commission and the United States Department of Justice (the date on which all such Notification and Report Forms required under the HSR Act have been initially filed, the "HSR Filing Date") and (2) as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)), file, make or give, as applicable, all other filings, requests and/or notices required under any other Antitrust Laws, in each case with respect to the Equity Transactions (the "Initial Filing Transaction") (the filings, requests and notices described in the foregoing clauses (1) and (2), collectively, the "Initial Antitrust Filings").  In addition, if, on or

-13-

prior to the one-year anniversary of the date on which the Initial Antitrust Clearance was obtained, the IOMS Rights Holder and its Designees (for the avoidance of doubt, expressly including for this purpose any Warrantholder (as defined in Warrant 1) pursuant to the exercise in-part of Warrant 1 pursuant to the terms thereof during the Warrant 1 Special Exercise Period) have not exceeded the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h), as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d), but in any event within ten (10) Business Days of such one-year anniversary, unless a later date is mutually agreed between the parties), the parties will file the Notification and Report Forms required under the HSR Act with the Federal Trade Commission and the United States Department of Justice with respect to the Equity Transactions in order to exceed the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h) (but not, for purposes of such filing, any greater notification threshold) (the "Second HSR Filing", and the date on which all such Notification and Report Forms comprising the Second HSR Filing shall have been initially filed, the "Second HSR Filing Date").   In addition, following the receipt of the Initial Antitrust Clearance, to the extent required by applicable law (including, for the avoidance of doubt any Antitrust Law) in connection with any acquisition of shares of Common Stock comprising all or any portion of the Equity Transactions (in each case, whether in full or in part), the parties shall file, make or give, as applicable, as promptly as practicable and advisable (as determined in good faith by Walgreens in accordance with the first sentence of Section 3.1(d)), any further required filings, requests and/or notices required under any Antitrust Laws, including the HSR Act (collectively, the "Other Antitrust Filings" and any such acquisitions, "Other Equity Transactions", *provided* that "Other Antitrust Filings" shall not include the Second HSR Filing).  Without limiting the generality of the foregoing, each party agrees to supply as promptly as reasonably practicable and advisable to the appropriate Governmental Entities any information and documentary material that may be requested pursuant to the HSR Act or any other Antitrust Laws.

(c)     Subject to the terms and conditions hereof (including the remainder of this Section 3.1) and the other Transaction Documents, each of the parties hereto agrees to use its reasonable best efforts to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Governmental Entity, so as to enable the parties hereto to give effect to the transactions contemplated hereby and by the other Transaction Documents in accordance with the terms hereof and thereof; provided, that notwithstanding anything to the contrary contained herein or in any of the other Transaction Documents, nothing in this Section 3.1 shall require, or be construed to require, any party hereto or any of its Affiliates to agree to (and no party hereto (other than Walgreens with respect to its and/or its Affiliates own assets, businesses or interests, in each case other than WBAD or any of its subsidiaries) or any of its Affiliates will agree to, without the prior written consent of the other parties): (i) sell, hold separate, divest, discontinue or limit (or any conditions relating to, or changes or restrictions in, the operation of) any assets, businesses or interests of it or its Affiliates (irrespective of whether or not such assets, businesses or interests are related to, are the subject matter of or could be affected by the transactions contemplated by the Transaction Documents); (ii) without limiting clause (i) in any respect, any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests that would reasonably be expected to adversely impact (x) the business of, or the financial, business or strategic benefits of the transactions contemplated hereby or by any of the other Transaction Documents to it or its Affiliates, or (y)

-14-

any other assets, businesses or interests of it or its Affiliates; or (iii) without limiting clause (i) in any respect, any modification or waiver of the terms and conditions of this Agreement or any of the other Transaction Documents that would reasonably be expected to adversely impact (x) the business of, or financial, business or strategic benefits of the transactions contemplated hereby or by any of the other Transaction Documents to it or its Affiliates, or (y) any other assets, businesses or interests of it or its Affiliates.  For purposes of the foregoing proviso, it is expressly acknowledged and agreed that the mere fact, in and of itself, that an approval or consent of a Governmental Entity required in connection with all or any portion of the Equity Transactions does not also expressly include or expressly constitute an affirmative approval or consent for the Investors' Beneficial Ownership of shares of Common Stock to exceed the Ultimate Standstill Level shall not be considered to adversely impact the Investors or their Affiliates in any way, including any of their respective assets, businesses or interests or their respective financial, business or strategic benefits from the transactions contemplated hereby or by any of the other Transaction Documents.  For purposes of this Agreement, the term (x) "Initial Antitrust Clearance" as of any time means (a) prior to such time, the expiration or termination of the waiting period under the HSR Act and the receipt of all exemptions, authorizations, consents or approvals, the making of all filings and the giving of all notices, and the expiration of all waiting periods, pursuant to any other Antitrust Laws, in each case to the extent required with respect to the Initial Filing Transaction, and (b) the absence at such time of any applicable law or temporary restraining order, preliminary or permanent injunction or other judgment, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation, decision or decree issued by any court of competent jurisdiction or other legal restraint or prohibition under any Antitrust Law, in each case that has the effect of preventing the consummation of the Initial Filing Transaction, (y) "Second HSR Clearance" as of any time following the Initial Antitrust Clearance means, with respect to the Equity Transactions (to the extent set forth in the Second HSR Filing), prior to such time, the expiration or termination of the waiting period under the HSR Act, and (z)  "Other Antitrust Clearance" as of any time following the Initial Antitrust Clearance means, with respect to any Other Equity Transaction, (a) prior to such time, the expiration or termination of the waiting period under the HSR Act and the receipt of all exemptions, authorizations, consents or approvals, the making of all filings and the giving of all notices, and the expiration of all waiting periods, pursuant to any other Antitrust Laws, in each case to the extent required with respect to such Other Equity Transaction, and (b) the absence at such time of any applicable law or temporary restraining order, preliminary or permanent injunction or other judgment, order, writ, injunction, legally binding agreement with a Governmental Entity, stipulation, decision or decree issued by any court of competent jurisdiction or other legal restraint or prohibition under any Antitrust Law, in each case that has the effect of preventing the consummation of such Other Equity Transaction.

(d)  Walgreens shall have the principal responsibility for devising and implementing the strategy (including with respect to the timing of filings) for obtaining any exemptions, authorizations, consents or approvals required under the HSR Act or any other Antitrust Laws in connection with the transactions contemplated hereby and by the other Transaction Documents; provided, however, that Walgreens shall consult in advance with each other party hereto and in good faith take each such other party's views into account regarding the overall antitrust strategy.  Each of the parties hereto will promptly notify the other parties of, and if in writing furnish the others with copies of (or, in the case of oral communications, advise the others of), any substantive communication that it or any of its Affiliates receives from any Governmental

-15-

[[3397517]]

Entity, whether written or oral, relating to the matters that are the subject of this Agreement or any of the other Transaction Documents and, to the extent reasonably practicable, permit the other parties to review in advance any proposed substantive written communication by such party to any Governmental Entity and consider in good faith the other parties' reasonable comments on any such proposed substantive written communications prior to their submission. No party hereto shall, and each party hereto shall cause its Affiliates not to, participate or agree to participate in any substantive meeting or communication with any Governmental Entity in respect of the subject matter of the Transaction Documents, including on a "no names" or hypothetical basis, unless (to the extent practicable) it or they consult with the other parties hereto in advance and, to the extent practicable and permitted by such Governmental Entity, gives the other parties hereto the opportunity to jointly prepare for, attend and participate in such meeting or communication.  The parties hereto will (and will cause their Affiliates to) coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the matters described in this Section 3.1, including (x) furnishing to each other all information required for any filing or submission under any Antitrust Law and (y) keeping each other reasonably informed with respect to the status of each exemption, authorization, consent, approval, filing and notice under any Antitrust Law, in each case, in connection with the matters that are the subject of this Agreement or any of the other Transaction Documents.  The parties hereto will provide each other with copies of all substantive correspondence, filings or communications between them or any of their Affiliates or representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, relating to the matters that are the subject of this Agreement or any of the other Transaction Documents; provided that such material may be redacted as necessary to (1) comply with contractual arrangements, (2) address good faith legal privilege or confidentiality concerns and (3) comply with applicable law.

(e)     Subject to the other provisions of this Agreement, including in this Section 3.1, in the event that any arbitral, administrative, judicial or analogous action, claim or proceeding is instituted (or threatened to be instituted) by a Governmental Entity or any other party challenging the transactions contemplated hereby or by any of the other Transaction Documents ("Transaction Litigation"), each party hereto shall use its reasonable best efforts to contest and resist any such Transaction Litigation and to have vacated, lifted, reversed or overturned any judgment, ruling, order, writ, injunction or decree, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation or implementation of the transactions contemplated hereby or by any of the other Transaction Documents.  Each party hereto shall keep each other party hereto reasonably informed unless doing so would reasonably be likely to jeopardize any privilege of such party regarding any such Transaction Litigation (subject to such party using reasonable best efforts to, and cooperating in good faith with the other parties in, developing and implementing reasonable alternative arrangements to provide such other parties with such information).  Subject to the immediately preceding sentence, each party hereto shall promptly advise each other party hereto orally and in writing and shall cooperate fully in connection with, and shall consult with each other with respect to, any Transaction Litigation and shall in good faith give consideration to each other's advice with respect to such Transaction Litigation.

(f)     As promptly as practicable following the date hereof, the Company shall adopt such amendments and take such further actions and do or cause to be done all things necessary,

-16-

proper or advisable under applicable law, to prevent the execution and delivery of the Transaction Documents and the consummation of the transactions contemplated thereby from constituting a "change in control," "change of control" or other similar term under any Company Benefit Plan (whether or not relating to matters set forth on Section 2.2(i) of the Company Disclosure Letter).

(g)    Notwithstanding anything herein to the contrary, from and after the earlier of (i) the completion in full of the Equity Transactions, (ii) the expiration, termination or cancellation of Warrant 2 without Warrant 2 having been exercised in full or (iii) the Warrant 2 Transferability Event, no party will have any further obligations under this Section 3.1; *provided*, that this Section 3.1(g) shall in no way relieve any party with respect to any breach by such party of this Section 3.1 prior to such time.

3.2    Public Announcements.  The parties acknowledge that the communication plan (including the initial press release of each party) regarding the initial announcement of the transactions contemplated by this Agreement and the other Transaction Documents to customers, suppliers, investors and employees and otherwise (the "Initial Communications Materials") has been agreed by the parties.  During the initial announcement period, no party shall originate any publicity, news release or other public announcement, written or oral, relating to this Agreement, the other Transaction Documents, the transactions contemplated hereby or thereby or the existence of any arrangement between the parties or make any other communication, in each case which is inconsistent with the Initial Communications Materials.  Thereafter, except as required by applicable law or by the rules or requirements of any stock exchange on which the securities of a party hereto are listed, no party hereto shall make, or cause to be made, or permit any of its Affiliates to make, any press release or public announcement or other similar communications in respect of the Transaction Documents or the transactions contemplated thereby without prior written consent (not to be unreasonably withheld, conditioned or delayed) of each other party hereto, to the extent such release, announcement or communication relates to the transactions contemplated hereby or by any of the other Transaction Documents; provided that no party shall have the right to consent to any release, announcement or communication of any other party (including, in the case of the Company and Walgreens, any filing required to be made under the Exchange Act) made in the ordinary course of business unless and to the extent such release, announcement or communication (x) relates specifically to the signing or completion of the transactions contemplated hereby or by any of the other Transaction Documents or (y) includes information with respect to the transactions contemplated hereby or by any of the other Transaction Documents that is inconsistent with the Initial Communications Materials; provided, further, that the immediately foregoing clauses (x) and (y) shall not apply to any release, announcement or other communication to the extent containing information that is consistent with releases, announcements or other communications previously consented to by the other parties in accordance with this Section 3.2.

3.3    Expenses.  Unless otherwise provided in any Transaction Document, each of the parties hereto will bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated under the Transaction Documents, including fees and expenses of its own financial or other consultants, investment bankers, accountants and counsel.

-17-

3.4     Sufficiency of Authorized Common Stock.  From and after the date hereof and until the date on which each of the Warrants has been fully exercised (or expires unexercised or is canceled in accordance with the terms hereof and thereof), the Company shall at all times have reserved for issuance, free of preemptive or similar rights, a sufficient number of shares of authorized and unissued Warrant Shares to effectuate such exercise in full (for the avoidance of doubt, without giving effect to any "cashless" or "net" exercise provisions therein).  Nothing in this Section 3.4 shall preclude the Company from satisfying its obligations in respect of the exercise of either Warrant by delivery of shares of Common Stock which are held in the treasury of the Company.

3.5     Pursuit of Other Opportunities.  From and after the date hereof to the date that is six (6) months after the date of this Agreement, each of the parties hereto agrees to cooperate and negotiate in good faith to explore the opportunities set forth on Section 3.5 of the Company Disclosure Letter (each such opportunity, an "Additional Opportunity").  Section 3.5 of the Company Disclosure Letter does not contain all the essential terms with respect to the Additional Opportunities, and the parties acknowledge that they must complete negotiations on the points set forth in Section 3.5 of the Company Disclosure Letter as well as on points beyond the scope of Section 3.5 of the Company Disclosure Letter in a mutually satisfactory manner, before definitive documents can be executed and any transactions with respect to the Additional Opportunities can be consummated.  Neither this Section 3.5 nor the provisions of Section 3.5 of the Company Disclosure Letter shall create or constitute any legally binding obligations between the parties, and none of the parties shall have any liability to the other parties with respect to, based on, arising from or relating to this Section 3.5 or the Additional Opportunities.  This Section 3.5 and the provisions of Section 3.5 of the Company Disclosure Letter do not express an agreement of the parties or an offer to enter into an agreement and are not intended to and do not create any legal or equitable obligations with respect to the Additional Opportunities.  Each of the parties hereto shall be free to withdraw from discussions and not continue to pursue any Additional Opportunity, without obligation or liability to the other parties or to any other person, if such party determines in its sole discretion, but after consultation with the other parties, that it is not in the best interests of such party to continue to pursue such Additional Opportunity.

3.6     Non-Solicit.

(a)     From and after the date hereof (x) to the date that is one (1) year after the later of (i) the termination of the Rx Distribution Agreement and (ii) the termination of the Generic Pharmaceuticals Purchasing Services Agreement, each of Walgreens and Alliance Boots covenants and agrees, individually on behalf of itself and not jointly, with the Company that it will not, nor will it permit its Affiliates to, directly or indirectly, solicit for employment any individual set forth on Section 3.6(a) of the Company Disclosure Letter (each, a "Key Company Employee"); and (y) to the date that is three (3) years after the date of this Agreement, each of Walgreens and Alliance Boots covenants and agrees that it will not, nor will it permit its Affiliates to, hire any Key Company Employee; provided, however, that the foregoing shall not preclude it or its Affiliates from (A) placing general solicitations not targeted at such Key Company Employees (so long as it and its Affiliates do not hire any such Key Company Employee) or (B) soliciting in any manner or hiring any such Key Company Employee whose employment with the Company and its Affiliates has terminated at least one (1) year prior to the date of such solicitation or hire, as applicable, so long as neither it nor its Affiliates solicited such

-18-

Key Company Employee in violation of this Section 3.6(a) prior to such one (1) year anniversary.

(b)     From and after the date hereof (x) to the date that is one (1) year after the later of (i) the termination of the Rx Distribution Agreement and (ii) the termination of the Generic Pharmaceuticals Purchasing Services Agreement, the Company covenants and agrees with each of Walgreens and Alliance Boots that the Company will not, nor will the Company permit its Affiliates to, directly or indirectly, solicit for employment any individual set forth on Section 3.6(b) of the Company Disclosure Letter (each, a "Key Walgreens/Alliance Boots Employee"); and (y) to the date that is three (3) years after the date of this Agreement, the Company covenants and agrees that it will not, nor will it permit its Affiliates to, hire any Key Walgreens/Alliance Boots Employee; provided, however, that the foregoing shall not preclude the Company or its Affiliates from (x) placing general solicitations not targeted at such Key Walgreens/Alliance Boots Employees (so long as the Company and its Affiliates do not hire any such Key Walgreens/Alliance Boots Employee) or (y) soliciting in any manner or hiring any such Key Walgreens/Alliance Boots Employee whose employment with Walgreens, Alliance Boots and their Affiliates has terminated at least one (1) year prior to the date of such solicitation or hire, as applicable, so long as neither the Company nor its Affiliates solicited such Key Walgreens/Alliance Boots Employee in violation of this Section 3.6(b) prior to such one (1) year anniversary.

3.7     Financing Cooperation.

(a)     From and after the date hereof, the Company shall, and shall cause its subsidiaries to, and shall use its reasonable best efforts to cause its and its subsidiaries' representatives to, cooperate with Walgreens and Alliance Boots in connection with any Debt Financing in the following manner (in each case to the extent reasonably required in connection with any such Debt Financing):

(i)     furnish the report(s) of the auditors with respect to the audited financial statements of the Company and its subsidiaries, and use reasonable best efforts to obtain the consent of such auditors to the use of such report(s) in accordance with normal custom and practice with respect to any such Debt Financing, and use reasonable best efforts to cause such auditors to provide customary comfort letters to the underwriters, initial purchasers or placement agents, as applicable, in connection with any such Debt Financing;

(ii)     furnish Walgreens and Alliance Boots (and their respective representatives) with additional financial statements, schedules or other financial data relating to the Company and its subsidiaries and assist Walgreens and Alliance Boots (and their respective representatives) with preparing pro forma financial statements, in each case, as reasonably requested in connection with any such Debt Financing (it being understood that none of Walgreens, Alliance Boots or any of their Affiliates (or any of their respective representatives) shall be permitted to disclose (whether by including such information in, or reflecting such information on, their financial statements or otherwise) any financial information provided by the Company pursuant to this clause (ii) prior to the

-19-

Company first publicly disclosing such information in its ordinary course of business);

(iii)     reasonably cooperate with the due diligence of the proposed lenders, underwriters, initial purchasers, ratings agencies or placement agents, as applicable, and/or Walgreens, Alliance Boots and their respective representatives in connection with any such Debt Financing, to the extent customary and reasonable and to the extent not unreasonably interfering with the business of the Company (and in the case of the provision of information, to the extent already existing or that can be prepared without excessive cost or management time), and only as long as any person involved in such due diligence enters into a confidentiality agreement with the Company in customary form and substance reasonably acceptable to the Company; *provided, however,* that none of the Company, its subsidiaries or their respective representatives shall be required to deliver any opinions, 10b-5 statements or officer's certificates in connection with any such due diligence efforts; *provided, further* that none of the Company, its subsidiaries or their respective representatives shall be required to provide any cooperation or information to the extent that (x) such information is competitively sensitive, (y) providing such cooperation or information (A) would reasonably be expected to jeopardize attorney-client privilege or loss of attorney work product protection, (B) would violate a confidentiality obligation to any person or (C) would violate any applicable law; *provided,* that with respect to clauses (x) and (y), the Company uses reasonable efforts, and cooperates in good faith with Walgreens and/or Alliance Boots, as applicable, to develop and implement reasonable alternative arrangements to provide Walgreens and Alliance Boots (and their respective representatives) with the intended benefits of this Section 3.7; and

(iv)     reasonably assist in the review or preparation of applicable portions (i.e., to the extent relating to the Company) of one or more confidential information memoranda, prospectuses, offering memoranda and other marketing and syndication materials in connection with such Debt Financing.

(b)     Notwithstanding anything in this Section 3.7 to the contrary, in fulfilling obligations of the Company pursuant to this Section 3.7, neither the Company nor any of its subsidiaries shall be required to pay any commitment or other fee, provide any security or incur any other liability or execute or enter into any agreement in connection with any such Debt Financing.  Walgreens and Alliance Boots shall promptly, upon request by the Company, reimburse the Company for all reasonable out of pocket costs and expenses incurred by the Company or any of its subsidiaries in connection with the cooperation of the Company and its subsidiaries contemplated by this Section 3.7.  For purposes of this Agreement, "Debt Financing" means any debt financing incurred by Walgreens or Alliance Boots, as applicable, for purposes of exercising the Warrants and/or acquiring Initial Open Market Shares, Additional Open Market Shares or any New Securities or Replacement Pre-emptive Shares (each as defined in the Shareholders Agreement), including, for the avoidance of doubt, any refinancings or "take-out" financings with respect thereto.  The obligations of the Company and its subsidiaries under this Section 3.7 shall automatically terminate upon the date that the Beneficial Ownership (as

-20-

defined in the Shareholders Agreement) of the Investors, in the aggregate, of Common Stock is less than five percent (5%).

## Article IV
### ADDITIONAL AGREEMENTS

4.1     Additional Equity Purchases.

(a)     The parties hereto acknowledge and agree that, from and after the date hereof, Walgreens (or any of its wholly-owned subsidiaries, or Alliance Boots or any of its wholly-owned subsidiaries, or the FW JV, in each case to the extent designated by Walgreens in writing) (Walgreens, in its capacity as the holder of the right to acquire (and/or to designate any such person(s) (the "Designees") to acquire) Initial Open Market Shares, the "IOMS Rights Holder") shall have the right to acquire, from time to time (but subject to Section 2.2 of the Shareholders Agreement), in one or more open market transactions, a number of shares of Common Stock not exceeding, in the aggregate, 19,859,795 shares of Common Stock, subject to adjustment pursuant to Section 4.1(c) (the "Initial Open Market Shares").

(b)     In addition (without limitation to Section 4.1(a)), in the event that, on any day during the Exercise Period (as defined in Warrant 1), the Market Price (as defined in Warrant 1) is less than the then-applicable Exercise Price (as defined in Warrant 1), the parties hereto acknowledge and agree that, from and after such day through the date which is five (5) days after the last day of the Exercise Period, any Warrantholder (as defined in Warrant 1) shall have the right to acquire (either directly or through Walgreens or any of its wholly-owned subsidiaries, or through Alliance Boots or any of its wholly-owned subsidiaries, or the FW JV, as designated by such Warrantholder in writing), from time to time (but subject to Section 2.2 of the Shareholders Agreement), in one or more open market transactions, a number of shares of Common Stock not exceeding, in the aggregate, the product of (i) (A) 14,185,570 shares of Common Stock (the "Aggregate Additional Open Market Shares"), subject to adjustment pursuant to Section 4.1(c), minus (B) the sum of (I) the greater of (x) zero and (y) (1) the number of Warrant 1 Shares previously issued upon exercise of Warrant 1 minus (2) 37.5% of the total number of Warrant 1 Shares, whether already issued upon exercise of Warrant 1 or remaining unexercised and underlying Warrant 1 and (II) the number of Required Shares, if any, actually purchased by the IOMS Rights Holder and its Designees during the Threshold Period pursuant to Section 4.1(c)(iii), and (ii) a fraction, the numerator of which is the sum of (A) the number of Warrant 1 Shares previously issued upon exercise of Warrant 1 in respect of the portion of Warrant 1 held by such Warrantholder and (B) the number of unexercised Warrant 1 Shares underlying the portion of Warrant 1 held by such Warrantholder, and the denominator of which is the total number of Warrant 1 Shares, whether already issued upon exercise of Warrant 1 or remaining unexercised and underlying Warrant 1 (the "Additional Open Market Shares").

(c)     Notwithstanding anything to the contrary in Section 4.1(a) or Section 4.1(b), each of (x) the number of Initial Open Market Shares (to the extent not already acquired by the IOMS Rights Holder or its Designees prior to the adjustment(s) provided for in this Section 4.1(c)) and (y) the number of Aggregate Additional Open Market Shares (to the extent not already acquired by the Warrantholder(s) or their permitted designees(s) prior to the adjustment(s) provided for in this Section 4.1(c)), shall be subject to adjustment from time to time from and after the execution

[[3397517]]

and delivery hereof as follows; *provided*, that if more than one subsection of this Section 4.1(c) is applicable to a single event, the subsection shall be applied that produces the largest adjustment and no single event shall cause an adjustment under more than one subsection of this Section 4.1(c) so as to result in duplication:

(i)      If the Company shall from and after the execution and delivery hereof (a) declare and pay a dividend or make a distribution on its Common Stock in shares of Common Stock, (b) split, subdivide or reclassify the outstanding shares of Common Stock into a greater number of shares, or (c) combine or reclassify the outstanding shares of Common Stock into a smaller number of shares, the number of Initial Open Market Shares and Aggregate Additional Open Market Shares at the time of the record date for such dividend or distribution or the effective date of such split, subdivision, combination or reclassification shall be proportionately adjusted to equal, immediately upon such record date or effective date, as the case may be, the number of shares of Common Stock that the Initial Open Market Shares and Aggregate Additional Open Market Shares, respectively, would have represented (including entitlements to receive shares of Common Stock) had the Initial Open Market Shares and Aggregate Additional Open Market Shares been acquired in full prior to such record date or effective date, as the case may be.

(ii)      If the Company shall from and after the execution and delivery hereof issue shares of Common Stock (or rights or warrants or any other securities or rights exercisable or convertible into or exchangeable (collectively, a "conversion") for shares of Common Stock) (collectively, "convertible securities") (other than in Permitted Transactions) (a "Subject Issuance"), then, in such event, the number of Initial Open Market Shares and Aggregate Additional Open Market Shares immediately prior to the Subject Issuance (each, an "Initial Number") shall be increased to the number obtained by multiplying the applicable Initial Number by a fraction (1) the numerator of which shall be the sum of (x) the number of shares of Common Stock outstanding immediately prior to the Subject Issuance and (y) the number of additional shares of Common Stock issued (or into which such issued convertible securities may be converted) and (2) the denominator of which shall be the number of shares of Common Stock outstanding immediately prior to the Subject Issuance.  For purposes of the foregoing, (I) "Permitted Transactions" shall include (a) issuances pursuant to which the adjustment set forth in Section 4.1(c)(i) is applicable, (b) issuances of shares of Common Stock (including upon exercise of options) to directors, advisors, employees or consultants of the Company pursuant to a stock option plan, employee stock purchase plan, restricted stock plan, other employee benefit plan or other similar compensatory agreement or arrangement approved by the Board of Directors of the Company, (c) conversions of convertible securities outstanding as of the date of this Agreement and disclosed in Section 2.2(b) of this Agreement in accordance with the terms of such convertible securities and (d) the exercise of the Warrants, (II) on any increase in the number of shares of Common Stock deliverable upon conversion of any convertible securities issued in the Subject Issuance (each, a "Post-Issuance Adjustment"), then, to the extent that, in respect of the same facts and events, the adjustment provisions set forth in this Section 4.1(c) (excluding this clause (II)) do not result in a proportionate increase in the number of Initial Open Market Shares and/or the number of Aggregate Additional Open Market Shares, in each case equal to or greater than the proportionate increase in respect of such convertible securities, then the number of Initial Open Market Shares and/or the number of Aggregate Open Market Shares, as applicable, then in effect, shall forthwith be readjusted to such number of Initial Open Market

-22-

Shares and/or the number of Aggregate Additional Open Market Shares, respectively, as would have been obtained had the Post-Issuance Adjustment been effective in respect of such convertible securities as of immediately prior to the Subject Issuance and (III) if the number of Initial Open Market Shares and Aggregate Additional Open Market Shares shall have been adjusted upon any Subject Issuance of convertible securities in accordance with this Section 4.1(c), subject to clause (II) above, no further adjustment of the number of Initial Open Market Shares and Aggregate Additional Open Market Shares shall be made for the actual issuance of shares of Common Stock upon the actual conversion of such convertible securities in accordance with their terms.  Any adjustment made pursuant to this Section 4.1(c)(ii) shall become effective immediately upon the Subject Issuance.

(iii)    During the period beginning on the later of (a) the acquisition in full by the IOMS Rights Holder and its Designees of all Initial Open Market Shares (before giving effect to the adjustment set forth pursuant to this Section 4.1(c)(iii)) and (b) the date on which the Initial Antitrust Clearance shall have been obtained, and ending immediately following the one-year anniversary of the date on which the Initial Antitrust Clearance shall have been obtained (such period, the "Threshold Period"), subject to the proviso to this Section 4.1(c)(iii), the number of Initial Open Market Shares shall be increased by such number of shares of Common Stock as is equal to the lesser of: (I) such number of shares of Common Stock as is applicable to enable the IOMS Rights Holder and its Designees to exceed the then-current $500 million (as adjusted) or greater notification threshold under HSR Act Rule 801.1(h), 16 C.F.R. § 801.1(h) prior to the expiration of the Threshold Period and (II) 2,837,114 shares of Common Stock (as adjusted to appropriately reflect any of the events referred to in this Section 4.1(c)) (such number of shares as determined by clauses (I) and (II), the "Required Shares"); provided, that (A) this Section 4.1(c)(iii) shall only be applicable following (1) the delivery of a written notice from Walgreens to the Company during the Threshold Period requesting that either this Section 4.1(c)(iii) or the Warrant 1 Special Exercise Period (as defined in Warrant 1) take effect (such notice, the "Threshold Notice") and (2) the earlier of (x) the fifth (5th) Business Day following such Threshold Notice, if the Company shall not have responded with a written notice to Walgreens specifying that it has elected for the Warrant 1 Special Exercise Period to take effect in lieu of this Section 4.1(c)(iii), and (y) the delivery by the Company to Walgreens of a written notice specifying that it has elected for this Section 4.1(c)(iii) to take effect in lieu of the Warrant 1 Special Exercise Period.

(iv)    All calculations under this Section 4.1(c) shall be made to round up to the nearest whole share of Common Stock.  Any adjustments pursuant to this Section 4.1(c) shall be made successively whenever an event referred to herein shall occur.

(v)    In the event that the Company shall propose to (1) take any action of the type described in this Section 4.1(c) (but only if the action of the type described in this Section 4.1(c) would result in an adjustment in the Initial Open Market Shares or Aggregate Additional Open Market Shares), or (2) declare any dividend or distribution (or to set any record date in respect of any such dividend or distribution) on shares of Common Stock payable, in whole or in part, in Other Voting Securities (as defined in Warrant 1), the Company shall provide written notice to each of Walgreens and Alliance Boots, which notice shall specify the record date, if any, with respect to any such action and the approximate date on which such action is to take place.  In the case of the foregoing clause (1) of this Section 4.1(c)(v), such notice shall also set

-23-

forth the facts with respect thereto as shall be reasonably necessary to indicate the effect on the Initial Open Market Shares and Additional Open Market Shares.  In the case of any action described in this Section 4.1(c)(v) which would require the fixing of a record date, such notice shall be given at least ten (10) days prior to the date so fixed.  In case of all other action, such notice shall be given at least ten (10) days prior to the taking of such proposed action unless the Company reasonably determines in good faith that, given the nature of such action, the provision of such notice at least ten (10) days in advance is not reasonably practicable from a timing perspective, in which case such notice shall be given as far in advance prior to the taking of such proposed action as is reasonably practicable from a timing perspective.

(d)     The parties agree to the matters set forth in Section 4.1(d) of the Company Disclosure Letter.

4.2     Acquisition for Investment.  Each of Walgreens and Alliance Boots acknowledges that the issuance of the Warrants and Warrant Shares has not been registered under the Securities Act or under any state securities laws.  (i) Each of Walgreens and Alliance Boots acknowledges that Walgreens is acquiring the Warrants and the Warrant Shares pursuant to an exemption from registration under the Securities Act solely for investment with no present intention to distribute them to any person in violation of the Securities Act or any other applicable securities laws, (ii) each of Walgreens and Alliance Boots agrees, individually on behalf of itself and not jointly, that it will not (and will not permit its Affiliates to) sell or otherwise dispose of the Warrants or the Warrant Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any applicable securities laws, (iii) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the Warrants Issuance and of making an informed investment decision, and has conducted a review of the business and affairs of the Company that it considers sufficient and reasonable for purposes of consummating the Warrants Issuance, (iv) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it is able to bear the economic risk of the Warrants Issuance and is able to afford a complete loss of such investment and (v) each of Walgreens and Alliance Boots acknowledges, individually on behalf of itself and not jointly, that it is an "accredited investor" (as that term is defined by Rule 501 under the Securities Act).

4.3     Legend.  Each of Walgreens and Alliance Boots agrees that all certificates or other instruments representing the Warrants and the Warrant Shares will bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.  THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER

PROVISIONS OF (1) A FRAMEWORK AGREEMENT, DATED AS OF MARCH 18, 2013, BY AND AMONG THE ISSUER OF THESE SECURITIES, WALGREEN CO., AN ILLINOIS CORPORATION, AND ALLIANCE BOOTS GMBH, A PRIVATE LIMITED LIABILITY COMPANY INCORPORATED UNDER THE LAWS OF SWITZERLAND, A COPY OF WHICH IS ON FILE WITH THE ISSUER AND (2) A SHAREHOLDERS AGREEMENT, DATED AS OF MARCH 18, 2013, BY AND AMONG THE  ISSUER OF THESE SECURITIES, WALGREEN CO. AND ALLIANCE BOOTS GMBH.  THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENTS.  ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENTS WILL BE VOID."

In the event that any Warrant Shares become registered under the Securities Act or the Company is presented with an opinion of counsel reasonably satisfactory, in form and substance, to the Company that the Warrant Shares are eligible to be transferred without restriction in accordance with Rule 144 under the Securities Act, the Company shall issue new certificates or other instruments representing such Warrant Shares which shall not contain such portion of the above legend that is no longer applicable; provided that the holder of such Warrant Shares surrenders to the Company the previously issued certificates or other instruments.

4.4  Anti-takeover Provisions and Rights Plan.  The Company shall not take any action that would cause this Agreement or any of the other Transaction Documents, or any of the transactions contemplated hereby or thereby, to be subject to any requirements imposed by any Anti-takeover Provision, or subject in any manner to any "poison pill" or similar shareholder rights plan or agreement, and shall take all necessary steps within its control to exempt (or ensure the continued exemption of) the Transaction Documents and such transactions from, or if necessary challenge the validity or applicability of, any applicable Anti-takeover Provisions, as now or hereafter in effect.

## Article V
### Miscellaneous

5.1  Termination of This Agreement; Other Triggers.

(a)  This Agreement may be terminated at any time:

(i)  with the prior written consent of each of Walgreens, Alliance Boots and the Company; or

(ii)  by any of Walgreens, Alliance Boots or the Company, upon the termination of the Shareholders Agreement in accordance with its terms.

(b)  If (x) the Initial Antitrust Clearance shall not have been obtained on or prior to the one-year anniversary of the HSR Filing Date, (y) to the extent applicable, the Second HSR Clearance shall not have been obtained on or prior to the one-year anniversary of the Second HSR Filing Date or (z) (1) any Other Antitrust Clearance in respect of an Other Antitrust Filing seeking to allow the Investors to acquire (in the aggregate, taking into account the Investors'

-25-

existing ownership) up to a number of shares of Common Stock equal to 24.99% or less of the then-issued and outstanding shares of Common Stock shall not have been obtained on or prior to the one-year anniversary of the initial filing, making or giving, as applicable, of such Other Antitrust Filing and (2) the party or parties, as applicable, proposing to consummate the applicable Other Equity Transaction have not, on or prior to such one-year anniversary, delivered a written notice to the other parties hereto specifying that it or they, as applicable, are no longer proposing to consummate such Other Equity Transaction at such time, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents:

> (i) the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens, cancel the Warrants (to the extent not already exercised or expired), in whole but not in part;

> (ii) the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens, terminate Section 4.1 and/or Section 4.4 of this Agreement, in each case in whole but not in part; and

> (iii) (1) at the election of Walgreens (in its sole discretion), the Rx Distribution Agreement (to the extent then still in effect) shall be immediately modified such that the defined term "Initial Term" set forth in the Rx Distribution Agreement shall mean the later of "August 31, 2017" and the date which is two (2) years after the date on which Walgreens elects to modify the Rx Distribution Agreement pursuant to this Section 5.1(b)(iii) and/or (2) at the election of the Company (in its sole discretion), on the one hand, or WBAD (in its sole discretion and by joint action of Walgreens and Alliance Boots), on the other hand, the Generic Pharmaceuticals Purchasing Services Agreement shall be immediately terminated;

*provided* that a party may not exercise any cancelation, termination or modification right pursuant to this Section 5.1(b) if the breach by such party of any obligation, representation or warranty under this Agreement has been the cause of, or resulted in, the failure of the Initial Antitrust Clearance to have been obtained on or prior to the one-year anniversary of the HSR Filing Date.

> (c) If any Other Antitrust Clearance necessary to allow the Investors to acquire (in the aggregate, taking into the account the Investors' existing ownership) up to a number of shares of Common Stock that is equal to or greater than 25% of the then-issued and outstanding shares of Common Stock shall not have been obtained on or prior to the one-year anniversary of the initial filing, making or giving, as applicable, of the related Other Antitrust Filing, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents, for all purposes under this Agreement and the other Transaction Documents, a "<u>Warrant 2 Transferability Event</u>" shall be deemed to have occurred with respect to such Warrant 2 Shares as would have caused the Investors to exceed the applicable threshold if the remaining portion of Warrant 2 was then exercised in full (such excess portion of Warrant 2, the "<u>Warrant 2 Transferable Portion</u>").

> (d) If, at any time, the Generic Pharmaceuticals Purchasing Services Agreement has been terminated (x) by the Company in accordance with its terms pursuant to Sections 5.B(ii)(a)

-26-

or 5.B.(ii)(b) thereof or (y) by mutual agreement of the Company and WBAD or pursuant to Sections 5.B(i)(c) or 5.B(ii)(c) thereof, then, without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents:

(i) the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens delivered no later than on the third (3rd) Business Day following the effective date of such termination, cancel the Warrants (to the extent not already exercised or expired), in whole but not in part;

(ii) the Company may (in its sole discretion), upon ten (10) Business Days prior notice to Walgreens delivered no later than on the third (3rd) Business Day following the effective date of such termination, terminate Section 4.1 and/or Section 4.4 of this Agreement, in each case in whole but not in part; and

(iii) in the case of clause (y), if the Company shall have exercised its rights pursuant to either Section 5.1(d)(i) or (ii), then, at the election of Walgreens (in its sole discretion), the Rx Distribution Agreement (to the extent then still in effect) shall be immediately modified such that the defined term "Initial Term" set forth in the Rx Distribution Agreement shall mean the later of "August 31, 2017" and the date which is two (2) years after the date on which Walgreens elects to modify the Rx Distribution Agreement pursuant to this Section 5.1(d)(iii).

(e) The parties expressly acknowledge and agree that, notwithstanding anything in the Transaction Documents to the contrary, if, at any time the Rx Distribution Agreement is terminated by Walgreens in accordance with its terms pursuant to Section 15.A thereof, then:

(i) at the election of the Company (in its sole discretion), on the one hand, or WBAD (in its sole discretion and by joint action of Walgreens and Alliance Boots), on the other hand, pursuant to written notice (the "Cross Termination Notice") delivered to the other (the date of the delivery of such Cross Termination Notice, the "Notice Delivery Date"), the Generics Pharmaceuticals Purchasing Services Agreement (to the extent then still in effect) shall terminate, effective on the twelve-month anniversary of the Notice Delivery Date (or such earlier date as the Company may specify at any time during such twelve-month period upon at least 30 days written notice, provided that any such earlier date shall be a month end);

(ii) if the Notice Delivery Date shall have occurred, to the extent a Walgreens Investor Rights Termination Event (as defined in the Shareholders Agreement) shall not have previously occurred, a Walgreens Investor Rights Termination Event shall be deemed to have occurred immediately upon the Notice Delivery Date, for all purposes under the Shareholders Agreement other than Sections 1.3(b) and (c) (with respect to which the Walgreens Investor Rights Termination Event shall occur pursuant to such defined term without giving effect to this clause (ii));

(iii) if the Notice Delivery Date shall have occurred, Section 4.1 and, subject to clause (v) below, Section 4.4 of this Agreement, and Section 2.3 of the Shareholders Agreement shall be terminated, in each case in whole but not in part;

-27-

(iv)    if the Notice Delivery Date shall have occurred, each Restricted Period (as defined in the Shareholders Agreement), to the extent then still in effect, shall be deemed to have expired for all purposes immediately as of the Notice Delivery Date;

(v)    with respect to any Warrant, (1) if the Notice Delivery Date shall have occurred earlier than the date that is six months prior to the Exercise Start Date (as defined in such Warrant) of such Warrant (without application of this clause (v)), then such Warrant shall be immediately canceled, (2) if the Notice Delivery Date shall have occurred on or after the date that is six months prior to the Exercise Start Date and prior to the Exercise Start Date (in each case without application of this clause (v)), then such Exercise Start Date shall be deemed to be the Notice Delivery Date and the Expiration Date (as defined in such Warrant) of such Warrant shall be deemed to be at 5:00 p.m., New York City time, on the six-month anniversary of the Notice Delivery Date, and (3) if the Notice Delivery Date shall have occurred after the Exercise Start Date for such Warrant (without application of this clause (v)), no adjustment shall be made to the Exercise Start Date or the Expiration Date of such Warrant (except in such case where the Exercise Start Date for such Warrant shall have been accelerated as a result of the occurrence of a Preliminary Control Date or an Other Voting Security Event (each as defined in such Warrant), in which case the Expiration Date (as defined in such Warrant) of such Warrant shall be deemed to be the earlier of (x) such Expiration Date without application of this clause (v) and (y) 5:00 p.m., New York City time, on the six-month anniversary of the Notice Delivery Date); provided that any exercise of any Warrant after the Notice Delivery Date and prior to the Expiration Time (as modified by this clause (v)) for such Warrant shall be only effected as a Cashless Exercise (as defined in such Warrant) (the Expiration Time determined by the immediately foregoing clauses (1), (2) and (3), the "Modified Expiration Time");

(vi)    if the Notice Delivery Date shall have occurred, to the extent not previously expired, from and after the Notice Delivery Date, the Standstill Period (as defined in the Shareholders Agreement) and the SP Standstill Period (as defined in the Shareholders Agreement), if then in effect, shall be deemed for all purposes to be the period beginning on the date of this Agreement and ending upon the later of (1) the 18 month anniversary of the Notice Delivery Date and (y) the date that the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, equals one share less than 10%;

(vii)    if the Notice Delivery Date shall have occurred, for the avoidance of doubt giving effect to the eighth and tenth sentences of Section 5.2 of the Shareholders Agreement, from and after the date of the later of (1) the Notice Delivery Date and (2) the latest to occur of the Modified Expiration Time in respect of each Warrant (the date determined pursuant to clause (1) and clause (2), the "Sell-down Date"), each Investor shall be required to Transfer (as defined in the Shareholders Agreement) to Persons other than Walgreens, Alliance Boots or any of their respective Permitted Transferees or Affiliates, in each case in accordance with the terms of the Shareholders Agreement (as modified pursuant to this Section 5.1(e)), by no later than the two-year anniversary of the Sell-down Date (such two-year period, the "Sell-Down Period"), a number of shares of Common Stock, if any, as is necessary so that the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, is less than 15% (such shares, the "Required Sell-Down Shares" and such required Transfers, the "Required Sell-

Down Transfers"), it being understood that subject to the obligation of the Investors to complete the Required Sell-Down Transfers prior to the expiration of the Sell-Down Period, and subject to compliance with the Shareholders Agreement (as modified pursuant to Section 5.1(e)(iv)), the manner, timing, volumes, prices and transferees applicable to any Required Sell-Down Transfers shall be in the Investors' respective sole discretion; provided, that, if at any time during the Sell-Down Period, (A) the Investors have not yet completed the Required Sell-Down Transfers and (B) the Company delivers to each of Walgreens and Alliance Boots a notice (the date of delivery of such notice, the "Repurchase Election Date") affirmatively and irrevocably electing to repurchase in full from the Investors a number of shares equal to (and not less than) the remaining Required Sell-Down Shares with respect to which Required Sell-Down Transfers have not yet occurred, the Investors shall Transfer to the Company, and the Company shall purchase from the Investors, all such remaining Required Sell-Down Shares at a per share purchase price, payable by the Company to the Investors in immediately available funds, equal to the greater of (x) Applicable Market Price on the trading day immediately prior to the Repurchase Closing Date and (y) the Weighted Average Price as of the Repurchase Closing Date.  The closing of such repurchase by the Company shall occur on a Business Day (the "Repurchase Closing Date") selected by the Investors, but in any event no later than on the tenth (10th) Business Day immediately following the Repurchase Election Date.  For purposes of this Section 5.1(e), (1) the "Applicable Market Price" means, as of any date of determination, the closing price (regular way) of the Common Stock on such date on the principal stock exchange on which the Company Common Stock is then listed and (2) the "Weighted Average Price" means, as of any date of determination, the weighted-average per share price (including the applicable Exercise Prices (as defined in the applicable Warrants) in respect of all exercises of the Warrants (whether pursuant to a Cash Exercise or Cashless Exercise)) paid by the Investors in respect of all acquisitions of Common Stock from and after the date hereof and on or prior to such date of determination;

(viii)   if the Notice Delivery Date shall have occurred, for the avoidance of doubt giving effect to the eighth and tenth sentences of Section 5.2 of the Shareholders Agreement, from and after the Notice Delivery Date, the Ultimate Standstill Level (as defined in the Shareholders Agreement) shall be deemed to mean "(1) prior to the two-year anniversary of the Sell-down Date, thirty percent (30%) and (2) from and after the two-year anniversary of the Sell-down Date, ten percent (10)%"; provided, that, from and after the two-year anniversary of the Sell-down Date and with respect to shares of Common Stock that represent collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group of less than 15% and more than 10%, if at any time during the Standstill Period (as modified by this Section 5.1(e)), the collective Beneficial Ownership of Common Stock of the Investors, SP (as defined in the Shareholders Agreement) and the SP Investors (as defined in the Shareholders Agreement), as a group, equals or exceeds the Ultimate Standstill Level, the Investors shall, in accordance with the Shareholders Agreement (as modified by this Section 5.1(e)), within a commercially reasonable and practicable time thereafter, taking into account market conditions, effect the Transfer of such number of shares of Common Stock as is necessary so that such collective Beneficial Ownership of Common Stock is no longer equal to or in excess of the Ultimate Standstill Level; provided, further, that, notwithstanding anything to the contrary (and, for the avoidance of doubt, without any implication of expanding the Investors' obligations pursuant to the immediately preceding proviso), and with respect to shares of Common Stock that represent collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group of less than 15% and more than 10%, in no event shall the Investors be required to

-29-

Transfer any shares of Common Stock (or be deemed to be in breach or default by virtue of not Transferring any shares of Common Stock) pursuant to this Section 5.1(e)(viii) to the extent that the then-current Applicable Market Price is less than the then-current Weighted Average Price; provided further, that, notwithstanding anything to the contrary, any shares that reflect collective Beneficial Ownership of Common Stock of the Investors, SP and the SP Investors as a group in excess of 15% remain subject to the obligations of clause (vii); and

(ix) if the Notice Delivery Date shall have occurred, each of the parties hereto agrees to act in good faith and execute and deliver, and/or cause the execution and delivery of, all such future amendment and modification agreements and such other instruments, in each case with respect to any Transaction Document (and, in the case Alliance Boots and Walgreens, the Transaction Rights Agreement and the limited liability company agreement of the FW JV), and to take, and/or cause the taking of, such other and further action as may be reasonably necessary or appropriate to carry out the provisions of, and the intention of the parties as expressed in, this Section 5.1(e).

(f) In the event of termination of this Agreement as provided in this Section 5.1, this Agreement (other than Section 1.3, Section 3.2, Section 3.3, Section 3.6, Section 4.2 (to the extent of any Initial Open Market Shares and Additional Open Market Shares that have been acquired prior to termination) and Section 4.3 (to the extent of any Initial Open Market Shares and Additional Open Market Shares that have been acquired prior to termination) and this Article V, each of which shall survive any termination of this Agreement, and other than the Confidentiality Agreements and the Transaction Rights Agreement, each of which shall survive in accordance with the terms thereof) shall forthwith become void and there shall be no liability on the part of any party hereto, except that nothing herein shall relieve any party from liability for any breach of this Agreement prior to such termination.

(g) Without affecting in any manner any prior exercise of the canceled Warrant(s), in the event that the either Warrant 1 and/or Warrant 2 are canceled in accordance with this Section 5.1, such canceled Warrant(s) shall be canceled and terminated and shall forthwith become void and the Company shall have no subsequent obligation to issue, and the Warrantholder (as defined in the Warrants) shall have no subsequent right to acquire, any Warrant 1 Shares (if Warrant 1 is canceled) or any Warrant 2 Shares (if Warrant 2 is canceled).

(h) Without affecting in any manner any prior acquisition of shares of Common Stock pursuant to the terms of the Transaction Documents, in the event that either Section 4.1 and/or Section 4.4 are terminated in accordance with this Section 5.1, such terminated Section(s) shall forthwith become void and there shall be no liability on the part of any party hereto with respect to such terminated Section(s), except that nothing herein shall relieve any party from liability for any breach of such terminated Section(s) prior to such termination.

5.2  Amendment.  No amendment of any provision of this Agreement will be effective unless made in writing and signed by an officer of a duly authorized representative of each party.

5.3  Waiver of Conditions.  The conditions to any party's obligation to consummate any transaction contemplated herein are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law.  No waiver will be

[[3397517]]

effective unless it is in writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

5.4     Counterparts and Facsimile.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.  Executed signature pages to this Agreement may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

**5.5     Governing Law; Submission to Jurisdiction; WAIVER OF JURY TRIAL. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.  In addition, each of the parties hereto (a) submits to the personal jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such dispute, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such dispute, any Delaware State court sitting in New Castle County, in the event any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the transactions contemplated hereby, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any claim, action or proceeding relating to this Agreement or the transactions contemplated hereby in any court other than the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such claim, action or proceeding, the United States District Court for the District of Delaware, or in the event (but only in the event) that such United States District Court also does not have jurisdiction over such claim, action or proceeding, any Delaware State court sitting in New Castle County.  Each party agrees that service of process upon such party in any such claim, action or proceeding shall be effective if notice is given in accordance with the provisions of this Agreement.  EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM, ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.5.**

5.6     Notices.  Any notice, request, instruction or other document to be given hereunder by any party to the others will be in writing and will be deemed to have been duly given (a) on

-31-

the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, or (b) on the second Business Day following the date of dispatch if delivered by a recognized next day courier service.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

### If to the Company, to:

| | |
|---|---|
| Name: | AmerisourceBergen Corporation |
| Address: | 1300 Morris Drive |
| | Chesterbrook, PA 19087 |
| Country: | United States |
| Fax: | 610 727 3612 |
| Attn: | General Counsel |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Cravath, Swaine & Moore LLP |
| Address: | Worldwide Plaza |
| | 825 Eighth Avenue |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 474-3700 |
| Attention: | Damien R. Zoubek, Esq. |
| | Robert I. Townsend III, Esq. |

### if to Walgreens, to:

| | |
|---|---|
| Name: | Walgreen Co. |
| Address: | 108 Wilmot Road |
| | Deerfield, Illinois 60015 |
| Country: | United States |
| Fax: | (847) 315-3652 |
| Attention: | Thomas J. Sabatino, Executive Vice President, |
| | General Counsel and Corporate Secretary |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Wachtell, Lipton, Rosen & Katz |
| Address: | 51 West 52nd Street |
| | New York, New York 10019 |
| Country: | United States |
| Fax: | (212) 403-2000 |
| Attention: | Andrew R. Brownstein, Esq. |
| | Benjamin M. Roth, Esq. |

-32-

*if to Alliance Boots, to:*

| | |
|---|---|
| Name: | Alliance Boots GmbH |
| Address: | 94 Baarerstrasse |
| | 6300 Zug |
| Country: | Switzerland |
| Attention: | Marco Pagni, Group Legal Counsel & |
| | Chief Administrative Officer |
| Email: | Marco.Pagni@allianceboots.com |

with a copy to (which copy alone shall not constitute notice):

| | |
|---|---|
| Name: | Darrois Villey Maillot Brochier |
| Address: | 69 avenue Victor Hugo |
| | 75116 Paris |
| Country: | France |
| Fax: | +33 1 45 02 49 59 |
| Attention: | Me. Alain Maillot |
| | Benjamin S. J. Burman, Esq. |

5.7    Entire Agreement, Etc.  This Agreement (including the Annexes hereto), the other Transaction Documents, the Confidentiality Agreements and, in the case of Walgreens and Alliance Boots, the Transaction Rights Agreement, constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof.  No party hereto shall take, or cause to be taken, including by entering into agreements or other arrangements with provisions or obligations that conflict, or purport to conflict, with the terms of the Transaction Documents or any of the transactions contemplated thereby, any action with either an intent or effect of impairing any such other persons' rights under any of the Transaction Documents. "Confidentiality Agreements" has the meaning ascribed to such terms in the Shareholders Agreement.

5.8    Definitions of "subsidiary" and "Affiliate".

(a)    When a reference is made in this Agreement to a subsidiary of a person, the term "subsidiary" means, with respect to such person, any foreign or domestic entity, whether incorporated or unincorporated, of which (a) such person or any other subsidiary of such person is a general partner or (b) at least a majority of the voting power to elect a majority of the directors or others performing similar functions with respect to such other entity is directly or indirectly owned or controlled by such person or by any one or more of such party's subsidiaries, or by such party and one or more of its subsidiaries.

(b)    The term "Affiliate" means, with respect to any person, any other person (for all purposes hereunder, including any entities or individuals) that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first person.  It is expressly agreed that, for purposes of this definition, (i) none of the Company or any of its subsidiaries is an Affiliate of Walgreens, Alliance Boots or WBAD (or any of their

-33-

respective subsidiaries) (and *vice versa*), and (ii) each of WBAD and the FW JV is an Affiliate of each of Walgreens and Alliance Boots (and *vice versa*).  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of securities, by contract, management control, or otherwise.  "Controlled" and "Controlling" shall be construed accordingly. Notwithstanding the foregoing, for all purposes of any Transaction Document or any other agreement that expressly incorporates this definition by reference hereto, in no event shall (i) Walgreens (or any of its subsidiaries) be deemed an Affiliate of  Alliance Boots (or any of its subsidiaries) (and *vice versa*), unless and until Alliance Boots shall have become a subsidiary of Walgreens, and in no event shall either Walgreens (or any of its subsidiaries) or Alliance Boots (or any of its subsidiaries) be deemed an Affiliate of the Company (or any of its subsidiaries) (and *vice versa*) or (ii) Alliance Boots (or any of its subsidiaries) or Walgreens (or any of its subsidiaries) be deemed an Affiliate of Kohlberg Kravis Roberts & Co. L.P., a Delaware limited partnership, or of any of its Affiliates (including its investment funds) or of any of its or its Affiliates' (including its investment funds') "portfolio companies" (as such term is customarily used among institutional investors) (and *vice versa*).

5.9     Assignment.  Neither this Agreement nor any right, remedy, obligation nor liability arising hereunder or by reason hereof shall be assignable by any party hereto without the prior written consent of the other parties, and any attempt to assign any right, remedy, obligation or liability hereunder without such consent shall be void, except that each of Walgreens and Alliance Boots may transfer or assign, in whole or from time to time in part, to one or more of its respective direct or indirect wholly-owned subsidiaries, or to the FW JV, its rights and/or obligations under this Agreement, but any such transfer or assignment will not relieve Walgreens or Alliance Boots, as applicable, of its obligations hereunder.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

5.10    Severability.  If any provision of this Agreement or a Transaction Document, or the application thereof to any person or circumstance, is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby or thereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

5.11    No Third Party Beneficiaries.  Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person other than parties hereto (and (a) any wholly-owned subsidiary of either Walgreens or Alliance Boots, or the FW JV, as applicable, to which an assignment is made in accordance with this Agreement and (b) any Warrantholder (as defined in Warrant 1) with respect to Section 4.1 and Additional Open Market Shares), any benefits, rights, or remedies.

5.12    Specific Performance.  The parties hereto agree that failure of any party to perform its agreements and covenants hereunder, including a party's failure to take all actions as

-34-

are necessary on such party's part in accordance with the terms and conditions of this Agreement to consummate the transactions contemplated hereby, will cause irreparable injury to the other parties, for which monetary damages, even if available, will not be an adequate remedy.  It is agreed that the parties shall be entitled to equitable relief including injunctive relief and specific performance of the terms hereof, without the requirement of posting a bond or other security, and each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of a party's obligations and to the granting by any court of the remedy of specific performance of such party's obligations hereunder, this being in addition to any other remedies to which the parties are entitled at law or equity.

* * *

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

AMERISOURCEBERGEN CORPORATION

By: _____

    Name:

    Title:

WALGREEN CO.

By: _____

    Name:

    Title:

ALLIANCE BOOTS GMBH

By: _____

    Name:

    Title

[[3397517]]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

AMERISOURCEBERGEN CORPORATION

By: _____

Name: Steven H. Collis

Title: President and CEO

*[Signature Page to Framework Agreement]*

WALGREEN CO.

By: _____

Name: Greg Wasson

Title: Chief Executive Officer

*[Signature Page to Framework Agreement]*

ALLIANCE BOOTS GMBH

By: _____
Name: Stefano Pessina
Title: Executive Chairman

*[Signature Page to Framework Agreement]*