# EXHIBIT F

Page 364

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF OHIO
             EASTERN DIVISION
```

_____

IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
OPIATE LITIGATION                  Case No. 17-md-2804

This document relates to:          Judge Dan
                                   Aaron Polster
The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005
City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132
The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090

_____

                    VOLUME II
       Videotaped Deposition of Joseph Rannazzisi
                 Washington, D.C.
                  May 15, 2019
                   8:43 a.m.



Reported by:  Bonnie L. Russo
Job No. 3301884

Page 375

1  P R O C E E D I N G S

3  THE VIDEOGRAPHER:  We are now on
4  the record.  My name is Dan Lawlor, I'm a
5  videographer with Golkow Litigation Services.
6  Today's date is May 15, 2019, and the time is
7  8:43 a.m.
8  This video deposition is being held
9  in Washington, D.C., in the matter of In RE:
10  National Prescription Opioid Litigation, MDL
11  No. 2804.  The deponent is Joseph Rannazzisi.
12  Counsel will be noted on the
13  stenographic record.  The court reporter is
14  Bonnie Russo and will now swear in the witness.

16  JOSEPH RANNAZZISI,
17  being first duly sworn, to tell the truth, the
18  whole truth and nothing but the truth,
19  testified as follows:
20  EXAMINATION BY COUNSEL FOR PLAINTIFFS
21  BY MR. LANIER:
22  Q.  Mr. Rannazzisi, thank you for your
23  time today.  My name is Mark Lanier.  You and I
24  have not met before you sat down here just a
25  few minutes ago; is that right?

Page 376

1        A.    That's correct.
2        Q.    You understand, though, that I
3   represent the claimants that are bringing this
4   lawsuit against the various opioid defendants
5   that are present in court today.
6              Do you understand?
7        A.    Yes.
8        Q.    All right.  I have got a picture
9   with some notes that I will make as we go
10  along.  That's you.
11             Did I spell your name right?
12       A.    Yes, sir.
13       Q.    Would you pronounce it for me so
14  that I can pronounce it right?
15       A.    Rannazzisi.
16       Q.    Rannazzisi.  All right.  And that
17  picture looks pretty much like you.  I don't
18  see much difference there.
19             Let me tell you where we would like
20  to go today and what all I need to ask you
21  about.  I have done a little roadmap for you
22  and for the jury so that we can follow along.
23  The roadmap, I am calling you the 60 Minute
24  Man.  You have been on 60 Minutes; is that
25  right?

Page 377

1   A.   Yes, sir.
2   Q.   All right.  So on 60 Minute Man
3   Road, I want to make a stop to talk about your
4   background, I want to make a stop to talk about
5   the 60 Minutes episode and then I want to ask
6   some follow-up questions and we will deal with
7   some roadblocks or some questions about your
8   testimony along the way.  Okay?
9   A.   Yes, sir.
10  Q.   So with that, if you have got any
11  questions as we go along, let me know but we're
12  going to begin with stopping at your background
13  and I will start a clean sheet on your
14  background so that we can look at it together.
15  All right?
16  A.   Yes, sir.
17  Q.   Would you please tell the jury a
18  little bit about where you are from, where you
19  grew up, just so they've got a feel for you.
20  A.   I grew up in a town on Long Island,
21  New York, Freeport, New York.  It's a smaller
22  town on the south shore of Long Island.  Went
23  to Freeport High School, from Freeport High
24  School, I went to Butler University.
25  Q.   And Butler university is in

Page 378

1  Indianapolis?
2      A.   Yes, sir.
3      Q.   What's their mascot, the Butler --
4      A.   Bulldogs.
5      Q.   -- bulldogs.
6      A.   Yes, sir.
7      Q.   All right.  So you were a bulldog
8  and when did you get out of college, out of
9  Butler?
10     A.   1984.
11     Q.   And what was your major?
12     A.   Pharmacy.
13     Q.   Are you actually a licensed
14 pharmacist or have you been at some point in
15 your life?
16     A.   Yes, sir.  I maintain my pharmacy
17 license, State of Indiana.
18     Q.   Okay.  So you are a licensed
19 pharmacist in Indiana.  What does that enable
20 you to do?
21     A.   It enables me to dispense medication
22 pursuant to physicians' prescriptions.
23     Q.   I assume that is if you are in
24 Indiana?
25     A.   If I am in Indiana, yes, sir.

Page 395

1   Q.   Sometimes you get paid to give
2   speeches?
3   A.   Yes, sir.
4   Q.   Sometimes you give speeches for
5   free?
6   A.   Yes, sir.  It's groups where
7   families have lost children or lost loved ones.
8   Those are free.  I generally just ask them to
9   pay for my way out and back.  Law enforcement,
10  free, except again, if they pay my way out and
11  back.
12           Pharmacy -- some pharmacy groups,
13  especially if it is, like, a state, they are
14  doing -- if they are doing continuing
15  education, I will do those for free as well.
16  Q.   What do you speak about?
17  A.   Generally my speeches are tailored
18  to what the audience, what they are interested
19  in.  Sometimes I will speak about the overall
20  opioid crisis where we will just talk about,
21  you know, how it occurred, historically what
22  happened.
23           For pharmacists, I generally stay
24  towards corresponding responsibility, helping
25  the states and the pharmacists understand what

Page 396

1  corresponding responsibility is and what is
2  required of a pharmacist with prescriptions and
3  what they are supposed to do, how they are
4  supposed to resolve red flags.
5       A lot of times, I go and speak and
6  then just help the parents, talk to parents,
7  you know, who have lost kids, talk to parents
8  who just want to tell their story which, you
9  know, is definitely -- it's tragic, all those
10 kids and all those people.  Very tragic.
11     Q.   All right.  That's going to do our
12 first stop on the road.  So we have got your
13 background information here.
14      It is going to be relevant as we go
15 along, but I want to move to the next stop on
16 the road, which is what I call the 60 Minute
17 stop.  Okay?
18     A.   Yes, sir.
19          MR. STEPHENS:  Object to form.
20          BY MR. LANIER:
21     Q.   All right.  Let's move to the 60
22 Minute stop and we will get a sheet set up for
23 that stop and talk to you about that.  Okay?
24     A.   Yes, sir.
25     Q.   First set of questions here, how on

Page 397

1  earth -- by the way, this 60 Minutes, that the
2  TV show, right?
3      A.   Yes, sir.
4      Q.   That's the one that's got on those
5  ads, the ticking clock, tick, tick, tick, tick,
6  tick?
7      A.   Yes, sir.
8      Q.   All right.  What -- how did you even
9  get involved to get on 60 Minutes?  How did
10 that come about?
11          MS. McCLURE:  Objection.
12          THE WITNESS:  I -- it basically
13 didn't start with 60 Minutes.  It started with
14 reporters calling asking certain things about
15 the opioid crisis and I never -- if a reporter
16 called and asked questions, I felt obligated to
17 answer them.
18          As more reporters called, reporters
19 obviously read other reports and they started
20 -- Washington Post called and they were looking
21 at a story and they asked several questions and
22 I explained how things happened and how things
23 occurred in the opioid crisis, and they were
24 very interested in the Insurance Patient Access
25 Act and one thing led to another and they

Page 398

1  started writing about different things and the
2  interplay between, you know, Congress and other
3  entities.
4          From there, 60 Minutes started
5  working with the Washington Post and we ended
6  up on 60 Minutes.
7          BY MR. LANIER:
8      Q.   Was not something you sought out?
9      A.   No, sir.
10          MR. STEPHENS:  Object to form.
11          BY MR. LANIER:
12     Q.   Why you?  Do you know?
13          MR. STEPHENS:  Object to form.
14          BY MR. LANIER:
15     Q.   Let me ask it this way.  Let me
16  re-ask the question.
17          In your mind, what made you
18  particularly important or useful for a 60
19  Minutes story?
20          MS. MAINIGI:  Objection.
21          MR. EPPICH:  Objection.
22          THE WITNESS:  I think because I was
23  -- I was there during that time period.  I was
24  there during the time period where the deaths
25  increased or the overdoses increased, and quite

Page 399

1  frankly, they saw -- they saw my testimony
2  before Congress and it wasn't difficult to see
3  in my testimony before Congress, you know, it
4  was -- there was a lot of -- there was quite a
5  bit of tension between what DEA was doing and
6  what Congress wanted us to do.
7           BY MR. LANIER:
8       Q.   All right.  If we -- I don't want to
9  go back necessarily to your background, but one
10 of the things that you did when you worked for
11 the DEA that we have left out is your testimony
12 to Congress.
13          You testified to Congress; is that
14 right?
15      A.   Yes, sir.
16      Q.   Do you recall how many times you got
17 called on to come give testimony to the United
18 States Congress?
19      A.   I believe it's right around 33,
20 maybe a little more.
21      Q.   So 33 times you were selected I
22 assume, or were you invited or how does that
23 work?
24          MR. STEPHENS:  Objection.
25          THE WITNESS:  Sometimes I was