UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*The County of Summit, Ohio*, et al. *v. Purdue Pharma L.P.*, et al., Case No. 18-op-45090<br><br>*The County of Cuyahoga, Ohio*, et al. *v. Purdue Pharma L.P.*, et al., Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

**MEMORANDUM IN SUPPORT OF
<u>CARDINAL HEALTH INC.'S MOTIONS *IN LIMINE*</u>**

Cardinal Health submits three motions *in limine*.

1.     **14,000 Orders Not Shipped**.  Plaintiffs' only evidence that Cardinal Health violated its CSA duties between 2012 and 2015 is that the company did not report to DEA approximately 14,000 suspicious orders, only four of which came from Cuyahoga or Summit pharmacies.  It is undisputed that Cardinal Health did not ship a single one of the 14,000 orders.  For that reason, the 14,000 unreported orders did not cause, and could not have caused, Plaintiffs (or anyone) any injury and should be excluded as irrelevant.

In 2018, while collecting documents for production to the Multistate AG group, lawyers for Cardinal Health discovered that approximately 14,000 suspicious orders had not been reported to DEA during the period 2012 to 2015—a period during which Cardinal Health was reporting tens of thousands of orders a year.  Cardinal Health promptly advised the DEA.[1]  DEA

---

[1]     *See* CAH_MDL2804_02101802 (attached as Ex. 1).

has never directed the company to submit the reports after-the-fact or to fault CAH formally or informally for the unreported orders, given that the orders were not shipped.

Further inquiry by Cardinal Health determined three things: (1) the company did not ship any of the orders; (2) the non-reporting was the result of an IT error (i.e., a programming mistake), not any individual's decision; and (3) the vast majority of the 14,000 orders were not "suspicious" according to conventional company thresholds, but only pursuant to an added layer of scrutiny adopted by the company. As is conventional, Cardinal Health reported orders that exceeded "base-code" thresholds, which are thresholds set for each class of drug (e.g., oxycodone as distinguished from hydrocodone as distinguished from codeine). But the company also employed "sub-base codes", which were limits established for particular dosages of a drug (e.g., 30 mg oxycodone v. 15 mg oxycodone). The vast majority of the 14,000 orders did not exceed base-code thresholds, only sub-base codes.

The Court should exclude evidence regarding the 14,000 unreported orders for two reasons. *First*, because the orders did not ship, the evidence is not relevant. Plaintiffs' theory of liability against Distributors is that they failed to develop and maintain adequate suspicious-order monitoring systems, such that Distributors either failed to flag suspicious orders or, if they flagged them, still shipped the orders to pharmacies in Cuyahoga and Summit, where the allegedly excessive number of pills led to diversion and injury to Plaintiffs. But neither Plaintiffs nor anyone else can have suffered any injury from pharmacy orders that were never filled—i.e., pills that were never distributed and, therefore, never dispensed or diverted. "No harm, no foul" is common sense. It is also the testimony of Plaintiffs' regulatory expert. *See* Rafalski Dep. 370:12-24 (not shipping an order "would obviously keep it from being distributed and it would not lead to diversion") (attached as Ex. 2); *id.* 371:14-17 ("just the mere fact of stopping a

shipment when you've identified it as a potential suspicious order would prevent diversion"); *id.* 371:18-23 ("not reporting the suspicious order to DEA is not what causes diversion").

*Second*, Cardinal Health promptly advised DEA of the unreported orders when it discovered them. More than a year has passed, and the agency has never directed the company to submit the orders. For what purpose, then, would Plaintiffs be introducing evidence of the unreported orders? It could only be for the purpose of arguing that Cardinal Health was obligated to report the orders and, by failing to do so, misled DEA and, in turn, prevented DEA from investigating those orders. But, in making that argument, the Counties would be stepping into DEA's shoes and policing the CSA regulations—and doing so when the agency has exercised its discretion ***not*** to take enforcement action. This would trespass the boundary of conflict preemption demarcated in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). The considerations that were important for the Supreme Court in holding that state-law fraud-on-the-FDA claims were preempted under the Food, Drug and Cosmetic Act also hold true for state-law fraud-on-the-DEA claims under the regulatory scheme created by the Controlled Substances Act and enforced by DEA as for the regulatory scheme:

- That the "conflict stems from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration, and that this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives";

- That "[a]ccompanying these disclosure requirements are various provisions aimed at detecting, deterring, and punishing false statements made during this and related approval processes";

- That the agency "has at its disposal a variety of enforcement options that allow it to make a measured response to suspected fraud upon the Administration";

- That "[t]his flexibility is a critical component of the statutory and regulatory framework under which the FDA pursues difficult (and often competing) objectives"; and, thus,

- State-law claims "would exert an extraneous pull on the scheme established by Congress, and it is therefore preempted by that scheme."[2]

Admission of the 14,000 unreported orders would exert just this kind of "extraneous pull" here.

   2. **"Interesting Gossip" Email**. The Court should exclude evidence or argument regarding a McKesson document (MCKMDL0054341) (attached as Ex. 3) pursuant to Federal Rules of Evidence 402 and 403. The document is an email, written by a McKesson employee in 2013. It reports a dinner conversation at which a Cardinal employee supposedly said that "Cardinal is not reporting suspicious orders to DEA." The author characterizes the information as "[i]nteresting gossip." He has since testified under oath that he was mistaken.[3] And the "gossip" in the email is false: Cardinal Health reported thousands of suspicious orders in the quarter in which the conversation took place, and even more in the subsequent quarter and for the year 2013.[4] Plaintiffs' own expert witnesses point to 2013 as the year when Cardinal began reporting suspicious orders to DEA.[5]

  Gossip is not relevant evidence, and certainly not gossip that is demonstrably inaccurate. Even if the email were somehow relevant, the probative value would be outweighed by the prejudice of injecting into the trial a falsehood that would require rebuttal and waste time at a trial in which Cardinal Health has only 12.5 hours to defend itself.

   3. **Misleading Data Comparisons**. The Court should prohibit Plaintiffs from offering opinion testimony by their expert, Dr. Craig McCann, based upon data produced by

---

[2]  531 U.S. at 348–49, 353.

[3]  Deposition of De Gutierrez-Mahoney, 425:12-426:8 (attached as Ex. 4).

[4]  Documents produced in discovery, based on data from 39 states, show more than 9,000 reports by Cardinal Health in the first quarter of 2013 and more than 15,000 reports in the second quarter of 2013. CAH_MDL_PRIORPROD_AG_0009297 - CAH_MDL_PRIORPROD_AG_ 0009335.

[5]  Excerpt of Report of James Rafalski at 67 (attached as Ex. 5).

4

Cardinal for the years 1996 through 2005—the period for which only Cardinal Health, and not any other distributors, retained and produced shipment data.  *See* Fed. R. Evid. 401, 402.  In the alternative, the Court should bar Plaintiffs from arguing or offering testimony that Cardinal Health shipped more suspicious orders than other distributors during that time without a limiting instruction that informs the jury that Cardinal preserved and produced a decade's worth of transactional data more than other distributors.  Absent the instruction, such testimony and argument would mislead the jury.

As defendants have explained in prior submissions, McCann identifies "suspicious orders" purportedly shipped by distributors by applying their shipment data against five algorithms.  *See* ECF # 1783 (Mot. to Exclude McCann) at 3-4.  Critically, his method only searches for a *first* order that would be "flagged" by such an algorithm, after which he treats *all* subsequent orders by that customer for the same drug category as "suspicious orders" based on an assumption directed by Plaintiffs' counsel.  *Id.*  Simple math makes it clear that the more years of data produced by a distributor, the earlier McCann would be capable of finding a *first* flagged order under his method, and the longer period of time thereafter in which he will be counting orders as suspicious.  Indeed, McCann agreed at his deposition that all else being equal, "you're flagging more orders for the distributors that you go back further in time with."  Excerpt of McCann Dep. at 354:22 – 355:14 (attached as Ex. 6); *id.* at 356:3-11.[6]

---

[6]  McCann explained further why that would be the case:

> … [T]he amount of prescription opioids increases significantly from 1997 to 2010 or '11… . And if Cardinal Health … and some other distributor, Distributor B, both were shipping from 1997, but for some reason Distributor B only produced data from 2002 in discovery, we would start observing Distributor B's data at a higher level than the levels we first were observing Cardinal Health's shipments.  And … *obviously before the Distributor B's data is produced, none of those get flagged, because there is no*

Cardinal preserved and produced shipment data *from 1996*, while other defendants generally did so from 2004 forward, and complete data is not available until *2006*. *See* Excerpt of MacDonald Rpt. ¶ 84 (attached as Ex. 7). Similarly, the ARCOS database produced by the government only has data beginning in 2006. As a result, Cardinal Health's data are the primary shipment records McCann analyzes from 1996 until 2006, after which he relies upon ARCOS data. This disparity in record-keeping unfairly inflates the total orders from Cardinal labeled as "suspicious" compared to other defendants. *Id.* at Table 6. Said differently, McCann's total numbers of "suspicious" orders for each distributor do not involve an apples-to-apples comparison. Cardinal Health appears to have more "suspicious" orders under his analysis only because he had a decades-worth more data from Cardinal. While the extent of the impact depends upon the particular algorithm used, it increases by 5% on the method preferred by Plaintiffs' DEA witness, Rafalski, and as much as 12% on other methods, the "flagged" orders *within* the years 2006 to present. *Id.* That is in addition to the thousands of shipments—nearly 20% of Cardinal's total—"flagged" by McCann from 1996 to 2006, using primarily Cardinal data. *See* Excerpt of McCann Rpt., Fig. 11 & 12, Tbl. 24-25, 28-29 (attached as Ex. 8). As a consequence, when McCann compares distributors side-by-side, his totals for Cardinal Health are anywhere from 25% to 32% higher than they would have been if Cardinal had retained shipment records for only as long as the other defendants (and DEA, in the ARCOS database).

Accordingly, the Court should preclude McCann from testifying to any opinions based upon data produced by Cardinal before 2006. *See* Fed. R. Evid. 401, 402. Evidence is relevant

---

> *data produced by Distributor B; whereas, given my stylized hypothetical, a bunch of the Cardinal Health shipments may be flagged*.

*See* Ex. 6 (excerpt of McCann Dep. at 356:16 – 357:13).

only if it has a tendency to make a fact of consequence more or less probable than it would be without the evidence. *Id.* But there is simply no relevance to a comparison of one party's actions starting *in 1996* with other parties' actions starting *in 2004-06*. The relevant comparison is with orders over the same time period. Even if minimally relevant, the court should preclude such testimony because its probative value is outweighed by unfair prejudice to Cardinal. When making decisions about comparative fault, the jury should not have to rely upon an apples-to-oranges comparison of one defendant's shipments over a *22* year period, against other defendants' shipments over a *10* or *12* year period. That creates a misleading impression and prejudices Cardinal in at least two ways. First, the standard of care changed during the 1996 to 2006 time period. *See* Ex. 6 (excerpt of McCann Dep. at 356:16 – 357:13). Second, there simply is a greater number of years for Cardinal orders to get flagged under one of the algorithms, leading to higher totals of orders flagged by McCann either because they exceeded one of his thresholds, or were given that label by mere assumption. The Court should therefore limit McCann to opinions based upon equivalent years. *See* Fed. R. Evid. 403; *see also State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2013) ("When conducting a comparative analysis … care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'") (excluding comparison based on inconsistent data sources)); *Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127, 1150 (N.D. Ill. 2014) (same).

...

Dated:  September 25, 2019

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:   */s/ F. Lane Heard III*
    Enu Mainigi
    F. Lane Heard III
    Ashley W. Hardin

    725 Twelfth Street NW
    Washington, DC  20005
    (202) 434-5000 / tel.
    (202) 434-5029/ fax
    emainigi@wc.com
    lheard@wc.com
    ahardin@wc.com

    *Attorneys for Defendant Cardinal Health, Inc.*

## CERTIFICATE OF SERVICE

I, F. Lane Heard III, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ F. Lane Heard III*
F. Lane Heard III
