# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

# OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF ALL TRACK ONE BELLWETHER TRIAL DEFENDANTS' MOTIONS IN LIMINE

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     IN LIMINE RULINGS REQUESTED...............................................................2

        1.      The Court should not permit plaintiffs to present evidence or argument to
                the jury concerning "future damages." ..................................................................2

        2.      The Court should preclude plaintiffs from offering individualized evidence
                concerning prescriptions, shipments, and other matters on which they
                successfully avoided discovery by claiming it was "irrelevant." ..........................5

        3.      The Court should preclude testimony from witnesses about personal
                stories of opioid abuse or related harms to themselves or others. .........................9

        4.      The Court should exclude lay and hearsay testimony about prescription
                opioids being a "gateway" to illicit opioid use.....................................................11

        5.      The Court should preclude evidence concerning lobbying and other
                protected petitioning activity. ...............................................................................13

        6.      The Court should bar plaintiffs from introducing evidence of alleged
                wrongful shipments to places outside Track One jurisdictions. ...........................16

        7.      The Court should exclude as irrelevant evidence that defendants violated
                alleged duties under the CSA or its regulations....................................................18

        8.      The Court should require plaintiffs to establish the necessary foundation
                for their experts' testimony...................................................................................22

        9.      The Court should not allow use of certain charts presenting misleading
                and irrelevant data.................................................................................................25

        10.     The Court should prohibit counsel from offering personal opinions, using
                visual aids to belittle witnesses, and similar conduct. ..........................................28

        11.     The Court should exclude evidence and argument concerning defendants'
                financial condition, revenues, or profitability.......................................................31

        12.     The Court should preclude questioning of witnesses concerning their
                feelings and opinions of personal responsibility, guilt, or sympathy
                concerning the opioid crisis. .................................................................................34

        13.     The Court should bar plaintiffs and their counsel from making statements
                at trial that appeal to the jurors in their capacity as taxpayers. ............................35

14.     The Court should preclude any comment regarding the absence of a
         corporate representative at trial.............................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andler v. Clear Channel Broad., Inc.*,
670 F.3d 717 (6th Cir. 2012) ....................................................................................23

*Atanus v. S&C Elec. Co.*,
454 F. Supp. 2d 753 (N.D. Ill. 2006) .......................................................................21

*BE & K Constr. Co. v. Nat'l Labor Relations Bd.*,
536 U.S. 516 (2002)...................................................................................................14

*Bedford v. Collins*,
567 F.3d 225 (6th Cir. 2009) .....................................................................................31

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Trans.*,
596 F.3d 357 (6th Cir. 2010) .......................................................................................4

*Bhandari v. VHA Southwest Community Health Corp.*,
778 F. Supp. 2d 1155 (D. N.M. 2011) ......................................................................32

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
113 F. Supp. 2d 345 (E.D.N.Y. 2000) ........................................................................3

*Boggs v. Divested Atomic Corp.*
1997 WL 33377790 (S.D. Ohio Mar. 24, 1997).......................................................10

*Boler Co. v. Watson & Chalin Mfg., Inc.*,
372 F. Supp. 2d 1013 (N.D. Ohio 2004)......................................................................8

*Bouchard v. American Home Products Corp.*,
213 F. Supp. 2d 802 (N.D. Ohio 2002)........................................................................1

*Campbell v. PMI Food Equip. Grp., Inc.*,
509 F.3d 776 (6th Cir. 2007) .....................................................................................14

*Chambers v. St. Mary's Sch.*,
697 N.E.2d 198 (Ohio 1998)......................................................................................21

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
538 F. Supp. 1257 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984) ...........15

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
734 F.2d 1157 (6th Cir. 1984) ...................................................................................15

*City of Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980) ................................................................32

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991)........................................................................14

*Davis v. Clark Cty. Bd. of Comm'r*,
    994 N.E.2d 905 (Ohio Ct. App. 2013)..................................................21

*Davis v. Marathon Oil Co.*,
    528 F.2d 395 (6th Cir. 1975) ............................................................10

*In re DePuy Orthopaedics, Inc.*,
    888 F.3d 753 (5th Cir. 2018) ...................................................1, 29, 30

*Dippin' Dots, LLC v. Travelers Prop. Cas. Co. of Am.*,
    322 F.R.D. 271 (W.D. Ky. 2017)........................................................33

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)........................................................................13

*Eaton v. Newport Bd. of Educ.*,
    975 F.2d 292 (6th Cir. 1992) ............................................................13

*Feminist Women's Health Ctr., Inc. v. Mohammad*,
    586 F.2d 530 (5th Cir. 1978) ............................................................15

*Ferrarelli v. Federated Fin. Corp. of Am.*,
    253 F.R.D. 432 (S.D. Ohio 2008) ......................................................33

*Flying J, Inc. v. Central CA Kenworth*,
    45 Fed. App'x 763 (9th Cir. 2002) .......................................................4

*Gomez v. Schoenbeck*,
    2019 WL 3887128 (S.D. Ill. Aug. 19, 2019) ........................................36

*Helminski v. Ayerst Labs.*,
    766 F.2d 208 (6th Cir. 1985) ............................................................34

*Henry v. Quicken Loans, Inc.*,
    2011 WL 13208621 (E.D. Mich. Jan. 31, 2011).....................................31

*Hirst v. Inverness Hotel Corp.*,
    544 F.3d 221 (3d Cir. 2008)..............................................................35

*Hitachi Medical Systems America, Inc. v. Horizon Medical Group*,
    2008 WL 11380203 (N.D. Ohio, Oct. 30, 2008) ...................................10

*Hodge v. Hurley*,
    426 F.3d 368 (6th Cir. 2005) ...................................................................30

*Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*,
    530 F. Supp. 1098 (E.D. Pa. 1982) ..........................................................13

*Iron Workers Local Union No. 17 Ins. Fund & its Trustees v. Philip Morris Inc.*,
    29 F. Supp. 2d 801 (N.D. Ohio 1998).................................................32, 33

*In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*,
    635 F.2d 67 (2d Cir. 1980).........................................................................26

*In re Lewis*,
    845 F.2d 624 (6th Cir. 1988) .......................................................................5

*Louzon v. Ford Motor Co.*,
    718 F.3d 556 (6th Cir. 2013) .......................................................................1

*Malone v. Courtyard by Marriott L.P.*,
    659 N.E.2d 1242 (Ohio 1996)....................................................................33

*Marzullo v. J.D. Pavement Maintenance*,
    975 N.E.2d 1 (Ohio Ct. App. 2011).............................................................3

*McLean v. 988011 Ontario, Ltd.*,
    224 F.3d 797 (6th Cir. 2000) .........................................................22, 23, 24

*Mitroff v. Xomox Corp.*,
    797 F.2d 271 (6th Cir. 1986) .....................................................................35

*Ohio ex rel. Morrison v. Wiener*,
    83 N.E.3d 292 (Ohio Ct. App. 2017)..........................................................21

*Myles v. Meineke*,
    82 Ohio App. 126 (Ohio Ct. App. 1948) .....................................................5

*Niskanen v. Giant Eagle, Inc.*,
    912 N.E.2d 595 (Ohio 2009)......................................................................33

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014)...................................................................................13

Opdyke Inv. Co. v. City of Detroit,
    883 F.2d 1265 (6th Cir. 1989) ...................................................................13

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)....................................................................................8

*Potters Med. Ctr. v. City Hosp. Ass'n*,
   800 F.2d 568 (6th Cir. 1986) ...................................................................14

*R.C. Olmstead, Inc., v. CU Interface, LLC*,
   606 F.3d 262 (6th Cir. 2010) .....................................................................4

*Roddy v. Monsanto Co.*,
   6 Fed. App'x 549 (8th Cir. 2001) ............................................................26

*Saint-Gobain Autover v. Xinyi Glass N. Am.*,
   2009 WL 10689369 (Oct. 23, 2009) ........................................................10

*Scott v. Condo*,
   2002 WL 832210 (Ohio Ct. App. May 3, 2002) .........................................3

*Shahid v. City of Detroit*,
   889 F.2d 1543 (6th Cir. 1989) .................................................................23

Snyder v. Phelps,
   562 U.S. 443 (2011) .................................................................................14

*Sprietsma v. Mercury Marine*,
   537 U.S. 51 (2002) ...................................................................................20

*State v. Clay*,
   181 Ohio App. 3d 563 (8th Dist. 2009) ...................................................30

*Taylor v. City of Cincinnati*,
   143 Ohio St. 426 (Ohio 1944) .................................................................21

*Tovey v. Nike, Inc.*,
   2014 WL 3510636 (N.D. Ohio July 10, 2014) ....................................24, 25

*United States Football League v. Nat'l Football League*,
   634 F. Supp. 1155 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) .............................15

*United States v. Alghazouli*,
   517 F.3d 1179 (9th Cir. 2008) .................................................................19

*United States v. Brawner*,
   173 F.3d 966 (6th Cir. 1999) .....................................................................1

*United States v. Daniel*,
   329 F.3d 480 (6th Cir. 2003) ...................................................................19

*United States v. Dimora*,
   879 F. Supp. 2d 718 (N.D. Ohio 2012) ....................................................32

*United States v. Freeman*,
730 F.3d 590 (6th Cir. 2013) ..........................................................................35

*United States v. Gessa*,
971 F.2d 1257 (6th Cir. 1992) ........................................................................17

*United States v. Jobson*,
102 F.3d 214 (6th Cir. 1996) .....................................................................16, 17

*United States v. Kilpatrick*,
798 F.3d 365 (6th Cir. 2015) ..........................................................................11

*United States v. McFadyen-Snider*,
552 F.2d 1178 (6th Cir. 1977) ...................................................................17, 18

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) ..........................................................................37

*United States. v. Murray*,
784 F.2d 188 (6th Cir. 1986) ............................................................................1

*United States v. Nixon*,
694 F.3d 623 (6th Cir. 2012) ..........................................................................37

*United States v. Palma*,
473 F.3d 899 (8th Cir. 2008) ..........................................................................36

*United States v. Phillips*,
872 F.3d 803 (6th Cir. 2017) ..........................................................................35

*United States v. Pits*,
85 F.3d 629 (6th Cir. 1996) ............................................................................37

*United States v. Ring*,
513 F.2d 1001 (6th Cir. 1975) ........................................................................17

*United States v. Schimmel*,
943 F.2d 802 (7th Cir. 1991) ..........................................................................36

*United States v. Semak*,
536 F.2d 1142 (6th Cir. 1976) ........................................................................17

*United States v. Signer*,
482 F.2d 394 (6th Cir. 1973) ..........................................................................37

*United States v. Solivan*,
937 F.2d 1146 (6th Cir. 1991) ........................................................................29

*VIBO Corp. v. Conway*,
    669 F.3d 675 (6th Cir. 2012) ........................................................................14

*Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
    641 F.2d 457 (7th Cir. 1981) ...............................................................13, 15

*Wilbon v. Plovanich*,
    2016 WL 3922906 (N.D. Ill. July 21, 2016)..........................................26

**Statutes**

18 U.S.C. § 1341 ............................................................................................19

18 U.S.C. § 1343 ............................................................................................19

18 U.S.C. § 1961 ......................................................................................*passim*

21 U.S.C. §§ 801–904, 951–971 ...................................................................19

21 U.S.C. § 843(a)(4) .....................................................................................18

Ohio Rev. Code § 119.03................................................................................20

Ohio Rev. Code § 2315.21..............................................................................33

Ohio Rev. Code § 2913.05..............................................................................20

Ohio Rev. Code § 2923.31.........................................................................19, 20

Ohio Rev. Code § 2923.32(A)(1) ...................................................................19

Ohio Rev. Code § 4729...................................................................................20

**Other Authorities**

Fed. R. Civ. P. 26.................................................................................4, 11, 12

Fed. R. Civ. P. 37...............................................................................................4

Fed. R. Civ. P. 42...........................................................................................33

Fed. R. Evid. 401......................................................................................36, 37

Fed. R. Evid. 402......................................................................................*passim*

Fed. R. Evid. 403......................................................................................*passim*

Fed. R. Evid. 404..............................................................................16, 17, 29

Fed. R. Evid. 602 ...................................................................................................................10

Fed. R. Evid. 701 .........................................................................................................11, 12, 35

Fed. R. Evid. 702 .........................................................................................................11, 12, 35

Ohio Rule of Professional Conduct 3.4(e).............................................................................28, 30

I.      **INTRODUCTION**

Motions *in limine* are a gateway mechanism to ensure the efficient and fair administration of trial.  They allow the Court to "ensure evenhanded and expeditious management of trial[] by eliminating evidence that is clearly inadmissible for any purpose."  *Bouchard v. American Home Products Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002) (internal citation omitted).  Granting such motions can streamline the trial.  *See United States v. Brawner,* 173 F.3d 966, 970 (6th Cir. 1999).  Early resolution of evidentiary issues also avoids needless interruption at trial by reducing arguments over evidence and setting clear expectations for the parties.  *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013).

Streamlining is particularly important here.  The Court has provided time allocations for this trial that presumptively permit each defendant just 12.5 hours to present its defenses.[1]  It is therefore critical that the parties focus their attention on the evidence and issues that are admissible and germane to the issues to be tried, without unnecessary side-shows on collateral issues.

Motions *in limine* also preserve trial integrity.  Ruling on certain critical questions now will reduce the risk that a jury will be tainted by improper references to inadmissible matters in opening statements or elsewhere.  *See United States. v. Murray*, 784 F.2d 188, 189 (6th Cir. 1986) (finding that a judge's prompt instruction to disregard improper evidence was "very close to an instruction to unring a bell" despite the diligence of the objection).  As explained below, that risk has already played out in at least one prior case involving the same counsel who represent plaintiffs in this case.  *See In re DePuy Orthopaedics, Inc.*, 888 F.3d 753, 785-87 (5th Cir. 2018) (new trial required).

---

[1] Defendants do not waive their objection to the insufficient time allotted to them for trial.

As this Court has observed on multiple occasions, these are important cases that have garnered unprecedented public attention.  The stakes are high, and all parties deserve a neutral forum.  Yet plaintiffs and their counsel may be tempted to divert the jury's attention away from the core facts and evidence with irrelevant and prejudicial spectacle.  Prudence dictates taking steps at the outset to ensure the integrity of the trial by precluding inadmissible evidence and improper argument.

This brief (and other *in limine* briefs filed by industry groups and individual defendants) reflects a good-faith effort to identify important evidentiary issues that merit resolution pre-trial. Where appropriate, this brief identifies specific examples of evidence that plaintiffs may offer. In most instances, however, defendants still have no meaningful notice of the *specific* evidence plaintiffs intend to offer at trial.  Plaintiffs served several hundred hours of deposition designations, an exhibit list with more than 150,000 documents, and a witness list with hundreds of names.  Although some reductions have since been made, these lists still massively exceed what plaintiffs can possibly present at trial.  Defendants reserve all objections to all evidence and arguments plaintiffs actually seek to present.

## II.     IN LIMINE RULINGS REQUESTED

### 1.     The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

In a telephonic conference with the Court on September 16, 2019, plaintiffs suggested for the first time that they would pursue "future" damages at trial on their RICO, OCPA, and conspiracy claims – separate and apart from their proposed "abatement" remedy.  That sudden announcement came after many months of expert disclosures, depositions, and motions, during which plaintiffs had every opportunity to develop their damages theories but failed to put forward any evidence supporting a future damages claim.  It is no coincidence that plaintiffs raised this issue only after the Court stated that it, not the jury, would determine the

appropriateness, structure, and amount of any "abatement" remedy.  The belated assertion that plaintiffs are seeking future damages is a transparent attempt to make an end-run around that decision.  It is too late to inject intricate, underdeveloped issues into an extraordinarily complex trial now less than one month away.  Doing so would violate federal discovery rules and unfairly prejudice defendants.  It would also create a risk of double recovery between a jury award and the prospective compensation plaintiffs have said they intend to seek under the mantle of nuisance "abatement."[2]  This Court should therefore bar plaintiffs from presenting future damages evidence in connection with any of their claims.

As a threshold matter, neither of plaintiffs' operative Complaints mention or seek future damages.  (Dkt. 1465 at ¶ 1138; Dkt. 1630 at ¶ 1179).  Indeed, plaintiffs expressly say that they brought these actions to "prevent future harm and redress past wrongs" – not to obtain future damages.

Plaintiffs also failed to provide any expert disclosures addressing future damages.  Because damages must be "reasonably certain to follow the injury complained of," *Marzullo v. J.D. Pavement Maintenance*, 975 N.E.2d 1, 10 (Ohio Ct. App. 2011), Ohio law typically requires future damages to be proved using expert evidence, *see, e.g.*, *Scott v. Condo*, 2002 WL 832210, at *2 (Ohio Ct. App. May 3, 2002) ("[W]ithout expert evidence on the future course of medical treatment, a jury is not permitted to simply infer from the expense of past treatment an amount of damages for future treatment."); *cf. also*, *e.g.*, *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345, 383 (E.D.N.Y. 2000) (rejecting speculative future damages under RICO).  But the report of plaintiffs' damages expert, Thomas McGuire, calculated only *past* damages for 2006-2018.[3]  Nor can plaintiffs claim that their abatement experts (Alexander

---

[2] Defendants maintain their position that the prospective compensation plaintiffs seek for public nuisance is not recoverable as "abatement."

[3] McGuire's only references to future damages were in footnotes, one of which stated that his methodology could theoretically be used to calculate future damages "[t]o the extent any bellwether government seeks damages at trial

and Liebman) provide what is needed on future compensatory damages because both experts stated unequivocally that they offer no such opinion.  Dkt. 1979-20 (Liebman Dep.) at 63:7-64:2; Dkt. 1974-04 (Alexander Dep.) at 64:8-16.

Plaintiffs' failure to satisfy basic expert disclosure obligations requires such evidence to be excluded from trial.  Allowing plaintiffs to advance a future compensatory damages theory would unfairly prejudice defendants.  With no expert analysis on plaintiffs' purported claim for future damages, defendants would have to go into trial blind on a potentially massive damages demand – precisely the kind of "trial by ambush" that federal discovery rules are designed to avoid.  *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010).  The Court should not allow that profoundly prejudicial result.  *See* Fed. R. Civ. P. 37(c) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or harmless."); *see also Bessemer & Lake Erie R.R. Co. v. Seaway Marine Trans.*, 596 F.3d 357, 366-69 (6th Cir. 2010) (affirming exclusion of future damages evidence for violation of discovery obligations); *Flying J, Inc. v. Central CA Kenworth*, 45 Fed. App'x 763, 767 (9th Cir. 2002) ("The court prohibited evidence of future damages . . . because Flying J's damages expert failed to include calculations of future damages in his expert report and concluded that the failure operated to the prejudice of defendants.").

Plaintiffs' eleventh-hour request to present evidence to the jury regarding "future damages" should also be rejected because it would impermissibly duplicate the relief plaintiffs claim they are entitled to collect for public nuisance "abatement."  Plaintiffs' "future damages" presumably consist of increased governmental expenditures, *i.e.*, money that they will need to

---

beyond 2018."  Dkt. 1911-5 at 7 n. 12.  *See also id.* at 44 n.90 ("Note that the fact that my calculation of damages is limited to 2006 through 2018 should not be interpreted as a conclusion that damages to the Bellwether governments ended in 2018, as these costs likely will continue in the future.").

spend in the future to deal with the problem of opioid use and abuse.  But that is precisely the relief that plaintiffs seek under the guise of the "abatement" remedy.  Permitting plaintiffs to seek both "future damages" and "abatement" poses an incurable risk of double recovery.  *See Myles v. Meineke*, 82 Ohio App. 126, 129 (Ohio Ct. App. 1948) ("It is elementary that plaintiff is entitled to but one satisfaction of his wrong. Recovery if allowed the plaintiff here would amount to an additional satisfaction for the one wrong.").[4]

Plaintiffs made a strategic litigation decision to produce an expert damages report focused exclusively on past damages, and then allowed *Daubert* and summary judgment motions to go by without hinting at a claim for future damages.  Because of these choices, the parties have not had an opportunity to litigate the adequacy of any future damages evidence plaintiffs might offer. This Court should exclude any future damages evidence from the trial of plaintiffs' RICO, OCPA, and conspiracy claims.

### 2. The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."

From the beginning of this litigation, plaintiffs have insisted that they intend to prove their claims through "aggregate" proof.  They successfully resisted defendants' efforts to obtain discovery that would look behind plaintiffs' generalized allegations to determine, for example, *which orders* shipped by *which distributors* plaintiffs contend were "suspicious" and might have been diverted to improper use, *which prescriptions* plaintiffs contend were improperly written because of the manufacturers' marketing activities, and *which incidents* of misuse of prescription opioids plaintiffs contend actually caused them harm.

---

[4] Allowing plaintiffs to seek future damages from the jury also would impede the Court's adjudication of plaintiffs' proposed "abatement" remedy.  If the jury were to award future damages, this Court would have no way of knowing what future expenses the jury included in its award (such that "abatement" compensation would be duplicative) or what expenses it rejected (such that "abatement" compensation would violate the Seventh Amendment).  *See In re Lewis*, 845 F.2d 624, 629 (6th Cir. 1988) ("[T]he judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim."(internal citation omitted)).

Defendants sought this information to establish that the facts of individual shipments, prescriptions, and incidents of misuse that plaintiffs seek to blur over with "aggregate" proof tell a very different story.  To develop such facts, defendants needed to know *which* shipments were alleged to be wrongful; *which* prescriptions were under attack; and *which* persons suffered addiction, required intervention from child protective services, or otherwise caused plaintiffs to incur costs for which they seek damages.  Plaintiffs, in response, asserted that such individualized information was *irrelevant*, because they intended to prove their case through aggregate, statistical evidence that would not address individual incidents.  *See, e.g.*, Dkt. 606 at 2-3 (Special Master Cohen's summary of plaintiffs' objections).

In a series of discovery orders, the Special Master and the Court took plaintiffs at their word that they intended to prove their claims at trial through "aggregate" evidence and denied defendants nearly all of the individualized discovery that would have enabled them to develop evidence showing, for example, that allegedly "suspicious" orders went to fill legitimate prescriptions and were not diverted, or that allegedly improper prescriptions went to alleviate genuine suffering without negative long-term effects on the patients who received them.

Discovery Ruling No. 1 was the seminal ruling on this subject.  In that Order, the Special Master largely accepted plaintiffs' argument that discovery concerning individual instances of inappropriate prescribing "has 'no relevance to the claims and defenses in this litigation.'"  Dkt. 606 at 3.  Given plaintiffs' representation that they intended to rest on "aggregate evidence and statistics showing defendants caused doctors' overall prescribing practices to become … medically unnecessary," the Special Master agreed that discovery concerning individual improper prescriptions would be "of limited relevance," and that plaintiffs needed to provide only enough information about individual cases to permit defendants to "understand" their aggregate proof.  *Id.* at 3, 5.  The Special Master warned, however, that "[w]hen Plaintiffs later

seek to prove causation or damages at trial, whether through expert testimony regarding a statistical model or otherwise, ***Plaintiffs may not rely affirmatively or defensively on any evidence or data they did not produce during discovery***."  *Id.* at 6 (emphasis added).

In subsequent orders, the Special Master and the Court applied the same reasoning to allow plaintiffs to limit their production of discovery concerning allegedly improper prescriptions, "suspicious" orders allegedly shipped by distributors, pharmacies allegedly involved in diversion, persons who allegedly suffered from addiction, and individual case files for minors allegedly removed because of parents' opioid abuse.  *See* Dkt. 1027, 1047, 1051 (as modified by Ex. 1), 1425, 1535.  In each instance, plaintiffs either were allowed to limit their responses and production to a small number of samples selected at their discretion,[5] or were allowed to provide placeholder responses that would not correspond to the evidence they would offer at trial.  *See* Dkt. 1051 at 6.  In some instances, moreover, defendants were prohibited from following up on the limited information that was provided.  *See id.* at 3 (providing, with respect to claims data, that "no person shall, without leave of Court, use any material produced pursuant to this *Ruling* in connection with any formal or informal third-party discovery").

In fact, plaintiffs have repeatedly affirmed that they will not present individualized evidence on these key issues.  For instance, plaintiffs have stated that, because they will rely upon aggregate proof, they "will not assert, either in expert opinions or factual presentations at trial, that any specific prescription was caused by defendants' deceptive marketing";[6] they "do not intend to assert, either in expert opinions or factual presentations at trial, than any specific prescription was unauthorized, medically unnecessary, ineffective, or harmful"; and they will not

---

[5] *See, e.g.*, Dkt. 1027 at 2-3.  Because plaintiffs had discretion to select the samples, there was no assurance that they were typical; nor did defendants have any way to test that question.

[6] *See* Ex. 2 (Plfs.' Suppl. Am. Resp. & Objs. to Mfr. Defs.' First Set of Interrogatories Submitted Pursuant to Disc. Ruling No. 13).

argue that the "filling of any specific prescription caused or led to harm for which Plaintiffs seek to recover."  Dkt. 1058 at 3-4.

Given these admissions, and having successfully secured orders limiting defendants' ability to obtain individualized evidence that would undermine plaintiffs' "aggregate" proof, plaintiffs should not now be permitted to present to the jury cherry-picked individualized instances of allegedly improper prescriptions, shipments, and patient outcomes that plaintiffs believe will *bolster* their case.  *See Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *Boler Co. v. Watson & Chalin Mfg., Inc.*, 372 F. Supp. 2d 1013, 1020 (N.D. Ohio 2004) ("[j]udicial estoppel preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship").  Plaintiffs succeeded in convincing the Special Master and the Court to accept their contention that the specifics of individual incidents of prescribing, individual shipments to pharmacies, individual pharmacies that received such shipments, and individual adverse impacts on patients or others were insufficiently relevant even to satisfy the liberal standard for discovery.  Plaintiffs should be compelled to abide by that position at trial, as Special Master Cohen warned them they would have to do.

Accordingly, plaintiffs should be precluded from offering testimony or other evidence purporting to address:

- Specific instances of medically unnecessary prescriptions;

- Specific instances of suspicious orders;

- Specific pharmacies allegedly involved in diversion;

- Specific persons who have suffered from addiction; and

- Specific instances of children being removed or otherwise served by child protective services.

This bar should apply to *all* individualized evidence plaintiffs might offer in these categories, including the limited examples they cherry-picked for disclosure in discovery, as defendants were precluded from obtaining broader discovery that would have uncovered counter-examples.  The examples were provided only to help defendants "understand" plaintiffs' planned aggregate proof and were *not* approved as a permissible way to bolster it.

### 3.    The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.

For multiple reasons, plaintiffs should be precluded from offering witness testimony relating to anecdotal personal stories about opioid abuse and related harms.  First, as discussed above, plaintiffs should be estopped from offering testimony purporting to establish that particular individuals received inappropriate prescriptions and/or became addicted, after they successfully avoided providing such individual information in discovery.

Second, the Court should bar such testimony because plaintiffs routinely blocked defendants from questioning deposition witnesses about this subject – including questions addressing the *positive* benefits most patients gain from taking lawfully prescribed opioid medications.  Plaintiffs regularly instructed deponents not to answer questions about their personal experiences with opioids or those of friends and family members.[7]  Moreover, no witnesses who had anecdotal testimony to offer about experiences with opioids, addiction, or related matters were identified in response to defendants' interrogatories seeking identification of persons with knowledge of plaintiffs' claims.  *See, e.g.*, Ex. 3 at 6-9.  Only *after* the close of discovery – when the period for noticing and taking depositions was long concluded – did

---

[7] *See, e.g.*, Ex. 4 (Paolino Dep.) at 260:1–261:6; Ex. 5 (Murray Dep.) at 346:24–347:8; Ex. 6 (Parfejewiec Dep.) at 181:6–182:8.  Plaintiffs regularly gave such instructions not to answer based on privacy grounds even though there is a Protective Order in this case that overrides any claim under HIPAA and provides appropriate protections for confidential information provided in discovery.  Dkt. 441 at 32, 74.  When a witness had a story plaintiffs wished to have told, they would occasionally refrain from instructing the witness not to answer, or the witness would even volunteer the information.  But in most instance all questioning on the subject was blocked by instructions not to answer.

plaintiffs serve "supplemental" responses to these interrogatories that added hundreds of additional names, including witnesses who plaintiffs apparently seek to call at trial to testify about personal experiences with opioids.  It is well settled that a party who fails to provide or obstructs discovery of evidence cannot then turn around and offer that same evidence at trial.[8]

Third, insofar as plaintiffs intend to offer anecdotal testimony from witnesses about drug abuse by family members or others, such testimony would in any event be inadmissible on foundational and hearsay grounds.  A witness cannot testify about prescriptions made to another person, about that other person's use or abuse of drugs, or about the cause of any overdose or death of that other person, unless the witness has *"personal* knowledge" of those facts.  Fed. R. Evid. 602 (emphasis added).

Finally, any such testimony should be barred under Rules 402 and 403.  These witnesses and any other persons about whose experiences the witnesses would be called to testify are not parties, and plaintiffs have disclaimed any effort to assert damages for the harms such persons allegedly suffered.  And although defendants have been deprived of the ability to depose these witnesses as a result of plaintiffs' discovery tactics, it is predictable that *none* of the witnesses will be able to tie any prescription pills that were used or abused in any individual situation to the conduct of any of the specific defendants involved in this trial.[9]  Such testimony would serve only to arouse the jurors' sympathies, with no proof tying any incident to a particular defendant.

---

[8] *See Davis v. Marathon Oil Co.*, 528 F.2d 395, 404 (6th Cir. 1975) (affirming order precluding witness that had not been timely disclosed); *Saint-Gobain Autover v. Xinyi Glass N. Am.*, 2009 WL 10689369, at *10 (Oct. 23, 2009) (excluding testimony and other evidence party refused to provide during discovery); *Hitachi Medical Systems America, Inc. v. Horizon Medical Group*, 2008 WL 11380203, at *3 (N.D. Ohio, Oct. 30, 2008) (barring party from presenting at trial evidence not provided in discovery).

[9] *See Boggs v. Divested Atomic Corp.* 1997 WL 33377790, at *8 (S.D. Ohio Mar. 24, 1997) (granting motion *in limine* to exclude anecdotal evidence in the absence of proof that the incidents at issue were caused by defendants' operations).

The probative value of such evidence is "substantially outweighed" by its potential for "unfair prejudice."  Fed. R. Evid. 403.

### 4. The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Plaintiffs intend to present evidence to the jury of a supposed causal connection, or "gateway," between prescription opioids and illicit opioid use.  In addition to the three experts plaintiffs have disclosed to opine on this so-called "gateway" theory, plaintiffs have identified several lay witnesses who may testify concerning the theory, including Dr. Thomas Gilson, Cuyahoga's Medical Examiner, who has formed opinions on the theory but does not claim to be – and was not identified in plaintiffs' expert disclosures as – an expert on the subject.  The Court should prohibit plaintiffs from introducing lay opinion testimony about their gateway theory that is (1) inconsistent with the narrow scope of lay opinion testimony authorized under Rule 701 and (2) based on unbridled speculation, inadmissible hearsay, or both.

First, Rule 701 permits opinion testimony from lay witnesses only when it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  This rule "is designed to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pretrial disclosure requirements set forth in … [Rule 26]."  *United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015); *see* Fed. R. Evid. 701, Advisory Committee Note (explaining that 701(c) was added in 2000 "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing").  Therefore, "if the opinion testimony draws on scientific, technical, or other specialized knowledge, then its admissibility should be assessed under Rule 702, not Rule 701."  *Kilpatrick*, 798 F.3d at 381.

11

Opinions suggesting that there is a "gateway" from prescription to illicit opioids necessarily require "specialized knowledge within the scope of Rule 702."  Plaintiffs do not dispute this; they disclosed *three* experts to address this theory – Anna Lembke, M.D., Katherine Keyes, Ph.D, and Jonathan Gruber, Ph.D.  As the Court found in denying defendants' *Daubert* challenge to these experts, they based their opinions upon "epidemiological studies and [their] own published literature and clinical experience."  Dkt. 2518 at 14.  Because opinions suggesting the existence of a gateway from prescription to illicit opioids are based on "specialized knowledge within the scope of Rule 702," lay witnesses, including Dr. Gilson, may not offer such opinions.[10]

Second, to the extent the lay testimony of these witnesses is based on anything other than rank speculation, it relies on inadmissible hearsay.  Lay witnesses who were able to identify any basis at all for their "gateway" opinions could cite only to "conversations" or "discussions" they had had with unidentified individuals.  For example, Jerry Craig, Executive Director of Summit County's Alcohol, Drug and Mental Health Board, identified the basis for his conclusions about the gateway theory as: "discussions . . . with individuals who've been affected by this and people who study this."[11]  Keith Martin, the Assistant Special-Agent-in-Charge of the DEA's Cleveland Field office, testified that his conclusions about the gateway theory were based on his conversations with parents.[12]

In light of the scientific, specialized nature of the theory and the tendency of lay witnesses to adopt the theory based on inadmissible hearsay, the Court should preclude plaintiffs

---

[10] Although Dr. Gilson is a physician, he is a lay witness on this topic.  As he admitted at his deposition, he is not an expert in either opioids or addiction.  Dkt. 1977-16 (Gilson Dep.) at 25:3–11; 30:18–22.  If plaintiffs contend that Dr. Gilson, or any other lay witness, is in fact an expert, their testimony should have been disclosed pursuant to Rule 26(a)(2)(C), and the absence of such a disclosure would be independent grounds for excluding the testimony.

[11] Dkt. 1976-7 (Craig Dep.) at 383:10–18.

[12] Ex. 7 (Martin Dep.) at 189:18–190:8.

from offering lay opinion testimony about the alleged gateway from prescription opioids to illicit opioids.

**5.     The Court should preclude evidence concerning lobbying and other protected petitioning activity.**

The First Amendment protects the right of citizens to petition the government.  Allowing evidence of such petitioning activity to be presented in litigation inherently chills the exercise of that right.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).  And permitting jurors to hear such evidence makes it more likely that jurors will be confused and inappropriately conflate the defendants' constitutionally protected behavior with illegal actions.  *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F.2d 457, 466 (7th Cir. 1981); *see also* Fed. R. Evid. 403.

Lobbying and other efforts to influence government action are protected by the First Amendment.  The *Noerr–Pennington* doctrine protects persons from liability for their speech and conduct in exercising their First Amendment right to petition the government.  *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298-99 (6th Cir. 1992) (lobbying activities by business interests "are protected by the first amendment right of petition").  The doctrine likewise extends to "publicity campaign[s] to influence governmental action," *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961), as well as to concerted action designed to influence the government, *see id.* at 135-36 (doctrine applies to "associating together in an attempt to persuade the legislature or executive to take particular action"); *Horsemen's Benevolent & Protective Ass'n, Inc. v. Pa. Horse Racing Comm'n*, 530 F. Supp. 1098, 1109 (E.D. Pa. 1982) (recognizing that "concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action" is protected by the First Amendment).  The Sixth Circuit has explained that "[a]lthough the *Noerr-Pennington* doctrine

13

was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims . . . ." *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007).

The "intent . . . of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*." *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012).  That is true for both legislative and administrative lobbying.  As to legislative lobbying, the First Amendment permits liability *only* where lobbying is "'not genuinely aimed at procuring favorable government action' at all." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (*quoting Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988)).  This "sham exception" has nothing to do with whether the communication contains untruths or otherwise employed "improper means." *Id.* at 380.  Rather, it applies only if the defendant does not genuinely seek the *result* it advocates.  *See VIBO*, 669 F.3d at 686 (defendant files frivolous objections to the license application of a competitor solely to delay).  The same general principles that immunize legislative lobbying apply to administrative lobbying. *See BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524-25 (2002).[13]

Plaintiffs do not contest that the defendants intended to procure favorable government action through their petitioning efforts.  Evidence of such activity is accordingly inadmissible under *Noerr-Pennington*.

In accordance with Supreme Court precedent, plaintiffs cannot offer evidence of defendants' lobbying efforts to prove conspiracy. *See Snyder v. Phelps*, 562 U.S. 443, 460 (2011) (holding that where allegedly tortious conduct is protected by the First Amendment, a

---

[13] Some courts have recognized a fraud exception to the *Noerr-Pennington* doctrine where knowing and willful misrepresentations are made to an agency, but only in the context of an *adjudicatory* proceeding. *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

plaintiff "cannot recover for civil conspiracy based on those torts").[14]  And the Sixth Circuit prohibits parties from using evidence of lobbying to establish a broader pattern of illicit conduct. *See City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984). A party may not circumvent *Noerr-Pennington* by asking questions "solely designed to create an inference which may be dispelled by disclosure of the protected activity."  *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1257, 1278 (N.D. Ohio 1980), *aff'd*, 734 F.2d 1157 (6th Cir. 1984).  Allowing such questioning would "gut the constitutional protection afforded under the *Noerr-Pennington* doctrine and have a 'chilling effect' upon the exercise of First Amendment rights."  *Cleveland Elec. Illuminating Co.*, 734 F.2d at 1171.

The Court should therefore exclude evidence of lobbying activity under Rule 403, given that the likelihood of unfair prejudice and confusion substantially outweighs any probative value of the evidence.  Fed. R. Evid. 403; *Weit*, 641 F.2d at 467. Indeed, because of its inherent chilling effect and its likelihood to confuse jurors, evidence of lobbying activity is considered presumptively prejudicial.  *United States Football League v. Nat'l Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("[E]xclusion of 'purpose and character' evidence consisting of conduct clearly embraced by *Noerr-Pennington* should be the rule rather than the exception in an antitrust case."); *see also Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 543 n.7 (5th Cir. 1978).  Cautionary instructions are insufficient to forestall confusion and unfair prejudice, as the *Noerr-Pennington* doctrine is complicated and difficult for lay jurors to fully comprehend in the context of complex litigation.  *Weit*, 641 F.2d at

---

[14] *See, e.g.*, Dkt. 2182 (Pls.' Consolidated Mem. in Opp. to Mot. for Summ. Judgment on Pls. Civil Conspiracy, RICO, and OCPA Claims) at 83, 86-87 (pointing to protected lobbying as evidence of existence of unlawful enterprise).

467.[15]  For these reasons, the Court should forbid plaintiffs from presenting any argument or evidence regarding defendants' lobbying activities.

      **6.**     **The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.**

Plaintiffs may seek to introduce evidence and argument concerning allegedly wrongful shipments to locations other than Summit and Cuyahoga counties.  For example, their Complaint offers anecdotal stories about "pill mills" in Florida and allegedly wrongful shipments in West Virginia without identifying a connection between such shipments and the Track One jurisdictions.

During discovery, plaintiffs suggested that shipments made outside the Track One jurisdictions might be relevant because some of the pills in those shipments could have "migrated" to Northern Ohio.  But plaintiffs have not developed any evidentiary support for that theory.  Their experts have not opined that prescription opioids sold in Florida, for example, had any material impact on Summit or Cuyahoga counties.  Nor have plaintiffs identified any other evidence demonstrating such a link.  Without an evidentiary nexus to plaintiffs' claims, there is no basis to admit evidence of shipments elsewhere.

Because plaintiffs cannot show relevance, any effort by plaintiffs to introduce evidence of allegedly wrongful shipments to other locations would constitute classic "other bad acts" evidence that is inadmissible under Fed. R. Evid. 404(b).  Although Rule 404 specifies limited allowable purposes for such evidence, none are applicable here.  The allowable purposes recognized by the rule are to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident – none of which apply here.  Fed. R. Evid. 404(b)(2).  Before admitting evidence for one of these purposes, a court must determine (1)

---

[15] While the *Weit* court noted that specific jury instructions may avoid confusion, "the more likely result is that the jury, unskilled in the constitutional considerations of Noerr-Pennington, would conclude that the passage of a favorable [law] was the product of an unlawful conspiracy." *Id.*

whether the factor identified to justify admission is material to the claims, (2) whether the evidence is probative on that factor, and (3) whether prejudice substantially outweighs that probative value. *See United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996).

Most of the Rule 404(b)'s permitted uses are clearly not available here because they are immaterial to the plaintiffs' claims. *See Jobson*, 102 F.3d at 220-21 (6th Cir. 1996) (exception applies when evidence of prior misconduct tends logically to prove an element of offense charged). The defendants' identity is not at issue. No defendant contests that it has the opportunity to distribute opioids or knows that it does so. Not have defendants alleged that they distributed opioids by mistake or accident, so there is no basis to present evidence of shipments elsewhere to prove *absence of* mistake or *lack of* accident. *See United States v. Semak*, 536 F.2d 1142, 1144 (6th Cir. 1976).

While scienter is a required element of plaintiffs' RICO claims, outside shipments are not probative on that issue. First, the fact that a defendant may have purportedly shipped suspicious orders at another time or place does not make it more likely that it intended to commit similar acts as alleged in the instant case. *See United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) (prior threatening letters inadmissible to prove intent behind threatening phone calls). Second, unproven allegations of misconduct have a lower probative value generally – plaintiffs would need to prove not just that a shipment occurred, but that it was wrongful – a contention defendants would be entitled to rebut. *See United States v. Gessa*, 971 F.2d 1257 (6th Cir. 1992). Thus, opening the door to evidence of shipments to other locations would require an inordinate amount of trial time to be expended on what is *at best* a collateral issue.

Finally, any limited probative value of such evidence is clearly outweighed by the unfair prejudice it would create. *See Ring*, 513 F.2d at 1007 (evidence of prior bad acts may not be introduced as a pretext for placing highly prejudicial evidence before the jury). Evidence of

other unproven allegations may put a party "on trial for . . . other bad acts" in a way that prejudices the right to a fair trial.  *United States v. McFadyen-Snider*, 552 F.2d 1178, 1184 (6th Cir. 1977).  Plaintiffs should not be permitted to cherry-pick purportedly wrongful shipments elsewhere rather than focusing on shipments that actually could have affected them.  *See id.* at 1182 (improper to introduce evidence of prior prostitution that "served only to cater to the passions of the jury").

> **7.  The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.**

The Court should exclude as irrelevant evidence purporting to demonstrate that defendants' conduct violated duties this Court has ruled arise under the Controlled Substances Act or its regulations – namely, to identify, inform DEA of, and not ship, "suspicious" orders. *See* Dkt. 2483.[16]  Even if plaintiffs are permitted to introduce any type of evidence of an allegedly inadequate monitoring system, or not reporting, or not halting shipment of "suspicious orders," plaintiffs should not be permitted to introduce evidence or argument, or to suggest in cross-examination, that such conduct violated "suspicious" order duties, the CSA, or implementing regulations.  Any such noncompliance or violation is irrelevant to the causes of action to be tried.

**Federal RICO.**  To prove a "[p]attern of racketeering activity," a plaintiff must prove at least two acts of "racketeering activity." 18 U.S.C. § 1961(5).  RICO limits "racketeering activity" to the criminal offenses listed in 18 U.S.C. § 1961(1)(A)–(G).

Even if a violation of 21 U.S.C. § 843(a)(4)(A) "can," in theory, constitute a predicate racketeering act under RICO, 18 U.S.C. § 1961(1)(D), as this Court held, *see* Dkt. 2580 at 3, a § 843(a)(4)(A) violation based on failure to comply with "suspicious" order duties is not the same

---

[16] Defendants maintain that the Court's rulings on alleged "suspicious" order duties and on a violation of 21 U.S.C. § 843(a)(4) as a possible RICO predicate are erroneous as a matter of law for reasons previously set forth.  However, these motions assume their validity for the sake of argument here.

thing as knowingly or intentionally furnishing false or fraudulent material information in, or omitting material information from documents under § 843(a)(4)(A), which includes only documents that are "required to be made, kept, or filed under this subchapter or subchapter II," *i.e.,* 21 U.S.C. §§ 801–904 (subchapter I), §§ 951–971 (subchapter II).  Moreover, failure to comply with "suspicious" order duties could not itself constitute predicate racketeering activity because plaintiffs have identified no evidence that would make the alleged noncompliance criminal, let alone "felonious" as required to constitute racketeering activity under 18 U.S.C. § 1961(1)(D).  Nor does it constitute one of the acts specified in § 1961(1)(D) (requiring "felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . punishable under any law of the United States").  Such failure to comply with suspicious order duties would amount, at most, to a regulatory violation.  And "the Supreme Court [has] made clear . . . that a criminal conviction for violating a regulation is permissible only if a statute explicitly provides that violation of that regulation is a crime."  *United States v. Alghazouli*, 517 F.3d 1179, 1184 (9th Cir. 2008).  The statute here does not do so.

Because evidence that conduct violated "suspicious" order duties is not evidence of felonious conduct, it does not establish an "indictable" act for federal mail or wire fraud, 18 U.S.C. §§ 1341, 1343, as required to constitute racketeering under 18 U.S.C. §1961(1)(B).  And such evidence does not establish intent to defraud a victim of money or property, as required for mail and wire fraud.  *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003).  Plaintiffs do not allege that defendants intended to defraud plaintiffs of money or property through violation of any "suspicious" order duties, and the Court rejected any reading of the allegations that would add up to a fraud-on-the-DEA claim.  Dkt. 2565 at 4–5, 9–10, 22.

**Ohio Corrupt Practices Act ("OCPA").**  To prove a "pattern of corrupt activity," Ohio Rev. Code § 2923.32(A)(1), plaintiffs must prove two or more incidents of "corrupt activity," which is defined as engaging in or conspiring to engage in conduct specifically listed in Ohio Rev. Code § 2923.31(I).  Plaintiffs rely on four purported "corrupt activities" –the three alleged federal RICO predicates discussed above, *see* Ohio Rev. Code § 2923.31(I)(1) (cross-referencing federal RICO predicates) and conduct that violates the analogous Ohio fraud statute, Ohio Rev. Code § 2913.05, listed in Ohio Rev. Code § 2923.31(I)(2)(a).  *See* Dkt. 1631 ¶¶ 987, 998, 1004-1006.  The analysis above regarding federal RICO predicates demonstrates that evidence that conduct purportedly violated "suspicious" order duties is not relevant to establishing those RICO predicates, and it is not relevant to the analogous Ohio fraud statute for similar reasons.

**Ohio Statutory Public Nuisance.**  Plaintiffs must prove "[t]he violation . . . of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse."  Ohio Rev. Code § 4729.35.  Any violation of "suspicious" order duties is premised on federal registration regulations that created that definition; any such violation is not a *statutory* violation as required to constitute a violation of the "laws" of the United States within the meaning of § 4729.35.  The public nuisance statute specifically lists *state* agency rules separately from "laws" of the state, demonstrating that the statute's use of the term "laws" does not encompass agency rules, even though state board of pharmacy rules are promulgated via notice-and-comment rulemaking and have the force and effect of law.  *See* Ohio Rev. Code §§ 119.03, 4729-1 *et seq.*  If "laws" were read to include agency rules, that would render superfluous the express reference in the same provision to state agency rules.  *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002) (rejecting broad interpretation of word "law" where it would render word "regulation" superfluous in provision applicable to state "law

20

or regulation"). The statute's failure to list *federal* agency rules means that a violation of a federal agency rule is not relevant to proving a statutory public nuisance.

**Ohio Common Law Absolute Public Nuisance *Per Se* Claim.**  Plaintiffs must prove that defendants violated a "safety statute."  A statute is a "safety statute" only if it sets forth a "specific legal requirement for the protection of others," rather than merely establishing a general rule of conduct.  *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 433 (Ohio 1944); *see also* 1 OJI-CV 621.01.  And *per se* liability may be premised on a statutory violation only where "a jury may determine whether there has been a violation thereof by finding a single issue of fact." *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998).  But any "suspicious" order duty is not a safety statute because it does not set forth a "specific legal requirement" as opposed to a general rule of conduct, and a jury would be required to make much more than a single finding of fact to determine if defendants' conduct violated such a duty, as this Court held when it identified a list of remaining issues of material fact on the issue, *see* Dkt. 2483 at 29.  *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998).  In addition, the Ohio Supreme Court has rejected attempts to rely on a failure to comply with a regulation as a violation of a safety statute. *Id.* at 202-03.

**Ohio Civil Conspiracy.**  Evidence that conduct violated "suspicious" order duties is not relevant because such a violation does not "recognize an independent cause of action," as required by Ohio law.  *See* Dkt. 491-1 at 36-38; 1079 at 14; 2149 at 12-13. *See Davis v. Clark Cty. Bd. of Comm'r*, 994 N.E.2d 905, 909 (Ohio Ct. App. 2013) ("claim for conspiracy cannot be made the subject of a civil action unless something is done which, in the absence of the conspiracy allegations, would give rise to an independent cause of action." (internal citation omitted)).  Such evidence also is not relevant because Ohio law requires, for civil conspiracy, that "the underlying unlawful act must be a tort."  *See, e.g., Ohio ex rel. Morrison v. Wiener*, 83

N.E.3d 292, 296 (Ohio Ct. App. 2017); *see also* 1 OJI-CV 443.01 ("case law defines 'unlawful act' as a tort"); *Atanus v. S&C Elec. Co.*, 454 F. Supp. 2d 753, 756 (N.D. Ill. 2006) ("violation of a federal regulation is not a tort . . . [and] is not an unlawful act that could form the basis of [a] conspiracy claim" under similar Illinois law.).

In sum, any evidence or argument that plaintiffs violated "suspicious" order duties under federal law is irrelevant to the claims to be tried and should be excluded. Alternatively, to the extent that the Court concludes that such evidence is relevant to any cause of action, the Court should limit admissibility to that cause of action, and admonish the jury that it is irrelevant to the other causes of action. The Court should accompany that with an instruction on the definition of "suspicious" order according to the federal regulation, and instruct the jury that "suspicious" orders are not evidence of diversion or likely diversion.

Finally, both on this and all other issues, the Court should preclude – as it did in ruling on certain *Daubert* motions – any expert or other testimony that purports to set out, or opine on, the content of the law, whether on "suspicious" order duties or any other subject. This Court recognized that an "evidentiary problem" exists "if 'testimony containing a legal conclusion is allowed, as it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury.'" Dkt. 2551 at 16–17 (quoting *United States v. Smith*, 70 Fed. App'x 804, 809 (6th Cir. July 15, 2003)). The Court should therefore exclude any evidence on the meaning of law.

### 8. The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.

An expert may base his or her opinions on assumptions, but at trial the expert "must find some support for those assumptions in the record." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000). The Court denied certain of defendants' motions to exclude expert testimony in part on the ground that, although some of the assumptions of plaintiffs' experts appeared to lack support in the record, plaintiffs could attempt to prove those assumptions at

trial.[17]  Defendants ask that the Court implement procedures to ensure that plaintiffs meet that burden in advance of any irrelevant, unfounded, and confusing expert testimony being allowed before the jury.

"[A]n expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds, based on what is known."  *McLean*, 224 F.3d at 800-01 (citation omitted).  "[I]t would prejudicially confuse the jury to hear an expert witness base his opinion . . . on facts that were for the jury to determine" for which there is no basis.  *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989); *see also Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012) (expert testimony should be excluded if based on unreasonable assumptions or facts contradicted by the record).

This is a genuine concern for several of plaintiffs' experts.  For example:

Plaintiffs' expert Lacey Keller's opinions rest on a variety of assumptions that plaintiffs are highly unlikely to be able to prove at trial.  For instance, Keller claims that had a manufacturer with a small market share "reported suspicious activity, prescriptions for millions of dosage units could have been stopped in Summit and Cuyahoga counties." Dkt. 1914-1 at 8 (quoting Dkt. 1914-4 (Keller Report) at 11, ¶ 34).  As Keller herself admitted, this opinion assumes that "each prescriber would have been stopped from prescribing all opioids immediately after his or her first prescription was reported to law enforcement and immediately after being flagged by any of Keller's 16 criteria." *Id.* at 9 (emphasis omitted).  For Ms. Keller's testimony to be admissible, therefore, there must be evidence that would allow a reasonable juror to conclude that, in fact, the moment a prescriber is reported to law enforcement, that prescriber

---

[17] *See, e.g.*, Dkt. 2492 (Op. & Order Denying Mot. to Exclude Keller); Dkt. 2558 (Op. & Order Granting in Part & Denying in Part Mot. to Exclude Perri); Dkt. 2495 (Order Denying Mot. to Exclude Rosenthal); Dkt. 2542 (Order Denying Mot. to Exclude Cutler).  Although the discussion below explicitly addresses proffered experts Keller, Perri, Rosenthal, and Cutler, defendants ask the Court to ensure that plaintiffs prove up the assumptions upon which expert testimony rests for both those and all plaintiffs' other expert witnesses.

never writes another prescription.  Because "revocation of prescribers' DEA licenses and other enforcement actions are not instantaneous and diversion investigations take significant time," Dkt. 2492 at 17, this is highly unlikely to happen.  Either way, as the Court already has held "Plaintiffs [are required to] . . . establish that their hypothetical(s) present an accurate summation of the evidence present in the record" before such testimony is admitted.  *Id*. at 18.

Plaintiffs' experts Perri and Rosenthal start with the unsupportable assumption that not just some, but all of the manufacturer defendants' marketing was false and misleading.  Dkt. 2558 at 14.  The Court acknowledged the legitimacy of defendants' concern that Perri's assumption amounts to an unsupportable hypothetical.  *Id.* at 14-15.  The Court ultimately held that "[a]t trial, prior to the introduction of Perri's testimony dependent on this assumption, the Court will require plaintiffs to establish that there is sufficient evidentiary support in the record for Perri's testimony."  *Id*. at 15.

The Court likewise agreed that Rosenthal's analysis necessarily assumes that all of the manufacturer defendants' marketing was false and misleading, but concluded that "whether Plaintiffs are able to prove their claims about the extent of Defendants' alleged unlawful promotion remains to be seen."  Dkt. 2495 at 15.  Plaintiffs claim that they will prove "that *all* of Defendants' promotional activity was fraudulent." *Id.* at 13.  If plaintiffs cannot do this, the Court should exclude all portions of Rosenthal's testimony that rest on that false assumption. *McLean*, 224 F.3d 797, 800-01; *Tovey v. Nike, Inc.*, 2014 WL 3510636, at *13 (N.D. Ohio July 10, 2014).

Because plaintiffs' expert David Cutler relies on Rosenthal's opinions and analysis for his own testimony concerning the manufacturer defendants, Cutler's testimony must be submitted to the same scrutiny.  Dkt. 1901 at 8-9; Dkt. 2460 at 8-9.  Other assumptions of Cutler also must be established before his testimony concerning distributor and pharmacy defendants

24

may be admitted.  For example, in "step three" of his analysis, Cutler multiplies his "average impact" of shipments on mortality by the percentages of prescriptions provided by Rosenthal for the manufacturers.  Dkt. 1895-4 (Cutler Report) at 60–62 & Tbl. III.9.  He did no comparable analysis for distributors but asserts that he could have done so using percentages, supplied to him by plaintiffs' counsel, of shipments that purportedly should have been blocked by distributors. *Id.* at App'x III.J ¶¶ 5–6 & Tbl. J.1.  Those assumed percentages provided to Cutler by counsel are unsupported by any facts or expert testimony in the record.[18]  Cutler's opinion as to the distributors cannot be admissible until and unless the assumed percentages are proven.

Given the complexity of this trial, and the legitimate concerns that many of plaintiffs' experts' opinions are based on assumptions entirely unsupported by any evidence, an orderly process is needed to ensure that plaintiffs have proven the assumptions their experts rely upon before these experts are allowed to take the stand.  Before permitting testimony from any expert witness whose testimony relies on assumptions requiring independent proof, the Court should hold a hearing outside the presence of the jury to hear argument on whether plaintiffs have presented sufficient evidence that would allow a reasonable jury to conclude that those assumptions have been confirmed.

**9.    The Court should not allow use of certain charts presenting misleading and irrelevant data.**

Defendants move *in limine* to preclude certain charts that are attached to plaintiffs' expert Craig McCann's report from being shown to the jury or admitted in evidence.[19]  These charts present aggregated data, in some cases aggregated from disparate sources, that is both misleading

---

[18] Cutler testified at deposition that "[t]hese percentages were given to me by counsel who said that they were the output of Mr. McCann's analysis," Dkt. 1976-10 (Cutler Dep.) at 594:11–595:3, but the percentages appear nowhere in McCann's report.  Distributors are not aware of any other source.

[19] In particular, defendants seek to exclude the charts in McCann's Appendix 9 at pages 1-216 and all of McCann's Appendix 10.  *See* Dkt. 1999-13, 1999-14, 1999-15.  Defendants will send copies of these charts to the Special Master.

and irrelevant.  The charts create the false impression that each distributor defendant's volume of relevant opioid shipments was greater than it actually was, and that the volume of defendants' shipments to each customer over time increased more dramatically than it actually did.  Because these charts present only aggregated data, it is impossible to tell from them how many orders each trial defendant shipped to any customer, much less whether any of those orders were "suspicious" or diverted for unlawful use.  As plaintiffs' DEA expert Jim Rafalski acknowledged, "you can't tell anything about any individual pharmacy" from McCann's aggregated charts.  Dkt. 1983-16 (Rafalski Dep.) at 514:8-515:4.

Because these charts are misleading and will not help the jury decide any material fact, they should not be admitted as evidence or used as demonstrative aids.  *See, e.g.*, *Wilbon v. Plovanich*, 2016 WL 3922906, at *3 (N.D. Ill. July 21, 2016) (affirming exclusion of demonstrative due to "risk that the jury might construe the map as Thornton's accurate description of the events"); *Roddy v. Monsanto Co.*, 6 Fed. App'x 549, 552 (8th Cir. 2001) (affirming exclusion of demonstrative because it included information "irrelevant to discrete instances of discrimination in rates of pay" and "facts underlying the chart ultimately came into evidence" in another form); *In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67, 73 (2d Cir. 1980) (affirming exclusion of chart that "could have misled the jury").

**Appendix 9, pp. 1-7**:  These charts purport to show oxycodone and hydrocodone shipments per capita, by state, from 1997 to 2017.  In addition to showing data for states outside of Ohio that are irrelevant to the Track One trial, these charts lump together *all* shipments from *all* distributors, including *non-party distributors*, so that it is impossible to tell what portions were shipped by any trial defendant.  This presentation would confuse and mislead the jury by suggesting conclusions about the trial defendants that the charts do not actually support.  It is

26

impossible to determine from charts like this what portion of the shipments were from any defendant to any customer.  In addition, none of the charts in Appendix 9 display the orders that plaintiffs claim should have been flagged as "suspicious."  It is therefore impossible to connect these charts to diversion, or failure to maintain controls against diversion, at any pharmacy.

**Appendix 9, pages 8-12, 13-216**: In addition to the problems identified above, these charts combine data from disparate sources − the ARCOS database (2006-2014) and defendants' transactional data (pre-2006 and post-2014).  By combining different datasets for different timeframes, these charts give the misleading impression that defendants' shipments increased more dramatically over time than they actually did.  For example, Cardinal Health's transactional data dates back to 1996, while others had no data for the early part of that period.  As later data is added to the dataset, it gives the false impression of a jump in shipment volume, when in reality what is shown is just a jump in available data.  *See, e.g.*, Appendix 9 at 9, 14.  These charts also include data for opioids other than oxycodone and hydrocodone − the only medications for which plaintiffs have offered expert opinions about "suspicious" orders.  The inclusion of irrelevant drugs gives the false impression that defendants' oxycodone and hydrocodone shipments were larger than they actually were.  These charts also include data for many severed or settled parties, again creating the misleading impression that the trial defendants' shipment volumes were greater than they actually were.

**Appendix 10:**  The charts in Appendix 10 show, in the aggregate, orders that McCann flagged as "suspicious."  Again, it is impossible to tell how many orders were flagged for any specific pharmacy, and it is therefore impossible to identify any diversion – or any failure to prevent diversion – from these charts.  As above, these charts would also mislead the jury to think the volume of shipments increased more dramatically than it actually did for any defendant.

27

**10.    The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.**

This Court has cautioned the parties and counsel about the need for this case to be tried based on the evidence and for full compliance with the Ohio Rules of Professional Conduct. Thus, in an order entered last February, the Court stated:

> "[It is imperative that this case be tried in the courtroom, and not in the media.  The Court reminds ***all*** attorneys . . . admitted to practice before the Court in this MDL, that they are subject to the Ohio Rules of Professional Responsibility . . . Thus, all attorneys who are participating or have participated in any aspect of this case may not conduct themselves in any way that would violate Ohio Rule of Professional Conduct 3.6 or one of this Court's prior orders . . . This includes making extrajudicial statements to the media regarding:  (1) settlement negotiations, (2) "the character, credibility, [or] reputation . . . of a party" or their counsel, (3) any 'information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create a substantial risk of prejudicing an impartial trial," [or] (4) any information designated . . . pursuant to the Protective Order issued in this case . . . Additionally, the Court directs all attorneys subject to this order to counsel their clients that it is in their best interest to adhere to this order as well."

Dkt. 1360 (emphasis in original; citations omitted).

The Court will presumably expect full compliance with this order in the coming weeks and during trial.  Defendants ask the Court also to make clear that full compliance with Ohio Rule of Professional Conduct 3.4(e) will be required,[20] and bar certain conduct that plaintiffs' counsel already have a demonstrated practice of pursuing, in this litigation and elsewhere.  The jury should consider evidence untainted by lawyers' purported personal opinions or theatrical efforts at manipulation.

**References to unrelated alleged bad acts.**  Counsel should be precluded from attributing to defendants alleged "bad acts" that are unrelated to the claims in this case.  In

---

[20] That rule states:  "A lawyer shall not . . . in trial, allude to any matter that the lawyer does not *reasonably believe* is relevant or that will not be supported by admissible evidence or by a good-faith belief that such evidence may exist, assert personal *knowledge* of facts in issue except when testifying as a witness, or state a personal opinion as the justness of a cause, the credibility of a witness, or the culpability of a civil litigant, or the guilt or innocence of an accused."  (Emphasis in original.)

general, the Federal Rules prohibit introduction of evidence of prior bad acts for the purpose of suggesting a propensity for misconduct.  Fed. R. Evid. 404(b).  This is particularly true for unrelated prior acts introduced to create a spectacle that has no purpose beyond inflaming the passions of the jury.  *United States v. Solivan*, 937 F.2d 1146, 1152 (6th Cir. 1991) (finding mistrial because the lawyer's comments were "calculated to inflame passion and prejudice").

There are concrete reasons for concern about this here.  An appellate court recently chastised lead counsel for plaintiffs, Mr. Lanier, for improper remarks creating a "spectacle" requiring a retrial.  *In re Depuy Orthopaedics, Inc.*, 888 F.3d 753, 787 (5th Cir. 2018).  In that case, counsel referred to bribes defendants' subsidiaries paid to the Iraqi government – events that had absolutely nothing to do with the case being tried.  *Id.* at 784.  Despite its irrelevance, the incident was repeatedly "wafted before the jury to trigger their punitive instinct."  *Id.* at 785.  During closing, counsel invited the jury to use it "as a proxy for [the defendant's] liability."  *Id.* The Fifth Circuit held that a curative instruction was inadequate and that a new trial was needed because "the taint is unmistakable."  *Id.* at 786.

In another tactic in that case, counsel introduced a letter with allegations of racism against the president of the defendant company and referred to the "filthy . . . racial email" in his closing argument to the jury.  *Id.* at 786.  This focused jurors' "attention on serious, and seriously distracting, claims of racial discrimination that defendants had no meaningful opportunity to rebut."  *Id.* at 787.  Such tactics seek a jury verdict guided by emotion, not evidence, and force the opposing party to expend resources defending against charges that are unrelated to the claims.

**Conduct designed to offer personal opinions on, bolster or belittle, or improperly influence a witness.**  Counsel should be precluded from offering their personal opinions on evidence at trial and from related conduct that has the effect of conveying such opinions.  The

Ohio Rules of Professional Conduct expressly prohibit counsel from introducing their "personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."  Rule 3.4(e).  Counsel argument is limited to the evidence and "reasonable inferences."  *State v. Clay*, 181 Ohio App. 3d 563, 575 (8th Dist. 2009).

Counsel should be cautioned against attempting to bolster the credibility of plaintiffs' witnesses by expressing counsel's personal approval of a witness's testimony or a statement or implication of fact that is not true.  In *Depuy Orthopaedics*, counsel introduced two doctors as "non-retained" experts and repeatedly emphasized to the jury that they were trustworthy because they were not being paid.  *See, e.g.*, 888 F.3d at 791.  But that was not true; counsel provided both a general charitable donation and post-trial "generous checks" to the witnesses.  *Id.* at 789.  The Fifth Circuit found that presenting the witnesses as "'non-retained' neutral part[ies]" was "deception, plain and simple."  *Id.* at 791.

Conversely, counsel should be prohibited from using nicknames or ad hoc drawings or other visual aids during examination of witnesses to belittle a witness, to mischaracterize testimony, or to prompt a witness's answers. Ad hominem attack on witnesses through nicknames or visual aids designed to comment on credibility is an inadmissible form of attorney commentary.  *See Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) (attorneys may not "comment on the credibility of a witness or . . . express a personal belief that a particular witness is lying").  Again, there is reason for concern based on prior conduct.  Plaintiffs' counsel have used ad hoc notes and drawings in exhibits created during depositions in this case for exactly such improper purposes, characterizing one witness's employment history, for example, as a "revolving door" (Ex. 8 (Mapes Dep.) at 337:8−339:24; Ex. 9 at 37) and his testimony as "muddy waters"  (Ex. 8 at 537:10−538:2; Ex. 9 at 39), or commenting on his personal

30

appearance (Ex. 8 at 336:10−14)   At other times during this same deposition, counsel wrote down his questions and then wrote down his desired answers before the witness had a chance to respond, seeking to prompt the desired responses.  *See* Ex. 8 at 343:5−345:4.

Because such tactics are designed to influence improperly a witness's testimony, to belittle a witness, and/or to communicate to the jury a belief that the witness is not credible, they should be precluded as the improper performative spectacle that they are.

**Golden Rule Arguments.**  Counsel should be precluded from making "Golden Rule" arguments asking the jury to place itself in the position of plaintiffs or members of their communities.  *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009).  This includes statements intended to appeal to jurors' fears, like "it could have been you" or "it could have been your children," when talking about alleged harms.  *Id.*  Such arguments invite decisions based on emotion rather than evidence and reason and are accordingly improper.

### 11.    The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability.

The Court should preclude plaintiffs from offering evidence or argument about defendants' overall financial condition, assets, revenues, or profitability.  It should also exclude reference or argument about punitive damages unless and until the jury determines – after the close of evidence – that plaintiffs have met their burden to seek punitive damages.

Defendants anticipate that plaintiffs will attempt to paint defendants as large, wealthy companies capable of paying a large judgment.  Allowing such evidence or argument would be unduly prejudicial and confusing to the jury.  This evidence has nothing to do with liability and will lead to time-consuming and unfairly prejudicial side-shows on collateral issues.  The Court should exclude it under Rule 403 for at least three reasons.

First, "[c]ourts have consistently held that evidence of a party's financial condition should be excluded as irrelevant or unduly prejudicial."  *Henry v. Quicken Loans, Inc.*, 2011 WL

13208621, at *3 (E.D. Mich. Jan. 31, 2011) (collecting Sixth Circuit cases).  Federal courts abide by the principle that "justice is not dependent upon wealth or poverty."  *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 757 (6th Cir. 1980) (citation omitted).  Evidence "designed to convey to the jury the image of the defendant as a giant in the field" is excludable on the grounds that it is "obviously an appeal to passion and prejudice." *Id.* at 756-57; *see also*, *e.g.*, *Bhandari v. VHA Southwest Community Health Corp.*, 778 F. Supp. 2d 1155, 1163-64 (D. N.M. 2011) (excluding evidence of defendant's overall revenues, profits, and wealth to protect against unfair prejudice).

Second, mini-trials on collateral issues such as a defendant's financial condition would waste time that is plainly not available in this trial.  To rebut such evidence, defendants would need to present evidence on their profit margins on opioid medications and other complex details.  But the Court has allotted defendants only 100 hours – presumptively just 12.5 hours to each of the eight defendants remaining in the Track One trial – for their *entire* defense.  Dkt. 2594 at 1-2.  That is patently insufficient to defend against the main issues in the case, much less to address issues that are collateral to, and would distract from, those main issues.  *See e.g.*, *United States v. Dimora*, 879 F. Supp. 2d 718, 742-43 (N.D. Ohio 2012) (evidence of financial disclosures properly excluded under Rule 403 to avoid mini-trials on collateral issues that would confuse and mislead the jury).

Finally, to the extent plaintiffs argue that evidence of wealth is relevant to determining punitive damages, that is incorrect.  Plaintiffs are not entitled to punitive damages as a matter of law on any of their claims.  RICO and OCPA do not allow for punitive damages.  *See Iron Workers Local Union No. 17 Ins. Fund & its Trustees v. Philip Morris Inc.*, 29 F. Supp. 2d 801, 819 (N.D. Ohio 1998) (recognizing that RICO and OCPA claims allow for treble damages, but not punitive damages).  Nor can plaintiffs obtain punitive damages on their public nuisance

claim, because they have abandoned all relief but for "equitable abatement relief."  (Dkt. 2212 at 1 n.2.).  Lastly, because their civil conspiracy claim is based upon RICO, OCPA, and public nuisance theories (Dkt. 2568 at 12), and none of those underlying causes of action of action allow for punitive damages in this case, punitive damages are simply unavailable here.  *See Iron Workers Local Union No. 17 Ins. Fund*, 29 F. Supp. 2d at 819 (recognizing that plaintiffs "cannot bring their civil conspiracy claim as a separate tort or claim without the underlying torts" and granting summary judgment on punitive damages claim because "none of these underlying causes of action provide for punitive damages").[21]

Moreover, even if punitive damages were available, such evidence is not admissible in the liability phase of the trial.  *See* Ohio Rev. Code § 2315.21(B); *Niskanen v. Giant Eagle, Inc.*, 912 N.E.2d 595 (Ohio 2009).  Before the Court may allow such evidence to be presented to the jury – or any suggestion that punitive damages are appropriate – the jury must first find, after the close of the evidence, that (1) compensatory damages are appropriate, and (2) the defendant in question has acted with "either malice or aggravated or egregious fraud."  *Niskanen*, 912 N.E.2d at 599 (citing Ohio Rev. Code 2315.21(C)(1) and (2)); *see also Dippin' Dots, LLC v. Travelers Prop. Cas. Co. of Am.*, 322 F.R.D. 271, 273, 275 (W.D. Ky. 2017) (bifurcating trial under Fed. R. Civ. P. 42(b) to prevent prejudice to defendant).

For all of these reasons, even if the Court finds that punitive damages are potentially available, it should bifurcate the trial and exclude from the first phase any reference to defendants' financial condition, revenues, profits, or punitive damages.  *See Ferrarelli v. Federated Fin. Corp. of Am.*, 253 F.R.D. 432, 433 (S.D. Ohio 2008) (bifurcation avoids the

---

[21] Moreover, there can be no punitive damages award without any underlying compensatory damages award.  *See* Ohio Rev. Code 2315.21(C)(1)-(2); *Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1242, 1248 (Ohio 1996) ("As we have held time and again, punitive damages may not be awarded when a jury fails to award compensatory damages.").  Compensatory damages are not available on the civil conspiracy claim based upon public nuisance because plaintiffs have disclaimed any such damages in connection with their public nuisance theory.  They cannot try to use a civil conspiracy claim to circumvent that decision.

possibility of prejudice that could result from evidence of a defendant's financial condition, which though relevant to punitive damages, is irrelevant to liability); *see also Helminski v. Ayerst Labs.*, 766 F.2d 208, 212 (6th Cir. 1985) (bifurcation is appropriate when evidence relevant to damages may have prejudicial impact on jury's liability determination).

> **12.    The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.**

Plaintiffs may seek to elicit testimony from individual witnesses affiliated with defendants concerning their personal feelings of personal responsibility or guilt relating to the opioid epidemic or their opinions about whether they or their employers violated legal requirements. In depositions, counsel for plaintiffs often asked such witnesses whether they believe personally that their conduct or that of their employers was responsible for the alleged increase in opioid abuse. Testimony of this nature should be excluded because it is irrelevant and prejudicial; it is also inadmissible under Federal Rule of Evidence 701.

Plaintiffs bear the burden of proving that defendants' alleged conduct caused the plaintiffs' damages. To carry that burden, plaintiffs must marshal *facts* concerning what defendants did and how that conduct ultimately caused plaintiffs harm. Individual employees' personal feelings, beliefs or opinions that they or their employers may bear "responsibility" for the opioid epidemic are irrelevant to whether the defendants are in fact legally responsible for harms to plaintiffs. Given the irrelevance of such testimony and the unfairly prejudicial impact it would have on the jury, plaintiffs should be precluded from asking individual lay witnesses about their personal feelings or opinions on the subject. Witnesses should not be put on the spot, challenged to admit to feelings of concern or remorse in a manner that prejudges the ultimate question of fault that is for the jury to decide. Deposition testimony of this kind – often elicited through argumentative, repetitive, and harassing questioning – should also be excluded on grounds of lack of relevance and unfair prejudice.

Even apart from its lack of relevance and unfairly prejudicial impact, such testimony would be inadmissible under Federal Rule of Evidence 701.  Rule 701 provides that lay opinion testimony is admissible only when that opinion is "rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Witnesses' views on their or their employers' "responsibility" amounts to legal conclusion. But, as this Court has already recognized, testimony presenting interpretations of the law is inadmissible:  "if testimony containing a legal conclusion is allowed, . . . it may convey a witness's unexpressed, and perhaps erroneous, legal standards to the jury."  Dkt. 2551 at 17 (internal marks and citation omitted).

More generally, opinion testimony from lay witnesses about "responsibility" for harms would be inappropriate because it goes to an ultimate issue – causation.  Under settled Sixth Circuit precedent, "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013). "Seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'"  *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986); *see also United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) (same); *Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226–27 (3d Cir. 2008) (quoting *Mitroff*) (holding that lay testimony "as to the ultimate issue of causation" should not have been admitted).

13. **The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.**

Plaintiffs and their counsel should be barred from making remarks to suggest either that the cost of governmental services allegedly provided in response to the opioid crisis was paid by

taxpayers, or that jurors as taxpayers would benefit from ordering defendants to pay money to plaintiffs.

"Remarks involving the individual pecuniary interests of jurors as taxpayers are universally viewed as improper."  *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2008) (citing cases).  After all, given that "pecuniary interests would necessarily disqualify a prospective juror from service," it is "patently improper to make an appeal to that interest." *United States v. Schimmel*, 943 F.2d 802, 806 (7th Cir. 1991) (marks and citation omitted); *see also Gomez v. Schoenbeck*, 2019 WL 3887128, at *3 (S.D. Ill. Aug. 19, 2019) (granting motion *in limine* to bar "arguments to jurors relating to their status as taxpayers").

In this case, any reference to taxpayers' role in funding government services would be legally irrelevant and calculated to inflame the jury, and thus in clear violation of Rules 401 and 403.  Plaintiffs complain of "extraordinary costs and losses" that are allegedly "related directly to Defendants' illegal actions," and plaintiffs charge that these costs were "borne by Plaintiffs and other governmental entities."  Dkt. 1465 at ¶¶ 20-21.  Because the plaintiffs have sued based on their own alleged injuries and not based on any injury allegedly sustained by the taxpaying public, any suggestion that these costs were ultimately paid by taxpayers would be legally irrelevant.  Worse, such remarks would carry a high risk of unfair prejudice, as they would suggest that a portion of these costs was ultimately paid by the very jurors sitting to decide this case, and implicitly encourage them to decide the case based on their own pecuniary interests instead of based on the evidence and instructions presented at trial.

### 14. The Court should preclude any comment regarding the absence of a corporate representative at trial.

The Court should preclude counsel for plaintiffs from advancing argument, comment, or innuendo to the jury, or soliciting testimony regarding, the fact that a defendant's corporate representative might not attend all or part of the trial.  Comments concerning the absence of

defendants' corporate representatives at trial are irrelevant and thus inadmissible.  Fed. R. Evid.

401, 402; *United States v. Nixon*, 694 F.3d 623, 636 (6th Cir. 2012).  The trial judge has full

authority to "exclude irrelevant matters," *United States v. Pits*, 85 F.3d 629, *1 (6th Cir. 1996)

(table), and the presence of corporate representatives has no bearing on any of the claims or

issues in this action.  Moreover, such comments are unfairly prejudicial to the defendants, Fed.

R. Evid. 403, because they improperly imply to the jury that the defendants do not take the

proceedings seriously or may otherwise exploit potential jury bias against large corporations.

Accordingly, counsel's statements (including opening and closing statements), as well as the

testimony counsel solicits from witnesses, must focus on the issues and admissible evidence, not

recite irrelevant and prejudicial observations to "poison the minds of the jury," *United States v.

Signer*, 482 F.2d 394, 398 (6th Cir. 1973); *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir.

2011).  The Court should accordingly prohibit counsel from making any comments or

arguments, or soliciting testimony, at trial regarding the absence of any defendant's corporate

representatives.

37

Dated:       September 25, 2019                     Respectfully Submitted,


 _/s/ Geoffrey E. Hobart_____            _/s/ Enu Mainigi_____
Geoffrey E. Hobart                                 Enu Mainigi
Mark H. Lynch                                       **WILLIAMS & CONNOLLY LLP**
Sonya D. Winner                                     725 Twelfth Street NW
Paul W. Schmidt                                     Washington, DC  20005
Phyllis A. Jones                                    Tel: (202) 434-5000
**COVINGTON & BURLING LLP**                         Fax: (202) 434-5029
One CityCenter                                      emainigi@wc.com
850 Tenth Street NW
Washington, DC 20001                                *Counsel for Cardinal Health, Inc.*
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com
pschmidt@cov.com
pajones @cov.com


*Counsel for McKesson Corporation*



 _/s/ Robert A. Nicholas_____            _/s/ John P. McDonald_____
Robert A. Nicholas                                 John P. McDonald
Shannon E. McClure                                 C. Scott Jones
**REED SMITH LLP**                                 Lauren M. Fincher
Three Logan Square                                 Brandan J. Montminy
1717 Arch Street, Suite 3100                       **LOCKE LORD LLP**
Philadelphia, PA 19103                             2200 Ross Avenue, Suite 2800
Tel: (215) 851-8100                                Dallas, TX 75201
Fax: (215) 851-1420                                Tel: (214) 740-8000
rnicholas@reedsmith.com                            Fax: (214) 756-8758
smcclure@reedsmith.com                             jpmcdonald@lockelord.com
                                                   sjones@lockelord.com
*Counsel for AmerisourceBergen Drug Corporation and*  lfincher@lockelord.com
*AmerisourceBergen Corporation*                    brandan.montminy@lockelord.com

                                                   *Counsel for Henry Schein, Inc. and*
                                                   *Henry Schein Medical Systems, Inc.*

 /s/ Steven A. Reed
Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
Harvey Bartle
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
harvey.bartle@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
Fax: (412) 560-7001

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc.,*
*Cephalon, Inc., Watson Laboratories, Inc., Actavis*
*LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.,*
*Warner Chilcott Company, LLC, Actavis South Atlantic*
*LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC,*
*Actavis Totowa LLC, Actavis Kadian LLC, Actavis*
*Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-*
*Salt Lake City, Actavis Laboratories FL, Inc., f/k/a*
*Watson Laboratories, Inc.-Florida, and appearing*
*specially for Teva Pharmaceutical Industries Ltd.*[22]

 /s/ Charles C. Lifland
Charles C. Lifland
Sabrina H. Strong
**O'MELVENY & MYERS LLP**
400 S. Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
clifland@omm.com
sstrong@omm.com

Daniel M. Petrocelli
Amy R. Lucas
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067-6035
Tel: (310) 553-6700
dpetrocelli@omm.com
alucas@omm.com

*Counsel for Janssen Pharmaceuticals,*
*Inc., Johnson & Johnson, Janssen*
*Pharmaceutica, Inc. n/k/a Janssen*
*Pharmaceuticals, Inc., and Ortho-*
*McNeil-Janssen Pharmaceuticals, Inc.*
*n/k/a Janssen Pharmaceuticals, Inc.*

*/s/ Kaspar Stoffelmayr*

Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreen Co. and Walgreen Eastern Co.*

---

[22] Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is an Israeli corporation that is not subject to and contests personal jurisdiction for the reasons explained in its motions to dismiss for lack of personal jurisdiction; Teva Ltd. is specially appearing to join this motion as a result of the Court's deadline to file motions in limine, and, thus, they do not waive and expressly preserve their pending personal jurisdiction challenges.

**<u>CERTIFICATE OF SERVICE</u>**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart