# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**MCKESSON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE AND ARGUMENT**

**TABLE OF CONTENTS**

Page

I. MCK-1:  The Court Should Prohibit Any Reference to Baseless Accusations. ............1

II. MCK-2:  The Court Should Prohibit Evidence or Argument About the U.S. House of Representatives Energy and Commerce Committee's Investigation. ............2

III. MCK-3:  The Court Should Prohibit the Introduction of Nationwide Trends in Drug Deaths..................................................................................................................3

IV. MCK-4:  The Court Should Prohibit Plaintiffs From Introducing Evidence or Argument About Allegations Contained in Letters From the DEA or DOJ. ..........4

V. MCK-5:  The Court Should Prohibit Introduction of Testimony from McKesson Witness Nathan Hartle Because of Plaintiffs' Badgering and Abusive Conduct. ......................................................................................................6

VI. MCK-6:  The Court Should Prohibit Introduction of Documents Related to McKesson's Relationship with CVS and Rite Aid In Light of Severance. ...................7

McKesson Corporation ("McKesson") seeks the exclusion of certain evidence and argument as identified below.

## I. MCK-1: The Court Should Prohibit Any Reference to Baseless Accusations.

In discovery, Plaintiffs' counsel routinely spun out baseless theories of wrongdoing and asked McKesson witnesses if they were aware of these made up "facts." For example, Plaintiffs' counsel asked multiple witnesses why former CEO John Hammergren "lied" when he testified before the U.S. House of Representatives Energy and Commerce Committee in 2018.[1] There is absolutely no evidence that Mr. Hammergren did any such thing. No member of the congressional committee, its staff, or anyone else—other than Plaintiffs' counsel—has ever suggested as much. In another example,[2] Plaintiffs' counsel asked witnesses to comment on a wild conspiracy theory involving the former Attorney General of the United States, Eric Holder, now a partner at McKesson's counsel, Covington & Burling LLP.[3] This questioning was not designed to discover facts, but merely to improperly denigrate McKesson and its employees.

In light of Plaintiffs' history of asking inappropriate questions to witnesses under oath, McKesson has every reason to suspect that counsel will attempt to bias the jury with the same baseless innuendo at trial. Any reference to such incendiary and false allegations—whether

---

[1] *See, e.g.*, ECF No. 2173-50/2213-27 (Oriente Tr.) at 277:4–21 (questioning by Michael Papantonio: "Q. [A]fter your president, Mr. Hammergren, CEO, testified that your company didn't do any marketing, do you remember any e-mails flying around – flying around at McKesson saying he just – he just committed perjury? . . . Was there any kind of e-mails like that that were flying around the McKesson headquarters?").

[2] *See* Letter from Mark Lynch to the Honorable Dan Aaron Polster (Feb. 11, 2019), *available at* https://static.reuters.com/resources/media/editorial/20190219/opioid--covingtonletter.pdf.

[3] *See, e.g.*, ECF No. 1962-23/1978-3 (Hartle Tr. 08.01.18) at 420:1–426:23 (questioning by Michael Papantonio: "Eric Holder was the Attorney General during the time that your company was negotiating to get out of the problems that you had in 2015. Mr. Eric Holder with Covington Burling, in the very building we're sitting right now, was the Attorney General, right? . . . Q. And Mr. Hobart is a partner with the Attorney General Eric Holder, a law partner at Covington & Burling with Eric Holder. You know that, correct? . . . Q. And so Mr. Hobart was able to get—to move from the DEA talking about a billion dollar—in excess of a billion dollar fine and potential criminal—criminal prosecution that—that all suddenly moved to $150 million fine . . . right?").

during opening statements or in witness questioning—is irrelevant, and serves no purpose other than to cause prejudice and confuse the jury. *See* Fed. R. Evid. 402, 403. Accordingly, the Court should strike deposition questions and answers involving these unfounded allegations (as set forth in McKesson's separate objections to Plaintiffs' deposition designations). The Court should likewise prohibit references to these accusations—as well as any other such unfounded accusations—in opening, closing, or during examination of witnesses.

## II. MCK-2: The Court Should Prohibit Evidence or Argument About the U.S. House of Representatives Energy and Commerce Committee's Investigation.

During discovery, Plaintiffs introduced letters, reports, and testimony related to an investigation by the House of Representatives, Energy and Commerce Committee into events occurring in West Virginia, including the committee majority staff's final report. *See, e.g.*, P-29375, P-29435, P-32672. The Court should prohibit reference to the congressional investigation or its findings as irrelevant and prejudicial, Fed. R. Evid. 402, 403, and should rule that committee correspondence and reports are inadmissible hearsay, Fed. R. Evid. 802.

The letters sent from members of Congress to McKesson are hearsay not within any exception as they merely repeat media reports and complaint allegations. *See, e.g.*, P-32672 (quoting allegations from the Charleston Gazette Mail, the Herald Dispatch, and *Morrisey v. McKesson Corp*, Civ. No. 16-C-1 (Boone Cty., W.Va. Cir. Ct.)). The majority staff's final report should likewise be excluded as hearsay. While certain reports may fall within the public records exception to hearsay, *see* Fed. R. Evid. 803(8), this exception does not apply where the investigation was "highly charged" and involved matters already a subject of litigation (and thus subject to influence by the litigants).[4] *See Anderson v. Westinghouse Savannah River Co.*, 406

---

[4] The report at issue is easily distinguishable from a routine public report not subject to influence by litigants. Notably, Plaintiffs' counsel in this litigation played an active role in the investigation process, including by briefing congressional staff and providing them with "factsheets" about the opioid epidemic.

2

F.3d 248, 264 (4th Cir. 2005) (affirming exclusion of report that "referr[ed] to a complaint from an individual who is a plaintiff in a companion case to this lawsuit"); *Anderson v. City of New York*, 657 F. Supp. 1571, 1577–79 (S.D.N.Y. 1987) (excluding report because the witnesses were "self-interested" and the report was the result of a "highly charged process"); *see also Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 813–15 (D.D.C. 1987) (excluding report due to the "danger that political considerations might affect the findings of such a report").

The Court should also prohibit introduction of these documents, as well as any reference to the congressional investigation at trial, as irrelevant and unduly prejudicial. *See* Fed. R. Evid. 402, 403.  The congressional investigation had a limited focus on West Virginia, and Plaintiffs have presented absolutely no evidence to show that any pills distributed in West Virginia caused harm in the Plaintiff Counties.  *See* Defendants' MIL 6.  As such, the report is of no (or at most minimal) probative value to the claims at issue in this case relating to opioid abuse in Ohio. Nonetheless, if introduced into evidence, the jury is likely to give the report and letters undue weight, given their official nature and appearance.  *Pearce*, 653 F. Supp. at 816–17 (finding exclusion appropriate due to "danger of unfair prejudice to [defendant] because of the undue weight that a jury is likely to attach to the official reports from Congress").  Exclusion is therefore warranted.

### III.   MCK-3:  The Court Should Prohibit the Introduction of Nationwide Trends in Drug Deaths.

During several depositions, Plaintiffs presented certain maps from the Centers for Disease Control ("CDC") that depict nationwide mortality from "drug poisoning" and baldly claimed that these maps depicted deaths related to McKesson's distribution of prescription

3

opioids.[5] That is far from the truth. The CDC makes clear that these maps depict data comprised of *all* death certificates that received an ICD-10[6] code related to any form of drug poisoning. This includes not only drug overdose deaths, but also deaths from homicide, suicide, and of undetermined intent. The ICD-10 codes also *do not* identify the type of substance involved.[7]

Introduction of these maps or similar nationwide data would be unduly prejudicial due to the high likelihood that the jury would be led to believe that the maps depict *prescription opioid* overdoses, or drug overdoses related to McKesson's distribution operations, rather than many other types of poisoning deaths. *Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1198 (D.C. Cir. 1986) (excluding exhibits under Rule 403 where a majority of the content was "unrelated" material); *United States v. Lachman*, 48 F.3d 586, 593–94 (1st Cir. 1995) (similar). Moreover, the nationwide data represented on the maps is irrelevant to the Plaintiff counties claims, as Plaintiffs do not have a scintilla of evidence that any death was caused by McKesson, and Plaintiffs cannot seek damages beyond their borders. *See* Defendants' MIL 6.

## IV.  MCK-4:  The Court Should Prohibit Plaintiffs From Introducing Evidence or Argument About Allegations Contained in Letters From the DEA or DOJ.

For substantially the same reasons that the Court should exclude settlement agreements

---

[5] *See, e.g.*, ECF No. 2173-50/2213-27 (Oriente Tr.) at 593:20–594:6 (questioning by Michael Papantonio: "Sir, do you understand that is children, mothers, fathers, uncles, sisters and brothers. That's a statistic. But what that statistic means, and those are family members dying because your company participated with CVS and Purdue and Teva and all these -- Cardinal, and participated in expanding the death map from what we see on the left to what we see on the right. Are you proud of that, sir?").

[6] "ICD-10" refers to the International Classification of Diseases, Tenth Edition, which is a standardized methodology used to "code" cause-of-death information on death certificates.

[7] Each map includes a citation to the CDC website: NCHS, Drug Poisoning Mortality in the United States, 1999-2017, https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/, which explains that the maps depicts all death certificates with codes X40-X44, X60-X64, X85, and Y10-Y14, *id.* at n.†. These ICD-10 codes do not differentiate between substances involved in the death. *See, e.g.,* CDC, Instruction Manual Pt. 9, Cause-of-Death Lists for Tabulating Mortality Statistics (2003), https://www.cdc.gov/nchs/data/dvs/im9_2002.pdf.pdf at Tbl. A (identifying codes X40-44 as "[a]ccidental poisoning by and exposure to drugs and other biological substances").

4

with DEA, it should likewise exclude related correspondence from the government to McKesson. *See* Distributor Defendants' MIL D-1.

Plaintiffs repeatedly questioned McKesson witnesses about inadmissible correspondence regarding investigations and settlement, which now appear on their exhibit list. *See, e.g.*, Pl. P-8233, P-8232, P-8229. In discovery, Plaintiffs questioned witnesses with these letters as though they contained uncontested facts or admissions, not mere allegations.[8] Use of these letters to try to prove the truth of their underlying allegations is impermissible under both Rule 408, which prohibits introduction of settlement offers and negotiations "to prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408, and under Rule 402 as hearsay.

On their face, the letters admit they were offered for the purpose of incentivizing settlement and that they contain only unproven "allegations," which cannot be given any presumption of truth. *See, e.g.*, P-8232 at 22. The letters were not the product of hearings or formal procedures aimed at developing a factual record and giving the parties an opportunity to respond to argument and to cross-examine witnesses. *See DeSantis v. Napolitano*, 2010 WL 2292592, at *23 (D.N.M. May 26, 2010). Rather, the Department of Justice sent the letters to counsel for McKesson for the stated purpose of encouraging settlement during an investigatory process, making the letters inherently one-sided.

The letters are also inadmissible because they do not relate to the Plaintiff counties or to any McKesson facility that serviced customers in the Plaintiff counties, and therefore lack probative value.[9] Nonetheless, the letters are highly prejudicial, as their "official nature" may

---

[8] *See, e.g.*, ECF No. 2173-50/2213-27 (Oriente Tr.) at 176:9-15 ("So let's see what the DEA says on this page. And again, this is your opportunity to tell me that you believe the DEA was lying. If you want to say that on the record, I'll be glad to take it. But let's look at what it says.").

[9] For example, Exhibit 8232 details the United States Attorney's Office for the District of Colorado's investigation of McKesson's *Aurora, Colorado* Distribution Center, located some 1,300 miles from Summit or Cuyahoga County.

give these unproven allegations the appearance of credibility, leading to jury confusion and prejudice to McKesson. *Park W. Galleries, Inc. v. Glob. Fine Art Registry*, 2010 WL 848689, at *1 (E.D. Mich. Mar. 8, 2010) (excluding evidence of an FBI investigation because its probative value was "substantially outweighed by the danger of unfair prejudice").

## V. MCK-5: The Court Should Prohibit Introduction of Testimony from McKesson Witness Nathan Hartle Because of Plaintiffs' Badgering and Abusive Conduct.

McKesson designated Mr. Nathan Hartle as the corporate designee for Topic 1 of Plaintiffs' First 30(b)(6) Deposition Notice and on Topics 9, 14, and 16–22 of Plaintiff's Second Deposition Notice. Each of these topics related to the operation of McKesson's regulatory affairs program. *See* Ex. 1; Ex. 2.[10] Rather than seek discovery within these topics, however, Plaintiff's counsel badgered Mr. Hartle with numerous wasteful, abusive, and out-of-scope questions that required specialized knowledge far outside Mr. Hartle possible knowledge. For example, Plaintiffs' counsel asked Mr. Hartle to speak on behalf of the company about documents dating back to 1910—a full 96 years before the start of the relevant time period for discovery. Counsel also asked Mr. Hartle, on behalf of McKesson, to "acknowledge" the veracity of the "gateway theory" of heroin use.[11] Answering this question would require specialized medical and public health knowledge; indeed, this theory lacks consensus even among trained medical professionals, as exhibited by the parties' expert submissions. Plaintiffs' counsel also asked a lengthy, repetitive, and abusive series of questions about whether Mr. Hartle believed McKesson was "responsible" for the "societal costs" of opioid epidemic. In response to

---

[10] *See* ECF No. 1962-23/1978-3 (Hartle Tr. 07.31.18) at 16:16–17:25 (identifying topics of designation).

[11] *See id.* at 320:14-17, 320:25–321:6 ("Q. As the McKesson corporate representative, do you acknowledge that abuse of prescription opium pills is a gateway to the initiation of heroin? . . . Q. If you abuse prescription opiates, the CDC says that you're 40 times more likely to initiate heroin use. Does McKesson acknowledge that—that prescription opiate pill abuse is a driving factor in the heroin epidemic we're also experiencing?").

6

being asked the same question at least *six times*,[12] Mr. Hartle answered that his answer would "depend" on more context and he was "not sure how to answer" Plaintiffs' question, but rather than move on from this already improper questioning, Plaintiffs' counsel then badgered Mr. Hartle to change his answer for three more transcript pages.[13]

Counsel's questioning was beyond merely objectionable; it was abusive and improper. The court should exclude Mr. Hartle's 30(b)(6) deposition testimony because of Plaintiffs' abuse of and disregard for the 30(b)(6) deposition process. At a minimum, Plaintiffs' questioning of Mr. Hartle was not even arguably within the scope of Mr. Hartle's designated topics and cannot bind McKesson. *Green v. Wing Enterprises, Inc.*, 2015 WL 506194, at *8 (D. Md. Feb. 5, 2015) ("[Q]uestioning . . . beyond the scope of the notice the testimony will constitute that of the deponent in an individual capacity.").

## VI. MCK-6: The Court Should Prohibit Introduction of Documents Related to McKesson's Relationship with CVS and Rite Aid In Light of Severance.

On August 15, 2019, the Court severed Rite Aid and CVS from the Track 1 Trial. ECF 2438. This severance creates significant evidentiary issues. The record makes clear that Plaintiffs will try their claims against Distributors by arguing that Distributors should have second-guessed the compliance programs of national chain pharmacies. *See, e.g.*, ECF 2182 at 59–66, 68–71. Admission of evidence regarding McKesson's relationship with CVS and Rite Aid into a trial that exclude these defendants would prejudice McKesson and lead to absurd

---

[12] *See id.* at 280:13–286:15 ("You're sitting here today. You have the opportunity to look in the camera and tell the jury whether or not you accept partial responsibility for the societal costs of prescription drug abuse in America."). Even as to Mr. Hartle's personal capacity, this and other questioning is objectionable on multiple grounds, including being leading, argumentative, repetitive, lacking in foundation, and asking a witness to improperly opine on the ultimate question for the jury.

[13] *See id.* at 280:21–283:6 (repeatedly answering that it would "depend[]"); *id.* at 284:11-17 (questioning by Mr. Paul Farrell: "I'd ask you to answer yes or no. A. I'm not sure how to answer that – that question specifically. Q. Well, you can say yes or … you can say no."); *id.* 286:5–12 ("Sir, we're not going to parse our percentages. …. So I don't want to put words in your mouth because it's got to come out of your mouth. So the answer is yes or no.")

7

results. McKesson would be forced to take up the mantle of defending CVS and Rite Aid's internal processes; a nearly impossible task given that Plaintiffs' claims date back more than a decade. Plaintiffs could merely assert that CVS and Rite Aid had no (or inadequate) suspicious order monitoring systems and force McKesson to try to construct an understanding of these separate entities' regulatory processes based on a limited, cold record of McKesson documents that employee turnover and the passage of time have robbed of context. The need for McKesson to defend CVS and Rite Aid will undoubtedly give rise to jury confusion by creating multiple "trials within a trial" into the programs of defendants that the Court has severed. *See Chism v. CNH Am. LLC*, 638 F.3d 637, 642 (8th Cir. 2011) ("The district court also may … avoid a trial within a trial"); *Widmer v. Warden, Corr. Reception Ctr.*, 2017 WL 447237, at *49 (S.D. Ohio Feb. 2, 2017) (affirming exclusion of evidence that would result in a "trial within a trial"). Given that McKesson may have as little as 14 hours to put on its defense, having to use its extremely limited time to explain CVS and Rite Aid's programs as well as its own will cause significant prejudice to McKesson and hamper its ability to defend itself. *See* Fed. R. Evid. 403.

Dated: September 25, 2019

Respectfully Submitted,

  */s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com

8

*Counsel for McKesson Corporation*

9

## **CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
