# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45004 | MDL No. 2804<br><br>Hon. Dan A. Polster |

## MCKESSON CORPORATION'S TRIAL BRIEF

McKesson Corporation ("McKesson") identifies the principal outstanding legal and factual issues relating to three key issues: (1) the purported duties not to ship and to report suspicious orders, (2) proximate causation, and (3) allocation of fault.

## I. ALLEGED FAILURE TO REPORT AND HALT SUSPICIOUS ORDERS

### A. Legal Standard

McKesson respectfully submits that the Court should exclude as irrelevant and unduly prejudicial any evidence relating to its purported violation of a supposed regulatory duty to refuse to ship suspicious orders.  *See* Defendants' MIL 7.

**RICO/OCPA.**  Plaintiffs' summary judgment briefing cited 21 U.S.C. § 823(b) and 21 C.F.R. § 1301.74 as the source of distributors' purported duty not to ship "suspicious orders."  *See* Dkt. No. 2182 at 97.  Any violation of such a "duty" would not constitute a RICO predicate act.[1]  RICO's enumerated predicate acts include "the *felonious* manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  But supposed "violations" of 21 U.S.C. § 823(b) and 21 C.F.R. § 1301.74 are not punishable as felonies.  Section 823 merely requires DEA to consider an applicant's "maintenance of effective controls against diversion" in the course of determining whether to register the applicant; it does not impose requirements on registrants that are enforceable under the penal code.  And it is well-established that the violation of *regulations*—like 21 C.F.R. § 1301.74—cannot give rise to felony liability.  *See, e.g.*, *United States v. Alghazouli*, 517 F.3d 1179, 1184 (9th Cir. 2008) ("a criminal conviction for violating a regulation is permissible only if a statute explicitly provides that violation of that

---

[1] McKesson respectfully submits that the Court erred in ruling that distributors have a "duty" to refuse to ship suspicious orders.  *See generally* Dkt. No. 2159.

regulation is a crime"). Accordingly, evidence of McKesson's alleged failure to halt suspicious orders is not relevant to Plaintiffs' RICO and OCPA claims.[2]

**Nuisance.** McKesson's alleged failure to refuse to ship suspicious orders is likewise irrelevant to Plaintiffs' nuisance claims. Under Ohio law, the violation of a federal regulation does not give rise to a statutory public nuisance claim.[3] Because there is no federal or Ohio statute or board of pharmacy rule prohibiting the shipment of suspicious orders, McKesson's alleged shipments are irrelevant to the statutory public nuisance claim. They are likewise irrelevant to the common law absolute public nuisance claim, among other reasons, because they do not involve the violation of a safety *statute* and because the Controlled Substances Act ("CSA") was not enacted "for the protection" of Plaintiffs.[4]

**Conspiracy.** Civil conspiracy is not "an independent cause of action." *See* Dkt. No. 2149 at 12–13. Because McKesson's alleged failure to halt suspicious orders is not relevant to Plaintiffs' substantive claims, is it likewise irrelevant to their tag-along conspiracy claims.

* * *

In short, evidence relating to McKesson's alleged failure to refuse to ship suspicious order should be excluded. For similar reasons, evidence regarding McKesson's alleged failure to report suspicious orders to DEA is likewise irrelevant and inadmissible.

---

[2] During discovery, moreover, Plaintiffs did not identify McKesson's alleged failure to refuse to ship suspicious orders as among the predicate acts at issue in this case. Rather, Plaintiffs' interrogatory responses identified only (i) mail and wire fraud and (ii) purported false or fraudulent statements to DEA. Plaintiffs should not be permitted to rely at trial on predicate act allegations that were not timely disclosed during discovery. *See* Distributor Defendants' MIL DD-6.

[3] Ohio Rev. Code § 4729.35 ("The violation … of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse" is "a public nuisance").

[4] *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 433 (1944) (a statute is a "safety statute" only if it sets forth a "specific legal requirement for the protection" of the plaintiff and those similarly situated); *see* Dkt. No. 1680 at 24 (CSA "was not intended to protect [governments] from spending more on addiction-related public services").

Prior to October 2018, the CSA statute did not require registrants to inform DEA of "suspicious orders"—indeed, the statute itself did not even use the term.[5] Because suspicious order reports were not required to be "made, kept or filed" under the statute, any failure to inform DEA of such orders could not as a matter of law violate the CSA.  *See* 21 U.S.C. § 843(a)(4). While a *regulation* under the CSA previously referenced "suspicious orders," *see* 21 C.F.R. § 1301.74(b), any purported "violation" of the regulation (1) does not constitute a felony criminal offense, and thus is irrelevant to Plaintiffs' RICO and OCPA claims, (2) does not violate a federal statute or Ohio law, and thus does not give rise to a statutory public nuisance claim, and (3) does not constitute violation of a safety statute, and thus does not give rise to a common law public nuisance claim.  *See supra* p. 1–2.[6]

### B.   McKesson's Evidence

Evidence relating to "violations" of supposed regulatory duties to report and not to ship suspicious orders should be excluded as irrelevant and unduly prejudicial.  In the event that the Court nevertheless permits Plaintiffs to introduce such evidence, McKesson will introduce evidence establishing that it complied with DEA's shifting guidance regarding suspicious orders. In the face of this evidence, Plaintiffs cannot establish their intentional tort claims.

---

[5] This reality is underscored by the fact that Congress, for the first time in October 2018, amended the CSA to require registrants to notify DEA "upon discovering a suspicious order."  *See* Pub. L. No. 115-271, 132 Stat. 3894, 3956 (Oct. 24, 2018) (codified at 21 U.S.C. § 832); *see also Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) ("When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'").

[6] McKesson respectfully submits that the Court erred in holding that "a violation of 21 U.S.C. § 843(A)(4)(a) can constitute a predicate act."  Dkt. No. 2580 at 3.  RICO's enumerated predicate acts include the "felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  18 U.S.C. § 1961(1)(D).  Violations of Section 843(a)(4) do not fall within that language because they consist only of "furnish[ing]" false information in, or "omit[ting]" material information from, certain "report[s]" or "record[s]"—not "buying, selling, or otherwise dealing" in controlled substances.  21 U.S.C. § 843(a)(4).  While Plaintiffs have asserted that furnishing false information or omitting material information in reports to DEA "may constitute concealment," the felonious "concealment" that is actionable under Section 1961(1)(D) has to do with the controlled substances themselves, not recordkeeping.

3

**Alleged "No Ship" Duty**. Prior to 2008, McKesson did not "block" suspicious orders. The evidence will show, however, that DEA did not require or expect distributors not to ship suspicious orders (as that term is defined in the CSA's implementing regulations) during this time period. DEA knew that McKesson—like all other registrants—was not routinely blocking orders that met the regulatory definition of "suspicious orders," and approved this practice as part of its periodic audit process. *See* Dkt. No. 2149 at 31.

The evidence will further show that McKesson's Controlled Substance Monitoring Program ("CSMP"), which launched in April 2008, fully satisfied any obligation to block suspicious orders. Through the CSMP, McKesson implemented customer-specific thresholds for all controlled substances. The evidence will show that McKesson's implementation of a threshold-based system was done at the behest of, and with full awareness by, DEA. Under the CSMP, if a customer placed an order in excess of a threshold, McKesson flagged and did not ship the order (or any other orders for similar drugs). In addition, McKesson conducted further due diligence and—unless that diligence demonstrated the absence of any cause for concern—McKesson terminated sales of *all* controlled substances to the customer. *See* Dkt. No 2149 at 32–33.

In short, the evidence will show that McKesson put in place and followed reasonable due diligence procedures designed to detect and prevent the shipment of suspicious orders.[7]

**Alleged Statutory Reporting Duty.** Prior to January 2009, McKesson reported suspicious orders (as that term is defined in 21 C.F.R. § 1301.74) to DEA. The evidence will show that

---

[7] Plaintiffs doubtless will point to the sheer volume of orders shipped by McKesson as evidence that it shipped suspicious orders. But that assertion is belied by Plaintiffs' own experts. According to those experts, the increase in the volume was attributable to manufacturer marketing, which changed the standard of care to approved the long-term use of prescription opioids for the treatment of chronic pain. If, as Plaintiffs' experts opine, the increase in volume was due to an increase in good-faith (albeit misguided) prescribing by doctors, then McKesson had no obligation to halt as "suspicious" orders placed by pharmacies to fill those prescriptions. McKesson has neither the duty nor the ability to second-guess the good-faith prescribing decisions of Ohio doctors. *See* Dkt. No. 1920-1 at 7–13.

4

McKesson's "DU-45" reports—which identified all orders that exceeded three times the monthly average for a Schedule II or III controlled substance—were submitted to DEA, and accepted by DEA, as suspicious order reports. *Id.* at 29–30.

Beginning in January 2009, McKesson began reporting to DEA only orders for which, after due diligence, McKesson determined that there was a substantial risk of diversion. The evidence will show that McKesson changed its approach to reporting with the knowledge of, and at the behest of, DEA. Specifically, DEA officials expressly instructed McKesson by email that "*[a] suspicious order should be reported to DEA only after your company has completed its due diligence and determined that you will not complete the sale because it is suspicious*." *Id.* at 37–38. This uncontroverted evidence disproves any assertion that McKesson knowingly and intentionally misled DEA by failing to report all suspicious orders. *See* 21 U.S.C. § 841, 843 (establishing penalties for "knowing[] or intentional[]" violations).[8]

The record will further show that McKesson reinstituted the practice of reporting all suspicious orders effective August 1, 2013, shortly after receiving revised guidance from DEA. Dkt. No. 2149 at 38 & n.74.

Plaintiffs may attempt to argue that two DOJ settlement agreements with McKesson, as well as letters written in connection with those matters, demonstrate its non-compliance with the CSA or its implementing regulations. However, *allegations* made by non-parties in separate

---

[8] The evidence will also show that McKesson reported *all* prescription opioid orders it shipped to DEA through the ARCOS database. As DEA has acknowledged, information submitted to the ARCOS database provided DEA with a complete picture of all opioid distributions during the relevant time-period, including sufficient information to identify any suspicious order patterns. Dkt. No. 2149 at 4, 39. McKesson's reporting of all controlled substance distribution of opioids further defeats any claim that McKesson *knowingly* concealed suspicious orders from DEA. *See, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002) (holding that where the senders knew that the recipient of information would not be misled, "they could not have had an intent to deceive[]" as required to establish scienter).

5

matters—for which there was never any adjudication on the merits—are inadmissible. The Court should therefore preclude Plaintiffs from offering the settlement agreements or related correspondence as evidence of McKesson's alleged wrongdoing. *See* Distributor Defendants' MIL DD-1; McKesson's MIL MCK-4.[9]

## II.  PROXIMATE CAUSATION

### A.  Legal Standard

To prove causation, Plaintiffs must establish a "***direct relation*** between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).[10] In assessing whether there is a "direct relation" between claimed injury and conduct, "[t]he general tendency of the law … is not to go beyond the first step." *Id.* at 271–72. "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (plurality opinion) (quoting *Holmes*, 503 U.S. at 271, 274).

The Sixth Circuit's decision in *City of Cleveland v. Ameriquest Mortg. Secs., Inc.*, 615 F.3d 496 (6th Cir. 2010) illustrates the proper application of these requirements. *Ameriquest* involved an attempt by an Ohio local government to recover costs incurred in responding to the subprime "crisis" that "devastated its neighborhoods and economy." *Id.* at 499. The Sixth Circuit held that

---

[9] The narrow "acceptance of responsibility" in McKesson's 2017 settlement agreement does not alter this result. In that agreement, McKesson merely acknowledged that, at some unidentified time after January 1, 2009, it "did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the [September 27, 2006 and December 27, 2007 DEA] Letters." Importantly, McKesson did *not* admit to violating the CSA or its implementing regulations, did *not* admit to any knowing or intentional violation, and did *not* admit to any conduct relating to pharmacies in Ohio. At all times since January 2009, moreover, McKesson blocked *all* orders of controlled substances that exceeded the thresholds established under the CSMP; accordingly, its purported "reporting" failures could not have injured Plaintiffs.

[10] This requirement applies to each of Plaintiffs' claims. *E.g.*, *Cleveland v. Ameriquest Mort. Secs., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010) ("the Ohio Supreme Court has adopted the *Holmes* Court's proximate cause analysis"); *see Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003) (noting that "the RICO statute incorporates general common law principles of proximate causation," and applying the *Holmes* proximate cause analysis to Ohio state-law tort claims); *JP Morgan Chase*, 2013 WL 1183332 at *5 ("The same proximate cause requirements … apply to both [RICO and OCPA] causes of action.").

6

the defendants' conduct was not a direct cause of the City's harm in part because the defendants did not sell loans directly to consumers.  *Id.* at 504–05.  It further observed, in support of its holding, that parties more directly responsible for the City's injuries included (i) the homeowners who voluntarily "chose to … default on their loans" and (ii) the "[d]rug dealers," "looters," and other "negligent or malicious" individuals who started fires at, sold drugs from, or vandalized abandoned homes.  *See id.* at 505.  The presence of these "independent actors between the alleged misconduct and the alleged injury" distinguished *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (2002), and compelled the conclusion that the claims were "too indirect to warrant recovery."  *Ameriquest*, 615 F.3d at 506.

*Ameriquest* also forecloses two additional arguments that Plaintiffs have made.  Plaintiffs have asserted that (1) their injury was a foreseeable consequence of McKesson's conduct, and (2) their burden of proof on causation should be lessened because McKesson's conduct was "intentional."  As the Sixth Circuit explained, however, "the requirement of a direct injury is … distinct from foreseeability and applies even if the Defendants intentionally caused the alleged course of events."  *Id.* at 502–03 (whether defendants "knew about the consequences of" their alleged wrongdoing "not relevant to [the] directness requirement").

### B.     Plaintiffs Lack of Causation Evidence Supporting Their Claim.

Plaintiffs have no evidence demonstrating a direct causal relationship between the opioid pills shipped by McKesson and Plaintiffs' alleged injuries.  As to alleged injuries from prescription opioids, they cannot identify any "pill mill" doctors supplied by McKesson and show that they were harmed as a result of those shipments.  Nor can they show that they incurred expense as a result of shipments to particular pharmacies in Summit or Cuyahoga Counties that McKesson knew (or should have known) were dispensing in the absence of legitimate prescriptions.  Indeed, Plaintiffs' diversion expert admits that he has no "knowledge of what happened to any of the drugs

7

that were distributed." Rafalski Tr. 582:9–19 (Dkt. No. 1969-19).  Plaintiffs' utter failure to establish a direct link between specific orders improperly shipped by McKesson and their injury (*i.e.*, increased expenses) is fatal to their claims.  *See* Dkt. No. 1920-1 at 14–19.

This case, moreover, is on all fours with *Ameriquest*.  Like the defendants in *Ameriquest*, who "did not directly make subprime loans to the homeowners of Cleveland," McKesson does not make opioids available to patients.  615 F.3d at 505.  Rather, a patient can obtain opioids only after a doctor makes an independent decision to write a prescription and a pharmacist makes the independent decision to fill the prescription.  Moreover, myriad acts of wrongdoing by "so many independent actors"—including the criminal diversion of opioids and their illicit use—stand between McKesson's alleged wrongdoing and Plaintiffs' injuries.  *Id.* at 505; *see* Dkt. No. 1920-5 (Drug Diversion by Third Parties in Summit and Cuyahoga Counties).  The evidence will show that the causal chain connecting McKesson's conduct to Plaintiffs' injuries is far more indirect and attenuated than the chain rejected by the Sixth Circuit as "too indirect."  Dkt. No. 1920-1 at 17–18.

Plaintiffs' experts cannot cure the fatal defects in their causation case.  While the Court has held that Plaintiffs may rely on "aggregate proof," Plaintiffs have no evidence—aggregate or otherwise—that McKesson's conduct caused their injury.  For example, no Plaintiff expert identifies which orders (or even what portion of orders in the aggregate) McKesson should have refused to ship as inappropriate under then-prevailing guidelines for the treatment of chronic pain.[11]  Nor does any Plaintiff expert opine that McKesson's alleged failure to conduct adequate due diligence resulted in any pharmacy orders being shipped that would not have shipped if there

---

[11] While Plaintiffs assert, with the benefit of hindsight, that many of the pills McKesson shipped were not "medically necessary," their own experts explain that the pills were overwhelmingly based on good-faith prescribing by doctors in accordance with the prevailing standard of care.  *See supra* n. 7.

had been adequate due diligence.[12]  Thus, the testimony of Plaintiffs' experts cannot demonstrate causation as to McKesson.  *See Id*. at 12–13 & nn. 29–30.

Plaintiffs' causation case is even more attenuated as to their attempt to recover costs related to illegal heroin and fentanyl use.  Plaintiffs seek damages based upon two distinct sets of injuries: harm allegedly flowing from (1) the purported over-prescription and over-supply of legal, prescription opioid medications, and (2) the use and abuse of illegal, non-prescription drugs, such as heroin and fentanyl.  McKesson distributes only FDA-approved, prescription medicines to DEA-registered pharmacies; it plays no role in the chain of distribution for illicit street drugs like heroin.  Moreover, multiple intervening steps by myriad independent actors stand between McKesson and Plaintiffs' harm flowing from illicit druf use. Dkt. No. 1920-1 at 21–23.  Accordingly, the jury could reasonably find that McKesson is not responsible for injury flowing from the use of non-prescription drugs.

## III.  ALLOCATION OF FAULT

At trial, it will be necessary for the jury to allocate fault among Plaintiffs, the litigating defendants, and absent third parties, including severed and settling defendants.

The Court's opinion denying Plaintiffs' motion for summary judgment on the question of joint and several liability held that the common law of Ohio governs the apportionment of harm on Plaintiffs' nuisance claim.[13]  At common law, even where a plaintiff demonstrates that more

---

[12] One of Plaintiffs' experts—David Cutler—purports to be capable of deriving percentages of opioid mortality that were driven by the shipments that McKesson should have flagged for additional diligence. Cutler Rpt. App. III.J at 2–5; Decl. of David Cutler ¶ 9 & App. A (Dkt. No. 2210–1). However, Dr. Cutler never timely performed this analysis.  While Plaintiffs attempted to remedy this critical defect by belatedly submitting a declaration from Dr. Cutler, that declaration appropriately was stricken by Special Master Cohen as untimely.  Because Plaintiffs cannot rely on the contents of the stricken declaration at trial, they have *no evidentiary support whatsoever* for their experts' supposed estimate of the share of harms attributable to McKesson's misconduct.

[13] McKesson respectfully submits that the Court erred in holding that Ohio's apportionment statute is inapplicable because Plaintiffs do not seek "compensatory damages."  Opinion & Order (Dkt. No. 2572) at 5–6.

9

than one defendant was responsible for its injury, the defendant is still entitled to seek allocation from the jury, provided the defendant demonstrates that the injury is subject to allocation.  *See Pang v. Minch*, 559 N.E.2d 1313, 1323-1324 (Ohio 1990) (adopting the approach set out in the Restatement of Torts).  In allocating fault, moreover, it "is not essential … that all of the tortfeasors who will become liable for some part of the apportioned damages be joined as defendants in the action."  Restatement (Second) of Torts § 433B (1965).

Accordingly, McKesson intends to seek a verdict form that asks the jury to allocate fault for Plaintiffs' injuries among multiple alleged causes, including for example (1) the third party criminal who diverted opioids to illicit use, (2) the opioid manufacturers who allegedly caused doctors to write medically unnecessary opioid prescriptions, and (3) Plaintiffs themselves.

Dated:     September 25, 2019

Respectfully Submitted,

 */s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Paul W. Schmidt
Christian J. Pistilli
Phyllis A. Jones
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com

*Counsel for McKesson Corporation*

## **CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

>  */s/ Geoffrey E. Hobart*
> Geoffrey E. Hobart