Exhibit 3

```
 1              IN THE DISTRICT COURT OF CLEVELAND COUNTY
                         STATE OF OKLAHOMA
 2
    STATE OF OKLAHOMA, ex rel.,        )
 3  MIKE HUNTER                        )
    ATTORNEY GENERAL OF OKLAHOMA,      )
 4                                     )
                      Plaintiff,       )
 5                                     )
          VS                           )   Case No. CJ-2017-816
 6                                     )
    (1) PURDUE PHARMA L.P.;            )
 7  (2) PURDUE PHARMA, INC.;/          )
    (3) THE PURDUE FREDERICK COMPANY;  )
 8  (4) TEVA PHARMACEUTICALS USA,      )
    INC.;                              )
 9  (5) CEPHALON, INC.;                )
    (6) JOHNSON & JOHNSON;             )
10  (7) JANSSEN PHARMACEUTICALS,       )
    INC.;                              )
11  (8) ORTHO-MCNEIL-JANSSEN           )
    PHARMACEUTICALS, INC.,             )
12  n/k/a JANSSEN PHARMACEUTICALS;     )
    (9) JANSSEN PHARMACEUTICA, INC.    )
13  n/k/a JANSSEN PHARMACEUTICALS,     )
    INC.;                              )
14  (10) ALLERGAN, PLC, f/k/a ACTAVIS  )
    PLC, f/k/a ACTAVIS, INC., f/k/a    )
15  WATSON PHARMACEUTICALS, INC.;      )
    (11) WATSON LABORATORIES, INC.;    )
16  (12) ACTAVIS LLC; AND              )
    (13) ACTAVIS PHARMA, INC., f/k/a   )
17  WATSON PHARMA, INC.,               )
                                       )
18                    Defendants.      )
                                       )
19                                     )
                                       )
20                                     )
                                       )
21
                  TRANSCRIPT OF MOTIONS HEARING
22              HAD ON THE 9TH DAY OF MAY, 2019,
                      BEFORE THE HONORABLE
23              THAD BALKMAN, DISTRICT JUDGE

24

25  REPORTED BY:  Tanya Burcham, CSR, RPR
```

1          **APPEARANCES**

2

3  **ON BEHALF OF THE PLAINTIFF:**

4                    MS. ABBY DILLSAVER
                    ATTORNEY GENERAL'S OFFICE
5                    313 NE 21ST STREET
                    OKLAHOMA CITY, OK 73105
6
                    MR. REGGIE WHITTEN
7                    MR. MICHAEL BURRAGE
                    WHITTEN BURRAGE
8                    512 NORTH BROADWAY AVENUE
                    SUITE 300
9                    OKLAHOMA CITY, OK  73102

10                    MR. BRAD BECKWORTH
                    MR. TREY DUCK
11                    MR. DREW PATE
                    NIX PATTERSON & ROACH LLP
12                    512 NORTH BROADWAY AVENUE
                    SUITE 200
13                    OKLAHOMA CITY, OK  73102

14                    MR. GLENN COFFEE
                    ATTORNEY AT LAW
15                    915 NORTH ROBINSON AVENUE
                    OKLAHOMA CITY, OK  73102

16

17

18

19

20

21

22

23

24

25

```
 1  ON BEHALF OF TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.;
    ACTAVIS LLC; ACTAVIS PHARMA, INC.; AND WATSON LABORATORIES,
 2  INC.:

 3                       MR. ROBERT MCCAMPBELL
                         MR. NICHOLAS MERKLEY
 4                       ATTORNEYS AT LAW
                         ONE LEADERSHIP SQUARE
 5                       15TH FLOOR
                         211 NORTH ROBINSON
 6                       OKLAHOMA CITY, OK  73102

 7                       MR. HARVEY BARTLE IV
                         MORGAN, LEWIS & BOCKIUS LLP
 8                       1701 MARKET STREET
                         PHILADELPHIA, PA  19193-2921

 9

10  ON BEHALF OF ORTHO McNEIL JANSSEN PHARMACEUTICALS, INC.;
    JANSSEN PHARMACEUTICA, INC.; JANSSEN PHARMACEUTICALS, INC.; AND
11  JOHNSON & JOHNSON:

12                       MR. LARRY OTTAWAY
                         MS. AMY SHERRY FISHER
13                       ATTORNEYS AT LAW
                         201 ROBERT S. KERR AVENUE
14                       SUITE 1200
                         OKLAHOMA CITY, OK  73102
15
                         MS. SABRINA H. STRONG
16                       ATTORNEY AT LAW
                         400 SOUTH HOPE STREET
17                       18TH FLOOR
                         LOS ANGELES, CA  90071
18
                         MR. JOHN SPARKS
19                       ODOM, SPARKS & JONES PLLC
                         HIPOINT OFFICE BUILDING
20                       2500 MCGEE DRIVE
                         SUITE 140
21                       OKLAHOMA CITY, OK  73072

22

23

24

25
```

**INDEX**

**PAGE:**

**EXBHIBITS**

<u>**NO:**</u>                                                              <u>**MARKED:**</u>

Defendant No. 1.........................................39
Defendant No. 2.........................................39
Defendant No. 3.........................................39
Defendant No. 4.........................................39

Certificate............................................176

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

**PROCEEDINGS**

1

2         THE COURT:  I anticipate we'll take a 20-minute

3  break sometime this morning when I realize Tanya needs a break

4  and maybe we all do.  I don't intend to take a lunch break

5  since we have a hard stop at 2:00.

6         I would like to begin with the defendants' request

7  for judicial notice this morning.

8         Mr. Merkley, are you going to argue that?

9         MR. MERKLEY:  I think so, Judge.

10         THE COURT:  I'll give you a full five-minute warning

11  for 20 minutes.  All right?

12         MR. MERKLEY:  Judge, I know you read the briefs.

13  This motion seeks a very simple ruling from the Court on a

14  purely legal issue that's very important for this trial.

15         As I mentioned before, throughout this case, I and

16  others have advised State's counsel that there would be a day

17  when they had to set aside the rhetoric and the innuendo and

18  come to this court of law and demonstrate to you as the

19  presiding judge and the person in charge of making sure we all

20  comply with the law, that the conduct they allege actually

21  occurred in Oklahoma.

22         Now, Brad and Reggie like to poke fun at me and call

23  me a book lawyer, all in good nature, of course.  We get along

24  well.  This is one of those times when I have to be a book

25  lawyer and ask the Court to recognize the law as clearly

1   defined by the United States Supreme Court.

2            So I'm asking the Court to formally recognize that

3   any attempt by the State to rely on defendants' conduct,

4   out-of-state conduct with no nexus to Oklahoma, nothing for

5   distinction, to prove unlawful conduct under Oklahoma law would

6   violate the Commerce Clause and Due Process Clause of the

7   United States Constitution.

8            It's purely a matter of law with no consideration of

9   fact necessary.  All the disputes of fact between the parties,

10  what conduct does or does not have a nexus to Oklahoma is

11  irrelevant for purposes of this ruling.  We're simply asking

12  the Court to recognize that conduct having no nexus to Oklahoma

13  would not give rise to liability under Oklahoma law.

14           So all the things the State says in its brief about

15  testimony in this case, anything on this big pile of boards we

16  have over here is wholly irrelevant to this particular motion.

17  We're going to have a trial in this case for two to three

18  months to convince this Court whether or not conduct did occur

19  in Oklahoma.  But for now, we're simply asking the Court to

20  recognize the law as is.

21           As you'll see in the brief, Judge, the Commerce

22  Clause will prove its reliance on out-of-state conduct with no

23  nexus to Oklahoma to prove state law claims.  United States

24  Supreme Court has held, quote:

25           The Commerce Clause precludes the application of a

state statute to commerce that takes place wholly outside the State's borders, whether or not that commerce has any effect within the State.  That's the *Healy* case.

Decades of Supreme Court precedent make clear that a state cannot penalize identity for out-of-state conduct having no nexus to the foreign state.  Those cases are cited on pages 5 and 6 of our motion.

Now the State argues that well-established Supreme Court precedent is inapplicable because this is not a situation where a statute or a law is being challenged or where a state regulatory body is accused of trying to control conduct beyond the boundaries of the state.  And, Judge, that argument is simply wrong.

First, there can be no legitimate dispute that the state is seeking to use our public nuisance statute to impose liability on the defendants for conduct occurring outside this state.  It's alleged in the petition.  It's been alleged in every brief filed, including the briefs that were argued to you last hearing.  It's on the foam board example that Mr. Beckworth likes to show you every time with his modified jury instruction.  It's the Oklahoma Public Nuisance Statute.

Imposing liability upon an entity for conduct occurring outside the state is regulating that conduct regardless of whether it's done in the form of a civil judgment for violating the statute or for a restriction or penalty

 1   directly imposed by a statute.  It's actually a matter the
 2   State cannot do indirectly through this Court what it can't do
 3   directly through a statute.  So if out-of-state conduct has no
 4   nexus to Oklahoma, the State can't use it to impose liability
 5   on these defendants using Oklahoma's Public Nuisance Statute.
 6           Also, Judge, as you see in the brief, the Due
 7   Process Clause for the reliance on the out-of-state conduct
 8   with no nexus to Oklahoma to prove state law claims.  The
 9   Supreme Court's made clear that the application of state law
10   and out-of-state conduct violates the Due Process Clause unless
11   the out-of-state conduct has significant contacts within the
12   state and implicates significant state interests.  That's the
13   *Phillips Petroleum* case.
14           The State doesn't dispute that the Supreme Court has
15   held that states do not have the power to punish an entity for
16   conduct that was lawful where it occurred and had no impact on
17   the State and its residents.  But the State -- in the next
18   cite, the *BMW* case which we cite in our brief, but the State
19   argues that that case should be distinguished because it only
20   applies when the out-of-state conduct is being used to prove
21   punitive damages.  And the State is free to use that
22   out-of-state conduct to establish liability including
23   causation.
24           And, Judge, contrary to the State's assertion in
25   that respect, *BMW* makes no such distinction.  While punitive

1  damages is what was being addressed in the *BMW* case, there is

2  no language in the holding that limits the holding to the

3  punitive damages.  And frankly, $4 million dollars in punitive

4  damages as it was being dealt with in the *BMW* case, is even

5  less material than billions of dollars the State is seeking

6  here against only two of the very many opioid manufacturers.

7           The two unpublished, nonbinding cases that the State

8  argues in support of its motion, cites in support of its motion

9  that are in support of its brief, saying that out-of-state

10 conduct can be used to prove causation are an absolute.  First

11 the *Hayes* case, that's the one the State primarily relies upon

12 and heavily underlines and bolds that case.  If you read the

13 rest of the opinion, it actually supports the defendants'

14 argument.  The Court expressly acknowledged in the order that

15 lawful out-of-state conduct, for it to be admissible under

16 United States Supreme Court precedent, quote:

17           That conduct must have a nexus to the specific harm

18 suffered by the plaintiff.  Close quote.

19           And that's *Hayes* at page 2.

20           The *Markum* case did not involve any argument about

21 out-of-state conduct having no nexus to Oklahoma.  The Court

22 just said:

23           Indicative of evidence both inside and outside of

24 Oklahoma was admissible for liability issues aside from

25 punitive damages.  But in that case, it appears from the facts

1   that the in-state and out-of-state conduct both had some nexus

2   to Oklahoma.  And also if you look at the *Binding* case in the

3   Tenth Circuit that the *Markum* case cites, that case didn't deal

4   with the issue at all.  So we're back with this motion,

5   applies only to out-of-state conduct, having no nexus to

6   Oklahoma and under established Supreme Court precedent, you

7   cannot -- the State cannot hold the defense liable for conduct

8   occurring outside the State's borders unless it has some nexus

9   with Oklahoma.

10          Finally, the State argues -- or doesn't dispute that

11  the Supreme Court's held in the context of the choice of the

12  law analysis that the State must have significant contacts or

13  significant aggregation contacts to the -- to the conduct at

14  issue to ensure that the choice of law is not arbitrary or

15  fair.  The State acknowledges that and they cite the

16  (indistinguishable) case which we cite.  And then they try to

17  distinguish it by saying that holding is inapplicable because

18  there is no choice of law at issue here and everybody agrees

19  Oklahoma law applies.

20          Again, the State's wrong.  If the State is permitted

21  to apply Oklahoma law to out-of-state conduct having no nexus

22  to Oklahoma, there's clearly a choice of law at issue in this

23  case.  But the defendants dispute that Oklahoma law is the

24  correct choice of law to apply in out-of-state conduct having

25  no nexus to Oklahoma.

1          I want to close, Judge, with two examples that I

2     think would bring the point home:

3          First, let's assume that California has experienced

4     an increase in earthquake activity and California hires an

5     anti-earthquake activist from New York to opine that oil and

6     gas fracking is what's actually causing the increase in the

7     California earthquake activity.  So California decides to sue

8     Continental Resources and Devon Energy, two large Oklahoma

9     producers, for public nuisance, alleging that they are jointly

10    and severally liable for the entirety of California's problem.

11         Now, let's assume that Continental and Devon both

12    have assets in California but both deny that they've ever

13    conducted any fracking activity in California.  There may be a

14    trial to determine whether either company ever fracked in

15    California, but if they did not, the Constitution precludes

16    California from holding Continental and Devon liable for

17    conduct done in Oklahoma, Texas and other states.  Such a

18    lawsuit could constitute an unconstitutional attempt to

19    regulate and punish activity conducted solely in other states.

20         The second example:  Let's assume that Kansas

21    experiences increases in marijuana-related crime since last

22    year when Oklahoma legalized medical marijuana despite the OBN

23    believing for many years, including still today, that marijuana

24    has ruined more lives in Oklahoma than any other drug.  So

25    Kansas hires an antimarijuana activist from New York to opine

1   that Kansas's problem is caused by the increase in marijuana in

2   Oklahoma.  Kansas decides to sue two large medical

3   manufacturers distributors from Oklahoma for public nuisance,

4   alleging they are jointly and severally liable for the entirety

5   of the Kansas problem.  Those two distributors claim they

6   haven't distributed medical marijuana to anyone in Kansas or

7   anyone from Kansas, for that matter.  There may be a trial to

8   determine whether or not that's true, whether either

9   distributed medical marijuana to anyone in or from Kansas.  But

10  if they did not, the Constitution precludes Kansas from holding

11  them liable for conduct done solely in Oklahoma.  That lawsuit

12  would constitute an unconstitutional attempt to regulate and

13  punish those distributors' activities conducted solely in

14  Oklahoma.

15          So in closing, Judge, this motion seeks one very

16  simple ruling on a purely legal basis.  We're asking the Court

17  to formally recognize that any attempt by the State to rely on

18  evidence of defendants' out-of-state conduct with no nexus to

19  Oklahoma to prove unlawful conduct under Oklahoma law, would

20  violate the commerce and Due Process Clause of the United

21  States Constitution.  The request is supported by longstanding

22  decisions of the United States Supreme Court, and we

23  respectfully request that the Court follow that binding

24  precedent and grant this motion.

25          THE COURT:  Thank you, Mr. Merkley.

1           Mr. Beckworth?

2           MR. BECKWORTH:  Good morning, Your Honor.  Brad

3   Beckworth for the State.

4           Your Honor, this shouldn't take too long.  I don't

5   know why Mr. Merkley doesn't like being a little bit of a book

6   lawyer, I'm one.  I think we all are.  We have a lot of law in

7   this case.  I do for sure.  One of the things about being a

8   book lawyer is I am also a fact lawyer.  Very -- this is very

9   simple.  Just -- you can put aside for a moment what the law is

10  or isn't.  What you've been asked to do is to issue an advisory

11  opinion.  And Mr. Merkley's examples -- and I'll get to why

12  they're factually inappropriate, but if you just listen

13  carefully to what he said, this is what he said:

14          Here is my fact pattern.  If there were a trial and

15  after that trial you found X, then we couldn't be held liable

16  for Y.  In both examples his main premise was "after a trial."

17  So that's the whole point here.  They are asking you to take

18  notice of what the law is.  Of course, we'll ask you to do that

19  too and the law has on this issue or many others that are here,

20  there's one part of law or an exception to the law or a part

21  that brings another law into play.  That's what trials are all

22  about.  If, after you get to the end, where you tell us all to

23  stop or you've had enough, you're going to have to make

24  decisions based on what you interpret the law to be and how the

25  facts that apply to that law affect your ultimate

1   determination.  We will put on evidence of these issues and

2   others through the course of the trial.  That's what it's all

3   about.

4          But to take judicial notice of the law being

5   something and then to try to say that all facts that might

6   prove our case under what that law is should not be allowed at

7   trial and we shouldn't be allowed to talk about them is

8   completely inappropriate and can't be done.  It's very

9   important that you -- we connect the dots here.

10          This motion for judicial notice is about

11   out-of-state conduct.  They have a motion in limine, both

12   defendants, about not letting us talk about their out-of-state

13   conduct.  So what they're trying to do is get you to say one

14   thing about what the law is as an improper advisory opinion.

15   And then to stifle us from talking about the very facts that

16   would show that such conduct is, in fact, impermissible under

17   the law at trial.  It's a two-step process they're trying to do

18   and neither one of them are appropriate.

19          On this -- the two examples that Mr. Merkley gave,

20   I -- it's kind of funny that he's using a New York expert on

21   this.  I think he's talking about Dr. Kolodny in both examples.

22   But both examples, the first one was fracking.  What he said

23   was that -- in his example, if there was conduct in Oklahoma by

24   an Oklahoma company but there was no proof that the conduct

25   actually took place in California or had any nexus to

1    California, then that conduct wouldn't be permissible to attach

2    or be part of the liability decision.

3             Well, let's assume that's true for a moment.  That's

4    not going to be the case here.  You've seen for two years all

5    of the acts of Teva and I'll also throw J&J into it, have done

6    locally in Oklahoma that were part of a national strategy.  His

7    other example was this marijuana one, again, saying that

8    distributors in Oklahoma can't be held liable for conduct in

9    Kansas if nothing that they did in Oklahoma had any nexus or

10   impact to Kansas.  Again, I don't know that that's the law, but

11   let's just assume he's right for a second.

12            His whole hypothesis was that the evidence at trial

13   was there was no nexus.  That's not going to be the case here.

14   I think it's really that simple.  The case law that they cite,

15   things like *BMW v. Gore* and many other cases in their brief,

16   those go to issues where states are trying to regulate wholly

17   through laws inconsistently out-of-state conduct.  That's what

18   that's about.  That's not what's at issue here.  Oklahoma has

19   its nuisance law.  It can apply that nuisance law.  You can

20   apply that nuisance law.  Their argument would be like saying

21   that in a car wreck case where it has a product liability

22   aspect to it, that a car that's manufactured in Detroit, when

23   it causes a wreck here due to -- and somebody dies due to

24   products liability, we can't talk about the decisions that were

25   made through the decision tree that led us to the problem that

1    occurred here in Oklahoma.

2            That's not the law.  That's never the case.  Judge

3    Burrage and Mr. Whitten do, as do I, but they're probably the

4    biggest guys in the state on insurance bad faith in this

5    courtroom and others around the state.  We look at the impact

6    locally of decisions made by claims folks in the State of

7    Oklahoma that are part of the bad faith decision tree that

8    starts at State Farms headquarters or Farmers headquarters or

9    whoever it is, they're all part of a national decision tree.

10   That's just how the law works and we all understand that.  But

11   let's just get to the facts real briefly.  And I'll do this one

12   short because I think the motions in limine we'll talk about it

13   a little bit more.

14           We've showed you an example of Teva, Your Honor, in

15   our brief on this at page 3 of the testimony of John Hassler.

16   He was the corporate designee that Teva put up, I think, 15

17   different dates.  This was the question he was asked.

18           "QUESTION:  That 2003 marketing plan and all of the

19   marketing plans for Actiq, those are nationwide in scope,

20   aren't they?

21           "ANSWER:  Yes.

22           "QUESTION:  They're not unique to any particular

23   region or state?

24           "ANSWER:  That's correct.

25           "QUESTION:  So that's the marketing plan for every

1   state in the country, including Oklahoma.  Right?

2           "ANSWER:  Yes."

3           He was next asked in a different deposition.

4           "QUESTION:  During the entire time that you sold the

5   branded Fentora product, your company had a marketing strategy

6   for that product.  Correct?

7           "ANSWER:  Yes.

8           "QUESTION:  It was a nationwide marketing strategy?

9           "ANSWER:  Yes.

10           "QUESTION:  It included Oklahoma?

11           "ANSWER:  Yes.

12           "Question:  You understand that Janssen sold those

13   opioids in Oklahoma just like it did in every other state in

14   this country.  Right?

15           This is a J&J rep.

16           "ANSWER:  Yes, it did.

17           This is a J&J rep.

18           "QUESTION:  One of the purposes in buying that data,

19   talking about buying IMS data where they track prescribers, is

20   to develop these call plans and list of doctors that you're

21   going to call on.  Right?

22           "ANSWER:  Correct.

23           "QUESTION:  Janssen buys that same data for the

24   doctors in Oklahoma.  Correct?

25           "ANSWER:  Janssen buys that data nationally and that

1  would be included in Oklahoma, yes.

2          "QUESTION:  It doesn't treat Oklahoma any different

3  with respect to the data it gathers.  Correct?

4          "ANSWER:  Correct."

5          So we can go through this over and over with the

6  defendants.  What happened is very simple, they had a national

7  strategy and they deployed it here.  That's what happens in a

8  lot of these types of cases.

9          With respect to Teva and Cephalon using -- let's use

10  Actiq, for example.  Let's not forget, Cephalon had a national

11  strategy to illegally, not unlawfully, illegally get its sales

12  reps to market its cancer drug off label for non-cancer uses.

13  And they instructed them to try to entice doctors to do that.

14  And they did it because the cancer market was too small.

15  People died and they wanted to recruit new people to make more

16  money.  They pled guilty to a federal crime for that.  They

17  settled with the State of Oklahoma on a limited basis under

18  false claims for that conduct that took place right here.  It

19  is the paradigm for the nexus of bad national marketing plans

20  that occurred here.

21          The same thing happened with speaker

22  (indistinguishable) for both of these defendants.  They would

23  have a national plan to use speakers.  Then they would take

24  that plan and go locally to their sales reps, recruit local

25  doctors to be part of that speaker program locally.  They would

1   also use national doctors to come in and be part of that

2   locally.  And all the companies did it.  I can give you

3   examples of that, CMEs, KOLs, whatever.  You've seen it for two

4   years and you're probably very aware of it.  I know you're very

5   aware of it.  All of that was a localized way to deal with the

6   national strategy.

7           Mr. Merkley is right.  I like my boards.  I'll give

8   you two real quick ones.  This is a board, Your Honor, that

9   comes out of a book -- if I may approach -- it's called

10  "Responsible Opioid Prescribing."  This is a pretty egregious

11  one.  I'll tell you how this one worked.

12          So "Responsible Opioid Prescribing" was a book

13  written by a guy that was very tied in with all of these

14  defendants.  And all of the different industry folks that were

15  on the Pain Care Forum, some of them helped fund it.  Purdue

16  was a direct funder of this book.  Cephalon, Teva's company,

17  was a direct funder of this book.  J&J with Robert Wood Johnson

18  Foundation, I believe, was funding it, and the American Pain

19  Foundation, which J&J labeled as go-to partner, as a

20  third-party advocate.  This book was sent out nationally as

21  part of a national strategy.  And one of the reasons it was

22  done was to get local folks to believe certain things about

23  opioids.

24          One of the things that is in the book is the use of

25  pseudoaddiction, which we'll show is a lie, and this consensus

1 statement that some of these groups used.  In Oklahoma alone,

2 there were 6,000 copies that we could find that were

3 disseminated here.  We think Purdue alone sent 300,000 copies

4 out nationally.  That's the last evidence we saw.  What is this

5 right here?  This was used to try to get people to understand

6 what pseudoaddiction is.  It's just unbelievable.  Their

7 behaviors on the one side that are less indicative of addiction

8 and behaviors on the other that are more indicative of

9 addiction.  I've put people under oath on this and it's just

10 unbelievable.  What they were trying to do is get doctors.

11 Pain care specialists, addiction specialists?  No.  Local GP's

12 who don't have any training in addiction and confuse them that

13 when people would come in asking for more opioids for them to

14 believe that behavior that looked aberrant was really just a

15 need to prescribe more drugs.  And just look at a few of these.

16 Like here's the lie.

17          If you went and did all of the things on the left,

18 you might not be an addict, like hoarding medication, stealing

19 someone else's pain medications, aggressively complaining to a

20 doctor for more drugs, using more drugs than recommended, all

21 of this kind of stuff.  You know, that's not addictive, don't

22 be worried about that.  But if you go to the other side, you

23 might be an addict.  But it's not indicative of addiction, more

24 addiction -- more of an addiction.  Performing sex for drugs,

25 i.e., prostitution.  Performing sex for money to buy drugs.

1   Literally human trafficking, prostituting others for money to

2   obtain drugs -- to obtain drugs.  This was the kind of stuff

3   that was addiction and they said it here 6,000 times.  Why?

4   Because they wanted people to believe that these drugs would

5   not harm them.  They wanted doctors to believe that they should

6   prescribe more and more and more and people died from this

7   right here.

8           Nexus, are you kidding me?

9           Now, the last we'll do this morning on this topic,

10  this is a J&J one.  But as I said, both of them filed a

11  (indistinguishable) we'll get to in a minute.  But we have

12  these in our brief examples of both of these.

13          This is how this worked:  This is a J&J national

14  plan and look what's on here, a nonpersonal plan.  KOL

15  delivered digital tactics.  WebMD, a website we've all been to.

16  Nucynta.com.  Self-guided details.  Field-driven digital

17  patterns.  Webinars through coalition and clinician website.

18  Direct mail.  All of that --

19          THE REPORTER:  Judge, I can't hear.

20          MR. BECKWORTH:  I'm sorry.  Am I going too fast?

21          THE REPORTER:  I just can't hear across.

22          MR. BECKWORTH:  I'm sorry.  I was going to say, all

23  of this stuff on this board are examples of the deployment of a

24  national strategy using interstate commerce to get right here

25  to Oklahoma.

1          And the last time I checked, we don't have a border

2  wall around the State that keeps digital commerce in the mail

3  from coming into this state.  That would be great if we did.

4  If we had a force field around the state that could have

5  stopped all of their conduct from coming into the state, we

6  wouldn't have a problem here.  But that didn't happen.

7  Instead, they preyed upon us, they preyed upon our doctors.

8  We'll prove that at trial.

9          The bottom line is very simple.  You cannot, you

10  Honor, issue an advisory opinion.  We will be put to the test,

11  it's our burden to show, that these national strategies were

12  part and parcel to a nexus to Oklahoma that, in fact,

13  unreasonably interfered with the rights and health of others.

14  And I think we will do that.  But the time to make that

15  decision will be when we rest, not to foreclose us from doing

16  it now.  Thank you.

17          THE COURT:  Thank you, Mr. Beckworth.

18          Mr. Merkley?

19          MR. MERKLEY:  Yes, Your Honor.

20          Well, not surprisingly, I didn't hear one, not one

21  word about book law in that entire argument.  Instead I heard

22  something about under the guise of fact lawyer, I heard a bunch

23  more rhetoric, accusations, and innuendos about the evidence.

24  That reasonable opioid prescribing document you saw, Judge,

25  that's not an accurate description of what the purpose was or

1  what its use was.  Not at all.  But there's no sense in us

2  getting into that and spending -- I mean, I don't have the time

3  to go through and explain all of that.

4          The point I made earlier, all of this information

5  about -- from Mr. Beckworth about facts which are just

6  accusations and rhetoric and innuendos are to distract.  We're

7  not here on this motion to talk about whether a nexus between

8  Oklahoma actually exists.  The main premise and what I've asked

9  you to do is not an advisory opinion, it's to recognize the law

10 as the United States Supreme Court has established it, that if

11 there is no nexus to Oklahoma, there can be no liability under

12 the Commerce and the Due Process Clause.  That's all I'm asking

13 you to do.  It's not an advisory opinion.  That's a judge of

14 this Court acknowledging existing United Supreme Court

15 precedent.  We don't need, as Mr. Beckworth advocated, you

16 don't need to hear at trial to make that determination.  You

17 know what the law is.  We've cited it to you.  We've provided

18 it to you again.  Frankly, there was no dispute to in

19 Mr. Beckworth's presentation.

20          In my examples, I acknowledge that we may have a

21 trial to determine whether that conduct happened in this case.

22 We're going to have a trial to determine whether they can prove

23 it, unless you exclude evidence on motions in limine or summary

24 judgment.  But the time for determining whether the nexus

25 existed between the conduct they allege and the State of

1   Oklahoma is later.  It's not what I'm asking to you do now.  We

2   simply want you to acknowledge the law as it stands.  We'll get

3   into all of the evidence later.

4           Responding to the car wreck example.  On that

5   example, the particular conduct and the faulty component that

6   caused the accident in Oklahoma made its way into Oklahoma.

7   There was a nexus right there and proof that that faulty

8   component made its way into Oklahoma.  These marketing plans

9   that he discussed, we disagree with the State about what those

10  plans say and what they mean, especially any implications of

11  illegality.  But we can all plan to do many things.  But if we

12  plan something and don't do it in Oklahoma, Oklahoma cannot

13  hold us liable for it.

14          So in the end, Judge, again a very simple legal

15  ruling.  I'm not asking you to issue any advisory opinion, I'm

16  not asking to you make any determination on the facts, I'm just

17  asking you to recognize the law as the United States Supreme

18  Court has determined it, that any attempt by the State to rely

19  on evidence of defendants' out-of-state conduct with no nexus

20  to Oklahoma to prove unlawful conduct under Oklahoma law, would

21  violate the Commerce and Due Process Clause of the United

22  States Constitution.

23          THE COURT:  So Mr. Merkley, you know, I just

24  listened to Mr. Beckworth who showed me the exhibits and the --

25  reflected the State's briefs.  Unless I'm missing something, I

1  think they're -- I don't know that they're necessarily

2  disagreeing.  I think he's making a point that whether it's

3  this book that was distributed 6,000 times in Oklahoma or

4  websites, I think he's saying all of these -- all of those

5  things had a nexus to Oklahoma.

6          MR. MERKLEY:  And Mr. Beckworth has been saying

7  stuff like that throughout the entirety of this case.  Someday

8  he'll have to come forward with actual evidence that that

9  happened.  He doesn't have a doctor to tell you they heard --

10  they saw or heard any of this alleged false marketing in

11  Oklahoma.  He doesn't have a patient to tell you that he

12  experienced any problems with using our particular opioids in

13  Oklahoma.  He doesn't have evidence of stuff occurring in

14  Oklahoma.  But none of that's relevant for the purposes of what

15  I'm asking you to do now.

16          And I think you're right, Mr. Beckworth does agree.

17  So I think the Court should just go ahead and enter -- grant

18  the motion and just formally recognize -- we'll deal with

19  motions in limine, deal with summary judgment motions and deal

20  with a trial later, but formally recognize that unless the

21  State can prove that the conduct it alleges occurred in

22  Oklahoma has a nexus to Oklahoma, it cannot hold the defendants

23  liable under the United States Constitution.

24          THE COURT:  So, for example, the Hassler deposition

25  testimony, would it be your contention that his testimony that

1 this marketing, this nationwide marketing campaign was

2 implemented in Oklahoma, would it be your contention that

3 that's not showing a nexus to Oklahoma?

4          MR. MERKLEY:  Absolutely, Judge.  That marketing

5 plan, there's nothing illegal or unlawful about that marketing

6 plan he's asking about.  That's the problem with relying on

7 simply him telling you about a marketing plan and a, quote,

8 deposition.  John Hassler testified we have a national

9 marketing plan.  That doesn't establish that any unlawful

10 marketing occurred inside the State of Oklahoma.  I can say I

11 have a national marketing plan, a national plan to do a number

12 of things.  That's a marketing plan.  That marketing plan

13 doesn't say -- and if he has evidence that that marketing plan

14 is -- illegal activity is going to occur in Oklahoma and then

15 he can show you the illegal activity occurred in Oklahoma, then

16 he might meet his burden.  In any event, it's irrelevant for

17 the purposes of what I'm asking you to do today which is just

18 recognize the law is what it is.  Conduct having no nexus to

19 Oklahoma cannot give rise to liability under the United States

20 Constitution.

21          THE COURT:  Okay.  Thank you, Mr. Merkley.

22          MR. BECKWORTH:  Do I need to respond?

23          THE COURT:  If you want to.

24          MR. BECKWORTH:  Do you want me to?  Your Honor,

25 just -- all I can say is that's the whole point of a trial.  We

```
 1   don't have a jury.  But what would normally happen, as you
 2   know, is we all argue our case.  There would be a jury charge
 3   conference and say, here is what the law is and then the jury
 4   would be asked to find if we proved up to that law.  There's no
 5   difference here.  They're asking for an advisory opinion.  I
 6   think the law is what it is.  No disrespect.  I did talk about
 7   the law.  The law that matters here is judicial notice and it's
 8   a proper issue of advisory opinion.  But the Supreme Court has
 9   never said that you can't use evidence of out-of-state conduct
10   to hold a defendant liable for conduct here in our state.
11   That's not what the law states.  Never.  In any example.
12           What -- like, BMW v. Gore says in the State Farm
13   case is, you can't hold a defendant liable on punitive damages,
14   for example, for egregious conduct that occurred wholly out of
15   the state.  Like, so if you have 5,000 wrecks in other states,
16   you have to focus on the wreck that happened in your state.
17           So -- but all of this, these national strategies
18   will show they were absolutely designed and intended to cause
19   an unreasonable interference with public health in Oklahoma.
20   And they did.  So let's not forget, this could be a summary
21   judgment motion.  At least with respect to Actiq, they pled
22   guilty to very specific conduct that occurred here.  I think
23   it's wholly proper.  I think we just go to trial; if
24   Mr. Merkley is right, we will lose, because he says we don't
25   have proof of anything.
```

```
 1            MR. OTTAWAY:  Your Honor, one correction for the
 2    record.
 3            THE COURT:  Sure.
 4            MR. OTTAWAY:  I'm looking at (indistinguishable)
 5    what Mr. Beckworth cited.  And while Abbott Pharma and Pharma
 6    nondefendants in this case are listed as funders, Janssen and
 7    Johnson & Johnson, who are defendants in this case, are not
 8    listed as funders.
 9            MR. BECKWORTH:  What I said was the Robert Wood
10    Johnson Foundation I believe was a funder, and also the
11    American Pain Foundation.  I don't think that's what I actually
12    said.
13            MR. OTTAWAY:  The Robert Wood Foundation is not
14    listed either, but I'm --
15            MR. BECKWORTH:  They were.
16            (Overlapping speaking.)
17            THE COURT:  One at a time.  One at a time.
18            MR. BECKWORTH:  Yeah.
19            MR. OTTAWAY:  Just pointing out, making sure the
20    record is clear.
21            MR. BECKWORTH:  Well, the record will be clear at
22    trial.  You're wrong.
23            MR. PATE:  The record has had problems with your
24    phone, Mr. Ottaway.  I don't know if you got that fixed.
25            MR. OTTAWAY:  That was actually Dave, not the phone.
```

1  The phone works fine.

2          MR. BECKWORTH:  More evidence of why we need a

3  trial.

4          THE COURT:  I'm going to go ahead and take judicial

5  notice of the fact that our Commerce Clause and Due Process

6  Clause requires that you have to show some nexus to the conduct

7  to prove any unlawful conduct under Oklahoma's Nuisance Law.

8  Is that clear enough?

9          MR. MERKLEY:  Yes.  Assuming when you say some

10  nexus, some nexus to Oklahoma is clear.

11          THE COURT:  Yes.  Yes.

12          MR. MERKLEY:  Thank you.

13          THE COURT:  Okay.  Why don't we start with Teva's

14  first motion in limine.  I believe one of the components of

15  that motion relates to out-of-state conduct.  I know there's a

16  number of things but that was one of them.

17          Mr. McCampbell, are you going to argue this one?

18          MR. MCCAMPBELL:  No, sir.  Before we start the

19  individual motions in limine, I'd ask the Court to give me five

20  minutes as an introduction to the motion in limine arguments.

21          THE COURT:  Sure.  And while I -- you know, we

22  talked about this 20 minutes thing.  I -- I read all of these

23  and some of these, I thought, man, we should be able to plow

24  through this in less than five minutes.  And then I think there

25  may be some that we may need to take the full 20 minutes and

1   maybe even more than that.  So I'll be a little bit flexible

2   and I'll certainly grant you a little extra time certainly for

3   this first one to make overall introductory arguments.

4           MR. MCCAMPBELL:  Thank you, Your Honor.  And I'd

5   agree with the Court, looking at the motions in limine, I think

6   some of them can go very quickly, some are going to take more.

7           Before we start addressing the individual motions,

8   I'd like to spend just a couple of minutes on a big picture

9   issue that's going to go through all of the motions and -- and

10  is going to go through trial.  And it's this:  Now I'm

11  responding to -- in the briefing, the plaintiffs gave you an

12  introduction to the brief.  There is a common introduction to

13  every motion.  And reading that, I was struck that there's

14  really a fundamental difference of opinion between the

15  plaintiffs and the defendants about the process and what's

16  going to happen.  I'd like to spend just a couple of minutes on

17  that.

18          THE COURT:  Sure.

19          MR. MCCAMPBELL:  And the difference of opinion is

20  this, Your Honor.  This trial, the plaintiffs brief you that

21  these motions in limine aren't important and we can just skip

22  through all of that and just have it all spill out in the

23  courtroom at trial and just go forward and whatever it is, it

24  is.  I obviously disagree.  And where the disagreement is, the

25  big disagreement I think is, what's the purpose of a trial and

1    what's the purpose of this Court?

2              A trial in this court, the purpose is to determine

3    justice between these parties based on this case, based on

4    admissible evidence.  And that's what we're asking you to do

5    today.  Let's go through the motions in limine and let's have a

6    trial based on admissible evidence, based on the issues in this

7    case before this Court.  As I read the plaintiff's briefs, I

8    see a different agenda about some sort of idea of generally

9    educating the public, what they'd like to do about these

10   defendants, and I submit that's not what this Court is about.

11             Now, the evidence will come in, the admissible

12   evidence in this trial.  The trial will be public, the public

13   will have the access to that and we're not concerned about

14   that.  Indeed, we're going to have admissible evidence we will

15   bring to this Court to show the Court that the plaintiff's

16   allegations are not well-found -- well-founded.  My point is,

17   the process, the process should be on these issues.  If I could

18   approach the bench, Your Honor.

19             THE COURT:  Yes, you may.

20             MR. MCCAMPBELL:  I picked out three particular

21   excerpts that illustrate my concern.  Looking at excerpt number

22   one from the common introduction they use, they say, well

23   motions are not concerned about this fact-finder.  To a large

24   extent that's true.  I mean we're arguing the motions in limine

25   in front of you.  We are concerned that this trial should not

1  be used in this Court.  The prestige of this Court should not

2  be used as a springboard to advance the plaintiff's agenda to

3  affect opinions outside of this courtroom.  The trial should be

4  admissible evidence to affect your opinion about what the

5  outcome will be.

6        Looking at number one, you say, well, I'm not

7  concerned about this factor, this fact finder and they talk

8  about the public eye.  Well, the public eye certainly has --

9  the public certainly has the right to have an open trial on

10  admissible evidence in this case.  It should not be a general

11  opportunity to generally educate the public on whatever agenda

12  the plaintiffs wish to proceed.

13        Next, looking at the second excerpt here.  The

14  plaintiffs assert the defendants' concern it's not about the

15  judge in this case but the exposure of prejudicial information

16  to millions of Americans, including countless prospective

17  jurors in hundreds of matters pending.  That's accurate.  We

18  are concerned about that.  We are not concerned about

19  admissible evidence in this case coming before this Court.

20  That's what the trial's going to be about.  But I could not

21  feel more strongly about this, Your Honor.  This Court, this

22  Court's authority, this Court's process should not be used as a

23  platform to try to affect opinions for jurors, media members,

24  whatever, that are outside this courtroom.  This trial should

25  be about the facts of this case and the chips will fall where

1   they may in a court of public opinion.

2           Last, item number three.  They say, well, the Court

3   ordered a televised trial.  And for purposes of deciding

4   motions in limine, the Court should not consider other states

5   laws under the jurors hypothetical trials.  Again, I have a

6   difference of opinion.  Because the trial's going to be

7   televised, that's why it's extremely important that this Court

8   maintain control of the courtroom, including enforcing the

9   Oklahoma Rules of Evidence.  That's what this trial should be

10  about.  So we believe these motions in limine are incredibly

11  important.

12          First off, they can save a lot of time in a trial

13  which is going to be too long anyway.  The defendants are

14  prejudiced if irrelevant and unfairly, prejudicial and

15  inadmissible evidence is admitted, and I know the Court wants

16  to avoid that.

17          So our request is that you will take these motions

18  in limine seriously, which I know you will.  You set aside a

19  significant amount of time to hear that.  Our request is that

20  this trial would be conducted solely upon the issues in this

21  case, before this Court, that are admissible under the Oklahoma

22  Rules of Evidence.  Thank you.

23          THE COURT:  Thank you.  And before I delve into

24  them, I would just tell you a couple of things.  One is, you're

25  right, Mr. McCampbell, I find these motions to be a great help

1 and utility to the Court, because I do want to do all I can

2 before the trial starts on May 28th, to make this a more

3 streamlined process, if you can.

4            Absolutely I know there's going to be objections and

5 I wouldn't expect any different.  But to the extent we can at

6 least narrow down some of the issues and take care of some of

7 those things today and the days ahead, I'm all for that.

8            So when I was making my notes the last couple of

9 days, I intended to make rulings on most of these but there's a

10 couple I'll probably say, well, we'll address that at trial.

11 But I do hope that at the end of this process today, both sides

12 have a little more certainty as to what specific evidence will

13 be and will not be admitted.

14            As far as the concern, I'm sure we'll get to spend a

15 lot of time here in the next few minutes about this.  But as

16 far as the concern for other -- for the public, I know -- you

17 know, there's been a lot said about the cameras and that's why

18 we have the media order, and that's why we want to make sure

19 that we do have good safeguards to prevent this trial from

20 becoming anything other than a search for the truth and to

21 allow the State to prosecute its case and the defendants to

22 defend themselves.

23            I think that maybe cameras are a little bit

24 different, but certainly I anticipate there will be a lot of

25 members of the written press here that will, you know,

1   certainly be looking at this evidence and they will be

2   disseminating it just as the television or other media-based

3   reporters will be.

4           I think that's all I want to say just at the outset.

5   But these motions in limine are advisory, and so if you don't

6   like my opinions, I'm not going to hold it against you if you

7   bring it up again at trial because that's precisely what they

8   are, is advisory opinions.

9           So with that, I'm prepared to go to the -- Teva's

10  the first one unless the State wanted to say something first

11  like Mr. McCampbell did.

12          MR. BECKWORTH:  For the record, your comments were

13  well reasoned.  We'll just address those in the course --

14          THE COURT:  Sure.

15          MR. BECKWORTH:  -- of responding, if that's okay

16  with you.

17          THE COURT:  Absolutely.  Mr. Merkley, go ahead.

18          MR. MERKLEY:  Your Honor, if I understood correctly,

19  at this particular time, with respect to our first one, do you

20  want to address the out-of-state conduct and not the --

21          THE COURT:  Oh, no.  We can address all of it.  I

22  just know that was one of several points in number one, as I

23  recall.

24          MR. MERKLEY:  Okay.  So, Your Honor, the first

25  motion in limine seeks to preclude the State from introducing

1  the State's Opioid Commission report.  And I don't know if you

2  want to take these one at a time, or if you want to take an

3  argument on all, I think five or six of them at one time and

4  hear from the State on all five or six of them.

5          THE COURT:  Let's do it that way.

6          MR. MERKLEY:  Okay.  I'll try to get right to the

7  point as we have limited time.  On the State's Opioid

8  Commission report, the first reason why we're asking the Court

9  to exclude, it's not relevant.  It's essentially a summary of

10  the government's case prepared by the attorney general,

11  plaintiff in this case, that even summarizes the opinion

12  testimony of Dr. Andrew Kolodny, the State's star witness from

13  New York.

14          It does not cite facts.  It's a summary of what the

15  State alleges in this case.  It has no bearing itself on

16  whether the defendants in this case caused a public nuisance.

17  It is simply a cumulative summary of the government's case that

18  it plans to bring to trial.  But it's unfairly prejudicial to

19  admit it, simply offered to skew the views of you, as the fact

20  finder, base -- based upon what these commissioners and the

21  attorney general have found, was unfounded; they just opined it

22  based upon what they heard and the views particularly of the

23  public by giving the appearance that this commission was a

24  formal investigation done by the government, in conclusion that

25  the government's case here is actually correct.

1              Importantly, Your Honor, it's without a doubt

2    hearsay.  It's undisputed that the State Opioids Commission

3    report out-of-state -- out-of-court statements.  It's

4    undisputed in the brief that it's offered to prove the truth of

5    the matter asserted.  The State argues that it's not that it's

6    subject to an exception of the hearsay rule.  We completely

7    disagree.  The State argues that it's Section 28038, which

8    allows the Court to provide an exception for factual findings

9    resulting from an investigation made pursuant to authority

10   granted by law.

11             But if you continue on to read the State statute, it

12   says, the following are not within this exception to the

13   hearsay rule.  One of those is investigation reports prepared

14   by or for a government, a public entity, or agency when offered

15   by it in a case when it is a party.  That clearly takes this

16   particular State's Opioid Commission report outside of that

17   exception to the hearsay rule.  It's being offered by the State

18   of Oklahoma in a case where it's a party.

19             The other example is factual findings resulting from

20   a special investigation of a particular complaint, accident, or

21   incident.  That's what this is.  The State's put -- is getting

22   ready to file a lawsuit against many opioid manufacturers, puts

23   together this commission and puts the forms and lots of

24   opinions about what happened and then turns around and files a

25   lawsuit.

1          And then the other matter which would exclude this

2    is the other provision which says, any matter as to which the

3    sources of information or other circumstances indicate lack of

4    trustworthiness.  And I'm going to get to that in a minute

5    because that also applies to the President's Commission Report.

6    I'm going to show you the law on how the Supreme Court said we

7    should evaluate that.  But I'm going to save that argument

8    until we get through the President's Commission Report.

9          So it's hearsay.  It's not subject to any exception.

10   It's not relevant.  And it would be unfairly prejudicial for

11   you to allow it in.  It's simply conclusions of the State

12   supporting the State's case.

13         With respect to the President's Commission, same

14   argument.  It's not relevant.  It's a national investigation

15   done at the request of the president.  It's a summary of what

16   opinions those commissioners had.  It simply cites to evidence,

17   a lot of which cites documents, a lot of which the State plans

18   to use in this case.  So in that respect, it's simply

19   cumulative.  It's unfairly prejudicial to allow that particular

20   evidence to come in and attempt to skew the views of you, as a

21   fact finder, and the public that's going to be watching this on

22   national TV, that there was some formal investigation done of

23   the opioid problem; in particular that there was some formal

24   investigation done of the problem here in Oklahoma.

25         The President's Commission doesn't mention what

1  happened specifically in Oklahoma.  It doesn't make any

2  findings specifically about the manufacturers that are left in

3  this lawsuit.  It's totally irrelevant to the State's public

4  nuisance claim that it was bringing to trial this summer.  It's

5  also hearsay, out-of-court statement offer to prove the truth

6  of the matter asserted.  Again, the government argues that it's

7  subject to 2803 as an exception.

8            I would say it -- it also involved, that exception

9  does not apply because as I'll show you in a second, this is a

10  situation where the information and the circumstances indicate

11  a lack of -- lack of trustworthiness and should not be admitted

12  in a court of law as evidence.

13            Your Honor, if I may approach, I want to hand you

14  some exhibits.

15            THE COURT:  Sure.

16            MR. MERKLEY:  I'm going to hand them to you all at

17  once like I did the other day.

18            I'll make Exhibit 1 the Oklahoma Opioid Commission

19  report.  Exhibit 2 will be the President's Opioid Commission

20  report.  Exhibit 3 will be the case of In Re: September 11th

21  litigation, 621 F. Supp.2d 131 United States District Court for

22  the Southern District of New York.  Exhibit 4 is the Commission

23  Charter for the President's Commission on Combating Drug

24  Addiction and the Opioid Crisis.

25            So, Your Honor, before I move on from the charter,

1   one of the points -- the point I wanted to make in support of

2   the charter is the presence of the Opioid Commission.  It makes

3   clear in paragraph 4 that the duties of the commission are

4   solely advisory.  The objective and the scope was simply to go

5   through and put together the opinions of heads of other

6   executive departments and agencies and other people on what the

7   problem is.  There was certainly no fact-finding, investigative

8   mission for the Opioid Commission and -- as we'll get into the

9   case law in a second on the September 11 case, that would

10  indicate a lack of trustworthiness.  And under the United

11  States Supreme Court precedent, it means it's hearsay, it's not

12  subject to exception.

13          So back to the September 11th case, 621 F. Supp.2d

14  131, beginning at page 154, which I have highlighted, Judge.

15  If you can turn to page 20 of the Westlaw version I handed you.

16          THE COURT:  I've got it.

17          MR. MERKLEY:  The Court makes it clear if -- if the

18  particular report is being argued to fit within this exception,

19  and then states on page 4, circumstances indicate the

20  government agency has functioned within its authorization and

21  in a trustworthy and reliable manner, the law assumes

22  admissibility but with ample provision for escape if sufficient

23  negative factors are present.

24          And then it goes on to quote from the United States

25  Supreme Court, that provision for escape is contained in the

1  final clause of the Rule.  Evaluative reports are admissible

2  unless the sources of information or other circumstances

3  indicate lack of trustworthiness.  The trustworthiness inquiry

4  -- and not an arbitrary distinction between fact and opinion --

5  was the Committee's primary safeguard against the admission of

6  unreliable evidence, and it is important to note that it

7  applies to all elements of the report.  Thus, a trial judge has

8  discretion, and indeed the obligation, to exclude an entire

9  report or portions thereof, whether narrow factual statements

10  or broader conclusions, that she determines to be

11  untrustworthy.

12          And then on the very next column, it notes -- the

13  Advisory Committee notes, and I should say this is under the

14  federal rules of evidence which is substantially the same as

15  Oklahoma rule of evidence, the standards apply.

16          The Advisory Committee provides four non-exclusive

17  factors upon which to determine trustworthiness:  timeliness of

18  the report, skill and experience of investigators, use of

19  hearings, and signs of investigatory bias.

20          In each one of these commission reports, there are

21  signs of bias.  It's people putting together saying there's a

22  real problem with opioids and we're going to find out who to

23  blame.  But importantly, what we want to focus on is the

24  element of the use of hearings to establish that this is a

25  trustworthy process.  The Court goes on in -- on page 156 to

1  say, in this particular case, the commission heard from 160

2  witnesses, was free from bias and conducted public hearings

3  that were the adequate equivalent of cross-examination in

4  protecting the litigant's rights.

5          That didn't happen.  There weren't -- there weren't

6  interviews with witnesses.  There weren't interviews with the

7  defendants in this case.  There's no indication of

8  free-from-bias.  There were no public hearing that provided the

9  adequate equivalent of cross-examination to protect the

10 defendants' rights.

11         If you turn to the next page on page 157.  The

12 highlight says that:

13         The Commissioners did not interview the terrorists

14 in this particular instance for the September 11th case, did

15 not make findings on the matter of their interrogations.  The

16 Commissioners asserted that their findings were reliable

17 because they're made carefully and based on the substantial

18 corroborative evidence.  But that determination was made for

19 the general -- for purpose of general education and not

20 extend -- and may not extend to the evidentiary requirements of

21 a trial.

22         And that's where we are here with both of these

23 Opioid Commission reports -- reports.  There was no witness

24 interviews.  The determination was made for general education

25 and not subject to evidentiary requirements.

 1          They're also prejudicial.  If you notice on -- if

 2     you turn to the next column there, paragraph 18 under 403, the

 3     Court notes that:

 4          The 9/11 Report, or large sections therein, cannot

 5     be admitted in full.  Although specific statements may be

 6     relevant, useful, and admissible, admitting longer sections of

 7     the report would cause the trial digress into innumerable

 8     arguments relating to myriad issues, causing undue prejudice,

 9     extensive delay, and confusion.  The imprimatur of the 9/11

10     commissions would extend to findings that were not fully tested

11     and cannot adequately be rebutted.

12          That's the case we have here.  Defendants weren't

13     there.  There was not an investigative process; there was not

14     an evidentiary process; there was no potential for

15     cross-examination.  Objections would be difficult to argue and

16     resolve.  However valuable an account it is to government

17     officials and the public, the 9/11 Report, here the opioid

18     reports, in contrast to its specific findings, cannot be

19     permitted to displace the time-tested search for truth by

20     examination and cross-examination.

21          And then if you look -- the Court goes on to say in

22     the next highlighted portion:

23          Admitting The 9/11 Report in bulk would choke the

24     proceedings.  Parties, if confronted by hearsay within a report

25     admitted under this exception, have the right to impeach the

1   report.  Inevitably, admitting any lengthy section of the

2   report, a book brimming with findings and recommendations, and

3   subjecting the many findings to impeaching arguments and

4   evidence, would overwhelm the trial and affect it's fairness.

5           The Court goes on a few lines later to:  Challenging

6   even a single filing could implicate a panoply of documents and

7   interviews.  The same is true with respect to both of these

8   Opioid Commission reports.  For all the reasons I've advocated,

9   they're not relevant, they're unfairly prejudicial.  They are

10  hearsay and not with an exception.  And in particular, our

11  state statute says that the State's Opioid Commission report is

12  -- clearly is not within statute other -- within the exception.

13  Because it says the government cannot use an investigative

14  report that it prepared in a case offering -- offering

15  evidence, itself.

16          Moving on to out-of-state conduct, Your Honor.

17          THE COURT:  Yeah, I think I'd like to go ahead and

18  hear from the State --

19          MR. MERKLEY:  Okay.

20          THE COURT:  -- on this -- on this specific issues

21  of that --

22          MR. MERKLEY:  That makes more sense to me.

23          THE COURT:  Thank you.

24          MR. BECKWORTH:  Just go through the ones that we've

25  covered so far, Your Honor?

 1          THE COURT:  Yes.  You can speak to the commission of

 2   the reports by the President's Commission and the Oklahoma

 3   Commission.

 4          MR. BECKWORTH:  Yes, Your Honor.  Thank you.  I'll

 5   also address Mr. McCampbell's earlier comments as well.

 6          THE COURT:  Okay.

 7          MR. BECKWORTH:  It kind of dovetails nicely into

 8   this.

 9          One of the last things Mr. McCampbell said, and I

10   wrote it down and I don't have the exact quote, but what I

11   think he said was, you know, we're going to be prejudiced if

12   you allow irrelevant, unduly prejudicial, and inadmissible

13   evidence into evidence.  Of course, if you do the wrong thing,

14   that would be wrong.  So that's a pretty straight statement.

15   Right?

16          What the motions in limine are doing, though, is

17   telling you to exclude now evidence that we will try to admit

18   during trial.  And one of the things that I find very

19   interesting about these motions is that they're really just

20   telling you to do your job, which we trust you will do.

21          But if you go back to his comments and you look at

22   the briefs and why we started our briefs out with kind of the

23   same thing in every one.  I did that, Your Honor, because I

24   didn't know which one you would read first.  I hope we made it

25   clear once you read them once you didn't read it again.

1          THE COURT:  It made it nice that I could breeze

2    through the first eight pages or so.

3          MR. BECKWORTH:  Yes, sir.  I know it was riveting

4    and I'm sure you wanted to take notes.

5          But the point of it is, is we -- this concern they

6    have, and Mr. McCampbell said it, he said, we're not concerned

7    about you having or you doing the right thing or admissible

8    evidence here.  They are concerned about other trials and other

9    forums.  But that's not what's before you.

10          And I do find it troubling that all we want to do is

11    arm you with the evidence and information you need to make the

12    right decision.  And what I think the defendants want to do is

13    put that duty second.  They don't necessarily want you to have

14    all the information you need to make the right decision because

15    they're worried that if you get that information, it might

16    impact them somewhere else.  But that's not our concern.  I'm

17    not representing another state.  As I sit here today, I don't

18    represent another state.  We represent two Indian tribes,

19    that's it, stuck in an MDL.  We're not out trying to market and

20    do other cases and, you know, whatever the public hears the

21    public hears; the facts are the facts.

22          Our concern is that you are armed with the right

23    information to do your job.  And I think the other takeaway,

24    before we get into the specifics is this:  Since you are the

25    fact-finder, as you know, motions in limine are largely

```
 1   disfavored.  They're actually -- the way this normally would
 2   work is, you know, there's evidence that they don't want a jury
 3   to hear because they can't unhear and they might not be able to
 4   follow instructions to disregard evidence.  So you don't ever
 5   want them to hear it.  What they've done, they've put all this
 6   at issue.  They're literally telling you the evidence.  Judge,
 7   here is the White House report.  It says really bad things
 8   about us.  Go read it and see what you think.  But Judge, don't
 9   let them talk about the trial.  They've put the stuff into
10   issue now.  You have read it.  It just doesn't make sense.
11   That's not what a motion in limine is about.  So it just -- I
12   understand the idea, and I respect it and we're going to do it
13   on our side as well, that you wanted a trial to have order.
14   You want it to move quickly.  But at the same time, we need to
15   get to the truth.
16          So let's go to the two that have been dealt with so
17   far.  I respectfully disagree with Mr. Merkley on the law.
18   Let's talk about General Hunter's Opioid Commission report.
19   The rule in Oklahoma, Your Honor, is 28038.  I know you've read
20   it, but let's go back through it because it answers the
21   question.
22          And first, by the way, again, here we are having an
23   evidentiary ruling and a motion in limine.  But this is what
24   the rule says and you know it:
25          To the extent not otherwise provided in this
```

1    paragraph -- and let's just stop there.  That's not -- so this

2    isn't the only way to get a document in.  As you know, experts

3    can rely upon hearsay as long as it's not violative of some

4    other rule in their testimony.  So we've got that over there on

5    the side that wasn't mentioned.

6              But secondly:  A record of a public officer agency

7    setting forth its regularly conducted and regularly recorded

8    activities or matters observed pursuant to a duty imposed by

9    law and to which there was a duty to report.

10             Okay.  Let's just stop there.

11             This document, the Oklahoma Opioid Commission final

12   report is on all fours with all of those requirements.

13             There's a second deal that refers to or factual

14   finding resulting from an investigation.  That's different.

15             So we meet the main criteria of exception eight.

16   Then you go into what Mr. Merkley's talked about.  Well,

17   there's some exceptions that even if you meet that rule, you

18   might not be able to use the document.

19             One is an investigative report by police and other

20   law enforcement personnel.  It's not what this is.  It's not an

21   investigative report.

22             Two:  An investigative report prepared by or for a

23   government, public office or agency when offered by it in a

24   case in which it is a party.  This is not an investigative

25   report.  If you go back into the heart of the rule, it sets all

1 of the things that I led with and then separately there's a

2 disjunctive or, or factual findings resulting from an

3 investigation.

4          So we're not precluded by one of those exceptions.

5 This is not a criminal case, so C doesn't prevent it.  It's not

6 a factual finding resulting from a special investigation on a

7 particular case or incident or complaint.  And it certainly is

8 not a matter to which the sources of information or other

9 circumstances indicate a lack of trustworthiness.

10          What it is, when you get to the bottom of it and

11 I'll encourage you at some point, Your Honor, to look at pages

12 7, 8, and 9.  This is the recommendations of this commission

13 about what needs to be done as an initial step in abating the

14 opioid crisis.  This is a case about abatement.

15          These are the recommendations of public and private

16 sector bipartisan folks, national experts and local law

17 enforcement, attorney general, others, all called in to convene

18 to do their job.

19          And yes, some of the folks that were involved, are

20 involved in this case.  You've heard me say it multiple times.

21 When you have a case like this, the people that are involved in

22 these matters want to be involved here because we're first and

23 it's incredibly important.  So we meet all of the criteria of

24 that rule.

25          Now, I'll tell you one thing that's very troubling

 1 to me.  We did not file motions in limine because we think you

 2 can do your job and we know you will do your job.  But what you

 3 haven't seen in this case is all the depositions they've taken.

 4 And when you look at their exhibit list, a lot of the stuff

 5 they've done at depositions is in there.

 6         The heart of their case is to try to say that the

 7 State is at fault.  We heard Mr. Brody, the last time he was

 8 here, refer to the State of Oklahoma, and I wrote it down, as a

 9 hypocrite.  Those words.  What they're trying to do is say that

10 we're at fault, that we're contributorily negligent or we

11 failed to mitigate damages.  That's inappropriate under the

12 law.  There's no negligence claim.  It's not what public

13 nuisance is.  So you can't talk about any failure on the part

14 of the State.  And there's no damages, so I don't see how you

15 can talk about a failure to mitigate.  We'll deal with that at

16 trial.

17         If you hear the evidence, we'll move to exclude

18 what's appropriate.  You'll rule one way or the other.  No

19 matter what you do with that, at the end of the case, you will

20 have heard their evidence through offers of proof, however you

21 allow that to happen.  There will be a closing argument about

22 tying the law to the facts, what we think is and isn't

23 appropriate, and you'll make a decision on that issue, for

24 example.

25         But if they're going to be allowed to talk about

1  fault on behalf of the State and conduct of the State, saying

2  the State didn't do enough or didn't do enough when, certainly

3  the Opioid Commission report is highly relevant to that.

4  Absolutely relevant.

5          And yeah, that might be a little prejudicial to

6  them, but that's not the standard.  It's unduly prejudicial

7  weight against probative value.  So I think this report comes

8  in.  I think they can cross-examine folks like Jessica Hawkins,

9  Commissioner White.  They're going to talk about what's in

10  their abatement plan and how it relates to what happened here.

11  So that's that.

12          The White House report is even easier.  All of those

13  exceptions that I just read, let's go back through a couple of

14  them.  The White House report is not an investigative report,

15  and even if it were, it's not an investigative report prepared

16  by or for a government when offered by, in this case, which is

17  a party.  So it's absolutely allowed under this exception on

18  the rule against hearsay.

19          Now the reason that Mr. Merkley didn't -- I think

20  the reason Mr. Merkley didn't talk about that exception is

21  because he knows I'm right.  I'm not going to presume that, but

22  I just think that's why he didn't do it.  So he went to the

23  idea of untrustworthiness.  I actually know a few of the folks

24  that were on the commission.  But the commission, to say that a

25  commission chaired by the governor of New Jersey at the time,

1  the governor of Massachusetts at the time, the governor of

2  North Carolina, who I know, Congressman Patrick Kennedy from

3  Rhode Island, Attorney General Pam Bondi from Florida.  We

4  represented Florida in the BP litigation where General Bondi

5  was our client.  To say that they are all untrustworthy, the

6  work that they did was untrustworthy, is troublesome to me.

7  Professor Mattis, I don't know her, but I think she's the chair

8  of Public Health and Addiction or director of it at Harvard.

9           To say that that type of commission is somehow

10 untrustworthy and shouldn't be allowed to be talked about at

11 trial is just inappropriate.  This commission had a lot of

12 different folks submit information to it.  Some of our experts,

13 some other folks are cited in it.  There are tons of documents

14 behind it.  But what the commission ultimately did was look at

15 what the root causes of the problem may be to understand how to

16 fix them.  There are pages upon pages of going to the president

17 and saying, President Trump, in order to fix this crisis, we

18 have to start doing these things.  More work is needed, but we

19 have to start here.

20          And our folks, when they talk about abatement --

21 look at this, Gary Medel, for example, submitted his own white

22 paper to the Opioid Commission to be considered.  All of that

23 is part and parcel and is highly relevant to the abatement

24 plan.  But the fact findings of this commission are also

25 absolutely relevant to what people believe were the root

1  causes.

2          And you've heard already today this idea that

3  there's this national plan.  Well, okay, let's just say it was

4  a national -- this is all national conduct.  The things that

5  the White House commission talks about from a national

6  perspective, they all happened here.  Use of

7  (indistinguishable) happened here.  Use of CMEs and Speaker

8  bureaus, happened here.  Overly-aggressive promotion of

9  opioids, happened here.  Trying to say that addiction was one

10 percent or less likely, happened here.  So the relevance of

11 this document is high.  We don't have a jury.  I think Your

12 Honor can absolutely determine what weight to give this and

13 what weight to give the Oklahoma Opioid Commission.

14         You know some of the folks.  Some of the folks will

15 be here at trial.  If they don't like, for example, on the

16 Opioid Commission, a statement, a recommendation, Commissioner

17 White, for example, she'll be here.  Talk to her.  Jessica

18 Hawkins, she will be here, so they can talk to her.  So I think

19 this is all about weight.  It has nothing to do with

20 admissibility, but certainly has nothing to do with the motion

21 in limine motion at this time.  Thank you.

22         THE COURT:  Thank you.  I'm going to -- I'll

23 announce decisions when we get through the rest of the first

24 motion -- the motion in limine.

25         So, Mr. Merkley, do you want to go ahead and talk

1    about the other components of that first motion?

2              MR. MERKLEY:  Sure.  May I have a minute or two to

3    respond to Mr. Beckworth's comments first?

4              THE COURT:  Sure.

5              MR. MERKLEY:  This idea that I'm somehow referring

6    to the commission of those reports as untrustworthy is beyond

7    me.  The Court knows that untrustworthiness is a legal term

8    defined by the rules of evidence and then further defined by

9    the United States Supreme Court.  And under the legal term

10   "untrustworthiness," these two reports are not trustworthy and

11   cannot fall within this exception because there were no witness

12   interviews or evidence to support the conclusions or findings

13   of the commission.

14             The hearings:  There were no hearings open to

15   everyone for input from others, including the manufacturers.

16   There was no potential for cross-examination, and there's no

17   input in the reports from the manufacturers.  The

18   manufacturers, in particular these manufacturers involved in

19   this case, aren't even referenced in those reports.  So I

20   didn't mean any personal attack on the untrustworthiness of

21   those individuals.  I think the Court knows that and I think

22   Mr. Beckworth knew that before that comment.  It's a legal

23   term.  The Court has to interpret the legal term and the case

24   law from the United States Supreme Court on how we determine

25   whether or not those instances are trustworthy enough to enter

1  them into evidence in this particular case.

2          The instance:  The comment about whether the State

3  is at fault.  There are certain instances and -- throughout

4  this trial where we, no doubt, will allege that the State had

5  some role in what happened as far as what they allege.  That's

6  not what this report addresses.

7          This report is particularly the State's report and

8  the President's report are summary reports prepared more

9  recently looking overall at an opioid crisis and really

10  providing a summary of the State's case.  They don't directly

11  relate to any of those instances where we will -- we will

12  present evidence about what the State did or did not do; and in

13  each one of those individual instances, the State can present

14  in evidence to contradict what we say.  They don't need a

15  summary report, a biased-summary report of a State Opioid

16  Commission to rebut those instances.

17          In response to Mr. Beckworth's reply to

18  Mr. McCampbell's comments, I want to make sure we're clear.

19  The State's going to get to use the evidence that's admissible

20  in this case.  We're seeking to exclude evidence that's not

21  admissible in this case and we're focused on this case.

22  Whether Mr. Beckworth represents other people across the

23  country or not, there's no doubt, he made it clear, he wants to

24  broadcast every piece of evidence he can find across the

25  country to influence and will influence the opinions of

 1  theories.  It's going to be on national TV.

 2            This case is going to be watched, it's going to

 3  be -- it's going to be evaluated by legal experts from some of

 4  these national networks as far as what comes in, what comes

 5  out, what's said in this trial, it's going to make national

 6  news.  That's what he wants.  He wants to broadcast this

 7  nationally.  That's why we're focused on these motions in

 8  limine.  We're not trying to keep anything out that is

 9  admissible, relevant and not unfairly prejudicial to this

10  particular case.

11            One last thing.  This is really important.

12  Mr. Beckworth says that these reports fall under the first part

13  of the 280.3 exception which are public records -- record of

14  public offerings setting forth its regularly conducted and

15  regularly recorded activities on matters observed by the duty

16  imposed by law.

17            If I had known that -- it did not occur to me that

18  Mr. Beckworth would even try to argue that because it's -- it

19  can't be questioned that these are not regularly conducted and

20  regularly recorded activities.  These are once-in-a-lifetime

21  Opioid Commission reports published by the State of Oklahoma

22  and the United States Government.  They're not a regular

23  activity.

24            There is a whole line of case law on what is and is

25  not a regular activity.  I would have provided you with case

 1  law on that if I had known that's what he intended to argue.

 2  This case fits within the second part which is the factual

 3  finding from a specific investigation made under an authority

 4  granted by law.  And in that case, under State law, the State

 5  Opioid Commission clearly can't come in because it is being

 6  offered by the State in a case brought by the State.  And both

 7  Opioid Commission reports fall within the untrustworthiness

 8  exception for the reasons I've stated earlier.

 9           THE COURT:  Thank you.  You want to move on?

10           MR. MERKLEY:  All right.  Moving on to out-of-state

11  conduct.  I think that one is pretty easy, Your Honor.  It's

12  the same arguments we made on the motion for judicial notice.

13           The State's response was, it's the same arguments we

14  made in response to the motion for judicial notice.  So we

15  think it's pretty much been decided that that motion should be

16  granted.

17           Allegations of marketing activity, branded or

18  unbranded should be excluded, unless there's no showing that

19  the marketing materials or representations were distributed to

20  the public in Oklahoma.  Allegations of misrepresentation of

21  any sort should be excluded, unless there's actual evidence

22  showing those alleged misrepresentations were made in Oklahoma

23  and relied upon by some person in the State of Oklahoma.

24           They don't have evidence of that.  But before they

25  offer that evidence to this Court at trial, they need to have

1   some sort of showing that this actually occurred in Oklahoma.

2   So at this particular time, we would ask you to issue a

3   motion -- issue an order excluding any evidence unless they can

4   make a factual showing this occurred in Oklahoma.

5           THE COURT:  Respond?

6           MR. BECKWORTH:  Do you want to complete all of

7   those?  I wasn't sure.

8           MR. MERKLEY:  I think we'll take them one at a time.

9   I think that's better.

10          MR. BECKWORTH:  We're doing out-of-state conduct?

11          MR. MERKLEY:  Just out-of-state conduct at this

12  time.

13          MR. BECKWORTH:  We can make that quick.  Your Honor,

14  real quick on the Opioid Commissioner's Report.  Mr. Merkley is

15  wrong factually.  They were both created for a specific

16  purpose.  Meaning they were -- when regularly conducted, they

17  were regularly conducted meetings within the scope of what they

18  were in the commission to do.  That's all the law requires and

19  that's what they are.  They're not agencies that set up to last

20  forever.  So that's wrong.

21          We already argued the out-of-state conduct.  I would

22  just say that your prior ruling, which we agree with, makes

23  this motion in limine have to fail.  Because what they asked

24  for and what you said was, if the law requires to have some

25  nexus to the State, which we don't disagree and we'll show that

1   these national plans ultimately work their way into here, it

2   was part and parcel of everything they did.  Then we've got to

3   prove that at trial.

4           Remember when I -- we argued about it earlier, I

5   said, wait, it's just part of the motion in limine.  What

6   they're saying now is, you can't talk about them.  You can't

7   talk about the national plans.  I don't know how I can show

8   stuff happened in Oklahoma if it's part and parcel of the

9   national strategy and marketing effort if we can't talk about

10  it.

11          I'll show you one example that -- J&J has the same

12  exact motion so we probably just -- I won't argue J&J.  I can

13  stand right here.  This is a Duragesic sales memo.  This is how

14  this worked.  When they would give statements to the national

15  sales force, they called it the 275 Sales Force because at that

16  time there were 275 reps nationally selling on Duragesic to

17  healthcare providers.  This is how it worked.

18          This is a national memo, national instruction

19  pursuant to a national strategy that goes out to all of their

20  sales force.  That's just how it worked.  So I would love to

21  see the defendant's try to argue at trial -- and I think

22  they're being very disingenuous to Your Honor to say that their

23  national strategies were not intended to be deployed in the

24  State of Oklahoma.  All of their cooperate reps have said

25  completely the opposite.  When they show up here at trial, if

1  they do, I would be happy to ask that question in front of Your

2  Honor.  I will ask them, I will tell everybody, Did you plan

3  for your national strategies to exempt Oklahoma?

4          And if they say yes, we wanted to exempt Oklahoma,

5  then I think they'll have a perjury problem.  We absolutely can

6  and should be allowed to talk about this.  And we have to be

7  able to comply with the law.  Thank you.

8          THE COURT:  Thank you, Mr. Beckworth.

9          MR. MERKLEY:  Back to the hearsay exception, Judge,

10  because this may come up again in subsequent arguments.  This

11  is not, and I'm not wrong on the facts nor am I wrong on the

12  law.  Regularly conducted and regularly recorded activities and

13  matters is not a one-time Opioid Commission report or any other

14  commission report.  And the case law defines that.  If you want

15  case law on that, I can get your case law on that.  I had no

16  idea he would even think to try to argue that.  They're not

17  regularly conducted activities by a state agency and they don't

18  fall within that exception.

19          Second, back to the out-of-state conduct.  I'm not

20  asking for anything different than what I asked for earlier but

21  what I am asking for on the motion in limine.  This Court has

22  already acknowledged that in order to find these defendants

23  liable, you've got to show some nexus to Oklahoma for this

24  out-of-state conduct.  That's a given.  That's a fact.  That's

25  a Supreme Court law.  So what I'm asking the Court to do is

1  tell the State:  You need to make -- and you can handle it

2  however you want, obviously, but they have to make some sort of

3  offer of proof, some sort of prima facia showing to you that

4  this particular conduct they allege occurred in Oklahoma before

5  they put it up in this courtroom and broadcast it to the world.

6  Because it didn't happen in Oklahoma.  We're going to maintain

7  it didn't happen in Oklahoma.  We've always maintained it

8  didn't happen in Oklahoma.

9          This marketing strategy:  Marketing strategies can

10  be nationwide.  But unless they show the conduct, this

11  particular conduct, this false marketing conduct that they

12  allege gave rise -- gives rise to Oklahoma, the liability in

13  Oklahoma, they don't get to rely on that.  They've got to show

14  this happened in Oklahoma for this Court to hold these

15  defendants liable in Oklahoma under Oklahoma's public nuisance

16  statute.  So for -- with respect to this particular motion in

17  limine, the Court has to make them come forward with some sort

18  of offer of proof in advance, some sort of prima facie showings

19  that the conduct they're about to get into occurred in Oklahoma

20  before they put it on the screen and put it on national TV.

21          THE COURT:  Okay.  Why don't you move on to --

22          MR. OTTAWAY:  Your Honor, we have a similar motion.

23  Do you want to hear that now?

24          THE COURT:  Sure.

25          MR. OTTAWAY:  I don't have much to offer on it.  As

1 one of the two lawyers in the courtroom who will never be

2 called a book lawyer, I won't mention the other one, our motion

3 is a corollary, if you will.  We cite some specific examples

4 where the State isn't even attempting to relate conduct in

5 Oklahoma references to the entire nation, not Oklahoma,

6 fighting back.

7           This is a nationwide conspiracy.  This is what I

8 found from the Kentucky litigation:  Different witnesses who

9 talk about -- talking to sales reps, some not even for these

10 defendants.  In fact, one witness, not from me at all, that

11 occurred at Georgetown or some other university or hospital,

12 talking about taking the business model to Europe and doing the

13 same thing there.  Those are the kinds of things I think the

14 Court should be very sensitive to when we get to this nexus in

15 Oklahoma because I agree with Nick in this case about that.

16 Oh, it's our motion number --

17           THE COURT:  12.

18           MR. OTTAWAY:  -- 12.  It's been briefed.  I don't

19 have anything more to say.

20           THE COURT:  Thank you.

21           MR. MERKLEY:  The next motion, Your Honor, is our

22 motion to exclude the evidence of the allegedly false

23 representations that were not identified in interrogatory

24 responses.  As the Court well knows by now, we made it clear

25 that this didn't happen in Oklahoma.  We've asked the State to

 1  come forward with evidence on what allegedly false

 2  representations it believes were made in Oklahoma.  We asked

 3  those specifically in interrogatories.  The State did not

 4  disclose any.  The State still cannot disclose any, but it

 5  certainly didn't disclose any in its interrogatories.  And case

 6  law says that when you refuse to answer interrogatories, refuse

 7  to come forward with evidence once you've been asked for it,

 8  you can't later come back and offer that evidence at trial.

 9          Specifically 12 O.S. Section 3237 E states:

10          If a party fails to serve answers to interrogatories

11  submitted under section 3233, the Court with the action that's

12  pending on the motion made by first orders in regard to that

13  failure to adjust, among others, and may take any action

14  authorized under certain paragraphs which include excluding the

15  evidence.

16          In the case of *State Ex Rel. Protective Health*

17  *Services v. Billings Fairchild Center, Incorporated*, Oklahoma

18  Civil Court of Appeals case 158 P.3rd 484 at page 489.  The

19  Court says, quote:

20          Civil trials no longer are to be conducted in the

21  dark.  Discovery, consistent with recognized privileges,

22  provides for the parties to obtain the fullest possible

23  knowledge of the issues and facts before trial.  The aim of

24  these liberal discovery rules is to make a trial less a game of

25  blind man's bluff and more a fair contest with the basic issues

1    and facts disclosed to the fullest practicable extent.

2                Close quote.

3                That's where we are, Judge.  We asked for the

4    evidence; they couldn't provide it.  They still can't provide

5    it.  They shouldn't be allowed to hide behind the law and bring

6    evidence to this Court, at trial, to the contrary.

7                Also the case of *McCormick v. Butterfly* (inaudible),

8    that's 2010 Westlaw 141 0981 at page 3, that's a Northern

9    District of Oklahoma case 2010, quote:

10               If the party fails to provide information in

11   response to an interrogatory or a supplemental response, that

12   party may not use such information at trial unless the failure

13   was substantially justified or harmless, closed quote.

14               There's no substantial justification.  The State

15   believes it has evidence that the defendants made allegedly

16   false representations which they should have disclosed in its

17   interrogatory responses.  It did not.  It's not harmless.  We

18   have gone through the entire discovery period, deposed all of

19   the witnesses in this case and we are weeks before trial.  The

20   State has not produced that evidence.  The State should not be

21   able to rely upon any such evidence if it hasn't.

22               THE COURT:  Thank you, Mr. Merkley.

23               MR. BECKWORTH:  Thank you, Your Honor.  I know this

24   shouldn't be very long.

25               We, as you know, appointed -- you appointed a

1  special discovery master and we've gone through quite a bit of

2  hearings in front of Judge Hetherington as you admitted in my

3  objections, Your Honor.  Mr. Merkley might be right, if someone

4  just doesn't answer.  We have tons of objections to the way

5  they asked the interrogatories in this case, about marshalling

6  evidence and the way they were asked and how they tied to

7  issues like reliance that, by the way, isn't part of the

8  nuisance case and individual patients and individual doctors.

9          They didn't get these objections ruled on at all and

10  that's their failure.  So we have stood on our objections.

11  There have been some that there have been motions to compel

12  filed on; and to the extent that Judge Hetherington requires us

13  to do some something different, we've complied.  Sometimes we

14  disagreed with that.  Those were, at times, appealed to Your

15  Honor.  Sometimes you went with us; sometimes you went against

16  us.  We complied with those.  So I'm not sure what this is

17  about.

18          I will tell you that we've made it very clear in

19  this case that we believe statements that are overstating the

20  efficacy and benefits of these drugs and their propriety for

21  certain times of ailments are misleading.  Understating the

22  risks and the problems associated with them are misleading.

23  Understated addictions, misleading.  It's pretty clear.

24          When -- I think you ruled against us on one issue

25  where everybody on the defense side had deposed the State on

1  certain issues about false statements and then we had to go

2  back and provide another witness on that.

3           One of the witnesses we produced a second time just

4  for Teva was Dr. Kolodny.  I was there for part of that.  I

5  think Dr. Kolodny testified for six hours, two full days.

6  Mr. Bartle asked a lot of questions.  He brought in binders

7  upon binders of examples of the statements from the defendant's

8  production that we have contended to be false.  They asked

9  about some of those; some of those they didn't.  This is a case

10 with 90 million pages of documents or more where we're not

11 required to -- and we objected on this basis and others --

12 marshal all of our evidence to answer the interrogatory.

13 They're not in the dark.  They know exactly the kinds of

14 statements that we believe are false and misleading.  They had

15 an opportunity to depose the State for -- so it's 12 hours, is

16 that right?  The second time, plus their part of the first time

17 which I think was six hours that all the defendants

18 participated in.  A lot of information was provided.

19           So I -- this is a nonissue to us.  There's no motion

20 to compel order or sanction recommended by Judge Hetherington

21 on anything.  So I think any type of motion like this has been

22 waived.

23           THE COURT:  Okay.

24           MR. MERKLEY:  First response to that, Your Honor.  I

25 don't think I have to file a motion to compel.  The State can

1    argue if it wants.  It has a particular allegedly false

2    representation later that thinks it was encompassed within its

3    discovery response, the interrogatory response, they can argue

4    it.  But the law says if you're asking an interrogatory about

5    those allegedly false representations and you fail to provide

6    them, you can't turn around and offer evidence at trial.

7              The next subject of our motion in limine.  One, is

8    evidence of statistics regarding opioid deaths from illegal

9    drugs.  And this is a very, very important one, Your Honor.

10   The State attempts to take both legal and illegal drugs that

11   have caused opioid overdose -- or that it caused an overdose

12   and say the defendants are responsible for both of those.  They

13   improperly blame legal and illegal drugs, even though it's

14   undisputed these manufacturers do not manufacturer illegal

15   drugs, they do not distribute illegal drugs and they have no

16   involvement whatsoever with the illegal drugs.  And that's

17   unfairly prejudicial, Your Honor, especially with a TV

18   audience.

19             One, it inflates the alleged harm by incorporating

20   statistics from illegal drugs for which the defendants cannot

21   possibly be held liable.  The State has no support for this

22   idea that they're linked, other than rank stipulation by some

23   of its witnesses.  The State wants to say, well, yeah, but they

24   all -- this illegal activity started with a legal prescription.

25   That's just rank speculation that they can't support.

```
 1             And three, and this is very important, Your Honor,
 2   this Court has consistently precluded us from obtaining patient
 3   level information that would contradict the State's evidence.
 4   We have been denied patient information and have no way of
 5   showing that a particular patient who overdosed on an illegal
 6   drug did not have a legal medicine manufactured by any one of
 7   these defendants prior to that, that would cause him or her to
 8   get hooked on opioids and then overdose on an illegal drug.
 9             We've been denied that information.  We have asked
10   for it several times.  We've made it clear from the beginning
11   of this case.  The State has always precluded us from having
12   it.  We brought it to this Court, to you and Judge
13   Hetherington.  We've been denied that information.  If we don't
14   have that information, the State can't turn around and say, oh,
15   well, you're responsible for all of these illegal opioids, too,
16   because they had to have started with a legal opioid.
17             When we don't have the ability and information to
18   show, no, patients A through Z did not start with a legal
19   opioid.  And if I had that information, I could show you that
20   and I could show you that at trial and to this national
21   audience the State wants to broadcast us to.  I can't do that.
22             And to that point, although this is a bench trial, a
23   potential prejudice is nevertheless real because, again, not
24   only do they not provide the information, but the information
25   they do provide -- we got into this with Judge Hetherington the
```

1   other day -- you'll be seeing it on appeal and you've seen it

2   in motions from the Janssen defense.  Even the information that

3   is provided is not adequately cross-walked so that we can show

4   you from this overdose opioid database back to these other data

5   bases which show individual medicines involving these

6   defendants, that there's no connection between the

7   manufacturers in this case or illegal medicines to illegal

8   drugs.

9          And again, the point's been made several times, but

10  due to the national television audience that's going to be

11  watching this case, this is extremely prejudicial to allow the

12  State to get up here and accuse these defendants of being

13  responsible for illegal drug activities without any evidence to

14  support it and without providing us the information, the

15  evidence that we need to dispute it.

16         THE COURT:  Thank you, Mr. Merkley.

17         MR. BECKWORTH:  Your Honor, once again, every single

18  argument is founded on a simple bedrock principle, this

19  hypothetical public audience.  They're not talking about what

20  you need to make your decisions.  They're talking about how

21  they need to hide.  And we'll talk about that in a little bit.

22  But, you know, look -- I'll come back to this in just a second,

23  Your Honor.

24         When we talk about this illegal drug, I'm not really

25  sure what specifically they're talking about.  There's two ways

1  you could skin that:

2          One is, do I take a prescription drug that wasn't

3  prescribed to me?  I think I'm hearing some of that.  And then

4  also what I think he's talking about is a type of drug that was

5  never a prescription drug, like heroin or analog substances.

6  So let's address both of these real quick.

7          On the prescription-type drugs that we have in the

8  State, we allege an overprescribing problem.  And part of that

9  problem is that when you subscribe or prescribe 90 days for a

10  toothache or you're too liberal on prescribing because of the

11  conduct that we've had in this case, that you have an

12  oversupply of pills.  And like you've heard with our history

13  experts that you allowed to testify last -- earlier this week,

14  it's foreseeable that when you have an oversupply of these

15  types of drugs, crime, diversion, addiction and a lot of harm

16  result.  So, of course, that should be allowed.

17          When you talk about drugs like that being evidence

18  that a death is a death whether I got it, went to my doctor and

19  took it or I stole it from my mom, either one of those is part

20  of it.  And you'll see and the evidence will be that many

21  times, like with -- I won't use a name, but like one of the

22  folks here today in the case, there are multiple opioids in the

23  system when they died.  That's part of the problem of

24  addiction, an overdose.  That's why we have an overdose

25  problem.

1              When you talk about analog, like, Chinese fentanyl.

2    One, we do not have the problem here.  I think our experts will

3    talk about that that a lot of other states have, yet.  But when

4    you look at things like heroin fentanyl, Dr. Kolodny talked

5    about this, I think several experts will talk about this.  I

6    think as many as 80 percent of studies show of folks that are

7    addicted to heroin, their first use was an opioid pain pill.

8    They really do take you to that level.  That's part of the

9    problem with overprescribing.  I think Commissioner White and

10   Ms. Hawkins will both testify at trial that if we had an

11   abatement order that literally said:  No more opioids are

12   allowed to treat anything starting today in the State of

13   Oklahoma, for chronic pain, you would immediately have the

14   beginning of a heroin epidemic, right?  Because if you take

15   these things away, people go through withdrawal and all the

16   other problems that are associated.  That's part of the

17   problem.  That's part of why we have to fix this, this entire

18   crisis with a very carefully planned out abatement plan.  So

19   all of this evidence is a part of it.  It is a problem that was

20   created by their conduct.

21              Also, you know, one of the things that we keep

22   hearing and they just haven't -- they just can't get their

23   hands around it.  And the public nuisance abatement case, I've

24   argued this many times, there's no issue of reliance on there.

25   That's not the case.  As you held the other day, it's an

1   unreasonable interference with the right of many.  Let me just

2   say this, it just crossed my mind:

3          This is a statement by Teva's CEO.  And all we've

4   heard Mr. Merkley talk about -- I'll just stand right here --

5   about is this idea that we've got to worry about the public.

6   So this was -- you know, we've -- we've been dealing with this

7   case for a long time.  Right here, the other day, the CEO,

8   he's -- their headquarters, he gave the following statement.

9   Mr. Whitten called us the other day and said they talked about

10  us being ambulance chasers.  Look what he says:

11         Mr. Schultz said it would, quote, be very strange to

12  do anything with settlement when you have done absolutely

13  nothing wrong.  And he gave quite a lengthy statement to the

14  Financial Times about how all these cases are bogus and it's

15  just a bunch of ambulance chasers.  Now, that's not about this

16  case in Oklahoma.  That's the CEO trying to save his skin

17  because they have analysts watching what's going to happen.

18  And he has made direct response to this case in the Financial

19  Times and told the world, We did absolutely nothing wrong.

20         Now, I do represent security shareholders, including

21  quite a few pension funds here in Oklahoma, and we'll see what

22  happens with their stock price.  But I'm pretty sure when

23  you're CEO you can't lie.  And I'm also pretty sure when you're

24  CEO you can't forget that you bought a company that pled guilty

25  to a federal crime.  So let's just -- you know, I don't really

 1  have anything to do with the merits of motion in limine here

 2  about what Your Honor has to decide.  But if we're going to

 3  talk about the hypothetical public that they don't want to hear

 4  about, then don't make statements like that.  And you

 5  shouldn't, if you're a lawyer for J&J, go to NPR and say that

 6  the State of Oklahoma's claims, and I quote, are baseless.  If

 7  you don't want the public to hear about the stuff, don't talk

 8  about it.  But that's what's happened.

 9          But in any event, none of that matters.  The only

10  thing that should matter in this case is whether evidence is

11  somehow so improper that it should never get to Your Honor.

12  And the mere fact that we keep discussing that is in front of

13  Your Honor, kind of shows it is irrelevant -- the arguments are

14  irrelevant.

15          THE COURT:  Thank you, Mr. Beckworth.  You provided

16  a good segue.  After we get through this and a break, we'll

17  take up Janssen, No. 1.  Talking about it already kind of.

18  Let's get through this one first.

19          MR. MERKLEY:  Mr. Beckworth's right, Your Honor.  I

20  do intend for my motion to apply to illegal activity in both

21  contexts he mentioned.

22          The point is, there's no link to the problem caused

23  to this illegal drug and the problems that result from these

24  illegal drugs to any legal activity, any legal distribution of

25  these legal medicines, and the defendant cannot be held liable

1    for someone else's purely illegal conduct.  Again, the status

2    that he references from Dr. Kolodny's rank speculation and Your

3    Honor and this Court has precluded us from having -- and the

4    State, at the State's request, has precluded us from having

5    access to the individual patient's information so we can show

6    the Court that the State's wrong in this instance.

7              In that instance, it's unfair, to say the least, to

8    allow the State to -- and unconstitutional -- to allow the

9    State to establish liability based on purely illegal conduct

10   without allowing us the evidence to show there's no connection

11   between that and our -- our medicines.

12             The next one's essentially the same argument, Your

13   Honor.  It references to opioids as a gateway to heroin and

14   other illegal drugs.  Again, there's no support for that.

15   That's just rhetoric, designed for a TV audience.  And I want

16   to go back to the TV audience part.

17             We're not trying to keep -- and Mr. Beckworth keeps

18   going to this and saying it's all about the TV audience.  We're

19   not trying to keep admissible evidence out of the public's

20   view.  The Court said we're going to put this on TV, we're

21   going to put it on TV.  We're trying to keep inadmissible

22   evidence out of the public view.  That's the whole point of

23   these motions.  So that's -- response to -- it should take care

24   of that.  I hope we don't have to hear that argument every time

25   he stands back up.  Because that's the point.  It's

1  inadmissible evidence that we're trying to keep out of the

2  public's view.

3          Again, in reference to opioids as a gateway to

4  heroin, there's no support for that.  That's, again, the State

5  trying to improperly inflate legal and illegal drugs.  It's

6  unfairly prejudicial to us, especially with a TV audience.  It

7  allows the State to improperly inflate its statistics on

8  overdose deaths, or overdose deaths or opioids problems by

9  trying to equate FDA-approved medicines properly prescribed by

10  physicians and heroin.

11          The State has no support for this other than the

12  rank speculation of Dr. Kolodny and others.  It should be

13  excluded.

14          MR. OTTAWAY:  Do you want me to go now, Brad?

15          MR. BECKWORTH:  Sure.

16          MR. OTTAWAY:  I don't care.  My experience is the

17  closer we get to trial, the more we get into the detail and the

18  actual evidence.  So I was interested in what Brad had to offer

19  when he was talking about illicit drugs.

20          Take, for example, the 80 percent of people who

21  start on heroin, start on prescription opioids.  Take that as a

22  fact for purposes of my argument here.  What do we do with the

23  other 20 percent?  Is it the State's now concession that that

24  other 20 percent is not part of what you're seeking in

25  recovery?  Because it gets very technical when we get into some

1  of these death statistics.  If you're talking about deaths

2  related or that have opioids in their system when they die,

3  that may be the result of taking methamphetamine which has been

4  cut with opioids and sold illegally.  It doesn't have anything

5  to do with either.  It shows up as an opioid death.  So the

6  details are really going to matter.  It would be nice if we

7  knew the extent to which.

8          If the State claims you're responsible for every

9  death caused by an illicit drug or whatever kind, then they

10 ought to say it.  If they're excluding some, let's hear it.

11 That would be important, I think, for Your Honor to know.

12         MR. BECKWORTH:  Well, Mr. Ottaway makes a great

13 point, Your Honor, because it's indivisible to the case.  And

14 we've alleged this displeasure and our witnesses state all the

15 time, Your Honor, it's multifaceted to this problem and it's

16 drug dealers, and it's China, and it's bad doctors, it's this,

17 it's that.  The one thing they always absolutely are consistent

18 about in saying, but it wasn't us.  We're zero, zero percent at

19 fault.  So you had a scheduling order that said bring in third

20 parties by this date and if you don't, you don't.  They didn't.

21 That's a problem for them.

22         Secondly to Mr. Ottaway's point, we've been over

23 this nuisance statute a lot.  I don't see any of that stuff in

24 there.  It's not.  It's not what a nuisance is about.  If you

25 caused the crisis, you caused the crisis.  It's an indivisible

 1   case.  Again, they can come back in a joint and several

 2   contribution case, if you find our my favor, they can go after

 3   anybody that they think they can prove their case is about.

 4   They are going to have a hard time doing that against one

 5   another because they've worked together and they always used to

 6   blame (indistinguishable).

 7          Now, on the gateway issue, which also goes back to

 8   Mr. Ottaway's point and Mr. Merkley, Judge, I don't have a copy

 9   of this, I'll just show it to you.  This is Exhibit 75 from the

10   deposition of Phil Cramer, and it is a document with a Bates

11   stamp of PBD 8901541900.

12          This is a page from a report that McKinsey & Company

13   gave to Purdue.  Now, McKinsey is an advisor consultant to drug

14   companies including J&J, Watson (indistinguishable) we'll get

15   to show you at trial when we get to the facts.  But here's what

16   it says:  Growing Opioid Abuse Epidemic, this is in bold.  Pain

17   relievers are second only to marijuana as, and I quote, a major

18   gateway drug for youth.  Pain relievers are second to marijuana

19   as first illicit drug used.  Youth pain reliever initiation

20   rate nearly match older ages.  OxyContin initiatives are

21   starting at a younger age.  Young users have a network of

22   suppliers for pain relievers.

23          And it's really interesting.  21 percent, it shows

24   are from one doctor.  46 percent comes free from a friend or

25   relative.  14 percent are bought from a friend or a dealer.  So

1  the idea that pain relievers are a gateway drug, that's not our

2  idea.  That's just what it is.  And an industry consultant is

3  who they all like or trusted and paid handsomely said so.  So

4  does the CDC.  But it won't be me testifying or Mr.  Whitten or

5  Mr. Burrage, or Mrs. (indistinguishable).  It's going to be the

6  State's experts on this, and the facts will be what they will

7  be.  So I don't think it's really in dispute that these drugs

8  are a gateway drug.

9           I also don't think it's in dispute that Oklahoma has

10  a terrible problem with youth-drug abuse and addiction.  I mean

11  I think we're in the Top 10 nationally, if I'm -- if I remember

12  that right, in that category, in the 12 to 17 age.  It's

13  terrible.  So is it a gateway drug?  I think so, but that's

14  something we will have to prove at trial.

15           THE COURT:  Mr. Merkley?

16           MR. MERKLEY:  Lastly, Your Honor, we have our motion

17  to exclude evidence of hearsay statements of alleged

18  co-conspirators.

19           First of all, any evidence of a conspiracy is just

20  frankly not relevant to this particular case based on public

21  nuisance and whether these defendants caused a nuisance in

22  Oklahoma.  But in any event, it's clearly hearsay.  The State

23  must affirmatively show that the statement meets the

24  co-conspirator exception by demonstrating that it was made

25  during a conspiracy and in furtherance of a conspiracy.  Again,

 1  although this is a bench trial, there's going to be a national

 2  audience watching.  It will be unfairly prejudicial to allow

 3  and dispute.  Admit evidence of an alleged conspiracy without

 4  making an affirmative showing to this Court that this

 5  conspiracy is relevant and that it -- that it can meet the

 6  hearsay exception for statements of the co-conspirator.  The

 7  State simply argues it's too early and any hearsay exception to

 8  comply.  We're simply asking the Court to enter an order saying

 9  no evidence of alleged conspiracy will be admitted unless an

10  exception is established on hand.

11          THE COURT:  Thank you.

12          MR. BECKWORTH:  Your Honor, of course that's not the

13  law.  But if it were, it's awesome because I will be able to

14  show a trial of documents from J&J where they refer to Purdue

15  and that's really what we were talking about as a partner,

16  partners at the table, they actually had (indistinguishable)

17  agreements.  So I don't think that will be a hard predicate to

18  lay.  And with respect to Teva, they were so addicted to the

19  OxyContin train, when they lost their patents cases, they cut a

20  deal to distribute Oxy that they bought from J&J, and from

21  Purdue, paid Purdue royalties on the sales and Purdue paid

22  Teva's -- paid their own sales reps to -- bonuses based on

23  sales of Teva.

24          And oh, I -- when I think he said, we don't have any

25  evidence, we haven't tried our case yet, but we're pretty good

1    at pulling up whatever they ask us about, there is this issue

2    that Noramco supplied the Oxy to Purdue and also that Teva

3    -- Oxy that Purdue makes Teva sold.  So if we had to lay a

4    predicate, we could do that.  But we don't have to because we

5    have deposition testimony of Purdue and, of course, they were

6    there and all these codefendants under their co-defense

7    agreement were there and had a full and fair opportunity to

8    question Purdue in those instances.

9            We have subpoenaed Purdue, both as a corporation and

10   as a -- certain individuals.  We're not sure whether they'll

11   comply or not -- actually, I'm working on that right now.  But

12   if they don't comply with the subpoenas, then the depositions

13   would be available because there would be unavailable

14   witnesses.  And then with respect to their documents,

15   conspirator or not, if they are business records, they're

16   admissible and we have a ton of business records from Purdue.

17           And then you have the residual catchall exception in

18   Oklahoma as just another example why these things would be

19   admissible when you look at their trustworthiness and the

20   circumstances.  It would be kind of silly that a document

21   that -- absolutely would be okay if a defendant, who they all

22   worked together with to defend this case and worked together

23   with -- in business, their statements would be admissible.  And

24   then because they settled, they lose all their trustworthiness

25   and shouldn't be allowed under the residual catchall provision,

 1   you know, that's just not how the law works.  So fortunately,

 2   the rules are pretty clear and I think all -- for all of those

 3   reasons and many others, we will be able to put on Purdue

 4   evidence at trial.

 5          Now with respect to maybe they're talking about

 6   other statements as well, like Endo and others.  To the extent

 7   that they worked with industry partners who are in different

 8   organizations, like, Pain Care Forum and others, of course

 9   those statements would be fair game.  We also have documents

10   that we got from quite a bit of these third-party advocates,

11   American Pain Foundation or others that have been produced to

12   the defendant.  Those are business records and fairly

13   admissible.  So, you know, whether we have to lay a predicate

14   or not is beside the point.  There's plenty of exceptions to

15   the rule that make these allowable.  Thank you.

16          MR. OTTAWAY:  Judge, I think we've been at this for

17   some time.  I think the reporter's desperate for a break, at

18   least I'm desperate for a break.  I'm not --

19          THE COURT:  We're going to stop right after we get

20   done with this one.

21          MR. MERKLEY:  I just have a couple of sentences.

22          THE COURT:  Sure.

23          MR. MERKLEY:  The rhetoric, accusations, innuendo,

24   Judge, again, all we're saying is conspiracy is not relevant.

25   We completely disagree that Mr. Beckworth shouldn't have to lay

1  a predicate that the exception to the hearsay rule applies

2  before he can admit the evidence he should.  We would ask the

3  Court to require him to do so, and that's all we're asking.

4  Before he comes into court in front of Your Honor and an actual

5  TV audience alleging a conspiracy and seeking to admit

6  statements of alleged co-conspirators -- co-conspirators, he

7  needs to establish that it's not hearsay and it's relevant.

8            THE COURT:  I'll start in reverse order.  I'm going

9  to deny the request to exclude -- to keep out the hearsay

10  statements and co-conspirators; however, I will require the

11  State to lay a predicate with regards to admissibility under

12  hearsay.  I'm just not going to blanket exclude those

13  statements.

14            With regards to references to opioids as gateway

15  drugs, I'm denying the motion.

16            With regards to the statistics, including illicit

17  drugs, I'm going to deny the motion.

18            With regards to the false representations not

19  identified in the interrogatory responses, I'm denying that as

20  well.

21            The additional notice of defendants' out-of-state

22  conduct, I'm denying that.  However, I'll just say the reason

23  I'm denying that is not because I believe that the Constitution

24  requires that there be a nexus as we've talked about earlier,

25  however, I don't think it's -- I'm not going to add another

1    step for the -- requiring the State to show prima facie

2    evidence before seeking to introduce that -- any of those types

3    of statements.

4            Finally, with regards to the two reports.  The

5    State's Opioid Commission, the President's Commission, I

6    believe those are relevant and I believe they survive the

7    challenges that the defendants have put forward and, therefore,

8    I'm denying the motion.

9            Let's take a break until 11:25.  And then we'll move

10   on.  We'll take up Janssen's first motion in limine.

11           MR. BECKWORTH:  Thank you, Your Honor

12      (Following the recess, proceedings resumed as follows:)

13           THE COURT:  Mr. Ottaway, you're recognized.

14           MR. OTTAWAY:  I'm confident that I'm going to win

15   this motion in limine because I can't imagine the Court

16   overruling a motion in limine that seeks to keep inflammatory

17   statements out of your court.  But as I indicated with the book

18   and with that last 20 percent, the closer we get to trial, the

19   more details matter.  And the Devil is in the details on this

20   one.  So it's more to lay down parameters and maybe the Court

21   can give us some guidance on where we go so we're not

22   constantly standing up and making this same objection.  There

23   is no question that this is an important topic for the reasons

24   the Court has already noted.  We are not just in front of you

25   but in front of the public as a whole.  We're not trying to

1  hide anything here, we're trying to keep inflammatory

2  statements out of the record.

3          As I said, though, the Devil is in the detail, and

4  what is an inflammatory statement.  We'd like to get some

5  guidance from the Court on that.  This ruling that the Court

6  made, for example, on the President's Commission Report has

7  some language in it that we believe can be excised without

8  hurting the plaintiff's.  An example is right there at the top:

9  Terrorist organization.  I've put some examples up from

10  hearings, things that have been said, carting the bodies away

11  in body bags, more people killed than the Vietnam War, Mother

12  Teresa, herself, would become an addict.

13          In the petition itself, depraved criminals.  Your

14  Honor has already heard me on the Opioid Kingpin and there's an

15  interesting corollary to that, here, in just a minute.  But the

16  opioid mafia is another one that comes in.  The reason I think

17  the opioid kingpin is interesting is because I discovered this

18  the other day.  There's a new suit or actually an amended

19  complaint, 250-page amended complaint.  Apparently this catches

20  on.  There is more than one kingpin because in that case, the

21  allegation is that the DEA-labeled nondefendant in this case,

22  Mallinckrodt, a kingpin, because it shipped pills to pharmacies

23  that were pill mills.  So we concede that language had an

24  impact.  And all we're asking is that we keep it out of this

25  case.  I don't mind arguing the facts with these fellows.

1   We're going to disagree about the facts.  We're going to

2   disagree about the law, what's the effect of the State,

3   (indistinguishable) is it not a defense in the public nuisance

4   case.  One of the things we shouldn't be arguing about is

5   whether we're going to let inflammatory statements be in the

6   record.

7            First, it's not relevant.  It doesn't have anything

8   to do with the merits of the case.  It is designed to illicit

9   an emotional response.  There is evidence which is persuasive

10  and there is evidence which is not persuasive; it is only

11  argumentative and inflammatory.  The rules provide that the

12  Court should be the watchdog on that, but we believe that in

13  this case, the Court is going to have to be particularly

14  vigilant.  We've given you some cases under the Rules of 2403.

15  It clearly applies in our case, even though it's a bench trial.

16           Allowing inflammatory statements and our required

17  response to them is a waste of time and the case is already

18  going to take, according to the plaintiff's, two months.  And

19  the State doesn't really argue why these are admissible or

20  should be allowed, other than the kingpin argument which you

21  allowed Dr. Kolodny to use as an expert opinion, why we should

22  get into the opioid mafia, the terrorist, Vietnam War, Mother

23  Teresa, etcetera.  And even the kingpin is a suspect now that

24  it's being picked up other places.  So we want you to bar all

25  of us from making inflammatory statements, to be cognizant that

 1  when they come up, if they come up, they should be dealt with

 2  quickly.  And that's all I have on our motion in limine, No. 1.

 3           THE COURT:  Okay.  Mr. Whitten?

 4           MR. WHITTEN:  Good morning, Your Honor.  So --

 5           MR. OTTAWAY:  He is the other nonbook lawyer.

 6           MR. WHITTEN:  You know, you say I don't know one

 7  time and it just follows you the rest of your life.

 8           MR. OTTAWAY:  You can't get away from it.

 9           MR. WHITTEN:  But you know, I'll start with that.

10  Larry, that's inflammatory.

11           MR. OTTAWAY:  It is.  And I would never say it in

12  the public.

13           MR. WHITTEN:  I'm going to have to repeat a few

14  things that were already said here this morning, but I will try

15  to be brief.  I can't cite you the case because I don't know

16  the law.  But you are familiar with the famous quote about

17  pornography where one of the U.S. Supreme Court judges said:

18           I don't know what it is but I'll know it when I see

19  it.  I hope I'm close on that quote.

20           You know, what is an inflammatory statement?  Was

21  what Larry said about me inflammatory?  What is an inflammatory

22  statement?

23           One man's trash might be another man's treasure,

24  and one man's inflammatory statement might be to another person

25  just for truth.  So I'll start with this, Your Honor.

1          Motions in limine are not -- are not universally

2   helpful in a bench trial.  So really, normally, you would be

3   worried about making an inflammatory comment, that is not

4   appropriate, or an inflammatory statement that is not

5   appropriate and the jury hears it and you can't un-ring the

6   bell.  But that's not the case with Your Honor.  So what

7   they're trying to do is handcuff us inappropriately.  And you

8   know, I kind of resent that.  We've tried a few lawsuits and

9   we've been around the block.  This is not our first rodeo.

10  We're not going to introduce anything in our humble opinion

11  that isn't legitimate.  But they're just trying to tie our

12  hands.

13          And then it becomes a game of gotcha, where if we

14  end up during the trial introducing something that we think

15  definitely is appropriate, then they stand up and say:  Judge,

16  that violates the -- remember you ruled they can't say anything

17  inflammatory.  So it becomes a game of gotcha.  The law in

18  Oklahoma is that motions in limine are not favored.  Period.

19  This is in our brief.  The people moving for motion in limine

20  have a heavy burden.  It's their burden.  And you know, the law

21  also is that relevant evidence is defined as evidence having

22  any tendency to make the existence of any fact that is of

23  consequence to the determination of the action, more probable

24  or less probable than it would be without the evidence.  It is

25  also the law that courts are reluctant to enter pretrial

1 rulings which broadly exclude evidence.  This is about as broad

2 as you can get, unless it is clear to the judge, it would be

3 inadmissible on all potential grounds.

4          So you know, I don't want to go through each one of

5 these one by one, but we're going to have a basis for

6 introducing anything that we talk about during the trial.  And

7 the way it's supposed to work is there's no jury here.  You're

8 the judge and they can make an objection then; and if you

9 sustain it, fair enough.  You're not going to rely upon it if

10 you were to issue a ruling later.  That's how it should work.

11          But like, for example, the terrorist and 175 deaths,

12 that's a quote out of the White House report.  We didn't say

13 it.  It's in the White House report.  So you should wait until

14 we introduce the White House report and see why we're

15 introducing it then, who we're introducing it through.  That

16 decision really hasn't even been made.  I'm going to guess

17 we'll probably do it through an expert witness like

18 Dr. Kolodny.  But that would be the best time for you to decide

19 and have really good lawyers like Larry come up and say, Judge,

20 we object to that White House report because of this reason.

21 And have a good reason.  Not some blanket broad objection

22 before the trial even starts, like it's inflammatory.

23          On the Mother Theresa thing, you know I hang around

24 with -- I'm not Catholic but I hang around with Sister Rosemary

25 (indistinguishable) from Uganda.  And I've spent a lot of time

1  with her, but she's not that well known.  Mother Teresa is,

2  she's no longer with us.  But the example of Mother Teresa was

3  used because she was universally regarded as someone with high

4  morals.  It's just an analogy.  That's all it is.

5        The testimony from Dr. Kolodny was that, if you

6  give -- if you give Mother Teresa opioids long enough, she too

7  would get addicted.  That's what we're talking about here.  And

8  it's just an analogy.  She's not even alive any more.  You

9  can't give her opioids.  It's just an analogy.  But

10  nonetheless, they should deal with that at the time of trial.

11        I could argue that many of the statements that have

12  been made about my friend Nick here this morning, who, by the

13  way, I have never said you were a book lawyer.  I don't know

14  what you're talking about.  But many of the statements Nick has

15  made today I could theoretically say, shoot, that's

16  inflammatory.  You're saying our claims are baseless and things

17  like that?  That's inflammatory.  Well, it might be to someone.

18  It's not to me.  It's wrong, but it's not inflammatory.

19        THE COURT:  Mr. Whitten, I think what I hear from

20  defendants, at least this is what I got out of reading the

21  briefs, is that because there will be citizens and reporters,

22  that once the State even mentions these words, even if the

23  defendants were to make an objection up here at a bench

24  conference, then that bell has been rung, so to speak.  That's

25  a fair concern.  Even -- even if it's not -- if I determine

1    it's not admissible, even if it's just uttered in the presence

2    of the world watching, that -- I think that's their -- their

3    concern is that the -- they think there's damage done.

4              MR. WHITTEN:  Well, let's talk about that.  Good

5    point.  The White House report is already out there.  Not only

6    did the White House issue it but it's been on the media, all

7    over the place.  So we didn't put it out there.  So these

8    alleged inflammatory things, the quote about Mother Teresa,

9    it's been on television several times.  I've seen Dr. Kolodny

10   and others talk about it because it's a commonly-used metaphor.

11   It's even in the film I helped produce, Killing Pain.  We talk

12   about that same metaphor, that same analogy.

13             But these things are already out there.  But Judge,

14   look, then it really come down to this.  I don't introduce

15   testimony or documents by evaluating whether they're

16   inflammatory or not.  I've never done that in my career.  I've

17   never had a court do a motion in limine like this.  We have --

18   we follow the rules of evidence.  And you know, if the

19   statement was found to be inflammatory, that alone doesn't mean

20   it's not admissible.  For example, what if we were trying a

21   murder case?  I mean, murdering someone you could argue is

22   inflammatory.  But if that's what the case is about, that's

23   what the case is about.  If the shoe fits, you know, wear it.

24   So I don't recall the word inflammatory being in the evidence

25   code.  If it is, I don't remember.  2403 would probably be the

1  closest thing to it.  It's more prejudicial than probative.

2  And all I'm saying is, don't handcuff us with a broad ruling

3  before the trial even starts.  We're going to have a basis for

4  everything we introduce.  There's a basis for every one of

5  those, including, like -- I haven't talked about the Vietnam

6  War, but, Judge, my recollection is that has been all over the

7  news, that we're losing more people to drug overdoses in one

8  year than we've lost in the entire, I think, 15 years or so of

9  Vietnam War.  That's already out there and that's an

10  appropriate analogy.  It's already out there.

11          But look, first you ought to wait until we move to

12  admit it or talk about it and then we have fine lawyers here.

13  They can approach the bench and argue about it.  But don't

14  handcuff us and say, you guys can't do anything, that's

15  inflammatory, before the trial starts.  That's way too broad.

16  We're certainly, I can assure the Court as an officer of the

17  Court, and I've been practicing in front of you for a long

18  time, I'm not going to try to introduce something solely

19  because it's inflammatory.  I am going to try to introduce

20  evidence that I think is relevant and important to our case.

21  And if, by the way, if it happens to be inflammatory but it's

22  still important and relevant and admissible, then it should

23  come in.  Thank you.

24          THE COURT:  Mr. Ottaway?

25          MR. OTTAWAY:  Yeah.  Two issues in there, Judge.  I

1    think we actually agree.  We just talk around it in opposite

2    ways.  There are two issues with inflammatory statements.  One

3    is in the evidence which can be dealt with, is it relevant or

4    is it overly prejudicial?  The other is in the statements of

5    counsel which come out as a corollary to the evidence.  I don't

6    know that I've ever had anybody oppose a motion to keep

7    inflammatory statements out of court.  But this is not

8    something we get on TV; it's not something that the news picks

9    up and says, in fact that they did it allows it to be used in

10   your courtroom.

11            This is a court of law.  It's going to be very

12   important that the public perceive this as a fair and balanced

13   trial.  And the use of inflammatory dialog, inflammatory

14   questioning, inflammatory statements is a hindrance to that and

15   a waste of time.  Calling us up to the bench every time that

16   happens to make an argument, both, makes it impossible, you

17   know, ring a bell and makes it a waste of the Court's time.  So

18   I'd just ask we have that order entered.  But the Devil is in

19   the details.  Reggie and I agree about that.

20            MR. WHITTEN:  But, Your Honor, again, this is a

21   definitional thing.  Why -- if you're like me, filing a motion

22   in limine requiring them not to introduce any evidence about

23   its 2403, more relevant, more probative than prejudicial.

24   That's not how we try cases.  And I don't anticipate the

25   Court's going to be calling us up, chewing us out over being

1 inflammatory.  We don't have a history of doing that.  I've

2 never even had a bar complaint.

3        So we're going to do this right and we're going --

4 we're only going to introduce evidence.  I can tell you as an

5 officer of the Court, we think it's important.  The Court's

6 already ruled against them on this Kolodny comment about

7 kingpin because that's what the expert thought it was.  The way

8 we should do this is that -- like we always do it.  And I've

9 never had anybody file, that I can recall, a motion in limine

10 like this against me, but I certainly never had a court rule

11 against me on something like this.  I am going to try the case

12 fairly.  And we'll do our job.

13        That's why we didn't file any motions in limine.  I

14 know they're going to do the same thing.  So I just ask you,

15 don't handcuff us before the trial even starts with these

16 really broad ones.  And that's what the law that's quoted in

17 the brief said, they're not favored, broad motions in limine

18 like this.

19        THE COURT:  You know, you all, both sides have

20 provided me -- looking at these tall binders, I've had lots of

21 background information that's been provided as far as putting

22 these comments in context.  You know, I know the two reports

23 were entered and were submitted today but those are being

24 attached to other exhibits.  I've reviewed a lot of the expert

25 depositions that have been attached to various motions.  So I

1 think that's the benefit of having these hearings right now as

2 opposed to putting the trial on hold and having sidebars is --

3 I feel like I am able to put a lot of this in context.

4          So I'm going to -- what I'm going to do is, I'm

5 going to deny the motion in limine as far as the statements

6 that you, Mr. Ottaway, pointed out.  I believe I've got the

7 context for those.  I invite the defendants and the State to

8 make objections.  If there are other statements that you feel

9 are inflammatory, I'm not going to be offended if you object,

10 because I think what I've heard both sides say here in the

11 courtroom this morning is you don't intend to offer additional

12 inflammatory statements.

13          I say additional overall.  And obviously there were

14 certain ones identified in this particular motion that we're

15 talking about now.  But I think Mr. Ottaway's concern is there

16 could be others and Mr. Whitten says he doesn't intend to offer

17 additional ones.  If that changes, you can certainly state your

18 objections and we'll hear it during the trial.

19          Let's go back to Teva defendants motion in limine

20 No. 2.

21          MR. CURRAN:  Thank you, Your Honor.

22          THE COURT:  Mr. Curran, go ahead.

23          MR. CURRAN:  I don't know how much time we need to

24 take up with any of these.  I think they're pretty basic.  I

25 certainly don't need anywhere near the argument or case law or

1   anything like that.  Judging from Your Honor's previous

2   comments, I think we can get through these really quick.  And

3   depending on how Your Honor feels about it, I may or may not

4   need to talk at all.

5           THE COURT:  I'll give you a chance.

6           MR. CURRAN:  Well, no, that's fine.  I'm not in love

7   with the sound of my own voice.

8           MR. WHITTEN:  I object to that.

9           MR. CURRAN:  I'm not in love with the sound of

10  Reggie's voice.

11          They're pretty basic.  Not mentioning defendants'

12  cooperation, defendant asserts to privilege motion practice and

13  removal.  I don't anticipate that Reggie or Brad or anybody is

14  going to unfairly try to throw that stuff out.  It's just --

15  basically it's -- it's -- maybe a word of warning to them to

16  try to avoid that kind of thing.  That's all we're seeking

17  here, Your Honor.  I know they wouldn't do it intentionally.

18  But, perhaps, a word from Your Honor before we start might be

19  of assistance.

20          THE COURT:  Okay.  You know what I -- in my notes I

21  have that the State thinks this is a little overbroad,

22  speculative.  Are there certain things that you want to -- can

23  you be a little more specific?

24          MR. CURRAN:  Sure.  Many times, and I've heard a few

25  here today, you know, the defendants cooperating this, the

1    defendants are all together in on this, and that speaks

2    actually more specifically to one that's coming up in the

3    motion in limine No. 3.  But -- and I know it may not matter

4    that much to Your Honor, but perhaps to those watching or in

5    attendance be insistent that there is some conspiracy in the

6    defense of the claim.  I don't think it's proper to comment on

7    or to insist.  And it's like, you know, you've heard the term

8    un-ring a bell.  You know, you can't just jump up and say, hey,

9    that's not fair, you can't do that.

10           Well they've already done it.

11           I agree with the motion in limine in general.

12   They're, by definition, somewhat proactive and prophylactic.

13   That's all we're seeking.  It's happened before and we would

14   like to at least reduce the times or amount of times it happens

15   during the trial.  If you want to take it one at a time, I

16   mean, they're really the same argument for all -- all four of

17   these, Your Honor, A through D.  It's just something that

18   doesn't need to be commented on as -- like these are bad things

19   or improper things is all.  That's all we're seeking to

20   exclude, Your Honor.

21           THE COURT:  Okay.  It seems like there's a -- one,

22   doesn't seem -- I know there's another motion in limine that's

23   asking that defendants be allowed to register objections

24   together and the State's argument was:  Which way do you want

25   to have it?  Do you want to cooperate as a team or do you want

1   to be separate?

2          MR. CURRAN:  Well, I think there are actually two

3   separate questions but we can do it any way Your Honor would

4   prefer.  If you would rather hear -- and maybe that's the

5   easiest way to do it, just everybody make your own objections.

6   But we're just looking to streamline it a little bit, Your

7   Honor, I think is the only thing.  If the better thing to do is

8   for both Janssen --

9          THE COURT:  What I think the point the State was

10  trying to make is that's an example of cooperation.  In other

11  words, the --

12         MR. CURRAN:  Well, not really cooperation -- excuse

13  me for interrupting, Your Honor.  Not really cooperation so

14  much but to streamline the proceedings, some as opposed to, you

15  know, getting a couple of people jumping up and objecting.  I

16  don't know how much of a difference it's going to make.  I mean

17  we can just -- it's not really cooperation so much as it is

18  trying to make these things move a little bit faster.

19         But in all honesty, Your Honor, I don't know how

20  much difference it would make by everyone requiring everybody

21  to make their own objections.  It was a thought to streamline

22  the proceedings a little bit.

23         THE COURT:  Okay.  Mr. Whitten, do you want to

24  respond?

25         MR. WHITTEN:  Judge, let me talk about the last one

1    first, if that's okay.

2              THE COURT:  Sure.

3              MR. WHITTEN:  I spent 20 years being a defense

4    lawyer, worked with Jeff on many cases together over the years.

5    I was taught as a young lawyer that the law in Oklahoma

6    requires you to make your objections or you waive them.  That's

7    what I was taught.  And I'm assuming that's still the law.  And

8    I try a lot of -- handled a lot of cases with Larry when we

9    were both representing defendants.  If I'm sitting there at

10   counsel table and Larry has one defendant and I've got another

11   defendant, and then Larry makes ten objections, I just sit

12   there on my hands.  I -- and -- and -- I ended up having to

13   appeal that case, I think I'm in trouble legally.  I think I

14   have to object for my client.  I can't sit here and let Larry

15   or Jeff, who are representing my codefendants, object for me.

16   I can't do that.  I don't think that's the law.  And I don't

17   think this is a discretionary call.  I just think you have to

18   make a record and you've got to make your own objections.

19              I don't think that's something that me or Larry or

20   Jeff can waive.  Again, I am not an appellate expert on law and

21   everybody is making fun of me because I don't know any law.

22   But I was taught that at a young age and I'm guessing that is

23   the law.  So I'm telling you from the State's standpoint, we're

24   not going to agree that one of them can object for the other

25   one.  And you can decide how you want to handle that but

1    that's -- that's my belief.

2            So moving on to these others.  Your Honor, it's

3    exactly the same thing.  We would ask that you not handcuff us

4    with broad motions like this.  As I sit here right now, I don't

5    know how the evidence is going to come in, but I can tell you

6    this:

7            One of our theories -- I'll just -- I know Larry

8    hasn't said anything but I'll talk about Johnson & Johnson for

9    a moment.  Johnson & Johnson provided most of the feedback, the

10   raw materials of opioids to many other defendants, including

11   our former defendant, Purdue.  So we are going to try to prove

12   that they are liable under that theory, and that they were

13   partners.  You know, one partner is liable for the conduct of

14   another partner under Oklahoma law.  We have documents

15   referring to it, where they're referring to themselves as

16   partners.  So that's not an argument thing; that's an

17   evidentiary thing.  I mean their documents speak for

18   themselves.  They wrote them.  It wasn't us.

19           So to try to exclude us from referring to them as

20   partners seems to me fly in the face of what the evidence will

21   be.  That's not argument, that's evidence.  We actually have

22   those documents.

23           Now, you know the argument really comes in closing

24   argument.  We shouldn't be discussing here in early May what's

25   going to be an argument.  I think in closing arguments, we have

1  the right to argue all these defendants conspired in the sense

2  that Purdue jumped onboard early with the help of J&J,

3  providing feedback and started making obscene amounts of money.

4  Many other companies jumped on the money train.  So I think

5  there's plenty of reasons to justify arguing there's a

6  conspiracy.

7          But that's not the issue right now.  Let's go back

8  to the law.  Just like the last motion in limine, we're not

9  supposed to be handcuffed with these broad motions and then we

10  play gotcha later.  Where we're just trying cases in order to

11  play, then get up and say, Judge, you handcuffed them, remember

12  you said, don't -- don't talk about these mean words like

13  partnering and conspiracy and things like that.  The way to

14  handle this is during trial.

15          These are very good lawyers, very good.  They know

16  how to do it.  Let's see the context of how we're going to

17  admit the document, the context of how we're questioning a

18  witness.  That's how we all learned to do it in law school.

19  And indeed, in all of these trial practices courses, some of

20  which I've taught, let's try our case.  Make your objections

21  and you'll be able to see then what the context is.

22          Honestly, Your Honor, you can't see it today, what

23  the context of questioning a witness is not even on the witness

24  stand today, is going to be.  You need to wait until you hear

25  the context.  So for the same reason you overruled the last

1  motion, it would be my request that you overrule this one.

2  They're not prejudiced.  They can handle this on a

3  case-by-case, question-by-question basis.

4        THE COURT:  Now, part -- part of the motion, I

5  thought, referenced that the State not talk about the

6  cooperation -- or their strategy and conduct regarding the

7  motion, practice, removal and then the motion to continue.

8        MR. CURRAN:  That's exactly right, Your Honor.

9        THE COURT:  And I think what -- the State responded

10 that you, in essence, agreed unless they opened the door.  Is

11 that --

12        MR. WHITTEN:  I think that's right.  I didn't

13 address that this morning because Jeff didn't bring it up.  But

14 you're bringing it up.  Right now, as I sit here today, I can't

15 see why I would ever address that.  But if for some reason, you

16 know, back -- this goes back to the context of what's going on

17 during the trial.  If they were to say something that called

18 for me to say, now wait a minute, you guys did this or you did

19 that.  But that hasn't happened.  We're sitting here debating

20 about hypotheticals, and I can't really see how that would

21 happen anyway.

22        THE COURT:  Okay.

23        MR. WHITTEN:  Did I answer your question, Your

24 Honor?

25        THE COURT:  Yes.

1          MR. CURRAN:  Just briefly, Your Honor.  What

2    Mr. Whitten was arguing was nothing what we had asked for.

3    We're simply asking that they not comment regarding the

4    cooperation defending the claim.  I have no idea factually

5    about the conspiracy, about the hobbies or whatever.  That's

6    not what we're asking the Court to decide today.  It's similar

7    to what Your Honor just alluded to, which is, commenting on the

8    cooperation defending the claim.  And I agree with it.  I think

9    it's fine we stand up and make our own objections.  And I agree

10   with everything he just said.  I've taught classes myself and

11   that's what I learned and that's what I teach.

12          So -- but what we're not looking for the Court's

13   rule excluding whatever any evidence they might have and not

14   have regarding manufacturer, that's not what this is

15   addressing.  It's simply improperly referring to the

16   cooperation and defending the claim.

17          MR. WHITTEN:  Well, this is really a strange motion.

18   I've never heard a motion where the two lawyers agree so much.

19   I can't imagine --

20          MR. OTTAWAY:  Just like inflammatory statements.

21          MR. WHITTEN:  I can't imagine doing what Jeff just

22   said.  But I don't know what they're going to do during trial,

23   so...

24          THE COURT:  Well, specifically what I wrote in my

25   notes is that they're seeking to exclude the State in talking

1    about the defendants' cooperating against the State as evidence

2    of a conspiracy.

3              Is that --

4              MR. WHITTEN:  I think we've said we don't see how

5    we're going to do that.  But it depends on what they do.  They

6    might open the door.  So again, I just don't see the law allows

7    us to be handcuffed on something that we said we don't intend

8    to do.  But they might open up the door.  So now we have to

9    worry about violating a motion in limine.  We ought to just try

10   the case like we all do.  If they stand up and open up the

11   door, you'll know it, I'll know it, and we would probably need

12   to then ask questions and they can say, Judge, wait a minute, I

13   object.  That's how we ought to handle it.  It's a -- imagine

14   using our imagination on how we're going to do this in some

15   hypothetical.  I've -- I just told the Court I don't think

16   we're going to do that.

17             THE COURT:  Okay.  Anything else you wanted to add?

18             MR. CURRAN:  Not substantively, Your Honor.

19             THE COURT:  Well, I am going to grant this motion in

20   limine.  What I've heard is that the State, that they feel like

21   if the defendants have opened the door, then we'll probably

22   readdress this.  But just heading -- going into the trial, I

23   would expect that references to the defendants' litigation

24   strategy and conduct would not be brought up at trial.

25             As far as requiring defendants to object

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1   individually during trial, kind of my opinion, it's more of a

2   pretrial matter, but -- but since we're talking about it, I

3   think I want to inform the defendants that I expect them to

4   individually make those objections.

5           Let's delve into Teva's motion in limine No. 3.

6           MR. CURRAN:  Thank you, Your Honor.  Your Honor, a

7   lot of this motion is similar.  There's one -- a couple I

8   really want to talk a bunch about.  We can take them one at a

9   time, refrain from addressing defense counsel (unintelligible).

10  I think that's pretty basic.  They shouldn't do that and we

11  shouldn't do that to them either.

12          Of course, Looking at B, no need for objections to

13  rule on that, refrain from characterizing previous testimony.

14  Again, that's something neither should do, improperly.  I'll

15  take Reggie at his word that they're not going to do anything

16  improper.  Please refrain from making general references to

17  defendants.  Now, that's -- that's -- that's kind of a

18  different animal.  We've seen this morning, even when

19  Mr. Beckworth brought up the (unintelligible).  He said, all

20  these defendants are tied into that.

21          Well, that's not true.  I know he wants that to be

22  true.  For example, Teva wasn't tied into it because fentanyl

23  came out in 2007 and Teva didn't buy Cephalon until 2011.  So

24  it's important to distinguish between the defendants what they

25  did and what they didn't do.  And improperly referencing all

1  defendants in addition to not being true can be a source of

2  confusion for Your Honor as well as whoever is watching this

3  and reporting on it.  So that's a little bit -- a different

4  specific animal.

5       Obtaining -- and I would be happy to entertain

6  whatever -- any kind of questions or any additional argument

7  there, Your Honor, but I think that's pretty easy to

8  understand.  Obtain approval of demonstrative exhibits prior to

9  trial.  We just want to know what's coming.  That's all.  You

10  know, I shudder to think of the cost of these fancy boards, but

11  we would sure like to know what they are before they show up.

12  And I think knowing that demonstrative exhibits before they

13  happen is -- I don't know what Your Honor's preference is on

14  that.  I think it's only fair to both sides and they should

15  expect the same from us.

16       And then F, refraining from commenting on alleged

17  deficiencies regarding discovery.  I know that's going to be a

18  little bit difficult as kind of a probative measure but we can

19  certainly see the instance where comments are made about

20  evidence we were not provided and they saw.  And I know Your

21  Honor has read this.  I don't want to waste a whole lot more of

22  your time with it.  But, you know, taking advantage of the fact

23  that they've had access to information that we ultimately were

24  not provided, whether it's, if by court ruling or whatever, I

25  think that's something important that has to be addressed at

 1   this stage before the trial starts.  And then informing

 2   witnesses of limine rule, that's pretty basic for both sides.

 3   Thank you, Your Honor.

 4            THE COURT:  Okay.  Mr. Whitten?

 5            MR. WHITTEN:  Yes, sir.  If I may, can I do this

 6   like I did the last one and start at the end?

 7            THE COURT:  Sure.

 8            MR. WHITTEN:  Well, this -- this demonstrative rule

 9   is very, very important to me.  And, you know, there are a lot

10   of really good lawyers in Oklahoma and people do this

11   different.  And I'm not the only lawyer in the case, but I can

12   tell you, I create most of my demonstratives on the fly.  And

13   may I use an example?

14            THE COURT:  Sure.

15            MR. WHITTEN:  I think Larry is one of the greatest

16   lawyers in the State.  He has used a demonstrative prop --

17   where is it?  Where is your phone?  There it is.  He's used

18   this as a demonstrative in this courtroom twice which I admire

19   and respect.  It's good lawyering.  But under this ruling here,

20   they've got to tell us in ten days or ten days before trial, I

21   think -- they're going to use the phone as a prop.  I'm

22   guessing Larry may not have even realized he was going to use

23   the phone as a demonstrative probably until the hearing.

24   That's just good lawyering.

25            THE COURT:  I think they're trying to eliminate

1     the -- the unfair surprise, so I think it's one thing to

2     conjure up something when you're sitting at counsel table

3     during a hearing, it's another thing to spend extra efforts,

4     you know, after hours, over the weekend and then --

5             MR. WHITTEN: Well --

6             THE COURT: -- lift it up under the table and show

7     it to us.

8             MR. WHITTEN: Let's address that one then. So I'll

9     get more specific. Generally speaking, I still think my point

10     is a good one. Sometimes demonstratives are created literally

11     on the fly. But I get your point, so let's move forward.

12             There is no court rule in Oklahoma. There is not a

13     statute, there's not a local court rule, there's nothing -- and

14     I've been practicing here almost 40 years, Larry is more than

15     40 years, but there is no rule we have to give our

16     demonstratives ten days before trial.

17             Now, generally, we'll create a lot of these. Now,

18     I'm not a computer guy, but these young folks, I can sit here

19     and tell them, hey, here is how the trial is going, let's

20     create a demonstrative, pull it up on your iPad and we'll

21     create one. That's how we intend to do a lot of this trial.

22     And this rule handicaps and makes really good trial lawyers

23     something less, because now they've got, what do they say, I'm

24     doing a lot of this with my grandchildren where we teach them

25     to paint by the numbers because they're so young, they're not

1    very good at painting without the numbers.  But really good

2    trial lawyers paint without the numbers.  We add the -- I'm

3    going to create a lot of demonstrative exhibits during trial.

4    I can't -- I don't think it's fair to require us to think ahead

5    and do all of our demonstratives in advance.

6            What -- what's coming next?  Do I have to write my

7    questions out ten days before trial and give it to them?  I

8    mean to some extent this is just good trial advocacy.  This is

9    what lawyers pay money to go see people, like, Jerry Spence,

10   and learn how to be, you know, really good trial lawyers.  This

11   is not right.  And this Court, in this county, has never

12   required, to my knowledge, any of us, in any case I've ever had

13   here in Cleveland County or anywhere throughout the state.

14   I've tried cases in most of the counties in this state and I'm

15   not familiar with that ever being required.  So this one is

16   really important to me.  I intend to use my time doing what I

17   do which is my work product.  I shouldn't have to disclose it

18   to them.  I am going to work before trial, but doing

19   demonstratives before trial was not one of the things we intend

20   to do.

21           With that said, there are many demonstratives that

22   we do have.  And they've seen those.  I'm not going to tell

23   you -- can I tell you that I'm going to use this one at trial?

24   No way.  I don't know.  But we should not be handicapped.  This

25   is a relatively new trend in the law where -- and I used to be

1  a defense lawyer -- but you want to take away the skill of some

2  really good plaintiff lawyers who have them and that's -- I

3  object to that.  I don't think it's fair and it would be

4  unprecedented.

5           So I would ask the Court not to make us do that.

6  It's not fair.  It's -- there's no authority for it that I know

7  of.  You may know of some authority, Judge.  Maybe you've

8  required it in a case that I don't know about.

9           THE COURT:  I think that's a Judge Cantrell rule.

10          MR. WHITTEN:  I haven't heard that one.

11          THE COURT:  That's -- that was part of the referee.

12  I think he has a rule on it.

13          MR. WHITTEN:  Now that's a new one to me,

14  but that -- that's a new one.  I haven't seen it.  And I don't

15  practice in federal court as much as some.  I do practice in

16  federal court but not as much as some people do.  Maybe there

17  is a trend, may be something that federal judges are requiring

18  that.  But as we point out in -- we're not in federal court and

19  we don't have those rules, so I would ask, as my friend Robert

20  McCampbell said, this is the trial of our lifetime, or

21  something -- I think that's something -- what he said Monday.

22  I agree with him.  Let us try our case the way we learned how

23  to do it and let us create our demonstratives in the ordinary

24  course of the moment.  And that's -- there's never been a rule

25  about that.

1          So let me go back to -- I'll just address the ones

2  that Jeff talked about.  I think the first thing he brought up

3  is, you know, he said, I don't expect Reggie to do anything

4  improper.  Well, he knows I'm not going to, so does Larry.  You

5  know, we might make a mistake.  We're never going to do

6  anything we know is improper.  That's never going to happen.

7  And I think the Court knows that too.  We shouldn't -- it's not

8  proper to file a motion in limine on something like that.  And

9  that's why we didn't file a silly motion in limine on -- on

10  them because I know these are good lawyers and my friends and

11  they're not going to do that.

12          On the other one, this is an evidentiary thing.  He

13  mentioned that Teva did not participate in the book called

14  "Responsible Opioid Prescribing".  But that, that's a good

15  point for cross-examination.  If it comes up, like

16  Mr. Beckworth brought it up today, let him cross-examine on

17  that.  But I believe the company they acquired, Cephalon, did.

18  Isn't that an issue?  Shouldn't the lawyers be allowed to fuss

19  about that by cross-examining people and introducing documents?

20  And look, if we had cross-examined over something that we're

21  just flat wrong, we'll look silly and we probably should.

22          But, you know, I just think this motion is another

23  one of those broad motions that should not be filed.  They are

24  not prejudiced by this.  There's no jury to worry about.  They

25  can object at the time.  And let's see what the context is.

1   It's much to do about nothing.  They don't even know if we're

2   going to do some of this stuff, nor do -- do we.  So I've asked

3   this question, Your Honor.  I respectfully request the motion

4   be overruled.

5            MR. CURRAN:  May I briefly, Your Honor?

6            THE COURT:  Sure.

7            MR. CURRAN:  With regard to the -- the other issue

8   Cephalon didn't do that.  They're separate companies, Your

9   Honor.  And if there were to be an award in this case, the

10  separateness of the companies is of paramount importance.  The

11  fact that they know Teva didn't participate in that and went

12  ahead and let Your Honor think they participated in that book

13  is a little bit disturbing.  So I would ask for some degree

14  of -- of word that -- and I'm not talking about that book in

15  particular.  It's a phenomenon that many of -- that all

16  defendants did this, the defendants were all tied into that.

17  The book itself is red herring.  But the point, the

18  illustration of that, for that (indistinguishable).  And then I

19  think I heard Reggie say -- first he says, nobody does it with

20  regard to identifying demonstrative exhibits, and then he said,

21  it's a new trend and then he finds out people actually do it,

22  and wait, they do it in federal court too.

23            This is a trial of a lifetime, I have no -- no

24  argument about that.  It's probably the biggest one any of us

25  will ever deal with.  But it's -- it shouldn't be done by

1  ambush or surprise.  They should at least show us the

2  demonstrative exhibits.  Whether they use them or not is

3  irrelevant.  We should -- we should know what's coming and not

4  have to deal with their asking for billions and billions of

5  dollars, and deal with on the fly that we have not seen.

6  That's all we're looking for with that, Your Honor.  And I

7  think that's all we talked about.

8          Am I wrong?  I think that's all we discussed and I

9  think Your Honor has read the rest of it.  I don't know how

10 much more time to take up.

11         THE COURT:  I think we've covered it.  Mr. Ottaway?

12         MR. OTTAWAY:  I just want to talk about the

13 demonstratives a bit.  There are three kinds of demonstratives.

14 One is not a demonstrative at all.  It's a blowup of a piece of

15 evidence, which I think we're going to talk about probably at

16 the pretrial conference, how do you want to use that?  What do

17 you want to do?

18         The other is a demonstrative that was prepared in

19 advance, say, to use during opening statement.  And I'm

20 perfectly willing to share mine, ten days.  I agree with

21 Reggie.  It's a little extreme because we're doing this and we

22 don't really have time.  The night before or use of a witness

23 before, I'm perfectly willing to trade with them if I have

24 something prepared in advance, particularly on opening

25 statement.  I'm going to use a demonstrative -- not an exhibit,

1    a demonstrative prepared by me that's been prepared in advance

2    and ought to be shared so that the other side can object if

3    there's an objection subject to it.

4            The third one is the one Reggie mentioned, which is

5    preparing demonstratives on the fly.  That's usually done with

6    the witness who is -- got in an area you didn't really

7    anticipate.  And I agree with Reggie on that.  I will do some

8    of that.  I think Judge Burrage knows that.  But if they've

9    been prepared in advance, there's no reason not to share them

10   shortly before they're going to be used so we don't bump into

11   this problem of Judge, wait a minute, that's not what was done,

12   that's not what was said, that's inflammatory.  It can be

13   handled so much easier.  And I'm willing to work something out

14   with Brad and Reggie to make sure that we can get those

15   exchanged, those ones that are prepared in advance.

16           MR. WHITTEN:  Let me be real clear.  We haven't

17   prepared them in advance.  And unless you order us to, we don't

18   intend to.  But even if you order us to, I guarantee we're

19   going to miss something.  I mean, some of our witnesses, many

20   of our witnesses are from out of state.  We may end up doing

21   our prep for them on direct.  Not all of it.  Because they

22   have -- most of them have been produced for depo.  But a lot of

23   it, we may -- remember those depos, we're on the defense.

24   We'll be on the offense during trial.  So we may handle them

25   totally different at trial than we do during the depo.  But any

1  demonstratives, we -- we reserve the right, unless,

2  respectfully, unless the Court orders us.  We'll follow your

3  orders, whatever you order us to do, you know that.  But our

4  preference would be to do these when we feel they need to be

5  done.

6          The second thing is sharing demonstratives.  You're

7  giving away your work product.  That's my work product.  And

8  sometimes I don't do those in connection with a witness.

9  Sometimes I'm sitting there at night, I think, you know, these

10  guys said something that, wow, here is an opportunity for me to

11  make point one, point two, point three, and it will help me win

12  my case.  I shouldn't be handcuffed in doing those ten days

13  before trial.  It's really impossible to do all of that.

14          And then opening statements.  I'll get back to,

15  again -- I want to address something my friend Jeff said.  I --

16  I don't know if I said it right or not.  My intention was to

17  say, I've never heard of a judge ordering us to do that.  I

18  have heard of lawyers of recent trend of having everybody

19  basically try their case and write their questions out in

20  advance.  I have heard of that.  That's what I was referring

21  to.  I said, Jeff, I said that wrong, I apologize.  But I've

22  never seen a court order us to do this and I -- this is not the

23  case for the Court to change, you know, the precedent and make

24  us try our case in advance.  I don't want to give them

25  demonstratives we use in our opening, beforehand, because I

1    used to do what Larry's doing.  I was a defense lawyer for

2    20 years.  I would have loved it if the plaintiff lawyer wrote

3    out everything they're going to say, that gives me a tactical

4    advantage to have it in advance and that's not right.  And I

5    spent 20 years, I never had anybody do that.  I never got that

6    advantage.  It's not fair.

7            And we have to go first.  The reason we have to go

8    first is because we have the burden of proof.  The burden of

9    proof is a hill and we have to climb.  So using our abilities

10   as trial lawyers, we should not be handcuffed on that or

11   punished if we are good trial lawyers.  We shouldn't be

12   punished for that.  I would request, respectfully, that the

13   Court not change all these years of precedent and how we've

14   done it forever and make us write it out, our stuff in advance.

15   I don't want to do that.  I will do it if you tell us to, of

16   course.  I'm not trying to sound disrespectful.  We'll follow

17   whatever order you enter, Your Honor.  But we don't want to do

18   that because it's not -- it's not right.

19            THE COURT:  All right.  I'm going to -- so there's a

20   couple of parts to this, this motion.  As far as the prior

21   approval of props, more than -- more than just props, I guess.

22   I'm going to deny it except for as it relates to opening

23   statements.  I want the parties to share the -- by the close of

24   business Friday, before trial, I want you to share any slides

25   or PowerPoints that do not include -- that include things other

1  than exhibits that have already been produced.  So if you're

2  creating a special PowerPoint or special slide as part of your

3  opening statement, just share it with the other side by close

4  of business Friday.

5           MR. BECKWORTH:  The Friday before --

6           THE COURT:  Friday the 24th.

7           MR. BECKWORTH:  Okay.

8           THE COURT:  All right.  But I'm not going to make

9  any other ruling concerning that.  Obviously, during the trial,

10  if the other side has a demonstrative and you want to object,

11  then make your objection.

12           With regards to informing witnesses of rulings,

13  yeah, I'm granting the request that that happen.  I'm going to

14  deny the other facets of the motion in limine No. 3.  As far as

15  -- I think we can probably have some more discussion at

16  pretrial conference about directing questions to counsel.  We

17  talked about the objections made by one defendant as opposed to

18  separate defendants.

19           All right.  Let's now go to Janssen's motion in

20  limine No. 2 regarding lobbying activities.

21           MR. BECKWORTH:  Your Honor, I might just ask on

22  this -- well, I don't know if this would help to go quicker.

23  It seems like their 2 and Teva's 10 probably are more the same

24  issue.  And 3, which is advocacy, which is very similar.  I

25  would think if they wanted to do and you wanted to --

```
 1              THE COURT:  I think 2 and 10 are very similar, but I

 2   know Mr. -- it looks like Ms. Strong's going to get to argue

 3   No. 2.  Was -- is there somebody on -- for Teva going to do No.

 4   10?

 5              MR. BARTLE:  I'll do No. 10, Your Honor.

 6              THE COURT:  Okay.  Can you guys squeeze that into

 7   20 minutes?

 8              MR. BARTLE:  Maybe 25, Judge, but I'll be quick.

 9              THE COURT:  Okay.

10              MR. BECKWORTH:  And on the 24th, I just want to make

11   sure we understand that that refers to creative demonstratives,

12   when it -- when they're applied to, for example, a page from an

13   exhibit that's blown up.

14              THE COURT:  Does not apply.  It's already been

15   shared.

16              MR. BECKWORTH:  Thank you.

17              MS. STRONG:  So this motion in limine is directed to

18   lobbying activities.  It's been made clear through the

19   discovery process that the State would like to introduce into

20   evidence examples of lobbying efforts by Janssen or J&J and to

21   hold premise to liability based on those efforts.  That is

22   absolutely prohibited under the Noerr-Pennington Doctrine or by

23   the U.S. Supreme Court and -- and recognized throughout the

24   country.  And so I want to just start with the basics of it.

25              The right to petition is a fundamental First
```

1   Amendment right, Your Honor.  And it's -- it's recognized in

2   some courts as the Noerr-Pennington Doctrine; in other courts

3   it's just petitioning activity.  It doesn't make a difference

4   which way you read it.  Some courts, you know, use one set of

5   language and directives; other courts refer to it as a

6   petitioning activity.  It's the same thing, Your Honor.  And

7   this has been recognized outside of the antitrust context.  The

8   initial report that -- the two opinions that the U.S. Supreme

9   Court came up with the context of antitrust claims, but it has

10  been expanded to all sorts of claims.  We've put some up on the

11  slides, Your Honor, to show you civil rights cases, RICO cases,

12  contract interference.  This is a -- a right that is recognized

13  no matter the nature of the claim.  And lobbying, specifically,

14  is a textbook-type petitioning activity that is protected.  And

15  the force of the protection is quite great, Your Honor.  The

16  U.S. Supreme Court has recognized that even where a party

17  lobbied with improper motives or used improper means, as long

18  as they were seeking favorable government action, the activity

19  would be protected.  And that is precisely what the State

20  alleges here, is that Janssen or J&J was out there trying to

21  influence government action, not some sham proceeding.  And so

22  we see even the case that they cited -- let me back up one --

23  even in the context of misstatements, here is a case in,

24  *International Brotherhood of Teamsters against Philip Morris*.

25  It's 1999 case out of the 7th Circuit.  The petitioning

1  immunity applied even where the tobacco manufacturers allegedly

2  made misstatements about the relationship between smoking and

3  health.  It still is protected.  And that's, again, precisely

4  what the State is alleging here.

5          The State points to a *California Motor* case and --

6  alleging that there's this -- there's an exception that ought

7  to apply.  No, that case actually does not support their

8  position because the sham exception clearly applies to

9  scenarios where they are not trying to influence government

10  behavior.  So in that case, what was actually happening, is

11  they were trying to prevent the competitors from having access

12  to the tribunal.  And in that case, it wasn't about actually

13  getting favorable action out of the agency, the legislature,

14  but it was actually trying to prohibit other parties from

15  having access.  And so in that context, it wasn't genuine

16  lobbying activity.  It wasn't really about the right to

17  petition, it was about blocking other folks's access.  And that

18  was a sham exception for which you don't get protection.

19  That's not what's alleged here, and so the sham exception does

20  not apply.

21          The protection extends to administrative lobbying as

22  well.  To the extent that the State would like to introduce any

23  evidence about activities related to State agencies, the

24  question comes, what's the status of that?  Is that the same as

25  the legislature or not?  The court has recognized that indeed

1    it is recognized when you are interacting with administrative

2    agencies as well.  There is a -- an exception that can be

3    broader in the context of administrative agencies.  And the

4    case law, I really want you to focus in on the cases, Your

5    Honor, because the case law talks about how it depends on the

6    nature of the administrative agency.

7         If the administrative agency is more like a judicial

8    body, more adjudicative, then if someone submits false and

9    misleading information, that would not be protected if it's in

10   the context of an adjudicative body.  If the administrative

11   agency is more like a legislative body, then even if there are

12   misstatements, that activity is going to be protected and

13   that's what the case law distinguishes when we get into the

14   context of administrative agency communications as opposed to

15   communications of the legislature.

16        So this is a really important distinguish --

17   distinction here.  In this case, they have not alleged that we

18   have submitted any false or misleading information to an

19   adjudicative body like an agency that would allow it to have

20   some type of exception here for false and misleading

21   statements; instead, there's no evidence of that whatsoever.

22   But to the extent that it would be -- I don't think there's any

23   adjudicative body at issue here, Your Honor, and if they would

24   like to tell me what that is, I would be curious to know

25   because I think every body that they identified would be

1   legislative in nature.  And I'll give you an example.

2             Courts, for example, have said, the San Francisco

3   Board of Permit Appeals, even though that place is where you

4   submit an application for a real state permit.  They function

5   more like a legislative body than an adjudicative body.  And

6   so, even if there was some false submissions to that body, they

7   would be protected.  I don't believe there's any false

8   submissions here whatsoever, Your Honor, but I wanted to point

9   out the distinction.  You've got to look at what the body is

10  that is at issue and then it dictates the nature of the

11  protection.  And I will -- I will give you a couple of cases,

12  Your Honor, to look at.

13            The two cases on the screen right now are important.

14  *BE&K Construction versus NLRB*, 536 U.S. 516.  The *Potters Med*

15  case, it's on the slide as well, Your Honor, but I want to give

16  you a third case that's not on the slide, that really gets into

17  the distinctions that are important for you to understand which

18  is the *Kottle versus Northwest Kidney Centers* case.  The cite

19  for that is 146 F.3rd 1056, the 9th Circuit 1998.

20            So in the context of that, Your Honor, we would ask

21  that no evidence be admitted with respect to Janssen or J&Js'

22  lobbying activities whatsoever, because it's protected and

23  there can be no liability based on it whatsoever, Your Honor.

24            THE COURT:  Is there no exception if those

25  activities further some unlawful activity?

 1          MS. STRONG:  There's no exception for that, Your

 2    Honor.  Again, if there's improper means, improper purpose, no.

 3    That is absolutely protected in these cases to establish that.

 4    Here is one in the context of the smoking industry, Philip

 5    Morris.  If the petitioning -- if the statements are designed

 6    to get favorable laws and ward off unfavorable ones, even where

 7    the tobacco manufacturers allegedly made the statements about

 8    the relationship between smoking and health, those petitioning

 9    activities are protected.

10          THE COURT:  Okay.

11          MS. STRONG:  It's very strong immunity.  Again, I

12    suggest you read those cases to better understand to the

13    extent.  I don't know they're going to make an argument that --

14    that they should fit into the administrative agency component

15    where there is greater space for an exception for false and

16    misleading statements.  So there's a few things to consider

17    there.  Is there such an administrative agency at issue?  I

18    don't believe so.  I think anything that they're going to

19    identify would be more in the nature of a legislative agency

20    and would fit the -- the kind of petitioning that is incredibly

21    protected.  But if they were to try to get it to the next

22    level, which I don't think they can, what is it that was

23    submitted to that agency that had an adjudicative process?

24    There was testimony, there was a right to appeal, things like

25    that.  I don't know what that evidence would be.  But to the

1  extent that they broadly talk about lobbying efforts and it's

2  clear, Your Honor, that lobbying efforts ought to be precluded

3  and there ought not be any evidence of that in this case.

4          THE COURT:  Okay.  Thank you.

5          Let's go ahead and hear Mr. Bartle first.

6          MR. BARTLE:  Your Honor, Harvey Bartle on behalf of

7  Teva and Actiq.  I promise to be very quick.  Teva and Actiq

8  defendants join in Ms. Strong's arguments and, like, what the

9  Court just said.  Thank you.

10          THE COURT:  Thank you.

11          MR. BECKWORTH:  I guess the law guys have to argue

12  the law sometimes, so Reggie and I will.

13          MR. OTTAWAY:  I object on Reggie's behalf, Your

14  Honor.

15          MR. BECKWORTH:  Well, one of my best friends, I fish

16  with him all the time and it's amazing the things he claims he

17  can't do.  I don't know how to back the truck up.  I don't know

18  how to back the boat off.  So over -- after a lot of time, I

19  figured it was -- really, what happened was, he just didn't

20  want to do the stuff and he always made me do it.  And what I

21  wonder is, Reggie is quite the law guy.

22          THE COURT:  You avoided the inflammatory comment.

23          MR. WHITTEN:  See my point?

24          THE COURT:  I'm kidding.

25          MR. BECKWORTH:  Your Honor -- so, Your Honor, just

1    to be clear, I disagree, point 1.  Point 2 is, we're not

2    alleging that the defendants have done something wrong by

3    lobbying.  They can lobby.  We're not alleging they've done

4    something wrong by associating.  They can associate.  We're not

5    alleging that they've done anything wrong by speaking.  They

6    can speak.  That's not what's at issue.  What is at issue is --

7    may I approach?

8               THE COURT:  Yes.

9               MR. BECKWORTH:  -- is improper influence through

10   lying, but also, as you hear me say sometimes -- do you mind if

11   I -- Your Honor, just to kind of back up a minute.  I don't

12   know if you've seen this document.

13              THE COURT:  This was attached but it wasn't that

14   clear.

15              MR. BECKWORTH:  Yes, sir.  So what this is, this is

16   a document that J&Js drug, Nucynta, when they lunched it.  Part

17   of their marketing activity, how they would market their drug

18   to make money was in a document that had this map, the

19   influence map.  We'll see this at trial.  I think the witness

20   said that influence (indistinguishable) influence props,

21   several dozen times.  But the word is whether it's an

22   influence.  And as you see here on this deal, and I'll walk you

23   through it here just as quick as I can.

24              Let's point you to the bottom.  The last thing on

25   here is value proposition, making money.  That's fine if they

1  want to make money.  That's fine.  But their witness testified

2  that the things that happened here are part of their P&L for

3  marketing.  They go against the bottom line for the product.

4  And what we have here, what we'll talk about here in the trial,

5  is these are all the boxes that influence the decision-making

6  of a prescriber.  You've heard, ad nauseam, these guys say,

7  well, we don't have any evidence of individual doctors.

8         Well, if you look here, the biggest box on here,

9  this is the money for the drug companies.  It's healthcare

10  providers, midlevel practitioners and pharmacists, because you

11  can't get a drug if they don't prescribe it.  And if you look

12  at this flow chart, it's confusing because there's so many darn

13  boxes and arrows.  But look at what they are.  Who do we have

14  to influence for me to get to the doctor?  Well, I use employer

15  collusion, I use Key opinion employers, self-insured private

16  employers, fully-insured private employers.  U.S. government,

17  state government, legislative channels. (Indistinguishable),

18  that is advocates for groups and prevention.

19         THE COURT:  Grassroots?

20         MR. BECKWORTH:  Sorry.  Grassroots, drug abuse

21  prevention, advocacy groups.  Medicare, health plans, pharmacy

22  benefit managers which we have state and private level.  Health

23  plan administrators, and on and on.  Then you get down here.

24         KOLs, a big part of our trial.  Professional groups

25  associations, we'll talk about those in a minute.  That's why I

1  want to tie this together.  Patient advocacy groups:  FDA, DEA

2  -- ah, she talked about administrative.  State medical pharmacy

3  courts, state law enforcement, state legislatures, HHS and IMO

4  DEA, Congress, state influence, activism.

5         Now we get down to the bottom.  We got the patient.

6  Who's talking to the patient?  Well, come all the way up here

7  on one side, but over here you have patient advocacy groups,

8  part of the defendant's influence operation.  All of this is

9  designed to get drugs to the doctor so they'll prescribe them

10  to get to the patient.  So in this instance J&J can make money.

11  Is it unlawful for them to lobby a state or federal government?

12  No.  But is it a part of the overall scheme that happens in the

13  case and to show how and why the drugs get to where they do and

14  how and why doctors may have been influenced improperly?

15  Absolutely.  And there's not an -- well, let me back up a

16  second.

17         We're not trying to say, nor will we ask you to find

18  that, because they lobbied someone, they are, therefore,

19  liable.  That's not it.  We are advocating.  And I think the

20  law absolutely allows us to show that you can't lie.  You

21  cannot lie.  You cannot engage in sham conduct.  You cannot go

22  to anyone with the false and deceptive purpose.  Now, here is a

23  great example of this.

24         May I approach again?

25         THE COURT:  Yes.

1          MR. BECKWORTH:  You've seen this document a lot.

2     This is why this gets confusing, why this is not appropriate

3     for a motion in limine, and why at the end of this case you

4     will be able to decide the findings of fact and conclusions of

5     law, what is and what is not appropriate evidence.  Now you've

6     seen me use this a lot.  I love this document.  It's quite

7     thick.  This says, Epidemic of Pain in America, American Pain

8     Foundation and Pain Care Forum.  I don't care to go through the

9     whole thing.

10          We've talked about it in the past.  But if you just

11     looked at this document, and I'm sure they will try to use it

12     at some point in the case and, say, well, this was a lobbying

13     effort.  We went to Washington.  Cooperation with a

14     representative.  This was part of our lobbying effort.  You

15     know that might be a decent argument if that were true.  This

16     was a document that's been widely-handed out.  It's in the

17     press.  The Associated Press has reported on it.  This document

18     wasn't just a lobbying effort.  This was a coordinated effort

19     by the Pain Care Forum, which Purdue created at the behest of a

20     lady, who we'll talk about at trial, who worked directly with

21     Purdue, who tried to shield industry so it looked like other

22     folks were behind stuff when it was really the manufacturers.

23          And trust me, when you say I talk about conjecture,

24     the document is clear about what happened.  Judge Hetherington

25     knows, he was in the deposition when we went over this.  They

1  all worked together and just like on that book, they're saying

2  I said something that's not true.  The American Pain

3  Foundation, this was Johnson & Johnson's go-to partner.  We'll

4  talk about how they funded them, how they all worked in

5  collaboration.

6         This document put out false information.  It had

7  statements that addiction rates weren't what they were, in

8  reality, the pseudoaddiction and other things that were false.

9  Who did it go to?  It didn't just go to members of Congress

10  that showed up.  It was handed out broadly and is in the public

11  domain.  So can we not talk about that at trial because it was,

12  in part, due to a lobbying effort?  I think not.  That's not

13  what the law says, nor is that what we're trying to do.  We're

14  not trying to say, you lobbied, therefore, you're liable.  I

15  don't even think we're trying to say, you know, you lobbied

16  dishonestly, therefore, you're liable.  That's not for us to

17  say.  What we're saying is, part and parcel of your overall

18  marketing attempts here were to lie and to deceive the public.

19  Everyone.  And there's plenty of evidence like that.

20         Now, going back to this influence map, I think this

21  is a very interesting thing for this case and not in the motion

22  of limine stage, but at the end of the trial, you're going to

23  have to decide whether conduct that they engaged in is

24  protected or not.  And that could be lobbying or other things.

25  For example, we all know it's going to be, I think, an argument

1 at some point in summary judgment tomorrow.  Is free speech

2 prohibited?  No.  But can I lie?  Mislead?  No.

3            So you're going to have to look at the end of this

4 case and go, here's what the law is.  There's a First Amendment

5 right.  I can do certain things under the First Amendment,

6 other things I can't.

7            Now, do the facts of this case rise to an exception

8 or a cause of liability under what is and isn't allowed?  It's

9 just that simple; and we'll get through all of that, through

10 the course of the trial.

11            Now, going back to my influence map.  I've raised an

12 issue earlier today and it will be part of this case.  A big

13 part of their case is that they're going to try this, to say

14 that the State failed, that our legislators failed and that we

15 should have stopped the crisis that they claim they had nothing

16 to do with.  Now, they can't do that.  That's not what the law

17 allows.  You can't say we failed to litigate because we're not

18 seeking damages.  But let's just say they were.  Is it really

19 okay to come into a state with a book like that one and say

20 that these drugs aren't really addictive, that pseudoaddiction

21 isn't real and all the other things that they said influenced

22 our legislators to make decisions, influenced our courts to

23 make decisions, influenced our boards to make decisions, go to

24 our DUR board and hammer them for years about their drugs, do

25 all the things that they did, then come in and say, State,

1   you're at fault.

2          Now we don't have a contributory negligence claim.

3   It's not allowed under the law in any way, shape or form.  But,

4   State, you're at fault and you should be responsible for your

5   own problem.  And by the way, the Judge can't see any evidence

6   about how we misled anybody.  We're just completely immune from

7   doing that.  That is not what the law says.  It's not what the

8   law allows.  So I think this is, quite frankly, an easy one.

9   I'm not in the robe and I don't have to make the decisions on

10  this, but I think it's an easy one to handle.

11          The law is what the law is.  There is protected

12  speech, there is not; there are protected rights, there are

13  not.  And we will put on evidence in this case, and you will

14  decide at the end that the evidence that we've shown fits

15  within the statutory constitutional legal framework, state law,

16  any federal law that overrides or places into that, and decide

17  whether we've met the requirements that we have to meet.  It's

18  that simple.  And I don't -- I don't mean to make light of the

19  fact that some of these issues are complex, but I think the way

20  to handle it is just as I've described.

21          THE COURT:  Now, do you all -- I don't know that I

22  informally invited the defendants to argue No. 3 regarding

23  advocacy groups, but I think I heard you --

24          MR. BECKWORTH:  That's fine.

25          THE COURT:  -- the defendant.  Okay.

```
1              MS. STRONG:  I do have an argument for that.

2              THE COURT:  I do want to hear you.

3              MS. STRONG:  So if I could just respond briefly.

4              Again, none of what he's talked about was allow --

5    the Court to allow the petitioning activity, the lobbying

6    activity itself to be admitted, Your Honor.  The case law is

7    extremely clear and I'm going to read some of it because it's

8    not -- the State's argument, that you cannot lie, that is not

9    reflected in the case law.  It is inconsistent with the case

10   law.

11             So look first to, 9th Circuit case, city -- Empress

12   versus City and County of San Francisco.  It's five -- 419

13   F.3rd 1052 2005.  It talks about the Supreme Court has

14   described the right to petition as among the most precious of

15   the liberties safeguarded by the Bill of Rights and intimately

16   connected, both in origin and in purpose, with other First

17   Amendment rights of free speech and free press.

18             Under the Noerr-Pennington doctrine, those who

19   petition all departments of the government for redress are

20   generally immune from liability.  It goes on to say:

21             In this case, the complaint here does not allege

22   that the defendant used government processes as opposed to the

23   outcome of those processes as a mechanism to injure the

24   Patel's, and that, therefore, the petitioning activity falls

25   under the sham exception for the Noerr-Pennington doctrine.  As
```

such, no matter what Shaw's motives were, his petitioning
activity as alleged is immunized under the Noerr-Pennington
doctrine.

And it goes on to cite several cases, pointing out
the illegal purposes and motivations behind petitioning do not
illegalize the petitioning conduct.

It's quite clear in the case law, Your Honor, that
even if the petitioning conduct is illegal, even -- even if
it's improper which there is no evidence of that here, but even
if it were true, what they all allege, it is protected and
people are immune from liability associated with that conduct
and so it cannot be introduced as it would provide a basis
arguably for liability. It cannot be protected activity and
cannot be introduced.

I want to point out one other quote, Your Honor,
from the *Kottle* case that I referenced earlier, which is,
146 F.3rd 1056. And it talks about the scope of the sham
exception. It says, the sham exception for intentional fraud
on a court cannot likely be taken to apply in a legislative
context because as the Supreme Court has observed, the
political arena has a higher tolerance for outright lies than
the judicial arena does.

So again, that case talks about the distinction
between adjudicated bodies and legislative bodies and talks
about how agencies can sometimes fall in one or the other. And

1    you've got to look at the process and decide if it's more like

2    a judicial body or more like a legislative body.  And unless

3    there's an ability to put on evidence, have an appellate right,

4    things of that nature, it ordinarily falls on the legislative

5    body.

6            And as a result, Your Honor, again, we would ask

7    that all petitioning and lobbying activity be excluded from

8    this case in light of these protections.

9            THE COURT:  Thank you, Ms. Strong.

10           MR. BECKWORTH:  May I?

11           THE COURT:  Yes.

12           MR. BECKWORTH:  Are they saying that they lied to

13   Congress and the State?  Is that the deal?

14           MS. STRONG:  I just said, Your Honor, we didn't.

15   There's absolutely no evidence of lying.  If you'd like to

16   interpret the argument that way, Brad, it is not what I said.

17   You're misinterpreting what I said.  I'm trying to explain to

18   you what the law is and I would ask the Court be properly

19   informed about the law.

20           MR. BECKWORTH:  The reason I asked that, Your Honor,

21   is if they -- I don't get it.  We'll put on evidence if they

22   did or didn't, I would think, and then you can hear the

23   evidence, and -- let, let me just say this.  If there's no

24   evidence they did anything wrong, then, of course, this would

25   be moot.  Right?  Because you wouldn't have to make a decision

1  about whether they had made wrongful conduct that would fit in

2  some exception or some type of rule.  So that would be gone.

3           If you do find evidence that they did something

4  wrong, I think you will then have to decide whether that

5  evidence is relevant or even something you can look at in

6  making your decision.  Let's say, for example, that we had ten

7  individual pieces of evidence, one of which was lobbying.  And

8  then we get down to it and you decide that we've carried our

9  burden of persuasion and production.

10          Do you look at No. 10 and say, that's the only

11  reason they're liable?  I don't think you would.  But you can

12  look at the law and decide whether you want to consider

13  something or not or whether you're able to consider something

14  or not.

15          I pulled one of the cases that Ms. Strong was

16  talking about, *California Motor* Transit.  I'm just reading the

17  quote, I can read -- can just read the whole case to you,

18  but...  it's on page 515:

19          United States Supreme Court First Amendment rights

20  may not be used as the means or the pretext for achieving

21  substantive evils which the legislature has the power to

22  control.

23          So that speaks for itself, to me.  I think we have

24  to look at what -- what we're dealing with here.  We're dealing

25  with the greatest manmade public health crisis in history.  We

1  allege they played a part in it.  They are going to allege that

2  the State of Oklahoma is at fault and they are going to say,

3  under oath, if they're consistent with what they said under --

4  previously, that they bear zero-point-zero percent

5  responsibility.  Well, that's something.  And then they're

6  going to say that even if we lied to the State, the Feds, or

7  anyone else to achieve the goal of making billions of dollars

8  and creating the worst nuisance in Oklahoma history, that we're

9  completely immune from lying to everyone.  Because First

10  Amendment protection are so absolute, that we can lie to the

11  decision-makers in the State of Oklahoma and then blame them

12  for believing our lies.

13          And the most remarkable thing that you just heard,

14  that I heard, that's why I asked the question that I did, is --

15  you know what, it's more okay to lie to a legislator than it is

16  to lie to a judge.  That's what we just heard.  Just -- you can

17  shake your head, that's what happened.  We all were here.  So I

18  think this is a strange argument to make at this stage of the

19  litigation.  I think the evidence will speak for itself.  I

20  also think you have to understand, Your Honor, the context of

21  the case.

22          One of the things that we'll show is, like, this

23  Pain Care Forum.  One of the reasons it existed is that, by

24  2001, Purdue, J&J, all of the main factors selling opioids

25  during that time, they knew a problem was brewing and was

1    getting really bad and they knew they had to push back, to lie

2    to make sure that more opioids were available.  They had

3    something they called barriers and they tried to say it was

4    barriers to access, but really what it was was barriers to make

5    money.  And I'll give you a great example:

6         The PPSG is the Pain and Policy Studies Group.  It's

7    a group out of Wisconsin.  Purdue funded them.  I think Johnson

8    & Johnson funded them.  I believe J&J did, but I don't have my

9    documents so I'm not going to qualify that one.  But they were

10   all on pain care -- you're shaking your head again -- they were

11   all on the Pain Care Forum together.  Let me give you an

12   example of how that works:

13        The PPSG would put out report cards on the efforts

14   of states and they rated Oklahoma as a C+ on opioid policy.

15   Now you would think that means that Oklahoma was too relaxed in

16   its laws and enforcement mechanisms about presenting opioid

17   abuse.  Not so.  The C+ myth that Oklahoma was too restrictive

18   compared to other states.  And so that document was

19   disseminated widely across the U.S. and into Oklahoma.  Well,

20   interestingly, what happened -- this is an example of Purdue's

21   and PPSG's -- PPSG then paid -- I'm sorry, Purdue paid for PPSG

22   to go out and get on radio shows and talk about Oklahoma and

23   others and how they needed to be more wide open in their

24   opioids.  Another example of that one:

25        PPSG, the three principals of it wrote an article

1  that was published in the Journal of American, the JAMA, in

2  that they went out and used the *Kottle* case.  You saw that last

3  week.  After that was published, Janssen, Purdue went out and

4  told their sales folks, told their media operatives,

5  respectively, to use that report in a way to tell the public,

6  tell doctors that there was not a problem of ER admissions tied

7  to overprescribing or increased prescribing of their drugs.

8          When I showed those internal documents to the guy at

9  PPSG that wrote the article, what he said was, I've never seen

10  this done before.  It's misleading and for them to use my work

11  in this way is deceptive.

12          So I don't think that whether you're petitioning the

13  State directly, like, appearing before the DUR Board or using

14  other people's work in a false and misleading manner through

15  your sales force, through your operatives, through the media is

16  protected speech.  It's not protected speech.  And I think

17  we'll show that at trial.  Thank you.

18          THE COURT:  Okay.

19          MS. STRONG:  And, Your Honor, I could not be more

20  clear.  There is no evidence of any misrepresentation stated to

21  anyone; the legislature, any administrative agency.  There's

22  nothing there.  What we're trying to do here is narrow the

23  case, Your Honor.  We know that they have made broad

24  allegations about lobbying.  It's unclear that -- what they're

25  going to try to introduce at trial, which is why I don't have

1  clarity.  But if they raise the issue of lobbying or

2  petitioning activity, I would ask that we pause or stop because

3  it ought not be introduced.  And it can be if they can

4  demonstrate that there's something that qualifies for a sham

5  exception because there's a tribunal, that's like a court, to

6  which they allege, and they have no good faith basis to state

7  that there was false information submitted, then maybe there

8  would be a basis to introduce that kind of evidence.

9          I don't believe any of that evidence exists on

10  either level, either from the falsity perception, Your Honor,

11  or from the nature of the tribunal would be at issue.  And I

12  want to just point out the case that he just quoted, the

13  *California Motor* case, I cited that in my original argument,

14  Your Honor, and I would note that in the case it expressly

15  says:

16          The allegations are not that conspirators sought to

17  influence public officials but that they sought to bar their

18  competitors from meaningful access to adjudicatory tribunal and

19  to usurp the decision-making process.

20          That's what I explained to you before.  That the

21  context of what he read was in the context of that case, where

22  it was not about legislative activity, petitioning activity

23  that is protected, Your Honor.

24          THE COURT:  I think we'll go ahead and hear

25  Ms. Fisher out on advocacy groups and then I'll rule.

1          MS. FISHER:  I will try to be brief on this, Your

2     Honor, because I know we've already heard the rebuttal on it.

3          So advocacy groups, like other companies, Johnson &

4     Johnson and Janssen, have participated in advocacy groups and

5     such association is not only proper but it is guaranteed by the

6     First Amendment.

7          Everybody today is suddenly proud to be a book

8     lawyer which is something that's ironic in this case because

9     we've been made fun of for being a book lawyer.  I was made fun

10    of for being a book lawyer, which is also ironic because I'm

11    not the strongest book lawyer, but I think that I would be

12    proud that I'm trying to talk to you about the First Amendment

13    today.

14         So the First Amendment:  Right of association is

15    guaranteed by the First Amendment.  So it's not only a book,

16    it's sort of the book we should be following in this case, Your

17    Honor.  So the right to association, an advocacy is for all

18    sorts of associations.  And the *Patterson* case which is at

19    59 -- excuse me, at 58 U.S Supreme Court states:

20         It is immaterial whether the belief sought to be

21    advanced by the association pertain to political, economic,

22    religious or cultural matters.

23         MR. MERKLEY:  May I interrupt?  Can I take that

24    down?

25         THE COURT:  Yes.

1           MS. FISHER:  I'm sorry.

2           So here, plaintiff hold Janssen and Johnson &

3   Johnson liable for statements made by these groups just because

4   of the association, and that's expressly what the First

5   Amendment forbids.  In order to show that Janssen and Johnson &

6   Johnson were liable for the statements, they must show that

7   Janssen or Johnson & Johnson specifically intended to further

8   the political statements or authorize the unlawful conduct

9   being challenged.  They can't do that in this case.

10          So there's case law here as well, Your Honor, I'm

11  going to briefly just show it to you, the, *In re Asbestos*

12  *School Litigation* case.  I will talk about that further in a

13  minute.  The joining organization, making contributions to them

14  and attending their meetings aren't the activity --

15  specifically, the activities that are protected by the First

16  Amendment.  The Patterson case says that any governmental

17  activity curtailing the freedom of association should get the

18  subject to the closest scrutiny.

19          And then there's another NAACP case, the Claiborne

20  Hardware case, it says, that you have to have the specific

21  intent to further the challenge or the illegal aim.

22          So without the specific intent, the First Amendment

23  bars the introduction of this evidence, Your Honor.  So

24  specifically the, *In re School* -- excuse me, *Asbestos School*

25  *Litigation* case, the defendants there, those were former

1   asbestos manufacturers who were members of an organization that

2   allegedly disseminated misleading information about the

3   dangerous of asbestos in schools, and the 3d Circuit held that

4   those defendants donate money, attending organ -- set meetings

5   of the organization provided no evidence that those defendants

6   specifically intended to further such wrongful conduct.

7           In plaintiff's papers, Your Honor, they attempt to

8   distinguish that case by stating that the harm the plaintiff

9   sought to hold the defendant liable for occurred before the

10  organization was formed.  But the 3d Circuit expressly

11  concluded that even if plaintiffs sought to recover from the

12  cause after the groups creation, and even if it is assumed for

13  the sake of argument that the record is sufficient to show that

14  some of the groups activities were unlawful and not entitled to

15  First Amendment protection, the defendants could still not be

16  held liable because membership contributions and meeting

17  attendance could not, as a matter of law, establish that the

18  defendant specifically intended to advance the unlawful

19  conduct, so there was no specific intent shown.

20          Plaintiff's papers also admit that joining the

21  organization, making donations is a protected activity, but it

22  seems to suggest that we should -- we should go ahead and admit

23  the evidence anyway.  If it's a protected activity where no

24  liability could attach to it, then it's not admissible

25  evidence.  It's not relevant to the case, Your Honor.  You've

1  already heard arguments about -- the misleading speech argument

2  where they cited case -- they cited cases on that.  We're not

3  making a misleading commercial speech argument.  So, here,

4  plaintiff does rely on the conduct of the organizations without

5  showing Janssen or Johnson & Johnson contributed to any

6  specific conduct.  It's protected by the First Amendments right

7  to associate.

8          What I heard Mr. Beckworth say earlier with that

9  document that was just taken down, the document he loves, this

10 one he loves, every document he just loves -- one of the

11 documents Mr. Beckworth loves.  But that one is that that was a

12 Purdue created organization, J&J's go-to partner and J&J funded

13 it.  J&J attended the meetings, but unless they can show

14 specific activities that J&J -- and specific intent, it's not

15 enough.  First Amendment protects that right to associate, Your

16 Honor.

17         Two organizations, you've already heard some about

18 them today, the AAPM and the APS.  Just again, donations and

19 attendance is not enough.  They have to show specific intent.

20 In the papers, they say they want to hold Johnson & Johnson

21 liable for the use of these groups.  You can't do that.  You

22 have to have a specific intent to further the statements.

23         We've learned about "Responsible Opioid

24 Prescribing."  They say, well, the author of that document was

25 a consultant to Johnson & Johnson and -- and so they can make

1  contributions to them and then there's an organization that

2  Johnson & Johnson contributed to that also funded the book.

3  Again, no proof that Johnson & Johnson intended to further any

4  statement in that book and without specific statements, it's

5  protected by the First Amendment.  So in summary, you must show

6  the specific intent to further the particular conduct,

7  otherwise, it's a violation of Johnson & Johnson's right to

8  associate.

9           We would ask you exclude the evidence.

10          THE COURT:  Thank you, Ms. Fisher.

11          MS. FISHER:  Thank you.

12          MR. BECKWORTH:  I think we can do this one pretty

13  quickly.  Kind of talk about some other -- Your Honor, that is

14  one of my favorite documents.  The fun thing about this case is

15  I have a lot more.

16          The whole concept here, again, is, we're not trying

17  to say that associating with someone else clearly leads to

18  liability.  If you have membership in the Pain Care Forum, you

19  can associate with trade groups if that's what they are.  You

20  can associate with other people, you're free to do that, if

21  that's what you're doing.  That's not what we're talking about

22  in the context of this case.

23          What Ms. Fisher just said in some of the cases she

24  quotes, said, we have to show that they intended to further the

25  specific statements they challenge and we have no evidence of

1   that.  Let me -- let, me give you just a very simple example of

2   how this works in context of this case.  Another favorite

3   document that I have yet to show.

4           The Pain Care Forum membership worked for a long

5   time to get something put into Obamacare that would require the

6   Institute of Medicine, the IOM, to put out a report on pain in

7   America.  Okay?  So let's just stop there for a second because

8   this goes back to the other issue as well.  Is it improper to

9   merely lobby to get a statute that requires a report to be

10  done?  I think, in and of itself, no, but here is why all of

11  this fits together and why I think you have to wait until the

12  end to see what is and what isn't a permissible method of

13  establishing liability.

14          Once that happened, the Institute of Medicine had an

15  advisory committee.  The majority of that committee --

16  Dr. Kolodny will talk about this, it's no surprise to anyone --

17  the majority of that committee had received funding from

18  different pharmaceutical companies.  They issue a report.  Now,

19  the report is not all bad, but there are things in there that

20  are false.  Like the number of people that have pain, and

21  America has chronic pain.

22          Now put that over on the side.  And IOM put out a

23  report that told Congress to -- should people that receive

24  funding from the opioid industry and pharmaceutical company be

25  involved?  Maybe not for me to say, but just troublesome.  So

1   put it in the bucket.  While that's going on, there's a lady

2   name Maya Christopher who is at the Center for Bioethics.  She

3   is a long-term old friend of the industry and a Pain Care Forum

4   member.  She decided that she's going to create something

5   called PAINS, P-A-I-N-S.

6           And what PAINS is, an amalgamation of different

7   members of the Pain Care Forum and she decides to put them

8   together.  And I think we've talked about this at one point in

9   a hearing with you or Judge Hetherington.  And in that effort,

10  she wrote kind of a mission statement or mandate; and what she

11  said before it ever came out is, we're going to take the IOM

12  report and we're going to use it to exert pressure and

13  influence on legislators and others to spread the message, to

14  get done what we want to get done, I'm paraphrasing there, but

15  it's "very troublesome" what's said.  Okay?  So you take that.

16  Now we've got the work of PAINS, an amalgamated group, a Pain

17  Care Forum users where you all are part of the receive funding

18  from one or more of the members of the Pain Care Forum.  Now

19  they have this PAINS document.

20          Then you go into, for example, J&J.  J&J's issue,

21  they've got advocacy documents, question their witnesses on it,

22  there's plenty of marketing documents on there.  And within

23  that, they talk about who are our go-to advocacy partners or

24  advocacy partners, and they even tier them one, two, who is

25  more important and who is less important on which issues.

1          Literally part of their marketing campaign for

2    Nucynta was to use PAINS and the IOM to then go out and tell

3    people, doctors, legislators, patients, the media, that the

4    real epidemic in America wasn't the opioid crisis, but that of

5    untreated pain, and that opioids ought to be used to treat that

6    pain.  Now, am I just saying this stuff?  We'll see at trial.

7    I bet you I have a document that will show you exactly what I

8    just said.  So why did I go and lay out that one example?

9    Because it shows why it's inappropriate at the motion in limine

10   stage.  What I think your burden will be, after I hopefully

11   have met mine, is to look at all the evidence, just like I laid

12   out but in the context of a trial, and determine whether any,

13   all, or none of what I just told you is something that

14   liability can attach to under whatever law is at issue; freedom

15   of association, freedom to petition, First Amendment.  Just

16   like the speech that defendants engage in, doesn't rise to the

17   level of non-protected commercial speech.

18          At the end of this year, you're going to be charged

19   with making findings and you'll have to determine whether, I

20   used the term res -- I went to law school so I want to use the

21   right words here.  But if you look at it all, you can decide

22   what is and is not something that liability can attach to.

23          So I took a little longer than you may have liked,

24   but that's just one example of how this all works in this case.

25   And you can't just say, oh, we cannot talk about, even talk

1   about the work we do with a group or lobbyist or anything else.

2   You have to talk about it to put it in context to know how it

3   works in the framework of the law.  Thank you.

4           THE COURT:  Thank you, Mr. Beckworth.

5           MS. FISHER:  Briefly, Your Honor, even assuming

6   everything Mr. Beckworth said is accurate and true and I assume

7   it is, it's still protected under the First Amendment.  He

8   didn't say anything other than what I told you is protected.

9   Thank you.

10          THE COURT:  In regards to Janssen's motion in limine

11  No. 2 and the motion in limine No. 3, I'm going to overrule

12  both of those.  I believe they're premature.  I am going to

13  allow for the State to introduce evidence of lobbying and

14  advocacy and certainly I invite the defendants to renew

15  objections.  I will give it the weight that it's due based on

16  the evidence.  There may not be any weight if I'm convinced of

17  the defendant's position after the evidence has been developed

18  further at trial.  Okay.

19          MS. FISHER:  Thank you, Your Honor.

20          MR. BARTLE:  Your Honor, you also denied Teva's

21  motion No. 10 as it relates --

22          THE COURT:  Yes.  Thank you for that clarification.

23  I was looking for my notes.  And yes, same ruling denying

24  Teva's motion No. 10.

25          Let's go to Teva's motion in limine No. 4.

1          MR. MERKLEY:  Thank you, Judge.

2          THE COURT:  Thank you.

3          MR. MERKLEY:  Unless I think I'm out of order, I

4     think our motion before relates to Purdue evidence.

5          THE COURT: Yes.

6          MR. MERKLEY:  It's a pretty simple argument there,

7     Your Honor.  Purdue is gone.  Purdue settled.  Purdue is out of

8     the case, but the State has made it very clear that it intends

9     to use evidence of Purdue's activity in an attempt to establish

10    liability on behalf of the remaining defendants.

11         I haven't kept an accurate count, but I'm almost

12    certain that Mr. Beckworth has said the word Purdue in all of

13    his evidentiary discussions and on all of these boards more

14    today than he has said the word Teva, who is a remaining

15    defendant.  One example was the Purdue and the EPS example he

16    just gave.

17         Judge, our position is pretty simple.  Purdue, at

18    this point, is no longer relevant to this case.  The test is

19    whether the remaining defendants, and it will be established at

20    trial, whether the remaining defendants created a public

21    nuisance.  It's not whether Purdue created a public nuisance.

22    The State argues that Purdue is still relevant because of some

23    alleged conspiracy, but conspiracy is not an element of public

24    nuisance.

25         In the case law, and this is pretty clear, as you've

```
 1    seen in pages 4 and 5 on our brief, Your Honor, the only
 2    evidence that provides legal relevance in this cause of action
 3    before the Court is relevant under the law.  Now the specific
 4    cause of action before the Court is public nuisance and the
 5    cause of action alleged against Teva, defendants, and J&J
 6    defendants, not Purdue.  Purdue is gone.  So that what's
 7    legally relevant to the Court.  What's relevant now is based on
 8    the facts, materials and the specific cause of action in the
 9    case.  (Indistinguishable).  Collateral facts are irrelevant
10    and should also be excluded.  That's in the evidence of Purdue.
11    Remote and collateral facts from which no fair or reasonable
12    inference can be drawn are to be excluded.  Again, evidence
13    related to Purdue's action cannot lead to any reasonable
14    presumption or inference involving the Teva and Actavis
15    defendants or even the J&J defendants in this case,
16    particularly that you can certainly not lead to any inference
17    that they committed some sort of unlawful act that would give
18    rise to liability under our public nuisance statute.
19    Conspiracy is not an issue and Purdue is no longer in this
20    case.
21            It would also be unfairly prejudicial to admit this
22    evidence, Your Honor.  Any small probative value the State can
23    argue about being able to tell it -- its story and don't
24    restrict us from telling our story about how all of this came
25    about, that's far outweighed by the potential for undue
```

```
 1  prejud -- potential prejudice.  You'll see from, and it's been
 2  clear from the evidence that what the State seeks to do is use
 3  e-mails between members of the Sackler family, internal Purdue
 4  sales-force training materials, Purdue marketing documents,
 5  Purdue e-mails to third-party public relations groups,
 6  marketing companies, all of these Purdue documents dating back
 7  to 1996 before Teva had any -- Teva had entered into the opioid
 8  pharmaceutical market.  Those documents relate solely to
 9  internal discussions and decisions by Purdue and cannot be used
10  or shown -- not be shown to have influenced the Teva entity.
11          And then building upon the inflammatory comments
12  earlier, that they could, therefore, utilize those documents in
13  an inflammatory manner in an attempt to show somehow Purdue's
14  actions were so inflammatory and because Teva talked to them,
15  they should be held liable as well.  And those statements
16  just -- just -- for purposes to inflame and detract from the
17  State's burden to show each individual remaining defendant is
18  liable for causing some sort of public nuisance.
19          I don't want to -- I know I've repeated this several
20  times but I don't want the Court to lose sight of the fact that
21  the bench trial does not change the fact, did not carry the
22  prejudice because the national TV audience could be watching it
23  and this is putting potential jurors in other cases -- and
24  potential jurors in other cases that will make a determination
25  on Purdue where Purdue is still present.
```

1          So we ask the Court to exclude all of the evidence

2     that's listed on page 7 and 8 of the motion.  That evidence

3     will not tend to prove or disprove any material fact at issue

4     involving the Teva or Actavis, defendants, and it would confuse

5     the record and unfairly prejudice the remaining defendants.

6     It, accordingly, should be excluded.

7               THE COURT:  Thank you, Mr. Merkley.

8               Mr. Beckworth?

9               MR. BECKWORTH:  Yes, Your Honor.  I will do this

10    pretty quickly.  I think you pretty much already ruled on this

11    in Teva's first motion in limine, general one, general in

12    limine one.  It talked about conduct of other defendants, I

13    thought, or other -- I don't know if you used the word

14    defendants or other.

15              MR. MERKLEY:  I think you referred to

16    co-conspirators.

17              MR. BECKWORTH:  Yes.  So you said that was allowed;

18    but the same argument I had there about admissibility, at

19    least, with respect to hearsay depositions and all of that

20    would -- we would readopt.

21              Going back to this comment that we talked about

22    Purdue more than Teva, not true.  We talked about Purdue and

23    Teva quite a bit.  But using, again, the Teva-Purdue

24    relationship, one of the things that Teva testified to was that

25    when you make a generic drug, you ride the wake of the work of

1    others.  Here, what we will show is that Teva, along with

2    everyone else, created the wave through its unranked marketing

3    and, therefore, made the way for generic drugs, as well as

4    their own drugs, like, Actiq, to be sold and more of it to be

5    sold.

6            But also that, with respect to Purdue, Teva went out

7    and tried to steal its patent, ultimately lost that on appeal

8    and because they wanted to keep selling OxyContin, a drug that

9    Purdue was marketing and an opioid that falls within what the

10   unbranded marketing was by Teva, they cut a deal with Purdue.

11           Purdue was selling it; Teva was paying royalties.

12   Purdue's sales reps were getting paid comp based on Teva drugs.

13   I can't imagine how that's not relevant.

14           Also in an indivisible injury case like this, we're

15   going to have to talk about the work that they all did in

16   collaboration and some of it with one another.  It's still an

17   indivisible injury.  I don't want to belabor the point.

18   There's a lot more evidence.

19           One the thing I had thought of through this whole

20   outside jury argument, you know, don't buy it but there's an

21   easy cure for it.  And if -- if any of these folks, some of

22   them probably will in a trial down the road, they can ask a

23   juror, did you see the Oklahoma trial or anything about it?  If

24   the answer is no, no problem; if the answer is yes, then they

25   have things, they can say things, like, were you influenced by

1    it?  Yes, I was.

2             Despite being influenced, will you follow the

3    instruction of a judge to only follow the law in this case and

4    render a verdict based on the law and facts in this case?

5             If they say no, I can't.  I'm pretty sure the Judge

6    is going to strike them.  So whatever may happen in a

7    hypothetical trial somewhere else, somewhere down the road, if

8    any of them come, they have plenty of remedies from it.  It can

9    be in the questionnaire.  Not our problem today.

10            Thank you, Your Honor.

11            THE COURT:  Thank you, Mr. Beckworth.

12            MR. OTTAWAY:  Do you want me to do No. 7 now, which

13   is the core to what we just heard?

14            THE COURT:  I think that would be a great idea,

15   Mr. Ottaway.

16            MR. OTTAWAY:  Your Honor, we --

17            MR. MERKLEY:  I just have three comments in

18   response.

19            THE COURT:  Yeah, and then we'll hear from

20   Mr. Ottaway.

21            MR. OTTAWAY:  It was a mediocre idea.

22            MR. MERKLEY:  Conspiracy is not an element of the

23   case.  Mr. Beckworth's comments about Teva creating a wave or

24   riding a wave -- if Mr. Beckworth has evidence he wants to show

25   the Court about Teva creating a wave or riding a wave or doing

1  whatever it is he's alleging Teva did, he can give you that

2  evidence.  That's why we're here today.  We're here to tell you

3  he needs to focus on what Teva did, what -- and did not do.

4  Not what Purdue did.  Evidence of what Purdue did to create

5  identity a wave or ride a wave is totally irrelevant.

6          THE COURT:  Thank you, Mr. Merkley.

7          Now Mr. Ottaway.

8          MR. OTTAWAY:  Thank you, Your Honor.  First, we

9  agree with Nick completely.  We also took it one step further.

10          As I told you, as we get closer to trial, the

11  details become more and more important, like, the allegations

12  are.  There's no question that the State has blamed Purdue for

13  the opioid crisis.  It's all over their petition, but it's also

14  been argued in hearings.  Purdue's fraudulent marketing scheme

15  created the opioid epidemic.  That's one of their briefs in

16  response to the filing.  Purdue let the lion out of the cage,

17  in an aggressive, concentrated and targeted way.  That was a

18  hearing on August 30th, just this last year.  But Purdue is no

19  longer a party.  It has settled out of this case and,

20  therefore, by force of logic, its liability cannot establish

21  liability on Johnson & Johnson.

22          Relevant evidence is that which tends to prove a

23  fact important in a case; and the issue here is Janssen and

24  J&J's conduct, not Purdue's conduct.  The evidence of Purdue's

25  conduct is irrelevant to proving whether Janssen committed an

1  unlawful act or performed an act required by 50 O.S. Section 1

2  (indistinguishable).  They say the evidence is relevant to the

3  opioid crisis but relevance and admissibility are two different

4  things.  The question in this case is not is Purdue liable?

5  The question in this case is:  Is Janssen at all liable?

6          Purdue evidence, they argue, may be admitted for

7  some other purpose.  That's why I filed this motion the way I

8  did.  If the Court rules for some reason that some evidence

9  about Purdue is going to come in, it should be clear that that

10  evidence cannot establish liability on Johnson & Johnson

11  because it has nothing to do with it.

12          THE COURT:  Thank you, Mr. Ottaway.

13          Mr. Beckworth, do you want to respond to that?

14          MR. BECKWORTH:  Yes, Your Honor.

15          I can do that pretty quickly, too.

16          Yes, we have to establish an independent liability.

17  But it's a joint and several liability case, so we have to

18  establish an indivisible injury.  We have to show that an

19  unreasonable interference with the public right occurred.

20  We'll be able to do that, I believe, with respect to the

21  defendants that remain in the case.  But you can't separate out

22  some of Purdue's conduct.  For example, J&J and Purdue worked

23  together with the drug called Ultram.  They worked together on

24  a Pain Care Forum, funneled the same advocacy groups.  It's

25  amazing and we'll talk about it here a little later.

1          Purdue had a company called Partners Against Pain

2    and J&J used almost the exact same language to refer to their

3    advocacy groups.  I questioned a witness about that.  There's

4    so much overlap.  It's like I've said many times, they were

5    competitors, but played in the same league and they had to play

6    on a field which they all did quite nicely.

7          On top of all of that, you have things like KOLs.

8    You will see at trial that we'll show, like Purdue, map of

9    KOLs.  And we'll get to show from that map who they used, who

10   they referred to, Teva, J&J, whatever it is.  There's so much

11   overlap and people.  Then you add to the fact that when you

12   have 395,000 calls upon doctors, essentially, you have to show

13   how it all worked because you wouldn't have Purdue, perhaps,

14   going in and then J&J going in and Cephalon coming in behind it

15   all on the same doctor, all trying to get market of the opioids

16   that they said were okay, to say now, here is our opioids.

17          I don't think it's possible to tell the story of

18   what each defendant did without telling part of the Purdue

19   story.  Mr. Ottaway is right.  We did say that Purdue caused

20   the opioids crisis here.  We also said his client did it and

21   Mr. Merkley's client did it too.  I would submit that Purdue

22   was smart.  They settled.  They capped their liability in this

23   case and they are no longer a contribution target for these two

24   defendants.  They chose to go to trial and prevail, which will

25   be up to you.  They can then go and seek contribution for one

1    another or anyone else they think they can prove liability to.

2    But the story of Purdue doesn't go away just because Purdue

3    paid what it could pay.  Thank you.

4              MR. OTTAWAY:  Your Honor, that's why I filed my

5    motion the way I did.  I think I didn't hear anything that

6    indicated they believed that Purdue's conduct for Johnson &

7    Johnson, so my motion should be sustained.

8              MR. BECKWORTH:  I disagree with that.

9              THE COURT:  As to the Teva motion No. 4 and Janssen

10   motion No. 7, I -- because I find that evidence is still

11   admissible and relevant, I am denying the motions.  Okay?

12             Let's take up Teva defendants motion in limine No.

13   5.

14             Mr. McCampbell, go ahead.

15             MR. MCCAMPBELL:  Thank you, Your Honor.  This motion

16   addresses the plaintiff's attempt to improperly use Cephalon's

17   previous federal conviction against Cephalon.

18             As the Court will recall, Cephalon pled guilty to an

19   off-labeled marketing charge, that, for ten months during 2001,

20   for a ten-month period, Cephalon was off-label marketing for

21   three drugs, one of which was Actiq, which is one at issue in

22   this case.  That evidence is inadmissible and reference to it

23   should be excluded.  There's two big points I would like to

24   make with the Court.

25             The first is that the plaintiff wants to use this as

1   character evidence, which is prohibited by Section 2404(b).

2           If I could approach the bench, Your Honor?

3           THE COURT:  Yes, you may.

4           MR. MCCAMPBELL:  2404(b) clearly provides that you

5   can't use evidence of a crime or -- or other wrong, to try to

6   prove that the defendant acted in conformity therewith on

7   another occasion.

8           And that's exactly what the plaintiffs want to do.

9   They have consistently talked about the fact that Cephalon has

10  this criminal conviction, therefore, they must be liable for

11  all of this.

12          You've heard that several times in here today.

13  Well, that kind of argument, that kind of inference is exactly

14  what 2404(b) is designed to prevent.

15          The other argument that plaintiffs make is, well,

16  this is substantive evidence of liability because of those

17  actions during those ten months in 2001.  And it's not.  And

18  the reason it's not is because off-label marketing is different

19  from the allegations in this case.  In this case, the

20  plaintiffs have said over and over and over that they believe

21  the defendants have been untruthful with respect to the risks

22  of opioids and that they've been untruthful in overstating the

23  benefits of opioids.

24          Off-label marketing is different.  There is no

25  requirement of showing any untruthful conduct in an off-label

1  marketing case and there was no finding of untruthful conduct

2  by Cephalon in the -- in that off-label marketing case.  So

3  off-label marketing, very specific animal.

4          The FDA, as the Courts heard over and over, the FDA

5  makes those labels, has all the details, including the

6  indicated-uses for that drug.  And the manufacture can only

7  promote the drug for those uses that have been approved by the

8  FDA.

9          Now, there are other uses.  I had a case -- had a

10  case a few years ago.  It was a liver transplant drug to

11  anti-rejection drug.  Doctors would also use it for lung

12  transplants because there wasn't an approved drug for lung

13  transplants.  If the doctor chooses to use the drug, that's

14  legal.  The company, however, can't promote it for that

15  off-label use.  And so what happened is the allegation is the

16  sales reps go out and say, look, here is the study that says

17  this works really well for lung transplants.

18          Well, even though that's a true statement, and even

19  though that's what the study says, it hasn't been through the

20  FDA procedure.  It hasn't been approved for that other use.

21  That's off-label marketing.  And the point of all of this is

22  that's different from deceptive conduct.  There is no

23  requirement for deceptive conduct in off-label marketing and

24  there was no finding that Cephalon committed any unlawful

25  conduct.

1            The difference between the two things, off-label

2    marketing on the one hand, and the allegations of this lawsuit

3    were discussed by the plaintiffs in one of their briefs.  And

4    it happened like this.

5            You'll recall one of the motions we filed was a

6    motion for summary judgment, because part of this off-label

7    marketing settlement -- there was a guilty plea in federal

8    court, there was also a nationwide settlement, Oklahoma settled

9    this with Cephalon.  We had a settlement agreement including a

10   release.  And that was the motion we teed up for the court.

11   The State briefed in opposition and it ended up going away,

12   because when the State dismissed the False Claims Act claims,

13   that released -- then that went away and so the Court didn't

14   have to decide it.

15           However, we discussed it in the course of that and

16   the State discussed it in the course of that.  If I can

17   approach, Your Honor?

18           THE COURT:  Yes.

19           MR. MCCAMPBELL:  And I'm giving the Court a copy of

20   the State's brief in opposition filed on March 18th.  I will

21   tell the Court this brief was filed under seal.  The parts I

22   wanted to discuss are not confidential and we can discuss it

23   without having to take any particular actions.  And the only

24   thing I really want to get out of this, Your Honor, if you turn

25   to page 3.

1           THE COURT:  Three?

2           MR. MCCAMPBELL:  Page 3, Your Honor.  And I've

3  underlined the portion there where the State's explaining to

4  the Court that this off-label marketing settlement doesn't

5  apply to this lawsuit.

6           They say, look, this settlement was only for this

7  narrow claim of off-label promotion and, therefore, they argue

8  the only claims released were off-label promotion.

9           You go to the next paragraph there, the settlement

10  did not cover Cephalon's conduct in what -- in overstating the

11  benefits and understating the risks of opioids, nor did the

12  settlement agreement cover Cephalon's conduct in working with

13  other defendants, and alleged third parties to carry out the

14  scheme.  So the only point I want to make is they're

15  recognizing the same distinction I'm arguing with the Court

16  today.  Off-label marketing is different from the State's

17  allegation that we overstated the benefits and understated the

18  risks of opioids.

19           For that reason, it is not proof of any liability.

20  It is highly prejudicial and unfairly prejudicial and the

21  State's -- the State has shown over and over again what they

22  want to use it for is to try to convince this Court that

23  because Cephalon pled guilty to this off-label marketing claim,

24  they must be guilty of this conduct all the time.  That's

25  exactly what 2404 is designed to prevent.

 1              I would ask the Court to exclude that evidence.

 2    Thank you.

 3              THE COURT:  Thank you, Mr. McCampbell.

 4              Mr. Burrage.

 5              MR. BURRAGE:  Thank you, Your Honor.  We've briefed

 6    this so I'll be brief.  The allegation is a campaign of false

 7    and misleading and deceptive marketing.  2404(b) does not apply

 8    in this case.

 9              In other words, we're using the guilty plea to prove

10    liability.  We're not talking about the character to other

11    crimes, so to speak.  It's to prove liability and so that

12    exception doesn't apply.

13              But even if you said it did apply, the exceptions

14    that we pointed out in the brief, promoting plans and so forth,

15    it would fall within that exception.  But it also goes to rebut

16    testimony that has been given in this case.  We set out on

17    page 9 of our brief about the reps saying that, you know, there

18    were -- didn't have any off-label representations made and

19    that's called Williams and Sarah Dunn, and it shows that that

20    testimony that was given is not true.

21              And it also shows that the marketing plans that

22    we're talking about in this case, that were covered by the plea

23    agreement ranked the agreement that went through.  I think,

24    2013, it talks about the plan and all the marketing plans for

25    this drug, and it says that they were used in Oklahoma.

1          And that -- there's two excerpts from the deposition

2    testimony showing that those plans were used in Oklahoma.  And

3    when you look at the plea agreement, it specifically says at

4    pages -- paragraphs, 12 through 18 that it's dealing with the

5    company's off-label marketing.  That's what we pled in our

6    petition.

7          So that's why the guilty plea is relevant in this

8    case and it was not released in the release and we've been

9    through that.  That was a False Claims Act case, and it only

10   released the False Claims Act allegations.  It didn't release

11   the off-label marketing and those other claims that we have set

12   forth.  Thank you.

13          THE COURT:  Thank you, Mr. Burrage.

14          Mr. McCampbell?

15          MR. MCCAMPBELL:  Mr. Burrage began his presentation

16   by telling the Court this was a case concerning a campaign of

17   false, misleading and deceptive marketing.  That's what this

18   case is about, also all of those things are different from

19   off-label marketing.

20          Thank you, Your Honor.

21          MR. DUCK:  Judge, may I address that?  There's one

22   point that there's a new answer here.

23          THE COURT:  Sure.

24          MR. DUCK:  And the point is, the fact that Cephalon

25   was off-label marketing a fentanyl product for use in noncancer

1    pain, the only indication it was proved that it was safe and

2    effective for by its very nature, means that Cephalon was

3    claiming it was safer and more effective than it actually was.

4              And upon the settlement that Cephalon entered into

5    with the Department of Justice, the press release was issued.

6    I would like to read that press release into the record.

7              The first page of last paragraph of that press

8    release states:

9              The FDA approved that the fentanyl product

10   manufactured as a lollipop for use-only in opioid chronic

11   cancer patients.  Meaning those patients for whom

12   morphine-based painkillers is no longer effective.  The drug is

13   a strong, highly-addictive narcotic with significant potential

14   for abuse.

15             From 2001 through at least 2006, Cephalon was

16   allegedly promoting the drug to noncancer patients to use for

17   such conditions such as; migraine; sickle-cell pain crises;

18   injuries and anticipation of changing wound dressings for

19   radiation therapy.  Cephalon also promoted actively the use to

20   patients who were not opioid tolerant and for whom it could

21   have life-threatening results.  Thank you, Judge.

22             THE COURT:  Mr. McCampbell?

23             MR. MCCAMPBELL:  None of that is inconsistent with

24   my argument.  That happened.  I know the State wants to poke at

25   us for having a conviction, but it was not for deceptive

 1  conduct and it's not properly part of this trial.  Thank you.

 2          THE COURT:  Okay.  As to No. 5, I'm going to grant

 3  the motion in limine.

 4          Let's move to Janssen's No. 4.

 5          MR. OTTAWAY:  Thank you, Your Honor.  Your Honor,

 6  can I get clarification on that?  Is the ruling that we can't

 7  refer to the fact that they pled to it?  We can talk about the

 8  conduct in the course of the trial?

 9          THE COURT:  Well, let's look at the specific request

10  here.  They've asked that any reference to the plea --

11          MR. BECKWORTH:  To plea.

12          THE COURT:  -- be excluded.

13          MR. BECKWORTH:  Thank you.

14          MR. MCCAMPBELL:  I'm sorry, Your Honor, our request

15  was to preclude the State from referring to or, otherwise,

16  offering information or evidence in any form regarding the

17  alleged criminal conduct or prior acts, including, but not

18  limited to.  So it -- if we exclude the plea, then the

19  underlying conduct is also irrelevant.

20          MR. BECKWORTH:  Your Honor, that's not right.  They

21  engaged in a massive campaign to replace dying cancer patients

22  with chronic pain patients and the conduct that is at issue is

23  a major part of this case.  The issue of, we're fine if we

24  don't get to refer to them as a criminal.  I mean that's public

25  domain.  Everybody knows.  But the conduct at issue is a major

1  part of this case.

2          THE COURT:  My ruling is based upon 12 O.S. 2404,

3  which is the statute we often see in criminal cases and it

4  certainly applies to the fact that Cephalon pled guilty to the

5  misdemeanor.

6          As far as the underlying facts, I am not going to

7  make my ruling that broad so you'll probably have to re-urge

8  that.  The defendants will have to re-urge it if they think the

9  State is intruding on that.

10          MR. BECKWORTH:  Thank you, Your Honor.

11          MR. MCCAMPBELL:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. OTTAWAY:  Thank you, Your Honor.  I think this

14  will take us through 2:00, Your Honor.  I know Brad wants to

15  get on the way and that's fine with us.

16          MR. BECKWORTH:  Your Honor, we shouldn't stop the

17  hearing because of me.  If you want to keep going, I'll deal

18  with what I can deal with.

19          THE COURT:  I think it probably would be a good idea

20  just to stop.  Tomorrow is -- we've got significant things.  On

21  the back end tomorrow, if we have room, time, we can do the

22  rest or we can bump them to next week.

23          Is there any objection to that?  Let me know if

24  there is.

25          MR. MCCAMPBELL:  No objection.

 1            THE COURT:  Let's go ahead with this one.  We

 2  wouldn't want to deprive you.

 3            MR. OTTAWAY:  Judge, this is Janssen's motion in

 4  limine No. 4, to exclude evidence regarding the Noramco,

 5  Tasmanian Alkaloids.  I know you've heard those names before,

 6  but we'll go through the same kind of things as the reason

 7  we're arguing this.  I don't have to repeat it.  Your Honor's

 8  hearing these motions so the arguments, you shouldn't -- I

 9  think I've already gone on.

10            As a little background, Noramco, which is a

11  subsidiary of Janssen -- was a subsidiary of Janssen in 1979 to

12  2016, a manufacturer's active pharmaceutical agreement which

13  you've heard through -- to as APIs for opioid prescription

14  medicines.  Tasmanian Alkaloids, J&J's subsidiary from 1982 to

15  2016 produced the raw materials and poppy straw used to make

16  the active pharmaceutical ingredients of themselves.  Both did.

17  So under the auspices of the Drug Enforcement Administration

18  they were only able to sell to the customers in the U.S.

19  authorized by the Food & Drug Administration and the DEA.

20            Oklahoma does not impose liability on component part

21  manufacturers.  This is a subject which you've heard before and

22  you heard a little bit of reference to it earlier today.

23            The Tasmanian Alkaloids contribution to most of what

24  they talk about on the other side of the room here, is growing

25  a poppy which had higher fee gain than regular poppies.  And

1  I'm not an expert on anything that I (indistinguishable) and so

2  will you at the end of this case, but it is a product which is

3  then integrated into the final product which is opioid

4  medications.  It's a perfectly lawful activity done under the

5  auspices of the government, the amount imported is controlled

6  through the DEA.

7        But Oklahoma does not impose liability under

8  proponent drug manufacturer, which is what (indistinguishable)

9  and what Noramco makes out of that fee gain.  There's no

10  question in this case that the DEA establishes quotas for the

11  importation of active pharmaceutical ingredients.

12        We've cited the statute that does that and those

13  quotas are annual and control the purchase or importation of

14  any APIs or opiate medications into the United States.  Federal

15  law authorized Noramco, Tasmanian Alkaloids and all the people

16  they sold to to obtain active farm ingredients.  It is

17  important to note that neither Noramco or Tasmanian Alkaloids

18  has been charged by the State here and would, in fact, market

19  these products to doctors in Oklahoma.  They don't engage in

20  marketing at all.

21        The State and federal law block liability for

22  federally authorized conduct, and I put some quotes there and

23  where they come from.  This is an argument that you have heard

24  before indirectly, but now I'm going to frame it more directly.

25  If the allegation in this case is that liability can be imposed

1   upon Janssen by reason of the lawful and regulated conduct of

2   Tasmanian Alkaloids and growing poppies, because where else are

3   you going to get this stuff, for Noramco, by turning it into an

4   active pharmaceutical ingredient and selling it to groups

5   authorized by the Food & Drug Administration, then you have run

6   directly afoul of this preemption for federally authorized

7   conduct.

8          Therefore, this evidence is irrelevant as to

9   liability.  There's no claim in this case that these companies

10  did anything that influenced doctors in Oklahoma or anywhere

11  else and it should be excluded under the same statute you just

12  cited.

13         The plaintiffs may argue that, well, this goes to

14  motive because Noramco made money, Tasmanian Alkaloids made

15  money.  These are independent subsidiaries.  There is no

16  piercing of the corporate veil in this case.  There is zero

17  evidence that Noramco had any involvement in or control over

18  how Janssen promoted its drugs or much less how Teva, Cephalon

19  or Purdue promoted or detailed theirs.  And letting the State

20  try to introduce this mode of entry is a complete waste of

21  time, because it doesn't have anything to do with the ultimate

22  decision you're going to have to make, which is, did Janssen

23  cause the opioid crisis by overpromoting and underselling both

24  the benefits and risks of its opioids medications?

25         As a result, the Court should take this issue out of

1    the case and grant the defendant's motion in limine No. 4.

2              THE COURT:  Thank you, Mr. Ottaway.

3              Mr. Beckworth?

4              MR. BECKWORTH:  Yes, Your Honor, that last point

5    about it being a tiny part, number one -- one of the

6    interesting things about J&J and Janssen is that they're a pain

7    and pharmaceutical franchise.

8              MR. OTTAWAY:  I didn't use tiny part.  I said tiny

9    portion.

10             MR. BECKWORTH:  I said tiny part and you used tiny

11   portion.  I'm sorry I used the wrong word.  That the

12   pharmaceutical side of J&J is a really big part of this

13   business.  I don't think I need to belabor -- I don't intend to

14   belabor this one because we argued it quite extensively with

15   Dr. Kolodny about the relevant testimony of Noramco.  If you

16   need a lot of argument, I will -- I will just say this.  We've

17   got -- a lot of this case is about unbranded marketing.  The

18   idea that you haven't made opioids more available, more

19   desired, more okay to get more prescriptions is a huge part of

20   this case and J&J had every reason to do it in its pain

21   franchise.

22             And the pain franchise, it's very important.  You'll

23   hear that word during trial, the pain franchise includes

24   Noramco.  When Noramco talks about itself, it's part of the

25   pain franchise.  Noramco supplied J&J as part of its products

1    for J&J's own drugs, as well as those drugs for third parties

2    like Purdue.

3              You've seen this document before.  This is one

4    that -- if I may approach?

5              THE COURT:  Yes.

6              MR. BECKWORTH:  -- Judge Hetherington said was

7    public now.  This is J&J's Noramco talking about itself.  And

8    one of the things they say is that their high fee based poppies

9    was transformational in the growth of Oxycodone.  Now Oxycodone

10   is a base product of API, active pharmaceutical agreement and

11   OxyContin, which was sold by Purdue and also by Teva, through

12   generic versions.

13             May I approach again, Your Honor?

14             THE COURT:  Yes.

15             MR. BECKWORTH:  This goes back to the whole kind

16   of -- why do we talk about Purdue.  I won't say this is one of

17   my favorite --

18             MS. FISHER:  Everyone is your favorite.  Just like

19   your children, you love them equally.

20             MR. BECKWORTH:  Oxycodone consumption, why does it

21   matter?  So this isn't about death.  We'll get to that.  It's

22   not about ER visits and all of the problems.  It's about

23   consumption, it's about motive.  With unbranded marketing and

24   branded marketing, the desire, the need, the appetite for these

25   drugs skyrocketed.  With that, when you create a need, you get

1   to do something... supply that need.  And here we see that

2   consumption of Oxycodone goes up.  We know that one of the main

3   API suppliers of Oxycodone was Noramco.

4           So clearly, that evidence is relevant to this case.

5   It's relevant to why they did what they did, it's relevant to

6   how they helped this crisis occur.  We'll have some evidence

7   and you'll see that Purdue, we'll talk about how the greatest

8   barrier to produce expansion was the ability to get product.

9   You'll see the other side of that with Noramco saying, we're

10  going to supply you that product.

11          Throughout the course of all of this, while Purdue

12  is engaging in improper conduct, J&J is right there alongside

13  them, doing the same kind of thing on its direct-sale side,

14  doing the same kind of thing on the unbranded marketing and

15  supplying it's partner at the table with the product to supply

16  this consumption demand.  I can't see how it wouldn't be

17  relevant.  Thank you.

18          THE COURT:  Thank you, Mr. Beckworth.

19          Mr. Ottaway?

20          MR. OTTAWAY:  Thank you, Your Honor.  We're arguing

21  the same point here.

22          The State's case is that Janssen oversold the

23  benefits and undersold the risk of its opioid products.

24  Noramco and Tasmanian Alkaloids didn't do any of that.  They

25  did supply the active pharmaceutical ingredient from which all

1  opioids can be made and that cannot be a basis of liability

2  here.  That's not what the State claims that Janssen and

3  Johnson & Johnson did wrong.  It's not what the State has

4  alleged throughout this entire case.

5       All we did with these two companies is engage in

6  completely lawful conduct under the control of two federal

7  agencies that has nothing to do with the allegations in this

8  courtroom and that evidence should be excluded, it's irrelevant

9  to the State's case.

10      If Janssen did something wrong in marketing these

11 drugs, that's Janssen's liability, but it can't be based on the

12 fact that Noramco and Tasmanian Alkaloids provided the active

13 pharmaceutical ingredient for it.

14      THE COURT:  The previous rulings by Judge

15 Hetherington, myself, both recognize that a connection of

16 Noramco, Tasmanian Alkaloids to Janssen or Johnson & Johnson, I

17 believe that they are relevant and they survived the

18 defendant's challenge and, therefore, I'm going to deny the

19 motion in limine No. 4 in this matter.

20      As I stated before, I think we ought to stop there

21 today.  I show the remaining Janssen motions 5, 6, 8, 9, 10,

22 11, 12, 13, 14 and Teva 6, 7, 8 and 9.

23      Is that -- are we all on the same page?

24      MR. WHITTEN:  Can you say Janssen again?

25      THE COURT:  The ones that remain are 5 and 6, 8, 9,

1  10, 11, 12, 13 and 14.  Although, I think --

2           MS. FISHER:  You did 12.

3           THE COURT:  -- 12.  We did 12 already.  So I'll mark

4  that off.

5           MR. WHITTEN:  Thank you.

6           THE COURT:  As far as tomorrow goes --

7           MR. MCCAMPBELL:  And Teva 6, 7, 8 and 9 are what I

8  have are still outstanding, Your Honor.

9           THE COURT:  6, 7, 8, and 9, yes.

10          MR. MCCAMPBELL:  Yes, sir.

11          THE COURT:  As far as tomorrow goes, I'll be

12  prepared to listen to arguments on the motions for summary

13  judgment.  I shouldn't say this, but I'm not going to limit you

14  to 20 minutes.  I might regret saying that.  We will begin at

15  8:15.  I know that's tough for you all coming from the City.

16  You know, if something happens where you can't control that,

17  I'm not going to be upset.

18          The sheriff's been kind enough to let you up here

19  early.  If you do get here, I'm not asking, if someone really

20  wants to get here before 8:00, I think they'll be prepared to

21  open the doors for you as early as a quarter till.

22          Again, don't take that as me telling you to do that,

23  but just let them know you're here for the hearing.  I think

24  that's mostly the west door.  So if you're going to get here

25  early, I would plan on using the west door which is the door

1  that is across from the railroad train.

2          We will break.  I need to leave promptly at 12:45.

3  I need to get to Yukon by 1:45 and we'll come back and resume

4  at 3:00.  Judge Hetherington is prepared to be here.  I can't

5  remember what he said, but you all know.

6          MR. WHITTEN:  What are we arguing on the 14th?  I

7  was unclear.

8          THE COURT:  That's the half day.

9          MR. MERKLEY:  I think it's definitely the remaining

10 motions in limine that we won't get to tomorrow.

11         THE COURT:  Definitely the remaining motions in

12 limine.

13         MS. FISHER:  What time on the 14th?

14         THE COURT:  The morning from 9:00 to 12:00.

15 Probably more like 9:00 to 11:00, if we can do it that much.  I

16 have to be somewhere.

17         All right, anything else?

18         MS. FISHER:  Thank you.

19         MR. MERKLEY:  Thank you.

20         THE COURT:  Thank you very much.

21     (End of proceedings.)

22                        *********

23

24

25

1                                   CERTIFICATE

2

3   STATE OF OKLAHOMA          )
    COUNTY OF CLEVELAND        )

4

5      I, Tanya Burcham, a Registered Professional Reporter within

6   and for the State of Oklahoma, do hereby certify that I was

7   present at the proceedings had May 9, 2019; that I recorded in

8   stenotype notes all of said proceedings, that I thereafter

9   transcribed my notes so taken and reduced same to typewritten

10  form, and that the foregoing Transcript of Proceeding is full,

11  true, correct and complete, to the best of my skill and

12  ability.

13     I further certify that I am not an attorney for nor relative

14  of any of said parties or otherwise interested in the outcome

15  or event of said action.

16     **IN WITNESS WHEREOF**, I have hereunto set my hand and affixed

17  my official seal this 11th day of May, 2019.

18

19                              _____

20                              Tanya Burcham, CSR, RPR

21

22

23

24

25

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT