# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-OP-45090<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 17-OP-45004 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

## TEVA AND ACTAVIS GENERIC DEFENDANTS' TRIAL BRIEF

To date, Plaintiffs have failed to identify how they intend to present their case at trial. Although the Court has limited Plaintiffs to 100 hours to present their case (Dkt. No. 2133), Plaintiffs originally designated over 200 witnesses to testify live at trial—and that list was only just reduced to 150 witnesses last night (September 24, 2019), despite an order from Special Master Cohen to reduce the list to 75 witnesses. Plaintiffs also designated nearly 100 hours of video deposition testimony. And they have provided Defendants with an unworkable exhibit list containing over 100,000 exhibits. As a result of this gamesmanship, the Teva and Actavis Generic Defendants have been prejudiced in their ability to prepare their trial defense.[1] Nonetheless, despite Plaintiffs' failure to meaningfully narrow their case to a reasonable and manageable number of witnesses, exhibits, defendants, and issues, the Teva and Actavis Generic Defendants provide the following trial brief explaining the key legal and factual arguments that they expect to present at trial.

## INTRODUCTION

Millions of citizens suffer annually from chronic pain, including break-through pain. Plaintiffs and their experts do not dispute that opioid medicines are an essential tool in helping patients alleviate that suffering. While each prescribing decision is highly individualized, opioids help alleviate pain when used as directed by patients who are appropriately screened and monitored by their prescribing doctors. Opioids can reduce health costs, too, such as by ensuring that patients

---

[1]  The "Teva Defendants" include Teva Pharmaceuticals USA, Inc., Cephalon, Inc., and Teva Pharmaceutical Industries Ltd. ("Teva Ltd."). "Actavis Generic Defendants" include: Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida. Teva Ltd. is an Israeli company that is not subject to personal jurisdiction for the reasons stated in its motion to dismiss for lack of personal jurisdiction. It is specially appearing to join this submission; thus, it does not waive and continues to contest personal jurisdiction and to preserve its pending personal jurisdiction challenge.

suffering from pain can return to work and do not have to be hospitalized.  This is particularly true with the use of short-acting opioids to treat break-through pain.  Because they come with risks, which have long been known to the medical community, opioids only can be prescribed by a licensed physician.  The FDA has approved each of the opioid medicines manufactured by the Teva and Actavis Generic Defendants as legal, safe, and effective for their intended use.  Each opioid medicine comes with a label that warns of the risks of that medicine, including the risk of addiction and abuse. Under Ohio law, each physician is obligated to be aware of these risks.

The Teva and Actavis Generic Defendants consist of 14 separate and distinct corporate entities.  None of the Teva or Actavis Generic Defendants approve, prescribe, or dispense opioids. The Actavis Generic Defendants do not market the safety or efficacy of the generic medicines they sell, and none of the companies have marketed any opioid medicines for long-term chronic pain. They have, at all times, manufactured and sold opioid medicines in accordance with quotas established by the Drug Enforcement Administration ("DEA").  Plaintiffs cannot present any evidence of a single Ohio (or other) doctor who was misled by any statement made by the Teva or Actavis Generic Defendants.  No patient will testify that he or she was harmed, became addicted, or overdosed as a result of any improper conduct on the part of the Teva or Actavis Generic Defendants.  And no County official will testify that either Plaintiff experienced any harm as a result of any specific prescription opioid manufactured by the Teva or Actavis Generic Defendants.

Nonetheless, Plaintiffs Summit County and Cuyahoga County (the "Counties") seek to force the Teva and Actavis Generic Defendants to pay billions of dollars to Plaintiffs for the tragic abuse of prescription and illicit opioids in the Counties, which Plaintiffs themselves admit has been the result of a myriad of factors unrelated to the conduct of the Teva or Actavis Generic Defendants.  The Counties' claims for violations of RICO and OCPA, public nuisance, and civil

2

conspiracy are based on two flawed theories of liability—that Defendants: (1) falsely promoted opioids to physicians; and (2) failed to prevent the illegal diversion of opioids by criminal third-parties by failing to identify, report and stop the shipment of "suspicious orders." The Counties have chosen *to plead* these claims by simply lumping together *all* manufacturers; however, this will not suffice at trial. The relevant and reliable evidence makes clear that there is *no* basis for liability on any claim as to any Teva or Actavis Generic Defendant.

I.  **PLAINTIFFS HAVE RECOGNIZED THAT TEVA LTD. HAS NOT ENGAGED IN ANY CONDUCT IN OHIO.**

As this Court has recognized, Plaintiffs have not alleged or adduced evidence of any "independent contacts [by Teva Ltd.] with the State of Ohio," or of any wrongful conduct by Teva Ltd. Dkt. No. 2131, at 6. Nor have Plaintiffs asserted a legal theory by which Teva Ltd. could be held responsible on the merits for Plaintiffs' claims. In fact, the Court still has not found that personal jurisdiction exists as to Teva Ltd.—a determination that would still have to take place after trial, even if there is some finding of liability as to one of Teva Ltd.'s subsidiaries. *Id.* Thus, there will be no basis to hold Teva Ltd. liable at any trial.

II. **THE EVIDENCE WILL SHOW THAT THE TEVA AND THE ACTAVIS GENERIC DEFENDANTS DID NOT ENGAGE IN ANY FALSE PROMOTION OF OPIOID MEDICINES THAT CAUSED THE COUNTIES HARM.**

Not all manufacturers—just as not all opioids—are the same. Teva Ltd. has not marketed, promoted, sold, or distributed opioid medicines in the United States. The Actavis Generic Defendants sold generic opioid medicines, but did not market their safety or efficacy. Cephalon and Teva USA sold unique branded opioid medicines, but never marketed them falsely or for chronic pain. As a result, the testimony will establish that none these companies caused the opioid abuse problem which has developed over many years in the Counties.

### A. The Testimony Will Show That The Actavis Generic Defendants Engaged In No Promotion, Much Less Any False Promotion, And Plaintiffs Offer No <u>Causation Model As To Them</u>.

The Actavis Generic Defendants sold generic medicines. Generic manufacturers compete on price and, given drug substitution laws (which allow pharmacists to substitute generic medicines for brand medicines at the pharmacy level), they do not promote opioids or any other generic medicines to physicians.[2] Consistent with their business model, the testimony to be adduced at trial, including testimony from Plaintiffs' own experts, will confirm that these entities did not promote the safety or efficacy of their opioid medications. The testimony will establish that: the Actavis Generic Defendants have sold only generic opioid medicines;[3] have never promoted the safety, efficacy, or therapeutic value of these medicines;[4] and have never used continuing medical education ("CME"), speaker programs, or third parties to promote these medicines.[5] There was no false promotion.

Moreover, Plaintiffs' lone causation expert, Dr. Rosenthal, has confirmed that Plaintiffs have no causation theory as to generic manufacturers like the Actavis Generic Defendants. Dr. Rosenthal will be forced to testify at trial that her causation modeling is based upon "detailing [by sales representatives] as the measure of marketing." Dkt. No. 1913-5, at 167:3–7; *see also* Pls.' Opp. to Rosenthal Daubert, Dkt. No. 2176, at 11 (Rosenthal's "model is intended to, and does, capture the average effect of all detailing.") She will further have to admit that her causation

---

[2] Dkt. No. 1860, at 3–7
[3] Dkt. No. 1860-8, Ex. 4 (Myers Declaration), at ¶ 4.
[4] *See* Dkt. No. 1860-9, Ex. 5 (Deposition of Douglas Boothe, former Executive VP and CEO of an Actavis Generic Defendant), at 146:21–147:10; Dkt. No. 1860-10, Ex. 6 (Deposition of Michael Perfetto, former VP of Sales and Marketing of an Actavis Generic Defendant), at 315:11–21; Dkt. No. 1860-11, Ex. 7 (Myers Deposition), at 83:6–11; Dkt. No. 1860-12, Ex. 8 (Deposition of Jinping McCormick, former Marketing Manager of an Actavis Generic Defendant), 20:10–13, 112:20–114:24, 258:3–15.
[5] Dkt. No. 1860-13, Ex. 9 (Boyer Deposition), at 22:21–24, 125:9–129:21; Dkt. No. 1860-8, Ex. 4, at ¶ 4 (Myers Declaration).

modeling rests upon the assumption that all "detailing" is false. Dkt. No. 2176 at 13. But this assumption defies common sense. No witness will be able to say, much less prove, that all "detailing" is false. Moreover, even Dr. Rosenthal has conceded that "***manufacturers will not detail physicians for generics***," Dkt. No. 1913-5 at 197:23–198:4 (emphasis added). Thus, her "aggregate" causation model—even if it were valid (and it very clearly is not)—does not even address generic manufacturers like the Actavis Generic Defendants.

Lastly, Plaintiffs will not succeed in arguing that the Actavis Generic Defendants should be liable because they ought to have refrained from selling FDA-approved drugs altogether, unless they corrected alleged misimpressions by others about opioids. The Supreme Court and the Sixth Circuit have both rejected this "stop-selling" theory of avoiding liability as preempted by federal law. *See Mut. Phar. Co., v. Bartlett*, 570 U.S. 472, 488 (2013) ("We reject this 'stop-selling' rationale as incompatible with our pre-emption jurisprudence."); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 925 (6th Cir. 2014) (same).

### B. Teva USA Engaged In No Promotion Of Opioid Medicines Prior to 2011.

Prior to 2011, Teva USA sold only generic medicines[6] and never promoted their safety, efficacy, or therapeutic value.[7] Like the Actavis Generic Defendants, Teva USA has never used CMEs, speaker programs, or third parties to promote its generic opioids.[8] Indeed, while Teva USA sells generic opioid medicines, it has never promoted those generic opioids to physicians in Ohio or elsewhere. For this reason, there is simply no false promotion claim that can be brought against Teva USA based upon its sale of generic medicines.

### C. Cephalon And Teva USA Engaged In No False Promotion Of Brand Opioid Medicines In The Counties.

---

[6] Dkt. No. 1860-16, Ex. 12, at ¶ 3 (Declaration of Christine Baeder, Head of Generics at Teva USA).
[7] *See* Dkt. No. 1860-14, Ex. 10 (Deposition of Christine Baeder), at 28:7–9, 40:9–13; Dkt. No. 1860-15, Ex. 11 (Deposition of John Hassler, Senior VP and General Manager at Teva USA), at 108:8–13.
[8] Dkt. No. 1860-16, Ex. 12, at ¶ 4 (Baeder Declaration).

Teva USA first became affiliated with Cephalon in 2011.  Cephalon has only ever manufactured, sold, and marketed two unique opioid medicines—Actiq and Fentora.  Those medicines account for well *less than 1% percent* of opioid prescriptions issued in the Plaintiff Counties.  Dkt. 1891-13, Ex. 9, S. Nicholson Report, ¶ 46.  Actiq and Fentora are not used for long-term chronic pain.  Instead, they are short-acting opioids indicated for the "management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[9]  Their labels have always come with numerous warnings of their risks, including the FDA-approved black-box warning that fully discloses the risks of abuse, addiction, overdose, and death.  Cephalon did not start to market Actiq until 2001 and ceased promotion of Actiq in 2006.  Cephalon obtained approval from the FDA to market and sell Fentora in September 2006; it stopped promoting Fentora in 2018.[10]

The testimony will establish that that Actiq and Fentora always have been subject to FDA-mandated risk management strategies to ensure doctors are fully aware of the risks of these medications and their FDA-approved indications.  For instance, since 2012, prescribers of Actiq and Fentora have also been required to comply with the stringent requirements of the TIRF REMS Program—*before* writing a prescription for these medicines.  This includes, among other things, passing a knowledge assessment about the risks and approved uses of Actiq and Fentora, reviewing the FDA-approved medication guides for Actiq and Fentora with the patient, and signing a patient-prescriber agreement that the prescriber understands and has counseled her patient about the risks and approved uses of Actiq and Fentora.[11]

---

[9] Dkt. No. 1891-52, Ex. 48 (Actiq Label); Dkt. No. 1891-11, Ex. 7 (Fentora Label).
[10] Dkt. No. 1891, at 5–6.
[11] Dkt. No. 1891, at 6–7.

The testimony at trial also will establish that the Teva Defendants have always had policies in place to train their staff and prevent any false or misleading marketing of Actiq and Fentora. Indeed, before it even became affiliated with Teva USA, Cephalon long had internal policies governing, among other things, promotional activities, meals and gifts, speaker programs, and detailing and call activity.[12] While Cephalon provided funding to third-party organizations and sponsored medical education events (conduct which is entirely legal), Cephalon's policies ensured that the activities of those organizations remained independent and the policies specifically prevented any influence by Cephalon over the content of third-party publications and educational programs.[13] The testimony a trial will confirm that those third–party organizations and speakers operated independently, and the Teva and Actavis Generic Defendants did not influence or dictate the content of their publications.[14] Given these facts, the Teva Defendants did not engage in any fraudulent conduct in the Counties.

### D. Plaintiffs Cannot Establish Causation As To The Teva And Actavis Generic Defendants.

The Counties cannot establish causation. At trial, the Counties will not be able to present testimony showing a single false statement that any Teva or Actavis Generic Defendant made to a single prescriber in the Counties; a single County doctor who was misled by anything that they said or did; or a single patient who was harmed because of a false statement. And no doctor or patient will provide any such testimony at trial. This is fatal to any theory of causation.[15]

---

[12] Dkt. No. 1891, at 8–9.
[13] *See* Dkt. Nos. 1891-27-31, Exs. 23-27; Dkt. No. 1891-32, Ex. 28 (Section 8(b) provides that "neither Cephalon nor its agents shall control the content of the Program"); Dkt. No. 1891-33, Ex. 29 (Section 7(a) provides the same).
[14] *See* Dkt. No. 1891, at 9.
[15] Other courts have rejected similar claims against the Teva Defendants for this very reason. *See Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538 (E.D. Pa. 2014), *aff'd*, 620 F. App'x 82 (3d Cir. 2015); *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. 13-7167, 2014 WL 2115498 (E.D. Pa. May 21, 2014); *Cent. Reg'l Emps. Ben. Fund v. Cephalon, Inc.*, No. 09-3418, 2010 WL

In addition, the Counties cannot establish proximate causation because there are numerous independent actors that break the chain of causation. At a minimum, the non-exhaustive chain of causation would include at least the following links:

- *Link One*: The Teva and Actavis Generic Defendants manufacture the opioids;

- *Link Two*: The FDA approves the sale of the medicines and their labeling;

- *Link Three*: The DEA sets quota limits to ensure that there is no "oversupply" of opioid medicines in the market;

- *Link Four*: An Ohio prescriber receives marketing material for branded opioid medicines attributable to the Teva and Actavis Generic Defendants and that marketing material is false or misleading in violation of an Ohio law;

- *Link Five*: Instead of exercising her own independent medical judgment, the Ohio prescriber writes a prescription for an opioid medicine to an Ohioan because of an allegedly false statement made by the Teva and Actavis Generic Defendants and without knowledge or an understanding of the risks of the medication as a learned intermediary, despite prominent and extensive labeling information provided on the medication—and, after 2012, despite the stringent TIRF REMS requirements;

- *Link Six*: Reimbursement policies by managed care organizations, like insurance companies, do not cause the Ohio prescriber to write the opioid prescription;

- *Link Seven*: The patient chooses to fill the medically inappropriate prescription without any knowledge about the risks of the medication;

- *Link Eight:* A distributor sells opioids to the pharmacy, without flagging the sale as suspicious;

- *Link Nine*: The pharmacist first decides whether to substitute a generic medicine for a branded medicine and then dispenses the medically unnecessary opioid prescription, without informing the patient about the risks or deeming the prescription to be medically unnecessary;

- *Link Ten*: The County and Ohio health administrators do not deem the opioid prescription to be medically unnecessary (and therefore deem it appropriate) by reimbursing for it (which the Counties continue to do);

---

1257790 (D.N.J. Mar. 29, 2010); *Cent. Reg'l Emps. Ben. Fund v. Cephalon, Inc.*, No. 09-3418, 2009 WL 3245485 (D.N.J. Oct. 7, 2009).

8

- *Link Eleven*: The patient, or someone who illegally obtained the opioid from the patient, misuses, abuses, and/or becomes addicted to opioids due to the allegedly fraudulently-induced prescription, as opposed to other factors or other medically appropriate prescriptions;

- *Link Twelve*: The patient or someone else who illegally diverted the opioid medicine suffers physical or other harm as a result of the medically unnecessary prescription, as opposed to numerous other factors or circumstances.

The Teva and Actavis Generic Defendants cannot be held responsible for the discretionary and fact-intensive decision-making of so many independent actors, including distributors, pharmacies, illegal pill mills, patients, the FDA, DEA, the State of Ohio, and the Counties themselves.

In fact, rather than blaming the Teva and the Actavis Generic Defendants, the Counties should be examining their own actions and inaction—which directly contributed to the opioid abuse problem in the Counties. By way of example only, the Counties continue to reimburse for opioid prescriptions for chronic pain today, thereby influencing what gets prescribed and dispensed to patients—and confirming (against their very own foundational theory in this case) that opioid prescriptions may be appropriate for chronic pain.[16]

Lastly, Plaintiffs' causation model is fatally flawed because it assumes that all marketing by all Defendants about opioids was false. Plaintiffs' experts were specifically instructed by Plaintiffs' attorneys to base their analysis and opinions on this erroneous assumption. Even Plaintiffs' experts have said this assumption is not correct. The undisputed evidence will confirm that point. Thus, Plaintiffs will not be able to prove causation at trial.

### IV. THE EVIDENCE WILL SHOW THAT ALL CLAIMS BASED UPON PLAINTIFFS' FAILURE-TO-PREVENT DIVERSION THEORY ARE FLAWED.

Plaintiffs' failure-to-prevent diversion theory, at bottom, seeks to hold the Teva and Actavis Generic Defendants legally responsible for failing to identify, report, and stop suspicious orders that

---

[16] Dkt. No. 1936-16, at ¶ 66.

9

criminal third parties may have illegally diverted. But trial will show that there is no evidence to support those claims as to the Teva and Actavis Generic Defendants.

As an initial matter, Plaintiffs argue that manufacturers should have identified, reported, and stopped orders *placed by Ohio pharmacies*. But as a general principle, manufacturers do not sell and ship opioids directly to pharmacies. Dkt. 1891-13, Ex. 9, S. Nicholson Report, ¶¶ 234–35. Such orders are placed with distributors, which manufacturers rely upon to monitor their own customers. *Id.*, ¶ 235. And Plaintiffs identify no obligation under state or federal law to know and report orders placed by the customers (*i.e.*, pharmacies) of a manufacturer's customers (*i.e.*, distributors). Even DEA executives could not point to any statute, regulation, formal notice, or correspondence communicating such a requirement.[17] Asked directly whether the DEA "ever provided any kind of guidance to manufacturers informing them that they were to know their customers' customer," DEA representative Thomas Prevoznik flatly answered: "No, not to my knowledge."[18]

Moreover, contrary to Plaintiffs' position, the Teva and Actavis Generic Defendants have always had suspicious-order-monitoring ("SOM") systems in place to identify and report any suspicious orders placed by their customers, have always taken additional steps to detect and prevent diversion, and have always fully complied with their CSA obligations. For instance, Cephalon has always had a DEA Compliance department, along with a SOM process, in place to identify, investigate, and, if necessary, report to the DEA suspicious orders of the only two opioids it manufactured and sold (Actiq and Fentora).[19] The same is true for Teva USA[20] and the Actavis Generic Defendants.[21] For approximately a decade, they have used computer software, with

---

[17] *See* Dkt. No. 1891-55, Ex. 51, D. Ashley Dep., 159:20–161:8.
[18] *See* Dkt. No. 1891-39, Ex. 35, T. Prevoznik Dep., 326:1–5.
[19] Dkt. No. 2180-38, Reed Decl. Ex. 35 C. McGinn Decl. ¶¶ 5–6.
[20] Dkt. No. 2180 at 29–31.
[21] *Id*. at 42–48.

proprietary algorithms, to review all orders based upon specified parameters.[22] Tellingly, the DEA has never taken any enforcement action against the Teva or Actavis Generic Defendants for any infractions.[23]

In addition, the testimony will show that Plaintiffs cannot establish any causation on their failure-to-prevent diversion theory. No witness will be able to identify a single order for shipment into the Counties connected to the Teva or Actavis Generic Defendants that was purportedly "suspicious," much less any that caused the Counties harm. This glaring failure alone defeats their claims. In fact, only one of Plaintiffs' experts, Dr. Keller, purports to address this fundamental issue, yet she will have to concede that she cannot identify any actual "suspicious" orders (as defined by DEA regulations)—only orders that she believes, after the fact, should have triggered further investigation. Dkt. No. 1979-6, L. Keller Dep., Jun. 13, 2019, 335:14–336:7; *id.* 336:12–16. And to do that, she relied upon ***post-shipment*** data pertaining to ***completed*** shipments to pharmacies and ***fulfilled prescriptions*** by physicians—data not available to the Teva and Actavis Generic Defendants at the time of evaluating orders. Dkt. No. 1999-7, Ex. 52, L. Keller Report, ¶¶ 32–33. Importantly, DEA representatives have made clear that there is no requirement to obtain and consider such data as part of any suspicious-order-monitoring program.[24] Because Plaintiffs cannot identify any suspicious orders (as defined by law) that should not have been filled, they cannot prove that the orders filled by the Teva and Actavis Generic Defendants would have been any different had they implemented the SOM systems that Plaintiffs now demand.

---

[22] *Id.* at 29–31, 42–48.
[23] *Id.* at 34; Dkt. No. 1939-10, Colder Rpt. 34 n.97.
[24] *See* Dkt. No. 1891-34, Ex. 30, K. Wright Dep., 220:20–221:3; *see also* Dkt. No. 1891-55, Ex. 51, D. Ashley Dep., 172:20–173:12; *see also* Dkt. No. 1891-39, Ex. 35, T. Prevoznik, 347:1–5; *see also* Dkt. No. 1891-57, Ex. 53, J. Rannazzisi Dep., 120:6–21.

## V. THERE IS NO EVIDENCE OF A CONSPIRACY OR CRIMINAL ENTERPRISE INVOLVING THE TEVA OR ACTAVIS GENERIC DEFENDANTS.

Given the absence of any proof of wrongdoing by the Teva or Actavis Generic Defendants, the Counties contend that they should be responsible for the acts of other Defendants. But the Counties cannot show that the Teva or Actavis Generic Defendants worked together—much less conspired with—any other Defendant to falsely market opioids or to illegally divert opioids in the Counties. The testimony from all of Defendants' witnesses will make clear that the Teva and Actavis Generic Defendants never reached any agreement, whether implicit or express, with anyone else to engage in any false marketing, diversion, or any other wrongful act. Nor were they part of some coordinated criminal enterprise. At most, the evidence will show that the Teva and Actavis Generic Defendants participated in some of the same trade associations and funded the same doctors and groups as other Defendants in this case. This is—at best—parallel conduct in a competitive industry—not the basis for a conspiracy or enterprise finding. *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012); *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010).

## CONCLUSION

After years of litigation, the Counties cannot even offer a single Ohio doctor who will say that he or she was misled into writing a harmful opioid prescription because of any false marketing statement by the Teva or Actavis Generic Defendants—much less show that any such marketing harmed the County. While the Counties face a problem with opioid abuse and addiction, this is a situation that they have long known about and that the Teva and Actavis Generic Defendants simply did not cause. The evidence at trial will establish that they are not and cannot be liable under any of Plaintiffs' legal theories.

Dated:  September 25, 2019

Respectfully submitted,

By: */s/ Steven A. Reed*
Eric W. Sitarchuk
Steven A. Reed
Harvey Bartle
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
eric.sitarchuk@morganlewis.com
steven.reed@morganlewis.com
harvey.bartle@morganlewis.com
rebecca.hillyer@morganlewis.com

Nancy L. Patterson
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
wendy.feinstein@morganlewis.com

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Cephalon, Inc., Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida, and appearing specially for Teva Pharmaceutical Industries Ltd.*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 25th day of September, 2019, the foregoing has been served via CM/ECF to all counsel of record.

                                          */s/ Steven A. Reed*
                                          Steven A. Reed

**CERTIFICATE OF SERVICE**