UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) ) | CASE NO. 1:17-MD-2804<br><br>JUDGE POLSTER<br><br>**OPINION AND ORDER** |

The first bellwether trial in this Opioid MDL is scheduled to begin in less than four weeks. Of the 22 named defendants, seven have filed a Motion to Disqualify (docket no. 2603), asking me to recuse myself from all MDL proceedings. For the reasons stated below, the motion is **DENIED**.

\* \* \* \* \*

The Opioid MDL (MDL No. 2804) was created by the Judicial Panel on Multidistrict Litigation nearly two years ago, in December of 2017. I was honored to accept the Panel's request that I undertake the assignment of MDL transferee Judge. At the outset, the MDL consisted of approximately 100 cases. It has since grown to more than 2,000 cases. The plaintiffs are primarily governmental entities – Cities and Counties from across the country, as well as Indian Tribes.[1] Just as there are thousands of plaintiffs, there are many dozens of defendants. These defendants include manufacturers of prescription opioids, distributors of these opioids, and pharmacies that dispense

---

[1] Other categories of plaintiff include hospitals, third-party payors, putative classes of individuals, and others.

them.

The governmental-entity plaintiffs assert against the defendants: (1) various legal claims, for which they seek damages as compensation; and (2) equitable public nuisance claims, regarding which they seek abatement and prospective injunctive relief.

During the same time period that the number of federal cases in the Opioid MDL ballooned, the number of cases filed in State courts also rose dramatically – there are now over 400 opioid-related cases pending in various State courts. These include at least 59 lawsuits filed by State Attorneys General, which include similar claims and allegations against the same defendants and seek similar monetary damages and equitable relief.

Many commentators and analysts have called the combined Opioid Litigation the most complex and important group of cases ever filed, and I would not disagree with that characterization. As was being reported even before the Opioid MDL was created, "more Americans died from drug overdoses in 2016 than the number of American lives lost in the entirety of the Vietnam War, which totaled 58,200."[2] The magnitude and significance of the "opioid crisis" and the Opioid Litigation cannot be overstated. Ever since my appointment as transferee Judge, every type of local and national media has reported daily, if not hourly, regarding developments in both the State and federal opioid litigation.

Of course, I was aware from the start about the extraordinary amount of publicity this MDL would receive. This publicity is understandable; the opioid epidemic is historic, one of the greatest tragedies of our time. It cuts across all ages, races, religions, and socio-economic groups. The

---

[2] *See* https://cbsn.ws/2yA09mq (Oct. 17, 2017) ("Drug overdoses killed more Americans last year than the Vietnam War.").

human toll is staggering, and the continuing economic burden on government at all levels is extreme. Publicly acknowledging this human toll does not suggest I am biased; it shows that I am human. I was very careful in what I said during the first hearing of this MDL in January of 2018, and I have been very careful about what I have said ever since.  For example, while moving defendants claim that the statements I made in Court at the outset (quoted at p. 2 of their memorandum) suggest bias, I was very careful to assign *responsibility* (as opposed to potential legal liability) to *everyone* in the case – including not only the MDL defendants *and plaintiffs*, but also the federal government, the medical profession, and even individual opioid drug users.  All of these groups are responsible to some degree for having created the opioid crisis, and all who have the power to do so must now take some responsibility for fixing it.  As the MDL Judge, the latter includes me, and I said so. Acknowledging the immense scope of the opioid crisis, and calling on all entities who have the power to ameliorate it to join me in doing so without delay, does not reflect any bias or prejudice toward any party to the litigation; and no reasonable observer would so conclude.

Since that time, I have pursued simultaneously and vigorously both a "settlement track" and a "litigation track."[3]  I have utilized the assistance of three very experienced and talented Special Masters to assist me in simultaneously managing both tracks.  Of course, neither plaintiffs nor defendants can credibly express surprise or dismay that I addressed the prospect of settlement from the very start.  Addressing settlement early and often is my standard operating procedure, and I

---

[3] *See Manual for Complex Litigation Fourth* §13.11 at 168 ("Settlement [and] . . . the pretrial process both can and should operate effectively on parallel tracks.").

believe this is partly why the MDL Panel chose me as transferee Judge.[4]  Nor can plaintiffs or defendants credibly complain of my public observations that any settlement will unquestionably require the defendants to pay money to the plaintiffs.  This is simply a fact of litigation, not an expression of bias or prejudice or prejudgment against any defendant.  Each defendant has a choice to litigate or settle; if it wants to settle, it will have to pay money to plaintiffs.  My statements that early settlements are preferable to settlements only after protracted litigation do not carry any negative implication, and the seven moving defendants' drawing of a negative inference is not accurate.

During the course of the last twenty months, I have worked ceaselessly with the parties and also my three Special Masters on both the settlement track and the litigation track.  These efforts have begun to bear fruit, as evidenced by the following:

- After having been postponed twice by party request, the first bellwether MDL trial is scheduled to begin in less than a month, on October 21, 2019, with jury selection starting on October 16.  At this juncture, there are two governmental-entity plaintiffs and seven defendants, which reflects a substantial whittling-down from the beginning of the case, when there were dozens of plaintiffs and over 20 defendants.[5]

- With the Court's help, the bellwether plaintiffs have reached multi-million dollar settlements

---

[4] The *Manual for Complex Litigation* suggests early discussion of settlement *should* be standard operating procedure.  *See id.* at 167 ("The judge can encourage the settlement process by asking [about it] at the first pretrial conference . . . ."); *see also id.* §11.214 at 40 ("At *each conference*, the judge should explore the settlement posture of the parties and the techniques, methods, and mechanisms that may help resolve the litigation short of trial.") (emphasis added).

[5] The current plaintiffs are Cuyahoga County and Summit County, Ohio, which encompass the cities of Cleveland and Akron, respectively.  Initially there were also dozens of city-plaintiffs within the two counties, but all of these cities have been dismissed or severed.  Similarly, the complaints and amended complaints named a total of 22 opioid manufacturers, distributors, and pharmacies, but the majority have either settled or been severed, leaving only seven defendants for trial (or fewer, if there are additional settlements).

- with three manufacturing defendants – Endo, Allergan, and Mallinckrodt. The Court continues to assist the parties with ongoing, serious negotiations, which may lead to additional bellwether case settlements before trial.

- In addition to addressing claims made in the bellwether cases, the Court has also assisted and overseen negotiations directed at achieving "global resolution" of ***all*** opioid litigation against the defendants, in both State and federal courts. These efforts led directly to the proposed multi-billion dollar agreed bankruptcy settlement with Purdue and the Sackler family.

The Court's settlement efforts have included countless meetings not only with all of the many parties' outside litigation counsel, but also their highest-ranking decision-makers, including General Counsel, Chief Financial Officers, and Chief Executive Officers, as well as their hired experts (e.g. outside accountants, financial advisors, and bankruptcy attorneys).

At the same time, the Court's litigation efforts (during only the 20 months since this MDL was formed) have so far included: (i) oversight of discovery involving over 450 depositions and over 160 million pages of documents; (ii) rulings on innumerable discovery motions, ranging from the trivial to motions to compel production of documents from the United States Drug Enforcement Agency; (iii) rulings on dozens of dispositive and *Daubert* motions; and (iv) deep preparation for the imminent bellwether trial, up to and including sending out jury questionnaires, review of potential jury instructions, and so on. My Special Masters have also coordinated the voluminous State court litigation with the federal court litigation.

Certain defendants[6] now point to a few discrete settlement and litigation events as a basis for

---

[6] Of the seven defendants remaining in the bellwether trial, five joined the Motion to Disqualify (AmerisourceBergen, Cardinal, McKesson, Walgreens, and Schein) and two did not (Teva and J&J). Three other MDL defendants who are no longer a part of the bellwether trial also joined the motion (CVS, Rite Aid, and Walmart), while many others did not (e.g. Purdue, Endo, Allergan, Mallinckrodt, Anda, DDM, HBC Giant Eagle, HD Smith, Kroger, Noramco, and Prescription Supply).

my recusal. Specifically, on September 14, 2019 – only 32 days before jury selection in the first MDL bellwether trial – a few of the distributor and pharmacy defendants (but none of the manufacturer defendants) filed this Motion to Disqualify. Their 36-page memorandum alleges that statements I have made in open court and to the media, beginning in January of 2018, create a reasonable question about my impartiality. Most of the statements concern the devastating impact of the opioid crisis, the urgent need to address it, and the benefit to everyone of settlement. The moving defendants allege these statements create the impression that I am biased against them and could not fairly preside over the upcoming October trial. On September 16, 2019, plaintiffs filed a Response (docket no. 2607), and the moving defendants filed a Reply on September 17, 2019 (docket no. 2616).

Plaintiffs' opposition memorandum succinctly refutes the arguments that allegedly support the moving defendants' Motion to Disqualify, and demonstrates that nothing I have said in or out of Court remotely suggests I could not fairly and impartially preside over the October trial; and also that no reasonable observer would question my impartiality. I will not repeat the plaintiffs' points here. It suffices to say that the burden to sustain a motion to disqualify a judge is exceedingly high, and the moving defendants have not met it. There are just a few points that need to be made.

To explain why they did not file their Motion to Disqualify earlier, the moving defendants advance the rationale that it was only recently, after two events occurred, that the need to seek recusal became clear. *See* Reply at 1 (docket no. 2616) (the "decision to file this motion . . . was based on an accumulation of statements made and actions taken by the Court over time, including the Court's recent decisions [1] to certify a novel 'negotiation class' and [2] to take on the role of finder of fact in any remedial phase of the nuisance case"). But neither of these two decisions show

6

any bias and neither provide "new" grounds for a motion to disqualify.

Regarding my certification of the Negotiation Class, it is true that this procedural mechanism is novel and also true that I issued the order very recently, on September 11, 2019 (docket no. 2591). But this matter has been under active consideration for months: the initial motion for approval was filed on June 14, 2019 (docket no. 1683), and I held a lengthy hearing on the certification motion on August 6, 2019 (tr. available at docket no. 2147). More important, as I have repeatedly made clear, the Negotiation Class mechanism is *entirely optional*. No defendant has to use it, and no defendant suffers any negative impact whatsoever if it decides not to. The Negotiation Class mechanism is simply another, as-yet-untested approach that a defendant *may* use to settle with plaintiffs. I have also repeatedly stated I have no preference for that settlement mechanism over any other that a defendant may choose.

Indeed, the entire motivation for creation of the Negotiation Class mechanism was the insistence of *defendants* that they would not seriously consider resolution unless there was a global mechanism to bind all Cities and Counties that filed lawsuits in the MDL, and also the 20,000 other Cities and Counties that potentially could file lawsuits. Defendants have repeatedly expressed frustration on this front, and the Negotiation Class simply provides a *voluntary* approach that may

7

help.[7]

I stated clearly at the hearing that the Negotiation Class under consideration need not be the exclusive vehicle for resolution, that nobody would ever be required to use it, and I encouraged alternative settlement concepts. *See, e.g.*, Hrg. Tr. at 55:7-8, 74:8-9 (docket no. 2147). The fact that some Attorneys General do not like the Negotiation Class mechanism because they believe only States, and not Cities and Counties, have authority to settle the opioid lawsuits, does not support the argument that "reasonable observers" now question my impartiality. It is also fair to state that the plaintiffs' work in creating the Negotiation Class mechanism, with my Special Masters' assistance, yielded increased agreement amongst Cities and Counties. I believe that without the cohesiveness that now exists among the 2,000 litigating Cities and Counties, the proposed multi-billion dollar bankruptcy settlement with Purdue and the Sackler family would not have occurred.

The second "recent event" that the moving defendants point to is my supposedly new

---

[7] The moving defendants argue that my Order certifying the Negotiation Class displayed bias when I stated certification would "remove 'an obstacle to settlement'" and "expedite relief to communities so they can better address this devastating national health crisis." Reply at 5 (docket no. 2616); *see also* Motion at 5, 12, and 18 (docket no. 2603-1).

When I addressed plaintiffs' motion for class certification, Rule 23(b)(3) required me to ascertain whether class certification was "superior to other available methods for fairly and efficiently adjudicating the controversy." Addressing that prong, the *defendants* explained that this question "can be answered in the affirmative only if certification of this class would actually help *to facilitate the settlement* of a substantial proportion of the pending litigation." Opposition to motion for class certification at 41 (docket no. 1949) (emphasis added). The defendants' own arguments on superiority therefore demanded that I address whether settlement would be advanced through certification of a Negotiation Class. Moreover, as to the value of settlement, the *defendants* stated they were "acutely aware of the benefits that could accrue if a legally supportable mechanism were available *to permit global settlements* in this litigation." *Id.* at 1 (emphasis added).

In other words, defendants made clear to the Court that settlement is important and the Court must decide whether certification of a Negotiation Class furthers that goal; but the moving defendants now insist the Court must disqualify itself for stating that settlement is important and certification of a Negotiation Class furthers that goal.

8

"decision to take on the role of finder of fact in any remedial phase of the nuisance case." Reply at 1 (docket no. 2616). But it is settled law that, if a defendant is found liable for creating a public nuisance, the decision of whether to impose an abatement remedy (and if so, what that remedy should be) is one that must be decided by the Court, not the jury. The Court stated this clearly weeks ago. *See* Order Denying Defendants' Motion to Exclude Abatement Experts at 3 (docket no. 2519) (August 26, 2019) ("In Ohio, '[w]hen a nuisance is established, the form and extent of the relief designed to abate the nuisance is within the discretion of the court.'") (citing 72 Ohio Jur. 3rd *Nuisances* §49). Moreover, everyone in this case has understood this from the start, as confirmed by recent submissions from the parties. *See* Certain Defendants' Position Paper at 6 n.7 (Sept. 13, 2019) (docket no. 2599) (conceding that "truly equitable relief . . . is for the Court to decide").

Defendants did recently raise the question of whether the Court or the jury would determine whether a public nuisance caused by any defendant *exists* (e.g., liability). After reviewing the parties' submissions and consulting with counsel on a September 16, 2019 telephone conference, I determined the best course of action is to let the jury decide public nuisance *liability*, while the question of abatement remains for the Court. It was *defendants* who argued for this conclusion, not plaintiffs.[8] The Court agreed with defendants because there is substantial overlap in the evidence going to the plaintiffs' nuisance claim and plaintiffs' other claims, and case-law supports allowing

---

[8] *See* docket no. 2599 at 1-2 (six trial defendants stating they "have a right to trial by jury of Ohio public nuisance claims with respect to the issues of liability and any legal damages . . . [but] the trial should be bifurcated, and any evidence or arguments relating to Plaintiffs' proposed remedies should not be presented to the jury" and instead decided by the Court); docket no. 2602 at 1 (defendant Teva stating it has "a right to trial by jury of Ohio public nuisance claims with respect to issues of liability, but a court should decide Plaintiffs' proposed "equitable abatement" remedy for the public nuisance claims"); *compare* docket no. 2601 at 1-2 (plaintiffs asserting "there is no right to a jury trial on [any aspect of] a public nuisance claim for abatement").

the jury to make the threshold liability determination.⁹  None of this remotely supports the moving defendants' claim that I am biased or appear biased against them, or that the grounds for claiming bias arose only recently.

This leaves, as grounds for the moving defendants' Motion to Disqualify, the comments I have made in Court or to the press.  I have addressed this above, but add these thoughts.  The opioid crisis is a topic of everyday conversation.  There are few if any Ohioans who don't have a family member, a friend, a parent of a friend, or a child of a friend who has not been impacted.  I have made this observation several times, partly to underscore how important resolution of this litigation is to all of our citizens (not just the parties themselves), and partly to reflect how hard it may be to pick a jury.  These comments do not show bias, nor do they provide grounds for a reasonable person to question my impartiality.  Nor does my speaking to the press show anything other than a desire to manage the MDL appropriately.  *See Civil Litigation Management Manual Second* at 131 (F.J.C. 2010) ("At the outset of a high-visibility case, you will want to take steps to gain the media's cooperation and goodwill.").  The moving defendants' citation of cases where other judges made comments to the media are distinguishable because those judges made explicit statements about the

---

⁹ I initially stated orally during a teleconference my intention to allow a jury to determine public nuisance liability, while I would decide abatement if necessary; shortly thereafter, the moving defendants filed their Motion to Disqualify.  More recently, I entered an Order reaffirming and explaining my decisions.  *See* docket no. 2629.  I have structured the October trial so that the jury, and not the Court, will be the trier of the facts.  The jury will decide whether any of the defendants is liable under any of the theories advanced by plaintiffs, and if so, what, if any, damages should be awarded.  Because the law is clear that, should the jury find a defendant liable for causing a public nuisance, any abatement remedy is a matter of equity for the Court to decide, I will need to hold a separate, post-trial evidentiary proceeding on remedy should the jury find public nuisance liability.

merits of the claims in litigation.[10]  I have not done this.

I freely admit I have been very active from the outset of this MDL in encouraging all sides to consider settlement.  It goes without saying that if even a small fraction of the 2,000 cases in the MDL requires a months-long trial, the federal judiciary will be overwhelmed and most of the defendants would be forced into bankruptcy, simply because of litigation costs. (Two manufacturer defendants – Insys and Purdue – have filed for bankruptcy this year.)  Ordinarily, the resolution of a social epidemic should be the responsibility of our other two branches of government, but these are not ordinary times.  I feel it is important for our citizens to know what I am doing and to have confidence that the judicial branch is up to the task – I have said so publicly.  The moving defendants complain that I have had a "personal mission" from the start of the case.  That is true, but it does not suggest any bias or partiality.  Prescription opioids are "controlled substances" under federal law.  Current levels of opioid overdoses make it painfully obvious that our system of "controls," which depend jointly upon all levels of government, the pharmaceutical industry, and the medical profession, has not performed the way it should.  The result one way or another of a

---

[10] The cases cited by the moving defendants, where courts held judges should have recused, are materially different on the facts. *See, e.g.*, *Ligon v. City of New York*, 736 F.3d 118, 125-26 (2nd Cir. 2013), *vacated in part*, 743 F.3d 362 (2nd Cir. 2014) ("the judge . . . urged a party to file a new lawsuit to assert [a new] claim, *suggested that such a claim could be viable and would likely entitle the plaintiffs to documents they sought*, and advised the party to designate it as a related case so that the case would be assigned to her") (emphasis added); *United States v. Cooley*, 1 F.3d 985, 990 (10th Cir. 1993) (before presiding over a criminal case against the defendants, the judge stated on national television that "these people are breaking the law"); *In re Boston's Children First*, 244 F.3d 164, 171, 167 (1st Cir. 2001) (in "a highly idiosyncratic case," the judge "arguably suggested that the petitioner's claims for certification and temporary injunctive relief were less than meritorious").

It is simply not true, as the moving defendants assert, that I have intimated my view on the merits of any of the claims or defenses asserted in this litigation.  And it is not reasonable to insist that my devoted efforts toward settlement have somehow suggested to a reasonable observer that I harbor some bias or prejudice.

single bellwether trial, or even of 2,000 trials, cannot bring about systemic change. This is why I have tried to engage everyone, including even non-parties to this litigation (such as State Attorneys General and the DEA), to look at ways to improve the system. Defendants have willingly participated in these discussions for many months, at the same time they have vigorously defended themselves against the allegations in the lawsuits; and as a result, there have already been some positive voluntary changes. For example, a motion for injunction against three Pharmacy Benefit Manager ("PBM") defendants was mooted after my settlement discussions led to voluntary adoption of changes to the PBMs' drug formularies, including limitations on the maximum number of opioid pills per prescription and number of opioid pills allowed to minors. I have requested and received the assistance of the State Attorneys General in the settlement track, because each defendant has made clear that a prerequisite to considering settlement is the development of a structure that would permit global resolution of both the State and federal litigation. Toward that end, my Special Masters have spent more than a year working intensively to develop such a structure, and I approved the creation of a Negotiation Class two weeks ago. At the same time, I encouraged defendants to develop any alternative structure if they felt one was better, and my Special Masters have long been working with the parties on those alternatives, as well.

It must be noted that any involvement in settlement by me and my Special Masters has been with the approval of any involved defendant. At no time before filing of the recent Motion to Disqualify has any defendant filed any objection suggesting in any way that my involvement in settlement discussions might compromise my ability to be fair and impartial in conducting a trial. To the contrary, in many instances defendants have reached out and requested my assistance, or the assistance of my Special Masters, in exploring settlement. Through these efforts, several defendants

have reached settlements and others are in active discussion. I do not believe that any of the settlements that have so far been achieved would have happened without my active participation and the work of my Special Masters.

The law is very clear that a party who feels a judge has said or done anything meriting the drastic remedy of disqualification must file a motion promptly. The seven moving defendants have long ago waived any objection to the conduct cited in their motion.[11] The moving defendants waited more than 18 months to complain about anything I have said in Court, or in public, or my involvement in settlement discussions. Tellingly, they have not cited a single instance in all of the myriad rulings I have made leading up to trial that would suggest to anyone bias or partiality. Indeed, the only time I have been reversed in this case is when I sided with the *defendants* and ruled that the DEA's ARCOS data should not be made public. Instead, the moving defendants filed their disqualification motion following months of settlement negotiations with the Court; after the Court issued opinions resolving dozens of *Daubert* and summary judgment motions; and close to the eve of trial. A party cannot sit on a disqualification issue and then deploy it only when it might be strategically beneficial.

And finally, it is appropriate to consider the impact of the remedy sought by the moving defendants, which they make explicit in their Reply: my removal not only from the upcoming October 21 bellwether trial, but from the entire MDL. This would require the Judicial Panel on Multidistrict Litigation to identify another judge who could abandon everything on his/her docket

---

[11] The grounds for recusal that defendants assert in their motion do not pertain only to the first bellwether trial. Just as defendants make clear they actually seek my recusal from the entire MDL, the question of waiver is applicable to the entire MDL. *See Manual for Complex Litigation Fourth* §13.11 at 168 ("Occasionally, the parties request that the assigned judge participate in settlement discussions, waiving the right to seek recusal.").

to try to learn and understand in less than four weeks what has taken me nearly two years, to come to Cleveland for two months to try this case, and then to undertake continued management of this MDL. Without this replacement judge, the first Opioid MDL bellwether trial will be postponed for some indefinite period of time and the Opioid MDL will quickly degenerate. The focus of opioid litigation will shift more heavily to State courts; the advantages to all parties of central, federal discovery and motion practice will wither; and the likelihood of nationwide, global resolution will wane. Such a result would starkly undermine the main point of my public comments: that the federal judicial branch is up to the task of addressing the opioid crisis, using all the tools it has, including both fairly-negotiated settlements and fairly-fought litigation.

The undersigned is confident that the imminent trial of the first bellwether case, along with the parties' ongoing settlement negotiations – addressing not only the bellwether trial, but also global resolution – will continue to bear fruit. And the undersigned is confident that no reasonable person can legitimately question my impartiality.

Accordingly, the moving defendants' Motion to Disqualify is **DENIED**.

/s/ *Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:** September 26, 2019