# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed:  September 26, 2019

Mr. Eric F. Citron
Goldstein & Russell
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814

Re:  Case No. 19-306, *In re: City of North Royalton, OH, et al*
Originating Case No. 1:17-md-02804; 1:18-op-45090

Dear Counsel,

The Petition for Permission to Appeal, filed pursuant to Fed. R. App. P. 5, has been docketed as case number **19-306**.

The Clerk's office will send you additional information as soon as the Court has finished its customary screening and issued a ruling on the petition.  In the meantime, only the usual appearance forms must be filed within 7 days.  An interested party may file a response within 10 days of service of the petition, unless other instructions are made.  Fed. R. App. P. 5(b)(2).

Sincerely yours,

s/Robin Baker
Case Management Specialist
Direct Dial No. 513-564-7014

cc:  Ms. Jayne Conroy
Mr. Christopher A. Seeger
Mr. James Gerard Stranch IV

Enclosure

**OFFICIAL COURT OF APPEALS CAPTION FOR 19-306**

In re: NATIONAL PRESCRIPTION OPIATE LITIGATION
_____

In re: CITY OF NORTH ROYALTON, OH; CITY OF EAST CLEVELAND, OH; CITY OF
MAYFIELD HEIGHTS, OH; CITY OF LYNDHURST OH; CITY OF HURON, OH; CITY OF
WICKLIFFE, OH

       Petitioners

No. _____

# United States Court of Appeals for the Sixth Circuit

IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION

CITY OF NORTH ROYALTON, OHIO; CITY OF EAST CLEVELAND, OHIO; CITY OF
MAYFIELD HEIGHTS, OHIO; CITY OF LYNDHURST, OHIO; CITY OF HURON, OHIO;
AND CITY OF WICKLIFFE, OHIO,
*Plaintiffs – Petitioners*,

_____

Petition for Permission to Appeal from the U.S. District Court
for the Northern District of Ohio, No. 1:17-md-02804-DAP

_____

## PETITION FOR PERMISSION TO APPEAL
## PURSUANT TO FED. R. CIV. P. 23(f)

_____

James L. Ferraro
Dick M. Ortega
THE FERRARO LAW FIRM
Brickell World Plaza
600 Brickell Avenue, Suite 3800
Miami, FL 33131
(305) 375-0111

Thomas C. Goldstein
Eric F. Citron
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
(202) 362-0636

*Counsel for Petitioners City of North Royalton, Ohio; City of East Cleveland,
Ohio; City of Mayfield Heights, Ohio; City of Lyndhurst, Ohio; City of Huron,
Ohio; and City of Wickliffe, Ohio*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

PETITION FOR REVIEW .........................................................................1

QUESTIONS PRESENTED.........................................................................1

STATEMENT ............................................................................................1

ARGUMENT .............................................................................................4

I.    Immediate Review Is Warranted. ..................................................4

II.    The Certification Order Is Unlawful. .............................................6

      A.    The Certification Order cannot be reconciled with the text and structure of Rules 23(b)(3) and 23(e). ....................................6

      B.    The class fails to provide adequate representation.............................14

      C.    Any doubt must be resolved against the Certification Order, which calls into question the constitutionality of Rule 23. .................16

          i.    Class counsel incentives .........................................16

          ii.    Adequate opportunity to opt out ...............................18

CONCLUSION ........................................................................................20

ATTACHMENT 1: Memorandum Opinion Certifying Negotiation Class (N.D. Ohio Sept. 11, 2019), Doc. 2590

ATTACHMENT 2: Order Certifying Negotiation Class and Approving Notice (N.D. Ohio Sept. 11, 2019), Doc. 2591

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)................................................................ 9, 14, 15, 16

*Clemons v. Norton Healthcare Inc. Ret. Plan,*
  890 F.3d 254 (6th Cir. 2018) ...............................................................10

*In re Delta Air Lines,*
  310 F.3d 953 (6th Cir. 2002) .................................................................4

*Dewey v. Volkswagen Aktiengesellschaft,*
  681 F.3d 170 (3rd Cir. 2012) ...............................................................15

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ...............................................................15

*In re Literary Works in Elec. Databases Copyright Litig.,*
  654 F.3d 242 (2d Cir. 2011) ................................................................15

*Logan v. Zimmerman Brush Co.,*
  455 U.S. 422 (1982)..............................................................................18

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999) .......................................................................*passim*

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985)..............................................................................19

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011).........................................................................9, 19

*Young v. Nationwide Mut. Ins. Co.,*
  693 F.3d 532 (6th Cir. 2012) .................................................................4

## Constitutional Provisions

U.S. Const. amend. V...............................................................................18

## Rules

Fed. R. App. P. 5......................................................................................1

Fed. R. Civ. P. 23 ...........................................................................*passim*

Fed. R. Civ. P. 23(a)...............................................................................10

Fed. R. Civ. P. 23(a)(4)...........................................................................14

Fed. R. Civ. P. 23(b) ...............................................................................10

Fed. R. Civ. P. 23(b)(3) ................................................................ *passim*

Fed. R. Civ. P. 23(c)(2)(B) .......................................................... *passim*

Fed. R. Civ. P. 23(c)(2)(B)(v) ...............................................................7

Fed. R. Civ. P. 23(c)(2)(B)(vi) ..............................................................7

Fed. R. Civ. P. 23(e) ..................................................................... *passim*

Fed. R. Civ. P. 23(e)(1) ..................................................................7, 9

Fed. R. Civ. P. 23(e)(1)(B)(i) ................................................................8

Fed. R. Civ. P. 23(e)(2)(C) ....................................................................8

Fed. R. Civ. P. 23(e)(3) advisory committee's note to 2003 amendment ..............13

Fed. R. Civ. P. 23(e)(4) ............................................................. 2, 7, 13

Fed. R. Civ. P. 23(f) ......................................................................1, 4

iii

# PETITION FOR REVIEW

Pursuant to Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5, Plaintiffs-Petitioners (Petitioners)[1] respectfully petition this Court for leave to appeal the District Court's September 11, 2019 Order certifying a "negotiation class" (Dkt. 2591) and accompanying Memorandum Opinion (Dkt. 2590, Certification Order or Order) pursuant to Fed. R. Civ. P. 23(b)(3).

## QUESTIONS PRESENTED

1.    Is the Certification Order permitted by Fed. R. Civ. P. 23?

2.    Is the Certification Order consistent with Due Process?

## STATEMENT

This Petition arises from the multi-district litigation (MDL) of more than 2,000 federal suits brought by local governmental entities against companies that manufacture, distribute, and sell opioids. (States are not parties. Other related litigation remains pending in state court.) Most of the actions seek, *inter alia*, reimbursement for expenditures in responding to the opioid crisis.

From the outset of the litigation, plaintiffs and defendants have been negotiating settlements, under the supervision of the District Court. But if that process had continued and the parties had reached a settlement and presented it to the District

---

[1]    Petitioners are six Ohio cities that filed a joint objection in the District Court: North Royalton; East Cleveland; Mayfield Heights; Lyndhurst; Huron; and Wickliffe.

Court with a motion for class certification, absent plaintiffs would have had the right to review the settlement and, if unsatisfied, opt out and pursue their own claims. Fed. R. Civ. P. 23(e)(4). So too, if plaintiffs secured the certification of a litigation class and then reached a settlement, the District Court would be overwhelmingly likely to authorize an opt out procedure, because absent class members would have never had any opportunity to consider any of the settlement's terms. *Id.*

Many of the defendants in these cases have the same attitude as do defendants in almost every mass action. They want global—*i.e.*, comprehensive and permanent—peace. They maintain that it is unacceptable that plaintiffs could opt out of a negotiated settlement and continue to litigate their claims. Order 2. The defendants' position, the District Court concluded, "created an obstacle to settlement" in this case. *Id.* The prospect that the "Defendants would then have paid a lot of money to settle non-litigating claims but would still have to litigate a host of potentially significant claims," it opined, was the basis for "creative thinking." *Id.*

The District Court appointed as Special Master a law professor who had co-authored an as-yet unpublished law review article proposing a way to remove that obstacle by giving defendants global peace: "a new form of class action entitled 'negotiation class certification.'" Order 2 & n.1. The distinctive feature of this new class action is to permit plaintiffs to opt out *only* "prior to a settlement being reached." *Id.* 2.

2

The District Court explained that in such a class action the "process unfolds in five stages":

(1)   Some plaintiffs unilaterally decide amongst themselves several features of any settlements, including principally how the proceeds of eventual settlements will be allocated among one category of class members (counties). By contrast, the allocation for many other plaintiffs (such as towns and cities) will be resolved after the opt out period.

(2)   The District Court approves those features of eventual settlements and certifies the negotiation class to resolve the others.

(3)   Plaintiffs are given notice and the opportunity to opt out of the negotiation class.

(4)   The class representatives negotiate settlements with defendants that wish to participate in the negotiation process.

(5)   The settlements are subject to preliminary approval by the District Court, a vote of the class, and final court approval. The vote requires approval by 75% of the voting class members, according to multiple measures. The District Court then grants final approval, binding all the class members.

Order 5-7.

Rejecting objections submitted by, *inter alios*, petitioners and other plaintiffs, 37 States, and various defendants, Order 4, the District Court held that Rule 23 authorizes such a scheme, *id.* 7. The Court recognized that prior to this case Rule 23 had been used to certify "trial class actions and settlement class actions." But it found significant that the Rule does not expressly "specif[y] that the class to be certified is for 'trial' or 'settlement' purposes," which the Court thought by inference authorized any other use of the class device—including for negotiation. *Id.* That conclusion was supported, the Court reasoned, by the fact that "Rule 23 is equitable in nature and its

3

purpose is to provide practical means for addressing complex litigation problems." *Id.* 9.

This Petition for leave to appeal followed.

## ARGUMENT

In determining whether to permit an appeal under Rule 23(f), this Court "eschew[s] any hard-and-fast test in favor of a broad discretion to evaluate relevant factors." *In re Delta Air Lines*, 310 F.3d 953, 959 (6th Cir. 2002) (per curiam). Those factors include whether the appeal "raises a novel or unsettled question" that is relevant "to class litigation in general," the "likelihood of the petitioner's success," and whether the District Court may later revisit its certification ruling. *Id.* at 959-60.[2] Each of those considerations weights decisively in favor of granting this Petition.

## I. Immediate Review Is Warranted.

This Court's immediate review of the Certification Order is plainly warranted. There is no doubt that the litigants and the judiciary would both benefit significantly from this Court's prompt determination of whether the District Court lawfully certified the class. Pursuant to the Certification Order, the following arduous process is now poised to begin:

---

[2] The District Court's Order is reviewed for abuse of discretion, but application of the wrong legal standard is, by definition, an abuse of discretion. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012).

(1)     respondents will notify tens of thousands of absent local governments of their "front end" opt out right;

(2)     those local governments will each determine individually whether to exercise that right;

(3)     respondents and numerous defendants will enter into negotiations, potentially reaching settlements;

(4)     the thousands of absent local governments will determine whether and how to vote with respect to accepting those settlements; and

(5)     the parties and objectors will litigate the fairness of those settlements, and the District Court will decide whether to approve them.

If this Court denies this Petition now, and instead invalidates the Certification Order on appeal from the District Court's approval of settlements (perhaps years from now), then all of that extensive effort will have been wasted.

No less important, in the interim, the litigation will *not* have moved forward under the traditional Rule 23 model. So, years of time may be lost. All agree that this litigation is intended to facilitate combatting an urgent national health care crisis. Multiple years of delay are too high a cost to pay to allow such a novel mechanism to proceed unexamined by this Court.

Respondents are in no position to oppose this Court's prompt determination of whether the Certification Order is lawful. In the District Court, they argued strenuously in favor of an early certification of the class on the ground that negotiations should not occur in the shadow of doubts about the class representatives' ability to resolve the litigation. So too, the District Court concluded that it "would be perverse

– and an enormous waste of judicial and social resources – to launch this whole
negotiation class only to later hold" that it was unlawful. Order 33 (quoting Dkt.
2529, at 3).

There is moreover no prospect that the District Court will later revisit its de-
termination to certify a negotiation class and allow the litigation to proceed to bind-
ing settlements. The Certification Order is definitive. It leaves no room for the Dis-
trict Court to later invalidate the class's authority to reach settlements.

## II.   The Certification Order Is Unlawful.

### A.   The Certification Order cannot be reconciled with the text and structure of Rules 23(b)(3) and 23(e).

The District Court in this case certified a class under Rule 23(b)(3). With re-
spect to such classes, the Rule authorizes only two forms of class action certification,
distinguished by the purpose for which a class will be certified. First, there are clas-
ses that are "proposed to be certified for purposes of settlement." Fed. R. Civ. P.
23(c)(2)(B). And, second, there are classes that are not so limited, and are instead
generally "certified under Rule 23(b)(3)" for all purposes, including litigation. *Id*.

Here, it is clear that the District Court certified the class "for purposes of set-
tlement," because the class it certified has no purpose or authority *other than* to seek
to reach a settlement. Indeed, if the class fails in achieving that purpose, it ceases to
exist. The Court thus made clear that the class could not litigate any claim. Order 32
("In reaching these conclusions, the Court makes clear that it has not certified these

claims or issues for trial."). Accordingly, the class certification the District Court undertook in this matter can be sustained, if at all, only by complying with Rule 23's dictates respecting a class that is "proposed to be certified for purposes of settlement." *See* Fed. R. Civ. P. 23(c)(2)(B), 23(e)(1).

But the Certification Order does not comply with the text of Rule 23 respecting such classes in several critical respects. *First*, in such a case, the district court provides simultaneous notice to the class of the "proposed" certification of a class action and the proposed settlement. *See* Fed. R. Civ. P. 23. Because the Rule contemplates that such classes have been proposed but not yet certified at the time of the notice, that notice must include two things: (1) the class notice, including the opportunity to opt out; and (2) the settlement notice, including the opportunity to object. *See* Fed. R. Civ. P. 23(c)(2)(B) (notice of the class action is provided "*upon ordering* notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement") (emphasis added); *see also* Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi) (providing that class notice must include notice of how to opt out). A case in which a class is certified "for purposes of settlement" thus contrasts procedurally with one in which "the class action was previously certified under Rule 23(b)(3)" for all purposes, because the class is not certified—and the opt out right is not provided—until the settlement is already reached. Fed. R. Civ. P. 23(e)(4).

The Certification Order does not fit into the procedure the Rule provides for settlement-only classes. Here, the certification precedes any (as yet unidentified) settlement, rather than happening simultaneously. That not only violates the Rule (which contemplates that classes created "for purposes of settlement" are still only "proposed" at the time of the Rule 23(e) fairness hearing) but also has enormous substantive implications. When a class is certified "for purposes of settlement," the plaintiffs are given the opportunity to opt out—while knowing the terms of the settlement. Fed. R. Civ. P. 23(c)(2)(B). The Certification Order strips the class members of that critical right by providing the right to opt out of the settlement-only class only before negotiations begin.

*Second*, before a class can be certified "for purposes of settlement" under the Rule, a settlement must exist. Rule 23 explicitly provides that a class may be certified "for purposes of settlement" only when the negotiations have been completed and there already exists "a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e). In fact, the District Court can only issue notice to a settlement class if it first determines as a preliminary matter that it "will likely be able to … approve the proposal [that is, the proposed settlement] under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B)(i). Then, after appropriate notice of the proposal, the District Court must make a finding "that [the settlement] is fair, reasonable, and adequate," including with respect to "the relief provided for the class." Fed. R. Civ. P.

23(e)(2)(C). Here, however, there is no settlement that the District Court even could consider or that could allow the Court to invoke the powers created by Rule 23(e). Instead, the Court considered only provisions presented unilaterally by the proposed class representatives, to which the defendants had not agreed at all.

Rule 23(b)(3) is already an "'adventuresome' innovation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), and the procedural mechanisms of the Rule are thus carefully designed to protect potential incursions on the rights of absent class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) (noting that Rule 23(b)(3)'s "greater procedural protections" fit Rule 23(b)(3)'s "'adventuresome innovation'" in "allow[ing] class certification in a much wider set of circumstances"). Accordingly, the Rule provides for the District Court to conduct a preliminary assessment of a "settlement"—not what the Court assessed here, which were provisions chosen by a group of self-selected plaintiffs that the defendants have never before indicated they would ever accept. And even if the Court takes a positive view of the "settlement," the Rule then requires that the Court direct complete notice to the proposed class, including notice of the nature of the settlement and class members' right to opt out. *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1).

No less important, the Rule lacks any of the procedures that would seem obviously necessary to protect the rights of class members in a "negotiation class."

9

That is strong evidence that the Rule does not contemplate such a scheme. The provisions of Rule 23(a) and Rule 23(b) address mandatory requirements of the class (such as numerosity) and the claims (such as predominance). *See* Order 15 (citing *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 278 (6th Cir. 2018)). By contrast, nothing in Rule 23(a) or Rule 23(b) spells out what features of a possible future settlement must be identified prior to the class notice for a negotiation class, nor does it explain how to assess those features before the class commences negotiating. Rule 23(e) provides criteria for assessing a settlement that has already been reached, but that situation is of course inapplicable here.

This case also illustrates the risks inherent in creating new procedures under Rule 23 that allow class members to be forever bound together in a negotiation class without any settled rules regarding the information they require. Here, the Court found it sufficient that respondents had identified the "proportion" of the monetary component of any settlement that particular counties would receive. But plaintiffs of course lack any information about the provision they care about most: *the actual amount of money*. If one county receives a wildly inadequate settlement amount— and one that it would never have accepted in exchange for abandoning the right to litigate its claims—it is cold comfort that it did no less badly than others. The counties also have no information on other critical provisions of any settlement, such as whether the defendants will make other, non-monetary contributions to combatting

10

the opioid epidemic. Equally important, other municipalities—such as towns and cities—must make the judgment whether to opt out without any information on the proportion of any settlement they would receive. It is thus unlikely that class members have actually received meaningful information to guide their right to opt out, even if it were permissible for the District Court to determine such critical issues on an ad hoc basis (which it is not).

There is moreover no justification for departing from the ordinary procedures contemplated by Rule 23. Respondents themselves stressed below that, prior to the Certification Order, plaintiffs were negotiating with defendants under the supervision of the District Court. Those plaintiffs were free to negotiate on behalf of a class with the same definition and same class representatives as the District Court approved in the Certification Order. If the plaintiffs and defendants successfully negotiated a settlement, they could present it for approval together with a class complaint. *See* Fed. R. Civ. P. 23(e). But the reason respondents did not follow that course is obvious. When a settlement class is properly presented, plaintiffs are entitled to notice of the settlement's terms and the opportunity to opt out. *Id.* That is precisely the right they seek to negate here.

In fact, the "negotiating class" is little more than a transparent effort to evade the procedures contemplated by Rule 23. Indeed, it is hard to see why, if the Certification Order is approved, the litigating parties in essentially any class action will

ever proceed through Rule 23(e)'s settlement class procedures. Defendants will always want to avoid post-settlement opt outs. The litigating plaintiffs and defendants will therefore determine basic terms of a settlement and secure the approval of a "negotiating class" to work out the important details.

So too, respondents are evading the strictures applicable to an ordinary litigating class. A certified litigating class can of course negotiate a settlement. And the prospect of litigation imposes pressure on the defendants to offer the plaintiffs better terms. In this case, respondents have never offered any explanation why they unilaterally disarmed themselves and disclaimed any ability to actually litigate on a class basis. The reason is obvious: it would be essentially certain that the District Court would grant plaintiffs the opportunity to opt out, because they would not previously have been presented with any of the settlement terms.

There is a still-further glaring omission from the Rule when it comes to the proposed negotiation class. If the premise is granted that it is sometimes appropriate to certify such a class, it becomes immediately obvious that there is no provision in the Rule to limit the circumstances in which that novel structure can be employed. Notably, the District Court's sole basis for creating the negotiation class procedure was the defendants' representation that they insist on "global" peace—the Court made no finding that the traditional class action mechanisms were unworkable, that

a back-end opt out would be impracticable, or that the same result could not be obtained through an opt-in mechanism. But it is hard to imagine that there is any case in which similar circumstances would not be presented, since global peace is the universal object of defendants in settling mass litigation. Moreover, if there is a procedure under which class members who want to opt out may nonetheless be forced to accept a settlement, it is hard to imagine that defendants will ever be willing to go without it, and that very fact will then be treated as a sufficient basis to create a "negotiation class." In other words, the purportedly extraordinary case will necessarily become the ordinary one, and because this innovation lacks any support in the Rule, there is nothing in the Rule to prevent that result.

Even if, contrary to the foregoing, the Certification Order were deemed to involve the mere certification of a class "under Rule 23(b)(3)," *see* Fed. R. Civ. P. 23(c)(2)(B)—despite the fact that the class lacks the essential power to litigate—it would still be invalid under Rule 23. When a class is certified with the prospect of later settlement, the Rule mandates that "the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members." Fed. R. Civ. P. 23(e)(4). The negotiations thus occur in the shadow of the District Court allowing a further, "back-end" opt out—a result the Rules Committee has favored because the "decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known." Fed. R. Civ.

P. 23(e)(3) advisory committee's note to 2003 amendment. The significant possibility that such an opt out will be granted obviously constrains the terms of the settlement, because they may be rejected by a substantial number of class members.

Here, by contrast, the District Court did everything possible to imply that it will not permit another opt out if the class enters into settlements. The Court's one and only basis for approving the negotiation class was the defendants' insistence that they would only enter into a settlement that gave them global peace and precluded further litigation by plaintiffs that were class members at the time. Further, the Court listed five stages of the process that notably excluded any back-end opt out. The fact that the District Court averted to the hypothetical prospect of a further opt out in a single, unelaborated and unexplained sentence in the Certification Order cannot overcome these clear signals that no such opt out will be permitted.

## B.    The class fails to provide adequate representation.

Rule 23(a)(4) allows certification only if "the representative parties will fairly and adequately protect the interests of the class." The principal role of the adequacy requirement is to prevent parties from determining the rights of absent class members through "a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627 (emphasis added). Accordingly, "[t]he adequacy inquiry under Rule 23(a)(4)

14

serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625.

Intra-class conflicts arise when class members seek conflicting remedies. Indeed, following *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *Amchem*, the clear rule is that, in any case involving subgroups with diverse or antagonistic interests, "[o]nly the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011). A representation is adequate if the "interests and incentives between the representative plaintiffs and the rest of the class" are aligned and not antagonistic. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3rd Cir. 2012); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (finding that the adequacy of representation turns on an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees).

The counties and cities whose claims would be bound to the negotiation class have substantially different interests in the nature of the relief they might receive and the consideration they may be willing to exchange. Some class members may have very little interest in prospective self-regulation given legislative regulation adopted by their applicable governing bodies. These class members may seek to maximize

the recovery for past damages in exchange for releasing defendants from all past and future liability. Other class members may not have suffered significant damages and are instead interested in maximizing the defendants' agreement to self-regulate.

The class cannot be certified because it fails to identify the distinctive interests of the numerous potential class members or propose separate classes with independent counsel to adequately represent their interest. *See Ortiz*, 527 U.S. at 856 ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims … requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

## C. Any doubt must be resolved against the Certification Order, which calls into question the constitutionality of Rule 23.

Even supposing that the class design at issue were permitted by the Rule, it would at least raise serious constitutional questions to provide only pre-settlement notice in this circumstance. That is true in two respects. First, the attorneys empowered to represent a settlement-only class do not have an adequate incentive to protect the interests of the class. And second, class members are not provided an adequate opportunity to protect themselves.

### i. Class counsel incentives

In *Ortiz*, the Supreme Court confronted a different but closely related problem involving the adequacy of counsel's incentives to protect the class in a settlement context. There, the issue was that some of the counsel representing the "substantially

16

unidentified global settlement class" had also negotiated a deal on behalf of separate, identified plaintiffs, whose payment was contingent on an agreement being reached with the broader class. 527 U.S. at 852. The Court reasoned that this left counsel in an untenable position: "Class counsel thus had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class." *Id.* The exact same incentive structure has, unfortunately, been created in this case as well: Because class counsel cannot take the case to trial, they face an overwhelming financial pressure to settle, and so reach any settlement they can get through a Rule 23(e) hearing, rather than to reach the best possible settlement for the class.

To be sure, there is always pressure on class counsel to settle, because a good outcome is more likely through settlement, and risk aversion points away from taking a case all the way to trial as the size of a class action gets larger and larger. But this is no defense to taking the situation over the line and creating a situation where settlement is the only way for class counsel to get their fee. The Supreme Court cautioned in *Ortiz* that courts would have to be particularly vigilant regarding the incentives of class counsel toward reaching any available settlement "in any class action settlement with the potential for gigantic fees." 527 U.S. at 852. As the Court explained: "In a strictly rational world, plaintiffs' counsel would always press for

17

the limit of what the defense would pay. But with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant." *Id.* at 852 n.30. This concern magnifies exponentially if counsel lacks the power to take the case to trial, and can only be assured of their entitlement to 10% of a judgment expected to be in the billions of dollars if they manage to reach a settlement the defendants can accept.

Indeed, evidence of the inadequate incentives of counsel might be evidenced in their advocacy of this plan itself. The main pressure to create this unique class that lacks a right to opt out of any negotiated settlement comes from the defendants' desire for global peace. Class counsel are indulging that desire with a plan that strips their own class members of their ordinary procedural rights. And what is worse, they now propose to enter negotiations with defendants having stripped themselves of a credible threat to take the case to trial. No counsel with a well-designed incentive structure would start unilaterally disarming before even entering negotiations.

### ii.    *Adequate opportunity to opt out*

The Fifth Amendment prohibits the federal government from depriving persons of their property "without due process of law." U.S. Const. amend. V. That prohibition governs the entry of a judgment resolving a claim in litigation, because the claim is a "species of property protected by the … Due Process Clause," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), the individual's right to pursue

the claim is "a constitutionally recognized property interest." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985).

On that basis, *Shutts* held that if a court "wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection," including not only the "best practicable" notice but also "an opportunity to remove himself from the class." 472 U.S. at 811-12; *see also Dukes*, 564 U.S. at 363 ("In the context of a class action predominantly for money damages we have held that absence of notice and opt out violates due process."). The right to object to the settlement is not enough: Class members must have the right to remove themselves from the judgment and pursue their claims on their own. The Court reaffirmed that "mandatory class actions aggregating damages claims implicate the due process 'principle' … 'deep-rooted [in our] historic tradition that everyone should have his own day in court.'" *Ortiz*, 527 U.S. at 846.

As an initial matter, when a constitutional right is given away—like the individual's right to litigate their own cause of action—that waiver is supposed to be knowing and voluntary. But class members here are being asked to tie themselves to the mast of the negotiation class without knowing whether the settlement will be for anything between millions and tens of billions of dollars. We assume that the negotiation class will also have (and, really, must also have) the power to negotiate for

19

injunctive relief, structural reforms, or the creation of programs that will have bene-
fits across multiple county or subcounty class members. At the time they are asked
to surrender their right to opt out, class members will have no idea what those pro-
grams might look like, how they will affect their interests, and whether those kinds
of relief will benefit them more or less than a strictly monetary settlement.

Class members are particularly ill-informed at this stage about what kinds of
claims—including future claims—are being released. Plaintiffs know what share of
a monetary award they are getting, and that they will not be entitled to opt out and
pursue their own case now if they do not exercise their pre-settlement right to be
excluded from the negotiation class. But often the nicest part of the negotiations
involves the determination of what kinds of claims will be released, for how long,
and to what extent. Defendants will no doubt want the broadest release that they can
secure, and plaintiffs' counsel will have at least some incentive to provide a broad
release, given the additional funds it can secure. Without knowing precisely what
rights will be traded away—even beyond the right to individually pursue this partic-
ular suit—plaintiffs are being asked to surrender rights absent the knowledge and
voluntariness that the Constitution requires.

## CONCLUSION

The Petition should be granted.

20

September 25, 2019

Respectfully submitted,

James L. Ferraro
Dick M. Ortega
THE FERRARO LAW FIRM
Brickell World Plaza
600 Brickell Avenue, Suite 3800
Miami, FL 33131
(305) 375-0111

/s/ Thomas C. Goldstein
Thomas C. Goldstein
Eric F. Citron
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814
(202) 362-0636
tgoldstein@goldsteinrussell.com

*Counsel for Petitioners City of North Royalton, Ohio; City of East Cleveland, Ohio; City of Mayfield Heights, Ohio; City of Lyndhurst, Ohio; City of Huron, Ohio; and City of Wickliffe, Ohio*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 5(c)(1) because it contains 4,951 words, excluding the parts exempted by Fed. R. App. P. 5(c) and 32(f) and Sixth Circuit Rule 32(b).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

September 25, 2019                    /s/ Thomas C. Goldstein
                                      Thomas C. Goldstein

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2019, an electronic copy of the foregoing Petition for Permission to Appeal Pursuant to Fed. R. Civ. P. 23(f) was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by e-mailing same to CA06-ECF-PetitionsForFiling@ca6.uscourts.gov.

I further certify service was accomplished on all other parties to the District Court action by simultaneously filing the foregoing document as an attachment to a notice of filing with the Clerk of Court for the U.S. District Court for the Northern District of Ohio by using that court's CM/ECF system, which will send notification of filing to all counsel of record in the District Court.

/s/ Thomas C. Goldstein
Thomas C. Goldstein

Case: 19-306 Document: 1-2 Filed: 09/26/2019 Page: 28

# ATTACHMENT 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| _____ ) | **Case No. 1:17-MD-2804** |
| **IN RE: NATIONAL PRESCRIPTION** ) | |
| **OPIATE LITIGATION** ) | **Judge Dan Aaron Polster** |
| ) | |
| ) | **MEMORANDUM OPINION** |
| ) | **CERTIFYING NEGOTIATION** |
| ) | **CLASS** |
| _____ ) | |

Before the Court is Plaintiffs' Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class.  Doc. #: 1820.  Various Defendants and a handful of putative class members oppose the motion, as do 37 State Attorneys General and the Attorneys General of Guam and the District of Columbia.  After consideration of all of the briefing on this motion, and oral argument held on August 6, 2019, and all of the prior proceedings herein, the Plaintiffs' Motion is **GRANTED-IN-PART**.  This Memorandum opinion explains the Court's reasoning.  An Order will issue separately.

## I.      THE NEGOTIATION CLASS CERTIFICATION MOTION

A.      <u>Background</u>

On December 12, 2017, the Judicial Panel on Multidistrict Litigation (JPML) transferred all opioid-related litigation pending in federal courts throughout the United States to this forum for consolidated pretrial proceedings.  Doc. #: 1.  At present, this multidistrict litigation (MDL) encompasses more than 2,000 individual actions.  Most of these constituent cases have been filed by cities and counties throughout the United States seeking, *inter alia,* reimbursement for monies they have expended – and continue to spend – addressing the opioid crisis.  The Defendants include numerous manufacturers, distributors, and pharmacies.  Beyond the

1

thousands of cases pending here, many other municipalities are litigating similar opioid-related lawsuits in state courts throughout the United States.

From the outset of this MDL, the Court has encouraged the parties to settle the case. Settlement is important in any case. Here, a settlement is especially important as it would expedite relief to communities so they can better address this devastating national health crisis. A Court-appointed Special Master (Professor Francis McGovern) has overseen extensive settlement negotiations. The Defendants have insisted throughout on the need for a "global settlement," that is, a settlement structure that resolves most, if not all, lawsuits against them arising out of the opioid epidemic. This has created an obstacle to settlement. In a standard settlement class action, the class members can opt out of the class after the settlement is reached. With thousands of counties and cities already litigating, the Defendants in this MDL are concerned that many of these Plaintiffs could opt out. The Defendants would then have paid a lot of money to settle non-litigating claims but would still have to litigate a host of potentially significant claims. This situation required creative thinking. The Special Master, in conjunction with experts and the parties in the case, developed an innovative solution: a new form of class action entitled "negotiation class certification."[1]

The idea is to undertake the class certification and opt-out process prior to a settlement being reached, as is done in a normal class action geared toward trial. This will fix a class size and provide the Defendants a sense of the precise scope of the group with whom they are negotiating. The class members' rights are protected in several critical ways. At the front end, before having to make the opt-out decision, the class members can calculate their share of any

---

[1] The Special Master and Professor Rubenstein, the Court's expert in this matter, have produced a scholarly version of the idea. *See* Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Class Actions Involving Large Stakeholders* (Duke Law Sch. Pub. Law & Legal Theory Series, Paper No. 2019-41, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3403834.

future settlement; here, groups of Plaintiffs and Plaintiffs' attorneys have worked together to establish a public health-based settlement allocation plan, the details of which are all made available to the Class and public at a case website, www.opioidsnegotiationclass.info.   At the back end, each class member will be entitled to vote (yes or no) on whether a proposed settlement amount is sufficient, and no settlement will be deemed accepted unless it garners a supermajority (75%) of those voting; here, a proposal will need to secure approval from six separate supermajority vote counts, reflecting different slices of the class.   Additionally, of course, the Court protects the absent class members:   Rule 23 requires that the Court make specific determinations before permitting a class action to go forward, Fed. R. Civ. P. 23(a), (b)(3), (c), (g), and similarly requires that the Court – independent of the class's vote – approve any proposed settlement and attorney's fees,  Fed. R. Civ. P. 23(e), (h).

As discussed more fully below, the Court is mindful of the fact that this is a novel procedure and one opposed by the vast majority of State Attorneys General, who themselves are actively pursuing important State opioid litigation.  The Court has determined that the procedure is a legitimate one, that certification is warranted based on the facts of the case, and that the whole process is more likely to promote global settlement than it is, as the Attorneys General argue, to impede it.  Regardless, there is nothing coercive about this process:  no Defendant has to employ it.  There is nothing exclusive about this process:  it does not interfere with the States settling their own cases any way they want, and it does not stop parties in the MDL from settling in other ways.  And there is nothing intrusive about this process:  it does not stop any litigation from continuing and in no way interferes with the upcoming bellwether trials in this MDL.  This process simply provides an option – and in the Court's opinion, it is a powerful, creative, and helpful one.  The Court therefore grants certification of the negotiation class but, mindful of the

objections that have been mounted against it, upon terms more carefully prescribed and delimited than those proposed by the Plaintiffs.

B.    The Motion

By motion dated June 14, 2019, the Plaintiffs' leadership team in this MDL filed a motion on behalf of 51 cities and counties entitled, Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, Doc. #: 1683; Doc. #: 1690 (corrected version).  A variety of parties responded to this motion, including a group of Distributor Defendants, Doc. #: 1720, and a group of Pharmacy Defendants, Doc. #: 1723, but no Manufacturer Defendants.  Moreover, two sets of State Attorneys General – representing 30 States, the District of Columbia, and Guam – sent letters to the Court registering their disapproval of the proposed motion.  Doc. ##: 1726, 1727.  The Court held a hearing on the initial motion on June 25, 2019, and at that time adopted a briefing schedule enabling the Plaintiffs to re-brief the motion in light of the filed oppositions. Accordingly, on July 9, 2019, the Plaintiffs filed a Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class.  Doc. #: 1820; *see also* Doc. #: 2135 (Statement of City of Manchester, New Hampshire Supplementing Plaintiffs' Renewed Motion).  On July 23, a set of nine Distributor and Pharmacy Defendants filed a brief opposing the motion, Doc. #: 1949, while a group of Manufacturing Defendants filed a brief asking the Court to clarify the relationship of negotiation class certification to *American Pipe* tolling, Doc. #: 1952;[2] other Defendants subsequently noted their joinder in these responses, Doc. ##: 1954, 2057.  A group of six (6) Ohio cities filed a brief in opposition, Doc. #: 1958, later joined by a seventh city, Doc. #: 2064, while another putative class member (City of Fargo, North Dakota) filed a brief asking the Court to clarify the end date for inclusion in a particular sub-group of the

---

[2] Movants disclaim any tolling effect of their motion, Doc. #: 2076 at 19, so the Court need not address this issue at this time.

proposed negotiation class, Doc. #: 1953. A letter to the Court joined by 37 State Attorneys General, as well as the Attorneys General of the District of Columbia and Guam, strongly urged the Court to reject the motion. Doc. ##: 1951, 1955. The Ohio Attorney General, who signed that letter, also filed a separate letter of his own registering further opposition. Doc. #: 1973. On July 30, 2019, the Plaintiffs filed a reply to these oppositions. Doc. #: 2076. On August 6, 2019, this Court held a hearing on the motion.

C.     The Proposed Process

The negotiation class certification process unfolds in five stages:

1.     *Allocation/Voting*. Class members first develop a plan for allocating a lump sum settlement among the class and a plan for voting on the reasonableness of any lump sum settlement that is achieved. This enables each class member to know its settlement share and franchise prior to the opt-out deadline. Here, the MDL Plaintiffs' leadership has met with numerous groups of Plaintiffs and public health experts to create the allocation plan. Doc. #: 1820-1 at 49. The plan proposes distributing 75% of the lump sum to counties, with each county's share calculated according to three equally-weighted public health factors. *Id.* at 48–49, 55–60. The county's share is then divided among the county and its constituent cities, ideally through negotiated agreement. *Id.* at 60. Of the remaining 25%, 10% is set aside for a "Private Attorneys' Fee Fund," from which private attorneys – defined as any counsel with representation agreements with one or more Class members executed as of June 14, 2019 – could seek fees in lieu of enforcement of private contingency fee contracts with their clients. *Id.* at 49–50. Finally, 15% is set aside for a "Class Members' Special Needs Fund," to cover the special needs and expenditures of any Class member that are not addressed by the class-wide allocation formula, including expenses associated with litigation. *Id.* at 96. All of these amounts are subject to

5

Court approval and any of this 25% (the Private Attorneys' Fee Fund and the Class Members' Special Needs Fund) not so distributed is then re-distributed across the class according to the allocation plan. *Id.* at 95, 97.

The voting model is both simple and complex. Doc. #: 1820 at 8–9. If a lump sum settlement is reached with a Defendant, each class member will be given the opportunity to cast a single, simple, yes/no vote as to whether the size of the lump sum settlement is sufficient. The votes will then be counted to ensure the settlement is accepted by 75% of all voting entities by number, 75% of all voting entities by population, and 75% of all voting entities by allocation; each of those three types of votes will be counted twice, once among jurisdictions that had filed lawsuits as of June 14, 2019 ("litigating entities") and once among jurisdictions that had not ("non-litigating entities"). The various counts ensure that: (1) the plethora of smaller counties cannot alone control an outcome (the population vote guards against that); (2) the plethora of small-recovery counties cannot alone control an outcome (the allocation vote guards against that); and that (3) neither the litigating nor non-litigating entities alone can control an outcome.

Part IV of this Memorandum analyzes the equities of the allocation and voting plans.

2. *Class Certification.* With the allocation and voting plans in place, plaintiffs move for certification of the negotiation class, as have the present movants.

3. *Notice and Opt-Out Period.* If the Court approves the motion, the class members are given notice of class certification and an opportunity to opt out. Here, movants propose a 60-day opt-out period. During that time, class members can assess their share of a lump sum settlement and the proposed voting structure at the class website to determine whether they want to be part of this negotiating group.

4. *Lump Sum Settlement Negotiation.* At the conclusion of the opt-out period, with the size of the class set, the class is ready to negotiate a settlement with one or more defendants. No defendant is required to negotiate with the class and the underlying litigation activities continue unabated.

5. *Judicial Approval, Including Class Vote.* If a settlement is reached, the parties move for judicial approval, as required by Rule 23(e). That process encompasses three parts: (a) the Court must preliminarily approve the settlement, Fed. R. Civ. P. 23(e)(1); (b) class members are then given their opportunity to vote on the settlement, and they may file objections with the Court, Fed. R. Civ. P. 23(e)(5); and (c) if the Class votes to accept the settlement, class counsel moves for final approval. The Court would then make the same determination as to the settlement's reasonableness as Rule 23 requires it to do in any class action. Fed. R. Civ. P. 23(e)(2).

## II.    RULE 23 AUTHORIZES NEGOTATION CLASS CERTIFICATION

Rule 23 authorizes a court to certify a case, or issues within a case, for class treatment if certain requirements are met. Since adoption of the current version of Rule 23 in 1966, courts have generally certified two types of class actions: trial class actions and settlement class actions. The present motion asks this Court to certify a "negotiation class action." The concept and procedure are set forth above. The question addressed here is whether Rule 23 authorizes this procedure. The Court finds that it does.

An important starting point is that the text of Rule 23 does not dictate, nor therefore limit, the uses to which the class action mechanism can be applied. Rule 23(a) and (b) set forth the requirements that must be met before a court can certify a class, but neither specifies that the class to be certified is for "trial" or "settlement" purposes. Defendants point to the fact that

several passages in Rule 23 specifically reference settlement, as opposed to trial, classes.  Doc. #: 1949 at 7.  They argue that these passages demonstrate that the Rule authorizes only trial and settlement classes.  *Id.*  Their argument is not convincing.  The passages they reference were not added to Rule 23 until December 2018, yet 21 years before that – when Rule 23 contained no explicit reference to settlement class actions – the Supreme Court affirmed courts' use of the settlement class action device.   *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 618 (1997).  Moreover, the passages that were added in 2018 do not authorize settlement classes but simply identify certain procedures relevant to those types of class actions.

The history of class action law provides further support for this new use of the class action procedure.  Soon after Rule 23's adoption in 1966, parties began asking courts to certify settlement class actions, that is, cases that had already been settled prior to the court's certification of a class.  *See, e.g.*, *Philadelphia Hous. Auth. v. Am. Radiator & Standard Sanitary Corp.*, 323 F. Supp. 364 (E.D. Pa. 1970), *aff'd and modified sub nom. Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971).  This development was deemed novel and had its share of detractors.  *See Manual for Complex Litigation* § 1:46 (4th ed. 1977) ("There is, to say the least, serious doubt that this practice is authorized by Rule 23 as amended, even if it is conceded that the courts are expected to develop new methods of employing the amended Rule 23.").  Many critics made the same argument then that detractors of the proposed negotiation class make now:  that the use is not authorized by the rule.  The lower courts rejected this argument, and in its 1997 decision in the *Amchem* case, the Supreme Court affirmed that Rule 23 authorized settlement class actions.  *Amchem*, 521 U.S. at 618 (noting that "all Federal Circuits recognize the utility of Rule 23(b)(3) settlement classes" and approving use of the device).  The Defendants' reliance on *Amchem* for the proposition that "in recent years [the Supreme Court

8

has] repeatedly warned that new innovations that go beyond the express scope of Rule 23 are prohibited," Doc. #: 1949 at 8 n.8, is therefore unpersuasive and inapposite.

Finally, it is not surprising that the history of Rule 23 supports different uses of the class action device, and the text does not prohibit these, because Rule 23 is equitable in nature and its purpose is to provide practical means for addressing complex litigation problems. Myriad judicial decisions have accordingly supported liberal application of Rule 23. *See, e.g.*, *Schneider v. Elec. Auto-Lite Co*., 456 F.2d 366, 370 (6th Cir. 1972) ("[T]he District Court was correct in liberally interpreting Rule 23 in order to avoid burdensome litigation and to give efficient disposition to this action.").

One aspect of the negotiation class action process that differs from a settlement class action is that class members must make their decision whether to opt out before knowing the size of the settlement. Some argue this violates the Due Process Clause. Doc. #: 1958 at 8–12. It does not. In a normal trial class action, class members must make their opt-out decision at the outset of the suit, before the result is known, and no one argues that process is unconstitutional. Moreover, in that process, if their trial attorneys later settle the case, Rule 23 enables a Court to offer a second opt-out opportunity but does not require it to do so. Fed. R. Civ. P. 23(e)(4). If there were a constitutional right to opt out once the outcome was known, Rule 23 would require a second opt-out opportunity, not just authorize it. Here, class members are given sufficient information to make an informed decision about whether they want to bind themselves to a negotiation process, from which they will receive a known portion of the outcome and in which they will get a right to vote on the settlement. Moreover, the Court always retains the option of enabling a second opt-out opportunity if circumstances require.

The Defendants also note that a few courts have rejected the 75% voting idea when employed outside the class action context, Doc. #: 1949 at 25–26 (citing *Tax Auth., Inc. v. Jackson Hewitt, Inc*., 898 A.2d 512, 521 (N.J. 2006); *Hayes v. Eagle-Picher Indus., Inc*., 513 F.2d 892, 894–95 (10th Cir. 1975)), and argue that the voting process therefore cannot be employed within the class action context. But the two contexts are distinct: class members in class actions, unlike individual mass tort plaintiffs, are not given individualized settlement approval rights. All class members are automatically bound unless they can and do opt out. Moreover, in a normal settlement class action, class members may either object or opt out, but if they object and lose their objection, they cannot then opt out: they are instead bound to a settlement with which they disagree. The voting process is therefore consistent with the class action mechanism.

More generally, the Defendants argue that a negotiation class violates Article III because it is somehow unrelated to a judicial function. Doc. #: 1949 at 7–8. They concede, as they must, that a settlement class is legitimate, noting that it assists a court in its judicial function of "entering a judgment of approval on a class settlement." *Id.* at 8. But negotiation class certification serves an even more important judicial function at an even more important juncture in the litigation: in certifying a negotiation class, the Court undertakes the familiar judicial function of ensuring that the class certification requirements are met and the absent class members' interests are protected by those who purport to represent them, *prior to those agents negotiating a settlement for the absent class members*. Negotiation class certification therefore corrects one of the long-standing concerns of settlement class actions: that un-approved agents have settled un-certified claims. *See, e.g.*, *Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3d Cir. 1971) (examining argument that lawyer, "having bargained the settlement terms

10

with defendants prior to his official designation by the court as class representative . . . may be under strong pressure to conform to the defendants' wishes").  Moreover, assisting parties in creating a settlement, particularly in a large case of this type with contested liability and adversarial litigation, is itself a meaningful judicial function.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 923 (6th Cir. 2019) (noting, without censure, that "[t]he district court presiding over this potentially momentous MDL has repeatedly expressed a desire to settle the litigation before it proceeds to trial").

## III.    THE REQUIREMENTS OF CLASS CERTIFICATION ARE MET

A.    <u>The Claims and Issues</u>

Rule 23(c)(1)(B) states that: "An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)."  Fed. R. Civ. P. 23(c)(1)(B).  The Defendants argue that the movants have failed to proffer sufficient evidence in support of their motion and/or that the motion is not tethered to a particular complaint.  Doc. #: 1949 at 9–13.  (Defendants also complain about a lack of discovery concerning the class representatives.  *Id.* at 12 n.13.  They filed two briefs in response to movants' original proposal, Doc. ##: 1720, 1723, and appeared at the June 25, 2019 hearing on the motion, yet never asked for or filed a motion seeking discovery).

The current motion does not arise in a factual vacuum.  This MDL has been pending for nearly two years.  The Court has undertaken extensive review of the factual and legal issues in the case.  Several bellwether trials will commence shortly and the Court has ruled on critical motions to dismiss, myriad discovery matters, and a variety of complex and voluminous summary judgment motions.  The Court and parties are deeply steeped in the legal and factual issues in the case, and the extensive record of the case – now over 2,500 entries on the MDL

docket alone – provides more than sufficient factual and legal context for a decision on class certification. The Defendants' concern that the present motion is not tethered to a specific complaint implies that there is an absence of relevant pleading in this matter. If there is a problem in this case, however, it is one of glut, not famine: there are more than 2,000 complaints pending here, many of which exceed 300 pages in length. Although parties sometimes make class allegations in their complaint, Defendants point to no precedent holding that class allegations in a complaint are a necessary prerequisite to a class certification motion under Rule 23; similarly, although in MDLs of this type there are sometimes master complaints, there is no MDL-specific (or any other) rule requiring such a complaint and, absent specific agreement to the contrary, such complaints are typically purely administrative in nature. *See* William B. Rubenstein, 3 *Newberg on Class Actions* § 10:15 (5th ed. 2019) [hereinafter *Newberg on Class Actions*].

Contrary to the Defendants' assertions, the movants specifically point the Court to the allegations contained in Cuyahoga County, Ohio's pleadings. Doc. #: 1820-1 at 78 n.40. Given the Court's extensive knowledge of the heavily-developed legal and factual record in this matter, and the discretion Rule 23 delegates to it, the Court adopts movants' approach but utilizes as its reference the allegations in substantially similar complaints filed by Summit County, Ohio (Doc. ##: 513, 1466). The Court references the Summit County pleadings for several inter-related reasons: (1) Summit County is one of two bellwether cases set for trial in the coming month, with its facts and legal allegations well-known to the Court and litigants; (2) Summit County's complaint was extensively tested through motions to dismiss covering thousands of pages of documents and nearly a year of litigation, Doc. #: 1203; (3) Summit County's complaint was the basis of a "short form complaint" process that enabled all plaintiffs in this MDL to incorporate

12

by reference certain of the legal and factual allegations therein, Doc. #: 1282; (4) the vast bulk of the 49 putative class representatives – and numerous other plaintiffs – have accordingly adopted the Summit County pleadings.[3]

The Summit County complaint and related short-form complaint enabled MDL plaintiffs – by checking a few boxes – to adopt two federal RICO claims and a set of factual allegations encompassing, *inter alia*, issues arising out of the federal Controlled Substances Act. The first RICO claim, levelled against manufacturers labelled "RICO Marketing Defendants," alleges the manufacturers engaged in a variety of activities that misled physicians and the public about the need for and addictiveness of prescription opioids, all in an effort to increase sales. *See* Summit County Pleadings, Doc. #: 513, ¶¶ 814–48 (facts), ¶¶ 878–905 (law), Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶3, at 3–4, ¶5. The second RICO claim, levelled against manufacturers and distributors labelled "RICO Supply Chain Defendants," alleges these defendants ignored their responsibilities to report and halt suspicious opioid sales, all in an effort to artificially sustain and increase federally-set limits (quotas) on opioid sales. *See* Summit County Pleadings, Doc. #: 513, ¶¶ 849–77 (facts) ¶¶ 906–38 (law), Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶3, at 3–4, ¶5. The complaints also allege that the Controlled Substances Act required the manufacturers, distributors, and pharmacies to create internal systems to identify, report, and suspend unlawful opioid sales, and that defendants failed to meet those obligations; these factual allegations underlie the second RICO claim above and are also

---

[3] The Court is aware that as Summit County's bellwether trial has approached, the County has settled with some defendants and that the County is no longer proposed as a class representative. Doc. #: 2583 at 5. However, using its complaints as the reference for analysis of the claims and issues suitable for class certification remains appropriate given that so many other plaintiffs here have adopted those same claims and issues through the short-form process and/or have filed complaints that are substantially identical in relevant passages to the Summit County complaint. *See, e.g.*, Second Amended Complaint of Cabell County Commission (W.Va.), Doc. #: 518; Second Amended Complaint of County of Monroe, Michigan, Doc. #: 522; Second Amended Complaint of Broward County, Florida, Doc. #: 525.

pertinent to adjudication of myriad state-based legal claims, from public nuisance to negligence. *See* Summit County Pleadings, Doc. #: 513, ¶¶ 504, 506–659, Short Form Complaint Ruling, Doc. #: 1282-1 at 3 ¶ 3.

Based on these pleadings, which are common across many, if not most, of the MDL litigants and putative Class Representatives, the Court will analyze the movants' request to certify for class treatment:[4]

1. a RICO <u>claim</u> arising out of the alleged Opioid Marketing Enterprise, as against five (5) named Defendants – Purdue, Cephalon, Janssen, Endo, and Mallinckrodt – under Rule 23(b)(3) (Doc. #: 1820-1 at 83);

2. a RICO <u>claim</u> arising out of the alleged Opioid Supply Chain Enterprise, as against eight (8) named Defendants – Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen – under Rule 23(b)(3) (Doc. #: 1820-1 at 84); and,

3. two <u>issues</u> related to Defendants' obligations under the Controlled Substances Act, against thirteen (13) named Defendants – Purdue, Cephalon, Endo, Mallinckrodt, Actavis, Janssen, McKesson, Cardinal, AmerisourceBergen, CVS Rx Services, Inc., Rite-Aid Corporation, Walgreens, and Wal-Mart – under Rule 23(c)(4) (Doc. #: 1820-1 at 91 n.46 & at 84–86):

   a. What are the specific obligations of each defendant under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations, 21 C.F.R. § 1301 *et seq.*, arising out of the requirement that registrants "provide effective controls and procedures to guard against theft and diversion of controlled substances," 21 C.F.R. § 1307.71(a)?

   b. Did each defendant's action satisfy these obligations with respect to prescription opioids?

---

[4] The Court uses simple names for the 13 Defendants listed in the following numbered paragraphs, but adopts the definitions of the related Defendant entities set out in the Summit County Complaint, Doc. #1466 at 13–35.

14

c.

B.     The Class Certification Standard

The Sixth Circuit has held that: "Any class certification must satisfy Rule 23(a)'s requirement of numerosity, commonality, typicality, and adequate representation [and] fit under at least one of the categories identified in Rule 23(b)." *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 278 (6th Cir. 2018).  Under Rule 23(b)(3), class certification is appropriate if (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) class resolution "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Additionally, Rule 23(c)(4) states that "[w]hen appropriate, an action may be . . . maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).  The Sixth Circuit recently affirmed the utility of such "issue certification," explaining that Rule 23(c)(4) "contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution."  *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 413 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019).  After confirming existence of a cognizable class, this Court will accordingly consider all of the factors of Rule 23(a) and 23(b)(3) as they apply to both the RICO claims and the CSA issues, as against each relevant Defendant.

C.     The Class is Ascertainable

Rule 23(b)(3) classes must be ascertainable.  *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016).  For a class to be ascertainable, the "class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012) (citation omitted).  It is administratively feasible for the Court to determine class

15

membership if the class is defined by reference to objective criteria, and with reasonable accuracy. *See id.* at 538–39; *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015).

> The present motion seeks certification of a single national class, defined as:

> all counties, parishes, and boroughs (collectively, "counties"); and all incorporated places, including without limitation cities, towns, villages, townships, and municipalities, as defined by the United States Census Bureau (collectively "cities") as listed on the Opioids Negotiation Class website, opioidsnegotiationclass.com.

Doc. #: 1820 at 3. The class definition is based on purely objective criteria and is accompanied by an Excel spreadsheet at the website that lists the names of each of the proposed class members in 34,458 rows. The class is therefore not only ascertain*able*, its membership has been ascertain*ed*. Defendants argue that the complexity of governmental structures across the country creates some ambiguous situations and they provide a single such example. Doc. #: 1949 at 3 n.3. Such minor technical issues can be worked out going forward. For purposes of class certification, the Court finds that the class is adequately defined.

D.     Rule 23(a)(1):  The Class is So Numerous That Joinder is Impracticable

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Sixth Circuit has held that "no strict numerical test exists to define numerosity," *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013), but that "'substantial' numbers . . . are sufficient to satisfy this requirement." *Id.* The proposed class consists of 34,458 public entities dispersed throughout the entire United States. Defendants explicitly concede that "numerosity is self-evident here." Doc. #: 1949 at 13. The Court finds that the class is so numerous that joinder of all members would be impracticable and thus that this requirement has been satisfied.

E.     Rule 23(a)(2):  There are Common Questions of Law or Fact

Rule 23(a)(2) requires plaintiffs to prove that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Despite the Rule's use of the plural "questions," the Supreme Court has held that a single common question will suffice. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Yet, "because the commonality requirement is qualitative, not quantitative," 1 *Newberg on Class Actions* § 3:22, at least one common issue must be central to the litigation, *see Wal-Mart*, 564 U.S. at 350 ("That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").

This putative class action occurs within a multi-district litigation (MDL). In creating this MDL, the Judicial Panel on Multidistrict Litigation (JPML) has steered thousands of individual actions pending throughout the nation to this Court. Its authority to do so turns on the presence of common questions. 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."). In initiating this MDL, the JPML held:

> All actions involve common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs. Both manufacturers and distributors are under an obligation under the Controlled Substances Act and similar state laws to prevent diversion of opiates and other controlled substances into illicit channels. Plaintiffs assert that defendants have failed to adhere to those standards, which caused the diversion of opiates into their communities.

Doc. #: 1 at 3. Rejecting the argument that uncommon issues would generate inefficiencies if an MDL were formed, the JPML concluded: "All of the actions can be expected to implicate common fact questions as to the allegedly improper marketing and widespread diversion of prescription opiates into states, counties and cities across the nation . . . ." *Id.*

17

While commonality for pre-trial centralization purposes under § 1407 may not be precisely the same test as commonality for class certification purposes under Rule 23, it is close[5] and, regardless, the JPML's recitation, like the movants' papers, Doc. #: 1820-1 at 64–66, 81, identifies common issues that are qualitatively decisive for Rule 23 purposes.  Moreover, there is direct evidence of the commonality of the claims and issues in this matter given that the short-form complaint process enabled MDL plaintiffs to adopt these specific claims and issues, and many did so.  The Court finds that there are questions of both law and fact, as to the specified claims and issues, common to the class with respect to each relevant Defendant; the discussion in sub-section I, below, concerning whether these common questions predominate, sets forth with more particularity the specific common RICO and CSA issues.

F.    Rule 23(a)(3):  The Class Representatives' Claims are Typical of Those of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims'" such that "by pursuing their own interests, the class representatives also advocate the interests of the class members."  *In re Whirlpool Corp.*, 722 F.3d at 852–53 (6th Cir. 2013) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)).  "The test for typicality is not demanding . . . . [T]he plaintiffs' claims need not be identical to those of the class; typicality will be satisfied so long as the named representatives' claims share the same essential characteristics as the claims of

---

[5] Defendants rely on *In re Saturn L-Series Timing Chain Prod. Liab. Litig.*, No. 8:07CV298, 2008 WL 4866604, at *25 n.21 (D. Neb. Nov. 7, 2008) to argue that "[c]lass certification thus cannot be bootstrapped from the existence of an MDL."  Doc. #: 1949 at 27.  But the footnote that they reference distinguished the JPML's finding of *commonality* from Rule 23's finding of *predominance*.  Moreover, in referencing the JPML's commonality finding as a good description of the common issues in this case, the Court is not "bootstrapping" on those findings; it is making its own independent determination of the presence of these findings and using the JPML's recitation as a descriptor.

the class at large."  1 *Newberg on Class Actions* § 3:29 (internal quotation marks and footnotes omitted).

As to the claims and issues identified for class treatment, the Court finds that the Class Representatives' claims are typical of those of the Class.  The movants propose a total of 49 different counties and cities – from 30 states – to serve as Class Representatives.[6]  The Court has reviewed the complaints (and where filed, short-form complaints) of each of the 49 proposed Class Representatives.  These complaints demonstrate that the Class Representatives and the absent Class Members share an identity of interests.  All are cities or counties, and are all generally interested in the same end: recouping money they have been forced to pay to address the opioid epidemic and ameliorating that epidemic.  If the Class Representatives pursue their own interests identified in these complaints, they will necessarily be pursuing the interests of the absent class members.  There is nothing unique about any of the proposed Class Representatives that would set them apart in meaningful ways from the absent class members.

The Defendants set forth a list of contentions to the contrary, Doc. #: 1949 at 38–39, but most are either irrelevant, recede in importance given the Court's adoption of the short-form complaint claims and issues for certification ("Differences in the causes of action asserted in the complaints . . . Differences in the identities of the defendants . . . Differences in the nature and quality of evidence available . . . ."), or are differences that do not defeat typicality ("Differences in the . . . scope of opioid-related harms . . . ."), *see Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (finding typicality requirement met where class representative's and "other class members' claims arise from the same practice . . . [and] the same defect . . . and are based on the same legal theory. Typicality is satisfied despite the different factual circumstances regarding the

---

[6] The movants initially proposed 51 class representatives, Doc. #: 1820 at 2, but later withdrew two (Cuyahoga County, Ohio and Summit County, Ohio).  Doc. #: 2583 at 5.

manifestation of the [defect] . . ."); 1 *Newberg on Class Actions* § 3:43 ("Courts routinely find that the proposed class representative's claims are typical even if the amount of damages sought differ from those of the class or if there are differences among class members in the amount of damages each is claiming.").

As to the RICO claims and CSA issues, the proposed Representatives' claims align with those of the class. The Court therefore finds that the claims of the 49 proposed Class Representatives are typical of those of the Class, as to the specified claims and issues, with respect to each relevant Defendant.

G.     Rule 23(a)(4):  The Class Representatives Will Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court looks to two criteria in determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (quoting *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1083 (6th Cir. 1996)).

Movants propose 49 Class Representatives. In their moving brief, movants describe each entity and briefly summarize how the opioid epidemic has impacted it. Doc. #: 1820-1 at 19–46. As above, the Court has also reviewed all of the relevant complaints and short-form complaints. Those documents demonstrate that each of the proposed Class Representatives is a member of the Class and each shares the same overriding interests as the other members of the Class in addressing the consequences of the opioid epidemic. Moreover, as each of these entities is a governmental unit – some, like Chicago, enormous – the Court is confident that the

20

representatives have the capacity to perform the functions of being actively engaged in the litigation, assisting Class Counsel with settlement negotiations, and, importantly, monitoring Class Counsel to ensure that the Class's interests remain paramount.

Most, if not all, of the proposed Class Representatives are entities that have been active in opioid litigation prior to the filing of the class action motion ("litigating entities"). This of course is of great value to the class: the litigating entities understand the case best and have been expending their own resources for years in a way that may now benefit the whole class. Many are large counties or cities with significant resources, skilled counsel, and enormous expertise as to the opioid epidemic. Who better to serve as representatives of a class? Defendants latch on to the fact that the allocation mechanism favors class representatives that primarily seek monetary relief for past damages over non-litigating entities that may be more interested in non-monetary relief, Doc. #: 1949 at 21–22, and that the voting scheme requires separate sets of approval from litigating and non-litigating entities, Doc. #: 1949 at 23–25. Below, the Court addresses the fairness of the allocation mechanism and finds no immediate fault. For present purposes, it reveals no fundamental conflict between litigating and non-litigating entities as to pursuit of this case against the Defendants that would render the list of 49 proposed representatives inadequate. *See* 1 *Newberg on Class Actions* § 3:58 ("Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement."). Similarly, the Court rejects the Defendants' contention that there is a fundamental conflict between counties as a group and cities as a group that would require separate counsel and sub-classing. Doc. #: 1949 at 19–21, 25. It is true that if a settlement is reached, each county and its constituent cities will need to work together – or, arguably, negotiate against one another – to divide the county-level allocation amongst themselves. But

21

these negotiations are local in nature, will vary county to county, and, contrary to the Defendants' assertions, there is not one set of interests shared by all counties that fundamentally conflicts with one set of interests shared by all cities.

Lesser concerns are as easily dismissed. The State Attorneys General suggest that the range of Class Representatives is incomplete because it does not encompass representatives from each of the 50 states nor, they allege, from "smaller counties and cities." Doc. #: 1951 at 7; *see also* Doc. #: 1973 at 5. Here, the Court has considered for certification two federal (RICO) claims and several issues related to federal law (CSA) that are similar across the country and class. This is not a situation requiring class representatives from each of the 50 states. Moreover, the list of Class Representatives encompasses smaller areas such as Cass County, North Dakota; City of Concord, New Hampshire; County of Fannin, Georgia; and County of Gooding, Idaho. Doc. #: 1820 at 1. Importantly, as discussed more fully below, the allocation formula rebuts any concerns that hard-hit small counties are disadvantaged in some way by the movants' proposal. Finally, some of the Class Representatives are individually represented by lawyers who simultaneously represent States that are objecting to certification of this Class. Doc. ##: 1949 at 17; 1949-2 at 16–17. The Court finds that this situation does not disqualify these entities from serving as Class Representatives.[7] The Class Representatives themselves have no conflict and, as generally large governmental units, they have the capacity to balance advice they might get from their individual lawyers against their responsibilities to the whole Class. The Court's conclusion is buttressed by the fact that there are both dozens of other Class

---

[7] Defendants' citation to the Seventh Circuit decision in *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002), on this point is inapposite. Doc. #: 1949 at 18. That case did not deal with the question of a class representative's separate lawyer, but rather with the class representative's lawyer as (former) class counsel. *Culver*, 277 F.3d at 913.

Representatives and a set of experienced Class Counsel, each of whom represents only counties and cities, not States.

Like the putative Class Members, the 49 proposed Class Representatives have allegedly been adversely impacted by the Defendants' actions with regard to the manufacturing and distribution of opioids and they seek to be compensated for their losses. The Court finds that the Class Representatives, individually and as a group, will adequately represent the interests of the class members, as to the specified claims and issues, with respect to each Defendant.

H.    Rule 23(g):  Class Counsel Are Adequate

Rule 23(g) states that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). In undertaking this appointment, the Rule directs the Court to consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.*

Movants propose the "the appointment of Jayne Conroy and Christopher Seeger as Co-Lead Negotiation Class Counsel and Gerard Stranch, Louise Renne, Zachary Carter, and Mark Flessner as Negotiation Class counsel," Doc. #: 1820 at 2, and have submitted Declarations from five of these lawyers, and a letter from one other, attesting to their experience, knowledge of the case, and willingness to commit resources. Doc. ##: 1820-1, Ex. A; 1821. As this Court has already held in appointing Interim Class Counsel:

> These documents demonstrate that Seeger is a very experienced and successful class action attorney, fully qualified to represent the Class. Two of the remaining five (Conroy and Stranch) have significant and impressive experience in leadership roles in mass tort MDLs in particular, Doc. #: 1820-1, Ex. A, while the remaining three are or were legal counsel for large cities (Renne/San Francisco; Carter/New York; and Flessner/Chicago), Doc. #: 1820-1 at 52. All have been

23

involved in opioid-related litigation. Applying Rule 23(g)'s four factor test, the Court finds that these lawyers are well-situated to represent the Class.

Doc. #: 2490 at 3.

In its Orders regarding appointment of Interim Class Counsel, Doc. ##: 2490, 2493, the Court acknowledged the significant contributions to date of the MDL Negotiation Committee, the members of which are identified in Doc. #: 118. While most of these lawyers will not serve as Class Counsel for the Negotiation Class, their depth of knowledge about this case and their general expertise can continue to provide significant benefit for the Class. Accordingly, the Court's Order will clarify that there is no bar to Class Counsel working with the MDL Negotiation Committee members in negotiating with Defendants, nor is there any bar to these MDL lawyers applying to share Class Counsel duties in the future should their representational situations change. However, as the Court's order appointing interim Class Counsel clarified, only Class Counsel will "(a) represent the Class in settlement negotiations with Defendants; (b) sign any filings with this or any other Court made on behalf of the Class; (c) assist the Court with functions relevant to a class action, such as but not limited to maintaining the Class website and executing a satisfactory notice program; and (d) speak on behalf of the Class in Court." Doc. #: 2490 at 5. Thus, only Class Counsel can bind the Class and Class Counsel must independently approve all final decisions concerning any Class-based settlement and be the sole signatories on behalf of the Class of all Class-based term sheets, settlement agreements, or similar documents.

With these clarifications in the final certification order, the Court finds that the proposed Class Counsel will alone act for the Class and will fairly and adequately represent the interests of the class.

I.    Rule 23(b)(3): Common Questions of Law or Fact Predominate

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry consists of two steps: "[a] court must first characterize the issues in the case as common or individual and then weigh which predominate." *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 413 (6th Cir. 2018) (alteration in original) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:50 (5th ed. 2010)).  Common questions are those where "the same evidence will suffice for each member to make a prima facie showing." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (citation and internal quotation marks omitted).

1.    *RICO Claims*

To prevail on their federal civil RICO claims, the Plaintiffs will have to establish that (1) the defendants committed a RICO violation, (2) there was an injury to the Plaintiffs' businesses or properties, and (3) said injury occurred "by reason of" the RICO violation. *See Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 453 (6th Cir. 2019).  In turn, the elements of a RICO violation are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483 (6th Cir. 2013) (citation omitted).  Each of these prongs then breaks down into various elements.  In the diagram below, the Court sets forth these elements and sub-elements and characterizes each as either common (blue) or individual (orange).

**RICO ELEMENTS: COMMON (BLUE) vs INDIVIDUAL (ORANGE)**

As is visually evident, there are a host of issues and sub-issues within the RICO claims. As applied to Plaintiffs' allegations concerning the existence of two national enterprises that disseminated a set of standard falsehoods in marketing and distributing opioids, all of the elements except injuries are common, not individual. Many courts have so held in similar circumstances. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 n.3 (9th Cir. 2017) (noting that the issues involved in proving a RICO violation "are appropriate for classwide litigation because they focus on" the defendants' conduct); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) ("[F]raud claims based on uniform misrepresentations . . . are appropriate subjects for class certification.") (citation and internal quotation marks omitted); *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 39 (E.D. Pa. 1985).

Defendants argue that causation should be characterized as an individual issue, Doc. #: 1949 at 37, but in this case – as to these RICO claims – the characterization of causation as common, not individualized, is supported by law and fact. Legally, plaintiffs alleging RICO claims predicated on mail and wire fraud may show third-party reliance and "need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that [**they**] relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008); *see also Brown v. Cassens Transp. Co.*, 546 F.3d 347, 357 (6th Cir. 2008). Factually, this Court has already held that the "[p]laintiffs have alleged sufficient facts to support a . . . direct chain of causation" involving third-party reliance. Doc. #: 1203 at 9–10 (listing steps in chain). Specifically, the Plaintiffs argue they suffered injuries because others (doctors, patients, etc.) relied on the Defendants' misrepresentations, enabling the Defendants to sell more opioids than the legitimate medical market could support. Whether

27

there was such third-party reliance is a question susceptible to class-wide proof, justifying characterization of this issue as common.

The numerous common issues obviously predominate. The fact that the "injury" prong alone is plausibly individualized does not alter this conclusion. Predominance does not require that *every* element can be established by class-wide proof, *see Sandusky*, 863 F.3d at 468, and the predominance requirement is satisfied "when liability can be determined on a class-wide basis, even when there are some individualized damage issues," *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (citation and internal quotation marks omitted). Similarly, the fact that affirmative defenses may arise, and apply only to some class members, "does not compel a finding that individual issues predominate over common ones." *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (citations and internal quotation marks omitted).

Given this analysis, it is not surprising that many courts within this Circuit have found that common issues predominate in the adjudication of specific RICO claims. *See Williams v. Duke Energy Corp.*, No. 1:08-CV-46, 2014 WL 12652315 at *14 (S.D. Ohio Mar. 13, 2014); *Lauber v. Belford High Sch.*, No. 09-CV-14345, 2012 WL 5822243 at *9 (E.D. Mich. Jan. 23, 2012) (bifurcating issues of liability and damages); *Gokare v. Fed. Express Corp.*, No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094870 at *14 (W.D. Tenn. Nov. 22, 2013) (for settlement purposes). This Court also so concludes.

2.    *CSA Issues*

The pleadings in this case, as discussed above, raise several specific issues arising out of the Controlled Substance Act for which movants seek certification: the nature of each Defendant's obligations under the Act and the question of whether each Defendant complied

with those obligations. Doc. #: 1820-1 at 84. These issues may arise in the adjudication of a federal (RICO) claim and of various state-law claims. The Court finds that common issues predominate in the resolution of these two specific issues, standing alone. Applying the Sixth Circuit's holding in *Martin*, the Court finds that both issues are "capable of resolution with generalized, class-wide proof" and "need only be answered once because the answers apply in the same way" across the Class. *Martin*, 896 F.3d at 414. The fact that these issues may be relevant to the pursuit of state-based legal claims that vary across the class, or to legal claims that entail the resolution of individualized issues of causation or damages, "does not mean that [these] individualized inquiries taint the certified issues." *Id.* On the contrary, the certified issues can be addressed without overlapping with other issues that may or may not be common. For example, the Summit County complaint sets forth that the CSA issues are relevant to, *inter alia*, its common law absolute public nuisance claim, Doc. #: 513 at ¶ 1010, and its negligence claim, *id.* at ¶¶ 1042, 1045, 1060. Resolution of the certified issues would speak to the duty and breach elements of a negligence claim, for example, without pretermitting non-class resolution of the causation and damage elements. Moreover, since the Court is certifying for classwide treatment only the specific issues identified, there are no "individualized inquiries that outweigh the common questions prevalent *within each issue.*" *Martin*, 896 F.3d. at 414 (emphasis added).[8]

In sum, the Court finds that common issues predominate over individualized issues with respect to both the RICO claims and the CSA issues, with respect to each specifically-identified Defendant.

---

[8] Heeding the Sixth Circuit's guidance, the Court is aware of the potential Seventh Amendment concerns raised by issue class certification and "will take care to conduct any subsequent proceedings in accordance with the Reexamination Clause." *Id.* at 416–17. Of course, since the Court is certifying the class solely for purposes of negotiation, these concerns are not present. Nonetheless, the Court notes the Sixth Circuit's conclusion that, "if done properly, bifurcation will not raise any constitutional issues." *Id.* at 417 (citations and internal quotation marks omitted).

J.     Rule 23(b)(3):  A Class Action is a Superior Method of Adjudication

For a class action to be maintained, Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement "is designed to achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011) (alteration in original) (internal quotation marks omitted) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).  Rule 23(b)(3) itself further enumerates four specific factors speaking to the desirability of a class suit.  Fed. R. Civ. P. 23(b)(3)(A)–(D).  Here, all cut in favor of certification of both the two RICO claims and two CSA issues as against all Defendants:

1.     *The class members' interests in individually controlling the prosecution or defense of separate actions*.  This MDL consists of nearly 2,000 individual actions by class members.  That would appear to cut against class certification, as it seems that many class members are capable of, and are, litigating individually.  However, the proposed class consists of more than 34,000 entities, meaning that a small fraction of them (fewer than 6% here in federal court) are litigating individually.  The vast bulk of class members are not actively involved in opioid litigation.  This factor cuts in favor of certifying a nationwide class.  This is particularly true in the negotiation class certification context for two reasons:  (a) any litigant interested in individually controlling its action can opt out and the proposed procedure will in no way interfere with that individual litigation, yet (b) negotiation class certification simultaneously engages absent class members in the negotiation and voting process.  To the extent this factor

30

favors individual control and involvement, the Court finds that the negotiation class will further that end, not impede it.

2. *The extent and nature of any litigation concerning the controversy already begun by or against class members*. As just noted, there are about 2,000 individual cases within this federal MDL and many more filed in state courts. Among those in coordinated pre-trial proceedings in this forum, a few have advanced toward bellwether trials, but all others are at earlier litigation phases. The proposed negotiation class will not displace or interfere with any of this on-going litigation. At the same time, this on-going litigation will resolve only a small quantity of the class's claims, as noted above, meaning that the extent of the on-going litigation is limited compared to the size of the class. This factor cuts in favor of certifying a nationwide negotiation class.

3. *The desirability or undesirability of concentrating the litigation of the claims in the particular forum*. The JPML has already coordinated the many pending cases in this forum. This factor therefore cuts in favor of certifying a negotiation class, as a class approach is an efficient means of handling the 2,000 individual matters that are here.

4. *The likely difficulties in managing a class action.* This prong is inapplicable to the proposed negotiation class, as the proposal is not for litigation or trial, but simply for settlement negotiations. *Amchem*, 521 U.S. at 620 (holding that where the plaintiffs' class certification "proposal is that there be no trial," it is unnecessary to "inquire whether the case, if tried, would present intractable management problems").

The Attorney General of the State of Ohio argues that a class action is not a superior form of adjudication because the claims are more properly the province of the States, not the cities and counties. Doc. #: 1973 at 4. The letter joined by roughly 40 Attorneys General

31

implies the same point without explicitly saying so. Doc. #: 1951 at 3–4. If the Attorneys General believe they control their local governments' litigation, then they can attempt to foreclose it directly. To date, they have made no effort in this Court to shut down their constituent entities' cases. Until they do so, this Court remains vested with more than 2,000 separate actions by cities and counties from throughout the United States. The Court cannot pretend these cases do not exist. The Judicial Panel on Multidistrict Litigation has ordered it to coordinate pretrial litigation in most of these cases and Article III requires it to resolve those directly filed here.

* * *

For the foregoing reasons, the Court finds that all of the class certification requirements are met with respect to the two RICO claims and two CSA issues, as to each relevant Defendant on each claim or issue. In reaching these conclusions, the Court makes clear that it has not certified these claims or issues for trial. Because of the limited nature of negotiation class certification, including the fact that no defendant is required to utilize this process, many Defendants in this MDL did not even file opposition briefs. The analysis in this Memorandum Opinion is in no way meant to foreclose any Defendant from making any argument in opposition to a later motion for class certification, if such a motion is ever made here or in another forum. The Court's Order will so hold.

IV.     **THE COURT WILL LIKELY BE ABLE TO FIND THAT THE ALLOCATION AND VOTING PLAN TREAT CLASS MEMBERS EQUITABLY RELATIVE TO EACH OTHER**

Rule 23 requires judicial approval of any proposed class action settlement.  Fed. R. Civ. P. 23(e).  The Rule sets forth a two-step process whereby the Court first ascertains whether the settlement is sufficiently likely to be approved as to warrant sending notice of it to the class, Fed. R. Civ. P. 23(e)(1)(B)(i), and then, after a notice and objection period, the Court makes a final determination of whether the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2).  One of the factors the Court must consider in making these assessments is whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  This means that if a monetary settlement is reached, this Court will be required to find that the money is being allocated fairly among the class members.

At this stage in the case, no settlement has been reached.  However, with the negotiation class certification proposal, the movants have identified the settlement allocation and voting plans up front.  They have done so to provide information to each class member about its relative share of any settlements reached and its relative enfranchisement under this proposal, so as to make the class member's current opt-out opportunity as meaningful as possible.  The allocation and voting plans are therefore fixed – class members will make opt-out decisions based on them – and they will not change if a settlement is reached.  Given that this class certification order could set in motion an elaborate negotiation and settlement process, the Court has stated that it should make a preliminary determination of the equity of these plans, given that it "would be perverse – and an enormous waste of judicial and social resources – to launch this whole negotiation class only to later hold that the allocation scheme, identified at the outset, was inequitable *ab initio*."  Doc. #: 2529 at 3.

33

The Court specifically focused on the fact that both the voting and allocation plans distinguish between: (1) putative class members that filed litigation arising out of the opioid epidemic by June 14, 2019 ("litigating entities"), Doc. #: 1820-1 at 52, and (2) those class members that had not filed such litigation ("non-litigating entities"). As noted above, 10% of any settlement achieved for the Class will be set aside to help defray the legal fees of the litigating entities alone, with any unused portion flowing back into the full class's recovery fund, Doc. #: 1820-1 at 95–96; another 15% of any settlement is set aside for two purposes, one of which is to help defray the litigation expenses of the litigating entities alone, with, again, any unused portion flowing back into the full class's recovery fund, *id*. at 96; the proposed voting structure requires separate supermajority approvals from different sets of litigating class members and non-litigating class members, *id*. at 53-55; and litigating entities primarily drafted the proposal. To assist the Court in evaluating these distinctions, and in lieu of sending notice to and seeking reactions from the whole class at this stage in the proceedings, the Court asked Special Master Cathy Yanni to file a report analyzing whether the proposed allocation and voting plans treat the non-litigating class members equitably. Doc. #: 2529.

On September 10, 2019, Special Master Yanni filed a 17-page report in response to the Court's request. Doc. #: 2579. The Court has carefully reviewed Special Master Yanni's thoughtful and thorough report and adopts her findings. As to the allocation plan, the Court agrees with Special Master Yanni's conclusion that the method for allocating the core class recovery (75% of the fund) reflects a lot of hard work and is a significant and eminently fair step toward resolution of these many cases. Nothing in the allocation model appears to skew toward any group other than those hardest hit by the opioid epidemic. The Attorney General of Ohio argues that the model favors large cities (many of which serve as Class Representatives), as

34

opposed to smaller hard-hit counties he identifies by name, Doc. #: 1973 at 5, but his understanding is incorrect.  A review of the allocations to the counties he identifies demonstrates that the smaller, hard-hit counties appropriately receive more recovery per capita than larger counties that have been less-severely impacted.[9]  Similarly, a handful of counties filed an objection to the plan, arguing that the counties hardest hit by the epidemic, as measured by the allocation tool, are not necessarily the same counties that have been forced to expend the most resources combatting the epidemic.  Doc. #: 1958 at 6–7.  The model sets aside 15% of the class's recovery in its Special Needs Fund to, *inter alia,* address precisely these sorts of possible problems.  There are a variety of intricacies of the model – how counties and cities will divide their county's recovery; how to deal with cities with recoveries so small as to be impractical to distribute; how the model works when a county opts out but its cities do not, etc. – but despite opponents' contentions, Doc. #: 1949 at 19–23, none of these is fatal and the movants' approach to each – as reflected in the updated notice and FAQ documents – is thoughtful and defensible.

Separate from the fairness of the allocation tool governing 75% of the class's recovery, the Court agrees with Special Master Yanni's conclusions that there is no inequity created by setting aside funds to address the litigation costs and legal fees of the parties that filed the early cases.  As she notes, the "litigating class members are responsible for, *inter alia*, launching this litigation in state and federal courts, generating the establishment of this MDL, pursuing bellwether cases, uncovering critical facts through the discovery process, and creating significant negotiating leverage."  Doc. #: 2579 at 7.  Given these facts, if a settlement is reached, these

---

[9] Application of the allocation tool at the case website shows that the large counties the Ohio Attorney General identifies have per capita settlement values of $2.79 (Cuyahoga); $4.46 (Franklin); and $3.43 (Summit), for an average of $3.56; the smaller counties on whose behalf the Attorney General protests have settlement values of $4.64 (Adams); $6.08 (Jackson); $2.65 (Perry); $6.15 (Ross); $5.68 (Scioto) and $3.01 (Vinton), for an average of $4.70, or 32% greater than the large counties.

early champions of the class will likely be able to demonstrate that they are eligible for fees and costs from a common fund and, indeed, it may be unfair to them to force them to bear these costs alone. *Id.* at 7–8. Additionally, as Special Master Yanni notes, all fees and costs in a class action must be adjudicated according to the procedures set forth in Rule 23(h) and this Court will carefully scrutinize each fee request, as well as the total amount of fees paid from the class's recovery to all of the many attorneys involved here – Class Counsel, the MDL leadership, litigating-entity lawyers, etc. – to ensure that the Class is not unduly taxed. *Id.* at 8. Importantly, the model clarifies that any monies in these separate pools that are not distributed to litigating entities would revert to the entire class.

The Court also accepts Special Master Yanni's conclusion that the voting plan – requiring separate sets of votes from litigating entities and non-litigating entities – does not treat the non-litigating counties unfairly. As she concluded:

> (1) all class members have the same franchise (one vote); (2) the vote-counting mechanism understandably ensures that any settlement is approved by a majority of the class, counted by head, by population, and by impact; (3) the vote-counting mechanism further ensures against the non-litigating class members approving a low settlement unacceptable to the litigating class members; (4) that assurance is defensible on the grounds that the litigating entities are the most knowledgeable about the value of the class's claims; and (5) the fact that nonlitigating entities must separately approve the settlement tempers concerns that the litigating entities will settle low to recover their costs, as does the fact that the litigating entities are likely to be able to spread their costs across the whole class as described above.

*Id.* at 13.

Finally, having found that neither the allocation nor voting mechanisms enshrine any fundamental intra-class conflict between litigating and non-litigating entities, Special Master Yanni concluded that a single set of class representatives and class counsel could represent the whole class, without the need for sub-classes. *Id.* at 13–17. The Court agrees.

36



V.      THE NOTICE AND EXCLUSION PLANS ARE SUFFCENT

A.      Notice

The moving parties submitted proposed notices and a notice plan, Doc. #: 1820-2, Ex. A, and Interim Class Counsel subsequently submitted updated versions of these documents.  Doc. ##: 2583, 2583-1, 2583-2.  The Court has carefully reviewed these documents and finds that they comply with the requirements of Rule 23 and that, as due process requires, they are "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections [or otherwise safeguard their interests]."  *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 759 (6th Cir. 2013) (citation and internal quotation marks omitted).

Rule 23(c) requires the Court in a class action under Rule 23(b)(3) to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," and notes that such notice may be "by one or more of the following: United States mail, electronic means, or other appropriate means."  Fed. R. Civ. P. 23(c)(2)(B).  Here the notice will be sent by first-class United States mail to all class members.  Doc. #: 2583 at 3–4.  It will also be posted at the class website.  *Id.* at 4.  The notice will also be emailed to that sub-set of the class for which the notice administrator has email addresses.  *Id*. at 4 n.1. The *method* requirements of Rule 23(c)(2)(B) are met.

The Rule further requires that the notice "clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding

38

effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B)(i)–(vii). The notice packet contains a two-page notice along with a 13-page set of Frequently Asked Questions (FAQs), Doc. #: 2583-1, in a format recommended by the Federal Judicial Center, *see* Fed. Judicial Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* 8 – 9 ( 2 0 1 0 ), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf. The two-page notice alone contains each of the seven pieces of information required by Rule 23 and the FAQs provide even more detailed information as to most. The *content* requirements of Rule 23(c)(2)(B) are met.

Beyond the basics, the Court notes, as discussed above, that the moving parties have gone to great lengths to make transparent the various aspects of this unique procedure – the allocation formula and its underlying components, the voting plans, etc. A class website, active since June, has provided a wealth of information to the putative class members and will continue to do so following certification. The moving parties have done a commendable job making transparent all of the moving parts of this novel procedure. The Court finds that the class members have been provided a wealth of pertinent information that will enable them to make informed decisions about whether to remain in or opt out of this Negotiation Class.

B.     Exclusion

Rule 23(c)(2)(B) requires, for any class certified under Rule 23(b)(3), that the district court send notice to class members informing them "that the court will exclude from the class any member who requests exclusion," Fed. R. Civ. P. 23(c)(2)(B)(v), and specifying "the time and manner for requesting exclusion," Fed. R. Civ. P. 23(c)(2)(B)(vi). The Federal Judicial Center recommends that a form be provided to class members, *see Manual for Complex Litigation* (*Fourth*) §§ 21.311–21.312 (2004) [hereinafter *Manual for Complex Litigation*], and

39

instructs that the form should "clearly and concisely explain the available alternatives and their consequences," *id.* at § 21.321.  Exclusion notices should require "that class members (1) mail a letter or post card; (2) by a date certain; (3) to a specific address; (4) clearly identifying themselves and/or some information demonstrating their membership in the class" but "[c]lass members are not required to give reasons for opting out."  3 *Newberg on Class Actions* § 9:46. Rule 23 does not mandate a time period within which class members must exercise their exclusion right, but the *Manual for Complex Litigation* suggests that class members be given a "reasonable time" and states that courts "usually establish a period of thirty to sixty days (or longer if appropriate) following mailing or publication of the notice for class members to opt out."  *Manual for Complex Litigation* § 21.321.

The movants propose that Class Members be required to fill out a designated Exclusion Request Form, Doc. #: 2583-2, and be given 60 days (until a date certain – November 22, 2019) to do so.  Doc. #: 2583 at 5. The movants explain that the "form can be submitted to the Notice Administrator via either first-class mail or email."  Doc. #: 2583 at 3.  The Exclusion Request Form is part of the Notice packet and will be posted and distributed in the same manner as the Notice packet.  *Id.*  The movants further explain that:

> Exclusion Request Forms would not have to be notarized but, instead, would have to be executed with an averment, pursuant to 28 U.S.C. § 1746, that the city or county official has the authority to submit the exclusion request.  Also, the form would contain an express acknowledgment of the consequences of opting out (including that the city or county will not share in any recovery achieved by the Class and that it may not be afforded an opportunity at a later date to revoke its opt-out request).  Mandating use of a specific form for opting out should sharply reduce, if not eliminate altogether, both disputes as to whether opt-out requests comported Court-directed requirements as well as potential arguments about whether optouts genuinely understood the ramifications of their exclusion requests.

*Id.*

The Court has reviewed the Exclusion Request Form and finds that it meets the requirements of Rule 23. It clearly explains the ramifications of exclusion, and it provides exact instructions about how and when to execute and return the form. The plan sufficiently protects the absent-class members' right to exclude themselves from this Class.

## CONCLUSION

For the foregoing reasons, the Court certifies a Negotiation Class on the claims and issues identified, against the Defendants identified, and appoints Class Counsel. The Negotiation Class is authorized to negotiate settlements with any of the 13 sets of Defendants identified herein, on any of the claims or issues identified here, or those arising out of a common factual predicate. *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009) ("The question [of whether a subsequent claim is barred] is not whether the definition of the claim in the complaint and the definition of the claim in the release overlap perfectly; it is whether the released claims share a 'factual predicate' with 'the claims pled in the complaint.'" (quoting *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008))). *See generally* 6 *Newberg on Class Actions* § 18:19. If Class Counsel seek to utilize the Negotiation Class to negotiate against any other Defendants, they may later make a formal motion to amend the class certification order accordingly. As set forth in an accompanying Order, this Court does ***not*** authorize the Negotiation Class to negotiate on behalf of cities and counties against their State governments, as its proponents suggested. Doc. #: 1820-1 at 53. This puts to rest a concern raised by the Attorneys General. Doc. #: 1951 at 3.

As noted throughout, an Order accompanies this Memorandum Opinion.

  */s/ Dan Aaron Polster    9/11/2019*
  **DAN AARON POLSTER**
  **UNITED STATES DISTRICT JUDGE**

# ATTACHMENT 2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| ) | **Case No. 1:17-md-2804** |
| **IN RE: NATIONAL PRESCRIPTION** ) | **Case No. 18-op-45090** |
| **OPIATE LITIGATION** ) | |
| ) | **Judge Dan Aaron Polster** |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | **ORDER CERTIFYING** |
| **All Cases** ) | **NEGOTIATION CLASS AND** |
| ) | **APPROVING NOTICE** |
| **and** ) | |
| ) | |
| *The County of Summit, Ohio, et al., v.* ) | |
| *Purdue Pharma L.P. et al.,* ) | |
| Case No. 18-op-45090 ) | |
| ) | |

1.       The Court held a hearing on August 6, 2019, to consider and determine Plaintiffs'

Renewed and Amended Motion for Certification of a Rule 23(b)(3) Cities/Counties Negotiation

Class.  Doc. #: 1820.

2.       Upon review and consideration of all of the papers and presentations submitted in

connection with the proposed Negotiation Class, this Court finds and **ORDERS** the following:

3.       This Court has been provided with information sufficient to enable it to determine

that it is appropriate (a) to grant certification to a Negotiation Class; (b) to approve the proposed

Notice Plan filed in Doc. #: 2583; (c) to set a deadline of November 22, 2019 for Class members

to opt out; and (d) to thereafter confirm the membership of the Class by entry of an Order

pursuant to Rule 23(c), giving all parties notice of the entities that are included in, and that are

excluded from, the Class.

4.       The Class is defined as:

1

All counties, parishes, and boroughs (collectively, "counties"); and all incorporated places, including without limitation cities, towns, townships, villages, and municipalities (collectively "cities").

A complete list of Class Members is available on the Opioids Negotiation Class website, www.opioidsnegotiationclass.info.

5. By separate Memorandum Opinion, the Court has found:

- that the class is so numerous that joinder of all members is impracticable; that there are questions of law and fact common to the class; that the claims of the representative parties are typical of the claims of the class; and that the representative parties will fairly and adequately protect the interests of the class, as required by Fed. R. Civ. P. 23(a)(1)–(4);

- that questions of law and fact common to class members predominate over any questions affecting only individual members with respect to a RICO <u>claim</u> arising out of the alleged Opioid Marketing Enterprise, as against five (5) named sets of Defendants (Purdue, Cephalon, Janssen, Endo, and Mallinckrodt), and as to a RICO <u>claim</u> arising out of the alleged Opioid Supply Chain Enterprise, as against eight (8) named Defendants (Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen), and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, as required by Rule 23(b)(3); and

- that questions of law and fact common to class members predominate over any questions affecting only individual members with respect to two specific <u>issues</u> related to the obligations of 13 sets of Defendants (Purdue, Cephalon, Endo, Mallinckrodt, Actavis, Janssen, McKesson, Cardinal, AmerisourceBergen, CVS Rx Services, Inc., Rite-Aid Corporation, Walgreens, and Wal-Mart) under the Controlled Substances Act, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy with respect to these issues, as required under Rule 23(c)(4), as interpreted by the Sixth Circuit in *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019).

The Court accordingly certifies the two RICO claims against the five and eight Defendants, respectively, under Rule 23(b)(3), and the two CSA issues against the 13 identified Defendants under Rule 23(c)(4). The accompanying Memorandum Opinion clarifies that these 13 identified Defendants encompass families of companies.

2

6.      In its Memorandum Opinion, the Court specifically found the 49 proposed Class Representatives' claims to be typical of those of the Class and found that these proposed Class Representatives will adequately represent the class.  The Court accordingly appoints these 49 entities to serve as the Negotiation Class's Class Representatives:

(1) County of Albany, New York; (2) City of Atlanta, Georgia; (3) Bergen County, New Jersey; (4) City of Baton Rouge/East Baton Rouge Parish, Louisiana; (5) Broward County, Florida; (6) Camden County, New Jersey; (7) Cass County, North Dakota; (8) City of Chicago, Illinois; (9) Cobb County, Georgia; (10) City of Concord, New Hampshire; (11) Cumberland County, Maine; (12) City of Delray Beach, Florida; (13) Denver, Colorado; (14) Escambia County, Florida; (15) Essex County, New Jersey; (16) County of Fannin, Georgia; (17) Franklin County, Ohio; (18) Galveston County, Texas; (19) County of Gooding, Idaho; (20) City of Grand Forks, North Dakota; (21) County of Hennepin, Minnesota; (22) City of Indianapolis, Indiana; (23) County of Jefferson, Alabama; (24) Jefferson County/ City of Louisville, Kentucky; (25) Jersey City, New Jersey; (26) Kanawha County, West Virginia; (27) King County, Washington; (28) City of Lakewood, Ohio; (29) City of Los Angeles, California; (30) City of Lowell, Massachusetts; (31) City of Manchester, New Hampshire; (32) Maricopa County, Arizona; (33) Mecklenburg County, North Carolina; (34) The Metropolitan Government of Nashville and Davidson County, Tennessee; (35) Milwaukee County, Wisconsin; (36) Monterey County, California; (37) City of Norwalk, Connecticut; (38) County of Palm Beach, Florida; (39) Paterson City, New Jersey; (40) City of Phoenix, Arizona; (41) Prince George's County, Maryland; (42) Riverside County, California; (43) City of Saint Paul, Minnesota; (44) City of Roanoke, Virginia; (45) County of Rockland, New York; (46) City and County of San Francisco, California; (47) County of Smith, Texas; (48) County of Tulsa, Oklahoma; and (49) Wayne County, Michigan.

7.      In its separate Memorandum Opinion, and the prior Interim Class Counsel Orders (Doc. ##: 2490, 2493), the Court has found that lawyers Jayne Conroy, Christopher Seeger, Gerard Stranch, Louise Renne, Zachary Carter, and Mark Flessner meet the requirements to serve as Negotiation Class Counsel, as required by Rule 23(g).  The Court accordingly appoints Jayne Conroy and Christopher Seeger to serve as Co-Lead Negotiation Class Counsel and Gerard Stranch, Louise Renne, Zachary Carter, and Mark Flessner to serve as Co-Negotiation Class Counsel.

3

8.      Class Counsel and only Class Counsel are authorized to (a) represent the Class in settlement negotiations with Defendants; (b) sign any filings with this or any other Court made on behalf of the Class; (c) assist the Court with functions relevant to a class action, such as but not limited to maintaining the Class website and executing a satisfactory notice program; and (d) represent the Class in Court.

9.      As explained in the accompanying Memorandum Opinion, the Court finds that there is no bar to Class Counsel working with the MDL Negotiation Committee members in negotiating with Defendants, nor is there any bar to these MDL lawyers seeking to apply to share Class Counsel responsibilities in the future should their representational situations change. However, as noted above, only Class Counsel can bind the Class and thus Class Counsel must independently approve all final decisions concerning any Class-based settlement and be the sole signatories on behalf of the Class of all Class-based term sheets, settlement agreements, or similar documents.

10.      In its Memorandum Opinion, the Court analyzed the scope of the claims and issues proposed for certification with reference to the complaints filed by Summit County, Ohio, Doc. ##:  513, 1466; these complaints also served as the basis for the Court's Order adopting a short-form complaint process in this MDL.  Doc. # 1282.  The Summit County, Ohio case number is accordingly attributed to this class action going forward and all matters in the class action will utilize the caption on this Order.  For administrative convenience, the Clerk may assign a different case number within the *Summit County* case for Class Action filings, to distinguish these from the individual filings in that case.

4

11.     As explained in the accompanying Memorandum Opinion, the Court has found that the proposed Class Action Notice program submitted by Interim Class Counsel on September 10, 2019, Doc. #: 2583, meets the requirements of Rule 23.  Accordingly, the proposed Class Action Notice program is approved for mailing to the whole Class, for posting on the Opioids Negotiation Class website, www.opioidsnegotiationclass.info, and for emailing to those members of the Class with email addresses known to the Notice provider.  The Class Action Notice, Doc. #: 2583-1, shall be mailed to all entities listed as Class members on www.opioidsnegotiationclass.info as soon as possible.  Epiq Global is hereby approved to serve as Class Notice provider, is authorized and directed to effectuate first-class mail and email notice to the Class, and is ordered to provide a Report to this Court, no later than December 1, 2019 on the completion of the Class Notice program.

12.     As explained in the accompanying Memorandum Opinion, the Court has found that the proposed plan for enabling Class Members to exclude themselves from the class, submitted by Interim Class Counsel on September 10, 2019, Doc. ##: 2583, 2583-2, meets the requirements of Rule 23.  Specifically, Class Members wishing to exclude themselves from – or "opt out" of – the class must request exclusion by signing the Exclusion Form, under penalty of perjury, and sending it via email to <info@OpioidsNegotiationClass.info> or via first-class mail to NPO Litigation, P.O. Box 6727, Portland, OR 97228-6727.  This request must be signed by an official or employee authorized to take legal action on behalf of the County or City requesting exclusion.  If the Class Member returns the Exclusion Request Form via email attachment, the email must be sent on or before November 22, 2019.  If the Class Member returns the Exclusion

Request Form via mail, it must use first-class U.S. mail and the mailing must be postmarked on or before November 22, 2019.

13. The Order does not certify the Negotiation Class for any purpose other than to negotiate for the class members with the thirteen (13) sets of national Defendants identified above. Accordingly, this Order is without prejudice to the ability of any Class member to proceed with the prosecution, trial, and/or settlement, in this or any court, of an individual claim, or to the ability of any Defendant to assert any defense thereto. This Order does not stay or impair any action or proceeding in any court, and Class members may retain their Class membership while proceeding with their own actions, including discovery, pretrial proceedings, and trials. In the event a Class Member reaches a settlement or trial verdict, it may proceed with its settlement/verdict in the usual course without hindrance by virtue of the existence of the Negotiation Class. Such Class Member may not, however, collect on its individual settlement/judgment and also participate in any Class settlement fund.

14. This Order is without prejudice to any party's ability to oppose the certification of this or any other class, proposed for litigation or settlement, with respect to any opioids-related claim, defense, issue, or question. Accordingly, no class member or any party, or counsel to a party, to this proceeding may cite this Order or the accompanying Memorandum Opinion as precedent or in support of, or in opposition to, the certification of any class for any other purpose in any opioids-related litigation by or against any party thereto. Persons not parties to this proceeding are informed that this Order and the accompanying Memorandum Opinion are not intended to serve as a precedent in support of, or in opposition to, any motion for class certification of any type pursued in any court on opioid-related matters.

15.     This Order does not alter existing law with respect to the relationship between any State and its political subdivisions.  As already ordered in appointing Interim Negotiation Class Counsel, Doc. #: 2490, Negotiation Class Counsel are authorized to negotiate settlements with Defendants on behalf of the putative class but are **_not_** authorized to negotiate on behalf of Class members within a given State against their State government should allocation disputes arise during or following State settlements.

16.     This Order does not approve, or commence the approval process for, any specific settlement or proposed settlement.  Any settlement reached with the Negotiation Class must and will be subject to the specific settlement approval process of Rule 23(e).

17.     The Court adopts by reference as applicable to Class Counsel the time-keeping guidelines, spending limitations, and other requirements of its Order Regarding Plaintiff Attorney's Fees and Expenses entered in this MDL, Doc. #: 358.

18.     If any settlement is reached under this process, supported by the Class, and approved by the Court, no attorney's fees of any kind will be distributed from the class's recovery or any other source except according to the procedures sets forth in Rule 23(h).  This includes Class Counsel's fees, fees for attorneys representing litigating entities (as described in the Memorandum Opinion, for whom 10% of any recovery is set aside), fees for MDL common benefit work, fees for objectors, or any other fee requests.

19.     This Order applies to the previously-identified 13 sets of national Defendants. None of these Defendants is required by this Order to engage with the Negotiation Class.  This is a voluntary mechanism developed to address the unique circumstances of this litigation, which the Court hopes will directly or indirectly facilitate the voluntary, fair, adequate and reasonable

7

resolution of the cities' and counties' claims pending in these MDL No. 2804 proceedings and in related state court litigation, and promote the overall resolution of the litigation.

20.     In light of its purpose to facilitate settlement, the Negotiation Class will terminate five (5) years from the date below, except as necessary to enable then-ongoing settlement negotiations, approval processes, enforcement and administration to be completed.


_____*/s/ Dan Aaron Polster   9/11/2019*_____
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

8