# EXHIBIT 2

```
                                                            Page 1

 1           IN THE UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4
                 ~~~~~~~~~~~~~~~~~~~~
 5
 6    IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION
 7                                     Case No. 17-md-2804
 8                                     Judge Dan Aaron
      This document relates to:        Polster
 9
      The County of Cuyahoga v. Purdue
10    Pharma L.P., et al.
      Case No. 18-OP-45090
11
12               ~~~~~~~~~~~~~~~~~~~~
13            Videotaped deposition of
                CYNTHIA G. WEISKITTEL
14
15                November 13, 2018
16                    8:59 a.m.
17
18
19                    Taken at:
20        Climaco, Wilcox, Peca & Garofoli
21          55 Public Square, Suite 1950
22                 Cleveland, Ohio
23
24
25         Renee L. Pellegrino, RPR, CLR
```

Page 66

1  that were involved in looking at this issue
2  collectively before 2014?
3  　　　　MR. GALLUCCI: Object to form.
4  　A.　I don't have that information.
5  　Q.　So you mentioned START, right?
6  START was started in 1997?
7  　A.　Correct.
8  　Q.　And that it generated data on a
9  statewide basis, correct?
10 　A.　It was agency data. SACWIS didn't
11 exist in '97.
12 　Q.　Are you aware of any analyses of
13 START data before 2014 to look at trends in drug
14 usage overall and the impact on family services?
15 　A.　As I said, START produced data
16 reports for many years.
17 　Q.　Do you remember any discussion that
18 went on before 2014 looking at START data to
19 look for trends or issues over time related to
20 drug use?
21 　　　　MR. GALLUCCI: Object to form.
22 　A.　I don't remember a specific
23 conversation.
24 　Q.　Do you remember that in general? Do
25 you remember that being something that went on

Page 67

1  before 2014?
2  　　　　MR. GALLUCI: Object to form.
3  　A.　The discussion of drugs was always
4  going on.
5  　Q.　I just want to distinguish because
6  you said in individual cases, for an individual
7  case file with an individual family or client,
8  part of what the caseworkers are always supposed
9  to pay attention to is the impact of drug use on
10 the situation they are in, the needs of the
11 child; is that fair?
12 　A.　Correct.
13 　Q.　And that is your goal is to protect
14 the child, correct?
15 　A.　Our goal it to ensure the safety of
16 children.
17 　Q.　And part of that analysis, at least
18 as long as you've been with the department, has
19 been to pay attention to drug use on an
20 individual or family-by-family basis, correct?
21 　A.　One of the factors we look at.
22 　Q.　And you said that over time there's
23 also been attention to trends in drug use or the
24 collective impact of drugs on the overall
25 caseload or the ability of the department to

Page 68

1  fulfill its function, correct?
2  　　　　MR. GALLUCCI: Object to form.
3  　A.　I'm sorry. Say it again. I
4  apologize.
5  　Q.　Maybe I should break that up.
6  　　　　I mean, one of the things that you
7  know happens as a director is you look at
8  whether essentially your group is doing a good
9  job, correct?
10 　A.　A good job? We're ensuring the
11 safety of children?
12 　Q.　Yes.
13 　A.　Yes.
14 　Q.　And you try to improve the function
15 of your group through seeking additional funding
16 or additional staffing or changing procedures,
17 among other things, correct?
18 　A.　Yes.
19 　Q.　And that's part of what your focus
20 has been as director over the last two and a
21 half years, correct?
22 　A.　Yes.
23 　Q.　And we'll get to it, but obviously
24 there have been well publicized issues with
25 deaths of children in 2018 that have led to a

Page 69

1  lot of attention and public statements and
2  changes in policies, correct?
3  　　　　MR. GALLUCCI: Object to form.
4  　A.　Yes.
5  　Q.　Going back before that, even before
6  the deaths that have been so widely publicized
7  of kids within the system, if you will, your
8  intention as director, and I assume as deputy
9  director, was looking at whether how well the
10 department did in protecting the safety of
11 children could be improved by additional funding
12 or staffing or changes in policies or practices;
13 is that right?
14 　　　　MR. GALLUCCI: Object to form.
15 　A.　We use available data to hit the
16 three points that we're to hit, safety, child
17 well-being and permanency.
18 　Q.　And so as long as you've been there,
19 you've been tracking through data essentially
20 performance?
21 　A.　Outcomes for families.
22 　Q.　Fair enough.
23 　　　　Okay. So over time you have used
24 data to track outcomes for families, which is a
25 measure of whether the department is fulfilling

Page 110

1 opiate abuse, heroin abuse, or do you attribute
2 that to various things?
3    A.   I believe opiates are playing a
4 major role, but other things are certainly
5 impacting that.
6    Q.   What else is impacting it?
7    A.   I think just the overall number of
8 calls being screened in has gone up, which has
9 given us more situations to look at.  I think
10 that those things are also impacting kids coming
11 into care.
12    Q.   By "those things," you just mean
13 that there are more calls being screened in?
14    A.   The percentage of calls being
15 screened in hasn't gone up.  It's the sheer
16 number of calls coming in that has caused the
17 increase in calls being screened in.
18    Q.   And why do you think the number of
19 calls coming in has gone up?
20    A.   I think it's impacted by multiple
21 things, certainly by the times we're living in.
22 Certainly by some of the attention the agency is
23 getting will cause that to happen.  Our data
24 will reflect that.
25    Q.   I don't know what you mean by "the

Page 111

1 times we're living in."  Can you just be a
2 little more specific?
3    A.   Certainly the use of drugs,
4 specifically opiates in our community, has had
5 an impact on the times that we're living in, the
6 availability of other options for families other
7 than custody of their children.
8    Q.   So are there factors, other than the
9 use of heroin and other opiates, that you think
10 leads to an increased number of calls to your
11 department?
12    A.   We have not -- we have not done an
13 analysis, but I suspect there could be, yes.
14    Q.   Like what?
15    A.   Again, some of the attention the
16 agency has received will cause -- our data will
17 reflect that any time the agency has had huge
18 attention from the media, that we will see calls
19 go up.
20    Q.   And the attention from the media is,
21 what we were talking about a little bit before,
22 some of the deaths and high-profile cases over
23 the last year or so?  Is that what you're
24 talking about?
25    A.   Yes.

Page 112

1    Q.   Can you identify any other factors
2 that you think lead to an increase in the number
3 of calls or increase in the number of children
4 being brought into custody?
5    A.   Not at this time.
6    Q.   And you said there's not been an
7 analysis done of the reasons for increased
8 calls, correct?
9    A.   We've looked at the overall
10 increase.  We are starting to look at what kind
11 of calls and that kind of thing, but no analysis
12 has been done.
13    Q.   Is there any analysis that's been
14 done of the impact of opioid or opiate abuse by
15 parents on the number of children being brought
16 into custody?
17    A.   A specific analysis?
18    Q.   Yes.
19    A.   No.
20    Q.   So we've identified two impressions
21 that you have from reviewing case files as they
22 relate to opiates, heroin and other opiates, one
23 being the number of children being brought into
24 custody, and then another one being your
25 impression that sometimes people start with a

Page 113

1 prescription opioid and then they go on to use
2 heroin and other street drugs.
3         Are there other impressions that you
4 have from reviewing case files that you would
5 testify about at trial potentially?
6    A.   Not at this time.
7    Q.   Now, you said that there's this
8 SACWIS database where data has been entered, and
9 you weren't sure when the data entry started,
10 correct?
11    A.   Which data entry?
12    Q.   Well, any data entry that your group
13 does.
14    A.   We started using SACWIS in December
15 of 2008, if that's what you're asking me.
16    Q.   What did you use before SACWIS?
17    A.   It was called FACTS.  It was a
18 homegrown system we used in Cuyahoga County.
19    Q.   Is there something called FACWIS?
20    A.   FACWIS is about the forms and the
21 process we use.  I don't know much about FACWIS,
22 to be honest with you.
23    Q.   And what sort of data analyses are
24 done with the data planted into SACWIS?
25    A.   There are state reports that can be

29 (Pages 110 - 113)

Page 254

1  A. I don't know.
2  Q. I'm sorry?
3  A. I don't know.
4  Q. You don't know if it was helpful?
5  A. I'm not sure that I found it
6  helpful.
7  Q. So you don't know if it would have
8  been helpful to you to have had that white paper
9  in hand maybe with, like, the Cuyahoga County
10 Opiate Task Force report that we went over right
11 before it to try to advocate for policy and
12 practice changes or increased funding and
13 staffing for your division over the last four
14 plus years?
15  A. I'm not sure.
16  Q. Do you think it's possible that
17 having those might have helped the division
18 perform its job better, including addressing
19 issues relating to heroin addiction and opiate
20 abuse?
21      MR. CIACCIO: Objection to form.
22  A. It might have.
23  Q. I'm sorry. I didn't hear your
24 answer.
25  A. I was waiting for him to speak. I'm

Page 255

1 sorry.
2     It may have helped. I don't know.
3  Q. In what areas do you think it may
4 have helped?
5  A. Possibly in the argument of why we
6 would be returning the advocates to the START
7 department.
8  Q. And are you still advocating in
9 budget discussions and internal dealings within
10 the department and the county to get that
11 funding to add the advocates back?
12  A. Yes.
13  Q. That's not something you've
14 abandoned hope for, correct?
15  A. Correct.
16  Q. Are there other changes that you
17 want to have made, too?
18  A. As related to opiates?
19  Q. Yes.
20  A. Certainly. I would like to see more
21 programming where kids could stay with their
22 parents. Absolutely.
23  Q. And I will set aside for now -- I
24 mean, we'll probably have time, but there have
25 been changes to policies implemented in 2018 as

Page 256

1 a result of the publicized deaths of the child
2 Garrett and Rodriguez, correct?
3  A. I'm not allowed to talk about the
4 cases. The prosecutor has asked us to not speak
5 on the cases specifically.
6  Q. I didn't ask you about the cases. I
7 asked about the policies and practices. They've
8 been produced in the litigation. There are
9 changes that you're on that changed some
10 policies and practices in the last couple of
11 months, correct?
12  A. There are panel recommendations that
13 are being implemented, if that's what you're
14 referring to.
15  Q. Yes.
16  A. Yes, there are panel recommendations
17 being implemented.
18  Q. And does any of that have to do with
19 opioids or opiates?
20  A. No.
21  Q. So that's why I was setting it
22 aside. Does that make sense? I'm asking you
23 about, have there been any recommended changes
24 to policies or practices at all as a result of
25 any of these task force or white papers or

Page 257

1 analyses of the impact of heroin abuse or opioid
2 abuse on child welfare and the department of
3 child and family services?
4  A. Policy changes?
5  Q. Yes.
6  A. Not that I'm aware of.
7  Q. Or changes in practices at all?
8  A. Not that I'm aware of.
9  Q. Any written guidances that you're
10 aware of, any written documents you're aware of
11 that advocate any kind of change to how the
12 division does its business as a result of any of
13 these documents?
14  A. Not that I'm aware.
15  Q. Just so it's clear, I'm not asking
16 you about what actually happened in the cases
17 that are in criminal prosecution, I guess, or
18 have other legal proceedings with the deaths in
19 2018, but none of those had to do with opiates
20 or prescription opioids, correct?
21      MR. CIACCIO: Again, I think she
22 answered before that she can't speak to anything
23 that has anything to do with the specific cases.
24      MR. ALEXANDER: I think she can
25 answer that question because I'm not asking what

65 (Pages 254 - 257)

Page 258

1 they actually involved. Just so it's clear --
2 and maybe you can enter a stipulation for
3 Plaintiffs. We're not going to hear something
4 like at trial where somebody says, oh, yeah,
5 those cases involved, you know, prescription
6 opioids and that was part of the case. Either
7 we get to ask questions about it or we get some
8 sort of stipulation that it won't be raised
9 later. You can't have a sword and a shield.
10     MR. CIACCIO: I'm not stipulating to
11 anything. I understand your position.
12   Q.  Go ahead and answer the question,
13 please, ma'am.
14     MR. CIACCIO: Okay. Go ahead.
15   A.  As far as I know, the prosecutions
16 do not involve that piece of the work.
17   Q.  I'm sorry. You said "the
18 prosecutions"?
19   A.  The cases that are being prosecuted,
20 as far as I know, do not include a discussion
21 about opiates. I don't have all the details of
22 the cases so I don't have any way of giving you
23 a hundred percent guarantee on that.
24   Q.  And you're not aware of cases where
25 there was a death of a child who was already

Page 259

1 part of the system for your case -- I'm not
2 asking about those two -- I'm asking in
3 general -- who was already part of your
4 division's clients where there was a death that
5 has been attributed to the use of a prescription
6 opioid?
7     MR. CIACCIO: You're just asking
8 generally if she's aware?
9     MR. ALEXANDER: Yes.
10     MR. CIACCIO: Just without the names
11 of any individuals, you can answer the question.
12   A.  We have had cases where children
13 have died from drug overdoses, but I am not
14 aware if it was prescription or illegal drugs.
15   Q.  Is that documented somewhere in
16 writing?
17   A.  Is it documented somewhere in
18 writing, the overdose?
19   Q.  The way that you're aware of it,
20 that they died as a result of some overdose, the
21 children who are clients of your division, yes.
22     MR. CIACCIO: Objection to form.
23   A.  Do I believe we have it in writing?
24   Q.  Yes.
25   A.  Yes.

Page 260

1   Q.  Would that just be in the individual
2 case files?
3   A.  Yes.
4   Q.  Would it be anywhere else?
5   A.  I don't think so.
6   Q.  So like -- first of all, do you know
7 how many deaths there are like this for any time
8 period?
9   A.  I don't.
10     MR. CIACCIO: Objection to form.
11   Q.  And if we wanted to figure out for
12 any of these individual cases if the death was
13 attributable to overdose or accidental use,
14 presumably not intentional use but accidental
15 use, of any particular drug, that detail might
16 be in the individual case file, correct?
17   A.  Yes.
18   Q.  And so, like, if a child encountered
19 fentanyl or the child somehow swallowed heroin
20 as opposed to taking a prescription opioid that
21 was prescribed to their parent, let's say, we
22 could look and see if that information is in the
23 case file, correct?
24   A.  Yes.
25   Q.  There would be no other way to get

Page 261

1 that, correct?
2   A.  As far as I know, there is no other
3 way to get that information.
4   Q.  Is there some way to identify those
5 case files?
6   A.  I don't have names, if that's what
7 you're asking me.
8   Q.  I wasn't asking for anybody's name.
9   A.  I know you're not asking me to name
10 somebody, but I don't know the names of the
11 children so I wouldn't know how to find the case
12 file.
13   Q.  Okay. All right.
14     So other than your recollection that
15 there have been some deaths and they may have
16 had to do with some drug, which may or may not
17 have been a prescription opioid, there's no way
18 that you're aware of to find these files, to
19 kind of do a little bit of fact checking to
20 figure out what the circumstances were, what
21 information exists on what drug was involved or
22 drugs were involved; is that correct?
23     MR. CIACCIO: Objection to form.
24   A.  As far as -- as far as I know, we --
25 I do not -- I wouldn't know how to go about

Page 338

1  THE WITNESS:  928 is my end.
2  Q.  Can you go back to 20, please?  I
3  think on 20 you had a combined exhibit.
4  A.  Oh, okay.  Sure.
5  MR. CIACCIO:  683 you're asking
6  about now?
7  MR. ALEXANDER:  Yes.  My apologies.
8  THE WITNESS:  683?
9  MR. CIACCIO:  Yes.  It's like the
10 second to last page.
11 THE WITNESS:  I gotcha.
12 Q.  We get these e-mails that kind of
13 interject and diverge, if you will, these
14 chains.  And so this is a response back to Mary
15 Louise Madigan after Deonna and you spoke
16 apparently.
17 Do you remember that discussion?
18 A.  Yes.
19 Q.  Was that an in-person discussion or
20 an e-mail exchange?
21 A.  She sits right next door.  I suspect
22 in person.
23 Q.  Okay.  So we saw that she sent you
24 an e-mail, at some point you spoke, and then you
25 had her send a response, correct?

Page 339

1  A.  Typically we talk and then she sends
2  an e-mail, correct.
3  Q.  And was the expectation that
4  eventually this information would be relayed to
5  the media?  Remember this started with the
6  Cleveland.com inquiry from Karen Farkas.
7  A.  Yes.  This would have been what we
8  would have prepared to send out after -- back to
9  the media.
10 Q.  It includes some of the same stuff
11 we talked about.  It says, "Seeing an increase
12 in opiate cases and custodies but not to the
13 same degree as other counties.  Opiates are part
14 of the reason but not the only reason."
15 You stand by both of those
16 statements, correct?
17 A.  I do.
18 Q.  And it says in parentheses there,
19 "This is what Cindy has said on Sound of Ideas
20 yesterday."
21 Do you recall what that is?
22 A.  The Ideas is the program I told you
23 about on public television.
24 Q.  Sound of Ideas?
25 A.  They must call it the Sound of

Page 340

1  Ideas.
2  Q.  Is that one where you, like, gave a
3  recorded statement or a written statement?
4  A.  No.  I was interviewed.  I didn't
5  give a recorded statement.
6  Q.  The next bullet says, "We are not
7  asking for additional money."
8  Do you know what's up with that
9  statement?  You were asking for additional money
10 throughout this period of time.
11 A.  Well, in May of '17 specifically, we
12 weren't asking for additional money due to the
13 increase in custodies; we were trying to watch
14 our numbers and caseloads, as it says, and
15 dealing with staff and budget resources as we
16 have.
17 Q.  But we saw back in January of 2017
18 you were asking for additional funding.
19 A.  There was a memo Tammy wrote asking
20 for additional money.  It not necessarily went
21 all the way downtown.  It was us putting
22 documentation together as budget requests came
23 up.
24 Q.  Did somebody put the brakes on that
25 request?

Page 341

1  A.  No.  We often write memos in
2  preparation to request money.  We're in the
3  process of doing that now.
4  Q.  It says, "We're in need of more
5  foster homes due to the increased need."  I
6  assume that's need for various reasons, not just
7  because of drug use, correct?
8  A.  Right.  And as it says, not only for
9  our county, but other counties.  So we're
10 competing with other counties for available
11 resources.  Franklin County pays almost twice
12 what we pay for foster care.  So if you're a
13 Franklin County foster parent, you wait for a
14 Franklin County kid because you make more -- you
15 get more compensation.  So we're competing with
16 other counties who also are seeing an increase
17 in opiate use in their counties.
18 Q.  Okay.  And have you gotten more
19 foster homes since this time period?
20 A.  We continue to work to increase our
21 foster homes.  We are very limited on foster
22 care placements.  We are actually putting more
23 kids in kin placement.
24 Q.  So that's with a relative?
25 A.  I'm sorry.  Yes.  The law is very

86 (Pages 338 - 341)

Page 346

1  grown over the last five or ten years.
2       Do you see that?
3    A.   Yes.
4    Q.   And that's kind of right up your
5  alley about a topic, right, foster care costs?
6    A.   Yep.
7    Q.   And Maggie Keenan, what was her
8  position in March of 2018?
9    A.   Office of business management.
10   Q.   She responded, "No, we haven't seen
11 an increase.  We have had an increase in
12 out-of-home placements, but based on drug test
13 results, it's not necessarily attributed to
14 opiates."
15       Do you see that?
16   A.   Yes.
17   Q.   Do you agree with that?
18   A.   Well, I agree with my statement
19 where I say to Walter I don't know how she knows
20 the answer to that question.
21   Q.   It says, "Despite the increase in
22 placements, costs have been flat or gone down."
23       Do you agree with the statement
24 about costs?
25   A.   Yes, because we've increased kinship

Page 347

1  placements.
2    Q.   So you said how would she know this,
3  because she would need drug test results to know
4  if there's an increase related to opiates,
5  correct?
6    A.   Yes.
7    Q.   And it says, "The costs on top of
8  our board and care would give us a different
9  picture of the total costs of placements.  We
10 have seen an increase in opiates.  Can I
11 attribute that as to why kids are coming into
12 care?  No."
13       Did I read that right, the first
14 sentence of the fifth paragraph in the first
15 e-mail?
16   A.   Yes.  And then it goes on to say all
17 the clients in drug courts are opiate clients.
18   Q.   What do you mean by "We have seen an
19 increase in opiates.  Can I attribute that as to
20 why kids are coming into care, no"?
21   A.   So I think what I'm saying -- we
22 have seen an increase in opiates, can I
23 attribute this to why kids are coming into care
24 -- I can tell you all of our clients, this is a
25 complete turnaround -- I'm sorry.  I -- so if

Page 348

1  you read the paragraph above it, I am talking
2  about there is an increase in board and care
3  dollars, they're being offset by kin placements,
4  and that we should look at those costs on top of
5  board and care costs.  The costs on top will
6  give us a different picture of placement costs.
7  I think what this should say is we have seen an
8  increase in opiates.  Can I attribute it totally
9  to that, the reason kids are coming into care,
10 no.  So I don't think it's well written.
11   Q.   Okay.  So when you say, "Can I
12 attribute that as to why kids are coming into
13 care, no," you mean to say --
14   A.   Can I totally attribute it to
15 opiates, no, is what I'm saying.
16   Q.   And can you -- are you in a position
17 to attribute some portion of that to opiates in
18 some sort of reasonable way, it's 5 percent
19 related, 8 percent related, 10 percent related?
20   A.   I can't give you a specific.
21   Q.   Is there any analysis that looks at
22 that issue that you're aware of?
23   A.   As I told you, we're starting to dig
24 into the drug of choice conversation from
25 earlier this year.

Page 349

1    Q.   Right.  That's where we're going to
2  go.  The next paragraph here says, "I would love
3  to be able to dig into more things like LOS
4  comparisons - are we running out of homes
5  because kids are staying longer because they
6  can't return to their drug-involved parent?"
7  And a series of questions.
8        Have you done anything since March
9  of this year, since this e-mail to Walter P, to
10 have analyses like that done?
11   A.   We have started to look at length of
12 stay for children -- that's what LOS refers
13 to -- and are trying to figure out what is
14 impacting length of stay, is that why the -- is
15 that why we have more kids in care.
16       So one of the things I would also
17 say to you, although this would have been early
18 on for this discussion -- actually, this is
19 right before the fatality.  The other thing our
20 data will tell you is that when the agency
21 receives a lot of attention due to a child
22 welfare death, not only will our custody numbers
23 go up, but some of that reason the custody
24 numbers go up is because kids aren't going out
25 of the system.

Page 350

1    Do you understand what I'm saying?
2    Q.  No.
3    A.  So it's not just kids coming in.
4  The kids that should be going home aren't going
5  home.  The county will stop.  The system will
6  stop.  Fear of sending another kid home
7  impacting will cause staff to stop.  This
8  happened prior to that happening.  I'm just
9  putting it out there, that our current length of
10 stay may have something to do with that.  We
11 have started looking at length of stay numbers,
12 yes, we have.  We are -- why are PPLAs going up.
13 It's a type of custody.  Yes, we've started to
14 dig into that.
15    Q.  Are there any reports or analyses
16 that have been finalized yet that look at the
17 impact --
18    A.  No.
19    Q.  -- of opiates or opioids on length
20 of stay or other metrics that might show the
21 burden on the child protective services?
22    A.  Not as of yet.
23        MR. ALEXANDER:  Do you want to break
24 now or do you want to do one more document?
25        THE WITNESS:  No.  We can take a

Page 351

1  break.
2        THE VIDEOGRAPHER:  Off the record,
3  3:50.
4        (Recess had.)
5        THE VIDEOGRAPHER:  On the record,
6  4:08.
7  BY MR. ALEXANDER:
8    Q.  Ms. Weiskittel, is there any of your
9  testimony thus far you need to change or
10 supplement in any way?
11    A.  I don't believe so.
12        MR. ALEXANDER:  That may have been
13 our last break before we're done today, so I'm
14 just going to state for the record a reservation
15 that we have in case we're rushing to be running
16 to airports or whatever or have some issue at
17 the end.
18        I think it's been apparent that
19 there are a number of documents that have been
20 identified, specific and categories of
21 documents, that have not been produced, or there
22 are improper claims of withholding on the basis
23 of privilege.  We'll have to follow up on that
24 later, in addition to other issues that may be
25 brought up in the transcript.  So I just want to

Page 352

1  state our reservation on behalf of my client to
2  seek additional documents and continue the
3  deposition upon the production of additional
4  documents.  We obviously are going to use up our
5  time and do the most we can subject to that
6  reservation.
7        And I don't know if any of the other
8  Defendants want to join in that at this time,
9  but I did want to state that now before we kind
10 of have the final push to finish up.
11        MR. SAROKHANIAN:  We join in the
12 same reservation.
13        MS. FRANKLIN:  We join in the same
14 reservation.
15        MR. HAWKINS:  We join in the same
16 reservation.
17        MR. ZIPP:  We join in the same
18 reservation.
19        MR. CIACCIO:  I'll just say whatever
20 discovery you believe is outstanding, just
21 follow up in writing.  I'm not specifically
22 aware of anything that we've failed to produce,
23 but, you know, we can take it up after the
24 deposition, like you said.
25        MR. ALEXANDER:  Yeah.  And, you

Page 353

1  know, there also was during the first hour when
2  I don't think you were in the room, so obviously
3  we will follow up by letter, and with the
4  transcript and all of that, following the
5  appropriate procedures that the Court has
6  outlined, but I do want to make sure that we
7  have this reservation on the record here.
8  BY MR. ALEXANDER:
9    Q.  With that, back to the exciting
10 questioning, the final push, Ms. Weiskittel.
11        The analyses that we talked about in
12 the last document that are -- were begun
13 sometime this spring, do you have an idea of
14 when those might be concluded?
15    A.  No.
16    Q.  Are there any ongoing analyses that
17 you're aware of or evaluations that you're aware
18 of to try to figure out the financial impact on
19 your division of anything relating to heroin,
20 opiates or specifically prescription opioid use?
21    A.  Well, as I've shared, we are looking
22 at certain data not specifically for those
23 reasons, so I don't know if those will be some
24 of the contributing reasons.
25    Q.  And let me just be clear.  We talked

89 (Pages 350 - 353)

Page 362

1  make sure that the information in the system was
2  as accurate as possible.
3      Q.  Have you done some sort of check to
4  see if the additional data that got entered as
5  part of the caseworker blitz was biased in some
6  way, in any direction?  It could have
7  underestimated opiates or overestimated opiates.
8      A.  No, we did not.
9      Q.  Would that be concerning to you if
10 there was some sort of bias in either direction?
11     A.  Well, for me, at the time we were
12 doing the blitz, there was no lawsuit, so no
13 staff would have been motivated by a lawsuit to
14 biasly report overuse as part of a lawsuit.
15 Many staff with the agency still don't know
16 there's a lawsuit going on.  So I think it's a
17 huge jump to say people are biased because they
18 think it's a good thing that we report opiates,
19 from my opinion.
20     Q.  I didn't ask you about bias because
21 of the lawsuit.  I just asked about bias that
22 leads to the data being skewed in one direction
23 or another.  Is there some reason why you think
24 that the bias could have related to the lawsuit
25 or pending litigation?

Page 363

1      A.  I would say I would totally think it
2  doesn't relate to the lawsuit.
3      Q.  All right.  So if we wanted to see
4  if the additional data that got added to the
5  SACWIS because of the caseworker blitz was
6  accurate or skewed in any direction, to do that
7  kind of analysis we would need to have access to
8  the case files, to look at them, to look at the
9  data in them?
10     A.  We -- that is one way.  I mean, I
11 think the other thing is our PEI people could
12 randomly pull some and look at them, if that's
13 what -- I'm not sure we'd give you access to
14 personal information of families.  We would have
15 to redact all the information.
16     Q.  And what would the PEI people
17 evaluate?
18     A.  Exactly what you're asking.  They
19 could look at the record and see if it matched
20 what was in SACWIS.
21     Q.  Have you ordered an analysis like
22 that?
23     A.  I have not.
24     Q.  Are you aware of any information
25 about prescription opioids that was inaccurately

Page 364

1  relayed by any manufacturer or distributor or
2  pharmacy in Cuyahoga County at any time?
3      A.  I don't understand the question.
4      Q.  So we talked about how you thought
5  that this was a case against drug manufacturers,
6  and I asked you about other people, like
7  pharmacies and distributors of pharmaceuticals.
8  Do you remember that question up front?
9      A.  Yes.
10     Q.  Now, are you aware of anything that
11 any of those entities ever said about a
12 prescription opioid that was inaccurate in any
13 way, about risks, benefits, addiction potential,
14 efficacy, anything?
15     A.  I have no idea.
16     Q.  And are you aware of any practices
17 from any of the distributors in particular that
18 were insufficient in any way and played any role
19 in contributing to any of the problems that you
20 saw in your patient population?
21     A.  I have no idea.
22     Q.  For SACWIS, do you know if it's
23 overwritten or if there's sequential -- if it's,
24 like, sequentially saved so you can see what
25 edits somebody made at any point in time?

Page 365

1      A.  It is sequentially saved.  You know
2  when notes are put in the system.  So the note
3  is dated, but it also tells you the date it was
4  put in.
5      Q.  So for, like, the caseworker blitz,
6  of updating the drug information, drug of choice
7  information, we could see who added that and
8  when if we had access to SACWIS?
9      A.  Yes.
10          - - - - -
11         (Thereupon, Deposition Exhibit 23,
12         E-Mail String with Attachment
13         Beginning Bates Number
14         CUYAH_002466134, was marked for
15         purposes of identification.)
16          - - - - -
17     Q.  Exhibit -- Exhibit 23,
18 Ms. Weiskittel, is a document starting with
19 Bates number CUYAH_002466134, and that goes
20 until 139, and then there's a document attached
21 to that, which is the natively -- native file
22 document that doesn't have a Bates number on it,
23 if that makes sense, so all of this together is
24 Exhibit 23.
25         So, to orient, you mentioned earlier

Page 366

1  that there was a panel that produced
2  recommendations this year --
3      A.   Yes.
4      Q.   -- for your division, correct?
5      A.   Yes.
6      Q.   And what was the name of the panel?
7      A.   I'm sorry.  I'm not trying to be
8  funny.  I think we just call it the panel
9  recommendations.
10     Q.   If you look at the attachment,
11 there's something called "Cuyahoga County
12 Independent Child Welfare Panel Report, June
13 28th, 2018," and then it lists the panel
14 members.
15     A.   Yes, it does.
16     Q.   Are we talking about the same thing;
17 that's the panel?
18     A.   Yes, we are.  Sorry.
19     Q.   And the mandate of the panel as
20 listed on -- it's numbered page 2, but it's
21 actually page 3 of the attachment, because it
22 starts on page number zero for some reason,
23 says -- their mandate was "All child deaths in
24 Cuyahoga County are reviewed by the Cuyahoga
25 County Child Fatality Review Board.  There are

Page 367

1  internal reviews within Cuyahoga County DCFS for
2  all child deaths with involvement by DCFS.  The
3  State Department of Jobs and Family Services
4  conducts independent reviews of certain child
5  fatalities with involvement by DCFS, and are
6  reviewed by -- and are reviewing this case."
7  Then it goes on to talk about essentially what
8  the panel did, how it relates to prior deaths in
9  the system, the findings relating to the
10 individual deaths, and then a series of
11 recommendations.
12          Is that a fair summary of that?
13     A.   Yes.
14     Q.   And in the e-mails that we have
15 before that, there's essentially a response
16 from, I guess, a day later relating to
17 individual recommendations, correct?
18     A.   Yes.
19     Q.   And the proposed response starts
20 with Jennifer Croessmann of the special -- who
21 is a special projects coordinator, office of the
22 director, within the department of health and
23 human services?
24     A.   Yes.
25     Q.   And how does that position relate to

Page 368

1  your job?
2      A.   So Jennifer works directly for
3  Walter, and so she does work in different
4  departments based on what Walter is looking for.
5      Q.   And so she sent a proposed response
6  to you within a day of when they issued their
7  report?
8      A.   Are you referring to the child --
9  the response list?  That didn't come from Jen.
10     Q.   So the attachment of child welfare
11 panel recommendations response list, who
12 generated that document?
13     A.   I'm sorry.  Which document are you
14 looking at?  I apologize.  I'm getting confused.
15     Q.   The start of Exhibit 23 is an e-mail
16 where Jennifer Croessmann e-mailed you and then
17 you forwarded it to Tamara Chapman-Wagner, Chris
18 Cabot --
19     A.   I apologize.  I was wrong.  Jen was
20 the -- Jen did send this information.  I
21 apologize.
22     Q.   Okay.  So a day after the report,
23 this special projects coordinator from the
24 office of the director sends back a response
25 list to you and you forward it to essentially

Page 369

1  three of your staff to help respond, correct?
2      A.   Yes.
3      Q.   The caseload projections on the
4  first part of this list, FTE projections, the
5  first one says, "ES."  What is that?
6      A.   Extended services.
7      Q.   And it says caseloads of 9.5.  Is
8  that the actual current calculation?
9      A.   No.  Those are caseloads we're
10 attempting to get to.
11     Q.   And that's the one where you said
12 it's currently 17?
13     A.   14.
14     Q.   Okay.  And the one below that, STS,
15 what is that?
16     A.   Short-term services.
17     Q.   And what's the current caseload?
18     A.   They're 17-ish.
19     Q.   And they want it to get down to 14?
20     A.   No.  We would like to get them to
21 12.
22     Q.   Why does it say caseloads of 14 here
23 then?
24     A.   Caseloads of 14 new assignments
25 based on their 1,250 investigations.  What that

Page 370

1  is saying to you is that's their new
2  assignments.  Those are investigations.
3  Short-term services also carry a few family
4  cases, which makes up the other three or so
5  cases per worker.  Short-term services is not
6  just investigations.
7      Q.   Okay.  So these projections on
8  caseloads and the targets that you've talked
9  about, this is a general functioning of the
10 department, not specific to opioids or opiates
11 and not specific to these panel recommendations,
12 correct?
13     A.   Yes.
14     Q.   At the end of this there's a part
15 where it says, "Restore START model."  Do you
16 see that?  And it says there's going to be a
17 2018-19 budget request.  This is with the Bates
18 ending in 37.  Do you see that?
19     A.   Yes.
20     Q.   And is that the plan, as far as you
21 know, is that the next budget request will ask
22 you -- ask to finally get the money you've been
23 asking for all along to restart the START
24 staffing at the levels that you wanted?
25          MR. CIACCIO:  Objection to form.

Page 371

1      A.   The panel recommendations included
2  restoring the advocates.  We were told that all
3  of the panel recommendations would be followed,
4  so yes, we believe that we will receive our
5  advocates.
6      Q.   And, in fact, more than you asked
7  for before.  Now you're going to ask for 26
8  advocates.  Do you see that on the next page?
9      A.   Yeah.  So then we would be back to a
10 one-to-one ratio.
11     Q.   And so this discussion in the
12 section about the effect of opiates and the
13 increase in drug-exposed infants over the past
14 four years, that's not part of why you're
15 actually going to get the increased funding,
16 though, is it?
17     A.   I'm sorry.  Say it again.
18     Q.   The increased funding for START
19 that's finally going to come through isn't
20 because of anything about opiate increases, it's
21 because of the attention paid to the deaths,
22 correct?
23          MR. CIACCIO:  Objection to form.
24     A.   The panel recommendations looked
25 at -- they looked at the death, but also the

Page 372

1  function of the agency.  I would say that it
2  wasn't strictly the deaths that would bring the
3  advocates back.  The deaths had to nothing do
4  with the lack of advocates.
5      Q.   There was nothing in the panel's
6  analysis that said that this is needed to
7  address the opioid crisis, correct?
8      A.   The panel recommendation I believe
9  says that they believe -- if you look at it --
10 we'll read what it says.  It says on page 20,
11 number 7, "The DCFS system will benefit from
12 other programs and supports, fully restore the
13 START model for substance abuse cases by adding
14 advocate positions."  So these are other
15 recommendations the panel made that did not have
16 specifically to do with the death of the child.
17     Q.   Is there anything in here that says
18 this is because of some trend with opioid or
19 opiate use?
20     A.   They don't address the specifics of
21 opiate use.
22     Q.   Have you had any interaction with
23 the panel or anybody over these last couple of
24 months since this was going on that the funding
25 is finally going to come in to increase the

Page 373

1  START staffing because of anything about opiates
2  as opposed to the general attention?
3      A.   I've had no conversation of that
4  kind.
5      Q.   And what's your take, that this is
6  because of increased attention and negative
7  press that you're finally going to get the
8  budget to increase the staffing to what you
9  wanted, or do you think this has to do somehow
10 with opioids or opiates?
11     A.   I don't know what the panel was
12 thinking.
13     Q.   So the discussion on the e-mail,
14 going back to the very beginning of this, from
15 Tammy Chapman-Wagner -- this is just a little
16 over four months ago -- says, starting with the
17 second part -- second paragraph, "We really
18 struggled with the staffing recommendations.  As
19 you will see we have scaled them way back.  We
20 would like to say that our 2018 asks with an
21 opportunity to revisit staffing levels end of
22 year.  This will give us a better measurement of
23 volume and impact with the staff we do hire.
24 Knowing how long it would take to" -- to
25 higher -- h-i-g-h-e-r it says -- "knowing even