**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*Track One Cases* | MDL NO. 2804<br><br>Civ. No. 1:17-md-02804-DAP<br><br>HON. JUDGE DAN A. POLSTER |

**TRACK ONE BELLWETHER TRIAL DEFENDANTS' REPLY TO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' JOINT MOTIONS IN LIMINE**

# TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................ 1

II.  REPLIES IN SUPPORT OF MOTIONS IN LIMINE ...................................................... 1

    1.  The Court should not permit plaintiffs to present evidence or argument to
        the jury concerning "future damages." ................................................................ 1

    2.  The Court should preclude plaintiffs from offering individualized evidence
        concerning prescriptions, shipments, and other matters on which they
        successfully avoided discovery by claiming it was "irrelevant." .......................... 5

    3.  The Court should preclude testimony from witnesses about personal
        stories of opioid abuse or related harms to themselves or others. ....................... 7

    4.  The Court should exclude lay and hearsay testimony about prescription
        opioids being a "gateway" to illicit opioid use. .................................................. 9

    5.  The Court should preclude evidence concerning lobbying and other
        protected petitioning activity. ............................................................................ 12

    6.  The Court should bar plaintiffs from introducing evidence of alleged
        wrongful shipments to places outside Track One jurisdictions. .......................... 16

    7.  The Court should exclude as irrelevant evidence that defendants violated
        alleged duties under the CSA or its regulations. ................................................ 18

    8.  The Court should require plaintiffs to establish the necessary foundation
        for their experts' testimony. .............................................................................. 21

    9.  The Court should not allow use of certain charts presenting misleading
        and irrelevant data. ........................................................................................... 23

    10.  The Court should prohibit counsel from offering personal opinions, using
         visual aids to belittle witnesses, and similar conduct. ....................................... 24

    11.  The Court should exclude evidence and argument concerning defendants'
         financial condition, revenues, or profitability. .................................................. 25

    12.  The Court should preclude questioning of witnesses concerning their
         feelings and opinions of personal responsibility, guilt, or sympathy
         concerning the opioid crisis. .............................................................................. 25

    13.  The Court should bar plaintiffs and their counsel from making statements
         at trial that appeal to the jurors in their capacity as taxpayers. .......................... 26

14.    The Court should preclude any comment regarding the absence of a
corporate representative at trial............................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Nat'l Farmers Org.*,
   687 F.2d 1173 (8th Cir. 1982) .................................................................15

*Ashtabula River Corp. Grp. II v. Conrail, Inc.*,
   549 F. Supp. 2d 981 (N.D. Ohio 2008).....................................................20

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
   229 F.3d 1135 (2d Cir. 2000)...........................................................13, 15

*Cal. Motor Transp. v. Trucking Unlimited*,
   404 U.S. 508 (1972)..........................................................................13, 14

*Campbell v. PMI Food Equip. Grp., Inc.*,
   509 F.3d 776 (6th Cir. 2007) ...................................................................12

*Chambers v. St. Mary's Sch.*,
   697 N.E.2d 198 (Ohio 1998)....................................................................20

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab.*
   *Litig.*, 295 F. Supp. 3d 927, 973...........................................................15

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
   734 F.2d 1157 (6th Cir. 1984) .................................................................14

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991)................................................................................13

*Davis v. Clark Cnty. Bd. of Commrs.*,
   994 N.E.2d 905 (Ohio 2013).....................................................................20

*Eaton v. Newport Bd. of Educ.*,
   975 F.2d 292 (6th Cir. 1992) ...................................................................12

*Francis v. Clark Equip. Co.*,
   993 F.2d 545 (6th Cir. 1993) ...................................................................22

*In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*,
   2010 WL 8334226 (N.D. Ohio Dec. 6, 2010), *aff'd sub nom. Decker v. GE*
   *Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) .........................................5

*Gomez v. Rivera*,
   344 F.3d 103 (1st Cir. 2003)...................................................................11

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ...................................................................................13, 15

*Johnson v. Advanced Bionics, LLC*,
2011 WL 1323883 (W.D. Tenn. Apr. 4, 2011).......................................................................22

*Jones v. Pramstaller*,
2013 WL 12249827 (W.D. Mich. Jan. 14, 2013) ..................................................................11

*Krulewitch v. United States*,
336 U.S. 440 (1949) (Jackson, J., concurring).......................................................................22

*Marshall v. Lonberger*,
459 U.S. 422 (1983)................................................................................................................22

*Nat.-Immunogenics Corp. v. Newport Tr. Group*,
2018 WL 6137597 (C.D. Cal. May 16, 2018) .......................................................................15

*Pluck v. BP Oil Pipeline Co.*,
2009 WL 10679665 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir.
2011) ........................................................................................................................................5

*Potters Med. Ctr. v. City Hosp. Ass'n*,
800 F.2d 568 (6th Cir. 1986) .................................................................................................14

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
657 F. Supp. 2d 905 (N.D. Ohio 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) ..........................5

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
2015 WL 627430 (E.D. Tex. Jan. 31, 2015)..........................................................................27

*Sahrbacker v. Lucerne Prods., Inc.*,
52 Ohio St. 3d 179 (1990)........................................................................................................1

*Shannon v. State Farm Ins.*,
2016 WL 3031383 (E.D. Mich. May 27, 2016)........................................................................5

*Smith v. Hickenlooper*,
164 F. Supp. 3d 1286, 1290 (D. Colo. 2016), *aff'd sub nom. Safe Sts. All. v.
Hickenlooper*, 859 F.3d 865 (10th Cir. 2017).......................................................................20

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ...........................................................................................13, 15

*Telecor Commun., Inc. v. S.W. Bell Tel. Co.*,
305 F.3d 1124 (10th Cir. 2002) .............................................................................................15

*United Mine Workers of America v. Pennington*,
  381 U.S. 657 (1965) .............................................................................................15

*United States v. Alghazouli*,
  517 F.3d 1179 (9th Cir. 2008) ...........................................................................19

*United States v. Freeman*,
  730 F.3d 590 (6th Cir. 2013) .............................................................................26

*United States v. Phillips*,
  872 F.3d 803 (6th Cir. 2017) .............................................................................26

*VIBO Corp. v. Conway*,
  669 F.3d 675 (6th Cir. 2012) .............................................................................13

*Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
  641 F.2d 457 (7th Cir. 1981) .............................................................................16

*In re Welding Fume Products Liability Litigation*,
  2010 WL 7699456 (N.D. Ohio June 4, 2010) ....................................................15

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab.
  Litig.*, 2011 WL 6740391 (S.D. Ill. Dec. 22, 2011) ..........................................27

**Statutes**

18 U.S.C. § 1961(1)(D) ...............................................................................................19

21 U.S.C. §§ 801–904, 951-971 ..................................................................................19

21 U.S.C. §§ 823, 841, 842 .........................................................................................18

21 U.S.C. § 843 ...........................................................................................................19

**Other Authorities**

21 C.F.R. § 1301.74(b) ...............................................................................................19

Andrew J. Wistrich et. al., *Can Judges Ignore Inadmissible Information? The
  Difficulty of Deliberately Disregarding*, 153 U. Pa. L. Rev. 1251, 1253 (2005) ...................22

Fed. R. Civ. P. 26 .......................................................................................................11

Fed. R. Evid. 104 ...................................................................................................21, 23

Fed. R. Evid. 403 ...................................................................................................16, 26

Fed. R. Evid. 404(b) ..............................................................................................16, 17

Fed. R. Evid. 701 ...........................................................................................9, 11, 12, 26

Fed. R. Evid. 702 ................................................................................................... *passim*

## I.      INTRODUCTION

Plaintiffs' Opposition to defendants' motions *in limine* is long on pages but short on substance.  This brief offers short replies on the joint motions presented by all defendants remaining in the Track One trial.[1]  For all or portions of some motions, plaintiffs' Opposition offers no substantive response.  Those motions should be granted to the extent conceded.  The remaining motions should also be granted, as plaintiffs' arguments are without merit.

## II.     REPLIES IN SUPPORT OF MOTIONS IN LIMINE

### 1.      The Court should not permit plaintiffs to present evidence or argument to the jury concerning "future damages."

After plaintiffs filed their Opposition and before this Reply was due, the Special Master entered an order stating the "Plaintiffs may not pursue future damages at trial."  Ex. 1 (October 10, 2019, Email from David R. Cohen).  That order renders this motion moot.  However, because the formalization of this ruling has not yet occurred as of this writing, *see id.*, the following discussion is provided for the record:

**Plaintiffs failed timely to disclose their future damages claim.**  Plaintiffs' claim that they adequately disclosed their claim for future damages during discovery is simply untrue.

First, plaintiffs' fact witnesses do not disclose a basis for their future damages claim.  As plaintiffs admit, they are required to prove their entitlement to future damages with "reasonable certainty."  *See* Dkt. 2727 (Plaintiffs' Omnibus Response to Defendants' Motions in Limine) at 7 ("Pl. Opp.").  While in certain circumstances (*e.g.*, a case involving lost wages) future damages may be proved without expert evidence, *see Sahrbacker v. Lucerne Products, Inc.*, 52 Ohio St.

---

[1] The distributor defendants are submitting a separate short reply on their joint motions, as provided in the Special Master's order on briefing of pretrial motions.  *See* Dkt. 1709 at 6.  Each defendant is submitting a reply addressing its individual motion as authorized by that same order.

3d 179, 179 (1990), that is not the case here, where even plaintiffs' claims for past damages are founded upon expert evidence. *See generally* Dkt. 1911-5 (McGuire Report).[2] In any event, plaintiffs cannot point to any non-expert testimony supporting their claim for future damages. Indeed, plaintiffs' fact witnesses were extensively deposed concerning plaintiffs' damages as reflected in their interrogatory responses (*see, e.g.*, Dkt. 2727-2, Ex. 2), and not a single one had an inkling as to how they were derived or calculated, pointing instead to expert reports that they claimed would later address that issue.[3]

Second, plaintiffs' interrogatory responses did *not* properly disclose a claim for future damages. While those responses generically referenced "future damages," they also stated that plaintiffs' "investigation" regarding "future costs" was "ongoing" and objected on the ground that the interrogatory "call[ed] for an expert opinion that will be the subject of a fully-supported and detailed expert opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure." Dkt. 2727-1 at 6; Dkt. 2727-2 at 7. The interrogatory responses did not disclose the basis for any future damages claim or how any future damages would be calculated; nor were the responses later supplemented to provide that information.

---

[2] Plaintiffs' claim for future damages is premised entirely on an extrapolation from their experts' calculation of past damages. *See* Dkt. 2727-4 at 1.

[3] *See, e.g.*, Dkt. 1982-14 (Nelsen 30(b)(6) Dep. Tr.) at 177-78, 185; Dkt. 2173-35 (Kearns Dep. Tr.) at 24-25; Dkt. 1979-5 (Keenan Dep. Tr.) at 431-33 ("Q. If you turn to the next to last page, there's a spreadsheet that attempts to estimate damages based on various categories. Have you ever seen this before? A. No, I have not. Q. Are you able to determine how this is computed? A. This document doesn't even detail what these numbers are? Q. What do you mean? A. I don't know what's being reported here. Is this total expenses? Is this revenue? Is this expenses related to opiates? There's no real detailing on the spreadsheet. . . . Q. Ms. Keenan, are you able to determine how these numbers were computed? A. I am not able to determine that, no. Q. Would you have any ability, based on the spreadsheet, to go and fact check this? A. No."); Dkt. 1979-4 (Keenan 30(b)(6) Dep. Tr.) at 101-02, 104, 107-08; Dkt. 1977-21 (Gutierrez Dep. Tr.) at 260-61.

Third, despite plaintiffs' promises in their interrogatory responses, they also did not disclose the basis for their future damages claim in their expert reports.  Plaintiffs' damages expert, McGuire, did not disclose any future damages in his report.  Rather, McGuire merely noted in a footnote that he *could* calculate future damages if asked to do so.  *See* Dkt. 1911-5 at 7 n.12.  While plaintiffs point to the report and testimony of their "abatement expert," Liebman, his report also did not purport to quantify future damages.  Rather, he purported to quantify the amount of money that would be required to "abate the opioid crisis."  Dkt. 2000-12 ¶ 14; *see also id.* at 2 n.3 (distinguishing McGuire's estimates of "the costs faced by Bellwether governments due to the opioid crisis").  These are legally distinct remedies.  Tellingly, the amounts that McGuire now identifies as "future damages" are not set forth in, or broken out as a subset of, Liebman's "abatement" figures.  *See id.* at 28–29 Tbls. 1–2.

Contrary to plaintiffs' suggestion, the mere fact that the money needed to implement the abatement plan "would be expended in the future," Pl. Opp. at 5, does not convert Liebman's abatement opinion into a quantification of future damages.  While (as plaintiffs appear to acknowledge) any future damages would be duplicative of the so-called abatement remedy, *see id.* at 7 n.9, the two remedies are analytically distinct and not co-extensive.[4]  The disclosure of an abatement opinion is no substitute for the timely disclosure of a future damages opinion.

**Defendants would be prejudiced if plaintiffs are permitted to add a claim for future damages on the eve of trial.**  Plaintiffs' assertion that their belated attempt to inject an $800-million future damages claim into the impending trial would not prejudice defendants is absurd.

---

[4] Because McGuire now calculates "future damages" for 2019 – a year not covered by Liebman's abatement estimates – plaintiffs' future damages increase the total amounts plaintiffs are seeking by $42 million.  For this reason, plaintiffs' assertion that their last-minute expert submissions "do not alter Defendants' overall exposure at trial," Pl. Opp. at 11, is wrong.

As a threshold matter, plaintiffs' failure to offer timely expert opinions on their claim for future damages was not substantially justified.  Plaintiffs do not argue that their experts were unable to offer their future damages opinions in accordance with the expert disclosure schedule in this case – nor could they.  Indeed, McGuire's expert report affirmatively acknowledged that he could have calculated future damages, but he did not do so.  *See* Dkt. 1911-5 at 7 n.12.

For this reason, plaintiffs' assertion that defendants have "known for eleven months that Plaintiffs are seeking future damages" ignores reality.  Plaintiffs' interrogatory responses stated that any claim for future damages would be set forth in "detailed expert opinion(s)."  Dkt. 2727-1 at 6; Dkt. 2727-2 at 7.  When the March 25, 2019, expert disclosure deadline came and went without any disclosure by plaintiffs of future damages, defendants reasonably concluded that plaintiffs were not moving forward with a future damages theory.

Plaintiffs' suggestion that their failure to timely produce expert evidence regarding future damages is "harmless," Pl. Opp. at 10–11, also strains credulity.  Just days before trial, they seek to assert a brand new, $880 million damages theory based on new expert opinions.  In order to respond, defendants would need to re-open both fact and expert discovery – a process that would likely take many months.  First, because plaintiffs' "future damages" estimate is based on a projection from purported 2018 costs, defendants would need to obtain document and deposition discovery regarding plaintiffs' actual 2018 costs.[5]  Second, defendants would need to re-depose not only McGuire and Liebman (as plaintiffs themselves concede, *see* Pl. Opp. at 10), but also

---

[5] Cuyahoga County has not produced *any* data regarding its 2018 expenditures, and the limited data produced by Summit County is woefully incomplete.

other experts – including Rosenthal, McCann and Cutler – regarding plaintiffs' future damages estimate.[6]  Third, defendants' experts would need to formulate their own opinions.

Without an opportunity to interrogate the basis for plaintiffs' eleventh-hour future damages claim and to develop a responsive expert case, defendants will be substantially prejudiced at trial.  With jury selection set to commence this week, there is insufficient time for the requisite fact and expert discovery.  The Court should strike plaintiffs' last-minute expert submissions on future damages and preclude them from offering evidence of such damages.[7]

### 2.  The Court should preclude plaintiffs from offering individualized evidence concerning prescriptions, shipments, and other matters on which they successfully avoided discovery by claiming it was "irrelevant."

Defendants' Motion No. 2 seeks to bar plaintiffs from offering certain individualized evidence, not because it is irrelevant, but because plaintiffs successfully argued that it was and thereby avoided producing it in discovery.  Plaintiffs have asserted throughout this case that they would be proving their claims through aggregate proof, and that the individualized evidence

---

[6] For example, McGuire's new "future damages" estimate is premised on the implicit assumption that harm to the plaintiff counties will remain steady over the next decade.  *See* Dkt. 2727-4 at 1. But McGuire has never explained or justified this assumption.  Nor has he ever opined on the extent of plaintiffs' harm; rather, he relies on the opinions of Cutler for that.  *See* Dkt. 1911-5 ¶ 11 ("[D]amages are estimated by applying the estimates of the percent of harms attributable to defendants' misconduct presented in the Cutler Report … to the identified affected costs in each division….").  Defendants thus would be entitled to depose Cutler on questions such as whether – notwithstanding the *decrease* in opioid mortality in the plaintiff counties – it is appropriate to project into the future based upon estimated 2018 harms.  Cutler in turn purports to rely on information he received from counsel and other experts.  *See* Dkt. 2000-4 (Cutler Report) at 60–62 & App'x III.J.  Defendants would need discovery on that information as well.

[7] *See, e.g.*, *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 914 (N.D. Ohio 2008), *aff'd*, 606 F.3d 262 (6th Cir. 2010) (rejecting declaration filed after due date for disclosure of expert reports); *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*, 2010 WL 8334226, at *1 (N.D. Ohio Dec. 6, 2010), *aff'd sub nom. Decker v. GE Healthcare Inc.*, 770 F.3d 378 (6th Cir. 2014) (striking portion of supplemental report not based on new information); *Pluck v. BP Oil Pipeline Co.*, 2009 WL 10679665, at *7 (N.D. Ohio Nov. 25, 2009), *aff'd*, 640 F.3d 671 (6th Cir. 2011) (striking new expert testimony submitted months after the deadline); *Shannon v. State Farm Ins.*, 2016 WL 3031383, at *3 (E.D. Mich. May 27, 2016) (listing Sixth Circuit decisions upholding orders striking experts).

underlying that aggregate proof is not relevant. Defendants' opening brief demonstrated, with citations to the record and applicable case law, that plaintiffs succeeded in obtaining orders that severely limited their obligation to produce such discovery in several categories. Dkt. 2661 at 5-9. Plaintiffs cannot use those orders as both a sword and a shield.

**Specific persons who have suffered from addiction and children served by child protective services.** Plaintiffs' response offers no opposition whatsoever with respect to these two categories. *See* Pl. Opp. at 12-15. The motion should accordingly be granted as to those categories, and plaintiffs should be precluded from offering any individualized evidence about people who have suffered addiction or children served by child protective services.

**Specific instances of medically unnecessary prescriptions**. Plaintiffs stress that they produced *some* individualized evidence in this category, but they do not (and cannot) dispute that these examples, which are all that the Special Master ordered them to provide, were their own cherry-picked selections, and that defendants were *not* given full discovery of evidence in this category, including evidence that could have shown plaintiffs' selected examples to be atypical.[8] They do not (and cannot) dispute that they objected to defendants' discovery requests about prescriptions on grounds of relevance due to their plan to rely on aggregate proof, and that the Special Master's Discovery Ruling 1, taking plaintiffs at their word, ordered the production of examples solely for purposes of assisting defendants to "understand" that aggregate proof. Dkt. 606 at 5. Plaintiffs should be estopped from using these cherry-picked prescriptions at trial.

---

[8] Plaintiffs take issue with defendants' use of the term "cherry-picked" (Pl. Opp. at 14-15) – but not because it is inaccurate. Rather, they emphasize that they were not ordered to do more. *Id.* But that is exactly the point. They succeeded in obtaining orders that severely limited discovery to items they were allowed to select at their own discretion.

**Specific instances of suspicious orders and pharmacies involved in diversion.**

Finally, with respect to the remaining two categories, plaintiffs do not (and cannot) dispute that the order requiring them to identify suspicious orders did not require them to identify the actual orders on which they intended to base their claims at trial.  Dkt. 1051 at 6.  But neither did their suspicious order monitoring expert "look at any particular order to see whether it was diverted" or to see "what happened to any of the drugs that were distributed to each of the pharmacies." Dkt. 1969-19/1983-16 (Rafalski Dep. Tr.) at 508:1-12, 582:9-19.  Plaintiffs should be precluded from offering evidence at trial of *any* particular suspicious order, or *any* pharmacy they allege was involved in diversion, that they failed to identify in discovery.  They also should be precluded from arguing that they can identify any additional suspicious orders beyond those they identified during discovery.[9]  Defendants reserve the right to object to any evidence plaintiffs might offer in these categories that *was* identified in discovery on any applicable ground, including positions plaintiffs took in discovery.

> **3.**     **The Court should preclude testimony from witnesses about personal stories of opioid abuse or related harms to themselves or others.**

Plaintiffs want to have their cake and eat it, too.  On the one hand, they do not want to have to prove – and the Court has relieved them of the burden to prove – that any individual became addicted or overdosed as a result of any defendant's conduct, and, in turn, caused the County Governments to expend resources.  To forestall arguments raised in defendants' motions to dismiss and summary judgment motions, plaintiffs disclaimed recovery on behalf of

---

[9] To be clear, this motion seeks to bar *plaintiffs* from offering evidence in these categories, as they are properly estopped from doing so by the positions they took in limiting discovery, to the prejudice of defendants.  Defendants, of course, have the due process right to point to whatever individualized evidence they have been able to obtain to challenge plaintiffs' aggregate proof, as well as to cross-examine plaintiffs' experts on their failure to consider such evidence.

individuals who suffered addiction-related harms.[10]  Yet, on the other hand, plaintiffs now want to tell individual stories of addiction and loss.  Their purpose is improper: to imply, without having to prove, that those stories somehow are connected to defendants' alleged misconduct, to arouse the jury's sympathies, and to make it more likely that the jury will base a verdict on the suffering of those individuals.

Take, for example, plaintiffs' proposed witness, Travis Bornstein.  Mr. Bornstein's son died of a fentanyl and heroin overdose, reportedly after first becoming addicted to prescription opioids.  There is no evidence connecting any of the pills taken by his son with any defendant, much less with the failure of any defendant to report or not ship a suspicious order.  Accordingly, the story of Mr. Bornstein's son's addiction and death is not relevant to any issue in this case. His personal story does not help establish that defendants engaged in any wrongdoing, much less any wrongdoing that caused injury to plaintiffs.[11]

---

[10] Dkt. 654 at 10–11 ("While it is true that thousands of people in Akron and Summit County have been personally touched by the opioid crisis, the Plaintiffs' public nuisance claim does not seek recovery based on, or for, the personal injuries of individual residents."); Dkt. 1203 at 20 (Plaintiffs may not recover for "the personal injuries of their citizens."); *see also id.* at 10 ("Plaintiffs' asserted damages are not recoverable by any other party."); Dkt. 2580 at 7 (re-adopting motion to dismiss holding that "Plaintiffs ha[ve] sufficiently alleged 'categories of costs . . . that cannot be said to arise directly out of Plaintiffs' residents' personal injuries.'"); Ex. 2 (Ltr. from the Honorable Dan A. Polster to D. Hunt, Clerk, United States Court of Appeals for the Sixth Circuit (Oct. 1, 2019)) ("[T]he bellwether Plaintiffs have consistently stated, and I have likewise repeatedly concluded, that the city and county Plaintiffs do not seek recovery based on injuries to individual residents …..") (citing Dkts. 654, 1115, 1203).

[11] Plaintiffs now claim that "Mr. Bornstein will testify regarding his experiences in the community with individuals and families whose lives have been ravaged by opioid addiction, and regarding his organization's efforts to address the opioid crisis caused by Defendants' actions."  Dkt. 2756 at 10–11.  There is no more relevance to those individuals' stories' than Mr. Bornstein's; plaintiffs cannot tie any defendant's conduct to any addiction or loss suffered by those individuals.  Nor is there relevance to the efforts of Mr. Bornstein's non-profit organization "to address the opioid crisis."

Plaintiffs tacitly admit this, for they do not explain why Mr. Bornstein's story, or any other, is relevant.  Nor do plaintiffs refute any of defendants' other arguments.[12]  Without defending the admissibility of any particular evidence, they simply assert that this type of evidence cannot be categorically excluded.  But given plaintiffs' failure to identify any respect in which such evidence *is* relevant and admissible, this argument necessarily fails.

Mr. Bornstein is a parent who lost his son.  His story is heartbreaking, as is that of any parent who has endured the death of a child, no matter the cause.  Any juror listening to his story – or others like it – is sure to be moved and may be motivated to "do something" to prevent other parents from suffering as he did, feeling the need to blame someone for what happened. Plaintiffs are banking on those types of purely emotional reactions motivating the jury to find in their favor.  That purpose is patently improper and unfairly prejudicial to defendants.  Permitting this type of evidence also will give plaintiffs all the benefits of these individual stories without putting them to the burden of proving up the required connections – if any – to any defendant's conduct.  The Court should exclude these anecdotal personal stories about opioid abuse and related harms from the Track One trial.

### 4.    The Court should exclude lay and hearsay testimony about prescription opioids being a "gateway" to illicit opioid use.

Under Federal Rule of Evidence 701(c), "*if a witness is not testifying as an expert*, testimony in the form of an opinion is limited to one that is … *not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702" (emphasis added).  Whether there

---

[12] Plaintiffs do not deny, for example, that they routinely instructed witnesses not to answer questions concerning personal use of opioids, instead pointing only to the fact that there were a few instances in which they chose not to do so.  Pl. Opp. at 16.  But a party cannot preserve its right to present evidence at trial on a subject merely by providing the limited discovery it finds convenient, while blocking the opposing party from obtaining related evidence that might undermine or contradict it.

is a causal connection between prescription and illicit opioid use is plainly within the scope of Rule 702.  Indeed, plaintiffs designated *three* experts to opine on the alleged connection.  The time to designate any additional experts on this subject expired months ago.

Plaintiffs concentrate their opposition to this motion on the proposed testimony of Dr. Thomas Gilson, the Cuyahoga County Medical Examiner.  They suggest that the motion is otherwise moot because two witnesses discussed as examples in defendants' motion, Jerry Craig and Keith Martin, are no longer on plaintiffs' witness list.  Pl. Opp. at 17 n.16.  But this does not moot defendants' motion to exclude lay witness testimony about the gateway theory from *any* witness.  Defendants cited Craig and Martin merely as illustrative examples; other witnesses who purported to testify on this subject in their depositions remain on plaintiffs' list.[13]

As for Dr. Gilson, who has not been designated as an expert and so will be testifying only as a fact witness, plaintiffs have offered no justification for permitting him to testify about an alleged causal connection between prescription and illicit opioid abuse.  Dr. Gilson's opinions are based on a "study" he allegedly performed in which he reviewed autopsy reports from a non-representative sample of Cuyahoga County residents, cross-referenced their identities with a database containing opioid prescription information (OARRS), and then drew conclusions about the relationship between prescription and illicit opioids.  That is precisely the sort of analytical exercise that expert witnesses perform and that is subject to challenge under *Daubert*.

Gilson's testimony about the gateway theory is not factual, lay testimony merely because he reached his conclusions while acting "in his capacity as Medical Examiner."  Pl. Opp. at 17.

---

[13] *See, e.g.*, Dkt. 1978-18 (Johnson Dep. Tr.) at 73:12-74:5 (testifying that "we know that 80 percent of our heroin users start with prescription opioids,"  based on "articles that I've read that talk about when folks self-report, in talking with Donna Skoda, in being at Opiate Task Force meetings … [and] presentations done by Dr. Doug Smith,"); Ex. 3 (Weiskittel Dep. Tr. at 50:4-52:15) (opinions about gateway connection based on discussions with her direct reports).

Medical examiners, including Dr. Gilson, routinely testify in an expert capacity; they cannot circumvent the expert disclosure requirements by testifying as percipient fact witnesses about scientific, technical, and specialized matters.  Indeed, such a result would be especially troubling here, given that Dr. Gilson's statistical analysis strayed far beyond his own area of expertise. Dkt. 1977-16 (Gilson Dep. Tr.) at 68:24-69:3 ("I know some statistics. I -- I don't hold a degree in statistics. And I would not say that I would be somebody consulted as an expert in statistics.").

There can be circumstances in which an individual with specialized knowledge is also a percipient fact witness.  *See, e.g.*, *Gomez v. Rivera*, 344 F.3d 103 (1st Cir. 2003); *Jones v. Pramstaller*, 2013 WL 12249827 (W.D. Mich. Jan. 14, 2013).  Whether Rule 26 applies depends on "the essence of the proffered testimony."  *Gomez*, 344 F.3d at 113.  For example, the witness in *Gomez* was a lawyer who participated in a meeting with the defendant in which he explained the defendant's legal obligations.  The Court held that the witness's testimony "was not admissible for the purpose of proving what obligations the law imposed upon the [defendant]," only "to show the [defendant's] understanding at the time and his ensuing state of mind."  *Id.* at 115.  In other words, the witness's opinions were not themselves admissible; the witness could testify only as to information about those opinions that had been conveyed to the defendant for purposes of establishing the defendant's state of mind.

Here, in contrast, it is Dr. Gilson's conclusions themselves that are being offered. Nothing prevents plaintiffs from eliciting testimony from Dr. Gilson about *facts* on which he is a percipient witness, such as his personal observations in autopsies he conducted.  But as the Advisory Committee Notes to Rule 701 explain, "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is

11

governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil … Rules."  Those standards are not satisfied here, either substantively or procedurally.

If plaintiffs had disclosed Dr. Gilson as an expert, full disclosure would have been required of his analysis and all supporting data.  Defendants would have had the opportunity to conduct an expert deposition, produce a responsive expert, and challenge Gilson's conclusions under *Daubert*.[14]  Plaintiffs cannot "evade the expert witness disclosure requirements … by simply calling an expert witness in the guise of a layperson."  Rule 701 Notes of the Advisory Committee.  Dr. Gilson's testimony about the "gateway theory," like those of plaintiffs' other lay witnesses who purport to have opinions on that subject, should be excluded.

### 5. The Court should preclude evidence concerning lobbying and other protected petitioning activity.

Allowing plaintiffs to introduce evidence of defendants' lobbying efforts or other petitioning activity would violate defendants' First Amendment rights.  None of plaintiffs' arguments on this issue have merit.

*First*, plaintiffs are wrong to suggest that the *Noerr-Pennington* doctrine is limited to the antitrust context.  Pl. Opp. at 22 n.23.  As decisions of both the Sixth Circuit and numerous other courts of appeals make clear, *Noerr-Pennington* broadly applies "to claims brought under both state and federal laws, including common law claims."  *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *accord Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) (holding that the First Amendment bars suits seeking to impose liability on petitioning

---

[14] To survive *Daubert*, plaintiffs would have had the burden of defending, among other things, Gilson's admitted lack of expertise on the kind of statistical analysis he purported to perform, as well as his highly skewed sample, the limitations of the OARRS database, and his failure to consider control or other variables.  The OARRS data set that Gilson used, which was critical to his conclusions, was not even produced, and no expert has had an opportunity to evaluate its reliability or limitations.

in the civil rights context).[15]  Accordingly, the *Noerr-Pennington* doctrine precludes plaintiffs from introducing evidence of such petitioning activity to establish liability.

*Second*, plaintiffs' invocation of *Noerr-Pennington*'s "sham" exception, and their assertion that the *Noerr-Pennington* doctrine does not "immunize[] fraud," are unavailing. While defendants dispute plaintiffs' allegation that their petitioning activity was fraudulent, that is not relevant under the *Noerr-Pennington* doctrine, which applies irrespective of a party's motive or intent in petitioning the government.  *See City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (holding that even if defendants lobbied for improper motives or used "improper means" in seeking "favorable government action," the First Amendment protects that petitioning); *VIBO Corp. v. Conway*, 669 F.3d 675, 683 (6th Cir. 2012) (The "intent … of private actors seeking government action is irrelevant to the application of *Noerr-Pennington*."). Rather, the "sham" exception applies only where a defendants' petitioning activity was not actually intended to achieve favorable government action, but was instead a pretext for achieving some other improper end – for example, blocking a competitor's access to the courts.  *See, e.g., Cal. Motor Transp. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972) (*Noerr-Pennington* "sham" exception applied where judicial and administrative proceedings were brought to "harass and deter" the plaintiffs so as to deny them "'free and unlimited access' to those tribunals," rather

---

[15] *See also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931 (9th Cir. 2006) ("[T]he *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("Although the *Noerr–Pennington* doctrine originated in antitrust law, its rationale is equally applicable to RICO suits.")

than to influence government action in favor of defendants).[16]  The First Amendment protects evidence of the petitioning activity that plaintiffs seek to introduce here.

*Third*, plaintiffs' Opposition makes clear that they intend to use evidence of defendants' protected lobbying and other petitioning activities to establish liability – a result the First Amendment forbids.  Plaintiffs suggest that evidence of defendants' petitioning activity may be "relevant and admissible to show the purpose and character of defendants' wrongful activities."  Pl. Opp. at 21-22 (citing *Pennington*).  As an initial matter, this argument makes no sense; the "purpose and character" of defendants' marketing or suspicious order monitoring programs can be assessed without reference to any lobbying conduct.

Plaintiffs' suggestion that evidence of lobbying can be used to show "knowledge and intent to participate in a RICO enterprise," Pl. Opp. at 23-24, only proves that they want to use protected activity to prove an essential element of their claim – a result the Constitution forbids.  *See Cal. Motor Transport Co.*, 404 U.S. at 510–11 ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a -vis their competitors.").[17]  In *Pennington*, the Supreme Court noted that evidence

---

[16]  As defendants pointed out in their initial Motion, Dkt. 2661 at 14 n.13, some courts have recognized a narrow fraud exception to the *Noerr-Pennington* doctrine where a defendant makes knowing and willful misrepresentations to an agency, but *only* in the context of an *adjudicatory* proceeding.  *See Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580 (6th Cir. 1986).

[17]  To the extent plaintiffs suggest that evidence of lobbying can be used to show the "purpose" or "character" of that lobbying, evidence of protected petitioning activity may be introduced only to show the "purpose" or "character" of conduct *that is not itself protected by the First Amendment*.  *See, e.g.*, *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 734 F.2d 1157, 1163 (6th Cir. 1984) (rejecting plaintiff's argument that it could introduce petitioning-related evidence to show

of petitioning activity might be admissible *if otherwise* "probative and not unduly prejudicial" on a disputed issue *other* than liability purportedly arising from the protected activity.  But *Pennington* is clear that First Amendment petitioning activity may not be used, as plaintiffs seek to do here, as a basis for imposing liability.  *See United Mine Workers of America v. Pennington*, 381 U.S. 657, 671 n.3 (1965) (petitioning activity is "barred from forming the basis for a suit").[18]

*In re Welding Fume Products Liability Litigation*, 2010 WL 7699456 (N.D. Ohio June 4, 2010), which plaintiffs cite, illustrates the point.  There, the defendants' lobbying materials were admitted, not to show that lobbying was evidence of any wrongdoing, but instead because the materials contained admissions showing the defendants knew of adverse medical effects of their products.  *Id.* at *93.  Indeed, the court admonished the plaintiffs that they "may not suggest to the jury that defendants were engaged in any improper activity by lobbying."  *Id.*; *see also Pennington*, 381 U.S. at 671 (reversing trial court instruction that lobbying activity could be considered for "whatever bearing it may have on the overall picture").  The other cases cited by plaintiffs are no different.[19]  In short, plaintiffs' attempt to rely on protected petitioning activity

---

the "'purpose' or the 'character' of [defendant's] action" because the underlying conduct itself was shielded).

[18] The two district court decisions cited by plaintiffs – *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Products Liab. Litig.*, 295 F. Supp. 3d 927, 973 n.7 (N.D. Cal. 2018) and *Nat.-Immunogenics Corp. v. Newport Tr. Group*, 2018 WL 6137597, at *4 (C.D. Cal. May 16, 2018) – do not call into question either the Supreme Court's clear directive that protected activity cannot form the basis for liability or the multiple appellate decisions affirming dismissal of RICO claims based on the *Noerr-Pennington* doctrine.  *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d at 942 (affirming dismissal of RICO claim that relied on evidence protected by *Noerr-Pennington*); *Bath Petroleum Storage, Inc.*, 229 F.3d at 1135 (same); *see also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund*, 196 F.3d at 826 (protected lobbying activity "cannot be a source of [RICO] liability directly under the *Noerr–Pennington* doctrine").

[19] *See, e.g.*, *Telecor Commun., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136–37 (10th Cir. 2002) (evidence held admissible because it was not offered for the "improper purpose of showing that [defendant] violated antitrust laws"); *Alexander v. Nat'l Farmers Org.*, 687 F.2d

to establish an element of their claim (*i.e.*, the existence of an enterprise or conspiracy) is precisely what the *Noerr-Pennington* doctrine prohibits.[20]

Even if relevant, any evidence of defendants' lobbying would be more prejudicial than probative, as it would inevitably invite the jury to impose liability based upon protected First Amendment conduct. Fed. R. Evid. 403; *Weit*, 641 F.2d at 466-67. The Court should bar plaintiffs from introducing evidence of lobbying or other petitioning activities at trial.

### 6. The Court should bar plaintiffs from introducing evidence of alleged wrongful shipments to places outside Track One jurisdictions.

Plaintiffs' Opposition does not seriously dispute that any evidence they might offer of allegedly wrongful shipments to places outside Summit and Cuyahoga Counties is admissible *only* if they can show that pills from those shipments were diverted and made their way to Summit and Cuyahoga Counties. Shipments made elsewhere, even if wrongful, are otherwise irrelevant. Plaintiffs do not even address, much less dispute, defendants' showing that, absent such foundation, Federal Rule of Evidence 404(b) would bar the admission of such evidence. Dkt. 2661 at 16-17. Indeed, plaintiffs' Opposition does not discuss Rule 404(b) at all.

Plaintiffs' Opposition fails to identify *any* evidence that *any* shipment made by *any* of these particular defendants to any location outside Cuyahoga or Summit Counties was diverted

---

1173, 1195 (8th Cir. 1982) (concluding that "joint efforts to influence public officials . . . are not illegal either standing alone or as part of a broader scheme").

[20] Plaintiffs argue that, to the extent defendants argue that "the DEA did not do enough to enforce the law," the Court should allow plaintiffs to "rebut this argument with evidence that . . . Defendants and their trade association lobbied to limit the DEA's enforcement authority. *Id.* at 24. Plaintiffs cite no case holding that protected petitioning activity may be introduced as "rebuttal" evidence. Evidence of lobbying or other protected petitioning activity is inadmissible to establish liability regardless of whether it is offered affirmatively or as "rebuttal." *See Weit v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 641 F.2d 457, 466-67 (7th Cir. 1981) (excluding lobbying evidence where it "pose[d] a serious problem of confusion of issues," particularly that it may prompt the jury to impose liability on protected lobbying).

and found its way into either county.  The most they offer are a couple of sources suggesting the possibility of "migration" of prescription opioids from Florida "into Ohio" and various other states.  Pl. Opp. at 32-33.  They identify no evidence that even suggests the existence of "migration" into Cuyahoga or Summit Counties (as opposed, for example, to Southern Ohio).

Moreover, the only specific defendant plaintiffs' Opposition attempts to connect to migration of any kind is Walgreens; plaintiffs identify no evidence whatsoever as to any other defendant.  And plaintiffs have provided no basis to deny this motion even as to Walgreens.  Plaintiffs quote a paragraph from the expert report of James Rafalski, who relies almost exclusively on a settlement agreement (which is itself the subject of a separate motion *in limine*) that in turn cites unproven and untested allegations of a handful of instances (fewer than five) of Walgreens pharmacies in Florida *dispensing* opioid medications to Ohio residents.  Even if these allegations had identified prescriptions dispensed to residents of Cuyahoga or Summit Counties – and they did not – they would be irrelevant.  As the Court has found, "Plaintiffs have disclaimed any cause of action against Retail Pharmacies in their capacity as retailers or dispensers of opioids."  Dkt. 1203 at 2.  Plaintiffs' claims are limited to alleged harm from *distribution* into Cuyahoga and Summit Counties.  Plaintiffs have no evidence, and their experts do not opine, that opioids distributed elsewhere – by Walgreens or anyone else – caused injury to plaintiffs.

Plaintiffs' only other argument on this point – that they should be allowed to offer evidence of wrongful shipments elsewhere because defendants' SOM programs were national in scope – is precisely the kind of argument for admissibility that Rule 404(b) rejects.  If a defendant made a wrongful shipment to a pharmacy in Utah, that is *not* admissible evidence of whether that defendant made wrongful shipments to Cuyahoga or Summit Counties that caused

injury to plaintiffs, any more than evidence of a prior automobile accident would be admissible in a personal injury case merely because the prior accident involved the same car and driver.

> **7.    The Court should exclude as irrelevant evidence that defendants violated alleged duties under the CSA or its regulations.**

Plaintiffs' primary argument in opposition to defendants' Motion No. 7 is that this Court has already ruled against defendants on the evidentiary question this motion presents.  That is incorrect.  The order plaintiffs cite, Dkt. 2483, was a ruling on general "duties" and specified that it did *not* "address the scope of possible liability [to plaintiffs] for breach of those duties," *id.* at 14.  At the time of that order, plaintiffs were pressing a negligence claim and asserted that such general duties and "breach of those duties" were relevant to that claim, but they have since elected to drop the negligence claim.  As defendants have demonstrated, any breach of the "duties" that the Court addressed in that order are not relevant to the remaining claims.

Plaintiffs' substantive arguments are also without merit.  Once again, plaintiffs seek to rely on allegations of vague, undefined "CSA violations."  *See* Pl. Opp. at 35.  But there is no general "CSA violation" that has uniform legal force, including with respect to plaintiffs' claims.  Plaintiffs must establish the relevance of any alleged failure to abide by a statutory or regulatory section by identifying that section and its relevance to an element of a claim to be tried.  Plaintiffs' Opposition fails entirely to satisfy this burden.

**RICO and OCPA.**  Defendants' motion demonstrated that plaintiffs cannot rely on any failure to abide by provisions of 21 U.S.C. §§ 823, 841, or 842 to establish a RICO or OCPA predicate act.  Plaintiffs offer no substantive refutation of that point.  This is unsurprising, as plaintiffs did not identify these sections in their interrogatory response listing the predicate acts on which their RICO and OCPA claims are based.  *See* Dkt. 2666 at 18.

As for the remaining statutory provision they cite, 21 U.S.C. § 843, plaintiffs skip a critical step.  The Court held that a violation of section 843 can be a predicate act under 18 U.S.C. § 1961(1)(D), but it did not rule that the allegations against defendants include conduct that would violate section 843.  They do not.  Section 843 applies only to documents that are "required to be made, kept, or filed under … subchapter [I] or subchapter II," *i.e.,* 21 U.S.C. §§ 801–904 (subchapter I), §§ 951–971 (subchapter II).  Any failure by plaintiffs to "inform [DEA] of suspicious orders," 21 C.F.R. § 1301.74(b), does not involve any such document, and thus cannot constitute a predicate act.

Plaintiffs' attempt to distinguish *United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), falls flat.  *See* Pl. Opp. at 36.  Whether 21 C.F.R. § 1301.74(b) is a "law" or has the "force of law" does not determine whether a failure to abide by that regulation would also violate section 843.  Section 843 is specific and clear, and plaintiffs offer no support for their wide-reaching argument that Congress made it a felony to omit *any* material information from *any* document required to be filed by *any* DEA-promulgated regulation.  The specificity Congress applied in enacting section 843 refutes any such suggestion.[21]

**Ohio Public Nuisance.**  Plaintiffs have indicated they are not pressing a statutory public nuisance claim at trial, *see* Dkt. 2715-3 at 77 n.12; Dkt. 2715-2 at 2, so any argument on that claim is moot.  As for common law public nuisance, plaintiffs fail to demonstrate how any failure to comply with duties related to suspicious orders is relevant to either their "unlawful" or "intentional" public nuisance variants.  The Court has not found any specific provision of law at

---

[21] Plaintiffs do not dispute that the Court has ruled that plaintiffs cannot rely on any fraud on the DEA to prove their claims, including those under RICO and OCPA.  *See* Pl. Opp. at 36-37; Dkt. 2565 at 4-5, 9-10, 22.  They do not demonstrate how failure by defendants to comply with any statutory or regulatory obligation would be relevant to fraud on anyone *other than* the DEA.

issue here to be a "safety statute" under Ohio law, and plaintiffs' *ipse dixit* that the whole of the CSA is a "safety statute" – without any supporting authority – is insufficient.  As defendants have demonstrated, the statutory sections plaintiffs cite are not "safety statutes," because they do not provide specific legal requirements for the protection of others that provide for a private right of action.  *See* Dkt. 2661 at 21; Dkt. 2667 at 2; *Ashtabula River Corp. Grp. II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 989 (N.D. Ohio 2008).  Plaintiffs cite no case in which a *regulation* was found to be a "safety *statute*," and the Ohio Supreme Court has ruled that failure to comply with a regulation (as opposed to a safety statute) cannot give rise to *per se* liability.  *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 202-03 (Ohio 1998).

**Ohio Civil Conspiracy.**  Plaintiffs fail to identify any provision of the CSA or regulations they cite as one that could "give rise to an independent cause of action," which is required to prove a civil conspiracy claim.  *See Davis v. Clark Cnty. Bd. of Commrs.*, 994 N.E.2d 905, 909 (Ohio 2013).  Plaintiffs do not point to a single purported violation that plaintiffs would have the right to bring an independent action to enforce.  *See, e.g.*, *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1290 (D. Colo. 2016), *aff'd sub nom. Safe Sts. All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017).

**Testimony about the law.**  Finally, plaintiffs do not provide grounds for denying defendants' request that they be barred from presenting evidence purporting to opine on the law – a prohibition this Court has already articulated.  *See* Dkt. 2551 at 16-17.  As to the unrelated question of whether contemporaneous DEA approvals communicated to defendants are

admissible at trial, defendants have addressed that issue in their opposition to plaintiffs' Motion

in Limine No. 15.  *See* Dkt. 2725 at 16-21.[22]

### 8.    The Court should require plaintiffs to establish the necessary foundation for their experts' testimony.

Defendants' motion asked for a common-sense procedure to confirm – outside the

presence of the jury – that plaintiffs have established a sufficient evidentiary foundation for

certain assumptions underlying expert testimony prior to that testimony being admitted.  Given

that their experts are prepared to offer numerous opinions that have no evidentiary basis,

plaintiffs naturally oppose any such procedure, arguing that "pre-testimony hearings are neither

required by the Federal Rules of Evidence nor necessary in this case" and that such hearings

"would serve only to interrupt the trial."  Pl. Opp. at 41.  In fact, the Federal Rules *do*

contemplate such hearings, which are important to ensure that improper and prejudicial

testimony is not presented to the jury.

Federal Rule of Evidence 104(a) states that "[t]he court must decide any preliminary

question about whether a witness is qualified, a privilege exists, or evidence is admissible."

Rule 104(b) mandates that "[w]hen the relevance of evidence depends on whether a fact exists,

proof must be introduced sufficient to support a finding that the fact does exist."  And Rule

104(c) requires that "[t]he court must conduct any hearing on a preliminary question so that the

---

[22]  Plaintiffs argue that the jury should be instructed that suspicious orders are evidence of "likely diversion."  Pl. Opp. at 40.  There is no basis for such an instruction, which would be legally wrong and wholly prejudicial.  Even under the reading of the CSA and regulations set forth in Dkt. 2483, with which defendants respectfully disagree, the Court has recognized a distinction between "suspicious orders" and orders that are "likely to be diverted," explaining that orders meeting the "suspicious order" definition may be shipped if they are "not likely to be diverted."  *See, e.g.*, Dkt. 2483 at 9–10.  Plaintiffs clearly seek to avoid their causation burden by relying upon argument about hypothetical "likely diversion," not actual diversion of specific alleged suspicious orders tied to defendants.  The jury should be instructed that suspicious orders are *not* evidence of likely diversion to avoid juror confusion on this important distinction.

jury cannot hear it if . . . justice so requires."  Holding a hearing outside the presence of the jury on these preliminary questions is particularly critical where, as here, there is a risk of exposing the jury to unreliable and speculative opinions that are devoid of evidentiary foundation.  This Court has already ruled that plaintiffs must demonstrate that their experts' hypothetical and speculative testimony rests upon some reliable foundation before it is admissible.  *See, e.g.*, Dkt. 2492 at 18 (ruling that "at trial, *prior to the introduction of Keller's testimony on this topic*, the Court will require Plaintiffs to clearly articulate the assumptions underlying their hypothetical(s) and establish that their hypothetical(s) present an accurate summation of the evidence present in the record" (emphasis added)).

Plaintiffs suggest that any expert testimony that is admitted despite lacking in foundation can be cured through objections or other procedural mechanisms *after* the jury has already heard it.  Pl. Opp. at 42-43.  The unwarranted prejudice flowing from such an approach is self-evident. *See Francis v. Clark Equip. Co.*, 993 F.2d 545, 551 (6th Cir. 1993) (finding that the trial "court's limiting instruction to the jury to 'disregard' the testimony 'that relates to [the risk-benefit] theory' could not effectively eliminate the prejudice and confusion caused by allowing the risk-benefit theory to be presented by plaintiff" and granting motion for new trial); *Johnson v. Advanced Bionics, LLC*, 2011 WL 1323883, at *5 n.6 (W.D. Tenn. Apr. 4, 2011) ("the risk that the jury will misapply some evidence despite a limiting instruction is too great to ignore").  Courts and academic studies alike have concluded that highly prejudicial testimony cannot be erased from jurors' consciousness through "curative" instructions.[23]  It is for this reason that

---

[23] *See, e.g.*, *Francis*, 993 F.2d at 551; *Marshall v. Lonberger*, 459 U.S. 422, 452 (1983) (recognizing that "a jury instruction is simply inadequate to ensure that a jury will disregard highly prejudicial evidence"); *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."); Andrew J. Wistrich et.

Rule 104(c) requires the Court to hold preliminary hearings on admissibility of evidence outside the presence of the jury whenever "justice so requires."  Justice requires such a procedure here.

9. **The Court should not allow use of certain charts presenting misleading and irrelevant data.**

Motion No. 9 explained that certain charts offered by plaintiffs' data expert Craig McCann are prejudicially misleading.  Dkt. 2661 at 25-27.  These charts aggregate shipping data from a large number of distributors and from disparate sources.  The charts include distributors that are not in the Track One trial.  They include shipments outside the Track One jurisdictions. They include medications on which plaintiffs have no expert testimony.  Plaintiffs do not deny any of this.  Nor do they deny that the effect of this aggregated data will be to mislead the jury into thinking that the trial defendants shipped significantly more oxycodone and hydrocodone to their communities than they actually did.  Plaintiffs also do not deny that, because these charts present this data in aggregated form, there is no way to tell from the charts which shipments relate to which pharmacies, and therefore no way to identify any diversion that may be associated with any of those shipments.

Plaintiffs' Opposition fails to address the misleading nature of these charts.  Indeed, they do not deny – and therefore concede – that defendants' description of these charts is accurate. Plaintiffs also make no attempt to demonstrate that these charts are relevant to show that any trial defendant's shipments to Cuyahoga or Summit County led to diversion.  And plaintiffs say nothing about the obvious prejudice to defendants from the use of misleading, irrelevant charts.

---

al., *Can Judges Ignore Inadmissible Information? The Difficulty of Deliberately Disregarding*, 153 U. Pa. L. Rev. 1251, 1253 (2005) ("The best way to prevent inadmissible information from influencing jurors is to shield them from it altogether.")

Instead of rebutting defendants' arguments, plaintiffs merely assert that defendants can "readily address" these issues "through objections to any direct examination of Dr. McCann" and in "cross-examination."  Pl. Opp. at 44.  That is no response to a motion *in limine*, particularly where defendants have specified exactly what should be excluded and why.  Addressing these objections at trial will waste valuable trial time.  These charts should be excluded now.

### 10. The Court should prohibit counsel from offering personal opinions, using visual aids to belittle witnesses, and similar conduct.

The principal focus of Motion No. 10 is, as the title indicates, a request for an order "prohibit[ing] counsel from offering personal opinions" about this litigation.  Plaintiffs' Opposition does not address this point at all; plaintiffs do not contest the incontestable fact that the Ohio Rules of Professional Conduct, to which this Court adheres, prohibit such conduct.  As that part of the motion is conceded, defendants ask that the Court order that much at least.

The Court should also bar plaintiffs' counsel from using demonstratives and other theatrical gestures to improperly belittle or bolster witnesses.  Contrary to the suggestion in plaintiffs' Opposition (at 45), defendants have not asked for a general ban on the use of demonstratives, which have a time-honored and appropriate role in trial presentation.  What defendants *have* requested – citing examples that plaintiffs make little effort to defend[24] – is a bar on *misuse* of demonstratives and other theatrical gestures to improperly belittle or intimidate an opposing witness – or to improperly bolster plaintiffs' own witnesses.  Dkt. 2661 at 29-31.

---

[24] Defendants cited multiple examples in their motion, including from depositions in this case. Plaintiffs make no effort to defend the latter; the only examples they address in their opposition are those from the *DePuy* case.  As for those, plaintiffs state only that the evidence and argument condemned by the Fifth Circuit was admitted by the district court in that case.  Pl. Opp. at 46. That does not change the fact that this and other conduct by plaintiffs' counsel was found to be so far out of bounds that the Fifth Circuit held that a new trial was required.

This is a serious case that merits serious treatment from all parties and their counsel. Plaintiffs' protestations about the "high caliber" of their "accomplished" counsel (Pl. Opp. at 44, 46) does not negate this fundamental truth.  To the contrary, such "accomplished" counsel are surely more than capable of presenting their clients' case in a responsible manner.

> **11.     The Court should exclude evidence and argument concerning defendants' financial condition, revenues, or profitability.**

Motion No. 11 seeks to "preclude plaintiffs from offering evidence or argument about defendants' overall financial condition, assets, revenues, or profitability," and any "reference or argument about punitive damages."  Dkt. 2661 at 31.  Plaintiffs concede that "they will not seek to introduce evidence of Defendants' overall financial condition or assets, as they are not seeking punitive damages."  Pl. Opp. at 47.  The Court should grant the motion to exclude that evidence.

> **12.     The Court should preclude questioning of witnesses concerning their feelings and opinions of personal responsibility, guilt, or sympathy concerning the opioid crisis.**

Plaintiffs' Opposition offers no substantive response to most of defendants' arguments on Motion No. 12, citing defendants' alleged failure to offer "examples" of the kinds of questions they seek to bar.  But defendants' motion clearly described the types of questions at issue – questions about personal feelings and opinions of personal responsibility, guilt or sympathy concerning the opioid crisis.  Notably, plaintiffs do not deny that they regularly asked defendants' witnesses such questions during deposition, and they certainly do not disclaim any intention of doing so at trial.  Such questions have ranged from "Do you think that you have any responsibility for the opioid crisis?" to the likes of "Is that your testimony, that you don't believe that [company] had any responsibility in the death catastrophe related to narcotics that they sold throughout the country?"  Such questions, which have no probative value and are clearly

designed to intimidate and harass the witness, are inadmissible under Rule 403.  Plaintiffs do not cite a single case to the contrary.

Such testimony is also inadmissible as improper lay opinion testimony under Rule 701. Plaintiffs themselves have identified the subject of causation as one properly addressed by expert opinion under Rule 702.  The opinion of lay witnesses on this subject is inadmissible under Federal Rule of Evidence 701(c).  And to the extent plaintiffs seek to offer such testimony as evidence of "fault," "[a] witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own."  *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013).

Plaintiffs argue that defendants' witnesses' "particularized knowledge about their own or their employers' policies and procedures" is relevant.  Pl. Opp. at 50.  But that is beside the point; this motion does not address such testimony.  There is no basis to question defendants' employees about whether they feel responsible for overdose deaths, whether they feel their employers are responsible for overdose deaths, or whether they feel guilt about their conduct or their employers' conduct, as plaintiffs regularly did in depositions.  *United States v. Phillips*, 872 F.3d 803, 810 (6th Cir. 2017) ("Seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact. …" (internal marks omitted)).

13.  **The Court should bar plaintiffs and their counsel from making statements at trial that appeal to the jurors in their capacity as taxpayers.**

This motion has been mooted by stipulation.  *See* Dkt. 2724 at 1.

14.  **The Court should preclude any comment regarding the absence of a corporate representative at trial.**

Although plaintiffs ask the Court to defer ruling on the questions of relevance and potential prejudice raised by Motion No. 14, they do not (and cannot) seriously maintain that any argument, comment, or innuendo about the presence or absence of defendant corporate

representatives would ever be relevant to findings of fact in this case, or that any such comment would be anything but improperly prejudicial.

The handful of cases that plaintiffs cite on this point are out-of-circuit, unpublished, and conclusory, and most are off-point. The court in *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & PMF Prod. Liab. Litig*., for instance, offered no reasoned basis for its order that the plaintiff was permitted to make reference to a corporate representative who was "customar[ily]" present at a trial. *See* 2011 WL 6740391, at *11 (S.D. Ill. Dec. 22, 2011). Other cases refer to witnesses, not corporate representatives. *See, e.g.*, *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co*., 2015 WL 627430, at *5 (E.D. Tex. Jan. 31, 2015) (denying motion to exclude "reference to … the absence of any Samsung witnesses at trial"). The presence or absence of corporate representatives has no bearing on the issues to be tried.

Dated:        October 14, 2019

Respectfully Submitted,

 /s/ Geoffrey E. Hobart
Geoffrey E. Hobart
Mark H. Lynch
Sonya D. Winner
Paul W. Schmidt
Phyllis A. Jones
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
swinner@cov.com
pschmidt@cov.com
pajones @cov.com

*Counsel for McKesson Corporation*

 /s/ Enu Mainigi
Enu Mainigi
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC  20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Cardinal Health, Inc.*

 /s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation and AmerisourceBergen Corporation*

 /s/ John P. McDonald
John P. McDonald
C. Scott Jones
Lauren M. Fincher
Brandan J. Montminy
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Tel: (214) 740-8000
Fax: (214) 756-8758
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com

*Counsel for Henry Schein, Inc. and Henry Schein Medical Systems, Inc.*

 /s/ Steven A. Reed

Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
Harvey Bartle
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com
harvey.bartle@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, Thirty-Second Floor
Pittsburgh, PA 15219-6401
Tel: (412) 560-7455
Fax: (412) 560-7001

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc.,*
*Cephalon, Inc., and Actavis LLC*

 /s/ Kaspar Stoffelmayr

Kaspar Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Matthew W. Brewer
**BARTLIT BECK LLP**
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
matthew.brewer@bartlitbeck.com

Alex J. Harris
**BARTLIT BECK LLP**
1801 Wewatta Street, Suite 1200
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreen Co.*

## <u>CERTIFICATE OF SERVICE</u>

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
