# EXHIBIT 3

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Mark H. Lynch

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5544
mlynch@cov.com

February 11, 2019

**BY EMAIL**

The Honorable Dan Polster
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, OH  44113-1837

Dear Judge Polster:

I write to provide the Court with additional information concerning the issues raised by Mr. Cheffo's letter of February 4, 2019, and Mr. Papantonio's response of February 5, 2019.  In his letter to this Court, Mr. Papantonio attempts to excuse his disparaging statements about Defendants by claiming that he overreacted in expressing his "personal opinion" in "a fit of genuine heartfelt emotion."  *See* Papantonio Ltr. at 4.  He suggests that this was a one-time lapse in judgment.  To the contrary, during the course of this litigation, Mr. Papantonio has repeatedly leveled false and malicious character attacks against Defendants and their counsel.  In addition, he has publicly disclosed highly confidential information obtained through discovery, and he has violated well-established rules governing the conduct of attorneys at depositions.  This conduct not only violates the rules, it also undermines constructive efforts to settle this litigation and runs the risk of tainting the jury pool, should a trial be necessary.

**I.    Character Attacks**

In July 2018 Mr. Papantonio devoted an entire "Ring of Fire" broadcast to espousing a baseless charge that McKesson's counsel, Geoffrey Hobart, conspired with the Attorney General of the United States, Eric Holder, to "work out some secret deal" whereby "all of [McKesson's liability] goes away."  *See* Exhibit A at p. 4 (transcript "Eric Holder Saved Opioid Peddlers From Being Thrown In Prison As Deaths Increased").[1]  This allegation appears to be based solely on the fact that Mr. Holder and Mr. Hobart were partners at Covington & Burling before Mr. Holder was appointed Attorney General and that Mr. Holder returned to Covington & Burling after his six years of service as Attorney General.  This allegation is incorrect. McKesson's settlement agreement with the Department of Justice is public, not a "secret deal"; and in any case it was finalized in January 2017, 21 months after Mr. Holder had left the Department of Justice in April 2015.  Nor is there any factual basis for the assertion Mr. Holder

---

[1] During the broadcast, Mr. Papantonio mispronounced Mr. Hobart's name as "Houghton."  A live version of the broadcast is available at https://trofire.com/2018/07/31/eric-holder-saved-opioid-peddlers-from-being-thrown-in-prison-as-deaths-increased/.

**COVINGTON**

The Honorable Dan Polster
February 11, 2019
Page 2

and Mr. Hobart ever discussed the McKesson case while the matter was pending before the Department of Justice.

Despite this Court's admonition on January 10, 2019, that "[n]o one may malign the character of anyone else," *see* Tr. at 3-4, Mr. Papantonio repeated his unfounded allegations of collusion between Mr. Holder and McKesson in the January 31, 2019 broadcast that focused on the Sacklers. *See* Exhibit B to Cheffo Ltr. at p. 3. Mr. Papantonio asserted that when Department of Justice personnel suggested action against McKesson, Mr. Holder told them, "No, we don't want to do that, they're our friends." *Id.* Mr. Papantonio and his co-host further asserted during the January 31, 2019 broadcast that Mr. Holder was "on the take," "paid off," and "bought off." Exhibit B to Cheffo Ltr. at p. 4. He also labeled the distributors whom he has deposed as "sociopaths." *Id.* at 1.[2]

## II. Disclosure of Information Subject To This Court's Protective Order

Contrary to Mr. Papantonio's claims in his recent letter to the Court, he has previously disclosed confidential testimony obtained from depositions in this case. During the July 31, 2018 Ring of Fire episode attacking Mr. Holder and Mr. Hobart, Mr. Papantonio described the deposition of a McKesson witness that had occurred on July 19, 2018. *Compare* Exhibit A at p. 4 *with* Oriente Tr. at 584-597. Under ¶ 25 of Case Management Order No. 2 (Dkt. 441), deposition testimony remains Highly Confidential for 30 days. Mr. Papantonio projected a deposition exhibit on the Ring of Fire screen, *see* Exhibit A at 1, and while displaying the exhibit, publicly summarized the witness's testimony about that exhibit in violation of the Protective Order's restrictions. *Id.* at 4.

---

[2] Of further concern is the broadcast of a version of Mr. Papantonio's Ring of Fire attack on Mr. Holder on August 2, 2018, on a media outlet funded by the Russian government. *See* https://www.rt.com/shows/americas-lawyer/434885-opioid-crisis-opioid-distributors/. As he acknowledged in his letter to the Court, Mr. Papantonio has "for the past three years . . . hosted a nationally syndicated TV program on RT America called America's Lawyer." "RT" was formerly known as "Russia Today." According to the declassified version of the report by the U.S. Intelligence Community on Russian meddling in U. S. elections, RT programming "highlights criticism of alleged US shortcomings in democracy and civil liberties" and is an important part of "a Kremlin-directed campaign to undermine faith in the US Government and fuel political protests." National Intelligence Council, Intelligence Community Assessment: Assessing Russian Activities and Intentions in Recent US Elections, Annex A at 1 (Jan. 6, 2017), https://www.dni.gov/files/documents/ICA_2017_01.pdf. Mr. Papantonio's baseless attack on the integrity of a former Attorney General of the United States and the Department of Justice fits those objectives. For its part, the Russian network's website hails Mr. Papantonio for "examining and exposing untold truths in corporate and environmental legal cases with a no-holds-barred approach in addressing bad lawyers and corruption among federal and state judges." See https://www.rt.com/shows/americas-lawyer.

**COVINGTON**

The Honorable Dan Polster
February 11, 2019
Page 3

### III. <u>Improper Conduct At Depositions</u>

There a few simple rules that govern the conduct of depositions:

- "The examination . . . of a deponent [shall] proceed as [it] would at trial." Fed. R. Civ. P. 30(c)(1). *See, e.g., Ethicon Endo-Surgery v. U.S. Surgical Corp.*, 160 F.R.D. 98, 99 (S.D. Ohio 1995)( depositions are to be "conducted in a manner that simulates the dignified and serious atmosphere of a courtroom" and "[c]onduct that is not permissible in the courtroom during the questioning of a witness is ordinarily not permissible at a deposition.").

- On cross-examination, a lawyer may only ask questions for which she has a good-faith factual basis. *See Jerkins v. Lincoln Elec. Co.*, 2011 WL 2621357, 1:04-CV-18810 (N.D. Ohio, Jul. 5, 2011) ("So long as defense counsel has a good-faith factual basis to ask questions on cross examination, and does not misrepresent the record, counsel may do so."); *United States v. Guay*, 108 F.3d 545, 552 (4th Cir. 1997) ("A cross-examiner inquiring into specific instances of a defendant's misconduct must have a good-faith factual basis for such questions"); Todd A. Berger, *The Ethical Limits of Discrediting the Truthful Witness: How Modern Ethics Rules Fail to Prevent Truthful Witnesses from Being Discredited Through Unethical Means*, 99 Marq. L. Rev. 283 (2015) at 311 ("In terms of cross-examination, perhaps the most important guiding principle emerging from each of the above three sets of ethical regulations is that, prior to questioning a witness, a good faith basis must exist to support the questions' underlying implication").

- "A deposition is not to be used as a device to intimidate a witness or opposing counsel so as to make that person fear the trial as an experience that will be equally unpleasant, thereby motivating him to either dismiss or settle the complaint." *Ethicon,* 160 F.R.D. at 99.

Mr. Papantonio has deposed three McKesson witnesses. In each of those depositions he broke the foregoing rules at least once in evoking the same unfounded assertions he has broadcast to the public. Set forth in Exhibit B are three examples.

In view of the foregoing, as well as the other evidence before the Court, McKesson agrees with Mr. Cheffo that Mr. Papantonio has forfeited the privilege of serving on the Plaintiffs' leadership team and examining any further witnesses in this litigation.

Respectfully submitted,

/s/ Mark Lynch
Mark H. Lynch
*Counsel for McKesson Corporation*

# Exhibit A

## Eric Holder Saved Opioid Peddlers From Being Thrown In Prison As Deaths Increased

trofire.com/2018/07/31/eric-holder-saved-opioid-peddlers-from-being-thrown-in-prison-as-deaths-increased/

July 31, 2018



One of the worst aspects of the opioid epidemic is the fact that it could have been fixed YEARS ago, had it not been for corporate-owned politicians. Ring of Fire's Mike Papantonio and Farron Cousins discuss this issue.

Click here to learn more about the dangers of opioids.



https://youtu.be/Yqx38aBC6OI

Transcript:

**Mike Papantonio:** One of the worst aspects of the opioid epidemic is the fact that it could have been fixed years ago had it not been for corporate-owned politicians. This story, to me, is nauseating, and I know we've told parts of this story. This story is going to be told more and more, Farron, as the litigation continues, but the thumbnail sketch is this. In our effort to become tribal in our politics, that is that Democrats do no harm if you're a Democrat, Republicans do no harm if you're a Republican, and we're incapable of actually looking back and saying, "What's real and what's not real," and this is a perfect situation. Okay?

So, let me not be tribal here as I tell this story. Since I'm one of the people taking the depositions of these opioid distributors that distributed opioids all over the country, it makes me a little angry because I'm seeing firsthand what actually happened, and we want to believe that somewhere in the political scale in the realm of politics, somebody says, "You know what? Sometimes corporate money just isn't important to me, and I'm gonna do the right thing," and I wish we could've said that about the eight years during the Obama Administration.

Let me preface it by saying, as you probably know, I appeared on television show after television show, everything from CNN to MSNBC to Fox News, supporting President Obama, but I gotta call shots like I see them. Now we learn that during the opioid crisis, the very worst time of the opioid crisis, that the attorney general who had been appointed by Obama was Eric Holder, and Eric Holder came from a law firm called the Covington Burling Law Firm in Washington DC, and he worked for them in their white-collar criminal

division, and he took care of handling the cases of white-collar criminals, Wall Street white criminals, pharmaceutical white criminals, environmental polluter white-collar criminals, you name it. Those are the people that he handled. He had a partner named Houghton who was also a lawyer for Covington Burling, and Houghton represented McKesson. Pick it up from there.

**Farron Cousins:** Well, McKesson, what we know, during the Obama years, the DEA, actually, a local office, really, of the DEA over in Colorado had been working around the clock. They had kind of this consortium, 12 different DEAs from 11 different states. They were ready to make the move on McKesson for creating these pill mills all over the country. They had all the evidence. They could show without a doubt McKesson knew they were shipping millions of pills to towns with populations of a few thousand. They knew McKesson knew what was happening. They knew it was addictive. They knew they were the problem.

So, before these DEA officials could make this move, they had everything ready, put all their ducks in a row, it was a slam dunk, they found out that at the same time they were doing this massive investigation, that Eric Holder had worked out this sweetheart deal with McKesson to allow them basically to get off the hook. They were gonna fine them one billion dollars, is what they were gonna do. They were gonna strip their license and registration so that they couldn't distribute these narcotics, basically, anymore, and they are, I believe, what, the third or fifth largest publicly-owned corporation, or publicly-traded, in the country, McKesson is.

**Mike Papantonio:** Right, right.

**Farron Cousins:** I mean, they're massive, but Eric Holder had gone behind their backs, made this deal, said, "We're gonna fine you a little bit," a fine that actually only amounted to a few million dollars more than what McKesson's CEO made last year.

**Mike Papantonio:** Yeah. Okay.

**Farron Cousins:** That's how tiny it is.

**Mike Papantonio:** Yeah. Let me put that in terms of what's real here. Okay? First of all, the lawyer for McKesson came from Covington & Burling, the same place that Eric Holder came from. They worked together. It wasn't like they just were casual acquaintances. They worked together on cases. One had an office right down the hall from Eric Holder. They socialized together. They worked together. They were friends. All of a sudden, Houghton is the attorney for McKesson, and regardless of what the DEA found, and they found conduct that was absolutely ... It was criminal conduct. They were prepared to go forward with a criminal case. They wanted a perp walk, is what they wanted, which has been long overdue in this business in general.

So, all of a sudden, this goes from we're gonna do all these bad things secretly, without the DEA even knowing about it, Eric Holden and Houghton, the Department of Justice, they work out some secret deal, and all of it goes away, and by the way, the CEO of this company, when they were fined 150 million dollars, the CEO's compensation package is 650 million dollars. The CEO's compensation package is 650 million dollars.

So, okay. Where does all this go? It tells the story. It tells in those years that they could've done something. It was the absolute worst time for progression of death in America from opioids. Kids were dying from opioids. Day one, they would be injured because football injury, a cheerleading injury, minor injuries, ankle sprains, things like that, and they're given these opioids because the doctors were lied to about the safety of opioid. The company that produced them, Purdue, told everybody, "This is safe. They're not addictive. Don't worry about it. This is a special kind of narcotic," is what they were telling everybody.

So, you've seen it. You've written about it in forms over the years. You've kept up with this and national trial lawyers. This is the comparison. This is 1999. This is the death map of 1999. Okay? This shows … If you look at the brown here, in 1999 this was the area people were dying. That was in West Virginia. Okay? Little bit of activity out here on the West Coast, but really, out of control over in West Virginia. By 2016, this is the death map. What this represents, these brown areas that you see, just the brown area, represents 30 human lives, 30 deaths for every 100,000 people. Okay?

The tan area is kind of the mean. It's only about 16 to 17 deaths per hundred-thousand people. The tan, as you can see, by 2016 is all over the chart. This is 1999. This is the progression of death in America. This was done by the CDC. When I showed this in a deposition to one of the witnesses, my reaction was this. He said he'd never seen it. Okay? For somebody to have never seen the CDC's death map, every year they showed the progression of death in the United States, every single year, and as we look at this, we understand the problem is nobody did anything about it.

# Exhibit B

## **EXAMPLES OF MR. PAPANTONIO'S IMPROPER QUESTIONING OF DEPOSITION WITNESSES**

    1.    In his examination of Nate Hartle, Mr. Papantonio insinuated his theory of collusion between Attorney General Holder and Mr. Hobart, for which he had no factual support.

QUESTIONS BY MR. PAPANTONIO:

Q.    You know what else I'm interested in? You ever met Mr. Hobart? We saw Mr. Hobart's name a lot. He's an attorney, right? You've met him?

A.    I have.

Q.    As a matter of fact, we're here in Covington & Burling here in Washington, DC, and this is where Mr. Hobart's office is, right? True?

A.    Correct.

Q.    Did you meet him here in this office?

A.    I've met Geoff.

Q.    You've met Geoff. That's his name, Geoff Hobart?

A.    Correct.

Q.    Did you know also in this -- also in this building that we're sitting right here -- you know who Eric Holder is?

A.    I do.

Q.    Did you meet Mr. Eric Holder? You been up to his office?

    MS. HENN: Objection to form

    THE WITNESS: I have not.

QUESTIONS BY MR. PAPANTONIO:

Q.    You haven't met him, right?

A.    No.

Q.    But you know that Eric Holder was the Attorney General during the time that your company was negotiating to get out of the problems that you had in 2015. Mr. Eric Holder with Covington Burling, in the very building we're sitting right now, was the Attorney General, right?

MS. HENN: Objection to form.

QUESTIONS BY MR. PAPANTONIO:

Q. You know that?

A. I know that.

Q. And you know that his partner who negotiated all these deals was Mr. Geoff Hobart, and he's also right here in this building, right? The building we're sitting in right here in Washington, DC.

MS. HENN: Objection to form.

QUESTIONS BY MR. PAPANTONIO:

Q. Yes?

A. Yes.

Q. You know this?

A. Yes.

\* \* \*

QUESTIONS BY MR. PAPANTONIO:

Q. And Mr. Hobart is a partner with the Attorney General Eric Holder, a law partner at Covington & Burling with Eric Holder. You know that, correct?

MS. HENN: Objection to form.

THE WITNESS: I do.

QUESTIONS BY MR. PAPANTONIO:

Q. And as a matter of fact, we're sitting in an office as we take this deposition, and in this office is Mr. Eric Holder's office, right? You know that?

MS. HENN: Objection to form.

THE WITNESS: I know it's in this complex, sure.

QUESTIONS BY MR. PAPANTONIO:

Q. In this complex.

And you know Mr. Hobart's office is in this complex, correct?

MS. HENN: Objection to form.

THE WITNESS: Correct.

QUESTIONS BY MR. PAPANTONIO:

Q. And so Mr. Hobart was able to get -- to move from the DEA talking about a billion dollar -- in excess of a billion dollar fine and potential criminal -- criminal prosecution that -- that all suddenly moved to $150 million fine for this conduct that we're talking about in Aurora, right?

MS. HENN: Objection to form.

QUESTIONS BY MR. PAPANTONIO:

Q. You know about that, don't you.

A. I know that's what it ended up, yes.

**2. In his examination of David Gustin, Mr. Papantonio asked the following leading questions for which he had no factual basis:**

QUESTIONS BY MR. PAPANTONIO:

Q. Sir, do you – are you familiar with the fact that your company decided where they would sell narcotic drugs throughout the country dependent on the economic despair within a particular area?

MS. BROWNING: Objection.

QUESTIONS BY MR. PAPANTONIO:

Q. Anybody every told you that?

MS. BROWNING: Object to the form.

QUESTIONS BY MR. PAPANTONIO:

Q. That they would make a decision to go to areas where there was job loss and where there's economic despair because they knew they could sell more narcotic drugs in areas like that, is that the first time you've heard that?

MS. BROWNING: Objection to the form of the question.

QUESTIONS BY MR. PAPANTONIO:

3

> Q. Have you ever heard that before?
>
> A. I've never heard anything like that.
>
> Q. All right. Did you know that your company actually analyzed where they would go in the country to sell drugs and they would focus on areas where there's economic despair?
>
> MS. BROWNING: Object to the form.
>
> THE WITNESS: I've never heard anything like that.

3. **In this examination of Mr. Oriente on charts of opioid fatalities prepared by the Center for Disease Control –which Mr. Papantonio dubbed "the death maps" – he engaged in the following questioning that was intended to inflame a jury and intimidate the witness rather than elicit evidence:**

> QUESTIONS BY MR. PAPANTONIO:
>
> Q. That map is bright red with dead people, isn't it, sir?
>
> MS. HENN: Objection to form.
>
> BY MR. PAPANTONIO:
>
> Q. It is bright red with dead people?
>
> MS. HENN: Objection to form.
>
> BY MR. PAPANTONIO:
>
> Q. Wouldn't you agree with that?
>
> Sir, do you understand that is children, mothers, fathers, uncles, sisters and brothers. That's a statistic. But what that statistic means, and those are family members dying because your company participated with CVS and Purdue and Teva and all these – Cardinal, and participated in expanding the death map from what we can see on the left to what we see on the right. Are you proud of that, sir?
>
> MS. HENN: Objection to form.
>
> BY MR. PAPANTONIO:
>
> Q. Are you proud of that?

4