# EXHIBIT 24

# COVINGTON

BEIJING  BRUSSELS  DUBAI  JOHANNESBURG  LONDON
LOS ANGELES  NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

Geoffrey E. Hobart

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5281
ghobart@cov.com

June 8, 2017

The Honorable Greg Walden
Chairman
Committee on Energy and Commerce
Congress of the United States
House of Representatives
2125 Rayburn House Office Building
Washington, DC  20515-6115

The Honorable Frank Pallone, Jr.
Ranking Member
Committee on Energy and Commerce
Congress of the United States
House of Representatives
2125 Rayburn House Office Building
Washington, DC  20515-6115

**Re:  McKesson Corporation**

Dear Chairman Walden and Representative Pallone:

I am writing on behalf of McKesson Corporation in response to your letter dated May 8, 2017, which raised concerns about the opioid epidemic in West Virginia and contained eight requests for information.  Below are responses to seven of the eight requests on behalf of McKesson U.S. Pharmaceutical.[1]  For ease of reference, McKesson U.S. Pharmaceutical is referred to as "McKesson" for the remainder of this response.

1. **Please provide the number of pills of hydrocodone and oxycodone sold by McKesson to purchasers in West Virginia each year from 2005 through 2016.**

In accordance with the agreement reached with the Committee staff, McKesson will separately provide the data specified in this request as soon as the data has been compiled and checked for accuracy.  McKesson expects to be able to produce this data to the Committee no later than June 30, 2017.

2. **Please provide the names and addresses of your distribution centers that served West Virginia each year from 2005 through 2016.**

   - Landover, Maryland (closed in 2012):  7721 Polk St., Landover, MD 20785
   - Washington Ct. Hse: 3000 Kenskill Ave., Washington Ct. Hse., OH 43160

---

[1] McKesson U.S. Pharmaceutical is the business unit of McKesson Corporation that is relevant to the requests contained in the Committee's May 8th letter.  Accordingly, the responses contained in this letter are based on information provided by McKesson U.S. Pharmaceutical.

CONFIDENTIAL-SUBJECT TO MDL 2804 PROTECTIVE ORDER
MCKMDL00373829

**COVINGTON**

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 2

- New Castle: 2798 New Butler Rd., New Castle, PA 16101
- Ruther Glen: 10504 McKesson Dr., Ruther Glen, VA 22546

3. **Does McKesson have monitoring systems in place to detect unusual or suspicious patterns or quantities of opioid orders? If so, please describe those monitoring systems. Do your distribution centers that serve West Virginia have their own policies and systems for monitoring opioid orders, or do they follow or rely on your company's monitoring system?**

McKesson is firmly committed to complying with both state and federal laws regulating the distribution of controlled substances, including opioids. McKesson has had a Controlled Substances Monitoring Program ("CSMP") in place for many years and it has evolved over time. The company has devoted significant resources in the past several years towards making key enhancements to its policies and procedures, including strengthening its compliance team, customer due diligence efforts, ongoing oversight, and customer education. McKesson has also devoted substantial resources to the development and implementation of advanced threshold analytics to monitor and control the distribution of controlled substances. McKesson's CSMP applies to all distributions of controlled substances from each of its distribution centers across the country, including those that service West Virginia.

**Expanded Compliance Team.** In order to further strengthen its compliance program, McKesson has added a number of subject matter experts to its CSMP team. McKesson's team now includes individuals with more than 240 years of cumulative DEA enforcement experience. In addition to hiring former DEA agents and diversion investigators, McKesson has hired industry experts with experience in the retail pharmacy industry, experience as state and board of pharmacy investigators, experience with pharmaceutical manufacturers, and experience with data analytics. McKesson believes that its current CSMP team is among the strongest in the industry.

**Customer due diligence.** McKesson performs comprehensive due diligence on prospective pharmacy customers before agreeing to supply controlled substances. McKesson requires all prospective customers to complete a detailed questionnaire, provide three months of dispensing data for analysis, undergo a site visit, and provide copies of all licenses.

**Ongoing oversight.** McKesson evaluates all customers' orders for controlled substances for potential suspicious orders. Additionally, as part of its customer monitoring process, pharmacies can be subjected to a complete due diligence examination by McKesson that may include an analysis of its purchase data for red flags, licensing verification, and open-source searches for adverse information about a pharmacy. McKesson's pharmacy reviews may also include an analysis of customer-provided aggregate dispensing data.

**Advanced threshold analytics capabilities and Suspicious Order Reporting.** McKesson has also expended significant resources to implement a cutting-edge controlled substances threshold management program, using complex data analytics to set and manage

COVINGTON

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 3

individual customer thresholds for controlled substances. In compliance with DEA regulations on suspicious orders (21 C.F.R. § 1301.74), McKesson's model analyzes each customer order against established monthly thresholds to determine whether that order should be filled. If a customer's order exceeds the monthly threshold, that order is blocked and not filled. McKesson reports each blocked order to DEA pursuant to 21 C.F.R. § 1301.74 and to state monitoring agencies pursuant to applicable state reporting regulations.

**Customer education**. McKesson has been proactive with respect to educating its customers about the importance of compliance with DEA and state agency regulations. McKesson educates customers and provides them with literature on how to identify the warning signs of prescription abuse and diversion. Similarly, McKesson trains and educates its own employees on the company's regulatory obligations, including CSMP-specific training sessions at annual sales meetings.

**Ongoing state and federal collaboration efforts**. McKesson is an active participant in state and federal legislative efforts around controlled substances. The company also strongly supports the Center for Disease Control's clinical guidelines and calls for additional formal and continuing medical education on the dangers of opioid use as important ways to curb clinically inappropriate prescribing, doctor shopping, abuse and diversion.

4.  **What policies and procedures does McKesson and/or your distribution centers that serve West Virginia have in place to take action in response to those detections, including notification of DEA and other authorities? Did your company or your distribution centers that serve West Virginia provide investigative leads to law enforcement authorities?**

McKesson's CSMP is a nationwide program and applies to each of McKesson's distribution centers, including those that service West Virginia. As noted above, McKesson monitors controlled substance orders using complex data analytics to set monthly thresholds for controlled substance orders. All orders in excess of a customer's monthly threshold are halted and reported to DEA and relevant state agencies as suspicious orders. Separate from McKesson's obligation to report suspicious orders, McKesson also proactively monitors its customers purchasing patterns and other external events that might indicate a need to review a customer more closely. For example, on many occasions, McKesson has performed a complete diligence review when a customer requests an increase in its monthly threshold for a controlled substance. In addition, McKesson often performs a complete due diligence review when McKesson receives a subpoena for information about a particular pharmacy or when McKesson otherwise becomes aware of information that might affect it decision to supply a pharmacy. For example, McKesson recently terminated a West Virginia customer's ability to purchase controlled substances after becoming aware that the West Virginia Attorney General had filed a lawsuit against the pharmacy related to its controlled substances dispensing practices.

As a general matter, McKesson does not provide specific investigative leads on customers to DEA or other state agencies. As a licensed and registered distributor of pharmaceuticals, McKesson's duties and obligations are defined by the Controlled Substances Act, DEA

CONFIDENTIAL-SUBJECT TO MDL 2804 PROTECTIVE ORDER           MCKMDL00373831

**COVINGTON**

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 4

regulations, applicable state laws, and state boards of pharmacy regulations. Consistent with its obligations, McKesson has developed and implemented its CSMP and reports potentially suspicious orders to the relevant authorities pursuant to applicable regulations. McKesson relies on state and federal law enforcement agencies to investigate potential diversion and to revoke the licenses of those physicians and pharmacists engaged in diversion. To assist with those investigations, McKesson has always cooperated fully with DEA and state authorities in response to any requests for information related to customers.

In addition, it is important to note that data regularly reported to DEA by distributors is available to law enforcement agencies to assist with the identification of potentially problematic pharmacies. For the past several years, McKesson has reported every controlled substance sales transaction to DEA, which is beyond what is required of every wholesaler to report under DEA ARCOS requirements. McKesson also reports all suspicious orders of controlled substances from each of its distribution centers. It is worth noting that many states have in place Prescription Drug Monitoring Programs, where information on prescriptions and controlled substances dispensed by pharmacies and health care providers is electronically stored for the sole purpose of providing an additional tool to assist with the reduction of the non-medical use and abuse of prescription drugs. Health care professionals and law enforcement agencies have access to this information. McKesson does not.

5. **Did McKesson and/or your distribution centers that serve West Virginia identify any patterns of opioid distribution in West Virginia that caused you to make a referral to the State Board of Pharmacy, DEA, or other authorities? If so, when did you become aware of those patterns?**

As noted in response to question #4, McKesson does not make any referrals or otherwise contact DEA, law enforcement agencies, or state boards of pharmacy about individual customers beyond what is required under the Controlled Substances Act, DEA regulations, applicable state laws, and state board of pharmacy regulations. However, McKesson has and will respond to any requests for information from these authorities related to sales to its customers

6. **Please describe what actions were taken after identifying such patterns, including a timeline for these actions.**

As noted in response to question #4, McKesson does not make any referrals or otherwise contact DEA, law enforcement agencies, or state boards of pharmacy about individual customers beyond what is required under the Controlled Substances Act, DEA regulations, applicable state laws, and state board of pharmacy regulations.

CONFIDENTIAL-SUBJECT TO MDL 2804 PROTECTIVE ORDER

MCKMDL00373832

COVINGTON

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 5

> 7. **If the reporting in the *Gazette-Mail* on opioid distribution to West Virginia is accurate, is McKesson taking any specific action to examine its sales and monitoring processes in West Virginia and nationwide? If so, what actions have you taken to date and what additional actions are planned?**

McKesson's CSMP is being used to review pharmacies, evaluate orders, and to terminate and report suspicious orders to both the DEA and the West Virginia State Board of Pharmacy. McKesson continues to evaluate the performance of the CSMP, including analyzing changing trends in diversion and abuse, and adapt its CSMP accordingly. McKesson is confident that its current program is operating effectively according to the standards expected by DEA.

With regard to articles published by the Charleston, West Virginia *Gazette-Mail*, the thesis of the reporting is that (1) drug companies (2) flooded West Virginia with prescription opioids (3) for profit, which (4) led to overdose deaths. Every part of that thesis is incorrect.

First, pharmaceutical distributors are not "drug companies." Distributors or wholesalers do not manufacture prescription drugs and distributors do not promote drugs to doctors. Distributors purchase prescription drugs from manufacturers and distribute them to licensed pharmacies in response to those pharmacies' orders.

Second, distributors do not "flood" or "pour" prescription drugs into any market. Pharmacies order drugs from distributors in order to fill prescriptions from doctors, who are legally required to prescribe controlled substances only for medically necessary reasons. Pharmacies can only dispense pharmaceutical products, including controlled substances, based on the number of prescriptions it receives. Thus, distributors do not supply prescription drugs in amounts greater than what the pharmacies order. Distributors respond precisely to pharmacies' orders. Also, no single distributor is aware of the total volume of any drug being distributed into any particular geographic area. Thus, comparing overall pill counts or volume to the population of selectively chosen geographic areas, particularly after the fact, does not establish that distributors "oversupplied" the geographic area in question.

Third, the *Gazette-Mail's* assertion that distributors "made billions" from the distribution of controlled substances in West Virginia is greatly exaggerated. The profit earned by McKesson Corporation from the distribution of controlled substances is a very small percentage of the company's overall net income. McKesson Corporation is a highly diversified, global company that ranks as the fifth largest company in the United States. Its profits and executive compensation have no material connection to income or profit generated from the distribution of opioid products. The *Gazette-Mail's* reporting fails to distinguish distributor profits from opioid sales from overall revenue. Instead, the *Gazette-Mail* relies on aggregate gross revenue numbers for an unidentified group of distributors over some unspecified period of time to allege an improper profit motive for the distribution of controlled substances.

Fourth, there is no link between distributors and the overdose deaths in West Virginia. Again, the mere juxtaposition of facts—volume of opioids distributed and overdose death rates—

CONFIDENTIAL-SUBJECT TO MDL 2804 PROTECTIVE ORDER                                     MCKMDL00373833

COVINGTON

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 6

does not establish any causal link.  The supply of lawful prescription opioids is determined by doctors' prescriptions and the pharmacies' decision to fill the prescription.  If a doctor writes a prescription for any drug for a legitimate medical purpose, the patient rightfully assumes that a pharmacy will fill that prescription.  To increase awareness by prescribing physicians about the risks associated with opioids, one of the CDC's responses to the opioid epidemic has been to take the unprecedented step of issuing prescribing guidelines to doctors.  The West Virginia Attorney General similarly issued prescribing guidelines.  As the *Gazette-Mail* reported, patients obtain "illegal prescriptions" from "dozens of doctors" and fill those prescriptions at "multiple pharmacies."  Distributors have no visibility into the prescribing decisions made by West Virginia physicians and while distributors may obtain some information related to the volume of prescriptions filled, they have no visibility into the decisions made by West Virginia pharmacists to fill those prescriptions.

The opioid problem in this country involves far more than the role played by distributors in the legitimate supply chain.  A 2013 study by the U.S. Department of Health and Human Services revealed that the vast majority of prescription opioid diversion occurs after pharmacies fill prescriptions.  According to this study, the majority of non-medical users of prescription opioids obtained those drugs from a friend or family member.  Education on the risks posed by opioid addiction is a critical element to fighting the problem.

8. **Is there any data that DEA could share with your company, as appropriate given law enforcement and commercial confidential information sensitivities, that would help improve detection of suspicious orders of opioids?**

Regulations promulgated by DEA require manufacturers and distributors to report all receipts and distributions of narcotic drugs, known as ARCOS reporting.  Suppliers of narcotic drugs are required to report this information by drug and by DEA registrant so the data is specific to quantity, type of drug and dosage form sold to each DEA registrant.  While some of this information is business confidential there is information DEA could provide to assist the industry from these reports.  For example, it would be helpful for DEA to provide distributors with periodic analysis or summaries of this data, especially if DEA is seeing an increase or other anomaly in distribution of certain drugs in certain cities or other geographic areas.  DEA could also highlight geographic areas where the agency is aware of increased criminal activity or diversion of certain drugs.  Distributors could use this data to compare or evaluate sales to their customers in the same area.  Also, DEA could provide each distributor with information about which of its customers was purchasing from multiple suppliers.  This is information that is not readily available to distributors and is often difficult to confirm.  DEA could provide the information without revealing confidential information about the other suppliers.  Knowledge that certain customers were purchasing from multiple suppliers would assist a distributor in evaluating its own sales to that customer.

**COVINGTON**

The Honorable Greg Walden
The Honorable Frank Pallone, Jr.
June 8, 2017
Page 7

        Please contact me if the Committee requires any additional information.

Sincerely,

*Geof Hobart*

Geoffrey E. Hobart
Counsel for McKesson
Corporation

CONFIDENTIAL-SUBJECT TO MDL 2804 PROTECTIVE ORDER    MCKMDL00373835