1                    UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3      -------------------------------X
       IN RE: NATIONAL PRESCRIPTION   :  *Case No. 1:17-md-2804*
4      OPIATE LITIGATION              :  *Cleveland, Ohio*
                                      :
5                                     :
       FINAL PRETRIAL PROCEEDINGS     :  *Tuesday, October 15, 2019*
6                                     :  *12:34 p.m.*
                                      :
7                                     :
                                      :
8                                     :
       -------------------------------X
9

10

11          TRANSCRIPT OF FINAL PRETRIAL PROCEEDINGS

12          BEFORE THE HONORABLE DAN AARON POLSTER

13               UNITED STATES DISTRICT JUDGE

14

15     SPECIAL MASTER:          DAVID R. COHEN

16

17

       Court Reporter:          Donnalee Cotone, RMR, CRR, CRC
18                              United States District Court
                                801 West Superior Avenue
19                              Court Reporters 7-189
                                Cleveland, Ohio 44113
20                              216-357-7078
                                donnalee_cotone@ohnd.uscourts.gov
21

22

23

24     Proceedings recorded by mechanical stenography, transcript

25     produced by computer-aided transcription.

```
 1      APPEARANCES:

 2

 3          On behalf of Plaintiffs:

 4
                    PETER H. WEINBERGER, ESQ.
 5                  Spangenberg, Shibley & Liber
                    1001 Lakeside Avenue, Suite 1700
 6                  1900 East Ninth Street
                    Cleveland, Ohio 44114
 7                  216-696-3232
                    pweinberger@spanglaw.com
 8

 9                  W. MARK LANIER, ESQ.
                    6810 FM 1960 West
10                  Houston, Texas 77069
                    813-659-5200
11                  wml@lanierlawfirm.com

12


13                  HUNTER J. SHKOLNIK, ESQ.
                    400 Broadhollow Road, Suite 305
14                  Melville, New York 11747
                    212-397-1000
15                  hunter@napolilaw.com

16


17                  JAYNE CONROY, ESQ.
                    Simmons Hanly Conroy LLC
18                  112 Madison Avenue
                    New York, New York 10016
19                  212-784-6400
                    jconroy@simmonsfirm.com
20

21

22

23

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3         On behalf of Plaintiffs:

 4              LINDA SINGER, ESQ.
                Motley Rice LLC
 5              28 Bridgeside Boulevard
                Mount Pleasant, South Carolina 29465
 6              843-216-9140
                dmigliori@motleyrice.com
 7              lsinger@motleyrice.com

 8

         On behalf of Defendant Cardinal Health, Inc.:
 9
                ENU MAINIGI, ESQ.
10              Williams & Connolly LLP
                725 Twelfth Street, NW
11              Washington, DC 20005
                202-434-5000
12              emainigi@wc.com

13

14         On behalf of Defendant AmerisourceBergen Drug
           Corporation:
15
                ROBERT A. NICHOLAS, ESQ.
16              Reed Smith, LLP
                Three Logan Square, Suite 3100
17              1717 Arch Street
                Philadelphia, Pennsylvania  19103
18              251-851-8100
                rnicholas@reedsmith.com
19

20         On behalf of Defendants Walgreen Co. and Walgreen
           Eastern Co.:
21
                KASPAR J. STOFFELMAYR, ESQ.
22              Bartlit Beck LLP
                54 West Hubbard Street, Suite 300
23              Chicago, Illinois  60654
                312-494-4400
24              kaspar.stoffelmayr@bartlit-beck.com

25
```

1           AFTERNOON SESSION, TUESDAY, OCTOBER 15, 2019

2               (Proceedings commenced at 12:34 p.m.)

3                           - - -

4               DEPUTY CLERK:  All rise.

12:39:53 5      THE COURT:  All right.  Good afternoon.

6       Please be seated.

7       All right.  Well, we're here for the final pretrial in

8  the opoid MDL, first bellwether trial, Summit County,

9  Cuyahoga County, against various defendants.

12:40:16 10     So the lawyers, parties, are here.  We have a number

11  of matters I wanted to cover.

12       All right.  We're set to begin jury selection

13  tomorrow.  We'll have 50, the first 50 jurors brought in.

14  The jury department will pick them at random from the

12:40:59 15  roughly 150 people that we have left.

16       The Court and the parties will know this afternoon

17  which 50, and then the order will be determined randomly

18  tomorow morning, and we'll -- that will be the order.

19       If we question jurors privately in chambers, we'll

12:41:30 20  just have one lawyer for each of the two plaintiffs and one

21  lawyer for each of the defendants.  There will be no

22  parties, no consultants, just -- I don't want to overwhelm

23  the jurors.

24       There were many motions in limine filed, and I'm going

12:41:57 25  to summarize my rulings now.

1        I'll try to be efficient, and I will say at the outset

2    that my main job in this trial, once we pick a fair and

3    impartial jury, is to have the same strike zone for each

4    side.  Probably no one is going to like my strike zone, but

12:42:23    5    I worked very hard to have the same strike zone for each

6    side.  And I will say at the outset, I'm going to have a

7    very wide strike zone when it comes to the parties

8    introducing evidence about what the federal government, DEA,

9    FDA, did or did not do.  That's an essential part of the

12:42:49    10    story, the narrative.

11        The facts are the facts.  Each side is going to use

12    those facts in their narrative for the jury and for public

13    consumption, and I'm going to let both sides have a great

14    deal of latitude on that.  We're obviously not going to have

12:43:09    15    witnesses purporting to tell the jury what the law is, but

16    in terms of what the DEA and FDA did or didn't do, and what

17    implications that would have, I'm going to let both sides

18    have at it.

19        All right.  I'm going to start with a series of

12:43:34    20    motions filed by defendant Henry Schein.

21        Schein's number 1, pleading 2645, is denied.  But it

22    is important that if the plaintiffs or witnesses use the

23    term defendants, if they don't mean it to mean all of the

24    defendants in this case, they've got to be specific, because

12:44:10    25    it isn't fair just to lump everyone together.  That isn't

1    fair, and it's going to be confusing.

2         So the witnesses and the lawyers need to be careful

3    about that.  If they do mean all of the defendants in this

4    case, fine; but if it's less than all, then they need to be

12:44:28  5    specific.

6         Schein number 2 is also denied.

7         Schein number 3 is denied without prejudice, but the

8    Schein defendants may object to any specific evidence or

9    argument that they feel is factually inaccurate and/or lacks

12:44:56 10    foundation.

11         Schein number 4 is denied.  That relates to

12    medications distributed by Schein to Dr. Brian Heim.  That

13    evidence can come in.

14         Schein number 5 is denied, reference's to Dr. Heim's

12:45:19 15    indictment.

16         Schein number 6, references to Dr. Harper, is also

17    denied.

18         Schein number 7 is denied.

19         Schein number 8 is also denied.  It may be relevant.

12:45:40 20    Evidence about drugs distributed outside of Summit County

21    may also be denied.

22         Schein 9 is also denied.  It references the DEA fines,

23    investigations, or admonitions.  It's denied without

24    prejudice.  If defendant Schein thinks that something is

12:45:59 25    relevant or extremely prejudicial, they can raise that

1   again.

2        Schein number 10 references the cease and desist

3   letter, is also denied.

4        And Schein number 11 is denied as to statute of

5   limitations.

6        And Schein number 12 is denied, references to Henry

7   Schein Animal Health.

8        All right, turning to Walgreens motions in limine.

9        Number 1, evidence or argument about Walgreens'

10  ownership interest in AmerisourceBergen is denied.

11       Number two, evidence relating to Florida DEA

12  enforcement action and related settlement, that's denied.

13  That goes with my general comments.

14       Number 3, references to DEA witness Joseph Rannazzisi

15  as the 60-Minute man.  I'm going to allow brief accurate

16  references to the fact that Mr. Rannazzisi, who was a former

17  DEA deputy administrator, did appear on *60 Minutes* and other

18  news reports because that happened, but the plaintiffs can't

19  overemphasize or dwell on these facts, and they're not to

20  refer to him at all as the 60-Minute man unless that's a

21  nickname that -- in fact, I don't think -- I'm not going to

22  allow that at all.  It's not relevant that someone may have

23  called him the 60-Minute man, so he'll just be Mr.

24  Rannazzisi.  And if he appeared on *60 Minutes*, quite

25  frankly, either side can raise that, and the defendants may

1    use it to impeach him.

2         All right.  Plaintiffs' omnibus motion *in limine*.  I'm

3    going to grant the motion.  There's not going to

4    be -- number one, there's not going to be any evidence or

12:48:24  5    testimony about attorneys' fee arrangements or how

6    litigation expenses are paid, or anything about that.  That

7    is not relevant.

8         Number two, the plaintiffs have withdrawn their motion

9    to preclude testimony as to when parties selected, hired, or

12:48:49  10   were considering hiring attorneys.  I will grant the second

11   part of the motion, any testimony as to the actual

12   arrangements or details of how attorneys are being paid or

13   how they're being retained; but when a Summit County or

14   Cuyahoga official retained or considered retaining an

12:49:22  15   attorney may be relevant.

16        Number three is denied as moot.  The parties have

17   worked that out, as with number four.

18        Number five, I'm granting in part.  There will not be

19   any reference to how attorneys for either side are being

12:49:51  20   paid, how much they're being paid, how they travel.  It is

21   always admissible to ask an expert witness how much he or

22   she is being paid directly or indirectly.  Any form of

23   compensation is fair game.

24        And a mode of transportation, if one is, you know,

12:50:14  25   flying lavishly to or from court or around, and where

1    they're getting the money to do that, parties can probe

2    that.  So it's fair game for witnesses, expert witnesses,

3    it's not for attorneys.

4         Number six, reference to defendants' philanthropy or

12:50:38  5    good deeds.  Plaintiffs' motion is overbroad because it

6    would preclude the defendants from saying anything about

7    themselves.

8         So defendants are allowed to introduce themselves,

9    describe accurately what they do, but evidence that parties

12:51:04 10    and/or their employees are good citizens, do good deeds in

11    the community, such as providing scholarships, community

12    service, that's not relevant for the corporation or for any

13    individual.  That has nothing to do with this case, unless

14    somehow someone feels that something specific that an

12:51:25 15    employee is doing is relevant; but as a general rule, it's

16    not, so that part is granted.

17         Number seven, reference to any alleged malpractice

18    claims involving the parties' designated experts.  I can't

19    decide this in the abstract, so it may be relevant as to a

12:51:44 20    particular witness.  We'll have to deal with it as it comes.

21         Number eight, it's granted in part.  The

22    defendants -- well, I mean, I think it actually is fair game

23    to call or refer or use expert reports of the other side if

24    they were noticed in the litigation but not called, so I'm

12:52:15 25    not sure what this refers to.  If they weren't noticed,

1    neither side can refer to the other sides' experts that

2    weren't noticed; but if they were noticed and then a side

3    decides not to call them, the other side is free to use

4    them.

12:52:39  5        But if the witness isn't being called or the report is

6    not being used by either side, the fact that there might be

7    a malpractice claim against the witness is irrelevant.  So

8    you can't just generally say, well, the plaintiffs had on

9    their list someone, and so-and-so has a malpractice claim,

12:53:00 10   because if the person is not testifying, it's irrelevant.

11        All right.  Number nine is denied without prejudice.

12   People can use, you know -- can use technology to present

13   their testimony or documents.

14        Number ten was resolved.  It's moot, the parties

12:53:23 15  worked that out.

16        Obviously, number 11 is granted.  The reference to

17   what motions *in limine* the parties filed or didn't file or

18   the Court's ruling is not relevant to anything.

19        Number 12, related to punitive damages, is resolved as

12:53:43 20  moot because the plaintiffs aren't seeking punitive damages,

21   so there obviously won't be any reference to them.

22        Number 13 is granted.  Defendants may not argue or

23   suggest that the Controlled Substances Act and its

24   implementing regulations have not always imposed the duties

12:54:08 25  that the Court has already determined, but this ruling does

1   not prevent any defendant from presenting evidence that

2   DEA's guidance has been inconsistent and/or shifted over

3   time, or to produce direct evidence of communications from

4   DEA to that defendant as to anything the defendant was

12:54:35  5   doing.

6        Number 14 is granted.  I'm going to exclude any

7   evidence or argument that plaintiffs' claims or verdicts

8   would interfere and/or negatively impact the pharmaceutical

9   industry and/or the government's regulation of the

12:54:54  10   pharmaceutical industry.

11        Number 15, reference to the DEA approving or endorsing

12   a particular defendant's suspicious order monitoring

13   program.  Again, this goes to what I said, so this is denied

14   without prejudice.  If the defendants have documents from

12:55:16  15   the DEA relevant to one of their programs, they can

16   introduce it.

17        16 is denied.  That goes along with what I said, this

18   is a suggestion or argument that DEA's failure to sanction

19   or initiate enforcement.  Both sides are free to bring in

12:55:48  20   evidence about what DEA did or didn't do with their

21   enforcement actions or their investigations and ask the jury

22   to draw conclusions therefrom.  That's fair game for both

23   sides.  So that was really 16 and 17 go together in that

24   regard.

12:56:12  25        All right.  18 is granted, any reference to any award

1    of damages might adversely affect the ability of any member

2    of the jury or the public to purchase or have available

3    medication.  We're obviously not going to have any testimony

4    or speculation on that.

12:56:44  5        19 is granted for the same reason.  We're not going to

6    have any testimony or speculation that a judgment might have

7    an adverse affect on any defendant's ability to compete in

8    the marketplace.

9        The same with 20.  We're not going to have any

12:57:00 10   testimony about that any verdict might adversely impact any

11   defendant's incentive or ability to develop new drugs.

12       21 is also granted for the same reason.

13       22 is denied without prejudice.  I can't address this

14   in the abstract.  If someone is trying to use deposition

12:57:33 15   testimony from a deposition where the other side didn't have

16   a -- wasn't present or didn't have a fair opportunity to be

17   there, I'll have to address it in advance of that witness.

18   So we'll have to take it up on a case-by-case basis,

19   witness-by-witness basis.

12:57:53 20       23, relative to learned intermediary, is granted in

21   part.  The defendants may not argue or suggest they

22   satisfied the duty to warn because of the mere existence of

23   the learned intermediary doctrine.  But of course defendants

24   may argue that their warnings to doctors were accurate and

12:58:15 25   that whatever happened is the doctor's responsibility after

1    that.  That's part of their defense.  They can defend

2    against these claims using that if they wish.

3         Number 24 is denied.  This relates to alleged failure

4    to mitigate.  If the defendants want to make that argument

12:58:36  5    or evidence, they can do so.

6         25 is, obviously, going to be granted.  We're not

7    going to have the personal identification data of any

8    children or any children in child protective custody.

9         And 26 is granted, too.  We're not going to have

12:58:57  10   testimony or evidence about individually-identifiable health

11   information or medical records of any individual person.  If

12   someone somehow feels it's become relevant then to -- notice

13   the Court in advance, and I'll address that.

14        Number 27, reference of identity of any undercover law

12:59:24  15   enforcement personnel.  I agree with plaintiffs, that

16   everyone has got to take reasonable steps to protect the

17   identity of undercover law enforcement personnel, but I'll

18   need to know that in advance, because a lot of these people

19   have testified in other proceedings, and if they have, well,

12:59:46  20   there's no more confidentiality.

21        The same with number 28, about reference to

22   individuals in the Cuyahoga County Jail.  I'm not sure how

23   it's relevant, but we'll take that up on a specific basis.

24        29, obviously there's not going to be any evidence

13:00:14  25   about allegations of any county corruption, but if there's

1    actual evidence of it and it's bearing on this case, well,

2    then, that may be relevant.

3         All right.  Number 30, I think, both sides agree that

4    the fact of the grand jury proceeding is inadmissible.  So

13:00:44  5    there won't be any reference to a grand jury investigation,

6    but if there are underlying facts that led to an

7    investigation, that's fair game for either side.

8         31 is granted as unopposed.

9         32 is granted as unopposed.

13:01:08 10         33, again, is granted.  We're not going to refer to

11    general investigations of people.  That's not relevant.  If

12    it led to an indictment and the charge is somehow relevant,

13    then so be it.

14         34 represented about podcasts or media coverage

13:01:30 15    regarding Cuyahoga County courts, that's -- I don't

16    understand exactly what plaintiffs are trying to preclude or

17    what the defendants are trying to admit, so that's denied

18    without prejudice.

19         35, reference to any investigation regarding the death

13:01:51 20    of Aniya Day Garrett.  I'm not going to issue a blanket

21    exclusion of this.  I'm not sure how it's going to be

22    relevant.  So before someone introduces that, they're going

23    to have to make a showing that it's relevant.

24         36, again, relates to corruption in Summit County.

13:02:17 25    The same thing, there's going to be no testimony about

1    allegations.  If there's evidence, actual evidence of

2    corruption, it may be relevant.

3         37, deaths of an individual while in the Summit County

4    Jail.  That's denied without prejudice.  Again, I fail to

13:02:38  5    see how it would be relevant.

6         All right.  Turning to Cardinal's motions *in limine*.

7         Number 1, evidence concerning 14,000 suspicious orders

8    which Cardinal did not report and did not ship, that's

9    denied.

13:02:54  10         Number 2 is denied, evidence and argument containing

11    an interest in gossip e-mail.

12         Number 3, evidence based on data produced by Cardinal

13    for the years 1996 through 2005 are denied, but all sides

14    are to be careful so we're not comparing apples with oranges

13:03:19  15    and drawing conclusions therefrom.  So if you have 20 years

16    of data, you can't say it leads to the same inference as 10

17    years, or the numbers are equivalent.

18         Turning to Track One defendants' omnibus motions *in*

19    *limine*.  Number 1, evidence or argument concerning future

13:03:42  20    damages, that's granted, because plaintiffs can't seek

21    future damages.

22         Number 2 is denied without prejudice.  Plaintiffs can

23    introduce individualized evidence of description and

24    shipments, but only if it was produced by the plaintiffs

13:04:08  25    during discovery.

1          Number 3, I can't rule on these in the abstract, so

2     it's denied without prejudice.

3          Number 4, lay and hearsay testimony about prescription

4     opioids being a gateway.  It's denied as to factual

13:04:46  5     testimony, testimony about facts is allowed.  I'm not going

6     to allow fact witnesses to give expert testimony, however.

7          Number 5, evidence concerning lobbying, that's denied

8     without prejudice.  It may be relevant.  Obviously, everyone

9     is free to lobby state, local, federal officials.  And

13:05:14  10    there's nothing wrong about that, but it may be relevant to

11    go to intent, or it may be relevant -- again, there's a wide

12    open strike zone about what the federal government did or

13    didn't do, and it may be relevant as to why the federal

14    government did or didn't do something.

13:05:31  15         Number 6 I'm denying.  Shipments to areas of the

16    country outside of Summit and Cuyahoga County may be

17    relevant.

18         I'm denying number 7.

19         I'm denying number 8.  We've already addressed number

13:05:52  20    eight with Daubert rulings.  I don't need to do it again.

21         Number 9, denying.

22         And 10, people can use charts and data.

23         Number 11, I'm granting in part and denying in part.

24    Evidence as to defendants' overall financial conditions,

13:06:19  25    sales, revenues, are not relevant.  Defendants' evidence as

1 │ to revenues and profitability directly relating to opoid

2 │ sales may be relevant.

3 │      Number 12 is denied without prejudice.  I think it's

4 │ too broad, but, again, I don't think -- we're not going to

13:06:47 5 │ have individual witnesses being asked about their personal

6 │ feelings about the opoid crisis or who is responsible.  That

7 │ would be improper questioning.

8 │      Number 13 was resolved by the parties, so that's moot.

9 │      14, I'm granting it.  Some of the defendants will have

13:07:12 10 │ corporate representatives at counsel table, some won't.

11 │ Some may have them some days, some may have them not other

12 │ days.  We're not going to have any comment.  It's not

13 │ relevant whether a corporate representative is here every

14 │ day or some of the days, so we're granting that.

13:07:31 15 │      All right.  McKesson's motions *in limine*.

16 │      All right.  Number 1 is denied without prejudice.

17 │ It's too broad.  I'll deal with it as it comes up.

18 │      Number 2 is denied.  Evidence relating to the U.S.

19 │ House Energy and Commerce Committee investigation, that may

13:07:55 20 │ be relevant.

21 │      Number 3, nationwide trends in drug deaths may be

22 │ relevant.

23 │      Number 4, evidence or argument about allegations

24 │ contained in letters from the DEA or DOJ.  They may be

13:08:15 25 │ admissible, so I'm denying that.

1       Number 5, I'm denying that, but additional rulings may

2   be made via objections to deposition designations.

3       Number 6, testimony, documents, relating to McKesson's

4   relationship with CVS and Rite Aid.  That's denied, it may

13:08:49  5   be relevant.

6       Turning to distributors' omnibus motions *in limine*.

7       Number 1 is denied.  Settlements with the DEA in West

8   Virginia may be relevant.

9       Number 2, nonparty corporate representatives

13:09:06 10   testifying to matters outside their personal knowledge, I'm

11   denying that without prejudice.  But, obviously, a witness

12   may only testify to evidence within his or her personal

13   knowledge.  If the witness is a corporate representative and

14   the witness knows from his or her experience what their own

13:09:31 15   company's practice is, they can testify to that, but they

16   can't speculate as to practices they don't know about or

17   something in some other department, or from a period of time

18   they don't know about.

19       I think everyone knows that.

13:09:47 20   All right.  Evidence of criminal indictments and

21   investigations without corresponding proof of final judgment

22   or conviction.  It's granted as to indictments that did not

23   lead to a conviction.

24       It's denied as to general criminal investigations,

13:10:05 25   unless the source of the information or other circumstances

1    lack trustworthiness.

2         Number 4, prohibit plaintiffs from stating expressly

3    or suggesting that the jury may infer that an older document

4    never existed just because it cannot be found.

13:10:35 5         I'm denying this.  This is -- this is for the jury.

6    If either sides wants to ask the jury to draw conclusions

7    from the fact that a document can't be found, they can make

8    the argument.  The jury can draw whatever conclusion it

9    wishes.

13:10:51 10        Number 5, evidence or arguments suggesting

11   distributors committed a fraud on the DEA.  Well, we don't

12   have a fraud on the DEA claim here, so plaintiffs can't

13   argue that there's a fraud on the DEA.  But it's open game,

14   open season on what DEA did or didn't do, or what the

13:11:24 15   parties produced to DEA.

16        Number 6 ties in with something I said before,

17   references broadly and generally to defendants.  So I'm

18   going to caution the plaintiffs that when -- if they mean

19   argument or a question or -- question to apply to all

13:11:46 20   defendants, fine; but if not, they're not just to lump them

21   all in, they're to be specific.

22        Number 7, evidence and arguments about RICO predicates

23   that plaintiffs did not identify in their discovery

24   responses, that's denied.

13:12:07 25        Number 8 is denied.

1       All right.  Turning to Teva and Actavis motions *in*

2   *limine*.

3       Number one, reference to the Cephalon misdemeanor

4   plea, that's denied.

13:12:26  5       Reference to off-label promotion is denied.  Reference

6   to the civil settlement between Cephalon and the Office of

7   Inspector General along with the settlement of the opoid

8   action brought by the Oklahoma attorney general, that's

9   denied.

13:12:42  10      Evidence of any harm that may have occurred outside of

11  these two counties is denied.

12      Evidence of market relating shipments outside of these

13  two counties is denied.

14      Evidence regarding Teva's financial support of

13:12:57  15  third-party groups is denied, it may be relevant.

16      Testimony from Russell Portenoy is denied, but it's

17  probably moot because I'm not sure he's going to be

18  appearing.

19      Number eight, argument that the Actavis generic

13:13:17  20  defendants should have made additional warnings regarding

21  their generic medicines or should have stopped selling them

22  is granted in part and denied in part.

23      Under the Supreme Court established law, a defendant

24  doesn't have to stop selling.  Defendants don't have to stop

13:13:39  25  selling, so no one can argue that they should have or were

1    required to.  But any evidence that any defendant engaged in

2    false marketing, that's an essential part of the plaintiffs'

3    claim.  That can come in.

4         All right.  I'm going to grant 9 and 10.  The purchase

13:14:22  5    price paid by Teva for Actavis I think is more prejudicial

6    than probative, so it's out.  And any reference to the

7    settlement agreement between Teva and Allergan, that's

8    granted, unopposed.

9         All right.  I think that takes care of all the motions

13:14:44  10    *in limine*.

11         All right.  Obviously, I've given each side 100 hours

12    so we get this trial to the jury well before Christmas.

13    Cardinal has raised a concern that it should get some

14    additional time because so many of the Cardinal witnesses

13:15:12  15    are going to be testifying live because it's within

16    100 miles of the Northern District of Ohio.

17         And the Court has some sympathy for Cardinal's

18    argument.  Obviously, you know, witnesses that are appearing

19    by deposition, their testimony is limited.  It's going to be

13:15:34  20    limited to certain excerpts, and there won't be any live

21    cross-examination.

22         I'm not -- I mean, the 100 hours is for the defendants

23    to use as they please.  I'm not saying that each defendant

24    has to have, you know, 16 and a half hours or whatever.  So

13:15:53  25    I think that the testimony that -- that the hours should be

1    used fairly, and obviously there needs to be and likely need

2    to be more cross-examination of witnesses that are appearing

3    live.

4         But I'm not going to -- I'm going to suggest that

13:16:10  5    that's something for the defendants to work out among

6    themselves.  I'm not going to give Cardinal more hours or

7    direct that the defendants allocate more to Cardinal, but

8    I'm suggesting that everyone needs to be fair about that.

9         I think Special Master Cohen has dealt with how he

13:16:31 10    wants the parties to deal with these deposition excerpt

11    objections, to get them to him on a rolling basis.  Everyone

12    knows when the witnesses will appear, and he will deal with

13    that.

14         All right.  There were objections to witnesses.  There

13:16:52 15    were two or three that came in very late, and may be I can

16    deal with them.  If I can deal with them quickly now, I

17    will.

18         All right.  The first one, this is a third-party

19    witness.  David Gustin filed a motion to quash the

13:17:14 20    plaintiffs' subpoena that he appear and testify.

21         All right.  Mr. Gustin is a former employee of

22    McKesson.  He retired in 2016.  He was director of

23    regulatory affairs for the central region in early 2014.  He

24    gave a seven-hour videotape deposition in August of 2018,

13:17:42 25    500-page deposition.

1          On March 21st of this year, Mr. Gustin was indicted in

2     the Eastern District of Kentucky, a federal indictment on a

3     felony charge alleging conspiracy with unnamed

4     coconspirators to distribute and dispense a quantity of

13:18:02  5     pills containing controlled substances between 2008 and

6     2016.

7          Mr. Gustin has represented through counsel that he

8     will exercise his Fifth Amendment right if he testifies.

9          Now, I always took the position when I was a

13:18:24 10     prosecutor that it was improper and prejudicial just to

11     bring a witness in to a trial or jury to take the Fifth when

12     everyone knew he was going to take the Fifth.

13          Can the plaintiffs articulate why it would be more

14     probative than prejudicial to bring in Mr. Gustin just to

13:18:47 15     take the Fifth?  He's a former employee of McKesson.  You

16     have his deposition.  You can seek to use his deposition.

17     He's clearly an unavailable witness.  He certainly has a

18     Fifth Amendment right, and if anyone would challenge it, I

19     most likely would overrule that challenge.

13:19:09 20          Can you articulate to me why it won't be unfairly

21     prejudicial to him and to McKesson to bring him in and take

22     the Fifth?

23                MR. WEINBERGER:  Your Honor, Peter Weinberger

24     on behalf of plaintiffs.  He doesn't have a right to

13:19:25 25     exercise his Fifth Amendment rights when he is not a

1    defendant in the civil action.  And so I understand your

2    analysis, Your Honor, but he can be compelled to testify,

3    and it is our preference that he respond to the subpoena,

4    and that we not have to play a seven-hour deposition.

13:19:46    5            THE COURT:  Well, I'm not sure -- you

6    think -- whatever testimony he's given, he's given.  All

7    right?  Anyone can use that.  All right?

8         But now he has a present Fifth Amendment right because

9    he's facing criminal indictment, and he's going to be asked

13:20:05   10    questions about the conduct during the time period when he

11    worked for McKesson during the indictment.  You can

12    challenge that, but I'm the one who would have to rule on

13    the challenge, and I think you'd have a very, very uphill

14    battle.

13:20:19   15         If you want to go through that, you can.  And if I,

16    you know -- but if I -- if you want to challenge his

17    assertion of the Fifth Amendment privilege, we're going to

18    do that one night.  We're not going to take up trial time,

19    and -- but I think you're going to lose.  He's got a Fifth

13:20:39   20    Amendment right.  If you're going to be asking him about

21    anything he did during the time frame of that indictment,

22    and I'm sure you are -- you're not going to be worried about

23    what he did in 2003 or something -- I'm going to sustain his

24    privilege.

13:20:56   25         I think we're going to leave it -- unless you can

1    articulate in writing why he does not have a Fifth Amendment

2    privilege to answer questions about conduct that forms the

3    basis of the indictment, I'm going to quash it.  But I'll

4    wait for your response.

13:21:19  5            MR. SHKOLNIK:  Judge Polster, Hunter Shkolnik.

6        Just if I can add to that.  In situations like this,

7    one option is that there's a stipulation that if the witness

8    was called and asked about any of these facts, he would

9    exercise his right under the Fifth Amendment, and it's a

13:21:34  10   stipulation that we can rely upon and utilize as part of our

11   evidence in chief.  We're entitled to it.

12            THE COURT:  But the only evidence then would

13   be some prejudice that a former employee of McKesson is

14   saying the Fifth.  That's the whole point.

13:21:49  15            MR. SHKOLNIK:  But the fact --

16            THE COURT:  You think -- I mean, I don't think

17   you can use against McKesson in this trial the fact that a

18   retired employee whose now been indicted is exercising his

19   Fifth Amendment right, the same way I don't think you can

13:22:08  20   introduce against McKesson the fact that this guy has been

21   indicted and say, well, that somehow shows that McKesson did

22   something wrong.

23            MR. SHKOLNIK:  Well, the indictment goes

24   directly to his job title and the distribution, which serves

13:22:21  25   as the basis of the claims.

1              THE COURT:  I understand.  An indictment is

2    only an allegation.  That's the same reason I ruled on these

3    motions *in limine*.  You can't just introduce evidence of

4    indictments that didn't lead to convictions.  That's unfair.

13:22:38  5       So unless the plaintiffs can convince me in writing,

6    clearly, that Mr. Gustin doesn't have a valid Fifth

7    Amendment right, I'm going to grant the motion to quash.

8         All right.  Then we've got Cardinal Health's motion to

9    quash the trial subpoena of Jennifer Norris, who is

13:23:00 10   Cardinal's in-house counsel.

11        All right.  I haven't read her deposition, all right?

12   I don't know what the plaintiffs are going to ask her.

13   Clearly, she can be subpoenaed to testify to anything within

14   her personal knowledge that's not privileged, and personal

13:23:25 15   knowledge could include her knowledge of Cardinal's general

16   practice and procedures.  All right.  That's her personal

17   knowledge.  Anything beyond that would be speculation.

18        So I don't know -- you know, I think everyone knows

19   that.  So I'm not going to quash the subpoena, because she

13:23:45 20   may have relevant testimony in this case which the

21   plaintiffs, if they want to have her live, can ask.

22        But if they ask her to guess or speculate, the

23   objection is going to be sustained.

24              MS. MAINIGI:  Enu Mainigi for Cardinal.  If I

13:24:02 25   may address that.

1      Miss Norris was not a percipient witness with anything

2   having to do with anti-diversion.  She did serve as the

3   corporate representative, and in that capacity, she learned

4   information for the purpose of providing 30(b)(6) testimony.

13:24:24  5   She has now been issued a trial subpoena to appear live

6   personally.

7      So she does not have personal knowledge, Your Honor,

8   she served as the 30(b)(6).

9      THE COURT:  Well, Ms. Mainigi, I don't have

13:24:40  10   any reason to doubt what you're saying.  I don't know what

11   the plaintiffs are going to ask her.  They can subpoena

12   anyone they want.  They know they can't ask someone to guess

13   or speculate.  They're pretty experienced lawyers.  They

14   know I'm not going to allow a witness to guess or speculate

13:24:55  15   or repeat hearsay, what someone told him or her, so I'm

16   assuming they're calling her to ask permissible questions,

17   the same way I'm assuming your witnesses, when you call

18   them, you intend to ask them admissible questions.

19      So I'm denying the motion to quash the subpoena on the

13:25:17  20   assumption that the plaintiffs understand the Rules of

21   Evidence.

22      MR. WEINBERGER:  Your Honor, Peter Weinberger

23   again.  I just want to note for the record, we did file a

24   written response with respect to the Gustin issue.

13:25:35  25      THE COURT:  I guess I didn't see it.  Anyway,

| | |
|---|---|
| 1 | I'm denying the motion to quash.  Obviously, you can only |
| 2 | ask -- well, you filed something on Gustin? |
| 3 | MR. WEINBERGER:  Yes. |
| 4 | THE COURT:  Well, can you articulate why you |
| 13:25:50  5 | don't think he has a Fifth Amendment privilege? |
| 6 | MR. WEINBERGER:  Well, he may have a Fifth |
| 7 | Amendment privilege, but not one that he can assert in this |
| 8 | action.  That's our point, Your Honor. |
| 9 | THE COURT:  Well, that wouldn't be much of a |
| 13:26:08 10 | Fifth Amendment privilege, Mr. Weinberger. |
| 11 | MR. WEINBERGER:  It has to do with whether or |
| 12 | not he has been civilly sued in this case, which he has not. |
| 13 | And I think -- |
| 14 | THE COURT:  But that has nothing to do -- his |
| 13:26:23 15 | Fifth Amendment privilege, he just needs a well-founded |
| 16 | belief that answers to these questions could, you know, |
| 17 | could hurt him, you know, could be used against him in a |
| 18 | criminal investigation, and he's under indictment.  It's not |
| 19 | a guess or a speculation.  He's under indictment, and you're |
| 13:26:46 20 | going to be asking him questions about that same period. |
| 21 | All right.  I'm going to grant that motion. |
| 22 | MS. SINGER:  Linda Singer for the plaintiffs. |
| 23 | Just to speak to the arguments that were made in the motion, |
| 24 | if I may, Your Honor, without speaking to whether he has a |
| 13:27:01 25 | right to invoke a Fifth Amendment privilege, I think |

1    plaintiffs have argued with case law support in its motion,

2    which I do not have in front of me, unfortunately, that a

3    witness taking a Fifth Amendment privilege which applies in

4    a criminal proceeding, the plaintiffs are still entitled to

13:27:19  5    claim an adverse inference in the civil litigation.

6         Mr. Gustin's responsibilities go directly to

7    McKesson's enforcement responsibilities that are at issue in

8    this case.  And the fact that he cannot get up and testify

9    as to what he did or didn't do, as Your Honor has said, in

13:27:39 10    that capacity at McKesson goes directly to plaintiffs'

11    claims, and the jury is entitled to make an inference.

12              THE COURT:  All right.  I think it is far more

13    prejudicial than probative, particularly since you have a

14    500-page deposition.  You have the testimony, and you can

13:27:56 15    put into evidence anything he testified to about what he did

16    or didn't do, assuming it's within his personal knowledge,

17    about all those things.  You've got his answers.

18         So I'm granting that motion, that motion to quash is

19    granted.

13:28:30 20         All right.  I've already told the parties -- I'm going

21    to reiterate, we're not going to be hopefully cluttering up

22    this trial about objections to the admissibility of

23    documents on grounds of authenticity.  And if we do, and the

24    objection is denied, I'm going to charge all that time to

13:28:49 25    the party that objected.  So both sides are aware of that.

1       There was a motion that was filed this week by some or

2   all of defendants asking me to order lawyers and witnesses

3   not to discuss this case outside of the courtroom.

4       I mean, we already have it for lawyers.  Specifically,

13:29:51  5   it was to preclude attorneys and witnesses from discussing

6   this case outside of the courtroom.

7       Certainly, my -- does anyone think there's a reason

8   for the Court not to issue this order?  I'm concerned -- I

9   mean, I'm not sequestering this jury.  There's already been

13:30:19 10   a tremendous amount of publicity about this, all right.  The

11   jury is going to hear from the lawyers what the lawyers need

12   to tell them with opening statements, closing arguments.

13   They'll hear the questions.  They'll hear from the witnesses

14   what the witnesses need to tell them from their testimony.

13:30:38 15       Certainly, lawyers shouldn't be talking to the press

16   about the case, and I don't think witnesses should be

17   either.  I don't think I've ever gagged witnesses, though,

18   and then there's a question of should it apply to parties.

19       And the problem is, the plaintiffs are public

13:30:59 20   officials, and so what does everyone think about this?

21               MR. SHKOLNIK:  Your Honor, on behalf of

22   Cuyahoga County, I think I feel comfortable.  We just spoke

23   with counsel.  We don't have intentions of making statements

24   regarding the trial, the case, but certainly, as government

13:31:26 25   officials and the government, if issues related to opioids

1    do come up, to curtail the government or its representatives

2    or its officials from talking about it, I think that's too

3    far --

4                    THE COURT:  Mr. Shkolnik, no way am I going to

13:31:42  5    try and curtail a public official's right to, you know, to

6    deal with the opoid crisis or talk about it.

7        I think the defendants' motion had to do with, like,

8    commenting on the trial or adding to their testimony, or

9    saying, you know, "I thought it was" you know what.  If they

13:32:05 10    want to criticize me, that's fine.  I don't care.  But

11    something having to do with directly commenting on what

12    happened in the courtroom, that's what I'm talking about.

13                    MR. SHKOLNIK:  And I understood that,

14    Your Honor.

13:32:18 15        The county has no problem with not commenting upon the

16    trial and what is happening here.

17                    THE COURT:  All right.

18                    MR. SHKOLNIK:  I just wanted to make that --

19                    THE COURT:  All right.  I think I'm going to

13:32:30 20    issue that order.  I don't want there to be any comment,

21    discussion by attorneys, parties, and witnesses, about

22    what's happened in the courtroom.

23        All right.  Everyone has worked extremely hard and

24    done, I think, a terrific job in getting this case ready for

13:33:04 25    trial.

1          The one aspect where I'm disappointed is the fact that

2    we are about to begin this trial, and we don't have any

3    semblance of final jury instructions.  The parties only

4    agreed on my boilerplate, which I didn't ask agreement about

13:33:26  5    that.  We sent that out so you wouldn't have to worry about

6    that.

7          The submissions would lead one to conclude that this

8    is the first civil RICO trial in this country.  It obviously

9    isn't, or the first public nuisance trial in any court in

13:33:43  10   Ohio, which it's not.

11         And, you know, as a result, I didn't need those jury

12   instructions for myself at the beginning.  You all needed

13   them.  When I was a trial lawyer, I wanted to know what the

14   law was before the case started, not after the evidence

13:33:58  15   submissions were in, and I'm encouraging the parties who are

16   here to urge their lawyers to work constructively.

17         The idea is not to gain these instructions or get

18   every last ounce of argument in them.  A jury instruction is

19   to be conservative.  By conservative, I mean it's what the

13:34:19  20   law is, not what the law might be or should be.  The law in

21   this district, this circuit, this country, what it is on

22   these issues.

23         You want an instruction that's going to be affirmed

24   one way or the another; in other words, it's accurate.  It's

13:34:34  25   not argument, it's accurate.  And you want it as clear as

1    possible to laypersons, which means as little legalese as

2    possible.  Some is inevitable, it's legal instructions.

3    That's what it should be.

4        And I know that if both sides, all sides work

13:34:52  5    constructively, they can produce instructions that are

6    90 percent agreed upon.  Yes, there may be a couple critical

7    legal issues I'm going to have to rule on, okay, but I've

8    never started a trial where there was nothing agreed on.

9        So as it now stands, you know, I'm going to be working

13:35:11  10   on it.  And if it takes two months it will take two months,

11   and it won't be good for either side.  But I'm making it

12   clear now on the record that both sides, all parties,

13   plaintiffs and the defendants, have waived any objection

14   they have to not getting timely jury instructions, because

13:35:28  15   it's of your own doing, their own doing.

16       You know, one of the key issues is joint and several

17   liability.  I'm going to have to decide that.  I believe

18   that the law imposes joint and several liability, but I'll

19   certainly have to carefully look at that.  But, again, I

13:35:49  20   will work on that.  If we've got to do it all ourselves from

21   scratch, which is the way it is now, it's going to take a

22   long time.

23       So, again, I would encourage some lawyers who aren't

24   going to be in this courtroom daily doing the witnesses to

13:36:06  25   work together, and to the extent you can submit anything

1      that you agree upon, the odds are 99.9 percent that I'm

2      going to give it, so I would encourage that.

3           I am working on preliminary jury instructions right

4      now, and I've got to tell the parties something -- the

13:36:28  5      jurors something about what they're going to be doing, what

6      the claims are, and what they're going to have to consider.

7           And I'm going to have it to do it somewhat generally,

8      and I will get that out to the parties this week so you can

9      look at them.  And if you think there's anything, you know,

13:36:48 10      that's just flat out wrong, let me know.  I don't want to

11      create an error, but, again, it's preliminary instructions.

12      So I'll get those out as soon as I can in a short turnaround

13      time.

14           All right.  We have some stipulations.  I guess I need

13:37:05 15      to know from all of you what you want me to do with them.

16           In some trials, the parties have wanted the judge to

17      read them all at the beginning or all at the end, or at

18      certain points; or sometimes the lawyers read them, you

19      know, in conjunction with a particular witness.  I really

13:37:24 20      don't care, I just want to know.

21           And I generally include those in the final

22      instructions, just so the jury is reminded of it, but you

23      all have to figure out, you know, how you want to -- what

24      you want to do with those.

13:37:39 25           And I'll take my cue from you.

1          LAW CLERK:  Right now we've got them in the

2    preliminary instructions.

3          THE COURT:  Well, I don't know.  I mean, one

4    idea I thought of would be to actually give each juror a

13:38:00  5    copy of them that they can keep and have.  I mean, if I read

6    off 20 stipulations, guess what?  After number one or two,

7    they're going to glaze over and not know what it counts for.

8          A stipulation only makes sense in the context of some

9    testimony or documents.  So what do you all think about

13:38:21 10    giving each juror a printed copy of them?

11          I give each juror a copy of the final jury

12    instructions at the end.  I don't give them the preliminary

13    instructions, but they're going to take back into their

14    room -- and I do that because, believe it or not, I had a

13:38:38 15    case where I was trying the case, and the judge gave one

16    copy, and the foreperson monopolized it and didn't show it

17    to anyone else.

18          It's hard to fathom, but it did happen to me.  So when

19    I became a judge, every juror is going to get his or her own

13:38:58 20    copy.  But what do you think about getting the copies.

21          MR. LANIER:  Your Honor, Mark Lanier for the

22    plaintiffs.  Currently we have scheduled a meeting with

23    Special Master Cohen at 1:00 p.m. on Sunday to deal with

24    exhibit issues.

13:39:11 25          THE COURT:  Okay.

1          MR. LANIER:  If the Court would indulge us,

2     we'll communicate with defense counsel between now and then,

3     and if we can't come up with an agreement deal with it with

4     the special master on Sunday.

13:39:23  5          THE COURT:  Okay.  If I just start off the

6     trial by reading 20 stipulations, Mr. Lanier, it's really a

7     waste.

8          MR. LANIER:  Agreed.

9          THE COURT:  At the end it may be useful with

13:39:34 10   the -- you know, after the summary and everything, but, so,

11    I'll take my cue from you.

12         MR. LANIER:  Thank you, Judge.

13       All right.  I'm reminding everyone that in terms of

14    our schedule, it looks like next Monday we'll be completely

13:39:55 15  opening statements.  I don't think there will be time for

16    any witnesses.  But we'll start with the testimony on

17    Tuesday.

18       There is no trial next Friday, October 25th.  There's

19    no trial Monday, November the 11th, that being Veterans Day.

13:40:11 20  It's a federal holiday.  And Thanksgiving week, the last

21    week of November, we're in trial only Monday and Tuesday,

22    the 25th and 26th.

23       So I'm going to tell all of the jurors that, so they

24    know.

13:40:33 25       I think I've got everything on my list.  But now, is

1    there anything that -- and let me say, with the jury, what

2    I'm going to do is, we're bringing in 50 tomorrow, and I've

3    got some questions for the whole panel which I will ask.

4    That's my customary practice.

13:40:59   5        Then I will let each side take a short period of time

6    to ask any additional questions, or maybe the same ones if

7    you want to ask it in a different way.  That's fine.

8        And then if there are questions often from

9    the -- maybe from the questionnaire that we want to question

13:41:25  10    individual jurors, since there are so many, just having

11    everyone congregate at the sidebar isn't very efficient, and

12    so I would bring the jurors into my chambers with just one

13    representative from each party, for no more than five

14    minutes of questioning.

13:41:41  15        And then we'll have for cause challenges, which I'll

16    deal with on the record, to any of the 50.  And if after

17    those for cause challenges we have at least 24 jurors, I

18    will then have the parties do their peremptory challenges.

19    We have up to six for the plaintiffs, up to six for the

13:42:11  20    defendants.  I want to end up with 12, so we need 24, and

21    we'll do it.

22        If we don't have 24, let's say we have only 20, what

23    we'll do is I'll direct those 20 to come back Thursday, and

24    we'll start up the process with the next 50.  And, you know,

13:42:36  25    when it's clear we'll have -- you know, then we'll have some

1    for cause challenges, and then I guess we'll have to do the

2    peremptories with the 20 left from day one and however is

3    left with day two, is what we'll do.  That's the way we'll

4    do it.

13:42:56  5        And I believe based on the very good and excellent

6    work we did last week, it won't take more than two days to

7    pick the jury.  We may be able to do it just in one.

8        But the process has worked very well and everyone

9    worked very hard, and I want to appreciate that cooperation,

13:43:15 10   and we excused a lot of jurors who clearly should have been

11   excused.

12        Okay.  Anything that any counsel for any of the

13   parties wish to raise?

14             MR. WEINBERGER:  Yes, Your Honor.  On behalf

13:43:31 15   of plaintiffs, Peter Weinberger.

16        On the voir dire issue, so maybe this is -- maybe I'm

17   wrongly assuming, but I'm assuming that we're going to be

18   able to voir dire the entire panel.

19             THE COURT:  Correct.  I'm going to be asking

13:43:44 20   my questions of, Mr. Weinberger, of the 50, and you can

21   address your questions to the whole 50, or you can say,

22   juror number 33, what do you think of this; either way.

23   And, yes, and challenges for cause will be to the whole 50

24   that we're having Wednesday, right.

13:44:05 25             MR. WEINBERGER:  And when we exercise

1    peremptories, is it going to be with respect to the first 12

2    in the box?

3                    THE COURT:  You can exercise your peremptory

4    on anyone.  I mean, you only have six.  If you want to use

13:44:18  5    your six on jurors 45 through 50, you can.

6        And the way I do it, just say we had 12 in the box,

7    and someone strikes number 6, well, then, I bring up the

8    first -- the next numbered juror, and he or she takes the

9    spot of number 6.  And we're going to end up with 12.

13:44:47  10        And the way I work it, whoever is left -- hopefully

11    all 12 are here at the end of the trial, and if so, we have

12    12 deliberate.  If someone has gotten sick or had a family

13    emergency we have only 11, and then we have only 11.  But

14    any one of the 12 stays on.

13:45:05  15                    MR. WEINBERGER:  So tomorrow we'll know sort

16    of the seating chart, you know, where is the next juror up

17    sitting at?

18                    THE COURT:  Yes, Mr. Weinberger, you'll know,

19    and you probably won't know until right then.  They'll come

13:45:19  20    in, and they'll have a name and number, and we'll know.  I

21    mean, we'll all have the questionnaires, so we'll know then.

22        The jury department will be doing that randomly.

23    You'll know tonight which are the 50, and then they'll come

24    in, and then we'll have to sort our questionnaires so we

13:45:35  25    know who is seated where.

1        MR. WEINBERGER:  And in terms of time for each

2   side for voir dire questioning, Your Honor?

3        THE COURT:  Well, what do you think is

4   reasonable? I normally don't allow a lot: 15, 20 minutes is

13:45:56 5   what I'm thinking.  Because, again, these jurors have been

6   asked a lot of questions, a lot of very good probing

7   questions, and we have their answers.

8        And obviously, if a juror has expressed on his or her

9   questionnaire some hesitation, some uncertainty in the

13:46:16 10   question, do you believe you can be fair and impartial, I'm

11   not going to question this juror out in this room.  That's

12   what I'm going to ask that juror back in my chambers.

13        So I'm thinking maybe 20 minutes for the plaintiffs,

14   20 minutes for the defendants on, you know, other questions,

13:46:35 15   or repeating my questions.

16        MR. LANIER:  Mark Lanier for plaintiffs.

17        If I understand your process right, you don't want us

18   to get answers in the global voir dire that would

19   commit -- that would be sufficient for cause.  If we look

13:46:58 20   like we've got someone who may have a for cause reason --

21        THE COURT:  Right.

22        MR. LANIER:  -- then we take them back

23   individually, and not try to mess up the whole panel.

24        THE COURT:  That's the whole point, correct,

13:47:11 25   Mr. Lanier, of doing it back there.

1    Obviously, I don't want some juror to blurt out why he

2    or she might have a problem, and everyone is going to --

3              MR. LANIER:  Hear it.

4              THE COURT:  One of two things will happen.  It

13:47:24  5    may taint everyone, or someone may think, hah, that's how

6    I'll get off this jury.  See what number 33 said?  That's

7    me, too.

8              MR. LANIER:  In light of that, if that's the

9    approach, then the 20 minutes should be valid for us to get

13:47:38 10    the questions we need to get out to elicit to know who to

11    take back to chambers.

12              THE COURT:  That's the idea.  Or, you know,

13    introduce yourself, or there's some general things you want

14    to throw out there, that's what it for.

13:47:53 15              MS. MAINIGI:  Your Honor, may I ask a

16    follow-up?  Enu Mainigi for Cardinal.

17         As I understood it, each one of the 50 will be taken

18    back for individual voir dire; is that correct?

19              THE COURT:  I think so; or maybe to save time,

13:48:08 20    if no one has a reason to do it, then I won't.  I mean, I've

21    been going back and forth as to whether we just bring

22    everyone back just to bring everyone back, or if there's

23    absolutely nothing on the questionnaire that creates any

24    issue, I don't know.  I mean, do you have a strong opinion

13:48:38 25    either way?

1          MS. MAINIGI:  I do, Your Honor, on behalf of

2     Cardinal.  We had understood that each individual juror

3     would be invited back, and it may be that one juror, we're

4     going to be done with them in 30 seconds because no one has

13:48:51  5     any questions; but we do think we need that opportunity to

6     ask those questions, especially if we're getting 20 minutes

7     on the front end.

8          THE COURT:  I may do it -- I may do it, if not

9     for that reason, I don't want any of the jurors to feel like

13:49:08  10     there was something wrong with them and they, you know, or

11     other jurors wondering, well, why did the Judge talk to him

12     and not me, or her or not me.

13          So I think probably out of fairness, I think it makes

14     sense to bring everyone back even if it turns out it's

13:49:26  15     really quick and nothing to ask.

16          I think it looks better, so we'll follow your

17     suggestion.

18          MS. MAINIGI:  Thank you.

19          MR. NICHOLAS:  Your Honor, Bob Nicholas from

13:49:35  20     AmerisourceBergen.  I have a follow-up question on that --

21          THE COURT:  Okay.

22          MR. NICHOLAS:  -- which is when jurors are

23     taken back individually, are we going to be making our

24     strike motions -- our cause motions back -- you know, one by

13:49:48  25     one, or are you bringing them all back and then we do it at

1    the end?

2              THE COURT:  Well, I think what's efficient,

3    Mr. Nicholas, is that after we finish asking the juror the

4    questions, the juror goes back, and then I think I might

13:50:11  5    say, does anyone feel this juror should be excused for

6    cause.  And I'll take it up right then, right there, when

7    we're fresh on it, rather than waiting what could be an hour

8    or something, and then going back to Juror Number 23.  I

9    think that's more efficient, and I think that's what we'll

13:50:30 10   do, and I'll rule on it.  And if no one has a challenge for

11   cause, then that's quick.  And if someone does, well, then,

12   I'll rule on it.

13        I think that makes sense, because what that juror has

14   said and how he or she has said it will be fresh in

13:50:47 15   everyone's mind, and it's the way to do it.

16              MR. NICHOLAS:  I would agree.

17              MR. WEINBERGER:  Your Honor, a couple of more

18   things on the plaintiffs' side.

19        As I understood your earlier ruling, you were allowing

13:51:05 20   each of the defendants to have a lawyer back and

21   interviewing an individual juror, and you were allowing us

22   one lawyer per plaintiff?

23              THE COURT:  Right.

24              MR. WEINBERGER:  Can we have three lawyers on

13:51:20 25   our side?  There's going to be six lawyers --

1                    THE COURT:  All right.  You can have three.

2    It's all right, two or three.  I didn't want to overwhelm

3    the -- I don't want the juror to feel uncomfortable.

4        Okay.  All right.  Any --

13:51:41  5                 MR. WEINBERGER:  Yes, Your Honor.  Sorry,

6    I'm --

7                 THE COURT:  No.  I understand, Mr. Weinberger,

8    these aren't all your questions.  You might have received

9    some from colleagues.  You're a spokesperson.

13:51:52  10                (Overlapping speakers.)

11                 MR. WEINBERGER:  I spent all night --

12                 UNIDENTIFIED SPEAKER:  *Mea culpa*.

13                 THE COURT:  That's all right.

14                 MR. WEINBERGER:  We've been discussing with

13:52:02  15  Special Master Cohen the issue of the length of the opening

16    statements, and we've made a couple of proposals.

17       Have you made a ruling on that, Your Honor?

18                 THE COURT:  I thought we did.

19                 LAW CLERK:  We did.

13:52:21  20                THE COURT:  Yeah, I thought we did.  I even

21    brought it out with me.

22                 SPECIAL MASTER COHEN:  Judge, there were three

23    versions that were floating through the e-mail, and all of

24    the parties agreed on what was called Version 3.

13:52:35  25                THE COURT:  Well, I'll just put it on.  It's

1    my understanding that everyone agreed on two and a quarter

2    hours total for plaintiffs, and 30 minutes for each

3    defendant family, so that would be 6 times 30 is 3 hours

4    total.

13:52:49  5         Now, that's a long opening statement for plaintiffs,

6    and I know, Mr. Lanier, you have a very fine reputation, but

7    I don't know too many people who can keep anyone's attention

8    for two and a quarter hours.  I've seen people who have

9    tried, and they didn't do too well.

13:53:15  10         So if you don't want to use all two and a quarter

11   hours, that's fine with me, and you may be helping your

12   clients.  But the parties agreed on it, so I'm not going to

13   pull the trapdoor on you.

14               MR. LANIER:  Thank you, Judge.

13:53:34  15               MR. WEINBERGER:  Your Honor, we submitted an

16   e-mail to you with respect to the issue of live video

17   streaming of the proceedings to a remote location, and we

18   learned after that that the defendants have objection to

19   that because of security issues.

13:53:54  20         And not to go through all of the details --

21               THE COURT:  On that, Mr. Weinberger -- I don't

22   want to cut you off.  I'm not certain that the Court has

23   ever permitted like live streaming of a trial outside of the

24   courtroom.  We're live streaming inside the courtroom to the

13:54:19  25   overflow rooms, two of them, and I hope people can hear and

1      see.

2              I mean, is it working okay in those other courtrooms?

3                      DEPUTY CLERK:  There wasn't anyone there.

4                      THE COURT:  Oh, there wasn't anyone there.  I

13:54:33  5    thought of it late.  All right.  I thought of it late.

6          But I don't think we've ever had actual live streaming

7      to a location outside of the courtroom.  Is that right?

8      Courthouse.  We've never done it, and I'm not sure it's even

9      permissible.

13:55:00  10                   MR. WEINBERGER:  So what our hope is, and it

11     has to do with room in the courthouse and, you know, both

12     sides have large teams.

13                     THE COURT:  Right.

14                     MR. WEINBERGER:  And we would want to live

13:55:13  15   stream it just to one location outside of the courthouse.

16     And I don't have the details now, but I have been assured by

17     my tech person, who has been in contact with Court Connect

18     on this, that it can be done in a way that assures both

19     sides that it's secure, and so there won't be a problem with

13:55:39  20   security.  It will help, and it has to do, frankly, Your

21     Honor, with the whole logistics and the large teams that we

22     have.

23          So let me address another issue that relates to that.

24                     THE COURT:  Well, let's stick with -- I mean,

13:55:55  25   the defendants had -- I mean, are you proposing while the

1    defendants don't want to do it, you just want to do it for

2    your side?

3                  MR. WEINBERGER:  Right.  Right.

4        And, again, I can -- look.  You ordered us to, earlier

13:56:11  5    on in this case, not to release ARCOS data.  And despite the

6    fact that it was shared with large numbers of people on our

7    side, it never got leaked out.

8        You know, I think that's a demonstration that you can

9    trust the lawyers on our side to, with the security of this

13:56:32 10    video feed, and it's just going to one location, Your Honor.

11                  THE COURT:  Well, look.  It's just come up.

12    To say I'm not a technological expert would be a gross

13    understatement.

14        I can understand, we've got lots of lawyers.  Everyone

13:56:52 15    can't fit in the courtroom.  I mean, even being in -- you

16    know, coming in the overflow room, as a principal matter, if

17    there's a secure way for only lawyers to see it, I don't

18    have any problem with it.  I don't know if it can be done

19    securely.  At least if it's done, both sides should have it.

13:57:15 20                  MS. MAINIGI:  Your Honor, Enu Mainigi for

21    Cardinal Health.

22        As Your Honor is aware, we do object to the live

23    streaming outside the courtroom.  We do think that there's

24    too much room for abuse.  We're not suggesting at all that

13:57:31 25    plaintiffs would do that.

1               THE COURT:  Well, how could it be abused?

2               MS. MAINIGI:  Well, we are worried that it

3      could be taped.  We're worried you can take your phone and

4      tape it.  As I understand it, in the courtroom, people are

13:57:43  5    not going to be allowed to videotape what's on stream.

6               THE COURT:  Right.  No one can walk in with

7      their cell phone and turn it on.

8               MS. MAINIGI:  But that cannot be prevented if

9      you're live streaming to the Ritz, for example.  You

13:57:57 10    can't --

11              THE COURT:  Well, that's a good point.

12              MS. MAINIGI:  You can't monitor people walking

13     in and out of the war room that are not lawyers.  People,

14     witnesses who have been sequestered, perhaps, Your Honor --

13:58:11 15    and I know we haven't necessarily gotten to that -- those

16     witnesses could inadvertently be wandering through.

17          We think there's way too much room for abuse here, so

18     I think it is for good reason that this Court has never

19     allowed live streaming outside the courtroom.

13:58:29 20              THE COURT:  Well, to be fair, Ms. Mainigi, no

21     one has ever asked me to do it.  I haven't refused to, it

22     never came up, so I never had to deal with it.

23              MR. WEINBERGER:  So let me tell you, so we

24     have an office in the Old Post Office building so we're not

13:58:47 25    talking about the Ritz, Your Honor.  And we can represent to

          1    the Court that where we would video stream it into that

          2    office would be a segregated room with no phones and no

          3    recording equipment.  And if we need to hire a deputy to

          4    assure the defense that we're following whatever order comes

13:59:09  5    out of the Court, we're happy to do that.

          6                THE COURT:  So, you know, I mean --

          7                MS. MAINIGI:  Your Honor, it seems like a

          8    whole lot of work and effort.  I don't understand why all

          9    the lawyers here --

13:59:21 10                THE COURT:  Well, I mean, it --

         11                MS. MAINIGI:  -- cannot come to the courtroom

         12    in the overflow courtroom.  That's what everybody is

         13    planning to do.  That is what Your Honor indicated we needed

         14    to do.

14:00:02 15                THE COURT:  Well, since I've never done this,

         16    I'm concerned.  And particularly since the defendants are

         17    objecting, I'm concerned about the security.

         18                SPECIAL MASTER COHEN:  Just so everybody is

         19    clear, there are two --

14:00:19 20                THE COURT:  And apparently, I've been reminded

         21    that live streaming was discouraged at a Judges' meeting.  I

         22    must have not been paying attention at that meeting, or

         23    maybe I was absent; but I'm concerned about it.

         24                SPECIAL MASTER COHEN:  Judge, there are two

14:00:42 25    overflow courtrooms, and the wells in both of those

1    courtrooms are available for counsel.

2                THE COURT:  Right.  Counsel can sit there.

3                SPECIAL MASTER COHEN:  The entire well.

4                THE COURT:  You can sit there and work, do

14:00:53  5    whatever you want.  The only thing you can't do a record.

6                DEPUTY CLERK:  First come, first seated.

7                THE COURT:  Right.  But the point is, I mean,

8    you can -- that's what they are there for.  That's why I

9    provided for two overflow courtrooms, to make sure, you

14:01:11  10   know, anyone will be able to sit.  And there's a lot of

11   room.  You see all the seats there.  Those wells are empty.

12   So all those seats will be available.  The jury box is

13   available.  There should be plenty of room.

14       So I think we're not going to have the live streaming.

14:01:30  15             MR. WEINBERGER:  All right.  One follow-up

16   issue, Your Honor.

17       The directive that we heard is that, particularly in

18   here, we can't have our lawyers using laptops when they're

19   sitting behind the rail.  And so people at the trial table

14:01:50  20   here are going to be communicating with people who have

21   laptops and smartphones to get exhibits, to plan for the

22   next day, et cetera, et cetera.

23                THE COURT:  Right.

24                MR. WEINBERGER:  So we would ask the Court's

14:02:05  25   indulgence to allow the lawyers working with us, who are

1    lucky enough to get seated behind the jury rail in this

2    courtroom, to be able to use laptops and smartphones.

3    Obviously, turning off any sound or any -- it will also

4    facilitate that people won't be walking back and forth

14:02:27 5    between --

6                    THE COURT:  Right.

7                    MR. WEINBERGER:  -- the space behind the jury

8    rail and the trial tables.

9                    MR. STOFFELMAYR:  Your Honor, if I may, Kapsar

14:02:38 10   Stoffelmayr for Walgreens.  I was asked on behalf of the

11   defendants to raise the same issue.  We think we will be

12   able to be much more efficient, run a smoother operation.

13                    THE COURT:  Well, I do, too.  I'm going to

14   trust lawyers.  If the public says what are you doing; well,

14:02:56 15   they're on the trial team, and they're communicating with

16   each other, and rather than having to interrupt and walk

17   back and forth, and stuff.  All right.

18        I trust all of you to not be secretly recording.  I

19   mean, quite frankly, someone could have some device in their

14:03:11 20   briefcase or whatever, and no one would know.

21                    LAW CLERK:  We're not reserving seats.

22                    THE COURT:  I know.  We're not reserving

23   seats, but I will allow lawyers working on this case.

24        I'll allow lawyers to do it in this courtroom so long

14:03:34 25   as they're not being obtrusive.  There can't be typing

1    noise, tapping that's disruptive.

2                    MR. STOFFELMAYR:  Your Honor, can I just ask

3    that that ruling include at least one paralegal per party?

4    We were especially concerned about the exhibits.

14:03:50  5                    LAW CLERK:  Now we're talking about reserving

6    sheets.

7                    THE COURT:  No, we're not reserving any seats.

8    I will allow a paralegal to have a laptop to communicate

9    with the lawyers.

14:04:00 10                    MR. STOFFELMAYR:  Thank you.

11                    THE COURT:  But, again, you got to do it in a

12   way not to allow any sound.  I'll allow that, we'll just do

13   it.

14                    MR. WEINBERGER:  And finally, Your Honor,

14:04:21 15   realizing that you have portable microphones, we are

16   wondering how strict you are in terms of having to stay at

17   the podium when we're giving opening, when we're inquiring

18   of a witness, et cetera.

19                    THE COURT:  All right.  I'm not strict.  The

14:04:41 20   only thing, I have two rules, Mr. Weinberger:  One, you have

21   to be audible for our court reporter, wherever you are; and

22   number two, I don't let anyone, like, crowd into the jurors'

23   space.  I've seen lawyers who have done that, and I've

24   required them to step back.

14:05:00 25        But if you, you know, so you've got to be -- those are

1    my only two rules.  So if you want to --

2                    DEPUTY CLERK:  The batteries on the portable

3    microphones are not the greatest, and they don't last two

4    and a quarter hours.  So --

14:05:23 5                    THE COURT:  That may be the way to limit you,

6    Mr. Lanier.

7                    DEPUTY CLERK:  So the only question would be,

8    if you're done, please put the one that you've used back on

9    the track, take another one, so they're constantly charging.

14:05:39 10                   THE COURT:  I wouldn't do that, intentionally

11   give you a short-life battery, Mr. Lanier.

12       But the point is, make sure that the court reporter

13   can hear you clearly and you're not crowding the jurors.

14   But I don't mind, some lawyers like to be at counsel table,

14:05:58 15  some at the podium, some like to walk around.  It's okay.

16                   MR. STOFFELMAYR:  Your Honor, we had one

17   additional question.  It's Kaspar Stoffelmayr, back in the

18   corner here.

19       We were just curious if the Court intended to issue a

14:06:21 20  Rule 16 order to exclude witnesses.  And if so, our request

21   is that it would not include expert witnesses, so that

22   expert witnesses can be in court to watch testimony, but

23   fact witnesses could not.

24                   THE COURT:  No one has raised it, so I don't

14:06:37 25  generally in a civil case exclude witnesses, but if there's

1    a particular reason to do so someone should raise it with

2    me.

3         Mr. Stoffelmayr, no one has raised that, and I

4    generally don't issue it in a civil case as a --

14:06:58  5              MR. STOFFELMAYR:  All right.  Why don't we

6    discuss it --

7                   THE COURT:  Why don't you discuss it and see

8    what you want to do.

9                   MR. STOFFELMAYR:  Great.  Thank you.

14:07:21  10             THE COURT:  Okay.  Special Master Cohen

11   advised me that -- well, I figured it would be around now.

12        The jury department has identified the 50 who we're

13   calling in now, so we can share that with counsel.

14                  DEPUTY CLERK:  I would just like to ask all of

14:07:39  15   you, if you do have any staff that manages to get a seat in

16   the Front Row, can you please have them bring some kind of

17   identification for the Court security officers so they know

18   that those people are allowed to use the laptops.

19                  THE COURT:  That's a good idea.

14:07:59  20                 DEPUTY CLERK:  Thank you.

21                  THE COURT:  Okay.  Thank you very much.

22        We're adjourned.

23                  DEPUTY CLERK:  All rise.

24                          - - -

25             (Proceedings adjourned at 2:08 p.m.)

1                            **C E R T I F I C A T E**

2

3           I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6       */s/ Donnalee Cotone _____15th of October, 2019*
        DONNALEE COTONE, RMR, CRR, CRC                      DATE
7       Realtime Systems Administrator

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25