**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF OHIO
EASTERN DIVISION**

--------------------------------------------------------
IN RE:  NATIONAL PRESCRIPTION  )
    OPIATE LITIGATION   )
             )
  This document relates to:  )
             )
*The County of Summit Ohio, et al. v. Purdue* )  MDL No. 2804
*Pharma L.P., et al.*      )
Case No. 18-op-45090    )  Hon. Judge Dan A. Polster
             )
  and       )
             )
*The County of Cuyahoga v. Purdue*  )
*Pharma L.P., et al.*      )
Case No. 1:18-op-45004   )
--------------------------------------------------------

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO OVERRULE PLAINTIFFS' OBJECTIONS REGARDING TESTIMONY AND REPORTS OF EXPERT WITNESSES (DOC. #2797)

## I.  INTRODUCTION

On the eve of trial, the Distributor Defendants (the "Distributors") have notified Plaintiffs

that they intend to call three of Plaintiffs' retained experts —Anna Lembke, David Kessler, and

Meredith Rosenthal—as live witnesses for the Distributors' case, despite the fact that none of these

experts is within the subpoena power of the Court.  The Distributors contend that Plaintiffs should

be compelled to produce these witnesses at trial for Defendants' benefit or, in the alternative, the

Distributors argue, if the witnesses cannot be compelled to appear, the Distributors say they should

be permitted to take additional depositions, which they characterize as *de bene esse*, in addition to

the depositions already taken pursuant to the order of the Court.[1]  *See* Certain Defendants' Motion and Incorporated Memorandum of Law to Overrule Plaintiffs' Procedural Objection to Testimony ("Def. Memo.") at 2-3.  In addition, Defendants argue they are entitled to introduce the expert reports of two other experts identified by Plaintiffs—Mark Schumacher and Jane Ballantyne— whom Plaintiffs do not intend to call at trial.  *Id.*  (In fact, in accordance with the Court's request that Plaintiffs' narrow and streamline their expert witness list, Dr. Ballantyne was *withdrawn* as an expert approximately six months ago and never deposed.)

There is no justification for any of this.  Whether or not any of the testimony or opinions offered by these experts supports the Distributors' defenses – the Distributors' argument that this is so is based on mischaracterizations of the opinions at issue[2] – the Distributors have no authority for their theory that they can compel these witnesses to appear at trial.  Nor can they support their request for additional, eve-of-trial (or during-trial) depositions of witnesses whose depositions they already took (or, in the case of Dr. Ballantyne, never sought once she was withdrawn as an expert.)

---

[1] As discussed below, Plaintiffs have already stated that they intend to call Dr. Lembke at trial, and hence Defendants' motion is moot as to her.

[2] The Distributors contend that the testimony of these witnesses support the defense theory that changes in the standard care explain "why the vast majority of pharmacy orders were not suspicious."  Def. Memo at 1-2.  According to the Distributors, because Plaintiffs' experts have opined that "manufacturers' deceptive marketing caused a change in the standard of care, and thereby caused doctors to prescribe opioids at vastly increased levels for long-term treatment of chronic pain," this supports their defense.  This is not so.  While certain of Plaintiffs' experts testified about changes in the standard of care, none of them testified that in light of these changes, the "vast majority" of pharmacy orders were not suspicious.  Indeed, these witnesses did not address the question of suspicious orders at all, much less connect opioid marketing to the prevalence, or lack thereof, of suspicious orders.  (Nor did any of their testimony explaining the role of the Manufacturers exculpate the Distributors from their own responsibility for the opioid crisis.)  Moreover, notwithstanding their retention of approximately 30 experts, Distributors do not identify any of their own experts that bridge the gap between changes in the standard of care and the suspiciousness of pharmacy orders.  Standing alone, the standard of care testimony from the subject witnesses would not form the basis for a defense, and hence is not relevant to the Distributors' defenses.

2

That, as they prepare for trial, Distributors may be unhappy with the depositions they took or have identified questions they wish they had asked provides no basis for a do-over depositions at this late date. Finally, Distributors' argument that they can offer Plaintiffs' expert reports as "adoptive admissions" has no basis in law or fact. These documents are hearsay for which no exception applies and should be excluded as such.[3]

## II. ARGUMENT

### A. The Distributors Should Not Be Permitted to Call Drs. Lembke, Kessler or Rosenthal at Trial

The Distributors should not be permitted to call Dr. Lembke as a witness because Plaintiffs intend to call her on their case-in-chief, and intend to do so in the first week of trial. Defendants will have every opportunity to cross-examine Dr. Lembke at that time and are not entitled to call her again after Plaintiffs rest. Indeed, the Distributors admit the relief they seek only applies "if Plaintiffs do not call them in their own case." Def. Memo. at 6; *see also* Def. Memo. at 10 ("Should Plaintiffs call these witnesses, then Distributors naturally would examine them during Plaintiffs' case."). Even if Plaintiffs did not intend to call Dr. Lembke as a witness, however, the Distributors would not be entitled to call her for the same reasons they are not entitled to call Drs. Kessler or Rosenthal, regardless of whether Plaintiffs call them or not.

Drs. Lembke, Kessler, and Rosenthal are all outside the subpoena power of the Court. The Distributors identify no doctrine under which their attendance at trial may be compelled. Indeed, the Sixth Circuit has held that a party may not be compelled to bring its own officers or employees

---

[3] The issues raised by Defendants' motion are distinct from the issues raised in Plaintiffs' Motion *in Limine* No. 8 ("MIL8"), which sought to preclude references to absent experts. On October 15, 2019, the Court granted in part and denied in part MIL8. Plaintiffs understand that ruling to be limited to the matters briefed by the parties in connection with the motions *in limine* and do not understand the ruling to address the further issues raised by Defendants' motion, which was filed with the Court after the close of business on Friday, October 11.

to trial.  *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 553 (6th Cir. 2015).  In *Hill*, the Court noted that the plaintiff could have subpoenaed a witness within the subpoena power of the court, or could have taken a deposition of a corporate officer during discovery.  Having failed to do either, the plaintiff could not compel the defendant to bring a witness to trial.  *Id.*  This is all the more true in the case of an expert witness, who is not under the control of the Plaintiffs and indeed, whom Plaintiffs must pay for his or her time to prepare to testify.  *See Sacklow v. Saks Inc.*, 377 F. Supp. 3d 870, 878 (M.D. Tenn. 2019) (noting that party does not have the power to make third-parties available for testimony).

Unable to identify a proper basis on which these witnesses can be compelled, Distributors instead accuse Plaintiffs of "inherently wrongful" conduct if these witnesses do not voluntarily testify.  This is nonsense – Plaintiffs have no obligation to call these witnesses.  The Distributors' reliance on *Steele v. Taylor*, 684 F.2d 1183 (6th Cir. 1982), is unavailing.  In *Steele,* a murder defendant caused a key witness to refuse to testify in contempt of court.  Here, Plaintiffs have not procured the absence of these witnesses; Plaintiffs may simply decline to call them as witnesses in their own case.[4]  That the witnesses happen to live outside the subpoena power of the court is a circumstance not of Plaintiffs' making and one the Distributors have been aware of for months.

The Distributors' argument that Plaintiffs have behaved wrongfully is particularly silly for two reasons.  First, at the time each side identified its expert witnesses, it was explicitly acknowledged that it was unlikely the parties would call all of the experts they identified. (Defendants identified more than 80 experts; Plaintiffs initially identified 21.  The Court suggested

---

[4] Defendants complained bitterly about the number of witnesses Plaintiffs identified and insisted that Plaintiffs dramatically cull their witness list. Now that Plaintiffs have done so, Distributors complain that Plaintiffs are acting wrongfully in failing to call these witnesses.

that 10 experts per side should be sufficient.)  Under these circumstances, no party can claim surprise that a particular expert witness is not being called by the party who identified him or her.

Second, these witnesses were made available for a total of five days of deposition, in full compliance with the discovery procedures ordered by the Court.  Defendants deposed Drs. Rosenthal and Kessler for two days each, and Dr. Lembke for one day.   The Distributors had the ability to designate portions of those deposition transcripts for use at trial.  Plaintiffs have done nothing to deprive the Distributors of the testimony of these witnesses.

No more availing for the Distributors are the authorities they cite that address the circumstances under which a party may use the testimony of an expert retained by another party. None of the cases holds or even suggests that where, as here, the witnesses in question are not within the subpoena power of the Court but gave lengthy deposition testimony, they can be compelled to attend trial. *See, e.g., DeLange Landen Op. Svce. LLC v. Third Pillar Sys. Inc.* 851 F.Supp.2d 850 (E.D. Pa. 2012) (permitting use of deposition testimony of expert); *Brigham Young Univ. v. Pfizer, Inc.*, No. 2:12-MC-143 (TS) (BCW), 2012 WL 1029304 (D. Utah Mar. 26, 2012) (permitting depositions of experts).  Indeed, Plaintiffs do not dispute that the Distributors could have designated deposition testimony of these experts.  Having failed to do so, however, the Distributors may not summon witnesses outside the subpoena power of the Court, nor compel Plaintiffs to produce these witnesses.

**B.    Defendants Should Not Be Permitted to Take Additional Depositions of Plaintiffs' Experts**

Nor should the Distributors be permitted to take additional depositions at this late date. The problem for which they seek relief from the Court is entirely of their own making.  They seek to show how changes in the standard of care that resulted from the Manufacturers' improper marketing explain the massive volume of the Distributors' opioids shipments and demonstrate that

the orders they shipped were not "suspicious." Def. Mem. at 11. This theory of defense is one Distributors were free to develop through their own experts. They also had the ability to elicit testimony from Drs. Lembke, Kessler, or Rosenthal during the 35 hours that these witnesses sat for deposition, and in fact had multiple counsel question these witnesses. Indeed, for Drs. Kessler and Rosenthal, Defendants had two days each to depose these witnesses. But Distributors are not entitled to compel these witnesses to testify at trial or sit for additional depositions at this late hour.

Obviously the imminence of trial makes the logistics of such depositions daunting if not impossible, and the burden such depositions would place on Plaintiffs as they prepare for the innumerable other aspects of this complex trial are substantial. In support of this extraordinary request, Distributors cite two cases that do not address the pertinent issues.[5] Lacking other support, Distributors simply assert that in thirty-five hours of deposition of these witnesses, they did not have the opportunity to develop the trial testimony they need.

Distributors' position is untenable and unsupportable. As to Dr. Rosenthal, Distributors acknowledge that they had two hours of questioning. They do not even begin to explain why this was inadequate. Nor do they offer any excuse for their eleventh-hour complaint – if the Distributors truly believed they did not have adequate time to examine Dr. Rosenthal at her deposition, they could have and should have sought more time in May, 2019, when the deposition was completed, not in October, 2019, on the eve of trial.

As to Drs. Lembke and Kessler, Distributors claim that nearly all of the deposition time was absorbed by Manufacturer Defendants. But the allocation of deposition time among the

---

[5] *In re N.C. Swine Farm Nuisance Litig.,* 2016 WL 3742135 (E.D.N.C. 2016) deal with a party's request for a *de bene esse* deposition of its own terminally ill expert. *Lucas v. Pactiv Corp.,* 2009 WL 5197838 (W.D. Va. Dec. 22, 2009) also deal with a request by a party for *de bene esse* depositions of its own physician experts, whose testimony were not substantially controverted, and for whom trial attendance would be a professional hardship.

Defendants was a matter as to which Plaintiffs had neither input nor knowledge.  If Distributors believed themselves prejudiced by that allocation, they needed to address that with their co-defendants and/or the Court at the time.  It was certainly foreseeable at the time of these witnesses' depositions and in the intervening months that as the result of settlement or other circumstances, the witnesses might not testify at trial.  Having failed to adequately prepare for this possibility, Defendants have effectively waived their ability to seek additional time for these depositions and cannot now seek *de bene esse* depositions.

Finally, in considering Distributors' request, the Court should be mindful of the purpose for which Distributors claim they will use the testimony of these witnesses.  They assert that testimony regarding changes in the standard of care that resulted from the improper marketing practices of others can form a defense against Distributors' practices in filling suspicious orders.  Def. Memo at 11.  But absent additional testimony from other experts linking changes in the standard of care to quantified increases in the level of opioids orders that would not be suspicious, the standard of care testimony has limited relevance and significant potential to confuse or mislead the jury.  The extraordinary procedures Distributors seek to invoke are particularly unwarranted in this context.

### C.  Defendants May Not Introduce Reports of Experts that Plaintiffs Do Not Intend to Call at Trial

Defendants argue that they are entitled to admit the reports of experts Plaintiffs do not intend to call at trial into "substantive evidence" as "adoptive admissions" pursuant to Federal Rule of Evidence 801(d)(2)(B). This is wrong as a matter of law.

As an initial matter, Plaintiffs note the irony – indeed, the impropriety -- of Defendants now seeking to introduce evidence that they successfully sought to exclude.  In their motion to exclude what they referred to as "non-economic marketing" opinions, Defendants contended that

Dr. Schumacher was: (1) unqualified to offer any marketing causation opinions because he had "no training and experience in marketing, much less pharmaceutical marketing"; (2) had no "economic training in causation analysis pertaining to pharmaceutical marketing"; and (3) lacked "experience in the complex regulatory framework that governs pharmaceutical marketing." Memorandum in Support of Motion to Exclude Marketing Causation Opinions of Mark Schumacher ("Schumacher Mem.") at 1. This Court agreed with the Defendants and limited Dr. Schumacher's testimony, holding that "Schumacher may not testify regarding the effect of Defendants' marketing efforts on doctors' prescribing practices." Doc. #2549 at 7. [6] Yet, the Distributors now argue that they should be permitted to offer Dr. Schumacher's expert report because it includes "*causation opinions about the effect of manufacturers' marketing*." Mot. at 5 (emphasis added). They offer the same justification with respect to Dr. Ballantyne. *Id.* Having successfully sought to exclude these very opinions on the basis that the experts were unqualified to give them, the Distributors may not now introduce them in their own defense.

Defendants also well know and do not dispute that expert reports are hearsay and, thus, ordinarily are not admissible as substantive evidence. Mot. at 13 n.3; *see also Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir.1994) (citing Fed.R.Evid. 702 & 703). Defendants attempt to skirt this rule by claiming in broad strokes that by disclosing the experts to Defendants, Plaintiffs' "manifested an adoption or belief in [the] truth" of their experts' opinion." Mot. at 12 (citation omitted). This is not how Rule 801(d)(2)(B) works.

As a general matter, statements of independent expert witnesses are not party admissions under Rule 801(d)(2). *See Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995) ("In

---

[6] The Court's reasoning presumably applies with equal force to Dr. Ballantyne, who also is not a marketing expert or an economist.

theory, despite the fact that one party retained and paid for the services of an expert witness, expert witnesses are supposed to testify impartially in the sphere of their expertise. Thus, one can call an expert witness even if one disagrees with the testimony of the expert."). *See also* 2 Kenneth S. Broun, McCormick on Evidence § 261, at 303 n.12 (7th ed. 2013) ("[i]n general, the opinion of an expert who was not called as a witness should not constitute an admission of the party that sought the opinion."). Instead, abundant case law spells out the hurdles a party must overcome to admit an expert report into evidence. "In the case of expert witnesses, admissibility under Rule 801(d)(2)(B) depends on a finding that the party has specifically adopted each statement at issue made by the expert, rather than treating as admissible any statement made by the witness within the scope of his agency." *Pernix Ireland Pain Dac v. Alvogen Malta Operations Ltd.*, 316 F. Supp. 3d 816, 824–25 (D. Del. 2018); *and see id.* at 824 (noting the "restrictive scope for adoptive admissions."). Thus, the rule requires an inquiry into the specific facts or positions expressed by the expert – and not a general one based on whether Plaintiffs retained and disclosed the expert.

Here, Defendants' motion fails because the position that purportedly is articulated in the reports that Plaintiffs adopted is a fiction. Defendants' motion is premised on the idea that the reports blame the opioid epidemic solely on the manufacturer defendants, and by disclosing the reports, Plaintiffs adopted this position. But the reports do not solely blame the manufacturer defendants for the opioid epidemic – they merely reflect that these particular experts were asked to opine on the manufacturer aspect of this case. There is not one word in any of the reports that exculpates the Distributors, let alone absolves them of their failure to maintain effective controls against diversion. Indeed, multiple reports specifically address the Distributors' role in causing the epidemic. *See e.g.,* Expert Report of James Rafalski, pp. 40-142; Expert Report of Craig McCann pp. 82-93. And others still explain how both manufactures and distributors contributed to

the catastrophe, including a specific analysis of past damages the Distributors are responsible for. *See, e.g.*, Expert Report of David Cutler, ¶¶ 9, 31, 72; Expert Report of Thomas McGuire, ¶¶ 8, 15, 19. And, contrary to Defendants' disingenuous argument, Mot. at 13, the Complaints themselves explain in great detail the role of both the manufacturers and distributors in causing the opioid epidemic. *See* Cuyahoga Third Amended Complaint, ¶ 9 ("This suit takes aim at *the two primary causes of the opioid crisis*: (a) a marketing scheme involving the false and deceptive marketing of prescription opioids, which was designed to dramatically increase the demand for and sale of opioids and opioid prescriptions; and (b) a supply chain scheme, pursuant to which the various entities in the supply chain failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market.") (emphasis added); Summit Third Amended Complaint, ¶ 9 (same); Cuyahoga TAC at ¶¶ 157–332 (detailing allegations against Marketing Defendants) and ¶¶ 485 – 602 (detailing allegations against Distributors and Pharmacies); Summit TAC at ¶¶ 169 – 344 (detailing marketing-related allegations against Marketing Defendants) and ¶¶ 501 – 627 (detailing diversion-related allegations).

Because the Ballantyne and Schumacher reports do not solely blame the manufacturers, or provide any evidentiary link between the standard of care issues discussed in the report and Defendants' entirely separate obligation to stop suspicious orders, it is not possible for Plaintiffs to have "adopted" this position by disclosing the experts and submitting the reports.

The Distributors acknowledge the limits of the rule, but ignore them. *See* Mot. at 13 n.3 (explaining that expert reports are hearsay and that the adoptive admissions rule requires that the statement be introduced "against [the] party" that manifested a belief in its truth.).  Here, Plaintiffs

10

have never manifested a belief that manufacturers were solely responsible for the opioid epidemic or that manufacturers' wrongful acts exculpated the Distributor Defendants – and, indeed, throughout this litigation, Plaintiffs pursued claims and developed evidence showing the Distributors' fault in the devastating opioid epidemic.

The cases cited by the Distributors do not help them, and, indeed, demonstrate the flaws in their adoptive admission argument. In *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1355–56 (5th Cir.1983), for example, plaintiffs' counsel supplied specific factual information to his expert that the expert then expressly relied on, and subsequently was not challenged by plaintiffs' counsel.  *Id.* at 783. The court determined that the plaintiffs vouched for and, thus, adopted the information that plaintiffs' counsel himself provided to the expert. Defendants cite to *Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, 789 F. Supp. 2d 777, 785 (E.D. Mich. 2011) for the proposition that disclosure of the expert is enough to satisfy Rule 801(d)(2)(B), Mot. at 12, but this grossly distorts the case.  In *Lear*, the plaintiff provided its expert with survey data that the expert then relied on to calculate damages. The court concluded that "having 'manifested an adoption or belief in [the] truth' of this data by providing it to an expert in need of information on the very subject addressed by the data, JCI established the predicate for admissibility of this data under Fed. R. Evid. 801(d)(2)(B)." *Id.* at 785. These cases are a far cry from this one.  Plaintiffs did not provide the experts with any data or information relied on by the experts that demonstrated that the manufacturers were solely responsible for the opioid epidemic, or that exculpated the Distributor Defendants, the experts never expressed these opinions, and Plaintiffs, thus, could not have and did not adopt these positions in this case by disclosing the experts.

Of course, the Distributors themselves could have blamed the Manufacturers in their answers, and could have retained experts to pursue this theory and to opine about the purported

relationship between a changed standard of care and Defendants' inability to identify suspicious orders, but they made the strategic decision not to do so. They should not be allowed to get around this failure by distorting what Plaintiffs' experts wrote in their reports and constructing a false exculpatory premise on which to build their adoptive admission argument. *See, e.g., N5 Techs. LLC v. Capital One N.A.*, 56 F. Supp. 3d 755, 765 (E.D. Va. 2014) (where a party "through reasonable efforts, could have retained its own expert … but chose not to do so, [it] must now live with the consequences of this choice and may not escape those consequences by seeking to admit defendants' expert report into evidence via Rule 801(d)(2) …."). Defendants' motion to admit reports from experts who will not be testifying at trial into evidence should be rejected.

Dated: October 16, 2019

Respectfully submitted,

s/Paul J. Hanly, Jr.
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

s/Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
6810 FM 1960 Rd W
Houston, TX  77069-3804
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com

*Lead Trial Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY  10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*

13

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing instrument was served via the Court's ECF system to all counsel of record on October 16, 2019.

<u>s/ Peter H. Weinberger          </u>
Peter H. Weinberger