# EXHIBIT A

# National Prescription Opiate Litigation Meeting

## Regarding Continuing Discovery Disputes

### January 10th, 2019



**CADY**
REPORTING SERVICES, INC.

Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

57

1  information, contrary to what Bratton said,
2  then you've got a real problem, and I'm talking
3  about summary judgment in their favor problem.
4       MS. DESH:  Okay.  So I'm just
5  trying to figure out exactly how we address
6  this issue based on the record that we have,
7  and as you've said, it's important to draw a
8  line between the dispensing and distribution
9  information.
10      SPECIAL MASTER COHEN:  Again,
11 this can be made difficult or not.  It's not
12 that difficult.  The question is fairly simple.
13 Were decisions made on whether an order is
14 suspicious, or once identified as suspicious,
15 whether to ship it, based on dispensing
16 information?
17      Dispensing information includes whether a
18 prescriber was a high-volume prescriber.  If
19 that data was collected, identified and used to
20 determine anything about shipping an order, it
21 needs to be produced.
22      MS. DESH:  And we have produced
23 the documents from the custodial files of the
24 Rx Integrity group that includes high
25 prescribers when they're talking about this,

58

1  and we've also produced additional documents on
2  top of that identifying high prescribers in
3  connection with the IMS data.  So based on our
4  review, to the extent that this was used, we
5  believe that we have produced that information.
6       SPECIAL MASTER COHEN:  Very good.
7       MR. MOUGEY:  Could I go back to
8  the question you asked?  The question you asked
9  was, are there policies and procedures written
10 down in some sort of a manual or formal
11 fashion.
12      SPECIAL MASTER COHEN:  You said
13 there isn't, and she said she's not sure.
14      MR. MOUGEY:  Fine.  So the
15 witness comes in and says, no, we're using this
16 as dispensing data.  I'm dispensing.  I took my
17 distributor suspicious order monitoring policy
18 hat off, and I'm just doing my dispensing side
19 data today.
20      In order for us to be able to
21 cross-examine these witnesses since there isn't
22 a checklist as to what to use for a manual --
23 or I'm sorry, for an override, or do we
24 increase the thresholds, do we turn the store
25 off the algorithm system, which they had the

59

1  ability to do, there is nothing in play that
2  you would go and look at for these 6, 7,000
3  pharmacies around the country, which you would
4  think that Walgreens would have.  So the fact
5  that a witness comes in and says, no, this
6  isn't what we use, our ability to cross-examine
7  witnesses is awfully convenient with the
8  absence of manuals and policies and procedures.
9       SPECIAL MASTER COHEN:  Here's
10 where I come down on this.  Given what Sharon
11 just said, and given what the Plaintiffs have
12 done in the Track One jurisdictions with their
13 claims and their agreement in CMO-1 as to what
14 they wanted, I'm going to stand pat right now
15 on this.  It may play out differently in Track
16 Two because different claims may be made.
17 Maybe you come back and get stuff that right
18 now you don't have yet because there are
19 different issues.
20      What I believe I've heard is, from
21 Sharon, is that we produced information about
22 high prescribers, and we produced everything
23 that has to do with high prescribers when that
24 information was used by Rx Integrity or any
25 other department at Walgreens that was making a

60

1  decision as to whether to ship an order.
2  That's what I'm hearing.  That's what she said.
3  I'm going to take her at her word.
4       If it turns out in continued discovery,
5  and I'm saying this for your benefit, of
6  course, in West Virginia when perhaps there are
7  prescriber claims made, and therefore, you
8  might get some additional information, that
9  that's not true, then we'll deal with that.
10      MR. MOUGEY:  Okay.
11      MR. SHKOLNIK:  Unfortunately, I
12 have to try a case here in this county.
13      SPECIAL MASTER COHEN:  I get it.
14 But I have to make that ruling, first of all,
15 based on Sharon's representations, and second
16 of all, as I've said repeatedly, what it is the
17 Plaintiffs have said about dispensing in this
18 case.  So you need to go to the next topic.
19      MR. MOUGEY:  The previous order,
20 with the understanding of what's in the
21 database and what fields there are and how far
22 back it goes, I'm assuming this is --
23      SPECIAL MASTER COHEN:  That can
24 still touch on dispensing.
25      MR. MOUGEY:  Pardon me?

61

1  SPECIAL MASTER COHEN: That can
2  still touch on dispensing. Just the question
3  of how far back does the data go and what
4  fields do we have, that's across the board.
5  MS. DESH: But just to be
6  clear --
7  SPECIAL MASTER COHEN: The
8  reports are different.
9  MS. DESH: Right. So the report
10 is, we have produced what we've identified in
11 the custodial files that the Rx Integrity group
12 actually used in the course of their job.
13 SPECIAL MASTER COHEN: Good.
14 That sounds like that's what they've asked for,
15 and --
16 MR. WEINBERGER: Did you hear
17 the --
18 SPECIAL MASTER COHEN: I heard
19 what she said, and she heard what I said.
20 MR. WEINBERGER: Okay. Okay.
21 SPECIAL MASTER COHEN: If it
22 turns out that they were using information
23 about prescriptions to make decisions about
24 whether orders were suspicious, whether they
25 were shipped, whether they should be

62

1  overridden, that should be produced. If they
2  haven't produced it in Track One, and it later
3  turns out that there was that information, then
4  there is going to be a very severe
5  repercussion. I can't be more clear than that,
6  I don't think.
7  MR. WEINBERGER: I doubt very
8  much that at Walgreens there is such a thing as
9  a distributor file versus a dispensing file. I
10 think that there is a database of information
11 that is available at various levels.
12 SPECIAL MASTER COHEN: I've been
13 as clear as I can be.
14 MR. WEINBERGER: Okay. I'm
15 sorry.
16 SPECIAL MASTER COHEN: Now
17 everybody knows what the risk/benefit analysis
18 is of standing pat or not.
19 MR. WEINBERGER: Okay.
20 MR. MOUGEY: 4, and again, this
21 just may be another just talking past each
22 other, but I think the way to understand number
23 4 is to first look at our letter --
24 SPECIAL MASTER COHEN: Let me
25 just add one point.

63

1  Hunter, if you believe there is some
2  information that you got from a deposition from
3  Mills or somebody else that would be valuable
4  for Sharon to see, then I suggest you show it
5  to her.
6  MR. SHKOLNIK: I will. We also
7  have some depositions coming up, and I think
8  they will be even more fine tuned.
9  SPECIAL MASTER COHEN: Go ahead.
10 MR. MOUGEY: 4, let's start off
11 with what I think is a fairly simplistic ask.
12 Perrysburg is one of the three distribution
13 centers across the country for Walgreens that
14 distributed Schedule II and Schedule III. At
15 various times it distributed to Trial Track
16 One.
17 Jupiter, Florida is another one of those
18 distribution centers. The DEA padlocked the
19 cage where Schedule II and III are kept in
20 Jupiter because of Walgreens' violations.
21 Walgreens started to shift some of the
22 distribution responsibilities to Perrysburg,
23 outside of Toledo, and the Perrysburg facility,
24 Walgreens, received six subpoenas and an
25 administrative warrant from the DEA. Early

64

1  '13, maybe late '12. Late '12, early '13.
2  We have asked the Court, whether through
3  both you and Judge Polster in CMO-1, that we
4  were entitled to receive documents produced to
5  the regulators.
6  So if you look at that, it's crystal
7  clear what we've asked for, what did you give
8  the regulators in prior production in response
9  to these six administrative subpoenas and the
10 warrant to the Perrysburg facility, and when
11 you look at the response is where we're still
12 confused sitting here right now about what the
13 answer is.
14 So if you look at Walgreens' response,
15 which is on Page 2 of 4, Government
16 Communications, Plaintiffs' Requests 4 and 5,
17 it says "Complete".
18 MR. SHKOLNIK: Here.
19 MS. DESH: I think he has my same
20 letter.
21 SPECIAL MASTER COHEN: I have
22 this letter. I'm not sure where you're
23 looking.
24 MR. SHKOLNIK: This is the
25 letter.