```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3

 4    IN RE:                         Case No. 1:17-md-2804
      NATIONAL PRESCRIPTION          Cleveland, Ohio
 5    OPIATE LITIGATION
                                     Wednesday, November 7, 2019
 6                                   2:26 p.m.

 7

 8

 9
                      TRANSCRIPT OF STATUS CONFERENCE
10              BEFORE THE HONORABLE DAN AARON POLSTER,
                    UNITED STATES DISTRICT JUDGE
11

12

13    APPEARANCES:              David Rosenblum Cohen,
                                Special Master
14
                                Francis McGovern,
15                              Special Master

16

17

18    (Appearances continued to Page 2.)

19

20    Official Court Reporter:  Heidi Blueskye Geizer
                                Certified Realtime Reporter
21                              United States District Court
                                801 West Superior Avenue
22                              7-178 U.S. Court House
                                Cleveland, Ohio   44113
23                              216-357-7092
                                Heidi_Geizer@ohnd.uscourts.gov
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
```

```
 1     APPEARANCES:   (Continued)

 2     For the Plaintiffs:        Peter H. Weinberger
                                   Hunter J. Shkolnik
 3                                 W. Mark Lanier
                                   Paul T. Farrell, Jr.
 4                                 Paul J. Hanly, Jr.
                                   Linda J. Singer
 5                                 Joseph F. Rice
                                   Archie C. Lamb, Jr.
 6                                 Mark P. Pifko
                                   William S. Ohlemeyer
 7

 8

 9     For the Defendants:        Donna M. Welch
                                   Charles C. Lifland
10                                 Mark H. Lynch
                                   Kaspar J. Stoffelmayr
11                                 Enu Mainigi
                                   Andrew K. Solow
12                                 Eric R. Delinsky
                                   Laura Wu
13                                 Shannon E. McClure
                                   Steven M. Pyser
14                                 John P. Lavelle, Jr.

15
                          -   -   -   -   -
16

17

18

19

20

21

22

23

24

25
```

1    AFTERNOON SESSION, WEDNESDAY, NOVEMBER 6, 2019  2:27 P.M.

2                    THE COURT:  This is a status conference in the

3    opioid MDL.  I want to discuss with everyone what the next

4    steps are.  I solicited proposals, recommendations, which

5    I've received and reviewed.

6         Obviously, and not surprisingly, the parties' counsel

7    took a different view over how to proceed, and we never

8    would get agreement on exactly how to proceed, but I wanted

9    to start off by talking about some principles that I hope we

10   can agree on.  And if we can agree on those, that will sort

11   of dictate where we go.

12        First and foremost, we have to change the paradigm.

13   Over the last year we've spent tens of millions of dollars

14   in attorneys' fees and expenses.  Huge expenditures of

15   special master time, which the parties have paid for, and

16   judicial resources, which the taxpayers have paid for.

17        We went up to the brink of trial and then we had what

18   I'll call a one-off settlement, which that's what we had.

19   It's great for Cuyahoga and Summit County.  And we also have

20   one global settlement that's being hotly disputed in

21   bankruptcy court.

22        This model isn't sustainable.  If I want to use a

23   biblical model, I'd have to be Methuselah and live a

24   thousands years, and do this one year at a time, that being

25   facetious.  So we can't keep doing it that way.

1    So it seems to me that I hope we can all agree on the

2    following principles:  That the Court should facilitate

3    global settlements when all parties are willing to negotiate

4    one.  If the parties don't want to, the parties don't have

5    to.

6    So it takes the plaintiffs, it takes the state AGs --

7    by plaintiffs, I mean the cities and counties, the

8    plaintiffs in my MDL cases -- and at least one defendant.

9    It could be more defendants, but at least one.  All right?

10   The Court doesn't force any settlements, but it's my job to

11   facilitate them if all parties want them.

12   Then we need to prepare and, if necessary, try a small

13   number of focused streamlined cases.  And by focused, I mean

14   cases that are just manufacturers, just distributors, just

15   pharmacies, with one or two legal theories that can be tried

16   in my view in about a month.  And the results should inform

17   everyone on the strengths and weaknesses of the plaintiffs'

18   cases and the strengths and weaknesses of the defendants'

19   cases, and how certain experts play out in front of a jury,

20   and certain documents, whatever, which should inform

21   everyone on going forward.

22   And in the event the plaintiffs would win, the damage

23   and/or abatement award could be informative.  That's if and

24   only if they would win.  That should be a reasonable

25   principle we all should agree on.

1      And the third one I hope we can all agree is that we

2  need to effectively utilize my resources and the resources

3  of my team, which is the three special masters and their

4  assistants.

5      So does anyone have a disagreement with any of those

6  what I'll call general principles?  If so, I'd like to hear

7  your disagreement.  (Pause.)

8      All right.  By everyone's silence, I'm going to take

9  silence as being agreement with those three principles.  I

10  mean, if someone has a disagreement, I want to hear from it.

11  I put these out, I thought they would be generally

12  applicable, but I may be wrong.

13              MR. SOLOW:  Your Honor, Andrew Solow on behalf

14  of the manufacturers.

15      To be clear, Your Honor, in concept, the second

16  principle about streamlined cases must come with caveats.

17  As set forth in our paper, the position paper of the

18  manufacturers and distributors, we do not believe it's

19  appropriate to sever cases either by defendants or causes of

20  action.  So to the extent you are looking for us to consent

21  to that, we do not.  We've laid down our objection to that,

22  and we stand by it.

23              THE COURT:  What is your objection?

24              MR. SOLOW:  We don't believe it's proper at

25  any point in the case for the plaintiffs to choose to only

1    proceed against certain defendants or on certain causes of

2    action, and leave those remaining defendants or causes of

3    action for a future time.

4         If they want to streamline the case by dismissing

5    defendants or causes of action with prejudice, that's how

6    you proceed.  But we don't think it's appropriate for a

7    plaintiff to bring a lawsuit, for example, and say we're

8    going to try the nuisance case cause of action and we're

9    just going to let the remaining causes of action sit around.

10              THE COURT:  The causes of action, you proceed

11   on causes of action; if they're dropped, they're dropped.

12   All right?  I agree with you.  We're not going to say go

13   against McKesson first on public nuisance and then next

14   month you go against McKesson on conspiracy.  No one is

15   suggesting that.

16        But are you saying that if there are hypothetically 25

17   defendants, all right, then you either have a trial with all

18   25 defendants or you don't have a trial at all?

19              MR. SOLOW:  Your Honor, our position is set

20   forth in our papers, is that --

21              THE COURT:  I'm asking you that.

22              MR. SOLOW:  And I'm answering, Your Honor --

23   is severance should be only considered after discovery is

24   completed.  It is prejudicial for parties to be sidelined

25   and not participate in discovery, pretrial motion practice,

1    and then at a later time be stuck with a case that they did

2    not participate in.

3         So we think if a severance decision is going to happen

4    about defendants, not causes of action as Your Honor has

5    conceded, that's a decision that should not be made up front

6    at the beginning portion of a case.

7              THE COURT:  Well, no one would be stuck with a

8    case if you hadn't participated.  If there was a

9    trial -- just say, all right, just say there are ten

10   defendants, and the Court says it's unmanageable, unworkable

11   to try ten cases, to try against ten defendants, so we're

12   doing five.  Okay?

13        We try that five, and then if at some future point the

14   other five are tried, they'd start again.  You'd have new

15   discovery.  There wouldn't have been discovery against those

16   five, those five wouldn't have had discovery against the

17   plaintiffs.

18        Obviously the documents are the documents, but you

19   wouldn't have to try a case with no discovery.

20        Well, all right.

21             MR. SOLOW:  We made our position clear, Your

22   Honor.

23             MR. STOFFELMAYR:  Your Honor, may I raise one

24   point briefly?  Kaspar Stoffelmayr, liaison counsel for the

25   pharmacy defendants, but I don't want to pretend I speak on

1    behalf of everybody.

2         But you know, I understand the practical issues with

3    trying to try a case with 25 defendants, obviously, but

4    there's a real concern that's been expressed by a lot of

5    people, I think, that if you start so sort of gerrymander

6    the group of defendants, it doesn't serve much purpose for

7    bellwether anymore.  Because if you think of the idea behind

8    a bellwether trial is you can't try 2,600 cases, we'll try a

9    handful to get a better understanding of what would happen

10    if we tried all 2,600, the other ones.

11         But if we try cases that don't look anything like the

12    other 2,600 because we've gerrymandered the groups of

13    defendants or the claims, the result of a trial that

14    involved only three distributors or only five pharmacies or

15    only 12 pharmacies, depending on the jurisdiction, everyone

16    is going to look at that and say, well, that's nice, but

17    that doesn't tell me anything about what would happen if you

18    tried the case of Ingham County, Michigan, as they actually

19    pled it against 25 defendants.

20         I understand you're going to say --

21              THE COURT:  The problem is when I did that,

22    Mr. Stoffelmayr, the response from the defendants are the

23    trial will take at least eight months.  All right?

24         So it's nice in theory, but it's not in practice.  So

25    we cannot try 25 defendants, and you know that.

1            MR. STOFFELMAYR:  Correct.  And I think the

2     problem here is that the cases have been over-pled against

3     way too many defendants.

4            THE COURT:  Maybe so.

5            MR. STOFFELMAYR:  And that remains the case.

6            THE COURT:  But the principle is you can't

7     try -- like Summit and Cuyahoga County started at 22

8     defendants, I believe, or families, I'll call 22 defendants

9     with maybe 8 or 10 claims, it was unworkable, unwieldy,

10    unmanageable.  By the time we were ready for trial it was a

11    manageable case, but again, that model of how it was done is

12    not sustainable.

13            MR. STOFFELMAYR:  But I think to answer your

14    question you started with, does anyone see a problem with

15    this, my problem the problem that certainly some people have

16    expressed, and I don't pretend to speak for everybody, is

17    that as a bellwether process it's not very interesting and

18    not very helpful.

19            THE COURT:  Well, the problem is we can't try

20    the kind of cases that the plaintiffs have brought, so

21    that's not an option.  I mean that's what we started with in

22    Summit and Cuyahoga County, 22 defendants and 8 or 10

23    claims, and the defendants said the trial is going to take

24    eight months.  So I said no jury can focus for eight months,

25    no Court has eight months.

1          So there was no disagreement on those principles, and

2     so I hear what you're saying, but I don't see any other way

3     to do bellwethers unless they are structured and focused.

4     And it seems to me also that it has the advantage of

5     simplicity, the jury can really focus on, all right, do the

6     plaintiffs have a case against the manufacturers.

7          Here is their argument:  The manufacturers

8     aggressively marketed these pills as being safe, effective,

9     nonaddictive, when they knew they weren't.  Can they prove

10    it, or they can't.  It's a simple principle.  Plaintiffs say

11    we can prove that, defendants say you can't.

12         Well, let's see.  With the distributors it is pretty

13    simple:  The distributors didn't do a good enough job in

14    making sure the pills went only to those people who should

15    have gotten them.  Plaintiffs say we can show their

16    suspicious order monitoring systems were ineffective, and

17    the distributors knew it.  The distributors are going to say

18    our systems were as good as we could make them, and they

19    complied with the law.

20         All right?  Again, it's simple to say that.  See what

21    a jury says with that.  Okay?  So you know, I want cases

22    that juries can understand so that no one can say, well,

23    we're going to ignore this result because this was such a

24    mish-mash, no one could make sense of it.  That doesn't help

25    anyone.

```
 1                    MS. MAINIGI:  Your Honor --

 2                    THE COURT:  Yes.

 3                    MS. MAINIGI:  Excuse me.  Enu Mainigi on

 4       behalf of Cardinal Health.

 5           I'd like to join in the objections to the basic

 6       principles Your Honor has articulated to the extent they're

 7       inconsistent with the proposed statement or proposed plan

 8       that we have filed.

 9           Let me touch on a different issue.

10                    THE COURT:  Let's stick with -- I don't

11       understand, Ms. Mainigi, what you're -- everyone wrote a

12       whole lot of different things.  Okay?  So if you're

13       saying you agree with Mr. Stoffelmayr, you want to go back

14       to 22 defendants and 10 claims.

15                    MS. MAINIGI:  I'd like to discuss a different

16       principle you'd raised, Your Honor.

17                    THE COURT:  Well, let's stick with one.  I'm a

18       simple-minded person, I want to stick with this one.  All

19       right?

20                    MS. MAINIGI:  Okay.  With respect to that

21       one --

22                    THE COURT:  Because that's the only one I have

23       heard objections to.  No one objected to the Court ought to

24       facilitate settlements when everyone is willing, and we

25       should effectively utilize my resources and the special
```

1      masters.  The only objection I'm hearing is to the second

2      one.

3                    MS. MAINIGI:  Your Honor, that's incorrect.  I

4      have an objection at least on behalf of Cardinal, I think

5      it's joined by the other distributors at the very least, to

6      the principle of effectively utilizing the resources of the

7      team to the extent that is inconsistent with the hub and

8      spoke concept that has been articulated by Special Master

9      McGovern to the parties over a period of the last six

10     months.

11         Our position is as our papers reflect, that the cases

12     that are under consideration at this point should be

13     remanded to the transferor court, and ultimately leave it up

14     to the transferor court to make a determination as to

15     whether and what assistance may still be needed.

16         But these cases Your Honor has done a tremendous job,

17     and Special Master Cohen has done a tremendous job of

18     overseeing general discovery in this matter for all of the

19     defendants.  The time has come for case-specific discovery

20     to occur, and it is our view that that ought to occur in the

21     transferor court in the particular jurisdiction.

22                    THE COURT:  Well, that's not inconsistent.  I

23     didn't say that principle number three was that I was going

24     to do everything.  Obviously, I can't.  I can't, I can't do

25     everything.  So I want to focus on are you objecting to if

1    cases are structured or remanded that they be focused?  You

2    want to go back to the 22 defendants and 10 causes of

3    action?

4                    MS. MAINIGI:  Your Honor, I do think that that

5    issue is an appropriate issue for the transferor judge to

6    take up.  I completely understand the concerns you are

7    articulating in terms of the unwieldiness, but I think the

8    proper way to deal with that is as was suggested before me,

9    for discovery to occur in front of the transferor court, and

10   then decisions related to any sort of severance or dropping

11   of claims or defendants can be made.

12                    THE COURT:  Well, I hear what you're saying,

13   and that is a way to do it, but I think it would be very

14   unfair for me to ask any other judge in the country to go

15   through what I've gone through over the past year, unless

16   you're proposing that you want to pay for a whole raft of

17   special masters at the same rate, maybe different ones, to

18   do everything that my three have done and taken all that

19   time.

20        And even then, I don't think I would ask any other

21   judge to do that.

22                    MS. MAINIGI:  Your Honor, I think that the

23   difficulty here is in part the premise that we've all been

24   discussing separately with the special masters.  The hub and

25   spoke involved as its basic core, as its basic premise, the

1    idea that the time would come when we were having these

2    discussions for remand back to the transferor court.

3         If there are a handful of cases spread out among a

4    handful of judges, I actually don't think it will be

5    unwieldy for those courts and judges to deal with those

6    particular issues.

7              THE COURT:  Do you have any idea what I've

8    been doing the last year?

9              MS. MAINIGI:  Your Honor, you have done a

10   tremen- --

11             THE COURT:  This has been unworkable,

12   unmanageable.  It was a miracle we got this case to the eve

13   of trial.

14             MS. MAINIGI:  I agree, Your Honor.

15             THE COURT:  So I'm not going to roll the dice

16   or ask anyone else to roll the dice that way.  That isn't

17   happening.  Okay?  You want that?  You know, it isn't going

18   to happen.  I hear your objection, it's overruled.

19             MS. McCLURE:  Your Honor, Shannon McClure.  On

20   behalf of my client AmerisourceBergen, I join in the other

21   objections.

22             THE COURT:  Fine.  You want to join?  That's

23   overruled, too.

24             MS. McCLURE:  Okay, fine.  Your Honor --

25             THE COURT:  This is going nowhere fast.

1          MS. McCLURE:  Your Honor, I also object to the

2     fact that --

3          THE COURT:  Object to what you want, file it

4     in writing.

5          MS. McCLURE:  Your Honor, you've requested

6     objections.  Would you like me to articulate the objections?

7          THE COURT:  All right.

8          MS. McCLURE:  Thank you, Your Honor.

9     To the extent you've articulated that silence is a

10    non-objection, we object to that point.  You've laid out

11    three principles for the first time today in court.

12    Obviously none of us have had the opportunity to discuss

13    them with our clients.

14    Second of all, to the extent that trying a case in

15    approximately a month is a realistic goal, given the

16    complexity even of the claims if you reduce them to one or

17    two and have plaintiffs dismiss with prejudice the other

18    ones, may be unrealistic.

19    Third of all, to the extent that RICO claims are tried

20    which involve conspiracies that are alleged among groups of

21    defendants, that cross-groups of defendants, trying those

22    separately is obviously prejudicial and not workable.

23    And fifth, I think that I would like the record to

24    reflect that objections articulated for one are taken for

25    the purposes of this to be objections for all so that we

1       don't have to sit here and memorialize our joinder.

2                    MR. WEINBERGER:  Your Honor, on behalf of the

3       plaintiffs, can we address a couple of these comments?

4                    THE COURT:  Sure.  This is going nowhere fast.

5       I'll just have to come up with it all myself.  I'm sorry I

6       brought everyone in here, but go ahead.

7                    MR. WEINBERGER:  I harken back to a couple of

8       hearings before that we had before we proceeded to trial and

9       settled that case, and that is that I was skeptical of the

10      possibility of both sides coming to some agreement as to how

11      we would handle remands and this hub and spoke concept, and

12      I guess I predicted correctly.

13           But having said that, you can take by our silence our

14      agreement with the principles that you've articulated, and I

15      would suggest to the Court that what you're hearing from the

16      other side is not really in a way of trying to efficiently

17      and expeditiously handle these cases as you are required to

18      do as a result of the referral from the JPML panel, but

19      rather to take advantage, take whatever advantage they can

20      in delaying this litigation.

21           And the fact that we got to a trial -- settled at 1:30

22      in the morning on the Monday before trial -- in about 20

23      short months, despite the fact that we disagreed on just

24      about everything is a tribute to you as the transferee

25      court, and the people that you had working with you, to get

1    us to that point.

2        So the fact is that our recommendation, our position

3    paper, is 90 percent squarely with where you are, Your

4    Honor, in terms of how the Court should manage this case

5    going forward.  And I think it's in accord with the

6    principles that you have suggested, and we would ask that

7    the Court consider our position seriously as you decide how

8    to go forward.

9        THE COURT:  Thank you.  I'm considering

10    everyone's position seriously.  I think I'm not going to

11    adopt the plaintiffs', I'm not going to adopt the

12    defendants'.  I'm thinking that certain things from each

13    position has merit.

14        It is pretty clear whatever I am going to do, people

15    are going to object, appeal, mandamus.  They can do whatever

16    they want.  I think what I'll probably just do is issue an

17    order, and move it.

18        MR. LYNCH:  Judge, Mark Lynch from McKesson.

19        If I could add one more principle to your list, and I

20    associate myself with all of the other remarks of defense

21    counsel here, but one more principle is these cases very

22    sorely need some appellate rulings.  And we would -- I would

23    suggest that you consider a 1292(b) certification of the

24    decisions on the motions to dismiss.  Those are still alive

25    with respect to the severed and non-settling parties, even

1    though three or four parties did settle.

2         And some appellate clarity on these issues would be of

3    enormous value moving this entire -- this whole

4    constellation of cases forward.

5         One other thing --

6              THE COURT:  Or it might bring it all to a

7    screeching halt.  So I understand that position.

8              MR. LYNCH:  Another thing I'd just like to

9    point out is you did valiant work in getting this case to

10   the eve of trial, there's been an enormous amount of

11   discovery of the defendants which essentially, I think,

12   takes care of all of the discovery at a generic corporate

13   level.

14        There may be a little bit of discovery that's

15   necessary when cases go back to a particular transferor

16   court, and you and the special masters get great credit for

17   that, but the remaining discovery is very geographic

18   specific.  It's going to relate to whatever the defendants

19   did in Huntington, West Virginia, or Chicago.  And it's also

20   going to relate to how the localities, how those

21   communities, how those governmental entities reacted.

22        So this is a situation where I think the transferor

23   courts are in a very good position to guide the discovery,

24   rather than you and a special master located in Cleveland

25   trying to figure out how the opioid crisis played out in

1   Chicago or Cabell County.

2       This is not typical of most MDLs where you have such

3   case-specific geographic discovery that needs to be done.

4   And while I don't disagree with you that there probably

5   aren't very many judges that are going to welcome having

6   these cases back on their dockets, I think really at the end

7   of the day it's the transferor judge who is going to be in

8   the best position to shape and guide the case, both in terms

9   of discovery and also in terms of dispositive motions, which

10  are going to involve the application of a state law that's

11  different than the law that you've already addressed under

12  Ohio.

13      So I would add those thoughts and those principles to

14  your list of considerations, with all respect.

15          THE COURT:  I appreciate that, and I think I

16  generally share that, and I wasn't contemplating that if I

17  remanded a case I would manage the discovery and do the

18  motions.  But I don't think it's fair or appropriate, nor

19  would it be productive to send a case to West Virginia or

20  Chicago or California, or whatever, with 22 or 25 defendants

21  and 10 causes of action.

22      That judge won't have a clue what to do and will spend

23  all of his or her time doing what I did.  All right?  I

24  mean, I would not ask one of my colleagues to do that, and I

25  just don't think that you're going to get a good result.

1          MR. LYNCH:  I understand that, Your Honor.  In

2     that regard, I think you hit the nail absolutely squarely on

3     the head earlier in your comments, where you said the cases

4     that the plaintiffs have pled can't be tried.  That's not

5     our fault, that's with the plaintiffs.

6          THE COURT:  Well, I can say this is the kind

7     of case I'm going to send, you know, I'm inclined to send to

8     West Virginia or Chicago, and if you're willing to

9     streamline your case to that you've got it.  If not, I may

10    not do it.

11         MS. MAINIGI:  Your Honor, may I add one more

12    point to the mix?  I apologize.

13         THE COURT:  All right.

14         MS. MAINIGI:  With respect to the location of

15    the cases, Your Honor, as an Ohio corporation, I do think

16    that one of the points I need to make, and I think this is

17    shared, is that if we are really going to move this MDL

18    along, if these next set of cases are really going to serve

19    as bellwethers or representative cases that can advance

20    resolution here ultimately, get us closer to settlement,

21    none of the cases that get remanded or get put up for

22    discovery should be from Ohio.

23         Ohio has been litigated, the case law has been

24    decided.  We don't think it would be appropriate to have any

25    more cases from Ohio in the next set of cases that go

1    through discovery.

2         Now, for some of the jurisdictions there's very

3    specific reasons.  For the city of Cleveland, as everyone

4    recalls, there were great discovery abuses that occurred

5    that led to the city of Cleveland no longer being in the mix

6    and put behind Track 2 with respect to moving forward.

7         But the general principle that the MDL, if it's going

8    to be successful, ought to be taking into account law from

9    other jurisdictions so that there is ultimately movement in

10   the entire MDL I think rings true.

11        I think that there's also a concern that if it is Ohio

12   again that is in the mix or is one of the cases in the mix,

13   we've got a concern that particular counties, cities, are

14   really going to reap the benefits that come early with a

15   bellwether that is not being shared by other jurisdictions

16   all over the country.

17        So I did want to note that principle as one that

18   underscores our proposal.

19                  MR. LYNCH:  And as a non-Ohio-based

20   corporation, we would agree with that as well.

21                  THE COURT:  I've been giving that a lot of

22   thought.  On the other hand, a great deal of work was done

23   to gear up for this trial.  I also have Track 1B.  All

24   right.  There needs to be a pharmacy case, and in my view

25   pharmacies as dispensers.  That was specifically not

1    developed here.  It needs to be developed, and there has to

2    be a trial worked up on that.

3          So the question is which case should that be, and I've

4    got some ideas.

5                MR. STOFFELMAYR:  Your Honor, could I address

6    that?  Because I think that's probably uniquely important to

7    us, of course.

8          You know, I completely agree that that is a theory of

9    liability that has not been worked up, and that will be an

10   enormous project to work that up.  It is a completely

11   different theory of liability involving obviously different

12   facilities, different witnesses, different regulatory

13   regime, both at the state level and the federal level.  In

14   many ways a much bigger case and much more complicated case

15   because it is a more granular theory of liability than what

16   we saw on the distribution side.

17         There are a lot of cases that have pled that theory of

18   liability.  As you know, it has not been pled so far in the

19   Track 1 complaints.  There's a motion to amend pending.  It

20   has been pled in the Track 2 complaints and, rough numbers,

21   I want to say half the cases in the MDL, not all; but maybe

22   it is more than half.  I don't want to promise I've got the

23   ratio right.

24         So there are plenty of opportunities to do that that

25   are consistent with, I think, some of the thoughts I think

1    you heard articulated, that it would be useful to the

2    parties to explore cases under different legal standards,

3    not just to revisit Ohio law.

4         But the other thing that I think is really important,

5    thinking about Track 1 specifically, and this probably would

6    include Cleveland and Akron, is that my experience and I

7    think most people's experience with how a bellwether process

8    is really useful, is getting a verdict is in some senses the

9    least important part of the process.

10        It can be important, obviously, but what a lot of

11   people would say, and I have certainly heard MDL judges say,

12   is forcing the parties to work a case up and get it ready

13   for trial is what is truly educational in forcing parties to

14   learn their case, really think about what is the expert

15   actually going to say about this, not just hypothetically

16   what I think an expert could say.  What does this case

17   really look like.

18        And from that perspective, whether we're talking about

19   a pharmacy case or a distribution case or a manufacturer

20   case, we already know probably most of what there is to know

21   about the case brought by Cuyahoga and Summit Counties.  We

22   know nothing about what a case looks like if it's brought by

23   a large coastal city.  We know nothing about what one of

24   these cases would look like brought by a rural community.

25   We know nothing about what one of these cases would look

1    like brought by an Indian tribe.

2         And all of these are going to look very different in

3    important ways.  From one perspective you could say, well,

4    the liability theory is the same no matter what.  The way

5    the opioids crisis has affected communities varies

6    enormously, the way prescription pills rather than illicit

7    heroin plays into that crisis varies enormously by

8    community.  And perhaps most importantly, what communities

9    have done to respond to the crisis, the kinds of services

10   they have provided and want to provide varies enormously.

11        So if we think of the bellwether process as an

12   educational process for the parties not just to get the

13   verdicts, but to learn cases and learn about cases, very

14   little is gained by redoing the same case over and over

15   again, and a lot could be gained with no real loss in time

16   by moving to other cases in other jurisdictions.

17             MR. WEINBERGER:  Your Honor, specifically to

18   address Mr. Stoffelmayr's comments, he must have read our

19   position paper, because our position as to how the cases

20   should proceed and which ones should be remanded does

21   exactly what it is that Mr. Stoffelmayr is suggesting in

22   terms of it exposing this litigation to a whole wide variety

23   of different plaintiffs and different causes of action.

24        As to the claim that our adding dispensing claims

25   somehow will create this complex long litigation, our

1    complaints have always included factual allegations

2    regarding dispensing conduct.  And the amended complaint

3    that we have filed gives more clarity to how it is the

4    dispensing claims should proceed.

5         And we are prepared to put together a discovery plan

6    with respect to those dispensing claims that I think will

7    demonstrate that we can -- we don't have to spend years

8    working up that case, that it very much what has been worked

9    up includes factual facts and discovery that will apply to

10   the dispensing claims.

11        And then finally, with respect to the comment about

12   the city Cleveland and its alleged abuse of discovery, I

13   can't leave that comment unaddressed.

14        In this litigation, city of Cleveland has produced

15   almost 700,000 documents, 5.5 million pages of documents.

16   And we continued on behalf of the city of Cleveland to

17   produce discovery even after Cleveland was severed from this

18   case, so much so, Your Honor, that eight of the city of

19   Cleveland witnesses who were deposed by the defendants were

20   on the defendants' witness list for purposes of this trial.

21        So to suggest that Cleveland and Akron should not go

22   forward as a bellwether based upon this allegation with

23   respect to the city of Cleveland just does not hold true.

24             THE COURT:  Well, to be fair, I don't want to

25   have a long discussion of this, but there were some very

1    significant problems in discovery that led to Akron and

2    Cleveland being severed out, and that's a fact.  That's why

3    we had to do it.

4        So no one is disputing that the city of Cleveland and

5    the city of Akron produced a large number of documents and

6    there were a large number of witnesses being deposed, but

7    there was a problem with the timeliness.

8                    MR. WEINBERGER:  Much of which, Your Honor,

9    was rectified subsequent to the severance.

10                    THE COURT:  I guess I wasn't tracking it then.

11                    MS. WU:  Your Honor, this is Laura Wu from

12    McKesson.  If I could speak very briefly to the Cleveland

13    issue.

14        As you may recall, Cleveland was seriously far behind

15    in discovery, threatening the schedule that you had put in

16    place for the bellwether trial.  The defendants were

17    prepared to seek relief, specifically including the

18    dismissal of Cleveland's claims based on the egregious

19    conduct that went forward over a period of months in

20    discovery, specifically including Cleveland's repeated

21    denial of the failings defendants had worked very hard to

22    uncover.

23        Defendants were prepared to move and, counseled by the

24    special masters, held off to allow Your Honor to have a

25    solution to allow the bellwether trial to go forward.

1          As you will also recall, you ruled that Cleveland was

2     essentially put in the penalty box for its conduct,

3     Cleveland could not go forward for trial until after Track

4     2, and there's no reason to change your prior rulings.

5                    THE COURT:  Well --

6                    MR. PIFKO:  Your Honor, Mark Pifko from Baron

7     & Budd, on behalf of Cleveland.  I would like to address

8     some of the comments that have many made.

9          First, it cannot be disputed, setting a trial date as

10    soon as possible would further the interests of resolving

11    this case.

12         As you know, on October 18th we had the first global

13    mediation with the distributors, and what drove that October

14    21st trial date.  Cleveland and Akron are undoubtedly, even

15    if there were issues, the next plaintiffs that are ready to

16    be tried in this litigation.

17         Now, Cleveland was a little delayed, but we've

18    completed our production.  We had an independent consultant

19    verify the collection.  That was completed in February.  And

20    the document production was completed in March.

21         And as Mr. Weinberger said, many of Cleveland's

22    witnesses were on the trial list.  About ten percent of the

23    defendants' document exhibits in the trial were from

24    Cleveland.  So the notion that Cleveland wasn't ready or

25    should be punished is false.

1          And I also want to add that when the severance order

2    was issued there was the notion -- that was entered in

3    February of this year, there was the notion that we were

4    going to set and start discovery in CT-2 and that we were

5    going to actually have a CT-1 trial, and neither of those

6    things have happened to date.

7          So the reason -- if we were going to have a CT-2

8    trial, we had started discovery back then, then sure it

9    might make sense -- we might be having that trial now, and

10   it might make sense to have Cleveland after that.  But we

11   never had that trial, and there hasn't been any discovery

12   produced in CT-2, so the reason for that sentence just

13   doesn't hold water anymore.

14         And again, I think it would be in the best interests

15   of the entire litigation to move forward with the

16   distributor case trial by Cleveland and Akron, who are

17   completely ready to go.

18              MS. WU:  Your Honor, Laura Wu from

19   McKesson --

20              THE COURT:  I don't want to do a lot of back

21   and -- there were problems with Cleveland, everyone knows

22   that.  That's why Cleveland was severed out.  So I don't

23   really need to revisit.  I know the history.  I'd rather not

24   have more of a public airing on that.

25         All right.  Look, I believe that what should be done

1    is there should be a focused trial against the big three

2    distributors, a focused trial against the manufacturers, and

3    a focused trial against the pharmacies as whatever the

4    pharmacies do.  Some of them distribute, all of them

5    dispense; whatever, the pharmacies.

6         And I think there should be only one or two causes of

7    action.  There's public nuisance.  I'm not sure if you need

8    conspiracy.  I don't know conspiracy, to do what.  But in my

9    view, it's public nuisance is the main one.

10        I don't really care where those are tried.  They

11   should be representative.  The parties seem to agree

12   that -- Track 2 is Huntington and Cabell County, so that's a

13   logical place to have one of them.  All right? I don't think

14   it matters which one.  All right?

15        Chicago, everyone is talking about Chicago.  That's

16   been worked up, there have been motions.  You know, there

17   are apparently local ordinance causes of action, that makes

18   that simple and streamlined.  That's a logical one.

19        Plaintiffs suggested California.  I think it makes

20   sense that San Francisco County and state, I think it makes

21   sense to have one on the west coast.  Again, it should

22   be -- I don't care who it is.

23        And then I want to have one tribe case, and it seems

24   to me rather than doing that I would logically go with the

25   Cherokee Nation.  It's far and away the largest tribe.  If

1     we're going to do one, I don't think it should be a real

2     small one.  We might as well do a large one that probably

3     covers -- that's a logical one to do.

4          So that's four cases.  Now, potentially there could be

5     one case in -- I could do one.  All right?  Potentially I

6     could do -- Track 1B could be the pharmacy case, because we

7     severed all the pharmacies.  They were all severed early,

8     and then Walgreens was severed at the end, when the

9     distributors all settled.  So potentially I could do that.

10    I don't have to, but I'm not trying to just export all the

11    trials, but that's one I could do.

12         It's logically still there.  It could be Summit and

13    Cuyahoga County against the pharmacies, and I'm willing to

14    do that.  It seems to me that -- I was thinking of a four or

15    five-week trial, and the plaintiffs were suggesting it could

16    be done in the spring.  I don't think that's realistic.  I

17    think it would be -- I was thinking of roughly a year, like

18    next October, because I was looking at the kind of schedule

19    we had.  It seems to me that would be doable, but again, I

20    don't have to do it.

21         But if we're going to do that there wouldn't be any

22    more severances.  These would be the cases.  There wouldn't

23    be a West Virginia Track 1-BC, there would be a West

24    Virginia case.  It would be just say hypothetical against

25    the big three distributors, and one or two causes of action,

1    and that would be it.  The other causes of action would be

2    dismissed and so would the other defendants, and that's what

3    would go forward, and that judge would manage it.

4         We do one in Chicago.  I mean, the plaintiffs have

5    suggested manufacturers only Chicago.  Distributors, big

6    three distributors only in West Virginia.  That's fine.

7         They suggested California, I think we might as well

8    have one there.  I don't know who the defendants are.  I do

9    not suggest sending to a California colleague 25 defendants

10   and 10 causes of action.

11        And then we need a pharmacy case.  If that's the one

12   to go to California, if the parties want to send it to

13   California, fine.  As I said, I think we need -- and then we

14   have a tribe case, and I guess the tribes are sort of -- I

15   haven't figured out which defendants and which causes of

16   action fit for the Cherokee case.  The parties can figure

17   that out.

18        So that's sort of where I'm coming from.

19             MS. MAINIGI:  Your Honor, if I may.  I think

20   it's extremely valuable to get your thoughts on these issues

21   because we haven't had the benefit of them yet.  One

22   suggestion and one comment.

23        The suggestion that I have is there was not much

24   opportunity to really meet and confer prior to today about

25   our respective proposals, just given the timing of when

1    people sent them in, and there just wasn't a lot of

2    communication about it last week.

3        I would suggest with the benefit of having seen each

4    other's proposals, as well as the guidance Your Honor has

5    provided, that perhaps we take some more time, just a short

6    amount, to see if we collectively can present a plan to you

7    that has the sign-off of both the defendants as well as the

8    PEC, just as a way to present Your Honor with something that

9    incorporates your ideas as well as incorporates the major

10   elements that each side cares about.

11       I think that that certainly would be possible given

12   some of the comments that you have made, and so I would

13   suggest we take the time to do it.

14       One minor note that I'll just make for the record,

15   with respect to the Cherokee Nation case that you mentioned,

16   I do think that that is an extremely complex case that could

17   bog down.  A lot of discovery in that --

18           THE COURT:  Then maybe it needs to be -- I'm

19   suggesting that be streamlined, too.  I don't want to send

20   to my colleague in Oklahoma 25 defendants and 10 causes of

21   action.  I mean, as I said, I'm not -- look.  Any of my

22   colleagues could do what I did.  I'm not saying they

23   couldn't do it.  I think it would be unfair and

24   counterproductive.

25       It seems to me that that's something for me to do in

1     conjunction with the parties, is send a case which we all

2     know can be tried -- okay?  Not an "if" -- rather than

3     sending one which we know can't be tried.  Why would we do

4     that.  I mean, it just doesn't make sense.  If we all know

5     the case can't be tried, why send it, and say, Judge, we

6     know you can't try this case, it's up to you to figure it

7     out.  Do what Polster did over the course of a year.

8                    MS. MAINIGI:  Your Honor, with respect to

9     Cherokee Nation, it's the difficulty is really the opposite

10    to some extent, in that the discovery for any one defendant

11    even of Cherokee Nation would involve discovery of 14

12    different counties in Oklahoma, 50 different law enforcement

13    agencies in Oklahoma.

14         So the plaintiffs' side, the discovery defendants need

15    to do of the plaintiffs' side is quite complex and would

16    take a tremendous amount of time.

17         But I hear what Your Honor is saying --

18                    THE COURT:  Well, I hadn't focused on that,

19    and that's a good point.

20                    MS. MAINIGI:  And I requested that you give us

21    time to continue to meet and confer on this, and perhaps

22    present a unified plan.

23                    MR. SOLOW:  Your Honor, Andrew Solow for the

24    manufacturers --

25                    THE COURT:  Let me -- it's the Cherokee

1    Nation, the people reside in that, but they don't -- you are

2    not going to be doing discovery of counties, would you?

3                   MS. MAINIGI:  Well, with respect to costs,

4    Your Honor, for example, and causation type of issues, as

5    well, those would involve the 14 counties and 50 different

6    law enforcement agencies.

7                   THE COURT:  Well, the entities, the Cherokee

8    Nation is bringing the case and seeking damage on its own

9    behalf.  So any expenses, whatever, it comes from the

10   Cherokee Nation.  It wouldn't be through any county or

11   county facilities.  It would be here is what the Cherokee

12   Nation claims that they've spent addressing the opioid

13   crisis for its members.

14                  MS. MAINIGI:  But --

15                  THE COURT:  They provide healthcare and

16   services.

17                  MS. MAINIGI:  But the Cherokee Nation has also

18   received assistance from those 14 counties and law

19   enforcement, so they would certainly be a basis for

20   discovery.  I'm not saying they would be parties, Your

21   Honor, obviously these counties and law enforcement

22   agencies.  My point is simply, and I didn't mean to get us

23   bogged down on this, but --

24                  THE COURT:  Look.  I picked them because

25   they're the largest.

1          MS. MAINIGI:  They're the largest, and

2   unfortunately they're the most complex.

3          The other complication, Your Honor, with the Cherokee

4   Nation is we already have a ruling in Oklahoma.  So to the

5   extent that we are trying to explore the laws of other

6   jurisdictions in an effort to cut a wide swath here on

7   rulings on case-specific workup related to other

8   jurisdictions to help bring about resolution, I'm not sure a

9   case in Oklahoma, where there's already been

10  substantial -- there's been a substantial ruling and

11  abatement money going back to the state of Oklahoma, which

12  will benefit the Cherokee Nation.

13          THE COURT:  Was there a settlement in Oklahoma

14  for abatement money?

15          MS. MS. MAINIGI:  There was a judgment in

16  Oklahoma, in the Oklahoma case, Your Honor, and two

17  settlements, Your Honor.

18          THE COURT:  Oh, right.

19          MR. OHLEMEYER:  Your Honor, if I may.

20          THE COURT:  Yes.

21          MR. OHLEMEYER:  Bill Ohlemeyer for the

22  Cherokee Nation.

23          With respect, I disagree with most of that.  It's not

24  as complicated as that.  It is a claim, as you have said,

25  brought on behalf of the Cherokee Nation which provides for

1      its members healthcare, law enforcement, social services.

2      It is as if it were a self-contained, as it is, sovereign

3      unit within the state of Oklahoma.

4           It doesn't require discovery of 50 different -- or 12

5      different counties or 50 different agencies.  It's a case

6      brought by a sovereign, just as if the state of Oklahoma had

7      brought a case on its behalf, which it did.

8           It's a relatively simple case.  There's only six

9      defendants in the case.

10                    THE COURT:  Who are the defendants?

11                    MR. OHLEMEYER:  The defendants are McKesson,

12     AmerisourceBergen, Cardinal; then Walmart, CVS, and

13     Walgreens, each of which is also a wholesaler as well as a

14     retail dispensary.

15                    MS. MAINIGI:  Your Honor, with respect to a

16     representative tribal case, the parties seem to be in

17     agreement that the Fond Du Lac case, which is in a brand new

18     jurisdiction, would be an appropriate case to work up.  I

19     don't think we need two tribal cases worked up, and I think

20     Fond Du Lac would have much greater, wider applicability and

21     could be done much more quickly.

22                    MR. SOLOW:  Your Honor, we also believe

23     whatever the tribal case selected, it should remain in

24     federal court.  That is something that the manufacturers and

25     defendants put into our proposal.

1            THE COURT:  I wasn't suggesting it go to state

2    court.

3            MR. SOLOW:  Well, Your Honor, there could be

4    an issue of a motion for remand back to state court, so we

5    think it should be a condition that whatever the tribal case

6    is --

7            THE COURT:  Well, that's for sure.  I'm not

8    remanding a case to federal court that's going to go to

9    state court.  I don't think anyone is contemplating that.

10            MR. SOLOW:  Great, Your Honor.

11        Next point on the city of Chicago, or otherwise known

12    as Chicago 1, the manufacturer case, it looks like the

13    parties are in agreement about that case as the manufacturer

14    case.

15        Your Honor, however, it strikes us as an odd request

16    from the plaintiffs that is not aligned with Your Honor's

17    principles, particularly the third one, that a case where

18    rulings have already been made by the district judge and

19    discovery rulings have already been made by the magistrate

20    court for Your Honor to then hold on to the case, decide

21    issues of amendments and discovery, and then send it back

22    for dispositive motions.

23        Our view is that case in an effectively use of your

24    resources would be remanded right now to that judge and that

25    magistrate who already have experience.  It simply doesn't

1      make sense, Your Honor, for you to be now making rulings

2      after another judge, and then when it's already contemplated

3      in both sides' parties that the trial judge will be making

4      additional rulings.

5                    THE COURT:  Well, if a case is remanded to

6      Chicago, the judge in Chicago will be handling the case.

7                    MR. SOLOW:  That's our view, it should be

8      remanded now.  The PEC's proposal is that first there should

9      be additional discovery and motion practice here before

10     remand.

11                   THE COURT:  Well, my basic thought is that if

12     I remand the case I remand the case, and that judge handles

13     it the way he or she sees fit.  If they want some help they

14     can ask for help, but it's that judge's call.

15          The only issue would be what to do if they were

16     fully-briefed motions that exist now, whether I should

17     decide them or that judge should, and there are probably

18     good arguments either way.

19          But I wasn't proposing that I would remand the case to

20     a judge in Illinois or California and I would somehow be

21     doing it.

22                   MR. SOLOW:  No, Your Honor, not to suggest you

23     would be doing anything after remand.  Our point is that the

24     remand should happen immediately.  Nothing further needs to

25     be done now.  Any remaining motion practice or discovery can

1    be done after remand.

2                    THE COURT:  Right, but the issue is what if

3    there is a fully-ripe motion right now.

4                    MR. SOLOW:  Candidly, Your Honor, it doesn't

5    make sense under your principle three for you or your

6    special masters to do it when there is a federal judge who

7    has already ruled on motion practice in that case and a

8    magistrate that's already made discovery rulings.  They're

9    well familiar with the case --

10                   THE COURT:  You are talking about the Fond Du

11   Lac case.

12                   MR. SOLOW: -- and could adjust easily --

13                   THE COURT:  It is my understanding that the

14   only defendant in that case is Mallinckrodt, and that

15   doesn't make sense to send a case with only one defendant.

16                   MS. MAINIGI:  We're double-checking, Your

17   Honor, but I don't think that's correct.  There's two Fond

18   Du Lac cases, I think.

19                   MS. SINGER:  Your Honor, this is Linda Singer

20   with the PEC.

21       While they are checking on the Fond Du Lac case, just

22   to speak to the city of Chicago issue, there are

23   fully-briefed motions pending before Your Honor.  And the

24   reason that we have suggested that you handle certain

25   discrete issues is because they are issues that you have

1    previously considered and ruled on, and that are no

2    different for the city of Chicago.  For instance, the

3    manufacturers' responsibility for their distribution of

4    controlled substances.

5         The Mallinckrodt case was not before the city of

6    Chicago court when it was transferred here.  That's an issue

7    Your Honor knows well.

8         And again, consistent with your principles of using

9    your resources and leveraging the knowledge you have

10   developed over this case and the rulings you have made, and

11   moving cases quickly and efficiently to remand courts, it

12   seems to make sense for those discrete issues to be decided

13   by Your Honor so the case goes back to a federal district

14   court --

15                  THE COURT:  That may make sense.  If I have

16   ruled on the same argument, then it probably makes sense for

17   me to rule on at least that motion or that portion of it,

18   because for consistency.

19                  MR. SOLOW:  Respectfully, Your Honor, we

20   disagree.

21                  THE COURT:  That's ultimately for me to

22   decide.  I can do it either way.  The law permits either

23   one, and I can do it.  I'll figure that out.

24        Again, I'm not going to -- a tribe case with only one

25   or two defendants would not be a good case to remand.

1              MS. MAINIGI:  The Minnesota Fond Du Lac case

2     does have multiple defendants, Your Honor, but I come back

3     to the idea that this is too important for us to kind of

4     decide on the fly.

5              THE COURT:  I'm just saying as a matter of

6     principle, I'm not going to remand any case --

7              MS. MAINIGI:  I understand.

8              THE COURT:  If West Virginia only had one or

9     two defendants, I wouldn't be considering it.

10             MS. MS. MAINIGI:  But I do think it would be

11    valuable, Your Honor, for us to get a little bit more time

12    to see if we can reach agreement on some of these issues,

13    with your guidance.

14             MR. DELINSKY:  Your Honor, Eric Delinsky on

15    behalf of CVS.

16        I would just like to second Miss Mainigi's motion for

17    the opportunity now to a take breath after having heard your

18    thoughts and to have a meaningful meet and confer with

19    plaintiffs.  I think we now understand what your vision for

20    this is, at least I for one, I didn't before, and I do now,

21    and I think that is a logical next step.  And then set a

22    time to report back to you in one form or another.

23             MR. RICE:  Your Honor, Joe Rice on behalf of

24    the PEC.

25        If Your Honor is going to delay this any further, put

1    a strict deadline, a strict timeline on it.  Because we've

2    had three or four calls with Professor McGovern on the

3    remand process, and people always said we need 30 days to do

4    this or 45 days to do this.

5         That is not needed here.  If they want to take a

6    couple of days --

7              THE COURT:  This is what I am going to do.

8    I'm going to give the parties a week from today, noon on

9    next Wednesday.  Today is the -- that's the 13th.  Noon on

10   Wednesday, November the 13th.

11        And what I want, I want a distributor case, I want a

12   manufacturer case, I want a pharmacy case, and I want a

13   tribe, Native American tribe.  All right?  And I want you to

14   agree on those four cases and where they should be, which

15   ones they are.

16        If you all can't agree I'll pick one, and I'll make

17   it.  Okay?  And I will dismiss claims.  If you all can't

18   agree, I'll do it myself.  And you want to all appeal to the

19   Supreme Court, be my guest.

20        But the cases will be streamlined and they'll be

21   focused, so any judge who gets that case will know how to

22   try it.  And once we do that, I'll figure out if there are

23   dispositive motions fully briefed in any of those cases,

24   whether I should decide them.

25        You can give me your opinion on that.  Again, that's

1    my call to make.

2                    MR. SHKOLNIK:  Judge Polster, Hunter Shkolnik

3    on behalf of Cuyahoga County.

4                    THE COURT:  Yes.

5                    MR. SHKOLNIK:  With respect to the potential

6    four cases, would that also include the potential CT-1B,

7    which is fully worked up here, or --

8                    THE COURT:  As I said, any of these cases

9    could be -- well, the only one, the only one that could be,

10   Summit and Cuyahoga would be the pharmacy.  Obviously it

11   can't be the manufacturers, it can't be distributors, and it

12   can't be the Native American tribe, Mr. Shkolnik.

13        So potentially number three could be -- I mean, I

14   threw it out as a possibility.  It's there, the case exists

15   now.  It's actually on my docket.  That's essentially 1B

16   with some streamlining.  So that could be one.  I'm not

17   saying it has to be, but it could be, it could be 1B. And

18   I'm obviously willing to do it.

19        The point of this, as I say, everyone knows an MDL

20   Judge can only try cases in his or her district absent full

21   consent, so I could do the pharmacy case.

22        So the idea would be these would be streamlined, it

23   would be only those defendants and those causes of actions,

24   and other defendants and causes of actions would be dropped,

25   and those cases would be tried.

1          And I'm confident that I could identify with the MDL

2     panel's help three or four judges in other jurisdictions to

3     expeditiously try these cases.  And I think it would be -- I

4     know I can do it if they're streamlined and focused, because

5     I can find colleagues in conjunction with the JPML to do it.

6     And they would understand that the trial would need to be

7     expeditious, obviously giving fair time for discovery, but

8     expeditious.  That's the whole point.

9          So hopefully you can use this discussion and what the

10    Court has said to come up with this.  If the parties fail

11    to -- can't come to agreement, you know, I guess give me

12    your competing proposals, and in very short order I will

13    issue an order, and that will be -- obviously it will be

14    suggestion, because any remand, I can't remand -- as

15    everyone knows, I cannot remand a case on my own.

16          I can make a suggestion of remand to the panel.  I

17    would think they'll agree to it, but I only have authority

18    to make a suggestion.

19                MS. MAINIGI:  Your Honor, thank you for the

20    additional time.  I think that will be helpful, and we will

21    work diligently during that time.

22                THE COURT:  I have the best lawyers in the

23    country, and I believe that you can do this.  I'll be very

24    disappointed if I just get a proposal from the

25    manufacturers, a proposal from the distributors, a proposal

1    from pharmacies, and a proposal from the plaintiffs.  If I

2    do, you know, I'll just come up in very short order with my

3    own, and that will be that, but I believe you can do this.

4         And again, I want you to really spend some time on the

5    Native American tribe cases.  It is very important that we

6    have one, but it's got to be doable, and it should be not

7    atypical.  Okay?

8         Obviously each Native American tribe is separate.

9    Some are large, some are small.  Some are in a very large

10   geographic area, some are probably just in one county.  But

11   since we're only going to have one, I want it to be a -- I

12   don't want people to say, well, this is totally

13   idiosyncratic and it is a very bad case to pick.

14        So we can work on that.

15             MR. LAMB:  Your Honor, Archie Lamb on behalf

16   of the Tribal Leadership Committee.

17        We've got a really hard-working committee.  We have

18   presented the papers outlining the Cherokee as the most

19   likely remand.

20        Your concern -- our concern is relative to the

21   abatement of the smaller tribes.  We have an agreement

22   internally to include the abatement should you choose to

23   send it back to Oklahoma.

24             THE COURT:  I didn't quite follow that.

25             MR. LAMB:  What I'm saying is we have an

1    agreement to make sure that the abatement model covers all

2    tribes, even if it's the Cherokee tribe.  The abatement

3    model is the most important for the remote tribes.

4         What we're saying, what I'm saying is the position we

5    presented is the position that we're going to maintain.  And

6    I don't want you to be thinking that there are other issues

7    relative to prosecuting the Cherokee case.

8              THE COURT:  Clearly one of the theories are

9    going to be public nuisance, and the Court has already ruled

10   that public nuisance -- well, I only did it for Ohio.  I

11   don't know what the law is in Oklahoma.

12        In Ohio I ruled that public nuisance liability is for

13   the jury.  If the jury finds liability, remedy is for the

14   Court in a subsequent proceeding.

15        And if, say hypothetically, Mr. Lamb, the Cherokee

16   case is picked, if that's the way Oklahoma law works, then

17   the jury would decide public nuisance liability.  If the

18   jury determines that there is public nuisance liability

19   against one or more defendants --

20              MR. LAMB:  Remember, Your Honor, Muscogee

21   Creek has survived motions to dismiss on Oklahoma law in

22   this court.  Those decisions have already been made.

23              THE COURT:  I'm just saying if Cherokee is

24   tried and the jury finds public nuisance liability, then

25   that would be for the judge to determine public nuisance

1    abatement for the Cherokee tribe --

2                    MR. LAMB:  Correct.

3                    THE COURT:  -- not for the whole country or

4    all the other tribes.

5                    MR. LAMB:  But I think the metrics of that

6    abatement model is what would apply universally.  That's our

7    point.

8                    THE COURT:  I would hope it might, but again,

9    that would simply be by agreement.  The judge would just

10   focus on abatement for the Cherokee Nation and make the

11   decision.

12                   MR. LAMB:  All right.  Thank you, Your Honor.

13                   THE COURT:  All right.  Is there anything

14   anyone else wants to comment on?

15        So hopefully it's just one submission.  File it by

16   noon next Wednesday, and then the Court will very promptly

17   issue the appropriate order or orders.

18                   MS. MAINIGI:  Thank you, Your Honor.

19                   THE COURT:  Thank you all.

20                        -  -  -  -  -

21        (Proceedings adjourned at 3:34 p.m.)

22
                     C E R T I F I C A T E
23        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
24
                      s/Heidi Blueskye Geizer_____ November 7, 2019
25                    Heidi Blueskye Geizer                 Date
                      Official Court Reporter