UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 1:17-md-2804 |
| ALL CASES | Judge Dan Aaron Polster |

**DISTRIBUTOR DEFENDANTS' PROPOSAL REGARDING SELECTIVE REMAND AND OPPOSITION TO PLAINTIFFS' PROPOSAL**

At the November 6, 2019 hearing, the Court provided a set of principles to guide selection of a small number of cases for remand to transferor courts:

- That four cases be selected—"a focused trial against the big three distributors, a focused trial against the manufacturers, and a focused trial against the pharmacies as whatever the pharmacies do," and a tribal case, Dkt. 2913 at 28:25–30:4; *see also id.* at 42:11–13 ("I want a distributor case, I want a manufacturer case, I want a pharmacy case, and I want a tribe, Native American tribe.");

- That each case contain only "one or two causes of action," *id.* at 29:6–7;

- That the four cases "be representative" of the cases in the MDL, *id.* at 29:10–11; and

- That the transferor courts would manage the cases going forward, including discovery and motions practice, *id.* at 19:15–18.

The Court spoke approvingly of the suggestion to remand the *City of Chicago* case against the manufacturers and one of the West Virginia cases (*Cabell County* or *City of*

1

*Huntington*) against the "big three distributors."  The Court also noted that a case in California or Track 1B could be the pharmacy case.  *Id.* at 30:5–7; 31:4–6.

Distributors'[1] proposed remand plan (below) is consistent with these four principles, as well as prior guidance provided by the Court and Special Masters, including Special Master McGovern's recommendation that, in light of other opioid trials already docketed for 2020 and 2021, no manufacturer, distributor, or pharmacy should be a defendant in more than two of the remanded cases.  Distributors' proposal also is consistent with the "hub and spoke" model, which Special Master McGovern has discussed with the parties for months, and which would allow the MDL to be maintained ("hub") while certain cases proceed in the transferor courts ("spokes").

Plaintiffs represented to the Court in their "supplemental submission" filed yesterday (November 12) that they have been meeting and conferring with Defendants "in an attempt to reach agreement by the Court-imposed deadline of 11/13/19," Dkt. 2921 at 1, but Plaintiffs have not in fact met and conferred in any meaningful way with Distributors.  Rather than discussing proposals that would comply with the principles set out by the Court on November 6, Plaintiffs simply doubled-down on their previous proposal.  Specifically, on November 11, Plaintiffs provided Distributors a proposal that includes *nine* total cases with *ten* plaintiffs, *six* of which include Distributors as defendants.[2]  This proposal is not consistent with any of the Court's

---

[1] For purposes of this submission, "Distributors" are AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.

[2] Because Plaintiffs' "supplemental submission" does not include a proposal for remand of any particular cases, Dkt. 2921, Distributors assume that the November 11 communication contains Plaintiffs' operative proposal for specific cases, and Distributors address that proposal as well as Plaintiffs' submission herein.  *See* Email from J. Rice to E. Mainigi (Nov. 11, 2019) (attached as Ex. 1).

guiding principles, would impose an undue and disproportionate burden on Distributors, is procedurally improper, and should be rejected.

Plaintiffs' proposal does not include agreement to narrow any claims in those nine cases. As demonstrated below, Plaintiffs' proposed tribe case is not "representative" of the tribal claims. And now—in their supplemental submission—Plaintiffs maintain the position, rejected by this Court last week, that the Court should abandon the "hub and spoke" remand proposal that has been under consideration for months and instead issue legal rulings, "develop a discovery plan that completes common discovery nationally," and set a series of trials in 2020 in jurisdictions where this Court has no ability to try the case in order to "apply maximum pressure on the parties"—read, "Defendants"—to settle the cases. *Id.* at 1–2. Given Plaintiffs' refusal to meet and confer with Defendants regarding a workable selective remand plan that adheres to the Court's guidance and stated objectives, and for the reasons given herein, the Court should reject Plaintiffs' proposal and adopt Distributors' proposal set forth below.

## I.     DISTRIBUTORS' REMAND PROPOSAL

**1.     A Distributor-focused case.** If there is a remand of one distributor-focused case, as the Court indicated it wants, Distributors and the Plaintiffs' Executive Committee ("PEC") agree that a West Virginia case should be selected. Consistent with that agreement, Distributors agree to immediate remand of *The Cabell County Commission, West Virginia v. AmerisourceBergen Drug Corp.*, Case No. 17-op-45053 ("*Cabell County*")—one of the "Track Two" cases—as the Distributor bellwether case. The Court should select one and only one case as the next Distributor-only bellwether case. As became evident during Track One discovery, the inclusion of both a city and a county with overlapping claims in one bellwether created

3

unnecessary complications, such as overlapping claims for damages, and dilatory conduct by one plaintiff negatively impacting the other.

Distributors make this proposal without waiver of their previously-stated objections and subject to the limitation that *Cabell County* will be the only Distributor-only bellwether case and that there will be immediate and complete remand of the case. Distributors also make this proposal subject to the condition that Plaintiffs will not seek remand of the case to state court and that the case will proceed in the federal transferor court.

    **2.**    **Tribal Case.**[3] Distributors propose that the Court select *Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al.*, Case No. 1:18-op-45749, as the tribal bellwether case.

This case already was selected as representative by the Court. It was subject to motion to dismiss briefing and decision by the Court as part of the bellwether briefing process and has been answered by the Defendants; it thus is in a position to be tried more quickly than other potential candidates. The case also includes a representative mix of defendants, as a compliment to the three industry-group-specific cases suggested by the Court.

The Blackfeet Tribe has approximately 16,000 enrolled members, and its territory comprises a significant part of Glacier and Pondera Counties in Montana. It thus is among the largest plaintiff tribes, and so will provide a meaningful test of tribal claims, but without the unmanageable burdens and unique challenges associated with the case brought by the Cherokee Nation. *See* pp. 7–11 below. It is located in a geography that is significantly different from all other bellwether jurisdictions previously selected or otherwise under active consideration for

---

[3] This submission makes an affirmative proposal regarding only the distributor-only focused case and the tribal case. Manufacturers and pharmacies have filed separate submissions with recommendations for the manufacturer- and pharmacy-focused cases.

4

trial, thus satisfying the Court's purpose in identifying bellwethers that will be of genuine value in promoting eventual global resolution of the litigation.  And, while this Court has decided motions to dismiss under Montana law, this would be the first case to proceed to trial under Montana law (unlike Oklahoma law, which has already been developed through trial, *see* pp. 7–11 below).[4]

As noted above, Plaintiffs refused to meet and confer in good faith with Distributors regarding the selection of a tribal case.  And, as noted below, Distributors have very significant concerns regarding the suitability of the *Cherokee Nation* case.  Distributors believe that a number of other cases might be suitable as tribal bellwether cases.  If the Court has concerns regarding the suitability of the *Blackfeet* case, Distributors respectfully suggest that the Court order Plaintiffs to meet and confer in good faith with Defendants regarding the selection of a case other than *Blackfeet* or *Cherokee Nation*.

As with the West Virginia case, whichever tribal case is selected, Plaintiffs should be required to agree to federal jurisdiction and agree not to seek remand of the case to state court.

## II. DISTRIBUTORS' OPPOSITION TO PLAINTIFFS' PROPOSAL

On November 11, 2019, the PEC provided Distributors with their proposal for the work up and remand of specific cases.  This proposal is essentially the same as the proposal Plaintiffs submitted on November 5, 2019:

---

[4] The *Blackfeet* case was originally filed in the District of Montana.  While the Tribe dismissed that action and then subsequently direct-filed in the MDL, the Court has the authority to transfer the case back to the court in which the Tribe is located and the vast majority of the relevant events took place.  *See, e.g.*, 28 U.S.C. § 1404.

5

- CT1B:  Summit and Cuyahoga Counties versus the pharmacy defendants, utilizing Plaintiffs' proposed amended complaint.  Plaintiffs propose that the case would remain under this Court's jurisdiction.

- CT1C:  Cities of Cleveland and Akron versus Distributors.   Plaintiffs propose that the case would remain under this Court's jurisdiction.

- CT2:  A West Virginia case against Distributors, with claims against the Distributors severed and immediately remanded to the West Virginia transferor court.  Plaintiffs propose that this Court would retain jurisdiction over part of the case and would oversee discovery against other defendants, including the pharmacy defendants, in tandem with CT1B.

- CT3:  The City of Chicago versus the manufacturers.

- CT4:  The City and County of San Francisco versus all defendants.  Plaintiffs propose immediate remand of the case.

- CT5:  The Cherokee Nation versus Distributors and pharmacies.  Plaintiffs propose immediate remand of the case.

This proposal is wholly inconsistent with this Court's four principles for selecting cases for remand.  As discussed above, the Court indicated at the November 6 hearing that it wants to remand *four* cases—"[1] a focused trial against the big three distributors, [2] a focused trial against the manufacturers, and [3] a focused trial against the pharmacies as whatever the pharmacies do" and [4] a tribal case.[5]

---

[5] Dkt. 2913 at 28:25–29:11 ("I believe that what should be done is there should be a focused trial against the big three distributors, a focused trial against the manufacturers, and a focused trial against the pharmacies as whatever the pharmacies do.  Some of them distribute, all of them dispense; whatever, the pharmacies.  And I think there should be only one or two causes of

6

### A. Plaintiffs' Proposal Is Unworkable, Unfair and Inconsistent with This Court's Guidance.

Rather than follow this Court's instructions, Plaintiffs instead propose *nine* cases with *ten* plaintiffs, including *six* cases against Distributors. Plaintiffs' proposal is untenable. First, the number of cases—nine in total and six against each of Distributors—is unduly burdensome. The Court contemplated *one* Distributor-focused trial and one tribal case that could include distributors as well as other defendants. Plaintiffs instead have proposed four Distributor-focused cases and three additional cases involving Distributors as defendants. No other defendant group faces so many trials under Plaintiffs' proposal. Plaintiffs have not offered any reason for singling out Distributors; doing so is certainly not consistent with either the principles articulated by the Court on November 6 or the general vision for this remand program that Special Master McGovern has been discussing with the parties for months.

Second, Plaintiffs' proposal regarding severance is inconsistent with this Court's direction that Plaintiffs should dismiss some parties and claims from the remanded cases to make them more manageable and triable. Dkt. 2913 at 9:19–21 ("Well, the problem is we can't try the kind of cases that the plaintiffs have brought …."). At a minimum, if the Court chooses to take some action regarding severance or dismissal of parties prior to remand, then it should apply that procedure uniformly to all the remanded cases.

### B. Certain of the Cases Identified By Plaintiffs Are Not Suitable Bellwethers.

In addition to Plaintiffs' fundamental failure to adhere to any of the Court's directions regarding the selection of cases for remand, Distributors have the following objections to certain of the specific cases proposed by Plaintiffs.

---

action."); *see also id.* at 42:11–13 ("I want a distributor case, I want a manufacturer case, I want a pharmacy case, and I want a tribe, Native American tribe.").

7

***Cherokee Nation Tribe Case.***  This Court has directed the parties to choose a tribal case for remand that is "doable, and it should not be atypical." Dkt. 2913, at 45.  The Cherokee Nation case fails to satisfy either criterion.  First, the Nation's status, size, and governance structure is not typical of the other tribal cases and would complicate discovery and trial of the case.  Second, the procedural posture of the Nation's case is atypical.  The Oklahoma Attorney General already has obtained a judgment for abatement, the benefits of which will flow to citizens of the Cherokee Nation residing in the state if the judgment is affirmed on appeal.  But the anticipated appeal of the Oklahoma trial court's judgment adds further uncertainty because the appeal may result in reversal of the trial court judgment and/or conflict with this Court's rulings.  To explain further:

***The Nation's Atypical Status and Governance Structure.***  Unlike many Western tribes, the Cherokee Nation was "not assigned to specific reservation areas but w[as] assigned land in fee with the intention of allowing development of their agrarian culture." *United States v. Adair*, 913 F. Supp. 1503, 1511 (E.D. Okla. 1995).  As a result, the Cherokee Nation's tribal land is not a single, contiguous area, as is true of traditional Native American reservations.[6]

The Cherokee Nation case is subject to jurisdictional uncertainty involving reservation disestablishment issues—i.e., issues that would arguably re-draw the map of Oklahoma.  On June 27, 2019, the Supreme Court of the United States restored *Sharp v. Murphy*[7] to the calendar

---

[6] Whether the Cherokee Nation's tribal land can be considered a "reservation" is an open legal question.  *See McKesson Corp. v. Hembree*, 2018 WL 340042, at *9 n.7 (N.D. Okla. Jan. 9, 2018).

[7] No. 17-1107.  As of this filing, the Supreme Court has yet to order additional briefing or oral argument.  Cases below: *Murphy v. Royal*, 875 F.3d 896 (10th Cir.) (murder occurred on Indian country because under the Muscogee (Creek) Nation Treaty of 1866 Congress had never taken

for reargument. *Murphy* will adjudicate "[w]hether the 1866 territorial boundaries of the Creek Nation within former Indian Territory of eastern Oklahoma constitute an "Indian reservation" today under 18 U.S.C. § 1151(a)".[8] While the disestablishment question is specific to the Creek Nation, the decision affects the Cherokee Nation, as well. The Cherokee, Muscogee, and other similarly-situated tribes have similar treaty provisions that define their former reservation boundaries.[9] These unresolved issues also make the Cherokee Nation case a bad candidate for a bellwether.

The size and scope of the Cherokee Nation also is unique. The Cherokee Nation's jurisdiction spans all or part of 14 counties in Oklahoma, such that there is a "checker-board[]

---

the required steps "unequivocally" disestablish the Creek reservation); *Murphy v. Royal*, 497 F. Supp. 2d 1257 (E.D. Okla. 2007) (reservation disestablished, but certifying appeal).

[8] On May 21, 2018, the Court granted the Petition for Writ of Certiorari on this question. The Court subsequently ordered the parties, the Solicitor General and the Muscogee (Creek) Nation to submit supplemental briefing on two additional questions:

> (1) Whether any statute grants the state of Oklahoma jurisdiction over the prosecution of crimes committed by Indians in the area within the 1866 territorial boundaries of the Creek Nation, irrespective of the area's reservation status. (2) Whether there are circumstances in which land qualifies as an Indian reservation but nonetheless does not meet the definition of Indian country as set forth in 18 U.S.C. § 1151(a).

[9] The State of Oklahoma's Petition for a Writ of Certiorari, filed on Feb. 6, 2018, stated:

> Litigants have invoked the decision below to reincarnate the historical boundaries of all "Five Civilized Tribes"—the Creeks, Cherokees, Choctaws, Chickasaws and Seminoles. This combined area encompasses the entire eastern half of the State. *The decision thus threatens to effectively redraw the map of Oklahoma.*

No. 17-1107, Petition at 2 (emphasis added).

9

[of] … state and tribal land."[10] Because the Nation's sovereign territory does not have clear boundaries—with its land on one side of a line and the State's, on the other—Defendants will require discovery, not only from the Nation, but also from the local and state agencies that serve the Nation's citizens, who live intermingled with non-Cherokee citizens in the 14 counties.[11] Because of this integration of the two communities, the Nation's "public health system includes tribal departments and programs, *local and state health agencies*, *public schools*, community organizations, the health care delivery system, faith-based organizations, *public safety, and education and youth development*, *among many others*."[12] The Nation itself alleges that it provides substance abuse treatment to its citizens in 10 different clinics within the 14-county jurisdictional area. Also, the Nation's law enforcement system is cross-deputized with 50 different municipal, county, state and federal agencies.[13] Thus, to understand the scope of the crisis, who provided public services for the Nation's citizens, and who then would provide abatement (if warranted and as requested by plaintiffs), discovery from these state agencies and organizations would be essential. This would be a far more extensive and complicated endeavor

---

[10] Common Questions, Cherokee Nation, https://www.cherokee.org/about-the-nation/frequently-asked-questions/common-questions/?page=1&pageSize=7 (last accessed Nov. 10, 2019). The Nation claims its Tribal Jurisdictional Service Area ("TJSA") "encompasses the whole or part of 14 Oklahoma Counties." Dkt. 2911 at ¶ 25.

[11] Cherokee Nation citizens are dual citizens of the Cherokee Nation and the United States, and they pay state, local, and federal taxes. *See* Common Questions, CHEROKEE NATION, https://www.cherokee.org/about-the-nation/frequently-asked-questions/common-questions/?page=1&pageSize=7 (last accessed Nov. 10, 2019).

[12] Cherokee Nation Public Health System Tribal Health Assessment and Improvement Plan 2013-2017, *available at* http://cherokeepublichealth.org/wp-content/uploads/2015/08/Tribal-Health-Assessment-and-Improvement-Plan-2013-2017_Lo-Res.pdf (last accessed Nov. 10, 2019).

[13] Marshal Service, Cherokee Nation, https://www.cherokee.org/all-services/marshal-service/ (last accessed Nov. 10, 2019).

than would discovery in a typical tribal case.  And even the 14-county area includes only approximately half of the Cherokee Nation's citizens, *see* Dkt. 2911 at ¶ 14, requiring extensive discovery outside these counties as well.  As Plaintiffs point out, the Nation "is the largest Indian Tribe in the United States in terms of population, [and] operates the largest healthcare system of any Indian Tribe".  Dkt. 2906 at 9.  As a result, the scope of discovery exceeds that for any other tribe and is likely to exceed the scope of discovery just completed for Cuyahoga and Summit Counties.

***The Nation's Atypical Procedural Posture***.  The Cherokee Nation case (and other cases in Oklahoma, such as the Muscogee (Creek)) also are not appropriate choices because the verdict and relief obtained by the State of Oklahoma in the first opioid trial put the Cherokee Nation's case in an uncertain procedural posture.  First, that verdict, and the abatement relief already granted, constrain the relief available to the Nation.  The Oklahoma trial court announced a judgment of hundreds of millions of dollars in favor of the State to abate the alleged nuisance, including specific funds for programs that flow to the benefit of all citizens of the State, which includes Cherokee Nation citizens, who have dual citizenship.  Double recovery is impermissible.

Second, the Nation's case would proceed in an uncertain legal environment.  In addition to the uncertainty and uniqueness of the Cherokee Nation at issue in *Sharp v. Murphy*, the opioid litigation in Oklahoma is poorly suited to serve as a bellwether.  The Oklahoma Attorney General's case is subject to appellate review, which could reverse the trial court on various issues and/or conflict with this Court's ruling on Oklahoma law in the Creek (Muscogee) case.

Third, as a result of the Oklahoma Attorney General's case and the ongoing appellate review in that matter, Oklahoma law as it relates to the opioid crisis is already in the process of

11

being developed. There is thus little advantage to be gained from trying a bellwether case under Oklahoma law.

For these reasons, the Cherokee Nation case is neither representative nor workable as an MDL bellwether case.

***City of Cleveland and City of Akron.*** The City of Cleveland's systematic discovery failures required its removal from Track One.[14] Due in part to those failures, this Court previously ordered that the trial of Akron and Cleveland's claims "shall not occur before the trial of the claims of the Track Two Bellwethers (as defined in docket no. 1218)." Dkt. 1392. During the conference on November 6, the Court confirmed that "there were problems with Cleveland, everyone knows that. That's why Cleveland was severed out." The Court further stated that it did "need to revisit the issue," and preferred "not to have more public airing on that." Dkt. 2913 at 28:20–24. Respecting the Court's preference on this point, Distributors do not offer more details here. However, if the Court contemplates shifting course and allowing Cleveland to reassume a trial track in the MDL, Distributors respectfully request the opportunity to brief the issue more fully.[15]

In any case, as a practical matter, Cleveland's claims may not be set for trial in the near term. Cleveland's failures necessarily precluded the parties from completing fact development prior to Cleveland and Akron's dismissal from Track One. Even if Cleveland's document discovery were now complete, which Distributors do not concede, most if not all of Cleveland's

---

[14] While much discovery already took place in Akron and Cleveland, fact discovery is not complete in Cleveland, and no expert discovery took place at all with respect to those two cities.

[15] On November 11, 2019, counsel for Cleveland sent an email to the Court (not made as a public filing on the docket) representing that its document discovery was complete. Defendants disagree with certain representations in that email and suggest that any further submissions on the subject, when and as needed, should be made on the public docket.

depositions would need to be reopened. In fact, counsel for Cleveland repeatedly has acknowledged Defendants' broad right to reopen depositions. Following completion of discovery, significant time must then be allowed for expert discovery and summary judgment prior to trial, because Cleveland and Akron did not participate in these aspects of the Track One litigation.

Moreover, Cleveland and Akron are not appropriate choices as "bellwether" jurisdictions at this stage. If the bellwether process is to serve the broader goals of the MDL, it is essential that the MDL facilitate consideration of the legal questions and factual issues in jurisdictions that have not yet been explored. The parties have focused their efforts on developing the cases of Cuyahoga and Summit Counties, and the Court has already ruled on questions on Ohio law. Continued focus on Ohio jurisdictions would not advance the broader purposes of the MDL and is unfair to other plaintiffs. Dkt. 2907 at 3–4.

**_The City and County of San Francisco_.** As discussed above, Plaintiffs have proposed that too many Distributor cases be remanded for the next round of trials. Consequently, the Court should not remand *City and County of San Francisco, California v. Purdue Pharma L.P.*, Case No. 3:18-cv-07591 (N.D. Cal.), if Distributors remain named defendants. Moreover, three of the claims in that case—false advertising, unfair competition, and public nuisance—are purportedly brought on behalf of the entire State of California, which would necessarily require state-wide discovery, instead of targeted bellwether discovery. If Plaintiffs continue to urge that this case be remanded, they should first dismiss Distributors.

**_The City of Chicago, Illinois_.** Distributors originally proposed that the Court file a Suggestion of Remand for *City of Chicago, Illinois v. Cardinal Health, Inc.*, No. 18-op-45281 (N.D. Ohio). Dkt. 2908 at 3. Although Plaintiffs apparently have rejected that proposal,

Distributors remain willing to agree to remand of that case in conjunction with *City of Chicago v. Purdue Pharma, L.P., et al.*, No. 17-op-45169 (N.D. Ohio), in the manner proposed by certain defendants in Dkt. 2908 at 3 & n.4, if it is one of only two Distributor cases selected for remand.

## CONCLUSION

The Court has indicated its desire to remand four, and only four, cases that meet certain criteria. Distributors' proposal accomplishes each of the Court's goals and should be implemented. Plaintiffs' proposal accomplishes none and should be rejected.

Dated: November, 13, 2019

    */s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Jennifer G. Wicht
Steven M. Pyser
Ashley W. Hardin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
jwicht@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

  */s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

    */s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

## **CERTIFICATE OF SERVICE**

    I, Ashley W. Hardin, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

                                                             */s/ Ashley W. Hardin*
                                                           Ashley W. Hardin