# Exhibit D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

      Cardinal Health provides below its written response to supplement the testimony of Jennifer Norris, Cardinal Health's 30(b)(6) representative, regarding one component of Topic (a) in Plaintiffs' First Notice of Deposition Pursuant to Rule 30(b)(6), as requested by Plaintiffs' letter of January 6, 2019.  Cardinal Health makes this response subject to and without waiving the general objections and specific objections and responses set forth in its July 31, 2018 Objections and Responses to Plaintiffs' First and Second Notices of Deposition Pursuant to Rule 30(b)(6).

## Topic (a)

- Your past/present suspicious orders monitoring system, SOMS program, policies and procedures;

Plaintiffs proposed the following question, answered herein, to resolve the pending dispute concerning this topic:[1]

> Please specify what actions and/or changes Cardinal made to its SOMP after September 2006 until 2008. Describe in detail any changes to the SOMP and when those changes were implemented. If those changes were implemented over time or in phases please provide the details of when the implementation began and when it was completed.  If during this time Cardinal began halting and not shipping suspicious orders please provide the date of implementation and a description of the program whereby Cardinal began halting and not shipping suspicious orders including, but not limited to, those suspicious orders identified in ingredient limit reports.

---

[1] On January 9, 2019, Plaintiffs proposed a written question that would satisfy this issue.  The issue was discussed that same day with Special Master Cohen and the parties were to continue to confer.  Since that date, Cardinal Health has not received any follow up from Plaintiffs.  As a result, to resolve this issue, Cardinal Health answers the question that Plaintiffs proposed as a full resolution of this issue.

1

In August 2005, Steve Reardon and Bob Giacalone from Cardinal Health met with Michael Mapes and Vickie Seeger of DEA.  During the meeting, both Mr. Mapes and Ms. Seeger provided information to Mr. Reardon and Mr. Giacalone on DEA's concern regarding the dispensing of controlled substances through illegitimate "internet" pharmacies.  DEA explained that these "internet" pharmacies would fill prescriptions that were submitted to the pharmacy via the internet, often for a patient in a different state.  The concern, DEA explained, was that these "internet" pharmacies were filling prescriptions written by doctors who were not physically examining the patients for whom they were writing prescriptions.  DEA's position, as stated at the August 2005 meeting, was that a prescription that was written without a physical examination was not issued in the usual course of medical practice and thus not a valid prescription.  Accordingly, it was DEA's view that a pharmacist adequately performing his or her corresponding responsibility should not fill such a prescription.  DEA informed Cardinal Health that it should terminate any pharmacy customer who Cardinal Health identified as engaged in dispensing of controlled substances pursuant to this type of "internet" interaction. DEA called this the "Internet Pharmacy Initiative."

In response to this guidance from the DEA, Cardinal Health developed a process and program to identify pharmacies suspected of engaging in illegitimate "internet" activity.  Among other measures, Cardinal Health trained its staff to identify such "internet" activity.  Senior management, the pharmaceutical distribution sales force, and operations personnel received training.  Cardinal Health also conducted site visits of certain pharmacies that were suspected of engaging in "internet" activity.  If the investigation uncovered evidence of inappropriate internet activity, Cardinal Health would cease distribution of controlled substances to that customer.

Cardinal Health communicated these termination decisions to DEA.  Cardinal Health terminated a number of suspected internet pharmacies from 2005 through 2007.

In September 2006, Joseph Rannazzisi wrote a letter to all DEA-registered distributors.  In that letter, Mr. Rannazzisi identified certain "Circumstances That Might Be Indicative of Diversion."  Mr. Rannazzisi also stated that a distributor should exercise "due diligence to avoid filling suspicious orders *that might be diverted* into other than legitimate medical, scientific, and industrial channels." (emphasis added).  Through its Ingredient Limit Reports and excessive order reports, Cardinal Health had been alerting DEA to all "suspicious orders" in accordance with the regulations and then-DEA guidance, even when there was no basis to believe that those orders "might be diverted."  A member of Cardinal Health's controlled substance anti-diversion team also had been reviewing the Ingredient Limit Reports to identify possible indications of inappropriate activity, and conducted investigations into those pharmacies.

When Cardinal Health received the letter from Mr. Rannazzisi, QRA professionals reviewed it in the context of DEA's Internet Pharmacy Initiative, as it had been described to Cardinal Health in the 2005 meeting and subsequent interactions.  Through site visits and investigations of alleged internet pharmacies, Cardinal Health was already looking for the "Circumstances That Might Be Indicative of Diversion" identified in Mr. Rannazzisi's letter.  And Cardinal Health, by proactively identifying and terminating suspected internet pharmacies, was exercising due diligence to avoid filing orders for controlled substances to pharmacies who were engaged in activity that DEA considered illegitimate.

In 2006 and 2007, Cardinal Health believed that its anti-diversion program was in full compliance with DEA regulations and guidance at the time.  DEA validated that understanding

in a phone conversation on April 26, 2007 when a DEA employee told Cardinal Health that it was doing the right things and heading in the right direction.

In September 2007, Cardinal Health was first made aware of changing DEA expectations regarding suspicious order monitoring.  At a September 2007 conference sponsored by the DEA, an employee of another wholesale distributor gave a presentation regarding that distributor's new process to monitor for suspicious orders.  That process, which DEA proclaimed the new industry standard, included guidance that *all* orders that were reported as suspicious should not be shipped to the pharmacy customer.  The September 2007 meeting is the first time Cardinal Health was made aware that DEA had an expectation that orders determined to be suspicious orders should not be shipped.

Immediately after that presentation, Cardinal Health began to develop a program in accordance with this new DEA guidance.  Through the fall of 2007 into the beginning of 2008, Cardinal Health was developing a centralized electronic monitoring system.  That system utilized thresholds.  As early as December 2007, Cardinal Health implemented individual daily order limiters for hydrocodone, oxycodone, alprazolam, and phentermine.  *See e.g.,* CAH_MDL_PRIORPROD_DEA07_00968292.  Orders that exceeded a pharmacy's monthly thresholds were not shipped, but rather held for review by a member of the anti-diversion team. Anti-diversion professionals would review the order and, based on the totality of circumstances, determine the appropriate course of action, including whether to release the order or not and whether to report to DEA as suspicious, as appropriate.