PSJ3

Exhibit 667B

Direct Sales v U.S.

CONFIDENTIAL

WMT_MDL_000043712

DIRECT SALES CO. *v.* U. S.                703

attention to the procedural delays in rate cases before that body, delays which he declared would be used to strangle financially weak water carriers, forcing them to "yield or transfer their operation to other streams." He pointed out this "would mean the death of water carriers"; that the railroads knew how to obtain delay and knew the disastrous consequences that would follow to their competitors; that railroads "seek to profit" by procedural delay; and that the diversity of their interests and extent of their revenues was so great that they could survive delays which would be unendurable for competitors.[18] The Congressman was a good observer and a sound prophet.

The judgment of the District Court enjoining enforcement of this order was correct and should be affirmed.

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this opinion.

---

## DIRECT SALES CO. *v.* UNITED STATES.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 593. Argued April 12, 1943.—Decided June 14, 1943.

A mail-order wholesale drug corporation made sales of morphine sulphate to a physician in unusually large quantities, frequently, and over an extended period. *Held,* that the evidence, from which it could be inferred that the seller not only knew the physician was selling the drug illegally but intended to coöperate with him therein, was sufficient to sustain the seller's conviction of conspiracy to violate the Harrison Narcotic Act. *United States* v. *Falcone,* 311 U. S. 205, distinguished. P. 714.

131 F. 2d 835, affirmed.

CERTIORARI, 318 U. S. 749, to review the affirmance of a conviction for conspiracy to violate the Harrison Narcotic Act. See also 44 F. Supp. 623.

[18] 86 Cong. Rec. 10181.

CONFIDENTIAL

WMT_MDL_000043713

*Mr. William B. Mahoney*, with whom *Mr. Edwin J. Culligan* was on the brief, for petitioner.

*Mr. Valentine Brookes*, with whom *Solicitor General Fahy, Assistant Attorney General Berge, Messrs. Oscar A. Provost* and *W. Marvin Smith* and *Miss Melva M. Graney* were on the brief, for the United States.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Petitioner, a corporation, was convicted of conspiracy to violate the Harrison Narcotic Act.[1] It challenges the sufficiency of the evidence to sustain the conviction. Because of asserted conflict with *United States* v. *Falcone*, 311 U. S. 205, certiorari was granted.

Petitioner is a registered drug manufacturer and wholesaler.[2] It conducts a nationwide mail-order business from Buffalo, New York. The evidence relates chiefly to its transactions with one Dr. John V. Tate and his dealings with others. He was a registered physician, practicing in Calhoun Falls, South Carolina, a community of about 2,000 persons. He dispensed illegally vast quantities of morphine sulphate purchased by mail from petitioner. The indictment charged petitioner, Dr. Tate, and three others, Black, Johnson and Foster, to and through whom Tate illegally distributed the drugs, with conspiring to violate

---

[1] The conspiracy statute, R. S. § 5440, as amended, 18 U. S. C. § 88, provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The pertinent provisions of the Harrison Act are set out in note 3, *infra*.

[2] 38 Stat. 785, as amended, 26 U. S. C. §§ 3220, 3221.

CONFIDENTIAL

WMT_MDL_000043714

§§ 1 and 2 of this Act,[3] over a period extending from 1933 to 1940. Foster was granted a severance, Black and Johnson pleaded guilty, and petitioner and Dr. Tate were convicted. Direct Sales alone appealed. The Circuit Court of Appeals affirmed. 131 F. 2d 835.

The parties here are at odds concerning the effect of the *Falcone* decision as applied to the facts proved in this case. The salient facts are that Direct Sales sold morphine sulphate to Dr. Tate in such quantities, so frequently and over so long a period it must have known he could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally. Not only so, but it actively stimulated Tate's purchases.

He was a small-town physician practicing in a rural section. All of his business with Direct Sales was done by mail. Through its catalogues petitioner first made

---

[3] 38 Stat. 785, as amended, 26 U. S. C. §§ 2553, 2554. The indictment charged the conspiracy's object was to violate those portions of the Act (as amended) which provide:

"It shall be unlawful for any person required to register under the provisions of this part or section 2551 (a) to import, manufacture, produce, compound, sell, deal in, dispense, distribute, administer, or give away any of the aforesaid drugs without having registered and paid the special tax as imposed by this part, or section 2551 (a)." 26 U. S. C. § 3224.

"It shall be unlawful for any person to purchase, sell, dispense, or distribute any of the drugs mentioned in section 2550 (a) except in the original stamped package or from the original stamped package; . . ." 26 U. S. C. § 2553.

"It shall be unlawful for any person to sell, barter, exchange, or give away any of the drugs mentioned in section 2550 (a) except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary." 26 U. S. C. § 2554 (a).

"It shall be unlawful for any person to obtain by means of said order forms any of the aforesaid drugs for any purpose other than the use, sale, or distribution thereof by him in the conduct of a lawful business in said drugs or in the legitimate practice of his profession." 26 U. S. C. § 2554 (g).

CONFIDENTIAL

WMT_MDL_000043715

Opinion of the Court.                319 U.S.

contact with him prior to 1933. Originally he purchased
a variety of pharmaceuticals. But gradually the charac-
ter of his purchases narrowed, so that during the last two
years of the period alleged for the conspiracy he ordered
almost nothing but morphine sulphate. At all times
during the period he purchased the major portion of his
morphine sulphate from petitioner. The orders were
made regularly on his official order forms. The testimony
shows the average physician in the United States does not
require more than 400 one-quarter grain tablets annually
for legitimate use. Although Tate's initial purchases in
1933 were smaller, they gradually increased until, from
November, 1937, to January, 1940, they amounted to
79,000 one-half grain tablets. In the last six months of
1939, petitioner's shipments to him averaged 5,000 to 6,000
half-grain tablets a month, enough as the Government
points out to enable him to give 400 average doses every
day.

These quantity sales were in line with the general mail-
order character of petitioner's business. By printed cata-
logues circulated about three times a month, it solicits
orders from retail druggists and physicians located for the
most part in small towns throughout the country. Of
annual sales of from $300,000 to $350,000 in the period
1936 to 1940, about fifteen per cent by revenue and two
and a half per cent by volume were in narcotics. The
mail-order plan enabled petitioner to sell at prices con-
siderably lower than were charged by its larger competi-
tors, who maintained sales forces and traveling represent-
atives. By offering fifty per cent discounts on narcotics,
it "pushed" quantity sales. Instead of listing narcotics,
like morphine sulphate, in quantities not exceeding 100
tablets, as did many competitors, Direct Sales for some
time listed them in 500, 1,000 and 5,000 tablet units. By
this policy it attracted customers, including a dispropor-

CONFIDENTIAL

WMT_MDL_000043716

Case: 1:17-md-02804-DAP  Doc #: 3003-19  Filed: 12/17/19  7 of 78.  PageID #: 433382

tionately large group of physicians who had been convicted of violating the Harrison Act.

All this was not without warning, purpose or design. In 1936 the Bureau of Narcotics informed petitioner it was being used as a source of supply by convicted physicians.[4] The same agent also warned that the average physician would order no more than 200 to 400 quarter-grain tablets annually [5] and requested it to eliminate the listing of 5,000 lots. It did so, but continued the 1,000 and 500 lot listings at attractive discounts. It filled no more orders from Tate for more than 1,000 tablets, but continued to supply him for that amount at half-grain strength. On one occasion in 1939 he ordered on one form 1,000 half and 100 quarter grains. Petitioner sent him the 1,000 and advised him to reorder the 100 on a separate order form. It attached to this letter a sticker printed in red suggesting anticipation of future needs and taking advantage of discounts offered. Three days later Tate ordered 1,000 more tablets, which petitioner sent out. In 1940, at the Bureau's suggestion, Direct Sales eliminated its fifty and ten per cent discounts. But on doing so it translated its discount into its net price.

Tate distributed the drugs to and through addicts and purveyors, including Johnson, Black and Foster. Although he purchased from petitioner at less than two dol-

---

[4] Thus, although there were more than 1,350 wholesale drug dealers in the United States from whom physicians might order narcotics (Traffic in Opium and Other Dangerous Drugs for the Year Ended December 31, 1941, United States Treasury, Bureau of Narcotics), about 27% of the 204 doctors convicted were petitioner's customers.

[5] Testimony in the record establishes that the practice in the profession is to give one-eighth or one-fourth grain doses, and only rarely one-half grain doses. Cf. *United States* v. *Berman*, 258 U. S. 280, 289. Furthermore, there was expert testimony to the effect that codein may be, and preferably is, used for the same medical purposes as morphine sulphate. During the period from 1934 to 1940, however, the record does not show that Tate ever ordered codein from petitioner.

CONFIDENTIAL                                        WMT_MDL_000043717

lars, he sold at prices ranging from four to eight dollars per 100 half-grain tablets and purveyors from him charged addicts as much as $25 per hundred.

On this evidence, the Government insists the case is in different posture from that presented in *United States* v. *Falcone.* It urges that the effort there was to connect the respondents with a conspiracy between the distillers on the basis of the aiding and abetting statute.[e] The attempt failed because the Court held the evidence did not establish the respondents knew of the distillers' conspiracy. There was no attempt to link the supplier and the distiller in a conspiracy *inter sese.* But in this case that type of problem is presented. Direct Sales was tried, and its conviction has been sustained, according to the claim, on the theory it could be convicted only if it were found that it and Tate conspired together to subvert the order form provisions of the Harrison Act. As the brief puts the Government's view, "Petitioner's guilt was not made to depend at all upon any guilt of Dr. Tate growing out of his relationship to defendants other than petitioner or upon whether these other defendants were linked with the Tate-Direct Sales conspiracy."

On the other hand, petitioner asserts this case falls squarely within the facts and the ruling in the *Falcone* case. It insists there is no more to show conspiracy between itself and Tate than there was to show conspiracy between the respondent sellers and the purchasing distillers there. At most, it urges, there were only legal sales by itself to Dr. Tate, accompanied by knowledge he was distributing goods illegally. But this, it contends, cannot amount to conspiracy on its part with him, since in the *Falcone* case the respondents sold to the distillers, knowing they would use the goods in illegal distillation.

---

[e] R. S. § 5323, 18 U. S. C. § 550.

CONFIDENTIAL

WMT_MDL_000043718

Petitioner obviously misconstrues the effect of the *Falcone* decision in one respect. This is in regarding it as deciding that one who sells to another with knowledge that the buyer will use the article for an illegal purpose cannot, under any circumstances, be found guilty of conspiracy with the buyer to further his illegal end. The assumption seems to be that, under the ruling, so long as the seller does not know there is a conspiracy between the buyer and others, he cannot be guilty of conspiring with the buyer, to further the latter's illegal and known intended use, by selling goods to him.

The *Falcone* case creates no such sweeping insulation for sellers to known illicit users. That decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. The Government did not contend, in those circumstances, as the opinion points out, that there was a conspiracy between the buyer and the seller alone. It conceded that on the evidence neither the act of supplying itself nor the other proof was of such a character as imported an agreement or concert of action between the buyer and the seller amounting to conspiracy. This was true, notwithstanding some of the respondents could be taken to know their customers would use the purchased goods in illegal distillation.

The scope of the concession must be measured in the light of the evidence with reference to which it was made. This related to both the volume of the sales and to casual and unexplained meetings of some of the respondents with others who were convicted as conspirators. The Court found this evidence too vague and uncertain to support a finding the respondents knew of the distillers' conspiracy,

CONFIDENTIAL

WMT_MDL_000043719

though not inadequate in some instances to sustain one that the seller knew the buyer would use the goods for illegal distilling. It must be taken also that the Government regarded the same evidence as insufficient to show the seller conspired directly with the buyer, by selling to him with knowledge of his intended illegal use.

Whether or not it was consistent in making this concession and in regarding the same evidence as sufficient to show that the sellers knew of and joined the buyers' distilling ring is not material. Nor need it be determined whether the Government conceded too much. We do not now undertake to say what the Court was not asked and therefore declined to say in the *Falcone* case, namely, that the evidence presented in that case was sufficient to sustain a finding of conspiracy between the seller and the buyer *inter sese*. For, regardless of that, the facts proved in this case show much more than the evidence did there.

The commodities sold there were articles of free commerce, sugar, cans, etc. They were not restricted as to sale by order form, registration, or other requirements. When they left the seller's stock and passed to the purchaser's hands, they were not in themselves restricted commodities, incapable of further legal use except by compliance with rigid regulations, such as apply to morphine sulphate. The difference is like that between toy pistols or hunting-rifles and machine guns. All articles of commerce may be put to illegal ends. But all do not have inherently the same susceptibility to harmful and illegal use. Nor, by the same token, do all embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully. Gangsters, not hunters or small boys, comprise the normal private market for machine guns. So drug addicts furnish the normal outlet for morphine which gets outside the restricted channels of legitimate trade.

CONFIDENTIAL      WMT_MDL_000043720

This difference is important for two purposes. One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote and coöperate in it. This intent, when given effect by overt act, is the gist of conspiracy. While it is not identical with mere knowledge that another purposes unlawful action, it is not unrelated to such knowledge. Without the knowledge, the intent cannot exist. *United States v. Falcone, supra.*[7] Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal. *Ibid.* This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in that case, was called a dragnet to draw in all substantive crimes.

The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latters' inherent capacity for harm and from the very fact they are restricted, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully. Additional facts, such as quantity sales, high-pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise. Knowledge, equivocal and uncertain as to one, becomes sure as to the other. So far as knowl-

---

[7] Although this principle was there applied to aiding and abetting a conspiracy among others, it has at least equal force in a situation where the charge is conspiring with another to further his unlawful conduct, without reference to any conspiracy between him and third persons.

CONFIDENTIAL

WMT_MDL_000043721

edge is the foundation of intent, the latter thereby also becomes the more secure.

The difference in the commodities has a further bearing upon the existence and the proof of intent. There may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. Concededly, not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy.[8] But this is not to say that a seller of harmful restricted goods has license to sell in unlimited quantities, to stimulate such sales by all the high-pressure methods, legal if not always appropriate, in the sale of free commodities; and thereby bring about subversion of the order forms, which otherwise would protect him, and violation of the Act's other restrictions. Such a view would assume that the market for opiates may be developed as any other market. But that is not true. Mass advertising and bargain-counter discounts are not appropriate to commodities so surrounded with restrictions. They do not create new legal demand and new classes of legitimate patrons, as they do for sugar, tobacco and other free commodities. Beyond narrow limits, the normal legal market for opiates is not capable of being extended by such methods. The primary effect is rather to create black markets for dope and to increase illegal demand and consumption.

[8] This may be true, for instance, of single or casual transactions, not amounting to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end. A considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy. There may be also a fairly broad latitude of immunity for a more continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase.

CONFIDENTIAL                                    WMT_MDL_000043722

When the evidence discloses such a system, working in prolonged coöperation with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible. The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested coöperation, stimulation, instigation. And there is also a "stake in the venture" which, even if it may not be essential, is not irrelevant to the question of conspiracy.[9] Petitioner's stake here was in making the profits which it knew could come only from its encouragement of Tate's illicit operations. In such a posture the case does not fall doubtfully outside either the shadowy border between lawful coöperation and criminal association or the no less elusive line which separates conspiracy from overlapping forms of criminal coöperation.

Unless, therefore, petitioner has been exempted arbitrarily by the statute's terms, the evidence clearly was sufficient to sustain its conviction for conspiring with Tate. Its position here comes down ultimately to the view alluded to above that the statute has, in fact, thus immunized its action. In effect this means the only restriction imposed upon it, apart from other provisions not now material, such as those affecting registration, was the requirement it should receive from purchasing physicians a signed order form for each sale. That done, in its view, its full duty to the law was fulfilled, it acquired a complete immunity, and what the physician had done

---

[9] Cf. *United States* v. *Falcone,* 109 F. 2d 579, 581 (C. C. A.); and compare *Backun* v. *United States,* 112 F. 2d 635, 637 (C. C. A.); *United States* v. *Harrison,* 121 F. 2d 930, 933 (C. C. A.); *United States* v. *Pecoraro,* 115 F. 2d 245, 246 (C. C. A.).

CONFIDENTIAL  WMT_MDL_000043723

or might do with the drugs became of no further concern to itself.   Such a view would legalize an express written agreement between a registered wholesaler and a physician for the former to supply him with all his requirements for drugs for both legal and illegal distribution, conditioned only upon his using the required order forms. The statute contains no such exemption in explicit terms. Nor was one implied.[10]

This being true, it can make no difference the agreement was a tacit understanding, created by a long course of conduct and executed in the same way.[11]  Not the form or manner in which the understanding is made, but the fact of its existence and the further one of making it effective by overt conduct are the crucial matters.  The proof, by the very nature of the crime, must be circumstantial[12] and therefore inferential to an extent varying with the conditions under which the crime may be committed.   But this does not mean either that the evidence may be equivocal or that petitioner is exempt from its effects when it is not so, merely because in the absence of excesses such as were committed and in other circumstances the order form would have given it protection.   It follows the mere fact that none of petitioner's representatives ever met Dr. Tate face to face or held personal communion with him is immaterial.   Conspiracies, in short, can be committed by mail and by mail-order houses.   This is true, notwithstanding the overt acts consist solely of sales, which but for their volume, frequency and prolonged

---

[10] Cf. *Gebardi* v. *United States,* 287 U. S. 112; see also 81 U. of Pa. L. Rev. 474.

[11] *Glasser* v. *United States,* 315 U. S. 60, 80; *United States* v. *Manton,* 107 F. 2d 834, 839 (C. C. A.); *United States* v. *Harrison,* 121 F. 2d 930, 934 (C. C. A.); cf. *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600; *Interstate Circuit* v. *United States,* 306 U. S. 208.

[12] *Ibid.*

CONFIDENTIAL                                                                       WMT_MDL_000043724

OWENS *v.* UNION PACIFIC R. CO.       715

703                    Opinion of the Court.

repetition, coupled with the seller's unlawful intent to further the buyer's project, would be wholly lawful transactions.

Accordingly, the judgment is

*Affirmed.*

---

OWENS, EXECUTRIX, *v.* UNION PACIFIC RAILROAD CO.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 580.  Argued April 7, 1943.—Decided June 14, 1943.

1. Upon the facts of this case under the Federal Employers' Liability Act, it can not be said that, as a matter of law, there was an assumption of risk by the decedent; his conduct amounted, at most, to contributory negligence, which may reduce the damages but does not bar recovery.  P. 724.

2. It is unnecessary in this case to determine whether the 1939 amendment of the Federal Employers' Liability Act, abolishing the defense of assumption of risk, applies where the accident occurred before, but the suit is brought after, that enactment.  P. 725.

129 F. 2d 1013, reversed.

CERTIORARI, 317 U. S. 623, to review the reversal of a judgment for the plaintiff in an action under the Federal Employers' Liability Act.

*Mr. Frank C. Hanley* for petitioner.

*Mr. L. R. Hamblen,* with whom *Mr. Roy F. Shields* was on the brief, for respondent.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Petitioner is the widow of an employee of respondent. In 1941 she brought this suit under the Federal Employers' Liability Act, 45 U. S. C. §§ 51–59. Her hus-

531559—44——49

CONFIDENTIAL                                                  WMT_MDL_000043725

CONFIDENTIAL

WMT_MDL_000043726

Suggested Questions

CONFIDENTIAL

WMT_MDL_000043727

## Suggested Questions for Distributors

This list of questions is not intended to be all inclusive nor should it be interpreted that every situation or registrant activity is covered.  This list of questions is provided to assist the distributor to formulate a better understanding of who its customers are and whether or not the distributor should sell controlled substances to those customers.  It is incumbent upon the distributor to ensure that sales to customers are for legitimate purposes.  It is further incumbent upon the distributor to identify illicit or suspicious activities which may result in the diversion of controlled substances.

The use of this list of questions should not be construed in any manner to be a mechanism or means that you have fully met the criteria and actions required by 21 USC 823 and/or other applicable state and federal laws.

Possible questions for a pharmacy:

- Does the pharmacy fill prescriptions via the Internet?  If so, is the pharmacy registered with the DEA under the Ryan Haight Act?
- Is this a mail order pharmacy (fills prescriptions for insurance, etc.)?
  **Note**:  A pharmacy may claim to be a mail order pharmacy but may actually be operating as an Internet pharmacy.  Do not accept the response to this question at face value.
- Is the pharmacy licensed in all states for which it mails or fills prescriptions?
- Does the pharmacy report to all states that have prescription monitoring programs in which their customers reside and to whom they dispense?
- Does the pharmacy provide services for any specialty customers such as Long Term Health Care, Hospice Centers, Assisted Care Living Facilities, etc.?
- Does the pharmacy have staff or a private firm that solicits practitioners to get more business?
- What is the pharmacy's ratio of controlled vs. non-controlled orders?
- Does the pharmacy order a full variety of controlled substances and are they fairly evenly dispersed?  If not, why the disparity?
- What are the hours of operation of the pharmacy?
- Does the pharmacy offer a full assortment of sundries to its customers (e.g., aspirin, snacks, cosmetics, etc.)?
- Does the pharmacy have security guards on the premises?  If so, why?
- What methods of payment does the pharmacy accept (cash, insurance, Medicaid) and in what ratios?
- Who is the pharmacy's primary supplier?
- Does the pharmacy order from other suppliers as well?  If so, why and what controlled substances?
- If this is a new account, why does the pharmacy want you to be their supplier?
- If you are not the only supplier, what controlled substances will the pharmacy be ordering from you, in what quantities, in what time frame, and will they be ordering these same products from other suppliers?

1 of 3

August 12, 2015

CONFIDENTIAL

WMT_MDL_000043728

- What ratio will you be supplying compared to other suppliers?
- Does the pharmacy fill prescriptions for out of state customers?  If so, for how many out of state customers (ratio or approximate number)?
- If the pharmacy fills prescriptions for pain management or other specialty practitioners (diet, oncology, etc.), is the pharmacist comfortable with the prescribing practices of the practitioner?
- Has the pharmacist questioned or been uncomfortable with the prescribing practices of any practitioner?
- Has the pharmacy ever refused to fill prescriptions for a practitioner?  If so, why and who?
- Are there particular practitioners who constitute most of the prescriptions it fills? Who are these practitioners (name and DEA registration number)?
- Does the pharmacy have any exclusive contracts, agreements, arrangements, etc., with any particular practitioner, business group, investors, etc.?  If so, explain those arrangements and/or obtain copies of those agreements.
- Is the pharmacist comfortable enough with the prescribing practices of any or all practitioners for whom he/she fills to stake his/her professional livelihood on it?
- Does the pharmacy supply, order for, or sell to any practitioners or other pharmacies?
- How does the pharmacy sell/transfer controlled substances to other pharmacies or practitioners?  Via a prescription, sales invoice, or DEA Form-222? (Transfer by prescriptions is not authorized).

Possible questions for a practitioner:

- What is the practitioner's specialty, if any (family practice, oncology, geriatrics, pain management, etc.)?
- Do the controlled substances being ordered correspond to his specialty or the treatment he provides?
- What method of payment does the practitioner accept (cash, insurance, Medicare) and what is the ratio of each?
- Has the practitioner ever been disciplined by any state or federal authority?
- How many patients does the practitioner see each day?  What is his weekly average?
- Does the practitioner prescribe as well as dispense?
- Why does the practitioner prefer to dispense as opposed to prescribe?
- Who was the practitioner's previous supplier?  Is he still ordering from this supplier?  If not, why is he looking for a new supplier?
- Do the hours of operation and the facility accommodate the type of practice being conducted?
- Does the practitioner's office have security guards on-site?  If so, why?
- Are all applicable state, federal, local licenses current and are they issued for the registered address at which the practitioner is practicing?

August 12, 2015

CONFIDENTIAL

WMT_MDL_000043729

- Does the practitioner see out of state patients?  If so,
  - From what states,
  - How many,
  - Approximate ratio of out of state compared to local, and
  - Why, specifically, they travel so far to see him?
- Can the practitioner provide a blank copy of an agreement which he enters into with a patient, specifying the course of treatment, the patient rights and responsibilities, and reasons for termination of treatment?
- Does the practitioner conduct random unannounced drug testing?
- What measures does the practitioner employ and/or monitor to prevent addiction and diversion of controlled substances?
- Is there more than one practitioner dispensing controlled substances from the registered location?
- Does the practitioner order for just himself or for the whole clinic?
- What controlled substances is the practitioner currently dispensing?  (If only one or two controlled substances are being ordered, have the practitioner fully explain why he administers or dispenses only these specific controlled substances).
- In what dosage levels is the practitioner dispensing (e.g., 2 tablets, 4 times a day, for 30 days; or 90, 120, 240 a week or month).
- Does the practitioner prescribe as well as dispense to his patients?
- Does the practitioner prescribe the same controlled substances as were dispensed to the patient?
- How many patients is the practitioner presently treating (day, week, and month)?

Should you have any additional questions, concerns, or issues beyond what has been presented, it is strongly recommended you contact your local DEA Office.

3 of 3

August 12, 2015

CONFIDENTIAL

WMT_MDL_000043730

CONFIDENTIAL

News Articles

CONFIDENTIAL

**NEW ORLEANS NEWS**

May 20, 2015
Public Information Officer
Number: 504-840-1363

### DEA Announces Largest-Ever Prescription Drug Operation
*Four state takedown targets dirty doctors, pharmacies, pill mills*

**MAY 20 (NEW ORLEANS)** – DEA and federal prosecutors today announced unprecedented enforcement action across the states of Arkansas, Alabama, Louisiana, and Mississippi in an effort to reverse the horrible effects produced by the trafficking and abuse of pharmaceuticals.  As part of this effort, dubbed Operation Pilluted, 22 doctors and pharmacists were arrested in the 15-month operation which involved nearly a thousand law enforcement officers across the four states. 280 arrests took place total across the four states as part of the operation.



As part of Operation Pilluted, DEA Little Rock arrested drug suspects at KJ Medical Clinic. This case is the largest single pharmaceutical operation in law enforcement history. Operation Pilluted resulted in the seizure of drugs and weapons and targeted pill mills, doctors prescribing for non-medical purposes, and illicit pharmacies.

Operation Pilluted was led by the DEA New Orleans Field Division and utilized intelligence data, information provided by state and local law enforcement, and complaints made by citizens, to identify DEA Registrants and others involved in prescribing, obtaining, and distributing dangerous and addictive controlled substances such as Oxycodone, Hydrocodone, and Xanax.  In 2013, approximately 43,982 unintentional drug overdose deaths occurred in the United States, one death every 13 minutes.  Nearly 52 percent of those deaths (22,767) were attributed to prescription drugs.  Of these, 71 percent (16,235) were attributed to opioid overdoses.

"DEA is committed to reducing the destruction brought on by the trafficking and abuse of prescription drugs through aggressive criminal enforcement, robust administrative oversight, and strong relationships with other law enforcement agencies, the public, and the medical community," said DEA Special Agent in Charge Keith Brown. "The doctors and pharmacists arrested in Operation Pilluted are nothing more than drug traffickers who prey on the addiction of others while abandoning the Hippocratic Oath adhered to faithfully by thousands of doctors and pharmacists each day across this country."

 

As part of Operation Pilluted, DEA Little Rock arrested drug suspects at KJ Medical Clinic. This case is the largest single pharmaceutical operation in law enforcement history. Operation Pilluted resulted in the seizure of drugs and weapons and targeted pill mills, doctors prescribing for non-medical purposes, and illicit pharmacies.

As part of Operation Pilluted, DEA Little Rock arrested drug suspects at KJ Medical Clinic. This case is the largest single pharmaceutical operation in law enforcement history. Operation Pilluted resulted in the seizure of drugs and weapons and targeted pill mills, doctors prescribing for non-medical purposes, and illicit pharmacies.

In addition to the arrest of 22 doctors and pharmacists, DEA took action to remove or restrict the ability of the targeted DEA Registrants to prescribe or dispense controlled substances.  As part of Operation Pilluted, DEA issued 2 Immediate Suspension Orders and obtained the voluntary surrender for cause of an additional 40 DEA Registrations.  DEA is pursuing Administrative Actions which may result in the revocation of additional DEA Registrations. The doctors and pharmacists arrested are part of a total of 280 individuals arrested on

CONFIDENTIAL    WMT_MDL_000043733

Search    Si                    Providence ☁ 72°    All Access | Activate | Sign In | eEdition | Subscriber Services



HOME   NEWS   POLITICS   SPORTS   BUSINESS   OPINION   ENTERTAINMENT   OBITS          MARKETPLACE   JOBS   CARS   HOMES

Tue, August 11, 2015 »    WEATHER   THINGS TO DO   MARKETS   LOTTERIES   VIDEO   RACE IN R.I.   ARCHIVES   BUSINESS SERVICES   SUMMERTIME FUND?   | EXPLORE ●

NEWS NOW          in Afghanistan arrives in US         ...    Medical marijuana user's case against RI firm moves forward         ...         AAA: R.I. gas prices drop 8

# CVS will pay $450,000 fine in painkillers case

    COMMENT 〈 6 〉    Recommend 〈 10 〉          0



CVS has agreed to settle allegations by the U.S. government that it filled invalid prescriptions and maintained deficient records. The Associated Press

**By Journal News Staff**

Posted Aug. 10, 2015 at 11:21 AM

PROVIDENCE, R.I. — Pharmacy chain CVS Health Corp. has agreed to pay $450,000 to resolve the United States' allegations that several of its Rhode Island stores violated the federal Controlled Substances Act by filling invalid prescriptions and maintaining deficient records.

U.S. Attorney Peter F. Neronha for Rhode Island and Michael J. Ferguson, special agent in charge of the Drug Enforcement Administration's New England Field Division, announced the settlement on Monday.

The settlement, signed Friday, caps an investigation by the U.S. Attorney's Office for the District of Rhode Island and the DEA Office of Diversion Control of CVS' conduct at its Rhode Island retail pharmacy locations in filling prescriptions for various controlled substances with a high potential for abuse.

"It should come as no surprise to any Rhode Island citizen — individual or corporate — that diversion and misuse of prescription painkillers are a public health crisis in the State of Rhode Island," Neronha said in a statement. "This crisis demands that all citizens — individual and corporate — act responsibly when it comes to the dispensing of controlled substances. Even in cases where there is no evidence of abuse or nefarious intent, this office remains committed to using all the legal tools at our disposal to ensure that everyone in the chain of controlled substance distribution — from physicians to pharmacists — abides by the strict requirements of the law."

## TOP CLICKS

POPULAR   EMAILED   COMMENTED

Police, on the hunt since June, arrest gang member Gibson, aka 'Lil Gibby' Aug. 10, 2015

Global eavesdroppers: In World War II, dozens of radio operators in Scituate dialed into enemy conversations worldwide Aug. 8, 2015

Donaldson: In wake of embarrassing revelations, NFL should try to settle Brady case Aug. 8, 2015

Gang suspect escapes from police on South Side, crashes after chase in East Providence Aug. 10, 2015

Magic Johnson says NFL should back off Tom Brady Aug. 10, 2015

CVS will pay $450,000 fine in painkillers case Aug. 10, 2015

### RHODE ISLAND DIRECTORY

**Featured Businesses**
University of RI Sailing Center
Lila Delman Real Estate International
RI ENT Physicians Inc.
Metro FIAT of Providence
Metro Motor Group - Honda

Find Rhode Island Attractions ▼

Search business by keyword     | Search |
Add your business here +



### DEALS RI





Lang's Bowlarama Pizza Bowl Gift Card
$37.50
**Buy Now!**

VIEW ALL DEALS »

CONFIDENTIAL                                                            WMT_MDL_000043734

Under the Controlled Substances Act and its implementing regulations, substances such as painkillers and opioids can only be prescribed for legitimate medical purposes by a physician. The law, however, also places a "corresponding responsibility" on the pharmacist filling the prescription to ensure that the prescription is valid and legal, and that the prescriber has the legal authority to prescribe the drug. The act also imposes a number of record-keeping requirements.

In this case, the United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for the opioid painkiller hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe these drugs. Additionally, the government alleged that CVS had record-keeping deficiencies. The DEA office in Providence conducted the investigation from Oct. 18, 2013, to March 2, 2015.

Under the terms of a civil agreement, CVS will pay a civil penalty of $450,000 for its alleged conduct. CVS, while acknowledging that its pharmacists bear a corresponding responsibility under the Controlled Substances Act, has denied wrongdoing in this case.

**» Comment or view comments**

## E-EDITION

**TODAY'S eEDITION**



SPORTS

Bolden battling to be more than 'special'

PLAYING FOR A CAUSE

Read          Subscribe

Top Video Headlines

of 3



MORE FROM PROVIDENCEJOURNAL.COM AND FROM AROUND THE WEB









Could this Tiny Stock be the Next Big Thing? (Venture capital log)

Medical marijuana sales boost R.I. coffers

Here's Why You Should Stop 'Googling' Names For Info (BeenVerified.com)

Jamie Collins continues to wow teammates

FROM AROUND THE WEB

Must-Have TaylorMade Drivers Being Sold for Next to Nothing (LifeFactopia)

Causes of Erectile Dysfunction (Health Central)

Fantasy Football: WR rankings for 2015 (ESPN Fantasy)

A popular new site reveals the truth about anyone's past. Simply enter name and state to see what is available online. What will you learn today? (Instant Checkmate)

Sandra Bland's Autopsy Details How She Died (The New York Times)

MORE FROM PROVIDENCEJOURNAL.COM

RI company seeks dismissal of medical marijuana user's case

Christina Applegate Ditched Brad Pitt Mid-Date 26 Years Ago for Another Guy... But Who Was It?

Former Attleboro mayor killed in crash

AP's Top Stories on video: Protests mark anniversary of Michael Brown's death in Ferguson, Mo.

John Kostrzewa: Rebirth of shopping center in Warwick will help revitalize R.I. economy

Recommended by

## » EVENTS CALENDAR

TUE    WED    THU    FRI    SAT    SUN    MON

Tuesday, August 11, 2015

Celebrating 50 Years! Rosie the Riveter Look - a - Like Contest          All Day

Battleship Cove

Bristol Explorer Pass          All Day

Blithewold Mansion Gardens & Arboretum

9th annualOne Act Play Festival          All Day

Theatre 82

Camel Rides Open          All Day

More Events »          Add Events »

EVENTS    VENUES    DINING

Events by eviesays.com

**NDN**



More videos:

  

TV GUIDE

CONFIDENTIAL          WMT_MDL_000043735

Cardinal Health settles drug distribution case - USATODAY.com
Page 1 of 3
Case: 1:17-md-02804-BAP Doc #: 3003-19 Filed: 12/17/19 26 of 78. PageID #: 433401

Subscribe | Mobile    Google USA TODAY stories, photos and more
Join USA TODAY
Sign in | Become a member

**News**

| Home | News | Travel | Money | Sports | Life | Tech | Weather

News: Communities | Education | Nation | Military | Election 2012 | Religion | Health & Wellness | Washington | World | Opinion

# Cardinal Health settles drug distribution case

By Donna Leinwand Leger, USA TODAY

Updated 5/15/2012 3:23 PM

Recommend [ 0 ]    11    8+1 [ 0 ]

Reprints & Permissions

The DEA suspended Cardinal Health, the country's second-largest drug distributor, from selling and shipping powerful painkillers and other drugs from its Lakeland, Fla., facility for two years as part of a settlement reached Tuesday.

The Drug Enforcement Administration sought to revoke Cardinal's license in February, accusing the company of selling excessive amounts — more than 12 million oxycodone pain pills — to four Florida pharmacies over three years. The DEA said the company did not report suspicious orders or visit the chain pharmacies that purchased large amounts of the drugs.

Kiichiro Sato, AP

Outside Cardinal Health headquarters in Dublin, Ohio

The DEA also suspended controlled substances licenses for two CVS pharmacies in Sanford, Fla., which purchased millions of oxycodone pills from Cardinal. A judge is expected to rule on the CVS case this month.

**Sponsored Links**

**Travel Guard® Insurance**
Get Travel Insurance Coverage for Your Vacation!
www.travelguard.com

**Extended Stay America**
Official Site. Free WIFI, Kitchens. Our best rates here, guaranteed.
www.extendedstayamerica.com

**Hot 3D Printing Stock**
CHGT Examines Bioprinting For New Printing Portal. Learn More!
investors.changingtechno.com

"Cardinal Health is not above the law," said Joe Rannazzisi, DEA deputy assistant administrator. "With this agreement, it admits that it neglected its vital responsibility to prevent the diversion of controlled substance medications."

While the agreement resolves the licensing issue, the DEA said it may pursue civil penalties, including fines, against the company. The Dublin, Ohio-based company had revenue of more than $100 billion in 2011.

This is the second time the DEA has taken action against Cardinal. In 2008, Cardinal paid a $34 million fine after the DEA accused it of shipping excessive amounts of hydrocodone, another powerful painkiller, to Internet pharmacies. As part of that settlement, the DEA suspended licenses at three distribution facilities for a year.

Cardinal admitted Tuesday it had "inadequate" control over some of its controlled drugs and had not fully complied with the 2008 agreement.

"This agreement allows us to put this matter behind us, and just as important, will clear the way for a more productive dialogue about how we and others in the health care and regulatory community can work together to prevent the abuse and misuse of prescription drugs," Cardinal CEO George Barrett said.

The five-year agreement applies to all 28 of Cardinal's distribution facilities and requires the company to review orders for the controlled drugs, visit pharmacies to look for signs of diversion and hire extra field inspectors for Florida pharmacies.

The Lakeland facility can still distribute non-controlled drugs and medical supplies.

**Videos you may be interested in**

  

Raw: Wildfire Spreading in Southern Califor...

Lingerie Fighting Championships 20 Weigh-ins from ...

Cheapest Places to Live in the Un... ALOT Finance

Promoted Links by Taboola

More videos

**Most Popular**

**Stories**
 HF Test

**Videos**
 Ed Baig reviews Kindle Paperwhite
 'Pregnant man' struggles through nasty divorce
 Tennis Channel Court Report 9-30-2012

**Photos**
 Dramatic weight-loss success stories
 Unrest in Syria
 Editorial Cartoons

**Most Popular E-mail Newsletter**

**Sign up to get:**
Top viewed stories, photo galleries and community posts of the day

**Most popular right now:**
HF Test



CONFIDENTIAL    WMT_MDL_000043736

Home → Collections → **Distribution Center**

## Walgreens agrees to record-breaking $80M fine to settle Florida oxycodone probe



Recommend ⟨ 58

4    * :    3

Tweet    g +1

June 11, 2013 | By Amy Pavuk, Orlando Sentinel

Walgreens has agreed to pay a record-breaking $80 million penalty to resolve a U.S. Drug Enforcement Administration investigation into the company's dispensing practices in Florida, including at an Oviedo pharmacy.

The DEA in September banned a Walgreens distribution center in Jupiter from dispensing controlled substances to its pharmacies in Florida and the East Coast, saying it was the single-largest distributor of oxycodone in the state.

The top six Walgreens pharmacies in Florida were also targeted in the probe, including the store on Lockwood Boulevard.

In addition to the penalty, the DEA also said in its settlement made public Tuesday that the Walgreens distribution center and six stores are banned from dispensing Schedule II through Schedule V drugs until 2014, which include the painkillers OxyContin, Percocet and Vicodin, and the sedative Xanax.

"National pharmaceutical chains are not exempt from following the law," said DEA Special Agent in Charge Mark R. Trouville in a prepared statement.

"This settlement sends out a clear message that all DEA registrants will be held accountable when they violate the law and threaten public health and safety," he said. "The DEA will continue its efforts to work with our registrants and our law enforcement partners to combat pharmaceutical drug abuse and diversion in Florida."

In a written statement released Tuesday from Kermit Crawford, president of pharmacy, health and wellness for Walgreens, said the company has worked closely with DEA in recent months to reach the agreement and has taken measures to enhance its ordering processes and inventory systems.

"As the largest pharmacy chain in the U.S., we are fully committed to doing our part to prevent prescription drug abuse," Crawford's statement said. "We will continue to advocate for solutions that involve all parties — including leaders in the community, physicians, pharmacies, distributors and regulators — to play a role in finding practical solutions that combat the abuse of controlled substances and ensure patient access to critical medications."

Several years ago, Florida became a top destination for drug addicts and dealers because of the state's proliferation of pain-management clinics and lax laws.

By 2010, 90 of the top 100 oxycodone-buying physicians in the country were from Florida.

In response, DEA began targeting national pharmacy chains and drug-wholesale distributor Cardinal Health, which federal authorities said were a danger to the public.

DEA banned two Sanford CVS pharmacies from dispensing controlled substances and in September targeted the Walgreens distribution center.

In addition to the Oviedo store, the five other Walgreens pharmacies targeted in the DEA probe are in Hudson, Fort Pierce, Port Richey and Fort Myers.

DEA said pharmacists at those stores filled prescriptions that they knew or should have known were not for legitimate use.

Federal authorities said the Oviedo store ordered about 80,900 oxycodone units from the Jupiter distribution center in 2009. By 2011, the pharmacy ordered nearly 1.7 million units.

### Related Articles

DEA investigating Oviedo Walgreens
*April 6, 2012*

Walgreens fights back against DEA, wants ban at Florida...
*October 11, 2012*

DEA tells Walgreens: Hand over customer files
*October 16, 2012*

Lake Mary pain doctor sentenced to 25 years in prison
*April 15, 2013*

Walgreens pharmacies in Oviedo, 2 other Florida locations...
*November 27, 2012*

### Find More Stories About

Distribution Center

CONFIDENTIAL                                                                 WMT_MDL_000043737

**57656**    Federal Register / Vol. 78, No. 182 / Thursday, September 19, 2013 / Notices

## GEORGIA

### Jones County

Shaver, Herman and Allene, House, 1421 Monticello Hwy., Wayside Community, 13000813

## ILLINOIS

### Cook County

Hines, Edward Jr., Veterans Administration Hospital Historic District, (United States Second Generation Veterans Hospitals MPS) 5000 S. 5th Ave., Hines, 13000814

## KANSAS

### Dickinson County

Kubach, Gustave A., House, 101 S. Buckeye Ave., Abilene, 13000815

### Johnson County

Westwood Hills Historic District, Bounded by State Line Rd., W. 50th St. Terr., Rainbow Blvd., N. side of W. 48th St. Terr., Westwood Hills, 13000816

### Miami County

New Lancaster General Store, 36688 New Lancaster Rd., New Lancaster, 13000817

New Lancaster Grange Hall, No. 223, 12655 W. 367th St., New Lancaster, 13000818

### Wyandotte County

Meeks, Cordell D. Sr., House, 600 Oakland Ave., Kansas City, 13000819

St. John the Divine Catholic Church, 2511 Metropolitan Ave., Kansas City, 13000820

## MISSOURI

### Jackson County

Braley, Charles A., House, 3 Dunford Cir., Kansas City, 13000821

## OREGON

### Multnomah County

Brooks, Andrew J. and Minnie J., House, 2216 SE. 32nd Ave., Portland, 13000822

## WASHINGTON

### King County

Ford Motor Company Assembly Plant, 4735 E. Marginal Way, Seattle, 13000823

## WISCONSIN

### Racine County

Burlington Cemetery Chapel, 701 S. Browns Lake Dr., Burlington, 13000824

[FR Doc. 2013–22769 Filed 9–18–13; 8:45 am]
BILLING CODE 4312–51–P

## DEPARTMENT OF JUSTICE

### Notice of Lodging of Proposed Consent Decree Under the Clean Air Act

On September 13, 2013, the Department of Justice lodged a proposed Consent Decree in *United States and San Joaquin Valley Unified Air Pollution Control District v. Post Holdings, Inc. and Ralcorp Holdings,*

*Inc,* Civil Action No. 1:13-cv-01482, with the United States District Court for the Eastern District of California, Fresno Division.

The proposed Consent Decree resolves the claims of the United States and the San Joaquin Valley Unified Air Pollution Control District (the "Air District") against Post Holdings, Inc. and Ralcorp Holdings, Inc. for violations of the Clean Air Act, 42 U.S.C. 7413, and the federally enforceable California state implementation plan. The plaintiffs alleged that defendants' cereal manufacturing facility in Modesto, California operated without the appropriate permits and pollution controls. Under the Consent Decree, defendants will pay a civil penalty of $635,000 ($317,500 shall be paid to the United States; $317,500 shall be paid to the Air District); shall operate and maintain the facility's pollution control equipment as specified; and shall comply with recordkeeping and monitoring requirements.

The publication of this notice opens a period for public comment on the Consent Decree. Comments should be addressed to the Assistant Attorney General, Environment and Natural Resources Division, and should refer to *United States and San Joaquin Valley Unified Air Pollution Control District v. Post Holdings, Inc. and Ralcorp Holdings, Inc.,* D.J. Ref. No. 90–5–2–1–10136. All comments must be submitted no later than thirty (30) days after the publication date of this notice. Comments may be submitted either by email or by mail:

| To submit comments: | Send them to: |
|---|---|
| By email ... | *pubcomment-ees.enrd@ usdoj.gov.* |
| By mail ..... | Assistant Attorney General, U.S. DOJ—ENRD, P.O. Box 7611, Washington, D.C. 20044–7611. |

During the public comment period, the Consent Decree may be examined and downloaded at this Justice Department Web site: *http:// www.usdoj.gov/enrd/Consent_ Decrees.html.* We will provide a paper copy of the Consent Decree upon written request and payment of reproduction costs. Please mail your request and payment to: Consent Decree Library, U.S. DOJ—ENRD, P.O. Box 7611, Washington, DC 20044—7611.

Please enclose a check or money order for $9.75 (25 cents per page

reproduction cost) payable to the United States Treasury.

**Henry S. Friedman,**
*Assistant Section Chief, Environmental Enforcement Section, Environment and Natural Resources Division.*

[FR Doc. 2013–22808 Filed 9–18–13; 8:45 am]
BILLING CODE 4410–15–P

## DEPARTMENT OF JUSTICE

### Drug Enforcement Administration

### S & S Pharmacy, Inc., d/b/a Platinum Pharmacy & Compounding; Decision and Order

On October 27, 2011, I, the Administrator of the Drug Enforcement Administration, issued an Order to Show Cause and Immediate Suspension of Registration to S & S Pharmacy, Inc., d/b/a Platinum Pharmacy & Compounding (hereinafter, Registrant), of Tampa, Florida. GX B, at 1. The Show Cause Order proposed the revocation of Registrant's Certificate of Registration as a retail pharmacy, which before it expired, authorized it to dispense controlled substances in schedules II through V, as well as the denial of any pending application to renew or modify its registration, on the ground that its "continued registration is inconsistent with the public interest." *Id.*

More specifically, the Order alleged that Registrant was "owned and operated by Ihab S. Barsoum," a registered pharmacist and that its registration was due to expire "on February 12, 2012." *Id.* The Order further alleged that Registrant's owner/ operator had "unlawfully distributed oxycodone, a Schedule II narcotic controlled substance, in exchange for cash, based on fraudulent prescriptions." *Id.* at 2. The Order then alleged that Barsoum had made the following five unlawful distributions:

(1) on January 24, 2011, 429 dosage units of oxycodone 30mg. and 372 dosage units of oxycodone 15mg. for $2,500 cash;

(2) on February 2, 2011, 1,000 dosage units of oxycodone 30mg. for $4,000 cash;

(3) on March 7, 2011, 2,000 dosage units of oxycodone 30mg. for $8,100 cash;

(4) on April 13, 2011, 700 dosage units of oxycodone 30mg. for $3,500 cash; and

(5) on June 23, 2011, 800 dosage units of oxycodone 30mg. for $4,000 cash. Id.

Based on the above, I further concluded that Registrant's continued registration during the pendency of the proceedings "constitutes an imminent

CONFIDENTIAL

WMT_MDL_000043738

quantity of controlled substances. *Id.* The CS was then observed travelling to and entering Registrant, as well as upon exiting Registrant and returning to meet the Agents. *Id.*

According to the S/A, the CS had attempted to give all nine prescriptions to Barsoum. *Id.* However, Barsoum gave the two blank prescriptions back to the CS. *Id.* The CS explained to Barsoum that the doctor's information including his DEA number had been placed on the prescriptions, and that the voice mail for the telephone number had been changed to "to match the new prescriptions." *Id.*

On March 7, 2011, the Agents again met with the CS, who informed them that Barsoum had texted him/her that he had 2,000 dosage units of oxycodone 30mg. available for sale. *Id.* at 9. The CS also told the Agents that he/she and Barsoum had exchanged text messages about providing fictitious prescriptions and that Barsoum needed a list of the names that were to be placed on the prescriptions so that he could enter the fictitious prescription data into Registrant's dispensing software on different days to make it appear that the dispensings had occurred on different days. *Id.* The CS faxed the names to Barsoum, who then sent a text to the CS acknowledging that he had received them. *Id.*

That same day, another undercover buy was performed. *Id.* After searching the CS and finding the CS to not possess any contraband, the CS was provided with $8,100 in cash, a recording device, and several incomplete fictitious prescriptions. *Id.* The CS was then observed travelling to and entering Registrant, as well as exiting Registrant and traveling to meet the Agents. *Id.*

Upon meeting the CS, the S/A received a paper bag which contained five bottles of oxycodone, which upon counting, totaled 2,000 dosage units of oxycodone 30mg. *Id.* at 9–10. After retrieving the recording device and three unused prescriptions from the CS, the CS was searched and found to not possess any contraband and excess currency. *Id.* at 10. Subsequently, the S/A listened to the recording of the transaction and determined that Barsoum was the person who had sold the oxycodone to the CS. *Id.* A transcription of the visit was also made and submitted as part of the record. *Id.*

On April 13, 2011, the Agents again met with the CS who informed them that Barsoum had texted him/her that he had 700 dosage units of oxycodone 30mg available for sale. *Id.* The Agents proceeded to conduct another undercover buy. *Id.* After searching the CS, who was found to not possess any

contraband, the CS was given $5,000 in cash, a recording device, and five incomplete fictitious prescriptions. *Id.* The Agents then observed the CS travelling to and entering Registrant, as well as upon exiting Registrant and travelling back to meet the Agents. *Id.*

Upon meeting with the Agents, the CS turned over a plastic bag which contained one bottle of 700 oxycodone 30mg. tablets. *Id.* at 11. The S/A then obtained the recording device, two unused prescriptions, and $1,500 of unused cash. *Id.* The CS was searched again and found to not possess any excess currency and contraband. *Id.* Later, the S/A listened to the recording and identified Barsoum as the person who had sold the drugs to the CS. *Id.* A transcription of the recording was made and submitted for the record.

On June 23, 2011, the Agents again met with the CS. *Id.* The CS reported that Barsoum had texted him/her that he had 1,000 dosage units of oxycodone 30mg. available for sale; however, the CS's texts to Barsoum had not been returned. *Id.* That day, the CS placed a phone call to Barsoum, which was recorded and monitored by the Agents; during the call, the CS told Barsoum that he was on his way to Registrant. *Id.* The Agents then proceeded to conduct another undercover buy.

After searching the CS and finding the CS to not possess any contraband, the CS was provided with a recording device, $5,000 cash, and eight incomplete fictitious prescriptions. *Id.* The Agents observed the CS travel to and enter Registrant; they also observed the CS exit Registrant, depart the parking lot, then immediately return and re-enter Registrant, followed by the CS again exiting Registrant and traveling back to meet with them. *Id.* at 12.

Upon meeting the Agents, the CS turned over a paper bag, which contained four bottles of oxycodone 30mg. tablets; subsequently, the contents of the bottles were counted and totaled 800 dosage units. *Id.* The S/A also retrieved the recording device, $1,000 in unused cash, and four unused prescriptions. *Id.* The CS was then searched and found to not possess any excess currency and contraband. *Id.*

The S/A reviewed the recording and again identified Barsoum as the person who sold the oxycodone to the CS. *Id.* Moreover, during the course of the transaction, Barsoum told the CS to fill out four prescriptions totaling 1,200 dosage units even though Barsoum was selling only 800 dosage units to the CS. *Id.*

On October 26, 2011, a federal grand jury indicted Barsoum on six felony counts of violating the Controlled

Substances Act. The charges included five counts of "knowingly and intentionally" distributing oxycodone "outside the course of professional practice," in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(C). GX 6, at 2–3. The indictment also charged Barsoum with one count of "knowingly and willfully conspir[ing] with other[ ]s" to unlawfully dispense oxycodone, in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(C) and 21 U.S.C. 846. *Id.* at 1. Finally, the indictment sought the forfeiture of, *inter alia,* "all of [Barsoum's] right, title and interest in" both "property constituting and derived from any proceeds . . . obtained, directly, or indirectly, as a result of such violations," as well as "property used and intended to be used in any manner or part to commit or to facilitate the commission of such violations." *Id.* at 4–5.

On July 5, 2012, a grand jury issued a superseding indictment, which again alleged each of the conspiracy and unlawful distribution counts, as well as sought the forfeiture of the above described property. *See* Superseding Indictment at 1–4, *United States* v. *Ihab "Steve" Barsoum,* No. 8:11–CR–548–T–33MAP (M.D. Fla. July 2012). Barsoum pled not guilty, went to trial, and was convicted on all six counts. *See* Judgment and Sentence at 1, *United States* v. *Barsoum* (Feb. 5, 2013). The District Court sentenced Barsoum to 204 months imprisonment on each count, with the "terms to run concurrently," and subsequently placed him in the custody of the U.S. Bureau of Prisons; the Court also imposed thirty-six months of supervised release following his term of imprisonment. *Id.* at 3–4. The Court further ordered that Barsoum "forfeit [his] interest in the following property to the United States: . . . any and all assets previously identified in the Indictment that are subject to forfeiture," and specifically identified the property to include, but not be "limited to," his DEA registration and two BMW automobiles. *Id.* at 6. Barsoum then filed a notice of appeal.

## Discussion

### Mootness

As found above, the registration at issue in this proceeding was due to expire on February 29, 2012, and in any event, as part of its judgment, the District Court ordered Mr. Barsoum to forfeit Registrant's registration. Moreover, Mr. Barsoum did not file either a renewal application or a new application. Accordingly, there is neither a registration to revoke nor an application to act upon.

WMT_MDL_000043739

**57660**     **Federal Register** / Vol. 78, No. 182 / Thursday, September 19, 2013 / Notices

of 4,929 tablets of oxycodone 30mg. and 372 tablets of oxycodone 15mg., in exchange for $22,100 in cash. The distributions were not dispensings within the meaning of the CSA because the controlled substances were not delivered "pursuant to the lawful order of[ ] a practitioner." 21 U.S.C. 802(10). Indeed, as the evidence shows, Barsoum required the CS to produce fictitious prescriptions in order to provide a paper trail which, in the event his pharmacy was inspected by the authorities, he could use to justify the distributions. In short each of the transactions was a blatant drug deal and a distribution in violation of the CSA. *See* 21 U.S.C. 841(a)(1), 21 CFR 1306.04(a).

Accordingly, I hold that the Government has established that Registrant, through its principal Mr. Barsoum, committed acts which rendered its registration "inconsistent with the public interest," 21 U.S.C. 824(a)(4), and which justified the immediate suspension of its registration as "an imminent danger to the public health or safety." *Id.* § 824(d). I therefore affirm the immediate suspension of Registrant's registration, and while Mr. Barsoum allowed Registrant's registration to expire, had he filed a renewal application, I would have revoked his pharmacy's registration.

Pursuant to 21 U.S.C. 824(f), "[u]pon a revocation order becoming final, all . . . controlled substances" seized pursuant to a suspension order, "shall be forfeited to the United States" and "[a]ll right, title, and interest in such controlled substances shall vest in the United States upon a revocation order becoming final." As the Agency has previously held, a registrant cannot defeat the effect of this provision by allowing its registration to expire. *Meetinghouse Community Pharmacy, Inc.,* 74 FR 10073, 10074 n.5 (2009); *RX Direct Pharmacy, Inc.,* 72 FR 54070, 54072 n.3 (2007). Registrant had the right to challenge the suspension order before the Agency but chose not to.

Accordingly, I declare forfeited to the United States all controlled substances that were seized pursuant to the Immediate Suspension Order, which have not been previously declared forfeited by the District Court in the Judgment and Sentence in *United States* v. *Barsoum.* I further hold that in the event the District Court's Judgment and Sentence are vacated, any controlled substances which had been previously declared forfeited by the District Court, shall be forfeited to the United States.

**Order**

Pursuant to the authority vested in me by 21 U.S.C. 824(a) and (d), as well as 28 CFR 0.100(b), I affirm the Order of Immediate Suspension of Registration issued to S & S Pharmacy, Inc., d/b/a Platinum Pharmacy & Compounding. Pursuant to the authority vested in me by 21 U.S.C. 824(f), as well as 28 CFR 0.100(b), I further order that all controlled substances seized pursuant to the Order of Immediate Suspension of Registration, which are not subject to forfeiture pursuant to the District Court's Judgment and Sentence in *United States* v. *Ihab "Steve" Barsoum,* No. 8:11–CR–548–T–33MAP (M.D. Fla. Feb. 5, 2013), be, and they hereby are, forfeited to the United States. This order is effective October 21, 2013.

Dated: September 8, 2013.

**Michele M. Leonhart,**
*Administrator.*

[FR Doc. 2013–22793 Filed 9–18–13; 8:45 am]

**BILLING CODE 4410-09-P**

---

**DEPARTMENT OF LABOR**

**Office of the Secretary**

**Agency Information Collection Activities; Submission for OMB Review; Comment Request; Labor Standards for Federal Service Contracts**

**ACTION:** Notice.

**SUMMARY:** The Department of Labor (DOL) is submitting the Wage and Hour Division (WHD) sponsored information collection request (ICR) titled, "Labor Standards for Federal Service Contracts," to the Office of Management and Budget (OMB) for review and approval for continued use, without change, in accordance with the Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3501 et seq.).

**DATES:** Submit comments on or before October 21, 2013.

**ADDRESSES:** A copy of this ICR with applicable supporting documentation; including a description of the likely respondents, proposed frequency of response, and estimated total burden may be obtained free of charge from the *RegInfo.gov* Web site at *http:// www.reginfo.gov/public/do/ PRAViewICR?ref_nbr=201304–1235–001* (this link will only become active on the day following publication of this notice) or by contacting Michel Smyth by telephone at 202–693–4129 (this is not a toll-free number) or sending an email to *DOL_PRA_PUBLIC@dol.gov.*

Submit comments about this request to the Office of Information and Regulatory Affairs, Attn: OMB Desk Officer for DOL–WHD, Office of Management and Budget, Room 10235, 725 17th Street NW., Washington, DC 20503, Fax: 202–395–6881 (this is not a toll-free number), email: *OIRA_ submission@omb.eop.gov.* Commenters are encouraged, but not required, to send a courtesy copy of any comments to the U.S. Department of Labor-OASAM, Office of the Chief Information Officer, Attn: Information Management Program, Room N1301, 200 Constitution Avenue NW., Washington, DC 20210, email: *DOL_PRA_PUBLIC@dol.gov.*

**FOR FURTHER INFORMATION CONTACT:** Michel Smyth by telephone at 202–693–4129 (this is not a toll-free number) or by email at *DOL_PRA_PUBLIC@dol.gov.*

**Authority:** 44 U.S.C. 3507(a)(1)(D).

**SUPPLEMENTARY INFORMATION:** The WHD administers the McNamara-O'Hara Service Contract Act (SCA), 41 U.S.C. 351 *et seq.* The SCA applies to every contract entered into by the United States or the District of Columbia, the principal purpose of which is to furnish services to the United States through the use of service employees. The SCA requires contractors and subcontractors performing services on covered federal or District of Columbia contracts in excess of $2,500 to pay service employees in various classes no less than the monetary wage rates and to furnish fringe benefits found prevailing in the locality, or the rates (including prospective increases) contained in a predecessor contractor's collective bargaining agreement. Safety and health standards also apply to such contracts. The WHD administers and enforces SCA compensation requirements. This ICR is to continue PRA authorization the following information collections: (1) Vacation Benefit Seniority List, (2) Conformance Record, and (3) Submission of Collective Bargaining Agreement. For additional substantive information about this ICR, see the related notice published in the Federal Register on May 7, 2013 (78 FR 26657).

This information collection is subject to the PRA. A Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by the OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information that does not display a valid Control Number. See 5 CFR 1320.5(a) and 1320.6. The DOL obtains OMB approval for this information collection under Control Number 1235–0007.

Oxycodone Data

CONFIDENTIAL





Wal-Mart Pharmacy Warehouse #45 Oxycodone Sales in Dosage Units to Pharmacies by State and Year from January 1, 2013, to June 30, 2015

*They are not putting quotas on distributors. What can be sold to pharmacy*

|      | NC | FL | AZ | OH | PA | CO | MO | VA | TN | SC | WI | OK |
|------|----|----|----|----|----|----|----|----|----|----|----|----|
| 2013 | 10,561,100 | 9,165,700 | 9,041,200 | 7,909,400 | 7,094,100 | 6,677,100 | 5,697,600 | 4,948,900 | 4,928,100 | 4,561,000 | 4,268,800 | 4,006,800 |
| 2014 | 20,089,100 | 19,633,700 | 18,518,800 | 16,033,500 | 13,811,300 | 12,233,000 | 10,871,000 | 10,022,200 | 1,040,800 | 8,897,600 | 7,544,000 | 8,461,500 |
| 2015 | 9,567,300 | 7,962,800 | 8,243,100 | 7,928,700 | 6,829,900 | 5,265,700 | 5,767,800 | 5,002,700 | 5,449,300 | 4,027,800 |  | 4,555,500 |



CONFIDENTIAL

WMT_MDL_000043744



**Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units by Strength from January 1, 2013, to December 31, 2013**

20mg, 2,640,000, 1%
30mg, 20,942,200, 6%
7.5mg, 27,511,600, 8%
5mg, 150,196,700, 44%
10mg, 108,803,000, 32%

*Straight entity + w/ Acetaminophen*

CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units by State from January 1, 2013, to December 31, 2013

CONFIDENTIAL

WMT_MDL_000043746



WMT_MDL_000043747



CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units from January 1, 2013, to December 31, 2013 (Pg.3)



CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales
in Dosage Units from January 1, 2013, to December 31, 2013 (Pg.5)



CONFIDENTIAL

WMT_MDL_000043752



**Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units by Strength from January 1, 2014, to December 31, 2014**

20mg, 3,519,100, 1%

30mg, 18,236,900, 6%

15mg, 27,374,600, 10%

5mg, 116,971,200, 41%

10mg, 98,678,200, 34%

7.5mg, 24,259,100, 8%

CONFIDENTIAL

WMT_MDL_000043753



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units by State from January 1, 2014, to December 31, 2014

CONFIDENTIAL

WMT_MDL_000043754



WMT_MDL_000043755



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units from January 1, 2014, to December 31, 2014 (Pg.2)

WMT_MDL_000043756



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units from January 1, 2014, to December 31, 2014 (Pg.3)

WMT_MDL_000043757



**Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales**
**Dosage Units from January 1, 2014, to December 31, 2014 (Pg.4)**

WMT_MDL_000043758



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units from January 1, 2014, to December 31, 2014 (Pg.5)



CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in
Dosage Units by Strength from January 1, 2015, to June 30, 2015

20mg, 2,171,600, 2%

40mg, 263,400, 0%

30mg, 7,963,000, 6%

80mg, 151,600, 0%

7.5mg, 11,901,800, 9%

5mg, 55,820,600, 40%

10mg, 46,563,000, 34%

CONFIDENTIAL

WMT_MDL_000043761



WMT_MDL_000043762

**Wal-Mart Warehouse #45 Top 30 Buyers of ____ycodone January 1, 2013, to June 30, 2015**

**2014 Estimated National Average for Pharmacies: 71,128 Dosage Units**

| Rank | DEA Number | Pharmacy | City | State | 2013 | 2014 | 2015 | Grand Total |
|---|---|---|---|---|---|---|---|---|
| 1 | BW6595586 | WAL-MART PHARMACY 10-1370 | BULLHEAD CITY | AZ | 335,000 | 0 | 292,000 | 627,000 |
| 2 | BW0771697 | WAL-MART PHARMACY 10-1001 | PUEBLO | CO | 321,000 | 597,300 | 0 | 918,300 |
| 3 | BW6229288 | WAL-MART PHARMACY 10-2666 | COLUMBUS | OH | 257,000 | 486,700 | 250,000 | 993,700 |
| 4 | BW5431084 | WAL-MART PHARMACY 10-1242 | HENDERSONVILLE | NC | 256,800 | 0 | 238,300 | 495,100 |
| 5 | BW3209257 | WAL-MART PHARMACY 10-1834 | GRANTS PASS | OR | 250,900 | 480,500 | 223,600 | 955,000 |
| 6 | BW5431111 | WAL-MART PHARMACY 10-1268 | WHITEVILLE | NC | 247,400 | 568,200 | 271,000 | 1,086,600 |
| 7 | BW4283519 | WAL-MART PHARMACY 10-2113 | PHOENIX | AZ | 238,100 | 526,300 | 153,500 | 917,900 |
| 8 | BW0162963 | WAL-MART PHARMACY 10-0842 | PUEBLO | CO | 234,500 | 368,600 | 0 | 603,100 |
| 9 | BW6263040 | WAL-MART PHARMACY 10-2555 | NEW CASTLE | DE | 230,800 | 325,300 | 0 | 556,100 |
| 10 | FW0382553 | WAL-MART PHARMACY 10-5424 | EAGLE POINT | OR | 229,600 | 0 | 0 | 229,600 |
| 11 | BW8225080 | WAL-MART PHARMACY 10-5101 | PAHRUMP | NV | 217,200 | 458,100 | 237,300 | 912,600 |
| 12 | BW1627578 | WAL-MART PHARMACY 10-1231 | DENVER | CO | 216,000 | 335,500 | 0 | 551,500 |
| 13 | BW5430296 | WAL-MART PHARMACY 10-0627 | DILLON | SC | 211,400 | 0 | 0 | 211,400 |
| 14 | BW9465647 | WAL-MART PHARMACY 10-5489 | PEMBROKE | NC | 203,800 | 311,900 | 0 | 515,700 |
| 15 | BW5430323 | WAL-MART PHARMACY 10-0630 | FLORENCE | SC | 200,900 | 420,200 | 160,300 | 781,400 |
| 16 | BW8111522 | WAL-MART PHARMACY 10-3582 | COLORADO SPRINGS | CO | 197,700 | 344,800 | 176,400 | 718,900 |
| 17 | BW7873652 | WAL-MART PHARMACY 10-3496 | MILWAUKEE | WI | 197,400 | 0 | 0 | 197,400 |
| 18 | BW8403002 | WAL-MART PHARMACY 10-5166 | DEMING | NM | 191,400 | 369,400 | 0 | 560,800 |
| 19 | BW5477648 | WAL-MART PHARMACY 10-1674 | HAGERSTOWN | MD | 188,700 | 443,600 | 189,400 | 821,700 |
| 20 | BW5430791 | WAL-MART PHARMACY 10-1060 | MORGANTON | NC | 183,300 | 324,200 | 146,700 | 654,200 |
| 21 | BW1549813 | WAL-MART PHARMACY 10-1200 | COLORADO SPRINGS | CO | 182,600 | 0 | 0 | 182,600 |
| 22 | BW7524603 | WAL-MART PHARMACY 10-2729 | FORT COLLINS | CO | 182,400 | 377,200 | 0 | 559,600 |
| 23 | BW9510606 | WAL-MART PHARMACY 10-5047 | AUDUBON | NJ | 177,000 | 330,800 | 201,500 | 709,300 |
| 24 | BW5495761 | WAL-MART PHARMACY 10-1510 | FLORENCE | KY | 174,200 | 357,300 | 0 | 531,500 |
| 25 | BW5462457 | WAL-MART PHARMACY 10-1850 | CHAMBERSBURG | PA | 173,900 | 336,700 | 152,100 | 662,700 |
| 26 | BW7103548 | WAL-MART PHARMACY 10-2929 | HOPE MILLS | NC | 172,800 | 308,900 | 0 | 481,700 |
| 27 | BW6871102 | WAL-MART PHARMACY 10-2837 | LAS VEGAS | NV | 171,600 | 0 | 0 | 171,600 |
| 28 | BW5504320 | WAL-MART PHARMACY 10-2481 | COAL TOWNSHIP | PA | 171,400 | 331,400 | 171,100 | 673,900 |
| 29 | BW5419610 | WAL-MART PHARMACY 10-0101 | ROLLA | MO | 171,000 | 229,700 | 164,900 | 565,600 |
| 30 | BW6264220 | WAL-MART PHARMACY 10-2547 | MONTICELLO | NY | 170,100 | 329,100 | 0 | 499,200 |
| 31 | BW5366427 | WAL-MART PHARMACY 10-1357 | SILVER CITY | NM | 169,500 | 335,800 | 159,600 | 664,900 |
| 32 | FW0116447 | WAL-MART PHARMACY 10-3350 | LAS VEGAS | NV | 167,000 | 313,100 | 0 | 480,100 |
| 33 | BW5373410 | WAL-MART PHARMACY 10-1344 | STAUNTON | VA | 166,900 | 363,700 | 190,300 | 720,900 |

CONFIDENTIAL

Wal-Mart Warehouse #45 Top 50 Buyers of xycodone January 1, 2013, to June 30, 2015
2014 Estimated National Average for Pharmacies: 71,128 Dosage Units

| 34 | BW6543210 | WAL-MART PHARMACY 10-2768 | MESA | AZ | 166,900 | 0 | 0 | 166,900 |
| 35 | BW4847767 | WAL-MART PHARMACY 10-2320 | COTTAGE GROVE | OR | 166,700 | 0 | 0 | 166,700 |
| 36 | BW1561984 | WAL-MART PHARMACY 10-1240 | SIERRA VISTA | AZ | 166,600 | 367,600 | 178,500 | 712,700 |
| 37 | BW6155382 | WAL-MART PHARMACY 10-2703 | FLORENCE | SC | 165,400 | 0 | 0 | 165,400 |
| 38 | BW3853240 | WAL-MART PHARMACY 10-2051 | KINGMAN | AZ | 163,400 | 391,700 | 201,700 | 756,800 |
| 39 | FW1129750 | WAL-MART PHARMACY 10-4557 | LAS VEGAS | NV | 163,300 | 418,000 | 192,700 | 774,000 |
| 40 | BW1294038 | WAL-MART PHARMACY 10-1149 | SAFFORD | AZ | 163,300 | 0 | 0 | 163,300 |
| 41 | BW5431096 | WAL-MART PHARMACY 10-1255 | LAURINBURG | NC | 163,200 | 332,800 | 0 | 496,000 |
| 42 | BW2570528 | WAL-MART PHARMACY 10-1560 | LAS VEGAS | NV | 161,600 | 0 | 0 | 161,600 |
| 43 | BW2532770 | WAL-MART PHARMACY 10-1573 | PRICE | UT | 159,000 | 317,900 | 163,700 | 640,600 |
| 44 | BW2143244 | WAL-MART PHARMACY 10-1384 | LA JUNTA | CO | 153,400 | 0 | 0 | 153,400 |
| 45 | BW4064717 | WAL-MART PHARMACY 10-2106 | RENO | NV | 152,000 | 305,800 | 164,400 | 622,200 |
| 46 | BW5397383 | WAL-MART PHARMACY 10-1863 | EASTLAKE | OH | 150,900 | 0 | 0 | 150,900 |
| 47 | BW2364278 | WAL-MART PHARMACY 10-1512 | CHANDLER | AZ | 150,400 | 323,300 | 0 | 473,700 |
| 48 | BW5479452 | WAL-MART PHARMACY 10-1225 | ORANGE PARK | FL | 150,100 | 332,800 | 162,900 | 645,800 |
| 49 | BW5508289 | WAL-MART PHARMACY 10-1741 | MILFORD | DE | 148,300 | 0 | 0 | 148,300 |
| 50 | BW1565932 | WAL-MART PHARMACY 10-1230 | SHOW LOW | AZ | 112,800 | 305,600 | 172,100 | 590,500 |

WMT_MDL_000043764



WMT_MDL_000043765



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone
Sales in Dosage Units from January 1, 2015, to June 30, 2015 (Pg.2)

WMT_MDL_000043766



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oyxcodone
Sales in Dosage Units from January 1, 2015, to June 30, 2015 (Pg.3)

WMT_MDL_000043767



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone Sales in Dosage Units from January 1, 2015, to June 30, 2015 (Pg.4)

WMT_MDL_000043768



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Oxycodone
Sales in Dosage Units from January 1, 2015 to June 30, 2015 (Pg.5)

WMT_MDL_000043769

Hydrocodone Data

CONFIDENTIAL



CONFIDENTIAL

WMT_MDL_000043771



Wal-Mart Pharmacy Warehouse #45 Hydrocodone Sales in Dosage Units to Pharmacies by State and Year from October 1, 2014, to June 30, 2015

|  | TX | CA | FL | OK | MO | IL | IN | NC | AR | TN | GA | MI | AL | OH | SC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | 14,344,700 | 10,258,000 | 8,090,300 | 7,103,200 | 7,090,600 | 7,009,500 | 6,786,000 | 5,908,800 | 5,672,500 | 5,574,700 | 5,322,000 | 5,263,000 | 5,089,100 | 4,678,600 | 4,285,800 |
| 2015 | 26,470,900 | 20,631,000 | 15,375,100 | 13,212,600 | 13,503,900 | 13,822,200 | 13,337,800 | 11,136,000 | 10,877,100 | 10,442,400 | 10,576,000 | 10,620,300 | 9,987,800 | 9,012,500 | 8,044,800 |

CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units by Month from October 1, 2014,  to June 30, 2015

WMT_MDL_000043773

**Wal-Mart Warehouse #45 Top 50 Buyers of Hydrocodone October 1, 2014, to June 30, 2015**

Estimated National Average for Pharmacies for this Period: 25,818 Dosage Units

| Rank | DEA Number | Pharmacy | City | State | 2014 | 2015 | Grand Total |
|------|-----------|----------|------|-------|------|------|-------------|
| 1 | BW3370563 | WAL-MART PHARMACY 10-1877 | PORTERVILLE | CA | 173,900 | 390,300 | 564,200 |
| 2 | BW3209257 | WAL-MART PHARMACY 10-1834 | GRANTS PASS | OR | 175,800 | 352,800 | 528,600 |
| 3 | BW0457033 | WAL-MART PHARMACY 10-0036 | PARAGOULD | AR | 176,000 | 312,000 | 488,000 |
| 4 | BW2568333 | WAL-MART PHARMACY 10-1575 | OROVILLE | CA | 161,100 | 316,000 | 477,100 |
| 5 | BW5579961 | WAL-MART PHARMACY 10-2238 | MUSKEGON | MI | 132,400 | 326,000 | 458,400 |
| 6 | BW0598144 | WAL-MART PHARMACY 10-0016 | VAN BUREN | AR | 149,700 | 296,500 | 446,200 |
| 7 | BW3048560 | WAL-MART PHARMACY 10-1772 | KLAMATH FALLS | OR | 142,500 | 295,000 | 437,500 |
| 8 | BW8225080 | WAL-MART PHARMACY 10-5101 | PAHRUMP | NV | 143,100 | 285,800 | 428,900 |
| 9 | BW3451084 | WAL-MART PHARMACY 10-1910 | CRESCENT CITY | CA | 143,800 | 284,400 | 428,200 |
| 10 | BW5593973 | WAL-MART PHARMACY 10-0492 | VINCENNES | IN | 144,600 | 283,200 | 427,800 |
| 11 | BW7648922 | WAL-MART PHARMACY 10-3473 | LAS VEGAS | NV | 134,400 | 291,900 | 426,300 |
| 12 | BW8425325 | WAL-MART PHARMACY 10-5136 | MARYSVILLE | CA | 138,800 | 285,600 | 424,400 |
| 13 | BW3540033 | WAL-MART PHARMACY 10-1951 | ONTARIO | OR | 135,700 | 287,100 | 422,800 |
| 14 | BW9738230 | WAL-MART PHARMACY 10-5133 | ANDERSON | CA | 159,300 | 262,000 | 421,300 |
| 15 | BW5430373 | WAL-MART PHARMACY 10-0638 | GAFFNEY | SC | 152,600 | 266,300 | 418,900 |
| 16 | BW6595586 | WAL-MART PHARMACY 10-1370 | BULLHEAD CITY | AZ | 138,600 | 271,300 | 409,900 |
| 17 | BW5593199 | WAL-MART PHARMACY 10-1026 | BEDFORD | IN | 131,000 | 277,200 | 408,200 |
| 18 | BW8954883 | WAL-MART PHARMACY 10-0130 | MUSKOGEE | OK | 126,900 | 281,100 | 408,000 |
| 19 | BW5593151 | WAL-MART PHARMACY 10-1728 | ANDERSON | IN | 133,100 | 271,200 | 404,300 |
| 20 | BW5554046 | WAL-MART PHARMACY 10-0047 | SALLISAW | OK | 133,200 | 259,500 | 392,700 |
| 21 | BW5397509 | WAL-MART PHARMACY 10-0015 | WEST PLAINS | MO | 130,100 | 251,200 | 381,300 |
| 22 | BW5552597 | WAL-MART PHARMACY 10-2522 | ESCANABA | MI | 112,000 | 268,600 | 380,600 |
| 23 | BW5182453 | WAL-MART PHARMACY 10-2537 | REDDING | CA | 125,500 | 252,200 | 377,700 |
| 24 | BW3719171 | WAL-MART PHARMACY 10-1983 | CERES | CA | 120,400 | 250,500 | 370,900 |
| 25 | BW5430765 | WAL-MART PHARMACY 10-1036 | FOREST CITY | NC | 124,700 | 245,700 | 370,400 |
| 26 | BW4168731 | WAL-MART PHARMACY 10-2099 | PASO ROBLES | CA | 124,700 | 246,500 | 367,100 |
| 27 | BW8099625 | WAL-MART PHARMACY 10-2418 | PLACERVILLE | CA | 124,700 | 245,000 | 364,300 |
| 28 | BW5566370 | WAL-MART PHARMACY 10-0947 | SHERMAN | TX | 124,700 | 249,000 | 362,500 |
| 29 | BW3541109 | WAL-MART PHARMACY 10-1903 | YUBA CITY | CA | 124,700 | 247,000 | 358,200 |
| 30 | BW5430474 | WAL-MART PHARMACY 10-1123 | SENECA | SC | 126,100 | 224,500 | 350,600 |
| 31 | FW1129750 | WAL-MART PHARMACY 10-4557 | LAS VEGAS | NV | 117,100 | 228,800 | 345,900 |
| 32 | BW5456113 | WAL-MART PHARMACY 10-0960 | DUNNELLOM | FL | 111,300 | 220,900 | 332,200 |
| 33 | FW0501038 | WAL-MART PHARMACY 10-4521 | LEXINGTON | SC | 81,000 | 158,500 | 239,500 |

*Based on same time period*

*← on both WK's Org & HCP*

*Just WM data*

*all stores are also purchasing from another distributor*

CONFIDENTIAL

WMT_MDL_000043774

Wal-Mart Warehouse #6 Top 50 Buyers of _____codone October 1, 2014, to June 30, 2015
Estimated National Average for Pharmacies for this Period: 25,818 Dosage Units

| Rank | DEA Number | Pharmacy | City | State | 2014 | 2015 | Grand Total |
|------|-----------|----------|------|-------|------|------|-------------|
| 34 | FW0488468 | WAL-MART PHARMACY 10-4384 | MOUNT PLEASANT | SC | 44,900 | 89,300 | 134,200 |
| 35 | BW2568092 | WAL-MART PHARMACY 10-1608 | RED BLUFF | CA | 125,700 | 0 | 125,700 |
| 36 | AW2963913 | WAL-MART PHARMACY 10-0011 | MOUNTAIN HOME | AR | 125,200 | 0 | 125,200 |
| 37 | AW2935952 | WAL-MART PHARMACY 10-0468 | TEXARKANA | AR | 120,900 | 0 | 120,900 |
| 38 | AW3015458 | WAL-MART PHARMACY 10-0119 | BATESVILLE | AR | 120,800 | 0 | 120,800 |
| 39 | BW5398272 | WAL-MART PHARMACY 10-0095 | DESLOGE | MO | 118,800 | 0 | 118,800 |
| 40 | BW5430311 | WAL-MART PHARMACY 10-0629 | UNION | SC | 116,900 | 0 | 116,900 |
| 41 | BW5396367 | WAL-MART PHARMACY 10-0063 | WAGONER | OK | 116,900 | 0 | 116,900 |
| 42 | BW5397888 | WAL-MART PHARMACY 10-0914 | CASSVILLE | MO | 116,400 | 0 | 116,400 |
| 43 | BW5376303 | WAL-MART PHARMACY 10-0969 | GULFPORT | MS | 114,900 | 0 | 114,900 |
| 44 | BW5438800 | WAL-MART PHARMACY 10-0520 | WINDER | GA | 112,700 | 0 | 112,700 |
| 45 | BW5496890 | WAL-MART PHARMACY 10-0694 | HENDERSON | KY | 112,500 | 0 | 112,500 |
| 46 | BW5466366 | WAL-MART PHARMACY 10-0019 | POPLAR BLUFF | MO | 111,300 | 0 | 111,300 |
| 47 | BW5356868 | WAL-MART PHARMACY 10-1976 | HORSEHEADS | NY | 29,900 | 56,600 | 86,500 |
| 48 | FW0597192 | WAL-MART PHARMACY 10-3864 | JACKSONVILLE | NC | 25,500 | 58,000 | 83,500 |
| 49 | BW5356806 | WAL-MART PHARMACY 10-1946 | MASSENA | NY | 15,200 | 32,000 | 47,200 |
| 50 | BW5356729 | WAL-MART PHARMACY 10-1831 | LIVERPOOL | NY | 15,500 | 30,000 | 45,500 |

CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in
Dosage Units by Strength from October 1, 2014, to December 31, 2014

10mg, 72,344,800, 46%

CONFIDENTIAL

WMT_MDL_000043776



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units by State from October 1, 2014, to December 31, 2014

CONFIDENTIAL

WMT_MDL_000043777



**Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units from October 1, 2014, to December 31, 2014 (Pg.1)**

CONFIDENTIAL



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units from October 1, 2014, to December 31, 2014 (Pg.2)

CONFIDENTIAL

WMT_MDL_000043779



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units from October 1, 2014, to December 31, 2014 (Pg.3)



CONFIDENTIAL



**Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units by Strength from January 1, 2015, to June 30, 2015**

CONFIDENTIAL

WMT_MDL_000043782



WMT_MDL_000043783



WMT_MDL_000043784



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone Sales in Dosage Units from January 1, 2015, to June 30, 2015 (Pg.2)

WMT_MDL_000043785



Wal-Mart Pharmacy Warehouse #45 (RW0282145) Hydrocodone
Sales in Dosage Units from January 1, 2015, to June 30, 2015 (Pg.3)



WMT_MDL_000043787



WMT_MDL_000043788