# PSJ9 Exh 16

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
                                   |
 4   OPIATE LITIGATION             | Case No. 17-MD-2804
                                   |
 5   This Document Relates to:     | Hon. Dan A. Polster
                                   |
 6   The County of Summit, Ohio,   |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13                           - - -
14                  Friday, December 7, 2018
15                           - - -
16         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
17                    CONFIDENTIALITY REVIEW
18                           - - -
19        Videotaped deposition of WILLIAM VERSOSKY,
          held at Foley & Lardner LLP, One Biscayne Tower,
20        2 Biscayne Boulevard, Suite 1900, Miami, Florida,
          commencing at 9:25 a.m., on the above date,
21        before Susan D. Wasilewski, Registered
          Professional Reporter, Certified Realtime
22        Reporter and Certified Realtime Captioner.
23                           - - -
24                  GOLKOW LITIGATION SERVICES
              877.370.3377 ph | 917.591.5672 fax
25                       deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   That's something that you -- you actually
 2   had a hand in developing, right?
 3      A.   Yes.
 4      Q.   And you developed this system, I think
 5   around the time you had -- you had Walgreens come to
 6   you to seek getting opioids from you, right?
 7      A.   Yeah, they were seeking to get controls from
 8   us, yes.
 9      Q.   And they were seeking to get controls from
10   you because they had had an entire distribution
11   center in Jupiter, Florida, shut down, right?
12      A.   I believe it --
13           MS. KOSKI:  Object to form.
14      A.   Yeah.  I believe it was their -- I thought
15   it was their wholesaler had a distribution center
16   shut down.
17      Q.   There was a distribution -- there was one or
18   two distribution centers shut down and they could no
19   longer get opioids from those places, right?
20      A.   Correct.
21      Q.   And so they could however -- the problem
22   apparently, was with the sent -- the distribution of
23   the drugs, but they were still allowed -- their
24   stores were still allowed to buy the drugs, they
25   just needed to find somewhere else to buy them,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right?
 2        A.    Correct.
 3        Q.    So at that time, you had a hand in
 4    developing this system and I'd like to go over that
 5    quickly.  I think this is it here.
 6              MR. PENNOCK:  Ben, yeah, this is it.
 7              (Anda-Versosky Exhibit 21 was marked for
 8    identification.)
 9    BY MR. PENNOCK:
10        Q.    Mr. Versosky, you -- we've marked as
11    Exhibit 21 to your deposition an e-mail thread.  It
12    begins with Bates number 0000725880 and the last
13    document is 883.
14              Okay?  You've had a chance to look at that?
15        A.    Yes.
16        Q.    And this is an e-mail from you to the
17    president of the company, Albert Paonessa, right?
18        A.    Yes.
19        Q.    This is from November 2012, right?
20        A.    Yes.
21        Q.    And it's titled -- you were forwarding it,
22    it's, Controlled Substances Query Questions, right?
23        A.    Yes.
24        Q.    You say:  Hi, Al, here is the reporting that
25    Chuck filled out in Cognos and the criteria
```

```
 1    questions below.  We can now utilize this program

 2    any time we get a file for a store or group of

 3    stores.  Also, when looking at this in Cognos,

 4    Mike's team can drill down into the store data if

 5    they want to look at the individual from the summary

 6    sheet.

 7            Have I read that correctly?

 8       A.   Yes.

 9       Q.   So you've -- earlier e-mail down here, you

10    wrote to Jeffrey Daum:  Hi, Jeff, here's an initial

11    list of triggers based on our discussion with

12    Robert.

13            Robert who?

14       A.   Robert Brown.

15       Q.   Compliance?

16       A.   Yes.

17       Q.   He may have more upon discussing with Mike

18    and the team.

19            Mike Cochrane, right?

20       A.   Yes.

21       Q.   But this should give you something to get

22    started on.

23            And these are -- so what you were all doing,

24    including you, is you were saying let's put together

25    a program to look at the dispensing data from the
```

```
 1    individual stores of Walgreens or ultimately any
 2    chain, right?
 3        A.   Sure.
 4        Q.   And then if these -- if these data points
 5    popped out of the dispensing data from a store, they
 6    would be what you were going to call flags.  Right?
 7        A.   Yes.  We were effectively taking the kind of
 8    manual process from more -- the things that Mike and
 9    Robert were looking for on that team and trying to
10    do it in a big data solution.
11        Q.   Right.  The things that they've been looking
12    for the last many years?
13        A.   Yes.
14        Q.   So now you -- whose idea was it to put
15    together this flag system?
16        A.   I think it was mine, yeah.
17        Q.   Okay.  But now --
18        A.   I mean --
19        Q.   November 2012 --
20        A.   Let me rephrase that.  I think it was mine
21    in trying to turn that into, kind of, a big data
22    solution, taking big chunks of data and run it
23    through that.  The flags weren't mine.  These were
24    things they were already looking at.
25        Q.   Got it.  So they were looking at the flags
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but they were doing it, sort of --
 2        A.   One off --
 3        Q.   -- the 19th century way?
 4        A.   -- one at a time.  Yes.
 5        Q.   Okay.  And now you had suggested, well,
 6    let's try to apply a creative program to do this?
 7        A.   And -- yes, and so that Jeff Daum was like
 8    a --
 9        Q.   Programmer?
10        A.   He was a programmer, a data programmer.
```

Golkow Litigation Services                                    Page 198

Highly Confidential - Subject to Further Confidentiality Review

 1     ▮     ▮     ███████████████████████████████████

 2     ▮     ███████████████████████████████

 3     ▮     ▮     ▮

 4     ▮     ▮     ███████████████████████████████████

 5     ▮     ██████████████

 6     ▮     ▮     ▮

 7     ▮     ▮     ▮     ██████████████████████

 8     ▮     █████████████████████████

 9     ▮           █████████████████

10     A.    Yes.

11     Q.    Okay.  All right.  So this ultimately was

12     created, maybe with some more flags than your

13     initial triggers, right?

14     A.    Yes.

15     Q.    And you applied that to Walgreens at that

16     time, the Walgreens data that you were provided, I

17     assume by Walgreens, right?

18     A.    Yes.

19     Q.    And -- okay.  I'll mark this?

20           (Anda-Versosky Exhibit 22 was marked for

21     identification.)

22     BY MR. PENNOCK:

23     Q.    So Walgreens had, like, what, 8,000 stores,

24     something like that?

25     A.    Yes.

```
 1      Q.   So you apply this to the data, your flags,
 2   your initial triggers, and it scored a lot of hits,
 3   didn't it?
 4      A.   Yes.
 5      Q.   So, if you look at -- I've just marked as
 6   Exhibit 22 to your deposition a document produced in
 7   native, a cover sheet 0000647317, and we see a
 8   report of these flags and if you turn to the second
 9   page, the overall total number of stores where you
10   looked at the data was 7,984.  Right?
11      A.   Yes.
12      Q.   And 3,768 of them popped at least one flag,
13   right?
14      A.   Yes.
15      Q.   And I'm sorry for zooming this in and out on
16   people.  Just --
```

[redacted]

```
23      A.   Yes.
24      Q.   And if we go back a page, and this is all
25   laid out by states, true?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.
 2      Q.    And if we look at Ohio, in Ohio there were
 3   255 stores, right?
 4      A.    Yes.
 5      Q.    And 192 of them hit a flag, at least one
 6   flag, right?
 7      A.    Yes.
 8      Q.    Which is 75 percent.  Right?
 9      A.    Yes.
10      ▆     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
11   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
12      ▆     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
13      A.    Yes.
14      Q.    Okay.  Now, so when you -- after you ran
15   this, did you provide this information to Walgreens?
16      A.    I believe we did, yes.
17      Q.    And when you provided it to them, did
18   they -- at any point thereafter, did Walgreens tell
19   you, well, I think we're going to be shutting down
20   some controlled substances sales at some of our
21   stores in Ohio?
22            MS. KOSKI:  Object to form.
23      A.    I don't recall that ever happening.
24      Q.    And let's just look at some of the Ohio
25   stores.
```