PSJ11 CVS Opp Exh 31

July 1, 2007

## Wholesale Supply Agreement

This letter will confirm the agreement ("**Agreement**") between Cardinal Health 110, Inc. ("**Cardinal**") and CVS Pharmacy Inc. ("**CVS**") under which CVS will purchase certain pharmaceutical and other products from Cardinal on the following terms and conditions:

**Section 1.** *Designation as Primary Wholesaler.*

(a)     Retail Pharmacies.   During the term of this Agreement, CVS will designate Cardinal as the primary wholesale pharmaceutical supplier to the designated pharmacies operated by CVS (collectively, the "**Pharmacies**" and individually, a "**Pharmacy**") subject to *Section 1(a) Disclosure Schedule*. A list of the Pharmacies (the "**Designated Pharmacy List**")  will be provided by CVS to Cardinal from time to time during the term of this Agreement.

(b)     Distribution Centers.   During the term of this Agreement, CVS will designate Cardinal as the primary wholesale pharmaceutical supplier to the designated distribution centers operated by CVS ("**CVS Pharmacy DCs**") subject to *Section 1(b) Disclosure Schedule*.

(c)     CVS Commitment.   This Agreement pertains only to CVS' Pharmacies and CVS Pharmacy DCs as detailed in *Section 1(a) Disclosure Schedule* and *Section 1(b) Disclosure Schedule*, respectively.

**Section 2.** *Sale of Merchandise and Brokerage Purchases.*

(a)     Primary Requirements.  Each of the Pharmacies and the CVS Pharmacy DCs will purchase from Cardinal during the term of this Agreement its Primary Wholesale Requirements (as defined in the *Section 2(a) Disclosure Schedule*) of pharmaceutical products ("**Rx Products**"), which consist of purchases of Rx Products for (a) delivery directly to the Pharmacies ("**Store Rx Purchases**"); and (b) delivery directly to the CVS Pharmacy DCs ("**Brokerage Purchases**"). CVS may purchase from Cardinal, at CVS' discretion, for delivery directly to the Pharmacies, its health and beauty aids, home health care products and other inventory carried by Cardinal ("**Store Other Purchases**").  For purposes of this Agreement, the term "**Qualified Purchases**" with respect to a period means all purchases of Merchandise made and paid for by CVS (and in some circumstances, either the CVS Pharmacy DCs or the Pharmacies are specifically designated) from Cardinal during that period, net of all returns and credits validated by CVS (related to ordering, shipping or accounting errors).   For purposes of this Agreement, the term "**Merchandise**" will mean the Rx Products (and Store Other Purchases, with respect to the Pharmacies only).  Notwithstanding anything in this Agreement to the contrary, CVS retains the right to purchase from any other source Rx Products which are unavailable from Cardinal.

**HIGHLY CONFIDENTIAL**                                              **CVS-MDLT1-000030995**

(b)  Brokerage Purchases.  The *Section 2(b) Disclosure Schedule* describes the terms by which CVS will make its Brokerage Purchases through Cardinal.

(c)  Discontinued Merchandise.  Cardinal will stock certain Merchandise that Cardinal would not otherwise stock but for CVS' request, except food items and Merchandise with limited dating ("**Specially Stocked Merchandise**"), subject to such credit considerations concerning the applicable manufacturer as Cardinal may reasonably consider appropriate (including but not limited to, potential insolvency or outstanding balance owed to Cardinal without legitimate reason for dispute).  CVS guarantees that at least six (6) pieces of each item of Specially Stocked Merchandise detailed in *Section 2(c) Disclosure Schedule* will be purchased from each of Cardinal's distribution centers servicing CVS Pharmacies per month.  If Cardinal notifies CVS that less than six (6) pieces of an item of Specially Stocked Merchandise were purchased in a  month from one of Cardinal's servicing distribution centers, then Cardinal may elect to discontinue carrying such item in its distribution centers.  If Cardinal elects to discontinue carrying any such item, CVS will accept and purchase the remaining Specially Stocked Merchandise at the purchase price for such Specially Stocked Merchandise until the Specially Stocked Merchandise is depleted.  Cardinal will use reasonable efforts to ensure that Specially Stocked Merchandise is discontinued in the most cost-effective manner, which may include, but not be limited to, returning such item directly to the manufacturer.  Alternatively, Cardinal and CVS may mutually agree to a dropship arrangement in lieu of Cardinal stocking the item.

(d)  Generally.  CVS will be liable for any payment owed to Cardinal from any Pharmacy or CVS Pharmacy DC for purchases made hereunder.  Cardinal reserves the right at all times to determine what Merchandise it will carry based upon product quality, manufacturer indemnity, insurance, and other policies, and other standards determined by it, and may delete from its available inventory items of Merchandise with limited or no movement activity (in which event CVS shall have the right to purchase such merchandise from any other source of its choosing).  Notwithstanding the foregoing, Cardinal's decision not to carry certain Merchandise for reasons other than product quality (relative to FDA instructions), manufacturer indemnity, and insurability shall not excuse Cardinal from complying with the service levels detailed in *Section 2(b) Disclosure Schedule* and *Section 9 Disclosure Schedule.* Both parties agree that Cardinal's inability to provide CVS with the service levels detailed in *Section 2(b) Disclosure Schedule* and *Section 9 Disclosure Schedule* represents a material breach of this Agreement.

(e)  Representation of Status.  Cardinal represents that it is, and will continue to be during the term of this Agreement, an industry leader in implementation of processes, practices and safeguards to prevent the distribution of all product that is contaminated, mislabeled, not approved for sale in the United States, counterfeit or otherwise unfit for use by consumers (collectively "**Unfit RX Product**").  Furthermore, Cardinal certifies to CVS that Cardinal will have acquired

**HIGHLY CONFIDENTIAL**                                                          **CVS-MDLT1-000030996**

pharmaceutical products purchased by CVS as further detailed in *Section 2(e) Disclosure Schedule*. *Section 2(e) Disclosure Schedule* shall be executed by the parties concurrent with the execution of this Agreement.

**Section 3.** *Purchase Price*. As further described in *Sections 3(a) and 3(b) Disclosure Schedules*, CVS will pay a purchase price ("**Cost of Goods**") for products purchased under this Agreement as follows:

(a)     Store Rx Purchases and Store Other Purchases. CVS will pay a Cost of Goods for Merchandise in an amount equal to Cardinal's Cost plus the percentage set forth in the *Section 3(a) Disclosure Schedule*. The term "**Cardinal's Cost**" as used herein means the manufacturer's published wholesale acquisition cost for Merchandise as of the date CVS orders said product, adjusted to reflect any then-applicable contract pricing, but without reduction for cash discounts. Manufacturer off-invoice quantity discounts and promotional allowances which are intended by the manufacturer to be passed through to Cardinal's retail national chain accounts will be made available to CVS.

By way of illustration only and not as a limitation, the 1% Abbott Return Allowance CVS receives based on CVS' Abbott warehouse and DSD purchases, is retained 100% by CVS. In the event that a vendor would begin to pass an "Abbott like" returns allowance to Cardinal, Cardinal would pass 100% of this allowance to CVS, based on CVS purchases (Pharmacies and CVS Pharmacy DCs, if applicable). Notwithstanding the foregoing, Cardinal will not accept any other return allowance on CVS' behalf relating to CVS' purchase volume (warehouse or DSD) without CVS' expressed written consent. It will be Cardinal's sole responsibility to notify in writing any pharmaceutical supplier (with copy to CVS subject to Section 13) offering a return allowance to Cardinal related to CVS' purchase volume that CVS utilizes its own return goods policy.

As set forth in *Section 3(a) Disclosure Schedule*, the purchase price for selected Merchandise, including but not limited to, multisource pharmaceuticals, CardinalSOURCE^SM generics, private label products, medical surgical supplies, home health care/durable medical equipment, Merchandise acquired from vendors not offering customary cash discount or other terms, and other non-pharmaceutical Merchandise will not be based upon Cardinal's Cost-plus pricing described above but will instead be net-billed in accordance with the terms and conditions established by Cardinal (including applicable mark-up) for such Merchandise. Merchandise described in this paragraph is sometimes referred to as "**Specially Priced Merchandise**." CVS may, but will have no obligation to, purchase any specified volume or percentage of its requirements for Specially Priced Merchandise.

(b)     Brokerage Purchases. CVS will pay a purchase price for all Brokerage Purchases in an amount equal to the cost set forth on the *Section 3(b) Disclosure Schedule*.

**HIGHLY CONFIDENTIAL**                                              **CVS-MDLT1-000030997**

(c)    Cost of Goods Adjustment.  CVS' Cost of Goods for Store Rx Purchases and Store Other Purchases will be subject to adjustment as described in the *Section 3(c) Disclosure Schedule*.

(d)    Generally.  Each party hereto acknowledges and agrees that its obligation to pay the purchase price for all Brokerage Purchases, Store Rx Purchases, Store Other Purchases and other amounts due or to become due under this Agreement will not be subject to any reduction, setoff, defense, counterclaim, or deferment for any reason, except as further described in this Agreement.

Each party acknowledges and agrees that its obligation to pay the other amounts due under this Agreement or become due under this Agreement will not be subject to any reduction, setoff, defense, counterclaim, or deferment for any reason, except as further described in this Agreement.  If a party to this Agreement that is obligated to pay monies hereunder (the "Payor") fails to pay the other party (the "Payee") amounts due under this Agreement (which Payee reasonably believes it is due), then Payee may setoff such amounts (that are not legitimately disputed by Payor) against amounts due Payor.  Any deductions incorrectly or improperly recognized (i.e., excluding legitimately disputed amounts) by Payee will be paid to Payor as soon as possible and in any event no later than fifteen (15) days following notification from Payor of such incorrect or improper deduction; provided Payee agrees that the deduction was incorrectly or improperly taken.  Payee agrees to pay when due any amounts not in dispute.

CVS and Cardinal commit to work with each other to mutually resolve any disputed amounts.

Furthermore, it is both parties intention that all Agreement components and incentives stand on their own; there will be no tying of incentives, rebates, or performance measurements (Warehouse Logistics Program, Pharmacy Site Incentive, Semi-Annual Generic Wrap Around Rebate, etc.).

**Section 4.    *Payment Terms*.**

(a)    Store Rx Purchases and Store Other Purchases.  CVS will cause Cardinal to receive payment in full and remittance by automated clearinghouse ("**ACH**") for all Store Rx Purchases and Store Other Purchases according to the schedule set forth in the *Section 4 Disclosure Schedule* subject to the terms and conditions of this Agreement.

(b)    Brokerage Purchases.  CVS will cause Cardinal to receive payment in full by ACH for all Brokerage Purchases according to the schedule set forth in the *Section 4 Disclosure Schedule* subject to the terms and conditions of this Agreement.

(c)    Automated Clearinghouse.  All payments made by CVS to Cardinal under this Agreement will be made via ACH, to a financial institution designated by Cardinal, so as to provide Cardinal with good funds immediately available to

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000030998**

Cardinal on the date such payment is due according to the schedule set forth in the *Section 4 Disclosure Schedule*. In the event that ACH is temporarily interrupted or cannot be utilized, CVS and Cardinal will seek alternative payment methods to ensure that Cardinal receives good funds as soon as practical. To the extent that a specific payment is unnecessarily delayed due to an issue with the ACH, CVS agrees to work with Cardinal to make such payment as expeditiously as possible. As indicated in *Section 4 Disclosure Schedule*, CVS and Cardinal may mutually agree to a payment arrangement that is reflective of a change in normal terms to accommodate for late payment due to the fact that the ACH was temporarily interrupted or could not be utilized.

(d) <u>Generally</u>. If Cardinal reasonably believes that CVS has suffered a material adverse effect with respect to its financial position, then Cardinal has the right to request that CVS provide it with information within one (1) business day from the date CVS receives the request (i.e., if CVS receives Cardinal's request at 3:00 p.m. Monday, the information will be provided no later than 3:00 p.m. Tuesday) that further describes or refutes (as applicable), in reasonable detail, such material adverse effect, and that may resolve any such concerns raised by Cardinal. In addition, CVS agrees to promptly notify Cardinal in the event CVS has suffered a material adverse effect with respect to its financial position, including, but not limited to an acceleration event under its credit facilities. If Cardinal has requested such information or CVS has notified Cardinal as set forth above and Cardinal and CVS cannot promptly resolve any such issues pursuant to a reasonable solution, then Cardinal may (i) limit CVS' daily purchases thereafter to the daily average of CVS' Qualified Purchases during the immediately preceding thirty (30) day period; (ii) modify payment terms, and (iii) in the event that CVS is in Payment Default (as defined below), give CVS notice of the amount of required payment under this Agreement by 10:00 a.m. Eastern Standard Time on a business day and require CVS to wire electronic confirmation of payment of such amount by non-refundable wire transfer by 2:00 p.m. Eastern Standard Time on the same business day. As used within this paragraph, a "**Payment Default**" shall mean a circumstance where CVS has failed to cause Cardinal to receive payment when due. If any of the foregoing actions are taken by Cardinal, the parties will meet every approximate thirty (30) days following the execution of such action to review CVS' financial condition, and to reasonably consider reinstating the payment terms which were in effect prior to execution of such action. If any of the foregoing actions are taken by Cardinal, then CVS may choose to terminate this Agreement with ninety (90) days written notice if it finds Cardinal's proposed terms unacceptable. If the Agreement is terminated pursuant to this Section 4(d), the Agreement shall remain in effect without modification (unless mutually agreed upon in writing by the parties) until expiration of the ninety (90) day notice period.

If CVS reasonably believes that Cardinal has suffered a material adverse effect with respect to its financial position that has materially, adversely affected (or will imminently materially, adversely affect) Cardinal's ability to perform any term or condition of this Agreement or Cardinal's ability to pay amounts due

**HIGHLY CONFIDENTIAL**                                                                    **CVS-MDLT1-000030999**

CVS, then CVS has the right to request that Cardinal provide it with information within one (1) business day from the date Cardinal receives the request (i.e., if Cardinal receives CVS' request at 3:00 p.m. Monday, the information will be provided no later than 3:00 p.m. Tuesday) that further describes or refutes (as applicable), in reasonable detail, such material adverse effect, and that may resolve any such concerns raised by CVS. In addition, Cardinal agrees to promptly notify CVS in the event Cardinal believes it has suffered, or will imminently suffer a material adverse effect with respect to its financial position, including an acceleration event under its credit facilities, that has materially, adversely effected (or will imminently materially, adversely affect) Cardinal's ability to perform any term or condition of this Agreement, or Cardinal's ability to pay amounts due CVS. If CVS has requested such information or Cardinal has notified CVS as set forth above, then CVS may (i) accelerate payment of any accrued rebates or any amounts due CVS, (ii) modify payment terms, and (iii) in the event that Cardinal is in Payment Default (as defined below), give Cardinal notice of the amount of required payment under this Agreement by 10:00 a.m. Eastern Standard Time on a business day and require Cardinal to wire electronic confirmation of payment of such amount by non-refundable wire transfer by 2:00 p.m. Eastern Standard Time on the same business day. As used within this paragraph, a "**Payment Default**" shall mean a circumstance where Cardinal has failed to cause CVS to receive payment when due. If any of the foregoing actions are taken by CVS, the parties will meet every approximate thirty (30) days following the execution of such action to review Cardinal's financial condition, and to reasonably consider reinstating the payment terms which were in effect prior to execution of such action. If any of the foregoing actions are taken by CVS, then Cardinal may choose to terminate this Agreement with ninety (90) days written notice if it finds CVS' proposed terms unacceptable. If the Agreement is terminated pursuant to this Section 4(d), the Agreement shall remain in effect without modification (unless mutually agreed upon in writing by the parties) until expiration of the ninety (90) day notice period.

(e) <u>Unconditional Guaranty</u>. As an inducement for Cardinal to supply Merchandise and provide services to the subsidiaries and affiliates of CVS, whether existing now or in the future, CVS Caremark Corporation guarantees to Cardinal the punctual and full payment (and not merely the ultimate collectablility) of all undisputed sums due from CVS to Cardinal under this Agreement.

**Section 5.** *Delivery/Order Submission Procedures*. Cardinal will deliver the Merchandise F.O.B. to the Pharmacies and exercise its good faith efforts to provide an efficient delivery schedule designed to meet the mutual needs of Cardinal and the Pharmacies. All deliveries will be accompanied by an invoice and all delivery costs (not including emergency deliveries) absorbed by Cardinal. Cardinal will deliver Merchandise to each Pharmacy five (5) days per week (Monday through Friday, except Pharmacies located outside of the continental United States or other Pharmacies mutually agreed upon by the parties from time to time) as mutually agreed upon by both parties (exclusive of holidays, etc.). Any additional deliveries will constitute emergency deliveries, which if

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                                **CVS-MDLT1-000031000**

required, will incur a separate delivery charge at Cardinal's cost for such deliveries. Delivery schedules and purchase order deadlines may be reviewed and changed from time to time as mutually agreed upon by Cardinal and CVS. Delivery of Brokerage Purchases will be subject to the terms and conditions set forth in the *Section 2(b) Disclosure Schedule*.

The Pharmacies will submit all orders, except for orders for Schedule II drugs, for all Merchandise to Cardinal via Telxon units (to be provided by Cardinal) or other mutually agreed upon method. Any such equipment supplied by Cardinal will be returned to Cardinal by CVS upon the expiration or termination of this Agreement for any reason, or upon Cardinal's request, if in Cardinal's reasonable discretion, Cardinal's proprietary rights are threatened. In the event that electronic order entry is temporarily interrupted for reasons beyond the control of CVS or Cardinal, CVS may place orders manually and both parties will use reasonable efforts to rectify the problem.

DEA Form 222 may be mailed, given to the delivery driver to be delivered to the applicable Cardinal distribution center, or other mutually agreed upon method. Schedule II orders will be delivered within one (1) business day of Cardinal's receipt of the signed original DEA Form 222. CVS acknowledges that if CVS gives the DEA Form 222s to the delivery driver, such forms will not be received by Cardinal until such time that the delivery driver physically delivers the DEA Form 222 to the applicable Cardinal distribution center. Notwithstanding the foregoing, no Schedule II orders will be delivered other than in compliance with DEA regulations.

Additionally, CII orders must be shipped 100% complete and courier must be present when order is received and checked in by CVS, CVS reserves the right to refuse any CII order that contains any shipping errors.

### Section 6.    *Other Services*.

(a)    CardinalCHOICE-HQ™. Cardinal will license two (2) CardinalCHOICE-HQ™ software systems to CVS' headquarters on the terms set forth in the *Section 6(a) Disclosure Schedule*. Such licensing will be pursuant to the terms and conditions of Cardinal's standard software license agreement for such software. In addition, Cardinal will provide CVS with the related hardware as described in the *Section 6(a) Disclosure Schedule*, pursuant to Cardinal's standard hardware purchase agreement. Cardinal will make available to all CVS locations (Pharmacies, CVS Pharmacy DCs, and support locations) access to Cardinal.com.

(b)    Management Information Services. Cardinal will provide to CVS those programs and services described in the Base Service Package set forth in *Section 6(b) Disclosure Schedule* on the terms and conditions described in that schedule.

(c)    RAPIDistribution$^{SM}$. Cardinal will make available to the Pharmacies participation in Cardinal's RAPIDistribution$^{SM}$ program, pursuant to the standard terms of that program.

---

**HIGHLY CONFIDENTIAL**                    **CVS-MDLT1-000031001**

(d)  Employees.

(i)  CVS will engage a Pharmacy DSD employee with the necessary skill set to act as a liaison between Cardinal and CVS. During the term of this Agreement and for a two (2) year period thereafter, Cardinal will not directly or indirectly employ, engage, or otherwise solicit for employment or engagement such employee, or induce or encourage such employee to terminate or otherwise modify such employee's relationship with CVS. Furthermore, Cardinal will provide CVS with employee funding as detailed in *Section 6(d) Disclosure Schedules*. The CVS Employee shall keep any and all information disclosed by Cardinal confidential pursuant to Section 17.

(ii)  Cardinal will also engage a Pharmacy employee with the necessary skill set to act as a liaison between Cardinal and CVS and work on matters related to this Agreement.   CVS and Cardinal will mutually agree on the appropriate candidate to fill this position as it becomes necessary from time to time. During the term of this Agreement and for a two (2) year period thereafter, CVS will not directly or indirectly employ, engage, or otherwise solicit for employment or engagement such employee, or induce or encourage such employee to terminate or otherwise modify such employee's relationship with Cardinal. The Cardinal employee shall keep any and all information disclosed by CVS confidential pursuant to Section 17.

(e)  ProfitPak®.  CVS will not participate in the ProfitPak® program.

## Section 7     CVS Generic Formulary and CardinalSOURCE^SM Program.

(a)  Cardinal understands that CVS has established a preferred list of generic Rx Products, which includes items CVS stocks in the CVS Pharmacy DCs and certain other products as CVS designates (the "**CVS Generic Formulary**"). Whenever a Pharmacy orders a generic product Cardinal will automatically substitute the corresponding CVS Generic Formulary item if applicable. Generic product shall be defined as a multi-source drug as detailed by First Data Bank's (FDB) NDDF Plus™ data dictionary. A generic drug will have the following values assigned to the NDC level by FDB:

- Generic Indicator (GI) = 1 (multiple source product)
- Generic Price Indicator (GPI) = 1 (product priced as a generic)

All drug products classified with a GI = 1 and a GPI = 1 will be considered generic drugs. In the event CVS, for substitution purposes, decides to elect certain items as brand or generic, contrary to what the result from FDB is; CVS will furnish Cardinal with notification and the drug shall be coded as instructed by CVS.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                          **CVS-MDLT1-000031002**

Cardinal will regularly update its files to ensure all generic classification criteria set forth above is refreshed expeditiously to ensure generic classification criteria reflects current marketplace conditions.

As stated above, whenever a Pharmacy orders a generic product Cardinal will automatically substitute to the corresponding CVS Generic Formulary item if applicable.  Substitution will be based on the five (5) digit GCN as defined by FDB or as specifically directed by CVS.  In addition, the program will ensure the formulary package size is shipped to the store in a quantity equal to or greater than the ordered quantity, unless otherwise specifically directed by CVS.

For example; if a Pharmacy orders three (3) units of an off-formulary item with a package size of 100 for which there is a corresponding CVS Formulary item with a package size of 500, then the program will ensure the total quantity shipped to the Pharmacy is equal to or greater than the ordered quantity, in this case one (1) unit of the CVS Formulary item in the 500-package size.  CVS' required substitution logic is further defined in *Section 7(a) Disclosure Schedule*.

CVS will have the ability to designate certain items, at the GCN or NDC level, to be excluded from package size substitution.  For example, items that are available and used in large package sizes (i.e. one pound topical creams).  Although the CVS Formulary may have corresponding items in smaller package sizes (i.e. 15 grams), CVS would require the original package size ordered to be shipped.  CVS may put any item it deems appropriate on this exclusion.  In addition, all package sizes should be consistent for metric sizes (i.e., one pint equal to 473 or 480 ml, 1 ounce equal to 28.4 or 30.0 grams).  Due to regulatory issues surrounding Schedule II (CIIs) these items will be excluded from package size substitution.

Cardinal will also allow CVS the ability to adjust (up or down) the quantity shipped to the Pharmacies. This adjustment will be made at an NDC level based on a predetermined Threshold Quantity (as defined below) and adjustment percentage.  Both the Threshold Quantity and adjustment percentage can be set to any value CVS deems appropriate.  The "**Threshold Quantity**" will be a minimum quantity that must be surpassed in order for the adjustment percentage to be applied.  If the Threshold Quantity is not exceeded, the item should be shipped as ordered.  The adjustment percentage will only be applied to that portion of the quantity ordered which exceeds the Threshold Quantity.  Once the adjustment percentage is applied and rounded up to the nearest whole unit, the result should be added to the Threshold Quantity to determine final shipment quantity.

For example, if CVS chooses to adjust orders for NDC 55555-4444-22 by 40% subject to a Threshold Quantity of three (3) bottle and if it is determined based on the substitution program that NDC 55555-4444-22 should be shipped in a quantity of five (5) units, then the quantity in excess of the Threshold Quantity (5-3=2), will be subject to a 40% adjustment percentage (2X40% =.8) and be rounded up to the nearest whole unit (.8 = 1).  The adjusted quantity one (1) will be added to

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**  **CVS-MDLT1-000031003**

the Threshold Quantity three (3), to determine final quantity to be shipped four (4). The adjustment percentage will be allowed to exceed 100% to any level CVS deems appropriate.

If the item ordered does not have a corresponding item on the CVS Formulary or if the item is unavailable, Cardinal will automatically substitute such item with the corresponding generic product, if any, from the CardinalSOURCE$^{SM}$ generic formulary (the "**Cardinal Generic Formulary**") in the original package size ordered.

In the event that the Cardinal Generic Formulary item is out-of-stock, then Cardinal will automatically substitute the item with the lowest cost corresponding item under the second tier CVS generic formulary (the "**Secondary CVS Generic Formulary**") in the original package size ordered. If a corresponding item is not available on the Secondary CVS Generic Formulary, Cardinal will ship the item as it was ordered. Notwithstanding anything in the foregoing to the contrary, CVS reserves the right to prohibit Cardinal from substituting certain items and/or order methods from the Cardinal Generic Formulary and Secondary CVS Generic Formulary for corresponding items on the CVS Generic Formulary.

CVS has provided Cardinal with a list of items on CVS' Generic Formulary as of the date of this Agreement. As items on the CVS Generic Formulary change from time to time, CVS will provide Cardinal with electronic notice of such changes including the proposed effective date of such change. As it pertains to Cardinal non-previously stocked items only, Cardinal will ensure best efforts are made to stock, and have available for Pharmacies to order within fourteen (14) days of receipt of such notice. In the event that Cardinal's inventory level of any product being deleted from the CVS Generic Formulary exceeds the amount anticipated to be purchased by CVS prior to CVS' proposed effective date of such deletion and the Rx Product is not on CardinalSOURCE$^{SM}$ or another of Cardinal's retail chain generic programs, then Cardinal will notify CVS of such situation and Cardinal and CVS will mutually agree upon the adjusted effective date of such deletion. In addition, CVS will provide Cardinal on a monthly basis, in an acceptable file format, with a list setting forth all items on CVS' Generic Formulary as of the end of the previous month. Cardinal will use the information on such files to verify its records of CVS' Generic Formulary and notify CVS of any discrepancies so that such discrepancies may be reconciled and corrected.

Cardinal will have the ability to perform package size substitution for branded items upon request by CVS. Branded items are defined as items for which either the GI or GPI indicators in FDB are not equal to 1. This definition specifically excludes items for which Cardinal has been notified by CVS to designate in a manner regardless of the GI or GPI indicators. In cases where an existing Rx Product's formulation is altered or changed and a new formulation is introduced, Cardinal will seek approval from CVS prior to any substitution to said new item.

**HIGHLY CONFIDENTIAL**                    **CVS-MDLT1-000031004**

Cardinal will accommodate the sequestering of inventory for CVS' sole use upon request by CVS on an item-by-item basis.

CVS may in the future decide to institute an OTC substitution program similar to the CVS generic substitution. Cardinal will support any OTC program as designed by CVS. OTC substitution will be based entirely on the FDB classification for Rx and OTC as well as brand and generic.

Any and all data and pricing (GCN, brand/generic indicator, package size, AWP, etc.) must be in accordance with the most recent First Data Bank data that is available. Cardinal proprietary and specific data elements and pricing will not be passed to CVS. CVS may instruct Cardinal to override any FDB classification, specifically as it relates to generic indicator.

(b)  CVS will be entitled to a discount (in the form of a rebate) based on the volume of generic Rx Products purchased by the Pharmacies as described in the *Section 7(b) Disclosure Schedule*.

### Section 8.  *Contract Administration*.

Cardinal will recognize and administer supplier contracts between CVS and any manufacturer or supplier ("**Manufacturer Contracts**") subject to their continued validity in accordance with applicable laws and subject to such credit considerations concerning the applicable manufacturer as Cardinal may reasonably consider appropriate. Notwithstanding the foregoing, Cardinal's decision not to recognize and administer a Manufacturer Contract, shall not excuse Cardinal from complying with the service level detailed in *Section 9 Disclosure Schedule* or extending the applicable manufacturer's pricing to CVS (i.e., CVS to be financially kept whole). Cardinal will begin recognizing and administering each new Manufacturer Contract, renewal, or replacement within the later of: (i) two (2) business days after Cardinal has received a copy of the new Manufacturer Contract, renewal or replacement from CVS, or (ii) the effective date of the new Manufacturer Contract, renewal or replacement. Manufacturer Contracts received by Cardinal directly from the manufacturer or supplier must be forwarded to CVS within twenty-four (24) hours for CVS' written approval prior to being administered.

### Section 9.  *Service Level*.

Cardinal will provide CVS with the service levels described in the *Section 9 Disclosure Schedule* and *Section 2(b) Disclosure Schedules*.

### Section 10.  *Returned Goods Policy*.

(a)     Cardinal will accept returns from the Pharmacies in accordance with the returns process as detailed in *Section 10(a) Disclosure Schedule*. Set forth in the *Section 2(b) Disclosure Schedule* is the return process for Brokerage Purchases.

**HIGHLY CONFIDENTIAL**                                   **CVS-MDLT1-000031005**

(b)     As it relates to non-merchantable pharmaceutical returns (expired, damaged, recalls, etc) CVS and Cardinal will work in accordance with the returns process set forth in the *Section 10(b) Disclosure Schedule*.

(c)     As it relates to Unfit Rx Product, CVS shall use commercially reasonable efforts to immediately return all Unfit Rx Product (whether alleged or verified) to Cardinal for full credit.  Cardinal will fully reimburse CVS at CVS' current cost for any and all Unfit Rx Product returned to Cardinal by CVS and all other expenses incurred by CVS as it pertains to Unfit Rx Product and Cardinal's instructions related to Unfit Rx Product.

### Section 11.    *Term*.

(a)     The term of this Agreement will begin on July 1, 2007 (the "**Commencement Date**"), and will continue for twenty four (24) months thereafter (the "**Initial Term**").  This Agreement may be renewed for successive renewal periods of one (1) year each upon mutual written agreement of the parties.  In the event either party desires not to renew the Agreement at the expiration of the Initial Term or any renewal term, that party shall provide the other party with at least ninety (90) days written notice prior to the expiration of the then current term.  In the event such notification is not provided with at least the ninety (90) day notice or if no notice is given, the then current term shall be extended for a period of ninety (90) days after the expiration of such term to provide for an adequate transition period.  Any reference in this Agreement to the "term of this Agreement" will include the Initial Term and any renewal term.

(b)     Either party may effect an early termination of this Agreement for cause by giving written notice to the other party, provided such party has first given written notice to the other party of the occurrence of a material breach of this Agreement (which notice will specify the nature of such breach) and the other party has failed to cure such breach within sixty (60) days following its receipt of such notice or, in the event such breach is not capable of being cured in such sixty (60) day period, the breaching party's failure to diligently prosecute such cure thereafter.  Notwithstanding the foregoing, any failure to make any payment when due under this Agreement or any failure by the other party to perform as described within this Agreement which negatively impacts the other party's ability to perform their respective business functions, such period in which to cure will be reduced to ten (10) days.

(c)     Either party will have the right to terminate this Agreement upon notice to the other party following the commencement of any bankruptcy or insolvency proceeding (whether voluntary or involuntary) with respect to such other party or its assets, the general assignment for the benefit of creditors by such other party, or the appointment of a receiver, trustee, or liquidator by or for such other party.

(d)     CVS' and Cardinal's payment obligations to each other which have accrued to date of termination or expiration will survive termination or expiration

**HIGHLY CONFIDENTIAL**                                                                                    **CVS-MDLT1-000031006**

of this Agreement as shall all other obligations which by their nature extend beyond the term of the agreement, including but not limited to the obligation in Sections 16, 17, and 18. CVS and Cardinal will mutually agree on the transition of services provided by the other.

(e)     Upon termination of this Agreement for any reason, CVS' rights as a licensee of CardinalCHOICE-HQ™ software and other Cardinal software will automatically expire, and CVS will (upon request) promptly return such software and any related hardware not purchased by CVS to a return location specified by Cardinal.     Upon termination of this Agreement for any reason, Cardinal will use its reasonable efforts to provide CVS with access to CVS' historical purchase data.

(f)     This Agreement will supersede and replace that certain Wholesale Supply Agreement dated January 1, 2004 by and between Cardinal and CVS (the **"Original Agreement"**), as amended and all extensions thereof.     Upon commencement of this Agreement, the Original Agreement will terminate and be of no further force or effect whatsoever.

(g)     For purposes of this Agreement  the term **"Program Year"** means the twelve (12) month period beginning on January 1st and ending on December 31st, except for the first Program Year, which will be a six (6) month period beginning July 1, 2007 and ending December 31st, 2007 and the final Program Year, which will be a six (6) month period beginning January 1st and ending June 30th of 2009.

### Section 12.     *Warehouse Logistics Program.*

CVS and Cardinal will implement a Warehouse Logistics Program ("**WLP**") as described in the *Section 12 Disclosure Schedule*.

### Section 13.     *Notices*.

All notices required or permitted under this Agreement will be in writing to the other party at the address set forth below (or such other address as that party may give to the other party by written notice hereunder) and will be deemed given (a) if delivered personally (including by overnight express or messenger), upon delivery, (b) if delivered by first class, registered or certified mail (return receipt requested), upon the earlier of actual delivery or three (3) days after being mailed, or (c) if given by telecopy, upon confirmation of receipt of automatic transmission report.

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031007**

If to:

CVS Pharmacy, Inc.                          CARDINAL HEALTH

One CVS Drive                               7000 Cardinal Place
Woonsocket, RI 02895                        Dublin, Ohio 43017
Attn: Senior Vice President,                Attn: Senior Vice President,
    Pharmacy Merchandising            Retail National Accounts
Telecopy: (401) 769-9473                    Telecopy: (614) 652-7020

with copy to:                               with copy to:

General Counsel                             Chief Legal Officer at the same address
at the same address                         Telecopy: (614) 757-8919
Telecopy: (401) 765-7887

**Section 14.**   *Taxes/Compliance with Laws*.

CVS will pay when due any sales, use, excise, gross receipts, or other federal, state, or local taxes or other assessments (other than any tax based solely on the net income of Cardinal) and related interest and penalties in connection with or arising out of the transactions contemplated by this Agreement. If Cardinal pays any such amounts which CVS is obligated to pay under this section, then CVS will promptly reimburse Cardinal in an amount equal to the amount so paid by Cardinal. If CVS pays any such amounts which Cardinal is obligated to pay under this section, then Cardinal will promptly reimburse CVS in an amount equal to the amount so paid by CVS.

If and to the extent any discounts, credits, rebates or other purchase incentives are paid or applied by Cardinal with respect to the Merchandise and/or Brokerage Purchases purchased under this Agreement, then applicable provisions of the Medicare/Medicaid and state health care fraud and abuse/anti-kickback laws (collectively, "fraud and abuse laws") may require disclosure of the applicable price reduction on CVS' claim or cost reports for reimbursement from governmental or other third parties. CVS agrees to comply with all applicable provisions of the fraud and abuse laws and to indemnify and hold Cardinal harmless for any failure on CVS' part to do so.

CVS will certify to Cardinal that all of the Pharmacies are properly and completely licensed in compliance with all applicable state and federal laws, regulations, rules and orders. Such certification will be provided in the form of a schedule listing all of the Pharmacies, and their respective state and federal license numbers and expiration dates. CVS will provide Cardinal with an updated good faith schedule no later than the twenty-fifth (25th) day of each month which will include information for the following month.

**Section 15.**   *Force Majeure*.

One or more of Cardinal's or CVS' obligations under this Agreement will be excused if, but only if, and to the extent that any delay or failure to perform such obligations is due to

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031008**

fire or other casualty, validated (by Cardinal and CVS) product or material shortages, strikes or labor disputes, transportation delays, validated (by Cardinal and CVS) manufacturer out-of-stocks or delivery disruptions, acts of God, validated (by Cardinal and CVS) seasonal supply disruptions, or other causes beyond the reasonable control of Cardinal or CVS (a "**Force Majeure Event**"). During the period of any such delay or failure, CVS may purchase the Primary Wholesale Requirements for the affected Pharmacies or CVS Pharmacy DCs from others, but will recommence purchasing from Cardinal within a reasonable amount of time following cessation of such delay or failure.

### Section 16. _Records and Audit_.

(a)     Cardinal will maintain records pertaining to the Merchandise purchased by CVS under this Agreement as required by applicable federal, state and local laws, rules and regulations. Not more than twice in any twelve (12) month period, and following thirty (30) days' advance written notice to Cardinal, or as required by administrative ruling or court order, CVS will have the right to appoint one or more of its agents or employees to review those relevant records applicable to its pharmaceutical purchases for the sole purpose of verifying compliance with the pricing terms of this Agreement or compliance with any other material terms of this Agreement. Any such review will be limited to twenty-four (24) months of historical information as of the date such review begins, except if Cardinal is required by applicable law to maintain records pertaining to the Merchandise purchased by CVS under this Agreement for a period longer than twenty-four (24) months, then Cardinal will also allow CVS to access such information. The information will be subject to a confidentiality agreement prepared by Cardinal and CVS and signed by CVS and its employee(s) and agent(s) who will have access to the information prior to beginning the review. Notwithstanding the foregoing, CVS may only appoint agents who are employees of one of the top national accounting firms, as may be deemed reasonably acceptable to Cardinal and CVS. Further, with respect to contracts between Cardinal and certain manufacturers which must remain confidential pursuant to a contractual provision, CVS may only review records relating to such contracts through an employee of one of the top national accounting firms deemed reasonably acceptable to Cardinal (i.e., not a CVS employee) to verify compliance with the pricing terms of such contracts. Such accounting firm may confirm to CVS that Cardinal has (or has not) complied with the pricing terms of such contracts, but may not (and will not) otherwise disclose to CVS the confidential information.

(b)     CVS will maintain records pertaining to the Merchandise purchased all Pharmacies and CVS Pharmacy DCs, whether now or hereafter owned, managed or operated by CVS, under this Agreement as required by applicable federal, state and local laws, rules and regulations. Not more than twice in any twelve (12) month period, or as required by administrative ruling or court order, and following thirty (30) days' advance written notice to CVS, Cardinal will have the right to appoint one or more of its employees or agents to review those relevant records applicable to such purchases of Rx Products for the sole purposes of verifying that each CVS Pharmacy DC is purchasing its Primary Wholesale Requirements of

**HIGHLY CONFIDENTIAL**     **CVS-MDLT1-000031009**

Brokerage Purchases from Cardinal, as further described in the *Section 2(a) Disclosure Schedule* or compliance with any other material terms of this Agreement. Any such review will be limited to twenty-four (24) months of historical information as of the date such review begins, except if CVS is required by applicable law to maintain records pertaining to the Merchandise purchased by CVS under this Agreement for a period longer than twenty-four (24) months, then CVS will allow Cardinal to access such information also. The information will be subject to a confidentiality agreement prepared by CVS and Cardinal and signed by Cardinal and its employee(s) and agent(s) who will have access to the information prior to beginning the review. Notwithstanding the foregoing, Cardinal may only appoint agents who are employees of one of the top national accounting firms, as may be deemed reasonably acceptable to CVS and Cardinal. Further, with respect to contracts between CVS and certain manufacturers which must remain confidential pursuant to a contractual provision, Cardinal may only review records relating to such contracts through an employee of one of the top national accounting firms deemed reasonably acceptable to CVS (i.e., not a Cardinal employee) to verify compliance with the terms of such contracts. Such accounting firm may confirm to Cardinal that CVS terms of this Agreement, but may not (and will not) otherwise disclose to Cardinal the confidential information.

### Section 17.    *Confidentiality*.

Each party acknowledges that as a result of this Agreement, that party and its employees and agents, will learn confidential information of the other party (including, but not limited to, the information Cardinal provides to CVS pursuant to the Warehouse Logistics Program set forth in the *Section 12 Disclosure Schedule*). Neither party will disclose any confidential information of the other party to any person or entity, or use, or permit any person or entity to use, any of such confidential information, excepting only:  (a) disclosures on a confidential basis to and use by the directors, officers, employees, and agents of that party who have a reasonable need to know such information in connection with that party's performance of this Agreement, (b) disclosures which are required by law, as reasonably determined by that party or its legal counsel, (c) disclosures which are made on a confidential basis to that party's attorneys, accountants, and other professional advisors in connection with matters relating to this Agreement, (d) information which is or becomes available to the other party on a non-confidential basis from a source entitled to disclose it on a non-confidential basis, (e) information that is or becomes generally available to the public or within the industry to which such information relates other than as a result of disclosure by the other party or its representatives, and (f) routine disclosures to IMS/DDD or similar organizations consistent with past practices, so long as confidential information regarding CVS is provided only on an aggregate or "blinded" basis and not identified specifically as CVS information other than as otherwise contemplated or described in this Agreement. The specific material terms of this Agreement will be deemed to be confidential information of each party. Each party will be responsible for any breach of this confidentiality provision by its representatives.

The obligations of confidentiality hereunder will survive the termination of this Agreement for a period of two (2) years. Upon termination of this Agreement (for any

**HIGHLY CONFIDENTIAL**                                                                **CVS-MDLT1-000031010**

reason) each party will promptly: (i) return to the other party all documentation and other materials (including copies of original documentation or other materials) containing any confidential information of the other party; or (ii) certify to the other party, pursuant to a certificate in form and substance reasonably satisfactory to the other party, as to the destruction of all such documentation and other materials.  Notwithstanding the foregoing, each party may keep one copy of any documentation containing confidential information of the other party, provided that such copy will be retained and used solely by the legal department of that party.

### Section 18.     *Indemnity*.

Cardinal will indemnify and hold harmless CVS and all future parent corporations, subsidiaries and affiliates and each of their officers, directors, employees and representatives (collectively referred to in this paragraph as CVS) from and against those claims, damages or liabilities (including expenses and attorneys fees)(exclusive of any incidental damages, which are defined as claims, damages and liabilities associated with or related to actual damages but are in excess of repayment for actual losses, and exclusive of any consequential damages, which are defined as claims, damages and liabilities that do not flow directly and immediately from an act that would require indemnification hereunder but that result indirectly from such an act) directly attributable to Cardinal's negligence or wrongdoing or the failure of Cardinal to properly store, handle or distribute Merchandise in accordance with this Agreement or in accordance with applicable law, it being understood, however, that Cardinal is not the manufacturer of the Merchandise and that no indemnification of any type is being provided other than as specifically stated in this paragraph.  In addition, Cardinal will transfer to CVS (on a non-exclusive basis) any representations, warranties and indemnities made by the manufacturers of the Merchandise to the extent that such representations, warranties and indemnities are assignable by Cardinal, and will cooperate with all reasonable requests made by CVS to enforce such representations, warranties and indemnities against such manufacturers.  Notwithstanding anything to the contrary herein, Cardinal reserves its own rights under such representations, warranties and indemnities made by such manufacturers and the remedies available to it for any breach of such representations, warranties and indemnities by the manufacturers.

CVS will indemnify and hold harmless Cardinal and all future parent corporations, subsidiaries and affiliates and each of their officers, directors, employees and representatives (collectively referred to in this paragraph as Cardinal) from and against those claims, damages or liabilities (exclusive of any incidental damages, which are defined as claims, damages and liabilities associated with or related to actual damages but are in excess of repayment for actual losses, and exclusive of any consequential damages, which are defined as claims, damages and liabilities that do not flow directly and immediately from an act that would require indemnification hereunder but that result indirectly from such an act) directly attributable to CVS' negligence or wrongdoing, it being understood, however, that no indemnification of any type is being provided other than as specifically stated in this paragraph.  The parties agree that neither CVS nor Cardinal will be obligated under this section 18 with respect to any claim that results solely from the negligence or intentional wrongdoing of the other party.

17                 CVS Cardinal Wholesaler Agreement 7-1-07.doc

### Section 19. *Insurance*.

Cardinal and CVS agree to maintain the insurance as set forth in the *Section 19 Disclosure Schedule.*

### Section 20. *Entire Agreement; Successors*.

This Agreement, together with the Disclosure Schedules referenced herein, constitutes the entire Agreement and understanding of the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, proposals, and understandings between the parties relative to the subject matter hereof. Cardinal may delegate its rights and obligations to any corporation that is controlled by or under common control with Cardinal Health, Inc. and CVS may delegate its rights and obligations to any corporation that is controlled by or under common control with CVS Corporation, provided that in each such assignment by Cardinal or CVS the assignor will remain the primary obligor for all payment obligations. If all or substantially all of the stock or assets of CVS Corporation are acquired by an unrelated third party (which expressly excludes a merger where CVS Corporation is the surviving entity), then Cardinal may elect (but will not be required) to terminate this Agreement during the thirty (30) day period following such acquisition, by providing written notice to CVS of its intent to terminate sixty (60) days prior to the intended termination date. Further, if all or substantially all of the stock or assets of Cardinal Health, Inc. are acquired by an unrelated third party (which expressly excludes a merger where Cardinal Health, Inc. is the surviving entity), then CVS may elect (but will not be required) to terminate this Agreement during the thirty (30) day period following such acquisition, by providing written notice to Cardinal of its intent to terminate sixty (60) days prior to the intended termination date. This Agreement will be binding on, and inure to the benefit of, and be enforceable by and against the respective successors and assigns of each party to this Agreement.

### Section 21. *Amendments*.

No changes to this Agreement will be made or be binding on any party unless made in writing and signed by each party to this Agreement.

### Section 22. *Waiver*.

Neither party's failure to enforce any provision of this Agreement will be considered a waiver of any future right to enforce such provision.

### Section 23. *Governing Law*.

This Agreement will be governed by the laws of the State of Ohio, without regard to choice of law principles.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL** **CVS-MDLT1-000031012**

**Section 24.**     <u>*Relationship of the Parties*</u>.

The relationship of the parties is and will be that of independent contractors. This Agreement does not establish or create a partnership or joint venture among the parties.

**Section 25.**     <u>*Severability*</u>.

The intention of the parties is to fully comply with all applicable laws and public policies, and this Agreement will be construed consistently with all such laws and policies to the extent possible. If and to the extent that a court of competent jurisdiction determines that it is impossible to so construe any provision of this Agreement and consequently holds that provision to be invalid, such holding will in no way affect the validity of the other provisions of this Agreement, which will remain in full force and effect.

**Section 26.**     <u>*Announcements*</u>.

CVS will not issue any press release or other public announcement, verbally or in writing, referring to Cardinal or any entity which is controlled by or under common control with Cardinal Health, Inc., without Cardinal's prior written consent and advice of counsel. CVS will provide Cardinal's Senior Vice President, Retail National Accounts, 7000 Cardinal Place, Dublin, Ohio 43017, with a written copy of any such press release or other public announcement no less than seventy-two (72) hours prior to CVS' intent to issue such release or announcement. CVS is responsible for confirming in writing that Cardinal's Senior Vice President, Retail National Accounts has received any such proposed press release. Any such press release or other public announcement proposed by CVS will be subject to Cardinal's revision and final approval. Nothing contained herein will limit the right of CVS to issue a press release if, in the opinion of CVS' counsel, such press release is required pursuant to state or federal securities laws, rules or regulations.

Cardinal will not issue any press release or other public announcement, verbally or in writing, referring to CVS or any entity which is controlled by or under common control with CVS Pharmacy, Inc., without CVS' prior written consent and advice of counsel. Cardinal will provide CVS' Senior Vice President, Pharmacy Merchandising and Director of Corporate Communications, One CVS Drive, Woonsocket, Rhode Island 02895, with a written copy of any such press release or other public announcement no less than seventy-two (72) hours prior to Cardinal's intent to issue such release or announcement. Cardinal is responsible for confirming in writing that CVS' Senior Vice President,Pharmacy Merchandising and Director of Corporate Communications  has received any such proposed press release. Any such press release or other public announcement proposed by Cardinal will be subject to CVS' revision and final approval. Nothing contained herein will limit the right of Cardinal to issue a press release if, in the opinion of Cardinal's counsel, such press release is required pursuant to state or federal securities laws, rules or regulations.

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000031013**

**Section 27.**     **_Authorized Signatories_.**

All signatories to this Agreement represent that they are authorized by their respective companies to execute and deliver this Agreement on behalf of their respective companies, and to bind such companies to the terms herein.

Accepted and Agreed to by:

Cardinal Health 110, Inc.

By: _Michael J Gander_

Its: _President/GM - Retail·ALTCARE_

Date: _6·14·07_

CVS Pharmacy, Inc.

By: _Nettler Leonard_

Its: _Senior VP Pharmacy_

Date: _6/26/07_

And with respect to Section 4(e) only:

CVS Caremark Corporation

By: _____

Its: _Secretary_

Date: _6-25-07_

CVS LEGAL
APPROVAL

_TLE_

---

20        CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                    **CVS-MDLT1-000031014**

*Section 1(a) Disclosure Schedule*

**Determination of Pharmacies that will Designate Cardinal as
Primary Wholesale Pharmaceutical Supplier**

As of the Commencement Date, and throughout the term of this Agreement, CVS will designate Cardinal as primary wholesale pharmaceutical supplier to the designated Pharmacies within this *Section 1(a) Disclosure Schedule*.

Notwithstanding anything in this Agreement to the contrary, CVS may elect at any time to change the designation of the Pharmacies. However, the total number of Pharmacies designated to Cardinal shall not be less than 4,800 Pharmacies.

In the event CVS acquires by purchase, merger or other combination, a retail pharmacy (or multiple retail pharmacies) then CVS may decide to award Cardinal any portion of said retail pharmacies at CVS' sole discretion (in which case Cardinal and CVS will meet to discuss the terms of said new business).

In no event will CVS be required to terminate any wholesaler agreement which may exist related to any retail pharmacies CVS acquires by purchase, merger or other combination.

Furthermore, CVS may decide to award any additional pharmacies related to the organic growth of CVS at CVS's sole discretion.

**Designated Pharmacy List.**

Upon Cardinal's request, as often as quarterly, CVS will provide Cardinal with the Designated Pharmacy List.  For each of the Pharmacies, CVS agrees that each such Pharmacy will purchase its Primary Wholesale Requirements of Store Rx Purchases from Cardinal, as further described in the *Section 2(a) Disclosure Schedule.*

**HIGHLY CONFIDENTIAL**   **CVS-MDLT1-000031015**

*Section 1(b) Disclosure Schedule*

### Total DC List

| | |
|---|---|
| CVS Pharmacy, Inc.<br>Three Berry Drive<br>Lumberton, NJ 08048 | CVS TN Distribution, Inc.<br>10017 Kingston Pike<br>Knoxville, TN 37922 |
| CVS Pharmacy, Inc.<br>150 Industrial Drive<br>North Smithfield, RI 02896 | CVS Indiana, L.L.C.<br>7590 Empire Drive<br>Indianapolis, IN 46219 |
| CVS Texas Distribution L.P.<br>700 CVS Drive<br>Ennis, TX 75119 | CVS Conroe TX Distribution, L.P.<br>100 S. Trade Center Pkwy.<br>Conroe, TX 77385 |
| CVS Orlando FL Distribution, L.L.C.<br>8201 Chancellor Drive<br>Orlando, FL 32809 | CVS Vero FL Distribution, L.L.C.<br>2575 98th Ave.<br>Vero Beach, FL 32966 |

As CVS opens additional pharmacy distribution centers to support Pharmacies, Cardinal may elect to be designated as the primary wholesale pharmaceutical supplier to such distribution centers (in which case Cardinal and CVS will meet to discuss the terms of said new business) in a timeframe so as not to compromise CVS' business operations. For each of the CVS Pharmacy DCs set forth above, CVS agrees that each such CVS Pharmacy DC will purchase its Primary Wholesale Requirements of Brokerage Purchases from Cardinal, as further described in the *Section 2(a) Disclosure Schedule*.

CVS will keep the Total DC List current and notify Cardinal of anticipated additions to or deletions from the Total DC List at least thirty (30) days prior to such addition or deletion. If such addition or deletion could not have been reasonably foreseen ninety (90) days in advance, CVS will notify Cardinal as soon as possible thereafter. In no event will Cardinal be required to service any CVS Pharmacy DC pursuant to the terms of this Agreement until thirty (30) days after CVS first notified Cardinal that the CVS Pharmacy DC would be added to the Total DC List. A CVS Pharmacy DC may only be deleted if it ceases operations.

If CVS acquires an additional distribution center or centers in support of acquired retail pharmacies (acquired by purchase, merger or other combination), then CVS may designate, at its sole discretion, Cardinal as the primary wholesale pharmaceutical supplier to such distribution centers (in which case Cardinal and CVS will meet to discuss the terms of said new business) in a timeframe so as not to compromise CVS' business operations.

In no event will CVS be required to terminate any wholesaler agreement which may exist related to acquired retail pharmacies.

---

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                              **CVS-MDLT1-000031016**

*Section 2(a) Disclosure Schedule*

### Primary Wholesale Requirements

The term **"Primary Wholesale Requirements"** means:

(a) with respect to the Pharmacies, Cardinal will be the sole wholesale supplier of all Rx Products to such Pharmacies.

(b) with respect to the CVS Pharmacy DCs, CVS will purchase from Cardinal its requirements of Rx Products from indirect manufacturers as detailed in and subject to *Section 12 Disclosure Schedule*.

Notwithstanding anything in this Agreement to the contrary, CVS retains the right to purchase from any other source Rx Products which are unavailable from Cardinal.

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000031017**

*Section 2(b) Disclosure Schedule*

**Warehouse and Brokerage Purchases -- Terms and Conditions**

### A. *Ordering/Delivery.*

All CVS purchase orders for those CVS Pharmacy DC's designated in *Section 1(b) Disclosure Schedule* for branded Rx Products (except for repack items) will be generated by Cardinal, on behalf of CVS, through CVS' ordering system. All orders referenced in this *Section 2(b) Disclosure Schedule* are intended to refer to orders generated by Cardinal. All orders will be handled through Cardinal's Brokerage Department located at its corporate headquarters or such other departments designated by Cardinal from time to time. All references to Cardinal in this *Section 2(b) Disclosure Schedule* are to Cardinal's Brokerage Department or other such designated department. All orders will be generated by specified manufacturer and will include the NDC number, complete product description and to which CVS Pharmacy DC the product is designated to be shipped. Quantities ordered will meet manufacturer requirements for minimum and/or multiple case quantities and/or minimum order size. All orders will be subject to shipping restrictions, cut-backs, allocations, backorders, delays and other restrictions imposed by manufacturers from time to time. CVS will only accept product shipped from Cardinal Brokerage Inventory to CVS Pharmacy DCs that has at least twelve (12) months dating remaining, unless otherwise approved by CVS.

### B. *Receiving and Shipping Discrepancies.*

#### 1. *Generally.*

In the event a discrepancy in quantity arises with respect to any shipment, the applicable CVS Pharmacy DC will notify Cardinal of the discrepancy within two (2) business days of the receipt date of the shipment, and will pay the undisputed amount of any such shipment, in accordance with the process for taking deductions set forth within this disclosure schedule. In turn, Cardinal may notify the supplier (if other than Cardinal) relative to the disputed quantity or pricing.

If CVS no longer has a direct relationship with a manufacturer or supplier and CVS reasonably believes such manufacture or supplier owes amounts to CVS, then CVS will deduct from amounts owed to Cardinal in the amount of such funds. Cardinal may, at its sole discretion, correspondingly deduct from amounts Cardinal owes to such manufacturer or supplier. CVS and Cardinal will be responsible to maintain detailed support documentation for any deductions or payback request and will make such documentation, upon request, available to the requesting party. Cardinal and CVS will not allow deductions if such deductions are not supported by detailed documentation.

#### 2. *Crossdock, Dropship, Replenishment Warehouse Discrepancies.*

A crossdock or dropship discrepancy is defined as one of the following scenarios:

---

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                        **CVS-MDLT1-000031018**

| Shortage (Quantity) | Item quantity on Cardinal invoice is greater than the quantity physically received by CVS Pharmacy DC |
| Overage (Quantity) | Item quantity on Cardinal invoice is less than the quantity physically received by CVS Pharmacy DC |
| Wrong Item (Quantity) | Cardinal invoices CVS for one item but CVS Pharmacy DC physically receives a different item |
| Short Dated (Quantity) | Cardinal invoices CVS for an item and CVS Pharmacy DC physically receives the item but cannot receive the item into its stock due to dating requirements [product expected to have minimum of 12 months dating unless pre-approved by ECR subject to *Section 12 Disclosure Schedule*] |
| Damaged (Quantity) | Cardinal invoices CVS for an item and CVS Pharmacy DC physically receives the item but cannot receive the item into its stock due to damage to the item |

Each CVS Pharmacy DC will provide the applicable Cardinal division with notice (i.e., via Warehouse Discrepancy Notification ("**WDN**"), which will be transmitted electronically or via facsimile) of all inbound receiving discrepancies between physical product and the accompanying packing list within two (2) business days of CVS' physical receipt of the product. The WDN must be transmitted directly to the designated Cardinal DC associate with a copy to Cardinal's Corporate Purchasing Department. Cardinal will use all reasonable efforts to respond to a WDN within two (2) business days of receipt of each such WDN. Cardinal and the CVS Pharmacy DCs will communicate the crossdock or dropship discrepancies and corresponding resolution to their respective accounting departments. CVS will process a deduction against payments due Cardinal (subject to *Section 2(b) Disclosure Schedule*) for the value of the discrepancy. Cardinal may request and CVS will provide additional written documentation in support of any processed deduction. If Cardinal, through its own review, has documentation which refutes CVS' claim, then CVS and Cardinal shall review such documentation and any necessary adjustment will be made. Discrepancies that remain unresolved fifteen (15) business days following the date of the WDN will be presented to senior management at both Cardinal and CVS, for resolution.

3. *Crossdock, Dropship, Replenishment Accounting Discrepancies*

An accounting discrepancy is defined as one or more of the following scenarios:

| Shortage (quantity) | Item quantity on Cardinal invoice is greater than the quantity physically received by CVS Pharmacy DC |
| Overage (quantity) | Item quantity on Cardinal invoice is less than the quantity physically received by CVS Pharmacy DC |
| Wrong item (quantity) | Cardinal invoices CVS for one item but CVS Pharmacy DC physically receives a different item |

**HIGHLY CONFIDENTIAL**                              **CVS-MDLT1-000031019**

| Short dated (quantity) | Cardinal invoices CVS for an item and CVS Pharmacy DC physically received the item but cannot receive the item into its stock due to dating requirements [product expected to have minimum of 12 months dating unless pre-approved by ECR subject to *Section 12 Disclosure Schedule*] |
|---|---|
| Damaged (quantity) | Cardinal invoices CVS for an item and CVS Pharmacy DC physically receives the item but cannot receive the item into its inventory due to damage to the item |
| Pricing | Cardinal's invoice price for an item is different than the price CVS reasonably understands it should pay for such item |
| Due Dating | Cardinal's invoice reflects a due date that is different from the date that CVS reasonably understands payment on the invoice to be due |
| Other | Any discrepancy where CVS reasonably understands the payment amount to be different from the amount reflected on the Cardinal invoice |

CVS' corporate accounting department will provide Cardinal with notice of all accounting discrepancies on or before the payment due date for the applicable invoice. Prior to submitting such notice to Cardinal, CVS agrees to re-verify the CVS Pharmacy DC's claim of the accounting discrepancy. The written notice for accounting discrepancies will take the form of an accounting discrepancy notification which will be generated and provided to Cardinal by CVS' accounting department (the "**ADN**"). This ADN will include the purchase order number, items involved, quantities, amounts and nature of the exception. CVS will process a deduction against payments due Cardinal (subject to *Section 2(b) Disclosure Schedule*) for the value of the discrepancy. Cardinal may request and CVS will provide additional written documentation in support of any processed deduction. If Cardinal, through its own review, has documentation which refutes CVS' claim, then CVS and Cardinal shall review such documentation and any necessary adjustment will be made. Cardinal and CVS will use all reasonable efforts to resolve the accounting discrepancies within fifteen (15) calendar days of receipt from CVS of the fully completed ADN. Discrepancies that remain unresolved fifteen (15) business days following the date of the ADN will be presented to senior management at both Cardinal and CVS for resolution.

### 4. *Warehouse Returns.*

#### a. *Crossdock Vendors.*

CVS will return all product by reason of overage, wrong item, unapproved, short-dated or damage relating to replenishment crossdock product purchases to the applicable Cardinal servicing division within five (5) business days of physical receipt of the product. CVS will label the product as a return, attach a completed WDN, and clearly reference the original shipment. CVS will process a deduction against future

---

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031020**

payment due Cardinal in the amount of the return subject to *Section 2(b) Disclosure Schedule.*

### b. *Dropship Vendors.*

CVS will return all product by reason of overage, wrong item, unapproved, short-dated or damage relating to replenishment dropship product purchases directly to the manufacturer, within five (5) business days of physical receipt of the product. CVS will process an offset against future payment due Cardinal in the amount of the return subject to *Section 2(b) Disclosure Schedule*

### c. *Direct Vendors.*

CVS will return all product resulting from replenishment direct product purchases shipment directly to the manufacturer. CVS will not deduct from amounts CVS owes Cardinal with respect to such replenishment direct product purchases.

CVS will return all short-dated or damaged product to CVS' designated third party returned goods processor, or directly to the manufacturer or manufacturer's processor, as CVS elects.

All other return scenarios will be handled on an exception basis with a process to be mutually agreed upon by both CVS and Cardinal.

### C. *Verification Process.*

#### CARDINAL SHIPMENTS TO CVS

| Replenishment Crossdock | |
|---|---|
| Shortage | ◆ CVS to verify shortage by recounting inbound shipment |
| | ◆ CVS to review discrepancy against receiving worksheet/manifest from Cardinal to confirm shortage not due to UOM issue |
| | ◆ CVS to check for merchandise on site but not received into system |
| | ◆ CVS to check for open receiving {overage receiving against different purchase order} |
| | ◆ CVS to cycle count on hand inventory |
| | ◆ CVS to review inventory adjustment records |
| | ◆ CVS to determine if shortage due to overage on other item |
| | ◆ Cardinal to review receiving worksheet/manifest for error |
| | ◆ Cardinal to review vendor packing list/BOL |
| | ◆ Cardinal to cycle count on hand inventory |
| | ◆ Cardinal to review inventory adjustment records |

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**  **CVS-MDLT1-000031021**

| Overage | ♦ CVS to verify overage by recounting inbound shipment<br>♦ CVS to review discrepancy against receiving worksheet/manifest from Cardinal to confirm overage not due to UOM issue<br>♦ CVS to determine if overage due to shortage on other item<br>♦ CVS to contact ECR to determine if product should be received or returned to Cardinal (notify Cardinal of ECR decision)<br>♦ CVS to cycle count on hand inventory<br>♦ CVS to review inventory adjustment records<br>♦ Cardinal to review receiving worksheet/manifest for error<br>♦ Cardinal to review vendor packing list/BOL<br>♦ Cardinal to cycle count on hand inventory<br>♦ Cardinal to review inventory adjustment records |
|---|---|
| Wrong Product | ♦ CVS to determine if item is correct, just wrong NDC number<br>♦ CVS to determine if wrong product is overage to product on purchase order or if product not on original purchase order<br>♦ CVS to determine if wrong product is due to shortage on other item<br>♦ CVS to contact ECR to determine if product should be received or returned to Cardinal (notify Cardinal of ECR decision)<br>♦ CVS to cycle count on hand inventory<br>♦ CVS to review inventory adjustment records<br>♦ Cardinal to review receiving worksheet/manifest for error<br>♦ Cardinal to review vendor packing list/BOL<br>♦ Cardinal to cycle count on hand inventory<br>♦ Cardinal to review inventory adjustment records |
| Short Dated Product | ♦ CVS to review receiving worksheet from Cardinal to determine if dating pre-approved<br>♦ CVS to contact ECR to determine if product should be received or returned to Cardinal (notify Cardinal of ECR decision)<br>♦ Cardinal to review receiving worksheet/manifest for error |
| Damaged Product | ♦ CVS to return product to Cardinal as per approved SOP |
| Invalid Purchase Order | ♦ CVS to contact Cardinal customer operations coordinator |

## Replenishment Dropship

| Shortage | ♦ CVS to verify shortage by recounting inbound shipment<br>♦ CVS to review discrepancy against packing list/BOL from manufacturer to confirm shortage not due to UOM issue<br>♦ CVS to check for merchandise on site but not received into system<br>♦ CVS to check for open receiving {overage receiving against different purchase order}<br>♦ CVS to cycle count on hand inventory<br>♦ CVS to review inventory adjustment records<br>♦ CVS to determine if shortage due to overage on other item<br>♦ Cardinal to contact vendor to coordinate resolution |
|---|---|

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                   **CVS-MDLT1-000031022**

| Overage | ♦ CVS to verify overage by recounting inbound shipment<br>♦ CVS to review discrepancy against packing list/BOL from vendor to confirm overage not due to UOM issue<br>♦ CVS to determine if overage due to shortage on other item<br>♦ CVS to contact ECR to determine if product should be received or returned to Manufacturer (notify Cardinal of ECR decision)<br>♦ CVS to cycle count on hand inventory<br>♦ CVS to review inventory adjustment records<br>♦ Cardinal to contact vendor to coordinate resolution |
|---|---|
| Wrong Product | ♦ CVS to determine if item is correct, just wrong NDC number<br>♦ CVS to determine if wrong product is overage to product on purchase order or if product not on original purchase order<br>♦ CVS to determine if wrong product is due to shortage on other item<br>♦ CVS to contact ECR to determine if product should be received or returned to manufacturer (notify Cardinal of ECR decision)<br>♦ Cardinal to contact vendor to coordinate resolution |
| Short Dated Product | ♦ CVS to contact ECR to determine if product should be received or returned to Cardinal (notify Cardinal of ECR decision)<br>♦ Cardinal to contact vendor to coordinate resolution |
| Damaged Product | ♦ CVS to return product to manufacturer as per manufacturer guidelines and notify Cardinal |

CVS Cardinal Wholesaler Agreement 7-1-07.doc

HIGHLY CONFIDENTIAL                                                        **CVS-MDLT1-000031023**

## D. *Indirect Deduction Process.*

The process relating to expired non-merchantable pharmaceutical returns is described in the *Section 10(b) Disclosure Schedule.* The following process applies to all other indirect manufacturer or supplier deductions. If CVS no longer has a direct relationship with a manufacturer or supplier and CVS reasonably believes such manufacturer or supplier owes amounts to CVS, then CVS will deduct from amounts owed to Cardinal in the amount of such funds. Cardinal may, at its sole discretion, correspondingly deduct from amounts Cardinal owes to such manufacturer or supplier. CVS and Cardinal will be responsible to maintain detailed support documentation for any deductions or payback request and will make such documentation, upon request, available to the requesting party. Cardinal and CVS will not allow deductions if such deductions are not supported by detailed documentation. The following terms and conditions apply to the indirect deduction process:

a.   CVS will deduct amounts which CVS reasonably believes are owed to CVS by certain vendors with which Cardinal has a current relationship. Cardinal may, at its sole discretion, correspondingly deduct from amounts Cardinal owes to such manufacturer or supplier.

b.   CVS and Cardinal will notify each indirect manufacturer or indirect supplier of their relationship as customer/wholesaler. CVS will instruct each indirect manufacturer or indirect supplier to issue any and all credits to Cardinal for any and all amounts owed to CVS. From time to time, CVS may identify a need to process a deduction against a specific manufacturer for which Cardinal has a current relationship, in these cases, CVS will process a deduction against future payment to Cardinal for all funds reasonably due CVS. Upon request, CVS will provide Cardinal with documentation (either in paper or electronic format) to substantiate each such deduction. This documentation may exclude pricing information if such information is deemed to be confidential information, as reasonably determined by CVS.

c.   Cardinal, at its sole discretion, will deduct such debit memo from the applicable manufacturer's account.

d.   CVS and Cardinal will work together to mutually resolve any deduction discrepancies.

## E. *Warehouse Service Level.*

Cardinal and CVS recognize the importance of maintaining adequate inventory of all CVS warehoused items, without compromising the inventory management objective embedded in this Agreement. To that end, Cardinal will provide CVS with a 97% service level ("**Warehouse Service Level** ") ("**WSL**"). The WSL 97% service level shall be defined as the aggregate brand service level from the CVS Pharmacy DCs to the CVS Pharmacies, excluding repackaged items, to be calculated on a monthly basis. The service level will be calculated using the following formula:

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031024**

[Total of CVS brand warehouse items shipped at cost (excluding repack)]/[Total of CVS brand warehouse items ordered at cost (excluding repack)]

This service level commitment is inclusive of any manufacturer back orders or allocated product.

The Warehouse Service Level shall be maintained with the aggregate number of inventory days in each of the CVS Pharmacy DCs to not exceed CVS' monthly budgeted days as provided to Cardinal by CVS.

With respect to the WLP (as defined in *Section 12 Disclosure Schedule*) if CVS notifies Cardinal that the aggregate WSL to the CVS Pharmacy DCs through the WLP during any month is less than 97%, then Cardinal will promptly use reasonable efforts to work with CVS to remedy its ordering practices to meet its service level commitments.

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031025**

*Section 2(c) Disclosure Schedule*

### Specially Stocked Merchandise

As of July 1, 2007, Cardinal is not carrying any Specially Stocked Merchandise on CVS' behalf.

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031026**

<u>*Section 2(e) Disclosure Schedule*</u>

### Wholesaler Certification

Cardinal Health 110, Inc., a wholesaler ("Wholesaler"), doing business with CVS Pharmacy, Inc. and its affiliates ("CVS"), hereby certifies that effective July 1, 2007 as follows:

1. Wholesaler represents that it is an industry leader in implementation of processes, practices and safeguards to prevent the distribution of all product that is contaminated, mislabeled, not approved for sale in the United States, counterfeit or otherwise unfit for use by consumers.

2. Wholesaler represents that it is compliant with all applicable state and federal laws, regulations, rules and orders governing the distribution of pharmaceutical product.

3. Wholesaler represents that it has been designated as an "Authorized Distributor of Record" by each manufacturer and for every product that may require such designation distributed by the Wholesaler to CVS Pharmacy, Inc. and its affiliates.

4. All pharmaceutical products sold to CVS and purchased by Wholesaler for resale, whether or not in connection with its repackaging business, shall be purchased by Wholesaler directly from the manufacturer of that product (or its designated exclusive distributor or its third party logistics provider) and from no other authorized distributor, agent, broker or third party seller.  The manufacturer (or its designated exclusive distributor or its third party logistics provider) must be licensed to manufacture and/or distribute said products in the United States.  Notwithstanding anything set forth herein, CVS and Wholesaler agree that returns of saleable goods from CVS or other entities to Wholesaler that were originally purchased from Wholesaler shall not cause those products to be ineligible under this Certification for subsequent distribution by Wholesaler, provided Wholesaler employs processes to reasonably ensure the integrity of said product.

5. Wholesaler agrees that CVS or its designated agent shall have the right, with advance notice, to inspect Wholesaler's facilities, processes and procedures, and internal business records relating to the procurement for and sale of product to CVS as is reasonably necessary to confirm compliance with this certification; provided, however, that CVS acknowledges that purchase price information shall be excluded from such record inspection and other information that may be considered proprietary will remain confidential.

6. Nothing in this Certification is intended to modify, alter, reduce or change the rights or obligations of Wholesaler and CVS as in the Wholesale Supply Agreement dated July 1, 2007 ("Agreement") executed between Wholesaler and CVS.  In the event there is any direct conflict between the terms of this Certification and the terms of the Agreement, the terms of the Agreement shall control.

Cardinal Health 110, Inc.

By: _Michael J Bender_

Name: _Michael J. Bender_

Title: _President/GM - Retail and Alt Care_

Date: _6·14·07_

CVS Pharmacy, Inc.
and its affiliates

By: _____

Name: _Matthew J. Lowell_

Title: _Senior VP Pharmacy_

Date: _6/26/07_

**HIGHLY CONFIDENTIAL**                                                     **CVS-MDLT1-000031027**

**Pharmacies Purchase Price**

## Cost of Goods for Store Rx Purchases and Store Other Purchases

CVS will pay to Cardinal a Cost of Goods for Store Rx Purchases and Store Other Purchases as follows:

| | |
|---|---|
| Rx Products (FDB branded) | Lower of WAC less 0.77% or CVS contract price less 0.77% |
| CVS Formulary Generics | Contract Prices, net billed |
| All other Generics | Lower of CVS contract price or "MFN Retail", net billed |
| Home Health Care/DME | "MFN Retail", net billed |
| HBC/OTC | "MFN Retail" less 0.77% |
| Repackaged Merchandise | NA |

For the purpose of this Agreement "MFN Retail" shall mean CVS will pay the lowest price offered by Cardinal to a retail customer in the same business segment as CVS (i.e. a national retail chain drug store or national chain supermarket with a minimum volume per site approximately equivalent to that of CVS and approximately the same business mix as CVS) for all Merchandise for which a purchase order has been issued as of the date the Merchandise was offered to a third party for such lower price. The prices of a purchase order shall be deemed automatically revised (by Cardinal to CVS) to equal the lowest prices at which Cardinal shall have sold or shall have offered such product to such a retailer.

CII orders must be shipped 100% complete and courier must be present when order is received and checked in by CVS.  CVS reserves the right to refuse any CII order that contains any shipping errors.

All Merchandise being delivered from Cardinal to CVS Pharmacies must have at least nine (9) months dating.  Under no circumstances will Merchandise be delivered to Pharmacies with less than nine (9) months dating remaining without expressed written approval by CVS' Senior Vice President, Pharmacy Merchandising for each occurrence. Furthermore, Cardinal represents that it is, and will continue to be during the term of this Agreement, an industry leader in implementation of processes, practices and safeguards to prevent the distribution of Merchandise will less than nine (9) months dating remaining to Pharmacies.

CVS will receive the Abbott Return Allowance for purchases of applicable Abbott products made through Cardinal on behalf of the Pharmacies.  The allowance will be equal to Abbott's published allowance percent and will be based on the Pharmacies gross purchases of applicable Abbott products (full WAC value), less any merchantable returns made to Cardinal, without any reduction for any other discount, allowance or rebate. Cardinal will calculate and provide CVS with a credit for the return allowance within thirty (30) days following the end of each Program Year.  The credit will be e-mailed,

**HIGHLY CONFIDENTIAL**    **CVS-MDLT1-000031028**

faxed and/or mailed in hard copy form to CVS' Manager of Wholesaler Programs. Cardinal's passing of the Abbott Return Allowance to CVS will not prevent CVS from receiving any other credit offered by Abbott related to product returns.

Cardinal reserves the right to adjust the Cost of Goods of any item of Merchandise in the event that the manufacturer of such item implements a change in policy which eliminates or decreases the cash discount terms effective on the Commencement Date with respect to such item.  The adjustment to the Cost of Goods for such item will be equal to the decrease (or elimination) of the cash discount percentage.

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031029**

### Cost of Goods for Brokerage Purchases

CVS will pay to Cardinal with respect to all Brokerage Purchases the lower of: 1) the manufacturer's published wholesale acquisition cost ("WAC") for such Brokerage Purchases as of CVS' PO date less "Trade Discount" (as defined below); 2) the net cost being extended to CVS via a manufacturer's deal or allowance less Trade Discount, or CVS' manufacturer contract price less Trade Discount.

For the purpose of this Agreement the Trade Discount shall mean 2.00% (standard 2.00% cash/prompt pay discount)  ("**Trade Discount**").

Notwithstanding anything in this Agreement to the contrary, in the event a manufacturer implements a change in policy which eliminates or decreases the cash/prompt pay discount terms then Cardinal may elect to exclude such manufacturer's purchases from the requirements contained within this Agreement. If Cardinal elects to exclude a manufacturer from the requirements of this Agreement then CVS may, at its sole discretion, purchase such manufacturer's products either directly from the manufacturer or from any other source.

Notwithstanding anything in this Agreement to the contrary, CVS will retain all applicable new product funding, to include, but not limited to:

(a) New product distribution allowances
(b) Off invoice opportunities
(c) Stock allowances
(d) Additional product
(e) Additional dating

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031030**

*Section 3(c) Disclosure Schedule*

### Pharmacy Site Incentive

Pharmacies will be eligible for the following Cost of Goods adjustment based upon the average, aggregate qualified monthly purchases per Pharmacy during a calendar quarter (the **"Pharmacy Site Incentive"**):

| Average, Aggregate Qualified Monthly Purchases per Pharmacy | Invoice Cost of Goods | Cost of Goods Adjustment | Net Cost of Goods after Adjustment |
|---|---|---|---|
| $29,000 - $33,999 | -0.77% | -0.60% | -1.37% |
| $34,000 - $39,999 | -0.77% | -0.70% | -1.47% |
| $40,000 - $43,999 | -0.77% | -0.86% | - 1.63% |
| $44,000 - $47,999 | -0.77% | -0.97% | -1.74% |
| $48,000 - $51,999 | -0.77% | -1.09% | -1.86% |
| $52,000 - $55,999 | -0.77% | -1.15% | -1.92% |
| $56,000 - $59,999 | -0.77% | -1.18% | -1.95% |
| $60,000 – $67,999 | -0.77% | -1.22% | -1.99% |
| $68,000 - $75,999 | -0.77% | -1.27% | -2.04% |
| $76,000 + | -0.77% | -1.31% | -2.08% |

If CVS' average, aggregate qualified monthly purchases per Pharmacy during a calendar quarter is less than $29,000, a Cost of Goods adjustment will be mutually determined at a percentage that is greater than the next category Cost of Goods adjustment.

At the end of each calendar quarter, Cardinal and CVS will evaluate CVS' average, aggregate qualified monthly purchases per Pharmacy during such quarter (i.e., Store Rx Purchases and Store Other Purchases only) of all Pharmacies divided by the total number of Pharmacies, adjusted as appropriate to reflect any additional or deleted Pharmacies). Payment will be paid to CVS in the form of a credit so that CVS receives such credit within thirty (30) days from the close of said quarter. The credit will be emailed, faxed and/or mailed in hard copy form to CVS' Manager of Wholesaler Programs.

The Pharmacy Site Incentive Payment calculation will be made as follows: Cardinal and CVS will evaluate CVS' average, aggregate qualified monthly purchases per Pharmacy during a calendar quarter. Utilizing this calculation Cardinal and CVS will determine which tier to utilize for the payout calculation.

For example, during a calendar quarter, CVS' average, aggregate qualified monthly purchases per Pharmacy was $71,000, then CVS' Pharmacy Site Incentive (additional Cost of Goods adjustment) will be Cardinal's Cost minus an additional 1.27%.

In addition, if CVS acquires a material number of Pharmacies which would place CVS' qualified monthly purchases per Pharmacy into a different Pharmacy Site Incentive volume category, then CVS may elect to notify Cardinal prior to Cardinal servicing such Pharmacies, and ask Cardinal to exclude these Pharmacies for the twelve (12) month period following the date of acquisition for purposes of calculating the Pharmacy Site Incentive only. If CVS does not notify Cardinal prior to Cardinal servicing such Pharmacies or CVS does not ask Cardinal to exclude such Pharmacies from the

**HIGHLY CONFIDENTIAL**                                                   **CVS-MDLT1-000031031**

calculation of the Pharmacy Site Incentive, then such Pharmacy or Pharmacies will be subject to the terms and conditions of this Agreement.

The Pharmacy Site Incentive is a "discount or other reduction in price" as such term is used under section 1128(B)(3)(A) of the Social Security Act, 42 U.S.C. 1320a-7b(b)(3)(a). CVS will disclose the Pharmacy Site Incentive and any other "discounts or other reductions in price" received by CVS from Cardinal under any state or federal program which provides cost or charge-based reimbursement to CVS for the Merchandise purchased by CVS under this Agreement.

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000031032**

*Section 4 Disclosure Schedule*

**Payment Terms**

*Store Rx Purchases and Store Other Purchases.*

(i)  *Payment Term*.  Not later than the Friday of each week, CVS will cause Cardinal to receive payment in full by ACH for all Merchandise delivered and services performed during the immediately preceding week (i.e., Monday through Friday).

(ii)  *Form of Remittance*.  Each payment by CVS to Cardinal will be accompanied by a remittance in a form deemed acceptable to Cardinal and CVS (EDI 820 format).

(iii)  *Late Payment; Finance Charges*. At the end of each calendar quarter, Cardinal will evaluate CVS' payment history based on weighted average payment days in accordance with the table set forth below, adjusted to reflect legitimately disputed amounts (such as duplicative invoices and incorrect billing information).  CVS and Cardinal acknowledge that CVS' Cost of Goods is based upon CVS achieving weighted average payment days of 9.5 days sales outstanding.  CVS will pay Cardinal for late payment an amount equal to 0.03% (an effective annual percentage rate of 10.95%) per weighted average payment day that CVS' payments are late (i.e., where CVS' weighted average payment days are greater than 10), up to fifteen (15) days, calculated in accordance with the formula set forth below.  CVS will pay Cardinal a penalty for late payment an amount equal to 0.033% (an effective annual percentage rate of 12%) per weighted average payment day, from the first day, that CVS' payments are late in excess of fifteen (15) days (i.e., where CVS' weighted average payment days are greater than 15).  Cardinal will pay CVS for early payment an amount equal to 0.03% (an effective annual percentage rate of 10.95%) per weighted average day CVS' payments are early (i.e., where CVS' weighted average payment days are less than 9.0).  Notwithstanding the foregoing, no payment will be made either by CVS or Cardinal in the event that CVS' weighted average payment days are greater than 9 but equal to or less than 10 (i.e., 9.0, 9.1, 9.2, 9.3, 9.4, 9.5, 9.6, 9.7, 9.8, 9.9, or 10.0).

For example:

| Calendar Quarter | Amount Paid | Required WAPD | Actual WAPD During Quarter | WAPD Variance | Adjustment Factor | (Credit) /Debit to CVS |
|---|---|---|---|---|---|---|
| 1st | 181,250,000 | 9.5 | 4.5 | (5.0) | 0.03% | ($271,875) |
| 2nd | 181,250,000 | 9.5 | 10.0 | .5 | N/A | N/A |
| 3rd | 181,250,000 | 9.5 | 10.2 | .7 | 0.03% | $38,062 |
| 4th | 181,250,000 | 9.5 | 25.5 | 16 | 0.033% | $957,000 |

Cardinal will deliver to CVS an analysis of CVS' payment history in aggregate format, or other mutually acceptable format, on a weekly basis for informational

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031033**

purposes (i.e., to assist CVS in managing its payment compliance). If the above calculation indicates that CVS owes Cardinal, then CVS will pay Cardinal such amounts within forty (40) days from the date of Cardinal's invoice for such amounts. If the above calculation indicates that Cardinal owes CVS, then Cardinal will pay CVS such amounts in the form of a credit memo to be used toward future purchases of Merchandise from Cardinal within forty (40) days following the end of the applicable quarter.

The parties may, but will not be obligated to, agree to a payment arrangement whereby CVS may make early payment on some invoices and late payment on other invoices (among other terms). In such event, no penalty (other than that to which the parties mutually agree) will be assessed on the agreed upon late payments, and no payment will be made to CVS relating to the agreed upon early payments (other than that to which the parties mutually agree), as long as payments are made when due in accordance with the agreed upon schedule.

### *Brokerage Purchases.*

For crossdock purchases, CVS will cause Cardinal to receive payment in full twenty-five (25) days from the date of Cardinal's shipment to the CVS Pharmacy DC's (Cardinal shipment date will be equal to Cardinal's invoice date). For dropship purchases, CVS will cause Cardinal to receive payment in full twenty-five (25) days from the date of the manufacturer's shipment to the CVS Pharmacy DC's (manufacturer shipment date will be equal to Cardinal's invoice date). If payment is due on Saturday, CVS will cause Cardinal to receive payment in full on the immediately preceding Friday, and if payment is due on Sunday, CVS will cause Cardinal to receive payment in full on the immediately following Monday.

Cardinal and CVS agree and acknowledge that timely payment is a material and critical part of this Agreement and Cardinal's pricing to CVS along with CVS' willingness to enter into such an Agreement. Accordingly, in the event Cardinal or CVS identifies that payments, rebates, funding or incentives are not received when due under this Agreement, Cardinal or CVS will notify the other of such payment problems, and the offending party will ensure that timely payment is made thereafter. If the problem is not cured to Cardinal's or CVS' satisfaction, then such party will bill back to the offending party for such amounts and any corresponding late payment finance charge, as further described below, that applies to such late payment. Notwithstanding the foregoing, CVS or Cardinal will remain responsible to make payments, rebates, funding or incentives when due under this Agreement. Any delay or failure by Cardinal or CVS to notify the other party as provided above will not relieve CVS or Cardinal of such obligations. Cardinal and CVS will work together in obtaining full value for such concealed shortages or damaged Merchandise as further set forth in the indirect deduction process described in *Section 2(b) Disclosure Schedule*. Further, CVS and Cardinal will be responsible to maintain detailed support documentation for any deductions or payback request and will make such documentation, upon request, available to the requesting party. Cardinal and CVS will not allow deductions if such deductions are not supported by detailed documentation.

**HIGHLY CONFIDENTIAL**      **CVS-MDLT1-000031034**

With respect to Brokerage Purchases only, CVS will pay a late payment finance charge calculated at the rate of 1% per month (or the maximum rate allowed by law, if such rate is less than 1% per month) on any amount not paid by CVS to Cardinal when due (other than legitimately disputed amounts) under the terms of this Agreement from the first (1st) day of delinquency until such amount is paid in full. Failure or delay by Cardinal to bill CVS for any such late payment finance charge will not waive Cardinal's right to receive the same.

With respect to all payments, rebates, funding, or incentives due CVS, Cardinal will pay a late payment finance charge calculated at the rate of 1% per month (or the maximum rate allowed by law, if such rate is less than 1% per month) on any amount not paid by Cardinal to CVS when due (other than legitimately disputed amounts) under the terms of this Agreement from the first (1st) day of delinquency until such amount is paid in full. Failure or delay by CVS to bill Cardinal for any such late payment finance charge will not waive CVS' right to receive the same.

The parties may, but will not be obligated to, agree to a payment arrangement whereby CVS may make early payment on some invoices and late payment on other invoices (among other terms). In such event, no penalty (other than that to which the parties mutually agree) will be assessed on the agreed upon late payments, and no payment will be made to CVS relating to the agreed upon early payments (other than that to which the parties mutually agree), as long as payments are made when due in accordance with the agreed upon schedule.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**

**CVS-MDLT1-000031035**

*Section 6(a) Disclosure Schedule*

**Cardinal Computer Services**
**Price Schedule**

**CardinalCHOICE®-HQ**

|  | CVS' Cost |
|---|---|
| Hardware Estimate | Included in Cost of Goods |
| Upgrades | Included in Cost of Goods |
| Software Initialization | |
| Version 2.1 | Included in Cost of Goods |
| Version 3.0 | Included in Cost of Goods |
| Upgrades and new releases and enhancements | Included in Cost of Goods |
| Support | |
| Help Desk & Maintenance | Included in Cost of Goods |

Cardinal will make available to all CVS' locations (Pharmacies, CVS Pharmacy DCs, and support locations) Cardinal.com.  CVS may access Cardinal.com, a healthcare internet web portal, at no additional cost, during the term of this Agreement.  Cardinal will assist in the transitioning of CVS locations to Cardinal.com by making reasonable changes to their web portal, limiting access to CVS proprietary information, and providing additional support as needed, at no additional cost to CVS.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                        **CVS-MDLT1-000031036**

## *Section 6(b) Disclosure Schedule*

### Base Service Package

| Programs & Services | Frequency |
|---|---|
| EOE Machines | One per store |
| Custom Invoices | With each order |
| Custom Price Stickers | With each order |
| Auto Generic and Package Size Substitution Program | Ongoing |
| Auto Repack Substitution Program | Ongoing |
| Microfiche Service | Once per quarter, upon CVS' request |
| Catalog | Once per quarter, upon CVS' request |

| Reports | Frequency |
|---|---|
| Category Purchase Summary | Monthly, upon request |
| Item Purchases Report | Monthly, upon request |
| Rx Velocity Report - Top 200 Items | Quarterly, upon request |
| Generic Purchase Report | Quarterly, upon request |
| Price Change Notification | Weekly, upon request |
| Controlled Substance Variance Report | Monthly, upon request |
| Ad Hoc Reports | Daily, upon request |

**Base Package Fee:** **No Additional Charge**
(included in Cost of Goods)

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031037**

*Section 6(d) Disclosure Schedule*

### Employee Funding

Cardinal will partially fund the cost of a CVS DSD Manager ("**Employee**") who will serve as an intermediary between Cardinal and CVS specifically related to the management of the Store Rx Purchases.  It is understood that the Employee shall be employed solely by CVS and that the Employee's salary and other employment benefits shall be the sole responsibility of CVS.  CVS agrees to indemnify and hold Cardinal harmless for all claims and liabilities, whether alleged or actual, relating to the Employee.

Cardinal will provide for the funding of this Employee pursuant to the schedule defined below:

| January 15, 2008 | $112,500 |
| January 15, 2009 | $56,250 |

Payments for employee funding made pursuant to any historical agreement between CVS and Cardinal are not represented in this *Section 6(d) Disclosure Schedule* and such payments will be retained by CVS.

**HIGHLY CONFIDENTIAL**                    **CVS-MDLT1-000031038**

*Section 7(a) Disclosure Schedule*

## CVS Generic Item and Package Size Substitution Logic



- • CVS may delineate certain items as Brand or Generic regardless of FDB classification.
- • CVS additionally has the ability to exclude certain NDCs or GCNs from package size substitution (i.e. creams and suspensions).
- • Package size must be consistent for metric sizes (i.e. 1 pint = 473ml or 480ml ; 1 ounce = 28.4gm or 30gm).

**HIGHLY CONFIDENTIAL**                                **CVS-MDLT1-000031039**

## _Unit Quantity Package Size Substitution._

A= Quantity of units (bottles) ordered
B= Package size of product ordered

**X= Quantity of formulary product units to ship**
Y= Package size of formulary product

Send the minimum quantity X (rounding up to the nearest
single unit) of formulary product such that:

$$(Y)(X) \geq (A)(B)$$

## EXAMPLE 1:

| Store Orders 3 (A=3) | Manufacturer | Pack Size |
|---|---|---|
| Hydrocodone | Watson | 100  (B=100) |

| CVS Formulary Item | Manufacturer | Pack Size |
|---|---|---|
| Hydrocodone | Mallinckrodt | 500  (Y=500) |

$500(X) \geq 3(100)$
$X = 300/500 = .60$

**Send 1 of the formulary product**

## EXAMPLE 2:

| Store Orders 2 | Manufacturer | Pack Size |
|---|---|---|
| Enalapril 10mg | Teva | 1000 |

| CVS Formulary Item | Manufacturer | Pack Size |
|---|---|---|
| Enalapril 10mg | Mylan | 100 |

$100(X) \geq 2(1000)$
$X = 20$

**Send 20 of the formulary product**

*CVS additionally has the ability to exclude certain NDCs or GCNs from package size substitution.
* Package size must be consistent for metric sizes.
* Generic CIIs must be excluded from package size substitution.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                          **CVS-MDLT1-000031040**

## Package Size Substitution Quantity Adjustment.

CVS requires the ability to adjust (up or down) the quantity of product our stores receive. This adjustment will be made on an NDC by NDC basis and will include a Threshold Quantity and an Adjustment Percentage. Both the Threshold Quantity and Adjustment Percentage can be set to any value CVS deems appropriate.



A = Threshold Quantity
B% = Adjustment Percentage
Y = Order Quantity
**X = Quantity to Send**

If $Y \leq A$, Ship Y

If $Y > A$, then: $[(Y-A)B\%]+A= X$

X must then be rounded up to the nearest whole unit.

**EXAMPLE:** CVS has instructed Cardinal to apply the following Quantity Adjustment to NDC 55555-4444-22: Threshold Quantity =3, Adjustment Percentage = 40%

After going through the Substitution Logic and the Package Size Formula, it has been determined that 5 units of NDC 55555-4444-22 should be sent to a store. The following Quantity Adjustment must then take place:

Threshold Quantity (A) = 3
Adjustment Percentage (B%) = 40%
Order Quantity (Y) = 5
**Quantity to Send = X**

$5 > 3$, therefore:

$[(Y-A)B\%]+A= X$

$[(5-3)40\%]+3= 3.8$ units.

**X = 4, Cardinal will ship 4 units instead of the original 5 units.**

**HIGHLY CONFIDENTIAL**      **CVS-MDLT1-000031041**

*Section 7(b) Disclosure Schedule*

### Semi-Annual Generic Wrap-Around Rebate for the Pharmacies

CVS will be eligible for the following discount on the Pharmacies' generic Rx Product purchases ("**Semi-Annual Generic Wrap-Around Rebate**"):

| Aggregate Qualified Semi-Annual Purchases of generic Rx Products by the Pharmacies | Rebate |
|---|---|
| $1 - $79,999 | 2.25% |
| $80,000 - $89,999 | 3.25% |
| $90,000 - $99,999 | 4.00% |
| $100,000- $119,999 | 4.50% |
| $120,000 - $139,999 | 5.00% |
| $140,000- $157,999 | 5.25% |
| $158,000+ | 5.50% |

Cardinal will provide CVS with a monthly report detailing the Pharmacies' aggregate qualified monthly purchases of generic Rx Products to date. At the end of June and the end of December of each year, Cardinal and CVS will evaluate CVS' aggregate qualified purchases of generic Rx Products by the Pharmacies during such six (6) month period. The Semi-Annual Generic Wrap-Around Rebate will be equal to a percentage (as set forth in the table above) of CVS' aggregate qualified semi-annual purchases of generic Rx Products by the Pharmacies during the applicable period. The Semi-Annual Generic Wrap-Around Rebate, if any, will be calculated and paid to CVS in the form of a credit so that CVS receives such credit within thirty (30) days from the close of said period. The credit will be emailed, faxed and/or mailed in hard copy form to CVS' Manager of Wholesaler Programs. In the event that the Semi-Annual Generic Wrap-Around Rebate will not be paid for any reason, Cardinal will use reasonable efforts to give CVS notice no later than forty-five (45) days prior to the end of the then-current period.

The Semi-Annual Generic Wrap-Around Rebate is a "discount or other reduction in price" as such term is used under section 1128(B)(3)(A) of the Social Security Act, 42 U.S.C. 1320a-7b(b)(3)(a). CVS will disclose the Semi-Annual Generic Wrap-Around Rebate and any other "discounts or other reductions in price" received by CVS from Cardinal under any state or federal program which provides cost or charge-based reimbursement to CVS for the Merchandise purchased by CVS under this Agreement.

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031042**

**Pharmacies Service Level**

Cardinal will exercise best efforts to provide the Pharmacies with the following average aggregate monthly Adjusted Service Level and Overall DSD Service Level (as defined within this disclosure schedule), calculated monthly as described below: (a) 95% adjusted with respect to branded Rx Products; (b) 96% adjusted with respect to CardinalSOURCE<sup>SM</sup> generic drugs; (c) 95% adjusted with respect to the CVS Generic Formulary; and (d) at a percentage to be mutually agreed upon by the parties with respect to home health care products (the "**Service Level Commitment**").

## CVS Generic Formulary Service Level.

For purposes of this Agreement, "**Adjusted Service Level**" for CVS Generic Formulary items during any particular month will be calculated using the following formula:

[Total items of CVS generic formulary (which includes Schedule II Rx Products and certain other products as CVS designates) by NDC (eleven digit) shipped] / (Total generic NDC's/items shipped within the same five (5) digit GCN as defined by FDB less Authorized Adjustments).

All orders submitted to Cardinal will be included in the Adjusted Service Level calculation, including, but not limited to: store telxon orders, AIMRx orders, First Pass orders, verbal orders, and CII orders.

The following items of merchandise are excluded from the Adjusted Service Level calculation and in aggregate constitute all "**Authorized Adjustments**":

1. *Validated long-term backorders* - long-term backorders will only be considered valid upon agreement between Cardinal and CVS that said supplier is unable to provide Cardinal with merchandise necessary for Cardinal to maintain an adequate inventory position. Cardinal will verbally communicate any long term back order situations for which an adjustment to the service level calculation is requested to CVS' Assistant Category Manager – Generics, in the event that person is unavailable, Cardinal will notify the Director, Category Management - Generics. Notification to CVS should only be made after Cardinal has exhausted all avenues to resolve such product shortage on its own. Upon notification from Cardinal, CVS will contact the respective supplier to validate the long term backorder status of said product or assist Cardinal with securing adequate inventory. Upon CVS receiving validation from supplier of a long term backorder status or said supplier's inability to ship the related product, the affected products will be considered an Authorized Adjustment. Only CVS validated long term backorders or CVS validated circumstances where a supplier is unable to ship the products in question will be considered in the Adjusted Service Level calculation. Each month Cardinal will provide a list detailing the agreed upon items to be excluded from CVS' Adjusted Service Level calculation and the number of units to be adjusted.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                **CVS-MDLT1-000031043**

2. _CVS specific do-not-substitute requests_ -  CVS may specifically request that no substitution be performed for specific items; CVS' Assistant Category Manager – Generics will notify Cardinal in writing of these items.  In addition, individual CVS stores may place verbal orders to Cardinal; if the Pharmacy specifically requests (phone in orders without a documented detailed specific request by CVS will not be considered an Authorized Adjustment) Cardinal not to perform a substitution for a specific item, then said item will be considered an Authorized Adjustment.  Cardinal will provide CVS on a monthly basis a report by item of the number of store specific do not substitute requests to include but not be limited to: CVS store number, NDC, item description, date, and quantity.  Reports should be provided no later than five (5) days following the close of the respective month.

3. _Excessive demand_ – an adjustment to the Adjusted Service Level will be allowed in validated cases where an items total month's GCN usage has increased at least 200% above the average monthly GCN demand for the previous two (2) months or CVS' generic formulary forecast as provided from time to time, which ever is greater.  Adjustment amount will only be for the number of units surpassing the applicable baseline.

   For example, if the average monthly demand for the prior two (2) month period is equal to 500 units per month, Authorized Adjustment will only be given for orders surpassing 1,500 units ((500 x 200%) + 500) during that month.  Cardinal must provide CVS with reporting detailing the applicable baseline usage figure and the current month usage figure to be eligible for the adjustment.  Increase in usage is determined by global CVS usage.

4. _Non-previously stocked items_ -  CVS at its discretion can choose to adjust the CVS Generic Formulary for additions, deletions, change in supplier, change in package size, etc.  CVS commits to the timely notification of all such changes in an electronic format; in addition, on a monthly basis CVS will provide an updated complete CVS Generic Formulary.  Cardinal will make available to CVS non-previously Cardinal stocked items within fourteen (14) days from notification.  Generic service level calculation will be adjusted for the fourteen (14) day period following CVS notification, during which Cardinal may service CVS stores using the previous formulary item if applicable.

Both Cardinal and CVS agree the achievement of the 95% Adjusted Service Level on a monthly basis represents a material aspect of this Agreement.  Failure by Cardinal to maintain a monthly Adjusted Service Level of 95% with respect to the CVS Generic Formulary (which includes Schedule II Rx Products and certain other products as CVS designates) (a "**Generic Service Level Failure**") will entitle CVS to be compensated for its Generic Damages (as defined herein).  For purposes of this _Schedule 9 Disclosure Schedule_, the term "**Generic Damages**" means an amount equal to the difference between the actual service level for the month and 95% multiplied by generic Rx Product purchase volume for the month multiplied by twenty percent (20%).  CVS will calculate

**HIGHLY CONFIDENTIAL**                                                                      **CVS-MDLT1-000031044**

and present Generic Damages, if any, to Cardinal before processing any financial transaction related to any funds being owed to CVS in connection with Generic Damages.

For example, if the Adjusted Generic Service Level is calculated at 94% for any given month, and the monthly generic purchase volume for that month was $15,000,000, then CVS may process an offset for $30,000 after notifying Cardinal of such transaction ((95%-94%) x $15,000,000 x 20%).

Cardinal and CVS agree to meet at CVS' Support Center as necessary to review the Adjusted Service Level performance and to use best efforts in order to maximize CVS' Adjusted Service Level defined within this *Section 9 Disclosure Schedule*.

### Branded Rx Products and Store Other Purchases –DSD Service Level.

Cardinal recognizes the significant impact of branded Rx Products and Store Other Purchases service level ("**Overall DSD Service Level**") can have on CVS' ability to service their customers. Therefore, both Cardinal and CVS agree that the Overall DSD Service Level is material to this Agreement. To that end, Cardinal and CVS will mutually agree to terms that will reflect the significance of Overall DSD Service Level. The terms will be specific towards each party's responsibilities, the calculation of Overall DSD Service Level, and remedies up to and including financial penalties. CVS and Cardinal agree that the arrived at structure of the Overall DSD Service Level will provide CVS with industry leading performance commitments.

**HIGHLY CONFIDENTIAL**     **CVS-MDLT1-000031045**

<u>*Section 10(a) Disclosure Schedule*</u>

### Pharmacies Merchantable Product Only Return Goods Policy

<u>*General Policy.*</u>

The parties acknowledge that returns are costly to both parties. Product in "merchantable condition" (as defined below) may generally be returned to Cardinal from which the product was originally purchased if the return is made within the timeframes and subject to the terms and conditions described below: The return of expired or non-merchantable product is detailed in *Section 10(b) Disclosure Schedule*.

| Return Made Within: | Normal Credit Amount: |
|---|---|
| 1 - 90 Days from Invoice Date | 100% of original invoice amount paid by customer. This policy covers all ordering/filling errors. |
| More than 90 Days | 100% of original contract or other "cost" paid by customer (i.e., not including any applicable mark-up and not to exceed actual amount paid) less a 25% restocking fee invoiced seperately to net at 75%. |

Merchandise will be considered to be in *"Merchantable condition"* except for the following:

A. Any item which has been used or opened, is a partial dispensing unit or unit of sale, is without all original packaging, labeling, inserts, or operating manuals, or that is stickered, marked, damaged, defaced, or otherwise cannot readily be resold by Cardinal for any reason.
B. Short-dated (less than nine (9) months expiration dating, unless received by CVS with less than twelve (12) months dating), outdated, or seasonal product and items purchased on a "special order" basis, including non-stock and dropship items.
C. Any sterile or refrigerated merchandise, unless Cardinal agrees and is specially assured that such merchandise was properly stored and protected at all times and such merchandise is returned separately in a package marked as such and accompanied by a separate credit request form.
D. In order for CVS to achieve compliance with Cardinal's excess returns policy, CVS will return product (in Merchantable Condition) to Cardinal only if such product is not stocked in the CVS Pharmacy DCs (excluding Cardinal errors or Merchandise that is delivered to CVS damaged or controlled Rx Products CIIIs - CVs). Further, CVS agrees that Cardinal may implement an automatic "block" of the return of items which are stocked in the CVS Pharmacy DCs, as indicated in the CVS monthly on-hand inventory electronic report provided to Cardinal by CVS.

<u>*Controlled Substances.*</u>

Credit for the return of controlled substances requires a separate Merchandise Return Authorization Form ("**MRA Form**") and must comply with all federal and state procedures and requirements in addition to the terms and conditions described herein.

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031046**

### *Shorts and Damaged Merchandise.*

Claims of order shortages (i.e., invoiced but not received), order errors and damage must be reported within three (3) business days from the applicable invoice date.  Controlled substance shortage claims must be reported immediately per DEA requirements.

### *Excess Returns.*

CVS Pharmacy returns in dollars will not exceed three percent (3%) of qualified monthly purchases of all of the Pharmacies (in dollars, each calendar month) excluding filling errors or damaged product.  Because CVS agrees only to return merchantable product to Cardinal if such product is not stocked in the CVS Pharmacy DCs (excluding Cardinal errors or Merchandise that is delivered to CVS damaged or controlled Rx Products CIIIs - CVs), CVS and Cardinal mutually agree that Cardinal will implement an automatic "block" of the return of those items which are included in the CVS monthly on-hand inventory electronic report provided to Cardinal by CVS.  This "block" is designed to limit returns in excess of 3%.  CVS and Cardinal may agree from time to time to implement a Pharmacies wide returns program in cases where CVS Pharmacies are holding excess inventory.  The parties will agree to the terms of such a returns program on an individual basis.  Returns made under the returns program will not be included in the excess returns calculation.

### *Ongoing Assurance and Cardinal Credit Request Form.*

Prior to returning any product to Cardinal, each customer must execute and deliver to Cardinal an Ongoing Assurance verifying that all returned merchandise has been kept under proper conditions for storage, handling, and shipping. All requests for credit must be submitted via EOE, on the CardinalCHOICE® system or by approved EDI interface. A fully completed MRA must accompany all merchandise to be returned.  A fully completed form includes, but is not limited to, the following information: the invoice number and invoice date for the merchandise to be returned. All return credit memos will have corresponding reference numbers that will provide CVS with a complete audit trail for reconciliation.

### *Shipping of Return Goods.*

Return merchandise must be placed in a proper shipping container and, for merchandise valued at more than $250, signed for by the driver when the product is picked up.  All MRAs will be reviewed by Cardinal for compliance with the returned goods policy within this *Section 10(a) Disclosure Schedule*. Cardinal will process credits within thirty (30) days of receipt of merchantable product from CVS.  In instance were credit has not been received for product returned to Cardinal for which Cardinal has no record of said return, CVS and Cardinal will use reasonable efforts to research and reach a mutually acceptable resolution.

**HIGHLY CONFIDENTIAL**                **CVS-MDLT1-000031047**

### *Monthly Reporting.*

Cardinal will provide an electronic report on a monthly basis, which will detail (1) CVS' excess return percentage, (2) claims of order shortages, order errors and damaged products that are reported in excess of three (3) business days from invoice date, (3) information relating to returns in excess of ninety (90) days, and (4) any restocking fees.

### *Other Restrictions.*

This policy is further subject to modification as may be deemed necessary to comply with applicable federal and/or state regulations, FDA guidelines, and state law.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                    **CVS-MDLT1-000031048**

<u>*Section 10(b) Disclosure Schedule*</u>

## Third Party Returned Goods Policy

The process relating to all other indirect manufacturer or supplier deductions is described in the *Section 2(b) Disclosure Schedule*.  The following process applies to non-merchantable pharmaceutical returns:

<u>General Policy.</u>

The following process applies to non-merchantable pharmaceutical returns (expired, damaged, recalls, etc.) that are often processed through a third party.  If CVS no longer has a direct relationship with a manufacturer or supplier and CVS reasonably believes such manufacturer or supplier owes amounts to CVS (as determined by CVS' Return Goods Policy), then CVS and Cardinal will follow the process detailed below to ensure CVS realizes the appropriate amounts due CVS.  CVS and Cardinal will be responsible to maintain detailed support documentation for any deductions or payback request and will make such documentation, upon request, available to the requesting party.

Instead of returning all indirect manufacturer or supplier (warehoused or non-warehoused) non-merchantable product to Cardinal for reimbursement, CVS will first attempt to recover amounts to which CVS believes it is entitled to receive for the return through the process outlined within this disclosure schedule.   CVS' Return Goods Policy as in effect from time to time will be the basis of valuing all of CVS' expired pharmaceutical returns.

Product may be returned to those indirect vendors: (a) with which Cardinal has a current relationship, (b) are not either insolvent or subject to a petition in bankruptcy, or (c) which do not have an outstanding balance due Cardinal at the date on which such Product is submitted for return.  If CVS elects to utilize a third party processor, product may only be returned through a third party return processor that agrees to communicate with Cardinal via EDI or other mutually acceptable electronic format ("**Third Party**") in accordance with the terms and conditions described in this policy.  CVS may decide at its own discretion the most efficient process to return expired returns to indirect manufacturers or suppliers or Cardinal, if applicable.  If CVS elects to return expired product directly to Cardinal, then CVS and Cardinal agree to determine a mutually acceptable process.  For any manufacturer or supplier that CVS elects to transition from a direct to an indirect purchasing relationship through Cardinal, the parties agree to work collaboratively to execute the process detailed within this disclosure schedule. Any Third Party selected by CVS must enter into a confidentiality agreement, in a form mutually acceptable to Cardinal and CVS, prior to accepting any returns from CVS.

<u>Procedures for Returns.</u>

CVS and Cardinal will notify each pharmaceutical manufacturer or supplier of their relationship as CVS/wholesaler.  CVS will send all returns of pharmaceutical product under this policy to its selected Third Party, if applicable.  The Third Party will identify the amount to which CVS believes it is entitled in exchange for the return.  CVS will

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031049**

instruct the Third Party to provide Cardinal with documentation (in electronic format) to substantiate each debit memo submitted to pharmaceutical manufacturer or suppliers on behalf of CVS.

CVS will instruct each pharmaceutical manufacturer or supplier to issue any and all credits or funding to Cardinal for merchandise that was purchased by CVS and is returned through a Third Party, and to reference the debit memo number corresponding to the debit memo prepared by the Third Party. CVS and Cardinal acknowledge that CVS will handle, without Cardinal's involvement, all matters relating to returns to pharmaceutical manufacturer or supplier with which CVS has a direct relationship.

CVS will pay the Third Party directly for all of such Third Party's fees relating to CVS' returns hereunder, including, but not limited to, processing fees, postage, delivery and destruction fees, reporting, EDI transactions, which will be CVS' sole responsibility.

CVS' account will be adjusted in accordance with the following procedure:

1) Once per week, Cardinal will credit CVS' account with the net amount due CVS for all Third Party Returns activities during the previous week, less the Processing Fee (defined below) (if applicable). Cardinal will retain all vendor credit information for a minimum of five (5) years and will provide said information to CVS upon request in a mutually acceptable electronic format.

2) Cardinal will adjust CVS' account upon the earlier of Cardinal's receipt of an actual credit from a pharmaceutical manufacturer or supplier, or within five (5) days following the date of a debit memo (initial full deductions to be processed within five (5) days of CVS' debit memo date, unless otherwise directed by CVS in writing) received by Cardinal which has been submitted to a pharmaceutical manufacturer or supplier. CVS will not deduct from any amounts owed to Cardinal, any amounts relating to the return of product through a Third Party unless Cardinal does not adjust CVS' account within such five (5) day period. If Cardinal fails to adjust CVS' account after the five (5) day period, CVS may deduct such amounts from amounts owed Cardinal. Cardinal may, at its sole discretion, correspondingly deduct from amounts Cardinal owes to such manufacturer or supplier. Notwithstanding anything in this Agreement to the contrary, CVS and Cardinal agree that the following manufacturers or suppliers shall be excluded from the requirements of this section 2: Alcon Labs, Barr/Duramed, Berlex, Boehringer-Ingleheim, Braintree, Dey Labs, Endo Pharmaceuticals, Forest, Galderma, GlaxoSmithKline, JOM, Monarch, Novartis, Roche, Salix, Sanofi-Aventis, Sciele, Solvay, Stiefel, Ther-Rx, Unimed, Wallace/Medpointe, Warner-Chilcott, Watson and Wyeth. For these manufacturers or suppliers, Cardinal will instead adjust CVS' account upon the earlier of Cardinal's receipt of an actual credit from the pharmaceutical manufacturer or supplier, or within thirty (30) days following the date of a debit memo received by Cardinal which has been submitted to the manufacturer or supplier. Further, the parties agree that any additional movement of a manufacturer or supplier from processes outlined in this section 2 will only be at the mutual agreement of both parties.

**HIGHLY CONFIDENTIAL**                                **CVS-MDLT1-000031050**

3) In addition, Cardinal is not responsible for resolving discrepancies related to product returned directly to the indirect manufacturer or supplier through such Third Party. For manufacturer or supplier return discrepancies made through a Third Party to an indirect manufacturer or supplier, Cardinal should direct these parties to CVS for resolution. CVS' dispute resolution process will include, but not be limited to, the following: initial manufacturer contact to review said issue, an internal financial reconciliation to review said account and the associated debits, a financial reconciliation with the manufacturer, and a settlement process/negotiation when applicable. CVS and Cardinal recognize that this general process will vary by manufacturer with respect to the methods as well as the associated timelines. That being said, CVS takes these matters seriously and understands that they impact both CVS and Cardinal. CVS will use all reasonable means to expeditiously resolve identified issues to the satisfaction of all associated parties. For return discrepancies related to product directly returned to Cardinal, Cardinal will address directly with the manufacturer.

4) At the end of each calendar week, Cardinal will post a single net dollar entry to CVS' accounts receivable balance and CVS will process a corresponding deduction in the amount of such entry. This single dollar entry will consist of the net amount from the following detailed transactions completed in the current calendar week: (a) credits or funding received from vendors, plus, (b) CVS debit memos deducted by Cardinal, less, (c) paybacks to vendors of previously deducted CVS debit memos, for which the vendor has now issued credit, plus, (d) CVS residual debit memo deductions deducted by Cardinal. Cardinal will execute the appropriate financial transactions so that CVS receives and maintains 100% of CVS' debit memo value. Accordingly, Cardinal will process initial and residual deductions in an amount so that funds received from the pharmaceutical manufacturer or supplier plus deductions processed and held are equal to 100% of CVS' debit memo amount. Cardinal may not process a residual deduction if the funds received from the manufacturer are (a) equal to or greater than 90% of CVS' original debit memo amount or (b) if a CVS debit memo has a remaining balance of less than $100.00 after processing funds received from a manufacturer. CVS, at its discretion, may notify Cardinal in writing in order to change either of the two payback conditions detailed in the preceding sentence. In the event that CVS elects to change the 90% payback condition set forth above, the subject vendors may be treated as Select Vendors, as described below, and the parties agree to make the appropriate adjustment, if necessary, to the Select Vendor Guarantee. Cardinal will not payback any CVS amounts (credits, deductions, funding, etc.) to any manufacturer or supplier outside of, or make any changes to, the process detailed within this disclosure schedule without first receiving written permission from CVS. Furthermore, CVS stipulates that CVS has the appropriate reserves to satisfy any necessary repayment of a CVS return goods discrepancies to the extent it is deemed appropriate by CVS. Therefore, Cardinal may not payback any disputed amounts without CVS' written approval. In addition, upon Cardinal's request (as often as monthly), CVS will provide Cardinal on a confidential basis (subject to Section 17 of this Agreement) a report that summarizes all return goods debit memos CVS has settled with indirect manufacturers ("**Settlement Database**"). On a quarterly basis, CVS will provide Cardinal on a confidential basis (subject to Section 17 of the Agreement) an electronic file which summarizes all updates made to the Settlement Database during that particular quarter. Cardinal will not contact any manufacturer

**HIGHLY CONFIDENTIAL**                                   **CVS-MDLT1-000031051**

related to the information contained in the Settlement Database.  In return for Cardinal's strict confidentiality as it pertains to CVS' Settlement Database, CVS will indemnify Cardinal against any financial liability related to a return goods debit memo listed in the Settlement Database.  Any payback request of a debit memo identified in the Settlement Database shall be directed to CVS for resolution.  CVS will not be financially responsible if Cardinal takes actions that are not consistent with this *Section 10 (b) Disclosure Schedule.*

The Settlement Database will not be subject to Section 16 of this Agreement; instead the following audit process will apply.  Not more than once in any twelve (12) month period, and following thirty (30) days' advance written notice to CVS, Cardinal will have the right to appoint an agent(s) (as further described below) to review those relevant records applicable to such Settlement Database.  Said audit will be strictly limited to verifying the following: 1) that each debit memo contained in the Settlement Database is included in a settlement agreement, and 2) that such agreement has been executed by both CVS and the applicable manufacturer.  No other terms or conditions contained within the settlement agreements or any other information gained through such audit process shall be disclosed to Cardinal.  Cardinal may only review records relating to the Settlement Database through an employee of one of the top national accounting firms deemed reasonably acceptable to CVS (i.e., not a Cardinal employee).  Any such review will be limited to twenty-four (24) months of historical information as of the date such review begins.  The information will be subject to a confidentiality agreement prepared by CVS and signed by Cardinal and its agent(s) who will have access to the information prior to beginning the review.  Notwithstanding the foregoing, Cardinal may only appoint agents who are employees of one of the top national accounting firms, as may be deemed reasonably acceptable to CVS.

In addition, the parties hereby acknowledge and agree that upon reasonable written request from Cardinal, CVS shall deliver to Cardinal a good faith written assessment of the potential exposure that CVS reasonably believes may exist at the date of the assessment with respect to the full and partial balance deductions that Cardinal has taken directly against its suppliers for product that CVS purchased directly from Cardinal and subsequently returned directly to the supplier rather than directly to Cardinal. The good faith assessment will include the population of full and partial balance deductions taken by Cardinal that fall within the twenty-four (24) month period ending approximately ninety (90) days prior to the date of Cardinal's written request.  The assessment provided will indicate that: (i) CVS has established reserves to cover its potential exposure at the date of the assessment, (ii) CVS will continue to establish reserves to cover its future exposure and (iii) Cardinal has, and will have, no exposure on any deductions contained in the Settlement Database so long as Cardinal does not take actions that are inconsistent with the provisions of this Disclosure Schedule.

If Cardinal believes it will be harmed due to manufacturer or supplier disputed amounts related to CVS' return goods, then Cardinal may at its option make payment to CVS in the amount of the manufacturer disputed amounts and repay an equal amount to such manufacturer or supplier.  This resolution process will be executed so that the related transactions are cash flow neutral to CVS; CVS is kept financially whole as stipulated in

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031052**

CVS' Return Goods Policy. With that being said, CVS will work with Cardinal to resolve all return goods discrepancies to the mutual satisfaction of both parties.

5) As long as CVS causes the Third Party (if applicable) to transmit to Cardinal information required by Cardinal in an electronic format acceptable to Cardinal, then Cardinal will waive the processing fee of ½% of the net returns received by Cardinal from all pharmaceutical manufacturers or suppliers (the "**Processing Fee**"). However, due to the excessive labor expenses Cardinal will incur if the information is not transmitted in an electronic format acceptable to Cardinal, including but not limited to cross referencing the Cardinal accounts payable vendor number to CVS' accounts payable vendor number, CVS will pay Cardinal the Processing Fee each month until the format is corrected to Cardinal's satisfaction. In addition, Cardinal will use its reasonable efforts to notify CVS promptly if the Third Party is unable to deliver the required information in Cardinal's desired format.

With the weekly credit information, Cardinal will provide CVS with a report of all manufacturer and supplier credits and debit memos posted during such week. As well, as often as monthly, Cardinal will provide CVS with a historical detailed return goods transaction report by debit memo by vendor. Cardinal will not perform a detail line reconciliation of the amounts authorized by pharmaceutical manufacturers or suppliers as compared to the original debit memo.

On a quarterly basis, Cardinal will provide CVS with a report detailing those vendors that have been in a debit balance with Cardinal for a period greater than eight (8) consecutive weeks. CVS and Cardinal will review the report to identify any vendor that may have open unresolved debit memos and seek appropriate resolution. If Cardinal obtains funds from a supplier who is in debit balance with Cardinal, Cardinal will arrange for an equitable prorata distribution of such credit to CVS.

If requested by CVS, Cardinal commits to assist CVS in (1) securing manufacturer or supplier participation in CVS' return goods reconciliation process; and (2) the collection activities of manufacturers or suppliers with no credit or insufficient credit activity as determined by CVS. On a biannual basis, CVS will submit to Cardinal's Chief Executive Officer, Healthcare Supply Chain Services and Cardinal's Group President, Healthcare Supply Chain Services, Pharmaceuticals a written assessment of Cardinal's performance relative to its impact on CVS' overall collection rate. To the extent any item is identified that has a negative impact on CVS' collection rate, Cardinal will provide an action plan to CVS detailing the steps Cardinal will take to rectify any potential issues.

**Exception Vendors.**

If Cardinal is unable to execute the process detailed within this disclosure schedule with any indirect manufacturer or supplier for any reason, then CVS may return said indirect manufacturer or supplier products directly to Cardinal in accordance with the financial process established within this disclosure schedule. Cardinal may, at its sole discretion, correspondingly deduct from amounts Cardinal owes to such manufacturer or supplier for said returns or return said product according to its own return goods policy to the

**HIGHLY CONFIDENTIAL**                                                              **CVS-MDLT1-000031053**

applicable manufacturer or supplier. With that being said, CVS will work with Cardinal to resolve all return goods discrepancies to the mutual satisfaction of both parties.

Notwithstanding anything in this Agreement to the contrary, CVS and Cardinal agree that the following pharmaceutical vendors shall be excluded from the requirements and processes detailed in this section: Abbott Laboratories, American Pharmaceutical Partners, American Regent, Aventis Behring, Aventis Pasteur, Eli Lilly and Company, Glenwood, Hollister-Stier, Hope Pharmaceutcals and Spectrum Chemical.

Notwithstanding anything in this Agreement to the contrary, Cardinal commits to assisting CVS with reconciling return goods debit memos associated with the following manufacturers: Cephalon, GSK, JOM, Novartis, Roche and Wyeth ("Select Vendors").

CVS and Cardinal agree that CVS will provide an electronic file, for each Select Vendor, detailing the return goods debit memos invoiced to the Select Vendor during the quarter within ninety (90) days following the close of CVS' fiscal quarter. The file will include CVS' debit memo number, CVS' debit memo date, CVS' debit memo amount, amount of credit received, debit/credit difference and debit/credit collection rate.

If requested by CVS, Cardinal commits to assist in the reconciliation process with CVS and the Select Vendors for the specific universe of debit memos identified in the quarterly file. The reconciliation will include, but is not limited to the following:

1. Identifying those debit memos for which the Select Vendor has not issued a return authorization and ensuring a return authorization is issued allowing CVS to return the product to the Select Vendor for credit;
2. Providing proof of delivery or debit memo detail to the Select Vendor for any debit memo that the Select Vendor has received the product, however, no credit has been issued;
3. Identifying all credits issued by the Select Vendor and ensuring the credits are sent to Cardinal for processing in a timely manner;
4. Receiving a confirmation from the Select Vendor that the Select Vendor has completed issuing all credits for the specific universe of debit memos;
5. Receiving debit memo/NDC level credit denial detail from the Select Vendor, in an electronic format, for the specific universe of debits identified in the quarterly file and validating the detail to ensure that all credit due CVS under the Select Vendor's published policy has been issued;
6. Identifying and resolving any discrepancies associated with debit memo/NDC level credit denial detail;
7. Identifying and resolving operational issues associated with the Select Vendor's return authorization or crediting process that negatively impact the timing and quality of credit issuance; and
8. Cardinal will submit a written quarterly report to CVS detailing Cardinal's accomplishments and findings associated with the specific universe of debit memos, issuance and processing of all credit due CVS, debit memo/NDC level credit denial discrepancies and recommendations to resolve operational issues negatively impact the timing and quality of credit issuance. CVS and Cardinal

**HIGHLY CONFIDENTIAL**                                     **CVS-MDLT1-000031054**

will meet on a quarterly basis to review Cardinal's report and determine a course of action that will ensure CVS receives all credit due.

CVS acknowledges that Cardinal may require CVS' assistance to obtain the appropriate level of CVS debit memo detail to execute the reconciliation process as detailed above.

CVS and Cardinal acknowledge that the best solution is for CVS to work directly with the Select Vendors to research, reconcile and resolve all return goods discrepancies. Return goods discrepancies will include, but not be limited to, debit memos with no credit issued (no activity) and debit memos with a low collection rate as determined by CVS.

Cardinal agrees to utilize its best efforts to assist CVS in the reconciliation process with the Select Vendors to include, but not be limited to, the involvement of Cardinal's Chief Executive Officer, Healthcare Supply Chain Services to assist CVS with securing Select Vendors' participation in the reconciliation process.

Cardinal will guarantee that CVS' aggregate annual non-recall return goods debit memo collection rate for the Select Vendors will not fall below 83.0% for a given year ("**Select Vendor Guarantee**"). Both parties agree that CVS' collection rate for a given year shall be defined as the total amount of credit issued by the Select Vendors for returns in that year divided by CVS' full gross debit memo value for the debit memos for such returns and that CVS' Return Goods and Product Recall/Withdrawal Policy, in effect from time to time, shall be the basis for calculating the value of all CVS return goods debit memos. In the event CVS' aggregate annual collection rate, as defined above, falls below 83.0% of CVS' full gross debit memo amount, Cardinal agrees to keep CVS financially whole for the difference between the actual aggregate annual collection rate and the agreed upon collection rate of 83.0% multiplied times CVS' aggregate full gross debit memo value for the debit memos for the returns in that year. Both parties agree that the aggregate annual non-recall collection rate will be based on returns made during the twelve (12) month period between each July 1st through June 30th during the term of this Agreement, with the Select Vendor Guarantee to be reconciled, and any necessary payment made, no later than the following December 31st. To the extent Cardinal utilizes all commercially reasonable efforts to adhere to the processes detailed in this disclosure schedule related to the Select Vendors, the parties acknowledge and agree that the Select Vendor Guarantee set forth in this disclosure schedule shall be CVS' sole remedy for any and all issues related to Cardinal's administration of the associated processes. The parties further agree that the Select Vendor Guarantee will survive the termination of this Agreement for a period of one (1) year to ensure returns made during the term of this Agreement are fully reconciled between the parties.

CVS and Cardinal agree that this Section is a material aspect to this Agreement and the parties are committed to work toward a fair and equitable resolution to all identified return goods discrepancies.

**HIGHLY CONFIDENTIAL**                    **CVS-MDLT1-000031055**

**Allowance Vendors.**

CVS currently receives, based on CVS' Abbott warehouse and DSD purchases, a return allowance which is retained 100% by CVS. In the event that a vendor would begin to pass an "Abbott like" returns allowance to Cardinal, Cardinal would pass 100% of this allowance to CVS, based on CVS' purchases (Pharmacies and CVS Pharmacy DCs, if applicable). Notwithstanding the foregoing, Cardinal will not accept any other return allowance on CVS' behalf relating to CVS' purchase volume (warehouse or DSD) without CVS' expressed written consent. It will be Cardinal's sole responsibility to notify in writing any pharmaceutical supplier (with copy to CVS subject to Section 13) offering a return allowance to Cardinal related to CVS' purchase volume that CVS utilizes its own return goods policy.

Cardinal and CVS may mutually agree to modify this Third Party returned goods policy in writing from time to time, except where required by law (in which case, Cardinal or CVS may modify this Third Party Returned Goods Policy without mutual agreement).

**HIGHLY CONFIDENTIAL**        **CVS-MDLT1-000031056**

### Warehouse Logistics Program

The goal of the **"Warehouse Logistics Program"** (WLP") is to develop the most efficient purchasing and distribution processes for CVS with pharmaceutical manufacturers under which Cardinal will direct all (100%) of CVS' purchase requirements for branded Rx Products (excluding repack items) ("**Branded Purchases**") on behalf of the CVS Pharmacy DCs which are or become part of this Agreement. The parties agree and acknowledge that this WLP is part of this Agreement, and is not a separate or distinct agreement.

Notwithstanding anything in this Agreement to the contrary, the WLP is intended and structured to provide 100% incremental financial and operational value to CVS and at no time shall Cardinal take any action in connection with the WLP which may negatively impact CVS' ability to service its Pharmacies, CVS Pharmacy DCs, or CVS' abilities to secure regular replenishment merchandise, including safety stock, from a manufacturer.

The WLP is designed to provide incremental financial value to CVS; CVS is to be kept whole on all non-price increase allocations, credit issuance, extended terms, etc. CVS will receive all other non-price increase allocations that CVS would otherwise be entitled to if CVS purchased the related product on a direct vendor basis (i.e., new product introductions, returns allowances, seasonal pushes, etc.).

As part of the WLP, Cardinal will pass to CVS funding (**"Incentive"**) in the form of a credit within thirty (30) days of the end of each CVS fiscal quarter equal to 1.18% times CVS Pharmacy DCs indirect Branded Purchases (in addition to passing the standard 2.00% cash/prompt pay discount, Trade Discount) for the respective CVS fiscal quarter during the term of this Agreement. The credit will be emailed, faxed and/or mailed in hard copy form to CVS' Manager of Wholesaler Programs. Additionally, Cardinal will provide CVS with the Warehoused Service Level detailed in *Section 2(b) Disclosure Schedule* through leveraging Cardinal's procurement and logistical expertise.

CVS will purchase from Cardinal its requirements of Rx Products from those indirect manufacturers as detailed below.

CVS will not be required to move or establish any other pharmaceutical manufacturers as a warehoused indirect vendor. Any further movement of pharmaceutical manufacturers from direct to an indirect purchasing relationship through Cardinal will be upon the mutual agreement of both parties and subject to the terms and conditions of such mutual agreement. However, nothing in this Agreement will prevent CVS from purchasing direct manufacturer's products from any other source. In the event CVS elects to transition any of the following manufacturers, Sepracor, Inc., Tap Pharmaceuticals and/or Schering from a direct to indirect purchasing relationship through another wholesaler, Cardinal will have the right of first refusal to meet the terms and conditions offered to CVS by the other wholesaler and subsequently fulfill CVS' requirements on an indirect basis. While CVS and Cardinal may both agree that it is in the best interest of both

**HIGHLY CONFIDENTIAL**

parties to shift a supplier from direct to indirect or visa versa, said decisions will always be made to reflect incremental value to CVS.

CVS is under no obligation to purchase any specific brokerage inventory and may eliminate (POX) or discontinue any item at its sole discretion.

### *Incentive Calculation.*

For all of CVS Pharmacy DCs indirect Branded Purchases, CVS will receive an Incentive within thirty (30) days of the end of each CVS fiscal quarter in the form of a credit equal to 1.18% times CVS Pharmacy DCs indirect Branded Purchases (in addition to passing the standard 2.00% cash/prompt pay discount, Trade Discount) for the respective CVS fiscal quarter during the term of this Agreement. The Incentive will be calculated based on CVS' receipt date of such indirect branded purchases for each fiscal month. CVS and Cardinal will agree with the method used to calculate each month's Branded Purchase totals.

For example; CVS' total indirect Branded Purchase volume for a specific CVS fiscal quarter equals $2,000,000,000, then Cardinal will pay to CVS within thirty (30) days of the end of the respective fiscal quarter $23,600,000 ($2,000,000,000 x 0.0118).

Further terms and conditions of the Incentive calculation are as follows:

1) CVS and Cardinal will publish the agreed to monthly indirect Branded Purchase volume eligible for the Incentive on a monthly basis; within fifteen (15) days of the respective CVS fiscal month's end or as soon as practical.

2) The Incentive will not be applied on direct Branded Purchases volume.

3) CVS contract pricing on select branded items will be eligible for the Incentive.

4) The calculation of the Incentive will be based off the PO Cost (branded WAC at the time of purchase or the CVS contract cost) prior to the application of the standard 2.00% cash/prompt pay discount (Trade Discount). For example, if the invoice PO cost is $100, then the Incentive would be calculated based on the $100, not the $98 (cost after the standard 2.00% cash/prompt pay discount, Trade Discount, is applied).

5) For all CVS warehouse purchases made through Cardinal, standard 2.00% cash/prompt pay discount (Trade Discount) passed to CVS is defined as the manufacturer's published standard 2.00% cash/prompt pay discount terms.

6) If CVS moves a vendor relationship from indirect to direct after the establishment of the fixed indirect and direct vendor pool, then Cardinal will not apply the Incentive calculation on that affected volume.

---

**HIGHLY CONFIDENTIAL**                                                              **CVS-MDLT1-000031058**

7) CVS to retain all applicable new product funding to include, but not limited to:
   a) New product distribution allowances
   b) Off invoice opportunities
   c) Stocking allowances
   d) Additional product
   e) Additional dating

8) CVS will receive the Abbott Return Allowance for applicable purchases of Abbott products made through Cardinal on behalf of the CVS Pharmacy DC's. The allowance will be equal to Abbott's published allowance percent and will be based on the CVS Pharmacy DC's gross purchases of applicable Abbott products (full WAC value), less any merchantable returns made to Cardinal, without any reduction for any other discount, allowance or rebate. Cardinal will calculate and provide CVS with a credit for the return allowance within fifteen (15) days following the end of CVS' fiscal month. The credit will be e-mailed, faxed and/or mailed in hardcopy form to CVS' Manager of Wholesaler Programs. Cardinal's passing of the 1% Abbott Return Allowance to CVS will not prevent CVS from receiving any other credit offered by Abbott related to product returns. In the event that a vendor would begin to pass an "Abbott like" returns allowance to Cardinal, Cardinal would pass 100% of this allowance to CVS, based on CVS purchases (Pharmacies and CVS Pharmacy DCs, if applicable). Notwithstanding the foregoing, Cardinal will not accept any other return allowance on CVS' behalf relating to CVS' purchase volume (warehouse or DSD) without CVS' expressed written consent. It will be Cardinal's sole responsibility to notify any pharmaceutical supplier in writing (with copy to CVS subject to Section 13) offering a return allowance to Cardinal related to CVS' purchase volume of CVS' Return Goods Policy.

9) CVS will only accept product shipped from Cardinal Brokerage Inventory to CVS Pharmacy DCs that has at least twelve (12) months dating remaining, unless otherwise approved by CVS.

Additional terms and conditions of the WLP are as follows:

1. *Term* – The WLP will commence as of July 1, 2007, and terminate upon the termination of the Agreement.

2. *Purchase Order Generation* – Cardinal will direct and generate all (100%) of CVS' purchase orders for branded Rx Products (excluding repack) on behalf of the CVS Pharmacy DCs (the "**Purchasing Activities**").

3. *Purchase Information* - CVS will provide Cardinal with daily electronic feeds updating information regarding CVS' purchases of branded Rx Products directly from manufacturers and from other sources on behalf of the CVS Pharmacy DCs pursuant to the WLP. Such information will include details regarding all purchase orders, WAC or actual purchase price for items purchased, receiving, shipments, inventory adjustments and levels, returns, on-hand inventory, warehouse movement, warehouse shortages and other information reasonably required by Cardinal to administer the

**HIGHLY CONFIDENTIAL**          **CVS-MDLT1-000031059**

WLP.  To assist Cardinal with demand forecasting, CVS will provide Cardinal with information reasonably requested by Cardinal including but not limited to new product launches, seasonal fluctuations, item promotions, and new store openings, and a change in CVS Pharmacy DC that services a particular Pharmacy.

4. *Confidentiality*   The parties acknowledge and agree that all information associated with the WLP is confidential information subject to the provisions of Section 17 of this Agreement.

5. *Records and  Audit* – The WLP is subject to the record keeping and audit provisions set forth in Section 16 of this Agreement.

6. *ACH* – All payments for invoicing under the WLP will be made via ACH.

7. *Waiver* – Neither party's failure to enforce any provision of this WLP will be considered a waiver of any future right to enforce such provision.

8. *Dispute Resolution Relating to the WLP* – CVS and Cardinal acknowledge that either party may from time to time may, in good faith, dispute any portion of the WLP.  In the event that either party disputes any portion on the WLP, each party agrees to use all reasonable efforts to resolve all such disputes as expeditiously as possible on a fair and equitable basis.  To that end, Cardinal and CVS will assemble a panel consisting of at least one (1) executive from CVS and one (1) executive from Cardinal (but in any event, an even number in the aggregate) (the "**Executive Committee**") to resolve disputes relating to the WLP and address other issues as they may determine.  With respect to reporting disputes, a copy of the terms of this Agreement, as amended from time to time, agreed upon facts and areas of disagreement, and a concise summary of the basis for each side's contentions will be provided to the executives who will review the same, confer, and attempt to reach a mutual resolution of the issue within thirty (30) days following either party's receipt of  notice of dispute.

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031060**

**Indirect Vendors**

1. 3M
2. Abbott
3. Alaven
4. Alcon
5. Allergan
6. Amgen
7. Astellas
8. Astra Zeneca
9. Auxilium
10. Aventis
11. Barr/Duramed
12. Bausch & Lomb
13. Berlex
14. Biogen
15. Biovail
16. Boehringer
17. Braintree
18. Bristol / MJ Labs
19. Cephalon
20. Connetics
21. Daiichi/Sankyo
22. Dey Labs
23. Eisai
24. Endo
25. Esprit Pharma
26. Ferndale
27. Forest
28. Galderma
29. Genzyme
30. Gilead Science Inc.
31. Glaxo
32. Graceway
33. Hill
34. ICN/Valeant
35. Intendis
36. JOM
37. Kos Pharm
38. Lilly
39. Mallinckrodt CD
40. Merck
41. Mission
42. Monarch
43. NABI
44. Novartis

CVS Cardinal Wholesaler Agreement 7-1-07.doc

**HIGHLY CONFIDENTIAL**                                                    **CVS-MDLT1-000031061**

45. Novo Nordisk
46. Odyssey
47. Organon
48. Oscient (Antara)
49. Otsuka
50. P&G
51. Pfizer
52. Pharmaderm
53. Reliant
54. Roche
55. Salix
56. Sanofi Aventis Dermik
57. ScandiPharm
58. Sciele
59. SK Beecham
60. Solvay
61. Stiefel
62. Takeda
63. Ther-Rx
64. UCB
65. Wallace/Medpointe
66. Warner-Chilcott
67. Watson
68. Wyeth

**HIGHLY CONFIDENTIAL**                                          **CVS-MDLT1-000031062**

<u>*Section 19 Disclosure Schedule*</u>

### Insurance

During the term of the Agreement, CVS and Cardinal will each maintain commercial general liability insurance having a limit of not less than $5 million, pursuant to one or more insurance policies with reputable insurance carriers.  Upon request, each party will deliver to the other certificates evidencing such insurance.  Cardinal's certificate of insurance to CVS will reflect  that CVS is named as an additional insured under such policy and will provide evidence of broad form vendor's coverage.  Neither party will cause nor permit such insurance to be canceled or modified (exclusive of appropriate replacement policies) to materially reduce its scope or limits of coverage during the term of the Agreement.

**HIGHLY CONFIDENTIAL**                              **CVS-MDLT1-000031063**