# EXHIBIT 66

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
     IN RE: NATIONAL         )
 4   PRESCRIPTION            )  MDL No. 2804
     OPIATE LITIGATION       )
 5   _____    )  Case No.
                             )  1:17-MD-2804
 6                           )
     THIS DOCUMENT RELATES    )  Hon. Dan A.
 7   TO ALL CASES            )  Polster
 8
                 TUESDAY, JULY 31, 2018
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                        - - -
12          Videotaped deposition of Nathan J.
13   Hartle, held at the offices of Covington &
14   Burlington, LLP, One City Center, 850 Tenth
15   Street Northwest, Washington, DC, commencing
16   at 9:04 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter, Certified Realtime Reporter,
19   Illinois, California & Texas Certified
20   Shorthand Reporter, Missouri & Kansas
21   Certified Court Reporter.
22                        - - -
                GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
24
25
```

Page 218

1   MS. HENN: Objection to form.
2   THE WITNESS: All I can tell
3   you is I -- what I've heard is that
4   it's the term that came from DEA.
5 QUESTIONS BY MR. FARRELL:
6   Q.   On page 2, it identifies
7 several different topics: public health
8 issue, DEA focus, McKesson involvement,
9 current status, and Lifestyle Drug Monitoring
10 Program. So these will be our jeopardy
11 questions today.
12      Public health issues. Can you
13 read what the very -- on page 3, can you read
14 what the first item is?
15   A.   "Abuse of prescription drugs
16 has risen 66 percent since 2000."
17   Q.   So this is McKesson telling
18 McKesson employees that we're in the business
19 of selling opium pills, and abuse has risen
20 66 percent since 2000.
21      Does that not give you,
22 Mr. McKesson Corporation, pause to think
23 about whether or not your role in the chain
24 of distribution is contributing to the abuse?
25      MS. HENN: Objection to form.

Page 219

1   THE WITNESS: Can you ask that
2   again, please?
3 QUESTIONS BY MR. FARRELL:
4   Q.   This is McKesson telling
5 McKesson employees that abuse of prescription
6 drugs has risen 66 percent since the year
7 2000.
8      Does that not give you,
9 Mr. McKesson Corporation, pause to think
10 about whether or not your role in the chain
11 of distribution is contributing to such
12 abuse?
13      MS. HENN: Objection to form.
14      THE WITNESS: I think it's --
15   it should give everybody pause that
16   that was the trend that was going on,
17   and it's a piece of information shared
18   with leaders to inform them. So --
19 QUESTIONS BY MR. FARRELL:
20   Q.   But not everybody is selling
21 opium pills; McKesson is.
22      MS. HENN: Counsel, can we just
23   make sure we let the witness finish
24   his answers?
25      MR. FARRELL: Sure. I was

Page 220

1   trying to make a snarky remark.
2      MS. HENN: Thank you.
3 QUESTIONS BY MR. FARRELL:
4   Q.   Not everyone is engaged in the
5 chain of distribution of opium pills, though?
6      MS. HENN: Objection to form.
7      THE WITNESS: Agree.
8 QUESTIONS BY MR. FARRELL:
9   Q.   So I'm asking you, McKesson
10 Corporation, whether or not you have any
11 regrets about selling so many opium pills.
12      MS. HENN: Objection to form.
13   Outside the scope.
14      THE WITNESS: Back to your
15   question about this, I would -- sure
16   that gives you pause, I mean, to
17   understand that there's an epidemic
18   out there. And clearly there's many
19   players involved in the flow of
20   distribution.
21 QUESTIONS BY MR. FARRELL:
22   Q.   As of 2007, McKesson is
23 recognizing that opioid painkillers kill more
24 than cocaine and heroin combined, agreed?
25      MS. HENN: Objection to form.

Page 221

1   THE WITNESS: Agree.
2 QUESTIONS BY MR. FARRELL:
3   Q.   And these are McKesson's words.
4      Where is McKesson getting this
5 data from?
6      MS. HENN: Objection to form.
7   Outside the scope.
8      THE WITNESS: I don't know
9   specifically where they -- their
10   source of data for that particular
11   line, but information from different
12   sources. Could be DEA, could be CDC,
13   it could be wherever.
14 QUESTIONS BY MR. FARRELL:
15   Q.   It says here, "Rogue Internet
16 pharmacies distributing oxycodone,
17 hydrocodone, phentermine and alprazolam," yet
18 McKesson was selling to rogue Internet
19 pharmacies, true?
20      MS. HENN: Objection to form.
21   Outside the scope.
22      THE WITNESS: Can you ask that
23   again, please?
24 QUESTIONS BY MR. FARRELL:
25   Q.   McKesson is noting that rogue

Page 222

1  Internet pharmacies are selling oxycodone and
2  hydrocodone, yet what's missing from this
3  slide is the fact that McKesson was supplying
4  the pills to the rogue Internet pharmacies.
5          MS. HENN:  Objection to form.
6          THE WITNESS:  And what's your
7      specific question again?
8  QUESTIONS BY MR. FARRELL:
9      Q.   What gives?
10         MS. HENN:  Objection to form.
11         THE WITNESS:  I don't know what
12     type of response a "what gives"
13     question is.
14 QUESTIONS BY MR. FARRELL:
15     Q.   Yeah.  You're noting that
16 people are dying, and part of the reason is
17 that rogue Internet pharmacies are out there.
18 Yet McKesson, during this time frame, is
19 selling to some of those very same Internet
20 pharmacies, and that's what the DEA fined you
21 for.
22         So is this ignorance of who
23 you're selling to?  Is this repackaging,
24 reframing the issue?  Or is it just flat out
25 a misrepresentation?

Page 223

1          MS. HENN:  Objection to form.
2      Outside the scope.
3          THE WITNESS:  This is raising
4      awareness in -- about the issues that
5      are the public health issues,
6      communicating with leaders and sharing
7      the -- where McKesson is enhancing the
8      program.
9  QUESTIONS BY MR. FARRELL:
10     Q.   But you understand that the
11 rogue Internet pharmacies were getting their
12 pills from, among other people, McKesson,
13 agreed?
14     A.   I understand.
15         MS. HENN:  Objection to form.
16 QUESTIONS BY MR. FARRELL:
17     Q.   Agreed?
18     A.   I understand.  Agreed.
19     Q.   I'm asking if you understand.
20 I want you to confirm that the rogue Internet
21 pharmacies were in fact getting some of their
22 pills from McKesson.
23         MS. HENN:  Objection to form.
24         THE WITNESS:  I don't have
25     specific details on that, but --

Page 224

1  QUESTIONS BY MR. FARRELL:
2      Q.   You understand that to be true?
3      A.   -- I understand that to be
4  true.
5      Q.   So McKesson Corporation admits
6  it was selling oxycodone and hydrocodone to
7  rogue Internet pharmacies in and around 2007?
8          MS. HENN:  Objection to form.
9      Outside the scope.
10         THE WITNESS:  Again, I don't
11     know the specific examples and --
12 QUESTIONS BY MR. FARRELL:
13     Q.   I'm not asking for specific
14 examples.
15     A.   Right.
16     Q.   I'm asking you to confirm that
17 in 2007, McKesson Corporation was selling
18 oxycodone and hydrocodone to rogue Internet
19 pharmacies.
20         MS. HENN:  Objection to form.
21         And, Counsel, I'll just ask you
22     to let him finish his answers so that
23     he can get his answers out.
24         MR. FARRELL:  Yes, ma'am.
25         THE WITNESS:  Again, I don't

Page 225

1      have the specific examples.  I believe
2      that to be true, but I don't know the
3      specific details.
4  QUESTIONS BY MR. FARRELL:
5      Q.   The next page, page 4,
6  "Internet pharmacies."  It says,
7  "Investigative work hours have doubled."
8          Do you know what it doubled
9  from or to?
10     A.   I do not.
11     Q.   "Cutting supply critical to
12 success."
13         What does that mean?
14     A.   I don't know.  I don't know
15 what the speaking points or -- it's one
16 bullet.  I'm not sure how it was represented
17 or communicated.
18     Q.   Do you know what price
19 diversion is?
20     A.   Not specifically.
21     Q.   Was McKesson at this time
22 considering that some of the Internet
23 pharmacies were competing with McKesson for
24 business?
25         MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  THE WITNESS: I do not know.
2  Pricing is not my area.
3  QUESTIONS BY MR. FARRELL:
4  Q.  Okay. It says, "Wholesalers.
5  DEA expects that you know your customers."
6  What does that mean? It's in
7  quotations.
8  A.  Right.
9  MS. HENN: Objection to form.
10  MR. FARRELL: Well, it is in
11  quotations, isn't it?
12  MS. HENN: I was objecting to
13  asking what DEA means when they said
14  "know your customers." That was what
15  was my objection.
16  QUESTIONS BY MR. FARRELL:
17  Q.  So McKesson is writing a slide
18  following a meeting with the DEA, reporting
19  to the DEA employees what the DEA's focus
20  was, and what McKesson is reporting is that
21  the DEA expects you to know your customers.
22  Is that fair?
23  A.  That's fair.
24  Q.  And when we do, quote, "know
25  our customers," end quote, that's a tag line

Page 227

1  for distributors with regard to knowing the
2  customers you're selling opium pills to?
3  MS. HENN: Objection to form.
4  THE WITNESS: That is a DEA tag
5  line.
6  QUESTIONS BY MR. FARRELL:
7  Q.  And then the next sentence, can
8  you read it out loud, please?
9  A.  The next bullet?
10  Q.  Yes.
11  A.  "Wholesalers accountable for
12  controlling quantities shipped."
13  Q.  Is that true or not true?
14  MS. HENN: Objection to form.
15  THE WITNESS: Can you add a
16  little more context to your question?
17  I know it's a true/false question,
18  but --
19  QUESTIONS BY MR. FARRELL:
20  Q.  Yes.
21  The DEA expects the wholesalers
22  to be accountable for controlling quantities
23  that they ship.
24  Is that fair or unfair?
25  MS. HENN: Objection to form.

Page 228

1  Go ahead.
2  THE WITNESS: That's what
3  the -- that's what the DEA expects, I
4  guess, yeah.
5  QUESTIONS BY MR. FARRELL:
6  Q.  Does McKesson acknowledge that
7  it is accountable for controlling the
8  quantities of opium pills shipped to American
9  pharmacies?
10  A.  We're accountable as a
11  distributor.
12  Q.  The next thing says, "5,000
13  dose units is average."
14  The average American pharmacy
15  in 2007, as reported by the DEA to McKesson,
16  was that 5,000 doses of oxycodone or 5,000
17  doses of hydrocodone was average.
18  A.  That's what the DEA -- DEA
19  calculations.
20  Q.  And McKesson at least validated
21  that number by repeating it on a slide to the
22  national operations conference in 2007.
23  MS. HENN: Objection to form.
24  QUESTIONS BY MR. FARRELL:
25  Q.  Agreed?

Page 229

1  A.  I wouldn't say that they
2  validated. We just repeated what was shared.
3  Q.  Did McKesson undertake any
4  investigation to determine what the average
5  was itself?
6  A.  I believe they did. I can't
7  speak to the examples, but we've used
8  analysts and reviewed data when developing
9  thresholds and...
10  Q.  Does McKesson acknowledge that
11  in 2007 5,000 dose units was average in the
12  United States of America?
13  MS. HENN: Objection to form.
14  Outside the scope.
15  THE WITNESS: We acknowledge
16  that's what the DEA shared. I mean,
17  there's many ways to get averages.
18  QUESTIONS BY MR. FARRELL:
19  Q.  Sitting here today, does
20  McKesson Corporation have any reason to
21  disagree or dispute the DEA's estimation of
22  what the average dose unit was?
23  MS. HENN: Objection to form.
24  Outside the scope.
25  THE WITNESS: What I would

Page 230

1    share is I believe that average is a
2    very rudimentary average, all
3    pharmacies divided by pills, and so it
4    doesn't account for different pharmacy
5    size. So it's the number that is the
6    result of that basic calculation.
7  QUESTIONS BY MR. FARRELL:
8    Q.   And as we saw from your prior
9  correspondence, McKesson was relying upon
10 that average when it estimated its threshold
11 of 8,000 units per month per pharmacy?
12       MS. HENN: Objection to form.
13       THE WITNESS: It was using that
14   data point. I mean not relying on
15   that number solely but using that as
16   one data point.
17 QUESTIONS BY MR. FARRELL:
18   Q.   So the answer is yes?
19       MS. HENN: Objection to form.
20       THE WITNESS: Not yes to that
21   fact we relied on it. We used the
22   data point.
23 QUESTIONS BY MR. FARRELL:
24   Q.   So McKesson Corporation used
25 the 5,000 dose unit as an average supplied

Page 231

1  the DEA as a data point when it set a
2  threshold of 8,000 units per pharmacy per
3  month?
4    A.   I would say that's fair.
5    Q.   The next page, page 5,
6  "McKesson Involvement, September 5th DEA
7  meeting in Washington, DC, outlined Internet
8  issue."
9        Have you reviewed any documents
10 pertaining to that meeting or the Internet
11 issue that's being referenced?
12   A.   I don't believe so.
13   Q.   Neither have I, because it
14 hasn't been produced, because I'm sure
15 counsel is going to argue it falls outside of
16 Discovery Decision Number 3.
17       The next one, "November 5, DEA
18 notified McKesson, six pharmacies in Florida,
19 excessive hydrocodone."
20       Have you seen that
21 correspondence?
22   A.   I can't recall if I've seen
23 that specific one.
24   Q.   You thinking about the one we
25 just read? That was April of 2007. This one

Page 232

1  is talking about a November 5th
2  correspondence.
3    A.   I don't recall.
4    Q.   The next one, "January 6, 2007,
5  meeting with DEA in Washington, DC."
6        And would you read what the
7  bullet point says?
8    A.   "Clear message from DEA."
9    Q.   So at this point in time,
10 McKesson is acknowledging to its entire
11 national operations conference that the
12 message they're receiving from the DEA was
13 clear?
14       MS. HENN: Objection to form.
15   Outside the scope.
16       THE WITNESS: Like parts of the
17   message, sure.
18 QUESTIONS BY MR. FARRELL:
19   Q.   So which parts were unclear?
20   A.   I don't know all of the message
21 that were communicated from DEA and how they
22 were communicated.
23   Q.   We can start with the
24 November 2006 letter from Joe Rannazzisi.
25 Certainly if there was some unclear message

Page 233

1  that was being sent, it would be at least
2  like a footnote here, right? Instead it
3  says, "Clear message from DEA."
4        MS. HENN: Objection to form.
5   Outside the scope.
6        THE WITNESS: I don't know that
7    I -- I don't know what was
8    specifically discussed in that
9    specific meeting, so I don't know the
10   types of messages that were shared in
11   that meeting.
12 QUESTIONS BY MR. FARRELL:
13   Q.   As of April of 2007, which we
14 believe to be the date of this conference,
15 have you seen any documentation anywhere in
16 the records of McKesson Corporation that
17 indicate that any message from the DEA to
18 date had been unclear?
19       MS. HENN: Objection to form.
20   Outside the scope.
21       THE WITNESS: Have I seen
22   formal documentation where somebody
23   said DEA was unclear?
24 QUESTIONS BY MR. FARRELL:
25   Q.   That was my question, yes.

Page 234

1  A. I have not seen any of that
2  documentation.
3  Q. "October '06, order to show
4  cause. Response, settle."
5      That's the message McKesson is
6  telling its national operations conference,
7  is they get an order to show cause from the
8  DEA, and your response is to enter into a
9  memorandum of understanding?
10     MS. HENN: Objection to form.
11     THE WITNESS: I don't know what
12  the context of the communication at --
13  this is one bullet point at a meeting
14  presented to a group. So there's
15  certainly speaking points and an
16  explanation. I -- so...
17 QUESTIONS BY MR. FARRELL:
18  Q. Fair enough.
19     Next page, page 6, "Current
20 Status, April '07, meeting with DEA
21 attorneys. What we have done: Created new
22 report in process."
23     This gets back to my earlier
24 questions of this new process is the
25 Lifestyle Drug Monitoring Program?

Page 235

1  A. Correct.
2  Q. It's a new process?
3  A. It is.
4  Q. Not a revision, not an
5  amendment, not a modification, not a --
6  what's the other word you used?
7  A. I called it an addition to the
8  existing program.
9  Q. Okay.
10 A. An enhancement.
11 Q. Next page, page 7, "Establish
12 threshold for excessive quantities, 8,000
13 dose units. Thorough due diligence of
14 customers exceeding threshold."
15     You agree this is, in fact,
16 what the law requires?
17     MS. HENN: Objection to form.
18     Outside the scope.
19     THE WITNESS: Could you ask
20  that again? This -- is it this
21  specific bullet you're talking about?
22 QUESTIONS BY MR. FARRELL:
23 Q. Yeah, this is McKesson's
24 Lifestyle Drug Monitoring Program, which is
25 an action plan submitted to the DEA to show

Page 236

1 this is what you're going to do to fulfill
2 your obligations under federal law.
3     MS. HENN: Objection to form.
4     THE WITNESS: I'd say that's
5  what we're doing to enhance our
6  knowledge of our customers and meet
7  our requirements and enhance our
8  program.
9 QUESTIONS BY MR. FARRELL:
10 Q. You're making it sound like
11 this was just a voluntary effort out of the
12 thin air. This was in response to the DEA
13 charging McKesson with misconduct.
14     MS. HENN: Objection to form.
15     THE WITNESS: I understand
16  that.
17 QUESTIONS BY MR. FARRELL:
18 Q. You agree?
19 A. Agree.
20 Q. Now, page 9, "Daily dosage
21 summary report." This is an important point,
22 "8,000 dose unit threshold." But above
23 that -- next page, not 8, the next page.
24 A. 9?
25 Q. Yeah.

Page 237

1     "8,000 dose unit threshold,
2 generic base code." What this means is is
3 that McKesson, when its calculating the
4 threshold, is doing it by generic base code,
5 meaning you don't get 8,000 oxy 10s and 8,000
6 oxy 20s and 8,000 oxy 40s; you get 8,000
7 oxys.
8  A. Correct. With that base
9 ingredient.
10 Q. Based on a four-digit base code
11 that -- provided by the DEA?
12 A. Yes.
13     (McKesson-Hartle Exhibit 19
14  marked for identification.)
15 QUESTIONS BY MR. FARRELL:
16 Q. We'll mark as 19, top
17 right-hand corner is 2007_5_15, Bates-stamped
18 MCKMDL00337303.
19     Is this, in fact, the Lifestyle
20 Drug Monitoring Program at McKesson?
21 A. Yes.
22 Q. Do you recognize this document
23 as a true and authentic version of the
24 Lifestyle Drug Monitoring Program?
25 A. I do.

Page 238

1  Q. And is it a document kept in
2  the regular course of business and produced
3  by your lawyers in this litigation?
4      MS. HENN: Objection to form.
5      THE WITNESS: Yeah.
6  QUESTIONS BY MR. FARRELL:
7  Q. You'll note under "reports,"
8  under "generic ingredient, base code and
9  dosage threshold," it's again affirming what
10 you've told the DEA you're going to do, and
11 that is you're going to set 8,000 doses as
12 the threshold per base code.
13 A. Correct.
14 Q. The bottom right-hand corner,
15 you'll see a date generated.
16     What does it say?
17 A. May 16, 2007.
18     (McKesson-Hartle Exhibit 20
19     marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21 Q. Exhibit 20, top right-hand
22 corner, 2007_06_12, Bates-stamped
23 MCKMDL00355527.
24     I'll represent to you again,
25 this was produced by your counsel in this

Page 239

1  litigation. It is another communication
2  dated June 12, 2007, by McKesson's lawyer to
3  the DEA. And this is an update regarding the
4  progress of the implementation of the
5  Lifestyle Drug Monitoring Program.
6      In the second sentence it
7  states, "As I stated in our last
8  conversation, McKesson has implemented this
9  program nationally, in quote, across its 30
10 distribution centers throughout the country."
11     Again, does this imply to you
12 that you were not implementing a national
13 policy prior to this?
14     MS. HENN: Objection to form.
15     THE WITNESS: It implies we
16     weren't implementing this specific new
17     policy across the country.
18 QUESTIONS BY MR. FARRELL:
19 Q. Page 21 is a copy of a sample
20 letter you told the DEA you were sending
21 across the country. And in the second full
22 paragraph, starting with the word
23 "pharmaceutical," it says --
24 A. I'm sorry, what page was that?
25 Q. Page 21.

Page 240

1      It says, "Pharmaceutical
2  wholesalers, including McKesson, are being
3  held accountable for controlling the
4  qualities of these drugs -- quantities of
5  these drugs shipped to customers and will be
6  held responsible for reviewing trends as
7  indicated by the customer's order history."
8      This is 2007, in an
9  acknowledgement by McKesson that it will be
10 held accountable for excessive orders,
11 agreed?
12     MS. HENN: Objection to the
13     form.
14     THE WITNESS: Agreed.
15 QUESTIONS BY MR. FARRELL:
16 Q. And then the next paragraph you
17 go so far as to say, "Shipment and monitoring
18 of these drugs will be measured by dose units
19 rather than sale units, with 8,000 dose units
20 as the threshold for excessive quantities."
21     So again, this is a recognition
22 that above 8,000 units of oxycodone and
23 hydrocodone is presumptively excessive, which
24 will trigger your three-level due diligence?
25 A. Correct.

Page 241

1  Q. The following page, page 22, is
2  an actual declaration, an affidavit that
3  you're asking people to sign about the
4  reasons they want to sell more than 8,000
5  pills.
6  A. Correct.
7  Q. And on page 25 is a pharmacy
8  questionnaire presumably sent to every
9  pharmacy in the country that was a customer
10 of McKesson, asking for certain data about
11 the controlled substances they're purchasing
12 from McKesson.
13     MS. HENN: Objection to form.
14 QUESTIONS BY MR. FARRELL:
15 Q. This is what you're telling the
16 DEA that you'll be doing from here on out
17 starting in 2007.
18 A. I don't know if this pharmacy
19 questionnaire was sent to every single
20 pharmacy. Chains are a little bit different.
21 Q. I think we'll get into that
22 tomorrow.
23 A. Okay. I'm sure we will.
24 Q. But in general, you're sending
25 it out to all the independent pharmacies at

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 participating in this amicus brief?
2    A.   I have not.
3    Q.   Are you aware of McKesson being
4 involved at all in the amicus briefs?
5        MS. HENN:  Objection to form.
6        THE WITNESS:  I'm not.
7        (McKesson-Hartle Exhibit 28
8 marked for identification.)
9 QUESTIONS BY MR. FARRELL:
10   Q.   I'm going to have marked
11 Exhibit 28, 2012_05_05.
12       Are you aware of the Wayback
13 Machine?
14   A.   Excuse me?
15   Q.   Are you aware of the Wayback
16 Machine?
17   A.   I am not.
18   Q.   The Wayback Machine is an
19 Internet service that's free, and what it
20 does is it's able to go and bring up old
21 websites based on dates and time.
22       And it just so happens that the
23 Wayback Machine captured the HDMA website in
24 May of 2012.  This comes from the HDMA
25 website, and this is a list of the board of

Page 275

1 directors.
2        Now, what's an executive
3 committee on a board of directors?
4        MS. HENN:  Objection to form.
5        Outside the scope.
6        THE WITNESS:  That's the senior
7    leaders driving this group.
8 QUESTIONS BY MR. FARRELL:
9    Q.   And, Mr. McKesson Corporation,
10 you were on the executive committee of HDMA
11 of 2012, were you not?
12       MS. HENN:  Objection to form.
13       Outside the scope.
14       THE WITNESS:  One of our senior
15    leaders is.
16 QUESTIONS BY MR. FARRELL:
17   Q.   You're in the senior leadership
18 of HDMA, and you signed off on an amicus
19 brief submitted to a federal court in
20 Washington, DC, in support of one of your
21 colleagues and members, Cardinal Health.
22       MS. HENN:  Objection to form.
23       Outside the scope.
24 QUESTIONS BY MR. FARRELL:
25   Q.   So I'm going to ask you a

Page 276

1 couple of questions about it.
2    A.   Okay.
3    Q.   If you flip to page 3...
4    A.   Of the brief?
5    Q.   Of the brief.
6        The very bottom of the page --
7        MS. HENN:  Are you talking
8    about the Bates numbers or the --
9        MR. FARRELL:  Yeah, the Bates
10   number.
11       MS. HENN:  Thank you.
12 QUESTIONS BY MR. FARRELL:
13   Q.   It says, "HDMA's members have
14 not only statutory and regulatory
15 responsibilities to detect and prevent
16 diversion of controlled prescription drugs,
17 but undertake such efforts as responsible
18 members of society."
19       Do you see that?
20   A.   I do.
21   Q.   Do you recognize this as an
22 acknowledgement that all of the distributors
23 in the country have a common law duty to the
24 people of the United States of America to
25 prevent diversion of controlled substances

Page 277

1 because you're selling controlled substances?
2        MR. SUDDATH:  Objection.
3        MS. HENN:  Objection to form.
4    Outside the scope.
5        THE WITNESS:  Okay.  Could you
6    ask me that again?
7 QUESTIONS BY MR. FARRELL:
8    Q.   Do you recognize this as an
9 acknowledgement that all of the distributors
10 in the country have a common law duty to the
11 American citizens to prevent controlled
12 substances from being diverted into the
13 illicit market?
14       MR. SUDDATH:  Objection.
15       MS. HENN:  Objection to form.
16   Outside the scope.
17 QUESTIONS BY MR. FARRELL:
18   Q.   I mean, isn't this what we
19 talked about earlier?
20   A.   I do.
21   Q.   You do, don't you?  Yes?
22   A.   Yes.
23   Q.   Because it's not just
24 statutory, regulatory.  You're engaged in
25 selling opium pills.  You owe a duty to the

Page 278

1 American people to do your very best to
2 prevent diversion.
3      MS. HENN: Objection to form.
4   Outside the scope.
5 QUESTIONS BY MR. FARRELL:
6   Q.   Agreed?
7   A.   Agreed.
8   Q.   And this is your trade
9 organization making the same representation
10 to a federal court in Washington, DC?
11      MS. HENN: Same objections.
12   Objection to form. Outside the scope.
13      THE WITNESS: Yes.
14 QUESTIONS BY MR. FARRELL:
15   Q.   Next sentence: "The public
16 health dangers associated with the diversion
17 and abuse of controlled prescription drugs
18 have been well-recognized over the years by
19 Congress, DEA, HDMA and its members, and
20 public health authorities."
21   Is that all true?
22      MS. HENN: Objection to form.
23   Outside the scope.
24      THE WITNESS: Yes.
25

Page 279

1 QUESTIONS BY MR. FARRELL:
2   Q.   The next sentence. This is the
3 part that I'd like to talk to you about, the
4 highlighted part. "The agency," meaning DEA,
5 "has failed to provide meaningful guidance to
6 assist the regulated industry in complying
7 with the DEA's interpretation of its
8 implementing regulations. HDMA respectfully
9 submits that despite the agency's oft-recited
10 refrain that the regulations are clear, the
11 regulated industry does not know the rules of
12 the road because DEA has not adequately
13 explained them."
14      McKesson has said the opposite
15 publicly and to its own people, agreed?
16      MS. HENN: Object to form.
17 QUESTIONS BY MR. FARRELL:
18   Q.   Remember the slide that said
19 clear? Remember your testimony about the
20 letters and the settlement agreement? You
21 said a few minutes ago it was clear.
22   A.   I do remember all of that. I
23 also --
24      MS. HENN: Object to form.
25   Go ahead.

Page 280

1      THE WITNESS: Oh, excuse me.
2   I also remember saying that
3   certain parts of those regulations
4   related to what a suspicious order is
5   is not clear.
6 QUESTIONS BY MR. FARRELL:
7   Q.   Page 7. "The societal costs of
8 prescription drug abuse are" -- what's it
9 say?
10   A.   I flipped to the wrong page.
11 Excuse me.
12   "Huge."
13   Q.   And if a distributor engages in
14 unlawful conduct, should the distributor be
15 held accountable for such societal costs?
16      MS. HENN: Objection to form.
17   Outside the scope.
18      THE WITNESS: Can you repeat
19   that, please?
20 QUESTIONS BY MR. FARRELL:
21   Q.   If a wholesale distributor
22 engages in unlawful conduct, should it be
23 held accountable for the societal costs of
24 prescription drug abuse?
25      MR. SUDDATH: Objection.

Page 281

1      MS. HENN: Same objections.
2      THE WITNESS: I believe
3   distributors have a responsibility in
4   preventing diversion.
5 QUESTIONS BY MR. FARRELL:
6   Q.   So should they be held
7 accountable for the societal costs that are
8 documented in this pleading and referenced as
9 huge?
10   A.   I think it depends.
11      MS. HENN: Objection to form.
12 QUESTIONS BY MR. FARRELL:
13   Q.   Depends on what?
14      MS. HENN: Same objection.
15   Go ahead.
16      THE WITNESS: It depends on the
17   facts and circumstances and, you know,
18   the information about the specific
19   situation.
20 QUESTIONS BY MR. FARRELL:
21   Q.   If a distributor repeatedly
22 fails to report suspicious orders, do you
23 believe it should be held accountable for the
24 societal costs of prescription drug abuse?
25      MR. SUDDATH: Objection.

Page 282

1  MS. HENN: Objection to form.
2  THE WITNESS: And I believe it
3  depends.
4  QUESTIONS BY MR. FARRELL:
5  Q.  On?
6  A.  The facts and circumstances.
7  Q.  How about the facts and
8  circumstances which led to McKesson paying
9  $150 million fine?
10  MS. HENN: Objection to form.
11  THE WITNESS: Again, I think it
12  depends.
13  QUESTIONS BY MR. FARRELL:
14  Q.  Do you think McKesson is partly
15  responsible for the societal costs of
16  prescription drug abuse in America?
17  MS. HENN: Objection to form.
18  THE WITNESS: Could you ask
19  that one again, please?
20  QUESTIONS BY MR. FARRELL:
21  Q.  Do you think McKesson is partly
22  responsible for the societal costs of
23  prescription drug abuse in America?
24  MS. HENN: Objection to form.
25  THE WITNESS: Again, there's a

Page 283

1  lot of people involved in -- it's a
2  very complicated and multi-faceted
3  issue, so...
4  QUESTIONS BY MR. FARRELL:
5  Q.  We'll get to the other people
6  in a second.
7  MS. HENN: Are you done with
8  your answer?
9  THE WITNESS: I am done.
10  MS. HENN: Okay.
11  QUESTIONS BY MR. FARRELL:
12  Q.  We'll get to the others in a
13  second. I want to talk about McKesson first.
14  This is your opportunity to
15  accept partial responsibility for the
16  societal costs of prescription drug abuse in
17  America; yes or no?
18  MS. HENN: Objection to form.
19  Also outside the scope.
20  THE WITNESS: So again, it
21  depends on -- it depends.
22  QUESTIONS BY MR. FARRELL:
23  Q.  You're McKesson Corporation.
24  A.  Right.
25  Q.  You're sitting here today. You

Page 284

1  have the opportunity to look in the camera
2  and tell the jury whether or not you accept
3  partial responsibility for the societal costs
4  of prescription drug abuse in America.
5  MS. HENN: Objection to form.
6  Outside the scope.
7  QUESTIONS BY MR. FARRELL:
8  Q.  I'd ask you to answer yes or
9  no.
10  MS. HENN: Same objections.
11  THE WITNESS: I'm not sure how
12  to answer that -- that question
13  specifically.
14  QUESTIONS BY MR. FARRELL:
15  Q.  Well, you can say yes or --
16  A.  I understand that.
17  Q.  -- you can say no.
18  A.  I understand that.
19  MS. HENN: Objection to form.
20  QUESTIONS BY MR. FARRELL:
21  Q.  If I asked you the same
22  question in your personal capacity, would
23  that help you answer the question better?
24  MS. HENN: Same objection.
25  Objection to form.

Page 285

1  THE WITNESS: Again, it
2  depends -- I would say it doesn't
3  change my answer. It depends on the
4  role that they played.
5  QUESTIONS BY MR. FARRELL:
6  Q.  Well, back to McKesson
7  Corporation, which is you sitting in the
8  chair today. Knowing what you know as the
9  30(b)(6) representative, the corporate
10  designee, knowing about your past conduct,
11  knowing about the past interactions with the
12  DEA, I'm going to ask you again: Does
13  McKesson Corporation accept partial
14  responsibility for the societal costs of
15  prescription drug abuse in America?
16  MS. HENN: Objection to form.
17  THE WITNESS: Again, you know,
18  I -- we're part of the closed system,
19  so we're responsible for preventing
20  diversion.
21  QUESTIONS BY MR. FARRELL:
22  Q.  So the answer is?
23  MS. HENN: Objection to form.
24  THE WITNESS: Again, I think
25  we're responsible for something. I

Page 286

1  don't know what -- how you define all
2  societal costs and -- I still believe
3  it depends on different circumstances.
4  QUESTIONS BY MR. FARRELL:
5      Q.   Sir, we're not going to parse
6  out percentages.
7      A.   Yeah.
8      Q.   Let's just talk globally for
9  McKesson Corporation. So I don't want to put
10 words in your mouth because it's got to come
11 out of your mouth. So the answer is yes or
12 no.
13          MS. HENN: Objection to form.
14          THE WITNESS: I would say yes,
15      partially.
16 QUESTIONS BY MR. FARRELL:
17     Q.   How about Purdue Pharma? Does
18 McKesson Corporation take the position that
19 Purdue Pharma is partially responsible for
20 the societal costs of prescription drug abuse
21 in America?
22          MS. HENN: Objection to form.
23          Outside the scope.
24          THE WITNESS: I'm not going to
25      answer for other companies. I'm --

Page 287

1      it's like I answered my question:
2      Those involved in this space,
3      depending on the facts and
4      circumstances, may be. So, yes.
5  QUESTIONS BY MR. FARRELL:
6      Q.   Flip to page 8, the last
7  paragraph. Your trade organization is saying
8  that the "DEA's goal, the prevention of
9  diversion of controlled prescription drugs,
10 is, of course, a public good."
11          Does McKesson validate,
12 acknowledge and affirm that statement?
13          MS. HENN: Objection to form.
14          THE WITNESS: Absolutely. The
15      prevention of the diversion of
16      controlled substances is good for the
17      public.
18          (McKesson-Hartle Exhibit 29
19      marked for identification.)
20 QUESTIONS BY MR. FARRELL:
21     Q.   Next exhibit I'm going to have
22 marked is Exhibit 29. It's Exhibit
23 2013_09_13. It's Bates stamp
24 MCK-AGMS-006000880.
25          Have you seen this document?

Page 288

1      A.   I have not.
2      Q.   Do you know who Gary Boggs is?
3      A.   I do know Gary.
4      Q.   I'll represent to you that on
5  the metadata that was provided by the --
6  McKesson, indicates that this presentation is
7  dated in late 2012 -- wait, late 2013, I
8  think, probably before Gary Boggs came on to
9  McKesson. We'll ask him when we depose him.
10          But anyway, this is a McKesson
11 spreadsheet from Gary Boggs. Gary Boggs is
12 former DEA.
13     A.   PowerPoint, not spreadsheet.
14     Q.   Yeah, I'm sorry.
15     A.   Okay.
16     Q.   He's former DEA, correct?
17     A.   Correct.
18     Q.   He was the number 2 man on Joe
19 Rannazzisi, yes?
20     A.   Yes.
21     Q.   And as we'll see later, he was
22 actually in the room for one of the
23 presentations when DEA was negotiating with
24 McKesson on the 2008 settlement.
25          Is that your memory as a

Page 289

1  corporate entity?
2          MS. HENN: Objection to form.
3          THE WITNESS: I wasn't aware
4      that he was specifically in the room,
5      but...
6  QUESTIONS BY MR. FARRELL:
7      Q.   The title of this PowerPoint
8  slide is what?
9      A.   Oh, "State of prescription drug
10 abuse."
11     Q.   And on the second page, talks
12 about the impact of effective compliance.
13 And it uses lots of America-related stuff,
14 eagles and flags and such.
15          Do you see that?
16     A.   I do see that.
17     Q.   "Protecting America from
18 Prescription Drug Diversion."
19          The next page is a history of
20 understanding the problem, and on page 4 it
21 talks about a collision course.
22          And presumably this is two
23 planes colliding in the air, and that's
24 OxyContin and Percocet.
25          Do you see that?

Page 290

1       MS. HENN:  Objection to form.
2       THE WITNESS:  I see that.
3  QUESTIONS BY MR. FARRELL:
4       Q.   "In the late 1990s, doctors
5  aggressively prescribing painkillers - a
6  radical change in health care behavior."
7       And that radical change in
8  health care behavior did what to the number
9  of prescriptions?
10      MS. HENN:  Objection to form.
11      THE WITNESS:  Increased them.
12 QUESTIONS BY MR. FARRELL:
13      Q.   Which resulted in an increase
14 or decrease in the number of pills McKesson
15 sold?
16      A.   I don't know exact numbers, but
17 it increased.
18      Q.   And then the last part,
19 "Manufacturers fueled the use of prescription
20 painkillers."
21      This is coming from your new
22 head of regulatory affairs at McKesson,
23 agreed?
24      MS. HENN:  Objection to form.
25      THE WITNESS:  Can you say that

Page 291

1  again?
2  QUESTIONS BY MR. FARRELL:
3       Q.   Yeah.
4       A.   He's not -- he wasn't the head
5  of regulatory affairs.
6       Q.   Then, but he is now?
7       A.   He's one of the leaders on the
8  regulatory affairs team.
9       Q.   Okay.  And this is his
10 statement that "Manufacturers fueled the use
11 of prescription painkillers."
12      Is that McKesson's position?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  I don't know if
15  that's his own specific words or he
16  got that from a previous deck from
17  DEA.  I'm not sure.
18 QUESTIONS BY MR. FARRELL:
19      Q.   We'll have to ask him.
20      But I'm asking McKesson whether
21 or not it shares this view.
22      MS. HENN:  Objection to form.
23      Outside the scope.
24      THE WITNESS:  Manufacturers are
25  part of the closed system, like -- and

Page 292

1  played a role.
2  QUESTIONS BY MR. FARRELL:
3       Q.   Does McKesson believe the
4  manufacturers fueled the use of prescription
5  painkillers?
6       MS. HENN:  Objection to form.
7       Outside the scope.
8       THE WITNESS:  I think they
9  played a role.  I think there's many
10  reasons -- many things that fueled the
11  epidemic.
12 QUESTIONS BY MR. FARRELL:
13      Q.   So would you rather just punt
14 on the question?
15      MS. HENN:  Objection to form.
16      THE WITNESS:  That's what I'm
17  going to share.  That's my answer.
18 QUESTIONS BY MR. FARRELL:
19      Q.   So yes or no, does McKesson
20 Corporation believe manufacturers fueled the
21 use of prescription painkillers?
22      MS. HENN:  Objection to form.
23      Outside the scope.
24      THE WITNESS:  Like I said,
25  my -- they're part of the system.

Page 293

1  They played a role.
2  QUESTIONS BY MR. FARRELL:
3       Q.   So the answer is?
4       A.   They played a role.  I wouldn't
5  say -- I wouldn't characterize it as fueled.
6  I don't know that I would use that language.
7       Q.   Fair enough.
8       The next page, 5 and 6,
9  document Purdue Pharma's $635 million fine,
10 Cephalon's $425 million fine.
11      Going to page 7, it's comparing
12 the US rates of opioid overdose deaths, sales
13 and treatment admissions.
14      Do you see that?
15      A.   I see that.
16      Q.   What is the correlation between
17 opioid sales and opioid deaths?  Are they
18 related or unrelated?
19      MS. HENN:  Objection to form.
20      THE WITNESS:  They're both
21  increasing at a similar rate.
22 QUESTIONS BY MR. FARRELL:
23      Q.   So that means they're related
24 or unrelated?
25      MS. HENN:  Objection to form.

Page 294

1        THE WITNESS:  They appear to be
2    related.
3 QUESTIONS BY MR. FARRELL:
4    Q.   Does McKesson believe that
5 opioid sales are related to opioid deaths?
6        MS. HENN:  Objection to form.
7    Outside the scope.
8        THE WITNESS:  Can you ask that
9    one more time, please?
10 QUESTIONS BY MR. FARRELL:
11   Q.   Does McKesson believe that
12 opioid sales are related to opioid deaths?
13       MS. HENN:  Objection to form.
14   Outside the scope.
15       THE WITNESS:  The volume of
16   opioids in the market and diversion is
17   related to opioid deaths, certainly.
18 QUESTIONS BY MR. FARRELL:
19   Q.   Page 8, the Controlled
20 Substances Act, the very last provision says,
21 "Creates checks and balances between
22 registrants to protect the public health and
23 safety."
24       Again, this is again a
25 reaffirmation from Gary Boggs, who is now one

Page 295

1 of your senior regulatory affairs management,
2 acknowledging that the registrants and the
3 DEA have a duty to protect the public health
4 and safety, agreed?
5    A.   Agreed.
6    Q.   Page 13.  It says, "What can
7 happen when these checks and balances
8 collapse?"
9        What do you believe this is a
10 picture of?
11       MS. HENN:  Objection to form.
12       THE WITNESS:  It's a building
13   falling down.
14 QUESTIONS BY MR. FARRELL:
15   Q.   A disaster?
16   A.   It's a building that's falling
17 down.  Why it fell down could be a disaster.
18   Q.   What do you infer from
19 Mr. Boggs' implication?
20   A.   That things can go wrong,
21 something can happen.
22   Q.   Page 16, pictures of pain
23 clinics and people waiting in line to
24 purchase pills sold by McKesson to
25 pharmacies.

Page 296

1        MS. HENN:  Objection to form.
2        MR. FARRELL:  You're right.
3    That's not necessarily a picture of
4    McKesson.
5 QUESTIONS BY MR. FARRELL:
6    Q.   You would agree with me that if
7 a McKesson sales agent came upon a pain
8 clinic and saw this, that would be a red
9 flag?
10       MS. HENN:  Objection to form.
11       THE WITNESS:  It would.
12 QUESTIONS BY MR. FARRELL:
13   Q.   Page 17, historical comparison.
14 He's comparing the opioid crisis to the BP
15 oil spill where 11 people were killed and BP
16 paid 40 billion, plus 16 billion to the Clean
17 Water Act.
18       Have more or less than 11
19 people been killed by the opioid crisis?
20   A.   Clearly more.
21   Q.   Have more people died today
22 than 11 people?
23       MS. HENN:  Objection to form.
24       THE WITNESS:  Based on the
25   statistics, yes.

Page 297

1 QUESTIONS BY MR. FARRELL:
2    Q.   Page 24.  Does McKesson
3 acknowledge and agree there is a national
4 epidemic of prescription pill addiction,
5 abuse, morbidity and mortality?
6        MS. HENN:  Objection to form.
7        THE WITNESS:  Absolutely.
8 QUESTIONS BY MR. FARRELL:
9    Q.   Does McKesson acknowledge the
10 economic impact of this national epidemic in
11 America is greater than $57 billion per year?
12       MS. HENN:  Objection to form.
13   Outside the scope.
14       THE WITNESS:  I don't know
15   where that -- the -- how the 57
16   billion was derived, but there's
17   clearly an -- or an economic impact to
18   the country.
19 QUESTIONS BY MR. FARRELL:
20   Q.   Page 37, "distributors have
21 great power."  The last provision.
22       You, McKesson Corporation,
23 control the supply to downstream customers.
24 Does McKesson acknowledge that duty?
25       MS. HENN:  Objection to form.

Page 318

1  So we have about an hour left;
2  we've been going about -- almost six
3  hours. So by agreement we've kept the
4  deposition days to seven hours long,
5  and I'll honor that.
6      MS. HENN: More than by
7  agreement. It's also ordered by the
8  judge.
9      MR. FARRELL: No question.
10     MS. HENN: Just a slight
11 clarification.
12     MR. FARRELL: No question.
13 Seven hours of answering questions is
14 enough for anybody.
15     MS. HENN: It is.
16     MR. FARRELL: That being said,
17 I know there's a burden on travel and
18 arrangements; we have a tight
19 schedule. So what I'm going to do is
20 I'm going to finish up some topics,
21 and I'm going to state for the record
22 that I have not been able to get
23 through all of the designated topics
24 today.
25     That being said, there are some

Page 319

1  additional topics that you were not
2  designated for. There's essentially
3  two notices.
4      So what we're -- what I'm going
5  to do is recommend that I finish up
6  the topics that I want to get to, and
7  then tomorrow is your fact deposition.
8  And what we'll do is work out with
9  counsel if there are any of these
10 questions that can be answered in
11 writing to avoid you having to come
12 back and testify on things that can be
13 answered.
14     And then in addition, there are
15 records and there are -- there is
16 transactional data historically and
17 suspicious order report historically
18 that have not been disclosed yet
19 because of our tight schedules that
20 I'll -- I will be going to ask --
21 eventually to ask for some additional
22 time from you to finish the stuff we
23 didn't get to finish and to ask
24 questions about documents that have
25 not been disclosed yet.

Page 320

1  Obviously, it's going to be
2  subject to the objection of your
3  lawyers, and I just wanted to place
4  that on the record.
5  QUESTIONS BY MR. FARRELL:
6    Q.   Jumping in real quick, I'm not
7  going to spend a whole lot of time on this; I
8  have a very specific question.
9      Before we get into the
10 document, there's a reference in here about
11 heroin, and I just wanted to see if I could
12 cut to the chase with you.
13   A.   Okay.
14   Q.   As the McKesson corporate
15 representative, do you acknowledge that abuse
16 of prescription opium pills is a gateway to
17 the initiation of heroin?
18     MS. HENN: Objection to form.
19 Outside the scope.
20     THE WITNESS: Based on
21 everything that I've read and in the
22 media and statistics and discussion, I
23 would agree -- agree to that.
24 QUESTIONS BY MR. FARRELL:
25   Q.   If you abuse prescription

Page 321

1  opiates, the CDC says that you're 40 times
2  more likely to initiate heroin use.
3      Does McKesson acknowledge
4  that -- that prescription opiate pill abuse
5  is a driving factor in the heroin epidemic
6  we're also experiencing?
7      MS. HENN: Objection to form.
8  Outside the scope.
9      THE WITNESS: Yeah, it's a
10 factor.
11 QUESTIONS BY MR. FARRELL:
12   Q.   That was easy.
13   A.   Yeah.
14   Q.   All right. Back to this amicus
15 business.
16     (McKesson-Hartle Exhibit 38
17 marked for identification.)
18 QUESTIONS BY MR. FARRELL:
19   Q.   I'm going to mark as
20 Exhibit 38, it's 2016_04_04. This is another
21 amicus brief. This one is Masters
22 Pharmaceutical.
23     Does McKesson acknowledge that
24 in 2016 when this amicus brief was submitted
25 that it was still on the executive committee

Page 362

1 Waterloo Road, Akron, number 2 pharmacy?
2    Look at what the number 4 one
3 is, just right down the street.
4    So again, I think it's worth
5 looking into, don't you think?
6    A.   I agree. I would love to have
7 more context and get into the details.
8    Q.   Okay. This is going to draw an
9 objection from your counsel. What would be a
10 reason to set a threshold for 999,999?
11    MS. HENN: Objection to form.
12    THE WITNESS: There are -- in
13    the system there are subsets to base
14    codes, and so a -- for example, 91 --
15    91 -- 9193, which is hydrocodone, may
16    have some subsets for reporting
17    purposes for us. There may be a
18    subset, and there could be one or more
19    of these. There could be a subset for
20    10 milligram. There could be a subset
21    for the single entity hydrocodone.
22    And so we can carve those out
23    from reporting purposes. That's --
24    the 999,999 does not mean that they
25    can get 999,000 pills. It means that

Page 363

1    that base code does not conflict with
2    the main parent -- what I would call a
3    parent base code.
4    And so it's for reporting
5    purpose only. It has nothing to do
6    with allowing the amount of that total
7    base code. The parent trumps that
8    one. It's for reporting purposes
9    only.
10 QUESTIONS BY MR. FARRELL:
11    Q.   Do you know how many doses
12 McKesson distributed of oxycodone nationwide
13 from January 1, 2006 and December 31, 2014?
14 This is from ARCOS.
15    A.   I don't have that number.
16    MS. HENN: Objection to form.
17 QUESTIONS BY MR. FARRELL:
18    Q.   9,288,258,480 doses of
19 oxycodone nationwide. That's more than
20 there's people in our country.
21    Distributed 423 million
22 oxycodone doses in the state of Ohio. That's
23 over 119 billion milligrams of oxycodone.
24    Do you think that's too many?
25    MS. HENN: Objection to form.

Page 364

1    THE WITNESS: You know, I
2    can't -- I can't say on the data and
3    the comparison compared to -- those
4    are data points to look at. They're
5    big numbers, no doubt.
6 QUESTIONS BY MR. FARRELL:
7    Q.   Do you agree that one of the
8 foreseeable harms of engaging in unlawful
9 conduct in the distribution of prescription
10 opioids is diversion?
11    MS. HENN: Objection. Form.
12    THE WITNESS: Could you ask
13    that again?
14 QUESTIONS BY MR. FARRELL:
15    Q.   One of the harms --
16    A.   You said foreseeable first, but
17 harms --
18    Q.   I'll go back and do it.
19    Do you agree that one of the
20 foreseeable harms of engaging in unlawful
21 conduct in the distribution of prescription
22 opioids is diversion?
23    MS. HENN: Objection to form.
24    THE WITNESS: I think it can
25    be.

Page 365

1 QUESTIONS BY MR. FARRELL:
2    Q.   Do you agree that filling
3 suspicious orders is a direct and proximate
4 cause of prescription opioid abuse,
5 addiction, morbidity and mortality?
6    MS. HENN: Objection to form.
7    THE WITNESS: Filling specific
8    orders?
9    MS. HENN: Suspicious orders is
10    the word he used.
11    THE WITNESS: Suspicious
12    orders.
13    There's a lot of reasons for --
14    that orders may get flagged as
15    suspicious, so I think it depends.
16 QUESTIONS BY MR. FARRELL:
17    Q.   That's fair.
18    A.   They'll get flagged as an order
19 of unusual size, frequency or pattern and not
20 mean that it's suspicious or
21 diversion-related.
22    Q.   Do you believe the prescription
23 opiate epidemic is an immediate hazard to
24 public health and safety?
25    MS. HENN: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    THE WITNESS: How do you -- how
2    are you defining "immediate hazard"?
3    QUESTIONS BY MR. FARRELL:
4    Q.    A hazard.
5    A.    A hazard?
6          Sure.
7          MR. FARRELL: Okay. We will
8    adjourn with the reservation of rights
9    for one day, continuing the subject
10   matters that most interest the
11   plaintiffs in the MDL in the 30(b)(6)
12   notices.
13         MS. HENN: And, I mean, we will
14   object to continuing past the limit
15   set by the Court. We feel that there
16   was a lot of time today that was spent
17   asking legal questions that could have
18   been spent on topics.
19         MR. FARRELL: There was also a
20   lot of time spent reading documents
21   that were listed in my 30(b)(6).
22         MS. HENN: Documents that you
23   put in front of the witness and wanted
24   him to read.
25         But more importantly, I wanted

Page 367

1    to ask the court reporter to please
2    designate this transcript
3    provisionally highly confidential,
4    which is required under the deposition
5    protocol, and I also wanted to reserve
6    the right to read and sign.
7          I have no questions, and so I
8    think we are finished.
9          VIDEOGRAPHER: Okay. The time
10   is 5:47 p.m., July 31, 2018. Going
11   off the record completing today's
12   videotaped session.
13         (McKesson-Hartle Exhibit 40
14   marked for identification.)
15   (Deposition concluded at 5:47 p.m.)
16         _ _ _ _ _ _

Page 368

1    CERTIFICATE
2
3          I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
4    Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
5    of the examination, Nathan J. Hartle was duly
     sworn by me to testify to the truth, the
6    whole truth and nothing but the truth.
7          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
     before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
     ability.
10
          I DO FURTHER CERTIFY that I am
11   neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
12   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
13   that I am not financially interested in the
     action.
14
15
17         CARRIE A. CAMPBELL,
           NCRA Registered Diplomate Reporter
18         Certified Realtime Reporter
           California Certified Shorthand
19         Reporter #13921
           Missouri Certified Court Reporter #859
20         Illinois Certified Shorthand Reporter
           #084-004229
21         Texas Certified Shorthand Reporter #9328
           Kansas Certified Court Reporter #1715
22         Notary Public
23         Dated: August 3, 2018

Page 369

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8          After doing so, please sign the
9    errata sheet and date it. You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13         It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you. If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.