# EXHIBIT 68

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                       EASTERN DIVISION

 4

 5    ------------------------------x

 6    IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7    OPIATE LITIGATION              ) 1:17-MD-2804

 8    APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9    ------------------------------x

10

11

12

            VIDEOTAPED DEPOSITION OF GARY L. BOGGS

13

                       WASHINGTON, D.C.

14

                   THURSDAY, JANUARY 17, 2019

15

                           9:07 A.M.

16

17

18

19

20

21

22

23    Pages: 1 - 429

24    Reported by: Leslie A. Todd
```

Page 110

1 legal obligation to maintain effective controls --
2 BY MR. HAWAL:
3  Q   So it is --
4  A   -- against diversion.
5  Q   It is an accurate statement.
6  A   I agree.
7  Q   And do you deny having made that
8 statement to a USA Today reporter in that context?
9  A   I don't.
10  Q   Do you deny having a conversation with a
11 USA Today reporter about the subject of diversion
12 of controlled substances and distributors'
13 obligations?
14  A   I do not.
15  Q   Okay.  And then it goes on to say:
16 "'The law requires distributors, such as Cardinal
17 Health, to have systems to detect suspicious
18 orders, which must then be reported to the DEA.
19 The Agency repeatedly warns distributors that the
20 size of an order alone triggers the distributors'
21 responsibility to report it to the DEA,' Boggs
22 said."
23     First of all, was that an accurate
24 statement?

Page 111

1     MR. STANNER:  Object to the form.
2 Accurate that it's there, or accurate that he said
3 it, or is the statement itself substantively
4 accurate?
5     THE WITNESS:  I believe you read it
6 correctly.
7 BY MR. HAWAL:
8  Q   Well, is it -- is it a true statement?
9  A   It's a paraphrase of the regulation,
10 yes.
11  Q   Again, do you have any reason to deny
12 having made that statement to a USA Today
13 reporter?
14  A   I do not.
15  Q   Then it says:  "'Distributors must cut
16 sales to those drugstores with suspicious orders,
17 even if they have a valid DEA license,' he said."
18     Is that also a true statement?
19     MR. STANNER:  Same objection.
20     THE WITNESS:  I don't know that I agree
21 with the characterization of that.  We have an
22 obligation to maintain effective controls against
23 diversion, and if that means stopping sales, that
24 could be, based upon the facts and circumstances,

Page 112

1 the outcome.
2 BY MR. HAWAL:
3  Q   And then it has a statement in
4 quotations:  "If all those players involved are
5 either complicit or not doing their due diligence
6 correctly, that whole system comes tumbling down."
7     Do you disagree that you made that
8 statement?
9  A   I don't.
10  Q   And then below that it has further
11 statements attributable to you.  It says:
12 "'Distributors can act more quickly than law
13 enforcement if they know something is wrong,'
14 Boggs said."
15     Do you have any reason to dispute having
16 said that statement?
17     MR. STANNER:  Again, I'm going -- I'm
18 going to object to the foundation on all the
19 questions that are clearly paraphrases and not
20 quotations.
21 BY MR. HAWAL:
22  Q   Do you agree -- do you have any reason
23 to disagree that you made such a statement or a
24 statement to that effect?

Page 113

1  A   I do not.
2  Q   And then it goes on to say:  "'We have
3 to investigate things in a different manner than a
4 company that can act on a suspicious order.  We
5 have to meet constitutional and legal
6 requirements.  They don't have to sell to
7 someone,' Boggs said.  'They have a moral
8 obligation as keepers of powerful and dangerous
9 substances to make sure those substances are used
10 for legitimate medical purposes.'"
11     Do you have any reason to dispute having
12 made those statements?
13  A   I do not.
14  Q   Looking at the context of these
15 statements and in terms of what this article is
16 reported to be about, would it be fair to say that
17 you as a DEA agent at the time were expressing
18 dissatisfaction or frustration with certain
19 distributors as to their failure to maintain
20 effective controls to prevent the diversion of
21 controlled substances?
22     MR. STANNER:  Object to the form.
23     MR. SATIN:  And I -- objection.  I'm
24 objecting pursuant to Touhy.

Page 114

1    I don't quite understand the question.
2 You can ask him about what he said but not why he
3 said it or what was going on at DEA at the time
4 that may have informed this statement.
5    MR. HAWAL: Counsel, this -- this is --
6 he clearly made a public statement, and I believe
7 that the Touhy requirements allow me to explore
8 the circumstances of this public statement. I
9 don't understand how you can object in the context
10 of what he says here.
11    MR. SATIN: So I -- I had a conversation
12 with the AUSA, Mr. Bennett, on this subject, and
13 while it's permissible to ask about the fact of
14 those public statements, but what is behind those
15 statements, the circumstances, the motives, the
16 background material, that is off-limits. That's
17 an issue you'll have to take up with the
18 government.
19    MS. KASWAN: We've been going quite a
20 while. Can we take a break?
21    MR. STANNER: The witness is fine, so
22 we're happy to keep going. Obviously, people
23 should feel free to use the restroom.
24    MS. KASWAN: I could use a break.

Page 115

1    THE VIDEOGRAPHER: The time is
2 11:24 a.m. We're going off the record.
3    (Recess.)
4    THE VIDEOGRAPHER: The time is
5 11:41 a.m., and we're back on the record.
6 BY MR. HAWAL:
7    Q   Mr. Boggs, continuing on with the
8 USA Today article that we've been discussing,
9 there's another statement that is attributable to
10 you, and it says: "'You can have the ostrich
11 approach. You can stick your head in the sand and
12 ignore blatant signs,' Boggs said."
13    And then it goes on to say: "This
14 company is sitting in a state that has been the
15 epicenter of the problem. It's no secret that the
16 drug of choice is oxycodone. I don't think you
17 have to be that strong of an investigator to put
18 two and two together," close quote.
19    Are those statements that you would have
20 made?
21    MR. STANNER: Object to the form of the
22 question, the word "attributable."
23    THE WITNESS: I -- I believe that
24 they're correct, yes.

Page 116

1 BY MR. HAWAL:
2    Q   Were these -- were these the kinds of
3 statements that are attributive -- attributed to
4 you in this article that you would have been
5 generally making during this frame?
6    MR. STANNER: Object to the form of the
7 question.
8 BY MR. HAWAL:
9    Q   In 2012.
10    MR. STANNER: Same objection.
11    THE WITNESS: I don't know that I
12 understand your question when you say --
13 BY MR. HAWAL:
14    Q   Well --
15    A   -- "generally making."
16    Q   Well, were these the kinds of statements
17 that you were generally making to individuals who
18 would have been inquiring about the opioid crisis
19 and certain distributors not living up to their
20 obligations under federal regulations?
21    MR. SATIN: Counsel, I'm sorry to
22 interrupt. Are you asking about statements he was
23 making --
24    MR. HAWAL: In the public domain.

Page 117

1    MR. SATIN: -- in the public domain?
2    MR. HAWAL: Yes, sir.
3    THE WITNESS: This is a statement I made
4 in this particular article. I don't recall every
5 statement that I made during that time frame.
6 BY MR. HAWAL:
7    Q   Let me ask you this: When you left DEA,
8 did you get some type of clearance from the DEA to
9 go work for McKesson?
10    A   I believe that I was interviewed by
11 McKesson counsel on -- on that.
12    Q   Well, I'm not so concerned about
13 McKesson's counsel. But did you seek clearance
14 from the DEA to go work for a distributor?
15    A   I don't recall doing that, no.
16    Q   So you don't have any type of written
17 agreement with the DEA that allowed you to go work
18 for McKesson?
19    A   I do not.
20    Q   Okay. So as far as you know, there were
21 no restrictions placed upon you by the DEA as to
22 what you could or could not communicate with
23 McKesson about as it relates to your pre, or --
24 prior employment with the DEA?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  MR. STANNER: Object to the form of the
2  question.
3  THE WITNESS: I don't have any
4  restrictions that I'm aware of, no, other than
5  what we're talking about today.
6  MR. STANNER: Mr. Hawal, I think someone
7  on the phone is complaining about the microphones.
8  Can the people on the phone hear us?
9  (UNIDENTIFIED SPEAKER): It sounds like
10 the mics have been turned down a little bit. I
11 don't know if there's a way to adjust the volume.
12 We were fine before the break.
13 MR. STANNER: I think we just tried to
14 do that. Has there -- have you -- have you
15 noticed any change? We just tried -- we just
16 changed the volume.
17 (UNIDENTIFIED SPEAKER): No, not yet.
18 THE VIDEOGRAPHER: Do you hear anything
19 better now?
20 (UNIDENTIFIED SPEAKER): Yes. Much
21 better. Thank you.
22 MR. STANNER: Great. If people on the
23 phone could mute their phones, that would be very
24 helpful. Thanks.

Page 119

1  (Plaintiffs' Exhibit No. 7 was
2  marked for identification.)
3  BY MR. HAWAL:
4  Q  Mr. Boggs, I'm handing you what has been
5  marked as Plaintiffs' Exhibit 7, which is a
6  different article but also from 2012. And this
7  was published in Bloomberg Businessweek. The
8  title of the article is "American Pain: The
9  Largest U.S. Pill Mill's Rise and Fall." "There
10 were 335 million prescriptions for painkillers
11 written in 2011. Is it any wonder some of them
12 were from criminals?"
13 And my question is, do you recall being
14 interviewed by someone from Bloomberg Businessweek
15 at or around this time where you made certain
16 statements that were -- that appeared in this
17 article?
18 A  I do not.
19 Q  I'm going to put on the screen a
20 paragraph that has certain statements that are
21 attributable to you. And it says: "Gary Boggs,
22 Special Agent with the DEA's Office of Diversion
23 Control says, 'The cases that the DEA has brought
24 in recent years involved wholesalers knowingly

Page 120

1  making enormous sales to customers that were
2  per se in violation of DEA rules. The notion put
3  out by HDMA that somehow or another the DEA is not
4  providing essential information to them is simply
5  not accurate,' says Boggs. 'It's a smoke screen.
6  It's a step out of desperation.'"
7  Do you remember making such statements
8  in 2012?
9  MR. STANNER: Object to the form,
10 compound. Vague if you're referring to the
11 quotation on the preceding sentence.
12 MR. HAWAL: Yes.
13 BY MR. HAWAL:
14 Q  Do you -- do you remember making such
15 statement?
16 MR. HAWAL: I'm sorry?
17 MR. STANNER: I'm sorry, you said,
18 "Yes." Do you mean -- are you referring just to
19 the quotation --
20 MR. HAWAL: Yes.
21 MR. STANNER: -- or to the entire --
22 MR. HAWAL: Yeah, quotations.
23 THE WITNESS: I -- I don't recall making
24 them.

Page 121

1  BY MR. HAWAL:
2  Q  Were these statements that were
3  consistent with statements that you would have
4  been making at that time in the public domain?
5  A  It appears a statement that I made for
6  this article.
7  Q  Okay. And in -- in June of 2012, were
8  you still a DEA employee or had you retired as of
9  that time?
10 A  I retired at the end of that month.
11 Q  Okay. I'm going to hand you another
12 exhibit. I think we're at Exhibit 8.
13 (Plaintiffs' Exhibit No. 8 was
14 marked for identification.)
15 BY MR. HAWAL:
16 Q  With regard to the statement that was in
17 the Bloomberg publication, you referred to HDMA.
18 HDMA is the trade association for pharmaceutical
19 wholesalers like McKesson and Cardinal and
20 AmerisourceBergen?
21 A  It was formerly HDA -- or HDMA. Now
22 it's HDA. Yes, it is.
23 Q  And you have attended HDMA meetings?
24 MR. SATIN: Are you asking about since

Page 122

1  he left the government or before?
2  BY MR. HAWAL:
3      Q   Well, let's talk about since you left
4  the DEA, have you attended HDMA meetings?
5      A   I don't believe I have, no.
6      Q   Sir, I'm handing you Exhibit No. 8,
7  which is a summary of a DEA/HDMA meeting,
8  December 19th, 2011.  At the bottom, there's a
9  bottom paragraph that discusses statements
10 attributable to you.
11         In two thousand -- in December of 2011,
12 would you have stated that:  "The DEA's single
13 greatest concern was the belief that wholesale
14 distributors were lax in analysis, review and
15 acting on their own ARCOS data"?
16         MR. SATIN:  Mr. Boggs, I'm going to
17 object to the extent that question calls for you
18 to disclose non-public information based on your
19 work when you were at DEA.
20         THE WITNESS:  I don't believe I can
21 answer that question.
22 BY MR. HAWAL:
23     Q   At that time, would you have stated that
24 the data that you were seeing from wholesalers

Page 123

1  was, quote, pretty egregious, close quote?
2         MR. SATIN:  Same instruction.
3  BY MR. HAWAL:
4      Q   Would you have said that:  "The DEA had
5  not seen" --
6         MR. HAWAL:  The next page, Evan.
7  BY MR. HAWAL:
8      Q   -- "had not seen changes in registrants'
9  behavior that it expected after presenting its
10 analysis of ARCOS data to them, so we have upped
11 our game"?
12         MR. SATIN:  Same instruction.
13         THE WITNESS:  I don't believe at this
14 time I can answer that question.
15 BY MR. HAWAL:
16     Q   The second paragraph of that page says
17 that:  "DEA stressed this point repeatedly
18 throughout the meeting.  They seemed frustrated
19 and stated this was occurring even among wholesale
20 distributors that had been in DEA's suspicious
21 educational meetings and even among those who had
22 suspicious SO monitoring programs."
23         "SO" would be suspicious order
24 monitoring programs?

Page 124

1      A   That's what it says in the document,
2  yes.
3      Q   "Their belief is that if the wholesale
4  distributors were to look at their own data,
5  problem customers would be very evident."
6         Were these statements that you were
7  convey -- conveying to the distributor trade --
8  trade organization, trade association during this
9  time frame?
10        MR. SATIN:  Same --
11        MR. STANNER:  Object --
12        MR. SATIN:  Same instruction.
13        MR. STANNER:  Object to the form of the
14 question.
15        THE WITNESS:  I don't believe at this
16 time I can answer that question.
17 BY MR. HAWAL:
18     Q   Mr. Boggs, since you went to McKesson,
19 were you aware or did you become aware that the
20 DEA continued to investigate McKesson and its
21 failures to live up to the 2008 settlement
22 agreement and its own obligations that it assumed
23 as a part of that agreement?
24        MR. STANNER:  Objection to the form of

Page 125

1  the question, compound, vague, misstates.
2         THE WITNESS:  I'm aware since I came to
3  McKesson that there had been an investigation of
4  the company related to that, that resulted in a
5  settlement, yes.
6  BY MR. HAWAL:
7      Q   And have you undertaken since you joined
8  McKesson to look at the basis for the charges by
9  the Department of Justice and the DEA that led to
10 the later settlement by McKesson?
11        MR. STANNER:  Object to the form of the
12 question.  I object to the use of the word
13 "charges by the Department of Justice."  I'm not
14 aware of any such thing.
15        THE WITNESS:  I have -- I reviewed the
16 settlement agreement and the terms within the
17 settlement agreement.
18 BY MR. HAWAL:
19     Q   Was it any part of your obligation or
20 job function to look at McKesson's failures since
21 2008 in order to try and correct them or improve
22 McKesson's Controlled Substance Monitoring
23 Program?
24        MR. STANNER:  Object to the form, vague.

Page 126

1    THE WITNESS:  There are certain terms
2 and requirements under that settlement agreement
3 that I'm responsible for overseeing that, and part
4 of my job is to oversee ways that we can continue
5 to evolve and improve our program to make sure
6 that we're doing the best that we can to adhere to
7 our regulation -- our regulatory obligations.
8 BY MR. HAWAL:
9    Q   Well, would you agree with me that it
10 would be difficult to make improvements if one
11 didn't go back and determine where improvements
12 were necessary or needed?
13    MR. STANNER:  Object to the form,
14 misstates the testimony.
15    THE WITNESS:  I -- I think in some times
16 that's an opportunity to do that.  I think other
17 times you have to take into consideration that,
18 you know, what may or may not have led to some
19 issues that, you know, many years ago was for a
20 different time and different type of diversion
21 scheme where the red flags may have been different
22 than what they are today.
23    So I want to make sure that I'm not
24 looking at things that are no longer valid in

Page 127

1 today's environment, so I'm looking more forward
2 and what is today's thread, if you will, of
3 diversion, and how best that we can identify that.
4 Not necessarily looking retrospective to schemes
5 that are no longer a relevant factor.
6 BY MR. HAWAL:
7    Q   Well, you would agree generally that if
8 one doesn't look at past mistakes, one won't learn
9 from their past mistakes.  Is that true?
10    MR. STANNER:  Object to the form of the
11 question.
12    THE WITNESS:  I think that that's
13 generally a -- a solid thing.
14    (Plaintiffs' Exhibit No. 9 was
15    marked for identification.)
16    MR. HAWAL:  Evan, 880.
17 BY MR. HAWAL:
18    Q   Mr. Boggs, I've handed you what has been
19 marked as Plaintiffs' Exhibit 9, bearing Bates
20 stamp MCK-AGMS-0060000880.
21    It is a PowerPoint presentation, "State
22 of Prescription Drug Abuse," with McKesson's name
23 at the top, and your name and the term "Olive
24 Branch."

Page 128

1    Do you recall this PowerPoint
2 presentation?
3    A   I do.
4    Q   Did you have a chance to review this
5 when you were preparing for this deposition with
6 your counsel?
7    A   I --
8    MR. STANNER:  Objection to the extent it
9 calls for privileged information.
10 BY MR. HAWAL:
11    Q   Did you review this?
12    A   I've looked at this document, yes.
13    Q   As part of your preparation for this
14 deposition?
15    A   I did.
16    Q   And this was prepared -- what does
17 "Olive Branch" mean?
18    A   Olive Branch is where the McKesson's
19 national redistribution center is.  It's Olive
20 Branch, Mississippi.
21    Q   Okay.  And this would have been prepared
22 after you left the DEA?
23    A   It would.
24    Q   Did it contain information that you

Page 129

1 would have learned or become aware of when you
2 worked for the DEA?
3    A   It did.  It does.
4    Q   Did you seek and obtain any clearance
5 from the DEA to make this presentation or put this
6 material together?
7    A   I did not.
8    Q   Now, when you reviewed this PowerPoint
9 presentation, did it appear to you to be correct
10 and accurate?  Was there anything -- or was there
11 anything that stood out as being inaccurate or
12 that you deemed required correction?
13    A   I --
14    MR. STANNER:  You're asking -- I'm
15 sorry, Counsel, you're asking at the time it was
16 prepared or since then?
17    MR. HAWAL:  No, when you -- when he
18 reviewed it in preparation for his deposition.
19    MR. STANNER:  My mistake.
20    THE WITNESS:  When I reviewed it, it
21 appeared to be an accurate representation of the
22 presentation that I gave.
23 BY MR. HAWAL:
24    Q   And when was it presented and -- and

Page 130

1 where?
2    A    It was presented at the national
3 redistribution center, McKesson's national
4 redistribution center in Olive Branch,
5 Mississippi. It would have been probably sometime
6 in the summer of 2013.
7    Q    And this was when you were retained to
8 be a consultant for McKesson?
9    A    It was.
10    Q    And who was in attendance for you to
11 present this to?
12    A    The individuals that were part of
13 McKesson's Regulatory Affairs program were in
14 attendance. There were representatives at the
15 distribution center leadership team, such as a
16 distribution center manager or a distribution
17 center director of operations from across the
18 country were in attendance. Don Walker was in
19 attendance. There were several other individuals.
20 I don't recall every single one of them.
21    Q    When you prepared this PowerPoint
22 presentation, were you using and/or including
23 information which you considered to be accurate?
24    A    I was using information related to

Page 131

1 the -- the presentation. I mean, I --
2    Q    Well, did you --
3    A    -- I wasn't trying to provide any
4 inaccurate information.
5    Q    Well, I assume that when you were making
6 this presentation to McKesson, you were intending
7 to provide accurate information, true, as you
8 understood it?
9    A    Absolutely.
10    Q    Okay. And the title of the -- on the
11 next page is "The Impact of Effective Compliance:
12 Protecting America from Prescription Drug
13 Diversion."
14       Is that a title that you created?
15    A    It is.
16    Q    And if we go to page 883, you have two
17 planes colliding, and you're referring to two
18 drugs, two opioid drugs, oxycodone and Percocet.
19       What was your purpose of having two
20 airplanes colliding in midair with that slide?
21    A    The purpose is to grab the attention of
22 the audience and recognize something significant.
23    Q    Okay. And the last bullet point on that
24 page, you indicate that "Manufacturers fueled the

Page 132

1 use of prescription painkillers."
2       What did you mean by that statement?
3    A    What I meant by that statement, which is
4 reflected in the -- the next slide, is an example
5 of a manufacturer who was involved in an
6 investigation or a settlement with the government
7 that was about the false or misleading of
8 OxyContin, which was specifically to Purdue
9 Pharma.
10    Q    And the next page references Purdue
11 Pharma in a $635 million fine that was imposed on
12 Purdue for misleading advertising about its
13 OxyContin product?
14    A    That's correct.
15    Q    And you -- you consider that to be one
16 of the causes of the opioid crisis in the United
17 States?
18       MR. STANNER: Object to the form of the
19 question.
20       THE WITNESS: I think it has a
21 contributing factor, yes.
22 BY MR. HAWAL:
23    Q    And then the next page, you reference a
24 company, Cephalon, in a $425 million fine, which

Page 133

1 it ended up agreeing to pay as a result of
2 inappropriate marketing of its drug fentanyl?
3    A    That's correct.
4    Q    Again, a factor that you considered to
5 be contributing to the opioid crisis in the United
6 States?
7       MR. STANNER: Object to the form.
8       THE WITNESS: I did.
9 BY MR. HAWAL:
10    Q    And then the next page you have a chart
11 or graph depicting rising opioid deaths, sales,
12 and treatment admissions from 1999 to 2010.
13 Correct?
14    A    I do.
15    Q    Would you agree, sir, that as -- the
16 quantity of opioids that are diverted into the
17 illicit marketplace has a direct relationship to
18 increases in deaths of patients as well as
19 treatment admissions?
20       MR. STANNER: Object to the --
21       MR. SATIN: Objection to form.
22       MR. STANNER: Object to the form of the
23 question, use of the phrase "diverted into the
24 illicit marketplace."

Page 134

1 THE WITNESS: I don't think that that's
2 what this slide represents, so I don't agree with
3 the way you've characterized that.
4 BY MR. HAWAL:
5     Q    So are you saying that you do not agree
6 that as greater amounts of opioid pills are
7 diverted into the illicit marketplace, that the
8 probability is that the number of addictions and
9 deaths will increase?
10        MR. STANNER: Same -- same objection. I
11 think it --
12        MR. HAWAL: I understand. All you have
13 to do is say, "Objection," Andrew.
14        MR. STANNER: Okay.
15        MR. HAWAL: That would be appreciated,
16 because the rules require no speaking objections.
17        MR. STANNER: I'm just trying to be
18 helpful.
19 BY MR. HAWAL:
20     Q    Sir?
21        MR. HAWAL: I understand. Thank you.
22        THE WITNESS: I -- I think there is a
23 correlation between diversion and -- and
24 associated problems with diversion.

Page 135

1 BY MR. HAWAL:
2     Q    Well, true. And the greater the amount
3 of diversion, the greater the likelihood is of
4 ensuing harm, such as addiction and death. True?
5     A    I believe that's a fair statement, yes.
6     Q    What was the source of this information
7 used to create this graph or chart?
8     A    I -- I don't recall.
9     Q    And two slides later, you have "Checks
10 and Balances under the CSA."
11        CSA refers to the Controlled Substances
12 Act?
13     A    It does.
14     Q    And are you quoting the Act as to what
15 the obligations of a wholesaler are in order to
16 identify a controlled substance -- or identify
17 suspicious orders as part of its obligation to
18 prevent diversion?
19     A    Not --
20        MR. STANNER: Object to form.
21        THE WITNESS: I'm sorry.
22        Not necessarily the Act but the
23 implementing regulation. This is part of the
24 regulation. But, yes, I'm quoting that.

Page 136

1 BY MR. HAWAL:
2     Q    And you have a slide, and,
3 unfortunately -- well, let me reference the Bates
4 number, 892, where you have a graph -- well, you
5 have photograph depicting what can happen when the
6 types of checks and balances are not followed,
7 correct, and you have a collapsing building?
8     A    That's what's on the slide, yes.
9     Q    Are you trying to emphasize how
10 important it is for distributors like McKesson to
11 strictly follow their legal obligations under the
12 Controlled Substances Act and the federal
13 regulations relating to controlled substances?
14     A    What I'm trying --
15        MR. STANNER: Object to the form,
16 compound.
17        THE WITNESS: What I'm trying to depict
18 here is, is all of the members within the closed
19 system of distribution, which would include
20 distributors, but it's not just isolated to them.
21 It's for all of them, all the --
22 BY MR. HAWAL:
23     Q    Including --
24     A    -- responsible --

Page 137

1     Q    Including manufacturers of opioids,
2 right?
3     A    And pharmacists -- or pharmacies and
4 pharmacists and doctors.
5     Q    On page 897, you reference "Florida pill
6 mills, resulting oxy spills."
7        Was there a particular problem in
8 Florida in the late 2000s, including 2009 and
9 2010, as it related to large quantities of opioids
10 being diverted into the illicit marketplace?
11     A    There was a significant diversion scheme
12 related to pain -- rogue pain clinics or what were
13 often referred to as pill mills.
14     Q    And where were those pill mills getting
15 their OxyContin, do you recall?
16        MR. STANNER: Object to the form.
17        MR. SATIN: And objection to the extent
18 it's asking for you to disclose information from
19 the -- your official work at DEA.
20        THE WITNESS: I don't think I can answer
21 that question at this time.
22 BY MR. HAWAL:
23     Q    Well, did you tell your audience when
24 you presented this slide in 2013 what the source

Page 138

1 of the OxyContin was in Florida?
2  MR. STANNER: Object to the form,
3 "source."
4  THE WITNESS: Well, this is not related
5 specifically to OxyContin. This is related to
6 oxycodone, which is --
7 BY MR. HAWAL:
8  Q  Okay. Oxycodone. I apologize.
9  A  -- which is broader.
10  Q  Did you tell your audience where the
11 oxycodone was being obtained?
12  MR. STANNER: Same objection.
13  THE WITNESS: I don't recall.
14 BY MR. HAWAL:
15  Q  Do you recall that it was from -- at
16 least partially from Mallinckrodt?
17  MR. SATIN: Same --
18  MR. STANNER: Same objection.
19  MR. SATIN: Same instruction.
20  THE WITNESS: I don't believe I made
21 that statement at all.
22 BY MR. HAWAL:
23  Q  On the next slide, 898, you indicated
24 oxycodone deaths in Florida rose from 340 in 2005

Page 139

1 to 1516 in 2010, a 346 percent increase.
2  Do you recall where you obtained that
3 information?
4  A  I believe I obtained that information
5 from the Florida Medical Examiner's public
6 website.
7  Q  And then on page 903, you have a slide
8 that references: "A national epidemic: More than
9 45 people die per day from prescription opioids."
10 And then you have some statistics.
11  And then you have the last sentence:
12 "Economic impact to America, $57 billion per
13 year."
14  Do you recall where you obtained that
15 data?
16  A  I believe there was a study published
17 that was publicly available on the internet that I
18 obtained that from. I don't recall the -- the
19 exact study, but I recall obtaining it off of the
20 internet.
21  Q  And -- and do you -- and do you recall
22 what kind of economic impact was being measured
23 when it was being referred to as 57 -- $57 billion
24 per year?

Page 140

1  A  I don't recall specifically, no. There
2 was several different areas. I just don't recall
3 specifically which ones.
4  Q  Well, was it -- was it primarily
5 economic impact or largely economic impact to
6 municipalities, counties and states --
7  MR. STANNER: Object to the form.
8 BY MR. HAWAL:
9  Q  -- across the United States?
10  MR. STANNER: Sorry. Object to the
11 form, asked and answered.
12  THE WITNESS: I don't recall it being
13 that specific. I recall it being more of -- loss
14 in work productivity, things like that, addiction
15 or something like that. But I don't recall it
16 specifically drilling down to what a county or
17 city would -- the amount attributable to that. I
18 don't recall that. I recall it more lost wages,
19 lost productivity.
20 BY MR. HAWAL:
21  Q  Have you seen any studies or statistics
22 that reference the cost to communities, both
23 cities and counties and states, as it relates to
24 the economic impact of the opioid crisis?

Page 141

1  MR. STANNER: Object to the form.
2  THE WITNESS: Not that I recall
3 specifically that, no.
4 BY MR. HAWAL:
5  Q  The next slide says: "Are we
6 contributing to the problem," question mark.
7  Are you -- you're referring to
8 distributors, right?
9  A  I am.
10  Q  And you're referencing problems that you
11 have seen as to what a distributor -- what certain
12 distributors have been doing to contribute to the
13 opioid crisis, correct?
14  A  The bullets that are in here are focused
15 specifically on a diversion scheme, and in this
16 case it would have been a pill mill or rogue pain
17 clinic. But that -- that was the focus of -- of
18 this particular slide and what some of the bullets
19 might be associated with that.
20  Q  Well, a pill mill is not going to get
21 pills unless it gets them directly from a
22 distributor or manufacturer, correct?
23  MR. STANNER: Object to the form.
24  THE WITNESS: Generally speaking, that's

Page 142

1 true.
2 BY MR. HAWAL:
3    Q   Yeah. And are you trying to emphasize
4 that part of the problem that was occurring with
5 certain pill mills is that distributors were
6 shipping controlled substances in exorbitant
7 amounts as one factor?
8        MR. STANNER: Same objection.
9        THE WITNESS: I believe it was more of
10 in terms of a specific or cumulative amounts that
11 would be going to a single location over a period
12 of time.
13 BY MR. HAWAL:
14    Q   I mean, for example, if a small
15 community in a given state that has, you know, 600
16 adults -- you know, a population of 600 adults and
17 is getting hundreds of thousands of opioid pills
18 provided to one pharmacy in such a small
19 community, that would indicate to you an example
20 of an exorbitant amount of pills going to a
21 potentially suspicious customer. Fair?
22    A   It could be, yes.
23    Q   This PowerPoint also supports the
24 proposition that the greater the number of opioid

Page 143

1 pills diverted, that the greater the likelihood of
2 harm to patients. True?
3    A   I'm sorry, where are we at? Which slide
4 are you on?
5    Q   The same one that we've been
6 referencing. I mean that's -- that supports
7 the --
8    A   I'm not sure which bullet you're looking
9 at.
10    Q   Well, I'm looking at the entire -- the
11 totality of the bullet points that you raise in
12 this that would support the notion that the
13 greater number of opioid pills that are diverted,
14 the greater the likelihood of harm that is caused.
15 True?
16        MR. STANNER: Object to the form.
17        THE WITNESS: I don't think that that's
18 what this slide -- this slide doesn't talk about
19 harm.
20 BY MR. HAWAL:
21    Q   Well, what other than harm would result
22 from an exorbitant amount of pills being shipped
23 to a given community where there's a known
24 epicenter of diversion?

Page 144

1        MR. STANNER: Same -- same objection.
2        THE WITNESS: I mean there can be
3 certain situations where an exorbitant amount is
4 totally legitimate. I mean on its face,
5 exorbitant amount is a red flag. It doesn't
6 necessarily mean where you can jump to the
7 conclusion an exorbitant amount automatically is
8 diversion.
9 BY MR. HAWAL:
10    Q   I'm not -- I'm not saying automatically,
11 but generally speaking, would you agree that an
12 exorbitant amount going to a small community that
13 is also in the epicenter of diversion, that that
14 would be consistent with a greater degree of harm?
15    A   I think it requires a greater -- you
16 know, more diligence to determine what's going on
17 and what the factors are there, and maybe it's
18 diversion or maybe there's a legitimate reason.
19    Q   Well, are you -- are you -- did you
20 create this slide because you knew that this had
21 been happening?
22    A   I created this slide because of the
23 rogue pill mills in Florida.
24    Q   So you knew that this was happening,

Page 145

1 exorbitant amounts of -- of opioids were being
2 provided to certain customers by distributors in
3 areas that were known to be epicenters of
4 diversion. True?
5        MR. STANNER: Object to the form.
6        THE WITNESS: For the pill mill, yes,
7 that was the purpose of the slide.
8 BY MR. HAWAL:
9    Q   And each of these factors would be a
10 potential red flag that a distributor should be
11 looking at. Correct?
12    A   They are -- they are red flags that you
13 should look at, yes.
14    Q   And these would be red flags that would
15 not have been first known in 2013, but would have
16 been red flags that distributors should have been
17 aware of for many years. True?
18        MR. STANNER: Object to the form.
19        THE WITNESS: I don't know that that's
20 necessarily the case. We're -- we're talking
21 about a couple of significant diversion schemes
22 that occurred at a period of time that have
23 never -- never happened before in this country.
24 So the red flags sometimes are very specific to

Page 146

1 that criminal scheme that may not be applicable to
2 other types of schemes or other day-to-day
3 operations of regular pharmacies or practitioners.
4 BY MR. HAWAL:
5  Q  Well, sir, if a -- if a distributor in
6 2005 was aware that these red flags were occurring
7 in a given community or related to a given
8 customer, should these have been red flags in 2005
9 as well as they were in 2013?
10     MR. STANNER:  Object to the form.
11     MR. SATIN:  And objection.  Don't answer
12 that if you're going to disclose non-public
13 information that you obtained while at the DEA.
14     THE WITNESS:  I think that they are red
15 flags, yes.
16 BY MR. HAWAL:
17  Q  Now, going to slide 907.  "Communication
18 Advanced Warnings."  These are bullet points that
19 indicate how distributors should have been aware
20 of their obligations to prevent diversion.
21 Correct?
22     MR. STANNER:  Object to the form.
23     THE WITNESS:  These -- these are some
24 indicate -- or some examples of where information

Page 147

1 was available to distributors, yes.
2 BY MR. HAWAL:
3  Q  And the next slide refers to ARCOS data.
4 What were you intending to communicate with that
5 slide?
6  A  That we need to as a distributor look at
7 the data, the ARCOS data, and look as -- at that
8 and whether or not there's any indication in there
9 that we need to follow up on.
10  Q  And when you reference -- when you're
11 referring to ARCOS data, you're referring to data
12 that distributors have relating to the quantity of
13 different opioids that are being distributed to
14 given customers?
15  A  Specific -- ARCOS data specific to that
16 distributor.
17  Q  Yes.
18  A  It's not all-encompassing --
19  Q  Right.
20  A  -- of what is going to a customer.
21  Q  I mean, for example, McKesson has
22 information in its data or its -- in its system
23 which identifies over time how many pills --
24 individual pills of a given opioid were

Page 148

1 distributed to a given customer.  True?
2     MR. STANNER:  Object to the form.
3     THE WITNESS:  That McKesson distributed,
4 yes.
5 BY MR. HAWAL:
6  Q  Right.  And early warning sign for an
7 emerging trend would reflect -- would reflect your
8 message to McKesson as to the importance of
9 looking at the quantity of controlled substances
10 that are being supplied to given customers, right?
11     MR. STANNER:  Object to the form.
12     THE WITNESS:  That's correct.
13 BY MR. HAWAL:
14  Q  And then on slide 920, you have a slide
15 that's identified "Detecting Suspicious Orders,"
16 and I assume that you were informing the McKesson
17 employees that were at the presentation that it's
18 important to look at red flags.  Correct?
19  A  That's correct.
20  Q  And not only have employees be vigilant
21 about individual customers, but also listening to
22 those employees when they identify signs that are
23 suspicious for diversion?
24     MR. STANNER:  Object to the form.

Page 149

1     THE WITNESS:  That's correct.
2 BY MR. HAWAL:
3  Q  And that would be part of the onboarding
4 process when a new customer is coming to McKesson
5 for the first time?
6     MR. STANNER:  Object to the form.
7     THE WITNESS:  That's correct.
8 BY MR. HAWAL:
9  Q  And periodically visiting individual
10 pharmacies to try and determine whether they are
11 legitimate or whether they are involved in
12 diversion?
13     MR. STANNER:  Same objection.
14     THE WITNESS:  That's correct.
15 BY MR. HAWAL:
16  Q  And what do you mean by, "Do not rely
17 solely on thresholds or algorithms as a shortcut
18 to detect suspicious orders"?
19  A  I mean that we need to conduct
20 additional -- or conduct due -- due diligence, I'm
21 sorry, of our customers, making sure that we
22 understand what they're doing, whether or not they
23 give us reason to believe that they're going to
24 fulfill their regulatory obligations.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  Q   And that -- that part of it would be
2  that if a customer, for example, wants to increase
3  their threshold, that requires some due diligence
4  on the part of McKesson before the threshold is
5  increased, correct?
6       MR. STANNER:  Object to the form.
7       THE WITNESS:  Generally speaking, yes, I
8  would agree with that.
9  BY MR. HAWAL:
10 Q   And that should have been occurring how
11 far back at a company like McKesson?
12      MR. STANNER:  Object to the form.
13      THE WITNESS:  Thresholds were not
14 necessarily something that was an industry
15 practice until probably 2006, '7 time frame.  So
16 around that time frame, I guess.
17 BY MR. HAWAL:
18 Q   Well, it could have been an industry
19 practice earlier than that.  There's nothing
20 unique about setting thresholds that coincides
21 with 2006 and 2007.  True?
22      MR. STANNER:  Object to the form.
23      THE WITNESS:  It -- it's one methodology
24 to identify and report suspicious orders.  There

Page 151

1  may be others.
2       (Plaintiffs' Exhibit No. 10 was
3       marked for identification.)
4  BY MR. HAWAL:
5  Q   Mr. Boggs, I'm going to hand you what's
6  been marked as Exhibit 10.  This is 301,
7  Operations Manual.
8       Mr. Boggs, I take it you've seen
9  McKesson's Operations Manual for the Controlled
10 Substance Monitoring Program?
11 A   I have.
12 Q   If you look at page 13 of 16, and the
13 numbering is at the top right-hand corner, this --
14 is this the -- this is the manual for the
15 Controlled Substance Monitoring Program that was
16 enacted as a part of McKesson's obligations with
17 its 2008 settlement?
18      MR. STANNER:  Object to the form of the
19 question, foundation.
20      THE WITNESS:  It -- it was the -- the
21 program for -- that was instituted in 2008 for --
22 BY MR. HAWAL:
23 Q   And if you look at page 13 of 16 under
24 "Due Diligence" -- do you see where it says

Page 152

1  "Customer Communications"?
2  A   I do.
3  Q   The first bullet point under that, it
4  says:  "All communications regarding controlled
5  substances are subject to subpoena and discovery."
6       Discovery, do you understand discovery
7  to be discovery by DEA investigations as well as
8  discovery in legal proceedings as we are
9  participating in here today?
10 A   That would be my understanding, yes.
11 Q   And it says in the third bullet point:
12 "Write information as if it were being viewed by
13 the DEA."  Do you see that?
14 A   I do.
15 Q   Does that convey to you a reminder to be
16 careful about how communications are occurring in
17 written format?
18      MR. STANNER:  Object to the form of the
19 question.  Calls for speculation, hearsay,
20 foundation.
21      THE WITNESS:  I don't agree with the
22 characterization of that.  I think that the intent
23 is to make sure that we're clear and that there's
24 not a -- a way to misconstrue what's being written

Page 153

1  so that someone -- a third party that may not know
2  anything about what transpired would -- would
3  understand it with -- with some clarity.
4  BY MR. HAWAL:
5  Q   Well, let's go to the next highlighted
6  bullet point.  It says:  "Refrain from using the
7  word 'suspicious' in communications.  Once
8  McKesson deems an order and/or customer
9  suspicious, McKesson is required to act.  This
10 means all controlled substances sales to that
11 customer must cease, and the DEA must be
12 notified."
13      As a former DEA representative, does it
14 trouble you that McKesson is formally instructing
15 its employees to refrain from using the word
16 "suspicious" in communications because of the
17 obligation that follows identifying an order as
18 suspicious?
19      MR. STANNER:  Object to the form of the
20 question on several bases.  I'll avoid a lengthy
21 objection.
22 BY MR. HAWAL:
23 Q   Does that trouble you, sir?
24 A   I think with my understanding and