# EXHIBIT 69

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

 2                  EASTERN DIVISION

 3                      - - -

 4   IN RE:  NATIONAL            )

     PRESCRIPTION                )  MDL No. 2804

 5   OPIATE LITIGATION           )

     _____ )  Case No.

 6                               )  1:17-MD-2804

     THIS DOCUMENT RELATES       )

 7   TO ALL CASES                )  Hon. Dan A. Polster

 8                      - - -

 9           Tuesday, August 7, 2018

10      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

               CONFIDENTIALITY REVIEW

11

                        - - -

12

13       Videotaped deposition of Jennifer R. Norris,

14   held at the offices of BakerHostetler, 200 Civic Center

15   Drive, Suite 1200, Columbus, Ohio, commencing at

16   8:09 a.m., on the above date, before Carol A. Kirk,

17   Registered Merit Reporter and Notary Public.

18

19                      - - -

20

21

22

23           GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

24               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 74 |
|---|
| 1  potentially dangerous drugs; would you agree with |
| 2  that? |
| 3      MS. MAINIGI:  Objection; form. |
| 4  Objection; scope. |
| 5    Q.  Or do you disagree? |
| 6      MR. FULLER:  Objection; form. |
| 7  Objection; scope. |
| 8    A.  I think they're using the term |
| 9  "dangerous" to create a category of drugs, not -- |
| 10  so ... |
| 11    Q.  Would you agree they're trying to |
| 12  control dangerous drugs, whether you look at it as |
| 13  a category or an individual drug, correct? |
| 14      MS. MAINIGI:  Objection; form. |
| 15  Objection; scope. |
| 16    A.  Yes, understanding the legitimate -- |
| 17  there is a legitimate purpose and use for these |
| 18  pharmaceuticals. |
| 19    Q.  That is undeniable as they set out in |
| 20  each one of their schedules.  We looked at |
| 21  Schedule II.  There is a legitimate medical |
| 22  purpose.  We can agree on that, correct? |
| 23    A.  Yes. |
| 24    Q.  But these are also potentially dangerous |

| Page 75 |
|---|
| 1  drugs, particularly when we're talking about |
| 2  Schedule II? |
| 3      MS. MAINIGI:  Objection; form. |
| 4  Objection; scope. |
| 5    A.  They're not particularly mentioning |
| 6  Schedule II in this language.  I agree that |
| 7  Schedule II drugs per the language have a high |
| 8  potential for abuse. |
| 9    Q.  So are they dangerous drugs or not; yes |
| 10  or no? |
| 11      MS. MAINIGI:  Objection; form. |
| 12  Objection; scope. |
| 13    Q.  You could say yes, no, or I don't know. |
| 14    A.  I can't opine on whether that's what |
| 15  they meant when they said "dangerous drug control" |
| 16  here.  I can only say what the statute says. |
| 17    Q.  Okay.  And it specifically refers to |
| 18  dangerous drugs? |
| 19    A.  The Congressional Record refers to |
| 20  dangerous drugs. |
| 21    Q.  Yes, ma'am. |
| 22    A.  The statute talks about drugs with a |
| 23  high potential for abuse, but also having a |
| 24  legitimate medical purpose. |

| Page 76 |
|---|
| 1    Q.  Do you think -- does Cardinal believe |
| 2  that drugs that have a high potential for abuse |
| 3  could be potentially dangerous? |
| 4      MS. MAINIGI:  Objection; form. |
| 5  Objection; scope. |
| 6    A.  Not necessarily. |
| 7    Q.  Well, that's why I said "can be |
| 8  potentially dangerous."  So let me ask the |
| 9  question again. |
| 10      Does Cardinal believe that drugs that |
| 11  have a high potential for abuse can be potentially |
| 12  dangerous? |
| 13      MS. MAINIGI:  Objection; form. |
| 14  Objection; scope. |
| 15    A.  Perhaps. |
| 16    Q.  So is that a yes? |
| 17      MS. MAINIGI:  Objection; form. |
| 18  Objection; scope. |
| 19    A.  Potentially.  Perhaps, yes. |
| 20    Q.  Okay.  So just so I get it clean on the |
| 21  record, does Cardinal believe that drugs that have |
| 22  a high potential for abuse can be potentially |
| 23  dangerous? |
| 24      MS. MAINIGI:  Objection; form.  Asked |

| Page 77 |
|---|
| 1  and answered multiple times now.  Objection; |
| 2  scope. |
| 3    A.  Perhaps, yes. |
| 4    Q.  And can we agree that the rules that are |
| 5  laid out are partially designed to keep the |
| 6  American people safe when we're dealing with |
| 7  controlled substances? |
| 8      MS. MAINIGI:  Objection; scope. |
| 9    A.  The rules, as I understand them, are to |
| 10  ensure that the participants in the distribution |
| 11  system understand their obligations and operate |
| 12  within that distribution -- that closed |
| 13  distribution system, maintaining the security of |
| 14  the pharmaceuticals we distribute, the scheduled |
| 15  substances we distribute. |
| 16    Q.  And the rules also indicate a |
| 17  Congressional finding that if we don't keep them |
| 18  in their legitimate channels, that they can be |
| 19  dangerous to the health and general welfare of the |
| 20  American public, correct? |
| 21      MS. MAINIGI:  Objection; form.  Asked |
| 22  and answered.  Objection; scope. |
| 23    A.  Congress made a finding that the illegal |
| 24  distribution -- let me make sure I read it |

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 correctly -- "would have a substantial and
2 detrimental effect on the health and general
3 welfare of the American people."
4     Q.  So can we agree that that's one of the
5 type of things that they're trying to protect
6 from?
7         MS. MAINIGI:  Objection; form.
8 Objection; scope.
9     A.  I don't know what Congress was thinking.
10 I know that was one of their findings as an
11 introduction.
12    Q.  So does Cardinal believe the intent
13 behind the Controlled Substances Act is to try to
14 protect the American people from the illicit
15 distribution of controlled substances; yes or no?
16        MS. MAINIGI:  Objection; form.
17 Objection; scope.
18    A.  Can you ask the question again?  I'm
19 sorry.
20    Q.  Sure.  Does Cardinal believe that the
21 Controlled Substances Act -- let me try that
22 again.
23        Does Cardinal believe that the
24 Controlled Substances Act is to protect the

Page 79

1 American people from the illicit distribution of
2 controlled substances; yes or no?
3         MS. MAINIGI:  Objection; form.
4 Objection; scope.
5     A.  I can't opine in my personal capacity on
6 what Cardinal believes.  Cardinal understands its
7 obligations under the statute, regs, and the
8 guidance from the DEA.
9     Q.  Okay.  Fair enough.  Let's go to that
10 Exhibit 8 now.  If you'll turn to page 6 of that
11 document.  On page 6, this is the introductory
12 statement by the chairman of the Subcommittee on
13 Oversight and Investigations, James Greenwood from
14 Pennsylvania.
15        Can you read that highlighted section
16 there that starts with "The use and the abuse."
17    A.  "The use and the abuse of OxyContin
18 provides quite a dilemma for us in Congress and
19 for the American public.  For some, OxyContin is
20 the angel of mercy.  For others, it is the angel
21 of death."
22    Q.  Do you recognize by this time in 2001,
23 that Congress has found that the use and abuse of
24 OxyContin has created quite a dilemma for the

Page 80

1 American public?
2         MS. MAINIGI:  Objection; scope.
3 Objection; form.
4     A.  I agree that that is what this language
5 says.
6     Q.  That that's what the Congress found in
7 the subcommittee, correct?
8         MS. MAINIGI:  Objection; form.
9 Objection; scope.
10    A.  Because I'm not really familiar with
11 this document, if this is what --
12    Q.  Well, I didn't alter it, I promise.
13    A.  No, I understand that.  I just want to
14 make sure we're talking about the same thing.  If
15 that is what this document says and if you're
16 telling me that's what this document is, that is
17 what this document says.
18    Q.  And, therefore, Congress made a finding
19 in the subcommittee that as of 2001, OxyContin is
20 providing a dilemma for the American public -- or
21 the abuse of OxyContin is, correct?
22        MS. MAINIGI:  Objection; form.
23 Objection; scope.
24    A.  That is what the document says, yes.

Page 81

1     Q.  Okay.  And if you go down to the next
2 paragraph that starts off "Today."
3         It says, "Today, we will hear from law
4 enforcement officials who argue that OxyContin has
5 quickly become the abuser's drug of choice
6 surpassing heroin and cocaine in some
7 jurisdictions."
8         Does Cardinal recognize that even again
9 back in 2001, that there's concern by law
10 enforcement of OxyContin becoming the abuser's
11 drug of choice?
12        MS. MAINIGI:  Objection; scope.
13    A.  That is what this language says.
14    Q.  And you have no reason to disagree with
15 this language, do you?
16        MS. MAINIGI:  Objection; scope.
17    A.  In my personal capacity, I don't if this
18 is what Congress had on the record.
19    Q.  And during 2001, Cardinal Health was
20 distributing OxyContin, correct?
21    A.  Yes.
22    Q.  If you turn to page 8.  Let me know when
23 you get there.
24        There's the rocket ship again.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    A.  Okay.
2    Q.  You see where it reads "These actions,
3  though commendable, also appear long overdue.
4  According to the DEA, the number of OxyContin --
5  excuse me -- oxycodone-related deaths has
6  increased nearly 400 percent since 1996, the same
7  period -- excuse me -- the same time period in
8  which the annual number of prescriptions for
9  OxyContin has risen from approximately 300,000 to
10  almost 6 million."
11       Did I read that correctly?
12    A.  I believe so.
13    Q.  And is Cardinal aware that deaths were
14  increasing from oxycodone overdoses during this
15  time frame?
16       MS. MAINIGI:  Objection; scope.  I'm
17  also going to interpose my one time, but have it
18  be continuing -- a time period objection
19  consistent with Discovery Rulings 2 and 3 of the
20  Special Master, which -- our reading of which
21  allows you to question on the time period 2006
22  forward with the exception of the suspicious order
23  reports aspect of those rulings.
24       So I will just interpose a continuing

Page 83

1  objection for any questions you ask that may
2  relate to time periods earlier than 2006.  She'll
3  answer all of your questions and we'll deal with
4  it later.
5       MR. FULLER:  That's fair enough.
6    A.  I'm sorry.  Could you repeat the
7  question?
8    Q.  And Cardinal was aware that during this
9  time frame that deaths were increasing from
10  OxyContin overdoses -- or excuse me -- oxycodone.
11  No, it's OxyContin.  No, it's not.  Back up.
12  Sorry.
13       Cardinal is aware that during this time,
14  oxycodone overdoses were rapidly increasing,
15  correct?
16       MS. MAINIGI:  Objection; scope.
17    A.  I can't speak as to what Cardinal Health
18  was aware of at this time.  I didn't work there.
19    Q.  Sure.  And I get that.  But one of the
20  things that Cardinal did was stay informed as to
21  what was going on in the world, the communities it
22  delivered to, correct?
23       MS. MAINIGI:  Objection; scope.
24    A.  Cardinal Health understands its

Page 84

1  customers and where it is delivering
2  pharmaceuticals to.
3       (Reporter clarification.)
4    A.  Cardinal Health understands who its
5  customers are and where it's delivering to.
6    Q.  And Cardinal Health would also stay
7  abreast of what's going on in those communities
8  that it's delivering to; is that fair?
9       MS. MAINIGI:  Objection; scope, as well
10  as time period.
11    A.  Again, I wasn't at the company at this
12  time.  I don't -- I don't know.
13    Q.  You would expect Cardinal Health would
14  be aware if drugs that it was distributing were
15  causing an increasing number of deaths in the
16  communities to which it distributed; is that fair?
17       MS. MAINIGI:  Objection; scope, form.
18    A.  I can't say.
19    Q.  Should Cardinal be aware if oxycodone
20  that it's distributing is causing nearly a
21  400 percent increase in deaths across this
22  country?
23       MS. MAINIGI:  Objection; scope, form,
24  and time period.

Page 85

1    A.  Cardinal Health -- Cardinal Health isn't
2  aware of deaths related to products it
3  distributes.
4    Q.  So Cardinal Health doesn't have any
5  information as to whether products it distributed
6  caused or contributed to anyone's demise?
7       MS. MAINIGI:  Objection; scope.
8    A.  I think, as we talked about earlier,
9  Cardinal Health distributes to licensed pharmacies
10  who dispense pursuant to prescriptions by licensed
11  physicians that then go to users.  Cardinal Health
12  is not aware of any deaths related to the
13  pharmaceuticals that it has distributed.
14    Q.  Are you sure?
15       MS. MAINIGI:  Objection; form.
16  Objection; scope.
17    A.  I am.
18    Q.  Give her just a second to --
19    A.  I'm sorry.
20    Q.  That's all right.
21       Is Cardinal aware that OxyContin -- or
22  excuse me -- oxycodone that's distributed by it or
23  others has contributed to increased deaths in this
24  country?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    MS. MAINIGI:  Objection; form.
2  Objection; scope.
3    A.  It is not.
4    Q.  So oxycodone, how does it get to the
5  pharmacies?
6    MS. MAINIGI:  Objection; scope.
7    A.  Cardinal Health distributes oxycodone,
8  as well as many other pharmaceuticals, to licensed
9  pharmacies.
10    Q.  And there are others out there that
11  distribute oxycodone and OxyContin as well,
12  correct?  AmerisourceBergen.
13    A.  Other distributors?
14    Q.  Yes, ma'am.
15    A.  Yes.
16    Q.  We don't have Joe making oxycodone in
17  his trailer up in the foothills of West Virginia,
18  do we?
19    MS. MAINIGI:  Objection; form.
20  Objection; scope.
21    A.  Not to my knowledge.
22    Q.  To your knowledge, no one is out there
23  in their homes or farmhouses manufacturing
24  OxyContin, correct?

Page 87

1    MS. MAINIGI:  Objection; form.
2  Objection; scope.
3    A.  Not to my knowledge.
4    Q.  So the only way these people are getting
5  oxycodone that they're overdosing from is when we
6  go up the chain from a manufacturer that has
7  distributed or sold to a wholesale distributor who
8  has sold to a pharmacy, correct?
9    MS. MAINIGI:  Objection; form.
10  Objection; scope.
11    A.  Cardinal Health has distributed the
12  pharmaceuticals to a licensed pharmacy for
13  dispensing pursuant to a licensed -- prescription
14  from a licensed physician.
15    Q.  Yes, ma'am.  I understand that.  You've
16  told me that several times, but that's not my
17  question.  So listen to my question, and we'll
18  move through this.
19    In order for the people out there to get
20  these oxycodone pills that they're overdosing on,
21  it had to have come through a wholesale
22  distributor; correct or incorrect?
23    MS. MAINIGI:  Objection; form.
24  Objection; scope.

Page 88

1    A.  The distributor -- I know you're not
2  going to want to hear -- the distributor
3  distributes to a licensed pharmacy who dispenses
4  pursuant to a prescription from a licensed
5  physician.
6    Q.  Yes, ma'am.  And I'll ask you again.
7  Just listen to my question and answer the question
8  I'm asking.
9    A.  I hear your question.  Yes.
10    Q.  Well, and I'm hearing your answer, but
11  my problem is you're not answering the question
12  I'm asking.  Okay?  So let me try it one more
13  time.
14    In order for the people out there that
15  are getting these oxycodone pills that are causing
16  these overdoses, those pills have to come through
17  a wholesale distributor; is that correct or
18  incorrect?
19    MS. MAINIGI:  Objection; asked and
20  answered multiple times.  Objection; scope.
21    Mike, you may not like her answer, but
22  she has, in fact, answered your question multiple
23  times.  I'll ask her to answer it again.
24    Q.  It's a yes or no question.

Page 89

1    Did those pills have to come through a
2  wholesale distributor?
3    MS. MAINIGI:  Objection; asked and
4  answered.  Objection; scope.
5    A.  Cardinal Health distributes to a
6  licensed pharmacy who dispenses prescriptions from
7  a licensed physician.
8    Q.  Again, that's not my question.  I'm
9  asking you if Cardinal knows whether these pills
10  that are causing overdoses have to come through a
11  licensed wholesale distributor before they get to
12  the person who is overdosing?  That's all I'm
13  asking.
14    I understand that you guys distribute to
15  licensed pharmacies.  You've made that abundantly
16  clear.
17    You would agree with me, would you not,
18  that those pills have to come through a wholesale
19  distributor before they get to the person that is
20  ultimately overdosing on them, correct?
21    MS. MAINIGI:  Objection; form.  Asked
22  and answered multiple times.  Objection; scope.
23    Answer it one more time.
24    Q.  I'll just be happy if you answer my

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1   question once.
2       A.   The pharmaceuticals move through the
3   closed distribution system, from a wholesaler to a
4   licensed pharmacy, dispensed from a licensed
5   prescriber.
6       Q.   So they have to go through a licensed
7   wholesale distributor before getting to the end
8   user or the person overdosing, correct?
9           MS. MAINIGI:  Objection; asked and
10  answered.  Objection; form.
11          Mike, why don't we -- she's answered it
12  multiple times.  You don't like her answer.  Why
13  don't you just move on?
14          MR. FULLER:  I just want her to answer
15  the question I asked.
16          MS. MAINIGI:  She's answered it multiple
17  times.
18          MR. FULLER:  No.
19  BY MR. FULLER:
20      Q.   Go ahead, ma'am.
21      A.   The pharmaceuticals we distribute are
22  distributed to a licensed pharmacy for dispensing
23  pursuant to a licensed prescription --
24  prescription from a licensed physician.  Sorry.

Page 91

1       Q.   If you go to the next section of this
2   page.  "In its testimony today, Purdue Pharma will
3   argue that the death figures heralded by
4   newspapers nationwide are inaccurate and are the
5   prime mover of negative hype surrounding
6   OxyContin."
7           Do you see that?
8       A.   I see that language.
9       Q.   And does Cardinal recognize that during
10  this time frame, newspapers are reporting these
11  death figures from OxyContin overdoses?
12          MS. MAINIGI:  Objection; form, time
13  period, and scope.
14      A.   I can't say.  Again, I didn't work at
15  the company and know what newspapers they may or
16  may not have read.
17      Q.   But, again, Cardinal did its job in
18  staying informed as to what's going on in the
19  communities that it's distributing to around the
20  country, correct?
21          MS. MAINIGI:  Objection; scope and time
22  period.
23      A.   Cardinal Health understands the
24  customers that it is distributing to.

Page 92

1       Q.   And the communities that they are
2   providing all these pills to, these drugs to,
3   correct?
4           MS. MAINIGI:  Objection; scope and form.
5       A.   I can't say what Cardinal Health was
6   doing at this time.  I wasn't there.
7       Q.   But you did just testify that Cardinal
8   did its job in staying informed as to what's going
9   on in the communities that it's distributing to
10  around the country -- or excuse me.  That's my
11  question.  I'm sorry.  I was going to say that
12  sounded like a pretty damn good answer.
13          MS. MAINIGI:  I would stick with that
14  one, Mike.
15      Q.   You testified that "Cardinal Health
16  understands customers that it's distributed to."
17  When you say "understands customers," what is its
18  obligation related to understanding customers, if
19  you know?
20      A.   I think -- I want to be careful about
21  the word -- use of the word "obligation."  As part
22  of Cardinal Health's anti-diversion program, we
23  have a "know your customer" component where we
24  inquire, ask questions, obtain information from

Page 93

1   our customers to get an idea about the general
2   area in which they're operating their business.
3       Q.   And the increase in prescriptions from
4   300,000 to almost 6 million from 1996 to 2001, you
5   would agree that's a significant increase in the
6   prescriptions for OxyContin, correct?
7           MS. MAINIGI:  Objection; scope.
8       A.   That's an increase from 300,000 to
9   6 million.  I don't know how we want to define
10  "significant."  During that time, the DEA was
11  approving and increasing the quotas to allow that
12  many prescriptions, so ...
13      Q.   So it's a 20-time increase over a what,
14  a five-year period, four-year -- five-year period?
15  Do you not consider that significant?
16          MS. MAINIGI:  Objection; form.
17  Objection; scope.
18      A.   It depends on the circumstances.  Like I
19  said, the DEA felt there was legitimate medical
20  needs for these prescriptions.  They were
21  increasing the quotas during this time period.
22      Q.   Do you have an understanding of how they
23  were increasing the quotas and what information
24  they were relying on when increasing these quotas?

Highly Confidential - Subject to Further Confidentiality Review

| Page 94 | Page 96 |
|---|---|
| 1       MS. MAINIGI: Objection; scope. | 1      Q.  Ma'am, even if it distributed some of |
| 2  Objection; time period. | 2  them, it would have increased the business; would |
| 3      A.  I don't know exactly how they increased | 3  it not? |
| 4  the quotas.  I would be guessing that they rely on | 4       MS. MAINIGI: Objection; scope. |
| 5  a variety of information. | 5  Objection; form.  Objection; time period. |
| 6      Q.  Including information provided by the | 6      A.  A small portion of the overall |
| 7  manufacturers and wholesale distributors, correct? | 7  pharmaceuticals that Cardinal Health distributes. |
| 8       MS. MAINIGI: Objection; scope. | 8      Q.  So is that a yes, it would have |
| 9      A.  That is likely one of the data points. | 9  increased the business? |
| 10     Q.  And this increase -- this 20 times | 10       MS. MAINIGI: Objection; asked and |
| 11  multiple increase in OxyContin prescriptions, | 11  answered.  Objection; form and scope, and time |
| 12  those pills all have to flow through the wholesale | 12  period. |
| 13  distributor as you testified, correct? | 13      A.  I don't know specifically. |
| 14       MS. MAINIGI: Objection; form. | 14       MR. FULLER: All right.  This is Norris |
| 15  Objection; scope.  Objection; asked and answered. | 15  31. |
| 16      A.  I believe I testified that the | 16           - - - |
| 17  pharmaceuticals are distributed by -- the pills | 17      (Cardinal-Norris Exhibit 9 marked.) |
| 18  are distributed by Cardinal Health to a licensed | 18           - - - |
| 19  pharmacy for dispensing pursuant to a prescription | 19       MR. FULLER: This is going to be |
| 20  from a licensed physician. | 20  Plaintiff's Exhibit Number 9. |
| 21      Q.  So that means more business for Cardinal | 21  BY MR. FULLER: |
| 22  Health, correct? | 22      Q.  Do you see this document, ma'am, what's |
| 23       MS. MAINIGI: Objection; scope. | 23  been marked as Plaintiff's Number 9?  It's |
| 24      A.  I don't know that Cardinal Health | 24  entitled "Under the Counter:  The Diversion and |

| Page 95 | Page 97 |
|---|---|
| 1  distributed all of these. | 1  Abuse of Controlled Prescription Drugs in the |
| 2      Q.  Well, they may not have distributed all | 2  U.S.," July of 2005? |
| 3  of them, but they probably distributed some of | 3      A.  I see that's the title of the document. |
| 4  them. | 4      Q.  Who does it say it's funded by with an |
| 5          Can we agree to that? | 5  unrestricted grant? |
| 6       MS. MAINIGI: Objection; scope. | 6      A.  It says, "Funded by an unrestricted |
| 7  Objection; time period. | 7  grant from Purdue Pharma LP." |
| 8      A.  Perhaps as a small percentage of | 8      Q.  And this was a study that was |
| 9  everything else Cardinal Health distributes to its | 9  commissioned by this grant by Purdue Pharma.  And |
| 10  customers. | 10  if you'll turn to page 9.  And just let me know |
| 11      Q.  So we can agree that this increase also | 11  when you get there. |
| 12  increased the business at Cardinal Health? | 12      A.  Okay. |
| 13       MS. MAINIGI: Objection; time period. | 13      Q.  And on page 9, do you see where it says |
| 14  Objection; scope. | 14  "The bottom line"? |
| 15      Q.  Yeah.  Let me strike that.  Let me ask | 15      A.  I see that. |
| 16  it a little better. | 16      Q.  Read that to us, if you would, please, |
| 17          We can agree that this 20-time increase | 17  or read it to the jury. |
| 18  in the number of OxyContin prescriptions also | 18      A.  "The bottom line:  Our nation is in the |
| 19  increased the business at Cardinal Health? | 19  throws of an epidemic of controlled prescription |
| 20       MS. MAINIGI: Objection; scope. | 20  drug abuse and addiction.  Today 15.1 million |
| 21  Objection; time period.  Objection; form. | 21  people admit abusing prescription drugs, more than |
| 22      A.  Not necessarily.  As I said, I don't | 22  the combined number who admit abusing cocaine, |
| 23  know that Cardinal Health distributed all or a | 23  hallucinogens, inhalants, and heroin combined." |
| 24  significant portion of these. | 24          Sorry.  I didn't read the numbers.  If |

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  you want me to read it --
2    Q.  No, no, no.
3    A.  -- again with the numbers, I can.
4    Q.  That's fine.  Thank you.
5       Does Cardinal recognize that at this
6  time during 2005 that we are in the throws of an
7  epidemic of controlled prescription drug abuse?
8       MS. MAINIGI:  Objection; scope.
9  Objection; time period.
10   A.  Cardinal Health recognizes that there is
11  an issue in the country with prescription drug
12  abuse.  It's not qualified to determine the timing
13  of that.  That's for the public policymakers, but
14  Cardinal Health understands there is a significant
15  issue.
16   Q.  And as it relates to this study, it
17  indicates that we're in the throws of it even back
18  in 2005, correct?
19      MS. MAINIGI:  Objection; scope.
20  Objection; time period.
21   A.  That is when this study was -- what this
22  study found at the time.  Again, Cardinal Health
23  isn't making a determination.  It's not in the
24  position to make the determination, but it is

Page 99

1  aware of it.
2    Q.  And at this time, at least according to
3  the findings in the study -- which you have no
4  reason to disagree with, correct?
5       MS. MAINIGI:  Objection; form.
6  Objection; scope.  Objection; time period.
7    A.  I haven't read the whole study, so I
8  can't say whether --
9    Q.  Sure.
10   A.  -- I agree or disagree.
11   Q.  But, again, sitting here today, you have
12  no basis to disagree with it.  I understand you
13  haven't read it.  I'm not asking you to read it.
14   A.  I can't say I agree or --
15      MS. MAINIGI:  Hang on.  Objection; form,
16  Objection; scope.  Objection; time period.
17      Go ahead.
18   A.  I can't say whether I agree or disagree
19  with the study.  It's a relatively voluminous
20  document that I have never seen before.
21   Q.  Sure.  And it finds that today
22  15.1 million people admit to prescription drug
23  abuse, more than cocaine, hallucinogens,
24  inhalants, and heroin combined, right?

Page 100

1       MS. MAINIGI:  Objection; form.
2  Objection; scope and time period.
3    A.  That is what the document says, yes.
4    Q.  And if you scroll on down to the next
5  highlighted section.  It says, "Children are
6  especially at risk.  In 2003, 2.3 million teens
7  between the ages of 12 and 17 admitted abusing
8  prescription drugs in the past year.  83 percent
9  of them admitted abusing opioids."
10      Do you see that?
11   A.  I see that language, yes.
12   Q.  Would you agree if that is true, that
13  that is clearly a sign of an epidemic in this
14  country?
15      MS. MAINIGI:  Objection; form, time
16  period, and scope.
17   A.  I agree that it's a finding.  I don't
18  know what the indicia of an epidemic -- I can't
19  say what the indicia of an epidemic are.  This is
20  a finding that the study made.
21   Q.  So you can't tell us whether it's an
22  epidemic whether 2.3 kids between the ages of 12
23  and 17, which, according to this, is 9.3 percent
24  of the kids in that age group are abusing

Page 101

1  prescription pain drugs, and you can't tell us
2  whether that's an epidemic --
3       MS. MAINIGI:  Objection.
4    Q.  -- an issue, a crisis?
5       MS. MAINIGI:  Excuse me.  Objection;
6  form, scope, and time period.
7    A.  Well, now you've introduced new words.
8  It's certainly an issue.  Again, I'm not -- I'm
9  not qualified to opine on what constitutes an
10  epidemic.
11   Q.  You certainly agree it's a bad issue?
12  Would you agree with that?
13      MS. MAINIGI:  Objection; form, scope,
14  and time period.
15   A.  It's an issue to be concerned about.
16   Q.  It's not something that we want
17  happening in this country?
18      MS. MAINIGI:  Objection; form, scope,
19  and time period.
20   A.  It's not something I would want
21  happening in this country.
22   Q.  Or anywhere else, for that matter,
23  correct?
24      MS. MAINIGI:  Objection; form, scope,

Highly Confidential - Subject to Further Confidentiality Review

| Page 102 |
|---|
| 1 and time period. |
| 2    A. No, I wouldn't want this to happen. |
| 3        - - - |
| 4    (Cardinal-Norris Exhibit 10 marked.) |
| 5        - - - |
| 6    Q. Okay. Ma'am, I think you have in front |
| 7 of you what for the record is Norris 12 and has |
| 8 been marked for this deposition Plaintiff's |
| 9 Exhibit Number 10; is that correct? It's the |
| 10 sticker number 10 on the bottom. |
| 11    A. It is. |
| 12    Q. All right. And do you know who Glenn |
| 13 Fine is? |
| 14    A. I don't, other than the document says |
| 15 Inspector General. |
| 16    Q. Inspector General. Well, I assure you |
| 17 that I didn't make that up. |
| 18    Okay. And do you see the subject? Read |
| 19 the subject to us, if you would, please. |
| 20    A. The subject is, "Review of the Drug |
| 21 Enforcement Administration's Investigations of the |
| 22 Diversion of Controlled Pharmaceuticals, Report |
| 23 number I-2002-010." |
| 24    Q. And I'll represent to you that this is a |

| Page 103 |
|---|
| 1 report that came out September of 2002. Cardinal |
| 2 also recognizes that it's the DEA which regulates |
| 3 wholesale distributors; is that correct? |
| 4    A. Among other bodies, yes. |
| 5    Q. Maybe some state entities and others out |
| 6 there, but as far as the federal government, one |
| 7 of the main ones is the DEA? |
| 8    A. Yes. |
| 9    Q. Is it the DEA that generally |
| 10 investigates and deals with diversion of |
| 11 controlled substances? |
| 12    A. I believe so. |
| 13    Q. If you'll turn to page 12. When you get |
| 14 there, let me know when you're ready. |
| 15    A. Okay. Just a second. |
| 16    Q. Yes, ma'am. |
| 17    A. Okay. |
| 18    Q. If you turn to page 12. Do you see the |
| 19 highlighted section there? |
| 20    A. I do. |
| 21    Q. If you'll read that aloud for us, |
| 22 please. |
| 23    A. "Diversion investigators represented |
| 24 10 percent, or 523, of the DEA's 5,124 authorized |

| Page 104 |
|---|
| 1 investigator positions in fiscal year 2001. The |
| 2 authorized diversion investigator positions were |
| 3 assigned as follows: 55 at headquarters, 455 at |
| 4 domestic field offices, and the remaining 13 at |
| 5 overseas offices." |
| 6    Q. So that puts somewhere about 510 DEA |
| 7 investigators keeping oversight of the controlled |
| 8 substances in this country, correct? |
| 9    MS. MAINIGI: Objection; time period, |
| 10 scope, form. |
| 11    A. There were 500 and so in the |
| 12 authorized -- |
| 13    Q. Well, I'm just doing -- |
| 14    A. -- diversion investigator positions. |
| 15    Q. Yeah. I'm doing 55 plus 455 I think is |
| 16 510, right? |
| 17    A. Sorry. |
| 18    MS. MAINIGI: Objection; form. |
| 19    A. And then plus 13. |
| 20    Q. Yeah, those are overseas. |
| 21    A. Yeah. Okay. |
| 22    Q. So we can agree that in -- at least |
| 23 according to this, the Inspector General report |
| 24 done in 2012 -- excuse me -- 2002, approximately |

| Page 105 |
|---|
| 1 510 DEA investigators related to diversion of |
| 2 controlled substances in this country; is that |
| 3 right? |
| 4    MS. MAINIGI: Objection; form, scope, |
| 5 time period. |
| 6    A. I believe that's what this says. |
| 7        - - - |
| 8    (Cardinal-Norris Exhibit 11 marked.) |
| 9        - - - |
| 10    Q. Now, let's continue to the next |
| 11 document. The next document is going to be |
| 12 Plaintiff's Norris 13, which is going to be |
| 13 Exhibit 11 to this deposition. |
| 14    Now, I'll represent to you that |
| 15 Plaintiff's 11 is part of a bigger Congressional |
| 16 record. It's about 900 pages. I decided not to |
| 17 print all 900 pages for you. |
| 18    A. I and our environment appreciate that. |
| 19    Q. You are welcome. You are welcome. |
| 20    This is a report done by the Honorable |
| 21 Rudolph Giuliani before the U.S. Senate Permanent |
| 22 Subcommittee on Investigations. |
| 23    Do you see that? |
| 24    A. I do. |

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| **Page 106** | **Page 108** |

**Page 106**

1   Q. And it's dated June 17th of 2004.
2   A. That is the date on the front.
3   Q. What is the title of this report?
4   A. Buy --
5   Q. I'm sorry. Go ahead.
6   A. "Buyers Beware: The Dangers of
7 Purchasing Pharmaceuticals Over the Internet."
8   Q. Now, you're aware that during this time
9 frame, that there was a concern about Internet
10 pharmacies; is that right?
11     MS. MAINIGI: Objection; form, time
12 period.
13   A. I am aware that Internet pharmacies
14 generally during this time period were on folks'
15 minds, yes.
16   Q. And it was an issue of concern, because
17 in 2008, Cardinal paid a $34 million fine related
18 to Internet pharmacies and the distributions
19 thereto, correct?
20     MS. MAINIGI: Objection; form, scope.
21   A. I believe it was an issue of concern
22 because we had communications with the DEA as far
23 back as, I believe, 2005 regarding Internet
24 pharmacies.

**Page 107**

1   Q. And then in 2008, Cardinal entered a
2 Memorandum of Agreement with the DEA related to
3 distributions pertaining to Internet pharmacies;
4 is that correct or incorrect?
5   A. Cardinal entered into a Memorandum of
6 Agreement in 2008 in which it made no admissions.
7   Q. It made no admissions, but the basis of
8 the allegations were related to distributions
9 related to Internet pharmacies; is that correct or
10 incorrect, ma'am?
11   A. It is correct that the allegations
12 related to Internet pharmacies.
13   Q. Okay. And we'll get into more of those
14 later, but that's fine.
15     If you'll turn to page 2. It says,
16 "Giuliani Partners LLC has been retained by the
17 Pharmaceutical Research and Manufacturers of
18 America (PhRMA) to evaluate the risks, if any,
19 associated with the importation of Canadian and
20 foreign medicines."
21     Do you see that there?
22   A. I see that language.
23   Q. And that's telling us, is it not, that
24 the Giuliani group, for lack of a better term, was

**Page 108**

1 hired by PhRMA to look into this issue of Canadian
2 and foreign medicines, right?
3     MS. MAINIGI: Objection; form and
4 time -- or excuse me. Objection; scope and time
5 period.
6   A. I believe that's what the language says.
7   Q. And if you'll turn to -- now to page 4.
8   A. Can you give me just a second, please?
9   Q. Sure. I'm sorry. I apologize.
10   A. That's okay. Okay.
11   Q. Ma'am, on page 4, read that first
12 highlighted sentence for us, please.
13   A. "On its face, it appears that the
14 distribution chain for prescription medicines in
15 the United States is fairly straightforward.
16 Manufacturers sell their products to wholesalers
17 who in turn sell the products to retail pharmacies
18 or stores who in turn dispense medicines to
19 patients with prescriptions."
20   Q. Okay.
21   A. "It is not until the" --
22   Q. Hold on. Just the first sentence.
23 That's all I asked.
24   A. Oh, I'm sorry.

**Page 109**

1   Q. And you would agree with us -- or agree
2 with the statement that on its face, it's a pretty
3 simplistic system; manufacturers to wholesalers,
4 then to retail pharmacies or drugstores, correct?
5     MS. MAINIGI: Objection; scope.
6   A. I would say that is the system. Not
7 even on its face, but yes.
8   Q. And I was saying it was pretty
9 simplistic on its face, correct?
10     MS. MAINIGI: Objection; scope.
11   A. I think it's -- it is simplistic.
12 It's -- that's the --
13   Q. Fair enough.
14     Then the report goes on to say, "It is
15 not until the system is studied in greater detail
16 that one begins to appreciate both the
17 complexities and the vulnerability of the
18 distribution chain and the potential for
19 exploitation or abuse."
20     Correct?
21     MS. MAINIGI: Objection.
22     Are you asking her if she agrees or
23 whether that's what it says?
24     MR. FULLER: Yes, ma'am. I'm asking her

Highly Confidential - Subject to Further Confidentiality Review

| Page 110 | Page 112 |
|---|---|

Page 110

1  if that's what it says first.

2      A.   That is what the sentence says, yes.

3      Q.   And do you agree that the chain is

4  subject to potential exploitation and abuse?

5          MS. MAINIGI:  Objection; scope.

6      A.   Not necessarily.

7      Q.   Has Cardinal been fined in the past for

8  potentially exploiting or abusing this closed

9  system distribution?

10          MS. MAINIGI:  Objection; form.

11      A.   Are you referring to the 2005 settlement

12  with New York?

13      Q.   I'm referring to the 2005 settlement

14  with New York, the 2008 settlement with the

15  Department of Justice, the 2012 settlement with

16  the Department of Justice where they admitted

17  violations, and the 2016 admission with the State

18  of New York related to additional violations.

19      A.   I'm not --

20          MS. MAINIGI:  Question?

21      Q.   Yes, ma'am.  You can go ahead.

22          MS. MAINIGI:  Is there a question

23  pending?

24          MR. FULLER:  Yeah.  She asked me what I

Page 111

1  was referring to.  I explained what I was

2  referring to.  And she can answer the question

3  that is still pending.

4          MS. MAINIGI:  Could we have that read

5  back, please?

6          (Record read back as follows:

7          "Question:  Has Cardinal been

8          fined in the past for potentially

9          exploiting or abusing this closed

10          system distribution?")

11          MS. MAINIGI:  Objection; form.

12  Objection; scope.

13      A.   I don't agree with the term

14  "exploiting."  Cardinal Health has paid fines in

15  the past related to particular settlements.

16      Q.   For settlements for allegations as well

17  as admitted violations of these laws related to

18  this distribution chain; is that accurate?

19          MS. MAINIGI:  Objection; form.

20  Objection; scope.

21      A.   We made settlement payments pursuant to

22  a settlement agreement with no admissions.  We

23  made a very limited admission and made a

24  settlement payment.

Page 112

1      Q.   So Cardinal has -- so Cardinal agrees

2  that it has had allegations as well as admitted

3  violations related to this vulnerable chain of

4  distribution related to controlled substances;

5  correct?

6          MS. MAINIGI:  Objection; form.

7  Objection; scope.

8      A.   Cardinal Health agrees that it made

9  payments related to allegations and made a

10  settlement payment with regard to specific

11  admissions.

12      Q.   So it made a $34 million payment related

13  to allegations in 2008; is that correct?

14      A.   It made a $34 million payment as a

15  settlement with the DEA.

16      Q.   It also made a $34 million payment

17  related to not just allegations but admissions in

18  2012, correct?

19      A.   Cardinal Health made a $34 million

20  payment in 2012 pursuant to a settlement agreement

21  in which it made very limited admissions.

22      Q.   And then in 2016, Cardinal made another

23  admission of liability and paid another

24  $10 million to New York, is that correct, for

Page 113

1  similar type of allegations?

2          MS. MAINIGI:  Objection; form.

3      A.   Let me clarify because I just misspoke.

4  In 2012, no payment was made.  In 2016,

5  34 million -- a total of $44 million was paid in

6  connection with a very limited settlement and very

7  limited admissions contained therein.

8      Q.   Okay.  So, again, just to clean it up,

9  Cardinal's admitted violations as well as paid

10  fines for allegations related to the -- related to

11  allegations that -- well, strike that.  Let me do

12  it a little easier.

13          Cardinal has paid fines related to

14  simply allegations of violations to the Controlled

15  Substances Act and distribution of controlled

16  substances, correct?

17      A.   No.  Cardinal Health paid fines as part

18  of a settlement agreement in which it made no

19  admissions.

20      Q.   But those settlement agreements were

21  related to allegations of violations of the

22  Controlled Substances Act; yes or no?

23          MS. MAINIGI:  Objection; form.

24      A.   There were allegations made.  Cardinal

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 114 | Page 116 |

**Page 114**

1 Health made no admissions.
2    Q.  What were those allegations?
3       MS. MAINIGI:  Objection; form.
4       Do you have the agreement so she can
5 look at it?
6    A.  In order to be clear, it would be
7 helpful to have the document so we can go through
8 the specific allegations, if that's what we want
9 to do.
10    Q.  No, ma'am.  I just want a general idea.
11 Do you know any of the allegations?
12       MS. MAINIGI:  Objection; form.
13    Q.  Did it have to do with the distribution
14 of controlled substances?
15       MS. MAINIGI:  Objection; form.
16    A.  I believe it had to do with the
17 distribution of controlled substances to certain
18 customers.  But, again, without the document in
19 front of me, I am not going to go into the
20 particulars.  I want to ensure that I am accurate
21 for the record.
22    Q.  And Cardinal also admitted to violations
23 of the Controlled Substances Act and as it relates
24 to this distribution of controlled substances,

**Page 115**

1 correct?
2       MS. MAINIGI:  Objection; form and scope.
3    A.  Again, in the 2016 settlement
4 agreement -- and, again, without having it in
5 front of me and being very clear about the
6 particulars -- there was a settlement made and
7 admission related to certain discrete issues.
8    Q.  And let's just make sure the record is
9 clear -- and we'll get it out later.
10       But the Memorandum of Understanding
11 entered and signed off on in 2012 actually
12 contains those admissions, correct?
13       MS. MAINIGI:  Objection; form.
14 Objection; scope.
15    A.  Without the documents in front of me --
16    Q.  Fair enough.
17    A.  I just want to be clear.
18       MR. FULLER:  Sure, sure.  Let's take
19 another quick break.
20       THE VIDEOGRAPHER:  The time is now
21 11:03.  Going off the record.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  Okay.  The time is
24 now 11:22.  Back on the record.

**Page 116**

1       MR. FULLER:  Hey, did you change out my
2 strips?
3       THE COURT REPORTER:  I added more.
4 You're on 12.
5       MR. FULLER:  Oh, am I?  Okay.
6       MS. MAINIGI:  Did you get like a speaker
7 over there?
8       MR. FULLER:  Yeah, I don't know what it
9 is, but I hear myself talking, and it's weird.
10       MS. MAINIGI:  I agree.
11       MS. VELDMAN:  Do you want him to lower
12 that?
13       THE VIDEOGRAPHER:  I did.  It should be
14 better now.
15       MR. FULLER:  How about now?  Better?
16       MS. MAINIGI:  (Indicates affirmatively.)
17          - - -
18    (Cardinal-Norris Exhibit 12 marked.)
19          - - -
20       MR. FULLER:  This is Norris 8, it's
21 going to be Plaintiff's Exhibit Number 12.
22 BY MR. FULLER:
23    Q.  And, ma'am, have you seen this case
24 before?

**Page 117**

1    A.  I have.
2    Q.  And what case is it?
3    A.  Masters Pharmaceutical, Inc. v. DEA.
4    Q.  Okay.  And you're aware this decision
5 came out in June of last year; is that correct?
6    A.  I believe so.
7    Q.  And it deals with the Controlled
8 Substances Act and the shipping and reporting
9 requirements; is that correct?
10    A.  I believe it mentions the shipping
11 requirement, and the reporting requirement is sort
12 of the central issue.
13    Q.  So it discusses both; is that correct?
14    A.  It makes reference to both, yes.
15    Q.  And if you'll turn to page 7 of the --
16 now, in -- let's back up for a second.
17       You've had an opportunity to read this
18 opinion before today?
19    A.  I have.
20    Q.  And you're probably aware -- and tell me
21 if you're not -- that the -- some of the other
22 Defendants in this case, AmerisourceBergen and
23 McKesson, have also designated 30(b) witnesses?
24    A.  Yes, I am aware.

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 118 | Page 120 |

**Page 118**

1     Q.   Have you reviewed any of their

2 testimony?

3     A.   No, I have not.

4     Q.   Okay. In preparation for this

5 deposition, did you actually read this opinion?

6     A.   I did.

7     Q.   Okay. And let me ask you, how much time

8 have you spent preparing for this deposition?

9     A.   The last three and a half weeks from

10 the -- beginning the -- Monday the 16th, I believe

11 it was, through today.

12     Q.   And I won't say 24 hours a day. Mainly

13 your working hours of your day have been

14 encompassed by preparing for this 30(b) notice --

15     A.   Yes.

16     Q.   -- or the notices, correct?

17     A.   Yes. I'm sorry.

18     Q.   Okay. And tell me -- again, other than

19 counsel, who else have you spoken with related to

20 the preparation for this 30(b) notice?

21     A.   I spoke to a variety of individuals at

22 Cardinal Health. I'll try to remember them all.

23 Michael Mone, Todd Cameron, Gilberto Quintero.

24     Q.   Hold -- slow down a little bit for me.

**Page 119**

1     A.   Sorry. Michael Mone.

2     Q.   Mr. Cameron?

3     A.   Todd Cameron.

4     Q.   Roberto?

5     A.   Gilberto Quintero.

6     Q.   Yes, ma'am.

7     A.   Danny Roberts.

8     Q.   Yes, ma'am.

9     A.   Linden Barber.

10     Q.   Yes, ma'am.

11     A.   Steve Reardon, Sean Callinicos.

12     Q.   Spell the last name for me.

13     A.   I believe it is C-a-l-l-i-n-c-o-s [sic]

14 or something to that effect.

15     Q.   Fair enough. He'll forgive you.

16     A.   Just one second. Let me try to

17 remember. I believe that's everybody. I believe

18 that's everyone. If I -- if somebody pops into my

19 brain, I will let you know.

20     Q.   And who did you speak -- other than

21 counsel -- with about the Masters Pharmaceutical

22 case?

23     A.   Todd Cameron and I -- Todd answered a

24 question regarding it.

**Page 120**

1     Q.   And what did Todd answer?

2     A.   Todd answered that upon the decision, he

3 reviewed the decision, reviewed it with counsel,

4 Cardinal Health counsel.

5     Q.   Internal counsel, or you're not sure?

6     A.   I'm not positive if it was also outside

7 counsel. We do have internal counsel, so ... and

8 determined that --

9       MS. MAINIGI: And one thing I will

10 caution you, Ms. Norris, is to not reveal any

11 privileged information that Mr. -- any privileged

12 exchanges Mr. Cameron may have had with counsel.

13     A.   And based on those reviews --

14       MS. MAINIGI: Perhaps you could phrase

15 it after his communications with counsel, what

16 actions he took.

17     A.   After Mr. Cameron's review of the case

18 and with counsel, he determined that no changes

19 were needed to our program, that it was in

20 compliance with the decision.

21     Q.   All right. So let's look at Masters

22 Pharmaceutical. And if you'll turn to page 7 for

23 me.

24     A.   Yes, I'm there.

**Page 121**

1     Q.   Okay. And if you will read where it

2 starts, "The security requirement."

3     A.   "The 'security requirement' at the heart

4 of the case mandates that distributors 'design and

5 operate a system' to identify 'suspicious orders

6 of controlled substances' and report those to DEA

7 (the Reporting Requirement)."

8     Q.   Does Cardinal Health agree that it has a

9 reporting requirement to identify and report

10 suspicious orders of controlled substances?

11     A.   Yes.

12     Q.   And what is Cardinal's position --

13 strike that.

14       And Cardinal agrees that has been the

15 obligation since the enactment of the Controlled

16 Substances Act and particularly this regulation in

17 1971, correct?

18       MS. MAINIGI: Objection; scope.

19 Objection; time period.

20     A.   Cardinal Health understands its

21 reporting obligation pursuant to the Controlled

22 Substances Act.

23     Q.   No, ma'am. That's not my question.

24 Okay. Let me ask it again.