EXHIBIT 71

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                EASTERN DIVISION
 4                   -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     -----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                   -  -  -
           Thursday, December 13, 2018
11                   -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13

                     -  -  -
14

               Videotaped deposition of
15   SHAUN ABREU, taken pursuant to notice,
     was held at the law offices of Locke
16   Lord, LLP, Brookfield Place, 200 Vesey
     St., 20th Floor, New York, New York
17   10281-2101, beginning at 9:06 a.m., on
     the above date, before Amanda Dee
18   Maslynsky-Miller, a Certified Realtime
     Reporter.
19

                     -  -  -
20

21

22

23        GOLKOW LITIGATION SERVICES
        877.370.3377 ph| 917.591.5672 fax
24            deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1                    (Whereupon, Exhibit

2            Schein-Abreu-6, Verification Team

3            Overview; July 2015, was marked

4            for identification.)

5                    -  -  -

6    BY MR. MIGLIORI:

7            Q.    Elia.

8                  Who is she?

9            A.    She works on my team.

10           Q.    Do you recall -- it's a

11   July -- it's Exhibit Number 6.  It's a

12   July 2015 PowerPoint, verifications team

13   overview.

14                 Do you remember preparing

15   this?

16           A.    2015?  I'm sure I did.  I

17   don't recall specifically.

18           Q.    That's you on the front

19   cover, anyway?

20           A.    Yes.

21           Q.    And it really goes into the

22   verification component of suspicious

23   orders, right?  The second page is the

24   licensing requirements?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2        Q.    And so part of verification

3  is that you have to make sure that your

4  doctors and customers, where applicable,

5  maintain state licensure, correct?

6        A.    Correct.

7        Q.    Do you know if Ohio -- it

8  says here, Example, Ohio.

9            Are you familiar with the

10  additional state requirements of state

11  licensure in Ohio?

12        A.    Yes.

13        Q.    What are they?

14        A.    That a customer maintain a

15  terminal distributor of dangerous drugs

16  license, Category III, for controlled

17  substances.

18        Q.    And does that change -- is

19  that any -- strike that.

20            Are your reporting

21  requirements different in Ohio because of

22  that requirement?

23        A.    Sorry, I'm not sure I

24  understand the question.

Highly Confidential - Subject to Further Confidentiality Review

1  Q.    Do you understand, as you

2  sit here today, that you have additional

3  reporting requirements to Ohio?

4  A.    For?

5  Q.    For controlled substances,

6  for the sale.

7  A.    To report transactions?

8  Q.    Yes.

9  A.    Yes.

10  Q.    Do you know how long that's

11  been in existence in Ohio?

12  A.    No, I'm not sure.

13  Q.    And, to your knowledge, has

14  Schein complied with that requirement?

15  A.    Yes.

16  Q.    Does Ohio have a suspicious

17  order monitoring -- a suspicious order

18  reporting requirement?

19  A.    I believe so.

20  Q.    And for all times that

21  you've -- that you -- going back to 1996,

22  or whenever the requirements started, has

23  Schein complied with the Ohio suspicious

24  order requirements?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. JONES:  Object to the

2     form.  Scope.  Calls for a legal

3     conclusion.

4          THE WITNESS:  Yeah, I'm not

5     sure, going back.

6  BY MR. MIGLIORI:

7     Q.    Have you looked for those

8  reporting -- that reporting data in Ohio?

9     A.    No.

10     Q.    All right.  There's a

11  controlled substance state licensure and

12  then a federal DEA licensure.

13          So that's part of your

14  verification team?

15     A.    Correct.

16     Q.    You also state here that, on

17  the next page, in your suspicious order

18  monitoring due diligence process, Henry

19  Schein has a Know Your Customer DEA

20  overview.

21          What is that?

22     A.    It's just something that we

23  provide to customers to explain our

24  process.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And is it a document?

2        A.    Yes.

3        Q.    Is it, like, a pamphlet?  Is

4   it a booklet?  What does it look like?

5        A.    It's just a two-page, or a

6   one-page, front-and-back, document.

7        Q.    Did you look at that in

8   preparation for today?

9        A.    No.

10       Q.    But it exists?  If I were to

11   say, can you send me over the Henry

12   Schein Know Your Customer DEA overview as

13   of 2015, that exists in your files,

14   right?

15       A.    Yes.

16       Q.    Okay.  The suspicious order,

17   due diligence suspicious order

18   monitoring, these are different things

19   that you look for, for verification,

20   correct?

21       A.    Yes.

22       Q.    One of them says, License

23   background review, disciplinary actions.

24             You do, at least as of 2015,

Highly Confidential - Subject to Further Confidentiality Review

1    look back to see whether or not there

2    have been any disciplinary, whether it be

3    licensure or, I assume, criminal

4    disciplinary actions for your customers,

5    correct?

6           A.    Correct.

7           Q.    And that information would

8    be in the due diligence file that we've

9    already talked about, right?

10          A.    Right.

11          Q.    You have an online

12   controlled substances form.

13                So you create an

14   Internet-based interface with the

15   clients, correct?

16          A.    Correct.

17          Q.    And there's a requirement

18   that the customer, at least as of 2015,

19   have a complete form, all fields are

20   filled in and an E-signature, right?

21          A.    Right.

22          Q.    And so for every customer,

23   in some accounting, for example, today,

24   there would be an online file relative to

Highly Confidential - Subject to Further Confidentiality Review

1   the due diligence for each and every

2   customer, correct?

3          A.    Could be a paper version as

4   well.

5          Q.    Okay.  It wasn't always the

6   case that every customer had a due

7   diligence file, correct?

8          A.    That's correct.

9          Q.    We'll get into that.

10         And then onboarding is

11  bringing on a new client, right?

12         A.    Right.

13         Q.    On Page 4 of Exhibit-6,

14  there are some additional due diligence

15  requirements for bringing on a new client

16  as of 2015.

17         It says, Speaking with the

18  sales team and attending onboarding

19  conference calls.

20         So the sales team is part of

21  the onboarding process, right?  They

22  bring in the new client?

23         A.    Yes.

24         Q.    And then you interact with

Highly Confidential - Subject to Further Confidentiality Review

1    the sales team in whether or not that

2    client, in fact, can be onboarded after

3    some due diligence, correct?

4        A.    Correct.

5        Q.    In 2015, the elements of

6    that due diligence for onboarding

7    included the questionnaire, correct?

8        A.    And licensing.

9        Q.    And licensing.

10        So they would have to fill

11    out a one-page questionnaire?

12        A.    It became two pages.

13        Q.    And then that questionnaire

14    goes in the due diligence file

15    immediately?

16        A.    Yes.

17        Q.    And then you would have to

18    go through a verification of the various

19    licenses for that state and federally,

20    correct?

21        A.    Correct.

22        Q.    And then, finally, on this,

23    this is a list, at least in 2015, of the

24    people within verification. It lists you

1    as the verifications manager.

2              What does Maggie Wilding do?

3         A.    She is the supervisor of our

4    team in Reno for verifications.

5         Q.    Does she report to you?

6         A.    Yes.

7         Q.    So Reno reports, generally,

8    to the Melville facility?

9         A.    To me, yes.

10        Q.    You oversee all the

11   verifications?

12        A.    Yes.

13        Q.    Christine Stratton, she is a

14   suspicious order monitoring team lead.

15             What department is she in?

16        A.    She is still in

17   verifications.

18        Q.    And what does she do?  What

19   does a team lead do?

20        A.    So, currently, she actually

21   is a supervisor.  But it would be her

22   role to assist in the SOM and Know Your

23   Customer processes.

24        Q.    Is she a supervisor in New

Highly Confidential - Subject to Further Confidentiality Review

1    York?

2        A.    Yes.

3        Q.    But she still reports to

4    you?

5        A.    Yes.

6        Q.    And Maggie, is she still the

7    supervisor in Reno?

8        A.    Yes.

9        Q.    How about Leah Mannino?

10       A.    She is no longer with the

11   company.

12       Q.    But she would have done the

13   same things that Christine was doing with

14   respect to team lead?

15       A.    Yes.

16       Q.    And she was in New York?

17       A.    Yes.

18       Q.    Has somebody filled in for

19   her now, that's there now?

20       A.    Yes.

21       Q.    Who is that?

22       A.    BriAnne Elia.

23       Q.    Judy Labarbera, a licensing

24   team lead.

Highly Confidential - Subject to Further Confidentiality Review

```
1              First of all, is Judy still

2   there?

3        A.    No.

4        Q.    Does somebody else have that

5   role?

6        A.    Yes.

7        Q.    Who is that?

8        A.    George Rodriguez.

9        Q.    And what does a licensing

10  team lead do?

11       A.    They work with the team on

12  verification for licensing credentials.

13       Q.    And BriAnne is now a team

14  lead, an SOM team lead, but here it says,

15  Verifications, manage accounts.

16             What is that job title?

17       A.    That was part of the

18  onboarding that we spoke of earlier.  So

19  she would engage with the customer to set

20  expectations for coming over.

21       Q.    Who is doing that now?

22       A.    Brian Fishman.

23       Q.    None of those folks have any

24  responsibilities with respect to the
```

```
1   database that you also manage, correct?

2           A.    That's correct.

3           Q.    I'll show you Exhibit Number

4   7.

5                        -  -  -

6                 (Whereupon, Exhibit

7           Schein-Abreu-7,

8           HSI-MDL-00000086-103, was marked

9           for identification.)

10                       -  -  -

11  BY MR. MIGLIORI:

12          Q.    Exhibit Number 7 is one of

13  many I think we may look at today, or

14  not.  But this was produced to us by

15  Henry Schein.  It's got the Bates number

16  on the bottom of HSIMDL86, is the top

17  page.

18                It's dated May 21st of 2018

19  and it's Revision Number 5 to the SOP,

20  right?

21                Is that correct?

22          A.    Yes, yes.

23          Q.    And you've seen forms like

24  this?  Every change to the standard
```

1  operating procedures of Schein relative

2  to suspicious order monitoring is

3  reflected somehow -- to the extent that

4  it's a change that goes into the books,

5  is reflected in one of these forms,

6  correct?

7          A.    Correct.

8          Q.    We'll get into different

9  things here, but this is an SOM from this

10 year.  It talks about some of the things

11 that we've already talked about today.

12              But for this purpose right

13 now, I just want to bring you to the page

14 that ends in 98.  There's a list of

15 states that have reporting requirements.

16 And it appears that this has been added

17 to the SOP for Henry Schein for Ohio.

18              Have you reviewed this in

19 preparation for today?

20         A.    Yes.

21         Q.    So you'll see that the Ohio

22 requirements are separate and apart from

23 the DEA requirements.

24              You agree with that, right?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And here is the citation,

3   and it's a requirement for wholesalers.

4          You understand that Schein

5   is considered a wholesaler in this

6   context, correct?

7    A.    Correct.

8    Q.    And that the reporting

9   requirement is to the Ohio Board of

10  Pharmacy in Columbus, Ohio.

11         Do you see that?

12   A.    Yes.

13   Q.    And then it says that,

14  There's a minimum requirement in the

15  state of Ohio that a system shall be

16  designed and operated to disclose orders

17  for controlled substances and other

18  dangerous drugs subject to abuse.

19         1, The wholesaler shall

20  inform the State Board of Pharmacy of

21  suspicious orders for drugs when

22  discovered.

23         That's similar to the DEA

24  requirement, too, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      Suspicious orders are those

3    which, in relation to the wholesaler's

4    record as a whole, are of unusual size,

5    unusual frequency or deviate

6    substantially from establishing buying

7    patterns.

8            Do you see that?

9        A.      Yes.

10       Q.      You'll agree with me that

11   nothing in there says only after due

12   diligence, correct?

13           MR. JONES:  Objection.  The

14       document speaks for itself.  The

15       statute speaks for itself.

16   BY MR. MIGLIORI:

17       Q.      It doesn't say after due

18   diligence, does it?

19       A.      Correct.

20       Q.      2, Reports generated by the

21   system shall be furnished to the state

22   Board of Pharmacy within three working

23   days of receipt of a request from the

24   board.

1          So if the board asks for

2    something, you have to respond.

3          Do you recall ever having to

4    do that at Schein, that is, provide a

5    report to the board specifically upon

6    their request?

7          A.    Not to my recollection, no.

8          Q.    Okay.  Then this provision G

9    says, with respect to verification of

10   license, Each wholesale distributor of

11   dangerous drugs registered with the state

12   Board of Pharmacy shall report any

13   suspicious purchases of any dangerous

14   drugs by a prescriber exempted from

15   licensure as a terminal distributor of

16   dangerous drugs.  A suspicious purchase

17   includes, but is not limited to, any

18   drugs that the prescriber is not

19   authorized to use in the course of his or

20   her own professional practice.

21          Have you searched, within

22   your files, any suspicious purchases that

23   meet the definition that I just read to

24   you, for Ohio?

Highly Confidential - Subject to Further Confidentiality Review

 1                MR. JONES:  Object to the

 2        form.  Object to scope.

 3                THE WITNESS:  Sorry, can you

 4        repeat the question?

 5   BY MR. MIGLIORI:

 6        Q.    Sure.

 7                This requirement for

 8   verification under Ohio law requires that

 9   suspicious purchases be reported to the

10   Ohio Board of Pharmacy when those

11   purchases include any drugs that the

12   prescriber is not authorized to use in

13   the course of his or her professional

14   practice.

15                Have you searched through

16   the Ohio -- or through the database at

17   Schein for any suspicious orders reported

18   to the Ohio Board of Pharmacy because of

19   that unauthorized use?

20                MR. JONES:  Object to the

21        form.  Misstates the document.

22                THE WITNESS:  Are we talking

23        with respect to Summit County or

24        Ohio as a whole?

Highly Confidential – Subject to Further Confidentiality Review

1  BY MR. MIGLIORI:

2      Q.    I'm asking for Ohio.

3            But if you only did it for

4  Summit, you can tell me that.

5      A.    Yes, I did, I searched for

6  Summit County.

7      Q.    And did you find any in

8  Summit County?

9      A.    No.

10     Q.    And folks that would fall

11 into the category of not being authorized

12 to use drugs would include, for example,

13 an orthodontist should not be ordering

14 things like anti-anxiety medication,

15 correct?  Is that within the system?

16           MR. JONES:  Objection to

17      form.  Lack of foundation.  Calls

18      for a legal conclusion.

19           THE WITNESS:  Arbitrarily or

20      regarding that specific example

21      you gave?

22 BY MR. MIGLIORI:

23     Q.    Isn't that -- I'm giving you

24 an example as something in the standard

1    operating procedures of your company as

2    being an unauthorized purchase.

3         A.    We have --

4              MR. JONES:  Same objections.

5              THE WITNESS:  We have

6         restrictions in place.

7    BY MR. MIGLIORI:

8         Q.    Yes.

9              And one of the restrictions

10   is, dentists don't normally prescribe

11   anti-anxiety medications, correct?

12             MR. JONES:  Objection to

13        form.

14             THE WITNESS:  Specifically

15        to that example?

16   BY MR. MIGLIORI:

17        Q.    Yes.

18        A.    Potentially.

19        Q.    In fact, there is a standard

20   operating procedure that says that if a

21   dentist is ordering anti-anxiety and

22   controlled substances, like a morphine

23   equivalence, that that is a red flag,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm not sure about that.

2         MR. JONES:  Objection.

3    BY MR. MIGLIORI:

4    Q.    One of the practices, or one

5    of the policies and procedures that

6    Schein adopted more recently is that

7    doctors can't self-medicate or order

8    controlled substances for their own

9    personal use.  Isn't that one of the

10   Schein policies?

11   A.    That's one of our policies.

12   Q.    Did you look, within the

13   Ohio reporting databases, for any reports

14   of doctors that you found, upon due

15   diligence, were using opiates or morphine

16   equivalents for self-medicating purposes?

17   A.    With respect to Summit

18   County?

19   Q.    I'm asking for Ohio, but you

20   can limit it to what you looked for.

21   A.    With respect to Summit

22   County, no.

23   Q.    So with respect to Summit

24   County, you did look for it and you did

Highly Confidential - Subject to Further Confidentiality Review

1    not find any?

2         A.    Correct.

3         Q.    If, in fact, though, you had

4    a doctor in Summit County that was

5    self-medicating and you became aware of

6    that, that fact would be, first, in the

7    due diligence file, correct?

8         A.    Yes.

9         Q.    And by operation of law, you

10   would have reported that to Ohio and to

11   the DEA?

12        A.    Yes.

13        Q.    And that would have been

14   reported as a suspicious order, correct?

15        A.    Correct.

16        Q.    And you've looked for both

17   the DEA and Ohio, and you found none for

18   Summit County?

19        A.    That's correct.

20        Q.    From 2009 to present?

21             MR. JONES:  Objection.

22             VIDEO TECHNICIAN:  The time

23        is now 11:49 a.m.  And we are

24        going off the record.

```
 1                    -   -   -

 2            (Whereupon, a brief recess

 3       was taken.)

 4                    -   -   -

 5            VIDEO TECHNICIAN:  The time

 6       is now 11:51 a.m.  We are back on

 7       the record.

 8                    -   -   -

 9            (Whereupon, Exhibit

10       Schein-Abreu-8,

11       HSI-MDL-00231455-458, was marked

12       for identification.)

13                    -   -   -

14   BY MR. MIGLIORI:

15       Q.    Let me show you -- we talked

16   a little bit about the Rannazzisi

17   letters.  Let me show you Exhibit Number

18   8.

19            This is the Dear Registrant

20   letter of September 27th, 2006.

21            Have you reviewed this?

22       A.    Yes.

23       Q.    And you see that this

24   document has actually got an HSI number
```

Highly Confidential - Subject to Further Confidentiality Review

1    on the bottom?  That means we received it

2    from your company.

3                So you'll agree with me that

4    Henry Schein, Inc., in fact, received and

5    maintained in its files a copy of the

6    September 27, 2006 letter -- I'll show

7    the name -- from Joseph Rannazzisi,

8    deputy assistant administrator, Office of

9    Diversion Control?

10        A.    Yes.

11        Q.    As the letter states, it's

12    being sent to every commercial entity

13    registered with the Drug Enforcement

14    Agency to distribute controlled

15    substances.

16                That would have included

17    Schein in 2006, correct?

18        A.    Yes.

19        Q.    The purpose of this letter

20    is to reiterate the responsibilities of

21    controlled substance distributors in view

22    of the prescription drug abuse problem

23    our nation currently faces.

24                You will agree with me that,

Highly Confidential - Subject to Further Confidentiality Review

1    as of 2006, it was understood within the

2    industry that the country was in a

3    drug -- a prescription drug abuse

4    national crisis --

5                    MR. JONES:  Object to the

6            form.

7    BY MR. MIGLIORI:

8            Q.    -- wouldn't you?

9            A.    Yes.

10           Q.    And that this letter was

11   not, on its face, designed to give new

12   guidance, but it was to, as he puts it,

13   reiterate the responsibilities of

14   controlled substance distributors in view

15   of that crisis.

16                  Do you see that?

17           A.    Yes.

18           Q.    All right.  Rannazzisi says,

19   As each of you undoubtedly -- is

20   undoubtedly aware, the abuse of

21   controlled prescription drugs is a

22   serious and growing health problem in the

23   country.  DEA has an obligation to combat

24   this problem, as one of the agency's core

Highly Confidential - Subject to Further Confidentiality Review

1  functions is to prevent the diversion of

2  controlled substances into illicit

3  channels.  And Congress assigned DEA to

4  carry out this function through the

5  enforcement of the Controlled Substances

6  Act and the DEA regulations to implement

7  that.

8             So on its face, Schein, you

9  would agree, was aware that in 2006, at

10  least, the purpose of the Controlled

11  Substances Act was to prevent diversion

12  of prescription drugs for illicit use and

13  abuse, correct?

14        A.    Correct.

15        Q.    And, in fact, that

16  relationship between the Controlled

17  Substances Act and the abuse of

18  prescription medications actually went

19  back to 1971, as we saw, correct?

20        A.    When it was initially

21  written?

22        Q.    Correct.

23        A.    Yes.

24        Q.    It says, in the middle of

Highly Confidential - Subject to Further Confidentiality Review

1  the next paragraph, Distributors are, of

2  course, one of the key components of the

3  distribution chain.  If the closed system

4  is to function properly, as Congress

5  envisioned, distributors must be vigilant

6  in deciding whether a prospective

7  customer can be trusted to deliver

8  controlled substances only for lawful

9  purposes.

10           You'll agree with me that

11  Henry Schein understood that the

12  distributors play an important role in

13  the prevention of diversion?

14           MR. JONES:  Object to the

15      form.  It goes outside the scope.

16           MR. MIGLIORI:  Well, that's

17      directly referencing a Rannazzisi

18      letter that's specifically

19      referenced in the notice.  So if

20      you don't -- if you don't have an

21      opinion on that, you can tell me

22      that.

23           MR. JONES:  It's also

24      outside the scope, per Special

```
 1              Master Cohen's ruling in

 2              September.

 3                   MR. MIGLIORI:  What part of

 4              the ruling?  Because if I can

 5              avoid it, I will.

 6                   MR. JONES:  Asking him about

 7              his -- about past, present

 8              interpretation, agreement or

 9              disagreement with statements made

10              in the Rannazzisi letters.

11                   I mean, we'll stipulate that

12              that's what the letter says.  But

13              as far as you're going to ask him

14              questions about what Henry Schein

15              thinks or believes or disagrees

16              with, then we're going to object

17              to the scope.

18         BY MR. MIGLIORI:

19              Q.   Well, I'm only going to ask

20         you questions to the extent that this

21         informs what the purpose of your

22         suspicious order monitoring program is,

23         okay?  I'm not asking you to confirm that

24         that's what Rannazzisi thought or what
```

1    the company thought back in 2006 or

2    before, okay?

3              It says that, The Controlled

4    Substances Act uses a concept of

5    registration as a primary means by which

6    manufacturers, distributors, and

7    practitioners are given legal authority

8    to handle controlled substances.

9              So you understand that the

10   registration of all of those entities is

11   what allows the DEA to require reporting

12   and detection of suspicious orders,

13   right?

14             MR. JONES:  Object to the

15        form.  Outside the scope.

16   BY MR. MIGLIORI:

17        Q.    Do you understand that?  If

18   you're a registrant, that you have to

19   comply with the Controlled Substances

20   Act?

21        A.    Yes.

22             MR. JONES:  Same objection.

23   BY MR. MIGLIORI:

24        Q.    All right.  In the middle of

Highly Confidential - Subject to Further Confidentiality Review

1    the second page, it says, The DEA

2    regulations require all distributors to

3    report suspicious orders of controlled

4    substances.  Specifically, the

5    regulations state the registrant shall

6    design and operate a system to disclose

7    to the registrant suspicious orders of

8    controlled substances.  The registrant

9    shall inform the field division of the

10   Office of the Administration in this area

11   of suspicious orders when discovered by

12   the registrant.  Suspicious orders

13   include orders of unusual size, orders

14   deviating substantially from normal

15   pattern, and orders of unusual frequency.

16              So we read this earlier.

17   But you'll agree with me that Henry

18   Schein was in receipt of this specific

19   provision and requirement of the CSA of

20   Henry Schein relative to controlled

21   substances and its customers, correct?

22              MR. JONES:  We'll stipulate

23         that Henry Schein received this

24         Rannazzisi letter on or about when

Highly Confidential - Subject to Further Confidentiality Review

1    it was dated.

2              Otherwise, I object --

3              MR. MIGLIORI:  You can

4         answer.

5              MR. JONES:  Otherwise, I

6         object to the question as outside

7         the scope.  The document speaks

8         for itself.

9              MR. MIGLIORI: Okay.  And

10        I'll note that.

11   BY MR. MIGLIORI:

12        Q.    You see that, in fact,

13   Schein received this excerpt in 2016 in

14   this Rannazzisi letter, correct?

15        A.    Correct.

16        Q.    You'll also see it says, in

17   the next -- two following paragraphs, it

18   says, Thus, in addition to reporting all

19   suspicious orders, a distributor has a

20   statutory responsibility to exercise due

21   diligence to avoid filling suspicious

22   orders that might be diverted into

23   other-than-legitimate medical, scientific

24   and industrial channels.

Highly Confidential - Subject to Further Confidentiality Review

1          Now, do you understand that

2     to mean that a suspicious order requires

3     due diligence in order for it to be

4     determined to be suspicious?

5          MR. JONES:  Object to the

6          form.  Object.  Goes specifically

7          and expressly outside the scope

8          that is allowed by the special

9          master's order.

10          You can ask him in his

11          individual capacity.  But this is

12          going outside the scope for which

13          this witness is here and outside

14          what the court has allowed.

15          MR. MIGLIORI:  That's fine.

16          I've got your objection.

17          And if that's what's ruled,

18          that this is his individual

19          capacity, I'm okay with that.

20     BY MR. MIGLIORI:

21          Q.    But I'm asking you, as your

22     capacity here, in regards to the stated

23     area of inquiry about the Rannazzisi

24     letter, would you agree with me that, at

1    least as of 2006, Henry Schein was put on

2    notice that the reporting requirement of

3    a suspicious order was separate and

4    distinct from the obligation to perform

5    due diligence?

6              MR. JONES:  Objection.

7         Form.  Calls for legal conclusion.

8         Outside the scope.  Runs afoul of

9         the court's order.

10   BY MR. MIGLIORI:

11        Q.    Sir, you can answer.  And

12   the court will determine whether you

13   answer it just for you or for the

14   company.

15        A.    Yes.

16        Q.    Okay.  So at least according

17   to this letter that Schein received in

18   2006, once something deviated from an

19   unusual size, pattern or frequency, that

20   was, by the DEA's perspective, a

21   suspicious order that needed to be

22   reported, and that was separate and

23   distinct from the obligation to then do

24   due diligence to see whether or not that

Highly Confidential - Subject to Further Confidentiality Review

1    order could be shipped?

2            Would you agree with me that

3    that's at least what Schein has been put

4    on notice of in 2006?

5            MR. JONES:  Object to the

6        form.  Object.  Compound.  Calls

7        for a legal conclusion.  Outside

8        the scope.  Calls for speculation.

9        The document speaks for itself.

10   BY MR. MIGLIORI:

11       Q.    Go ahead.

12       A.    I'm sorry, can you restate

13   the question?

14       Q.    Sure.

15            MR. MIGLIORI:  And I'll

16        accept the objection that comes

17        back as well.

18   BY MR. MIGLIORI:

19       Q.    You'll agree with me that at

20   least with respect to this letter that

21   Schein received in 2006, it made it clear

22   that a suspicious order was a deviation

23   of size, frequency and pattern, and that

24   alone had to be reported; separate and

1   distinct from that, there was an

2   obligation to then do due diligence?

3               That's at least what the DEA

4   is telling Schein here in 2006, correct?

5               MR. JONES:  Same objections.

6               THE WITNESS:  Yes.

7   BY MR. MIGLIORI:

8       Q.    That system, though, was not

9   put in place at Schein where the

10  reporting occurred before due diligence

11  until, I think you said, after the

12  Masters decision, correct?

13              MR. JONES:  Objection.

14          Vague.  Objection as to time.

15              THE WITNESS:  So what time

16          periods are you referring to?

17  BY MR. MIGLIORI:

18      Q.    The Schein system didn't

19  report that way, that is, suspicious

20  orders the way it's described here in the

21  Rannazzisi letter, didn't report that way

22  to DEA until after the Masters decision

23  in 2017, correct?

24              MR. JONES:  Object to the

1          form.  Lack of foundation.  Vague.

2          Outside the scope.  Calls for a

3          legal conclusion.

4    BY MR. MIGLIORI:

5          Q.    Go ahead.

6          A.    We reported orders that were

7    deemed suspicious.

8          Q.    Right.  I understand that.

9    I'm trying to figure out by which

10   definition.

11          The definition in this

12   Exhibit-7 that I'm reading from right

13   now, where -- I'm sorry, Exhibit-8, where

14   a suspicious order needs to be reported

15   if it's in deviation of size, pattern or

16   frequency at the time that that deviation

17   is discovered, that's what's said here in

18   this letter, correct?

19          MR. JONES:  Objection.

20   Form.  Document speaks for itself.

21   BY MR. MIGLIORI:

22          Q.    Go ahead.

23          A.    Correct.

24          Q.    Schein reported it as a

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order to DEA only after it did

2    due diligence and determined that it was

3    suspicious, until the Masters decision in

4    2017, correct?

5         A.    Correct.

6              MR. JONES:  Asked and

7         answered.  Objection.  Asked and

8         answered.

9    BY MR. MIGLIORI:

10        Q.    Only after Masters did

11   Schein begin to report suspicious orders

12   when they deviated from size, pattern and

13   frequency and then performed due

14   diligence to determine whether or not to

15   ship the order, correct?

16        A.    Correct.

17        Q.    The letter goes on to say,

18   In a similar vein, given the requirement

19   under Section 823(e) that a distributor

20   maintain effective controls against

21   diversion, a distributor may not simply

22   rely on the fact that the person placing

23   the suspicious order is a DEA registrant

24   and turn a blind eye to the suspicious

Highly Confidential - Subject to Further Confidentiality Review

1    circumstances.

2            So verification in and of

3    itself is not due diligence; is that a

4    fair statement?

5            MR. JONES:  Objection.

6        Form.  Vague.  Overly broad.

7        Misstates the document.

8    BY MR. MIGLIORI:

9        Q.    Will you agree with that?

10       A.    License verification?

11       Q.    Yes.

12       A.    Yes.

13       Q.    So the fact, merely, that

14   somebody has a DEA registration, one of

15   the customers of Schein, or is registered

16   with the Ohio Board of Pharmacy, that

17   process, while it's part of your due

18   diligence to make sure they, in fact, are

19   licensed, that is not a sufficient amount

20   of due diligence at any time from 1996 to

21   present, that's not enough due diligence

22   at any level, correct?

23           MR. JONES:  Object as to

24       form.  Overly broad.  Vague.

Highly Confidential - Subject to Further Confidentiality Review

1                THE WITNESS:  Correct.

2    BY MR. MIGLIORI:

3         Q.    Do you want me to restate

4    it?

5         A.    No.

6               Yes.

7         Q.    So if we were to start in

8    1996, due diligence has always been more

9    than just verification, according to the

10   Controlled Substances Act, correct?

11        A.    Which time are you talking

12   about?  The time period from --

13        Q.    From 1996 on.

14        A.    Yes.

15        Q.    That is, because you had a

16   license, you were required to design a

17   system and monitor a system, but the mere

18   fact of a physician or a healthcare

19   provider having a license, that wasn't,

20   by itself, sufficient due diligence with

21   respect to investigating what could

22   potentially be a suspicious order,

23   correct?

24               MR. JONES:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Form.  Vague.  Overly broad.

2    Compound.

3  BY MR. MIGLIORI:

4    Q.    Is that correct?

5    A.    Correct.

6    Q.    All right.  And then this

7  same letter in 2006 lists certain

8  activities that should raise suspicions

9  of a concern, at least, for diversion of

10 controlled substances.

11    Do you see that?

12    A.    Yes.

13    Q.    And if you go through some

14 of these, ordering excessive quantities

15 of a limited variety of controlled

16 substances while ordering few, if any,

17 other drugs; that will be a red flag,

18 correct?

19    A.    A potential red flag, yes.

20    Q.    And in terms of putting that

21 into the Henry Schein due diligence

22 program, that really started some time in

23 2011 and '12, correct?

24    MR. JONES:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    Form.

2              THE WITNESS:  So when you

3         say "in part of that program"?

4    BY MR. MIGLIORI:

5         Q.    So the initial due diligence

6    program that we talked about was really

7    if an order triggered and became pended

8    in the Henry Schein system, a form -- a

9    one-page form would be mailed out to the

10   doctor -- let's start in 2006 -- a

11   one-page form would be sent out to the

12   doctor, the doctor would send it back

13   filling in the different information

14   requested.

15             And that would be a basis

16   for a determination about whether an

17   order was suspicious; is that true?

18        A.    True.

19        Q.    That system evolved, as you

20   said, over time.

21             And the on-site visits and

22   the phone calls and the Internet

23   searches, that really began around 2012,

24   correct?

1      A.    That's right.

2      Q.    And in 2012, you would look

3   at factors like the -- let's see,

4   ordering excessive quantities of a

5   limited variety of controlled substance

6   in combination with excessive quantity of

7   lifestyle drugs.

8            Sort of the analysis of

9   dispensing history and on-site visits,

10   that really was an evolution of the Know

11   Your Customer policies that began in

12   2012, ramping up to 2015, right?

13            MR. JONES:  Objection.

14       Form.  Overly broad.  Vague.

15   BY MR. MIGLIORI:

16      Q.    Is that right?

17      A.    It may have been prior to

18   that.  I don't remember the exact year.

19      Q.    Well, you know that the

20   suspicious order monitoring program

21   revision that started to look at the due

22   diligence component began in 2009.

23            Have you heard of the

24   company Buzzeo?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Did you ever work with

3    Buzzeo?

4    A.    Yes.

5    Q.    And Buzzeo was brought in to

6    help redesign the suspicious order

7    monitoring program and develop the Know

8    Your Customer component as part of its

9    charge, correct?

10    A.    Yes.

11    Q.    And that charge, really, was

12    investigated and analyzed over time; but

13    it really wasn't until 2010, '11, '12,

14    that those aspects of Know Your Customer

15    were codified in changes to the standard

16    operating procedures, correct?

17          MR. JONES:  Object to form.

18          Overly broad.  Object as to time.

19    BY MR. MIGLIORI:

20    Q.    Is that correct?

21    A.    Sounds right, yes.

22          MR. JONES:  Don, lunch is

23          here, if you're at a transition

24          point.

1       MR. MIGLIORI:  How about,

2       let me -- just give me one second,

3       because it might cause me to cut

4       out some of these documents.

5            Can you give me ten minutes,

6       does that work?

7            MR. JONES:  Ten minutes

8       to --

9            MR. MIGLIORI:  Before we

10      break.

11           MR. JONES:  Yes.

12           MR. MIGLIORI:  Thanks.

13           This is Exhibit Number 9.

14                -  -  -

15           (Whereupon, Exhibit

16      Schein-Abreu-9,

17      HSI-MDL-000993112-115, was marked

18      for identification.)

19                -  -  -

20  BY MR. MIGLIORI:

21      Q.   This is the February 7, 2007

22  Rannazzisi letter.

23           Again, this was -- if you

24  look at the bottom of this document, it's

Highly Confidential - Subject to Further Confidentiality Review

1    got the HSI number on it.  So that's

2    produced to us by Henry Schein.

3              Do you see that?

4         A.    Yes.

5         Q.    I will simplify this by just

6    simply saying, you'll agree with me that

7    Henry Schein was, in fact, in receipt of

8    this particular Rannazzisi letter,

9    correct?

10        A.    Right.

11        Q.    And I'll accept that this

12   letter speaks for itself in its contents.

13             It does talk about the

14   obligations, though, of the distributor

15   of controlled substances, correct?

16        A.    Yes.

17        Q.    It uses the same term here

18   that the letter is to reiterate the

19   responsibilities, correct?

20        A.    Yes.

21        Q.    Meaning it's to remind the

22   company of the responsibilities, not to

23   state new responsibilities.

24             Do you understand that?