# EXHIBIT 72

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                        - - -

 5   IN RE: NATIONAL PRESCRIPTION

 6   OPIATE LITIGATION              Case No.

 7                                  1:17-MD-2804

 8   APPLIES TO ALL CASES           Hon. Dan A.

 9                                  Polster

10   Case No. 1:17-MD-2804

11                        - - -

12               January 30, 2019

13      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14               CONFIDENTIALITY REVIEW

15             Videotaped deposition of JEFFREY

16   S. PEACOCK, held at 200 Vesey Street, New York,

17   New York, commencing at 9:16 a.m., on the

18   above date, before Marie Foley, a Registered

19   Merit Reporter, Certified Realtime

20   Reporter and Notary Public.

21                        - - -

22            GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24               Deps@golkow.com
```

1      would trigger a due diligence file to be
2      reviewed.  So, just to clarify that.
3          Q.    So this number 930 could be new
4      onboarded clients along with those that
5      never had a Know Your Customer letter in
6      the file that you were retroactively
7      catching up on?
8          A.    Correct.
9          Q.    All right.  But the 930 is for
10     the calendar year 2016, correct?
11         A.    Correct.
12         Q.    And the DEA customer audits,
13     that would be your department or
14     Verifications going out to see your
15     customers?
16         A.    My department.
17         Q.    And, who would perform those
18     audits?  Is that the team, the --
19         A.    Under Frank O'Regan.
20         Q.    -- Tina or Fred?
21         A.    Yeah.
22         Q.    Is it Fred or Frank?
23         A.    Frank.
24         Q.    They would go out and they would

```
 1   go out based on would it be the high risk
 2   prioritized that is -- do they go out
 3   randomly, or do they go out to specific
 4   facilities based on risk?
 5        A.   Based on risk.
 6        Q.   Okay.  And, so, in 2013, if I'm
 7   reading this right, 103 such audits were
 8   performed of customers throughout the
 9   U.S.?
10        A.   Mm-hm.
11        Q.   Yes?
12        A.   Yes.
13        Q.   And in 2016, 120 DEA audits
14   performed by Henry Schein within your
15   department were performed throughout the
16   United States?
17        A.   Yes.
18        Q.   And, obviously, that would
19   include the State of Ohio, where we are in
20   this litigation?
21        A.   It would include.  Whether it's
22   true or not for Ohio, I can't say.
23        Q.   To find out which are from Ohio
24   and which are from others, there is a way
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      to search that information, correct?
 2          A.    Yes.
 3          Q.    And, is that in the JDE?
 4          A.    It would be in the share --
 5      share drive.
 6          Q.    Share drive?
 7          A.    Yeah.
 8          Q.    Okay.
 9          A.    All the reports would be in
10      there.
11          Q.    Do you know how far that --
12      those reports go back?
13          A.    I do not.
14          Q.    Did you do anything to educate
15      yourself at all, before we take a break,
16      about Ohio-specific actions taken,
17      investigations, audits in preparation for
18      today?
19          A.    I did not.
20              MR. MIGLIORI:  Okay.  Let's take
21      a break and see if I can get my voice
22      back.
23              THE VIDEOGRAPHER:  All right.
24      The time is 10:29 a.m.
```

```
 1                 Going off the record.
 2                 (Recess taken.)
 3                 THE VIDEOGRAPHER:  We are back
 4        on the record.
 5                 The time is 10:48 a.m.
 6                 MR. MIGLIORI:  I appreciate the
 7        education you gave me on the systems
 8        of the company.  I want to take a step
 9        back and talk about opioids
10        specifically and your obligations on
11        opioids.
12                 Let me show you Exhibit
13        Number 5.
14                 (Peacock Exhibit 5, Title 21
15        United States Code Annotated Section
16        801, was marked for identification, as
17        of this date.)
18    BY MR. MIGLIORI:
19        Q.   As the vice-president of, among
20    other things, Regulatory Affairs, you
21    agree with me that it's within your
22    department ultimately that you are
23    responsible for compliance with the
24    Controlled Substance Act, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. And Congress made certain |
| 3 | findings about controlled substances, like |
| 4 | opioids. |
| 5 | Have you ever seen these before? |
| 6 | MR. McDONALD: In this form? |
| 7 | MR. MIGLIORI: And I'm referring |
| 8 | to Exhibit 5 is the -- is the direct |
| 9 | Congress findings in the Controlled |
| 10 | Substance Act relative to controlled |
| 11 | substances. |
| 12 | A. I have not. |
| 13 | Q. Let's see if you understand that |
| 14 | this is part of your charge and |
| 15 | responsibility within Regulatory Affairs |
| 16 | at Henry Schein. |
| 17 | It says Congress -- |
| 18 | MS. BORSAY: I'm sorry to |
| 19 | interrupt. This is Casteel Borsy with |
| 20 | Jones Day on the phone. |
| 21 | I'm having a really difficult |
| 22 | time hearing the questions now. I |
| 23 | could hear them before the break. So |
| 24 | I don't know if you moved or don't |

1      have a microphone.

2           MR. MIGLIORI:  As I was saying

3   at the break, I developed a cold and

4   my voice is starting to fade.

5           So, I will try to talk louder,

6   but it -- I feel like I'm screaming.

7   But I'll keep -- there's no way to

8   move the phone.  The microphones are

9   built into the table.

10          MS. BORSAY:  Okay.  Thank you.

11          MR. MIGLIORI:  But I'll do my

12  best.

13  BY MR. MIGLIORI:

14     Q.   It says:  Congress makes the

15  following findings.  Many of the drugs

16  included within the subchapter have a

17  useful and legitimate medical purpose and

18  are necessary to maintain the health and

19  general welfare of the American people.

20          You understand that to be true

21  for controlled substances?

22     A.   Yes, sir.

23     Q.   The illegal importation,

24  manufacture, distribution or possession of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    improper use of controlled substances have

 2    a substantial and detrimental effect on

 3    the health and general welfare of the

 4    American people.

 5               Do you agree with that

 6    statement?

 7        A.    I do.

 8        Q.    Do you believe today that we are

 9    in an epidemic with respect to the abuse

10    and misuse of opioids?

11        A.    I --

12               MR. McDONALD:  Object to the

13        form.

14               Go ahead.

15        A.    I do.

16        Q.    We talked about this a little

17    earlier, but controlled substances have a

18    schedule.  Schedule II opioids are, A, the

19    drug or other substance -- are classified

20    as this:  The drug or other substance has

21    a high potential for abuse.

22               You understand that to be true

23    for opioids, correct?

24        A.    That's correct.
```

```
 1      Q.    The drug or other substance has
 2   a currently accepted medical use in
 3   treatment in the United States or
 4   currently accepted medical use with severe
 5   restrictions.
 6            Do you appreciate that?  Do you
 7   agree with that?
 8      A.    Accepted medical use, yes.
 9      Q.    And that there are severe
10   restrictions on that use, correct?
11            MR. McDONALD:  Object to the
12      form.
13            If you know, tell him.
14      A.    In terms of -- not -- I don't --
15   I'm not following what it says.
16      Q.    That there are severe
17   restrictions placed on the use of --
18      A.    In the ability to acquire them?
19      Q.    And distribute them.
20      A.    Yep.  Yes.
21      Q.    Okay.  The abuse of the drug or
22   other substance may lead to severe
23   psychological or physical dependence.
24            Do you understand that to be
```

```
 1   part of the classification of a Schedule
 2   II drug?
 3        A.    Yes, sir.
 4        Q.    Is there somebody at Henry
 5   Schein that is specifically tasked with
 6   overseeing the compliance with Schedule II
 7   controlled substances, or is that a
 8   general obligation within your department,
 9   of all people that work for you?
10        A.    In the Regulatory Department,
11   it's general.
12        Q.    And you understand that you have
13   a registration that is given by the
14   attorney general of the United States to
15   distribute Schedule II controlled
16   substances which requires you to be in
17   compliance with the Controlled Substances
18   Act, correct?
19        A.    That is correct.
20        Q.    And that failure to comply with
21   the Controlled Substances Act could cause,
22   among other things, the suspension or
23   revocation of that DEA registration,
24   correct?
```

1  A.    Correct.

2  Q.    And part of that obligation of
3  Henry Schein is to maintain an effective
4  control against diversion of particular
5  controlled substances into other than
6  legitimate medical, scientific and
7  industrial channels.

8        Do you understand that to be
9  Henry Schein's obligation as a DEA
10 registrant?

11 A.    Yes, sir.

12 Q.    In carrying out that obligation,
13 do you understand that there's a specific
14 provision of the Controlled Substance Act,
15 this is Exhibit Number 6, that requires
16 Henry Schein, as a DEA registrant, to
17 design and operate a system to disclose to
18 the registrant suspicious orders of
19 controlled substances?

20       Do you understand that is the
21 obligation of Henry Schein to design and
22 operate that system?

23 A.    Yes, sir.

24       (Peacock Exhibit 6, Title 21

1      Code of Federal Regulations Section

2      1301.74, was marked for

3      identification, as of this date.)

4  BY MR. MIGLIORI:

5    Q.  (Reading)  The registrant shall

6  inform the field office -- field division

7  office of the administration in his area

8  of suspicious orders when discovered by

9  the registrant.

10      Do you understand that

11  suspicious orders are to be, and have been

12  since 1971, reported to the DEA field

13  office when they are discovered?

14      MR. McDONALD:  Object to the

15    form.

16    A.  Yes, sir.

17    Q.  (Reading)  Suspicious orders

18  include orders of unusual size, orders

19  deviating substantially from a normal

20  pattern, and orders of unusual frequency.

21      Do you understand that to be, in

22  part, the definition of a suspicious

23  order?

24      MR. McDONALD:  Object to the

1       form.

2       A.    I do.

3       Q.    So, an order that deviates from
4  a prior order in size, in pattern, or in
5  frequency, by this definition, is presumed
6  suspicious until determined otherwise,
7  correct?

8             MR. McDONALD:  Object to the
9       form.

10      A.    Yes.  Yes.

11      Q.    In your review of the historical
12 suspicious ordering monitoring programs of
13 Henry Schein, did you ever learn that the
14 suspicious order monitoring program
15 through 2009, at least, did not measure
16 deviations in frequency or pattern?  Did
17 you ever learn that fact?

18      A.    I did not.

19      Q.    Okay.

20      A.    I had no understanding, no.

21      Q.    And, to the extent that that is
22 true or not, that is something you leave
23 to those that were there at the time,
24 correct?

1    A.    I would have to investigate.
2    Can't really make a determination, sir.
3    Q.    I guess my question is more
4    simple then.  You're not the person to
5    either refute that or affirm that
6    statement, correct?
7    A.    That's correct.
8    Q.    Are you aware that in Ohio, in
9    searching for suspicious orders in this
10   case, Henry Schein represented and
11   represents that it found no suspicious
12   orders reported to the DEA from 2009 to
13   the present, that is during the period of
14   time that it had transactional
15   information?
16        MR. McDONALD:  Object to the
17   form; mischaracterizes and misstates
18   the assertions of Henry Schein in this
19   case.
20   BY MR. MIGLIORI:
21   Q.    Were you aware of that?
22        MR. McDONALD:  Object.  Same
23   objection.
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MIGLIORI:
 2        Q.    You can answer.
 3        A.    Could you reclarify or restate,
 4    please?
 5              I'm sorry.
 6        Q.    Were you asked to help prepare
 7    answers to interrogatories in this case,
 8    or provide information so that the company
 9    could respond to written questions in this
10    case?
11        A.    No, I was not.
12        Q.    Did you review yesterday any of
13    the written responses of the company in
14    this case?
15        A.    No, I did not.
16        Q.    Did they show you that Henry
17    Schein has not produced any suspicious
18    orders for Ohio in this case?
19        A.    No, they had not.
20        Q.    Does it surprise you that there
21    are no suspicious orders reported to the
22    DEA by Henry Schein in this case?
23              MR. McDONALD:  Object to the
24        form.
```

```
 1         A.    I would have to see what the
 2   ordering patterns are, how much the
 3   volumes were.  There's no way I could make
 4   a determination just without any
 5   information, sir.
 6         Q.    You would agree with me that if
 7   there were no suspicious orders for Ohio
 8   from 2009 to present, it would mean that
 9   there were no orders that deviated in
10   size, frequency, or pattern, by
11   definition, correct?
12               MR. McDONALD:  Object to the
13      form.
14         A.    So, I think, you know, I'd have
15   to understand what the -- what the scope
16   of this, you know, question is.
17               So, if we looked at sales
18   volumes, numbers, et cetera, what's the
19   practices are there, what's the percentage
20   of our total sales, et cetera, I'd be
21   better apt to answer that question.
22         Q.    Fair enough.  But I'm not asking
23   you about reporting.
24               I'm just simply saying that if
```