# EXHIBIT 73

```
 1            UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL            )   MDL No. 2804
     PRESCRIPTION OPIATE        )
 4   LITIGATION,                )   Case No.
                                )   1:17-MD-2804
 5                              )
     THIS DOCUMENT RELATES TO   )   Hon. Dan A.
 6   ALL CASES                  )   Polster
                                )
 7

 8                     — — —
 9            Tuesday, January 22, 2019

                       — — —
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                CONFIDENTIALITY REVIEW

                       — — —
12

13

14

15        Videotaped 30(b)(6) Deposition of
     Walmart, through the testimony of Susanne
16   Hiland, held at 4206 South J.B. Hunt Drive,
     Rogers, Arkansas, commencing at 8:22 a.m., on
17   the above date, before Debra A. Dibble,
     Certified Court Reporter, Registered
18   Diplomate Reporter, Certified Realtime
     Captioner, Certified Realtime Reporter and
19   Notary Public.
20

                       — — —
21

22

23          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | fax 917.591.5672
24                deps@golkow.com

25
```

```
 1            decision.  If you're asking about
 2            another Masters decision, please
 3            clarify for the record so there's no
 4            confusion.
 5       Q.       (BY MR. BOWER)  Do you agree
 6  that Walmart was aware of the DEA case
 7  against Masters prior to 2017?
 8               MS. TABACCHI:  This is beyond
 9            the scope of the notice.  The witness
10            can testify in her individual
11            capacity.
12               THE WITNESS:  I see the
13            information in this email exchange.
14       Q.       (BY MR. BOWER)  And are you
15  aware that -- strike that.
16               During this time period, was
17  Walmart a member of the NACDS?
18               MS. TABACCHI:  Object to the
19            form.
20               THE WITNESS:  Yes.
21       Q.       (BY MR. BOWER)  Are you aware
22  that sometime in between September of 2015
23  and the time frame of the Masters decision,
24  NACDS submitted an amicus brief in the
```

```
 1    Masters case?
 2              MS. TABACCHI:  Object to the
 3         form.
 4              THE WITNESS:  We weren't party
 5         to the amicus brief.
 6         Q.   (BY MR. BOWER) That wasn't my
 7    question.  Can you -- I'll read back my
 8    question.  Okay?
 9              Are you aware that sometime
10    between September of 2015 and the time frame
11    of the Masters decision in 2017, that the
12    NACDS submitted an amicus brief in the
13    Masters case?
14              MS. TABACCHI:  I'm just going
15         to caution the witness not to reveal
16         the substance of communications with
17         counsel.  If you are aware of the
18         answer to Ms. Bower's question without
19         having discussed that with counsel,
20         you may answer.
21              THE WITNESS:  I'm a member of
22         the NACDS Policy Council.  And so
23         there may have been communication
24         about the Masters decision.  I don't
```

```
 1           know the specifics around that
 2           communication.
 3              Q.    (BY MR. BOWER)  As a member of
 4      the policy -- when were you a member of the
 5      policy council for NACDS?
 6              A.    2007 to present.
 7              Q.    As a member of the policy
 8      counsel, would you not have reviewed amicus
 9      briefs submitted in connection with
10      suspicious order monitoring?
11                   MS. TABACCHI:  Object to the
12           form.
13                   THE WITNESS:  No.  That was --
14           there were other groups, and there was
15           a group -- a legal group that reviewed
16           and worked on amicus briefs, and I was
17           not a -- I was not a member of that.
18              Q.    (BY MR. BOWER)  Was anyone from
19      Walmart aware that the NACDS would be
20      submitting an amicus brief in the Masters
21      case prior to its submission?
22                   MS. TABACCHI:  Object to the
23           form.  Beyond the scope.
24                   THE WITNESS:  Through
```

Highly Confidential - Subject to Further Confidentiality Review

    1              communication in policy council, it
    2              may have -- it may have come up as a
    3              topic.  It likely did come up.  I
    4              don't have recollection of the timing
    5              or the details of that information.
    6         Q.     (BY MR. BOWER)  Would you agree
    7    that Walmart made changes to its suspicious
    8    order monitoring program after the Masters
    9    decision came out in 2017?
   10              MS. TABACCHI:  Object to the
   11         form.
   12              THE WITNESS:  The changes that
   13         we made were how we reported the
   14         orders that we were reviewing.
   15         Q.     (BY MR. BOWER)  Would you agree
   16    that Walmart began reporting more orders as a
   17    result of Masters Pharmaceutical's decision?
   18              MS. TABACCHI:  Object to the
   19         form.
   20              THE WITNESS:  We reported
   21         orders of interest, and that was at a
   22         rate that was higher than -- we had --
   23         we had not previously been reporting
   24         orders of interest before due

```
 1            diligence was applied to those orders.
 2                  MR. BOWER:  Why don't we take a
 3       quick break.
 4                  MS. TABACCHI:  Sure.
 5                  MR. BOWER:  We can be quick, if
 6       you want.  I don't know how long you
 7       need.
 8                  THE VIDEOGRAPHER:  3:00 p.m.
 9       We are off the video record.
10                  (Recess taken, 3:00 p.m. to
11       3:22 p.m.)
12                  THE VIDEOGRAPHER:  3:22.  We
13       are on the video record.
14       Q.    (BY MR. BOWER)  We are back on
15   the record.  Let me hand you what is marked
16   as Exhibit 10, which is a copy of the Masters
17   decision.  Take a moment to review it, but I
18   assume you're familiar with that decision;
19   correct?
20                  MS. TABACCHI:  Just have her
21       look at it, please.
22                  (Whereupon, Deposition Exhibit
23       Walmart 10, Masters decision, was
24       marked for identification.)
```

```
 1                MS. TABACCHI:  I did review the
 2        decision in preparation.
 3        Q.      (BY MR. BOWER) Do you have a
 4   copy of the decision in the binder you
 5   brought with you today?
 6        A.      Yes.
 7        Q.      Does the copy that you have in
 8   the binder have a Bates number on it?
 9        A.      It does not.  It's one that I
10   printed.
11        Q.      So I know there was
12   representation made that --
13                MS. TABACCHI:  That would be
14        the one exception, something from a
15        public record.
16                MR. BOWER:  No, that's fine.
17                MS. TABACCHI:  I thought of
18        that when she mentioned she had it.
19        Otherwise, I'm not aware of anything
20        else.  It's either produced or in the
21        public record.  There was nothing
22        else.
23                MR. BOWER:  Thank you for that.
24        Q.      (BY MR. BOWER)  So I want to
```

Highly Confidential - Subject to Further Confidentiality Review

 1   have -- I have a few questions on the
 2   decision.  Feel free to review the one in the
 3   binder or the one I've given you.  They
 4   should be identical.
 5        A.   I believe they're identical.
 6        Q.   Did you review this decision in
 7   preparation for your testimony today?
 8        A.   Yes.
 9        Q.   And did the folks at Walmart
10   review the decision when it was issued?
11             MS. TABACCHI:  Object to the
12        form.  Beyond the scope.
13             THE WITNESS:  Based on
14        communication and changes that were
15        applied to how we reported orders of
16        interest, the answer is yes.
17        Q.   (BY MR. BOWER)  So if you just
18   turn -- look at the first page of the
19   Masters, right at the beginning there under
20   the opinion -- are you with me there?
21             The Court notes that -- about
22   two sentences down, that "Over the past two
23   decades, DEA has been battling a steep
24   increase in prescription opioid abuse, a

```
 1    problem DEA views as epidemic."
 2              Do you see that?
 3              MS. TABACCHI:  I'm sorry, Zach.
 4        I don't see where you are.
 5              MR. BOWER:  Sorry.  Just on the
 6        first page, bottom right-hand corner,
 7        about the middle of that paragraph,
 8        right under "Opinion."
 9              MS. TABACCHI:  The Court
10        notes -- oh, "The Court notes."  Those
11        are your words.
12              MR. BOWER:  Those are my words.
13              MS. TABACCHI:  I'm trying to
14        find the Court notes.
15              MR. BOWER:  Sorry about that.
16              MS. TABACCHI:  Can you do that
17        again?
18              MR. BOWER:  Sure.
19        Q.    (BY MR. BOWER) The language in
20   the opinion reads, "Over the past two
21   decades, DEA has been battling a steep
22   increase in prescription opioid abuse, a
23   problem that DEA views as an epidemic."
24              Do you see that?
```

```
 1        A.    Yes.
 2        Q.    Does Walmart have a similar
 3   feeling that there's been an opioid epidemic
 4   for the past two decades?
 5              MS. TABACCHI:  Object to the
 6        form.  Beyond the scope.
 7              THE WITNESS:  We are aware of
 8        the issues, the health issues related
 9        to the opioid crisis, epidemic,
10        however it's referred to in ...
11        Q.    (BY MR. BOWER) And does Walmart
12   disagree that the crisis has been going on
13   for approximately two decades?
14              MS. TABACCHI:  Object to the
15        form.  Beyond the scope of the notice.
16              The witness can testify in her
17        individual capacity, not on behalf of
18        Walmart, as to this particular
19        question.
20              THE WITNESS:  So I know that
21        there have been issues with controlled
22        substances, diversion, and misuse over
23        a period of -- a long period of time.
24        Q.    (BY MR. BOWER)  And indeed,
```

```
 1     would you disagree that Walmart has been in
 2     conferences and meetings where those issues
 3     were discussed over a long period of time?
 4               MS. TABACCHI:  Object to the
 5          form.  Beyond the scope.
 6               THE WITNESS:  The time period,
 7          I don't know.  Certainly we've
 8          attended meetings where opioid issues
 9          have been discussed.
10          Q.   (BY MR. BOWER)  And you've
11     attended meetings, for example, of the NACDS
12     where opioid issues were discussed; correct?
13          A.   Correct.
14          Q.   Have you attended other
15     meetings where opioid issues were discussed?
16               MS. TABACCHI:  Is the "you" now
17          Susanne Hiland?
18               MR. BOWER:  Yeah.
19               THE WITNESS:  Yes.
20          Q.   (BY MR. BOWER) And have folks
21     from Walmart in addition to yourself attended
22     meetings where opioids were discussed?
23               MS. TABACCHI:  Object to the
24          form.  Beyond the scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  Yes.
 2         Q.    (BY MR. BOWER)  Do you know how
 3   long Walmart has been a member of NACDS?
 4         A.    My knowledge is that it has
 5   been at least since the early 2000s.
 6         Q.    Okay.  All right.  So I just
 7   have a couple questions, then, on the
 8   language of the opinion here.
 9               If you could turn to page 2.
10   I'm looking at the right-hand column there.
11   The paragraph beginning "Whereas here."
12               Do you see that?
13         A.    I see that.
14         Q.    About halfway there, the Court
15   describes the reporting requirement.
16               Do you see that?
17         A.    Yes.
18         Q.    Okay.  At the time of this
19   opinion, was Walmart familiar with the
20   reporting requirement?
21               MS. TABACCHI:  Object to the
22         form.  Beyond the scope.
23               THE WITNESS:  Our understanding
24         was that we would -- in our policy,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        was that we would report orders deemed
 2        suspicious to the DEA.
 3             Q.    (BY MR. BOWER)  And at the time
 4   of this opinion, did Walmart's policies
 5   reflect that the reporting required was a
 6   relatively modest one?
 7             MS. TABACCHI:  Object to the
 8        form.  Beyond the scope of the notice.
 9             THE WITNESS:  I don't know that
10        we gauged the modesty of the
11        requirement.
12             Q.    (BY MR. BOWER)  Well, do you
13   agree here that the Court is stating that the
14   reporting requirement is a relatively modest
15   one?
16             MS. TABACCHI:  Object to the
17        form.  Beyond the scope.
18             THE WITNESS:  I see that
19        represented here.
20             Q.    (BY MR. BOWER)  And, in fact,
21   after Walmart saw this representation, it
22   changed the way it reported its orders; is
23   that correct?
24             MS. TABACCHI:  Object to the
```

```
 1            form.
 2                 THE WITNESS:  After the Masters
 3            decision, we did begin reporting
 4            orders of interest before we conducted
 5            due diligence.
 6       Q.   (BY MR. BOWER)  And Walmart
 7  changed the way it reported its orders
 8  because it hadn't been reflecting that the
 9  reporting requirement was a relatively modest
10  one; isn't that correct?
11                 MS. TABACCHI:  Oh, object to
12            the form.
13                 Could you please read that
14            back?
15                 MR. BOWER:  I'll rephrase.
16       Q.   (BY MR. BOWER)  After the
17  Masters decision came down, Walmart changed
18  the way it reported orders of controlled
19  substances because its prior program did not
20  reflect that the reporting requirement was a
21  modest one, did it?
22                 MS. TABACCHI:  Object to the
23            form.  Beyond the scope.
24                 THE WITNESS:  We reported
```

```
 1              orders that were deemed suspicious,
 2              which was -- was the process that we
 3              had in place pre-Masters.
 4         Q.   (BY MR. BOWER)  And what do you
 5    mean by "deemed suspicious"?
 6         A.   After conducting due diligence
 7    on an order of interest, if we could not
 8    clear all red flags associated with that
 9    order of interest, it was deemed suspicious
10    and then reported to the DEA and not shipped.
11         Q.   So prior to Masters, in order
12    for an order to be reported to the DEA,
13    Walmart would have not cleared all red flags
14    in connection with that order; is that
15    correct?
16              MS. TABACCHI:  Object to the
17         form.
18              THE WITNESS:  That's not
19         correct.  I think that's -- that's an
20         incorrect statement.
21         Q.   (BY MR. BOWER) Okay.  How would
22    you correct that statement?
23         A.   The accurate statement is that
24    prior to Masters, Walmart would report orders
```

1      that were identified as suspicious orders to

2      the DEA.

3           Q.    And how would Walmart determine

4      whether an order was a suspicious order prior

5      to Masters?

6                 MS. TABACCHI:  Object to the

7           form.  Asked and answered.

8                 THE WITNESS:  We would review

9           the orders of interest, conduct due

10          diligence on those orders of interest,

11          identify -- having identified red

12          flags that caused it to be an order of

13          interest, and -- and then, if those

14          red flags could not be satisfied, it

15          would be considered a suspicious

16          order, not shipped, and reported to

17          the DEA.

18          Q.    (BY MR. BOWER)  And indeed

19     those orders of interest that you were

20     reviewing were flagged, or otherwise

21     identified, because they were, for example,

22     of unusual size; isn't that correct?

23                MS. TABACCHI:  Object to the

24          form.  Beyond the scope.

```
 1            THE WITNESS:  They may have
 2        been flagged for the reason of size.
 3        Q.    (BY MR. BOWER)  They were
 4   flagged because they were unusual size.
 5            Would you agree with that?
 6            MS. TABACCHI:  Object to the
 7        form.
 8            THE WITNESS:  They may have
 9        been flagged because they hit an
10        established threshold.  And, in fact,
11        that threshold, as I testified
12        earlier, sometimes was adjusted
13        because that threshold was not an
14        unusual size.  It was something that
15        was validated for that location, and
16        those -- and the threshold was then
17        adjusted because it was not unusual.
18        Q.    (BY MR. BOWER)  So is it your
19   testimony that if a threshold was not
20   adjusted and an order was flagged, that that
21   order would have been an unusual size?
22            MS. TABACCHI:  Object to the
23        form.
24            THE WITNESS:  No.  I was just
```