EXHIBIT 74

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5

    IN RE NATIONAL PRESCRIPTION   | Case No. 17-MD-2804

 6                                |

    OPIATE LITIGATION             | Hon. Dan A. Polster

 7                                |

    APPLIES TO ALL CASES          |

 8

 9                        - - -

10             Thursday, November 15, 2018

11                        - - -

12

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13

                   CONFIDENTIALITY REVIEW

14

                          - - -

15

16

17

         Videotaped deposition of JEFF ABERNATHY,

18    held at the offices of Mitchell Williams,

      4206 South J.B. Hunt Drive, Suite 200, Rogers,

19    Arkansas, commencing at 9:37 a.m., on the above

      date, before Susan D. Wasilewski, Registered

20    Professional Reporter, Certified Realtime

      Reporter and Certified Realtime Captioner.

21

22

23                        - - -

24            GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

1    is that the folks under this "Vault Input" were

2    responsible for reviewing 222 reports and

3    determining whether the orders were high; is that

4    correct?

5         MR. MAZZA:  Object as to form.

6    A.   They looked at the orders, and they alerted

7    us if something seemed a little high.  I don't -- I

8    mean, that -- I mean, that's what they did as far

9    as -- that was just something that they did.  It

10   was --

11   Q.   Okay.  Well, do you know how they were

12   supposed to determine whether something was high?

13   Were there any written policies or procedures at

14   that time?

15   A.   As far as quantity or something, I don't

16   think so.  If they saw something that most all other

17   stores was getting, you know, 10 bottles or whatever

18   it may be and they saw something that was, you know,

19   a whole lot higher than that, they may say, "Hey,

20   this looks a little strange," or -- so --

21   Q.   And who would they say that to?

22   A.   It would -- mostly it was Sharon; or if I

23   was around, she -- they would tell us --

24   Q.   Okay.

25   A.   -- and tell me, tell a member of management.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And this is in 2007, correct?

 2        A.    Uh-huh.

 3        Q.    And what would happen if they told you that

 4   an order looked high?  What would you do?

 5        A.    Typically, I'd go call the store and ask

 6   them, "Hey, I saw this order, is this correct?  Is

 7   this what you wanted," or --

 8        Q.    And then what would happen?

 9        A.    Just listen to what they said.  A lot of

10   times it was -- and I would say more times than not

11   it was that they were ordering by the pill rather

12   than the bottle a lot of times.  They would get

13   confused in that.  So they may only want, you know,

14   a bottle of 100, they may want 100 pills, so they

15   would input 100, when really they just wanted one

16   bottle.  So, you know, we would see stuff like that.

17        Q.    And if that happened, what would you do?

18        A.    I would talk to the pharmacist and confirm

19   the order.  And if that's what the reasoning was,

20   and he said, "No, I don't want that many, this is

21   what I wanted," then we would correct that order.

22        Q.    And what do you mean you "would correct the

23   order"?

24        A.    Well, we would --

25        Q.    Would you cut the order?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yeah, we'd cut it to what he wanted.

 2           MR. MAZZA:  Objection to form.

 3      Q.   Okay.  Would you report that order to the

 4  DEA?

 5      A.   I didn't report it to the DEA.

 6      Q.   Did anybody report it to the DEA?

 7      A.   I don't know.

 8      Q.   Well, who would know that?

 9      A.   I mean, I don't know.

10      Q.   Sir, you were the operations manager for

11  this DC, right?

12      A.   Yes, sir.

13      Q.   Okay.  You don't know who would have

14  reported it?

15      A.   I don't know.

16      Q.   Do you know whether it was reported?

17      A.   I don't know if it was reported.

18      Q.   Do you have any reason to believe that it

19  was reported?

20      A.   I don't know if it was reported.  I didn't

21  report it, so I don't know what happened to it after

22  that.

23      Q.   Do you have any reason to believe that it

24  was reported?

25      A.   I -- I can't answer that question because I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    don't know.

 2        Q.   Have you ever seen a report to the DEA made

 3    by Walmart of an order that was cut?

 4        A.   I've never -- no, because I've never

 5    reported anything to the DEA.

 6        Q.   Do you know whether anyone at Walmart has

 7    ever reported anything to the DEA?

 8        A.   I know that our home office, Health &

 9    Wellness Logistics staff, they do report stuff to

10    the home office; but I don't know what they report,

11    but I do know they are in communication with them.

12        Q.   Sir, I just want to make sure your answer is

13    clear for the record.  You said, "I know that our

14    home office, Health & Wellness Logistics staff, they

15    do report stuff to the home office."

16             Do you mean they do report stuff to the DEA?

17        A.   I'm sorry.  Can you repeat that?

18             MR. BOWER:  Can you just --

19             THE COURT REPORTER:  Sure.

20             MR. BOWER:  -- read back my question, I

21    guess?

22             THE COURT REPORTER:  I'll read it a little

23    bit slower.

24             MR. BOWER:  I warned you.  I apologize.

25             (Discussion off the record.)
```

 1          THE COURT REPORTER:  Do you want his answer

 2     or his question -- your question?

 3          MR. BOWER:  Just read his answer back and --

 4          THE COURT REPORTER:  Okay.

 5          MR. BOWER:  -- just make sure.  See if he

 6     wants to clarify that for the record.

 7          THE COURT REPORTER:  Okay.

 8          (The answer was read by the reporter.)

 9     A.   I mean --

10  BY MR. BOWER:

11     Q.   Is that an accurate statement, sir?

12     A.   That's accurate.

13     Q.   So the home office Health & Wellness

14  Logistics staffs, they report the stuff to the home

15  office?

16     A.   To -- I think -- I'm confused because you

17  said that they -- do they report stuff to the home

18  office.

19     Q.   That's your testimony, sir.  Is that

20  accurate?

21     A.   Our Health & Wellness Logistics home office

22  team reports -- I know that they report stuff to the

23  DEA, but I don't think that's what you said, though.

24  You said does that team report to the home office.

25     Q.   I think the record is clear now, so I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    appreciate that.

 2        A.   Okay.

 3        Q.   How do you know that they report stuff to

 4    the DEA?

 5        A.   I -- I mean I know that they are in

 6    communication with them.  I thought that's what they

 7    were doing.

 8        Q.   And how do you know that?

 9        A.   Just if we have questions about stuff and we

10    call and ask them, they would say, "Well, let me get

11    with someone at the DEA and ask," so --

12        Q.   Well, my question is on reporting, sir.

13        A.   Okay.

14        Q.   Do you know whether anyone at Walmart

15    reports orders that have been cut to the DEA?

16        A.   I don't know who reports to the DEA, if any.

17    I personally don't know.

18        Q.   So the answer to my question is no, you

19    don't know whether Walmart reports those cuts,

20    correct?

21        A.   Correct.

22        Q.   Sir, before we were talking about your

23    discussions with the stores regarding their orders,

24    if you had to call them up.

25             Do you recall that discussion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, sir.

 2      Q.   And one of the reasons you mentioned was

 3   that they may have ordered incorrectly, correct?

 4      A.   Yes, sir.

 5      Q.   Any other reasons that you recall where the

 6   stores would have provided a justification for an

 7   order that required you to call them?

 8      A.   No, sir.  That's the one I remember.  I

 9   mean, I don't -- I mean, there's been thousands of

10   orders.  There may have been other reasons.  That's

11   just the one that happened most commonly.  That's

12   just the one I know of.

13      Q.   So as you sit here today, no other -- you

14   can't recall any other reason why a store would have

15   had an order that required you to call them?

16      A.   No, sir.

17      Q.   And when you say there -- there were

18   thousands of orders; is that correct, sir?

19      A.   (Nodding head.)

20      Q.   How many orders were there per day?

21      A.   What time frame?

22      Q.   In 2007 time frame for C2 controlled

23   substances.

24      A.   At the time -- we serviced all the Walmart

25   facilities at the time.  We serviced each facility
```

Highly Confidential - Subject to Further Confidentiality Review

1    one time a week.  We had a four-day operation, so it

2    was roughly around probably 800 to 900 orders a day.

3        Q.   So there were thousands of orders a week,

4    correct?

5        A.   Yeah.

6        Q.   And these folks on Exhibit 1, under the

7    "Vault" and at "Vault Input" box, those folks were

8    responsible for reviewing all those orders; is that

9    correct?

10       A.   They -- yes.  They pulled the forms and

11   printed the forms for those orders.

12       Q.   Are you aware of any written policies or

13   procedures that they were to use to monitor those

14   orders in 2007?

15       A.   No.

16       Q.   Sir, were you aware that in 2007, the nation

17   was undergoing an opioid epidemic?

18       A.   No, sir.

19       Q.   And when did you -- are you -- as you sit

20   here today, are you aware that the nation is

21   undergoing an opioid epidemic?

22       A.   I mean, yes, from what I've seen on TV.

23       Q.   Okay.  When was the first time you became

24   aware of it?

25       A.   I don't -- I don't know a date.  I mean --

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Approximately?

2        A.    Probably a year or so ago.

3        Q.    Of 2017?

4        A.    2016, like during the campaigns for

5   presidency, you know, it seems like it came up.

6        Q.    You never -- never talked about it at work

7   before that, correct?

8        A.    I mean, no.

9        Q.    Never seen any correspondence from the DEA

10   regarding the opioid epidemic before 2017, correct?

11        A.    No, sir.

12        Q.    Have you -- as you sit here today, have you

13   seen any -- from any government agency regarding the

14   opioid epidemic?

15        A.    No, sir.

16        Q.    And all the opioids prior to April 2008 that

17   were sold at Walmart pharmacies went through 6045,

18   correct?

19        A.    Can you repeat that?  I'm sorry.

20        Q.    Sure.  Is that --

21              MR. BOWER:  Can you read back my question?

22              THE COURT REPORTER:  No.  Sorry.

23              MR. BOWER:  That's fine.

24   BY MR. BOWER:

25        Q.    Sir, prior to April 2018 --
```

```
 1      A.   Okay.

 2      Q.   -- okay, were all the opioids that Walmart

 3   dispensed from its pharmacies distributed by 6045?

 4      A.   No.

 5      Q.   Okay.  Where else would Walmart pharmacies

 6   get opioid products?

 7      A.   The pharmacies could get product from

 8   McKesson and AmerisourceBergen.

 9      Q.   Do you know what time period the pharmacies

10   could get products from McKesson?

11      A.   Since I've been there, they've been able to

12   do that.

13      Q.   Okay.  And is that continuously since --

14   from 2006 through today?

15      A.   Through 2000 --

16           MR. MAZZA:  Object to form.

17           Go ahead.

18      A.   Since 2007, when I was a part of the C2

19   distribution side.

20      Q.   So you don't know what was happening in

21   2006, correct?

22      A.   No.  I was in a different operation.

23      Q.   And the same for AmerisourceBergen, 2007

24   through today?

25      A.   I can't -- I don't know exactly about
```

```
 1    AmerisourceBergen.  I'm not sure -- I know that our

 2    Sam's Clubs get their stuff through

 3    AmerisourceBergen, so --

 4        Q.   Sam's Clubs also get their Controlled 2

 5    substances from 6045, correct?

 6        A.   They -- they switched solely to

 7    AmerisourceBergen, but I can't remember the time

 8    frame that they did that; but prior to that, they

 9    did.

10        Q.   Okay.  Do you remember approximately when

11    they made that switch?

12        A.   I don't.  I don't.

13        Q.   Sir, have you -- what -- strike that.

14             What's your current title, sir?

15        A.   Operations manager.

16        Q.   Have you ever seen a written description of

17    the duties and responsibilities for that position?

18        A.   I mean, to my knowledge, no.  I mean, I

19    don't -- I mean, I don't recall seeing something.

20        Q.   When you took that position, you didn't

21    receive any paperwork stating what the position

22    required and what your -- what the expectations

23    were?

24        A.   It -- I believe on the job description, it

25    was on there.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Did you receive a written job description?

 2      A.   When I took the position, yes, I think it

 3   was part of that.

 4           (Abernathy Exhibit 2 was marked for

 5   identification.)

 6           MR. MAZZA:   Thanks.

 7   BY MR. BOWER:

 8      Q.   Sir, you've been handed what's been marked

 9   as Exhibit 2 for today's deposition.  This is just a

10   two-page exhibit, Bates numbers ending in 12752 and

11   12737.  It appears to be two organizational charts:

12   One for the pharmacy distribution group or division,

13   and one for the Health & Wellness Distribution group

14   or division.

15           Do you see that, sir?

16      A.   Yes, sir.

17      Q.   Have you seen these documents before today?

18      A.   No, sir.

19      Q.   Was there a point in time when you were made

20   aware that you were part of the pharmacy

21   distribution operations at Walmart?

22      A.   I mean, when I applied for the job, I knew

23   that's what I was applying for.

24      Q.   Okay.  So if you compare this Exhibit 2 to

25   Exhibit 1, does the -- did that -- did the
```

 1   organizational structure of 6045 fit within this

 2   larger pharmacy distribution operations, or were

 3   they separate groups, in your mind?

 4          I'm just trying to get a sense of how 6045

 5   fits within this first page of Exhibit 2 here, if at

 6   all?

 7          MR. MAZZA:  Object to form.

 8   A.   Well, this was from 2007, you said, and this

 9   is from 20- -- I mean from 2010.

10   Q.   Correct.  Well, let me ask it a different

11   way if you're having -- if that doesn't make sense

12   in your mind.

13          Were there any changes in the structure of

14   the distribution side of the business between 2007

15   and 2010?

16   A.   2010?  So, I mean, I know that we reported

17   to Tim Harris.  So my boss, Mike, he would report to

18   Tim, so --

19   Q.   Was that also the case in 2007?

20   A.   I'm trying to remember back.  I'm not sure

21   if it's the same in 2007 as it was in 2010.

22   Q.   And what about if you turn to Page 2 of that

23   exhibit, sir, now we're into 2011, do you see the

24   date under "Health & Wellness Distribution" there,

25   "Fourth Quarter 2011"?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, sir.

 2        Q.    Okay.  Do you recall a structural change

 3   during this time period?  And by that, I mean

 4   between 2010 and 2011 where the pharmacy

 5   distribution was in some way changed or reorganized

 6   to Health & Wellness Distribution?

 7        A.    I mean, I don't -- I don't remember any

 8   changes, I mean, structurally.

 9        Q.    There were no changes during this time

10   period that impacted your duties and

11   responsibilities; is that correct?

12        A.    I mean, I don't remember anything.

13        Q.    Let's look -- if you could for me, turn back

14   to the first page of Exhibit 2.  During this time

15   period in 2010, can you identify for us the folks on

16   this page that may have been responsible for

17   suspicious order monitoring for controlled

18   substances?

19        A.    2010.  I'm trying to remember back to 2010.

20        Q.    Well, can you recall generally what the

21   procedure was for suspicious order monitoring in

22   2010 for controlled substances?

23        A.    We -- it was -- it was the same as I had

24   mentioned before.  You know, if we saw an order or

25   something that looked not like the rest of them, we
```

Highly Confidential - Subject to Further Confidentiality Review

1    asked questions about that.

2           I don't know that there was a specific

3    person.  I mean, we just -- I mean, everybody just

4    wanted to make sure that the order was correct.

5        Q.   Well, in 2010, was anyone on this page

6    responsible for reviewing those orders?  Did anyone

7    have that specific responsibility?

8           MR. MAZZA:  Object to form.

9        A.   I mean, no, sir, not specifically do this,

10   no, sir.  We just -- that's just what we did.

11       Q.   And can you describe what you mean when you

12   say "that's just what we did"?  What does that mean?

13       A.   Well, we just -- when we were printing the

14   forms and looking at the orders, we just, like I

15   said, if a quantity stood out that seemed to be not

16   normal or what they perceived as normal, they would

17   report that to one of the managers, and we would

18   call the store and ask about, "Is the order correct?

19       Q.   And we're talking about 700 to 800 orders

20   per day, correct?

21       A.   Yes, sir.

22       Q.   Would you yourself review 700 to 800 orders

23   each day?

24       A.   I personally would not.

25       Q.   Okay.  How many orders would you review?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I didn't review any orders.  I just, if they

2   brought something to me, I went and called the

3   store.

4      Q.   Okay.  And when you say when "they brought

5   something to me," are those people who could have

6   brought them to you reflected on Exhibit 2?

7      A.   "Hourly associates" under the 6045.  I mean,

8   that's who those people were.

9      Q.   Okay.  So during this time period, Walmart

10   had hourly associates reviewing 700 to 800 orders

11   per day for purposes of carrying out its suspicious

12   order monitoring; is that correct?

13      A.   Those associates reviewed those orders.  I

14   mean, if there was something wrong with them, they

15   let us know and we called the store to find out if

16   that was correct.

17      Q.   And how would they let you know?  Would they

18   give you a call?  Would they send you an e-mail?

19   What would they physically do?

20      A.   Typically, it was a pretty small building.

21   They would just come over and just say, "Hey, this

22   doesn't look right," or, "This looks high," or,

23   "Just something about this, can you check on it?"

24          "Yeah.  Sure.  I'll call and find out."

25      Q.   Other than whether something was high or

1    Q.   Well, why don't you take a minute to review

2    it, then, but we'll have some questions on it.  Have

3    you had a chance to review the document, sir?  Are

4    you still looking?

5    A.   Yes, sir.

6    Q.   What does POM stand for?

7    A.   Pharmacy order monitoring.

8    Q.   And this document is titled Health &

9    Wellness Pharmacy Order Monitoring Alerts Guide.  Do

10   you see that?

11   A.   Yes, sir.

12   Q.   And it's dated 3/31/2016?

13   A.   Yes, sir.

14   Q.   Do you have any recollection as to why you

15   prepared this document?

16   A.   I don't know why I prepared it.

17   Q.   Do you, as you sit here today, have any

18   knowledge as to what process or procedure is

19   reflected in this document?

20   A.   I mean, it looks like the steps that were

21   taken for the Reddwerks order alerting, and then it

22   moves into the pharmacy order monitoring process at

23   the home office.

24   Q.   Sir, if you could turn to -- and I

25   apologize, the document doesn't have page numbers,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but the fifth page in the document?

 2            MR. MAZZA:  Including the title page?

 3            MR. BOWER:  Yeah.  It has -- should have

 4    DC/POM at the top.

 5            MR. MAZZA:  Say that again.

 6            MR. INNES:  Fourth page.

 7            MR. BOWER:  Sorry, fourth page?

 8            MR. MAZZA:  DC/POM?

 9            MR. BOWER:  Yeah.  Sorry, I had a cover page

10    on mine.  I apologize.

11    BY MR. BOWER:

12        Q.  Do you see that?  Are you on that page, sir?

13        A.  Yes, sir.

14        Q.  And that page, the first bullet point says:

15    How an order moves through the review process.

16            Do you see that?

17        A.  Yes, sir.

18        Q.  Okay.  So the DC action, if you go on the

19    left, you have the arrow over the order.

20            Do you see that, sir?

21        A.  Yes, sir.

22        Q.  And then:  DC action needed, review flagged

23    orders.

24            Do you see that?

25        A.  Yes, sir.
```

```
 1       Q.   So is it -- is it your recollection that

 2    even during -- even as of March 31st, 2016, the DC

 3    was responsible for reviewing flagged orders?

 4       A.   Yes, sir.

 5       Q.   Okay.  And who at DC6045 was responsible for

 6    doing that in March 2016?

 7       A.   It would have been one of the operations

 8    managers there.  I believe at this time, I had moved

 9    to the home office as part of the pharmacy

10    operation -- Pharmacy Order Monitoring Team, so one

11    of the ops managers would have done that.

12       Q.   And if you look at the first dash under the

13    bullet point, it says:  An order is alerted as being

14    over the weekly threshold.

15            Do you see that?

16            THE COURT REPORTER:  Can you say it again?

17            MR. BOWER:  Sure.

18       Q.   An order is alerted as being over the weekly

19    threshold.

20            Do you see that, sir, right under the first

21    bullet point there at the top?

22       A.   Oh.

23       Q.   Sorry about that.

24       A.   Okay.

25       Q.   Did Walmart at some point change its numeric
```

```
 1    thresholds from daily to weekly?

 2        A.   I believe at some point we did look at a

 3    weekly total.

 4        Q.   Well, was this a policy in place in March

 5    2016?

 6        A.   I believe so.

 7        Q.   All right, sir.  At this point, you were at

 8    the home office, so you were -- had some

 9    responsibility for implementing the policy, correct?

10        A.   I don't understand.

11        Q.   Well, let me -- let me ask it a different

12    way.

13             What were your responsibilities with respect

14    to the monitoring of suspicious orders in March of

15    2016?

16        A.   So once the orders showed up at the DC, and

17    they hit the button to send it to the home office,

18    then that's when I would review those orders.

19        Q.   And during this time period were you

20    responsible for reviewing the orders from DC6045?

21        A.   On some days.  It wasn't my primary

22    responsibility every day.

23        Q.   And other than yourself, who else had that

24    responsibility?

25        A.   Dena McClamroch.  She was on the team, so
```

1    her and I did those in the beginning.  There was,

2    like -- there was a guy that was there.  His name

3    was Justin, but he wasn't there very long after I

4    got there.  So for a majority of the time, it was

5    Dena and I.

6        Q.   Oh, is that Justin Rafiee?

7        A.   Yes, sir.

8        Q.   And during this time period, how would you

9    determine whether it would be Dena or you or Justin

10   to review the orders from 6045?

11       A.   We would alternate the DCs amongst ourself.

12   It was just a -- so on Mondays, you will do these

13   DCs.  On Tuesdays, you'll do these DCs.  And we just

14   rotated those out.

15       Q.   And what criteria would you use to review

16   the orders that were alerted from 6045?

17       A.   Let's see.  Some that I can think of right

18   off the top of my head was we would look at -- my

19   mind went blank.

20            We would look at -- let's see.  I would go

21   back into Archer, which is the application we keyed

22   notes and those types of things into.  One of the

23   things I would do is look to see had that flag --

24   store flagged before, what -- how many times had it

25   flagged.

Highly Confidential - Subject to Further Confidentiality Review

 1          I would go back and run a query to find out,

 2   you know, how many bottles it had ordered over a

 3   four-week period and a twelve-week period.  I

 4   would -- I would call the store, talk to the

 5   pharmacy manager.

 6          Those are some of the things that we did to

 7   review the orders.

 8      Q.   Anything else that you can recall that you

 9   did to review the orders?

10      A.   Right off the top of my head, that's what

11   comes to mind.

12      Q.   Sir, you were one of the three people at

13   Walmart -- Walmart home office to review Schedule II

14   narcotics for the entire country, correct?

15      A.   Yes.

16      Q.   You were reviewing the suspicious orders for

17   opioids, right?

18      A.   For controlled drugs, yes.

19      Q.   Including the opioid -- opioids that were

20   leading to the nationwide epidemic, correct?

21      A.   Yes.

22      Q.   At this point, were you aware of the

23   epidemic, sir?

24      A.   I knew that there was an issue, yes, sir.

25      Q.   What was your understanding of the issue in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    2016?

 2        A.   That there was a -- according to the TV,

 3    that there was an epidemic.

 4        Q.   No one at Walmart was discussing it at this

 5    time?

 6        A.   We -- I don't know discussing it.  We were

 7    definitely trying to make sure that we were

 8    following the policies and procedures and monitor

 9    those.

10        Q.   Sir, while you were at the home office in

11    2016, did you have any written policies or

12    procedures that you referenced when reviewing a

13    suspicious order to determine whether it should be

14    cut?

15        A.   We had some policies and procedures.  I

16    don't know that I referenced them every time I had a

17    review.  I just -- there was a, you know, work

18    process.  Here's what you do.  Here's tools you have

19    available to research that, and --

20        Q.   Is that process reflected in this document?

21    If you go two pages further, it has some with -- the

22    page with the title HO Action Needed.

23             Did you see that?

24        A.   Yes, sir.

25        Q.   Were you a member of the POM Team?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   Yes, sir.

2       Q.   Who were -- who were the other members of

3    the team in 2016?

4       A.   Dena McClamroch and Justin.  I can't

5    pronounce his last name, but he was there.

6       Q.   And it was just you three on the POM Team?

7       A.   Yes.

8       Q.   When was that team formed?

9       A.   I don't -- I don't know when it was formed.

10   I came to it about March of 2016.

11      Q.   Was the team already in existence when you

12   came to it?

13      A.   Yes, sir.

14      Q.   And were those other two individuals already

15   on the team?

16      A.   Yes, sir.

17      Q.   Did you replace anybody?

18      A.   No, sir.

19      Q.   So you mentioned one of the things you would

20   do would -- check Archer to determine whether this

21   store had been flagged in the past, correct?

22      A.   Yes, sir.

23      Q.   What does that mean, whether a store -- a

24   store had been flagged?

25      A.   So we would key every -- for all the stores

Highly Confidential - Subject to Further Confidentiality Review

1    that were flagged, we would go into an application

2    called Archer, and we would key in specific things

3    that -- Archer, you know, asked for information.  We

4    would key that in so that -- to let the store -- or

5    to put in there what we did with that flagged order

6    and what the outcome was, those types of things,

7    just notes about orders that were flagged.

8        Q.   So let me -- let me try to ask it a

9    different way.  What does it mean when a store is

10   flagged?

11       A.   So in the -- in the Reddwerks system,

12   thresholds were set.  Once the store exceeded that

13   threshold, it flagged in the Reddwerks system.

14       Q.   So what do you mean by exceeded the

15   threshold?  Are you talking about something other

16   than oxy-30 orders over 20?

17       A.   Yes.  Whatever thresholds that they set in

18   Reddwerks for that to flag, for each store, for each

19   item.

20       Q.   Other than over 50 orders, and the over

21   30 -- over 20 orders for oxy-30, were there any

22   other thresholds that would cause a store to be

23   flagged?

24       A.   I don't know.  I mean, I didn't set any

25   thresholds.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Well, sir, you were one of the three people

2    for all of Walmart to review suspicious orders,

3    correct?

4    A.   I reviewed the orders that were flagged and

5    sent to me.

6    Q.   And you don't even know under what

7    circumstances a store would be flagged?

8    A.   It was flagged based on the store item and

9    quantity.  That's -- that's what I knew.

10    Q.   But you don't know what items would cause a

11    store to be flagged, correct?

12         MR. MAZZA:  Objection; form.

13    Q.   Well, let me ask a different way.  Do you

14    know what items would cause a store to be flagged?

15    A.   What items?

16    Q.   Just using your words, sir.

17    A.   So a store would flag if it went over a

18    threshold that the system had set.  So it would say,

19    hey, this is over the threshold.  You need to review

20    it.

21    Q.   But you don't know what the threshold was,

22    do you?

23    A.   I don't know what the threshold was.

24    Q.   So you don't know why any particular store

25    was flagged, do you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   I knew it was over whatever the threshold

 2   was, so I knew it was over a quantity amount.

 3       Q.   And when did -- when did Walmart start

 4   flagging orders in -- strike that.

 5            When did Walmart start flagging stores in

 6   Archer?

 7       A.   I don't know -- we didn't flag stores in

 8   Archer.  It was just a -- it was just an application

 9   that was used that we would enter information into.

10       Q.   Well, sir, you went into Archer to determine

11   whether a store was flagged, correct?

12       A.   I went into Archer to find out -- for a

13   store that had been flagged today, I would go back

14   and look to say, oh, well, it flagged last week or

15   the week before or two days ago.  How many times had

16   it flagged.  That's what I was going back into

17   Archer to look --

18       Q.   And when --

19       A.   -- history.

20       Q.   -- did Walmart start flagging stores for

21   exceeding the thresholds?

22       A.   Whenever we rolled out the Reddwerks, the

23   automated Reddwerks system.

24       Q.   Well, we've looked at that, and that was

25   late two thousand -- I mean, strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              That was sometime in 2015, correct?

 2      A.   Yes, sir.

 3      Q.   So in your responsibilities in reviewing

 4   suspicious orders for Walmart, you could only go

 5   back a year to see whether that store had exceeded

 6   its threshold; is that correct?

 7      A.   I mean, yes, sir.  I mean, that's what was

 8   in Archer.

 9      Q.   Did you have any concerns that the store may

10   have been ordering too much for that entire year?

11   Did you ever go -- ask to go back further?

12      A.   No.

13      Q.   Well, we were already epidemic proportions,

14   right, sir?  The country is already in the middle of

15   an epidemic, right?  And you are comparing orders

16   that were already part of the epidemic, correct?

17              MR. MAZZA:  Objection; form.

18      A.   I was reviewing orders following the

19   guidelines, the training, the policy and procedures

20   that were given to me inside that format.

21      Q.   Other than reviewing -- strike that.

22              Other than looking at whether a store had

23   been flagged and how many times it had been

24   flagged -- strike that one.  I apologize.

25              In your capacity and responsibility for
```