# EXHIBIT 75

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL            )   MDL No. 2804
     PRESCRIPTION OPIATE        )
 4   LITIGATION,                )   Case No.
                                )   1:17-MD-2804
 5                              )
     THIS DOCUMENT RELATES TO   )   Hon. Dan A.
 6   ALL CASES                  )   Polster
                                )
 7
 8                       — — —
 9          Wednesday, December 12, 2018
                         — — —
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                CONFIDENTIALITY REVIEW
                         — — —
12
13
14
15         Videotaped Deposition of MIRANDA
     JOHNSON, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 8:51 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
                         — — —
20
                GOLKOW LITIGATION SERVICES
21         877.370.3377 ph | fax 917.591.5672
                    deps@golkow.com
22
23
24
25
```

```
 1           form.
 2                   THE WITNESS:  Yes, I believe
 3           so.
 4           Q.    (BY MR. INNES)  And how long
 5   was the -- strike that.
 6                   After the rollout, was it
 7   ever -- was it discontinued at any point in
 8   time?
 9                   MS. TABACCHI:  Object to the
10           form.
11                   THE WITNESS:  Can you clarify
12           that question?
13                   MR. INNES:  Sure.
14           Q.    (BY MR. INNES)  So you
15   testified that the Reddwerks system as it
16   relates to C-IIs and C-IIIs rolled out to
17   DC 6045 sometime in 2015.
18                   When did it become permanent?
19                   MS. TABACCHI:  Object to the
20           form.
21                   THE WITNESS:  The Reddwerks
22           enhancement rolled to DC 6045 for
23           C-IIs, and then the other DCs during
24           2015 and was in place after that.
25           Q.    (BY MR. INNES)  So it was
```

1  seamless.  From rollout until whenever
2  Reddwerks was ultimately discontinued, there
3  was no break in service, for instance?
4            MS. TABACCHI:  Object to the
5       form.
6            THE WITNESS:  We rolled out in
7       pilot to one DC.  And maybe two -- and
8       we may have had issues in two of them
9       during our pilot phase where we had to
10      pull it back out because things were
11      not working the way we expected.
12      Q.    (BY MR. INNES)  Was 6045 one of
13  those?
14      A.    I do think 6045 had some issues
15  when we first rolled out.  But if my memory
16  serves, by the end of 2015, we were back in
17  6045.
18      Q.    During that break, how were --
19  if they weren't identified -- if orders of
20  interest weren't identified by Reddwerks, how
21  were they identified?
22           MS. TABACCHI:  Object to the
23      form.
24           THE WITNESS:  Just as I
25      mentioned before, Reddwerks still had

```
 1          criteria in place to identify orders,
 2          and then logistics compliance was
 3          involved -- I believe they were
 4          involved in determining whether it was
 5          an order of interest.
 6          Q.    (BY MR. INNES)  Okay.  So
 7   it's -- the break would have been only as to
 8   the enhancements; right?
 9          A.    Correct.
10          Q.    Okay.
11          A.    Correct.
12          Q.    But the prior configurations of
13   Reddwerks would have remained in place?
14          A.    Correct.
15          Q.    And the prior configuration of
16   Reddwerks as it relates to orders of
17   interest, what's your understanding of what
18   that configuration was?
19                MS. TABACCHI:  Object to the
20          form.
21                THE WITNESS:  My understanding
22          was there were criteria in the system
23          to flag orders that were over that
24          criteria.
25          Q.    (BY MR. INNES)  By "criteria,"
```

Highly Confidential - Subject to Further Confidentiality Review

1  do you mean threshold?
2       A.    I believe some of the criteria
3  were what you would consider a threshold, but
4  I think there was another criteria that was a
5  difference from a typical average or
6  something like that.
7       Q.    Okay.  Do you know how the
8  thresholds were determined at that time?
9       A.    I don't.  That was before I was
10 in role.
11      Q.    So part of your
12 responsibilities and the focus as the
13 director of controlled substances was to save
14 a stalled program; is that right?
15            MS. TABACCHI:  Object to the
16      form.
17            THE WITNESS:  My
18      responsibilities were to move forward
19      with the enhancements that we had
20      planned.
21      Q.    (BY MR. INNES)  Okay.  And to
22 determine enhancements, did you have to do an
23 evaluation of what was happening -- oh, I'm
24 sorry -- of what the configuration was at the
25 time?

Golkow Litigation Services                                Page 69

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. TABACCHI:  Object to the
 2        form.
 3                THE WITNESS:  I was not focused
 4        on the current configuration.  I was
 5        focused on what we wanted the
 6        enhancements to be.
 7                MS. TABACCHI:  Michael, when
 8        you get to a good point, can we take a
 9        quick break?
10                MR. INNES:  Sure.  Now is
11        totally fine.
12                VIDEOGRAPHER:  We are going off
13        the record at 10:03 a.m.
14                (Recess taken, 10:03 a.m. to
15        10:29 a.m.)
16                VIDEOGRAPHER:  We are back on
17        the record at 10:29 a.m.
18        Q.    (BY MR. INNES)  We're back, and
19   then I should state for the record, if you
20   need to take a break at any time, let us
21   know.
22        A.    Okay.  Thank you.
23        Q.    So during your tenure as
24   director of controlled substances, we agree
25   that Walmart had policies in place to prevent
```

```
 1    the diversion of Schedule II and Schedule III
 2    drugs; is that right?
 3         A.    Yes.  I'm aware of policies to
 4    do that.
 5         Q.    And in fact you were in charge
 6    of those policies; is that right?
 7               MS. TABACCHI:  Object to the
 8         form.
 9               THE WITNESS:  Not all of the
10         policies.
11         Q.    (BY MR. INNES)  Not all of the
12    policies.  What policies were you in charge
13    of?
14         A.    I was responsible for policies
15    related to the order monitoring program for a
16    period of time.  Also our policies related to
17    prescription monitoring programs and
18    corresponding responsibility.
19         Q.    Corresponding responsibility
20    to?  What is that in reference to?
21         A.    It's a requirement our
22    pharmacists have in evaluating controlled
23    substances prescriptions.
24         Q.    The order monitoring policies,
25    what were those policies?
```

```
 1                MS. TABACCHI:  Object to the
 2        form.
 3                THE WITNESS:  There was one
 4        policy that -- I can't remember the
 5        number off the top of my head.  It was
 6        one that we reviewed earlier.  But I
 7        wasn't responsible for it the entire
 8        time, but there was a portion of the
 9        time that it was -- I was responsible
10        for the policy.
11        Q.     (BY MR. INNES)  And what
12   portion of the time was that?
13        A.     I believe the transition
14   occurred sometime in 2015.
15        Q.     Okay.  And if you -- you said
16   we saw it earlier.  Do you want to take a
17   minute and flip through and see if we can
18   find it?
19        A.     Sure.
20                So it would be the 21.04.02
21   policy.
22        Q.     And which tab is that you're
23   referring to?
24        A.     Because I'm not sure of the
25   timeframe, I'm not sure if it's tab 4 or
```

```
 1    tab 5.
 2         Q.    I can try to help you with
 3    that.
 4               Tab 4 is December 2015 to --
 5    I'm sorry, tab 4 is March 15th to
 6    December 15th.
 7         A.    Because I'm not sure of the
 8    timeframe of when the transition occurred for
 9    me to be responsible for the policies, I'm
10    not sure which one was in effect at that
11    time.
12         Q.    Okay.  So you're aware that
13    during the time period -- well, you were
14    aware that for several decades now, the
15    country has been enduring an opioid epidemic;
16    is that right?
17               MS. TABACCHI:  Object to the
18         form.
19               THE WITNESS:  Can you clarify
20         that.
21         Q.    (BY MR. INNES)  During your
22    time as a controlled substance director, do
23    you agree that the country is enduring an
24    opioid epidemic?
25         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And as part of your
 2   responsibilities as controlled substance
 3   director was to make sure that Walmart
 4   complied with the DEA's regulations; is that
 5   right?
 6                MS. TABACCHI:  Object to the
 7          form.
 8                THE WITNESS:  There are certain
 9          regulations that I was responsible for
10          supporting the compliance program, not
11          all of DEA's regulations.
12          Q.    (BY MR. INNES)  And those
13   regulations that you were responsible for,
14   those related to the distribution of C-IIs
15   and C-IIIs?
16                MS. TABACCHI:  Object to the
17          form.
18                THE WITNESS:  Some of them did,
19          yes.
20          Q.    (BY MR. INNES)  And as you sit
21   here today, you can't recall which policies
22   were in place during that time?
23                MS. TABACCHI:  Object to the
24          form, misstates the testimony.
25                THE WITNESS:  I recall which
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          policies were in place at that time.
 2          I don't recall when I transitioned to
 3          be the one responsible for that
 4          policy, what time that occurred.
 5     Q.   (BY MR. INNES)  Okay.  I mean,
 6  that's a pretty big responsibility; right?
 7  When we're -- taking over the policies that
 8  are directly related to C-IIs and C-IIIs?
 9               MS. TABACCHI:  Object to the
10          form.
11               THE WITNESS:  There was a
12          logistics compliance and practice
13          compliance -- were both involved in
14          the order monitoring process.  At one
15          point in time, logistics compliance
16          was the lead responsible party, and
17          that transitioned to practice
18          compliance being the lead responsible
19          party.
20     Q.   (BY MR. INNES)  But you don't
21  recall when that transition occurred?
22     A.   I don't remember the exact
23  date.
24     Q.   Approximate date?
25     A.   It was generally in 2015
```

```
 1      sometime.
 2           Q.     So when you took that role on,
 3      what did you do?
 4                  MS. TABACCHI:  Object to the
 5           form.
 6                  THE WITNESS:  I don't remember
 7           exactly.  I believe we were still
 8           working on the enhancements to
 9           Reddwerks, so it was continued work on
10           that.
11           Q.     (BY MR. INNES)  What did you do
12      to identify excessive quantities of
13      controlled substances that were ordered in a
14      given period of time?
15                  MS. TABACCHI:  Object to the
16           form.
17                  THE WITNESS:  So we put the
18           Reddwerks enhancements in place to
19           identify orders of interest.
20           Q.     (BY MR. INNES)  Okay.  What
21      were those enhancements?
22           A.     We made adjustments to
23      thresholds for pharmacies, and we allowed a
24      longer timeframe for orders to be evaluated.
25                  We also brought the evaluation
```

```
 1   process to the home office.
 2        Q.    Okay.  So any other
 3   enhancements that were made?
 4             MS. TABACCHI:  Object to the
 5        form.
 6             THE WITNESS:  Nothing I can
 7        think of right now.
 8        Q.    (BY MR. INNES)  Is there
 9   anything that would refresh your recollection
10   as to what enhancements were made?
11             MS. TABACCHI:  Object to the
12        form.
13             THE WITNESS:  I don't know.
14        Q.    (BY MR. INNES)  You stated one
15   of the enhancements was adjustments to the
16   thresholds.  When was that enhancement put in
17   place?
18             MS. TABACCHI:  Object to the
19        form.
20             THE WITNESS:  As we rolled out
21        the Reddwerks upgrade.
22        Q.    (BY MR. INNES)  And when was
23   that?
24        A.    It went into the DCs at various
25   times throughout 2015.
```

```
 1          Q.    When did it go to DC 6045?
 2          A.    I don't remember exactly.
 3          Q.    When you say "adjustments to
 4     thresholds," what exactly does that mean?
 5          A.    The thresholds were more
 6     tailored for specific locations and specific
 7     drugs.
 8          Q.    How did you tailor them to
 9     specific locations?
10                MS. TABACCHI:  Object to the
11          form.
12                THE WITNESS:  There was -- the
13          thresh -- the updated thresholds were
14          developed before I started in role,
15          but my understanding is there was a
16          third party with experience in
17          statistics that developed the process
18          for the thresholds.
19          Q.    (BY MR. INNES)  Okay.  I
20     thought we were -- your earlier testimony was
21     that you were focused on enhancements to
22     thresholds.  Right?
23          A.    (Witness nods.)
24          Q.    That --
25          A.    Yes.  Actually implementing
```

```
 1    those into the system.
 2        Q.    Okay.  So development of
 3    thresholds occurred prior to you taking the
 4    role?
 5              MS. TABACCHI:  Object to the
 6        form.
 7              THE WITNESS:  The -- yes.  The
 8        concept for how thresholds would be
 9        developed in the new version was done
10        before I was in role.
11        Q.    (BY MR. INNES)  And did you
12    have any -- after you came into the role, did
13    you have any input into the adjustment of
14    thresholds?
15              MS. TABACCHI:  Object to the
16        form.
17              THE WITNESS:  Yes.
18        Q.    (BY MR. INNES)  And what was
19    that?
20        A.    There were occasions where we
21    would adjust thresholds based on evaluation
22    of a specific pharmacy and their threshold
23    versus a big drug.
24        Q.    What was -- what went into that
25    evaluation?
```

```
 1                MS. TABACCHI:  Object to the
 2         form.
 3                THE WITNESS:  After a review of
 4         an order, a detailed review of an
 5         order, if a threshold didn't seem to
 6         be correct for that drug, myself and
 7         the senior director of logistics could
 8         decide that a threshold needed to be
 9         modified.
10         Q.    (BY MR. INNES)  What went into
11    that review?
12                MS. TABACCHI:  Object to the
13         form.
14         Q.    (BY MR. INNES)  Exactly what
15    was the review that you did?
16                MS. TABACCHI:  Object to the
17         form.
18                THE WITNESS:  Oh, okay.  We
19         reviewed data from the pharmacy
20         location and then had a discussion to
21         understand whether or not we felt the
22         current threshold was appropriate
23         based on the data.  And if not, then
24         we would make a modification.
25         Q.    (BY MR. INNES)  Okay.  So what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    data were you looking at?
 2              MS. TABACCHI:  Object to the
 3        form.
 4              THE WITNESS:  We looked at
 5        their dispensing data.
 6        Q.    (BY MR. INNES)  Anything else?
 7        A.    I mean, we -- typically we'd
 8    have feedback from the pharmacy about, you
 9    know, why they might need more, and then
10    dispensing data to see if that seemed
11    appropriate.
12        Q.    And "feedback from the
13    pharmacy," what do you mean by that?
14        A.    There were times when we would
15    call the pharmacy or also talk to their
16    market leader and ask questions about the
17    pharmacy and, you know, why there may be a
18    change in dispensing.
19        Q.    A couple of times you've said
20    "We" would call the pharmacy or "we" would do
21    something.  Who are you referring to when you
22    say "we"?
23        A.    There were -- logistics
24    compliance may have been involved and then
25    also our team in practice compliance.
```