# EXHIBIT 77

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____  )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                   FRIDAY, JANUARY 4, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW
11                       - - -
12            Videotaped deposition of Ramona
13    Sullins, held at the offices of JONES DAY, 77
14    West Wacker Drive, Chicago, Illinois,
15    commencing at 7:31 a.m., on the above date,
16    before Carrie A. Campbell, Registered
17    Diplomate Reporter, Certified Realtime
18    Reporter, Illinois, California & Texas
19    Certified Shorthand Reporter, Missouri &
20    Kansas Certified Court Reporter.
21                       - - -
                 GOLKOW LITIGATION SERVICES
22         877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
23
24
25
```

```
 1   together.
 2        Q.    At the time it was your
 3   understanding that the Reddwerks project was
 4   simply -- strike that.
 5              What was your understanding of
 6   why the Reddwerks project was needed during
 7   this time period?
 8        A.    During 2010?
 9        Q.    Yeah.  2011.
10        A.    I'm sorry.  That we needed to
11   put in a threshold order level alert into the
12   system.  That was my understanding.
13        Q.    But you didn't have any
14   understanding as to why that system was
15   needed, correct?
16        A.    Correct.
17        Q.    And indeed that system wasn't
18   limited to Schedule II products, correct?
19        A.    Correct.
20        Q.    And it wasn't limited to
21   Schedule III products, correct?
22        A.    Correct.
23        Q.    It applied to all -- strike
24   that.
25              It applied to all prescription
```

```
 1    products, correct?
 2         A.    It applied to all products.
 3         Q.    When did the rollout of the
 4    C-S-O-S, CSOS, occur?
 5         A.    I think we did a pilot in 2012,
 6    at the end of 2012.
 7         Q.    Was the CSOS specific to 6045?
 8         A.    Yes.
 9         Q.    Do you recall when it was
10    actually put in practice in 6045?
11         A.    2000 -- I'm guessing 2013 if we
12    did it at the end of 2012.
13         Q.    While you were working on CSOS,
14    did you have any understanding as to why
15    Walmart was implementing that process?
16         A.    To go away from the paper 222
17    forms.
18         Q.    And did you have any further
19    understanding as to why Walmart wanted to go
20    away from the paper 222s?
21         A.    No.  We had -- we had old
22    computers that were running the system and
23    old dot matrix printers that were obsolete,
24    and we couldn't find replacements for those,
25    so that was a part of the initiative to move
```

```
 1    to the electronic CSOS.
 2         Q.    And at some point did you
 3    become aware that Walmart -- Walmart
 4    Distribution Center 6045 was running daily
 5    over 20 reports?
 6         A.    I did become aware of it.  I
 7    was -- may have been copied on a couple of
 8    e-mails on that, yeah.
 9         Q.    Sorry.  You said you were
10    copied on a couple of e-mails; is that
11    correct?
12         A.    I don't know how many.  I
13    believe I was -- I had one e-mail or
14    something.
15         Q.    Well, weren't you, in fact, the
16    person to inform the folks at DC 6045 of the
17    new process?
18              MS. FUMERTON:  Objection.
19         Form.
20              THE WITNESS:  I don't recall.
21    QUESTIONS BY MR. BOWER:
22         Q.    You don't recall one way or the
23    other; is that correct?
24         A.    I don't recall informing them.
25         Q.    Do you recall having meetings
```

```
 1   about the process?
 2        A.    No.
 3        Q.    Do you recall discussing the
 4   process with Bart?
 5        A.    No.
 6              (Walmart-Sullins Exhibit 2
 7        marked for identification.)
 8   QUESTIONS BY MR. BOWER:
 9        Q.    Okay.  You've been handed
10   what's been marked as Exhibit 2 to today's
11   deposition.  It's an e-mail -- short e-mail
12   chain to yourself and others in July of 2012.
13              Let me know when you've had a
14   chance to review it.
15        A.    Okay.  Okay.
16        Q.    Does this refresh your
17   recollection regarding your role in rolling
18   out this process at 6045?
19        A.    It does.
20        Q.    Okay.  And what was your role?
21        A.    To inform them to put the -- to
22   let them know that there was going to be a 20
23   limit on the oxy 30.
24        Q.    And why were you the one that
25   was supposed to inform them of that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.      Because I had to send an e-mail
 2   to Reddwerks, and I had owned that
 3   relationship with Reddwerks.
 4        Q.      Okay.  Did you also own the
 5   relationship with the DC team?
 6        A.      I was one of, you know, three
 7   that owned that relationship as well.
 8        Q.      All right.  And indeed, your
 9   e-mail says "DC team, we," affecting
10   inclusion of yourself, correct?
11                I mean, it's your words, right?
12   You say, "DC team, we," right?
13        A.      Right.
14        Q.      Right?
15                "We have been asked to limit
16   the quantity of Item 3880693, oxycodone 30."
17                Do you see that?
18        A.      I do.
19        Q.      Okay.  Did you have at that
20   time any understanding as to why that was
21   occurring?
22        A.      No.
23        Q.      Did it matter to you?
24        A.      No, I was just asked to do it.
25        Q.      And who asked you to do it?
```

```
 1       A.     From this e-mail, it looks like
 2   Brandon.
 3       Q.     Well, let's look at that
 4   e-mail, all right?
 5              Brandon writes, "Ramona, as we
 6   discussed today," correct?
 7       A.     Right.
 8       Q.     "And based on Bart's data,"
 9   right?
10              Do you know what data he's
11   referring to?
12       A.     No, I don't.
13       Q.     Do you know who Bart is?
14       A.     Bart was in replenishment.
15       Q.     Do you know what data he
16   provided?
17       A.     No, I don't know what data he
18   provided.  I don't recall it.
19       Q.     And Brandon goes on to write,
20   he says, "After two weeks, we will then visit
21   on what our next step of drugs to focus on
22   will be."
23              Do you see that?
24       A.     I see that.
25       Q.     Do you and him visit on "what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   our next step of drugs" we'll focus on will
 2   be?
 3        A.    I don't recall.
 4        Q.    Do you recall -- strike that.
 5              All right.  Are you aware the
 6   country is undergoing an opioid epidemic?
 7        A.    I am aware of that.
 8        Q.    When did you become aware of
 9   that?
10        A.    I don't know exactly when.
11   I've seen it in the news.
12        Q.    Did you ever discuss it at
13   work?
14        A.    No.
15        Q.    No?
16              Didn't concern you at all that
17   you had a role in limiting one of the most
18   highly abused drugs in the country?
19              MS. FUMERTON:  Objection.
20        Form.
21              THE WITNESS:  Ask your question
22        again.
23   QUESTIONS BY MR. BOWER:
24        Q.    Did it concern you at all that
25   you played a role in limiting the ordering by
```

```
 1    Walmart pharmacies of one of the highest
 2    abused drugs in the country?
 3              MS. FUMERTON:  Objection.
 4         Form.
 5              THE WITNESS:  Was I concerned?
 6    QUESTIONS BY MR. BOWER:
 7         Q.    Yeah.
 8         A.    No, I was asked to do
 9    something.
10         Q.    Okay.  Are you aware that
11    oxy 30 was being -- strike that.
12              Are you aware that orders of
13    oxy 30 were being limited because of its
14    potential for abuse?
15              MS. FUMERTON:  Objection.
16         Form.
17              THE WITNESS:  No, I had no
18         knowledge of why.
19    QUESTIONS BY MR. BOWER:
20         Q.    Did it matter to you from your
21    perspective?
22              MS. FUMERTON:  Objection.
23         Form.
24              THE WITNESS:  I was asked to do
25         a job.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. BOWER:
 2        Q.    And so let's get into more of
 3   what job you were asked to do.
 4              Okay?
 5        A.    Okay.
 6        Q.    Your first e-mail here, the
 7   bottom says, "Brandon, came looking for you
 8   to discuss the queries I had ran on the items
 9   listed below."
10              Why were you running those
11   queries?
12        A.    I was asked to run those.
13        Q.    And who asked you to run those?
14        A.    Tim Harris.
15        Q.    Tim Harris.
16              And what queries did he ask you
17   to run?
18        A.    To run data on multiple items.
19        Q.    Do you have any idea why you
20   were running on the -- a query for the
21   Item 3880910?
22        A.    No, I was just asked to run it.
23        Q.    Did you ever ask why?
24        A.    No.
25        Q.    What -- where did you run these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   queries?
 2        A.    In Teradata.
 3        Q.    And what's Teradata?
 4        A.    So it's a place where all, to
 5   my understanding, data lives for, in this
 6   case, shipment.
 7        Q.    What do you mean by "shipment"?
 8        A.    Ships to the store.
 9        Q.    Who would you have e-mailed at
10   Reddwerks to make the appropriate change to
11   the order level alert parameter screen?
12        A.    It would have been a support
13   call to --
14        Q.    Well, it says "I will be
15   sending Reddwerks an e-mail."
16              Do you see that?
17        A.    Yes.
18        Q.    So that statement is not
19   correct?
20        A.    So it's a support e-mail
21   address.
22        Q.    Oh, okay.
23              Do you recall what that e-mail
24   address is?
25        A.    It used to be
```

1    support@Reddwerks.com.

2        Q.    And after you sent that e-mail,

3    how long would it have taken for this change

4    to be made?

5        A.    An overnight change.

6        Q.    Do you recall what the prior

7    order level alert was for oxy 30?

8        A.    I don't recall.

9        Q.    And then in your e-mail you

10   write, "If we receive calls from the stores

11   asking for additional oxy 30 product, please

12   direct them to the regional."

13        Why did you write that?

14       A.    Because we had stores that

15   would call the distribution center to be

16   added for an additional day of shipment.

17       Q.    I understand that stores could

18   call, but why are you directing them to the

19   regional?

20       A.    To the store's regional.

21       Q.    Why are you providing that

22   instruction?

23       A.    I don't recall, other than

24   that's what we would do.

25       Q.    How did you know that that was

```
 1   the appropriate thing to do?
 2       A.    I don't know.  I mean, that's
 3   what we did with stores, is direct them to
 4   who their boss was.
 5       Q.    So by the regional -- the
 6   regional would be referring to the store's
 7   boss?
 8       A.    Yes.
 9       Q.    And then you next write, "Also,
10   we will need to keep track of the stores
11   calling in to the DC or submitting a web form
12   for additional oxycodone 30 product."
13             Do you see that?
14       A.    Yes.
15       Q.    Why did you write that?
16       A.    I really don't know, other than
17   to keep track of who was calling in so that
18   we could report that back to their regional.
19       Q.    But you didn't know why there
20   was a specific emphasis on oxy 30; is that
21   correct?
22       A.    That's correct.
23       Q.    And you never asked anybody why
24   oxy 30, correct?
25       A.    No, I did not.
```