EXHIBIT 78

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3   IN RE: NATIONAL        )   MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION,            )   Case No.
                            )   1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO )  Hon. Dan A.
 6   ALL CASES              )   Polster
                            )
 7
 8                    __ __ __
 9          Wednesday, January 9, 2019

                      __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW

                      __ __ __
12
13
14
15      Videotaped Deposition of GEORGE
     CHAPMAN, held at 4206 South J.B. Hunt Drive,
16   Rogers, Arkansas, commencing at 9:00 a.m., on
     the above date, before Debra A. Dibble,
17   Certified Court Reporter, Registered
     Diplomate Reporter, Certified Realtime
18   Captioner, Certified Realtime Reporter and
     Notary Public.
19
20
21

                      __ __ __
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    area of responsibility at that point?

2              MR. VARNADO:  Object to the

3         form.

4              THE WITNESS:  I'm sorry, what

5         was that?

6         Q.    (BY MR. INNES)  I'm sorry.

7              What was your area of

8    responsibility at that point?

9         A.    Our area of responsibility was

10   everything within the practice compliance and

11   the practice of pharmacy at our locations,

12   our retail pharmacy settings.

13        Q.    What was your responsibility at

14   that point as it related to the distribution

15   of opioids?

16             MR. VARNADO:  Object to the

17        form.

18             THE WITNESS:  Can you repeat

19        that?

20             MR. INNES:  Sorry, that was

21        fast.  I'm sorry.

22        Q.    (BY MR. INNES)  What was your

23   responsibility at that point as it related to

24   the distribution of opioids?

25             MR. VARNADO:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              form.

 2                   THE WITNESS:  We dispensed

 3              opioids in our retail pharmacies.

 4              Q.    (BY MR. INNES)  In 2014, was

 5      Walmart a distributor of opioids?

 6              A.    That was not my area of

 7      responsibility.

 8              Q.    What responsibility, if any,

 9      did you have in 2014 regarding distribution?

10              A.    Someone in our area worked with

11      our logistics partners to make enhancements

12      to their system.

13              Q.    Who was that person?

14              A.    Miranda Johnson.

15              Q.    Okay.  And at that point in

16      time, 2014, you were the senior director of

17      health and wellness compliance?

18              A.    Yes.

19              Q.    And did Ms. Johnson report to

20      you at that point in time?

21              A.    She did not.  She reported to

22      someone else.

23              Q.    Who did she report to at that

24      point?

25              A.    She reported to Tim Koch.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    K-O-C-H.

 2          Q.      And at that point in time, was

 3    Mr. Koch involved in the -- was Mr. Koch

 4    involved in the -- strike that.

 5                  In 2014, senior director of

 6    health and wellness compliance that dealt

 7    with Walmart's compliance with the CEA -- CSA

 8    as it relates to the distribution of opioids

 9    was Tim Koch?

10                  MR. VARNADO:  Object to the

11            form.

12                  THE WITNESS:  Tim Koch would

13            have been a senior director.  His

14            responsibility would have been for

15            making sure our stores, our pharmacy

16            retail sites had the appropriate

17            practice acts for both federal and

18            state legislation.

19                  But we did not have

20            responsibility for logistics.

21          Q.      (BY MR. INNES)  What do you

22    mean -- are you using "logistics" as a

23    synonym for "distribution"?

24          A.      Logistics is our distribution.

25          Q.      Is it your understanding that
```

Highly Confidential - Subject to Further Confidentiality Review

1   during that point in time, health and

2   wellness compliance had no role in compliance

3   with the CSA as it relates to the

4   distribution of opioids?

5                MR. VARNADO:  Object to form.

6                Go ahead.

7                THE WITNESS:  What time period?

8                MR. INNES:  We're in 2014.

9                THE WITNESS:  2014, that

10          responsibility was with our logistics

11          distribution center folks.

12          Q.    (BY MR. INNES)  Okay.  Practice

13   compliance had no role at all?

14                MR. VARNADO:  Object to form.

15                THE WITNESS:  Practice

16          compliance did not have responsibility

17          for the logistics department and SOM

18          reporting.

19          Q.    (BY MR. INNES)  That's not my

20   question.  I want to know if the practice

21   compliance division had any responsibility

22   regarding the distribution of opioids in

23   2014.

24          A.    No.

25          Q.    When, if ever, did the practice

Highly Confidential - Subject to Further Confidentiality Review

1    compliance division have responsibility

2    relating to the distribution of opioids?

3         A.    The practice compliance

4    department would not have responsibility for

5    distribution.

6         Q.    What role, if any, did the

7    practice compliance division have relating to

8    the diversion or potential diversion of

9    opioids in 2014?

10              MR. VARNADO:  Object to form.

11              THE WITNESS:  Practice

12         compliance had responsibility for

13         theft and diversion within our

14         pharmacies for -- either by

15         pharmacists, technicians, or for

16         forged or altered prescriptions that

17         would be presented at our pharmacies.

18         Q.    (BY MR. INNES)  When, if ever,

19    did -- strike that.

20              Can you describe those

21    responsibilities in detail?

22         A.    I'm sorry, can you --

23         Q.    Can you describe those

24    responsibilities that you had?

25              MR. VARNADO:  Object to the

```
 1              form.

 2                   THE WITNESS:  For the

 3              pharmacist, technician, or forged or

 4              altered prescriptions.

 5         Q.    (BY MR. INNES)  Let me rephrase

 6    the question.

 7                   Your testimony is that practice

 8    compliance had responsibility for the theft

 9    and diversion within our pharmacies, for

10    either pharmacists, technicians, or forged or

11    altered prescriptions that would be presented

12    to our pharmacists.

13                   Is that accurate?

14                   THE WITNESS:  Practice

15              compliance had the responsibility for

16              reporting to the DEA or to state

17              regulatory agencies of any theft or

18              diversion within our pharmacies.

19              Reporting.

20         Q.    (BY MR. INNES)  And we're

21    talking in 2014 right now?

22         A.    Yes.

23         Q.    Was that same responsibility

24    with practice compliance before 2014?

25         A.    Yes.
```

1      Q.      What years was that -- let me

2  do it differently.

3              What years, to the best of your

4  knowledge, was practice compliance

5  responsible or involved in the reporting that

6  you just described?

7      A.      Since I came to the regulatory

8  affairs area, it would have been from -- that

9  I know of -- would have been from 2012 on.

10     Q.      But you did come to regulatory

11  affairs prior to 2012; correct?

12     A.      It -- it -- that's correct.

13              So it would -- it would have

14  been in -- when I came over to regulatory

15  affairs, which was 2009.

16     Q.      2009.  Okay.

17              So from 2009 forward, to the

18  best of your knowledge, practice compliance

19  was responsible or involved in reporting a

20  diversion to the DEA and --

21              MR. VARNADO:  Object to the

22         form.

23     Q.      (BY MR. INNES) -- and state

24  agencies?

25              MR. VARNADO:  Sorry.  Object to

Highly Confidential - Subject to Further Confidentiality Review

1      the form.

2            THE WITNESS:  Practice

3      compliance had responsibility if we

4      had diversion in our pharmacies, of

5      reporting that diversion if it was a

6      pharmacist, if it was a technician, or

7      if we had some theft or loss inside

8      our pharmacy due to a robbery would

9      have been our responsibility.

10           Q.    (BY MR. INNES)  What about

11     orders placed by pharmacists to Walmart

12     distribution centers?

13           A.    Can you be more specific?

14           Q.    If an order was -- if an order

15     that met the criteria --

16                 Strike that.

17                 We'll circle back to this.  I

18     think there's a better -- maybe a better way

19     to get where we need to go.

20                 I asked you earlier when you

21     first became aware of a DEA regulation

22     requiring Walmart to identify suspicious

23     orders.  And your testimony is -- was that

24     2015?

25                 MR. VARNADO:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  That I understood
2        the responsibility for our warehouses
3        to report SOM reporting?  Is that what
4        you're asking?
5        Q.     (BY MR. INNES)  For Walmart.
6        A.     Sometime around 2014, I would
7    have been aware of the responsibility for
8    reporting of suspicious order monitoring.
9        Q.     Do you consider suspicious
10   order monitoring to be a part of diversion?
11           MR. VARNADO:  Object to form.
12           THE WITNESS:  My understanding
13        of diversion was within our pharmacies
14        with the pharmacy technician, forged
15        or altered prescription, theft or
16        robbery.  Now I understand that
17        diversion is included within what's
18        considered suspicious order
19        monitoring.
20        Q.     (BY MR. INNES)  And when did
21   that understanding change to your current
22   understanding?
23        A.     I can't remember an exact date,
24   but it would be after conversations began
25   around the opioid crisis.

1          Q.      When did the opioid crisis

2    begin?

3                  MR. VARNADO:  Object to the

4          form.

5                  THE WITNESS:  I first became

6          aware of when everyone was using the

7          term around -- "opioid crisis" --

8          probably 2014, 2015.

9          Q.      (BY MR. INNES)  So is that

10   around the time your understanding changed?

11         A.      My understanding of?

12         Q.      Diversion.

13         A.      I'm sorry?

14         Q.      Diversion.

15         A.      Yes.

16         Q.      End of 2014, beginning of 2015,

17   you came to a different understanding of

18   diversion?  Your current understanding of

19   diversion?

20         A.      That a suspicious order could

21   be considered as diversion.

22         Q.      When did you first become

23   aware, if ever, that Walmart is required to

24   maintain effective controls against

25   diversion?

Highly Confidential - Subject to Further Confidentiality Review

1         A.      Can you repeat that?  I'm

2    sorry.

3         Q.      Certainly.

4               When did you first become

5    aware, if ever, that Walmart has a

6    responsibility to maintain effective controls

7    against diversion?

8         A.      Since beginning my role in

9    2009, I would have been aware of our

10   responsibility to prevent diversion as it

11   pertained to forged and altered

12   prescriptions, theft within our pharmacies.

13   That was my understanding.

14        Q.      But again, in 2014, late 2014,

15   2015, your understanding of diversion

16   changed?

17        A.      That a suspicious order could

18   be considered diversion activity.

19        Q.      I just want to make sure I have

20   the record clear here.

21               So your first awareness that

22   Walmart had an obligation to maintain

23   effective controls against diversion was

24   sometime in 2009; is that right?

25        A.      I can't speak to when Walmart

1    understood their obligation.  That wasn't

2    controlled by our department.

3         Q.    If I misspoke -- I'm interested

4    in your knowledge.  So I can rephrase that

5    question.

6              I see that I do have it wrong

7    in my transcript.  Let me rephrase that.

8              It's your testimony that you

9    first became aware of Walmart's obligation to

10   maintain effective controls against diversion

11   sometime in 2009?

12             MR. VARNADO:  Object to form.

13             THE WITNESS:  Can you repeat

14        that?  I'm sorry.

15        Q.    (BY MR. INNES)  You first

16   became aware of Walmart's obligation to

17   maintain effective controls against diversion

18   sometime in 2009.

19        A.    Diversion, as my understanding

20   of it, was 2009 when I joined the regulatory

21   affairs.

22        Q.    Again, I'm just asking whether

23   or not you had a particular awareness of that

24   particular piece of the Controlled Substances

25   Act.  Divorced from what your understanding

1    of diversion was, I just want to know if you

2    were aware of that particular obligation

3    under the CSA.  And that would have been in

4    2009.  Do I have that correct?

5                    MR. VARNADO:  Object to form.

6                    THE WITNESS:  The particular

7          piece of?

8                    MR. INNES:  Walmart's

9          obligation to maintain effective

10          controls against diversion.

11                    THE WITNESS:  Are you talking

12          about SOM reporting?

13          Q.    (BY MR. INNES)  Is SOM

14    reporting part of Walmart's maintenance of

15    effective controls against diversion?

16          A.    My understanding of diversion

17    at the time in 2009 was what I described

18    earlier.  But then around 2014, we became

19    more involved with logistics and their

20    responsibility for reporting SOM.

21          Q.    When you became more involved

22    with the logistics team and their

23    responsibility for reporting SOM, do you

24    recall at that time if the logistics team had

25    a different understanding of diversion than

1    you did in 2014?

2                  MR. VARNADO:  Object to the

3            form.

4                  THE WITNESS:  I can't speak to

5            their understanding.

6            Q.    (BY MR. INNES)  Did you ever

7    have a conversation with anyone in logistics

8    regarding what diversion was as it relates to

9    the CSA in 2014?

10           A.    I can't recall that

11   conversation.

12           Q.    Was there a conversation?

13           A.    I can't recall that there was a

14   conversation.

15           Q.    There may have been a

16   conversation?

17           A.    I'm sorry?

18           Q.    There may have been a

19   conversation?

20           A.    I can't recall that.

21           Q.    You can't recall whether or not

22   there was a conversation?

23           A.    I don't know if there was any

24   conversation.

25                  MR. INNES:  For the record, now

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I'm getting glare off the computer

 2              screen, so we're all on an even

 3              playing field.

 4                   MR. VARNADO:  All in it

 5              together now.

 6                   MR. INNES:  I just want the

 7              record to be clear now.

 8                   THE WITNESS:  The sun is

 9              terrible.

10                   (Discussion off the record.)

11                   THE VIDEOGRAPHER:  Let's go off

12              the record for one second, if that's

13              okay.

14                   MR. INNES:  Sure.

15                   THE VIDEOGRAPHER:  11:08.  We

16              are off video record.

17                   (Recess taken, 11:08 a.m. to

18              11:17 a.m.)

19                   THE VIDEOGRAPHER:  11:17.  We

20              are on the video record.

21         Q.   (BY MR. INNES)  Mr. Chapman,

22    let me continue on this same vein for a

23    little while.

24              When, if ever, did you become

25    aware of Walmart's responsibility to exercise
```

1    due diligence to avoid fulfilling suspicious

2    orders that might be diverted into other than

3    legitimate medical and scientific or

4    industrial channels?

5              MR. VARNADO:  Object to form.

6              THE WITNESS:  We started

7         working with the logistics group under

8         a suspicious order monitoring program

9         sometime in 2014.

10        Q.    (BY MR. INNES)  Okay.  And I'm

11   not sure that fully answers my question.

12             Is it your testimony that

13   sometime in 2014, you became a Walmart -- you

14   became aware of Walmart's statutory

15   responsibility to exercise due diligence to

16   avoid filling suspicious orders that might be

17   diverted into other than legitimate medical

18   and scientific or industrial channels?

19             MR. VARNADO:  Object to the

20        form.

21             THE WITNESS:  Can you repeat

22        that?

23        Q.    (BY MR. INNES)  Is it your

24   testimony that sometime in 2014, you became

25   aware of Walmart's responsibility to exercise

1    shipping until it cleared its investigation

2    of that order?

3              MR. VARNADO:  Object to the

4         form.

5              THE WITNESS:  That would be a

6         procedure guide that the logistics

7         team would have had, and I'm not aware

8         of it.

9              Or I can't recall it.

10        Q.    (BY MR. INNES)  Are you saying

11   that that is a policy that would not have

12   been in your purview during that time?

13        A.    Correct.

14        Q.    Are you aware of a policy in

15   logistics that articulated that?

16        A.    I don't know.

17        Q.    Okay.  So let's carry forward

18   to 2014 now.

19              You're a senior director at

20   health and wellness practice compliance.  The

21   same procedure -- the same policies and

22   procedures that were articulated in the

23   written portion of Walmart's response and

24   that we discussed for the year 2013, those

25   have now carried forward to 2014, are still

Highly Confidential - Subject to Further Confidentiality Review

1    in place.

2              Is that a correct

3    understanding?

4              MR. VARNADO:  Object to the

5         form.

6              THE WITNESS:  Which -- I don't

7         know what you're referring to.  Which?

8              MR. INNES:  Sure.

9              So if you look at the written

10        portion of the response at bullets 3,

11        4, and 5.

12             THE WITNESS:  Okay.

13        Q.    (BY MR. INNES)  Is there any --

14        A.    This is what you're talking

15   about?  The bullet?

16        Q.    Yes.

17             And specifically bullets 3, 4,

18   and 5.

19        A.    Okay.

20        Q.    All of those policies are in

21   effect in 2014; is that correct?

22        A.    These are all pharmacy

23   distribution procedures that they would be

24   following, and I know they existed before

25   2015.

```
 1            Q.     Thank you for that.  So my
 2      question is a little bit more specific.
 3                   I'm wondering if you have any
 4      reason to believe that any of these policies
 5      were not in effect in the year 2014?
 6            A.     No.
 7            Q.     Okay.  Thank you.
 8                   Again, in tab 2, do you have
 9      any reason to believe that this policy was
10      not in effect in 2014?
11            A.     Tab 2, the logistics pharmacy
12      manual, controlled substance?
13            Q.     Yes, sir.  It ends in Bates
14      No. 11106.
15            A.     Yeah, it has a -- it has a date
16      stamp of November 2010 was the last time,
17      according to this document, that it was
18      revised.
19            Q.     Okay.  Does that cause you to
20      question whether or not that was in effect in
21      the year 2014?
22            A.     No.
23            Q.     So again my question is, do you
24      have any reason to believe that this document
25      was not in effect in 2014?
```

1      A.      No.

2      Q.      And I'll direct your attention

3  to tab 3.

4          Do you have any reason to

5  believe that this policy was not in effect in

6  October of 2014?

7      A.      Now, when?

8      Q.      October of 2014.

9      A.      This has a date of

10  September 2014, so that would be -- should be

11  the published date of this document.

12      Q.      But you've had an opportunity

13  to review this document, and in your role as

14  the senior director of health and wellness

15  practice compliance, in --

16      A.      I -- I was copied on this

17  document and had seen this document, and this

18  would have been Miranda's help with the

19  logistics team as they updated their

20  document.  And I don't know if this was a

21  prior version or not, but this was Miranda's

22  working with the logistics team.

23      Q.      Okay.  Let's unpack that a

24  little bit.  You say you were copied on this

25  document.  I don't see your name attached to

Highly Confidential - Subject to Further Confidentiality Review

1    this document.  Do you recall this from

2    somewhere else?

3         A.    I have seen this document

4    before, and I have received this as a copy.

5         Q.    When was that?

6         A.    I don't know the exact date.

7    I'd have to -- I'd have to look at my email.

8         Q.    Right.  To put a finer point on

9    it, is this one of the documents that you

10   reviewed as part of your preparation for

11   today?

12        A.    I have seen this one, yes, in

13   preparation.

14        Q.    Okay.  It's one of the ones

15   that you reviewed in those three meetings; is

16   that correct?

17        A.    Yes.

18        Q.    Based on your knowledge of the

19   Controlled Substances Act and Walmart's

20   requirements vis-à-vis the distribution of

21   opioids in 2014, was it your opinion that

22   this document was in compliance with federal

23   regulations?

24             MR. VARNADO:  Object to the

25        form of the question.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  Yeah, my

2      understanding of the Controlled

3      Substance Act and responsibility on

4      order monitoring, when this document

5      was produced, that this was in

6      compliance with DEA requirements.

7          Q.    (BY MR. INNES)  Is it your

8   understanding that this document, at tab 3,

9   beginning at 111 -- sorry, strike that.

10          Bates No. 11107 replaced the

11   policy that was at tab 2, which is Bates

12   No. 11106?

13          A.    I don't have knowledge that

14   this -- this one under tab 3 replaced the one

15   under tab 2.

16          They don't have the same title.

17          Q.    Mr. Chapman, I'll just direct

18   you to the chart that is on -- at tab 1,

19   page 3.

20          A.    Tab 1, page 3?  Or the bullet

21   points?

22          Q.    I'm sorry.  Yeah.

23          And you'll see there that it

24   says the approximate effective date of

25   Document 11106, the effective date ends on

```
1    October of 2014.
2              And then you'll see that the
3    next line down that says the policy beginning
4    with Bates 11107 is -- the approximate
5    effective date begins in October of 2014.
6         A.    I see that.
7         Q.    Does that change your
8    understanding that -- at all, that the policy
9    in tab 2 was replaced by the policy in tab 3?
10             MR. VARNADO:  Object to the
11             form.
12             THE WITNESS:  All I'm aware of
13             is what's here on this paper.  I don't
14             have firsthand knowledge that this
15             tab 2 document replaced tab 3.
16        Q.    (BY MR. INNES)  Okay.  So when
17    you -- when the logistics team rolled SOMs to
18    the compliance team at the end of 2014, what,
19    if anything, did you do to familiarize
20    yourself with the policies that were in place
21    at the time of that transition?
22        A.    We would have -- we would have
23    been involved with logistics in 2014, but
24    again, it didn't do the transition until
25    sometime in 2014, 2015.  So I don't know the
```

Highly Confidential - Subject to Further Confidentiality Review

1    exact date.

2         Q.    Okay.  Again, my question is

3    slightly different.  I'm wondering, when you

4    were going through that transition period,

5    what did you do, if anything, to familiarize

6    yourself with Walmart's SOM policies that

7    were, at that time, housed in logistics?

8         A.    I would not, in my position,

9    have gone through and reviewed logistics

10   policies when they made changes from one

11   policy to the next.

12        Q.    That would have been

13   Ms. Johnson's responsibility?

14        A.    It would have been logistics'

15   responsibility, but Miranda would have had

16   knowledge of it.

17        Q.    And during the transition --

18        A.    I assume.

19        Q.    And during the transition,

20   would it have been Ms. Johnson tasked with

21   knowing what the policies were that your

22   department was now taking ownership of?

23        A.    She would know the current

24   policy as that transitioned from logistics to

25   practice compliance.

1       Q.     And at that point in time, she

2    was reporting directly to you; right?  This

3    is October 2015?

4       A.     October 2015, she would have

5    reported to me.

6       Q.     Mm-hmm.

7              And as your direct report, did

8    you have any oversight over -- as to what

9    Ms. Johnson was doing, or not doing, with

10   respect to the transition of suspicious order

11   monitoring from logistics to compliance?

12             MR. VARNADO:  Object to the

13        form.

14             THE WITNESS:  I would have -- I

15        would have information on the projects

16        she was working on, but I would not be

17        into the great detail of every single

18        item that she was working on.

19       Q.     (BY MR. INNES)  At this point

20   in time, you're well aware of the opioid

21   crisis that is going on in October of 2015;

22   is that right?

23       A.     At this time period, the opioid

24   crisis was a topic of conversation around the

25   U.S.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was it a topic of conversation

2  at Walmart?

3    A.    Yes, we would have been having

4  conversations that this was a national issue.

5    Q.    And now your department is

6  taking the mantle on Walmart's efforts to

7  make sure that the opioid crisis can be

8  abated; is that right?

9              MR. VARNADO:  Object to the

10        form.

11              THE WITNESS:  We would have

12        been responsible for -- in 2015, of

13        taking over the suspicious order

14        monitoring.

15    Q.    (BY MR. INNES)  And the

16  suspicious order monitoring is directed at,

17  in large part, making sure that opioids are

18  not diverted to places where they should not

19  go; is that correct?

20              MR. VARNADO:  Object to the

21        form.

22              THE WITNESS:  Again, we would

23        be looking at records as they're

24        placed to our warehouse and reviewing

25        those orders, if we consider those an

Highly Confidential - Subject to Further Confidentiality Review

1    order of interest or a suspicious

2    order.

3          Q.    (BY MR. INNES)  I'm getting

4    something different than what you were doing

5    and were not doing.  I'd like to know why it

6    seems you were not having more of a hands-on

7    role with Ms. Johnson when she's -- when your

8    department is assuming the mantle of the --

9    of Walmart's efforts to prevent diversion.

10              MR. VARNADO:  Object to the

11         form.

12              THE WITNESS:  My responsibility

13         is much larger than this one singular

14         issue, so I would not be down in all

15         of the details of every single project

16         that she was working on.

17         Q.    (BY MR. INNES)  Was there a

18    reason that -- strike that.

19              Did you -- during the

20    transition did you review Walmart's policies

21    and procedures that were in place to ensure

22    that they were compliant with federal and

23    state regulations?

24              MR. VARNADO:  Object to the

25         form.

1           THE WITNESS:  We have an

2           ongoing process to ensure that our

3           policies and procedures stay updated.

4      Q.     (BY MR. INNES)  You didn't feel

5   it necessary for you to take a personal role

6   in that as the director of -- senior director

7   of practice compliance?

8           MR. VARNADO:  Object to the

9           form.

10           THE WITNESS:  I have directors

11           and senior directors that had

12           responsibility for making sure that we

13           were -- we continued to maintain

14           compliance within state level, federal

15           level, on many different areas.

16      Q.     (BY MR. INNES)  So you didn't

17   take a personal role in the review of these

18   policies and procedures as they relate to

19   Walmart's compliance with federal and state

20   regulations?

21      A.     I'm sure I would have reviewed

22   a document and looked at the document and

23   been made aware of the document, but I didn't

24   do -- review work on the document.

25      Q.     Are you a member of the health

1    and wellness advisory panel?

2        A.    Health and wellness advisory

3    panel.  Is it the health and wellness

4    compliance advisory panel?  What -- what's

5    the full name?

6        Q.    I can direct you to Bates

7    No. 11109.  It's the last page of tab 3.  In

8    the middle of the page it says "The health

9    and wellness advisory panel."

10       A.    Yeah, that's the -- that's

11   the -- yes.

12             I was not a -- I was a stand-in

13   voting member.  I was not a voting member of

14   that -- of that panel.

15       Q.    At what time were you a

16   stand-in voting member of that panel?

17       A.    If my -- if my vice president

18   wasn't in that meeting, then if there was

19   something to be voted on, as it were, then I

20   would participate in that role.

21       Q.    Did you attend advisory panel

22   meetings in a non-voting role?

23       A.    I'm sure I did.

24       Q.    At those advisory panel

25   meetings that you attended, whether they were

1    in a voting role or non-voting role, were

2    distribution of opioids discussed?

3          A.    The controlled substance

4    program, opioids would be discussed.  SOM

5    reporting would have been discussed, but not

6    distribution.

7                And I'm talking logistics side.

8    Logistics was, I believe, a part of this

9    panel as well.

10          Q.    So the health and wellness

11    advisory panel, to your knowledge, never

12    discussed distribution of opioids, but they

13    did discuss SOM reporting?

14          A.    There would have been

15    discussions around the SOM program.

16          Q.    Were there minutes taken of

17    these meetings?

18          A.    That, I don't know.

19          Q.    Who would know if there was

20    minutes taken of those meetings?

21          A.    That would be our -- health and

22    wellness legal would know.

23          Q.    Who was in charge of taking

24    minutes for these meetings?

25                MR. VARNADO:  And let me

Highly Confidential - Subject to Further Confidentiality Review

```
 1              just -- there's a little bit of

 2              confusion here.  I just want to

 3              object.  To the extent it's calling

 4              for privileged deliberations during

 5              the controlled substance advisory

 6              panel, I'm going to instruct the

 7              witness not to answer about those

 8              privileged communications involving

 9              meetings that were done at the

10              direction of counsel.

11                   If you're talking about some

12              other committee, so be it.

13         Q.    (BY MR. INNES)  Are you taking

14    counsel's advice and not answering this

15    question?

16         A.    Yes.

17         Q.    Okay.  Who are the members of

18    the health and wellness advisory panel?

19         A.    Without having a document that

20    shows all the members, I could probably only

21    name a few, but ...

22         Q.    Are there any members of

23    Walmart's legal department that are members

24    of the health and wellness advisory panel?

25         A.    Yes.
```

 1          Q.      How many members are part of

 2    the -- strike that.

 3                  Are the members of the legal

 4    department lawyers?

 5          A.      I'm sorry, say that again?

 6          Q.      Are the members of the legal

 7    department that are members of the health and

 8    wellness advisory panel, are those folks

 9    lawyers?

10          A.      Those would be Walmart

11    associates.

12          Q.      And a Walmart associate is a

13    lawyer?

14          A.      Yeah.  Walmart legal.

15          Q.      Are members of -- are the

16    members of the health and wellness advisory

17    panel that are Walmart in-house lawyers, are

18    they voting members?

19          A.      I don't remember.

20          Q.      Is there anything that would

21    refresh your recollection as to that

22    question?

23          A.      I know we had a document that

24    shows who was voting members.

25                  MR. INNES:  Counsel, I don't