# EXHIBIT 79

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3   IN RE: NATIONAL              )   MDL No. 2804
     PRESCRIPTION OPIATE          )
 4   LITIGATION,                  )   Case No.
                                  )   1:17-MD-2804
 5                                )
     THIS DOCUMENT RELATES TO     )   Hon. Dan A.
 6   ALL CASES                    )   Polster
                                  )
 7
 8                       — — —
 9            Thursday, January 10, 2019
                         — — —
10
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                         — — —
12
13
14
15        Videotaped Deposition of ROXANNE REED,
     held at 4206 South J.B. Hunt Drive, Rogers,
16   Arkansas, commencing at 8:08 a.m., on the
     above date, before Debra A. Dibble, Certified
17   Court Reporter, Registered Diplomate
     Reporter, Certified Realtime Captioner,
18   Certified Realtime Reporter and Notary
     Public.
19
20
21
                         — — —
22
              GOLKOW LITIGATION SERVICES
23        877.370.DEPS | fax 917.591.5672
                   deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

 1     different people, that worked on our Tableau
 2     dashboard project with health and wellness
 3     compliance.
 4          Q.    Do any of these names -- strike
 5     that.
 6                Do you know whether any of
 7     these folks in this email were Walmart
 8     employees during this time period, which is
 9     January 2014?
10               MS. FUMERTON:  And I don't -- I
11          haven't looked, but I'm assuming the
12          entire document?
13               MR. BOWER:  No, I'm just
14          talking about this top email here.
15               Thank you for that
16          clarification.
17               THE WITNESS:  These names do
18          not look like any Walmart associates
19          that I would have known.
20          Q.    (BY MR. BOWER)  Do you have any
21     understanding, then, as to how this document
22     came to appear in your custodial file?
23          A.    I have no idea.
24          Q.    Okay.  Just a couple more
25     questions, then, based upon your experience

Golkow Litigation Services                          Page 78

1    with the Access and other work in the
2    databases.
3             The approach, for example,
4    references -- do you see that?  It has key
5    deliverables and purpose and then approach?
6    Kind of headings to the left of the page?
7             Do you see that?
8       A.    Yes.
9       Q.    Okay.  Under "Approach," it
10   says, "Use 52 week order history to establish
11   'normal' order amounts."
12            Do you see that?
13      A.    Yes.
14      Q.    During this time period, which
15   is January 2014, where would Walmart -- where
16   within Walmart would that data have been
17   available?
18            MS. FUMERTON:  Objection, form.
19            THE WITNESS:  The order
20      history, I do not know.
21      Q.    (BY MR. BOWER)  Do you know
22   whether order history was available anywhere
23   within Walmart during this time period?
24      A.    As far as order history, I
25   don't know where within Walmart order history

1  was kept.
2      Q.  What information was used in
3  Access to perform these calculations that you
4  referred to earlier?
5      A.  The shipment history would be
6  used.
7      Q.  And where was that information
8  located?
9      A.  Teradata.
10     Q.  Do you have any knowledge as to
11 how far back Teradata maintains shipment
12 history?
13         MS. FUMERTON:  Objection, form.
14         MR. BOWER:  I'll strike that.
15     Q.  (BY MR. BOWER)  In other words,
16 2014, if you were to access Teradata, how far
17 back could you go to determine shipment
18 history to a particular pharmacy?
19     A.  I don't know what the retention
20 period is specifically for the logistics
21 data.
22     Q.  What's the farthest back you've
23 ever gone to pull purchase -- sorry, shipment
24 history in Teradata?
25     A.  Exact numbers, I wouldn't know.

```
 1    I know at any point in time recently I've
 2    pulled up to two years back.  So I haven't
 3    pulled more than two years back at any one
 4    time.
 5         Q.   Okay.  And do you know whether
 6    the information in Teradata is backed up by
 7    Walmart?
 8              MS. FUMERTON:  Objection, form.
 9              THE WITNESS:  I don't know the
10         exact backup policies for the Teradata
11         system.
12              I do know that there are --
13         there's processes in place for
14         duplication of the database, and like
15         if one goes down, there's another,
16         like, data center that houses it.  But
17         I don't know the exact backup
18         schedule.
19         Q.   (BY MR. BOWER)  And, I mean,
20    the data in Teradata is important to Walmart;
21    correct?
22              MS. FUMERTON:  Objection, form.
23              THE WITNESS:  Teradata does
24         house important information for
25         different business segments, yes.
```

```
 1         Q.     (BY MR. BOWER)   Right.
 2   Walmart uses the data in Teradata for many
 3   reasons; correct?
 4         A.     Yes.
 5         Q.     So you would expect that
 6   Walmart would have a process in place to make
 7   sure that data is maintained, wouldn't you?
 8                MS. FUMERTON:  Objection, form.
 9                THE WITNESS:  So Teradata is a
10          big database that I know is duplicated
11          to maintain the integrity of the data
12          and the security of the database and
13          the information within it.
14         Q.     (BY MR. BOWER)   So just
15   going -- a couple more questions on this
16   page.  At the top of the page references a
17   project goal.  Do you see that?
18                And we're still on page ending
19          in 9626.
20         A.     Yes.
21         Q.     Do you see that?
22                Project goal is stated as "To
23   identify and report suspicious orders of
24   controlled substances and other frequently
25   abused drugs."
```

```
 1                  Do you see that?
 2        A.        Yes.
 3        Q.        Do you know whether Walmart
 4   asked the folks at Mu Sigma to work on this
 5   project?
 6                  MS. FUMERTON:  Objection, form.
 7                  THE WITNESS:  I don't know.
 8        Q.        (BY MR. BOWER)  Do you know who
 9   would know that?  Would it be Kristy?
10        A.        Since Kristy worked with them,
11   I would assume she would have been involved.
12        Q.        Do you know what the reference
13   on the top of this page to "frequently abused
14   drugs" means?
15        A.        I do not.
16        Q.        Are you aware that our country
17   is in the middle of an opioid crisis?
18        A.        Yes.
19                  MS. FUMERTON:  Objection, form.
20        Q.        (BY MR. BOWER)  And when did
21   you first become aware of the opioid crisis?
22                  MS. FUMERTON:  Objection, form.
23                  THE WITNESS:  I don't know the
24        exact time.
25        Q.        (BY MR. BOWER)  Do you know an
```

```
 1    approximate time?
 2         A.    I would say that those terms I
 3    first heard in the media within the last
 4    couple of years.
 5         Q.    By "those terms," you mean
 6    opioid crisis?
 7         A.    Yes.
 8         Q.    What about a broader issue with
 9    respect to abuse of controlled substances?
10               MS. FUMERTON:  Objection, form.
11               THE WITNESS:  What's your
12         question?
13         Q.    (BY MR. BOWER)  I'm just trying
14    to figure out.  You seem to be stuck on my
15    term "opioid crisis."  I'm just trying to
16    figure out if you use different terms, if you
17    define it as abuse of prescription drugs, of
18    drug issues with respect to Schedule II
19    narcotics.  Anything broader than that.  When
20    did you first become aware that our country
21    was having a problem with prescription drug
22    abuse?
23               MS. FUMERTON:  Objection, form.
24               THE WITNESS:  So I've worked in
25         the health and wellness space the
```

```
 1            majority of my career.  Now, I've
 2            worked in an independent pharmacy when
 3            I was in high school, in college.  And
 4            so I would say that's been something
 5            that's been known by me for the
 6            majority of my career, that ...
 7       Q.   (BY MR. BOWER)  I don't want to
 8  cut you off.  Are you --
 9       A.   Yeah.
10       Q.   Did you have any discussions
11  about prescription drug abuse with folks at
12  Walmart?
13            MS. FUMERTON:  Objection, form.
14            THE WITNESS:  I don't know of
15       any specific conversations about
16       prescription drug abuse.
17            So it could come up in context
18       of a diversion investigation, or a
19       controlled substance loss
20       investigation.  And of course later,
21       in SOM.  But not -- not specifically
22       meetings about drug abuse issues.
23       Q.   (BY MR. BOWER)  And I
24  appreciate that clarification.
25            So -- and I don't want to spend
```

```
 1    too much time on this, but, for example, how
 2    would it come up in connection with, for
 3    example, SOM -- you said, "of course, later
 4    in SOM."  How would that come up?
 5                 MS. FUMERTON:  Objection, form.
 6                 THE WITNESS:  So when reviewing
 7         an order, part of what we were looking
 8         for are signs that something
 9         inappropriate may be going on.  So a
10         red flag wasn't cleared.  And that
11         could be an indication of
12         inappropriate use.  And so generally,
13         you know, the possibility of
14         inappropriate use would be talked
15         about during any kind of alert review.
16         Q.     (BY MR. BOWER)  And when you
17    were reviewing an order, what type of
18    information were you looking at?
19                 MS. FUMERTON:  Objection, form.
20                 THE WITNESS:  It -- there was a
21         wide array of information, including
22         dispensing trends, past order history.
23         Things like that.
24         Q.     (BY MR. BOWER)  What do you
25    mean by "dispensing trends"?
```

```
 1                What specific information would
 2    you look at?
 3                MS. FUMERTON:  Objection, form.
 4                THE WITNESS:  The actual trend
 5        of dispensing:  Has the amount of that
 6        particular drug in question gone up or
 7        down, or was it steady.
 8                What the quantity of pills per
 9        prescription.
10                We would look at insurance,
11        what we call distribution.  So whether
12        insurance was used or whether cash was
13        used.
14                How far patients were
15        traveling.  How far away prescribers
16        were from the location.
17                Things like that.
18        Q.    (BY MR. BOWER)  And I
19    appreciate that information.  I just want to
20    go through each one of those to make sure I
21    understand what you're actually looking at.
22                So the first one you mentioned
23    was -- it would help if I could read my own
24    writing.
25                So the first thing you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    mentioned was the actual trend of dispensing.
 2    Has that amount of that particular drug in
 3    question gone up or down or is it steady?
 4              So that information, was it
 5    specific to a pharmacy?
 6       A.     Yes.  It was the pharmacy and
 7    drug that alerted.
 8       Q.     And by "drug," do you mean NDC?
 9    Or something else?
10       A.     When a -- so a specific item,
11    so NDC would alert.  We would look at the
12    entire GPI for that drug.
13       Q.     And I appreciate that.  So can
14    you just, for the record, clarify what you
15    mean by "GPI"?
16       A.     So GPI is the global product
17    indicator.
18       Q.     Okay.  And what does that mean?
19       A.     It is a more universal term.
20    The NDC is manufacturer-specific, and the
21    GPI, each number means something.  I don't
22    know what they all mean.  But the entire
23    number together refers to a drug.
24              So, for instance, hydrocodone
25    10/325 has one GPI regardless of the multiple
```

Highly Confidential - Subject to Further Confidentiality Review

1   NDCs that are made.
2       Q.   Okay.  Does the GPI
3   consider different -- for example, you
4   mentioned hydrocodone -- different strengths
5   of hydrocodone?
6       A.   The entire GPI would be one
7   strength of hydrocodone.  If you back off a
8   couple numbers, then it would be a different
9   strength of hydrocodone -- or it would be
10  like a hydrocodone as a drug class, and then
11  a couple more numbers would mean like the
12  opioid, you know, drug class.  Things like
13  that.  They stair-step.
14      Q.   Okay.  I appreciate that.  I
15  didn't mean to cut you off.
16           When reviewing an order, would
17  you limit your review to the GPI or would you
18  back off and look at the more broader
19  information?
20           MS. FUMERTON:  Objection, form.
21           THE WITNESS:  For what
22  timeframe?
23      Q.   (BY MR. BOWER)  Well, that's a
24  fair point.  Let's start with when was the
25  first time you would have used this