# EXHIBIT 100

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                       - - -

 5    IN RE: NATIONAL PRESCRIPTION

 6    OPIATE LITIGATION               Case No.

 7                                    1:17-MD-2804

 8    APPLIES TO ALL CASES            Hon. Dan A.

 9                                    Polster

10    Case No. 1:17-MD-2804

11                       - - -

12                  March 21, 2019

13                       - - -

14      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

15               CONFIDENTIALITY REVIEW

16           Videotaped deposition of PAUL

17    CAMPANELLI, held at 250 West 55th Street,

18    New York, New York, commencing at 9:10 a.m.,

19    on the above date, before Marie Foley, a

20    Registered Merit Reporter, Certified

21    Realtime Reporter and Notary Public.

22              GOLKOW LITIGATION SERVICES

23         877.370.3377 ph | 917.591.5672 fax

24                  Deps@golkow.com
```

Page 58

1  Q. In the middle we have oxycodone,
2  right?
3  A. Yes.
4  Q. And to the far right we have
5  oxymorphone?
6  A. Yes.
7  Q. Okay. And do you have the
8  knowledge, sir, that in fact Qualitest was
9  in the business of making, selling and
10 distributing hydrocodone opioid products?
11     MR. STERN: Objection; lack of
12 foundation. Objection to the form.
13 BY MR. BUCHANAN:
14 Q. You can answer.
15 A. I'm aware that Qualitest
16 manufactured hydrocodone.
17 Q. Okay. And we talk hydrocodone
18 products, we're talking about
19 hydrocodone/APAP, that's that Vicodin
20 tablet, right? Or the brand?
21 A. That's my understanding. Okay.
22 Q. And we go to the middle column
23 here and we see oxycodone again and we
24 have oxycodone APAP at the bottom.

Page 59

1     I think you told us a few
2  minutes ago oxycodone APAP would be the
3  Endo-branded product Percocet, right?
4  A. Correct.
5  Q. And then we have other oxycodone
6  tablets which if they were ER would be
7  OxyContins, right?
8  A. If they were ER.
9  Q. And if you just sold them plain,
10 it would just be OxyContin, right?
11    MR. STERN: Objection to the
12 form.
13 BY MR. BUCHANAN:
14 Q. IR?
15 A. IR here is an immediate release
16 product.
17 Q. Thank you.
18    Then on the right we have
19 oxymorphone, that's the active ingredient
20 in that drug that you marketed under the
21 brand name Opana, correct?
22    MR. STERN: Objection to the
23 form.
24 A. Oxymorphone here is a generic

Page 60

1  version of Opana IR.
2  Q. And we're already using terms
3  that may not be clear. I guess IR is
4  immediate release?
5  A. Correct.
6  Q. ER is extended-release?
7  A. Correct.
8  Q. Okay. So when we talk about
9  oxycodone ER, which I think you said was
10 OxyContin, that's oxycodone
11 extended-release, right?
12 A. Yes.
13 Q. If you're talking oxycodone IR,
14 that's the active ingredient in OxyContin
15 but for immediate-release?
16 A. Yes.
17 Q. Thank you. All right.
18    Let's go forward to the next
19 one. Some Par products.
20    Can we pass over, please,
21 Exhibit 204?
22    (Campanelli Exhibit 204,
23 document, was marked for
24 identification, as of this date.)

Page 61

1  BY MR. BUCHANAN:
2  Q. I think you told us, sir, that
3  you were the CEO of Par from 2012 to 2015,
4  correct?
5  A. Correct.
6  Q. And you worked there, I think,
7  from, what, 2000 to 2012 in various roles
8  as you escalated through the management
9  ranks, right?
10 A. Yes, from 2001 through 2015.
11 Q. Okay. Let's just kind of get in
12 context, if you will, where Par was in the
13 mix, okay.
14    Par made fentanyl products,
15 right?
16 A. No.
17 Q. No, sir?
18 A. No.
19 Q. We have shipping records that
20 reflect that you were selling fentanyl.
21 A. Par sold fentanyl.
22 Q. Fair enough.
23    So the fuss or the disagreement
24 was "make" versus "sold"?

Page 62

1    MR. STERN: Objection to the
2 form.
3    A.  Correct.
4    Q.  And help me out, sir.
5        You didn't make, but you
6 acquired it?
7    A.  Correct.
8    Q.  And then sold it?
9    A.  Yes.
10   Q.  Does that mean you had a
11 contract manufacturer?
12   A.  Yes.
13   Q.  For each of these columns here
14 in the chart, and I probably should have
15 oriented us a little bit, these are Par
16 opioid drugs as we've identified from, if
17 you will, the order records that Par has
18 provided to us.
19       Fair?
20       MR. STERN: Objection to the
21 form.
22 BY MR. BUCHANAN:
23   Q.  I'll tell you that. That's my
24 representation.

Page 63

1        Do you recollect, sir, selling
2 fentanyl-containing products while at Par?
3        MR. STERN: Objection to the
4 form.
5    A.  Par sold two forms of fentanyl
6 products.
7    Q.  Okay. They sold fentanyl
8 citrate?
9    A.  Yes.
10   Q.  And that's the lozenge or
11 lollipop?
12   A.  Correct.
13   Q.  You also sold fentanyl patch?
14   A.  We sold fentanyl patch for a
15 period of time.
16   Q.  Okay. You also sold Morphine,
17 right?
18       MR. STERN: Objection to the
19 form.
20   A.  We sold Morphine.
21   Q.  Okay. Same qualification that
22 you provided with regard to fentanyl, sir.
23 That you sold it but didn't make it?
24       MR. STERN: Objection to the

Page 64

1 form.
2    A.  Par manufactured and sold
3 Morphine.
4    Q.  You did, okay.
5        Let's look at oxycodone ER, sir.
6        That would be the OxyContin,
7 right?
8    A.  Yes.
9    Q.  So, Par, did they manufacture
10 and sell generic OxyContin?
11   A.  No. Par sold.
12   Q.  Okay. And with regard to
13 hydrocodone, looks like you sold some
14 liquids. That would be the active
15 ingredient in Vicodin hydrocodone, right?
16       MR. STERN: Objection to the
17 form.
18       MR. BUCHANAN: I'll withdraw.
19 BY MR. BUCHANAN:
20   Q.  Hydrocodone, that's the active
21 ingredient in Vicodin?
22   A.  Correct.
23   Q.  And you sold hydrocodone
24 liquids, fair?

Page 65

1        MR. STERN: Objection to the
2 form.
3    A.  Par sold, did not manufacture,
4 Tussionex.
5    Q.  Okay. And, certainly you were
6 kind of boots on the ground, so to speak,
7 or maybe not on the ground, but you were
8 at Par between 2010 and 2015 when these
9 products were either being made and sold
10 or sold by Par.
11       Fair?
12   A.  Fair.
13   Q.  Okay. You have recollection
14 that those were, in fact, active products
15 in the Par portfolio eligible for
16 purchase.
17       Fair?
18   A.  Yes.
19   Q.  Okay. You can set that aside.
20       MR. BUCHANAN: You can take that
21 down, Corey. Thank you.
22 BY MR. BUCHANAN:
23   Q.  We're doing pretty good on
24 agreeing with one another on the various

Page 66

1  facts, sir. I imagine we'll have some
2  fuss at some point today, but I want to
3  see if there's an area where we agree
4  there's no fuss.
5       No dispute, sir, that there is
6  an opioid epidemic in the country today.
7       Fair?
8       MR. STERN: Objection to the
9    form.
10      A.   There's no dispute that there's
11 an opioid abuse epidemic.
12      Q.   You're qualifying it with the
13 word "abuse"?
14      A.   Correct.
15      Q.   I see.
16      When did you become aware that
17 there was an opioid epidemic of any form,
18 sir?
19      MR. STERN: Objection to the
20   form.
21      A.   Where it resonated was in the
22 2015 time frame.
23      Q.   Okay.
24      MR. BUCHANAN: Can I have

Page 67

1    Exhibit 1?
2       (Campanelli Exhibit 1, document,
3       was marked for identification, as of
4       this date.)
5  BY MR. BUCHANAN:
6       Q.   To make this, I guess, easy
7  today, hopefully. We'll see if it works.
8  We've got a good portion of the day's
9  exhibits in a binder before you. We've
10 got a copy for your counsel.
11      MR. BUCHANAN: Here you are
12   (handing). There you go.
13      Q.   The tab is the exhibit number.
14 So when I say go to Exhibit 1, please, you
15 can just go to Tab 1. Okay.
16      I will reference additional
17 numbers today. That's more for my tech
18 down the end of the table so he can put
19 them up on the screen for our benefit.
20      MR. STERN: Mr. Buchanan, excuse
21   me. These will be marked. There's no
22   exhibit stickers on mine. They're
23   going to be -- we can deal with this
24   on a break. We just need to make sure

Page 68

1  we get them in the record the right
2  way.
3       MR. BUCHANAN: The witness's are
4    marked.
5       MR. STERN: They are, okay.
6       MR. BUCHANAN: We have an
7  exhibit tab in the corner, hopefully
8  if we've passed you the right binder,
9  sir.
10      MR. STERN: Yep. Thank you.
11      (Pause.)
12 BY MR. BUCHANAN:
13      Q.   Sir, before you is --
14      MR. STERN: I'm sorry,
15 Mr. Buchanan. Can we straighten
16 out -- we can go off the record for a
17 minute? It will be my time. I just
18 want to straighten out the binders.
19      MR. BUCHANAN: That's fine.
20      THE VIDEOGRAPHER: All right.
21 The time is 9:47 a.m.
22      Off the record.
23      (Discussion held off the
24 record.)

Page 69

1       THE VIDEOGRAPHER: Okay. The
2  time is 9:47 a.m.
3       Back on the record.
4  BY MR. BUCHANAN:
5       Q.   Sir, do you have before you the
6  binder that we passed you with exhibits
7  for today?
8       A.   Yes.
9       Q.   Okay. If you turn to Tab 1,
10 that should be Exhibit 1 for today's
11 deposition. There should be a notation on
12 the bottom right corner.
13      A.   Okay.
14      MR. BUCHANAN: I'm going to ask
15 my tech, please, to pull up 1888,
16 E1888, for those viewing this.
17      Q.   Sir, in 2011, the CDC declared
18 an epidemic, right?
19      A.   I'm not sure that's what this is
20 saying.
21      Q.   Well, before you, sir, we have
22 the November 2011 CDC Vital Signs Alert,
23 correct?
24      A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  Q. It says: Prescription painkiller
2  overdoses in the U.S.
3     Do you see that?
4  A. Yes.
5  Q. Let's look at the first
6  sentence.
7     Could you read that into the
8  record, sir?
9  A. (Reading) Deaths from
10 prescription painkillers - with an
11 asterisk - have reach epidemic levels in
12 the past decade.
13 Q. Okay. Let's pause on that.
14    In 2011, the CDC declared a
15 prescription painkiller death overdose
16 epidemic.
17    Correct?
18    MR. STERN: Objection to the
19 form.
20 A. That's what it says.
21 Q. And we see what prescription
22 painkillers are being referred to,
23 correct?
24 A. I see that.

Page 71

1  Q. There's a footnote at the bottom
2  it says: Prescription painkillers refers
3  to opioid or narcotic pain relievers,
4  including drugs such as Vicodin - in
5  parentheses - hydrocodone.
6     You see that?
7  A. I see it.
8  Q. Each of the three entities'
9  drugs that we looked at included
10 hydrocodone products.
11    Fair?
12    MR. STERN: Object to the form.
13 A. I see the products listed.
14 Q. We looked at drug charts just a
15 moment ago, sir. I think it was 202, 203,
16 204.
17    You recall that?
18 A. I recall.
19 Q. Each of the products -- excuse
20 me. Each of the charts reflect drug
21 products made by Endo, Par and Qualitest
22 with the active ingredient hydrocodone,
23 correct?
24    MR. STERN: Objection to the

Page 72

1  form.
2  A. Not all made.
3  Q. Sold, sir.
4  A. Yes.
5  Q. Okay. I understand that as a
6  matter of the way you have chosen to do
7  business at various points in time, you
8  being a royal you, sometimes you contract
9  out manufacturing, correct?
10 A. Correct.
11    MR. STERN: Objection to the
12 form.
13 BY MR. BUCHANAN:
14 Q. Nonetheless, you marketed and
15 sold, you being Qualitest, Par and Endo,
16 hydrocodone-containing products, correct?
17    MR. STERN: Objection to the
18 form.
19 A. We sold.
20 Q. Okay. So as it relates to the
21 first category, Vicodin, in parens
22 hydrocodone, we can agree that Par, Endo
23 and Qualitest all made
24 hydrocodone-containing products, correct?

Page 73

1  A. We sold these products
2  containing these actives.
3  Q. We can agree, sir, that Par,
4  Endo and Qualitest also sold
5  oxycodone-containing products, correct?
6     MR. STERN: Objection to the
7  form.
8  A. The company sold
9  oxycodone-containing products.
10 Q. Okay. And with regard to
11 oxycodone-containing products, not just
12 any oxycodone products. The company also
13 sold generic OxyContin.
14    Correct?
15    MR. STERN: Objection to the
16 form.
17 A. Par sold OxyContin
18 extended-release generics.
19 Q. And for a period of time, Endo
20 did as well, correct?
21    MR. STERN: Objection to the
22 form.
23 A. Endo sold immediate-release
24 OxyContin.

Page 110

1    As the CEO, this is something
2 that may or may not get to my level.
3 That's may -- that may be what's going on
4 here, sir.
5    Q.  Well, we could agree, sir, that
6 at least within Endo, Endo had the
7 awareness in 2011 --
8    A.  We can agree that --
9    Q.  Let me just finish my question
10 first.
11    We can agree, sir, that at least
12 within Endo, Endo had the knowledge of the
13 direct correlation between unintentional
14 overdose deaths and sales of prescription
15 opioids as reflected on this chart,
16 correct, sir?
17    A.  What we can agree is that Endo
18 had the knowledge and at the professional
19 level, if we're going back to the e-mail,
20 the communication of where this material
21 went, is you can see it did not go to a
22 CEO level at Endo.  It's quite possible
23 that Par had the same knowledge and also
24 would not have gone to the CEO level.

Page 111

1    Q.  It's still an epidemic today,
2 right?
3    MR. STERN:  Object to the form.
4    A.  We have an opioid abuse crisis.
5    Q.  I mean, the CDC did not stop
6 writing about this in 2011, right, sir?
7    A.  I'm sure they did not.
8    Q.  Okay.  You've seen the 2016 CDC
9 guidelines?
10    A.  Where am I --
11    Q.  Have you seen the 2016 CDC
12 guidelines, sir?
13    A.  No, I have not.
14    Q.  Could you go, please, to
15 Exhibit 2.
16    (Campanelli Exhibit 2, document,
17 was marked for identification, as of
18 this date.)
19    MR. BUCHANAN:  Corey, could you
20 pull up E729?
21 BY MR. BUCHANAN:
22    Q.  Sir, let's go to the first page,
23 dot-1.  CDC guideline for prescribing
24 opioids for chronic pain.  United States

Page 112

1 2016.
2    Do you see that?
3    A.  I do.
4    MR. BUCHANAN:  Let's go to
5 dot-4, Corey.
6    Actually, let's just pull up
7 slide 44, Corey.  And we'll just mark
8 this.
9    You can look at the full
10 document, sir.  At any point when I
11 show you a slide today that's based on
12 an exhibit, feel free to look at the
13 full.
14    THE WITNESS:  Okay.
15    MR. STERN:  I'm sorry,
16 Mr. Buchanan.  I don't have a 44.
17    MR. BUCHANAN:  It's being passed
18 over to you.
19    MR. STERN:  Thank you.
20    MR. BUCHANAN:  I wasn't sure we
21 were going to need to use it.
22    What exhibit number?
23    This is Exhibit 205, a
24 demonstrative aid, sir.

Page 113

1    (Campanelli Exhibit 205,
2 document, was marked for
3 identification, as of this date.)
4 BY MR. BUCHANAN:
5    Q.  You are free, of course, to look
6 at the page, which is dot-4, or you're
7 free to look at the demonstrative that's
8 on the screen.
9    MR. STERN:  Just to be clear,
10 Mr. Buchanan, for the record, what's
11 Exhibit 205, the demonstrative is not
12 the same thing as dot-4.  You just
13 said he can look at the screen or he
14 can look at --
15    MR. BUCHANAN:  It is.  It is.
16    MR. STERN:  What?  I may be on
17 the wrong 44.
18    MR. BUCHANAN:  I'm sorry.
19 You know what, let's clarify.
20    MR. STERN:  Should we hold on to
21 these?
22    (Pause.)
23    MR. BUCHANAN:  I'm not clear on
24 the confusion, sir.

Page 114

1  MR. STERN: Your representation
2  made it seem as though, and maybe I
3  misunderstood you, that dot-4 of
4  Exhibit 2 was the same document as
5  205.
6      So here's dot-4 and here's 205
7  (indicating).
8      MR. BUCHANAN: Let me see.
9      MR. STERN: These may be
10 excerpts.
11     MR. BUCHANAN: No. To be clear,
12 in the top right corner it says E729
13 of the --
14     MR. STERN: Right.
15     MR. BUCHANAN: Okay. E729, sir,
16 is the source of the quotes that are
17 on the slide.
18     MR. STERN: The source. I'm
19 sorry.
20     I just want the record to be
21 clear that what is portrayed on 205 is
22 the not same thing as the text of
23 dot-4.
24     MR. BUCHANAN: That's fine. I

Page 115

1  accept that, sir. The text is as
2  reflected --
3      MR. STERN: In here.
4      MR. BUCHANAN: Yes.
5      For simplicity for the witness
6  on a dense page, we prepared these.
7  BY MR. BUCHANAN:
8  Q. Sir, you are free to refer to
9  E729.4, which is the hard copy of the
10 document.
11     MR. STERN: May I have a moment,
12 Mr. Buchanan, just to explain to Mr.
13 Campanelli.
14     So, this dot-4 refers to that
15 dot-4.
16     THE WITNESS: Got it.
17     MR. STERN: And these are
18 purported to be excerpts of this page.
19 This is the preceding page, the dot-3.
20     THE WITNESS: Okay.
21 BY MR. BUCHANAN:
22 Q. With that confusion hopefully
23 clarified either some by me or others, I'm
24 not sure, but I am ready to go if you are,

Page 116

1  sir.
2      Are you familiar that the CDC
3  issued guidelines concerning the
4  prescription of opioids for chronic pain
5  in 2016?
6  A. Not specifically.
7  Q. Okay. In their prescribing
8  guidelines, sir, they describe the
9  epidemic.
10     You see that on page dot-4 of
11 Exhibit 2?
12 A. This sheet, sir (indicating)?
13     Where am I looking? Am I
14 looking at this sheet?
15 Q. You can look at either.
16 A. I see these words. I assume
17 that they're in the same.
18 Q. (Reading) From 1999 to 2014,
19 more than 165,000 people -- persons died
20 from overdose related to opioid pain
21 medications in the United States.
22     Do you see that, sir?
23 A. I see that.
24 Q. That's alarming, right?

Page 117

1  A. Yes.
2  Q. That is not good.
3      MR. STERN: Objection to the
4  form.
5  BY MR. BUCHANAN:
6  Q. Fair?
7  A. Fair. Very bad.
8  Q. We saw, sir, a moment ago the
9  direct correlation between sales and
10 deaths.
11     Do you recall that?
12 A. I saw the sales going up and I
13 saw the increase in deaths, yes.
14 Q. As the executive of a
15 pharmaceutical company looking at a
16 situation, sir, did you assess the role
17 that your sales played in escalating
18 opioid deaths over the years?
19     MR. STERN: Objection to the
20 form.
21 A. I did not assess my sales with
22 the opioid deaths.
23     We did take actions to stop
24 selling product.

Page 118

1  Q. Okay. So then would it be fair
2  to say, sir, that you recognized that your
3  sale of opioid products was leading to
4  over -- overdose deaths?
5       MR. STERN: Objection to the
6  form; lack of foundation.
7  A. We were aware in 2016 when the
8  product was abused or misused it would
9  lead or could lead to deaths.
10 Q. Okay. We'll talk about that in
11 greater detail a little later.
12 A. Okay.
13 Q. (Reading) In the past decade -
14 according to the CDC - while the death
15 rates for the top leading causes of death,
16 such as heart disease and cancer, have
17 decreased substantially, the death rate
18 associated with opioid pain medications
19 has increased markedly. Sales of opioid
20 pain medication have increased in parallel
21 with opioid-related overdose deaths.
22      Do you see that, sir?
23 A. I see that.
24 Q. That's the point we were talking

Page 119

1  about?
2       MR. STERN: Mr. Buchanan, I
3  apologize. Can you, as you're doing
4  this, it's totally fine, I understand
5  what you're doing. Can you at least
6  give us -- tell us where these
7  excerpts are appearing on the page?
8       MR. BUCHANAN: I'm happy to have
9  somebody try and highlight this as we
10 proceed. I'd rather continue with my
11 examination in the form that I'm
12 doing.
13      MR. STERN: Okay. Well, then
14 hold on just one moment so I can
15 orient myself.
16      (Pause.)
17      MR. STERN: Thank you.
18 BY MR. BUCHANAN:
19 Q. And just before counsel's
20 question or interruption, I want to get
21 back to my question.
22      That was: In the past decade,
23 while the death rates for the top leading
24 causes of death, such as heart decease and

Page 120

1  cancer, have decreased substantially, the
2  death rate associated with opioid pain
3  medication has increased markedly. Sales
4  of opioid pain medication have increased
5  in parallel with opioid-related overdose
6  deaths.
7       Did I read that correctly, sir?
8  A. Yes.
9  Q. Okay. That's that point we were
10 talking about a moment ago, sir, that
11 direct correlation between increasing
12 sales and increasing prescription overdose
13 opioid deaths, correct?
14 A. I see the parallel.
15 Q. (Reading) In 2013 - the CDC
16 continues - on the basis of DSM-IV
17 diagnosis criteria, an estimated 1.9
18 million persons abused or were dependent
19 on prescription opioid pain medications.
20      Do you see that, sir?
21 A. I do.
22 Q. That's not good.
23      MR. STERN: Object to the form.
24

Page 121

1  BY MR. BUCHANAN:
2  Q. Do you agree?
3  A. Is that a question?
4  Q. It is.
5  A. I'm sorry. Could you ask it
6  again?
7  Q. Do you agree, sir, that that's
8  not good?
9       MR. STERN: Object to the form.
10 A. 1.9 million persons abuse is not
11 good.
12 Q. Does it surprise you, sir, that
13 that abuse and dependence is having real
14 consequences on communities in this
15 country?
16      MR. STERN: Object to the form.
17 A. I'm aware of the impact in the
18 communities.
19 Q. You're aware of the billions and
20 billions of dollars of financial impact,
21 human toll, loss of life, disruption to
22 family --
23      MR. STERN: Objection.
24 Q. -- that is being suffered in the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  communities in this country.
2      True?
3      MR. STERN: Objection to form;
4  lack of foundation.
5      A.   I'm certainly -- I'm not aware
6  of the dollar amount you just indicated,
7  but clearly I am aware and sympathetic to
8  the families in the communities all around
9  the United States.
10     Q.   That awareness, sir, you
11 reached, it took four years, four years
12 for you, sir, as a pharmaceutical
13 executive, CEO of a company, to even
14 become aware of the existence of a
15 problem?
16     MR. STERN: Objection to the
17 form and mischaracterizing --
18 BY MR. BUCHANAN:
19     Q.   Following the CDC announcement
20 in 2011?
21     MR. STERN: Objection to the
22 form and mischaracterizing the
23 witness's testimony.
24     A.   As I said before, in 2015, the

Page 123

1  2015 time frame, it started to resonate
2  with me.
3      Q.   Would it surprise you, sir, if
4  this had resonated with people, with
5  families, with government agencies, with
6  the CDC in a massive human toll all around
7  you for years and years before 2015?
8      MR. STERN: Objection to the
9  form; lack of foundation.
10     A.   Can you -- can you rephrase that
11 for me so I understand it better?
12     Q.   I'm saying, sir, would it
13 surprise you, there's 165,000 overdose
14 deaths secondary to prescription pain
15 medication between 1999 and 2014 and
16 you're saying, sir, that did not resonate
17 with you until 2015?
18     MR. STERN: Objection to the
19 form.
20     A.   I was aware of an issue in terms
21 of the use of it being an epidemic abuse
22 issue, that did not resonate with me until
23 2015. In my role, again, I was aware of
24 orders that would come in to our office

Page 124

1  and we would process in normal course
2  based upon wholesaler use. That's what we
3  were doing.
4      Q.   By definition, sir, as the
5  company selling controlled substances, you
6  know those substances, people want to get
7  them out of that controlled system, right?
8      MR. STERN: Object to the form.
9      A.   We have systems and procedures
10 to protect against that.
11     Q.   They are products that are
12 targets for abuse and diversion, right?
13     MR. STERN: Object to the form;
14 lack of foundation.
15     A.   They could be. And that's why
16 we have systems and procedures and safes
17 and security cameras to help curb that.
18     Q.   165,000 people in 15 years died
19 from these pain medications in the United
20 States.
21     You see that?
22     MR. STERN: Object to the form.
23     A.   I see it.
24     Q.   The estimate was in 2011 some

Page 125

1  400,000 treatment admissions every year
2  for opioid-related treatment secondary to
3  addiction or dependence.
4      You recall that?
5      A.   No. I'm not following the
6  question, sir.
7      Q.   Do you recall in the 2011 sheet,
8  sir, 400,000 or so admissions for
9  treatment?
10     A.   Okay. I recall that.
11     Q.   Does it surprise you, sir, that
12 there is a vast human toll that goes back
13 not just to 2015, 10, 15, 17, 18 years
14 since you were marketing and promoting
15 these drugs?
16     MR. STERN: Objection to the
17 form.
18     A.   As I sit here today, I clearly
19 understand it. It's a terrible situation.
20 We also have a duty and a responsibility
21 that there's millions of people that need
22 these drugs as well.
23     It's a terrible situation on the
24 deaths. I admit to that. And for that a

Page 126

1  lot of people feel terrible, including
2  myself.
3      Q.   How many hundreds of people did
4  Par have working at in 2012, 2013, 2014?
5      A.   I'm sorry?
6      Q.   How many hundreds of people did
7  Par have working at it in 2012, '13, '14?
8      A.   Probably about a thousand.
9      Q.   Not one of a thousand people,
10 sir, in that entity brought the epidemic
11 to your desk and said "I've got real
12 concerns about what we're doing here"?
13     A.   As I sit here today, I don't
14 recall.  I'm not saying it didn't happen,
15 but I don't -- I don't recall that
16 happening.
17          MR. BUCHANAN:  I suggest we take
18     a short break.
19          MR. STERN:  Sure.
20          THE VIDEOGRAPHER:  Remove your
21     microphones, please.
22          The time is 10:38 a.m.
23          Off the record.
24          (Recess taken.)

Page 127

1           THE VIDEOGRAPHER:  We are back
2      on record.
3           The time is 10:53 a.m.
4  BY MR. BUCHANAN:
5      Q.   Sir, I'd like to circle back to
6  where we were finishing.  We were talking
7  about kind of where we were, so to speak,
8  in the last several years with regard to
9  this epidemic.
10          I want to kind of see where your
11 products kind of fit into the mix, if
12 that's okay.
13          Do you still have Exhibit 202?
14 You remember that pill chart we were
15 looking at?
16          MR. BUCHANAN:  Can you pull up
17     202, Corey?  Slide 20.
18 BY MR. BUCHANAN:
19     Q.   And these are the various
20 products that Endo has marketed and sold
21 over the years, correct, sir?
22     A.   I -- I know that it's marketed
23 Opana.  I'm not sure if it marketed or
24 pro -- I know it marketed and promoted

Page 128

1  Opana and Percocet.  That I do know.
2      Q.   Okay.  Two big brands for the
3  company?
4      A.   Two brands, yes.
5      Q.   Okay.  Let's -- let's kind of
6  talk about what that means in terms of
7  sales.
8           MR. BUCHANAN:  I'm sorry.  Can
9      we go off the record for a moment?
10          THE VIDEOGRAPHER:  The time is
11     10:55 a.m.
12          Going off the record.
13          (Recess taken.)
14          (Campanelli Exhibit 206,
15     document, was marked for
16     identification, as of this date.)
17          THE VIDEOGRAPHER:  We are back
18     on the record.
19          The time is 11:03 a.m.
20 BY MR. BUCHANAN:
21     Q.   Sir, passing you what we've
22 marked as Exhibit 206.  This is a chart of
23 Endo's various products over the years and
24 sales volume in pills, or extended units.

Page 129

1  I'll represent to you, sir, that it's
2  generated from data that's been identified
3  to us by defense counsel, Endo's counsel,
4  in this litigation.
5           We can see --
6           MR. BUCHANAN:  If you go to the
7      far left column, please, Corey.
8      Q.   We can see, if you will, various
9  products listings on the left and we can
10 see sales volume in extended units.
11 That's pills, or conversions for other
12 types of formulations, over the various
13 years.  And we see going back to 1999 Endo
14 was making Endocet.
15          You see that, sir?
16     A.   Yes.
17     Q.   I think you told us, and we saw
18 in the prior exhibit, that Endocet was a
19 generic form of Percocet, right?
20     A.   Correct.
21     Q.   So, in 1999, Endo made some 160
22 million Endocet tablets, according to
23 shipment data and reflected on this chart,
24 correct, sir?

Page 130

1  A. Yes.
2  Q. We see Percocet, some hundred
3  million or so tablets, 102, 101.
4     You see that?
5  A. Yes, I see it.
6  Q. Okay.
7     MR. BUCHANAN: And we can scroll
8  it all the way to the right, maybe,
9  Corey. If you can split the screen so
10 we can kind of see where we were with
11 the product listing on the left and
12 the total pills that were sold on the
13 right.
14    There's a totals column, Corey.
15 Can you just give us the totals?
16    There we go. Great.
17    Can you get them to the same
18 scale, roughly, so we can line them
19 up? And really all I need is the
20 totals column, Corey.
21    Thank you.
22    There we go. And if you can
23 mush them together so we can kind of
24 see the products and see the totals.

Page 131

1  And they're a little off, I guess.
2     There we go.
3  BY MR. BUCHANAN:
4  Q. So, you can see, sir, Endocet
5  total sales of this Percocet generic
6  formulation over the years roughly 4.2
7  billion pills.
8     You see that, sir?
9     MR. STERN: Objection to the
10 form.
11 A. No. No, I don't see that.
12 Q. If you go to the far right
13 column total pills sold over the course of
14 the period of time?
15 A. You -- your question flipped on
16 me, just so you know.
17 Q. Fair enough. Sorry about that.
18    Do you understand my question
19 now to be referring to total sales of
20 Endocet between the period of time they
21 started selling it until they stopped
22 would be about 4.2 billion Endocets?
23 A. I think you need to clarify your
24 question, sir.

Page 132

1  Q. And, what's confusing about it,
2  or what's tripping us up?
3  A. Are you saying sales or units,
4  sir?
5  Q. I'm sorry. Sales of those
6  units.
7     These are, in fact, the units
8  that have been represented as sold to us.
9  A. Okay.
10    MR. STERN: Not dollars, is the
11 point.
12    MR. BUCHANAN: Fair.
13    MR. STERN: Right.
14    MR. BUCHANAN: Fair.
15 BY MR. BUCHANAN:
16 Q. And I'm -- you sold this volume
17 of pills, sir?
18 A. This sheet indicates that we've
19 sold these unit -- extended units of these
20 pills.
21 Q. Fair enough. Thank you.
22    Yeah, I did not mean to suggest
23 that these are dollars. There's a legend
24 at the top that I think reflects extended

Page 133

1  units. That's what we're talking about
2  with these numbers.
3  A. Okay.
4  Q. Okay. And we're looking at just
5  the Endo numbers in this chart, I'll
6  represent to you, sir. Okay.
7     MR. STERN: Objection to the
8  form.
9  BY MR. BUCHANAN:
10 Q. So, we see roughly 4.2 billion
11 Endocet units, that's pills, over the time
12 that Endo provided us data from '99 to
13 present, right?
14 A. 4.2 billion extended units.
15 Q. For Percocet we see, as the
16 brand, Endo's brand, we see some 1.6
17 billion extended units, correct?
18 A. Correct.
19 Q. All right. So, those two
20 oxycodone acetaminophen combinations
21 represent almost, what, 6 billion pills
22 sold by Endo for that controlled
23 substance.
24    Is that right?

Page 338

1  have a date on the back.
2      It's 2003, okay.
3      Let's go to dot-3.
4      Just to orient ourselves, sir,
5  in 2003, you all were still supporting the
6  American Pain Foundation, right?
7      MR. STERN: Objection to the
8  form; lack of foundation.
9      A.  From the document you showed me,
10 it appears that Endo supported.
11     Q.  Okay.  And on this page it says:
12 Know the facts.
13     Right?
14     A.  Yes.
15     Q.  Facts, with an exclamation
16 point, right?
17     A.  Yes.
18     Q.  It's got a few points, then it
19 says, again:  Not all healthcare providers
20 know how to treat your pain.
21     Right?
22     A.  That's what the words say.
23     Q.  (Reading) If your health care
24 provider is unable to treat your pain

Page 339

1  effectively, ask him or her to refer to a
2  specialist.  You may need to consider
3  changing providers.
4      You see that?
5      A.  I see it.
6      Q.  That is the recommendation in
7  the patient brochure that you all were
8  funding, you all being Endo?
9      MR. STERN: Objection to the
10 form; lack of foundation.
11     A.  Again, I don't know any
12 underlying information that would have led
13 to that -- that -- that point.
14     Q.  Okay.  Next point says:  Pain
15 medications rarely cause addiction.
16     Do you see that?
17     A.  I see it.
18     Q.  Looks like the one we looked at
19 a few minutes ago, right?
20     A.  It was on the previous deck,
21 yes.
22     Q.  Again, telling patients, telling
23 health care providers combating opiophobia
24 pain medications rarely cause addiction,

Page 340

1  right?
2      MR. STERN: Objection to the
3  form of the question; lack of
4  foundation.
5      A.  Again, I don't see the
6  opiophobia here.
7      Q.  No, I -- this was the message
8  the company -- excuse me, the APF was
9  communicating with the company dollars to
10 consumers and health care providers,
11 right?
12     MR. STERN: Objection to the
13 form of the question; lack of
14 foundation.
15     A.  They're communicating this point
16 as you're referencing.
17     Q.  Okay.
18     (Reading) Pain medications
19 rarely cause addiction.  Morphine and
20 similar pain medications called opioids
21 can be highly effective for certain
22 conditions.  Unless you have a history of
23 substance abuse, there's little risk of
24 addiction.

Page 341

1      And it continues.
2      You see that?
3      A.  Yes.
4      Q.  That's not true.
5      MR. STERN: Objection to the
6  form; lack of foundation.
7  BY MR. BUCHANAN:
8      Q.  Right, sir?
9      A.  I don't know the answer to that.
10     Q.  As a person sitting here, sir,
11 in 2019, president of a pharmaceutical
12 company, is it rare to --
13     MR. STERN: I'm sorry.  I also
14 object because the entire sentence was
15 not read just now.
16     MR. BUCHANAN: You just
17 interrupted my question, counsel.
18     MR. STERN: I apologize.
19     MR. BUCHANAN: There's
20 opportunity for redirect, and I
21 certainly wouldn't objected to a
22 comment before, but now I'm in a
23 question.
24

Page 342

1  BY MR. BUCHANAN:
2     Q.  As a person sitting here, sir,
3  in 2019, president of a pharmaceutical
4  company, are you surprised to see the
5  addiction risk of opioid medications
6  described as rare?
7        MR. STERN:  Objection; lack of
8     foundation; mischaracterizes the
9     document; and objection to form.
10    A.  As I sit here today, opioid
11 abuse and misuse is not surprising to see
12 that as addiction.
13       As the products that contain
14 opioids are prescribed for the indication
15 and use with respect to the label and the
16 indication, those drugs help millions of
17 Americans relieve pain.
18    Q.  Sir, within the walls of Endo at
19 this very point in time, the company was
20 aware that the risk of addiction was
21 anything but rare.
22       Right?
23       MR. STERN:  Objection to the
24    form.

Page 343

1        At this point in time 2003?
2        MR. BUCHANAN:  Yeah, 2003, early
3     2000s.
4        MR. STERN:  Lack of foundation.
5     A.  I have no idea what was going on
6  within the four walls of Endo in 2003.
7     Q.  Okay.  Let's look at 34, next in
8  order.
9        (Campanelli Exhibit 34, e-mail,
10    was marked for identification, as of
11    this date.)
12 BY MR. BUCHANAN:
13    Q.  This is an e-mail from a Matthew
14 Clark to Ms. Kitlinski and others sent on
15 I guess it's March of 2004, attaching an
16 article Nicholson Drugs 2003.
17       Do you see that?
18    A.  I see it.
19    Q.  (Reading) Dear all:  Article
20 mentioned yesterday.
21       Do you see that?
22    A.  I see it.
23    Q.  Okay.  Next page:  Responsible
24 prescribing of opioids for the management

Page 344

1  of chronic pain.
2        I'm sorry.  Dot-2.
3     A.  I see it.
4        MR. BUCHANAN:  Corey, could you
5     go to dot-3, please?
6  BY MR. BUCHANAN:
7     Q.  It states:  Estimates of
8  addiction rates among patients with
9  chronic non-cancer pain range from 3.2 to
10 18.9 percent.
11       Do you see that, sir?
12    A.  I see it.
13    Q.  High side of the range, one in
14 five people?
15    A.  Almost.
16    Q.  Is that rare to you?
17       MR. STERN:  Objection; lack of
18    foundation.
19    A.  Again, I don't know what this is
20 quoting, what statistics are used, what's
21 being reported here.
22    Q.  Is that rare to you?
23    A.  I don't know -- I don't know
24 it -- I don't know how to respond to that.

Page 345

1     Q.  One in five people addicted
2  chronic use of non-cancer pain opioids, is
3  that rare to you, sir?
4        MR. STERN:  Objection to the
5     form; lack of foundation.
6     A.  I don't know if that includes
7  people that are abusing or misusing or
8  people that are using a drug for its
9  intended purpose.
10    Q.  18.9 percent is not rare, sir.
11       We can agree on that?
12       MR. STERN:  Objection to the
13    form; lack of foundation.
14    A.  I just don't know.
15    Q.  Okay.  Are you familiar with the
16 literature, sir, even as of today saying
17 the rates of addiction are 8 to 12
18 percent?
19       MR. STERN:  Objection to the
20    form; lack of foundation.
21    A.  I'm not familiar with the
22 statistics.
23    Q.  I'd just like to know, sir, if
24 you were aware that the rate of addiction

Page 346

1 was 8 to 12 percent, would you have
2 endorsed characterizing that risk as rare,
3 sir?
4     MR. STERN: Objection to the
5     form of the question; lack of
6     foundation.
7     A. You're asking me to go back in
8 time back in 2003. I would need to know a
9 lot of information to be able to -- to
10 really respond to that intelligently.
11     Q. Okay. Well, there's no debate,
12 sir, we got a lot of addicted people in
13 this country following the last 15 years
14 of messages like we just looked at, right?
15     MR. STERN: Objection to the
16     form of the question; lack of
17     foundation.
18     A. I will agree that we have too --
19 too much addiction in this country. I do
20 not know if it's tied back to this
21 statement.
22     Q. Let's go to Exhibit 36, please.
23     (Campanelli Exhibit 36,
24     document, was marked for

Page 347

1     identification, as of this date.)
2 BY MR. BUCHANAN:
3     Q. Because when you use the term
4 "rare," rare actually does have a meaning
5 in the pharmaceutical industry, right?
6     MR. STERN: Objection to the
7     form of the question.
8     A. I'd have to look at it on a
9 product-by-product basis.
10    Q. You've heard of CIOMS, sir?
11    A. No, I have not.
12    Q. Okay. CIOMS is the Council for
13 International Organizations of Medical
14 Science.
15    Are you aware of that?
16    A. No.
17    Q. Don't know it by the long name
18 or the acronym?
19    A. No.
20    Q. Okay. Exhibit 36, sir, is a
21 document entitled "Benefit-Risk Balance
22 for Marketed Drugs: Evaluating safety
23 signals."
24    You see that, sir?

Page 348

1     A. Yes.
2     Q. Reported by the CIOMS Working
3 Group.
4     You see that?
5     A. I see it.
6     Q. Geneva 1998?
7     A. I see it.
8     Q. Okay. Quantification of risk.
9     Please go to dot-48.
10    As I said, sir, in your field,
11 the pharmaceutical industry, adverse
12 events are, in fact, characterized by
13 certain terms like "rare" and "common" and
14 "frequent."
15    Right?
16    A. I -- I don't know the answer to
17 that.
18    MR. BUCHANAN: Can you please
19    pull it up, Corey?
20    Q. (Reading) Quantification of
21 risk. Incidence of the reaction.
22    Okay.
23    A. I see that.
24    Q. Okay. I'm going to the middle

Page 349

1 of the paragraph it says: However, risk
2 can often be approximated in terms of
3 magnitudes of 10 as suggested in the CIOMS
4 III report.
5     Do you see that, sir?
6     A. I see it.
7     Q. (Reading) Greater than or equal
8 to 1 percent comon or frequent.
9     You see that?
10    A. I see it.
11    Q. (Reading) Greater than or equal
12 to 1 per 1,000 but less 1 percent uncommon
13 or infrequent.
14    You see that?
15    A. I see it.
16    Q. (Reading) Greater than or equal
17 to 1 per 10,000 but less than 1 per 1,000,
18 that's rare.
19    Right?
20    MR. STERN: Objection; lack of
21    foundation.
22 BY MR. BUCHANAN:
23    Q. Did I read that correctly, sir?
24    A. You read it correctly.

Page 350

1  Q. (Reading) Less than 1 per 10,000
2  very rare.
3      Right?
4      MR. STERN: Objection; lack of
5  foundation.
6      If you're asking what --
7      MR. BUCHANAN: I'm asking the
8  questions I just asked, counsel.
9  A. I see the words.
10 Q. Okay. Will you agree we looked
11 at the report from with inside the
12 company's walls from 2004, the 3.2 to 18.9
13 percent.
14     Do you recall seeing that just a
15 moment ago with me, sir?
16 A. I see the estimates that you've
17 put back on the screen.
18 Q. Yes, okay.
19     Let's now go back to the CIOMS
20 chart. You tell us where does even the
21 low end of that range, 3.2 percent, where
22 does that fall in these categories for
23 ranking frequency?
24 A. Can I bring up the other --

Page 351

1  bring up the other --
2      MR. BUCHANAN: Can you pull them
3  up side-by-side, Corey, so he's got
4  them both?
5  BY MR. BUCHANAN:
6  Q. On the left is the CIOMS
7  definition of the various frequencies. On
8  the right is the publication from within
9  the company's walls of addiction rates.
10     Okay. So let's use the low end
11 of the rate from the publication of
12 addiction rates of 3.2 percent.
13     What I'll ask you to do, sir, is
14 looking at 3.2 percent, could you tell the
15 jury the frequency of that using the terms
16 that CIOMS says should be used?
17 A. I don't know on the bottom here
18 what the number of -- of cases it's
19 referring to where it says: Estimates of
20 the addiction rates among patients with
21 chronic non-cancer range from 3.2 to 18
22 percent.
23 Q. 3.2, sir, where does that fall
24 in the ranges that are provided in CIOMS?

Page 352

1  A. It would be -- it would be very
2  rare.
3  Q. 3.2?
4  A. Where am I looking?
5  Q. 3.2 percent would be common or
6  frequent.
7  A. Where am I looking?
8  Q. You're looking at the top of
9  your screen, sir.
10     (Reading) Risk can often be
11 approximated in terms of the magnitudes of
12 10 as suggested in the CIOMS II report,
13 colon.
14 A. I stand corrected.
15     Yes, I see it. Common or
16 frequent.
17 Q. Right.
18     Addiction is common.
19     MR. STERN: Objection to the
20 form.
21 BY MR. BUCHANAN:
22 Q. Addiction is frequent.
23     MR. STERN: Objection to the
24 form of the question; lack of

Page 353

1  foundation.
2  BY MR. BUCHANAN:
3  Q. Those are the terms CIOMS said
4  should be used to characterize the rates
5  we're look at in this publication from
6  2004.
7      Correct, sir?
8      MR. STERN: Objection to the
9  form. Objection to lack of
10 foundation.
11 A. As I said, I don't know what the
12 basis of this 1998 CIOMS document is. I
13 don't know if it -- if all drugs fall into
14 the same category. I don't know if this
15 is an FDA term or is this a -- I don't
16 know if this is tied to any special
17 indication of -- of drug.
18 Q. Okay, sir. Using the CIOMS
19 definitions, let's just stay with my
20 question. Using the CIOMS definition, 3.2
21 percent addiction rate is common or
22 frequent, correct?
23     MR. STERN: Objection to the
24 form; lack of foundation.