EXHIBIT 110

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------      )
IN RE: NATIONAL               ) MDL No. 2804
PRESCRIPTION OPIATE           )
LITIGATION                    ) Case No.
------------------------      ) 1:17-MD-2804
                              )
THIS DOCUMENT RELATES TO      ) Hon. Dan A. Polster
ALL CASES                     )
------------------------      )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF

REX SWORDS

December 21, 2018

Chicago, Illinois

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1
2
3    The videotaped deposition of REX SWORDS,
4    called by the Plaintiffs for examination, taken
5    pursuant to the Federal Rules of Civil Procedure of
6    the United States District Courts pertaining to the
7    taking of depositions, taken before CORINNE T.
8    MARUT, C.S.R. No. 84-1968, Registered Professional
9    Reporter and a Certified Shorthand Reporter of the
10   State of Illinois, at the offices of Bartlit Beck
11   Herman Palenchar & Scott, Suite 600, 54 West
12   Hubbard Street, Chicago, Illinois, on
13   December 21, 2018, commencing at 8:11 a.m.
14
15
16
17
18
19
20
21
22
23
24

Page 3

1    APPEARANCES:
2    ON BEHALF OF THE PLAINTIFFS:
3        LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR P.A.
4        316 South Baylen Street, Suite 600
         Pensacola, Florida 32502
5        205-396-3982
         BY: PETER J. MOUGEY, ESQ.
6        pmougey@levinlaw.com
7
8        NAPOLI SHKOLNIK, PLLC
         360 Lexington Avenue, 11th Floor
9        New York, New York 10017
         212-397-1000
10       BY: HUNTER J. SHKOLNIK, ESQ.
         hunter@napolilaw.com
11           (via telephonic communication)
12
13
     ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
14   aka WALGREEN CO. and THE DEPONENT:
15       BARTLIT BECK LLP
         54 West Hubbard Street, Suite 300
16       Chicago, Illinois 60654
         312-494-4475
17       BY: KASPAR STOFFELMAYR, ESQ.
         kaspar.stoffelmayr@BartlitBeck.com
18
19
20
21
22
23
24

Page 4

1    APPEARANCES (Continued):
2    ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
     ENDO PHARMACEUTICALS, INC.,
3    PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
     COMPANIES, INC. (f/k/a Par Pharmaceutical
4    Holdings, Inc.):
5        ARNOLD & PORTER KAYE SCHOLER LLP
         601 Massachusetts Avenue, NW
6        Washington, DC 20001-3743
         202-942-5000
7        EVELINA J. NORWINSKI, ESQ.
         evelina.norwinski@arnoldporter.com
8            (via telephone/livestream)
9
10   ON BEHALF OF McKESSON CORPORATION:
11       TABET DIVITO & ROTHSTEIN LLC
         209 South LaSalle Street, 7th Floor
12       Chicago, Illinois 60604
         312-762-9461
13       BY: KYLE A. COOPER, ESQ.
         kcooper@tdrlawfirm.com
14
15
16   ON BEHALF OF CARDINAL HEALTH, INC.:
17       WILLIAMS & CONNOLLY LLP
         725 Twelfth Street, N.W.
18       Washington, DC 20005
         202-434-5013
19       BY: MATTHEW C. MONAHAN, ESQ.
         mmonahan@wc.com
20           (via livestream)
21
22
23
24

Page 5

1    APPEARANCES (Continued):
2    ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
     AMERISOURCEBERGEN CORPORATION:
3
     REED SMITH LLP
4        10 South Wacker Drive, 40th Floor
         Chicago, Illinois 60606-7507
5        312-207-2834
         BY: M. PATRICK YINGLING, ESQ.
6        MPYingling@reedsmith.com
7
8    ON BEHALF OF WALMART:
9        JONES DAY
         77 West Wacker Drive
10       Chicago, Illinois 60601-1692
         312-782-3939
11       BY: JASON Z. ZHOU, ESQ.
         jzhou@jonesday.com
12
13   ON BEHALF OF HBC COMPANY:
14       MARCUS & SHAPIRA LLP
         One Oxford Centre, 35th Floor
15       Pittsburgh, Pennsylvania 15219
         412-338-4383
16       BY: ELLY HELLER-TOIG, ESQ.
         ehtoig@marcus-shapira.com
17           (via telephone/livestream)
18
19
20
21
22
23
24

2 (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
1    ALSO PRESENT:
2        ALEXANDRA M. GARLOCK, Paralegal
         agarlock@levinlaw.com,
3          Levin Papantonio Thomas Mitchell
           Rafferty & Proctor P.A.
4
         MADISON SHELQUIST, Legal Assistant,
5          Levin Papantonio Thomas Mitchell
           Rafferty & Proctor P.A.
6
7        COREY SMITH, Trial Technician
8
9
10   VIDEOTAPED BY:  BEN STANSON
11
12   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
1              I N D E X
2    REX SWORDS          EXAMINATION
3        BY MR. MOUGEY.................  10
         BY MR. STOFFELMAYR...........  364
4
5
6           E X H I B I T S
7    WALGREENS-SWORDS EXHIBIT        MARKED FOR ID
8    No. 1    Resume, Rex. A. Swords, R.Ph.;   34
             P-WAG-02115
9
     No. 2    3/1/12 e-mail;           75
10            WAGFLDEA00001536
11   No. 3    DEA Compliance Working Group,   94
             January 10, 2013, Meeting
12            Summary
              WAGMDL00496404 - 00496406
13
     No. 4    9/16/12 e-mail string;       116
14            WAGMDL00528179 - 00528180
15   No. 5    3/20/13 e-mail string with   131
             attachment;
16            WAGMDL00574824 - 00574825
17   No. 6    10/3/13 e-mail string with   157
             attachment;
18            WAGMDL0018597 - 00018610
19   No. 7    Binder containing Settlement   183
             and Memorandum of Agreement
20            and other documents;
              WAGMDL00490963 - 00490973;
21            P-WAG-0001
22   No. 8    Administrative Inspection    251
             Warrant;
23            WAGMDL00493697 - 00493700
24
```

Page 8

```
1           E X H I B I T S
2    WALGREENS-SWORDS EXHIBIT        MARKED FOR ID
3    No. 9    2/12/13 e-mail string;      259
             WAGMDL00478001 -00478002
4
     No. 10   3/26/13 e-mail with        269
5             attachment;
              WAGMDL00663366 - 00663368
6
     No. 11   8/26/09 Project Request     278
7             Estimate;
              WAGMDL00492067 - 00492069
8
     No. 12   6/23/08 memo;              279
9             WAGMDL00624503 - 00624508
10   No. 13   9/23/11 Project: DEA       310
             Suspicious Order - Phase III;
11            WAGMDL00492378 - 00492380
12   No. 14   11/9/11 Project: DEA       313
             Suspicious Order - Phase III;
13            WAGMDL00492375 - 00492376
14   No. 15   10/1/12 e-mail string;     320
             WAGMDL00705318 - 00705320
15
     No. 16   12/28/12 e-mail string;    324
16            WAGMDL00308497 - 00308498
17   No. 17   7/2/12 e-mail with attachment;   327
             WAGMDL00077015 - 00077016
18
     No. 18   7/8/16 e-mail string;      336
19            WAGMDL00129607 - 00129610
20   No. 19   12/3/16 e-mail with attachment;   337
             WAGMDL00129005 - 00129007
21
     No. 20   Spreadsheet;               339
22            WAGMDL00400358
23
24
```

Page 9

```
1        THE VIDEOGRAPHER:  We are now on the record.
2    My name is Ben Stanson.  I'm a videographer for
3    Golkow Litigation Services.
4        Today's date is December 21, 2018, and
5    the time is 8:11 a.m.
6        This video deposition is being held in
7    Chicago, Illinois in the matter of the National
8    Prescription Opiate Litigation, MDL No. 2804,
9    pending in the U.S. District Court, Northern
10   District of Ohio, Eastern Division.
11       The deponent is Rex Swords.
12       Counsel, please introduce yourselves for
13   the record.
14       MR. MOUGEY:  I'm Peter Mougey on behalf of the
15   Plaintiffs.  Go ahead.
16       MS. GARLOCK:  Alexandra Garlock on behalf of
17   the Plaintiffs.
18       MS. SHELQUIST:  Madison Shelquist on behalf of
19   the Plaintiffs.
20       MR. COOPER:  Kyle Cooper on behalf of
21   McKesson.
22       MR. YINGLING:  Patrick Yingling for
23   AmerisourceBergen.
24       MR. STOFFELMAYR:  Kaspar Stoffelmayr for
```

3  (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1   Walgreens.
2        THE REPORTER:  Counsel on the phone.
3        MR. NORWINSKI:  This is Evelina Norwinski from
4   Arnold & Porter on behalf of the Endo and Par
5   Defendants.
6        THE VIDEOGRAPHER:  Thank you.  Our Court
7   Reporter is Corinne Marut.  Will you please swear
8   in the witness.
9        (WHEREUPON, the witness was duly
10       sworn.)
11           REX SWORDS,
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14           EXAMINATION
15  BY MR. MOUGEY:
16   Q.   Good morning, Mr. Swords.  My name is
17  Peter Mougey.  I represent the Plaintiffs in this
18  case.
19        Start with your resume, but I wanted to
20  ask you a couple questions beforehand.  Have you
21  given testimony prior to today?
22   A.   Yes.
23   Q.   And when I say "testimony," I mean in
24  the form of depositions or sworn statements or

Page 11

1   interviews.
2        Can you walk me through what your
3   proceedings or investigations or that you've
4   provided testimony or sworn statements?
5   A.   I have been either in deposition or
6   sworn statement or trial with respect to
7   third-party payment litigation, prescription error
8   litigation, and I think that probably covers it,
9   those two areas.
10   Q.   Those two areas.  And the third-party
11  payment litigation, where was -- where did you --
12  where was that pending?
13   A.   I believe that was in Memphis.
14   Q.   In Memphis?
15   A.   Um-hmm.
16   Q.   And would you just generally describe
17  what the content of your testimony was.
18   A.   It was a lawsuit that we brought on
19  against CVS Caremark at the time for access to
20  Medicare Part D, any willing provider status.
21   Q.   And when was that?  When was the
22  litigation?
23   A.   I don't remember the exact dates.  It
24  would have been early 2000s.

Page 12

1   Q.   Okay.  And the second general was the
2   prescription error litigation.  Can you give me
3   just a general description of what --
4   A.   Those were both depositions.
5   Q.   Okay.
6   A.   And one of them was early 1990s, and
7   there have been some other ones in the 2000s more
8   recently.
9   Q.   So, when you say there have been some
10  other ones, what are you -- so, you gave me two
11  when I asked the question initially.  So, what are
12  the other ones in addition to those two?
13   A.   They were prescription error cases.
14   Q.   Okay.  There was a series of
15  prescription --
16   A.   Categories.
17   Q.   -- prescription error cases.  There was
18  a series of cases?
19   A.   I believe I've had three total
20  depositions with respect to prescription errors.
21   Q.   And are you equating number of
22  depositions with the number of cases?
23   A.   Yes.
24   Q.   And would you generally give me a

Page 13

1   description of the prescription error litigation?
2   A.   They were prescription -- there were
3   claims that we had made prescription errors, and so
4   cases were brought against Walgreens for that.
5   Q.   So, were those -- would you call those
6   malpractice claims where there was an adverse
7   effect from an error over a prescription that was
8   dispensed?
9   A.   More so probably in the -- what they
10  would have categorized as a malpractice.
11   Q.   Okay.  Like a medical malpractice case
12  almost?
13   A.   It would have been an error in filling a
14  prescription.
15   Q.   And those cases, you say early 1990s.
16  Have those -- were they all confined to the 1990s
17  or have they been over a series of time?
18   A.   No.  The first one was in the 1990s and
19  I've had a couple in the last five, six years.
20   Q.   Why don't you just walk me through when
21  the three -- I think you said there were three of
22  them, correct?
23   A.   Yes.
24   Q.   When were -- just generally when were

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    the --
2        A.    The first one would have been around
3    1995, '94, somewhere in the early '90s there.
4        Q.    Right.
5        A.    And then the other two were -- the
6    second one was probably closer to 2010 to 2012,
7    somewhere in there.  And the third one, the more
8    recent one, would have been 2015 or '16 maybe.
9        Q.    And outside of those two general
10   categories, you haven't given any sworn statements,
11   testimony, any affidavits to -- in any other
12   proceeding?
13       A.    Well, I have presented at Board of
14   Pharmacy.  I'm not sure what you're categorizing
15   as --
16       Q.    I'm really not.  I'm asking you -- I'm
17   doing that on purpose.  So, I am not asking have
18   you given a depo.  I'm not asking if it was under
19   oath.
20             I'm trying to ask you a broad question
21   of any statement or anything you've provided to any
22   regulator, board, any oversight committee in
23   relation to your roles at Walgreens.
24       A.    Well, part of my role would be to speak

Page 15

1    to various groups on behalf of the company.  So,
2    I've spoken with NACDS.  I've spoken with NABP.
3    I've spoken with various Boards of Pharmacy
4    throughout my time with Walgreens.
5        Q.    Let's start with regulators.  Any -- any
6    regulators, State or Federal, that you've provided
7    any sworn statements or testimony?
8        A.    No sworn statements or testimony.
9        Q.    Any that you have provided any
10   statements whatsoever even if they weren't under
11   oath to any State or Federal regulator?
12       A.    Yes, I've had conversations with state
13   and federal regulators.  So...
14       Q.    And what type of conversations were
15   those?
16       A.    I've spoken again at Board of Pharmacy
17   meetings on behalf of the company.  I've spoken
18   with various trade organizations on behalf of the
19   company.
20       Q.    Now, a trade organization is not a
21   regulator, right?
22       A.    If you say so.
23       Q.    You think a trade organization is a
24   regulator in your book?

Page 16

1        A.    It's not -- I don't know whether -- I'm
2    trying to be as complete with my answer as I can
3    with you and...
4        Q.    Yes.  Let's keep it to the regulators
5    for a minute.  To me a regulator is any state
6    regulator or federal regulator.
7        A.    Okay.
8        Q.    And I'm excluding trade organizations.
9        A.    Okay.
10       Q.    Okay?  Statements, sworn testimony,
11   affidavits, anything to a State or Federal
12   regulators?
13       A.    State Board of Pharmacies.  I've spoken
14   with DEA.  I've had meetings with the DEA.
15       Q.    Anything else other than state --
16   state -- I'm sorry -- Board of Pharmacies and the
17   DEA?
18       A.    Not that I can recall.
19       Q.    Let's break out those two categories.
20             Explain, talk to me about your different
21   interactions where you've given statements or sworn
22   statements or testimony or affidavits to the DEA.
23       A.    Well, those would have been in the last
24   ten years or so with respect to their I would call

Page 17

1    routine questions from the DEA about different
2    issues throughout the course of business.
3        So, I've had interaction with them at
4    that point where they've requested files or
5    information on, you know, policies, procedures,
6    those sort of things, records, and then I've had
7    conversations with them around dispensing habits,
8    things like that, both individually as well as part
9    of forum groups.
10       Q.    Any of those interactions with the DEA,
11   were your statements recorded in any shape, form or
12   fashion?
13       A.    Not that I'm aware of.
14       Q.    When I say "recorded," I mean either
15   just an audio recording, a video recording, a Court
16   Reporter taking down any of your interactions with
17   the DEA?
18       A.    Not that I recall, no.
19       Q.    Let's go back to the Board of Pharmacy.
20             Would you give me just a general
21   description of your interactions with the Board of
22   Pharmacy as far as statements, sworn statements,
23   testimony with the Board of Pharmacies?
24       A.    Well, as part of my normal duties at the

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  time, we present different -- different policies or
2  operating requests to various Boards of Pharmacy to
3  get their approval, those kind of things.  So,
4  would have had discussions around those type of
5  areas.
6      Q.   Which?  When you say a Board of
7  Pharmacy, are you talking state regulators or more
8  at the federal level or both?
9      A.   A State Board of Pharmacy.
10     Q.   Okay.  And which State Board of
11 Pharmacy?
12     A.   Well, I know I have spoken at the
13 New Mexico State Board of Pharmacy.  I know I have
14 spoken at the Arizona State Board of Pharmacy.
15 Those are --
16     Q.   So, you -- I didn't mean to interrupt.
17 Go ahead.
18     A.   Those are the two I recall.
19     Q.   When you say you've spoken at, do you
20 mean a conference or some sort of continuing
21 education where you come in and present or are you
22 talking about where you were called in as a
23 representative of Walgreens to give a statement?
24     A.   Well, it was never as I was called in.

Page 19

1  I would have requested to speak to them.
2      Q.   So, when you've "spoken at," to me that
3  sounds like a conference.  So, when you say you've
4  "spoken at," you contacted one of the State Board
5  of Pharmacies and you asked to sit down with them,
6  is that --
7      A.   At a regular meeting, yes.
8      Q.   At a regular meeting?
9      A.   Right.
10     Q.   So, give me some more information about
11 what would cause you to contact a State Board of
12 Pharmacy, the two that you recall, New Mexico and
13 Arizona, and cause a sitdown.
14     A.   Well, as I stated before, State Boards
15 of Pharmacy have regular meetings.  They're
16 required to by regulation.  So, the process would
17 have been if you were -- if you were asking for
18 clarification on a particular rule or you were
19 asking for what we call waivers to an existing
20 regulation, you would typically meet in front of
21 the Board of Pharmacy at their regularly scheduled
22 meeting and make such a request of them.
23         So, that was -- that was a normal --
24 that was part of my responsibilities on occasion to

Page 20

1  do that.
2      Q.   So, you contacted State Board of
3  Pharmacies.  You asked to be put on the agenda for
4  the regular meetings to seek clarification
5  regarding some rule or whatever in Arizona and/or
6  New Mexico?
7      A.   That's correct.
8      Q.   Okay.  Thank you.  And you haven't been
9  based out of New Mexico or Arizona for quite some
10 time, correct?
11     A.   That's correct.
12     Q.   So, you're talking about earlier in your
13 career?
14     A.   Both earlier in my career and as my --
15 you know, and as my role of overseeing pharmacy
16 operations for Walgreens.
17     Q.   But you have not been based out of
18 New Mexico and/or Arizona since November 2006,
19 correct?
20     A.   That's correct.
21     Q.   Now, anything that you just described to
22 me as far as your meetings with the DEA and/or the
23 Board of Pharmacies relate to Schedule II or
24 Schedule III narcotics?

Page 21

1      A.   Yes.
2      Q.   And either of those relate to,
3  specifically under Schedule II or Schedule III,
4  opiates?
5      A.   Yes.
6      Q.   And can you give me a little more
7  information on the kind of the rubric you just
8  described, the DEA and the State Board of
9  Pharmacies, what the specifics were of when you
10 were either seeking clarification from the State
11 Board and/or the DEA meetings?
12     A.   With the State Board of Pharmacy I spoke
13 at the New Mexico State Board of Pharmacy meeting
14 specifically around our targeted good faith
15 dispensing memo.  They had some questions as to how
16 we were applying that and actually refusing to fill
17 prescriptions.  So, they requested to meet with our
18 representatives, and I was one of the
19 representatives that was there to address the board
20 with their request.
21     Q.   And when was this?
22     A.   Roughly, I don't know, 2012, 2013,
23 somewhere in there.  I'm not sure of the exact
24 dates.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1      Q.   And the targeted GFD is a specific
2    policy within Walgreens focused on Schedule II and
3    Schedule III, correct?
4      A.   That's correct.
5      Q.   And, so, walk me through what some of
6    the questions were from the -- was it the
7    New Mexico or Arizona?  I'm sorry.
8      A.   It was New Mexico Board of Pharmacy.
9      Q.   New Mexico.  Please walk me through some
10   of the questions or the issues that were discussed
11   with the New Mexico Board of Pharmacy regarding
12   Walgreens targeted GFD?
13     A.   Well, I don't recall their specific
14   questions.  I can --
15     Q.   Generally speaking.
16     A.   Generally speaking, they were -- they
17   were concerned.  They had received consumer
18   complaints and physician complaints about us having
19   a process that would seek to verify, understand the
20   legitimacy of prescriptions by the physician, to
21   review dispensing records, to look at patient
22   characteristics.
23          And, so, the Board of Pharmacy had
24   supposedly received complaints from the physician

Page 23

1    community as well as the consumer community that we
2    were restricting access to their medications by our
3    policy.
4      Q.   Was that a hearing?  What kind of
5    proceeding was that?
6      A.   It was a Board of Pharmacy meeting.
7      Q.   So, that wasn't one of the examples
8    where you called them and asked for clarification?
9      A.   I believe at that time they were
10   inquiring as to what it was.  We offered to come in
11   and explain it to them.
12     Q.   Yes, sir.  They called Walgreens and
13   asked you all to come explain something?
14     A.   I don't know that they called us, but I
15   think the reference was made that they wanted to
16   understand more about it.
17     Q.   They contacted Walgreens, they asked
18   Walgreens to appear at one of their meetings.  This
19   wasn't where you call and just asked for
20   clarification, right?
21     A.   I don't believe we made contact with
22   them initially.
23     Q.   So, when I asked you earlier about your
24   communications with the regulators and you said,

Page 24

1    "Well, I just called and I would ask to come in and
2    talk to them," that's a different category.  This
3    is a category where Walgreens was asked to appear
4    at one of the regularly scheduled meetings and come
5    in and explain its targeted GFD in 2012, 2013?
6      A.   Again, it was a long time ago.  I don't
7    recall the specifics of how the event occurred.
8    I've described the event as I recall it.
9      Q.   Was there an outcome or a holding or a
10   finding or anything along those lines after
11   Walgreens appeared at the Board of Pharmacy meeting
12   regarding its targeted GFD?
13     A.   Not that I recall.
14     Q.   So, that's one example of one State
15   Board of Pharmacy.  Is there another?
16     A.   Not that I know of.
17     Q.   So, where we started down this line of
18   questioning is I was asking about times when you
19   appeared in front of Board of Pharmacies or that
20   you contacted them or they contacted you, whatever
21   the communication was.  You gave me this example.
22   Is there any other examples that you can recall?
23     A.   With respect to what, sir?
24     Q.   The statements, the communications, the

Page 25

1    testimony, all those categories we started off
2    with.
3      A.   Yes, I --
4      Q.   Then we started -- then we went narrower
5    into the Board of Pharmacies.  You said two, New
6    Mexico and Arizona?
7      A.   Yes.
8      Q.   And then I asked you some specific
9    instances of communications, and this was one of
10   the specific instances.  Can you provide me some
11   other specific instances?
12     A.   Sure.  I've appeared before the Arizona
13   State Board of Pharmacy with requests for variance
14   to waivers, with -- around process, those kind of
15   things.
16     Q.   When you say "variance to waivers," can
17   you give me a little more understanding of what
18   you're referencing?
19     A.   State Boards obviously have regulations,
20   and one of the things as technology and other
21   things improve, sometimes regulations don't keep up
22   with those changes.
23          So, you would go in.  It would be --
24   there would be a process for you to go in and ask

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 the State Board for a waiver to do something that
2 may not have been contemplated when the regulation
3 was written.
4 Q. All right. Anything with the Arizona
5 State Board of Pharmacy in relation to Schedule II
6 and Schedule III and, more specifically, opiates?
7 A. Not that I recall.
8 Q. The other category was the DEA?
9 A. Yes.
10 Q. Will you walk me through what -- I'm not
11 talking letters back and forth. I'm asking for
12 right now just communications with the DEA
13 involving statements from you on behalf of
14 Walgreens.
15 A. Well, the DEA through NABP had agreed to
16 several meetings that were held with a consortium
17 of retailers, and so I was part of those meetings.
18 Q. That was actually a committee, correct,
19 sir?
20 A. Yes.
21 Q. It actually was a committee you chaired,
22 right, co-chaired?
23 A. No, incorrect.
24 Q. The committee with the DEA -- the DEA

Page 27

1 compliance committee?
2 A. For NACDS I co-chaired it. I referred
3 to NABP, which I did not co-chair. That was a
4 consortium meeting.
5 Q. All right. So, while we're going
6 through these DEA communications, let's go ahead
7 and include all the different committees and task
8 forces and things you served on. Okay.
9 So, that was NABP, and you said that was
10 a series of meetings. A series of meetings
11 regarding what?
12 A. Well, through -- through NABP, they had
13 requested or brokered or arranged for a meeting of
14 many of the different pharmacy retailers along with
15 representatives from the DEA to discuss the
16 challenges around the opioid issues.
17 And Walgreens --
18 Q. What time frame? I'm sorry.
19 A. Walgreens participated along with other
20 retailers.
21 Q. Sure. And what time frame was this?
22 A. Roughly speaking, probably 2012, 2013,
23 maybe '14. I don't know the specific time frame,
24 but there were a series of meetings.

Page 28

1 Q. How many meetings do you think there
2 were?
3 A. I think there were maybe four or five
4 meetings.
5 Q. Were there -- did you take notes on
6 those meetings or any memorialization of what
7 occurred during those meetings?
8 A. I'm not sure if NABP took notes on it.
9 I mean, we would have taken notes probably specific
10 towards --
11 Q. And I'm sorry. What I asked you was did
12 you take notes?
13 A. Not that I recall. I mean, it's
14 possible I did, but I don't recall.
15 Q. Is it your general practice during
16 meetings you don't take any notes during meetings?
17 You just --
18 A. When something is noteworthy I take a
19 note on it.
20 Q. So, there was nothing noteworthy that
21 occurred during four meetings with the NABP that
22 you recall taking any notes or keeping a file on?
23 A. I'm sure I took notes. I don't -- you
24 know, I don't recall what the notes would have been

Page 29

1 about or what the purpose of the specific note
2 would have been but...
3 Q. Do you have a regular practice when you
4 take notes, you come back to the office and you ask
5 somebody to put those in a file for you so you can
6 refer to them until your next meeting with the
7 NABP?
8 A. No, that would not be a regular practice
9 of mine.
10 Q. So, you wouldn't store anything so the
11 next time you go to the meeting with the NABP you
12 would have a way to refresh your recollection of
13 what occurred at the last meeting, what the action
14 items were, nothing like that?
15 A. Well, these particular meetings were
16 also attended by with our attorneys. So, our
17 attorney would have been the one taking most of the
18 notes.
19 Q. Right. And -- but we already got back
20 to the fact that you might have taken some notes.
21 A. Yeah.
22 Q. I appreciate the fact that your counsel
23 took notes, but what I'm asking about is your
24 notes.

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    So, if you wanted to refer back to
2 action items or what happened at the last meeting
3 to refresh your memory so you went to the next one,
4 you know, Mr. Swords knew what was going on. So
5 how did you do that?
6    A.   I would -- you know, I may have taken a
7 note. I don't recall.
8    Q.   Are there -- were there agendas that
9 were issued for these meetings?
10    A.   I don't recall.
11    Q.   You don't recall. So, you think you
12 just went in with counsel and NABP and everyone
13 else and you just sat around a table and just kind
14 of riffed and free formed it over the meetings
15 or --
16    MR. STOFFELMAYR: Objection.
17 BY MR. MOUGEY:
18    Q.   -- do you actually think there were some
19 agendas?
20    MR. STOFFELMAYR: Objection to the form. Go
21 ahead.
22 BY THE WITNESS:
23    A.   The meetings were held. They were
24 arranged by NABP. We attended those meetings.

Page 31

1 BY MR. MOUGEY:
2    Q.   And you don't recall if there was any
3 agendas or lists or anything that you kept or
4 anybody put together to give some structure to
5 those meetings?
6    A.   I don't recall the specifics around the
7 mechanics of the meeting.
8    Q.   I didn't ask you about specifics.
9 Didn't ask you about mechanics. I just asked you:
10 Do you recall, generally, agendas, lists, action
11 items, anything that were kept in relation to those
12 meetings?
13    A.   No, I don't recall that.
14    Q.   Do you have any recollection of how you
15 would prepare for those meetings that you went to?
16 I'm assuming you went to all three or four of the
17 series of them that you -- that were held?
18    A.   No, I did not attend all of them.
19    Q.   How many of them do you recall that you
20 attended?
21    A.   Maybe half of them.
22    Q.   So, one or two?
23    A.   Again, I don't recall the specific
24 number. I know I didn't attend all of them because

Page 32

1 I wasn't available for all of them.
2    Q.   I'm not asking about a specific. You
3 said there was a series of them. Do you remember
4 if there was ten? Do you remember if there was
5 four? Do you remember if there was 20? Just
6 generally.
7    A.   No, I don't remember.
8    Q.   You don't have any recollection of
9 whether there was 20 or 2?
10    A.   I specifically said earlier that I
11 believe there were four to six meetings or
12 something.
13    Q.   You actually said three or four.
14    A.   Okay.
15    Q.   But four to six?
16    MR. STOFFELMAYR: Objection to form. Don't
17 argue with him.
18 BY MR. MOUGEY:
19    Q.   Who else from Walgreens went with you to
20 those meetings?
21    A.   Our counsel, Dwayne Piñon, and I believe
22 occasionally Tasha Polster would have been
23 attending.
24    Q.   We were talking about meetings with the

Page 33

1 DEA. Do you recall any other meetings, statements,
2 any other interactions with the DEA?
3    A.   Outside the NABP meeting, no direct
4 meetings with just -- just DEA.
5    Q.   Now, when I'm asking about DEA, and you
6 just qualified that with "just DEA." So, anything
7 where DEA was present other than the NABP meeting
8 that you just referenced?
9    A.   Not that I recall.
10    Q.   Let me ask that a little bit different
11 way.
12    Any meetings with federal regulators
13 including the Department of Justice regarding
14 Walgreens' dispensing practices, suspicious order
15 monitoring policies, anything along those lines?
16    A.   Not that I recall.
17    (WHEREUPON, Jason Zhou, Esq. entered
18    the deposition proceedings.)
19 BY MR. MOUGEY:
20    Q.   Now, the series -- everything you've
21 just walked me through, New Mexico, Arizona,
22 anything that -- any of the meetings, the -- where
23 you appeared in front of pharmacy boards, did all
24 of that relate to dispensing practices at

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 Walgreens?
2     A.   Yes.
3     Q.   Do you have any experience prior to the
4 creation of the Pharmaceutical Integrity Department
5 at Walgreens in suspicious order monitoring
6 policies or procedures?
7     A.   No.
8     Q.   I will hand you what I'm going to mark
9 as Swords 1.
10         (WHEREUPON, a certain document was
11          marked as Walgreens-Swords Exhibit
12          No. 1: Resume, Rex. A. Swords,
13          R.Ph.; P-WAG-02115.)
14 BY MR. MOUGEY:
15     Q.   This is a copy of your resume provided
16 by counsel.  Do you recognize this document?
17     A.   I do.
18     Q.   And is this an accurate copy of your --
19 what appears to be your resume, sir?
20     A.   It is.
21     Q.   And is it current and up to date?
22     A.   It was as of this time, yes.
23     Q.   When you say "as of this time," it says
24 January '18 to the present.  So, within the last

Page 35

1 several months?
2     A.   Yeah.
3     Q.   Yeah.  And, sir, you began at Walgreens
4 in 1993, right?
5     A.   No.
6     Q.   No.  When it says on the back of your
7 resume, "Pharmacy Supervisor - New Mexico, Pharmacy
8 Supervisor - Arizona," those were not Walgreens
9 positions?
10     A.   Those were Walgreens positions.  I have
11 been employed --
12     Q.   So, when did you begin -- your resume
13 doesn't go all the way back to the beginning of
14 your career?
15     A.   That's correct.
16     Q.   Okay.  So, when did you begin at
17 Walgreens?
18     A.   1986.
19     Q.   1986.  And what did you do at 1986 at
20 Walgreens?
21     A.   I was a pharmacy intern.
22     Q.   And how long were you a pharmacy intern?
23     A.   While I was in pharmacy school.
24     Q.   That's good, but I don't understand how

Page 36

1 long you were in pharmacy school.  So, could you
2 help me with --
3     A.   '86 to '89.
4     Q.   '86 to '89.  Thank you.
5         And that was when you were in pharmacy
6 school?
7     A.   Correct.
8     Q.   Thank you.  And after '86 to '89 while
9 you were in pharmacy school, what was your next
10 position at Walgreens?
11     A.   Staff pharmacist.
12     Q.   Staff pharmacist.  And how long were you
13 a staff pharmacist?
14     A.   '89, after licensing, to '91 maybe.  A
15 couple of years.
16     Q.   And then after '91, before pharmacy
17 supervisor position in '93, what did you do?
18     A.   I was a pharmacy manager for Walgreens.
19     Q.   Until -- '91 till when?
20     A.   Until the position of the pharmacy
21 supervisor.
22     Q.   '93.  So, your pharmacy intern position
23 was in New Mexico, staff pharmacist was also in
24 New Mexico?

Page 37

1     A.   Yes.
2     Q.   '91 to '93, where was that?
3     A.   Pharmacy manager position?
4     Q.   Yes, sir.
5     A.   New Mexico.
6     Q.   Thank you.  So, the initial part of your
7 career you were back and forth between New Mexico
8 and Arizona up until January of 2001?
9     A.   Well, I wouldn't characterize it as back
10 and forth.  I moved from New Mexico to Arizona.
11     Q.   You went from one state to another state
12 over a course of '86 to 2001, five years, you --
13 one, two, three moves back and forth between
14 Arizona and New Mexico, right?
15     A.   No.  I lived in New Mexico and I moved
16 to Arizona.  I did not move back to New Mexico
17 after Arizona.
18     Q.   So, you have been with -- I had it at 25
19 years.  You have to help me with the math.
20     A.   32 years.
21     Q.   32 years you've been at Walgreens?
22     A.   Yes, sir.
23     Q.   So, pretty much all the way from when
24 you were in pharmacy school working on your

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Bachelor of Pharmacy at University of New Mexico
2  all the way through today you've been at Walgreens,
3  correct?
4      A.   That is correct.
5      Q.   And is it fair to characterize your
6  career at Walgreens since January of 2009 roughly
7  till today as more of an operations role?
8      A.   I'm not sure what you mean by
9  "operations role."  I mean, I can walk you through
10  the resume if that's what you'd like to do.
11     Q.   Let's do that.  I was trying to make it
12  easy, but let's go ahead and walk through your
13  resume.
14         So, your first several roles were at the
15  pharmacy level day to day for the first several
16  years of your career, correct?
17     A.   Correct.
18     Q.   Where you filled roles you just walked
19  through, intern, staff pharmacist, manager,
20  pharmacy supervisor, store manager, all the way up
21  until January of 2001, correct?
22     A.   Correct.
23     Q.   And then beginning in 2001, again, this
24  isn't a memory test, just generally speaking, you

Page 39

1  were more of a district manager level, correct?
2      A.   Supervisor.
3      Q.   Supervisor.  And -- but if you look at
4  your resume, January of '01, Cleveland, Ohio,
5  pharmacy and district manager, right?
6      A.   Correct.
7      Q.   And that was in Cleveland until
8  February 2005, correct?
9      A.   Correct.
10     Q.   And explain to me what the -- your
11  district manager roles were from '01 to '06, just
12  generally speaking?
13     A.   District managers for Walgreens at the
14  time were responsible for the pharmacy and retail
15  operations for the stores they oversaw.
16     Q.   So, it was related to just the pharmacy
17  operations?
18     A.   Pharmacy and store operations.  Retail.
19     Q.   Pharmacy and store operations?
20     A.   Yes.
21     Q.   Okay.  Is there anything that's carved
22  out of pharmacy and store operations?
23     A.   I'm not sure what you mean by "carved
24  out."

Page 40

1      Q.   Well, I mean, is it the entire
2  operation?
3      A.   It's the whole store.
4      Q.   It's the whole thing?
5      A.   The whole store.
6      Q.   The whole shooting match, right?
7      A.   Yes.
8      Q.   So, how many stores did you oversee when
9  you were in Cleveland?
10     A.   I think when I left Cleveland, it was 32
11  to 35 stores, something like that.
12     Q.   32 to 35 stores.  And how many stores in
13  Tucson?
14     A.   Tucson would have been somewhere around,
15  you know, 30, 30 -- around 30 stores.
16     Q.   Generally the same number?
17     A.   Yeah.
18     Q.   And your next role, actually your next
19  two roles included some component with the mail
20  service pharmacy, correct?
21     A.   Correct.
22     Q.   Would you explain to me what a mail
23  service pharmacy is.
24     A.   They are a service where people who are

Page 41

1  contracted with certain PBM or payer plans can
2  submit their prescriptions to a mail facility.
3  Those prescriptions are prepared and mailed and
4  returned to their home through U.S. Postal Service,
5  basically.
6      Q.   In the description on your resume for
7  both, you referred to a -- I think a retail
8  component of the mail service, and I may have that
9  incorrect.  Tell me if I'm wrong.
10     A.   Which?  Where are you referring to, sir?
11     Q.   On page 2 of your resume, right in the
12  middle of the page, "Director, Central Pharmacy
13  Operations."
14         Do you see that?
15     A.   I do.
16     Q.   And the second -- I'm going to call it a
17  bullet although there is no bullet,
18  "Transactional" -- "Transitioned," rather, "two
19  mail service facilities to centralized facilities
20  supporting retail, mail and E-com business lines."
21         Do you see that?
22     A.   Correct.
23     Q.   Can you just explain to me what that
24  means?

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    A.   Well, what I was referring to here is
2  we -- we had two -- we at the time, we operated two
3  mail facilities.  That was part of my
4  responsibility was the oversight of those two
5  facilities, in addition to some centralization
6  activities that support our retail stores,
7  including the mail order business as well as our
8  e-commerce business lines.
9    Q.   Tell me, explain to me generally what
10  the scope of the mail service facilities was,
11  meaning the types of products that were -- that you
12  all managed in those facilities?
13    A.   Prescription pharmaceuticals, small
14  amount of OTC products that would have been ordered
15  on a physician's order, submitted to us either
16  directly by the physician or by the patient.  We
17  would fulfill the orders for contracted plans and
18  return the orders via mail or some other courier
19  service.
20    Q.   These were -- these were large
21  operations?
22    A.   They're large buildings, yes.
23    Q.   Yes, sir.  And also contained
24  Schedule II and Schedule III controlled substances,

Page 43

1  correct?
2    A.   Yes.
3    Q.   Including opiates, correct?
4    A.   Yes.
5    Q.   And, now, did the -- explain what, if
6  any, interaction between Walgreens SOMs or
7  suspicious order monitoring policies and orders for
8  Schedule II and Schedule III opiates, how did that
9  work at Walgreens?
10    A.   I didn't have that --
11    MR. STOFFELMAYR:  Objection to the form.  Go
12  ahead.
13  BY THE WITNESS:
14    A.   I had no responsibility for it.  I had
15  no involvement on suspicious order monitoring.
16  BY MR. MOUGEY:
17    Q.   Are you aware -- and that was a little
18  different answer to the question than the question
19  I asked.
20       Was there a suspicious order monitoring
21  policy at Walgreens overseeing the Schedule II and
22  Schedule III controlled substances that were
23  shipped out of those -- out of the mail service
24  facilities?

Page 44

1    A.   I don't know of any policy around that.
2    Q.   You don't know -- and you spent from
3  November of '06 to April of '11 in some form or
4  fashion overseeing those facilities, correct?
5    A.   Correct.
6    Q.   And you have no understanding even
7  generally of whether there was any suspicious order
8  monitoring policy that was applicable to those mail
9  service facilities?
10    MR. STOFFELMAYR:  Objection to the form.
11  BY THE WITNESS:
12    A.   Suspicious order monitoring refers to
13  the distribution of that.  We weren't distributing.
14  We were dispensing.  So, it's not -- we didn't have
15  a suspicious order monitoring policy at the
16  dispensing side of the operation.
17  BY MR. MOUGEY:
18    Q.   Covering anything having to do with your
19  distribution responsibilities?
20    A.   We --
21    MR. STOFFELMAYR:  Objection to the form.  Go
22  ahead.
23  BY THE WITNESS:
24    A.   Again, it wasn't -- we weren't

Page 45

1  distributing.  We were dispensing on physician
2  orders.
3  BY MR. MOUGEY:
4    Q.   So, the answer to my question is no, we
5  did not have any suspicious order monitoring policy
6  regarding Walgreens' distributor responsibilities
7  that you were aware of in the mail service
8  facilities?
9    MR. STOFFELMAYR:  Objection to the form.
10  BY THE WITNESS:
11    A.   Again, we weren't distributing.  We were
12  dispensing.  We don't have a suspicious order
13  monitoring policy around the dispensing, which is
14  what I was responsible for.
15  BY MR. MOUGEY:
16    Q.   I am a little confused by that, so help
17  me out.  I'm sorry if I'm a slow here.  All right.
18       So, you've overseen stores throughout
19  your entire career, right?
20    A.   Yes.
21    Q.   Those are pharmacies when we say
22  "stores," right?
23    A.   Yes.
24    Q.   And those dispense, correct?

12 (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1     A.   Yes.
2     Q.   As a dispenser, Walgreens has its own
3  responsibilities under the Controlled Substance Act
4  as a dispenser, correct?
5     A.   That is correct.
6     Q.   And separate and apart from those
7  responsibilities of Walgreens as a dispenser under
8  the Controlled Substance Act, you're also aware
9  that Walgreens has responsibilities under the
10  Controlled Substance Act as a distributor, correct?
11     A.   I am -- I am aware of that, yes.
12     Q.   And those are separate and distinct
13  responsibilities, correct?
14     A.   That's correct.
15     Q.   And are you generally familiar with
16  Walgreens' responsibilities under the Controlled
17  Substance Act as a dispenser?
18     A.   Yes.
19     Q.   Are you generally familiar with
20  Walgreens' responsibilities under the Controlled
21  Substance Act as a distributor?
22     A.   Yes.
23     Q.   Now, where I'm confused, and maybe my
24  questions are a little inartful or a little slow

Page 47

1  because we got started early this morning, but
2  there are Walgreens' suspicious order monitoring
3  policies and procedures that are used from
4  Walgreens as a distributor to identify suspicious
5  orders at Walgreens as a dispenser or its stores,
6  correct?
7     MR. STOFFELMAYR: Objection to the form. Go
8  ahead.
9  BY THE WITNESS:
10     A.   There are processes for identifying
11  suspicious orders from a distribution perspective.
12  That's where your question was referencing was
13  distribution.
14     What I'm telling you is I'm aware of the
15  dispensing requirements for the mail order
16  facility.  I didn't have a suspicious order
17  monitoring responsibility for the mail order
18  facilities.
19  BY MR. MOUGEY:
20     Q.   And, again, I'm just being a little slow
21  here, but you have -- what I'm asking is that
22  Walgreens has individual stores that are
23  dispensers, correct?
24     A.   Yes.

Page 48

1     Q.   Okay.  And those stores or dispensaries
2  are or interact with Walgreens as a distributor and
3  Walgreens' suspicious order monitoring policies and
4  procedures, correct?
5     MR. STOFFELMAYR: Objection to the form.
6  BY THE WITNESS:
7     A.   Walgreens stores dispense and we have
8  previously operated as a distributor as well.
9  BY MR. MOUGEY:
10     Q.   Yes, sir.  And there are suspicious
11  order monitoring policies and procedures that
12  review and monitor the orders at Walgreens
13  pharmacies, correct?
14     A.   Yes.
15     Q.   Now, maybe this is a terrible analogy,
16  but the mail service facilities are just -- they
17  are very large dispensaries that dispense hundreds
18  of thousands, if not millions of Schedule II and
19  Schedule III narcotics on a regular basis, correct?
20     A.   Well, they are -- they are large
21  dispensaries.  I wouldn't -- I don't know the exact
22  amount of Schedule II or Schedule III narcotics
23  that are coming out of there.
24     Q.   So --

Page 49

1     (Clarification requested by the
2         reporter.)
3  BY THE WITNESS:
4     A.   Schedule II or Schedule III narcotics
5  that are dispensed, I don't know the numbers.
6  BY MR. MOUGEY:
7     Q.   Help me to understand why -- so, the
8  mail service facilities I think you described as
9  dispensaries, correct?
10     A.   Yes.
11     Q.   All right.  So, why would there be a
12  suspicious order monitoring policy that oversees,
13  monitors, identifies suspicious orders at the
14  retail store pharmacies, but not the mail service
15  facility that still dispenses Schedule II and
16  Schedule III opiates?
17     MR. STOFFELMAYR: Objection to the form. Go
18  ahead.
19  BY THE WITNESS:
20     A.   Well, the same policy would apply to
21  both.  What I was referring to earlier was I had no
22  responsibility for how that was -- the mechanics of
23  that suspicious order monitoring process at the
24  mail facility.

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 BY MR. MOUGEY:
2    Q.   Again, maybe it's just early and I
3 haven't had enough coffee, but your answer to my
4 question, before I said, "You have no
5 understanding, even generally, of whether there was
6 any suspicious order monitoring policy that was
7 applicable to those mail service facilities?"
8        And your answer to me was, "Suspicious
9 order monitoring refers to the distribution of
10 that.  We weren't distributing.  We were
11 dispensing.  So, we didn't have a suspicious order
12 monitoring policy at the dispensing side of that
13 operation."
14       So, let's go back to that.  Okay.
15 That's where I got confused was that answer.  Okay?
16       So, is that the right answer, that we
17 didn't have a suspicious order monitoring policy at
18 the dispensing side of the operation, or is what I
19 think the answer you just gave, and maybe I'm just
20 misunderstanding, that we did have a suspicious
21 order monitoring policy that monitored and
22 identified potentially suspicious orders at the
23 mail service facilities?
24    A.   There is a policy, but it's not

Page 51

1 administered by the mail order facility.  So, the
2 folks at the mail order facility are not the ones
3 that are administering the suspicious order
4 monitoring policy at Walgreens.
5    Q.   So, it wasn't that you didn't have a
6 suspicious order monitoring policy.  It was just
7 not employed at the mail service facilities?
8    A.   No.  It was that we as in the people
9 responsible for running the facilities weren't the
10 ones administering the suspicious order monitoring
11 process.  That was a Walgreens.
12    Q.   Walgreens corporate?
13    A.   Yes.
14    Q.   Okay.  So, there was a suspicious order
15 monitoring policy that was used to identify and
16 monitor suspicious orders at the mail service
17 facilities that you were in charge of or from '06
18 to 2011?
19    A.   There was one applied to those just like
20 the retail stores, yes.
21    Q.   And -- thank you.
22       So, now, who was in charge of or
23 responsible for deploying the suspicious order
24 monitoring policy at the mail service facilities?

Page 52

1 What department or person or whoever you can
2 identify?
3    A.   Well, that would have been prior -- so,
4 from the time of 2012-'13, somewhere in there,
5 would have been the Pharmaceutical Integrity group.
6    Q.   Late '12, early '13 is when the
7 Pharmaceutical Integrity group was initiated,
8 correct?
9    A.   I believe that's the general dates.
10    Q.   All right.
11    A.   I don't know the specific dates.
12    Q.   After that -- I'm sorry.  I didn't mean
13 to interrupt you.
14    A.   I said I don't know the specific date.
15    Q.   Okay.  So, I'm talking about the period
16 prior to that.  So, your resume, "Vice President,
17 Walgreens, Mail Service Pharmacy, Walgreens Health
18 Services, Deerfield, Illinois, November 2006 to
19 November 8," first bullet on your resume,
20 "Responsible for a business unit with over
21 800 million of revenue, 100 million in profit and
22 operating budget of over 30 million, dispensing
23 7 million mail prescriptions per year," correct?
24 That's what you got on your resume, right?

Page 53

1    A.   Correct.
2    Q.   That's your responsibility, mail
3 service, there were three different operations in
4 '06, correct?
5    A.   Correct.
6    Q.   And you actually ultimately condensed
7 those down to two, correct?
8    A.   That's correct.
9    Q.   All right.  So in the beginning, let's
10 start with year by year.  '06, who do you believe,
11 whether department or individual, was responsible
12 for deploying the suspicious order monitoring
13 policies over or interacting with the mail service
14 facilities identifying suspicious orders?
15    A.   That would have been the distribution.
16    Q.   That's right.  That would be the
17 distribution.  What department within distribution
18 was responsible for deploying the suspicious order
19 monitoring policies at the mail order facilities in
20 2006?
21    A.   The distribution department.
22    Q.   There is a department called
23 distribution?
24    A.   Supply chain.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.   Supply chain.
2    A.   Distribution and supply chain.
3    Q.   All right.  And can you give me any
4  individual --
5    A.   As well as our wholesaler that we
6  primarily used a wholesaler at the mail facility.
7    Q.   Okay.  When you say you "used a
8  wholesaler," you mean to supply?
9    A.   Yes.
10    Q.   In '06?
11    A.   Yes.
12    Q.   But that changed over time?
13    A.   Yes.
14    Q.   And actually it ended up being Walgreens
15  supplying itself for a large block of time,
16  correct?
17    A.   Not at the mail facilities.  Mail
18  facilities were operated a little differently than
19  the retail facilities.
20    Q.   Had the mail service facilities remained
21  under your purview as you moved up the food chain
22  at Walgreens?
23    A.   Yes.
24    Q.   And you don't believe that Walgreens

Page 55

1  ever supplied itself in those mail service
2  facilities?
3    A.   No.  That's not what I said.
4    Q.   Okay.  I'm trying to understand.
5    A.   We used more wholesaling than our retail
6  stores would have used because time of delivery.
7  We would -- we received deliveries twice a day.
8  Typical Walgreens store would receive deliveries
9  once a week.  So, different operating model.  So, a
10  little different usage.
11    Q.   So, again, I apologize.  I probably just
12  don't understand the jargon.  But when I asked you
13  earlier just a minute ago, I said Walgreens
14  supplied itself for large blocks of time at the
15  mail facilities; and I think your answer you said
16  not at the mail facilities, they were operated a
17  little differently.
18    So, did Walgreens, in your understanding
19  ever supply itself in the mail facility space?
20    A.   Yes.
21    Q.   Okay.  And it changed, the distribution
22  model changed at the mail service facilities over
23  time, right?
24    A.   It has changed over time.  What I'm

Page 56

1  referring to, though, is we always had a dual
2  distribution -- a dual distributor supplier to the
3  mail facilities.  That was both heavily relied on a
4  wholesaler as well as the Walgreen distribution
5  network.
6    Q.   We'll get back to that later.
7    So, now we're in '06 and we're talking
8  about who oversaw the distribution supply chain,
9  and that was the specific departments that you
10  referred me to, correct, distribution or the supply
11  chain department that was responsible for deploying
12  the suspicious order monitoring policies to
13  identify suspicious orders at the mail order
14  facilities, correct?
15    MR. STOFFELMAYR:  Objection to the form.
16  BY THE WITNESS:
17    A.   Correct.
18  BY MR. MOUGEY:
19    Q.   And do you have any individual --
20    MR. STOFFELMAYR:  Pause to give me a second.
21  Go ahead.  I apologize.
22  BY MR. MOUGEY:
23    Q.   Do you have an individual that you
24  recall in '06 that you interacted with that was

Page 57

1  responsible for the suspicious order monitoring
2  policies deployed at the mail service facilities?
3    A.   No.  I don't recall.
4    Q.   All right.  Now, let's broaden that time
5  period up.
6    When from '06 until when do you believe
7  that the distribution supply chain was responsible
8  for deploying the suspicious order monitoring
9  policies to identify suspicious orders over the
10  mail service facilities?
11    MR. STOFFELMAYR:  Objection to the form.
12  BY THE WITNESS:
13    A.   Prior to the formation of the
14  Pharmaceutical Integrity company --
15  BY MR. MOUGEY:
16    Q.   Right.
17    A.   -- it would have been the responsibility
18  of the supply chain and distribution.
19    Q.   Okay.  So, the answer to that question
20  is kind of easy.  From '06 to Pharmaceutical
21  Integrity, it was kind of one department you're
22  putting under the label of distribution/supply
23  chain that was responsible for implementing
24  Walgreens' suspicious order monitoring policies and

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  procedures to identify suspicious orders at the
2  mail service facility?
3      MR. STOFFELMAYR: Objection to the form. Go
4  ahead.
5  BY THE WITNESS:
6      A.  Correct.
7  BY MR. MOUGEY:
8      Q.  And do you, sir, have an understanding
9  of generally what the metrics were during -- from
10  '06 to '11 -- I'm sorry -- '06 to the beginning of
11  Pharmaceutical Integrity, of what the metrics were
12  for that suspicious order monitoring policy or
13  procedure?
14      A.  No.
15      Q.  Not even generally?
16      A.  Not even generally.
17      Q.  Do you have any recollection of any
18  interaction as vice president responsible for this
19  business unit, do you have recollection of any
20  interaction with the individuals from supply chain
21  regarding the suspicious order monitoring policies
22  and procedures at Walgreens mail service
23  facilities?
24      A.  No.

Page 59

1      Q.  No one ever came to you in your '06 to
2  April '11 when you were directly responsible for
3  these mail service facilities and asked about one
4  single order asking you to explain or for more
5  information regarding any line of business from the
6  supply chain group or department about a
7  potentially suspicious order?
8      A.  Not that I recall.
9      Q.  Do you recall receiving any reports from
10  supply chain regarding suspicious orders that were
11  flagged as part of the Walgreens' suspicious order
12  monitoring policies and procedures?
13      A.  Not that I recall.
14      Q.  So, really sitting here today, you have
15  no understanding of anything generally or specific
16  about Walgreens' suspicious order monitoring
17  policies that were used at the mail service
18  facilities that you oversaw?
19      MR. STOFFELMAYR: Objection to the form.
20  BY THE WITNESS:
21      A.  Prior to the formation of Pharmaceutical
22  Integrity, no.
23  BY MR. MOUGEY:
24      Q.  Okay. Thank you. Now, you prefaced

Page 60

1  that last question with "prior to the
2  Pharmaceutical Integrity Department" because the
3  Pharmaceutical Integrity Department, once it was
4  created, was under your purview, correct, sir?
5      A.  That's correct.
6      Q.  And tell me what the genesis of that
7  decision. How did you become responsible for the
8  Pharmaceutical Integrity Department?
9      A.  Well, at the time I was vice president
10  of pharmacy services for the company and this was
11  viewed as part of a service support operation and
12  so that's why it was -- it rolled into my
13  organization.
14      Q.  Can you expand more on your answer of
15  why Pharmaceutical Integrity was a service support
16  operation?
17      A.  Well, it's sort of a shared services
18  operation. It's supporting a corporate function,
19  not an individual business function. So...
20      Q.  What do you mean by "shared service"?
21      A.  It's something that is applied broadly
22  across the organization.
23      Q.  Would you consider Pharmaceutical
24  Integrity to be a compliance function?

Page 61

1      A.  I -- you may be able to characterize it
2  at that.
3      Q.  I'm not trying to characterize it. I'm
4  asking you.
5      Is it a -- is it a -- is it a compliance
6  function? Is Pharmaceutical Integrity group a
7  compliance function?
8      MR. STOFFELMAYR: Objection to the form. Go
9  ahead.
10  BY THE WITNESS:
11      A.  I would probably call it more of a
12  monitoring function. But...
13  BY MR. MOUGEY:
14      Q.  What's the difference between compliance
15  versus monitoring?
16      MR. STOFFELMAYR: Objection to the form.
17  BY THE WITNESS:
18      A.  I'm -- my -- you know, my thought is
19  what their job is they monitor what's going on and
20  report, you know, act on those things.
21  BY MR. MOUGEY:
22      Q.  Monitoring what is going on. Okay.
23      So, how much day-to-day knowledge did
24  you have of the workings of the Pharmaceutical

16 (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Integrity Department?
2      A.   Well, it was one --
3      MR. STOFFELMAYR:  Excuse me.  Objection to the
4  form.  Go ahead.
5  BY THE WITNESS:
6      A.   It was one of my responsibilities.  So,
7  you know, I would -- I had a manager over that.  I
8  had staff over there that would handle the
9  day-to-day operations of that.  I would say I was
10 involved more at a, you know, a high -- you know, a
11 higher level, so to speak, bigger issues, those
12 kind of things.
13 BY MR. MOUGEY:
14     Q.   Did you have an understanding of --
15 let's do it this way.
16          What is your just general description of
17 what Pharmaceutical Integrity Department did?
18     A.   They would review and monitor orders and
19 dispensing habits of the pharmacy, and then
20 intervene in those where they -- where they had a
21 reason to look more closely at something.  So, they
22 were supporting the stores.
23     Q.   Did you say "they were supporting the
24 stores"?

Page 63

1      A.   Yes.
2      Q.   So, is that how you characterize, just
3  generally speaking, Pharmaceutical Integrity is
4  that their function was to support the stores?
5      A.   Support activity of the stores, yes.
6      Q.   What do you mean by "activity"?
7      A.   Well, their primary role is around
8  controlled substances.  So, stores dispense, order
9  controlled substances.
10          The Pharmaceutical Integrity's role is
11 to monitor that activity, resolve issues around
12 that activity, working both with our supplier
13 partners as well as the stores.
14     Q.   Now, would you characterize each one of
15 these moves on your resume as kind of moving up the
16 corporate ladder or promotions from step to step to
17 step?
18     A.   No.  That's not how I would characterize
19 it.  There are several lateral moves here.
20     Q.   So, you have under top of page 2 of your
21 resume, "Divisional Vice President, Pharmacy
22 Services."  You have specifically identified that
23 you were "responsible for key operational and
24 function support areas," and Pharmaceutical

Page 64

1  Integrity is listed underneath that description,
2  correct?
3      A.   That is correct.
4      Q.   And you include Pharmaceutical Integrity
5  as a key operational and functional support area
6  "charged with the delivery of creative solutions
7  and industry leading innovation in support for
8  store operations," correct?
9      A.   I characterized it?
10     Q.   That's your resume I just read, right?
11     A.   Where do you see that, sir?
12     Q.   Under "Divisional Vice President" at the
13 top of the page.  So, if it helps, sometimes this
14 screen in front of you has the section I am reading
15 highlighted to kind of point you to the section.
16          So, you see the language --
17     A.   Yes.
18     Q.   -- "Responsible for key operational and
19 functional support areas and charged with the
20 delivery of creative solutions and industry leading
21 innovation in support for store operations."
22          Correct?
23     A.   That's what it says, yes.
24     Q.   And one of the bullets underneath of

Page 65

1  that description is Pharmaceutical Integrity,
2  correct?
3      A.   As one of the business lines that I was
4  responsible for, yes.
5      Q.   Yes, sir.  And that description is on
6  your resume that Pharmaceutical Integrity is a
7  group responsible for supporting and delivering
8  operational components for stores, correct?
9      A.   Correct.
10     Q.   Now, I've looked through your resume
11 here, and it's very impressive, but I don't see the
12 word "compliance" anywhere in your resume or
13 "monitoring" anywhere in your resume.  Am I
14 incorrect?
15          Is there a compliance or a monitoring
16 function or regulatory function anywhere in your
17 resume?
18     A.   There is not.
19     Q.   There is not.  So, you would not
20 characterize Pharmaceutical Integrity as a
21 compliance function or a monitoring function,
22 correct?
23     MR. STOFFELMAYR:  Objection to the form.
24 BY THE WITNESS:

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1     A.   Well, I previously said it was a
2   monitoring function.
3   BY MR. MOUGEY:
4     Q.   Right.  But when you sit down to put
5   together a resume like you did here, yours is two
6   and a half pages long, very detailed,
7   single-spaced, you didn't choose to describe, when
8   you are putting together your CV or your resume
9   here, any monitoring or compliance function,
10   correct?
11     A.   There is no compliance or monitoring
12   listed --
13     Q.   Yes, sir.
14     A.   -- as a specific function in my resume.
15     Q.   But today, as you're testifying in front
16   of this jury about Walgreens' role and its
17   suspicious order monitoring policies, today the
18   description is "monitoring" but it doesn't appear
19   anywhere in your resume, correct?
20     A.   It does not appear in the resume.
21     Q.   All right.  So, sir, would you agree
22   with me that Pharmaceutical Integrity was created
23   in late 2012 in response to investigations by the
24   DEA?

Page 67

1     A.   Yes.
2     Q.   And would you agree with me that the
3   primary role of Pharmaceutical Integrity was
4   designed to identify suspicious orders and report
5   those to the DEA?
6     A.   That would have been one of the
7   responsibilities.
8     Q.   Another one of the responsibilities of
9   Pharmaceutical Integrity Department was to perform
10   due diligence on those suspicious orders, correct,
11   sir?
12     A.   Yes.
13     Q.   And you would agree with me, sir, that
14   Walgreens' responsibility was to perform due
15   diligence on those suspicious orders prior to being
16   shipped, correct?
17     MR. STOFFELMAYR:  Objection to the form.
18   BY THE WITNESS:
19     A.   Yes.
20   BY MR. MOUGEY:
21     Q.   Now, after your divisional vice
22   president, pharmacy services from May 2011 to
23   February of 2014, your next title was vice
24   president, pharmacy and retail operations and

Page 68

1   planning, correct, sir?
2     A.   That's correct.
3     Q.   And that was December '14 to
4   December 2017, correct?
5     A.   Correct.
6     Q.   And did the Pharmaceutical Integrity
7   group, was it still under your reporting structure
8   from '14 to '17?
9     A.   Yes.
10     Q.   Now, and I skipped a step.  I apologize.
11         As your previous entry on page 2 at the
12   top of the page from May '11 to February of '14,
13   did part of your responsibilities still include the
14   oversight of the mail service facilities?
15     A.   Yes.
16     Q.   And, so, you generally had an
17   understanding at a higher level of what was going
18   on at the mail service facilities, correct?
19     A.   Yes.
20     Q.   And I believe in your CV or your resume
21   you tout some of the efficiencies that you
22   implemented to save Walgreens' money, correct?
23     A.   Yes.
24     Q.   And as a matter of fact, if we were to

Page 69

1   go through line by line of your resume,
2   there are several examples you give during your
3   tenure at Walgreens about saving money to the
4   bottom line of Walgreens, correct?
5     A.   Yes.
6     Q.   And many of those were due to
7   efficiencies, correct?
8     A.   Yes.
9     Q.   And those efficiencies could have been
10   technology, correct?
11     A.   Yes.
12     Q.   They were consolidation like the mail
13   service facilities where you took three into two
14   and created economies of scale, correct?
15     A.   Yes.
16     Q.   There are example after example after
17   example of Mr. Swords at Walgreens doing a good job
18   saving Walgreens money, correct?
19     A.   Yes.
20     MR. STOFFELMAYR:  Objection to the form.
21   BY MR. MOUGEY:
22     Q.   I'm sorry.  Yes?
23     A.   Yes.
24     Q.   And increasing the bottom line profits

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  of Walgreens, correct?
2       MR. STOFFELMAYR:  Objection to the form.
3  BY THE WITNESS:
4       A.   Yes.
5       Q.   And you've come from your days at an
6  intern as a kid starting Bachelor of Pharmacy,
7  University of New Mexico in Albuquerque, to here in
8  Chicago or right outside of Chicago, have made a
9  considerable progression up the corporate ladder at
10  Walgreens, correct?
11      A.   Yes.
12      Q.   And you've been provided handsomely in
13  compensation as you moved up the food chain,
14  correct, sir?
15      A.   Well, I don't know what your definition
16  of "handsomely" is, but I have received raises as
17  I've gone along.
18      Q.   Yes, sir.  And you make a good living at
19  Walgreens, correct?
20      A.   I make a fair living, yes.
21      Q.   Yes, sir.  You receive options on
22  stocks?
23      A.   I do.
24      Q.   Yes, sir.  So, you profit if Walgreens

Page 71

1  profits through the stock options, correct?
2       A.   Yes.
3       Q.   And the way those work is you get
4  options as part of your compensation package to
5  purchase Walgreens stock at a specific price,
6  right?
7       A.   That's correct.
8       Q.   And if the price of the stock continues
9  to rise, Mr. Swords makes money on the continued
10  upswing of Walgreens stock, correct?
11      A.   Just like every shareholder.
12      Q.   Yes, sir.  So, the more money Walgreens
13  makes, the more money Mr. Swords makes, correct?
14      MR. STOFFELMAYR:  Objection to the form.  Go
15  ahead.
16  BY THE WITNESS:
17      A.   Yes.
18  BY MR. MOUGEY:
19      Q.   Now --
20      MR. STOFFELMAYR:  When you get to a good spot,
21  it's been about an hour.
22      MR. MOUGEY:  Perfect spot.  How long?
23      MR. STOFFELMAYR:  Like five minutes.
24      THE VIDEOGRAPHER:  We are off the record at

Page 72

1  9:13 a.m.
2       (WHEREUPON, a recess was had
3       from 9:13 to 9:23 a.m.)
4       THE VIDEOGRAPHER:  We are back on the record
5  at 9:23 a.m.
6  BY MR. MOUGEY:
7       Q.   All right, Mr. Swords.  During your
8  tenure at Walgreens you served on the DEA
9  compliance committee formation or DEA compliance
10  committee, rather, that included issues related to
11  controlled substances, more specifically
12  Schedule II and Schedule III opiates, correct?
13      A.   Are you referring to the NACDS?
14      Q.   Well, you tell me.
15      A.   Well, I'm not sure which -- I'm not sure
16  which one you're referring to.
17      Q.   Well, tell me which ones there are out
18  there.  Tell me how many different committees did
19  you refer -- did you sit on that related to DEA
20  compliance that covered the topics of Schedule II
21  and Schedule III controlled substances including
22  opiates?
23      A.   I participated and co-chaired the NACDS.
24      Q.   Okay.

Page 73

1       A.   And then I participated in the NABP.
2       Q.   Help me to understand.  Were these both
3  kind of compliance-related committees?
4       A.   I don't know that I'd characterize them
5  as compliance.  They were meetings to get together
6  with a collaboration of other pharmacy retailers to
7  discuss ongoing challenges, operating issues around
8  the controlled substance.
9       Q.   Collaboration, challenges, but not
10  compliance, correct?
11      MR. STOFFELMAYR:  Objection to the form.
12  BY THE WITNESS:
13      A.   There were -- there were certainly
14  discussions around compliance with respect to what
15  the DEA was bringing up, you know, the issues the
16  DEA was raising.
17  BY MR. MOUGEY:
18      Q.   Tell me what time frame you co-chaired
19  or were on the NACDS committee.
20      A.   I'm not sure of the specific dates, but
21  I believe the committee ran for 18 months or so.
22      Q.   All right.  And during what time period
23  was that 18 months?
24      A.   Again, I'm not sure of the specific

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  dates, but I seem to recall it was 2012 to 2014 or
2  something around there.
3      Q.   And NABP, how long did you serve on that
4  committee?
5      A.   Well, again, that wasn't really a
6  committee.  That was an invite from NABP for
7  retailers to join in a discussion with the DEA.  We
8  were one of the retailers that would attend.
9      Q.   And how long a period of time were you
10  attending meetings with the NABP and the DEA?
11      A.   Like I previously stated, we -- I recall
12  a number of meetings that occurred, three to six.
13  I attended some of those meetings, not all of them.
14  You know, I don't know the specific time frame of
15  that.  Generally speaking --
16      Q.   2001 or was it, you know, 2011, 2012,
17  '13?  Just give me a general time frame.
18      A.   Well, again, I believe they were around
19  the time frame of 2012 to 2014, 2015.  Again, I
20  don't -- I don't know the specific dates of the
21  meetings.
22      Q.   And just to make clear, I'm not asking
23  you did they start on September 21, 2011 and go to
24  October 13 of 2013.  So, when I use the word "time

Page 75

1  frame," I'm just asking you for just a time frame,
2  an annual, just generally a time frame.
3      A.   Well, I'm struggling to give you that
4  time frame in that respect, the year.  I don't
5  know the specific year that some of these occurred
6  in.  I'm doing my best to answer your question with
7  respect to the time frame.  I don't know what the
8  dates were.
9      Q.   I will hand you what I'm going to mark
10  as Swords 2.
11          (WHEREUPON, a certain document was
12          marked as Walgreens-Swords Exhibit
13          No. 2: 3/1/12 e-mail;
14          WAGFLDEA00001536.)
15  BY MR. MOUGEY:
16      Q.   Purports to be an -- this is an internal
17  document from Walgreens, Bates numbered
18  WAGFLDEA1536, is from Laura Merten.  Do you know
19  who Laura Merten is?
20      A.   I do.
21      Q.   And Laura Merten is Walgreens', at this
22  point in time, chief compliance officer, correct?
23      A.   She was.
24      Q.   And if Ms. Merten is sending a memo

Page 76

1  regarding a DEA compliance committee, you would
2  think that the -- one of the topics at this -- of
3  this committee would be compliance, right?
4      A.   Yes.
5      Q.   And it was or references you as one of
6  the members of that committee, correct?
7      A.   That's what the statement says here,
8  yes.
9      Q.   And if we actually read the memo dated
10  3/1/2012, "As one of the nation's largest
11  healthcare providers, Walgreens supports the
12  government's mission of promoting economy,
13  efficiency, effectiveness in the delivery of
14  healthcare services."
15          Do you see that, sir?
16      A.   I do.
17      Q.   "As part of an effective proactive
18  compliance program, we have initiated the DEA
19  Compliance Committee to assure continuing
20  compliance with the regulations established with
21  the U.S. Drug Enforcement Administration, the DEA."
22          Do you see that, sir?
23      A.   I do.
24      Q.   And you've been invited to participate

Page 77

1  in this important initiative, correct?
2      A.   That's what it says, yes.
3      Q.   And according to Ms. Merten, "It is our
4  plan to hold meetings quarterly, although we may
5  have a more frequent schedule as we establish our
6  agenda."
7          Do you see that, sir?
8      A.   I do.
9      Q.   And did you, in fact, sir, continue
10  from -- did you agree to serve as co-chair of this
11  committee?
12      A.   No, I did not.
13      Q.   And Dave Lovejoy, who is Dave Lovejoy?
14      A.   He was my boss at the time.
15      Q.   He was your boss.
16          And let's go through each one of these.
17      A.   Okay.
18      Q.   So, Dave Lovejoy was your boss.
19          And Suzanne Hansen, who was that?
20      A.   She was at this time group vice
21  president of pharmacy operations.
22      Q.   Suzanne Hansen at this time was pharmacy
23  operations?
24      A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.  I don't mean this in any like -- I'm not
2  trying to be disparaging or negative in any way.
3        In banking, financial services, the
4  "vice president" sometimes gets doled out to
5  everybody, right?
6    A.  Yeah.
7    Q.  I don't mean that disrespectfully.
8        At Walgreens that to me seems to be a
9  fairly senior designation as VP of certain business
10  operations.
11        Was she head of pharmacy operations or
12  did she have -- is there like a president above
13  her?
14    A.  She would have reported to Kermit
15  Crawford, president of pharmacy operations.
16    Q.  VP of pharmacy operations would be the
17  second person?
18    A.  No.  As I said, she was the group vice
19  president of pharmacy operations.
20    Q.  I missed the word "group."  Okay.  So,
21  what group?
22    A.  That's just -- that's a title.  So,
23  group vice president.  So, she had many other
24  responsibilities.  Pharmacy operations would have

Page 79

1  been one of them.
2    Q.  I'm having a little trouble with the org
3  structure at Walgreens, and I'm confident there is
4  some variations and tweaks over time.  But has it
5  generally remained the same over time, when I say
6  "over time," over the last, say, ten years?
7    A.  I would say that's a fair statement,
8  yeah.
9    Q.  Do you mind just kind of walking me
10  through some of the different if you call them
11  groups or divisions, just give me a little bit of
12  the thumbnail sketch of the org structure at
13  Walgreens.  I'm assuming you are familiar with
14  that?
15    A.  I am.
16    Q.  Okay.  Would you mind walking me through
17  that.
18    A.  Sure.  So, prior to the merger with
19  Boots, there would largely have been two separate
20  business units:  store operations and pharmacy
21  operations.
22        Each one of those respective
23  organizations had a president over those
24  operations.  Pharmacy operations would have been

Page 80

1  Kermit Crawford.  Store operations would have been
2  Mark Wagner.  Both those gentlemen would have
3  reported in to the CEO at the time, Greg Wasson.
4        Underneath them are varying
5  responsibilities.  As I referred here, group vice
6  president, Suzanne Hansen, group vice president,
7  Dave Lovejoy, both reported in to Kermit Crawford.
8    Q.  Would you -- I'm sorry if you already
9  told me this.  But which groups is both Ms. Hansen
10  and Mr. Lovejoy?
11    A.  So, Suzanne would have been group vice
12  president of pharmacy operations.
13    Q.  Okay.
14    A.  Dave Lovejoy would have been group vice
15  president of pharmacy services.
16    Q.  All right.  How many more groups were
17  there under the pharmacy umbrella?
18    A.  I don't know all of them.  There would
19  have certainly been some purchasing groups
20  underneath there.
21    Q.  Inventory?
22    A.  Yes.  Other functions.
23    Q.  Okay.  And I have the org chart for the
24  pharmacy, but I didn't know how many of them there

Page 81

1  were.  I couldn't get a feel for globally.
2        So, on the store operations side, there
3  is also groups under the store operations?
4    A.  Similar, similar parallel.
5    Q.  Four, five, six, seven, ten, somewhere,
6  each side had groups underneath them?
7    A.  Exactly.
8    Q.  Okay.  Fair enough.  And your -- you
9  started off with the explanation, I think you said,
10  before the merger with Boots?
11    A.  Yes.
12    Q.  Okay.  I don't remember when the Boots
13  merger was.  Can you help me?
14    A.  Four years ago.
15    Q.  Four years ago.  So, that's roughly
16  around '14?
17    A.  Yeah.
18    Q.  Okay.  How long has Mr. Lovejoy been
19  your direct report in your various roles?
20    A.  Well, he was never my direct report.  I
21  reported to him.
22    Q.  I'm sorry.  I said it backwards.  Yes,
23  you reported.
24        How long did you report directly to him?

Page 82

1      A.   Maybe a year and a half, a year,
2   something like that.
3      Q.   Okay.  So, I went back to your resume
4   for a second.
5          Pharmacy and retail operations, pharmacy
6   services.  Are those groups underneath the pharmacy
7   or are those even subgroups further down the org
8   structure?
9      A.   Those are groups underneath the
10  pharmacy.
11     Q.   Okay.  So, store operations is when I
12  walk into Walgreens and there is all kinds of stuff
13  on the shelves and the pharmacy is in the back, I'm
14  assuming store operations is predominantly
15  everything besides the pharmacy?
16     A.   Yeah, that's a --
17     Q.   Fair enough.
18     A.   Generally speaking, yes.
19     Q.   So, let's stick with pharmacy for a
20  second, and I'm going to go back to your CV so I
21  kind of understand this a little bit better.
22         I'll tell you what.  I'm going to come
23  back because I'm going to pull the org charts and
24  I'm going to come back and I think that will make

Page 83

1   it easier for both of us so it's not a memory test.
2   All right?
3      A.   Okay.
4      Q.   All right.  So we were on Swords 2,
5   Bates No. 1536, and we were going through these
6   folks with Ms. Hansen, Mr. Lovejoy.  Who is Tim
7   Gorman?
8      A.   Tim was a, I believe at this time, a
9   senior director in our loss prevention/asset
10  protection.
11     Q.   Okay.  And that's another group under
12  pharmacy?
13     A.   No.  That's separate outside pharmacy.
14  It would have -- at that time that would have
15  reported in to store operations.
16     Q.   Okay.  And how about Mr. Gates?
17     A.   I'm not sure what Rick's position was at
18  this time, but likely he was on the store
19  operations side at that point.  But, again, I don't
20  have his...
21     Q.   You don't remember exactly?
22     A.   I don't remember exactly.
23     Q.   How about Frank DeStefano?
24     A.   He would have been over our purchasing

Page 84

1   at pharmaceutical purchasing.
2      Q.   Okay.  And Dan Coughlin?
3      A.   He was supply chain distribution.
4      Q.   And that's under which umbrella?
5      A.   Separate division.
6      Q.   I thought there was kind of two
7   umbrella, store operations and pharmacy?
8      A.   For the retail operations side, but
9   there are -- marketing is there.  You've got
10  distribution supply chain.  You've got -- those all
11  would roll up to Greg Wasson as well.  They had all
12  separate leaders outside Kermit or...
13     Q.   Do you remember, outside of marketing
14  and distribution supply chain, where else, what
15  other umbrellas or structure that reported directly
16  in to Mr. Wasson?
17     A.   No.  I mean, legal would have been one.
18     Q.   Okay.
19     A.   I mean, I don't know all the -- I don't
20  know what all Greg's direct report line was.
21     Q.   Let me make sure I -- we have five I
22  think.  Pharmacy, store operations, marketing,
23  distribution/supply and legal.  Is that fair?
24     A.   There is probably a property one in

Page 85

1   there as well.  Store property.  But, again, I
2   don't --
3      Q.   There's more.  The five or six we've
4   just identified were direct reports according to
5   whatever you can remember?
6      A.   Yes.
7      Q.   And, now, when you just mentioned
8   distribution and supply, let me go back to your
9   previous testimony when you were with -- overseeing
10  the mail services and we were talking about
11  suspicious order monitoring policy, your
12  recollection or understanding was that that was
13  deployed or implemented through distribution and
14  supply prior to Pharmaceutical Integrity, correct?
15     A.   Correct.
16     Q.   Okay.  So, do you -- let's go to the
17  next one.  Dan Coughlin.  If you already covered
18  him, I apologize.  Do you remember who Dave --
19  which --
20     A.   Dan.  Yeah, he was the supply
21  distribution guy that I mentioned.
22     Q.   Okay.  And, so, would Dan Coughlin have
23  any responsibility over suspicious order monitoring
24  policies that were implemented at Walgreens through

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  distribution and supply?
2      A.  I don't know what Dan's responsibilities
3  were.
4      Q.  Do you know his -- I'm sorry.
5      A.  I know he worked in the supply
6  distribution area.
7      Q.  Do you know what his title was?
8      A.  I believe he was divisional vice
9  president.
10     Q.  So, somewhere underneath his purview of
11  divisional vice president he would have had some
12  contact with the suspicious order monitoring
13  policies and procedures?
14     A.  I don't --
15     MR. STOFFELMAYR:  Objection to the form.  Go
16  ahead.
17  BY THE WITNESS:
18     A.  I don't know that.  I don't know what
19  his responsibilities are.
20  BY MR. MOUGEY:
21     Q.  Okay.  And I just wrote through my last
22  name.  Is it Ken Amos or Ames?
23     A.  Amos.
24     Q.  Amos, all right, with an M.  Which --

Page 87

1  where did Ken fall into the org structure?
2      A.  Ken would have also been asset
3  protection/loss prevention.
4      Q.  So, this is a fairly -- is it fair to
5  say this is a fairly senior group of folks at
6  Walgreens that we just went through that received
7  this memo from Laura Merten, chief compliance
8  officer?
9      A.  Well, it's a group of senior directors
10  and vice presidents.  I don't know what you mean by
11  senior but...
12     Q.  Senior directors and vice presidents is
13  fair enough with me.  It's not -- we are not in the
14  store level, correct?
15     A.  Correct.
16     Q.  We are further up the food chain.  We're
17  at corporate level, people that have
18  responsibilities, significant responsibilities, in
19  different groups, correct?
20     A.  Correct.
21     Q.  Now, let's go back to this memo.  It
22  says, "Your input and expertise will be crucial to
23  the success of this committee and your decisions
24  and recommendations will help to support our

Page 88

1  corporate culture of ethics, integrity and
2  compliance.  It is our plan to hold meetings
3  quarterly," and we went through that language
4  before.
5      Do you -- I think you told me that these
6  went from like 2012-2014.  Do you recall if you
7  actually -- if this committee had quarterly
8  meetings?
9      A.  My recollection is we had one or two
10  meetings.
11     Q.  And that's it?
12     A.  Yeah.
13     Q.  All right.  So, if we go back to this
14  first paragraph, so, this committee was part of an
15  effective proactive compliance program.
16     Now, there was only one to two meetings.
17  What happened to this committee as part of an
18  effective compliance program?  Do you have an
19  understanding of why there was only one to two
20  meetings?
21     A.  I really don't know why.  I know Laura
22  exited the company sometime around that, and I
23  don't know why the --
24     Q.  Was compliance part of the legal

Page 89

1  department, do you have an understanding?
2      A.  I don't know for sure what -- how that
3  rolled up but...
4      Q.  Okay.  Do you have an understanding of
5  whether compliance was its own separate group?
6      A.  I don't.  I don't know.
7      Q.  Do you see "Committee counsel: Dwayne
8  Piñon."  Am I mispronouncing that?  Very bottom of
9  the page.
10     A.  Piñon.
11     Q.  And Garry Hodge?
12     A.  Yes.
13     Q.  And those were both counsel?
14     A.  Yes.
15     Q.  And in-house counsel at Walgreens?
16     A.  Correct.
17     Q.  Now, again, I'm going to go back to what
18  I asked before, and I apologize if you already
19  answered these.
20     But did you take notes during the couple
21  of meetings that you recall?
22     A.  I may have taken notes.  I mean, I
23  don't.  I don't know.
24     Q.  Did anybody come to you and ask you, "Do

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  you have a place that you keep notes"?  Did anybody
2  come to you and ask, "Hey, Rex, have you got notes
3  from any meetings you attended regarding opiates or
4  Schedule II, III controlled substances"?  Did
5  anybody come to you and ask you?
6     A.  As part of this action?
7     Q.  Yes, sir.
8     A.  Yes.
9     Q.  All right.  You went and looked all the
10  regular places you would keep notes or agendas or
11  minutes and look to see if you could find anything?
12     A.  That's correct.
13     Q.  And you couldn't identify anything?
14     A.  No.
15     Q.  All right.
16     A.  Well, I don't know that I couldn't
17  identify.  I had nothing in my possession.  I
18  understand that they had other things, but I didn't
19  have anything at that time.
20     Q.  Do you recall if there were minutes or
21  agendas from these meetings?
22     A.  I don't.
23     Q.  Anything similar to this kind of
24  compliance-focused meeting that you were invited to

Page 91

1  join?
2     A.  Not that I recall.
3     Q.  And you see the date of this meeting,
4  3/1/2012.  This corresponds with the DEA
5  investigation into several Walgreens pharmacies and
6  distribution centers?
7     A.  Yes.
8     MR. STOFFELMAYR:  Objection to the form.  Go
9  ahead.
10  BY THE WITNESS:
11     A.  Yes.
12  BY MR. MOUGEY:
13     Q.  Was that part of the catalyst for this
14  meeting?
15     MR. STOFFELMAYR:  Objection.
16  BY THE WITNESS:
17     Q.  Or for these types of meetings?
18     MR. STOFFELMAYR:  Objection to the form.
19  BY THE WITNESS:
20     A.  I don't know what the catalyst was that
21  Laura requested the meeting.
22  BY MR. MOUGEY:
23     Q.  Was there a sense of urgency within
24  Walgreens to -- to further enhance the suspicious

Page 92

1  order monitoring policies and procedures after the
2  DEA investigation started into the Jupiter
3  distribution center?
4     A.  I would say that -- I don't know if I'd
5  phrase it quite like that.  I think we did -- we
6  started a thorough review of what the process was
7  and what was going on, yes.
8     Q.  Okay.  One thing that I just -- I didn't
9  understand looking at that when I saw that memo and
10  that you were invited, and I don't mean any
11  disrespect here, but when I looked through your CV
12  you had, and I think as you agreed, you have no
13  compliance background, correct?
14     A.  Correct.
15     Q.  And this is kind of a DEA compliance
16  meeting, correct?
17     A.  Correct.
18     Q.  Why do you think you were asked -- do
19  you have an understanding of why you were asked to
20  be part of a DEA compliance meeting, important
21  function at Walgreens, without and you have
22  virtually no compliance background?
23     MR. STOFFELMAYR:  Objection to the form.
24  BY THE WITNESS:

Page 93

1     A.  Because I was the divisional vice
2  president of pharmacy services.
3  BY MR. MOUGEY:
4     Q.  Who in this meeting, the folks that we
5  just walked through, other than Ms. Martin, had
6  compliance experience?
7     MR. STOFFELMAYR:  Objection to the form.
8  BY THE WITNESS:
9     A.  I don't know what the other people's
10  backgrounds around compliance are.
11  BY MR. MOUGEY:
12     Q.  You don't know anybody that had a
13  compliance background that was invited to the DEA
14  compliance meeting other than Ms. Martin?
15     A.  What I said is I don't know what their
16  backgrounds are --
17     Q.  I understand.
18     A.  -- relating to compliance.
19     Q.  You don't recall sitting through those
20  couple meetings, somebody standing up and saying,
21  "I'm the one that has the background in compliance
22  and made the presentations and kind of helped
23  educate everybody else."  You don't recall?
24     A.  I don't recall that happening.

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    Q.   Let me hand you what I will mark as
2  Swords 3.
3              (WHEREUPON, a certain document was
4              marked as Walgreens-Swords Exhibit
5              No. 3:  DEA Compliance Working
6              Group, January 10, 2013, Meeting
7              Summary WAGMDL00496404 - 00496406.)
8    MR. STOFFELMAYR:  Make sure you give me a
9  chance to object.
10 BY MR. MOUGEY:
11   Q.   Swords 3 is titled "DEA Compliance
12 Working Group."
13             Do you see that, sir?
14   A.   I do.
15   Q.   And that is the National Association of
16 Chain Drug Stores or NACDS, correct?
17   A.   Correct.
18   Q.   And you were asked to be or you
19 ultimately ended up being the co-chair of the DEA
20 compliance working group, correct?
21   A.   Correct.
22   Q.   Any understanding of why you were asked
23 to co-chair a DEA compliance working group with no
24 compliance background?

Page 95

1    A.   Again, it was -- I was the lead for
2  Walgreens from a vice -- the pharmacy services side
3  of the -- of the equation here.
4    Q.   So, Walgreens asked you to participate
5  in this committee, this DEA compliance working
6  group?
7    A.   Correct.
8    Q.   And do you have any understanding of why
9  Walgreens would ask Rex Swords, with no compliance
10 background, to be its representative on the DEA
11 compliance working group?
12   A.   I was asked to participate, and that's
13 what I did.
14   Q.   And -- but you don't have any
15 understanding of why you were asked?
16   A.   I do not.
17   Q.   So, I'm assuming that as part of the DEA
18 compliance committee that we just looked at, Swords
19 2, and then Swords 3, the document we have in front
20 of us, that you spent some time getting up to speed
21 understanding the regulatory scheme that Walgreens
22 was under in both its dispensing role and its
23 distribution role?
24   A.   Correct.

Page 96

1    Q.   And who helped educate you on Walgreens
2  responsibility as a distributor under the
3  Controlled Substance Act?
4    A.   In-house counsel.
5    Q.   In-house counsel.  And same question but
6  on the dispensing side.  I'm assuming the answer is
7  the same, in-house counsel?
8    A.   In-house counsel.
9    Q.   And who specifically did you sit down
10 with to understand the details of Walgreens'
11 responsibilities under the Controlled Substance Act
12 as a distributor?
13   A.   Dwayne Piñon.
14   Q.   And is the answer the same for
15 understanding Walgreens' responsibilities under the
16 Controlled Substance Act as a dispenser?
17   A.   Yes.
18   Q.   And you understand that -- and I
19 apologize.  I think we did this earlier.
20             But you understand that Walgreens'
21 responsibilities under the Controlled Substance Act
22 as a distributor and as a dispenser are separate
23 and distinct responsibilities?
24   A.   Correct.

Page 97

1    Q.   But there is some overlap between the
2  two as far as, for example, information that one
3  would rely on to make the decisions implementing
4  Walgreens' responsibilities under the CSA, correct?
5    MR. STOFFELMAYR:  Objection to the form.
6  BY THE WITNESS:
7    A.   I'm not sure I understand what the
8  question is.
9  BY MR. MOUGEY:
10   Q.   That was a terrible question.  Yeah.
11             Some of the information that Walgreens
12 used to discharge its responsibilities as a
13 distributor under the Controlled Substance Act
14 would be the same information that it would rely on
15 to discharge its responsibilities under the
16 Controlled Substance Act as a dispenser, correct?
17   A.   I'm still not sure I'm following the
18 question.
19   Q.   Let's just keep going.
20             The date of this, January 10, 2013.
21 "Co-chairs Jason Ausili and Rex Swords started the
22 meeting with a description of the working group's
23 charge from the NACDS Board of Directors.  In
24 particular, the work group is tasked with helping

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1   to curb prescription drug abuse through the
2   development of an industry-wide code for controlled
3   substance dispensing."
4       Correct?
5   A.  Correct.
6   Q.  So, this DEA compliance working group
7   was more focused on dispensing than Walgreens' role
8   as a distributor, is that -- do you agree with
9   that?
10  A.  I would.
11  Q.  All right.  The next sentence says,
12  "The co-chairs emphasized the need to be
13  forward-thinking with the code, and go beyond
14  simply codifying known red flags for abuse."
15      Do you see that?
16  A.  I do.
17  Q.  Do you have an understanding of what the
18  reference to "red flags" is in Swords 3?
19  A.  Yes, I do.
20  Q.  What is your understanding of what is
21  referenced here as "red flags"?
22  A.  The DEA had established what they
23  considered a series of activities or items that
24  they would consider -- that they believed that

Page 99

1   pharmacists and other health professionals should
2   consider as red flags, something to alert you, if
3   you will, to suspicious activity.
4   Q.  And that would require some additional
5   follow-up.  Is that fair?
6   A.  Or consideration, yes.
7   Q.  What's the difference between follow-up
8   or consideration?  If something is a red flag, you
9   just -- you have to ask a couple more questions.
10  Is that fair?
11  A.  Depending on what the red flag is,
12  right.
13  Q.  Maybe is it -- how about this.  If it's
14  a red flag, you have to take a further look?
15  A.  Again, I think it's -- may require
16  further action or consideration.
17  Q.  What I'm struggling with is the word
18  "may."  Okay.
19      So, a red flag.  A red flag pops.  One
20  has to look at the red flag to understand whether
21  or not further action is needed.  Correct?
22  A.  Yes.
23  Q.  So, this memo goes on, and I'm going
24  to look at the second sentence of the second

Page 100

1   paragraph, "In addition, NACDS circulated the
2   following documents for consideration:  a legal
3   overview of considerations for the development and
4   implementation of a voluntary code."
5       Do you have any recollection of what
6   that document was?
7   A.  I recall there being a document.  I
8   don't recall the specifics of it.
9   Q.  Do you recall who drafted it?
10  A.  I believe it was NACDS counsel.
11  Q.  And who would that be, do you recall?
12  A.  I don't -- Don something.
13  Q.  Don something?
14  A.  I don't -- I don't remember his specific
15  name.  I think it was Don something.
16  Q.  Okay.  And No. 2, "An overview of DEA
17  standards and red flags discussed in recent DEA
18  cases."
19      Now, was there, when you met with
20  Mr. Piñon internally to get up to speed on the
21  details of the Controlled Substance Act, did part
22  of what you reviewed include DEA cases?
23      MR. STOFFELMAYR:  Let me just ask you to
24  answer that question with a yes or a no and not go

Page 101

1   beyond that.
2   BY THE WITNESS:
3   A.  Yes.
4   BY MR. MOUGEY:
5   Q.  And do you have an independent
6   recollection today of what those cases were?
7       MR. STOFFELMAYR:  Just answer that question
8   with a yes or a no.
9   BY THE WITNESS:
10  A.  Yes.
11  BY MR. MOUGEY:
12  Q.  And what were those cases?
13      MR. STOFFELMAYR:  I'm going to object and
14  instruct him not to answer based on privilege.
15  BY MR. MOUGEY:
16  Q.  Do you consider those cases to be
17  helpful when educating yourself about what the
18  details of Walgreens' responsibilities were under
19  the Controlled Substance Act?
20  A.  Yes.
21  Q.  And that was part of what you used to
22  educate yourself on understanding how Walgreens
23  discharged its responsibilities under the
24  Controlled Substance Act, correct?

26 (Pages 98 to 101)

Page 102

1    MR. STOFFELMAYR:  Objection to the form.
2  BY THE WITNESS:
3    A.  Yes.
4  BY MR. MOUGEY:
5    Q.   And would you please explain to me what
6  your education on the details of Walgreens'
7  responsibilities under the Controlled Substance Act
8  included?
9    MR. STOFFELMAYR:  And, Mr. Swords, in
10  answering that question, I'm not sure I totally
11  understand it, but as you understand it, answer the
12  question.
13    But I'm going to instruct you to the
14  extent that requires you to get into the substance
15  of confidential communications with Mr. Piñon or
16  any other lawyers, not to -- not to reveal that;
17  and if that's a complicated instruction, we can
18  step in the hallway and figure it out.
19    THE WITNESS:  We should probably do that.
20  BY MR. MOUGEY:
21    Q.   I would like you to answer the question
22  that I asked.
23    A.  Can you restate the question for me?
24    Q.  Yes, sir.  Would you please explain to

Page 103

1  me the details of Walgreens' responsibilities under
2  the Controlled Substance Act as a distributor.
3    MR. STOFFELMAYR:  Hold on a second.
4    So, two things.  I'm going to object to
5  the form of the question and foundation.
6    Mr. Piñon -- not Mr. Piñon.
7    Mr. Swords, to the extent that would
8  require you to reveal legal advice obtained from
9  counsel for Walgreens, I'm going to instruct you
10  not to answer.
11    THE WITNESS:  Okay.
12  BY THE WITNESS:
13    A.  So, what is the question again?
14  BY MR. MOUGEY:
15    Q.   Is your understanding of what Walgreens'
16  responsibility as a distributor under the
17  Controlled Substance Act, did that come entirely
18  from counsel?
19    A.  Yes.
20    Q.  From legal counsel?
21    A.  Yes.
22    Q.  So, that was the -- your education and
23  understanding of the details of Walgreens'
24  responsibilities under the Controlled Substance Act

Page 104

1  came from counsel, Walgreens' counsel?
2    A.  With respect to suspicious order
3  monitoring and distributing, yes.
4    Q.  So, sitting here today, are you telling
5  me, given counsel's instruction, that you can't
6  answer my question explaining Walgreens'
7  responsibilities as a distributor under the
8  Controlled Substance Act because it all came from
9  Walgreens' counsel?
10    A.  That is how I was educated as to the
11  responsibility for distribution and suspicious
12  order monitoring was from legal counsel.
13    Q.  Yes, sir.  And there was -- your
14  education process was on the details of Walgreens'
15  responsibilities under the Controlled Substance Act
16  as a distributor came from Walgreens' counsel?
17    A.  Correct.
18    Q.  So, sir, would you please explain to me
19  the details, as you understand it, of Walgreens'
20  responsibilities under the Controlled Substance Act
21  as a distributor?
22    MR. STOFFELMAYR:  So, again, I'm going to
23  object on the basis of privilege and instruct you
24  not to answer, Mr. Swords, unless there is some

Page 105

1  part of that question you can answer without
2  getting into the substance of legal advice obtained
3  from Mr. Piñon or other counsel for Walgreens.
4  BY THE WITNESS:
5    A.  Well, again, my education of the
6  responsibility came from interactions with our
7  legal counsel.  So, I mean, I don't know -- I don't
8  know what I can answer and what I can't answer
9  here.  So...
10    MR. STOFFELMAYR:  Okay.
11  BY MR. MOUGEY:
12    Q.   Well, you do know what you can and what
13  you can't answer.  I'm asking you to please explain
14  the details, as you understand them, of Walgreens'
15  responsibilities as a distributor under the
16  Controlled Substance Act.
17    MR. STOFFELMAYR:  And given his prior
18  testimony, Mr. Swords, I'm going to object on the
19  basis of privilege and instruct you not to answer.
20    MR. MOUGEY:  Kaspar, the order from -- whether
21  it was Judge Polster or -- I think it was Judge
22  Polster, and you and I were in the courtroom the
23  same day the order was made from Judge Polster --
24  that Defendants in this case cannot use

27 (Pages 102 to 105)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  attorney-client to not disclose the details of
2  their understanding of the suspicious order
3  monitoring policies.
4       What am I missing?
5       MR. STOFFELMAYR:  That's not his order at all.
6  I don't want to waste time on this.
7       MR. MOUGEY:  I don't want to waste time.  I am
8  sitting here on the Friday before the holidays
9  taking a deposition, and this is the second or
10  third deposition that your firm has instructed its
11  employees not to answer questions on their
12  understanding of their responsibilities under the
13  Controlled Substance Act as a distributor because
14  it came from counsel.
15       MR. STOFFELMAYR:  I stand by that objection,
16  and I don't think it's inconsistent with the
17  judge's order.
18  BY MR. MOUGEY:
19       Q.   And you understand that the point of
20  this today is to understand and elicit your
21  testimony as a senior person at Walgreens as to
22  your understanding, Mr. Swords, of Walgreens'
23  responsibilities under the Controlled Substance
24  Act.

Page 107

1       You understand that's why we're here
2  today, sir, correct?
3       MR. STOFFELMAYR:  Objection to the form.
4  We're here today because you noticed his
5  deposition.
6  BY MR. MOUGEY:
7       Q.   And you understand, sir, this case is
8  entirely about Walgreens discharging its
9  obligations under the Controlled Substance Act as a
10  distributor, correct?
11       MR. STOFFELMAYR:  Objection to the form.
12  BY THE WITNESS:
13       A.   I understand that I had a subpoena to
14  appear here for this issue, you know.
15  BY MR. MOUGEY:
16       Q.   You don't know anything about what this
17  litigation is about?
18       A.   I'm not sure I understand what the
19  litigation is about, no.
20       Q.   Other than cases that you -- let me stop
21  and just make a quick.
22       MR. MOUGEY:  I am reserving our right to keep
23  this deposition open at the conclusion of today
24  based on your refusal to answer based on counsel's

Page 108

1  instruction your understanding of the details of
2  Walgreens' responsibilities as a distributor based
3  on your counsel instructing you not to answer due
4  to the fact that your entire understanding of the
5  regulatory structure is from counsel.  So, just...
6       MR. STOFFELMAYR:  That's not a question.  He
7  is just putting that on the record.
8  BY MR. MOUGEY:
9       Q.   Now, outside of the cases you reviewed,
10  what other documents, types of documents,
11  categories, did you review to educate yourself on
12  Walgreens' responsibilities as a distributor under
13  federal law?
14       MR. STOFFELMAYR:  Mr. Swords, if you can
15  answer that with broad categories of documents,
16  that's fine.
17       But I don't want you to go into the
18  substance of those documents or other
19  communications you had with Mr. Piñon, and I
20  instruct you not to do that.
21  BY THE WITNESS:
22       A.   I reviewed the Controlled Substances
23  Act.
24  BY MR. MOUGEY:

Page 109

1       Q.   Did -- in part of that Controlled
2  Substance Act was the regulations thereunder?
3       A.   Correct.
4       Q.   For example, Walgreens' responsibilities
5  to design and implement a system for suspicious
6  orders, correct?
7       MR. STOFFELMAYR:  Objection to the form.  Just
8  answer yes or no if you recall.
9  BY THE WITNESS:
10       A.   Yes.
11  BY MR. MOUGEY:
12       Q.   How long ago were these meetings with
13  Walgreens' counsel?  What time period?
14       A.   2012.
15       Q.   And who was in the meetings other than
16  yourself and Mr. Piñon?
17       A.   I don't recall all the meetings.  But it
18  would have been typically attorneys and myself,
19  Dwayne was the lead attorney.  There were other
20  attorneys at different times involved.
21       Q.   How many other attorneys?
22       A.   I remember Patty Zagami being involved.
23  She is an in-house attorney for us.  And maybe
24  Garry Hodge at one point or another involved.

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Q.   Those were both in-house counsel?
2    A.   Yes.
3    Q.   Any outside counsel?  When I say
4  "outside counsel," I mean like Kaspar here from a
5  firm outside of Walgreens.
6    A.   With respect to?
7    Q.   Sitting in on these meetings where you
8  were being educated on the details of the
9  Controlled Substance Act.
10   A.   Yes.
11   Q.   And what -- do you remember what law
12 firm?
13   A.   I don't remember the name of them but...
14   Q.   Do you remember the name of the lawyers?
15   A.   No, I don't.
16   Q.   Do you remember what city they were in?
17   A.   Washington, D.C. I believe.
18        Alice was one of the names.  I don't
19 recall.
20        MR. STOFFELMAYR:  We will Google "Alice,
21 Washington, D.C. lawyer."
22 BY MR. MOUGEY:
23   Q.   How many meetings were there?
24   A.   I don't recall the number.

Page 111

1    Q.   Were there 15 or were there five or --
2    A.   There were a number of meetings.
3    Q.   There were several?
4    A.   Yes.
5    Q.   And over how long a period of time?
6    A.   Months.
7    Q.   And what was the -- what was the
8  catalyst for the meetings?  What was the reason for
9  the meetings?  Why were you being educated on the
10 details of the Controlled Substance Act in 2012?
11   A.   The formation of the Pharmaceutical
12 Integrity group as well as the action in Florida.
13   Q.   All right.  What did you have to do with
14 the action in Florida?
15   A.   Well, I was -- again, this was all
16 happening in parallel.  So, the Pharmaceutical
17 Integrity group was being formed as part of that.
18 There were various activities happening in Florida
19 as a response to the DEA inquiries in Florida, and
20 I was -- I was part of that.
21   Q.   Was the law firm in DC Latham & Watkins?
22   A.   I believe that's right, yeah.
23        MR. STOFFELMAYR:  Help us find Alice.
24 BY MR. MOUGEY:

Page 112

1    Q.   How long were you typically in one of
2  these meetings on any given day?
3    A.   The meetings would vary, but typically
4  hour, hour and a half maybe.  Maybe some were
5  longer, some were shorter.
6    Q.   Were you given materials to read prior
7  to the meetings?
8    A.   I don't recall getting anything prior to
9  meetings.
10   Q.   Were you given materials at the
11 meetings, kind of homework assignments, to read
12 afterwards?
13   A.   Don't recall that happening.  I recall
14 being provided documents in meetings.
15   Q.   Did you take those --
16   A.   And --
17   Q.   I'm sorry.  Go ahead.
18   A.   And reviewing those documents in the
19 meeting.
20   Q.   Do you recall those meetings -- taking
21 those documents with you after the meetings?
22   A.   No, I don't.
23   Q.   You don't recall or you didn't?
24   A.   I don't recall.

Page 113

1    Q.   Okay.  Were you given or provided
2  memoranda from counsel explaining Walgreens'
3  responsibilities under the Controlled Substance
4  Act?
5    A.   I don't recall ever receiving that.
6    Q.   Let me make sure I understand.  You were
7  asked to oversee the Pharmaceutical Integrity group
8  at Walgreens initially in mid-2012, correct?
9    A.   Sometime in 2012.
10   Q.   You and Mr. Lovejoy, correct?
11   A.   Dave Lovejoy was my -- my direct -- he
12 was -- I reported directly to Dave.
13   Q.   And it was -- was it your job to
14 populate or fill out the individual people in the
15 Pharmaceutical Integrity group?
16   A.   In conjunction with the leader of that
17 group that I had selected, which was Tasha, yes.
18   Q.   Okay.  So, you identified Ms. Polster
19 and in conjunction with Ms. Polster, you selected
20 individuals to populate the Pharmaceutical
21 Integrity group, correct?
22   A.   Correct.
23   Q.   And in order for you to discharge your
24 responsibilities overseeing the Pharmaceutical

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Integrity group, you had to understand the details
2    of the regulatory scheme that Walgreens had to
3    comply with, correct?
4        MR. STOFFELMAYR:  Objection to the form.
5    BY THE WITNESS:
6        A.    Correct.
7    BY MR. MOUGEY:
8        Q.    And in order to fulfill your charge from
9    Walgreens, you sat with counsel in DC to understand
10   the regulatory structure?
11       MR. STOFFELMAYR:  Objection to the form.
12   BY THE WITNESS:
13       A.    No.
14   BY MR. MOUGEY:
15       Q.    And what was the purpose of the meeting,
16   then, with sitting with the lawyers in DC going
17   through the responsibilities of Walgreens under the
18   Controlled Substance Act?
19       A.    I never sat with lawyers in DC.
20       Q.    The lawyers came to you here in Chicago?
21       A.    Correct.
22       Q.    I'm sorry.  So, bad question.  Thank
23   you.
24           So, you sat with lawyers and went

Page 115

1    through the regulatory structure and Walgreens'
2    responsibility as a distributor so you could
3    fulfill your charge at Walgreens to oversee the
4    Pharmaceutical Integrity Department?
5        A.    Correct.
6        Q.    Now, Ms. Polster, what was her prior
7    role at Walgreens before Pharmaceutical Integrity?
8        A.    She's had a number of roles.  She is a
9    long-term employee.  I don't know the specific role
10   prior to that.
11       Q.    Why did you handpick Ms. Polster to run
12   Pharmaceutical Integrity?
13       A.    Because she's a very detailed and
14   capable leader in the organization, and that's what
15   I needed.
16       Q.    Had you interacted with her prior to
17   Pharmaceutical Integrity --
18       A.    Certainly.
19       Q.    -- at Walgreens?
20       A.    Certainly.
21       Q.    And in what capacity?
22       A.    Our paths -- we're both long-term
23   employees.  Our paths have crossed a number of
24   times but...

Page 116

1        Q.    You don't recall her title or her role
2    before Pharmaceutical Integrity?
3        A.    I do not.
4        Q.    Okay.  Was it compliance?
5        A.    I don't recall.
6        Q.    I hand you what we will mark as Swords
7    4.  Internal e-mail dated 9/16/2012.
8           (WHEREUPON, a certain document was
9            marked as Walgreens-Swords Exhibit
10           No. 4:  9/16/12 e-mail string;
11           WAGMDL00528179 - 00528180)
12   BY MR. MOUGEY:
13       Q.    You know who Mike Bleser is, correct?
14       A.    Bleser, yes.
15       Q.    Bleser.  And his title was what?
16       A.    His title today?
17       Q.    I'm sorry.  On Bates No. 528179 there is
18   an e-mail dated September 16, 2012 and it's from
19   Mike Bleser.
20           Do you recall what his role or title was
21   at this point in time?
22       A.    He was -- he was in our purchasing
23   department.  I'm not sure what his title was.
24       Q.    Okay.  And you were not copied on this

Page 117

1    e-mail, but you're referenced in the body of the
2    e-mail.  And I wanted to ask what understanding you
3    have about the reference to you.
4        A.    I don't know.  I will have to read the
5    e-mail.
6        Q.    I know.  I'm going to point your
7    attention.  Bear with me.  Okay?
8           The third hash line down beginning with
9    "Responsibility."  Do you see that?
10       A.    Um-hmm.
11       Q.    "Responsibility for using this new
12   system (along with creating store level
13   interventions) has been given to the new
14   Pharmaceutical Integrity team under Dave Lovejoy
15   and Rex Swords."
16           Right?
17       A.    That's what it says, yes.
18       Q.    Do you have an independent recollection
19   of when you were asked to oversee the creation of
20   Pharmaceutical Integrity?
21       A.    I don't know the exact dates of when
22   that happened.
23       Q.    Any general time frame?
24       A.    It was sometime early '12 or so.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1      Q.   Early '12.  And, so, Dave Lovejoy at
2  this point was your -- you reported directly to
3  him, correct?
4      A.   That's correct.
5      Q.   And, so, he had the kind of the -- well,
6  strike that.
7           The bullet under the one we just
8  reviewed, "LP," which is loss prevention, correct?
9      A.   Correct.
10     Q.   "And Rx Purchasing and Supply Chain have
11  committed to continue to assist the Pharmaceutical
12  Integrity team as the SOM process evolves."
13          Do you see that?
14     A.   I do.
15     Q.   And would you agree with Mr. Bleser's
16  comments that the SOM process, suspicious order
17  monitoring process, was evolving as of September of
18  2012?
19     A.   I don't know what he means by
20  "evolving."  We were implementing different systems
21  at that time, yes.
22     Q.   Okay.  Let's continue to the -- what is
23  your understanding of, when you came into
24  Pharmaceutical Integrity and started building it

Page 119

1  out, what Walgreens' metrics were to identify
2  suspicious orders?
3      A.   My understanding?
4      Q.   Yes, sir.
5      A.   Prior to the establishment of
6  Pharmaceutical Integrity?
7      Q.   Yes, sir.
8      A.   None.
9      Q.   There was none.  And --
10     MR. STOFFELMAYR:  There was no understanding
11  or there was no metrics?
12     THE WITNESS:  No understanding.
13  BY MR. MOUGEY:
14     Q.   So, was part of your --
15     MR. MOUGEY:  Thank you, Kaspar, for
16  interjecting yourself.
17     MR. STOFFELMAYR:  I apologize.  I apologize.
18  BY MR. MOUGEY:
19     Q.   What did you do to educate yourself
20  about what Walgreens' metrics were at the time that
21  Pharmaceutical Integrity was being created?
22     A.   I met with our counsel.
23     Q.   So, would you please explain to me what
24  Walgreens' metrics were for its suspicious order

Page 120

1  monitoring policies to identify suspicious orders
2  when Pharmaceutical Integrity was created in 2012?
3      MR. STOFFELMAYR:  Mr. Swords, if there is
4  factual information that you learned --
5      THE WITNESS:  I'm not sure I actually even
6  understand the question.
7      MR. STOFFELMAYR:  Okay.
8      THE WITNESS:  From a time frame on the
9  question.  So...
10  BY MR. MOUGEY:
11     Q.   It was 2012 --
12     A.   If you can clarify that for me.
13     Q.   -- with Pharmaceutical Integrity, right?
14     A.   Yep.
15     Q.   Would you please explain to me what
16  Walgreens' policies were to identify suspicious
17  orders at the time you began to implement the
18  Pharmaceutical Integrity Department.
19     A.   So, we were establishing a number of
20  algorithms that we would use to deploy against the
21  order -- order monitoring and request for products,
22  and so this team was partnering with the supply
23  chain at that time to develop that process.
24     Q.   Okay.  What I'd like to understand, and

Page 121

1  I'm sorry, the way I phrased that question was not
2  what I was intending to elicit, was:  Could you
3  please explain, when you took over Pharmaceutical
4  Integrity, what policies and procedures were in
5  place at the time Pharmaceutical Integrity
6  Department was created to identify suspicious
7  orders?
8      A.   So, there were prior pharmaceutical --
9  prior -- I don't have knowledge on prior to
10  Pharmaceutical Integrity.
11     Q.   You don't have knowledge or you do have
12  knowledge but that knowledge came from counsel and
13  your counsel has instructed you not to answer?
14     MR. STOFFELMAYR:  Well, I didn't.
15  BY THE WITNESS:
16     A.   The knowledge came after the formation
17  of Pharmaceutical Integrity.
18  BY MR. MOUGEY:
19     Q.   I understand.  So, when you began
20  Pharmaceutical Integrity, building it out in 2012,
21  did you educate yourself about the details of what
22  Walgreens' suspicious order monitoring policies
23  were prior to Pharmaceutical Integrity?
24     A.   Yes.

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    Q.   And what were those policies and
2    procedures that Walgreens used to identify
3    suspicious orders prior to Pharmaceutical Integrity
4    being created?
5        MR. STOFFELMAYR: And, Mr. Swords, let me
6    explain.  If there is factual information, you
7    know, we did A and B or we did C, whatever it is,
8    it's fine to answer the question if you have
9    knowledge of factual information.
10       But I don't want you to go into the
11   substance of any legal advice or opinions or
12   anything like that that you may have received from
13   lawyers for the company.
14       THE WITNESS:  Okay.
15       MR. STOFFELMAYR: Does that make sense?
16       THE WITNESS: I hope so.  I'll do my best
17   here.
18   BY THE WITNESS:
19       A.   So, I knew at that time that our
20   responsibility was to report orders that were
21   deemed suspicious to the DEA.
22   BY MR. MOUGEY:
23       Q.   And once Walgreens identified orders
24   that were suspicious, it was required to perform

Page 123

1    due diligence before they were shipped, correct?
2        MR. STOFFELMAYR: Objection to the form.
3    BY THE WITNESS:
4        A.   I don't -- again, I don't know what the
5    requirements were prior to.  I know there was a
6    process where they would identify them and report
7    them to the DEA.
8        Q.   Right.  And that's the first step, and
9    the second step I'm asking is:  Do you understand
10   that Walgreens was required to perform due
11   diligence on those suspicious orders prior to being
12   shipped?
13       MR. STOFFELMAYR: I'm going to object to the
14   form of the question.
15   BY THE WITNESS:
16       A.   I understand that there -- that the
17   opinion afterwards was that was the case.  Again,
18   my understanding of our responsibility was to
19   report suspicious orders to the DEA.
20   BY MR. MOUGEY:
21       Q.   What I'm asking you is in the beginning
22   of Pharmaceutical Integrity in 2012, your process
23   to understand what Walgreens had done prior to
24   Pharmaceutical Integrity.  That's a -- that's an

Page 124

1    important part of you implementing this department,
2    correct?
3        A.   Knowing what was going on prior.
4        Q.   Sure.
5        A.   Yes.
6        Q.   Of course.  I mean, in order to -- I
7    mean, Walgreens was -- had several open
8    investigations around the country regarding its
9    distribution centers and its dispensing practices
10   from the DEA, correct?
11       MR. STOFFELMAYR: Objection to the form.
12   BY THE WITNESS:
13       A.   I know there were a number.  I don't
14   know all the details around them.
15   BY MR. MOUGEY:
16       Q.   I didn't ask you all the details.  The
17   question I simply asked was:  Walgreens had several
18   open investigations around the country regarding
19   its distribution centers and its dispensing
20   practices from the DEA regarding controlled
21   substances, correct?
22       A.   Correct.
23       Q.   And in order for you --
24       MR. STOFFELMAYR: Wait for a second.

Page 125

1    BY MR. MOUGEY:
2        Q.   In order for you to implement a new
3    department, Pharmaceutical Integrity, designed to
4    fulfill obligations, Walgreens' obligations, under
5    the Controlled Substance Act, it was important you
6    have an understanding of what Walgreens was doing
7    prior to you taking over.  Correct?
8        A.   Yes.
9        Q.   And you went about trying to understand
10   what Walgreens had been doing prior to the creation
11   of Pharmaceutical Integrity, correct?
12       A.   Yes.
13       Q.   And part of that education process, you
14   understood that Walgreens had an obligation to
15   design a system to identify suspicious orders,
16   correct?
17       A.   I'm sorry.
18       Q.   You understood as part of your education
19   process that Walgreens had a responsibility to
20   design a system to identify suspicious orders,
21   correct, sir?
22       A.   I knew our responsibility was to report
23   suspicious orders.
24       Q.   The question I asked you was a little

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1   different. I'm talking about the system that
2   Walgreens had to design. Let's do that again.
3           Walgreens had a responsibility to design
4   a system to identify suspicious orders, correct?
5       A.   Walgreens' responsibility as my
6   understanding was to report suspicious orders.
7       Q.   In order to identify the suspicious
8   orders, Walgreens had to create a system to
9   identify them in the hundreds of thousands of
10  orders it received every day, correct?
11      A.   It had to have a process to report the
12  orders, yes.
13      Q.   Yes, sir. I'm not asking about
14  reporting. Right now I'm just asking you about
15  identifying the suspicious orders. Okay. In order
16  to report, you have to find the suspicious orders.
17  Correct?
18      A.   Yes.
19      Q.   All right. So, what I'm asking you
20  simply, simple question, Walgreens had a
21  responsibility to design a system to identify
22  suspicious orders of controlled substances but more
23  specifically opiates, correct, sir?
24      MR. STOFFELMAYR: Objection to the form.

Page 127

1   BY THE WITNESS:
2       A.   Yes.
3   BY MR. MOUGEY:
4       Q.   All right. And once those suspicious
5   orders were identified by the process that
6   Walgreens designed, it had a responsibility to
7   report those to the DEA, correct, sir?
8       MR. STOFFELMAYR: Objection to the form.
9   BY THE WITNESS:
10      A.   Yes.
11  BY MR. MOUGEY:
12      Q.   And once Walgreens identified those
13  suspicious orders, it had an obligation to perform
14  due diligence before it shipped those orders,
15  correct?
16      MR. STOFFELMAYR: Objection to the form of the
17  question. If you have an independent understanding
18  of that, that's fine. But I don't want you to go
19  into the substance of any legal advice you obtained
20  from Mr. Piñon or others.
21  BY THE WITNESS:
22      A.   Okay. So, do you want to restate?
23  BY MR. MOUGEY:
24      Q.   Certainly. It's hard when I ask a

Page 128

1   question and then you get a few sentences in
2   between, isn't it? So, let's do it again.
3           And once Walgreens identified those
4   suspicious orders, it had an obligation to perform
5   due diligence before it shipped those orders,
6   correct?
7       MR. MOUGEY: And I understand Mr. -- or,
8   Kaspar, your objection is still standing.
9   BY MR. MOUGEY:
10      Q.   Please answer.
11      A.   Yes.
12      MR. STOFFELMAYR: Subject to my instruction.
13  You understand that, right?
14      MR. MOUGEY: I want a clean record to this.
15  You have a standing objection, Kaspar.
16      MR. STOFFELMAYR: There is -- it's not the
17  objection. It's the instruction that's important.
18      MR. MOUGEY: Standing objection and
19  standing --
20      MR. STOFFELMAYR: No, no, no.
21      MR. MOUGEY: Standing instruction.
22      MR. STOFFELMAYR: It doesn't work that way.
23      MR. MOUGEY: Actually it does. We've had
24  specific rulings in this case, and I want a clean

Page 129

1   record with a clean answer; and your
2   several-sentence instruction in between my question
3   and the answer is impeding my ability to take the
4   testimony today.
5           So, let me do it again.
6       MR. STOFFELMAYR: Let me -- if you don't want
7   me to instruct him after your question, you got to
8   let me instruct him before your question.
9       MR. MOUGEY: You have.
10      MR. STOFFELMAYR: Because it needs to be clear
11  to him, it needs to be clear to him, not to you,
12  what the instruction is.
13      MR. MOUGEY: You've given the same instruction
14  over and over again and, quite frankly -- well, you
15  have given the instruction over and over again and
16  I've agreed that you have a standing instruction at
17  this juncture on this line of questioning, you have
18  a standing instruction and a standing objection to
19  my question.
20      MR. STOFFELMAYR: All right. Mr. Swords.
21      MR. MOUGEY: Go ahead and do it one more time
22  and I will ask my question.
23      MR. STOFFELMAYR: Mr. Swords, I am addressing
24  you, okay, not Mr. Mougey.

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    In answering these questions, if you
2 have an understanding from other sources, that's
3 fine.  But if responding to the question requires
4 you to reveal legal advice that you obtained
5 confidentially from Mr. Piñon or other lawyers for
6 Walgreens, I instruct you not to answer the
7 question to that extent.
8    Does that make sense to you?
9    THE WITNESS:  I believe so.
10   MR. STOFFELMAYR:  Okay.
11   THE WITNESS:  I'll give it a shot.
12 BY MR. MOUGEY:
13   Q.   And once Walgreens identified those
14 suspicious orders, it had an obligation to perform
15 due diligence before it shipped those orders,
16 correct, Mr. Swords?
17   A.   Yes.
18   Q.   And, sir, the answer to those three
19 questions, had to design a system, it had to
20 identify suspicious reports, it had to report those
21 suspicious orders to the DEA and that Walgreens had
22 to perform due diligence on those suspicious orders
23 before they were shipped was in place from at least
24 2000 until Walgreens stopped distributing in 2014,

Page 131

1 correct, sir?
2    MR. STOFFELMAYR:  Objection to the form of the
3 question and the same instruction.
4 BY THE WITNESS:
5    A.   That's my understanding.
6 BY MR. MOUGEY:
7    Q.   I hand you what I will mark Swords 5.
8       (WHEREUPON, a certain document was
9       marked as Walgreens-Swords Exhibit
10      No. 5:  3/20/13 e-mail string with
11      attachment; WAGMDL00574824 -
12      00574825.)
13 BY MR. MOUGEY:
14   Q.   The first page of this document, Bates
15 No. 574824, is an e-mail from Ms. Polster to
16 members of the Pharmaceutical Integrity team.
17      Do you see that, sir?
18   A.   I do.
19   Q.   And if you would, sir, turn to the next
20 page, Bates No. 25, what purports to be a
21 memorandum from Ms. Polster to yourself, correct,
22 sir?
23   A.   Yes.
24   Q.   And do you recognize this document, sir?

Page 132

1    A.   I mean, I recognize it's a document
2 published by Tasha.
3    Q.   Yes, sir.  You got memos that looked
4 similar to this from Ms. Polster as kind of
5 updating you and keep you in the loop, so to speak,
6 on what was going on with Pharmaceutical Integrity,
7 correct, sir?
8    A.   As well as other various business.
9    Q.   Yes, sir.  But this is -- I'm not saying
10 this is the only type of memo you ever got, but
11 this is just one way Ms. Polster helped keep you up
12 to speed on Pharmaceutical Integrity, correct?
13   A.   Correct.
14   Q.   And as you can see under the subject
15 line, it's stated "Status," right?
16   A.   Yes.
17   Q.   And the date is November 30 of 2012,
18 correct, sir?
19   A.   Yes.
20   Q.   And there are in the production a series
21 of these kind of similar memoranda where she is
22 keeping you up to date on, for example, filling out
23 the individuals in Pharmaceutical Integrity,
24 correct?

Page 133

1    A.   I haven't seen them, but she would
2 regularly provide status updates to me.
3    Q.   And those status updates would give you
4 what was going on with the development of the
5 algorithm or the metrics used to identify
6 suspicious orders at Walgreens, correct?
7    A.   There were various updates on the
8 activity around her responsibilities.
9    Q.   I just have one specific question on
10 this memo, Bates No. 25.  You see on the third
11 entry down, the American Academy of Pain
12 Management.
13      Do you see that, sir?
14   A.   I do.
15   Q.   Do you have an understanding of what the
16 American Academy of Pain Management is?
17   A.   I do.
18   Q.   And it references a "document prepared
19 and will be sent to AAPM," which appears to be the
20 acronym for American Academy of Pain Management,
21 right?
22   A.   Correct.
23   Q.   "This weekend for their review.  We
24 expect to hear back from them following their board

34 (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  meeting which takes place on December 6."
2      Do you see that, sir?
3  A.  I do.
4  Q.  Do you have any recollection of what
5  that specific memo that's referenced here that was
6  being sent to AAPM?
7  A.  I recall us having interaction with
8  AAPM. I don't recall the specifics of the memo.
9  Q.  What is your understanding of what AAPM
10  is?
11  A.  They're a physician group, a pain
12  management specialty physician group.
13  Q.  And do you have understanding of what
14  Walgreens Pharmaceutical Integrity group's
15  interactions with AAPM would have been covering,
16  what the detail was?
17  A.  I recall we were engaging them with
18  respect to our targeted good faith dispensing
19  practices and things like that so that they
20  would -- they could provide input.
21  Q.  Let's go back to the very first entry on
22  the interview. "Interviews. Completed four
23  interviews for business analyst position, decision
24  will be finalized next week. Manager Rx Integrity

Page 135

1  position being posted. I expect to hear from
2  recruiter by the end of day."
3      Do you see that, sir?
4  A.  I do.
5  Q.  As of November 30, 2012, Ms. Polster was
6  still working on filling out the individual roles
7  for the Pharmaceutical Integrity Department,
8  correct, sir?
9  A.  That's what it appears, yes.
10  Q.  Do you have an understanding or a
11  recollection from kind of the inception of
12  Pharmaceutical Integrity until the department was
13  built out and functioning how long that took?
14  A.  I don't recall the time frame.
15  Q.  Was it several months, years?
16  A.  Again, I don't recall the specific time
17  frame. It certainly wouldn't have been years.
18  Q.  All right. In fact, Pharmaceutical
19  Integrity group was never kind of completely filled
20  out with the entire organizational chart and the
21  roles that were envisioned, correct, sir?
22  A.  I don't -- I don't know that.
23  Q.  Do you know what IMS is?
24  A.  Yes.

Page 136

1  Q.  What is IMS?
2  A.  It's a data -- data company.
3  Q.  And do you have an understanding of how
4  long -- well, did Walgreens ever use or have an
5  agreement with IMS to use the data that it
6  gathered?
7  A.  We -- we've used IMS data for a number
8  of years on different things.
9  Q.  Help me out with "a number of years."
10  What does that mean? How long -- how far back does
11  Walgreens' relationship with IMS go?
12  A.  I don't know the specifics around the
13  Walgreen relationship.
14  Q.  20 years, 2 years?
15  A.  I don't know.
16  Q.  You don't know. Did you use IMS data in
17  your roles at Walgreens?
18  A.  I personally, no.
19  Q.  Did anyone under your purview use data
20  from IMS to discharge its responsibilities at
21  Walgreens?
22  A.  Not that I'm aware of.
23  Q.  Did Pharmaceutical Integrity have access
24  to IMS data when it discharged its responsibilities

Page 137

1  at Walgreens?
2  A.  I think we used at them at some point in
3  time. I'm not sure whether we ever fully adopted
4  everything they had, but I know we had discussions
5  with them.
6  Q.  Who would know the answer of when
7  Pharmaceutical Integrity began using IMS data at
8  Walgreens?
9  A.  Probably Tasha or her team, one of her
10  team members. They would have been consuming the
11  data if it was used.
12  Q.  Is there one group at Walgreens that has
13  to approve contracts with outside vendors such as
14  IMS?
15  A.  It depends on the value of the business,
16  the contract.
17  Q.  What's the threshold that usually has to
18  get approved?
19  A.  They vary during -- they've changed over
20  the years.
21  Q.  Ballpark it for me.
22  MR. STOFFELMAYR: Objection to the form. Go
23  ahead.
24  BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1      A.   Typically if it's more than $100,000, it
2   goes through a procurement process.
3   BY MR. MOUGEY:
4      Q.   And, so, if the agreement with IMS was
5   I'm going to say high five figures, six figures, it
6   usually would go through a procurement process and
7   the contracts would be centralized at some hub at
8   Walgreens?
9      A.   Correct.
10      Q.   And do you have understanding, say, from
11   which department at Walgreens would that
12   procurement process go through?
13      A.   There is a procurement department.
14      Q.   There is.  Okay.  So, do you have an
15   understanding at any point in time what individuals
16   or groups under your purview would use from IMS
17   data?
18      A.   I believe we had reviewed dispensing
19   history by physicians.  We looked at some
20   de-identified patient demographic information.
21      Q.   In what -- in what function?  How did
22   you use the two examples you just gave me?
23      A.   In the Pharmaceutical Integrity.
24      Q.   Okay.  Anything outside of

Page 139

1   Pharmaceutical Integrity?
2      A.   Not that I used.
3      Q.   Okay.  I'm not asking you.  The question
4   I asked you was people under your purview.
5         Do you have an understanding of what
6   individuals under your kind of umbrella were using
7   IMS for?
8      A.   The only people I know that were using
9   IMS were the ones I referenced.
10      Q.   Let me broaden out the question.
11         Outside of kind of your direct report
12   chain, do you have any understanding of what
13   Walgreens was using IMS data for?
14      A.   I think we use it to determine market
15   share data, to look at purchasing habits, you know.
16   Again, I'm not the expert on IMS.
17      Q.   I'm not asking you to be an expert.  I'm
18   asking a very general question.
19         What type of data did Walgreens use from
20   IMS as part of its day-to-day business?
21      A.   Outside the ones that were in the
22   Pharmaceutical Integrity, I can't speak to it.  I
23   don't know.
24      Q.   When you said, referenced earlier that

Page 140

1   IMS was used to look at purchasing habits,
2   purchasing habits of what?
3      A.   Consumers.
4      Q.   And the IMS, just to be a little more
5   specific, the data that they collected was in the
6   context of pharmaceuticals, correct?
7      MR. STOFFELMAYR:  Objection to the form.  Go
8   ahead.
9   BY THE WITNESS:
10      A.   That's the one I'm familiar with.  I
11   don't know if they do other things.
12   BY MR. MOUGEY:
13      Q.   So, when you're saying purchasing
14   habits, you're not talking about hairbrushes in the
15   supply side at Walgreens, are you?
16      A.   No.
17      Q.   You're talking about pharmaceutical
18   prescriptions, correct?
19      A.   Correct.
20      Q.   All right.  And, now, let me broaden
21   that question up because IMS, as you are aware,
22   ultimately ended up being purchased or rebranded as
23   IQVIA?
24      A.   I know they went through some.  I'm not

Page 141

1   familiar with the details.
2      Q.   You understand that there is other
3   companies outside of IMS and IQVIA that have
4   similar roles that collect data regarding
5   pharmaceuticals, correct?
6      A.   Yes.
7      Q.   And do you know if -- does your answers
8   to any of the previous questions change if it's not
9   in the context of IMS?
10      MR. STOFFELMAYR:  Objection to the form.
11   BY THE WITNESS:
12      A.   I don't --
13   BY MR. MOUGEY:
14      Q.   So, what I'm asking is did Walgreens use
15   any other data collection companies to -- in its
16   day-to-day business activities?
17      A.   Sure.
18      Q.   And what other data collection companies
19   would -- and I'm talking about in the
20   pharmaceutical context, not hairbrushes.
21      A.   Well, the -- the only one that I would
22   be aware of is -- I'm trying to think of the name
23   of it.  Lexecon or --
24      Q.   Okay.

36 (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    A.   I think it's big in the legal area too.
2 They do a lot of different data stuff.  But I think
3 it's Lexecon or Lexapro or something like that.
4    Q.   Do you have an understanding of what
5 data was pulled from Lexecon or Lexapro, whatever
6 you recall?
7    A.   It would have been data similar to what
8 IMS provides.
9    Q.   Which would be data regarding in the
10 context of pharmaceutical prescribing and from
11 doctors, correct?
12    A.   Yes.
13    Q.   So, if I use the word "supply chain,"
14 you're familiar with that just general description
15 of what supply chain is?
16    A.   Yes.
17    Q.   So, if I use the words "upstream" and
18 "downstream," that makes sense to you in the
19 business context, right?
20    A.   I'd need you to be more specific.
21 Different people have different interpretations of
22 what those are.
23    Q.   Why don't you tell me what your
24 understanding of what supply chain is?

Page 143

1    A.   Well, supply chain --
2    Q.   In the context -- let's do it -- I'm
3 sorry.  Bad question.
4         Why don't you tell me what your
5 understanding of what supply chain is in the
6 context of controlled substances?
7    A.   Manufacturer to wholesaler or
8 distributor to pharmacists, pharmacy, dispenser, to
9 patient.
10    Q.   There you go.
11    A.   Roughly.
12    Q.   Roughly.  Just generally speaking.
13         So, if I say "upstream" and
14 "downstream," what is your understanding of what
15 upstream and downstream mean in the supply chain
16 context of controlled substances?
17    A.   Well, what it means to me.
18    Q.   Yes.
19    A.   Is upstream would be prior to dispensing
20 and downstream would be dispensing and patient.
21    Q.   Walgreens would use a data source
22 company, whether it be IMS or somebody similar, to
23 gather upstream and downstream information
24 regarding Schedule II, Schedule III controlled

Page 144

1 substances?
2    A.   We used it to review drug purchasing
3 habits across a variety of classes of medications.
4    Q.   And why would Walgreens use data to
5 review drug purchasing habits across a variety of
6 classes in its day-to-day business?
7    A.   Other groups were using it.  I'm not
8 sure what the actual intent of.  What I saw
9 reported was sort of market share by category kind
10 of data that would -- that would be presented.
11    Q.   Would it be fair to say that Walgreens
12 is using that data for competitive purposes to
13 increase its profitability?
14    A.   I don't -- I don't know what the
15 ultimate outcome of it is.
16    Q.   And your specific group that you were
17 responsible for, Pharmaceutical Integrity, is it
18 fair to say that it was using the outside vendors'
19 data collection to discharge its responsibilities
20 as part of its suspicious order monitoring process?
21    A.   Yes.
22    Q.   Help me to understand how Pharmaceutical
23 Integrity would use IMS data or somebody, another
24 vendor similar, to discharge its responsibilities

Page 145

1 under the suspicious order monitoring policy
2 process.
3    A.   At a high level, because I wasn't, I
4 wasn't the one responsible for actually doing it,
5 the work, but we would take data provided to us by
6 the -- by the vendor.
7         That would help you identify what we
8 would term high prescribing physicians, which would
9 then allow you to do a further review or due
10 diligence around those physicians to understand was
11 there, you know -- what was leading to them showing
12 up on the report.
13    Q.   And that information, as far as
14 identifying high prescribing physicians, was
15 helpful to Walgreens when discharging its
16 responsibilities as a distributor, correct?
17    A.   As a dispenser?
18    Q.   As a distributor.
19         Let me redo the question for you.
20         That information, similar IMS or a
21 similar vendor, on high prescribing physicians, was
22 helpful to Walgreens when discharging its
23 responsibility as a distributor under its
24 suspicious order monitoring policies and

37 (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1   procedures, correct, sir?
2       A.   I don't know how that would have been
3   used for that.
4       Q.   I'm not asking you how it was or how
5   specifically they used it or what the exact report
6   was.
7           All I'm asking is:  You understand that
8   one of the metrics for identifying suspicious
9   orders is comparing a physician's Schedule II and
10  Schedule III opiate prescriptions to their overall
11  prescribing habits, correct?
12      MR. STOFFELMAYR:  Objection to the form.
13  BY THE WITNESS:
14      A.   We would have used the data to look for
15  outliers, yes.
16  BY MR. MOUGEY:
17      Q.   Yes, sir.  Let's use -- are you
18  comfortable with the term "red flags"?  Outliers or
19  red flags?
20      A.   I mean, there are a number of things
21  that could be called red flags.  I know the term
22  "red flags," yes.
23      Q.   Yes, sir.  You'd agree with me that
24  outlier, red flag is kind of a similar connotation?

Page 147

1       A.   Similar.
2       Q.   Yes, sir.  So, would Walgreens -- you
3   would agree with me that one metric or test to
4   identify a prescriber that was an outlier was to
5   run metrics of the percentage of Schedule II and
6   Schedule III opiates as a percentage of the overall
7   prescribing habits of a physician, correct?
8       MR. STOFFELMAYR:  Objection to the form.
9   BY THE WITNESS:
10      A.   That would have been one of the
11  components, yes.
12  BY MR. MOUGEY:
13      Q.   And that component, to identify outlier
14  physicians, was an important piece of Walgreens'
15  responsibilities as a distributor, correct, sir?
16      MR. STOFFELMAYR:  Objection to the form.
17  BY THE WITNESS:
18      A.   It was an important part of the process,
19  yes.
20  BY MR. MOUGEY:
21      Q.   And the process, sir, being Walgreens'
22  process of suspicious order monitoring as a
23  distributor, correct, sir?
24      MR. STOFFELMAYR:  Objection to the form.

Page 148

1   BY THE WITNESS:
2       A.   Yes.
3   BY MR. MOUGEY:
4       Q.   Now, are you familiar with -- let me do
5   it another way.
6           Did the Pharmaceutical Integrity group
7   have a resource for communicating to Walgreens
8   employees its policies and procedures?
9       A.   Yes.
10      Q.   And what was that resource?
11      A.   Well, there were several different ways
12  they could communicate that.
13      Q.   Help me.
14      A.   E-mail being a primary one.
15      Q.   Primary one would be e-mail.  Okay.
16  What's another one?
17      A.   They could have -- they had meetings,
18  conference calls, things of those nature.
19      Q.   So, we had e-mails.  We had conference
20  calls.  Anything else?
21      A.   Meetings.  In-person meetings.
22      Q.   So, we had e-mail.  We had conference
23  calls.  We had in-person meetings.
24          Any other resources that Pharmaceutical

Page 149

1   Integrity used to communicate with the employees
2   regarding its policies and procedures to identify
3   suspicious reports?
4       A.   Well, that's primarily how it would have
5   distributed and made people aware of the policy and
6   procedures.
7       Q.   Okay.  Those three -- those three
8   mechanisms you just relayed:  e-mail, telephone
9   conferences and -- what was the third one?
10      A.   Just meetings.
11      Q.   Just meetings.
12      A.   In-person meetings.
13      Q.   I mean, there is 250,000 employees at
14  any given point at Walgreens, right?
15      A.   Correct.  But they're not all involved
16  in distributing or dispensing of controlled
17  substances.
18      Q.   Yes, sir.  But there is 5,000 stores,
19  correct, sir?
20      A.   No.  That's not correct.
21      Q.   There's 4,000 stores in the early 2000s.
22  There is 8,000 stores as we get into 2015, '16,
23  correct?
24      A.   Yes.

38 (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    Q.   There is thousands and thousands and
2  thousands of employees at Walgreens that are
3  involved in the dispensing of pharmaceuticals,
4  correct?
5    A.   Correct.
6    Q.   There is thousands and thousands and
7  thousands of employees at Walgreens that have some
8  responsibility for dispensing controlled substances
9  such as Schedule II and Schedule III opiates,
10 correct, sir?
11   A.   Correct.
12   Q.   So, meetings probably isn't a really
13 efficient forum to relay Walgreens' policies and
14 procedures to all those folks, right, unless you
15 guys have one heck of a conference room?
16   A.   Well, what I -- what I would say is that
17 the type of the communication vehicle depends on
18 the group that you're trying to reach.
19   Q.   So, if you're communicating to the
20 masses, primarily e-mails and telephone
21 conferences, right?
22   A.   E-mails, telephone conferences, LTMP,
23 training platforms, those kind of things.
24   Q.   What's LTMP stand for?

Page 151

1    A.   Learning and talent management training
2  platform.
3    Q.   Walgreens has an intranet.  You're
4  familiar with that term, correct?
5    A.   Yes.
6    Q.   And intranet means just when you log on
7  to the system at Walgreens, it's a centralized
8  place for Walgreens' policies and procedures to be
9  stored for Walgreens' employees, correct?
10   A.   Correct.
11   Q.   And that's an efficient way to
12 communicate with employees of Walgreens' policies
13 and procedures, correct?
14   A.   It's a form of communication, yes.
15   Q.   And, so, that would be included in the
16 mix along with the meetings and the telephone
17 conferences and the e-mails, right?
18   A.   Sure.
19   Q.   And, so, if there is updates -- there
20 were updates to Walgreens' policies and procedures
21 under Pharmaceutical Integrity on the specific
22 policies and procedures, right?
23   A.   Sure.
24   Q.   They were pretty frequent updates on

Page 152

1  Walgreens' suspicious order monitoring policies and
2  procedures under Pharmaceutical Integrity, correct?
3    A.   I don't know the frequency.  There were
4  updates.
5    Q.   Well, Pharmaceutical Integrity build-out
6  was complete and operational at the beginning of
7  '13, correct?
8    A.   Sometime around that time.
9    Q.   And Walgreens got out of the
10 distribution business at the kind of end of '14, is
11 that fair?
12      MR. STOFFELMAYR:  Objection to the form.
13 BY THE WITNESS:
14   A.   I'm not sure of the particular dates,
15 but something around that time.
16 BY MR. MOUGEY:
17   Q.   I was pretty general.  I didn't say
18 October 21.
19   A.   Sometime --
20   Q.   End of 2014 Walgreens was out of the
21 distribution business on Schedule II and
22 Schedule III opiates, correct?
23   A.   I believe that's generally.
24   Q.   And, sir, you understand that there were

Page 153

1  five different phases of Walgreens' suspicious
2  order monitoring policy and procedures during that
3  beginning of '13 towards the end of '14, correct?
4      MR. STOFFELMAYR:  Objection to the form.
5  BY THE WITNESS:
6    A.   I don't know about five different
7  phases, no.
8  BY MR. MOUGEY:
9    Q.   Do you know that there were several
10 different phases?
11   A.   Phases to what?
12   Q.   Walgreens' suspicious order monitoring
13 policies and procedures.
14   A.   I know there were regular updates to the
15 policy and procedure.  I don't --
16   Q.   You don't know how many phases.  That's
17 how 30,000 foot you were.  You're not familiar or
18 recall how many phases there were?
19   A.   I don't.
20      MR. STOFFELMAYR:  I don't think it's
21 intentional, but you are cutting him off a little
22 bit at the end of his answers, Peter.
23 BY MR. MOUGEY:
24   Q.   And if I am cutting you off, I'm trying

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  to move things along.  And if I am and you're not
2  finishing your answer, just tell me and say, "I'm
3  not done," and I'll stop because when you take a
4  breath, I think you're done and I'm going.  Okay?
5      A.  Okay.
6      Q.  And I don't mean to be cutting you off.
7      MR. STOFFELMAYR:  The video will have to be
8  slowed down for both of you guys.
9      MR. MOUGEY:  Heck, I think I'm talking slow
10  today.
11     MR. STOFFELMAYR:  I know.
12     MR. MOUGEY:  For a Southern boy I talk pretty
13  fast I guess.
14  BY MR. MOUGEY:
15     Q.  So, the Walgreens intranet, did
16  Pharmaceutical Integrity have a place on the
17  intranet that it used to help communicate with
18  Walgreens' employees?
19     A.  I believe there is a link under policies
20  and procedures or someplace there is a link.
21     Q.  Okay.  And did you have the
22  Pharmaceutical Integrity group develop a manual
23  laying out the details of their policies and
24  procedures regarding its suspicious order

Page 155

1  monitoring process?
2      A.  I'm sure we did.
3      Q.  You're sure you did.  So, we should
4  be -- it would be important to have a manual kind
5  of encapsulating step by step so somebody could
6  reference it, right?
7      A.  Well, I guess it's what you define as a
8  manual.  Is there a hard three-ring binder sitting
9  someplace that has every step?  Probably not.  Are
10  there documented steps and processes along the way?
11  Probably.
12     Q.  And those documented steps and processes
13  along the way, you would think that we would be --
14  that it would be a wise business practice to
15  encapsulate or capture the kind of different
16  versions along the way of Walgreens' suspicious
17  order monitoring process and procedures, right?
18     A.  I would say you would have a historical
19  view of it.
20     Q.  So, if any given point in time a
21  pharmacist in Topeka, Kansas wants to see what the
22  policies and procedures are, it would make sense
23  for there to be a kind of one place, one-stop shop
24  for that pharmacist to go look at, right?

Page 156

1      A.  Correct.
2      MR. STOFFELMAYR:  Objection to the form.
3         Got to give me a second.
4      THE WITNESS:  Yep.  Sorry.
5  BY MR. MOUGEY:
6      Q.  And the intranet or e-mail would be a
7  good place for those to reside so the individuals
8  and employees at Walgreens would understand what
9  that process is, right?
10     A.  That would -- those would be options for
11  that, yes.
12     Q.  Are there any other options that I'm --
13  that we are not capturing here, intranet, e-mail,
14  other than those two, that would be a place to
15  capture that policies and procedures at any given
16  point in time?
17     A.  I think those are the primary places.
18     Q.  Any other ancillary ones?
19     A.  Not that I can -- not that I can think
20  of.  Communication happens in many different ways,
21  and there is different ways that that happens
22  during different times.
23     Q.  I hand you what we will mark as Swords
24  6.

Page 157

1         (WHEREUPON, a certain document was
2         marked as Walgreens-Swords Exhibit
3         No. 6:  10/3/13 e-mail string with
4         attachment; WAGMDL00018597 -
5         00018610.)
6      MR. STOFFELMAYR:  Did you mean to write on
7  this one?  Is this yours?
8      MR. MOUGEY:  I did.
9      MR. STOFFELMAYR:  Save me writing "6."
10  BY MR. MOUGEY:
11     Q.  If you would, flip through this
12  document, sir.  It's Bates numbered WAGMDL18597.
13  It appears to be a PowerPoint with your name on the
14  first slide if you look at Bates No. 98.  Correct,
15  sir?
16     A.  That's correct.
17     Q.  And it's dated October 2013, correct?
18     A.  That's correct.
19     Q.  And if you go back to the first page,
20  Bates No. 97, at the bottom it's an e-mail from
21  Ms. Polster, the head of Pharmaceutical Integrity,
22  dated September 27, 2013, to two of her
23  subordinates asking them to put together some
24  slides to relay "the different tools we have

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1   built," right?
2       A.   Correct.
3       Q.   And, sir, do you have an understanding
4   when Ms. Polster is referring to "tools" what she
5   means?
6       A.   A general understanding.
7       Q.   General.  What's your general
8   understanding?
9       A.   Well, she's talking about the good faith
10  dispensing, suspicious order monitoring, you know,
11  the things that the team had put into place.
12      Q.   Okay.  And good faith dispensing, which
13  we talked a little earlier about Walgreens'
14  responsibilities as a dispenser and Walgreens'
15  responsibilities as suspicious order monitoring.
16  Okay?
17           And the GFD, good faith dispensing, and
18  specifically the targeted good faith dispensing,
19  that fulfills or attempts to fulfill Walgreens'
20  responsibilities as a dispenser to monitor for
21  suspicious orders, correct?
22      MR. STOFFELMAYR:  Objection to the form.
23  BY THE WITNESS:
24      A.   No, that's not the purpose of that.

Page 159

1   BY MR. MOUGEY:
2       Q.   What's your understanding of what the
3   GFD is?
4       A.   The GFD targeted drug is a tool to be
5   used by pharmacists to help them arrive at a
6   decision as to dispense or not to dispense a
7   prescription.
8       Q.   Okay.  And maybe we're not -- speaking
9   past each other.
10           That tool, the GFD, was designed to
11  fulfill Walgreens' obligations as a dispenser,
12  correct?
13      MR. STOFFELMAYR:  Objection to the form.
14  BY THE WITNESS:
15      A.   Again, it's a tool that a pharmacist can
16  employ to help them arrive at a decision of
17  dispensing a prescription or not to dispense a
18  prescription.
19  BY MR. MOUGEY:
20      Q.   That GFD didn't fulfill Walgreens'
21  responsibility as a distributor, did it, sir?
22      A.   No.
23      Q.   Okay.  So, on the distributor side, the
24  other tool was the SOM, the suspicious order

Page 160

1   monitoring policy, the tools, assisted Walgreens or
2   was designed to assist Walgreens to fulfill its
3   obligations as the distributor, correct?
4       MR. STOFFELMAYR:  Objection to the form.  Go
5   ahead.
6   BY THE WITNESS:
7       A.   Yes.
8   BY MR. MOUGEY:
9       Q.   And you would agree with me that both
10  the SOM tool and the GFD tool, dispenser,
11  distributor, had some overlap?
12      A.   I'm sorry.
13      Q.   For example, the data sources used for
14  GFD and for SOM had some overlap, correct?
15      A.   No.
16      Q.   There was -- totally different data
17  sources.  Let me ask it a different way.
18           The data used to identify red flag
19  prescriptions under GFD often was used to assist
20  Walgreens to fulfill its role as a distributor
21  under the SOM, correct?
22      A.   No.
23      Q.   You think they're totally different?
24      A.   Yes.

Page 161

1       Q.   Okay.  So, this was an e-mail -- this
2   was a PowerPoint, beginning of one, built for you
3   to help relay the tools that had been developed for
4   market leaders?
5       A.   Correct.
6       Q.   What are market leaders?
7       A.   Regional vice presidents.
8       Q.   Of what side of what we were talking
9   about earlier of the organization structure?
10      A.   Of the operations side.
11      Q.   Of the operations side.  Under the
12  pharmacy piece, correct?
13      A.   They have control over all retail
14  operations.
15      Q.   Do you recall where this meeting took
16  place?
17      A.   I'm sure this was in Deerfield.
18      Q.   In Deerfield.  And let's just walk
19  through this first slide.  "Rex Swords,
20  October 2013, Rx Integrity Update, Market
21  Leadership Meeting," correct?
22      A.   Correct.
23      Q.   You were up to speed with the details to
24  the point where you could sit and make a

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  presentation to the market leaders about what had
2  been implemented at Walgreens, correct?
3      A.   Correct.
4      Q.   On both the GFD side and the SOM side,
5  correct?
6      A.   Certainly.
7      Q.   I'm sorry.  Yes?
8      A.   Yes.  I mean, I wasn't the only one in
9  the meeting.  I was the one doing the facilitation
10  and the presentation.  I had Tasha there as well as
11  other members.
12      Q.   Sure, but you wouldn't -- I just
13  interrupted.  Were you finished?
14      A.   I had Tasha there as well as other
15  members of her team there.
16      Q.   But you certainly wouldn't give a
17  presentation and put your name on it unless you had
18  some familiarity with the details about the
19  suspicious order monitoring policies, correct?
20      A.   Correct.
21      Q.   And same thing is true on the good faith
22  dispensing, you certainly wouldn't get up in front
23  of your market leaders, despite who is there, and
24  give a presentation without having some

Page 163

1  understanding of the details, correct?
2      A.   Correct.
3      Q.   All right.  On the very first slide that
4  you are relaying the accomplishments since the
5  agreement, what agreement are you referring to
6  here?
7      A.   Our agreement, settlement agreement with
8  the DEA.
9      Q.   And that settlement agreement -- I'm
10  sorry.
11          The "Agreement" as referenced here on
12  Bates No. 99 was the one in which Walgreens paid a
13  significant fine, correct, sir?
14      MR. STOFFELMAYR:  Objection to the form.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. MOUGEY:
18      Q.   And that fine covered both dispensing
19  practices and Walgreens distribution centers,
20  correct?
21      MR. STOFFELMAYR:  Objection to the form.
22  BY THE WITNESS:
23      A.   Correct.
24  BY MR. MOUGEY:

Page 164

1      Q.   And that fine that Walgreens paid
2  covered Walgreens' failures to implement a system
3  to identify suspicious orders on the distribution
4  side, correct?
5      MR. STOFFELMAYR:  Objection to the form.
6  BY THE WITNESS:
7      A.   I know we had a settlement with them.  I
8  know we paid a fine.  I'm -- what the conclusions
9  of that were, I'm not.
10  BY MR. MOUGEY:
11      Q.   Well, you understand that that fine that
12  Walgreens paid covered or encompassed the
13  distribution side, correct?
14      A.   Yes.
15      Q.   And that Walgreens' policies and
16  procedures to identify and report suspicious orders
17  were lacking in some respects, correct?  You
18  understand that at least, correct?
19      MR. STOFFELMAYR:  Objection to the form.
20  BY THE WITNESS:
21      A.   Yes.
22  BY MR. MOUGEY:
23      Q.   So, under the "Agenda, "Accomplishments
24  since the agreement," talks about the "Rx Integrity

Page 165

1  Website."
2          Do you see that?
3      A.   I do.
4      Q.   And is that the intranet that we were
5  referring to earlier?
6      A.   Yes.
7      Q.   So, if I wanted to go, Peter Mougey in
8  Pensacola, Florida wanted to log on my computer and
9  I wanted to look at the Rx Integrity website, I
10  couldn't do that, right?
11      A.   No.
12      Q.   I had to be a Walgreens employee?
13      A.   Correct.
14      Q.   Hence that intranet versus internet,
15  right?
16      A.   Yes.
17      Q.   Okay.  And are you familiar with the
18  Rx Integrity intranet or website?
19      A.   I'm familiar with where it's located
20  and --
21      Q.   Generally?
22      A.   Yeah.
23      Q.   Did you actually go and look at it?
24      A.   Sure.

42 (Pages 162 to 165)

Page 166

1    Q.   And see what kind of information on
2  there?
3    A.   Yeah.
4    Q.   Do you think it was detailed information
5  that would educate Walgreens' employees about its
6  policies and procedures under the suspicious order
7  monitoring program?
8    A.   I believe it educated -- it's meant for
9  our retail folks.  So, it educated our retail side
10  of the equation as to what their responsibilities
11  around the issue is, yes.
12    Q.   Okay.  And in addition to educating them
13  on the responsibilities, would it give them kind of
14  an overview of how the suspicious order monitoring
15  policies and procedures worked at Walgreens?
16    A.   Yeah.
17    Q.   And the next entry is the "Rx Integrity
18  Web Portal."  Can you describe to us what that is?
19    A.   That's -- that's a process for the --
20  for the stores to communicate directly around
21  orders and things like that.
22    Q.   And it's kind of an interface from the
23  stores to corporate on the questions regarding
24  specific orders, correct?

Page 167

1    A.   Yes.
2    Q.   All right.  And that's kind of your --
3  that's kind of -- would you agree with me, fair,
4  that that's your purview of expertise or specialty
5  at Walgreens, which was creating a system designed
6  to promote efficiency through your career at
7  Walgreens?
8    A.   Well, I don't --
9    MR. STOFFELMAYR:  Objection to the form.  Go
10  ahead.
11  BY THE WITNESS:
12    A.   I don't think that's how I would
13  characterize it.  I've been involved in many
14  efficiency projects throughout the.
15  BY MR. MOUGEY:
16    Q.   And the next bullet, "Ceiling Limit
17  Tool."  What are ceiling limit tools?
18    A.   We had established ceiling limits in our
19  stores around how much product could be ordered at
20  a time, and that was a tool that we had used to
21  administer it.
22    Q.   All right.  Those ceiling limit tools,
23  once it was hit, there was -- and I'm talking
24  specifically about Schedule II, Schedule III

Page 168

1  opiates, once that ceiling tool was hit, the store
2  couldn't order any more, right?
3    A.   The order wouldn't be processed.
4    Q.   The order wouldn't be processed.
5         And was that hard-and-fast or were there
6  loopholes or exceptions around that ceiling limit?
7    MR. STOFFELMAYR:  Objection to the form.
8  BY THE WITNESS:
9    A.   I wouldn't call them loopholes or
10  exceptions.  What they were were, there was a
11  process once you hit that, there was an escalation
12  process that could occur for further review if
13  there were, you know, reasons for that to occur.
14  BY MR. MOUGEY:
15    Q.   And that was heavily monitored to ensure
16  that the overrides that allowed a store to go over
17  and above that ceiling limit were monitored,
18  correct?
19    A.   Yes.
20    Q.   There was not -- if I use the word
21  "visibility" in regard to orders, there were people
22  that were monitoring the overrides, so to speak,
23  through the ceiling form -- through the override
24  form, correct?

Page 169

1    A.   Yes.
2    Q.   And the different -- there is several
3  different ways for stores to order Schedule II and
4  Schedule III opiates if over and above the ceiling
5  limit, correct?
6    A.   Different ways for them to order?
7    Q.   Yes, sir.  Over and above the ceiling
8  limit.
9    A.   Over and above the ceiling limit they
10  have to go through the Pharmaceutical Integrity in
11  order for them --
12    Q.   And is that --
13    A.   -- for the order to be processed.
14    Q.   Okay.  Is that true from the beginning
15  of '13 all the way through the end of '14?
16    A.   That's my understanding.
17    Q.   Because that would be a pretty big hole
18  in the system if a pharmacist could order above the
19  ceiling limit through another means and it wasn't a
20  review and approved by the Pharmaceutical Integrity
21  group, right?
22    A.   Our intent was --
23    MR. STOFFELMAYR:  Objection to the form.  Go
24  ahead.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 BY THE WITNESS:
2    A.   Our intent was to capture all the
3 orders.
4 BY MR. MOUGEY:
5    Q.   Right.  Because it would be a
6 significant hole if a pharmacist was able to order
7 more Schedule II and Schedule III opiates above the
8 ceiling limit without it being approved by the
9 Pharmaceutical Integrity group, correct?
10    A.   That would -- that would have been an
11 exception to what the process was intended to be.
12    Q.   And I want to make sure.  I appreciate
13 that it was an exception and for what it was
14 intended.
15       But the point of this system was for
16 Pharmaceutical Integrity to review and approve
17 orders, correct?
18    A.   Yes.
19    Q.   And review and approve orders especially
20 over the ceiling limit, correct?
21    A.   Yes.
22    Q.   Because an order over the ceiling limit
23 would be an outlier, correct?
24    A.   Yes.

Page 171

1    Q.   And that would be a red flag that
2 warranted more inquiry, correct?
3    A.   It would require further review, yes.
4    Q.   Yes, sir.  And if there were ways around
5 that ceiling tool to order more Schedule II and
6 Schedule III, that exception could possibly swallow
7 the rule, the ceiling tool, correct?
8    MR. STOFFELMAYR:  Objection to the form.  Go
9 ahead.
10 BY THE WITNESS:
11    A.   It would have been an exception to the
12 ceiling tool.  That --
13 BY MR. MOUGEY:
14    Q.   And that was -- go ahead.
15    A.   That was not intended.
16    Q.   And by "not intended," meaning sitting
17 here today you can't think or identify any
18 exceptions to the ceiling limits tool that were not
19 being reviewed and approved by Pharmaceutical
20 Integrity, correct?
21    A.   Not sitting here today, no.
22    Q.   You can't think of any?
23    A.   I can't think of any, no.
24    Q.   Because that would be a problem if a

Page 172

1 pharmacist was able to go around the over -- the
2 ceiling limits tool outside of the approval process
3 of Pharmaceutical Integrity for Schedule II and
4 Schedule III opiates, correct, sir?
5    MR. STOFFELMAYR:  Objection to the form.
6 BY THE WITNESS:
7    A.   Well, I don't know that I'd say it was a
8 problem.  It would be, you know, it would be
9 opposite of what we were trying to accomplish,
10 right?  So, we'd want to understand what was
11 happening there and then correct that.
12 BY MR. MOUGEY:
13    Q.   I'm a little confused.  It's not a
14 problem, but it's an opposite of what you're trying
15 to accomplish.
16       What you were trying to accomplish, when
17 I say "you," I mean Walgreens through
18 Pharmaceutical Integrity, was that, A, to design a
19 system to identify suspicious orders, correct?
20    A.   Yes.
21    Q.   And that if those suspicious orders,
22 once they were identified, to have further inquiry
23 or due diligence, correct?
24    A.   Yes.

Page 173

1    Q.   And in order for those two steps,
2 identify the suspicious orders and perform further
3 due diligence, that would mean that the orders
4 needed to be funneled through Pharmaceutical
5 Integrity, correct?
6    A.   It was important for us to have all the
7 order information.
8    Q.   When we started talking about visibility
9 before, the visibility of orders outside of the
10 ceiling limits tool should be, the process was
11 designed so that Pharmaceutical Integrity had to
12 approve those, correct?
13    A.   Yes.
14    Q.   And the next entry is the "Controlled
15 Substance Override Form," correct?
16    A.   Yes.
17    Q.   And that's an example of a store
18 entering an order that exceeded the ceiling limits
19 tool that Pharmaceutical Integrity had to review
20 and approve, correct?
21    A.   That's correct.
22    Q.   And it is important for it to have an
23 effective system that those -- all of the
24 exceptions to the ceiling limits tool be closed and

Page 174

1  have to be run through Pharmaceutical Integrity for
2  approval, correct?
3        MR. STOFFELMAYR:  Objection to the form.
4  BY MR. MOUGEY:
5     Q.   That's the point of the system that
6  Walgreens designed, correct?
7  BY MR. MOUGEY:
8     A.   That was the intention of the system.
9     Q.   The next entry, the Form 106, that's a
10  theft loss form to the DEA, correct, sir?
11     A.   Yes.
12     Q.   And then the "Pharmacist GFD
13  Opportunities Review Tool."
14        Do you see that?
15     A.   Yes.
16     Q.   Okay.  And now, if you would, sir, go to
17  the very next page.  And this is the Pharmaceutical
18  Integrity intranet available to website employees
19  or an example of a screen shot, right?
20     A.   Yes.
21     Q.   If you look in that left-hand column,
22  you'll see links to the DEA, right?
23     A.   Yes.
24     Q.   And by the "DEA Website," the "DEA Local

Page 175

1  Office Locations," the "Pharmacists Manual."
2        Do you see that, sir?
3     A.   Yes.
4     Q.   And under -- below that, "Policies and
5  Procedures," you see the "Target Drug Good
6  Faith" -- is it "Dispensing"?
7     A.   Yes.
8     Q.   Yes.  And then below that, "Controlled
9  Substance Prescriptions and Good Faith Dispensing,"
10  correct?
11     A.   Yes.
12     Q.   Now, those are Walgreens attempting to
13  fulfill its obligations on the dispensing side,
14  correct?
15        MR. STOFFELMAYR:  Objection to the form.
16  BY THE WITNESS:
17     A.   Yes.
18  BY MR. MOUGEY:
19     Q.   And, hence, both of those have the word
20  "dispensing" in them, correct?
21     A.   Yes.
22     Q.   And you see below, at the very last
23  entry, "Rx Integrity Operations," "Rx Integrity Web
24  Portal"?

Page 176

1     A.   Yes.
2     Q.   And "Contact Rx Integrity."  It's just a
3  link and it shoots an e-mail back, correct?
4     A.   Yes.
5     Q.   Now, that "Operations" section, that is
6  more -- I'm going to use the word "operational."
7  Is that a fair description?
8     A.   I'm not sure what you mean by
9  "operational."
10     Q.   Right.  Let's just use "operational" in
11  the same context you use it 15, 20, 30 times in
12  your CV.
13        MR. STOFFELMAYR:  Objection to the form.
14  BY THE WITNESS:
15     A.   What this is referring to is a way to
16  contact the Rx Integrity operations group.
17  BY MR. MOUGEY:
18     Q.   Yes, sir.  And the entry above that, the
19  web portal, is more of an operational component,
20  meaning forms and ways to communicate back with
21  Rx Integrity, right?
22     A.   Yes.
23     Q.   And when I say "operational" and the way
24  you use it in your CV, it's a means to communicate

Page 177

1  between the stores and Rx Integrity, correct?
2     A.   Yes.
3     Q.   Not policies and procedures about what
4  the SOM policy, suspicious order monitoring
5  policies and procedures are, right?
6        MR. STOFFELMAYR:  Objection to the form.
7  BY THE WITNESS:
8     A.   No.
9  BY MR. MOUGEY:
10     Q.   So, if we go above that, FAQ, Frequently
11  Asked Questions, the first entry is, "How do you
12  complete an override form?"  Right?
13     A.   Yes.
14     Q.   "How to place orders for C-II through
15  C-V and PSE," correct?
16     A.   Yes.
17     Q.   And that's Schedule II through V are
18  controlled substances, correct?
19     A.   Yes.
20     Q.   And PSE -- I can never remember what
21  that stands for.
22     A.   Pseudoephedrine.
23     Q.   Thank you.  And the last, third bullet,
24  "DEA Visit Guidelines 'Do's and Don'ts.'"  So,

45 (Pages 174 to 177)

Page 178

1    that's when the DEA shows up and asks questions,
2    correct?
3        A.   Yes.
4        Q.   Now, above that there are some forms,
5    override form again, along with a couple of others,
6    correct?
7        A.   Yes.
8        Q.   Do you see anywhere on this list -- and
9    when it's blue like that and it has a little
10   underline, that's a link, right?
11       A.   Correct.
12       Q.   You can click on it and it'll take you
13   somewhere else on the Walgreens intranet, correct?
14       A.   Correct.
15       Q.   Now, do you see anywhere on all these
16   links under Rx Integrity where Pharmaceutical
17   Integrity would relay to its stores the intent or
18   the purpose of the suspicious order monitoring
19   policies on its distribution side?
20       A.   No.
21       Q.   Do you see anything on here that would
22   help communicate with the distribution centers
23   about what the purpose of the suspicious order
24   monitoring policies and procedures are and how they

Page 179

1    apply to the distribution centers?
2        A.   No.
3        Q.   Do you see any -- I'm going to call it a
4    manual and you referred -- you and I are close to
5    the same age.  A three-ring binder, like old
6    school.
7             Anything like that manual in the
8    electronic form encapsulating what Pharmaceutical
9    Integrity's current set of suspicious order
10   monitoring policies and procedures are?
11       A.   Well, there is nothing here that says a
12   manual.  I would say in today's day and age this
13   would be classified as a manual today.
14       Q.   This would be classified.  But can you
15   find anywhere, point me to anywhere in all those
16   blue links about, as of October of '13, what
17   Walgreens' policies and procedures were regarding
18   its suspicious order monitoring program?
19       A.   No.
20       Q.   And is the same true if you look at this
21   entire page, do you see anything specific to
22   Walgreens Pharmaceutical Integrity communicating
23   with its employees about what its policies and
24   procedures were for its suspicious order monitoring

Page 180

1    program?
2        A.   No, because this was retail-focused.
3    This was not focused on the distribution side.  It
4    was focused on the dispensing side.
5        Q.   But can you point me to somewhere, a
6    document that exists which encapsulates Walgreens'
7    suspicious order monitoring policies and procedures
8    at any given point in time?
9        A.   No, I can't point you to it.
10       Q.   So, that would go back to where we
11   started this.  I should look in the e-mails and
12   those kind of communications to find what the
13   policies and procedures are?
14            MR. STOFFELMAYR:  Objection to the form.
15   BY THE WITNESS:
16       A.   Correct.
17   BY MR. MOUGEY:
18       Q.   Getting -- you prepared for today,
19   right?
20       A.   Certainly.
21       Q.   And did you review documents in
22   preparation for today?
23            MR. STOFFELMAYR:  Answer yes or no to that
24   question.

Page 181

1    BY THE WITNESS:
2        A.   Yes.
3    BY MR. MOUGEY:
4        Q.   All right.  Can you -- in preparation
5    for today, can you point me to any document that
6    you can remember that encapsulates Walgreens'
7    Pharmaceutical Integrity Department suspicious
8    order monitoring policies and procedures at any
9    given point in time?
10            MR. STOFFELMAYR:  For now just answer yes or
11   no.
12   BY THE WITNESS:
13       A.   No.
14   BY MR. MOUGEY:
15       Q.   All right.  The next page, "Rx Integrity
16   Website."
17            I will tell you what.  I think that --
18            MR. STOFFELMAYR:  We have gone about two
19   hours.
20            MR. MOUGEY:  Sure.
21            MR. STOFFELMAYR:  If you are done with this
22   document or want to break in the middle of it.
23            MR. MOUGEY:  Let me just flip through it real
24   quick.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1      MR. STOFFELMAYR:  Sure.
2      MR. MOUGEY:  Okay.  It's good.
3      MR. STOFFELMAYR:  All right.
4      MR. MOUGEY:  Thank you.
5      THE VIDEOGRAPHER:  We are off the record at
6   11:10 a.m.
7          (WHEREUPON, a recess was had
8              from 11:10 to 11:24 a.m.)
9      THE VIDEOGRAPHER:  We are back on the record
10  at 11:24 a.m.
11  BY MR. MOUGEY:
12     Q.   Bear with me one second.
13         We just went through a series of slides
14  where you referenced an agreement, and you and I
15  went through a series of questions discussing the
16  agreement with the -- with the DEA.
17         Have you had an opportunity to review
18  the agreement in its entirety?
19     A.   I reviewed it years ago when it
20  occurred.  I haven't reviewed it recently.
21     Q.   Okay.  And I'm going to hand you what we
22  are going to mark as Swords 7.
23         (WHEREUPON, a certain document was
24              marked as Walgreens-Swords Exhibit

Page 183

1          No. 7:  Binder containing
2          Settlement and Memorandum of
3          Agreement and other documents;
4          WAGMDL00490963 - 00490973;
5          P-WAG-0001.)
6   BY MR. MOUGEY:
7      Q.   This document as compared to several
8   others have a few different page numbering systems
9   on it and it gets a little confusing.  Okay?
10         So, let me see if I can -- to make it
11  easier for you and I to communicate, there is a
12  series of numbers after the 13 pages that -- the
13  first 1 through 13, that's the signed version.
14  Okay?
15     A.   Okay.
16     Q.   And after the first 13 --
17     A.   The next --
18     Q.   -- there is another 1 of 3.  Do you see
19  that?
20     A.   1 of 3.
21     Q.   Actually, let me even --
22     A.   Yes.
23     Q.   Let me take a step back.  Let's just do
24  this.

Page 184

1          Let's start on the very first page
2   titled "Settlement and Memorandum of Agreement."
3          Do you see that, sir?
4      A.   I do.
5      Q.   And it has a section titled "Procedural
6   Background."  The next section is "Stipulation and
7   Agreement."  Okay?
8      A.   Yes.
9      Q.   And if you page -- if you turn to the
10  very last two pages of this agreement, 11, 12, and
11  13, the last three pages, you'll see a series of
12  signatures?
13     A.   Okay.
14     Q.   And one of those is Thomas Sabatino, who
15  is the executive VP, general counsel and corporate
16  secretary.
17         Do you see that?
18     A.   Yes, I do.
19     Q.   And page 11 of 13 -- I'm sorry.  Yes.
20  Page 11 of 13 is dated 6/10 of '13.
21         Do you see that?
22     A.   On page 12?
23     Q.   Page 11.
24     A.   Okay.  Yes.

Page 185

1      Q.   All right.  And then below that, I think
2   we've found our missing Alice.
3      A.   You found Alice.
4      Q.   There she is.  What's the name of that
5   book, Finding Waldo?
6          So, Alice Fisher --
7      MR. STOFFELMAYR:  Finding Nemo.  Where's
8   Waldo.
9      MR. MOUGEY:  I always get those two mixed up.
10  BY MR. MOUGEY:
11     Q.   Alice Fisher, Philip Perry at
12  Latham & Watkins.
13         Is Alice one of the lawyers you were
14  meeting with to help educate yourself on the
15  details of Walgreens' responsibilities under the
16  Controlled Substance Act?
17     A.   Yes.
18     Q.   And then below you will see another
19  lawyer, David Weinstein with Clarke and
20  Silverglate.  Does that ring a bell?
21     A.   Yes.
22     Q.   Is David another lawyer that you met
23  with?
24     A.   Yes.

47 (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1     Q.  How about Philip Perry? Does that ring
2 a bell?
3     A.  Maybe. I know there was another one. I
4 don't -- that might have been. I'm sure it was
5 him.
6     Q.  Did you take part in any of the
7 discussions prior to this agreement being executed
8 in June of '13 or were the conversations with
9 counsel after the -- this agreement was executed?
10     A.  No, I was part of the discussions with
11 counsel prior.
12     Q.  Okay. Were you -- who else besides you
13 was participating in conversations with outside and
14 inside counsel regarding the DEA investigations?
15     A.  I can tell you that I know Tasha was
16 involved in it. Outside that, I'm not sure who
17 else.
18     Q.  Was the purpose of your conversations to
19 assist Walgreens in its defense or was the purpose
20 of your conversations with counsel to educate you
21 on the details of Walgreens' obligations under the
22 Controlled Substance Act as a distributor?
23     MR. STOFFELMAYR: Objection to the form.
24 BY THE WITNESS:

Page 187

1     A.  I would say I served both purposes at
2 different times.
3 BY MR. MOUGEY:
4     Q.  Okay. Were the topics of different
5 meetings with these lawyers designed around
6 assisting in the defense and then at other points
7 in times you sat down with Walgreens' outside
8 counsel being educated on Walgreens'
9 responsibilities under the Controlled Substance
10 Act?
11     A.  Yes.
12     MR. STOFFELMAYR: Objection. Sorry.
13     THE WITNESS: Sorry.
14     MR. MOUGEY: I'm sorry.
15 BY MR. MOUGEY:
16     Q.  You're able to kind of distinguish which
17 meetings you were assisting with the defense of
18 Walgreens with counsel as opposed to meetings with
19 outside counsel or inside counsel educating
20 yourself on Walgreens' responsibilities under the
21 Controlled Substance Act for the development of
22 Pharmaceutical Integrity?
23     A.  Well, there were -- there were separate
24 meetings and then there were meetings that one

Page 188

1 subject would bleed into the other and back and
2 forth.
3     Q.  But there were some separate meetings?
4     A.  Yes.
5     Q.  What I'd like you to do is flip to,
6 there is a next section, page 1, 2, and 3.
7     A.  Okay.
8     Q.  Go through that. And then you'll see
9 page 1 of 143.
10     Do you see that?
11     A.  Page 1 of 143?
12     Q.  Right.
13     A.  Oh.
14     MR. STOFFELMAYR: Do you mind if I -- got it.
15 BY THE WITNESS:
16     A.  Page 1 of 343. Is that it?
17     MR. STOFFELMAYR: Page 1 of 343. You got it
18 right.
19 BY MR. MOUGEY:
20     Q.  Let's start at page 1 of 143 -- of 343,
21 and I'm going to refer to those numbers to make it
22 easy for you and I to go back and forth.
23     A.  Okay.
24     Q.  Okay. Let's kind of walk through.

Page 189

1     Do you recall there is different pieces
2 of this document referring to different
3 investigations at different Walgreens stores and
4 distribution centers around the country?
5     A.  Yes.
6     Q.  All right. So, let's start on page 1 of
7 143 under the "Procedural Background." Under 1,
8 "Walgreens owns or operates (or has previously
9 owned and operated) distribution centers that are
10 or were registered with the DEA as distributors of
11 Schedule II through V controlled substances."
12     Right?
13     A.  Yes.
14     Q.  And that's -- we have been talking about
15 this morning Walgreens' responsibility as a
16 distributor, correct?
17     A.  That's part of what we've talked about
18 today, yes.
19     Q.  Yes, sir. Thank you.
20     And then paragraph 2 is referencing
21 "Walgreens owns or operates (or has previously
22 owned or operated) pharmacies that are or were
23 registered with the DEA as retail chain
24 pharmacies."

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    That's what we have been referring as
2  dispensaries, correct?
3    A.  Correct.
4    Q.  Now, if we go down to paragraph 3,
5  references "On April 7, 2011, Walgreens entered
6  into a Settlement and Release Agreement and
7  Administrative Memorandum of Agreement with DEA,"
8  and that's Appendix A.
9    Do you have a recollection, do we need
10  to go back to Appendix A or do you have a
11  recollection of what conduct that covers?
12    A.  Well, I'd have to see it.
13    Q.  Okay.
14    A.  If you have a page number.
15    MR. STOFFELMAYR:  You guys okay?
16    MR. MOUGEY:  No, bear with me.
17    I'm going to have -- we're going to have
18  to find it because I had them tabbed out and we
19  switched gears here.  So, just bear with me.  Okay.
20  BY MR. MOUGEY:
21    Q.  Turn to page 14.
22    A.  Okay.
23    Q.  Page 14 is Appendix A and you see on
24  page 15 it's titled "Administrative Memorandum of

Page 191

1  Agreement."
2    Do you see that?
3    A.  Yes.
4    Q.  And if you look under "Background," it
5  refers to "September 30, 2009, Deputy Assistant
6  Administrator, Office of Diversion Control issued
7  an Order to Show Cause proposing to revoke DEA
8  Certificate of Registration," goes through the DEA
9  number and it references the San Diego, California
10  address, correct, sir?
11    A.  It does.
12    Q.  And then the next paragraph references
13  an OTSC, Order to Show Cause, and it goes through
14  1, 2, 3 and 4, which relate to the scope of
15  Walgreens' responsibilities as a dispensary or a
16  pharmacy, correct?
17    A.  Yes.
18    MR. STOFFELMAYR:  Objection to the form.
19    Give me a second.
20  BY MR. MOUGEY:
21    Q.  1, 2, 3 and 4 refer to Walgreens as a
22  pharmacy, correct, sir?
23    A.  Yes.
24    Q.  All right.  And if you go back to page 1

Page 192

1  of 343, paragraph 4 and 5 reference --
2    A.  Let me catch up with you.
3    Q.  Yes, sir.  I'm sorry.
4    A.  Okay.
5    Q.  Paragraphs 4 and 5 reference Walgreens
6  distribution center and that encompasses or the
7  scope is Walgreens as a distributor, correct, sir?
8    A.  Yes.
9    Q.  And that, sir, is Exhibit B, correct?
10    A.  I'd have to see Exhibit B.
11    Q.  Exhibit B is page 23 of 43.
12    A.  So, 23 of 343?
13    Q.  Yes, sir.
14    A.  Okay.  So, I'm sorry.  What's the
15  question?
16    Q.  I just want to go through what the
17  scope.  You couldn't remember exactly what the
18  scope of each one of these pieces were, and we're
19  going to look through them.  Okay?
20    A.  Okay.
21    Q.  Because I understand this is a large
22  document, and it's difficult to kind of wield your
23  way through.
24    Exhibit B, Page No. 23 of 343, is dated

Page 193

1  September 13 of 2012.
2    Do you see that?
3    A.  Yes.
4    Q.  And that is directed to Walgreens,
5  correct?
6    A.  Yes.
7    Q.  And it's from the Department of Justice,
8  correct?
9    A.  Yes.
10    Q.  And it's titled "Order to Show Cause and
11  Immediate Suspension of Registration," correct?
12    A.  Yes.
13    Q.  You'd agree with me that's kind of a big
14  deal when you get an Order to Show Cause with an
15  immediate suspension from the Department of
16  Justice, correct?
17    A.  Yes.
18    Q.  And the very first paragraph under
19  "Notice," this is the second paragraph, "is hereby
20  given to inform Walgreen Corporation of the
21  immediate suspension of DEA Certificate of
22  Registration," it gives a number, and it cites
23  "pursuant to 21 USC Section 824(d), because such
24  registration constitutes an imminent danger to the

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1   public health and safety."
2       Do you see that, sir?
3   A.   I do.
4       Q.   And, sir, you understand that paragraph
5   that we just read is the Department of Justice
6   believes that the distribution center operated by
7   Walgreens poses an imminent danger to the public
8   health and safety?
9   A.   That's what it says.
10      Q.   And as a result, it issued an immediate
11  suspension of Walgreens' distribution centers
12  registration, correct, sir?
13  A.   That's what it says.
14      Q.   Under paragraph 1, the distribution
15  center is Walgreens' Jupiter, Florida distribution
16  center and it provides the registration number,
17  correct, sir?
18  A.   Yes.
19      Q.   And, sir, Jupiter is one of three
20  Walgreens distribution centers at that point in
21  time that distributed Schedule II opiates, correct?
22  A.   That is correct.
23      Q.   It was Jupiter, Perrysburg and Woodland,
24  California, correct, sir?

Page 195

1   A.   Correct.
2       Q.   And if you would, sir, please turn to
3   page 24 of 343.
4       Sir, you understand that oxycodone is a
5   Schedule II controlled substance, correct?
6   A.   Yes.
7       Q.   And Schedule II have a higher risk of
8   addiction and abuse than a Schedule III opiate,
9   correct, sir?
10  A.   That's generally how the classification
11  works.
12      Q.   Schedule II has a medicinal use, but a
13  highly addictive and high potential for abuse,
14  correct?
15  A.   Generally speaking, yes.
16      Q.   Paragraph 3 on page 24 of 343,
17  "Oxycodone is a dangerously addictive Schedule II
18  controlled substance which is known to be highly
19  abused and diverted in the State of Florida."
20      Do you see that, sir?
21  A.   I see that, yes.
22      Q.   Do you agree with that statement from
23  the DEA?
24      MR. STOFFELMAYR:  Objection to the form.

Page 196

1   BY THE WITNESS:
2   A.   I agree that oxycodone is a Schedule II
3   controlled substance.
4   BY MR. MOUGEY:
5       Q.   Do you agree --
6   A.   And can be addictive.
7       Q.   Do you agree that it's dangerously
8   addictive?
9   A.   All drugs by prescription are classified
10  as dangerous drugs.
11      Q.   Yes, sir.  And they're categorized,
12  correct, sir?
13  A.   Yes, sir.
14      Q.   And Schedule II is the lowest -- or let
15  me do it the other way.
16      Schedule II is the -- is the category
17  with the highest probability of abuse with some
18  medicinal value, correct?
19  A.   Actually, that would be Schedule I.
20      Q.   Schedule I has no medicinal value,
21  correct?
22  A.   No, that's not correct.  Cocaine is
23  Schedule I and it has medicinal value.
24      Q.   Okay.  Cocaine has medicinal value.

Page 197

1   I'll go with that.
2       So, oxycodone is one schedule behind
3   cocaine, correct?
4   A.   It is a Schedule II drug.
5       Q.   And one schedule behind cocaine,
6   correct?
7   A.   There are other drugs in Schedule I as
8   well.
9       Q.   I understand.
10  A.   I gave you --
11      Q.   I'm asking you --
12  A.   I gave you one example.
13      Q.   And I didn't ask you all of them.  I'm
14  just saying that schedule --
15  A.   It's in a different --
16      Q.   Oxycodone is one schedule behind
17  cocaine, correct?
18  A.   It is in Schedule II, yes.
19      Q.   Yes, sir.  One schedule behind.  I
20  don't -- the jury is not going to know if there is
21  1.1, 1.2, 1.3, all the way to 1.99.  What I'm
22  asking you is a pretty clear question.
23      Oxycodone is one schedule behind
24  cocaine, correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1     MR. STOFFELMAYR: Move to strike the speech.
2 But go ahead and answer the question.
3 BY THE WITNESS:
4     A.   Oxycodone is a Schedule II narcotic,
5 yes.
6 BY MR. MOUGEY:
7     Q.   And it is one schedule behind cocaine,
8 correct, sir?
9     A.   Yes.
10     Q.   Thank you.  Sir, if you would, please,
11 turn to page 25, it's the next page, of 343 under
12 paragraph 6.  And I want to take your attention to
13 middle of the paragraph, the sentence begins with
14 "Respondent."
15         Do you see that, sir?
16     A.   I do.
17     Q.   And you understand that Respondent is
18 Walgreens?
19     A.   That's my understanding.
20     Q.   "Respondent failed to conduct adequate
21 due diligence of its retail stores, including but
22 not limited to, the six stores identified above,
23 and continued to distribute large amounts of
24 controlled substances to pharmacies that it knew or

Page 199

1 should have known that were dispensing those
2 controlled substances pursuant to prescriptions."
3         Do you see that, sir?
4     A.   I do.
5     Q.   Do you agree with that sentence?
6     MR. STOFFELMAYR: Objection to the form.
7 BY THE WITNESS:
8     A.   I agree that that's what that says, yes.
9 BY MR. MOUGEY:
10     Q.   I understand that's what it says, and I
11 appreciate that you agree with me that that's what
12 it says.
13         But what I'm asking is, do you, Rex
14 Swords, agree with the DEA's statement on page 25
15 of 43 that we just -- 343 that we just read?
16     MR. STOFFELMAYR: Same objection.
17 BY THE WITNESS:
18     A.   I agree that that's the allegation that
19 the DEA had at the time of the order of injunction.
20 BY MR. MOUGEY:
21     Q.   But what I'm asking you is a little
22 different.  Do you agree with the DEA's statement
23 that "Respondent," Walgreens, "failed to conduct
24 adequate due diligence of its retail stores,

Page 200

1 including but not limited to, the six stores
2 identified above, and continued to distribute large
3 amounts of controlled substances to pharmacies that
4 it knew or should have known were dispensing those
5 controlled substances pursuant to prescriptions"?
6     MR. STOFFELMAYR: Objection to the form.
7 BY THE WITNESS:
8     A.   No, I don't -- I don't particularly
9 agree with the full statement here.
10 BY MR. MOUGEY:
11     Q.   You don't agree.  Do you agree with any
12 part of it?  Do you agree that Walgreens failed to
13 conduct adequate due diligence of its retail
14 stores?
15     MR. STOFFELMAYR: Same objection.
16 BY THE WITNESS:
17     A.   Yes, I would -- I would say that there
18 were -- there were some challenges around these six
19 particular stores out of the 800 or so we have in
20 Florida.
21 BY MR. MOUGEY:
22     Q.   The next paragraph, "The DEA's
23 investigation of Respondent also revealed that
24 Walgreens failed to detect and report suspicious

Page 201

1 orders by its pharmacy customers in violation of
2 21 CFR," Code of Federal Regulations, "Section
3 1301.74(b)."
4         Do you see that, sir?
5     A.   I do.
6     Q.   Do you agree with the DEA's statement
7 that I just read?
8     MR. STOFFELMAYR: Objection to the form.
9 BY THE WITNESS:
10     A.   What I agree with is that's the DEA's
11 position, that it failed to.
12 BY MR. MOUGEY:
13     Q.   Do you agree, sir, with the DEA's
14 statement that Walgreens failed to detect and
15 report suspicious orders by its pharmacy customers
16 in violation of 21 CFR Section 1301.74(b)?
17     MR. STOFFELMAYR: Objection to the form.
18 BY THE WITNESS:
19     A.   No, because my understanding is that we
20 did detect and report them to the DEA.
21 BY MR. MOUGEY:
22     Q.   Your understanding is that Walgreens
23 detected and reported suspicious orders to the DEA?
24     A.   Yes.

51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1      Q.   Through what mechanism, sir?  What
2   reporting mechanism?
3      A.   My understanding is that we supplied
4   them with both manual reports as well as electronic
5   media that contained those records.
6      Q.   And do you understand what the criteria
7   is for those reports?
8      A.   I do not.
9      Q.   Sitting here today, you have no idea
10  what those reports were?
11     A.   No.
12     Q.   You don't know what the -- what the
13  formula or mechanism for those reports was?
14     A.   No.
15     Q.   Have you ever seen one of the reports?
16     A.   I have not.
17     Q.   So, your statement that you disagree
18  with paragraph 7 on page 25 is based on someone
19  telling you that we did give or provide the DEA
20  suspicious reports that we detected through its
21  system to identify suspicious orders?
22     MR. STOFFELMAYR:  Objection to the form.
23  BY THE WITNESS:
24     A.   Yes.

Page 203

1   BY MR. MOUGEY:
2      Q.   But you've never seen them, you don't --
3   haven't done any due diligence to see what the
4   trigger of the metric on the report was?
5      A.   No.
6      Q.   You don't have any specifics sitting
7   here today of what that report was?
8      A.   No.
9      Q.   What do you think after, what did we
10  say, 32 years in the pharmaceutical industry -- do
11  I remember that right?
12     A.   I have been with Walgreens --
13     Q.   '86 to -- I'm sorry.  I didn't mean to
14  interrupt you.
15          Tell me how many years you have been
16  with Walgreens.
17     A.   32 years.
18     Q.   32 years.  Do you have an understanding
19  of what -- why the DEA wanted suspicious orders
20  reported to it from distributors that were licensed
21  under the federal code?
22     MR. STOFFELMAYR:  Objection.
23  BY MR. MOUGEY:
24     Q.   What was the purpose?

Page 204

1      MR. STOFFELMAYR:  Objection to the form.
2   BY THE WITNESS:
3      A.   The purpose was to detect diversion,
4   misuse.
5   BY MR. MOUGEY:
6      Q.   And what do you -- what do you think
7   that -- was the purpose of reporting these
8   suspicious orders fulfilled if the orders came --
9   the suspicious order reporting came 30 days after
10  the order was shipped?
11     MR. STOFFELMAYR:  Objection to the form.
12  BY THE WITNESS:
13     A.   I believe that the early understanding
14  was that the obligation was to report and the
15  investigative side of it was the DEA's
16  responsibility.
17  BY MR. MOUGEY:
18     Q.   But what I'm asking you was -- is a
19  little different.
20          The purpose of the reports identifying
21  suspicious orders was to assist the DEA to identify
22  potential areas of diversion, right?
23     A.   Correct.
24     Q.   And do you agree that in order to

Page 205

1   fulfill that purpose, the DEA to spot problem areas
2   of diversion, that the suspicious order reports
3   should be sent to the DEA when they were
4   discovered?
5      MR. STOFFELMAYR:  Objection to the form.
6   BY THE WITNESS:
7      A.   I believe there is some reporting
8   requirement there from a timeliness perspective.  I
9   don't know what it is.
10  BY MR. MOUGEY:
11     Q.   But -- and I'm not asking you a
12  technical.  I'm asking for just a general
13  understanding that Walgreens' purpose in sending
14  suspicious orders to the DEA was to assist the DEA
15  in identifying diversion, correct?
16     A.   Yes.
17     Q.   And you could understand why the DEA
18  would want those reports contemporaneous to when
19  Walgreens discovered them, correct?
20     MR. STOFFELMAYR:  Objection to the form.
21  BY THE WITNESS:
22     A.   Yes.
23  BY MR. MOUGEY:
24     Q.   And that getting those reports weeks or

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1   a month later didn't fulfill the purpose to assist
2   the DEA in contemporaneously identifying areas of
3   diversion, correct?
4        MR. STOFFELMAYR:  Objection to the form.
5   BY THE WITNESS:
6        A.   Well, I don't know what the DEA's -- I
7   don't know how fast the DEA acts.  I don't know
8   whether a week after it's done is too late for the
9   DEA or 30 days is too late for the DEA.  I don't
10  know how quick they're acting on information.
11  BY MR. MOUGEY:
12       Q.   Well, you would agree with me that --
13  let's just keep going.
14       If you would, sir, please go to page 26,
15  paragraph 8, "Walgreens failed to maintain an
16  adequate suspicious order reporting system and as a
17  result, has ignored readily identifiable orders and
18  ordering patterns that, based on information
19  available throughout the Walgreens Corporation,
20  should have been obvious signs of diversion
21  occurring at Respondent's customer pharmacies."
22       Did I read that right?
23       A.   You did.
24       Q.   And do you agree with the DEA statement

Page 207

1   that I just read in paragraph 8?
2        MR. STOFFELMAYR:  Objection to the form.
3   BY THE WITNESS:
4        A.   No, I don't.
5   BY MR. MOUGEY:
6        Q.   Paragraph 9, "Respondent's practice with
7   regard to suspicious order reporting was to send
8   the local DEA field office a monthly report labeled
9   'Suspicious Control Drug Orders.'"
10       Do you see that, sir?
11       A.   I do.
12       Q.   And you don't have any reason to
13  question the veracity of that or the truth of that
14  first sentence in paragraph 9, correct?
15       A.   I don't know one way or another.
16       Q.   "Two reports were provided, one for
17  suspicious orders of Schedule II drugs, another for
18  suspicious orders of drugs in Schedules III through
19  V.  These reports were transmitted on Respondent's
20  behalf from Walgreens' corporate headquarters in
21  Deerfield, Illinois."
22       And that's the corporate headquarters,
23  right?
24       A.   That's correct.

Page 208

1        Q.   "Respondent's suspicious order report
2   for December '11 appears to include suspicious
3   orders placed by its customers for the past six
4   months.  The report for just suspicious orders of
5   Schedule II drugs is 1,712 pages and includes
6   reports on approximately 836 pharmacies in more
7   than a dozen states and Puerto Rico."
8        Do you see that, sir?
9        A.   I see it.
10       Q.   Did I read that right?
11       A.   You did.
12       Q.   "The reports are based on a formula that
13  assigns an average monthly order for a particular
14  drug, which is then multiplied by a 'DEA factor,'
15  (which is always 3, regardless of the drug or the
16  average order amount).
17       Do you see that, sir?
18       A.   I see it.
19       Q.   And do you have any understanding of
20  what formula or criteria Walgreens was using to
21  identify suspicious orders that it was reporting to
22  the DEA?
23       A.   I do not.
24       Q.   Under paragraph 10, take your attention

Page 209

1   to the four lines up on the right-hand side, the
2   sentence that begins with, "As such."
3        Do you see that?
4        A.   Yes.
5        Q.   "As such, Respondent's reports,
6   consisting of nothing more than an aggregate of
7   completed transactions, did not comply with the
8   requirement to report suspicious orders as
9   discovered, despite the title Respondent attached
10  to those reports."
11       Do you see that, sir?
12       A.   I do.
13       Q.   Sitting here today, sir, do you have any
14  understanding of whether Walgreens was performing
15  due diligence on the orders it identified to the
16  DEA as suspicious?
17       A.   Prior to this -- prior to the inception
18  of Pharmaceutical Integrity, no.
19       Q.   No, you don't have an understanding or
20  no, Walgreens was not performing due diligence on
21  the orders that it was supplying to the --
22  identifying for the DEA?
23       A.   I have no understanding.
24       Q.   When you started or initiated the

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1   Pharmaceutical Integrity Department, you didn't go
2   back and ask anyone, "What are we doing to perform
3   due diligence on suspicious orders"?
4       A.   I had conversations with the attorneys
5   to bring me up to speed on what the current
6   practice was.
7       Q.   And could anybody point you to any due
8   diligence files that were performed on these 1,712
9   pages of reports identified that were given to the
10  DEA?
11      MR. STOFFELMAYR: Objection to the form.
12  BY THE WITNESS:
13      A.   That -- that wasn't the discussion.  The
14  discussion was around process.
15  BY MR. MOUGEY:
16      Q.   Could you -- could anyone point you to
17  any process and evidence of that process that there
18  was due diligence being performed on suspicious
19  orders that Walgreens was providing to the DEA?
20      A.   The process that was described was the
21  reporting process to the DEA.
22      Q.   Yes, sir.  And no one ever described any
23  process to you that there was due diligence being
24  performed on orders identified as suspicious by

Page 211

1   Walgreens before they were shipped, correct, sir?
2       A.   No one ever described to me that
3   process.
4       Q.   Were you told that there was no due
5   diligence being performed on orders that were
6   identified as suspicious and reported to the DEA?
7       A.   The discussion, again, was around the
8   process of reporting.
9       Q.   I understand.  But were you told that
10  there was no process for performing due diligence
11  on orders that were identified by Walgreens and
12  then reported to the DEA?
13      MR. STOFFELMAYR: Objection to the form.  Go
14  ahead.
15  BY THE WITNESS:
16      A.   I was not told one way or another as
17  respects to the...
18  BY MR. MOUGEY:
19      Q.   Did you ask someone, "Are we performing
20  due diligence on our suspicious orders"?
21      A.   No, I did not.
22      Q.   Did you go seek out any opinion from
23  anyone out of the compliance department whether
24  that would be wise?

Page 212

1       A.   I did not.
2       Q.   So, you're now directly in charge of the
3   pharmaceutical department in late 2012, correct?
4       A.   Correct.
5       Q.   Early 2013 we're building out the
6   suspicious order monitoring policies and procedures
7   through Pharmaceutical Integrity, correct?
8       A.   Correct.
9       Q.   Did you go ask anybody at any point in
10  time, "How do I effectively build out the due
11  diligence component or requirement of our
12  suspicious order monitoring responsibilities"?
13      A.   Certainly, but it wasn't retrospective.
14  It was prospective.  I wasn't concerned as much
15  with what had been occurring.  What I was concerned
16  with is what were we going to do moving forward.
17      Q.   So, here we have this organization with
18  a couple of hundred thousand employees and you
19  didn't decide am I going to pave a new road or use
20  the road that we've already paved before for due
21  diligence?
22      MR. STOFFELMAYR: Objection to the form.
23  BY MR. MOUGEY:
24      Q.   Your -- go ahead.

Page 213

1       A.   The objective that we had was what are
2   we going to do moving forward.  It wasn't -- it
3   wasn't a -- there wasn't -- the concern was not
4   about so much as what the current process was or
5   what had occurred.  It was about what are we going
6   to do moving forward.
7       Q.   Mr. Swords, your CV touts, in more than
8   one instance, your ability to effectively implement
9   cost-saving measures at Walgreens, correct?
10      A.   Yes.
11      Q.   You touted in your resume on more than
12  one occasion your ability to create processes and
13  procedures efficiently to improve the profitability
14  of Walgreens, correct, sir?
15      A.   Yes.
16      Q.   And, sir, it's your testimony to this
17  jury today that with all of your experience in
18  developing efficient procedures, you never asked
19  anyone at Walgreens what system was in place prior
20  to the creation of Pharmaceutical Integrity on
21  performing due diligence on suspicious order?
22      A.   That's correct.  I never discussed due
23  diligence.  What I understood was the process we
24  had was reporting of the suspicious orders to the

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  DEA. That's what I based my knowledge on and
2  that's where we started from a roadmapping
3  perspective for Pharmaceutical Integrity.
4      Q.  So, Mr. Swords, one of the -- who's
5  built his career on creating efficient processes on
6  Walgreens, never asks about what the retrospective
7  process was but just decides to get out the new
8  equipment and pave a brand-new road. Is that your
9  testimony today, sir?
10     A.  That's my testimony.
11     MR. STOFFELMAYR: Objection to the form. Go
12  ahead.
13  BY MR. MOUGEY:
14     Q.  Sir, did you have an understanding when
15  you came into Pharmaceutical Integrity in the
16  beginning, middle -- I'm sorry.
17         Is it your understanding when you came
18  into Pharmaceutical Integrity in 2012 that there
19  was an opiate epidemic?
20     A.  I quickly became aware of the issue,
21  yes.
22     Q.  But you weren't prior to coming into
23  Pharmaceutical Integrity?
24     A.  No.

Page 215

1      Q.  Were you aware that there had been
2  ongoing Congressional hearings on the opiate
3  epidemic beginning as early as 2000?
4      A.  Not that I recall.
5      Q.  Were you aware that there had been at
6  the point in time when Pharmaceutical Integrity was
7  created in 2012 that there had been 12 or 13 years
8  of Congressional hearings and investigation into
9  the use of opiates in this country?
10     MR. STOFFELMAYR: Objection to the form.
11  BY THE WITNESS:
12     A.  I was not.
13  BY MR. MOUGEY:
14     Q.  You were not aware from all of your time
15  at Walgreens on the pharmacy side that deaths
16  related to overdoses from opiates year in and year
17  out were increasing over the course of a decade?
18     A.  I was not.
19     Q.  Zero training at Walgreens prior to
20  Pharmaceutical Integrity working your way all the
21  way up to the pharmacy side beginning in 1986 all
22  the way to Pharmaceutical Integrity in 2012, you
23  had absolutely zero training on an opiate epidemic
24  that was getting larger and larger and larger as we

Page 216

1  proceeded through 2000, 2001, 2002, all the way up
2  to Pharmaceutical Integrity's creation in 2012?
3      A.  I did not.
4      MR. STOFFELMAYR: Objection to the form.
5      THE WITNESS: Sorry.
6      MR. STOFFELMAYR: Go ahead.
7  BY MR. MOUGEY:
8      Q.  I'm sorry. Your answer was "I did not"?
9      A.  I did not.
10     Q.  Sir, you understand what the word
11  "systemic" is?
12     A.  Yes.
13     Q.  And what is your understanding of what
14  the word "systemic" is?
15     A.  Depends on how the word is used.
16     Q.  Just I'm asking you just for a
17  definition of what your understanding.
18     A.  Widespread.
19     Q.  Widespread?
20     A.  Ingrained.
21     Q.  A culture failure?
22     MR. STOFFELMAYR: Objection to the form.
23  BY THE WITNESS:
24     A.  I don't -- I gave you my understanding

Page 217

1  of it.
2  BY MR. MOUGEY:
3      Q.  Do you believe that the Walgreens
4  failure to identify suspicious orders and perform
5  due diligence on those suspicious orders was
6  systemic or widespread?
7      MR. STOFFELMAYR: Objection to the form.
8  BY THE WITNESS:
9      A.  No.
10  BY MR. MOUGEY:
11     Q.  And, sir, if you would, turn to page 33
12  of 343.
13     A.  Okay.
14     Q.  Do you see paragraph 23?
15     A.  Yes.
16     Q.  And the third line down, do you see the
17  DEA's use of "systemic shortcomings"?
18     A.  I see the use of the word, yes.
19     Q.  And the use of the word in paragraph 23
20  was the DEA allegation that there were systemic
21  shortcomings in regard to Walgreens' dispensing of
22  controlled substances II and III, more specifically
23  opiates?
24     A.  Well, I think the full sentence states

55 (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  that the voluntary dispensing restrictions enacted
2  by us were not sufficient in whoever's view this is
3  that's writing this.
4      Q.   Well --
5      A.   That's what the full sentence says.
6      Q.   I understand.  Page 33 of 343.  If you'd
7  turn back to page 23 of 343.  What I want to point
8  out is that paragraph 23 is part of --
9      MR. STOFFELMAYR:  Paragraph?
10     MR. MOUGEY:  23.
11     MR. STOFFELMAYR:  I'm sorry.  Never mind.
12 BY MR. MOUGEY:
13     Q.   What I wanted to point out, sir, is that
14 paragraph 23 is part of the immediate suspension of
15 Walgreens' Jupiter distribution center.
16     Do you see that, sir?
17     A.   Yes.
18     Q.   And that paragraph 23, the systemic
19 shortcomings, the widespread problems within
20 Walgreens, is part of the Jupiter distribution
21 center, correct, sir?
22     MR. STOFFELMAYR:  Objection to the form.
23 BY THE WITNESS:
24     A.   The -- the reference that they're making

Page 219

1  is in response to the immediate suspension of
2  registration for Jupiter.  They're talking about
3  the dispensing here for Jupiter.
4  BY MR. MOUGEY:
5      Q.   What they're referring to in paragraph
6  23 is "voluntary dispensing restrictions."
7      Do you see that, sir?
8      A.   I see the words, yes.
9      Q.   And the voluntary dispensing
10 restrictions would include Walgreens' targeted Good
11 Faith Dispensing Policies, correct, sir?
12     MR. STOFFELMAYR:  Objection to the form.
13 BY THE WITNESS:
14     A.   I understand that's the allegation that
15 they're making in the Order to Show Cause.
16 BY MR. MOUGEY:
17     Q.   Yes, sir.  If we look at that paragraph
18 in total, "Voluntary dispensing restrictions
19 enacted either in anticipation of or in reaction to
20 regulatory action," and regulatory action would be
21 the DEA, correct, sir?
22     A.   Yes.
23     Q.   "Do not indicate to me that Respondent
24 and its parent company have recognized and

Page 220

1  adequately reformed the systemic shortcomings
2  discussed herein."
3      Correct, sir?
4      A.   That's what it says.
5      Q.   That's a very serious allegation in this
6  document, that there were systemic shortcomings
7  within Walgreens, correct, sir?
8      A.   That's the allegation, yes.
9      Q.   The paragraph goes on, "On the contrary,
10 when a company undertakes to survey its stores for
11 regulatory compliance, then selectively edits that
12 survey for the explicit purpose of avoiding
13 evidence of its own non-compliance, as Walgreens
14 apparently did in May 2011, claims of effective
15 remedial measures have less credibility.  I give
16 significant weight to the fact that Walgreens
17 appears to have deliberately structured certain of
18 its anti-diversion measures to avoid learning about
19 and/or documenting evidence consistent with
20 diversion.  At best, I regard this as deliberate
21 indifference on Walgreens' part as to its
22 obligations as a DEA registrant."
23     Correct, sir?
24     A.   That's what it says.

Page 221

1      MR. STOFFELMAYR:  Objection to the form.
2      Hold on.
3  THE WITNESS:  I'm sorry.
4  BY THE WITNESS:
5      A.   That's what it says, yes.
6  BY MR. MOUGEY:
7      Q.   And you understand what "remedial
8  measures" mean, correct, sir?
9      A.   Yes.
10     Q.   And remedial measures means how am I
11 going to fix this problem, right?
12     A.   Generally speaking, yes.
13     Q.   Yes, sir.  So, in part of your education
14 process to address the ongoing opiate epidemic to
15 educate yourself, Walgreens set up meetings with
16 lawyers, correct, sir?
17     A.   Yes.
18     Q.   And here we are today talking to a jury
19 about Walgreens' responsibilities and its measures
20 taken to address the opiate epidemic, yet your
21 lawyer is telling you not to answer because you
22 were directed to go talk to counsel, correct, sir?
23     MR. STOFFELMAYR:  Objection to the form.
24 BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1      A.   My understanding is my attorney has said
2   not to disclose what was attorney-client privilege.
3   BY MR. MOUGEY:
4      Q.   Walgreens didn't send you to the outside
5   Walgreens compliance folks, correct?
6      A.   I spoke with compliance folks as well,
7   yes.
8      Q.   You testified earlier today that your
9   education process about Walgreens' responsibility
10  came from lawyers, correct, sir?
11     A.   That's correct, yes.
12     Q.   So, do you believe that that's part of
13  Walgreens' plan was to cover up the information
14  given to you under the guise of attorney-client
15  privilege by talking to outside counsel and not
16  getting the information directly from the people on
17  the front lines?
18     MR. STOFFELMAYR:  Objection to the form.
19  BY THE WITNESS:
20     A.   I certainly don't believe that was the
21  intent.
22  BY MR. MOUGEY:
23     Q.   Don't you find it odd that your
24  education process, you weren't directed to meet

Page 223

1   with a series of people on the front lines but were
2   instead sent to meet with lawyers from DC to find
3   out what's going on at Walgreens?
4      MR. STOFFELMAYR:  Objection to the form.
5   BY THE WITNESS:
6      A.   I don't find that peculiar at all.
7   BY MR. MOUGEY:
8      Q.   And that type of conduct you don't
9   believe, meaning covering up communications about
10  what was going on at Walgreens under the guise of
11  attorney-client, is what the DEA is referencing
12  here in paragraph 23?
13     A.   These are --
14     MR. STOFFELMAYR:  Objection to the form. Go
15  ahead.
16  BY THE WITNESS:
17     A.   These are allegations.
18  BY MR. MOUGEY:
19     Q.   The type of conduct alleged in paragraph
20  23, the systemic shortcomings, the covering up,
21  effective -- I'm sorry -- selectively editing
22  surveys for the explicit purpose of avoiding
23  evidence of its own non-compliance, is that
24  consistent with you being sent to communicate with

Page 224

1   outside counsel about Walgreens' policies and
2   procedures and then covering that up with
3   attorney-client privilege?
4      Is that conduct consistent with what's
5   alleged in paragraph 23?
6      MR. STOFFELMAYR:  Objection to the form.
7   BY THE WITNESS:
8      A.   I'm not sure what the question is.
9   BY MR. MOUGEY:
10     Q.   Covering up communications internally at
11  Walgreens under the guise of attorney-client about
12  Walgreens' internal policies and procedures, is
13  that practice, telling you not to answer today, is
14  that consistent with the allegations in paragraph
15  23 wherein Walgreens selectively edited surveys for
16  the explicit purpose of avoiding evidence of its
17  own non-compliance?
18     A.   There --
19     MR. STOFFELMAYR:  Objection to the form. And
20  please don't raise your voice with the witness.
21     MR. MOUGEY:  I'm not raising my voice with the
22  witness.
23  BY MR. MOUGEY:
24     Q.   Please answer the question, sir.

Page 225

1      A.   There is no process at Walgreens to have
2   me meet with attorneys to cover anything up.
3      Q.   Yet you're being instructed repeatedly
4   today to not answer questions about your
5   educational process on what Walgreens'
6   responsibilities were and what processes and
7   procedures were in place, correct, sir?
8      MR. STOFFELMAYR:  Objection to the form. It's
9   completely untrue.
10  BY MR. MOUGEY:
11     Q.   Correct, sir?  You've been instructed
12  not to testify today repeatedly about your
13  educational process of what the policies and
14  procedures were at Walgreens on suspicious order
15  monitoring when you took over, correct, sir?
16     A.   I have --
17     MR. STOFFELMAYR:  Objection to the form. Go
18  ahead.
19  BY THE WITNESS:
20     A.   I have been instructed not to divulge
21  attorney-client privilege.
22  BY MR. MOUGEY:
23     Q.   About your communications with counsel
24  to educate yourself on the details of what

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  Walgreens' suspicious order monitoring policies and
2  procedures were, correct, sir?
3       MR. STOFFELMAYR: Objection to the form. Why
4  do you keep saying that?
5  BY THE WITNESS:
6       A. Again, I've been instructed by my
7  attorney not to divulge the conversations that took
8  place under attorney-client privilege.
9  BY MR. MOUGEY:
10      Q. About suspicious order monitoring
11 policies and procedures at Walgreens, correct, sir?
12      MR. STOFFELMAYR: Objection to the form.
13 BY THE WITNESS:
14      A. About many things including those.
15 BY MR. MOUGEY:
16      Q. Yes, sir. So, the answer to my question
17 is yes, correct?
18      A. No.
19      MR. STOFFELMAYR: Objection to the form.
20 BY THE WITNESS:
21      A. The answer is not that I have been
22 instructed to mislead or hide information. The
23 information, what I've been instructed is not to
24 convey to you how I went about becoming educated to

Page 227

1  the fact with the attorneys.
2  BY MR. MOUGEY:
3       Q. And that's how you educated yourself was
4  to go meet with attorneys and now not testify today
5  under the guise of attorney-client, correct?
6       MR. STOFFELMAYR: Objection to the form.
7  BY THE WITNESS:
8       A. Part of the education process was the
9  meeting with attorneys.
10 BY MR. MOUGEY:
11      Q. Please turn back to page 1 of 343, sir.
12 We can go through one of these at a time if you'd
13 like, but what I would like to direct -- what I'd
14 like you to do is to look at paragraphs 6, 7, 8, 9
15 and 10. Let me know when you've had a chance just
16 to review those.
17      A. Okay.
18      Q. Paragraphs 6, 7, 8, 9 and 9 all identify
19 several --
20      MR. STOFFELMAYR: You mean 10, right?
21      MR. MOUGEY: No. Thank you, but no.
22      MR. STOFFELMAYR: Okay.
23 BY MR. MOUGEY:
24      Q. Paragraphs 6, 7, 8, 9 all identify

Page 228

1  individual Walgreens stores around the country that
2  had failed to meet their obligations under the
3  Controlled Substance Act as alleged by the DEA,
4  correct, sir?
5       A. No. It identifies six stores in
6  Florida, not around the country.
7       Q. Redo the question.
8            Paragraphs 3, 6, 7, 8 and 9 identify
9  stores from as far away as California to Florida
10 wherein Walgreens received Orders to Show Cause by
11 the DEA for failing to fill -- fulfill its
12 responsibilities under the Controlled Substance
13 Act, correct, sir?
14      MR. STOFFELMAYR: Objection to the form.
15 BY THE WITNESS:
16      A. I'd have to go back and review
17 Appendix A, if you want to give me the reference on
18 the page.
19 BY MR. MOUGEY:
20      Q. I sure will. Page 15, sir.
21      A. 15 of 343?
22      Q. Yes, sir. 15 of 343.
23           That was the one where we started off,
24 looking at California, San Diego.

Page 229

1       A. I got it.
2       Q. The question I asked, sir, was,
3  paragraphs 3, 6, 7, 8 and 9 identify Walgreens
4  stores from as far away as California to Florida
5  wherein Walgreens received Orders to Show Cause
6  from the DEA for failing to fulfill its
7  responsibilities under the Controlled Substance
8  Act, correct, sir?
9       A. It identifies seven stores, six of them
10 in Florida, one in California.
11      Q. So, the answer to my question is yes,
12 correct?
13      A. The answer is yes, it identifies seven
14 stores, one in California and six in Florida.
15      Q. Are you telling the -- this jury today
16 that just seven stores is okay?
17      A. That's all that's listed in this.
18      Q. And that's okay? That's okay?
19      MR. STOFFELMAYR: Objection to the form.
20 Please stop raising your voice.
21 BY MR. MOUGEY:
22      Q. That's okay? Just six or seven stores
23 is okay?
24      MR. STOFFELMAYR: Stop arguing. Stop raising

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  your voice.  Ask a question.
2      MR. MOUGEY:  My voice is not raised.
3      MR. STOFFELMAYR:  Absolutely is, 100 percent
4  is.
5      MR. MOUGEY:  There's a recording.
6      MR. STOFFELMAYR:  100 percent is.  You are
7  arguing with him.  Ask a question.  He will answer
8  your question.
9      MR. MOUGEY:  I have asked a question three or
10  four times before you gave your speech.
11  BY MR. MOUGEY:
12      Q.  Six or seven stores is okay?
13      A.  No, it's not okay.
14      Q.  And have you seen the references that
15  these are examples of systemic failures, systemic
16  shortcomings in Walgreens' system?
17      A.  I saw the opinion --
18      MR. STOFFELMAYR:  Objection to the form.  Go
19  ahead.
20      THE WITNESS:  I'm sorry.
21  BY THE WITNESS:
22      A.  I saw the opinion in here that that was
23  the writer's opinion, yes.
24  BY MR. MOUGEY:

Page 231

1      Q.  Sir, staying on page 15, you see the
2  reference under "Background" "On September 30,
3  2009."
4          Do you see that, sir?
5      A.  I do.
6      Q.  So, Walgreens had notice from the DEA as
7  early as 2009 that it had shortcomings with its
8  system?
9      MR. STOFFELMAYR:  Objection to the form.
10  BY THE WITNESS:
11      A.  If you'd like, I'll read the whole
12  thing.  I don't -- I'm not sure what the Memorandum
13  of Agreement or what was involved with this store,
14  but I'll be happy to read it if you'd like me to.
15  BY MR. MOUGEY:
16      Q.  Whatever you need to do to answer the
17  question.
18      A.  Okay.  Then I'll read it.
19      Q.  If you want to sit and take your time
20  reading the whole thing, go ahead, as we have
21  already walked through paragraphs 1 and 2.  But if
22  you want to do it again, feel free.
23          Paragraphs 1 and 2 don't answer your
24  question?

Page 232

1      A.  Yep.
2      Q.  They do answer your question, right?
3      A.  What's the question?
4      Q.  Well, paragraph -- let's look at
5  paragraph 2.
6      A.  Okay.
7      Q.  "The Order to Show Cause alleged that
8  Walgreens," this is San Diego store, "dispensed
9  controlled substances to individuals based on
10  purported prescriptions issued by physicians who
11  were not licensed to practice medicine in
12  California."
13          Right?
14      A.  That's what it says, yes.
15      Q.  So, clearly, Walgreens' system failed to
16  detect prescriptions from unlicensed physicians in
17  California, correct?
18      MR. STOFFELMAYR:  Objection to the form.
19  BY THE WITNESS:
20      A.  That's what -- that's what it says, yes.
21  BY MR. MOUGEY:
22      Q.  No. 2, did you fix that problem when
23  Pharmaceutical Integrity opened in late '12, early
24  '13?

Page 233

1      A.  I believe we did.
2      Q.  Do you know how long that went on that
3  Walgreens' system allowed prescriptions of
4  controlled substances to be dispensed to physicians
5  that weren't even licensed in the state they were
6  issued in?
7      MR. STOFFELMAYR:  Objection to the form.  Go
8  ahead.
9  BY THE WITNESS:
10      A.  I should rephrase.  I believe that the
11  system was corrected at the time this occurred.
12  BY MR. MOUGEY:
13      Q.  No. 2, "Dispensed controlled substances
14  to individuals located in California based on
15  Internet prescriptions issued by physicians for
16  other than a legitimate medical purpose and/or
17  outside the usual course of professional practice
18  in violation of federal and state law."
19          Do you see that, sir?
20      A.  I do.
21      Q.  That was as of 2009, correct?
22      A.  Yes.
23      Q.  No. 3, "Dispensed controlled substances
24  to individuals that Walgreens knew or should have

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 known were diverting the controlled substances."
2      Do you see that, sir?
3    A.  I do.
4    Q.   And that's as of 2009, correct?
5    A.   Correct.
6    Q.   And these Orders to Show Cause in
7  paragraphs 6, 7, 8, 9, continued after this 2009
8  agreement, correct, sir?
9    A.   That's correct.  They're different time
10 frame.
11   Q.   And, sir, if you look at page 2 of 343.
12   A.   Okay.
13   Q.   Do you see the words "Stipulation and
14 Agreement"?
15   A.   I do.
16   Q.   What does "Stipulation and Agreement"
17 mean to you?
18   A.   What it means to me is this is the terms
19 and what we've agreed to do.
20   Q.   Paragraph 2, "Walgreens acknowledges
21 that suspicious order reporting for distribution to
22 certain pharmacies did not meet the standards
23 identified by DEA in three letters from DEA's
24 Deputy Assistant Administrator, Office of Diversion

Page 235

1  Control, sent to every registered manufacturer and
2  distributor, including Walgreens," and it provides
3  the date going back to 2006.
4      Correct, sir?
5    A.   That's what it says, yes.
6    Q.   Yes, sir.  And you understand that
7  Walgreens has acknowledged and agreed that
8  Walgreens' suspicious order monitoring reporting
9  failed to meet the standards as identified in those
10 letters?
11   A.   That's what it says, yes.
12   Q.   I understand that's what it says.
13      Do you agree with that in your position
14 at Walgreens?
15      Based on your review getting
16 Pharmaceutical Integrity off the ground, doing all
17 the due diligence you performed to educate yourself
18 on all the details, do you agree that Walgreens'
19 suspicious order reporting on the distribution side
20 did not meet the standards identified by the DEA?
21   MR. STOFFELMAYR:  Objection to the form.
22 BY THE WITNESS:
23   A.   Yes.
24 BY MR. MOUGEY:

Page 236

1    Q.   Do you agree, sir, as well that
2  Walgreens acknowledges that certain Walgreens
3  retail pharmacies did on some occasions dispense
4  certain controlled substances in a manner not fully
5  consistent with its compliance obligations under
6  the Controlled Substance Act?
7    MR. STOFFELMAYR:  Objection to the form.
8  BY THE WITNESS:
9    A.   Yes.
10 BY MR. MOUGEY:
11   Q.   And you agree, sir, that that is an
12 accurate statement?
13   MR. STOFFELMAYR:  Objection to the form.
14 BY THE WITNESS:
15   A.   Yes.
16   MR. MOUGEY:  Kaspar, I am moving to a couple
17 new docs.  It's 12:25.  Do you want to stop for
18 lunch, take a half hour, go to 1:00?
19   MR. STOFFELMAYR:  It looks like it's out
20 there.  Yeah, we can break now.
21   MR. MOUGEY:  Okay.
22   THE VIDEOGRAPHER:  We are off the record at
23 12:22 p.m.
24      (WHEREUPON, a recess was had

Page 237

1      from 12:22 to 12:52 p.m.)
2    THE VIDEOGRAPHER:  We are back on the record
3  at 12:52 p.m.
4  BY MR. MOUGEY:
5    Q.   Mr. Swords, you do not believe there
6  were systemic shortcomings within Walgreens
7  regarding its suspicious order monitoring policies
8  and procedures in relation to its distribution
9  centers, correct, sir?
10   A.   I don't have an opinion on the
11 distribution side of it.  I wasn't involved in the
12 suspicious order monitoring process.
13   Q.   I am a little confused by that.  We have
14 spent hours going through your role where
15 Pharmaceutical Integrity group reported directly to
16 you, correct?
17   A.   Yes.
18   Q.   And they kept you up to date on their
19 progress made in developing the suspicious order
20 monitoring policies and procedures on the
21 distribution side, correct?
22   A.   Let me clarify.  I was speaking --
23   Q.   Yeah, please.
24   A.   I was speaking prior to the formation of

60  (Pages 234 to 237)

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1  Pharmaceutical Integrity.
2      Q.   Up until 2013, you had been intimately
3  involved in almost every component of Walgreens on
4  the pharmacy side, correct?
5      A.   I had significant responsibilities on
6  the pharmacy side, yes.
7      Q.   And you saw, my guess is, dozens and
8  dozens and dozens of different kinds of reports and
9  updates regarding Walgreens' pharmaceutical
10 operations, correct?
11     A.   Yes.
12     Q.   You've seen policy manuals on different
13 components of Walgreens related to its
14 pharmaceutical dispensing policies and practices,
15 correct?
16     A.   I've certainly seen policies.  I
17 wouldn't refer to them as manuals, but yes.
18     Q.   You've seen operations policies and
19 procedures related to Walgreens, correct?
20     A.   Yes.
21     Q.   And, so, up until your involvement with
22 Pharmaceutical Integrity in sometime in 2012, you
23 have absolutely zero interaction with anyone from
24 any department related to Walgreens' role as a

Page 239

1  distributor in its suspicious order monitoring
2  policies?
3      A.   That's correct.
4      Q.   Is that because there wasn't a
5  department that was responsible for implementing
6  Walgreens' suspicious order monitoring policies and
7  procedures?
8      A.   No.  Like I said, I wasn't involved in
9  it.  I don't know what the process was.
10     Q.   If there were regulatory problems with
11 the pharmacies that you were responsible for,
12 wouldn't you expect someone from Walgreens to keep
13 you up to speed on what was happening?
14     A.   It depends on what the issue was.
15     Q.   Regulatory actions involving Walgreens
16 violations under the Controlled Substance Act?
17     A.   At what time frame are you referring to?
18     Q.   Up until Pharmaceutical Integrity.
19     A.   No, it would not have been.
20     Q.   But somehow you were handpicked to run
21 the department responsible for compliance with the
22 Controlled Substance Act and, more specifically,
23 the suspicious order monitoring policies?
24     A.   That's correct.

Page 240

1      Q.   The algorithm or the metric used to
2  identify suspicious orders, when you started or
3  began in Pharmaceutical Integrity in 2012, did you
4  continue to use that same policy or procedure?
5      A.   That was -- that was handled by the
6  folks under me.  I wasn't involved directly with
7  that.  I couldn't -- I couldn't speak to what the
8  algorithm was or how it worked.
9      Q.   I don't think I asked you that.  Okay.
10 I didn't ask you how, what it was.  I didn't ask
11 you the metric.  I didn't ask you the formula.  I
12 didn't ask you what it was.
13          I just asked you:  Was the same policy
14 and procedure in place to identify suspicious order
15 monitoring prior to Pharmaceutical Integrity in
16 2012, did you continue using a similar metric?
17     MR. STOFFELMAYR:  Objection to the form.
18 BY THE WITNESS:
19     A.   What we did was build upon what we --
20 what had previously been done.
21 BY MR. MOUGEY:
22     Q.   So, the answer is yes?
23     MR. STOFFELMAYR:  Objection to the form.
24 BY MR. MOUGEY:

Page 241

1      Q.   You built on the same or similar metric
2  that was used prior to you getting there?
3      A.   I would -- I would clarify -- I would
4  consider it an enhancement of what was being done,
5  yes.
6      Q.   What specifically was enhanced?  What
7  did you build on once you started with
8  Pharmaceutical Integrity?
9      A.   Well, we -- you reviewed some of it
10 earlier today with the portal, the compliance
11 policy around targeted good faith dispensing,
12 the --
13     Q.   Hold on a minute.
14     MR. STOFFELMAYR:  Hold on.
15 BY MR. MOUGEY:
16     Q.   I thought good faith dispensing was --
17     MR. STOFFELMAYR:  He was in the middle of an
18 answer.
19 BY MR. MOUGEY:
20     Q.   Good faith dispensing is the dispensing
21 side.  I am talking about the distribution side.
22 The algorithm used to identify suspicious orders.
23 That's what we are talking about, right?
24     MR. STOFFELMAYR:  Please don't interrupt him.

61 (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

BY MR. MOUGEY:

Q.   That's what we're talking about, right?

A.   Well, I previously answered that I wasn't involved directly with the algorithm. You asked me a question about what we did to enhance it. I was describing what I viewed as some of the enhancements that we made.

Q.   The algorithm wasn't used for good faith dispensing. That was totally separate you testified to earlier, correct?

MR. STOFFELMAYR:  Objection to the form.

BY THE WITNESS:

A.   Yes. What I was referring to, you -- my understanding of your question was what enhancements were made. I was referring to the broad sense of what enhancements were made.

BY MR. MOUGEY:

Q.   To the algorithm, to the metric, to the suspicious order monitoring formula, what enhancements were made?

A.   I wasn't involved in the algorithm. I can't -- I can't tell you what specific enhancements were made to the algorithm.

Q.   So, you just know enhancements were

Page 243

made?

A.   I know that improvements were made, yes.

Q.   So, what is the basis of your testimony today that enhancements were made but you don't specifically know?

A.   Because I saw the results of what happened. We put steps into place. We put monitoring into place. We had steps where ceiling limits were put into place. All those things occurred with Pharmaceutical Integrity.

Q.   And those worked?

A.   I believe they were very effective.

Q.   How many people did you have working in Pharmaceutical Integrity at its peak?

A.   I think we have six people there.

Q.   Six people. What -- can you give me some quantifiable metrics of why you believed it was -- it worked?

A.   Well, we know we had orders that were number of orders reviewed, generally from, you know, from a regulatory perspective. I believe that the regulators and folks that we had conversations with felt like we were taking the right steps. Dealing with other inside industry

Page 244

folks, they felt like the steps we were taking were good steps and good measures. So, this is what we based it on.

Q.   So, people told you it was working?

A.   Yes.

Q.   You have no -- sitting here, you have no quantifiable measures -- when you said "this is working," what quantifiable measures can you tell me?

A.   Well, we know that we decreased the amount of shipments. So, that would tell you that we were hitting ceiling levels and applying appropriate, you know, applying control measures to the -- to the issue.

Q.   That's a quantifiable one. Why don't you give me some meat on the bones on decreased number of shipments?

A.   I don't have the specifics on that.

Q.   Anything general?

A.   There were -- there was a decrease in the amount of product shipments on the Schedule II items.

Q.   That's it. Anything else?

A.   Well, also decreased dispensing along

Page 245

with the shipments, right. So, you don't buy stuff you don't sell. We didn't -- we didn't -- we didn't dispense as many prescriptions because of the targeted good faith dispensing actions that we took into place and some of the other things we put into place. So, that decreased the shipments as well.

Q.   What year did you see the decrease begin?

A.   Almost immediately.

Q.   Any idea just generally percentage-wise what the decrease in the shipments of Schedule II?

A.   I don't recall what it was.

Q.   I mean, was it 75 or was it 7?

A.   Number-wise?

Q.   Percentage.

A.   Oh. It wasn't -- certainly wasn't 75%. It was -- it was probably high single, low double digits kind of thing.

Q.   High single, low double digit percentages decrease in the number of shipments of Schedule II?

A.   Looking across the nation, yes.

Q.   Almost immediately?

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    A.   Almost immediately.
2    Q.   So, give me almost immediately.
3    A.   Six months or so into --
4    Q.   Six months?
5    A.   -- into the process.
6    Q.   Mid-2013.  Fair?
7    A.   Yeah, somewhere in there.
8    Q.   Okay.  So, peak we said we had six
9    people, right?
10        MR. STOFFELMAYR:  Objection to the form.
11   BY MR. MOUGEY:
12   Q.   In Pharmaceutical Integrity?
13   A.   Yes.
14   Q.   Okay.  And some of them weren't even
15   added until February, even March of 2013, right?
16   A.   The staff was built out during that
17   time, yes.
18   Q.   So, by middle of 2013, within six
19   months, Walgreens had decreased Schedule II
20   shipments low single digit -- I'm sorry -- high
21   single digit, low double digit numbers?
22   A.   That's my -- that's my recall.
23   Q.   So, 7, 8, 9, 10, 11%, somewhere in that
24   ballpark?

Page 247

1    A.   That's my recollection, yeah.
2    Q.   Any idea what the operational budget of
3    those six people was for the first year?
4    A.   I have no idea.
5    Q.   Let's -- let's run some numbers maybe
6    just in our head.  Okay?  Just ballpark range.
7        What's Ms. Polster make?
8    A.   Loaded all in, quarter of a million.
9    Q.   And the -- let's not do individuals so
10   we get anybody frustrated.
11   A.   Individual --
12   Q.   Let's do the manager level.  Okay?
13   A.   Individual managers, call it 200.
14   Q.   And the analysts?
15   A.   Analysts, probably 120.
16   Q.   Okay.  And my recollection, at the peak
17   we had three or four analysts and four managers,
18   right?
19   A.   Sounds about right.
20   Q.   So, let's just -- let's just call it
21   roughly 400K in analysts and roughly 800K in
22   manager range, 4 times 200, 3 or 4 times 120.  How
23   is that?
24   A.   Okay.  Yeah.

Page 248

1    Q.   Is that fair?  And then we have
2    Ms. Polster.
3        So, if we add those up, that's
4    1.45 million in just overhead on salaries and
5    options and all in, whatever you call it, right,
6    correct?
7    A.   Correct.
8    Q.   Okay.  So --
9    A.   At the support center.
10   Q.   At the support center.
11       There was no technology sea change in
12   the beginning of '13 that enabled Walgreens to make
13   that meaningful impact you referenced on reduction
14   in Schedule IIs, correct?
15       MR. STOFFELMAYR:  Objection to the form.
16   BY THE WITNESS:
17   A.   I'm not sure I understand the question
18   on it.
19   BY MR. MOUGEY:
20   Q.   There wasn't any technology that was
21   invented or came out which enabled Walgreens to all
22   of a sudden start implementing these changes with
23   the decrease in the number of shipments of
24   Schedule IIs in the middle of part of 2013, right?

Page 249

1        MR. STOFFELMAYR:  Objection to the form.
2    BY THE WITNESS:
3    A.   I wouldn't classify it as technology.
4    There were different systems and processes put in
5    place as part of that.
6    BY MR. MOUGEY:
7    Q.   Yes, sir.  So, Walgreens took a handful
8    of people, including yourself, and said we need to
9    enhance our suspicious order monitoring policies
10   and procedures in place and within months had a
11   meaningful impact on the percentage of Schedule IIs
12   shipped throughout the country, correct?
13   A.   Yes.
14   Q.   And nothing had prevented Walgreens from
15   implementing similar measures the decade before,
16   correct?
17       MR. STOFFELMAYR:  Objection to the form.
18   BY THE WITNESS:
19   A.   Not to my knowledge.
20   BY MR. MOUGEY:
21   Q.   Now, are you aware, sir, that there were
22   similar problems with the Perrysburg distribution
23   center as there was with the distribution center in
24   Jupiter?

63 (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1      MR. STOFFELMAYR:  Objection to the form.
2  BY THE WITNESS:
3      A.   What do you mean by similar problems?
4  BY MR. MOUGEY:
5      Q.   The distribution center in Jupiter, you
6  understand that the DEA went in and padlocked the
7  cage with Schedule II and Schedule III opiates,
8  correct?
9      A.   I understand that there were similar
10  actions proposed for the Perrysburg.  I don't know
11  ultimately what happened there.
12      Q.   But the question I asked you was
13  you're -- was a little different.
14          The question I asked you was:  You are
15  aware that the DEA came in and actually locked up
16  the cage with Schedule II and Schedule III opiates
17  in the Jupiter distribution center?
18      A.   Yes, in Jupiter I'm aware of that.
19      Q.   Okay.  So, when I'm talking about
20  similar issues, the DEA thought there was a problem
21  enough to put a padlock on the opiate storage
22  center and distribution center in Jupiter.
23          Just to be clear, those are the kind of
24  problems I'm talking about.  Are we on the same

Page 251

1  page?
2      A.   Okay.
3      Q.   Okay.  So, were you aware that the DEA
4  had similar concerns about the Perrysburg
5  distribution center?
6      A.   I was aware they had similar concerns.
7      Q.   Okay.  So, the Perrysburg distribution
8  center, just to kind of recap some previous
9  testimony, was the second of three distribution
10  centers for Schedule II?
11      A.   Correct.
12      Q.   And that would be OxyContin, amongst
13  others?
14      A.   Yes.
15      Q.   Okay.  And I'm going to hand you, sir,
16  what I'm going to mark as Swords 8.
17          (WHEREUPON, a certain document was
18              marked as Walgreens-Swords Exhibit
19              No. 8:  Administrative Inspection
20              Warrant; WAGMDL00493697 -
21              00493700.)
22  BY MR. MOUGEY:
23      Q.   Which is a copy of a subpoena received
24  by Walgreens for the Perrysburg distribution center

Page 252

1  in -- at least it's signed on February of 2013.
2      A.   Okay.
3      Q.   Okay.  So, you see in the very first
4  page captioned "In the United States District Court
5  for the Northern District of Ohio, Western
6  Division."
7          Do you see that?
8      A.   Yes.
9      Q.   "In the Matter of the Administrative
10  Inspection of Walgreens Corporation," it says
11  Perrysburg, Ohio, correct?
12      A.   Yes.
13      Q.   And if memory serves me correctly,
14  Perrysburg is outside of Toledo, correct?
15      A.   It's close to Toledo.
16      Q.   Yes, sir.  And you see that it's an
17  Administrative Inspection Warrant on the upper
18  right-hand side of the page.
19          Do you see that, sir?
20      A.   Yes.
21      Q.   And it's addressed to "Wayne Groves,
22  Diversion Investigator, and any other authorized
23  Diversion Investigator or special agent of the Drug
24  Enforcement Administration (DEA) of the U.S.

Page 253

1  Department of Justice."
2          Do you see that, sir?
3      A.   I do.
4      Q.   And if you turn to Bates No. 493699,
5  paragraph 4, it's page 3 of the document.
6      A.   Okay.
7      Q.   That the DEA was "authorized to remove
8  for copying from the above-described controlled
9  premises the following records, reports, files and
10  inventories, including computerized records, as are
11  appropriate and necessary to the effective
12  accomplishment of the inspection."
13          Do you see that?
14      A.   I do.
15      Q.   And it goes on in paragraphs A and B to
16  elaborate some specific documents.  Correct?
17          A is the reference to relate to the
18  distribution of controlled substances, correct?
19      A.   It appears that's what it says.
20      Q.   Yes, sir.  And this is February 5, 2013,
21  signed by the U.S. Magistrate Judge, Northern
22  District of Ohio.
23          Do you see that on the last page?
24      A.   Yes, I do.

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1      Q.   Okay.  And, sir, this is almost right on
2  top of the ongoing investigation into the
3  Perrysburg -- I'm sorry -- the Jupiter distribution
4  center in Florida, correct?
5      A.   Yes.
6      Q.   Now, the Perrysburg distribution center
7  was ultimately shut down as far Schedule II and
8  Schedule III controlled substances, correct?
9          MR. STOFFELMAYR:  Objection to the form.
10 BY THE WITNESS:
11     A.   All of our distribution centers
12 eventually were -- after the action in Jupiter, the
13 decision of the company was to discontinue all
14 controlled substance distribution for the
15 company -- by the company for the company,
16 transition that to a wholesaler.
17 BY MR. MOUGEY:
18     Q.   Yes, sir.  Did that have any reason or
19 was that decision made because of the DEA's
20 investigation into those distribution centers?
21         MR. STOFFELMAYR:  Objection to the form.
22 BY THE WITNESS:
23     A.   It was made as a result of some of
24 the -- the actions that were being taken and to

Page 255

1  make sure that we had the appropriate supply of
2  medications moving forward.
3  BY MR. MOUGEY:
4      Q.   That's a little -- that question is a
5  little different than what I think I asked.  You
6  said it was -- your answer was "The actions
7  taken -- were being taken and to make sure we had
8  the appropriate supply of medications."
9          But what I'm asking, sir, is a little
10 different.  What I'm asking was:  Were those
11 distribution centers as far as Schedule II and
12 Schedule III, Perrysburg and Woodland, shut down,
13 no longer distributing opiates, because of the
14 DEA's investigation?
15         MR. STOFFELMAYR:  Objection to the form.
16 BY THE WITNESS:
17     A.   They -- the -- DEA action at the Jupiter
18 warehouse led us to the conclusion that we should
19 not be distributing our own controlled substances
20 and we wanted to transition that into the
21 Cardinal -- at the time Cardinal wholesaler.
22 BY MR. MOUGEY:
23     Q.   Did the decision to shut down Perrysburg
24 have anything to do with the DEA warrant into the

Page 256

1  Perrysburg facility?
2          MR. STOFFELMAYR:  Objection to the form.  Go
3  ahead.
4  BY THE WITNESS:
5      A.   I don't know what -- I wasn't involved
6  in the decision as to whether Perrysburg shuts
7  down.  I know that the strategy of the company was
8  to eliminate the distribution of controlled
9  substances by ourselves.
10 BY MR. MOUGEY:
11     Q.   I wasn't asking if you were involved in
12 the decision to shut it down.  Okay.
13         You are now in charge of, early '13,
14 you're in charge of Pharmaceutical Integrity,
15 right?
16     A.   Yes.
17     Q.   You're in charge of suspicious order
18 monitoring, orders going into those distribution
19 centers, correct?
20     A.   Yes.
21     Q.   That is your direct purview, correct?
22     A.   That's correct.
23     Q.   You are facing actually going to
24 administrative hearing with the DEA and the

Page 257

1  Department of Justice on the Jupiter distribution
2  center, correct?
3      A.   Yes.
4      Q.   Now your Perrysburg distribution center
5  receives a subpoena into similar issues, correct?
6      A.   Yes.
7      Q.   Do you believe that the Perrysburg
8  facility was shut down because of similar problems
9  as to what was happening in Jupiter?
10         MR. STOFFELMAYR:  Objection to the form.
11 BY THE WITNESS:
12     A.   I think it was shut down out of concern
13 of the continued supply of medications to our
14 pharmacies and, you know, the decision was made to
15 transition that business out of Walgreens and into
16 a wholesaler.
17 BY MR. MOUGEY:
18     Q.   There would be no concern about supply
19 unless it was shut down, right?
20         MR. STOFFELMAYR:  Objection to the form.
21 BY THE WITNESS:
22     A.   I suppose you could frame it that way.
23 BY MR. MOUGEY:
24     Q.   I'm not -- it's not a reach here.

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    You're not going to have supply problems unless the
2    distribution center gets shut down, right?
3         MR. STOFFELMAYR:  Same objection.
4    BY THE WITNESS:
5         A.   Correct.
6    BY MR. MOUGEY:
7         Q.   Okay.  So, let's go back to my question.
8         Do you believe that the Perrysburg
9    facility was shut down, Schedule II and
10   Schedule III opiates, because of similar problems
11   of what was happening at the Jupiter distribution
12   center?
13        MR. STOFFELMAYR:  Objection to the form.
14   BY THE WITNESS:
15        A.   I believe it was shut down out of
16   concern of what was occurring in Jupiter that could
17   have an impact on our ability to supply medications
18   at our other -- from our other two distribution
19   centers.
20        The company at that point decided to
21   change the strategy and move to a wholesaler
22   supply -- supplier strategy for controlled
23   substances.
24   BY MR. MOUGEY:

Page 259

1         Q.   I hand you what I've marked as Swords 9.
2              (WHEREUPON, a certain document was
3              marked as Walgreens-Swords Exhibit
4              No. 9:  2/12/13 e-mail string;
5              WAGMDL00478001 -00478002.)
6    BY MR. MOUGEY:
7         Q.   Start at the bottom of the page, an
8    e-mail from Sue Thoss.  Do you know who Sue Thoss
9    is?
10        A.   I do.
11        Q.   And who is Sue Thoss?
12        A.   Sue Thoss was a divisional vice
13   president in our supply and distribution, supply
14   chain and distribution.
15        Q.   Which is the division that you believed
16   was responsible for implementing Walgreens'
17   suspicious order monitoring policy prior to
18   Pharmaceutical Integrity, correct?
19        A.   Correct.
20        Q.   So, Sue Thoss should kind of know
21   something about suspicious order monitoring
22   policies and interactions with the DEA as it
23   relates to the distribution centers, correct?
24        A.   I don't know what Sue Thoss knows.  I

Page 260

1    know where she worked and what her responsibility
2    was.
3         Q.   Right.  But Sue Thoss has under her
4    purview of responsibility, she was responsible for
5    overseeing, as far as your testimony, the
6    suspicious order monitoring policies and procedures
7    at Walgreens in relation to the distribution
8    centers?
9         A.   I don't believe that's what I testified
10   to with Sue Thoss.  I said Sue Thoss was in supply
11   chain and distribution, logistics.  I don't know
12   whether she was responsible for suspicious order
13   monitoring or somebody else in supply chain was
14   responsible for that.
15        Q.   She is a divisional VP, right?
16        A.   Yes.
17        Q.   Fairly senior role, correct?
18        A.   There are a number of them in supply
19   chain.
20        Q.   I didn't ask you how many.  What I asked
21   you was:  A fairly senior role?
22        A.   Yes.
23        Q.   Okay.  Thank you.
24        How many divisional VPs are there in the

Page 261

1    supply chain?
2         A.   At least five that I know of.
3         Q.   And that's across the entire U.S.?
4         A.   Yes.
5         Q.   So, there is five divisional VPs in the
6    supply chain.  Supply chain group is responsible
7    for overseeing Walgreens' suspicious order
8    monitoring policies and procedures, according to
9    your testimony today, prior to Pharmaceutical
10   Integrity, correct?
11        A.   That's correct.
12        Q.   Thank you.  So, Ms. Thoss e-mails a
13   series of folks here, and let's go through them.
14   Just walk me through on the bottom of this e-mail,
15   Bates No. 478001, who all these folks are.
16        Who is Joseph Tiemeyer?
17        A.   I have no idea.
18        Q.   Lynn Guyot?
19        A.   I have no idea.
20        Q.   You don't have any idea who all those
21   people are on that e-mail chain?
22        A.   You asked me about --
23        Q.   That was my next question.  It's a third
24   question.  You didn't know the first two.  So,

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  instead of going through them one by one, do you
2  know any of the people on the e-mail chain?
3    A.  I do, yes.
4    Q.  Which ones do you know?
5    A.  I know Denise Wong.
6    Q.  Okay.  Who is Denise Wong?
7    A.  She was formerly our chief information
8  officer.
9    Q.  Okay.
10   A.  I know Brian Amend.
11   Q.  Okay.
12   A.  I think he is like IT programmer kind of
13  guy.
14   Q.  Okay.
15   A.  Vinayak, same thing, IT.  I'm not sure.
16   Q.  What but just IT?
17   A.  Yeah.  Those are the ones I know.
18   Q.  All right.  And Ms. Thoss relies to this
19  group of individuals, "Last week the DEA came to
20  Perrysburg with subpoenas."  Do you see the date,
21  February 11, right?
22   A.  Yes.
23   Q.  Subpoena we just saw was executed by a
24  federal magistrate on February 3, right?

Page 263

1    A.  Um-hmm.
2    Q.  So, eight days earlier, correct?
3    A.  Yes.
4    Q.  So, "Last week the DEA comes to
5  Perrysburg with subpoenas looking at records for
6  suspicious drug ordering dating back to
7  February 2011."
8        Correct?
9    A.  Yes.
10   Q.  "We believe they could lock Perrysburg
11  up and not allow us to ship from there."
12       Do you see that, sir?
13   A.  Yes, I do.
14   Q.  Was the fact that Walgreens was
15  concerned about the DEA locking up Perrysburg in
16  early '13 being discussed in the Pharmaceutical
17  Integrity Department?
18   A.  Sure.
19   Q.  So, there was concern that Perrysburg
20  was going to succumb to the same problems that the
21  Jupiter distribution center had, correct, sir?
22   MR. STOFFELMAYR:  Objection to the form.
23  BY THE WITNESS:
24   A.  That's correct, which is why I mentioned

Page 264

1  that the strategy was to remove all controlled
2  substances dispensing from Walgreens.
3  BY MR. MOUGEY:
4    Q.  So, now we're talking --
5    A.  I'm sorry.  Let me correct myself.  Not
6  dispensing.  Distribution.
7    Q.  So, now here we are, early '13, that two
8  out of the three distribution centers at Walgreens
9  are talking about being locked up from the DEA yet
10  you don't believe there is any widespread or
11  systemic problems at Walgreens on the suspicious
12  order monitoring policy on the distributor side?
13   MR. STOFFELMAYR:  Objection to the form.
14  BY THE WITNESS:
15   A.  Not with respect to what we were doing
16  on Pharmaceutical Integrity.
17  BY MR. MOUGEY:
18   Q.  February 2013.  You have --
19  Pharmaceutical Integrity is just getting off the
20  ground, correct?
21   A.  Yes.
22   Q.  Do you believe that there were systemic
23  or widespread problems with Walgreens' suspicious
24  order monitoring policies as of the time that

Page 265

1  Walgreens received the subpoena from the DEA and
2  was expressing concerns about being locked up?
3    MR. STOFFELMAYR:  Objection to the form.  Go
4  ahead.
5  BY THE WITNESS:
6    A.  I think there were -- there were
7  certainly gaps or challenges with reporting that we
8  were working through, primarily dating back prior
9  to the understanding of just reporting versus
10  investigating.
11   Q.  Yes, sir.  And those gaps or challenges
12  with reporting were widespread, not just regional
13  issues, correct, sir?
14   MR. STOFFELMAYR:  Objection to the form.  Go
15  ahead.
16  BY THE WITNESS:
17   A.  Well, they -- I don't know how you
18  characterize widespread.  They would have involved
19  all three distribution centers.  All work on the
20  same platform.  So, if it's happening at one
21  distribution center from a reporting structure, you
22  know, IT is IT.
23  BY MR. MOUGEY:
24   Q.  Yes, sir.  So, the gaps that you're

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  referencing would be widespread across the entire
2  distribution network of Schedule II and
3  Schedule III opiates at Walgreens, correct, sir?
4     MR. STOFFELMAYR:  Objection to the form.
5  BY THE WITNESS:
6     A.   Prior to the Pharmaceutical Integrity,
7  yes.
8  BY MR. MOUGEY:
9     Q.   Yes, sir.  There were gaps in Walgreens'
10  suspicious order monitoring policies prior to
11  Pharmaceutical Integrity, beginning in 2013, in
12  relation to Schedule II and Schedule III opiates,
13  correct, sir?
14     MR. STOFFELMAYR:  Objection to the form.  Go
15  ahead.
16  BY THE WITNESS:
17     A.   I think that's certainly the conclusion
18  that the DEA had.
19  BY MR. MOUGEY:
20     Q.   I'm not asking about what the conclusion
21  of the DEA had.  Before you testified you didn't
22  know what the DEA was thinking.
23     Right now I'm asking what Rex Swords
24  thinks, Rex Swords that takes over Pharmaceutical

Page 267

1  Integrity in 2012 that was responsible for and
2  implementing and enhancing the suspicious order
3  monitoring policies.  Right?
4     A.   Yes.
5     Q.   So, here we are several months after
6  you've now taken over, correct, sir?
7     A.   Yes.
8     Q.   And, sir, it is your testimony based on
9  once you began at Pharmaceutical Integrity that
10  there were retrospective gaps in the nationwide
11  distribution at Walgreens of Schedule II and
12  Schedule III narcotics, correct, sir?
13     MR. STOFFELMAYR:  Objection to the form.
14  BY THE WITNESS:
15     A.   With respect to suspicious order
16  monitoring.
17  BY MR. MOUGEY:
18     Q.   Yes, sir.  With respect to suspicious
19  order monitoring at Walgreens prior to
20  Pharmaceutical Integrity, there were gaps --
21     A.   Yes.
22     Q.   -- in Walgreens' policies and
23  procedures, correct, sir?
24     MR. STOFFELMAYR:  Objection to the form.  Go

Page 268

1  ahead.
2  BY THE WITNESS:
3     A.   Yes.
4  BY MR. MOUGEY:
5     Q.   I'm sorry, Mr. Swords.  Bear with me one
6  second.
7     A.   No problem.
8     Q.   Let's talk about Woodland.
9        Woodland is the California distribution
10  center that essentially serviced the western part
11  of the United States with Schedule II and
12  Schedule III, amongst other pharmaceuticals,
13  correct?
14     A.   Correct.
15     Q.   And that is the third distribution
16  center at Walgreens that distributed Schedule II
17  and Schedule III, correct?
18     A.   Correct.
19     Q.   And because of the gaps that you
20  mentioned earlier, pre-Pharmaceutical Integrity,
21  was Woodland told to get out of the C-II operations
22  as soon as possible by the DEA?
23     A.   By the DEA?
24     Q.   Yes, sir.

Page 269

1     A.   Not to my knowledge.
2     Q.   Why do you believe that Walgreens shut
3  down the Woodland C-II operations, Schedule II
4  operations?
5     A.   Because it was our strategy to remove
6  ourselves from the distribution of controlled
7  substances and transfer that to a wholesaler.
8     Q.   So, it was just a coincidental timewise
9  that Walgreens is exiting from distribution of
10  Schedule II and Schedule III at the same time the
11  DEA is issuing warrants on the distribution
12  centers?
13     A.   No, it was precipitated by the Jupiter
14  action, and then we continued.  On review, the
15  strategy was we should just move all of this
16  business to Cardinal instead of being a distributor
17  ourselves.
18     Q.   I will hand you what we will mark as
19  Swords 10.
20        (WHEREUPON, a certain document was
21        marked as Walgreens-Swords Exhibit
22        No. 10:  3/26/13 e-mail with
23        attachment; WAGMDL00663366 -
24        00663368.)

68 (Pages 266 to 269)

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    BY MR. MOUGEY:
2       Q.   Start at the very top of this document,
3    sir, and I'm -- the -- I'm going to mispronounce
4    the name.  I'll just do the last one.  Pandit?
5       A.   Vinayak.
6       Q.   Vinayak.  And what department was
7    Vinayak in?
8       A.   Supply chain.
9       Q.   Supply chain.  You see below that Ms. --
10   is it Ms. Thoss?
11      A.   Yes.
12      Q.   The divisional VP, one of the five, is
13   copied on this e-mail?
14      A.   Yes.
15      Q.   Do you know anyone else on this e-mail
16   chain other than Ms. Thoss and Vinayak?
17      A.   As I stated before, I know Brian Amend.
18   I know Mike DuPont.  I know Morgan Knight.
19      Q.   And what is Vinayak Pandit's role in
20   supply chain, if you know?
21      A.   As I mentioned, he is IT.  You know, I
22   don't know the particular.
23      Q.   So, are you familiar with what Project
24   Forest is?

Page 271

1       A.   I am.
2       Q.   What is Project Forest?
3       A.   That was our movement of all of our
4    distribution to ABC.
5       Q.   So, why the name Project Forest?
6       A.   I have no idea.  We have all kinds of
7    project names.  I don't know how they get
8    generated.
9       Q.   Project Gap, Project Forest.  What's
10   Project Gap?
11      A.   There's all kinds.  I don't know what
12   Project Gap is.  But, I mean, there is all kinds of
13   projects.
14      Q.   So, Project Forest is the migration
15   to -- from Walgreens' distribution centers like
16   Perrysburg, Jupiter and Woodland, to using another
17   vendor?
18      A.   It's the -- it's the migration of all of
19   our prescription distribution to AmerisourceBergen.
20      Q.   Now, when you say "all of our
21   prescription distribution," for every single
22   prescription getting rid of every distribution
23   center or just the three?
24      A.   No, all of them.

Page 272

1       Q.   Okay.  And did that get implemented?
2       A.   Yes.
3       Q.   So, Walgreens at what point in time no
4    longer distributes any pharmaceuticals out of its
5    own warehouses?
6       A.   I don't know the specific time.  It was,
7    you know, '13, '14.  I'm sure Cardinal or ABC could
8    probably give you the exact dates but...
9       Q.   So, Ms. Thoss, the divisional VP of
10   supply chain, is on this e-mail chain wherein
11   they're discussing on the third bullet down that
12   the "DEA wants us to get out of Woodland for C-II
13   operations as soon as possible."
14           Do you see that?
15      A.   I see that statement, yes.
16      Q.   It's the third bullet from the bottom
17   that begins with "DEA"?
18      A.   Yes, I see it.
19      Q.   Did I read that correctly?
20      A.   Yes, you did.
21      Q.   So, was there discussion within
22   Pharmaceutical Integrity in the beginning of 2013
23   that the DEA wanted Walgreens to get out of
24   Woodland with C-II operations?

Page 273

1       A.   I don't remember that specific topic of
2    discussion.  I remember the topic being we are
3    going to get out of the distribution of controlled
4    substances, period.
5       Q.   Wouldn't -- I mean, as the guy running
6    Pharmaceutical Integrity now in charge of
7    suspicious operating -- suspicious order
8    monitoring, if in fact this conversation is
9    accurate with Ms. Thoss and the DEA had told
10   Walgreens that it wanted it out of Woodland,
11   wouldn't you have wanted to know that as you're
12   implementing new policies and procedures to oversee
13   C-II and C-III?
14      A.   Well, it didn't really matter to me
15   whether it was the DEA that wanted it or whatever.
16   Where we were heading was getting out of the
17   distribution.  It wasn't important to me what
18   the -- what the point of getting out of it was.
19           The point was we are going to get out of
20   it.  You have to -- you have to be able to support
21   the go-forward strategy, which is all wholesalers
22   supplied controlled substances.
23      Q.   So, now you were no longer really the
24   manager or the overhead of Pharmaceutical Integrity

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  in charge of suspicious order monitoring policies
2  and procedures over controlled substances.  You
3  were managing a migration away from one
4  distribution strategy to another?
5       MR. STOFFELMAYR:  Objection to the form.
6  BY THE WITNESS:
7       A.   No.  That's not what I was saying.
8  BY MR. MOUGEY:
9       Q.   Yes, sir.  Because you were still
10  running Pharmaceutical Integrity in relation to
11  suspicious order monitoring of controlled
12  substances all the way up until late 2014 on the
13  distribution side, correct?
14       A.   That's correct.
15       Q.   And you -- your testimony to this jury
16  is you didn't want -- you don't think it was
17  important that you knew why Woodland was getting
18  out of distributing drugs like OxyContin.  You
19  just -- it was just important to you that that
20  was -- that model was changing?
21       A.   What I said was is I don't know what the
22  DEA's thought was around Woodland.  What I know is
23  we were moving to a strategy of being wholesaler
24  supplied.  That's where we were building.  That's

Page 275

1  where we were heading.
2       We were heading that way as soon as the
3  action in Jupiter began.  We took a look at it and
4  we said, "Why are we in this business?"
5       Q.   Walgreens decided we have widespread
6  shortcomings.  We're not really good at this
7  distribution model and we need to have other
8  companies, vendors come in to run this part of our
9  operation for us?
10       A.   I don't think I'd characterize it as
11  that.  I think the evaluation was having our -- one
12  of our partners be involved in that process versus
13  us distributing internally, and having that
14  additional layer of oversight in addition to what
15  we were building with Pharmaceutical Integrity, so
16  to speak, that independent analysis and review as
17  part of that was part of the -- part of the
18  strategy.
19       Q.   Pharmaceutical Integrity at the time of
20  this e-mail had been fully staffed for no more than
21  30 days, correct, sir?
22       A.   I don't know the specific timing.  It's
23  possible.  I don't know.
24       Q.   Within a couple months, beginning of

Page 276

1  2013, correct?
2       A.   Yeah, something in there, yeah.
3       Q.   So, at the time that you're being asked
4  to run, oversee Pharmaceutical Integrity, your
5  testimony is that Walgreens made a business
6  decision to get out of the distribution business?
7       A.   That's correct.
8       Q.   So, you were asked to run a department
9  that really was meaningless or had no -- had no
10  significant impact at Walgreens because you all
11  were implementing an exit strategy?
12       A.   That's your characterization, not mine.
13       Q.   No, sir.  I'm asking you a question.
14       A.   No, I don't think I would characterize
15  it as that at all.
16       Q.   That was an important role you were
17  placed in in Walgreens in 2012 to implement and
18  create suspicious order monitoring policies and
19  procedures, correct?
20       A.   I believe it was important -- important
21  work done, yes.
22       Q.   And that group continued all the way to
23  the end of 2014 overseeing Walgreens' distribution
24  of Schedule II and Schedule III opiates, correct,

Page 277

1  sir?
2       A.   Correct.
3       Q.   What is your understanding of when the
4  Woodland operation was shut down?
5       A.   I don't have a date for you.
6       Q.   Even a general range?
7       A.   Couldn't even give you a general range.
8  I don't know when it was.
9       Q.   Now, I don't mean to put words in your
10  mouth.  Just to make sure I am on the same page.
11       When you started Pharmaceutical
12  Integrity and implemented the suspicious order
13  monitoring policy system, do you have a general
14  understanding of the formula that was used to
15  detect suspicious orders?
16       A.   No.  Not the understanding of the
17  formula used.
18       Q.   Do you have a general understanding of
19  the results of the formula that was used?
20       A.   Generally speaking, yes.
21       Q.   And that formula that was used was
22  intended to identify suspicious orders, correct?
23       A.   Yes.
24       Q.   And those suspicious orders were then

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  flagged and reported to the DEA, correct?
2      A.   That's my understanding, yes.
3      Q.   And then before those suspicious orders
4  were flagged and reported to the DEA, there was due
5  diligence performed on those orders before they
6  were shipped, right?
7      A.   On the supply chain?
8      Q.   Yes.
9      A.   I'm not sure what the total process
10 there was on supply chain.  I wasn't involved in
11 that.
12     Q.   All right.  Let's see if we can go
13 through this process, as you understand it, in the
14 beginning of 2013.
15         So, let me hand you what I'm going to
16 mark as Swords 11.
17             (WHEREUPON, a certain document was
18             marked as Walgreens-Swords Exhibit
19             No. 11:  8/26/09 Project Request
20             Estimate; WAGMDL00492067 -
21             00492069.)
22 BY MR. MOUGEY:
23     Q.   Swords 11, which is Bates No. 492067, is
24 an August 26, 2009 memorandum drafted by a

Page 279

1  programmer analyst titled "DEA Suspicious Order
2  Item Limits - Phase II."
3         Do you see that?
4      A.   I do.
5      Q.   I want to direct your attention to the
6  bottom of the first paragraph under "Description"
7  where "Rx Services will have the" -- actually, let
8  me -- I just got started on the wrong stack.
9         I'll tell you what.  Hold off on that,
10 and let me -- I apologize.  I just grabbed the
11 wrong stack.  Keep that Swords 11 in front of you.
12 I'm going to come back to that in just a minute.
13 Okay?
14             (WHEREUPON, a certain document was
15             marked Walgreens-Swords Exhibit
16             No. 12:  6/23/08 memo;
17             WAGMDL00624503 - 00624508.)
18 BY MR. MOUGEY:
19     Q.   Okay.  So, Swords 12 is a memorandum
20 dated June 23, 2008.
21         Do you see that?
22     A.   I do.
23     Q.   And you see the section where it was
24 drafted from Wayne Bancroft and Tracy Morris,

Page 280

1  correct?
2      A.   Yes.
3      Q.   And do you know who Wayne Bancroft and
4  Tracy Morris are?
5      A.   I do not.
6      Q.   And the deliverable was a "proposal for
7  defining 'suspicious orders' in the Walgreens
8  distribution system."
9         Do you see that?
10     A.   I do.
11     Q.   And the regarding or the topic of the
12 memo is the "DEA suspicious order reporting"?
13     A.   I see that, yes.
14     Q.   Sir, you don't have an understanding
15 that the genesis of the algorithm or the
16 methodology or the metrics, whatever you want to
17 call it, for the metrics that were in place you
18 took over, were created by Wayne Bancroft and Tracy
19 Morris?
20     A.   No, I don't.
21     Q.   Under the "Overview," what I want to do
22 is I want to use these documents for you to help me
23 understand your understanding of how the system
24 worked when you took over.  Okay?  So, whether this

Page 281

1  is the same or different.  All right, sir?
2      A.   Okay.
3      Q.   Does that make sense?
4      A.   All right.
5      Q.   So, in 2008, when Mr. Bancroft drafted
6  this memo -- did you review this memo in
7  preparation for today?
8      A.   No, I've never seen it before.
9      Q.   "The DEA is requiring Walgreens to
10 monitor the orders for controlled substances that
11 our stores place on our distribution centers for
12 suspicious activity."
13         Did I read that right?
14     A.   You did.
15     Q.   The next sentence says, "Suspicious
16 orders are defined in terms of order size and order
17 frequency."
18         Do you agree with that sentence?
19     A.   I think that's -- that's part of how you
20 could determine suspicious orders.
21     Q.   Okay.  And the next sentence goes on,
22 "This document proposes a methodology for
23 identifying suspicious orders in terms of order
24 size and order frequency."

71 (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1          Did I get that right?
2     A.    That's what it says, yes.
3     Q.    All right.  Now, I'm going to come back
4  to the first page, but what I'd like you to do is
5  to flip through the next couple pages and look at
6  the methodology on tolerance limits and order
7  frequency and if that appears to be, and I'm not
8  asking you identical, I understand you're not a
9  math Ph.D., but does this look similar to what was
10 in place when you came on Pharmaceutical Integrity
11 that you're saying I really don't understand the
12 formula?
13    A.    I have --
14         MR. STOFFELMAYR:  Objection to the form.  Go
15 ahead.
16         THE WITNESS:  I'm sorry.
17 BY THE WITNESS:
18    A.    I have no idea.
19 BY MR. MOUGEY:
20    Q.    You have no idea?
21    A.    I've never seen this before so I --
22    Q.    Well, I'm not asking -- I'm asking you
23 have you ever even seen the formula that your
24 group --

Page 283

1     A.    No.
2     Q.    Before you answer the question, maybe
3  you could wait until I finish.  Okay?
4     A.    Okay.
5     Q.    Have you ever seen the formula that your
6  group was using at Pharmaceutical Integrity in
7  early 2013?
8     A.    No.
9     Q.    You've never asked to see the formula?
10    A.    No.
11    Q.    Have you ever had anybody explain it to
12 you?
13    A.    Yeah.  They've explained it to me in
14 broad terms.
15    Q.    But you've never said, "Let me see the
16 formula," or ask the guy that wrote it to "Come and
17 help me get educated" --
18    A.    No.
19    Q.    -- "on what I was doing"?
20    A.    Why would I do that?  I don't --
21    Q.    Why would you do that.  I guess that's a
22 good point.  So --
23    A.    I don't -- you know --
24         MR. STOFFELMAYR:  You guys are arguing with

Page 284

1  each other.
2         THE WITNESS:  Okay.
3         MR. MOUGEY:  I don't think we're arguing with
4  at all.
5  BY MR. MOUGEY:
6     Q.    You are answering.  Please go ahead.
7  And while you're answering the question, I don't
8  think it's appropriate that your counsel tells you
9  to stop talking or whatever else.
10         So, go ahead, please.
11         MR. STOFFELMAYR:  Actually I meant you were
12 arguing with him.
13         MR. MOUGEY:  Thank you.  Either way isn't
14 really appropriate.
15 BY MR. MOUGEY:
16    Q.    Go ahead.
17    A.    The level of detail as to the formulaic
18 algorithm is not the level that I need.
19    Q.    I'm not asking you for the -- what I'm
20 asking is generally to understand what you were
21 doing with the formula at Pharmaceutical Integrity
22 in early '13.  Do you have an understanding?
23    A.    Yes.
24    Q.    Okay.  Why don't you tell me in early

Page 285

1  '13 what you think you were doing?
2     A.    We were looking at order history.
3     Q.    How far back?
4     A.    I don't know the specific time frame.
5     Q.    Okay.
6     A.    We would look at order history.  We
7  would look at recent trends on the medication and
8  then we would look at the amount of volume that
9  was -- that was moving compared to their peer
10 groups on some of these issues, and there were a
11 number of factors that would go into determining,
12 you know, the first filter on what would be
13 suspicious in our mind.
14    Q.    What number of factors?
15    A.    I just gave you the ones I can recall.
16    Q.    Okay.  You said, "and then there was a
17 number of factors."  So, you're telling me this is
18 all you can remember?
19    A.    That's what I recall.
20    Q.    And this formula, metric, was in place
21 and still in place up to today in the
22 Pharmaceutical Integrity Department, correct?
23    A.    I don't know what's in place today in
24 Pharmaceutical Integrity.

72 (Pages 282 to 285)

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    Q.   How long did you continue to oversee
2  Pharmaceutical Integrity?
3    A.   I left that a couple years ago.
4    Q.   So, 2016?
5    A.   Yeah.
6    Q.   So, from 2012 to 2016 this is what you
7  can remember, order history, recent trends, volume,
8  and I think you said moving compared to peer groups
9  and then a number of other factors?
10   A.   Right.
11   Q.   That's your understanding?
12   A.   Correct.
13   Q.   Do you have -- order history, I asked
14  you about how long or how far back, you didn't
15  know, right?
16   A.   I don't know.
17   Q.   Do you know what was pulled as part of
18  the order history to look at?  Was it NDC code?
19  Was it by drug family?  How did -- what data pull
20  was there?
21   A.   I don't know the specifics of it.
22   Q.   Really you don't even know the
23  generalities of the order history part, right?
24      MR. STOFFELMAYR: Objection to the form.

Page 287

1  BY MR. MOUGEY:
2    Q.   Other than just the label order history?
3      MR. STOFFELMAYR: Objection to the form.
4  BY MR. MOUGEY:
5    Q.   What do you remember anything about
6  order history?
7    A.   It would -- we were looking back a
8  certain number of weeks on there.  I don't know
9  whether, you know -- I don't know what the number
10  of weeks were, but we were looking in the
11  historical movement of the product, see what the
12  trends were, see --
13   Q.   Before you go into the others, let's
14  stick on order history.
15      You don't know the weeks even generally
16  and you don't know what data was being pulled under
17  the order history component, right?
18   A.   It would have been by product, the
19  movement of that drug for a particular number of
20  weeks.
21   Q.   And I am going to come back at the end
22  and I'm going to ask you how all these parts
23  identified suspicious orders.  Okay?
24      So, recent trends.  What recent trends?

Page 288

1    A.   What's dispensing activity at the store
2  look like more recently.  So, there have been
3  spikes, movements, declines, increases of that
4  particular item.
5    Q.   I apologize, but I could have -- I must
6  have misunderstood.  I thought earlier in the day
7  that the dispensing activity was totally separate
8  from the suspicious order monitoring.  They are
9  interspersed a little bit?
10   A.   Well, you're going -- this is what
11  drives orders.  So...
12   Q.   That would make sense.  So --
13   A.   Maybe I'm misunderstanding your
14  question.
15   Q.   Maybe I misunderstood your answer.  That
16  could be my fault.
17      So, recent trends includes dispensing
18  activities, spikes, movements, indices, ups and
19  downs is what you're looking at?
20   A.   Maybe I need to have a better
21  understanding of what exactly -- are you referring
22  to suspicious order monitoring or are you -- I need
23  to -- I'm not sure I'm following exactly.
24   Q.   Suspicious order monitoring.

Page 289

1    A.   Okay.
2    Q.   We're talking about the formula that you
3  never looked at and your general understanding of
4  what it was.
5    A.   I was --
6      MR. STOFFELMAYR: Objection to the form. Go
7  ahead.
8  BY THE WITNESS:
9    A.   I was giving you some of the parameters
10  that would -- that we'd look at when an order
11  reached us to determine whether we felt there was
12  another review necessary of that.
13  BY MR. MOUGEY:
14   Q.   Okay.
15   A.   Sort of an order of interest, right.
16   Q.   So, let's go back.
17      The order history, the recent trends,
18  the volume and the number of other factors, is that
19  suspicious order monitoring that you're talking
20  about or dispensing?
21   A.   That's suspicious order monitoring.
22   Q.   And that's on the distribution side,
23  right?
24   A.   Yes.

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Q.   So, we got through recent trends.  Do
2  you recall anything other than dispensing
3  activities, spikes, any movements, indices,
4  anything other than those generalities under what's
5  included under recent trends?
6    A.   That's generally what the Pharmaceutical
7  Integrity would -- those are some of the components
8  they would have been looking at, probably not all
9  of them.  I don't know what all of them are.
10    Q.   Okay.  So, the next thing, you said
11  volume, peer groups.  What did you mean by that?
12    A.   So, is this -- does this particular
13  store that's requesting that order stand out from
14  the rest of the surrounding stores.
15    Q.   What methodology was used to identify
16  those outliers?
17    A.   Well, we have --
18    MR. STOFFELMAYR:  Objection to the form.  Go
19  ahead.
20    THE WITNESS:  Sorry.
21  BY THE WITNESS:
22    A.   We have order history around those other
23  stores as well.
24  BY MR. MOUGEY:

Page 291

1    Q.   But you don't -- you don't have any
2  understanding, despite 2012 to 2016 being in your
3  purview, what order was identified as an outlier,
4  what the parameters were?
5    A.   Well, I gave you some of the criteria
6  that we would have looked at.  I don't have a list
7  of every criteria that we would have looked at.
8    Q.   I'm sorry.  Maybe I'm again still in the
9  slow category.
10    Tell me what specific components you
11  gave me to identify outliers.
12    A.   Outliers orders?
13    Q.   Yes, sir.
14    A.   High volume, are they the exception to
15  the trade area, so what do other Walgreens stores,
16  has there been a recent increase in the volume.
17  So, not only a look-back of a longer term, but
18  what's happened in the last three, four, five weeks
19  at the store.  So, what's shifting around.
20    Q.   Did you use any of the other IMS or
21  vendor data collection services as part of your
22  suspicious order monitoring?
23    A.   No.  That would have been more around
24  dispensing.

Page 292

1    Q.   So, once an outlier was identified in
2  Pharmaceutical Integrity, an outlier order, then
3  what happened?
4    A.   The Pharmaceutical Integrity group would
5  have contacted -- first thing is the order would
6  have been stopped or reduced and the -- with the
7  ceiling limit applied or whatever needed to happen
8  at that point, and then typically the
9  Pharmaceutical Integrity company would reach out to
10  the store to find out what's driving that, probably
11  engage their local leadership, too, for more
12  information about what's going on at a particular
13  store.
14    So, for example, if the store appears
15  high, is it a store that just converted to 24 hours
16  and so now they have more demand because they are
17  servicing emergency rooms around the area, is it a
18  store where the clinic just opened up across the
19  street that's an oncology clinic and dispensing
20  habits change occasionally and sometimes that leads
21  to things looking odd that aren't really odd.
22    Q.   All right.  Let's go back to the stopped
23  or reduced I think is what you said, right?
24    A.   Um-hmm.

Page 293

1    Q.   So, an outlier order is flagged and it's
2  stopped or reduced and then it's reported to the
3  DEA?
4    A.   It is -- it is sent to the wholesaler.
5  So, we're the intermediary before the wholesaler
6  gets the item.
7    Q.   Okay.  But when you say "the
8  wholesaler," you mean another vendor like a
9  Cardinal or ANDA?
10    A.   Yes.
11    Q.   Okay.  Right now I'm talking about
12  Walgreens' role as a distributor, right, because
13  that's -- we're not talking about Walgreens as a
14  dispenser.  We're talking about Walgreens as a
15  distributor, right?  Suspicious order monitoring
16  policy.  Walgreens is a distributor.  Does that
17  make sense?
18    A.   Well, I'm sorry.  I thought you were
19  talking about while we were in Pharmaceutical
20  Integrity time frame, and basically we're out of
21  the dispensing opportunities by that time.  We've
22  transitioned it to Cardinal.
23    Q.   You mean --
24    A.   And they are applying their own set of

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1   standards around the orders as well as what we're
2   doing.
3       Q.   2012, you were asked to run
4   Pharmaceutical Integrity to the end of 2014.
5   You're still running Pharmaceutical Integrity and
6   Walgreens is still acting as a distributor for
7   opiates, correct?
8       A.   At select distribution centers, that may
9   be true. I don't know what time frame the DCs
10  rolled off, but --
11      Q.   But you were still distributing late
12  into 2014?
13      A.   If that's the date you have. I don't
14  have a date.
15      Q.   That's the time period. We're talking
16  about Walgreens as a distributor.
17      A.   Okay.
18      Q.   Okay. So, let's go back to stopped or
19  reduced. All right.
20          So, stopped or reduced, orders
21  identified as an outlier, is that order reported to
22  the DEA?
23      A.   Yes.
24      Q.   And because if it wasn't sending the

Page 295

1   order to the DEA, Walgreens would not be fulfilling
2   its responsibilities, correct?
3           MR. STOFFELMAYR: Objection to the form.
4   BY THE WITNESS:
5       A.   We have an obligation to report to the
6   DEA.
7   BY MR. MOUGEY:
8       Q.   So, the order comes in. It's halted,
9   reduced and reported. Do I have that sequence
10  right?
11          MR. STOFFELMAYR: Objection to the form.
12  BY THE WITNESS:
13      A.   Yes.
14  BY MR. MOUGEY:
15      Q.   All right. When I say "reported," I
16  mean reported to the DEA is your understanding,
17  correct?
18      A.   If we couldn't resolve the issue, yes.
19      Q.   All right. So, you just added another
20  piece into there. So, let me go back and make sure
21  I understand.
22          So, stopped or reduced and the order
23  that's reduced is then sent to the DEA, correct,
24  sir?

Page 296

1       A.   I don't know the particular mechanics.
2   What would happen here is with the Pharmaceutical
3   Integrity group, what would occur, we were looking
4   at orders of interest.
5           So, an order would come in. They've got
6   their algorithm that Ed Bratton and a bunch of
7   other smart guys figured out. That goes against
8   the algorithm. They look at the other factors,
9   what we have been talking about.
10          And, so, is that -- does that turn into
11  a suspicious order or is there -- that order of
12  interest now has a reasonable explanation for
13  what's happening. Then that would get transmitted
14  for the order fulfillment.
15      Q.   Okay. So, let's go back to my initial
16  question. Order comes in and it's identified as an
17  outlier from the formula. Are we on the same page?
18      A.   Okay.
19      Q.   And Walgreens' practice in
20  Pharmaceutical Integrity was to reduce that order,
21  correct?
22      A.   On certain orders, yes.
23      Q.   Well, if it was flagged as an outlier,
24  it was reduced, correct?

Page 297

1       A.   Or canceled.
2       Q.   And if it was reduced or canceled as an
3   outlier, was that order reported to the DEA as
4   suspicious?
5       A.   That's my understanding.
6       Q.   Okay. And at that point the
7   Pharmaceutical Integrity would look to see if there
8   was any reasons why it had popped on the outlier
9   report like you mentioned, whether there was a
10  24-hour emergency -- 24-hour store with an
11  emergency room nearby, things of that nature?
12      A.   Correct.
13      Q.   Is that your testimony? Okay.
14          So, now, when is the override form
15  implemented, according to your testimony?
16      A.   For the store --
17      Q.   Yes.
18      A.   -- to implement it?
19          When we would block the order and we
20  would notify the store that the order has been
21  canceled or blocked and they can -- they can
22  leverage the CSO override form to submit the
23  documentation of what's -- what's occurred.
24      Q.   And if that was approved, a new order

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1   was submitted, correct?
2       A.   Correct.
3       Q.   Okay.  So, you'd agree with me in that
4   process that if the -- if Walgreens was not
5   reporting orders that were flagged as outliers on
6   the system after they were reduced, that Walgreens
7   was not fulfilling its responsibilities as a
8   distributor?
9       A.   We --
10      MR. STOFFELMAYR:  Objection to the form. Go
11  ahead.
12  BY THE WITNESS:
13      A.   We had an obligation to report, yes.
14  BY MR. MOUGEY:
15      Q.   And you had an obligation to report
16  orders that had been reduced and not filled as to
17  the DEA, correct?
18      MR. STOFFELMAYR:  Same objection.
19  BY THE WITNESS:
20      A.   If they were classified as suspicious
21  orders, yes.
22  BY MR. MOUGEY:
23      Q.   I'm not trying to put labels on things.
24  I'm trying to go with your formula.

Page 299

1           So, the formula identifies an outlier.
2   Are we on the same page?
3       A.   Yes.
4       Q.   And it was reduced.  Still on the same
5   page?
6       A.   Yes.
7       Q.   That order, Walgreens had an obligation
8   to report to the DEA, correct?
9       MR. STOFFELMAYR:  Objection to the form.
10  BY THE WITNESS:
11      A.   Again, if it was -- if it met those
12  criteria, yes, we would report it.
13  BY MR. MOUGEY:
14      Q.   And when you say "those criteria,"
15  meaning that it was flagged as an outlier and it
16  was reduced.  When those two criteria were met,
17  Walgreens had an obligation to report that order to
18  the DEA, correct?
19      A.   That's my --
20      MR. STOFFELMAYR:  Objection to the form.
21  Sorry.
22  BY THE WITNESS:
23      A.   That's my understanding.
24  BY MR. MOUGEY:

Page 300

1       Q.   Okay.  And if it didn't report that
2   outlier that had been reduced, Walgreens wasn't
3   fulfilling its responsibilities as a distributor,
4   correct?
5       MR. STOFFELMAYR:  Objection to the form.
6   BY THE WITNESS:
7       A.   Correct.
8   BY MR. MOUGEY:
9       Q.   Let's go back to that override form for
10  a second.  All right.
11          So, orders come in.  It's been flagged
12  as an outlier, reduced or taken to zero.  Your
13  understanding it was being reported to the DEA
14  to fulfill its obligations.  And what was the --
15  how did the override process start?
16      A.   The store would have been notified that
17  it was canceled and the store could request the
18  override.
19      Q.   Okay.  And, so, then the interface, the
20  pharmacist or the store would get on and interface
21  with the Pharmaceutical Integrity?
22      A.   They'd fill out the form, which would
23  route to Pharmaceutical Integrity.
24      Q.   All right.  And then --

Page 301

1       A.   I believe --
2       Q.   Sorry.
3       A.   I believe that their field leadership at
4   the time had to also sign, so to speak, approve
5   the -- approve the request.
6       Q.   Okay.
7       A.   So, there was multiple layers of
8   validation of -- was -- for the request to
9   override.
10      Q.   All right.  Now, did Walgreens have a
11  mechanism for capturing when Pharmaceutical
12  Integrity group approved an override, like the
13  reasons?
14      A.   I believe they did.
15      Q.   And that went into some sort of a
16  database or some -- some electronic to capture
17  those reasons?
18      A.   That's my understanding, yes.
19      Q.   So, were there policies and procedures
20  in place to guide Pharmaceutical Integrity about
21  when to approve an override form request from the
22  store or not?
23      A.   I believe there were -- there were
24  policies or, you know, checkpoints, so to speak,

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  that they would go through particularly around the
2  red flags and, again, looking at overall, the
3  overall landscape of the store, what's it look like
4  overall, is this a one-drug issue or are there
5  multiple drugs.  What's the environment, so to
6  speak.
7       Q.    Did you use the word -- was it
8  "checklist" you said?
9       A.    You know, I don't want to imply it's
10  like a formal checklist that they go through
11  because I don't think that's the case, but they
12  would go through a series of...
13       Q.    Was it -- in the policies and
14  procedures, were there some -- did it provide some
15  criteria for when an override should be approved
16  and maybe when they should be rejected?  Is there
17  any -- any direction given to Pharmaceutical
18  Integrity kind of guiding them on when to say yes
19  or no to the override form?
20       A.    I don't have the detail around that.
21       Q.    I'm not really asking you for specific
22  detail of what they were.  Is there something that
23  you have seen and approved -- because nothing would
24  have gone out without you approving it, right?

Page 303

1       A.    That's not true.
2       Q.    The criteria for approving an
3  override -- let's start over again.
4            Approving an override is an important
5  decision from Pharmaceutical Integrity, is it not?
6       A.    Yes.
7       Q.    Okay.  Because the algorithm was
8  designed to put ceiling limits, correct?
9       A.    Correct.
10       Q.    And once it hit that ceiling limit, I
11  mean, you tell me, but it's got to be a pretty good
12  reason for going over that ceiling limit, right?
13       A.    Correct.
14       Q.    And if Pharmaceutical Integrity is going
15  to say okay to going over the ceiling limit, it's
16  got to be a pretty good explanation for why?
17       A.    Correct.
18       Q.    Because it was flagged initially as an
19  outlier, right?
20       A.    Yes.
21       Q.    You have to have a reason why it's an
22  outlier, correct?
23       A.    Correct.
24       Q.    So, you would agree that it was

Page 304

1  important for Pharmaceutical Integrity to be given
2  some direction about when to say yes to an override
3  request?
4       A.    Yes.
5       Q.    And that direction would include just
6  generally some criteria that they were to use when
7  making a decision, an important decision, on that
8  override request, right?
9       A.    Yes.
10       Q.    And that was one of the primary
11  responsibilities of Pharmaceutical Integrity was to
12  make sure these outliers had answers or reasons why
13  they were outliers, right?
14       A.    Correct.
15       Q.    And if the outlier was approved for an
16  override, you would believe that there was some
17  significant information gathered to and recorded to
18  evidence that decision-making process, right?
19       A.    Correct.
20       Q.    Okay.  And your team, Pharmaceutical
21  Integrity, was trained on the criteria and how to
22  document and evidence the reasons given for the
23  override form?
24       A.    Correct.

Page 305

1       Q.    And did they have the ability to go back
2  and see or analyze for a particular store how many
3  overrides they received in the past?
4       A.    That's my understanding.
5       Q.    Because that would be a pattern that
6  would be important to see just how many times a
7  specific store had received an override, correct?
8       A.    Yes, because it may indicate the ceiling
9  is set incorrectly for that particular store.
10       Q.    Okay.  Now, the process that we're
11  talking about now, the override form, and we hit
12  this earlier this morning, that was designed to --
13  I'm going to say -- close off Walgreens' system so
14  if an outlier was identified, it had to get
15  approved by Pharmaceutical Integrity, correct?
16       A.    Correct.
17       Q.    And you don't believe that there were
18  any other way for a store to go around the
19  rejection of an outlier to get more Schedule II or
20  Schedule III, correct?
21       MR. STOFFELMAYR:  Objection to the form.
22  BY THE WITNESS:
23       A.    The intent was Pharmaceutical Integrity
24  would review all order requests.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  BY MR. MOUGEY:
2      Q.   Okay.  And that's -- Walgreens has a
3  responsibility to design a system to identify and
4  report and do due diligence on those outliers
5  essentially, correct?
6      MR. STOFFELMAYR:  Objection to the form.
7  BY THE WITNESS:
8      A.   Yes.
9  BY MR. MOUGEY:
10     Q.   Okay.  And if Walgreens' system didn't
11 effectively monitor and identify those suspicious
12 orders, that may or may not meet the obligations as
13 a distributor as licensed under the Controlled
14 Substance Act, correct?
15     MR. STOFFELMAYR:  Objection to the form.
16 BY THE WITNESS:
17     A.   I mean, I don't know all the legal
18 descriptions, but in general the idea was we would
19 review all orders.
20 BY MR. MOUGEY:
21     Q.   Okay.  I'm going to have you go back to
22 what I've already marked as Swords 11.  Remember
23 earlier when I kind of bounced in the wrong
24 direction?

Page 307

1      A.   Got it.
2      Q.   I apologize.
3      A.   Yes.
4      MR. STOFFELMAYR:  This is the estimate?
5  BY MR. MOUGEY:
6      Q.   Yes, entitled "Project Request
7  Estimate."
8          The last paragraph underneath
9  "Description."
10         Do you see that?
11     A.   Yes.
12     Q.   "Rx Services will have the ability to
13 remove items from the order limitation process or
14 to remove an entire store from the order limit
15 program for a limited amount of time."
16         Do you see that?
17     A.   I do.
18     Q.   Do you believe -- let's do it this way.
19 Do you believe that that or have an understanding
20 that being able to remove an entire store from the
21 order limit program would impact Pharmaceutical
22 Integrity's ability to monitor suspicious orders?
23     A.   If the stores weren't reporting, yes.
24     Q.   Yes.  Because if they were removed from

Page 308

1  the system, then they --
2      A.   I wouldn't see them.
3      Q.   Then you wouldn't see them?
4      A.   Yeah.
5      Q.   So, sitting here today, are you aware of
6  whether or not stores could remove themselves or
7  stores -- let me do that again.
8          Do you have an understanding of whether
9  or not stores could be removed from the monitoring
10 system at Walgreens?
11     A.   Not to my knowledge.
12     Q.   Okay.  Let me hand you what -- are you
13 aware that the order cutting flag could be turned
14 off?
15     A.   That doesn't sound familiar to me.
16     Q.   That doesn't -- would that -- do you
17 know whether or not the Walgreens system could turn
18 the order cutting flag off where it just bypassed
19 the suspicious order monitoring at Walgreens?
20     A.   I don't know that.
21     Q.   Okay.  Now, Walgreens' suspicious order
22 monitoring policies, did that -- that covered
23 obviously orders from Walgreens as or sent to
24 Walgreens as a distributor, correct?

Page 309

1      A.   Yes.
2      Q.   Do you know if Pharmaceutical
3  Integrity's suspicious order monitoring policies
4  system also covered orders that were sent to other
5  vendors?
6      A.   If they would have been in the data,
7  then, yes, they would have.  If the order request
8  came through the data, then, yes, it would have --
9  it would have followed that same process.
10     Q.   Okay.  But the part I don't understand
11 is if it was in the same data.  So, if a -- let's
12 go back to your override.  Okay.
13         Override was rejected, said no.  Okay?
14     A.   Right.
15     Q.   Could the store then order from another
16 vendor?
17     A.   Not to my knowledge.
18     Q.   Okay.  Because that would be a pretty
19 significant exception to the policies and
20 procedures at Walgreens on identifying suspicious
21 orders, right?
22     A.   Well, again --
23     MR. STOFFELMAYR:  Objection to the form.  Go
24 ahead.

78 (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    BY THE WITNESS:
2       A.   Certainly the intent was to have all --
3    all order data.
4    BY MR. MOUGEY:
5       Q.   Because, I mean, if you went to the
6    override form and they -- your group said no and
7    the store could go around and order it from
8    Cardinal, that kind of -- that is a loophole for
9    the entire system, is it not?
10      A.   It is.
11      MR. STOFFELMAYR:  Objection.
12   BY THE WITNESS:
13      A.   It would be.
14   BY MR. MOUGEY:
15      Q.   So, let me hand you what I'm going to
16   mark as Swords 13.
17           (WHEREUPON, a certain document was
18             marked as Walgreens-Swords Exhibit
19             No. 13: 9/23/11 Project: DEA
20             Suspicious Order - Phase III;
21             WAGMDL00492378 - 00492380.)
22   BY MR. MOUGEY:
23      Q.   Purports to be a memorandum from
24   Walgreens, Bates No. 492378, "DEA Suspicious Order

Page 311

1    - Phase III, September 23, 2011."
2           Do you see that?
3       A.   I do.
4       Q.   Go down to No. 6.
5       A.   Okay.
6       Q.   "Only DC," and that's distribution
7    center, right?
8       A.   Correct.
9       Q.   "Only DC auto ordering and PDQ ordering
10   is going through DEA limitations."
11           And the answer is, "Yes."  Correct?
12      A.   That's what it says, yes.
13      Q.   All right.  Does that -- DC auto
14   ordering and PDQ does not include an order going to
15   another vendor, correct?
16      A.   Well, the way the ordering system works
17   at Walgreens is we have one order source.  So, what
18   would happen is a store would order a C-II order,
19   it would go to our distribution center, Jupiter,
20   Woodland, Perrysburg.
21           If those orders can't be fulfilled at
22   that center, they would route that order to our
23   wholesaler back up, Cardinal in this particular
24   instance.

Page 312

1       Q.   But you're referencing supply issues,
2    correct?  If there wasn't that C-II in the
3    distribution center, correct?
4       A.   Correct.
5       Q.   I think what I'm asking is a little
6    different, and I apologize if I don't understand.
7           But DEA limitations is the suspicious
8    order monitoring phase 3, correct?
9       A.   Correct.
10      Q.   And only DC, distribution center, and
11   PDQ?
12      A.   Correct.
13      Q.   Are going through Walgreens' suspicious
14   order monitoring policy system?
15      A.   Correct.
16      Q.   At this point in time, September 2011, a
17   store could have its request for an override turned
18   down and then order from another vendor, correct?
19      A.   Not to my knowledge.
20      Q.   All right.  I hand you what I've marked
21   as Swords 14, which is Bates No. 492375.  It's
22   P-WAG-1763.
23           (WHEREUPON, a certain document was
24             marked as Walgreens-Swords Exhibit

Page 313

1             No. 14:  11/9/11 Project: DEA
2             Suspicious Order - Phase III;
3             WAGMDL00492375 - 00492376.)
4    BY MR. MOUGEY:
5       Q.   "Project:  DEA Suspicious Order - Phase
6    III, November 9, 2011."
7           Do you see that, sir?
8       A.   I do.
9       Q.   No. 1, "If DEA reduced item," and that's
10   what we just went over.  That's the suspicious
11   order monitoring policy of Walgreens, correct?
12      A.   I don't know what this is referring to.
13   "DEA reduced item."  I'm not sure what that
14   terminology means.
15      Q.   The last -- the memo we just looked at
16   is "DEA limitations" and this one is "DEA reduced
17   item."
18           Do you see that?
19      A.   I see the one that -- yeah.  "DEA
20   limitations," yes.
21      Q.   "If the DEA reduced item is manually
22   ordered from Cardinal within the next 92 hours,
23   what kind of action to take place?"
24           The order was reduced.  Then it's

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  manually entered into Cardinal, which is another
2  vendor, correct?
3      A.   It is another vendor, yes.
4      Q.   And actually Walgreens was one of
5  Cardinal's largest customers nationwide, correct?
6      A.   Well, that would be true of anybody we
7  do business with.
8      Q.   Yes, sir.  Because of the amount of
9  controlled substances and prescriptions that are
10 put into the stream of commerce from Walgreens,
11 correct?
12     A.   Because we are a large pharmacy
13 retailer, yes.
14     Q.   Yes, sir.  With six people in
15 Pharmaceutical Integrity as of 2012, right?
16     A.   And robust systems, yes.
17     Q.   Yes, sir.  So, one of those robust
18 systems, "If the DEA reduced item is manually
19 ordered by Cardinal from the store within the next
20 92 hours, what kind of action is to take place?"
21     "It shows user on the report or on the
22 ADR4 outline screens."
23     Do you see that?
24     "Online screens."

Page 315

1      Do you see that, sir?
2      A.   I see what it says, yes.
3      Q.   It says, "Resolved.  Let system order
4  the item but show the user on the report."
5      Correct?
6      A.   That's what it says, yes.
7      Q.   So, Walgreens system as of November of
8  2011 would allow a store whose order had been
9  reduced to manually order the item from another
10 vendor?
11     A.   I don't have any knowledge about this.
12 I don't know.  I don't know what the reference to
13 this is.  I don't know -- first time I have seen
14 it.
15     I don't have any idea what Rakesh, I
16 guess is who the programmer that was doing this,
17 what they're referencing.
18     Q.   And that was an important --
19     A.   I can --
20     Q.   You took over a few months after this,
21 several months after this, correct?
22     A.   2012, something in there, a year later.
23     Q.   Which is another couple months after
24 November 9, 2011, correct?

Page 316

1      A.   I think it was late '12, but okay.
2      Q.   You think it was late '12?
3      A.   Yeah.
4      Q.   Although we looked at an e-mail earlier
5  today that identified you and Mr. Lovejoy as the
6  head, whatever date that was, right?
7      A.   As part of a committee, yes.
8      Q.   No.  As head of the Pharmaceutical
9  Integrity group.
10     A.   Like I've stated many times today, I
11 don't have all the dates of when everything was.
12 You know, what I know here is this is
13 November 2011, this document.
14     Q.   A matter of months before you took over,
15 right?
16     A.   I don't know.
17     Q.   And you don't have any idea when you
18 took over of whether or not the system allowed an
19 order that had been reduced to be manually entered
20 to Cardinal and filled from another vendor,
21 correct?
22     A.   I --
23     MR. STOFFELMAYR:  Objection to the form.
24     Go ahead.  Sorry.

Page 317

1  BY THE WITNESS:
2      A.   I have no knowledge of that.
3  BY MR. MOUGEY:
4      Q.   Under 3, "Do we need Central store
5  system based functionality to maintain and control
6  store to go through the DEA limitations?"
7      Do you see that?
8      A.   I do.
9      Q.   Do you have any understanding of whether
10 or not a store could remove itself as of late 2011
11 from the DEA functionality?
12     A.   I don't.
13     Q.   And underneath -- you know who
14 Barb Martin is, correct?
15     A.   I know who she is, yes.
16     Q.   What is Barb Martin's role?
17     A.   She is in pharmaceutical purchasing.
18     Q.   Yes, sir.  Is she an important part of
19 suspicious order monitoring policy?
20     A.   Not to my knowledge.
21     Q.   No.  Do you have any understanding of
22 whether or not she had an important role with
23 performing due diligence on suspicious order
24 monitors?

Page 318

1    A.   Not that I'm aware of.
2    Q.   Never have heard her in the context of
3  performing due diligence on orders that were
4  flagged at Walgreens?
5    A.   I haven't, no.
6    Q.   Would you expect in your meetings that
7  if somebody was performing due diligence on
8  suspicious orders that you would know what
9  department they were in?
10   A.   I know what department Barb --
11   Q.   What department do you think was
12 performing due diligence on the outliers or
13 suspicious orders?
14   A.   Pharmaceutical Integrity.
15   Q.   Nobody outside of Pharmaceutical
16 Integrity?
17   A.   Not to my knowledge.
18   Q.   Okay.  You would think you would know
19 that, though, if that was happening outside of
20 Pharmaceutical Integrity, correct?
21   A.   Yeah.
22   Q.   Okay.  So, "As per Barb Martin, this is
23 needed along with the free format text to add notes
24 or comments indicating the reason why the store was

Page 319

1  turned off from the DEA."
2      Do you see that?
3    A.   I do.
4    Q.   Did you direct anybody in Pharmaceutical
5  Integrity when it started to make sure that
6  specific stores couldn't be turned off from the
7  DEA?
8    A.   Not that I recall.
9    Q.   Do you recall even that stores could be
10 turned off from the DEA?
11   A.   I have no knowledge that stores could be
12 turned off from anything.
13   Q.   I hand you what I'm going to mark as
14 Swords Exhibit 15.
15   A.   Can we get to a point where we can have
16 a break in a minute?
17   Q.   Yeah, we can take one now if you like.
18   A.   Whatever is convenient for you.
19   THE VIDEOGRAPHER:  We are off the record at
20 2:14 p.m.
21      (WHEREUPON, a recess was had
22       from 2:14 to 2:27 p.m.)
23      (WHEREUPON, a certain document was
24       marked Walgreens-Swords Exhibit

Page 320

1      No. 15:  10/1/12 e-mail string;
2      WAGMDL00705318 - 00705320.)
3    THE VIDEOGRAPHER:  We are back on the record
4  at 2:27 p.m.
5  BY MR. MOUGEY:
6    Q.   Mr. Swords, I've just handed you what we
7  marked as Swords 15, Bates No. 705318.  It's an
8  e-mail, October 1, 2012, from yourself to your
9  boss, David Lovejoy, and Kermit Crawford.  Those
10 are about as senior as you get in your group,
11 right?
12   A.   Correct.
13   Q.   And the e-mail is discussing oxycodone
14 and PDQ, right?
15   A.   Correct.
16   Q.   PDQ is an acronym?
17   A.   Yes.
18   Q.   Pretty damn quick?
19   A.   Something like that, yeah.
20   Q.   Pretty darn quick, something along those
21 lines?
22   MR. STOFFELMAYR:  Depends who you are talking
23 to.
24 BY MR. MOUGEY:

Page 321

1    Q.   And there were some concerns with
2  oxycodone being ordered PDQ, correct?
3    A.   Correct.
4    Q.   And October 2012, you had now been or
5  were in charge of Pharmaceutical Integrity as of
6  this time, correct?
7    A.   Correct.
8    Q.   And you identified a pretty significant
9  hole in the system of Walgreens in regard -- in
10 relation to PDQ orders, right?
11   A.   Yes.
12   Q.   That's when a pharmacist needed an order
13 pretty -- pretty darn quick and could enter it into
14 the DC, correct?
15   A.   Correct.
16   Q.   And you laid out that hole, I think you
17 referred to it earlier as a gap, in Walgreens'
18 system when you took over, correct?
19   A.   Correct.
20   MR. STOFFELMAYR:  Objection to the form.
21      Give me a second.
22   THE WITNESS:  I'm sorry.
23 BY MR. MOUGEY:
24   Q.   And as you pointed out to your bosses,

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    "PDQ orders did not aggregate to the monthly
2    cumulative limits although line limits are still
3    imposed on the individual order. Therefore,
4    without this edit, stores could order PDQ every day
5    for Oxy and as long as they didn't trip the line
6    limit" -- "line order limit edit, they would
7    receive the product and end up exceeding our
8    monthly cumulative totals."
9         Correct?
10        A.   That's what it says, yes.
11        Q.   Suffice it to say that if a store went
12   in and ordered Oxy on a daily limit, as long as it
13   didn't exceed that daily line limit, its cumulative
14   orders through the month could surpass the ceiling,
15   correct?
16        A.   Correct.
17        Q.   That was one of the gaps you mentioned
18   earlier in Walgreens' system for Oxy, correct?
19        A.   Yes.
20        Q.   You go on to relay, "As Dave mentions,
21   stores still have access to product if needed
22   outside their normal order process using the
23   controlled substance override," which is what your
24   point is, it has to go through Pharmaceutical

Page 323

1    Integrity, correct?
2         A.   Correct.
3         Q.   And this was a significant gap in
4    Walgreens' system that your group identified and
5    attempted to close shortly after you took over,
6    correct, sir?
7         MR. STOFFELMAYR: Objection to the form. Go
8    ahead.
9    BY THE WITNESS:
10        A.   It was certainly a gap, yes.
11   BY MR. MOUGEY:
12        Q.   And shortly after you took over, with
13   Walgreens' team that they have put on, the six
14   people, you all identified the gap and attempted to
15   close it with the override form, correct, sir?
16        A.   Well, not close it with the override
17   form. Close it through the application to not
18   allow that to occur. The override form was already
19   in place.
20        Q.   Fair enough. The PDQ gap was closed.
21   How is that?
22        A.   Correct.
23        Q.   Okay. I'm going to hand you what I've
24   marked as Exhibit 16, which is P-WAG-5140, and --

Page 324

1    I'm sorry. P-WAG-1990. Bates No. 308497, an
2    e-mail from Ms. Polster dated 12/28/2012.
3         (WHEREUPON, a certain document was
4         marked as Walgreens-Swords Exhibit
5         No. 16:  12/28/12 e-mail string;
6         WAGMDL00308497 - 00308498.)
7    BY MR. MOUGEY:
8         Q.   You're familiar with the concept of
9    interstoring, correct, sir?
10        A.   Yes.
11        Q.   Interstoring was another gap in
12   Walgreens' process when you took over, correct,
13   sir?
14        A.   Yes.
15        Q.   And an interstore would be that one
16   Walgreens could order or secure a controlled
17   substance from another Walgreens store, correct?
18        A.   Interstore allowed you to move
19   pharmaceutical product as well as other retail
20   product from store to store and transfer the cost
21   and inventory and those type of things, yes.
22   Not --
23        Q.   So 12 --
24        A.   Not with controlled Schedule II drugs,

Page 325

1    though.
2         Q.   But with Schedule III?
3         A.   Only through certain circumstances could
4    you -- Schedule III actually required a higher
5    level of approval to interstore. Any scheduled
6    drug required pharmacy supervisor sign-off or
7    signature on.
8         Q.   Before Pharmaceutical Integrity?
9         A.   Yes.
10        Q.   There was another gap in Walgreens'
11   system and that was interstoring, correct, sir?
12        A.   I --
13        MR. STOFFELMAYR: Objection to the form. Go
14   ahead.
15        THE WITNESS: I'm sorry.
16   BY THE WITNESS:
17        A.   I wouldn't clarify -- I wouldn't call it
18   a gap. There was a -- there was a process that
19   stores could interstore. We didn't want them to be
20   able to interstore controlled substances because we
21   were seeking to have more information, more control
22   over that process.
23   BY MR. MOUGEY:
24        Q.   And run it all through Pharmaceutical

82 (Pages 322 to 325)

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  Integrity so they could be approved, correct?
2      A.   Correct.
3      Q.   And, so, by -- before Pharmaceutical
4  Integrity there were not as robust processes and
5  procedures in place for interstoring, correct?
6      A.   That's not how I would characterize it.
7  Interstoring process didn't change outside
8  Pharmaceutical Integrity.  What we do is remove the
9  ability to move controlled substances through the
10  interstore process.
11      Q.   Yes, sir.  You removed the ability to
12  interstore controlled substances in between
13  Walgreens stores, correct?
14      A.   That's correct.
15      Q.   And prior to Pharmaceutical Integrity,
16  stores had the ability to move controlled
17  substances store to store, correct?
18      A.   With the parameters I described as
19  requiring a second signature authority from a
20  pharmacy supervisor over that area.
21      Q.   Yes, sir.  And if you would, sir, please
22  go to Exhibit P-WAG-5140, Bates No. 77015.  I'm
23  going to mark as Swords 17 a document dated
24  7/2/2012.

Page 327

1          (WHEREUPON, a certain document was
2          marked as Walgreens-Swords Exhibit
3          No. 17:  7/2/12 e-mail with
4          attachment; WAGMDL00077015 -
5          00077016.)
6  BY MR. MOUGEY:
7      Q.   Although you're not -- don't have an
8  exact date when you started, you don't have any
9  reason to quibble with by July of 2012 you were
10  involved in Pharmaceutical Integrity and suspicious
11  order monitoring, right?
12      A.   Again, I don't know the specific dates,
13  but it's possible that that -- I was there at that
14  time.  I just don't know the exact date.
15      Q.   Attached to this e-mail is a PowerPoint,
16  sir.
17      A.   Okay.
18      Q.   I'd like you to turn to Bates No. 77016.
19      A.   Okay.
20      Q.   "Ongoing Controlled Drug Review Logic."
21  716?
22      Q.   I'm sorry.  77016.
23      A.   Okay.
24      MR. STOFFELMAYR:  Mine looks different.

Page 328

1      THE WITNESS:  Yeah, mine does.
2      MR. STOFFELMAYR:  There is some confusion.
3      THE WITNESS:  This is 77016.
4      MR. STOFFELMAYR:  My 77016 is different than
5  your 77016.  They both look different from the --
6      THE WITNESS:  They are all numbered that.
7      MR. STOFFELMAYR:  Oh.
8      THE WITNESS:  That's the problem.
9      MR. STOFFELMAYR:  It's the first page.
10      MR. MOUGEY:  Oh, because it's in native
11  format.  I'm sorry.  Meaning it's the PowerPoint.
12  BY MR. MOUGEY:
13      Q.   Turn to the third page in.  It's titled
14  "Ongoing Controlled Drug Order Review Logic."
15      A.   Okay.  All right.
16      Q.   Okay?  What I want to direct your
17  attention on the left-hand side of the table or box
18  is the word "Phase."
19          Do you see that?
20      A.   I do.
21      Q.   And then below that there is dates, and
22  it begins with August of '09 to September of '10.
23          Do you see that, sir?
24      A.   I do.

Page 329

1      Q.   And during that time frame Walgreens,
2  which is W-A-G, right, WAG?
3      A.   Yes.
4      Q.   "Reviews WAG DC orders only."  Do you
5  see that?
6      A.   Yes.
7      Q.   All right.  So, were you aware from
8  August of '09 to September of '10 that Walgreens'
9  suspicious order monitoring system only reviewed
10  Walgreens' distribution centers?
11      A.   Well, all orders came via that process.
12  There is no way for the store to go directly to the
13  wholesaler.  They don't have 222s at their store to
14  go anywhere but WAG DCs.
15      Q.   Yes, sir, but what I'm asking you is
16  outside of the WAG suspicious order monitoring
17  process.  Okay.
18          So, you see the title of the chart,
19  "Ongoing Controlled Drug Order Review Logic,"
20  correct?
21      A.   Yes.
22      Q.   And right below that, "Review all
23  controlled drug and PSE orders, flag select orders
24  as suspicious, reduce order quantity for subset of

83 (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1   flagged orders."
2         Do you see that, sir?
3      A.   I do.
4      Q.   And that that process only reviews WAG
5   DC orders, do you see that below?
6      A.   Yes, that's what it says.
7      Q.   And "Key Points," "No order reductions
8   in phase 1" off to the right.
9         Do you see that?
10     A.   I do.
11     Q.   No. 2, 9/10 to current, which it's now,
12  as of the date of this e-mail that transmitted the
13  PowerPoint, July of 2012, that the system still
14  only reviewed WAG DC orders.  Do you see that?
15     A.   I do.
16     Q.   Off to the right, "Key Points,"
17  "Reductions begin in phase 2."
18        That's the process you mentioned earlier
19  that the outliers are identified and reduced.
20        Do you see that?
21     A.   I do.
22     Q.   And that didn't begin until September of
23  '10 and only applies to WAG DC orders.
24        Do you see that?

Page 331

1      A.   That's what it says, yes.
2      Q.   Under 3, estimated 6/10 to 7/12,
3   "Reviews WAG DC orders plus checks to see if no
4   vendor order placed within 48 hours for same drug."
5         Do you see that, sir?
6      A.   I do.
7      Q.   So, if an order was entered by a
8   pharmacist that was routed to an outside vendor,
9   WAG DC orders plus checks to see if vendor order
10  placed within 48 hours for same drug, correct?
11     A.   That's what it says, yes.
12     Q.   So, a vendor order -- so, go back to the
13  override form -- I'm sorry.
14        If the override was denied, a store
15  could order from -- through an outside vendor?
16     A.   That's not my understanding.
17     Q.   Let me do it another way because I think
18  what you're -- you and I are talking past each
19  other where you're saying that they couldn't order
20  directly from the vendor.  Correct?
21     A.   That's correct.
22     Q.   Okay.  What I'm suggesting, and maybe
23  inartfully, is that the store could order from a
24  vendor outside of Walgreens' suspicious order

Page 332

1   monitoring system.  Okay?
2      A.   I don't know how that process could have
3   taken place but...
4      Q.   Because that would be a problem?
5      A.   That would be a gap, yes.
6      Q.   Under 4, July 12, about the time when
7   Pharmaceutical Integrity is in play, correct?
8      A.   Something around there, yeah.
9      Q.   "Reviews WAG DC orders plus applies same
10  logic to vendor orders making them eligible for
11  flagging and order reduction."
12        Do you see that?
13     A.   I do.
14     Q.   That appears from that entry, July of
15  '12, that the suspicious order monitoring policy
16  was just implemented for vendor orders, correct?
17     A.   Well, I believe what the document is
18  stating is at this time period we may have
19  transitioned one DC over to Cardinal for supply and
20  so what we are saying here is we'll apply the same
21  logic to vendor orders going to Cardinal.  Part of
22  the other chain is still getting fulfillment
23  through our DC centers.
24     Q.   Sir, your stores at Walgreens were being

Page 333

1   supplied in a backstop role from Cardinal and
2   Amerisource and ANDA for years prior to Walgreens
3   getting out of the distribution business, correct?
4      A.   That's correct.
5      Q.   Okay.
6      A.   And the order process for those drugs
7   would be I submit my order.  That goes to our DC.
8   If our DC cannot fulfill that order, they're the
9   ones that get to route it to ANDA, Cardinal,
10  et cetera.  Not the store.
11     Q.   So, the logic, sir, if it gets rerouted
12  to another store, Walgreens' suspicious order
13  monitoring -- I'm sorry.  Let me do that again.
14        If the order is rerouted to a vendor
15  outside of Walgreens, that order is not reviewed up
16  until July of 2012 by Walgreens' suspicious order
17  monitoring process, correct?
18     A.   I don't -- I don't have knowledge about
19  that.
20     Q.   You don't know.
21        4.  Go across the page under --
22     A.   You're on a different page?
23     Q.   I'm sorry.  No. 4.  Same page.  Same
24  page.

84 (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1     A.  Okay.
2     Q.  4.  Under "Key Points."  Fourth text box
3  down on the right.  "Both WAG DC and vendor orders
4  reduced if thresholds exceeded."
5         Do you see that?
6     A.  I do.
7     Q.  And you see in the entries above that
8  that only WAG DC orders were reduced if thresholds
9  were increased, correct?
10     A.  Correct.
11     Q.  But you have no idea sitting here today
12  whether or not stores were allowed to enter orders
13  to outside vendors if their orders had been
14  decreased?
15     A.  Not to my knowledge.
16     Q.  What do you know about 340B?
17     A.  General concept.  I know.
18     Q.  What's your understanding of the general
19  concept of 340B?
20     A.  It's a government-sponsored program that
21  takes care of low income, indigent folks.  Clinics,
22  hospitals apply for 340B status and Walgreens
23  participates by fulfilling 340B prescriptions.
24     Q.  Okay.  And were the mail service centers

Page 335

1  that you were responsible for, did they fill 340B
2  prescriptions?
3     A.  No, they did not.
4     Q.  All right.  So these were filled at the
5  individual store level?
6     A.  That's correct.
7     Q.  Do you have any idea or feel for how
8  large percentage-wise of Walgreens operations 340B
9  were?
10     A.  I don't.
11     Q.  Do you have an understanding of whether
12  or not 340B's were subject to Walgreens' suspicious
13  order monitoring policies and procedures?
14     A.  I believe there was early on they
15  weren't and we made -- we took steps through
16  Pharmaceutical Integrity, we took steps later on to
17  incorporate that.
18         340B is kind of a funny program the way
19  it works.  It's a replenishment model and so it's a
20  little different on how you receive medications for
21  it.
22     Q.  So, up -- do you have an understanding
23  or an idea of when that gap was closed, meaning the
24  340B orders for Schedule II and Schedule III

Page 336

1  opiates went through the suspicious order
2  monitoring policies and procedures?
3     A.  I recall it was later in the process.  I
4  don't know the specific times, but it would have
5  been -- it would have been later in that -- later
6  in the life span, so to speak, of Pharmaceutical
7  Integrity.
8     Q.  I hand you what I'm going to mark as
9  Swords 18 dated July 18, 2016.
10         (WHEREUPON, a certain document was
11         marked as Walgreens-Swords Exhibit
12         No. 18:  7/8/16 e-mail string;
13         WAGMDL00129607 - 00129610.)
14  BY MR. MOUGEY:
15     Q.  Do you recognize the folks in the top of
16  that e-mail?
17     A.  No, I don't.
18     Q.  It says, "We verified that ceiling and
19  tolerance limit is not checked for 340B items at
20  the store.  Please let us know if any other
21  information related would be required from our
22  end."
23         Do you see that?
24     A.  I do.

Page 337

1     Q.  So, does this refresh your recollection
2  in any way about the timing of when the 340B gap
3  was closed?
4     A.  Well, as I said, it was later in the
5  process of Pharmaceutical Integrity.  This may be,
6  you know, around that time, '16.
7     Q.  Okay.
8     A.  I'm not sure of the penetration of 340B
9  on Schedule II or controls.  They work off of
10  formulary.  I don't know what that formulary is.
11     Q.  I hand you what we will mark as Swords
12  19.
13         (WHEREUPON, a certain document was
14         marked as Walgreens-Swords Exhibit
15         No. 19:  12/3/16 e-mail with
16         attachment; WAGMDL00129005 -
17         00129007.)
18  BY MR. MOUGEY:
19     Q.  Dated 12/13/2016.  And the form
20  transmitted in this e-mail, do you recognize this
21  type of format as a kind of a work flow control
22  mechanism within Walgreens?
23     A.  I believe they actually call it a Demand
24  Management IT request form.

85 (Pages 334 to 337)

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q.   Okay.  So, it's a way to manage projects
2    and keep track?
3    A.   Yeah.
4    Q.   Okay.  Dated 12/13/2016.  Look below
5    under the "Meeting Notes."
6    A.   Um-hmm.
7    Q.   The end of '16 being discussed is 340B
8    system.  "Add 340B orders into suspicious order
9    monitoring tool."
10        Do you see that, sir?
11   A.   I do.
12   Q.   Sir, I think you're not kind of
13   quibbling at me that at least until late 2016,
14   340Bs also were not captured in Walgreens'
15   suspicious order monitoring policy?
16   A.   Correct.  Yeah, I mean, I don't know the
17   particular time frame.  This sounds about right.
18   Q.   And this is about the end of your tenure
19   in Pharmaceutical Integrity?
20   A.   Correct.
21   Q.   Overseeing it, correct?
22   A.   Correct.
23   Q.   I'm going to test your eyesight here.
24   Printed it about as big as I could.  I hand you

Page 339

1    what I have marked as Swords 20.
2        (WHEREUPON, a certain document was
3        marked as Walgreens-Swords Exhibit
4        No. 20: Spreadsheet;
5        WAGMDL00400358.)
6    BY MR. MOUGEY:
7    Q.   I think we can read this.  This is a
8    document that we received from Walgreens as part of
9    the discovery process.  Okay?
10   A.   Okay.
11   Q.   And I believe that this is an export out
12   of Walgreens' databases of the override process.  I
13   would like for you to help me figure out what
14   exactly this is.
15   A.   I'll do my best.
16   Q.   Let's just kind of walk through this
17   spreadsheet and help me figure out what some of
18   these fields are.  Okay?
19        So, "Request ID" on the left-hand side
20   is obviously some sort of a tracking mechanism for
21   a specific request, correct?
22   A.   Correct, yes.
23   Q.   A store comes in, asks for an override,
24   it's assigned a specific request ID number, right?

Page 340

1    A.   Yes, that's what it appears.
2    Q.   The next is a "Request Date."  Do you
3    see that?
4    A.   I do.
5    Q.   And that request date appears to be the
6    date that the request came in.  The one that we
7    have here is 9/20/13.
8        Do you see that?
9    A.   I do.
10   Q.   I want you to help me.  Go all the way
11   over to column R.
12   A.   Column R.  Okay.
13   Q.   Do you see the request date is 9/20 on
14   this first one, 8:26 a.m., correct?
15   A.   Yes.
16   Q.   And then the "Request Status Date/Time,"
17   9/20/13, 12:54, correct?
18   A.   Yes.
19   Q.   So, what is that, approximately --
20   A.   Four hours.
21   Q.   -- four and a half, four hours
22   afterwards.  Okay.
23        And, so, let's go back to -- do you have
24   an understanding of whether the "Request Status

Page 341

1    Date/Time," that was when it was either approved or
2    disapproved?
3    A.   I believe that's the time it was
4    approved.
5    Q.   Okay.  And then the store number, every
6    Walgreens has a store number, correct?
7    A.   Correct.
8    Q.   And that we can track and identify
9    which -- where these stores belong based on that
10   store number?
11   A.   Correct.
12   Q.   In the address, so to speak?
13   A.   Correct.
14   Q.   But internally this is Walgreens' way of
15   identifying each and every store?
16   A.   That's correct.
17   Q.   Okay.  And then the next number, the WIC
18   number, W-I-C?
19   A.   Yes.
20   Q.   I don't know what that stands for.  What
21   is that?
22   A.   It's a Walgreen order number.  It's an
23   item order number for internal ordering system.
24   Q.   "NDC Code" is obviously the DEA NDC

Page 342

1  drug?
2     A.   National Drug Code.
3     Q.   National Drug Code identifying specific
4  information about the controlled substance,
5  correct?
6     A.   Well, it identifies specific information
7  about the product.
8     Q.   The product.  And in this case in the
9  override form that we are looking at would be
10  Schedule II or Schedule III, right?
11     A.   Well, the NDC refers to the manufacturer
12  and the product.  So, it would be whoever the
13  product manufacturer in this example is for
14  oxycodone APAP 525.
15     Q.   Right.
16     A.   I don't know who it is.  That's who it
17  would have been.
18     Q.   The "UPC Code" is?
19     A.   That's a little different.  That's
20  actually the bar code.  Information on the bottle
21  itself, not necessarily the NDC number as well.
22     Q.   And then the "PLN Number"?
23     A.   That's an internal number used for
24  grouping particular categories together.  I never

Page 343

1  use it.  I don't know what actually -- it's got
2  some function.  I don't know what it is.
3     Q.   We can see in column H the actual drug
4  name?
5     A.   Yes.
6     Q.   Whether it's a combination drug,
7  whenever it is, is listed in column H; and we can
8  see for those few entries are all oxycodone,
9  correct?
10     A.   Correct.
11     Q.   And then the "Requested Quantity" is 3
12  and the "Request Reason Code" is 2?
13     A.   Correct.
14     Q.   Tell me what the requested -- what's the
15  quantity refer to?
16     A.   The number of units of stock units being
17  requested.
18     Q.   All right.  So, and that obviously
19  correlates with the NDC code, correct?
20     A.   Correct.
21     Q.   And then the request reason code.  Where
22  can I -- what are the reason codes?  That's a bad
23  question.
24        Where can I find out what the reason

Page 344

1  codes are?
2     A.   Well, Tasha's team could certainly tell
3  you what the reason codes are.
4     Q.   Are they written somewhere?
5     A.   It's probably part of the system.  So,
6  they have a drop-down.  They'd select a reason
7  code.  Whatever I select corresponds to a No. 2 is
8  out of stock.  No. 3 is whatever.  Right.
9     Q.   So, if I go to the very far U -- just
10  bear with me and let your eye go down that line all
11  the way down to U.  Was it U?  Yes.  U.  All the
12  way down the right-hand column.
13        Do you see how it -- there is almost
14  like a line with the explanations?
15     A.   Yes.
16     Q.   And they all end in, not all, but a lot
17  of them, "Override approved.  Your order was sent
18  directly to your DC"?
19     A.   Yes.
20     Q.   Now, does that -- does U correlate with
21  the "Request Reason Code"?
22     A.   Yes.  I believe it does.
23     Q.   I could kind of match up if I went
24  through here and matched them up, whatever is

Page 345

1  entered maybe would have a drop-down menu so you
2  would click and then it would populate in U?
3     A.   I don't know.  That's possible, but I
4  don't know for sure.
5     Q.   Very unlikely that whoever is from
6  Pharmaceutical Integrity is typing in the same
7  notes in U over and over and over again?
8     A.   Well, I mean, even if you just use the
9  first two, you can kind of say that logic doesn't
10  work, right, because the reason request is 2 and 2
11  and you have got two different order statuses over
12  here.  So, they don't correspond.
13     Q.   How do you think U is populated?
14     A.   I think that's a text or free form that
15  the individual under column S is entering.
16     Q.   All right.  So, the information that's
17  in both J under "Request Reason Code" and U is what
18  would give Pharmaceutical Integrity information if
19  you were looking back about why the override was
20  approved or disapproved, correct?
21     A.   That's my understanding.
22     Q.   And this -- the information put into
23  these has to be -- it's important, is it not?
24     A.   It certainly serves a purpose, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1      Q.   More than serves a purpose.  I mean, the
2   override form is can this store exceed the ceiling
3   limits that we've placed on it and that's -- this
4   is a representation of Walgreens Pharmaceutical
5   Integrity talking to the store, correct?
6      A.   As well as their supervisor.
7      Q.   Yes, sir.
8      A.   That's why you have column Q with the
9   sort of the request description, right?  The stores
10  don't necessarily get to request directly.  It's
11  the supervisor of that store that has to initiate
12  the request.
13     Q.   All right.  So, maybe J and K match up.
14  So, J and K correlate.  So, and I missed that
15  earlier.
16          Request reason code 22, emergency
17  situation, emergency situation, right?
18     A.   That could be.
19     Q.   So, emergency situation, and that could
20  be just about anything I would think, right?  That
21  doesn't really give you a lot of information,
22  emergency situation, does it?
23     A.   I'm sure it's a drop-down selection they
24  have.

Page 347

1      Q.   Okay.  And then L, "Pack Size."  What's
2   that mean?
3      MR. STOFFELMAYR:  Where do you see that?
4      MR. MOUGEY:  L, after K.  K, L.
5      MR. STOFFELMAYR:  I'm sorry.  Column L.
6   BY MR. MOUGEY:
7      Q.   "Pack Size."
8      A.   The unit size.  Appears to be the unit
9   size.
10     Q.   And M, "UOM"?
11     A.   I don't know what that -- I don't know
12  what that stands for.
13     Q.   Unit order monitoring?
14     A.   I don't --
15     Q.   You don't know?
16     A.   I have no idea.
17     Q.   Next one, "DC Number"?
18     A.   Um-hmm.
19     Q.   What's that?
20     A.   That would be distribution center that
21  they're serviced out of.
22     Q.   Okay.  And then --
23     A.   Is my understanding.
24     Q.   O, "Control Drug Class"?

Page 348

1      A.   Correct.
2      Q.   What's that mean?
3      A.   That would be their schedule.
4      Q.   Okay.  P, "Request Status Code."
5      A.   I don't know.  My -- I don't want to
6   guess.  I don't know what it means.
7      Q.   Okay.  And then "Request Status
8   Description," and you can see here which ones were
9   approved and they say "DM approved," "Rx approved,"
10  "DM approved," right?
11     A.   Yes.
12     Q.   And DM is the divisional manager?
13     A.   District manager.
14     Q.   District manager.  And I'm a little
15  confused.  I thought they were getting approved by
16  Pharmaceutical Integrity?
17     A.   They are, but -- so, the process, we
18  don't let the stores just make the call.  They have
19  to talk to their leadership over them in the area
20  and say I need a request to exceed my ceiling for
21  these -- this product.  The DM has to go in and
22  make that request to us.
23          So, there is -- it's another -- it's
24  another level, layer of approval process.

Page 349

1      Q.   So, it goes through the DM first and
2   then it goes through Pharmaceutical Integrity?
3      A.   Correct.
4      Q.   And then the request --
5      A.   I believe they actually, the way it
6   works, is the store submits the request.  It goes
7   to the DM.  They have to approve it.  They can
8   approve it or decline it.  If it declines, it just
9   goes back to the store.  If they approve it, then
10  it routes to Pharmaceutical Integrity for review.
11     Q.   Okay.  And "Request Status Role" and
12  then obviously we went through the "Request Status
13  Comments," U, at the end, right?
14     A.   Correct.
15     Q.   Now, I could be mistaken, but I believe
16  that the earliest entry we have been able to find
17  on any override form is September 13.  Okay.  So,
18  I'm looking at column B.  I'm not asking you to...
19          But do you have any understanding of
20  when these override forms or anything similar to
21  this documenting the reasons why the ceilings were
22  allowed to be overridden were captured prior to
23  Pharmaceutical Integrity?
24     A.   I don't, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    Q.   You don't know or you didn't ask?
2    A.   I don't know.  I don't know where they
3 would have been documented.
4    Q.   Was your charge to come in just to start
5 a whole new operation?
6    A.   Yes.
7    Q.   I don't want anyone to look in the
8 rearview mirror.  Start from scratch?
9    MR. STOFFELMAYR:  Objection to the form.
10 BY THE WITNESS:
11    A.   That wasn't how it was described to me.
12 It was described --
13 BY MR. MOUGEY:
14    Q.   How was it described?  You went to
15 Villanova undergrad?
16    A.   No.
17    Q.   Where did you go?
18    A.   I did not.  I took executive --
19    Q.   New Mexico?
20    A.   Correct.
21    Q.   So, you come in in '12.  Walgreens has
22 several thousand stores at that point, right?
23    A.   Yeah.
24    Q.   It has hundreds of thousands of

Page 351

1 employees, correct?
2    A.   Um-hmm.
3    Q.   It had been distributing controlled
4 substances through distribution centers for a long
5 period of time, correct?
6    A.   Yes.
7    Q.   It was in the middle of a significant
8 investigation by the DEA, correct?
9    A.   Yes.
10    Q.   As a matter of fact, it looked like the
11 case may actually get tried about the same time
12 that Pharmaceutical Integrity was being created,
13 correct?
14    A.   Yes.
15    Q.   There was preparation for an actual
16 administrative proceeding with the DEA, correct?
17    A.   Yes.
18    Q.   And you personally were preparing as a
19 possible witness in that case, were you not?
20    A.   I was.
21    Q.   And, so, you were intimately aware of
22 the pressure Walgreens was under in '12 and early
23 '13 with what you referred to earlier as gaps in
24 its system, correct?

Page 352

1    A.   Yes.
2    Q.   And I think it would be fair to say that
3 there was some significant sense of urgency when
4 you took over with Pharmaceutical Integrity.  Is
5 that fair?
6    A.   That's fair.
7    Q.   And as you became educated about what
8 was going on nationally, did you come to understand
9 the significance of the opiate epidemic across the
10 country?
11    A.   Yes.
12    Q.   And you could see that year after year
13 after year for at least a decade that deaths had
14 been increasing, correct?
15    MR. STOFFELMAYR:  Objection to the form.
16 BY THE WITNESS:
17    A.   Yes.
18 BY MR. MOUGEY:
19    Q.   And you were being educated internally
20 through PowerPoints and whatever else from your --
21 from Walgreens that opiate overdoses had overtaken
22 even motor vehicle accidents as a leading cause of
23 death, correct?
24    A.   Yes.

Page 353

1    Q.   And do you know anyone, just socially,
2 kids, family, that you know throughout your network
3 socially of people who have been impacted by the
4 opiate crisis?
5    A.   Yes.
6    Q.   And do you have -- I'm not -- don't
7 tell -- I'm not asking names or anything else.
8        But do you have people that you know or
9 your kids know or spouse knows that had problems
10 with opiate abuse?
11    A.   Yes.
12    Q.   Do you know specifically people -- I'm
13 not asking names -- but that had overdosed?
14    A.   Yes.
15    Q.   Do you or your kids or your social
16 network know people who had overdosed?
17    A.   Yes.
18    Q.   Do you know people who had died?
19    A.   Yes.
20    Q.   So, you understood when you took over in
21 Pharmaceutical Integrity the significance of the
22 national crisis and the import of the task at hand?
23    A.   I certainly was educated, yes.
24    Q.   Did it give you pause for concern about

Page 354

1    the gaps that Walgreens had in its suspicious order
2    monitoring system on the distributor side when you
3    took over?
4        A.   Certainly I wanted -- my job as I saw it
5    was to improve the process and close whatever gaps
6    that may exist to make it a more -- more robust
7    process.
8        Q.   Did any of your team members have -- and
9    I'm saying team in the Pharmaceutical Integrity
10   Department.  I realize you had more areas under
11   your auspices than that.
12            But did any of the team members in
13   Pharmaceutical Integrity have backgrounds in
14   compliance?
15       A.   Not that I'm aware of.
16       Q.   It was a combination of people that had
17   pharmaceutical backgrounds, technical backgrounds
18   and some loss prevention.  Is that fair?
19       A.   Pharmacy backgrounds, what I would call
20   people that were strong with data and analytics and
21   loss prevention.  That would generally surmise who
22   they were.
23       Q.   So -- this is my word.  You tell me if
24   it's wrong.

Page 355

1            You and Tasha Polster assembled a SWAT
2    team, so to speak, of some different areas of
3    specialty.  Is that fair?
4        A.   Well, we certainly hoped to get the
5    right talent in the right place.
6        Q.   Okay.  And you selected Tasha Polster,
7    an administrative assistant, correct?
8            Tasha Polster and an administrative
9    assistant was part of the team, right?
10       A.   I'm not following you.
11       Q.   I'm going to walk through them.  I am
12   looking through the org chart in my head.  Bear
13   with me.
14            You have got Tasha Polster, right?
15       A.   Um-hmm.
16       Q.   You have four managers underneath Tasha,
17   correct?
18       A.   Correct.
19       Q.   And they were each in charge of
20   geographic locations, correct?
21       A.   That's correct.
22       Q.   Underneath one of them is a business
23   analyst, correct?
24       A.   Correct.

Page 356

1        Q.   And there was -- I forget the exact
2    title, but there were also four spots in the org
3    chart underneath the business analysts initially
4    that weren't filled, is that?
5        A.   There was -- we did a high-level sketch
6    when we first started out as what we thought it
7    might look like, yes.
8        Q.   So, Tasha, four business analysts and
9    four managers, so approximately eight people, give
10   or take.  Does that sound about right?
11       A.   Yeah.
12       Q.   Made a fairly significant dent in a
13   matter of months on the amount of scheduled
14   narcotics, opiates that went from Walgreens across
15   the country.  Fair?
16       A.   Well, I think we certainly stood up a
17   number of policies and processes and tools that
18   impacted the dispensing of opioids across the
19   country, yes.
20       Q.   And that was just in a matter of months?
21       A.   Six, eight months, nine months,
22   something like that.
23       Q.   Did you ever get to the point where you
24   were, after you saw what the impact in the opiate

Page 357

1    crisis was across the country as you were being
2    educated starting Pharmaceutical Integrity, get to
3    the point where you were frustrated or upset with
4    how did this happen in the company that I had spent
5    32 years with and how did it get this bad?
6        MR. STOFFELMAYR:  Objection to the form.  Go
7    ahead.
8    BY THE WITNESS:
9        A.   I think there were a number of
10   frustrations not only with, you know -- just in
11   general it's a very complex issue, as I'm sure
12   you're aware.  And as I came up to speed on what it
13   was, I would say that I was frustrated in many ways
14   with what was going on.
15            I was frustrated with the DEA's
16   interaction with us.  I was frustrated with what
17   some pharmacists would do on this.  I was
18   frustrated with -- there was -- it's a -- it's a
19   significant issue.
20       Q.   And Walgreens tapped you and your
21   experience after whatever that point in time was,
22   20 plus years at Walgreens, I need you to assemble
23   a team and I need you to come in and help fix that,
24   and did you ever get to the point where you, "Why

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  in the world did Walgreens not do this ten years
2  ago"?
3      MR. STOFFELMAYR: Objection to the form.
4  BY THE WITNESS:
5      A.  I wouldn't say I got to that point.
6  BY MR. MOUGEY:
7      Q.  There was nothing stopping Walgreens
8  from doing what Rex Swords and Tasha Polster did in
9  2013 from doing that at the very beginning of the
10 opiate crisis ten years earlier, correct?
11     MR. STOFFELMAYR: Objection to the form.
12 BY MR. MOUGEY:
13     Q.  There was nothing stopping Walgreen from
14 doing what you did 10, 11, 12, 13 years earlier,
15 correct?
16     MR. STOFFELMAYR: Objection to the form.
17 BY THE WITNESS:
18     A.  No.
19 BY MR. MOUGEY:
20     Q.  It was a culture issue at Walgreens that
21 said, in response to DEA investigations, in
22 response to a case about to get tried, that
23 Walgreens assembled you and asked you to put
24 together a team to close the gaps, correct?

Page 359

1      MR. STOFFELMAYR: Objection to the form. Go
2  ahead.
3  BY THE WITNESS:
4      A.  I wouldn't characterize it as a culture
5  issue.  I would characterize it more as an
6  awareness issue.
7  BY MR. MOUGEY:
8      Q.  And Walgreens throughout the 2000s
9  profited from a dramatically increasing opiate
10 business at its pharmacies around the country and
11 the profits from the controlled substances it sold
12 went to its bottom lines -- bottom line and didn't
13 take any steps until as dramatic as was taken in
14 2013 to close the gaps, correct?
15     MR. STOFFELMAYR: Objection to the form.
16 BY THE WITNESS:
17     A.  Well, I'm not sure I -- it sounded like
18 a statement, not a question to me.  Is there -- is
19 there a question?
20 BY MR. MOUGEY:
21     Q.  Yes.  What took Walgreens until 2013 to
22 put together eight people out of hundreds of
23 thousands of employees to close the gaps on its
24 suspicious order monitoring policies and

Page 360

1  procedures?
2      A.  Again, I think --
3      MR. STOFFELMAYR: Objection to the form. Go
4  ahead.
5      THE WITNESS: I'm sorry.
6  BY THE WITNESS:
7      A.  Again, I think it was an awareness.
8  This was an issue of national proportion and what
9  happened in Florida really sort of caught people
10 off guard, and we did our best at that time as a
11 company to react to it as quickly as we could.
12 BY MR. MOUGEY:
13     Q.  When you say it took Walgreens off
14 guard, I asked you earlier about your awareness of
15 Congressional hearings that began in late '90s,
16 early 2000s.  Don't you think somebody at Walgreens
17 should have been aware of Congressional
18 investigations that occurred 12, 13 years prior to
19 you coming on board?
20     A.  I don't -- I don't have an opinion on
21 that.  It's -- I don't know what -- what they
22 should or shouldn't have done or what we do as far
23 as monitoring Congressional investigations.
24     Q.  Do you have a -- Walgreens pays for a

Page 361

1  team of lobbyists, does it not?
2      A.  We do have lobbyists, yes.
3      Q.  Yes, sir.  And you would think that
4  anybody with their ear to the ground in DC would
5  know that there was a raging opiate epidemic
6  roaring through the 2000s, would you not?
7      MR. STOFFELMAYR: Objection to the form.
8  BY THE WITNESS:
9      A.  I think, you know, lobbyists do what
10 lobbyists do.  I'm not a lobbyist.  I don't know.
11 BY MR. MOUGEY:
12     Q.  Walgreens.  You would think Walgreens
13 with its hundreds of thousands of employees and
14 several thousand stores have had an awareness of
15 a raging opiate epidemic through the 2000s and have
16 taken action prior to 2013, would you not?
17     MR. STOFFELMAYR: Objection to the form.
18 BY THE WITNESS:
19     A.  Again, I don't have an opinion on it.
20     MR. MOUGEY: Kaspar, if I could take -- let me
21 take five minutes.  I have got a couple docs.  I
22 want to organize them.  My goal is to try to be
23 done in the next 45 minutes.  Does that work for
24 the cat?

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    MR. STOFFELMAYR:  Yes.
2    MR. MOUGEY:  Okay.
3    THE VIDEOGRAPHER:  We are going off the record
4  at 3:10 p.m.
5         (WHEREUPON, a recess was had
6          from 3:10 to 3:39 p.m.)
7    THE VIDEOGRAPHER:  We are back on the record
8  at 3:39 p.m.
9  BY MR. MOUGEY:
10    Q.   We talked about 340B just for a few
11  minutes earlier.  340B.  When did Walgreens -- let
12  me use the word "participating."  I don't know if
13  that's the right word.
14         But when did Walgreens participate in
15  the distribution of Schedule II/Schedule III
16  opiates in 340B?
17    A.   I don't know the dates.  I don't know
18  the dates on.  We have participated broadly in 340B
19  for years.  I'm not sure.
20    Q.   You don't remember?
21    A.   I'm not involved in 340B, so I don't
22  know the dates.
23    Q.   Who would -- what part of the
24  organizational structure at Walgreens would you

Page 363

1  consider to be the -- would know about the 340B
2  program?
3    A.   There is actually a 340B team.
4    Q.   Is there?
5    A.   Yes.
6    Q.   Do you know who's on it?
7    A.   Carl Meehan is the senior director for
8  340B.
9    Q.   Carl Meehan.  And who else is on the
10  team?
11    A.   I don't know the rest of them.  I know
12  the leader.
13    Q.   You know Carl?
14    A.   I know, yeah, I know Carl.
15    Q.   So, it's a big enough business segment
16  that there's at least a team that's designed to
17  manage that process?
18    A.   Yes.
19    MR. MOUGEY:  I don't have any further
20  questions.
21    MR. STOFFELMAYR:  If you don't mind, when you
22  are answering, just --
23    THE WITNESS:  Look at the camera.
24    MR. STOFFELMAYR:  Don't look at me because it

Page 364

1  looks weird.  It's fine.
2         I'm going to follow up.  I just -- a
3  couple things, Mr. Swords.
4              EXAMINATION
5  BY MR. STOFFELMAYR:
6    Q.   You were asked a question a moment ago
7  about a 340B program.  Do you recall that?
8    A.   I do.
9    Q.   And the question was asked in terms of
10  340B distribution.  And just so everybody is clear,
11  as far as you understand it, is Walgreens'
12  involvement in the 340B program as a distributor or
13  dispensing entity or some other way?
14    A.   We are a dispensing entity.  340B is
15  sort of a voucher program.  So, we participate and
16  fill prescriptions for 340B clients.
17    Q.   Do you -- as far as your involvement or
18  knowledge goes, does Walgreens have any involvement
19  in distributing 340B products to other dispensing
20  entities?
21    A.   No.
22    Q.   Some hours ago you were asked some
23  questions about data that the company obtains from
24  companies like IMS or IQVIA or Lexecon.  Do you

Page 365

1  recall those questions?
2    A.   I do.
3    Q.   And you were asked about some of the
4  ways in which the Pharmaceutical Integrity group or
5  others might use that data.
6         Do you use IQVIA data or Lexecon data to
7  evaluate dispensing practices or to evaluate
8  distribution?
9    A.   Dispensing.
10    Q.   Does that data play any role in your
11  evaluation of distribution activities?
12    A.   Not that I'm aware of.
13    Q.   Then you recall some questions earlier
14  today about ways in which the company communicates
15  with its pharmacists about policies and procedures?
16    A.   Yes.
17    Q.   And you made a reference in the middle
18  of one of your answers that I wanted to follow up
19  on to something called LTM.  Do you recall that?
20    A.   LTMP is what we call it, yes.
21    Q.   Could you tell us, what is LTMP?
22    A.   It's a learning talent management
23  platform.  It's how we deploy all of our training,
24  notices, annual attestations for things like HIPAA,

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 controlled substance compliance work, all those
2 things.
3 That's what every team member that's
4 responsible for those certain segments would
5 receive that electronically and go through that
6 training process and attest or take a test or
7 attest at the end that they have completed it.
8 Q. For your pharmacists, does that training
9 including Walgreens' policies and procedures around
10 dispensing opioids?
11 A. Yes. Controlled substances. I wouldn't
12 say it's specific to opioids, but around controlled
13 substances, yes.
14 Q. And how often do your pharmacists go
15 through that training?
16 A. I believe that's an annual requirement.
17 Q. One last question.
18 You were asked a couple questions about
19 interstoring, I think it was phrased. Do you
20 recall that?
21 A. Yes.
22 Q. And did I understand correctly that when
23 interstoring goes on with controlled substances,
24 there are additional procedures than with other

Page 367

1 pharmaceuticals?
2 A. Well, there is no interstoring today of
3 controlled substances. Prior to us stopping that
4 with the Pharmaceutical Integrity teamwork, the
5 process would require a pharmacy supervisor or
6 district manager level responsibility to sign off
7 and permit that interstoring of controlled
8 substances to occur. But, again, no Schedule IIs
9 could be done. It was only Schedule III through
10 Vs.
11 Q. Were Schedule II controlled substances
12 ever eligible for interstoring?
13 A. No. Only when a store closes, you know,
14 completely closes the pharmacy would we have moved
15 those prescriptions to another pharmacy using the
16 DEA 222 forms to make the transition.
17 MR. STOFFELMAYR: Thank you, Mr. Swords.
18 That's all I have.
19 MR. MOUGEY: I don't have anything further.
20 MR. STOFFELMAYR: Great. Thank you.
21 MR. MOUGEY: Thank you, Mr. Swords.
22 Appreciate it. Thank you, you guys.
23 THE VIDEOGRAPHER: We are off the record at
24 3:44 p.m.

Page 368

1 (Time Noted: 3:44 p.m.)
2 FURTHER DEPONENT SAITH NAUGHT.

Page 369

1 I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2 Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:
3 That previous to the commencement of the
examination of the witness, the witness was duly
4 sworn to testify the whole truth concerning the
matters herein;
5 That the foregoing deposition transcript
was reported stenographically by me, was thereafter
6 reduced to typewriting under my personal direction
and constitutes a true record of the testimony
7 given and the proceedings had;
8 That the said deposition was taken
before me at the time and place specified;
9 That the reading and signing by the
witness of the deposition transcript was agreed
10 upon as stated herein;
That I am not a relative or employee of
11 attorney or counsel, nor a relative or employee of
such attorney or counsel for any of the parties
12 hereto, nor interested directly or indirectly in
the outcome of this action.
13
14 _____
CORINNE T. MARUT, Certified Reporter
15
(The foregoing certification of this
16 transcript does not apply to any
reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
certifying reporter.)
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1      INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8  sheet and date it.
9          You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12          It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within thirty (30) days of receipt of the
15  deposition transcript by you.  If you fail to do
16  so, the deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24

Page 372

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4          I, REX SWORDS, do hereby certify under
5  oath that I have read the foregoing pages, and that
6  the same is a correct transcription of the answers
7  given by me to the questions therein propounded,
8  except for the corrections or changes in form or
9  substance, if any, noted in the attached Errata
10  Sheet.
11
12
13  _____
14  REX SWORDS           DATE
15
16
17  Subscribed and sworn
   to before me this
18  _____ day of _____, 20____.
19  My commission expires:_____
20
   _____ Notary Public
21
22
23
24

Page 371

1          - - - - - -
            E R R A T A
2          - - - - - -
3
4  PAGE LINE CHANGE
5  ____ ____ _____
6          REASON: _____
7  ____ ____ _____
8          REASON: _____
9  ____ ____ _____
10          REASON: _____
11  ____ ____ _____
12          REASON: _____
13  ____ ____ _____
14          REASON: _____
15  ____ ____ _____
16          REASON: _____
17  ____ ____ _____
18          REASON: _____
19  ____ ____ _____
20          REASON: _____
21  ____ ____ _____
22          REASON: _____
23  ____ ____ _____
24          REASON: _____

Page 373

1      LAWYER'S NOTES
2  PAGE LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Highly Confidential - Subject to Further Confidentiality Review

**A**

**aapm** 133:19
134:6,8,9,15
**abc** 271:4 272:7
**ability** 129:3
213:8,12
258:17 305:1
307:12,22
326:9,11,16
**able** 61:1 170:6
172:1 187:16
273:20 307:20
325:20 349:16
**abovedescribed**
253:8
**absolutely**
215:23 230:3
238:23
**abuse** 98:1,14
195:8,13
196:17 353:10
**abused** 195:19
**academy** 133:11
133:16,20
**access** 11:19
23:2 136:23
322:21
**accidents** 352:22
**accomplish**
172:9,15,16
**accomplishme...**
253:12
**accomplishme...**
163:4 164:23
**accurate** 34:18
236:12 273:9
370:17
**acknowledged**
235:7
**acknowledges**
234:20 236:2
**acknowledgm...**
372:2
**acronym** 133:20
320:16
**act** 46:3,8,10,17

46:21 61:20
96:3,11,16,21
97:13,16
100:21 101:19
101:24 102:7
103:2,17,24
104:8,15,20
105:16 106:13
106:24 107:9
108:23 109:2
110:9 111:10
113:4 114:18
125:5 185:16
186:22 187:10
187:21 228:3
228:13 229:8
236:6 239:16
239:22 306:14
**acting** 206:10
294:6
**action** 29:13
30:2 31:10
90:6 99:16,21
111:12,14
219:20,20
254:12 255:17
269:14 275:3
313:23 314:20
361:16 369:12
**actions** 239:15
245:4 250:10
254:24 255:6
**activities** 42:6
98:23 111:18
141:16 288:18
290:3 365:11
**activity** 63:5,6
63:11,12 99:3
133:8 281:12
288:1,7
**acts** 206:7
**actual** 144:8
343:3 351:15
**add** 248:3
318:23 338:8
**added** 246:15

295:19
**addiction** 195:8
**addictive** 195:13
195:17 196:6,8
**addition** 12:12
42:5 100:1
166:12 275:14
**additional** 99:4
275:14 366:24
**address** 21:19
191:10 221:14
221:20 341:12
**addressed**
252:21
**addressing**
129:23
**adequate** 198:20
199:24 200:13
206:16
**adequately**
220:1
**administer**
167:21
**administered**
51:1
**administering**
51:3,10
**administration**
76:21 252:24
**administrative**
7:22 190:7,24
251:19 252:9
252:17 256:24
351:16 355:7,8
**administrator**
191:6 234:24
**adopted** 137:3
**adr4** 314:22
**adverse** 13:6
**advice** 103:8
105:2 122:11
127:19 130:4
**affidavits** 14:11
16:11,22
**agarlock** 6:2
**age** 179:5,12

**agenda** 20:3
77:6 164:23
**agendas** 30:8,19
31:3,10 90:10
90:21
**agent** 252:23
**aggregate** 209:6
322:1
**ago** 24:6 55:13
81:14,15
109:12 182:19
286:3 358:2
364:6,22
**agree** 66:21 67:2
67:13 77:10
98:8 118:15
146:23 147:3
160:9 167:3
193:13 195:22
196:2,5,7
199:5,8,11,14
199:18,22
200:9,11,11,12
201:6,10,13
204:24 206:12
206:24 235:13
235:18 236:1
236:11 281:18
298:3 303:24
**agreed** 26:15
92:12 129:16
234:19 235:7
369:9
**agreement** 7:19
136:5 138:4
163:5,5,7,9
163:11 164:24
182:14,16,18
183:3 184:2,7
184:10 186:7,9
190:6,7 191:1
231:13 234:8
234:14,16
**ahead** 9:15
18:17 27:6
30:21 38:12

43:12 44:22
47:8 49:18
56:21 58:4
61:9 62:4
71:15 86:16
91:9 112:17
129:21 137:23
140:8 160:5
167:10 169:24
171:9,14 198:2
211:14 212:24
214:12 216:6
223:15 225:18
230:19 231:20
233:8 256:3
265:4,15
266:15 268:1
282:15 284:6
284:10,16
289:7 290:19
298:11 309:24
316:24 323:8
325:14 357:7
359:2 360:4
**aka** 3:14
**albuquerque**
70:7
**alert** 99:2
**alexandra** 6:2
9:16
**algorithm** 133:5
240:1,8 241:22
242:4,8,18,21
242:23 280:15
284:18 296:6,8
303:7
**algorithms**
120:20
**alice** 110:18,20
111:23 185:2,3
185:6,11,13
**allegation**
199:18 217:20
219:14 220:5,8
**allegations**
223:17 224:14

Highly Confidential - Subject to Further Confidentiality Review

Page 375

**alleged** 223:19
224:5 228:3
232:7
**alliance** 3:13
**allow** 145:9
263:11 315:8
323:18
**allowed** 168:16
233:3 316:18
324:18 334:12
349:22
**amend** 262:10
270:17
**american**
133:11,16,20
**amerisource**
333:2
**amerisourceb...**
5:2,2 9:23
271:19
**ames** 86:22
**amos** 86:22,23
86:24
**amount** 42:14
48:22 208:16
244:11,21
285:8 307:15
314:8 356:13
**amounts** 198:23
200:3
**analogy** 48:15
**analysis** 275:16
**analyst** 134:23
279:1 355:23
**analysts** 247:14
247:15,17,21
356:3,8
**analytics** 354:20
**analyze** 305:2
**ancillary** 156:18
**anda** 293:9
333:2,9
**annual** 75:2
365:24 366:16
**answer** 16:2
43:18 45:4

50:3,8,15,16
50:19 55:15
57:19 60:14
75:6 96:6,14
100:24 101:7
101:14 102:11
102:21 103:10
104:6,24 105:1
105:8,8,13,19
106:11 107:24
108:3,15 109:8
121:13 122:8
128:10 129:1,3
130:6,18 137:6
154:2 180:23
181:10 198:2
216:8 221:21
224:13,24
225:4 226:16
226:21 229:11
229:13 230:7
231:16,23
232:2 240:22
241:18 255:6
283:2 288:15
311:11
**answered** 89:19
242:3
**answering**
102:10 130:1
284:6,7 363:22
**answers** 141:7
153:22 304:12
365:18 372:6
**anticipation**
219:19
**antidiversion**
220:18
**anybody** 31:4
89:24 90:1,5
93:12 210:7
212:9 247:10
283:11 314:6
319:4 361:4
**apap** 342:14
**apart** 46:6

**apologize** 55:11
56:21 68:10
85:18 89:18
96:19 119:17
119:17 279:10
288:5 307:2
312:6
**apparently**
220:14
**appear** 23:18
24:3 66:18,20
107:14
**appearances** 3:1
4:1 5:1
**appeared** 24:11
24:19 25:12
33:23
**appears** 34:19
133:19 135:9
157:13 208:2
220:17 253:19
282:7 292:14
332:14 340:1,5
347:8
**appendix** 190:8
190:10,23
228:17
**applicable** 44:8
50:7
**application**
323:17
**applied** 51:19
60:21 292:7
**applies** 330:23
332:9
**apply** 49:20
179:1 332:20
334:22 369:16
**applying** 21:16
244:12,13
293:24
**appreciate**
29:22 170:12
199:11 367:22
**appropriate**
244:13 253:11

255:1,8 284:8
284:14 370:5
**approval** 18:3
172:2 174:2
325:5 348:24
**approve** 137:13
170:16,19
173:12,20
301:4,5,21
349:7,8,9
**approved**
137:18 169:20
170:8 171:19
297:24 301:12
302:15,23
304:15 305:15
326:1 341:1,4
344:17 345:20
348:9,9,9,10
348:15
**approving**
302:24 303:2,4
**approximately**
208:6 340:19
356:9
**april** 44:3 59:2
190:5
**area** 64:5 86:6
142:1 291:15
292:17 326:20
348:19
**areas** 11:9,10
18:5 63:24
64:19 204:22
205:1 206:2
354:10 355:2
**arent** 292:21
**argue** 32:17
**arguing** 229:24
230:7 283:24
284:3,12
**arizona** 18:14
19:13 20:5,9
20:18 22:7
25:6,12 26:4
33:21 35:8

37:8,10,14,16
37:17
**arnold** 4:5 10:4
**arnoldporter**
4:7
**arranged** 27:13
30:24
**arrive** 159:5,16
**asked** 12:11
19:5 20:3 23:8
23:13,17,19,23
24:3 25:8
28:11 31:9
43:19 55:12
59:3 89:18
92:18,19 94:18
94:22 95:4,12
95:15 102:22
113:7 117:19
124:17 125:24
139:4 177:11
213:18 229:2
230:9 240:9,13
242:5 250:12
250:14 255:5
260:20 261:22
276:3,8 283:9
286:13 294:3
358:23 360:14
364:6,9,22
365:3 366:18
**asking** 14:16,17
14:18 19:17,19
24:18 26:11
29:23 32:2
33:5 47:21
59:4 61:4
74:22 75:1
105:13 123:9
123:21 126:13
126:14,19
139:3,17,18
141:14 146:4,7
157:23 197:11
197:22 199:13
199:21 204:18

Highly Confidential - Subject to Further Confidentiality Review

205:11,12
216:16 255:9
255:10 256:11
266:20,23
276:13 282:8
282:22,22
284:19,20
302:21 312:5
329:15 349:18
353:7,13
**asks** 178:1 214:6
339:23
**assemble** 357:22
**assembled** 355:1
358:23
**asset** 83:9 87:2
**assigned** 339:24
**assignments**
112:11
**assigns** 208:13
**assist** 118:11
160:2,19
186:19 204:21
205:14 206:1
**assistant** 6:4
191:5 234:24
355:7,9
**assisted** 160:1
**assisting** 187:6
187:17
**association**
94:15
**assuming** 31:16
79:13 82:14
95:17 96:6
**assure** 76:19
**attached** 209:9
327:15 370:11
372:9
**attachment** 7:15
7:17 8:5,17,20
131:11 157:4
269:23 327:4
337:16
**attempted** 323:5
323:14

**attempting**
175:12
**attempts** 158:19
**attend** 31:18,24
74:8
**attended** 29:16
30:24 31:20
74:13 90:3
**attending** 32:23
74:10
**attention** 117:7
198:12 208:24
279:5 328:17
**attest** 366:6,7
**attestations**
365:24
**attorney** 29:17
109:19,23
222:1 226:7
369:10,11
370:13
**attorneyclient**
106:1 222:2,14
223:11 224:3
224:11 225:21
226:8 227:5
**attorneys** 29:16
109:18,20,21
210:4 225:2
227:1,4,9
**audio** 17:15
**august** 278:24
328:22 329:8
**ausili** 97:21
**auspices** 354:11
**authority**
326:19
**authorized**
252:22 253:7
174:18 206:19
**auto** 311:9,13
**available** 32:1
**avenue** 3:8 4:5
**average** 208:13
208:16
**avoid** 220:18

**avoiding** 220:12
223:22 224:16
**aware** 17:13
43:17 45:7
46:8,11 47:14
136:22 140:21
141:22 149:5
214:20 215:1,5
215:14 249:21
250:15,18
251:3,6 308:5
308:13 318:1
329:7 351:21
354:15 357:12
360:17 365:12
**awareness** 359:6
360:7,14
361:14

---

**B**

**bachelor** 38:1
70:6
**back** 17:19
26:11 29:4,19
30:1 35:6,13
37:7,9,13,16
50:14 56:6
72:4 82:3,13
82:20,23,24
85:8 87:21
88:13 89:17
133:24 134:21
136:10 157:19
176:3,20
180:10 182:9
183:23 188:1
188:22 190:10
191:24 210:2
218:7 227:11
228:16 235:3
237:2 258:7
263:6 265:8
279:12 282:3
285:3 286:14
287:7,21
289:16 292:22

294:18 295:20
296:15 300:9
305:1 306:21
309:12 311:23
320:3 331:12
340:23 345:19
349:9 362:7
**background**
92:13,22 93:13
93:21 94:24
95:10 184:6
189:7 191:4
231:2
**backgrounds**
93:10,16
354:13,17,17
354:19
**backstop** 333:1
**backwards**
81:22
**bad** 114:22
143:3 343:22
357:5
**ballpark** 137:21
246:24 247:6
**bancroft** 279:24
280:3,18 281:5
**banking** 78:3
**bar** 342:20
**barb** 317:14,16
318:10,22
**bartlit** 2:10 3:15
**bartlitbeck** 3:17
**based** 20:9,17
101:14 107:24
107:24 108:2
202:18 206:18
208:12 214:1
232:9 233:14
235:15 244:3
267:8 317:5
341:9
**basically** 41:5
293:20
**basis** 48:19
104:23 105:19

243:3
**bates** 75:17 83:5
116:17 131:14
131:20 133:10
157:12,14,20
163:12 253:4
261:15 278:23
310:24 312:21
320:7 324:1
326:22 327:18
**baylen** 3:4
**bear** 117:7
182:12 190:16
190:19 268:5
344:10 355:12
**beck** 2:10 3:15
**becoming**
226:24
**began** 35:3
120:17 121:19
137:7 240:3
267:9 275:3
360:15
**beginning** 35:13
38:23 53:9
58:10 117:8
123:21 152:6
153:3 161:2
169:14 214:16
215:3,21
248:12 266:11
272:22 275:24
278:14 358:9
**begins** 198:13
209:2 272:17
328:22
**behalf** 3:2,13
4:2,10,16 5:2,8
5:13 9:14,16
9:18,20 10:4
15:1,17,18
26:13 207:20
**believe** 11:13
12:19 23:9,21
32:11,21 52:9
53:10 54:24

57:6 68:20
73:21 74:18
83:8 86:8
100:10 110:17
111:22 130:9
138:18 152:23
154:19 166:8
204:13 205:7
217:3 222:12
222:20 223:9
233:1,10 237:5
243:12,21
257:7 258:8,15
260:9 263:10
264:10,22
269:2 276:20
301:1,3,14,23
304:16 305:17
307:18,19
332:17 335:14
337:23 339:11
341:3 344:22
349:5,15
366:16
**believed** 98:24
243:17 259:15
**believes** 194:6
**bell** 185:20
186:2
**belong** 341:9
**ben** 6:10 9:2
**best** 75:6 122:16
220:20 339:15
360:10
**better** 82:21
288:20
**beyond** 98:13
101:1
**big** 142:1 169:17
193:13 338:24
363:15
**bigger** 62:11
**binder** 7:19
155:8 179:5
183:1
**bit** 33:10 79:11

**boy** 154:12
**brandnew** 214:8
**bratton** 296:6
**break** 16:19
181:22 236:20
319:16
**breath** 154:4
**brian** 262:10
270:17
**bring** 210:5
**bringing** 73:15
**broad** 14:20
108:15 242:16
283:14
**broaden** 57:4
139:10 140:20
**broadly** 60:21
362:18
**brokered** 27:13
**brought** 11:18
13:4
**budget** 52:22
247:2
**build** 212:10
240:19 241:7
**building** 118:24
121:20 212:5
274:24 275:15
**buildings** 42:22
**buildout** 152:5
**built** 135:13
158:1 161:2
214:5 241:1
246:16
**bullet** 41:17,17
52:19 118:7
167:16 177:23
272:11,16
**bullets** 64:24
**bunch** 296:6
**business** 17:2
41:20 42:7,8
52:20 58:19
59:5 60:19
65:3 78:9
79:20 132:8

134:23 137:15
139:20 141:16
142:19 144:6
152:10,21
155:14 257:15
269:16 275:4
276:5,6 314:7
333:3 355:22
356:3,8 359:10
363:15
**buy** 245:1
**bypassed** 308:18

**C**

**cage** 250:7,16
**california** 191:9
194:24 228:9
228:24 229:4
229:10,14
232:12,17
233:14 268:9
**call** 13:5 16:24
19:19 23:19
41:16 61:11
79:10 168:9
179:3 247:13
247:20 248:5
280:17 325:17
337:23 348:18
354:19 365:20
**called** 2:4 10:12
18:22,24 23:8
23:12,14 24:1
53:22 146:21
365:19
**calls** 148:18,20
148:23
**camera** 363:23
**canceled** 297:1,2
297:21 300:17
**cant** 104:5 105:8
105:13 139:22
171:17,22,23
180:9 242:22
242:22 311:21
**capable** 115:14

**capacity** 115:21
**captioned** 252:4
**capture** 155:15
156:15 170:2
301:16
**captured** 338:14
349:22
**capturing**
156:13 301:11
**cardinal** 4:16
255:21,21
269:16 272:7
293:9,22 310:8
311:23 313:22
314:1,19
316:20 332:19
332:21 333:1,9
**cardinals** 314:5
**care** 334:21
**career** 20:13,14
35:14 37:7
38:6,16 45:19
167:6 214:5
**carefully** 370:4
**caremark** 11:19
**carl** 363:7,9,13
363:14
**carved** 39:21,23
**case** 1:5 10:18
13:11 105:24
107:7 123:17
128:24 302:11
342:8 351:11
351:19 358:22
**cases** 1:7 12:13
12:17,18,22
13:4,15 100:18
100:22 101:6
101:12,16
107:20 108:9
**cat** 361:24
**catalyst** 91:13
91:20 111:8
**catch** 192:2
**categories** 12:16
14:10 16:19

**boy** 154:12 — (second column)
**bleed** 188:1
**bleser** 116:13,14
116:15,19
**blesers** 118:15
**block** 54:15
297:19
**blocked** 297:21
**blocks** 55:14
**blue** 178:9
179:16
**board** 14:13,22
15:16 16:13,16
17:19,21,23
18:6,9,10,13
18:14 19:4,11
19:21 20:2,23
21:8,11,12,13
21:19 22:8,11
22:23 23:6
24:11,15,19
25:5,13 26:1,5
97:23 133:24
360:19
**boards** 15:3
18:2 19:14
25:19 33:23
**body** 117:1
**bones** 244:16
**book** 15:24
185:5
**boots** 3:13 79:19
81:10,12
**boss** 77:14,15,18
320:9
**bosses** 321:24
**bottle** 342:20
**bottom** 69:4,24
89:8 157:20
259:7 261:14
272:16 279:6
359:12,12
**bounced** 306:23
**box** 328:17
334:2

**82:21 153:22**
288:9

Highly Confidential - Subject to Further Confidentiality Review

25:1 108:11,15
342:24
**categorized**
13:10 196:11
**categorizing**
14:14
**category** 24:2,3
26:8 144:9
196:16 291:9
**caught** 360:9
**cause** 19:11,13
191:7,13
193:10,14
219:15 228:10
229:5 232:7
234:6 352:22
**ceiling** 167:16
167:17,18,22
168:1,6,17,23
169:4,7,9,19
170:8,20,22
171:5,7,12,18
172:2 173:10
173:18,24
243:8 244:12
292:7 303:8,10
303:12,15
305:8 322:14
336:18 346:2
348:20
**ceilings** 349:21
**center** 92:3
192:6 194:6,15
194:16 218:15
218:21 248:9
248:10 249:23
249:23 250:5
250:17,22,22
251:5,8,24
254:4,6 257:2
257:4 258:2,12
263:21 265:21
268:10,16
271:23 311:7
311:19,22
312:3,10

347:20
**centers** 91:6
124:9,19
163:19 178:22
179:1 189:4,9
194:11,20
237:9 251:10
254:11,20
255:11 256:19
258:19 259:23
260:8 264:8
265:19 269:12
271:15 281:11
294:8 329:10
332:23 334:24
351:4
**central** 41:12
317:4
**centralization**
42:5
**centralized**
41:19 138:7
151:7
**centre** 5:14
**ceo** 80:3
**certain** 34:10
41:1 75:11
78:9 94:3
116:8 131:8
157:1 182:23
220:17 234:22
236:2,4 251:17
259:2 269:20
278:17 279:14
287:8 296:22
310:17 312:23
319:23 324:3
325:3 327:1
336:10 337:13
339:2 366:4
**certainly** 73:13
80:19 115:18
115:20 127:24
135:17 162:6
162:16,22
180:20 212:13

222:20 238:16
245:17 265:7
266:17 310:2
323:10 344:2
345:24 353:23
354:4 355:4
356:16
**certificate** 191:8
193:21
**certification**
369:15
**certified** 2:9
369:2,14
**certify** 369:2
372:4
**certifying**
369:17
**cetera** 333:10
**cfr** 201:2,16
**chain** 53:24 54:1
54:2,21 56:8
56:11 57:7,18
57:23 58:20
59:6,10 70:13
84:3,10,14
87:16 94:16
118:10 120:23
139:12 142:13
142:15,24
143:1,5,15
189:23 259:14
260:11,13,19
261:1,6,6,21
262:2 270:8,9
270:16,20
272:10,10
278:7,10
332:22
**chaired** 26:21
**challenges** 27:16
73:7,9 200:18
265:7,11
**chance** 94:9
227:15
**change** 141:8
248:11 258:21

292:20 326:7
371:4
**changed** 54:12
55:21,22,24
137:19
**changes** 25:22
248:22 370:10
372:8
**changing** 274:20
**characteristics**
22:22
**characterizati...**
276:12
**characterize**
37:9 38:5 61:1
61:3 63:2,14
63:18 65:20
73:4 167:13
265:18 275:10
276:14 326:6
359:4,5
**characterized**
64:9
**charge** 51:17,22
97:23 114:8
115:3 212:2
256:13,14,17
273:6 274:1
321:5 350:4
355:19
**charged** 64:6,19
**chart** 80:23
135:20 329:18
355:12 356:3
**charts** 82:23
**checked** 336:19
**checklist** 302:8
302:10
**checkpoints**
301:24
**checks** 331:3,9
**chicago** 1:18
2:12 3:16 4:12
5:4,10 9:7 70:8
70:8 114:20
**chief** 75:22 87:7

262:7
**choose** 66:7
**cii** 177:14
268:21 269:3
272:12,24
273:13 311:18
312:2
**ciii** 273:13
**circulated** 100:1
**circumstances**
325:3
**cites** 193:22
**city** 110:16
**civil** 2:5
**claims** 13:3,6
220:14
**clarification**
19:18 20:4
21:10 23:8,20
49:1
**clarify** 120:12
237:22 241:3
325:17
**clarke** 185:19
**class** 347:24
**classes** 144:3,6
**classification**
195:10
**classified** 179:13
179:14 196:9
298:20
**classify** 249:3
**clean** 128:14,24
129:1
**clear** 74:22
129:10,11
197:22 250:23
364:10
**clearly** 232:15
**cleveland** 39:4,7
40:9,10
**click** 178:12
345:2
**clients** 364:16
**clinic** 292:18,19
**clinics** 334:21

Highly Confidential - Subject to Further Confidentiality Review

close 179:4
252:15 305:13
323:5,15,16,17
354:5 358:24
359:14,23
closed 173:24
323:20 335:23
337:3
closely 62:21
closer 14:6
closes 367:13,14
cocaine 196:22
196:24 197:3,5
197:17,24
198:7
cochair 27:3
77:10 94:19,23
cochaired 26:22
27:2 72:23
73:18
cochairs 97:21
98:12
code 98:2,13
100:4 201:2
203:21 286:18
341:24 342:2,3
342:18,20
343:12,19,21
344:7,21
345:17 346:16
348:4
codes 343:22
344:1,3
codifying 98:14
coffee 50:3
coincidental
269:8
collaboration
73:6,9
collect 141:4
collected 140:5
collection
141:15,18
144:19 291:21
column 174:21
340:11,12

343:3,7 344:12
345:15 346:8
347:5 349:18
com 1:23 3:6,10
3:17 4:7,13,19
5:6,11,16 6:2
combination
343:6 354:16
come 18:21
23:10,13 24:1
24:4 29:4 70:5
82:22,24 89:24
90:2,5 103:17
275:8 279:12
282:3 283:16
287:21 296:5
300:11 350:4
350:21 352:8
357:23
comes 263:4
295:8 296:16
339:23
comfortable
146:18
coming 48:23
214:22 360:19
commencement
369:3
commencing
2:13
comments
118:16 318:24
349:13
commerce
314:10
commission
372:19
committed
118:11
committee 14:22
26:18,21,24
27:1 72:9,10
73:19,21 74:4
74:6 76:1,3,6
76:19 77:11
87:23 88:7,14

88:17 89:7
95:5,18 316:7
committees 27:7
72:18 73:3
communicate
148:12 149:1
151:12 154:17
166:20 176:20
176:24 178:22
183:11 223:24
communicates
365:14
communicating
148:7 150:19
179:22
communication
3:11 24:21
150:17 151:14
156:20
communicatio...
23:24 24:24
25:9 26:12
27:6 102:15
108:19 180:12
223:9 224:10
225:23
community 23:1
23:1
companies 4:3
141:3,15,18
275:8 364:24
company 5:13
15:1,17,19
57:14 60:10
88:22 122:13
136:2 143:22
219:24 220:10
254:13,15,15
254:15 256:7
258:20 292:9
357:4 360:11
364:23 365:14
compared 183:7
285:9 286:8
comparing
146:9

compensation
70:13 71:4
competitive
144:12
complaints
22:18,18,24
complete 16:2
152:6 177:12
completed
134:22 209:7
366:7
completely
135:19 225:9
367:14
complex 357:11
compliance 7:11
27:1 60:24
61:5,7,14
65:12,15,21
66:9,11 72:9,9
72:20 73:5,10
73:14 75:22
76:1,3,18,19
76:20 87:7
88:2,15,18,24
89:5 92:13,15
92:20,22 93:6
93:10,13,14,18
93:21 94:5,11
94:20,23,24
95:5,9,11,18
98:6 116:4
211:23 220:11
222:5,6 236:5
239:21 241:10
354:14 366:1
compliancefoc...
90:24
compliancerel...
73:3
complicated
102:17
comply 114:3
209:7
component
40:19 41:8

147:13 176:19
212:11 238:3
287:17
components
65:8 147:11
238:13 290:7
291:10
computer 165:8
computerized
253:10
concept 324:8
334:17,19
concern 213:3
257:12,18
258:16 263:19
353:24
concerned 22:17
212:14,15
263:15
concerning
369:4
concerns 251:4
251:6 265:2
321:1
conclusion
107:23 255:18
266:17,20
conclusions
164:8
condensed 53:6
conduct 190:11
198:20 199:23
200:13 223:8
223:19 224:4
conference
18:20 19:3
148:18,19,22
150:15
conferences
149:9 150:21
150:22 151:17
confident 79:3
confidential 1:9
102:15
confidentiality
1:10

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| **confidentially** 130:5 | **contact** 19:11 23:21 86:12 176:2,16 | 43:22 46:3,8 46:10,16,20 63:8,9 72:11 | 366:11,12,23 367:3,7,11 | 47:6,23 48:4 48:13,19 49:9 52:8,23 53:1,4 |
| **confined** 13:16 | **contacted** 19:4 | 72:21 73:8 | **controls** 337:9 | 53:5,7,8 54:16 |
| **confused** 45:16 46:23 50:15 172:13 237:13 348:15 | 20:2 23:17 24:20,20 292:5 | 90:4 96:3,11 96:16,21 97:13 | **convenient** 319:18 | 56:10,14,17 |
| | **contained** 42:23 | 97:16 98:2 | **conversation** 273:8 | 58:6 60:4,5 |
| **confusing** 183:9 | 202:5 | 100:21 101:19 | **conversations** | 64:2,3,8,22 65:2,8,9,22 |
| **confusion** 328:2 | **containing** 7:19 183:1 | 101:24 102:7 103:2,17,24 | 15:12,14 17:7 186:8,13,18,20 | 66:10,19 67:10 67:16 68:1,2,4 |
| **congressional** 215:2,8 360:15 360:17,23 | **contemplated** 26:2 | 104:8,15,20 105:16 106:13 106:23 107:9 | 210:4 226:7 243:23 | 68:5,18,22 69:4,7,10,14 |
| **conjunction** 113:16,19 | **contemporane...** 205:18 | 108:22 109:1 110:9 111:10 | **converted** 292:15 | 69:18 70:1,10 70:14,19 71:1 |
| **connolly** 4:17 | **contemporane...** 206:2 | 113:3 114:18 124:20 125:5 | **convey** 226:24 **cooper** 4:13 9:20 | 71:7,10,13 72:12 73:10 |
| **connotation** 146:24 | **content** 11:17 | 126:22 143:6 143:16,24 | 9:20 **copied** 116:24 | 75:22 76:6 77:1,24 85:14 |
| **consider** 60:23 98:24 99:2 101:16 241:4 363:1 | **context** 140:6 141:9,20 142:10,19 143:2,6,16 176:11 318:2 | 149:16 150:8 173:14 175:8 177:18 185:16 186:22 187:9 | 270:13 **copy** 34:15,18 251:23 | 85:15 87:14,15 87:19,20 89:16 90:12 92:13,14 92:16,17 94:16 |
| **considerable** 70:9 | **continue** 77:9 | 187:21 189:11 | **copying** 253:8 | 94:17,20,21 |
| **consideration** 99:6,8,16 100:2 | 118:11,22 240:4,16 286:1 | 195:5,18 196:3 198:24 199:2 | **corey** 6:7 **corinne** 2:7 6:12 | 95:7,24 96:24 96:13 97:4 98:4,5 |
| **considerations** 100:3 | **continued** 4:1 5:1 71:9 198:23 200:2 | 200:3,5 217:22 228:3,12 229:7 232:9 233:4,13 | 10:7 369:1,14 **corporate** 51:12 | 99:21 101:24 104:17 107:2 |
| **considered** 98:23 | 234:7 257:13 269:14 276:22 | 233:23 234:1 236:4,6 239:16 | 60:18 63:16 70:9 87:17 | 107:10 109:3,6 113:8,10,21,22 |
| **consistent** 220:19 223:24 224:4,14 236:5 | **continues** 71:8 **continuing** 18:20 76:19 | 239:22 253:8 253:18 254:8 254:14 255:19 | 88:1 166:23 184:15 207:20 207:22 | 114:3,6,21 115:5 116:13 118:3,4,8,9 |
| **consisting** 209:6 | **contract** 137:16 | 256:8 258:22 | **corporation** | 123:1 124:2,10 |
| **consolidation** 69:12 | **contracted** 41:1 42:17 | 264:1 269:6 273:3,22 274:2 | 4:10 5:2,2 193:20 206:19 | 124:21,22 125:7,11,16,21 |
| **consortium** 26:16 27:4 | **contracts** 137:13 138:7 | 274:11 281:10 306:13 314:9 | 252:10 **correct** 13:22 | 126:4,10,17,23 127:7,15 128:6 |
| **constitutes** 193:24 369:6 | **contrary** 220:9 **control** 161:13 | 322:23 324:16 324:24 325:20 | 20:7,10,11,19 20:20 22:3,4 | 130:16 131:1 131:21 132:7 |
| **consumer** 22:17 23:1 | 191:6 207:9 235:1 244:13 | 326:9,12,16 327:20 328:14 | 26:18 35:15 36:7 38:3,4,16 | 132:12,13,18 132:24 133:6 |
| **consumers** 140:3 | 317:5 325:21 337:21 347:24 | 329:19,23 342:4 351:3 | 38:17,21,22 39:1,6,8,9 | 133:22 135:8 135:21 138:9 |
| **consuming** 137:10 | 369:17 **controlled** 42:24 | 359:11 366:1 | 40:20,21 41:22 43:1,3 44:4,5 46:10,13,14 | 140:6,18,19 141:5 142:11 145:16 146:1 |

| | | | | |
|---|---|---|---|---|
| 146:11 147:7 | 213:9,14,22 | 304:14,19,24 | **correctly** 252:13 | 249:12 352:10 |
| 147:15,23 | 218:21 219:11 | 305:7,15,16,20 | 272:19 366:22 | 356:15,19 |
| 149:15,19,20 | 219:21 220:3,7 | 306:5,14 | **correlate** 344:20 | 357:1 359:10 |
| 149:23 150:4,5 | 220:23 221:8 | 308:24 311:8 | 346:14 | **couple** 10:20 |
| 150:10,11 | 221:16,22 | 311:11,15 | **correlates** | 13:19 36:15 |
| 151:4,9,10,13 | 222:5,10,11 | 312:2,3,4,8,9 | 343:19 | 89:20 93:20 |
| 152:2,7,22 | 225:7,11,15 | 312:12,15,18 | **correspond** | 99:9 178:5 |
| 153:3 156:1 | 226:2,11,17 | 313:11 314:2,5 | 345:12 | 212:18 236:16 |
| 157:14,16,17 | 227:5 228:4,13 | 314:11 315:5 | **corresponds** | 275:24 282:5 |
| 157:18 158:2 | 229:8,12 | 315:21,24 | 91:4 344:7 | 286:3 315:23 |
| 158:21 159:12 | 232:17 233:21 | 316:21 317:14 | **cost** 324:20 | 361:21 364:3 |
| 160:3,14,21 | 234:4,5,8,9 | 318:20 320:12 | **costsaving** 213:9 | 366:18 |
| 161:5,12,21,22 | 235:4 237:9,16 | 320:15 321:2,3 | **coughlin** 84:2 | **courier** 42:18 |
| 162:2,3,5,19 | 237:21 238:4 | 321:6,7,14,15 | 85:17,22 | **course** 17:2 |
| 162:20 163:1,2 | 238:10,15,19 | 321:18,19 | **couldnt** 81:1 | 37:12 124:6 |
| 163:13,20,23 | 239:3,24 | 322:9,15,16,18 | 90:13,16 | 215:17 233:17 |
| 164:4,13,17,18 | 242:10 248:6,7 | 323:1,2,6,15 | 165:10 168:2 | **court** 1:1 9:9 |
| 165:13 166:24 | 248:14 249:12 | 323:22 324:9 | 192:17 240:7,7 | 10:6 17:15 |
| 168:18,24 | 249:16 250:8 | 324:12,17 | 277:7 295:18 | 252:4 370:17 |
| 169:5 170:9,17 | 251:11 252:11 | 325:11 326:1,2 | 319:6 331:19 | **courtroom** |
| 170:20,23 | 252:14 253:16 | 326:5,13,14,17 | **counsel** 9:17 | 105:22 |
| 171:2,7,20 | 253:18 254:4,8 | 329:20 331:10 | 10:2 29:22 | **courts** 2:6 |
| 172:4,11,19,23 | 256:19,21,22 | 331:20,21 | 30:12 32:21 | **cover** 222:13 |
| 173:5,12,15,20 | 257:2,5 258:5 | 332:7,16 333:3 | 34:16 89:7,13 | 225:2 |
| 173:21 174:2,6 | 259:18,19,23 | 333:4,17 334:9 | 89:15 96:4,5,7 | **covered** 72:20 |
| 174:10 175:10 | 260:17 261:10 | 334:10 335:6 | 96:8 100:10 | 85:17 163:18 |
| 175:14,20 | 261:11 263:2,8 | 338:16,20,21 | 103:9,18,20 | 164:2,12 |
| 176:3 177:1,15 | 263:21,24 | 338:22 339:21 | 104:1,1,9,12 | 308:22 309:4 |
| 177:18 178:2,6 | 264:5,20 | 339:22 340:14 | 104:16 105:3,7 | **covering** 44:18 |
| 178:11,13,14 | 265:13 266:3 | 340:17 341:6,7 | 106:14 108:3,5 | 134:15 223:9 |
| 180:16 189:16 | 266:13 267:6 | 341:11,13,16 | 109:13 110:1,3 | 223:20 224:2 |
| 190:2,3 191:10 | 267:12,23 | 342:5 343:9,10 | 110:4 113:2 | 224:10 |
| 191:16,22 | 268:13,14,17 | 343:13,19,20 | 114:9 119:22 | **covers** 11:8 |
| 192:7,9 193:5 | 268:18 274:13 | 345:20 346:5 | 121:12,13 | 190:11 |
| 193:8,11,16 | 274:14 275:21 | 348:1 349:3,14 | 184:15 186:9 | **crawford** 78:15 |
| 194:12,17,21 | 276:1,7,19,24 | 350:20 351:1,5 | 186:11,14,20 | 80:1,7 320:9 |
| 194:22,24 | 277:2,22 278:1 | 351:8,13,16,24 | 187:8,18,19,19 | **create** 126:8 |
| 195:1,5,9,14 | 280:1 285:22 | 352:14,23 | 221:22 222:15 | 213:12 276:18 |
| 196:12,18,21 | 286:12 294:7 | 355:7,17,18,20 | 224:1 225:23 | **created** 60:4 |
| 196:22 197:3,6 | 295:2,17,23 | 355:21,23,24 | 284:8 369:10 | 66:22 69:14 |
| 197:17,24 | 296:21,24 | 358:10,15,24 | 369:11 | 119:21 120:2 |
| 198:8 204:23 | 297:12 298:1,2 | 359:14 372:6 | **counsels** 104:5 | 121:6 122:4 |
| 205:15,19 | 298:17 299:8 | **corrected** | 107:24 | 215:7 280:18 |
| 206:3 207:14 | 299:18 300:4,7 | 233:11 | **country** 124:8 | 351:12 |
| 207:24 211:1 | 303:8,9,13,17 | **corrections** | 124:18 189:4 | **creating** 117:12 |
| 212:3,4,7,8 | 303:22,23 | 370:4,6 372:8 | 215:9 228:1,6 | 167:5 214:5 |

Highly Confidential - Subject to Further Confidentiality Review

creation 34:4
117:19 125:10
213:20 216:2
creative 64:6,20
credibility
220:15
crisis 353:4,22
357:1 358:10
criteria 202:6
208:20 291:5,7
299:12,14,16
302:15 303:2
304:6,21
crossed 115:23
crucial 87:22
csa 97:4
cso 297:22
culture 88:1
216:21 358:20
359:4
cumulative
322:2,8,13
curb 98:1
current 34:21
179:9 210:5
213:4 330:11
customer 206:21
customers 201:1
201:15 208:3
314:5
cutting 153:21
153:24 154:6
308:13,18
cv 66:8 68:20
82:20 92:11
176:12,24
177:15 213:7
cvs 11:19

**D**

daily 322:12,13
damn 320:18
dan 1:6 84:2
85:17,20,22
danger 193:24
194:7

dangerous
196:10
dangerously
195:17 196:7
dans 86:2
darn 320:20
321:13
data 136:2,2,5,7
136:16,19,24
137:7,11
138:17 139:13
139:15,19
140:5 141:4,15
141:18 142:2,5
142:7,9 143:21
144:4,10,12,19
144:23 145:5
146:14 160:13
160:16,18
286:19 287:16
291:21 309:6,8
309:11 310:3
354:20 364:23
365:5,6,6,10
database 301:16
databases
339:12
date 9:4 34:21
52:14 91:3
97:20 132:17
132:22 235:3
237:18 262:20
277:5 294:13
294:14 316:6
327:8,14
330:12 340:2,5
340:6,13,16
341:1 370:8
372:14
dated 76:9 116:7
116:18 157:17
157:22 184:20
192:24 279:20
324:2 326:23
336:9 337:19
338:4

dates 11:23
21:24 52:9,11
73:20 74:1,20
75:8 117:21
152:14 272:8
316:11 327:12
328:21 362:17
362:18,22
dating 263:6
265:8
dave 77:13,13
77:18 80:7,14
85:18 113:11
113:12 117:14
118:1 322:20
david 185:19,22
320:9
day 5:9 38:15,15
55:7 105:23
112:2 126:10
135:2 179:12
288:6 322:4
372:18
days 70:5 204:9
206:9 263:2
275:21 370:14
daytoday 61:23
62:9 139:20
141:16 144:6
dc 4:6,18 111:21
114:9,16,19
223:2 311:6,9
311:13 312:10
321:14 329:4
330:5,14,23
331:3,9 332:9
332:19,23
333:7,8 334:3
334:8 344:18
347:17 361:4
dcs 294:9 329:14
dea 7:11 8:10,12
16:14,14,17,22
17:1,10,17
20:22 21:8,11
26:8,12,15,24

26:24 27:6,15
33:1,2,4,5,6,7
66:24 67:5
72:8,9,19
73:15,16 74:7
74:10 76:1,18
76:21 91:4
92:2,15,20
93:13 94:5,11
94:19,23 95:5
95:10,17 98:6
98:22 100:16
100:17,22
111:19 122:21
123:7,19
124:10,20
127:7 130:21
163:8 174:10
174:22,24,24
177:24 178:1
182:16 186:14
189:10,23
190:7 191:7,8
193:21 195:23
199:19 201:20
201:23 202:19
203:19 204:21
205:1,3,14,14
205:17 206:2,7
206:9,9,24
207:8 208:14
208:22 209:16
209:22 210:10
210:19,21
211:6,12 214:1
217:20 219:21
220:22 223:11
228:3,11 229:6
231:6 234:23
235:20 250:6
250:15,20
251:3 252:24
253:7 255:17
255:24 256:24
259:22 262:19
263:4,15 264:9

265:1 266:18
266:21,22
268:22,23
269:11 272:12
272:17,23
273:9,15 278:1
278:4 279:1
280:12 281:9
293:3 294:22
295:1,6,16,23
297:3 298:17
299:8,18
300:13 310:19
310:24 311:10
312:7 313:1,5
313:9,13,16,16
313:19,21
314:18 317:6
317:11 319:1,7
319:10 341:24
351:8,16
358:21 367:16
deal 193:14
dealing 243:24
deas 199:14,22
200:22 201:6
201:10,13
204:15 206:6
217:17 234:23
254:19 255:14
274:22 357:15
death 352:23
deaths 215:15
352:13
decade 215:17
249:15 352:13
december 1:16
2:13 9:4 68:3,4
134:1 208:2
decide 212:19
decided 258:20
275:5
decides 214:7
decision 60:7
134:23 159:6
159:16 254:13

Highly Confidential - Subject to Further Confidentiality Review

Page 383

254:19 255:23
256:6,12
257:14 276:6
303:5 304:7,7
**decisionmaking**
304:18
**decisions** 87:23
97:3
**decline** 349:8
**declines** 288:3
349:8
**decrease** 244:20
245:8,12,21
248:23
**decreased**
244:10,16,24
245:6 246:19
334:14
**deemed** 122:21
370:16
**deerfield** 52:18
161:17,18
207:21
**defendants** 10:5
105:24
**defense** 186:19
187:6,17
**define** 155:7
**defined** 281:16
**defining** 280:7
**definition** 70:15
216:17
**deidentified**
138:20
**deliberate**
220:20
**deliberately**
220:17
**deliverable**
280:6
**deliveries** 55:7,8
**delivering** 65:7
**delivery** 55:6
64:6,20 76:13
**demand** 292:16
337:23

**demographic**
138:20
**denied** 331:14
**denise** 262:5,6
**dent** 356:12
**department**
33:13 34:4
52:1 53:11,17
53:21,22 56:11
57:21 59:6
60:2,3,8 62:1
62:17 67:9
89:1 115:4
116:23 120:18
121:6 124:1
125:3 135:7,12
138:11,13
181:7 193:7,15
194:5 210:1
211:23 212:3
238:24 239:5
239:21 253:1
257:1 263:17
270:6 276:8
285:22 318:9
318:10,11
354:10
**departments**
56:9
**depending**
99:11
**depends** 137:15
150:17 216:15
239:14 320:22
**deploy** 120:20
365:23
**deployed** 57:2
85:13
**deploying** 51:23
53:12,18 56:11
57:8
**depo** 14:18
**deponent** 3:14
9:11 368:2
372:2
**deposing** 370:13

**deposition** 1:13
2:3 9:6 11:5
33:18 106:9,10
107:5,23 369:5
369:7,9 370:3
370:11,15,16
**depositions** 2:7
10:24 12:4,20
12:22
**deps** 1:23
**deputy** 191:5
234:24
**describe** 11:16
66:7 166:18
**described** 20:21
21:8 24:8 49:8
210:20,22
211:2 326:18
350:11,12,14
**describing** 242:6
**description** 12:3
13:1 17:21
41:6 62:16
64:1 65:1,5
66:18 97:22
142:14 176:7
279:6 307:9
346:9 348:8
**descriptions**
306:18
**design** 109:5
125:15,20
126:2,3,21
130:19 172:18
306:3
**designation** 78:9
**designed** 67:4
125:3 127:6
159:10 160:2
167:5 173:11
174:6 187:5
303:8 305:12
363:16
**despite** 162:23
209:9 291:2
**destefano** 83:23

**detail** 134:16
284:17 302:20
302:22
**detailed** 66:6
115:13 166:4
**details** 96:10
100:21 101:18
102:6 103:1,23
104:14,19
105:14 106:1
108:1 110:8
111:10 114:1
121:21 124:14
124:16 141:1
154:23 161:23
162:18 163:1
185:15 186:21
225:24 235:18
**detect** 200:24
201:14,20
204:3 232:16
277:15
**detected** 201:23
202:20
**determine**
139:14 281:20
289:11
**determining**
285:11
**develop** 120:23
154:22
**developed** 161:3
**developing**
213:18 237:19
**development**
98:2 100:3
133:4 187:21
**didnt** 18:16 31:8
31:9,24 43:10
44:14 47:16
50:11,17 51:5
52:12 66:7
80:24 90:18
92:8 112:23
121:14 124:16
152:17 159:20

197:13 203:13
206:1 210:1
212:19 222:4
240:10,10,11
240:12 245:2,2
245:3 260:20
261:24 266:21
273:14 274:16
286:14 300:1
306:10 322:5
322:13 325:19
326:7 330:22
350:1 359:12
**died** 353:18
**diego** 191:9
228:24 232:8
**difference** 61:14
99:7
**different** 16:20
17:1 18:1,1
24:2 27:7,14
33:10 43:18
53:3 55:9,10
72:18 79:10
87:19 109:20
118:20 126:1
136:8 142:2,21
142:21 148:11
153:1,6,10
155:15 156:20
156:21,22
157:24 160:16
160:17,23
169:2,3,6
183:8 187:2,4
189:1,2,3
197:15 199:22
204:19 234:9
238:8,12 249:4
250:13 255:5
255:10 281:1
312:6 327:24
328:4,5 333:22
335:20 342:19
345:11 355:2
**differently**

Highly Confidential - Subject to Further Confidentiality Review

54:18 55:17
**difficult** 192:22
**digit** 245:20
  246:20,21,21
**digits** 245:19
**diligence** 67:10
  67:15 123:1,11
  127:14 128:5
  130:15,22
  145:10 172:23
  173:3 198:21
  199:24 200:13
  203:3 209:15
  209:20 210:3,8
  210:18,23
  211:5,10,20
  212:11,21
  213:21,23
  217:5 235:17
  278:5 306:4
  317:23 318:3,7
  318:12
**direct** 33:3
  81:19,20 84:20
  85:4 113:11
  139:11 227:13
  256:21 279:5
  319:4 328:16
  369:17
**directed** 193:4
  221:22 222:24
**direction** 302:17
  304:2,5 306:24
  369:6
**directly** 42:16
  59:2 81:24
  84:15 113:12
  118:2 166:20
  212:2 222:16
  237:15 240:6
  242:4 329:12
  331:20 344:18
  346:10 369:11
**director** 41:12
  83:9 363:7
**directors** 87:9

87:12 97:23
**disagree** 202:17
**disapproved**
  341:2 345:20
**discharge** 97:12
  97:15 113:23
  136:20 144:19
  144:24
**discharged**
  101:23 136:24
**discharging**
  107:8 145:15
  145:22
**disclose** 106:1
  222:2
**discontinue**
  254:13
**discovered**
  205:4,19 209:9
**discovery** 339:9
**discuss** 27:15
  73:7
**discussed** 22:10
  100:17 213:22
  220:2 263:16
  338:7
**discussing**
  182:15 272:11
  320:13
**discussion** 74:7
  210:13,14
  211:7 272:21
  273:2
**discussions** 18:4
  73:14 137:4
  186:7,10
**disparaging**
  78:2
**dispensaries**
  48:1,17,21
  49:9 190:2
**dispensary**
  191:15
**dispense** 45:24
  48:7,17 63:8
  159:6,6,17

236:3 245:3
**dispensed** 13:8
  49:5 232:8
  233:4,13,23
**dispenser** 46:2,4
  46:7,17 47:5
  96:16,22 97:16
  143:8 145:17
  158:14,20
  159:11 160:10
  293:14
**dispensers** 47:23
**dispenses** 49:15
**dispensing** 17:7
  21:15 22:21
  33:14,24 44:14
  44:16 45:1,12
  45:13 47:15
  50:11,12,18
  52:22 62:19
  95:22 96:6
  98:3,7 124:9
  124:19 134:18
  138:18 143:19
  143:20 149:16
  150:3,8 158:10
  158:12,17,18
  159:17 162:22
  163:18 175:6,9
  175:13,20
  180:4 199:1
  200:4 217:21
  218:1 219:3,6
  219:9,11,18
  238:14 241:11
  241:16,20,20
  242:9 244:24
  245:4 264:2,6
  288:1,7,17
  289:20 290:2
  291:24 292:19
  293:21 356:18
  364:13,14,19
  365:7,9 366:10
**disrespect** 92:11
**disrespectfully**

78:7
**distinct** 46:12
  96:23
**distinguish**
  187:16
**distribute**
  198:23 200:2
**distributed**
  149:5 194:21
  268:16
**distributes**
  272:4
**distributing**
  44:13 45:1,11
  50:10 104:3
  130:24 149:16
  255:13,19
  274:18 275:13
  294:11 351:3
  364:19
**distribution**
  44:13,19 47:11
  47:13 50:9
  53:15,17,17,21
  53:23 54:2
  55:21 56:2,4,8
  56:10 57:7,18
  57:22 84:3,10
  84:14,23 85:8
  85:13,21 86:1
  86:6 91:6 92:3
  95:23 104:11
  124:9,19
  152:10,21
  163:19 164:3
  164:13 178:19
  178:22 179:1
  180:3 189:4,9
  192:6 194:6,11
  194:14,15,20
  218:15,20
  234:21 235:19
  237:8,11,21
  241:21 249:22
  249:23 250:5
  250:17,22

251:5,7,9,24
  253:18 254:3,6
  254:11,14,20
  255:11 256:8
  256:18 257:1,4
  258:2,11,18
  259:13,14,23
  260:7,11
  263:21 264:6,8
  265:19,21
  266:2 267:11
  268:9,15 269:6
  269:9,11 271:4
  271:15,19,21
  271:22 273:3
  273:17 274:4
  274:13 275:7
  276:6,23 280:8
  281:11 289:22
  294:8 311:6,19
  312:3,10
  329:10 333:3
  347:20 351:4
  362:15 364:10
  365:8,11
**distributor** 45:6
  46:10,21 47:4
  48:2,8 56:2
  96:2,12,22
  97:13 98:8
  103:2,16 104:7
  104:16,21
  105:15 106:13
  107:10 108:2
  108:12 115:2
  143:8 145:16
  145:18,23
  147:15,23
  159:21,23
  160:3,11,20
  186:22 189:16
  192:7 235:2
  239:1 264:12
  269:16 293:12
  293:15,16
  294:6,16 298:8

Highly Confidential - Subject to Further Confidentiality Review

300:3 306:13
308:24 354:2
364:12
**distributors**
189:10 203:20
**district** 1:1,1 2:6
9:9,10 39:1,5
39:11,13 252:4
252:5 253:22
348:13,14
367:6
**diversion** 191:6
204:3,22 205:2
205:15 206:3
206:20 220:20
234:24 252:22
252:23
**diverted** 195:19
**diverting** 234:1
**division** 1:2 9:10
84:5 252:6
259:15
**divisional** 63:21
64:12 67:21
86:8,11 93:1
259:12 260:15
260:24 261:5
270:12 272:9
348:12
**divisions** 79:11
**divito** 4:11
**divulge** 225:20
226:7
**dm** 348:9,10,12
348:21 349:1,7
**docs** 236:17
361:21
**doctors** 142:11
**document** 1:6
34:10,16 75:11
75:17 94:3
95:19 100:6,7
116:8 131:8,14
131:24 132:1
133:18 157:1
157:12 180:6

181:5,22
182:23 183:7
189:2 192:22
220:6 251:17
253:5 259:2
269:20 270:2
278:17 279:14
281:22 304:22
310:17 312:23
316:13 319:23
324:3 326:23
327:1 332:17
336:10 337:13
339:2,8
**documentation**
297:23
**documented**
155:10,12
350:3
**documenting**
220:19 349:21
**documents** 7:20
100:2 108:10
108:10,15,18
112:14,18,21
180:21 183:3
253:16 280:22
**doesnt** 35:13
66:18 128:22
308:15,16
345:9 346:21
**doing** 14:17
69:17 75:6
125:6,10 145:4
162:9 210:2
235:16 264:15
283:19 284:21
285:1 294:2
315:16 358:8,9
358:14 370:7
**doled** 78:4
**don** 100:12,13
100:15
**dont** 11:23
13:20 16:1
21:22 22:13

23:14,21 24:6
25:21 27:23
28:14,16,23,24
30:7,10,11
31:2,6,13,23
32:7,8,16
35:24 44:1,2
45:12 48:21
49:5 52:11,14
54:24 55:12
57:3 65:11
70:15 73:4
74:14,20,20
75:4,7 78:1,7
80:18 81:12
83:19,21,22
84:19,19 85:2
86:2,14,18,18
87:10 88:21,23
89:2,6,6,23,23
90:16,22 91:20
92:4,10 93:9
93:12,15,19,23
93:24 95:14
100:8,12,14,14
105:7,7 106:6
106:7,16
107:16 108:17
109:17 110:13
110:15,18,24
112:8,13,22,23
112:24 113:5
115:9 116:1,5
117:4,21
118:19 121:9
121:11 122:10
123:4,4 124:13
127:18 129:6
134:8 135:14
135:16,22,22
136:12,15,16
139:23 140:11
141:12 142:23
143:4 144:14
144:14 146:2
152:3 153:6,15

153:16,19,20
154:6 167:8,12
172:7 186:4
197:20 200:8,8
200:11 202:12
203:2,6 205:9
206:6,7,7,9
207:4,12,15
209:19 216:24
222:20,23
223:6,8 224:20
231:12,23
237:10 239:9
240:9 241:24
243:4 244:15
244:18 245:1,2
245:13 250:10
256:5 259:24
260:9,11
261:20 264:10
265:17 270:22
271:7,11 272:6
273:1 274:16
274:21 275:10
275:22,23
276:14 277:5,8
277:9 280:14
280:20 282:11
283:20,23
284:3,7,24
285:4,23
286:16,21,22
287:8,9,15,16
290:9 291:1,1
291:6 294:9,13
296:1 302:9,11
302:20 305:17
306:17 308:20
309:10 312:6
313:12 315:11
315:12,12,13
315:15 316:11
316:16,17
317:12 327:7,8
327:12,14
329:13 332:2

333:18,18,20
335:10 336:4
336:17 337:10
338:16 341:20
342:16 343:1,2
345:3,4,12
346:10 347:11
347:11,14,15
348:5,5,6,18
349:24 350:1,2
350:2,7 353:6
360:16,20,20
360:21 361:10
361:19 362:12
362:17,17,20
362:21 363:11
363:19,21,24
367:19
**donts** 177:24
**dos** 177:24
**double** 245:18
245:20 246:21
**downs** 288:19
**downstream**
142:18 143:14
143:15,20,23
**dozen** 208:7
**dozens** 238:7,8,8
**drafted** 100:9
278:24 279:24
281:5
**dramatic** 359:13
**dramatically**
359:9
**drive** 5:4,9
**drives** 288:11
**driving** 292:10
**dropdown** 344:6
345:1 346:23
**drug** 76:21
94:16 98:1
144:2,5 159:4
175:5 197:4
207:9 208:14
208:15 252:23
263:6 286:19

287:19 325:6
327:20 328:14
329:19,23
331:4,10 342:1
342:2,3 343:3
343:6 347:24
**drugs** 196:9,10
197:7 207:17
207:18 208:5
274:18 302:5
324:24 333:6
**dual** 56:1,2
**due** 67:10,14
69:6 108:3
123:1,10
127:14 128:5
130:15,22
145:9 172:23
173:3 198:21
199:24 200:13
203:3 209:15
209:20 210:3,7
210:18,23
211:4,10,20
212:10,20
213:21,22
217:5 235:17
278:4 306:4
317:23 318:3,7
318:12
**duly** 10:9,12
369:3
**dupont** 270:18
**duties** 17:24
**dwayne** 32:21
89:7 96:13
109:19

_____

**E**

**ear** 361:4
**earlier** 20:12,14
23:23 32:10
49:21 55:13
96:19 139:24
158:13 161:9
165:5 222:8

241:10 242:10
263:2 268:20
288:6 305:12
306:23 316:4
321:17 322:18
330:18 346:15
351:23 358:10
358:14 360:14
362:11 365:13
**earliest** 349:16
**early** 11:24 12:6
13:15 14:3
47:1 50:2 52:6
117:24 118:1
149:21 204:13
212:5 215:3
231:7 232:23
256:13 263:16
264:7 283:7
284:22,24
335:14 351:22
360:16
**easier** 83:1
183:11
**eastern** 1:2 9:10
**easy** 38:12 57:20
188:22
**ecom** 41:20
**ecommerce** 42:8
**economies** 69:14
**economy** 76:12
**ed** 296:6
**edit** 322:4,6
**edited** 224:15
**editing** 223:21
**edits** 220:11
**educate** 93:23
96:1 101:22
108:11 119:19
121:21 166:5
185:14 186:20
221:15 225:24
235:17
**educated** 104:10
110:8 111:9
166:8,9 187:8

226:24 227:3
283:17 352:7
352:19 353:23
357:2
**educating**
101:17 166:12
187:19
**education** 18:21
102:6 103:22
104:14 105:5
125:13,18
221:13 222:9
222:24 227:8
**educational**
225:5,13
**effect** 13:7
**effective** 76:17
88:15,18
173:23 220:14
223:21 243:12
253:11
**effectively**
212:10 213:8
306:11
**effectiveness**
76:13
**efficiencies**
68:21 69:7,9
**efficiency** 76:13
167:6,14
**efficient** 150:13
151:11 213:18
214:5
**efficiently**
213:13
**ehtoig** 5:16
**eight** 263:2
356:9,21
359:22
**either** 11:5
17:14 21:2,10
42:15 219:19
284:13 341:1
**elaborate**
253:16
**electronic** 179:8

202:4 301:16
**electronically**
366:5
**elicit** 106:20
121:2
**eligible** 332:10
367:12
**eliminate** 256:8
**elly** 5:16
**email** 7:9,13,15
7:17 8:3,4,14
8:15,17,18,20
75:13 116:7,10
116:18 117:1,2
117:5 131:10
131:15 148:14
148:15,22
149:8 156:6,13
157:3,20 161:1
176:3 259:4,8
261:14,21
262:2 269:22
270:13,15
272:10 275:20
316:4 320:1,8
320:13 324:2,5
327:3,15
330:12 336:12
336:16 337:15
337:20
**emails** 148:19
150:20,22
151:17 180:11
261:12
**emergency**
292:17 297:10
297:11 346:16
346:17,19,22
**emphasized**
98:12
**employ** 159:16
**employed** 35:11
51:7
**employee** 115:9
165:12 369:10
369:10

**employees**
106:11 115:23
148:8 149:1,13
150:2,7 151:9
151:12 154:18
156:8 166:5
174:18 179:23
212:18 351:1
359:23 361:13
**enabled** 248:12
248:21
**enacted** 218:1
219:19
**encapsulate**
155:15
**encapsulates**
180:6 181:6
**encapsulating**
155:5 179:8
**encompassed**
164:12
**encompasses**
192:6
**ended** 54:14
94:19 140:22
**endo** 4:2,2 10:4
**enforcement**
76:21 252:24
**engage** 292:11
**engaging** 134:17
**enhance** 91:24
242:5 249:9
**enhanced** 241:6
**enhancement**
241:4
**enhancements**
242:7,15,16,20
242:23,24
243:4
**enhancing** 267:2
**ensure** 168:15
**enter** 321:13
334:12
**entered** 33:17
190:5 314:1
316:19 331:7

345:1
entering 173:18
345:15
entire 40:1
45:19 108:4
135:20 179:21
261:3 266:1
307:14,20
310:9
entirely 103:17
107:8
entirety 182:18
entities 364:20
entitled 307:6
entity 364:13,14
entries 334:7
343:8
entry 68:11
133:11 134:21
166:17 173:14
174:9 175:23
176:18 177:11
332:14 349:16
environment
302:5
envisioned
135:21
epidemic 214:19
215:3,23
221:14,20
352:9 361:5,15
equating 12:21
equation 95:3
166:10
equipment
214:8
errata 370:6,7
370:10,13
372:9
error 11:7 12:2
12:13,17 13:1
13:7,13
errors 12:20
13:3
escalation
168:11

especially
170:19
esq 3:5,10,17 4:7
4:13,19 5:5,11
5:16 33:17
essentially
268:10 306:5
establish 77:5
established
76:20 98:22
167:18
establishing
120:19
establishment
119:5
estimate 8:7
278:20 307:4,7
estimated 331:2
et 333:10
ethics 88:1
evaluate 365:7,7
evaluation
275:11 365:11
evelina 4:7,7
10:3
event 24:7,8
eventually
254:12
everybody 78:5
93:23 364:10
evidence 210:17
220:13,19
223:23 224:16
304:18,22
evolves 118:12
evolving 118:17
118:20
exact 11:23
21:23 48:21
117:21 146:5
272:8 327:8,14
356:1
exactly 81:7
83:21,22
192:17 288:21
288:23 339:14

examination 2:4
7:2 10:14
364:4 369:3
examined 10:13
example 24:14
24:21 69:16,16
69:17 97:2
109:4 132:22
160:13 173:17
174:19 197:12
292:14 342:13
examples 23:7
24:22 69:2
138:22 230:15
exceed 322:13
346:2 348:20
exceeded 173:18
334:4
exceeding 322:7
exception
170:11,13
171:6,11
291:14 309:19
exceptions 168:6
168:10 171:18
173:24
excluding 16:8
excuse 62:3
executed 186:7
186:9 262:23
executive 184:15
350:18
exhibit 7:7 8:2
34:11 75:12
94:4 116:9
131:9 157:2
182:24 192:9
192:10,11,24
251:18 259:3
269:21 278:18
279:15 310:18
312:24 319:14
319:24 323:24
324:4 326:22
327:2 336:11
337:14 339:3

exist 354:6
existing 19:19
exists 180:6
exit 276:11
exited 88:22
exiting 269:9
expand 60:14
expect 133:24
135:1 239:12
318:6
experience 34:3
93:6 213:17
357:21
expert 139:16
139:17
expertise 87:22
167:4
expires 372:19
explain 16:20
23:11,13 24:5
39:10 40:22
41:23 42:9
43:5 59:4
102:5,24
104:18 105:13
119:23 120:15
121:3 122:6
283:11
explained
283:13
explaining
104:6 113:2
explanation
81:9 296:12
303:16
explanations
344:14
explicit 220:12
223:22 224:16
export 339:11
expressing
265:2
extent 102:14
103:7 130:7
eye 344:10
eyesight 338:23

**F**

facilitation
162:9
facilities 41:19
41:19 42:3,5
42:10,12 43:24
44:4,9 45:8
47:18 48:16
49:8 50:7,23
51:7,9,17,24
53:14,19 54:17
54:18,19,20
55:2,15,16,22
56:3,14 57:2
57:10 58:23
59:3,18 68:14
68:18 69:13
facility 41:2
47:16 49:15,24
51:1,2 54:6
55:19 58:2
256:1 257:8
258:9
facing 256:23
fact 29:20,22
68:24 77:9
108:4 135:18
220:16 227:1
263:14 273:8
351:10
factor 208:14
factors 285:11
285:14,17
286:9 289:18
296:8
factual 120:4
122:6,9
fail 370:15
failed 198:20
199:23 200:12
200:24 201:11
201:14 206:15
228:2 232:15
235:9
failing 228:11
229:6

failure 216:21
217:4
failures 164:2
230:15
fair 38:5 70:20
79:7 81:8
82:17 84:23
87:4,13 99:5
99:10 144:11
144:18 152:11
167:3 176:7
246:6 248:1
323:20 352:2,5
352:6 354:18
355:3 356:15
fairly 78:9 87:4
87:5 260:17,21
356:12
faith 21:14
134:18 158:9
158:12,17,18
162:21 175:6,9
219:11 241:11
241:16,20
242:8 245:4
fall 87:1
familiar 46:15
46:19 79:13
140:10 141:1
142:14 148:4
151:4 153:17
165:17,19
270:23 308:15
324:8
familiarity
162:18
family 286:19
353:2
faq 177:10
far 17:22 20:22
97:2 136:10
145:13 228:9
229:4 254:7
255:11 260:5
285:3 286:14
344:9 360:22

364:11,17
fashion 17:12
44:4
fast 154:13
206:7
fault 288:16
fax 1:22
february 39:8
67:23 68:12
246:15 252:1
253:20 262:21
262:24 263:7
264:18
federal 2:5 15:6
15:11,13 16:6
16:11 18:8
33:12 108:13
201:2 203:21
233:18 262:24
feel 81:1 231:22
335:7
felt 243:23 244:1
289:11
field 207:8 301:3
fields 339:18
figure 102:18
339:13,17
figured 296:7
figures 138:5,5
file 28:22 29:5
files 17:4 210:8
253:9
fill 21:16 113:14
228:11 300:22
335:1 364:16
filled 38:18
135:19 298:16
316:20 335:4
356:4
filling 13:13
132:22 135:6
filter 285:12
finalized 134:24
financial 78:3
find 90:11
111:23 126:16

179:15 180:12
190:18 222:23
223:2,6 292:10
343:24 349:16
finding 24:10
185:5,7
fine 108:16
122:8 127:18
130:3 163:13
163:18 164:1,8
164:11 364:1
finish 283:3
finished 162:13
finishing 154:2
firm 106:10
110:5,12
111:21
first 10:12 13:18
14:2 38:14,15
52:19 88:14
123:8 131:14
134:21 157:14
157:19 161:19
163:3 177:11
183:13,16
184:1 193:18
207:14 247:3
252:3 261:24
279:6 282:4
285:12 292:5
315:13 328:9
340:14 345:9
349:1 356:6
fisher 185:6,11
five 13:19 28:3
37:12 71:23
81:5 84:21
85:3 111:1
138:5 153:1,6
261:2,5 270:12
291:18 361:21
fix 221:11
232:22 357:23
flag 99:8,11,14
99:19,19,20
146:24 160:18

171:1 308:13
308:18 329:23
flagged 59:11
278:1,4 293:1
296:23 298:5
299:15 300:11
303:18 318:4
330:1
flagging 332:11
flags 98:14,18
98:21 99:2
100:17 146:18
146:19,21,22
302:2
flip 157:11
181:23 188:5
282:5
floor 3:8 4:11
5:4,14
florida 3:4
111:12,14,18
111:19 165:8
194:15 195:19
200:20 228:6,9
229:4,10,14
254:4 360:9
flow 337:21
focused 22:2
98:7 180:3,4
folks 51:2 83:6
87:5 93:4
150:14 166:9
222:5,6 240:6
243:22 244:1
261:13,15
334:21 336:15
follow 364:2
365:18
followed 309:9
following 97:17
100:2 133:24
253:9 288:23
355:10
follows 10:13
followup 99:5,7
food 54:21 70:13

87:16
foot 153:17
forces 27:8
foregoing 369:5
369:15 372:5
forest 270:24
271:2,5,9,14
forget 356:1
form 10:24
17:11 30:20
32:16 43:11
44:3,10,21
45:9 47:7 48:5
49:17 56:15
57:11 58:3
59:19 61:8,16
62:4 65:23
67:17 69:20
70:2 71:14
73:11 86:15
91:8,18 92:23
93:7 97:5
102:1 103:5
107:3,11 109:7
114:4,11 123:2
123:14 124:11
126:24 127:8
127:16 131:2
137:22 140:7
141:10 146:12
147:8,16,24
151:14 152:12
153:4 156:2
158:22 159:13
160:4 163:14
163:21 164:5
164:19 167:9
168:7,23,24
169:23 171:8
172:5 173:15
174:3,9,10
175:15 176:13
177:6,12 178:5
179:8 180:14
186:23 191:18
195:24 199:6

200:6 201:8,17
202:22 204:1
204:11 205:5
205:20 206:4
207:2 210:11
211:13 212:22
214:11 215:10
216:4,22 217:7
218:22 219:12
221:1,23
222:18 223:4
223:14 224:6
224:19 225:8
225:17 226:3
226:12,19
227:6 228:14
229:19 230:18
231:9 232:18
233:7 235:21
236:7,13
240:17,23
242:11 246:10
248:15 249:1
249:17 250:1
254:9,21
255:15 256:2
257:10,20
258:13 263:22
264:13 265:3
265:14 266:4
266:14 267:13
267:24 274:5
282:14 286:24
287:3 289:6
290:18 295:3
295:11 297:14
297:22 298:10
299:9,20 300:5
300:9,22
301:21 302:19
304:23 305:11
305:21 306:6
306:15 309:23
310:6 316:23
321:20 323:7
323:15,17,18

325:13 331:13
337:19,24
342:9 345:14
346:2 349:17
350:9 352:15
357:6 358:3,11
358:16 359:1
359:15 360:3
361:7,17 372:8
formal 302:10
format 318:23
328:11 337:21
formation 57:13
59:21 72:9
111:11 121:16
237:24
formed 30:14
111:17
formerly 262:7
forms 176:20
178:4 349:20
367:16
formula 202:13
208:12,20
240:11 242:19
277:14,17,19
277:21 282:12
282:23 283:5,9
283:16 284:21
285:20 289:2
296:17 298:24
299:1
formulaic
284:17
formulary
337:10,10
forth 26:11 37:7
37:10,13 188:2
188:22
forum 17:9
150:13
forward 212:16
213:2,6 255:2
forwardthinki...
98:13
found 185:2,3

foundation
103:5
four 28:3,21
31:16 32:5,11
32:13,15 81:5
81:14,15
134:22 209:1
230:10 247:17
247:17 291:18
340:20,21,21
355:16 356:2,8
356:9
fourth 334:2
frame 27:18,21
27:23 73:18
74:14,17,19
75:1,1,2,4,7
117:23 120:8
135:14,17
234:10 239:17
257:22 285:4
293:20 294:9
329:1 338:17
frank 83:23
frankly 129:14
free 30:14
231:22 318:23
345:14
frequency 152:3
281:17,24
282:7
frequent 77:5
151:24
frequently
177:10
friday 106:8
front 19:20
24:19 33:23
64:14 66:15
95:19 162:22
222:17 223:1
279:11
frustrated
247:10 357:3
357:13,15,16
357:18

frustrations
357:10
fulfill 42:17
114:8 115:3
125:4 158:19
159:11,20
160:2,20
175:13 205:1
206:1 228:11
229:6 300:14
333:8
fulfilled 204:8
311:21
fulfilling 295:1
298:7 300:3
334:23
fulfillment
296:14 332:22
fulfills 158:19
full 200:9
217:24 218:5
fully 137:3
236:4 275:20
function 60:18
60:19,24 61:6
61:7,12 63:4
63:24 65:16,16
65:21,21 66:2
66:9,14 92:21
138:21 343:2
functional 64:5
64:19
functionality
317:5,11
functioning
135:13
functions 80:22
funneled 173:4
funny 335:18
further 1:10
82:7 87:16
91:24 99:14,16
99:21 145:9
168:12 171:3
172:22 173:2
363:19 367:19

368:2

G
gap 271:9,10,12
321:17 323:3
323:10,14,20
324:11 325:10
325:18 332:5
335:23 337:2
gaps 265:7,11,24
266:9 267:10
267:20 268:19
322:17 351:23
354:1,5 358:24
359:14,23
garlock 6:2 9:16
9:16
garry 89:11
109:24
gates 83:16
gather 143:23
gathered 136:6
304:17
gears 190:19
general 12:1,3
14:9 17:20
28:15 52:9
62:16 74:17
117:23 139:18
142:14 152:17
158:6,7,7
184:15 205:12
244:19 277:6,7
277:13,18
289:3 306:18
334:17,18
357:11
generalities
286:23 290:4
generally 11:16
12:24 13:24
22:15,16 31:10
32:6 38:24
39:12 40:16
42:9 44:7
46:15,19 50:5

58:9,15,16
59:15 63:3
68:16 74:15
75:2 79:5
82:18 143:12
152:23 165:21
195:10,15
221:12 243:20
245:11 277:20
284:20 287:15
290:6 304:6
354:21
**generated** 271:8
**genesis** 60:6
280:15
**gentlemen** 80:2
**geographic**
355:20
**getting** 95:20
105:2 112:8
180:18 205:24
215:24 222:16
235:15 241:2
264:19 271:22
273:16,18
274:17 332:22
333:3 348:15
**gfd** 22:1,12 24:5
24:12 158:17
159:3,4,10,20
160:10,14,19
162:4 174:12
**give** 12:2,24
17:20 18:23
19:10 21:6
25:17 31:4
54:3 56:20
69:2 74:17
75:3 79:11
94:8 130:11
133:3 156:3
162:16,24
166:13 191:19
202:19 220:15
228:17 243:16
244:16 246:2

272:8 277:7
321:21 345:18
346:21 353:24
356:9
**given** 10:21
14:10,18 16:21
104:5 105:17
112:2,6,10
113:1 117:13
129:13,15
149:14 155:20
156:15 180:8
181:9 193:20
210:9 222:14
302:17 304:1
304:22 369:7
372:7
**gives** 193:22
**giving** 289:9
**globally** 81:1
**go** 9:15 17:19
18:17 25:23,24
27:6 29:11
30:20 35:13
38:12 43:11
44:21 47:7
49:17 50:14
56:21 58:3
61:8 62:4 69:1
71:14 74:23
77:16 82:20
85:8,16 86:15
87:21 88:13
89:17 91:8
98:13 100:24
108:17 112:17
122:10 127:18
129:21 134:21
136:11 137:22
138:6,12 140:7
143:10 155:24
157:19 160:4
165:7,23 167:9
168:16 169:10
169:23 171:8
171:14 172:1

174:16 177:10
180:10 188:8
188:22 190:4
190:10 191:24
192:16 197:1
198:2 206:14
210:1 211:13
211:22 212:9
212:24 214:11
216:6 221:22
223:14 225:17
227:4,12
228:16 230:18
231:20 233:7
236:18 256:2
258:7 261:13
265:3,14
266:14 267:24
278:12 282:14
284:6,10,16
285:11 287:13
289:6,16
290:18 292:22
294:18 295:20
296:15 298:10
298:24 300:9
302:1,10,12
305:1,18
306:21 309:12
309:23 310:7
311:4,19
316:24 317:6
322:20,24
323:7 325:13
326:22 329:12
329:14 331:12
333:21 340:10
340:23 344:9
344:10 348:21
350:17 357:6
359:1 360:3
366:5,14
**goal** 361:22
**goes** 99:23 138:2
191:8,13 220:9
253:15 281:21

296:7 333:7
349:1,2,6,9
364:18 366:23
**goforward**
273:21
**going** 27:5 30:4
34:8 41:16
61:19,22 68:17
75:9 82:20,22
82:23,24 83:5
89:17 92:7
97:19 99:23
101:13 102:13
103:4,9 104:22
105:18 114:16
117:6 123:13
124:3 132:6
133:4 138:5
154:4 176:6
179:3 182:21
182:22 188:21
190:17,17
192:19 197:20
206:13 212:16
212:19 213:2,5
221:11 223:3
223:10 235:3
237:14 251:15
251:16 256:18
256:23 258:1
262:1 263:20
270:3 273:3,19
278:15 279:12
282:3 287:21
287:22 288:10
292:12 303:12
303:14,15
305:13 306:21
310:15 311:10
311:14 312:13
319:13 323:23
326:23 332:21
336:8 338:23
352:8 355:11
357:14 362:3
364:2

**golkow** 1:22,23
9:3
**good** 10:16
21:14 35:24
69:17 70:18
71:20 134:18
156:7 158:9,12
158:17,18
162:21 175:5,9
182:2 219:10
241:11,16,20
242:8 244:2,2
245:4 275:6
283:22 303:11
303:16
**google** 110:20
**gorman** 83:7
**governments**
76:12
**governmentsp...**
334:20
**grabbed** 279:10
**great** 367:20
**greg** 80:3 84:11
**gregs** 84:20
**ground** 235:16
264:20 361:4
**group** 7:11 52:5
52:7 59:6 61:6
65:7 68:7
77:20 78:18,20
78:21,23 80:5
80:6,11,14
83:11 87:5,9
89:5 94:6,12
94:20,23 95:6
95:11 97:24
98:6 111:12,17
113:7,15,17,21
114:1 134:11
134:12 135:19
137:12 144:16
148:6 150:18
154:22 169:21
170:9 176:16
237:15 261:6

262:19 276:22
282:24 283:6
292:4 296:3
301:12 310:6
316:9 320:10
323:4 365:4
**grouping** 342:24
**groups** 15:1
17:9 79:11
80:9,16,19
81:3,6 82:6,9
87:19 97:22
134:14 138:16
144:7 285:10
286:8 290:11
**groves** 252:21
**guard** 360:10,14
**guess** 154:13
155:7 238:7
283:21 315:16
348:6
**guide** 301:20
**guidelines**
177:24
**guiding** 302:18
**guise** 222:14
223:10 224:11
227:5
**guy** 85:21
262:13 273:5
283:16
**guyot** 261:18
**guys** 150:15
154:8 190:15
283:24 296:7
367:22

**H**

**habits** 17:7
62:19 139:15
140:1,2,14
144:3,5 146:11
147:7 292:20
**hairbrushes**
140:14 141:20
**half** 31:21 66:6

82:1 112:4
236:18 340:21
**hallway** 102:18
**halted** 295:8
**hand** 34:8 75:9
94:1 116:6
131:7 156:23
182:21 251:15
259:1 269:18
278:15 308:12
310:15 312:20
319:13 323:23
336:8 337:11
338:24 353:22
**handed** 320:6
**handful** 249:7
**handle** 62:8
**handled** 240:5
**handpick**
115:11
**handpicked**
239:20
**handsomely**
70:12,16
**hansen** 77:19,22
80:6,9 83:6
**happen** 292:7
296:2 311:18
357:4
**happened** 30:2
88:17 117:22
243:7 250:11
291:18 292:3
360:9
**happening**
93:24 111:16
111:18 112:13
172:11 239:13
257:9 258:11
265:20 296:13
318:19
**happens** 156:20
156:21
**happy** 231:14
**hard** 127:24
155:8

**hardandfast**
168:5
**hash** 117:8
**havent** 14:10
20:8 50:3
133:1 182:20
203:3 318:5
**hbc** 5:13
**head** 78:11
157:21 247:6
316:6,8 355:12
**heading** 273:16
275:1,2
**headquarters**
207:20,22
**health** 4:2,16
52:17 99:1
194:1,8
**healthcare**
76:11,14
**hear** 133:24
135:1
**heard** 318:2
**hearing** 23:4
256:24
**hearings** 215:2,8
360:15
**heavily** 56:3
168:15
**heck** 150:15
154:9
**held** 9:6 26:16
30:23 31:17
**hellertoig** 5:16
**help** 36:2 37:19
45:16 49:7
73:2 81:13
87:24 111:23
136:9 144:22
145:7 148:13
154:17 159:5
159:16 161:3
178:22 185:14
280:22 283:17
339:13,17
340:10 357:23

**helped** 93:22
96:1 132:11
**helpful** 101:17
145:15,22
**helping** 97:24
**helps** 64:13
**hereto** 369:11
**herman** 2:11
**hey** 90:2
**hide** 226:22
**high** 62:10 138:5
145:3,8,14,21
195:13 245:18
245:20 246:20
291:14 292:15
**higher** 62:11
68:17 195:7
325:4
**highest** 196:17
**highlevel** 356:5
**highlighted**
64:15
**highly** 1:9
195:13,18
**hipaa** 365:24
**historical**
155:18 287:11
**history** 138:19
285:2,6 286:7
286:13,18,23
287:2,6,14,17
289:17 290:22
**hit** 167:23 168:1
168:11 303:10
305:11
**hitting** 244:12
**hodge** 89:11
109:24
**hold** 77:4 88:2
103:3 221:2
241:13,14
279:9
**holding** 24:9
**holdings** 4:4
**hole** 169:17
170:6 321:9,16

**holidays** 106:8
**home** 41:4
**homework**
112:11
**hon** 1:6
**hope** 122:16
**hoped** 355:4
**hospitals** 334:22
**hour** 71:21
112:4,4 236:18
**hours** 181:19
237:14 292:15
312:22 314:20
331:4,10
340:20,21
364:22
**hub** 138:7
**hubbard** 2:12
3:15
**hundred** 212:18
**hundreds** 48:17
126:9 350:24
359:22 361:13
**hunter** 3:10,10

**I**

**id** 7:7 8:2 73:4
92:4 120:24
142:20 172:7
188:5 190:12
192:10 227:13
228:16 275:10
282:4 327:18
339:19,24
**idea** 202:9
245:11 247:2,4
261:17,19,20
271:6 282:18
282:20 306:18
315:15 316:17
334:11 335:7
335:23 347:16
**identical** 282:8
**identifiable**
206:17
**identified** 50:22

Highly Confidential - Subject to Further Confidentiality Review

63:22 85:4
113:18 122:23
127:5,12 128:3
130:13 172:22
198:22 200:2
209:15 210:9
210:24 211:6
211:11 234:23
235:9,20
287:23 291:3
292:1 294:21
296:16 305:14
316:5 321:8
323:4,14
330:19
**identifies** 49:13
228:5 229:9,13
299:1 342:6
**identify** 47:4
51:15 52:2
56:13 57:9
58:1 67:4
90:13,17 119:1
120:1,16 121:6
122:2 123:6
125:15,20
126:4,7,9,21
130:20 133:5
145:7 147:4,13
149:2 160:18
164:3,16
171:17 172:19
173:2 202:21
204:21 208:21
217:4 227:18
227:24 228:8
229:3 240:2,14
241:22 277:22
290:15 291:11
306:3,11 341:8
**identifying**
47:10 53:14
126:15 145:14
146:8 204:20
205:15 206:2
209:22 281:23

309:20 341:15
342:3
**ignored** 206:17
**ii** 20:23 21:3
22:2 26:5
42:24 43:8,21
48:18,22 49:4
49:15 72:12,20
90:4 143:24
146:9 147:5
150:9 152:21
167:24 169:3
170:7 171:5
172:3 177:17
189:11 194:21
195:5,7,12,17
196:2,14,16
197:4,18 198:4
207:17 208:5
217:22 244:21
245:12,22
246:19 250:7
250:16 251:10
254:7 255:11
258:9 266:2,12
267:11 268:11
268:16 269:3
269:10 276:24
279:2 305:19
324:24 335:24
337:9 342:10
362:15 367:11
**iii** 8:10,12 20:24
21:3 22:3 26:6
42:24 43:8,22
48:19,22 49:4
49:16 72:12,21
90:4 143:24
146:10 147:6
150:9 152:22
167:24 169:4
170:7 171:6
172:4 195:8
207:18 217:22
250:7,16 254:8
255:12 258:10

266:3,12
267:12 268:12
268:17 269:10
276:24 305:20
310:20 311:1
313:2,6 325:2
325:4 335:24
342:10 362:15
367:9
**iis** 248:14,24
249:11 367:8
**ill** 82:22 122:16
130:11 154:3
197:1 231:11
231:14,18
270:4 279:9
339:15
**illinois** 1:18 2:10
2:12 3:16 4:12
5:4,10 9:7
52:18 207:21
**im** 9:2,14 14:14
14:16,16,16,18
14:20 16:1,8
16:16 17:13
21:23 22:7
26:10,11 27:18
28:8,11,23
29:23 31:16
32:2 33:5 34:8
38:8 39:23
41:9,16 45:17
45:17 46:23
47:14,14,20,21
50:19 52:12,15
55:4,24 58:10
61:3,3,18
69:22 72:15,15
73:20,24 74:22
75:1,3,6,9 78:1
79:2,3,13 80:8
81:22 82:13,20
82:22,23,24
83:17 86:4
89:17 93:21
95:17 96:6

97:7,17,17
99:17,23
101:13 102:10
102:13 103:4,9
104:22 105:13
105:18 107:18
112:17 114:22
116:17,23
117:6 120:5
121:1 123:9,13
123:21 125:17
126:1,13,14,19
132:9 136:22
137:3 138:5
139:3,16,17,17
140:10,24
141:14,19,22
143:2 144:7
146:4,7 152:14
153:24 154:2,4
154:9 155:2
156:12 160:12
161:17 162:7
163:9 164:8,9
165:19 167:23
172:13 176:6,8
179:3 182:21
184:19 186:4
186:16 187:14
188:21 190:17
192:3,14
197:11,13,21
199:13,21
203:13 204:18
205:11,12
214:16 216:8
216:16 218:11
221:3 223:21
224:8,21
230:20 231:12
246:20 248:17
250:18,19,24
251:15,16
254:3 255:9,10
257:24 262:15
264:5 266:20

266:23 268:5
270:3,3 272:7
276:13 278:9
278:15 279:12
282:3,7,16,22
282:22 284:19
284:19 287:22
288:13,23,23
291:8,8 293:11
293:18 298:23
298:24 302:21
305:13 306:21
310:15 312:5
313:13 318:1
319:13 321:22
323:23 324:1
325:15 326:22
327:22 328:11
329:15 331:13
331:22 333:13
333:23 336:8
337:8 338:23
346:23 347:5
348:14 349:18
349:18 353:6,7
353:12 354:9
354:15 355:10
355:11 357:11
359:17 360:5
361:10 362:19
362:21 364:2
365:12
**immediate**
193:11,15,21
194:10 218:14
219:1
**immediately**
245:10,24
246:1,2
**imminent**
193:24 194:7
**impact** 248:13
249:11 258:17
276:10 307:21
356:24
**impacted** 353:3

Golkow Litigation Services - 877.370.DEPS

356:18
impeding 129:3
imperative
370:12
implement
109:5 120:17
125:2 164:2
213:8 276:17
297:18
implementation
100:4
implemented
68:22 85:13,24
162:2 272:1
277:12 297:15
332:16
implementing
57:23 97:3
118:20 124:1
239:5 248:22
249:15 259:16
267:2 273:12
276:11
imply 302:9
import 353:22
important 77:1
92:20 124:1
125:5 128:17
147:14,18
155:4 173:6,22
273:17 274:17
274:19 276:16
276:20,20
303:4 304:1,7
305:6 315:18
317:18,22
345:23
imposed 322:3
impressive
65:11
improve 25:21
213:13 354:5
improvements
243:2
ims 135:23
136:1,5,7,11

136:16,20,24
137:7,14 138:4
138:16 139:7,9
139:13,16,20
140:1,4,21
141:3,9 142:8
143:22 144:23
145:20 291:20
364:24
inartful 46:24
inartfully
331:23
inception 135:11
209:17
include 27:7
64:4 68:13
100:22 208:2
219:10 304:5
311:14
included 40:19
72:10 102:8
151:15 290:5
includes 208:5
288:17
including 33:13
42:7 43:3
72:21 198:21
200:1 226:14
235:2 249:8
253:10 366:9
income 334:21
inconsistent
106:16
incorporate
335:17
incorrect 26:23
41:9 65:14
incorrectly
305:9
increase 144:13
291:16
increased 334:9
increases 288:3
increasing 69:24
215:17 352:14
359:9

independent
101:5 117:18
127:17 275:16
indicate 219:23
305:8
indicating
318:24
indices 288:18
290:3
indifference
220:21
indigent 334:21
indirectly
369:11
individual 47:22
53:11 54:4
56:19,23 60:19
113:14 135:6
228:1 247:11
247:13 322:3
335:5 345:15
individually
17:8
individuals
58:20 113:20
132:23 138:15
139:6 156:7
232:9 233:14
233:24 247:9
262:19
industry 64:7,20
203:10 243:24
industrywide
98:2
inform 193:20
information
17:5 19:10
21:7 59:5 97:2
97:11,14 120:4
122:6,9 138:20
143:23 145:13
145:20 166:1,4
173:7 206:10
206:18 222:13
222:16 226:22
226:23 262:7

292:12 304:17
325:21 336:21
342:4,6,20
345:16,18,22
346:21
ingrained
216:20
inhouse 89:15
96:4,5,7,8
109:23 110:1
initial 37:6
296:15
initially 12:11
23:22 113:8
303:18 356:3
initiate 346:11
initiated 52:7
76:18 209:24
initiative 77:1
injunction
199:19
innovation 64:7
64:21
inperson 148:21
148:23 149:12
input 87:22
134:20
inquiries 111:19
inquiring 23:10
inquiry 171:2
172:22
inside 186:14
187:19 243:24
inspection 7:22
251:19 252:10
252:17 253:12
instance 213:8
311:24
instances 25:9
25:10,11
instruct 101:14
102:13 103:9
104:23 105:19
108:20 129:7,8
130:6
instructed

106:10 121:13
225:3,11,20
226:6,22,23
instructing
108:3
instruction
102:17 104:5
108:1 128:12
128:17,21
129:2,12,13,15
129:16,18
131:3
instructions
370:1
integrity 34:4
52:5,7 57:14
57:21 58:11
59:22 60:2,3,8
60:15,24 61:6
62:1,17 63:3
64:1,4 65:1,6
65:20 66:22
67:3,9 68:6
85:14 88:1
111:12,17
113:7,15,21
114:1 115:4,7
115:12,17
116:2 117:14
117:20 118:12
118:24 119:6
119:21 120:2
120:13,18
121:4,5,10,17
121:20,23
122:3 123:22
123:24 125:3
125:11 131:16
132:6,12,23
134:14,24
135:7,12,19
136:23 137:7
138:23 139:1
139:22 144:17
144:23 148:6
149:1 151:21

152:2,5 154:16
154:22 157:21
161:20 164:24
165:9,18
166:17 169:10
169:20 170:9
170:16 171:20
172:3,18 173:5
173:11,19
174:1,18
175:23,23
176:2,16,21
177:1 178:16
178:17 179:22
181:7,15
187:22 209:18
210:1 212:7
213:20 214:3
214:15,18,23
215:6,20,22
232:23 235:16
237:15 238:1
238:22 239:18
240:3,15 241:8
243:10,14
246:12 256:14
259:18 261:10
263:17 264:16
264:19 266:6
266:11 267:1,9
267:20 268:20
272:22 273:6
273:24 274:10
275:15,19
276:4 277:12
282:10 283:6
284:21 285:22
285:24 286:21
290:7 292:2,4
292:9 293:20
294:4,5 296:3
296:20 297:7
300:21,23
301:12,20
302:18 303:5
303:14 304:1

304:11,21
305:15,23
314:15 316:9
318:14,16,20
319:5 321:5
323:1 325:8
326:1,4,8,15
327:10 332:7
335:16 336:7
337:5 338:19
345:6,18 346:5
348:16 349:2
349:10,23
351:12 352:4
353:21 354:9
354:13 357:2
365:4 367:4
**integritys** 63:10
179:9 216:2
307:22 309:3
**intended** 170:11
170:14 171:15
171:16 277:22
**intending** 121:2
**intent** 144:8
169:22 170:2
178:17 222:21
305:23 310:2
**intention** 174:8
**intentional**
153:21
**interact** 48:2
**interacted** 56:24
115:16
**interacting**
53:13
**interaction** 17:3
43:6 58:18,20
134:7 238:23
357:16
**interactions**
16:21 17:10,16
17:21 33:2
105:6 134:15
259:22
**interest** 289:15

296:4,12
**interested**
369:11
**interface** 166:22
300:19,20
**interjecting**
119:16
**intermediary**
293:5
**intern** 35:21,22
36:22 38:19
70:6
**internal** 75:16
116:7 224:12
341:23 342:23
**internally**
100:20 224:10
275:13 341:14
352:19
**internet** 165:14
233:15
**interpretations**
142:21
**interrupt** 18:16
52:13 203:14
241:24
**interrupted**
162:13
**interspersed**
288:9
**interstore**
324:15,18
325:5,19,20
326:10,12
**interstoring**
324:9,11
325:11 326:5,7
366:19,23
367:2,7,12
**intervene** 62:20
**interventions**
117:13
**interview**
134:22
**interviews** 11:1
134:22,23

**intimately** 238:2
351:21
**intranet** 151:3,6
154:15,17
156:6,13 165:4
165:14,18
174:18 178:13
**introduce** 9:12
**invented** 248:21
**inventories**
253:10
**inventory** 80:21
324:21
**investigating**
265:10
**investigation**
91:5 92:2
200:23 215:8
254:2,20
255:14 351:8
**investigations**
11:3 66:23
124:8,18
186:14 189:3
358:21 360:18
360:23
**investigative**
204:15
**investigator**
252:22,23
**invite** 74:6
**invited** 76:24
90:24 92:10
93:13
**involved** 62:10
109:20,22,24
149:15 150:3
167:13 186:16
231:13 237:11
238:3 239:8
240:6 242:4,21
256:5,11
265:18 275:12
278:10 327:10
362:21
**involvement**

43:15 238:21
364:12,17,18
**involving** 26:13
239:15
**iqvia** 140:23
141:3 364:24
365:6
**isnt** 38:24 128:2
150:12 284:13
**issue** 107:14
166:11 214:20
239:14 244:14
295:18 302:4
357:11,19
358:20 359:5,6
360:8
**issued** 30:9
191:6 194:10
232:10 233:6
233:15
**issues** 17:2
22:10 27:16
62:11 63:11
72:10 73:7,15
250:20 257:5
265:13 285:10
312:1
**issuing** 269:11
**item** 279:2 288:4
293:6 313:9,13
313:17,21
314:18 315:4,9
341:23
**items** 29:14 30:2
31:11 98:23
244:22 307:13
336:19
**itll** 178:12
**ive** 12:19 13:19
15:2,2,3,12,16
15:17 16:13,14
17:3,6 24:8
25:12 65:10
70:17 129:16
167:13 226:6
226:23 238:16

259:1 281:8
282:21 306:22
312:20 316:10
320:6 323:23

**J**

**january** 7:11
34:24 37:8
38:6,21 39:4
94:6 97:20
**jargon** 55:12
**jason** 5:11 33:17
97:21
**job** 61:19 69:17
113:13 354:4
**join** 74:7 91:1
**jones** 5:9
**jonesday** 5:11
**joseph** 261:16
**judge** 105:21,21
105:23 253:21
**judges** 106:17
**july** 327:9
330:13 332:6
332:14 333:16
336:9
**juncture** 129:17
**june** 186:8
279:20
**jupiter** 92:2
194:15,19,23
218:15,20
219:2,3 249:24
250:5,17,18,22
254:3,12
255:17 257:1,9
258:11,16
263:21 269:13
271:16 275:3
311:19
**jury** 66:16
197:20 213:17
221:18 229:15
274:15
**justice** 33:13
193:7,16 194:5

253:1 257:1
**jzhou** 5:11

**K**

**kansas** 155:21
**kaspar** 3:17,17
9:24 105:20
110:4 119:15
128:8,15
236:16 361:20
**kaye** 4:5
**kcooper** 4:13
**keep** 16:4 25:21
90:1,10 97:19
107:22 132:5
132:11 206:13
226:4 239:12
279:11 338:2
**keeping** 28:22
132:22
**ken** 86:22 87:1,2
**kept** 31:3,11
237:18
**kermit** 78:14
80:1,7 84:12
320:9
**key** 63:23 64:5
64:18 330:7,16
334:2
**kid** 70:6
**kids** 353:2,9,15
**kind** 18:3 21:7
23:4 25:14
30:13 57:20,21
62:12 63:15
64:15 73:3
79:9 82:21
84:6 90:23
92:15 93:22
112:11 118:5
132:4,21
135:11,19
139:6,11 144:9
146:24 150:23
152:10 155:4
155:15,23

166:1,13,22
167:2,3 180:12
187:16 188:24
192:22 193:13
245:19 250:23
251:8 259:20
262:12 302:18
306:23 310:8
313:23 314:20
335:18 337:21
338:12 339:16
344:23 345:9
**kinds** 82:12
238:8 271:6,11
271:12
**knew** 30:4
122:19 125:22
198:24 200:4
233:24 274:17
**knight** 270:18
**know** 16:1 17:5
18:12,13 20:15
21:22 23:14
24:16 27:23
28:24 30:4,6
31:24 40:15
44:1,2 48:21
49:5 52:11,14
61:18,20 62:7
62:10,10 70:15
73:4,15 74:14
74:14,16,20
75:5,7,18
80:18,24 84:19
84:20 86:2,4,5
86:7,18,18
87:10 88:21,21
88:23 89:2,6
89:23 90:16
91:20 92:4
93:9,12,15
105:7,8,12
107:14,16
115:9 116:13
117:4,6,21
118:19 122:7

123:4,5 124:13
124:14 135:22
135:23 136:12
136:15,16
137:4,6 139:8
139:15,23
140:11,24
141:7 144:14
145:11 146:2
146:21 152:3
153:6,9,14,16
154:11 158:10
164:7,8 168:13
172:7,8 186:3
186:15 197:20
202:12 205:9
206:6,7,7,10
207:15 227:15
233:2 239:9
242:24 243:2,5
243:19,21
244:10,13
250:10 256:5,7
257:14 259:8
259:20,24
260:1,11 261:2
261:24 262:2,4
262:5,10,17
265:17,22
266:22 270:15
270:17,18,18
270:20,21,22
271:7,11 272:6
272:7 273:11
274:21,22
275:22,23
277:8 280:3
283:23 285:4
285:12,23
286:15,16,17
286:21,22
287:8,9,9,15
287:16 290:9
294:9 296:1
301:24 302:9
306:17 308:17

308:20 309:2
313:12 315:12
315:12,13
316:12,12,16
317:13,15
318:8,10,18
327:12,14
332:2 333:20
334:16,17
336:4,20 337:6
337:10 338:16
341:20 342:16
343:1,2 345:3
345:4 347:11
347:11,15
348:5,6 350:1
350:2,2 353:1
353:2,8,9,12
353:16,18
357:10 360:21
361:5,9,10
362:12,17,17
362:22 363:1,6
363:11,11,13
363:14,14
367:13
**knowing** 124:3
**knowledge**
61:23 121:9,11
121:12,12,16
122:9 214:1
249:19 269:1
308:11 309:17
312:19 315:11
317:2,20
318:17 319:11
333:18 334:15
364:18
**known** 98:14
195:18 199:1
200:4 234:1
**knows** 259:24
353:9
**kyle** 4:13 9:20

**L**

Highly Confidential - Subject to Further Confidentiality Review

**label** 57:22
287:2
**labeled** 207:8
**labels** 298:23
**lacking** 164:17
**ladder** 63:16
70:9
**laid** 321:16
**landscape** 302:3
**language** 64:16
88:3
**large** 42:20,22
48:17,20 54:15
55:14 192:21
198:23 200:2
314:12 335:8
**largely** 79:19
**larger** 215:24,24
215:24
**largest** 76:10
314:5
**lasalle** 4:11
**late** 52:6 66:23
206:8,9 212:3
232:23 274:12
294:11 316:1,2
317:10 338:13
360:15
**lateral** 63:19
**latham** 111:21
185:12
**laura** 75:18,19
75:21 87:7
88:21 91:21
**law** 108:13
110:11 111:21
233:18
**lawsuit** 11:18
**lawyer** 110:21
185:19,22
221:21
**lawyers** 102:16
110:14 114:16
114:19,20,24
122:13 130:5
185:13 187:5

221:16 222:10
223:2 373:1
**layer** 275:14
348:24
**layers** 301:7
**laying** 154:23
**lead** 95:1 109:19
**leader** 113:16
115:14 363:12
**leaders** 84:12
161:4,6 162:1
162:23
**leadership**
161:21 292:11
301:3 348:19
**leading** 64:7,20
145:11 352:22
**leads** 292:20
**learned** 120:4
**learning** 151:1
220:18 365:22
**led** 255:18
**left** 40:10 286:3
**lefthand** 174:21
328:17 339:19
**legal** 6:4 84:17
84:23 88:24
100:2 103:8,20
104:12 105:2,7
122:11 127:19
130:4 142:1
306:17
**legitimacy** 22:20
**legitimate**
233:16
**letters** 26:11
234:23 235:10
**level** 18:8 38:15
39:1 62:11
68:17 87:14,17
117:12 145:3
247:12 284:17
284:18 325:5
335:5 348:24
367:6
**levels** 244:12

**leverage** 297:22
**levin** 3:3 6:3,5
**levinlaw** 3:6 6:2
**lexapro** 142:3,5
**lexecon** 141:23
142:3,5 364:24
365:6
**lexington** 3:8
**licensed** 203:20
232:11 233:5
306:13
**licensing** 36:14
**life** 336:6
**limit** 167:16,17
167:22 168:6
168:17 169:5,8
169:9,19 170:8
170:20,22
292:7 303:10
303:12,15
307:14,21
322:6,6,12,13
336:19
**limitation**
307:13
**limitations**
311:10 312:7
313:16,20
317:6
**limited** 198:22
200:1 307:15
**limits** 167:18
171:18 172:2
173:10,18,24
243:9 279:2
282:6 303:8
322:2,2 346:3
**line** 24:17 59:5
69:1,1,1,4,24
84:20 117:8
129:17 132:15
217:16 322:2,5
322:6,13
344:10,14
359:12 371:4
373:2

**lines** 24:10
33:15 41:20
42:8 65:3
209:1 222:17
223:1 320:21
359:12
**link** 154:19,20
176:3 178:10
**links** 174:22
178:16 179:16
**list** 178:8 291:6
**listed** 64:1 66:12
229:17 343:7
**lists** 31:3,10
**litigation** 1:5,22
9:3,8 11:7,8,11
11:22 12:2
13:1 107:17,19
**little** 21:6 25:17
33:10 43:17
45:16 46:24,24
47:20 54:18
55:10,17 79:2
79:11 82:21
125:24 140:4
153:21 158:13
172:13 178:9
183:9 199:21
204:19 237:13
250:13 255:4,5
255:9 288:9
312:5 335:20
342:19 348:14
**lived** 37:15
**livestream** 4:8
4:20 5:17
**living** 70:18,20
**llc** 4:11
**llp** 3:15 4:5,17
5:3,14
**loaded** 247:8
**lobbyist** 361:10
**lobbyists** 361:1
361:2,9,10
**local** 174:24
207:8 292:11

**located** 165:19
233:14
**locations** 175:1
355:20
**lock** 263:10
**locked** 250:15
264:9 265:2
**locking** 263:15
**log** 151:6 165:8
**logic** 327:20
328:14 329:19
332:10,21
333:11 345:9
**logistics** 260:11
**long** 24:6 35:22
36:1,12 66:6
71:22 74:3,9
81:18,24
109:12 111:5
112:1 135:13
136:4,10 233:2
286:1,14 322:5
322:12 351:4
**longer** 112:5
255:13 272:4
273:23 291:17
**longterm** 115:9
115:22
**look** 22:21 39:3
62:21 90:11
99:14,20,24
139:15 140:1
146:14 155:24
157:14 165:9
165:23 174:21
179:20 180:11
191:4 192:19
219:17 227:14
232:4 234:11
275:3 282:5,9
285:6,7,8
286:18 288:2
289:10 296:8
297:7 302:3
328:5 338:4
350:7 356:7

363:23,24
lookback 291:17
looked 65:10
90:9 92:11
95:18 132:3
138:19 289:3
291:6,7 313:15
316:4 351:10
looking 92:9
228:24 245:23
263:5 285:2
287:7,10
288:19 290:8
292:21 296:3
302:2 342:9
345:19 349:18
355:12
looks 236:19
327:24 364:1
loop 132:5
loophole 310:8
loopholes 168:6
168:9
loss 83:9 87:3
118:8 174:10
354:18,21
lot 142:2 344:16
346:21
lovejoy 77:13,13
77:18 80:7,10
80:14 81:18
83:6 113:10,11
117:14 118:1
316:5 320:9
low 245:18,20
246:20,21
334:21
lowest 196:14
lp 118:8
ltm 365:19
ltmp 150:22,24
365:20,21
lunch 236:18
lynn 261:18

—————

**M**

madison 6:4
9:18
magistrate
253:21 262:24
mail 40:19,22
41:2,8,19,20
42:3,7,10,18
43:23 44:8
45:7 47:15,17
48:16 49:8,14
49:24 50:7,23
51:1,2,7,16,24
52:17,23 53:2
53:13,19 54:6
54:17,17,20
55:1,15,16,19
55:22 56:3,13
57:2,10 58:2
58:22 59:3,17
68:14,18 69:12
85:10 334:24
mailed 41:3
maintain 206:15
317:5
making 218:24
219:15 304:7
332:10
malpractice
13:6,10,11
manage 338:1
363:17
managed 42:12
management
133:12,16,20
134:12 151:1
337:24 365:22
manager 36:18
37:3 38:19,20
39:1,5,11 62:7
134:24 247:12
247:22 273:24
348:12,13,14
367:6
managers 39:13
247:13,17
355:16 356:9

managing 274:3
manner 236:4
manual 154:22
155:4,8 175:1
179:4,7,12,13
202:4
manually
313:21 314:1
314:18 315:9
316:19
manuals 238:12
238:17
manufacturer
143:7 235:1
342:11,13
march 246:15
marcus 5:14
marcusshapira
5:16
mark 34:8 75:9
80:2 94:1
116:6 131:7
156:23 182:22
251:16 269:18
278:16 310:16
319:13 326:23
336:8 337:11
marked 7:7 8:2
34:11 75:12
94:4 116:9
131:9 157:2
182:24 251:18
259:1,3 269:21
278:18 279:15
306:22 310:18
312:20,24
319:24 320:7
323:24 324:4
327:2 336:11
337:14 339:1,3
market 139:14
144:9 161:4,6
161:20 162:1
162:23
marketing 84:9
84:13,22

martin 93:5,14
317:14 318:22
martins 317:16
marut 2:8 6:12
10:7 369:1,14
massachusetts
4:5
masses 150:20
match 40:6
344:23 346:13
matched 344:24
materials 112:6
112:10
math 37:19
282:9
matter 9:7 68:24
252:9 273:14
316:14 351:10
356:13,20
matters 369:4
matthew 4:19
mckesson 4:10
9:21
mdl 1:4 9:8
mean 10:23
17:14 18:16,20
28:9,13 38:8,9
39:23 40:1
52:12 54:8
60:20 63:6
78:1,7 84:17
84:19 87:10
89:22 92:10
105:7 110:4
124:6,7 132:1
136:10 143:15
146:20 149:13
154:6 157:6
162:8 172:17
173:3 176:8
203:13 221:8
227:20 234:17
245:14 250:3
271:12 273:5
277:9 290:11
293:8,23

295:16 303:11
306:17 310:5
338:16 345:8
346:1 347:2
348:2
meaning 42:11
171:16 176:20
223:9 299:15
328:11 335:23
meaningful
248:13 249:11
meaningless
276:9
means 41:24
118:19 143:17
151:6 158:5
169:19 176:24
221:10 234:18
313:14 348:6
369:16
meant 166:8
284:11
measures 213:9
220:15,18
221:8,10,19
244:2,7,8,13
249:15
meat 244:16
mechanics 31:7
31:9 49:22
296:1
mechanism
202:1,2,13
301:11 337:22
339:20
mechanisms
149:8
media 202:5
medical 13:11
233:16
medicare 11:20
medication
285:7
medications
23:2 144:3
255:2,8 257:13

258:17 335:20
**medicinal**
195:12 196:18
196:20,23,24
**medicine** 232:11
**meehan** 363:7,9
**meet** 19:20
21:17 222:24
223:2 225:2
227:4 228:2
234:22 235:9
235:20 306:12
**meeting** 7:11
19:7,8,22
21:13 23:6
24:11 27:4,13
29:6,11,13
30:2 31:7 33:3
33:7 90:24
91:3,14,21
92:16,20 93:4
93:14 94:6
97:22 112:19
114:15 134:1
161:15,21
162:9 185:14
227:9 338:5
**meetings** 15:17
16:14 19:15
20:4,22 21:11
23:18 24:4
26:16,17 27:10
27:10,24 28:1
28:4,6,7,16,16
28:21 29:15
30:9,14,23,24
31:5,12,15
32:11,20,24
33:1,4,12,22
73:5 74:10,12
74:13,21 77:4
88:2,8,10,16
88:20 89:21
90:3,21 91:17
93:20 109:12
109:15,17

110:7,23 111:2
111:8,9 112:2
112:3,7,9,11
112:14,20,21
148:17,21,21
148:23 149:10
149:11,12
150:12 151:16
187:5,17,18,24
187:24 188:3
221:15 318:6
**member** 366:3
**members** 76:6
131:16 137:10
162:11,15
354:8,12
**memo** 8:8 21:15
75:24 76:9
87:7,21 92:9
99:23 132:10
133:10 134:5,8
279:16 280:12
281:6,6 313:15
**memoranda**
113:2 132:21
**memorandum**
7:19 131:21
183:2 184:2
190:7,24
231:12 278:24
279:19 310:23
**memorializati...**
28:6
**memory** 30:3
38:24 83:1
252:13
**memos** 132:3
**memphis** 11:13
11:14
**mentioned** 85:7
85:21 263:24
268:20 270:21
297:9 322:17
330:18
**mentions** 322:20
**menu** 345:1

**merger** 79:18
81:10,13
**merten** 75:18,19
75:21,24 77:3
87:7
**met** 100:19
119:22 185:22
299:11,16
**methodology**
280:16 281:22
282:6 290:15
**metric** 147:3
203:4 240:1,11
240:16 241:1
242:18 285:20
**metrics** 58:9,11
119:1,11,20,24
133:5 146:8
147:5 243:17
280:16,17
**mexico** 18:13
19:12 20:6,9
20:18 21:13
22:7,8,9,11
25:6 33:21
35:7 36:23,24
37:5,7,10,14
37:15,16 38:1
70:7 350:19
**mid2012** 113:8
**mid2013** 246:6
**middle** 41:12
181:22 198:13
214:16 241:17
246:18 248:24
351:7 365:17
**migration**
271:14,18
274:3
**mike** 116:13,19
270:18
**million** 52:21,21
52:22,23 247:8
248:4
**millions** 48:18
**mind** 79:9,16

188:14 218:11
285:13 363:21
**mine** 29:9
276:12 327:24
328:1
**minute** 16:5
55:13 241:13
279:12 319:16
**minutes** 71:23
90:11,20
361:21,23
362:11
**mirror** 350:8
**mislead** 226:22
**mispronounce**
270:3
**mispronounci...**
89:8
**missed** 78:20
346:14
**missing** 106:4
185:2
**mission** 76:12
**mistaken** 349:15
**misunderstan...**
50:20 288:13
**misunderstood**
288:6,15
**misuse** 204:4
**mitchell** 3:3 6:3
6:5
**mix** 151:16
**mixed** 185:9
**mmonahan** 4:19
**model** 55:9,22
274:20 275:7
335:19
**moment** 364:6
**monahan** 4:19
**money** 68:22
69:3,18 71:9
71:12,13
**monitor** 48:12
51:16 61:19
62:18 63:11
158:20 281:10

306:11 307:22
**monitored** 50:21
168:15,17
**monitoring**
33:15 34:5
43:7,15,20
44:8,12,15
45:5,13 47:2
47:17 48:3,11
49:12,23 50:6
50:9,12,17,21
51:4,6,10,15
51:24 53:12,19
56:12 57:1,8
57:24 58:12,21
59:12,16 61:12
61:15,22 65:13
65:15,21 66:2
66:9,11,17,18
85:11,23 86:12
92:1 104:3,12
106:3 118:17
120:1,21
121:22 144:20
145:1,24
147:22 152:1
153:2,12 155:1
155:17 158:10
158:15 160:1
162:19 166:7
166:14 168:22
177:4 178:18
178:24 179:10
179:18,24
180:7 181:8
212:6,12
225:15 226:1
226:10 235:8
237:7,12,20
239:1,6,23
240:15 242:19
243:8 249:9
256:18 259:17
259:21 260:6
260:13 261:8
264:12,24

266:10 267:3
267:16,19
273:8 274:1,11
276:18 277:13
288:8,22,24
289:19,21
291:22 293:15
308:9,19,22
309:3 312:8,14
313:11 317:19
327:11 329:9
329:16 332:1
332:15 333:13
333:17 335:13
336:2 338:9,15
347:13 354:2
359:24 360:23
**monitors** 49:13
317:24
**month** 206:1
322:14
**monthly** 207:8
208:13 322:1,8
**months** 35:1
73:21,23 111:6
135:15 208:4
246:3,4,19
249:10 267:5
275:24 315:20
315:21,23
316:14 356:13
356:20,21,21
**morgan** 270:18
**morning** 10:16
47:1 189:15
305:12
**morris** 279:24
280:4,19
**motor** 352:22
**mougey** 3:5 7:3
9:14,14 10:15
10:17 30:17
31:1 32:18
33:19 34:14
43:16 44:17
45:3,15 47:19

48:9 49:6 50:1
56:18,22 57:15
58:7 59:23
61:13,21 62:13
66:3 67:20
69:21 71:18,22
72:6 73:17
75:15 86:20
91:12,16,22
93:3,11 94:10
97:9 101:4,11
101:15 102:4
102:20 103:14
105:11,20
106:7,18 107:6
107:15,22
108:8,24
109:11 110:22
111:24 114:7
114:14 116:12
119:13,15,18
120:10 121:18
122:22 123:20
124:15 125:1
127:3,11,23
128:7,9,14,18
128:21,23
129:9,13,21,24
130:12 131:6
131:13 138:3
140:12 141:13
146:16 147:12
147:20 148:3
152:16 153:8
153:23 154:9
154:12,14
156:5 157:8,10
159:1,19 160:8
163:17,24
164:10,22
165:7 167:15
168:14 170:4
171:13 172:12
174:4,7 175:18
176:17 177:9
180:17 181:3

181:14,20,23
182:2,4,11
183:6 185:9,10
187:3,14,15
188:19 190:16
190:20 191:20
196:4 198:6
199:9,20
200:10,21
201:12,21
203:1,23 204:5
204:17 205:10
205:23 206:11
207:5 210:15
211:18 212:23
214:13 215:13
216:7 217:2,10
218:10,12
219:4,16 221:6
222:3,22 223:7
223:18 224:9
224:21,23
225:10,22
226:9,15 227:2
227:10,21,23
228:19 229:21
230:2,5,9,11
230:24 231:15
232:21 233:12
235:24 236:10
236:16,21
237:4 240:21
240:24 241:15
241:19 242:1
242:17 246:11
248:19 249:6
249:20 250:4
251:22 254:17
255:3,22
256:10 257:17
257:23 258:6
258:24 259:6
264:3,17
265:23 266:8
266:19 267:17
268:4 270:1

274:8 278:22
279:18 282:19
284:3,5,13,15
287:1,4 289:13
290:24 295:7
295:14 298:14
298:22 299:13
299:24 300:8
306:1,9,20
307:5 310:4,14
310:22 313:4
317:3 320:5,24
321:23 323:11
324:7 325:23
327:6 328:10
328:12 336:14
337:18 339:6
347:4,6 350:13
352:18 358:6
358:12,19
359:7,20
360:12 361:11
361:20 362:2,9
363:19 367:19
367:21
**mouth** 277:10
**move** 37:16
154:1 198:1
258:21 269:15
324:18 326:9
326:16
**moved** 37:10,15
54:21 70:13
367:14
**movement** 271:3
287:11,19
**movements**
288:3,18 290:3
**moves** 37:13
63:15,19
**moving** 63:15
212:16 213:2,6
236:16 255:2
274:23 285:9
286:8
**mpyingling** 5:6

**multiple** 301:7
302:5
**multiplied**
208:14

**N**

**nabp** 15:2 26:15
27:3,9,12 28:8
28:21 29:7,11
30:12,24 33:3
33:7 73:1 74:3
74:6,10
**nacds** 15:2 27:2
72:13,23 73:19
94:16 97:23
100:1,10
**name** 9:2 10:16
86:22 100:15
110:13,14
141:22 157:13
162:17 185:4
270:4 271:5
343:4
**names** 110:18
271:7 353:7,13
**napoli** 3:8
**napolilaw** 3:10
**narcotic** 198:4
**narcotics** 20:24
48:19,22 49:4
267:12 356:14
**narrower** 25:4
**nation** 245:23
**national** 1:4 9:7
94:15 342:2,3
353:22 360:8
**nationally** 352:8
**nations** 76:10
**nationwide**
267:10 314:5
**native** 328:10
**nature** 148:18
297:11
**naught** 368:2
**ndc** 286:18
341:24,24

342:11,21
343:19
**nearby** 297:11
**necessarily**
342:21 346:10
**necessary**
253:11 289:12
370:4
**need** 98:12
142:20 190:9
231:16 249:8
275:7 284:18
288:20,22
317:4 348:20
357:22,23
**needed** 99:21
115:15 173:4
292:7 318:23
321:12 322:21
**needs** 129:10,11
**negative** 78:2
**nemo** 185:7
**network** 56:5
266:2 353:2,16
**never** 18:24
81:20 114:19
135:19 177:20
203:2 213:18
213:22 214:6
218:11 281:8
282:21 283:9
283:15 289:3
318:2 342:24
**new** 3:9,9 18:13
19:12 20:6,9
20:18 21:13
22:7,8,9,11
25:5 33:21
35:7 36:23,24
37:5,7,10,14
37:15,16 38:1
70:7 117:11,13
125:2 212:19
214:7 236:17
273:12 297:24
350:5,19

**nine** 356:21
**noncompliance**
220:13 223:23
224:17
**normal** 17:24
19:23 322:22
**northern** 1:1 9:9
252:5 253:21
**norwinski** 4:7,7
10:3,3
**notary** 372:20
**note** 28:19 29:1
30:7
**noted** 368:1
370:10 372:9
**notes** 28:5,8,9
28:12,16,22,23
28:24 29:4,18
29:20,23,24
89:20,22 90:1
90:2,10 318:23
338:5 345:7
373:1
**noteworthy**
28:18,20
**notice** 193:19
231:6
**noticed** 107:4
**notices** 365:24
**notified** 300:16
**notify** 297:20
**november** 20:18
44:3 52:18,19
132:17 135:5
313:6 315:7,24
316:13
**number** 12:21
12:22 31:24
40:16 74:12
110:24 111:2
115:8,23
120:19 124:13
136:7,9 146:20
190:14 191:9
193:22 194:16
243:20 244:17

245:21 248:23
260:18 285:11
285:14,17
286:9 287:8,9
287:19 289:18
339:24 341:5,6
341:10,17,18
341:22,23
342:21,22,23
343:16 347:17
356:17 357:9
**numbered** 75:17
157:12 328:6
**numbering**
183:8
**numbers** 49:5
183:12 188:21
246:21 247:5
**numberwise**
245:15
**nw** 4:5

_____
**O**
**oath** 14:19 15:11
372:5
**object** 94:9
101:13 103:4
104:23 105:18
123:13
**objection** 30:16
30:20 32:16
43:11 44:10,21
45:9 47:7 48:5
49:17 56:15
57:11 58:3
59:19 61:8,16
62:3 65:23
67:17 69:20
70:2 71:14
73:11 86:15
91:8,15,18
92:23 93:7
97:5 102:1
106:15 107:3
107:11 109:7
114:4,11 123:2

124:11 126:24
127:8,16 128:8
128:15,17,18
129:18 131:2
137:22 140:7
141:10 146:12
147:8,16,24
152:12 153:4
156:2 158:22
159:13 160:4
163:14,21
164:5,19 167:9
168:7 169:23
171:8 172:5
174:3 175:15
176:13 177:6
180:14 186:23
187:12 191:18
195:24 199:6
199:16 200:6
200:15 201:8
201:17 202:22
203:22 204:1
204:11 205:5
205:20 206:4
207:2 210:11
211:13 212:22
214:11 215:10
216:4,22 217:7
218:22 219:12
221:1,23
222:18 223:4
223:14 224:6
224:19 225:8
225:17 226:3
226:12,19
227:6 228:14
229:19 230:18
231:9 232:18
233:7 235:21
236:7,13
240:17,23
242:11 246:10
248:15 249:1
249:17 250:1
254:9,21

255:15 256:2
257:10,20
258:3,13
263:22 264:13
265:3,14 266:4
266:14 267:13
267:24 274:5
282:14 286:24
287:3 289:6
290:18 295:3
295:11 298:10
298:18 299:9
299:20 300:5
305:21 306:6
306:15 309:23
310:11 316:23
321:20 323:7
325:13 350:9
352:15 357:6
358:3,11,16
359:1,15 360:3
361:7,17
**objective** 213:1
**obligation**
125:14 127:13
128:4 130:14
204:14 295:5
298:13,15
299:7,17
**obligations**
107:9 125:4,4
159:11 160:3
175:13 186:21
220:22 228:2
236:5 300:14
306:12
**obtained** 103:8
105:2 127:19
130:4
**obtains** 364:23
**obvious** 206:20
**obviously** 25:19
308:23 339:20
341:24 343:18
349:12
**occasion** 19:24

Highly Confidential - Subject to Further Confidentiality Review

213:12
**occasionally**
32:22 292:20
**occasions** 236:3
**occur** 168:12,13
296:3 323:18
367:8
**occurred** 24:7
28:7,21 29:13
74:12 75:5
182:20 213:5
233:11 243:10
297:23 360:18
**occurring**
206:21 212:15
258:16
**october** 74:24
152:18 157:17
161:20 179:16
320:8 321:4
**odd** 222:23
292:21,21
**offered** 23:10
**office** 29:4 175:1
191:6 207:8
234:24
**officer** 75:22
87:8 262:8
**offices** 2:10
**oh** 188:13
245:17 328:7
328:10
**ohio** 1:1 9:10
39:4 252:5,11
253:22
**okay** 12:1,5,14
13:11 16:7,9
16:10 18:10
20:8 27:8
32:14 35:16
39:21 48:1
50:14,15 51:14
52:15 54:7
55:4,21 57:19
59:24 61:22
72:24 77:17

78:20 79:16
80:13,23 81:8
81:12,18 82:3
82:11 83:3,11
83:16 84:2,18
85:16,22 86:21
89:4 92:8
99:18 100:16
103:11 105:10
113:1,18 116:4
116:24 117:7
118:22 120:7
120:24 122:14
126:15 127:22
129:24 130:10
138:14,24
139:3 141:24
148:15 149:7
154:4,5,21
158:12,16
159:8,23 161:1
165:17 166:12
169:14 174:16
182:2,21 183:9
183:14,15
184:7,13,24
186:12 187:4
188:7,23,24
190:13,15,19
190:22 192:4
192:14,19,20
196:24 217:13
227:17,22
229:16,18,18
229:22,23
230:12,13
231:18 232:6
234:12 236:21
240:9 246:8,14
247:6,12,16,24
248:8 250:19
251:2,3,7,15
252:2,3 253:6
254:1 256:12
258:7 260:23
262:6,9,11,14

272:1 279:13
279:19 280:24
281:2,21 283:3
283:4 284:2,24
285:5,16
287:23 289:1
289:14 290:10
293:7,11
294:17,18
296:15,18
297:6,13 298:3
300:1,19 301:6
303:7,15
304:20 305:10
306:2,10,21
308:12,21
309:10,12,13
309:18 311:5
316:1 318:18
318:22 323:23
327:17,19,23
328:15,16
329:17 331:22
332:1 333:5
334:1,24 337:7
338:1,4 339:9
339:10,18
340:12,22
341:5,17 347:1
347:22 348:4,7
349:11,17
355:6 362:2
**old** 179:5
**once** 55:9 60:3
122:23 127:4
127:12 128:3
130:13 167:23
168:1,11
172:22 241:7
267:9 292:1
303:10
**oncology** 292:19
**onedrug** 302:4
**ones** 12:7,10,12
51:2,10 72:17
139:9,21

156:18 262:4
262:17 285:15
333:9 348:8
**onestop** 155:23
**ongoing** 73:7
215:2 221:14
254:2 327:20
328:14 329:19
**online** 314:24
**open** 107:23
124:7,18
**opened** 232:23
292:18
**operated** 42:2
48:8 54:18
55:16 189:9,22
194:6
**operates** 189:8
189:21
**operating** 18:2
52:22 55:9
73:7 273:7
**operation** 40:2
44:16 50:13,18
60:11,16,18
275:9 277:4
350:5
**operational**
63:23 64:5,18
65:8 152:6
176:6,9,10,19
176:23 247:2
**operations**
20:16 38:7,9
39:15,17,18,19
39:22 41:13
42:21 53:3
62:9 64:8,21
67:24 77:21,23
78:10,11,15,16
78:19,24 79:20
79:21,24,24
80:1,12 81:2,3
82:5,11,14
83:15,19 84:7
84:8,22 161:10

161:11,14
175:23 176:5
176:16 238:10
238:18 268:21
269:3,4 272:13
272:24 335:8
**opiate** 1:4 9:8
146:10 195:8
214:19 215:2
215:23 221:14
221:20 250:21
352:9,21 353:4
353:10 356:24
358:10 359:9
361:5,15
**opiates** 21:4
26:6 43:3,8
49:16 72:12,22
90:3 126:23
147:6 150:9
152:22 168:1
169:4 170:7
172:4 194:21
215:9,16
217:23 250:7
250:16 255:13
258:10 266:3
266:12 276:24
294:7 336:1
356:14 362:16
**opinion** 123:17
211:22 230:17
230:22,23
237:10 360:20
361:19
**opinions** 122:11
**opioid** 27:16
**opioids** 356:18
366:10,12
**opportunities**
174:13 293:21
**opportunity**
182:17
**opposed** 187:18
**opposite** 172:9
172:14

Highly Confidential - Subject to Further Confidentiality Review

**options** 70:21
71:1,4 156:10
156:12 248:5
**order** 8:10,12
33:14 34:5
42:7,15 43:7
43:15,20 44:7
44:12,15 45:5
45:12 47:2,15
47:16,17 48:3
48:11 49:12,23
50:6,9,11,17
50:21 51:1,2,3
51:6,10,14,23
53:12,18,19
56:12,13 57:1
57:8,24 58:12
58:21 59:4,7
59:11,16 63:8
66:17 85:11,23
86:12 92:1
104:2,12
105:20,23
106:2,5,17
113:23 114:8
118:16 119:24
120:21,21
121:22 124:6
124:23 125:2
126:7,15
144:20 145:1
145:24 147:22
152:1 153:2,12
154:24 155:17
158:10,15
159:24 162:19
166:6,14 168:2
168:3,4 169:3
169:6,11,13,18
170:6,22 171:5
173:1,7,18
177:4 178:18
178:23 179:9
179:18,24
180:7 181:8
191:7,13

193:10,14
199:19 204:9
204:10,24
205:2 206:16
207:7 208:1,13
208:16 212:6
212:12 213:21
219:15 225:14
226:1,10 232:7
234:21 235:8
235:19 237:7
237:12,19
239:1,6,23
240:14 242:19
249:9 256:17
259:17,21
260:6,12 261:7
264:12,24
266:10 267:2
267:15,19
273:7 274:1,11
276:18 277:12
279:1 280:12
281:16,16,23
281:24 282:6
285:2,6 286:7
286:13,18,23
287:2,6,14,17
288:8,22,24
289:10,15,17
289:19,21
290:13,22
291:3,22 292:2
292:5 293:1,15
294:21 295:1,8
295:22 296:5
296:11,11,14
296:16,20
297:3,19,20,24
299:7,17
305:24 307:13
307:14,21
308:13,18,19
308:21 309:3,7
309:15 310:3,7
310:20,24

311:14,17,18
311:18,22
312:8,14,18
313:2,5,11,24
315:3,8,9
316:19 317:19
317:23 321:12
322:3,4,6,22
324:16 327:11
328:14 329:9
329:16,19,24
330:7 331:4,7
331:9,12,15,19
331:23,24
332:11,15
333:6,7,8,12
333:14,15,16
335:13 336:1
338:8,15
341:22,23
344:17 345:11
347:13 354:1
359:24
**ordered** 42:14
167:19 313:22
314:19 321:2
322:12
**ordering** 206:18
263:6 311:9,9
311:14,16
341:23
**orders** 42:17,18
43:7 45:2 47:5
47:11 48:12
49:13 50:22
51:16 53:14
56:13 57:9
58:1 59:10
62:18 67:4,10
67:15 109:6
119:2 120:1,17
121:7 122:3,20
122:23 123:11
123:19 125:15
125:20,23
126:4,6,8,10

126:12,15,16
126:22 127:5
127:13,14
128:4,5 130:14
130:15,21,22
133:6 146:9
158:21 164:3
164:16 166:21
166:24 168:21
170:3,17,19
172:19,21
173:2,3,9
177:14 201:1
201:15,23
202:21 203:19
204:8,8,21
205:14 206:17
207:9,17,18
208:3,4,21
209:8,15,21
210:3,19,24
211:5,11,20
213:24 217:4,5
228:10 229:5
234:6 240:2
241:22 243:19
243:20 256:18
277:15,22,24
278:3,5 280:7
281:10,16,20
281:23 287:23
288:11 291:12
294:1,20 296:4
296:22 298:5
298:16,21
300:11 306:12
306:19 307:22
308:23 309:4
309:21 311:21
318:3,8,13
321:10 322:1
322:14 329:4
329:11,23,23
330:1,5,14,23
331:3,9 332:9
332:10,16,21

334:3,8,12,13
335:24 338:8
**org** 79:2,12
80:23 82:7,23
87:1 355:12
356:2
**organization**
15:20,23 60:13
60:22 115:14
161:9 212:17
**organizational**
135:20 362:24
**organizations**
15:18 16:8
79:23
**organize** 361:22
**original** 370:13
**otc** 42:14
**otsc** 191:13
**outcome** 24:9
144:15 369:12
**outlier** 146:24
147:4,13
170:23 291:3
292:1,2 293:1
294:21 296:17
296:23 297:3,8
299:1,15 300:2
300:12 303:19
303:22 304:15
305:14,19
**outliers** 146:15
146:18 290:16
291:11,12
298:5 304:12
304:13 306:4
318:12 330:19
**outline** 314:22
**outside** 14:9
33:3 70:8
83:13 84:12,13
108:9 110:3,4
110:5 137:13
138:24 139:11
139:21 141:3
144:18 172:2

Highly Confidential - Subject to Further Confidentiality Review

173:9 186:13
186:16 187:7
187:19 222:4
222:15 224:1
233:17 252:14
318:15,19
322:22 326:7
329:16 331:8
331:15,24
333:15 334:13
**overall** 146:10
147:6 302:2,3
302:4
**overdosed**
353:13,16
**overdoses**
215:16 352:21
**overhead** 248:4
273:24
**overlap** 97:1
160:11,14
**override** 168:23
173:15 177:12
178:5 297:14
297:22 300:9
300:15,18
301:9,12,21
302:15,19
303:3,4 304:2
304:8,16,23
305:7,11
309:12,13
310:6 312:17
322:23 323:15
323:16,18
331:13,14
339:12,23
342:9 344:17
345:19 346:2
349:17,20
**overrided**
349:22
**overrides**
168:16,22
305:3
**oversaw** 39:15

56:8 59:18
**oversee** 40:8
113:7 115:3
117:19 273:12
276:4 286:1
**overseeing**
20:15 43:21
44:4 85:9
113:24 260:5
261:7 276:23
338:21
**overseen** 45:18
**oversees** 49:12
**oversight** 14:22
42:4 68:14
275:14
**overtaken**
352:21
**overview** 100:3
100:16 166:14
280:21
**owned** 189:9,22
**owns** 189:8,21
**oxford** 5:14
**oxy** 322:5,12,18
**oxycodone**
195:4,17 196:2
197:2,16,23
198:4 320:13
321:2 342:14
343:8
**oxycontin**
251:12 274:18

**P**
**pack** 347:1,7
**package** 71:4
**padlock** 250:21
**padlocked** 250:6
**page** 41:11,12
63:20 64:13
68:11,12 89:9
131:14,20
157:19 174:17
179:21 181:15
183:8 184:1,9

184:19,20,22
184:23 188:6,9
188:11,16,17
188:20 189:6
190:14,21,23
190:24 191:24
192:11,24
195:3,16
198:11,11
199:14 202:18
206:14 217:11
218:6,7 227:11
228:18,20
231:1 234:11
251:1 252:4,18
253:5,23 259:7
277:10 282:4
296:17 299:2,5
328:9,13
333:21,22,23
333:24 371:4
373:2
**pages** 66:6
183:12 184:10
184:11 208:5
210:9 282:5
372:5
**paid** 163:12
164:1,8,12
**pain** 133:11,16
133:20 134:11
**palenchar** 2:11
**pandit** 270:4
**pandits** 270:19
**papantonio** 3:3
6:3,5
**par** 4:3,3,3 10:4
**paragraph**
88:14 100:1
189:20 190:4
191:12 192:1
193:18,19
194:4,14
195:16 198:12
198:13 200:22
202:18 206:15

207:1,6,14
208:24 217:14
217:19 218:8,9
218:14,18
219:5,17 220:9
223:12,19
224:5,14 232:4
232:5 234:20
253:5 279:6
307:8
**paragraphs**
192:5 227:14
227:18,24
228:8 229:3
231:21,23
234:7 253:15
**paralegal** 6:2
**parallel** 81:4
111:16
**parameters**
289:9 291:4
326:18
**parent** 219:24
**part** 11:20 14:24
17:8,24 19:24
26:17 37:6
42:3 59:11
60:11 68:13
71:4 76:17
88:14,17,24
90:6 91:13
92:20 95:17
100:21 101:21
105:1 109:1
111:17,20
119:14 124:1
125:13,18
139:20 144:20
147:18 186:6
186:10 189:17
200:12 218:8
218:14,20
220:21 221:13
222:12 227:8
248:24 249:5
268:10 275:8

275:17,17,17
281:19 286:17
286:23 291:21
309:10 316:7
317:18 332:21
339:8 344:5
355:9 362:23
**participate**
76:24 95:4,12
362:14 364:15
**participated**
27:19 72:23
73:1 362:18
**participates**
334:23
**participating**
186:13 362:12
**particular** 19:18
29:15 97:24
152:14 200:19
208:13 270:22
287:19 288:4
290:12 292:12
296:1 305:2,9
311:23 338:17
342:24
**particularly**
200:8 302:1
**parties** 369:11
**partnering**
120:22
**partners** 63:13
275:12
**parts** 287:22
**paths** 115:22,23
**patient** 22:21
42:16 138:20
143:9,20
**patrick** 5:5 9:22
**pattern** 305:5
**patterns** 206:18
**patty** 109:22
**pause** 56:20
353:24
**pave** 212:19
214:8

Highly Confidential - Subject to Further Confidentiality Review

paved 212:20
payer 41:1
payment 11:7
    11:11
pays 360:24
pbm 41:1
pdq 311:9,14
    312:11 320:14
    320:16 321:2
    321:10 322:1,4
    323:20
peak 243:14
    246:8 247:16
peculiar 223:6
peer 285:9 286:8
    290:11
pending 9:9
    11:12
penetration
    337:8
pennsylvania
    5:15
pensacola 3:4
    165:8
people 40:24
    51:8 87:17
    113:14 139:4,8
    142:21 149:5
    168:21 222:16
    223:1 243:13
    243:15,16
    244:4 246:9
    247:3 249:8
    261:21 262:2
    314:14 323:14
    353:3,8,12,16
    353:18 354:16
    354:20 356:9
    359:22 360:9
peoples 93:9
percent 230:3,6
percentage
    147:5,6 245:16
    249:11
percentages
    245:21

percentagewise
    245:11 335:8
perfect 71:22
perform 67:9,14
    122:24 123:10
    127:13 128:4
    130:14,22
    173:2 210:2
    217:4
performed
    210:8,18,24
    211:5 235:17
    278:5
performing
    209:14,20
    211:10,19
    213:21 317:23
    318:3,7,12
period 52:15
    57:5 73:22
    74:9 109:13
    111:5 273:4
    294:15 332:18
    351:5
permit 367:7
perry 185:11
    186:1
perrysburg
    194:23 249:22
    250:10 251:4,7
    251:24 252:11
    252:14 254:3,6
    255:12,23
    256:1,6 257:4
    257:7 258:8
    262:20 263:5
    263:10,15,19
    271:16 311:20
person 52:1
    78:17 106:21
personal 369:6
personally
    136:18 351:18
perspective
    47:11 205:8
    214:3 243:21

pertaining 2:6
peter 3:5 9:14
    10:17 153:22
    165:7
ph 1:22 7:8
    34:13 282:9
pharmaceutical
    4:3,3,3 34:4
    52:5,7 57:14
    57:20 58:11
    59:21 60:2,3,8
    60:15,23 61:6
    61:24 62:17
    63:3,10,24
    64:4 65:1,6,20
    66:22 67:3,9
    68:6 84:1
    85:14 111:11
    111:16 113:7
    113:15,20,24
    115:4,7,12,17
    116:2 117:14
    117:20 118:11
    118:24 119:6
    119:21 120:2
    120:13,18
    121:3,5,8,10
    121:17,20,23
    122:3 123:22
    123:24 125:3
    125:11 131:16
    132:6,12,23
    134:14 135:7
    135:12,18
    136:23 137:7
    138:23 139:1
    139:22 140:17
    141:20 142:10
    144:17,22
    148:6,24
    151:21 152:2,5
    154:16,22
    157:21 169:10
    169:20 170:9
    170:16 171:19
    172:3,18 173:4

173:11,19
    174:1,17
    178:16 179:8
    179:22 181:7
    187:22 203:10
    209:18 210:1
    212:3,7 213:20
    214:3,15,18,23
    215:6,20,22
    216:2 232:23
    235:16 237:15
    238:1,9,14,22
    239:18 240:3
    240:15 241:8
    243:10,14
    246:12 256:14
    259:18 261:9
    263:16 264:16
    264:19 266:6
    266:11,24
    267:9,20
    272:22 273:6
    273:24 274:10
    275:15,19
    276:4 277:11
    282:10 283:6
    284:21 285:22
    285:24 286:2
    290:6 292:2,4
    292:9 293:19
    294:4,5 296:2
    296:20 297:7
    300:21,23
    301:11,20
    302:17 303:5
    303:14 304:1
    304:11,20
    305:15,23
    307:21 309:2
    314:15 316:8
    317:17 318:14
    318:15,20
    319:4 321:5
    322:24 324:19
    325:8,24 326:3
    326:8,15

327:10 332:7
    335:16 336:6
    337:5 338:19
    345:6,18 346:4
    348:16 349:2
    349:10,23
    351:12 352:4
    353:21 354:9
    354:13,17
    357:2 365:4
    367:4
pharmaceutic...
    4:2 42:13
    140:6 141:5
    150:3 268:12
    272:4 367:1
pharmacies
    16:13,16 17:23
    19:5 20:3,23
    21:9 24:19
    25:5 45:21
    48:13 49:14
    91:5 189:22,24
    198:24 200:3
    206:21 208:6
    234:22 236:3
    239:11 257:14
    359:10
pharmacist
    36:11,12,13,23
    38:19 155:21
    155:24 159:15
    169:18 170:6
    172:1 174:12
    300:20 321:12
    331:8
pharmacists
    99:1 143:8
    159:5 175:1
    357:17 365:15
    366:8,14
pharmacy 14:14
    15:3,16 17:19
    17:22 18:2,7,9
    18:11,13,14
    19:12,15,21

Highly Confidential - Subject to Further Confidentiality Review

20:15 21:12,13
22:8,11,23
23:6 24:11,15
25:13 26:5
27:14 33:23
35:7,7,21,22
35:23 36:1,5,9
36:16,18,20,22
37:3,24 38:1
38:15,20 39:5
39:14,16,18,19
39:22 40:20,23
41:12 52:17
60:10 62:19
63:21 67:22,24
70:6 73:6
77:21,22 78:11
78:15,16,19,24
79:20,24 80:12
80:15,17,24
82:5,5,6,10,13
82:15,19 83:12
83:13 84:7,22
93:2 95:2
143:8 161:12
191:16,22
201:1,15
215:15,21
238:4,6 314:12
325:6 326:20
354:19 367:5
367:14,15
**phase** 8:10,12
279:2 310:20
311:1 312:8
313:2,5 328:18
330:8,17
**phases** 153:1,7
153:10,11,16
153:18
**philip** 185:11
186:1
**phone** 10:2
**phrase** 92:5
**phrased** 121:1
366:19

**physician** 22:18
22:20,24 42:16
45:1 134:11,12
147:7
**physicians**
42:15 138:19
145:8,10,14,21
146:9 147:14
232:10,16
233:4,15
**piece** 147:14
161:12 295:20
**pieces** 189:1
192:18
**pittsburgh** 5:15
**piñon** 32:21
89:8,10 96:13
100:20 102:15
103:6,6 105:3
108:19 109:16
127:20 130:5
**place** 90:1 121:5
130:23 134:1
151:8 154:16
155:23 156:7
156:14 158:11
161:16 177:14
213:19 225:7
226:8 240:14
243:7,8,9
245:5,6 249:5
249:10 280:17
281:11 282:10
285:20,21,23
301:20 313:23
314:20 323:19
326:5 332:3
355:5 369:8
**placed** 208:3
276:17 331:4
331:10 346:3
**places** 90:10
156:17
**plaintiffs** 2:4 3:2
9:15,17,19
10:17

**plan** 77:4 88:2
222:13
**planning** 68:1
**plans** 41:1 42:17
**platform** 151:2
265:20 365:23
**platforms**
150:23
**play** 332:7
365:10
**please** 9:12 10:7
22:9 102:5,24
104:18 105:13
119:23 120:15
121:3 128:10
195:2 198:10
206:14 224:20
224:24 227:11
229:20 237:23
241:24 284:6
284:10 326:21
336:20 370:3,7
**pllc** 3:8
**pln** 342:22
**plus** 331:3,9
332:9 357:22
**pmougey** 3:6
**point** 17:4 64:15
75:22 83:19
106:19 109:24
116:21 117:6
118:2 137:2
138:15 149:14
155:20 156:16
161:24 170:15
174:5 179:15
180:5,8,9
181:5,9 194:20
210:7,16 212:9
215:6 218:7,13
258:20 272:3
273:18,19
283:22 292:8
297:6 312:16
319:15 322:24
350:22 356:23

357:3,21,24
358:5
**pointed** 321:24
**points** 187:6
330:7,16 334:2
**policies** 17:5
18:1 33:15
34:6 43:7 47:3
48:3,11 53:13
53:19 56:12
57:2,9,24
58:21 59:12,17
66:17 85:24
86:13 92:1
106:3 120:1,16
121:4,22 122:1
145:24 148:8
149:2 150:13
151:8,12,20,22
152:1 153:13
154:19,23
155:22 156:15
162:19 164:15
166:6,15 175:4
177:3,5 178:19
178:24 179:10
179:17,23
180:7,13 181:8
212:6 219:11
224:1,12
225:13 226:1
226:11 237:7
237:20 238:14
238:16,18
239:2,6,23
249:9 259:22
260:6 261:8
264:24 266:10
267:3,22
273:12 274:1
276:18 301:19
301:24 302:13
308:22 309:3
309:19 335:13
336:2 356:17
359:24 365:15

366:9
**policy** 22:2 23:3
43:21 44:1,8
44:15 45:5,13
49:12,20 50:6
50:12,17,21,24
51:4,6,15,24
58:12 85:11
145:1 149:5
153:2,15 160:1
177:4 238:12
240:4,13
241:11 259:17
264:12 277:13
293:16 312:14
313:11 317:19
332:15 338:15
**polster** 1:6
32:22 105:21
105:22,23
113:18,19
115:6,11
131:15,21
132:4,11 135:5
157:21 158:4
247:7 248:2
324:2 355:1,6
355:8,14 358:8
**popped** 297:8
**pops** 99:19
**populate** 113:14
113:20 345:2
**populated**
345:13
**portal** 166:18
175:24 176:19
241:10
**porter** 4:5 10:4
**poses** 194:7
**position** 36:10
36:17,20,22
37:3 83:17
134:23 135:1
201:11 235:13
**positions** 35:9
35:10

Highly Confidential - Subject to Further Confidentiality Review

possession 90:17
possible 28:14
  268:22 272:13
  275:23 327:13
  345:3 351:19
possibly 171:6
postal 41:4
posted 135:1
potential 195:13
  204:22
potentially
  50:22 59:7
powerpoint
  157:13 161:2
  327:15 328:11
  330:13
powerpoints
  352:20
practice 28:15
  29:3,8 155:14
  207:6 210:6
  224:13 232:11
  233:17 296:19
practices 33:14
  33:24 124:9,20
  134:19 163:19
  238:14 365:7
precipitated
  269:13
predominantly
  82:14
prefaced 59:24
premises 253:9
preparation
  180:22 181:4
  281:7 351:15
prepare 31:15
prepared 41:3
  133:18 180:18
preparing
  351:18
prepharmace...
  268:20
prescriber 147:4
prescribing
  142:10 145:8

145:14,21
146:11 147:7
prescription 1:4
  9:8 11:7 12:2
  12:13,15,17,20
  13:1,2,3,7,14
  42:13 98:1
  159:7,17,18
  196:9 271:19
  271:21,22
prescriptions
  21:17 22:20
  41:2,3 52:23
  140:18 146:10
  160:19 175:9
  199:2 200:5
  232:10,16
  233:3,15 245:3
  314:9 334:23
  335:2 364:16
  367:15
present 6:1 18:1
  18:21 33:7
  34:24
presentation
  162:1,10,17,24
presentations
  93:22
presented 14:13
  144:10
president 52:16
  58:18 60:9
  63:21 64:12
  67:22,24 77:21
  78:4,12,15,19
  78:23 79:23
  80:6,6,12,15
  86:9,11 93:2
  259:13
presidents 87:10
  87:12 161:7
pressure 351:22
pretty 37:23
  151:24 152:17
  154:12 169:17
  197:22 303:11

303:16 309:18
320:18,20
321:8,13,13
prevented
  249:14
prevention 83:9
  87:3 118:8
  354:18,21
previous 68:11
  85:9 141:8
  251:8 369:3
previously 48:8
  66:1 74:11
  189:8,21
  240:20 242:3
price 71:5,8
primarily 54:6
  149:4 150:20
  265:8
primary 63:7
  67:3 148:14,15
  156:17 304:10
printed 338:24
prior 10:21 34:3
  52:3,16 57:13
  59:21 60:1
  67:15 79:18
  85:14 105:17
  112:6,8 115:6
  115:10,16
  119:5 121:8,9
  121:9,23 122:3
  123:5,11,23
  124:3 125:7,10
  143:19 186:7
  186:11 209:17
  209:17 213:19
  214:22 215:19
  237:24 240:15
  241:2 259:17
  261:9 265:8
  266:6,10
  267:19 326:15
  333:2 349:22
  360:18 361:16
  367:3

privilege 101:14
  104:23 105:19
  222:2,15 224:3
  225:21 226:8
proactive 76:17
  88:15
probability
  196:17
probably 11:8
  13:9 14:6
  27:22 28:9
  55:11 61:11
  84:24 102:19
  137:9 150:12
  155:9,11
  245:18 247:15
  272:8 290:8
  292:10 344:5
problem 171:24
  172:8,14 205:1
  221:11 232:22
  250:20 268:7
  328:8 332:4
problems
  218:19 239:10
  249:22 250:3
  250:24 257:8
  258:1,10
  263:20 264:11
  264:23 353:9
procedural
  184:5 189:7
procedure 2:5
  58:13 153:15
  240:4,14
procedures 17:5
  34:6 47:3 48:4
  48:11 58:1,22
  59:12 86:13
  92:1 121:4
  122:2 146:1
  148:8 149:2,6
  150:14 151:8
  151:13,20,22
  152:2 153:2,13
  154:20,24

155:17,22
156:15 164:16
166:6,15 175:5
177:3,5 178:24
179:10,17,24
180:7,13 181:8
212:6 213:13
213:18 224:2
224:12 225:7
225:14 226:2
226:11 237:8
237:20 238:19
239:7 249:10
260:6 261:8
267:23 273:12
274:2 276:19
301:19 302:14
309:20 326:5
335:13 336:2
360:1 365:15
366:9,24
proceeded 216:1
proceeding
  14:12 23:5
  351:16
proceedings
  11:3 33:18
  369:7
process 19:16
  22:19 25:14,24
  49:23 51:11
  92:6 104:14
  118:12,16,17
  120:23 123:6
  123:22 125:13
  125:19 126:11
  127:5 138:2,6
  138:12 144:20
  145:2 147:18
  147:21,22
  155:1,17 156:9
  166:19 168:11
  168:12 170:11
  172:2 173:10
  210:14,17,17
  210:20,21,23

Highly Confidential - Subject to Further Confidentiality Review

211:3,8,10
213:4,23 214:7
221:14 222:9
222:24 225:1,5
225:13 227:8
237:12 239:9
246:5 275:12
278:9,13 298:4
300:15 304:18
305:10 307:13
309:9 322:22
324:12 325:18
325:22 326:7
326:10 329:11
329:17 330:4
330:18 332:2
333:6,17 336:3
337:5 339:9,12
348:17,24
354:5,7 363:17
366:6 367:5
**processed** 168:3
168:4 169:13
**processes** 47:10
155:10,12
213:12 214:5
225:6 249:4
326:4 356:17
**proctor** 3:3 6:3
6:5
**procurement**
138:2,6,12,13
**product** 167:19
244:21 287:11
287:18 322:7
322:21 324:19
324:20 342:7,8
342:12,13
348:21
**production**
132:20
**products** 42:11
42:14 120:21
364:19
**professional** 2:8
233:17 369:2

**professionals**
99:1
**profit** 52:21
70:24
**profitability**
144:13 213:13
**profited** 359:9
**profits** 69:24
71:1 359:11
**program** 76:18
88:15,18 166:7
179:18 180:1
307:15,21
334:20 335:18
363:2 364:7,12
364:15
**programmer**
262:12 279:1
315:16
**progress** 237:19
**progression**
70:9
**project** 8:6,10
8:12 270:23
271:2,5,7,9,9
271:10,12,14
278:19 307:6
310:19 313:1,5
**projects** 167:14
271:13 338:1
**promote** 167:6
**promoting**
76:12
**promotions**
63:16
**property** 84:24
85:1
**proportion**
360:8
**proposal** 280:6
**proposed** 250:10
**proposes** 281:22
**proposing** 191:7
**propounded**
372:7
**prospective**

212:14
**protection** 83:10
87:3
**provide** 25:10
133:2 134:20
202:19 302:14
**provided** 11:4
14:21 15:6,9
34:15 70:12
112:14 113:1
145:5 207:16
**provider** 11:20
**providers** 76:11
**provides** 142:8
194:16 235:2
**providing**
210:19
**pse** 177:15,20
329:23
**pseudoephedr...**
177:22
**public** 194:1,7
372:20
**published** 132:2
**puerto** 208:7
**pull** 82:23
286:19
**pulled** 142:5
286:17 287:16
**purchase** 71:5
**purchased**
140:22
**purchasing**
80:19 83:24
84:1 116:22
118:10 139:15
140:1,2,13
144:2,5 317:17
**purported**
232:10
**purports** 75:16
131:20 310:23
**purpose** 14:17
29:1 114:15
158:24 178:18
178:23 186:18

186:19 203:24
204:3,7,20
205:1,13 206:1
220:12 223:22
224:16 233:16
345:24 346:1
**purposes** 144:12
187:1
**pursuant** 2:5
193:23 199:2
200:5
**purview** 54:21
60:4 86:10
136:19 138:16
139:4 167:4
256:21 260:4
291:3
**put** 20:3 29:5
31:4 66:4
157:23 158:11
162:17 243:7,7
243:9 245:5
249:4 250:21
277:9 298:23
303:8 314:10
323:13 345:22
358:23 359:22
**putting** 57:22
66:8 108:7
**pwag0001** 7:21
183:5
**pwag02115** 7:8
34:13
**pwag1763**
312:22
**pwag1990** 324:1
**pwag5140**
323:24 326:22

_____

**Q**

**qualified** 33:6
**quantifiable**
243:17 244:7,8
244:15
**quantity** 329:24
343:11,15

**quarter** 247:8
**quarterly** 77:4
88:3,7
**question** 12:11
14:20 43:18,18
45:4 47:12
50:4 57:19
60:1 75:6 96:5
97:8,10,18
100:24 101:7
102:10,12,21
102:23 103:5
103:13 104:6
105:1 108:6
114:22 120:6,9
121:1 122:8
123:14 124:17
125:24 126:20
127:17 128:1
129:2,7,8,19
129:22 130:3,7
131:3 133:9
139:3,10,18
140:21 143:3
145:19 180:24
192:15 197:22
198:2 207:13
224:8,24
226:16 228:7
229:2,11 230:1
230:7,8,9
231:17,24
232:2,3 242:5
242:14 248:17
250:12,14
255:4 258:7
261:23,24
276:13 283:2
284:7 288:14
296:16 343:23
359:18,19
364:6,9 366:17
**questioning**
24:18 129:17
**questions** 10:20
17:1 21:15

22:6,10,14
46:24 99:9
106:11 130:1
130:19 141:8
166:23 177:11
178:1 182:15
225:4 363:20
364:23 365:1
365:13 366:18
372:7
**quibble** 327:9
**quibbling**
338:13
**quick** 107:21
181:24 206:10
320:18,20
321:13
**quickly** 214:20
360:11
**quite** 20:9 92:5
129:14

**R**

**rafferty** 3:3 6:3
6:5
**raging** 361:5,15
**raise** 224:20
**raised** 230:2
**raises** 70:16
**raising** 73:16
224:21 229:20
229:24
**rakesh** 315:15
**ran** 73:21
**range** 247:6,22
277:6,7
**reach** 150:18
257:24 292:9
**reached** 289:11
**react** 360:11
**reaction** 219:19
**read** 64:10 76:9
112:6,11 117:4
194:5 199:15
201:7 206:22
207:1 208:10

231:11,14,18
272:19 281:13
339:7 370:3
372:5
**readily** 206:17
**reading** 64:14
231:20 369:8
**real** 181:23
**realize** 354:10
**really** 14:16
59:14 74:5
88:21 150:12
273:14,23
275:6 276:9
282:11 284:14
286:22 292:21
302:21 346:21
360:9
**rearview** 350:8
**reason** 62:21
111:8 207:12
254:18 303:12
303:21 318:24
327:9 343:12
343:21,22,24
344:3,6,21
345:10,17
346:16 370:5
371:6,8,10,12
371:14,16,18
371:20,22,24
**reasonable**
296:12
**reasons** 168:13
297:8 301:13
301:17 304:12
304:22 349:21
**rebranded**
140:22
**recall** 16:18
17:18 18:18
19:12 22:13
24:7,8,13,22
26:7 28:13,14
28:22,24 30:7
30:10,11 31:2

31:6,10,13,19
31:23 33:1,9
33:16 56:24
57:3 59:8,9,13
74:1,11 88:6
89:21 90:20
91:2 93:19,23
93:24 100:7,8
100:9,11 109:8
109:17 110:19
110:24 112:8
112:13,13,20
112:23,24
113:5 116:1,5
116:20 134:7,8
134:17 135:14
135:16 142:6
153:18 161:15
189:1 215:4
245:13 246:22
285:15,19
290:2 319:8,9
336:3 364:7
365:1,13,19
366:20
**recap** 251:8
**receipt** 370:14
**receive** 55:8
70:21 322:7
335:20 366:5
**received** 22:17
22:24 55:7
70:16 87:6
122:12 126:10
228:10 229:5
251:23 265:1
305:3,7 339:8
**receives** 257:5
**receiving** 59:9
113:5
**recess** 72:2
182:7 236:24
319:21 362:5
**recognize** 34:16
131:24 132:1
336:15 337:20

**recognized**
219:24
**recollection**
29:12 31:14
32:8 58:17,19
85:12 88:9
100:5 101:6
117:18 134:4
135:11 190:9
190:11 247:1
247:16 337:1
**recommendati...**
87:24
**record** 9:1,13
71:24 72:4
108:7 128:14
129:1 182:5,9
236:22 237:2
319:19 320:3
362:3,7 367:23
369:6
**recorded** 17:11
17:14 304:17
**recording** 17:15
17:15 230:5
**records** 17:6
22:21 202:5
253:9,10 263:5
**recruiter** 135:2
**red** 98:14,18,21
99:2,8,11,14
99:19,19,20
100:17 146:18
146:19,21,22
146:24 160:18
171:1 302:2
**redo** 145:19
228:7
**reduce** 296:20
329:24
**reduced** 292:6
292:23 293:2
294:19,20
295:9,22,23
296:24 297:2
298:6,16 299:4

299:16 300:2
300:12 313:9
313:13,16,21
313:24 314:18
315:9 316:19
330:19 334:4,8
369:6
**reduction**
248:13 332:11
**reductions**
330:7,17
**reed** 5:3
**reedsmith** 5:6
**refer** 29:6 30:1
72:19 188:21
191:21 238:17
343:15
**reference** 23:15
98:18 117:3
155:6 192:1,5
218:24 228:17
231:2 253:17
315:12 365:17
**referenced** 33:8
98:21 117:1
134:5 139:9,24
163:11 182:14
248:13
**references** 76:5
133:18 190:5
191:9,12
230:14
**referencing**
25:18 47:1
189:20 223:11
266:1 312:1
315:17
**referred** 27:2
41:7 56:10
80:5 179:4
321:17 351:23
**referring** 41:10
42:1 49:21
56:1 72:13,16
158:4 163:5
165:5 176:15

189:2 190:1
219:5 239:17
242:13,15
288:21 313:12
**refers** 44:12
50:9 191:5
342:11
**reformed** 220:1
**refresh** 29:12
30:3 337:1
**refusal** 107:24
**refusing** 21:16
**regard** 168:21
207:7 217:21
220:20 321:9
**regarding** 20:5
22:11 24:12
27:11 33:13
45:6 58:21
59:5,10 76:1
90:3 124:8,18
124:20 141:4
142:9 143:24
149:2 154:24
166:23 179:17
186:14 237:7
238:9 280:11
**regardless**
208:15
**regional** 161:7
265:12
**registered** 2:8
189:10,23
235:1 369:2
**registrant**
220:22
**registration**
191:8 193:11
193:22,24
194:12,16
219:2
**regular** 19:7,8
19:15 20:4
29:3,8 48:19
90:10 153:14
**regularly** 19:21

24:4 133:2
**regulation** 19:16
19:20 26:2
**regulations**
25:19,21 76:20
109:2 201:2
**regulator** 14:22
15:11,21,24
16:5,6,6
**regulators** 15:5
15:6,13 16:4
16:12 18:7
23:24 33:12
243:22
**regulatory**
65:16 95:21
108:5 114:2,10
115:1 219:20
219:20 220:11
239:10,15
243:21
**rejected** 302:16
309:13
**rejection** 305:19
**relate** 20:23
21:2 33:24
191:14 253:17
**related** 39:16
72:10,19
215:16 238:13
238:19,24
336:21
**relates** 1:6
259:23
**relating** 93:18
**relation** 14:23
26:5 31:11
237:8 260:7
266:12 274:10
321:10
**relationship**
136:11,13
**relative** 369:10
369:10
**relay** 150:13
157:24 161:3

178:17 322:20
**relayed** 149:8
**relaying** 163:4
**release** 190:6
**relied** 56:3
**relies** 262:18
**rely** 97:3,14
**remained** 54:20
79:5
**remedial** 220:15
221:7,10
**remember** 11:23
32:3,4,5,7
81:12 83:21,22
84:13 85:5,18
100:14 109:22
110:11,13,14
110:16 177:20
181:6 192:17
203:11 273:1,2
285:18 286:7
287:5 306:22
362:20
**remove** 253:7
264:1 269:5
307:13,14,20
308:6 317:10
326:8
**removed** 307:24
308:9 326:11
**repeatedly**
225:3,12
**rephrase** 233:10
**replenishment**
335:19
**report** 61:20
67:4 81:19,20
81:24 84:20
122:20 123:6
123:19 125:22
126:6,11,16
127:7 130:20
139:11 145:12
146:5 164:16
200:24 201:15
201:20 203:4,7

204:14 207:8
208:1,4 209:8
295:5 297:9
298:13,15
299:8,12,17
300:1 306:4
314:21 315:4
**reported** 6:12
78:14 80:3,7
81:21,23 83:15
84:15 113:12
118:2 144:9
201:23 203:20
211:6,12
237:15 278:1,4
293:2 294:21
295:9,15,16
297:3 300:13
369:5
**reporter** 2:9,9
10:2,7 17:16
49:2 369:2,2
369:14,17
**reporting** 68:7
126:14 202:2
204:7,9 205:7
206:16 207:7
208:21 210:21
211:8 213:24
234:21 235:8
235:19 265:7,9
265:12,21
280:12 298:5
307:23
**reports** 59:9
85:4 130:20
149:3 202:4,7
202:10,13,15
202:20 204:20
205:2,18,24
207:16,19
208:6,12 209:5
209:10 210:9
238:8 253:9
**represent** 10:17
**representation**

346:4
**representative**
18:23 95:10
**representatives**
21:18,19 27:15
**reproduction**
369:16
**request** 8:6
19:22 21:20
120:21 278:19
300:17 301:5,8
301:21 304:3,8
307:6 309:7
312:17 337:24
339:19,21,24
340:2,5,6,13
340:16,24
343:12,21
344:21 345:10
345:17 346:9
346:10,12,16
348:4,7,20,22
349:4,6,11,12
**requested** 17:4
19:1 21:17
27:13 49:1
91:21 343:11
343:14,17
**requesting**
290:13
**requests** 18:2
25:13 305:24
**require** 99:4,15
103:8 171:3
367:5
**required** 19:16
122:24 123:10
325:4,6 336:21
**requirement**
205:8 209:8
212:11 366:16
**requirements**
47:15 123:5
**requires** 102:14
130:3
**requiring** 281:9

Highly Confidential - Subject to Further Confidentiality Review

326:19
**rerouted** 333:11
333:14
**reserving**
107:22
**reside** 156:7
**resolve** 63:11
295:18
**resolved** 315:3
**resource** 148:7
148:10
**resources**
148:24
**respect** 11:6
12:20 16:24
24:23 73:14
75:4,7 104:2
110:6 134:18
264:15 267:15
267:18
**respective** 79:22
**respects** 164:17
211:17
**respondent**
198:14,17,20
199:23 200:23
209:9 219:23
**respondents**
206:21 207:6
207:19 208:1
209:5
**responding**
130:3
**response** 66:23
111:19 219:1
358:21,22
**responsibilities**
19:24 44:19
45:6 46:3,7,9
46:13,16,20
62:6 67:7,8
68:13 78:24
80:5 86:2,19
87:18,18 96:11
96:15,21,23
97:4,12,15

101:18,23
102:7 103:1,24
104:7,15,20
105:15 106:12
106:23 108:2
108:12 109:4
113:3,24
114:17 133:8
136:20,24
144:19,24
145:16 147:15
158:14,15,20
166:10,13
185:15 187:9
187:20 191:15
212:12 221:19
225:6 228:12
229:7 238:5
295:2 298:7
300:3 304:11
**responsibility**
42:4 43:14
47:17 49:22
53:2 57:17
67:14 85:23
96:2 103:16
104:11 105:6
115:2 117:9,11
122:20 123:18
125:19,22
126:3,5,21
127:6 145:23
150:8 159:21
189:15 204:16
222:9 260:1,4
306:3 367:6
**responsible**
39:14 45:14
51:9,23 52:20
53:11,18 56:11
57:1,7,23
58:18 59:2
60:7 63:23
64:18 65:4,7
144:17 145:4
239:5,11,21

259:16 260:4
260:12,14
261:6 267:1
335:1 366:4
**rest** 290:14
363:11
**restate** 102:23
127:22
**restricting** 23:2
**restrictions**
218:1 219:6,10
219:18
**result** 194:10
206:17 254:23
**results** 243:6
277:19
**resume** 7:8
10:19 34:12,15
34:19 35:7,12
38:10,13 39:4
41:6,11 52:16
52:19,24 63:15
63:21 64:10
65:6,10,12,13
65:17 66:5,8
66:14,19,20
68:20 69:1
82:3 213:11
**retail** 39:14,18
41:7,20 42:6
49:14 51:20
54:19 55:5
67:24 82:5
84:8 161:13
166:9,9 189:23
198:21 199:24
200:13 236:3
324:19
**retailer** 314:13
**retailers** 26:17
27:14,20 73:6
74:7,8
**retailfocused**
180:2
**retrospective**
212:13 214:6

267:10
**return** 42:18
370:12
**returned** 41:4
**reveal** 102:16
103:8 130:4
**revealed** 200:23
**revenue** 52:21
**review** 1:10
22:21 48:12
62:18 92:6
108:11 133:23
144:2,5 145:9
168:12 169:20
170:16,19
171:3 173:19
174:13 180:21
182:17 227:16
228:16 235:15
269:14 275:16
281:6 289:12
305:24 306:19
327:20 328:14
329:19,22
349:10
**reviewed** 100:22
108:9,22 118:8
138:18 171:19
182:19,20
241:9 243:20
329:9 330:14
333:15
**reviewing**
112:18
**reviews** 329:4
330:4 331:3
332:9
**revoke** 191:7
**rex** 1:14 2:3 7:2
7:8 9:11 10:11
34:12 90:2
95:9 97:21
117:15 161:11
199:13 266:23
266:24 358:8
372:4,14

**ricks** 83:17
**rico** 208:7
**rid** 271:22
**riffed** 30:14
**right** 14:4 15:21
19:9 23:20
26:4,12,22
27:5 29:19
35:4 37:14
39:5 40:6
41:11 45:17,19
45:22 49:11
50:16 52:10,24
53:9,16 54:3
55:23 57:4,16
64:10 66:4,21
70:8 71:6 72:7
73:22 76:3
78:5 80:16
83:2,4 86:24
88:13 90:9,15
98:11 99:12
107:22 111:13
111:22 117:16
120:13 123:8
126:14,19
127:4 128:13
129:20 132:15
133:21 135:18
140:20 142:19
149:14 150:14
150:21 151:17
151:22 155:6
155:17,24
156:9 158:1
163:3 165:10
165:15 167:2
167:22 168:2
169:21 170:5
172:10 174:19
174:22 176:10
176:21 177:5
177:12 178:10
180:19 181:4
181:15 182:3
185:1 188:12

188:18 189:6
189:12 191:24
203:11 204:22
206:22 207:23
208:10 221:11
227:20 232:2
232:13 241:23
242:2 243:24
245:1 246:9,15
247:18,19
248:5,24 254:1
256:15 257:19
258:2 260:3,15
262:18,21,24
266:23 267:3
278:6,12 281:1
281:4,13 282:1
282:3 286:10
286:15,23
287:17 289:15
289:23 292:22
292:23 293:11
293:12,15
294:19 295:10
295:15,19
300:10,24
301:10 302:24
303:12,19
304:8,13,18
309:14,21
311:7,13
312:20 314:15
316:6,15
320:11,14
321:10 327:11
328:15 329:2,7
329:22 330:8
330:16 334:3
335:4 338:17
339:24 342:10
342:15 343:18
344:8 345:10
345:16 346:9
346:13,17,20
348:10 349:13
350:22 355:5,5

355:9,14
356:10 362:13
**righthand** 209:1
252:18 344:12
**ring** 185:20
186:1
**rise** 71:9
**risk** 195:7
**road** 212:19,20
214:8
**roadmapping**
214:2
**roaring** 361:6
**robust** 314:16
314:17 326:4
354:6
**role** 14:24 20:15
38:7,9 40:18
63:7,10 66:16
67:3 95:22,23
98:7 115:7,9
116:1,20
160:20 237:14
238:24 260:17
260:21 270:19
276:16 293:12
317:16,22
333:1 349:11
365:10
**roles** 14:23
38:14,18 39:11
40:19 81:19
115:8 135:6,21
136:17 141:4
**roll** 84:11
**rolled** 60:12
89:3 294:10
**room** 150:15
297:11
**rooms** 292:17
**rothstein** 4:11
**roughly** 21:22
27:22 38:6
81:15 143:11
143:12 247:21
247:21

**route** 300:23
311:22 333:9
**routed** 331:8
**routes** 349:10
**routine** 17:1
**rubric** 21:7
**rule** 19:18 20:5
171:7
**rules** 2:5
**rulings** 128:24
**run** 115:11
147:5 174:1
239:20 247:5
275:8 276:4,8
294:3 325:24
**running** 51:9
273:5 274:10
294:5
**rx** 118:10
134:24 161:20
164:24 165:9
165:18 166:17
175:23,23
176:2,16,21
177:1 178:16
181:15 279:7
307:12 348:9

————————
**S**
**sabatino** 184:14
**safety** 194:1,8
**saith** 368:2
**salaries** 248:4
**san** 191:9
228:24 232:8
**sat** 30:13 114:9
114:19,24
187:7
**save** 68:22 157:9
**saving** 69:3,18
**saw** 92:9 144:8
230:17,22
238:7 243:6
262:23 354:4
356:24
**saying** 93:20

132:9 140:13
197:14 226:4
274:7 282:11
331:19 332:20
354:9
**says** 34:23 35:6
64:23 76:7
77:2 87:22
98:11 117:17
179:11 194:9
194:13 199:8
199:10,12
218:5 220:4,24
221:5 232:14
232:20 235:5
235:11,12
252:10 253:19
281:15 282:2
311:12 315:2,3
315:6 322:10
330:6 331:1,11
336:18
**scale** 69:14
**schedule** 20:23
20:24 21:3,3
22:2,3 26:5,6
42:24,24 43:8
43:8,21,22
48:18,19,22,22
49:4,4,15,16
72:12,12,20,21
77:5 90:4
143:24,24
146:9,10 147:5
147:6 150:9,9
152:21,22
167:24,24
169:3,4 170:7
170:7 171:5,6
172:3,4 177:17
189:11 194:21
195:5,7,8,12
195:17 196:2
196:14,16,19
196:20,23
197:2,4,5,7,14

197:16,18,19
197:23 198:4,7
207:17 208:5
244:21 245:12
245:22 246:19
248:14,24
249:11 250:7,7
250:16,16
251:10 254:7,8
255:11,12
258:9,10 266:2
266:3,12,12
267:11,12
268:11,12,16
268:17 269:3
269:10,10
276:24,24
305:19,20
324:24 325:2,4
335:24,24
337:9 342:10
342:10 348:3
362:15,15
367:8,9,11
**scheduled** 19:21
24:4 325:5
356:13
**schedules**
207:18
**scheme** 95:21
114:2
**scholer** 4:5
**school** 35:23
36:1,6,9 37:24
179:6
**scope** 42:10
191:14 192:7
192:17,18
**scott** 2:11
**scratch** 350:8
**screen** 64:14
174:19
**screens** 314:22
314:24
**sea** 248:11
**second** 12:1 14:6

41:16 56:20
78:17 82:4,20
99:24,24 103:3
106:9 123:9
124:24 156:3
182:12 191:19
193:19 251:9
268:6 300:10
321:21 326:19
**secretary** 184:16
**section** 64:14,15
176:5 184:5,6
188:6 193:23
201:2,16
279:23
**secure** 324:16
**see** 41:14,21
64:11,16 65:11
76:15,22 77:7
89:7 90:11
91:3 94:13
98:15 117:9
118:13 131:17
132:14 133:10
133:13 134:2
135:3 155:21
165:2 166:1
174:14,22
175:2,5,22
178:8,15,21
179:3,21
183:10,18
184:3,11,17,21
185:18 188:8
188:10 190:12
190:23 191:2
192:10 193:2
194:2 195:20
195:21 198:15
199:3 201:4
203:3 207:10
208:8,9,17,18
209:3,11
217:14,16,18
218:16 219:7,8
231:1,4 233:19

234:2,13 245:8
252:3,7,16,19
253:2,13,23
262:20 263:12
270:9 272:14
272:15,18
278:12 279:3
279:21,23
280:9,13 283:9
283:15 287:11
287:12 297:7
305:2,6 307:10
307:16 308:2,3
311:2 313:7,18
313:19 314:23
315:1,2 317:7
319:2 328:19
328:23 329:5
329:18 330:2,5
330:9,14,20,24
331:3,5,9
332:12 334:5,7
336:23 338:10
340:3,8,13
343:3,8 344:13
347:3 348:8
352:12
**seek** 20:4 22:19
211:22
**seeking** 21:10
325:21
**seen** 133:1
202:15 203:2
230:14 238:12
238:16,18
281:8 282:21
282:23 283:5
302:23 315:13
**segment** 363:15
**segments** 366:4
**select** 294:8
329:23 344:6,7
**selected** 113:17
113:19 355:6
**selection** 346:23
**selectively**

220:11 223:21
224:15
**sell** 245:2
**send** 207:7
222:4
**sending** 75:24
205:13 294:24
**senior** 78:9 83:9
87:5,9,11,12
106:21 260:17
260:21 320:10
363:7
**sense** 91:23
122:15 130:8
142:18 155:22
242:16 281:3
288:12 293:17
352:3
**sent** 133:19
134:6 205:3
223:2,24 235:1
293:4 295:23
308:23 309:4
344:17
**sentence** 98:11
99:24 198:13
199:5 207:14
209:2 217:24
218:5 281:15
281:18,21
**sentences** 128:1
**separate** 46:6,12
79:19 83:13
84:5,12 89:5
96:22 187:23
188:3 242:9
288:7
**september** 74:23
116:18 118:17
157:22 191:5
193:1 231:2
311:1 312:16
328:22 329:8
330:22 349:17
**sequence** 295:9
**series** 12:14,18

13:17 27:10,10
27:24 31:17
32:3 33:20
98:23 132:20
182:13,15
183:12 184:11
223:1 261:13
302:12
**serious** 220:5
**serve** 74:3 77:10
**served** 27:8 72:8
187:1
**serves** 252:13
345:24 346:1
**service** 40:20,23
40:24 41:4,8
41:19 42:10,19
43:23 44:9
45:7 48:16
49:8,14 50:7
50:23 51:7,16
51:24 52:17
53:3,13 54:20
55:1,22 57:2
57:10 58:2,22
59:3,17 60:11
60:15,20 68:14
68:18 69:13
334:24
**serviced** 268:10
347:21
**services** 1:22 9:3
52:18 60:10,17
63:22 67:22
76:14 78:3
80:15 82:6
85:10 93:2
95:2 279:7
291:21 307:12
**servicing** 292:17
**set** 179:9 221:15
293:24 305:9
**settlement** 7:19
163:7,9 164:7
183:2 184:2
190:6

**seven** 81:5 229:9
229:13,16,22
230:12
**severalsentence**
129:2
**shape** 17:11
**shapira** 5:14
**share** 139:15
144:9
**shared** 60:17,20
**shareholder**
71:11
**sheet** 370:6,8,10
370:13 372:10
**shelquist** 6:4
9:18,18
**shelves** 82:13
**shes** 115:8,13
158:9
**shifting** 291:19
**ship** 263:11
**shipments**
244:11,17,21
245:1,6,12,21
246:20 248:23
**shipped** 43:23
67:16 123:1,12
127:14 128:5
130:15,23
204:10 211:1
249:12 278:6
**shkolnik** 3:8,10
**shooting** 40:6
**shoots** 176:3
**shop** 155:23
**shortcomings**
217:17,21
218:19 220:1,6
223:20 230:16
231:7 237:6
275:6
**shorter** 112:5
**shorthand** 2:9
369:2
**shortly** 323:5,12
**shot** 130:11

| | | | | |
|---|---|---|---|---|
| 174:19 | 87:18 163:13 | 104:13,18 | 228:13,20,22 | **six** 13:19 32:11 |
| **shouldnt** 360:22 | 170:6 220:16 | 107:2,7 119:4 | 229:2,8 231:1 | 32:15 74:12 |
| **show** 191:7,13 | 238:5 276:10 | 119:7 125:21 | 231:4 233:19 | 81:5 85:3 |
| 193:10,14 | 304:17 309:19 | 126:13,23 | 234:2,8,11 | 138:5 198:22 |
| 219:15 228:10 | 321:8 323:3 | 127:7 130:18 | 235:4,6 236:1 | 200:1,18 208:3 |
| 229:5 232:7 | 351:7 352:3 | 131:1,17,19,22 | 236:11 237:9 | 228:5 229:9,14 |
| 234:6 315:4 | 356:12 357:19 | 131:24 132:3,7 | 249:7,21 | 229:22 230:12 |
| **showing** 145:11 | **signing** 369:8 | 132:9,18 | 251:15 252:16 | 243:15,16 |
| **shows** 178:1 | 370:9 | 133:13 134:2 | 252:19 253:2 | 246:3,4,8,18 |
| 314:21 | **signoff** 325:6 | 135:3,8,21 | 253:20 254:1 | 247:3 314:14 |
| **shut** 254:7 | **signs** 206:20 | 146:1,17,23 | 254:18 255:9 | 323:13 356:21 |
| 255:12,23 | **silverglate** | 147:2,15,21,23 | 263:12,21 | **size** 281:16,24 |
| 256:12 257:8 | 185:20 | 149:18,19 | 265:11,13,24 | 347:1,7,8,9 |
| 257:12,19 | **similar** 81:4,4 | 150:10 152:24 | 266:3,9,13 | **sketch** 79:12 |
| 258:2,9,15 | 90:23 132:4,21 | 157:12,15 | 267:6,8,12,18 | 356:5 |
| 269:2 277:4 | 141:4 142:7 | 158:3 159:21 | 267:23 268:24 | **skipped** 68:10 |
| **shuts** 256:6 | 143:22 144:24 | 163:13 169:7 | 270:3 274:9 | **slide** 157:14 |
| **side** 44:16 50:12 | 145:20,21 | 171:4 172:4 | 275:21 276:13 | 161:19 163:3 |
| 50:18 81:2,6 | 146:24 147:1 | 174:10,16 | 277:1 280:14 | **slides** 157:24 |
| 83:19 84:8 | 240:16 241:1 | 175:2 176:18 | 281:1 291:13 | 182:13 |
| 95:2 96:6 | 249:15,22 | 184:3 189:19 | 295:24 313:7 | **slow** 45:17 46:24 |
| 140:15 159:23 | 250:3,9,20 | 191:10,22 | 314:8,14,17 | 47:20 154:9 |
| 161:8,10,11 | 251:4,6 257:5 | 192:3,7,9,13 | 315:1 317:18 | 291:9 |
| 162:4,4 164:4 | 257:8 258:10 | 194:2,4,12,17 | 323:6,15 324:9 | **slowed** 154:8 |
| 164:13 166:9 | 282:9 349:20 | 194:19,24 | 324:13 325:11 | **small** 42:13 |
| 175:13 178:19 | **simple** 126:20 | 195:2,4,9,20 | 326:11,21,21 | **smart** 296:7 |
| 180:3,4 204:15 | **simply** 98:14 | 196:11,12,13 | 327:16 328:23 | **smith** 5:3 6:7 |
| 209:1 215:15 | 124:17 126:20 | 197:19,24 | 329:15 330:2 | **social** 353:15 |
| 215:21 235:19 | **single** 59:4 | 198:8,10,15 | 331:5 332:24 | **socially** 353:1,3 |
| 237:11,21 | 245:18,20 | 199:3 201:4,13 | 333:11 338:10 | **sold** 359:11 |
| 238:4,6 241:21 | 246:20,21 | 202:1 206:14 | 338:12 346:7 | **solutions** 4:2 |
| 241:21 252:18 | 271:21 | 207:10 208:8 | 361:3 | 64:6,20 |
| 264:12 274:13 | **singlespaced** | 208:17 209:11 | **sit** 19:5 66:4 | **som** 118:12,16 |
| 289:22 328:17 | 66:7 | 209:13 210:22 | 72:19 96:9 | 159:24 160:10 |
| 339:19 354:2 | **sir** 23:12 24:23 | 211:1 213:14 | 161:24 231:19 | 160:14,21 |
| **sign** 301:4 367:6 | 26:19 34:19 | 213:16 214:9 | **sitdown** 19:13 | 162:4 177:4 |
| 370:7 | 35:3 37:4,22 | 214:14 216:10 | **sitting** 59:14 | **somebody** 29:5 |
| **signature** 325:7 | 41:10 42:23 | 217:11 218:13 | 93:19 104:4 | 93:20 143:22 |
| 326:19 | 48:10 58:8 | 218:16,21 | 106:8 110:7 | 144:23 155:5 |
| **signatures** | 60:4 64:11 | 219:7,11,17,21 | 114:16 155:8 | 260:13 318:7 |
| 184:12 | 65:5 66:13,21 | 220:3,7,23 | 171:16,21 | 360:16 |
| **signed** 183:13 | 67:11,13 68:1 | 221:8,13,16,22 | 202:9 203:6 | **someplace** |
| 252:1 253:21 | 70:14,18,21,24 | 222:10 224:24 | 209:13 244:6 | 154:20 155:9 |
| **significance** | 71:12 76:15,22 | 225:7,11,15 | 308:5 334:11 | **soms** 43:6 |
| 352:9 353:21 | 77:7,9 90:7 | 226:2,11,16 | **situation** 346:17 | **soon** 268:22 |
| **significant** | 94:13 102:24 | 227:11 228:4 | 346:17,19,22 | 272:13 275:2 |

**sorry** 16:16 22:7
27:18 28:11
45:17 52:12
58:10 69:22
80:8 81:22
86:4 112:17
114:22 116:17
121:1 125:17
143:3 156:4
160:12 162:7
163:10 184:19
187:12,13,14
192:3,14
203:13 214:16
216:5,8 218:11
221:3 223:21
230:20 246:20
254:3 264:5
268:5 282:16
290:20 291:8
293:18 299:21
301:2 316:24
321:22 324:1
325:15 327:22
328:11 331:13
333:13,23
347:5 360:5
**sort** 17:6 18:20
60:17 144:9
289:15 301:15
339:20 346:9
360:9 364:15
**sound** 308:15
356:10
**sounded** 359:17
**sounds** 19:3
247:19 338:17
**source** 143:21
311:17
**sources** 130:2
160:13,17
**south** 3:4 4:11
5:4
**southern** 154:12
**space** 55:19
370:5

**span** 336:6
**speak** 14:24
19:1 62:11
132:5 139:22
168:22 240:7
275:16 301:4
301:24 302:6
336:6 341:12
355:2
**speaking** 22:15
22:16 27:22
38:24 39:12
63:3 74:15
82:18 143:12
159:8 195:15
221:12 237:22
237:24 277:20
**special** 252:23
**specialty** 134:12
167:4 355:3
**specific** 22:1,13
25:8,10,11
27:23 28:9
29:1 31:23
32:2 52:11,14
56:9 59:15
66:14 71:5
73:20,24 74:14
74:20 75:5
100:14 115:9
128:24 133:9
134:5 135:16
140:5 142:20
144:16 151:21
166:24 179:21
242:22 253:16
272:6 273:1
275:22 285:4
291:10 302:21
305:7 319:6
327:12 336:4
339:21,24
342:3,6 366:12
**specifically** 21:3
21:14 26:6
32:10 63:22

72:11 96:9
126:23 146:5
158:18 167:24
217:22 239:22
241:6 243:5
353:12
**specifics** 21:9
24:7 31:6,8
100:8 134:8
136:12 203:6
244:18 286:21
**specified** 369:8
**speech** 198:1
230:10
**speed** 95:20
100:20 132:12
161:23 210:5
239:13 357:12
**spent** 44:2 95:20
237:14 357:4
**spikes** 288:3,18
290:3
**spoke** 21:12
222:6
**spoken** 15:2,2,3
15:16,17 16:13
18:12,14,19
19:2,4
**spot** 71:20,22
205:1
**spots** 356:2
**spouse** 353:9
**spreadsheet**
8:21 339:4,17
**stack** 279:8,11
**staff** 36:11,12,13
36:23 38:19
62:8 246:16
**staffed** 275:20
**stand** 106:15
150:24 290:13
**standards**
100:17 234:22
235:9,20 294:1
**standing** 93:20
128:8,15,18,19

128:21 129:16
129:18,18
**stands** 177:21
341:20 347:12
**stanson** 6:10 9:2
**start** 10:19 15:5
53:10 74:23
184:1 188:20
189:6 248:22
259:7 270:2
300:15 303:3
350:4,8
**started** 24:17
25:1,4 47:1
81:9 92:2,6
97:21 118:24
173:8 180:11
209:24 214:2
228:23 240:2
241:7 277:11
279:8 319:5
327:8 356:6
**starting** 70:6
357:2
**state** 2:10 15:6
15:11,12 16:5
16:11,13,15,16
18:7,9,10,13
18:14 19:4,11
19:14 20:2
21:8,10,12,13
24:14 25:13,19
26:1,5 37:11
37:11 195:19
233:5,18 370:5
**stated** 19:14
74:11 132:15
270:17 316:10
369:9
**statement** 11:6
14:21 18:23
76:7 79:7
195:22 199:14
199:22 200:9
201:6,14
202:17 206:24

236:12 272:15
359:18
**statements**
10:24 11:4
14:10 15:7,8
15:10 16:10,21
16:22 17:11,22
17:22 24:24
26:13 33:1
**states** 1:1 2:6
208:7 217:24
252:4 268:11
**stating** 332:18
**status** 11:20
132:15 133:2,3
334:22 340:16
340:24 348:4,7
349:11,12
**statuses** 345:11
**staying** 231:1
**stenographica...**
369:5
**step** 63:16,16,17
68:10 102:18
123:8,9 155:5
155:5,9 183:23
**steps** 155:10,12
173:1 243:7,8
243:24 244:1,2
335:15,16
359:13
**stick** 82:19
287:14
**stipulation**
184:6 234:13
234:16
**stock** 71:1,5,8
71:10 343:16
344:8
**stocks** 70:22
**stoffelmayr** 3:17
3:17 7:3 9:24
9:24 30:16,20
32:16 43:11
44:10,21 45:9
47:7 48:5

Highly Confidential - Subject to Further Confidentiality Review

| | | | | |
|---|---|---|---|---|
| 49:17 56:15,20 | 186:23 187:12 | 295:11 298:10 | 297:16,20 | 325:19 326:13 |
| 57:11 58:3 | 188:14,17 | 298:18 299:9 | 300:16,17,20 | 326:16 332:24 |
| 59:19 61:8,16 | 190:15 191:18 | 299:20 300:5 | 301:22 302:3 | 334:12 341:9 |
| 62:3 65:23 | 195:24 198:1 | 305:21 306:6 | 305:2,7,9,18 | 346:9 348:18 |
| 67:17 69:20 | 199:6,16 200:6 | 306:15 307:4 | 307:14,20 | 350:22 361:14 |
| 70:2 71:14,20 | 200:15 201:8 | 309:23 310:11 | 309:15 310:7 | **strategy** 256:7 |
| 71:23 73:11 | 201:17 202:22 | 316:23 320:22 | 311:18 312:17 | 258:21,22 |
| 86:15 91:8,15 | 203:22 204:1 | 321:20 323:7 | 314:19 315:8 | 264:1 269:5,15 |
| 91:18 92:23 | 204:11 205:5 | 325:13 327:24 | 317:4,6,10 | 273:21 274:4 |
| 93:7 94:8 97:5 | 205:20 206:4 | 328:2,4,7,9 | 318:24 322:11 | 274:23 275:18 |
| 100:23 101:7 | 207:2 210:11 | 347:3,5 350:9 | 324:17,20,20 | 276:11 |
| 101:13 102:1,9 | 211:13 212:22 | 352:15 357:6 | 326:17,17 | **stream** 314:10 |
| 103:3 104:22 | 214:11 215:10 | 358:3,11,16 | 329:12,13 | **street** 2:12 3:4 |
| 105:10,17 | 216:4,6,22 | 359:1,15 360:3 | 331:14,23 | 3:15 4:11,17 |
| 106:5,15 107:3 | 217:7 218:9,11 | 361:7,17 362:1 | 333:10,12 | 292:19 |
| 107:11 108:6 | 218:22 219:12 | 363:21,24 | 335:5 336:20 | **strike** 118:6 |
| 108:14 109:7 | 221:1,23 | 364:5 367:17 | 339:23 341:5,6 | 198:1 |
| 110:20 111:23 | 222:18 223:4 | 367:20 | 341:10,15 | **string** 7:13,15 |
| 114:4,11 | 223:14 224:6 | **stood** 356:16 | 346:2,5,11 | 7:17 8:3,14,15 |
| 119:10,17 | 224:19 225:8 | **stop** 107:20 | 349:6,9 367:13 | 8:18 116:10 |
| 120:3,7 121:14 | 225:17 226:3 | 154:3 229:20 | **stored** 151:9 | 131:10 157:3 |
| 122:5,15 123:2 | 226:12,19 | 229:24,24 | **stores** 39:15 | 259:4 320:1 |
| 123:13 124:11 | 227:6,20,22 | 236:17 284:9 | 40:8,11,12,12 | 324:5 336:12 |
| 124:24 126:24 | 228:14 229:19 | **stopped** 130:24 | 40:15 42:6 | **strong** 354:20 |
| 127:8,16 | 229:24 230:3,6 | 292:6,22 293:2 | 45:18,22 47:5 | **structure** 31:4 |
| 128:12,16,20 | 230:18 231:9 | 294:18,20 | 47:22 48:1,7 | 68:7 79:3,12 |
| 128:22 129:6 | 232:18 233:7 | 295:22 | 51:20 55:6 | 82:8 84:15 |
| 129:10,20,23 | 235:21 236:7 | **stopping** 358:7 | 62:22,24 63:4 | 87:1 108:5 |
| 130:10 131:2 | 236:13,19 | 358:13 367:3 | 63:5,8,13 65:8 | 114:10 115:1 |
| 137:22 140:7 | 240:17,23 | **storage** 250:21 | 94:16 149:18 | 161:9 265:21 |
| 141:10 146:12 | 241:14,17,24 | **store** 29:10 | 149:21,22 | 362:24 |
| 147:8,16,24 | 242:11 246:10 | 38:20 39:18,19 | 166:20,23 | **structured** |
| 152:12 153:4 | 248:15 249:1 | 39:22 40:3,5 | 167:19 169:3 | 220:17 |
| 153:20 154:7 | 249:17 250:1 | 49:14 55:8 | 177:1 178:17 | **struggling** 75:3 |
| 154:11 156:2 | 254:9,21 | 64:8,21 79:20 | 189:3 198:21 | 99:17 |
| 157:6,9 158:22 | 255:15 256:2 | 80:1 81:2,3 | 198:22 199:24 | **stuff** 82:12 |
| 159:13 160:4 | 257:10,20 | 82:11,14 83:15 | 200:1,14,19 | 142:2 245:1 |
| 163:14,21 | 258:3,13 | 83:18 84:7,22 | 220:10 228:1,5 | **subgroups** 82:7 |
| 164:5,19 167:9 | 263:22 264:13 | 85:1 87:14 | 228:9 229:4,9 | **subject** 1:10 |
| 168:7 169:23 | 265:3,14 266:4 | 117:12 168:1 | 229:14,16,22 | 128:12 132:14 |
| 171:8 172:5 | 266:14 267:13 | 168:16 173:17 | 230:12 281:11 | 188:1 335:12 |
| 174:3 175:15 | 267:24 274:5 | 231:13 232:8 | 290:14,23 | 370:9 |
| 176:13 177:6 | 282:14 283:24 | 288:1 290:13 | 291:15 307:23 | **submit** 41:2 |
| 180:14,23 | 284:11 286:24 | 291:19 292:10 | 308:6,7,9 | 297:22 333:7 |
| 181:10,18,21 | 287:3 289:6 | 292:13,14,15 | 319:6,9,11 | **submits** 349:6 |
| 182:1,3 185:7 | 290:18 295:3 | 292:18 297:10 | 322:4,21 | **submitted** 42:15 |

Highly Confidential - Subject to Further Confidentiality Review

298:1
**subordinates**
157:23
**subpoena**
107:13 251:23
257:5 262:23
265:1
**subpoenas**
262:20 263:5
**subscribed**
372:17
**subset** 329:24
**substance** 46:3,8
46:10,17,21
73:8 96:3,11
96:16,21 97:13
97:16 98:3
100:21 101:19
101:24 102:7
102:14 103:2
103:17,24
104:8,15,20
105:2,16
106:13,23
107:9 108:18
109:2 110:9
111:10 113:3
114:18 122:11
125:5 127:19
173:15 175:9
185:16 186:22
187:9,21 195:5
195:18 196:3
228:3,12 229:7
236:6 239:16
239:22 254:14
306:14 322:23
324:17 342:4
366:1 372:9
**substances**
42:24 43:22
63:8,9 72:11
72:21 90:4
108:22 124:21
126:22 143:6
143:16 144:1

149:17 150:8
177:18 189:11
198:24 199:2
200:3,5 217:22
232:9 233:4,13
233:23 234:1
236:4 253:18
254:8 255:19
256:9 258:23
264:2 269:7
273:4,22 274:2
274:12 281:10
314:9 325:20
326:9,12,17
351:4 359:11
366:11,13,23
367:3,8,11
**success** 87:23
**succumb** 263:20
**sudden** 248:22
**sue** 259:8,8,11
259:12,20,24
260:3,10,10
**suffice** 322:11
**sufficient** 218:2
**suggesting**
331:22
**suite** 2:11 3:4,15
**summary** 7:12
94:7
**supervision**
369:17
**supervisor** 35:7
35:8 36:17,21
38:20 39:2,3
325:6 326:20
346:6,11 367:5
**supplied** 55:1,14
202:3 273:22
274:24 333:1
**supplier** 56:2
63:12 258:22
**supply** 53:24
54:1,2,8 55:19
56:8,10 57:7
57:18,22 58:20

59:6,10 84:3
84:10,14,23
85:8,14,20
86:1,5 118:10
120:22 140:15
142:13,15,24
143:1,5,15
255:1,8 257:13
257:18 258:1
258:17,22
259:13,13
260:10,13,18
261:1,6,6
270:8,9,20
272:10 278:7
278:10 312:1
332:19
**supplying** 54:15
209:21
**support** 42:6
60:11,15 63:4
63:5,24 64:5,7
64:19,21 87:24
248:9,10
273:20
**supporting**
41:20 60:18
62:22,23 65:7
**supports** 76:11
**suppose** 257:22
**supposedly**
22:24
**sure** 14:14 21:23
25:12 27:21
28:8,23 38:8
39:23 72:15,15
73:20,24 79:18
83:17 84:21
89:2 94:8 97:7
97:17 102:10
107:18 113:6
116:23 120:5
124:4 137:3
141:17 144:8
151:18,23
152:14 155:2,3

161:17 162:12
165:24 170:12
176:8 181:20
182:1 186:4,16
224:8 228:20
231:12 248:17
255:1,7 262:15
263:18 272:7
277:10 278:9
288:23 295:20
304:12 313:13
319:5 337:8
345:4 346:23
357:11 359:17
362:19
**surmise** 354:21
**surpass** 322:14
**surrounding**
290:14
**survey** 220:10
220:12
**surveys** 223:22
224:15
**suspension**
193:11,15,21
194:11 218:14
219:1
**suspicious** 8:10
8:12 33:14
34:5 43:7,15
43:20 44:7,12
44:15 45:5,12
47:2,4,11,16
48:3,10 49:12
49:13,23 50:6
50:8,11,17,20
50:22 51:3,6
51:10,14,16,23
53:12,14,18
56:12,13 57:1
57:8,9,24 58:1
58:12,21 59:7
59:10,11,16
66:17 67:4,10
67:15 85:11,23
86:12 91:24

99:3 104:2,11
106:2 109:5
118:16 119:2
119:24 120:1
120:16 121:6
121:22 122:3
122:21,24
123:11,19
125:15,20,23
126:4,6,7,15
126:16,22
127:4,13 128:4
130:14,20,21
130:23 133:6
144:20 145:1
145:24 146:8
147:22 149:3
152:1 153:1,12
154:24 155:16
158:10,15,21
159:24 162:19
164:3,16 166:6
166:14 172:19
172:21 173:2
177:4 178:18
178:23 179:9
179:18,24
180:7 181:7
200:24 201:15
201:23 202:20
202:21 203:19
204:8,9,21
205:2,14
206:16 207:7,9
207:17,18
208:1,2,4,21
209:8,16 210:3
210:18,24
211:6,20 212:6
212:12 213:21
213:24 217:4,5
225:14 226:1
226:10 234:21
235:8,19 237:7
237:12,19
239:1,6,23

240:2,14
241:22 242:19
249:9 256:17
259:17,21
260:6,12 261:7
263:6 264:11
264:23 266:10
267:2,15,18
273:7,7 274:1
274:11 276:18
277:12,15,22
277:24 278:3
279:1 280:7,12
281:12,15,20
281:23 285:13
287:23 288:8
288:22,24
289:19,21
291:22 293:15
296:11 297:4
298:20 306:11
307:22 308:19
308:21 309:3
309:20 310:20
310:24 312:7
312:13 313:2,5
313:10 317:19
317:23 318:8
318:13 327:10
329:9,16,24
331:24 332:15
333:12,16
335:12 336:1
338:8,15 354:1
359:24
**suzanne** 77:19
77:22 80:6,11
**swallow** 171:6
**swat** 355:1
**swear** 10:7
**switched** 190:19
**swords** 1:14 2:3
7:2,8 9:11
10:11,16 30:4
34:9,12 69:17
71:9,13 72:7

75:10 83:4
94:2,11 95:9
95:18,19 97:21
98:18 102:9
103:7 104:24
105:18 106:22
108:14 116:6
117:15 120:3
122:5 129:20
129:23 130:16
131:7 156:23
161:19 182:22
199:14 213:7
214:4 237:5
251:16 259:1
266:23,24
268:5 269:19
278:16,23
279:11,19
306:22 310:16
312:21 319:14
320:6,7 326:23
336:9 337:11
339:1 358:8
364:3 367:17
367:21 372:4
372:14
**sworn** 10:10,13
10:24 11:4,6
14:10 15:7,8
16:10,21 17:22
369:4 372:17
**system** 109:5
117:12 125:15
125:20 126:1,4
126:8,21
130:19 151:7
164:2 167:5
169:18 170:15
172:19 173:23
174:5,8 202:21
206:16 213:19
230:16 231:8
232:15 233:3
233:11 277:13
280:8,23 298:6

305:13 306:3
306:10 308:1
308:10,17
309:4 310:9
311:16 312:14
315:3,7 316:18
317:5 321:9,18
322:18 323:4
325:11 329:9
330:13 332:1
338:8 341:23
344:5 351:24
354:2
**systemic** 216:11
216:14 217:6
217:17,20
218:18 220:1,6
223:20 230:15
230:15 237:6
264:11,22
**systems** 118:20
183:8 249:4
314:16,18

---
**T**
---
**tabbed** 190:18
**tabet** 4:11
**table** 30:13
328:17
**take** 28:5,12,16
28:18 29:4
89:20 99:14
112:15 129:3
145:5 154:3
178:12 183:23
186:6 198:12
208:24 231:19
236:18 313:23
314:20 319:17
356:10 359:13
361:20,21
366:6
**taken** 2:4,7 28:9
29:20 30:6
89:22 221:20
254:24 255:7,7

267:6 300:12
332:3 359:13
361:16 369:7
**takes** 134:1
266:24 334:21
**talent** 151:1
355:5 365:22
**talk** 16:20 24:2
154:12 221:22
268:8 348:19
**talked** 158:13
189:17 362:10
**talking** 18:7,22
20:12 26:11
32:24 52:15
56:7 85:10
126:1 140:14
140:17 141:19
154:9 158:9
161:8 167:23
173:8 189:14
219:2 221:18
222:15 241:21
241:23 242:2
250:19,24
264:4,9 284:9
289:2,19
293:11,13,14
293:19 294:15
296:9 305:11
320:22 331:18
346:5
**talks** 164:24
**tapped** 357:20
**target** 175:5
**targeted** 21:14
22:1,12 24:5
24:12 134:18
158:18 159:4
219:10 241:11
245:4
**tasha** 32:22
113:17 132:2
137:9 162:10
162:14 186:15
355:1,6,8,14

355:16 356:8
358:8
**tashas** 344:2
**task** 27:7 353:22
**tasked** 97:24
**tdrlawfirm** 4:13
**team** 117:14
118:12 120:22
131:16 137:9
137:10 158:11
162:15 304:20
323:13 344:2
354:8,9,12
355:2,9 357:23
358:24 361:1
363:3,10,16
366:3
**teamwork** 367:4
**technical** 205:12
354:17
**technician** 6:7
**technology**
25:20 69:10
248:11,20
249:3
**telephone** 4:8
5:17 149:8
150:20,22
151:16
**telephonic** 3:11
**tell** 41:9 42:9
60:6 72:14,17
72:18 73:18
82:22 142:23
143:4 154:2
181:17 186:15
203:15 242:22
244:8,11 279:9
284:24 291:10
303:11 343:14
344:2 353:7
354:23 365:21
**telling** 47:14
104:4 202:19
221:21 224:13
229:15 285:17

Highly Confidential - Subject to Further Confidentiality Review

**tells** 284:8
**ten** 16:24 32:4
  79:6 81:5
  358:1,10
**tenure** 69:3 72:8
  338:18
**term** 145:8
  146:18,21
  151:4 291:17
**terminology**
  313:14
**terms** 234:18
  281:16,23
  283:14 364:9
**terrible** 48:15
  97:10
**test** 38:24 83:1
  147:3 338:23
  366:6
**testified** 10:13
  222:8 242:10
  260:9 266:21
**testify** 225:12
  227:4 369:4
**testifying** 66:15
**testimony** 10:21
  10:23 11:4,17
  14:11 15:7,8
  16:10,22 17:23
  25:1 85:9
  105:18 106:21
  129:4 213:16
  214:9,10 243:3
  251:9 260:5
  261:9 267:8
  274:15 276:5
  297:13,15
  369:6
**text** 318:23
  334:2 345:14
**thank** 10:6 20:8
  36:4,8 37:6
  51:21 59:24
  114:22 119:15
  177:23 182:4
  189:19 198:10

227:21 260:23
261:12 284:13
367:17,20,21
367:22
**thats** 20:7,11,20
22:4 24:2,14
35:15,24 38:10
39:21 46:14
47:12 50:15
52:9,24 53:2,8
53:16 55:3
60:5,12 63:18
64:10,23 68:2
71:7 76:7 77:2
78:22,22 79:7
81:15 82:16
83:11,13 84:4
88:11 90:12
95:12 102:17
106:5 107:1
108:6,16
111:22 115:14
117:17 118:4
123:8,24,24
127:18 128:17
130:2 131:5
134:5 135:9
140:10 149:4
149:20 151:11
152:23 153:16
157:16,18
158:24 166:19
166:19 167:2,3
167:4,12
169:16 173:17
173:21 174:5,9
177:17 178:1
178:10 183:13
189:14,17
190:1,8 193:13
194:9,13
195:10 196:22
198:19 199:8
199:10,11,18
201:10 207:22
207:24 213:22

214:1,2,10
218:3,5 219:14
220:4,5,8,24
221:5 222:11
222:12 227:3
229:17,17,18
229:18,22
232:14,20,20
234:4,9 235:5
235:11,12
239:3,24
241:23 242:2
244:15,23
246:22,22
247:1 248:3
253:19 255:4
256:22 260:9
261:3,11
263:24 266:17
274:7,14,24,24
276:7,12 278:2
281:19,19
282:2 283:21
285:19 286:11
289:21,22
290:6,13
292:19 293:13
294:13,15
295:23 297:5
299:19,23
301:18 302:11
303:1 305:4
306:2 311:6,12
313:9,10 315:6
321:12 322:10
326:6,14 328:8
330:6,18 331:1
331:11,16,21
333:4 335:6
340:1 341:3,16
342:16,19,19
342:23 343:22
345:3,14,16,21
346:3,8 352:6
355:21 362:13
363:16 366:3,3

366:16 367:18
**theft** 174:10
**theres** 85:3
  149:21 230:5
  271:11 363:16
**thereunder**
  109:2
**theyre** 19:15
  42:22 134:11
  149:15 160:23
  196:11 206:10
  218:24 219:2,5
  219:15 234:9
  272:11 315:17
  333:8 347:21
**theyve** 17:4
  137:19 283:13
  296:5
**thing** 40:4 92:8
  162:21 231:12
  231:20 245:19
  262:15 290:10
  292:5
**things** 17:6,8
  18:3 25:15,20
  25:21 27:8
  61:20 62:12
  90:18 103:4
  134:19 136:8
  140:11 146:20
  148:18 150:23
  154:1 158:11
  166:21 226:14
  243:9 245:5
  292:21 297:11
  298:23 324:21
  364:3 365:24
  366:2
**think** 11:8 13:21
  15:23 23:15
  28:1,3 30:11
  30:18 40:10
  41:7 49:8
  50:19 55:15
  76:2 81:9
  82:24 84:22

88:5 92:5,12
92:18 96:19
99:15 100:15
105:21 106:16
137:2 139:14
141:22 142:1,2
153:20 154:4,9
155:13 156:17
156:19 160:23
166:4 167:12
171:17,22,23
181:17 185:1
203:9 204:6
217:24 240:9
243:15 255:5
257:12 262:12
265:6 266:17
274:16 275:10
275:11 276:14
281:19 284:3,8
285:1 286:8
292:23 302:11
312:5 316:1,2
318:11,18
321:16 331:17
338:12 339:7
345:13,14
346:20 352:2
356:16 357:9
360:2,7,16
361:3,9,12
366:19
**thinking** 266:22
**thinks** 266:24
**third** 14:7
  106:10 117:8
  133:10 149:9
  177:23 217:16
  261:23 268:15
  272:11,16
  328:13
**thirdparty** 11:7
  11:10
**thirty** 370:14
**thomas** 3:3 6:3,5
  184:14

thorough 92:6
thoss 259:8,8,11
  259:12,20,24
  260:3,10,10
  261:12 262:18
  270:10,16
  272:9 273:9
thought 61:18
  84:6 241:16
  250:20 274:22
  288:6 293:18
  348:15 356:6
thousand
  212:18 350:22
  361:14
thousands 48:18
  126:9 150:1,1
  150:2,6,6,7
  350:24 359:23
  361:13
three 12:19
  13:21,21 31:16
  32:13 37:13
  53:3 69:13
  74:12 130:18
  149:7,7 184:11
  194:19 230:9
  234:23 247:17
  251:9 264:8
  265:19 271:23
  291:18
threering 155:8
  179:5
threshold
  137:17
thresholds 334:4
  334:8
thumbnail 79:12
tiemeyer 261:16
till 36:19 38:7
tim 83:6,8
time 9:5 11:19
  13:17 15:4
  18:1 20:10
  23:9 24:6
  27:18,21,23

29:11 34:22,23
39:14 42:2
52:4 54:12,15
55:6,14,23,24
57:4 60:9
73:18,22 74:9
74:14,17,19,24
75:1,2,4,7,22
77:14,20,22
79:4,5,6 80:3
83:8,14,18
90:19 95:20
106:6,7 109:13
111:5 116:21
117:23 118:21
119:20 120:8
120:17,23
121:5 122:19
129:21 135:14
135:16 137:3
138:15 152:8
152:15 155:20
156:16 167:20
180:8 181:9
194:21 199:19
212:10 215:6
215:14 227:12
231:19 233:11
234:9 239:17
246:17 255:21
264:24 269:10
272:3,6 275:19
276:3 285:4
293:20,21
294:9,15 301:4
307:15 312:16
315:13 321:6
327:14 329:1
332:6,18 337:6
338:17 340:16
341:1,3 351:5
351:11 357:21
360:10 368:1
369:8
timeliness 205:8
times 24:18

109:20 115:24
156:22 176:11
187:2,7 230:10
247:22,22
305:6 316:10
336:4
timewise 269:8
timing 275:22
337:2
title 67:23 78:22
  86:7 116:1,15
  116:16,20,23
  209:9 329:18
  356:2
titled 94:11
  184:2,5 190:24
  193:10 279:1
  328:13
today 10:21 38:2
  38:7 59:14
  66:15,17 101:6
  104:4 106:20
  107:2,4,23
  116:16 129:4
  154:10 171:17
  171:21 179:13
  180:18,22
  181:5 189:18
  202:9 203:7
  209:13 213:17
  214:9 221:18
  222:8 224:13
  225:4,12 227:4
  229:15 241:10
  243:4 261:9
  281:7 285:21
  285:23 308:5
  316:5,10
  334:11 365:14
  367:2
todays 9:4
  179:12
told 80:9 88:5
  211:4,9,16
  244:4 268:21
  273:9

toledo 252:14,15
tolerance 282:6
  336:19
tool 159:4,10,15
  159:24 160:10
  160:10 167:17
  167:20 168:1
  171:5,7,12,18
  172:2 173:10
  173:19,24
  174:13 338:9
tools 157:24
  158:4 160:1
  161:3 167:17
  167:22 356:17
top 63:20 64:13
  68:12 254:2
  270:2 336:15
topeka 155:21
topic 273:1,2
  280:11
topics 72:20
  76:2 187:4
total 12:19
  219:18 278:9
totally 102:10
  160:16,23
  242:9 288:7
totals 322:8
tout 68:21
touted 213:11
touts 213:7
track 338:2
  341:8
tracking 339:20
tracy 279:24
  280:4,18
trade 15:18,20
  15:23 16:8
  291:15
trained 304:21
training 150:23
  151:1 215:19
  215:23 365:23
  366:6,8,15
transactional

41:18
transactions
  209:7
transcript 369:5
  369:9,16
  370:15,16
transcription
  372:6
transfer 269:7
  324:20
transition
  254:16 255:20
  257:15 367:16
transitioned
  41:18 293:22
  332:19
transmitted
  207:19 296:13
  330:12 337:20
trends 285:7
  286:7 287:12
  287:24,24
  288:17 289:17
  290:1,5
trial 6:7 11:6
tried 351:11
  358:22
trigger 203:4
trip 322:5
trouble 79:2
true 162:21
  169:14 179:20
  294:9 303:1
  314:6 369:6
truth 207:13
  369:4
try 361:22
trying 14:20
  16:2 38:11
  55:4 61:3 78:2
  125:9 141:22
  150:18 153:24
  172:9,14,16
  298:23,24
tucson 40:13,14
turn 131:19

184:9 190:21
195:2 198:11
217:11 218:7
227:11 253:4
296:10 308:17
327:18 328:13
**turned** 308:13
312:17 319:1,6
319:10,12
**tweaks** 79:4
**twelfth** 4:17
**twice** 55:7
**two** 11:9,10
12:10,12 14:5
14:9 16:19
18:18 19:12
25:5 31:22
37:13 40:19
41:18 42:2,2,4
53:7 66:5
69:13 79:19
84:6 88:9,16
88:19 97:2
103:4 138:22
156:14 157:22
173:1 181:18
184:10 185:9
207:16 258:18
261:24 264:7
299:16 345:9
345:11
**type** 15:14 18:4
132:10 138:20
139:19 150:17
223:8,19
324:21 337:21
**types** 42:11
91:17 108:10
**typewriting**
369:6
**typical** 55:8
**typically** 19:20
109:18 112:1,3
138:1 292:8
**typing** 345:6

## U

**ultimate** 144:15
**ultimately** 53:6
94:19 140:22
250:11 254:7
**umbrella** 80:17
84:4,7 139:6
**umbrellas** 84:15
**umhmm** 11:15
117:10 263:1
292:24 338:6
347:18 351:2
355:15
**undergrad**
350:15
**underline**
178:10
**underneath** 64:1
64:24 80:4,20
81:6 82:6,9
86:10 307:8
317:13 355:16
355:22 356:3
**understand**
22:19 23:16
35:24 49:7
55:4,12 73:2
82:21 90:18
92:9 93:17
96:10,18,20
97:7 99:20
102:11,11
104:19 105:14
106:19,20
107:1,7,13,18
113:6 114:1,9
120:6,24
121:19 123:9
123:16,23
125:9 128:7,13
141:2 144:22
145:10 146:7
152:24 156:8
164:11,18
172:10 192:21
194:4 195:4

197:9 198:17
199:10 202:6
205:17 211:9
216:10 218:6
219:14 221:7
235:6,12
248:17 250:6,9
278:13 280:23
282:8,11
284:20 295:21
309:10 312:6
352:8 364:11
366:22
**understanding**
25:17 44:6
50:5 55:18
58:8 59:15
62:14 68:17
85:12 88:19
89:1,4 92:19
94:22 95:8,15
95:21 96:15
98:17,20
101:22 103:15
103:23 106:2
106:12,22
108:1,4 117:2
118:23 119:3
119:10,12
123:18 125:6
126:6 127:17
130:2 131:5
133:15 134:9
134:13 135:10
136:3 138:10
138:15 139:5
139:12 142:4
142:24 143:5
143:14 158:3,6
158:8 159:2
163:1 169:16
198:19 201:19
201:22 202:3
203:18 204:13
205:13 208:19
209:14,19,23

214:14,17
216:13,17,24
222:1 242:14
265:9 277:3,14
277:16,18
278:2 280:14
280:23 284:22
286:11 288:21
289:3 291:2
295:16 297:5
299:23 300:13
301:18 305:4
307:19 308:8
317:9,21
331:16 334:18
335:11,22
340:24 345:21
347:23 349:19
**understood**
125:14,18
213:23 353:20
**undertakes**
220:10
**unit** 52:20 58:19
347:8,8,13
**united** 1:1 2:6
252:4 268:11
**units** 79:20
343:16,16
**university** 38:1
70:7
**unlicensed**
232:16
**untrue** 225:9
**uom** 347:10
**upc** 342:18
**update** 161:20
**updates** 133:2,3
133:7 151:19
151:20,24
152:4 153:14
238:9
**updating** 132:5
**upper** 252:17
**ups** 288:18
**upset** 357:3

**upstream**
142:17 143:13
143:15,19,23
**upswing** 71:10
**urgency** 91:23
352:3
**usage** 55:10
**usc** 193:23
**use** 74:24 105:24
120:20 136:4,5
136:16,19
138:16,22
139:14,19
141:14 142:13
142:17 143:21
144:4,23
146:17 168:20
176:6,10,11,24
195:12 212:19
215:9 217:17
217:18,19
240:4 280:22
291:20 302:7
304:6 343:1
345:8 362:12
365:5,6
**user** 314:21
315:4
**usual** 233:17
**usually** 137:17
138:6

## V

**validation** 301:8
**value** 137:15
196:18,20,23
196:24
**variance** 25:13
25:16
**variations** 79:4
**variety** 144:3,5
**various** 15:1,3
15:18 18:2
81:19 111:18
132:8 133:7
**vary** 112:3

137:19
**varying** 80:4
**vehicle** 150:17
352:22
**vendor** 144:24
145:6,21
271:17 291:21
293:8 309:16
311:15 312:18
314:2,3 315:10
316:20 331:4,8
331:9,12,15,20
331:24 332:10
332:16,21
333:14 334:3
**vendors** 137:13
144:18 275:8
309:5 334:13
**veracity** 207:13
**verified** 336:18
**verify** 22:19
**version** 183:13
**versions** 155:16
**versus** 61:15
165:14 265:9
275:12
**vice** 52:16 58:18
60:9 63:21
64:12 67:21,23
77:20 78:4,18
78:23 80:5,6
80:11,14 86:8
86:11 87:10,12
93:1 95:2
161:7 259:12
**video** 9:6 17:15
154:7
**videographer**
9:1,2 10:6
71:24 72:4
182:5,9 236:22
237:2 319:19
320:3 362:3,7
367:23
**videotaped** 1:13
2:3 6:10

**view** 155:19
218:2
**viewed** 60:11
242:6
**villanova** 350:15
**vinayak** 262:15
270:5,6,7,16
270:19
**violation** 201:1
201:16 233:18
**violations**
239:16
**virtually** 92:22
**visibility** 168:21
173:8,9
**visit** 177:24
**voice** 224:20,21
229:20 230:1,2
**volume** 285:8
286:7 289:18
290:11 291:14
291:16
**voluntary** 100:4
218:1 219:6,9
219:18
**voucher** 364:15
**vp** 78:9,16
184:15 260:15
270:12 272:9
**vps** 260:24
261:5
**vs** 367:10

---
**W**
**wacker** 5:4,9
**wag** 329:2,2,4
329:14,16
330:4,14,23
331:3,9 332:9
334:3,8
**wagfldea0000...**
7:10 75:14
**wagfldea1536**
75:18
**wagmdl00018...**
7:18 157:4

**wagmdl00077...**
8:17 327:4
**wagmdl00129...**
8:20 337:16
**wagmdl00129...**
8:19 336:13
**wagmdl00308...**
8:16 324:6
**wagmdl00400...**
8:22 339:5
**wagmdl00478...**
8:3 259:5
**wagmdl00490...**
7:20 183:4
**wagmdl00492...**
8:7 278:20
**wagmdl00492...**
8:13 313:3
**wagmdl00492...**
8:11 310:21
**wagmdl00493...**
7:23 251:20
**wagmdl00496...**
7:12 94:7
**wagmdl00528...**
7:14 116:11
**wagmdl00574...**
7:16 131:11
**wagmdl00624...**
8:9 279:17
**wagmdl00663...**
8:5 269:23
**wagmdl00705...**
8:14 320:2
**wagmdl18597**
157:12
**wagner** 80:2
**wait** 124:24
283:3
**waiver** 26:1
**waivers** 19:19
25:14,16
**waldo** 185:5,8
**walgreen** 3:14
56:4 136:13
193:20 341:22

358:13
**walgreens** 3:13
10:1 13:4
14:23 15:4
18:23 20:16
22:2,12 23:12
23:17,18 24:3
24:11 26:14
27:17,19 32:19
33:14 34:1,5
35:3,8,10,17
35:20 36:10,18
37:21 38:2,6
39:13 43:6,9
43:21 45:6
46:2,7,9,16,20
47:2,4,5,22
48:2,3,7,12
51:4,11,12
52:17,17 54:14
54:22,24 55:8
55:13,18 57:24
58:22 59:11,16
66:16 67:14
68:22 69:3,4
69:17,18 70:1
70:10,19,24
71:5,10,12
72:8 75:17,21
76:11 78:8
79:3,13 82:12
85:24 87:6
89:15 91:5,24
92:21 95:2,4,9
95:21 96:1,10
96:15,20 97:4
97:11 98:7
101:18,22
102:6 103:1,9
103:15,23
104:1,6,9,14
104:16,19
105:3,14
106:21,22
107:8 108:2,12
109:4,13 110:5

113:2,8 114:2
114:9,17 115:1
115:3,7,19
119:1,20,24
120:16 121:22
122:2,23
123:10,23
124:7,17 125:4
125:6,10,14,19
126:2,3,5,8,20
127:6,12 128:3
130:6,13,21,24
133:6 134:14
136:4,11,17,21
137:1,8,12
138:8,11
139:13,19
140:15 141:14
143:21 144:4
144:11 145:15
145:22 147:2
147:14,21
148:7 149:14
150:2,7,13
151:3,7,8,9,12
151:20 152:1,9
152:20 153:1
153:12 154:15
154:18 155:16
156:8 158:13
158:14,19
159:11,20
160:1,2,20
162:2 163:12
163:19 164:1,2
164:12,15
165:12 166:5
166:15 167:5,7
172:17 174:6
175:12 178:13
179:17,22
180:6 181:6
185:15 186:19
186:21 187:7,8
187:18,20
189:3,8,15,21

| | | | | |
|---|---|---|---|---|
| 190:5 191:15 | 272:23 273:10 | 251:18 259:3 | **warehouses** | 276:22 284:13 |
| 191:21 192:5,7 | 275:5 276:5,10 | 269:21 278:18 | 272:5 | 305:18 307:18 |
| 193:4 194:7,11 | 276:17,23 | 279:15 310:18 | **warrant** 7:22 | 311:16 329:12 |
| 194:15,20 | 280:7 281:9 | 312:24 319:24 | 251:20 252:17 | 331:17 335:18 |
| 198:18 199:23 | 291:15 293:12 | 324:4 327:2 | 255:24 | 337:2 338:1 |
| 200:12,24 | 293:13,14,16 | 336:11 337:14 | **warranted** | 340:10 341:14 |
| 201:14,22 | 294:6,16 295:1 | 339:3 | 171:2 | 344:11,12 |
| 203:12,16 | 296:19 298:4,6 | **walk** 11:2 13:20 | **warrants** 269:11 | 349:5 364:13 |
| 205:13,19 | 299:7,17 300:2 | 22:5,9 26:10 | **washington** 4:6 | **wayne** 252:21 |
| 206:15,19 | 301:10 305:13 | 38:9,12 82:12 | 4:18 110:17,21 | 279:24 280:3 |
| 207:20 208:20 | 306:2,10 | 161:18 188:24 | **wasnt** 23:7,19 | 280:18 |
| 209:14,20 | 308:10,17,19 | 261:14 339:16 | 32:1 44:24 | **ways** 148:11 |
| 210:19 211:1 | 308:21,23,24 | 355:11 | 51:5 74:5 | 156:20,21 |
| 211:11 213:9 | 309:20 310:24 | **walked** 33:21 | 145:3,4 162:8 | 169:3,6 171:4 |
| 213:14,19 | 311:17 312:13 | 38:18 93:5 | 169:19 210:13 | 176:20 357:13 |
| 214:6 215:15 | 313:11 314:4 | 231:21 | 212:13,14 | 365:4,14 |
| 215:19 217:3 | 314:10 315:7 | **walking** 79:9,16 | 213:2,3,3 | **wc** 4:19 |
| 217:21 218:15 | 318:4 321:9,17 | **walmart** 5:8 | 237:11 239:4,8 | **web** 166:18 |
| 218:20 219:10 | 322:18 323:4 | **want** 106:6,7 | 240:6 242:4,8 | 175:23 176:19 |
| 220:7,13,16,21 | 323:13 324:12 | 108:17 122:10 | 242:21 245:17 | **website** 165:1,9 |
| 221:15,19 | 324:16,17 | 127:18,22 | 245:17 248:20 | 165:18 174:18 |
| 222:4,5,9,13 | 325:10 326:13 | 128:14,24 | 256:5,11 | 174:24 181:16 |
| 223:3,10 224:1 | 329:1,8,10 | 129:6 170:12 | 273:17 278:10 | **wed** 172:10 |
| 224:11,12,15 | 331:24 332:24 | 172:10 181:22 | 294:24 300:2 | 289:10 |
| 225:1,5,14 | 333:2,12,15,16 | 192:16 198:12 | 312:2 350:11 | **week** 55:9 |
| 226:1,11 228:1 | 334:22 335:8 | 205:18 218:7 | **wasson** 80:3 | 134:24 206:8 |
| 228:10 229:3,5 | 335:12 337:22 | 228:17 231:19 | 84:11,16 | 262:19 263:4 |
| 230:16 231:6 | 338:14 339:8 | 231:22 236:17 | **waste** 106:6,7 | **weekend** 133:23 |
| 232:8,15 233:3 | 339:12 341:6 | 274:16 279:5 | **watkins** 111:21 | **weeks** 205:24 |
| 233:24 234:20 | 341:14 346:4 | 280:16,21,22 | 185:12 | 287:8,10,15,20 |
| 235:2,7,8,14 | 350:21 351:22 | 302:9 325:19 | **way** 29:12 33:11 | 291:18 |
| 235:18 236:2,2 | 352:21 354:1 | 328:16 340:10 | 35:13 37:23 | **weight** 220:16 |
| 237:6 238:3,9 | 356:14 357:20 | 348:5 350:7 | 38:2,20 62:15 | **weinstein** |
| 238:13,19,24 | 357:22 358:1,7 | 361:22 | 71:3 78:2 | 185:19 |
| 239:6,12,15 | 358:20,23 | **wanted** 10:19 | 121:1 128:22 | **weird** 364:1 |
| 246:19 248:12 | 359:8,21 | 23:15 30:1 | 132:11 148:5 | **went** 25:4 30:3 |
| 248:21 249:7 | 360:13,16,24 | 117:2 165:7,8 | 151:11 155:10 | 30:12 31:15,16 |
| 249:14 251:24 | 361:12,12 | 165:9 203:19 | 155:13,16 | 32:19 37:11 |
| 252:10 257:15 | 362:11,14,24 | 218:13 255:20 | 160:17 169:15 | 82:3 87:6 88:3 |
| 259:16 260:7 | 364:11,18 | 272:23 273:10 | 176:15,23 | 88:6 90:9 |
| 261:7 263:14 | 366:9 | 273:11,15 | 192:23 196:15 | 114:24 125:9 |
| 264:2,8,11,23 | **walgreensswo...** | 354:4 365:18 | 197:21 207:15 | 140:24 182:13 |
| 265:1 266:3,9 | 7:7 8:2 34:11 | **wants** 155:21 | 211:16 215:20 | 182:15 226:24 |
| 267:11,19,22 | 75:12 94:4 | 272:12 | 215:21,22 | 233:2 250:6 |
| 268:16 269:2,9 | 116:9 131:9 | **warehouse** | 216:1 257:22 | 301:15 310:5 |
| 271:15 272:3 | 157:2 182:24 | 255:18 | 274:12 275:2 | 313:10 322:11 |

Highly Confidential - Subject to Further Confidentiality Review

336:1 344:23
349:12 350:14
356:14 359:12
**west** 2:11 3:15
5:9
**western** 252:5
268:10
**weve** 85:3
128:23 136:7
185:2 189:17
212:20 234:19
293:21 346:3
**whats** 61:14,19
99:7 137:17
148:16 150:24
158:7 159:2
185:4 192:14
223:3 224:4
232:3 247:7
271:9 285:23
288:1 290:4
291:18,19
292:10,12
296:13 297:23
297:23 302:3,5
334:18 343:14
347:1,19 348:2
**whatsoever**
15:10
**wheres** 185:7
**whoevers** 218:2
**wholesaler** 54:5
54:6,8 56:4
143:7 254:16
255:21 257:16
258:21 269:7
274:23 293:4,5
293:8 311:23
329:13
**wholesalers**
273:21
**wholesaling**
55:5
**whos** 214:4
363:6
**wic** 341:17,18

**widespread**
216:18,19
217:6 218:19
264:10,23
265:12,18
266:1 275:5
**wield** 192:22
**williams** 4:17
**willing** 11:20
**wise** 155:14
211:24
**witness** 10:8,9
10:12 30:22
43:13 44:11,23
45:10 47:9
48:6 49:3,19
56:16 57:12
58:5 59:20
61:10,17 62:5
65:24 67:18
70:3 71:16
73:12 86:17
91:10,19 92:24
93:8 97:6
101:2,9 102:2
102:19 103:11
103:12 105:4
107:12 108:21
109:9 114:5,12
119:12 120:5,8
121:15 122:14
122:16,18
123:3,15
124:12 127:1,9
127:21 130:9
130:11 131:4
137:24 140:9
141:11 146:13
147:9,17 148:1
152:13 153:5
156:4 158:23
159:14 160:6
163:15,22
164:6,20
167:11 168:8
170:1 171:10

172:6 175:16
176:14 177:7
180:15 181:1
181:12 186:24
187:13 188:15
196:1 198:3
199:7,17 200:7
200:16 201:9
201:18 202:23
204:2,12 205:6
205:21 206:5
207:3 210:12
211:15 215:11
216:5,23 217:8
218:23 219:13
221:3,4,24
222:19 223:5
223:16 224:7
224:20,22
225:19 226:5
226:13,20
227:7 228:15
230:20,21
231:10 232:19
233:9 235:22
236:8,14
240:18 242:12
248:16 249:2
249:18 250:2
254:10,22
255:16 256:4
257:11,21
258:4,14
263:23 264:14
265:5,16 266:5
266:16 267:14
268:2 274:6
282:16,17
284:2 289:8
290:20,21
295:4,12
298:12,19
299:10,22
300:6 305:22
306:7,16 310:1
310:12 317:1

321:22 323:9
325:15,16
328:1,3,6,8
350:10 351:19
352:16 357:8
358:4,17 359:3
359:16 360:5,6
361:8,18
363:23 369:3,3
369:9 370:1
**wong** 262:5,6
**woodland**
194:23 255:12
268:8,9,21
269:3 271:16
272:12,24
273:10 274:17
274:22 277:4
311:20
**word** 65:12
74:24 78:20
99:17 142:13
168:20 175:19
176:6 216:10
216:14,15
217:18,19
302:7 328:18
354:23 362:12
362:13
**words** 142:17
219:8 234:13
277:9
**work** 43:9 71:3
97:24 128:22
145:5 265:19
276:21 337:9
337:21 345:10
361:23 366:1
**worked** 86:5
166:15 240:8
243:11,18
260:1 280:24
**working** 7:11
37:24 63:12
94:5,12,20,23
95:5,11 97:22

98:6 135:6
215:20 243:13
244:4,8 265:8
**workings** 61:24
**works** 195:11
311:16 335:19
349:6
**world** 358:1
**wouldnt** 29:10
37:9 48:21
135:17 162:12
162:16,22
168:3,4,9
238:17 239:12
249:3 273:5,11
308:2,3 325:17
325:17 358:5
359:4 366:11
**write** 157:6
**writers** 230:23
**writing** 157:9
218:3
**written** 26:3
344:4
**wrong** 41:9
279:8,11
306:23 354:24
**wrote** 86:21
283:16

| **X** |
| --- |

| **Y** |
| --- |

**yeah** 29:21 35:2
35:3 40:17
78:6 79:8
81:17 82:16
85:20 88:12
97:10 111:22
165:22 166:3
166:16 236:20
237:23 246:7
247:1,24
262:17 276:2,2
283:13 286:5
308:4 313:19
316:3 318:21

319:17 320:19
328:1 332:8
338:3,16
350:23 356:11
363:14
**year** 52:23 53:10
53:10 75:4,5
82:1,1 215:16
215:16 245:8
247:3 315:22
352:12,12,13
**years** 13:19
16:24 36:15
37:12,19,20,21
38:16 79:6
81:14,15
135:15,17
136:8,9,14,14
137:20 182:19
203:10,15,17
203:18 215:7
286:3 333:2
357:5,22 358:1
358:10,14
360:18 362:19
**yep** 120:14
156:4 232:1
**yingling** 5:5
9:22,22
**york** 3:9,9
**youd** 38:10
146:23 193:13
218:6 227:12
231:11,14
298:3
**youll** 174:22
184:11 188:8
**youre** 14:14
20:12 25:18
46:8 57:21
66:15 72:16
117:1 140:13
140:14,17
142:14 150:18
150:19 151:3
153:17 154:1,4

155:3 172:14
187:16 212:2
225:3 250:13
256:14,17
258:1 265:24
273:11 276:3
282:8,11 284:7
285:17 288:10
288:19 289:19
294:5 312:1
324:8 327:7
331:18,19
333:22 338:12
357:12
**youve** 11:3
14:21 15:6
16:21 18:19
19:2,3 33:20
37:21 38:2
45:18 70:5,12
76:24 84:9,10
129:13 203:2
225:11 227:15
238:12,18
267:6 283:9,15

--- **Z** ---

**zagami** 109:22
**zero** 215:19,23
238:23 300:12
**zhou** 5:11 33:17

--- **0** ---

**00** 236:18
**000** 138:1
149:13,18,21
149:22 153:17
**00018610** 7:18
157:5
**00077016** 8:17
327:5
**00129007** 8:20
337:17
**00129610** 8:19
336:13
**00308498** 8:16
324:6

**00478002** 8:3
259:5
**00490973** 7:20
183:4
**00492069** 8:7
278:21
**00492376** 8:13
313:3
**00492380** 8:11
310:21
**00493700** 7:23
251:21
**00496406** 7:12
94:7
**00528180** 7:14
116:11
**00574825** 7:16
131:12
**00624508** 8:9
279:17
**00663368** 8:5
269:24
**00705320** 8:14
320:2
**01** 39:4,11
**06** 39:11 44:3
51:17 53:4,10
54:10 56:7,24
57:6,20 58:10
58:10 59:1
**08** 8:8 279:16
**09** 8:6 278:19
328:22 329:8

--- **1** ---

**1** 1:5 7:8,9 8:14
34:9,12 75:13
76:10 91:4
183:13,18,20
188:6,9,11,16
188:17,20
189:6,7 191:14
191:21,24
194:14 197:21
197:21,21,21
197:21 208:5

210:8 227:11
231:21,23
236:18 248:4
313:9 320:1,8
330:8
**10** 5:4 7:3,11,17
8:4,14 94:6
97:20 157:3
182:6,8 184:20
208:24 227:15
227:20 246:23
269:19,22
320:1 328:22
329:8 330:11
330:23 331:2
358:14 362:4,6
**100** 52:21 138:1
230:3,6
**10017** 3:9
**106** 174:9
**11** 2:13 8:6,10
8:12,12 9:5
44:3 58:10
59:2 68:12
182:6,8,8,10
184:10,19,20
184:23 208:2
246:23 262:21
278:16,19,23
279:11 306:22
310:19 313:1,1
358:14
**116** 7:13
**11th** 3:8
**12** 7:9,13 8:3,8
8:14,15,15,17
8:20 52:6
75:13 116:10
117:24 118:1
184:10,22
215:7 232:23
236:17,23
237:1,1,3
259:4 279:16
279:19 316:1,2
320:1 324:2,5

324:5,23 327:3
331:2 332:6,15
337:15,19
338:4 340:17
350:21 351:22
358:14 360:18
**120** 247:15,22
**13** 7:15,17 8:3,4
8:10 52:6 72:1
72:3 74:17,24
131:10 152:7
153:3 157:3
169:15 179:16
183:12,13,16
184:11,19,20
184:20 186:8
193:1 215:7
232:24 248:12
256:13 259:4
263:16 264:7
269:22 272:7
284:22 285:1
310:16,19
337:19 338:4
340:7,17
349:17 351:23
358:14 360:18
**1301** 201:3,16
**131** 7:15
**14** 8:12 27:23
68:3,8,12
81:16 152:10
153:3 169:15
190:21,23
272:7 312:21
313:1 319:20
319:22
**143** 188:9,11,20
189:7
**15** 8:14 111:1
176:11 190:24
228:20,21,22
231:1 319:14
320:1,7
**15219** 5:15
**1536** 83:5

**157** 7:17
**16** 7:13 8:15,18
  8:20 14:8
  116:7,10,18
  149:22 323:24
  324:5 336:12
  337:6,15 338:7
**17** 8:17 68:8
  326:23 327:3
**17md2804** 1:5
**18** 8:18 34:24
  73:21,23 336:9
  336:9,12
**183** 7:19
**19** 8:20 337:12
  337:15
**1986** 35:18,19
  35:19 215:21
**1990s** 12:6 13:15
  13:16,18
**1993** 35:4
**1995** 14:3

_____
**2**
**2** 7:9 8:3,17 32:9
  41:11 63:20
  68:11 75:10,13
  83:4 95:19
  100:16 136:14
  188:6 189:20
  191:14,21
  197:21 231:21
  231:23 232:5
  232:22 233:13
  234:11,20
  259:4 319:20
  319:22,22
  320:4 326:24
  327:3 330:11
  330:17 343:12
  344:7 345:10
  345:10
**20** 7:15 8:21
  32:5,9 131:10
  136:14 176:11
  339:1,4 340:7

340:13,17
357:22 372:18
**200** 247:13,22
**2000** 130:24
  215:3 216:1
**20001** 3743 4:6
**20005** 4:18
**2000s** 11:24 12:7
  149:21 359:8
  360:16 361:6
  361:15
**2001** 37:8,12
  38:21,23 74:16
  216:1
**2002** 216:1
**2005** 39:8
**2006** 20:18
  52:18 53:20
  235:3
**2008** 279:20
  281:5
**2009** 38:6 191:5
  231:3,7 233:21
  234:4,7 278:24
**2010** 14:6
**2011** 51:18
  67:22 74:16,23
  190:5 220:14
  263:7 311:1
  312:16 313:6
  315:8,24
  316:13 317:10
**2012** 14:6 21:22
  24:5 27:22
  66:23 74:1,16
  74:19 76:10
  91:4 109:14
  111:10 113:9
  116:7,18
  118:18 120:2
  120:11 121:20
  123:22 132:17
  135:5 193:1
  212:3 214:18
  215:7,22 216:2
  238:22 240:3

**240**:16 267:1
  276:17 286:6
  291:2 294:3
  314:15 315:22
  320:8 321:4
  324:2 326:24
  327:9 330:13
  333:16
**201213** 52:4
**20122014** 88:6
**2013** 7:11 21:22
  24:5 27:22
  74:24 94:6
  97:20 157:17
  157:22 161:20
  212:5 238:2
  246:15,18
  248:24 252:1
  253:20 264:18
  266:11 272:22
  276:1 278:14
  283:7 358:9
  359:14,21
  361:16
**2014** 67:23 74:1
  74:19 130:24
  152:20 274:12
  276:23 294:4
  294:12
**2015** 14:8 74:19
  149:22
**2016** 286:4,6
  291:2 336:9
  337:19 338:4
  338:13
**2017** 68:4
**2018** 1:16 2:13
  9:4
**2024345013**
  4:18
**2029425000** 4:6
**2053963982** 3:5
**209** 4:11
**21** 1:16 2:13 9:4
  74:23 152:18
  193:23 201:2

**201**:16
**2123971000** 3:9
**22** 236:23 237:1
  346:16
**222** 367:16
**222s** 329:13
**23** 8:8,10 72:3,5
  192:11,12,24
  217:14,19
  218:7,8,10,14
  218:18 219:6
  223:12,20
  224:5,15
  279:16,20
  310:19 311:1
**24** 182:8,10
  195:3,16
  292:15
**24hour** 297:10
  297:10
**25** 37:18 131:20
  133:10 198:11
  199:14 202:18
  236:17
**250** 149:13
**251** 7:22
**259** 8:3
**26** 8:4,6 206:14
  269:22 278:19
  278:24 340:14
**269** 8:4
**27** 157:22
  319:22 320:4
**278** 8:6
**279** 8:8
**28** 8:15 324:2,5
**2804** 1:4 9:8

_____
**3**
**3** 7:9,11,15,17
  8:4,20 75:13
  76:10 91:4
  94:2,5,11
  95:19 98:18
  131:10 157:3
  183:18,20

**188**:6 190:4
  191:14,21
  195:16 197:21
  208:15 228:8
  229:3 233:23
  247:22 253:5
  262:24 269:22
  312:8 317:4
  331:2 337:15
  343:11 344:8
  362:4,6,6,8
  367:24 368:1
**30** 40:15,15,15
  52:22 132:17
  135:5 153:17
  176:11 191:5
  204:9 206:9
  231:2 275:21
  370:14
**300** 3:15
**308497** 324:1
**310** 8:10
**3122072834** 5:5
**3124944475**
  3:16
**3127629461**
  4:12
**3127823939**
  5:10
**313** 8:12
**316** 3:4
**32** 37:20,21
  40:10,12
  203:10,17,18
  357:5
**320** 8:14
**324** 8:15
**32502** 3:4
**327** 8:17
**33** 217:11 218:6
**336** 8:18
**337** 8:20
**3377** 1:22
**339** 8:21
**34** 7:8
**340b** 334:16,19

Highly Confidential - Subject to Further Confidentiality Review

334:22,23
335:1,8,18,24
336:19 337:2,8
338:7,8 362:10
362:11,16,18
362:21 363:1,3
363:8 364:7,10
364:12,14,16
364:19
**340bs** 335:12
338:14
**343** 188:16,17
188:20 192:1
192:12,24
195:3,16
198:11 199:15
217:12 218:6,7
227:11 228:21
228:22 234:11
**35** 40:11,12
**35th** 5:14
**360** 3:8
**364** 7:3
**370** 1:22
**39** 362:6,8

### 4

**4** 7:13 116:7,10
149:21 191:14
191:21 192:1,5
247:22,22
253:5 332:6
333:21,23
334:2
**400k** 247:21
**40th** 5:4
**4123384383**
5:15
**43** 192:11
199:15
**44** 367:24 368:1
**45** 248:4 361:23
**478001** 261:15
**48** 331:4,10
**492067** 278:23
**492375** 312:21

**492378** 310:24
**493699** 253:4

### 5

**5** 7:15 131:7,10
149:18 192:1,5
253:20
**52** 237:1,3
**525** 342:14
**528179** 116:17
**54** 2:11 3:15
340:17
**5672** 1:22
**574824** 131:15
**591** 1:22

### 6

**6** 7:17 8:8 134:1
156:24 157:3,9
184:20 198:12
227:14,18,24
228:8 229:3
234:7 279:16
311:4 331:2
**600** 2:11 3:4
**601** 4:5
**606011692** 5:10
**60604** 4:12
**606067507** 5:4
**60654** 3:16

### 7

**7** 7:19 8:17,18
52:23 182:22
183:1 190:5
202:18 227:14
227:18,24
228:8 229:3
234:7 245:14
246:23 326:24
327:3 331:2
336:12
**705318** 320:7
**712** 208:5 210:8
**716** 327:21
**725** 4:17
**74** 201:3,16

**75** 7:9 245:14,17
**77** 5:9
**77015** 326:22
**77016** 327:18,22
328:3,4,5
**7th** 4:11

### 8

**8** 2:13 7:22 8:6
8:18 9:5 52:19
149:22 206:15
207:1 227:14
227:18,24
228:8 229:3
234:7 246:23
251:16,19
278:19 336:12
340:14
**800** 52:21
200:19
**800k** 247:21
**824** 193:23
**836** 208:6
**841968** 2:8 6:12
369:1
**86** 36:3,4,8
37:12 203:13
**877** 1:22
**89** 36:3,4,8,14

### 9

**9** 7:13 8:3,10,12
72:1,3,3,5
116:7,10 207:6
207:14 227:14
227:18,18,24
228:8 229:3
234:7 246:23
259:1,4 310:19
313:1,6 315:24
330:11 340:7
340:13,17
**90s** 14:3 360:15
**91** 36:14,16,19
37:2
**917** 1:22
**92** 313:22

314:20
**93** 36:17,22 37:2
**94** 7:11 14:3
**97** 157:20
**98** 157:14
**99** 163:12
197:21