EXHIBIT 11

```
 1              UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3                      - - -

 4   IN RE:  NATIONAL           )

     PRESCRIPTION               )  MDL No. 2804

 5   OPIATE LITIGATION          )

     _____ )  Case No.

 6                              )  1:17-MD-2804

     THIS DOCUMENT RELATES      )

 7   TO ALL CASES               )  Hon. Dan A. Polster

 8                      - - -

 9              Tuesday, August 7, 2018

10       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

11

                        - - -

12

13        Videotaped deposition of Jennifer R. Norris,

14   held at the offices of BakerHostetler, 200 Civic Center

15   Drive, Suite 1200, Columbus, Ohio, commencing at

16   8:09 a.m., on the above date, before Carol A. Kirk,

17   Registered Merit Reporter and Notary Public.

18

19                      - - -

20

21

22

23           GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

## Page 2

```
 1          A P P E A R A N C E S :
 2  On behalf of the Plaintiffs:
         MCHUGH FULLER LAW GROUP
 3       BY:  MICHAEL J. FULLER, JR., ESQUIRE
            mike@mchughfuller.com
 4       97 Elias Whiddon Road
         Hattiesburg, Mississippi  39402
 5       601-261-2220
            and
 6       GREENE KETCHUM FARRELL BAILEY & TWEEL LLP
         BY:  PAUL THOMAS FARRELL, JR., ESQUIRE
 7          paul@greeneketchum.com
         419 11th Street
 8       Huntington, West Virginia  25701
         304-521-4778
 9
    On behalf of the Cardinal Health, Inc.:
10       WILLIAMS & CONNOLLY LLP
         BY:  ENU MAINIGI, ESQUIRE
11          emainigi@wc.com
            NEELUM J. WADHWANI, ESQUIRE
12          nwadhwani@wc.com
         725 Twelfth Street, N.W.
13       Washington, DC  20005
         202-434-5420
14
    On behalf of the AmerisourceBergen:
15       REED SMITH LLP
         BY:  ROBERT A. NICHOLAS, ESQUIRE
16          rnicholas@reedsmith.com
         Three Logan Square
17       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania  19103
18       215-851-8100
19  On behalf of HBC:
         MARCUS & SHAPIRA LLP
20       BY:  ERIN GIBSON ALLEN, ESQUIRE
            allen.marcus-shapira.com
21       One Oxford Center, 35th Floor
         301 Grant Street
22       Pittsburgh, Pennsylvania  15219-6401
         412-338-4682
23
24
```

## Page 3

```
 1  On behalf of Walmart:
         JONES DAY
 2       BY:  BRANDY H. RANJAN, ESQUIRE
            branjan@jonesday.com
 3       325 John H. McConnell Boulevard, Suite 600
         Columbus, Ohio  43215-2673
 4       614-469-3939
 5  On behalf of Prescription Supply, Inc.:
         PELINI, CAMPBELL & WILLIAMS LLC
 6       BY:  PAUL B. RICARD, ESQUIRE
            pbricard@pelini-law.com
 7       8040 Cleveland Avenue NW, Suite 400
         North Canton, Ohio  44720
 8       330-305-6400
 9  On behalf of Miami-Luken:
         JACKSON KELLY PLLC
10       BY:  JENNIFER L. HUGHES, ESQUIRE
            jhughes@jacksonkelly.com
11       500 Lee Street East, Suite 1600
         Charleston, West Virginia  25301
12       304-340-1393
13  On behalf of CVS Indiana, LLC and CVS RX Services, Inc.:
         ZUCKERMAN SPAEDER LLP
14       BY:  R. MILES CLARK, ESQUIRE
            mclark@zuckerman.com
15          ERIC R. DELINSKY, ESQUIRE
            edelinsky@zuckerman.com
16          (VIA TELECONFERENCE)
         1800 M Street NW, Suite 1000
17       Washington, DC  20036-5807
         202-778-1800
18
    On behalf of Johnson & Johnson and
19  Janssen Pharmeceuticals:
         TUCKER ELLIS LLP
20       BY:  JUSTIN E. RICE, ESQUIRE
            justin.rice@tuckerellis.com
21       950 Main Avenue, Suite 1100
         Cleveland, Ohio  44113
22       216-592-5000
23
24
```

## Page 4

```
 1  On behalf of McKesson:
         COVINGTON & BURLING LLP
 2       BY:  EMILY L. KVESELIS, ESQUIRE
            ekveselis@cov.com
 3          MARK H. LYNCH, ESQUIRE
            mlynch@cov.com
 4          (VIA TELECONFERENCE)
         One CityCenter
 5       850 Tenth Street, NW
         Washington, DC  20001
 6       202-662-5110
 7  On behalf of Endo Pharmaceuticals, Inc. and
    Endo Health Solutions Inc.:
 8       ARNOLD & PORTER KAYE SCHOLER, LLP
         BY:  ANGEL NAKAMURA, ESQUIRE
 9          angel.nakamura@apks.com
            (VIA TELECONFERENCE)
10       777 S. Figueroa Street, Suite 4400
         Los Angeles, California  90017
11       213-243-4000
12  On behalf of Teva Pharmaceuticals USA, Inc., Cephalon,
    Inc., Watson Laboratories, Inc., Actavis LLC, Actavis
13  Pharma, Inc., f/k/a Watson Pharma, Inc.:
         MORGAN, LEWIS & BOCKIUS LLP
14       BY:  JONATHAN E. MAIER, ESQUIRE
            jonathan.maier@morganlewis.com
15          (VIA TELECONFERENCE)
         1111 Pennsylvania Avenue, NW
16       Washington, DC  20004
         202-739-5806
17
    On behalf of Anda, Inc.:
18       FOLEY & LARDNER LLP
         BY:  KATY E. KOSKI, ESQUIRE
19          kkoski@foley.com
            (VIA TELECONFERENCE)
20       111 Huntington Avenue, Suite 2500
         Boston, Massachusetts  02199
21       617-502-3242
22
23
24
```

## Page 5

```
 1  On behalf of the Allergan Defendants:
         KIRKLAND & ELLIS LLP
 2       BY:  PRATIK K. GHOSH, ESQUIRE
            pratik.ghosh@kirkland.com
 3          (VIA TELECONFERENCE)
         300 North LaSalle
 4       Chicago, Illinois  60654
         312-862-3689
 5
    On behalf of Millinckrodt:
 6       ROPES & GRAY LLP
         BY:  MAX R. MAEROWITZ, ESQUIRE
 7          max.maerowitz@ropesgray.com
            (VIA TELECONFERENCE)
 8       800 Boylston Street
         Boston, Massachusetts  02199
 9       614-951-7000
10  On behalf of The Kroger Company:
         BOWLES RICE LLP
11       BY:  UNAIZA RIAZ, ESQUIRE
            uriaz@bowlesrice.com
12       600 Quarrier Street
         Charleston, West Virginia  25301
13       304-347-1114
14
15  ALSO PRESENT:
16       Caitlin E. Anderson, Esq., Cardinal Health
         A.J. Elkins, McHugh Fuller
17       Darnell Brown, Videographer
         Gina Veldman, Trial Technician
18       Colleen McNamara, Williams & Connolly
         Matthew Monahan, Williams & Connolly
19       Miranda Petersen, Williams & Connolly
20
21
22                    - - -
23
24
```

Page 6

```
 1    VIDEOTAPED DEPOSITION OF JENNIFER R. NORRIS
 2              INDEX TO EXAMINATION
 3    WITNESS                               PAGE
 4    JENNIFER R. NORRIS
 5      CROSS-EXAMINATION BY MR. FULLER:         14
        CROSS-EXAMINATION BY MR. FARRELL:       169
 6      CROSS-EXAMINATION (CONT'D) BY MR. FULLER: 224
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1    VIDEOTAPED DEPOSITION OF JENNIFER R. NORRIS
 2              INDEX TO EXHIBITS
 3            DESCRIPTION                PAGE
      CARDINAL-NORRIS
 4    Exhibit 1    First Notice of Deposition    17
                   Pursuant to Rule 30(b)(6) and
 5                 Document Request Pursuant to
                   Rule 30(B)(2) and Rule 34 to
 6                 Defendant Cardinal Health, Inc.
      CARDINAL-NORRIS
 7    Exhibit 2    Second Notice of Deposition    18
                   Pursuant to Rule 30(b)(6) and
 8                 Document Request Pursuant to
                   Rule 30(B)(2) and Rule 34 to
 9                 Defendant Cardinal
      CARDINAL-NORRIS
10    Exhibit 3    Cardinal Health, Inc.'s        20
                   Objections and Responses to
11                 First and Second Notice of
                   Deposition to Rule 30(B)(6)
12    CARDINAL-NORRIS
      Exhibit 4    Document titled "United States 21
13                 Code Annotated; Title 21. Food
                   and Drugs; Chapter 13. Drug
14                 Abuse Prevention and Control;
                   Subchapter 1. Control and
15                 Enforcement; Part A.
                   Introductory Provisions"
16    CARDINAL-NORRIS
      Exhibit 5    Congressional Record from the  35
17                 Controlled Substances Act
      CARDINAL-NORRIS
18    Exhibit 6    Code of Federal Regulations    62
                   1301.74
19    CARDINAL-NORRIS
      Exhibit 7    Document titled "Title 21 -    66
20                 Food and Drugs"
      CARDINAL-NORRIS
21    Exhibit 8    HathiTrust document,          69
                   "Oxycontin: Its Use and Abuse"
22
23
24
```

Page 8

```
 1              INDEX TO EXHIBITS (CONT'D)
 2            DESCRIPTION                PAGE
      CARDINAL-NORRIS
 3    Exhibit 9    Document titled "Under the     96
                   Counter: The Diversion and
 4                 Abuse of Controlled
                   Prescription Drugs in the
 5                 U.S." CAH_MDL_ PRIORPROD_
                   DEA12_000001669
 6    CARDINAL-NORRIS
      Exhibit 10   Memorandum for Asa Hutchinson, 102
 7                 Administrator, Drug Enforcement
                   Administration from Glenn A.
 8                 Fine, Inspector General
      CARDINAL-NORRIS
 9    Exhibit 11   Document titled, "Hearing      105
                   Before the U.S. Senate
10                 Permanent Subcommittee on
                   Investigations, Buyers Beware:
11                 The Dangers of Purchasing
                   Pharmaceuticals Over the
12                 Internet," 6/17/2004
      CARDINAL-NORRIS
13    Exhibit 12   861 Federal Reporter, 3d       116
                   Series, Masters Pharmaceutical,
14                 Inc., v. Drug Enforcement
                   Administration
15    CARDINAL-NORRIS
16    Exhibit 13   Drug Enforcement Administration 140
                   to Cardinal Health, dated
17                 9/27/2006, CAH_MDL_PRIORPROD_
                   DEA07_00837645 - 837648
18    CARDINAL-NORRIS
      Exhibit 14   Defendants Cardinal Health 110, 156
19                 Inc., and Cardinal Health 411,
                   Inc.'s Response to Plaintiff's
20                 Hearing Brief
      CARDINAL-NORRIS
21    Exhibit 15   Dear Registrant letter, dated  174
                   12/27/2007, CAH_MDL_PRIORPROD_
22                 DEA12_0001090 and 10981
      CARDINAL-NORRIS
23    Exhibit 16   Document titled "HDMA Executive 185
                   Committee Meeting, 6/12/2016,"
24                 ABDCMDL00275057 - 275100
```

Page 9

```
 1              INDEX TO EXHIBITS
 2            DESCRIPTION                PAGE
      CARDINAL-NORRIS
 3    Exhibit 17   Brief for Healthcare           190
                   Distribution Management
 4                 Association and National
                   Association of Chain Drug
 5                 Stores as Amici Curiae in
                   Support of Neither Party
 6    CARDINAL-NORRIS
      Exhibit 18   Crisis Playbook: An            209
 7                 Interactive Guide to Crisis
                   Communications,
 8                 ABDCMDL00278063 - 278106
      CARDINAL-NORRIS
 9    Exhibit 19   DEA Compliance Manual, CAH_MDL_ 228
                   PRIORPROD_DEA07_0138385 -
10                 1384238
      CARDINAL-NORRIS
11    Exhibit 20   Document titled "Required      228
                   Reports to DEA," CAH_MDL_
12                 PRIORPROD_HOUSE_ 0002197 - 2200
      CARDINAL-NORRIS
13    Exhibit 21   Document titled "Standard      234
                   Operating Procedures, Corporate
14                 Quality & Regulatory
                   Compliance," CAH_MDL_
15                 PRIORPROD_DEA07_0118833 -
                   1188720
16    CARDINAL-NORRIS
      Exhibit 22   Corporate Quality Regulatory   234
17                 Compliance Manual, Issue Date:
                   6-15-2006, CAH_MDL_PRIORPROD_
18                 DEA07_1188147 - 1188182
      CARDINAL-NORRIS
19    Exhibit 23   Cardinal Health Corporate      238
                   Compliance Policy, 2/5/2006
20    CARDINAL-NORRIS
      Exhibit 24   Document titled "Assurance of  240
21                 Discontinuance Pursuant to
                   Executive Law 63(15)"
22    CARDINAL-NORRIS
      Exhibit 25   Settlement and Release         275
23                 Agreement and Administrative
                   Memorandum of Agreement,
24                 CAH_MDL_PRIORPROD_HOUSE_ 0004009- 4056
```

Page 10

INDEX TO EXHIBITS (CONT'D)
DESCRIPTION                          PAGE
CARDINAL-NORRIS
Exhibit 26    Anti-Diversion - Know Your      249
              Customer Compliance Manual,
              CAH_MDL_PRIORPROD_DEA07_
              01181142 - CAH_MDL_PRIORPROD_
              DEA07_01181172
CARDINAL-NORRIS
Exhibit 27    Sales - Highlight Report,       251
              CAH_MDL_PRIORPROD_AG_
              0000344 - 347
CARDINAL-NORRIS
Exhibit 28    Standard Operating Procedure,   254
              Pharmaceutical Distribution,
              CAH_MDL_PRIORPROD_AG_
              0000154 - 160
CARDINAL-NORRIS
Exhibit 29    Custodial file containing       271
              various documents
CARDINAL-NORRIS
Exhibit 30    Thumb drive                     261
CARDINAL-NORRIS
Exhibit 31    (Withdrawn)                     287
CARDINAL-NORRIS
Exhibit 32    E-mail to Mr. Brantley and      289
              others from Mr. Reardon, dated
              9/14/07, with attachments,
              CAH_MDL_PRIORPROD_DEA07_
              0119835 - 1T98358
CARDINAL-NORRIS
Exhibit 33    E-mail chain ending with an     301
              e=mail to Michael Mone and
              others from Ms. McPherson,
              dated 1/25/08
CARDINAL-NORRIS
Exhibit 34    Administrative Memorandum       306
              Agreement, CAH_MDL_PRIORPROD_
              BOP_0000042 - 49
CARDINAL-NORRIS
Exhibit 35    Document titled, "CVS 5195      310
              Threshold Changes," Bates-
              stamped CAH_MDL_PRIORPROD_
              DEA12_00004729 - 4938

Page 11

1              - - -

2        P R O C E E D I N G S

3              - - -

4        THE VIDEOGRAPHER:  Good morning.  We are

5  now on the record.  My name is Darnell Brown, and

6  I'm the videographer with Golkow Litigation

7  Services.  Today's date is August 7, 2018, and the

8  time is 8:09 a.m.

9        This video deposition is being held in

10  Columbus, Ohio, in the matter of In Re:  National

11  Prescription Opioid Litigation for the United

12  States District Court for the Northern District of

13  Ohio.  The deponent is Jennifer Norris.

14        Counsel, please identify yourselves for

15  the record.

16        MR. FULLER:  Mike Fuller on behalf of

17  the Plaintiff.

18        MR. ELKINS:  A.J. Elkins for the

19  Plaintiff.

20        MS. VELDMAN:  Gina Veldman for the

21  Plaintiff.

22        MR. FULLER:  Paul Farrell will be here

23  at some point on behalf of the Plaintiff.

24        MR. NICHOLAS:  Bob Nicholas, Reed Smith,

Page 12

1  for AmerisourceBergen.

2        MS. RANJAN:  Brandy Ranjan, Jones Day,

3  for Walmart.

4        MR. RICE:  Justin Rice, Tucker Ellis, on

5  behalf of Johnson & Johnson and Janssen

6  Pharmaceuticals.

7        MR. RICARD:  Paul Ricard for

8  Prescription Supply.

9        MR. CLARK:  Miles Clark from Zuckerman

10  Spaeder on behalf of CVS Indiana LLC and CVS RX

11  Services, Inc.

12        MS. KVESELIS:  Emily Kveselis from

13  Covington & Burling on behalf of McKesson.

14        MS. ALLEN:  Erin Gibson Allen from

15  Marcus & Shapira on behalf of Defendant HBC.

16        MS. ANDERSON:  Caitlin Anderson,

17  in-house counsel at Cardinal Health.

18        MS. WADHWANI:  Neelum Wadhwani,

19  Williams & Connolly, on behalf of Cardinal Health.

20        MS. MAINIGI:  Enu Mainigi from

21  Williams & Connolly on behalf of Cardinal Health.

22        Also here from Williams & Connolly are

23  Colleen McNamara, Matt Monahan, and Miranda

24  Petersen.

Page 13

1        THE VIDEOGRAPHER:  Those on the phone?

2        MR. LYNCH:  Mark Lynch from Covington &

3  Burling for McKesson.

4        MR. MAIER:  Jonathan Maier from Morgan

5  Bockius for Teva.

6        MS. KOSKI:  Katy Koski from Foley &

7  Lardner for Anda, Inc.

8        MR. DELINSKY:  Eric Delinsky from

9  Zuckerman Spaeder for CVS Indiana and CVS RX

10  Services.

11        MS. NAKAMURA:  Angel Nakamura of

12  Arnold & Porter for the Endo Defendants and the

13  Par Pharmaceutical Defendants.

14        MR. GHOSH:  Pratik Ghosh with Kirland &

15  Ellis for Allergan.

16        MR. MAEROWITZ:  Max Maerowitz with

17  Ropes & Gray for Millinckrodt.

18        MS. RIAZ:  Unaiza Riaz with Bowles Rice

19  for Kroger Company.

20        MS. HUGHES:  Jennifer Hughes from

21  Jackson Kelly for Miami-Luken.

22        MR. FULLER:  Anybody else?

23        THE VIDEOGRAPHER:  Okay.  The court

24  reporter is Carol Kirk, who will now swear in the

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  witness.
2      - - -
3      JENNIFER R. NORRIS
4  being by me first duly sworn, as hereinafter certified,
5  deposes and says as follows:
6      CROSS-EXAMINATION
7  BY MR. FULLER:
8   Q.  Ma'am, please state your name for the
9  record.
10  A.  Jennifer Robison Norris.
11  Q.  And, Ms. Norris, where are you currently
12  employed?
13  A.  Cardinal Health.
14  Q.  And how long have you been at Cardinal
15  Health?
16  A.  Eighteen years.
17  Q.  And what is your current position at
18  Cardinal?
19  A.  I'm an attorney in the legal department.
20  Q.  Do you have any particular title?
21  A.  I do.  I'm vice president, associate
22  general counsel, mergers and acquisitions.
23  Q.  I'm sorry.  You said mergers and
24  acquisitions, right?

Page 15

1  A.  Mm-hmm, and integration.
2  Q.  And how long have you held that title?
3  A.  I've been in that group -- my titles
4  varied, but I've been in that group for
5  approximately two years.
6  Q.  And that's the mergers and acquisitions
7  and integrations group?
8  A.  Yes.
9  Q.  How about prior to that?
10  A.  Prior to that, I was still a vice
11  president, associate general counsel, but I was in
12  our commercial group supporting our pharmacy
13  distribution business primarily.
14  Q.  When you say supporting pharmacy
15  distribution, give me an understanding of what you
16  would be doing in that role.
17  A.  My primary role was with acute care and
18  alternate care customers, working on the customer
19  facing agreements and issues that came up from
20  time to time with those customers.
21  Q.  Okay.  And how about prior to that?
22  A.  I've always been in that group.  Again,
23  my title has varied, and I've supported other
24  groups within Cardinal Health.  I supported

Page 16

1  sourcing at one time.  We had a corporate sales
2  group, sold all of the products and services
3  within Cardinal Health that I supported.
4      I supported our specialty pharmaceutical
5  distribution business, our specialty services
6  business, the 3PL, the third-party logistics
7  business we have, as well as working on 340B and
8  other matters within pharmacy distribution.
9  Q.  I've seen 340B before.  What's 340B?
10  A.  It's a federally mandated essentially
11  drug discount program for certain types of
12  customers.
13  Q.  Got it.  Well, you have the pleasure or
14  the curse of being designated today as a 30(b)
15  witness.  Are you aware of that?
16  A.  I am.
17  Q.  And do you understand what that means?
18  A.  I do.
19  Q.  That's because you're a lawyer, right?
20      MS. MAINIGI:  Objection.
21  A.  Because I'm a lawyer, and that's what I
22  was asked to do.
23  Q.  Sure.
24  A.  I was not aware of what a 30(b)(6)

Page 17

1  witness was before I was asked to do this.
2  Q.  Well, and just so everybody is on the
3  same page then, that means you've been designated
4  as the representative for Cardinal Health.
5  Because Cardinal Health can't speak on its own,
6  you're here to speak on their behalf on certain
7  subject matters.  Is that your understanding?
8  A.  That is my understanding.
9      - - -
10  (Cardinal-Norris Exhibit 1 marked.)
11      - - -
12  Q.  And I'm going to attach as Exhibit 1 --
13      MR. FULLER:  And, Counsel, I'll just
14  hand everything to you, and you can take one and
15  pass the extras down.
16      And this is Norris 1 for the record, now
17  marked as Plaintiff's 1.
18  BY MR. FULLER:
19  Q.  This is a copy of one of the two
20  notices.
21      Have you seen this document before?
22  A.  I have.
23  Q.  Now, I'm going to sort of weave into
24  this in an agreement that your counsel and I have

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 related to certain topics. So you're going to be
2 deposed on Notice 1 for Items A through N.
3        Is that your understanding?
4    A. That is my understanding.
5        MR. FULLER: And, Counsel, pursuant to
6 our agreement, that will be answered in writing at
7 a later date, right?
8        MS. MAINIGI: Correct.
9        MR. FULLER: Okay.
10 BY MR. FULLER:
11    Q. And do you feel comfortable being
12 designated over those areas set out in Notice 1?
13 And that's A through N.
14    A. I do.
15        MS. MAINIGI: Just for the purpose of
16 the record, Mr. Fuller, we will just note that she
17 will testify consistent with the objections that
18 we served as to both notices.
19        MR. FULLER: We'll get there, too. I
20 will give them -- give her those as well.
21        ---
22    (Cardinal-Norris Exhibit 2 marked.)
23        ---
24

Page 19

1 BY MR. FULLER:
2    Q. Now, Norris Number 2, which is the
3 second 30(b) notice, will be marked as Plaintiff's
4 2 for the purposes of the deposition.
5        Do you have that document now in front
6 of you?
7    A. I do.
8    Q. Okay. And have you seen that document
9 previously?
10    A. I have.
11    Q. Now, it's my understanding that with the
12 agreement of counsel, you're going to testify to
13 the subject areas of 7, 8, 12, and 22 with a
14 possibility of some examination on subject area
15 number 6.
16        Is that your understanding as well,
17 Ms. Norris?
18    A. It is.
19        MS. MAINIGI: And just to be clear,
20 Mr. Fuller, she is prepared to testify as to
21 Topic 6 today.
22        MR. FULLER: All right.
23 BY MR. FULLER:
24    Q. And, Ms. Norris, are you comfortable

Page 20

1 testifying to all those topic areas that we just
2 mentioned?
3    A. I am.
4        ---
5    (Cardinal-Norris Exhibit 3 marked.)
6        ---
7    Q. And then in full fairness and
8 disclosure, as counsel just mentioned, here is
9 Plaintiff's Exhibit Number 3, which is Norris
10 Number 3, which is Cardinal Health's objections to
11 the prospective 30(b)(6) notices.
12        Have you seen this prior to today?
13    A. I have.
14    Q. And you've had an opportunity to review
15 it as well?
16    A. I did review it.
17    Q. All right. Now, ma'am, you are -- and I
18 say "you." I'm sorry.
19        Speaking on behalf of Cardinal, you're
20 in the business of distributing prescription
21 medications, as well as other things, correct?
22    A. Yes.
23    Q. And that also includes controlled
24 substances; is that right?

Page 21

1    A. Yes. Those are some of the prescription
2 medications that we distribute.
3    Q. And there are certain statutes and
4 regulations and rules that apply to you in
5 distributing those medications; is that fair?
6    A. Yes.
7    Q. And one of them is the Controlled
8 Substances Act; is that right?
9    A. Yes.
10    Q. And we'll spend a good part of our day
11 talking about the Controlled Substances Act and
12 its various portions and parts.
13        MR. FULLER: I'm going to mark as
14 Plaintiff's Number 3 -- or excuse me --
15 Plaintiff's Number 4, which is Norris Number 4.
16        ---
17    (Cardinal-Norris Exhibit 4 marked.)
18        ---
19 BY MR. FULLER:
20    Q. And you have that document in front of
21 you?
22    A. I do.
23    Q. Okay. And I'll represent to you that
24 this is a portion of the Controlled Substances

Page 22

1 Act, not the entire thing. And if you look there,
2 it says "United States Code Annotated. Title 21.
3 Chapter 13. Drug Abuse Prevention and Control."
4     Do you see that?
5   A. I do.
6   Q. And do you know that to be the portion
7 of the U.S. Code that contains the Controlled
8 Substances Act?
9   A. I believe so, yes.
10  Q. And this is Subchapter 1, Part A,
11 Introductory Provisions.
12     And have you seen this before?
13  A. I have.
14  Q. Okay. And you're aware that in Section
15 801, Congress of the United States of America made
16 certain declarations and findings; is that right?
17     MS. MAINIGI: Objection.
18  A. That's what the section says,
19 "Congressional Findings and Declarations."
20  Q. Okay. Particularly related to
21 controlled substances --
22     MS. MAINIGI: Objection.
23  Q. -- is that true?
24     MS. MAINIGI: Excuse me.

Page 23

1   A. It goes on to say, colon, "Controlled
2 Substances."
3   Q. Yes, ma'am. And then it says, "Congress
4 makes the following findings and declarations."
5     And if you would, let's start with the
6 first one and read that one aloud for us, please.
7   A. "Many of the drugs included within this
8 subchapter have a useful and legitimate medical
9 purpose and are necessary to maintain the health
10 and general welfare of the American people."
11  Q. Does Cardinal agree with that statement
12 by Congress?
13     MS. MAINIGI: Objection; form.
14 Objection; outside the scope of the agreed-upon
15 notice 30(b)(6) topics.
16     You may answer in your personal
17 capacity.
18     As a short form, I will just from here
19 after say "Objection; scope," and the witness will
20 understand that she can answer the question
21 anyway.
22     MR. FULLER: Thank you.
23  A. Can you please repeat the question?
24 Sorry.

Page 24

1   Q. That's all right.
2     Does Cardinal agree with this statement?
3   A. In my personal --
4     MS. MAINIGI: Excuse me. Objection;
5 scope.
6     Go ahead.
7   A. In my personal capacity, I agree that's
8 what the words say.
9   Q. You also agree that controlled
10 substances have legitimate medical purposes and
11 are necessary to maintain the health and welfare
12 of the American people?
13  A. I agree that --
14     MS. MAINIGI: Objection; scope.
15  A. -- that was Congress' finding.
16  Q. Okay. And read aloud Number 2 for us,
17 Congress' second finding of this Controlled
18 Substances Act.
19  A. "The illegal importation, manufacture,
20 distribution, and possession and improper use of
21 controlled substances have a substantial and
22 detrimental effect on the health and general
23 welfare of the American people."
24  Q. Does Cardinal agree and accept that that

Page 25

1 was the United States of America Congress' finding
2 related to controlled substances?
3     MS. MAINIGI: Objection; scope.
4   A. I agree that that's what the finding
5 says.
6   Q. Now, let's pull that apart a little bit.
7 It says that "The illegal importation,
8 manufacture, distribution, and possession and
9 improper use of controlled substances can have --
10 or has -- excuse me -- have a substantial and
11 detrimental effect on the health and general
12 welfare."
13     For Cardinal's purpose, we're worried
14 about -- or focused on the distribution, correct?
15 You don't manufacture, right?
16  A. Cardinal Health does not manufacture.
17  Q. Okay. And you don't actually use the
18 drugs that you distribute either, do you?
19  A. The company does not use the drugs.
20  Q. So we're focused just on distribution.
21 So do you agree or disagree that the illegal
22 distribution of controlled substances have a
23 substantial detrimental effect on the health and
24 general welfare of the American people?

Page 26

1      MS. MAINIGI:  Objection; scope.
2      A.  I agree that that's what the finding
3  says.
4      Q.  Do you agree that it can?
5      MS. MAINIGI:  Objection; scope.
6      A.  The illegal distribution may.
7      Q.  That's fair enough.
8      And, again, as you know as a lawyer, I'm
9  going to be asking you a bunch of questions, and
10  I'm only asking that you answer to the best of
11  your ability, okay?
12      And if there's something that's unclear
13  about my question, please ask me, and I'll
14  certainly try to clarify it the best I can.
15      A.  I understand.
16      Q.  And I assume counsel has told you this,
17  but if at any time you need a break, let me know.
18  We'll take a break.  We'll probably stop about
19  every hour, give or take a little bit, and for
20  lunch.  If you need anything more than that, no
21  problem.  Just let me know.  Fair?
22      A.  I understand.
23      Q.  Okay.  And I was already moving to the
24  next topic, and I've got multiple pages here.

Page 27

1  Sorry.
2      If you turn to the next page, page 2.
3  You see this is another section of the Controlled
4  Substances Act.  Do you see that at the top, Title
5  21, Chapter 13.  Drug Abuse Prevention and --
6  excuse me -- Drug Abuse Prevention and Control?
7      A.  I see that.
8      Q.  Okay.  And it deals with the authority
9  to control standards and schedules.
10      Do you see that?
11      A.  I do.
12      Q.  Okay.  And it's Section 812, Schedules
13  of Controlled -- and I didn't put Schedules I,
14  III, IV, and V in here, because I didn't think it
15  was necessary.  I included Schedule II.
16  Cardinal --
17      MR. FULLER:  I'm sorry.  Go ahead.
18      MS. MAINIGI:  So, Mike, just for the
19  purpose of the record, you have excerpted parts of
20  this regulation but left out other parts of the
21  regulation?
22      MR. FULLER:  The code, yes, ma'am.
23      And to be fair, you're not going to be
24  able to Google and find this on the Internet.

Page 28

1  This was created by a Paul Farrell, Jr.
2      MS. MAINIGI:  Well, I'm glad it's marked
3  as an exhibit.
4      MR. FULLER:  The gentleman raising his
5  hand down the table.
6  BY MR. FULLER:
7      Q.  So, ma'am, Ms. Norris, Cardinal is in
8  the business of distributing Schedule II
9  controlled substances, amongst other things; is
10  that right?
11      A.  It is.
12      Q.  And you are also aware, as Cardinal,
13  that Schedule IIs have a heightened standard when
14  dealing with them, heightened security standard;
15  is that correct?
16      MS. MAINIGI:  Objection.
17      A.  I know that Schedule IIs, in addition to
18  other controlled substances, have different
19  controls, for lack of a better word, that need to
20  be applied in the manufacture, distribution,
21  dispensing, prescribing, and using.
22      Q.  Fair enough.  Now, it says Schedule II.
23  And read A to us, if you don't mind, please.
24      A.  Schedule II.  A2?

Page 29

1      Q.  Yes, ma'am -- no, no.  2A.
2      A.  2A?
3      Q.  Yes, ma'am.  I'm sorry.
4      A.  I'm sorry.  "Schedule II.  The drug or
5  other substance has a high potential for abuse."
6      Q.  Now, as Cardinal Health, you know that
7  Schedule IIs do have a high potential for abuse;
8  is that correct?
9      MS. MAINIGI:  Objection; scope.
10      A.  That's what the statute says here.
11      Q.  But as a distributor of controlled
12  substances, and particularly Schedule IIs, do you
13  also know that to be the case?
14      MS. MAINIGI:  Objection; scope.
15      Q.  Let me ask it differently.  Maybe make
16  it a little easier.
17      Sitting here today as Cardinal Health,
18  do you agree that the U.S. Congress has determined
19  that Schedule IIs are drugs and other substances
20  that have a high potential for abuse?
21      MS. MAINIGI:  Objection; scope.
22      A.  That is the definition that is included
23  in this statute.
24      Q.  That's the definition provided by the

Page 30

1 U.S. Congress, correct?
2    A.  Yes, it is.
3       MS. MAINIGI:  Objection; scope.
4    A.  Yes, in this statute.
5    Q.  And read B to us, if you don't mind.
6    A.  "The drug or other substance has a
7 currently accepted medical use in treatment in the
8 United States or a currently accepted medical use
9 with severe restrictions."
10   Q.  And Cardinal also accepts that finding
11 by the U.S. Congress; is that right?
12      MS. MAINIGI:  Objection; scope.
13   A.  That is what the statute says.
14   Q.  And does Cardinal accept that finding by
15 Congress --
16      MS. MAINIGI:  Objection; scope.
17   Q.  -- or do you disagree?
18   A.  That is what the statute says.
19   Q.  So do you accept it or not?
20      MS. MAINIGI:  Objection; scope.
21   A.  In my personal capacity, that's what the
22 statute says.
23      MR. FULLER:  Give me one second.
24      (Pause in proceedings.)

Page 31

1 BY MR. FULLER:
2    Q.  Ma'am, read C to us aloud, please.
3    A.  "Abuse of the drug or other substances
4 may lead to severe psychological or physical
5 dependence."
6    Q.  And do you agree with that finding by
7 the U.S. Congress related to Schedule II
8 controlled substances?
9       MS. MAINIGI:  Objection; scope.
10   A.  I agree that's what the statute says.
11 I'm not a medical professional to opine on that
12 particular statement.
13   Q.  Fair enough.
14      Now, let's go to page 3.  This is still,
15 what, Exhibit 4.
16      Ma'am, do you see at the top this is
17 another section of the Controlled Substances Act,
18 correct?
19   A.  Yes.
20      MS. MAINIGI:  Objection.
21   Q.  This deals with "Registration of
22 Manufacturers, Distributors, and Dispensers
23 Controlled Substances."
24      Do you see that?

Page 32

1    A.  I see that title, yes.
2    Q.  And it's Section 821, Rules and
3 Regulations.  If you would read that aloud to us,
4 please.
5    A.  "The Attorney General is authorized to
6 promulgate rules and regulations and to charge
7 reasonable fees relating to the registration and
8 control of the manufacture, distribution, and
9 dispensing of controlled substances and to listed
10 chemicals."
11   Q.  And does Cardinal agree or disagree that
12 the Attorney -- the U.S. Attorney General has the
13 authority to enact these rules and regulations
14 related to both regulating as well as controlling
15 controlled substances?
16      MS. MAINIGI:  Objection; form.
17 Objection; scope.
18   A.  I agree the statute says the Attorney
19 General is authorized to promulgate rules and
20 regulations relating to the registration and
21 control of the manufacture, distribution, and
22 dispensing of controlled substances and listed
23 chemicals.
24   Q.  And, again, the distribution part is

Page 33

1 what applies to Cardinal.  Can we agree on that?
2    A.  I agree that Cardinal Health is a
3 distributor.
4    Q.  Okay.  And if you look down at the
5 bottom section, when does it indicate this statute
6 was created?  If you look down at the bottom, when
7 does it indicate this statute was created?
8       MS. MAINIGI:  Objection; scope.
9    A.  The paper says October 27, 1970.
10   Q.  And do you know whether the -- strike
11 that.
12      Does Cardinal know whether the
13 Controlled Substances Act went into effect in
14 1970?
15      MS. MAINIGI:  Objection; scope.
16   A.  I thought it was 1971, but --
17   Q.  Somewhere around that time frame; is
18 that fair?
19   A.  The early '70s, yes.
20   Q.  We'll go to page number 4.  And this
21 deals with registration requirements, Section 823.
22      Do you see that?
23   A.  I see Section 823, Registration
24 Requirements.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  Q. One of the things that the potential
2  distributor has to do is maintain the "maintenance
3  of the effective control against diversion of
4  particular controlled substances into other than
5  legitimate medical, scientific, and industrial
6  channels."
7      Did I read that correctly?
8  A. "Distributors of controlled substances
9  in Schedule I or Schedule II. The following
10 factors shall be considered."
11     Now, I assume there are more factors.
12 You only listed one of them.
13 Q. That's correct, yes, ma'am.
14 A. But one of the factors in determining
15 whether or not the issuance of a registration is
16 inconsistent with the public interest is
17 maintaining -- maintenance of an effective control
18 against diversion of particular controlled
19 substances into other than legitimate medical,
20 scientific, and industrial channels.
21 Q. And sitting here today, do you take the
22 position that Cardinal maintains such effective
23 controls?
24 A. Yes.

Page 35

1              - - -
2      (Cardinal-Norris Exhibit 5 marked.)
3              - - -
4  Q. Now, this is going to help us, at least
5  to some degree, talk about when that act was
6  passed.
7      Counsel is handing you what is marked as
8  Norris 5 and Plaintiff's Exhibit Number 5.
9      Have you seen this document before?
10     MS. MAINIGI: Counsel, can you just
11 represent to us what it is so that we don't have
12 to spend too much time taking a look through it?
13     MR. FULLER: Sure. It is the
14 Congressional Record from the Controlled
15 Substances Act.
16 A. I have not seen this document before,
17 no.
18 Q. Okay. And then, therefore, I will
19 represent to you that it is the Congressional
20 Record from the Controlled Substances Act. It's
21 the discussion they had on the floor when they
22 were passing the Act.
23     And if you look on the second page, it
24 has a date of September 10, 1970.

Page 36

1      Do you see that?
2  A. September 10, 1970. I see August 12,
3  1970.
4      MS. MAINIGI: I think he's on the prior
5  page.
6  A. Oh, you mean actually the first page?
7  Q. Yeah. I'm sorry.
8  A. I'm sorry. September 10, 1970, yes.
9  Q. Okay. And on that same page, you see up
10 near the top, it's the Comprehensive Drug Abuse
11 Prevention and Control Act of 1970.
12 A. Yes, I see that title.
13 Q. Okay. And if you will for me turn to
14 page 5. So we're on the same page, in the upper
15 right-hand corner, there is a -- most of the
16 documents are going to have a Norris and the
17 number of the exhibit, or the way I've numbered
18 the exhibit, and then a dash and then a page
19 number. When I call out a page number, that will
20 be what I will be referring to. Is that okay?
21 A. Okay.
22 Q. All right. So if you go to page 5, this
23 is titled -- or at least on this page this is
24 titled Control and Enforcement.

Page 37

1      Do you see that?
2  A. I see that title.
3  Q. And then read the first statement there.
4  A. "The bill provides for control by the
5  Justice Department of problems related to drug
6  abuse through registration of manufacturers,
7  wholesalers, retailers, and all others in the
8  legitimate distribution chain and makes
9  transactions outside the legitimate distribution
10 chain illegal."
11 Q. Does Cardinal agree with that statement?
12 Strike that. Let me ask it differently.
13     Does Cardinal accept that that is one of
14 the Congressional bases for passing this act?
15     MS. MAINIGI: Objection; scope.
16 A. I acknowledge that that's what's written
17 in the record here.
18 Q. And that they make or are attempting to
19 make transactions outside the legitimate
20 distribution chain illegal?
21     MS. MAINIGI: Objection; scope.
22 A. That's the statement this language
23 makes.
24 Q. And let me ask you -- we'll get to

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 regulations and such further down the road.
2     But as Cardinal, sitting here today, is
3 it your understanding that if we don't comply --
4 well, let me ask it differently.
5     If we follow the regulations of the
6 Controlled Substances Act, then we are acting
7 legally. Would you agree with that?
8     MS. MAINIGI: Objection; form.
9 Objection; scope.
10     A. The company's obligation is to follow
11 the regulations and the guidance provided by the
12 DEA.
13     Q. And that includes the -- not just the
14 regulations, but also the statutes pertaining to
15 it, correct?
16     A. The statutes, the regulations, the
17 applicable law.
18     Q. All the appropriate rules?
19     A. The applicable law as modified or
20 provided and the additional guidance by the DEA.
21     Q. Okay. And would you -- does Cardinal
22 agree that if we don't follow those rules as
23 you've labeled them, that we are breaking the law?
24     MS. MAINIGI: Objection; form.

Page 39

1 Objection; scope.
2     A. A failure -- Cardinal Health's
3 obligations are to follow the law.
4     Q. And if we don't follow the law, for
5 example, the Controlled Substances Act, then we're
6 breaking the law --
7     MS. MAINIGI: Objection; form.
8 Objection; scope.
9     Q. -- correct?
10     MS. MAINIGI: Excuse me.
11     MR. FULLER: Sorry.
12     A. If you don't follow the law, you're
13 breaking the law.
14     Q. Is that a yes?
15     A. Yes.
16     MS. MAINIGI: Objection; form.
17 Objection; scope to that.
18     MR. FULLER: I just asked if that was a
19 yes.
20     MS. MAINIGI: It's a poorly phrased
21 question, and it's outside the scope.
22     MR. FULLER: I'm from Mississippi.
23 There's going to be a lot of poorly phrased
24 questions. I'm kidding.

Page 40

1 BY MR. FULLER:
2     Q. So now if you'll turn to page 8 of this
3 document.
4     All right. Since this one is a little
5 longer, it's going to be my turn to read it, okay?
6     A. Sure.
7     Q. I didn't think you'd object to that.
8     On page 8 it says, "This bill is
9 designed to improve the administration and
10 regulation of manufacturing, distribution, and
11 dispensing of controlled substances by providing
12 for a closed system of distribution for legitimate
13 handlers of such drugs.
14     "Such a closed system should
15 significantly reduce the widespread diversion of
16 these drugs out of the legitimate channels into
17 the illegitimate market while at the same time
18 providing the legitimate drug industry with a
19 unified approach to narcotic and dangerous drug
20 control."
21     Did I read that right?
22     A. Generally.
23     Q. And does Congress -- excuse me.
24     Does Cardinal accept that that was the

Page 41

1 intent by the U.S. Congress, to create a closed
2 system of distribution?
3     MS. MAINIGI: Objection; scope.
4     A. I agree that the language here discusses
5 the closed system of distribution.
6     Q. And then that was something that
7 Congress intentionally created, right --
8     MS. MAINIGI: Objection.
9     Q. -- a close system of --
10     MR. FULLER: I'm sorry.
11     MS. MAINIGI: No. Go ahead.
12     Q. Let me try again. And what we're doing,
13 so that you know, is we're trying to make sure the
14 record is clear because it's all sloppy if she's
15 objecting and I'm still talking or I start talking
16 again before she finishes her objection. So I
17 apologize for that.
18     MS. MAINIGI: Was there a question?
19     MR. FULLER: Huh? Yeah. I'm trying to
20 remember what it was.
21 BY MR. FULLER:
22     Q. Ms. Norris, can we agree that through
23 this section of this Congressional history, that
24 Congress was attempting to create a closed system

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 to try to contain the controlled substances into
2 the legitimate channels of distribution?
3 　　　MS. MAINIGI: Objection; scope.
4 　　A. I agree that's what the language says.
5 I don't -- obviously I haven't read every -- all
6 the context around it, but the language
7 highlighted defines the closed distribution
8 system.
9 　　Q. Okay. And it even indicates that even
10 as far back as 1970, Congress is trying to
11 significantly reduce the widespread diversion of
12 controlled drugs out of legitimate channels into
13 the illicit market, correct?
14 　　　MS. MAINIGI: Objection; scope.
15 　　A. That is what the language says.
16 　　Q. And that one of the ways they do that is
17 by creating this closed system.
18 　　　Do you have an understanding of what
19 this "closed system" is?
20 　　A. I do, yes.
21 　　Q. Can you -- explain it briefly.
22 　　A. It's the system that Cardinal Health
23 operates in. It purchases pharmaceuticals it
24 distributes from licensed manufacturers. It

Page 43

1 distributes those pharmaceuticals to licensed
2 pharmacies for dispensing by those pharmacies
3 to -- pursuant to prescriptions by licensed
4 practitioners.
5 　　Q. So what Congress was doing was limiting
6 those who could participate in this industry,
7 correct?
8 　　　MS. MAINIGI: Objection; scope.
9 　　A. I think it was laying out the system to
10 go from the -- from licensed player to licensed
11 player.
12 　　Q. And that's my point. You have to be a
13 licensed player. I can't go out and set up Mike's
14 Drive-Thru Pharmacy and start getting controlled
15 substances shipped to me, right?
16 　　　MS. MAINIGI: Objection; scope.
17 　　A. Not if you're not licensed
18 appropriately.
19 　　Q. Not licensed. And what Congress has
20 done is it created licensed manufacturers,
21 correct?
22 　　　MS. MAINIGI: Objection; scope.
23 　　A. I don't know if Congress created them,
24 but there are licensed manufacturers, yes.

Page 44

1 　　Q. Fair enough. Let me ask that
2 differently.
3 　　A. Sorry.
4 　　Q. No, no. You're absolutely right.
5 　　　Congress has created a licensing
6 requirement for manufacturers; is that correct?
7 　　　MS. MAINIGI: Objection; scope.
8 　　A. I believe so.
9 　　Q. We know that Congress has created a
10 licensing requirement for wholesale distributors
11 such as Cardinal Health, correct?
12 　　A. Yes.
13 　　Q. And if you're not licensed, you can't
14 play in this ball game; is that fair?
15 　　　MS. MAINIGI: Objection; form.
16 Objection; scope.
17 　　A. I believe that -- yes, that's the --
18 　　Q. So --
19 　　A. That's the closed distribution system.
20 Sorry.
21 　　Q. No. And if I start to do that, I
22 apologize. It's just that I'm thinking you're
23 done. In normal conversation, it happens.
24 　　A. I may have pregnant pauses --

Page 45

1 　　Q. Yes.
2 　　A. -- so give me a chance.
3 　　Q. No, no. Same here. Same here.
4 　　　By the time we've finished, we'll both
5 know it, and it will be too late, though.
6 　　　All right. If you'll turn to page 11 of
7 this document. Let me know when you get there.
8 　　　And if you want to look at any other
9 part of this document, 90 whatever pages, you are
10 more than free to do that, Ms. Norris.
11 　　　Are you there on page 11?
12 　　A. I am. Just give me one second, please.
13 　　Q. Sure.
14 　　A. Okay.
15 　　Q. All right. And on page 11 -- and on
16 page 11, Congress says that "The price for
17 participation in this traffic should be
18 prohibitive. It should be made too dangerous to
19 be attractive."
20 　　　And here they're talking about the
21 illegal traffic; is that correct?
22 　　　MS. MAINIGI: Objection; form.
23 Objection; scope.
24 　　A. I believe, based on the language here --

Page 46

1 again, I don't have the full context, but the
2 first sentence refers to illegal traffic, and it
3 seems to be referring -- the language in the
4 second sentence seems to -- and third seem to be
5 referring to that.
6     Q.   And "to be prohibitive," what does
7 "prohibitive" mean, if you know?
8         MS. MAINIGI:  Objection.
9     A.   To cause someone to not do something.
10     Q.   To detour some sort of -- I'm sorry.  Go
11 ahead.  I'm doing it again.
12     A.   No.  That's fine.
13     Q.   To detour -- "detour" is not the right
14 word.
15         MS. MAINIGI:  Deter.
16     Q.   Deter.  See, I told you.  Thank you.
17 Start again.
18         "Prohibitive" in this sense means to
19 deter some type or fashion of conduct.
20         Can we agree on that?
21     A.   Yes.
22     Q.   And that Congress is trying to make it
23 too dangerous to be attractive; is that right?
24         MS. MAINIGI:  Objection; scope.

Page 47

1     A.   Congress is making the statement that
2 the price for participation should be made too
3 dangerous to be attractive, participation in the
4 illegal and -- in the illegal trafficking.
5     Q.   Right.  And we know from an earlier
6 section of the code, that the U.S. Congress gave
7 the Department of Justice the ability to control
8 that issue, correct?
9     A.   Yes.
10         MS. MAINIGI:  Objection; scope.
11     Q.   Yes, I believe that's what we talked
12 about.  When it says "made too dangerous to be
13 attractive," is it -- we can agree, can we not,
14 that that means the penalty needs to be high
15 enough to deter the conduct; is that fair?
16         MS. MAINIGI:  Objection; scope.
17     A.   Generally, yes.  I couldn't say what
18 that is.
19     Q.   When you say "what that is," you mean
20 what the penalty would have to be?
21         MS. MAINIGI:  Objection; scope.
22     A.   Yes.
23     Q.   Correct.  And I'm not even asking you
24 about that.  That's for DOJ and DEA to figure out.

Page 48

1 But fair enough.
2         If you'll next turn to page 26 of this
3 document.  And you see the section there under law
4 enforce -- I'm sorry.  You're not there yet.  I
5 apologize.
6     A.   Sorry.
7     Q.   It's a big document, and I cheated a
8 little bit because mine has tabs.
9     A.   Page 26?
10     Q.   Yes, ma'am.
11     A.   Yes.
12     Q.   Okay.  And you see the section there
13 under Law Enforcement?
14     A.   I do.
15     Q.   And can you read that highlighted
16 section for us, please.
17     A.   "Titles II and Titles III of the bill
18 deal with law enforcement aspects of drug abuse
19 and provide authority for the Department of
20 Justice to keep track of all drugs subject to
21 abuse manufactured or distributed in the United
22 States in order to prevent diversion of these
23 drugs from legitimate channels of commerce."
24     Q.   And Cardinal agrees that the Department

Page 49

1 of Justice has that authority which we just
2 mentioned earlier, correct?
3         MS. MAINIGI:  Objection; scope.
4     A.   The Department of Justice -- I guess we
5 were talking about the Attorney General earlier.
6     Q.   And who heads up the Department of
7 Justice?
8     A.   The Attorney General.  So the -- yes,
9 yes.
10     Q.   Different terms, but generally we're
11 speaking about the same entity or guy or girl,
12 whoever it may be?
13     A.   I'm just a lowly commercial attorney
14 so --
15     Q.   No.  Nothing lowly about it.
16     A.   -- to get all of this straight.
17     Q.   And the goal is, at least according to
18 this section, for the Department of Justice "to
19 keep track of all drugs subject to abuse
20 manufactured or distributed in the United States
21 in order to prevent the diversion of these drugs
22 from legitimate channels of commerce."
23         Do you agree with that?
24         MS. MAINIGI:  Objection; scope.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1      A.   I agree that that's what the language
2   says, yes.
3      Q.   And do you agree that that's a good goal
4   to have?
5         MS. MAINIGI:  Objection; scope.
6      A.   Generally speaking, yes.
7      Q.   Does Cardinal try to operate in a
8   fashion that prevents the diversion of controlled
9   substances into the illicit market?
10      A.   Yes.
11      Q.   Why?
12         MS. MAINIGI:  Objection; scope.
13      A.   Cardinal Health, in performing its
14   distribution services, follows the applicable
15   laws, rules, and regulations, and the guidance
16   provided by the DEA.
17      Q.   And Cardinal is in the business of
18   dealing and distributing controlled substances,
19   particularly Schedule IIs, correct?
20      A.   Not dealing.
21      Q.   Sorry.  Distributing.  Let me ask it
22   again.
23         Cardinal is in the business of
24   distributing controlled substances, including

Page 51

1   Schedule IIs; is that correct?
2      A.   Cardinal Health distributes
3   pharmaceuticals, including controlled substances,
4   which includes Schedule II items.
5      Q.   And as we discussed earlier, Schedule
6   IIs have a heightened designation to them because
7   they are considered to be potentially dangerous --
8         MS. MAINIGI:  Objection.
9      Q.   -- is that correct?
10         MS. MAINIGI:  Excuse me.  Objection;
11   scope.
12      A.   Schedule IIs, as I understand it, have
13   additional controls that need to be applied to the
14   manufacture, distributing, dispensing,
15   prescribing, and using, yes.
16      Q.   And is that because they are potentially
17   dangerous?
18         MS. MAINIGI:  Objection; scope.
19      A.   One of the comments, I believe, were
20   made they have the -- they could --
21      Q.   And you can refer back -- I'm sorry.
22      A.   Yeah.
23      Q.   You can refer back to it if you need to.
24      A.   They have a high potential for abuse

Page 52

1   according to the Congressional -- according to the
2   statute, but they also have a legitimate medical
3   purpose.
4      Q.   Sure.  And as a distributor, Cardinal
5   wants to try to prevent as much abuse and
6   addiction as we can, correct?
7         MS. MAINIGI:  Objection; scope.
8      A.   Cardinal Health's obligation is to
9   operate in the closed distribution system in
10   accordance with the applicable laws, rules,
11   regulations, and guidance from the DEA.
12      Q.   Does Cardinal also want to, in its
13   operations, do what it can to prevent abuse and
14   addiction?
15         MS. MAINIGI:  Objection; scope.
16      A.   Cardinal Health wants to perform its
17   services in compliance with the applicable laws,
18   rules, and regulations, and the guidance by the
19   DEA.
20      Q.   No.  I understand that.  You said that.
21   But do they want to help try to prevent abuse and
22   addiction?
23         MS. MAINIGI:  Objection; asked and
24   answered.  Objection; scope.

Page 53

1      A.   Cardinal Health doesn't interact with
2   the ultimate users of the pharmaceuticals.  As we
3   talked about, the system is -- Cardinal Health is
4   removed through the closed distribution system.
5      Q.   Cardinal Health isn't removed; it's
6   specifically included in the closed distribution
7   system; is that true?
8      A.   I misspoke.  Cardinal Health is removed
9   from the ultimate user within the closed
10   distribution system.
11      Q.   But Cardinal Health does have
12   obligations related to the distribution in
13   ensuring that they -- that these controlled
14   substances maintain into the licit market and not
15   the illicit market, correct?
16         MS. MAINIGI:  Objection; form.
17      A.   Cardinal Health has an obligation to
18   maintain effective controls against diversion.
19      Q.   Why?
20         MS. MAINIGI:  Objection; form.
21   Objection; scope.
22      A.   I'm not sure I understand your question.
23      Q.   Sure.  You said --
24         MR. FULLER:  I can never work these

Page 54

1 little computer thingies.

2 THE COURT REPORTER: The arrow on the

3 right.

4 MR. FULLER: Yeah, I pushed it. It

5 doesn't work for me. I don't know why.

6 BY MR. FULLER:

7 Q. You said Cardinal Health has an

8 obligation to maintain effective controls against

9 diversion. Why?

10 MS. MAINIGI: Objection; form.

11 Objection; scope.

12 A. My understanding is that's the language

13 of the law that applies to us.

14 Q. So are they only doing that because

15 that's the law that applies to them?

16 MS. MAINIGI: Objection; scope.

17 A. Cardinal Health is a corporation that

18 operates in accordance with the laws that apply to

19 it.

20 Q. All right. Now, we're going to just

21 turn one page, page 27 of this document.

22 You see the section there Registration

23 Requirements?

24 A. I do.

Page 55

1 Q. It says, "The legislation provides that

2 all persons engaged in the legitimate distribution

3 chain involving drugs included in one of the

4 schedules under this bill must be registered with

5 the Attorney General."

6 Does Cardinal agree and concur with that

7 statement?

8 MS. MAINIGI: Objection to scope.

9 A. I agree that's what that sentence

10 says, yes.

11 Q. And is that a requirement, to be a

12 distributor when you're dealing with controlled

13 substances, is to be registered through the

14 Attorney General?

15 MS. MAINIGI: Objection; form.

16 A. That is my understanding.

17 Q. And Cardinal is registered with the

18 Attorney General through the DEA, correct?

19 A. Yes.

20 Q. Okay. And, again, that goes to that

21 whole closed system we were talking about earlier.

22 You have to have a ticket to be able to

23 participate in this distribution chain; is that

24 right?

Page 56

1 MS. MAINIGI: Objection; form.

2 Objection; scope.

3 A. That is my understanding, that the

4 parties in the closed distribution chain are all

5 licensed in their various functions.

6 Q. Now, if you go to page 34. And I

7 promise we're getting to the end of my tabs in

8 this document.

9 Did you make it there?

10 A. I have.

11 Q. It says, "The illegal importation,

12 manufacture, distribution, and possession, and

13 improper use of controlled substances have a

14 substantial detrimental effect on the public's

15 health and general welfare."

16 Do you see that?

17 A. I do.

18 Q. And does Cardinal agree that that's one

19 of the findings by Congress?

20 MS. MAINIGI: Objection; scope.

21 A. I believe, as we talked about before, in

22 accordance with Section 801, that is a finding of

23 Congress, yes.

24 Q. And that's one of the goals behind this

Page 57

1 Controlled Substances Act, again, is to ensure the

2 legitimate distribution of controlled substances

3 in keeping them out of the illicit market, right?

4 MS. MAINIGI: Objection; scope.

5 A. Yes.

6 Q. And Cardinal also recognizes that

7 distributions into the illicit market have a

8 substantial and detrimental effect on the public's

9 health and general welfare?

10 MS. MAINIGI: Objection; scope.

11 A. Distribution -- the illegal distribution

12 has a substantial detrimental effect on the

13 public's health and general welfare.

14 Q. Okay. Turn to page 44, if you would,

15 please.

16 And this section just sort of

17 resolidifies what we read earlier. Do you see

18 Section 301 sort of in the middle of the page

19 there?

20 A. I do.

21 Q. And it says, "Section 301 authorizes the

22 Attorney General to promulgate rules and

23 regulations and to charge reasonable fees relating

24 to the registration and control of the

Page 58

1 manufacture, distribution, and dispensing of
2 substances covered by this Act."
3         Does Cardinal recognize that as part of
4 the powers conferred to the Attorney General by
5 the United States Congress?
6         MS. MAINIGI:  Objection; scope.
7     A.  That's what the language says.
8     Q.  If you'll turn one more page, 44 -- or
9 excuse me.  45.  It starts at the bottom of the
10 page under the Section 303, Registration
11 Requirements.
12         Do you see that?
13     A.  I see the highlighted section.  Just one
14 second.
15     Q.  Take your time.  And I'll tell you, the
16 question is going to go on to the next page, so
17 you might want to flip over.
18     A.  Okay.
19     Q.  Okay.  So I'm not going to start all the
20 way at the top.  I'm going to start where it says
21 "In determining."
22         Do you see that?  Second to last line on
23 the first page.
24     A.  Yes, sir.

Page 59

1     Q.  Ms. Norris, can you read from "In
2 determining" just through -- actually, let me
3 strike that.  I'll just read it to you to make it
4 easier because I know where I want to go.
5         Ms. Norris, "In determining the public
6 interest, the Attorney General shall consider the
7 following factors."
8         Do you see that?
9     A.  I do.
10     Q.  And the following factors include 1
11 through 5, but particularly 1 is "The maintenance
12 of the effective controls against diversion of
13 particular controlled substances into other than
14 legitimate medical, scientific, and industrial
15 channels."
16         Does Cardinal agree that that is one of
17 the requirements to be a participant in this
18 distribution channel?
19         MS. MAINIGI:  Objection; scope.
20     A.  I believe that's generally the
21 obligation.
22     Q.  And then it goes on to 2, 3, and 4, but
23 significant to us is 5.  "Such other factors as
24 may be relevant to and consistent with public

Page 60

1 health and safety."
2         Do you see that?
3     A.  I see that.
4     Q.  And we're next going to move to the
5 regulations which deal with suspicious orders.
6         You're aware of that, correct?
7         MS. MAINIGI:  Objection; form.
8     A.  I'm not aware we're going to move to
9 that.  I'm aware of the regulations.
10     Q.  Well, this is sort of a prequel in a
11 movie.  I'm giving you the foreshadowing, okay?
12     A.  Okay.
13         MR. FULLER:  You don't have to shake
14 your head every time I do something.
15         MS. MAINIGI:  Just waiting for the next
16 question.
17 BY MR. FULLER:
18     Q.  But before we do that, you are aware
19 that there is a suspicious order reporting
20 requirement; is that correct?
21     A.  I am.
22     Q.  And this obligation to maintain
23 effective controls against diversion is separate
24 and distinct from that other regulation; would you

Page 61

1 agree?
2         MS. MAINIGI:  Objection; form.
3 Objection; scope.
4     A.  They're in two separate places, but I
5 would argue that suspicious order reporting is
6 part of maintaining effective controls against
7 diversion.
8     Q.  It may be a subset, correct?
9     A.  Yes.
10     Q.  You would also agree, as Cardinal, that
11 there are other things that we have to do to
12 maintain effective controls against diversion
13 other than suspicious order reporting, correct?
14         MS. MAINIGI:  Objection; form.
15     A.  Yes.
16     Q.  What are some of those other things that
17 Cardinal has to do to prevent or have effective
18 controls against diversion?
19         MS. MAINIGI:  Objection; form.
20 Objection; scope.
21         I think, Mike, if you are asking what
22 does Cardinal do to meet its obligations, that
23 might be the better question.
24         MR. FULLER:  I'll strike the question.

Page 62

1 Don't worry about it.
2 BY MR. FULLER:
3     Q.  All right.  I think we're done with that
4 book.
5             - - -
6     (Cardinal-Norris Exhibit 6 marked.)
7             - - -
8     Q.  All right.  Next is Norris 6, which is
9 going to be Plaintiff's Number 6.
10        What did I tell you?  Where do we go
11 next?
12        I'm sorry.  Do you have Exhibit Number 6
13 in front of you, Ms. Norris?
14     A.  I do.
15     Q.  Okay.  And this is -- we were earlier
16 looking at the U.S. Code, correct, and now we're
17 looking at the Code of Federal Regulations, right?
18     A.  Yes.
19     Q.  Okay.  And this is still Title 21,
20 Chapter 2.  Do you see that?  "Drug Enforcement
21 Administration, Department of Justice."
22     A.  I see that in the title.
23        MS. MAINIGI:  And, Mr. Fuller, for the
24 purpose of the record, is it fair to say that you

Page 63

1 again have just excerpted a portion of the
2 regulations?
3        MR. FULLER:  Yes, ma'am.  Although, we
4 sometimes question what our rulemaking bodies do,
5 they did not start with B.
6        MS. MAINIGI:  Thank you.
7        MR. FULLER:  Fair enough.
8 BY MR. FULLER:
9     Q.  And this is -- Ms. Norris, this is Part
10 1301, "Registration of Manufacturers,
11 Distributors, and Dispensers of Controlled
12 Substances, Security Requirements."
13        Have you seen this section before or the
14 complete section?
15     A.  I have.
16     Q.  And if you will read 1301.74 there to
17 us, please.
18     A.  "Other security controls for
19 non-practitioners; narcotic treatment programs and
20 compounders for narcotic treatment programs."
21     Q.  And does Cardinal agree that this
22 section applies to them?
23        MS. MAINIGI:  Objection; scope.
24     A.  It's my understanding that this section

Page 64

1 applies to Cardinal.
2     Q.  Okay.  And then read the requirements
3 under B to us, if you would, please.
4     A.  "The registrant shall design and operate
5 a system to disclose to the registrant suspicious
6 orders of controlled substances.  The registrant
7 shall inform the field division office of the
8 administration in his area of suspicious orders
9 when discovered by the registrant.  Suspicious
10 orders include orders of unusual size, orders
11 deviating substantially from a normal pattern, and
12 orders of unusual frequency."
13     Q.  And does Cardinal believe it fits the
14 description of registrant as it relates to this
15 code section -- this regulation?  I'm sorry.
16     A.  Yes.  Cardinal is a registrant.
17     Q.  And does Cardinal believe it has an
18 obligation under this regulation to operate a
19 system to disclose suspicious orders of controlled
20 substances?
21     A.  Cardinal Health's obligation is to
22 comply with this section, which requires it to
23 design and operate a system to disclose suspicious
24 orders of controlled substances.

Page 65

1     Q.  And if you look at the bottom of this
2 section, it gives a date.
3        Do you see that date there, April 24th
4 of 1971?
5     A.  I do.
6     Q.  And I'll represent to you that that's
7 the date this particular regulation was created.
8        Is that your understanding, is that this
9 regulation has been in place since approximately
10 1971?
11     A.  It is.
12     Q.  Is it your understanding that this
13 regulation has remained significantly unchanged
14 since 1971, meaning that there has been a
15 suspicious order reporting requirement since that
16 time?
17     A.  The language of the statute has not
18 changed since 1971.  Guidance from the DEA
19 regarding the statute has evolved over time.
20     Q.  So, again, let me ask the question.  Is
21 it your understanding that Cardinal has had a
22 suspicious order reporting requirement since 1971?
23     A.  This requirement has been in place since
24 1971 and applicable to Cardinal Health as modified

Page 66

1 by the guidance provided by the DEA over the
2 years.
3     Q.  Sure.  And we'll talk about that.
4     A.  Sure.
5     Q.  I'm sure we will spend a good bit of the
6 day on that.
7         Does Cardinal operate a system to
8 disclose suspicious orders?
9     A.  Yes.
10     Q.  And have they always operated or
11 maintained such a system?
12     A.  Yes, in accordance with the DEA
13 guidance.
14             ---
15     (Cardinal-Norris Exhibit 7 marked.)
16             ---
17     Q.  And just so we have -- no, that's not
18 going to work.
19         I'm going to put up Exhibit Number 7,
20 which is Norris 07 and also going to be
21 Plaintiff's Exhibit Number 7.  You see -- and I'm
22 sorry.  I'm jumping around on you.  But back on
23 Number 6, you see there at the bottom, it also
24 says, "36 FR 7778" -- excuse me.

Page 67

1         MS. MAINIGI:  You're at the bottom of
2 the 6?
3     A.  Yep.  Yes, I see that.
4     Q.  Actually, just ignore that.
5     A.  Okay.
6     Q.  Go on to Number 7.  And if you will
7 turn -- and, again, feel free to review it.  If
8 you'll go to page 7 of that document.  I'm sorry.
9 Page 10.
10         Do you see the highlighted section
11 there?
12     A.  I'm sorry.  What page?  I was
13 familiarizing --
14     Q.  I'm sorry.  Page --
15     A.  -- myself at least with what this
16 document is.
17     Q.  Fair enough.  Fair enough.
18         And I'll represent to you it is the
19 actual regulation back in 1971.
20     A.  Okay.  And now what page?
21     Q.  It's page 10 of that document.  And if
22 you look real briefly at the highlighted section,
23 tell me whether it appears to be the same
24 regulation that we just read.

Page 68

1     A.  Generally.  There's some variation.
2     Q.  But no substantive changes; can we
3 agree?
4         MS. MAINIGI:  Objection.
5     A.  It does not appear to be substantive.
6     Q.  So does Cardinal agree and accept that
7 the obligations under 21 CFR 1301.74(b) have been
8 in place and applied to Cardinal since 1971?
9         MS. MAINIGI:  Objection; form.
10 Objection; scope.
11     A.  This regulation has been in place since
12 1971.  To the extent Cardinal Health was
13 distributing pharmaceuticals -- I believe they
14 were -- yes, this is applicable.
15     Q.  Thank you.  I was going to go back and
16 place that caveat in there, but you did it for me.
17 I appreciate that.
18         We've been going a little over an hour
19 already.  Do you mind if we take a break real
20 quick?
21     A.  It's up to you.
22         MR. FULLER:  Are you good?
23         MS. MAINIGI:  Mm-hmm.
24         THE VIDEOGRAPHER:  The time is now 9:23.

Page 69

1 Going off the record.
2         (Recess taken.)
3         THE VIDEOGRAPHER:  The time is now 9:44.
4 Back on the record.
5             ---
6     (Cardinal-Norris Exhibit 8 marked.)
7             ---
8 BY MR. FULLER:
9     Q.  Next we'll mark Plaintiff's Exhibit
10 Number 8, which is Norris 11.
11         MS. MAINIGI:  Norris 11?
12         MR. FULLER:  Yes.  So that's my sort of
13 Bates numbering at the top.  Sorry.
14         MS. MAINIGI:  But the last one we marked
15 was Norris 7, right?
16         MR. FULLER:  Yes.
17         MS. MAINIGI:  Okay.  But you want to
18 jump to 11?
19         MR. FULLER:  Yes, ma'am.
20         MS. VELDMAN:  No, no.  It's still 8.
21         MR. FULLER:  No.  For the record, it's
22 going to be 8, but my numbering system is going to
23 be --
24         MS. MAINIGI:  Yeah.  Thank you.

Page 70

1 MR. FULLER: Sorry.

2 MS. MAINIGI: No, no, no. That's okay.

3 A. We're done with the regulations?

4 Q. Yes, ma'am.

5 MR. FULLER: And I'm sorry, Enu -- or

6 Counsel. It's -- I have them labeled a certain

7 way so --

8 MS. MAINIGI: That's totally fine.

9 MR. FULLER: -- Gina knows, but as far

10 as Plaintiff exhibit numbers --

11 MS. MAINIGI: She seems to have it under

12 control, so all good.

13 MR. FULLER: She does a great job.

14 BY MR. FULLER:

15 Q. Ms. Norris, have you ever heard of the

16 HathiTrust?

17 A. I have not.

18 Q. Neither had I until this litigation, or

19 until Paul Farrell, Jr., told me about it.

20 MR. FULLER: That is awful loud.

21 MS. MAINIGI: Yeah. I was just thinking

22 the same thing. It is very loud.

23 THE WITNESS: If you speak up, I think I

24 will be fine. I will ensure that I do the same.

Page 71

1 MR. FULLER: I don't know how it's

2 picking up on the tape, though. All right. Well,

3 we'll try.

4 BY MR. FULLER:

5 Q. The HathiTrust is a non-profit set of

6 libraries that actually collects stuff throughout

7 history, generally Congressional type of items.

8 And what you have before you, if you turn to the

9 second page, is a hearing before the Subcommittee

10 on Oversight and Investigations.

11 Do you see that?

12 A. I see that in the title, yes.

13 Q. Yes, ma'am. And what is the title of

14 this hearing?

15 A. "OxyContin: Its Use and Abuse."

16 Q. And you're aware, are you not, that

17 OxyContin is a product that was put on the market

18 in 1996 by Purdue Pharma?

19 MS. MAINIGI: Objection; scope.

20 A. I don't -- I don't know the exact date

21 in my personal capacity.

22 Q. Do you know what OxyContin is?

23 A. I do.

24 Q. What is OxyContin?

Page 72

1 MS. MAINIGI: Objection; scope.

2 A. It's a pharmaceutical to treat pain.

3 Q. It's an opioid medication, right?

4 MS. MAINIGI: Objection; scope.

5 A. I believe it is an opioid, yes.

6 Q. Okay. And let's back up a little bit

7 before we get into this document.

8 And going back to the regulations and

9 everything that we just went through, rules, for a

10 lack of a better term, do you have an

11 understanding that the -- does Cardinal have an

12 understanding that the Controlled Substances Act

13 was designed to prevent the American public from

14 diversion of controlled substances?

15 MS. MAINIGI: Objection; scope.

16 A. The -- I believe the Controlled

17 Substances Act was designed to ensure there was

18 oversight over the distribution of controlled

19 substances.

20 Q. And why do we want oversight over

21 controlled substances? Because they're

22 potentially dangerous; is that right?

23 MS. MAINIGI: Objection; scope.

24 A. I believe we read Congress identified

Page 73

1 that at least Schedule II controlled substances

2 have a high potential for abuse.

3 Q. And that they're actually dangerous if

4 not used appropriately, correct?

5 MS. MAINIGI: Objection; scope.

6 A. They have a high potential for abuse.

7 Q. So does that mean they're potentially

8 dangerous?

9 MS. MAINIGI: Objection; scope.

10 A. I'm not sure. "Dangerous" has a lot of

11 connotations. They have a high potential for

12 abuse per the language in the statute --

13 regulation. Sorry.

14 Q. So, ma'am, going back to Exhibit Number

15 5, which you have there, on page 8 of that

16 document -- let me know when you have that.

17 A. I do. Page 8, yes.

18 Q. It says there at the end that "While at

19 the same time providing the legitimate drug

20 industry with a unified approach to narcotic and

21 dangerous drug control."

22 Correct?

23 A. That's what the language says, yes.

24 Q. So it recognizes that these are

Page 74

1 potentially dangerous drugs; would you agree with
2 that?
3         MS. MAINIGI:  Objection; form.
4 Objection; scope.
5     Q.  Or do you disagree?
6         MR. FULLER:  Objection; form.
7 Objection; scope.
8     A.  I think they're using the term
9 "dangerous" to create a category of drugs, not --
10 so ...
11     Q.  Would you agree they're trying to
12 control dangerous drugs, whether you look at it as
13 a category or an individual drug, correct?
14         MS. MAINIGI:  Objection; form.
15 Objection; scope.
16     A.  Yes, understanding the legitimate --
17 there is a legitimate purpose and use for these
18 pharmaceuticals.
19     Q.  That is undeniable as they set out in
20 each one of their schedules.  We looked at
21 Schedule II.  There is a legitimate medical
22 purpose.  We can agree on that, correct?
23     A.  Yes.
24     Q.  But these are also potentially dangerous

Page 75

1 drugs, particularly when we're talking about
2 Schedule II?
3         MS. MAINIGI:  Objection; form.
4 Objection; scope.
5     A.  They're not particularly mentioning
6 Schedule II in this language.  I agree that
7 Schedule II drugs per the language have a high
8 potential for abuse.
9     Q.  So are they dangerous drugs or not; yes
10 or no?
11         MS. MAINIGI:  Objection; form.
12 Objection; scope.
13     Q.  You could say yes, no, or I don't know.
14     A.  I can't opine on whether that's what
15 they meant when they said "dangerous drug control"
16 here.  I can only say what the statute says.
17     Q.  Okay.  And it specifically refers to
18 dangerous drugs?
19     A.  The Congressional Record refers to
20 dangerous drugs.
21     Q.  Yes, ma'am.
22     A.  The statute talks about drugs with a
23 high potential for abuse, but also having a
24 legitimate medical purpose.

Page 76

1     Q.  Do you think -- does Cardinal believe
2 that drugs that have a high potential for abuse
3 could be potentially dangerous?
4         MS. MAINIGI:  Objection; form.
5 Objection; scope.
6     A.  Not necessarily.
7     Q.  Well, that's why I said "can be
8 potentially dangerous."  So let me ask the
9 question again.
10         Does Cardinal believe that drugs that
11 have a high potential for abuse can be potentially
12 dangerous?
13         MS. MAINIGI:  Objection; form.
14 Objection; scope.
15     A.  Perhaps.
16     Q.  So is that a yes?
17         MS. MAINIGI:  Objection; form.
18 Objection; scope.
19     A.  Potentially.  Perhaps, yes.
20     Q.  Okay.  So just so I get it clean on the
21 record, does Cardinal believe that drugs that have
22 a high potential for abuse can be potentially
23 dangerous?
24         MS. MAINIGI:  Objection; form.  Asked

Page 77

1 and answered multiple times now.  Objection;
2 scope.
3     A.  Perhaps, yes.
4     Q.  And can we agree that the rules that are
5 laid out are partially designed to keep the
6 American people safe when we're dealing with
7 controlled substances?
8         MS. MAINIGI:  Objection; scope.
9     A.  The rules, as I understand them, are to
10 ensure that the participants in the distribution
11 system understand their obligations and operate
12 within that distribution -- that closed
13 distribution system, maintaining the security of
14 the pharmaceuticals we distribute, the scheduled
15 substances we distribute.
16     Q.  And the rules also indicate a
17 Congressional finding that if we don't keep them
18 in their legitimate channels, that they can be
19 dangerous to the health and general welfare of the
20 American public, correct?
21         MS. MAINIGI:  Objection; form.  Asked
22 and answered.  Objection; scope.
23     A.  Congress made a finding that the illegal
24 distribution -- let me make sure I read it

Page 78

1 correctly -- "would have a substantial and
2 detrimental effect on the health and general
3 welfare of the American people."
4     Q.  So can we agree that that's one of the
5 type of things that they're trying to protect
6 from?
7         MS. MAINIGI:  Objection; form.
8 Objection; scope.
9     A.  I don't know what Congress was thinking.
10 I know that was one of their findings as an
11 introduction.
12     Q.  So does Cardinal believe the intent
13 behind the Controlled Substances Act is to try to
14 protect the American people from the illicit
15 distribution of controlled substances; yes or no?
16         MS. MAINIGI:  Objection; form.
17 Objection; scope.
18     A.  Can you ask the question again?  I'm
19 sorry.
20     Q.  Sure.  Does Cardinal believe that the
21 Controlled Substances Act -- let me try that
22 again.
23         Does Cardinal believe that the
24 Controlled Substances Act is to protect the

Page 79

1 American people from the illicit distribution of
2 controlled substances; yes or no?
3         MS. MAINIGI:  Objection; form.
4 Objection; scope.
5     A.  I can't opine in my personal capacity on
6 what Cardinal believes.  Cardinal understands its
7 obligations under the statute, regs, and the
8 guidance from the DEA.
9     Q.  Okay.  Fair enough.  Let's go to that
10 Exhibit 8 now.  If you'll turn to page 6 of that
11 document.  On page 6, this is the introductory
12 statement by the chairman of the Subcommittee on
13 Oversight and Investigations, James Greenwood from
14 Pennsylvania.
15         Can you read that highlighted section
16 there that starts with "The use and the abuse."
17     A.  "The use and the abuse of OxyContin
18 provides quite a dilemma for us in Congress and
19 for the American public.  For some, OxyContin is
20 the angel of mercy.  For others, it is the angel
21 of death."
22     Q.  Do you recognize by this time in 2001,
23 that Congress has found that the use and abuse of
24 OxyContin has created quite a dilemma for the

Page 80

1 American public?
2         MS. MAINIGI:  Objection; scope.
3 Objection; form.
4     A.  I agree that that is what this language
5 says.
6     Q.  That that's what the Congress found in
7 the subcommittee, correct?
8         MS. MAINIGI:  Objection; form.
9 Objection; scope.
10     A.  Because I'm not really familiar with
11 this document, if this is what --
12     Q.  Well, I didn't alter it, I promise.
13     A.  No, I understand that.  I just want to
14 make sure we're talking about the same thing.  If
15 that is what this document says and if you're
16 telling me that's what this document is, that is
17 what this document says.
18     Q.  And, therefore, Congress made a finding
19 in the subcommittee that as of 2001, OxyContin is
20 providing a dilemma for the American public -- or
21 the abuse of OxyContin is, correct?
22         MS. MAINIGI:  Objection; form.
23 Objection; scope.
24     A.  That is what the document says, yes.

Page 81

1     Q.  Okay.  And if you go down to the next
2 paragraph that starts off "Today."
3         It says, "Today, we will hear from law
4 enforcement officials who argue that OxyContin has
5 quickly become the abuser's drug of choice
6 surpassing heroin and cocaine in some
7 jurisdictions."
8         Does Cardinal recognize that even again
9 back in 2001, that there's concern by law
10 enforcement of OxyContin becoming the abuser's
11 drug of choice?
12         MS. MAINIGI:  Objection; scope.
13     A.  That is what this language says.
14     Q.  And you have no reason to disagree with
15 this language, do you?
16         MS. MAINIGI:  Objection; scope.
17     A.  In my personal capacity, I don't if this
18 is what Congress had on the record.
19     Q.  And during 2001, Cardinal Health was
20 distributing OxyContin, correct?
21     A.  Yes.
22     Q.  If you turn to page 8.  Let me know when
23 you get there.
24         There's the rocket ship again.

Page 82

1    A.   Okay.

2    Q.   You see where it reads "These actions,
3 though commendable, also appear long overdue.
4 According to the DEA, the number of OxyContin --
5 excuse me -- oxycodone-related deaths has
6 increased nearly 400 percent since 1996, the same
7 period -- excuse me -- the same time period in
8 which the annual number of prescriptions for
9 OxyContin has risen from approximately 300,000 to
10 almost 6 million."

11    Did I read that correctly?

12    A.   I believe so.

13    Q.   And is Cardinal aware that deaths were
14 increasing from oxycodone overdoses during this
15 time frame?

16    MS. MAINIGI:  Objection; scope.  I'm
17 also going to interpose my one time, but have it
18 be continuing -- a time period objection
19 consistent with Discovery Rulings 2 and 3 of the
20 Special Master, which -- our reading of which
21 allows you to question on the time period 2006
22 forward with the exception of the suspicious order
23 reports aspect of those rulings.

24    So I will just interpose a continuing

Page 83

1 objection for any questions you ask that may
2 relate to time periods earlier than 2006.  She'll
3 answer all of your questions and we'll deal with
4 it later.

5    MR. FULLER:  That's fair enough.

6    A.   I'm sorry.  Could you repeat the
7 question?

8    Q.   And Cardinal was aware that during this
9 time frame that deaths were increasing from
10 OxyContin overdoses -- or excuse me -- oxycodone.
11 No, it's OxyContin.  No, it's not.  Back up.
12 Sorry.

13    Cardinal is aware that during this time,
14 oxycodone overdoses were rapidly increasing,
15 correct?

16    MS. MAINIGI:  Objection; scope.

17    A.   I can't speak as to what Cardinal Health
18 was aware of at this time.  I didn't work there.

19    Q.   Sure.  And I get that.  But one of the
20 things that Cardinal did was stay informed as to
21 what was going on in the world, the communities it
22 delivered to, correct?

23    MS. MAINIGI:  Objection; scope.

24    A.   Cardinal Health understands its

Page 84

1 customers and where it is delivering
2 pharmaceuticals to.

3    (Reporter clarification.)

4    A.   Cardinal Health understands who its
5 customers are and where it's delivering to.

6    Q.   And Cardinal Health would also stay
7 abreast of what's going on in those communities
8 that it's delivering to; is that fair?

9    MS. MAINIGI:  Objection; scope, as well
10 as time period.

11    A.   Again, I wasn't at the company at this
12 time.  I don't -- I don't know.

13    Q.   You would expect Cardinal Health would
14 be aware if drugs that it was distributing were
15 causing an increasing number of deaths in the
16 communities to which it distributed; is that fair?

17    MS. MAINIGI:  Objection; scope, form.

18    A.   I can't say.

19    Q.   Should Cardinal be aware if oxycodone
20 that it's distributing is causing nearly a
21 400 percent increase in deaths across this
22 country?

23    MS. MAINIGI:  Objection; scope, form,
24 and time period.

Page 85

1    A.   Cardinal Health -- Cardinal Health isn't
2 aware of deaths related to products it
3 distributes.

4    Q.   So Cardinal Health doesn't have any
5 information as to whether products it distributed
6 caused or contributed to anyone's demise?

7    MS. MAINIGI:  Objection; scope.

8    A.   I think, as we talked about earlier,
9 Cardinal Health distributes to licensed pharmacies
10 who dispense pursuant to prescriptions by licensed
11 physicians that go to users.  Cardinal Health
12 is not aware of any deaths related to the
13 pharmaceuticals that it has distributed.

14    Q.   Are you sure?

15    MS. MAINIGI:  Objection; form.
16 Objection; scope.

17    A.   I am.

18    Q.   Give her just a second to --

19    A.   I'm sorry.

20    Q.   That's all right.

21    Is Cardinal aware that OxyContin -- or
22 excuse me -- oxycodone that's distributed by it or
23 others has contributed to increased deaths in this
24 country?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    MS. MAINIGI:  Objection; form.
2  Objection; scope.
3    A.  It is not.
4    Q.  So oxycodone, how does it get to the
5  pharmacies?
6    MS. MAINIGI:  Objection; scope.
7    A.  Cardinal Health distributes oxycodone,
8  as well as many other pharmaceuticals, to licensed
9  pharmacies.
10    Q.  And there are others out there that
11  distribute oxycodone and OxyContin as well,
12  correct?  AmerisourceBergen.
13    A.  Other distributors?
14    Q.  Yes, ma'am.
15    A.  Yes.
16    Q.  We don't have Joe making oxycodone in
17  his trailer up in the foothills of West Virginia,
18  do we?
19    MS. MAINIGI:  Objection; form.
20  Objection; scope.
21    A.  Not to my knowledge.
22    Q.  To your knowledge, no one is out there
23  in their homes or farmhouses manufacturing
24  OxyContin, correct?

Page 87

1    MS. MAINIGI:  Objection; form.
2  Objection; scope.
3    A.  Not to my knowledge.
4    Q.  So the only way these people are getting
5  oxycodone that they're overdosing from is when we
6  go up the chain from a manufacturer that has
7  distributed or sold to a wholesale distributor who
8  has sold to a pharmacy, correct?
9    MS. MAINIGI:  Objection; form.
10  Objection; scope.
11    A.  Cardinal Health has distributed the
12  pharmaceuticals to a licensed pharmacy for
13  dispensing pursuant to a licensed -- prescription
14  from a licensed physician.
15    Q.  Yes, ma'am.  I understand that.  You've
16  told me that several times, but that's not my
17  question.  So listen to my question, and we'll
18  move through this.
19    In order for the people out there to get
20  these oxycodone pills that they're overdosing on,
21  it had to have come through a wholesale
22  distributor; correct or incorrect?
23    MS. MAINIGI:  Objection; form.
24  Objection; scope.

Page 88

1    A.  The distributor -- I know you're not
2  going to want to hear -- the distributor
3  distributes to a licensed pharmacy who dispenses
4  pursuant to a prescription from a licensed
5  physician.
6    Q.  Yes, ma'am.  And I'll ask you again.
7  Just listen to my question and answer the question
8  I'm asking.
9    A.  I hear your question.  Yes.
10    Q.  Well, and I'm hearing your answer, but
11  my problem is you're not answering the question
12  I'm asking.  Okay?  So let me try it one more
13  time.
14    In order for the people out there that
15  are getting these oxycodone pills that are causing
16  these overdoses, those pills have to come through
17  a wholesale distributor; is that correct or
18  incorrect?
19    MS. MAINIGI:  Objection; asked and
20  answered multiple times.  Objection; scope.
21    Mike, you may not like her answer, but
22  she has, in fact, answered your question multiple
23  times.  I'll ask her to answer it again.
24    Q.  It's a yes or no question.

Page 89

1    Did those pills have to come through a
2  wholesale distributor?
3    MS. MAINIGI:  Objection; asked and
4  answered.  Objection; scope.
5    A.  Cardinal Health distributes to a
6  licensed pharmacy who dispenses prescriptions from
7  a licensed physician.
8    Q.  Again, that's not my question.  I'm
9  asking you if Cardinal knows whether these pills
10  that are causing overdoses have to come through a
11  licensed wholesale distributor before they get to
12  the person who is overdosing?  That's all I'm
13  asking.
14    I understand that you guys distribute to
15  licensed pharmacies.  You've made that abundantly
16  clear.
17    You would agree with me, would you not,
18  that those pills have to come through a wholesale
19  distributor before they get to the person that is
20  ultimately overdosing on them, correct?
21    MS. MAINIGI:  Objection; form.  Asked
22  and answered multiple times.  Objection; scope.
23    Answer it one more time.
24    Q.  I'll just be happy if you answer my

Page 90

1  question once.
2      A.  The pharmaceuticals move through the
3  closed distribution system, from a wholesaler to a
4  licensed pharmacy, dispensed from a licensed
5  prescriber.
6      Q.  So they have to go through a licensed
7  wholesale distributor before getting to the end
8  user or the person overdosing, correct?
9          MS. MAINIGI:  Objection; asked and
10  answered.  Objection; form.
11         Mike, why don't we -- she's answered it
12  multiple times.  You don't like her answer.  Why
13  don't you just move on?
14         MR. FULLER:  I just want her to answer
15  the question I asked.
16         MS. MAINIGI:  She's answered it multiple
17  times.
18         MR. FULLER:  No.
19  BY MR. FULLER:
20      Q.  Go ahead, ma'am.
21      A.  The pharmaceuticals we distribute are
22  distributed to a licensed pharmacy for dispensing
23  pursuant to a licensed prescription --
24  prescription from a licensed physician.  Sorry.

Page 91

1      Q.  If you go to the next section of this
2  page.  "In its testimony today, Purdue Pharma will
3  argue that the death figures heralded by
4  newspapers nationwide are inaccurate and are the
5  prime mover of negative hype surrounding
6  OxyContin."
7          Do you see that?
8      A.  I see that language.
9      Q.  And does Cardinal recognize that during
10  this time frame, newspapers are reporting these
11  death figures from OxyContin overdoses?
12         MS. MAINIGI:  Objection; form, time
13  period, and scope.
14      A.  I can't say.  Again, I didn't work at
15  the company and know what newspapers they may or
16  may not have read.
17      Q.  But, again, Cardinal did its job in
18  staying informed as to what's going on in the
19  communities that it's distributing to around the
20  country, correct?
21         MS. MAINIGI:  Objection; scope and time
22  period.
23      A.  Cardinal Health understands the
24  customers that it is distributing to.

Page 92

1      Q.  And the communities that they are
2  providing all these pills to, these drugs to,
3  correct?
4          MS. MAINIGI:  Objection; scope and form.
5      A.  I can't say what Cardinal Health was
6  doing at this time.  I wasn't there.
7      Q.  But you did just testify that Cardinal
8  did its job in staying informed as to what's going
9  on in the communities that it's distributing to
10  around the country -- or excuse me.  That's my
11  question.  I'm sorry.  I was going to say that
12  sounded like a pretty damn good answer.
13         MS. MAINIGI:  I would stick with that
14  one, Mike.
15      Q.  You testified that "Cardinal Health
16  understands customers that it's distributed to."
17  When you say "understands customers," what is its
18  obligation related to understanding customers, if
19  you know?
20      A.  I think -- I want to be careful about
21  the word -- use of the word "obligation."  As part
22  of Cardinal Health's anti-diversion program, we
23  have a "know your customer" component where we
24  inquire, ask questions, obtain information from

Page 93

1  our customers to get an idea about the general
2  area in which they're operating their business.
3      Q.  And the increase in prescriptions from
4  300,000 to almost 6 million from 1996 to 2001, you
5  would agree that's a significant increase in the
6  prescriptions for OxyContin, correct?
7          MS. MAINIGI:  Objection; scope.
8      A.  That's an increase from 300,000 to
9  6 million.  I don't know how we want to define
10  "significant."  During that time, the DEA was
11  approving and increasing the quotas to allow that
12  many prescriptions, so ...
13      Q.  So it's a 20-time increase over a what,
14  a five-year period, four-year -- five-year period?
15  Do you not consider that significant?
16         MS. MAINIGI:  Objection; form.
17  Objection; scope.
18      A.  It depends on the circumstances.  Like I
19  said, the DEA felt there was legitimate medical
20  needs for these prescriptions.  They were
21  increasing the quotas during this time period.
22      Q.  Do you have an understanding of how they
23  were increasing the quotas and what information
24  they were relying on when increasing these quotas?

Page 94

1     MS. MAINIGI: Objection; scope.
2 Objection; time period.
3    A. I don't know exactly how they increased
4 the quotas. I would be guessing that they rely on
5 a variety of information.
6    Q. Including information provided by the
7 manufacturers and wholesale distributors, correct?
8     MS. MAINIGI: Objection; scope.
9    A. That is likely one of the data points.
10    Q. And this increase -- this 20 times
11 multiple increase in OxyContin prescriptions,
12 those pills all have to flow through the wholesale
13 distributor as you testified, correct?
14     MS. MAINIGI: Objection; form.
15 Objection; scope. Objection; asked and answered.
16    A. I believe I testified that the
17 pharmaceuticals are distributed by -- the pills
18 are distributed by Cardinal Health to a licensed
19 pharmacy for dispensing pursuant to a prescription
20 from a licensed physician.
21    Q. So that means more business for Cardinal
22 Health, correct?
23     MS. MAINIGI: Objection; scope.
24    A. I don't know that Cardinal Health

Page 95

1 distributed all of these.
2    Q. Well, they may not have distributed all
3 of them, but they probably distributed some of
4 them.
5    Can we agree to that?
6     MS. MAINIGI: Objection; scope.
7 Objection; time period.
8    A. Perhaps as a small percentage of
9 everything else Cardinal Health distributes to its
10 customers.
11    Q. So we can agree that this increase also
12 increased the business at Cardinal Health?
13     MS. MAINIGI: Objection; time period.
14 Objection; scope.
15    Q. Yeah. Let me strike that. Let me ask
16 it a little better.
17    We can agree that this 20-time increase
18 in the number of OxyContin prescriptions also
19 increased the business at Cardinal Health?
20     MS. MAINIGI: Objection; scope.
21 Objection; time period. Objection; form.
22    A. Not necessarily. As I said, I don't
23 know that Cardinal Health distributed all or a
24 significant portion of these.

Page 96

1    Q. Ma'am, even if it distributed some of
2 them, it would have increased the business; would
3 it not?
4     MS. MAINIGI: Objection; scope.
5 Objection; form. Objection; time period.
6    A. A small portion of the overall
7 pharmaceuticals that Cardinal Health distributes.
8    Q. So is that a yes, it would have
9 increased the business?
10     MS. MAINIGI: Objection; asked and
11 answered. Objection; form and scope, and time
12 period.
13    A. I don't know specifically.
14    MR. FULLER: All right. This is Norris
15 31.
16       ---
17    (Cardinal-Norris Exhibit 9 marked.)
18       ---
19    MR. FULLER: This is going to be
20 Plaintiff's Exhibit Number 9.
21 BY MR. FULLER:
22    Q. Do you see this document, ma'am, what's
23 been marked as Plaintiff's Number 9? It's
24 entitled "Under the Counter: The Diversion and

Page 97

1 Abuse of Controlled Prescription Drugs in the
2 U.S.," July of 2005?
3    A. I see that's the title of the document.
4    Q. Who does it say it's funded by with an
5 unrestricted grant?
6    A. It says, "Funded by an unrestricted
7 grant from Purdue Pharma LP."
8    Q. And this was a study that was
9 commissioned by this grant by Purdue Pharma. And
10 if you'll turn to page 9. And just let me know
11 when you get there.
12    A. Okay.
13    Q. And on page 9, do you see where it says
14 "The bottom line"?
15    A. I see that.
16    Q. Read that to us, if you would, please,
17 or read it to the jury.
18    A. "The bottom line: Our nation is in the
19 throws of an epidemic of controlled prescription
20 drug abuse and addiction. Today 15.1 million
21 people admit abusing prescription drugs, more than
22 the combined number who admit abusing cocaine,
23 hallucinogens, inhalants, and heroin combined."
24    Sorry. I didn't read the numbers. If

Page 98

1 you want me to read it --
2    Q.  No, no, no.
3    A.  -- again with the numbers, I can.
4    Q.  That's fine.  Thank you.
5        Does Cardinal recognize that at this
6 time during 2005 that we are in the throws of an
7 epidemic of controlled prescription drug abuse?
8        MS. MAINIGI:  Objection; scope.
9 Objection; time period.
10   A.  Cardinal Health recognizes that there is
11 an issue in the country with prescription drug
12 abuse.  It's not qualified to determine the timing
13 of that.  That's for the public policymakers, but
14 Cardinal Health understands there is a significant
15 issue.
16   Q.  And as it relates to this study, it
17 indicates that we're in the throws of it even back
18 in 2005, correct?
19       MS. MAINIGI:  Objection; scope.
20 Objection; time period.
21   A.  That is when this study was -- what this
22 study found at the time.  Again, Cardinal Health
23 isn't making a determination.  It's not in the
24 position to make the determination, but it is

Page 99

1 aware of it.
2    Q.  And at this time, at least according to
3 the findings in the study -- which you have no
4 reason to disagree with, correct?
5        MS. MAINIGI:  Objection; form.
6 Objection; scope.  Objection; time period.
7    A.  I haven't read the whole study, so I
8 can't say whether --
9    Q.  Sure.
10   A.  -- I agree or disagree.
11   Q.  But, again, sitting here today, you have
12 no basis to disagree with it.  I understand you
13 haven't read it.  I'm not asking you to read it.
14   A.  I can't say I agree or --
15       MS. MAINIGI:  Hang on.  Objection; form,
16 Objection; scope.  Objection; time period.
17       Go ahead.
18   A.  I can't say whether I agree or disagree
19 with the study.  It's a relatively voluminous
20 document that I have never seen before.
21   Q.  Sure.  And it finds that today
22 15.1 million people admit to prescription drug
23 abuse, more than cocaine, hallucinogens,
24 inhalants, and heroin combined, right?

Page 100

1        MS. MAINIGI:  Objection; form.
2 Objection; scope and time period.
3    A.  That is what the document says, yes.
4    Q.  And if you scroll on down to the next
5 highlighted section.  It says, "Children are
6 especially at risk.  In 2003, 2.3 million teens
7 between the ages of 12 and 17 admitted abusing
8 prescription drugs in the past year.  83 percent
9 of them admitted abusing opioids."
10       Do you see that?
11   A.  I see that language, yes.
12   Q.  Would you agree if that is true, that
13 that is clearly a sign of an epidemic in this
14 country?
15       MS. MAINIGI:  Objection; form, time
16 period, and scope.
17   A.  I agree that it's a finding.  I don't
18 know what the indicia of an epidemic -- I can't
19 say what the indicia of an epidemic are.  This is
20 a finding that the study made.
21   Q.  So you can't tell us whether it's an
22 epidemic whether 2.3 kids between the ages of 12
23 and 17, which, according to this, is 9.3 percent
24 of the kids in that age group are abusing

Page 101

1 prescription pain drugs, and you can't tell us
2 whether that's an epidemic --
3        MS. MAINIGI:  Objection.
4    Q.  -- an issue, a crisis?
5        MS. MAINIGI:  Excuse me.  Objection;
6 form, scope, and time period.
7    A.  Well, now you've introduced new words.
8 It's certainly an issue.  Again, I'm not -- I'm
9 not qualified to opine on what constitutes an
10 epidemic.
11   Q.  You certainly agree it's a bad issue?
12 Would you agree with that?
13       MS. MAINIGI:  Objection; form, scope,
14 and time period.
15   A.  It's an issue to be concerned about.
16   Q.  It's not something that we want
17 happening in this country?
18       MS. MAINIGI:  Objection; form, scope,
19 and time period.
20   A.  It's not something I would want
21 happening in this country.
22   Q.  Or anywhere else, for that matter,
23 correct?
24       MS. MAINIGI:  Objection; form, scope,

Page 102

1 and time period.

2    A. No, I wouldn't want this to happen.

3             - - -

4     (Cardinal-Norris Exhibit 10 marked.)

5             - - -

6    Q. Okay. Ma'am, I think you have in front

7 of you what for the record is Norris 12 and has

8 been marked for this deposition Plaintiff's

9 Exhibit Number 10; is that correct? It's the

10 sticker number 10 on the bottom.

11    A. It is.

12    Q. All right. And do you know who Glenn

13 Fine is?

14    A. I don't, other than the document says

15 Inspector General.

16    Q. Inspector General. Well, I assure you

17 that I didn't make that up.

18      Okay. And do you see the subject? Read

19 the subject to us, if you would, please.

20    A. The subject is, "Review of the Drug

21 Enforcement Administration's Investigations of the

22 Diversion of Controlled Pharmaceuticals, Report

23 number I-2002-010."

24    Q. And I'll represent to you that this is a

Page 103

1 report that came out September of 2002. Cardinal

2 also recognizes that it's the DEA which regulates

3 wholesale distributors; is that correct?

4    A. Among other bodies, yes.

5    Q. Maybe some state entities and others out

6 there, but as far as the federal government, one

7 of the main ones is the DEA?

8    A. Yes.

9    Q. Is it the DEA that generally

10 investigates and deals with diversion of

11 controlled substances?

12    A. I believe so.

13    Q. If you'll turn to page 12. When you get

14 there, let me know when you're ready.

15    A. Okay. Just a second.

16    Q. Yes, ma'am.

17    A. Okay.

18    Q. If you turn to page 12. Do you see the

19 highlighted section there?

20    A. I do.

21    Q. If you'll read that aloud for us,

22 please.

23    A. "Diversion investigators represented

24 10 percent, or 523, of the DEA's 5,124 authorized

Page 104

1 investigator positions in fiscal year 2001. The

2 authorized diversion investigator positions were

3 assigned as follows: 55 at headquarters, 455 at

4 domestic field offices, and the remaining 13 at

5 overseas offices."

6    Q. So that puts somewhere about 510 DEA

7 investigators keeping oversight of the controlled

8 substances in this country, correct?

9      MS. MAINIGI: Objection; time period,

10 scope, form.

11    A. There were 500 and so in the

12 authorized --

13    Q. Well, I'm just doing --

14    A. -- diversion investigator positions.

15    Q. Yeah. I'm doing 55 plus 455 I think is

16 510, right?

17    A. Sorry.

18      MS. MAINIGI: Objection; form.

19    A. And then plus 13.

20    Q. Yeah, those are overseas.

21    A. Yeah. Okay.

22    Q. So we can agree that in -- at least

23 according to this, the Inspector General report

24 done in 2012 -- excuse me -- 2002, approximately

Page 105

1 510 DEA investigators related to diversion of

2 controlled substances in this country; is that

3 right?

4      MS. MAINIGI: Objection; form, scope,

5 time period.

6    A. I believe that's what this says.

7             - - -

8     (Cardinal-Norris Exhibit 11 marked.)

9             - - -

10    Q. Now, let's continue to the next

11 document. The next document is going to be

12 Plaintiff's Norris 13, which is going to be

13 Exhibit 11 to this deposition.

14      Now, I'll represent to you that

15 Plaintiff's 11 is part of a bigger Congressional

16 record. It's about 900 pages. I decided not to

17 print all 900 pages for you.

18    A. I and our environment appreciate that.

19    Q. You are welcome. You are welcome.

20      This is a report done by the Honorable

21 Rudolph Giuliani before the U.S. Senate Permanent

22 Subcommittee on Investigations.

23      Do you see that?

24    A. I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  Q.  And it's dated June 17th of 2004.
2  A.  That is the date on the front.
3  Q.  What is the title of this report?
4  A.  Buy --
5  Q.  I'm sorry.  Go ahead.
6  A.  "Buyers Beware:  The Dangers of
7  Purchasing Pharmaceuticals Over the Internet."
8  Q.  Now, you're aware that during this time
9  frame, that there was a concern about Internet
10  pharmacies; is that right?
11     MS. MAINIGI:  Objection; form, time
12  period.
13  A.  I am aware that Internet pharmacies
14  generally during this time period were on folks'
15  minds, yes.
16  Q.  And it was an issue of concern, because
17  in 2008, Cardinal paid a $34 million fine related
18  to Internet pharmacies and the distributions
19  thereto, correct?
20     MS. MAINIGI:  Objection; form, scope.
21  A.  I believe it was an issue of concern
22  because we had communications with the DEA as far
23  back as, I believe, 2005 regarding Internet
24  pharmacies.

Page 107

1  Q.  And then in 2008, Cardinal entered a
2  Memorandum of Agreement with the DEA related to
3  distributions pertaining to Internet pharmacies;
4  is that correct or incorrect?
5  A.  Cardinal entered into a Memorandum of
6  Agreement in 2008 in which it made no admissions.
7  Q.  It made no admissions, but the basis of
8  the allegations were related to distributions
9  related to Internet pharmacies; is that correct or
10  incorrect, ma'am?
11  A.  It is correct that the allegations
12  related to Internet pharmacies.
13  Q.  Okay.  And we'll get into more of those
14  later, but that's fine.
15     If you'll turn to page 2.  It says,
16  "Giuliani Partners LLC has been retained by the
17  Pharmaceutical Research and Manufacturers of
18  America (PhRMA) to evaluate the risks, if any,
19  associated with the importation of Canadian and
20  foreign medicines."
21     Do you see that there?
22  A.  I see that language.
23  Q.  And that's telling us, is it not, that
24  the Giuliani group, for lack of a better term, was

Page 108

1  hired by PhRMA to look into this issue of Canadian
2  and foreign medicines, right?
3     MS. MAINIGI:  Objection; form and
4  time -- or excuse me.  Objection; scope and time
5  period.
6  A.  I believe that's what the language says.
7  Q.  And if you'll turn to -- now to page 4.
8  A.  Can you give me just a second, please?
9  Q.  Sure.  I'm sorry.  I apologize.
10  A.  That's okay.  Okay.
11  Q.  Ma'am, on page 4, read that first
12  highlighted sentence for us, please.
13  A.  "On its face, it appears that the
14  distribution chain for prescription medicines in
15  the United States is fairly straightforward.
16  Manufacturers sell their products to wholesalers
17  who in turn sell the products to retail pharmacies
18  or stores who in turn dispense medicines to
19  patients with prescriptions."
20  Q.  Okay.
21  A.  "It is not until the" --
22  Q.  Hold on.  Just the first sentence.
23  That's all I asked.
24  A.  Oh, I'm sorry.

Page 109

1  Q.  And you would agree with us -- or agree
2  with the statement that on its face, it's a pretty
3  simplistic system; manufacturers to wholesalers,
4  then to retail pharmacies or drugstores, correct?
5     MS. MAINIGI:  Objection; scope.
6  A.  I would say that is the system.  Not
7  even on its face, but yes.
8  Q.  And I was saying it was pretty
9  simplistic on its face, correct?
10     MS. MAINIGI:  Objection; scope.
11  A.  I think it's -- it is simplistic.
12  It's -- that's the --
13  Q.  Fair enough.
14     Then the report goes on to say, "It is
15  not until the system is studied in greater detail
16  that one begins to appreciate both the
17  complexities and the vulnerability of the
18  distribution chain and the potential for
19  exploitation or abuse."
20     Correct?
21     MS. MAINIGI:  Objection.
22     Are you asking her if she agrees or
23  whether that's what it says?
24     MR. FULLER:  Yes, ma'am.  I'm asking her

Page 110

1  if that's what it says first.

2      A.  That is what the sentence says, yes.

3      Q.  And do you agree that the chain is

4  subject to potential exploitation and abuse?

5          MS. MAINIGI:  Objection; scope.

6      A.  Not necessarily.

7      Q.  Has Cardinal been fined in the past for

8  potentially exploiting or abusing this closed

9  system distribution?

10         MS. MAINIGI:  Objection; form.

11     A.  Are you referring to the 2005 settlement

12  with New York?

13     Q.  I'm referring to the 2005 settlement

14  with New York, the 2008 settlement with the

15  Department of Justice, the 2012 settlement with

16  the Department of Justice where they admitted

17  violations, and the 2016 admission with the State

18  of New York related to additional violations.

19     A.  I'm not --

20         MS. MAINIGI:  Question?

21     Q.  Yes, ma'am.  You can go ahead.

22         MS. MAINIGI:  Is there a question

23  pending?

24         MR. FULLER:  Yeah.  She asked me what I

Page 111

1  was referring to.  I explained what I was

2  referring to.  And she can answer the question

3  that is still pending.

4          MS. MAINIGI:  Could we have that read

5  back, please?

6          (Record read back as follows:

7          "Question:  Has Cardinal been

8          fined in the past for potentially

9          exploiting or abusing this closed

10         system distribution?")

11         MS. MAINIGI:  Objection; form.

12  Objection; scope.

13     A.  I don't agree with the term

14  "exploiting."  Cardinal Health has paid fines in

15  the past related to particular settlements.

16     Q.  For settlements for allegations as well

17  as admitted violations of these laws related to

18  this distribution chain; is that accurate?

19         MS. MAINIGI:  Objection; form.

20  Objection; scope.

21     A.  We made settlement payments pursuant to

22  a settlement agreement with no admissions.  We

23  made a very limited admission and made a

24  settlement payment.

Page 112

1      Q.  So Cardinal has -- so Cardinal agrees

2  that it has had allegations as well as admitted

3  violations related to this vulnerable chain of

4  distribution related to controlled substances;

5  correct?

6          MS. MAINIGI:  Objection; form.

7  Objection; scope.

8      A.  Cardinal Health agrees that it made

9  payments related to allegations and made a

10  settlement payment with regard to specific

11  admissions.

12     Q.  So it made a $34 million payment related

13  to allegations in 2008; is that correct?

14     A.  It made a $34 million as a

15  settlement with the DEA.

16     Q.  It also made a $34 million payment

17  related to not just allegations but admissions in

18  2012, correct?

19     A.  Cardinal Health made a $34 million

20  payment in 2012 pursuant to a settlement agreement

21  in which it made very limited admissions.

22     Q.  And then in 2016, Cardinal made another

23  admission of liability and paid another

24  $10 million to New York, is that correct, for

Page 113

1  similar type of allegations?

2          MS. MAINIGI:  Objection; form.

3      A.  Let me clarify because I just misspoke.

4  In 2012, no payment was made.  In 2016,

5  34 million -- a total of $44 million was paid in

6  connection with a very limited settlement and very

7  limited admissions contained therein.

8      Q.  Okay.  So, again, just to clean it up,

9  Cardinal's admitted violations as well as paid

10  fines for allegations related to the -- related to

11  allegations that -- well, strike that.  Let me do

12  it a little easier.

13         Cardinal has paid fines related to

14  simply allegations of violations to the Controlled

15  Substances Act and distribution of controlled

16  substances, correct?

17     A.  No.  Cardinal Health paid fines as part

18  of a settlement agreement in which it made no

19  admissions.

20     Q.  But those settlement agreements were

21  related to allegations of violations of the

22  Controlled Substances Act; yes or no?

23         MS. MAINIGI:  Objection; form.

24     A.  There were allegations made.  Cardinal

Page 114

1  Health made no admissions.
2      Q.  What were those allegations?
3          MS. MAINIGI:  Objection; form.
4          Do you have the agreement so she can
5  look at it?
6      A.  In order to be clear, it would be
7  helpful to have the document so we can go through
8  the specific allegations, if that's what we want
9  to do.
10     Q.  No, ma'am.  I just want a general idea.
11 Do you know any of the allegations?
12         MS. MAINIGI:  Objection; form.
13     Q.  Did it have to do with the distribution
14 of controlled substances?
15         MS. MAINIGI:  Objection; form.
16     A.  I believe it had to do with the
17 distribution of controlled substances to certain
18 customers.  But, again, without the document in
19 front of me, I am not going to give you the
20 particulars.  I want to ensure that I am accurate
21 for the record.
22     Q.  And Cardinal also admitted to violations
23 of the Controlled Substances Act and as it relates
24 to this distribution of controlled substances,

Page 115

1  correct?
2          MS. MAINIGI:  Objection; form and scope.
3      A.  Again, in the 2016 settlement
4  agreement -- and, again, without having it in
5  front of me and being very clear about the
6  particulars -- there was a settlement made and
7  admission related to certain discrete issues.
8      Q.  And let's just make sure the record is
9  clear -- and we'll get it out later.
10         But the Memorandum of Understanding
11 entered and signed off on in 2012 actually
12 contains those admissions, correct?
13         MS. MAINIGI:  Objection; form.
14 Objection; scope.
15     A.  Without the documents in front of me --
16     Q.  Fair enough.
17     A.  I just want to be clear.
18         MR. FULLER:  Sure, sure.  Let's take
19 another quick break.
20         THE VIDEOGRAPHER:  The time is now
21 11:03.  Going off the record.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  Okay.  The time is
24 now 11:22.  Back on the record.

Page 116

1          MR. FULLER:  Hey, did you change out my
2  strips?
3          THE COURT REPORTER:  I added more.
4  You're on 12.
5          MR. FULLER:  Oh, am I?  Okay.
6          MS. MAINIGI:  Did you get like a speaker
7  over there?
8          MR. FULLER:  Yeah, I don't know what it
9  is, but I hear myself talking, and it's weird.
10         MS. MAINIGI:  I agree.
11         MS. VELDMAN:  Do you want him to lower
12 that?
13         THE VIDEOGRAPHER:  I did.  It should be
14 better now.
15         MR. FULLER:  How about now?  Better?
16         MS. MAINIGI:  (Indicates affirmatively.)
17             - - -
18     (Cardinal-Norris Exhibit 12 marked.)
19             - - -
20         MR. FULLER:  This is Norris 8, it's
21 going to be Plaintiff's Exhibit Number 12.
22 BY MR. FULLER:
23     Q.  And, ma'am, have you seen this case
24 before?

Page 117

1      A.  I have.
2      Q.  And what case is it?
3      A.  Masters Pharmaceutical, Inc. v. DEA.
4      Q.  Okay.  And you're aware this decision
5  came out in June of last year; is that correct?
6      A.  I believe so.
7      Q.  And it deals with the Controlled
8  Substances Act and the shipping and reporting
9  requirements; is that correct?
10     A.  I believe it mentions the shipping
11 requirement, and the reporting requirement is sort
12 of the central issue.
13     Q.  So it discusses both; is that correct?
14     A.  It makes reference to both, yes.
15     Q.  And if you'll turn to page 7 of the --
16 now, in -- let's back up for a second.
17         You've had an opportunity to read this
18 opinion before today?
19     A.  I have.
20     Q.  And you're probably aware -- and tell me
21 if you're not -- that the -- some of the other
22 Defendants in this case, AmerisourceBergen and
23 McKesson, have also designated 30(b) witnesses?
24     A.  Yes, I am aware.

Page 118

1    Q.  Have you reviewed any of their
2  testimony?
3    A.  No, I have not.
4    Q.  Okay.  In preparation for this
5  deposition, did you actually read this opinion?
6    A.  I did.
7    Q.  Okay.  And let me ask you, how much time
8  have you spent preparing for this deposition?
9    A.  The last three and a half weeks from
10  the -- beginning the -- Monday the 16th, I believe
11  it was, through today.
12    Q.  And I won't say 24 hours a day.  Mainly
13  your working hours of your day have been
14  encompassed by preparing for this 30(b) notice --
15    A.  Yes.
16    Q.  -- or the notices, correct?
17    A.  Yes.  I'm sorry.
18    Q.  Okay.  And tell me -- again, other than
19  counsel, who else have you spoken with related to
20  the preparation for this 30(b) notice?
21    A.  I spoke to a variety of individuals at
22  Cardinal Health.  I'll try to remember them all.
23  Michael Mone, Todd Cameron, Gilberto Quintero.
24    Q.  Hold -- slow down a little bit for me.

Page 119

1    A.  Sorry.  Michael Mone.
2    Q.  Mr. Cameron?
3    A.  Todd Cameron.
4    Q.  Roberto?
5    A.  Gilberto Quintero.
6    Q.  Yes, ma'am.
7    A.  Danny Roberts.
8    Q.  Yes, ma'am.
9    A.  Linden Barber.
10    Q.  Yes, ma'am.
11    A.  Steve Reardon, Sean Callinicos.
12    Q.  Spell the last name for me.
13    A.  I believe it is C-a-l-l-i-n-c-o-s [sic]
14  or something to that effect.
15    Q.  Fair enough.  He'll forgive you.
16    A.  Just one second.  Let me try to
17  remember.  I believe that's everybody.  I believe
18  that's everyone.  If I -- if somebody pops into my
19  brain, I will let you know.
20    Q.  And who did you speak -- other than
21  counsel -- with about the Masters Pharmaceutical
22  case?
23    A.  Todd Cameron and I -- Todd answered a
24  question regarding it.

Page 120

1    Q.  And what did Todd answer?
2    A.  Todd answered that upon the decision, he
3  reviewed the decision, reviewed it with counsel,
4  Cardinal Health counsel.
5    Q.  Internal counsel, or you're not sure?
6    A.  I'm not positive if it was also outside
7  counsel.  We do have internal counsel, so ... and
8  determined that --
9    MS. MAINIGI:  And one thing I will
10  caution you, Ms. Norris, is to not reveal any
11  privileged information that Mr. -- any privileged
12  exchanges Mr. Cameron may have had with counsel.
13    A.  And based on those reviews --
14    MS. MAINIGI:  Perhaps you could phrase
15  it after his communications with counsel, what
16  actions he took.
17    A.  After Mr. Cameron's review of the case
18  and with counsel, he determined that no changes
19  were needed to our program, that it was in
20  compliance with the decision.
21    Q.  All right.  So let's look at Masters
22  Pharmaceutical.  And if you'll turn to page 7 for
23  me.
24    A.  Yes, I'm there.

Page 121

1    Q.  Okay.  And if you will read where it
2  starts, "The security requirement."
3    A.  "The 'security requirement' at the heart
4  of the case mandates that distributors 'design and
5  operate a system' to identify 'suspicious orders
6  of controlled substances' and report those to DEA
7  (the Reporting Requirement)."
8    Q.  Does Cardinal Health agree that it has a
9  reporting requirement to identify and report
10  suspicious orders of controlled substances?
11    A.  Yes.
12    Q.  And what is Cardinal's position --
13  strike that.
14    And Cardinal agrees that has been the
15  obligation since the enactment of the Controlled
16  Substances Act and particularly this regulation in
17  1971, correct?
18    MS. MAINIGI:  Objection; scope.
19  Objection; time period.
20    A.  Cardinal Health understands its
21  reporting obligation pursuant to the Controlled
22  Substances Act.
23    Q.  No, ma'am.  That's not my question.
24  Okay.  Let me ask it again.

Page 122

1  Cardinal agrees that this reporting
2  requirement has been the obligation since the
3  enactment of the regulation that we looked at
4  earlier in 1971 related to suspicious orders,
5  correct?
6       MS. MAINIGI:  Objection; time period.
7  Objection; scope.
8    A.  This reporting requirement has existed
9  since 1971 in the statute.
10   Q.  And the rendition of it that we just
11 read is the obligation that it places on Cardinal,
12 correct?
13      MS. MAINIGI:  Objection; form.
14   A.  That is correct, as modified by the DEA
15 guidance we have received over the years, yes.
16   Q.  Well, now, that's a different
17 qualification now.  Okay.
18      I believe you've already agreed -- and
19 correct me if I am wrong -- that the reporting
20 requirement requires Cardinal to identify and
21 report suspicious orders of controlled substances;
22 is that accurate?
23   A.  That is what the regulation requires.
24   Q.  And that regulation has been in place

Page 123

1  since 1971 and has always required that; is that
2  Cardinal's position?
3       MS. MAINIGI:  Objection; scope.
4  Objection; time period.
5    A.  The language of the statute has always
6  required that.  The DEA's guidance to us on how to
7  implement that has changed over time.
8    Q.  And I'm not asking about implementation
9  right now.
10   A.  Okay.
11   Q.  So let's separate the two, okay?
12   A.  Okay.
13   Q.  As far as the reporting requirement
14 itself, has that been an obligation that's been on
15 Cardinal since the regulation was enacted in 1971
16 with the caveat whenever Cardinal started
17 distributing controlled substances?
18   A.  Yes.  Yes.
19   Q.  Then it reads, "The Reporting
20 Requirement is a relatively modest one that
21 requires only that a distributor provide the basic
22 information about certain orders to DEA so that
23 DEA investigators in the field can aggregate
24 reports from every point along the legal regulated

Page 124

1  supply chain and use that information to ferret
2  out potential legal activity."
3       MS. MAINIGI:  Legally.
4       MR. FULLER:  I'm sorry.  Where did I
5  screw up?
6       MS. MAINIGI:  You said "legal," not
7  "legally."
8       MR. FULLER:  Potentially a legal
9  activity.  Sorry.
10      MS. MAINIGI:  "Along the legally
11 regulated supply chain."
12 BY MR. FULLER:
13   Q.  All right.  Well, let's try this again.
14      Ms. Norris, the case then reads, "The
15 Reporting Requirement is a relatively modest one.
16 It requires only that a distributor provide basic
17 information about certain orders to the DEA so
18 that DEA investigators in the field can aggregate
19 reports from every point along the legally
20 regulated supply chain and use the information to
21 ferret out potential illegal activity."
22      Is that correct?
23   A.  That is correct.
24   Q.  And is that Cardinal's understanding of

Page 125

1  the law?
2       MS. MAINIGI:  Objection; scope.
3    A.  I believe so, yes.
4    Q.  Okay.  And let's break it down.  It says
5  that it requires a distributor to provide basic
6  information about certain orders to the DEA.  And
7  Cardinal would agree that the basic information is
8  at least to provide the order that's being
9  submitted that qualifies as suspicious, correct?
10      MS. MAINIGI:  Objection; scope.
11   A.  Generally, yes.
12   Q.  Okay.  "And this is just a further
13 explanation of the reporting requirement we just
14 talked about; therefore, it applies all the way
15 back to 1971 when the suspicious order regulation
16 was enacted."
17      Does Cardinal agree with that?
18      MS. MAINIGI:  Objection; scope.
19 Objection; time period.
20   A.  I can't opine on that.  This feels like
21 more commentary about what they thought it meant
22 in the case that's then referenced there.
23   Q.  So does -- I'm sorry.  Go ahead.
24   A.  But the reporting requirement went back

Page 126

1 to 1971.
2 Q. So as it relates to what you've
3 qualified as commentary, does Cardinal agree or
4 disagree with that, that that is their obligation?
5 MS. MAINIGI: Objection; form.
6 Objection; scope. Objection; time period.
7 A. I believe that that is Cardinal's
8 obligation.
9 Q. Now, let's go further down. Let's go
10 down to the next sentence. "Once a distributor
11 has reported a suspicious order, it must make one
12 of two choices: Decline to ship the order or
13 conduct some due diligence; and if it is able to
14 determine that the order is not likely to be
15 diverted into legal channels, ship the order," and
16 then in parentheses "Shipping requirement."
17 Does Cardinal agree that based on this
18 case, Masters Pharmaceutical, as of June of last
19 year, Cardinal now has a shipping requirement?
20 MS. MAINIGI: Objection; scope.
21 A. In 2017, did Cardinal Health have a
22 shipping requirement?
23 Q. Yes, ma'am.
24 A. Yes.

Page 127

1 Q. Prior to 2000- -- prior to the rendering
2 of the Masters Pharmaceutical case, did Cardinal
3 have a shipping requirement?
4 A. Yes.
5 Q. How far back does Cardinal take the
6 position that this shipping -- strike that.
7 Prior to 2017 and the rendering of this
8 Masters Pharmaceutical opinion, does Cardinal
9 believe its shipping requirement was the same as
10 outlined here in the Masters Pharmaceutical case?
11 A. Generally, yes.
12 Q. Okay. So as it relates to -- and we're
13 not going to talk necessarily about how far back
14 it goes yet.
15 So we have an understanding, the
16 shipping requirement gives you two choices,
17 correct?
18 A. As it's laid out here, yes.
19 Q. And you agree -- Cardinal agrees with
20 that, correct?
21 A. Yes.
22 Q. Okay. The first choice is you can
23 decline the ship? You can cut the order as
24 Cardinal uses the phrase, correct?

Page 128

1 A. Yes.
2 Q. The other alternative is to conduct due
3 diligence, and if it's able to -- or if Cardinal
4 is able to determine that the order is not likely
5 to be diverted into legal channels, then ship the
6 order? Is that Cardinal's understanding?
7 A. Correct.
8 Q. Prior to the enactment or the rendering
9 of this Masters Pharmaceutical opinion, when you
10 mentioned there was a shipping requirement
11 Cardinal believes it had, how far back did that
12 same shipping requirement go?
13 A. Back to approximately 2007.
14 Q. We're going to baby step this, okay? So
15 bear with me.
16 A. Okay.
17 Q. So from approximately some point in
18 2007, Cardinal believes it had the shipping
19 requirement that's set out in the Masters
20 Pharmaceutical case applicable to them?
21 A. Approximately, because obviously I think
22 we'll get there. The Dear Registrant letters
23 started coming out. So approximately that time
24 period.

Page 129

1 Q. So since 2007 or approximately that time
2 period, Cardinal has not shipped suspicious
3 orders, correct?
4 A. Since 2007, Cardinal Health has not
5 shipped an order that it has reported as
6 suspicious to the DEA.
7 Q. And since 2007, Cardinal has not shipped
8 a suspicious order that it hasn't determined --
9 that it hasn't done the due diligence on to
10 determine it's not going to be diverted, correct?
11 MS. MAINIGI: Objection; form.
12 A. Since approximately 2007, Cardinal
13 Health has not shipped an order it has reported as
14 suspicious to the DEA.
15 Q. Okay. So how many orders since 2007 --
16 how many suspicious orders has Cardinal shipped
17 that it failed to report to the DEA --
18 MS. MAINIGI: Objection; form.
19 Q. -- since 2007?
20 A. None to Cardinal Health's knowledge.
21 Q. Prior to 2007, was Cardinal shipping
22 suspicious orders?
23 A. Prior to its understanding from the DEA
24 of the obligation, the change, the sea change in

Page 130

1 the obligation to suddenly -- suddenly maybe is
2 the wrong word -- to not --
3    Q.  I mean, suddenly is good for you.
4    A.  -- to not ship pursuant to the guidance
5 by the DEA, it was a report only period.  Cardinal
6 Health made the reports as required by the DEA.
7    Q.  So prior to 2007, Cardinal was shipping
8 suspicious orders?  Well, strike that.  Let me
9 back up.
10       Prior to this approximate time frame of
11 2007, which we have yet to nail down, Cardinal was
12 shipping orders that it reported as suspicious?
13    A.  During the time period prior to 2007,
14 Cardinal Health's obligation was to report only.
15    Q.  Yes, ma'am.  I got that.  But my
16 question is, prior to this approximate 2007 time
17 frame, Cardinal was shipping suspicious orders
18 after it reported -- well, strike that.  Let me
19 ask it differently.
20       Prior to 2007, do you know whether
21 Cardinal was reporting and then shipping
22 suspicious orders or shipping suspicious orders
23 and then reporting?
24       MS. MAINIGI:  Objection; form.

Page 131

1 Objection; time period.
2       Go ahead.
3    A.  In accordance from the guidance we
4 received from the DEA, Cardinal Health was making
5 the reports as required by the DEA, the ingredient
6 limit reports and the excessive order reports, and
7 it was shipping orders in accordance with the
8 guidelines from the DEA.  If pursuant to one of
9 those excessive order reports the DEA said "Do not
10 ship," we did not ship.
11    Q.  You mentioned excessive order reports
12 and some other type of reports.
13    A.  Ingredient limit reports.
14    Q.  Was Cardinal actually reporting
15 suspicious orders prior to this time period in
16 2007?
17       MS. MAINIGI:  Objection; time period.
18       Go ahead.
19    A.  As required by the DEA, we were
20 submitting the ingredient limit reports pursuant
21 to the guidance we received, as well as the
22 excessive order reports.
23    Q.  But during this time prior to 2007,
24 Cardinal knew that it had a rule that it had to

Page 132

1 comply with that required the reporting of
2 suspicious orders, correct?
3    A.  Cardinal understood the language of the
4 statute --
5    Q.  Hold on.  Hold on.  I'm not --
6       MS. MAINIGI:  Let her finish.  Let her
7 finish.
8       MR. FULLER:  Okay.
9 BY MR. FULLER:
10    Q.  Sorry.  Go ahead.
11    A.  Cardinal Health understood the language
12 of the statute and the guidance we received from
13 the DEA and was making the reports accordingly.
14    Q.  So my question is, did Cardinal file
15 suspicious order reports prior to approximately
16 2007?
17       MS. MAINIGI:  Objection; form.
18    A.  I don't know that that's what they were
19 calling them at that time.  Again, we filed per
20 the DEA's guidance ingredient limit reports,
21 excessive order reports.
22    Q.  So prior to 2007 -- so prior to 2007,
23 Cardinal was knowingly shipping orders that it
24 knew qualified as suspicious under the regulation,

Page 133

1 correct?
2       MS. MAINIGI:  Objection; form.
3 Objection; time period.
4    A.  No, not necessarily.
5    Q.  What you've told us -- and see if I
6 understand it correctly.
7       You told us that prior to 2007, Cardinal
8 only had a reporting requirement according to
9 Cardinal, correct?
10    A.  According to Cardinal and others, yes.
11    Q.  And, therefore, Cardinal believes it was
12 doing what it was supposed to do in reporting
13 suspicious orders, but it was still shipping
14 suspicious orders, correct?
15    A.  Cardinal Health was doing what it was
16 directed to do by the DEA.
17    Q.  So I'm just asking, during this time
18 frame prior to 2007, did Cardinal report orders as
19 potentially suspicious or suspicious orders and
20 then still send the shipments out?
21       MS. MAINIGI:  Objection; time period.
22    A.  Yes.  That is the direction we received
23 from the DEA.  We made the reports as required,
24 and there was not a shipping requirement.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q.   Now, just so I understand, what is an --
2    you said "an excessive order report." What is
3    that?
4        A.   Within the distribution centers, the
5    folks that are picking the orders have the ability
6    to identify an order of a new rule, size, pattern,
7    or frequency, and raise their hand, so to speak,
8    to identify that order, and in doing so, during
9    this time period, we were submitting those to the
10   DEA as excessive order reports.
11       Q.   Would they be submitted order by order,
12   or was it a compilation of things that occurred
13   over a period of time?
14       A.   My understanding is order by order.
15       Q.   And what's an ingredient limit report?
16       A.   An ingredient limit report is the report
17   that was required pursuant to the 1998 DEA report
18   to, I believe, the Attorney General. It included
19   the algorithm for certain pharmaceuticals, and we
20   on a monthly basis provided the report of the
21   customers who had exceeded the designated amount
22   that you achieve pursuant to doing the algorithm,
23   the math problem.
24       Q.   And that was done by ingredient,

Page 135

1    correct?
2        A.   I believe so. I'm not -- I'm actually
3    not positive.
4        Q.   So does Cardinal believe -- well, let's
5    try to nail down this time frame in 2007 first,
6    okay?
7        A.   Okay.
8        Q.   What is its -- what is Cardinal's
9    position as to -- strike that.
10           Is it Cardinal's position or
11   understanding that the initial Rannazzisi letter
12   in 2006 informed them of a shipping requirement as
13   we've described it?
14       A.   Yes. That was the first communication
15   Cardinal received regarding this sea change of
16   adding a shipping requirement to the obligations.
17       MS. MAINIGI:   Can I just add a
18   clarification, because when you see the phrase
19   "shipping requirement," it suggests you should
20   ship. But by "shipping requirement," you're both
21   saying "do not ship;" is that fair?
22       MR. FULLER:   I think that's fair. Thank
23   you.
24

Page 136

1    BY MR. FULLER:
2        Q.   Would you agree with that?
3        A.   I would agree with that.
4        Q.   Okay. Now, conversely, when we say
5    "reporting requirement," we don't mean not report?
6        A.   Correct.
7        Q.   Okay.
8        A.   We can blame Masters.
9        Q.   Tell me what Cardinal's position --
10   strike that.
11           So it's Cardinal's position that the
12   first time they were informed of a potential
13   shipping requirement was in Rannazzisi's 2006
14   letter that was sent to all the distributors in
15   the industry?
16       A.   Yes.
17       Q.   Cardinal also had meetings with the DEA
18   around this time frame as well, correct?
19       A.   Yes.
20       Q.   When is the first meeting that Cardinal
21   had with the DEA?
22       MS. MAINIGI:   Objection to form.
23       Starting when?
24       Q.   Any time prior to this that you're aware

Page 137

1    of.
2        A.   Prior to the receipt of the first
3    Rannazzisi letter?
4        Q.   Yes, ma'am.
5        A.   I know we had a meeting with the DEA
6    regarding Internet pharmacies in 2005, but not
7    with -- not the subject of what ultimately came
8    out in the Rannazzisi letter.
9        Q.   Well, then let's backstep that. There
10   was actually a meeting with Cardinal and the DEA
11   in approximately August of 2005; is that correct?
12       A.   I believe that's the time frame, yes.
13       Q.   And this meeting included concerns
14   related to the Controlled Substances Act and the
15   distribution of controlled substances, correct?
16       MS. MAINIGI:   Objection; time frame.
17       A.   I know the meeting -- the topic of the
18   meeting was Internet pharmacies. I don't know the
19   answer to that question.
20       Q.   Ma'am, you referenced the meeting. The
21   topic was Internet pharmacies, but it also dealt
22   with the Controlled Substances Act and
23   distribution of controlled substances, correct?
24       MS. MAINIGI:   Objection; time frame and

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 just continuing objection on --
2     MR. FULLER: Sure.
3     MS. MAINIGI: -- this 2005 meeting.
4     MR. FULLER: Right, right.
5     MS. MAINIGI: I won't put that objection
6 in again for this.
7     MR. FULLER: And "form" is fine. I get
8 what you're preserving.
9     A. I'm sorry. Repeat the question.
10     Q. Sure.
11     A. I apologize.
12     Q. You referenced the meeting. The topic
13 was Internet pharmacies, but it also dealt with
14 the Controlled Substances Act and the distribution
15 of controlled substances, correct --
16     A. I don't --
17     Q. -- or do you know?
18     A. I don't recall. I saw a reference to
19 that meeting. I went over that in my preparation,
20 but I can't recall whether that was -- those were
21 specific topics. I know it was a meeting
22 regarding Internet pharmacies.
23     Q. Was there any more communication with
24 the DEA that Cardinal had between August of 2005

Page 139

1 and the receipt of the first Rannazzisi letter?
2 And I believe it's September of 2006.
3     A. I believe that's approximately correct.
4 I don't -- I am not aware of any specific
5 communications, but Cardinal Health communicates
6 regularly with the DEA.
7     Q. Was there any --
8     A. I can't say right now what specific
9 communications or timing of the communications
10 there might have been.
11     Q. Was there any further communication
12 between Cardinal Health and the DEA between
13 September of '06 and December of '07 when the
14 second Rannazzisi letter came out?
15     A. The second being the third, right?
16     Q. Technically, yes, ma'am.
17     A. Yes.
18     Q. And what was that?
19     A. I don't know the specifics of the
20 communication, but I know that I was told by Steve
21 Reardon there were communications with the DEA
22 regarding the Rannazzisi letter, as well as
23 attendance at a meeting in, I believe it was the
24 fall of 2007, September maybe, with the DEA.

Page 140

1     Again, I can't presently speak to every
2 single communication that Cardinal Health had.
3     Q. So is it Cardinal's position -- here.
4 We keep talking about it, so I'm just going to
5 give it to you.
6     A. That would be great.
7     MR. FULLER: There you go, Counsel.
8     MS. MAINIGI: Thank you.
9     MR. FULLER: Sure. And it's Norris 14,
10 and it's going to be Plaintiff's Exhibit 13 for
11 purposes of this deposition. And for the record
12 and everybody listening in, now we finally have
13 something with a Bates number on it, and it's
14 CAH_MDL_PRIORPROD_ DEA07_00837645.
15     - - -
16     (Cardinal-Norris Exhibit 13 marked.)
17     - - -
18 BY MR. FULLER:
19     Q. And, Ms. Norris, this is, I believe, a
20 document that was provided to us by your counsel.
21     Do you see that in front of you?
22     A. I see the document, yes.
23     Q. Are you aware that this was a letter
24 that the DEA did send back in 2006, and

Page 141

1 specifically September 27 -- God bless you --
2 September 27, 2006 to Cardinal Health.
3     A. Yes.
4     Q. And in your preparation for this
5 deposition, you had this document obtained and
6 you've reviewed this document; is that correct?
7     A. I have.
8     Q. And does this copy of it appear to be
9 the same as the copy that you pulled from
10 Cardinal's files to review?
11     A. Yes. It appears to be the document I've
12 reviewed.
13     Q. Now, you mentioned earlier just briefly
14 that there was a second and a third -- well, yeah,
15 a second and a third letter, right?
16     A. Yes.
17     Q. And that's because in the early part of
18 2007, the DEA sent another copy of this letter out
19 to all the wholesale distributors; is that
20 correct?
21     A. That is what I understand, yes.
22     Q. And you believe that letter to be a
23 pretty much identical copy of this one; is that
24 right?

Page 142

1  A.  Yes.
2  Q.  And then when I said the second DEA
3 letter, that is my fault, and I apologize.  But it
4 was actually -- you're correct -- the third that
5 was sent at the end of 2007.
6     Is that your understanding?
7  A.  That is my understanding.
8  Q.  Okay.  Fair enough.  I apologize for
9 that confusion.  Completely on me.
10     So, ma'am, read the first two sentences
11 of this letter from the DEA to Cardinal Health.
12  A.  "This letter is being sent to every
13 commercial entity in the United States registered
14 with the Drug Enforcement Administration to
15 distribute controlled substances.  The purpose of
16 this letter is to reiterate the responsibilities
17 of controlled substance distributors in view of
18 the prescription drug abuse problem our nation
19 currently faces."
20  Q.  Does Cardinal recognize that at this
21 point of time in 2006, that we did have a
22 prescription drug abuse problem in our nation?
23     MS. MAINIGI:  Objection; scope.
24  A.  Yes.

Page 143

1  Q.  And Cardinal also recognizes that it is
2 one of a multitude of players in this distribution
3 channel of prescription drugs, correct?
4  A.  Yes.
5  Q.  And that -- strike that.
6     If you'll go down to the Background
7 section.  Do you see that section next?
8  A.  Yes.
9  Q.  And if you'll read that first sentence,
10 "As each of you are -- or is undoubtedly aware."
11  A.  "As each of you is undoubtedly aware,
12 the abuse (nonmedical use) of controlled
13 prescription drugs is a serious and growing health
14 problem in this country."
15  Q.  Does Cardinal accept and adopt that
16 statement during this time frame, or does Cardinal
17 reject that statement?
18     MS. MAINIGI:  Objection; scope.
19 Objection; form.
20  A.  I think it's a fair statement.
21  Q.  If you'll go down to the next paragraph
22 and read that next sentence there for me, please,
23 "The CSA was."  And so we're clear when we say
24 "CSA," we mean Controlled Substances Act; is that

Page 144

1 fair?
2  A.  Yes.
3  Q.  Okay.  Go ahead, ma'am.
4  A.  "The CSA was designed by Congress to
5 combat diversion by providing for a closed system
6 of drug distribution in which all legitimate
7 handlers of controlled substances must obtain a
8 DEA registration, and as a condition of
9 maintaining such registration, must take
10 reasonable steps to ensure that their registration
11 is not being utilized as a source of diversion."
12  Q.  Does Cardinal accept the DEA's statement
13 that the CSA was designed by Congress to combat
14 diversion?
15     MS. MAINIGI:  Objection; form.
16 Objection; scope.
17  A.  I agree that that's what it says there.
18  Q.  And, yes, ma'am, I get that that's what
19 it says there.  But does Cardinal agree that that
20 was the design of the CSA, was to combat
21 diversion?
22     MS. MAINIGI:  Objection; form.
23 Objection; scope.  Objection; time period.
24  A.  I'm answering in my personal capacity.

Page 145

1 That's what it says there.
2  Q.  Well, you'll notice under C, it asks for
3 the past and present interpretation, compliance,
4 and agreement and/or disagreement with the Dear
5 Registrant letters from the DEA.  And this is a
6 Dear Registrant letter from the DEA.  We can agree
7 with that, correct?
8  A.  Correct.
9  Q.  So I want to know if Cardinal agrees --
10 not in your personal capacity.  I want to know if
11 Cardinal agrees with the statement that "The CSA
12 was designed by Congress to combat diversion."
13     MS. MAINIGI:  So I'm just going to note,
14 since you read the particular topic, Mike, that
15 you think is applicable here --
16     MR. FULLER:  Yes, ma'am.
17     MS. MAINIGI:  -- it says -- the rest of
18 the topic reads, "Disagreement" -- picking up
19 where you were, "Disagreement with the Dear
20 Registrant letters from the DEA outlining the
21 duties imposed on a distributor under federal
22 law."  The topic is not "let us know if every
23 single sentence in the Dear Registrant letter is a
24 sentence you agreed with."

Page 146

1      MR. LEVIN:  And "object to form" is
2  fine, Counsel.  Please.
3      MS. MAINIGI:  Thank you.
4  BY MR. FULLER:
5      Q.  Does Cardinal agree or disagree that the
6  CSA was designed to combat diversion?
7      MS. MAINIGI:  Objection; time period,
8  Objection; scope.  Objection; form.
9      A.  I agree that that's the statement that's
10  made here.
11      Q.  Do you agree that that was the design
12  behind the CSA --
13      MS. MAINIGI:  Same.
14      Q.  -- or do you disagree --
15      MS. MAINIGI:  Excuse me.  Same --
16      Q.  -- or do you not know?
17      MR. FULLER:  Sorry.
18      MS. MAINIGI:  Same objections.
19      A.  I can't speak to all of what is behind
20  the design of the CSA.  I can say that that is
21  what this sentence says.
22      Q.  So sitting here today, Cardinal doesn't
23  know what the design or the purpose behind the CSA
24  was, correct?

Page 147

1      MS. MAINIGI:  Objection; time period.
2  Objection; scope.
3      A.  That's not what I said.  I said --
4      Q.  So does Cardinal do know?
5      MS. MAINIGI:  Same objections.
6      A.  I said I can't -- I can't opine on the
7  entire thought process behind the CSA.  I can tell
8  you that is what that sentence says.
9      Q.  Okay.  But we know from reading earlier
10  that Congress has said that the design is to
11  prevent diversion, correct?
12      MS. MAINIGI:  Do you want to refer her
13  to a particular exhibit?
14      MR. FULLER:  She's welcome to flip
15  through.
16      A.  Part of the design is to ensure that
17  there are effective controls against diversion.
18      Q.  To prevent diversion, right?
19      A.  To maintain --
20      MS. MAINIGI:  Objection; form.
21      Q.  I'm sorry?
22      MS. MAINIGI:  Objection; scope.
23      A.  To maintain effective controls against
24  diversion, yes.

Page 148

1      Q.  Does that mean prevent diversion?
2      MS. MAINIGI:  Objection; form and scope.
3      A.  It means maintain effective controls
4  against diversion.
5      Q.  Against would be preventing, right?
6      MS. MAINIGI:  Objection; scope.
7      A.  Generally, yes.
8      Q.  I mean, it's sort of like going back to
9  the shipping requirement.  It's really a not
10  shipping requirement, right?
11      A.  Correct.
12      Q.  Okay.  Does Cardinal or is Cardinal --
13  strike that.
14      Is Cardinal required to take reasonable
15  steps to ensure that the registration isn't being
16  utilized as a source of diversion?
17      A.  I don't recall that being anywhere in
18  the statute or the regulations.  Cardinal Health's
19  obligation is to comply with the statute,
20  regulations, and guidance provided by the DEA.
21      Q.  So -- and I understand your response,
22  but now I'm asking you whether Cardinal has to
23  take reasonable steps to ensure that the
24  registration is not being utilized as a source of

Page 149

1  diversion.
2      A.  That is a statement in this letter.
3      Q.  And Cardinal either agrees, the answer
4  is yes; or disagrees, the answer is no; or I don't
5  know?
6      MS. MAINIGI:  Objection.
7      Q.  So let me --
8      MR. FULLER:  I'm sorry.  Go ahead.
9      MS. MAINIGI:  No.  Go ahead.
10      Are you done with your question?
11      MR. FULLER:  No.  I was going to ask a
12  cleaner one, which I imagine is what you wanted.
13  BY MR. FULLER:
14      Q.  Ms. Norris, speaking on behalf of
15  Cardinal, does Cardinal agree that it has to take
16  reasonable steps to ensure that their registration
17  is not being utilized as a source of diversion?
18      A.  Cardinal Health has an obligation to
19  comply with the statute, the regulations, the law
20  that applies, and the guidance provided by the
21  DEA.
22      Q.  And does that mean they have to take
23  steps to prevent their registration from being
24  used as a source of diversion; yes or no?

Page 150

1     A.  That is guidance provided by the DEA.

2     Q.  So being that this letter is guidance

3 provided by the DEA, then the answer is yes,

4 Cardinal has to take steps to prevent its

5 registration from being used as a source of

6 diversion, correct?

7     A.  Generally, yes.

8     Q.  Generally, yes, or yes?

9     A.  Generally, yes, in accordance with the

10 statute, the regulations, and the guidance

11 provided by the DEA.

12     Q.  Well, you've told me that several times.

13 And then I asked the follow-up, being that this

14 letter is guidance from the DEA, you would agree

15 with that, correct?

16     A.  Um-hmm, yes.

17     Q.  Cardinal agrees that this September 27,

18 2006 letter provided by Rannazzisi, who was at the

19 DEA, is providing guidance to the wholesale

20 distributor industry, correct?

21     A.  Correct.

22     Q.  Okay. And as part of that guidance,

23 he's telling wholesale distributors, including

24 Cardinal, that they need to take steps to prevent

Page 151

1 the registration from being used as a source of

2 diversion; yes or no?

3     A.  Yes, that is the guidance provided in

4 this letter.

5     Q.  Fair enough. Thank you. Read the rest

6 of that paragraph for me, please.

7     A.  "Distributors are, of course, one of the

8 key components in the distribution chain. If the

9 closed system is to function properly, as Congress

10 envisioned, distributors must be vigilant in

11 deciding whether a prospective customer can be

12 trusted to deliver controlled substances only for

13 lawful purposes."

14     "This responsibility is critical as

15 Congress has expressly declared that the illegal

16 distribution of controlled substances has a

17 substantial and detrimental effect on the health

18 and general welfare of the American people."

19     Q.  And Cardinal agrees and accepts that

20 distributors are one of the key components in the

21 distribution chain; is that right?

22     MS. MAINIGI: Objection; form.

23     A.  Yes.

24     Q.  And that the distributors must be

Page 152

1 vigilant in deciding whether a prospective

2 customer can be trusted to deliver controlled

3 substances only for lawful purposes; correct?

4     MS. MAINIGI: Objection; form.

5     A.  In maintaining effective controls

6 against diversion, yes.

7     Q.  So if Cardinal has a basis or a reason

8 for knowing a customer of theirs, a drugstore or

9 pharmacy, may be obtaining controlled substances

10 for an unlawful purpose, Cardinal has an

11 obligation not to participate in that scheme,

12 correct?

13     MS. MAINIGI: Objection; form.

14     A.  If Cardinal Health is aware that a

15 customer is doing that, Cardinal Health would not

16 sell to that customer.

17     Q.  Now, let me ask you, as it relates to

18 Cardinal's obligation, does Cardinal actually have

19 to be aware of actual diversion by the drugstore

20 or pharmacy or the potential for diversion by that

21 drugstore or pharmacy?

22     MS. MAINIGI: Objection; scope.

23     A.  What obligation are you referring to?

24     Q.  The obligation where it's going to sell

Page 153

1 those drugs to that pharmacy.

2     MS. MAINIGI: Objection; form and scope.

3     A.  Under the statute, Cardinal has an

4 obligation to identify and report suspicious

5 orders, and then under the additional guidance

6 provided by the DEA, the further obligation to not

7 ship those orders that it has reported as

8 suspicious.

9     Q.  And as we talked earlier, Cardinal has

10 an affirmative obligation to maintain effective

11 controls against diversion, correct?

12     A.  Correct.

13     Q.  That's separate from the suspicious

14 order regulation; isn't that true?

15     A.  Correct.

16     Q.  So in order to --

17     A.  Not completely separate, but yes.

18     Q.  It's in the Controlled Substances Act, I

19 will give you that.

20     A.  Yes.

21     Q.  And the Controlled Substances Act

22 spawned the regulation created by the DEA for

23 suspicious orders, fair enough?

24     A.  Yes.

Page 154

1    Q.  Okay.  So the requirement to maintain

2 effective controls against diversion means we have

3 to try to prevent diversion; is that correct?

4        MS. MAINIGI:  Objection; scope.

5 Objection; form.

6    A.  Cardinal Health has an obligation to

7 maintain those effective controls against

8 diversion.

9    Q.  And maintaining effective controls

10 against diversion is not shipping requirements,

11 shipping pills, shipping opioids to entities that

12 we suspect may be diverting them, correct?

13        MS. MAINIGI:  Objection; form.

14    A.  If we have a reasonable belief, if we

15 know they are diverting, then we do not ship to

16 them.

17    Q.  Now, let's break that answer down,

18 because that's two.  Is it a reasonable belief or

19 we know they're diverting?  Do you actually have

20 to know they're diverting before you hold a

21 shipment --

22        MS. MAINIGI:  Objection; form.

23    Q.  -- at least according to Cardinal?

24        MS. MAINIGI:  Objection; form.

Page 155

1    A.  No.

2    Q.  So if Cardinal suspects diversion from a

3 pharmacy or a drugstore, it has the affirmative

4 obligation to not sell opioids to that drugstore,

5 correct?

6        MS. MAINIGI:  Objection; scope.

7 Objection; form.

8    A.  Cardinal Health's anti-diversion program

9 is designed to identify those customers that we

10 suspect of diversion through our Know Your

11 Customer policy, through the other -- the

12 suspicious order monitoring, and if we have reason

13 to believe, we suspect that they are diverting,

14 then we will not ship to them.

15    Q.  So let me see if I can use what you just

16 told me to clean up the question and answer, okay?

17 So bear with me.

18        So under Cardinal's obligation to

19 maintain effective controls against diversion, if

20 Cardinal's anti-diversion program identifies a

21 drugstore or a pharmacy that may be diverting

22 controlled substances, Cardinal is not going to

23 sell to them, correct?

24        MS. MAINIGI:  Objection; form.

Page 156

1    A.  If they pose an unreasonable risk of

2 diversion or we know they are diverting, Cardinal

3 Health will not sell to them.

4    Q.  What is an unreasonable risk of

5 diversion?  It's basically they might be

6 diverting, right?

7        MS. MAINIGI:  Objection; form.

8    A.  We have reason to believe, based on the

9 totality of circumstances, they present a risk of

10 diversion, an unreasonable risk of diversion.

11    Q.  So -- and that's what I'm trying to find

12 out, what that unreasonable qualification is

13 there.

14        MS. MAINIGI:  Is that a question?

15        MR. FULLER:  No.  It's a statement.

16 We're going to jump around a little bit, and I

17 apologize.

18            - - -

19        (Cardinal-Norris Exhibit 14 marked.)

20            - - -

21        MR. FULLER:  Gina, this is Norris 24.

22        And for the record, this is Plaintiff's

23 Exhibit 14.

24

Page 157

1 BY MR. FULLER:

2    Q.  Ms. Norris, have you ever seen this

3 document before?

4    A.  I have not.

5    Q.  And I'll represent to you that it is

6 from the United States District Court, District of

7 Arizona.

8        Do you see that?

9    A.  I see that.

10    Q.  And it's a case in which Arizona

11 Pharmacy, LLC sued Cardinal Health 110, Inc., et

12 al.  And this document is actually Defendant

13 Cardinal's -- Cardinal Health 110, Inc., and

14 Cardinal Health 411, Inc.'s Response to

15 Plaintiff's Hearing Brief.

16        And what I'm going to tell you is that

17 the basis of this action is that Arizona Pharmacy,

18 LLC filed a lawsuit requesting a restraining order

19 against Cardinal for stopping shipments.  Okay?

20    A.  Mm-hmm, yes.

21    Q.  And this is Cardinal's response to that

22 temporary restraining request, okay?

23    A.  Okay.

24    Q.  So it was written by Cardinal's lawyers

Page 158

1 and filed in the Federal District Court in
2 Arizona. All right?
3    A. Okay. Can you give me a minute to read
4 through it?
5    Q. You certainly may, yes, ma'am.
6       MS. MAINIGI: Do you want to focus us on
7 what topic you're concentrating on so she can --
8       MR. FULLER: Well, there's highlights in
9 there, like there have been with all the
10 documents, but I think the witness generally likes
11 to flip past that like she's been doing. So we'll
12 just let her take her look.
13 BY MR. FULLER:
14    Q. Ms. Norris, you can take as much time as
15 you want and review the document, but I'm going to
16 focus on the bottom of page 6 where it talks about
17 "might."
18    A. I've just gotten there.
19    Q. Perfect timing then, huh?
20    A. Yep.
21    Q. And you just let me know when you're
22 ready. We've got all day, until about 7:30
23 tonight.
24       MR. FULLER: It's not that long of a

Page 159

1 drive.
2       MS. MAINIGI: We'll find out.
3    A. Okay.
4    Q. Okay, ma'am. So if you'll turn to page
5 6.
6    A. Yes.
7    Q. And you've had a chance to review this
8 document, at least most of it, correct?
9    A. Just now, yes.
10    Q. Yes, ma'am. And it is practically what
11 I -- well, I say practically. It is what I
12 explained to you. It's an action by a pharmacy
13 or -- a former customer of Cardinal because they
14 cut -- Cardinal cut them off in trying to get a
15 restraining order to continue shipments of
16 controlled Schedule II substances, opioids,
17 correct?
18       MS. MAINIGI: Objection to form.
19    A. The last piece, the specifics aren't
20 included here, but the distribution of controlled
21 substances I believe is what is at issue.
22    Q. Fair enough.
23       And then if you look down there at the
24 bottom, do you see that, where it says, "Cardinal

Page 160

1 Health has an obligation to avoid filling orders
2 that might be diverted."
3       Is that correct? Does Cardinal Health
4 have an obligation to avoid filling orders that
5 might be diverted?
6    A. That is the statement that --
7       MS. MAINIGI: Objection. Excuse me.
8 Objection to scope.
9    A. That is the statement that is made here.
10    Q. Is that an obligation that Cardinal has,
11 is to prevent from filling orders that might be
12 diverted?
13    A. Cardinal Health has an obligation to
14 maintain effective controls against diversion.
15    Q. So you agree with this statement made by
16 Cardinal's lawyers to the District Court in
17 Arizona, in an attempt to prevent from having a
18 restraining order put on them, to actually provide
19 controlled substances, correct?
20       MS. MAINIGI: Objection to form.
21 Objection to scope.
22    A. Cardinal Health has an obligation to do
23 its due diligence and understand all of the
24 factors related to that order and determine

Page 161

1 whether or not that order poses an unreasonable
2 risk of diversion.
3    Q. And if there's a risk of diversion, it
4 has to not ship that order; do you agree?
5       MS. MAINIGI: Objection to form.
6    A. If Cardinal Health identifies an
7 unreasonable risk of diversion, we will not ship
8 the order.
9    Q. And the lawyer in this brief goes on to
10 say, "Any emphasis on whether the Plaintiff is
11 actually diverting controlled substances is a red
12 herring that has no bearing on whether its
13 ordering pattern indicates -- or its ordering
14 patterns indicate that it might be engaged in
15 diversion."
16       Do you agree with that statement, ma'am?
17    A. One of the ways that Cardinal Health has
18 determined whether a customer poses an
19 unreasonable risk of diversion is to look at
20 ordering patterns and determine whether those are
21 similar to other customers who we have terminated
22 for diverting. That was an element of our
23 program, an anti-diversion program.
24    Q. And so is that yes to the question?

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    MS. MAINIGI: Objection to form.
2    Q. And, ma'am, you can say "no." You can
3  disagree with the statement that Cardinal's
4  lawyers put before the Federal District Court in
5  Arizona. That's okay.
6    A. I understand. One of the indications
7  that Cardinal Health looks at for purposes of
8  determining whether a customer poses an
9  unreasonable risk of diversion is ordering
10  pattern.
11    Q. So is that a yes?
12    A. Yes what?
13    Q. Yes to my question.
14    MS. MAINIGI: Do you want to ask it
15  again?
16    Q. The question was, "And the lawyer in
17  this brief goes on to say, 'Any emphasis on
18  whether the Plaintiff is actually diverting
19  controlled substances is a red herring that has no
20  bearing on whether the ordering -- order
21  pattern -- ordering pattern indicates or it --
22  ordering pattern." I'll try it again. Jeez
23  Louise.
24    And, ma'am, I'm looking at the second

Page 163

1  sentence there in that paragraph. And does
2  Cardinal agree that any emphasis on whether a
3  Plaintiff is actually diverting a controlled
4  substance is a red herring, and it has no bearing
5  on whether its ordering patterns indicate that it
6  might be engaged in diversion."
7    Does Cardinal agree; yes or no?
8    MS. MAINIGI: Objection to form.
9    A. Not necessarily. It's looking at the
10  circumstances in total.
11    Q. Right.
12    A. I guess --
13    Q. I'm sorry. Go ahead.
14    A. But I guess I'm having a hard time
15  parsing out exactly what you're asking here.
16    Q. Well, let's break it down a little bit.
17    A. Okay.
18    Q. Cardinal's obligation to maintain
19  effective controls against diversion doesn't mean
20  it has to actually go out and prove that the
21  drugstore or pharmacy is diverting?
22    MS. MAINIGI: Objection; form.
23  Objection; scope.
24    A. Correct.

Page 164

1    Q. Okay. And what Cardinal is attempting
2  to do is to operate in the safest way possible
3  when it's dealing with controlled substances; is
4  that true?
5    MS. MAINIGI: Objection; scope.
6    A. Cardinal Health takes very seriously its
7  obligations related to all of the work it
8  provides, but also in regard to its distributing
9  of controlled substances, yes.
10    Q. And it wants to do it the safest way
11  possible; one, for the general public and, two, to
12  comply with the regulations; is that fair?
13    MS. MAINIGI: Objection; scope.
14  Objection; form.
15    A. Cardinal Health wants to ensure that
16  it's complying with the obligations under the
17  statute and the guidance.
18    Q. Does it also want to ensure that it does
19  what it can to prevent the public from harm?
20    MS. MAINIGI: Objection; scope.
21  Objection; form.
22    A. I don't know that Cardinal owes a duty
23  to the public regarding that. Cardinal Health has
24  an obligation to comply with its obligations under

Page 165

1  the law and the guidelines --
2    Q. And I'm just --
3    A. -- guidance.
4    Q. I'm sorry. Go ahead.
5    A. Guidance instead of guidelines. Sorry.
6    Q. And I'm just asking if Cardinal wants to
7  do what it can to help protect the public from
8  harm; yes or no?
9    MS. MAINIGI: Objection; scope.
10  Objection; form.
11    A. Cardinal Health operates in accordance
12  with the applicable laws, statutes, regulations,
13  and guidance.
14    Q. Does Cardinal Health operate with a
15  moral compass, too?
16    MS. MAINIGI: Objection; form.
17  Objection; scope.
18    Q. Or does Cardinal not care if --
19    MS. MAINIGI: I think soon it should be
20  time for a lunch break, Mike, because I think
21  we're --
22    MR. FULLER: As soon as we finish this
23  document, yes, ma'am.
24    MS. MAINIGI: Fine. Then go back to the

Page 166

1 document, because there's nothing about a moral
2 compass in the document.
3     A.  I'm sorry.  What was your question?
4     Q.  Does Cardinal not feel that it has an
5 obligation to the general public?
6         MS. MAINIGI:  Objection to scope.
7 Objection to form.
8     A.  Cardinal Health does not have an
9 obligation to the general public.  Cardinal Health
10 has an obligation to perform its duties in
11 accordance with the law, the statute, regulations,
12 and guidance.
13     Q.  And I got it.  So the answer is no,
14 Cardinal Health does not believe it has an
15 obligation to the general public, correct?
16         MS. MAINIGI:  Objection to form.
17 Objection to scope.
18     A.  No.
19     Q.  No, that's not correct, or no, you agree
20 with me?
21         MS. MAINIGI:  Objection to form.
22 Objection to scope.
23     Q.  Let me ask it a different way.  Yes or
24 no, does Cardinal have a general obligation to

Page 167

1 protect the public?
2         MS. MAINIGI:  Objection to form.
3 Objection to scope.
4     A.  Cardinal Health has an obligation to
5 comply with the laws that apply to the services it
6 provides.
7     Q.  Yes, ma'am.  But that wasn't my
8 question.  Not even close.
9         My question is simply does Cardinal
10 believe that it has an obligation to the general
11 public in distributing controlled substances?
12 It's either yes, we do, or no, we don't.  We know
13 about the regs.
14         MS. MAINIGI:  Objection to form.  She's
15 been asked that question a number of times and
16 answered it a number of times.  Objection to
17 scope.
18     Q.  Go ahead.
19     A.  I'll say it again.  Cardinal Health has
20 an obligation to comply with the applicable laws,
21 rules, regulations, and guidance in the
22 performance of its services.
23         MR. FULLER:  And I'll reserve my right
24 to come back and have you compelled to answer that

Page 168

1 question.
2         We'll take a lunch break.
3         MS. MAINIGI:  I thought you wanted to
4 finish this document?  Why don't we finish the
5 document.
6         MR. FULLER:  Okay.
7         MR. FARRELL:  Well, at this pace, we'll
8 be here all day.
9         MR. FULLER:  That's all right.
10         MS. MAINIGI:  Talk to your guy.
11         MR. FARRELL:  Well, talk to your
12 witness.  She hasn't answered the question yet.
13         MS. MAINIGI:  If he's got more
14 questions --
15         MR. FULLER:  Oh, he's got to switch the
16 media anyway.
17         MR. FARRELL:  Let's take a lunch break.
18         THE VIDEOGRAPHER:  The time is now
19 12:39.  Going off the record.
20              - - -
21         Thereupon, at 12:39 p.m. a lunch
22         recess was taken until 1:49 p.m.
23              - - -
24

Page 169

1         Tuesday Afternoon Session
          July 7, 2018
2              1:49 p.m.
3              - - -
4         THE VIDEOGRAPHER:  All right.  The time
5 is now 1:49.  Back on the record.
6              - - -
7         CROSS-EXAMINATION
8 BY MR. FARRELL:
9     Q.  Good afternoon.  My name is Paul
10 Farrell, and I'm going to be covering some of the
11 subject matters in the first notice of the
12 30(b)(6) deposition.
13         I'd like to reference where we left off,
14 which is Norris 14 or the deposition -- Plaintiff
15 Exhibit 13, and it was the September 27, 2006
16 correspondence from DEA to Cardinal Health.
17         You recognize this document, yes?
18     A.  I do.
19     Q.  Now, one of the questions I have is when
20 you look at the addressee, it says Knoxville,
21 Tennessee.  Can you confirm whether one of these
22 Dear Registrant letters, identical to the
23 September 27, 2006 letter to Knoxville, Tennessee,
24 was also sent to all of the other Cardinal Health

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  distribution centers.
2      A.  That is my understanding, yes.
3      Q.  Without belaboring the point, when you
4  review this 2006 correspondence from the DEA,
5  sitting here today, does Cardinal Health affirm
6  and ratify the statements regarding the law
7  contained therein?
8          MS. MAINIGI:  Objection; scope.
9  Objection; form.
10         MR. FARRELL:  Well, it can't be outside
11 the scope.  It like literally was written in there
12 because I typed it myself.
13         MS. MAINIGI:  That's my objection.
14         MR. FARRELL:  Okay.
15         MS. MAINIGI:  If you want to point her
16 to a particular sentence that happens to relate
17 back to your topic, that's fine.
18         MR. FARRELL:  That's okay.
19 BY MR. FARRELL:
20     Q.  So what I'm asking, sitting here today,
21 representing Cardinal Health, do you accept the
22 statements set forth in the September 27, 2006
23 letter from the DEA related to the duties under
24 the regulations?

Page 171

1          MS. MAINIGI:  Objection to form.
2  Objection to scope.
3      A.  I accept that this letter laid out
4  duties and regulations, but that it also presented
5  new duties that Cardinal Health was to comply with
6  under the regulations.
7      Q.  So as of September 27, 2006, you
8  acknowledge that this letter sets forth the
9  obligations under the Controlled Substances Act
10 and under the Code of Federal Regulations for
11 Cardinal Health?
12         MS. MAINIGI:  Objection; scope.
13 Objection; form.
14     A.  As to the reiteration of the reporting
15 requirement, yes.  Again, the "shipping
16 requirement," to use short form, was a new -- new
17 idea to Cardinal Health at the time they received
18 this letter.  So it was not -- I do not agree that
19 that was an obligation in the statute going back.
20     Q.  Okay.  So let's start over.
21         Do you agree that on September 27, 2006,
22 Cardinal Health got instructions with a new
23 requirement called the shipping requirement?
24         MS. MAINIGI:  Objection to form.

Page 172

1      A.  Yes.
2      Q.  And from that point forward, that was
3  the law in the United States of America according
4  to Cardinal?
5          MS. MAINIGI:  Objection to form.
6      A.  From that point forward, that was the
7  guidance the DEA was providing to Cardinal Health
8  regarding its obligations.
9      Q.  And according to the DEA, if you did not
10 follow this guidance, you may be engaging in
11 unlawful conduct?
12         MS. MAINIGI:  Objection to form.
13 Objection to scope.
14     A.  We may be engaging in activities that do
15 not comply with the statute, regulations, and
16 DEA's guidance.
17     Q.  Okay.  Has Cardinal Health since
18 September 27, 2006 accepted the duties set forth
19 in the Dear Registrant letter?
20         MS. MAINIGI:  Objection to form.
21     A.  Generally, yes, as further modified by
22 additional DEA guidance.
23     Q.  Very good.  So sitting here today, you
24 can tell me that as of September 27, 2006,

Page 173

1  Cardinal Health's position has been that it will
2  comply moving forward with the Dear Registrant
3  letter?
4          MS. MAINIGI:  Objection to form.
5      A.  Generally speaking, yes, as modified by
6  the additional guidance Cardinal Health received
7  over time.
8      Q.  Is there anything set forth in the 2006
9  Dear Registrant letter that Cardinal Health
10 objects to, disagrees with, or takes exception to?
11         MS. MAINIGI:  Objection to form.
12         Do you want her to take a look at the
13 letter?
14         MR. FARRELL:  I'm assuming she already
15 has since it's listed specifically in the subject
16 matter for this deposition.
17     A.  Generally speaking, at least one of the
18 issues that Cardinal Health took umbrage with was
19 that -- the idea that the shipping requirement had
20 always existed.
21     Q.  Okay.
22     A.  It had not.
23     Q.  Okay.  So do you believe that within the
24 2006 registrant letter, there is a statement

Page 174

1 imposing a shipping requirement?
2     MS. MAINIGI:  Objection; asked and
3 answered.
4     A.  Generally speaking, yes.
5     MS. MAINIGI:  And, again, shipping
6 requirement being defined right now for the
7 purposes of our conversation by how Masters
8 defined it, which is a do not ship requirement.
9     MR. FARRELL:  So raise your right hand.
10     MS. MAINIGI:  Do you agree?
11     MR. FARRELL:  Well, I have to raise my
12 right hand if I'm going to testify.  So I'll make
13 you a deal.  Let's both raise our right hands.
14     MS. MAINIGI:  I'm asking you a question.
15 BY MR. FARRELL:
16     Q.  Okay.  So I'm now going to have marked
17 the next sequential exhibit, which is the
18 Deposition Exhibit 15, but is Norris 15, which
19 I'll represent to you is the December 27, 2007 DEA
20 letter that you just referenced.
21         - - -
22     (Cardinal-Norris Exhibit 15 marked.)
23         - - -
24

Page 175

1 BY MR. FARRELL:
2     Q.  And, again, what you'll note is that it
3 is addressed to Syracuse, New York.  I'm assuming
4 that Cardinal Health will acknowledge this 2007
5 Dear Registrant letter was, in fact, sent to every
6 one of the distribution facilities Cardinal Health
7 had at the time across the country.
8     A.  Yes.
9     Q.  Do you recognize this document?
10     A.  I do.
11     Q.  Is this, in fact, the second Dear
12 Registrant letter sent by the DEA to Cardinal
13 Health?
14     A.  Technically the third, but yes.
15     Q.  Okay.  So tell me -- explain that to me.
16     A.  I think, as we talked about --
17     MS. MAINIGI:  Objection; asked and
18 answered.
19     A.  As we talked about this morning, there
20 were actually two different -- two different
21 versions of letter one.  "Versions" is not the
22 right word, because they sent almost an identical
23 copy in February, I believe, of 2007 of what they
24 had sent in 2006.  So this is technically the

Page 176

1 third letter; although, it is the second from a
2 substantive standpoint.
3     Q.  So you recognize this as a true and
4 accurate copy of that document?
5     A.  Yes.
6     Q.  In fact, does it have a Bates stamp in
7 the bottom right-hand corner?
8     A.  It has a stamp in the bottom right-hand
9 corner.
10     Q.  Okay.  And read those letters and
11 numbers.
12     A.  CAH_MDL_PRIORPROD_DEA12_00010980.
13     Q.  All right.  So have you reviewed this
14 document before coming here today?
15     A.  Yes.
16     Q.  All right.  You'll agree with me that it
17 further clarifies the shipping requirement as the
18 DEA was interpreting it in 2007?
19     MS. MAINIGI:  Objection to form.
20     A.  Yes.
21     Q.  And you agree that as of this letter,
22 there can be no doubt that a shipping requirement
23 exists in the United States of America?
24     MS. MAINIGI:  Objection to form.

Page 177

1     A.  This letter clarifies DEA's guidance
2 that there was a shipping requirement.
3     Q.  Has Cardinal Health always taken that
4 position?
5     MS. MAINIGI:  Objection to form.
6 Objection; time period.
7     Go ahead.
8     A.  Always in what -- I don't know what time
9 period you're referring to as "always," because we
10 didn't receive the letter until December 27, 2007.
11     Q.  Fair enough.
12     After December 27, 2007, has Cardinal
13 Health always taken the position that there was a
14 shipping requirement?
15     MS. MAINIGI:  Objection to form.
16     A.  Yes.
17     Q.  So since 2007, Cardinal Health has
18 always taken the position there was a duty to stop
19 shipment of suspicious orders?
20     MS. MAINIGI:  Objection to form.
21     Q.  That's your position today?
22     MS. MAINIGI:  Sorry.  Objection; form.
23 Objection; scope.
24     A.  Cardinal Health designed the

Page 178

1 enhancements to its program after 2007 to ensure
2 that suspicious orders were not shipped. Orders
3 reported as suspicious were not shipped.
4      Q.  That wasn't my question.
5           My question is, since 2007, has Cardinal
6 Health always taken the position that there is a
7 duty to stop shipment of suspicious orders?
8           MS. MAINIGI:  Objection; form and scope.
9      A.  Cardinal Health designed its program
10 after 2007 -- in 2007, the enhancements to its
11 program, to ensure that it didn't ship orders it
12 had reported as suspicious.
13      Q.  I think that must be written behind me
14 somewhere.  Let me ask again.
15           Since 2007, has Cardinal Health always
16 taken the position that there is a duty to stop
17 shipment of suspicious orders?
18           MS. MAINIGI:  Objection; asked and
19 answered.  Objection; scope.
20      A.  I'm not sure I understand the nuance in
21 your question.  We designed the program --
22      Q.  There is no nuance.
23           MS. MAINIGI:  Can you let her finish?
24      A.  We designed the program to comply with

Page 179

1 the guidance --
2      Q.  I know.  This is the third time you've
3 said that.  What I'm trying --
4           MS. MAINIGI:  Would you just let her
5 explain?
6           MR. FARRELL:  No, I'm not, because we've
7 moving through this.
8           MS. MAINIGI:  You're going to --
9           MR. FARRELL:  Yes, I'm going to
10 interrupt her.
11 BY MR. FARRELL:
12      Q.  I'm asking you whether or not the
13 position you're taking today about the 2007 letter
14 and the shipping requirement has changed over time
15 since 2007?
16           MS. MAINIGI:  So phrase it in the form
17 of a question --
18           MR. FARRELL:  I'm not.
19           MS. MAINIGI:  -- and she'll answer it.
20           MR. FARRELL:  I'm not.  I can't be any
21 clearer.
22           MS. MAINIGI:  Object.
23           Is that your question?
24      A.  I guess I don't -- I'm sorry.  I guess I

Page 180

1 don't understand the question.  We designed our
2 program to comply with the guidance.
3           MS. MAINIGI:  And I'll interpose an
4 objection to form.  Objection to scope.
5      Q.  Since 2007, has Cardinal Health always
6 taken the position that there is a shipping
7 requirement as outlined in Masters Pharmaceutical?
8      A.  Taken the position where?
9           MS. MAINIGI:  Same objections.
10      Q.  Anywhere.  Why don't we just say first
11 the public record.
12           MS. MAINIGI:  Objection to form.
13      A.  This -- to the best of my knowledge,
14 this was the program -- we designed the program to
15 comply, and there was a shipping -- we do not ship
16 the orders that we report as suspicious.
17      Q.  Have you changed that position in a
18 court of public record since 2007 --
19           MS. MAINIGI:  Objection to form.
20      Q.  -- to the best of your knowledge?
21      A.  Not to my knowledge.
22      Q.  Okay.  Will you -- I'm going to bring up
23 now a transcript from June 20, 2017 in the United
24 States District Court for the Southern District of

Page 181

1 West Virginia.  So we'll go to the front page
2 first, and I'll show it to you.
3           MS. MAINIGI:  Can we have a copy?
4           MR. FARRELL:  I don't have one.
5 BY MR. FARRELL:
6      Q.  So you see the date June 20?
7           MS. MAINIGI:  You've got to let her read
8 the transcript.
9      Q.  Do you see the date June 20?
10      A.  I do.
11      Q.  Okay.  This is ten days before the
12 Masters Pharmaceutical case was released.  I'll
13 represent that to you.  Now I'm going to go to
14 page 88.  This is counsel for Cardinal Health.
15           MS. MAINIGI:  Can we go all the way up
16 to the top?
17      Q.  So I'd ask for you to read what's
18 highlighted.  Read it aloud.
19      A.  "Because there is no statute, no
20 regulation at the federal or state level that says
21 distributors should stop shipments if there's
22 suspicious orders."
23      Q.  Now I'm going to have you look down to
24 the provision that's highlighted below that.

Page 182

1 Would you read that aloud?
2    A.  "There's no duty, there's no regulation
3 that says we're supposed to stop shipment."
4    Q.  That's what I was trying to figure out,
5 is whether or not -- it looks like ten days before
6 the Masters case came out, Cardinal Health's
7 position was there was no duty to stop shipment.
8        MS. MAINIGI:  Objection; form.
9 Objection; scope.
10    A.  The language says there's no statute, no
11 regulation at the federal or state level, which is
12 true.  There is no statute and no regulation that
13 says distributors should stop shipments if there's
14 suspicious orders.  Cardinal Health's position has
15 not changed on that.
16    Q.  Do you recognize that the Masters
17 Pharmaceutical case that came out rejected that
18 position?
19        MS. MAINIGI:  Objection to form.
20    A.  I don't believe they rejected the
21 position regarding the statute or the regulation
22 statement.
23    Q.  You understand that Masters
24 Pharmaceutical, as you went through this morning,

Page 183

1 has a shipping requirement?
2    A.  Yes.
3    Q.  It says you have a duty to stop shipment
4 of suspicious orders?
5        MS. MAINIGI:  Objection to form.
6    A.  It refers to a shipping requirement,
7 yes.
8    Q.  So I'm asking you, sitting here today,
9 does Cardinal Health believe there is a shipping
10 requirement as set forth in Masters
11 Pharmaceutical?
12        MS. MAINIGI:  Objection to form.
13    A.  Yes.
14    Q.  And it has been so since at least the
15 2007 Dear Registrant letter according to Cardinal
16 Health?
17    A.  I believe that's also the reference in
18 Masters.
19    Q.  Very good.  Now what I'm going to ask
20 you to go and look at is -- you're familiar with
21 the amicus brief in Masters Pharmaceutical?
22    A.  I am.
23    Q.  Did you participate in writing it?
24    A.  I did not.

Page 184

1    Q.  Was Cardinal Health -- did Cardinal
2 Health approve or ratify it prior to its filing?
3        MS. MAINIGI:  Objection to form.
4    A.  Cardinal Health provided commentary on
5 it prior to its filing.
6    Q.  Did Cardinal Health approve it?
7    A.  Cardinal Health provided commentary.
8    Q.  Did Cardinal Health approve it?
9        MS. MAINIGI:  Objection to form.  Asked
10 and answered.
11    A.  Cardinal Health provided commentary.
12    Q.  Did Cardinal Health approve it?
13        MS. MAINIGI:  Objection to form.  Asked
14 and answered.
15    A.  It provided commentary on it.
16    Q.  Did Cardinal Health approve the document
17 prior to filing?  Fifth time I'm asking.
18    A.  I understand.
19        MS. MAINIGI:  Objection to form.  Asked
20 and answered.
21    A.  Cardinal Health provided commentary on
22 the amicus brief.
23    Q.  Let me give you a hint.  I'm not going
24 to ask you a question that I probably don't know

Page 185

1 the answer to.
2        So are you aware of whether or not
3 Cardinal Health approved the amicus brief prior to
4 filing?
5        MS. MAINIGI:  Objection to form.  Asked
6 and answered.
7    A.  It provided commentary.  I don't know if
8 that commentary rose to the level of approval.
9        - - -
10    (Cardinal-Norris Exhibit 16 marked.)
11        - - -
12    Q.  I'm going to have marked now Deposition
13 Exhibit 16.  I'm going to hand it to you.  It is
14 Bates-stamped ABDCMDL00275057.  It is the
15 Healthcare Distribution Management Association's
16 Executive Committee Meeting summary from June 12,
17 2016 held in Colorado Springs, Colorado.
18        Have you seen or are you familiar with
19 this document?
20    A.  I am not.  I have not.
21    Q.  When you flip to page 2, you'll notice
22 that it says June 12, 2016, or on the front page
23 as well.
24    A.  Yes, it says June 12, 2016.

Page 186

1    Q.   The first thing I'd like to direct your
2  attention to is the very beginning on page 4.  And
3  you'll notice at the top, these are the minutes
4  from the Pebble Beach, California Executive
5  Committee meeting.  And you'll see in
6  attendance -- well, you see the second person who
7  is in attendance?
8    A.   Yes.
9    Q.   Who is that?
10    A.   John Giacomin, Vice Chairman.
11    Q.   Of?
12    A.   CEO, Pharmaceutical Segment, Cardinal
13  Health, Inc.
14    Q.   So Cardinal Health, Inc. sent their CEO
15  of the Pharmaceutical Segment to this meeting,
16  correct?
17    A.   Well, I believe John serves on the
18  Executive Committee.
19    Q.   Cardinal Health sent its CEO to attend
20  this meeting?
21       MS. MAINIGI:  Objection; scope.
22    A.   The CEO of the Pharmaceutical Segment
23  who was on the Executive Committee.
24    Q.   Of HDMA?

Page 187

1    A.   Yes.
2    Q.   Now, if you look down at the bottom at
3  the Welcome and Administrative Matters, actually
4  Mr. Giacomin from Cardinal Health chaired this
5  meeting, correct?
6    A.   That's what it appears from the
7  language, yes.
8    Q.   Now, if you flip to the next page under
9  paragraph C, Legal Issues, the first item is the
10  Masters Pharmaceuticals case.
11       Would you read aloud what the summary
12  says?
13    A.   "The status of the Masters litigation as
14  well as discussion of the draft amicus curiae
15  brief to be possibly filed on behalf of HDMA will
16  be discussed later in the meeting led by President
17  Gray and HDMA General Counsel Gallenagh."
18    Q.   Now, if you flip to the next page,
19  you'll see that there is a provision -- no.  We're
20  going to go down to the Masters first.  You're
21  going to see that under Masters amicus brief, it
22  states, "The central theme of the draft brief is
23  that DEA must follow statutory and regulatory
24  requirements regarding the imposition of

Page 188

1  suspicious order reporting.  Notice-and-comment
2  rule-making required."
3       Do you see that?
4    A.   I see that.
5    Q.   So when you look below at the actions,
6  you'll see that it was subject to a vote and
7  approved to submit an amicus brief, agreed?
8       MS. MAINIGI:  Objection to form.
9    A.   The executive committee approved filing
10  of the brief.
11    Q.   Right.  Now, flip to the previous page.
12  And the interesting thing is that they're talking
13  about the West Virginia litigation.
14    A.   I'm sorry.  Flip to what page?  I
15  apologize.
16    Q.   That's all right.  The previous page.
17  It will be 5 at the bottom of the page, I think.
18    A.   Yes.
19    Q.   And you'll see that there's a provision
20  in there about the West Virginia litigation under
21  Item 4.  And the paragraph at the bottom of the
22  page --
23       MS. MAINIGI:  I think she's reading it.
24  Can you give her a moment to take a look at it?

Page 189

1    A.   Okay.
2    Q.   Now, the last paragraph that's on that
3  page starting with "Counsel Frank," will you read
4  that aloud, please?
5    A.   "Counsel Frank characterized the series
6  of DEA and state actions as efforts to improperly
7  expand distributors' responsibilities beyond
8  simply reporting suspicious orders to actually
9  preventing the distribution of controlled
10  substances to licensed dispensers.  States are
11  bringing these actions for similar reasons but
12  also in an effort to collect monetary damages and
13  penalties."
14    Q.   So now you understand my confusion from
15  this morning when it seems as if Cardinal Health
16  is participating in an amicus brief and
17  characterizing the DEA and the state actions as
18  actually requiring you, Cardinal Health, to
19  prevent distribution of controlled substances to
20  licensed dispensers.
21       So, again, my question goes back to it.
22  Prior to the release of Masters Pharmaceutical,
23  are you sure Cardinal Health hadn't flip-flopped
24  its positions regarding the shipping requirement?

Page 190

1    MS. MAINIGI:  Objection to form.
2  Objection to scope.
3    A.  No, I do not believe Cardinal Health
4  flip-flopped its position.  We designed our
5  program to comply with the shipping requirement.
6  The fact that we participated in these briefs
7  doesn't mean that we were not complying with the
8  requirements as we understood the DEA to have
9  provided us guidance for.
10    Q.  Understood.  We'll get to the brief now,
11  which is going to be marked as Exhibit 17.  It's
12  Norris 20.
13        - - -
14    (Cardinal-Norris Exhibit 17 marked.)
15        - - -
16  BY MR. FARRELL:
17    Q.  Have you seen and read this brief
18  before?
19        MS. MAINIGI:  Well, can you let her lay
20  eyes on it, and then she can tell which one you're
21  talking about.
22    Q.  Have you reviewed this document prior to
23  today?
24    A.  I have.

Page 191

1    Q.  You're aware that it's one of the items
2  listed in the 30(b)(6) notice?
3    A.  I am.
4    Q.  This is the amicus brief that was
5  approved by HDMA during a meeting chaired by
6  Cardinal Health's CEO.
7    A.  Approved to be filed, yes.
8    Q.  Approved to be filed.  Ratifying its
9  truth and accuracy?
10        MS. MAINIGI:  Objection to form.
11        And I hope you're not mischaracterizing
12  facts to this witness.  Did you show her where it
13  was approved?
14        MR. FARRELL:  Yeah.  Again, this is
15  about your 15th speaking objection.  She can
16  answer the question.
17        MS. MAINIGI:  I don't think so.
18    A.  The action was --
19        MR. FARRELL:  Gee, that's amazing that
20  she picked up right on what your objection was.
21  Enu, that's not an appropriate objection.  She can
22  ask or answer herself.
23  BY MR. FARRELL:
24    Q.  The fact of the matter is we walked

Page 192

1  through the fact that this amicus brief was
2  approved for filing by HDMA and was eventually
3  filed by HDMA?
4    A.  Correct.  It was approved for filing
5  subject to final review and approval.
6    Q.  And that chairman of that committee was
7  who?
8    A.  The chairman at the time was Ted
9  Schurer.
10    Q.  The acting chair?
11    A.  Yes.  I assume where you're going is
12  John was chairing the meeting that day.
13    Q.  So this nonsense objection gets right
14  back to where we were.  This is the amicus brief
15  that Cardinal Health, as a member of HDMA,
16  submitted in the Masters Pharmaceutical case,
17  agreed?
18        MS. MAINIGI:  Objection to form.
19    A.  This is the amicus brief that HDMA
20  filed.
21    Q.  All right.  Now, if you flip to page 5,
22  Norris 20-005.
23    A.  Yes.
24    Q.  So at the very -- the first highlighted

Page 193

1  provision in there, I'll read it aloud to make
2  this quicker.  "The public health dangers
3  associated with diversion and abuse of controlled
4  prescription drugs have been well recognized by
5  Congress, DEA, public health authorities, and
6  others, including HDMA and NACDS and their
7  members."
8        Do you see that?
9    A.  I do.
10    Q.  Sitting here today, does Cardinal Health
11  ratify and agree with that statement?
12        MS. MAINIGI:  Objection to form.
13  Objection; scope.
14    A.  Cardinal Health agrees with this
15  statement.
16    Q.  So if controlled substances that
17  Cardinal Health sells gets diverted, it has the
18  potential to cause public health dangers, agreed?
19        MS. MAINIGI:  Objection; scope.
20    A.  Can you repeat the question?
21    Q.  Cardinal Health has an obligation --
22  well, wait a minute.  Where am I here?
23        If controlled substances that Cardinal

Page 194

1  Health sells gets diverted, it has the potential
2  to cause public health dangers, agreed?
3      MS. MAINIGI:  Objection to form.
4  Objection to scope.
5      A.  Not necessarily.
6      Q.  So you disagree with the statement that
7  your trade organization submitted in the Masters
8  Pharmaceutical case?
9      MS. MAINIGI:  Objection; form.
10 Objection; scope.
11     A.  I don't think I'm disagreeing with the
12 statement.
13     Q.  Okay.  So how about this:  Let's play
14 true or false.  I'll read the sentence, and you
15 say true or say false, okay?
16     MS. MAINIGI:  The witness can answer as
17 she likes.
18     A.  Okay.
19     Q.  "The public health dangers associated
20 with the diversion and abuse of controlled
21 prescription drugs have been well recognized by
22 Congress, DEA, public health authorities and
23 others, including HDMA and NACDS and their
24 members."

Page 195

1      True or false?
2      MS. MAINIGI:  Objection; form.
3  Objection; scope.
4      A.  True.
5      Q.  "HDMA and NACDS members not only have
6  statutory and regulatory responsibilities to guard
7  against diversion of controlled prescription drugs
8  but undertakes such efforts as responsible members
9  of society."
10     True or false?
11     MS. MAINIGI:  Objection; form.
12 Objection; scope.
13     A.  I disagree with the "undertake such
14 efforts as responsible members of society."  We
15 have a statutory and regulatory obligation that we
16 comply with.
17     Q.  So it's false?
18     MS. MAINIGI:  Objection to form.
19 Objection to scope.
20     A.  No, not in total.
21     Q.  You're sitting here on behalf of
22 Cardinal Health today, not in-house counsel.
23     Does Cardinal Health accept or reject
24 the fact that as responsible members of society,

Page 196

1  they have a duty to guard against diversion?
2      MS. MAINIGI:  Objection; asked and
3  answered.  Objection; scope.
4      A.  Cardinal Health has regulatory and legal
5  obligations that it must comply with in performing
6  its services, which is what it does.
7      Q.  We're going to get to your tag line
8  later.  Again, your answer was clear before.  You
9  don't have to repeat it.  You can just say "ditto"
10 to save time.
11     I'm asking you whether or not you
12 acknowledge that the amicus brief submitted on
13 behalf of Cardinal Health's trade organization
14 states that as responsible members of society, you
15 have a duty to guard against diversion.
16     MS. MAINIGI:  Objection to form.  Asked
17 and answered.  Objection; scope.
18     A.  That is a statement in the amicus brief.
19     Q.  I'm going to ask you for a third time.
20 Do you agree with this statement, yes or no?
21     MS. MAINIGI:  Objection to form.  Asked
22 and answered.  Objection; scope.
23     A.  I believe I answered.  I don't believe
24 that -- with the statement in total.

Page 197

1      Q.  So it's false; you do not believe
2  there's a duty?
3      MS. MAINIGI:  Objection to form.
4  Objection; asked and answered.  Objection; scope.
5      A.  No, I don't believe there is a duty.
6      Q.  Yet Cardinal Health approved the
7  submission of this document to the D.C. Circuit
8  Court of Appeals?
9      MS. MAINIGI:  Objection; form.
10     A.  Yes.  Cardinal Health approved this to
11 be filed.
12     Q.  Now, if you go down to the next part,
13 you'll see where it says "But in certain recent
14 pronouncements."
15     Would you read that?
16     A.  Yes.
17     Q.  It says, "DEA has required distributors
18 not only to report suspicious orders, but to
19 investigate orders; as an example, interrogating
20 pharmacies and physicians and take action to halt
21 orders before they are filed.
22     "Those added obligations would
23 significantly expand the report only duty of
24 distributors under the longstanding regulatory

Page 198

1 scheme and impose impractical obligations on
2 distributors."
3         Does Cardinal Health agree or disagree
4 with that statement?
5         MS. MAINIGI:  Objection to form.
6 Objection; scope.
7    A.  Cardinal Health agrees that the
8 reporting obligation was a new obligation imposed
9 by -- sorry.  I misspoke.  The shipping obligation
10 was a new obligation imposed by the DEA which
11 Cardinal Health complied with once they were made
12 aware of it.
13    Q.  This is -- listen.  This amicus brief
14 was submitted in what year?
15    A.  2016, '17.
16    Q.  Okay.  And what year did Cardinal Health
17 receive the shipping requirement Dear Registrant
18 letter?
19    A.  Initially in 2006.
20    Q.  So a decade earlier, correct?
21        MS. MAINIGI:  Objection to form.
22    A.  Correct.
23    Q.  This document submitted by Cardinal
24 Health's trade group seems to indicate a rejection

Page 199

1 of the shipping requirement ten days before the
2 Masters Pharmaceutical case was released.
3         MS. MAINIGI:  Objection to form.
4 Objection; argumentative.  Objection; scope.
5    A.  I believe when you read the brief in
6 total, it refers clearly to the 2006 DEA letters.
7 So the -- if there is an insinuation that they are
8 somehow saying that it's new then in 2016, '17,
9 that's not the -- that's not what the entire
10 letter says.
11    Q.  Well, let's go to page 9 where the brief
12 literally says, "Nothing" --
13        MS. MAINIGI:  Can you wait until she
14 gets to page 9, please?
15        And then do you want to draw her
16 attention to where on page 9 you are?
17    A.  I'm on page 9.
18    Q.  I'll give you one hint to what I'm going
19 to read next.  It's highlighted.
20    A.  Okay.
21    Q.  "Nothing in Sections 1301.72 to 1301.76
22 requires distributors to investigate the
23 legitimacy of orders or to halt shipment of any
24 orders deemed to be suspicious."

Page 200

1         That's the position Cardinal Health was
2 taking through its trade group in June of 2016 --
3 2017.  That's not true, is it?
4         MS. MAINIGI:  Objection to form.
5 Objection to scope.
6    A.  It is true.  There is nothing in the
7 regulation.  The guidance provided by the DEA
8 provided the shipping requirements.
9    Q.  So, again, with the word games.
10        Go to the next provision.  "There is no
11 prohibition on shipment of suspicious orders."
12        Does Cardinal Health agree with that?
13        MS. MAINIGI:  Objection to form.
14 Objection to scope.
15    Q.  Your lawyer is telling a West Virginia
16 federal court there is no duty.  You're saying --
17 your amicus brief is saying there is no duty.
18 Cardinal Health has been fined for a violation of
19 that duty, and yet you're saying you've been in
20 compliance with this since at least 2007.
21        Is that your testimony today?
22        MS. MAINIGI:  Objection to form.
23 Objection; scope.
24    A.  There is no obligation in the statute

Page 201

1 regarding the shipping requirement, but the
2 guidance provided by the DEA provided that, and
3 Cardinal Health has complied.
4    Q.  And the D.C. Circuit Court of Appeals
5 has affirmed the DEA's position, agreed?
6        MS. MAINIGI:  Objection.  Outside the
7 scope.
8        MR. FARRELL:  It is not.  It's actually
9 listed in the scope.  I'll repeat the question.
10 BY MR. FARRELL:
11    Q.  The D.C. Circuit Court of Appeals in
12 Masters Pharmaceutical affirmed the position taken
13 by the DEA in its 2006 and 2007 Dear Registrant
14 letters --
15        MS. MAINIGI:  Objection.
16    Q.  -- agreed?
17        MS. MAINIGI:  Excuse me.  Objection;
18 scope.
19    A.  It affirmed that there is a shipping
20 requirement.
21    Q.  So the answer to my question is yes?
22        MS. MAINIGI:  Objection; form.
23 Objection; scope.
24    A.  Yes.  They affirmed there is a shipping

Page 202

1 requirement.

2    Q.  Now, you testified earlier that there
3 were -- that the DEA told Cardinal Health that the
4 duty was report only prior to 2006.

5        Do you remember that testimony?

6    A.  I don't know that I said the DEA told
7 us.  It was our understanding that it was report
8 only based on the guidance we had received from
9 the DEA prior to 2006.

10    Q.  I've got to write that word down.
11 Guidance.

12        What guidance did you receive?  Is it in
13 writing somewhere?

14    A.  There's the 1998 DEA report to the
15 Attorney General that speaks to the required
16 reporting.

17    Q.  So wait a minute.  You're relying upon a
18 1998 letter to the Attorney General as the basis
19 for compliance with your duty to prevent
20 diversion, yes?

21        MS. MAINIGI:  Objection; scope.
22 Objection; form.

23        MR. FARRELL:  Well, hold on.  You can't
24 object to the scope when she's relying on a 1998

Page 203

1 document for her deposition today.

2        MS. MAINIGI:  I'm objecting to scope.

3 BY MR. FARRELL:

4    Q.  So I'm asking you again.  Other than the
5 1998 letter, are there any other written documents
6 that you rely upon as guidance that your duty was
7 report only?

8    A.  At this time, I'm not aware of any
9 specific other written documents.

10    Q.  Okay.  This 1998 letter, who was it to
11 and from?

12    A.  It wasn't a letter.  It was a report by
13 the DEA to the Attorney General.

14    Q.  Of the United States?

15    A.  Yes.

16        MR. FARRELL:  Well, don't huff.  There's
17 like 50 of them.  You should know.  They all sued
18 you.

19 BY MR. FARRELL:

20    Q.  You also talked about a 2005 meeting
21 with the DEA regarding Internet pharmacies.

22    A.  Yes.

23    Q.  Was that related to diversion of
24 controlled substances, including opioids?

Page 204

1    A.  I believe I answered this morning.  I
2 don't know specifically.  I know the topic of the
3 meeting was Internet pharmacies.

4    Q.  You're not aware of what the Internet
5 pharmacies was, what they talked about, what the
6 issue was?

7        MS. MAINIGI:  Objection; asked and
8 answered.

9        She discussed it this morning.  I don't
10 know if you were in the room or not when she did,
11 because you might have been wandering in and out.

12        MR. FARRELL:  Ooh, that was a little
13 catty.

14    A.  I can't recall all the specifics of the
15 meeting, as I stated this morning.

16    Q.  All right.  So let's -- then let's put
17 it even broader.

18        When is the earliest that you believe
19 Cardinal Health had interactions with the DEA
20 regarding diversion of controlled substances?

21        MS. MAINIGI:  Objection; scope.
22 Objection; time period.

23    A.  I can't speak to all of the interactions
24 that Cardinal Health had with the DEA.  Again,

Page 205

1 pursuant to the 1998 DEA report to the Attorney
2 General, that provided guidance to us as to what
3 we were supposed to be doing regarding the
4 reporting of controlled substances.

5    Q.  You paid a fine in 2008, correct?

6        MS. MAINIGI:  Objection.

7    A.  We paid a settlement.

8    Q.  You paid a settlement in 2008, right?

9    A.  Yes.

10    Q.  Did it include conduct prior to '08, to
11 the best of your knowledge?

12    A.  Without the document in front of me, I
13 cannot be positive.  I believe there were years
14 referenced prior to 2008.

15    Q.  Okay.  Because I haven't seen it, and
16 one of the subject matters is Cardinal Health's
17 interactions with the DEA.  I'm trying to figure
18 out if those interactions go prior to 2006.  And
19 what you're telling me is at a minimum, there's a
20 1998 letter.  Are you aware of anything else, any
21 other meetings, presentations, documents?

22    A.  I'm not aware --

23        MS. MAINIGI:  Objection.  Excuse me.
24 Objection to form.

Page 206

1    A. I'm not aware of anything specifically.
2  The company presently doesn't have that
3  information, but I can't say with any specificity.
4    Q. Since at least 2007, do you agree that
5  shipping a suspicious order without conducting due
6  diligence is unlawful?
7      MS. MAINIGI: Objection to form.
8  Objection; scope.
9    A. Shipping a suspicious order without
10 conducting due diligence, an order that has been
11 reported as suspicious without conducting due
12 diligence, does not comport with the guidance that
13 we've received from the DEA.
14   Q. So is shipping a suspicious order
15 illegal?
16     MS. MAINIGI: Objection to form.
17 Objection; scope.
18   A. It does not comply with the guidance
19 provided by the DEA.
20   Q. Does that make it illegal or unlawful?
21     MS. MAINIGI: Objection; form.
22 Objection; scope.
23   A. It does not comply with the guidance
24 provided by the DEA.

Page 207

1    Q. So let's play fill-in-the-blank.
2  Halting a suspicious order is?
3      MS. MAINIGI: Objection to form.
4  Objection; scope.
5    Q. Fill in the blank.
6    A. An obligation that Cardinal Health has
7  under the guidance provided by the DEA.
8    Q. You're good. I mean, you've got this
9  down. Let's get to -- let's get to a multiple
10 choice since I can't get the fill-in-the-blank.
11     MS. MAINIGI: You know what? I'd like
12 to take a break.
13     MR. FARRELL: Well, I'm almost done.
14     MS. MAINIGI: I'd like to take a break.
15     MR. FARRELL: Yeah, as soon as I finish
16 my question that's pending. Because if we break
17 right now, you can't talk to her --
18     MS. MAINIGI: That's fine.
19     MR. FARRELL: -- while there's a
20 question pending.
21     MS. MAINIGI: I don't need to talk to
22 her. I don't think there's a question pending.
23 What is the question pending?
24     MR. FARRELL: She says, "Repeat the

Page 208

1  question." Right?
2      MS. MAINIGI: No.
3      MR. FARRELL: That's the wrong thing.
4      MS. MAINIGI: Let's see where your
5  question is pending.
6      Let's see. The last thing I believe you
7  said, "You're good. You've got this down. Let's
8  get to multiple choice since I can't get the
9  fill-in-the-blank."
10     I think that was the precursor to
11 something or other, but there's no question
12 pending, so I'd like to take a break.
13     MR. FARRELL: There is a question
14 pending, and so I'm going to object to breaking
15 while this subject matter is pending.
16     MS. MAINIGI: Okay. You can't object to
17 that. I would like to go off the record.
18     THE VIDEOGRAPHER: The time is now 2:32.
19 Going off the record.
20     (Recess taken.)
21     THE VIDEOGRAPHER: The time is now 2:54.
22 Back on the record.
23     MS. MAINIGI: Counsel, I did notify
24 Mr. Cohen of what we thought was inappropriate

Page 209

1  behavior on your behalf. We are moving forward,
2  but I think he's available later if we feel the
3  need to engage him.
4      MR. FARRELL: Understood.
5              ---
6      (Cardinal-Norris Exhibit 18 marked.)
7              ---
8  BY MR. FARRELL:
9    Q. I'm going to have marked next which is
10 Plaintiff's Exhibit 18. It is Bates-stamped
11 ABDC_MDL_00278063. And I'm going to show it to
12 you and ask if you've seen this document before.
13     MS. MAINIGI: Counsel, did you receive
14 permission from ABDC to utilize this at the
15 deposition?
16     MR. FARRELL: I did not, nor do I think
17 I need to under 33M of the protective order.
18     MS. MAINIGI: Okay. We will check that
19 while you're questioning. I believe the process
20 at least is that you do need to get permission,
21 but we'll let you keep going for now, and if
22 there's a dispute about that, we'll take it up.
23     MR. FARRELL: It's marked as
24 confidential. And under 33M, what it states is

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 that there are limitations on use, and one of the
2 exceptions is it can be used with in-house counsel
3 as well as parties.
4      So my interpretation of the rule is
5 since this is an HDMA document, it isn't an
6 internal document from AmerisourceBergen or an
7 internal trade secret or proprietary information.
8 And, in fact, on page 2 of the document, it
9 indicates that Cardinal Health was a part of the
10 crisis executive committee.
11 BY MR. FARRELL:
12     Q.  So if you want to take a minute to
13 review it, you can do so.
14     MS. MAINIGI:  Well, I'll certainly let
15 the witness review it, but we'll take your
16 position under advisement and let you keep going.
17     Can you identify the year this document
18 is from?
19     MR. FULLER:  Only from metadata.
20     MS. MAINIGI:  And what did you conclude?
21     MR. FULLER:  April 25, 2013.  It was an
22 attachment to an e-mail.
23 BY MR. FARRELL:
24     Q.  I'm not going to spend a tremendous

Page 211

1 amount of time on this document.
2     A.  That's fine.  I'm sorry.  I've never
3 seen this document before, so I'm not even clear
4 exactly what the purpose of it is.  So I just
5 wanted to make sure I at least --
6     Q.  I'll walk you through some of the
7 highlights.
8     Will you identify the title of this
9 document?
10     A.  The title on the front page is "Crisis
11 Playbook:  An Interactive Guide to Crisis
12 Communications."
13     Q.  And it's published by whom?
14     A.  HDMA is listed on the front.
15     Q.  And, again, this is the trade
16 organization which includes as its members, and on
17 the executive committee, Cardinal Health?
18     A.  Yes.
19     Q.  And if you look on page 2, you'll notice
20 that the Core Crisis Team is identified, and it
21 appears to be internal employees of HDMA.  And
22 underneath it is the executive committee, and at
23 the time, it identifies Mark -- or Mike Kaufmann
24 from Cardinal Health, agreed?

Page 212

1     A.  Agreed.
2     Q.  On page 3, it identifies the objectives
3 of this Crisis Playbook, and would you read the
4 first two.
5     A.  "Provide clear" --
6     MS. MAINIGI:  Excuse me.  Objection;
7 scope.
8     A.  "Provide clear guidelines for
9 classifying crisis situations.  Define roles and
10 responsibilities in a crisis situation."
11     Q.  And read the very last entry point.
12     MS. MAINIGI:  Objection; scope.
13     A.  "Have ready-to-use response materials on
14 hand for high risk scenarios."
15     Q.  Now, this was created in the year 2013,
16 and as Cardinal Health, are you familiar with it
17 at all?
18     MS. MAINIGI:  Objection; scope.
19     A.  I am not.
20     Q.  If you flip to page 4 where it says
21 "Communicate Early."  Can you read that aloud?
22     A.  "Getting ahead of an issue, or getting
23 your message across as early as possible, is
24 always -- almost always the best way to minimize

Page 213

1 damage from a negative event."
2     Q.  And then over where it says "Express
3 emotion appropriately," would you read that aloud?
4     A.  "The public demands more than the letter
5 of the law or minimum adherence to regulations."
6     Q.  You understand that today I am
7 representing a number of different public entities
8 that are, in fact, demanding more than recitation
9 of your adherence to regulations?
10     MS. MAINIGI:  Objection; scope, if that
11 is a question.
12     Q.  The very thing that's in this crisis
13 plan management is what you've been repeating
14 today; would you agree with that?
15     MS. MAINIGI:  Objection; scope.
16 Objection; form.
17     A.  I don't agree with that.
18     Q.  So we'll flip all the way over to page
19 12, Communications Approach.
20     MS. MAINIGI:  Can you give us the Bates
21 number, please --
22     MR. FARRELL:  I gave you my copy.
23     MS. MAINIGI:  -- because there's no page
24 numbers.

Page 214

1  THE WITNESS: I don't see a page number.
2  MS. VELDMAN: 74 is the last four
3  digits, 74.
4  THE WITNESS: 74?
5  MS. VELDMAN: The last two digits on the
6  bottom.
7  BY MR. FARRELL:
8  Q. So as of 2013, this crisis management
9  plan provided by HDMA to its members includes a
10  consideration of being able to drive the narrative
11  in a crisis.
12  Do you see that?
13  MS. MAINIGI: Objection; scope.
14  A. I see a comment that says, "If you
15  announce first, to what extent will you be able to
16  drive the narrative?"
17  Q. If you flip to the next page, you'll see
18  in 2013, HDMA has already used this chart to run a
19  risk analysis of the controlled substance
20  diversion issue.
21  Do you see that?
22  MS. MAINIGI: Objection; scope.
23  A. I see the bullet point.
24  Q. Are you aware of whether or not HDMA

Page 215

1  circulated to Cardinal Health bullet points to
2  discuss diversion lawsuits or diversion issues?
3  MS. MAINIGI: Objection; scope.
4  A. I am not.
5  Q. Flip to --
6  MR. FARRELL: It's my 16.
7  MS. VELDMAN: 16? On the top?
8  MR. FARRELL: Yeah.
9  MS. VELDMAN: Okay. 78.
10  MS. MAINIGI: Thank you.
11  BY MR. FARRELL:
12  Q. On the last -- the page that's
13  documented 078, Core Messaging. It says, "Draft
14  topline messages, consisting of three to five
15  message points that give an overview of the full
16  narrative and that will likely be included in all
17  communication materials."
18  Are you aware of whether or not HDMA
19  coordinated with its members, including the big
20  three and those that are on the executive
21  committee, to coordinate core messaging related to
22  diversion or diversion lawsuits?
23  A. I do not know.
24  MS. MAINIGI: Objection. Excuse me.

Page 216

1  Objection; scope.
2  A. I do not know.
3  MR. FARRELL: Exhibit page 19?
4  MS. VELDMAN: 81.
5  BY MR. FARRELL:
6  Q. The last three digits are 081,
7  Third-Party Outreach. It says, "Identify
8  potential third parties who could speak
9  knowledgably about the issue by noting individuals
10  or groups who have commented on the issue in news
11  coverage, at conferences, or in published
12  materials."
13  Are you aware of any such coordinated
14  activity?
15  MS. MAINIGI: Objection; scope.
16  A. I am not.
17  MR. FARRELL: Exhibit page 24?
18  MS. VELDMAN: 86.
19  BY MR. FARRELL:
20  Q. 086 on the Bates stamp. This Crisis
21  Playbook identifies six issues related to
22  diversion. If you flip to the next page, Scenario
23  1 is a DEA Registration Suspension.
24  A. I see "Scenario 1: DEA Registration

Page 217

1  Suspension."
2  Q. So if, in fact, this document was
3  created in 2013, this is after the DEA's attempt
4  to revoke Cardinal Health's registration, agreed?
5  MS. MAINIGI: Objection; scope.
6  Objection; form.
7  A. This is after the 2012 action taken by
8  the DEA.
9  Q. But before the 2016 fine assessed by the
10  DEA?
11  A. Before the 2016 settlement agreement,
12  yes.
13  Q. And at the top right-hand corner, what
14  you'll see is one of the key considerations.
15  Would you read that aloud?
16  A. "Does this present an opportunity for
17  HDMA to proactively push its message of
18  misdirected DEA enforcement with national media."
19  Q. Has Cardinal Health engaged in proactive
20  efforts to shift the message toward misdirected
21  DEA enforcement?
22  MS. MAINIGI: Objection; scope.
23  Objection; form.
24  A. I do not recall specifically, no.

Page 218

1  Q. If, in fact, Cardinal Health has in the
2 past intervening five years attempted to direct
3 blame toward the DEA, you would agree that it
4 happens to coincide with the 2013 playbook?
5      MS. MAINIGI: Objection; scope.
6 Objection; form.
7  A. Just because HDMA published a playbook
8 that I know Mike Kaufmann was on the executive
9 committee does not mean that that's necessarily
10 how Cardinal Health handled its communications
11 related to the issue at hand.
12  Q. If you flip to the next page, "Scenario
13 1: DEA Registration Suspension," there's a "Tough
14 Q&A" question. So this is a playbook that HDMA,
15 your trade group, circulated amongst its members,
16 including Cardinal Health, and it's how to react
17 in the media if one of your members gets its
18 registration suspended.
19      And one of the tough questions it was
20 prepping its members for is, if it's asked, "What
21 is HDMA's perspective on the registration
22 suspension? Was this action warranted?"
23      Would you read the next sentence?
24      MS. MAINIGI: Objection; scope.

Page 219

1 Objection; form.
2  A. "HDMA is not familiar with the
3 particulars of this situation, but we are
4 disappointed that the DEA appears to be pursuing a
5 path of conflict rather than collaboration with
6 our industry."
7  Q. So, again, in 2013, this is HDMA
8 advising its constituents, including Cardinal
9 Health, to push the message that the DEA's
10 enforcement actions are paths of conflict rather
11 than collaboration?
12      MS. MAINIGI: Objection; scope.
13 Objection; form.
14  A. It's providing guidance to the HDMA
15 members that the HDMA members can then choose to
16 use at their discretion.
17      MR. FARRELL: Exhibit page 28?
18      MS. VELDMAN: 90.
19 BY MR. FARRELL:
20  Q. 090 Bates stamp page. Literally this is
21 a scenario in 2013 on how its members, including
22 Cardinal Health, should respond in the media to
23 lawsuits on diversion. And if you look over on
24 the right-hand side of the draft statement, the

Page 220

1 highlighted portion that states, "Although
2 distributors do not dispense drugs directly to
3 patients and do not have" --
4      MS. MAINIGI: There's nothing
5 highlighted. I'm sorry to interrupt, but you said
6 look at the highlighted. We don't see anything
7 highlighted.
8  A. I see the sentence that begins "Although
9 distributors."
10  Q. We lost our screen somehow, so let me
11 just read it out loud. "Although distributors do
12 not dispense drugs directly to patients and do not
13 have access to individual patient information, we
14 share a common goal with doctors, pharmacists,
15 manufacturers, law enforcement, and policymakers
16 to ensure a safe and sufficient supply of
17 medicines for patients in need while keeping
18 prescription drugs out of the hands of individuals
19 who abuse them."
20      This is a 2013 statement that mimics a
21 very good amount of the things you've been saying
22 here today, doesn't it?
23      MS. MAINIGI: Objection; form.
24 Objection; scope. Objection; argumentative.

Page 221

1  A. This language is generally aligned with
2 the understanding that Cardinal Health has a
3 certain obligation in the supply chain, and it
4 follows the statute, regulations, guidance that
5 govern that.
6  Q. And if you flip to the next page. The
7 second sentence of the second paragraph is
8 literally what you just said. It says, "We can
9 tell you that our members are registered with the
10 DEA and follow rigorous statutory and regulatory
11 requirements to detect and prevent diversion."
12      Do you see that?
13      MS. MAINIGI: Objection; scope.
14  A. No. I'm sorry. I don't see it. Which
15 paragraph?
16  Q. It's the second full paragraph in the
17 left-hand column, the second sentence. "We can
18 tell you ..."
19  A. And I'm sorry. What was your question?
20  Q. That's literally what you've been saying
21 all day today, and it's written in the 2013 crisis
22 handbook.
23      MS. MAINIGI: Objection; form.
24 Objection; argumentative. Objection; scope.

Page 222

1  A.  Okay.

2  Q.  And if you flip to 32.

3      MS. VELDMAN:  Page 94 on the bottom.

4      MR. FARRELL:  Mine doesn't have a Bates

5  stamp.

6      THE VIDEOGRAPHER:  Okay.  Page 94.

7      MS. MAINIGI:  91?

8      THE WITNESS:  94.

9      MS. VELDMAN:  094.

10      MS. MAINIGI:  Okay.

11  BY MR. FARRELL:

12  Q.  094.

13  A.  Yes.

14  Q.  So what is Scenario 4 that HDMA is

15  preparing for back in 2013?

16      MS. MAINIGI:  Objection; scope.

17  A.  The title of the page is "Scenario 4:

18  Congressional Inquiry."

19  Q.  So five years before Congress subpoenaed

20  Cardinal Health, McKesson, AmerisourceBergen, H.D.

21  Smith and Miami-Luken, HDMA was ahead of the wave

22  and already prepping and preparing and advising

23  for media statements regarding a Congressional

24  inquiry.

Page 223

1      Do you agree with that?

2      MS. MAINIGI:  Objection; argumentative.

3  Objection; form.  Objection; scope.

4  A.  The document covers Congressional

5  inquiry.  And, again, it's guidance to be provided

6  to the members that the members can use at their

7  discretion.

8  Q.  Five years before Congress had an

9  inquiry?

10      MS. MAINIGI:  Objection; form.

11  Objection; scope.  Objection; argumentative.

12  A.  Yes, five years prior to the inquiry

13  you're referencing.

14  Q.  Now, under "Tough Q&A," there's a

15  question and then the second full sentence that

16  starts "Every distributor."

17      MS. MAINIGI:  Can you tell us where you

18  are?

19      MS. VELDMAN:  It's 095.

20      MR. FARRELL:  It's the same page.

21      MS. MAINIGI:  No, it's a different page.

22      MS. VELDMAN:  It's 095.

23      MR. FARRELL:  Did I flip pages?  Oh,

24  yeah, she's right.  095.

Page 224

1  A.  And I'm sorry.  Which question are you

2  looking at?

3  Q.  The very first question.  And I'm going

4  to direct your attention to the answer.  And this

5  will be my hand-off point to Mr. Fuller to go back

6  to -- it's a perfect transition.

7      It states in the second full sentence of

8  the second paragraph, "Every distributor must

9  monitor suspicious orders and report to the DEA if

10  it appears a pharmacy's controlled substances

11  volume or pattern of ordering might signal

12  diversion."

13      So, again, in 2013, this is what the

14  HDMA, your trade group, is advising you to do or

15  what to say about your duties if asked by

16  Congress, agreed?

17      MS. MAINIGI:  Objection; form, scope,

18  argumentative.

19  A.  It's guidance they provided.  If we're

20  testifying in front of Congress, we'll say what we

21  actually do.

22          ---

23      CROSS-EXAMINATION (CONT'D.)

24

Page 225

1  BY MR. FULLER:

2  Q.  All right, Ms. Norris.  Then let's talk

3  about what you guys actually did.

4      Cardinal is required to have a

5  suspicious order monitoring program; is that

6  correct?

7  A.  Cardinal is required to report

8  suspicious orders, and then as clarified and

9  promulgated in the 2006-'07 Rannazzisi letters, to

10  not ship the suspicious orders.

11  Q.  Is Cardinal required to have a

12  suspicious order monitoring program?

13  A.  Cardinal Health is required --

14  Q.  No, I know the suspicious order

15  requirement.  I'm talking about a suspicious order

16  monitoring program.  Is Cardinal Health required

17  to have one?

18      MS. MAINIGI:  Objection; form.

19  A.  Cardinal Health is required to comply

20  with the statute that it is to report suspicious

21  orders.  If it designs a program called suspicious

22  order monitoring system, that's the method in

23  which we're complying with our obligation to --

24  part of the way we're complying with our

Page 226

1 obligation to report the suspicious orders as
2 required by the statute -- the regulation. Sorry.
3    Q. Does Cardinal have a suspicious order
4 monitoring program?
5    A. It does.
6    Q. And when did it first create it?
7       MS. MAINIGI: Objection; time period.
8    A. Cardinal Health has had a suspicious
9 order monitoring system specifically since about
10 2007.
11    Q. So prior to 2007, Cardinal Health did
12 not have a specific suspicious order monitoring
13 program --
14       MS. MAINIGI: Object.
15    Q. -- is that correct?
16       MS. MAINIGI: Excuse me. Objection;
17 form.
18    A. Cardinal Health maintained the program
19 as it understood as directed by the DEA to report
20 the orders pursuant to the ingredient limit
21 reports we talked about this morning, as well as
22 the excessive order reports. But as far as an
23 electronic suspicious order monitoring system, our
24 program evolved in 2007 to include that.

Page 227

1    Q. So prior to 2007, Cardinal was not
2 monitoring suspicious orders electronically; can
3 we agree on that?
4    A. No. Cardinal Health -- the reports were
5 generated electronically, the ingredient limit
6 reports, as well as the ARCOS reports actually,
7 but --
8       (Reporter clarification.)
9    A. As well as the ARCOS reports. So they
10 were produced electronically.
11    Q. You mentioned "the ARCOS reports."
12 Those are basically data dumps into the DEA of the
13 ARCOS required data; is that correct?
14    A. Those are the --
15       MS. MAINIGI: Excuse me. Objection;
16 form and scope.
17    A. Those are the reports that we are
18 required to submit by the DEA, which we do.
19    Q. Let me ask it a little differently.
20       So prior to 2007, there was no system
21 for electronically monitoring or analyzing orders,
22 correct?
23       MS. MAINIGI: Objection.
24    A. Prior to 2007, we were submitting the

Page 228

1 reports, the ingredient limit reports, the ARCOS
2 reports, the excessive limit reports. Again, the
3 ingredient limit report and ARCOS reports were
4 electronic. Beginning in 2007, as the program
5 evolved, we developed the actual electronic order
6 monitoring of our customers.
7    Q. Okay.
8       - - -
9       (Cardinal-Norris Exhibit 19 marked.)
10       - - -
11    Q. So Norris 62 -- I'm sorry it's so big
12 and bulky, but it is what it is. It's now going
13 to be marked as Plaintiff's Number 19.
14       MR. FULLER: Right?
15 BY MR. FULLER:
16    Q. 19. And have you seen this document
17 before?
18    A. Yes. I believe this is the document
19 I've seen.
20       MR. FULLER: Okay. And for the record,
21 it is CAH_MDL_PRIORPROD_DEA07_01383895.
22       - - -
23       (Cardinal-Norris Exhibit 20 marked.)
24       - - -

Page 229

1       MR. FULLER: Now I'm going to hand
2 counsel what is Norris Exhibit 63, Plaintiff's
3 Exhibit Number 20, which for the record has a
4 Bates number similar. Although, it's
5 HOUSE_0002197.
6 BY MR. FULLER:
7    Q. I'm going to try to simplify things just
8 a little bit. If you'll flip to page 43 of the
9 book, which is Number 19. Is that the same as
10 what I've handed you as Plaintiff's Exhibit Number
11 20?
12       MS. MAINIGI: 43 of the manual?
13       MR. FULLER: It looks more like a book
14 to me.
15    A. It doesn't look to be exactly the same.
16 This has 71 in the bottom, not 51. I believe what
17 you're actually looking for is page 144.
18    Q. I'm sorry.
19    A. That would match what you provided me
20 separately.
21    Q. Help me out where you're at.
22    A. Page 144 of the manual you provided to
23 me actually matches with the excerpt you provided
24 separately as Exhibit 20.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.  Yes.  All right.  And this -- thank you.
2  And this manual, did Cardinal create this?
3    A.  To the best of my knowledge, yes.
4    Q.  It wasn't created by the DEA, to your
5  knowledge?
6    A.  I don't believe so.  Although, DEA --
7  references to DEA regulations are included in the
8  manual.
9    Q.  Certainly.  And this was created in, I
10  think you said what, 2000?
11    A.  The date on the bottom is 4/ or 5/2000.
12  I do not know if that is the creation date.
13  There's multiple dates.  For instance, I see 1995,
14  1999, 1998, 1995.  So I actually don't know when
15  the manual was created as a whole.
16    Q.  And is it your understanding that this
17  was the policy and procedure, suspicious order
18  monitoring manual, whatever you want to call it,
19  that was in place for Cardinal from approximately
20  April of 2000 until sometime in 2006?
21    A.  Are you referring to the excerpt?
22    Q.  Yes, ma'am.  We can refer to it either
23  way, whether --
24    A.  Well, I just wanted to make sure you

Page 231

1  weren't referring to something else in the manual.
2    Q.  No, ma'am.  Either the excerpt or the
3  pages that are the same in the manual.
4    A.  This is our required reports to the DEA.
5  At this time it was a report only requirement, and
6  this is -- this is what represented our
7  requirements under that.
8    Q.  Sure.  And I'm trying to find out
9  what -- and you call them SOPs, right, standard
10  operating procedures?
11    A.  Call what SOPs?
12    Q.  Policies and procedures that you have
13  within Cardinal.
14       MS. MAINIGI:  Objection; form.
15    Q.  Do you not refer to them as SOPs?
16       MS. MAINIGI:  Objection; form.
17    A.  I guess sometimes we do.
18    Q.  Okay.
19    A.  Yeah.
20    Q.  Because the more recent ones have -- say
21  SOP?
22    A.  I believe so, yes.
23    Q.  Okay.  So what do you guys refer to
24  this -- and I say "you guys."  What does Cardinal

Page 232

1  refer to this document as?
2       MS. MAINIGI:  Objection; form.
3    Q.  And we'll go with this one.
4    A.  This is our DEA compliance manual.
5    Q.  Okay.  And is it the equivalent of the
6  standard operating procedures or the policies and
7  procedures that Cardinal had in place from
8  approximately April of 2000 until sometime in
9  2006?
10       MS. MAINIGI:  Objection; time period.
11  Objection; form.
12    A.  I believe there is a later version
13  before 2006 of, for example, this required reports
14  to the DEA.  But beginning in 2000 until the later
15  version came into effect, this was the --
16    Q.  And when do you believe that later
17  version was?
18    A.  I believe it was 2005.
19    Q.  And do you recollect -- have you
20  reviewed that document?
21    A.  I have reviewed the -- yes, I have --
22  and specifically the excerpt related to required
23  reports to DEA.  I believe at that point, it's
24  more clearly labeled SOP or policy and procedure,

Page 233

1  something like that.
2    Q.  Okay.  So then this was in place from
3  2000 until sometime during 2005?
4       MS. MAINIGI:  Objection; time period.
5    A.  This particular provision, yes.
6    Q.  This manual?
7    A.  Again, the entire manual has other dates
8  that predate 2000, so -- and I don't know if,
9  like, this particular provision -- I'm sorry.  I
10  know the record can't see me showing it.  The
11  excerpt required reports to the DEA like that.  I
12  know that there's a particular later policy on
13  that, 2005-ish.  I don't know as to all of the
14  other pieces of this manual.
15    Q.  Fair enough.  As it relates to what
16  we're talking about, suspicious order, controlled
17  substance monitoring, we know this excerpt is what
18  was in place from 2000 until approximately 2005?
19       MS. MAINIGI:  Objection; time period.
20    A.  Yes.
21    Q.  Okay.  And it's Cardinal's position
22  during this time frame that they only had a
23  reporting requirement, not a shipping requirement,
24  correct?

Page 234

1    A.  That is correct.  The guidance we'd
2  received from the DEA was report only.
3        MR. FULLER:  Next we'll mark 21 and 22.
4              - - -
5    (Cardinal-Norris Exhibits 21 and 22 marked.)
6              - - -
7        MR. FULLER:  All right.  21 for the
8  record is going to be Norris 61, Norris 61.  And
9  it's going to be, again, Plaintiff's Exhibit
10  Number 21.  It's got a Bates number on it -- I'm
11  going to shorten it -- DEA07_01188323.
12        Exhibit 22 is going to be Norris 67,
13  Gina.  And it's DEA07_01188147.
14  BY MR. FULLER:
15    Q.  And on the standard operating procedures
16  manual that I've now marked 21 -- and I think you
17  have a subpart of that as 22; is that right?  I
18  think the subpart comes from about page 86.
19        MS. MAINIGI:  Is 22 a subpart of 21?
20        MR. FULLER:  I believe so, but we're
21  going to make sure.
22        MS. MAINIGI:  That's the question.
23    A.  Yes, that appears to be correct.
24    Q.  Okay.  And I'm going to combine this

Page 235

1  question for 19, 20, 21, and 22.  You have
2  reviewed all these documents before, correct,
3  prior to coming here today?
4    A.  I have.
5    Q.  These appear to be a duplicate copy of
6  what you reviewed, correct?
7    A.  They do.
8    Q.  Okay.  These are -- whether you want to
9  refer to them as policies and procedures or
10  standard operating procedures, which this one
11  says, they are documents that Cardinal maintained
12  in the normal course of business; is that true?
13        MS. MAINIGI:  Objection; form.
14    A.  Yes.
15    Q.  And, to your knowledge, these are fair
16  and accurate representations of what was in place
17  at the time, correct?
18    A.  To my knowledge.
19    Q.  Now, you mentioned an '05, and I haven't
20  seen an '05, and that's why I wanted to try to
21  clarify with Exhibit 22.
22    A.  I apologize.  It's '06.
23    Q.  Okay.
24    A.  I looked at a lot of documents.

Page 236

1    Q.  If you're spending three weeks, I
2  suspect you did.
3        And Exhibit 22 is signed off on and
4  approved by who?
5    A.  Steve Reardon.
6    Q.  And who is Steve Reardon?
7    A.  He's listed as our vice president,
8  quality and regulatory affairs.
9    Q.  Now, is it Cardinal's position at this
10  point in time that it was still just a reporting
11  requirement, no shipping requirement?
12    A.  Yes.
13    Q.  Did Cardinal have at this point in time
14  a suspicious order monitoring program?
15    A.  Cardinal Health had the anti-diversion
16  program in place at the time that I've previously
17  discussed that required reports to the DEA, as
18  well as the -- the ARCOS, the ingredient limit
19  reports, the excessive order reports, and that was
20  our obligation pursuant to reporting of suspicious
21  orders, as we understood it, from the DEA.
22    Q.  And if you turn to -- and, again, I'm on
23  Exhibit 22.  Turn to page 5, down there near the
24  bottom, Number 5.

Page 237

1    A.  Yes.
2    Q.  Now, does that set out what Cardinal
3  believed to be its suspicious order obligation at
4  that time?
5    A.  Yes.
6    Q.  Then around the 2005-2006 time frame,
7  Cardinal Health had an issue arise in New York,
8  correct?
9        MS. MAINIGI:  Objection to form.
10    A.  Can you be more specific?
11    Q.  Yes, ma'am.  The New York Attorney
12  General brought an action against Cardinal related
13  to secondary sources for medication, as well as
14  potential diversion; is that right?
15    A.  Yes, I believe potential price
16  diversion.
17    Q.  And that agreement, let me ask, was
18  actually executed I'll represent to you in
19  December of '06, but the investigation began in
20  2005.
21        In February 2006, Cardinal puts in place
22  a new anti-diversion compliance policy.  Do you
23  see that?  Oh, I'm sorry.  It's Norris 57.
24              - - -

Page 238

1    (Cardinal-Norris Exhibit 23 marked.)
2          - - -
3    A.  I see that that's the title of it.  Can
4  you give me a second to review it?  I've not seen
5  this particular policy.
6    Q.  And I'll apologize.  I tried to print
7  off with the Bates number at the bottom, but I
8  wasn't competent to do that.
9        MS. MAINIGI:  Is this from our
10  production?
11        MR. FULLER:  Yes, ma'am.
12        MS. MAINIGI:  Okay.
13        MR. FULLER:  And as I just mentioned, I
14  apologize, I couldn't get it to print with a Bates
15  number.
16        Ms. Wadhwani, this is the one you
17  pointed out to me some time ago.
18    A.  Okay.
19    Q.  So this anti-diversion compliance policy
20  was enacted in February of 2006; is that correct?
21    A.  Yes.
22    Q.  And this is another policy and procedure
23  that Cardinal keeps in the normal course of
24  business?

Page 239

1    A.  Yes.
2    Q.  And I'll represent to you it was
3  provided by counsel related to some prior
4  productions, okay?
5    A.  Okay.
6    Q.  And you had indicated you have not seen
7  this one prior to today; is that correct?
8    A.  I don't believe so.  I don't recall
9  seeing this particular one.
10    Q.  And it is for basically exclusively
11  closed-door pharmacies; is that right?
12    A.  Yes.
13    Q.  The issue with closed-door pharmacies
14  was price diversion; is that correct?
15    A.  That is correct.
16        MS. MAINIGI:  Objection; form.
17    Q.  And in --
18    A.  Correct.
19        MR. FULLER:  I'm sorry.
20        MS. MAINIGI:  Objection; form.  Sorry.
21  Objection; form.  Objection; scope.
22        Go ahead.
23    A.  That is correct.  That's my
24  understanding, yes.

Page 240

1    Q.  The price diversion is someone buying at
2  a discounted rate from Cardinal and turning around
3  and selling them on the open market at a higher
4  price, right?
5        MS. MAINIGI:  Objection; form and scope.
6    A.  Correct.
7    Q.  Now, it still leaves open the issue of
8  diversion; does it not?
9        MS. MAINIGI:  Objection; form.
10    A.  I don't know what you mean by "open."
11  At this time, we still have our policy in place
12  regarding our required reporting to the DEA to
13  comply with our obligations under the controlled
14  substance regulations and guidance.
15          - - -
16    (Cardinal-Norris Exhibit 24 marked.)
17          - - -
18    Q.  Yes, ma'am.  And when we talk about --
19  well, let's just move to it.
20        Here's that New York agreement.  And,
21  again, this was not produced.  At least the copy I
22  pulled was pulled off the Internet.  And it's
23  Norris 30.
24        In your review and preparation, have you

Page 241

1  seen this agreement before?
2    A.  In my review and preparation, no.
3    Q.  But you were yet aware of it, correct?
4    A.  Yes.
5    Q.  Why didn't you review this document?
6        MS. MAINIGI:  Objection; scope and
7  perhaps privileged.
8    Q.  Don't need to tell me anything counsel
9  said.  I'm not concerned about that.  Let me ask
10  it differently.
11        How did you know about this?
12    A.  Because I worked at Cardinal Health
13  during this time period in the pharmaceutical
14  distribution business and was aware of the issue.
15    Q.  Okay.  And this is an issue where the
16  Office of the Attorney General began investigation
17  in 2005 focusing on the secondary market for
18  pharmaceuticals; is that correct?
19        MS. MAINIGI:  Objection; form.
20    A.  Generally speaking, yes.
21    Q.  Well, I hope so, because I read it from
22  the first two lines there.
23        Do you see that?
24    A.  Again, I haven't seen the document,

Page 242

1  so -- in my preparation.
2       MS. MAINIGI:  Do you want her to review
3  it?
4       A.  If you can give me a minute, I can
5  familiarize myself with it.
6       Q.  Well, I'll just ask you questions, and
7  if you need to take the time, you can take the
8  time then, okay?
9       A.  We'll start with the first question, and
10  we'll go from there.
11       Q.  Fair enough.  Fair enough.
12       You mentioned you were involved.  What
13  was your involvement in this -- related to this
14  issue, this potential investigation by the New
15  York Attorney General?
16       A.  As a commercial attorney in the
17  pharmaceutical distribution business that works
18  with -- that was working with hospital and
19  closed-door pharmacies -- that was part of the
20  customer group that I supported -- I was aware of
21  the issue, and then ultimately was aware of the
22  policies, procedures we put in place.  I don't
23  recall seeing this specific policy, but aware of
24  what we committed to the Attorney General that we

Page 243

1  would do going forward.
2       Q.  Okay.  And there's two issues raised in
3  this agreement, is that correct, broad
4  picture-wise?
5       MS. MAINIGI:  Objection; scope.
6  Objection; form.
7       I think you've got to give her a chance
8  to read the agreement if you want her to answer
9  that question.
10       Q.  Okay.  Let me just ask it differently.
11  You're aware, are you not, that this -- the
12  concerns that the New York Attorney General had
13  was one with obtaining substances from alternate
14  source vendors, correct?
15       MS. MAINIGI:  Objection; scope and form.
16       Go ahead.
17       A.  Generally.
18       Q.  And then potentially diversion as well,
19  correct?
20       A.  Price diversion.
21       MS. MAINIGI:  Objection; form and scope.
22       A.  Can you give me a minute now before we
23  get too far down into the questions?
24       Q.  If you want to take the time,

Page 244

1  absolutely.  Go ahead.
2       A.  Just I want to make sure I'm familiar.
3       MR. FULLER:  Why don't we take a break
4  and let you read that.  We've been going for a
5  while now.
6       THE VIDEOGRAPHER:  The time is now 3:49.
7  Going off the record.
8       (Recess taken.)
9       THE VIDEOGRAPHER:  Okay.  The time is
10  now 4:05.  Back on the record.
11       MS. MAINIGI:  Mr. Fuller, Ms. Norris has
12  one clarification that she would like to put on
13  the record.
14       MR. FULLER:  Okay.
15       THE WITNESS:  I just want to make sure
16  that I was clear, because I think we were using
17  "suspicious order monitoring system" and
18  "suspicious order monitoring program" somewhat
19  interchangeably, and those are two different
20  things.
21       Cardinal Health has had a suspicious
22  order monitoring program in place since the
23  inception of the statute, which imposed the
24  requirements on us to monitor for suspicious

Page 245

1  orders.
2       Q.  And does that include the documents that
3  we looked at, or is that a separate --
4       A.  That's part -- you mean the compliance
5  policies and procedures, the reporting
6  requirements?
7       Q.  Yes, ma'am.  I'm not sure what you want
8  to call them.  I think it's 19, 21 -- 19, 20, 21,
9  and 22.
10       A.  Those detailed --
11       Q.  The suspicious ordering monitoring
12  programs?
13       A.  Yes.
14       Q.  Was there anything else that was sent
15  out in the suspicious order monitoring programs
16  other than what's in those documents?  Are there
17  other documents that set out this, quote, unquote,
18  program?
19       A.  Not to my knowledge during that time
20  period.
21       Q.  And these documents were in place up
22  until the -- I think the 2006 document we looked
23  at; is that right?
24       A.  They were -- the second packet was dated

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  2006.
2     Q.  Okay.  Correct.  So are there any other
3  documents out there that would set out what
4  Cardinal's suspicious order monitoring system or
5  program was that you are aware of?
6     A.  The suspicious order monitoring program,
7  not that I'm aware of, no.
8     Q.  Now, how about the suspicious order
9  monitoring systems?
10    A.  When I refer to the suspicious order
11  monitoring system, I'm referring to the
12  enhancement to the program that we made in the
13  2007 time frame, the electronic order monitoring
14  program with thresholds.
15    Q.  Okay.  So prior to 2007 or whenever this
16  new upgrade was rolled out, Cardinal did not
17  monitor thresholds, correct?
18    A.  We didn't call them thresholds, but the
19  ingredient limit reports acted like a threshold.
20  When the customer purchased the amount as
21  indicated by the DEA that they wanted reported, we
22  reported it, and we had the ingredient -- I'm
23  sorry -- the excessive limit reports which were
24  guided somewhat in part by dosage limit charts

Page 247

1  that were posted in our cages and vaults that gave
2  guidance to appropriate amounts of the particular
3  drugs listed that should be ordered by that type
4  of customer.
5     Q.  Okay.  Have you had a chance to review
6  the document that we were looking at?
7     A.  Yes, generally.
8     Q.  Okay.  And if you go to page 2.
9     A.  Yes.
10    Q.  Paragraph 2.
11    A.  Yes.
12    Q.  It says, "Cardinal is one of three
13  primary distributors of pharmaceuticals in the
14  United States."
15       That's correct?  Cardinal
16  AmerisourceBergen, and McKesson.  Would you agree
17  with that?
18    A.  The three you listed are the three
19  largest distributors in the market.
20    Q.  And it says, "Up until the end of the
21  practice in December of '05, or 2005, Cardinal,
22  like the other national full-line distributors,
23  bought and sold drugs in the secondary market
24  buying from and selling to wholesalers known as

Page 248

1  alternative source vendors or AVS [sic].
2       "As one Cardinal employee wrote in a
3  2001 e-mail to colleagues worried about risks of
4  the AVS [sic] market, the firm 'must understand
5  the need not to kill the golden goose, ASV, who is
6  laying the golden eggs.'"
7       Do you know, because you were involved
8  to some degree with this, what risks he was
9  referring to?
10       MS. MAINIGI:  Objection; form.
11  Objection; scope.
12    A.  I do not --
13       MS. MAINIGI:  Objection; time period.
14    A.  I do not know.
15    Q.  Okay.  If you'll go to page 4.
16    A.  Yes.
17    Q.  And there in paragraph 11, it talks
18  about "Cardinal repeatedly sold pharmaceuticals to
19  customers that it knew or should have known were
20  diverting pharmaceuticals."
21       Correct?
22    A.  The sentence says that.  It's talking
23  about price diversion.
24    Q.  Okay.  And paragraph 12, "Similarly,

Page 249

1  starting in January of '03 -- or 2003, Cardinal
2  was alerted that its customers in the Carrington
3  network of closed-door pharmacies were diverting
4  drugs."
5       Do you see that?
6     A.  I see that.  Again, referring to price
7  diversion, yes.
8     Q.  And ultimately Carrington ended up under
9  criminal investigation, correct?
10       MS. MAINIGI:  Objection; scope.
11  Objection; form.
12    A.  I see the note or the statement that
13  Carrington was under criminal investigation, yes.
14           - - -
15    (Cardinal-Norris Exhibit 26 marked.)
16           - - -
17    Q.  This is Norris 66 and Plaintiff's
18  Exhibit Number 26.
19       Ms. Norris, have you seen this document
20  prior to today?
21    A.  I have.
22    Q.  And this is Cardinal's Anti-Diversion -
23  Know Your Customer Compliance Manual; is that
24  correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1   A.   Yes.  That's what it's labeled.
2   Q.   And this was enacted in -- approximately
3 sometime in 2006; is that accurate?
4   A.   I believe the effective date is
5 November 1, 2006 --
6   Q.   Okay.
7   A.   -- on page 66.
8   Q.   And are you aware whether Cardinal had a
9 prior Know Your Customer Compliance Manual?
10   A.   Specifically titled that, I don't know.
11   Q.   Do you know of any type of Know Your
12 Customer Compliance Manual, whether it was titled
13 that or not?
14   A.   I know that part of what we were doing
15 prior to this time period was ensuring that we
16 obtained the license and verified the address of
17 the customers that we were selling to as was
18 required.
19   Q.   Right.  I'm just asking if there was an
20 earlier manual.
21   A.   I don't know.
22   Q.   And now I think we're going to get into
23 what you were talking about earlier, some of
24 these -- and let me ask you on 26, I know you

Page 251

1 mentioned you reviewed that.  Is that a document
2 that Cardinal usually keeps in the normal course
3 of business?
4   A.   Yes.
5   Q.   And it's a policy and procedure that
6 applied across Cardinal nationwide; is that right?
7   A.   To our pharmaceutical distribution
8 business, yes.
9   Q.   And according to you, it appears to be a
10 true and accurate copy of what you reviewed prior
11 to today?
12   A.   Yes.
13        - - -
14    (Cardinal-Norris Exhibit 27 marked.)
15        - - -
16   Q.   Okay.  Now, going on to Number 27.  33.
17 Norris 33 is going to be Plaintiff's Exhibit
18 Number 27.
19        This is another policy and procedure,
20 correct?  Highlight Report - Sales?
21   A.   Yes.
22   Q.   Is this something that would also be
23 provided to the -- strike that.
24        The Bates number on the bottom, it's

Page 252

1 AG_0000344 for the record.
2        Again, is this a policy and procedure
3 that's kept in the normal course?
4   A.   Yes.
5   Q.   And this was actually created or
6 implemented or the issue date is December 22nd of
7 2008?
8   A.   That is the issue date according to the
9 document.
10   Q.   And these reports were provided to the
11 sales personnel, correct?
12   A.   The Highlight Reports?
13   Q.   Yes, ma'am.
14   A.   Yes.
15   Q.   And it would warn the sales personnel
16 about increases in customers' ordering practices;
17 is that right?
18   A.   It would notify the salesperson when the
19 customer was approaching a certain level of their
20 threshold.
21   Q.   Would these reports also be provided to
22 the QRA, quality regulatory -- I think it's
23 assurance committee that you guys have?
24   A.   The committee?  I don't know what

Page 253

1 committee you're referring to.
2   Q.   Yeah, the quality regulatory group.
3   A.   The quality regulatory group?
4   Q.   Yes, ma'am.
5   A.   That's the group that's producing the
6 report.
7   Q.   So they created all these policies and
8 procedures then, correct?
9        MS. MAINIGI:  Objection; form.
10   A.   "They" being?
11   Q.   QRA.
12   A.   The anti-diversion team within QRA --
13   Q.   Okay.
14   A.   -- but they're also QRA.
15   Q.   Got it.  I apologize.
16   A.   That's all right.  I just want to make
17 sure I'm understanding your questions.
18   Q.   Were there additional policies and
19 procedures that got created and implemented in
20 2012?
21        MS. MAINIGI:  Objection; form.
22   Q.   I'll strike that.  That's a bad
23 question.
24        MR. FULLER:  This is 37.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

```
 1            ---
 2      (Cardinal-Norris Exhibit 28 marked.)
 3            ---
 4  BY MR. FULLER:
 5      Q.  This is going to be Plaintiff's Exhibit
 6  Number 28, AG_0000154.  This is a policy and
 7  procedure related to detecting or reporting
 8  suspicious orders and responding to threshold
 9  events.
10       Do you see that?
11      A.  I see that's the title.
12      Q.  And the purpose of this?  Read the
13  purpose to us, please.
14      A.  "The purpose of this standard operating
15  procedure is to provide guidance to Cardinal
16  Health employees in the Quality and Regulatory
17  Affairs section on responding, detecting, and
18  reporting suspicious orders and processing,
19  documenting, and making judgments about threshold
20  events, including making decisions about releasing
21  or cutting orders that are suspicious or exceed a
22  threshold."
23      Q.  Okay.  And if you go back to page 37 --
24  or excuse me.  Page 4.
```

Page 255

```
 1      A.  Yes.
 2      Q.  6.15, do you see that, "Unusual -- or
 3  excuse me -- "Orders of unusual size are
 4  significantly larger than the orders normally
 5  placed by the customer or by the customers that
 6  have a size and type of business that is similar
 7  to the ordering customer's business."
 8      A.  I see that language, yes.
 9      Q.  Would Cardinal compare the ordering
10  customer to other similarly situated customers in
11  determining whether there was orders of abnormal
12  size and frequency and pattern?
13      A.  That is one of the items of comparison.
14      Q.  So did Cardinal actually do that,
15  though?
16       MS. MAINIGI:  Objection; form.
17      A.  Yes.
18      Q.  And how did it make the determination of
19  what similarly situated customers it was going to
20  compare these customers to?
21       And let's sort of break it down a little
22  bit.  You guys classified customers in different
23  categories, correct?
24      A.  We did.
```

Page 256

```
 1      Q.  You had small, medium, and large, and it
 2  was based on dollar volume; is that correct?
 3      A.  Yes.
 4      Q.  You had different types of operations,
 5  whether it was retail chain or independent
 6  hospitals, nursing homes, whatever the case may
 7  be, correct?
 8      A.  Yes.
 9      Q.  Now, somehow, if you're going to be
10  comparing them on a cross-section, there's got to
11  be a way we determine which ones we're comparing
12  to whom; is that true?
13      A.  Yes.  Although, I think you're somewhat
14  mixing two time periods through the evolution of
15  our program.  The small, medium, large and class
16  of trade designations for determining thresholds
17  was during the 2008 to 2012 period.
18      Q.  Okay.
19      A.  After 2012, so we're talking that's I
20  believe the date of this particular policy is
21  June 2012 --
22      Q.  Yes, ma'am.
23      A.  -- we've gone to -- I don't know how
24  else to explain this.
```

Page 257

```
 1       We've gone to a program where each
 2  customer's orders are displayed on a chart that --
 3  where other customer orders are of that same
 4  product to determine whether that particular order
 5  is an outlier.
 6      Q.  Okay.  So how do we pick the other
 7  customers that are going on that chart?  Say we've
 8  got XYZ Company.  How do we pick the other
 9  customers that go on the chart with that
10  particular drugstore pharmacy?
11      A.  I don't remember that particular detail.
12      Q.  But somehow that's being done, correct?
13      A.  Yes.
14      Q.  And Cardinal recognizes that's a way --
15  or one thing to look at when evaluating orders of
16  unusual size, pattern, and frequency?
17      A.  That is one thing to look at, yes.
18      Q.  And it's your testimony that Cardinal
19  did do that?
20      A.  That is one thing that we looked at,
21  where they compared to other customers.
22      Q.  And did it also compare them to other
23  customers prior to 2012?
24      A.  Yes.  But then we set -- each customer
```

Page 258

1  had an individual threshold based on the
2  comparisons and then the particular factors
3  applicable to that customer.
4      Q.  So after 2012, did we get rid of the
5  independent thresholds?
6      A.  No.  We still have independent
7  thresholds.
8      Q.  Okay.  So, again, my question is, did we
9  compare them to like customers prior to 2012?  And
10  the answer I believe, if I understood you, is yes,
11  we did?
12      A.  Comparing them to like customers was one
13  of the ways that we set the threshold.
14      Q.  And if you go over to page 5, it's
15  6.2.1.1.  "When the QRA personnel determines that
16  an order will be released because the personnel
17  has found that the drugs are likely to be
18  diverted, the personnel must ensure that the
19  reasons for releasing the order and relevant
20  information considered have been recorded prior to
21  releasing the order."
22      Do you see that?
23      A.  I see that.
24      Q.  Did I read it correctly?

Page 259

1      A.  That is what the paper says.  I don't
2  think it's accurate.
3      Q.  It should be "When the QRA personnel
4  determines that the order will be released because
5  the personnel has found that the drugs are not
6  likely to be diverted," correct?
7      A.  I believe so.
8      Q.  Okay.
9      A.  Yes.
10      Q.  You believe that just to be a
11  typographical error, or we have just solved the
12  opioid epidemic?
13      A.  I believe that that's a typo.
14      Q.  Nobody else apparently thought that was
15  as funny as I did.
16      MS. MAINIGI:  I'll just note for the
17  record it's possible this is a draft, because if
18  you look at the bottom of each one of the pages,
19  it certainly doesn't look like a document right
20  now that is in final form.
21      Q.  So before we release an order, we have
22  to make sure we have documentation presumptively
23  in some sort of diligence file, or due diligence
24  file, before we release it, correct, if it exceeds

Page 260

1  a threshold?
2      A.  Correct.
3      Q.  And if we're not doing that, we're not
4  fulfilling our obligation under this policy and
5  procedure, correct?
6      A.  We would not be in compliance with the
7  policy if we're not doing what the policy says.
8      Q.  And if we're not doing our due diligence
9  and we're shipping and cutting -- or excuse me --
10  shipping and releasing orders they're going to
11  flag as suspicious, we wouldn't be complying with
12  the law either, correct?
13      MS. MAINIGI:  Objection to scope.
14  Objection; form.
15      A.  We wouldn't be complying with our
16  policy, and we would not be complying with the
17  obligation under the statute and the relevant
18  guidance that the DEA has provided that orders
19  identified as suspicious should not be shipped.
20      Q.  So does that mean we'd be breaking the
21  law?
22      MS. MAINIGI:  Objection; scope.
23  Objection; form.
24      A.  We would be violating our obligation

Page 261

1  under the applicable law and guidance.
2      Q.  So is that the same as breaking the law,
3  or is that different?
4      MS. MAINIGI:  Objection; form.
5  Objection; scope.
6      A.  If you're insinuating it's something
7  different, then -- no, it's not the same, but if
8  we do not perform our obligations under -- we're
9  required to obligate -- we required to perform our
10  obligations pursuant to the law.
11      (Discussion held off the record.)
12      MR. FULLER:  I'm going to provide a
13  thumb drive to the court reporter.  This is what
14  we used with Ms. Justice previously.
15      - - -
16      (Cardinal-Norris Exhibit 30 marked.)
17      - - -
18      MS. MAINIGI:  What do you want us to do
19  with that?
20      MR. FULLER:  You can hold it.  I'm just
21  giving you a copy of what the witness is going to
22  see.
23  BY MR. FULLER:
24      Q.  And what we've done, Ms. Norris, is

Page 262

1  we've been provided with the --
2       MR. FULLER:  You can read it on the
3  flight home.
4  BY MR. FULLER:
5       Q.  We've taken the detailed distribution
6  information that we've been provided by
7  Cardinal --
8       MS. MAINIGI:  What topic does this
9  relate to?
10      MR. FULLER:  Complying with the policies
11 and procedures and how they interpret them.
12      MS. MAINIGI:  I'm sorry.  Which topic?
13 Are you on Notice 1 or Notice 2?
14      MR. FULLER:  That would be somewhere on
15 Notice 1.
16 BY MR. FULLER:
17      Q.  So what we have there --
18      MS. MAINIGI:  So, Counsel -- I'm sorry
19 to keep interrupting you, but is this West
20 Virginia distribution data?  Because I don't
21 understand how this is in within the geographic
22 scope of what's currently allowed to be questioned
23 on or where it is in the topics.
24      MR. FULLER:  Okay.  So this is Summit

Page 263

1  and Cuyahoga County.
2       MS. MAINIGI:  Okay.  And so these are --
3       MR. FULLER:  So it's not West Virginia.
4       MS. MAINIGI:  This is Notice 2, and it's
5  the CT-1 specific topics then?  Because we agreed
6  we would do those --
7       MR. FULLER:  Yes.  It's application of
8  the policies and procedures we've just been
9  talking about.
10      MS. MAINIGI:  Okay.  So if it relates to
11 the Notice 2, CT-1 specific topics --
12      MR. FULLER:  No.  It would fall under
13 CT-1 related to the policies and procedures that
14 were in place, the standard operating procedures.
15 And I want to see if I'm understanding what the
16 witness has testified to.
17      MS. MAINIGI:  Okay.  Well, we'll wait
18 for the question.
19 BY MR. FULLER:
20      Q.  All right.  So what you see in front of
21 you, Ms. Norris, is the detailed distribution
22 data -- now that they've changed the screen on
23 us -- was the detailed distribution data for
24 Cuyahoga and Summit Counties.

Page 264

1       And what we did is we overlaid the
2  suspicious order reports that were provided to us
3  by your counsel as well.  I want to say it's Bates
4  numbers 12, 13, and 14 of the specific production
5  in this case.
6       MR. FULLER:  And, Counsel, for your
7  benefit, also included on the thumb drive.  Okay.
8  BY MR. FULLER:
9       Q.  And what I've done is I've had the guys
10 who've worked with the ARCOS data for us create a
11 code so I could basically have a numeric value for
12 the suspicious order plugged in, you know, bring
13 up that suspicious order and then substitute the
14 shipments of that same drug family.
15 BY MR. FULLER:
16      Q.  And you would agree with me, would you
17 not, that based on the thresholds in the policies
18 and procedures that we've looked at, that once an
19 entity hits its threshold and has a threshold
20 event, it can no longer ship that drug family to
21 that same customer, drugstore, or pharmacy,
22 correct?
23      MS. MAINIGI:  Objection; form.
24      Go ahead.

Page 265

1       A.  During the applicable monthly accrual
2  cycle.
3       Q.  Correct.
4       A.  Yes.
5       Q.  Okay.
6       MR. FULLER:  So if you'll plug in Number
7  43 for me.  Actually, hold on.
8       (Discussion held off the record.)
9       MR. FULLER:  Yeah, so plug in 43.
10      MS. MAINIGI:  Do you have a hard copy of
11 this?
12      MR. FULLER:  Of this big 'ole
13 spreadsheet?  No.
14      MS. MAINIGI:  Or any part of it that
15 you're intending to ask her about?
16      MR. FULLER:  No.  I'm attaching the
17 thumb drive as the page saver.
18      If you'll click on the purple display.
19 BY MR. FULLER:
20      Q.  So this is Ritzman Pharmacy 101
21 located --
22      MS. MAINIGI:  What's the name of the
23 pharmacy?
24      MR. FULLER:  R-i-t-z-m-a-n Pharmacy.

Page 266

BY MR. FULLER:

Q. Located at 1323 Copley Road, Akron, Ohio, which I'll tell you is in Summit County, West -- I was going to say West Virginia -- Ohio.

A. I think it's actually Copley Road, but yeah.

Q. I'll take your word on it. And this facility had --

MR. FULLER: If you'll scroll over to the right some to the date.

Q. -- had a threshold event --

MS. VELDMAN: Right here?

MR. FULLER: Yep.

BY MR. FULLER:

Q. -- on January 21st of '14.

A. I lost the highlighting.

Q. Yeah. It moved where we were in the document.

MS. VELDMAN: All right. Hold on.

MR. FULLER: There you go. Now just slide it over.

BY MR. FULLER:

Q. January 21st of '14. Do you see that?

A. January 21st, 2014.

Page 267

Q. And it apparently had numerous orders that breached a threshold number.

Do you see the blue highlights there, oxycodone?

A. Yes.

Q. And then on January 22nd, we see more shipments going to this facility for hydrocodone -- or excuse me -- oxycodone, correct?

A. The line right below the blue part?

Q. Yes, ma'am.

A. Yes.

Q. You see we have a quantity ordered and a quantity shipped of 12 on January 22nd?

A. Yes.

Q. And then on January 23rd, we actually have three different orders for three different amounts of oxycodone.

The way you described our system to us -- or Cardinal's system to us, is that should not happen unless there's a reason to release them and it's been documented in the diligence file, correct?

MS. MAINIGI: Objection.

A. Well, I don't know that I can say based

Page 268

simply on this information, because I don't know when this customer's monthly accrual ended, and that would -- you know, the orders on the 21st were cut, not shipped.

Q. Correct.

A. And then if the customer started their new accrual period on the 22nd, that wouldn't be documented in this system. It wouldn't be a threshold event because they're starting their new monthly accrual period, as an example of this data.

Q. Right. And that's one explanation, correct, as to why these may have shipped on the 22nd?

MS. MAINIGI: Objection; form. Objection; scope.

A. That is an explanation that occurs to me from looking at this data, yes.

Q. Another explanation is we could have had a threshold increase, right?

MS. MAINIGI: Objection; form. Objection; scope.

A. We could have, yes.

Q. Now, there's a procedure to go through

Page 269

for a threshold increase, and that would have to be something that was documented; is that correct?

MS. MAINIGI: Objection; form.

A. Yes.

Q. Okay. What type of things generate or cause a threshold increase? Are you aware?

A. I am aware of some of them, yes.

Q. What type of things would cause or be a legitimate threshold increase?

A. The customer's business could change. For example, they have a hospital nextdoor that had 100 beds. They open up a wing that has an additional 400 beds. They open up a cancer center. There's another type of doctor office that opens down the street, for example.

Q. So some change in the business climate or the operations? Maybe another pharmacy down the road went out of business?

A. Yes.

Q. That would be a legitimate reason to increase a threshold, correct?

A. Yes.

Q. Something like Thanksgiving wouldn't necessarily be a legitimate reason to increase a

Page 270

1  threshold, would it?
2      MS. MAINIGI:  Objection; scope.
3      A.  There was a period of time --
4      Q.  Go ahead.
5      A.  There was a period of time -- and I'm
6  thinking of a specific example in the information
7  that I reviewed -- that based on how many, for
8  example, Mondays and Tuesdays are in a month,
9  whether there's a holiday in a month, for example,
10  Thanksgiving, that could affect the customer's
11  ordering pattern for that month.
12      And I believe it was explained in Nick
13  Rousch's declaration that there might be a
14  threshold increase to account for that for that
15  month.
16      Q.  And then the threshold would have to be
17  reduced back down presumptively, correct?  It
18  wouldn't be a permanent increase?
19      A.  That would be my presumption, because it
20  was reflecting very specific circumstances.
21      MR. FULLER:  Gina, run 98 for me.
22      MS. VELDMAN:  94?
23      MR. FULLER:  98.
24      MS. VELDMAN:  Sorry.

Page 271

1  BY MR. FULLER:
2      Q.  And this is a New Choice Pharmacy,
3  23rd Street, Cuyahoga Falls, Ohio.
4      Do you see that?
5      A.  I see one line highlighted, yes.
6      Q.  Okay.  And that I'll represent to you is
7  the suspicious order -- or excuse me -- the
8  threshold event.
9      MR. FULLER:  If you'll go over to the
10  date.
11  BY MR. FULLER:
12      Q.  This is December 19th of 2014.  And,
13  again, oxycodone, an order is cut on the 19th.
14  Then on the 19th, 22nd, 23rd, we have a bunch of
15  orders filled for oxycodone.
16      Do you see that?
17      MS. MAINIGI:  Objection; form.
18  Objection; scope.
19      A.  I see that, yes.
20          - - -
21      (Cardinal-Norris Exhibit 29 marked.)
22          - - -
23      MR. FULLER:  And I'll attach as
24  Plaintiff's Exhibit Number 29 -- and there's two

Page 272

1  more copies of it -- what I've been provided is a
2  custodial file.
3      MS. MAINIGI:  Are you representing this
4  is the entire custodial file that you were
5  provided?
6      MR. FULLER:  It is what I was able to
7  find and what you guys produced.  And when you
8  produced them, you didn't separate them out in any
9  way, so I pulled it together the best I can.  And
10  if you want to at the end, we can go through all
11  the different Bates numbers that are there.  But
12  for the record, the first page of this composite
13  exhibit is CAH_MDL_2804_00001537.
14  BY MR. FULLER:
15      Q.  And I've looked through it.  And you can
16  look through it as well.  But I will represent to
17  you I did not see any indication for this
18  December 19th of 2014 event.
19      Now, granted, we should see, if there
20  was some sort of cutting or -- excuse me -- of
21  releasing this order or threshold increase, we
22  should see this document in the diligence file; is
23  that correct?
24      MS. MAINIGI:  Objection; form.

Page 273

1  Objection; scope.
2      MR. FULLER:  Sure.
3      MS. MAINIGI:  I was waiting for him to
4  actually finish his paragraph long sentence.
5  BY MR. FULLER:
6      Q.  Go ahead.
7      A.  I don't, again, know from the
8  information provided here that there was a
9  threshold increase.  The customer ordered 18.
10  That breached the threshold.  I don't know by how
11  much, because then the customer only ordered six
12  later that day.  If the sixth was under the
13  customer's threshold, that would have gone through
14  as not creating a threshold event.  Again, I don't
15  know how much they were over their threshold with
16  the 18, order of 18, based on the information
17  here.
18      Q.  Okay.  So my question is that we have
19  this threshold event.  We're going to halt all
20  orders.  Now you're telling me if they hadn't
21  reached -- if there was some gap in what they
22  ordered in their threshold, they could still fill
23  that gap, right?
24      MS. MAINIGI:  Objection; form.

Page 274

1 Objection; scope.
2　A. Yes.
3　Q. If there is no gap and we're shipping
4 additional orders of the same oxycodone to this
5 pharmacy, we should see some sort of documented
6 explanation in their diligence file; is that
7 correct?
8　　MS. MAINIGI: Objection; form.
9　A. Unless -- not necessarily, because then
10 perhaps their accrual period started over.
11　Q. I'll give you that. Absolutely. But
12 based on the policy and procedure we read earlier,
13 if we're releasing that order, we need to document
14 why we're releasing it, correct?
15　　MS. MAINIGI: Objection; form.
16　A. If the order exceeds the threshold and
17 we release the order, if we release the order,
18 there would be documentation, yes.
19　Q. You expect to see that in -- whatever
20 customer it is, in their diligence file, correct?
21　　MS. MAINIGI: Objection; form.
22　A. Yes.
23　Q. Okay.
24　A. There is a note about a threshold

Page 275

1 increase in the file, by the way.
2　Q. On that date?
3　A. No, not on that date. Just generally.
4　Q. Yeah, I know. I saw others, but ...
5　A. Can we take a break --
6　　MS. MAINIGI: Sure.
7　A. -- maybe before we start --
8　　MS. MAINIGI: Yeah.
9　Q. Sure.
10　A. Can we do that before we start --
11　Q. Absolutely, yes, ma'am.
12　　THE VIDEOGRAPHER: The time is now 4:46.
13 Going off the record.
14　　(Recess taken.)
15　　THE VIDEOGRAPHER: Okay. The time is
16 now 5:02. Back on the record.
17　　MR. FULLER: Where's that thumb drive?
18 We're going to attach that thumb drive as
19 Plaintiff's Exhibit 30.
20　　---
21　　(Cardinal-Norris Exhibit 25 marked.)
22　　---
23 BY MR. FULLER:
24　Q. Now, Ms. Norris, you have before you, I

Page 276

1 think, Plaintiff's Exhibit 29; is that correct?
2　A. 20- --
3　Q. 29?
4　A. It says 25.
5　Q. Does it have a sticker that says 25 on
6 it?
7　A. Yes.
8　　MS. MAINIGI: Yes.
9　A. The document you handed to me just
10 before break is labeled 25.
11　Q. Okay. Well, let's go with that. 25 it
12 is.
13　A. Okay.
14　Q. And you've seen this document before?
15　A. I have.
16　Q. And you know this to be the Memorandum
17 of Agreement between the United States Department
18 of Justice, the DEA, and Cardinal Health, correct?
19　A. Yes. The Settlement and Release
20 Agreement and Administrative Memorandum of
21 Agreement, yes.
22　Q. And for the record, it's
23 CAH_MDL_PRIORPROD_ HOUSE_0004009. And this
24 included allegations related to several of

Page 277

1 Cardinal's facilities; is that right?
2　A. Allegations, yes.
3　Q. Against the Auburn, Washington
4 distribution center, the Lakeland, Florida
5 distribution center, the Swedesboro, New Jersey
6 distribution center, the Dublin Court and
7 Stafford, Texas distribution center, the McDonough
8 facility in Georgia, the Valencia facility in
9 California, the Denver facility in Colorado; is
10 that correct?
11　A. Those are the facilities listed, yes.
12　Q. And Cardinal -- well, strike that.
13　　The allegations were that Cardinal was
14 shipping suspicious orders, correct?
15　A. The allegation in Number 8 is that
16 Cardinal Health failed to report suspicious
17 orders.
18　Q. And then if you'll turn to -- and along
19 with this -- and you've -- strike that.
20　　This document, you understand, is kept
21 in the normal course there at Cardinal. You've
22 reviewed it prior to today, and it appears to be
23 accurate and complete; is that fair?
24　　MS. MAINIGI: Objection to form.

Page 278

1    A.  This document I'm looking at right now,
2 I don't understand what you mean by "kept in the
3 normal course of business."
4    Q.  Cardinal maintains it.  They have it in
5 their filing system somewhere, correct?
6        MS. MAINIGI:  Objection to form.
7    A.  Yes.
8    Q.  Okay.  And it appears to be accurate and
9 complete compared to the one that you previously
10 reviewed prior to today; is that correct?
11    A.  It does, yes.
12    Q.  Okay.  And if you'll turn to page 21.
13 Because you're also aware that there were
14 immediate suspension orders issued to each of
15 these facilities as well, correct?
16    A.  Yes.
17    Q.  And on page 21, we have I believe it's
18 page 2 of the Lakeland, Florida distribution
19 center immediate suspension order; is that right?
20    A.  Yes.
21    Q.  And it says -- right above the diagram,
22 it says, "Retail pharmacies in Florida order an
23 average of less than 8,400 dosage units of
24 hydrocodone per month."

Page 279

1        Do you see that?
2    A.  I see that sentence.
3    Q.  And hydrocodone excludes oxycodone and
4 other derivatives, correct?  We're just looking at
5 hydrocodone here, correct?
6        MS. MAINIGI:  Objection; scope.
7    A.  I don't know the statement just because
8 I'm not familiar enough -- I'm not a pharmacist,
9 but --
10    Q.  Fair enough.  Fair enough.  I'll strike
11 it.
12        It's referencing hydrocodone per month,
13 correct?
14    A.  Yes.
15    Q.  Okay.  "Respondents distributed
16 hydrocodone to pharmacies engaged in the diversion
17 of controlled substances as reflected in the chart
18 below.  Respondent knew or should have known that
19 the pharmacies were diverting hydrocodone into
20 other than legitimate medical, scientific, and
21 industrial channels."
22        And Cardinal denies that, correct?
23    A.  That is the allegation that was made.
24    Q.  And Cardinal denies that still to today,

Page 280

1 correct?
2    A.  It was the allegation that was made.
3    Q.  I'm asking you if you agree or disagree
4 with it.
5        MS. MAINIGI:  Objection; scope.
6    A.  Cardinal Health made no admission
7 related to the allegation.
8    Q.  It denied the allegations, didn't it?
9    A.  It made no admission related to the
10 allegation.
11    Q.  Do you know whether Cardinal denied the
12 allegations?  And if you don't know, just say you
13 don't know.  That's fine by me.
14    A.  Cardinal Health made no admission
15 related to the allegations.
16    Q.  Do you know whether Cardinal Health
17 denied the allegations?
18        MS. MAINIGI:  Objection; asked and
19 answered.
20    A.  Cardinal Health made no admission
21 related to the allegations that were made.
22    Q.  All right.  Let's look at the first one.
23 Medipharm-Rx, Inc.  Monthly average --
24 understanding that the average for pharmacies in

Page 281

1 Florida is less than 4,800 -- received over
2 155,000 per month for at least a four-month time
3 frame.
4        Do you see that?
5    A.  I see that, and it's actually 8,400 is
6 the average, not 4,800.
7    Q.  Excuse me.  8,400.  I'm a little
8 dyslexic.  I apologize.
9        DRM Enterprise, Inc., received nearly
10 just shy of a million dosages over 22 months, an
11 average of over 42,000 per month from a period of
12 January of '06 to October of '07.
13        Do you see that?
14    A.  I see that information.
15    Q.  Jen-Mar Pharmacy Services, Inc., over an
16 11-month period, for the first three months
17 received an average of 2,700 pills.  In the last
18 eight months, 43,000 pills.
19        Does that seem suspicious, a jump like
20 that, an increase in -- what is that? -- about 15
21 times from one month to the next?
22        MS. MAINIGI:  Objection; form.
23 Objection; scope.
24    A.  Not necessarily.  I don't know the

Page 282

1 circumstances surrounding the increase in
2 purchases.
3    Q.  National Pharmacy, over a 9-month period
4 received 70,000 plus pills of hydrocodone.  And,
5 again, all in the Florida area, correct?
6    A.  Out of the Lakeland distribution center.
7 So generally the Florida and surrounding area I
8 believe is what they service.
9    Q.  O-R-G, Inc., 1.2 million over a
10 five-month period, 242,000 pills plus per month
11 for a five-month time frame.
12       Does that cause you any concerns sitting
13 here today?
14       MS. MAINIGI:  Objection; form.
15 Objection; scope.
16    A.  No, because I don't know the totality of
17 the circumstances related to those distributions.
18    Q.  And what documents would you want to see
19 to make that determination?
20       MS. MAINIGI:  Objection; scope.
21    A.  The Know Your Customer questionnaire, as
22 well as any related documentation obtained as part
23 of the due diligence.
24    Q.  So there should be due diligence related

Page 283

1 to these transactions, right?
2    A.  There should be -- the Know Your
3 Customer process should be followed if thresholds
4 were increased.
5    Q.  We should see documentation or
6 explanation why, correct?
7    A.  Yes.
8    Q.  Okay.  What else would you want to see?
9 Would you want to see any site visits?
10       MS. MAINIGI:  Objection; form.
11 Objection; scope.
12    A.  If site visits were warranted by the
13 information in the Know Your Customer and other
14 information we gathered, yes.
15    Q.  If they're there, you'd want to see
16 them, right --
17       MS. MAINIGI:  Objection; form.
18    Q.  -- if they're available?
19       MS. MAINIGI:  Objection; scope.
20    A.  Yeah.
21    Q.  Because part of the process is you want
22 to collect as much information as you can to make
23 the right decision when you're dealing with these
24 controlled substances and whether to ship them or

Page 284

1 not; is that fair?
2       MS. MAINIGI:  Objection to form.
3 Objection; scope.
4    A.  We want to understand the totality of
5 the circumstances, yes.
6    Q.  United Prescription Services, Inc., over
7 a four-month period, 287,000 hydrocodone pills
8 dumped into one pharmacy, correct?
9    A.  287,025 pills per month average were
10 shipped to that pharmacy.
11    Q.  Satellite Drug and Pharmacy, the first
12 four months of a 19-month time frame, 375 pills on
13 average.  The next 15 months, 69,500 pills on
14 average per month into that pharmacy.  That's not
15 normal, is it, that type of increase?
16       MS. MAINIGI:  Objection to form.
17 Objection to scope.
18    A.  Not necessarily.  Without the totality
19 of circumstances, I cannot say.
20    Q.  And if you turn to the next page.  Do
21 you see paragraph D there?
22    A.  Yes.
23    Q.  And who is Eric Brantley; do you know?
24    A.  The manager of quality and regulatory

Page 285

1 affairs.
2    Q.  So was he the guy that manages all of
3 quality and regulatory affairs for Cardinal during
4 this time?
5    A.  No.  He's a manager within our quality
6 and regulatory affairs department.
7    Q.  So what does he manage, what area?
8    A.  I believe he was originally brought on
9 as part of the Internet pharmacy initiative after
10 we had the meeting with the DEA, and -- I'm not
11 positive, so I can't say for sure his -- his
12 obligations expanded over time.
13    Q.  Are you aware that in September of 2006,
14 he sent an e-mail to the DEA saying that Cardinal
15 was discontinuing its sales to a pharmacy referred
16 to as RKR, and they didn't discontinue their
17 sales?
18       MS. MAINIGI:  Objection; form.
19 Objection; scope.
20    A.  I'm not aware of that e-mail, no.
21    Q.  And that they continued to provide that
22 pharmacy with over 393,000 hydrocodone products?
23       MS. MAINIGI:  Is that a question?
24       MR. FULLER:  Yes.

Page 286

1        MS. MAINIGI:  Objection; form.
2   Objection; scope.
3        A.   That is an allegation that's made.
4        Q.   And I think you've testified
5   consistently that Cardinal would not ship an order
6   that it knew -- or that should have known it would
7   be diverted, correct --
8        MS. MAINIGI:  Objection to form.
9        Q.   -- or had the potential for being
10  diverted?
11       MS. MAINIGI:  Objection to form.
12       A.   Cardinal Health does not ship orders
13  that it has reported as suspicious.
14       Q.   And even going back to -- prior to
15  2007 -- strike that.
16       And if Cardinal had reason to know that
17  a pharmacy or drugstore was diverting product, it
18  would not ship to that pharmacy, correct?
19       A.   If Cardinal Health determined that
20  customer posed an unreasonable risk of diversion,
21  it would not ship to that customer.
22       MR. FULLER:  This is going to be
23  Plaintiff's Exhibit Number 31, and it's Norris 25.
24             ---

Page 287

1        (Cardinal-Norris Exhibit 31 marked.)
2             ---
3        MS. MAINIGI:  Was this produced by
4   Cardinal?
5        MR. FULLER:  It was.
6        MS. MAINIGI:  And you don't have a Bates
7   number?
8        MR. FULLER:  Yeah, I apologize.  I'm not
9   great on -- I'll see if I can get one, though, for
10  the record.
11       MS. MAINIGI:  You know, let me -- I'd
12  like to take a break, please, before we start.  I
13  just want to check on privilege status.
14       THE VIDEOGRAPHER:  The time is now 5:18.
15  Going off the record.
16       (Recess taken.)
17       THE VIDEOGRAPHER:  Okay.  The time is
18  now 5:24.  Back on the record.
19       MS. MAINIGI:  Counsel, what you just
20  marked as P-31 --
21       MR. FULLER:  I have the Bates number, if
22  it helps.
23       MS. MAINIGI:  Oh, you do?  Okay.  I
24  think we found it, but just for the purpose of the

Page 288

1   record, P-31 appears to be a privileged document
2   which obviously was inadvertently produced.  And
3   so we request that pursuant to the protective
4   order, that you give us back all copies that you
5   have of this document.  We'll send you a follow-up
6   letter, and we will put it on the privilege log.
7   Obviously, we will not let Ms. Norris be
8   questioned on it.
9        MR. FULLER:  Sure.  Fair enough.  So
10  just to put it on the record, the Bates number is
11  CAH_MDL_PRIORPROD_DEA07_00968964.  And we'll hold
12  that issue until it's resolved.
13       MS. MAINIGI:  Okay.  Thank you.
14       MR. FULLER:  Sure.
15       UNIDENTIFIED SPEAKER:  Hey guys, are we
16  on mute?
17       MR. FULLER:  Probably.
18       UNIDENTIFIED SPEAKER:  I think so.
19       THE VIDEOGRAPHER:  Can you hear us?
20       UNIDENTIFIED SPEAKER:  Yeah, we can hear
21  you.
22       MR. FULLER:  We were just whispering and
23  messing with you guys to see if you were really
24  paying attention.

Page 289

1             ---
2        (Cardinal-Norris Exhibit 32 marked.)
3             ---
4   BY MR. FULLER:
5        Q.   All right.  The next document you're
6   being provided is Norris 74, I think.  Do you have
7   it?
8        A.   I don't see that number on here.
9        Q.   No.  It was a last minute add, but for
10  the record, DEA07_01198345.
11       Have you seen this document before?
12       A.   I have.
13       Q.   Okay.  And did you review it in your
14  preparation for the deposition today?
15       A.   I did.
16       Q.   And it appears to be a document or an
17  e-mail from Steve -- is it Reardon?
18       A.   Reardon.
19       Q.   Reardon.  And this is a document that's
20  maintained in Cardinal's normal business, I'm
21  assuming, on its e-mail server, correct?
22       A.   In accordance with its document
23  retention policies, yes.
24       Q.   Fair enough.  And does this document and

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 the attachments thereto appear to be fair and
2 accurate to what the copy you reviewed?
3    A.  Yes.
4    Q.  Okay.  And this is actually a summary of
5 a meeting that HDMA had with DEA, correct?
6    A.  That's one part of it, yes.
7    Q.  And this is an e-mail from Mr. Reardon
8 to a Mr. Brantley, who we mentioned earlier,
9 Carolyn McPherson, as well as others; is that
10 right?
11    A.  It is.
12    Q.  And what's the subject?
13    A.  The subject is "DEA suspicious order
14 monitoring."
15    Q.  And it says, "The HDMA met with DEA
16 officials last Friday, September 7th, to discuss
17 the agency's current policy position on suspicious
18 orders of controlled substances."
19       Do you see that there?
20    A.  I see that sentence, yes.
21    Q.  And then it talks about a summary.  And
22 then it says, "The DEA is setting a new standard
23 with which we must comply."
24       Correct?

Page 291

1    A.  Correct.
2    Q.  And then Mr. Reardon says, "This is all
3 coming about as the result of problems with
4 Internet pharmacies and controlled substance
5 diversion."
6       Isn't that right?
7    A.  That is what this sentence says.
8    Q.  It then talks about that they
9 recently -- recently they suspended ABC -- which I
10 think, if you and I are on the same page, is
11 AmerisourceBergen, correct?
12    A.  Correct.
13       MS. MAINIGI:  It's ABC registration.
14       MR. FULLER:  Yeah.  Thank you.  I got
15 it.
16 BY MR. FULLER:
17    Q.  "They recently suspended an ABC
18 registration and used the suspension to get them
19 to implement a complex and onerous suspicious
20 order monitoring program that meets the criteria
21 spelled out in the HDMA meeting summary."
22       And then he goes on to say at the
23 bottom, "We need to be proactive and implement a
24 program that we develop that will satisfy the

Page 292

1 DEA's expectations and that it is not dictated to
2 us by the agency pursuant to a regulatory action."
3       Correct?
4    A.  I see that sentence.
5    Q.  And was this prior to the initiation of
6 the regulatory action --
7       MS. MAINIGI:  Objection to form.
8    Q.  -- or do you know?
9    A.  I believe that the orders to show cause
10 were issued after that.
11    Q.  And Mr. Reardon wanted to try to prevent
12 a regulatory action being forced to adopt any sort
13 of policies and procedures on suspicious order
14 monitoring program, correct?
15    A.  Mr. Reardon understood the obligations
16 that the DEA was implementing, the new obligations
17 relating to the shipping requirement, and wanted
18 to make sure that we had a program implemented
19 that would comply with those new -- the new
20 guidance.
21    Q.  But you said they told you about them
22 way back in 2006, right?
23    A.  The initial communication from
24 Rannazzisi was in 2006.

Page 293

1    Q.  And you still hadn't done anything to
2 implement them now in September of 2007, correct?
3    A.  I cannot --
4       MS. MAINIGI:  Objection; form.
5    A.  I cannot presently say the corporation
6 doesn't have present knowledge of the actions that
7 we took and the timing of what those actions that
8 we took in that period.
9    Q.  So if I understand you correctly, you
10 don't have knowledge as to what actions you,
11 Cardinal, took during that time frame; is that
12 correct?
13    A.  I don't know the timing and the actions
14 taken during the time period --
15    Q.  So you can't tell me --
16    A.  -- based on current knowledge.
17    Q.  So sitting here after prepping for
18 three, three and a half weeks, whatever it was,
19 you still can't tell us what action Cardinal took
20 from the time it was told it had a shipping
21 requirement for almost a year, as to what they did
22 in relation to that new obligation or what they
23 considered a new obligation?
24       MS. MAINIGI:  Objection to form.

Page 294

1 Misstates her testimony.
2 　　A.　The corporation does not have present
3 knowledge about the actions and timing of the
4 actions that were taken during that period
5 presently.
6 　　Q.　How doesn't the corporation know what it
7 did?
8 　　　　MS. MAINIGI:　Objection.
9 　　Q.　Was it taking any medication in the time
10 that would inhibit its ability to remember?
11 　　　　MS. MAINIGI:　You don't need to answer
12 that question.
13 　　Q.　How does the corporation not know what
14 it did for a year?
15 　　　　MS. MAINIGI:　Objection to form.
16 　　A.　The corporation does not presently have
17 knowledge of the timing and actions taken during
18 the period presently.
19 　　Q.　Does it expect to somehow magically get
20 knowledge at some point in time?
21 　　　　MS. MAINIGI:　Objection to form.
22 Outside the scope.
23 　　A.　I believe this case and the discovery
24 related to it is continuing.

Page 295

1 　　Q.　So you think the corporation may
2 discover what it did ten or eleven years ago at
3 some future point in time?　Is that your
4 testimony?
5 　　　　MS. MAINIGI:　Objection to form.
6 　　A.　The corporation cannot presently say
7 that -- speak regarding what it was doing in the
8 timing during that period.
9 　　Q.　When can it speak to when it first took
10 action; do you know?
11 　　　　MS. MAINIGI:　Objection to form.
12 　　A.　No.
13 　　Q.　So sitting here today, the corporation
14 can't answer when it first took action related to
15 the Rannazzisi letter of 2006, correct?
16 　　A.　I cannot say right now.
17 　　Q.　Turn to the next page, please.　Do you
18 see "Key Takeaways"?
19 　　A.　Yes.
20 　　Q.　And, there again, in this summary from
21 HDMA being provided to its members is again the
22 DEA's position on suspicious orders and that they
23 have a stop shipment or a due diligence
24 requirement, correct?　I'm sorry.　It's under the

Page 296

1 "Key takeaways from the meeting were."
2 　　A.　I'm sorry.　Repeat your question.
3 　　Q.　Sure.　In this summary being provided by
4 HDMA to its members, which Cardinal is one of, as
5 you testified earlier, a board member and an
6 executive committee meeting and whatever else,
7 correct?
8 　　A.　Correct.
9 　　Q.　It indicates the DEA is still of the
10 position that the registrants have a shipping
11 requirement to either hold shipment or do due
12 diligence before the order gets shipped if it's a
13 suspicious order, correct?
14 　　A.　I'm sorry.　Can you repeat the question
15 one more time?
16 　　Q.　Sure.　Let's just keep going.
17 　　　　They say, "Simply complying with the
18 suspicious orders, regulatory requirement, does
19 not mean in the agency's view that the registrant
20 is maintaining effective program to detect and
21 prevent diversion."
22 　　　　Do you see that?
23 　　A.　I do.
24 　　Q.　Cardinal knew that as far back as the

Page 297

1 first Rannazzisi letter in I believe it was
2 September of '06, correct?
3 　　　　MS. MAINIGI:　Objection to form.
4 　　A.　That is the information provided in the
5 initial Rannazzisi letter.
6 　　Q.　Okay.　And then also the DEA goes on and
7 indicates to the HDMA that they do not have the
8 resources to inspect every pharmacy; therefore, it
9 is important that the distributor know their
10 customers, correct?
11 　　A.　Correct.
12 　　Q.　You would agree with me that that is a
13 good idea on behalf of Cardinal to know who it's
14 distributing controlled substances to, correct?
15 　　　　MS. MAINIGI:　Objection; scope.
16 Objection; form.
17 　　A.　The Knowing Your Customer is a component
18 of our anti-diversion program.
19 　　Q.　And as you testified to earlier, even
20 prior to that program going into place, you still
21 would take steps to know the customer; is that
22 fair?
23 　　A.　We've always had the anti-diversion
24 program, the suspicious order monitoring program.

Page 298

1  But, yes, but Know Your Customer has been a part
2  of that all along, yes.
3      Q.  And I'm still taken aback.
4          Based on when Cardinal became informed
5  of this shipping requirement by the DEA, sitting
6  here today, you can't tell us when they took any
7  action in that regard, correct?  Actually, let's
8  backstep it.
9          The policies and procedures that were
10 entered into in the latter part of '08 -- we
11 looked at some of them earlier, right, December of
12 '08?
13     A.  Mm-hmm.
14     Q.  Do you remember that?
15     A.  Yes.
16     Q.  Okay.  Some of those, I believe -- and
17 correct me if I'm wrong -- include a shipping
18 requirement; do they not?
19     A.  The policy that we looked at mentions
20 held orders.
21     Q.  So we know at least two years after
22 Cardinal was aware of the shipping requirement,
23 they did something, right?
24     MS. MAINIGI:  Objection; form.

Page 299

1      Q.  September of '06 to December of '08.  I
2  was giving you the benefit of the doubt.  It's
3  actually 26 months, a little over two years,
4  correct?
5      A.  We have a policy dated 2008 that
6  mentions held orders.  It does not -- it does not
7  make a statement about prior time period.
8      Q.  And sitting here today, can you tell the
9  jury if Cardinal did anything prior to that policy
10 related to what Cardinal considers new obligation
11 as far as shipping requirement?
12     MS. MAINIGI:  Objection to form.
13     A.  Yes.  Our anti-diversion program was
14 implemented -- anti-diversion system, suspicious
15 order monitoring system, was implemented in late
16 2007.
17     Q.  And did it include a shipping
18 requirement?
19     A.  Yes.
20     Q.  And where is the policy that
21 specifically provides the shipping requirement?
22     A.  I don't have a copy of that particular
23 policy.
24     Q.  Did you review it?

Page 300

1      A.  I don't recall specifically.
2      Q.  So sitting here today, you don't know if
3  there was a shipping requirement in 2007, correct?
4      MS. MAINIGI:  Objection to form.
5  Misstates her testimony.
6      A.  My understanding is our suspicious order
7  monitoring system, including the shipping
8  requirement, was implemented in late 2007.
9      Q.  Well, just a minute ago you couldn't
10 tell me when y'all first did something in relation
11 to the new shipping requirement.
12         Wasn't that your testimony?
13     MS. MAINIGI:  Objection to form.
14 Misstates her testimony.
15     A.  I don't believe so.  I believe we were
16 talking about the period between 2006 and 2000- --
17 the receipt of the first letter and when we did
18 implement.  We never established when we
19 implemented.
20     Q.  So you believe that you implemented a
21 policy and procedure for the shipping requirement
22 in late 2007?
23     MS. MAINIGI:  Objection to form.
24     A.  We initiated our suspicious order

Page 301

1  monitoring system in late 2007.  I cannot speak to
2  policies and procedures.
3      Q.  Okay.  Fair enough.  Who is Dendright?
4      A.  Dendright?
5      Q.  Yes, ma'am.
6      A.  My understanding is that Dendright is a
7  third party we engaged to perform, I believe, site
8  visits.
9          - - -
10         (Cardinal-Norris Exhibit 33 marked.)
11         - - -
12     MR. FULLER:  I apologize.  This is
13 another e-mail that was produced.  It's Norris 43.
14 It will be Plaintiff's 33.  And I'll get the Bates
15 number to supplement it, Counsel.
16     MS. MAINIGI:  Okay.
17 BY MR. FULLER:
18     Q.  Ms. Norris, do you know if you've seen
19 this document before?
20     A.  I have not.
21     Q.  And the subject line of this e-mail
22 chain is "Lois & Clark 0102."
23         Do you see that?
24     A.  I see that subject line, yes.

Page 302

1  Q.  I guess you could say "Lois & Clark
2  #0102."
3  A.  I'm assuming that's maybe their customer
4  number or something like that.
5  Q.  Sure.  If you go back to the very
6  beginning of it, there's an e-mail from a Kelly
7  Segee --
8  A.  Yes.
9  Q.  -- related to increases in thresholds.
10     Do you see those there?
11  A.  I see the numbers she lays out.
12  Q.  And if you go to the first page -- and
13  you can read the rest of it if you'd like.
14  A.  Yes.  Please give me a minute.
15  Q.  Sure.
16  A.  Okay.
17  Q.  So, Ms. Norris, if you look, Michael
18  Mone sends an e-mail on January 25th.  Just the
19  second e-mail in the chain.
20  A.  Yes.
21  Q.  It says the Dendright report.  Is that
22  the company you were referring to earlier that
23  would provide -- what did you say?  Site visits?
24  A.  I believe that's a third party we

Page 303

1  engaged to perform site visits, yes.
2  Q.  For what time period was Dendright
3  providing site visits?
4  A.  I don't recall specifically.
5  Q.  Are they still providing site visits?
6  A.  We have a third party providing certain
7  site visits.  I can't remember if it's Dendright.
8  Q.  But at least apparently in 2008, it was
9  Dendright?
10  A.  They performed this site visit, it
11  appears, yes.
12  Q.  And when you say "site visit," is that
13  like the investigative visit to a particular
14  pharmacy?
15  A.  Yes.  At the request of QRA, they would
16  go out to perform a site visit.
17  Q.  So prior to 2007, did Cardinal have a
18  system for detecting all suspicious orders?
19  A.  Prior to 2007, Cardinal Health had a
20  suspicious order monitoring program that produced
21  the reports as required by the DEA, the ingredient
22  limit report, the excessive order report.
23  Q.  So it did not have a specific suspicious
24  order program, correct?

Page 304

1  MS. MAINIGI:  Objection; form.
2  Misstates her testimony.
3  Q.  Actually, let me ask it differently.  It
4  didn't have a specific system in place to report
5  suspicious orders?
6  MS. MAINIGI:  Objection to form.
7  A.  It had the -- as part of the program, it
8  had the system in place to calculate the
9  algorithms to make the suspicious -- to make the
10  ingredient limit reports as required.
11  Q.  Okay.  Right.  No, I got that.
12     But, again, did Cardinal Health have a
13  system for detecting all suspicious orders prior
14  to January 2007?
15  MS. MAINIGI:  Objection to form.
16  A.  I believe I stated that we had a program
17  in place to make the reports that we were required
18  to make to the DEA on the ingredient limit report.
19  MS. MAINIGI:  Mike, I'd like to go off
20  the record for just a couple of minutes.
21  MR. FULLER:  Sure.
22  MS. MAINIGI:  I think we're about ten
23  minutes out.
24  THE VIDEOGRAPHER:  The time is now 5:48.

Page 305

1  Going off the record.
2     (Recess taken.)
3  THE VIDEOGRAPHER:  The time is now 5:58.
4  Back on the record.
5  MS. MAINIGI:  I think there was some
6  confusion, Mr. Fuller, before the break, so
7  Ms. Norris is just going to clarify so that it's
8  clear.
9  BY MR. FULLER:
10  Q.  Okay.  Ms. Norris, what do you need to
11  clarify?
12  A.  I think we're still talking past each
13  other.  On the suspicious order reporting
14  requirement, prior to 2007 Cardinal Health
15  complied with its suspicious order reporting
16  requirement in the statute.
17     In doing -- but they did that by
18  submitting the ingredient limit reports and the
19  excessive order reports.  That constituted our
20  suspicious order reporting.
21  MS. MAINIGI:  And do you want to draw
22  his attention to this document?
23  A.  And as further set forth in Cardinal
24  Exhibit 20, Norris Exhibit 20, that we talked

Page 306

1  about earlier.
2      Q.  Okay.  And did you talk about this
3  change in your testimony with your counsel on the
4  break?
5      A.  It's not a change in my testimony.  It's
6  a clarification.  And we did talk about the need
7  to make the clarification, yes.
8      Q.  And based on the conversation you had,
9  you've now come back in and clarified or changed
10  or altered, whatever you want to label it, your
11  testimony, correct?
12      MS. MAINIGI:  Objection to form.
13  Misstates her testimony.
14      A.  I'm clarifying the position that I've
15  been testifying to throughout today.
16      Q.  Okay.  So I'll ask the question again.
17  Did Cardinal have in place a system for reporting
18  all suspicious orders prior to 2007?
19      A.  Yes.
20          - - -
21      (Cardinal-Norris Exhibit 34 marked.)
22          - - -
23      Q.  Now, as Norris 19, I'm going to pass you
24  what has been marked as Plaintiff's 34.  And I'm

Page 307

1  willing to bet you've looked at this before today.
2      A.  Yes.
3      Q.  Does that appear to be a true and
4  accurate copy of the Memorandum of Agreement
5  between the United States Department of Justice,
6  the DEA, and Cardinal Health?
7      A.  Yes.  It's not the fully executed copy,
8  but ...
9      Q.  And if you turn to page 2 of that
10  document.
11      A.  Yes.
12      Q.  Do you see there in the first paragraph,
13  "Cardinal admits that its due diligence efforts
14  for some pharmacy customers and its compliance
15  with the 2008 MOA in certain respects were
16  inadequate."
17      Correct?
18      A.  I see that language, yes.
19      Q.  Does Cardinal agree with that?
20      A.  "Cardinal agrees that its due diligence
21  efforts for some pharmacy customers in certain
22  respects were inadequate and thus its compliance
23  with the 2008 MOA."
24      Q.  Oh, and then we -- before we finish with

Page 308

1  this topic, you mentioned two reports when you
2  talked about the prior to '07 suspicious order
3  reporting, the ingredient --
4      A.  The ingredient limit report.
5      Q.  And then another one.
6      A.  Excessive order reports.
7      Q.  Where would I find those reports?
8      A.  My understanding is that some of them
9  have been produced.
10      Q.  And where does Cardinal keep those
11  reports?
12      MS. MAINIGI:  Objection; outside the
13  scope.
14      Q.  Are they electronic reports?  I think
15  you testified earlier they were.
16      MS. MAINIGI:  Objection to form.
17      A.  No, I didn't testify that those were
18  electronic.  I -- the reports I have seen appear
19  to be facsimiles, faxes, that were sent back and
20  forth.  So I guess maybe that's electronic.
21      Q.  Are they handwritten?
22      A.  It's a form that's filled out with
23  handwriting on it, yes.
24      MS. MAINIGI:  I believe Ms. Norris

Page 309

1  referred you to Exhibit 20, which is a policy that
2  contains reference to them.
3      MR. FULLER:  Thank you.
4  BY MR. FULLER:
5      Q.  Okay.  So I believe -- and I may be
6  wrong, but I believe earlier you testified that
7  those were electronic reports.
8      Are you now saying they are not
9  electronic reports?
10      MS. MAINIGI:  Objection to form.
11      A.  The ingredient limit report is prepared
12  electronically.  The excessive order reports are
13  filled out when one comes up and sent to the DEA.
14      Q.  So that's a system that's done manually,
15  correct?
16      A.  Yes.  These are the orders that are
17  identified in the distribution center as the folks
18  are picking them.
19      Q.  And based on the -- now I'm switching
20  back gears to Exhibit 34.
21      A.  Okay.
22      Q.  All right.  So based on this Memorandum
23  of Understanding entered in 2012, there were fines
24  of combined, I guess, $44 million paid by Cardinal

Page 310

1 for its breaches of the Controlled Substances Act,
2 correct?
3    A.  There was a settlement of 44 -- a total
4 of $44 million.  And in connection -- in the
5 settlement agreement, there was an admission, a
6 limited admission, as to certain actions by
7 Cardinal.
8    Q.  Well, it says the "Covered Conduct:  The
9 conduct in the February 2nd, 2012 order to show
10 cause, the failure to maintain effective controls
11 against diversion; C, the failure to detect and
12 report suspicious orders and the failure to adhere
13 to the 2008 MOA."
14      Is that what it says?
15    A.  That's the definition of covered
16 conduct.
17    Q.  Okay.  Now, let me show you -- and I
18 know we're getting close on time.
19    A.  Which is what the settlement relates to.
20      - - -
21    (Cardinal-Norris Exhibit 35 marked.)
22      - - -
23    Q.  All right.  And that's going to be
24 Exhibit 35.

Page 311

1      Now, ma'am, before we jump in real
2 briefly to those threshold changes, you referenced
3 a 1998 report to the U.S. Attorney General.  At
4 what point in time did Cardinal adopt that
5 document as its policies or procedures?
6    A.  1998 when we received notice of it, I
7 believe.
8    Q.  So Cardinal officially adopted it into
9 its policies and procedures in 1998 --
10    MS. MAINIGI:  Objection; time period.
11    Q.  -- correct?
12    A.  I don't know the answer about policies
13 and procedures.  That was the guidance we received
14 in 1998, which we followed.
15    Q.  But this was a report provided to the
16 U.S. Attorney General.  You mentioned that
17 earlier, correct?
18    A.  Correct, by the DEA.
19    Q.  Not provided to the wholesale
20 distributors?
21    A.  It wasn't a report directly to the
22 wholesale distributors.  It was to the Attorney
23 General.
24    Q.  And you have no knowledge of Cardinal

Page 312

1 actually adopting that as a policy, procedure, or
2 in any other form or format, correct?
3    MS. MAINIGI:  Objection; misstates her
4 testimony.  Objection; time period.
5    A.  That is the process that we were
6 following in order to comply with our obligations
7 under the suspicious reporting regulation as we
8 talked about earlier pursuant to this policy.
9    Q.  Sure.  You explained that -- my question
10 is, did Cardinal ever formally adopt it?  I think
11 we saw Mr. Reardon sign off on a policy and
12 procedure previously approving it and accepting
13 it.
14    MS. MAINIGI:  I'll let her answer the
15 question.
16    A.  I don't specifically recall.
17    Q.  Okay.
18    MS. MAINIGI:  We are at seven hours, as
19 I understand it.  The deposition is now over.
20 We will designate the transcript highly confidential,
21 and we will read and sign.
22    MR. FULLER:  I'd like to finish with the
23 last exhibit that's already been entered.
24    MS. MAINIGI:  I'm sorry.  It's seven

Page 313

1 hours.  We're done.
2    MR. FULLER:  Okay.  Well, we believe
3 that will be good cause shown.
4    MS. MAINIGI:  Well, we don't agree
5 pursuant to the agreement that we have.  Thank
6 you.
7    MR. FULLER:  Thank you.
8      We can go off the record.
9    THE VIDEOGRAPHER:  The time is now 6:09.
10 This concludes the deposition.  Going off the
11 record.
12    (Signature not waived.)
13      - - -
14      Thereupon, at 6:09 p.m., on Tuesday, July 7,
15 2018, the deposition was concluded.
16      - - -
17
18
19
20
21
22
23
24

Page 314

1          CERTIFICATE
2  STATE OF OHIO     :
              SS:
3  COUNTY OF FRANKLIN  :
4
5      I, JENNIFER R. NORRIS, do hereby certify that
6  I have read the foregoing transcript of my
7  cross-examination given on July 7, 2018; that together
8  with the correction page attached hereto noting changes
9  in form or substance, if any, it is true and correct.
10      _____
          JENNIFER R. NORRIS
11
12      I do hereby certify that the foregoing
13  transcript of the cross-examination of JENNIFER R.
14  NORRIS was submitted to the witness for reading and
15  signing; that after she had stated to the undersigned
16  Notary Public that she had read and examined her
17  cross-examination, she signed the same in my presence on
18  the _____ day of _____, 2018.
19
      _____
20      NOTARY PUBLIC - STATE OF OHIO
21
22  My Commission Expires:
23  _____, _____.
24

Page 315

1          CERTIFICATE
2  STATE OF OHIO     :
              SS:
3  COUNTY OF FRANKLIN  :
4      I, Carol A. Kirk, a Registered Merit Reporter
    and Notary Public in and for the State of Ohio, duly
5  commissioned and qualified, do hereby certify that the
    within-named JENNIFER R. NORRIS was by me first duly
6  sworn to testify to the truth, the whole truth, and
    nothing but the truth in the cause aforesaid; that the
7  deposition then given by her was by me reduced to
    stenotype in the presence of said witness; that the
8  foregoing is a true and correct transcript of the
    deposition so given by her; that the deposition was
9  taken at the time and place in the caption specified and
    was completed without adjournment; and that I am in no
10  way related to or employed by any attorney or party
    hereto or financially interested in the action; and I am
11  not, nor is the court reporting firm with which I am
    affiliated, under a contract as defined in Civil Rule
12  28(D).
13      IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio on
14  this 10th day of July 2018.
15
16
17
18      _____
          CAROL A. KIRK, RMR
19          NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21          - - -
22
23
24

Page 316

1          DEPOSITION ERRATA SHEET
2  Deposition of:  Jennifer R. Norris
3  Matter of:  National Prescription Opiate Litigation
4  Page Line  Correction or Change and Reason
5  ___ ____ _____
6  ___ ____ _____
7  ___ ____ _____
8  ___ ____ _____
9  ___ ____ _____
10  ___ ____ _____
11  ___ ____ _____
12  ___ ____ _____
13  ___ ____ _____
14  ___ ____ _____
15  ___ ____ _____
16  ___ ____ _____
17  ___ ____ _____
18  ___ ____ _____
19  ___ ____ _____
20  ___ ____ _____
21  ___ ____ _____
22  ___ ____ _____
23  ___ ____ _____
24  Date _____ Signature _____