# EXHIBIT 32

```
 1              IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

       IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804

 4     OPIATE LITIGATION NO. 2804       )

                                        )

 5     APPLIES TO ALL CASES             ) Hon. Dan A. Polster

                                        )

 6

 7         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 8                  CONFIDENTIALITY REVIEW

 9

                VIDEO DEPOSITION OF JOHN GILLIES

10

                    February 7, 2019

11                      9:07 a.m.

12                  HIGHLY CONFIDENTIAL

           SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

13

14

           Reporter:  John Arndt, CSR, CCR, RDR, CRR

15                   CSR No. 084-004605

                       CCR No. 1186

16

17

18

19

20

21

22

23

24
```

## Page 2

1  DEPOSITION OF JOHN GILLIES produced,
sworn, and examined on January 7, 2019, at Bryan Cave
2  Leighton Paisner LLP, 211 North Broadway, Suite 3600,
in the City of St. Louis, State of Missouri, before
3  John Arndt, a Certified Shorthand Reporter and
Certified Court Reporter.
4
5  APPEARANCES OF COUNSEL
6
On Behalf of Plaintiffs:
7    Keller Rohrback LLP
     1201 Third Avenue, Suite 3200
8    Seattle, WA 98101
     (206) 623-1900
9    BY: MR. DAVID J. KO
        dko@kellerrohrback.com
10      MS. ALISON S. GAFFNEY
        agaffney@kellerrohrback.com
11      MR. DEAN KAWAMOTO
        dkawamoto@kellerrohrback.com
12
On Behalf of Tennessee Action:
13    Branstetter, Stranch & Jennings, PLLC
      223 Rosa L. Parks Avenue, Suite 200
14    Nashville, TN 37203
      (615) 254-8801
15    BY: MS. TRICIA HERZFELD
         triciah@bsjfirm.com
16
On Behalf of AmerisourceBergen:
17    Reed Smith LLP
      136 Main Street, Suite 250
18    Princeton, NJ 08540
      (609) 514-5959
19    BY: MS. SHANA E. RUSSO
         srusso@reedsmith.com
20       (present via speakerphone)
21  On Behalf of Walmart:
      Jones Day
22    325 John H. McConnell Boulevard, Suite 600
      Columbus, OH 43215
23    (614) 469-3939
      BY: MS. BRANDY H. RANJAN
24       branjan@jonesday.com

## Page 3

1  APPEARANCES OF COUNSEL (CONTINUED)
2
On Behalf of Endo Pharmaceuticals and Par
3  Pharmaceuticals:
     Arnold & Porter Kaye Scholer, LLP
4    70 West Madison Street, Suite 4200
     Chicago, IL 60602
5    (312) 583-2434
     BY: MS. CAITLIN M. MIKA
6       caitlin.mika@arnoldporter.com
        (present via speakerphone)
7
On Behalf of Cardinal Health:
8    Armstrong Teasdale, LLP
     7700 Forsyth Boulevard, Suite 1800
9    St. Louis, MO 63105
     (314) 552-6672
10   BY: MS. SARAH E. HARMON
        sharmon@armstrongteasdale.com
11
On Behalf of Mallinckrodt, SpecGX LLC, and John
12  Gillies:
     Ropes & Gray LLP
13   800 Boylston Street
     Boston, MA 02199
14   (617) 951-7000
     BY: MR. ANDREW O'CONNOR
15      andrew.o'connor@ropesgray.com
        MR. JOSH GOLDSTEIN
16      joshua.goldstein@ropesgray.com
17
Also present: James Arndt, videographer
18
19
20
21
22
23
24

## Page 4

1  INDEX OF INTERROGATION
2  Examination by Mr. Ko          Page 9
3  Examination by Ms. Herzfeld    Page 274
   Examination by Mr. O'Connor    Page 326
4
   INDEX OF EXHIBITS
5
6  Exhibit Mallinckrodt-Gillies-001    Page 12
   (Notice of deposition)
7
8  Exhibit Mallinckrodt-Gillies-002    Page 52
   (E-mail chain with attachment)
9  (MNK-T1_0000273575 - MNK-T1_0000273582)
10 Exhibit Mallinckrodt-Gillies-003    Page 52
   (DEA letter)
11 (MNK-T1_0000270069 - MNK-T1_0000270070)
12 Exhibit Mallinckrodt-Gillies-004    Page 80
   (E-mail message)
13 (MNK-T1_0001806623)
14 Exhibit Mallinckrodt-Gillies-005    Page 80
   (Dosage Suspicious Orders for Dec 2003)
15 (MNK-T1_0001806624)
16 Exhibit Mallinckrodt-Gillies-006    Page 94
   (E-mail message with attachment)
17 (MNK-T1_0007026341 - MNK-T1_0007026342)
18 Exhibit Mallinckrodt-Gillies-007    Page 98
   (Suspicious Order Monitoring
19 Team Charter)
   (MNK-T1_0000496062)
20 Exhibit Mallinckrodt-Gillies-008    Page 105
   (Notes from meeting with DEA Albany)
21 (MNK-T1_0007053963 - MNK-T1_0007053966)
22 Exhibit Mallinckrodt-Gillies-009    Page 132
   (DEA Compliance Procedure)
23 (MNK-T1_0000419993 - MNK-T1_0000419997)
24

## Page 5

1  INDEX OF EXHIBITS (CONTINUED)
2
3  Exhibit Mallinckrodt-Gillies-010    Page 118
   (E-mail message with attachment)
4  (MNK-T1_0000273892 - MNK-T1_0000273895)
5  Exhibit Mallinckrodt-Gillies-011    Page 144
   (DEA Compliance Procedure)
6  (MNK-T1_0000296382 - MNK-T1_0000296386)
7  Exhibit Mallinckrodt-Gillies-012    Page 152
   (Global Controlled Substance
8  Compliance Procedure)
   (MNK-T1_0004154292 - MNK-T1_0004154296)
9  Exhibit Mallinckrodt-Gillies-013    Page 157
   (Global Controlled Substance
10 Compliance Procedure)
   (MNK-T1_0004154297 - MNK-T1_0004154300)
11
12 Exhibit Mallinckrodt-Gillies-014    Page 162
   (E-mail message with attachment)
13 (MNK-T1_0000264240)
14 Exhibit Mallinckrodt-Gillies-015    Page 169
   (11/02/10 memorandum)
15 (MNK-T1_0000269399 - MNK-T1_0000269400)
16 Exhibit Mallinckrodt-Gillies-016    Page 172
   (Global Controlled Substance
17 Compliance Procedure)
   (MNK-T1_0000264275 - MNK-T1_0000264278)
18 Exhibit Mallinckrodt-Gillies-017    Page 173
   (E-mail chain with attachment)
19 (MNK-T1_0000264199 - MNK-T1_0000264204)
20 Exhibit Mallinckrodt-Gillies-018    Page 179
   (Mallinckrodt Suspicious Order
21 Monitoring Procedure)
   (MNK-T1_0000259166 - MNK-T1_0000259170)
22 Exhibit Mallinckrodt-Gillies-019    Page 182
   (Modifications to Procedures for
23 Identification and Review of
   Unusual Orders)
24 (MNK-T1_0000571916 - MNK-T1_0000571917)

Page 6

## INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-020          Page 189
(Identification and Investigation of
Unusual Orders of Controlled Substances
And Reports of Suspicious Orders of
Controlled Substances)
(MNK-T1_0002357607 - MNK-T1_0002357611)
Exhibit Mallinckrodt-Gillies-021          Page 192
(E-mail message with attachment)
(MNK-T1_0007728781 - MNK-T1_0007728786)
Exhibit Mallinckrodt-Gillies-022          Page 204
(Identification, Investigation, and
Reports of Controlled Substances
Suspicious Orders)
(MNK-T1_0007476261 - MNK-T1_0007476265)
Exhibit Mallinckrodt-Gillies-023          Page 211
(Identification, Investigation, and
Reports of Controlled Substances
Suspicious Orders)
(MNK-T1_0005620500 - MNK-T1_0005620504)
Exhibit Mallinckrodt-Gillies-024          Page 214
(Identification, Investigation, and
Reports of Controlled Substances
Suspicious Orders)
(MNK-T1_0000511246 - MNK-T1_0000511249)
Exhibit Mallinckrodt-Gillies-025          Page 224
(E-mail message with attachment)
(MNK-T1_0000263874 - MNK-T1_0000263876)
Exhibit Mallinckrodt-Gillies-026          Page 254
(E-mail message)
(MNK-T1_0003044340)
Exhibit Mallinckrodt-Gillies-027          Page 257
(Mallinckrodt Controlled Substance
Suspicious Order Monitoring Program)
(MNK-T1_0000296470 - MNK-T1_0000296476)

Page 7

## INDEX OF EXHIBITS (CONTINUED)

Exhibit Mallinckrodt-Gillies-028          Page 260
(Draft Notes for SOM Steering
Committee Meeting 09/28/11)
(MNK-T1_0002077756 - MNK-T1_0002077758)
Exhibit Mallinckrodt-Gillies-029          Page 262
(E-mail message)
(MNK-T1_0000284620)
Exhibit Mallinckrodt-Gillies-030          Page 269
(Letter to Assistant U.S. Attorney)
(MNK-T1_0008434954 - MNK-T1_0008434992)
Exhibit Mallinckrodt-Gillies-031          Page 302
(List of files on server)
(MNK-T1_0007900223)
Exhibit Mallinckrodt-Gillies-032          Page 305
(Prescription Drug Prosecutions)
(MNK-TNSTA00607255 - MNK-TNSTA00607313)

(Exhibits are attached.)

Page 8

THE VIDEOGRAPHER:  We are now on the record.  My name is James Arndt.  I'm a videographer for Golkow Litigation Services.  Today's date is February 7th, 2019, and the time is 9:07 AM.

This video deposition is being held in St. Louis, Missouri, in the matter of the National Prescription Opiate Litigation for the United States District Court for the Northern District of Ohio, Eastern Division.  The deponent is John Gillies.

Will counsel please identify themselves?

MR. KO:  Good morning, everyone.  David Ko, Keller Rohrback, on behalf of the plaintiffs.

MS. GAFFNEY:  Alison Gaffney from Keller Rohrback on behalf of the plaintiffs.

MR. KAWAMOTO:  Dean Kawamoto, also from Keller Rohrback, for the plaintiffs.

MS. HARMON:  Sarah Harmon with Armstrong Teasdale for Cardinal Health, Inc.

MS. HERZFELD:  Tricia Herzfeld from Branstetter, Stranch & Jennings on behalf of the Tennessee plaintiffs.

MS. RANJAN:  Brandy Ranjan from Jones Day on behalf of Walmart.

MR. GOLDSTEIN:  Joshua Goldstein, Ropes &

Page 9

Gray, on behalf of the witness, Mallinckrodt LLC, and SpecGX LLC.

MR. O'CONNOR:  Andrew O'Connor on behalf of the witness, Mallinckrodt LLC, and SpecGX.

THE VIDEOGRAPHER:  Will attorneys present by phone please identify themselves?

MS. MIKA:  Caitlin Mika from Arnold & Porter on behalf of Endo and Par entities.

MS. RUSSO:  Shana Russo, Reed Smith, on behalf of AmerisourceBergen Drug Corporation.

THE VIDEOGRAPHER:  The court reporter is John Arndt and he will now swear in the witness.

The witness, JOHN GILLIES, first having been duly sworn, testified as follows:

EXAMINATION

BY MR. KO:

Q.   Good morning.

A.   Good morning.

Q.   Would you please state and spell your name for the record?

A.   Sure.  John Gillies.  G-I-L-L-I-E-S.

Q.   And Mr. Gillies, where do you currently reside?

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    A.   In St. Louis, Missouri.

2    Q.   And have you had your deposition taken

3 before?

4    A.   Yes.

5    Q.   Approximately how many times?

6    A.   Twice.

7    Q.   And was that in connection with your time

8 at FBI or in connection with your time at Mallinckrodt?

9    A.   With my previous employer.

10   Q.   Not Mallinckrodt?

11   A.   Not Mallinckrodt.

12   Q.   So you understand generally how these

13 depositions go, but just as a brief reminder of the

14 important rules to me, it's very important that we

15 create a clean record.

16        As we alluded to before, the court

17 reporter has the most important job here, so it's

18 important not to speak over one another, so please wait

19 until I finish my question before moving on to your

20 response, and likewise I'll wait until you finish your

21 response before moving onto my next question.

22        Okay?

23   A.   Yes.

24   Q.   It's also very important that to the

Page 11

1 extent that I ask a yes-or-no question and your answer

2 is in fact yes or no, please say those words rather

3 than shaking your head or nodding your head.

4        Sound good?

5    A.   Yes.

6    Q.   And from time to time, counsel, your

7 counsel, or other counsel might object to my

8 questioning, but unless you get a clear instruction not

9 to answer, I'd ask that you respond to my question.

10        Does that sound good?

11   A.   Yes.  Yes.

12   Q.   And Mr. Gillies, we'll be here for a

13 substantial period of time today, so to the extent you

14 need breaks, please ask and we'll do our best to

15 accommodate.

16        Okay?

17   A.   Thank you.

18   Q.   Mr. Gillies, is there anything that you

19 can think of today that would prevent you from

20 testifying truthfully or honestly?

21   A.   No.

22   Q.   Great.  I understand that you have been

23 designated on behalf of Mallinckrodt to testify on

24 certain topics pursuant to a 30(b)6 notice.

Page 12

1        Is that your understanding?

2    A.   Yes.

3    Q.   I'm going to go ahead and hand you a copy

4 of what's going to be marked as Gillies Exhibit 1.

5        [Exhibit Mallinckrodt-Gillies-001

6        marked for identification.]

7    Q.   And I'll represent for the record that

8 this is the amended notice of deposition pursuant to

9 Rule 30(b)6 that we issued to Mallinckrodt.

10        Does that look familiar to you, Mr.

11 Gillies?

12   A.   Yes.

13   Q.   And just so I understand it, just so the

14 record is clear, you are here testifying on behalf of

15 Mallinckrodt; is that correct?

16   A.   Correct.

17   Q.   And Mallinckrodt is defined as

18 Mallinckrodt LLC and SpecGX LLC; is that correct?

19   A.   Yes.

20   Q.   And are you also testifying on behalf of

21 Mallinckrodt PLC today?

22   A.   No, not that I'm aware of.

23        MR. KO:  And I'll note for the record, as

24 counsel is aware, that Mallinckrodt PLC has moved to

Page 13

1 dismiss themselves from this litigation, but it is

2 certainly plaintiffs' position that the PLC should be

3 in the litigation, and we expect this testimony to be

4 on behalf of the PLC as well.

5        MR. O'CONNOR:  Okay.  And we want to make

6 clear that his testimony today is only on behalf of LLC

7 and SpecGX LLC, and PLC is not subject to the

8 jurisdiction of the Northern District of Ohio.

9 BY MR. KO:

10   Q.   Now, throughout this day -- we'll be

11 taking a look at that notice shortly, but throughout

12 this day we'll also be looking potentially at some

13 documents that include Covidien e-mail addresses and

14 Covidien labels.

15        Can we agree for purposes of the

16 deposition today that Mallinckrodt includes Covidien?

17   A.   Yes.

18   Q.   And the same with Tyco.  There will be

19 some -- perhaps some Tyco e-mail addresses and some

20 Tyco documents.

21        Can we agree that Tyco is synonymous with

22 Mallinckrodt for purposes of today's deposition?

23        MR. O'CONNOR:  I just want to be very

24 clear that those are other companies, and he's

Page 14

1 authorized to speak, as he said, on behalf of LLC and
2 SpecGX.
3      MR. KO: When I refer -- I understand,
4 Andrew.
5 BY MR. KO:
6     Q. When I refer to Tyco and/or Covidien and
7 some documents, unless there is a clear objection or a
8 clear instruction otherwise, can we agree that just for
9 ease of reference that when I refer to Tyco and/or
10 Covidien it's also synonymous with Mallinckrodt?
11     A. Yes.
12     Q. Okay, great. Turning to this deposition
13 notice. As we discussed before, there are some topics
14 that you have been designated to testify on behalf of
15 Mallinckrodt, and that includes, if you turn to Page 5,
16 Topic 1. Is that correct?
17     A. Yes.
18     Q. And I also understand that you have been
19 designated by Mallinckrodt to testify as to portions of
20 Topic 2. Is that correct?
21     A. Yes.
22     Q. And in particular I think there are some
23 carve-outs there, so I believe that your testimony
24 today is specifically regarding suspicious order

Page 15

1 monitoring and potential diversion?
2     A. Yes.
3     Q. Is that correct?
4     A. Yes.
5     Q. And just so the record is clear, let me
6 read into the record the topic as I understand that you
7 are testifying on behalf of Mallinckrodt today.
8     And that would be, quote, the role of
9 wholesalers, distributors, and pharmacies, including
10 but not limited to defendants, in the supply chain for
11 your opioid products and the responsibilities of each
12 with respect to suspicious order monitoring and
13 potential diversion, end quote.
14     Do you understand to be testifying on that
15 topic today?
16     A. Yes.
17     Q. Great. Now, in addition you are also
18 testifying on behalf of Mallinckrodt for portions of
19 Topic 3; is that correct?
20     A. Yes.
21     Q. And again, just so the record is clear,
22 let me read the portion of Topic 3 that I believe that
23 you are testifying on behalf of Mallinckrodt.
24     And that would be, quote, warning letters

Page 16

1 sent to you by the DEA and any other communications
2 between you and the DEA regarding your marketing of
3 your opioid products, your response to these letters,
4 all subsequent actions you took in response to those
5 communications, and all budgets for any such actions by
6 year, end quote.
7     Is that a correct understanding of what
8 you're testifying on behalf of?
9     A. Yes.
10     Q. Great. Now, I also understand that you
11 are testifying on behalf of Mallinckrodt for portions
12 of Topic 4. Is that correct?
13     A. Yes.
14     Q. And again, so the record is clear, the
15 portion of Topic 4 that you are testifying on behalf of
16 Mallinckrodt today is, quote, your interactions with
17 the DEA regarding the scheduling of controlled
18 substances, the setting of quotas, or the distribution
19 of controlled substances, including compliance,
20 regulatory and administrative actions, communications,
21 and penalties, end quote.
22     Is that consistent with your understanding
23 that you're testifying on behalf of Mallinckrodt on
24 that topic?

Page 17

1     A. Yes.
2     Q. Great. I also understand that you are
3 testifying on behalf of Mallinckrodt on Topic 5. Is
4 that correct?
5     A. Yes.
6     Q. And in addition Topic 6?
7     A. Yes.
8     Q. Also Topic 7?
9     A. Yes.
10     Q. And turning to the next page, on Page 7,
11 there is also Topics 14 and 15. It's my understanding
12 that you are testifying on behalf of Mallinckrodt on
13 those topics. Is that accurate?
14     A. Yes to 14. Yes to 15.
15     Q. Great. And then finally if you move
16 forward to Page 11, I understand you are also being
17 designated to speak on behalf of Mallinckrodt on
18 portions of topic 27. Is that accurate?
19     A. Yes.
20     Q. And again, so the record is clear, the
21 portion of 27 that you will be testifying on
22 Mallinckrodt today is, quote, to the extent not
23 encompassed within other topics, your suspicious order
24 monitoring and compliance concerning your generic

Page 18

1  opioid products. Is that accurate?

2      A.  Yes.

3      Q.  Great. Thank you for that.

4      MR. O'CONNOR: Counsel, just for clarity.

5      MR. KO: Sure.

6      MR. O'CONNOR: I think on Number 4, per

7  our letter of October 15th, Mr. Webb was testified --

8  or was designated to testify regarding all of 4 except

9  for the setting of quotas, and it's only the setting of

10  quotas that's within Mr. Gillies's topics.

11      MR. KO: And Andrew, I believe that you

12  had sent an e-mail in early January before Mr. Webb's

13  deposition clarifying that actually Mr. Webb was only

14  testifying on behalf of communications, interactions

15  with the FDA.

16      MR. O'CONNOR: Okay.

17      MR. KO: And I had sent a follow-up e-mail

18  confirming.

19      MR. O'CONNOR: Happy to confirm that at

20  the next break, and we can handle it --

21      MR. KO: I think regardless, some of the

22  questions that I'll be asking today, just for your

23  edification, that relate to the DEA could fall under

24  other categories.

Page 19

1      MR. O'CONNOR: Fair enough. Thank you.

2      MR. KO: So if it becomes an issue, we can

3  discuss and put it on the record.

4      MR. O'CONNOR: Okay.

5  BY MR. KO:

6      Q.  Now, for the topics that we went over

7  today just a moment ago, again, just so the record is

8  clear, you understand that you are speaking on behalf

9  of Mallinckrodt; correct?

10      A.  Yes.

11      Q.  And you are not testifying in your

12  individual capacity?

13      A.  Correct.

14      Q.  And you understand that your testimony

15  will bind Mallinckrodt; is that correct?

16      A.  Yes.

17      Q.  Great. Mr. Gillies, what did you do to

18  prepare for this deposition?

19      A.  I met with counsel a number of times,

20  reviewed policies, procedures, e-mails, other

21  documents.

22      Q.  And when you said counsel, is that Mr.

23  O'Connor and Mr. Goldstein here?

24      A.  Yes.

Page 20

1      Q.  Any other additional counsel?

2      A.  Mr. Davison.

3      Q.  And approximately how many times did you

4  meet with them?

5      A.  Four or five. Four in person, one

6  videoconference.

7      Q.  And when was the date of the first

8  preparation session?

9      A.  I believe it was in September of 2018.

10      Q.  And approximately how many hours would you

11  say you have spent preparing for this deposition?

12      A.  Approximately 80 hours total.

13      Q.  And when you said a moment ago that you're

14  reviewing documents -- well, strike that.

15      The 80 hours in preparation -- are those

16  all hours you spent with counsel, or are you talking

17  about additional hours that you spent on your own

18  preparing?

19      A.  No, that would be a combination of counsel

20  and individual.

21      Q.  Understood. Approximately how many hours

22  did you meet with counsel?

23      A.  Approximately 40.

24      Q.  Okay, great. And when you said a moment

Page 21

1  ago you were -- that you reviewed some documents, were

2  these all documents that were selected by your counsel?

3      MR. O'CONNOR: You can answer that.

4      A.  Yes.

5  BY MR. KO:

6      Q.  In other words, did you provide any

7  documents to your counsel or did you independently

8  review any documents on your own outside of counsel's

9  presence?

10      A.  No.

11      Q.  Great. And have you reviewed any of the

12  court pleadings in the national opioid litigation?

13      A.  So can you further define that for me?

14      Q.  Sure. Have you looked at the applicable

15  complaints in this action?

16      A.  Yes.

17      Q.  Which ones?

18      A.  The original one.

19      Q.  Got it. And I'm not trying to put you

20  through a legal test at all.

21      A.  No --

22      Q.  I'm just trying to get an understanding of

23  what documents you may have looked at. So were these

24  documents also selected by counsel?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1     A.   Yes.

2     Q.   Great. In addition to complaints, were

3 there any other pleadings or documents that looked

4 similar to, for example, the 30(b)6 notice that's in

5 front of you that you reviewed?

6     A.   I would have looked at this document, but

7 I don't recall seeing anything else like this.

8     Q.   Okay. Thanks. And in preparation for

9 this deposition, did you speak with any current or

10 former employees at Mallinckrodt?

11     A.   Yes.

12     Q.   Which ones?

13     A.   Karen Harper.

14     Q.   And when did you speak with her?

15     A.   It would have been in January.

16     Q.   January of this year?

17     A.   I'm sorry. January 2019.

18     Q.   Great. And did you speak with her

19 specifically about your deposition, or this case, or

20 what did you guys discuss?

21     A.   Would have discussed a question I had on

22 one of these topics.

23     Q.   I see. And which topic was that?

24         MR. O'CONNOR: And counsel, I'm going to

Page 23

1 object to the extent some of that discussion took place

2 in the presence of counsel and instruct the witness not

3 to answer under attorney-client privilege.

4         MR. KO: Okay.

5 BY MR. KO:

6     Q.   Do you recall -- are you going to follow

7 that instruction?

8     A.   Yes.

9     Q.   Okay. Do you recall which topic you

10 discussed with Ms. Harper?

11         MR. O'CONNOR: Same objection, same

12 instruction.

13 BY MR. KO:

14     Q.   Other than Ms. Harper, did you speak with

15 any other current or former Mallinckrodt employee

16 outside the presence of counsel?

17     A.   No.

18     Q.   And I'm sure you're aware that there are

19 other depositions taking place in this case of

20 Mallinckrodt current and former employees; correct?

21     A.   Yes.

22     Q.   And did you review any transcripts of

23 these depositions?

24     A.   No.

Page 24

1     Q.   And Mr. Gillies, I assume that

2 Mallinckrodt is paying for your representation by

3 Andrew and Joshua today. Is that correct?

4     A.   Are they paying me or paying them? I'm

5 sorry. I don't understand the question.

6     Q.   Are you being compensated in any way for

7 your testimony today individually?

8     A.   I mean, I'm employed by Mallinckrodt, so

9 my compensation comes from my employer.

10     Q.   Outside of your regular compensation, are

11 you getting any additional compensation?

12     A.   No.

13     Q.   And are you paying for your counsel both

14 in terms of preparation for this deposition and/or

15 conducting this deposition?

16     A.   Me personally?

17     Q.   Yes.

18     A.   No.

19     Q.   Great. You can set that aside. You may

20 want to refer to it from time to time, but I'll just --

21 we can move that aside for the moment.

22     A.   Okay.

23     Q.   Mr. Gillies, you are currently director of

24 global security at Mallinckrodt; is that correct?

Page 25

1     A.   I'm currently the vice-president of global

2 security.

3     Q.   Vice-president. Thanks for the

4 clarification. Have you ever been a director of global

5 security or a director at Mallinckrodt?

6     A.   Yes.

7     Q.   And how long -- or how long ago was that

8 when you first became director?

9     A.   Yes. I was director when I joined

10 Mallinckrodt in June of 2012.

11     Q.   And are you still currently a director or

12 are you no longer a director?

13     A.   So I'm no longer a director.

14     Q.   And when did that occur that you no longer

15 became a director?

16     A.   I can't recall the exact date, but I

17 believe it was 2015.

18     Q.   And so you have been vice-president of

19 global security since 2015?

20     A.   Correct.

21     Q.   And you said a moment ago that you became

22 director in 2012. Is that also when you joined

23 Mallinckrodt?

24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  Q.  And approximately when in 2012?

2  A.  June of 2012.

3  Q.  Is it accurate to say that currently one

4  of your primary responsibilities is to oversee

5  Mallinckrodt's compliance with the Controlled

6  Substances Act?

7  A.  I'm one of the members of the suspicious

8  order monitoring team.

9  Q.  And in addition to being one of the

10  members of the suspicious order monitoring team, do you

11  have additional duties to ensure that Mallinckrodt

12  complies with its duties under the Controlled

13  Substances Act?

14  MR. O'CONNOR:  Objection to form.

15  A.  Yes.

16  BY MR. KO:

17  Q.  And for purposes of the deposition today,

18  is it okay if I refer to the Controlled Substances Act

19  as the CSA?

20  A.  Yes.

21  Q.  And okay to refer to suspicious order

22  monitoring as SOM?

23  A.  Yes.

24  Q.  Okay, great.  And I assume that you're

Page 27

1  familiar with the CSA; correct?

2  A.  Yes.

3  Q.  And you're familiar that a fundamental

4  duty of any registrant of the CSA is to maintain

5  effective controls against diversion?

6  MR. O'CONNOR:  Objection to form.

7  A.  Yes.

8  BY MR. KO:

9  Q.  And is it also fair to say that one of the

10  fundamental duties of the CSA is for a registrant to

11  design and implement a system to identify and detect

12  suspicious orders?

13  MR. O'CONNOR:  Objection to form.

14  A.  Yes.

15  BY MR. KO:

16  Q.  And you would certainly agree that

17  Mallinckrodt as a registrant of the CSA has these

18  duties; correct?

19  MR. O'CONNOR:  Objection to form.

20  A.  Yes.

21  BY MR. KO:

22  Q.  Now, is it accurate to state that

23  Mallinckrodt did not always comply with these duties?

24  MR. O'CONNOR:  Objection to form.

Page 28

1  A.  No.

2  BY MR. KO:

3  Q.  Well, you're familiar with the memorandum

4  of understanding between the DEA and Mallinckrodt;

5  correct?

6  A.  Yes.

7  Q.  And we'll get into more of the details

8  later, but you're familiar with all the provisions of

9  the memorandum of understanding; is that fair?

10  A.  Yes.

11  Q.  And in the memorandum of understanding

12  there is a provision referenced in that agreement

13  titled admission of responsibility.

14  Are you familiar with that provision?

15  MR. O'CONNOR:  Objection to form.

16  A.  Yes.

17  BY MR. KO:

18  Q.  And we can refer to the document later if

19  we need to, but in that provision there's a statement

20  that indicates that Mallinckrodt from certain times

21  through -- from 2008 to 2012 did not always comply with

22  the standard set forth in DEA letters in 2006 and 2007

23  regarding its suspicious order monitoring program.

24  Isn't that accurate?

Page 29

1  MR. O'CONNOR:  Objection to form.

2  A.  That's my understanding without reading

3  that document.

4  BY MR. KO:

5  Q.  So we had just talked about one of the

6  duties under the CSA being a registrant's obligation to

7  design and implement a system to identify suspicious

8  orders.

9  Do you recall that?

10  A.  I'm sorry.  Could you say that again?

11  Q.  Sure.  We had just talked about one of the

12  duties under the CSA being a registrant's obligation to

13  design and implement a system to identify suspicious

14  orders.

15  A.  Yes.

16  Q.  And in the admission of responsibility in

17  the MOU, memorandum of understanding, between

18  Mallinckrodt and DEA, Mallinckrodt acknowledged that

19  from certain times from 2008 through 2012 it did not

20  always follow the recommendations set forth in DEA

21  letters in 2006 and 2007 regarding SOM programs.

22  Isn't that accurate?

23  MR. O'CONNOR:  Objection to form.

24  A.  No.  No.

Page 30

BY MR. KO:

1 BY MR. KO:

2    Q.   Well, we'll get to the MOU later, then.

3    A.   Okay.

4    Q.   Again, I don't want this to be a memory

5 test or anything.

6    A.   Yeah.

7    Q.   So we'll talk about those provisions

8 later.

9         Going back to your background, I've seen

10 in certain documents that you have a BA in accounting

11 in business from Illinois State.  Is that correct?

12   A.   A bachelor's of science.

13   Q.   Sorry.  I apologize for that.  A

14 bachelor's of -- so you have a bachelor's of science in

15 accounting and business administration from Illinois

16 State.  Is that correct?

17   A.   That's correct.  Uh-huh.

18   Q.   And you graduated in 1982?

19   A.   Yes.

20   Q.   And after graduation you went to work for

21 the FBI, is my understanding.  Is that correct?

22   A.   Yes.

23   Q.   And was that immediately after graduation?

24   A.   No.

Page 31

1    Q.   What did you do between graduation and

2 working for the FBI?

3    A.   I was doing accounting work, and I joined

4 the FBI in October of 1983.

5    Q.   And where did you do your accounting work?

6    A.   It was in Chicago.

7    Q.   Who was your employer?

8    A.   It was Curtis Kruber (ph) -- Kruber, CPA.

9 Excuse me.

10   Q.   And when you went to work for the FBI,

11 what was your first job at the FBI?

12   A.   It was a general support position.

13   Q.   General support in what division?

14   A.   Chicago division.

15   Q.   In what department?

16   A.   It was for the entire office.

17   Q.   I see.  And I don't want to go over too

18 much of your background.  There's -- as you understand,

19 you have a deposition under your personal capacity

20 tomorrow.  But I just -- I do want to understand when

21 you became a special agent in charge of the Miami

22 division.

23   A.   October of 2009.

24   Q.   And how long were you in that role?

Page 32

1    A.   Until June 2012.

2    Q.   When you went to go work for Mallinckrodt?

3    A.   That's correct.

4    Q.   And both as a special agent in charge of

5 the Miami division of the FBI and even prior to that, I

6 want to get an understanding of when you first became

7 aware of the opioid crisis.

8        MR. O'CONNOR:  Again, you can answer at a

9 general level.  As we discussed, there's Touhy

10 regulations that govern his ability to speak to

11 confidential information, so at a very high level you

12 can answer whether you were aware.

13   A.   It would have been during that time

14 between 2009 and 2012.

15 BY MR. KO:

16   Q.   So you -- and during that time, given that

17 you were in Florida, I presume that you became aware of

18 certain issues with respect to the opioid crisis in

19 Florida in particular as well; correct?

20       MR. O'CONNOR:  Again, you can speak to

21 your general awareness to the extent you don't reveal

22 any confidential government information subject to the

23 Touhy regulations.  And if you can't answer, then I

24 would object and instruct you not to.

Page 33

1    A.   Could you restate that question?  I'm

2 sorry about that.

3 BY MR. KO:

4    Q.   Sure, I can repeat it.

5    A.   Yeah, you can repeat it?  That's fine.

6    Q.   Given that you were in Florida, I presume

7 that you became aware of certain issues with respect to

8 the opioid crisis in Florida in particular; correct?

9        MR. O'CONNOR:  Object to the form, and

10 give the same instruction with respect to the Touhy

11 issue.

12   A.   I'm going to take my counsel's advice on

13 that.

14 BY MR. KO:

15   Q.   Sure.  And Mr. Gillies, I'm certainly not

16 trying to pry into anything that might be confidential

17 or violate any of your obligations under the law.  I'm

18 just trying to get a general understanding of whether

19 or not you became aware of certain issues in Florida

20 related to the opioid crisis in the 2009 through 2012

21 time period.

22       MR. O'CONNOR:  Going to make the same

23 objections.

24   A.   I'm going to have to take my counsel's

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  advice on that.
2  BY MR. KO:
3      Q.  Okay.  Let me try this way.  Mr. Gillies,
4  there's certainly publicly available information about
5  the role you played with respect to certain
6  investigations that occurred in Florida.
7          Are you aware of those?
8      A.  Yes.
9      Q.  So I'm just asking with respect to the
10 publicly available information out there that suggests
11 that you played a role in, for example, prosecution of
12 certain pill mills in Florida, I just want to make sure
13 that the record is clear today.
14         At some point in time during the 2009 and
15 2012 time period, or perhaps before, you became aware
16 that there were certain issues with respect to the
17 opioid crisis in Florida; is that fair?
18         MR. O'CONNOR:  Object to form.  You can
19 answer with respect to publicly available information.
20     A.  Yes.
21 BY MR. KO:
22     Q.  Now, is it also accurate to say -- putting
23 aside your role in the FBI, is it also accurate to say
24 that Mallinckrodt became aware of certain issues in

Page 35

1  Florida as alerted by the DEA?
2          MR. O'CONNOR:  Object to form.
3      A.  Mallinckrodt became aware of the full
4  scope of the problem after a DEA meeting in August of
5  2011.
6  BY MR. KO:
7      Q.  And setting aside your answer with respect
8  to the full scope of the problem, Mallinckrodt
9  understood that there were certain issues with respect
10 to the Mallinckrodt pills being diverted in Florida
11 prior to that meeting as well; correct?
12         MR. O'CONNOR:  Objection to form.
13     A.  Mallinckrodt was aware of an opioid
14 problem, and they were aware of unscrupulous doctors
15 writing scripts for opioids.
16 BY MR. KO:
17     Q.  And what time period were they aware of
18 this?
19     A.  Again, they became aware of the full scope
20 after the August 2011 DEA meeting, so they were aware
21 of unscrupulous doctors and some opioid issues prior to
22 that.
23     Q.  And would it be accurate to say that they
24 became aware of an opioid problem and aware of

Page 36

1  unscrupulous doctors writing scripts for opioids as
2  early as 2008?
3          MR. O'CONNOR:  Objection to form.
4      A.  I don't have any recollection of it being
5  2008.
6  BY MR. KO:
7      Q.  I've probably seen a lot more documents
8  than you have.
9      A.  I'm sure you have.
10     Q.  But have you in any of your review of
11 documents as selected by counsel today, did you see any
12 reference to a growing opioid crisis and problems in
13 Florida in particular earlier than 2008?
14     A.  No.
15     Q.  And again, all these documents were
16 selected by your counsel, is that correct, that you
17 reviewed in preparation for this deposition?
18     A.  Yes.
19     Q.  Mr. Gillies, you are aware of the
20 controlled substance compliance group at Mallinckrodt;
21 is that correct?
22     A.  Yes.
23     Q.  And were you ever a member or are
24 currently a member of the controlled substance

Page 37

1  compliance group?
2      A.  I am a member of the SOM team, and we have
3  a DEA compliance group.  Is that what you're referring
4  to?
5      Q.  Well, that's actually helpful to clarify,
6  because I've seen plenty of references in the documents
7  to both a DEA compliance team and a controlled
8  substance compliance team.
9          Is it your testimony that there are two
10 distinct teams, or are they the same but just used
11 interchangeably?
12         MR. O'CONNOR:  Objection to form.
13     A.  So I'm sorry.  I'm not familiar with that
14 second term, the controlled substance compliance team.
15 I am familiar with the DEA compliance team.
16 BY MR. KO:
17     Q.  Got it.  And what are the general roles
18 and responsibilities of the DEA compliance team?
19     A.  I'm not part of that team, so my general
20 understanding is that that team works closing with DEA
21 on any issues -- that's where the quota numbers are
22 prepared from.
23     Q.  In addition to quota, anything else?
24     A.  I'm sure there are.  I'm just not part of

Page 38

1    that team, so I can't give you a list.

2        Q.   And a moment ago you said you were part of

3    the SOM team.  Is the SOM team under the umbrella of

4    the DEA compliance team, or is it a separate group?

5        A.   Separate.

6        Q.   And currently who are the members of the

7    SOM team?

8        A.   So we have a representative from DEA

9    compliance, from security, from legal, and government

10   compliance.

11       Q.   And --

12       A.   There may be others.

13       Q.   And is the representative from security --

14   is that you?

15       A.   Yes.

16       Q.   And the representatives from legal -- who

17   are they?

18           MR. O'CONNOR:  You can answer that.

19       A.   Don Lohman, general counsel.

20   BY MR. KO:

21       Q.   Is he the only representative of legal on

22   the SOM team?

23       A.   Jason Tilly.

24       Q.   Is he also --

Page 39

1        A.   Associate general counsel.

2        Q.   And then you mentioned government

3    compliance a moment ago.  Who is the individual that is

4    the representative on the SOM team from that group?

5        A.   Gail Tetzlaff.

6        Q.   And have you been a member of the SOM team

7    ever since you joined Mallinckrodt in June of 2012?

8        A.   Yes.

9        Q.   And was there ever a period of time in

10   which you were not a member of the SOM compliance team

11   during the time period between June 2012 and current?

12       A.   I've been a member of the SOM team since I

13   joined Mallinckrodt.

14       Q.   So in your review of documents and in

15   preparing for this deposition today, did you see any

16   reference to a controlled substance compliance group

17   that was ever formed?

18       A.   I have no recollection of that, but if you

19   have a document, I'll look at it.

20       Q.   Sure.  Is it your understanding that prior

21   to your employment at Mallinckrodt that the DEA

22   compliance team was always separate from an SOM team,

23   or was there ever a point in Mallinckrodt's history

24   where the SOM team was under the umbrella of the DEA

Page 40

1    compliance team?

2           MR. O'CONNOR:  Objection to form.

3        A.   I'm unaware of the SOM team being under

4    the umbrella of DEA compliance.

5    BY MR. KO:

6        Q.   And is it -- so is it your test -- well,

7    strike that.

8           Did Mallinckrodt always have an

9    independent and separate SOM team?

10          MR. O'CONNOR:  Objection to form.

11       A.   So can you define always?

12   BY MR. KO:

13       Q.   How about from the period of 2008 to the

14   period of when you joined in June of 2012, do you have

15   an understanding of whether or not the SOM team was

16   independent of any other group at Mallinckrodt?

17          MR. O'CONNOR:  Objection to form.

18       A.   Yes, I believe them to be independent.

19   BY MR. KO:

20       Q.   Now, turning back to your testimony a

21   moment ago about how Mallinckrodt became aware of the

22   full scope of the problem in Florida after an August

23   23rd, 2011, meeting.

24          Is it accurate to state that Mallin -- or

Page 41

1    excuse me -- that the DEA focused particularly on

2    Mallinckrodt opioids, oxy 15s and oxy 30s in

3    particular?

4           MR. O'CONNOR:  Objection to form.

5        A.   I don't know if I heard you misspeak, but

6    August of 2011.  Correct?

7    BY MR. KO:

8        Q.   Okay.  I may have misspoken, and let me

9    rephrase my question in any event to make it --

10       A.   Okay.

11       Q.   -- hopefully a little more simple.  The

12   DEA met with Mallinckrodt many times during the 2009

13   through 2012 time period; is that fair to say?

14          MR. O'CONNOR:  Objection to form.

15       A.   I don't know about many times, but we met

16   with DEA.

17   BY MR. KO:

18       Q.   Did Mallinckrodt meet with DEA on more

19   occasions than the August 23rd, 2011, meeting?

20       A.   I'm sorry.  Could you give me that date

21   again?

22       Q.   Sure.  I believe that you said that the

23   meeting was in August of 2011.

24       A.   That's correct.

Page 42

1      Q.   And I believe in particular it was August
2  23rd of 2011.
3      A.   Okay.
4      Q.   That's what I --
5      A.   That's what it was, you throwing the 23rd
6  at me.  I'm sorry.  I don't have the exact date on
7  that.  That's why I was using August of 2011.  That's
8  where you were throwing me off.  Okay, I'm sorry.  Now
9  I understand.  Okay.
10     Q.   So in addition to the August 2011 meeting
11 with DEA, Mallinckrodt had additional meetings with DEA
12 regarding diversion of Mallinckrodt opioids; is that
13 fair to say?
14         MR. O'CONNOR:  Objection to form.
15     A.   We -- Mallinckrodt had additional meetings
16 with the DEA.  It wasn't necessarily for that purpose.
17 BY MR. KO:
18     Q.   What other purposes were they for?
19     A.   They inspect our facilities, and so some
20 of the meetings were about inspections of our
21 facilities.
22     Q.   Sure.  And I understand there are a
23 variety of purposes or a variety of reasons for why DEA
24 met with Mallinckrodt, but with respect to diversion of

Page 43

1  Mallinckrodt opioids, is it your testimony today that
2  Mallinckrodt only met once with DEA regarding diversion
3  of Mallinckrodt opioids?
4      A.   During which time frame again?  I'm sorry.
5      Q.   At any time.
6      A.   No.
7      Q.   So in addition to the August 2011 meeting
8  between Mallinckrodt and DEA, there were additional
9  meetings, were there not, where diversion of
10 Mallinckrodt opioids was discussed between Mallinckrodt
11 and DEA; is that fair to say?
12     A.   Yes.
13     Q.   And a moment ago I had referred to oxy 15s
14 and oxy 30s.  It's your understanding that Mallinckrodt
15 manufactured generic oxycodone in the 15-milligram
16 strength; is that accurate?
17     A.   Yes.
18     Q.   And in addition, Mallinckrodt also
19 manufactured oxycodone 30?
20     A.   Yes.
21     Q.   And for purposes of the deposition today,
22 is it okay if I refer to those as oxy 15s and oxy 30s?
23     A.   Yes.
24     Q.   During the August 2011 meeting, one of

Page 44

1  Mall -- one of DEA's focuses were the diversion of
2  Mallinckrodt opioids, and in particular the diversion
3  of Mallinckrodt oxy 15s and 30s; is that accurate?
4      A.   The discussion was about Mallinckrodt
5  oxycodone products going into Florida.
6      Q.   And in particular oxy 15s and oxy 30s, or
7  just oxycodone products in general?
8      A.   15s and 30s.
9      Q.   So is it fair to say that Mallinckrodt
10 knew that Mallinckrodt-manufactured opioids were being
11 abused and diverted in Florida?
12         MR. O'CONNOR:  Objection to form.
13     A.   I don't know about the abuse part, but
14 they would have become aware of some of the diversion
15 of the products.
16 BY MR. KO:
17     Q.   And what's your understanding of
18 diversion, Mr. Gillies?
19     A.   Outside the legal supply chain.  So if you
20 write me a legitimate script and I get it filled and I
21 give it to people around this table, there's diversion
22 there.  One of the other things we could also do is we
23 could have an employee that diverts product.
24     Q.   And could diversion lead to abuse of a

Page 45

1  product?
2          MR. O'CONNOR:  Objection to form.
3      A.   It could.
4  BY MR. KO:
5      Q.   And would you agree that diversion of an
6  opioid product could also lead to its misuse?
7      A.   Could.
8      Q.   Is it fair to say that Mallinckrodt was
9  also aware of the Oxy Express?
10         MR. O'CONNOR:  Objection to form.
11     A.   I'm not aware of Mallinckrodt being aware
12 of the Oxy Express.
13 BY MR. KO:
14     Q.   During both the August 2011 meetings and
15 other meetings, did DEA ever inform or discuss the Oxy
16 Express with Mallinckrodt?
17         MR. O'CONNOR:  Objection to form.
18     A.   Not that I'm aware of.
19 BY MR. KO:
20     Q.   And in your review of documents today in
21 preparation for this deposition as selected by counsel,
22 did you see any references to the Oxy Express?
23     A.   I did not.
24     Q.   Do you have an understanding of what the

Page 46

1 Oxy Express is?
2          MR. O'CONNOR:  Objection.  To the -- I'm
3 assuming, counsel, you are asking him in his capacity
4 as an employee of Mallinckrodt did he learn about that
5 term.  Otherwise, there's Touhy implications.
6          So you can answer to the extent that it's
7 based on Mallinckrodt knowledge.
8      A.    No.
9 BY MR. KO:
10     Q.    You don't have any understanding of what
11 the Oxy Express is?
12          MR. O'CONNOR:  Same --
13 BY MR. KO:
14     Q.    And I know that you keep looking at
15 counsel, but I'd ask that unless he actually lodges his
16 objection clearly on the record and instructs you not
17 to answer that you refrain from looking at him every
18 time that I ask you a question.
19     A.    I'm not looking at him every time you ask
20 me a question, but I've got legal implications when you
21 ask me this question, so I just want to make sure that
22 I'm not overstepping my legal bounds for my
23 responsibility to my former employer.
24          So I believe I just answered your question

Page 47

1 when it came to Mallinckrodt.
2          MR. O'CONNOR:  I'm going to make the same
3 objection clearly and on the record.
4 BY MR. KO:
5      Q.    So you -- have you seen any documents at
6 all that -- Mallinckrodt documents that reference the
7 Oxy Express?
8      A.    I have not.
9      Q.    And have you had any discussions with
10 anyone regarding -- outside the presence of your
11 counsel regarding the Oxy Express?
12     A.    No.
13     Q.    So turning back to the DEA compliance
14 group, as it stands today, approximately how many
15 full-time employees are part of the DEA compliance
16 group?
17     A.    Six or seven is my estimate.
18     Q.    And do you have an understanding of how
19 that has changed over time, if at all?
20     A.    I don't think it's changed much over time.
21     Q.    So as far as you know, as far as the DEA
22 compliance group has been in existence, approximately
23 six to seven full-time employees have been part of that
24 group?  Is that accurate?

Page 48

1      A.    That's my understanding.
2      Q.    And with respect to -- I know we had just
3 discussed the individuals that were part of the SOM
4 team.  How many full-time employees are part of the SOM
5 team right now?
6      A.    Approximately nine.
7      Q.    And has that changed over time?
8      A.    It's grown.
9      Q.    And when -- when was the SOM team first
10 created?
11     A.    I don't know the answer to that.
12     Q.    We can take a look at some documents
13 later, but does it refresh your recollection at all if
14 I say that the SOM -- it's my understanding the SOM
15 team was created in 2008.
16          Is that consistent with your
17 understanding, or are we going to need to look at some
18 more documents to establish that?
19          MR. O'CONNOR:  Objection to form.
20     A.    I don't have an understanding of exactly
21 when it started.
22 BY MR. KO:
23     Q.    Do you have a general understanding of
24 whether or not it started before 2008 or after 2008?

Page 49

1      A.    I do not.
2      Q.    And as we discussed before with respect to
3 the topics that are outlined in that notice, one of the
4 topics includes Mallinckrodt's suspicious order
5 monitoring system; is that accurate?
6      A.    Yes.
7      Q.    And you were -- you're prepared to testify
8 on behalf of the company on all things related to
9 suspicious order monitoring; is that fair?
10     A.    Yes.
11     Q.    And your testimony is that you don't
12 know -- today you don't -- sitting here, you don't know
13 when the SOM team began?
14     A.    That's correct.  I cannot recall.
15     Q.    Is it -- going back to the DEA compliance
16 group, I know you had talked about certain things that
17 they were responsible for, but you couldn't recall
18 everything.
19          Is it fair to say that the DEA compliance
20 group is responsible for any DEA reporting requirement?
21          MR. O'CONNOR:  Objection to form.
22     A.    Yes.
23 BY MR. KO:
24     Q.    And those would include any year-end ARCOS

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 reports that Mallinckrodt has to submit to DEA; is that
2 accurate?
3          MR. O'CONNOR: Objection to form.
4     A.   Yes.
5 BY MR. KO:
6     Q.   And it would also be accurate to say that
7 the -- well, strike that.
8          The SOM team, you have testified, is
9 independent from the DEA compliance group. So I want
10 to get an understanding of whether or not the DEA
11 compliance group has any involvement in SOM whatsoever
12 or if the SOM team runs completely independent of DEA
13 compliance.
14          MR. O'CONNOR: Objection to form.
15 BY MR. KO:
16     Q.   So there wasn't a question there, so I'll
17 just ask the question.
18          Does the DEA compliance group have any
19 responsibility over the SOM team?
20     A.   There are DEA compliance members on the
21 SOM team.
22     Q.   And which individuals are those?
23     A.   Karen Harper, Eileen Spaulding, and
24 Michelle -- and I can't recall her last name.

Page 51

1     Q.   Are those the only three individuals that
2 are both part of DEA compliance and the SOM team?
3     A.   That's my understanding.
4     Q.   And going back to the DEA compliance
5 group, in addition to quota requests and communications
6 with DEA regarding Mallinckrodt's quota, is it also
7 accurate to say the DEA compliance group has
8 responsibility coordinating any audits done by DEA of
9 Mallinckrodt facilities?
10     A.   Yes.
11          MR. O'CONNOR: Objection to form.
12 BY MR. KO:
13     Q.   Is it also accurate to say that the DEA
14 compliance group is responsible for tracking
15 Mallinckrodt's internal consumption of their quota
16 request?
17          MR. O'CONNOR: Objection --
18 BY MR. KO:
19     Q.   Or of the annual quota allocation?
20          MR. O'CONNOR: Objection.
21     A.   Yes.
22 BY MR. KO:
23     Q.   Earlier we were talking about
24 Mallinckrodt's duties under the Controlled Substances

Page 52

1 Act. Do you recall that?
2     A.   Yes.
3     Q.   Now, in addition to the statute --
4 obviously it's complex and has many layers to it.
5          With respect to suspicious order
6 monitoring in particular, is it accurate to say that
7 Mallinckrodt received certain letters in the 2006 and
8 2007 time period regarding its obligations under the
9 CSA and in particular its obligations to design and
10 implement the suspicious order monitoring system?
11          MR. O'CONNOR: Objection to form.
12     A.   We received a DEA letter 2007 -- 2007.
13 The 2006 letter -- I don't believe we received a copy
14 of that until later, in 2007 or 2008.
15 BY MR. KO:
16     Q.   Okay. I'm going to go ahead and hand you
17 a copy of what's been marked as Gillies Exhibit 2.
18          [Exhibit Mallinckrodt-Gillies-002
19          marked for identification.]
20     Q.   And for the record, Gillies Exhibit 2 is
21 MNK-T1_000273575. And then I'm also going to hand you
22 a copy of what's going to be marked as Gillies Exhibit
23 3.
24          [Exhibit Mallinckrodt-Gillies-003

Page 53

1          marked for identification.]
2     Q.   And for the record, that ends in Bates
3 270069.
4          And let's start with the second exhibit --
5 or excuse me -- Gillies Exhibit 2.
6     A.   Okay.
7     Q.   And I see that there's a cover letter, and
8 we can talk about that in a moment, but this is -- the
9 letter that you see attached to this e-mail is a
10 September 27th, 2006, letter from the DEA; is that
11 accurate?
12     A.   Yes.
13     Q.   And this -- it's signed by Joe Rannazzisi?
14     A.   Yes.
15     Q.   By the way, did you know Joe Rannazzisi
16 prior to the time that you joined Mallinckrodt?
17     A.   No.
18     Q.   Do you know him now?
19     A.   I know who he is.
20     Q.   But you don't have a personal relationship
21 with him?
22     A.   I do not.
23     Q.   And in addition to the letter that you see
24 in -- that's reflected in Exhibit 2, there's another

Page 54

1   letter that's in front of you that's marked as Gillies
2   Exhibit 3 that's dated December 27th, 2007; is that
3   correct?
4       A.   Yes.
5       Q.   And are these the two letters that we just
6   discussed a moment ago that Mallinckrodt received
7   regarding its duties under the CSA?
8           MR. O'CONNOR:  Objection to form.
9       A.   Yes.
10  BY MR. KO:
11      Q.   And throughout today we might be referring
12  to these letters.  Is it okay if we refer to these as
13  the Rannazzisi letters?
14      A.   Yes.
15      Q.   Okay, great.  So turning back to -- I'm
16  sorry to jump around, but turning back to Gillies
17  Exhibit 2, I just want to make sure I understand your
18  testimony a moment ago.
19           You said that you don't believe that
20  Mallinckrodt received this letter immediately after it
21  was dated September 27th, 2006.  Is that correct?
22      A.   That's correct.
23      Q.   And your testimony is that Mallinckrodt
24  received it at some point in time in 2007 or 2008?

Page 55

1       A.   Correct.
2       Q.   And I just want to clarify for the record.
3   If you look at the cover e-mail, you see Ms. Harper
4   sending this letter around.  Is that accurate?
5           MR. O'CONNOR:  Objection to form.
6       A.   So this is from Karen, and the attachment
7   says DEA letter September 27th, 2006.
8   BY MR. KO:
9       Q.   So I just want to clarify for the record.
10  I want to make sure that it's clear.
11           Is it accurate to say that Mallinckrodt
12  received or individuals at Mallinckrodt received this
13  letter in 2007?
14      A.   The date of this is December 13th, 2007.
15      Q.   So yes or no?  Is it accurate to say that
16  Mallinckrodt received the September 27th, 2006,
17  Rannazzisi letter at some point in 2007?
18      A.   Yes.
19      Q.   And by the way, there are some individuals
20  that are referenced in this letter at Mallinckrodt,
21  including individuals by the name of Eldon Hanson and
22  Todd Forthaus.  Do you see that?
23      A.   Yes.
24      Q.   Do you know who they are?

Page 56

1       A.   I'm familiar with Eldon's name, but not
2   Todd.
3       Q.   And who is Eldon Henson, and what was his
4   role at Mallinckrodt?
5       A.   I'm sorry.  I don't know what his role
6   was.
7       Q.   Okay.  Fair enough.  And there are also
8   references, if you look on Pages 2 and 3 of this
9   e-mail, to Vince Kaiman and Tim Wright.
10           Do you know who those individuals are?
11      A.   I do not.
12      Q.   Now, if you look at the second page of
13  this e-mail.  Sorry, just stick on that exhibit.
14      A.   This one?  Okay.
15      Q.   Yeah.  Thank you.  So the second page of
16  that e-mail -- I'm about two-thirds of the way down --
17  there is an e-mail from Dirk Stevens to Eldon Hanson.
18  Do you see that?
19      A.   Yes.
20      Q.   From December 13th?
21      A.   Yes.
22      Q.   10:45?  And again, Eldon Hanson was a
23  Mallinckrodt employee; is that correct?
24      A.   Yes.

Page 57

1       Q.   And in that e-mail, he is being asked by
2   Dirk Stevens, quote, do you have a diversion policy.
3   Do you see that?
4       A.   Yes.
5       Q.   What is your understanding -- well, strike
6   that.
7           With respect to Mallinckrodt's obligations
8   under the CSA, and in particular its obligations to
9   design and implement an SOM program, when did
10  Mallinckrodt first memorialize in writing a policy with
11  respect to these obligations?
12           MR. O'CONNOR:  Object to form.
13      A.   So Mallinckrodt always had an SOM program,
14  but I do not know the date of any formal document.
15  BY MR. KO:
16      Q.   When you say that Mallinckrodt always had
17  an SOM program, can you -- do you have an understanding
18  of when it first began?
19      A.   I do not.
20      Q.   And do you have -- I assume I know the
21  answer to this, but when Mallinckrodt first implemented
22  an SOM program, do you know if there was any policy
23  memorialized in writing regarding that program at that
24  time?

Page 58

```
1    A.   I do not.
2    Q.   And turning to the top of the first page,
3  the Karen Harper e-mail to Bill Ratliff.  There's an
4  occasion -- do you see -- about three lines down where
5  she indicates that, quote, she was forwarded policy E-9
6  for St. Louis and A-14 for WGTC regarding the same.
7    A.   Okay.
8    Q.   And for ease of reference, you can see
9  the --
10   A.   Okay.
11   Q.   Obviously the exhibit is in front of you,
12 but if you'd like to look at the big screen, it's there
13 behind me as well.
14        Do you have any understanding of what the
15 security policy E-9 is?
16   A.   I do not.
17   Q.   Or do you have any understanding of what
18 the A-14 for WGTC is?
19   A.   I do not.
20   Q.   Is there any indication in that e-mail
21 that Karen Harper is actually providing anyone with the
22 diversion policy requested in the previous e-mail we
23 looked at?
24   A.   Could you say that again?
```

Page 59

```
1    Q.   Let me ask it a different way.  Do you
2  have any understanding whether Mallinckrodt as of
3  December 2007 had a written SOM policy?
4    A.   I'm unaware whether they did or did not.
5    Q.   You can set that aside and look at Gillies
6  Exhibit 3.
7         And so this is the second Rannazzisi
8  letter that Mallinckrodt received from DEA; is that
9  correct?
10   A.   Yes.
11   Q.   And there's a received stamp that
12 indicates that Mallinckrodt in fact received this at
13 least no later than January 4th, 2008.  Is that
14 accurate?
15   A.   Yes.
16   Q.   And this particular letter is specifically
17 addressed to Mallinckrodt Hobart facility?
18   A.   Yes.
19   Q.   And so the record is clear, there's no
20 dispute that Mallinckrodt received this letter;
21 correct?
22   A.   Correct.
23   Q.   By the way, do you have an understanding
24 of who these Rannazzisi letters were circulated to at
```

Page 60

```
1  Mallinckrodt?
2    A.   No.
3    Q.   Do you know whether or not -- I -- well,
4  strike that.
5         Turning to this letter, there are a series
6  of statements being made with respect to a registrant's
7  duties around the CSA.  Is that accurate?
8    A.   Yes.
9    Q.   And in the second paragraph, there is a
10 statement made by DEA that, quote, that, in addition to and
11 not in lieu of the general requirement under 21 U.S.C.
12 823 that manufacturers and distributors maintain
13 effective controls against diversion, DEA regulations
14 require all manufacturers and distributors to report
15 suspicious orders of controlled substances, Title 21
16 CFR, 1301.74B.
17        Did I read that portion correctly?
18   A.   That's what this letter states.
19   Q.   And so is it accurate to say that
20 Mallinckrodt knew that the obligation to report
21 suspicious orders of controlled substances was an
22 additional requirement under the CSA as required by the
23 CFRs?
24        MR. O'CONNOR:  Objection to form.
```

Page 61

```
1    A.   Yes.
2  BY MR. KO:
3    Q.   And moving on to the second part of that
4  sentence.  The letter continues, quote -- well, strike
5  that.
6         The letter indicates that DEA regulations,
7  quote, require a registrant design and operate a
8  system to disclose to the registrant suspicious orders
9  of controlled substances, end quote.
10        Did I read that correct -- portion of the
11 paragraph correctly?
12   A.   Yes.
13   Q.   And so in addition to the duty to maintain
14 effective controls against diversion, Mallinckrodt knew
15 that it had to design and operate a system to disclose
16 to the registrant suspicious orders of controlled
17 substances; is that accurate?
18   A.   Yes.
19   Q.   And moving on to the next sentence, it
20 indicates that the regulation -- let me be clear.
21        The next statement states, quote, the
22 regulation clearly indicates that it is the sole
23 responsibility of the registrant to design and operate
24 such a system, end quote.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Did I read that correctly?

2    A.    Yes.

3    Q.    And so is it fair to say that Mallinckrodt

4  knew as of the date of receiving this letter that the

5  DEA expected the sole responsibility to design and

6  operate an SOM system to lie with the registrant -- in

7  this case, Mallinckrodt?

8         MR. O'CONNOR:  Objection to form.

9  BY MR. KO:

10   Q.    Is that correct?

11   A.    Yes.

12   Q.    Now, moving on to the third paragraph.

13 The second sentence indicates, quote, filing a monthly

14 report of completed transactions, for example,

15 excessive purchase report or high unit purchases, does

16 not meet the regulatory requirement to report

17 suspicious orders, end quote.

18        Did I read that correctly?

19   A.    That's what it says.

20   Q.    So is it fair to say that Mallinckrodt

21 understood that simply filing a monthly excessive order

22 report would not meet the regulatory requirements under

23 the CSA?

24        MR. O'CONNOR:  Objection to form.

Page 63

1    A.    When this letter received, that was the

2  industry standard prior.

3  BY MR. KO:

4    Q.    And I understand, but my question was just

5  simply a yes-or-no question.

6         Is it fair to say that Mallinckrodt

7  understood that simply filing a monthly excessive order

8  report would not meet the regulatory requirements under

9  the CSA as of the date of this letter?

10        MR. O'CONNOR:  Objection to form.

11   A.    Yes.

12 BY MR. KO:

13   Q.    So if Mallinckrodt was sending monthly

14 reports to DEA after January 4th, 2008, that would not

15 be consistent with the standard set forth in this

16 letter; is that accurate?

17        MR. O'CONNOR:  Objection to form.

18   A.    Yes.

19 BY MR. KO:

20   Q.    Going on to the next sentence, the letter

21 indicates, that quote, registrants are reminded that

22 their responsibility does not end merely with the

23 filing of a suspicious order report.  Registrants must

24 conduct an independent analysis of suspicious orders

Page 64

1  prior to completing a sale to determine whether the

2  controlled substances are likely to be diverted from

3  legitimate channels.

4         Did I read that correctly?

5    A.    Yes.

6    Q.    So again, is it fair to say that the DEA

7  expectation as of the date of this letter was that --

8  and Mallinckrodt in fact understood that their

9  responsibilities do not end with merely filing a

10 suspicious order report?  Is that accurate?

11        MR. O'CONNOR:  Objection to form.

12   A.    Yes.

13 BY MR. KO:

14   Q.    In other words, Mallinckrodt must, as of

15 the date of this letter, conduct an independent

16 analysis of suspicious orders prior to completing a

17 sale determine -- to determine whether the controlled

18 substances are likely to be diverted.  Is that

19 accurate?

20        MR. O'CONNOR:  Objection.

21   A.    Yes.

22 BY MR. KO:

23   Q.    So as of the date of this letter, it would

24 be accurate to say that if Mallinckrodt released an

Page 65

1  order prior to completing a sale and without doing any

2  sort of independent analysis would not be consistent

3  with the standard set forth in this letter?

4         MR. O'CONNOR:  Objection to form.

5    A.    I'm sorry.  Could you state that one more

6  time?

7  BY MR. KO:

8    Q.    Sure.  Would it be accurate to say that if

9  Mallinckrodt released an order prior to completing a

10 sale and without doing any sort of independent

11 analysis, that would not be consistent with the

12 standard set forth in this letter?

13   A.    No.

14        MR. O'CONNOR:  Same objection.

15 BY MR. KO:

16   Q.    It would not be accurate to say that?

17   A.    Correct.

18   Q.    And why is that?

19   A.    This is referring to suspicious orders.

20   Q.    I see.  I see what you're saying.  Let me

21 rephrase my question.

22        So would it be accurate to say -- well,

23 strike that.

24        In the third sentence that we just read,

Page 66

1 the DEA provides guidance, does it not, that
2 registrants must conduct an independent analysis of
3 suspicious orders prior to completing a sale?
4     A.   Yes.
5     Q.   So are you suggesting that that provision
6 only applies with respect to a suspicious order but not
7 any other order?
8     A.   Yes, that's what the regulation says.
9     Q.   And what is your understanding of what
10 constitutes a suspicious order?
11    A.   So DEA defines it as size, normal
12 pattern -- and there's a third one.  Yeah.
13    Q.   Well, it's actually -- it's later on in
14 this letter, so why don't we actually turn to that
15 portion of this letter.
16        The fourth paragraph down at the bottom of
17 this page states the regulation specifically states
18 that suspicious orders include orders of an unusual
19 size, orders deviating substantially from a normal
20 pattern, and orders of an unusual frequency, end quote.
21        Did I read that correctly?
22    A.   Yes.
23    Q.   So is it your understanding that a
24 suspicious order, among other things, constitutes those

Page 67

1 elements?
2     A.   Yes.
3     Q.   And so would it be accurate to say that
4 one purpose of why Mallinckrodt designed and
5 implemented a suspicious order monitoring system is to
6 identify orders of an unusual size?
7     A.   Yes.
8     Q.   And also to identify orders that deviate
9 substantially from a normal pattern?
10    A.   Yes.
11    Q.   And also Mallinckrodt designed and
12 implemented an SOM program to identify orders of an
13 unusual frequency?
14    A.   Yes.
15    Q.   Would you agree with me that one of the
16 purposes of identifying a suspicious order is also to
17 make sure that Mallinckrodt fills orders only for
18 legitimate scientific and medical means?
19        MR. O'CONNOR:  Objection to form.
20    A.   Yes.
21 BY MR. KO:
22    Q.   Now, is it also fair to say that an
23 effective SOM program would also be able to identify
24 whether a pharmacy or clinic is ordering excessive

Page 68

1 quantities of one particular controlled substance
2 relative to others it orders?
3        MR. O'CONNOR:  Objection to form.
4     A.   So could you further define that?
5 BY MR. KO:
6     Q.   Well, is one purpose -- well, would you
7 agree with me that a pharmacy that orders 90 percent --
8 for example, 90 percent of one particular drug relative
9 to others would warrant further investigation?
10        MR. O'CONNOR:  Objection --
11    A.   So I'm not going to see that as the
12 manufacturer.
13 BY MR. KO:
14    Q.   What do you mean by that?
15    A.   I'm not selling to pharmacies.  We sell to
16 the distributors and wholesalers who sell to the
17 pharmacies.  So I'm not going to see any other product,
18 and we're only selling the generic controlleds to the
19 distributors and wholesalers.
20    Q.   At a certain point in time Mallinckrodt
21 became aware and had access to information regarding
22 downstream transactions between its wholesale
23 distributor customers and pharmacies and clinics; is
24 that accurate?

Page 69

1     A.   With pharmacies.  Not all pharmacies.
2 Some pharmacies.
3     Q.   So yes or no?  At a certain point in time,
4 Mallinckrodt became aware and had access to information
5 regarding downstream transactions between its wholesale
6 distributor customers and pharmacy and clinics; is that
7 accurate?
8         MR. O'CONNOR:  Objection to form.
9     A.   Could you restate that question or at
10 least just repeat it one more time?
11 BY MR. KO:
12    Q.   Sure.  At a certain point in time,
13 Mallinckrodt became aware and had access to information
14 regarding downstream transactions between its wholesale
15 distributor customers and pharmacies and clinics?
16        MR. O'CONNOR:  Same objection.
17 BY MR. KO:
18    Q.   Is that accurate?
19    A.   For some of them, yes.
20    Q.   And I know that you just said a moment ago
21 that Mallinckrodt had no visibility beyond -- or I
22 don't -- I'm not trying to take words out of your
23 mouth, but you seemed to imply that Mallinckrodt did
24 not know what was going on with respect to its drugs

Page 70

1  after it went to the distributor.
2          That's not entirely accurate; is that
3  correct?
4          MR. O'CONNOR: Objection to form.
5      A.   That wasn't your question, so that was not
6  my response. That's a completely different thing that
7  you're asking me now.
8  BY MR. KO:
9      Q.   Okay. So I'll go back to my original
10  question, then.
11     A.   Okay.
12     Q.   Wouldn't it be reflective -- well, strike
13  that.
14          Would you agree with me that an effective
15  suspicious order monitoring program would be able to
16  identify whether a pharmacy or clinic is ordering
17  excessive quantities of a limited variety of controlled
18  substances?
19          MR. O'CONNOR: Objection to form.
20     A.   I'm not going to see, as the manufacturer,
21  all the products that they are or are not ordering.
22  BY MR. KO:
23     Q.   Yeah. Regardless of whether or not you
24  can see, and we can talk -- discuss later about all the

Page 71

1  pieces of information that a registrant potentially
2  could have had -- any particular manufacturing
3  registrant.
4          But for purposes of an SOM program -- you
5  have responsibilities with respect to the SOM program
6  today, do you not?
7      A.   Yes.
8      Q.   And I'm simply asking whether or not you
9  believe -- or you would agree with me that an effective
10  SOM program would be able to identify, regardless of
11  whether or not you think the manufacturer can or cannot
12  identify the details of the downstream transaction --
13  would you agree that an effective SOM program would be
14  able to identify whether a pharmacy or clinic is
15  ordering excessive quantities of a limited variety of
16  controlled substances?
17          MR. O'CONNOR: Objection to form.
18     A.   Are you talking about my SOM program?
19  BY MR. KO:
20     Q.   I'm talking about an effective SOM --
21  program.
22     A.   Okay.
23          MR. O'CONNOR: Same objection.
24     A.   Manufacturers or distributors? I mean,

Page 72

1  that's going to depend on what my answer is.
2  BY MR. KO:
3      Q.   Okay. Let's start with the manufacturers.
4      A.   No.
5      Q.   Your answer is no?
6      A.   Yes.
7      Q.   Let's turn to the top of Page 2.
8          Actually, before we get there, I also want
9  to ask whether or not you would agree with me that an
10  effective SOM program would also be able to identify
11  whether or not a pharmacy or clinic is ordering from
12  multiple distributors with respect to the same
13  controlled substance?
14          MR. O'CONNOR: Objection to form.
15     A.   That would be a factor to consider.
16  BY MR. KO:
17     Q.   And in addition to a factor to consider,
18  would it be reflective of an effective SOM program for
19  a registrant to determine whether or not a pharmacy or
20  clinic is ordering the same controlled substance from
21  multiple distributors?
22          MR. O'CONNOR: Objection to form.
23     A.   It would be a factor to consider.
24  BY MR. KO:

Page 73

1      Q.   And I'm asking a yes-or-no question.
2      A.   Oh, I'm sorry.
3      Q.   Yeah. Yes or no, would it be reflective
4  of an effective SOM program for a registrant to
5  determine whether or not a pharmacy or clinic is
6  ordering the same controlled substance from multiple
7  distributors?
8          MR. O'CONNOR: Objection to form.
9      A.   Yes.
10          MR. O'CONNOR: Counsel, we're about an
11  hour and 20 minutes in. Can we take a five- or
12  10-minute break?
13          MR. KO: Sure. Sounds good.
14          MR. O'CONNOR: Okay.
15          THE VIDEOGRAPHER: We are going off the
16  record at 10:22 AM.
17          [A brief recess was taken.]
18          THE VIDEOGRAPHER: We are back on the
19  record at 10:40 AM.
20  BY MR. KO:
21     Q.   Welcome back from the break. Just a few
22  more questions on Exhibit 3. You have it in front of
23  you.
24          At the top of Page 2, there's a statement

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 that says, quote, registrants that rely on rigid
2 formulas to define whether an order is suspicious may
3 be failing to detect suspicious orders. For example, a
4 system that identifies orders as suspicious only if the
5 total amount of controlled substance ordered during one
6 month exceeds the amount ordered the previous month by
7 a certain percentage or more is insufficient.
8     Did I read that correctly?
9    A.   Yes.
10    Q.   So would you agree with me that
11 Mallinckrodt knew as of the date of this letter that
12 rigid -- adherence to a rigid formula to define whether
13 an order is suspicious would be inadequate?
14        MR. O'CONNOR: Objection to form.
15    A.   That's what the letter says, yes.
16 BY MR. KO:
17    Q.   So yes or no? Would you agree with me
18 that Mallinckrodt knew as of the date of this letter
19 that adherence to a rigid formula to identify whether
20 an order is suspicious would be inadequate?
21        MR. O'CONNOR: Objection to form. Asked
22 and answered.
23    A.   Yes.
24 BY MR. KO:

Page 75

1    Q.   Thank you. Now, we had discussed -- you
2 can set this aside, actually.
3    A.   Okay.
4    Q.   Earlier we had discussed whether or not
5 Mallinckrodt had written policies with respect to its
6 SOM program.
7     Do you recall that testimony?
8    A.   Yes.
9    Q.   And I know you said you don't recall when
10 it first started, but at a certain point in time there
11 were certain written policies that were drafted and
12 revised and circulated within Mallinckrodt; is that
13 correct?
14    A.   Yes.
15    Q.   And when do you recall the first written
16 policy -- or when did Mallinckrodt first begin writing
17 or drafting these written policies?
18        MR. O'CONNOR: Objection to form.
19    A.   I don't have any recollection of the date.
20 BY MR. KO:
21    Q.   And you understand -- Mallinckrodt -- is
22 it accurate to say that Mallinckrodt manufactured
23 opioids beginning in approximately 1996?
24        MR. O'CONNOR: Objection to form.

Page 76

1    A.   I believe we were manufacturing opioids at
2 least from 1996.
3 BY MR. KO:
4    Q.   And did Mallinckrodt have an SOM program
5 since when it began manufacturing prescription opioids?
6    A.   That's my understanding.
7    Q.   But you don't have a recollection of
8 whether or not there was a written policy at the time
9 that first -- that Mallinckrodt first began
10 manufacturing prescription opioids; is that accurate?
11    A.   That's correct.
12    Q.   Now, with respect to the suspicious order
13 monitoring procedures, is it accurate to state that
14 Mallinckrodt had at certain points a two-tiered system
15 to identify suspicious orders?
16        MR. O'CONNOR: Objection to form.
17    A.   Yes.
18 BY MR. KO:
19    Q.   And I understand and I believe that there
20 are three tiers now, but for some portion of when
21 Mallinckrodt had an SOM program, there were two tiers
22 with respect to identifying a suspicious order; is that
23 correct?
24        MR. O'CONNOR: Objection to form.

Page 77

1    A.   So I believe there's two tiers now.
2 BY MR. KO:
3    Q.   Oh, is that -- okay. Was there ever a
4 time that there was a three-tier system?
5    A.   Yes.
6    Q.   And with respect to the two-tiered system,
7 the first tier -- and correct me if I'm wrong -- but
8 the first tier attempts to identify whether an order is
9 either peculiar or unusual; is that accurate?
10        MR. O'CONNOR: Objection to form.
11    A.   The Tier 1 of the program applies to the
12 big three plus one regarding oxy 15s and oxy 30s.
13 BY MR. KO:
14    Q.   And that's the two-tier structure right
15 now that you're describing; correct?
16    A.   That's correct.
17    Q.   Let's talk about the 2008 to 2012 time
18 period.
19    A.   Okay.
20    Q.   Did you have an understanding of whether
21 or not there were two or three tiers during that time
22 period?
23    A.   In --
24        MR. O'CONNOR: Objection to form.

Page 78

1     A.    In early 2012, there was the three-tiered
2  system.
3  BY MR. KO:
4     Q.    And so prior to --
5     A.    And then September 2012 was a two-tiered
6  system.
7     Q.    Got it.  Thank you.  And so prior to 2012,
8  was the SOM program -- the intent of the SOM program
9  was to have a two-tiered system?
10          MR. O'CONNOR:  Objection to form.
11    A.    I don't know what that intent was.
12 BY MR. KO:
13    Q.    Sure.  Well, I was hoping not to go
14 through each -- well, we will go through some of the
15 SOM policies, but I'm just hoping to get a general
16 understanding of what your -- of the systems that
17 Mallinckrodt had in place, but we can look at the
18 policies in a moment.
19    A.    Okay.
20    Q.    Now, do you have an understanding of how
21 many orders Mallinckrodt has identified as being
22 suspicious?
23    A.    I do not.
24    Q.    You have no understanding of how many

Page 79

1  orders Mallinckrodt has notified to the DEA at any
2  point in Mallinckrodt's history as to how many orders
3  are suspicious?
4     A.    I know there has been suspicious orders,
5  and I know they've been identified to the DEA.
6     Q.    But you have no understanding of how many
7  orders have been identified to the DEA?
8     A.    I do not.
9     Q.    As you know, other depo -- other
10 individuals have been deposed in this case, and Ms.
11 Harper has testified that prior to 2008, Mallinckrodt
12 had identified approximately 10 or less suspicious
13 orders to the DEA.
14          Does that sound familiar to you at all?
15          MR. O'CONNOR:  Objection to form.
16    A.    It does not, but --
17 BY MR. KO:
18    Q.    Does it refresh your recollection at all
19 that Mallinckrodt had identified only a small number of
20 suspicious orders prior to 2008?
21          MR. O'CONNOR:  Objection to form.
22    A.    Again, I don't know how many there were
23 prior to that time.
24 BY MR. KO:

Page 80

1     Q.    And you have -- in addition to not knowing
2  exactly how many, you don't have any understanding of
3  the general amount of suspicious orders that were
4  reported to the DEA prior to 2008?
5     A.    I don't.  I just know that there were
6  suspicious orders reported to the DEA.
7     Q.    From the period 2008 through 2011, do you
8  have any understanding of how many suspicious orders
9  were reported to the DEA?
10    A.    I do not.
11    Q.    I'm going to hand you a copy of what will
12 be marked as Gillies Exhibit 4 and --
13          MS. GAFFNEY:  5.
14 BY MR. KO:
15    Q.    -- 5.  And for the record I'll note that
16 Gillies Exhibit 4 ends in Bates 1806623, and Exhibit 5
17 is actually the attachment which ends in 1806624.
18          [Exhibit Mallinckrodt-Gillies-004
19          marked for identification.]
20          [Exhibit Mallinckrodt-Gillies-005
21          marked for identification.]
22    Q.    So Mr. Gillies, does this document look
23 familiar to you at all?
24    A.    I mean, I don't recall it, but --

Page 81

1     Q.    Well, let's just take a look at the
2  first -- well, this -- for the record, this is an
3  e-mail that Karen Harper sends to you on April 25th,
4  2014.  Is that accurate?
5     A.    Yes.
6     Q.    And at the top of the e-mail she states,
7  quote, 12-31-2003, the oldest SOM report to DEA that
8  was retrievable this evening attached.  Given the
9  report number identity, we may be able to retrieve
10 older information through IS, end quote.
11          Did I read that correctly?
12    A.    Yes.
13    Q.    First off, IS is information systems;
14 correct?
15    A.    Yes.
16    Q.    And that's a group at Mallinckrodt; right?
17    A.    Yes.
18    Q.    And they were -- they had some
19 responsibilities with respect to the SOM program?
20          MR. O'CONNOR:  Objection to form.
21 BY MR. KO:
22    Q.    Is that accurate?
23    A.    I don't know what their role would have
24 been.  This is our IT department, and so I don't know

Page 82

1  if they were just pulling records for her.
2      Q.   Sure.  So that's helpful.  So the IS group
3  referenced here is essentially the IT department at
4  Mallinckrodt; correct?
5      A.   That's correct.  Yeah.
6      Q.   And does the IT department currently have
7  a role with respect to retrieving information for
8  purposes of Mallinckrodt's SOM program?
9      A.   Yes.
10     Q.   And they provide regular monthly reports
11 to the SOM team; is that accurate?
12          MR. O'CONNOR:  Objection to form.
13     A.   I don't know how regularly they provide
14 that information.
15 BY MR. KO:
16     Q.   Now, this document indicates that the
17 earliest SOM report, at least as of 2014, that Ms.
18 Harper could find was from 2003.  Is that accurate?
19     A.   That's what it says.  And it says we may
20 be able to retrieve older information through the IT
21 department.
22     Q.   And have you seen any suspicious order
23 reports prior to 2003?
24     A.   Not that I can recall.

Page 83

1      Q.   Are you aware of any suspicious order
2  reports prior to 2003?
3      A.   No.
4      Q.   Now, in the next sentence down, Ms. Harper
5  indicates to you, quote, 10-2008.  SOM report
6  submission to DEA local office is temporarily
7  discontinued per direction of DEA.  SOM team begins
8  work on revised algorithm system.
9          Did I read that correctly?
10     A.   Yes.
11     Q.   And what is your understanding of which
12 reports were being discontinued per the direction of
13 the DEA?
14     A.   The peculiar order reports.
15     Q.   And is it accurate to say that those are
16 the monthly reports that -- well, let's take a step
17 back.
18          What are the peculiar order reports that
19 Mallinckrodt created prior to October of 2008?
20     A.   So they would have been the algorithm
21 reports to show any orders regarding the unusual size,
22 pattern, et cetera.
23     Q.   So is it fair to say that Mallinckrodt had
24 an algorithm to determine whether or not an order was

Page 84

1  peculiar?
2      A.   Yes.
3      Q.   And if that algorithm was triggered, a
4  report was created?  Is that accurate?
5      A.   Yes.
6      Q.   And the reports that are referenced here
7  in this e-mail that were temporarily discontinued to be
8  sent to the DEA, those are those peculiar order
9  reports; is that accurate?
10     A.   That's my understanding.
11     Q.   And the e-mail goes on to state that the
12 SOM team is working on a revised algorithm system, and
13 that -- well, first of all, you see that portion of the
14 e-mail?
15     A.   Yes.
16     Q.   And the revised algorithm system is with
17 respect to the peculiar order algorithm; is that
18 accurate?
19     A.   Yes.
20     Q.   And to be clear, Mallinckrodt
21 distinguished between a peculiar order and a suspicious
22 order; is that accurate?
23     A.   Yes.
24     Q.   And the basic structure, at least as of

Page 85

1  the time of this e-mail and as of the time that
2  Mallinckrodt utilized peculiar orders -- the basic
3  structure was if an order was determined to be
4  peculiar, it would be elevated for further review to
5  determine whether or not it was suspicious for purposes
6  of notifying the DEA; is that accurate?
7      A.   Correct.
8      Q.   And so when this e-mail is discussing --
9  when Ms. Harper is discussing with you the fact that
10 these reports are being temporarily discontinued per
11 the direction of the DEA, what is your understanding of
12 what Ms. Harper is referring to here?
13          MR. O'CONNOR:  Objection to form.
14     A.   She's referring to the reports that we
15 were sending to the DEA are no longer being sent to the
16 DEA per their direction.
17 BY MR. KO:
18     Q.   And was -- and I guess I was unclear, and
19 I apologize for that.  The direction of the DEA -- I
20 want to focus on that portion.
21          Is that in reference to the Rannazzisi
22 letters that we were just discussing a moment ago?
23     A.   Yes.  The December 2007 letter.
24     Q.   Correct.  And the portion of that letter

Page 86

1 that discusses the concept of not sending monthly
2 excessive order reports to DEA; correct?
3     A.   That's right.  That was the industry
4 standard, and then in that letter they said
5 discontinue.
6     Q.   And that letter, to be clear, was dated
7 December 27th and received in January of 2008; correct?
8     A.   That's the date stamp on here, yes.
9     Q.   And this chronology indicates that
10 Mallinckrodt stopped sending the reports in October of
11 2008; correct?
12     A.   That's what this indicates, but that's not
13 what my recollection is, that we had stopped submitting
14 these reports a lot earlier than this.
15     Q.   So would it be accurate to say that if
16 Mallinckrodt sent monthly reports at some point in time
17 between January of 2008 and October of 2008, that would
18 be inconsistent with the standard set forth in the
19 December 27th, 2007, Rannazzisi letter; correct?
20         MR. O'CONNOR:  Objection to form.
21     A.   Per the December 2007 letter, the DEA was
22 advising registrants to stop sending those reports.
23 BY MR. KO:
24     Q.   So would it be accurate to say that if

Page 87

1 Mallinckrodt sent monthly letters to DEA between
2 January 2008 and October 2008, that practice would be
3 inconsistent with the standard set forth in the
4 December 27th, 2007, Rannazzisi letter; correct?
5     MR. O'CONNOR:  Objection to form.
6     A.   So to be accurate, those SOM reports.  I
7 believe you used the term letter, so I just want to
8 make sure that it was -- I don't want to be confused.
9         So I think you're talking about the
10 reports; correct?
11 BY MR. KO:
12     Q.   Sure.  So --
13     A.   Okay.
14     Q.   And you're absolutely right.  Thank you
15 for the clarification.  So just so the record is
16 perfectly clear, would it be fair to say that if
17 Mallinckrodt sent monthly reports to the DEA between
18 January 2008 and October 2008 regarding any kind of
19 excessive order, that practice would be inconsistent
20 with the standard set forth in the December 27th, 2007,
21 Rannazzisi letter; correct?
22         MR. O'CONNOR:  Same objection.
23     A.   Yes.
24 BY MR. KO:

Page 88

1     Q.   Now, further on in this e-mail, the next
2 section down, Ms. Harper indicates 7-20-2010, DEA St.
3 Louis visits St. Louis plant for a physical security
4 inspection, and advises Mallinckrodt that DEA SOM
5 expectation is that Mallinckrodt know their customer's
6 customer.
7         Did I read that correctly?
8     A.   Yes.
9     Q.   So is it accurate to say that Mallinckrodt
10 knew at least as of July 20th, 2010, that the DEA
11 expected Mallinckrodt to know their customer's
12 customer?
13         MR. O'CONNOR:  Objection to form.
14     A.   So it's not part of the regulations, but
15 that's what DEA was advising us now, that they expected
16 us to know our customer's customer.
17 BY MR. KO:
18     Q.   So is it accurate to say that as of July
19 20th, 2010, Mallinckrodt knew that the DEA expected
20 Mallinckrodt to know their customer's customer?
21         MR. O'CONNOR:  Objection to form.
22     A.   That's what the DEA in St. Louis advised
23 us.
24 BY MR. KO:

Page 89

1     Q.   And further on in that paragraph, there's
2 also an indication that Mallinckrodt begins evaluating
3 the use of chargeback data for SOM.  Do you see that
4 portion of the e-mail?
5     A.   Yes.
6     Q.   And so at least as of July 2010,
7 Mallinckrodt -- is it fair to say that Mallinckrodt
8 began contemplating use of chargeback data in
9 connection with its suspicious order monitoring
10 program?
11     A.   Yes.
12     Q.   And turning to the -- actually, turning to
13 the attachment of the e-mail, which as indicated by Ms.
14 Harper's cover e-mail to you was an SOM report.  Do you
15 see that?
16     A.   Yes.
17     Q.   And so is it fair to say that this is an
18 example of an SOM report that Mallinckrodt had created
19 and apparently sent to the DEA in 2003?
20     A.   That's what it appears to be.
21     Q.   And do you have any understanding of how
22 Mallinckrodt identified the suspicious orders that
23 appeared here?
24     A.   Through the use of the algorithms that

Page 90

1  they were utilizing.

2      Q.   So it's your testimony that Mallinckrodt

3  utilized an algorithm as of 2003?

4      A.   Yes.

5      Q.   And separate and apart from the algorithm,

6  do you know whether or not Mallinckrodt utilized any

7  other elements to identify a suspicious order at that

8  time?

9          MR. O'CONNOR:  Objection to form.

10  Objection to form.

11      A.   The -- every order was being reviewed by a

12  customer service rep.  So in addition to the

13  algorithms, every order was reviewed by customer

14  service.

15  BY MR. KO:

16      Q.   And how do you know that?  Is that what

17  you were told by counsel?

18          MR. O'CONNOR:  Objection.  Instruct you

19  not to answer what we discussed.

20  BY MR. KO:

21      Q.   Earlier you said --

22          MR. O'CONNOR:  (Inaudible) privilege.

23  BY MR. KO:

24      Q.   Earlier you said that you did not recall

Page 91

1  ever seeing an SOM program prior to a certain time

2  period.  Is that accurate?

3          MR. O'CONNOR:  Objection.  Form.

4      A.   I didn't recall seeing -- I believe the

5  question was a written report, so I didn't recall

6  seeing a written report.

7  BY MR. KO:

8      Q.   So if you've never seen a written report,

9  how did you gain an understanding of what the SOM

10  program was like prior to when Mallinckrodt ever had a

11  written report?

12      A.   So I was advised by another employee.

13      Q.   And which employee?

14      A.   Karen Harper.

15      Q.   And when did she advise you of that?

16      A.   January of this year.

17      Q.   So prior to January of 2019, did you ever

18  have an understanding of what the SOM program was like

19  prior to when Mallinckrodt had a written report -- or

20  written policy?  Excuse me.

21          MR. O'CONNOR:  Objection.  Form.

22      A.   Outside of what she might have discussed

23  with me in this e-mail, no.

24  BY MR. KO:

Page 92

1      Q.   And turning back to your testimony earlier

2  just a moment ago, when you were saying the customer

3  service reps would sometimes review the order.

4          Do you know whether or not that review was

5  ever documented in any way?

6      A.   I do not, but they reviewed every order.

7      Q.   And when you say they reviewed every

8  order, are you saying that they reviewed every single

9  order ever entered into between Mallinckrodt and a

10  wholesaler distributor customer?

11      A.   I'm saying that they reviewed every one of

12  these orders that had the peculiar order report.

13      Q.   I see.  So outside of the peculiar order

14  algorithm system, was there a separate system or

15  protocol for a customer service rep to identify an

16  order as being potentially peculiar?

17          MR. O'CONNOR:  Objection to form.

18      A.   Not that I'm aware of.

19  BY MR. KO:

20      Q.   So in other words, the customer service

21  rep or individual that would review an order is doing

22  so only after it is identified as peculiar by a certain

23  algorithm; is that accurate?

24          MR. O'CONNOR:  Objection to form.

Page 93

1      A.   That's my understanding.

2  BY MR. KO:

3      Q.   And so earlier we had talked about a

4  multitiered structure or a two-tiered structure, and we

5  had identified or we had discussed the concept of first

6  an order being triggered pursuant to an algorithm and

7  then subsequently being identified as peculiar.

8          Do you recall that discussion?

9      A.   Yes.

10      Q.   And after that review, then an order

11  was -- or excuse me.

12          After that report was created, the order

13  would then be analyzed to determine whether or not it

14  was suspicious; right?

15      A.   Correct.

16      Q.   And I'm just trying to get an

17  understanding of when the customer service rep would

18  review the order, and it would be after the order was

19  identified as peculiar; correct?

20      A.   That's my understanding.

21      Q.   And they would not review -- just so the

22  record is clear, they would not review every order

23  prior to any identification of the order being

24  peculiar; is that correct?

Page 94

1    MR. O'CONNOR: Objection to form.
2    A.   Correct.
3  BY MR. KO:
4    Q.   And so going -- just looking back at this
5  document, the orders that appear here -- it's your
6  testimony that it's your belief these orders were
7  identified pursuant to whatever algorithm was in place
8  as of 2003; correct?
9    A.   That's my understanding.
10   Q.   And these orders then would not have been
11 identified through any other process other than the
12 peculiar order algorithm that was in place; correct?
13   A.   Not that I'm aware of.
14   Q.   You can set that aside. I'm going to hand
15 you a copy of what's going to be marked as Gillies
16 Exhibit --
17   MS. GAFFNEY: 6.
18 BY MR. KO:
19   Q.   -- 6. And for the record, this is --
20 ends in Bates 7026341.
21   [Exhibit Mallinckrodt-Gillies-006
22   marked for identification.]
23   Q.   And this is a letter from Eileen Spaulding
24 to Karen Harper dated April 24th, 2014, and you said

Page 95

1  earlier that Eileen is a member of the SOM team; is
2  that correct?
3    A.   She is.
4    Q.   And she's also a member of the DEA
5  compliance group?
6    A.   She is.
7    Q.   And similarly, Karen Harper is also a
8  member of the DEA compliance group and the SOM team?
9    A.   Yes.
10   Q.   And Eileen indicates to Karen that, quote,
11 I can recall having a suspicious order monitoring
12 system in place of some type with the start of
13 distribution activities from Hobart 2001, end quote.
14   Did I read that correctly?
15   A.   Yes.
16   Q.   So -- and let me continue. However, the
17 attached is the earliest SOM report that I have in my
18 e-mail system. At this time the reports were being
19 generated monthly. The attached report is for December
20 2013 orders that were reviewed.
21   And I believe she means to reference
22 December 2003, but we can go over that later. But did
23 I read that portion of the e-mail correctly?
24   A.   Yes.

Page 96

1    MR. O'CONNOR: Objection.
2  BY MR. KO:
3    Q.   So again, as of April 2014, Eileen, a
4  member of the SOM team, is identifying to Karen, also a
5  member of the SOM team, that the earliest SOM report
6  that Mallinckrodt has access to is as of 2003; is that
7  accurate?
8    MR. O'CONNOR: Objection to form.
9    A.   I'm sorry. Could you restate that one
10 more time?
11 BY MR. KO:
12   Q.   Sure. As of April 2014, Eileen, a member
13 of the SOM team, is identifying to Karen, also a member
14 of the SOM team, that the earliest SOM report that
15 Mallinckrodt had access to is as of 2003. Is that
16 accurate?
17   MR. O'CONNOR: Same objection.
18   A.   She's saying the attached report is from
19 there.
20 BY MR. KO:
21   Q.   Is there any reference to a SOM report
22 prior to 2003?
23   A.   Not in this e-mail, no.
24   Q.   And Ms. Spaulding also indicates that

Page 97

1  there -- she does recall having an SOM system in place
2  starting in 2001. Is that accurate?
3    A.   Yes.
4    Q.   And do you have any reason to dispute the
5  veracity of this e-mail?
6    A.   No.
7    MR. O'CONNOR: Objection to form.
8  BY MR. KO:
9    Q.   Have you seen any documents that suggest
10 an SOM system in place prior to 2001?
11   A.   Not that I can recall.
12   Q.   Have you seen any documents that indicate
13 an SOM report prior to 2003?
14   A.   Not that I can recall.
15   Q.   You can set that aside. Now, is it
16 accurate to state that Mallinckrodt made substantial
17 changes to its SOM policy between the 2008 to 2011 time
18 period?
19   MR. O'CONNOR: Objection to form.
20   A.   We were always looking to enhance the
21 program.
22 BY MR. KO:
23   Q.   So is it accurate to state that during
24 the 2008 through 2011 time period, Mallinckrodt made

Page 98

1  substantial revisions to its SOM program?
2         MR. O'CONNOR: Objection to form.
3      A.  So there were changes made.
4  BY MR. KO:
5      Q.  And would you agree with me that there
6  were substantial changes?
7         MR. O'CONNOR: Objection to form.
8      A.  I don't know that I would characterize it
9  as substantial.
10  BY MR. KO:
11     Q.  How would you characterize it?
12     A.  That there were changes made to the SOM
13  program with the more experience that they had and the
14  more information they got.
15     Q.  And the changes were made with the intent
16  to improve and enhance the system, as you said;
17  correct?
18     A.  Yeah, to enhance the system.  Correct.
19     Q.  I'm going to hand you a copy of what's
20  going to be marked as Gillies Exhibit 7.
21         [Exhibit Mallinckrodt-Gillies-007
22         marked for identification.]
23     Q.  And for the record, this is a document
24  titled suspicious order monitoring team charter, with

Page 99

1  Bates ending in 496062.
2         So I know earlier we had discussed whether
3  or not you were aware of when Mallinckrodt first began
4  its SOM team.
5         Does this document accurately reflect that
6  the SOM team began on March 28th of 2008?
7         MR. O'CONNOR: Objection to form.
8      A.  I'm sorry.  Could you repeat the question?
9  I'm finished reading this document now.
10  BY MR. KO:
11     Q.  Sure.  Does this document accurately
12  reflect that the SOM team began on March 28th, 2008?
13         MR. O'CONNOR: Objection to form.
14     A.  No.
15  BY MR. KO:
16     Q.  Have you -- at the very beginning of this
17  document -- first of all, it's titled suspicious order
18  monitoring team charter; is that accurate?
19     A.  Yes.
20     Q.  Do you recall -- is there a team charter
21  in place currently for the SOM team?
22     A.  I don't know that there -- the procedure
23  is called a charter or anything, so --
24     Q.  And with respect to this particular

Page 100

1  document, this indicates, does it not, that the
2  suspicious order monitoring team start date was March
3  28th, 2008?
4      A.  That's what contained on that line, but
5  later it says it's an upgrade to Mallinckrodt's
6  existing SOM program, so if there's an existing SOM
7  program, then there's got to be team members that are
8  working on that program.
9      Q.  Well, I understand the difference
10  between -- well, I understand your point about a
11  program, but the fact that there is a program in place,
12  does that necessarily mean that there was a team in
13  place as well?
14     A.  Yes.
15     Q.  And have you seen any documents predating
16  March 28th, 2008, that reflect an official team to the
17  suspicious order monitoring system that Mallinckrodt
18  had?
19         MR. O'CONNOR: Objection to form.
20     A.  So there were team members.
21  BY MR. KO:
22     Q.  So is it your testimony today that were
23  team members of the suspicious order monitoring team
24  prior to March 2008?

Page 101

1      A.  Yes.
2      Q.  And who were they?
3      A.  I don't know the names of who was
4  involved, but we had an algorithm system.  We had the
5  customer service reps.  Karen Harper.  DEA compliance
6  was part of that SOM team.
7      Q.  And how do you know that there was --
8  well, first of all, we've established that you haven't
9  seen any documents that reflect an SOM team prior to
10  March 2008; is that accurate?
11         MR. O'CONNOR: Objection to form.
12     A.  A document that lists team members?
13  Correct.
14  BY MR. KO:
15     Q.  And so how do you have knowledge regarding
16  the composition of an SOM team prior to March of 2008?
17     A.  Because there was an SOM program.
18     Q.  Other than -- and you learned that there
19  was an SOM program through your conversations with
20  Karen Harper; is that accurate?
21     A.  Yes.
22     Q.  And you have not seen any documents
23  reflecting an actual SOM program prior to 2008; is that
24  accurate?

Page 102

1    MR. O'CONNOR: Objection to form.
2    A.   No.
3 BY MR. KO:
4    Q.   You have seen documents reflecting an SOM
5 program prior to 2008?
6    A.   I mean, you just showed me a document that
7 had a peculiar order report, and this came from the SOM
8 program.
9    Q.   And separate and apart from whether or not
10 there was an SOM report, did you review or have any
11 understanding in the documents you reviewed in
12 connection with this deposition of the team members
13 that were part of that SOM program?
14    A.   No.
15    Q.   And do you have an understanding of
16 whether or not there was any written policy governing
17 the SOM program prior to 2008 at Mallinckrodt?
18    MR. O'CONNOR: Objection to form.
19    A.   No.
20 BY MR. KO:
21    Q.   So at least we can agree, for purposes of
22 this document, it indicates that the team's start date
23 for this particular suspicious order monitoring team is
24 as of March 2008; is that accurate?

Page 103

1    A.   For this particular team, yes.
2    Q.   And the team leader is Karen Harper; is
3 that accurate?
4    A.   That's what this document says.
5    Q.   And is it your -- has Karen Harper always
6 been the team leader of the suspicious order monitoring
7 team at Mallinckrodt?
8    MR. O'CONNOR: Objection to form.
9    A.   No.
10 BY MR. KO:
11    Q.   And during what periods of time was she
12 the team leader of the SOM team?
13    A.   So on this team, from that date until 2011
14 time frame.
15    Q.   So the record is clear, your testimony is
16 that Karen Harper was the team leader of the SOM
17 program from approximately March of 2008 to 2011?
18    A.   For this team. Some of the members could
19 have changed through that time, though.
20    Q.   Was there another suspicious order
21 monitoring team between the 2008 and 2011 time period?
22    A.   Not that I'm aware of.
23    Q.   So I'm just trying to get an
24 understanding. When you say of this team, you're

Page 104

1 referring to this team as outlined in this charter?
2    A.   Yeah, I believe that was your earlier
3 question, to clarify that we had a team previous to
4 this based on the SOM program. So from this team.
5    Q.   Separate and apart from this document --
6 let's pretend that the document doesn't exist -- how
7 long was Ms. Harper the team leader of the suspicious
8 order monitoring program team at Mallinckrodt?
9    MR. O'CONNOR: Objection to form.
10    A.   So I don't know all the dates. I'm sorry.
11 BY MR. KO:
12    Q.   Do you know -- do you have any
13 understanding of whether or not she was the team leader
14 prior to 2008?
15    MR. O'CONNOR: Objection to form.
16    A.   Yes.
17 BY MR. KO:
18    Q.   And how did you gain that understanding?
19    A.   From Karen.
20    Q.   And did she tell you how long she was the
21 team leader prior to 2008?
22    A.   She did not.
23    Q.   And how about after 2011? Did you have
24 any conversations with her about how long she was a

Page 105

1 team leader of the SOM team after 2011?
2    A.   I did not.
3    Q.   Who is the team leader currently of the --
4 of Mallinckrodt's SOM program?
5    MR. O'CONNOR: Objection to form.
6    A.   Don Lohman.
7 BY MR. KO:
8    Q.   And how long has he been the team leader?
9    A.   Since sometime in 2011.
10    Q.   And was Ms. Harper -- did she continue to
11 be a member of the SOM team after 2011?
12    A.   Yes.
13    Q.   And you can actually set that document
14 aside. I'm going to hand you a copy of what will be
15 marked as Gillies Exhibit 8.
16    MS. GAFFNEY: 8.
17    [Exhibit Mallinckrodt-Gillies-008
18    marked for identification.]
19 BY MR. KO:
20    Q.   And for the record, this ends in Bates
21 7053963. And this also reflects some notes from a
22 Hobart meeting with DEA Albany on SOM and quota between
23 DEA and Mallinckrodt.
24    And Mr. Gillies, I'm happy to allow you to

Page 106

1  review other portions of this document if you'd like,
2  but I just want to direct you to certain portions of
3  it.
4        First of all, at the top of this e-mail
5  there's a list of people who attended this meeting at
6  both Mallinckrodt and DEA; is that accurate?
7        A.   Yes.
8        Q.   And both Mr. Lohman and Ms. Harper were in
9  attendance?
10       A.   That's what this states.
11       Q.   As well as Ms. Spaulding?
12       A.   Yes.
13       Q.   Now, I want to go down to the portion of
14  these notes at the bottom of the first page regarding
15  SOM.  Do you see that?
16       A.   Yes.
17       Q.   And it appears that Mr. Lohman had some
18  interactions with the DEA regarding Mallinckrodt's SOM
19  program; is that fair?
20       A.   Yes.
21       Q.   And turning to Page 2 of these notes,
22  there was a question apparently asked by the DEA, how
23  many orders have been deemed suspicious?  Do you see
24  that?

Page 107

1        A.   Yes.
2        Q.   And the answer that either Mr. Lohman or
3  someone in attendance at Mallinckrodt gave was none.
4  It was explained that this updated SOM program went
5  into effect on 3-1-12 and no orders have been determined
6  to be suspicious since that time.
7        Did I read that correctly?
8        A.   Yes.
9        Q.   Is it accurate to state then that the
10  updated SOM program did not become effective at
11  Mallinckrodt until March 1st, 2012, according to this
12  document?
13       MR. O'CONNOR:  Objection to form.
14       A.   I mean, without reading this whole
15  document, I'm not sure that's what that says, but --
16  BY MR. KO:
17       Q.   Okay.  And let me just ask you.  Do you
18  have an understanding of whether or not the SOM program
19  was updated in March of 2012?
20       A.   There was an update during that time
21  frame.
22       Q.   And that update, among other things,
23  changed the structure from a peculiar order
24  classification to an unusual order classification; is

Page 108

1  that accurate to say?
2        MR. O'CONNOR:  Objection to form.
3        A.   I don't know.
4  BY MR. KO:
5        Q.   You have no recollection of what -- well,
6  strike that.
7        So it's your understanding that there was
8  an update to the SOM program in March of 2012;
9  accurate?
10       A.   Yes.
11       Q.   Do you have under -- any understanding of
12  what provisions of the SOM program were updated during
13  that time?
14       A.   There was an algorithm change.
15       Q.   And what did that algorithm change consist
16  of?
17       A.   I believe the algorithm had a 2X, and it
18  was updated to a ██.
19       Q.   And when you say 2X, can you please
20  describe to the court -- 2X relative to what?
21       A.   I cannot recall.
22       Q.   Let's actually set this document aside.
23  And I'll hand you a copy of what's previously marked as
24  Stewart Exhibit 1.

Page 109

1        A.   Okay.
2        Q.   Which for the record, it ends in Bates
3  299558.  This is a short e-mail exchange, so go ahead
4  and take a look at it.
5        A.   Okay.
6        Q.   Let me know when you're done.
7        A.   Okay.
8        Q.   So this e-mail exchange dated April 1st,
9  2008, involves, among others, Karen Harper, Jim Rausch,
10  and Bill Ratliff; is that correct?
11       A.   Yes.
12       Q.   And who was Jim Rausch?
13       A.   He was one of the customer service reps.
14       Q.   And did he have responsibilities with
15  respect to Mallinckrodt's SOM program?
16       A.   Yes.
17       Q.   And what were those responsibilities?
18       A.   He was reviewing the orders.
19       Q.   And was he reviewing -- when you say
20  orders, is he reviewing peculiar orders in particular?
21       A.   Yes.
22       Q.   And peculiar orders that are triggered
23  under the then-existing algorithm utilized by
24  Mallinckrodt; correct?

Page 110

1    A.   Correct.
2    Q.   Bill Ratliff is also mentioned here.  Who
3  is he?
4    A.   He was the former head of security for
5  Mallinckrodt.
6    Q.   And what responsibilities did he have with
7  respect to the SOM program?
8    A.   He was part of the SOM team.
9    Q.   And what were his responsibilities?
10    A.   I can't recall.
11    Q.   And do you know how long he was a member
12  of the SOM team?
13    A.   While he was employed.
14    Q.   While he was employed at Mallinckrodt?
15    A.   Yeah.  But I do not know what his start
16  date was at Mallinckrodt.
17    Q.   Is it your understanding that he was a
18  member of the SOM team throughout the duration of his
19  employment?
20    A.   That's my understanding.
21    Q.   And what about Mr. Rausch?  How long was
22  he part of the SOM team?
23    A.   I do not know what his dates were.
24    Q.   Now, we can go over some of the details of

Page 111

1  this e-mail if you'd like, but is this -- is it
2  accurate to state that this is an e-mail that reflects
3  the practice we were describing a moment ago or earlier
4  today regarding Mallinckrodt sending monthly reports to
5  DEA?
6        MR. O'CONNOR:  Objection to form.
7    A.   That's how I understand this reference.
8  BY MR. KO:
9    Q.   In other words, as of April of 2008,
10  Mallinckrodt, and in particular Jim Rausch, is sending
11  monthly peculiar order reports to DEA; is that correct?
12    A.   Yes.
13    Q.   And the DEA tells Mr. Ratliff and
14  Mallinckrodt to stop sending those letters; correct?
15    A.   That's what referenced in here, yes.
16    Q.   And in the second paragraph of this
17  e-mail, Mr. Ratliff indicates I advised that we have a
18  conference call planned with Frank Sapienza on Friday
19  to strengthen our suspicious order identification
20  system, end quote.
21        Did I read that correctly?
22    A.   Yes.
23    Q.   First of all, who's Frank Sapienza?
24    A.   He was an outside contractor that was

Page 112

1  hired by Mallinckrodt, former DEA employee.
2    Q.   And was he an outside contractor retained
3  to advise specifically on SOM obligations?
4    A.   Yes.
5    Q.   And I believe he was also retained to
6  advise on other Mallinckrodt DEA obligations such as
7  any responsibilities with respect to quota.  Is that
8  accurate?
9    A.   I don't know that.
10    Q.   Now, Mr. Ratliff indicates that as of
11  April 1st, 2008, there is a need to strengthen
12  Mallinckrodt's suspicious order identification system.
13  Do you see that?
14        MR. O'CONNOR:  Objection to form.
15    A.   That's what you've highlighted there, that
16  they had the conference call with Sapienza to
17  strengthen the system.
18  BY MR. KO:
19    Q.   So it accurate to state that as of
20  April of 2008, individuals within the SOM team at
21  Mallinckrodt felt the need to strengthen Mallinckrodt's
22  suspicious order monitoring program?
23        MR. O'CONNOR:  Objection to form.
24    A.   I think the team was always looking to

Page 113

1  enhance the program.
2  BY MR. KO:
3    Q.   And is it accurate to state that as of
4  April 2008, individuals in the SOM team specifically
5  felt the need to strengthen Mallinckrodt's suspicious
6  order monitoring program?
7        MR. O'CONNOR:  Objection to form.  Asked
8  and answered.
9    A.   Yes.
10  BY MR. KO:
11    Q.   Now, do you have any understanding of
12  whether or not Mallinckrodt resumed -- well, strike
13  that.
14        Once Mallinckrodt stopped sending monthly
15  reports to DEA, was there any communications with the
16  DEA that Mallinckrodt had regarding which orders were
17  either peculiar or suspicious?
18        MR. O'CONNOR:  Objection to form.
19    A.   Possibly.
20  BY MR. KO:
21    Q.   Do you recall seeing any documentation or
22  did you talk with anyone regarding any type of reports
23  that Mallinckrodt sent following its decision to stop
24  sending monthly reports to the DEA in April of 2008?

Page 114

1    A.   So my understanding is that it was April
2 of 2008 that we stopped sending them, not October that
3 was referenced in this previous document you showed me.
4 And then in 2012, we started sending reports to the DEA
5 again.
6    Q.   So that's helpful.  So there was a period
7 of time in which reports were not sent to the DEA; is
8 that accurate?
9    A.   Yes.
10    Q.   And that period of time was from mid-2008
11 through 2012; correct?
12    A.   From April 2008 till some time in 2012.
13    Q.   And do you have a general understanding of
14 when in 2012 that practice resumed?
15    A.   I don't.
16    Q.   And in 2012, what did those reports
17 consist of?
18    A.   I don't recall.  But I believe we've given
19 those reports to you guys.  So I just don't recall what
20 they were.
21    Q.   And when you say given those reports to
22 you guys, you mean that your counsel has produced those
23 documents in this litigation?
24    A.   Yes.  Sorry.

Page 115

1    Q.   That's okay.  And were those -- strike
2 that.
3         Do you have any understanding of why there
4 was -- why Mallinckrodt decided not to send any reports
5 to DEA during that approximate three-and-a-half-year
6 time period?
7         MR. O'CONNOR:  Objection to form.
8    A.   So this would have been in response to the
9 December 2007 letter where DEA advised stop sending the
10 reports.
11 BY MR. KO:
12    Q.   But eventually Mallinckrodt resumed their
13 practice of sending some sort of report to DEA, as you
14 said, in 2012; right?
15    A.   That's correct.
16    Q.   So what was it about those reports that
17 satisfied Mallinckrodt sufficient enough to send
18 letters again to the DEA?  Or reports.  Strike that.
19         MR. O'CONNOR:  Objection to form.
20 BY MR. KO:
21    Q.   Let me make sure the record is -- poor
22 question.  Let me ask it again.
23         There was a three-and-a-half-year time
24 period in which Mallinckrodt did not send monthly

Page 116

1 excessive order reports to the DEA; correct?
2    A.   Whatever that time frame is from April of
3 2008 to 2012, yes.
4    Q.   So there was -- during that time period,
5 Mallinckrodt did not send any type of monthly excessive
6 order report to DEA; correct?
7    A.   Correct.
8    Q.   And when Mallinckrodt began to send
9 monthly reports again to the DEA, what happened that --
10 or what happened to reflect the understanding that
11 Mallinckrodt would then be resuming delivery of
12 order -- monthly order reports to DEA?
13         MR. O'CONNOR:  Objection to form.
14    A.   So there's a privilege here.
15         MR. O'CONNOR:  In that case, I would
16 object and instruct the witness not to answer to the
17 extent it would require revealing communications with
18 counsel on the basis of attorney-client privilege.
19 BY MR. KO:
20    Q.   So is your complete answer covered by the
21 privilege?
22    A.   On this question, yes.
23    Q.   So during the 2012 time period when
24 Mallinckrodt began resuming sending reports to the DEA,

Page 117

1 was that when you were part of -- was that after you
2 joined Mallinckrodt?
3    A.   It either started right before I joined or
4 right after I joined.
5    Q.   So then it's safe to say approximately in
6 the summer of 2012 was when Mallinckrodt resumed
7 sending monthly reports to DEA?
8    A.   That's my understanding.
9    Q.   And -- but you don't know what those
10 reports consist of?
11    A.   It wasn't part of my role on the SOM team,
12 so no, I don't recall what they consist of.
13    Q.   And separate and apart from your role on
14 the SOM team, you didn't review any of those reports or
15 gain an understanding of what those reports consisted
16 of in preparation for your deposition today?
17    A.   Again, I believe I was shown the
18 documents, but I just can't recall.
19    Q.   And when you say you were shown the
20 documents, what documents were you specifically shown
21 in this context?
22    A.   Would have been copies of these reports.
23    Q.   And you have no recollection of what those
24 reports consisted of right now?

Page 118

1    A.   I do not.

2    Q.   Yeah, you can set that aside.  Thank you.

3    A.   Okay.

4    Q.   Sorry.  Bear with us.  Some technical
5 difficulties.

6    A.   That's all right.

7         [Exhibit Mallinckrodt-Gillies-010

8         marked for identification.]

9    Q.   I'm going to hand you a copy of what's
10 going to be marked as Gillies Exhibit 10.  And for the
11 record, this is an April 8th, 2008, e-mail between
12 Karen Harper and Bill Ratliff ending in Bates 273892
13 with an attachment.

14        So earlier today we were discussing
15 whether or not Mallinckrodt had written policies
16 governing its SOM program.

17        Do you recall that?

18   A.   Yes.

19   Q.   And you said that you had no recollection
20 of when or whether you've seen any of the written
21 policies with respect to its SOM program.

22        Do you recall that?

23   A.   Prior to a certain date, was your
24 question, so --

Page 119

1    Q.   Right.  And is that -- so this document
2 reflects, as I alluded to earlier, an e-mail from Ms.
3 Harper to Mr. Ratliff attaching an SOM draft policy; is
4 that accurate to say?

5    A.   I'm sorry.  Can I have a moment to read
6 this?

7    Q.   Sure.

8    A.   Okay.  I'm sorry.  Go ahead.

9    Q.   Does the attachment contained in this
10 exhibit -- the attachment that is titled DEA compliance
11 procedure, controlled substance suspicious order
12 monitoring -- does this reflect a draft SOM policy of
13 Mallinckrodt?

14   A.   Yes.

15   Q.   And in the cover e-mail, there is a
16 reference from Ms. Harper to Mr. Ratliff that she's
17 attaching it for his review; correct?

18   A.   Yes.

19   Q.   And that she's making a start or she's
20 making a first pass at a certain document.  Is that
21 accurate?

22        MR. O'CONNOR:  Objection to form.

23   A.   Yes.

24 BY MR. KO:

Page 120

1    Q.   And the first -- one of the documents that
2 she is referencing is in fact this SOM compliance
3 procedure policy; correct?

4    A.   This controlled substance SOM procedure?

5    Q.   Yes, the attachment.

6    A.   Yes.  Okay.  Yeah.

7    Q.   So is it accurate to say -- well, let's
8 take a step back.

9         You had indicated earlier that you had
10 reviewed certain documents in preparation for this
11 deposition today and that you had seen some written
12 policies; correct?

13   A.   Yes.

14   Q.   Did you review this written policy?

15   A.   No.

16   Q.   You did not?  Okay.  Is it accurate --
17 regardless of whether or not you reviewed this
18 particular one, is it accurate to state that this is a
19 draft of Mallinckrodt's SOM policy?

20   A.   That's what it appears to be, a draft.

21   Q.   And this draft is dated -- well, this
22 draft doesn't have a date, but it's circulated on April
23 1st, 2008; correct?

24   A.   The date on the e-mail is April -- is that

Page 121

1 6th or 8th?

2    Q.   Yeah, I believe it's April 8th.  So --

3    A.   Okay.

4    Q.   Thank you for that clarification.  So this
5 first draft of Mallinckrodt's SOM program is circulated
6 as of April 8th, 2008; correct?

7    A.   Yes.

8    Q.   And in this particular draft policy, you
9 see the reference to peculiar order and suspicious
10 order?

11   A.   Yes.

12   Q.   And is there any indication in this
13 particular draft regarding any algorithm of how a
14 peculiar order is determined by Mallinckrodt?

15   A.   Can you restate that, or repeat the
16 question?

17   Q.   Sure.  Sure.  I'll actually rephrase the
18 question.

19        As of April 8th, 2008, is it accurate to
20 say that Mallinckrodt did not memorialize a particular
21 algorithm for purposes of defining a peculiar order?

22        MR. O'CONNOR:  Objection to form.

23   A.   Not in this document.

24 BY MR. KO:

Page 122

1    Q.   And do you have any understanding of
2 whether or not a peculiar order algorithm was
3 memorialized in any way outside of this document as of
4 April of 2008?
5         MR. O'CONNOR:  Objection to form.
6    A.   I know there was an algorithm, but I'm
7 unaware of any report.
8 BY MR. KO:
9    Q.   In other words, just so the record is
10 clear, as far as you know, as of April of 2008 there
11 was no separate document that governed the definition
12 of what constitutes a peculiar order?
13        MR. O'CONNOR:  Objection to form.
14    A.   Okay -- that was a different question that
15 you just asked me.  So I have no recollection of that.
16 BY MR. KO:
17    Q.   And for purposes of this document, there's
18 no algorithm that's set forth in terms of what
19 constitutes a peculiar order; correct?
20    A.   Not in this document.
21    Q.   And there -- as far as you know, you've
22 not reviewed any other documents during this time
23 period that reflect a written policy memorializing what
24 constitutes a peculiar order; is that accurate?

Page 123

1         MR. O'CONNOR:  Objection to form.
2    A.   Not that I can recall.
3 BY MR. KO:
4    Q.   And other than this draft SOM policy,
5 would Mallinckrodt have any other type of written
6 document that would define the algorithm used for
7 defining a peculiar order?
8    A.   I don't know the answer to that question.
9    Q.   Now, at the top of this page, in the top
10 right-hand corner there's an indication of effective
11 date and supersede date, and in fact, on top of that,
12 revision.
13        Do you see those?
14    A.   Yes.
15    Q.   And as we discussed earlier, there's no
16 effective date for this because it's a draft, among
17 other reasons, but do you see where it says Revision
18 Number 1?
19    A.   Yes.
20    Q.   So would it be fair to say that this is
21 the SOM team's first pass at a written SOM policy?
22        MR. O'CONNOR:  Objection to form.
23    A.   Yes.
24 BY MR. KO:

Page 124

1    Q.   And with respect to the supersedes date,
2 there's no document that this particular draft is
3 superseding, so that also indicates that this is
4 Mallinckrodt's first pass at a written SOM policy;
5 correct?
6    A.   It says no.
7    Q.   Okay.  Great.  You can set that aside.
8         MR. O'CONNOR:  Counsel, can we take a
9 short break and then --
10        MR. KO:  Sure.
11        MR. O'CONNOR:  It's been about an hour,
12 and then do lunch --
13        MR. KO:  Sure.  That's fine.
14        MR. O'CONNOR:  -- after a short break?
15        MR. KO:  Okay.
16        THE VIDEOGRAPHER:  We are going off the
17 record at 11:46 AM.
18        [A brief recess was taken.]
19        THE VIDEOGRAPHER:  We are back on the
20 record at 11:59 AM.
21 BY MR. KO:
22    Q.   Welcome back from the break.  In front of
23 you you have what has previously been marked as Stewart
24 Exhibit 13, which I'll represent for the record is

Page 125

1 titled DEA compliance procedure, controlled substance
2 suspicious order monitoring, ending in Bates 268911.
3         So feel free to look through this if you'd
4 like in detail, but I just have a few questions about
5 this that hopefully you can answer without going
6 through all the doc -- or throughout all the language
7 in it.  But again, feel free to go ahead if you need
8 to.
9         So this -- the date of this is May 13th,
10 2008; correct?
11    A.   Yes.
12    Q.   And this appears to be a Draft 2; is that
13 accurate?
14    A.   That's what it says -- Draft 2.
15    Q.   And did you review this particular draft
16 written policy in connection with preparing for this
17 deposition today?
18    A.   No.
19    Q.   And for this particular draft there is --
20 consistent with the one that we just looked at from
21 April, there are definitions of peculiar orders and
22 suspicious orders.  Do you see that?
23    A.   Yes.
24    Q.   And as far as the peculiar order is

Page 126

1 defined, there's no indication of an algorithm in that

2 particular definition; is that accurate?

3     A.   It doesn't say algorithm, but meets an

4 internal established criteria.

5     Q.   Is there any indication in this document

6 of an algorithm or a specific algorithm that

7 Mallinckrodt is utilizing for purposes of defining a

8 peculiar order?

9         MR. O'CONNOR:  Objection to form.

10     A.   No mention of algorithm.

11 BY MR. KO:

12     Q.   So is it accurate to say that as of May

13 13th, 2008, there was no algorithm that is mentioned at

14 least for purposes of the draft SOM policy?

15         MR. O'CONNOR:  Objection to form.

16     A.   It's not mentioned in this document.

17 BY MR. KO:

18     Q.   And turning to the last page of this

19 document that I believe you were just at, there is a --

20 there's an indication that the security director and

21 DEA compliance should be responsible for maintaining a

22 file for record retention of suspicious order

23 monitoring documents and reports.

24         Do you see that portion of the draft

Page 127

1 policy?

2     A.   Yes.

3     Q.   And do you have any understanding of

4 whether or not Mallinckrodt did in fact keep some sort

5 of file for record retention of SOM documents and

6 reports?

7     A.   Yes.

8     Q.   And in what type of -- what type of

9 retention policy did Mallinckrodt utilize to maintain

10 these types of documents and reports?

11     A.   I don't recall.

12     Q.   So -- well, I'm having trouble

13 understanding.  So you believe that Mallinckrodt

14 maintains a record retention policy with respect to SOM

15 documents and reports, but you don't know -- well,

16 strike that.  Let's take it one at a time.

17         So Mallinckrodt -- it's your understanding

18 that Mallinckrodt maintains a record retention policy

19 with respect to SOM documents and reports?

20     A.   Yes.

21     Q.   And how do you know that?

22     A.   I believe we provided you guys in this

23 matter a number of these documents.

24     Q.   Do you have any understanding of what time

Page 128

1 period that covers?

2     A.   I know it was in the material that I

3 reviewed, but I don't recall.

4     Q.   Do you have an understanding of whether or

5 not Mallinckrodt had any kind of formal documentation

6 or record retention policy with respect to SOM

7 documents and reports during the 2008 to 2011 time

8 period?

9         MR. O'CONNOR:  Objection to form.

10     A.   My recollection is yes.

11 BY MR. KO:

12     Q.   And what is that recollection based on?

13     A.   Based on the -- what I learned preparing

14 for this deposition.

15     Q.   And that -- and what you learned was

16 through review of certain documents that reflected SOM

17 documents and reports; is that accurate to say?

18     A.   Yes.

19     Q.   And I'm just trying to get an

20 understanding of what that specifically consisted of,

21 because you're telling me that you reviewed certain

22 things.

23         So what did you review?

24         MR. O'CONNOR:  Objection to form, and to

Page 129

1 the extent we're talking about the collection of

2 documents that were selected by counsel for his review,

3 I'm going to instruct him not to answer.  We've been

4 pretty indulgent on individuals, but we're not getting

5 into the full selection of documents.

6 BY MR. KO:

7     Q.   Do you want me to repeat my question or

8 rephrase?

9         MR. O'CONNOR:  Do you want to ask a more

10 tailored question?

11         MR. KO:  Sure.

12         MR. O'CONNOR:  Because otherwise he's

13 standing --

14         MR. KO:  Sure.

15 BY MR. KO:

16     Q.   What documents did you review to help

17 inform you that Mallinckrodt had a formal document

18 retention policy with respect to its SOM documents and

19 records from the 2008 through 2011 time period?

20         MR. O'CONNOR:  You can answer at a high

21 level.

22     A.   Okay.  There were documents provided to me

23 in preparation for providing this deposition.

24 BY MR. KO:

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q.   Yeah, I understand the documents were
2  provided to you, and I'm asking you which documents did
3  you review to help inform you that Mallinckrodt had a
4  formal documentation or document retention policy with
5  respect to its SOM program in the 2008 through 2011
6  time period?
7    A.   So there were e-mails and policies,
8  procedures, and a list of documents that were provided
9  to you in this matter.
10    Q.   And which -- let's take the policies and
11  procedures.  Which policies and procedures are you
12  referring to?
13    A.   I don't recall.
14    Q.   And let's take the e-mails.  Which
15  e-mails -- were there e-mails that actually indicated
16  that there was a formal document retention policy with
17  respect to SOM records and documents from the 2008 and
18  2011 time period?
19    A.   I --
20        MR. O'CONNOR:  Again, I'm going to object.
21  We're not going to get into individual document by
22  document everything he reviewed.
23        MR. KO:  I understand that.
24        MR. O'CONNOR:  I'll instruct the witness

Page 131

1  not to answer on the basis of attorney-client
2  privilege.
3  BY MR. KO:
4    Q.   So were there -- without discussing the
5  details of the specific e-mails, is it your testimony
6  that you reviewed e-mails that suggested that
7  Mallinckrodt had a formal document retention policy
8  with respect to SOM documents and reports in the 2008
9  and 2011 time period?
10    A.   I don't recall that.
11    Q.   So you don't recall seeing any e-mails
12  that reflect -- so just so the record is clear, yes or
13  no, do you recall reviewing e-mails from the 2008 and
14  2011 time period that reflect a document retention
15  policy with respect to SOM documents and records?
16    A.   No.
17    Q.   And then just the last part of your
18  answer, you said that you reviewed certain e-mails and
19  policies and procedures and other documents provided to
20  our side.
21        Can you generally describe what that third
22  category consisted of without getting into the details
23  of what was selected by counsel?
24        MR. O'CONNOR:  Again, you can respond at a

Page 132

1  very high level.
2    A.   My recollection was it was just the
3  categories of documents that were provided to you guys
4  from the peculiar order reports.
5  BY MR. KO:
6    Q.   Other than --
7    A.   And there were other documents, too, that
8  were provided to you guys that I reviewed.
9    Q.   But to be clear, did any of these
10  documents that you review suggest that Mallinckrodt had
11  some sort of formal document or retention policy with
12  respect to Mallinckrodt SOM reports or documents during
13  the 2008-2011 time period?
14    A.   I don't recall --
15        MR. O'CONNOR:  Objection to form.
16    A.   I don't recall a document that says that.
17  BY MR. KO:
18    Q.   You can set that one aside.
19        [Exhibit Mallinckrodt-Gillies-009
20        marked for identification.]
21    Q.   I'm going to hand you a copy of what's --
22  we're going a little bit out of order, but this is
23  Gillies Exhibit 9.  And for the record, this ends in
24  Bates 419993.

Page 133

1        And so Mr. Gillies, is it accurate to say
2  that this document reflects a Draft 3 published June
3  2nd, 2008, of Mallinckrodt's SOM policy?
4    A.   Yes.
5    Q.   And similar to the question I asked with
6  respect to the prior Draft 2 from May.  In the peculiar
7  order definition, there's no indication of an algorithm
8  that Mallinckrodt is utilizing to define a peculiar
9  order; is that correct?
10    A.   Again, I'll have to go through this to make
11  sure there's no reference to that.
12    Q.   Sure.  Well, let me just ask you a narrow
13  question.
14    A.   Okay.
15    Q.   On the definitions page at the bottom of
16  the first page.
17    A.   Okay, I'm sorry.
18    Q.   The definition appears to be similar to
19  the previous two drafts we reviewed; correct?
20    A.   Yes.
21    Q.   And in that particular definition of a
22  peculiar order, there's no reference to what the
23  algorithm Mallinckrodt would utilize to define a
24  peculiar order; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.   Correct.  Correct.
2    Q.   Now, going back to the top of this e-mail,
3  in the purpose section, the second sentence states,
4  quote, DEA cannot, will not tell a DEA registrant if an
5  order is legitimate and/or if an order should be
6  shipped.
7       Did I read that correctly?
8    A.   Yes.
9    Q.   And it continues to say it is fundamental
10  for sound operations that DEA registrants take
11  reasonable measures to identify their customers,
12  understand the normal and expected transactions
13  typically conducted by those customer, and consequently
14  identify those transactions that are suspicious in
15  nature.
16       Did I read that correctly?
17    A.   Yes.
18    Q.   Now, with respect to that second -- or the
19  last sentence that I just read, is it accurate to say
20  that Mallinckrodt has memorialized in this particular
21  draft the understanding that it should know their
22  customers in connection with implementing an SOM
23  program?
24       MR. O'CONNOR:  Objection to form.

Page 135

1    A.   Yes.
2  BY MR. KO:
3    Q.   And would you also agree with me that this
4  particular language reflects an understanding by
5  Mallinckrodt that they would need to know their
6  customers' transactions that they enter into as well;
7  correct?
8       MR. O'CONNOR:  Objection to form.
9    A.   It says identify those transactions that
10  are suspicious in nature.
11  BY MR. KO:
12    Q.   And so would you agree with me that this
13  language reflects an understanding by Mallinckrodt that
14  they would need to know the details of the customers'
15  transactions regarding Mallinckrodt opioids?
16       MR. O'CONNOR:  Objection to form.
17    A.   Between Mallinckrodt and the customer?
18  BY MR. KO:
19    Q.   No, between Mallinckrodt's customer and a
20  pharmacy and/or clinic that the wholesale distributor
21  is dealing with.
22       MR. O'CONNOR:  Same objection.
23    A.   No.
24  BY MR. KO:

Page 136

1    Q.   And the portion of this policy that states
2  that it is fundamental for the DEA registrant to
3  understand the normal and expected transactions
4  typically conducted by those customer -- what is your
5  understanding of what those transactions consist of?
6    A.   So I --
7       MR. O'CONNOR:  Objection to form.
8    A.   I interpret this between Mallinckrodt and
9  the customer.
10  BY MR. KO:
11    Q.   So is it your understanding that the,
12  quote, normal and expected transactions, end quote, are
13  transactions between Mallinckrodt and its customers?
14    A.   That's how I read this.
15    Q.   And so in order -- is it your testimony
16  then that Mallinckrodt's suspicious order monitoring
17  system was only designed to identify the orders that
18  were suspicious as between Mallinckrodt and its
19  distributors?
20       MR. O'CONNOR:  Objection to form.
21    A.   That's what the regulation is, yes.
22  BY MR. KO:
23    Q.   And do you believe that -- well, let's
24  fast-forward to today's version of Mallinckrodt's SOM

Page 137

1  program.
2       Doesn't Mallinckrodt's current iteration
3  of the SOM program try and understand where
4  Mallinckrodt pills are going after the transaction
5  occurs between Mallinckrodt and the distributor?
6       MR. O'CONNOR:  Objection to form.
7    A.   After the transaction between Mallinckrodt
8  and its customer?  I just want to make sure I
9  understood your question correctly.
10  BY MR. KO:
11    Q.   The question is doesn't Mallinckrodt's
12  current iteration of its SOM program try and understand
13  where Mallinckrodt pills are going after the
14  transaction between Mallinckrodt and the distributor?
15    A.   Yes.
16       MR. O'CONNOR:  Same objection.
17  BY MR. KO:
18    Q.   And so in other words, Mallinckrodt's
19  current iteration of its SOM program tries to
20  understand knowledge of Mallinckrodt's customer's
21  customer; is that accurate?
22       MR. O'CONNOR:  Objection to form.
23    A.   Yes, we're going above and beyond what the
24  regulation calls for here in trying to accomplish that.

Page 138

```
1  BY MR. KO:
2      Q.   And turning back to the purpose statement
3  of this particular draft that's dated June of 2008.
4           Is it your testimony that you don't
5  believe this draft policy reflects an understanding of
6  Mallinckrodt to try and know its customer's customer?
7           MR. O'CONNOR:  Objection --
8      A.   No, there was no regulation at that time.
9  BY MR. KO:
10     Q.   I understand that there was no regulation.
11 I'm just talking specifically about this document.
12     A.   Okay.  So my interpretation of this
13 document is between Mallinckrodt and its customer --
14 the wholesaler distributor.
15     Q.   Understood.  And are you aware of any --
16 earlier we had discussed that document that had a
17 chronology that Ms. Harper summarized for you.
18          Do you recall that document?
19          MR. O'CONNOR:  Objection to form.
20     A.   Are you talking about the one that ends in
21 6623?  I'm sorry.  Is that --
22 BY MR. KO:
23     Q.   Yes.
24     A.   Okay.  I just want to make sure we're on
```

Page 139

```
1  the same page.
2      Q.   Sure.
3      A.   Okay.
4      Q.   So we had discussed that you had agreed
5  that Mallinckrodt knew at least as of July 2010 that it
6  had an obligation to know its customer's customer?
7           MR. O'CONNOR:  Objection to form.
8      A.   So we didn't have an obligation to know
9  our customer's customer, but we were being informed by
10 the DEA in St. Louis that that's something we should be
11 looking at.
12 BY MR. KO:
13     Q.   So as of -- we had discussed how as of
14 July 2010 you had been advised by the DEA that you
15 should know your customer's customer; correct?
16     A.   Yes, but there's still no regulation.
17     Q.   I understand --
18     A.   Okay.
19     Q.   -- that your testimony is that there's no
20 regulation or you believe that there's no obligation,
21 but would it be appropriate, Mr. Gillies, if
22 Mallinckrodt did not follow the advice of DEA at the
23 time?
24          MR. O'CONNOR:  Objection to form.
```

Page 140

```
1      A.   So in our anti-diversion efforts, this is
2  one of those times that we were going above and beyond
3  what was called for in the regulations.
4  BY MR. KO:
5      Q.   Well, that's not the question I asked.
6      A.   I'm sorry.
7      Q.   Is it your test --
8      A.   I misunderstood your question.
9      Q.   Sure.  Is it your testimony today that you
10 believe that it would be appropriate to not follow the
11 advice of the DEA to know your customer's customer as
12 of July 2010?
13          MR. O'CONNOR:  Objection to form.
14     A.   I'm telling you there's no regulation that
15 requires us to do this, but we do do it.
16 BY MR. KO:
17     Q.   I understand what your testimony is with
18 respect to whether or not there is a regulation, but my
19 question is simply whether or not you believe it would
20 be appropriate for Mallinckrodt to not follow the
21 advice of the DEA regarding its advice that you should
22 know your customer's customer.
23          MR. O'CONNOR:  I'm going to object to form
24 and asked and answered.  This is the third time.
```

Page 141

```
1      A.   So I have a legal --
2  BY MR. KO:
3      Q.   You can answer.
4      A.   I have a legal question.
5      Q.   Why don't you answer -- try and answer the
6  question first.
7           MR. O'CONNOR:  If you believe questions
8  that concerns privilege, then we can go off the record
9  and talk about it.
10 BY MR. KO:
11     Q.   Let --
12     A.   Yes, I actually -- I do believe there's a
13 legal issue that is problematic.
14          MR. O'CONNOR:  Okay.
15     A.   I just want to get a clarification.
16          MR. O'CONNOR:  Then I'd ask that we either
17 move off the question or we can take a break.
18     A.   It should be really quick.
19 BY MR. KO:
20     Q.   Yeah, let's not take a break.
21     A.   Okay.
22     Q.   You can discuss it with your counsel over
23 the lunch break.  We can go back on it.
24     A.   Okay.
```

Page 142

1    Q.   Do you recall seeing any documents or
2  reviewing any documents that suggest that the DEA had
3  advised Mallinckrodt of knowing their customer's
4  customer in the 2008 time period?
5    A.   No.
6    Q.   Do you recall seeing any documents other
7  than the document that's in front of you which
8  indicates Ms. Harper's comments to you regarding DEA
9  advice regarding knowledge of customer's customer --
10 strike that.  Let me ask again.
11       Prior to 2010, have you seen any documents
12 that reference an obligation or advice by the DEA
13 regarding Mallinckrodt knowing their customer's
14 customer?
15   A.   Prior to this time frame?
16   Q.   (Nodding "yes.")
17   A.   No.
18   Q.   And then going back to the Draft 3 that we
19 were discussing a moment ago.
20   A.   Okay.
21   Q.   Now, I know that we had discussed -- first
22 of all, you agree with me that this is a draft;
23 correct?
24   A.   It says Draft 3.

Page 143

1    Q.   And if you look, for example, like on Page
2  4, which we'll turn to here, there are still question
3  marks and blanks with respect to what to include in
4  this particular draft; correct?
5    A.   Yes, I see those now.
6    Q.   And in that particular section at the top
7  of Page 4, I believe there is a reference to an
8  algorithm to try and define a particular peculiar
9  order.
10       Do you see that portion of draft policy?
11   A.   Yes.
12   Q.   So is it accurate to say that this
13 particular draft is the first time that Mallinckrodt
14 tries to incorporate reference to an algorithm into its
15 written draft SOM policy?
16       MR. O'CONNOR:  Objection to form.
17   A.   So I don't recall whether there was
18 anything written prior to this, but --
19 BY MR. KO:
20   Q.   So is it fair to say that --
21   A.   But we did have an algorithm.
22   Q.   I understand that you testified at length
23 that you believe there was an algorithm, but in terms
24 of an actual algorithm being memorialized in writing,

Page 144

1  do you recall seeing anything prior to June of 2008
2  that reflects a written memorialization of the
3  algorithm utilized by Mallinckrodt?
4        MR. O'CONNOR:  Objection to form.
5    A.   I can't recall that.
6  BY MR. KO:
7    Q.   You can set this one aside.
8    A.   Okay.
9    Q.   We'll move on to Gillies -- now back on
10 track.  Gillies Exhibit 11.
11       [Exhibit Mallinckrodt-Gillies-011
12       marked for identification.]
13   Q.   And for the record, this is titled DEA
14 compliance procedure controlled substance suspicious
15 order monitoring, Draft 4, ending in Bates 296382.
16       So Mr. Gillies, this particular document
17 reflects in the top right-hand corner that it is Draft
18 4, published July 8th, 2008; correct?
19   A.   Correct.
20   Q.   And so this appears to be the fourth
21 iteration of the documents that we've been going over;
22 correct?
23   A.   Yes.
24   Q.   And by the way, do you have any

Page 145

1  understanding of -- well, the originator of this
2  document is Karen Harper.  Do you see that?
3    A.   Yes.
4    Q.   And I'll represent to you that in the
5  previous three versions that we looked at she was also
6  the originator.
7        Do you have any understanding of who Ms.
8  Harper circulated these draft policies to?
9    A.   I do not.
10   Q.   Do you have any understanding of whether
11 or not these draft procedures were circulated to anyone
12 outside of the DEA compliance team?
13   A.   I believe -- yes.
14   Q.   And who outside of the DEA compliance team
15 were these draft procedures circulated to?
16   A.   Bill Ratliff.
17   Q.   And correct me if I'm wrong, but I believe
18 you told me that he was part of the DEA compliance
19 team, or was he not?
20       MR. O'CONNOR:  Objection to form.
21   A.   I did not say that.
22 BY MR. KO:
23   Q.   He was just part of the SOM team?
24   A.   That's correct.

Page 146

1    Q.   So Bill Ratliff was never part of the DEA
2  compliance team?
3    A.   I didn't say that either.
4    Q.   I see.
5    A.   I'm not aware of that.
6    Q.   Understood.
7    A.   But he was security, and then you had DEA
8  compliance.
9    Q.   Understood.  Other than Mr. Ratliff, are
10  you aware of anyone else that these draft DEA
11  compliance procedures would have been circulated to?
12    A.   I'm unaware of who else they went to.
13    Q.   Now, in the scope section of this
14  particular draft, there's a reference to the fact that
15  this particular draft applies -- I'll just read it so
16  the record is clear.
17        Scope, applies internally to Covidien
18  customer service group, information services group, DEA
19  compliance, and security for monitoring of controlled
20  substance orders received electronically or manually,
21  bulk or finished dosage products, for all active
22  accounts, new or established, from order placement to
23  shipment.
24        Did I read that correctly?

Page 147

1    A.   Yes.
2    Q.   So focusing on the portion that indicates
3  bulk or finished dosage products, what is the
4  difference -- can you explain to the court what the
5  difference is between the two?
6    A.   Bulk -- the bulk products are at our St.
7  Louis facility.  These are the manufacturing, and the
8  finished dosage products is at our Hobart facility for
9  the actual manufacturing of the tablets.
10    Q.   So in other words, is it fair to say that
11  Hobart is where Mallinckrodt converts the actual
12  product into a pill, for example?  Is that correct?
13    A.   Correct.
14    Q.   And the St. Louis facility is where
15  Mallinckrodt processes and manufactures the raw
16  product; correct?
17    A.   Correct.
18    Q.   And so do you have any understanding
19  whether or not Mallinckrodt ever had a separate SOM
20  program with respect to its bulk product relative to
21  its dosage products?
22        MR. O'CONNOR:  Objection to form.
23    A.   I don't believe it was separate, but as it
24  applied to bulk, there were address verifications from

Page 148

1  the 222 forms to make sure that what the customer
2  address and the ship to address in our records and
3  stuff matched.  That was one of the SOM steps for bulk.
4  BY MR. KO:
5    Q.   Okay.  So that -- to be clear, the address
6  verification form was a feature unique to the bulk SOM
7  program?  Is that your testimony?
8    A.   Yeah, for the 222s.  Yes.  Uh-huh.
9    Q.   Through the 222 forms?
10    A.   Correct.
11    Q.   And at any time in Mallinckrodt's history,
12  are you aware of whether or not there was a separate
13  bulk SOM program?
14        MR. O'CONNOR:  Objection to form and
15  scope.
16    A.   Again, I'm unaware of a separate one, so
17  the SOM program that I'm aware of included both.
18  BY MR. KO:
19    Q.   I see.  So as far as your understanding,
20  Mallinckrodt's SOM program governed both its bulk
21  product and its dosage products; correct?
22    A.   Correct.
23    Q.   And at least for purposes of this draft
24  procedure, it seems to make clear that the SOM program

Page 149

1  is both for bulk and finished dosage products; correct?
2    A.   Correct.
3    Q.   For Mallinckrodt's current SOM program, is
4  there any sort of distinction or delineation made
5  between Mallinckrodt bulk and dosage products with
6  respect to SOM?
7        MR. O'CONNOR:  Objection to form.
8    A.   No.
9  BY MR. KO:
10    Q.   Now, turning to the next page, Page 2 of
11  this particular policy, again we see definitions of
12  both peculiar and suspicious orders.  Do you see that?
13    A.   Yes.
14    Q.   So is it accurate to say that this
15  particular draft has a definition of a peculiar order
16  that's consistent with the others, and it does not
17  specifically identify the peculiar order algorithm; is
18  that correct?
19        MR. O'CONNOR:  Objection to form.
20    A.   Yes.
21  BY MR. KO:
22    Q.   And so is it accurate to state that as of
23  July 8th, 2008, Mallinckrodt had not incorporated an
24  algorithm into its SOM policy?  Is that accurate?

Page 150

1    MR. O'CONNOR: Objection to form.
2    A.   No.
3    BY MR. KO:
4    Q.   For purposes of the written policies that
5    Mallinckrodt was attempting to create, is it accurate
6    to say that there is no definition of -- or there's no
7    indication in this document of a specific algorithm
8    that's utilized for purposes of identifying a peculiar
9    order?
10    MR. O'CONNOR: Objection to form.
11    A.   Sorry.  I'm going to have to read this
12    document to see whether that's an accurate statement or
13    not.
14    BY MR. KO:
15    Q.   Sure.
16    A.   So --
17    MR. KO:  And while you go over that
18    document, maybe we can -- we can shoot for like a 12:45
19    break for lunch.  Is that good?
20    MR. O'CONNOR:  Sounds good.
21    MR. KO:  Okay.
22    A.   So there's no mention of algorithm in this
23    document.
24    BY MR. KO:

Page 151

1    Q.   So as of July 8th, 2008, is it accurate to
2    state that Mallinckrodt had not yet incorporated an
3    algorithm into its suspicious order monitoring draft
4    policy?
5    MR. O'CONNOR: Objection to form.
6    A.   It's not listed in this policy.
7    BY MR. KO:
8    Q.   So is it -- and my question was different.
9    A.   Okay.
10    Q.   As of July -- yes or no -- as of July 8th,
11    2008, is it accurate to state that Mallinckrodt had not
12    yet incorporated an algorithm into its suspicious order
13    monitoring draft policy?
14    MR. O'CONNOR:  Same objection.
15    A.   So again, as I stated earlier, the word
16    algorithm is not in here, but when it refers to
17    established criteria, then I believe that to be the
18    algorithm even though the word algorithm is not in this
19    document.
20    BY MR. KO:
21    Q.   And what was your understanding of what
22    the established criteria was as of July 8th, 2008?
23    A.   I don't recall the algorithm, but there is
24    a reference down here to 2X.  I don't recall.

Page 152

1    Q.   So you don't have an understanding of
2    what -- your testimony is that you don't have an
3    understanding of what that algorithm consisted of, but
4    you believe that there was an algorithm that was
5    utilized at the time?
6    A.   That's correct.
7    Q.   And separate and apart from whether or not
8    there was an algorithm utilized, for purposes of this
9    particular document, the algorithm is not spelled out
10    in this particular draft policy; correct?
11    A.   Correct.
12    Q.   You can set that one aside.
13    A.   Okay.
14    Q.   And I'll hand you a copy of what's going
15    to be marked as Gillies Exhibit 12.
16    [Exhibit Mallinckrodt-Gillies-012
17    marked for identification.]
18    Q.   And for the record, Gillies Exhibit 12
19    is -- ends in Bates 4154292.
20    And Mr. Gillies, this is -- this
21    particular draft procedure is dated November 4th, 2009;
22    correct?
23    A.   Correct.
24    Q.   And unlike -- well, first of all, have you

Page 153

1    reviewed a procedure like this before?
2    A.   Yes.
3    Q.   And this particular procedure, unlike the
4    ones that we were going over a moment ago with respect
5    to SOM algorithms or criteria in particular, this one
6    governs the new and existing customer account setups
7    and ongoing reviews; is that accurate to say?
8    A.   That's what this subject is, yes.
9    Q.   And if we go on, the purpose of this
10    document -- one of the purposes of this document is to
11    establish a procedure outlining the process for
12    monitoring new controlled substance customer accounts
13    and ongoing review of existing controlled substance
14    customer accounts.
15    You see that?
16    A.   Yes.
17    MR. O'CONNOR:  Objection.
18    BY MR. KO:
19    Q.   So did Mallinckrodt have -- prior to
20    November of 2009, are you aware of any written policies
21    or procedures governing the process for monitoring new
22    and existing customer accounts of Mallinckrodt?
23    A.   I can't recall.
24    MR. O'CONNOR:  Objection to form and

Page 154

1  scope.
2  BY MR. KO:
3      Q.   Does the current iteration of
4  Mallinckrodt's SOM program have any written policy or
5  procedure related to new and existing customer
6  accounts?
7          MR. O'CONNOR:  Same objections.
8      A.   I can't recall.
9  BY MR. KO:
10     Q.   Are you aware, in addition to -- so
11 obviously this is -- well, if you look at Page 3 of
12 this document, there are some question marks --
13     A.   Sure.
14     Q.   -- with respect to what the policy should
15 say.  So this reflects that this is a draft; correct?
16     A.   I don't see draft on this document, so I'd
17 be speculating.
18     Q.   Would you agree with me that a document
19 that includes some question marks would not be a final
20 or formal policy?
21         MR. O'CONNOR:  Objection to form.
22     A.   I don't believe it would be.
23 BY MR. KO:
24     Q.   And I know I asked you about prior to this

Page 155

1  time period, but following November of 2009, do you
2  recall seeing any written policies or procedures
3  governing existing customer accounts or new customer
4  accounts?
5      A.   Yes.
6      Q.   And when -- approximately when were those
7  policies in place?
8      A.   I don't recall the dates.
9      Q.   At some point after 2009, though; correct?
10     A.   That's my recollection.
11     Q.   And approximately how many policies have
12 you either reviewed or has Mallinckrodt implemented
13 since 2009?
14         MR. O'CONNOR:  Objection to form and
15 scope.
16     A.   My recollection is that there's several
17 that I reviewed.
18 BY MR. KO:
19     Q.   So in addition to -- well, Mallinckrodt
20 had certain policies and procedures with respect to its
21 SOM program, as we discussed; correct?
22     A.   Correct.
23     Q.   And in addition to those policies and
24 procedures, did Mallinckrodt also have other policies

Page 156

1  and procedures in place with respect to its duties
2  under the Controlled Substances Act?
3      A.   Yes.
4      Q.   And one of those policies and procedures
5  is reflected by this draft policy; correct?
6          MR. O'CONNOR:  Objection to form.
7      A.   Again, I'd have to read this entire
8  document, but --
9  BY MR. KO:
10     Q.   Well, let's take a step back to the
11 question I asked before.
12     A.   Okay.
13     Q.   You had indicated that there were certain
14 policies and procedures in place with respect to
15 Mallinckrodt's duties under the CSA; correct?
16     A.   Yes.
17     Q.   And what did those policies and procedures
18 consist of other than those governing its SOM
19 obligations?
20     A.   Security.
21     Q.   Anything else?
22     A.   Not that I can recall.
23     Q.   Do you know whether or not Mallinckrodt
24 had any policies and procedures with respect to its

Page 157

1  customer audit programs?
2          MR. O'CONNOR:  Objection to form.
3      A.   Yes, I think we did.
4  BY MR. KO:
5      Q.   And was there ever a time when
6  Mallinckrodt had a policy or procedure with respect to
7  specific customer accounts that it had deemed to be
8  potentially suspicious?
9          MR. O'CONNOR:  Objection to form.
10     A.   I don't recall that.
11 BY MR. KO:
12     Q.   Okay.  Fair enough.  You can set this one
13 aside, and I want to -- before breaking for lunch,
14 let's just go over one more document.
15     A.   Okay.
16     Q.   This will be Gillies Exhibit 13.
17         [Exhibit Mallinckrodt-Gillies-013
18         marked for identification.]
19     Q.   For the record, this ends in Bates
20 4154297.  And this particular document is dated
21 November 4th, 2009.
22         Do you see that, Mr. Gillies?
23     A.   Yes.
24     Q.   And this -- the subject of this particular

Page 158

1 policy is identification and review of peculiar orders,
2 controlled substance suspicious order monitoring
3 program.
4     Did I read that correctly?
5    A.  Yes.
6    Q.  And Karen Harper continues to be the
7 originator of this document?
8    A.  Yes.
9    Q.  And turning your attention to the second
10 page of this document, there's a reference to the 2X
11 algorithm or criteria that we were discussing
12 previously; correct?
13    A.  Yes.
14    Q.  And the specific definition of a peculiar
15 order as defined by this policy is an order that is two
16 times the average amount of product ordered during the
17 previous 18 months by DEA reporting class; correct?
18    A.  Yes.
19    Q.  So is it accurate to say that as of
20 November 2009 -- or strike that.
21     Is it accurate to say that November 2009
22 is the first time there is mention of a specific
23 algorithm that will be utilized to determine whether or
24 not an order is peculiar in an SOM written policy?

Page 159

1     MR. O'CONNOR:  Objection to form.
2    A.  No.
3 BY MR. KO:
4    Q.  Did you recall seeing any other documents
5 prior that predate November of 2009 that memorialize
6 the written -- or that memorialize the algorithm that
7 Mallinckrodt was going to utilize for purposes of
8 defining a peculiar order?
9    A.  Yes, I believe there was a document that
10 you showed me earlier.  Wasn't there a reference to the
11 algorithm in that?
12    Q.  For purposes of -- I see what you're
13 saying, but for purposes -- I'm just asking for
14 purposes of defining a peculiar order in the draft
15 written policy, is this the first time you see a
16 reference made to an algorithm?
17    A.  Okay.  In that particular definition?
18    Q.  Correct.
19    A.  Yes.
20    Q.  And in the prior drafts that we had seen,
21 there was no mention to the specific algorithm that was
22 being utilized for purposes of defining a peculiar
23 order; correct?
24     MR. O'CONNOR:  Objection to form.

Page 160

1    A.  Correct.
2 BY MR. KO:
3    Q.  And this particular algorithm or formula
4 that is being utilized -- does this refresh your
5 recollection at all as to how long prior to November
6 2009 Mallinckrodt may have been utilizing this formula?
7     MR. O'CONNOR:  Objection to form.
8    A.  No.
9     MR. KO:  Okay.  We can take a break for
10 lunch.
11     MR. O'CONNOR:  Sounds good.
12    A.  May I take this document so I can ask that
13 legal question?
14     MR. KO:  You can -- let's --
15     MR. O'CONNOR:  We can go off the record.
16     MR. KO:  Yeah, we can go off the record.
17     THE VIDEOGRAPHER:  We are going off the
18 record at 12:47 PM.
19     [A recess was taken.]
20     THE VIDEOGRAPHER:  We are back on the
21 record at 1:37 PM.
22 BY MR. KO:
23    Q.  Welcome back from lunch, Mr. Gillies.
24    A.  Thank you.

Page 161

1    Q.  Before we broke, we were discussing
2 Exhibit 13, and I just had a couple follow-up questions
3 before we move on to the next exhibit.
4     Can you turn to the top of Page 3?  And at
5 the top of Page 3 there's a reference to -- there's a
6 Number 4, and there's a reference to reviewing the
7 order based on the criteria.  Do you see that?
8    A.  Number 4, yes.
9    Q.  And then there's some language that says,
10 quote, we should probably rephrase this to something
11 like place the order in appropriate hold status while
12 being evaluated, end quote.
13     Did I read that correctly?
14    A.  Yes.
15    Q.  And so does that -- does this language
16 indicate that this version is still in draft form?
17    A.  I don't know that, but I think it's fair
18 to say that.
19    Q.  So this particular document dated
20 11-4-2009 regarding Mallinckrodt's controlled substance
21 suspicious order monitoring program appears to be a
22 draft; is that fair to say?
23    A.  Yes.
24    Q.  You can set that one aside.  And I'm going

Page 162

1 to now hand you a copy of what will be marked as

2 Gillies Exhibit --

3        [Exhibit Mallinckrodt-Gillies-014

4        marked for identification.]

5    Q.   This is one document, which for the record

6 is a cover e-mail and an attachment, and the cover

7 e-mail is Bates MNK-T1_0000264240.

8        And then the attachment ends in 264260,

9 and I'll represent for the record and for counsel there

10 are a series of attachments to this cover e-mail, and

11 this, for efficiency purposes, is just one of the

12 attachments that's referenced in the e-mail.

13    A.   Okay.

14    Q.   First let's turn to the policy -- the

15 draft policy ending in 260.

16        This particular policy is dated October

17 29th, 2010; correct?

18    A.   Yes.

19    Q.   And again, this is a policy that governs

20 Mallinckrodt's SOM program; is that accurate?

21    A.   Yes.

22    Q.   And in the prior version that we were --

23 if you go to the -- if you turn to Page 2 of this

24 policy.

Page 163

1    A.   What -- I'm sorry.  Which one?  The

2 current one you just gave me?

3    Q.   Yeah, the one I just gave you.

4    A.   Oh, okay.  Okay.

5    Q.   Sorry.  I was just giving your counsel an

6 extra copy.

7    A.   Oh, okay.

8    Q.   Page 2 of this policy has a reference to

9 peculiar order like the other ones; correct?

10    A.   Yes.

11    Q.   And here you have a definition of a

12 peculiar order as being one that is, quote, controlled

13 substance order that meets an internal established

14 criteria of 3X the average amount of product ordered

15 during the previous 12 months by DEA reporting class.

16        Did I read that correctly?

17    A.   Yes.

18    Q.   And so in the prior version we just looked

19 at, the peculiar order algorithm was 2X the average

20 amount of product ordered during the prior 18 months by

21 DEA reporting class; correct?

22    A.   Correct.

23    Q.   So does this policy reflect a revision in

24 the peculiar order algorithm to 3X the prior 12-month

Page 164

1 order history?

2    A.   Yes.

3        MR. O'CONNOR:  Objection.

4 BY MR. KO:

5    Q.   And do you have any understanding of why

6 this change occurred with respect to Mallinckrodt's

7 peculiar order algorithm?

8    A.   It's my understanding under the 2X that

9 there were too many hits on the algorithm, and our

10 outside DEA consultant advised that if you have too

11 many hits hitting your peculiar order report and none

12 of them are, you should change it to focus a little bit

13 more on those that could truly be peculiar.

14 BY MR. KO:

15    Q.   And this outside DEA consultant, was that

16 Mr. Sapienza?

17    A.   Sapienza.  Yeah.

18    Q.   Sapienza?  Okay.  And other than Mr.

19 Sapienza, did Mallinckrodt obtain any other advice with

20 respect to changing the algorithm from 2X to 3X?

21    A.   Not that I'm --

22        MR. O'CONNOR:  Object -- I'm just going to

23 object to the extent that involves any attorney-client

24 communications.

Page 165

1    A.   Not that I'm aware of, other than their

2 experience with the previous algorithm and then the

3 information they got from the consultant.

4 BY MR. KO:

5    Q.   And so in addition to changing the formula

6 from 2X to 3X the average amount, the time period

7 that's reviewed is decreased from 18 months to 12

8 months as well; correct?

9    A.   Yes.

10    Q.   And so again, just so the record is clear,

11 your testimony is that the intent behind doing this was

12 to minimize the amount of peculiar order reports that

13 were being produced?

14        MR. O'CONNOR:  Objection to form.

15    A.   From the experience of reviewing the

16 previous algorithm reports, it was -- there were too

17 many hits on the system, and an outside consultant said

18 if there's too many, then it's -- and none of them were

19 turning out to be suspicious, that we needed to tighten

20 that up a little bit.

21 BY MR. KO:

22    Q.   And the reason why you moved down from 18

23 months to 12 months and up from 2X to 3X is to, as you

24 say, tighten up the amount of orders that were reported

Page 166

1 under the peculiar order standard?

2    A.  That were hitting the report; correct.

3    Q.  Now, turning to the cover e-mail that

4 attaches this particular document, there's an e-mail

5 from Karen Harper to Howard Davis dated November 18th,

6 2010. Do you see that?

7    A.  Yes.

8    Q.  Do you know who Howard Davis is?

9    A.  He was another outside consultant that we

10 hired on a contract basis.

11    Q.  And was he another outside consultant that

12 Mallinckrodt hired on a contract basis to specifically

13 advise Mallinckrodt regarding its suspicious order

14 monitoring program?

15       MR. O'CONNOR:  Objection to form.

16    A.  I believe that to be the main reason.

17 BY MR. KO:

18    Q.  Do you have any understanding of what

19 other reasons he may have been retained for?

20    A.  I can't recall the details in the contract

21 specifically whether there were other items that he

22 would assist on.

23    Q.  And separate and apart from the contract,

24 do you have any understanding of what services Howard

Page 167

1 Davis provided when he was retained as an outside

2 consultant outside of advice he gave on Mallinckrodt's

3 SOM program?

4       MR. O'CONNOR:  Objection to form.

5    A.  Not sure I'm understanding the question.

6 Work outside of work he was doing for Mallinckrodt?

7 BY MR. KO:

8    Q.  No, I'm only talking about with respect to

9 work he did for Mallinckrodt.

10    A.  Okay.

11    Q.  So let me rephrase.  Because in response

12 to my question a moment ago, you were referencing the

13 contract.

14    A.  Uh-huh.

15    Q.  And I don't mean to put you through a

16 memory test of what the contract may or may not have

17 said.  I'm just simply asking you do you recall whether

18 or not Mallinckrodt utilized Mr. Davis for any other

19 purpose outside of advising Mallinckrodt regarding its

20 suspicious order monitoring program?

21    A.  Not that I can recall.

22    Q.  So it's fair to say that the primary

23 reason why Mallinckrodt retained Mr. Davis was to

24 advise -- was for Mr. Davis to advise Mallinckrodt

Page 168

1 regarding its SOM program; correct?

2    A.  That's what I said, yes.

3    Q.  At the beginning of this e-mail, Ms.

4 Harper states Howard, please revise the QSP order

5 monitoring document incorporating recent program

6 enhancements with recent activities.

7       Do you see that portion of the e-mail?

8    A.  I do.

9    Q.  And do you have an understanding of what

10 QSP order monitoring document is referring to?

11    A.  No.

12    Q.  Do you have any reason to believe that Ms.

13 Harper is not asking Mr. Davis to revise the SOM policy

14 that we just looking at that's included as an

15 attachment to this exhibit?

16       MR. O'CONNOR:  Objection to form.

17    A.  Again, I'm unfamiliar with what she's

18 referring to as the QSP order monitoring document and

19 this attached document.  I don't see a reference to

20 that QSP, so I don't know.

21 BY MR. KO:

22    Q.  Fair enough.

23    A.  Okay.

24    Q.  Do you have -- sure.  Do you have any

Page 169

1 understanding of whether or not Mr. Davis was ever

2 specifically asked to revise a Mallinckrodt suspicious

3 order monitoring policy?

4    A.  No.

5    Q.  Let me quickly hand you a copy of what's

6 going to be marked as Gillies Exhibit 15.

7       [Exhibit Mallinckrodt-Gillies-015

8       marked for identification.]

9    Q.  And I apologize.  I do believe this

10 exhibit has been referenced in other documents, but for

11 purposes of today we'll just go ahead and call it

12 Gillies Exhibit 15.  And it reflects a November 2nd,

13 2010, memorandum from Howard Davis to Karen Harper

14 ending in Bates 269399.

15       Mr. Gillies, does this document look

16 familiar to you?

17    A.  Yes.

18    Q.  Is this a document that you reviewed in

19 preparation for this deposition today?

20       MR. O'CONNOR:  You can answer generally

21 whether you've reviewed it.

22    A.  Yes.

23 BY MR. KO:

24    Q.  And in this document, Mr. Davis makes

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  reference to a certain document titled Mallinckrodt
2  standard operating procedure SOPC hyphen six --
3      A.   Yes.
4      Q.   -- comp 3.0.  Do you see that?
5      A.   I'm sorry.  That's C hyphen -- where are
6  you at that you're referencing?  Because you said a
7  six, and I don't see a six, and I just want to make
8  sure.  Is the six the S that's there?
9      Q.   Sure.  I may have misspoke.
10     A.   Okay.  I'm sorry.
11     Q.   Let me be clear.
12     A.   Okay.
13     Q.   So the record is clear, Mr. Davis states,
14  quote, reference is made to Mallinckrodt standard
15  operating procedure SOPC-S comp 3.0 --
16     A.   Okay.  Thank you.
17     Q.   -- entitled identification and review of
18  peculiar orders.
19     A.   Okay.
20     Q.   Did I read that correctly?
21     A.   Yes.
22     Q.   Is it fair to say that Mr. Davis is
23  referencing the standard operating procedure referenced
24  as part of Exhibit 14 that we just looked at a moment

Page 171

1  ago?
2      A.   Yes.
3      Q.   And you understood both in your review of
4  this memorandum and in your preparations that Mr. Davis
5  did indeed review certain SOM procedures and policies
6  of Mallinckrodt; correct?
7      A.   Correct.
8      Q.   And this memorandum reflects his review
9  and advice to Karen Harper regarding this particular
10  SOM policy; correct?
11         MR. O'CONNOR:  Objection to form.
12     A.   Yes.
13  BY MR. KO:
14     Q.   That's all the questions I have on that.
15  Set that one aside.
16         By the way, do you have any understanding
17  of how long Mr. Davis was retained as an outside
18  consultant for Mallinckrodt?
19     A.   A short time, was my recollection, and his
20  contract was not renewed.
21     Q.   And do you -- I'm trying to get an
22  understanding of what you mean by short time.  Do you
23  recall whether or not it was half a year?  Are you
24  talking a year?  Do you have any understanding of how

Page 172

1  long he was actually retained?
2          MR. O'CONNOR:  Objection to form.
3      A.   My belief was less than a year.
4  BY MR. KO:
5      Q.   Less than a year?
6          By the way, do you know who Mr. Davis is?
7      A.   I know who he is now.
8      Q.   You didn't know him -- did you know him --
9  at the time you joined Mallinckrodt in 2012, did you
10  know of Howard Davis?
11     A.   I did not.
12     Q.   I'm going to hand you a copy of what's
13  going to be marked as or has been marked as Gillies
14  Exhibit 16.
15         [Exhibit Mallinckrodt-Gillies-016
16         marked for identification.]
17     Q.   And I just have a few questions about
18  this.
19         For the record, this is a document ending
20  in Bates 264275, and it is the global controlled
21  substance compliance procedure as of January 4th, 2011.
22         And you see, Mr. Gillies, that this is --
23  continues to be another version of the -- of
24  Mallinckrodt's SOM policy; is that fair to say?

Page 173

1      A.   Yes.
2      Q.   And it's dated January 4th, 2011?
3      A.   Yes.
4      Q.   And for this particular draft or version,
5  the peculiar order definition remains the same as the
6  previous version we looked at; correct?
7      A.   Correct.
8      Q.   So just so the record is clear, as of
9  January of 2011, the peculiar order algorithm utilized
10  by Mallinckrodt was a criteria reflecting ▮▮▮▮▮
11  the average amount of the product ordered during the
12  previous 12 months by DEA reporting class; correct?
13     A.   Yes.
14     Q.   You can set that one aside.
15         I'm now going to hand you a copy of what
16  will be marked as Gillies Exhibit 17, which for the
17  record is a cover e-mail from April 7th, 2011, ending
18  in Bates 264199.
19         [Exhibit Mallinckrodt-Gillies-017
20         marked for identification.]
21     Q.   And an attachment ending in 264199.
22         MR. KO:  Here you go.  You can have it.
23         MR. O'CONNOR:  Thanks.
24     A.   Okay.

Page 174

BY MR. KO:

1   BY MR. KO:
2       Q.   Just a few questions on this as well.
3   Turn to the attachment.
4       A.   Yeah, I'm sorry.  What did you say the
5   number on the attachment was?
6       Q.   The attachment ended in Bates 264200.
7       A.   Okay.  Thanks.
8       Q.   I may have misspoke.  Yeah, you're right.
9   The cover e-mail ends in 199.
10      A.   Okay.
11      Q.   The attachment ends in 200.
12      A.   I just wanted to make sure we were looking
13  at the same document.
14      Q.   Yeah.  Thank you for that clarification.
15          So this is another version or draft of
16  Mallinckrodt's SOM written policy dated March 28th,
17  2011; correct?
18      A.   Yes.
19      Q.   And by this, just so the record is clear,
20  I'm referring to the document ending in Bates 200.
21          And turning to the next page, again you
22  see a definition of peculiar order; correct?
23      A.   Yes.
24      Q.   And the definition of a peculiar order

Page 175

1   remains unchanged from the prior two versions; correct?
2       A.   Correct.
3       Q.   So as of March 28th, 2011, the formula
4   utilized by Mallinckrodt to determine whether or not an
5   order was peculiar was to determine whether or not the
6   order was ███████ the average amount of product
7   ordered during the previous 12 months by DEA reporting
8   class; correct?
9       A.   Correct.
10      Q.   And going back to the cover e-mail ending
11  in 199, I believe there's a reference made to a --
12          MR. KO:  Thanks, Andrew.
13  BY MR. KO:
14      Q.   Well, let me ask it this way.  So there's
15  a -- this is an e-mail exchange between Eileen
16  Spaulding and Karen Harper from the March and April of
17  2011 time period; correct?
18      A.   Yes.
19      Q.   And is it fair to say that Karen is asking
20  Eileen to make some revisions to this particular
21  policy?  Correct?
22      A.   Could you repeat your question?
23      Q.   Sure.  In the underlying e-mail dated
24  March 30th, 2011, Karen is asking Eileen to make some

Page 176

1   revisions to this particular document; correct?
2       A.   She's asking her to clean up the format.
3       Q.   Okay.  Fair enough.
4       A.   Okay.
5       Q.   In the April -- in the corresponding April
6   7th e-mail from Eileen to Karen --
7       A.   Okay.
8       Q.   -- Eileen appears to make some additions
9   to the document; is that correct?
10      A.   I'm sorry.  I didn't read that part.
11  So -- yes.
12      Q.   So does this e-mail reflect that the
13  attachment ending in Bates 200 is a draft written
14  policy of Mallinckrodt's SOM program?
15      A.   Again, it doesn't say draft on here.  So
16  she could have been making some enhancements to an
17  actual policy.
18      Q.   I understand that.  But as it relates to
19  this particular -- I have a specific question with
20  respect to this policy --
21      A.   Okay.
22      Q.   -- that's attached to this particular
23  e-mail.
24      A.   Right.

Page 177

1       Q.   This document that ends in Bates 200
2   appears to be a draft SOM policy of Mallinckrodt;
3   correct?
4       A.   I don't know that.
5       Q.   So I'll represent to you that this
6   attachment that is referenced in Eileen's e-mail to
7   Karen is in fact the attachment that's part of this
8   e-mail.
9       A.   Okay.
10      Q.   And so with that representation, would you
11  agree with me that the policy dated March 28th, 2011,
12  ending in dash 200 is a draft version of Mallinckrodt's
13  SOM policy, or is it your belief -- or you can't answer
14  that question?
15      A.   Well, again, I'll stick with my original
16  answer, which is no, it could be revisions to an
17  existing policy.  So I don't know that to be a draft.
18  I guess that's what I'm saying.
19          So if I knew this to be a draft, fine, but
20  I don't know this to be a draft, so these could be
21  revisions she made to an existing policy.
22      Q.   Fair enough.
23      A.   Okay.
24      Q.   Do you know -- have you seen -- in any of

Page 178

1  the review of your documents in preparation for this
2  deposition, have you ever seen an SOM written policy in
3  this time period of March 28th, 2011, that reflects a
4  formal written policy of Mallinckrodt?
5         MR. O'CONNOR: Objection to form.
6     A.   This may have been one of the documents
7  that I reviewed, and it appears to me to be a formal
8  written policy.
9  BY MR. KO:
10    Q.   But in the cover e-mail, there are some
11 changes being made; is that fair?
12    A.   That's fair.
13    Q.   And so all I'm asking is that for this
14 particular document ending in dash 200, that appears to
15 be a draft policy because Eileen and Karen are making
16 some slight changes to it; is that correct?
17    A.   No, that's not my testimony. My testimony
18 is that I don't know this to be a draft, and this could
19 be a formal policy in play that has some revisions made
20 to it. That's --
21    Q.   Sure. Fair enough. Do you recall seeing
22 a formal policy during the March 2011 time period
23 regarding Mallinckrodt's SOM program?
24    A.   Again, I may have reviewed this policy.

Page 179

1     Q.   And is it your testimony that Mallinckrodt
2  did in fact have a formal written policy as of 2011
3  regarding its SOM program?
4         MR. O'CONNOR: Objection to form.
5     A.   That's my understanding.
6  BY MR. KO:
7     Q.   And who informed you that the particular
8  version that you may have looked at was in fact the
9  formal policy regarding Mallinckrodt's SOM program?
10    A.   I didn't say anybody did. I said that I
11 may have reviewed this during that period and made that
12 conclusion on my own.
13    Q.   I see. We can set that one aside.
14    A.   Okay.
15    Q.   We will now go over what's been marked as
16 Gillies Exhibit 18. Excuse me.
17        [Exhibit Mallinckrodt-Gillies-018
18        marked for identification.]
19    Q.   And for the record, this ends in Bates
20 259166, and this is titled Mallinckrodt suspicious
21 order monitoring procedure dated August 8th, 2011.
22        On this particular document, the
23 originator continues to be Karen Harper. Do you see
24 that?

Page 180

1     A.   Yes.
2     Q.   And it indicates that she is senior
3  manager of controlled substance compliance; correct?
4     A.   Yes.
5     Q.   And earlier I know you had said that you
6  were unaware of whether or not there was controlled
7  substance compliance group. Does this refresh your
8  recollection at all that there was in fact such a group
9  at Mallinckrodt?
10    A.   So I'm going to take this that the DEA
11 compliance and the controlled substance compliance are
12 the same.
13    Q.   Okay. Fair enough. So is it your
14 understanding that there were certain times at
15 Mallinckrodt where the DEA compliance group was also
16 referred to as the controlled substance compliance
17 group?
18    A.   So my recollection is I only knew that
19 group as DEA compliance.
20    Q.   And you have no recollection of whether or
21 not there was an actual or formal group called the
22 controlled substance compliance group at Mallinckrodt?
23        MR. O'CONNOR: Objection to form.
24    A.   I'm unaware of that, and from looking at

Page 181

1  this title I believe them to be the same.
2  BY MR. KO:
3     Q.   And do you have any understanding -- or
4  did you review any documents that predate August 2011
5  that may have referenced a controlled substance
6  compliance group?
7     A.   So some of the previous documents that you
8  showed me had that same title -- or that same name
9  after Karen's title, so the answer to your question is
10 yes.
11    Q.   But -- and your testimony is that you
12 believe them to be essentially synonymous; is that
13 correct?
14    A.   That's correct.
15    Q.   And for this particular document, if you
16 look at the top of Page 2, the definition of peculiar
17 order is again set forth. Do you see that?
18    A.   Yes.
19    Q.   And as with the previous three versions
20 that we have looked at, the definition of a peculiar
21 order remains unchanged. Is that accurate?
22    A.   Yes.
23    Q.   So as of August 8th, 2011, so the record
24 is clear, Mallinckrodt utilized a peculiar order

Page 182

1  algorithm which identified a peculiar order as one
2  being an order that was ███████ the average amount
3  of product ordered by -- or ordered during the previous
4  12 months by DEA reporting class; correct?
5     A.  Yes.
6     Q.  Set that one aside.  Move on to what's
7  going to be marked as Gillies Exhibit 19.  And this
8  document ends in Bates 571916.
9        [Exhibit Mallinckrodt-Gillies-019
10             marked for identification.]
11    Q.  So earlier today we had discussed the fact
12 that Mallinckrodt had a two-tier or sometimes
13 three-tier structure in identifying suspicious orders;
14 correct?
15    A.  Correct.
16    Q.  And in all of the documents that we just
17 looked at and all the policies, the definition of a
18 peculiar order -- or excuse me -- the tier system in
19 identifying a suspicious order included an initial
20 determination of whether or not an order was peculiar;
21 correct?
22    A.  Correct.
23    Q.  And at some point in time Mallinckrodt
24 moved to a definition -- or strike that.

Page 183

1        At some point in time Mallinckrodt removed
2  the definition of a peculiar order for purposes of
3  identifying a suspicious order; is that accurate?
4        MR. O'CONNOR:  Objection to form.
5     A.  I'm not aware of that.
6  BY MR. KO:
7     Q.  You have no recollection of whether or not
8  Mallinckrodt had moved to a definition of an unusual
9  order for purposes of identifying a suspicious order?
10    A.  I'm sorry.  Yes.
11    Q.  And that occurred in generally the late
12 2011, early 2012 time period; correct?
13    A.  Yes.
14    Q.  And this particular document -- it's not
15 in the same format as all those other policies, but
16 it's titled modifications to procedures for
17 identification and review of unusual orders.  Correct?
18    A.  Yes.
19    Q.  And it appears to be dated December 8th,
20 2011?
21    A.  Yes.
22    Q.  And there's a description -- we don't need
23 to go over in detail, but there's a description of how
24 the then-existing algorithm worked for identifying

Page 184

1  suspicious orders.  Is that fair to say?
2     A.  Yes.
3     Q.  And the change -- is it accurate to say
4  that this document reflects a description of how
5  Mallinckrodt is moving from a peculiar order
6  classification or system to an unusual order system?
7        MR. O'CONNOR:  Objection to form.
8     A.  Yes.
9  BY MR. KO:
10    Q.  And in this document, there's an
11 indication that, quote, target date for go live for the
12 unusual order detection system is March 1st, 2012.
13       Did I read that correctly?
14    A.  Yes.
15    Q.  Do you have any reason to dispute that the
16 unusual order detection system was in fact implemented
17 at some point in early 2012?
18    A.  I think that's accurate.
19    Q.  And can you explain to the court what the
20 difference is between -- or can you explain to the
21 court why there was a change made to the unusual order
22 system?
23       MR. O'CONNOR:  Objection to form.
24    A.  No.

Page 185

1  BY MR. KO:
2     Q.  You don't have an understanding of why
3  Mallinckrodt changed from a peculiar order system to an
4  unusual system?
5        MR. O'CONNOR:  Objection to form.
6     A.  I believe them to be synonymous.
7  BY MR. KO:
8     Q.  So was this just a matter of changing
9  terminology?
10       MR. O'CONNOR:  Objection to form.
11    A.  That's my understanding.
12 BY MR. KO:
13    Q.  And here there's a reference made I
14 believe for the first time to the three-tier system
15 that you were alluding to earlier.  Do you see
16 reference to that?
17    A.  I do.
18    Q.  And can you describe what those three
19 tiers were?
20    A.  Tier 1 was the big three distributors plus
21 H.D. Smith, oxycodone 15s, and oxycodone 30s.
22       Tier 2 were the other distributors and all
23 their products plus the big three and H.D. Smith's
24 other products.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 And then Tier 3 were new SKUs outside of
2 those products, and that was used for a short time and
3 then incorporated into the other two tiers.
4 Q. Okay. And approximately how long was this
5 three-tier system utilized?
6 A. I believe approximately three to six
7 months, maybe.
8 Q. In the 2012 time period?
9 A. Yes.
10 Q. And turning back to this document, there
11 actually is a reference made underneath the general
12 section we were just looking at about the tiers. Do
13 you see that -- Tier 1?
14 A. Yes.
15 Q. And then there's Tier 2 and 3 later on?
16 A. Could have read this. Right --
17 Q. In Tier 1 -- and I appreciate the response
18 that you gave, but Tier 1 seems to reflect what you had
19 just described; correct?
20 A. Yes.
21 Q. In other words, Mallinckrodt was trying to
22 design an SOM program that would focus on oxy 15s and
23 oxy 30s; correct?
24 A. Correct.

Page 187

1 MR. O'CONNOR: Objection to form.
2 A. Correct.
3 BY MR. KO:
4 Q. And in particular -- strike that.
5 In addition, Mallinckrodt was also trying
6 to design an SOM program that was specifically focused
7 on ABC, Cardinal, McKesson, and H.D. Smith; correct?
8 MR. O'CONNOR: Objection to form.
9 A. Yes.
10 BY MR. KO:
11 Q. And earlier you had said the big three
12 plus H.D. Smith. These are the four distributors that
13 were customers of Mallinckrodt that it was focusing on
14 for purposes of its SOM program at this time; correct?
15 A. Correct.
16 MR. O'CONNOR: Objection to form.
17 BY MR. KO:
18 Q. And in your description that you gave a
19 moment ago regarding Tiers 2 and 3, that seems to be a
20 little different than what's referred to in this
21 particular document.
22 A. Okay.
23 Q. And here -- in particular, this document
24 indicates that Tier 2 is, quote, an enhanced standard

Page 188

1 algorithm designed to restrict increases over time that
2 will apply to orders from all other customers of SKUs
3 identified by DEA as particularly subject to diversion
4 and abuse.
5 Did I read that correctly?
6 A. Yes.
7 Q. Do you know whether or not that particular
8 tier was ever utilized in connection with
9 Mallinckrodt's SOM program?
10 A. I mean, the tier continues right on the
11 second page. So if I could just --
12 Q. Fair enough. And take your time to read
13 that. I'll let you review that.
14 A. All right, thanks. Okay. So can you
15 repeat your question now?
16 Q. Sure. Was the description contained in
17 this particular exhibit regarding Tier 2 ever utilized
18 or memorialized in a Mallinckrodt SOM policy?
19 MR. O'CONNOR: Objection to form.
20 A. I believe, yes.
21 BY MR. KO:
22 Q. And approximately when was that?
23 A. The same time frame.
24 Q. And was it --

Page 189

1 A. Oh. December 2011. Yeah, so again, the
2 date on this is December 2011, and my understanding is
3 that this procedure went into play in March of 2012.
4 Q. And in fact, the procedure outlined here
5 with respect to Tier 2 and Tier 3 -- is it your
6 testimony that those tiers were in fact utilized as of
7 March of 2012?
8 A. Yes.
9 Q. You can set that document aside. I'm
10 going to hand you what's just been marked as Gillies
11 Exhibit 20.
12 [Exhibit Mallinckrodt-Gillies-020
13 marked for identification.]
14 Q. And this document ends in Bates 2357607,
15 and it is titled identification and an investigation of
16 unusual orders of controlled substances and reports of
17 suspicious orders of controlled substances. Do you see
18 that?
19 A. Yes.
20 Q. There's no date on this particular
21 document, but there is a reference in the top
22 right-hand corner that says that it's new. Do you see
23 that?
24 A. I do.

Page 190

1    Q.   And I know you said earlier that you've
2 reviewed some SOM policies in preparation for this
3 deposition.
4         Do you recall reviewing this SOM policy?
5    A.   I believe I did.
6    Q.   And is this the policy -- so a moment ago
7 we were talking about the unusual order system, the
8 target date for that system to go live as of March of
9 2012.
10        Does this particular policy reflect the
11 new revised system that Mallinckrodt implemented at
12 that time?
13        MR. O'CONNOR:  Objection to form.
14   A.   I believe it did.
15 BY MR. KO:
16   Q.   And in this particular document there are
17 definitions made to unusual order and suspicious order.
18 Do you see that?
19   A.   Yes.
20   Q.   And similar to some of the prior policies
21 that we were discussing earlier today that first
22 determined whether an order was peculiar and then
23 subsequently analyzed for whether or not the order was
24 suspicious, here we have a multitiered approach as well

Page 191

1 that distinguishes between an unusual order and a
2 suspicious order; correct?
3        MR. O'CONNOR:  Objection to form.
4    A.   Yes.
5 BY MR. KO:
6    Q.   And an unusual order is one -- well, let
7 me read it so that the record is clear.
8         An unusual order.  An order received by
9 Mallinckrodt directly from a customer for a Schedule II
10 through V controlled substance product which exceeds
11 the internal limit set by the application of the
12 three-tiered system of specifically-created algorithms
13 defined in this policy.
14        Did I read that correctly?
15   A.   Yes.
16   Q.   And that three-tiered system is defined
17 later on in 4.3 through 4.5 of the definitions,
18 correct, on the first page?
19   A.   Oh.  Okay.  Yes.
20   Q.   So in other words, if through analysis of
21 Tiers 1 through 3 an order is triggered as being
22 unusual, it would warrant further investigation to
23 determine whether or not an order was suspicious
24 sufficient to notify the DEA; correct?

Page 192

1    A.   That's my understanding.
2    Q.   We can set that one aside.  I'm going to
3 hand you now a copy of what will be marked as Gillies
4 Exhibit 21, which is a cover e-mail from Eileen to
5 Karen Harper dated September 20th, 2012, together with
6 an attachment that begins on Bates 7728782.
7        [Exhibit Mallinckrodt-Gillies-021
8        marked for identification.]
9    Q.   So before -- we can look at the cover
10 e-mail in a moment, but looking at the policy itself,
11 this appears to be another written policy of
12 Mallinckrodt's SOM program; is that correct?
13   A.   Yes.
14   Q.   And there's no date, similar to the one we
15 just looked at, but the cover e-mail for this
16 particular attachment is from September of 2012;
17 correct?
18   A.   Yes.
19   Q.   So in September of 2012 Mallinckrodt is
20 making revisions to its SOM policy; correct?
21   A.   Correct.
22   Q.   And in the definitions section, there
23 is -- you see that there is a reference to Tiers 1 and
24 2 but not Tier 3?

Page 193

1    A.   Correct.
2    Q.   And so earlier when we had discussed the
3 period of time in which there was a three-tiered
4 structure and it moved back to a two-tiered structure,
5 is it your recollection that by September of 2012
6 Mallinckrodt had a two-tiered structure to identify
7 whether an order was unusual?
8    A.   Yes.
9    Q.   And so is it fair to say from March of
10 2012 through September of 2012, Mallinckrodt utilized a
11 three-tiered structure to analyze whether an order was
12 unusual?
13   A.   Yes.
14   Q.   And after moving back to two tiers to
15 define an unusual order, has there been any point in
16 time from 2012 to present in which Mallinckrodt
17 utilized anything other than a two-tiered structure to
18 determine whether or not an order was unusual?
19        MR. O'CONNOR:  Objection to form.
20   A.   Not that I'm aware of.
21 BY MR. KO:
22   Q.   And if we examine the -- this particular
23 draft, there is no reference made to suspicious order.
24 Do you see that?


Page 194

1      A.   Well, I mean, under 4.1 it says unusual
2  orders will be reported to DEA upon discovery as
3  suspicious orders in accordance with the CFR.
4      Q.   Okay.  Fair enough.  I guess I meant to
5  say in the prior version there was a clear definition
6  of an unusual order and a clear definition of
7  suspicious order; correct?
8      A.   Okay.  Yes.
9      Q.   And in this version the definition for
10  suspicious order is removed; correct?
11          MR. O'CONNOR:  Objection to form.
12      A.   Correct.  I do not see that definition.
13  BY MR. KO:
14      Q.   And in the two-tiered system that now
15  comprises the unusual orders algorithm, do you have an
16  understanding of why that change was made from three
17  tiers back down to two?
18      A.   It was my understanding that the third
19  tier was incorporated into the Tier 2.
20      Q.   And so in other words -- well, how was it
21  incorporated?
22      A.   It's my understanding that there were few,
23  if any, that fell into that Tier 3 category, and that
24  if it were to -- if that category or that instance were

Page 195

1  to happen, it would now be picked up by Tier 2.
2      Q.   I see.  And so when you say that there
3  were few, if any, that fell into the Tier 3 category,
4  that was the Tier 3 category that was in existence from
5  March of 2012 through September of 2012?
6      A.   That's right.  So this would have been an
7  enhancement to that based on the experience over the
8  previous six months.
9      Q.   And with respect to Tier 2, the standard
10  algorithm is referenced as follows.  ▨ the average
11  number of orders of a product during the previous 18
12  months by the customer, and, B, ▨ the average volume
13  of product ordered during the previous 18 months by the
14  customer.
15          Did I read that correctly?
16      A.   Yes.
17      Q.   And so what's different about this
18  particular algorithm is that there's an increase in the
19  time period; is that correct?
20      A.   Yes.
21      Q.   From 12 months to 18 months?
22      A.   Correct.
23      Q.   And there's -- what I want to understand
24  and make sure I have correct is that there's reference

Page 196

1  made to both the average number of orders and the
2  average number of volume.  Do you see that?
3      A.   Yes.
4      Q.   So in order to trigger this algorithm
5  referenced in Tier 2, did the order have to be both
6  ▨▨▨▨▨ the average number of orders and ▨▨
7  ▨ the average of volume in order to trigger the
8  unusual orders algorithm set forth in this policy?
9          MR. O'CONNOR:  Objection to form.
10      A.   So the way I read 4.3, yes.
11  BY MR. KO:
12      Q.   And prior -- it's fair to say that prior
13  to two thousand -- September of 2012, Mallinckrodt did
14  not utilize or did not investigate into the total
15  average volume of a product that was ordered during a
16  prior time period?
17          MR. O'CONNOR:  Objection to form.
18      A.   I'm not aware of that.
19  BY MR. KO:
20      Q.   Did you ever see reference to any written
21  SOM policy prior to September of 2012 that incorporated
22  historical overview of the average volume of a product
23  ordered by a particular customer?
24          MR. O'CONNOR:  Objection to form.

Page 197

1      A.   Not that I can recall.
2  BY MR. KO:
3      Q.   And in this document, the Tier 1 sets
4  forth a tier devoted to oxy 15s and oxy 30s by certain
5  distributors; correct?
6      A.   Yes.
7      Q.   And --
8      A.   Similar to the previous.
9      Q.   Right.  And there was -- well, explain to
10  the court why it was important for Mallinckrodt to
11  focus on oxy 15s and oxy 30s and set that apart for
12  purposes of its SOM policy.
13          MR. O'CONNOR:  Objection to form.
14      A.   These were our largest customers.
15  BY MR. KO:
16      Q.   And by largest customers you mean ABC,
17  McKesson, Cardinal, and H.D. Smith?
18      A.   Yes.
19      Q.   And what about with respect to oxy 15s and
20  oxy 30s?  Were -- was that the primary -- or did those
21  prescription opioids reflect the majority of drugs
22  manufactured by Mallinckrodt during this time?
23      A.   I don't know that to be the case.
24      Q.   Is it accurate to state that following the

Page 198

1 August 2011 meeting that we had discussed before with
2 the DEA, the DEA was particularly concerned about
3 diversion of oxy 15s and oxy 30s of -- manufactured by
4 Mallinckrodt; correct?
5 　　　　MR. O'CONNOR:　Objection to form.
6 　　A.　I don't know that that characterizes the
7 meeting accurately.　From my recollection, they were
8 telling us that they were concerned about oxy 15s and
9 oxy 30s, and I don't know that they qualified it saying
10 that it was just Mallinckrodt oxy 15s or 30s.
11 BY MR. KO:
12 　　Q.　Fair enough.　Mallinckrodt manufactures
13 oxy 15s and oxy 30s; correct?
14 　　A.　That's correct.
15 　　Q.　And Mallinckrodt has been manufacturing
16 those products for -- since at least the mid-2000s;
17 correct?
18 　　A.　That's my understanding.
19 　　Q.　And when you said a moment ago that --
20 when you were talking about your recollection of what
21 the DEA said, that was through your review of
22 documents; correct?
23 　　A.　Correct.
24 　　Q.　In other words, I mean, you weren't at the

Page 199

1 meeting?
2 　　A.　I was not.
3 　　Q.　That predates your --
4 　　A.　It does.
5 　　Q.　-- employment with Mallinckrodt; correct?
6 　　A.　Correct.
7 　　Q.　And so going back to this document, there
8 is obviously a specific reference made to oxy 15s and
9 oxy 30s; correct?
10 　　A.　Yes.
11 　　Q.　And so why was it the case that
12 Mallinckrodt had designated a specific tier in its SOM
13 policy for oxy 15s and oxy 30s?
14 　　A.　As we had previously in the policies, I
15 believe it came from the discussion with DEA.
16 　　Q.　So as a result of DEA's -- is it fair to
17 say as a result of DEA's increased scrutiny on oxy 15s
18 and oxy 30s, Mallinckrodt decided to designate those
19 particular drugs as part of its SOM written policy?
20 　　　　MR. O'CONNOR:　Objection to form.
21 　　A.　As a separate tier, yes.
22 BY MR. KO:
23 　　Q.　And this particular document indicates
24 that, quote, these products have been identified by DEA

Page 200

1 as particularly subject to diversion and abuse, end
2 quote.
3 　　　　Did I read that correctly?
4 　　A.　Yes.
5 　　Q.　Were there any other drugs that the --
6 prior to 2012 that the DEA had informed Mallinckrodt of
7 being subject to diversion and abuse?
8 　　　　MR. O'CONNOR:　Objection to form.
9 　　A.　Not that I'm aware of.
10 BY MR. KO:
11 　　Q.　Do you know whether or not the DEA had
12 informed Mallinckrodt that the methadone that it was
13 manufacturing was subject to diversion and abuse?
14 　　　　MR. O'CONNOR:　Objection to form.
15 　　A.　No.
16 BY MR. KO:
17 　　Q.　You have no knowledge of that, or you
18 believe --
19 　　A.　I'm not aware of that.
20 　　Q.　You're not aware of that?　Okay.　In
21 addition to oxy 15s and oxy 30s, Mallinckrodt
22 manufactured other prescription opioids; correct?
23 　　A.　Correct.
24 　　Q.　Including from the hydrocodone and

Page 201

1 hydromorphone molecules?
2 　　A.　Yes.
3 　　Q.　And do you recall prior to 2012 whether or
4 not the DEA had any communications with Mallinckrodt
5 regarding whether or not these products were subject to
6 diversion and abuse?
7 　　A.　No.
8 　　Q.　No, you don't have any recollection of
9 those communications?
10 　　A.　I do not.　Yes.
11 　　Q.　But you don't know whether or not they
12 happened one way or the other?
13 　　A.　I have no recollection of that being
14 discussed --
15 　　Q.　Got it.
16 　　A.　-- prior to this time frame.
17 　　Q.　And what about following September 2012?
18 Did Mallinckrodt have any discussions with DEA
19 regarding the diversion and abuse potential of any
20 hydrocodone or hydromorphone products?
21 　　A.　I became aware of that.
22 　　Q.　During what time period?
23 　　A.　Post-September 2012 time frame.
24 　　Q.　And when approximately?

Page 202

1    A.   Sometime after September of 2012.  So
2 October, November time frame.  Late 2012.
3    Q.   So shortly after?
4    A.   Shortly after.  Yeah.
5    Q.   I see.  So fair to say that in the fall of
6 2012, Mallinckrodt communicated with the DEA regarding
7 the diversion and abuse potential of its hydrocodone
8 and hydromorphone products?
9    A.   Again, not -- it wasn't Mallinckrodt.  It
10 was just you need to start looking at hydrocodone too.
11        So they didn't say we have a problem with
12 Mallinckrodt hydrocodone; it's we're seeing a problem
13 with hydrocodone now too.
14    Q.   I understand.
15    A.   Okay.  I just want to make sure I'm
16 understanding your question, because --
17    Q.   Sure.  And that's a fair clarification of
18 the record.
19    A.   Okay.
20    Q.   Mallinckrodt did in fact manufacture
21 certain hydrocodone and hydromorphone products;
22 correct?
23    A.   Correct.
24    Q.   And it's your testimony today -- is it an

Page 203

1 accurate reflection of your testimony that Mallinckrodt
2 communicated with the DEA regarding the abuse and
3 diversion potential of hydrocodone and hydromorphone
4 products in general?
5    A.   Yes.
6    Q.   You can set that one aside.
7        And by the way, with respect to
8 hydrocodone and hydromorphone, did those discussions
9 about the abuse and diversion potential of those
10 products -- how long did they last?
11        MR. O'CONNOR:  Objection to form.
12    A.   I don't know what you mean by the timing
13 of that.  You mean like a five-minute meeting or over a
14 certain amount of time?
15 BY MR. KO:
16    Q.   Yeah.
17    A.   So I'm sorry.
18    Q.   Fair enough.  Did you -- when you began
19 having discussions with the DEA about the hydro --
20 about the abuse and diversion potential of
21 hydromorphone and hydrocodone, how -- do you recall how
22 many meetings with the DEA Mallinckrodt had on this
23 topic?
24    A.   Several, at least.

Page 204

1    Q.   And do you recall for what time period
2 these discussions covered?
3    A.   So my recollection is late 2012 into early
4 2013.
5    Q.   And do you recall any discussions with the
6 DEA regarding the abuse and diversion potential of
7 hydrocodone and hydromorphone following early 2013?
8    A.   I have no recollection of any specific
9 discussions on that.
10    Q.   Here is a copy of what's going to be
11 marked as Gillies Exhibit 22.
12        [Exhibit Mallinckrodt-Gillies-022
13        marked for identification.]
14    Q.   And for the record, this document ends in
15 Bates 7476261, and it is entitled identification
16 investigation reports of controlled substances
17 suspicious orders, effective date October 18th, 2012.
18        Do you recall reviewing this document in
19 preparation for this deposition today?
20    A.   No.
21    Q.   For this particular -- let me take a step
22 back.
23        Did you review any written policies
24 regarding Mallinckrodt's SOM procedure in preparation

Page 205

1 for your deposition today?
2    A.   I believe I did.
3    Q.   Which ones?
4        MR. O'CONNOR:  I'm going to object.
5 Again, we're not going to get into the specific
6 selection of documents on the basis of work product and
7 attorney-client privilege.
8 BY MR. KO:
9    Q.   Did review of those documents help refresh
10 your recollection at all as to Mallinckrodt's SOM
11 policies over time?
12        MR. O'CONNOR:  Objection to form.
13 Objection to the extent you're asking him to confirm
14 which documents.
15 BY MR. KO:
16    Q.   And I'm not.  I'm simply asking whether or
17 not review of certain SOM written policies that you
18 claim you have reviewed help refresh your recollection
19 regarding SO -- Mallinckrodt's SOM system.
20    A.   Yes.
21    Q.   And which specific documents did you
22 review?
23        MR. O'CONNOR:  Again, same objection.
24 Instruct the witness not to answer.

Page 206

1    MR. KO: Okay. Well, and I'll note for
2  the record that that's an improper instruction, because
3  anything that refresh the witness's recollection in
4  terms of preparing for this deposition certainly is not
5  subject to the privilege.
6    MR. O'CONNOR: We can address that issue
7  later.
8  BY MR. KO:
9    Q.  So just so the record is clear, Mr.
10 Gillies, you did review specific written policies
11 regarding Mallinckrodt's SOM program; correct?
12   A.  Yes.
13   Q.  And do you recall approximately how many
14 you reviewed?
15   A.  I do not.
16   Q.  Was it more than five?
17   A.  No.
18   Q.  So you reviewed -- was it more than three?
19   A.  I don't know how many I did, but I don't
20 believe it was more than five.
21   Q.  And for what time period did those
22 policies span?
23   A.  Yeah. I don't recall.
24   Q.  But you reviewed no more than five written

Page 207

1  policies for a time period you don't recall, is that
2  accurate, in connection with preparing for this
3  deposition?
4    A.  Correct.
5    Q.  And you don't recall reviewing -- as we
6  discussed earlier, you don't recall reviewing this
7  particular one; correct?
8    A.  During my preparation for this deposition?
9    Q.  Yes.
10   A.  No.
11   Q.  How about outside of the preparation for
12 the deposition, do you recall ever seeing any
13 Mallinckrodt written SOM policies?
14   A.  Yes.
15   Q.  Which ones?
16   A.  I recall this one.
17   Q.  You do recall reviewing this one, then,
18 but not --
19   A.  But now I got the clarification, it wasn't
20 for this purpose.
21   Q.  And you recall --
22   A.  And I was employed by Mallinckrodt at this
23 time.
24   Q.  Okay. We'll get -- that segues into a few

Page 208

1  of the questions that I want to ask about this.
2    This is -- this document reflects that you
3  are part of the SOM leadership team; correct?
4    A.  Yes.
5    Q.  And was this the first document that you
6  became -- or the first SOM policy that you became
7  involved in after you joined Mallinckrodt?
8    MR. O'CONNOR: Objection to form.
9    A.  I don't think so.
10 BY MR. KO:
11   Q.  So prior to this date you had reviewed
12 some other drafts or policies; correct?
13   A.  Yes.
14   Q.  And for this particular version of the SOM
15 policy, there is a definition of suspicious order. Do
16 you see that -- in 4.1?
17   A.  Yes.
18   Q.  And there's no -- the definition of an
19 unusual order is removed; correct?
20   A.  Yes.
21   MR. O'CONNOR: Objection to form.
22 BY MR. KO:
23   Q.  But regardless of the names of the
24 definition, the two-tiered structure for determining

Page 209

1  whether or not an order may potentially be suspicious
2  remains the same from the prior version we looked at;
3  correct?
4    A.  Yes.
5    Q.  And going back to the SOM leadership team,
6  we see that it's comprised of Don Lohman, you, John
7  Gillies, Gail Tetzlaff, who you believe referred to
8  before, and Karen Harper.
9    A.  Correct.
10   Q.  Do you see that?
11   A.  Uh-huh.
12   Q.  Was that the same leadership structure
13 that was in place when you joined Mallinckrodt in June
14 of 2012?
15   MR. O'CONNOR: Objection to form.
16   A.  Yes.
17 BY MR. KO:
18   Q.  And I believe you -- again, you referred
19 to Gail before, and you referred to the SOM leadership
20 team, but I want to understand clearly whether or not
21 this -- well, strike that.
22   Since 2012 to present, has the composition
23 of the SOM leadership team changed at all?
24   A.  Yes.



Page 210

1  Q.  In what way has it changed?

2  A.  I believe we have an additional member or

3  two to the leadership team.

4  Q.  And who are they?

5  A.  I believe Jason Tilly is part of the

6  leadership team, and I believe there's one other party.

7  But I -- sorry.  I can't remember their name.

8  Q.  Okay.  Fair enough.  And do you recall

9  when Mr. Tilly was added to the SOM leadership team?

10  A.  I don't recall the time frame.

11  Q.  And how about the other individual who you

12  don't recall?  Do you have any understanding of when

13  she or he was added to the team?

14  A.  I believe we added another member sometime

15  in late 2018.

16  Q.  So recently?

17  A.  Recently.  Uh-huh.

18  Q.  So fair to say from 2012 through 2018 the

19  composition of the SOM leadership team were the four

20  individuals listed here and Mr. Tilly at some point?

21  MR. O'CONNOR:  Object to form.

22  A.  Yes.

23  BY MR. KO:

24  Q.  You can set that aside.  I'm now going to

Page 211

1  hand you a copy of what will be marked as -- or what

2  has been marked as Gillies Exhibit 23.

3  [Exhibit Mallinckrodt-Gillies-023

4  marked for identification.]

5  Q.  For the record, this ends in Bates

6  5620500.

7  And this is a document titled

8  identification, investigation, and reports of

9  controlled substances suspicious orders, effective date

10  November 1st, 2012.  Do you see that?

11  A.  Yes.

12  Q.  And it appears to supersede the prior

13  version that we just looked at from October 18th, 2012?

14  A.  Yes.

15  Q.  And I just have a quick question on this

16  document.

17  A.  Uh-huh.

18  Q.  Here in Tier 2, there's an adjustment made

19  to the algorithm.  Is that accurate?

20  A.  Yes.

21  Q.  And the specific adjustment that is made

22  is from -- down from ▇▇▇ to ▇▇▇▇▇▇▇▇ of the

23  previous 18-month average number of orders in volume;

24  correct?

Page 212

1  A.  Correct.

2  Q.  And why was this change made?

3  A.  An enhancement to the program.  So we had

4  the ▇▇ at one point, then we had the ▇▇, and through

5  time we enhanced the program again, and it's always

6  undergoing review, and at this point a change was made

7  to ▇▇

8  Q.  And it's my understanding that the -- is

9  it the case that the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

10  ▇▇▇▇▇▇▇▇▇▇▇ order in volume is the current system

11  in place as well?

12  A.  That's correct.

13  Q.  So is it accurate to say that from

14  November 2012 to present the algorithm to detect

15  suspicious order has not changed?

16  MR. O'CONNOR:  Objection to form.

17  A.  That's my understanding.

18  BY MR. KO:

19  Q.  And just so the record is clear, the -- in

20  this particular document, the special attention on oxy

21  15s and 30s distributed by Mallinckrodt's major

22  customers remains to be in the policy; correct?

23  A.  Correct.

24  Q.  And in the current iteration of the SOM

Page 213

1  policy, does that Tier 1 still exist?

2  A.  In this policy?

3  Q.  I'm sorry.

4  A.  I'm sorry.

5  Q.  Yeah, I'm sorry if I confused you.  In the

6  current iteration of Mallinckrodt's SOM policy today,

7  is there still special attention given to oxy 15s and

8  oxy 30s?

9  MR. O'CONNOR:  Objection to form.

10  A.  Yes.

11  BY MR. KO:

12  Q.  And is there still special attention given

13  to oxy 15s and 30s distributed by ABC, McKesson,

14  Cardinal, and H.D. Smith?

15  MR. O'CONNOR:  Objection to form.

16  A.  Yes.

17  BY MR. KO:

18  Q.  Okay.  Thank you.  You can set that aside.

19  MR. O'CONNOR:  Should we take a break?

20  MR. KO:  Yeah, sure.

21  THE VIDEOGRAPHER:  We are going off the

22  record at 2:46 PM.

23  [A brief recess was taken.]

24  THE VIDEOGRAPHER:  We are back on the

Page 214

1 record at 3:06 PM.
2 BY MR. KO:
3    Q.   Welcome back from the break.  This is the
4 home stretch, at least with respect to my questioning,
5 Mr. Gillies, so thank you for your patience today.
6    A.   Yes.
7    Q.   I'm going to hand you -- or you have in
8 front of you a copy of what's been marked as Gillies
9 Exhibit --
10    MS. GAFFNEY:  24.
11 BY MR. KO:
12    Q.   -- 24.  And for the record, this document
13 ends in Bates 511246, and it is titled identification,
14 investigation, and reports of controlled substances
15 suspicious orders, and the effective date is August
16 17th, 2015, in the top right-hand corner.
17    Do you see that, Mr. Gillies?
18    [Exhibit Mallinckrodt-Gillies-024
19    marked for identification.]
20    A.   Yes.
21    Q.   Did you review this particular policy in
22 preparation for your deposition today?
23    A.   No.
24    Q.   And this particular document seems to

Page 215

1 indicate that it's superseding a prior version dated
2 March 7th, 2013.  Do you see that?
3    A.   Yes.
4    Q.   Do you recall whether or not you reviewed
5 the March 7th, 2013, SOM policy?
6    A.   I don't recall as we sit here.
7    Q.   And do you know whether or not
8 Mallinckrodt's current SOM policy is -- well, strike
9 that.
10    Do you have any understanding of whether
11 or not this version that we're looking at is
12 Mallinckrodt's current SOM written policy?
13    A.   I do not.
14    Q.   Do you know -- have you seen recently
15 Mallinckrodt's written SOM policy?
16    A.   I believe I've seen one more recent than
17 this.
18    Q.   And do you know what approximate effective
19 date that particular document has?
20    A.   I do not.
21    Q.   But it's your understanding that there may
22 be one that postdates August 17th, 2015; is that
23 correct?
24    A.   I believe there is.

Page 216

1    Q.   And no more than that additional one;
2 correct?
3    In other words, have you seen -- outside
4 of the document that postdates August 17th, 2015, have
5 you seen any other additional SOM written policies
6 other than that version?
7    MR. O'CONNOR:  Objection to form.
8    A.   My recollection is that there might be two
9 after this.
10 BY MR. KO:
11    Q.   But you don't have an understanding of
12 when those effective -- when the effective dates of
13 those written policies were; correct?
14    A.   That's correct.
15    Q.   Now, turning to this particular document,
16 I just have a few questions on this.
17    A.   Yes.
18    Q.   Here we have an identification of who is
19 on the SOM team but not any names.  Do you see that in
20 Section 4.5?
21    A.   I do.
22    Q.   And there is also an indication of a
23 senior data analyst being part of the team.
24    A.   Yes.

Page 217

1    Q.   You see that?  And does that refresh your
2 recollection at all that there were, in addition to Mr.
3 Tilly and perhaps the other individual who you don't
4 recall was added in 2018, does that refresh your
5 recollection as to an additional member of the SOM team
6 as of 2015?
7    A.   Yes.
8    Q.   And who was this particular individual?
9    A.   Jen Buist.
10    Q.   And she currently is still with
11 Mallinckrodt; correct?
12    A.   No.
13    Q.   Did she recently leave Mallinckrodt?
14    A.   No.
15    Q.   When did she leave Mallinckrodt?
16    A.   Several years ago.
17    Q.   Do you have an approximate time -- do you
18 have a general understanding of the approximate time
19 period in which she left?
20    A.   2015 is my recollection.
21    Q.   So maybe around the time of this --
22 effective date of this document?
23    MR. O'CONNOR:  Objection to form.
24    A.   I don't know the exact time.

Page 218

BY MR. KO:

1 Q. Fair enough. Who took over or who was
Jennifer's predecessor?

A. I don't know that she had had a
predecessor, and I don't know that this position --
that this position exists. So --

Q. In other words, you don't know if -- prior
to Jennifer being the SOM data analyst and being on the
SOM leadership team, that position was not in existence
at Mallinckrodt? Is that your testimony?

MR. O'CONNOR: Objection to form.

A. I'm sorry. Your question is confusing me,
because you said the predecessor, right, to Jen? I'm
sorry. Go ahead.

BY MR. KO:

Q. Yeah. No, and I can see I was confusing
because I was initially going to ask who took over for
Jen, but I also wanted to get an understanding --

A. Okay.

Q. -- of who was in place, if anyone, before
Jen.

A. Yeah.

Q. So I apologize. So the record is clear,
was there a senior data analyst for the SOM program

Page 219

prior to Jennifer?

A. So -- I don't believe so, but Jen's time
goes back to 2011.

Q. And what were Jennifer's roles and
responsibilities as a senior data analyst for the SOM
team?

A. She reviewed the peculiar, unusual reports
that were produced twice a day. She was one of the
analysts that reviewed those.

Q. And the purpose of her review was to
determine whether or not the peculiar or unusual order
would be suspicious sufficient to notify the DEA;
correct?

A. Correct.

Q. And after Jennifer left in the 2015 time
period, who took over for her as a senior data analyst?

A. I think that position went away and a new
position was created.

Q. I see. And what was that new position?

A. I don't recall what the new position is.

Q. Does that new position currently exist as
part of the SOM leadership team that you're a part of?

A. Part of the SOM team. I don't believe
part of the leadership team.

Page 220

Q. Got it. And who is that individual that
plays the role of the new position that you don't
recall the title of?

A. Yes. It's a -- I believe I identified her
earlier today, but I only recall her first name.
Rochelle.

Q. I see. And generally speaking, what are
her responsibilities?

A. One of her responsibilities is going to be
reviewing any chargeback data that we may have on
pharmacies of concern, doing some record reviews, and
there's other things in her job description, but I
don't recall them all, so -- but she is part of the SOM
team.

Q. With respect to the chargebacks, what is
your understanding of what the chargeback data
consisted of or consists of today?

MR. O'CONNOR: Objection to form and
scope.

A. It would be pharmacy, name, distributor
that distributes to the pharmacy, and what Mallinckrodt
product is involved in the chargeback.

BY MR. KO:

Q. Is it accurate to also say that the

Page 221

chargeback data reveals a -- the pharmacy or clinic
that purchases the Mallinckrodt controlled substance or
Mallinckrodt pharmaceutical from a distributor?

MR. O'CONNOR: Objection to form.

A. Yes.

BY MR. KO:

Q. And Mallinckrodt is currently utilizing
that chargeback data in connection with its SOM
program; correct?

A. Correct.

Q. And Mallinckrodt has in the past utilized
the chargeback data in connection with its SOM program;
correct?

A. Correct.

Q. And I believe Mallinckrodt began utilizing
this information as early as 2010. Is that accurate to
state?

A. Yes.

Q. And Mallinckrodt has been paying
distributors chargeback amounts pursuant to agreements
it has with the distributors for as long as -- well,
strike that.

Do you have an understanding of when
Mallinckrodt first entered into an agreement with a

Page 222

1 distributor whereby Mallinckrodt would pay chargeback
2 amounts to its customers?
3     MR. O'CONNOR: Objection to scope.
4     A. No.
5 BY MR. KO:
6     Q. Do you have any recollection of whether
7 that was before or after 2005?
8     MR. O'CONNOR: Same objection.
9     A. No.
10 BY MR. KO:
11     Q. Turning back to this document. Here we
12 have -- I know we have talked about the difference
13 between two tiers and three tiers.
14     A. Uh-huh.
15     Q. But here we have a reference to three
16 tiers. Do you see that?
17     A. Yes.
18     Q. And I know -- so earlier you said that you
19 believe that beginning in 2012 Mallinckrodt had
20 utilized just the two-tier system; correct?
21     A. Correct.
22     Q. So does this refresh your recollection at
23 all that Mallinckrodt actually moved back to a
24 three-tier system at some point in time?

Page 223

1     A. I see it there. My recollection was we
2 were -- had two tiers, but there is a third tier listed
3 here.
4     Q. And currently as it stands now, however,
5 there is just a two-tier system; correct?
6     A. That's my understanding.
7     Q. And when did -- how long has
8 Mallinckrodt's two-tier system been in effect?
9     A. I'm sorry. I don't know. I thought it
10 was from September of 2012, so clearly there was a
11 change, according to this document.
12     Q. Sure. And so it's fair to say that as of
13 August 17th, 2015, Mallinckrodt is utilizing a
14 three-tier structure to determine whether or not an
15 order is suspicious?
16     A. That's what it says at this time.
17     Q. And with respect to the third tier,
18 there's a reference made to a monthly limit placed on a
19 customer based on customer bill-to address for a
20 particular SKU for a particular amount.
21     Did I read that correctly?
22     A. Yes.
23     Q. And as far as you understand the current
24 iteration of Mallinckrodt's SOM program, does that tier

Page 224

1 exist in any way in Mallinckrodt's SOM program today?
2     A. I don't believe it does.
3     Q. So would it be fair to say that the
4 current iteration of Mallinckrodt's SOM program
5 contains the first two tiers mentioned in this
6 document?
7     A. Yes.
8     Q. So at some point in time the third tier
9 was removed, but you don't recall when?
10     A. Correct.
11     Q. All right. You can set that one aside.
12 So your counsel just received his wish, and probably
13 yours too. That was the last policy that we're going
14 to go over today.
15     A. I can feel the air-conditioning kicking on
16 already.
17     Q. I'm going to hand you a copy of what has
18 been marked as Gillies Exhibit 25.
19     [Exhibit Mallinckrodt-Gillies-025
20     marked for identification.]
21     Q. And I just have a few quick questions
22 about this.
23     For the record, this is an e-mail dated
24 March 10th, 2009, from Wendy "Slab" to Karen Harper,

Page 225

1 ending in Bates 263874, and containing an attachment
2 that begins at 875.
3     Do you know who Wendy "Slab" is?
4     A. I don't recall who she is. And I do
5 believe you pronounce it Wendy Slaby.
6     Q. Wendy Slaby. Thank you.
7     A. Uh-huh.
8     Q. This appears to be a flowchart of how a
9 peculiar order -- or excuse me.
10     This appears to be a flowchart of how a
11 suspicious order is identified after it is identified
12 as a peculiar order. Is that fair to say?
13     A. I'm sorry. Could you say that one more
14 time?
15     Q. Yeah. It was a bad question. Let me ask
16 again.
17     Earlier we had discussed the concept of a
18 multitiered structure for which Mallinckrodt first
19 identified a particular order and then did continued
20 analysis to determine whether or not it was suspicious
21 sufficient to notify the DEA; correct?
22     A. Correct.
23     Q. And this document appears to be a
24 flowchart reflecting that process. Is that fair to

Page 226

1 say?

2    A.   Yes.

3    Q.   And you don't need to count all the boxes,

4 but there appear to be several boxes of analyses that

5 Mallinckrodt is undergoing to determine whether or not

6 the order should ship or whether or not the order

7 should be notified to the DEA.  Is that fair to say?

8    A.   Yes.

9    Q.   And the date of this e-mail attaching this

10 flowchart is from March of 2009; correct?

11    A.   Correct.

12    Q.   So at least as of the date of this e-mail,

13 this appears to be a flowchart that Mallinckrodt is

14 trying to follow to determine whether or not an order

15 is suspicious after it is identified as peculiar;

16 correct?

17    A.   Yes.

18    Q.   And just so I understand clearly, is it

19 accurate to state that this analysis only occurs after

20 an order is identified as peculiar?

21    A.   Yes.

22    Q.   So none of these factors are examined if

23 the peculiar order algorithm we've discussed before is

24 not triggered; correct?

Page 227

1    A.   Correct.

2    Q.   And with respect to some of these

3 analyses -- for example, the annotate report with

4 explanation -- do you see that?

5    A.   Yes.

6    Q.   And apparently that was supposed to be

7 done by the customer service rep manager who reviews

8 the peculiar order report.  Do you see that?

9    A.   Yes.

10    Q.   Do you have any understanding of whether

11 or not this annotated report was documented in any way?

12    A.   I have no recollection of that.

13    Q.   Do you recall ever seeing any annotated

14 reports from CSR managers during the 2008 to 2012 time

15 period?

16    A.   I do not recall that.

17    Q.   Currently do CSR managers review certain

18 orders and annotate any kind of report with an

19 explanation for why the order might be suspicious or

20 not?

21       MR. O'CONNOR:  Objection to form.

22    A.   No.

23 BY MR. KO:

24    Q.   And moving down this flowchart, there is a

Page 228

1 reference made to the filing of a peculiar order report

2 with annotation.  Do you see that?

3    A.   Yes.

4    Q.   And I believe that peculiar order

5 report -- the intention was to file that report and

6 document the reasons for why a CSR manager believed the

7 report was suspicious or not.  Is that accurate?

8       MR. O'CONNOR:  Object to form.

9    A.   No, I think the way you phrased the

10 question, my answer would be no.

11 BY MR. KO:

12    Q.   Okay.  Do you recall ever seeing any

13 peculiar order reports with annotations from customer

14 service rep managers in the 2008 or 2012 time period?

15    A.   No.

16    Q.   Have you seen any peculiar order reports

17 with annotations from any customer service represent

18 manager ever in connection with Mallinckrodt's SOM

19 policy?

20    A.   I don't recall seeing any.

21    Q.   You can actually set that document aside.

22 That's all the questions I have on that.

23       Now, earlier today we had discussed

24 Mallinckrodt's retention of Frank Sapienza and Howard

Page 229

1 Davis in connection with its CSA obligations in general

2 and its SOM obligations in particular.

3       Were there any other individuals or

4 entities that Mallinckrodt retained to assist in

5 implementing its SOM program?

6    A.   Yes.

7    Q.   And who are these individuals or which

8 entities would these be?

9    A.   I'll give you the entity, Buzzeo.

10    Q.   And so in addition to Frank Sapienza and

11 Howard Davis and the entity Buzzeo, were there any

12 other individuals or entities that Mallinckrodt

13 retained in connections with its duties to design and

14 implement a suspicious order monitoring program?

15    A.   Time frame?

16    Q.   At any time.

17    A.   Okay.  Including up to today?

18    Q.   Yes.

19    A.   I believe the answer is yes.

20    Q.   Okay.  And which other entities or

21 individuals?

22    A.   I can't recall the entity, but I believe

23 there was at least one more company that we engaged for

24 this purpose.

Page 230

1    Q.    And approximately what time period was
2  that from?
3    A.    My recollection was the 2016 time frame.
4    Q.    So fairly recently?
5    A.    Yes.
6    Q.    And do you have any -- I know you don't
7  recall the name of the entity, but do you recall what
8  they were retained to do?
9    A.    I do not, but it was another former DEA
10 official.
11   Q.    I see.  So it was an individual that was
12 retained?
13   A.    No, it was a company.
14   Q.    I see.
15   A.    Yeah.  But the individual that the company
16 dealt with was a former DEA official.
17   Q.    Got it.  And do you have any recollection
18 of what they were -- general recollection --
19   A.    I do not.
20   Q.    -- of what they were retained to do?
21   A.    No.
22   Q.    Going back to Buzzeo.  When were they
23 retained, and for approximately how long?
24       MR. O'CONNOR:  I'm going to object to --

Page 231

1  Buzzeo was retained in connection with this litigation
2  in 2018 in connection with suspicious order monitoring,
3  and so John, I'm going to instruct you not to answer
4  with respect to anything beyond the fact of the
5  engagement.
6  BY MR. KO:
7    Q.    Okay.  So can I --
8    A.    Okay.
9    Q.    Can I accept that representation then made
10 by your counsel?  Is it accurate to say that
11 Mallinckrodt retained Buzzeo in connection with this
12 litigation in 2018?
13   A.    Okay.  Yes.
14   Q.    Apart from the retention of Buzzeo for
15 purposes of this litigation in 2018, was Buzzeo
16 retained at any time prior to that by Mallinckrodt in
17 connection with its SOM responsibilities?
18   A.    Yes.
19   Q.    And when was that?
20   A.    My recollection is that we utilized them
21 as early as 2012.
22   Q.    And for what purpose?
23   A.    For SOM purposes.
24   Q.    Any specific purpose, or just generally to

Page 232

1  advise Mallinckrodt regarding its SOM obligations?
2    A.    Yes.
3    Q.    Well, let me ask again, because I don't
4  think that was a yes-or-no question.  But was -- for
5  what general purpose did Mallinckrodt retain Buzzeo
6  for?
7    A.    To assist us in our SOM efforts.
8    Q.    And was there any particular aspect of the
9  SOM efforts that Buzzeo advised Mallinckrodt on?
10   A.    Yes.
11   Q.    And what were those aspects?
12   A.    Do I have a privilege?
13       MR. O'CONNOR:  I mean, we can go off the
14 record.
15       MR. KO:  Sure.  Let's do it.  Sure.
16       MR. O'CONNOR:  Yeah.
17       MR. KO:  We'll go off the record for a
18 moment.
19       THE VIDEOGRAPHER:  We are going off the
20 record at 3:30 PM.
21       [A brief recess was taken.]
22       THE VIDEOGRAPHER:  We are back on the
23 record at 3:38 PM.
24 BY MR. KO:

Page 233

1    Q.    So the question that I had asked prior to
2  taking that short break was whether or not there was a
3  particular aspect of the SOM efforts that Buzzeo
4  advised Mallinckrodt on, and I believe you said the
5  answer was yes, and then I had asked you what aspects,
6  and so I'll repeat that question now.
7        What aspects was Buzzeo retained to advise
8  Mallinckrodt on regarding Mallinckrodt's SOM efforts?
9        MR. O'CONNOR:  And I'm going to object on
10 scope and attorney-client privilege with respect to the
11 2018 engagement through outside counsel, but you can
12 answer with respect to other engagements.
13   A.    So on the other engagements -- those were
14 not SOM engagements.
15 BY MR. KO:
16   Q.    So to be clear, in 2012, when you were
17 saying earlier that Mallinckrodt had retained Buzzeo,
18 that was not in connection with any SOM efforts?
19   A.    That's correct.  I misspoke if that's what
20 I had said.
21   Q.    And in 2012 then what -- for what purpose
22 was Buzzeo retained by Mallinckrodt for?
23       MR. O'CONNOR:  Object to scope, but you
24 can answer.

Page 234

1    A.    There were recordkeeping discussions that
2  they were providing us advice on and reviewing
3  security.
4  BY MR. KO:
5    Q.    Recordkeeping discussions regarding what
6  records?
7    A.    Records that we needed to maintain,
8  biannual inventories, records that the DEA may ask for
9  if they come and do an inspection.
10    Q.    I see.  And by security, what do you mean?
11    A.    The security practices at our Hobart
12  facility.
13    Q.    Understood.  And how long was their
14  retention during that 2012 time period?
15        MR. O'CONNOR:  Object to scope.
16    A.    My recollection is several months.
17  BY MR. KO:
18    Q.    So other than -- so now that I
19  understand -- and thank you for the clarification
20  regarding their role in 2012.
21        So other than Frank Sapienza and Howard
22  Davis and potentially this other entity that you don't
23  recall, were there any other individuals or entities
24  that Mallinckrodt retained for purposes of assisting

Page 235

1  Mallinckrodt with its SOM obligations?
2    A.    No, not that I can recall.
3    Q.    Okay.  Thank you.  Now, you're familiar
4  with -- well, you are familiar with the compensation
5  structure of certain customer service reps and national
6  account managers at Mallinckrodt; correct?
7        MR. O'CONNOR:  Object to form and scope.
8    A.    I don't recall their compensation
9  packages.
10  BY MR. KO:
11    Q.    Are you familiar with the term NAMs or
12  national account managers?
13    A.    Yes.
14    Q.    Mallinckrodt employs certain national
15  account managers; correct?
16    A.    Correct.
17    Q.    And they have responsibility with respect
18  to Mallinckrodt customers, including wholesale
19  distributors; correct?
20        MR. O'CONNOR:  Objection to scope and
21  form.
22    A.    Yes.
23  BY MR. KO:
24    Q.    And in addition to national account

Page 236

1  managers, Mallinckrodt also employs customer service
2  representatives; correct?
3    A.    Correct.
4        MR. O'CONNOR:  Same objections.
5  BY MR. KO:
6    Q.    And generally speaking, what's your
7  understanding of what customer service
8  representatives -- what function they perform?
9        MR. O'CONNOR:  Object to scope.
10    A.    So the customer service reps review every
11  order that comes in and make sure that all the
12  information is there, and --
13  BY MR. KO:
14    Q.    And when you say every order, I just want
15  to make sure I understand what you're saying when you
16  mean every order.  Is this every order ever between
17  Mallinckrodt and any customer, or are you talking about
18  every peculiar order or unusual order?  What do you
19  mean by every order?
20    A.    So --
21        MR. O'CONNOR:  Object to form.
22    A.    So the customer service reps review every
23  order.  I might not have been clear earlier.  Customer
24  service reps review every order.  The customer service

Page 237

1  managers review those peculiar orders.
2  BY MR. KO:
3    Q.    I see.  And --
4    A.    So I apologize if I misspoke earlier
5  today.  I might have used those terms synonymously when
6  you were asking me a certain question.  But the reps
7  review every order and the managers review the peculiar
8  orders.
9    Q.    Okay.  Thank you for that clarification.
10  And by every order, just so I understand clearly, you
11  are referring to every order between Mallinckrodt and
12  one of its customers, the wholesale distributor;
13  correct?
14    A.    That's correct.
15    Q.    And with respect to national account
16  managers, their compensation is tied to the amount of
17  Mallinckrodt prescription opioids they sell to
18  customers; is that accurate?
19        MR. O'CONNOR:  Objection to scope and
20  form.
21    A.    I'm sorry.  I don't know that.
22  BY MR. KO:
23    Q.    You have no understanding of how national
24  account managers are compensated?

Page 238

1    A.   No, I do not.
2         MR. O'CONNOR:  Same --
3    BY MR. KO:
4    Q.   Do you have any understanding of how
5    customer service representatives are compensated?
6         MR. O'CONNOR:  Same objection.
7    A.   I do not.
8         MR. KO:  And I'll just note for the record
9    to preserve it that I believe Mr. Gillies was supposed
10   to be prepared to testify regarding any compensation to
11   any person or committee with any responsibility for any
12   of the level of sales of controlled substances or
13   opioid products, and so I believe we were expecting
14   testimony related to your understanding of that topic,
15   and I'll note for the record that it appears that Mr.
16   Gillies is unprepared to testify on that topic.
17   BY MR. KO:
18   Q.   In addition to national account managers
19   and customer service representatives, do you know any
20   other categories of employees at Mallinckrodt who were
21   involved in the marketing and sales of Mallinckrodt's
22   prescription opioids?
23   A.   I do not.
24   Q.   Now, earlier today we had talked about the

Page 239

1    memorandum of understanding entered into between
2    Mallinckrodt and the DEA in 2017.  Do you recall that?
3    A.   Yes.
4    Q.   Were you involved at all in the
5    negotiations leading up to that memorandum of
6    understanding?
7    A.   No.
8    Q.   Do you have any understanding of when
9    Mallinckrodt first became aware that it was being
10   formally investigated by the DEA?
11   A.   September of 2011.
12   Q.   And was that pursuant to a subpoena that
13   Mallinckrodt received?
14   A.   I don't know that.
15   Q.   And a moment ago you said you weren't
16   involved at all in the negotiations leading up to the
17   memorandum of understanding.  But were you -- did you
18   have any discussions with DEA regarding their
19   investigation that led to that memorandum of
20   understanding?
21   A.   Yes.
22   Q.   And who did you have those discussions
23   with?
24   A.   Heather White, DEA Albany.

Page 240

1    Q.   In addition to Heather White, do you
2    recall anyone else at DEA you discussed DEA's
3    investigation with?
4    A.   I believe Susan Baker was part of that
5    team.
6    Q.   Was she also in the DEA Albany office?
7    A.   She was out of the DEA New York office.
8    Q.   Other than Ms. Baker or Ms. White, do you
9    recall discussing DEA's investigation of Mallinckrodt
10   that led to the memorandum of understanding with any
11   other DEA individual?
12   A.   No, and this -- sorry.  Maybe I
13   misunderstood your question.  This would have been pre
14   any negotiations on that agreement.  So there were
15   discussions about the investigation, but pre the
16   negotiations, just to make it clear.
17   Q.   I understand.
18   A.   Okay?
19   Q.   Okay.  So the record is clear then, and
20   the way I understand your testimony, is that you spoke
21   with Ms. White and Ms. Baker regarding the DEA's
22   investigation of Mallinckrodt at some point after 2011
23   but before --
24   A.   So --

Page 241

1    Q.   -- Mallinckrodt and DEA negotiated the
2    memorandum of understanding?  Is that accurate?
3    A.   To be more clear, at some time after June
4    of 2012.
5    Q.   Okay.  And when did the negotiations that
6    led up to the memorandum of understanding begin between
7    Mallinckrodt and DEA?
8    A.   My recollection is that they were ongoing
9    for I think more than a year.
10   Q.   So at some -- safe to say that the
11   negotiations regarding the memorandum of understanding
12   began at some time in 2016?
13   A.   I believe that's accurate.
14   Q.   And so your discussions with Ms. White and
15   Ms. Baker regarding DEA's investigation occurred at
16   some point between June of 2012 and before 2016?
17   A.   Correct.
18   Q.   And in connection with the investigation,
19   do you know whether -- well, strike that.
20        In your discussions with Ms. White and Ms.
21   Baker, were you ever formally interviewed or did you
22   ever sit for any kind of formal interview with the DEA?
23   A.   No.
24   Q.   Are you aware of whether or not

Page 242

1 Mallinckrodt had any interviews with any Mallinckrodt
2 employee arising out of its investigation of
3 Mallinckrodt?
4      A.   So I'm sorry.  Could you repeat that
5 question?
6      Q.   Sure.  Are you aware of whether
7 Mallinckrodt sat for any interviews -- or strike that.
8           Are you aware of whether or not the DEA
9 had any interviews with any Mallinckrodt employee
10 arising out of the DEA's investigation of Mallinckrodt?
11      A.   No.
12      Q.   And do you have knowledge of whether or
13 not that is in fact the case, or are you saying you
14 don't recall whether or not that occurred?
15      A.   I have no recollection that anybody was
16 interviewed.
17      Q.   Do you know if any Mallinckrodt employee
18 provided any statements -- sworn statements to the DEA
19 regarding Mallinckrodt's investigation?
20      A.   No.
21      Q.   Or excuse me.  Regarding the DEA's
22 investigation of Mallinckrodt?
23      A.   No.
24      Q.   And do you know -- so in addition to your

Page 243

1 communications with Ms. White and Ms. Baker, do you
2 know whether or not any other Mallinckrodt employees
3 communicated with DEA regarding its investigation of
4 Mallinckrodt?
5      A.   Yes.
6      Q.   And which individuals would those be?
7      A.   Joe Weustner and I believe Don Lohman.
8      Q.   And you said Joe --
9      A.   Weustner.
10      Q.   Joe Weustner?
11      A.   W-E-U-S-T-N-E-R.
12      Q.   And what is his job title at Mallinckrodt?
13      A.   He was a VP associate general counsel.
14      Q.   In addition to Joe and Don, do you recall
15 any other individuals who communicated with the DEA
16 regarding their investigation?
17      A.   No.
18      Q.   Do you recall whether or not Ms. Harper
19 communicated with the DEA regarding their investigation
20 of Mallinckrodt?
21      A.   I can't recall whether she was at the
22 meeting.
23      Q.   And you just referenced a meeting.  What
24 meeting are you describing?

Page 244

1      A.   The meeting with the DEA where Susan Baker
2 and Heather White were present discussing their
3 investigation.
4      Q.   I see.  And you were present at that
5 meeting as well?
6      A.   I was.
7      Q.   So in addition to Mr. Weustner, Mr.
8 Lohman, and yourself, were there any other Mallinckrodt
9 employees that were present at the meeting?
10      A.   Not that I can recall.
11      Q.   And from the DEA's side, other than Ms.
12 Baker and Ms. White, were there any other DEA officials
13 there?
14      A.   There were.
15      Q.   And who were they?
16      A.   One was their special agent in charge of
17 their New York office.  And I'm sorry, I do not recall
18 his name.  I believe there was a DEA representative
19 from Washington D.C.  I'm sorry, I do not remember his
20 name.  And I can't recall if there was any other DEA
21 personnel there.
22      Q.   And when did this meeting take place?
23      A.   I don't recall.  I'm going to say spring
24 2014.

Page 245

1      Q.   Okay.  Thank you.  That's helpful.
2 Following the -- this meeting, do you recall any other
3 meetings in which you were present with the DEA
4 regarding its investigation of Mallinckrodt?
5      A.   No.
6      Q.   And in addition to this meeting, do you
7 recall any other meetings, regardless of whether or not
8 you were involved with the DEA, regarding its
9 investigation of Mallinckrodt?
10      A.   I do not.
11      Q.   You don't recall, or you don't believe any
12 such meetings took place?
13      A.   I don't recall.
14      Q.   Now, the agreement resulted among other
15 things in a $35 million payment made by Mallinckrodt to
16 the Department of Justice; correct?
17      A.   Yes.
18      Q.   Were you involved -- or who was involved
19 in the negotiation of the monetary fine?
20           MR. O'CONNOR:  Objection to form.
21      A.   There was legal counsel involved.
22 BY MR. KO:
23      Q.   So is it your understanding that it was
24 primarily handled by Mr. Lohman and Mr. Weustner?

Page 246

1    A.   Yes.
2    Q.   Was there anyone outside of the legal
3  department or legal counsel that handled the
4  negotiations over the monetary fine that Mallinckrodt
5  paid to the DEA?
6         MR. O'CONNOR:  Objection to form.
7    A.   Within Mallinckrodt?
8  BY MR. KO:
9    Q.   Yes.
10   A.   No.
11   Q.   So you don't believe anyone outside of
12 legal counsel handled --
13   A.   I don't recall anyone else outside legal
14 counsel.
15   Q.   -- being involved in the discussions
16 about the monetary fine imposed on Mallinckrodt;
17 correct?
18   A.   Correct.
19   Q.   Now, in addition to DEA's investigation
20 which resulted in the 2017 memorandum of understanding
21 and the $35 million fine, there have been other
22 investigations by other government entities into
23 Mallinckrodt; is that fair to say?
24        MR. O'CONNOR:  Objection to form.

Page 247

1    A.   What government entities?
2  BY MR. KO:
3    Q.   Sure.  Fair enough.  Are you aware of any
4  other investigations done by any senators with respect
5  to Mallinckrodt's marketing or distribution of its
6  opioid products?
7         MR. O'CONNOR:  Object to form.
8    A.   I'm aware of a senator requesting
9  information.
10 BY MR. KO:
11   Q.   And which senator was that?
12   A.   Claire McCaskill.
13   Q.   And when was that?
14   A.   I don't recall what the time frame was.
15   Q.   And who was involved in preparing the
16 information in response to Senator McCaskill's request?
17   A.   My understanding, legal counsel.
18   Q.   And do you have any understanding of what
19 information Senator McCaskill requested of
20 Mallinckrodt?
21   A.   I do not.
22   Q.   In addition to Senator McCaskill's request
23 and the DEA's investigation which resulted in the 2017
24 memorandum of understanding, are you aware of any other

Page 248

1  investigations performed by any entity regarding
2  Mallinckrodt's manufacturing or distribution of its
3  opioid products?
4         MR. O'CONNOR:  Objection to form.
5    A.   I don't know of any.
6  BY MR. KO:
7    Q.   Were you -- was it the case that earlier
8  last year in the beginning of 2018, prosecutors from
9  the Southern District of Florida had issued grand jury
10 subpoenas to Mallinckrodt regarding its manufacturing
11 and distribution of prescription opioids?
12   A.   I'm not aware of that.
13   Q.   You're not aware of that?  Are you aware
14 of any other subpoenas issued by the Department of
15 Justice at any time regarding Mallinckrodt's marketing
16 or manufacturing of any of its generic or branded
17 opioid products?
18   A.   I am not.
19   Q.   So are you aware of any 2017 subpoena by
20 the Department of Justice regarding Mallinckrodt's
21 manufacturing and marketing of Exalgo, Xartemis, and
22 Roxicodone, among other products?
23   A.   I am not.
24   Q.   Are you aware of any civil investigative

Page 249

1  demands from any other officials -- from any officials
2  in any state in the United States regarding
3  Mallinckrodt's marketing and distribution of
4  prescription opioids?
5    A.   State authorities?  I'm not aware of any.
6    Q.   Are you aware of any civil investigative
7  demand by the State of Washington regarding
8  Mallinckrodt manufacture and distribution of its
9  prescription opioids?
10   A.   I am not.
11   Q.   Are you aware of Missouri's civil
12 investigative demand of information related to
13 Mallinckrodt's manufacture and distribution of its
14 prescription opioids?
15   A.   I am not.
16   Q.   Now, one of the -- as we discussed earlier
17 today, one of the primary responsibilities of the DEA
18 compliance group is to communicate with the DEA
19 regarding Mallinckrodt's annual quota request.  Is that
20 accurate?
21   A.   Yes.
22   Q.   And there are different types of quotas
23 set by the DEA; correct?
24   A.   Correct.

Page 250

1    Q.   And can you describe to the court what
2   those different types of quotas consist of?
3    A.   For the individual controlled substance
4   products, the DEA has a set quota that they then give
5   to the manufacturers.
6    Q.   And is that a reference to a manufacturing
7   quota?
8    A.   Yes.
9    Q.   And in addition to the manufacturing
10   quota, there's also -- the DEA has -- provides guidance
11   on procurement quota as well; correct?
12    A.   Correct.
13    Q.   And what does procurement quota consist
14   of?
15    A.   So the manufacturing quota would be for
16   our St. Louis facility, and the procurement quota would
17   be for our Hobart facility on the number of tablets
18   that we're going to make.
19    Q.   So in other words, would it be fair to say
20   that the procurement quota governs the amount that
21   Mallinckrodt can turn into an actual extended unit
22   release or pill -- strike that.  Let me ask it a
23   different way.
24        The manufacturing quota established by the

Page 251

1   DEA governs how much raw product Mallinckrodt can
2   manufacture; correct?
3    A.   Correct.
4    Q.   And the procurement quota governs how much
5   of that raw product Mallinckrodt can turn into a pill;
6   correct?
7    A.   Yes, and in our request to the DEA, we
8   tell them how many pills it's estimated that we would
9   make.
10    Q.   And so in connection with your
11   communications with the DEA, are you saying that there
12   is a separate procedure with respect to the procurement
13   quota relative to the manufacturing quota, or would you
14   regularly communicate with the DEA regarding both
15   quotas?
16    A.   Yeah.
17        MR. O'CONNOR:  Objection to form.
18    A.   Both quotas.
19   BY MR. KO:
20    Q.   And regarding the manufacturing quota set
21   by the DEA, they generally set that once a year;
22   correct?
23    A.   That's my understanding.
24    Q.   And are you currently involved in that

Page 252

1   process?
2    A.   I am not.
3    Q.   Who on the DEA compliance team is
4   responsible for working with the DEA and Mallinckrodt's
5   annual quota request today?
6    A.   Karen Harper.
7    Q.   And in addition to Karen Harper, are there
8   any other individuals that assist her in the annual
9   quota request?
10    A.   It's my recollection that Dave Hunter
11   assists her on the manufacturing for the St. Louis
12   plant, and Eileen Spaulding, it's my understanding,
13   assists her on the procurement.
14    Q.   And is it your understanding that Ms.
15   Harper had the primary responsibility of working with
16   the DEA regarding Mallinckrodt's annual quota
17   request -- or strike that.
18        How long has Ms. Harper had the
19   responsibility of working with the DEA regarding
20   Mallinckrodt's quota requests?
21    A.   I know that it predates 2008.
22    Q.   And throughout that time period, there was
23   no other individual who had that primary responsibility
24   at Mallinckrodt; is that accurate?

Page 253

1    A.   Yes.
2    Q.   Now, we've made mention to -- we've made
3   mention to Mallinckrodt's St. Louis and Hobart
4   facilities.  Is the St. Louis facility synonymous or
5   different from the Webster Groves facility?
6    A.   It's different.
7    Q.   And what did the -- can you describe to
8   the court what the Webster Groves facility was in
9   charge of or what happened at the Webster Groves
10   facility?
11        MR. O'CONNOR:  Objection to form.
12    A.   Our Webster Groves facility is an R & D
13   facility.
14   BY MR. KO:
15    Q.   Got it.  Was there any manufacturing of
16   opioids done at the Webster Groves facility?
17    A.   Time frame?
18    Q.   At any time.
19    A.   Yes.
20    Q.   And when was that?
21    A.   November 2018.
22    Q.   So somewhat recently?
23    A.   Uh-huh.
24    Q.   Prior to November of 2018, was there any

Page 254

1 manufacturing that occurred at the Webster Groves
2 facility?
3     A.   I'm unaware of any manufacturing taking
4 place.
5     Q.   And prior to 2018, the Webster Groves
6 facility was primarily utilized as an R & D facility;
7 is that accurate?
8     A.   Was and is.  Yeah.
9     Q.   I'm going to hand you a copy of what's
10 been marked as Gillies Exhibit 26.
11         [Exhibit Mallinckrodt-Gillies-026
12         marked for identification.]
13     Q.   And for the record, this ends in Bates
14 3044340, and it's an e-mail chain from June 20th, 2012,
15 between Kenneth Yamashita and Eileen Spaulding.
16         And I just have a quick question on this
17 e-mail.  Feel free to review it if you need to in
18 responding to my question.
19     A.   Uh-huh.
20     Q.   But at the top, Ken indicates, quote, did
21 you get the impression now that if our quota
22 justification and suspicious order monitoring program
23 is good, we will get the quota or at least some
24 portion, end quote.

Page 255

1         Did I read that correctly?
2     A.   Yes.
3     Q.   First of all, do you know who Ken
4 Yamashita is?
5     A.   Yes.
6     Q.   And who is he?
7     A.   He was the head of our Hobart facility.
8     Q.   And what do you -- and by head of Hobart
9 facility, what exactly do you mean?
10     A.   He was -- he ran the administration of the
11 facility.
12     Q.   And he's asking a question to Eileen of
13 whether or not the quota justification -- or strike
14 that.
15         He's asking whether or not the SO -- if
16 the SOM program is adequate that Mallinckrodt would
17 obtain the quota that they sought.
18         Do you have any recollection of whether or
19 not the quota justification or the quota request was
20 ever tied to Mallinckrodt's SOM program?
21         MR. O'CONNOR:  Objection to form.
22     A.   Can I just read the rest of this document?
23 BY MR. KO:
24     Q.   Sure.

Page 256

1     A.   And then let me answer that.  Okay.  So
2 could you repeat your question now?
3     Q.   Sure.  Do you have any recollection of
4 whether or not the quota -- whether or not the SOM
5 program that Mallinckrodt implemented was tied in any
6 way to Mallinckrodt's quota requests?
7         MR. O'CONNOR:  Object to form.
8     A.   No.
9 BY MR. KO:
10     Q.   Did Mallinckrodt ever learn from the DEA
11 if -- that if it had a robust SOM program it would more
12 likely be able to maximize its quota requests?
13     A.   No.
14     Q.   Did you ever -- did you review any
15 documents in preparation for this deposition today that
16 had any connection between quota requests and
17 Mallinckrodt's SOM program?
18     A.   Not that I recall.
19     Q.   You can set that one aside.  So earlier we
20 had talked about the meeting that Mallinckrodt had with
21 DEA in August of 2011.  Do you recall that?
22     A.   Yes.
23     Q.   And do you recall who requested that
24 meeting?

Page 257

1     A.   I know that we had requested a meeting
2 with the DEA since the spring of 2011, and I think this
3 August meeting was in response to our ongoing request
4 to meet with them.
5     Q.   And is it fair to say that during this
6 meeting, two of the issues that were discussed were
7 Mallinckrodt's SOM program and issues with respect to
8 Mallinckrodt's quota requests?
9         MR. O'CONNOR:  Objection to form.
10     A.   I know one of the issues was we wanted to
11 tell DEA about our SOM program and everything that we
12 were doing.
13 BY MR. KO:
14     Q.   Okay.  And was another topic of the
15 meeting issues with respect to Mallinckrodt's quota
16 requests?
17     A.   I don't recall that.
18     Q.   I'm going to hand you a copy of what's
19 going to be marked as Gillies Exhibit 27.
20         [Exhibit Mallinckrodt-Gillies-027
21         marked for identification.]
22     Q.   Does this document look familiar at all to
23 you?
24     A.   Yes.

Page 258

1  Q.  And did you review this document in
2  preparation for this deposition today?
3      A.  No.
4      Q.  And how does this document look familiar
5  to you?  Did you review it at some point separate and
6  apart from preparing for this deposition?
7      A.  Yes.
8      Q.  And approximately when do you think that
9  was?
10     A.  I believe this is one of the documents I
11 reviewed after I joined Mallinckrodt.
12     Q.  And as I understand it, I believe this is
13 a deck that Mallinckrodt used during that meeting and
14 presented it to the DEA.
15         Is that consistent with your
16 understanding?
17     A.  Yes.
18     Q.  And I just have a few quick questions
19 about it.  On the second page of this deck there is a
20 reference made to suspicious order monitoring
21 presentation agenda.  Do you see that?
22     A.  Yes.
23     Q.  So just so the record is clear, the
24 primary topic of the DEA meeting in August of 2011 was

Page 259

1  regarding Mallinckrodt's SOM program; correct?
2      A.  Correct.
3          MR. O'CONNOR:  Objection to form.
4  BY MR. KO:
5      Q.  And if you look at Page 7 of this report,
6  there's an additional reference made to subpoenas, SOM
7  quota review, and business relationships.  Do you see
8  that?
9      A.  Yes.
10     Q.  And the context of these references is
11 being made in the context of the SOM program challenges
12 and issues.  Do you see that?
13     A.  Yes.
14     Q.  So would it be accurate to say that in
15 addition to Mallinckrodt SOM being reviewed at the
16 meeting, Mallinckrodt also discussed challenges and
17 issues with respect to subpoenas it was receiving, SOM
18 quota review, and certain business relationships it
19 had?
20         MR. O'CONNOR:  Objection to form.
21     A.  That's what this slide says.
22 BY MR. KO:
23     Q.  And do you -- I know a moment ago that you
24 said you weren't familiar with whether or not quota was

Page 260

1  discussed during this meeting.
2      A.  Uh-huh.
3      Q.  But does this refresh your recollection at
4  all as to what aspects of quota were discussed with the
5  DEA during this meeting?
6      A.  No.
7      Q.  No reason to dispute that quota issues
8  were discussed with the DEA during August 23rd, 2011,
9  though; right?
10         MR. O'CONNOR:  Objection to form.
11     A.  So it's a bullet point on this slide.  I
12 don't know whether they actually talked about it.  I
13 have no recollection of that.
14 BY MR. KO:
15     Q.  Fair enough.  You can set that aside.  I'm
16 going to hand you a copy of what's marked as Gillies
17 Exhibit 28.
18         [Exhibit Mallinckrodt-Gillies-028
19         marked for identification.]
20     Q.  And for the record, this document is
21 titled draft notes for SOM steering committee meeting,
22 9-28-11, and it ends in Bates 2077756.
23         And Mr. Gillies, this appears to be --
24 well, earlier we had went over certain policies

Page 261

1  regarding Mallinckrodt's SOM, and in some of those
2  policies there was reference made to a steering
3  committee; correct?
4      A.  Yes.
5      Q.  And from time to time members of the
6  steering committee would meet to discuss Mallinckrodt's
7  SOM program; correct?
8      A.  Correct.
9      Q.  And this appears to be notes that are
10 being prepared in connection with the steering
11 committee meeting; right?
12     A.  Correct.
13     Q.  And so halfway down the first page there
14 is a brief recap of the DEA meeting.  You see that?
15     A.  Yes.
16     Q.  And it appears that their recap is
17 being -- that Don is providing the recap, and I imagine
18 that would be Don Lohman?
19     A.  That would be my understanding.
20     Q.  And there are a variety of things that are
21 discussed here, but it appears that the summary of the
22 meeting, Don indicates that, quote, at our request, on
23 August 23rd, 2011, met with the DEA office of diversion
24 control and quota section in Washington D.C. to discuss

Page 262

1 our SOM program, which monitors suspicious orders of
2 controlled substances and our outstanding quota
3 requests, end quote.
4          Did I read that correctly?
5     A.  Yes.
6     Q.  So is it accurate to say that -- and just
7 so the record is clear -- that during the August 2011
8 meeting, two of the topics that were discussed were
9 suspicious order monitoring and outstanding quota
10 requests of Mallinckrodt?
11    A.  Yes.
12    Q.  That's all I have with that document.  I'm
13 going to hand you a copy of what's been marked as
14 Gillies Exhibit 29.
15         [Exhibit Mallinckrodt-Gillies-029
16         marked for identification.]
17    Q.  And for the record, this document ends in
18 Bates 284620 and is an e-mail from Karen Harper to
19 herself dated Saturday, April 23rd, 2011.  And it
20 appears to be some notes that she took from a DEA
21 conference that she attended.
22         Did you -- does this document look
23 familiar at all to you?
24    A.  No.

Page 263

1     Q.  Did you review this document in connection
2 with your preparing for this deposition today?
3     A.  No.
4     Q.  Do you know who Michael Morley is?
5     A.  I do not.
6     Q.  Do you know who Kyle Wright is?
7     A.  I do not.
8     Q.  Do you have any understanding of how
9 frequent members of the DEA compliance team attended
10 DEA conferences regarding Mallinckrodt's CSA
11 obligations?
12    A.  I do not.
13    Q.  Do you know whether or not Mallinckrodt
14 employees ever attended DEA conferences regarding their
15 CSA obligations?
16    A.  Yes.
17    Q.  And do you have any understanding of how
18 frequent they attended such conferences?
19    A.  So can you restate that question?  Because
20 I may have misunderstood the previous question.
21    Q.  Well, I had asked you whether or not --
22 sure.
23    A.  Okay.
24    Q.  I asked you whether or not you were aware

Page 264

1 of whether or not Mallinckrodt employees attended DEA
2 conferences, and I believe you said yes, and my
3 follow-up question was whether or not you had an
4 understanding of how frequent they attended such
5 conferences.
6     A.  Okay.  So I think I did misunderstand the
7 way you phrased it, but that time the answer is yes,
8 and I believe it was annually.
9     Q.  And was it typically the case that Ms.
10 Harper would attend?
11    A.  Yes.
12    Q.  And do you know any other Mallinckrodt
13 employees that attended any annual DEA conferences?
14    A.  Eileen Spaulding.  Time frame?
15    Q.  At any time.
16    A.  Jen Buist.  I can't recall if there was
17 anybody else.
18    Q.  At the bottom of this e-mail, Karen Harper
19 indicates that, quote, someone in your company is
20 accountable for making decisions about customers, SOM.
21 All decisions should be documented in file by customer.
22 Do you see that?
23    A.  Yes.
24    Q.  So is it accurate to say that Karen Harper

Page 265

1 is indicating that there should be some sort of
2 documentation procedure with respect to all decisions
3 regarding SOM?
4          MR. O'CONNOR:  Objection to form.
5     A.  So can you repeat that question?
6 BY MR. KO:
7     Q.  Sure.  Is it accurate to say that Karen
8 Harper is indicating that there should be some sort of
9 documentation procedure with respect to all decisions
10 regarding SOM?
11    A.  Yes.
12    Q.  And we had talked about it a little bit
13 before, but are you aware of whether or not there was
14 any kind of formal documentation procedure regarding
15 Mallinckrodt's SOM in the 2011 time period?
16         MR. O'CONNOR:  Objection to form.
17    A.  I believe there was.
18 BY MR. KO:
19    Q.  And what is that understanding based upon?
20    A.  From reviewing procedures.
21    Q.  And which -- the same procedures we were
22 kind of discussing before?
23    A.  Yes.
24    Q.  Outside of those procedures, did you

Page 266

1 review any other documents that suggested there was a
2 formal documentation procedure governing the decisions
3 made by any individuals at Mallinckrodt with respect to
4 its SOM?
5    A.   I don't recall that.
6    Q.   So is it fair to say that at least as of
7 the date of this letter, Mallinckrodt is aware that DEA
8 is expecting some sort of formal documentation
9 regarding its SOM decisions and policies?
10       MR. O'CONNOR:  Objection to form.
11    A.   That's what this note references.
12 BY MR. KO:
13    Q.   So is it -- I understand that that's what
14 the note references, but I'm asking you as a
15 designee -- a corporate designee of Mallinckrodt
16 sitting here today, yes or no, is it fair to say that
17 as of the date of this letter, Mallinckrodt is aware
18 that DEA is expecting some sort of formal documentation
19 procedure regarding its SOM decisions and policies?
20       MR. O'CONNOR:  Objection to form.
21    A.   Yes.
22 BY MR. KO:
23    Q.   And underneath the section Kyle Wright,
24 there's an indication, quote, I am coming.  You don't

Page 267

1 want me.  I can tear you apart.  If DEA can see where
2 drugs are going, Mallinckrodt knows full well where
3 drugs are going.
4       Did I read that correctly?
5    A.   Yes.
6    Q.   And so is it fair to say that the DEA
7 certainly expects Mallinckrodt to understand where all
8 of its drugs are going even after Mallinckrodt ships
9 them to its distributor customers?
10       MR. O'CONNOR:  Objection to form.
11    A.   I don't know that that's what it's saying,
12 because our product goes to the distributors and
13 wholesalers.  So I don't see a reference that it says
14 that this goes further beyond that.
15       But in this case, the DEA can see, because
16 they've got all the information, right, through ARCOS.
17 So they see where it goes, so they can see that we're
18 sending it to the distributors or wholesalers, but
19 because they get the ARCOS information from others,
20 they can see where that goes too.
21 BY MR. KO:
22    Q.   And we had discussed earlier the concept
23 of chargeback data; correct?
24    A.   Correct.

Page 268

1    Q.   And we had established that chargeback
2 data allowed Mallinckrodt to see where its pills were
3 going and specifically to which pharmacies and clinics
4 Mallinckrodt drugs were going after Mallinckrodt
5 shipped to its distributors; correct?
6       MR. O'CONNOR:  Objection to form.
7    A.   Not all pharmacies.  There has to be a
8 chargeback relationship and corrected as retroactive.
9       MR. O'CONNOR:  Counsel, just a heads-up.
10 By our count, you have about a minute.
11       MR. KO:  Okay.  I have one more -- I
12 thought I had about 15 minutes.  But --
13       MR. O'CONNOR:  You're welcome to check.
14 How much --
15       MR. KO:  It's your math versus Alison's,
16 but --
17       MR. O'CONNOR:  How much time --
18       MR. KO:  Not to put you on the spot, but I
19 got one more document.
20       MR. O'CONNOR:  Okay.
21       THE VIDEOGRAPHER:  I've got five hours, 25
22 minutes.
23       MR. KO:  Okay.
24       MR. O'CONNOR:  And we had 5:25 for the

Page 269

1 limit; right?
2       MR. KO:  All right.
3       MR. O'CONNOR:  But one document quickly.
4       MR. KO:  Okay.  Thank you for that.
5 BY MR. KO:
6    Q.   There's -- Mr. Gillies, I'm handing you a
7 copy of a document that's been marked as Gillies
8 Exhibit --
9       MS. GAFFNEY:  30.
10 BY MR. KO:
11    Q.   -- 30.  Thank you.
12       [Exhibit Mallinckrodt-Gillies-030
13       marked for identification.]
14    Q.   And for the record, this is a March 18th,
15 2013, correspondence dated -- or I said the date
16 already -- ending in Bates 8434954.  And I have a very
17 specific question.
18    A.   Okay.
19    Q.   So again, if you need to read more of the
20 document, please feel free to do so.
21       But first of all, this appears to be a
22 communication made by an outside counsel for
23 Mallinckrodt to an assistant U.S. attorney.  Is that
24 accurate?

Page 270

1    A.   Yes.

2    Q.   And in Section 1 of the document, there is

3  reference made to a certain percentage of oxy 15s and

4  oxy 30s distributed by certain of Mallinckrodt's

5  customers; right?

6    A.   Yes.

7    Q.   And those customers are the big three

8  distributors and H.D. Smith; correct?

9    A.   Correct.

10    Q.   And they distributed oxy 15s and oxy 30s;

11  correct?

12    A.   Correct.

13    Q.   And turning to the next page -- this is

14  just the final line of questioning.  Do you see the

15  section Page 3 -- or sorry -- do you see the section

16  Question 3?

17    A.   Just for my reference in the future, if I

18  have to go back, could you put the Bates number on it?

19  Because you said this was the only Bates number.  You

20  said ending in this number, but is this a new number

21  here?

22    Q.   Right.  That's just the next page --

23    A.   Okay.

24    Q.   -- of the document.  So regardless, we're

Page 271

1  on Page 2 of this document.

2    A.   Okay.  Thank you.

3    Q.   And there's a question asked, quote, what

4  percentage of sales of oxycodone products involve

5  customers that fall under the chargeback system.

6    Did I read that correctly?

7    A.   Yes.

8    Q.   And the answer that's provided is from

9  2009 through 2012, approximately 96 percent of the

10  total volume by dosage units of oxycodone 15-milligram

11  products manufactured and distributed by Mallinckrodt

12  fell under the chargeback system.

13    Did I read that correctly?

14    A.   Yes.

15    Q.   So a moment ago you had said not all

16  requests -- not all -- sorry -- not all transactions

17  resulted in a chargeback request?

18    A.   That's correct.

19    Q.   But at least with respect to oxycodone 15

20  milligrams, from 2009 to 2012, 96 percent resulted in a

21  chargeback request; is that accurate?

22    MR. O'CONNOR:  Objection to scope.

23    A.   Yes.

24  BY MR. KO:

Page 272

1    Q.   And similarly, the next sentence talks

2  about  percentage of chargeback requests for oxycodone

3  30, and this sentence reads from 2009 through 2012,

4  approximately 98 percent of the total volume by dosage

5  unit of oxycodone 30-milligram products manufactured

6  and distributed by Mallinckrodt fell under the

7  chargeback system.

8    Did I read that correctly?

9    A.   Yes.

10    MR. O'CONNOR:  Same objection.

11  BY MR. KO:

12    Q.   So is it accurate to say that the vast

13  majority of -- if not nearly 100 percent, of all

14  oxycodone 15-milligram and oxycodone 30-milligram

15  orders resulted in a chargeback request by a

16  distributor --

17    MR. O'CONNOR:  Objection --

18  BY MR. KO:

19    Q.   -- in the 2009 through 2012 time period?

20    MR. O'CONNOR:  Objection to form and

21  scope.

22    A.   Not all, but vast majority.

23  BY MR. KO:

24    Q.   Right.  And I said, just so the record is

Page 273

1  clear, is it accurate to say that nearly 100 percent of

2  all oxycodone 15-milligram and oxycodone 30-milligram

3  orders resulted in a chargeback request by a

4  distributor?

5    A.   It would be --

6    MR. O'CONNOR:  Objection to form and

7  scope.

8    A.   It would be more accurate to say 96

9  percent and 98 percent.

10  BY MR. KO:

11    Q.   Okay.  Fair enough.  So 96 percent of all

12  oxy 15 orders of Mallinckrodt-manufactured oxy 15

13  resulted in a chargeback request from the 2009 through

14  2012 time period; correct?

15    MR. O'CONNOR:  Objection to form, scope.

16  Asked and answered.

17    A.   Yes.

18  BY MR. KO:

19    Q.   And final question.  98 percent of the

20  total volume of oxycodone 30-milligram products

21  manufactured by Mallinckrodt resulted in a chargeback

22  request made by a distributor in the 2009 through 2012

23  time period; correct?

24    MR. O'CONNOR:  Objection to form, scope.

Page 274

1  Asked and answered.
2      A.   Correct.
3          MR. KO:  Okay.  Those are all the
4  questions I have.  Thank you for your patience.
5      A.   Thank you.
6          THE VIDEOGRAPHER:  We are going off the
7  record at 4:32 PM.
8          [A brief recess was taken.]
9          THE VIDEOGRAPHER:  We are back on the
10  record at 4:49 PM.
11          EXAMINATION
12  BY MS. HERZFELD:
13      Q.   Mr. Gillies, my name is Tricia Herzfeld,
14  and I'm an attorney representing the plaintiffs in the
15  Tennessee litigation.  Are you familiar with the
16  Tennessee litigation?
17      A.   Yes.
18      Q.   And what is it that you know about the
19  Tennessee litigation?
20      A.   That you have a claim against Mallinckrodt
21  and others for the opioid crisis.
22      Q.   What else do you know about it?
23      A.   That's about my recollection.
24      Q.   Do you know who the plaintiffs are in the

Page 275

1  Tennessee litigation?
2      A.   I do not recall.
3          MS. HERZFELD:  And before we get going in
4  the deposition today, we're going to lodge our usual
5  objections for failure to comply with the MDL protocol,
6  which has also been entered and established in Dunaway
7  (ph) cases.
8          MR. O'CONNOR:  And we're going to respond
9  with our usual objection to your objections.
10          MS. HERZFELD:  There we go.  Okay.
11  BY MS. HERZFELD:
12      Q.   And Mr. Gillies, what did you do to
13  prepare for the Tennessee portion of your deposition
14  today?
15      A.   I met with legal counsel, and my
16  recollection is that some of the documents that I
17  reviewed might be associated with that matter.
18      Q.   How long would you say you met with your
19  counsel specifically about the Tennessee matter?
20      A.   Several hours.
21      Q.   And when was that?
22      A.   Between September and -- September 2018
23  and January 2019.
24      Q.   And so how was that broken up?  That's a

Page 276

1  long period of time.
2      A.   I know.  There were approximately four
3  meetings and a videoconference during that time where
4  issues were being discussed and Tennessee came up.
5      Q.   So the meetings and the videoconference,
6  were they specifically about Tennessee?
7      A.   No.
8      Q.   Have you had any meetings or conversations
9  with your counsel specifically about Tennessee?
10      A.   No.
11      Q.   So your discussions about Tennessee with
12  your counsel, all told, would you say -- specifically
13  about Tennessee -- how long?
14      A.   With counsel?
15      Q.   Yes, sir.
16      A.   Several hours.
17      Q.   Several hours?
18      A.   Yes.
19      Q.   And so you said several hours specifically
20  about Tennessee?
21      A.   Correct.
22      Q.   Then you said several conversations
23  between September 2018 and January 2019 were those
24  other things and Tennessee was brought up, so I guess

Page 277

1  I'm a little confused.
2      A.   Okay.  So there were four meetings with
3  counsel and a videoconference, and at some point during
4  those meetings, some issues on Tennessee came up.
5      Q.   And so each of those meetings would you
6  say was roughly how long?
7          MS. MIKA:  Sorry to interrupt the
8  deposition, but you're muted.
9          THE REPORTER:  Okay, I just turned you
10  guys back on.
11  BY MS. HERZFELD:
12      Q.   I'm sorry.  And so how long would you say
13  each of those meetings was?
14      A.   So four of the meetings were approximately
15  eight hours.  The videoconference was four hours.  And
16  then combined, several hours over that time frame was
17  devoted to Tennessee.
18      Q.   And who was on those calls?
19      A.   So on the call was Andrew O'Connor and
20  Bill Davison.
21      Q.   Anybody else?
22      A.   No.
23      Q.   And what about in the meetings?
24      A.   In the meetings would have been Andrew,

Page 278

1  Bill, and Josh.
2      Q.   Anybody else?
3      A.   No.
4      Q.   Have you read the Tennessee complaint?
5      A.   I don't think so.
6      Q.   And do you know if the allegations in the
7  Tennessee complaint are meaningfully different than the
8  allegations in the MDL?
9      A.   I do not.
10         MR. O'CONNOR:  Objection to form.
11  BY MS. HERZFELD:
12     Q.   I'm sorry.  You said I do not?
13     A.   That's correct.
14     Q.   And I'm sorry.  I might have asked you
15  this question before.  Did you review any
16  Tennessee-specific documents in preparation for your
17  testimony today?
18     A.   I believe I reviewed some documents that
19  related to Tennessee.
20     Q.   Are you finished?
21     A.   I am.
22     Q.   And when you looked at those documents,
23  did they refresh your recollection in any way?
24     A.   Refresh my recollection of what?

Page 279

1      Q.   Whatever the topic was of the document.
2      A.   Yes.
3      Q.   And how many documents that related to
4  Tennessee would you say you reviewed?
5      A.   Less than five.
6      Q.   And what types of documents were they?
7          MR. O'CONNOR:  Object to work product,
8  attorney-client privilege.  You can answer at a high
9  level.
10     A.   E-mails.
11  BY MS. HERZFELD:
12     Q.   Just e-mails?
13     A.   That's all I can recall.
14     Q.   And were those e-mails selected for you by
15  your counsel, or did you look at some on your own?
16     A.   Would have been presented to me in
17  preparation from counsel.
18     Q.   And I believe you said you did some
19  preparation outside of your preparation with counsel
20  earlier; is that correct?
21     A.   Yes.
22     Q.   Did you focus any of that preparation time
23  on the Tennessee litigation?
24     A.   No.

Page 280

1      Q.   Did you search your e-mails or your
2  documents for anything having to do with Tennessee
3  prior to attending this deposition today?
4      A.   No.
5      Q.   Going to Topic 1.  What was done by
6  Mallinckrodt to ensure compliance with Tennessee state
7  statutes and local laws?
8          MR. O'CONNOR:  Objection.
9          MS. HERZFELD:  What's the objection?
10         MR. O'CONNOR:  Form and potentially scope.
11  Form for now.
12  BY MS. HERZFELD:
13     Q.   Okay.  I'm looking here.  I just want
14  to -- I want to be very clear.  So looking at that very
15  first topic, Topic 1 is your procedures, organization,
16  and personnel assignments, oversight, due diligence,
17  and quality control regarding compliance with the CSA
18  and all state and local laws and regulations concerning
19  the diversion of opioids.  So I'll repeat the question.
20         What was done by Mallinckrodt to ensure
21  compliance with Tennessee state statutes and local laws
22  regarding the manufacturing or distribution of opioids?
23         MR. O'CONNOR:  Objection to form.
24     A.   I don't know.

Page 281

1  BY MS. HERZFELD:
2      Q.   Do you know if there were any policies in
3  place to ensure compliance with Tennessee state and
4  local laws regarding the manufacturing or distribution
5  of opioids?
6      A.   I know there were some policies in place
7  for some states.  I'm not sure whether Tennessee fell
8  within that.
9  BY MS. HERZFELD:
10     Q.   Do you know which states you can recall?
11     A.   I do not.
12     Q.   Who would have been in charge of ensuring
13  compliance with Tennessee state statutes and local laws
14  regarding the manufacturing and distribution of
15  controlled substances?
16     A.   I don't know.
17     Q.   And your answers are for 2008 forward?
18     A.   Yes.
19     Q.   And who would have been in charge for due
20  diligence to ensure that Tennessee state and local laws
21  were being followed with regard to manufacturing or
22  distributing controlled substances in Tennessee?
23     A.   I don't know.
24     Q.   Did Mallinckrodt do anything to ensure

## Page 282

1 that it was in compliance with Tennessee code annotated
2 53-11-302, 303, and 304 concerning the manufacturing of
3 controlled substances?
4     A.  I'm unfamiliar with those.
5     Q.  And how are you familiar with those?
6     A.  I said I'm unfamiliar with those.
7     Q.  So my answer is (sic) here as
8 Mallinckrodt's corporate representative today, what did
9 Mallinckrodt do, if anything, to ensure compliance with
10 TCA 53-11-302, 303, and 304 regarding the manufacturing
11 or distribution of controlled substances?
12     A.  And I'm sorry.  What's the question there?
13     Q.  I'll repeat it.
14     A.  Okay.  Thank you.
15     Q.  Uh-huh.  Did Mallinckrodt do anything to
16 ensure that it was in compliance with Tennessee code
17 annotated 53-11-303, 302, and 304, concerning the
18 manufacturing and distribution of controlled
19 substances?
20     A.  I don't know.
21     Q.  Did Mallinckrodt do anything to ensure it
22 was in compliance with Tennessee code annotated
23 53-11-401 regarding the distribution of controlled
24 substances?

## Page 283

1     A.  I don't know.
2     Q.  Did Mallinckrodt do anything to ensure
3 that it was compliance with the Drug Dealer Liability
4 Act, Tennessee code annotated 29-38-101?
5     A.  I don't know.
6     Q.  What were -- did Mallinckrodt have
7 policies regarding the detection of potential diversion
8 of opioids in Tennessee?
9     A.  We had a national program.
10     Q.  And is that the national program that was
11 run by Karen Harper?
12     A.  Yes.
13     Q.  And she would have been in charge of that?
14     A.  Yes.
15     Q.  So she would have been the person with the
16 most knowledge outside of anyone?
17     MR. O'CONNOR:  Objection to form.
18     MS. HERZFELD:  You're right.  I'll
19 withdraw the question.
20 BY MS. HERZFELD:
21     Q.  Were there any specific policies regarding
22 potential diversion of opioids in Tennessee?
23     A.  Again, there was on some states.  I'm not
24 sure if Tennessee was one of those states.

## Page 284

1     Q.  Do you recall any of the states that were?
2     A.  I do not.
3     Q.  Do you recall what area of the country
4 they were in?
5     A.  I do not.
6     Q.  Did Mallinckrodt do anything to monitor
7 the potential diversion of opioids in Tennessee
8 specifically?
9     A.  It was a national program.
10     Q.  But anything specifically about Tennessee?
11     A.  Not that I'm aware of.
12     Q.  What about auditing the -- or the
13 potential diversion of opioids in Tennessee?  Did
14 Mallinckrodt do anything specifically for Tennessee in
15 auditing potential diversion of opioids in Tennessee?
16     MR. O'CONNOR:  Objection to form.
17     A.  Not that I'm aware of.
18 BY MS. HERZFELD:
19     Q.  What about specific investigations of
20 potential diversion of opioids in Tennessee?  Did
21 Mallinckrodt do anything specific -- strike that.  I
22 got all caught up on that one.
23     Did Mallinckrodt do anything specifically
24 to investigate the potential diversion of its opioids

## Page 285

1 in Tennessee?
2     A.  Yes.
3     Q.  What did you do?
4     A.  I believe there were several
5 investigations that were brought to our attention by
6 law enforcement, and law enforcement was looking for
7 assistance, so we provided the assistance.
8     Q.  Are you finished with your answer?
9     A.  I am.
10     Q.  And so you said there were several
11 investigations.  What were they?
12     A.  I'm not going to recall all of them.  One
13 that sticks out is the Sunrise investigation.
14     Q.  And were you involved in that?
15     A.  No.
16     Q.  And what was the extent of the involvement
17 of Tennessee law enforcement in the Sunrise
18 investigation, to your knowledge?
19     A.  To my knowledge, that they had through
20 their investigation recovered a bottle of Mallinckrodt
21 product, and asked if there was anything that we could
22 do to identify where the bottle may have shipped to.
23     And so we -- first report we ran was the
24 lot number to see which distributors received that lot,

Page 286

1  and then to further assist, they looked to see if there
2  was any other data in Mallinckrodt's possession that
3  might help law enforcement in this case, and they
4  looked at chargeback data. And because they had the
5  bottle, they were able to get some chargeback data that
6  led to Sunrise.
7      Q.   What other investigations -- law
8  enforcement investigations in Tennessee are you aware
9  of?
10     A.   Specifically, I can't recall at this time.
11  But there were -- it's my recollection that there were
12  some other law enforcement agencies that had contacted
13  us looking for similar information either on a lot
14  trace or the amount of active ingredient in one of our
15  pills.
16     Q.   And if I was looking for documents about
17  those other investigations -- lot traces or the amount
18  of active ingredient in your pills -- where would I
19  find those documents?
20     A.   Either with a search within our DEA
21  compliance or our security.
22     Q.   And you're head of security; is that
23  right?
24     A.   I am.

Page 287

1      Q.   So have you personally been involved in
2  any?
3      A.   I believe I have.
4      Q.   And so you think those documents would
5  either be with DEA compliance group or in the security
6  group? They'd be stored there?
7      A.   Correct.
8      Q.   And going back to the Sunrise thing you
9  said before, was that investigation -- that was before
10  your time at Mallinckrodt?
11     A.   Yes.
12     Q.   And so how did you learn the information
13  about that investigation?
14     A.   From legal counsel and Karen Harper.
15     Q.   And when did you learn about it?
16     A.   I'd say the first time -- can't recall,
17  but I'm going to say it was approximately 2014.
18     Q.   And who told you about it in 2014?
19     A.   Karen --
20         MR. O'CONNOR: I'm going to object to the
21  extent it calls for attorney-client privilege
22  information.
23  BY MS. HERZFELD:
24     Q.   Did your attorney tell you in 2014

Page 288

1  something that you need to object -- do you need to
2  have a privilege there?
3      A.   Karen Harper.
4      Q.   Okay. Karen Harper. Okay. And in that
5  investigation, does Morristown, Tennessee, ring a bell
6  to you?
7      A.   It does not.
8      Q.   So -- but in that investigation having to
9  do with Sunrise, those drugs were eventually traced
10  back to a Dr. Barry Schultz; is that correct?
11     A.   That's correct.
12     Q.   And Barry Schultz was a physician in
13  Florida; is that right?
14     A.   That's correct.
15     Q.   And he was running what some would
16  characterize as a pill mill; is that right?
17         MR. O'CONNOR: Objection. Form.
18     A.   That's my understanding.
19  BY MS. HERZFELD:
20     Q.   And so in that investigation what they
21  learned is that those pills went into the illegal drug
22  market along the Oxy Highway; is that right?
23         MR. O'CONNOR: Objection to form.
24     A.   I'm sorry. Who's they that learned that?

Page 289

1  BY MS. HERZFELD:
2      Q.   Mallinckrodt learned that?
3      A.   Oh, okay.
4         MR. O'CONNOR: Same objection.
5      Q.   So what did Mallinckrodt learn?
6  BY MS. HERZFELD:
7      Q.   Yes, sir.
8      A.   Okay.
9      Q.   Would you like me to say that again?
10     A.   Yeah, please.
11     Q.   Sure. And so during the investigation
12  with law enforcement, Mallinckrodt learned that those
13  pills had come from the pill mill, Dr. Schultz, made it
14  into the illegal drug market, up the Oxy Highway; is
15  that correct?
16         MR. O'CONNOR: Objection. Form.
17     A.   So define the Oxy Highway, and then --
18  BY MS. HERZFELD:
19     Q.   Up I-75.
20     A.   Okay. Yes.
21     Q.   And based on that investigation with law
22  enforcement in Tennessee, those illegal drugs made it
23  into the illegal drug market in Tennessee; is that
24  right?

Page 290

1    MR. O'CONNOR: Objection to form.
2    A.   That's my understanding.
3  BY MS. HERZFELD:
4    Q.   And that was Mallinckrodt's understanding
5  at the time; is that right?
6    MR. O'CONNOR: Same objection.
7    A.   That's correct.
8  BY MS. HERZFELD:
9    Q.   And other than those two topics, the
10 Sunrise investigation, and then when you said either
11 lot traces or amount of active ingredients, can you
12 think of any other communication that Mallinckrodt has
13 had with Tennessee law enforcement specifically?
14   A.   I cannot.
15   Q.   What about any communication Mallinckrodt
16 has had with Tennessee law enforcement generally? Can
17 you recall any?
18   A.   No.
19   Q.   Did Mallinckrodt have any policies
20 regarding the disclosure of suspicious orders in
21 Tennessee to the DEA?
22   A.   I'm unaware of any suspicious orders to
23 Tennessee.
24   Q.   And when you say unaware of any suspicious

Page 291

1  orders to Tennessee, do you mean shipped or meant for
2  Tennessee?
3    MR. O'CONNOR: Objection to form.
4  BY MS. HERZFELD:
5    Q.   Well, I guess what do you mean when you
6  say --
7    A.   Yeah.  I mean --
8    Q.    -- you're unaware of any suspicious
9  orders to Tennessee?  What do you mean by that?
10   A.   Yeah. So I'm unaware that there were any
11 suspicious orders reported to DEA that were intended
12 for Tennessee.
13   Q.   And so to your knowledge there weren't any
14 reports of suspicious orders to DEA about Tennessee?
15   A.   Right.
16   Q.   And who would have been in charge of
17 making those reports if they had occurred?
18   A.   DEA compliance.
19   Q.   And who is head of DEA compliance?
20   A.   Karen Harper.
21   Q.   What about any reports of suspected
22 diversion to the DEA -- I'm going to back up again.
23       What about -- did Mallinckrodt ever make
24 any reports of suspected diversion in Tennessee to the

Page 292

1  DEA?
2    A.   Not that I'm aware of.
3    Q.   Did Mallinckrodt ever make any reports of
4  suspected diversion to any Tennessee law enforcement?
5    A.   Not that I'm aware of.
6    Q.   Did Mallinckrodt ever make any reports of
7  suspected diversion to federal law enforcement with
8  jurisdiction over Tennessee, like the U.S. Attorney's
9  office for Tennessee, for example?
10   MR. O'CONNOR: Objection to form.
11   A.   Yeah. So I'm unaware of any suspicious
12 reports related to Tennessee that were reported to the
13 DEA.
14 BY MS. HERZFELD:
15   Q.   And when you say suspicious reports, do
16 you also mean suspected diversion?
17   A.   Yes, because I'm unaware of any suspected
18 diversion that Mallinckrodt was aware of taking place
19 in Tennessee outside of that Sunrise matter and the
20 doctor that was located in Florida.
21   Q.   And if there was suspected diversion in
22 Tennessee, who would have been in charge of reporting
23 that to Tennessee law enforcement?
24   A.   Security.

Page 293

1    Q.   And security would have been you?
2    A.   Currently would be me, but -- time frame;
3  right? So June 2012 on, law enforcement contact -- I
4  was the main law enforcement contact for Mallinckrodt
5  and had contact with federal, state, and local law
6  enforcement across the country.
7    Q.   And before you it would have been Mr.
8  Ratliff?
9    A.   Correct.
10   Q.   Did Mallinckrodt ever report to the DEA
11 that it was limiting sales of anyone in Tennessee that
12 they suspected of suspicious orders?
13   A.   So I can't recall any sales of our
14 products to distributors in Tennessee. So can you
15 restate -- just repeat your question?
16   Q.   Sure. Sure. I'll kind of rephrase it.
17       I guess I'm wondering if you know if
18 Mallinckrodt ever reported to the DEA of halting of
19 sales to anyone involved in suspicious orders in
20 Tennessee.
21   A.   No.
22   Q.   I'm going to back up a little bit, too.
23 And when I'm saying sales, I don't just mean to the
24 distributors. Also based on chargeback data. You had

Page 294

1   access to chargeback data at Mallinckrodt; is that
2   correct?
3          MR. O'CONNOR:  Objection to form.
4      A.  But those weren't our sales.  The sales
5   were from -- those sales to the pharmacies would have
6   been from the distributors.
7   BY MS. HERZFELD:
8      Q.  And I --
9      A.  Did we have chargeback data?  Yes.  Those
10  were retroactive.
11     Q.  So I'm going to back up my questions a
12  little bit.
13         So to your knowledge there weren't any
14  distributors in Tennessee that Mallinckrodt was selling
15  opioid products to?  Is that your testimony?
16     A.  That I can recall.  Correct.
17     Q.  And so I shouldn't have said sales,
18  perhaps.
19         So when we're talking about the shipping
20  of Mallinckrodt opioids that end up to people in
21  Tennessee, Mallinckrodt would have some of that
22  information via chargeback data; is that correct?
23     A.  Correct.
24         MR. O'CONNOR:  Objection to form.

Page 295

1   BY MS. HERZFELD:
2      Q.  And based on that chargeback data,
3   Mallinckrodt would sometimes put different pharmacies
4   on chargeback restrictions; is that right?
5      A.  That's correct.
6      Q.  And so based on those chargeback
7   restrictions, did Mallinckrodt ever report the limiting
8   of the ability to process chargebacks for pharmacies in
9   Tennessee?
10         MR. O'CONNOR:  Objection to form.
11     A.  So I'm sorry.  I'm not sure I understand
12  that question.
13  BY MS. HERZFELD:
14     Q.  Sure.
15     A.  So are you asking me did we restrict a
16  pharmacy in Tennessee?  Is that the question?
17     Q.  It's not.
18     A.  Okay.
19     Q.  But sure, do you know if you did?
20     A.  I don't recall, but I know the records
21  were provided of all the pharmacies that were
22  chargeback restricted.
23     Q.  In Tennessee?
24     A.  For the entire country.

Page 296

1      Q.  And so I guess my question is a little bit
2   more basic.
3      A.  Okay.
4      Q.  Mallinckrodt could do chargeback
5   restrictions; is that right?
6      A.  Yes.
7      Q.  And chargeback restrictions would then
8   give a financial incentive for the distributor not to
9   do business with that particular pharmacy; is that
10  correct?
11     A.  Can you repeat that question?  Because I
12  think --
13     Q.  Do I have it backwards?
14     A.  I think so.
15     Q.  So the chargeback restriction would give a
16  financial incentive for the distributor not to do
17  business with that pharmacy; is that right?
18     A.  I'm wondering if you're still getting that
19  wrong.  A financial incentive not to sell?
20     Q.  Okay.  I'm going to back up.
21     A.  Okay.
22     Q.  Explain to me your understanding of a
23  chargeback.  Let's start there.
24     A.  So it's --

Page 297

1          MR. O'CONNOR:  Objection to scope.
2      A.  It's a contractual relationship between
3   Mallinckrodt and its customers, distributors and
4   wholesalers.  After they've bought the product, if they
5   sell it to one of their customers for less than what
6   they bought it, they can charge back that difference to
7   us.
8   BY MS. HERZFELD:
9      Q.  And if Mallinckrodt put somebody on a
10  chargeback restriction, what is the impact that that
11  has for the wholesaler?
12         MR. O'CONNOR:  Objection to form.
13     A.  It could be a financial disincentive,
14  because if they continue to sell to the pharmacy they
15  would not be made whole.
16  BY MS. HERZFELD:
17     Q.  So that is one way that Mallinckrodt would
18  deal with its customers' customers, is chargeback
19  restrictions; is that right?
20         MR. O'CONNOR:  Objection to form.
21     A.  One way Mallinckrodt could deal with its
22  customer's customer, by chargeback restricting them?
23  BY MS. HERZFELD:
24     Q.  Yes, sir.

Page 298

1   A.  Yes.

2   Q.  Was there ever anything between chargeback
3   restrictions, like a chargeback limiting?

4       MR. O'CONNOR:  Objection to form.

5   A.  I don't even know what that means.  I'm
6   sorry.

7   BY MS. HERZFELD:

8   Q.  So did you ever -- did Mallinckrodt ever
9   attempt to limit the sale of or the distribution of --
10  I'm going to back up.  Strike that.  Start over.

11      Did Mallinckrodt ever try to limit the
12  volume of its products, its opioid products, to
13  particular pharmacies?

14  A.  So we didn't sell to the pharmacies; the
15  distributors did.

16  Q.  I understand.

17  A.  Okay.

18  Q.  But you could disincentivize the
19  distributors from doing business with pharmacies by
20  implementing chargeback restrictions.

21      That's what we've established; right?

22  A.  We wouldn't know which pharmacies the
23  distributors were selling to unless we looked at the
24  chargeback data.

Page 299

1   Q.  Okay, but that's not my question.

2   A.  Okay.  Then I'm confused by what you're
3   trying to ask me on this.

4   Q.  So what I'm say --

5   A.  Because we sell to distributors and the
6   wholesalers, and you're asking me to reduce product to
7   the pharmacy that I'm not selling to.  That's how I
8   understood your question.

9   Q.  So what do you understand the purpose of
10  chargeback restrictions to be?

11  A.  So if we think there's a potential for
12  diversion based on the information that we've seen,
13  then we restrict the chargebacks, advising the
14  distributors that we have an issue with this pharmacy.

15      So if they want to continue to sell, they,
16  the distributors or wholesalers, that's on them, but
17  we're not going to give them the chargeback.  So the
18  restriction comes from we not paying the distributors
19  and the wholesalers that difference.

20      That's the piece there, and it has nothing
21  to do with the pharmacy, because we won't know which
22  pharmacy that is until weeks or a month or longer
23  later.

24  Q.  And so other than chargeback restrictions,

Page 300

1   that's all you would do if you had a suspicion that a
2   pharmacy based on information that you had might be
3   engaged in diversion?

4       Did I understand that correctly?

5       MR. O'CONNOR:  Objection to form.

6   A.  Yeah, could you restate that one more
7   time?

8   BY MS. HERZFELD:

9   Q.  Sure.  So I think from your explanation
10  that you just gave me is you said if you, based on the
11  information Mallinckrodt had, suspected that a pharmacy
12  might be engaged in diversion, you would notify the
13  distributor that you would be placing that pharmacy on
14  chargeback restriction.

15      Did I understand that correctly?

16  A.  That's correct.  We would notify the DEA
17  and all distributors that -- so you might be the only
18  distributor providing product, but we would notify the
19  DEA and all distributors that we were chargeback
20  restricting that pharmacy.

21  Q.  And when did that begin?

22  A.  The earliest I recall was 2011.

23  Q.  And was that notifying the DEA in 2011 or
24  notifying all the distributors in 2011?

Page 301

1   A.  Both.

2       MR. O'CONNOR:  Objection.

3   BY MS. HERZFELD:

4   Q.  And so I guess my question is, other than
5   that process which you've just explained, was there
6   anything else you would do if you suspected a potential
7   pharmacy was engaging in diversion?

8   A.  If we did suspect, we'd contact law
9   enforcement.

10  Q.  And which law enforcement?  The DEA?

11  A.  DEA, the applicable state or local agency.

12  Q.  And where would I find records of those
13  contacts with state or local agencies?

14  A.  Well, first of all, you would have -- if
15  the record existed, it would be in security's files.
16  But I'm not saying that there are any that exist.

17  Q.  Is there a reason that there wouldn't be
18  ones that exist?

19  A.  Yeah, because we didn't have any
20  information that a particular pharmacy was involved in
21  diversion.

22  Q.  Can you recall a time when you had
23  information that a particular pharmacy was involved in
24  diversion?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    A.   I can recall a time when there were
2  pharmacies that I had concern about, and I notified the
3  DEA on that.
4    Q.   Is that all?
5    A.   Yes.
6    Q.   Does Mallinckrodt to your knowledge have
7  any suspicious order monitoring policies and procedures
8  that are specific to Tennessee?
9    A.   No, it's a national program.
10   Q.   I'm going to show you what we will mark
11 here as Plaintiff's Exhibit 31.
12       [Exhibit Mallinckrodt-Gillies-031
13       marked for identification.]
14   Q.   I don't like to use the ELMO.
15   A.   Really?
16   Q.   Do you want me to use -- I can use it if
17 you want me to use it, but for me I don't use it.
18 Okay.  Here.  Ooh, it's really small.  Yeah, I can see
19 why.
20       THE VIDEOGRAPHER:  Can you see?
21       MS. HERZFELD:  Can you see?  How's that?
22       THE VIDEOGRAPHER:  Here you go.
23 BY MS. HERZFELD:
24   Q.   That's good.  Is that better?

Page 303

1    A.   Could you blow that up?  Yeah, that --
2        THE VIDEOGRAPHER:  That's as big as it
3  gets.
4    A.   Okay.
5  BY MS. HERZFELD:
6    Q.   When we all get over a certain age, it
7  makes it difficult to see.  Okay.  Okay.  If you'll
8  take a look at this document.
9    A.   I'm not going to be able to see it here.
10 So can you just --
11   Q.   Just -- you can see it from there.
12   A.   Okay.
13   Q.   Yeah.  Okay.  I'm just going to show you
14 this document here, and this is a document that's been
15 produced to us in discovery.
16   A.   Okay.
17   Q.   Can you tell from this document what it
18 appears to be?
19   A.   I mean, it appears to be a search of files
20 that they're providing.
21   Q.   And so when I look at this document, it
22 looks to me like it's a printout of all the different
23 kinds of places where documents are maybe stored on a
24 server, like an internal Mallinckrodt server.

Page 304

1    A.   Okay.
2    Q.   Am I right in that?
3        MR. O'CONNOR:  Objection to scope.
4    A.   I mean, I'm uncertain, but it says
5  department, legal, and stuff, and the purpose and the
6  file path.  I mean, it looks like folders within a
7  computer system.
8  BY MS. HERZFELD:
9    Q.   And do you have any way of knowing if this
10 is a complete listing of the files in the computer
11 system?
12       MR. O'CONNOR:  Objection to scope.
13   A.   I have no idea.
14 BY MS. HERZFELD:
15   Q.   And when you say that documents would be
16 in security, for example --
17   A.   Uh-huh.
18   Q.   -- there's a security folder at
19 Mallinckrodt?
20   A.   Yes.
21   Q.   And that would look something like one of
22 these?  It's not like a filing cabinet; it's like a
23 computer path?
24   A.   That's correct.

Page 305

1    Q.   Okay.  That's my only question to that.
2    A.   Okay.
3    Q.   Thank you.  Okay.  Moving on to Exhibit
4  32.
5        [Exhibit Mallinckrodt-Gillies-032
6        marked for identification.]
7    Q.   This one's a little bit easier to see.
8  Okay.
9    A.   Okay.
10   Q.   Have you seen this document before?
11   A.   I believe I have.
12   Q.   And it looks like at the bottom it says
13 it's the DEA distributor conference PowerPoint from
14 September 23rd, 2015.  Is that correct?
15   A.   Yes.
16   Q.   And I think you were talking before about
17 different DEA conferences that occur throughout the
18 years.  Is that right?
19   A.   Yes.
20   Q.   And did you ever attend those DEA
21 conferences?
22   A.   Put on by DEA?  No.  Put on by others?
23 Yes.
24   Q.   And if somebody from Mallinckrodt attended

Page 306

1 those conferences from DEA, they would bring back
2 information to the team; is that right?
3     A.   That's right.
4     Q.   And is that how this PowerPoint made it
5 back from this conference to Mallinckrodt?
6     A.   I don't know how it made it back, so --
7     Q.   But you've seen it before?
8     A.   I believe I have.
9     Q.   If you'll flip through with me here.
10    A.   Okay.
11    Q.   To -- there aren't really any pages on it.
12    A.   Okay.
13    Q.   There aren't page numbers.  It's about --
14 one that says at the bottom MNK_TNSTA00607267.  It's
15 the first map.  If you'll take a look at that for me,
16 please.
17    A.   Yes.
18    Q.   You see where I'm at?
19    A.   Yes.
20    Q.   Could you please tell me what the title of
21 this map is?
22    A.   2007 Tennessee opioid prescriptions.
23    Q.   And that's showing prescription rate per
24 hundred population; is that right?

Page 307

1     A.   Yes.
2     Q.   Flip with me to the next page, please.
3 Could you tell me the title there?
4     A.   2008 Tennessee opioid prescriptions.
5     Q.   And that's also showing prescription rates
6 per hundred population; is that right?
7     A.   Yes.
8     Q.   And the highest prescription rate is the
9 darkest color; is that right?
10    A.   Yes.
11    Q.   And from the 2007 page to 2008 page, do
12 you agree that there are more darkened colors in 2008
13 than there were in 2007?
14         MR. O'CONNOR:  Objection to form.
15    A.   Yes.
16 BY MS. HERZFELD:
17    Q.   If you'll flip with me to the next page,
18 please.  Could you read the title there for me, please?
19    A.   2009 Tennessee opioid prescriptions.
20    Q.   And that also is a prescription rate per
21 hundred population; is that right?
22    A.   Correct.
23    Q.   And the darkened number is the highest
24 number of prescription rates per hundred population; is

Page 308

1 that right?
2     A.   Correct.
3     Q.   And does there appear to be more darkened
4 shades on the 2009 than there were on the 2008?
5         MR. O'CONNOR:  Objection to form.
6     A.   Yes.
7 BY MS. HERZFELD:
8     Q.   If you'll flip with me to the next page.
9 If you could give me the title here, please.
10    A.   2010 Tennessee opioid prescriptions.
11    Q.   And this also shows the prescription rate
12 per hundred population, with the darkest number being
13 the highest; is that correct?
14    A.   Correct.
15    Q.   And does 2010's map look darker in some
16 sections than 2009?
17         MR. O'CONNOR:  Objection to form.
18    A.   Yes.
19 BY MS. HERZFELD:
20    Q.   If you'll flip with me to the next page,
21 please.  What is the title of that page?
22    A.   2011 Tennessee opioid prescriptions.
23    Q.   And this it says here is a map of
24 Tennessee, with the darkest colors being the highest

Page 309

1 rate of prescription per hundred population; is that
2 correct?
3     A.   Correct.
4     Q.   And would you agree that the 2011 map
5 looks darker than the 2010 map?
6         MR. O'CONNOR:  Objection to form.
7     A.   Yes.
8 BY MS. HERZFELD:
9     Q.   And if you look at the 2007 map compared
10 to the 2011 map.
11         Based on these two documents, would you
12 say the prescription rate for opioids per hundred
13 population in Tennessee went up?
14    A.   Yes.
15    Q.   If you'll flip with me to the next page,
16 the one at the bottom that says 607272.  Could you read
17 the title of that page for me, please?
18    A.   Painkiller prescriptions by state.
19    Q.   Okay.  Could you read the rest of the
20 slide for me here?
21    A.   In 2012, southern states had the most per
22 person.  The top three states were Alabama, Tennessee,
23 and West Virginia.  Alabama, 143 per hundred people.
24 Tennessee, 143 per hundred people.  West Virginia, 138

Page 310

1  per hundred people. Lowest, Hawaii, 52 per hundred
2  people.
3      Q.   If you'll switch with me to the next page,
4  please. Read the title of that page for me.
5      A.   Tennessee pain clinics, 2014.
6      Q.   And this shows that there are 307
7  certified clinics within Tennessee; is that right?
8      A.   That's what it says, yes.
9      Q.   And it breaks it down by counties; is that
10 right?
11     A.   Yes.
12     Q.   If you'll flip with me to the next page,
13 724 -- 7274. Okay. If you could tell me what the
14 title of this page is, please.
15     A.   Tennessee top 10 controlled substances,
16 2014.
17     Q.   And what is the top controlled substance
18 for Tennessee in 2014, according to this chart?
19     A.   Hydrocodone products.
20     Q.   And the second?
21     A.   Alprazolam.
22     Q.   And the third?
23     A.   Oxycodone.
24     Q.   And does Mallinckrodt produce oxycodone?

Page 311

1      A.   Yes.
2      Q.   And does Mallinckrodt produce hydrocodone?
3      A.   Yes.
4      Q.   If you'll switch to the next one for me,
5  please, the one at the bottom that says 7275. Read the
6  top of the page for me, please.
7      A.   Impact in Tennessee.
8      Q.   And then what is the next line that starts
9  with deaths?
10     A.   Deaths. Over 1,000 people are dying from
11 in the state every year.
12     Q.   And the next one that starts with
13 children?
14     A.   Children. 50 percent of the children in
15 DCS care are there because of parental drug abuse.
16 Over the past decade, there's been a tenfold rise in
17 the incidence of babies born with neonatal abstinence
18 syndrome.
19     Q.   And the one that says health care costs?
20     A.   Health care costs. ER visits for
21 overdoses have increased 40 percent from 2005 to 2010.
22 Estimated cost of providing drug treatment to Tennessee
23 drug abusers living below the poverty line is $28
24 million.

Page 312

1      Q.   Where it says crime?
2      A.   Drug-related crimes have increased 33
3  percent from 2005 to 2012. Lost productivity,
4  prescription drug abuse cost was estimated at $143
5  million in 2008. Adjusted for inflation, it's now $160
6  million.
7      Q.   And if you'll switch with me then to the
8  next -- the page at the bottom that's 7277. Could you
9  read the title of that page for me, please?
10     A.   Unlawful distribution.
11     Q.   And the first line it says is
12 inappropriate or overprescribing. Would you agree that
13 that is unlawful distribution of opioids?
14          MR. O'CONNOR: Objection to form.
15     A.   If there wasn't a legitimate medical
16 purpose.
17 BY MS. HERZFELD:
18     Q.   What about knowledge of redistribution?
19 Would that constitute unlawful distribution of opioids?
20          MR. O'CONNOR: Objection to form.
21     A.   So just so that I'm clear, what are we
22 saying knowledge of redistribution is?
23 BY MS. HERZFELD:
24     Q.   Knowledge of redistribution of an opioid

Page 313

1  without a legitimate medical purpose.
2          MR. O'CONNOR: Objection to form. Same
3  objection.
4      A.   So somebody's redistributing the product
5  for a nonmedical purpose or a scientific purpose;
6  right?
7  BY MS. HERZFELD:
8      Q.   Or a drug abuse purpose?
9      A.   Or doing it for a drug abuse purpose?
10     Q.   Yes, sir.
11     A.   Okay.
12     Q.   Would you consider that to be unlawful
13 distribution of an opioid product?
14          MR. O'CONNOR: Objection. Form.
15     A.   It would be diversion of the product.
16 BY MS. HERZFELD:
17     Q.   And is diversion of the product unlawful?
18     A.   And it could be.
19     Q.   Lax or careless prescription practices.
20 Could that be indicative of unlawful distribution?
21          MR. O'CONNOR: Objection to form.
22     A.   I don't know what that relates to, but it
23 could be.
24 BY MS. HERZFELD:

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    Q.   What about people who are doctor shoppers?
2 Could that indicate unlawful distribution?
3        MR. O'CONNOR:  Objection to form.
4    A.   It could be somebody that's involved in
5 the illicit drug trade.
6 BY MS. HERZFELD:
7    Q.   And prescription rings would be
8 prescription drug rings.  That would be an unlawful
9 distribution of opioids; is that correct?
10       MR. O'CONNOR:  Objection to form.
11   A.   Yes.
12 BY MS. HERZFELD:
13   Q.   You can switch with me on -- oops.  Losing
14 myself here.  Okay.  If you'll switch with me to the
15 one at the bottom that says 7286.  It says United
16 States versus Lang.  Do you see that?
17   A.   Yes.
18   Q.   And this says Superior One Medical Clinic.
19 Do you know where Superior One Medical Clinic is
20 located?
21   A.   I do not.
22   Q.   If I told you it was in Tennessee, would
23 you have any reason to doubt that?
24       MR. O'CONNOR:  Objection to form.

Page 315

1    A.   I don't think you would mislead me.
2 BY MS. HERZFELD:
3    Q.   I'm going to just flip through this to
4 make this a little bit quicker.  Okay.  On the one at
5 the bottom that says 7288.  Okay.  Can you read me the
6 title of that document, please?
7    A.   Oxycodone's street value is based on
8 prescriptions.
9    Q.   Are you aware that there is a street value
10 for oxycodone?
11       MR. O'CONNOR:  Objection to form.
12   A.   Yes.
13 BY MS. HERZFELD:
14   Q.   And if you'll switch with me almost all
15 the way here to the back.  The one that's 7309.  My
16 apologies.  Okay.  Could you read the top of that title
17 for me?
18   A.   More east Tennessee pill defendants.
19   Q.   And this indicates -- one, two, three,
20 four, five, six, seven, eight, nine, 10, 11, 12 -- 12
21 people who pled guilty or were found guilty of some
22 crime involving pills in east Tennessee, according to
23 this chart; is that correct?
24       MR. O'CONNOR:  Objection.

Page 316

1    A.   I'll take your comment that that's
2 accurate.
3 BY MS. HERZFELD:
4    Q.   Is that what the page shows?
5    A.   It shows names, ages, and then I'm making
6 the assumption that that's their sentencing and how it
7 either occurred through a plea or trial.
8    Q.   So based on these documents that we've
9 looked at, was Mallinckrodt aware that there was an
10 opioid crisis in Tennessee?
11       MR. O'CONNOR:  Objection to form.
12   A.   As I've stated earlier, Mallinckrodt
13 became aware of the scope of the opioid crisis after
14 our meeting with the DEA in August of 2011.
15 BY MS. HERZFELD:
16   Q.   And Mallinckrodt was aware that there was
17 an opioid crisis in Tennessee as well; is that correct?
18       MR. O'CONNOR:  Objection to form.
19   A.   I don't know that.
20 BY MS. HERZFELD:
21   Q.   If you'll switch with me to the page here
22 in this one last one here, 7310, the second to third
23 back.  Okay.  Could you read the title of that page for
24 me, please?

Page 317

1    A.   Red flags.
2    Q.   And red flags that are indicated by this
3 DEA PowerPoint here -- the first one is complaints.
4 Did Mallinckrodt consider complaints to be a red flag
5 of diversion?
6        MR. O'CONNOR:  Objection to form.
7    A.   Mallinckrodt considered certain red flags.
8 I'm not sure what the complaint is referencing here on
9 this page.  So --
10 BY MS. HERZFELD:
11   Q.   I'll rephrase the question.  When
12 Mallinckrodt was looking for red flags of diversion,
13 would Mallinckrodt look for complaints about a
14 particular location?
15   A.   So --
16       MR. O'CONNOR:  Objection to form.
17   A.   Complaints against a pharmacy?
18 BY MS. HERZFELD:
19   Q.   Sure.
20   A.   Yes.
21   Q.   Complaints about a doctor?
22   A.   Yes.
23   Q.   Complaints about there being a pill mill
24 someplace?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    MR. O'CONNOR: Objection to form.
2    A.   Yes.
3 BY MS. HERZFELD:
4    Q.   What about form of payment? Is form of
5 payment something that Mallinckrodt would look at?
6    A.   Yes.
7    Q.   What about the types of customers? Is
8 that something Mallinckrodt would look at?
9    A.   So again, our customers are the
10 distributors and the wholesalers, so I'm assuming on
11 this page this is talking about customers to the
12 pharmacy.
13    Do you know? Because I don't know what
14 types of customers here, but our customers are the
15 wholesalers and distributors. So -- I don't know how
16 they're defining types of customers here, so it's hard
17 for me to answer that question.
18    Q.   So when we said before form of payment is
19 something that Mallinckrodt would look at to indicate
20 diversion, is that form of payment of the distributor?
21    A.   No, in that case, working through the
22 distributors and the wholesalers, we would learn
23 whether there's a high percentage of cash being paid
24 for products. So from that perspective, that's one of

Page 319

1 the red flags we would be looking for.
2    Q.   And would you look through the
3 distributors or wholesalers for the types of customers?
4    A.   No.
5    Q.   Would you look through the distributors or
6 wholesalers for the type of location?
7    MR. O'CONNOR: Object to form.
8    A.   So if the distributor or wholesaler --
9 actually, if Mallinckrodt became concerned about a
10 pharmacy, we would do some research on the location of
11 that pharmacy.
12    But again, I don't know what they mean by
13 type of location, so I don't know how to fully reply to
14 that question without knowing what he meant or she
15 meant when she wrote type of location.
16 BY MS. HERZFELD:
17    Q.   Is that -- is the type of location for
18 where a pharmacy is located, is that something that
19 Mallinckrodt would request information of routinely
20 from his wholesalers or distributors?
21    A.   No.
22    MR. O'CONNOR: Objection to form.
23 BY MS. HERZFELD:
24    Q.   What about an unexplained increase in

Page 320

1 sales? Is that one of the routine things Mallinckrodt
2 would look for through its wholesalers or distributors?
3    MR. O'CONNOR: Objection to form.
4    A.   So again, our sales are to the
5 distributors and wholesalers. In our chargeback
6 review, if we saw an increase in sales, we would ask
7 for an explanation from the distributors or the
8 wholesalers.
9 BY MS. HERZFELD:
10    Q.   And that's how the process goes now?
11    A.   That is how the process is, yes.
12    Q.   And is that how the process has been the
13 entire time you've been at Mallinckrodt?
14    A.   Yes.
15    Q.   And when you would communicate with
16 Mallinckrodt about some of these types of things -- you
17 said you would get that information through your
18 distributors or wholesalers.
19    When they gave you that information, would
20 Mallinckrodt do anything to verify that information, or
21 would you just accept what your wholesalers or
22 distributors tell you?
23    MR. O'CONNOR: Objection to form.
24    A.   So can you repeat that question?

Page 321

1 BY MS. HERZFELD:
2    Q.   Sure.
3    A.   Just so I completely understand it. Yeah.
4    Q.   Yeah. I'm going to try not to go through
5 the whole list, because --
6    A.   Okay.
7    Q.   But you had said before that when we were
8 talking about some of these questions --
9    A.   Uh-huh.
10    Q.   -- you would try to -- Mallinckrodt would
11 try to get that information through its wholesalers or
12 distributors in some circumstances. Did I characterize
13 your testimony fairly?
14    A.   Yeah, if we became aware of a pharmacy
15 that we should be concerned about. Okay.
16    Q.   But absent somebody making you aware of
17 something you should -- Mallinckrodt would be concerned
18 about with a particular pharmacy, you didn't routinely
19 check on these things for your customer's customer; is
20 that right?
21    MR. O'CONNOR: Objection to form.
22    A.   That's correct.
23 BY MS. HERZFELD:
24    Q.   So I guess my question is, if you had a

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  concern about a particular pharmacy -- for example,
2  because of an increased amount of sales -- and you
3  reached out to your distributor, your wholesaler
4  person, as you've said that you would, you would ask
5  them for an explanation?
6      A.   That's right.
7      Q.   And then they would come back to you with
8  an explanation?
9      A.   That's correct.
10     Q.   Would you do any additional investigation
11 to verify that the explanation they gave you was
12 accurate, or would you --
13     A.   No.
14         MR. O'CONNOR:  Objection to form.
15     A.   We worked with these distributors and
16 wholesalers, and I trusted what they were telling me.
17 BY MS. HERZFELD:
18     Q.   Okay.  That's my last question on this
19 document.
20     A.   Okay.
21         MR. KO:  Tricia, I hate to interrupt.  Can
22 we go off the record for just one minute?
23         MS. HERZFELD:  Sure.
24         THE VIDEOGRAPHER:  We are going off the

Page 323

1  record at 5:47 PM.
2          [A brief recess was taken.]
3          THE VIDEOGRAPHER:  We are back on the
4  record at 6:02 PM.
5  BY MS. HERZFELD:
6      Q.   Okay, Mr. Gillies.  We're back on the
7  record after a short break.  I just have a few more
8  questions for you, and hopefully they'll be pretty
9  quick.
10         When you were talking earlier about the
11 role of wholesalers and distributors in the supply
12 chain and the policies that you have, along with those
13 for the distribution of opioids, are those different in
14 any way for Tennessee than they are nationally?
15     A.   No.
16         MR. O'CONNOR:  Objection to form.
17 BY MS. HERZFELD:
18     Q.   Have you been involved -- strike that.
19         Have you -- are you aware of any formal or
20 informal investigations about opioid distribution
21 within Tennessee?
22     A.   Outside what we've discussed?
23     Q.   Yes, sir.
24     A.   No.

Page 324

1      Q.   And other than what we've discussed with
2  your previous interaction with law enforcement in
3  Tennessee, are you aware of any other inquiries from
4  law enforcement in Tennessee about opioid abuse in
5  Tennessee?
6      A.   Not that I can recall.
7      Q.   And has Mallinckrodt communicated at all
8  with the Tennessee Attorney General about opioid abuse
9  or diversion in Tennessee?
10     A.   I don't know about Tennessee.
11     Q.   Do you know who the Attorney General of
12 Tennessee is right now?
13     A.   I do not.
14     Q.   Does the name Herb Slatery ring any bells
15 to you?
16     A.   I'm sorry.  It does not.
17     Q.   What about a gentleman named Bob Cooper?
18 Kind of a general name, but Bob Cooper as the Tennessee
19 Attorney General, does that mean anything to you?
20     A.   No.
21     Q.   Have you personally communicated with
22 anyone at the Tennessee Attorney General's office about
23 the abuse or diversion of opioids in Tennessee?
24     A.   No.

Page 325

1      Q.   I think there was a topic about online
2  pharmacies.  Do you know if any online pharmacies
3  shipped any Mallinckrodt products to Tennessee?
4      A.   I'm not aware of any.
5      Q.   Do you know if online pharmacies' ordering
6  of Mallinckrodt products had any connection to
7  Tennessee in any way?
8          MR. O'CONNOR:  Objection to form.
9      A.   I'm sorry.  Could you restate that one
10 more time?  Or repeat it, actually, not restate it.
11 BY MS. HERZFELD:
12     Q.   Sure.  Do you know if any online
13 pharmacies' ordering of Mallinckrodt products have any
14 connection to Tennessee?
15     A.   I do not.
16         MR. O'CONNOR:  Objection.
17         MS. HERZFELD:  Okay.  I don't have any
18 more questions for you.
19     A.   Okay.
20         MS. HERZFELD:  Thank you.
21     A.   Thank you.
22         MR. O'CONNOR:  Any questions from anybody
23 else?
24         MS. HARMON:  No.

Page 326

1      MR. O'CONNOR: I just have a very short,
2  very short list of questions.
3      MS. HERZFELD: Like your two minutes.
4      MR. O'CONNOR: Actually, it might be two
5  minutes. All right.
6      MR. GOLDSTEIN: It's attorney two minutes.
7              EXAMINATION
8  BY MR. O'CONNOR:
9      Q.   Mr. Gillies, earlier today you provided
10  testimony in response to questions from Mr. Ko about
11  discussions with DEA concerning the abuse potential of
12  hydrocodone and hydromorphone; correct?
13     A.   Yes.
14     Q.   And you recall Mr. Ko's questions asked
15  about those two products together?
16     A.   Yes.
17     Q.   Are you aware of any discussions with the
18  DEA about the abuse potential of hydromorphone in
19  particular?
20     A.   No.
21     Q.   In preparing for today's deposition, you
22  reviewed materials related to Mallinckrodt's national
23  suspicious order monitoring program; correct?
24     A.   Correct.

Page 327

1      Q.   And you also reviewed materials relating
2  to other national efforts or national controls geared
3  towards the prevention of diversion?
4      A.   Yes, our program is national.
5      Q.   Does that suspicious order monitoring
6  program apply in the State of Tennessee?
7      A.   It would.
8      Q.   And do the other anti-diversion controls
9  you discussed today also apply in the State of
10  Tennessee?
11     A.   Yes.
12     MR. O'CONNOR: All right. That's all I
13  have.
14     MS. HERZFELD: You're free to go.
15     MR. O'CONNOR: You want to go off the
16  record?
17     THE WITNESS: We're all free to go.
18     THE VIDEOGRAPHER: We are going off the
19  record at 6:07 PM.
20
21          [SIGNATURE RESERVED.]
22
23
24

Page 328

1              C E R T I F I C A T E
2
3      I, JOHN ARNDT, a Certified Shorthand
4  Reporter and Certified Court Reporter, do hereby
5  certify that prior to the commencement of the
6  examination, JOHN GILLIES was sworn by me to testify
7  the truth, the whole truth and nothing but the truth.
8      I DO FURTHER CERTIFY that the foregoing is a
9  true and accurate transcript of the proceedings as
10  taken stenographically by and before me at the time,
11  place and on the date hereinbefore set forth.
12     I DO FURTHER CERTIFY that I am neither a
13  relative nor employee nor attorney nor counsel of any
14  of the parties to this action, and that I am neither a
15  relative nor employee of such attorney or counsel, and
16  that I am not financially interested in this action.
17
18
19  _____
20     JOHN ARNDT, CSR, CCR, RDR, CRR
21     CSR No. 084-004605
22     CCR No. 1186
23
24

Page 329

1
2      I, JOHN GILLIES, the witness herein,
3  having read the foregoing testimony of the pages of
4  this deposition, do hereby certify it to be a true and
5  correct transcript, subject to the corrections, if any,
6  shown on the attached page.
7
8
9
10          _____
11              JOHN GILLIES
12
13
14  Sworn and subscribed to before me,
15  This _____ day of _____, 201_.
16
17
18  _____
19     Notary Public
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1　　　　　DEPOSITION ERRATA SHEET

2

3　Page No._____Line No._____Change to:_____

4　_____

5　Reason for change:_____

6　Page No._____Line No._____Change to:_____

7　_____

8　Reason for change:_____

9　Page No._____Line No._____Change to:_____

10　_____

11　Reason for change:_____

12　Page No._____Line No._____Change to:_____

13　_____

14　Reason for change:_____

15　Page No._____Line No._____Change to:_____

16　_____

17　Reason for change:_____

18　Page No._____Line No._____Change to:_____

19　_____

20　Reason for change:_____

21

22　SIGNATURE:_____DATE:_____

23　　　　　JOHN GILLIES

24