# EXHIBIT 34

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2               EASTERN DIVISION
 3

     IN RE: NATIONAL       )
 4   PRESCRIPTION          )  MDL No. 2804
     OPIATE LITIGATION     )
 5   _____  )  Case No.
                           )  1:17-MD-2804
 6                         )
     THIS DOCUMENT RELATES )  Hon. Dan A.
 7   TO ALL CASES          )  Polster
 8
              TUESDAY, JANUARY 15, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                  - - -
12            Videotaped deposition of Karen
13   Harper, held at the offices of STINSON
14   LEONARD STREET LLP, 7700 Forsyth Boulevard,
15   Suite 1000, St. Louis, Missouri, commencing
16   at 9:09 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter and Certified Realtime Reporter.
19
20
21
22                  - - -
          GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
25
```

Page 2

```
 1        A P P E A R A N C E S :
 2
 3    KELLER ROHRBACK LLP
      BY:  DAVID KO
 4        dko@kellerrohrback.com
          DEREK LOESER
 5        dloeser@kellerrohrback.com
      1201 Third Avenue, Suite 3200
 6    Seattle, Washington 98101
      (206) 428-0562
 7    Counsel for Plaintiffs
 8
 9    BRANSTETTER STRANCH & JENNINGS, PLLC
      BY:  TRICIA HERZFELD
10        triciah@bsjfirm.com
      223 Rosa L. Parks Avenue, Suite 200
11    Nashville, Tennessee 37203
      (615) 254-8801
12    Counsel for the Tennessee Action
13
14    ARMSTRONG TEASDALE
      BY:  JULIE FIX MEYER
15        jfixmeyer@armstrongteasdale.com
      7700 Forsyth Boulevard, Suite 1800
16    St. Louis, Missouri 63105
      (314) 621-5070
17    Counsel for Cardinal Health, Inc.
18
19    COVINGTON & BURLING LLP
      BY:  EMILY KVESELIS
20        ekveselis@cov.com
      850 Tenth Street, NW
21    Washington, DC 20001-4956
      (202) 662-6000
22    Counsel for McKesson Corporation
23
24
25
```

Page 3

```
 1    JACKSON KELLY, PLLC
      BY:  SYLVIA WINSTON NICHOLS
 2        sylvia.winston@jacksonkelly.com
          (VIA TELECONFERENCE)
 3    150 Clay Street, Suite 500
      Morgantown, West Virginia 26501
 4    (304) 284-4138
      Counsel for AmerisourceBergen
 5
 6
 7    JONES DAY
      BY:  NICHOLAS HODGES
 8        nhodges@jonesday.com
      4655 Executive Drive, Suite 1500
 9    San Diego, California 92121
      (858) 314-1200
10    Counsel for Walmart
11
12    ROPES & GRAY, LLP
      BY:  WILLIAM DAVISON
13        william.davison@ropesgray.com
          ANDREW O'CONNOR
14        Andrew.O'Connor@ropesgray.com
      800 Boylston Street
15    Boston, Massachusetts 02199-3600
      (617) 951-7000
16    Counsel for Mallinckrodt
17
18    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  DAVID HIBEY
19        david.hibey@arnoldporter.com
          (VIA TELECONFERENCE)
20    601 Massachusetts Avenue, NW
      Washington, DC 20001-3743
21    (202) 942-5000
      Counsel for Endo Pharmaceuticals
22    Inc., and Endo Health Solutions Inc.
23
24
25
```

Page 4

```
 1    FOX ROTHSCHILD LLP
      BY:  JACOB PERSKIE
 2        jperskie@foxrothschild.com
          (VIA TELECONFERENCE)
 3    1301 Atlantic Avenue, Suite 400
      Atlantic City, New Jersey 08401
 4    (609) 572-2355
      Counsel for Validus Pharmaceuticals
 5
 6
 7    VIDEOGRAPHER:
          JAMES ARNDT,
 8        Golkow Litigation Services
 9            – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            INDEX
 2                    PAGE
 3    APPEARANCES..................................  2
 4    EXAMINATIONS
 5      BY MR. KO....................................  14
 6      BY MS. HERZFELD........................... 454
 7      BY MR. O'CONNOR........................... 610
 8      BY MS. HERZFELD........................... 615
 9      BY MR. KO................................... 615
10
11            EXHIBITS
12    No.      Description          Page
13    Mallinckrodt  Karen Harper LinkedIn        40
      Harper 1      Profile printout
14
      Mallinckrodt  E-mail(s),          109
15    Harper 2      MNK-T1_0000275504 -
                    MNK-T1_0000275524
16
      Mallinckrodt  E-mail(s),          130
17    Harper 3      MNK-T1_0000283074 -
                    MNK-T1_0000283098
18
      Mallinckrodt  E-mail(s),          151
19    Harper 4      MNK-T1_0001308810 -
                    MNK-T1_0001308811
20
      Mallinckrodt  E-mail(s),          158
21    Harper 5      MNK-T1_0000273902 -
                    MNK-T1_0000273909
22
      Mallinckrodt  DEA Compliance All Site      211
23    Harper 6      Conference Call,
                    MNK-T1_0000287983 -
24                  MNK-T1_0000287985
25
```

Page 6

Mallinckrodt E-mail(s)    220
Harper 7    MNK-TI_0000274572

Mallinckrodt E-mail(s)    230
Harper 8    MNK-TI_0000419810 -
MNK-TI_0000419815

Mallinckrodt Deposition transcript of    225
Harper 9    Karen Harper taken on
November 7, 2013

Mallinckrodt E-mail(s)    240
Harper 10    MNK-TI_0007146630 -
MNK-TI_0007146633

Mallinckrodt E-mail(s)    249
Harper 11    MNK-TI_0000301994

Mallinckrodt E-mail(s)    262
Harper 12    MNK-TI_0000419907 -
MNK-TI_0000419908

Mallinckrodt E-mail(s)    267
Harper 13    MNK-TI_0000302096 -
MNK-TI_0000302100

Mallinckrodt E-mail(s)    289
Harper 14    MNK-TI_0000278806 -
MNK-TI_0000278810

Mallinckrodt E-mail(s)    300
Harper 15    MNK-TI_0000270090

Mallinckrodt E-mail(s)    326
Harper 16    MNK-TI_0000280260

Mallinckrodt E-mail(s)    343
Harper 17    MNK-TI_0000368390 -
MNK-TI_0000368391

Mallinckrodt E-mail(s)    346
Harper 18    MNK-TI_0000279142

Mallinckrodt E-mail(s)    347
Harper 19    MNK-TI_0000301020

Mallinckrodt E-mail(s)    349
Harper 20    MNK-TI_0000372333 -
MNK-TI_0000372334

Page 7

Mallinckrodt E-mail(s)    354
Harper 21    MNK-TI_0007728295 -
MNK-TI_0007728296

Mallinckrodt E-mail(s)    358
Harper 22    MNK-TI_0000500657 -
MNK-TI_0000500660

Mallinckrodt E-mail(s)    371
Exhibit 23    MNK-TI_0000421850 -
MNK-TI_0000421854

Mallinckrodt November 1, 2010 letter to    374
Harper 24    US Department of Justice
from Covidien,
MNK-TI_0000280607 -
MNK-TI_0000280609

Mallinckrodt Harvard (MI) Summary,    379
Harper 25    MNK-TI_0000264292

Mallinckrodt Controlled Substance    393
Harper 26    Compliance/Suspicious Order
Monitoring Audit 12/07/10,
MNK-TI_0000307304 -
MNK-TI_0000307308

Mallinckrodt September 21, 2011 letter to    397
Harper 27    Wayne Corona from Karen
Harper,
MNK-TI_0000970734 -
MNK-TI_0000970735

Mallinckrodt October 17, 2011 letter from    400
Harper 28    Karen Harper to 43
wholesalers/distributors,
MNK-TI_0000289368 -
MNK-TI_0000289369

Mallinckrodt E-mail(s)    405
Harper 29    MNK-TI_0000291258 -
MNK-TI_0000291259

Mallinckrodt Brooks Pharmacy Monthly    417
Harper 30    Total 15mg & 30mg Oxy "Sales
Qty Govt UOM" 2010-2011

Page 8

Mallinckrodt Island Drug Total 15mg &    422
Harper 31    30mg Oxy "Sales Qty Govt
UOM" 2010-2011

Mallinckrodt November 2, 2010 memorandum    431
Harper 32    from Karen Harper to Howard
Davis,
MNK-TI_0000269399 -
MNK-TI_0000269400

Mallinckrodt E-mail(s),    444
Harper 33    MNK-TI_0000485740 -
MNK-TI_0000485741

Mallinckrodt E-mail(s),    461
Harper 34    MNK_TNSTA05123927

Mallinckrodt E-mail(s),    471
Harper 35    MNK-TI_0007185722 -
MNK-TI_0007185732

Mallinckrodt Mallinckrodt Chargeback    496
Harper 36    Restriction Reinstatement
Listing 11/13/2017,
MNK_TNSTA00609639

Mallinckrodt E-mail(s),    502
Harper 37    MNK_TNSTA05340154 -
MNK_TNSTA05340156

Mallinckrodt E-mail(s),    504
Harper 38    MNK_TNSTA05337163

Mallinckrodt E-mail(s),    511
Harper 39    MNK-TI_0007026593 -
MNK-TI_0007026594

Mallinckrodt Suspicious Order Monitoring    517
Harper 40    Chargeback Data 2009, 2010,
2011 Combined, Oxy 30 Totals
by State and Population
MNK_TNSTA05126722

Mallinckrodt DIRJ and Pill Mill Physician    531
Harper 41    Lists,
MNK-TI_0007704503

533

Page 9

Mallinckrodt IMS High Oxy 30 Prescribers    ---
Harper 42    Jan 2012,
MNK-TI_0005947296

Mallinckrodt IMS Prescribers thru Jan    535
Harper 43    2013 - Condensed,
MNK-TI_0007704471

Mallinckrodt Prescriber List    535
Harper 44    MNK-TI_0005947297

Mallinckrodt Oxy 15 and Oxy 30 Ship to    537
Harper 45    and Sold via by month
Jan-Dec 2011 run 2-15-12
non-merged cells,
MNK_TNSTA02527616

Mallinckrodt Oxy 15 and 30 Ship to and    540
Harper 46    Sold via by month Jan-Dec
run 2-15-12 non-merged
cells,
MNK_TNSTA02527616

Mallinckrodt HydroApap 10s Ship to and    543
Harper 47    Sold via by month Jan
2012-Dec 2012 All APAP,
MNK_TNSTA02527625

Mallinckrodt HydroApap 10s Ship to Sold    548
Harper 48    via by mo Jan2015-Dec2015
APAP run 1-15-16,
MNK-TI_0007717730

Mallinckrodt Cardinal Top 40 Oxycodone    551
Harper 49    30mg Pharmacies As of March
2012,
MNK-TI_0004592727

Mallinckrodt Pharmacy Information Sheet,    558
Harper 50    MNK-TI_0004592754 -
MNK-TI_0004592758

Mallinckrodt Pharmacy Information Sheet,    562
Harper 51    MNK_TNSTA05350336

Mallinckrodt Cardinal Health March 5-6,    570
Harper 52    2012 Summary Report,
MNK_TNSTA05353270 -
MNK_TNSTA05353272

Page 10

1  Mallinckrodt  Pharmacy Information Sheet,  572
   Harper 53    Cardinal Health,
2             MNK_TNSTA00612651
3  Mallinckrodt  Pharmacy Information Sheet,  574
   Harper 54    Cardinal Health,
4             MNK_TNSTA00607869
5  Mallinckrodt  Riggs Pharmacies all sales  578
   Harper 55    run T1-30-12,
6             MNK_TNSTA00612647
7  Mallinckrodt  Oxy 15 and 30 Ship to and  590
   Harper 56    Sold via by month Jan-Dec
8             2011 run 2-15-12 non-merged
             cells,
9             MNK_TNSTA02527616
10 Mallinckrodt  HydroApap 10s Shp to Sold  593
   Harper 57    via by mo Jan2015-Dec2015
11            325 APAP run 1-15-16,
             MNK-T1_0007717730
12 Mallinckrodt  "DEA investigators seeking  602
   Harper 58    answers in small Tennessee
13            town"
14 Mallinckrodt  E-mail(s),                  603
   Harper 59    MNK-T1_0006462195 -
15            MNK-T1_0006462197
16 Mallinckrodt  E-mail(s),                  606
   Harper 60    MNK-T1_0007185456 -
17            MNK-T1_0007185457
18 Mallinckrodt  E-mail(s),                  608
   Harper 61    MNK-T1_0007259043
19
20 Mallinckrodt  E-mail(s),                  615
   Harper 62    MNK-T1_0000387492
21
22   (Exhibits attached to the deposition.)
23
24
25

Page 11

1      VIDEOGRAPHER:  We are now on    08:49:49
2  the record.  My name is James Arndt.    09:08:57
3  I'm a videographer for Golkow    09:09:00
4  Litigation Services.    09:09:01
5      Today's date is January 15th of    09:09:01
6  2019, and the time is 9:09 a.m.    09:09:05
7      This video deposition is being    09:09:07
8  held in St. Louis, Missouri, in the    09:09:09
9  matter of the National Prescription    09:09:11
10 Opiate Litigation for the United    09:09:14
11 States District Court for the Northern    09:09:15
12 District of Ohio, Eastern Division.    09:09:17
13     The deponent is Karen Harper.    09:09:18
14     Will counsel please identify    09:09:20
15 themselves.    09:09:22
16     MR. KO:  Good morning.  David    09:09:23
17 Ko, Keller Rohrback, on behalf of    09:09:25
18 plaintiffs.    09:09:27
19     MR. LOESER:  Derek Loeser from    09:09:28
20 Keller Rohrback for the plaintiffs.    09:09:28
21     MS. HERZFELD:  Tricia Herzfeld,    09:09:30
22 Branstetter, Branch & Jennings, for    09:09:31
23 the Tennessee plaintiffs.    09:09:31
24     MS. FIX MEYER:  Julie Fix    09:09:34
25 Meyer, Armstrong Teasdale, for    09:09:34

Page 12

1  Cardinal Health.    09:09:38
2      MS. KVESELIS:  Emily Kveselis,    09:09:38
3  Covington & Burling, for McKesson.    09:09:40
4      MR. HODGES:  Nick Hodges, Jones    09:09:41
5  Day, for Walmart.    09:09:42
6      MR. DAVISON:  William Davison,    09:09:44
7  Ropes & Gray, for Mallinckrodt, LLC,    09:09:44
8  SpecGx, LLC, and the witness.    09:09:45
9      MR. O'CONNOR:  Andrew O'Connor    09:09:45
10 from Ropes & Gray for Mallinckrodt,    09:09:49
11 LLC, SpecGx and Ms. Harper.    09:09:52
12     VIDEOGRAPHER:  Will counsel    09:09:53
13 present by phone please identify    09:09:53
14 themselves.    09:09:56
15     MR. HIBEY:  David Hibey of    09:09:58
16 Arnold & Porter for the Endo and Par    09:10:01
17 defendants.    09:10:03
18     MR. PERSKIE:  Jacob Perskie,    09:10:04
19 Fox Rothschild, for Validus.    09:10:09
20     MS. WINSTON:  Sylvian Winston    09:10:11
21 of Jackson Kelly for the    09:10:12
22 AmerisourceBergen Drug Corporation.    09:10:15
23     VIDEOGRAPHER:  The court    09:10:19
24 reporter is Carrie Campbell, and she    09:10:20
25 will now swear in the witness.    09:10:21

Page 13

1      KAREN HARPER,
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Plaintiffs, as follows:
6
7      MR. KO:  Before we get started,    09:10:30
8  I just wanted to note for the record    09:10:32
9  that yesterday evening Mallinckrodt's    09:10:33
10 counsel had provided some documents,    09:10:35
11 another production of documents,    09:10:38
12 including some documents apparently    09:10:39
13 from Ms. Harper's custodial file.  It    09:10:40
14 appears to be a fairly substantial    09:10:44
15 production.    09:10:46
16     We didn't get a chance to    09:10:47
17 review those, so I just wanted to note    09:10:48
18 for the record that we reserve the    09:10:49
19 right to reopen this deposition based    09:10:50
20 on that review.    09:10:52
21     MR. O'CONNOR:  And we believe    09:10:52
22 the documents we produced don't    09:10:53
23 prejudice the plaintiffs in any way,    09:10:55
24 and I'm happy to discuss that further,    09:10:59
25 but do disagree with your    09:11:00

Page 14

```
1    characterization.                09:11:01
2         DIRECT EXAMINATION            09:11:03
3    QUESTIONS BY MR. KO:               09:11:04
4    Q.   Good morning.  We met earlier,  09:11:05
5    just a moment ago.                 09:11:06
6         Could you please state and     09:11:07
7    spell your name for the record?    09:11:09
8    A.   Yes.  Karen Harper, K-a-r-e-n,  09:11:09
9    H-a-r-p-e-r.                       09:11:12
10   Q.   Ms. Harper, where do you      09:11:14
11   currently reside?                  09:11:16
12   A.   St. Louis County, Missouri.   09:11:17
13   Q.   Okay.  And I know that you have  09:11:19
14   had your deposition taken at least once  09:11:21
15   before in connection with a matter involving  09:11:23
16   Island Drug Pharmacy.              09:11:28
17        Have you had your deposition     09:11:29
18   taken at any other time other than that  09:11:30
19   instance?                          09:11:32
20   A.   Earlier in my life, before I   09:11:32
21   was an employee of Mallinckrodt.   09:11:35
22   Q.   Okay.  So how many times have  09:11:37
23   you been deposed?                  09:11:38
24   A.   Two -- twice.                 09:11:38
25   Q.   Okay.  So you understand       09:11:40
```

Page 15

```
1    probably some of the ground rules, but I just  09:11:42
2    want to remind you of a few that are  09:11:44
3    important to me today.             09:11:47
4         The court reporters have the    09:11:48
5    most important job here in transcribing  09:11:49
6    everything that we're saying, so it's  09:11:52
7    important that we don't talk over one  09:11:53
8    another.  So please wait until I finish my  09:11:54
9    question before you move on to your response,  09:11:56
10   and likewise, I'll wait until you finish your  09:11:58
11   question {sic} before I move on to my next  09:12:00
12   question.                          09:12:03
13        Does that sound good?          09:12:03
14   A.   Yes.                          09:12:04
15   Q.   And to the extent I ask a yes   09:12:05
16   or no question, I would ask that you actually  09:12:07
17   in fact answer yes or no, if that's your  09:12:11
18   response, rather than shaking your head or  09:12:11
19   nodding your head.                 09:12:15
20   A.   Understood.                   09:12:16
21   Q.   Okay.  And from time to time    09:12:16
22   counsel at this table may object to my  09:12:17
23   questioning, but unless you get a clear  09:12:19
24   instruction not to respond, I would ask that  09:12:21
25   you respond to my question.        09:12:23
```

Page 16

```
1    Okay?                              09:12:23
2    A.   Yes.                          09:12:24
3    Q.   I think we're here for a fairly  09:12:25
4    long time today, so to the extent you need  09:12:27
5    breaks throughout the day, please feel free  09:12:30
6    to ask and I'll do my best to accommodate.  09:12:33
7         Okay?                         09:12:35
8    A.   Thank you.                    09:12:36
9    Q.   Ms. Harper, is there anything  09:12:36
10   that you can think of today that will prevent  09:12:41
11   you from testifying truthfully and honestly?  09:12:43
12   A.   No.                           09:12:46
13   Q.   Great.                        09:12:46
14        Ms. Harper, what did you do to  09:12:47
15   prepare for this deposition today?  09:12:51
16   A.   I met with my attorneys.      09:12:52
17   Q.   Okay.  And who are they?       09:12:54
18   A.   Ropes & Gray.                 09:12:55
19   Q.   Okay.  And Mr. O'Connor and    09:12:58
20   Mr. Davison sitting here today, are those the  09:13:00
21   two individuals that you met with?  09:13:02
22   A.   Yes, among others.            09:13:03
23   Q.   Okay.  And how many attorneys  09:13:04
24   did you meet with?                 09:13:06
25   A.   At least one other.           09:13:06
```

Page 17

```
1    Q.   Okay.  And how many times did   09:13:08
2    you meet?                          09:13:09
3    A.   Five times.                   09:13:09
4    Q.   Okay.  So you met for five     09:13:10
5    different days or five different sessions?  09:13:13
6    A.   Five different sessions.      09:13:14
7    Q.   Okay.  And how many hours total  09:13:16
8    would you say that would be?       09:13:17
9    A.   The first two sessions were    09:13:18
10   eight -- two eight-hour days, so 16 and 16,  09:13:21
11   32.  Then we had an eight-hour day, 40, and  09:13:26
12   another two eight-hour days.  So 56 hours.  09:13:30
13   Q.   Sounds like a lot of           09:13:34
14   preparation.                       09:13:36
15        Other than your outside          09:13:37
16   counsel, or other than Ropes & Gray, were  09:13:42
17   there any other people present during your  09:13:44
18   meetings?                          09:13:49
19   A.   No.                           09:13:50
20   Q.   Okay.  And in those meetings,   09:13:50
21   did you review any documents?      09:13:53
22   A.   Yes.                          09:13:54
23   Q.   Okay.  And did -- were those    09:13:55
24   documents selected by counsel?     09:13:58
25   A.   Yes.                          09:14:01
```

Page 18

1    Q.    Okay.  And did you provide any    09:14:02
2  documents in any of these meetings?    09:14:04
3    A.    Not in those meetings.    09:14:06
4    Q.    Okay.  In preparation for this    09:14:09
5  deposition today, have you spoken with any    09:14:15
6  current or former employees of Mallinckrodt    09:14:18
7    A.    Only to the extent that I    09:14:20
8  needed to be absent from work.    09:14:23
9    Q.    Okay.  Are you aware that other    09:14:26
10  former and current employees of Mallinckrodt    09:14:31
11  have been deposed?    09:14:32
12    A.    Yes.    09:14:33
13    Q.    Okay.  Have you spoken with any    09:14:34
14  of those deponents?    09:14:36
15    A.    No, sir.    09:14:37
16    Q.    Okay.  You know who Bill    09:14:38
17  Ratliff is, right?    09:14:41
18    A.    Yes.    09:14:42
19    Q.    Have you spoken with him about    09:14:42
20  this deposition at all?    09:14:44
21    A.    No.    09:14:44
22    Q.    Okay.  Do you know who John    09:14:45
23  Gillies is?    09:14:48
24    A.    Yes.    09:14:48
25    Q.    Have you spoken with him?    09:14:48

Page 19

1    A.    No.    09:14:50
2    Q.    Okay.  Ms. Harper, where did    09:14:53
3  you go to school?  I mean, college, excuse    09:14:55
4  me.    09:14:58
5    A.    I only have a couple of years    09:14:58
6  partial college credits, and so that was at    09:15:00
7  community college district, St. Louis,    09:15:03
8  Missouri.    09:15:06
9    Q.    Okay.  And what was the name of    09:15:06
10  that school?    09:15:07
11    A.    Meramec Community College.    09:15:07
12    Q.    Okay.  And did you actually    09:15:09
13  obtain a degree?    09:15:11
14    A.    I did not.    09:15:11
15    Q.    Okay.  And where did you -- by    09:15:12
16  the way, what year did you stop going to    09:15:18
17  school?    09:15:20
18    A.    So I graduated from high school    09:15:20
19  and took intermittent college classes but    09:15:22
20  never achieved a degree.  So I graduated from    09:15:26
21  high school in 1974.    09:15:28
22    Q.    Okay.  And after you stopped    09:15:30
23  going to community college, where did you    09:15:34
24  first work?    09:15:35
25    A.    Goldman and Gibson.  It was a    09:15:36

Page 20

1  specialty advertising company.    09:15:44
2    Q.    Okay.  And what did you do    09:15:45
3  there?    09:15:46
4    A.    Clerical.    09:15:46
5    Q.    Okay.  When did you first start    09:15:47
6  working at Mallinckrodt?    09:15:49
7    A.    In March of 1975.    09:15:50
8    Q.    Okay.  So there was a brief    09:15:53
9  period of about approximately one year    09:15:54
10  between when you ceased going to community    09:15:56
11  college and when you started working at    09:15:58
12  Mallinckrodt?    09:16:00
13    A.    Yes.    09:16:00
14    Q.    Okay.  And what was your first    09:16:00
15  job at Mallinckrodt?    09:16:02
16    A.    Clerk typist.    09:16:02
17    Q.    Okay.  And clerk typist for    09:16:05
18  what division or department?    09:16:08
19    A.    Purchasing group in the    09:16:09
20  corporate area.    09:16:12
21    Q.    Okay.  And how long did you do    09:16:12
22  that?    09:16:15
23    A.    Approximately one year.    09:16:15
24    Q.    Okay.  I may want to walk    09:16:18
25  through each position you had at    09:16:24

Page 21

1  Mallinckrodt, but why don't we try this way.    09:16:25
2        When did you first become    09:16:28
3  senior manager of controlled substance    09:16:30
4  compliance?    09:16:32
5    A.    I don't remember the year.    09:16:33
6    Q.    Okay.  Do you remember if it    09:16:35
7  was the late '70s or the early '80s?    09:16:36
8    A.    I'm sorry, I don't remember the    09:16:41
9  year.    09:16:42
10    Q.    Okay.  And when I say    09:16:42
11  "controlled substance compliance," it's my    09:16:43
12  understanding that the group was actually    09:16:44
13  called DEA compliance at the time.    09:16:46
14    A.    Correct.    09:16:48
15    Q.    Does that comport with your    09:16:49
16  understanding?    09:16:50
17    A.    Yes.  Yes.    09:16:50
18    Q.    And so you have no recollection    09:16:51
19  of when you became senior manager of DEA    09:16:54
20  compliance?    09:16:56
21    A.    I have recollection, but I    09:16:56
22  can't remember the year.  I'm sorry.    09:17:00
23    Q.    Okay.  And what is your    09:17:02
24  recollection?  Is it approximately -- I mean,    09:17:03
25  are we talking the 1990s that you became the    09:17:05

Page 22

```
1   senior manager or is it the '80s?          09:17:08
2       A.   It would have been in the -- in   09:17:10
3   the -- after 2000.                          09:17:13
4       Q.   After 2000?                        09:17:14
5       A.   Yes.                               09:17:15
6       Q.   Okay.  So from the period          09:17:16
7   between when you became senior manager of   09:17:17
8   controlled substance compliance, or DEA     09:17:21
9   compliance, and when you were first started 09:17:23
10  at Mallinckrodt, there was approximately    09:17:26
11  25 years that had passed?                    09:17:28
12      A.   Yes.                               09:17:29
13      Q.   Okay.  And how was it that you     09:17:29
14  became senior manager of that group after   09:17:38
15  starting as a clerical typist?              09:17:42
16      A.   I moved into senior manager        09:17:45
17  after I went to the controlled substances   09:17:48
18  compliance group.  I was a coordinator in   09:17:52
19  that department, then became manager and then 09:17:55
20  became senior manager.                       09:17:58
21      Q.   Okay.  And when did you become     09:17:59
22  coordinator of the DEA compliance/CSC?      09:18:04
23      A.   I'm not certain of the year.       09:18:07
24  2001, approximate.                          09:18:11
25      Q.   Okay.  That's -- I believe         09:18:13
```

Page 23

```
1   that's when you said you became senior      09:18:15
2   manager.                                    09:18:17
3       I was asking when you first             09:18:18
4   became a coordinator, as you described      09:18:19
5   earlier.  Approximately when was that?      09:18:21
6       A.   No, sir, I'm sorry.  I think I     09:18:22
7   said I became senior manager after year 2000, 09:18:24
8   but I couldn't remember the year.  I        09:18:27
9   apologize.                                  09:18:30
10      Q.   I got it.                          09:18:30
11      So around 2001 is when you              09:18:30
12  became a coordinator --                     09:18:32
13      A.   Yes.                               09:18:35
14      Q.   -- at the control --               09:18:35
15      A.   Yes.                               09:18:36
16      Q.   -- for the DEA compliance          09:18:37
17  group?                                      09:18:38
18      A.   Yes.  Yes.                         09:18:38
19      Q.   That's helpful.  Thank you.        09:18:39
20  And at the time you became                  09:18:40
21  involved in the DEA compliance group, were  09:18:45
22  you aware that Mallinckrodt was manufacturing 09:18:48
23  controlled substances?                       09:18:50
24      A.   Yes.                               09:18:50
25      Q.   Including prescription opioids?    09:18:51
```

Page 24

```
1       A.   Yes.                               09:18:52
2       Q.   Okay.  And by the way, have you    09:18:55
3   ever worked for the DEA?                    09:18:59
4       A.   No.                                09:19:00
5       Q.   Have you ever worked for the       09:19:01
6   government?                                 09:19:02
7       A.   No.                                09:19:02
8       Q.   Have you worked in any -- for      09:19:03
9   any employer that -- whose responsibility it 09:19:07
10  was to perform diversion-type activities on 09:19:11
11  controlled substances?                       09:19:16
12      A.   No.                                09:19:16
13      Q.   Okay.  Other than the one year     09:19:17
14  between finishing your -- or other than the 09:19:19
15  one year between when you stopped going to  09:19:23
16  community college and when you started      09:19:26
17  working at Mallinckrodt, fair to say that you 09:19:28
18  had no other employment?                     09:19:30
19      In other words, from 1975 to            09:19:33
20  present, you have always worked at          09:19:34
21  Mallinckrodt, correct?                       09:19:35
22      A.   That is correct.                   09:19:36
23      Q.   Okay.  At the time you joined      09:19:37
24  in 2001, the approximate 2001 time period,  09:19:43
25  when you joined the DEA compliance team,    09:19:46
```

Page 25

```
1   approximately how large was that team?      09:19:49
2       A.   Three or four people.              09:19:51
3       Q.   Okay.  And who were those three    09:19:53
4   or four people?                             09:19:54
5       A.   My manager and two other           09:19:54
6   compliance coordinators.                    09:20:00
7       Q.   Okay.  Who was your manager at     09:20:01
8   that time?                                  09:20:03
9       A.   The gentleman's name is Jay        09:20:03
10  Foushee.                                    09:20:07
11      Q.   Okay.                              09:20:07
12      A.   Would you like for me to spell     09:20:07
13  that?                                       09:20:09
14      Q.   That's okay.  We can get it        09:20:09
15  later.                                      09:20:11
16      A.   All right.                         09:20:11
17      Q.   And so you reported to him?        09:20:12
18      A.   Yes.                               09:20:14
19      Q.   Okay.  And you said two other      09:20:15
20  compliance managers.  Who --                09:20:16
21      A.   Compliance coordinators.           09:20:19
22      Q.   Coordinators, excuse me.           09:20:20
23      A.   Yes, sir.                          09:20:20
24      Q.   Thank you.                         09:20:21
25      Who were they?                          09:20:23
```

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    A.   Mary Lewis and a gentleman      09:20:23
2  named Lee Nelson.                       09:20:25
3    Q.   And did the composition or the   09:20:27
4  size of this team change over time?     09:20:34
5    A.   Yes.                             09:20:37
6    Q.   Okay.  Did it expand, I assume?  09:20:39
7    A.   Yes.                             09:20:41
8    Q.   And when did you -- when do you  09:20:41
9  recall when it first expanded beyond the   09:20:46
10  four -- three or four people you've    09:20:48
11  mentioned?                             09:20:52
12    A.   After a few years went by --    09:20:52
13  and I'm sorry, I don't know the year -- the   09:20:55
14  company purchased another -- an additional   09:20:56
15  controlled substances facility in Hobart,   09:21:00
16  New York, and the department grew after that.   09:21:04
17    Q.   Okay.  Did it -- and how -- to   09:21:07
18  what extent did it grow?               09:21:10
19    A.   There are two persons who were   09:21:12
20  in the DEA compliance group at Hobart,   09:21:14
21  New York, as an isolated department, and we   09:21:17
22  became one group.  And there was another   09:21:21
23  person who was in the group at our Webster   09:21:24
24  Groves narcotics manufacturing facility, so   09:21:28
25  our group became united as one corporate   09:21:29

Page 27

1  department, if you will.               09:21:33
2    Q.   Okay.  So far to say it         09:21:34
3  doubled in size?  Your group --        09:21:37
4    A.   Yes.                            09:21:39
5    Q.   -- became seven or eight        09:21:39
6  people?                               09:21:41
7    A.   Yes.                            09:21:41
8    Q.   Okay.  At any time that you     09:21:42
9  were involved in the DEA compliance group,   09:21:44
10  was the group ever comprised of more than ten   09:21:47
11  individuals?                          09:21:51
12    A.   No.                            09:21:51
13    Q.   Okay.  It was always           09:21:52
14  approximately anywhere from three to eight   09:21:53
15  people?                               09:21:55
16    A.   Yes.                           09:21:55
17    Q.   Okay.  Ms. Harper, are you     09:21:55
18  familiar with the Controlled Substances Act?   09:21:59
19    A.   Yes.                           09:22:00
20    Q.   And are you familiar that      09:22:01
21  pursuant to Controlled Substances Act that   09:22:03
22  registrants have a fundamental duty to   09:22:05
23  maintain effective controls against   09:22:13
24  diversion?                            09:22:10
25    A.   Yes, I believe the language is   09:22:10

Page 28

1  to guard against diversion, but, yes.   09:22:13
2    Q.   Okay.  And are you familiar    09:22:16
3  that under the -- do you mind if I call the   09:22:20
4  Controlled Substances Act the CSA?     09:22:24
5    A.   I don't mind.                   09:22:25
6    Q.   Okay.  Are you familiar that   09:22:26
7  pursuant to the CSA that registrants have a   09:22:27
8  duty to monitor and implement a system to   09:22:30
9  identify suspicious orders?            09:22:32
10       MR. O'CONNOR:  Object to form.   09:22:33
11       THE WITNESS:  Yes, I'm aware.   09:22:35
12  QUESTIONS BY MR. KO:                   09:22:36
13    Q.   Okay.  And these obligations   09:22:37
14  have existed since the time that CSA was   09:22:39
15  enacted, correct?                     09:22:41
16       MR. O'CONNOR:  Object to form.   09:22:42
17       THE WITNESS:  I don't know the   09:22:44
18  date of the CSA versus the creation of   09:22:47
19  CFR 21.                              09:22:53
20  QUESTIONS BY MR. KO:                   09:22:55
21    Q.   Okay.  And by CFR 21, are you   09:22:55
22  referring to the -- what's commonly referred   09:22:57
23  to the regs that are interpreting the CSA?   09:22:59
24    A.   Yes.                           09:23:04
25    Q.   Okay.  Regardless of when they   09:23:04

Page 29

1  were enacted, you understood at the time that   09:23:06
2  you joined the DEA compliance group in 2001   09:23:07
3  that the CSA required registrants to design   09:23:10
4  and implement a system to identify suspicious   09:23:15
5  orders; is that correct?              09:23:19
6    A.   Yes.                           09:23:19
7    Q.   Okay.  What was your           09:23:21
8  compensation when you first became a   09:23:24
9  coordinator at -- in the DEA compliance group   09:23:27
10  in 2001?                              09:23:30
11    A.   I don't know.                  09:23:30
12    Q.   Okay.  Can you give us an      09:23:32
13  approximation?                        09:23:34
14    A.   I'm sorry, I really can't.     09:23:35
15    Q.   Was it less than $50,000?      09:23:36
16    A.   I honestly don't know.  I can't   09:23:37
17  remember, I'm sorry.                  09:23:40
18    Q.   Okay.  Was it less than        09:23:41
19  $25,000?                             09:23:43
20    A.   I'm sorry, I can't remember.   09:23:43
21    Q.   All right.  What was your      09:23:45
22  compensation when you became senior manager   09:23:47
23  of DEA compliance?                    09:23:49
24    A.   I can't remember my salary over   09:23:50
25  the years.                           09:23:52

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    Q.    Okay.  Do you have an          09:23:54
2    approximate recollection of how much you    09:23:55
3    made?                                 09:23:57
4    A.    No, sir.                        09:23:57
5    Q.    Okay.  Do you recall if it was    09:23:59
6    $75,000 or more or above?             09:24:01
7    A.    No, sir, I don't recall.        09:24:03
8    Q.    Okay.  Do you know what your     09:24:04
9    salary is currently?                  09:24:09
10   A.    Yes.                            09:24:10
11   Q.    Okay.  And you're currently     09:24:13
12   director of controlled substance compliance,    09:24:15
13   correct?                              09:24:18
14   A.    Yes.                            09:24:19
15   Q.    And what is your salary         09:24:19
16   currently?                            09:24:21
17   A.    It's -- I'm going to give you    09:24:21
18   two numbers because I get that mixed up as    09:24:24
19   well, I'm sorry.  It's either ██████ or    09:24:27
20   ██████ per year.                      09:24:31
21   Q.    ██████████████████              09:24:32
22   A.    ██████████████                  09:24:34
23   Q.    ██████████████████              09:24:35
24   ██████████                           09:24:39
25   A.    ████████████████████            09:24:40

Page 31

1    ██████████                           09:24:42
2    Q.    And when did you start          09:24:42
3    ██████████████████?                  09:24:44
4    A.    I don't recall the year.        09:24:44
5    Q.    Okay.  And do you have any       09:24:45
6    other -- do you have a retirement package at    09:24:49
7    all?                                  09:24:51
8    A.    Yes.                            09:24:52
9    Q.    Okay.  And what does that        09:24:53
10   consist of?                           09:24:54
11   A.    It's 401(k).                    09:24:55
12   Q.    Okay.  Other than the 401(k)     09:24:56
13   and ██████████████████, do you        09:24:58
14   have any other additional compensation in    09:25:01
15   addition to your salary?              09:25:04
16   A.    Yes.                            09:25:05
17   Q.    And what does that consist of?    09:25:07
18   A.    A bonus, an annual bonus.       09:25:08
19   Q.    Okay.  And approximately how     09:25:10
20   much is that?                         09:25:11
21   A.    It's -- it's a percent of the    09:25:11
22   salary based upon the performance of the    09:25:14
23   company.                              09:25:17
24   Q.    Okay.  And what's the           09:25:17
25   approximate percentage that you received last    09:25:18

Page 32

1    year?                                 09:25:20
2    A.    It's 20 percent.                09:25:20
3    Q.    Okay.  And has that -- over the    09:25:23
4    time that you've either been senior manager    09:25:27
5    or director of controlled substance         09:25:28
6    compliance, has it been that approximate    09:25:30
7    percentage?                           09:25:32
8    A.    Yes.                            09:25:32
9    Q.    Okay.  Great.                    09:25:34
10        Ms. Harper, have you reviewed     09:25:35
11   any court documents or pleadings in this    09:25:39
12   case?                                 09:25:42
13   A.    I'm not certain.                09:25:42
14   Q.    Okay.  Are you aware that        09:25:46
15   there's a case currently pending in Ohio,    09:25:49
16   generally titled the national opioid        09:25:54
17   litigation?                           09:25:56
18   A.    Yes.                            09:25:56
19   Q.    And you're aware that there are    09:25:57
20   approximately 1500 jurisdictions that have    09:25:58
21   filed suit against various manufacturers,    09:26:02
22   distributors and retail pharmacies of       09:26:07
23   prescription opioids?                 09:26:08
24   A.    Yes.                            09:26:08
25   Q.    Okay.  And are you aware that     09:26:08

Page 33

1    these jurisdictions have alleged that these    09:26:09
2    entities are responsible for the opioid    09:26:12
3    crisis?                               09:26:14
4    A.    Yes.                            09:26:15
5    Q.    Okay.  By the way, are you       09:26:16
6    aware -- strike that.                 09:26:20
7        Are you generally aware that       09:26:20
8    these jurisdictions are alleging that these    09:26:25
9    entities should be responsible for the costs    09:26:28
10   that these entities have incurred as a result    09:26:30
11   of responding to the opioid crisis?     09:26:33
12   A.    Yes, in general.                09:26:35
13   Q.    Okay.  And are you aware of any    09:26:36
14   complaints that have actually been filed    09:26:39
15   against your company?                 09:26:42
16   A.    No.                             09:26:43
17   Q.    Okay.  So you haven't read any    09:26:46
18   of the complaints that have been filed    09:26:47
19   against Mallinckrodt?                 09:26:50
20   A.    I've read pieces of the MDL,     09:26:51
21   but nothing specific to Mallinckrodt.    09:26:55
22   Q.    Okay.  When you say "pieces of    09:26:56
23   the MDL," what do you mean?            09:26:59
24   A.    The multi-district litigation.    09:27:01
25   Q.    And particularly when you say    09:27:03

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  "pieces," I'm just trying to get an          09:27:04
2  understanding of what you've reviewed.       09:27:06
3      A.    So we receive a pharma news        09:27:07
4  brief every single day, and so there will be 09:27:10
5  excerpts from the various matters related to 09:27:13
6  the MDL, Judge Polster's rulings, et cetera. 09:27:16
7      Q.    I see.                             09:27:20
8          So in other words, you're            09:27:20
9  getting and receiving and reviewing these    09:27:22
10 news updates about the MDL?                   09:27:26
11     A.    Correct.                           09:27:28
12     Q.    Okay.  Great.                      09:27:29
13         Ms. Harper, do you agree that        09:27:30
14 there's an opioid epidemic in this country?  09:27:35
15         MR. O'CONNOR:  Object to form.       09:27:37
16         THE WITNESS:  Yes, I do.             09:27:38
17 QUESTIONS BY MR. KO:                          09:27:39
18     Q.    Okay.  And are you aware that       09:27:41
19 there's been an opioid epidemic in this       09:27:43
20 country for quite some time?                  09:27:45
21         MR. O'CONNOR:  Object to form.       09:27:47
22         THE WITNESS:  I don't know,          09:27:47
23     sir, what you mean by "quite some        09:27:50
24     time."                                   09:27:51
25         Can you -- I don't know.             09:27:52

Page 35

1  QUESTIONS BY MR. KO:                          09:27:53
2      Q.    When did you first start            09:27:54
3  believing that there was an opioid epidemic   09:27:57
4  in this country?                              09:28:02
5          MR. O'CONNOR:  Object to form.        09:28:03
6          THE WITNESS:  Approximately           09:28:04
7      mid-2000s.                                09:28:05
8  QUESTIONS BY MR. KO:                          09:28:06
9      Q.    Mid-2000s?                          09:28:07
10     A.    Yes, sir.                           09:28:08
11     Q.    Okay.  Are you familiar with        09:28:08
12 Mallinckrodt's market share of prescription   09:28:10
13 opioids?                                      09:28:13
14     A.    On some products, yes.             09:28:13
15     Q.    Okay.  With respect to the          09:28:18
16 generic product line of Mallinckrodt, are you 09:28:20
17 aware of Mallinckrodt's market share in the   09:28:24
18 generic line of business?                     09:28:27
19     A.    Not overall, no, sir.             09:28:29
20     Q.    Okay.  Are you aware that           09:28:31
21 Mallinckrodt has been either the number one   09:28:34
22 or number two in terms of market share        09:28:36
23 generic manufacturer of prescription opioids  09:28:40
24 for the last 20 or so years?                  09:28:42
25         MR. O'CONNOR:  Object to form.       09:28:43

Page 36

1          THE WITNESS:  That is not            09:28:44
2      the sta -- pardon me, the statistic I    09:28:46
3      have heard.                              09:28:48
4  QUESTIONS BY MR. KO:                          09:28:48
5      Q.    Okay.  What is the statistic        09:28:49
6  that you have heard?                          09:28:50
7      A.    That we're in the top five --      09:28:50
8      Q.    Okay.                              09:28:50
9      A.    -- of the share of generic         09:28:53
10 suppliers.                                    09:28:55
11     Q.    Okay.  And generic suppliers of     09:28:55
12 prescription opioids in particular, correct?  09:28:58
13     A.    Yes.                               09:28:59
14     Q.    Okay.  And currently, do you        09:29:00
15 understand that Mallinckrodt has the number   09:29:05
16 one market share of generic prescription      09:29:07
17 opioids?                                      09:29:10
18         MR. O'CONNOR:  Object to form.       09:29:10
19         THE WITNESS:  I don't -- I'm         09:29:11
20     sorry.  I don't know.  I don't know      09:29:12
21     our current market position.             09:29:13
22 QUESTIONS BY MR. KO:                          09:29:14
23     Q.    Okay.  During your time as          09:29:14
24 director or senior manager of controlled      09:29:18
25 substance compliance, have you ever inquired  09:29:21

Page 37

1  as to the market share of Mallinckrodt with   09:29:23
2  respect to prescription opioids?              09:29:26
3      A.    On certain specific drug           09:29:28
4  substances, yes.                              09:29:31
5      Q.    And which specific drug             09:29:32
6  substances?                                   09:29:34
7      A.    So I'll use the example            09:29:34
8  methylphenidate.  When we're applying for     09:29:40
9  quota, if there is an intent or if we have a  09:29:43
10 belief that we will grow our market share, I  09:29:46
11 need to learn the existing market share that  09:29:48
12 Mallinckrodt holds.                           09:29:51
13     Q.    Okay.  And when over the last       09:29:52
14 20 or so years have you inquired into that?   09:29:57
15         Has that been inquiries that         09:30:03
16 you've made on a fairly regular basis?        09:30:04
17         MR. O'CONNOR:  Object to form.       09:30:07
18         THE WITNESS:  Yes, in               09:30:07
19     coordination with quota requests to      09:30:08
20     DEA, yes.                                09:30:09
21 QUESTIONS BY MR. KO:                          09:30:10
22     Q.    And those quota requests on an      09:30:10
23 annual basis, correct?                        09:30:13
24     A.    Quota is granted on an annual      09:30:13
25 basis, but the requests are an iterative      09:30:16

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  process throughout a calendar year.  09:30:19
2      Q.    Okay.  And so you would say  09:30:20
3  that you have regularly -- I just want to  09:30:22
4  make sure I understand when you -- when you  09:30:25
5  have inquired into understanding  09:30:28
6  Mallinckrodt's market share, and you've said  09:30:30
7  on a fairly consistent basis, correct?  09:30:32
8      A.    Yes.  09:30:34
9      Q.    Okay.  And consistent means  09:30:36
10 throughout the year, as you've described, in  09:30:40
11 connection with issues when dealing with  09:30:42
12 quota requests to the DEA?  09:30:45
13     MR. O'CONNOR:  Object to form.  09:30:47
14     THE WITNESS:  Yes, throughout  09:30:47
15 the year, but on certain drug  09:30:49
16 substances at different times, sir.  09:30:51
17 QUESTIONS BY MR. KO:  09:30:52
18     Q.    Okay.  Going back to your  09:30:53
19 current position as director of controlled  09:30:57
20 substance compliance --  09:31:01
21     A.    Sorry.  09:31:02
22     Q.    That's okay.  09:31:03
23         -- when did you become  09:31:05
24 director?  09:31:07
25     A.    Within the last six months.  09:31:08

Page 39

1      Q.    Okay.  So fairly recently?  09:31:11
2      A.    Yes, sir.  09:31:12
3      Q.    And before that, you were  09:31:13
4  senior manager of controlled substance  09:31:15
5  compliance, correct?  09:31:17
6      A.    Yes.  09:31:18
7      Q.    Okay.  And so was this  09:31:18
8  considered a promotion?  09:31:20
9      A.    Yes, sir.  09:31:21
10     Q.    Okay.  And who did you replace,  09:31:22
11 if at all?  If anyone?  09:31:25
12     A.    No one.  09:31:27
13     Q.    So was this position created  09:31:28
14 for you?  09:31:30
15     A.    Yes.  09:31:30
16     Q.    Okay.  And what were the  09:31:31
17 circumstances of creating this position?  09:31:34
18     A.    It was an evolution, if you  09:31:36
19 will, of my -- my existing job  09:31:39
20 responsibilities that merited a different  09:31:43
21 title.  09:31:46
22     Q.    Okay.  And now that you're  09:31:46
23 director, do you have people that report to  09:31:55
24 you?  09:31:56
25     A.    Yes.  09:31:56

Page 40

1      Q.    And who reports to you?  09:31:57
2      A.    I have two direct reports.  09:31:58
3  They are managers of controlled substances  09:32:01
4  compliance.  09:32:04
5      Q.    And who are they?  09:32:07
6      A.    There's a gentleman named --  09:32:07
7  his name is Dave Hunter.  09:32:10
8      Q.    And who is the other person?  09:32:14
9  You said there were two?  09:32:17
10     A.    Eileen Spaulding.  09:32:17
11     Q.    Okay.  And you have worked with  09:32:19
12 Mr. Hunter and Ms. Spaulding before, correct?  09:32:21
13     A.    Correct.  09:32:24
14     Q.    And you worked with them in  09:32:25
15 connection with the controlled substance  09:32:26
16 compliance team throughout the time you were  09:32:30
17 senior manager, correct?  09:32:31
18     A.    Correct.  09:32:32
19         (Mallinckrodt-Harper Exhibit 1  09:32:40
20     marked for identification.)  09:32:40
21 QUESTIONS BY MR. KO:  09:32:40
22     Q.    I'd like to hand you an  09:32:41
23 exhibit.  Go ahead and mark this as Harper  09:32:42
24 Exhibit 1.  09:32:56
25         And there's no Bates on this,  09:33:09

Page 41

1  but this -- this appears to be a printout of  09:33:12
2  your LinkedIn profile; is that correct?  09:33:14
3      A.    Yes.  09:33:16
4      Q.    And does that appear to be an  09:33:16
5  accurate reflection or copy of your LinkedIn  09:33:19
6  profile?  09:33:23
7      A.    Yes.  09:33:23
8      Q.    And I don't want to spend too  09:33:23
9  much time on it, but I do want to ask you a  09:33:25
10 question about your involvement in the  09:33:27
11 National Association of Drug Diversion  09:33:33
12 Investigators.  09:33:36
13         Do you see that reference?  I  09:33:37
14 believe that's on the next page.  09:33:38
15     A.    Yes, I see it.  Yes.  09:33:43
16     Q.    And it indicates that you've  09:33:44
17 been a member of the NADDI since 2013?  09:33:46
18     A.    Yes.  09:33:50
19     Q.    What is the NADDI?  09:33:51
20     A.    It's a group -- it's a  09:33:54
21 consortium of industry, law enforcement  09:34:00
22 leaders that assemble to discuss the issues  09:34:05
23 around diversion.  09:34:10
24     Q.    Okay.  And diversion of  09:34:12
25 controlled substances?  09:34:14

Page 42

1 A. Yes. 09:34:15
2 Q. And did you have any 09:34:20
3 involvement in the NADDI prior to 2013? 09:34:21
4 A. Yes. 09:34:23
5 Q. Okay.  And what was that 09:34:28
6 involvement? 09:34:29
7 A. We received drug feed -- pardon 09:34:29
8 me, information feed entitled "RX News." 09:34:32
9 Q. From the NADDI? 09:34:37
10 A. Yes, sir. 09:34:40
11 Q. Other than receiving news from 09:34:41
12 the NADDI, did you have any other type of 09:34:45
13 involvement with them? 09:34:47
14 A. No. 09:34:48
15 Q. Okay.  Were you ever -- the 09:34:50
16 first time you became a member of the NADDI 09:34:55
17 was in 2013? 09:34:57
18 A. Yes. 09:34:58
19 Q. Okay.  Do you have any 09:35:00
20 involvement with any type of diversion 09:35:02
21 organization prior to 2013? 09:35:05
22 A. Yes. 09:35:06
23 Q. And which one is that? 09:35:08
24 A. The group name is Midwest 09:35:09
25 Controlled Substances Compliance Discussion 09:35:09

Page 43

1 Group. 09:35:18
2 Q. Okay.  And I believe I've seen 09:35:18
3 plenty of references to that group in the 09:35:21
4 documents, but is that -- correct me if I'm 09:35:23
5 wrong, but is that a type of industry working 09:35:27
6 group? 09:35:28
7 A. That's correct. 09:35:29
8 Q. In other words, there were 09:35:29
9 other manufacturers and distributors that 09:35:30
10 were part of that group? 09:35:33
11 A. No distributors. 09:35:33
12 Q. Okay.  So manufacturers of 09:35:35
13 prescription opioids were in that group; is 09:35:36
14 that correct? 09:35:38
15 A. Yes. 09:35:38
16 Q. Okay.  Other than that group, 09:35:39
17 any other organization that you were involved 09:35:46
18 in? 09:35:47
19 A. No. 09:35:48
20 Q. Okay.  Are you familiar with 09:35:48
21 the National Association of Controlled 09:35:51
22 Substances Authorities? 09:35:53
23 A. Oh, yes. 09:35:53
24  I beg your pardon. 09:35:55
25 Q. Okay.  So you had involvement 09:35:55

Page 44

1 with them? 09:35:56
2 A. I'd like to clarify my previous 09:35:57
3 answer. 09:36:00
4 Q. Sure. 09:36:00
5 A. I have been a member of 09:36:00
6 National Association of Controlled Substances 09:36:02
7 Authorities. 09:36:05
8 Q. Okay.  Since when? 09:36:05
9 A. I don't recall the date. 09:36:06
10 Approximately December 2013 forward. 09:36:11
11 Q. Okay.  So about the same time 09:36:13
12 you joined the NADDI? 09:36:14
13 A. Yes, sir. 09:36:15
14 Q. Okay.  Did you have any 09:36:16
15 involvement with this National Association of 09:36:17
16 Controlled Substances Authorities prior to 09:36:24
17 2013? 09:36:24
18 A. Not that I recall. 09:36:25
19 Q. Okay.  So fair to say other 09:36:28
20 than the Midwest Substance Compliance working 09:36:33
21 group, prior to 2013 you had no other 09:36:37
22 involvement with any other diversion-type 09:36:43
23 group? 09:36:45
24 A. Not that I recall. 09:36:46
25 Q. Okay.  Did you ever consider 09:36:48

Page 45

1 membership or joining any such groups? 09:36:55
2 A. No. 09:36:57
3 Q. Okay.  Why not? 09:36:58
4 A. My job was full time and my 09:36:59
5 husband was ill, so I did not participate in 09:37:08
6 extracurricular activities, if you will. 09:37:12
7 Q. Okay.  And let's take a step 09:37:14
8 back. 09:37:21
9  When you became -- I understand 09:37:21
10 you don't recall when you became senior 09:37:24
11 manager of controlled substance compliance, 09:37:26
12 but turning back to the first page of your 09:37:28
13 LinkedIn profile, it indicates that -- or at 09:37:30
14 least the profile indicates that you have 09:37:34
15 been senior manager for 43 years. 09:37:35
16  Is that incorrect? 09:37:37
17 A. That's incorrect. 09:37:38
18 Q. Okay.  It's more accurate to 09:37:39
19 say that you've been senior manager for some 09:37:41
20 period less than 17 years when considering 09:37:44
21 that you joined the controlled substance 09:37:46
22 compliance group in 2001? 09:37:48
23 A. Yes. 09:37:49
24 Q. Okay.  And when you first 09:37:50
25 became senior manager of the controlled 09:37:55

Page 46

1  substance compliance group, what were your          09:37:57
2  general responsibilities?                           09:38:00
3       A.    The same as they were as                 09:38:01
4  manager, except with one exception. I had --        09:38:06
5  when the company met with DEA, I was present         09:38:12
6  at those meetings where I had not been              09:38:16
7  necessarily in my previous position.               09:38:19
8       Q.    Okay. So in your previous               09:38:21
9  position, you had never communicated -- or          09:38:22
10 never met with the DEA, but when you became         09:38:26
11 senior manager, you became more involved and        09:38:29
12 met actually with the DEA?                          09:38:32
13      MR. O'CONNOR:  Object to form.                 09:38:33
14      THE WITNESS:  So I'd like to                   09:38:34
15      clarify, please.                               09:38:35
16 QUESTIONS BY MR. KO:                                09:38:36
17      Q.    Sure.                                    09:38:36
18      A.    All through my career in                 09:38:37
19 controlled substances compliance, I                 09:38:40
20 communicated with DEA in the course of              09:38:41
21 inspections and on quota requests.                  09:38:46
22      Q.    Okay. And so how did that                09:38:51
23 change when you became senior manager?              09:38:54
24      A.    So there were times when we met          09:38:56
25 with DEA in Washington, DC, and I then would        09:38:58

Page 47

1  participate in those meetings.                      09:39:05
2       Q.    I see.                                   09:39:07
3            And a moment ago when you said            09:39:08
4  that the only thing that really changed was         09:39:16
5  your interactions with the DEA relative to          09:39:19
6  when you were a manager, tell -- please             09:39:22
7  describe what your responsibilities were then      09:39:25
8  as a manager of the controlled substance           09:39:27
9  compliance group.                                   09:39:31
10      A.    As a manager of the controlled          09:39:31
11 substances compliance group, I had primary          09:39:33
12 responsibilities associated with the               09:39:38
13 St. Louis plant function in the beginning.          09:39:40
14 And then as time went on, we acquired the           09:39:44
15 Hobart, New York, facility, and they came in        09:39:48
16 as part of our group.                               09:39:53
17      MR. KO:  Sorry, do you mind if                 09:40:15
18      we go off the record for just a                09:40:17
19      second?                                        09:40:18
20      VIDEOGRAPHER:  We're going off                 09:40:19
21      the record at 9:40 a.m.                        09:40:19
22      (Off the record at 9:40 a.m.)                  09:40:25
23      VIDEOGRAPHER:  We are back on                  09:40:38
24      the record at 9:40 a.m.                        09:40:44
25

Page 48

1  QUESTIONS BY MR. KO:                                09:40:46
2       Q.    So when you say you had primary          09:40:46
3  responsibilities associated with St. Louis          09:40:49
4  and Hobart facilities, what exactly do you          09:40:51
5  mean?                                               09:40:54
6       A.    Prior to that, the controlled           09:40:54
7  substances compliance group at each facility        09:40:59
8  operated reporting to the management of their       09:41:02
9  separate sites. And so eventually the group         09:41:07
10 became one, and my position provided a              09:41:11
11 corporate oversight for all the facilities          09:41:14
12 that had controlled substances compliance           09:41:17
13 personnel.                                          09:41:19
14      Q.    Okay. And when you became                09:41:19
15 senior manager, those responsibilities              09:41:22
16 continued, correct?                                 09:41:24
17      A.    Yes.                                     09:41:25
18      Q.    Okay. And as you said, you               09:41:26
19 started interacting with the DEA on a more          09:41:28
20 regular basis.                                      09:41:31
21           Do you recall when you first              09:41:32
22 started communicating with the DEA more             09:41:35
23 frequently?                                         09:41:37
24      MR. O'CONNOR:  Object to form.                 09:41:38
25      THE WITNESS:  I don't know the                 09:41:38

Page 49

1      year. Well, it was when I became               09:41:41
2      senior manager, but I don't know that          09:41:44
3      year, I'm sorry.                               09:41:45
4  QUESTIONS BY MR. KO:                                09:41:45
5       Q.    Okay. Real briefly turning              09:41:45
6  back to your membership in the NADDI, are you       09:41:50
7  aware that they conduct trainings on topics         09:41:54
8  such as diversion?                                  09:41:58
9       A.    Yes.                                     09:42:00
10      Q.    Okay. Did you ever attend any           09:42:00
11 of those trainings?                                 09:42:01
12      A.    Yes.                                     09:42:02
13      Q.    Did you ever attend those               09:42:03
14 trainings before 2013?                              09:42:04
15      A.    I don't think so, but I do not          09:42:06
16 know.                                               09:42:09
17      Q.    Okay. Prior to 2013, did you            09:42:09
18 ever attend any type of training related to         09:42:12
19 diversion?                                          09:42:16
20      A.    Yes.                                     09:42:16
21      Q.    Okay. And what type of                  09:42:17
22 trainings?                                          09:42:18
23      A.    So there were DEA conferences           09:42:19
24 for industry.                                       09:42:22
25      Q.    Uh-huh. And --                          09:42:26

Page 50

```
1    A.    And --                    09:42:26
2    Q.    Go ahead.  Sorry.         09:42:27
3    A.    I apologize.              09:42:27
4    Q.    That's okay.              09:42:28
5    A.    They're private industry  09:42:29
6  conferences, not -- so they were hosted by   09:42:33
7  other than DEA.                   09:42:40
8    Q.    Sure.                     09:42:41
9         Similar to the Midwest     09:42:42
10 substance compliance group you were referring  09:42:44
11 to, or something separate?        09:42:45
12   A.    Something separate.       09:42:46
13   Q.    Okay.  And these were put on   09:42:47
14 by, as you said, private entities?   09:42:50
15   A.    Yes.                      09:42:52
16   Q.    Okay.  And in the -- from the   09:42:53
17 2001 to 2013 time period, how frequently did   09:42:58
18 you attend these trainings?       09:43:02
19   A.    Approximately one per year.   09:43:03
20   Q.    One per year.  Okay.      09:43:07
21         And the DEA conferences, do you   09:43:08
22 recall going to those on an annual basis or   09:43:10
23 was that less frequent than an annual basis?   09:43:12
24   A.    When they were offered, there   09:43:16
25 was a period of time they weren't offered on   09:43:19
```

Page 51

```
1  an annual basis.  But, yes, when they were   09:43:22
2  offered, I would attend, yes.     09:43:23
3    Q.    Okay.  And do you recall     09:43:25
4  attending a DEA conference in the fall   09:43:27
5  of 2008?                          09:43:32
6    A.    I'm so sorry, I'm not good on   09:43:32
7  my years.                         09:43:37
8    Q.    Sure.                     09:43:37
9    A.    I can't place the fall of 2008   09:43:37
10 and a conference at that time.    09:43:40
11   Q.    That's fine.  We can get to   09:43:40
12 some documents --                 09:43:42
13   A.    Okay.                     09:43:42
14   Q.    -- that will hopefully refresh   09:43:42
15 your recollection later.          09:43:46
16   A.    All right.                09:43:47
17   Q.    Do you maintain relationships   09:43:48
18 with any other individuals who have similar   09:43:49
19 jobs as you do for other entities?   09:43:52
20   A.    Yes.                      09:43:52
21   Q.    Which individuals and for what   09:44:02
22 entities do they work for?        09:44:04
23   A.    So there's a director of    09:44:05
24 controlled substances compliance at Teva   09:44:12
25 Pharmaceuticals.                  09:44:15
```

Page 52

```
1    Q.    Uh-huh.                   09:44:15
2    A.    Director of controlled       09:44:16
3  substances compliance at Noramco, and   09:44:18
4  representatives -- and I don't know their   09:44:29
5  exact titles -- Actavis and Watson.  So those   09:44:30
6  are the ones that come to mind.   09:44:35
7    Q.    Okay.  And the director of   09:44:38
8  Teva, who is she or he?           09:44:42
9    A.    Her name is Colleen McGinn.   09:44:44
10   Q.    And how long have you known   09:44:47
11 her?                              09:44:49
12   A.    Since I joined the controlled   09:44:49
13 substances compliance group.      09:44:52
14   Q.    In 2001?                  09:44:52
15   A.    Yes.                      09:44:56
16   Q.    Okay.  And did you speak with   09:44:57
17 her about diversion-type activities?   09:44:58
18         MR. O'CONNOR:  Object to form.   09:45:02
19         THE WITNESS:  Yes.        09:45:03
20 QUESTIONS BY MR. KO:              09:45:03
21   Q.    And how frequent?         09:45:04
22   A.    Intermittently.  I don't know   09:45:05
23 the frequency.                    09:45:09
24   Q.    Okay.  Are you aware of Federal   09:45:09
25 Register notices?                 09:45:21
```

Page 53

```
1    A.    Yes.                      09:45:22
2    Q.    Did you regularly review them   09:45:22
3  during your time in the DEA compliance group?   09:45:23
4    A.    Yes.                      09:45:26
5         MR. O'CONNOR:  Object to form.   09:45:26
6         THE WITNESS:  Yes.        09:45:28
7  QUESTIONS BY MR. KO:             09:45:28
8    Q.    How frequent would you say you   09:45:28
9  reviewed those?                   09:45:30
10   A.    I or someone in my group    09:45:31
11 monitored the Register every single day.   09:45:37
12   Q.    Okay.                     09:45:40
13   A.    For DEA notices.          09:45:41
14   Q.    I see.                    09:45:43
15         And when did you start doing   09:45:43
16 that?                             09:45:45
17   A.    I don't recall the year.  It --   09:45:46
18 I don't recall the year.          09:45:49
19   Q.    And would you say it was your   09:45:50
20 responsibility to review those notices?   09:45:54
21   A.    Initially, yes.           09:45:57
22   Q.    Okay.  And when did -- and I   09:45:58
23 assume you don't do that anymore if you said   09:46:04
24 "initially"?                      09:46:07
25   A.    It depends on the nature of the   09:46:08
```

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  notice that we're antici -- if we're          09:46:09
2  anticipating pivotal Federal Register Notice   09:46:10
3  about quota or our DEA registration, I         09:46:12
4  continue to monitor them, but other -- other   09:46:16
5  folks within my team monitor them on a daily   09:46:18
6  basis.                                         09:46:21
7      Q.   Okay.  And who would be those         09:46:22
8  individuals?                                   09:46:24
9      A.   The gentleman's name is Dave          09:46:25
10 Hunter.  He's the manager at the St. Louis     09:46:29
11 plant.                                         09:46:31
12     Q.   And he also, as you said              09:46:32
13 before, reports to you directly right now?     09:46:37
14     A.   Yes.                                  09:46:39
15     Q.   Are you aware of reviewing any        09:46:42
16 Federal Register Notices in the mid-2000s?     09:46:44
17     A.   I'm certain -- I'm not certain        09:46:47
18 because I'm mixed up on my years.              09:46:54
19     Q.   Sure.                                 09:46:56
20          But -- so I guess I'm trying to       09:46:56
21 get an understanding of when you started       09:46:58
22 reviewing these Federal Register Notices.      09:47:01
23     A.   Certainly that's helpful.            09:47:03
24          When I joined the controlled          09:47:05
25 substances compliance group.                   09:47:08

Page 55

1      Q.   Okay.  Again, we'll get to some       09:47:08
2  of those in a moment.                          09:47:14
3      A.   Okay.                                 09:47:15
4      Q.   Now, when you were in the DEA         09:47:16
5  compliance group, did you become aware of DEA  09:47:25
6  actions and investigations against major       09:47:29
7  distributors?                                  09:47:33
8      A.   Yes.                                  09:47:33
9      Q.   And those major distributors          09:47:34
10 are ABC, Cardinal and McKesson?                09:47:35
11     A.   Yes.                                  09:47:38
12     Q.   And did you review the details        09:47:38
13 of these investigations or DEA actions when    09:47:42
14 you became aware of them?                      09:47:48
15          MR. O'CONNOR:  Object to form.        09:47:48
16          THE WITNESS:  Not on a detailed       09:47:49
17     level all the time, but at a high          09:47:53
18     level, yes.                                09:47:55
19 QUESTIONS BY MR. KO:                           09:47:56
20     Q.   Okay.  Would it be fair to say        09:47:56
21 that these settlements and DEA actions of the  09:47:58
22 distributors caught your attention in          09:48:01
23 mid-2000 time period?                          09:48:04
24          MR. O'CONNOR:  Object to form.        09:48:04
25

Page 56

1  QUESTIONS BY MR. KO:                           09:48:05
2      Q.   The mid-2000s?                        09:48:06
3      A.   Yes.                                  09:48:07
4      Q.   Okay.  And would it also be           09:48:07
5  fair to say that up to that point, DEA         09:48:11
6  actions were against small or mid-sized        09:48:15
7  distributors related to their diversion-type  09:48:23
8  activities?                                    09:48:24
9      A.   I can't answer that question.         09:48:24
10 I don't know.                                  09:48:26
11     Q.   Now, at some point did you also       09:48:26
12 become aware of an action involving Purdue?    09:48:31
13          MR. O'CONNOR:  Object to form.        09:48:36
14          THE WITNESS:  Yes.                    09:48:37
15 QUESTIONS BY MR. KO:                           09:48:38
16     Q.   In particular, did you ever           09:48:40
17 become aware of the Purdue consent decree in   09:48:41
18 2007?                                          09:48:45
19     A.   Yes.                                  09:48:45
20     Q.   And are you aware that                09:48:45
21 investigation revolved around Purdue's         09:48:50
22 manufacturing, promotion and advertising       09:48:54
23 activities of OxyContin?                       09:48:56
24     A.   Yes.                                  09:48:57
25     Q.   Okay.  And at the time you            09:48:59

Page 57

1  became aware of that consent decree, I assume  09:49:04
2  you're also aware that Mallinckrodt was        09:49:08
3  manufacturing a generic form of OxyContin?     09:49:10
4          MR. O'CONNOR:  Object to form.         09:49:12
5          THE WITNESS:  I don't know the         09:49:12
6      timing of when we entered the market       09:49:16
7      for OxyContin -- or, I'm sorry, the        09:49:18
8      generic oxycodone, so I don't know         09:49:22
9      exactly the timing relative to the         09:49:23
10     Purdue matter.                             09:49:25
11 QUESTIONS BY MR. KO:                           09:49:26
12     Q.   Okay.  So you are aware that          09:49:26
13 Mallinckrodt has manufactured oxycodone,       09:49:28
14 correct?                                       09:49:31
15     A.   Yes.                                  09:49:31
16     Q.   And oxycodone, generally              09:49:31
17 speaking, is a generic form of a prescription  09:49:34
18 opioid?                                        09:49:36
19     A.   Oxycodone is the name of the          09:49:38
20 molecule, so, yes, it's -- yes, oxycodone is   09:49:39
21 manufactured into the generic, yes.            09:49:43
22     Q.   Okay.  And you're also aware          09:49:46
23 that Mallinckrodt manufactured various dosage  09:49:48
24 strengths of oxycodone, correct?              09:49:53
25     A.   Yes.                                  09:49:54

Page 58

1    Q.   Including oxy 15 milligrams and    09:49:55
2  oxy 30 milligrams, correct?    09:49:58
3    A.   Yes, in the IR release form,    09:49:59
4  yes.    09:50:03
5    Q.   And by "IR" you mean immediate    09:50:03
6  release, correct?    09:50:05
7    A.   Yes, sir.    09:50:05
8    Q.   Now, one of your primary    09:50:06
9  responsibilities as senior manager of    09:50:28
10 controlled substance compliance was to design    09:50:31
11 and implement a system to identify suspicious    09:50:35
12 orders, correct?    09:50:37
13       MR. O'CONNOR:  Object to form.    09:50:37
14       THE WITNESS:  We already had a    09:50:39
15    system in place.    09:50:42
16 QUESTIONS BY MR. KO:    09:50:43
17    Q.   Okay.  So when you say "we    09:50:43
18 already had a system in place," first of all,    09:50:44
19 when -- what time period are you talking    09:50:48
20 about right now?    09:50:49
21    A.   All the way back to my days    09:50:50
22 before controlled substances compliance, I    09:50:55
23 was aware that we had a system in place    09:50:58
24 designed to detect orders of unusual pattern,    09:51:02
25 size and frequency.    09:51:05

Page 59

1    Q.   Okay.  And what did that    09:51:07
2  system -- what was your understanding of what    09:51:09
3  that system consisted of?    09:51:11
4    A.   There was a algorithm in --    09:51:14
5  programmed by IT into our order entry system    09:51:20
6  that would flag orders for further review.    09:51:26
7    Q.   Okay.  Other than that    09:51:29
8  algorithm, were there any other elements of    09:51:32
9  that system?    09:51:35
10   A.   Yes, quite a few others.    09:51:36
11   Q.   Okay.  And what did those    09:51:39
12 consist of?    09:51:41
13   A.   So we had commercial    09:51:42
14 representative -- national account managers    09:51:46
15 that were our eyes and ears and boots on the    09:51:49
16 ground at the customer accounts.  We trained    09:51:51
17 them to be vigilant for any potential sign --    09:51:54
18 red flags that could be indicative of    09:51:59
19 diversion as they visited customers.    09:52:01
20       May I go on, please?    09:52:05
21   Q.   Yeah.    09:52:06
22   A.   We have customer service    09:52:07
23 representatives who are veteran in the    09:52:08
24 business, and they were in general familiar    09:52:10
25 with customers' order patterns, and so they    09:52:13

Page 60

1  had responsibility, if they saw anything that    09:52:20
2  appeared to be unusual to them, to escalate    09:52:22
3  to their manager.    09:52:24
4       We took precautions to make    09:52:26
5  certain that every single order we shipped    09:52:28
6  was to a valid DEA registration, every order    09:52:30
7  for Schedule II drugs was -- that we received    09:52:35
8  a 222 form that was filled out correctly, and    09:52:39
9  that the order -- the address on the 222    09:52:42
10 forms coincided exactly with the ship to    09:52:45
11 address in our company's order management    09:52:48
12 system.    09:52:51
13   Q.   Okay.  And I want to get an    09:52:52
14 understanding of when these elements were in    09:52:53
15 place, because I've reviewed a lot of    09:52:57
16 documents in this case and I've been able to    09:53:00
17 determine -- or at least from my    09:53:02
18 interpretation I've been able to see some of    09:53:04
19 these things that you have discussed during    09:53:07
20 certain time periods.  But I want to    09:53:08
21 understand what you said a moment ago when    09:53:10
22 you said that Mallinckrodt always had a    09:53:14
23 system.    09:53:15
24       Do you recall that testimony?    09:53:15
25   A.   Yes, I do.    09:53:17

Page 61

1    Q.   Are these things that you're    09:53:18
2  describing, are you testifying that    09:53:20
3  Mallinckrodt always had all these elements in    09:53:21
4  connection with the suspicious order    09:53:26
5  monitoring program?    09:53:29
6       MR. O'CONNOR:  Object to form.    09:53:29
7       THE WITNESS:  There's one that    09:53:30
8    I'm not certain of, but all the other    09:53:35
9    elements, yes, have been in place    09:53:37
10   since I became aware all the way back    09:53:40
11   to my days in manufacturing and within    09:53:42
12   the scope of DEA audits.    09:53:44
13 QUESTIONS BY MR. KO:    09:53:46
14   Q.   Okay.  So prior to, for    09:53:46
15 example, 2003 --    09:53:54
16   A.   Yes.    09:53:54
17   Q.   -- there was -- I just want to    09:53:55
18 make sure I understand.    09:53:58
19   A.   Certainly.    09:53:58
20   Q.   The suspicious order monitoring    09:53:59
21 program, as you understand it, consisted of    09:54:01
22 both an algorithm and other factors that you    09:54:04
23 had previously described; is that correct?    09:54:07
24   A.   Yes.    09:54:07
25   Q.   Okay.  Now, setting aside what    09:54:09

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  you understood to be the -- by the way, do    09:54:13
2  you mind if I call suspicious order    09:54:17
3  monitoring "SOM" for short?    09:54:19
4      A.  I don't mind.    09:54:20
5      Q.  Okay.  Other than what you    09:54:21
6  believe to be the elements of Mallinckrodt's    09:54:25
7  SOM program, when you became involved as a    09:54:28
8  senior manager of the controlled substances    09:54:33
9  compliance group, is it accurate to say that    09:54:36
10  one of your primary responsibilities was to    09:54:39
11  design and implement a system to identify    09:54:41
12  suspicious orders?    09:54:44
13      MR. O'CONNOR: Object to form.    09:54:44
14      THE WITNESS:  So, sir, we    09:54:45
15  already had a system in place to    09:54:47
16  identify suspicious orders.    09:54:49
17  QUESTIONS BY MR. KO:    09:54:51
18      Q.  Okay.  Well, it's my    09:54:51
19  understanding that you revised that system    09:54:55
20  over time when you were a senior manager.    09:54:58
21      Is that fair to say?    09:55:00
22      A.  Yes.    09:55:01
23      Q.  Okay.  So during the time that    09:55:02
24  you were senior manager, is it accurate to    09:55:05
25  say that you continued to help design and    09:55:06

Page 63

1  implement Mallinckrodt's suspicious order    09:55:10
2  monitoring system?    09:55:12
3      A.  Yes.    09:55:13
4      Q.  Okay.  Now, a fundamental    09:55:14
5  feature of any SOM program is to prevent    09:55:17
6  diversion of controlled substances, so just    09:55:20
7  prescription opioids manufactured by    09:55:23
8  Mallinckrodt; is that correct?    09:55:24
9      MR. O'CONNOR: Object to form.    09:55:25
10      THE WITNESS:  Not to prevent,    09:55:26
11  but to guard against diversion.    09:55:30
12  QUESTIONS BY MR. KO:    09:55:32
13      Q.  Okay.  So you have a    09:55:32
14  distinction between prevent and guard    09:55:33
15  against?    09:55:36
16      A.  Yes.    09:55:36
17      Q.  Okay.  And what is that    09:55:36
18  distinction?    09:55:38
19      A.  So prevent is an absolute.  It    09:55:38
20  means we can assure that there's never any    09:55:41
21  diversion of our product.    09:55:44
22      Guard against means to the    09:55:46
23  extent we're able, detect orders that may    09:55:50
24  be -- that are cause for further review,    09:56:00
25  sorry.    09:56:02

Page 64

1      Q.  That's okay.    09:56:03
2      And when you say "may be," is    09:56:04
3  one way to say it that a fundamental feature    09:56:08
4  of a SOM program is to guard against the    09:56:12
5  potential diversion of controlled substances?    09:56:16
6      MR. O'CONNOR: Object to form.    09:56:17
7      THE WITNESS:  Yes.    09:56:18
8  QUESTIONS BY MR. KO:    09:56:20
9      Q.  Okay.  And guarding against the    09:56:20
10  diversion of prescription opioids is an    09:56:23
11  important responsibility of a company that    09:56:25
12  manufactures prescription opioids; wouldn't    09:56:28
13  you say?    09:56:29
14      A.  Yes.    09:56:31
15      Q.  Okay.  And as we discussed    09:56:32
16  before, the CSA imposes that obligation on    09:56:33
17  registrants in the supply chain, including on    09:56:37
18  Mallinckrodt, correct?    09:56:39
19      MR. O'CONNOR: Object to form.    09:56:40
20      THE WITNESS:  Yes.    09:56:40
21  QUESTIONS BY MR. KO:    09:56:41
22      Q.  And would you agree with me    09:56:43
23  that that would be one of the most    09:56:45
24  fundamental duties of the CSA?    09:56:46
25      MR. O'CONNOR: Object to form.    09:56:48

Page 65

1      THE WITNESS:  The CSA covers    09:56:48
2  many aspects, my understanding, for --    09:56:53
3  to maintain the closed system of    09:56:57
4  distribution, and suspicious order    09:57:00
5  monitoring is one of those components.    09:57:02
6  QUESTIONS BY MR. KO:    09:57:03
7      Q.  Sure.    09:57:03
8      And I understand that there are    09:57:04
9  a lot of aspects to the CSA, but from your    09:57:06
10  perspective, would you agree with me that    09:57:09
11  guarding against diversion, as you put it, is    09:57:12
12  one of the fundamental duties of the CSA?    09:57:15
13      MR. O'CONNOR: Objection.    09:57:17
14  Form.    09:57:18
15      THE WITNESS:  I can't say if    09:57:18
16  it -- yes.  Yes.  Yes.    09:57:22
17  QUESTIONS BY MR. KO:    09:57:23
18      Q.  Okay.  Now, as we discussed    09:57:24
19  before, in connection with these duties, you    09:57:29
20  helped revise Mallinckrodt's suspicious order    09:57:33
21  monitoring program, correct?    09:57:36
22      A.  Correct.    09:57:37
23      Q.  And these revisions occurred    09:57:38
24  generally in the 2000 -- the late, I guess I    09:57:42
25  would say -- I would describe it this way.    09:57:49

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 These revisions occurred 09:57:50
2 sometime between the 2008 and 2012 time 09:57:52
3 period. Would that be fair to say? 09:57:55
4 MR. O'CONNOR: Object to form. 09:57:57
5 THE WITNESS: Yes, but they're 09:57:58
6 ongoing to this day, yes. 09:57:59
7 QUESTIONS BY MR. KO: 09:58:00
8 Q. Would it be accurate to say 09:58:00
9 that there was increased scrutiny on 09:58:01
10 Mallinckrodt's SOM program in 2008? 09:58:03
11 MR. O'CONNOR: Object to form. 09:58:07
12 THE WITNESS: I can't say that. 09:58:07
13 QUESTIONS BY MR. KO: 09:58:13
14 Q. Okay. 09:58:14
15 A. No. 09:58:14
16 Q. Do you recall a time in which 09:58:14
17 you believed there was increased scrutiny on 09:58:18
18 Mallinckrodt's SOM program? 09:58:21
19 MR. O'CONNOR: Object to form. 09:58:22
20 THE WITNESS: We had ongoing 09:58:23
21 discussions with DEA, but, yes, yes, 09:58:26
22 there was a time. 09:58:29
23 QUESTIONS BY MR. KO: 09:58:29
24 Q. And approximately what time 09:58:30
25 period was that? 09:58:31

Page 67

1 A. We met with DEA in August 09:58:32
2 of 2011, I do remember that date -- 09:58:36
3 Q. Okay. 09:58:38
4 A. -- and they had some additional 09:58:39
5 suggestions about potential enhancements of 09:58:41
6 our suspicious order monitoring program. 09:58:43
7 Q. Do you recall any instances in 09:58:45
8 which you met with DEA prior to that in which 09:58:55
9 you discussed Mallinckrodt's SOM program? 09:58:59
10 A. Yes. 09:59:01
11 Q. Okay. When was that? 09:59:02
12 A. I don't remember the year, but 09:59:03
13 there was a discussion with DEA St. Louis on 09:59:06
14 that topic. 09:59:10
15 Q. Okay. By the way, when you 09:59:11
16 became senior manager of controlled substance 09:59:16
17 compliance group -- of the controlled 09:59:19
18 substance compliance group, you were the -- 09:59:21
19 you had the primary responsibility of 09:59:24
20 revising and designing Mallinckrodt's SOM 09:59:26
21 program; is that fair to say? 09:59:29
22 MR. O'CONNOR: Object to form. 09:59:31
23 THE WITNESS: So it was all -- 09:59:32
24 I was part of a team. It was a team 09:59:32
25 effort, sir. 09:59:34

Page 68

1 QUESTIONS BY MR. KO: 09:59:34
2 Q. Okay. And when you say you 09:59:35
3 were "part of a team," who was on that team? 09:59:36
4 A. Security. 09:59:38
5 Q. Okay. And security, is that 09:59:42
6 Bill Ratliff? 09:59:43
7 A. It was Bill Ratliff, and he's 09:59:44
8 retired, and now it's John Gillies. 09:59:47
9 Q. Okay. Anybody other than Bill 09:59:49
10 Ratliff or John Gillies? 09:59:51
11 A. Yes, legal. 09:59:53
12 Q. Was that Mr. Lohman and 09:59:54
13 Ms. Duft? 09:59:56
14 A. Yes. 10:00:00
15 Q. Okay. Who else? 10:00:01
16 A. Members of the commercial 10:00:06
17 group. Members of the IT group. 10:00:09
18 Q. So other than security, legal, 10:00:10
19 commercial and IT, were there any other 10:00:16
20 groups or departments that were part of the 10:00:18
21 SOM team? 10:00:20
22 A. Yes. Members of the SOM team 10:00:21
23 came and went through different iterations of 10:00:23
24 the program, so I don't recall the 10:00:27
25 composition of the team at a specific time, 10:00:29

Page 69

1 but there was a patient and product 10:00:31
2 monitoring group that was a participant in 10:00:34
3 the team. Credit department was a 10:00:39
4 participant in the team. And those are the 10:00:42
5 ones I can recall. 10:00:44
6 Q. Okay. Thank you. 10:00:46
7 When you referenced the 10:00:46
8 commercial group a moment ago, what did that 10:00:51
9 consist of? 10:00:56
10 In other words, who were 10:00:57
11 members of that commercial group? 10:00:59
12 A. Primarily John Adams. 10:01:00
13 Q. Anyone else? 10:01:05
14 A. A gentleman named Steve Becker. 10:01:07
15 Q. Okay. And Steve Becker was a 10:01:09
16 national account manager, correct? 10:01:14
17 A. Correct. 10:01:15
18 Q. Okay. Were there any other 10:01:16
19 customer service representatives that were 10:01:18
20 part of that group? 10:01:19
21 A. Yes. 10:01:20
22 Q. Okay. Who were they? 10:01:21
23 A. The lady's name is Brenda 10:01:22
24 Rehkop; she's passed away. Cathy Stewart. 10:01:29
25 Jim Rausch. 10:01:35

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q.    And Jim Rausch was part of        10:01:36
2    commercial?                             10:01:40
3    A.    Well, we distinguish --           10:01:40
4    customer service is not considered to be part    10:01:46
5    of commercial, although it would seem that it    10:01:47
6    would be, so customer service is a separate    10:01:49
7    group.                                  10:01:51
8    Q.    Okay.  Than commercial you're    10:01:51
9    saying?                                 10:01:53
10   A.    Yes.                             10:01:53
11   Q.    Now, you mentioned some names    10:01:54
12   of people that have been deposed previously    10:01:57
13   in this case in the past few weeks.  Many of    10:02:01
14   them have testified that you are the person    10:02:05
15   most knowledgeable about Mallinckrodt's SOM    10:02:07
16   program.                                10:02:10
17       Would you agree with that        10:02:10
18   assessment?                             10:02:11
19       MR. O'CONNOR:  Object to form.    10:02:11
20       THE WITNESS:  Well, I'm not a    10:02:12
21   vain person, but, yes, I know a lot    10:02:17
22   about the program, but it's all been    10:02:18
23   with the contributions of a -- team    10:02:20
24   effort as time has gone on.             10:02:22
25

Page 71

1    QUESTIONS BY MR. KO:                    10:02:23
2    Q.    Sure.                            10:02:23
3        Do you believe there's anyone    10:02:25
4    in the SOM team or anyone else in the    10:02:27
5    company, for that matter, with more knowledge    10:02:30
6    about Mallinckrodt's suspicious order    10:02:31
7    monitoring program than you?            10:02:33
8        MR. O'CONNOR:  Object to form.    10:02:36
9        THE WITNESS:  I'll say that's    10:02:36
10       unlikely.                         10:02:37
11   QUESTIONS BY MR. KO:                    10:02:38
12   Q.    Okay.  By the way, other than    10:02:38
13   the SOM program that you helped revise,    10:02:43
14   design and implement, were there any other    10:02:48
15   programs or systems in place at Mallinckrodt    10:02:53
16   related to diversion of controlled    10:02:57
17   substances?                             10:03:00
18   A.    Yes.                             10:03:00
19   Q.    Okay.  And what were those?    10:03:04
20   A.    So we -- we work with law        10:03:05
21   enforcement and give testimony when    10:03:12
22   requested.  We provide placebos for law    10:03:17
23   enforcement use on specific cases.  We have a    10:03:20
24   department that educates prescribers and    10:03:25
25   patients on the proper prescribing and    10:03:30

Page 72

1    dispensing and consumption of controlled    10:03:34
2    substances.                             10:03:39
3        So we have many programs within    10:03:40
4    Mallinckrodt, as a responsible manufacturer,    10:03:42
5    aimed at guarding against diversion.    10:03:45
6    Q.    Okay.  And taking that last    10:03:46
7    category that you described with respect to    10:03:48
8    educating, I guess the public on safe    10:03:50
9    prescribing and dispensing, when did    10:03:55
10   Mallinckrodt first engage in that type of    10:03:57
11   conduct?                                10:04:01
12   A.    I do not know the answer.        10:04:01
13   Q.    Do you generally recall if it    10:04:03
14   was after 2010?                         10:04:06
15   A.    I'm sorry, I don't know when    10:04:06
16   the group --                            10:04:08
17   Q.    Okay.                            10:04:10
18   A.    -- was created.                  10:04:10
19   Q.    And then when you described the    10:04:11
20   law enforcement activities, it seemed like to    10:04:12
21   me, and correct me if I'm wrong, that    10:04:16
22   those -- you provided that type of support    10:04:21
23   when they requested it; is that fair to say?    10:04:23
24       MR. O'CONNOR:  Object to form.    10:04:27
25       THE WITNESS:  Yes.               10:04:28

Page 73

1    QUESTIONS BY MR. KO:                    10:04:30
2    Q.    Okay.  So in other words, there    10:04:30
3    wasn't a program in place in which you were    10:04:32
4    regularly providing testimony, for example,    10:04:35
5    but you were -- you were providing testimony    10:04:37
6    to help law enforcement when they requested    10:04:39
7    it; is that fair?                       10:04:41
8    A.    So I don't know -- I may not be    10:04:42
9    aware of other people in other groups that    10:04:46
10   provided testimony, such as our research    10:04:48
11   scientists, so -- but those are the times    10:04:50
12   that I am aware.                         10:04:54
13   Q.    Okay.  Now, is it accurate to    10:04:55
14   say that one of the -- you mentioned this a    10:04:56
15   moment ago, but I just want to make sure I    10:05:00
16   understand correctly.                   10:05:02
17       But is it accurate to say that    10:05:03
18   one purpose of a SOM program is to identify    10:05:05
19   orders of unusual size?                 10:05:08
20   A.    Yes.                             10:05:10
21   Q.    Okay.  And would it also be --    10:05:11
22   well, why is that?                      10:05:13
23   A.    It's one of the indicators that    10:05:15
24   may be -- that may prompt -- well, should --    10:05:23
25   will prompt additional investigation of that    10:05:26

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 order.                                      10:05:28
2      Q.   Okay.  And other than that        10:05:29
3 general concept that -- in particular, the  10:05:31
4 size of an order at its most fundamental     10:05:34
5 level is important because an excessive order 10:05:37
6 or an order of -- that's -- that's large    10:05:42
7 could potentially be unusual; is that       10:05:47
8 correct?                                      10:05:49
9           MR. O'CONNOR:  Object to form.    10:05:49
10           THE WITNESS:  Yes, but it's all   10:05:50
11      relative to what -- what is large.  I   10:05:55
12      can't define large.                     10:05:58
13 QUESTIONS BY MR. KO:                          10:05:59
14      Q.   Sure.                              10:05:59
15           But generally speaking,            10:06:00
16 shipping too many prescription opioids could 10:06:01
17 potentially be problematic, correct?         10:06:03
18           MR. O'CONNOR:  Objection to        10:06:05
19      form.                                    10:06:06
20           THE WITNESS:  I don't have all     10:06:06
21      the information, I'm sorry, to answer   10:06:08
22      that question completely.                10:06:09
23 QUESTIONS BY MR. KO:                          10:06:10
24      Q.   Sure.                              10:06:11
25           Another purpose of a SOM           10:06:11

Page 75

1 program is to identify orders that deviate   10:06:14
2 from a normal pattern; would you agree with  10:06:18
3 me?                                           10:06:19
4      A.   Yes.                                10:06:19
5      Q.   Okay.  And it's important to        10:06:20
6 identify ordering patterns at a general      10:06:22
7 level; is that correct?                       10:06:25
8      A.   Yes.                                10:06:25
9      Q.   Okay.  And another purpose of a    10:06:27
10 SOM program is to identify orders of unusual 10:06:28
11 frequency; is that fair to say?              10:06:32
12      A.   Yes.  Yes.                         10:06:34
13      Q.   And it's important to identify     10:06:35
14 the timing of orders; that would be fair to  10:06:37
15 say?                                          10:06:39
16           MR. O'CONNOR:  Object to form.     10:06:39
17           THE WITNESS:  Yes.                 10:06:40
18 QUESTIONS BY MR. KO:                          10:06:41
19      Q.   Okay.  And would you agree with    10:06:41
20 me that one of -- or another central purpose 10:06:43
21 of identifying suspicious orders is to avoid 10:06:47
22 filling them for any other purpose than      10:06:50
23 legitimate, scientific or medical needs?     10:06:53
24           MR. O'CONNOR:  Object to form.     10:06:55
25           THE WITNESS:  Yes.                 10:06:56

Page 76

1 QUESTIONS BY MR. KO:                          10:07:01
2      Q.   Okay.  Would you agree with me     10:07:01
3 that an effective SOM program would be able  10:07:05
4 to identify whether a pharmacy or clinic is  10:07:08
5 ordering excessive quantities of controlled  10:07:12
6 substances?                                   10:07:15
7           MR. O'CONNOR:  Object to form.     10:07:15
8           THE WITNESS:  No.                  10:07:16
9 QUESTIONS BY MR. KO:                          10:07:16
10      Q.   Okay.  You don't believe that     10:07:18
11 would be an effective SOM program, or you    10:07:18
12 wouldn't -- you don't agree with me?         10:07:21
13      A.   So would you please rephrase      10:07:23
14 the question?                                 10:07:25
15      Q.   Sure.                              10:07:26
16           Would you agree with me that an   10:07:27
17 effective SOM program would be able to       10:07:28
18 identify whether a pharmacy or a clinic is   10:07:31
19 ordering excessive quantities of controlled  10:07:34
20 substances?                                   10:07:36
21           MR. O'CONNOR:  Same objection.    10:07:36
22           THE WITNESS:  So the components   10:07:37
23      of the SOM program that point out a    10:07:43
24      reason for further investigation,      10:07:50
25      they're not singular.  So DEA tells us 10:07:52

Page 77

1      that these things are to be considered  10:07:58
2      during the course of our                10:08:00
3      investigation, but no one factor is     10:08:02
4      conclusively -- indicates diversion.    10:08:05
5 QUESTIONS BY MR. KO:                          10:08:12
6      Q.   Sure, I understand that, and I     10:08:13
7 understand that there are several different   10:08:15
8 things that you may consider.                 10:08:17
9           But would you agree with me        10:08:18
10 that one aspect of an effective SOM program  10:08:19
11 would be to identify pharmacies or clinics   10:08:24
12 that order excessive amounts of controlled   10:08:26
13 substances?                                   10:08:29
14           MR. O'CONNOR:  Object to form.    10:08:29
15           THE WITNESS:  So we do not sell   10:08:29
16      to pharmacies or clinics.  We sell to   10:08:32
17      wholesalers and distributors.          10:08:36
18 QUESTIONS BY MR. KO:                          10:08:37
19      Q.   I understand that.                 10:08:38
20           But as -- as an entity that       10:08:39
21 sells to wholesalers, distributors, you know 10:08:41
22 that eventually those products are going     10:08:44
23 somewhere else; is that fair to say?         10:08:47
24      A.   Yes.                               10:08:49
25      Q.   The distributors aren't           10:08:49

Page 78

1  necessarily providing them directly to the  10:08:50
2  consumers at that point, correct?  10:08:54
3      A.  Yes.  Yes.  10:08:55
4      Q.  So eventually these  10:08:55
5  distributors distribute these controlled  10:08:58
6  substances to, among other entities,  10:09:03
7  pharmacies and clinics; is that correct?  10:09:05
8      A.  Yes.  10:09:07
9      Q.  Okay.  So would you agree with  10:09:08
10 me that one component of a -- an effective  10:09:10
11 suspicious order monitoring program is to  10:09:14
12 identify whether or not these downstream  10:09:16
13 pharmacies or clinics are ordering excessive  10:09:19
14 quantities of controlled substances?  10:09:21
15      MR. O'CONNOR:  Object to form.  10:09:22
16      THE WITNESS:  We -- throughout  10:09:23
17      time we've been asking -- we always  10:09:26
18      ask DEA for additional guidance  10:09:29
19      because the regulations state "know  10:09:30
20      your customer."  10:09:32
21 QUESTIONS BY MR. KO:  10:09:33
22      Q.  Right.  10:09:34
23      A.  And we weren't aware of an  10:09:35
24 obligation, if you will, to monitor  10:09:41
25 customers' customers or if the tools existed  10:09:43

Page 79

1  to do so.  10:09:48
2      Q.  And we'll get to that in a  10:09:49
3  moment, but I just have a very specific  10:09:53
4  question that I was hoping that you could  10:09:55
5  answer.  10:09:56
6      Now, you agreed with me that  10:09:57
7  distributors sell downstream to pharmacies  10:10:01
8  and clinics, correct?  10:10:03
9      A.  That's correct.  10:10:04
10     Q.  And at some point -- and I  10:10:05
11 understand your testimony that you became  10:10:06
12 aware that you had to, in your words, know  10:10:08
13 your customer, correct?  10:10:10
14     A.  Know your customer is part of  10:10:11
15 the regulations.  10:10:13
16     Q.  Right.  10:10:14
17      And then also you talked about  10:10:14
18 knowing your customer's customer as well,  10:10:16
19 correct?  10:10:19
20     A.  Yes.  10:10:19
21     Q.  And putting aside when you  10:10:19
22 became aware of that, I'm simply asking you:  10:10:22
23 Would you agree with me that one component of  10:10:24
24 an effective SOM program would be to identify  10:10:27
25 whether or not a downstream pharmacy or  10:10:31

Page 80

1  clinic is ordering excessive quantities of  10:10:33
2  controlled substances?  10:10:36
3      MR. O'CONNOR:  Object to form.  10:10:36
4      THE WITNESS:  So, yes, that  10:10:38
5      could be one component.  10:10:41
6  QUESTIONS BY MR. KO:  10:10:42
7      Q.  Okay.  Now, would you also  10:10:42
8  agree with me that an effective SOM program  10:10:49
9  would be able to identify whether or not that  10:10:53
10 downstream pharmacy or clinic was ordering  10:10:56
11 from multiple distributors?  10:10:58
12      MR. O'CONNOR:  Object to form.  10:10:59
13      THE WITNESS:  It could be one  10:11:00
14      component, yes.  10:11:03
15 QUESTIONS BY MR. KO:  10:11:04
16     Q.  Okay.  And in fact, that was  10:11:04
17 something that was important to Mallinckrodt  10:11:06
18 to try and determine at some point in the, I  10:11:08
19 believe, the 2010 or 2011 time period,  10:11:15
20 correct?  10:11:19
21      MR. O'CONNOR:  Object to form.  10:11:19
22      THE WITNESS:  When we received  10:11:19
23      guidance from DEA that that was an  10:11:20
24      appropriate thing to monitor, yes.  10:11:22
25

Page 81

1  QUESTIONS BY MR. KO:  10:11:23
2      Q.  Okay.  So in other words, if a  10:11:23
3  downstream pharmacy or clinic was ordering  10:11:25
4  the same oxy 15 manufactured by Mallinckrodt  10:11:26
5  from five different distributors, it would be  10:11:30
6  important to know that, correct?  10:11:32
7      A.  It could be one indicator --  10:11:34
8      Q.  Right.  10:11:37
9      A.  -- precipitating further  10:11:37
10     review.  10:11:40
11     Q.  And you would agree with me  10:11:40
12 that an effective SOM program would be able  10:11:41
13 to determine or identify whether or not that  10:11:44
14 downstream pharmacy or clinic was ordering  10:11:47
15 from multiple distributors, correct?  10:11:49
16      MR. O'CONNOR:  Object to form.  10:11:51
17      THE WITNESS:  Yes.  That's one  10:11:52
18      component of many, yes.  10:11:54
19 QUESTIONS BY MR. KO:  10:11:55
20     Q.  Now, some of these factors we  10:12:07
21 were just discussing, is it fair to say that  10:12:09
22 you acquired this knowledge of -- strike  10:12:14
23 that.  10:12:19
24      Was there ever a time when you  10:12:19
25 were senior manager of controlled substance  10:12:28

Page 82

1 compliance where you became aware that 10:12:30
2 relying on a simple algorithm or numerical 10:12:38
3 formulation alone was insufficient for 10:12:41
4 purposes of complying with your duties under 10:12:43
5 the CSA? 10:12:45
6          MR. O'CONNOR: Object to form. 10:12:45
7          THE WITNESS: Yes. 10:12:46
8 QUESTIONS BY MR. KO: 10:12:46
9     Q.   Okay.  And approximately when 10:12:46
10 was that? 10:12:48
11    A.   It was a guidance letter from 10:12:51
12 DEA. 10:12:54
13    Q.   Okay. 10:12:54
14    A.   And it was 2006 or 2007. 10:12:54
15    Q.   Okay.  So you would agree with 10:12:59
16 me then that an ineffective SOM program would 10:13:00
17 be one that just simply relies on numerical 10:13:07
18 formulas to try and understand orders that 10:13:11
19 are suspicious; is that fair to say? 10:13:14
20          MR. O'CONNOR: Object to form. 10:13:17
21          THE WITNESS: That's the 10:13:17
22    guidance that -- yes, from DEA. 10:13:18
23 QUESTIONS BY MR. KO: 10:13:19
24    Q.   Okay.  Well, regardless of the 10:13:19
25 guidance that you received, I'm just simply 10:13:21

Page 83

1 asking you today, as you sit here in your 10:13:22
2 position as someone that is most 10:13:25
3 knowledgeable about Mallinckrodt's SOM 10:13:28
4 program: Would you agree with me that an 10:13:31
5 ineffective SOM program would be one that 10:13:34
6 simply relies on numerical formulas to 10:13:38
7 identify suspicious orders? 10:13:40
8          MR. O'CONNOR: Object to form. 10:13:41
9          THE WITNESS: Yes. 10:13:42
10 QUESTIONS BY MR. KO: 10:13:42
11    Q.   Okay.  Now, you talked a moment 10:13:49
12 ago about how there was always -- as far as 10:13:51
13 you know, there was always an SOM program at 10:13:54
14 Mallinckrodt as far as -- as long as you 10:13:57
15 could recall. 10:14:01
16    A.   Yes. 10:14:01
17    Q.   Now, from my position, looking 10:14:01
18 at the documents, the first reference I see 10:14:05
19 to an SOM program existing at Mallinckrodt is 10:14:07
20 from 2003. 10:14:11
21          Is it your testimony that an 10:14:13
22 SOM program existed prior to that? 10:14:15
23    A.   Yes. 10:14:16
24    Q.   Okay.  And the program prior to 10:14:17
25 2003 consisted of, in your testimony, of both 10:14:21

Page 84

1 the algorithm and some of the other factors 10:14:24
2 that you were describing before? 10:14:26
3    A.   Yes. 10:14:28
4    Q.   And turning to that algorithm, 10:14:28
5 what was your understanding of what that 10:14:31
6 algorithm consisted of? 10:14:34
7    A.   I don't know the specific 10:14:36
8 multiplier, but it measured each customer 10:14:39
9 against their previous order history. 10:14:43
10    Q.   Okay.  And when you say a 10:14:48
11 "multiplier," what do you mean? 10:14:54
12    A.   There was a formula that 10:14:55
13 indicated -- a cause for additional 10:14:59
14 investigation would be if that order pattern 10:15:02
15 exceeded a certain formula, such 1.5 as a 10:15:07
16 multiplier. 10:15:10
17    Q.   And a 1.5 multiplier relative 10:15:11
18 to what? 10:15:14
19    A.   That customer's previous order 10:15:15
20 pattern. 10:15:18
21    Q.   Okay.  And I have seen some 10:15:18
22 references in the documents to a previous 10:15:20
23 order pattern consisting of anywhere from 7 10:15:22
24 to 18 months. 10:15:26
25          Does that comport with your 10:15:27

Page 85

1 general understanding? 10:15:30
2          MR. O'CONNOR: Object to form. 10:15:31
3          THE WITNESS: I don't know.  I 10:15:31
4    know about the 18 months; I don't know 10:15:33
5    about the seven. 10:15:34
6 QUESTIONS BY MR. KO: 10:15:37
7    Q.   Okay.  But generally speaking, 10:15:37
8 what you mean when you say "multiplier" and 10:15:41
9 when you referenced 1.5, are you saying that 10:15:42
10 the algorithm in place before 2003 was 10:15:44
11 utilization of some multiplier relative to 10:15:50
12 the previous ordering history of a 10:15:52
13 Mallinckrodt customer?  Is that accurate? 10:15:55
14    A.   Yes.  Yes. 10:15:57
15    Q.   Okay.  And the customers at the 10:15:57
16 time, of course, are wholesale distributors, 10:15:59
17 right? 10:16:01
18    A.   I can't -- we only sold to 10:16:02
19 other manufacturers from the St. Louis plant 10:16:08
20 manufacturing until we acquired our Hobart, 10:16:12
21 New York, facility, and I always forget what 10:16:16
22 year that was.  I'm sorry. 10:16:18
23    Q.   Okay.  So prior to -- was that 10:16:19
24 generally 2004, 2005; do you know? 10:16:21
25    A.   I can't remember the year, I'm 10:16:24

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   sorry.                              10:16:25
2       Q.    Okay.  That's all right.        10:16:25
3   That's helpful.                     10:16:26
4       So before acquiring the Hobart      10:16:27
5   facility, Mallinckrodt was only distributing   10:16:30
6   to other manufacturers?             10:16:32
7       A.    Yes, and some researchers, yes.   10:16:33
8       Q.    Okay.                     10:16:37
9       A.    But not wholesalers,        10:16:37
10  distributors.                        10:16:39
11      Q.    And these other manufacturers   10:16:39
12  included entities like Purdue?       10:16:42
13      A.    I don't know if Purdue was a   10:16:44
14  customer, but they were dosage pharm   10:16:45
15  manufacturers who chose to buy our bulk   10:16:48
16  narcotics.                          10:16:51
17      Q.    Right.  Okay.               10:16:52
18      So then -- thank you for         10:16:53
19  bringing up the bulk narcotics.      10:16:55
20      This order -- excuse me.  This   10:16:57
21  SOM program that you're describing, was there   10:17:03
22  an SOM program that existed both with respect   10:17:05
23  to Mallinckrodt's bulk business and its   10:17:08
24  dosage business at the time you became   10:17:14
25  involved in the DEA compliance group?   10:17:17

Page 87

1       A.    It always existed for the bulk   10:17:19
2   business, and it existed when we bought the   10:17:24
3   Hobart facility.  But I'm sorry, I can't   10:17:26
4   remember what year that was relative to when   10:17:29
5   I was in the DEA compliance group, but I   10:17:31
6   believe it was during my time in the DEA   10:17:34
7   compliance group, yes.              10:17:37
8       Q.    Okay.  And then I just want to   10:17:38
9   make sure the record is clear because we're   10:17:39
10  talking about the bulk business.  But when   10:17:41
11  did you became {sic} aware of an algorithm or   10:17:43
12  a suspicious order monitoring program that   10:17:45
13  applied to the dosage side of Mallinckrodt's   10:17:49
14  business?                            10:17:55
15      MR. O'CONNOR:  Object to form.   10:17:55
16      THE WITNESS:  When we began      10:17:55
17      participating in the dosage generic   10:17:58
18      business.                        10:18:00
19  QUESTIONS BY MR. KO:                 10:18:00
20      Q.    And that was after you acquired   10:18:01
21  the Hobart facility?                 10:18:02
22      A.    Yes.                      10:18:04
23      Q.    Okay.  So prior to that time,   10:18:04
24  Mallinckrodt did not have -- because they   10:18:06
25  weren't participating.  But they did not have   10:18:09

Page 88

1   a SOM program for anything other than the   10:18:11
2   bulk side of the business; is that accurate?   10:18:14
3       MR. O'CONNOR:  Object to form.   10:18:16
4       THE WITNESS:  Yes.              10:18:17
5   QUESTIONS BY MR. KO:                 10:18:19
6       Q.    Okay.                     10:18:19
7       MR. O'CONNOR:  Counsel, we've    10:18:30
8       been going a little more than an hour.   10:18:31
9       Should we take a break?          10:18:35
10      MR. KO:  Sure.                   10:18:36
11      VIDEOGRAPHER:  We are going off   10:18:36
12      the record at 10:18 a.m.         10:18:38
13      (Off the record at 10:18 a.m.)   10:18:39
14      VIDEOGRAPHER:  We are back on     10:35:34
15      the record at 10:35 a.m.         10:35:43
16  QUESTIONS BY MR. KO:                 10:35:44
17      Q.    Welcome back from the break,   10:35:46
18  Ms. Harper.                          10:35:49
19      A.    Thank you.                 10:35:49
20      Q.    Now, at some point in time when   10:35:50
21  you were involved in the controlled substance   10:35:52
22  compliance group, did you become aware of   10:35:54
23  diversion issues in the state of Florida in   10:35:58
24  particular?                          10:36:01
25      MR. O'CONNOR:  Object to form.   10:36:02

Page 89

1       THE WITNESS:  Yes.              10:36:02
2   QUESTIONS BY MR. KO:                 10:36:03
3       Q.    Okay.  And approximately when   10:36:03
4   was that?                            10:36:04
5       A.    I don't know the exact year.   10:36:04
6   I'm sorry.                           10:36:10
7       Q.    Okay.  And were you aware of   10:36:10
8   the problems that existed in Florida through,   10:36:13
9   among other things, communications with the   10:36:15
10  DEA?                                 10:36:17
11      MR. O'CONNOR:  Object to form.   10:36:18
12      THE WITNESS:  Yes.              10:36:18
13  QUESTIONS BY MR. KO:                 10:36:21
14      Q.    Okay.  And is it fair to say   10:36:21
15  that the DEA was focused on the distribution   10:36:24
16  of Mallinckrodt oxy -- oxycodone       10:36:28
17  15 milligrams and oxycodone 30 milligrams?   10:36:32
18      MR. O'CONNOR:  Object to form.   10:36:35
19      THE WITNESS:  Yes.              10:36:36
20  QUESTIONS BY MR. KO:                 10:36:36
21      Q.    Okay.  And do you mind if I   10:36:37
22  call that, just for shorthand, oxy 15 and   10:36:40
23  oxy 30s?                             10:36:47
24      A.    I don't mind.              10:36:48
25      Q.    So you were aware at some point   10:36:49

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  in time when you were involved with the          10:36:52
2  controlled substance compliance group that       10:36:53
3  Mallinckrodt was manufacturing a substantial     10:36:57
4  amount of oxy 15s and 30s that were ending up     10:36:59
5  in Florida; is that accurate?                     10:37:03
6          MR. O'CONNOR: Objection to              10:37:05
7      form.                                         10:37:06
8          THE WITNESS: So I don't know             10:37:06
9      our market share over time, and              10:37:07
10     substantial is -- I don't have enough         10:37:08
11     information relative to other                 10:37:10
12     suppliers to answer that question.            10:37:11
13     I'm sorry.                                    10:37:13
14  QUESTIONS BY MR. KO:                             10:37:13
15     Q.   Sure.                                    10:37:13
16          But you knew that -- you became          10:37:13
17  aware at some point that Mallinckrodt was        10:37:16
18  sending hundreds of millions of pills to the     10:37:19
19  state of Florida, and in particular oxy 15s      10:37:22
20  and oxy 30s; is that fair to say?                10:37:25
21     A.   So we sell to wholesalers and            10:37:28
22  distributors who subsequently sell to            10:37:31
23  downstream registrants. Some of those are in     10:37:34
24  Florida, yes, but I believe we only have one     10:37:36
25  distributor actually located within the state    10:37:38

Page 91

1  of Florida.                                       10:37:40
2      Q.   Yeah.                                    10:37:40
3          And setting aside who you                 10:37:41
4  directly sold to, at some point in time you       10:37:44
5  became acutely aware of the amount of oxy 15s     10:37:47
6  and 30s that were ending up in Florida,           10:37:51
7  regardless of who you initially sold them to;     10:37:55
8  is that fair to say?                              10:37:58
9      A.   Yes.                                     10:37:58
10     Q.   Okay. And you also became               10:37:59
11  aware that Mallinckrodt-manufactured generic     10:38:03
12  opioids, including oxy 15s and 30s, were         10:38:07
13  being widely abused and diverted in Florida;     10:38:10
14  is that fair to say?                             10:38:16
15          MR. O'CONNOR: Objection to              10:38:16
16      form.                                        10:38:17
17          THE WITNESS: Yes.                        10:38:17
18  QUESTIONS BY MR. KO:                             10:38:17
19     Q.   Okay. And are you also                  10:38:18
20  familiar with the term "the Oxy Express"?        10:38:20
21     A.   Yes.                                     10:38:24
22     Q.   In fact, you gave a                      10:38:24
23  presentation, I believe, at one point in time    10:38:25
24  about the Oxy Express; is that accurate?         10:38:26
25          MR. O'CONNOR: Object to form.           10:38:29

Page 92

1          THE WITNESS: Yes.                        10:38:30
2  QUESTIONS BY MR. KO:                             10:38:30
3      Q.   And the Oxy Express is also             10:38:30
4  shorthand for the migration of pills from        10:38:32
5  Florida up north through the I-75 corridor;      10:38:38
6  is that fair to say?                             10:38:42
7      A.   I'm not certain of the exact           10:38:42
8  road, but, yes, yes, in general.                 10:38:44
9      Q.   Okay. But generally speaking,          10:38:45
10  you agree with me that the Oxy Express refers   10:38:47
11  to the migration of pills outside of the        10:38:50
12  state of Florida?                               10:38:51
13     A.   Yes.                                    10:38:52
14     Q.   Okay. And these pill migrated          10:38:52
15  to other states, including, for example,        10:38:55
16  Ohio; is that correct?                          10:38:58
17          MR. O'CONNOR: Objection to             10:38:59
18      form.                                       10:38:59
19          THE WITNESS: Yes.                       10:38:59
20  QUESTIONS BY MR. KO:                            10:39:00
21     Q.   Okay. Have you ever heard the          10:39:01
22  term "blue highway"?                            10:39:04
23     A.   No.                                     10:39:06
24     Q.   Okay. You understood that              10:39:07
25  Mallinckrodt oxy 15s and 30s were blue,         10:39:09

Page 93

1  correct?                                         10:39:13
2      A.   Oh, yes. Yes.                           10:39:13
3      Q.   Okay. And you understood that           10:39:14
4  a distinct feature of these oxy 15s and 30s      10:39:15
5  and -- were -- was the fact that they were       10:39:20
6  blue, and they were one of the only              10:39:22
7  prescription opioids on the market that were     10:39:24
8  that color.                                      10:39:25
9          MR. O'CONNOR: Objection to             10:39:26
10      form.                                       10:39:27
11  QUESTIONS BY MR. KO:                            10:39:27
12     Q.   Do you understand that to be           10:39:28
13  the case?                                       10:39:29
14     A.   So I know that oxy 30s are             10:39:29
15  blue. I'm not certain if oxy 15s are blue or    10:39:32
16  not, sir, I'm sorry. They may be a different    10:39:35
17  color.                                          10:39:38
18     Q.   Okay. So with respect to at            10:39:38
19  least oxy 30 -- and again, we're talking        10:39:39
20  about the IR oxy 30s.                           10:39:41
21     A.   Yes.                                    10:39:43
22     Q.   Those pills were blue, and you         10:39:44
23  understood that those pills were migrating      10:39:47
24  north away from Florida; is that fair to say?   10:39:49
25          MR. O'CONNOR: Objection to             10:39:51

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  form.                    10:39:51
2        THE WITNESS:  Yes.          10:39:52
3  QUESTIONS BY MR. KO:              10:39:52
4     Q.   Okay.  We'll get to this a    10:39:53
5  little bit later, but about a year and a half  10:40:02
6  ago you obviously became aware of a       10:40:06
7  settlement between Mallinckrodt and DOJ; is    10:40:07
8  that correct?                10:40:11
9     A.   Yes.                10:40:11
10    Q.   And the settlement was with     10:40:12
11 respect to Mallinc -- among other things,     10:40:13
12 Mallinckrodt's conduct with respect to    10:40:16
13 suspicious order monitoring of controlled    10:40:21
14 substances, correct?             10:40:23
15    A.   Yes.                10:40:24
16    Q.   Okay.  And the settlement      10:40:27
17 resulted in a $35 million payment by your     10:40:32
18 employer to the government, correct?      10:40:34
19    A.   Yes.  And given that the       10:40:36
20    Q.   Okay.  And given that the      10:40:38
21 settlement revolved largely around        10:40:40
22 Mallinckrodt's suspicious order monitoring    10:40:44
23 activities -- I mean, that was something that  10:40:48
24 was your responsibility during the relevant   10:40:52
25 time period covered under the settlement; is  10:40:55

Page 95

1  that correct?                10:40:57
2        MR. O'CONNOR:  Objection to    10:40:57
3     form.                   10:40:57
4        THE WITNESS:  Yes.          10:40:58
5  QUESTIONS BY MR. KO:              10:41:00
6     Q.   Okay.  And the relevant time   10:41:00
7  period of the settlement, I believe, or the   10:41:02
8  covered conduct as described in the       10:41:04
9  settlement -- actually, strike that.      10:41:07
10       Are you familiar with the terms   10:41:09
11 of the settlement?               10:41:10
12    A.   Yes.                10:41:10
13    Q.   You reviewed them?          10:41:11
14    A.   Yes.                10:41:12
15    Q.   Did you play a role in        10:41:13
16 negotiating any of the terms?          10:41:15
17    A.   No.                10:41:17
18    Q.   Okay.  That was presumably done  10:41:18
19 by counsel?                 10:41:21
20    A.   Yes.                10:41:21
21    Q.   Both in-house and outside      10:41:22
22 counsel?                  10:41:24
23    A.   Yes.                10:41:24
24    Q.   Okay.  Were you consulted at   10:41:25
25 all in connection with the settlement?    10:41:27

Page 96

1     A.   Yes.                10:41:28
2     Q.   Okay.  And I understand the    10:41:29
3  settlement includes a period described     10:41:33
4  "covered conduct."              10:41:37
5        Do you recall that provision of   10:41:37
6  the settlement agreement?         10:41:39
7     A.   Yes.                10:41:40
8     Q.   And the time period for that   10:41:40
9  covered conduct was from January 1, 2008, to  10:41:42
10 January 1, 2012.               10:41:47
11       Is that consistent with your     10:41:48
12 understanding?               10:41:49
13    A.   I don't remember the specific  10:41:50
14 times of the covered conduct, but --     10:41:52
15    Q.   Okay.                10:41:52
16    A.   I don't.  I'm sorry.         10:41:54
17    Q.   All right.  That's fine.  We   10:41:56
18 can get to that later.            10:41:56
19    A.   Okay.               10:41:57
20    Q.   But in general terms, there was  10:41:57
21 a period of time in which the government      10:41:59
22 alleged that Mallinckrodt had a deficient SOM  10:42:01
23 program; is that fair to say?          10:42:04
24    A.   I don't know that the term     10:42:06
25 "deficient" was used.            10:42:07

Page 97

1     Q.   Okay.               10:42:08
2     A.   But, yes, it was mentioned in  10:42:09
3  the memorandum of agreement.          10:42:10
4     Q.   Yeah.               10:42:13
5        That Mallinckrodt's SOM -- the   10:42:14
6  settlement agreement indicated that       10:42:16
7  Mallinckrodt's SOM program did not comport    10:42:19
8  with the DEA guidelines set forth in a couple  10:42:22
9  letters sent by the DEA; is that correct?     10:42:27
10       MR. O'CONNOR:  Objection to     10:42:29
11    form.                   10:42:29
12       THE WITNESS:  I don't remember   10:42:29
13    the specifics of the language.  I'm     10:42:30
14    sorry.                  10:42:33
15 QUESTIONS BY MR. KO:              10:42:33
16    Q.   Okay.  That's fine.          10:42:33
17       Was this settlement ever        10:42:34
18 discussed in any performance review that you   10:42:37
19 had recently?                10:42:40
20    A.   No.                10:42:40
21    Q.   Okay.  Was there ever any      10:42:42
22 discussion of you losing your job as a result  10:42:45
23 of the settlement?               10:42:46
24    A.   I offered to quit.         10:42:47
25    Q.   You offered to quit.         10:42:48

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1        Why was that?                10:42:49
2        A.    So that -- so that perhaps if    10:42:50
3    the company chose to bring someone in my    10:42:55
4    place, that I would gladly leave.    10:42:58
5        Q.    Okay.  And you offered to quit    10:43:01
6    because it was your responsibility during the    10:43:03
7    time of the covered conduct and the time    10:43:06
8    period in the settlement to monitor and    10:43:08
9    revise and design Mallinckrodt's suspicious    10:43:10
10    order monitoring system, correct?    10:43:14
11        MR. O'CONNOR:  Object to form.    10:43:15
12        THE WITNESS:  Yes.  It happened    10:43:15
13    on my watch.                    10:43:16
14    QUESTIONS BY MR. KO:                10:43:17
15        Q.    By the way, are you aware of    10:43:23
16    any -- of whether or not the company    10:43:23
17    maintained a personnel file for you?    10:43:27
18        A.    Yes.                10:43:28
19        Q.    Okay.                10:43:31
20        A.    Yes.                10:43:31
21        Q.    And I take it you had annual    10:43:32
22    reviews?                    10:43:37
23        A.    Yes.                10:43:37
24        Q.    Okay.  And did you receive    10:43:38
25    copies of these annual reviews to the extent    10:43:39

Page 99

1    they were in writing?                10:43:41
2        A.    Yes, I suppose.  Yes.        10:43:42
3        Q.    Okay.  Do you recall collecting    10:43:48
4    them, keeping them, storing them?    10:43:54
5        A.    No.                10:43:56
6        Q.    Okay.  Do you have any        10:43:56
7    documentation that you keep from the company    10:44:02
8    regarding your personnel file in any fashion?    10:44:05
9        A.    I do not.                10:44:09
10        Q.    Okay.  Everything, you believe,    10:44:10
11    is held by the company with respect to your    10:44:12
12    employment history and your personnel file;    10:44:15
13    is that fair to say?                10:44:17
14        A.    Yes.                10:44:17
15        Q.    Okay.  Earlier this morning we    10:44:18
16    were talking about your understanding of    10:44:30
17    Mallinckrodt's SOM program when you joined    10:44:33
18    that -- the CSC group, correct?        10:44:37
19        A.    Uh-huh.                10:44:39
20        Q.    And by CSC, I'm referring to    10:44:39
21    the controlled substance compliance group.    10:44:41
22    Is that fair to say?                10:44:43
23        A.    Yes.                10:44:44
24        Q.    Or fair to use for purposes of    10:44:44
25    this deposition today?                10:44:45

Page 100

1        A.    Yes.                10:44:46
2        Q.    Okay.  And regarding        10:44:47
3    Mallinckrodt's SOM program, you mentioned the    10:44:49
4    role of national account managers.    10:44:53
5        Do you recall that?            10:44:56
6        A.    I do.                10:44:57
7        Q.    And also that customer service    10:44:58
8    representatives were involved?        10:45:00
9        A.    Yes, that's correct.        10:45:02
10        Q.    And I believe you testified    10:45:03
11    that they were necessary because they were    10:45:05
12    your eyes and ears on the ground -- or eyes    10:45:07
13    and ears to your customers and the customers'    10:45:09
14    customers and also the boots on the ground.    10:45:13
15        Is that an accurate --        10:45:15
16        MR. O'CONNOR:  Objection to    10:45:17
17    form.                        10:45:17
18    QUESTIONS BY MR. KO:                10:45:18
19        Q.    -- statement?            10:45:18
20        A.    So they were the eyes and ears    10:45:19
21    to our customers, but I do not necessarily    10:45:21
22    know that they were the eyes and ears to our    10:45:23
23    customers' customers.                10:45:28
24        Q.    Got it.                10:45:29
25        So it's accurate to say that    10:45:29

Page 101

1    you had NAMs, the national account managers,    10:45:32
2    and the CSRs, the customer service    10:45:34
3    representatives, involved because they were    10:45:36
4    your eyes and ears to your customers,    10:45:37
5    correct?                    10:45:40
6        MR. O'CONNOR:  Object to form.    10:45:40
7        THE WITNESS:  Yes.  Yes.  Yes.    10:45:40
8    QUESTIONS BY MR. KO:                10:45:41
9        Q.    Okay.  And you -- is it fair to    10:45:42
10    say that you then relied on these NAMs and    10:45:47
11    CSRs to identify and assist with the    10:45:49
12    detection of suspicious orders?        10:45:53
13        MR. O'CONNOR:  Object to form.    10:45:54
14        THE WITNESS:  To assist, yes.    10:45:56
15    To bring things to our attention for    10:46:01
16    further investigation, yes.            10:46:03
17    QUESTIONS BY MR. KO:                10:46:05
18        Q.    And you said earlier that you    10:46:05
19    had a team, and they were part of it, so they    10:46:06
20    were -- they were part of the team in    10:46:08
21    which -- they were part of the SOM team,    10:46:12
22    correct?                    10:46:14
23        MR. O'CONNOR:  Object to form.    10:46:15
24        THE WITNESS:  They were part of    10:46:15
25    the SOM team at the time that we were    10:46:18

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  enhancing the program but not as an          10:46:20
2  ongoing, current-day member of the           10:46:23
3  team.                                         10:46:25
4  QUESTIONS BY MR. KO:                          10:46:25
5      Q.   Got it.                              10:46:27
6          And when did that occur, that         10:46:27
7  they were...                                  10:46:30
8          Well, when you said they were         10:46:31
9  part of the SOM team at that time, what time  10:46:39
10 period are you talking about?                 10:46:41
11     A.   So we went through several           10:46:42
12 projects of enhancing the suspicious order    10:46:50
13 monitoring program, and one of the components 10:46:53
14 was a customer checklist that each customer   10:46:55
15 was to fill out once per year.                10:46:58
16         So the NAMs and the customer          10:47:01
17 service reps were important contributors to   10:47:04
18 that effort because they knew more about the  10:47:06
19 customer side of the house, but as we sit     10:47:10
20 here today, they are not part of the          10:47:13
21 suspicious order monitoring team.             10:47:15
22     Q.   Got it.  Thank you for the           10:47:16
23 clarification.                                10:47:17
24         So at some point in time when         10:47:17
25 you were part of the CSC team, the            10:47:24

Page 103

1  involvement of the NAMs and the customer      10:47:27
2  service reps in the day-to-day monitoring of  10:47:29
3  the customers was removed off their plate; is 10:47:34
4  that fair to say?                             10:47:38
5          MR. O'CONNOR:  Object to form.        10:47:38
6          THE WITNESS:  So I would have         10:47:41
7      never called the NAMs a day-to-day        10:47:41
8      monitoring.  The customer service         10:47:44
9      reps, yes, as they reviewed orders        10:47:46
10     that came in, that has not changed.       10:47:48
11     So I'd like to clarify that point.        10:47:49
12         But when we speak of the              10:47:51
13     suspicious order monitoring team, the     10:47:53
14     commercial -- neither the commercial      10:47:56
15     group nor customer service is             10:47:57
16     currently on the team.                    10:47:59
17 QUESTIONS BY MR. KO:                          10:48:00
18     Q.   Okay.  So when they were part        10:48:00
19 of the team, the NAMs and the CSRs assisted   10:48:02
20 in rooting out potential diversion of         10:48:06
21 Mallinckrodt controlled substances; is that   10:48:10
22 accurate?                                     10:48:12
23         MR. O'CONNOR:  Objection.             10:48:12
24         THE WITNESS:  So they assisted        10:48:13
25     in bringing things to our attention       10:48:15

Page 104

1      for additional investigation.            10:48:17
2  QUESTIONS BY MR. KO:                          10:48:17
3      Q.   Okay.                                10:48:19
4      A.   Not necessarily conclusion           10:48:19
5  diversion.                                    10:48:21
6      Q.   Okay.  That's helpful.               10:48:22
7          And with regard to the SOM            10:48:24
8  program, the NAMs -- so then it's fair to say 10:48:26
9  that the NAMs' and the CSRs' job was to alert 10:48:28
10 you to -- alert you to potential diversion;   10:48:32
11 is that accurate?                             10:48:34
12     A.   Yes, I believe the structure         10:48:35
13 for customer service was they would escalate  10:48:36
14 to their manager first, who would then, if    10:48:39
15 appropriate, come to the controlled           10:48:41
16 substances compliance group with that         10:48:43
17 concern.                                      10:48:44
18     Q.   Okay.  So if a -- if an              10:48:45
19 individual who was a national account manager 10:48:48
20 or customer service representative testified  10:48:50
21 that she or he was not involved in            10:48:54
22 identifying suspicious orders, that would not 10:48:57
23 be accurate, correct?                         10:48:59
24         MR. O'CONNOR:  Objection to           10:49:00
25     form.                                     10:49:01

Page 105

1          THE WITNESS:  It would not be         10:49:01
2      accurate.                                 10:49:08
3  QUESTIONS BY MR. KO:                          10:49:15
4      Q.   Okay.  Now, throughout the time      10:49:15
5  you were involved with the CSC and in         10:49:18
6  connection with your duties to revise the SOM 10:49:20
7  program, did you ever consult any third       10:49:25
8  parties or consultants to assist you in       10:49:28
9  implementing and maintaining an SOM program?  10:49:33
10     A.   Yes.                                 10:49:36
11     Q.   Okay.  And which third parties       10:49:37
12 or vendors would those be?                    10:49:38
13     A.   The company is Drug and              10:49:39
14 Chemical Advisory Group.  I'm not certain if  10:49:47
15 they still exist, but that was the firm at    10:49:48
16 the time.  And that group was made up of      10:49:55
17 former DEA executives.                        10:49:57
18     Q.   Okay.  Including Frank               10:49:59
19 Sapienza?                                     10:50:02
20     A.   Sapienza, yes, sir.                  10:50:02
21     Q.   Other than the drug and             10:50:04
22 chemical group, anyone else?                  10:50:05
23     A.   Yes.                                 10:50:06
24     Q.   Who or which entities?              10:50:06
25     A.   A gentleman, Howard Davis.  He       10:50:09

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    was retired DEA diversion program manager.    10:50:13
2        Q.    Okay.  Other than the drug and    10:50:20
3    chemical group and Mr. Davis, did you retain    10:50:21
4    any other entities to assist in the    10:50:25
5    implementation of Mallinckrodt's SOM program?    10:50:28
6        A.    Is there a specific time frame    10:50:30
7    to which you refer?    10:50:34
8        Q.    During the time period in which    10:50:35
9    you were senior manager of the controlled    10:50:37
10   substance compliance group.    10:50:40
11       A.    Yes.    10:50:41
12       Q.    Okay.  And who would -- who    10:50:44
13   would that individual be or which entities    10:50:45
14   would that be?    10:50:47
15       A.    So I get -- I get confused    10:50:48
16   because we did not retain the consulting    10:50:50
17   group for this purpose.  They were retained    10:50:55
18   through outside counsel, so Mallinckrodt did    10:50:58
19   not retain them.    10:51:01
20       Q.    I see.    10:51:02
21            So outside counsel, do you mean    10:51:03
22   Ropes & Gray?    10:51:05
23       A.    Yes.    10:51:05
24       Q.    Okay.  And which third-party    10:51:06
25   consultant or vendor are you referring to?    10:51:11

Page 107

1        A.    They've changed names    10:51:12
2    throughout the years.  It was at one time    10:51:14
3    called Buzzeo Consulting.  Their named    10:51:16
4    changed to IQVIA, Quintiles IMS, and now    10:51:20
5    they're known only at IMS.    10:51:27
6        Q.    And my understanding of IMS    10:51:31
7    is -- and IQVIA is that it's a database that    10:51:32
8    tracks detailed patient-level information.    10:51:36
9    So I just want to make sure I understand what    10:51:39
10   you're referring to in terms of their    10:51:41
11   retention.    10:51:44
12            Is it your testimony that you    10:51:45
13   believe that they actually testified as    10:51:47
14   consultants for the company, or did you    10:51:51
15   simply acquire data from them?    10:51:53
16            MR. O'CONNOR:  Objection to    10:51:55
17       form.    10:51:56
18            THE WITNESS:  We did not    10:51:56
19       acquire data from them.  The company    10:51:59
20       may have in some respect, but the old    10:52:01
21       Buzzeo group became a part of the    10:52:04
22       IQVIA IMS organization, so they    10:52:06
23       were -- primarily we dealt with    10:52:13
24       another gentleman who was a former    10:52:15
25       official at DEA.    10:52:18

Page 108

1    QUESTIONS BY MR. KO:    10:52:19
2        Q.    Okay.  Other than the Buzzeo    10:52:19
3    group, the drug and chemical group and    10:52:25
4    Mr. Howard Davis, do you recall any other    10:52:27
5    entities or individuals that Mallinckrodt    10:52:29
6    retained for purposes of implementing its SOM    10:52:31
7    program at the time you were senior manager?    10:52:34
8        A.    Yes.    10:52:36
9        Q.    Okay.  Who else?    10:52:37
10       A.    So there's -- there is a lady    10:52:39
11   who was a former employee.  Her name is    10:52:41
12   Jennifer, but she goes by Jen, Buist,    10:52:45
13   B-u-i-s-t.    10:52:51
14       Q.    And if memory serves me    10:52:51
15   correct, Ms. -- or Jennifer was retained    10:52:55
16   sometime after 2012.    10:52:58
17            Is that consistent with your    10:53:02
18   understanding?    10:53:02
19       A.    Yes.    10:53:02
20       Q.    Okay.  In other words, she    10:53:06
21   wasn't retained -- or she wasn't part of the    10:53:08
22   SOM team in the 2008 to 2012 time period, was    10:53:10
23   she?    10:53:12
24       A.    No.    10:53:13
25            (Mallinckrodt-Harper Exhibit 2    10:53:13

Page 109

1        marked for identification.)    10:53:13
2    QUESTIONS BY MR. KO:    10:53:13
3        Q.    Okay.  Why don't we turn to a    10:53:13
4    new exhibit.  This will be marked as Harper    10:53:22
5    Exhibit 2.    10:53:26
6            And for the record, Harper    10:53:39
7    Exhibit 2 is MNK-T1_0000275504.    10:53:41
8            And, Ms. Harper, I just want to    10:53:54
9    direct you to some pages on this document.    10:53:56
10   And we can get to -- well, let's take a step    10:54:04
11   back.    10:54:08
12            This appears to be an e-mail    10:54:08
13   dated February 23, 2009, from you to Eileen    10:54:11
14   Spaulding and Mary Lewis; is that correct?    10:54:15
15       A.    Yes.    10:54:18
16       Q.    And it's attaching a    10:54:18
17   presentation you're making regarding the    10:54:20
18   controlled substance compliance group?    10:54:22
19       A.    Yes.    10:54:24
20       Q.    Okay.  And I have seen a lot of    10:54:24
21   these presentations, and I believe that you    10:54:28
22   have given some of these presentations, so    10:54:30
23   I'm assuming they look familiar to you, but    10:54:33
24   does this presentation that you see attached    10:54:35
25   to this e-mail -- do you recall this    10:54:36

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  particular presentation?                    10:54:40
2          MR. O'CONNOR: Objection to       10:54:41
3     form.                                   10:54:42
4          THE WITNESS: Not this one        10:54:44
5     specifically, but as I read it, I'm     10:54:44
6     familiar -- I'm refamiliarizing         10:54:46
7     myself.                                 10:54:49
8  QUESTIONS BY MR. KO:                       10:54:49
9     Q.   Sure. Do you recall giving        10:54:49
10 presentations to other people or groups at  10:54:52
11 Mallinckrodt regarding the controlled      10:54:55
12 substance compliance roles and             10:54:56
13 responsibilities during the 2008 to 2017 time  10:54:58
14 period?                                     10:55:03
15    A.   Yes.                                10:55:03
16    Q.   Okay. And this was one of         10:55:03
17 those presentations?                        10:55:06
18    A.   Yes.                                10:55:06
19    Q.   Turning to page 2, which you're   10:55:07
20 on --                                       10:55:13
21    A.   Okay.                               10:55:13
22    Q.   -- of the deck, you see that      10:55:14
23 the controlled substance compliance group was  10:55:15
24 established in August 2008.                 10:55:16
25         Do you see that?                    10:55:18

Page 111

1     A.   I see that.                         10:55:18
2     Q.   Okay. And that the name was       10:55:19
3  changed from DEA compliance to the CSC,    10:55:21
4  correct?                                    10:55:29
5     A.   Yes. Yes.                           10:55:29
6     Q.   Okay. And just to help you       10:55:29
7  along, the portion I was referencing just a  10:55:35
8  moment ago was right there.                 10:55:43
9         And so the CSC group of which      10:55:44
10 you were senior manager was established in  10:55:47
11 August 2008, according to this presentation,  10:55:49
12 correct?                                    10:55:51
13    A.   Yes, according to the             10:55:52
14 presentation.                               10:55:54
15    Q.   And is that consistent with      10:55:54
16 your recollection?                          10:55:57
17    A.   I'm so uncertain of the years    10:55:58
18 the different events happened. I know this  10:56:01
19 happened. I see that the presentation reads  10:56:03
20 that way, but if it conflicts with a date   10:56:05
21 that I previously provided, I apologize.     10:56:08
22    Q.   Sure. No need to apologize.       10:56:12
23 This isn't necessarily a memory test.       10:56:15
24    A.   Okay.                               10:56:17
25    Q.   But I'm just curious -- well, I  10:56:18

Page 112

1  want you to confirm that at least as       10:56:19
2  reflected on this deck, the CSC group was  10:56:22
3  established in August of 2008, correct?    10:56:27
4          MR. O'CONNOR: Objection to       10:56:29
5     form.                                   10:56:31
6          THE WITNESS: Yes.                 10:56:32
7  QUESTIONS BY MR. KO:                       10:56:32
8     Q.   And you were senior manager of   10:56:32
9  that group at this time, correct?          10:56:33
10    A.   I was manager.                     10:56:34
11    Q.   You were manager. Okay.          10:56:40
12         And when -- and so at some       10:56:42
13 point you became senior manager?           10:56:44
14    A.   Yes.                                10:56:45
15    Q.   Okay. And as we discussed       10:56:46
16 earlier, you don't recall exactly when?     10:56:47
17    A.   No, I'm sorry.                     10:56:49
18    Q.   Okay. Now, based on this        10:56:51
19 document, is it accurate to say that prior to  10:56:56
20 August 2008 there was no such group at      10:56:58
21 Mallinckrodt called the controlled substance  10:57:00
22 compliance group? Is that correct?         10:57:02
23    A.   Correct.                           10:57:04
24    Q.   Okay. I want to turn to         10:57:04
25 page 11 of this document, of the deck in   10:57:12

Page 113

1  particular. And there is a reference made to  10:57:17
2  the controlled substance compliance team.     10:57:20
3          Do you see that?                   10:57:21
4     A.   Yes, I do.                          10:57:22
5     Q.   And it indicates here that you    10:57:24
6  are the manager, as we just discussed, of   10:57:26
7  controlled substance compliance, correct?   10:57:28
8     A.   Correct.                           10:57:31
9     Q.   And this comprises the entire     10:57:31
10 controlled substance compliance team?       10:57:34
11    A.   Yes.                                10:57:35
12    Q.   And it looks like you reported   10:57:37
13 to Ms. JoAnne Levy?                          10:57:41
14    A.   Levy, yes, sir.                     10:57:43
15    Q.   Levy, thank you.                   10:57:44
16         And what was her role?            10:57:45
17    A.   She was the vice president of    10:57:47
18 the logistics group.                        10:57:50
19    Q.   And did she have any day-to-day  10:57:51
20 involvement with the controlled substance   10:57:54
21 compliance team?                            10:57:55
22    A.   Yes.                                10:57:56
23    Q.   Okay. And what did that         10:57:56
24 day-to-day involvement consist of?          10:57:57
25    A.   As our vice president, she was   10:57:59

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 part of the team that enhanced the suspicious 10:58:03
2 order monitoring program. 10:58:09
3     Q.    Okay. 10:58:09
4     A.    We also deferred to her on 10:58:09
5 certain matters of, pardon me, of quota and 10:58:14
6 other duties related to the DEA compliance 10:58:19
7 group. 10:58:22
8     Q.    Okay. Now, with respect to the 10:58:22
9 revisions and implementation of 10:58:30
10 Mallinckrodt's SOM program in particular, is 10:58:31
11 it fair to say that you were the team leader 10:58:36
12 of that particular group? 10:58:38
13     A.    No. 10:58:41
14     Q.    It's not. 10:58:41
15         You don't believe you were the 10:58:42
16 team leader of -- during -- well, let me take 10:58:43
17 that back. 10:58:47
18         So from the time period of 10:58:47
19 August 2008 to 2012, were you the team leader 10:58:50
20 of Mallinckrodt's SOM program? 10:58:57
21     A.    We did not have a designated 10:59:00
22 team leader. 10:59:02
23     Q.    Okay. 10:59:03
24     A.    And we would have deferred to 10:59:04
25 the most senior official on the team, but we 10:59:06

Page 115

1 did not have a designated leader. 10:59:10
2     Q.    And when you say "defer to the 10:59:12
3 most senior official," are you referring to 10:59:13
4 Ms. Levy? 10:59:15
5     A.    At that time, yes. 10:59:16
6     Q.    Okay. There has been -- again, 10:59:18
7 this isn't a memory test. 10:59:21
8     A.    Okay. 10:59:23
9     Q.    So if your recollection is 10:59:23
10 different, I totally understand. 10:59:25
11         But I have seen reference to 10:59:27
12 documents that suggest that you were the team 10:59:28
13 leader of the SOM program. 10:59:30
14         Do you -- you dispute that? 10:59:32
15         MR. O'CONNOR: Objection to 10:59:33
16     form. 10:59:34
17         THE WITNESS: I don't dispute 10:59:34
18     that. 10:59:36
19 QUESTIONS BY MR. KO: 10:59:36
20     Q.    Okay. You don't dispute that. 10:59:36
21     A.    I may have been referenced as 10:59:38
22 the team leader, but I didn't -- I was a key 10:59:40
23 contributor, but I didn't perceive myself as 10:59:43
24 the leader. 10:59:46
25     Q.    All right. But as we discussed 10:59:46

Page 116

1 before, it's highly unlikely that anyone else 10:59:47
2 at Mallinckrodt knew more about 10:59:49
3 Mallinckrodt's SOM program other than you, 10:59:52
4 correct? 10:59:54
5     A.    Correct. 10:59:54
6     Q.    Okay. And in addition to you 10:59:55
7 having involvement in the SOM program at 11:00:02
8 Mallinckrodt, Ms. Spaulding also played a key 11:00:03
9 role; would you agree with that? 11:00:06
10         MR. O'CONNOR: Objection to 11:00:08
11     form. 11:00:10
12         THE WITNESS: Yes. 11:00:10
13 QUESTIONS BY MR. KO: 11:00:10
14     Q.    And she's based out of the 11:00:10
15 Hobart office? 11:00:12
16     A.    Yes. 11:00:13
17     Q.    And by the way, you were based 11:00:13
18 here in St. Louis, correct? 11:00:16
19     A.    Yes. 11:00:17
20     Q.    And were you based not in the 11:00:17
21 Hazelwood office but a different office? 11:00:20
22     A.    I've had three different 11:00:23
23 offices in the St. Louis area. 11:00:25
24     Q.    Okay. During the 2008 to 2012 11:00:26
25 time period, where were you located? 11:00:30

Page 117

1     A.    I believe I was at Hazelwood. 11:00:32
2     Q.    And where was Ms. Levy? 11:00:37
3     A.    At Hazelwood. 11:00:42
4     Q.    Okay. I want to turn to 11:00:43
5 page 15 of this deck, and here it appears 11:00:45
6 that you are describing some recent 11:00:58
7 developments in the controlled substance 11:01:01
8 compliance group; is that accurate? 11:01:03
9     A.    Contributions, yes, sir. 11:01:06
10     Q.    Contributions. 11:01:07
11         And one contribution appears to 11:01:07
12 be the implementation of an SOM program? 11:01:09
13         MR. O'CONNOR: Objection to 11:01:14
14     form. 11:01:14
15         THE WITNESS: So it's not 11:01:14
16     qualified here, but we had a program 11:01:18
17     in place, so that would have been an 11:01:20
18     enhancement activity of the SOM 11:01:23
19     program. 11:01:24
20 QUESTIONS BY MR. KO: 11:01:25
21     Q.    Okay. And an enhancement 11:01:25
22 activity, in other words, an attempt to 11:01:27
23 revise it and improve the program; is that 11:01:32
24 accurate? 11:01:35
25     A.    Yes. Yes. 11:01:35

Page 118

1    Q.   And when -- here it says, "CSOS    11:01:36
2  receipt guidance for customers."    11:01:39
3         What does CSOS refer to?    11:01:40
4    A.   So the DEA implemented an    11:01:42
5  electronic 222 format, and some of our    11:01:45
6  customers are narcotic treatment programs.    11:01:51
7  They had a lot of questions around how to    11:01:54
8  manage their recordkeeping, so we provided    11:01:57
9  guidance to those customers.    11:02:01
10    Q.   Okay.  And the 222 form is a    11:02:02
11  form required by the DEA that every    11:02:04
12  registrant fills out when ordering    11:02:05
13  prescription -- or controlled substances; is    11:02:07
14  that accurate?    11:02:09
15    A.   Schedule II.    11:02:09
16    Q.   Schedule II in particular?    11:02:10
17    A.   Yes.    11:02:12
18    Q.   Thank you.    11:02:12
19         And here, the next reference is    11:02:12
20  to what -- the next item down refers to    11:02:16
21  something we had just previously discussed    11:02:20
22  about Federal Register Notices.    11:02:22
23         Do you see that?    11:02:24
24    A.   Yes.    11:02:24
25    Q.   And so you are informing    11:02:25

Page 119

1  whoever's at this presentation that one    11:02:27
2  contribution of the CSC group is to watch    11:02:30
3  Federal Register Notices that come out that    11:02:39
4  are relevant for Mallinckrodt, correct?    11:02:41
5    A.   Correct.    11:02:41
6    Q.   And the Federal Register    11:02:42
7  Notices, what was your understanding of    11:02:44
8  generally what those consisted of?    11:02:46
9         Actually, take that back.    11:02:48
10         Is it -- a Federal Register    11:02:49
11  Notice -- with respect to the Federal    11:02:54
12  Register Notices that you paid particularly    11:02:57
13  close attention to, those were notices that    11:02:58
14  interpreted certain DEA statutes; is that    11:03:02
15  fair to say?    11:03:05
16         MR. O'CONNOR:  Objection to    11:03:05
17         form.    11:03:05
18         THE WITNESS:  I would not call    11:03:06
19         them interpretations.  They were    11:03:08
20         statements of quota, the US aggregate    11:03:11
21         quota, notices of proposed rulemaking,    11:03:16
22         who had applied to become a new    11:03:19
23         registrant, things like that.    11:03:20
24  QUESTIONS BY MR. KO:    11:03:22
25    Q.   Okay.  And the statements, did    11:03:22

Page 120

1  they also include -- or did you also review    11:03:24
2  and read statements regarding Federal    11:03:30
3  Register Notices of suspicious order    11:03:41
4  monitoring activities?    11:03:42
5         MR. O'CONNOR:  Objection to    11:03:42
6         form.    11:03:43
7  QUESTIONS BY MR. KO:    11:03:43
8    Q.   It was a poor question.  Let me    11:03:44
9  ask it again.    11:03:46
10         When reviewing the Federal    11:03:46
11  Register Notices, did you also see and review    11:03:48
12  notices that related to SOM activities of    11:03:50
13  other registrants?    11:03:52
14    A.   Yes.    11:03:54
15    Q.   And my presumption is that you    11:03:55
16  paid particularly close attention to some of    11:04:00
17  those notices?    11:04:01
18         MR. O'CONNOR:  Objection.    11:04:02
19         THE WITNESS:  One in    11:04:03
20         particular, yes.    11:04:03
21  QUESTIONS BY MR. KO:    11:04:04
22    Q.   Would that be the Southwood --    11:04:04
23    A.   Yes.    11:04:04
24    Q.   -- notice?    11:04:06
25         Okay.  Do you recall when you    11:04:06

Page 121

1  reviewed that one?    11:04:07
2    A.   When DEA called it out in one    11:04:09
3  of their guidance letters as being    11:04:12
4  instructive, that is what we went to    11:04:14
5  immediately and reviewed.    11:04:16
6    Q.   Okay.  And you recall this was    11:04:17
7  generally in the 2007 or early 2008 time    11:04:19
8  period?    11:04:23
9    A.   It was 2006, 2007, approximate,    11:04:24
10  but I don't remember the dates.    11:04:26
11    Q.   Okay.  With respect to    11:04:27
12  participate in RiskMAP program, an FDA    11:04:33
13  initiative, can you describe to the Court    11:04:38
14  what the RiskMAP program was?    11:04:41
15    A.   I don't remember the definition    11:04:45
16  of the acronym, but it pertained -- it was an    11:04:47
17  FDA program where certain drug substances    11:04:53
18  were monitored forward through the supply    11:04:56
19  chain.    11:04:59
20    Q.   Okay.  And when you say    11:05:00
21  "forward," do you mean after they left the    11:05:02
22  warehouses of the manufacturer facility?    11:05:09
23    A.   Yes.    11:05:12
24    Q.   Okay.  So would it be fair to    11:05:13
25  say that another way of saying -- well,    11:05:16

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  strike that.                                      11:05:24
2        Now, there's also a reference      11:05:24
3  made to working with the DEA on methadone.   11:05:29
4        Do you see that?             11:05:35
5  A.    Yes.                          11:05:36
6  Q.    And Mallinckrodt manufactures a   11:05:36
7  large amount of generic methadone as well,    11:05:38
8  correct?                            11:05:41
9        MR. O'CONNOR: Objection to      11:05:41
10       form.                        11:05:42
11       THE WITNESS: We manufacture     11:05:42
12       methadone, and I don't again have -- I   11:05:44
13       don't know if we're the largest, or    11:05:45
14       large, but, yes, we manufacture it.   11:05:46
15 QUESTIONS BY MR. KO:               11:05:47
16 Q.    Okay. And despite not knowing    11:05:48
17 whether or not you are the largest, or large,   11:05:52
18 you do understand that Mallinckrodt has for    11:05:55
19 quite some time manufactured generic       11:05:58
20 methadone, correct?                  11:05:59
21 A.    Yes.                          11:06:00
22 Q.    Okay. And since at least the    11:06:01
23 mid-'90s, if not prior to that?        11:06:02
24 A.    I don't recall the year because   11:06:06
25 previously it was manufactured by an external   11:06:09

Page 123

1  party and shipped to Mallinckrodt for       11:06:11
2  distribution, so I don't know when we brought   11:06:13
3  the manufacturing in-house.           11:06:15
4  Q.    Sure.                         11:06:17
5  A.    Of the methadone, 40            11:06:17
6  milligrams, that is.                 11:06:19
7  Q.    And thank you for that          11:06:20
8  clarification.                       11:06:21
9        Mallinckrodt manufactured       11:06:21
10 various different strengths of methadone,    11:06:22
11 correct?                            11:06:25
12 A.    Yes.                          11:06:25
13 Q.    I believe in 5, 10 and          11:06:27
14 40-milligram dosages, among other quantities?   11:06:30
15 A.    Yes.                          11:06:33
16 Q.    Okay. And at a certain point    11:06:33
17 in time, the DEA alerted you and the CSC    11:06:35
18 group of methadone abuse and diversion,      11:06:39
19 correct?                            11:06:41
20       MR. O'CONNOR: Objection to      11:06:42
21       form.                        11:06:45
22       THE WITNESS: They called it     11:06:45
23       the methadone mortality working group.   11:06:46
24       DEA asked us to come to Washington,   11:06:48
25       DC, along with other major      11:06:51

Page 124

1  manufacturers -- there were two or      11:06:53
2  three others -- and have a           11:06:54
3  collaborative discussion with them in   11:06:57
4  terms of how the 40-milligram         11:06:58
5  methadone specifically was being       11:07:02
6  distributed at pharmacies, and the     11:07:07
7  data that they were seeing related to   11:07:10
8  the mortality that they were         11:07:12
9  associating with those distributions.   11:07:13
10 QUESTIONS BY MR. KO:               11:07:15
11 Q.    And when you say "mortality,"   11:07:15
12 you're saying that there were a large amount   11:07:18
13 of -- or there were people that were       11:07:19
14 overdosing on methadone at the time that you    11:07:21
15 met with DEA, correct?               11:07:25
16       MR. O'CONNOR: Objection to      11:07:27
17       form.                        11:07:27
18       THE WITNESS: Yes, but may I     11:07:28
19       please add that that was because there   11:07:29
20       were physicians that were writing them   11:07:33
21       for purposes other than which they    11:07:34
22       were FDA-approved.             11:07:38
23 QUESTIONS BY MR. KO:               11:07:39
24 Q.    Okay. And that's based on your   11:07:40
25 understanding what the DEA was telling you,    11:07:42

Page 125

1  correct? Or do you actually have personal    11:07:44
2  knowledge?                          11:07:46
3  A.    I do not have any personal      11:07:46
4  knowledge.                          11:07:47
5  Q.    So it was based on what the DEA   11:07:47
6  was telling you?                     11:07:49
7  A.    Yes.                          11:07:50
8  Q.    And do you recall when --       11:07:50
9  approximately when that meeting in       11:07:51
10 Washington, DC, was?                 11:07:53
11 A.    I don't recall the date.        11:07:54
12 A.    Was it before 2008?             11:07:57
13 A.    I'm sorry, I don't recall the    11:08:00
14 date.                               11:08:01
15 Q.    Fair enough.                   11:08:02
16       And going back to the RiskMAP    11:08:02
17 and trying to understand, as you described,    11:08:09
18 the path of a drug that a manufacturer      11:08:12
19 produced, forward, as you said, do you recall   11:08:20
20 at a certain point in time creating a RiskMAP   11:08:25
21 for oxycodone 30?                    11:08:31
22 A.    I do not.                      11:08:32
23 Q.    Okay. You don't recall any      11:08:34
24 involvement in a RiskMAP for oxy 30s or 15s?   11:08:36
25 A.    We may have been asked to       11:08:39

Highly Confidential – Subject to Further Confidentiality Review

Page 126

1  report in to the -- it was called the patient  11:08:41
2  and product monitoring group.  It was  11:08:44
3  specific to fentanyl in the beginning, but I  11:08:50
4  don't -- I don't know to which other products  11:08:53
5  it may have expanded, but we did annual  11:08:55
6  reporting to that group.  11:08:57
7  Q.  Sure.  Okay.  11:08:58
8  You didn't have any specific  11:09:00
9  responsibility with respect to that RiskMAP  11:09:02
10  report that you may have done for the FDA,  11:09:05
11  correct?  11:09:08
12  A.  So we had responsibility for  11:09:08
13  reporting any thefts or losses of these  11:09:11
14  specific drugs, but it was an internal  11:09:13
15  reporting to the patient and product  11:09:16
16  monitoring group who assembled a whole large  11:09:17
17  report consisting of other information for  11:09:21
18  the FDA.  11:09:24
19  Q.  Okay.  I understand.  11:09:25
20  And did you have any -- a  11:09:26
21  specific involvement with that?  11:09:29
22  A.  Only to the extent if we --  11:09:30
23  they contacted us once a year and asked if we  11:09:32
24  had any recorded thefts or losses, DEA 106  11:09:35
25  forms, for those drug products.  11:09:41

Page 127

1  Q.  Okay.  If you turn to page 18  11:09:42
2  of this deck, and there's a reference made to  11:09:52
3  the cost of noncompliance.  11:10:02
4  Do you see that?  11:10:03
5  A.  I do see it.  11:10:04
6  Q.  And by the way, do you have any  11:10:05
7  reason to doubt that this was a presentation  11:10:07
8  you made, or do you think that someone else  11:10:08
9  made this presentation?  11:10:11
10  A.  I have no reason to doubt I --  11:10:12
11  I did make the presentation.  11:10:14
12  Q.  You did make this presentation?  11:10:15
13  A.  Yeah.  11:10:16
14  Q.  Okay.  So here you're  11:10:16
15  describing the cost of noncompliance, and in  11:10:18
16  particular the cost of noncompliance with the  11:10:22
17  CSA; is that fair to say?  11:10:24
18  A.  Yes.  11:10:25
19  Q.  Okay.  And you are talking  11:10:25
20  about, I think, other fines paid by other  11:10:27
21  pharmacies and other entities and registrants  11:10:32
22  of the CSA, correct?  11:10:36
23  A.  Well, this one is specific to a  11:10:37
24  fine paid by Rite Aid and its subsidiaries.  11:10:41
25  Q.  Right.  11:10:47

Page 128

1  Now, in addition to an actual  11:10:48
2  cost, a business and corporate cost, would  11:10:52
3  you agree with me that the cost of  11:10:54
4  noncompliance is actually overdose deaths?  11:10:55
5  MR. O'CONNOR:  Objection to  11:11:00
6  form.  11:11:01
7  QUESTIONS BY MR. KO:  11:11:02
8  Q.  In other words, there's a human  11:11:02
9  cost of noncompliance, is there not?  11:11:04
10  MR. O'CONNOR:  Objection to  11:11:06
11  form.  11:11:06
12  THE WITNESS:  There is a human  11:11:07
13  cost based upon the diversion of  11:11:10
14  prescription opioids, yes.  11:11:14
15  QUESTIONS BY MR. KO:  11:11:16
16  Q.  And that human cost is  11:11:16
17  manifested in either mortality or morbidity  11:11:17
18  in the form of more people addicted to  11:11:21
19  opioids.  Would you agree with me on that?  11:11:24
20  MR. O'CONNOR:  Objection to  11:11:25
21  form.  11:11:26
22  THE WITNESS:  Correct.  Yes.  11:11:26
23  Sorry.  11:11:27
24  QUESTIONS BY MR. KO:  11:11:27
25  Q.  So in addition to the costs of  11:11:28

Page 129

1  noncompliance here that you list, a real and  11:11:30
2  tangible cost of noncompliance is -- are the  11:11:35
3  amount of lives affected by the abuse and  11:11:38
4  diversion of prescription opioids, correct?  11:11:41
5  MR. O'CONNOR:  Objection to  11:11:42
6  form.  11:11:44
7  THE WITNESS:  I agree, yes.  11:11:44
8  QUESTIONS BY MR. KO:  11:11:45
9  Q.  Okay.  And as we discussed  11:11:45
10  before, many, if not all, of the complaints  11:11:49
11  that have been filed against various entities  11:11:55
12  involved in the supply chain of prescription  11:11:59
13  opioids allege that state and local  11:12:01
14  governments have had to incur the burden of  11:12:09
15  responding to the overdose rates and  11:12:12
16  morbidity rates that have been caused as a  11:12:16
17  result of the opioid crisis?  11:12:19
18  MR. O'CONNOR:  Objection to  11:12:23
19  form.  11:12:24
20  THE WITNESS:  Yes, that is the  11:12:24
21  information that has been reported,  11:12:25
22  yes.  11:12:26
23  QUESTIONS BY MR. KO:  11:12:26
24  Q.  Okay.  And that is -- in  11:12:26
25  addition to the information that has been  11:12:27

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 reported, is that consistent with your  11:12:29
2 understanding? Do you believe that to be the  11:12:31
3 case?  11:12:32
4       MR. O'CONNOR: Objection to  11:12:32
5 form.  11:12:33
6       THE WITNESS: I don't have  11:12:33
7 firsthand knowledge of the costs, but  11:12:36
8 I have no reason to doubt that  11:12:39
9 reporting.  11:12:40
10 QUESTIONS BY MR. KO:  11:12:41
11   Q.   Okay. By the way, do you  11:12:46
12 know -- do you personally know anyone  11:12:47
13 impacted by the opioid crisis?  11:12:49
14   A.   I do not.  11:12:52
15   Q.   You're lucky.  11:12:54
16   A.   I know. I know that.  11:12:55
17       (Mallinckrodt-Harper Exhibit 3  11:13:05
18       marked for identification.)  11:13:05
19 QUESTIONS BY MR. KO:  11:12:57
20   Q.   I want to turn to the next  11:12:57
21 exhibit, which will be marked as Harper  11:13:03
22 Exhibit 3.  11:13:05
23       For the record, this is ending  11:13:11
24 in Bates stamp 283074.  11:13:13
25       And it is an e-mail dated  11:13:24

Page 131

1 April 12, 2011, from you to Michael  11:13:26
2 Santowski.  11:13:31
3       Who is Michael Santowski?  11:13:32
4   A.   He was the gentleman to whom I  11:13:35
5 reported at the time.  11:13:38
6   Q.   Okay. And he was -- was he  11:13:38
7 part of the controlled substance compliance  11:13:42
8 team?  11:13:43
9   A.   We reported to him, so he had  11:13:44
10 oversight for several groups, including ours,  11:13:49
11 yes.  11:13:52
12   Q.   I see.  11:13:52
13       And now it appears that you've  11:13:53
14 become the senior manager of the controlled  11:13:54
15 substance compliance group.  11:13:56
16       Do you see that?  11:13:57
17   A.   Yes.  11:13:57
18   Q.   So at least as of April 12,  11:13:58
19 2011, you were the senior manager of the CSC?  11:14:00
20   A.   I agree.  11:14:04
21   Q.   Okay. And this is another  11:14:05
22 presentation you made regarding the SOM  11:14:08
23 program at Mallinckrodt.  11:14:12
24       Do you see that?  11:14:13
25   A.   So clearly I created the  11:14:14

Page 132

1 presentation, but the e-mail indicates it was  11:14:20
2 provided to Michael Santowski for training of  11:14:24
3 the executive committee. So that was a level  11:14:28
4 I didn't -- that was senior executives within  11:14:31
5 the organization.  11:14:32
6   Q.   I see. That's very helpful.  11:14:33
7       So you didn't actual present  11:14:35
8 this deck to the executive committee?  11:14:37
9   A.   I have a number of slides that  11:14:38
10 I pull in and out of presentations as  11:14:42
11 appropriate for the audience. So I'm certain  11:14:44
12 I presented variations of these slides to  11:14:47
13 different audiences, but I did not present  11:14:50
14 this deck to the executive committee.  11:14:52
15   Q.   Okay. That's helpful.  11:14:55
16       But you created the deck for  11:14:56
17 Mr. Santowski, if I understand correctly?  11:14:58
18   A.   Yes.  11:15:00
19   Q.   Okay. I want to turn to page 4  11:15:01
20 of this deck. And here we have some of the  11:15:07
21 regulations that interpret the CSA.  11:15:19
22       Do you see that?  11:15:21
23   A.   I think that's verbatim, but,  11:15:22
24 yes, yes. Not an interpretation, but the  11:15:29
25 statements in the Code of Federal  11:15:32

Page 133

1 Regulations.  11:15:35
2   Q.   Okay. Great. Thank you for  11:15:35
3 that clarification.  11:15:36
4       So these are statements that  11:15:37
5 actually appear in the regulations as  11:15:39
6 codified by 21 CFR 1301.74, correct?  11:15:42
7       MR. O'CONNOR: Objection to  11:15:47
8 form.  11:15:47
9       THE WITNESS: Yes.  11:15:47
10 QUESTIONS BY MR. KO:  11:15:48
11   Q.   Okay. And we have previously  11:15:48
12 discussed Mallinckrodt's responsibilities  11:15:51
13 with respect to suspicious orders, but I just  11:15:53
14 want to make sure.  11:15:56
15       You would agree that all the  11:15:57
16 responsibilities and requirements set forth  11:16:00
17 here are responsibilities that Mallinckrodt  11:16:02
18 had, correct?  11:16:04
19       MR. O'CONNOR: Objection to  11:16:06
20 form.  11:16:07
21       THE WITNESS: Yes, correct.  11:16:07
22 QUESTIONS BY MR. KO:  11:16:08
23   Q.   Okay. And that includes a duty  11:16:08
24 to design and operate a suspicious order  11:16:11
25 identification system.  11:16:15

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Mallinckrodt had that duty,    11:16:17
2  correct?    11:16:18
3    A.  Yes.    11:16:18
4    Q.  And Mallinckrodt had a duty to    11:16:18
5  require -- or Mallinckrodt had a duty to    11:16:24
6  report suspicious orders to the DEA when    11:16:26
7  discovered via a monitoring process, correct?    11:16:28
8    A.  Yes.    11:16:31
9    Q.  And Mallinckrodt had a duty    11:16:31
10  to -- had a duty to ensure that this    11:16:34
11  responsibility to report suspicious orders    11:16:38
12  did not end merely with filing a suspicious    11:16:39
13  order report; is that correct?    11:16:43
14    MR. O'CONNOR:  Objection to    11:16:44
15    form.    11:16:45
16    THE WITNESS:  So the statement    11:16:45
17    is correct, but I -- I must -- I would    11:16:46
18    like to clarify.    11:16:49
19    All these are not straight from    11:16:50
20    CFR 21.  Some of the statements, I    11:16:53
21    believe, particularly the italicized    11:16:55
22    one at the bottom, may have been    11:16:58
23    culled from a DEA -- one of the DEA    11:17:01
24    guidance letters.    11:17:04
25

Page 135

1  QUESTIONS BY MR. KO:    11:17:04
2    Q.  Okay.  But regardless of where    11:17:05
3  it came from, at least at the time of this    11:17:08
4  presentation, you believe that Mallinckrodt    11:17:10
5  had a duty to ensure that their suspicious    11:17:12
6  order responsibilities did not end merely    11:17:17
7  with the filing of a suspicious order report;    11:17:18
8  is that correct?    11:17:21
9    MR. O'CONNOR:  Objection to    11:17:21
10    form.    11:17:22
11    THE WITNESS:  Correct.    11:17:22
12    Correct.    11:17:22
13  QUESTIONS BY MR. KO:    11:17:23
14    Q.  And Mallinckrodt also -- you    11:17:23
15  also understand that Mallinckrodt was not    11:17:26
16  going to get any specific guidance from the    11:17:30
17  DEA at this time on whether or not their    11:17:33
18  particular SOM program would be endorsed --    11:17:37
19    MR. O'CONNOR:  Objection to    11:17:40
20    form.    11:17:41
21  QUESTIONS BY MR. KO:    11:17:41
22    Q.  -- is that accurate?    11:17:41
23    A.  That's accurate.    11:17:42
24    Q.  Okay.  And when did you    11:17:43
25  understand DEA to tell you that first; do you    11:17:45

Page 136

1  have any recollection?    11:17:48
2    MR. O'CONNOR:  Objection to    11:17:48
3    form.    11:17:49
4    THE WITNESS:  I'm fairly    11:17:49
5    certain that that was in one of the    11:17:51
6    guidance letters from DEA circa 2006,    11:17:56
7    2007.    11:17:59
8  QUESTIONS BY MR. KO:    11:18:00
9    Q.  Okay.  And then finally, this    11:18:00
10  last bullet indicates that -- or you would    11:18:04
11  agree with me that Mallinckrodt had a duty to    11:18:08
12  conduct an independent analysis of suspicious    11:18:10
13  orders prior to completing a sale to    11:18:13
14  determine whether or not the controlled    11:18:14
15  substances are likely to be diverted.    11:18:17
16    MR. O'CONNOR:  Objection to    11:18:19
17    form.    11:18:19
18  QUESTIONS BY MR. KO:    11:18:19
19    Q.  Is that accurate?    11:18:19
20    A.  Yes.    11:18:20
21    Q.  Okay.  Now, turning to the next    11:18:21
22  page, here you put in this presentation the    11:18:30
23  number of people -- the number of registrants    11:18:36
24  there are in the supply chain -- or the    11:18:39
25  number of registrants that are part of the    11:18:43

Page 137

1  CSA; is that correct?    11:18:44
2    A.  As of that time, yes.    11:18:45
3    Q.  Right, as of that time.    11:18:48
4    A.  Yes.    11:18:49
5    Q.  And there's a specific quote    11:18:49
6  that you include in this presentation that    11:18:51
7  says that "the DEA must rely on the states    11:18:53
8  and individual registrants to monitor."    11:18:56
9    Do you see that?    11:18:58
10    A.  I do see that.    11:18:58
11    Q.  And the "individual    11:18:59
12  registrants" obviously refers to entities    11:19:00
13  like Mallinckrodt?    11:19:03
14    A.  Correct.    11:19:04
15    Q.  And so at least as of this    11:19:05
16  time, the date of this deck, you understood    11:19:07
17  that the DEA was not going to give you    11:19:10
18  specific guidance but was going to rely on    11:19:11
19  registrants like Mallinckrodt to monitor    11:19:16
20  their controlled substances, correct?    11:19:18
21    MR. O'CONNOR:  Objection to    11:19:19
22    form.    11:19:20
23    THE WITNESS:  Correct.    11:19:20
24  QUESTIONS BY MR. KO:    11:19:21
25    Q.  Okay.  Now, I want to turn to    11:19:21

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    page 7 of this particular report, and there's    11:19:29
2    a reference made to Florida.  And I know we    11:19:36
3    had spoken a little bit about problems in    11:19:39
4    Florida a moment ago, but on page 7 -- give    11:19:43
5    you a moment to get there.    11:19:49
6        A.  I'm sorry, the front and back    11:19:50
7    is mixing me up.    11:19:52
8        Q.  Yeah.    11:19:53
9        A.  Okay.  Thank you.  I am at    11:19:53
10    page 7.    11:19:55
11        Q.  Sure.    11:19:56
12        Page 7 gives some color to what    11:19:56
13    we were previously discussing about the    11:19:59
14    problem in Florida, and here you describe    11:20:01
15    that most, if not almost all, 98 percent, of    11:20:04
16    all doctors dispensing oxycodone nationally    11:20:09
17    are in Florida.    11:20:12
18        Do you see that?    11:20:12
19        A.  I do.    11:20:13
20        Q.  So you were aware at the time    11:20:13
21    of this presentation that there was a --    11:20:16
22    almost all of the -- or the top doctors    11:20:20
23    dispensing oxycodone were in Florida,    11:20:23
24    correct?    11:20:25
25        MR. O'CONNOR:  Objection to    11:20:26

Page 139

1    form.    11:20:27
2        THE WITNESS:  Yes.  Accepting    11:20:27
3    as factual this data published by the    11:20:32
4    Florida governor's office, yes.    11:20:35
5    QUESTIONS BY MR. KO:    11:20:38
6        Q.  Right.  And you had    11:20:38
7    knowledge -- or you understood there to be a    11:20:39
8    big problem in Florida at this time --    11:20:41
9        MR. O'CONNOR:  Objection to    11:20:43
10    form.    11:20:43
11    QUESTIONS BY MR. KO:    11:20:43
12        Q.  -- with respect to prescription    11:20:43
13    opioids manufactured by Mallinckrodt,    11:20:45
14    correct?    11:20:46
15        MR. O'CONNOR:  Same objection.    11:20:46
16        THE WITNESS:  A problem, yes.    11:20:47
17    The -- sorry.  The adjective "big,"    11:20:50
18    again, is a relative term, but, yes, a    11:20:53
19    problem in Florida.    11:20:56
20    QUESTIONS BY MR. KO:    11:20:57
21        Q.  Okay.  And in fact, there was    11:20:57
22    substantially more oxycodone manufactured by    11:20:59
23    Mallinckrodt that was being dispensed in    11:21:03
24    Florida than all the other remaining states    11:21:05
25    combined according to this deck, correct?    11:21:07

Page 140

1        MR. O'CONNOR:  Objection to    11:21:09
2    form.    11:21:09
3        THE WITNESS:  So there are    11:21:09
4    other manufacturers of oxycodone --    11:21:13
5    QUESTIONS BY MR. KO:    11:21:14
6        Q.  I understand that.    11:21:14
7        A.  -- and this is not specific to    11:21:15
8    Mallinckrodt oxycodone.    11:21:16
9        Q.  Okay.  But Mallinckrodt    11:21:18
10    manufactured oxy 15s and 30s in large    11:21:19
11    amounts, correct?    11:21:22
12        A.  Mallinckrodt manufactured oxy    11:21:23
13    15s and 30s, and again, "large" is -- I don't    11:21:25
14    have enough reference information relative to    11:21:28
15    the other manufacturers' production to answer    11:21:31
16    the question.    11:21:35
17        Q.  Well, let's talk about that    11:21:36
18    then.  The next -- the previous page,    11:21:40
19    actually, page 6, there's a description of    11:21:42
20    oxycodone market share of Mallinckrodt    11:21:45
21    relative to the rest of your competitors.    11:21:47
22        Do you see that?    11:21:50
23        A.  I do see it.    11:21:51
24        Q.  So at least as of Q4 of 2010,    11:21:53
25    it appears that Mallinckrodt has a 52 percent    11:21:59

Page 141

1    share of oxycodone in the nation; is that    11:22:02
2    accurate?    11:22:08
3        MR. O'CONNOR:  Object to form.    11:22:08
4        THE WITNESS:  Yes.    11:22:09
5    QUESTIONS BY MR. KO:    11:22:11
6        Q.  Okay.  And then that rose    11:22:12
7    slightly in Q1 of 2011 -- fiscal year 2011 to    11:22:16
8    56 percent.    11:22:19
9        Do you see that?    11:22:20
10        A.  Yes, I do see that statistic,    11:22:23
11    yes.    11:22:26
12        Q.  All right.  And so there -- and    11:22:26
13    none of Mallinckrodt's competitors are    11:22:27
14    anywhere close to Mallinckrodt's market share    11:22:29
15    based on this table, correct?    11:22:32
16        A.  Correct.    11:22:33
17        Q.  And in fact, as we just    11:22:35
18    previously described and went over, the total    11:22:37
19    percentage of Mallinckrodt's competitors is    11:22:41
20    less than Mallinckrodt's own share of the    11:22:44
21    market of oxycodone, correct?    11:22:47
22        MR. O'CONNOR:  Objection to    11:22:50
23    form.    11:22:51
24        THE WITNESS:  Yes.  As I sit    11:22:51
25    here and perform quick math, yes.    11:22:53

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Yes.                            11:22:55
2    QUESTIONS BY MR. KO:            11:22:56
3        Q.   Okay.  Now, based, I believe --  11:22:56
4    if you turn to page 14 of this deck now,  11:23:05
5    going forward.                  11:23:08
6        And there's reference made to a  11:23:20
7    conversation that Mallinckrodt had with the  11:23:22
8    DEA on July 20, 2010.           11:23:25
9        Do you see that?            11:23:28
10   A.   I do.                      11:23:29
11       Q.   And do you recall that  11:23:29
12   conversation?                   11:23:32
13   A.   I do.                      11:23:32
14       Q.   And you participated in it?  11:23:33
15   A.   Yes.                       11:23:35
16       Q.   Okay.  And we'll get to that in  11:23:35
17   a moment --                     11:23:36
18   A.   All right.                 11:23:37
19       Q.   -- but I just want to talk  11:23:37
20   about some of the things that you've put in  11:23:40
21   this presentation, including the fact that  11:23:42
22   Mallinckrodt is viewed as the kingpin within  11:23:44
23   the drug cartel.                11:23:47
24       Do you see that reference?   11:23:48
25   A.   I do.                      11:23:50

Page 143

1        Q.   And that was something that the  11:23:50
2    DEA had indicated to you?       11:23:52
3    A.   Yes.                       11:23:53
4        Q.   Okay.  And my presumption is  11:23:55
5    that they expressed that view because  11:23:57
6    Mallinckrodt had the majority of the market  11:23:59
7    share of oxycodone?             11:24:02
8        MR. O'CONNOR:  Objection to  11:24:03
9    form.                           11:24:03
10       THE WITNESS:  I know the view  11:24:03
11   was expressed, but I don't know what  11:24:05
12   the basis was because this is talking  11:24:07
13   about Harvard Drug distributor.  11:24:09
14   QUESTIONS BY MR. KO:            11:24:12
15       Q.   Okay.  So you -- regardless,  11:24:12
16   you recall during this DEA meeting in July  11:24:16
17   of 2010 that DEA had expressed the view that  11:24:20
18   Mallinckrodt was viewed as the kingpin within  11:24:22
19   the drug cartel?                11:24:24
20   A.   I do.                      11:24:25
21       Q.   Okay.  And we had discussed a  11:24:26
22   little time ago that -- about Mallinckrodt's  11:24:31
23   duties to know their customers' customers,  11:24:34
24   and here you indicate that at least as of the  11:24:36
25   date of this meeting, you understood that DEA  11:24:38

Page 144

1    expected Mallinckrodt to understand and know  11:24:43
2    their customer's customer; is that correct?  11:24:47
3        MR. O'CONNOR:  Objection to  11:24:51
4    form.                           11:24:51
5        THE WITNESS:  Yes, that's per  11:24:51
6    DEA St. Louis, yes.             11:24:53
7    QUESTIONS BY MR. KO:            11:24:54
8        Q.   Okay.  So as of July 20th -- no  11:24:54
9    later than July 20, 2010, you understood that  11:24:56
10   Mallinckrodt had an obligation as required by  11:25:00
11   the DEA to know their customer's customer,  11:25:02
12   correct?                        11:25:05
13       MR. O'CONNOR:  Objection to  11:25:05
14   form.                           11:25:06
15       THE WITNESS:  So it was told to  11:25:06
16   us by DEA St. Louis, but DEA Albany  11:25:07
17   contradicted the statement.     11:25:10
18   QUESTIONS BY MR. KO:            11:25:12
19       Q.   Okay.  And we'll get to that  11:25:12
20   maybe in a moment, but -- well, first of all,  11:25:13
21   is there any indication of a contradiction on  11:25:17
22   this deck?                      11:25:19
23   A.   Well, so the DEA expectation,  11:25:19
24   I'm using that term as all of DEA here when I  11:25:24
25   prepared the bullet point on the slide, but  11:25:28

Page 145

1    the comment came from DEA St. Louis.  11:25:31
2        Q.   Okay.  So when you say that you  11:25:33
3    are referring to DEA -- the DEA expectation,  11:25:34
4    then it is fair to say that based on your  11:25:39
5    conversation with the DEA on July 20th, you  11:25:41
6    understood that Mallinckrodt had an  11:25:43
7    obligation to know your customer's customer;  11:25:46
8    is that correct?                11:25:50
9        MR. O'CONNOR:  Objection to  11:25:50
10   form.                           11:25:50
11       THE WITNESS:  So again, I'm  11:25:50
12   sorry, it was DEA St. Louis, and it  11:25:51
13   was DEA St. Louis expectation because  11:25:54
14   that was a quote from the  11:25:58
15   conversation.                   11:25:59
16   QUESTIONS BY MR. KO:            11:25:59
17       Q.   Okay.  So I just want to make  11:25:59
18   sure the record is clear.        11:26:01
19       Based on your conversations  11:26:02
20   with DEA St. Louis, it was your understanding  11:26:03
21   that the DEA St. Louis required Mallinckrodt,  11:26:06
22   and in fact expected Mallinckrodt, to know  11:26:10
23   their customer's customer as of July 20,  11:26:13
24   2010; is that correct?          11:26:15
25       MR. O'CONNOR:  Objection to  11:26:16

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    form.                          11:26:16
2        THE WITNESS:  Yes.          11:26:16
3    QUESTIONS BY MR. KO:            11:26:17
4        Q.   Okay.  By the way, we talked    11:26:17
5    about Mr. Ratliff a moment ago.    11:26:31
6        When did you first start       11:26:34
7    working with Mr. Ratliff?          11:26:35
8        A.   I don't know the year.    11:26:37
9        Q.   Okay.  It was before the 2008  11:26:38
10   time period?                    11:26:41
11       A.   I don't know when he came to   11:26:41
12   us, I'm sorry.                  11:26:45
13       Q.   Sure.                 11:26:46
14       Do you know who Pete Kleissle    11:26:47
15   is?                            11:26:51
16       A.   Yes.                 11:26:51
17       Q.   He was at DEA, correct?   11:26:52
18       A.   Yes.                 11:26:53
19       Q.   Do you recall any conversations  11:26:53
20   with Pete Kleissle regarding your obligations  11:26:55
21   to know your customer's customer?     11:26:59
22       A.   So when I'm using the term   11:27:01
23   "DEA" here, this conversation was indeed with  11:27:06
24   Pete Kleissle.                  11:27:10
25       Q.   Okay.  So Pete Kleissle     11:27:11

Page 147

1    specifically told you and other people that  11:27:15
2    were at this meeting that you had an   11:27:18
3    obligation to know your customer's customer  11:27:20
4    or --                          11:27:23
5        A.   It was only me.        11:27:23
6        Q.   Only you.  Okay.       11:27:24
7        And who did you share that    11:27:27
8    information with?               11:27:28
9        A.   The person to whom I reported  11:27:28
10   at the time and Bill Ratliff, because I don't  11:27:35
11   believe our group reported to him, but we   11:27:38
12   work in close conjunction with the security  11:27:39
13   group in DEA compliance.         11:27:41
14       Q.   Okay.  And so the person you   11:27:42
15   reported to at the time was Ms. Levy or was  11:27:44
16   it Mr. Santowski?  You don't recall?   11:27:46
17       A.   It was another person, Tom   11:27:48
18   Berry.                        11:27:52
19       Q.   Tom Berry.  Okay.       11:27:52
20       So other than Mr. Berry and    11:27:52
21   Mr. Ratliff, did you talk about this   11:27:54
22   conversation you had with Mr. Kleissle with  11:27:56
23   anyone else?                   11:27:58
24       A.   I may have discussed it --   11:27:59
25   well, clearly I put it in a presentation, so  11:28:04

Page 148

1    I may have carried this information back to  11:28:05
2    the suspicious order monitoring team at the  11:28:08
3    time.                          11:28:10
4        Q.   Okay.  I want to turn back to   11:28:10
5    the table of contents of this deck, which   11:28:26
6    appears on page 2.  And again, I understand  11:28:32
7    that you didn't actually make this    11:28:41
8    presentation, but you prepared all the   11:28:44
9    materials in this presentation, correct?   11:28:47
10       A.   Yes.                 11:28:48
11       Q.   Including some of the things   11:28:50
12   that we went over and also this reference to  11:28:52
13   an OxyContin Express video?        11:28:55
14       A.   Yes.                 11:28:58
15       Q.   And do you recall ever      11:28:59
16   presenting -- I know you didn't make this   11:29:01
17   presentation, but did you recall presenting  11:29:04
18   about the OxyContin Express in other settings  11:29:07
19   at Mallinckrodt?                11:29:13
20       A.   Yes, I believe so.       11:29:13
21       Q.   Okay.  And that video, again,   11:29:13
22   consisted of your understanding of migration  11:29:15
23   of opioid pills moving north from Florida,   11:29:17
24   correct?                      11:29:20
25       A.   Correct.             11:29:21

Page 149

1        Q.   And unfortunately we don't have  11:29:22
2    the video to play, but I believe --   11:29:27
3        A.   Unfortunately, a lot of the   11:29:28
4    time I couldn't get the video to play.   11:29:31
5        Q.   Oh, okay.            11:29:32
6        Well, I believe there's some   11:29:33
7    stills, at least, in this presentation.   11:29:34
8    Turning to page 16.             11:29:36
9        A.   All right.           11:29:37
10       Q.   Do you recall that particular   11:29:47
11   image?                        11:29:48
12       A.   I do.               11:29:48
13       Q.   This was an image that was    11:29:49
14   included in your video?          11:29:50
15       A.   I don't think so.  I think it   11:29:51
16   was separate.                  11:29:54
17       Q.   This is just an image?     11:29:55
18       A.   Yes.                 11:29:56
19       Q.   Okay.  This was an image of, I   11:29:57
20   think, a pill mill in Florida?      11:29:59
21       MR. O'CONNOR:  Objection to      11:30:01
22   form.                          11:30:01
23       THE WITNESS:  Yes.          11:30:01
24   QUESTIONS BY MR. KO:            11:30:02
25       Q.   And the pill mill was, I      11:30:02

Highly Confidential - Subject to Further Confidentiality Review

Page 150

```
1    think -- I think this particular picture was    11:30:04
2    of Tru-Valu, I believe.                          11:30:06
3          Does that name ring a bell?               11:30:08
4          MR. O'CONNOR: Objection to                11:30:12
5    form.                                            11:30:12
6          THE WITNESS: The name rings a             11:30:12
7    bell, but I don't have a way of                  11:30:13
8    identifying the pharmacy here.                   11:30:14
9    QUESTIONS BY MR. KO:                             11:30:16
10     Q.   Okay. By the way, what's your            11:30:16
11   definition of a pill mill?                       11:30:17
12     A.   The definition of a pill mill,           11:30:18
13   from my perspective, is a facility wherein       11:30:20
14   patients who may not legitimately have the       11:30:28
15   need for a prescription would go and have --     11:30:33
16   some doctors were overprescribing or selling     11:30:38
17   oxycodone specifically within the state of       11:30:43
18   Florida because it was a DEA-registered          11:30:45
19   activity at the time.                            11:30:47
20     Q.   And then, therefore, as a                11:30:48
21   result of the wide -- or overprescription of     11:30:51
22   oxycodone, those particular prescription         11:30:53
23   opioids were being widely abused and             11:30:56
24   diverted; is that correct?                       11:30:59
25         MR. O'CONNOR: Objection to                11:30:59
```

Page 151

```
1    form.                                            11:31:00
2          THE WITNESS: So, yes,                     11:31:00
3    that's -- that's one of the                      11:31:02
4    contributing factors, yes.                       11:31:03
5    QUESTIONS BY MR. KO:                             11:31:05
6      Q.   Okay. And you understood                 11:31:05
7    during the 2008 through 2012 time period that    11:31:07
8    there were a large amount of pill mills in       11:31:10
9    Florida, correct?                                11:31:13
10     A.   I don't know the number, and I           11:31:14
11   don't have a -- a basis for correlation in       11:31:16
12   terms of large -- I'm sorry, I can't answer      11:31:18
13   the question.                                    11:31:21
14     Q.   Relative to any other states             11:31:22
15   that you were looking at during your time as     11:31:25
16   senior manager of controlled substance           11:31:26
17   compliance, do you recall any other state in     11:31:28
18   which you've examined pill mill activities       11:31:32
19   other than Florida?                              11:31:34
20     A.   No, the focus was Florida.               11:31:36
21         (Mallinckrodt-Harper Exhibit 4           11:31:54
22   marked for identification.)                      11:31:54
23   QUESTIONS BY MR. KO:                             11:31:40
24     Q.   Okay. Okay. We can set this              11:31:40
25   aside. Right now turn to what will be marked     11:31:49
```

Page 152

```
1    as Harper Exhibit 4. For the record, that'll     11:31:52
2    end in Bates stamp 496098.                       11:31:58
3          Actually, we'll skip that one.            11:32:18
4    Let's go to -- I'll take that one. Still         11:32:22
5    Exhibit 4. Strike that.                          11:32:32
6          Exhibit 4 is actually ending in           11:32:34
7    Bates stamp 1308810. That is Harper             11:32:36
8    Exhibit 4.                                       11:32:44
9          You keep that one. That's the            11:32:44
10   official copy with the --                        11:32:46
11     A.   Okay. I apologize. Sorry.               11:32:48
12     Q.   No need to apologize.                    11:32:49
13         For the record, this is a                 11:32:50
14   March 3, 2008 e-mail from you to Bill            11:33:02
15   Ratliff.                                         11:33:05
16         Do you see that?                           11:33:06
17     A.   I do.                                     11:33:06
18     Q.   Do you have any reason to doubt          11:33:06
19   that you sent this e-mail to Mr. Ratliff on      11:33:08
20   March 3, 2008?                                   11:33:11
21     A.   No reason to doubt it.                   11:33:11
22     Q.   Okay. So I know you said a               11:33:13
23   moment ago you don't recall when you started     11:33:14
24   working with Mr. Ratliff, but at least as of     11:33:16
25   March of 2008, you seemed to be working with    11:33:18
```

Page 153

```
1    him in connection with DEA compliance,           11:33:20
2    correct?                                         11:33:24
3      A.   Correct.                                  11:33:24
4      Q.   And it appears that you're               11:33:24
5    preparing some DEA compliance monthly           11:33:25
6    highlights as of February 2008.                  11:33:30
7          Do you see that?                           11:33:32
8      A.   Yes.                                      11:33:32
9      Q.   And do you recall how                     11:33:33
10   frequently you prepared these monthly            11:33:35
11   highlights?                                      11:33:37
12     A.   I believe it was monthly.                11:33:38
13     Q.   And do you recall when you               11:33:39
14   first started preparing these?                   11:33:40
15     A.   I do not.                                 11:33:42
16     Q.   And here the distribution is to          11:33:44
17   Mr. Ratliff.                                     11:33:47
18         Do you recall ever sending               11:33:48
19   these DEA compliance monthly highlights to       11:33:50
20   anyone else?                                     11:33:55
21     A.   They would have been sent to             11:33:55
22   the person to whom I reported, so it was Bill    11:33:57
23   Ratliff at the time. So there would have         11:33:59
24   been other people as -- as my manager changed    11:34:00
25   over time.                                       11:34:03
```

Page 154

1    Q.   I see.                    11:34:04
2         So you sent -- during the time    11:34:04
3    period in which you created a DEA compliance    11:34:07
4    monthly highlight, you sent those to your    11:34:10
5    direct report each month, correct?    11:34:12
6    A.   The person to whom I reported,    11:34:14
7    yes.                          11:34:16
8    Q.   Okay.                    11:34:16
9    A.   And I can't rule out no one    11:34:16
10   else received this, but this is directed to    11:34:19
11   Bill Ratliff only on the correspondence.    11:34:22
12   Q.   And as a general matter, these    11:34:24
13   monthly highlights were sent only to your    11:34:26
14   direct report; is that fair to say?    11:34:29
15   A.   The person to whom I reported    11:34:31
16   directly, yes.                 11:34:33
17   Q.   Okay.  Thank you.          11:34:33
18        And I just want to go over one    11:34:34
19   quick thing on this particular e-mail.    11:34:38
20        Do you see three sections down    11:34:42
21   the portion of the e-mail that refers to    11:34:46
22   suspicious order monitoring?    11:34:48
23   A.   Yes, I see it.            11:34:49
24   Q.   You indicate to Mr. Ratliff    11:34:51
25   that "the need for a comprehensive review and    11:34:55

Page 155

1    upgrade of our suspicious order monitoring    11:34:58
2    program has received elevated priority."    11:34:59
3         Did I read that correctly?    11:35:02
4    A.   Yes.                     11:35:03
5    Q.   So is it fair to say that as of    11:35:05
6    March of 2008, your belief was that    11:35:08
7    Mallinckrodt's SOM program needed to be    11:35:12
8    reviewed and upgraded and that -- needed to    11:35:15
9    be reviewed and upgraded?    11:35:19
10        MR. O'CONNOR:  Objection to    11:35:20
11        form.                    11:35:20
12        THE WITNESS:  It states -- yes,    11:35:20
13        it states "upgraded."  I would have    11:35:22
14        changed that terminology if I could,    11:35:24
15        but it says "upgraded," yes.    11:35:26
16   QUESTIONS BY MR. KO:           11:35:27
17   Q.   Okay.  And you also state that    11:35:28
18   "as of March 3, 2008, the need to review and    11:35:31
19   upgrade Mallinckrodt's SOM program is an    11:35:36
20   elevated priority"; is that correct?    11:35:40
21   A.   Yes.                     11:35:42
22   Q.   Okay.  You can set that aside.    11:35:42
23        Do you recall -- you can refer    11:35:54
24   back to that document if you like, but do you    11:35:55
25   recall why you felt at that particular time    11:35:58

Page 156

1    that Mallinckrodt's SOM program needed to    11:36:02
2    be -- needed to receive elevated priority?    11:36:04
3    A.   I do.                    11:36:08
4    Q.   Yeah.  And what were the    11:36:09
5    reasons for that?              11:36:11
6    A.   So this master compounding    11:36:12
7    pharmacy sale, which we did not make, the    11:36:15
8    matter was brought to our attention by a DEA    11:36:20
9    investigator.  But after the decision was    11:36:23
10   made that that was a suspicious order we    11:36:26
11   would not ship, one of the narcotic -- the    11:36:28
12   NAMs -- but she was on the bulk side.  She    11:36:31
13   said to us, "Ah, I was in that place, and it    11:36:34
14   didn't look right."           11:36:37
15        So that prompted a reeducation    11:36:38
16   of the commercial group, our eyes and ears in    11:36:41
17   the market again, to call to our attention    11:36:45
18   anything that looked abnormal with any of the    11:36:47
19   facilities to which we were selling.    11:36:50
20   Q.   Okay.  And during this time    11:36:52
21   period -- we had talked a moment ago about    11:36:54
22   certain DEA guidance letters that you had    11:36:56
23   received in 2006 through 2007 time period,    11:36:59
24   correct?                      11:37:01
25   A.   Yes.                     11:37:01

Page 157

1    Q.   And those letters were sent by    11:37:01
2    Joseph Rannazzisi, correct?    11:37:04
3    A.   I believe, yes.  Yes, he was    11:37:05
4    deputy assistant administrator.  Yes.    11:37:08
5    Q.   And is it okay for purposes of    11:37:13
6    this deposition to refer to those guidance    11:37:16
7    letters as the Rannazzisi letters?    11:37:17
8    A.   Yes.                     11:37:19
9    Q.   Okay.  So was one of the    11:37:19
10   reasons why you were putting more attention    11:37:20
11   to Mallinckrodt's SOM program a result of    11:37:25
12   receiving these -- of receiving the    11:37:28
13   Rannazzisi letters?           11:37:30
14   A.   It caused us to pay -- to give    11:37:31
15   more attention to our suspicious order    11:37:36
16   monitoring, but specifically this event is as    11:37:38
17   I just previously spoke, where we had a    11:37:41
18   Mallinckrodt person out at this facility, and    11:37:44
19   in retrospect they said it didn't look right    11:37:47
20   and it wound up to be a suspicious order.    11:37:50
21        So we wanted to reeducate our    11:37:52
22   sales force about their reviewing customer    11:37:53
23   accounts when they were in there.    11:37:57
24   Q.   Sure.  And I understand the    11:37:59
25   specific example you're giving, and I    11:38:00

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    appreciate that.  You have great recall about    11:38:02
2    that.                                11:38:06
3            But in terms of revising and      11:38:06
4    enhancing your SOM program, would it be    11:38:09
5    accurate to say that in early 2008, one of    11:38:12
6    the reasons why you wanted to do so was a    11:38:16
7    result of receiving the Rannazzisi letters?    11:38:19
8    A.   Yes.                    11:38:20
9    Q.   Okay.  I want to hand you --    11:38:21
10   you can set that aside.              11:38:24
11           (Mallinckrodt-Harper Exhibit 5    11:38:25
12   marked for identification.)          11:38:25
13   QUESTIONS BY MR. KO:                 11:38:25
14   Q.   I want to hand you what's been    11:38:26
15   marked as Harper Exhibit 5, and that ends in    11:38:27
16   Bates stamp 273902.  And this is an e-mail,    11:38:31
17   for the record, that you sent to several    11:38:45
18   people dated April 10, 2008.          11:38:47
19           Do you have any reason to doubt    11:38:51
20   that you sent this e-mail on this day and    11:38:55
21   time?                          11:38:56
22   A.   I have no reason to doubt it.    11:38:56
23   Q.   Okay.  And here you talk about    11:38:58
24   reference to the Drug and Chemical Advisory    11:39:01
25   Group.  That's the group that we were    11:39:05

Page 159

1    discussing before that Frank Sapienza was    11:39:06
2    part of, correct?                    11:39:10
3    A.   Correct.                  11:39:12
4    Q.   And so at least as of this    11:39:12
5    time you are consulting with them -- well, is    11:39:14
6    it fair to say that as of April 10, 2008, you    11:39:16
7    are consulting with the Drug and Chemical    11:39:18
8    Advisory Group in connection with your duties    11:39:20
9    to design and implement a suspicious order    11:39:21
10   monitoring program?                  11:39:24
11   A.   That's correct.             11:39:24
12   Q.   Okay.  And on the additional    11:39:26
13   items for consideration section, you talk    11:39:29
14   about the Southwood Federal Register Notice.    11:39:33
15           Do you see that?          11:39:37
16   A.   I do.                    11:39:38
17   Q.   And when you describe the    11:39:39
18   Southwood Federal Register Notice, you take    11:39:51
19   some important elements of that notice and    11:39:56
20   relay them to the people you are e-mailing    11:40:03
21   here.                          11:40:05
22           Do you see that?          11:40:05
23   A.   I do.                    11:40:06
24   Q.   And so when you -- you are    11:40:06
25   saying that you should incorporate certain    11:40:09

Page 160

1    questions taken from Southwood into a    11:40:12
2    checklist, correct?                  11:40:19
3    A.   Correct.                  11:40:19
4    Q.   And this checklist is reference    11:40:21
5    to a customer checklist that Mallinckrodt    11:40:24
6    utilized in connection with this SOM program,    11:40:27
7    correct?                        11:40:30
8            MR. O'CONNOR:  Objection to    11:40:30
9    form.                          11:40:31
10           THE WITNESS:  It was being    11:40:31
11   implemented at the time, yes.          11:40:33
12   QUESTIONS BY MR. KO:                 11:40:34
13   Q.   Okay.  So, and when you say    11:40:34
14   "implemented at the time" -- thank you for    11:40:37
15   that -- as of April 10, 2008, there wasn't    11:40:38
16   necessarily a checklist that was final,    11:40:42
17   correct?                        11:40:44
18   A.   There were several checklists.    11:40:45
19   Okay.                          11:40:49
20           So may I explain, please?      11:40:49
21   Q.   Sure.                    11:40:51
22   A.   So there was a customer account    11:40:52
23   setup which had been in existence ad    11:40:53
24   infinitum, but this was a new customer    11:40:59
25   checklist that asked our customers to attest    11:41:01

Page 161

1    to their -- that they had a suspicious order    11:41:05
2    monitoring program.  And we got that guidance    11:41:10
3    straight from Drug and Chemical Advisory    11:41:12
4    Group, that that would be a tool to augment    11:41:16
5    our program.                    11:41:18
6    Q.   Okay.  So a moment ago when you    11:41:18
7    said that there was always a customer account    11:41:21
8    setup, as far as you understood, in    11:41:23
9    connection with SOM procedure, prior to this    11:41:24
10   date was there ever a customer checklist that    11:41:28
11   was part of that customer account setup?    11:41:31
12   A.   Right.  So, no, I'd like to    11:41:33
13   clarify because the previous checklist was    11:41:34
14   not in conjunction with SOM.  So this is the    11:41:37
15   first SOM checklist.                  11:41:40
16   Q.   Great.                    11:41:41
17           So accurate to say that as of    11:41:42
18   April of 2008, you are developing the first    11:41:45
19   customer checklist to be filled out in    11:41:47
20   connection with Mallinckrodt's SOM program?    11:41:50
21   Correct?                        11:41:53
22   A.   That's correct.             11:41:53
23   Q.   Okay.  And some of the    11:41:54
24   questions that you want included in the    11:41:56
25   checklist, at least your suggestion, if I    11:41:59

Page 162

1  understand correctly, is to try and determine   11:42:01
2  the overall percentage of controlled            11:42:03
3  substance filled by the pharmacy.               11:42:05
4       Do you see that?                           11:42:06
5  A.   I do see that.                             11:42:07
6  Q.   And so that was an important               11:42:08
7  feature of the checklist to you at this time.   11:42:10
8       MR. O'CONNOR: Objection to                 11:42:11
9  form.                                           11:42:12
10 QUESTIONS BY MR. KO:                            11:42:12
11 Q.   Correct?                                   11:42:13
12 A.   So it was -- they were                     11:42:13
13 statements taken from Southwood, and I'm        11:42:17
14 asking the question: Should we incorporate      11:42:19
15 these questions?                                11:42:21
16 Q.   Okay. And you're asking the                11:42:23
17 question, "should we incorporate," because      11:42:27
18 you have received a Federal Register Notice     11:42:28
19 that suggests that you should consider asking   11:42:30
20 those questions, correct?                       11:42:32
21      MR. O'CONNOR: Objection to                 11:42:33
22 form.                                           11:42:35
23      THE WITNESS: Yes.                          11:42:35
24 QUESTIONS BY MR. KO:                            11:42:35
25 Q.   Okay. And one question that                11:42:35

Page 163

1  you believe you should ask in light of          11:42:38
2  reviewing Southwood is to determine the         11:42:41
3  overall percentage of controlled substances     11:42:42
4  filled by a particular pharmacy, correct?       11:42:44
5       MR. O'CONNOR: Objection to                 11:42:46
6  form.                                           11:42:47
7       THE WITNESS: So we don't ship              11:42:47
8  to pharmacies, so we adapted the                11:42:50
9  spirit of this question to ask the              11:42:53
10 question of our distributor customers.          11:42:56
11 QUESTIONS BY MR. KO:                            11:42:59
12 Q.   Right.                                     11:42:59
13      But the idea is to understand,             11:43:00
14 notwithstanding the fact that you don't ship    11:43:02
15 directly to pharmacies, the idea is to          11:43:04
16 understand what overall percentage of a         11:43:08
17 controlled substance is being filled by a       11:43:12
18 downstream pharmacy, that is, a customer of     11:43:13
19 one of your distributors, correct?              11:43:17
20      MR. O'CONNOR: Objection to                 11:43:18
21 form.                                           11:43:19
22      THE WITNESS: That's correct.               11:43:19
23 QUESTIONS BY MR. KO:                            11:43:19
24 Q.   Okay. And another important                11:43:20
25 question that you glean from your review of     11:43:25

Page 164

1  Southwood is to input into the checklist        11:43:27
2  identification of the percentage of             11:43:32
3  prescriptions filled by the -- filled by the    11:43:35
4  pharmacy that originate from the Internet.      11:43:37
5       Do you see that?                           11:43:39
6       MR. O'CONNOR: Objection to                 11:43:39
7  form.                                           11:43:41
8       THE WITNESS: It was -- yes, it             11:43:41
9  was stated -- it was suggested in               11:43:42
10 Southwood's.                                    11:43:44
11 QUESTIONS BY MR. KO:                            11:43:45
12 Q.   Okay. And that -- you felt                 11:43:45
13 that that was an important element to be        11:43:47
14 included in the checklist at the time,          11:43:49
15 correct?                                        11:43:51
16 A.   So I pulled -- we pulled these             11:43:52
17 from Southwood's, but they were not             11:43:57
18 applicable to the questions we asked            11:43:59
19 distributors. Some of them became part of a     11:44:02
20 pharmacy information sheet, so I'm -- I'm        11:44:05
21 confusing the names of our forms, and I         11:44:08
22 apologize for that.                             11:44:10
23      So this was taken from                     11:44:11
24 Southwood's for evaluation by the team:         11:44:12
25 Could we, should we, incorporate these          11:44:14

Page 165

1  statements into our direct customer            11:44:17
2  checklist.                                      11:44:19
3  Q.   Right. And thank you for that.            11:44:19
4       So these are questions that you           11:44:21
5  believe should be incorporated into the new    11:44:23
6  customer checklist that you were working on    11:44:25
7  in April of 2008, correct?                     11:44:27
8  A.   I did not know if we should --            11:44:28
9  should use them.                               11:44:33
10 Q.   But you believe that they were            11:44:33
11 good suggestions pursuant to your review of    11:44:36
12 Southwood, correct?                            11:44:39
13      MR. O'CONNOR: Objection to                 11:44:40
14 form.                                           11:44:41
15      THE WITNESS: So I pulled them             11:44:41
16 out of Southwood, but I was learning          11:44:42
17 more and more and more about the              11:44:43
18 business and our customers at the             11:44:45
19 time, and I did not know if these had         11:44:48
20 relevance to be added to this direct         11:44:50
21 customer checklist.                           11:44:54
22 QUESTIONS BY MR. KO:                          11:44:55
23 Q.   Fair enough.                            11:44:55
24      Was the purpose of posing these         11:44:56
25 questions an attempt to understand more, as  11:45:00

Page 166

1  you said, about Mallinckrodt's business?      11:45:04
2  Correct?                    11:45:06
3        MR. O'CONNOR:  Objection to      11:45:07
4  form.                      11:45:08
5        THE WITNESS:  Yes.          11:45:08
6  QUESTIONS BY MR. KO:             11:45:09
7     Q.   And in particular, the       11:45:09
8  questions you posed here you were considering  11:45:11
9  to include in your checklist because they    11:45:15
10  provide details of the downstream customer   11:45:18
11  that purchases drugs from distributors that   11:45:21
12  you ship and sell to directly, correct?     11:45:25
13        MR. O'CONNOR:  Objection to     11:45:27
14  form.                     11:45:28
15        THE WITNESS:  Correct.        11:45:28
16  QUESTIONS BY MR. KO:            11:45:32
17     Q.   So is it fair to say that you    11:45:33
18  are trying to understand details of where    11:45:35
19  Mallinckrodt drugs end up in terms of which  11:45:41
20  pharmacy or clinic they go to?         11:45:45
21        MR. O'CONNOR:  Objection to     11:45:46
22  form.                     11:45:47
23        THE WITNESS:  We had two       11:45:47
24  checklists.                  11:45:51
25        May I restate this?  Is that    11:45:51

Page 167

1  all right with you?             11:45:54
2  QUESTIONS BY MR. KO:             11:45:54
3     Q.   Yeah, sure.            11:45:55
4     A.   So this was within the scope of  11:45:55
5  the suspicious order checklist going to our  11:45:59
6  direct customers.  Okay?  So these questions  11:46:02
7  were not applicable to our business because  11:46:07
8  we sold to wholesaler and distributor.     11:46:08
9        But as time went on, we        11:46:10
10  developed a pharmacy information sheet which,  11:46:13
11  when we had conversations with the       11:46:16
12  distributors about their customers, we asked  11:46:18
13  these questions from Southwood's:  Are you   11:46:21
14  aware that your pharmacy customer has these  11:46:25
15  percentages, et cetera.            11:46:27
16        So there are two checklists,     11:46:28
17  and I think they're getting interchanged    11:46:29
18  here, and I apologize for the confusion.    11:46:31
19     Q.   That's okay.  I appreciate the   11:46:33
20  response.  I just have a simple yes or no    11:46:37
21  question.                  11:46:40
22     A.   All right.             11:46:41
23     Q.   Is it accurate to say, yes or   11:46:41
24  no, that one of the reasons why you are     11:46:44
25  suggesting the consideration of these      11:46:46

Page 168

1  questions as you learned from Southwood was   11:46:50
2  to understand more about the downstream     11:46:52
3  customer of a distributor that you ship drugs  11:46:54
4  to?                      11:46:57
5        MR. O'CONNOR:  Objection to     11:46:57
6  form.                     11:46:58
7        THE WITNESS:  Yes.          11:46:58
8  QUESTIONS BY MR. KO:            11:47:01
9     Q.   Okay.  Thank you.         11:47:02
10        There's also a reference made,   11:47:04
11  next item down -- next paragraph, excuse me,  11:47:08
12  starting with "Kim France."  Do you see     11:47:13
13  there's a reference made to IntegriChain?    11:47:16
14        To help orient you, I've       11:47:21
15  highlighted it on the screen for you.      11:47:23
16     A.   Oh, thank you.           11:47:25
17     Q.   Yeah.                11:47:25
18     A.   Yes, I see it.           11:47:34
19     Q.   Okay.  And you participated in  11:47:35
20  the potential retention of IntegriChain, did  11:47:37
21  you not?                   11:47:42
22     A.   Correct.              11:47:42
23     Q.   Okay.  And so did Kimberly     11:47:42
24  France, as I understand it?          11:47:49
25     A.   Yes.                11:47:50

Page 169

1     Q.   And who is Ms. France?       11:47:50
2     A.   She was -- she was with the    11:47:51
3  patient and product monitoring group that had  11:47:53
4  a different focus and goal than the DEA     11:47:56
5  compliance group.              11:48:00
6     Q.   Okay.  And both she and you    11:48:01
7  were involved in the potential retention of   11:48:06
8  IntegriChain during this 2008 time period,   11:48:08
9  correct?                   11:48:12
10     A.   Yes, among others, yes.      11:48:12
11     Q.   Okay.  And this e-mail       11:48:14
12  specifically states from you that "one of the  11:48:16
13  goals of the Mallinckrodt IntegriChain     11:48:19
14  project being considered as part of RiskMAP  11:48:22
15  is to combine prescription data from Verispan  11:48:24
16  and IMS, added Mallinckrodt sales data and,   11:48:29
17  coupled with ARCOS data from DEA, to provide  11:48:32
18  a mechanism to detect diversion through the   11:48:34
19  supply chain."                11:48:37
20        Did I read that correctly?      11:48:38
21     A.   Yes, you did.            11:48:39
22     Q.   Okay.  And so was one of the   11:48:42
23  purposes of trying to retain IntegriChain to  11:48:44
24  understand where Mallinckrodt prescription   11:48:48
25  opioids were ending up once they had left    11:48:52

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  Mallinckrodt facilities in Hobart and        11:48:54
2  St. Louis?                                    11:48:56
3      A.   We were looking at that as a        11:48:57
4  possibility, yes.                             11:49:01
5      Q.   Okay.  And so you were trying        11:49:01
6  to understand and trying to detect diversion  11:49:02
7  throughout the supply chain with the help of  11:49:05
8  IntegriChain; is that correct?                11:49:09
9           MR. O'CONNOR:  Objection to         11:49:11
10     form.                                      11:49:12
11          THE WITNESS:  Yes, that is the       11:49:12
12     service they offered, yes.                 11:49:13
13  QUESTIONS BY MR. KO:                          11:49:20
14     Q.   Okay.  And can you generally         11:49:21
15  describe to the Court your involvement with   11:49:22
16  this project?                                 11:49:23
17     A.   IntegriChain came in to              11:49:24
18  Mallinckrodt and gave one or two             11:49:28
19  presentations.  I'm not certain.  And then we 11:49:30
20  evaluated the merit of adding that to our     11:49:35
21  suspicious order monitoring, and we decided   11:49:39
22  not to add IntegriChain's services.           11:49:40
23     Q.   And why did you decide not to        11:49:43
24  retain them?                                  11:49:45
25     A.   So IntegriChain was a vendor,        11:49:45

Page 171

1  and their data collection did not add value   11:49:49
2  from our perspective to our suspicious order   11:49:54
3  monitoring program at the time.               11:49:57
4      Q.   Uh-huh.  And why did you feel        11:49:58
5  like they did not add value?                  11:50:00
6      A.   Well, it was a multitude of         11:50:01
7  data from different sources, not necessarily  11:50:06
8  specific to Mallinckrodt data, and we         11:50:10
9  evaluated it, as I said.                      11:50:14
10          This also says "coupled with         11:50:16
11  ARCOS data from DEA."  DEA has steadfastly    11:50:18
12  throughout time refused to share ARCOS data   11:50:22
13  with anyone, and so that was another key      11:50:25
14  component of their program.                   11:50:28
15          So for those reasons we              11:50:31
16  declined the service.                         11:50:32
17     Q.   Do you recall how long you           11:50:34
18  evaluated whether or not you were going to    11:50:35
19  retain IntegriChain?                          11:50:36
20     A.   It was straightaway, shortly         11:50:38
21  after their one or two presentations.         11:50:42
22     Q.   Okay.  I have seen reference to      11:50:46
23  documents in which you have -- you have asked 11:50:51
24  approval from Bill Ratliff to be part of the  11:50:53
25  IntegriChain project.                         11:50:56

Page 172

1      Do you have any reason to                 11:50:58
2  dispute that?                                  11:50:59
3           MR. O'CONNOR:  Objection to         11:51:00
4      form.                                      11:51:00
5           THE WITNESS:  I have no reason       11:51:00
6      to dispute it.                             11:51:01
7  QUESTIONS BY MR. KO:                           11:51:02
8      Q.   Okay.  So do you recall              11:51:02
9  actually asking for approval from Mr. Ratliff  11:51:04
10  to participate in the potential retention of  11:51:07
11  IntegriChain?                                 11:51:09
12     A.   I do.                                 11:51:10
13     Q.   Okay.  And that was obviously        11:51:11
14  prior to this date, but do you recall whether 11:51:13
15  or not that was in the 2007 time period?      11:51:15
16     A.   I don't recall the date, I'm        11:51:17
17  sorry.                                        11:51:21
18     Q.   Okay.  I want to go forward to       11:51:21
19  the second attachment, titled "IntegriChain   11:51:29
20  Pilot Program and Overview."  And I don't --  11:51:33
21  we don't need to go through this in detail,   11:51:36
22  but do you recall who actually drafted this   11:51:38
23  language?                                     11:51:45
24     A.   It was not me.                        11:51:46
25     Q.   Okay.  Was it someone at             11:51:49

Page 173

1  Mallinckrodt?                                  11:51:50
2      A.   I do not know, or if it was         11:51:50
3  IntegriChain.                                  11:51:53
4      Q.   Okay.  But as far as you know,       11:51:54
5  you didn't draft this particular language,    11:51:55
6  correct?                                       11:51:57
7      A.   I'm positive I did not.             11:51:57
8      Q.   Okay.  Despite not knowing who       11:51:59
9  may have drafted it, as you said, you were     11:52:07
10  considering retention of IntegriChain because 11:52:09
11  they were going to hopefully help detect      11:52:13
12  diversion throughout the supply chain.  So    11:52:17
13  separate and apart from what I'm              11:52:19
14  highlighting, sorry.                          11:52:22
15     A.   Oh, I'm sorry.                        11:52:22
16     Q.   Yeah, no, that's okay.  Let me       11:52:23
17  repeat.                                       11:52:25
18     A.   Okay.                                 11:52:26
19     Q.   You were considering the             11:52:26
20  retention of IntegriChain because they were   11:52:27
21  going to help detect diversion throughout the 11:52:30
22  supply chain, correct?                        11:52:31
23          MR. O'CONNOR:  Objection to         11:52:32
24     form.                                      11:52:33
25          THE WITNESS:  Yes, that was          11:52:33

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    what they advertised. Yes.          11:52:33
2    QUESTIONS BY MR. KO:                11:52:36
3       Q.   That was the intent?        11:52:37
4       A.   Yes.              11:52:37
5       Q.   And one of the ways that they    11:52:38
6    would do that was through capturing -- at    11:52:39
7    least representing to you that they would    11:52:41
8    capture detailed data, correct?        11:52:43
9       A.   Correct.           11:52:45
10      Q.   And so -- and in particular, in    11:52:46
11   the second sentence of this background     11:52:48
12   material, it indicates that "detailed data    11:52:51
13   through surveillance and pharmacovigilance    11:52:56
14   an important resource for the company."     11:53:00
15       Do you see that?           11:53:02
16      A.   I do see that.        11:53:03
17      Q.   Would you agree with that     11:53:03
18   statement?                  11:53:04
19      A.   I would not.          11:53:04
20      Q.   You don't believe detailed data    11:53:05
21   is an important resource for the company?    11:53:08
22      A.   I don't understand how     11:53:09
23   pharmacovigilance, which in my understanding  11:53:10
24   is adverse event reporting, could be an    11:53:12
25   important resource for the company.       11:53:18

Page 175

1       Also, this statement -- may I    11:53:20
2    say something else, please?          11:53:22
3       Q.   Of course.          11:53:24
4       A.   So this document, it switches    11:53:24
5    back and forth, so it's confusing in terms of 11:53:26
6    they're talking about "the company,"      11:53:30
7    Mallinckrodt, but then "our company,"      11:53:33
8    indicating IntegriChain.          11:53:36
9       So it's difficult to -- to    11:53:38
10   define every sentence and under --       11:53:43
11      Q.   Sure. Fair enough.        11:53:46
12      A.   Thank you. Thank you.      11:53:47
13      Q.   Fair enough. And we can put    11:53:47
14   the document aside because I don't mean to    11:53:49
15   put you through a memory test of the actual   11:53:51
16   document.                  11:53:53
17      A.   Okay.             11:53:53
18      Q.   I would just ask you separately    11:53:53
19   whether or not you believe detailed data is    11:53:55
20   an important resource for the company to    11:53:57
21   utilize in trying to detect diversion?    11:54:00
22      A.   Yes. In general, yes.       11:54:03
23      Q.   Okay. And a moment ago when    11:54:04
24   you were talking about what your       11:54:06
25   understanding of pharmacovigilance is, you    11:54:06

Page 176

1    described it as being a report of adverse    11:54:08
2    events, correct?               11:54:10
3       A.   Yes.              11:54:11
4       Q.   Why would -- why would not    11:54:12
5    considering an adverse event be a fruitful    11:54:17
6    thing to do in connection with trying to    11:54:20
7    detect suspicious orders?          11:54:22
8       MR. O'CONNOR: Objection to       11:54:23
9    form.                    11:54:24
10      THE WITNESS: Adverse events      11:54:25
11   were handled by patient and product      11:54:27
12   monitoring, and they were events such     11:54:30
13   as a doctor had a patient on the       11:54:34
14   operating table and had administered a    11:54:35
15   Mallinckrodt medication and there was     11:54:37
16   some unexpected symptom occurring. So    11:54:38
17   it was like a hotline of          11:54:44
18   pharmacovigilance.              11:54:47
19   QUESTIONS BY MR. KO:               11:54:49
20      Q.   Okay. And was that -- did --    11:54:49
21   during your time at Mallinckrodt, did you    11:54:51
22   ever receive -- or were you aware of any    11:54:54
23   adverse event reports related to diversion?    11:55:00
24      MR. O'CONNOR: Objection to       11:55:02
25   form.                    11:55:03

Page 177

1       THE WITNESS: Yes.          11:55:03
2    QUESTIONS BY MR. KO:               11:55:08
3       Q.   Okay. And did you -- during    11:55:08
4    your time at Mallinckrodt, did you ever    11:55:13
5    receive or were you aware of any adverse    11:55:15
6    event reports related to the abuse of    11:55:18
7    prescription opioids manufactured by      11:55:20
8    Mallinckrodt?                11:55:23
9       A.   Yes.              11:55:24
10      Q.   Okay. And notwithstanding the    11:55:27
11   fact that some of these adverse event reports  11:55:29
12   included instances of diversion and abuse,    11:55:31
13   you don't believe that it was necessary to    11:55:35
14   include these -- or consider these reports in  11:55:37
15   connection with Mallinckrodt's duties to    11:55:40
16   implement and design a suspicious order    11:55:42
17   monitoring program?              11:55:44
18      MR. O'CONNOR: Objection to       11:55:44
19   form.                    11:55:46
20      THE WITNESS: So this was one    11:55:46
21   of the tools that was offered to us,     11:55:49
22   among many, and eventually we realized    11:55:51
23   that we had the chargeback tool which     11:55:55
24   could give us the detailed data about    11:56:00
25   the Mallinckrodt product, whereas       11:56:03

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    IntegriChain was talking about the    11:56:05
2    universe of products not specific to    11:56:07
3    Mallinckrodt.    11:56:08
4    QUESTIONS BY MR. KO:    11:56:08
5        Q.    Sure.  And I understand --    11:56:09
6    maybe it'll help to put the document aside.    11:56:10
7        A.    Okay.    11:56:13
8        Q.    I really don't have any more    11:56:13
9    questions on it.  I was just asking with    11:56:14
10   respect to your statement about    11:56:16
11   pharmacovigilance and adverse --    11:56:18
12       A.    Uh-huh.    11:56:18
13       Q.    -- event reports in particular.    11:56:19
14           You had suggested that it was    11:56:19
15   not necessary to review adverse event reports    11:56:24
16   in connection with Mallinckrodt's duties to    11:56:27
17   design and implement an SOM program.    11:56:33
18           Is that what you testified to?    11:56:35
19           MR. O'CONNOR:  Objection to    11:56:37
20   form.    11:56:37
21           THE WITNESS:  Yes.    11:56:37
22   QUESTIONS BY MR. KO:    11:56:38
23       Q.    Okay.  And my question is, why    11:56:38
24   would you not consider such adverse event    11:56:39
25   reports relating to the abuse and diversion    11:56:42

Page 179

1    of Mallinckrodt prescription opioids that    11:56:44
2    were contained in such adverse event reports    11:56:47
3    as you testified?    11:56:49
4        A.    Okay.  Please, I'd like to take    11:56:50
5    a break and confer with my attorneys on this    11:56:54
6    answer.    11:56:56
7           MR. KO:  Okay.    11:56:57
8           MR. O'CONNOR:  Answer the    11:56:57
9    pending question.    11:57:00
10          THE WITNESS:  Because the    11:57:01
11   adverse events that came to my    11:57:03
12   attention were notices of document    11:57:04
13   retention notice of litigation against    11:57:09
14   the company for people who took    11:57:11
15   fentanyl -- various -- various    11:57:19
16   episodes that resulted in abuse or a    11:57:22
17   lawsuit against the company as a    11:57:27
18   result of perceived Mallinckrodt    11:57:30
19   responsibility.    11:57:33
20   QUESTIONS BY MR. KO:    11:57:34
21       Q.    Okay.  And with respect to that    11:57:35
22   example in particular about the fentanyl    11:57:37
23   episode, that was related to an overdose?    11:57:41
24          MR. O'CONNOR:  And just for    11:57:48
25   clarity, I'm instructing you not to    11:57:49

Page 180

1    answer to the extent answering his    11:57:52
2    question would reveal any    11:57:54
3    conversations you had with company    11:57:56
4    counsel.    11:57:57
5           THE WITNESS:  Okay.  I can    11:57:58
6    answer because it did not relate to    11:58:01
7    conversation with company counsel.    11:58:04
8    QUESTIONS BY MR. KO:    11:58:05
9        Q.    Okay.    11:58:05
10       A.    The adverse event that was    11:58:05
11   reported was a result of someone -- the    11:58:08
12   allegation was stealing fentanyl patches from    11:58:12
13   a glove compartment of a car that was hot.    11:58:16
14   Fentanyl, the active ingredient is activated    11:58:19
15   by heat.  And so the person who suffered the    11:58:21
16   adverse event had stolen the fentanyl,    11:58:24
17   allegedly, taken it and, yes, overdosed.  And    11:58:27
18   I don't know if they expired or not.  I know    11:58:32
19   there was a medical emergency.    11:58:35
20       Q.    Isn't that an example of    11:58:37
21   diversion leading to an opioid overdose?    11:58:39
22       A.    Yes, it's diversion at the    11:58:41
23   patient level, yes.    11:58:47
24       Q.    Okay.  And diversion at the    11:58:47
25   patient level is something that would be    11:58:49

Page 181

1    important for you to understand that is    11:58:52
2    occurring in connection with your duties as    11:58:53
3    someone responsible for designing and    11:58:57
4    implementing a system to detect suspicious    11:59:00
5    orders, is it not?    11:59:03
6           MR. O'CONNOR:  Objection to    11:59:04
7    form.    11:59:05
8           THE WITNESS:  So it's    11:59:05
9    impossible, completely impossible.  We    11:59:12
10   can monitor potentially down to the    11:59:14
11   pharmacy level, but once the    11:59:15
12   prescription is dispensed, we cannot    11:59:17
13   prevent diversion when it gets into a    11:59:21
14   private person's hands.    11:59:24
15   QUESTIONS BY MR. KO:    11:59:25
16       Q.    I know that you may think that    11:59:26
17   you cannot prevent diversion, but my question    11:59:27
18   is simply whether or not it would be    11:59:30
19   important to know whether Mallinckrodt drugs    11:59:33
20   were being diverted in instances like you    11:59:36
21   just described.    11:59:39
22       A.    Yes.    11:59:41
23          MR. O'CONNOR:  Objection to    11:59:42
24   form.    11:59:43
25

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  QUESTIONS BY MR. KO:                11:59:43
2      Q.   And in particular, it would be  11:59:43
3  important to know -- if there were thousands  11:59:45
4  of overdoses that resulted from diversion of  11:59:46
5  Mallinckrodt drugs, that would be important  11:59:50
6  to know in connection with your duties as  11:59:52
7  a -- someone responsible for implementing an  11:59:55
8  SOM program, correct?           11:59:58
9          MR. O'CONNOR:  Objection to  11:59:59
10     form.                      11:59:59
11         THE WITNESS:  So will you  11:59:59
12     please repeat the question?  I'm  12:00:03
13     sorry.                     12:00:04
14  QUESTIONS BY MR. KO:             12:00:04
15     Q.   Sure.                  12:00:04
16         If there were thousands of  12:00:04
17  overdoses that resulted from the diversion of  12:00:06
18  Mallinckrodt drugs, that would be important  12:00:08
19  to know in connection with your duties as  12:00:11
20  someone responsible for implementing an SOM  12:00:13
21  program, correct?               12:00:15
22         MR. O'CONNOR:  Objection.  12:00:16
23         THE WITNESS:  Yes.  So the  12:00:17
24     question is hypothetical -- yes,  12:00:20
25     thousands, yes, that would have been a  12:00:21

Page 183

1  concern.                       12:00:23
2  QUESTIONS BY MR. KO:             12:00:23
3      Q.   And overdose deaths that result  12:00:28
4  from someone taking a pill from a patient is  12:00:32
5  a sign of diversion, is it not?       12:00:35
6          MR. O'CONNOR:  Objection.  12:00:38
7      Form.                      12:00:40
8          THE WITNESS:  It's a form of  12:00:40
9      diversion.  It's misuse of a  12:00:42
10     prescription drug, yes.         12:00:43
11         MR. O'CONNOR:  Counsel, we've  12:00:46
12     been going almost an hour and a half.  12:00:47
13     Should we take another break?   12:00:48
14         MR. KO:  Yeah, I was just going  12:00:50
15     to say it's time for a break.    12:00:52
16         VIDEOGRAPHER:  We are going off  12:00:54
17     the record at 12 p.m.          12:00:55
18     (Off the record at 12:00 p.m.)  12:00:58
19         VIDEOGRAPHER:  We are back on  12:13:39
20     the record at 12:13 p.m.        12:13:43
21  QUESTIONS BY MR. KO:             12:13:45
22     Q.   Welcome back from the break,  12:13:47
23  Ms. Harper.                     12:13:49
24     A.   Thank you.              12:13:50
25     Q.   Going back to the -- do you  12:13:50

Page 184

1  have Exhibit 6 in front of you?      12:13:58
2      A.   It's Exhibit 2.          12:14:00
3      Q.   Oh, Exhibit 2.  Okay.  You can  12:14:01
4  set that aside.                  12:14:02
5          I'm going to hand you a copy of  12:14:03
6  what's previously been marked as Exhibit 21  12:14:04
7  of the Stewart deposition.         12:14:06
8          MR. KO:  And for the record,  12:14:18
9      this is -- ends in Bates 274111, and  12:14:20
10     it is an e-mail from Cathy Stewart to  12:14:26
11     several people, and you are among the  12:14:29
12     recipients.                 12:14:32
13  QUESTIONS BY MR. KO:             12:14:32
14     Q.   Do you see that?         12:14:32
15     A.   I do.                   12:14:32
16     Q.   And it's dated May 14, 2008,  12:14:33
17  correct?                        12:14:35
18     A.   Yes.                   12:14:35
19     Q.   And by the way, who is -- or  12:14:36
20  you know Cathy Stewart, right?      12:14:37
21     A.   Yes.                   12:14:39
22     Q.   You worked with her in  12:14:40
23  connection with SOM procedure --    12:14:42
24     A.   Yes.                   12:14:44
25     Q.   -- and activities?        12:14:44

Page 185

1      A.   (Witness nods head.)       12:14:46
2      Q.   Okay.  And do you respect her  12:14:46
3  opinions?                       12:14:48
4      A.   Yes.                   12:14:48
5      Q.   Okay.  And did you work with  12:14:49
6  her closely throughout the 2008 and 2012 time  12:14:51
7  period?                         12:14:54
8      A.   I can't -- she wasn't in that  12:14:54
9  role for an extremely long time, so I don't  12:14:56
10 know when she left, I'm sorry.      12:14:58
11     Q.   Did you work with her closely  12:15:00
12 in connection with SOM-related activities at  12:15:01
13 Mallinckrodt in the 2007, 2008 time period?  12:15:04
14     A.   I don't know when she started.  12:15:07
15 Clearly it was in May of 2008, but I don't  12:15:12
16 know the start or the end date of when she  12:15:15
17 became part of the initiative.      12:15:18
18     Q.   And you attended a -- you  12:15:21
19 attended a conference with her --   12:15:27
20     A.   Yes.                   12:15:28
21     Q.   -- in 2008, correct?       12:15:29
22     A.   Yes.                   12:15:30
23     Q.   And this was, I believe, in  12:15:30
24 October of 2008, and it was the Buzzeo  12:15:32
25 conference?                     12:15:36

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    A.    Yes.                    12:15:36
2    Q.    And I know that postdates the    12:15:36
3  date of this letter, but do you recall anyone  12:15:38
4  else attending that conference other than you  12:15:42
5  and Cathy from Mallinckrodt?         12:15:45
6    A.    I do not.               12:15:47
7    Q.    Okay.  So as far as you recall,  12:15:48
8  you were the only -- you and Cathy were the  12:15:55
9  only two that attended the Buzzeo conference  12:15:57
10 in 2008?                       12:16:00
11   A.    Yes.                    12:16:01
12   Q.    And what was her position       12:16:01
13 during the 2008 time period?         12:16:03
14   A.    Manager of dosage customer      12:16:04
15 service.                       12:16:09
16   Q.    Okay.  So she was a customer    12:16:09
17 service rep -- or sorry, excuse me.  She was  12:16:11
18 involved in the customer service group,      12:16:14
19 correct?                       12:16:16
20   A.    Correct.  The reps reported to  12:16:16
21 her.                         12:16:17
22   Q.    Right.                  12:16:18
23        And so she, at least of this    12:16:18
24 time, was having some involvement in the     12:16:23
25 revising of Mallinckrodt's SOM program; is   12:16:25

Page 187

1  that fair to say?                12:16:29
2    A.    Yes.                    12:16:29
3    Q.    Okay.  And also it appears that  12:16:30
4  at this time the customer service group is   12:16:33
5  having some involvement in the implementation  12:16:35
6  of the revised SOM program.          12:16:38
7        Separate and apart from what    12:16:39
8  the e-mail says, is it your recollection that  12:16:41
9  the customer service group had some     12:16:44
10 involvement in the revising of Mallinckrodt's  12:16:45
11 SOM program in 2008?             12:16:47
12        MR. O'CONNOR:  Objection to    12:16:49
13 form.                         12:16:50
14        THE WITNESS:  Yes.         12:16:50
15 QUESTIONS BY MR. KO:              12:16:50
16   Q.    Okay.  Ms. Stewart says that --  12:16:51
17 in particular that she is advising everyone  12:17:00
18 on this e-mail that she is working with you  12:17:03
19 and Mr. Harper to develop procedures to      12:17:06
20 ensure that Mallinckrodt maintains compliance  12:17:11
21 with DEA requirements to identify suspicious  12:17:15
22 orders; is that correct?             12:17:18
23   A.    So I'm Harper, and it talks     12:17:18
24 about working with me and Bill Ratliff.      12:17:21
25   Q.    Right.                  12:17:23

Page 188

1    A.    Yes.                    12:17:23
2    Q.    So Ms. Stewart is at this time,  12:17:24
3  as of May 14, 2008, working with you and     12:17:27
4  Mr. Ratliff to specifically ensure that      12:17:32
5  Mallinckrodt maintains compliance with DEA   12:17:40
6  requirements related to identification of    12:17:42
7  suspicious orders, correct?          12:17:44
8    A.    I don't see the word         12:17:45
9  "specifically," but, yes, she is assisting   12:17:49
10 with enhancing the program.          12:17:52
11   Q.    Okay.  And then she also        12:17:55
12 mentioned -- mentions that "in light of the  12:17:57
13 recent developments with McKesson, a good    12:17:59
14 deal of focus is being placed on this        12:18:02
15 project."                       12:18:03
16        Do you see that?           12:18:04
17   A.    I do.                   12:18:04
18   Q.    And is she referring to a DEA   12:18:05
19 investigation that ultimately resulted in a  12:18:08
20 DEA action against McKesson in the early 2008  12:18:12
21 time period?                    12:18:16
22   A.    Yes.                    12:18:16
23   Q.    Okay.  And McKesson, as we      12:18:17
24 mentioned before, is a -- is one of the -- or  12:18:21
25 one of the major distributors that faced DEA  12:18:23

Page 189

1  scrutiny regarding their distribution of     12:18:25
2  prescription opioids, correct?       12:18:28
3    A.    Yes.                    12:18:29
4    Q.    Okay.  Now, she goes on to      12:18:32
5  describe generally when an order is deemed    12:18:34
6  peculiar by a customer service rep.          12:18:41
7        Do you see that?           12:18:42
8    A.    Uh-huh.  Yes.             12:18:42
9    Q.    And she says that "an order is  12:18:44
10 deemed peculiar by a customer service rep    12:18:50
11 based on a set of guidelines currently being  12:18:52
12 developed."                     12:18:56
13        Do you see that reference?     12:18:56
14        First sentence of the second   12:19:05
15 paragraph.                     12:19:07
16   A.    Yes, yes, yes, I see it.  Yes,  12:19:07
17 thank you.                     12:19:08
18   Q.    So fair to say as of May 14,    12:19:08
19 2008, Mallinckrodt is developing certain      12:19:13
20 guidelines to determine whether or not an    12:19:15
21 order is peculiar?                12:19:17
22   A.    It's not correct.           12:19:20
23   Q.    Okay.  Is it -- is that -- is   12:19:21
24 your testimony that it's not correct because  12:19:24
25 you always had a system to determine whether  12:19:25

Page 190

1  or not an order was peculiar?                    12:19:28
2      A.   That's correct.              12:19:29
3      Q.   Okay.  So is it fair to say      12:19:30
4  that as of May 14, 2008, you are revising   12:19:31
5  set of guidelines to determine whether or not  12:19:37
6  it's peculiar?                    12:19:39
7      A.   Yes.                 12:19:40
8      Q.   Okay.  And what is the     12:19:41
9  difference from your perspective between a      12:19:47
10  peculiar order and a suspicious order?      12:19:49
11      A.   We -- at different times with    12:19:51
12  the enhancements of our program, we called      12:19:58
13  orders "peculiar," we called orders      12:20:01
14  "unusual," and we called orders "suspicious."  12:20:03
15  So at this time, the peculiar order was      12:20:06
16  something that came to our attention and     12:20:10
17  warranted additional review but was not      12:20:14
18  necessarily deemed to be suspicious.      12:20:17
19      Q.   Okay.  So a peculiar order, if  12:20:19
20  I understand your testimony correctly, is not  12:20:21
21  necessarily synonymous with a suspicious   12:20:23
22  order; is that correct?              12:20:26
23      A.   Correct.              12:20:26
24      Q.   Okay.  And if I understand both   12:20:28
25  this e-mail and some other documents I've   12:20:32

Page 191

1  reviewed, my understanding is that once an     12:20:35
2  order is identified as peculiar, certain      12:20:38
3  people make the determination of whether or     12:20:42
4  not the order is ultimately suspicious     12:20:44
5  sufficient to notify the DEA; is that      12:20:46
6  accurate?                    12:20:48
7           MR. O'CONNOR:  Objection to     12:20:48
8      form.                 12:20:49
9           THE WITNESS:  Yes.     12:20:49
10  QUESTIONS BY MR. KO:                 12:20:50
11      Q.   Okay.  And so for purposes of     12:20:50
12  this e-mail from Ms. Stewart to you, among   12:20:54
13  others, she is discussing a revision of what  12:20:58
14  determines a peculiar order, correct?      12:21:03
15      A.   A peculiar order as recognized   12:21:05
16  by customer service.              12:21:11
17      Q.   Okay.              12:21:12
18      A.   Yes.              12:21:12
19      Q.   And is it accurate to say that   12:21:13
20  a peculiar order -- whether or not an order     12:21:17
21  was deemed peculiar was based on an      12:21:22
22  algorithm, as we discussed earlier; is that  12:21:25
23  correct?                    12:21:29
24      A.   That was one of the reasons,   12:21:29
25  but in the case of a customer service rep, it  12:21:31

Page 192

1  could have been anything that came to the      12:21:34
2  customer service rep's attention as them   12:21:35
3  being familiar with the account.      12:21:39
4      Q.   Okay.  Because as you testified   12:21:41
5  previously, they were your eyes and ears to   12:21:43
6  the customer, correct?              12:21:47
7      A.   That was the NAMs.  But, yes,      12:21:48
8  the customer service reps were veterans with  12:21:49
9  the accounts, and, yes, they knew the      12:21:51
10  customers.                    12:21:56
11      Q.   So would you agree -- because I  12:21:56
12  realize that you are trying to make a      12:22:04
13  distinction between the NAMs and the CSRs.      12:22:08
14      But would it be fair to say      12:22:11
15  that the CSRs had deep knowledge about the     12:22:12
16  customers?                    12:22:16
17           MR. O'CONNOR:  Objection to     12:22:16
18      form.                 12:22:17
19  QUESTIONS BY MR. KO:                 12:22:17
20      Q.   Of Mallinckrodt?              12:22:17
21      A.   I wouldn't use the term "deep   12:22:18
22  knowledge."  They had knowledge of the      12:22:22
23  customers from the customer service      12:22:24
24  perspective.                    12:22:26
25      Q.   Okay.  And when you said      12:22:27

Page 193

1  earlier that the NAMs were your eyes and      12:22:29
2  ears, would you also say that the customer   12:22:34
3  service reps to some extent were the eyes and  12:22:36
4  ears for the Mallinckrodt business as well?  12:22:38
5      A.   If you use the term -- making   12:22:40
6  an inferential leap, because the customer   12:22:45
7  service reps didn't see the customers or --   12:22:48
8  they talked to the customers and took      12:22:50
9  customer orders.                 12:22:52
10      Q.   Okay.  Let me make sure I      12:22:53
11  understand it.                 12:22:55
12      They didn't see the customers,      12:22:55
13  but they talked to them?              12:22:57
14      A.   Yes.              12:22:58
15      Q.   Okay.  So they didn't actually   12:22:58
16  visit them like the NAMs did, but they would  12:23:00
17  speak to them via telephone only?      12:23:03
18           MR. O'CONNOR:  Objection to     12:23:05
19      form.                 12:23:06
20           THE WITNESS:  Correct.      12:23:06
21  QUESTIONS BY MR. KO:                 12:23:06
22      Q.   But the CSRs had, through these  12:23:06
23  conversations, presumably had knowledge about  12:23:10
24  the customers, correct?              12:23:11
25      A.   Yes.              12:23:13

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Q.    Turning back to this          12:23:20
2  distinction between peculiar and suspicious,  12:23:21
3  do you ever recall an instance in which an    12:23:23
4  order was identified as suspicious but not    12:23:25
5  peculiar?                          12:23:30
6    A.    I don't know that answer.     12:23:31
7    Q.    Okay.  Do you ever recall an   12:23:32
8  instance in which an order was identified as  12:23:36
9  unusual but not peculiar?            12:23:38
10   A.    I can't say.  I'm sorry.      12:23:39
11   Q.    Okay.  Is it accurate to      12:23:43
12 describe at least the -- well, strike that.   12:23:45
13       Prior to the revision of the    12:23:50
14 SOM program in 2008 that's reflected in these 12:23:55
15 e-mails that we're going over, is it accurate 12:24:00
16 to say that an order was first -- an          12:24:04
17 evaluation was made first about whether or    12:24:10
18 not an order was peculiar, separate and apart 12:24:11
19 from an analysis of whether or not an order   12:24:14
20 was suspicious?                    12:24:15
21       MR. O'CONNOR:  Objection to     12:24:16
22   form.                        12:24:17
23       THE WITNESS:  It appeared, yes. 12:24:17
24   That was a term that we used, yes.  12:24:21
25

Page 195

1  QUESTIONS BY MR. KO:                 12:24:23
2    Q.    So in addition to it being a   12:24:24
3  term that you used, is it accurate to say     12:24:26
4  that at Mallinckrodt, before making a         12:24:28
5  determination with respect to whether an      12:24:31
6  order was suspicious, the existing SOM        12:24:33
7  program at the time determined first whether  12:24:37
8  an order was peculiar?               12:24:39
9    A.    Yes, that was the term we used, 12:24:42
10 yes.                           12:24:46
11   Q.    And then once an order was      12:24:46
12 deemed to be peculiar, you subsequently made  12:24:48
13 a determination of whether or not that order  12:24:50
14 was suspicious, correct?             12:24:53
15   A.    Yes.                     12:24:55
16   Q.    Okay.  And you had mentioned a  12:24:56
17 moment ago that there were other              12:25:11
18 circumstances besides the algorithm that      12:25:14
19 would potentially make an order peculiar.     12:25:17
20       Do you recall that?             12:25:20
21   A.    Yes.  I'm using the terms       12:25:21
22 "peculiar," "suspicious," "unusual,"          12:25:26
23 interchangeably, yes.                12:25:31
24   Q.    Okay.  Well, I would not like   12:25:32
25 to use those words interchangeably --         12:25:35

Page 196

1    A.    Okay.  All right.  Okay.  Thank 12:25:35
2  you.                           12:25:35
3    Q.    -- and I'm trying to understand 12:25:35
4  the distinctions between them.       12:25:39
5    A.    Okay.  Thank you.             12:25:40
6    Q.    So with respect to            12:25:42
7  identification of a peculiar order, you had   12:25:43
8  previously testified that if an order met a   12:25:44
9  certain threshold by an algorithm determined  12:25:53
10 by Mallinckrodt, it would be deemed peculiar. 12:25:55
11       MR. O'CONNOR:  Objection to     12:25:58
12   form.                        12:25:59
13 QUESTIONS BY MR. KO:                 12:25:59
14   Q.    Correct?                   12:25:59
15   A.    Correct.                   12:25:59
16   Q.    And in addition to the         12:26:00
17 algorithm triggering a peculiar order, you    12:26:03
18 had also testified that there were other      12:26:06
19 circumstances that may indicate an order was  12:26:08
20 peculiar as identified by a customer service  12:26:11
21 rep, correct?                      12:26:14
22   A.    Correct.                   12:26:14
23   Q.    Okay.  And who other than the   12:26:15
24 CSRs had a responsibility or an obligation to 12:26:20
25 determine whether or not this order was       12:26:26

Page 197

1  peculiar?                          12:26:28
2        MR. O'CONNOR:  Objection to     12:26:28
3    form.                        12:26:29
4        THE WITNESS:  Peculiar, using    12:26:29
5    the strictest definition of the term.  12:26:37
6    The national account managers, if they  12:26:43
7    saw something when they were at the    12:26:43
8    accounts, the customer service review  12:26:43
9    and the peculiar order algorithm       12:26:50
10   detection, yes.                 12:26:50
11 QUESTIONS BY MR. KO:                 12:26:52
12   Q.    Okay.  So I'm setting aside the 12:26:52
13 algorithm detection.                 12:26:54
14   A.    Okay.                     12:26:55
15   Q.    So for purposes of identifying  12:26:56
16 an order as peculiar, do you recall any       12:26:59
17 instances in the 2007 through 2010 time       12:27:00
18 period in which orders were identified as     12:27:03
19 peculiar by either a CSR or an NAM, separate  12:27:05
20 and apart from whether or not an algorithm    12:27:10
21 triggered the order to be peculiar?  12:27:14
22   A.    Yes.                     12:27:17
23   Q.    Okay.  And other than the CSRs  12:27:18
24 and the NAMs, did anyone else have            12:27:22
25 responsibility with respect to determining    12:27:25

Page 198

1    whether or not that order was peculiar?        12:27:26
2    Separate and apart from the algorithm.        12:27:32
3        A.    Separate from the algorithm?        12:27:33
4        So may I ask a question,        12:27:37
5    please?        12:27:38
6        Q.    Sure.        12:27:38
7        A.    So there was -- we spoke        12:27:39
8    earlier about a circumstance where a DEA        12:27:40
9    investigator contacted Mallinckrodt. It was        12:27:44
10   a compounding pharmacy. So I don't know if        12:27:48
11   that was within the same time frame.        12:27:50
12       But so my point is, peculiar        12:27:52
13   order information could come from an external        12:27:56
14   source, potentially.        12:27:59
15       Q.    Okay. So other than an        12:28:00
16   external source or from some evaluation made        12:28:03
17   by a CSR or an NAM, apart from the algorithm        12:28:06
18   that triggered a peculiar order, were there        12:28:11
19   any other circumstances in which a peculiar        12:28:15
20   order was identified at Mallinckrodt?        12:28:19
21       A.    No.        12:28:20
22       Q.    Okay. Is it your understanding        12:28:21
23   that Mallinckrodt could not ship a peculiar        12:28:30
24   order without first conducting some sort of        12:28:37
25   due diligence on that order?        12:28:38

Page 199

1        A.    It is not.        12:28:39
2        MR. O'CONNOR: Objection to        12:28:39
3        form.        12:28:40
4    QUESTIONS BY MR. KO:        12:28:40
5        Q.    It is not your understanding.        12:28:41
6        So a peculiar order could ship        12:28:42
7    without conducting due diligence then,        12:28:43
8    correct?        12:28:45
9        A.    Correct.        12:28:45
10       Q.    Okay. So isn't that an unusual        12:28:46
11   circumstance?        12:28:55
12       MR. O'CONNOR: Objection to        12:28:55
13       form.        12:28:57
14   QUESTIONS BY MR. KO:        12:28:57
15       Q.    In other words, if you're not        12:28:57
16   performing any -- earlier we made a        12:29:01
17   distinction between peculiar and suspicious        12:29:03
18   orders, correct?        12:29:05
19       A.    Correct.        12:29:05
20       Q.    And the latter is something        12:29:05
21   that you ultimately have to report to the        12:29:07
22   DEA, correct?        12:29:08
23       A.    Correct.        12:29:09
24       Q.    And we had also discussed about        12:29:09
25   how evaluation of a peculiar order is        12:29:16

Page 200

1    necessary to determine whether or not that        12:29:18
2    is, in fact, suspicious, correct?        12:29:21
3        A.    Correct.        12:29:22
4        Q.    So it's your testimony sitting        12:29:23
5    here today that you did not always perform        12:29:27
6    due diligence on peculiar orders before        12:29:29
7    shipping them, correct?        12:29:31
8        MR. O'CONNOR: Objection to        12:29:31
9        form.        12:29:32
10       THE WITNESS: Correct.        12:29:32
11   QUESTIONS BY MR. KO:        12:29:33
12       Q.    Okay. Shipping of a peculiar        12:30:03
13   order without doing due diligence would seem        12:30:04
14   contradictory to what Ms. Stewart is trying        12:30:06
15   to describe here, right?        12:30:10
16       MR. O'CONNOR: Objection to        12:30:12
17       form.        12:30:13
18       THE WITNESS: Yes.        12:30:13
19   QUESTIONS BY MR. KO:        12:30:16
20       Q.    Okay. And to be clear, so the        12:30:17
21   record is clear, she is suggesting that if an        12:30:21
22   order is deemed peculiar, it should be placed        12:30:23
23   on hold and the DEA compliance group will be        12:30:26
24   advised.        12:30:30
25       Do you see that?        12:30:30

Page 201

1        A.    I do.        12:30:31
2        Q.    And in particular, Mr. Ratliff        12:30:32
3    and you are the DEA compliance group as        12:30:34
4    referenced by Ms. Stewart, correct?        12:30:38
5        A.    Correct.        12:30:39
6        Q.    And she also states that "DEA        12:30:40
7    compliance will then conduct a more in-depth        12:30:44
8    investigation and determine if the situation        12:30:47
9    warrants notification to the DEA."        12:30:49
10       Do you see that?        12:30:51
11       A.    I do see it.        12:30:52
12       Q.    And so your testimony, so the        12:30:53
13   record is clear, is that that more in-depth        12:30:55
14   investigation did not always occur, correct?        12:30:58
15       MR. O'CONNOR: Objection to        12:30:59
16       form.        12:31:00
17       THE WITNESS: There were times        12:31:00
18   that we shipped an order before the        12:31:01
19   review was complete, but we never        12:31:03
20   shipped a suspicious order.        12:31:06
21   QUESTIONS BY MR. KO:        12:31:07
22       Q.    Okay. Well, separate and apart        12:31:08
23   from the terminology now --        12:31:09
24       A.    Okay.        12:31:10
25       Q.    -- the process as described by        12:31:11

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 Ms. Stewart and your testimony here today, 12:31:14
2 after an order was deemed to be peculiar from 12:31:17
3 a variety of means that we discussed, it was 12:31:22
4 not always the case that the order was placed 12:31:26
5 on hold and an in-depth investigation ensued, 12:31:30
6 correct? 12:31:34
7         MR. O'CONNOR: Objection to 12:31:34
8     form. 12:31:34
9         THE WITNESS: So the order was 12:31:34
10     always placed on hold, but sometimes 12:31:35
11     it was released from hold and shipped 12:31:37
12     prior to the completion of the review. 12:31:39
13 QUESTIONS BY MR. KO: 12:31:41
14     Q.    Okay. Now, a moment ago you 12:31:41
15 said that you believe you never shipped a 12:32:03
16 suspicious order, correct? 12:32:04
17     A.    Correct. 12:32:05
18     Q.    But that is just simply based 12:32:05
19 on your understanding of whether or not that 12:32:09
20 formal label was made by someone at 12:32:11
21 Mallinckrodt, correct? 12:32:15
22         MR. O'CONNOR: Objection to 12:32:17
23     form. 12:32:18
24 QUESTIONS BY MR. KO: 12:32:18
25     Q.    Let me ask a different way. 12:32:18

Page 203

1         If you release an order without 12:32:20
2 conducting an investigation or performing due 12:32:23
3 diligence, that order could potentially be 12:32:26
4 suspicious, could it not? 12:32:28
5         MR. O'CONNOR: Objection to 12:32:30
6     form. 12:32:30
7         THE WITNESS: That's correct. 12:32:30
8 QUESTIONS BY MR. KO: 12:32:31
9     Q.    Okay. And in particular, just 12:32:48
10 to make sure the record is clear, if you 12:32:50
11 release a peculiar order without conducting 12:32:53
12 an investigation or performing due diligence, 12:32:55
13 that peculiar order could potentially be 12:32:58
14 suspicious, could it not? 12:33:00
15         MR. O'CONNOR: Objection to 12:33:01
16     form. 12:33:02
17         THE WITNESS: It could. 12:33:02
18 QUESTIONS BY MR. KO: 12:33:04
19     Q.    Okay. Okay. Now, if you turn 12:33:04
20 to the second page of this e-mail -- it's 12:33:32
21 unfortunately just a one-page document. 12:33:41
22     A.    Okay. Thank you. 12:33:42
23     Q.    And at the top, Ms. Stewart is 12:33:43
24 indicating that "in addition to order 12:33:47
25 quantities by product, we hope to also 12:33:52

Page 204

1 develop criteria for orders that deviate from 12:33:55
2 normal ordering patterns and/or from unusual 12:33:57
3 order frequency. Not yet sure how to capture 12:34:01
4 this. Hope to identify an algorithm that 12:34:05
5 will support a parsing through the data to 12:34:08
6 identify patterns, frequency, et cetera." 12:34:10
7         Did I read that correctly? 12:34:13
8     A.    Yes, you did. 12:34:14
9     Q.    So is it accurate to say that 12:34:15
10 as the date of this e-mail, Mallinckrodt had 12:34:17
11 not yet developed a criteria in its 12:34:18
12 suspicious order monitoring system to 12:34:23
13 identify orders that deviate from a normal 12:34:25
14 ordering pattern? 12:34:27
15         MR. O'CONNOR: Objection to 12:34:28
16     form. 12:34:32
17         THE WITNESS: Not correct. 12:34:35
18 QUESTIONS BY MR. KO: 12:34:36
19     Q.    Okay. Is it correct to say 12:34:36
20 that at the date of this e-mail, Mallinckrodt 12:34:37
21 is working on revising the criteria for 12:34:39
22 identifying orders that deviate from a normal 12:34:42
23 ordering pattern? 12:34:44
24     A.    Yes. 12:34:44
25     Q.    And also accurate to say that 12:34:44

Page 205

1 at this time Mallinckrodt is revising its 12:34:46
2 criteria for determining whether or not a 12:34:48
3 usual -- an order that deviates from usual 12:34:53
4 order frequency; is that correct? 12:34:56
5         MR. O'CONNOR: Objection to 12:34:57
6     form. 12:34:58
7         THE WITNESS: Correct. 12:34:58
8 QUESTIONS BY MR. KO: 12:34:58
9     Q.    And Ms. Stewart indicates that 12:34:59
10 she's not sure how to capture this as of the 12:35:00
11 date of this e-mail. 12:35:06
12         Do you see that? 12:35:07
13     A.    I see that. 12:35:07
14     Q.    And so is it fair to say that 12:35:08
15 you -- would you agree with this statement, 12:35:09
16 that at the time you weren't sure how to 12:35:11
17 capture this criteria in revising your SOM 12:35:12
18 policy? 12:35:15
19     A.    We were working through the 12:35:16
20 algorithm to understand -- there were several 12:35:18
21 approaches to the analysis, and we had not 12:35:25
22 settled on a specific one at this time. 12:35:28
23     Q.    Okay. And the algorithm at the 12:35:30
24 time of the -- at the time of this e-mail, 12:35:35
25 what was your understanding what the 12:35:36

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  algorithm was?                    12:35:37
2      A.  It was comparing a customer's    12:35:38
3  order history to itself and flagging any  12:35:41
4  order that exceeded a multiplier.    12:35:46
5      Q.  And at the time, do you recall   12:35:49
6  what the multiplier was?           12:35:50
7      A.  I do not.                   12:35:51
8      Q.  Do you recall if it was a 2X    12:35:52
9  multiplier?                        12:35:54
10     A.  I do not.                   12:35:55
11     Q.  Okay.  In the next paragraph,   12:35:56
12 Ms. Stewart indicates that "the sales force  12:36:06
13 will play a key role in this process by   12:36:07
14 verifying the customer's physical site and  12:36:11
15 operations ring true with the type of    12:36:14
16 business they purport to run."       12:36:16
17     Do you see that?               12:36:17
18     A.  I do.                      12:36:17
19     Q.  Do you agree that the sales    12:36:18
20 force would play this key role in trying to  12:36:20
21 identify the customer's physical site and  12:36:22
22 operations?                        12:36:27
23     A.  That was a suggestion from Drug  12:36:27
24 and Chemical Advisory Group that we did not  12:36:30
25 implement.  We used the sales force, but they  12:36:34

Page 207

1  did not play the key role in determining  12:36:35
2  whether the customer was set up or not.   12:36:38
3      Q.  Okay.  And to be clear, is the  12:36:40
4  sales force discussed here and as you just  12:36:41
5  testified to, are you talking about NAMs and  12:36:46
6  CSRs or both?  Or NAMs or CSRs or both?   12:36:48
7      A.  NAMs.                      12:36:54
8      Q.  Okay.  So the sales force      12:36:55
9  described in this e-mail is just with respect  12:36:56
10 to the national account managers, correct?  12:36:58
11     A.  Yes.                       12:37:00
12     Q.  Okay.  And you can set that     12:37:00
13 aside.  Thank you.                 12:37:14
14     Now, is it fair to say that in    12:37:21
15 the early 2008 time period you were working  12:37:27
16 on revising and revamping Mallinckrodt's SOM  12:37:28
17 program?  Is that accurate?         12:37:32
18     A.  Yes.                       12:37:33
19     MR. O'CONNOR:  Objection to       12:37:33
20     form.                         12:37:34
21 QUESTIONS BY MR. KO:                  12:37:34
22     Q.  And you had hoped to roll out a  12:37:35
23 formal SOM program at some -- as quickly as  12:37:40
24 possible; is that fair to say?      12:37:45
25     MR. O'CONNOR:  Objection to       12:37:47

Page 208

1      form.                         12:37:48
2      THE WITNESS:  So again -- I'm      12:37:48
3      sorry -- we've always had a program,  12:37:49
4      so we were hoping to enhance it and  12:37:51
5      introduce everyone to the enhancements  12:37:53
6      at that time.                  12:37:55
7  QUESTIONS BY MR. KO:                  12:37:55
8      Q.  Okay.  And the enhanced        12:37:56
9  version, just so the record is clear, extra  12:37:58
10 attention to the enhanced version was given  12:38:02
11 in early 2008, correct?            12:38:04
12     A.  Yes.                       12:38:05
13     Q.  And it was your hope to roll    12:38:06
14 out an enhanced version as quickly as     12:38:08
15 possible; is that fair to say?      12:38:11
16     A.  Yes.                       12:38:12
17     Q.  And it's important to roll out  12:38:13
18 an enhanced SOM program because failure to do  12:38:15
19 so would result in further diversion and   12:38:18
20 abuse of -- potentially of Mallinckrodt   12:38:21
21 opioids, correct?                  12:38:24
22     MR. O'CONNOR:  Objection to       12:38:24
23     form.                         12:38:25
24     THE WITNESS:  So we always had    12:38:25
25     a backbone program in place, and we  12:38:26

Page 209

1      were enhancing the program.        12:38:29
2  QUESTIONS BY MR. KO:                  12:38:30
3      Q.  Did you feel that backbone SOM  12:38:32
4  program was sufficient in terms of complying  12:38:34
5  with your duties under the CSA?     12:38:36
6      A.  Yes.                       12:38:38
7      Q.  Okay.  Well, then why did you   12:38:39
8  feel the need to enhance it?        12:38:41
9      A.  Because as time went on, we got  12:38:42
10 further guidance from DEA.  Any piece of   12:38:44
11 information that we gleaned, we acted upon it  12:38:47
12 immediately.  And we led the industry in   12:38:51
13 every aspect of enhancing our suspicious   12:38:53
14 order monitoring program.           12:38:57
15     Q.  Okay.  When you say you acted   12:38:57
16 on everything "immediately," what does that  12:38:59
17 mean?                              12:39:03
18     Did you act on advice from the    12:39:05
19 DEA as soon as you heard it?  Is that what  12:39:07
20 your testimony is today?           12:39:12
21     A.  So immediately -- that was a    12:39:12
22 poor choice of words.  As soon as possible,  12:39:16
23 yes.                               12:39:18
24     Q.  Okay.  And what does "as soon   12:39:19
25 as possible" mean to you?           12:39:21

Highly Confidential - Subject to Further Confidentiality Review

Page 210

```
 1          MR. O'CONNOR:  Objection to      12:39:21
 2      form.                    12:39:22
 3          THE WITNESS:  Depending upon     12:39:22
 4      varying amounts of time, depending how   12:39:24
 5      long it would have taken to implement    12:39:27
 6      the suggestion from DEA.          12:39:28
 7  QUESTIONS BY MR. KO:                12:39:29
 8      Q.   Okay.  Was it your goal at the  12:39:30
 9  time that you were trying to enhance your SOM 12:39:32
10  program in early 2008 to make revisions and  12:39:35
11  roll out a formal enhanced policy as quickly  12:39:38
12  as possible?                 12:39:40
13      A.   Yes.                12:39:42
14      Q.   Okay.  And when would you say   12:39:43
15  you actually rolled out a formal SOM policy   12:39:46
16  that satisfied you, as someone who was in     12:39:49
17  charge of overseeing the SOM program?        12:39:53
18          MR. O'CONNOR:  Objection to      12:39:54
19      form.                    12:39:56
20          THE WITNESS:  So the existing    12:39:56
21      policy always satisfied me, but we       12:39:58
22      continued to work on enhancing our       12:40:00
23      policies.                12:40:02
24  QUESTIONS BY MR. KO:                12:40:02
25      Q.   Okay.  And with respect to      12:40:03
```

Page 211

```
 1  enhancing it in particular as we discussed in 12:40:07
 2  early 2008, when would you say that process   12:40:10
 3  was actually complete?              12:40:13
 4      A.   I can't answer that because      12:40:16
 5  enhancements are always ongoing.  They're     12:40:18
 6  ongoing up to today.  So there's no start and 12:40:21
 7  stop time to the enhancements.          12:40:24
 8          (Mallinckrodt-Harper Exhibit 6   12:40:27
 9      marked for identification.)          12:40:27
10  QUESTIONS BY MR. KO:                12:40:27
11      Q.   Fair enough.             12:40:28
12          I'm going to hand you a copy of  12:40:28
13  what will be marked as Harper Exhibit 6.      12:40:30
14          And for the record, this is --   12:40:41
15  ends in Bates stamp 387983.          12:40:42
16          Ms. Harper, this appears to be   12:41:00
17  a June 17, 2008, DEA compliance all site      12:41:01
18  conference call with notes attached to it.    12:41:06
19          Is that accurate -- an accurate  12:41:09
20  description of the document?          12:41:13
21      A.   Yes.                12:41:14
22      Q.   And you were present at this    12:41:14
23  meeting?  You're listed as an attendee?       12:41:15
24      A.   Yes.                12:41:17
25      Q.   And it appears that the purpose 12:41:17
```

Page 212

```
 1  of this meeting in the first sentence         12:41:25
 2  underneath agenda, it states that "The        12:41:27
 3  purpose of the meeting" -- and these calls -- 12:41:33
 4  "was to share information between sites and   12:41:37
 5  to help each other gain a broader knowledge   12:41:39
 6  of the supply chain process."          12:41:41
 7          Did I read that correctly?       12:41:43
 8      A.   Yes.                12:41:44
 9      Q.   And so there were frequent       12:41:44
10  calls at the time to try and better          12:41:45
11  understand and gain knowledge of the supply   12:41:47
12  chain process?               12:41:51
13      A.   Yes.                12:41:51
14      Q.   Okay.  And I just actually want  12:41:51
15  to turn to your portion of the          12:41:55
16  presentation -- or the notes that capture     12:41:59
17  your presentation, which is at the bottom of  12:42:00
18  page 2.                  12:42:05
19          Do you see where it says,        12:42:07
20  "Karen gave a brief update on Covidien's      12:42:08
21  efforts"?                 12:42:11
22      A.   I do see that.             12:42:12
23      Q.   And by the way, Covidien is --   12:42:12
24  was your -- was the actual -- was the former  12:42:15
25  employer -- was your former employer?        12:42:19
```

Page 213

```
 1      A.   Right.  Our company has changed  12:42:22
 2  corporate structure and ownership, yes.       12:42:25
 3      Q.   Thank you.              12:42:26
 4      A.   Yes.                12:42:26
 5      Q.   You put it more artfully than    12:42:27
 6  me.                   12:42:28
 7          Covidien, at the time of         12:42:28
 8  2000 -- 2008, Mallinckrodt was essentially    12:42:33
 9  Covidien.  And so for purposes of this        12:42:35
10  deposition, when I refer to Covidien, it's    12:42:37
11  synonymous with Mallinckrodt; is that fair?   12:42:40
12      A.   That's fair.             12:42:43
13      Q.   Okay.  And you give a general    12:42:44
14  overview of the SOM program, and you say that 12:42:50
15  your efforts are ongoing to, quote, "Improve  12:42:57
16  our current suspicious order monitoring       12:43:01
17  system in light of recent DEA actions with    12:43:05
18  other registrants regarding this law."        12:43:08
19          Did I read that correctly?       12:43:10
20      A.   Can you point that out to me,    12:43:10
21  please, the sentence?              12:43:13
22      Q.   Sure.  I just highlighted it.    12:43:13
23  It's at the top -- it's the first sentence    12:43:17
24  underneath your portion of the presentation.  12:43:18
25      A.   So I see that that is what it    12:43:20
```

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    reads, but I don't know that I published          12:43:24
2    these notes or if Ms. Woznick was              12:43:26
3    interpreting the discussion and documenting      12:43:32
4    it --                                          12:43:33
5        Q.   Fair enough.                         12:43:35
6        A.   -- as she saw fit.                   12:43:35
7        Q.   Fair enough.                         12:43:37
8            Would you agree with me that          12:43:37
9    one of the reasons why you were seeking to     12:43:38
10   improve Mallinckrodt's SOM system was in       12:43:41
11   light of recent DEA actions at the time?       12:43:45
12       A.   Yes.                                 12:43:48
13       Q.   Okay. And the persons               12:43:51
14   responsible on the bottom right-hand corner    12:43:56
15   are listed as you and Eileen Spaulding.        12:44:03
16           Do you see that?                      12:44:06
17       A.   I do.                                12:44:06
18       Q.   And so is it fair to say that        12:44:07
19   based on this document, you and Eileen are     12:44:07
20   the people responsible for implementing an     12:44:11
21   improved SOM program at Mallinckrodt at this   12:44:15
22   time?                                         12:44:17
23           MR. O'CONNOR: Objection.             12:44:17
24   Form.                                         12:44:18
25           THE WITNESS: So not in               12:44:19

Page 215

1        isolation. We were members of the         12:44:20
2        team, and we were the representatives      12:44:21
3        of the DEA compliance group on the         12:44:22
4        team, but there were others on the         12:44:25
5        team.                                     12:44:26
6    QUESTIONS BY MR. KO:                          12:44:26
7        Q.   Okay. But you guys were -- is        12:44:26
8    it fair to say that you were the team leaders  12:44:30
9    of the SOM team, or do you disclaim that       12:44:31
10   responsibility?                               12:44:34
11       A.   I --                                 12:44:34
12           MR. O'CONNOR: Objection to           12:44:34
13   form.                                         12:44:35
14           THE WITNESS: The leader of the       12:44:35
15       team was always the most senior           12:44:43
16       official, so in one case it was JoAnne    12:44:44
17       Levy. So I was a key contributor to       12:44:47
18       the team, as was Eileen, but I don't      12:44:50
19       know that I was ever designated as the    12:44:52
20       team leader.                             12:44:53
21   QUESTIONS BY MR. KO:                          12:44:54
22       Q.   Okay. So is it your testimony        12:44:54
23   that you believe, at least as of the time     12:44:56
24   that JoAnne Levy was your direct report, that 12:44:58
25   she was the team leader of the SOM policy and 12:45:02

Page 216

1    program?                                      12:45:04
2        A.   I believe so, yes.                   12:45:04
3        Q.   Okay. And then at other             12:45:07
4    times -- I believe the name you referenced    12:45:14
5    before was Todd?                              12:45:15
6            I'm sorry, who --                     12:45:17
7            MR. O'CONNOR: Objection to           12:45:18
8    form.                                         12:45:18
9    QUESTIONS BY MR. KO:                          12:45:18
10       Q.   Who did you report to after          12:45:19
11   JoAnne Levy?                                  12:45:21
12       A.   Tom Berry.                          12:45:21
13       Q.   Tom Berry. Thank you.               12:45:22
14       A.   Yeah.                               12:45:24
15       Q.   So Mr. Berry, would you agree        12:45:24
16   that after -- once you began reporting to     12:45:26
17   Mr. Berry, would you say that Mr. Berry was   12:45:31
18   the team leader for the SOM team?             12:45:34
19       A.   No.                                 12:45:36
20       Q.   Okay. At the time that you          12:45:36
21   reported to Mr. Berry, would you say that you 12:45:37
22   were the team leader of the SOM team?         12:45:39
23       A.   So I'm sorry to repeat, but         12:45:41
24   there was no designated leader except in the  12:45:47
25   case of JoAnne Levy, who was the senior       12:45:49

Page 217

1    official. Tom Berry was not as actively        12:45:52
2    involved in the team because he was new to     12:45:55
3    the controlled substances business, and so I   12:45:58
4    would not state anyone's name specifically     12:46:01
5    during this time period as the leader.         12:46:03
6        Q.   Separate and apart of whether        12:46:04
7    or not there was an official designation, did  12:46:11
8    you consider yourself, along with Eileen       12:46:13
9    Spaulding, to the team leader of implementing  12:46:18
10   an improved SOM program during the 2008 time   12:46:20
11   period?                                        12:46:23
12       A.   Yes. I would consider it            12:46:23
13   controlled substances compliance              12:46:25
14   responsibility, and I was the leader of that   12:46:26
15   group at that time, yes.                       12:46:28
16       Q.   Okay. You thank.                    12:46:28
17           And this document indicates a        12:46:31
18   deadline. Do you see that?                     12:46:36
19       A.   I do see it.                         12:46:37
20       Q.   And the deadline, according to       12:46:43
21   this document, is fourth quarter 2008 fiscal   12:46:46
22   year?                                         12:46:50
23       A.   Yes.                                12:46:50
24       Q.   By the way, what was              12:46:50
25   Mallinckrodt's fiscal year?                    12:46:52

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    A.   At that time it ended in          12:46:53
2  October -- September.                    12:46:57
3    Q.   September.  Okay.                  12:46:58
4        So it was at least as of the       12:47:02
5  date of this call and the notes that were   12:47:05
6  drafted pursuant to this call that an    12:47:10
7  improved SOM program would be complete no   12:47:15
8  later than October of 2008?              12:47:18
9        MR. O'CONNOR:  Objection to        12:47:19
10    form.                                 12:47:19
11        THE WITNESS:  No, sir.            12:47:19
12  QUESTIONS BY MR. KO:                    12:47:20
13    Q.   Is that accurate or is that --   12:47:21
14    A.   No.                              12:47:21
15    Q.   That's incorrect?                12:47:22
16    A.   That's incorrect.                12:47:23
17    Q.   Okay.  So what is this deadline  12:47:24
18  referring to?                           12:47:25
19    A.   The update that would be         12:47:26
20  provided on the next team call.         12:47:27
21    Q.   Okay.  So it wasn't necessarily  12:47:29
22  your goal to complete the SOM revisions by   12:47:31
23  fourth quarter of 2008?                 12:47:35
24    A.   No.                              12:47:36
25    Q.   Okay.  Did you have a -- did     12:47:36

Page 219

1  you have a firm goal at any point in time   12:47:41
2  other than trying to effectuate an improved   12:47:43
3  SOM program as soon as possible?         12:47:46
4    A.   No.                               12:47:47
5    Q.   Okay.  By the way, turning back   12:47:48
6  to the first page, there are a list of   12:47:54
7  attendees.                              12:48:00
8        Are all those people folks on     12:48:02
9  the DEA/controlled substance compliance team?   12:48:06
10    A.   No.                             12:48:10
11    Q.   Okay.  Which individuals were   12:48:11
12  not on the DEA compliance team?         12:48:13
13    A.   Joe Ruffino.                     12:48:15
14    Q.   Okay.                            12:48:23
15    A.   And I can't be certain about    12:48:23
16  Patti Woznick.  So Patti and Joe were in   12:48:27
17  purchasing, and dotted line, Hobart     12:48:30
18  compliance reported to Patti for a while, and   12:48:34
19  then they came into part of this       12:48:37
20  synchronized, coordinated group.  So Patti   12:48:42
21  may or may not have been part of the team at   12:48:45
22  the time.                              12:48:48
23    Q.   Okay.  So other than Joe and    12:48:48
24  potentially Patti, everyone else was a member   12:48:50
25  of the DEA compliance team?            12:48:52

Page 220

1    A.   Yes.  Well, we reported to       12:48:53
2  JoAnne Levy, yes.                       12:48:55
3        MR. KO:  Okay.  And with that,    12:48:59
4  I think we can break for lunch.         12:49:00
5        THE WITNESS:  Okay.               12:49:02
6        VIDEOGRAPHER:  We are going off   12:49:02
7  the record at 12:49 p.m.                12:49:03
8        (Off the record at 12:49 p.m.)    12:49:04
9        (Mallinckrodt-Harper Exhibit 7   13:37:59
10    marked for identification.)           13:36:59
11        VIDEOGRAPHER:  We are back on     13:36:59
12  the record at 1:37 p.m.                 13:37:01
13  QUESTIONS BY MR. KO:                    13:37:02
14    Q.   Welcome back from lunch,         13:37:03
15  Ms. Harper.                            13:37:06
16    A.   Thank you.                       13:37:07
17    Q.   I appreciate your patience to   13:37:07
18  stay.  We've got a few more hours to go.   13:37:09
19        I've handed you a copy of        13:37:12
20  what's been marked as Harper Exhibit 7.  13:37:14
21        And for the record, this         13:37:16
22  document ends in Bates 274572.          13:37:17
23        And this is a July 29, 2008,     13:37:21
24  e-mail from you to Mr. Ratliff; is that   13:37:25
25  correct?                               13:37:27

Page 221

1    A.   Yes.                             13:37:27
2    Q.   And this appears to be another   13:37:27
3  monthly report as of July 2008 that you are   13:37:29
4  sending on that we discussed previously   13:37:32
5  today?                                 13:37:35
6    A.   Correct.                         13:37:35
7    Q.   In terms of we had discussed     13:37:36
8  the fact that you had sent monthly reports to   13:37:38
9  Mr. Ratliff.                           13:37:42
10        And I just wanted to ask a few   13:37:43
11  questions on this document.            13:37:45
12        It appears here on the third     13:37:46
13  section down that you are working on a draft   13:37:48
14  of the SOM policy, and you indicate that   13:37:56
15  hopefully the final draft is close to   13:38:02
16  publication.                           13:38:04
17        Do you see that?                  13:38:05
18    A.   I do see it.                     13:38:05
19    Q.   Is it accurate to say as of     13:38:06
20  July 29, 2008, you're working on a final   13:38:07
21  revised draft of the SOM policy?        13:38:10
22    A.   Yes, as it stood at the time,   13:38:14
23  yes.                                   13:38:16
24    Q.   And then you're awaiting         13:38:16
25  feedback from Ms. Stewart?             13:38:18

Page 222

```
 1    A.   Yes.                    13:38:19
 2    Q.   And that you are hoping to      13:38:19
 3  train and implement the revised SOM program  13:38:26
 4  in August, later that summer, correct?      13:38:28
 5    A.   Yes.                    13:38:30
 6    Q.   Okay.  So at this point it's    13:38:31
 7  still a work in progress, the revised SOM    13:38:32
 8  program, correct?              13:38:35
 9        MR. O'CONNOR:  Objection to    13:38:36
10  form.                        13:38:36
11        THE WITNESS:  Yes.  Yes.      13:38:36
12  QUESTIONS BY MR. KO:            13:38:38
13    Q.   And at the bottom of this      13:38:38
14  e-mail, there's another reference to        13:38:44
15  IntegriChain.  I don't want to ask you any   13:38:45
16  questions about that.  We've talked about    13:38:49
17  that.                        13:38:50
18        But you also discuss in this    13:38:50
19  e-mail how, quote, "How review of           13:38:53
20  Mallinckrodt chargebacks could be used to   13:38:55
21  help our customers monitor their customers," 13:38:57
22  end quote.                    13:39:01
23        Did I read that correctly?     13:39:01
24    A.   Yes.                    13:39:02
25    Q.   So fair -- well, as of the date 13:39:02
```

Page 223

```
 1  of this e-mail, is it fair to say that you   13:39:06
 2  were considering how to utilize chargeback   13:39:10
 3  information to understand how to help        13:39:12
 4  customers monitor their customers?          13:39:16
 5    A.   Yes, that's correct.          13:39:18
 6    Q.   Okay.  You can set that aside.  13:39:19
 7        And was one reason to utilize   13:39:22
 8  chargeback information -- or strike that.    13:39:39
 9        What is your understanding of   13:39:41
10  chargeback -- chargeback data, separate and 13:39:43
11  apart from what's included in that?         13:39:47
12    A.   Like currently my --         13:39:48
13    Q.   Yeah.  What's your            13:39:50
14  understanding of what chargeback data       13:39:51
15  consists of.                  13:39:54
16    A.   Certainly.                13:39:54
17        We sell to wholesalers and     13:39:55
18  distributors at a certain price, and there  13:39:56
19  are wholesaler/distributor customers, their 13:40:01
20  customers, who have negotiated discounts    13:40:04
21  through purchasing co-ops, et cetera.       13:40:07
22        And so they then purchase from  13:40:10
23  our distributors.  The downstream registrants 13:40:12
24  purchase from our distributor at a lesser   13:40:14
25  price than the distributor has paid         13:40:19
```

Page 224

```
 1  Mallinckrodt to begin with.              13:40:20
 2        So then in that circumstance,   13:40:21
 3  the distributor applies back to Mallinckrodt 13:40:23
 4  to be made whole -- to be made whole for that 13:40:25
 5  differential.  So I'd like to point out that 13:40:28
 6  all transactions are not subject to         13:40:32
 7  chargebacks, and chargebacks are after the  13:40:34
 8  fact, retrospective information.            13:40:36
 9    Q.   And when you say "all          13:40:39
10  transactions are not subject to chargebacks," 13:40:41
11  what you mean by that, if I understand you   13:40:44
12  correctly, is that, you know, chargeback only 13:40:47
13  occurs if a distributor or customer of      13:40:49
14  Mallinckrodt makes such a request to        13:40:50
15  Mallinckrodt, correct?          13:40:52
16    A.   Correct.                  13:40:53
17    Q.   Pursuant to the terms of the   13:40:53
18  agreement between the distributor and       13:40:56
19  Mallinckrodt, correct?          13:40:58
20    A.   That's correct.            13:40:58
21    Q.   Okay.  And separate and apart  13:40:59
22  from whether or not all information, as you  13:41:01
23  describe, is contained in the chargeback    13:41:05
24  information -- or chargeback data, for lack  13:41:07
25  of a better term, was there also a certain  13:41:09
```

Page 225

```
 1  point in time where you expanded the        13:41:12
 2  examination of, quote/unquote, downstream    13:41:17
 3  data?                        13:41:22
 4        MR. O'CONNOR:  Object to form.  13:41:22
 5  QUESTIONS BY MR. KO:            13:41:23
 6    Q.   Let me strike that.          13:41:24
 7        In addition to chargeback data  13:41:24
 8  as you described, were there any other       13:41:26
 9  sources of information that you asked to be  13:41:28
10  pulled for purposes of understanding the    13:41:32
11  obligation to monitor customers' customers?  13:41:36
12    A.   I -- not as you state the      13:41:38
13  question, I'm not aware.        13:41:41
14        (Mallinckrodt-Harper Exhibit 9  13:41:44
15  marked for identification.)          13:41:44
16  QUESTIONS BY MR. KO:            13:41:44
17    Q.   Okay.  I'm going to hand you a 13:41:44
18  copy -- going back to your description of    13:41:46
19  chargebacks, I'm going to hand you a copy of 13:41:48
20  what will be marked as -- I hate to go out of 13:41:50
21  order because I already premarked something, 13:41:52
22  but this is going to be Harper Exhibit 9.    13:41:54
23        And for the record, this is a   13:41:57
24  copy of your deposition transcript that you  13:41:59
25  sat for in connection with the Island Drug   13:42:04
```

Page 226

1  matter that we were discussing earlier today.   13:42:09
2        Do you recall sitting for that   13:42:12
3  deposition?                           13:42:12
4     A.   Yes.                          13:42:13
5     Q.   And Island Drug was a pharmacy   13:42:13
6  that actually one of your distributors   13:42:15
7  shipped to, correct?                  13:42:17
8     A.   May I have a minute to   13:42:18
9  refamiliarize myself with the document?  Is   13:42:27
10  that all right?                       13:42:30
11     Q.   Actually, I just want to -- is   13:42:31
12  it for purposes of answering my question?   13:42:31
13     A.   Yes, sir.                     13:42:32
14     Q.   You don't need to answer that.   13:42:33
15  I just actually want to turn your attention   13:42:34
16  to page 12.  I'm sorry, page 11.      13:42:36
17        And so in connection with this   13:42:54
18  deposition testimony, do you see the question   13:43:05
19  that's asked:  "And what is a chargeback   13:43:08
20  system, if you'll define that, please?"   13:43:12
21        Do you mind reading your   13:43:14
22  response to that question in the record?   13:43:15
23     A.   I don't mind.                 13:43:17
24     Q.   Okay.  Thank you.            13:43:19
25     A.   "Mallinckrodt sells controlled   13:43:20

Page 227

1  substances to wholesalers at a standard   13:43:22
2  price.  Some pharmacies negotiate a   13:43:24
3  discounted price.  When the wholesaler honors   13:43:27
4  the discounted price to the pharmacy, they   13:43:30
5  then submit a chargeback request   13:43:32
6  retroactively to Mallinckrodt so that they   13:43:35
7  can be made financially whole for the   13:43:39
8  difference in price."                 13:43:41
9        Is that enough or shall I go   13:43:44
10  on?                                   13:43:46
11     Q.   Can you please continue?      13:43:46
12     A.   Certainly.                    13:43:47
13        "In doing so, the wholesaler   13:43:48
14  tells Mallinckrodt exactly which pharmacy to   13:43:51
15  which the drugs were sold, what the DEA   13:43:53
16  registration number is, the pharmacy address,   13:43:55
17  the quantity, and which drugs they have sold   13:43:58
18  to that pharmacy."                    13:44:01
19     Q.   Okay.  And as you sit here   13:44:04
20  today, is that still an accurate description   13:44:06
21  of how you understand the chargeback system?   13:44:11
22     A.   The only thing I would amend,   13:44:13
23  if possible, is to qualify that and say -- so   13:44:16
24  provided there was a chargeback transaction,   13:44:22
25  this is still the case, yes.          13:44:24

Page 228

1     Q.   Okay.  So for purposes of this   13:44:25
2  deposition, is it true that provided there   13:44:29
3  was a chargeback request, Mallinckrodt would   13:44:31
4  know exactly which pharmacy the drugs were   13:44:35
5  sold to?                              13:44:37
6     A.   Yes.                          13:44:38
7     Q.   And provided that there was a   13:44:39
8  chargeback request, Mallinckrodt would know   13:44:41
9  what the DEA registration number of the   13:44:43
10  downstream entity is, correct?        13:44:46
11     A.   Yes.                          13:44:47
12     Q.   And Mallinckrodt would also   13:44:48
13  know exactly which pharmacy address its pills   13:44:50
14  were being shipped to, correct?       13:44:54
15     A.   Correct.                      13:44:55
16     Q.   And Mallinckrodt would also   13:44:56
17  understand the quantity of pills being   13:44:58
18  shipped to that particular -- particular   13:44:59
19  pharmacy or clinic, correct?          13:45:02
20        MR. O'CONNOR:  Objection to   13:45:03
21     form.                             13:45:04
22        THE WITNESS:  That's correct.   13:45:04
23  QUESTIONS BY MR. KO:                  13:45:04
24     Q.   And Mallinckrodt would know   13:45:05
25  exactly which drugs they have sold to that   13:45:06

Page 229

1  particular pharmacy, correct?         13:45:08
2     A.   Correct.                      13:45:09
3     Q.   And I want to focus on your   13:45:11
4  qualification when you say you -- this would   13:45:15
5  only be the case if Mallinckrodt obtained a   13:45:19
6  chargeback request.                   13:45:22
7        First of all, wasn't it the   13:45:22
8  case that a chargeback request -- it was   13:45:25
9  certainly uncommon if a chargeback request   13:45:28
10  did not occur, correct?               13:45:30
11        MR. O'CONNOR:  Objection to   13:45:32
12     form.                             13:45:33
13        THE WITNESS:  Yes.             13:45:33
14  QUESTIONS BY MR. KO:                  13:45:36
15     Q.   In most instances, Mallinckrodt   13:45:37
16  and you expected a chargeback request to be   13:45:40
17  made by a distributor, correct?       13:45:43
18     A.   Yes.                          13:45:45
19     Q.   And move -- and putting aside   13:45:46
20  whether or not a chargeback was paid, does   13:45:52
21  the chargeback data track all downstream   13:45:56
22  customer sales?                       13:45:58
23        MR. O'CONNOR:  Objection to   13:46:00
24     form.                             13:46:01
25        THE WITNESS:  "Downstream   13:46:01

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    customers" meaning the pharmacy?          13:46:04
2    QUESTIONS BY MR. KO:                      13:46:05
3        Q.    Yes.                            13:46:06
4        A.    Their sales?                    13:46:06
5        Q.    The sales made to the           13:46:07
6    pharmacies by the distributors.           13:46:10
7        A.    For Mallinckrodt product, yes.  13:46:12
8        Q.    Okay.  So just so the record is 13:46:15
9    clear, the chargeback data would include all 13:46:17
10   downstream customer sales made by a       13:46:21
11   distributor to a pharmacy or clinic, correct? 13:46:24
12       A.    Correct.                        13:46:27
13       Q.    Okay.  And so you can set this  13:46:28
14   one aside.                                13:46:37
15           (Mallinckrodt-Harper Exhibit 8   13:46:53
16       marked for identification.)           13:46:53
17   QUESTIONS BY MR. KO:                      13:46:53
18       Q.    I'm now going to go back in     13:46:46
19   time -- or back in order and hand you a copy 13:46:47
20   of what's going to be marked -- or what has 13:46:49
21   been marked as Harper Exhibit 4 -- or 8,  13:46:50
22   excuse me.                                13:46:52
23           And this is a -- for the          13:46:56
24   record, this document ends in Bates 419810, 13:47:00
25   and this is a December 14, 2007, e-mail from 13:47:06

Page 231

1    you to Ms. Levy.                          13:47:10
2           Is that correct?                   13:47:12
3        A.    Yes.                            13:47:12
4        Q.    And going down to the bottom of 13:47:15
5    this page, you indicate that you are      13:47:23
6    receiving -- you have received the attached 13:47:29
7    memo as part of a training at a recent    13:47:33
8    seminar.                                  13:47:35
9           Do you see that?                   13:47:35
10       A.    Yes.                            13:47:36
11       Q.    And the memo is what's          13:47:36
12   contained in this attachment, and it's one of 13:47:38
13   the DEA guidance letters that we referred to 13:47:40
14   earlier today; is that correct?           13:47:42
15       A.    Yes.                            13:47:43
16       Q.    And would it also be fair to    13:47:44
17   say that this is one of the Rannazzisi    13:47:46
18   letters that we referred to?  Correct?    13:47:48
19       A.    Yes.                            13:47:50
20       Q.    So as of December 5, 2007, or   13:47:53
21   no later than December 5, 2007, you were in 13:47:58
22   possession of one of the Rannazzisi letters 13:48:01
23   dated December -- September 27, 2006,     13:48:04
24   correct?                                  13:48:08
25       A.    Yes.                            13:48:08

Page 232

1        Q.    Okay.  And you indicate that it 13:48:10
2    gives specific guidance on suspicious order 13:48:16
3    monitoring.                               13:48:20
4           Do you see that?                   13:48:20
5        A.    Yes, I do see it.               13:48:21
6        Q.    And so is it fair to say that   13:48:23
7    you in fact believe it to be the case that 13:48:26
8    this letter was instructive on your       13:48:27
9    obligations to design and implement a     13:48:31
10   suspicious order monitoring system?       13:48:34
11       A.    It was instructive in terms of  13:48:35
12   guidance.                                 13:48:38
13       Q.    Okay.                           13:48:39
14       A.    Yes.                            13:48:39
15       Q.    And you also ask -- or you      13:48:40
16   don't -- you don't ask anything, but Jim  13:48:45
17   Rausch responds to your e-mail.           13:48:47
18           Do you see that?                  13:48:48
19       A.    Yes, I do.                      13:48:49
20       Q.    And he indicates that "We,"     13:48:51
21   being Mallinckrodt, "send a suspicious order 13:48:55
22   report to the DEA monthly."               13:48:57
23           Correct?                          13:48:59
24       A.    Correct.                        13:48:59
25       Q.    Did you ever review any of      13:49:00

Page 233

1    those reports prior to the time of this   13:49:02
2    e-mail?                                   13:49:07
3        A.    I'm not certain.                13:49:07
4        Q.    Okay.  Generally speaking, was  13:49:12
5    it Mr. Rausch's responsibility to send these 13:49:13
6    reports to the DEA monthly?               13:49:14
7        A.    Yes.                            13:49:15
8        Q.    Okay.  And do you have an       13:49:16
9    understanding of -- well, earlier we were 13:49:19
10   talking about the distinction between     13:49:22
11   peculiar and suspicious orders.           13:49:24
12           Do you recall that?               13:49:25
13       A.    Yes.                            13:49:25
14       Q.    Is it your understanding that   13:49:26
15   these monthly reports being sent by       13:49:27
16   Mr. Rausch were a compilation of the peculiar 13:49:31
17   orders that Mallinckrodt had identified?  13:49:34
18       A.    Yes.                            13:49:36
19       Q.    Okay.  So in other words, it    13:49:38
20   wasn't necessarily the case that they were -- 13:49:40
21   that Mallinckrodt was sending any         13:49:42
22   notification of suspicious orders to DEA, 13:49:44
23   correct?                                  13:49:46
24       A.    Correct.                        13:49:46
25       Q.    It was just simply a monthly    13:49:47

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  report that contained all the peculiar orders   13:49:49
2  that Mallinckrodt had identified, right?        13:49:51
3      A.   Correct.                               13:49:53
4      Q.   Okay.  And do you recall -- I          13:49:54
5  know I've asked this question in another form   13:50:08
6  or in a different way, but do you recall        13:50:11
7  prior to December 5, 2007, whether or not       13:50:13
8  Mallinckrodt had ever identified a suspicious   13:50:16
9  order to the DEA?                               13:50:18
10     A.   Yes, I do recall.                      13:50:20
11     Q.   You do recall instances in            13:50:22
12 which Mallinckrodt identified a suspicious      13:50:24
13 order to the DEA?                               13:50:26
14     A.   Yes.                                   13:50:26
15     Q.   Okay.  And when did that occur?        13:50:27
16     A.   So there was the case we talked        13:50:28
17 about with the compounding pharmacy.            13:50:31
18     Q.   Okay.                                  13:50:34
19     A.   And there were several others,         13:50:35
20 but I don't recall the particulars of those     13:50:38
21 reports.                                        13:50:40
22     Q.   Fair enough.                           13:50:41
23          So you do recall some instances        13:50:41
24 in which suspicious orders were reported to     13:50:45
25 Mallinckrodt prior to December 14, 2007?        13:50:48

Page 235

1      A.   Reported to the DEA?                   13:50:52
2      Q.   Yes.                                   13:50:53
3      A.   Yes, sir.                              13:50:54
4      Q.   Okay.  And approximately -- I          13:50:54
5  know you've -- you don't know the exact         13:50:58
6  amount, but you've given some examples.         13:51:00
7          Do you know whether or not it           13:51:02
8  was -- there were 10 instances or 50            13:51:04
9  instances?                                      13:51:06
10         Do you know approximately how           13:51:07
11 many suspicious orders Mallinckrodt reported    13:51:08
12 to the DEA?                                     13:51:09
13     A.   I will approximate it to be ten        13:51:10
14 or less.                                        13:51:15
15     Q.   Okay.  So in the entire time           13:51:16
16 that you were a part of the DEA compliance      13:51:17
17 team, you recall ten orders being              13:51:21
18 identified -- approximately ten orders being    13:51:24
19 identified as suspicious to the DEA?            13:51:25
20         MR. O'CONNOR:  Objection to             13:51:27
21 form.                                           13:51:27
22         THE WITNESS:  Prior to this?            13:51:27
23 QUESTIONS BY MR. KO:                            13:51:36
24     Q.   Right.                                 13:51:36
25     A.   Yes.  Re -- but -- Rausch was          13:51:37

Page 236

1  sending reports as well, but the confirmed      13:51:41
2  suspicious orders to DEA were ten or less.      13:51:45
3      Q.   Right.                                 13:51:46
4          And as we discussed, the                13:51:47
5  report -- the monthly reports were just the     13:51:49
6  peculiar orders that Mallinckrodt had           13:51:50
7  identified, correct?                            13:51:52
8      A.   Correct.                               13:51:52
9      Q.   And not necessarily any -- or          13:51:53
10 not any suspicious orders, correct?             13:51:55
11     A.   Correct.                               13:51:57
12     Q.   Okay.  By the way, there's             13:51:58
13 reference made to someone by the name of Sean   13:52:07
14 Welch.                                          13:52:10
15         Do you see that?                        13:52:10
16     A.   Yes.                                   13:52:11
17     Q.   Who is he?                             13:52:12
18     A.   He was a co-manager of customer        13:52:13
19 service at that time.  I believe Jim Rausch     13:52:19
20 may have reported to him.                       13:52:22
21     Q.   Okay.  Was he involved on the          13:52:25
22 SOM team as well?                               13:52:27
23     A.   Only in terms of being kept            13:52:28
24 informed of our activity.                       13:52:36
25     Q.   So he didn't have any                  13:52:37

Page 237

1  day-to-day responsibility with respect to the   13:52:44
2  SOM program?                                     13:52:48
3      A.   He did not.                            13:52:49
4      Q.   Okay.  And you also indicate,          13:52:49
5  going back to the bottom e-mail from you to     13:52:51
6  Jim and Sean, you say that you received the     13:52:53
7  attached memo as part of a training at a        13:52:56
8  recent seminar.                                 13:52:58
9          Do you recall which seminar             13:52:59
10 this was?                                        13:53:00
11     A.   Yes, it was the Buzzeo.                13:53:00
12     Q.   Okay.  So the 2007 Buzzeo              13:53:02
13 conference, correct?                             13:53:05
14         We'll just -- assuming -- I             13:53:08
15 mean, the e-mail is dated --                     13:53:10
16     A.   Yes, yes, yes.                         13:53:11
17     Q.   -- December 5th.                       13:53:11
18     A.   Because it says "recent," yes.         13:53:12
19     Q.   Right.                                 13:53:15
20     A.   Yes, sir.                              13:53:15
21     Q.   And the Buzzeo conference was          13:53:15
22 an annual occurrence, generally speaking, in    13:53:16
23 the fall of each year, correct?                 13:53:19
24     A.   Yes.                                   13:53:20
25     Q.   Okay.  So was it the case              13:53:21

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 that -- well, did you ever receive this 13:53:24
2 correspondence from Mr. Rannazzisi prior to 13:53:27
3 the 2007 Buzzeo conference? 13:53:31
4 A. No. 13:53:34
5 Q. Okay. In going back to the ten 13:53:35
6 instances in which you recall in which a 13:53:46
7 suspicious order was identified, certainly 13:53:50
8 it's more than one, but I just want to make 13:53:52
9 sure I understand. 13:53:56
10 Did you say approximately ten, 13:53:56
11 or do you think it was ten or less? 13:53:58
12 A. Ten or less. 13:53:59
13 Q. Ten or less. 13:54:00
14 And do you recall if it was 13:54:01
15 five, or where in the spectrum between one 13:54:03
16 and ten? 13:54:06
17 A. I'm sorry, I can't recall. I 13:54:07
18 really can't recall. 13:54:09
19 Q. Would it be fair to say, 13:54:09
20 relative to all the peculiar orders that you 13:54:11
21 had reported to you on a monthly basis to the 13:54:13
22 DEA, that the identification of a suspicious 13:54:16
23 order was extremely rare given that number? 13:54:19
24 MR. O'CONNOR: Objection to 13:54:22
25 form. 13:54:22

Page 239

1 THE WITNESS: If we can say 13:54:22
2 extremely rare was a low percentage, 13:54:24
3 if you don't mind that term, yes. 13:54:26
4 Yes. 13:54:28
5 QUESTIONS BY MR. KO: 13:54:29
6 Q. Well, in these peculiar -- 13:54:29
7 these monthly peculiar order reports that Jim 13:54:30
8 Rausch was sending to the DEA, did you have 13:54:33
9 any understanding of how many orders were 13:54:35
10 included in that report? 13:54:36
11 A. I did not. 13:54:38
12 Q. Okay. There were quite a few, 13:54:40
13 weren't there? 13:54:42
14 MR. O'CONNOR: Objection to 13:54:43
15 form. 13:54:44
16 THE WITNESS: I don't know if 13:54:44
17 this was the report that included the 13:54:47
18 dosage form orders out of Hobart or if 13:54:51
19 this was a separate report that Jim 13:54:54
20 Rausch was sending for the bulk API 13:54:55
21 orders. 13:55:00
22 QUESTIONS BY MR. KO: 13:55:00
23 Q. Fair enough. 13:55:00
24 Well, regardless of whether or 13:55:01
25 not we can clarify that distinction, you do 13:55:05

Page 240

1 agree with me that the actual amount of 13:55:07
2 suspicious orders that were reported to the 13:55:09
3 DEA prior to 2007 was a very low percentage 13:55:10
4 relative to all peculiar orders reported to 13:55:16
5 the DEA, correct? 13:55:18
6 MR. O'CONNOR: Objection to 13:55:19
7 form. 13:55:19
8 THE WITNESS: Yes, correct. 13:55:19
9 QUESTIONS BY MR. KO: 13:55:20
10 Q. Okay. We can set this one 13:55:21
11 aside. 13:55:29
12 (Mallinckrodt-Harper Exhibit 10 13:55:29
13 marked for identification.) 13:55:30
14 QUESTIONS BY MR. KO: 13:55:30
15 Q. Want to now turn your attention 13:55:30
16 to what's going to be marked as exhibit -- 13:55:31
17 Harper Exhibit 10. 13:55:33
18 And for the record, this 13:55:39
19 document ends in Bates 7146630. 13:55:40
20 And this appears to be -- if 13:55:56
21 you look at the bottom e-mail on the first 13:55:57
22 page, there's a reference made to an e-mail 13:56:00
23 you send to several people on January 4, 13:56:04
24 2008? 13:56:09
25 Do you see that? 13:56:09

Page 241

1 A. Yes. 13:56:10
2 Q. Any reason to dispute -- or any 13:56:11
3 reason to dispute whether or not you sent 13:56:14
4 this letter -- or e-mail? 13:56:16
5 A. No. 13:56:18
6 Q. Okay. And on this particular 13:56:19
7 e-mail, you are attaching another memo/DEA 13:56:24
8 guidance letter; is that correct? 13:56:31
9 A. Yes. 13:56:33
10 Q. And this is separate and apart 13:56:34
11 from the prior Rannazzisi letter that we 13:56:39
12 discussed. This appears to be another one, 13:56:41
13 dated December 27, 2007, correct? 13:56:43
14 A. Correct. 13:56:46
15 Q. And you received this -- you 13:56:46
16 actually received this correspondence, 13:56:49
17 correct? 13:56:51
18 A. Correct. 13:56:51
19 Q. Directly from Mr. Rannazzisi? 13:56:51
20 A. Yes. 13:56:54
21 Q. Okay. And turning back to 13:56:55
22 the -- to your e-mail, you indicate that the 13:57:00
23 guidance letter or the memo as referred to in 13:57:08
24 this e-mail that you received on January 4, 13:57:12
25 2000-A -- 2008 targets manufacturers as well 13:57:15

Page 242

```
 1   as distributors in terms of suspicious order   13:57:20
 2   monitoring obligations.                        13:57:23
 3          Did I read that correctly?              13:57:23
 4   A.   Yes.                                      13:57:24
 5   Q.   So is it fair to say that as of           13:57:24
 6   January 4, 2008, you understand that the DEA   13:57:28
 7   expected compliance with the standards set     13:57:31
 8   forth in this letter?  Correct?                13:57:35
 9          MR. O'CONNOR:  Objection to             13:57:36
10      form.                                       13:57:36
11          THE WITNESS:  So these aren't           13:57:36
12      regulations.  It's a guidance.              13:57:39
13   QUESTIONS BY MR. KO:                           13:57:40
14   Q.   Sure.                                     13:57:41
15   A.   So, yes, we understood that               13:57:41
16   this was additional guidance on SOM.           13:57:43
17   Q.   And my question was whether or            13:57:46
18   not you understood that as of January 4,       13:57:49
19   2008, you understood that the DEA expected     13:57:52
20   compliance with the standards set forth in     13:57:56
21   that letter.                                   13:57:58
22          MR. O'CONNOR:  Objection to             13:57:59
23      form.                                       13:57:59
24          THE WITNESS:  No.                       13:57:59
25
```

Page 243

```
 1   QUESTIONS BY MR. KO:                           13:58:00
 2   Q.   So you believed that the things           13:58:00
 3   set forth in this letter you did not           13:58:02
 4   necessarily have to comply with?               13:58:04
 5   A.   No.                                       13:58:06
 6   Q.   Okay.  You believe you did not            13:58:06
 7   have to comply with -- with the instructions   13:58:09
 8   as sent out by Mr. Rannazzisi on...            13:58:14
 9   A.   So this is another guidance               13:58:18
10   meant for industry which we attempted to       13:58:20
11   incorporate into our program.  But this was    13:58:23
12   not -- it quotes the regulations, but this     13:58:27
13   was not promulgated in CFR 21.                 13:58:30
14   Q.   I understand that and I -- I              13:58:34
15   very clearly under the distinction that        13:58:35
16   you're trying to make, and my question simply  13:58:37
17   was whether or not you believed you were       13:58:39
18   expected to comply with the instructions set   13:58:42
19   forth in that letter.                          13:58:45
20          MR. O'CONNOR:  Same objection.          13:58:45
21          THE WITNESS:  Yes.                      13:58:46
22   QUESTIONS BY MR. KO:                           13:58:51
23   Q.   All right.  You certainly did             13:58:51
24   not want to follow -- or you certainly         13:58:52
25   believed that Mallinckrodt could not follow    13:58:54
```

Page 244

```
 1   the instructions set forth in that letter,     13:58:56
 2   correct?                                       13:58:58
 3          MR. O'CONNOR:  Objection to             13:58:58
 4      form.                                       13:58:59
 5          THE WITNESS:  Could you please          13:58:59
 6      repeat that question?  I'm sorry.           13:59:01
 7   QUESTIONS BY MR. KO:                           13:59:02
 8   Q.   Sure.                                     13:59:03
 9          You certainly believed that             13:59:03
10   Mallinckrodt could not follow the              13:59:07
11   instructions set forth in that letter,         13:59:10
12   correct?                                       13:59:12
13          MR. O'CONNOR:  Objection to             13:59:13
14      form.                                       13:59:13
15          THE WITNESS:  I did not believe         13:59:13
16      that.                                       13:59:14
17   QUESTIONS BY MR. KO:                           13:59:14
18   Q.   Right.                                    13:59:15
19          You believed that Mallinckrodt          13:59:15
20   should follow the instructions set forth in    13:59:17
21   that letter, correct?                          13:59:19
22   A.   Correct.                                  13:59:20
23   Q.   Thank you.                                13:59:21
24   A.   Yes.                                      13:59:22
25   Q.   That was an inartful question             13:59:22
```

Page 245

```
 1   by me.  I apologize.                           13:59:24
 2          Now, going back to the bottom           13:59:26
 3   of that first page, you also reference         13:59:37
 4   another -- well, you reference a Federal       13:59:41
 5   Register Notice.                               13:59:41
 6          Do you see that?                        13:59:44
 7   A.   Yes.                                      13:59:44
 8   Q.   72 FR 36487.                              13:59:44
 9          And I believe that's a                  13:59:51
10   reference to the Southwood Federal Register    13:59:51
11   Notice that we discussed earlier today,        13:59:53
12   correct?                                       13:59:55
13   A.   Yes, it is.                               13:59:55
14   Q.   Okay.  So again, as of January            13:59:57
15   4, 2008, you understood that the DEA was       13:59:59
16   instructing you to read, review and follow     14:00:05
17   the guidelines set forth in that Federal       14:00:11
18   Register Notice, correct?                      14:00:13
19          MR. O'CONNOR:  Objection to             14:00:14
20      form.                                       14:00:14
21          THE WITNESS:  So this is a              14:00:14
22      guidance, and it referenced                 14:00:16
23      Southwood's, and Southwood's was the        14:00:18
24      relationship from a distributor to the      14:00:22
25      pharmacy.  And we sell to                   14:00:23
```

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    distributors, not directly to          14:00:24
2    pharmacies.                            14:00:26
3    QUESTIONS BY MR. KO:                   14:00:26
4        Q.   And I understand the          14:00:26
5    distinction being made, but there were  14:00:28
6    certain statements made in Southwood,   14:00:30
7    correct, as we discussed earlier?      14:00:32
8        A.   Yes.                          14:00:33
9        Q.   And it was your understanding  14:00:33
10   that there were certain principles to follow  14:00:36
11   as a result of the statements set forth in  14:00:42
12   Southwood, or did you believe that you did  14:00:43
13   not have to follow those?              14:00:45
14        MR. O'CONNOR:  Objection to       14:00:46
15   form.                                  14:00:47
16        THE WITNESS:  Certain             14:00:47
17   principles, yes.                       14:00:48
18   QUESTIONS BY MR. KO:                   14:00:49
19        Q.   So in other words, there were  14:00:49
20   certain principles that you believe you had  14:00:50
21   to follow as a result of the Southwood  14:00:52
22   Federal Register Notice, correct?      14:00:54
23        MR. O'CONNOR:  Objection.         14:00:55
24   Form.                                  14:00:55
25        THE WITNESS:  Yes.  Correct.      14:00:55

Page 247

1    QUESTIONS BY MR. KO:                   14:00:57
2        Q.   So the letters that you had   14:01:06
3    received from Mr. Rannazzisi, as we described  14:01:07
4    were the Rannazzisi letters, just so the  14:01:11
5    record is clear, those are two letters that  14:01:13
6    you became aware of sometime in the 2007,  14:01:16
7    2008 time period?                      14:01:19
8        A.   Yes.                          14:01:20
9        MR. O'CONNOR:  Objection to        14:01:21
10   form.                                  14:01:22
11   QUESTIONS BY MR. KO:                   14:01:22
12        Q.   And it's your testimony that  14:01:22
13   you only received directly the e-mail -- or  14:01:23
14   the letter reflected in Exhibit 10 directly,  14:01:27
15   correct?                               14:01:30
16        A.   Correct.                     14:01:31
17        Q.   Okay.  And in connection with  14:01:33
18   revising and improving Mallinckrodt's SOM  14:01:37
19   program, is one of the reasons for improving  14:01:40
20   the SOM program a result of reading these  14:01:44
21   letters?                               14:01:49
22        MR. O'CONNOR:  Objection.         14:01:49
23        THE WITNESS:  Yes.                14:01:50
24   QUESTIONS BY MR. KO:                   14:01:53
25        Q.   Okay.  Thank you.  You can set  14:01:54

Page 248

1    that aside.                            14:01:56
2        Actually, sorry, there was one     14:01:57
3    more question, but maybe you don't need to  14:02:09
4    consult with that actual exhibit.      14:02:12
5        Do you know who Kyle Wright is?     14:02:13
6        A.   Yes.                          14:02:15
7        Q.   He was at DEA, correct?       14:02:17
8        A.   Yes.                          14:02:19
9        Q.   And do you recall meeting with  14:02:20
10   him at various DEA meetings or conferences?  14:02:25
11        A.   Yes.                         14:02:28
12        Q.   And did you meet with him prior  14:02:29
13   to or after the receipt of that e-mail, or do  14:02:33
14   you not recall?                        14:02:36
15        A.   I do not recall.             14:02:37
16        Q.   Do you recall meeting with him  14:02:38
17   in the 2011 time period?               14:02:39
18        A.   I'm sorry, I remember meeting  14:02:40
19   with him at a conference, but not the date.  14:02:42
20        Q.   Sure.                        14:02:44
21        And do you recall the substance    14:02:47
22   of the conversation you had with Mr. Wright?  14:02:51
23        A.   Yes.                         14:02:53
24        Q.   And what was the substance of  14:02:55
25   the conversation you had with him?     14:02:57

Page 249

1        A.   He had been speaking from the  14:02:58
2    podium about suspicious order monitoring, and  14:03:01
3    I asked to speak to him during a breakout  14:03:06
4    session to talk about the attributes of our  14:03:09
5    program.                               14:03:11
6        Q.   Okay.  And I believe we have   14:03:12
7    some documentation about that, so we'll cover  14:03:15
8    that later.                            14:03:17
9        But other than that particular      14:03:18
10   conversation you had with him, do you recall  14:03:21
11   any other meetings or conversations you had  14:03:23
12   with Mr. Wright?                       14:03:24
13        A.   I'm not certain if he was at a  14:03:26
14   subsequent meeting at DEA in 2011.  I can't  14:03:31
15   recall if he was in attendance.        14:03:35
16        Q.   Okay.  Fair enough.          14:03:36
17        (Mallinckrodt-Harper Exhibit 11    14:03:42
18   marked for identification.)            14:04:00
19   QUESTIONS BY MR. KO:                   14:04:00
20        Q.   I'm going to hand you a copy of  14:03:38
21   what has been marked as Harper Exhibit 11.  14:03:40
22        A.   Uh-huh.                      14:03:40
23        Q.   And for the record, this      14:04:00
24   exhibit ends in Bates 301994, and it appears  14:04:04
25   to be an e-mail chain between you and Jim  14:04:12

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  Rausch from April 21, 2008.          14:04:14
2        Do you see that?          14:04:19
3    A.   Yes.          14:04:19
4    Q.   And in this e-mail chain, I      14:04:20
5  believe you're asking what the algorithm --   14:04:24
6  you're asking Mr. Rausch what the algorithm    14:04:29
7  is to determine orders of excessive quantity,   14:04:31
8  frequency or outside of the normal pattern;    14:04:36
9  is that correct?          14:04:38
10   A.   Yes.          14:04:38
11   Q.   And in particular -- I said     14:04:39
12 "algorithm," but you specifically asked what    14:04:43
13 the current equation is, correct?       14:04:45
14   A.   Yes.          14:04:47
15   Q.   And he responds that "the      14:04:48
16 metric is 2X the previous fiscal year and    14:04:52
17 year-to-date average for a SKU and customer."  14:04:56
18        MR. O'CONNOR:  Objection to    14:05:00
19   form.          14:05:04
20 QUESTIONS BY MR. KO:          14:05:04
21   Q.   Well, let me just make sure the  14:05:05
22 record is clear.          14:05:06
23        His response to your question    14:05:06
24 is, quote, "Any order quantity that is double   14:05:08
25 the previous fiscal year and YTD" -- in other  14:05:09

Page 251

1  words, year-to-date -- "average for a SKU and  14:05:13
2  customer."          14:05:15
3        Did I read that correctly?      14:05:16
4    A.   Yes.          14:05:16
5    Q.   Okay.  And so does this refresh   14:05:17
6  your recollection that in the April 2008 time  14:05:21
7  period, the algorithm that you were using for  14:05:23
8  the peculiar order threshold was 2X the      14:05:24
9  previous fiscal year?          14:05:26
10   A.   Yes.          14:05:27
11   Q.   Okay.  And at that time, it's    14:05:28
12 also fair to say based on this e-mail that    14:05:30
13 you didn't actually know until Jim responded   14:05:32
14 what the formula actually was?          14:05:35
15        MR. O'CONNOR:  Objection to    14:05:36
16   form.          14:05:38
17        THE WITNESS:  That's not       14:05:38
18   correct.          14:05:39
19 QUESTIONS BY MR. KO:          14:05:39
20   Q.   Well, why did you ask him then?  14:05:40
21   A.   Because I asked the current     14:05:42
22 equation.  It had moved from 1.5 to 3 to 2.   14:05:44
23 It moved around.          14:05:47
24   Q.   Right.          14:05:48
25   A.   The multiplier.  So I asked him  14:05:48

Page 252

1  what the current one is --          14:05:50
2    Q.   Sure.          14:05:52
3    A.   -- at that time.          14:05:52
4    Q.   I see what you're saying.       14:05:52
5    A.   Okay.          14:05:54
6    Q.   And so my question was simply:   14:05:54
7  At the time of this e-mail, you did not know   14:05:56
8  the then current equation to determine a    14:05:59
9  peculiar order, correct?          14:06:02
10   A.   That's correct.          14:06:03
11   Q.   And based on your e-mail, you    14:06:04
12 had thought that perhaps it was just a 1.2    14:06:07
13 metric?          14:06:09
14        MR. O'CONNOR:  Objection to    14:06:11
15   form.          14:06:12
16        THE WITNESS:  Yes.          14:06:12
17 QUESTIONS BY MR. KO:          14:06:13
18   Q.   All right.  Okay.          14:06:14
19        And just, again, to be clear,    14:06:17
20 this -- this e-mail talks about an excessive   14:06:19
21 quantity calculation.  That's the title of    14:06:22
22 the e-mail, right?          14:06:25
23   A.   Yes.          14:06:26
24   Q.   And Mallinckrodt's then system   14:06:27
25 to determine whether or not an order was of   14:06:36

Page 253

1  an excessive quantity, frequency or outside   14:06:39
2  of normal pattern was to use the 2X metric    14:06:42
3  that we've been describing today; is that    14:06:45
4  correct?          14:06:47
5    A.   Yes.          14:06:47
6    Q.   Okay.  You can set that aside.   14:06:49
7        Now, the date of this e-mail is  14:07:02
8  April 21, 2008, correct?          14:07:03
9    A.   Yes, correct.          14:07:05
10   Q.   And that's approximately three   14:07:07
11 and a half months after you received       14:07:08
12 notification from the DEA, and in particular  14:07:10
13 the second Rannazzisi letter, correct?       14:07:14
14   A.   Yes.          14:07:17
15   Q.   So is it fair to say that it     14:07:17
16 took you three and a half months to ask     14:07:18
17 Mr. Rausch what your then existing peculiar   14:07:21
18 order algorithm metric was?          14:07:24
19        MR. O'CONNOR:  Objection to    14:07:26
20   form.          14:07:27
21        THE WITNESS:  We were rewriting  14:07:27
22   the policies in the systems and      14:07:29
23   procedures, and, yes, I did not know   14:07:31
24   it by heart.  So there was a reference  14:07:32
25   made, and I wanted to detail it in the  14:07:34

Highly Confidential - Subject to Further Confidentiality Review

Page 254

```
1    procedure.                    14:07:36
2    QUESTIONS BY MR. KO:           14:07:36
3        Q.   Okay.  Thank you for that.   14:07:36
4            And I was just asking whether   14:07:37
5    or not you agree with the fact that it took   14:07:41
6    you three and a half months after receiving   14:07:43
7    the second Rannazzisi letter directed at   14:07:45
8    manufacturers to ask Mr. Rausch what the then   14:07:50
9    existing peculiar order algorithm was.   14:07:59
10           MR. O'CONNOR:  Objection.   14:08:01
11       Form.                       14:08:03
12           THE WITNESS:  Yes.      14:08:03
13   QUESTIONS BY MR. KO:           14:08:03
14       Q.   Okay.  Thank you.  You can set   14:08:03
15   that one aside.                 14:08:16
16           And I think -- or excuse me, I   14:08:18
17   will hand you a copy of what's previously   14:08:19
18   been marked as Exhibit 1 to the Stewart   14:08:21
19   deposition.                     14:08:24
20           MR. KO:  And for the record,   14:08:26
21       this document ends in Bates 299558.   14:08:27
22   QUESTIONS BY MR. KO:           14:08:27
23       Q.   Sorry to jump around, but going   14:08:42
24   back to the previous line of questioning, do   14:08:43
25   you recall why it took you three and a half   14:08:48
```

Page 255

```
1    months to ask for the existing algorithm?   14:08:50
2            MR. O'CONNOR:  Objection to   14:08:52
3        form.                       14:08:54
4            THE WITNESS:  I was writing the   14:08:54
5        procedure, and I wanted to document.   14:08:56
6        I knew the algorithm existed; I just   14:08:57
7        did not know the multiplier.   14:08:59
8    QUESTIONS BY MR. KO:           14:09:00
9        Q.   Okay.  And when you say you   14:09:00
10   were "writing the procedure," what are you   14:09:03
11   talking about?                  14:09:05
12       A.   I'm documenting the process   14:09:05
13   flow for our suspicious order monitoring   14:09:09
14   program within Mallinckrodt.    14:09:11
15       Q.   Okay.  And that's reflected in   14:09:12
16   a policy, where I think we'll have a copy of it   14:09:13
17   that we can show you, but it's the actual   14:09:16
18   policy of identifying -- company policy of   14:09:18
19   identifying a suspicious order, correct?   14:09:23
20       A.   Yes.                    14:09:24
21           MR. O'CONNOR:  Objection to   14:09:26
22       form.                       14:09:26
23   QUESTIONS BY MR. KO:           14:09:26
24       Q.   All right.  Now, turning back   14:09:27
25   to this document, this appears to be an   14:09:27
```

Page 256

```
1    e-mail chain between you -- well, excuse me.   14:09:32
2            It's an e-mail chain involving   14:09:35
3    Mr. Ratliff and Mr. Rausch in which you are   14:09:40
4    also a recipient, dated April 1, 2008; is   14:09:42
5    that correct?                   14:09:46
6        A.   Yes.                    14:09:46
7        Q.   And earlier we had spoken about   14:09:48
8    Pete Kleissle of the DEA, and you recall   14:09:58
9    meeting him sometime in 2010, correct?   14:10:01
10       A.   Yes.                    14:10:04
11       Q.   And it appears here that   14:10:05
12   Mr. Kleissle has had some interactions with   14:10:06
13   Mr. Ratliff and Mr. Rausch as well, correct?   14:10:09
14       A.   I believe directly with   14:10:11
15   Mr. Ratliff, who was passing on the   14:10:15
16   information to Jim Rausch.       14:10:17
17       Q.   Okay.  And it was also your   14:10:18
18   understanding that Mr. Rat -- or excuse me,   14:10:20
19   Mr. Rausch was sending monthly reports to   14:10:23
20   Mr. Kleissle at DEA --          14:10:27
21       A.   Yes.                    14:10:29
22       Q.   -- prior to this time, correct?   14:10:30
23       A.   Yes.                    14:10:31
24       Q.   And those were the peculiar   14:10:31
25   order reports that we were discussing   14:10:32
```

Page 257

```
1    previously, correct?            14:10:33
2        A.   Yes.                    14:10:34
3        Q.   Now, in response to receiving   14:10:36
4    those monthly reports, Mr. Ratliff reports a   14:10:38
5    conversation that he had with Mr. Kleissle   14:10:45
6    about them; is that correct?    14:10:48
7        A.   Correct.                14:10:49
8        Q.   In particular, Mr. Ratliff   14:10:52
9    says, "Pete Kleissle, DEA diversion group   14:10:56
10   supervisor, St. Louis, just called regarding   14:10:58
11   several letters he has received from you   14:11:02
12   detailing suspicious orders."   14:11:04
13           Did I read that correctly?   14:11:07
14       A.   Yes.                    14:11:07
15       Q.   He goes on to say, "He advised   14:11:09
16   that he needs more information in that if it   14:11:12
17   is suspicious, why are we filling the order.   14:11:14
18   I explained that we use a calculation based   14:11:17
19   upon an amount previously ordered.  He   14:11:19
20   stated, 'If you think it is suspicious, don't   14:11:23
21   fill it.'  I will go into more detail on   14:11:26
22   Friday."                        14:11:30
23           Did I read that correctly?   14:11:30
24       A.   Yes.                    14:11:31
25       Q.   Now, we had discussed earlier   14:11:32
```

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  today about instances in which Mallinckrodt    14:11:38
2  was shipping a peculiar order before making    14:11:42
3  any kind of due diligence determination.    14:11:46
4      Do you recall that testimony?    14:11:49
5  A.  Yes, there was a short period    14:11:50
6  of time, yes.  There was a period of time.    14:11:52
7  Q.  Okay.  And this seems to    14:11:54
8  reflect that practice; is that fair to say?    14:11:57
9      MR. O'CONNOR:  Objection to    14:12:02
10  form.    14:12:03
11      THE WITNESS:  No, not -- no, it    14:12:03
12  does not.    14:12:08
13  QUESTIONS BY MR. KO:    14:12:08
14  Q.  Okay.  Well, Mr. Kleissle is    14:12:08
15  concerned about -- Mr. Kleissle is concerned,    14:12:10
16  is he not, about the fact that Mallinckrodt    14:12:14
17  is actually filling orders --    14:12:17
18      MR. O'CONNOR:  Objection.    14:12:19
19  QUESTIONS BY MR. KO:    14:12:19
20  Q.  -- that appear on the peculiar    14:12:19
21  order report?    14:12:20
22      MR. O'CONNOR:  Objection to    14:12:21
23  form.    14:12:21
24      THE WITNESS:  My understanding    14:12:21
25  of this instruction is, if it's    14:12:23

Page 259

1  suspicious, do not report it and don't    14:12:25
2  ship it.  But if you're going to ship    14:12:28
3  it, it's not suspicious.    14:12:30
4  QUESTIONS BY MR. KO:    14:12:32
5  Q.  Okay.  Well --    14:12:33
6  A.  Sorry.  Sorry.    14:12:34
7  Q.  No, it's okay.  We'll try to    14:12:35
8  unpack that in a moment.    14:12:36
9  A.  Okay.    14:12:37
10  Q.  But he does say, "If you think    14:12:37
11  it is suspicious, don't fill it," correct?    14:12:40
12  A.  Yes.    14:12:42
13  Q.  Okay.  And he also is advising    14:12:43
14  that he needs more information based on the    14:12:48
15  peculiar order reports that Mr. Rausch --    14:12:55
16  Mr. Rausch is sending to him; is that fair to    14:12:57
17  say?    14:12:59
18  A.  Yes.    14:12:59
19  Q.  Okay.  So as of the date of    14:13:01
20  this e-mail, is it fair to say that    14:13:03
21  Mallinckrodt knew from the DEA that they    14:13:05
22  needed more information on the monthly    14:13:09
23  reports that they were sending to DEA?    14:13:11
24      MR. O'CONNOR:  Objection to    14:13:13
25  form.    14:13:14

Page 260

1      THE WITNESS:  Yes.    14:13:14
2  QUESTIONS BY MR. KO:    14:13:14
3  Q.  Okay.  And in response to    14:13:15
4  Mr. Ratliff's e-mail, Mr. Rausch says, "Bill,    14:13:22
5  okay.  I think we just sent the monthly one    14:13:28
6  out yesterday, so maybe that's the one he    14:13:30
7  just got.  We won't send out any more."    14:13:32
8      Did I read that correctly?    14:13:35
9  A.  Yes.    14:13:35
10  Q.  So as of the date of this    14:13:37
11  e-mail, it appears that Mr. Rausch is no    14:13:40
12  longer going to send the peculiar order    14:13:45
13  reports on to DEA; is that accurate?    14:13:46
14  A.  Yes.    14:13:49
15  Q.  And did you agree with that    14:13:50
16  practice?    14:13:51
17  A.  Yes.    14:13:52
18  Q.  Okay.  And you agreed with that    14:13:55
19  because you were going to revamp and improve    14:13:56
20  your SOM program, correct?    14:14:02
21  A.  Yes.    14:14:03
22  Q.  You can set that one aside.    14:14:04
23      Actually, I take that back.    14:14:37
24  Sorry to jump around again.    14:14:39
25  A.  No worries.    14:14:40

Page 261

1  Q.  But can you grab that document    14:14:41
2  again?    14:14:44
3  A.  Is this number 1?    14:14:44
4  Q.  Yes.    14:14:44
5  A.  Stewart?    14:14:46
6  Q.  Stewart Exhibit 1.    14:14:48
7  A.  All right.  Yes, I have it.    14:14:50
8  Q.  And Mr. Ratliff indicates to    14:14:50
9  the recipients of this e-mail, including you,    14:14:57
10  that "I advised that we have a conference    14:15:00
11  call planned with Frank Sapienza on Friday to    14:15:04
12  strengthen our suspicious order    14:15:07
13  identification system."    14:15:10
14      Did I read that correctly?    14:15:10
15  A.  Yes.    14:15:12
16  Q.  So do you agree -- do you agree    14:15:12
17  with Bill's sentiment at that time that your    14:15:13
18  suspicious order monitoring system needed to    14:15:17
19  be strengthened?    14:15:20
20      MR. O'CONNOR:  Objection to    14:15:21
21  form.    14:15:22
22      THE WITNESS:  No.    14:15:22
23  QUESTIONS BY MR. KO:    14:15:22
24  Q.  You did not believe it needed    14:15:22
25  to be strengthened?    14:15:24

Highly Confidential - Subject To Further Confidentiality Review

Page 262

1    A.    Semantics. I believe it needed    14:15:25
2  to be enhanced, but I would not have used the    14:15:27
3  word "strengthen."    14:15:29
4    Q.    Okay. So as of April 1, 2008,    14:15:31
5  you believed that Mallinckrodt's suspicious    14:15:34
6  order monitoring program needed to be    14:15:37
7  enhanced?    14:15:38
8    A.    Yes.    14:15:38
9    Q.    Okay. You can set that one    14:15:39
10  aside.    14:15:42
11    I'm now going to hand you a    14:15:53
12  copy of what will be marked as Harper    14:15:55
13  Exhibit 12.    14:15:57
14    MR. KO: For the record, this    14:15:58
15  is -- ends in Bates stamp 419907.    14:15:58
16    (Mallinckrodt-Harper Exhibit 12    14:16:01
17  marked for identification.)    14:16:02
18  QUESTIONS BY MR. KO:    14:16:02
19    Q.    And this is an e-mail chain in    14:16:21
20  which you are involved in in the late April    14:16:24
21  to early May 2008 time period; is that    14:16:27
22  correct?    14:16:35
23    A.    Yes.    14:16:35
24    Q.    And do you have any reason to    14:16:36
25  doubt that you sent and received the e-mails    14:16:39

Page 263

1  reflected in this exhibit?    14:16:43
2    A.    No.    14:16:44
3    Q.    Okay. And at the very bottom    14:16:45
4  of the first page of the exhibit -- the first    14:16:47
5  page.    14:16:54
6    A.    Oh, I'm terribly sorry.    14:16:55
7    Q.    That's okay.    14:16:57
8    -- you indicate that on    14:16:58
9  April 23, 2008, you attended a meeting to    14:16:59
10  discuss -- or sorry, you attended a meeting    14:17:01
11  of the Midwest Controlled Substance    14:17:03
12  Discussion Group in Chicago.    14:17:05
13    Do you see that?    14:17:06
14    A.    Yes.    14:17:07
15    Q.    And that was one of the    14:17:07
16  industry groups involving manufacturers that    14:17:09
17  you had referenced earlier today?    14:17:11
18    A.    Yes.    14:17:12
19    Q.    And one of the agenda items was    14:17:13
20  suspicious order monitoring, correct?    14:17:18
21    A.    Yes.    14:17:19
22    Q.    And there is reference made to    14:17:19
23  DEA advice that one member of the industry    14:17:28
24  received.    14:17:31
25    Do you see that?    14:17:31

Page 264

1    A.    Yes.    14:17:32
2    Q.    And the DEA advice that our    14:17:33
3  member received was that the DEA expected    14:17:37
4  registrants to know their customer, correct?    14:17:41
5    A.    Correct.    14:17:44
6    Q.    And I want to focus on the    14:17:44
7  portion of your e-mail in which you say that    14:17:48
8  "The DEA advice includes comparing" -- quote,    14:17:54
9  "Compare that activity to a bank's obligation    14:17:59
10  to report $10,000 transactions to law    14:18:01
11  enforcement for detection and money    14:18:03
12  laundering while having the ability to detect    14:18:05
13  multiple transactions at $9,999."    14:18:08
14    Did I read that correctly?    14:18:14
15    A.    Yes.    14:18:14
16    Q.    Is it a fair interpretation of    14:18:16
17  what you're saying here that it's important    14:18:21
18  for registrants to not just know about orders    14:18:22
19  that are actually suspicious and violate DEA    14:18:27
20  regulations or statutes, but also to    14:18:33
21  determine whether or not there are other    14:18:37
22  orders that could potentially violate such    14:18:38
23  duties and statutes under the CSA?    14:18:42
24    MR. O'CONNOR: Objection to    14:18:43
25  form.    14:18:44

Page 265

1    THE WITNESS: My interpretation    14:18:44
2  of the comment is that the suspicious    14:18:46
3  order monitoring system should detect    14:18:48
4  orders that are causing uplift -- or    14:18:51
5  the algorithm to flag for unusual    14:18:56
6  pattern, size or frequency, but also    14:18:58
7  those that come in by other --    14:19:00
8  analysis come in just under those    14:19:06
9  metrics.    14:19:07
10  QUESTIONS BY MR. KO:    14:19:07
11    Q.    So ones that could potentially    14:19:08
12  be suspicious and ones that could potentially    14:19:09
13  trigger your algorithm, correct?    14:19:12
14    MR. O'CONNOR: Objection.    14:19:12
15  Form.    14:19:13
16    THE WITNESS: Yes. Cause for    14:19:13
17  further review, yes.    14:19:16
18  QUESTIONS BY MR. KO:    14:19:18
19    Q.    All right. So in other words,    14:19:18
20  you would agree with me that an effective SOM    14:19:21
21  program would not simply just identify actual    14:19:25
22  orders that are suspicious but orders that    14:19:29
23  come -- using your words, that come close to    14:19:32
24  being suspicious as well, correct?    14:19:37
25    MR. O'CONNOR: Objection to    14:19:38

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  form.                        14:19:39
2       THE WITNESS:  That was the        14:19:39
3  advice given by this member of       14:19:40
4  industry, yes.               14:19:41
5  QUESTIONS BY MR. KO:           14:19:42
6       Q.   And then regardless of the     14:19:42
7  advice given by the member of the industry,   14:19:43
8  is it your opinion that an effective SOM      14:19:45
9  program would both flag actual suspicious    14:19:47
10 orders and those that come close to being a   14:19:50
11 suspicious order?            14:19:52
12      MR. O'CONNOR:  Objection to       14:19:52
13 form.                       14:19:54
14      THE WITNESS:  Not necessarily,    14:19:54
15 no.                         14:19:55
16 QUESTIONS BY MR. KO:           14:19:55
17      Q.   Okay.  So you don't -- you    14:19:56
18 didn't -- you didn't agree with the DEA      14:19:58
19 advice that was being given?         14:19:59
20      A.   So this is a person at a      14:20:00
21 conference making a comparison, and it was,   14:20:04
22 again, another suggestion.  But we understood  14:20:07
23 that we were still refining our algorithm at   14:20:11
24 the time to detect orders of unusual pattern,  14:20:15
25 size and frequency, not necessarily those     14:20:20

Page 267

1  that meet the suggestion.        14:20:23
2       Q.   Understood.             14:20:25
3            And you're right, that is the   14:20:26
4  fundamental duty at the end of the day.  You   14:20:29
5  were working -- it's correct that at this     14:20:32
6  time you were working on an algorithm to     14:20:33
7  detect orders of unusual pattern, size and    14:20:35
8  frequency, correct?          14:20:42
9       A.   Yes.                  14:20:43
10      Q.   Okay.  You can set that one    14:20:43
11 aside.                      14:20:53
12      (Mallinckrodt-Harper Exhibit 13   14:21:15
13 marked for identification.)        14:21:15
14 QUESTIONS BY MR. KO:           14:21:15
15      Q.   Now, you said previously that    14:21:24
16 you recall attending the Buzzeo conferences   14:21:25
17 in certain years when you were senior manager  14:21:27
18 of controlled substance compliance group,     14:21:29
19 correct?                    14:21:32
20      A.   Yes.                  14:21:32
21      Q.   And do you recall attending in   14:21:33
22 2007 and 2008?               14:21:35
23      A.   I don't -- I can't recall the   14:21:37
24 dates.                      14:21:39
25      Q.   I'll hand you a copy of what   14:21:40

Page 268

1  has been marked as Harper Exhibit 13.    14:21:52
2       For the record, this e-mail       14:21:58
3  chain ends in Bates 302096.        14:22:00
4            And this is an e-mail dated    14:22:11
5  November 4, 2008, from Cathy Stewart to      14:22:13
6  several people, including you, correct?      14:22:15
7       A.   Correct.               14:22:17
8       Q.   And they appear to attach notes   14:22:17
9  that she took at a conference she attended,    14:22:20
10 and I believe that is the Buzzeo conference;   14:22:24
11 is that correct?             14:22:26
12      A.   Yes.                  14:22:26
13      Q.   Does this refresh your         14:22:27
14 recollection as to whether or not you        14:22:29
15 attended this particular conference as well?   14:22:30
16      A.   Yes.                  14:22:32
17      Q.   And did you in fact attend this   14:22:33
18 conference with Ms. Stewart?        14:22:35
19      A.   Yes.                  14:22:35
20      Q.   Okay.  And she indicates in her   14:22:36
21 e-mail to you that "A lot of energy is being   14:22:42
22 focused on suspicious order monitoring."      14:22:46
23      Do you see that?            14:22:50
24      A.   Oh, yes.  Yes, I do.          14:22:51
25      Q.   And do you recall that at       14:22:54

Page 269

1  this -- during this Buzzeo conference in     14:22:56
2  late -- or fall of 2008 that there was in     14:23:01
3  fact a lot of attention being given to       14:23:03
4  suspicious order monitoring?        14:23:08
5       A.   Yes.                  14:23:08
6       Q.   Okay.  And she also indicates    14:23:09
7  in the second sentence of the second         14:23:17
8  paragraph -- you know, I've been talking      14:23:21
9  quite a bit, so I'll let you -- if you don't   14:23:25
10 mind, do you want to read that second        14:23:28
11 sentence?                    14:23:29
12      A.   The second sentence of the       14:23:29
13 second paragraph?            14:23:30
14      Q.   Yeah.                  14:23:30
15      A.   "Other highlights, i.e., more    14:23:31
16 intensive focus on carriers, are provided as   14:23:34
17 a heads-up that this is on its way."         14:23:37
18      Q.   And can you read the sentence    14:23:41
19 before that?                14:23:42
20      A.   "The attached is for           14:23:43
21 informational" -- oh, I'm sorry.         14:23:45
22      Q.   The sentence before that.       14:23:47
23      A.   "As the team leader, I will      14:23:48
24 depend on Karen Harper to determine which    14:23:53
25 areas of our SOM process may need to be      14:23:55

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 looked at again."                        14:23:57
2      Q.   Okay.  So certainly from the    14:23:58
3 perspective of Ms. Stewart, she believed that  14:23:59
4 you were the team leader of the SOM process;   14:24:01
5 is that correct?                          14:24:04
6      A.   That's what this states, yes.   14:24:04
7      Q.   Okay.  And you, in fact,        14:24:06
8 believed that you were effectively the team   14:24:08
9 leader for the enhancement of the SOM process  14:24:10
10 during this time period, correct?         14:24:12
11          MR. O'CONNOR:  Objection.        14:24:13
12      Form.                              14:24:14
13          THE WITNESS:  Yes.              14:24:14
14 QUESTIONS BY MR. KO:                      14:24:15
15      Q.   And turning the next -- turning 14:24:19
16 to the next page, you see her actual notes.   14:24:20
17      Do you recall reading and           14:24:27
18 reviewing these notes?                    14:24:29
19      A.   Yes.                          14:24:30
20      Q.   Okay.  She indicates that,      14:24:32
21 quote, "We must also formally document the    14:24:43
22 investigation of each peculiar, suspicious,   14:24:47
23 peculiar, order that gets identified,      14:24:51
24 including the hows and the whys of the logic  14:24:53
25 we used to deem the order appropriate to ship  14:24:55

Page 271

1 or not."                                  14:24:58
2      Did I read that correctly?           14:24:59
3      A.   Yes.                           14:24:59
4      Q.   Okay.  And do you recall         14:25:00
5 whether or not you implemented that policy    14:25:01
6 change into the enhanced SOM program?        14:25:05
7          MR. O'CONNOR:  Objection to      14:25:08
8      form.                              14:25:09
9          THE WITNESS:  Yes.  Yes, we       14:25:09
10      did.  Pardon me.                    14:25:12
11 QUESTIONS BY MR. KO:                      14:25:13
12      Q.   So is it your testimony that    14:25:13
13 for the revised and enhanced SOM program that  14:25:15
14 you eventually rolled out at a future date   14:25:18
15 from the date of this e-mail, you formally    14:25:21
16 documented every single peculiar order,      14:25:23
17 including the hows and whys of the logic we   14:25:30
18 used to deemed the order appropriate to ship  14:25:35
19 or not?                                   14:25:37
20      A.   Yes.                          14:25:37
21      Q.   Okay.  And do you know whether  14:25:37
22 or not those -- and I think earlier I had    14:25:38
23 said "peculiar, suspicious, peculiar," but I  14:25:40
24 mean to say "particular suspicious."        14:25:42
25      A.   That's how the sentence reads.  14:25:43

Page 272

1      Q.   Right.  So --                  14:25:43
2      A.   Yes.                           14:25:44
3      Q.   I apologize for that.           14:25:45
4      A.   Quite all right.               14:25:50
5      Q.   Do you know whether or not the  14:25:51
6 formal documentation was contained in any    14:25:52
7 sort of database?                         14:25:56
8      A.   It is, yes.                    14:25:57
9      Q.   Okay.  And what database would  14:25:58
10 that all be kept in?                      14:26:00
11      A.   It's the share drive at        14:26:02
12 Mallinckrodt.                             14:26:05
13      Q.   Okay.  And so your testimony is 14:26:06
14 that every single order that was identified  14:26:08
15 as suspicious was formally documented, or is  14:26:11
16 it your testimony that every single order    14:26:17
17 that was identified as peculiar was formally  14:26:19
18 documented, or both?                      14:26:21
19          MR. O'CONNOR:  Objection to     14:26:21
20      form.                              14:26:22
21          THE WITNESS:  Both, but not     14:26:22
22      necessarily at that time.  But as time  14:26:24
23      went on, yes, every order review was   14:26:26
24      documented and why.                 14:26:29
25

Page 273

1 QUESTIONS BY MR. KO:                      14:26:30
2      Q.   Okay.  And do you recall        14:26:30
3 approximately when that formal documentation  14:26:31
4 began?                                    14:26:36
5      A.   In 2012.                       14:26:37
6      Q.   Okay.  So that would be four    14:26:41
7 years after the date of this particular      14:26:44
8 e-mail, correct?                          14:26:48
9      A.   Correct.                       14:26:48
10      Q.   Do you know why it took so      14:26:49
11 along to enact that policy?               14:26:51
12      A.   So we were working on enhancing 14:26:53
13 our program again.  I keep stating that.     14:26:56
14      These are suggestions by            14:27:00
15 breakout speakers and not necessarily -- she  14:27:03
16 talks about they're not all-inclusive,       14:27:06
17 they're for informational purposes.          14:27:09
18      So it was our intent to do so,       14:27:10
19 but we had not completely incorporated the   14:27:13
20 explanation into every order that was        14:27:17
21 reviewed at that time.                    14:27:19
22      Q.   But you -- excuse me.  You did  14:27:21
23 ultimately adopt a system whereby you        14:27:25
24 formally documented every peculiar and       14:27:27
25 suspicious order in 2012, correct?          14:27:29

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    A.   Yes.                    14:27:31
2    Q.   And that's four years after you   14:27:32
3  first discussed the possibility of doing so,   14:27:33
4  correct?                     14:27:35
5    A.   It's four years after the topic   14:27:36
6  was made -- mentioned at a conference, yes.   14:27:38
7    Q.   And reference was made by      14:27:40
8  Ms. Stewart that "we must also formally   14:27:44
9  document."                    14:27:47
10        Did I read that correctly?    14:27:47
11        So just the record -- just so   14:27:56
12  the record is clear, Ms. Stewart indicates in   14:27:57
13  her notes that, quote, "We must also formally   14:28:00
14  document the investigation of each particular   14:28:04
15  suspicious, open parens, peculiar, close   14:28:09
16  parens, order that gets identified," end   14:28:11
17  quote.                        14:28:15
18        Did I read that correctly?    14:28:15
19    A.   Yes, you did.          14:28:15
20    Q.   Okay.  So as of the fall   14:28:16
21  of 2008, she is suggesting, is she not, that   14:28:21
22  you must formally document each suspicious or   14:28:23
23  peculiar order?                  14:28:25
24    A.   She is relaying those notes   14:28:25
25  from the conference, not necessarily as a   14:28:29

Page 275

1  mandate that we incorporate them.     14:28:32
2    Q.   Sure.                 14:28:34
3    A.   So they're notes that she took   14:28:35
4  at a conference.                 14:28:38
5    Q.   Right.  And I understand it's   14:28:39
6  not a mandate, but she is making a suggestion   14:28:39
7  that you should formally document each       14:28:41
8  suspicious and peculiar order, is she not?   14:28:43
9    A.   Not necessarily.  She's   14:28:44
10  relaying comments made at a conference by a   14:28:45
11  speaker.                      14:28:47
12    Q.   Okay.  Is it fair to say   14:28:48
13  that -- this Buzzeo conference that you   14:28:49
14  attended each year, it was an important   14:28:53
15  conference, correct?               14:28:56
16    A.   Yes.                  14:28:56
17    Q.   And it was a conference in   14:28:56
18  which you would gain important insight   14:28:58
19  regarding your duties under the CSA to   14:29:01
20  maintain effective controls against   14:29:03
21  diversion, among other things, correct?   14:29:05
22        MR. O'CONNOR:  Objection to   14:29:06
23    form.                    14:29:06
24        THE WITNESS:  Yes.        14:29:06
25

Page 276

1  QUESTIONS BY MR. KO:            14:29:07
2    Q.   And as we described earlier,   14:29:07
3  there weren't necessarily other       14:29:10
4  extracurricular activities that you were   14:29:12
5  involved in with respect to your diversion   14:29:14
6  responsibilities at Mallinckrodt, correct?   14:29:16
7        MR. O'CONNOR:  Objection to   14:29:18
8    form.                    14:29:18
9        THE WITNESS:  Correct.     14:29:18
10  QUESTIONS BY MR. KO:            14:29:19
11    Q.   And so this conference was an   14:29:19
12  important conference for you to attend in   14:29:21
13  which you could further understand your   14:29:23
14  responsibilities under the CSA, correct?   14:29:25
15        MR. O'CONNOR:  Objection to   14:29:27
16    form.                    14:29:28
17        THE WITNESS:  Yes.        14:29:28
18  QUESTIONS BY MR. KO:            14:29:28
19    Q.   So is it fair to say that the   14:29:29
20  advice and suggestions that were borne out of   14:29:31
21  this conference were important suggestions to   14:29:34
22  follow?                       14:29:38
23        MR. O'CONNOR:  Objection to   14:29:39
24    form.                    14:29:40
25        THE WITNESS:  They were     14:29:40

Page 277

1  elements to be considered as part of   14:29:41
2    our suspicious order monitoring   14:29:42
3    program, not necessarily a mandate to   14:29:44
4    be followed.                14:29:46
5  QUESTIONS BY MR. KO:            14:29:48
6    Q.   Okay.  And an element to be   14:29:48
7  considered as of the fall of 2008 was formal   14:29:49
8  documentation of every single peculiar and   14:29:51
9  suspicious order, correct?           14:29:54
10    A.   Yes, based upon one of the   14:29:54
11  conference speakers, yes, sir.        14:29:56
12    Q.   And again, it took you four   14:29:57
13  years to actually implement a system in which   14:30:06
14  you would formally document each peculiar or   14:30:09
15  suspicious order, correct?           14:30:13
16    A.   Yes.                  14:30:15
17    Q.   And during that four-year time   14:30:17
18  period, do you have any understanding of how   14:30:21
19  many pills were diverted in the country,   14:30:25
20  Mallinckrodt pills were diverted in the   14:30:27
21  country?                      14:30:29
22        MR. O'CONNOR:  Objection to   14:30:29
23    form.                    14:30:30
24        THE WITNESS:  I do not.    14:30:30
25

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    QUESTIONS BY MR. KO:                    14:30:30
2        Q.    Do you have an understanding of   14:30:32
3    whether or not that time period reflected the  14:30:33
4    peak of pills that were being distributed   14:30:39
5    into Florida?                            14:30:43
6            MR. O'CONNOR: Objection to        14:30:43
7        form.                                14:30:44
8            THE WITNESS: Yes.                14:30:44
9    QUESTIONS BY MR. KO:                    14:30:44
10       Q.    You do have an understanding,   14:30:44
11   correct?                                 14:30:45
12       A.    Yes.                           14:30:45
13       Q.    And during that time period    14:30:45
14   there were -- there was a large concern from  14:30:47
15   2008 through 2012 that many of Mallinckrodt  14:30:51
16   pills were going into Florida and being   14:30:54
17   abused and diverted, correct?            14:30:56
18           MR. O'CONNOR: Objection to        14:30:57
19       form.                                14:30:58
20           THE WITNESS: Yes.                14:30:58
21   QUESTIONS BY MR. KO:                    14:31:00
22       Q.    Okay. Do you believe that       14:31:04
23   earlier adoption of the formal documentation  14:31:05
24   to identify peculiar or suspicious orders  14:31:07
25   would have helped stop the flow of diversion  14:31:10

Page 279

1    and abuse that was occurring of Mallinckrodt  14:31:13
2    pills had you implemented this policy      14:31:16
3    earlier?                                 14:31:18
4            MR. O'CONNOR: Objection to        14:31:18
5        form.                                14:31:18
6            THE WITNESS: No.                 14:31:18
7    QUESTIONS BY MR. KO:                    14:31:19
8        Q.    You don't believe that?        14:31:19
9        A.    I do not.                      14:31:20
10       Q.    Okay. So you don't -- well,    14:31:21
11   then why did you adopt this formal procedure  14:31:23
12   in 2012?                                 14:31:25
13       A.    It was -- as we continued the  14:31:25
14   enhancement of our program, it was --     14:31:30
15           THE WITNESS: This may be a       14:31:36
16       privileged --                        14:31:37
17           MR. O'CONNOR: Then I guess I     14:31:39
18       would instruct you not to answer with  14:31:40
19       respect to any sort of attorney-client  14:31:42
20       communications.                      14:31:46
21           But you can answer to the        14:31:46
22       extent you can without getting into  14:31:47
23       those communications with counsel.   14:31:48
24           THE WITNESS: Okay.               14:31:49
25

Page 280

1    QUESTIONS BY MR. KO:                    14:31:52
2        Q.    So are you going to follow your  14:31:58
3    counsel's instruction?                   14:31:59
4        A.    Yes, sir.                      14:31:59
5        Q.    Okay. Now, I know you said     14:32:00
6    earlier that this wasn't necessarily a    14:32:09
7    mandate but a suggestion.                14:32:11
8            But is there any reason you can   14:32:13
9    think of for not following this advice that  14:32:14
10   you learned at the Buzzeo conference in 2008?  14:32:19
11       A.    No.                            14:32:21
12       Q.    Okay. Now, one thing -- going   14:32:22
13   down to the fifth paragraph of this page,  14:32:27
14   Ms. Stewart writes in her notes that "The  14:32:36
15   general consensus is that sales reps are not  14:32:38
16   considered a good option for on-site       14:32:42
17   investigations and initial review prior to  14:32:44
18   accepting new customers due to their       14:32:47
19   perceived bias in getting the customer     14:32:48
20   approved for sales revenue purposes."      14:32:50
21           Did I read that correctly?        14:32:53
22       A.    Yes.                           14:32:55
23       Q.    And so understanding your      14:32:56
24   perspective that these aren't necessarily  14:33:02
25   mandates, but is it fair to say that one  14:33:04

Page 281

1    thing -- one piece of advice and/or a     14:33:06
2    suggestion that you learned following this  14:33:09
3    conference was that the general consensus is  14:33:11
4    that sales reps should not be involved in  14:33:15
5    reviewing new customers due to their      14:33:21
6    perceived bias in getting sales?         14:33:21
7            MR. O'CONNOR: Objection to        14:33:23
8        form.                                14:33:24
9            THE WITNESS: That's correct,     14:33:24
10       and we did not.                       14:33:26
11   QUESTIONS BY MR. KO:                    14:33:28
12       Q.    In other words -- well, I think  14:33:29
13   you were asking {sic} my next question.    14:33:32
14           So you never had sales reps      14:33:34
15   involved in initial reviews of -- initial  14:33:36
16   reviews of new customers?                14:33:42
17       A.    So we had -- we had the sales  14:33:43
18   force calling on customers. We had an     14:33:46
19   independent new customer setup process --  14:33:48
20       Q.    Right.                         14:33:51
21       A.    -- which involved the customer  14:33:51
22   filling out the application.             14:33:52
23           At one time we considered that   14:33:54
24   the sales reps would fill out the         14:33:55
25   application, and we -- we did not utilize  14:33:58

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1   that --                              14:34:02
2        Q.    Okay.                     14:34:02
3        A.    -- as part of the program.    14:34:02
4             So the customer fills out the    14:34:03
5   application.  We run the credit, the Dun &    14:34:05
6   Bradstreet, et cetera.  And that's the way --    14:34:08
7   so it's not predicated upon the salesperson's    14:34:10
8   review of the customer.                 14:34:14
9        Q.    And by the way, the sales reps    14:34:16
10  referred to here, again, are these both NAMs    14:34:18
11  and CSRs, or NAMs or CSRs, or which -- which    14:34:22
12  sales reps is Cathy referring to?        14:34:26
13            MR. O'CONNOR:  Objection to    14:34:27
14  form.                                 14:34:28
15            THE WITNESS:  NAMs.         14:34:28
16  QUESTIONS BY MR. KO:                   14:34:29
17       Q.    NAMs.  Okay.               14:34:29
18            And so your testimony is that    14:34:29
19  NAMs were not involved in any initial review    14:34:32
20  of new customers?                      14:34:36
21       A.    Not to my knowledge.        14:34:38
22       Q.    Okay.  So if -- if for purposes    14:34:41
23  of the new checklist -- new customer        14:34:46
24  checklist form NAMs had some input and      14:34:49
25  involvement, that would be contrary to your    14:34:51

Page 283

1   expectation --                         14:34:53
2            MR. O'CONNOR:  Objection.    14:34:54
3   Form.                                 14:34:55
4   QUESTIONS BY MR. KO:                   14:34:56
5        Q.    -- is that correct?         14:34:56
6        A.    I don't -- can you provide more    14:34:57
7   detail to give me more information to answer    14:35:01
8   the question, please?                   14:35:03
9        Q.    Sure.                      14:35:04
10            Well, maybe I'll -- I'll try it    14:35:05
11  this way.  Did you believe in the fall     14:35:07
12  of 2008 that it was a good idea to consult    14:35:11
13  national account managers in connection with    14:35:14
14  approval of new customers for purposes of    14:35:17
15  filling out the new customer checklist?     14:35:22
16            MR. O'CONNOR:  Objection to    14:35:24
17  form.                                 14:35:25
18            THE WITNESS:  No.          14:35:25
19  QUESTIONS BY MR. KO:                   14:35:25
20       Q.    Okay.  And how about with     14:35:26
21  respect to determining whether or not any    14:35:28
22  orders of new customers were peculiar and/or    14:35:33
23  suspicious?  Did you believe that NAMs had    14:35:37
24  any involvement in that process following the    14:35:41
25  fall of 2008?                          14:35:45

Page 284

1        A.    Yes.                       14:35:47
2        Q.    They did have involvement?    14:35:48
3        A.    Yes.                       14:35:49
4        Q.    Okay.  And what involvement --    14:35:50
5   what did that involvement consist of?       14:35:52
6        A.    So if an order was flagged as    14:35:54
7   peculiar, suspicious, unusual, whatever the    14:35:57
8   naming convention was at the time, we would    14:36:00
9   at times consult with the NAMs to ask them if    14:36:05
10  they had more information on the account that    14:36:08
11  would help us in our review of that order    14:36:12
12  that had been flagged.                  14:36:14
13       Q.    Okay.  And sometimes they would    14:36:15
14  clear these orders, correct?             14:36:18
15            MR. O'CONNOR:  Objection to    14:36:19
16  form.                                 14:36:20
17            THE WITNESS:  Yes.  Yes.    14:36:20
18  QUESTIONS BY MR. KO:                   14:36:23
19       Q.    In other words, sometimes they    14:36:24
20  would conclusively -- or sometimes they would    14:36:27
21  make the recommendation to you that that     14:36:28
22  particular order was not suspicious         14:36:31
23  sufficient to alert the DEA, correct?       14:36:34
24            MR. O'CONNOR:  Objection to    14:36:36
25  form.                                 14:36:36

Page 285

1            THE WITNESS:  Yes, with      14:36:36
2   appropriate explanation, yes.            14:36:38
3   QUESTIONS BY MR. KO:                   14:36:39
4        Q.    Right.                     14:36:40
5            And that explanation, what did    14:36:40
6   that usually consist of?  Was that in the    14:36:43
7   form of an e-mail?  A telephone call?       14:36:46
8            MR. O'CONNOR:  Objection.    14:36:49
9   QUESTIONS BY MR. KO:                   14:36:49
10       Q.    How did that message -- how was    14:36:49
11  that message conveyed to you?             14:36:51
12       A.    It could have been either,     14:36:53
13  e-mail or telephone.                    14:36:55
14       Q.    But we know at least from the    14:36:56
15  2008 to 2012 time period, there was no formal    14:37:01
16  documentation of that, correct?           14:37:04
17       A.    Not relative to every order    14:37:05
18  that was flagged by the algorithm, correct.    14:37:08
19       Q.    Okay.  And separate and apart    14:37:10
20  from what's included in Ms. Stewart's notes,    14:37:15
21  do you believe having salespeople involved in    14:37:19
22  the identification of suspicious orders is a    14:37:21
23  good thing?                            14:37:25
24            MR. O'CONNOR:  Objection to    14:37:26
25  form.                                 14:37:27

Highly Confidential - Subject to Further Confidentiality Review

Page 286

```
 1        THE WITNESS:  No.  They --          14:37:27
 2    facilitating in the review, yes, but    14:37:31
 3    not in the identification, no.  I do     14:37:33
 4    not think they should be involved.       14:37:36
 5 QUESTIONS BY MR. KO:                        14:37:38
 6    Q.   Okay.  And so if they were --       14:37:39
 7 so I understand this is a hypothetical, but 14:37:43
 8 bear with me.                     14:37:45
 9        So would it be appropriate then 14:37:46
10 if a national account manager was the only  14:37:49
11 source for determining whether or not a     14:37:57
12 peculiar order was suspicious or not?       14:38:00
13    A.   Yes.                  14:38:01
14    Q.   It would be appropriate?       14:38:01
15    A.   Yes.                  14:38:02
16    Q.   So in that case, isn't the NAM  14:38:03
17 the only person providing input as to whether 14:38:07
18 or not an order is suspicious?          14:38:09
19    A.   Yes.                  14:38:10
20    Q.   Okay.  And so you're saying     14:38:15
21 that's okay?                    14:38:16
22    A.   Yes.                  14:38:17
23    Q.   Okay.  So you don't have any    14:38:17
24 problems, as someone who is in charge of    14:38:20
25 running a suspicious order monitoring       14:38:22
```

Page 287

```
 1 program, of having national account managers 14:38:24
 2 who have an incentive for new sales and new  14:38:29
 3 business to be involved in the decision of   14:38:34
 4 whether or not to identify an order as       14:38:36
 5 suspicious or not?                14:38:39
 6        MR. O'CONNOR:  Objection to      14:38:39
 7    form.                  14:38:40
 8        THE WITNESS:  I do not have any  14:38:40
 9    problem with that.             14:38:44
10 QUESTIONS BY MR. KO:                    14:38:45
11    Q.   Okay.  National account        14:38:45
12 managers at Mallinckrodt were compensated on 14:38:47
13 a commission -- or excuse me.            14:38:48
14        Do you have an understanding of  14:38:50
15 how national account managers were          14:38:52
16 compensated?                    14:38:53
17    A.   I do not.              14:38:53
18    Q.   Do you understand that national 14:38:54
19 account managers had a -- received a         14:38:58
20 commission based on the amount of sales      14:39:01
21 activity that they were able to retain?      14:39:04
22    A.   I don't know how their pay is   14:39:06
23 structured.                     14:39:08
24    Q.   Okay.  Setting aside whether or 14:39:09
25 not you knew how NAMs were paid, don't you   14:39:12
```

Page 288

```
 1 believe that conflict of interest exists in  14:39:17
 2 having an individual who has a financial      14:39:20
 3 incentive to create new sales also determine 14:39:23
 4 whether or not an order is suspicious?       14:39:25
 5        MR. O'CONNOR:  Objection to      14:39:27
 6    form.                  14:39:28
 7        THE WITNESS:  I believe that     14:39:28
 8    the greater incentive is regulatory 14:39:30
 9    compliance and DEA compliance, as was 14:39:33
10    carried throughout our organization,  14:39:36
11    would override any financial         14:39:38
12    incentive.                14:39:40
13 QUESTIONS BY MR. KO:                    14:39:41
14    Q.   Do you believe that the        14:39:42
15 national account managers had -- believed    14:39:43
16 that they had a greater incentive to comply  14:39:45
17 with the regulatory statutes laid out under  14:39:48
18 the CSA?                    14:39:51
19    A.   Yes.                  14:39:53
20    Q.   Okay.  And you believe -- well, 14:39:54
21 strike that.                    14:39:57
22        Do you recall following the      14:39:57
23 date of this particular Buzzeo conference    14:40:13
24 ever discussing removing NAMs from the       14:40:16
25 suspicious order monitoring and peculiar     14:40:22
```

Page 289

```
 1 order monitoring review structure?          14:40:22
 2    A.   No.                  14:40:25
 3    Q.   Okay.  Do you ever recall       14:40:27
 4 removing any member of sales force -- that   14:40:30
 5 includes NAMs and customer service reps --   14:40:33
 6 from the peculiar order/suspicious order     14:40:37
 7 review system?                  14:40:41
 8    A.   No.                  14:40:43
 9    Q.   Okay.  You can set this         14:40:43
10 document aside.                 14:40:53
11        (Mallinckrodt-Harper Exhibit 14  14:40:57
12    marked for identification.)         14:40:58
13 QUESTIONS BY MR. KO:                    14:40:58
14    Q.   I'm going to hand you a copy of 14:40:58
15 what will be marked as Harper Exhibit 14.    14:40:59
16        Now, do you recall -- I know     14:41:35
17 you said you didn't recall the specifics of  14:41:54
18 how NAMs were compensated at Mallinckrodt,   14:41:57
19 but do you know whether or not they received 14:41:59
20 any bonuses based in part of the volume of   14:42:01
21 their sales of controlled substances         14:42:03
22 manufactured by Mallinckrodt?            14:42:05
23    A.   I do not know.           14:42:06
24    Q.   Did you ever inquire as to      14:42:07
25 whether or not they were being compensated on 14:42:10
```

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 that basis?                          14:42:11
2     A.   Nope.                       14:42:12
3     Q.   How come you never inquired  14:42:13
4 about that?                          14:42:15
5     A.   Because the controlled      14:42:15
6 substances compliance group operated, to the  14:42:19
7 extent it was possible, autonomously unless  14:42:21
8 we needed guidance from the NAMs on specific  14:42:27
9 orders. So I never knew how they were  14:42:30
10 compensated, why. I don't know how much  14:42:32
11 oxycodone was sold for. I don't know any of  14:42:34
12 the financial pieces of that.        14:42:38
13     Q.   Sure.                       14:42:38
14     A.   Thank you.                  14:42:40
15     Q.   Okay. And you say that you  14:42:41
16 needed -- at times you needed guidance from  14:42:45
17 them on specific -- you needed guidance from  14:42:47
18 NAMs on specific orders --           14:42:50
19     A.   Uh-huh.                     14:42:53
20     Q.   -- with respect to identifying  14:42:53
21 a peculiar or suspicious order, correct?  14:42:55
22     A.   Not identifying but reviewing.  14:42:57
23     Q.   Reviewing.                  14:43:00
24          With the ultimate goal of   14:43:01
25 trying to determine whether or not that order  14:43:02

Page 291

1 was suspicious, correct?             14:43:04
2     A.   Correct.                     14:43:05
3     Q.   So NAMs played -- would you  14:43:06
4 agree with me that NAMs played an integral  14:43:10
5 role in determining whether or not an order  14:43:13
6 could potentially be suspicious?     14:43:15
7          MR. O'CONNOR: Objection to   14:43:16
8     form.                            14:43:18
9          THE WITNESS: Certain orders.  14:43:18
10          May I explain or --         14:43:21
11 QUESTIONS BY MR. KO:                 14:43:23
12     Q.   Well, let me -- certain orders.  14:43:24
13 Do you mean certain orders that were  14:43:25
14 previously flagged as peculiar?      14:43:27
15     A.   Yes.                        14:43:28
16     Q.   Okay. So once an order was  14:43:29
17 flagged as peculiar, is it accurate to say  14:43:30
18 that NAMs played an integral role in  14:43:34
19 determining whether or not that peculiar  14:43:39
20 order was ultimately deemed to be suspicious  14:43:41
21 sufficient to notify the DEA?        14:43:45
22          MR. O'CONNOR: Objection to   14:43:46
23     form.                            14:43:46
24          THE WITNESS: Not every order.  14:43:46
25

Page 292

1 QUESTIONS BY MR. KO:                 14:43:47
2     Q.   Correct.                     14:43:47
3          But for some?               14:43:47
4     A.   For some, yes.               14:43:48
5     Q.   Okay. So is it the case that  14:43:50
6 for some orders, national account managers  14:43:53
7 played an integral role in determining  14:43:56
8 whether or not a peculiar order was  14:43:59
9 ultimately determined to be suspicious?  14:44:00
10          MR. O'CONNOR: Objection to   14:44:02
11     form.                            14:44:03
12          THE WITNESS: They assisted in  14:44:03
13     the review, and the ultimate decision  14:44:05
14     about whether the order was suspicious  14:44:06
15     or not rests -- always did rest with  14:44:08
16     the controlled substances compliance  14:44:11
17     group.                           14:44:12
18 QUESTIONS BY MR. KO:                 14:44:12
19     Q.   Including you and Mr. Ratliff,  14:44:13
20 among other people, correct?         14:44:14
21     A.   Correct.                     14:44:15
22     Q.   Okay. So if -- in the scenario  14:44:16
23 we were just discussing, if the national  14:44:21
24 account manager -- well, strike that.  14:44:25
25          When the national account    14:44:28

Page 293

1 manager was assisting in the review of  14:44:38
2 whether or not a peculiar order was deemed --  14:44:39
3 was going to be deemed as suspicious or not,  14:44:43
4 can you think of any instances in which the  14:44:46
5 input of the national account manager was the  14:44:53
6 only input you received in making a  14:44:55
7 determination of whether or not the order was  14:44:57
8 suspicious?                          14:44:59
9     A.   Yes, outside of the controlled  14:45:00
10 substances compliance group, yes.    14:45:06
11     Q.   Were there instances in which  14:45:07
12 the determination that the -- that you and  14:45:10
13 Mr. Ratliff made as to whether an order was  14:45:17
14 suspicious or not relied solely on the input  14:45:19
15 of a national account manager?       14:45:23
16     A.   Yes.                        14:45:24
17 QUESTIONS BY MR. KO:                 14:45:43
18     Q.   Okay. I'm going to hand you a  14:45:38
19 copy of what's going to be marked as Harper  14:45:40
20 Exhibit 14.                          14:45:43
21          MR. KO: And this is, for the  14:45:46
22     record, an e-mail from Dave Hunter to  14:45:51
23     several people, including you, on  14:45:55
24     November 19, 2009, and Bates ending in  14:45:58
25     278806.                          14:46:03

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  QUESTIONS BY MR. KO:                14:46:03
2      Q.  Do you recall this -- or do you  14:46:13
3  have any reason to dispute that you received  14:46:15
4  this e-mail?                        14:46:16
5      A.  I have no reason to dispute.  14:46:17
6      Q.  Okay.  And here Mr. Hunter is  14:46:18
7  attaching notes from the Buzzeo conference I  14:46:21
8  believe he attends in 2009; is that correct?  14:46:27
9      A.  Yes.  Seeing this, so, yes.  14:46:29
10     Q.  Okay.  And do you recall      14:46:33
11 attending this particular Buzzeo conference  14:46:34
12 as well?                            14:46:35
13     A.  I do not.                   14:46:35
14     Q.  Okay.  So you recall attending  14:46:36
15 the 2008 Buzzeo conference with Ms. Stewart,  14:46:39
16 but you don't recall attending this       14:46:41
17 conference with Mr. Hunter; is that fair?  14:46:43
18     A.  That's fair.                 14:46:46
19     Q.  Okay.  Do you recall Mr. Hunter  14:46:48
20 sending these notes to you about what     14:46:54
21 transpired at this particular Buzzeo      14:46:59
22 conference?                         14:47:01
23     A.  I do not specifically recall  14:47:02
24 it, but I can refamiliarize myself with the  14:47:05
25 content.                            14:47:08

Page 295

1      Q.  Sure.                      14:47:08
2          And there are notes.  I just  14:47:09
3  want to turn to the first page of notes that  14:47:11
4  he drafts.  These appear to be notes that he  14:47:17
5  has created following his attendance at the  14:47:20
6  2009 Buzzeo conference; is that correct?  14:47:24
7      A.  Yes.                       14:47:25
8      Q.  And looking down at the bottom  14:47:28
9  of this page, he indicates where I'm       14:47:32
10 highlighting right now, "Sir, suspicious  14:47:34
11 order monitoring was certainly a hotbed of  14:47:37
12 discussion."                        14:47:39
13         Do you see that?             14:47:40
14     A.  So that's a question, yes,    14:47:40
15 that's a question as documented here.     14:47:44
16     Q.  Right.                     14:47:45
17         And it's a question by someone  14:47:46
18 in the audience, some registrant or someone  14:47:47
19 who attended the conference, correct?    14:47:50
20     A.  Yes.                       14:47:51
21     Q.  Okay.  And so it's fair to say  14:47:52
22 that as of the fall of 2009, their        14:47:57
23 continual -- there's continual attention and  14:48:01
24 scrutiny being given to Mallinckrodt's   14:48:02
25 suspicious order monitoring system?      14:48:05

Page 296

1      MR. O'CONNOR:  Objection to      14:48:07
2  form.                               14:48:08
3      THE WITNESS:  So all suspicious  14:48:08
4  order monitoring systems, not           14:48:14
5  necessarily unique to Mallinckrodt,      14:48:15
6  yes.                                14:48:16
7  QUESTIONS BY MR. KO:                14:48:16
8      Q.  Right.  Right.              14:48:16
9          So as a general matter in 2009,  14:48:17
10 would you agree with the statement that   14:48:19
11 suspicious order monitoring continued to be  14:48:22
12 given close scrutiny by the DEA?         14:48:25
13     A.  Yes.                       14:48:27
14     Q.  Okay.  And the question is    14:48:28
15 asked, "Are there any plans for DEA to    14:48:31
16 publicize information to implement?"     14:48:35
17         Do you see that?             14:48:37
18     A.  Yes.                       14:48:38
19     Q.  "SOM incorporate algorithms   14:48:39
20 where products are more likely to be     14:48:43
21 diverted."                          14:48:45
22         Did I read that correctly as   14:48:47
23 well?                               14:48:48
24     A.  You did.                    14:48:48
25     Q.  Okay.  And there is a response  14:48:50

Page 297

1  given by someone at DEA, it appears.    14:48:51
2          Do you see that?             14:48:54
3      A.  Yes.                       14:48:54
4      Q.  And that's Jim Crawford?      14:48:55
5          Did you know who he has?       14:48:57
6      A.  Yes.                       14:48:59
7      Q.  Okay.  Did you communicate with  14:49:00
8  him at all during the 2008, 2012 time period?  14:49:01
9      A.  No.                        14:49:04
10     Q.  Okay.  But you just knew -- you  14:49:05
11 just knew who he was, but you didn't     14:49:08
12 necessarily communicate with him?        14:49:10
13     A.  Correct.  He and Mark Caverly  14:49:11
14 spoke at the end of every Buzzeo conference.  14:49:15
15     Q.  Got it.                     14:49:16
16         And it's -- he says in response  14:49:17
17 to this question, quote, "Whatever we put out  14:49:20
18 will be outdated by the time we put it out.  14:49:24
19 You're looking at a number.  Tell me how much  14:49:27
20 that we can exceed.  DEA can't do that.  It's  14:49:30
21 part of your due diligence, knowing your  14:49:33
22 customer," end quote.                14:49:37
23         Did I read that correctly?     14:49:38
24     A.  Yes.                       14:49:39
25     Q.  Okay.  So this appears to be  14:49:39

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  some Q&As in which -- there is a question in  14:49:41
2  which registrants are asking whether or not  14:49:44
3  DEA will give guidance on an appropriate  14:49:48
4  suspicious order monitoring algorithm.  14:49:54
5      Is that a fair characterization  14:49:55
6  of the question that was asked?  14:49:56
7      MR. O'CONNOR:  Objection to  14:49:58
8  form.  14:49:58
9      THE WITNESS:  Yes.  14:49:58
10  QUESTIONS BY MR. KO:  14:49:59
11      Q.  And the response given was that  14:49:59
12  DEA was not going to provide such concrete  14:50:03
13  guidance; is that correct?  14:50:06
14      A.  I'd like to reread the answer,  14:50:06
15  please.  14:50:10
16      Q.  Sure.  14:50:10
17      A.  Yes, that's the gist of the  14:50:11
18  response, yes.  14:50:19
19      Q.  Okay.  So as of the fall  14:50:20
20  of 2009, is it accurate to say that  14:50:22
21  Mr. Hunter informed you that the DEA was not  14:50:27
22  going to give concrete guidance as to what  14:50:31
23  particular algorithm to implement?  14:50:33
24      A.  Yes.  14:50:35
25      Q.  Okay.  Now, the following  14:50:36

Page 299

1  question by someone in the audience was,  14:50:39
2  "Well, what then does the DEA expect?"  14:50:43
3      And a response was given by  14:50:45
4  Mr. Caverly.  It says, quote, "Previously DEA  14:50:47
5  sat down with National Drug Association with  14:50:51
6  an algorithm.  DEA standpoint:  You know our  14:50:55
7  customers better than we do.  DEA stepped  14:50:59
8  away from providing guidelines.  It is not  14:51:01
9  going to happen," end quote.  14:51:04
10      Did I read that correctly?  14:51:06
11      A.  Yes.  14:51:06
12      Q.  So as of the date of this  14:51:07
13  e-mail in the fall of 2009, you understood  14:51:09
14  that the DEA was not going to provide  14:51:12
15  guidelines with respect to SOM algorithms,  14:51:15
16  correct?  14:51:18
17      A.  Yes.  14:51:18
18      Q.  You can set that aside.  14:51:25
19      MR. O'CONNOR:  We've been going  14:51:29
20  about an hour 15.  Maybe we should  14:51:30
21  take a break.  14:51:32
22      MR. KO:  Yeah, we can take a  14:51:32
23  break.  Sounds good.  14:51:34
24      VIDEOGRAPHER:  We are going off  14:51:37
25  the record at 2:51 p.m.  14:51:39

Page 300

1      (Off the record at 2:51 p.m.)  14:51:40
2      VIDEOGRAPHER:  We are back on  15:10:02
3  the record at 3:10 p.m.  15:10:03
4  QUESTIONS BY MR. KO:  15:10:05
5      Q.  Now, Mr. Harper {sic}, is it  15:10:08
6  fair to say from the 2008 through 2009 time  15:10:10
7  period you are continually working to revise  15:10:16
8  and improve the enhanced suspicious order  15:10:17
9  monitoring system at Mallinckrodt, correct?  15:10:20
10      A.  Correct.  15:10:22
11      Q.  Okay.  And you also continue to  15:10:22
12  work on peculiar order algorithms in the 2008  15:10:27
13  through 2009 time period, correct?  15:10:33
14      A.  Correct.  15:10:34
15      Q.  And with respect to the  15:10:34
16  checklists we were discussing previously,  15:10:36
17  you're continually working on revising and  15:10:38
18  implementing a -- both a new customer  15:10:41
19  checklist and a customer checklist throughout  15:10:45
20  the 2008 and 2009 time period, correct?  15:10:47
21      A.  Correct.  15:10:49
22      (Mallinckrodt-Harper Exhibit 15  15:11:00
23  marked for identification.)  15:11:00
24  QUESTIONS BY MR. KO:  15:11:00
25      Q.  Okay.  I'm going to hand you a  15:11:01

Page 301

1  copy of what's going to be marked as Harper  15:11:02
2  Exhibit 15.  And in conjunction with that,  15:11:06
3  I'm going to hand you also a document that's  15:11:13
4  previously been identified as Exhibit 35 of  15:11:14
5  the Stewart deposition.  They're both right  15:11:16
6  here.  15:11:22
7      For the record, Harper  15:11:23
8  Exhibit 15 ends in Bates stamp 270090.  15:11:24
9      And of course the second  15:11:31
10  document I referenced was Stewart Exhibit 35  15:11:33
11  that ends in 477900.  15:11:37
12      Now, turning your attention  15:11:43
13  first to the e-mail identified as Harper  15:11:44
14  Exhibit 15, this is an e-mail exchange you  15:11:48
15  had with Eileen Spalding dated October 31,  15:11:53
16  2010, correct?  15:11:59
17      A.  Correct.  15:11:59
18      Q.  And earlier when I had -- just  15:12:00
19  a moment ago when we were discussing  15:12:05
20  continual revisions and enhancements to  15:12:06
21  Mallinckrodt's SOM program in the 2008 and  15:12:11
22  2009 time period, it's also safe to say that  15:12:14
23  in 2010 you're also continually working on  15:12:18
24  improving the SOM program, correct?  15:12:21
25      A.  Correct.  15:12:22

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q.   And in fact, that work          15:12:23
2  continues in 2011 as well?             15:12:25
3    A.   Yes.                            15:12:27
4    Q.   When would you say you actually 15:12:28
5  implemented a procedure or an SOM policy that 15:12:31
6  sufficiently addressed some of the concerns 15:12:37
7  you raised in the 2008 time period with 15:12:41
8  respect to Mallinckrodt's SOM program? 15:12:43
9         MR. O'CONNOR:   Objection.     15:12:46
10        Form.                           15:12:46
11        THE WITNESS:   I don't know the 15:12:46
12        first date of the publication.  Again, 15:12:47
13        just as the program is constantly 15:12:50
14        being enhanced, we're constantly 15:12:53
15        updating our procedure, so I don't 15:12:56
16        have the date of the publication.  I'm 15:12:57
17        sorry.                          15:12:58
18  QUESTIONS BY MR. KO:                  15:12:58
19    Q.   And is it -- do you have a     15:12:59
20  general understanding of the approximate time 15:13:01
21  period of the date of publication?   15:13:03
22        Do you recall whether or not it 15:13:04
23  was after 2011?                       15:13:05
24    A.   I don't recall.                15:13:07
25    Q.   Okay.                          15:13:08

Page 303

1    A.   I just don't know.             15:13:08
2    Q.   You remember a meeting you had 15:13:09
3  with DEA in 2011, often referred to as the 15:13:12
4  earthquake meeting?  Correct?         15:13:14
5    A.   Yes.                            15:13:16
6    Q.   And it's referred to in that   15:13:17
7  manner because there was an earthquake that 15:13:18
8  day outside of DC, in Virginia in particular? 15:13:20
9    A.   Yes.                            15:13:23
10    Q.   As of the date of that meeting, 15:13:24
11  you had not yet adopted a formal procedure 15:13:28
12  for the enhanced SOM program, correct? 15:13:31
13        MR. O'CONNOR:   Objection to   15:13:34
14        form.                           15:13:35
15        THE WITNESS:   I don't know what 15:13:35
16        date we wrote the procedure, so I 15:13:36
17        can't make -- I cannot answer, I'm 15:13:38
18        sorry.                          15:13:40
19  QUESTIONS BY MR. KO:                  15:13:40
20    Q.   Fair enough.  Okay.           15:13:40
21        So turning back to this        15:13:42
22  particular exhibit, in the second paragraph 15:13:46
23  of the bottom e-mail starting with   15:14:01
24  "Basically," can you read that for the 15:14:04
25  record?                               15:14:06

Page 304

1    A.   "Basically, during the last two 15:14:06
2  years, all peculiar orders that were on the 15:14:09
3  daily report were investigated by CSR 15:14:13
4  manager, were deemed to be okay, and none 15:14:18
5  rose to the level of peculiar.  As you will 15:14:21
6  see, it was not feasible to forward the 15:14:26
7  peculiar order report to DEA due to the 15:14:28
8  lengthiness as we were tweaking the  15:14:34
9  algorithms."                          15:14:36
10    Q.   Okay.  And in the e-mail above, 15:14:37
11  you amend your statement about none rising to 15:14:40
12  the level of peculiar.  And what you actually 15:14:45
13  meant was that no peculiar orders rose to the 15:14:47
14  level of suspicious; is that correct? 15:14:50
15    A.   That is correct.               15:14:52
16    Q.   So as of October 31, 2010, is  15:14:53
17  it accurate to say that Mallinckrodt did not 15:14:59
18  identify a single suspicious order between 15:15:02
19  beginning of 2000 -- excuse me, between 15:15:07
20  August of 2008 to October 31, 2010?  15:15:11
21        MR. O'CONNOR:   Objection to   15:15:15
22        form.                           15:15:17
23        THE WITNESS:   None that rose to 15:15:17
24        the level of suspicious and reported 15:15:19
25        to DEA, that is correct.        15:15:22

Page 305

1  QUESTIONS BY MR. KO:                  15:15:23
2    Q.   Right.                         15:15:24
3        And so we had discussed earlier 15:15:24
4  about the significant amount of diversion and 15:15:30
5  abuse of Mallinckrodt pills that occurred in 15:15:34
6  Florida in the 2008 through 2012 time period. 15:15:36
7        Do you recall that?             15:15:38
8        MR. O'CONNOR:   Objection.      15:15:38
9        THE WITNESS:   Significant is   15:15:39
10        your word, but, yes, the diversion, 15:15:40
11        yes.                            15:15:42
12  QUESTIONS BY MR. KO:                  15:15:42
13    Q.   You recall that we discussed   15:15:44
14  diversion and abuse of Mallinckrodt pills 15:15:47
15  occurring in Florida throughout the 2008 15:15:49
16  through 2012 time period, correct?   15:15:51
17    A.   Yes.                            15:15:53
18    Q.   Okay.  And during at least a   15:15:54
19  two-year time period between 2008 and 2010, 15:15:58
20  Mallinckrodt's suspicious order monitoring 15:16:01
21  policy and system did not identify a single 15:16:04
22  suspicious order, correct?            15:16:07
23    A.   Correct.                       15:16:08
24    Q.   Okay.  And in the third        15:16:10
25  paragraph below in your e-mail you state, 15:16:13

Page 306

1 quote, "It is significant to note that 15:16:18
2 neither Sunrise or Harvard triggered the 15:16:21
3 algorithms that were in place for direct 15:16:23
4 customers because we were looking at overall 15:16:25
5 purchase trends for each distributor, not 15:16:26
6 reviewing where the distributors were sending 15:16:29
7 our product, and our program met CFR 15:16:31
8 requirements. In essence, the program was 15:16:37
9 expanded within the last month to our 15:16:41
10 customers' customers." 15:16:43
11 Did I read that correctly? 15:16:45
12 A. Yes. 15:16:45
13 Q. Now, Sunrise and Harvard were 15:16:46
14 two distributors that were customers of 15:16:48
15 Mallinckrodt, correct? 15:16:49
16 A. Correct. 15:16:50
17 Q. And they both had their license 15:16:50
18 eventually suspended by the DEA at some time 15:16:52
19 in the 2010 time period? 15:16:54
20 A. Correct. 15:16:56
21 Q. And so they had their licenses 15:16:57
22 suspended because they were selling to 15:17:01
23 customers, and in particular, pharmacies and 15:17:03
24 pain clinics that were engaged in 15:17:11
25 diversion -- 15:17:13

Page 307

1 MR. O'CONNOR: Objection to 15:17:13
2 form. 15:17:13
3 QUESTIONS BY MR. KO: 15:17:13
4 Q. -- correct? 15:17:14
5 A. That is what was reported in 15:17:14
6 the media, yes. 15:17:17
7 Q. Okay. And was it -- and in 15:17:18
8 addition to what was reported in the media, 15:17:20
9 you eventually acquired some level of 15:17:22
10 knowledge of certain orders that Sunrise and 15:17:24
11 Harvard had shipped to pharmacies and clinics 15:17:28
12 in Florida, did you not? 15:17:31
13 MR. O'CONNOR: Objection to 15:17:33
14 form. 15:17:33
15 THE WITNESS: Yes. 15:17:33
16 QUESTIONS BY MR. KO: 15:17:33
17 Q. Okay. And so ultimately 15:17:34
18 Sunrise and Harvard had their license 15:17:36
19 suspended by the DEA due to suspicious orders 15:17:38
20 that they had shipped in at least the 2008 15:17:41
21 through 2000 {sic} time period; is that 15:17:46
22 correct? 15:17:48
23 A. Yes. 15:17:48
24 Q. Okay. And here you're 15:17:49
25 indicating that your suspicious order 15:17:50

Page 308

1 monitoring system did not trigger the 15:17:53
2 algorithms that were in place for that time 15:17:56
3 period. And I presume the algorithms you're 15:18:01
4 discussing are the peculiar order algorithms, 15:18:04
5 correct? 15:18:06
6 A. Correct. 15:18:06
7 Q. So in other words, because 15:18:07
8 their orders were not either 2X or 15:18:10
9 potentially 3X of the prior fiscal year, as 15:18:13
10 we previously discussed, there was never a 15:18:18
11 peculiar order flag that was raised with 15:18:23
12 respect to their orders -- 15:18:25
13 MR. O'CONNOR: Objection to 15:18:26
14 form. 15:18:27
15 QUESTIONS BY MR. KO: 15:18:27
16 Q. -- fair? 15:18:27
17 A. Fair. 15:18:27
18 Q. Okay. And you note that your 15:18:28
19 suspicious order monitoring system at the 15:18:32
20 time was unable to identify whether or not 15:18:33
21 certain of their orders were suspicious 15:18:37
22 because, of course, you just had a peculiar 15:18:39
23 order algorithm that was based on a metric of 15:18:43
24 orders relative to prior order history. 15:18:49
25 MR. O'CONNOR: Objection to 15:18:52

Page 309

1 form. 15:18:53
2 THE WITNESS: So enabling is 15:18:53
3 paraphrasing, but we were looking at 15:18:56
4 different purchasing trends and not at 15:19:01
5 the downstream registrant. 15:19:05
6 QUESTIONS BY MR. KO: 15:19:07
7 Q. Right. 15:19:07
8 And I didn't say -- just so the 15:19:08
9 record is clear, I didn't say "enable"; I 15:19:09
10 said "unable." 15:19:12
11 A. Unable, yes. 15:19:12
12 Q. Right. 15:19:13
13 So Mallinckrodt's suspicious 15:19:14
14 order monitoring program at the time was 15:19:15
15 unable to identify any suspicious orders of 15:19:17
16 Sunrise or Harvard because you were merely 15:19:23
17 looking at a numerical metric of order 15:19:26
18 history -- of orders relative to order 15:19:31
19 history of Sunrise and Harvard, correct? 15:19:33
20 MR. O'CONNOR: Objection. 15:19:35
21 Form. 15:19:36
22 THE WITNESS: Correct. 15:19:37
23 QUESTIONS BY MR. KO: 15:19:37
24 Q. Okay. At the time that you 15:19:45
25 learned that Sunrise and Harvard had their 15:19:45

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  licenses suspended by the DEA, did that      15:19:48
2  concern you?                                  15:19:50
3      A.  Yes.                                  15:19:50
4      Q.  Okay.  And it also -- and it          15:19:50
5  concerned you because you had been unable to  15:19:52
6  detect the fact that they actually had        15:19:56
7  shipped many suspicious orders, according to  15:19:58
8  the DEA, prior to 2010, correct?              15:20:00
9      MR. O'CONNOR:  Objection to               15:20:01
10 form.                                         15:20:02
11     THE WITNESS:  It concerned me             15:20:02
12 because they were direct customers of         15:20:05
13 Mallinckrodt.                                 15:20:06
14 QUESTIONS BY MR. KO:                          15:20:07
15     Q.  Okay.  And they were direct           15:20:07
16 customers of Mallinckrodt that had            15:20:09
17 Mallinckrodt pills sold to pharmacies and     15:20:12
18 clinics -- strike that.                       15:20:16
19     When you say it concerned you             15:20:22
20 because they were direct customers of         15:20:27
21 Mallinckrodt, is it also accurate to say that 15:20:28
22 you were concerned because Mallinckrodt pills 15:20:30
23 may have been diverted or abused as a result  15:20:37
24 of shipments made by Sunrise and Harvard?     15:20:40
25     MR. O'CONNOR:  Objection to               15:20:42

Page 311

1  form.                                         15:20:43
2      THE WITNESS:  Yes.                         15:20:44
3  QUESTIONS BY MR. KO:                          15:20:46
4      Q.  Okay.  Now, I want to turn to         15:20:47
5  the -- you can keep the e-mail in front of    15:20:49
6  you if you'd like, but this document which is 15:20:53
7  Exhibit 35, that appears to be a chronology   15:20:58
8  of the suspicious order monitoring program    15:21:03
9  from August 2008 through 2010; is that        15:21:05
10 correct?                                       15:21:08
11     A.  That is correct.                      15:21:08
12     Q.  And it's specifically a               15:21:08
13 chronology of the SOM program regarding       15:21:12
14 Mallinckrodt's dosage products during that    15:21:14
15 time period, correct?                          15:21:17
16     A.  Correct.                              15:21:17
17     Q.  And in Exhibit 15, you                15:21:18
18 reference to Ms. Spaulding a chronology, a    15:21:22
19 lengthy chronology, to try and get her up to  15:21:25
20 speed on what has occurred with respect to    15:21:28
21 Mallinckrodt's SOM program.                    15:21:30
22     Do you see a reference to that?           15:21:32
23     It'll be at the --                        15:21:38
24     A.  Yes, yes, I do.                       15:21:39
25     Q.  Do you recall whether or not         15:21:41

Page 312

1  this chronology is the chronology that you    15:21:41
2  conveyed to Ms. Spaulding?                    15:21:44
3      A.  Yes, I believe it is.                 15:21:47
4      Q.  Okay.  And does the                   15:21:48
5  chronology -- indicates that in the fall      15:22:04
6  of 2008 -- well, first of all, there's a      15:22:07
7  reference made at the top of the page to an   15:22:09
8  old version that was being sent to DEA        15:22:11
9  Albany.                                        15:22:15
10     Do you see that?                          15:22:16
11     A.  Yes, I do.                            15:22:16
12     Q.  And in your chronology you           15:22:16
13 indicate, quote, "This reporting system was   15:22:22
14 discontinued at the direction of suspicious   15:22:24
15 order monitoring team pending new order       15:22:27
16 algorithms that the SOM team was working to   15:22:30
17 establish."                                    15:22:32
18     Did I read that correctly?               15:22:33
19     A.  Yes.                                  15:22:33
20     Q.  So, again, in the fall of 2008,      15:22:35
21 you are continually working on revising the   15:22:37
22 SOM program, correct?                          15:22:40
23     A.  Correct.                              15:22:41
24     Q.  And you had abandoned a              15:22:42
25 reporting system that was in place to send    15:22:45

Page 313

1  reports to DEA Albany as of this date,        15:22:49
2  correct?                                       15:22:52
3      A.  Yes.                                  15:22:52
4      Q.  Okay.  Turning to the next           15:22:54
5  page, there's an indication on February 16,   15:23:11
6  2009, that "SOM draft procedure sent to legal 15:23:18
7  department for further review relative to new 15:23:22
8  tasks being created as part of the revised    15:23:29
9  program."                                      15:23:31
10     Do you see that?                          15:23:31
11     A.  Yes.                                  15:23:31
12     Q.  So legal played a part in the        15:23:31
13 review of the SOM draft procedures and the    15:23:33
14 ultimate implementation of the revised SOM    15:23:36
15 program; is that fair to say?                 15:23:39
16     A.  Yes.                                  15:23:40
17     Q.  Okay.  And do you recall             15:23:40
18 working with Mr. Lohman and Ms. Duft in       15:23:41
19 connection with implementation of the revised 15:23:45
20 SOM program?                                   15:23:47
21     A.  Yes.                                  15:23:48
22     Q.  Is it fair to say that they          15:23:48
23 had -- in addition to working with them, is   15:23:54
24 it fair to say that they had -- or how would  15:23:56
25 you describe their involvement in the         15:24:01

Page 314

1  implementation of the revised SOM program?  15:24:02
2       MR. O'CONNOR: I'm just going  15:24:05
3  to remind the witness not to get into  15:24:06
4  any specific communications with  15:24:07
5  counsel.  15:24:08
6       THE WITNESS: They were  15:24:09
7  contributors and reviewers in terms of  15:24:13
8  the current system set of enhancements  15:24:15
9  that we were working on.  15:24:17
10 QUESTIONS BY MR. KO:  15:24:18
11      Q.  Sure.  15:24:18
12      And do you recall how  15:24:18
13 frequently you communicated with them during  15:24:22
14 this time period?  15:24:24
15      A.  I do not.  15:24:25
16      Q.  Okay.  Do you recall whether or  15:24:26
17 not it was monthly communications with them  15:24:27
18 or weekly communications?  15:24:30
19      A.  I do not.  15:24:32
20      Q.  Relative to other people that  15:24:33
21 you had worked with in connection with  15:24:35
22 revising the SOM policy, do you have any  15:24:36
23 understanding of whether or not their  15:24:40
24 involvement was higher or lower than, for  15:24:42
25 example, your interactions with Mr. Ratliff  15:24:47

Page 315

1  in the security department?  15:24:49
2       MR. O'CONNOR: Objection to  15:24:53
3  form.  15:24:53
4       THE WITNESS: I'm sorry, I  15:24:53
5  thought you were talking about legal.  15:24:54
6  QUESTIONS BY MR. KO:  15:24:55
7       Q.  I am.  And I'm just trying to  15:24:55
8  get an understanding --  15:24:57
9       A.  Okay.  15:24:57
10      Q.  Because since you can't  15:24:59
11 necessarily recall how involved they were,  15:25:01
12 I'm just trying to get an understanding of  15:25:03
13 perhaps seeing if you knew how much they were  15:25:05
14 involved relative to other groups that were  15:25:07
15 part of the SOM team.  15:25:08
16      So it's fair to say that they  15:25:09
17 were part of the SOM -- legal was part of the  15:25:10
18 SOM team, correct?  15:25:13
19      A.  Correct.  15:25:13
20      Q.  And you had some interaction  15:25:14
21 with them in implementing an SOM program,  15:25:16
22 correct?  15:25:19
23      A.  Correct.  15:25:19
24      Q.  And would you say that that  15:25:20
25 involvement or interaction was more or less  15:25:22

Page 316

1  than the interaction you had with other  15:25:26
2  groups?  15:25:29
3       A.  I don't know.  I can't say.  15:25:30
4       Q.  Okay.  15:25:33
5       A.  I can't answer.  15:25:33
6       Q.  Do you recall if you had any  15:25:33
7  kind of day-to-day communication with them?  15:25:35
8       A.  I don't recall, but I do not  15:25:37
9  think so.  15:25:43
10      Q.  Okay.  Now, on the next --  15:25:43
11 well, the next entry is redacted, but the  15:25:50
12 entry after that dated March 2, 2009,  15:25:52
13 indicates that "Mr. Rausch continues to work  15:25:54
14 with IS to define the criteria of what would  15:25:57
15 be peculiar -- what would be a peculiar order  15:25:59
16 and how to determine programmatic flags for  15:26:01
17 detection."  15:26:05
18      Did I read that correctly?  15:26:06
19      A.  Yes, you did.  15:26:06
20      Q.  Okay.  And perhaps it might  15:26:09
21 mean to say problematic, but in any way, we  15:26:10
22 don't need to guess.  15:26:14
23      It's fair to say that as of  15:26:17
24 March 2, 2009, Jim Rausch is continuing to  15:26:19
25 try and define the criteria of what  15:26:24

Page 317

1  constitutes a peculiar order.  15:26:26
2       MR. O'CONNOR: Objection.  15:26:27
3  QUESTIONS BY MR. KO:  15:26:27
4       Q.  Correct?  15:26:28
5       A.  That is correct.  15:26:28
6       Q.  And IS is information systems?  15:26:29
7       A.  Yes, that's correct.  15:26:31
8       Q.  And was there a point person  15:26:32
9  in -- at IS that you worked with or you knew  15:26:34
10 was part of the SOM team?  15:26:37
11      A.  I don't know.  15:26:39
12      Q.  Okay.  Now, further down on  15:26:41
13 June 29, 2009, you indicate that "revised  15:26:48
14 questionnaire -- customer questionnaires are  15:26:54
15 submitted to legal that have been updated  15:26:56
16 based upon CSF focus group meetings Jim  15:26:58
17 Rausch and Cathy Stewart conducted with  15:27:02
18 CSRs."  15:27:04
19      Did I read that correctly?  15:27:05
20      A.  Yes.  15:27:05
21      Q.  So again, you're continually  15:27:06
22 working on the customer checklists or  15:27:07
23 questionnaires that will be submitted to  15:27:10
24 Mallinckrodt customers in connection with the  15:27:13
25 SOM program; fair to say?  15:27:15

Page 318

1    A.   Yes.                    15:27:17
2    Q.   Okay.  And the -- by the way,    15:27:18
3  in this chronology that you drafted, you    15:27:36
4  represented to Eileen that this was an    15:27:40
5  attempt by you to provide an extensive    15:27:44
6  chronology on SOM activities during this    15:27:49
7  two-year time period.              15:27:52
8         Why were you providing this to    15:27:52
9  her?                            15:27:56
10    A.   I was assigned at the St. Louis    15:27:56
11  plant, working in the plant during a work    15:27:57
12  stoppage which had gone on for an extended    15:28:00
13  period of time, months, and so I wanted to    15:28:04
14  update Eileen on the status of the current    15:28:07
15  system of enhancements.              15:28:10
16    Q.   Okay.  And do you recall    15:28:11
17  whether or not you may have provided this to    15:28:13
18  her in preparation for any meetings that she    15:28:15
19  was having with DEA?                15:28:18
20    A.   I don't recall.              15:28:19
21    Q.   Okay.  And you did reference a    15:28:23
22  work stoppage at Mallinckrodt.  I understand    15:28:26
23  that there was a strike by some employees at    15:28:29
24  Covidien at the time.              15:28:31
25    A.   Is that referenced here?        15:28:31

Page 319

1    Q.   I don't think it is.          15:28:33
2    A.   Okay.                      15:28:34
3    Q.   Yeah, but --                15:28:34
4    A.   All right.                  15:28:34
5    Q.   -- just -- just generally there    15:28:35
6  was --                          15:28:35
7    A.   Yes, you're correct.  Yes.    15:28:35
8    Q.   There was a strike by Covidien    15:28:37
9  employees in the 2010 time period.        15:28:39
10         How long did that last?        15:28:41
11    A.   17 weeks, I believe.          15:28:42
12    Q.   Okay.  A fairly long strike.    15:28:51
13    A.   (Witness nods head.)          15:28:52
14    Q.   And during that time period,    15:28:53
15  was there any work done on attempting to    15:28:54
16  improve or revise the SOM process?        15:28:56
17    A.   Yes.                      15:29:00
18    Q.   And who was that work done by?    15:29:01
19    A.   So the work was ongoing, with    15:29:03
20  Jim Rausch working with IT on the algorithms,    15:29:06
21  so other subcomponents of the team continued    15:29:10
22  while I was away.                  15:29:13
23    Q.   Okay.  And with respect to this    15:29:15
24  chronology, you have no reason to dispute the    15:29:17
25  accuracy of any of these events that you    15:29:21

Page 320

1  report to Ms. Spaulding, do you?        15:29:25
2    A.   I do not.                  15:29:26
3    Q.   Okay.  And by the way, what was    15:29:29
4  the approximate date of the strike?      15:29:30
5    A.   It was in 2010, and I believe    15:29:31
6  it would have started in March or April    15:29:38
7  because our union contract's due in March,    15:29:39
8  but I think they had an extension until    15:29:43
9  April.  So I'm not -- around that time.    15:29:45
10    Q.   Okay.  Great.              15:29:48
11         And it lasted until May or June    15:29:49
12  of 2010?                        15:29:54
13    A.   Or longer.  I can't --        15:29:54
14    Q.   Sure.                    15:29:57
15    A.   I can't remember when it was    15:29:57
16  over.                          15:29:58
17    Q.   Sure.                    15:29:58
18         Turn to page 4 of this report,    15:29:59
19  this chronology.  There's a reference made    15:30:02
20  that on April 30, 2010, the peculiar order    15:30:11
21  calculations changed from a 2X factor to a 3X    15:30:14
22  factor.                        15:30:18
23         Do you see that reference?      15:30:20
24    A.   I do.                    15:30:21
25    Q.   So if I understand correctly,    15:30:22

Page 321

1  the peculiar order algorithm on April 30,    15:30:27
2  2010, increased from 2X to 3X, correct?    15:30:30
3    A.   That's correct.              15:30:36
4    Q.   So in other words, as of April    15:30:36
5  30, 2010, the algorithm that Mallinckrodt    15:30:38
6  utilized to determine whether or not an order    15:30:42
7  was suspicious was by determining whether an    15:30:44
8  order was three times greater than the prior    15:30:50
9  year average; is that accurate?          15:30:54
10    A.   Yes.                      15:30:57
11    Q.   Okay.  And this increase        15:30:58
12  resulted for a variety of reasons, is my    15:31:04
13  understanding, but is one of the reasons that    15:31:08
14  you increased from 2X to 3X because the    15:31:11
15  peculiar order report was too lengthy?    15:31:14
16         MR. O'CONNOR:  Objection to    15:31:18
17    form.                        15:31:19
18         THE WITNESS:  Yes.          15:31:20
19  QUESTIONS BY MR. KO:                15:31:20
20    Q.   So it was creating an          15:31:21
21  administrative burden because there were too    15:31:22
22  many orders to review?              15:31:25
23         MR. O'CONNOR:  Objection to    15:31:26
24    form.                        15:31:27
25         THE WITNESS:  Yes.          15:31:27

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  QUESTIONS BY MR. KO:        15:31:29
2      Q.   Okay.  And so you and others    15:31:29
3  believed that increasing the peculiar order    15:31:33
4  algorithm to 3X would reduce the amount of    15:31:37
5  reports that were printed for the SOM team to    15:31:39
6  review, correct?        15:31:43
7      A.   That's correct, and the hope    15:31:45
8  was that the truly -- the orders that needed    15:31:47
9  to be investigated further would then print    15:31:50
10 based upon this new change in the algorithm.    15:31:54
11     Q.   Okay.  And the increase from 2X    15:31:59
12 to 3X occurs during this time period -- well,    15:32:07
13 strike that.        15:32:10
14         I believe as of the date of --    15:32:27
15 I know you don't recall when the actual    15:32:29
16 revised SOM policy was formalized, but at    15:32:32
17 least as of the date of this e-mail,    15:32:34
18 October 31, 2010, the revised SOM program had    15:32:36
19 yet to be formalized; is that correct?    15:32:38
20         MR. O'CONNOR:  Objection.    15:32:40
21 Form.        15:32:41
22         THE WITNESS:  So that    15:32:41
23 depends -- yes.  In a final SOP, yes,    15:32:46
24 but I believe that we were updating    15:32:50
25 our work instructions or our    15:32:52

Page 323

1      procedures all the way along the line.    15:32:53
2      But, yes, finalized, signed, sealed,    15:32:56
3      yes, it was not at that time.        15:32:59
4  QUESTIONS BY MR. KO:        15:33:00
5      Q.   And when we talk about the    15:33:00
6  final SOP or SOM procedure, this was a formal    15:33:01
7  document which lays out the criteria for    15:33:04
8  identifying a suspicious order, correct?    15:33:07
9      A.   Correct.        15:33:10
10     Q.   And so at the time -- as of    15:33:11
11 October 31, 2010, a final SOM procedure that    15:33:13
12 outlines the criteria for identifying a    15:33:19
13 suspicious order had not yet been finalized,    15:33:22
14 correct?        15:33:25
15     A.   So does this -- oh, that --    15:33:25
16 yes, that's correct based upon this e-mail,    15:33:30
17 yes.        15:33:32
18     Q.   Okay.  I'm going to hand you a    15:33:47
19 copy of what will be marked as Harper    15:33:49
20 Exhibit 16.        15:33:50
21     A.   May I put these aside?    15:33:51
22     Q.   Yes, you may.        15:33:52
23     A.   All right.        15:33:54
24     Q.   Actually, I lied.  It won't be    15:33:54
25 Exhibit 16.  It's previously been marked as    15:34:02

Page 324

1  Exhibit 33 to the Stewart deposition.    15:34:04
2          MR. KO:  And for the record, it    15:34:15
3      ends in Bates 279975.        15:34:11
4  QUESTIONS BY MR. KO:        15:34:11
5      Q.   And this appears to be an    15:34:22
6  e-mail exchange between you and Ms. Stewart.    15:34:23
7          Do you see that?        15:34:25
8      A.   Yes.        15:34:26
9      Q.   And I just have a couple    15:34:26
10 questions on this.        15:34:28
11         Ms. Stewart asks on Monday,    15:34:32
12 August 9, 2010, quote, "How's progress on the    15:34:36
13 revised suspicious order monitoring program    15:34:43
14 going?" end quote.        15:34:44
15         Did I read that correctly?    15:34:47
16     A.   Yes.        15:34:48
17     Q.   Okay.  And your response -- you    15:34:48
18 respond several things, but your response to    15:34:53
19 this question is, quote, "We had a meeting    15:34:54
20 last week that could only be classified as a    15:34:57
21 train wreck, but the effort will continue and    15:35:00
22 I will not be discouraged.  I will not be    15:35:02
23 discouraged.  I will not be discouraged."    15:35:38
24         Did I read that correctly?    15:35:07
25     A.   Yes.        15:35:07

Page 325

1      Q.   Okay.  So fair to say that as    15:35:08
2  of August 9, 2010, at least with respect to    15:35:11
3  the meeting you had on the revised SOM    15:35:14
4  program, you believed that the meeting was a    15:35:16
5  train wreck, correct?        15:35:19
6      A.   That particular meeting, but I    15:35:21
7  don't remember what the meeting was, and it's    15:35:23
8  an inartful term on my part.  But, yes,    15:35:24
9  that's what the e-mail says.        15:35:29
10     Q.   And you have no reason to doubt    15:35:30
11 that you sent this e-mail to Ms. Stewart?    15:35:32
12     A.   I don't.        15:35:34
13     Q.   Okay.  Were you frustrated at    15:35:35
14 the time in August of 2010 with how the    15:35:39
15 revised suspicious order monitoring program    15:35:42
16 was going?        15:35:44
17     A.   I would like -- I would like to    15:35:44
18 read this whole e-mail, please, for context,    15:35:51
19 because it appears to be talking about    15:35:53
20 exports, import permits and letters of    15:35:56
21 non-reexport.        15:35:59
22         So we've switched the    15:36:00
23 conversation to SOM, but I don't see that on    15:36:01
24 this page.        15:36:04
25     Q.   Sure.  Sure.        15:36:05

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1     So I guess -- I'll just ask you     15:36:05
2  a question to save time.     15:36:08
3         Ms. Stewart clearly asks you     15:36:10
4  whether -- how progress on the revised     15:36:12
5  suspicious order monitoring program is going,     15:36:16
6  correct?     15:36:17
7     A.  Yes.     15:36:17
8     Q.  And separate and apart --     15:36:17
9  separate and apart from what you responded to     15:36:18
10  her, however inartful that was, my question     15:36:22
11  to you is:  Do you recall in the 2010 time     15:36:25
12  period being frustrated at the progress of     15:36:29
13  the revised SOM policy at Mallinckrodt?     15:36:32
14     A.  Yes.     15:36:35
15     Q.  Okay.  And as of August 2010,     15:36:40
16  this is about two and a half years after you     15:36:55
17  first identify SOM as being an elevated     15:36:58
18  priority for you; is that fair to say?     15:37:01
19     A.  Yes.     15:37:03
20         (Mallinckrodt-Harper Exhibit 16     15:37:07
21     marked for identification.)     15:37:07
22  QUESTIONS BY MR. KO:     15:37:07
23     Q.  Okay.  I'm going to hand you a     15:37:07
24  copy of what's going to now be marked as --     15:37:08
25  you can set that aside.     15:37:11

Page 327

1     A.  All right.     15:37:12
2     Q.  This is a copy of Harper     15:37:13
3  Exhibit 16.  And for the record, it ends in     15:37:20
4  Bates 280260.     15:37:25
5         And this is an e-mail exchange     15:37:37
6  between, again, you and Ms. Spaulding dated     15:37:38
7  September 24, 2010?     15:37:44
8     A.  Correct, yes.     15:37:45
9     Q.  And Ms. Spaulding asks at the     15:37:46
10  bottom how a conference call on SOM went.     15:37:54
11         Do you see that?     15:37:59
12     A.  Uh-huh.  I do.     15:38:00
13     Q.  And you respond, and I'd ask     15:38:01
14  that you read the first full sentence at the     15:38:05
15  top of your e-mail.     15:38:11
16     A.  "Interesting, the group     15:38:12
17  decided" --     15:38:15
18     Q.  I'm sorry, just I guess --     15:38:15
19     A.  Oh, I beg your pardon.     15:38:17
20     Q.  Yeah, I guess "pretty well" is     15:38:19
21  the first sentence.  Just so just start     15:38:20
22  reading from "pretty well."     15:38:23
23     A.  Oh, I'm sorry.     15:38:25
24     Q.  That's okay.     15:38:25
25     A.  "Pretty well.  Interesting, the     15:38:26

Page 328

1  group decided that the actual day-to-day     15:38:28
2  monitoring responsibility should be switched     15:38:31
3  to a non-customer service function in that     15:38:32
4  those that have responsibility to manage the     15:38:38
5  orders have a conflict of interest in     15:38:40
6  deciding which orders should ultimately be     15:38:42
7  shipped, with the ultimate right -- with     15:38:46
8  ultimate right of refusal retained by the     15:38:50
9  controlled substances compliance group."     15:38:55
10     Q.  Okay.  Thank you for that.     15:38:56
11         So is it accurate to say that     15:38:57
12  one of the things that came out of this     15:39:00
13  conference call regarding Mallinckrodt's then     15:39:03
14  existing SOM procedure was that you were     15:39:05
15  attempting to shift the day-to-day monitoring     15:39:09
16  responsibility of particular orders to a     15:39:12
17  non-customer service function?     15:39:19
18     A.  That is correct.     15:39:20
19     Q.  Okay.  And earlier we had     15:39:21
20  discussed about -- earlier we had discussed     15:39:27
21  the fact that certain salespeople did not     15:39:29
22  have day-to-day monitoring responsibilities     15:39:32
23  with respect to SOM.     15:39:34
24         Does this change your testimony     15:39:36
25  at all or refresh your recollection at all     15:39:38

Page 329

1  that at one point in time NAMs and/or     15:39:40
2  customer service representatives did, indeed,     15:39:44
3  have day-to-day monitoring responsibilities     15:39:49
4  with respect to Mallinckrodt's suspicious     15:39:50
5  order monitoring program?     15:39:52
6         MR. O'CONNOR:  Objection to     15:39:53
7     form.     15:39:54
8         THE WITNESS:  So I'd like to     15:39:54
9     clarify, please.     15:39:54
10         When we talk about commercial     15:39:55
11     group, that's the NAMs.     15:39:56
12         Customer service is not called     15:39:58
13     commercial group, unless I     15:40:00
14     inadvertently referred to them as that     15:40:01
15     here.  They've never been part --     15:40:04
16     even -- it seems like they would be     15:40:07
17     commercial.  They are not commercial     15:40:09
18     group.     15:40:10
19         So this is talking about switch     15:40:12
20     from a non-customer service function.     15:40:13
21  QUESTIONS BY MR. KO:     15:40:15
22     Q.  Okay.  So are you referring     15:40:16
23  here to CSRs or NAMs?     15:40:17
24     A.  CSRs.     15:40:20
25     Q.  Okay.  So then prior to the     15:40:21

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  date of this e-mail, it would be accurate to    15:40:25
2  say that CSRs had actual day-to-day             15:40:27
3  monitoring responsibilities with respect to     15:40:30
4  Mallinckrodt's SOM program?                      15:40:31
5      A.   So I'd like to clarify. It was    15:40:33
6  Jim Rausch in particular who was the manager  15:40:34
7  of C -- customer service.                        15:40:36
8      Q.   Okay. So what you're saying       15:40:39
9  then through this e-mail is that you wanted    15:40:41
10 to remove Jim Rausch from the day-to-day       15:40:45
11 monitoring of Mallinckrodt's SOM program?      15:40:48
12     A.   The group decided that, yes.      15:40:50
13     Q.   Okay. And did you in fact         15:40:52
14 implement this policy change?                    15:40:53
15     A.   Yes.                              15:40:55
16     Q.   Okay. Now, I know that you're     15:40:55
17 not referring to NAMs here, but would you      15:41:11
18 agree with me that -- well, first of all, let  15:41:15
19 me back up.                                      15:41:19
20          Do you have any understanding      15:41:19
21 of how many national account managers there   15:41:20
22 were at Mallinckrodt?                           15:41:23
23     A.   I do not.                         15:41:24
24     Q.   Okay. Does the number four        15:41:25
25 sound accurate to you?                          15:41:29

Page 331

1      A.   It's possible. I just don't --   15:41:30
2  I don't know.                                    15:41:32
3      Q.   Okay. Would you -- if I           15:41:33
4  represented to you, and assuming that I could  15:41:38
5  prove at trial that there were approximately   15:41:40
6  eight national account managers at            15:41:42
7  Mallinckrodt during the 2005 through 2015     15:41:44
8  time period, does that -- is that consistent   15:41:48
9  with your understanding?                         15:41:49
10          MR. O'CONNOR: Object to form.     15:41:51
11          THE WITNESS: I just don't know    15:41:52
12     who the NAMs were at any particular     15:41:55
13     time or assigned to which product       15:41:57
14     line.                                   15:41:59
15 QUESTIONS BY MR. KO:                         15:42:00
16     Q.   Sure.                             15:42:00
17          But you interacted with many of   15:42:00
18 the NAMs, correct?                              15:42:03
19     A.   Correct.                          15:42:04
20     Q.   And how many NAMs did you         15:42:05
21 interact with?                                   15:42:06
22     A.   Four to six, I'm guesstimating.   15:42:06
23     Q.   And among those were Victor       15:42:13
24 Borelli, Steve Becker and Jane Williams,       15:42:16
25 correct?                                         15:42:19

Page 332

1      A.   Yes, except Jane Williams was     15:42:19
2  vice president. And she was in charge of the   15:42:22
3  NAMs but not a NAM herself.                      15:42:24
4      Q.   Right. Thank you for the          15:42:26
5  clarification.                                   15:42:27
6          So during the two -- would it      15:42:27
7  be accurate to say that during the 2005       15:42:30
8  through 2017 time period you interacted with  15:42:35
9  about four NAMs?                                 15:42:37
10     A.   So there was also -- Bonnie New   15:42:39
11 is another. There was a gentleman who -- a     15:42:46
12 name Dave Irwin. Again, people transitioned   15:42:51
13 roles over time, and, I'm sorry, I cannot say  15:42:53
14 that at one certain time frame which NAMs I    15:42:54
15 interacted with.                                 15:42:57
16     Q.   Sure. And I'm just trying to      15:42:57
17 get a general understanding.                     15:42:59
18     A.   Okay.                             15:43:00
19     Q.   So approximately four to five     15:43:01
20 NAMs that you interacted with in connection    15:43:02
21 with your -- in connection with your          15:43:04
22 responsibilities in designing, implementing,  15:43:08
23 an SOM program, correct?                         15:43:09
24     A.   I'll agree with approximately,    15:43:11
25 yes.                                            15:43:13

Page 333

1      Q.   Okay. And despite not knowing     15:43:13
2  exactly how much NAMs made, was it your       15:43:24
3  understanding that NAMs were compensated      15:43:26
4  based on the amount of customers that they    15:43:27
5  had?                                            15:43:32
6      A.   No, I didn't -- I didn't know.   15:43:32
7      Q.   You had no understanding?         15:43:34
8      A.   Right.                            15:43:35
9      Q.   Okay. To the extent they were    15:43:36
10 compensated based on the volume of pills      15:43:40
11 purchased by their customers, would you agree  15:43:46
12 that that would be a conflict of interest --   15:43:48
13          MR. O'CONNOR: Object to form.     15:43:51
14 QUESTIONS BY MR. KO:                         15:43:51
15     Q.   -- to the extent they were        15:43:51
16 involved in the SOM monitoring process?        15:43:52
17          MR. O'CONNOR: Same objection.     15:43:54
18          THE WITNESS: So I'm sorry, are    15:43:54
19     we making the -- the inferential leap   15:43:55
20     that they were definitely -- because I  15:43:59
21     don't know about their compensation,    15:44:01
22     if it was dollars, pills, accounts,     15:44:01
23     regions. I don't know that.            15:44:04
24 QUESTIONS BY MR. KO:                         15:44:05
25     Q.   Sure.                             15:44:06

Highly Confidential – Subject to Further Confidentiality Review

Page 334

1    Assuming that NAMs were paid              15:44:06
2  based on volume of pills sold, at least in    15:44:09
3  part --                                        15:44:11
4    A.   Okay.                                   15:44:11
5    Q.   -- were paid based on the              15:44:13
6  amount of pills that they were able to sell    15:44:14
7  to a particular customer, would you agree      15:44:16
8  that that would be a conflict of interest to   15:44:18
9  have them involved in evaluating whether or    15:44:21
10 not an order was suspicious?                   15:44:23
11    MR. O'CONNOR:   Object to form.            15:44:24
12    THE WITNESS:   No.                          15:44:25
13 QUESTIONS BY MR. KO:                           15:44:26
14    Q.   Okay.  And going back to the          15:44:26
15 e-mail that's in front of you and -- you       15:44:41
16 indicate that at least from this meeting it    15:44:45
17 was agreed that customer service              15:44:51
18 representatives would no longer be involved    15:44:56
19 in the day-to-day monitoring because of        15:44:58
20 their -- because of a conflict of interest.    15:45:00
21    MR. O'CONNOR:   Object to form.            15:45:02
22 QUESTIONS BY MR. KO:                           15:45:03
23    Q.   Do you see it?                         15:45:05
24    A.   Yes.  Yes, I do see that.  Yes.       15:45:06
25    Q.   And what is the conflict of           15:45:09

Page 335

1  interest that you're referring to there?       15:45:10
2    A.   It's a -- you know, it's just a        15:45:11
3  conglomeration of even though customer         15:45:12
4  service is separate from the NAMs and          15:45:16
5  separate from commercial, customer service     15:45:20
6  does maintain a relationship with the          15:45:22
7  customers.  And so that's the basis on which   15:45:24
8  this statement was made.                       15:45:26
9    Q.   Well, how -- how was it any            15:45:28
10 different -- how was the conflict of interest  15:45:34
11 that applies with respect to the customer      15:45:36
12 service group any different than a conflict    15:45:38
13 of interest that would apply with respect to   15:45:40
14 the national account managers?                 15:45:43
15    A.   So customer service group             15:45:44
16 maintained the relationship with the           15:45:51
17 customer, as did the NAMs.                      15:45:53
18    Could you repeat that question,            15:45:55
19 please?  I'm getting mixed up as I'm thinking  15:45:56
20 of my answer.  I'm sorry.                       15:46:01
21    Q.   Sure.                                  15:46:03
22    How was the conflict of                    15:46:03
23 interest that applies with the customer        15:46:04
24 service group that you're referring to in      15:46:07
25 this e-mail differ in any way from the         15:46:10

Page 336

1  conflict of interest that would apply with     15:46:13
2  respect to a national account manager?         15:46:15
3    MR. O'CONNOR:   Object to form.             15:46:16
4    THE WITNESS:   So it doesn't,               15:46:17
5  because neither of them, neither the           15:46:18
6  NAMs or customer service, were --             15:46:20
7  after this, they were not directly             15:46:26
8  responsible for the day-to-day                15:46:28
9  monitoring.  They were consulted or            15:46:29
10 rose situations to our attention.             15:46:31
11 QUESTIONS BY MR. KO:                           15:46:33
12    Q.   I understand that that was            15:46:34
13 the -- what happened after this e-mail, and    15:46:34
14 that change was attempted to be made.  But     15:46:37
15 prior to the date of this, you are             15:46:40
16 indicating, are you not, in this e-mail that   15:46:46
17 a conflict of interest exists with respect to  15:46:47
18 the customer service group?                    15:46:49
19    A.   It does state -- yes, it does         15:46:51
20 state that.                                     15:46:59
21    Q.   And you said also that national       15:46:59
22 account managers have involvement in -- in     15:47:01
23 Mallinckrodt customers as well, right?         15:47:04
24    A.   Correct.                               15:47:06
25    Q.   And that approximately four to        15:47:07

Page 337

1  eight national account managers that           15:47:11
2  Mallinckrodt had, they were in charge of       15:47:12
3  wholesale distributors that Mallinckrodt       15:47:15
4  supplied drugs to, correct?                     15:47:18
5    MR. O'CONNOR:   Object to form.             15:47:20
6    THE WITNESS:   Correct.                      15:47:20
7  QUESTIONS BY MR. KO:                           15:47:21
8    Q.   And so the -- do you believe          15:47:22
9  that a conflict of interest exists with        15:47:28
10 respect to a national account manager's        15:47:32
11 involvement in the suspicious order           15:47:34
12 monitoring program given that their --        15:47:36
13 assuming this was true -- given that their     15:47:40
14 primary form of compensation was the amount    15:47:44
15 of pills they were able to sell --            15:47:47
16    MR. O'CONNOR:   Object to form.            15:47:49
17 QUESTIONS BY MR. KO:                           15:47:49
18    Q.   -- to a particular Mallinckrodt       15:47:50
19 customer?                                       15:47:52
20    MR. O'CONNOR:   Objection.                 15:47:52
21    THE WITNESS:   No, I do not.               15:47:53
22 QUESTIONS BY MR. KO:                           15:47:54
23    Q.   Okay.  It's okay to say no.          15:47:54
24    A.   Oh, I'm sorry.  I'm sorry.           15:48:06
25    Q.   No, don't be sorry.                   15:48:09

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Here's --                          15:48:09
2    A.   That was for emphasis.        15:48:09
3    Q.   I want to hand you a copy of   15:48:10
4  what's going to be -- what has previously  15:48:11
5  been marked -- you can set that aside --  15:48:12
6  what's previously been marked as Exhibit 44  15:48:17
7  of the Stewart deposition.           15:48:19
8    MR. KO:  And for the record,      15:48:20
9    it's dated -- sorry, that's -- ends  15:48:22
10    in Bates 3028219.                 15:48:25
11  QUESTIONS BY MR. KO:                 15:48:25
12    Q.   And before turning to the text  15:48:32
13  of this document, Mr. -- as we discussed  15:48:33
14  before, Mr. Borelli is a national account  15:48:37
15  manager, correct?                    15:48:40
16    A.   Yes.                          15:48:40
17    Q.   Okay.  And he was a national  15:48:41
18  account manager in charge of certain  15:48:44
19  distributors that Mallinckrodt shipped pills  15:48:45
20  to, correct?                         15:48:47
21    A.   Yes.                          15:48:48
22    Q.   And the context of this e-mail,  15:48:49
23  or the subject, is Sunrise Wholesale,  15:48:56
24  correct?                             15:48:57
25    A.   Yes.                          15:48:58

Page 339

1    Q.   And as we discussed before,   15:48:58
2  Sunrise had its license revoked by the DEA in  15:48:59
3  2010 as a result of suspicious orders they  15:49:02
4  were shipping to Florida, correct?   15:49:05
5    MR. O'CONNOR:  Object to form.    15:49:07
6    THE WITNESS:  Yes.               15:49:08
7  QUESTIONS BY MR. KO:                  15:49:09
8    Q.   Okay.  And Sunrise was a       15:49:09
9  customer, again, of Mallinckrodt?    15:49:11
10    A.   Yes.                          15:49:13
11    Q.   And is it your understanding  15:49:14
12  that Mr. Borelli was in charge of the Sunrise  15:49:17
13  account?                             15:49:24
14    A.   Yes.                          15:49:24
15    Q.   Okay.  And Ms. Stewart        15:49:24
16  indicates some language to you about  15:49:27
17  Mr. Borelli and indicates that the e-mail  15:49:31
18  importance is high.                  15:49:34
19    She says quote, "FYI, the         15:49:35
20  customer service reps all state that Victor  15:49:38
21  will tell them anything they want to hear  15:49:41
22  just so he can get the sale," end quote.  15:49:42
23    Did I read that correctly?       15:49:46
24    A.   You did.                      15:49:46
25    Q.   Okay.  And Mr. Borelli had    15:49:47

Page 340

1  involvement in the suspicious order   15:49:49
2  monitoring program, did he not?      15:49:51
3    A.   To the extent that we would    15:49:52
4  occasionally ask the NAMs questions after the  15:49:58
5  algorithm indicated an order was for further  15:50:01
6  review, yes, that's correct.         15:50:03
7    Q.   So were there instances in     15:50:03
8  which Mr. Borelli cleared -- or concluded  15:50:04
9  that a peculiar order was not suspicious and  15:50:11
10  relayed that information to you?     15:50:14
11    MR. O'CONNOR:  Object to form.    15:50:15
12    THE WITNESS:  Yes.               15:50:16
13  QUESTIONS BY MR. KO:                  15:50:17
14    Q.   Okay.  And the date of this    15:50:18
15  e-mail is May 20, 2008, correct?     15:50:18
16    A.   Yes.                          15:50:21
17    Q.   This is simultaneous to when   15:50:21
18  you are first starting to revamp your -- the  15:50:26
19  revised SOM program, correct?        15:50:31
20    A.   Yes.                          15:50:32
21    Q.   And you learned Mr. Borelli --  15:50:32
22  you learned from Ms. Stewart that all the  15:50:34
23  customer service reps all state that  15:50:36
24  Mr. Borelli will tell them anything they want  15:50:38
25  to hear just so he can get the sale, correct?  15:50:40

Page 341

1    A.   Yes, I see that that's printed  15:50:44
2  in the e-mail, yes, sir.             15:50:46
3    Q.   Okay.  So given that           15:50:47
4  Mr. Borelli has an incentive to obtain as  15:50:51
5  many sales as possible, is it still your  15:50:54
6  testimony that you believe it's not a  15:50:57
7  conflict of interest for him to be involved  15:50:58
8  in the evaluation of a peculiar order?  15:51:00
9    MR. O'CONNOR:  Object to form.    15:51:01
10    THE WITNESS:  Yes.  Yes.          15:51:03
11  QUESTIONS BY MR. KO:                  15:51:03
12    Q.   By the way, how many times did  15:51:04
13  Mr. Borelli confirm that an order was  15:51:05
14  actually suspicious?                 15:51:08
15    A.   I don't know.                 15:51:10
16    Q.   Well, you had previously -- we  15:51:16
17  had previously discussed an e-mail in which  15:51:18
18  you told Ms. Spaulding that no orders rose to  15:51:19
19  the level of suspicious in the 2008 to 2000  15:51:24
20  {sic} time period --                 15:51:26
21    A.   Okay.                         15:51:27
22    Q.   -- correct?                    15:51:28
23    A.   Uh-huh.                        15:51:28
24    Q.   So I take it that Mr. Borelli  15:51:29
25  never, ever identified a peculiar order as  15:51:33

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    being suspicious; is that accurate?          15:51:35
2          MR. O'CONNOR:  Object to form.          15:51:37
3          THE WITNESS:  Yes.          15:51:38
4    QUESTIONS BY MR. KO:          15:51:39
5    Q.     And the same would be true with          15:51:39
6    respect to Ms. New and Mr. Becker, correct?          15:51:41
7    A.     Yes.  Yes, I'm following you,          15:51:43
8    yes.          15:51:44
9    Q.     Yeah.          15:51:44
10          So to the extent that          15:51:44
11   Mr. Becker or Ms. New evaluated whether or          15:51:46
12   not a peculiar order was suspicious, they          15:51:50
13   never, in fact, reported that such an order          15:51:52
14   was suspicious to you, correct?          15:51:57
15   A.     Correct.          15:51:58
16   Q.     Okay.  Oh, and with respect          15:51:59
17   to -- so in addition to Ms. New, Mr. Becker          15:52:17
18   and Mr. Borelli, were there any other NAMs          15:52:22
19   during the 2008 to 2000 {sic} time period          15:52:25
20   that informed you that a peculiar order          15:52:30
21   should rise to the level of a suspicious          15:52:33
22   order?          15:52:35
23   A.     Tim Berry was a NAM for the          15:52:35
24   generics group at one point, and Dave Irwin,          15:52:38
25   but I just don't remember specifically          15:52:42

Page 343

1    conferring with them in terms of an order          15:52:43
2    that required further review.          15:52:46
3    Q.     Okay.  As you sit -- well,          15:52:48
4    again, based on your representation to          15:52:52
5    Ms. Spaulding that there were no suspicious          15:52:54
6    orders as of October 31, 2010, is it fair to          15:52:57
7    say that no national account manager ever          15:53:00
8    reported to you that a peculiar order should          15:53:03
9    rise to the level of being a suspicious          15:53:05
10   order?          15:53:08
11   A.     Yes.          15:53:08
12          (Mallinckrodt-Harper Exhibit 17          15:53:08
13   marked for identification.)          15:53:08
14   QUESTIONS BY MR. KO:          15:53:09
15   Q.     Okay.  I want to turn to a copy          15:53:09
16   of what will be marked as exhibit -- Harper          15:53:15
17   Exhibit 17.          15:53:19
18          And for the record, this          15:53:34
19   document is -- ends in Bates stamp 368390.          15:53:35
20          In an August 26, 2010 e-mail          15:53:50
21   from you to others, you state, "Ginger and          15:53:54
22   Kate," is the first page, "Although we          15:54:00
23   require direct customers to submit a          15:54:04
24   suspicious order monitoring customer          15:54:06
25   questionnaire with proof of their annual DEA          15:54:07

Page 344

1    license renewal, the question whether our          15:54:10
2    customers monitor their customers was removed          15:54:12
3    from the questionnaire by the Mallinckrodt          15:54:14
4    suspicious order monitoring team because          15:54:16
5    there is no actual regulatory obligation to          15:54:19
6    monitor customers' customers."          15:54:23
7          Did I read that correctly with          15:54:25
8    the exception of the insertion "is"?          15:54:26
9    A.     Yes.          15:54:30
10   Q.     Okay.  And so at -- is it safe          15:54:30
11   to say that prior to -- at some point prior          15:54:33
12   to August 26, 2010, in your customer          15:54:35
13   checklist you had a question of whether or          15:54:40
14   not your customers monitor their customers?          15:54:43
15   Correct?          15:54:50
16   A.     Yes.          15:54:50
17   Q.     But you removed that question          15:54:51
18   from the questionnaire, correct?          15:54:53
19   A.     Yes.          15:54:53
20   Q.     Set that aside.          15:54:54
21   A.     All right.          15:54:54
22   Q.     Did you believe that removing          15:55:10
23   that question from your questionnaire was an          15:55:10
24   enhancement of your SOM program?          15:55:12
25   A.     I don't think it was not, so          15:55:15

Page 345

1    that's a double negative.  I don't think it          15:55:17
2    was to the detriment of the program.          15:55:21
3    Q.     Okay.  So you don't regret          15:55:23
4    removing that question from your          15:55:25
5    questionnaire?          15:55:26
6    A.     No.          15:55:27
7    Q.     Okay.  And that's          15:55:28
8    notwithstanding the fact that you did receive          15:55:30
9    guidance from the DEA that they expected you          15:55:33
10   to monitor your customer's customer, correct?          15:55:35
11          MR. O'CONNOR:  Object to form.          15:55:37
12          THE WITNESS:  Correct.          15:55:39
13   QUESTIONS BY MR. KO:          15:55:39
14   Q.     Okay.  So you received guidance          15:55:40
15   from the DEA that it was important for          15:55:42
16   Mallinckrodt to know your customer's          15:55:46
17   customer, yet you removed that question from          15:55:48
18   your questionnaire; is that accurate?          15:55:50
19          MR. O'CONNOR:  Object to form.          15:55:53
20          THE WITNESS:  Yes.          15:55:53
21          May I add, please?          15:55:54
22   QUESTIONS BY MR. KO:          15:55:55
23   Q.     This is a yes or no question.          15:55:56
24   That's all I needed.          15:55:57
25   A.     All right.          15:55:58

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Q.    Counsel can -- has the          15:55:59
2   opportunity to do some redirect if he would    15:56:01
3   like.                          15:56:02
4    A.    Okay.  Thank you.           15:56:03
5         (Mallinckrodt-Harper Exhibit 18   15:56:07
6   marked for identification.)           15:56:08
7   QUESTIONS BY MR. KO:                  15:56:08
8    Q.    I'm going to hand you a copy of  15:56:08
9   what's going to be marked as Harper        15:56:09
10   Exhibit 18.                      15:56:12
11         And for the record, this         15:56:21
12   document ends in Bates 279142.          15:56:22
13         This is an April 29, 2010         15:56:28
14   e-mail you send to Ms. Spaulding regarding    15:56:32
15   suspicious order monitoring.           15:56:36
16         You state, quote, "We have        15:56:38
17   working algorithms, and J. Rausch has been   15:56:43
18   reviewing peculiar orders for several weeks.  15:56:46
19   I have a meeting with Jim tomorrow because   15:56:48
20   the review is taking several hours a day, yet  15:56:50
21   still results in him making a judgment call   15:56:53
22   that he is not comfortable with.  Bottom line  15:56:55
23   is that tomorrow I plan on having something   15:56:59
24   for you to give DEA.  Trying desperately to   15:57:01
25   clear up all loose ends before the potential  15:57:04

Page 347

1   work stoppage."                   15:57:06
2         Did I read that correctly?        15:57:07
3    A.    Yes.                    15:57:08
4    Q.    Okay.  And is it accurate to     15:57:09
5   say that as of April 29, 2010, it's your     15:57:12
6   understanding that Mr. Rausch is still making  15:57:16
7   judgment calls on peculiar orders that he is  15:57:19
8   not comfortable with?               15:57:21
9    A.    Yes.                    15:57:22
10    Q.    Okay.  You can set that aside.    15:57:23
11         Now, as we discussed, in         15:57:25
12   addition to algorithms, you had checklists    15:57:34
13   that you were working on at the same time    15:57:38
14   with respect to new and current customers,   15:57:39
15   correct?                       15:57:41
16    A.    Correct.                 15:57:41
17         (Mallinckrodt-Harper Exhibit 19   15:57:48
18   marked for identification.)           15:57:48
19   QUESTIONS BY MR. KO:                  15:57:48
20    Q.    I'm going to hand you a copy of  15:57:48
21   what's going to be marked as Harper        15:57:49
22   Exhibit 19, and it ends in Bates 301020.     15:57:51
23         And this is a July 22, 2009       15:57:58
24   e-mail from Ms. Stewart to many people,      15:58:00
25   including you, regarding the customer       15:58:02

Page 348

1   checklist.                      15:58:05
2         Is that accurate?             15:58:10
3    A.    Yes, it is, yes.             15:58:11
4    Q.    And she indicates that you left  15:58:12
5   a message regarding a customer checklist,     15:58:16
6   correct?                       15:58:19
7    A.    Yes.  I just had to figure out   15:58:19
8   who was leaving the message.  Yes.  Yes.      15:58:24
9    Q.    Sure.                    15:58:26
10         And Ms. Stewart seems to be       15:58:26
11   referencing some failures on the customer    15:58:28
12   checklist that seemed to be the result of    15:58:31
13   confusion as it relates to the form itself.   15:58:35
14         Do you see that reference?        15:58:39
15    A.    Yes.                    15:58:40
16    Q.    So at the time of this e-mail,   15:58:42
17   there was certainly some confusion with      15:58:44
18   respect to the questionnaire that you were   15:58:46
19   trying to roll out in 2009, correct?         15:58:47
20    A.    Yes.                    15:58:49
21    Q.    And Ms. Stewart indicates that   15:58:49
22   she's actually putting customers that have    15:58:51
23   been put on hold as a result of this customer  15:58:54
24   checklist, and she's actually recommending    15:58:57
25   that they be taken off.              15:59:01

Page 349

1         Is that consistent with how       15:59:03
2   this e-mail reads?                  15:59:05
3         MR. O'CONNOR:  Object to form.   15:59:06
4         THE WITNESS:  Yes.           15:59:06
5   QUESTIONS BY MR. KO:                  15:59:09
6    Q.    So in other words, while there   15:59:09
7   was confusion surrounding this particular     15:59:10
8   version of the customer checklist, for any    15:59:13
9   customers that were put on hold at that time,  15:59:18
10   she had recommended putting them off of hold  15:59:19
11   and releasing orders; is that correct?       15:59:22
12    A.    Yes.                    15:59:25
13         MR. O'CONNOR:  Object to form.   15:59:26
14   QUESTIONS BY MR. KO:                  15:59:27
15    Q.    You can set that one aside.      15:59:28
16         (Mallinckrodt-Harper Exhibit 20   15:59:37
17   marked for identification.)           15:59:37
18   QUESTIONS BY MR. KO:                  15:59:37
19    Q.    I'm going to hand you a copy of  15:59:38
20   what's going to be marked as Harper        15:59:39
21   Exhibit 20.                      15:59:40
22         For the record, this ends in      15:59:42
23   Bates stamp 372333.                 15:59:44
24         And this is an e-mail exchange    15:59:50
25   that you are having with Ms. Spaulding in     15:59:52

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1  the -- on February 11, 2011; is that     15:59:56
2  accurate?                                 15:59:59
3     A.   Yes.                   16:00:00
4     Q.   Okay.  And I want to focus on    16:00:05
5  the second e-mail down in the chain that you  16:00:09
6  draft to Ms. Spaulding regarding the customer  16:00:13
7  checklist.                    16:00:20
8          Do you see where you have      16:00:21
9  indicated that you have discovered a      16:00:23
10 disconnect in the system?            16:00:25
11    A.   I do.                 16:00:26
12    Q.   And you're talking about the   16:00:27
13 system of the customer checklist, correct?  16:00:28
14    A.   Yes.                  16:00:30
15    Q.   And you indicate that, quote,   16:00:31
16 "We have significant gaps in that although   16:00:35
17 CDIG send out the annual update SOM customer  16:00:40
18 checklist, when the system indicates customer  16:00:44
19 account DEA registration is nearing renewal   16:00:48
20 time, they do nothing if the SOM customer   16:00:51
21 checklist is not ever returned by the     16:00:54
22 customer."                    16:00:56
23          Did I read that correctly?     16:00:57
24    A.   Yes.                  16:00:57
25    Q.   Okay.  And CDIG basically --    16:00:59

Page 351

1  CDIG stands for customer data integrity     16:01:03
2  group, correct?                  16:01:06
3     A.   Correct.               16:01:07
4     Q.   And they had some involvement   16:01:07
5  in the SOM procedure, in particular the    16:01:08
6  customer checklist, correct?          16:01:11
7     A.   Yes.                  16:01:12
8     Q.   But if I understand this e-mail  16:01:13
9  correctly, is it accurate to say that as of   16:01:16
10 February of 2011 you were -- you discovered   16:01:19
11 that all SOM customer checklists were not    16:01:24
12 actually being returned by the customers,   16:01:28
13 correct?                     16:01:30
14          MR. O'CONNOR:  Object to form.  16:01:30
15          THE WITNESS:  Yes.          16:01:31
16 QUESTIONS BY MR. KO:               16:01:31
17    Q.   You would agree that this is a   16:01:32
18 significant gap in the review system, would   16:01:33
19 you not?                     16:01:36
20    A.   It's a gap -- yes.  In this    16:01:37
21 component of the review system, yes, it is a  16:01:41
22 gap.                       16:01:43
23    Q.   Because you relied on the      16:01:43
24 customer checklist to obtain information from  16:01:44
25 the customer, correct?             16:01:47

Page 352

1     A.   Yes.                  16:01:47
2     Q.   And in some instances, you     16:01:48
3  never actually in fact received the      16:01:50
4  checklist, correct?              16:01:53
5     A.   I believe this says during the  16:01:53
6  renewal.                     16:01:56
7     Q.   Yeah.                 16:01:58
8          During the renewal time period,  16:01:59
9  CDIG does nothing if the SOM customer      16:02:01
10 checklist is ever returned; is that correct?  16:02:05
11    A.   So customers would have sent in  16:02:07
12 an initial checklist, but then this is the   16:02:13
13 annual update that they may not have turned   16:02:17
14 in, and CDIG may not have caught that fact,   16:02:19
15 yes.                       16:02:20
16    Q.   All right.  So they may have    16:02:20
17 turned in a checklist at one point in time,   16:02:21
18 but the requirement and the expectation     16:02:24
19 certainly was that they would turn in at    16:02:26
20 least an annual checklist as well, correct?   16:02:27
21          MR. O'CONNOR:  Object to form.  16:02:30
22          THE WITNESS:  Yes.          16:02:30
23 QUESTIONS BY MR. KO:               16:02:31
24    Q.   And that wasn't always        16:02:31
25 happening as of 2011, correct?         16:02:32

Page 353

1     A.   Correct.               16:02:33
2     Q.   And so would you say that --    16:02:34
3  we'll move on.  You can set that aside.    16:02:42
4  Thank you.                    16:02:44
5          Now, earlier we were discussing  16:02:53
6  chargebacks.                   16:02:55
7          Do you recall that?         16:02:55
8     A.   Yes.                  16:02:56
9     Q.   Do you remember when you first  16:02:57
10 started looking into utilization of      16:03:01
11 chargebacks -- or chargeback data to      16:03:04
12 understand the details of where your pills,   16:03:09
13 Mallinckrodt pills, were going?         16:03:12
14          MR. O'CONNOR:  Object to form.  16:03:13
15          THE WITNESS:  Yes.          16:03:14
16 QUESTIONS BY MR. KO:               16:03:15
17    Q.   And when was that?          16:03:15
18    A.   I believe it was within the    16:03:16
19 scope of our involvement in the Sunrise    16:03:19
20 investigation.                  16:03:23
21    Q.   Okay.  And that was in the 2009  16:03:23
22 time period?                   16:03:26
23    A.   I don't remember the -- I'm    16:03:27
24 terrible with my years.  I'm sorry, I don't   16:03:29
25 remember.                     16:03:33

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    (Mallinckrodt-Harper Exhibit 21    16:03:33
2    marked for identification.)    16:03:34
3    QUESTIONS BY MR. KO:    16:03:34
4    Q.    Okay.  I'm going to hand you a    16:03:34
5    copy of what's going to be marked as Harper    16:03:35
6    Exhibit 21.    16:03:37
7    A.    Okay.    16:03:39
8    Q.    And this is an e-mail chain    16:03:39
9    involving you, among other people, in the    16:03:58
10   April 17, 2007 time period; is that accurate?    16:04:03
11   A.    Yes.    16:04:06
12   Q.    And I don't believe I    16:04:08
13   identified this document, but it ends in    16:04:09
14   Bates 7728295.    16:04:14
15       Starting with the second to the    16:04:17
16   last e-mail at the bottom of this chain from    16:04:31
17   Vince Kaiman to Jeff Burd in which you are    16:04:33
18   cc'd, as of 2:47 -- let's start there.    16:04:38
19       First of all, who's Vince    16:04:43
20   Kaiman?    16:04:45
21   A.    He was director or vice    16:04:45
22   president of commercial group at that time.    16:04:48
23   Q.    Okay.  And he is inquiring in    16:04:53
24   an e-mail exchange with Jeff Burd whether or    16:04:57
25   not Jeff can also find out of the    16:05:02

Page 355

1    40-milligram sales into the channel, how much    16:05:06
2    of it ends up in clinics.    16:05:08
3       Do you see that portion of the    16:05:13
4    e-mail I'm referencing?    16:05:14
5    A.    Yes.    16:05:15
6    Q.    So in other words, Vince is    16:05:18
7    asking -- and the 40-milligram sales is a    16:05:20
8    reference to the methadone 40 milligrams,    16:05:22
9    correct?    16:05:24
10   A.    Yes.    16:05:25
11   Q.    Manufactured by Mallinckrodt?    16:05:25
12   A.    Yes.    16:05:27
13   Q.    And he is trying to determine    16:05:28
14   where those Mallinckrodt pills ends up in    16:05:31
15   clinics.    16:05:37
16       Is that a fair characterization    16:05:37
17   of the question he's asking Jeff?    16:05:39
18       MR. O'CONNOR:  Object to form.    16:05:41
19       THE WITNESS:  It's how many end    16:05:41
20   up in clinics versus retail.    16:05:43
21   QUESTIONS BY MR. KO:    16:05:46
22   Q.    Okay.  And there's some    16:05:47
23   discussion back and forth about how one might    16:05:52
24   go about doing that, but Vince at some point    16:05:55
25   in the e-mail chain says, "Would chargebacks    16:05:58

Page 356

1    help?"    16:06:03
2       Do you see that?    16:06:07
3    A.    Yes.    16:06:07
4    Q.    Okay.  And Mr. Burd's response    16:06:07
5    is, "Okay, I'll start to look into it.  Yeah,    16:06:12
6    it would be through chargebacks."    16:06:16
7       Do you see that portion of the    16:06:18
8    e-mail?    16:06:20
9    A.    I do.    16:06:20
10   Q.    So is it fair to say that this    16:06:20
11   e-mail chain reflects an understanding by    16:06:22
12   Mallinckrodt employees that they could    16:06:27
13   utilize chargebacks to understand where    16:06:30
14   Mallinckrodt-manufactured pills were ending    16:06:32
15   up?    16:06:36
16   A.    Yes.    16:06:36
17   Q.    And the date of this e-mail is    16:06:36
18   April 17, 2007, correct?    16:06:38
19   A.    Correct.    16:06:39
20   Q.    And you were on this e-mail    16:06:40
21   chain?    16:06:43
22   A.    Correct.    16:06:43
23   Q.    Okay.  And I want to pay -- I    16:06:44
24   want to turn your attention to the top of    16:06:52
25   this e-mail in which Jeff Burd -- by the way,    16:06:54

Page 357

1    who is Jeff Burd?    16:06:58
2    A.    He was in commercial group, but    16:06:59
3    I believe he was on the branded side.  I    16:07:00
4    didn't have any interaction with him.    16:07:02
5    Q.    Sure.    16:07:03
6       And Mr. Burd, who appears was a    16:07:04
7    senior marketing manager, he is -- he    16:07:08
8    indicates that, "Well, we were able to get at    16:07:11
9    this data quicker than I expected, with    16:07:14
10   Kate's help."    16:07:17
11       Do you see that?    16:07:18
12   A.    I do.    16:07:19
13   Q.    So is it a fair    16:07:19
14   characterization of this e-mail that he was    16:07:21
15   able to obtain the chargeback data a lot    16:07:22
16   quicker than he had expected?    16:07:26
17       MR. O'CONNOR:  Object to form.    16:07:27
18       THE WITNESS:  Yes.    16:07:28
19   QUESTIONS BY MR. KO:    16:07:28
20   Q.    Okay.  And if you look at the    16:07:29
21   timestamp, it looks like it takes him --    16:07:30
22   certainly the same day, but he responds    16:07:33
23   within six hours of when he says he will look    16:07:35
24   into it, correct?    16:07:39
25   A.    Yes.    16:07:40

Highly Confidential - Subject to Further Confidentiality Review

Page 358

```
1      Q.   So in a six-hour time period,      16:07:41
2  is it accurate to say that a Mallinckrodt      16:07:45
3  employee was able to utilize chargeback data      16:07:46
4  to understand where Mallinckrodt products      16:07:50
5  were ending up?                          16:07:52
6           MR. O'CONNOR:  Object to form.      16:07:53
7           THE WITNESS:  Yes.               16:07:53
8  QUESTIONS BY MR. KO:                      16:07:55
9      Q.   Okay.  And by the way, do      16:07:56
10 you -- there's a reference here to Kate.  It      16:08:00
11 says that he's able to -- he was able to      16:08:04
12 utilize Kate's help to get this data.      16:08:07
13      Do you see that?                     16:08:09
14      A.   Yes, I do.                      16:08:09
15      Q.   And that was Kate Neely?      16:08:10
16      A.   Yes.  Kate Muhlenkamp at the      16:08:12
17 time, yes.                               16:08:14
18      Q.   Right.                         16:08:15
19      A.   Yes.                           16:08:15
20      Q.   Thank you.                      16:08:16
21      (Mallinckrodt-Harper Exhibit 22      16:08:18
22      marked for identification.)           16:08:18
23 QUESTIONS BY MR. KO:                      16:08:18
24      Q.   I'm going to hand you now a      16:08:26
25 copy of what will be marked as Harper      16:08:28
```

Page 359

```
1  Exhibit 22.                              16:08:31
2           And we can go through this      16:08:37
3  document and we can take a break.         16:08:38
4           MR. O'CONNOR:  Okay.             16:08:38
5  QUESTIONS BY MR. KO:                      16:08:38
6      Q.   If that doesn't -- or if you      16:08:42
7  don't mind.                              16:08:44
8      A.   That's acceptable, thank you,      16:08:45
9  yes.                                     16:08:45
10      Q.   For the record, this e-mail      16:08:53
11 exchange ends in Bates 500657.  And this is      16:08:54
12 an e-mail exchange from actually the 2009 to      16:08:59
13 2010 time period.                        16:09:04
14           And the title of the e-mail is      16:09:08
15 "Chargeback Information Request."           16:09:09
16      Do you see that?                     16:09:10
17      A.   Yes, but I see that it started      16:09:11
18 in 2010, not in 2009.                    16:09:14
19      Q.   And it's a little confusing      16:09:17
20 because I think that's reference made to a      16:09:19
21 subsequent e-mail.  But if you look at the      16:09:22
22 bottom of the second page, there is an e-mail      16:09:24
23 from you to Tiffany Rowley dated November 19,      16:09:27
24 2009.                                    16:09:33
25      Do you see that?                     16:09:33
```

Page 360

```
1      A.   Oh, here.  Yes.                 16:09:33
2      Q.   Okay.  Now, in that           16:09:41
3  November 19, 2009 e-mail, you ask, among      16:09:45
4  other things, to Tiffany, quote, "Is it      16:09:48
5  feasible to run chargeback summary reports      16:09:53
6  each time we receive information through the      16:09:55
7  industry about DEA actions against pharmacies      16:09:57
8  or physicians?"                          16:09:59
9           Did I read that correctly?      16:10:00
10      A.   Yes.                           16:10:00
11      Q.   So is it fair to say that at      16:10:02
12 least as of November 2000 -- fair to say that      16:10:04
13 as of November 19, 2009, you're inquiring      16:10:11
14 about how to utilize chargeback summary      16:10:15
15 reports to determine where Mallinckrodt pills      16:10:18
16 are ending up?                           16:10:22
17           MR. O'CONNOR:  Object to form.      16:10:23
18           THE WITNESS:  Yes.               16:10:24
19 QUESTIONS BY MR. KO:                      16:10:24
20      Q.   Okay.  And was this -- does      16:10:25
21 this refresh your recollection at all that      16:10:28
22 this was about the time you were -- you      16:10:32
23 became interested in utilizing chargeback      16:10:34
24 information consistent with the DEA      16:10:36
25 investigation against Sunrise?            16:10:39
```

Page 361

```
1           MR. O'CONNOR:  Object to form.      16:10:41
2           THE WITNESS:  No.                16:10:42
3  QUESTIONS BY MR. KO:                      16:10:44
4      Q.   Okay.                          16:10:44
5      A.   Well, around the same time,      16:10:44
6  but -- this is not speaking of that, but,      16:10:46
7  yes, at the same time, yes, sir, sorry.      16:10:48
8      Q.   Yeah, I understand that this      16:10:50
9  doesn't make any reference --             16:10:51
10      A.   Okay.  I apologize.  Yes.      16:10:52
11      Q.   Yeah, that's okay.             16:10:54
12           Around this time was when      16:10:54
13 Sunrise -- you began looking into Sunrise as      16:10:56
14 well, correct?                           16:10:59
15      A.   Yes.                           16:11:00
16      Q.   And you also were trying to      16:11:01
17 pull chargeback data and chargeback      16:11:04
18 information in connection with understanding      16:11:07
19 where your pills ended up after distributing      16:11:09
20 to Sunrise, correct?                     16:11:13
21           MR. O'CONNOR:  Object to form.      16:11:14
22           THE WITNESS:  Yes.  The company      16:11:15
23 was.  I -- yes, not me personally,      16:11:16
24 yes.                                     16:11:18
25
```

Page 362

1  QUESTIONS BY MR. KO:                    16:11:18
2      Q.   But it was in connection with   16:11:20
3  your obligations as the team leader of the   16:11:21
4  suspicious order monitoring program --    16:11:23
5      A.   Yes.                16:11:24
6      Q.   -- right?           16:11:24
7      A.   Yes.                16:11:25
8      Q.   Okay.  Now, after you asked    16:11:25
9  that question on November 19, 2009,        16:11:29
10 Tiffany -- by the way, who is Tiffany Rowley   16:11:33
11 Kilper?                       16:11:37
12     A.   She -- she was with the        16:11:37
13 contract group, contract administration, but   16:11:41
14 I'm not certain of what her role entailed.   16:11:45
15     Q.   Okay.  But she was someone who   16:11:48
16 you consulted with to pull chargeback         16:11:50
17 information, correct?              16:11:52
18     A.   Yes.                16:11:53
19     Q.   Okay.  And she responds, "Sure,   16:11:57
20 Karen, I can always provide that data."    16:12:02
21          Do you see that?          16:12:05
22     A.   Yes.                16:12:05
23     Q.   And unfortunately, for this     16:12:08
24 e-mail exchange there's no date that's     16:12:10
25 indicated for that particular e-mail, but we   16:12:17

Page 363

1  can move up to your Monday, February 22, 2010   16:12:19
2  e-mail.                       16:12:22
3          Do you see that?          16:12:23
4      A.   I do.                16:12:23
5      Q.   And you say, "Tiffany, we       16:12:24
6  exchanged e-mails several months ago about   16:12:27
7  running chargeback reports as a benefit to   16:12:28
8  the business based upon information we        16:12:30
9  receive regarding DEA actions against        16:12:33
10 registrants and industry news."           16:12:35
11         Did I read that correctly?     16:12:39
12     A.   Yes.                16:12:39
13     Q.   So for whatever reason, three    16:12:41
14 months pass between when you first ask      16:12:45
15 Ms. Kilper to identify and run certain      16:12:49
16 requests with respect to chargeback         16:12:51
17 information and when you follow up again with   16:12:53
18 her about this request; is that accurate?   16:12:59
19     A.   Yes.                16:13:01
20     Q.   Okay.  And then she responds    16:13:01
21 that same day that -- with some questions,   16:13:03
22 but ultimately she -- well, let me read it   16:13:10
23 for you.                      16:13:13
24          She says, "Karen, if you could   16:13:14
25 give me an estimate of how frequent the    16:13:17

Page 364

1  requests might be or how many end user        16:13:18
2  inquiries per month, I can run this by my    16:13:21
3  manager to ensure she agrees this fits our   16:13:24
4  area.  I just pull the data from Cognos.    16:13:26
5  It's nothing complicated at all.  I'd be    16:13:29
6  happy to train someone in your group to do   16:13:31
7  this if that makes more sense."           16:13:33
8          Did I read that correctly?     16:13:35
9      A.   Yes.                16:13:35
10     Q.   So as of February 22, 2010, is   16:13:35
11 it accurate to say that Mallinckrodt        16:13:43
12 certainly has the ability to run chargeback   16:13:44
13 information and chargeback data to determine   16:13:51
14 where Mallinckrodt pills are going?         16:13:53
15          MR. O'CONNOR:  Object to form.   16:13:54
16          THE WITNESS:  Yes.          16:13:55
17 QUESTIONS BY MR. KO:                 16:13:55
18     Q.   Okay.  And this request        16:13:55
19 actually originated on November 19, 2009, as   16:13:56
20 indicated by your original e-mail, correct?   16:14:04
21     A.   Yes.                16:14:06
22     Q.   And she's -- it's accurate to   16:14:08
23 say that at least based on              16:14:11
24 Ms. Rowley-Kilper's characterization, it's   16:14:16
25 nothing complicated at all to pull this data,   16:14:17

Page 365

1  correct?                      16:14:20
2          MR. O'CONNOR:  Object to form.   16:14:20
3          THE WITNESS:  Correct.        16:14:21
4  QUESTIONS BY MR. KO:                 16:14:22
5      Q.   And she would be happy to train   16:14:22
6  someone in your group to do it yourself?    16:14:24
7      A.   Correct.             16:14:25
8      Q.   Did you take her up on her      16:14:26
9  offer?                        16:14:27
10     A.   No.                 16:14:28
11     Q.   Okay.  Ms. Kilper always ran    16:14:28
12 the chargeback reports, correct?           16:14:31
13          MR. O'CONNOR:  Object to form.   16:14:32
14          THE WITNESS:  Not always.      16:14:34
15 QUESTIONS BY MR. KO:                 16:14:34
16     Q.   Did you ever run a chargeback   16:14:35
17 report?                       16:14:36
18     A.   No.                 16:14:36
19     Q.   You had some other people do    16:14:37
20 it, correct?                   16:14:38
21     A.   Yes.                16:14:38
22     Q.   And was there ever a time in    16:14:38
23 which it was indicated to you that it would   16:14:41
24 be difficult to pull this data?           16:14:44
25     A.   No.                 16:14:47

Page 366

1    Q.   Okay.  In fact, it was quite    16:14:49
2  easy and they could -- whomever you directed    16:14:52
3  would always comply with your request for    16:14:55
4  this information, correct?    16:14:57
5         MR. O'CONNOR:  Object to form.    16:14:58
6         THE WITNESS:  Yes.  Yes.    16:14:59
7  QUESTIONS BY MR. KO:    16:14:59
8    Q.   Now, turning to the first page    16:15:00
9  of this e-mail, you indicate -- sorry, not    16:15:03
10  you, but Ms. Johnson, who appears to be a    16:15:09
11  compliance assistant, she asks you whether or    16:15:12
12  not anything has been figured out on the    16:15:16
13  chargeback requests yet.    16:15:18
14         Do you see that?    16:15:19
15    A.   Yes.    16:15:19
16    Q.   And that's dated March 8, 2010?    16:15:24
17    A.   Yes.    16:15:27
18    Q.   And it appears that there was    16:15:28
19  no response by you until Tiffany asks whether    16:15:31
20  or not someone was in her court on this,    16:15:37
21  because she never heard back in response to    16:15:40
22  your questions.    16:15:42
23         Do you see that?    16:15:43
24    A.   Yes.    16:15:44
25    Q.   Okay.  And finally at the top    16:15:45

Page 367

1  of this e-mail, you indicate to Carrie that    16:15:48
2  "I have the next steps on this.  I'll discuss    16:15:51
3  with you later this week.  I am booked solid    16:15:53
4  with meetings today.  Thanks for following up    16:15:56
5  to get your project going."    16:15:59
6         Did I read that correctly?    16:16:02
7    A.   Yes.    16:16:02
8    Q.   Okay.  So is it fair to say    16:16:02
9  that there is a approximately four-month time    16:16:03
10  period in which -- between when you first    16:16:05
11  asked for this information and when action is    16:16:07
12  actually taken on obtaining this chargeback    16:16:12
13  information?    16:16:16
14    A.   Yes.    16:16:17
15    Q.   Okay.  And of course it's clear    16:16:23
16  from this e-mail exchange that the ball was    16:16:25
17  in your court to respond to Carrie.    16:16:29
18         And unfortunately I don't have    16:16:31
19  any subsequent documentation of when, in    16:16:33
20  fact, you responded, but at least four months    16:16:35
21  go by between when you first ask and when you    16:16:37
22  again follow up with Tiffany and Carrie on    16:16:40
23  the chargeback data requests, correct?    16:16:43
24         MR. O'CONNOR:  Object to form.    16:16:45
25         THE WITNESS:  Yes.    16:16:45

Page 368

1         MR. KO:  Why don't we take a    16:16:47
2  break.    16:16:52
3         MR. O'CONNOR:  Sure.    16:16:53
4         VIDEOGRAPHER:  We are going off    16:16:54
5  the record at 4:16 p.m.    16:16:55
6         (Off the record at 4:16 p.m.)    16:16:56
7         VIDEOGRAPHER:  We are back on    16:35:05
8  the record at 4:35 p.m.    16:35:06
9  QUESTIONS BY MR. KO:    16:35:07
10    Q.   Welcome back, Ms. Harper.    16:35:08
11  Thank you for your patience today.  I    16:35:11
12  appreciate your -- the time that you have    16:35:13
13  spent, and we have, I think, a few more hours    16:35:14
14  to go.    16:35:19
15         So before we broke, we were    16:35:19
16  talking about utilization of chargeback data.    16:35:22
17         Do you recall that?    16:35:26
18    A.   Yes.    16:35:26
19    Q.   And --    16:35:27
20         MR. O'CONNOR:  Can we go off    16:35:28
21  the record for just a second to put    16:35:30
22  the mic on?    16:35:31
23         THE WITNESS:  Oh, I'm sorry.    16:35:36
24  QUESTIONS BY MR. KO:    16:35:38
25    Q.   So a moment ago we were talking    16:35:57

Page 369

1  about chargebacks, correct?    16:35:58
2    A.   Yes.    16:36:00
3    Q.   And was -- in the late 2009    16:36:00
4  time period you had asked about whether or    16:36:05
5  not someone could run certain chargeback data    16:36:09
6  for you so that you could understand the    16:36:11
7  details of a transaction in which    16:36:15
8  Mallinckrodt was sending its pills to a    16:36:18
9  particular distributor, correct?    16:36:22
10         MR. O'CONNOR:  Object to form.    16:36:23
11         THE WITNESS:  Yes.    16:36:23
12  QUESTIONS BY MR. KO:    16:36:23
13    Q.   And specifically, was it your    16:36:24
14  idea to take the information you learned --    16:36:28
15  well, strike that.    16:36:29
16         One of the reasons for    16:36:34
17  identifying -- or utilizing chargeback    16:36:38
18  information was to take the information you    16:36:40
19  received regarding certain DEA actions    16:36:46
20  against registrants and industry news that    16:36:50
21  you had acquired, correct?    16:36:52
22         MR. O'CONNOR:  Object to form.    16:36:53
23         THE WITNESS:  Yes.    16:36:54
24  QUESTIONS BY MR. KO:    16:36:54
25    Q.   So the idea was to take that    16:36:54

Highly Confidential - Subject To Further Confidentiality Review

Page 370

1 information regarding specific pharmacies and 16:36:59
2 doctors and go into your data to determine 16:37:04
3 whether or not Mallinckrodt was selling to 16:37:07
4 these pharmacies or physicians, correct? 16:37:10
5     MR. O'CONNOR: Object to form. 16:37:13
6     THE WITNESS: Whether or not 16:37:13
7   they were our -- they were downstream 16:37:15
8   customers of the distributors of our 16:37:18
9   product, yes. 16:37:20
10 QUESTIONS BY MR. KO: 16:37:21
11   Q. Right. 16:37:21
12     So the idea -- 16:37:21
13   A. Yes. 16:37:22
14   Q. -- of -- one of the reasons for 16:37:22
15 why you utilize chargeback information is to 16:37:26
16 determine whether or not Mallinckrodt was 16:37:29
17 selling to pharmacies or physicians that were 16:37:36
18 customers of distributors that you sold to, 16:37:38
19 correct? 16:37:40
20     MR. O'CONNOR: Object to form. 16:37:41
21     THE WITNESS: Yes. 16:37:42
22 QUESTIONS BY MR. KO: 16:37:43
23   Q. Okay. And the idea of using 16:37:48
24 this chargeback information was also to make 16:37:49
25 sure your customers/wholesale distributors 16:37:52

Page 371

1 were not also selling Mallinckrodt drugs to 16:37:56
2 these pharmacies or physicians, correct? 16:38:00
3   A. Yes. 16:38:02
4   Q. Okay. And again, you had this 16:38:03
5 idea, or at least you discussed the 16:38:07
6 possibility of obtaining this data, as of 16:38:11
7 November 2009, correct? 16:38:14
8   A. Yes. 16:38:15
9   Q. And also turning back to some 16:38:17
10 of the e-mails that we had discussed 16:38:20
11 previously in 2007, you were -- it's accurate 16:38:23
12 to say that Mallinckrodt employees knew as of 16:38:28
13 2007 how to utilize chargeback data to 16:38:31
14 understand where pills were going after they 16:38:34
15 were shipped to Mallinckrodt customers, 16:38:37
16 correct? 16:38:39
17     MR. O'CONNOR: Object to form. 16:38:39
18     THE WITNESS: Yes. 16:38:39
19     (Mallinckrodt-Harper Exhibit 23 16:38:51
20   marked for identification.) 16:38:51
21 QUESTIONS BY MR. KO: 16:38:51
22   Q. Okay. I'm going to hand you a 16:38:52
23 copy of what will be marked as Harper 16:38:53
24 Exhibit 23. 16:38:55
25     And for the record, this 16:39:02

Page 372

1 document ends in Bates 421850. 16:39:03
2     And this is an e-mail chain 16:39:21
3 from the July 21, 2000 time period regarding 16:39:23
4 Mallinckrodt suspicious order monitoring and 16:39:29
5 the Harvard Drug license suspension. 16:39:30
6     Do you see that? 16:39:32
7   A. I'm reading the e-mail, 16:39:33
8 please -- 16:39:41
9   Q. Sure. 16:39:41
10   A. -- so that I can understand the 16:39:41
11 whole context. 16:39:41
12   Q. Absolutely. 16:39:41
13     And my questions will relate to 16:40:02
14 just the first page of this e-mail. 16:40:04
15   A. All right. I'm ready. Thank 16:40:06
16 you. 16:40:07
17   Q. Okay. On July 21, 2010, 16:40:07
18 Mr. Ratliff asks you whether or not, quote, 16:40:14
19 "As an aside, are we capable of knowing our 16:40:19
20 customers' customers with any specificity?" 16:40:22
21 end quote. 16:40:27
22     Did I read that correctly? 16:40:28
23   A. Yes. 16:40:28
24   Q. And you respond that same day 16:40:29
25 that -- well, why don't you read the first 16:40:30

Page 373

1 sentence of that e-mail response. 16:40:35
2   A. "Using chargeback data, it is 16:40:39
3 indeed possible to know our customer's 16:40:41
4 customer with great specificity." 16:40:46
5   Q. Okay. And do you have any 16:40:49
6 reason to doubt that you in fact sent that 16:40:50
7 e-mail to Mr. Ratliff on July 21, 2010? 16:40:51
8   A. No. 16:40:54
9   Q. And so it's accurate to state 16:40:55
10 that as of July 2010, you understood that you 16:40:58
11 could utilize chargeback data to understand 16:41:03
12 with great specificity knowledge of your 16:41:07
13 customer's customer; is that accurate? 16:41:11
14   A. Knowledge of who our customer 16:41:14
15 was shipping to, yes. 16:41:20
16   Q. Okay. So just so the record is 16:41:21
17 clear, yes or no: Is it accurate to state 16:41:25
18 that as of July 2010, you understood that you 16:41:26
19 could utilize chargeback data to understand 16:41:32
20 with great specificity where -- where your 16:41:34
21 pills were going after you shipped to the 16:41:38
22 distributor? 16:41:42
23     MR. O'CONNOR: Object to form. 16:41:42
24     THE WITNESS: Yes. 16:41:43
25

Highly Confidential - Subject to Further Confidentiality Review

Page 374

QUESTIONS BY MR. KO:                    16:41:43
1
2        Q.   You can set that aside.        16:41:46
3            (Mallinckrodt-Harper Exhibit 24   16:41:48
4    marked for identification.)              16:41:49
5  QUESTIONS BY MR. KO:                    16:41:49
6        Q.   This is a copy of what will be    16:41:59
7    marked as Harper Exhibit 24.            16:42:00
8            And this ends, for the record,    16:42:09
9    ends in Bates 280607.                   16:42:09
10           And this appears to be a         16:42:31
11   November 1, 2010 letter that you send to Paul   16:42:32
12   Kleissle, correct?                       16:42:38
13       A.   Yes.                  16:42:39
14       Q.   And you'll see later on there's   16:42:40
15   the signature block of you on the second   16:42:43
16   page.                            16:42:46
17       A.   Yes.                  16:42:47
18       Q.   And is it accurate to say that   16:42:47
19   you're sending him this correspondence on   16:42:49
20   November 1, 2010, to describe to him what you   16:42:52
21   can utilize based on the chargeback       16:42:56
22   information that you are -- that you have   16:42:59
23   been reviewing in that 2010 time period?   16:43:00
24       A.   Yes.                  16:43:03
25       Q.   Okay.  That's all I have on    16:43:04

Page 375

1    that document.                     16:43:14
2            Now, in connection with running   16:43:15
3    chargeback reports, is it also accurate to   16:43:28
4    say that indirect match reports were reports   16:43:33
5    that you asked to be run to understand the   16:43:40
6    downstream details of a transaction?      16:43:44
7            MR. O'CONNOR:  Object to form.   16:43:46
8            THE WITNESS:  I don't           16:43:47
9        understand the term "indirect match   16:43:49
10       report."                     16:43:50
11   QUESTIONS BY MR. KO:                    16:43:52
12       Q.   Okay.  How about -- let's --    16:43:52
13   I'm sorry, let's go back to that document   16:43:55
14   then that we just set aside.            16:43:58
15       A.   All right.              16:43:59
16       Q.   And in the first sentence of    16:44:00
17   this correspondence to Mr. Kleissle, you   16:44:09
18   ask -- or you indicate, "In an ongoing effort   16:44:12
19   to enhance our existing suspicious order   16:44:15
20   monitoring program and in accordance with 21   16:44:18
21   CFR 1301.74, Mallinckrodt has begun the    16:44:22
22   process of reviewing sales to indirect end   16:44:26
23   user customers, open parens, retail       16:44:30
24   pharmacies, close parens, but geographic   16:44:34
25   region.  This analysis is accomplished by a   16:44:36

Page 376

1    review of chargeback data."            16:44:39
2            Did I read that correctly?      16:44:41
3        A.   Yes.                   16:44:41
4        Q.   Okay.  And understanding that   16:44:41
5    you don't recall the use of the word      16:44:45
6    "indirect match report," you at least in this   16:44:47
7    correspondence refer to retail pharmacies as   16:44:53
8    indirect end user customers, correct?     16:44:55
9        A.   Yes.                   16:44:58
10       Q.   Okay.  Do you recall a time in   16:45:00
11   which -- and you state to Mr. Kleissle that   16:45:03
12   you can do this and accomplish this by     16:45:07
13   reviewing chargeback data, correct?       16:45:11
14       A.   Yes.                   16:45:12
15       Q.   Okay.  And so do you recall a   16:45:12
16   time in which you had asked for reports to be   16:45:15
17   run on indirect end user customers?       16:45:20
18       A.   Yes.                   16:45:24
19       Q.   Okay.  And these -- you can set   16:45:25
20   that aside.                        16:45:28
21           And in these reports -- you ran   16:45:28
22   certain reports or had asked certain reports   16:45:37
23   to be run in connection with certain       16:45:39
24   customers that you were shipping drugs to,   16:45:44
25   including Harvard, for example, correct?   16:45:47

Page 377

1            MR. O'CONNOR:  Object to form.   16:45:51
2            THE WITNESS:  Yes.             16:45:51
3    QUESTIONS BY MR. KO:                    16:45:53
4        Q.   By the way, when asking others   16:46:04
5    to run reports about indirect end users, did   16:46:06
6    you have a name for these reports, or did you   16:46:13
7    call them by a specific moniker?          16:46:15
8        A.   I believe chargeback reports.   16:46:19
9        Q.   Okay.                  16:46:21
10       A.   Yes.                   16:46:21
11       Q.   So that's helpful.            16:46:22
12           So you -- is it accurate to say   16:46:23
13   that identification of pills that end up --   16:46:28
14   end up at retail pharmacies was accomplished   16:46:35
15   through running chargeback reports?        16:46:38
16       A.   Yes.                   16:46:41
17       Q.   Okay.  And you performed        16:46:41
18   chargeback reports in connection with various   16:46:46
19   distributors that had their license suspended   16:46:50
20   by the DEA, including Harvard, for example,   16:46:52
21   correct?                          16:46:54
22           MR. O'CONNOR:  Object to form.   16:46:55
23           THE WITNESS:  Yes.             16:46:56
24   QUESTIONS BY MR. KO:                    16:46:56
25       Q.   Okay.  And also Masters and     16:46:57

**Page 378**

1 Sunrise and Cedardale?                  16:46:59
2        MR. O'CONNOR:  Same objection.   16:47:05
3        THE WITNESS:  Yes.               16:47:06
4 QUESTIONS BY MR. KO:                    16:47:06
5    Q.  Okay.  Did you also run          16:47:06
6 chargeback reports for customers of     16:47:08
7 KeySource?                              16:47:09
8    A.  Yes.                             16:47:11
9    Q.  Okay.  So is it fair to say      16:47:14
10 that you had chargeback reports run for 16:47:18
11 customers of KeySource, Cedardale, Masters, 16:47:24
12 Sunrise and Harvard?                    16:47:29
13   A.  Yes.                             16:47:30
14   Q.  And this was all in the 2009 to  16:47:30
15 2010 time period?                       16:47:32
16   A.  I'm terrible with my years,      16:47:33
17 but -- I don't know the year.           16:47:36
18   Q.  Okay.                            16:47:40
19   A.  The years.                       16:47:40
20   Q.  Generally speaking, was it --    16:47:40
21 do you recall these reports being run in the 16:47:42
22 2009 through 2011 time period?          16:47:45
23   A.  Yes.                             16:47:47
24   Q.  Okay.  Now, the chargeback       16:47:52
25 reports you could distinguish by Mallinckrodt 16:47:58

**Page 379**

1 drug, correct?                          16:48:02
2        MR. O'CONNOR:  Objection.        16:48:04
3        THE WITNESS:  Yes.               16:48:04
4 QUESTIONS BY MR. KO:                    16:48:05
5    Q.  In other words, you could        16:48:05
6 determine -- you could sort by all oxy 15s or 16:48:06
7 30s that Mallinckrodt was sending to a  16:48:13
8 particular customer, correct?           16:48:14
9    A.  Yes.                             16:48:16
10       (Mallinckrodt-Harper Exhibit 25  16:48:19
11       marked for identification.)      16:48:20
12 QUESTIONS BY MR. KO:                    16:48:20
13   Q.  Okay.  I'm going to hand you a   16:48:20
14 copy of what's going to be marked as    16:48:22
15 Exhibit 25.                             16:48:25
16       And I will represent to counsel  16:48:30
17 and for the record that this is a       16:48:32
18 demonstrative chart that we have prepared 16:48:33
19 based on chargeback data that you had pulled 16:48:36
20 for Harvard.                            16:48:39
21       And we can refer to it in a      16:48:48
22 moment, but again, to be clear, you had run 16:48:51
23 chargeback reports in connection with   16:48:55
24 customers of Harvard Drug, correct?     16:48:57
25   A.  Yes.                             16:48:59

**Page 380**

1    Q.  And do you recall who you had    16:48:59
2 perform that analysis?                   16:49:07
3    A.  No.                              16:49:08
4    Q.  Either Ms. Spaulding or          16:49:08
5 Ms. Rowley-Kilper?                       16:49:10
6    A.  It may have been Ms. Neely.      16:49:11
7    Q.  Ms. Neely, okay.                 16:49:13
8        Now, I'll represent for the      16:49:16
9 record that this is a summary of the     16:49:19
10 chargeback information that appears on that 16:49:20
11 report.  And if you look at the bottom row 16:49:28
12 total, there appears to be 12,487 total  16:49:33
13 orders recorded in which Harvard Drug sold 16:49:43
14 controlled substances.                  16:49:48
15       Do you see that?                  16:49:49
16   A.  Yes.                             16:49:49
17   Q.  So I'll represent to you for     16:49:50
18 the record that the chargeback data that you 16:49:52
19 had run for Harvard Drug reported that there 16:49:58
20 were 12,000 -- a total of 12,487        16:49:59
21 transactions.                           16:50:02
22       MR. O'CONNOR:  Counsel, I'm      16:50:03
23       going to object.                 16:50:03
24       Just to be clear, are you        16:50:04
25       saying that this is a document that 16:50:06

**Page 381**

1 you've prepared based on produced       16:50:08
2 data?                                   16:50:11
3        MR. KO:  Based on produced       16:50:11
4 data, the Bates number which appears     16:50:13
5 at the top of this.                      16:50:14
6        MR. O'CONNOR:  Okay.  So the     16:50:15
7 fact that the Bates number is at the     16:50:15
8 top here does not mean that this is a    16:50:17
9 copy of the document we produced?       16:50:18
10       MR. KO:  That's -- that's        16:50:20
11       right.                           16:50:22
12       MR. O'CONNOR:  Okay.  Thank      16:50:22
13 you.                                    16:50:24
14       MR. KO:  This itself is not a    16:50:24
15 copy of a document that you produced     16:50:27
16 but is instead based on the             16:50:29
17 information that is -- appears on this   16:50:30
18 Bates number.                           16:50:32
19       MR. O'CONNOR:  Thank you.        16:50:32
20 QUESTIONS BY MR. KO:                    16:50:33
21   Q.  Now, I'll represent to you that  16:50:36
22 this Bates number -- or this document   16:50:38
23 reflects that Harvard Drug was doing business 16:50:44
24 as First Veterinary Supply.             16:50:48
25       Do you recall ever being made    16:50:51

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1   aware of certain transactions or pills that   16:50:56
2   were being sent to a First Veterinary Supply?   16:50:58
3       A.   No.   16:51:00
4       Q.   Okay.  Would you agree with me   16:51:02
5   that sending pills to a -- prescription   16:51:03
6   opioids to a veterinarian clinic would be   16:51:07
7   suspicious or potentially suspicious?   16:51:14
8           MR. O'CONNOR:  Object to form.   16:51:15
9           THE WITNESS:  That depends on   16:51:16
10      the product and the quantities.   16:51:18
11  QUESTIONS BY MR. KO:   16:51:19
12      Q.   Okay.  Do you recall shipping   16:51:19
13  prescription opioids to vet clinics?   16:51:23
14      A.   I cannot say if we did or did   16:51:25
15  not.   16:51:26
16      Q.   Okay.  Harvard Drug -- do you   16:51:27
17  recall when Harvard Drug had its license   16:51:41
18  suspended by the DEA?   16:51:44
19      A.   2010 or before, around that   16:51:45
20  time.   16:51:51
21      Q.   Okay.  And they had their   16:51:52
22  license suspended because of diversion of   16:51:54
23  pills -- diversion of pills by certain   16:51:58
24  customers that they sold to, correct?   16:52:05
25          MR. O'CONNOR:  Object to form.   16:52:07

Page 383

1           THE WITNESS:  Yes.   16:52:08
2   QUESTIONS BY MR. KO:   16:52:10
3       Q.   Okay.  And would you agree with   16:52:10
4   me that First Vet Supply is not a physician   16:52:25
5   or a pain clinic?   16:52:30
6       A.   I don't know their business   16:52:32
7   model.  I don't -- is their DEA registration   16:52:34
8   number the same as Harvard Drug Group?   16:52:38
9       Q.   I believe that to be the case,   16:52:42
10  actually.   16:52:44
11      A.   So, many of our distributors   16:52:44
12  had d/b/a second lines, and that's a -- my   16:52:54
13  understanding is a legal term implying the   16:52:57
14  organization of a corporation.  So I only   16:52:59
15  knew this customer as Harvard Drug.   16:53:01
16      Q.   Okay.  Setting aside the name,   16:53:03
17  did you understand that a large percentage of   16:53:10
18  drugs sold by Harvard Drug were going to   16:53:15
19  Florida?  And in particular, I direct you to   16:53:18
20  the percentages that appear in the middle of   16:53:28
21  the screen that show Florida percentage.   16:53:24
22      A.   So total POs doesn't tell me   16:53:28
23  number of drugs.  They could have been   16:53:30
24  purchase orders for a hundred drugs or 10,000   16:53:33
25  dosage units, so I can't -- I don't have   16:53:35

Page 384

1   enough information to answer that question.   16:53:37
2       Q.   Okay.  But if you look at   16:53:39
3   Florida percent POs -- do you see that?   16:53:40
4       A.   I do.   16:53:43
5       Q.   Okay.  And is that -- in the   16:53:44
6   chargeback data, you had been able to   16:53:47
7   determine what percentage of purchase orders   16:53:51
8   went to Florida, correct?   16:53:55
9       A.   No.   16:53:56
10      Q.   You did not?   16:54:01
11      A.   No.   16:54:02
12      Q.   Okay.  Wasn't it the case that   16:54:02
13  through the chargeback data you knew you   16:54:08
14  could understand, as we discussed earlier,   16:54:11
15  where the pills that you sold to the   16:54:13
16  distributors were going?   16:54:16
17      A.   Yes, but in this context, I   16:54:17
18  believe the purchase order to be the purchase   16:54:20
19  order from Harvard to Mallinckrodt as the   16:54:22
20  supplier, not forward through the supply   16:54:25
21  chain.   16:54:27
22      Q.   Okay.  So it's your   16:54:27
23  understanding that this is just -- well,   16:54:28
24  Harvard Drug, do you know where they were   16:54:32
25  located?   16:54:35

Page 385

1       A.   I believe Wisconsin.   16:54:35
2       Q.   Okay.  I think they were in   16:54:37
3   Michigan, but somewhere in the Midwest.   16:54:40
4       A.   All right.   16:54:42
5       Q.   So you're saying that this is   16:54:42
6   the percentage of initial pills that go to   16:54:43
7   the distributor?   16:54:47
8       A.   Again, these are purchase   16:54:48
9   orders.  They could have been for 100 pills   16:54:51
10  or a million pills.  I don't have enough   16:54:55
11  information to answer the question.   16:54:57
12      Q.   Okay.  Turn to the second page   16:54:58
13  of this document.  And so these -- these   16:55:06
14  columns, by the way, are taken straight from   16:55:14
15  the -- I'll represent to you that they're   16:55:16
16  taken straight from the chargeback reports   16:55:18
17  that are reflected by this Bates number.   16:55:22
18          And if you see on the far   16:55:25
19  right-hand side above the oxy 15 and oxy 30   16:55:27
20  sections, do you see the reference to UOM?   16:55:30
21      A.   I do.   16:55:34
22      Q.   And what's your understanding   16:55:34
23  of UOM?   16:55:35
24      A.   Unit of measure.   16:55:36
25      Q.   Okay.  And would that actually   16:55:38

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1  be synonymous with, for example, a pill?    16:55:40
2      A.   Yes.                  16:55:44
3      Q.   So that's the actual amount of    16:55:45
4  pills that are being shipped for that    16:55:47
5  particular order, correct?         16:55:51
6      A.   It -- this is a monthly total,   16:55:53
7  so, yes, if we're -- yes, I'm sorry, I didn't  16:55:59
8  have the correlation to -- that a PO equals   16:56:04
9  one month in -- I'm just not familiar with   16:56:08
10 the spreadsheet, so, yes.         16:56:10
11     Q.   Yeah, fair enough.        16:56:12
12         And on the -- on this document    16:56:13
13 there's an indication also of Florida     16:56:18
14 percentage sales, quantity government UOM.   16:56:21
15         Do you see that?          16:56:24
16     A.   Yes.                  16:56:24
17     Q.   Do you recall that particular    16:56:25
18 data field in the chargeback information?    16:56:28
19     A.   Yes.                  16:56:30
20     Q.   Okay.  And so does that reflect  16:56:31
21 the percentage of pills that went to     16:56:33
22 downstream customers of Mallinckrodt?    16:56:37
23         MR. O'CONNOR:  Object to form.   16:56:40
24 QUESTIONS BY MR. KO:              16:56:45
25     Q.   In other words -- let me ask it  16:56:46

Page 387

1  a different way.                16:56:47
2          Does this percentage reflect   16:56:47
3  the total percentage of pills relative to the  16:56:49
4  total order that ended up in Florida?    16:56:52
5          MR. O'CONNOR:  Object to form.  16:56:55
6          THE WITNESS:  Yes.         16:56:55
7  QUESTIONS BY MR. KO:              16:56:56
8      Q.   Okay.  So you'll see that the   16:56:56
9  summary indicates below that from the fourth  16:57:00
10 quarter 2008 through the second quarter of   16:57:04
11 2010, that at least with respect to oxy 15s,  16:57:06
12 90.5 percent of Mallinckrodt pills that were  16:57:13
13 sold to Harvard ended up in Florida.     16:57:17
14         Do you see that?          16:57:20
15     A.   Yes.                  16:57:21
16     Q.   Okay.  And likewise with      16:57:22
17 respect to oxy 30s during that same time    16:57:23
18 period, 88 percent ended up in Florida,    16:57:27
19 correct?                    16:57:31
20     A.   Yes.                  16:57:31
21     Q.   Okay.  Was it suspicious to you 16:57:31
22 at the time that such a disproportionate    16:57:37
23 percentage of pills were ending up in    16:57:41
24 Florida?                    16:57:43
25         MR. O'CONNOR:  Object to form.  16:57:43

Page 388

1          THE WITNESS:  So this report   16:57:44
2  that you extracted from our production    16:57:48
3  information, it is -- it is data that     16:57:51
4  for certain came to me?          16:57:54
5  QUESTIONS BY MR. KO:              16:57:57
6      Q.   Uh-huh.               16:57:59
7      A.   It is?                 16:58:00
8      Q.   No.  Yes, this is -- this is    16:58:01
9  data based on chargeback reports that were   16:58:03
10 requested at the direction of you, correct.   16:58:07
11     A.   I -- I don't know.        16:58:11
12     Q.   Okay.  That wasn't my question.  16:58:15
13     A.   Okay.                 16:58:17
14     Q.   I'll represent to you that     16:58:17
15 these chargeback reports were run in     16:58:18
16 connection with your investigation of where  16:58:21
17 your pills were going.            16:58:24
18         So my question to you simply    16:58:25
19 is:  Were you aware at the time -- or is it   16:58:28
20 suspicious -- separate and apart from the    16:58:32
21 process of running this report --       16:58:34
22     A.   Uh-huh.               16:58:36
23     Q.   -- is it suspicious to you that 16:58:36
24 90 percent of all pills that you shipped to  16:58:40
25 Harvard Drug end up going to Florida?    16:58:44

Page 389

1          MR. O'CONNOR:  Object to form.  16:58:47
2          THE WITNESS:  Yes, it appears   16:58:48
3  to be a disproportionate percentage of    16:59:24
4  this product going into Florida.       16:59:28
5  QUESTIONS BY MR. KO:              16:59:30
6      Q.   Okay.  Thank you for waiting.   16:59:30
7      A.   It's all right.          16:59:31
8      Q.   And based on this review of    16:59:32
9  Harvard chargeback information, did you also  16:59:41
10 conclude that Harvard's suspicious order    16:59:45
11 monitoring system was inadequate?      16:59:47
12     A.   Can you tell me when -- I don't  16:59:49
13 know when Harvard was suspended.  So was this 16:59:54
14 after their suspension that I had the report  16:59:56
15 pulled?                     16:59:59
16     Q.   Well, I would say separate and   16:59:59
17 apart from these numbers --         17:00:01
18     A.   Okay.                 17:00:04
19     Q.   -- did you review chargeback    17:00:04
20 data to make the determination of whether or  17:00:07
21 not Harvard's suspicious order monitoring   17:00:10
22 system was effective?            17:00:12
23         MR. O'CONNOR:  Object to form.   17:00:14
24         THE WITNESS:  I don't know.  I   17:00:14
25 don't know how to answer the question.   17:00:20

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    QUESTIONS BY MR. KO:                    17:00:23
2      Q.   Okay.  Do you recall a period    17:00:23
3    of time, or do you recall ever reviewing the  17:00:24
4    suspicious order monitoring systems of your  17:00:26
5    distributors?                           17:00:29
6      A.   Of our distributors?             17:00:29
7      Q.   Yes.                             17:00:32
8      A.   To their downstream customers?   17:00:33
9      Q.   Correct.                         17:00:35
10     A.   Yes.                             17:00:35
11     Q.   In other words, Mallinckrodt     17:00:36
12   was the registrant in the CSA that had duties  17:00:38
13   to maintain effective controls against  17:00:42
14   diversion, but so too were distributors as  17:00:44
15   well, correct?                          17:00:46
16         MR. O'CONNOR:  Object to form.    17:00:47
17         THE WITNESS:  Correct.            17:00:47
18     Correct.                             17:00:47
19   QUESTIONS BY MR. KO:                    17:00:48
20     Q.   So distributors like both        17:00:48
21   Harvard or Sunrise, including the major  17:00:53
22   distributors like ABC, McKesson and Cardinal,  17:00:56
23   all had duties to maintain effective controls  17:00:59
24   against diversion, correct?             17:01:02
25         MS. KVESELIS:  Object to form.    17:01:04

Page 391

1          THE WITNESS:  Correct.           17:01:05
2    QUESTIONS BY MR. KO:                    17:01:06
3      Q.   And all these registrants had    17:01:06
4    duties to implement and design an effective  17:01:08
5    suspicious order monitoring program, correct?  17:01:11
6          MR. O'CONNOR:  Object to form.    17:01:12
7          THE WITNESS:  That guards         17:01:13
8      against -- yes, guards against        17:01:16
9      diversion, yes.                       17:01:18
10   QUESTIONS BY MR. KO:                    17:01:20
11     Q.   And was there a period of time   17:01:20
12   in which Mallinckrodt decided to perform an  17:01:21
13   audit or a review of your distributors' SOM  17:01:25
14   programs?                               17:01:32
15     A.   Yes.                             17:01:32
16     Q.   And during that review and       17:01:32
17   based on that review, did you make       17:01:33
18   determinations as to whether or not you would  17:01:36
19   continue to ship to certain distributors?  17:01:38
20     A.   Yes.                             17:01:40
21     Q.   And one of the reasons for       17:01:40
22   which you decided to stop shipping to certain  17:01:46
23   distributors was as a result of pulling  17:01:49
24   chargeback information in which you could  17:01:52
25   identify details of where your pills were  17:01:54

Page 392

1    going after you shipped them to the      17:01:57
2    distributor, correct?                   17:01:59
3          MR. O'CONNOR:  Object to form.    17:02:00
4          THE WITNESS:  That's one of the   17:02:00
5      reasons that pointed us to a certain  17:02:04
6      distributor, to go and visit them,   17:02:06
7      yes.                                  17:02:08
8    QUESTIONS BY MR. KO:                    17:02:08
9      Q.   Okay.  And some of this          17:02:09
10   chargeback data, by the way, some of the  17:02:10
11   chargeback information was provided to you by  17:02:13
12   certain distributors, correct?          17:02:15
13         MR. O'CONNOR:  Object to form.    17:02:17
14         THE WITNESS:  No, this is our     17:02:17
15     information.                          17:02:20
16   QUESTIONS BY MR. KO:                    17:02:20
17     Q.   Okay.  In 2010 you performed --  17:02:21
18   at some point in 2010 you performed some  17:02:36
19   audits of your distributors, correct?   17:02:39
20     A.   Yes.                             17:02:41
21     Q.   And you recall that these        17:02:43
22   audit -- in these audits you actually went to  17:02:46
23   the -- your customer and visited some of  17:02:51
24   their facilities?                       17:02:53
25     A.   Yes.                             17:02:55

Page 393

1      Q.   And you went to -- I believe     17:02:55
2    you performed on-site audits of at least  17:02:58
3    Masters and KeySource; is that correct?  17:03:02
4      A.   Correct.                         17:03:04
5      Q.   Okay.  And these -- what was     17:03:04
6    the purpose of performing these on-site  17:03:06
7    audits?                                 17:03:10
8      A.   So we had reviewed -- the        17:03:11
9    purpose was to review their suspicious order  17:03:14
10   monitoring and understand which -- what due  17:03:19
11   diligence they perform when reviewing their  17:03:21
12   customers.                              17:03:24
13         (Mallinckrodt-Harper Exhibit 26   17:03:26
14     marked for identification.)           17:03:27
15   QUESTIONS BY MR. KO:                    17:03:27
16     Q.   Okay.  I'm going to hand you a   17:03:27
17   copy of what's going to be marked as Harper  17:03:28
18   Exhibit 26.                             17:03:30
19         And for the record, this is --    17:03:33
20     ends in Bates 48430.                  17:03:34
21     I just have some general             17:03:47
22   questions about this, so feel free to consult  17:03:49
23   the document if you need to.  But I just want  17:03:51
24   to know whether or not this reflects the  17:03:54
25   written report of your on-site audit to  17:03:56

Highly Confidential – Subject to Further Confidentiality Review

Page 394

1  Masters as of December 7, 2010?                17:04:00
2      A.   Yes.                                  17:04:02
3      Q.   And so as you described, one of       17:04:03
4  the purposes of performing this audit was to   17:04:04
5  review Masters' suspicious order monitoring    17:04:08
6  system; is that correct?                       17:04:11
7      A.   Yes.                                  17:04:11
8      Q.   Okay.  And do you recall              17:04:12
9  actually going out to Masters Pharmaceutical   17:04:17
10  located in Cincinnati, Ohio?                  17:04:19
11      A.   Yes.                                 17:04:20
12      Q.   And you went there with              17:04:20
13  Mr. Ratliff, correct?                         17:04:21
14      A.   Yes.                                 17:04:22
15      Q.   And at the time you -- there         17:04:23
16  was some certain with respect to Masters      17:04:27
17  Pharmaceutical activities, and so that        17:04:30
18  prompted the need for you and Mr. Ratliff to  17:04:32
19  go visit; is that accurate?                   17:04:35
20      A.   Okay.                                17:04:40
21      Q.   Okay.  And by the way, Masters       17:04:40
22  Pharmaceutical also had its license suspended 17:04:42
23  by the DEA at some point, correct?            17:04:43
24      A.   Yes.                                 17:04:44
25      Q.   Okay.  I believe that was 2014,      17:04:44

Page 395

1  but it related -- is it consistent with your  17:04:49
2  understanding that it related to activities   17:04:51
3  regarding their distribution of prescription  17:04:53
4  opioids in the 2008 through 2014 time period? 17:04:56
5          MR. O'CONNOR:  Object to form.        17:04:59
6          THE WITNESS:  I don't know the        17:04:59
7      date of the covered conduct.              17:05:01
8  QUESTIONS BY MR. KO:                          17:05:04
9      Q.   Okay.  Was there ever a time         17:05:04
10  when you ceased or put a temporary hold on   17:05:10
11  shipping orders to Masters?                  17:05:13
12      A.   Yes.                                17:05:14
13      Q.   And that occurred at some point     17:05:14
14  in the late 2010 time period, right?         17:05:16
15      A.   Yes.                                17:05:18
16      Q.   And after this review, it was       17:05:18
17  determined that they were -- it was          17:05:24
18  sufficient to resume shipments to Masters; is 17:05:28
19  that fair to say?                            17:05:34
20      A.   No.                                 17:05:34
21      Q.   Or did you -- at the time you       17:05:34
22  ceased sending shipments to Masters in late  17:05:36
23  2010, did you ever resume shipments to       17:05:39
24  Masters?                                     17:05:41
25      A.   No.                                 17:05:42

Page 396

1      Q.   Okay.                                17:05:43
2      A.   It's my understanding that they     17:05:44
3  have recently been reissued a DEA             17:05:47
4  registration, but I don't know the current   17:05:49
5  status, but from 2010 forward, no.           17:05:50
6      Q.   Fair enough.                        17:05:53
7          And in addition to the on-site       17:05:54
8  audit of Masters, you had done an on-site     17:06:00
9  audit of KeySource as well, correct?         17:06:03
10      A.   Yes.                               17:06:06
11      Q.   Do you recall any other on-site    17:06:06
12  audits that you were -- you participated in? 17:06:09
13      A.   Sunrise, previously, and then      17:06:10
14  there were others subsequently.  But at this 17:06:12
15  time I did not go to Cedardale; several of my 17:06:15
16  colleagues did.                             17:06:19
17      Q.   Got it.                            17:06:20
18          So other than on-site audits       17:06:20
19  performed of Cedardale, KeySource, Sunrise   17:06:23
20  and Masters, are you aware of any other      17:06:28
21  on-site audits that the SOM team conducted?  17:06:30
22      A.   Ever?                              17:06:33
23      Q.   From in the 2009 through 2012      17:06:35
24  time period.                                17:06:38
25      A.   Yes.                               17:06:39

Page 397

1      Q.   Okay.  Which additional on-site     17:06:40
2  audits did you perform?                       17:06:44
3      A.   We went to AmerisourceBergen,       17:06:45
4  McKesson, Cardinal, and I believe HD Smith,   17:06:49
5  although -- yes, HD Smith, yes.               17:06:56
6      Q.   And again, the purpose of these     17:06:59
7  on-site audits was to, among other things,    17:07:01
8  examine and understand their SOM program?     17:07:04
9      A.   Yes.                                17:07:05
10          (Mallinckrodt-Harper Exhibit 27    17:07:19
11      marked for identification.)            17:07:19
12  QUESTIONS BY MR. KO:                        17:07:05
13      Q.   Okay.  Now, turning to -- you      17:07:05
14  can set that aside, and I'm going to hand you 17:07:15
15  a copy of what will be marked as Exhibit 27. 17:07:17
16          And for the record, this ends      17:07:23
17  in Bates 970734.                            17:07:25
18          And this appears to be a letter    17:07:38
19  you drafted to Masters on September 21, 2011, 17:07:40
20  correct?                                    17:07:46
21      A.   Yes.                               17:07:46
22      Q.   Okay.  And now, you had            17:07:46
23  testified that you ceased shipments to       17:07:48
24  Masters at the end of 2010; is that correct? 17:07:52
25      A.   Approximate time.  I'm not         17:07:55

Page 398

1    certain.                        17:07:57
2        Q.    But despite -- well, you      17:07:57
3    stopped shipping to them, but you are still   17:08:02
4    undergoing a review of their SOM program; is   17:08:05
5    that correct?                    17:08:08
6        A.    At their request, yes.        17:08:08
7        Q.    At their request.  Okay.       17:08:09
8        And on -- this culminates in a       17:08:11
9    letter on September 21, 2011, from you to     17:08:15
10   Mr. Corona, who I believe is the president of  17:08:20
11   Masters Pharmaceutical.                17:08:24
12       Is that consistent with your         17:08:24
13   understanding?                     17:08:25
14       A.    I don't know his title.  He was   17:08:25
15   an executive, yes.                 17:08:28
16       Q.    Okay.  And you indicate that,    17:08:28
17   among other things, "We are not comfortable   17:08:30
18   that your suspicious order monitoring program 17:08:33
19   is robust enough to identify suspicious       17:08:34
20   orders of controlled substances to ensure     17:08:37
21   that the products are being used for          17:08:39
22   legitimate medicinal purposes."              17:08:42
23       Did I read that correctly?          17:08:46
24       A.    Yes.                   17:08:46
25       Q.    And you continue that "As       17:08:46

Page 399

1    parted of our SOM and through evaluation of   17:08:48
2    customer buying patterns and chargeback data, 17:08:50
3    we have identified unusual purchasing        17:08:53
4    patterns by some of your customers for       17:08:54
5    oxycodone 15-milligram and 30-milligram      17:08:56
6    tablets."                        17:09:01
7        Did I read that correctly?          17:09:02
8        A.    Yes.                   17:09:02
9        Q.    So this is an example of how    17:09:03
10   you have utilized chargeback data that        17:09:05
11   Mallinckrodt can acquire to identify certain  17:09:09
12   customer buying patterns, among other things, 17:09:15
13   correct?                         17:09:17
14       A.    Correct.                17:09:18
15       Q.    And also to identify unusual    17:09:18
16   purchasing patterns by some of Masters'       17:09:22
17   customers, correct?                 17:09:24
18       MR. O'CONNOR:  Object to form.       17:09:25
19       THE WITNESS:  Correct.           17:09:25
20   QUESTIONS BY MR. KO:                  17:09:26
21       Q.    Okay.  And based on that        17:09:26
22   review, you indicate that you are not         17:09:29
23   prepared, Mallinckrodt is not prepared, to    17:09:33
24   resume sales of controlled substances,        17:09:35
25   correct?                         17:09:37

Page 400

1        A.    Yes.                   17:09:37
2        Q.    Okay.  So you've done an       17:09:38
3    analysis of their SOM program, and you        17:09:39
4    conclude that Mallinckrodt is not comfortable 17:09:43
5    making any sales to them?             17:09:46
6        A.    Yes.                   17:09:47
7        Q.    You can set that aside.        17:09:47
8        (Mallinckrodt-Harper Exhibit 28      17:10:00
9        marked for identification.)          17:10:01
10   QUESTIONS BY MR. KO:                  17:10:01
11       Q.    And I'm going to hand you a     17:10:01
12   copy of what'll be marked as Harper          17:10:02
13   Exhibit 28.                      17:10:05
14       And for the record, this ends        17:10:07
15   in Bates 289368.                   17:10:08
16       Does this letter look familiar       17:10:15
17   to you, Ms. Harper?                 17:10:18
18       A.    Yes.  Yes.               17:10:19
19       Q.    And this is -- in your ongoing  17:10:19
20   review of chargeback data, you are able to    17:10:21
21   identify through this letter that you send to 17:10:24
22   your customers a series of pharmacies that    17:10:30
23   your customers ship to that you will not be   17:10:36
24   processing chargeback requests for; is that   17:10:39
25   accurate?                        17:10:42

Page 401

1        A.    Yes, and it was also after     17:10:42
2    meeting with the distributors to understand   17:10:46
3    their due diligence at the pharmacy level,    17:10:48
4    yes.                         17:10:50
5        Q.    Okay.  And just so I understand 17:10:50
6    this document and just so the record is       17:10:51
7    clear, I understand you sent this same letter 17:10:53
8    to all 43 wholesale distributors of          17:10:57
9    Mallinckrodt as of October 17, 2011, correct? 17:11:04
10       A.    Yes.                   17:11:06
11       Q.    And so these were all your      17:11:06
12   customers that you shipped Mallinckrodt       17:11:07
13   opioids to, correct, during this time period? 17:11:12
14       A.    Well, specifically oxycodone 15 17:11:14
15   and 30, yes.                     17:11:16
16       Q.    Okay.  So 40 -- there were 43   17:11:17
17   wholesale distributors as of October 17,      17:11:20
18   2011, that you had previously done business   17:11:24
19   with that was -- that you had shipped oxy 15s 17:11:27
20   and oxy 30s to, correct?             17:11:29
21       MR. O'CONNOR:  Object to form.       17:11:31
22       THE WITNESS:  You know, I'd         17:11:32
23       like to clarify my previous -- so    17:11:35
24       these were all wholesalers and       17:11:37
25       distributors of records as purchasing 17:11:39

Page 402

1    opioids, but they may not have          17:11:42
2    purchased oxy 15 and 30.  They may      17:11:43
3    have purchased other opioids.           17:11:46
4        So that's the correct answer.       17:11:48
5    QUESTIONS BY MR. KO:                     17:11:50
6        Q.    Okay.  Thank you for the      17:11:50
7    clarification.                           17:11:51
8        A.    You're welcome.               17:11:52
9        Q.    So then is it fair to say that 17:11:53
10   these 43 wholesalers and distributors   17:11:54
11   constituted all the wholesaler distributors 17:11:59
12   that Mallinckrodt did business with in terms 17:12:02
13   of shipping prescription opioids to?    17:12:05
14       A.    To the best of my             17:12:07
15   understanding, yes.                      17:12:08
16       Q.    Okay.  And as we just discussed 17:12:09
17   a moment ago, "effective immediately,   17:12:17
18   Mallinckrodt will no longer process     17:12:21
19   chargebacks from distributor sales of   17:12:22
20   Mallinckrodt products to the pharmacies 17:12:25
21   identified on attachment 1 hereto."     17:12:27
22       And those pharmacies are of         17:12:29
23   course the ones listed in the second page of 17:12:31
24   this document, correct?                  17:12:33
25       A.    Yes.                          17:12:33

Page 403

1        Q.    Okay.  And so you're not      17:12:34
2    necessarily saying here that these pharmacies 17:12:37
3    need to be placed on any kind of do not ship 17:12:40
4    list.  You're simply telling these     17:12:43
5    distributors that you're not going to process 17:12:44
6    any chargeback requests related to these 17:12:46
7    particular pharmacies, correct?         17:12:49
8        MR. O'CONNOR:  Object to form.      17:12:50
9        THE WITNESS:  Yes.                  17:12:50
10   QUESTIONS BY MR. KO:                     17:12:51
11       Q.    Okay.  And by the way, going  17:12:51
12   back to the first paragraph of this     17:12:53
13   correspondence, you indicate to your    17:12:57
14   customers at the end of the first paragraph 17:13:01
15   that, quote, "As a DEA registrant,      17:13:04
16   Mallinckrodt, LLC, a Covidien company,  17:13:06
17   Mallinckrodt, has developed and maintains a 17:13:10
18   comprehensive program that includes review of 17:13:12
19   customer orders, IMS data and chargeback 17:13:14
20   information and, where appropriate,     17:13:17
21   subsequent audits of distributors' suspicious 17:13:20
22   order monitoring programs," end quote.  17:13:22
23       Did I read that correctly?          17:13:26
24       A.    Yes.                          17:13:27
25       Q.    So we discussed the concept of 17:13:27

Page 404

1    Mallinckrodt doing audits of your customers' 17:13:28
2    SOM programs.  I want to understand to what 17:13:33
3    extent you actually utilize IMS data to make 17:13:36
4    certain determinations as well.         17:13:39
5        A.    Okay.  We used IMS data to look 17:13:41
6    at the prescribers of oxycodone 15s and 30s. 17:13:47
7    When we spoke to the distributors about these 17:13:53
8    potentially -- about these pharmacies that 17:13:57
9    displayed red flags, we asked the       17:14:00
10   distributors if they had a list of the top 17:14:04
11   prescribers that were writing RXs at these 17:14:06
12   pharmacies, and then that was a method of 17:14:09
13   comparison that we had to this IMS data list 17:14:12
14   of the top prescribers in the country.  17:14:14
15       Q.    Okay.  And when do you recall  17:14:16
16   first utilizing the IMS data in connection 17:14:22
17   with this review of prescriber-level    17:14:26
18   information?                             17:14:28
19       A.    I don't know when it started. 17:14:28
20       Q.    Okay.  Are you currently       17:14:30
21   utilizing IMS data in connection with your 17:14:34
22   suspicious order monitoring system?     17:14:36
23       A.    No.                           17:14:37
24       Q.    Okay.  Other than for purposes 17:14:38
25   of sending out this letter to make      17:14:39

Page 405

1    distributors aware that chargeback requests 17:14:46
2    will not be honored, do you recall ever 17:14:48
3    utilizing IMS data in connection with SOM 17:14:51
4    activities?                             17:14:55
5        A.    Not that I recall.            17:14:55
6        Q.    You can -- I'd actually ask   17:14:56
7    that you keep that document in front of you, 17:15:08
8    but just probably you can refer to the back 17:15:09
9    because I want to ask you some questions 17:15:11
10   about these pharmacies.                  17:15:12
11       A.    All right.                    17:15:13
12       (Mallinckrodt-Harper Exhibit 29     17:15:15
13   marked for identification.)              17:15:16
14   QUESTIONS BY MR. KO:                     17:15:16
15       Q.    So I'm going to hand you a copy 17:15:16
16   of what will be marked as Harper Exhibit 29. 17:15:17
17       A.    Oh, my gosh.                  17:15:30
18       Q.    And for the record, this      17:15:32
19   document ends in Bates 32384 and is an e-mail 17:15:35
20   from Wayne Corona at Masters to you, dated 17:15:40
21   October 10 -- 20, 2011.                 17:15:46
22       Do you recall this e-mail?          17:15:49
23       A.    Yes.                          17:15:50
24       Q.    Okay.  This is Masters'        17:15:51
25   response to the letter that you had sent to 17:15:55

Page 406

1  them that we just previously discussed that    17:15:59
2  reflects Exhibit 28; is that correct?    17:16:03
3      A.  I don't see -- we had a    17:16:04
4  separate letter addressed -- is this in your    17:16:11
5  pile?  I'm so confused.    17:16:16
6          Okay.  We had a separate letter    17:16:18
7  addressed to Masters.    17:16:23
8      Q.  Okay.  And in that separate    17:16:23
9  letter, you were identifying -- I believe    17:16:24
10  I've seen that, but in that separate letter    17:16:29
11  you identify these same pharmacies; is that    17:16:31
12  correct?    17:16:32
13      A.  Yes.  Yes.    17:16:32
14      Q.  So at some point before this    17:16:34
15  e-mail, you had obviously indicated to    17:16:38
16  Masters that there were certain pharmacies    17:16:40
17  that you weren't going to honor chargebacks    17:16:48
18  to, correct?    17:16:52
19      A.  Yes.    17:16:52
20      Q.  And I assume that there was a    17:16:52
21  separate e-mail sent to Masters, because at    17:16:54
22  the time you weren't doing business with    17:16:57
23  them?    17:16:59
24      A.  I believe this is the time we    17:17:00
25  notified Masters that we were going to    17:17:04

Page 407

1  discontinue sales of Mallinckrodt product to    17:17:07
2  Masters.    17:17:09
3      Q.  Okay.    17:17:10
4      A.  So it would have been a letter.    17:17:10
5          But we sent several letters to    17:17:11
6  Masters, and so I -- the content of each one    17:17:13
7  I can't attest to.    17:17:19
8      Q.  Sure.  Fair enough.    17:17:19
9          In any event, Mr. Corona,    17:17:20
10  who -- it does appear in the end of this    17:17:24
11  e-mail that he is the president of Masters    17:17:27
12  Pharmaceutical.    17:17:29
13          Do you see that?  I've    17:17:29
14  highlighted it.    17:17:38
15      A.  Yes, I do.  Yes.  Yes.    17:17:38
16      Q.  So you had sent some    17:17:39
17  correspondence to Jennifer Seiple at Masters,    17:17:42
18  and you had identified these pharmacies that    17:17:46
19  appear in attachment 1, correct?    17:17:49
20      A.  Yes.    17:17:50
21      Q.  Okay.  And he responds that "As    17:17:51
22  you can see, the dates of termination predate    17:18:03
23  your notification."    17:18:06
24          Do you see that?    17:18:08
25      A.  I do.    17:18:08

Page 408

1      Q.  Okay.  So is it accurate to say    17:18:09
2  that what he's trying to tell you is that for    17:18:12
3  each one of these pharmacies that you have    17:18:15
4  identified as being problematic, he has    17:18:16
5  indicated that Masters has already placed    17:18:21
6  them on Masters' termination list; is that    17:18:24
7  accurate?    17:18:28
8      A.  Yes.    17:18:28
9      Q.  Okay.  And for several of these    17:18:29
10  pharmacies, Masters had placed these    17:18:32
11  pharmacies on the termination list    17:18:36
12  approximately one year prior to you notifying    17:18:39
13  Masters of these problematic pharmacies; is    17:18:42
14  that accurate?    17:18:47
15      A.  Yes.    17:18:47
16      Q.  Okay.  Now, he goes on to    17:18:48
17  say -- and I recall earlier when we discussed    17:18:57
18  how you had indicated to Masters that they    17:19:01
19  had an inadequate SOM program.    17:19:04
20      A.  Yes.    17:19:06
21      Q.  Okay.  And he responds, quote,    17:19:07
22  "In your last two letters to Masters, you    17:19:11
23  have judged our SOMs to be inadequately    17:19:16
24  robust, yet somehow we identified these    17:19:18
25  accounts well before you, exclamation point."    17:19:20

Page 409

1          Did I read that correctly?    17:19:23
2      A.  Yes.    17:19:23
3      Q.  So, again, is it accurate to    17:19:24
4  state that Masters had identified one -- at    17:19:27
5  least one year prior, in some instances, some    17:19:30
6  pharmacies that were deemed to be    17:19:33
7  problematic, sufficient to place them on    17:19:34
8  their termination list before you were able    17:19:36
9  to make that same determination?    17:19:39
10      MR. O'CONNOR:  Object to form.    17:19:40
11      THE WITNESS:  Yes.    17:19:41
12  QUESTIONS BY MR. KO:    17:19:41
13      Q.  Okay.  And earlier we had --    17:19:42
14  you had testified that one of the reasons why    17:19:46
15  you had audited Masters was to review their    17:19:48
16  SOM program, correct?    17:19:51
17      A.  Yes.    17:19:52
18      Q.  Okay.  And yet through your    17:19:53
19  review, you were unable to determine which    17:19:55
20  pharmacies they placed on their termination    17:20:00
21  list, correct?    17:20:02
22      A.  Correct.    17:20:03
23      Q.  Okay.  Isn't that reflective of    17:20:04
24  an inadequate audit on the part of    17:20:10
25  Mallinckrodt?    17:20:12

Highly Confidential – Subject to Further Confidentiality Review

Page 410

1    MR. O'CONNOR: Object to form.    17:20:12
2    THE WITNESS: No.    17:20:13
3    QUESTIONS BY MR. KO:    17:20:13
4    Q.    Okay. Do you feel that had you    17:20:14
5    asked Masters the simple question of which    17:20:16
6    pharmacies they had placed on their do not    17:20:21
7    ship list, you would have also understood    17:20:23
8    that these pharmacies were problematic?    17:20:26
9    A.    I do not know.    17:20:31
10    Q.    Okay. Do you agree with me    17:20:32
11    that had you asked that question in your    17:20:34
12    audit, you would have learned that these    17:20:36
13    pharmacies were problematic?    17:20:38
14    A.    If they would have provided    17:20:40
15    this listing, yes.    17:20:42
16    Q.    Okay. Regardless of whether or    17:20:43
17    not they provided the listing --    17:20:45
18    A.    Uh-huh.    17:20:47
19    Q.    -- the purpose of your audit in    17:20:47
20    late 2010 was to understand Masters' SOM    17:20:50
21    program, was it not?    17:20:56
22    A.    Yes.    17:20:57
23    Q.    And you were doing an    17:20:57
24    independent review?    17:20:58
25    A.    Yes, a Mallinckrodt review of    17:21:01

Page 411

1    their program, yes.    17:21:02
2    Q.    Right.    17:21:03
3    And in connection with that    17:21:04
4    review, did you ever ask them whether or not    17:21:05
5    they had placed certain pharmacies on their    17:21:08
6    do not ship list?    17:21:11
7    A.    I don't -- I don't know. I    17:21:11
8    don't recall.    17:21:14
9    Q.    Okay. Had you asked that    17:21:14
10    question, you would have certainly learned    17:21:15
11    this information, correct?    17:21:18
12    MR. O'CONNOR: Object to form.    17:21:18
13    THE WITNESS: Perhaps.    17:21:19
14    QUESTIONS BY MR. KO:    17:21:20
15    Q.    Okay. Sitting here today, is    17:21:20
16    it reflective of an adequate audit if you    17:21:28
17    didn't ask Masters whether or not they had    17:21:31
18    any pharmacies on their termination list?    17:21:34
19    MR. O'CONNOR: Object to form.    17:21:37
20    THE WITNESS: No.    17:21:37
21    QUESTIONS BY MR. KO:    17:21:38
22    Q.    So to be clear, not asking them    17:21:41
23    whether or not they had pharmacies on their    17:21:45
24    termination list is indicative of an    17:21:47
25    inadequate audit, correct?    17:21:51

Page 412

1    MR. O'CONNOR: Object to form.    17:21:52
2    THE WITNESS: I'm sorry, there    17:21:53
3    were double negatives. Will you    17:21:55
4    please restate? I'm sorry.    17:21:57
5    QUESTIONS BY MR. KO:    17:21:58
6    Q.    Sorry, I have a bad habit of    17:21:58
7    that.    17:22:02
8    So not asking Masters whether    17:22:03
9    or not they had pharmacies on their    17:22:04
10    termination list is indicative of an    17:22:05
11    inadequate audit, correct?    17:22:09
12    MR. O'CONNOR: Object to form.    17:22:10
13    THE WITNESS: I do not agree.    17:22:11
14    QUESTIONS BY MR. KO:    17:22:12
15    Q.    You do not agree.    17:22:12
16    Had you simply asked Masters    17:22:13
17    whether or not certain pharmacies appeared on    17:22:19
18    their do not ship list, you would have    17:22:21
19    learned that certain pharmacies did in fact    17:22:23
20    appear on that list, correct?    17:22:25
21    MR. O'CONNOR: Objection.    17:22:27
22    Asked and answered.    17:22:28
23    THE WITNESS: I don't know if    17:22:28
24    they would have given us this list.    17:22:30
25

Page 413

1    QUESTIONS BY MR. KO:    17:22:33
2    Q.    Okay. But you don't recall    17:22:34
3    ever asking that question?    17:22:35
4    A.    I do not.    17:22:36
5    Q.    Okay. Certainly if you had    17:22:37
6    asked that question, you would have been able    17:22:39
7    to determine whether or not certain    17:22:41
8    pharmacies appeared on their do not ship    17:22:43
9    list, correct?    17:22:45
10    MR. O'CONNOR: Objection.    17:22:45
11    Asked and answered.    17:22:46
12    THE WITNESS: So, sir, I'll    17:22:46
13    answer again. This whole Masters'    17:22:47
14    event became quite adversarial. And I    17:22:51
15    don't mean to be irreverent, because    17:22:55
16    I'm under testimony, but this Wayne    17:22:57
17    Corona, I expected to find a dead    17:22:58
18    chicken on my porch.    17:23:00
19    He called me, he hounded me, he    17:23:02
20    was angry, angry about our decision,    17:23:04
21    and so he was defending, I'm going to    17:23:06
22    say, to Mallinckrodt Masters' SOM    17:23:10
23    program with these series of    17:23:14
24    communications.    17:23:15
25

Page 414

1  QUESTIONS BY MR. KO:                 17:23:15
2     Q.   Okay.  Is it fair to say that   17:23:16
3  Masters identified problematic pharmacies   17:23:17
4  before you had identified them in your   17:23:24
5  October 17, 2011 correspondence to them?   17:23:27
6     A.   Yes.                          17:23:30
7          MR. O'CONNOR:  Object to form.   17:23:30
8          THE WITNESS:  According to this   17:23:31
9  e-mail, yes.                         17:23:32
10  QUESTIONS BY MR. KO:                 17:23:33
11     Q.   Okay.  Do you -- had you had   17:23:33
12  the information -- let's take Gulf Coast, for   17:23:39
13  example.                             17:23:42
14          Do you see that -- by the way,   17:23:42
15  do you recall Gulf Coast medical pharmacy?   17:23:46
16     A.   The names all run together.  I   17:23:48
17  do not.  I'm sorry.                  17:23:51
18     Q.   They were -- I believe that   17:23:51
19  they were the subject of a DEA indictment,   17:23:53
20  and they were a particularly problematic   17:23:55
21  customer.                            17:23:58
22          But regardless, in -- as of   17:23:59
23  October 28, 2010, Masters had placed Gulf   17:24:03
24  Coast on their termination list, correct?   17:24:07
25          MR. O'CONNOR:  Object to form.   17:24:09

Page 415

1          THE WITNESS:  Yes.           17:24:10
2  QUESTIONS BY MR. KO:                 17:24:14
3     Q.   And sitting here today, would   17:24:14
4  you agree with me that if you had shipped   17:24:17
5  pills to distributors that sold eventually to   17:24:20
6  Gulf Coast after October 20, 2010, that would   17:24:25
7  have been a problem, correct?        17:24:31
8          MR. O'CONNOR:  Object to form.   17:24:32
9          THE WITNESS:  Not a problem we   17:24:33
10  were aware of.                       17:24:37
11  QUESTIONS BY MR. KO:                 17:24:37
12     Q.   Certainly I understand that you   17:24:39
13  may not have been aware of it, but is it --   17:24:41
14  is it reflective of an effective SOM program   17:24:46
15  if you ship orders to a pharmacy that you   17:24:50
16  know appear on your customer's termination   17:24:53
17  list?                                17:24:56
18          MR. O'CONNOR:  Object to form.   17:24:56
19          THE WITNESS:  If we know a   17:24:57
20  customer -- if we know a pharmacy   17:24:58
21  appears on our customer's termination   17:25:01
22  list, we also discontinue honoring of   17:25:03
23  chargebacks to that pharmacy.        17:25:07
24  QUESTIONS BY MR. KO:                 17:25:07
25     Q.   Okay.  So that's helpful.     17:25:08

Page 416

1  So -- I thank you for that clarification.   17:25:10
2          So to be clear, if you obtain   17:25:11
3  knowledge from a customer that they have   17:25:13
4  placed a particularly pharmacy -- particular   17:25:16
5  pharmacy on their do not ship list, you also   17:25:18
6  would no longer honor chargeback requests   17:25:22
7  from that particular distributor as it   17:25:26
8  relates to pills shipped to that pharmacy,   17:25:29
9  correct?                             17:25:31
10     A.   Correct.                      17:25:32
11     Q.   And it would have also been   17:25:33
12  problematic to do so, right, because that   17:25:36
13  particular pharmacy for a variety of reasons   17:25:38
14  would have certain red flags, correct?   17:25:43
15          MR. O'CONNOR:  Object to form.   17:25:45
16          THE Witness:  Yes.           17:25:45
17  QUESTIONS BY MR. KO:                 17:25:47
18     Q.   And potentially that pharmacy   17:25:48
19  would be engaged in diversion of prescription   17:25:49
20  opioids, correct?                    17:25:52
21          MR. O'CONNOR:  Object to form.   17:25:53
22          THE WITNESS:  Potentially.     17:25:53
23  QUESTIONS BY MR. KO:                 17:25:54
24     Q.   Okay.  And so for each one of   17:25:55
25  these pharmacies that are listed here that   17:25:58

Page 417

1  predate your correspondence on October 17th,   17:26:02
2  you would agree with me that had you known   17:26:11
3  from Masters that they were placed on their   17:26:13
4  termination list, you would have also agreed   17:26:18
5  that these pharmacies were problematic?   17:26:20
6          MR. O'CONNOR:  Object to form.   17:26:22
7          THE WITNESS:  Yes.           17:26:23
8  QUESTIONS BY MR. KO:                 17:26:23
9     Q.   Okay.  And shipping orders --   17:26:24
10  and I understand you don't believe you knew   17:26:27
11  at the time, but shipping orders to these   17:26:30
12  pharmacies after they were placed on a   17:26:33
13  termination list would not be indicative of   17:26:36
14  an effective SOM program, correct?   17:26:38
15          MR. O'CONNOR:  Object to form.   17:26:40
16          THE WITNESS:  Correct.        17:26:40
17          (Mallinckrodt-Harper Exhibit 30   17:27:03
18  marked for identification.)          17:27:03
19  QUESTIONS BY MR. KO:                 17:27:03
20     Q.   Okay.  I'm going to hand you a   17:27:04
21  copy of what's being marked as Harper   17:27:04
22  Exhibit 30.                          17:27:07
23          And for the record, this is a   17:27:10
24  demonstrative based on chargeback information   17:27:12
25  produced to us.  And to be clear, it's not   17:27:15

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1  any copy provided by your counsel or by          17:27:19
2  Mallinckrodt but something that we have           17:27:24
3  prepared.                                         17:27:25
4       So Brooks Pharmacy was a              17:27:44
5  pharmacy that appeared on your letter to all     17:27:47
6  distributors, correct?                           17:27:50
7       A.   Yes.                        17:27:51
8       Q.   Including to Masters, correct?    17:27:51
9       A.   Yes.                        17:27:53
10      Q.   And Masters had indicated to      17:27:53
11  you that they had already placed Brooks on       17:27:58
12  their termination list as of October 4, 2010,    17:27:59
13  correct?                                         17:28:02
14      A.   Yes.                        17:28:02
15      Q.   Okay.  Based on this chart, it   17:28:03
16  appears that several hundred thousand pills     17:28:09
17  nevertheless shipped to Brooks Pharmacy from     17:28:11
18  the period between October 4, 2010, and          17:28:13
19  October 17, 2011, based on chargeback data       17:28:16
20  that has been provided to us.                    17:28:20
21      Do you see that?                17:28:21
22      A.   So, yes, but may I ask what the   17:28:22
23  unit of measure is here, please?                 17:28:26
24      Q.   Those are total pills.          17:28:28
25      A.   Dosage units.               17:28:30

Page 419

1       Q.   Dosage units.               17:28:31
2       A.   All right.  All right.  Thank    17:28:32
3  you.                                              17:28:32
4       Q.   So hundreds of thousands of     17:28:32
5  dosage units/pills are delivered to Brooks       17:28:35
6  Pharmacy through Cardinal between October 4,    17:28:39
7  2010, and October 17, 2011, correct?             17:28:42
8       MR. O'CONNOR:  Object to form.      17:28:45
9       MS. FIX MEYER:  Object to form.    17:28:46
10      THE WITNESS:  The graph            17:28:47
11  indicates that Cardinal sold this          17:28:49
12  product to that downstream customer.       17:28:52
13      MS. FIX MEYER:  Object to the      17:28:55
14  form.  Foundation.                         17:28:57
15  QUESTIONS BY MR. KO:                   17:28:58
16      Q.   You can answer the question.    17:28:59
17  She's just lodging her objection for the        17:29:00
18  record.                                          17:29:02
19      A.   Okay.  So if I'm to believe the  17:29:02
20  graph is gospel, yes.  It appears that          17:29:04
21  Cardinal told that number of dosage units to    17:29:06
22  Brooks Pharmacy.                                 17:29:10
23      Q.   And again, had you asked        17:29:10
24  Masters which pharmacies appeared on their      17:29:11
25  termination list, you would have understood     17:29:19

Page 420

1  that Masters put Brooks Pharmacy on their do     17:29:20
2  not ship list as of October 4, 2010, correct?   17:29:25
3       MR. O'CONNOR:  Object to form.      17:29:27
4       MS. FIX MEYER:  Object to form.    17:29:28
5       THE WITNESS:  If they would        17:29:29
6  have given it to us.  We had some          17:29:30
7  customers that declined to provide         17:29:31
8  that information, unfortunately.           17:29:32
9  QUESTIONS BY MR. KO:                   17:29:35
10      Q.   Now -- but we had spoken about   17:29:35
11  an audit before, but you performed an on-site   17:29:36
12  audit of Masters, correct?                       17:29:41
13      A.   Yes.                        17:29:42
14      Q.   And that on-site audit was all   17:29:42
15  day, I believe?                                  17:29:44
16      A.   Yes.                        17:29:44
17      Q.   Okay.  And again, sitting here   17:29:46
18  today, do you believe that shipments made to    17:29:52
19  a -- an end user after one of your customers    17:29:53
20  puts them on the termination list is            17:30:00
21  indicative of an effective suspicious order    17:30:02
22  monitoring program?                              17:30:04
23      MR. O'CONNOR:  Object to form.      17:30:05
24      MS. FIX MEYER:  Object to          17:30:06
25  foundation.                                17:30:07

Page 421

1       THE WITNESS:  If we are aware      17:30:07
2  of it?                                     17:30:08
3  QUESTIONS BY MR. KO:                   17:30:09
4       Q.   Yes.                        17:30:09
5       A.   So, yes, but not if we're not   17:30:10
6  aware of it.                                     17:30:12
7       Q.   Okay.  But you had the ability,  17:30:13
8  and as reflected by this chargeback data that   17:30:15
9  you had acquired, you had the ability to        17:30:19
10  understand where your -- the details of where   17:30:22
11  your pills were going after you shipped them    17:30:24
12  to the distributor, correct?                     17:30:26
13      MR. O'CONNOR:  Object to form.      17:30:27
14      THE WITNESS:  Yes.                 17:30:29
15  QUESTIONS BY MR. KO:                   17:30:29
16      Q.   Okay.  And by the way, as we     17:30:29
17  discussed before, you did an audit of          17:30:35
18  Cardinal's SOM program as well, correct?        17:30:38
19      A.   Yes.                        17:30:40
20      Q.   And so would you agree that      17:30:40
21  Cardinal could have asked the same question    17:30:41
22  as well?                                         17:30:43
23      MR. O'CONNOR:  Object to form.      17:30:44
24      MS. FIX MEYER:  Objection to        17:30:44
25  foundation.  Object to form.               17:30:45

Highly Confidential – Subject to Further Confidentiality Review

Page 422

1      THE WITNESS: I don't know the      17:30:46
2  specifics of Cardinal's interaction      17:30:47
3  with the pharmacies or with their      17:30:49
4  customers, so I don't know that -- I      17:30:51
5  cannot answer.      17:30:52
6  QUESTIONS BY MR. KO:      17:30:53
7      Q.   Sure.  Fair enough.      17:30:53
8      Regardless, is it accurate to      17:30:54
9  state, assuming that these numbers are true,      17:30:59
10  that Mallinckrodt shipped hundreds of      17:31:00
11  thousands of pills to customers, including      17:31:05
12  Cardinal, that eventually shipped to Brooks      17:31:10
13  Pharmacy after they were placed on the      17:31:13
14  termination list by Masters?      17:31:16
15      MR. O'CONNOR: Object to form.      17:31:18
16      MS. FIX MEYER: Object to form.      17:31:19
17  Object to foundation.      17:31:22
18      THE WITNESS: Yes.      17:31:23
19  QUESTIONS BY MR. KO:      17:31:23
20      Q.   Set that aside.      17:31:24
21      (Mallinckrodt-Harper Exhibit 31      17:31:48
22  marked for identification.)      17:31:49
23  QUESTIONS BY MR. KO:      17:31:49
24      Q.   I'm going to hand you just      17:31:50
25  another quick copy of some data we were able      17:31:52

Page 423

1  to pull from the chargeback information      17:31:54
2  produced by your counsel, and that is -- I'm      17:31:55
3  sorry.  I'm handing you a copy of what will      17:32:00
4  be marked as Harper Exhibit 31.      17:32:02
5      MR. O'CONNOR: So, again,      17:32:04
6  Counsel, this is a document you      17:32:06
7  created?      17:32:07
8      MR. KO:  This is a      17:32:07
9  demonstrative exhibit created by us,      17:32:08
10  correct, based on the Excel files      17:32:10
11  produced to us.      17:32:13
12      THE WITNESS: Yes, I know.  I'm      17:32:13
13  just verifying it against that list,      17:32:13
14  yes.  Okay.      17:32:16
15  QUESTIONS BY MR. KO:      17:32:18
16      Q.   So here, I'll -- this is      17:32:18
17  similar to Exhibit 30.  This is a chart that      17:32:19
18  shows pills that were shipped to Island Drug      17:32:23
19  by your customers from the January 2010 to      17:32:28
20  September 2011 time period.      17:32:33
21      And in particular, there is      17:32:35
22  again -- on the left-hand side the numbers      17:32:44
23  are reflective of dosage units --      17:32:45
24      A.   Thank you.      17:32:47
25      Q.   -- slash pills.      17:32:47

Page 424

1      And it appears that based on      17:32:50
2  the chargeback data that you had access to,      17:32:53
3  Mallinckrodt had shipped to distributors that  17:32:57
4  shipped to Island Drug in the June 3, 2010,      17:32:59
5  through October 17, 2011 time period,      17:33:03
6  correct?      17:33:05
7      A.   Yes.      17:33:06
8      Q.   Okay.  And similar to Brooks      17:33:06
9  Pharmacy, would you agree with me that      17:33:10
10  shipping drugs to customers who shipped to      17:33:13
11  Island Drug after they appeared on a      17:33:19
12  termination list would be indicative of an      17:33:22
13  inadequate SOM program?      17:33:26
14      MR. O'CONNOR: Object to form.      17:33:28
15      THE WITNESS: No.      17:33:29
16  QUESTIONS BY MR. KO:      17:33:29
17      Q.   You would not.      17:33:30
18      A.   I would not.      17:33:31
19      Q.   Okay.  You had -- as we      17:33:33
20  discussed before, you had access to this      17:33:38
21  chargeback data, correct?      17:33:40
22      A.   Yes.      17:33:41
23      Q.   Okay.  And you also performed      17:33:42
24  an on-site audit of Masters, correct?      17:33:45
25      A.   Yes.      17:33:48

Page 425

1      Q.   And so assuming you had asked      17:33:48
2  them the question of whether or not Masters      17:33:50
3  had placed Island Drug on their do not ship      17:33:53
4  list, would you agree with me that it would      17:33:57
5  be indicative of an inadequate SOM program if  17:34:00
6  you continued to ship drugs to customers who  17:34:05
7  shipped to Island Drug?      17:34:08
8      MR. O'CONNOR: Object to form.      17:34:09
9      THE WITNESS: So the premise is      17:34:09
10  that we would have asked Masters for      17:34:13
11  their do not ship list, and there's no      17:34:15
12  assurance whether they would or would      17:34:20
13  not have provided it.  But if we would      17:34:21
14  have known which customers Masters had      17:34:24
15  terminated, we would have put them on      17:34:26
16  our chargeback restriction list.      17:34:28
17  QUESTIONS BY MR. KO:      17:34:29
18      Q.   And you would have also -- you      17:34:30
19  would have also determined that you should      17:34:34
20  stop shipping orders to customers that sell      17:34:36
21  to that particular pharmacy as well, correct?  17:34:38
22      MR. O'CONNOR: Object to form.      17:34:40
23      THE WITNESS: Stop -- there's a      17:34:40
24  distinction there.  Stop -- stop the      17:34:43
25  payment of chargebacks.  We cannot      17:34:45

Page 426

1    totally stop the shipment of          17:34:48
2    Mallinckrodt product to a pharmacy.    17:34:49
3    QUESTIONS BY MR. KO:                   17:34:51
4       Q.  Okay.  You would recommend     17:34:51
5    to -- one of the reasons why you would not   17:34:57
6    honor the chargeback request is to notify the   17:34:58
7    distributor that you would not be paying them   17:35:01
8    the difference between the amount that they   17:35:03
9    agreed upon with you and the subsequent price   17:35:07
10   that they're receiving for the drug in the   17:35:10
11   downstream transaction, correct?      17:35:12
12      A.  Yes.                           17:35:13
13      Q.  Okay.  So it would -- in other   17:35:13
14   words, it would alert the distributor -- it   17:35:14
15   would alert the distributor to the     17:35:23
16   possibility that that particular pharmacy was   17:35:25
17   problematic, correct?                 17:35:26
18           MR. O'CONNOR:  Object to form.   17:35:27
19           THE WITNESS:  Yes.            17:35:27
20           MR. KO:  Okay.  You can set    17:35:29
21   this aside.                           17:35:36
22           Why don't we take a quick break   17:35:41
23   and...                                17:35:43
24           VIDEOGRAPHER:  We are going off   17:35:45
25   the record at 5:35 p.m.               17:35:46

Page 427

1       (Off the record at 5:35 p.m.)     17:35:48
2           VIDEOGRAPHER:  We are back on   17:46:10
3    the record at 5:46 p.m.               17:46:12
4    QUESTIONS BY MR. KO:                  17:46:14
5       Q.  Okay.  Thank you again,       17:46:14
6    Ms. Harper.  As the court reporter indicated,   17:46:17
7    we have about approximately 25 minutes, and I   17:46:18
8    appreciate your patience thus far today.   17:46:20
9           Going back to our discussion   17:46:22
10   about Harvard, putting aside the details of   17:46:26
11   how that chart was created or the information   17:46:32
12   that you had requested through chargeback   17:46:37
13   reports, sitting here today, you weren't   17:46:39
14   aware that Harvard Drug had sent, on 12,486   17:46:43
15   occasions, oxy 15 and 30 to pain clinics,   17:46:49
16   pharmacies and medical doctors; is that   17:46:53
17   accurate?                             17:46:55
18           MR. O'CONNOR:  Object to form.   17:46:55
19           THE WITNESS:  I'm not aware or   17:46:55
20   I wasn't aware?  I'm sorry.            17:46:58
21   QUESTIONS BY MR. KO:                  17:47:00
22      Q.  Let's take you weren't aware at   17:47:00
23   the time.                             17:47:03
24           MR. O'CONNOR:  Same objection.   17:47:03
25           THE WITNESS:  I wasn't aware at   17:47:04

Page 428

1    the time of their suspension.         17:47:06
2    QUESTIONS BY MR. KO:                  17:47:07
3       Q.  All right.  And you weren't    17:47:07
4    aware of the total amount of oxy 15 and   17:47:09
5    oxy 30 pills they sent to end users,   17:47:11
6    including pain clinics and pharmacies,   17:47:17
7    correct?                              17:47:20
8       A.  So I realize I'm under oath,   17:47:20
9    and I saw that data that I -- you said I   17:47:23
10   extracted, and I don't know the timing of   17:47:25
11   that in correlation to when their license was   17:47:27
12   suspend, if it was before or after.   17:47:30
13      Q.  And I'll represent to you it   17:47:31
14   was before their license was suspended.   17:47:32
15           And I am just simply asking --   17:47:34
16      A.  Okay.                         17:47:36
17      Q.  -- whether or not at any point   17:47:36
18   in time you became aware of how many orders   17:47:38
19   of oxy 15 or oxy 30s they had sent to pain   17:47:41
20   clinics, pharmacies or medical doctors.   17:47:45
21      A.  In Florida?                    17:47:47
22      Q.  At any time.                   17:47:50
23      A.  Anywhere?                      17:47:50
24      Q.  Anywhere.                      17:47:51
25      A.  Clearly, I must have because --   17:47:52

Page 429

1    but -- was that chargeback report unique to   17:47:55
2    Florida?                              17:47:58
3           I'm sorry.                    17:48:00
4       Q.  No, that's okay.              17:48:00
5       A.  I'm so sorry.  I'm getting     17:48:01
6    mixed up here.                        17:48:03
7       Q.  No, it's okay.               17:48:03
8           Sitting here today, would you   17:48:05
9    agree with me that it would be suspicious for   17:48:20
10   Harvard Drug to sell oxy 15s and oxy 30s to   17:48:21
11   pain clinics, pharmacies and medical doctors   17:48:25
12   through a veterinary supply company?   17:48:28
13           MR. O'CONNOR:  Object to form.   17:48:32
14           THE WITNESS:  I don't know   17:48:33
15   their corporate structure, so that   17:48:34
16   would have been something, if it had   17:48:36
17   come to our attention, we would have   17:48:38
18   asked Harvard more questions about   17:48:41
19   their -- their business model.        17:48:43
20   QUESTIONS BY MR. KO:                  17:48:44
21      Q.  Sure.                         17:48:44
22           As a general matter, do you   17:48:45
23   recall any instances in which you sold   17:48:46
24   prescription opioids to vet companies?   17:48:48
25           MR. O'CONNOR:  Object to form.   17:48:51

Page 430

1         THE WITNESS: There may have          17:48:51
2     been one.                                17:48:55
3  QUESTIONS BY MR. KO:                        17:48:55
4     Q.    Okay.  And what -- which           17:48:55
5  instance was that, and when did that occur?  17:48:57
6     A.    It was -- I don't know the         17:48:59
7  date.  I remember a customer -- no, strike  17:49:01
8  that, please.                               17:49:06
9         I'm not aware of any sales to        17:49:06
10 veterinary companies.                       17:49:09
11    Q.    Are you aware of any legitimate     17:49:10
12 medical reason for Mallinckrodt to ship pills  17:49:15
13 to veterinary clinics?  And by "pills" I mean  17:49:19
14 particularly prescription opioids.          17:49:25
15        MR. O'CONNOR:  Object to form.       17:49:26
16        THE WITNESS:  So through some        17:49:27
17     event, I don't remember why, we         17:49:31
18     checked with a couple vets, and indeed  17:49:33
19     there are times when doctors prescribe  17:49:36
20     opioids for pain in animals.            17:49:38
21 QUESTIONS BY MR. KO:                        17:49:41
22    Q.    Would you agree with me that       17:49:42
23 that would be a rare occurrence?            17:49:42
24        MR. O'CONNOR:  Object to form.       17:49:44
25        THE WITNESS:  I don't know the       17:49:45

Page 431

1  frequency.                                  17:49:45
2     (Mallinckrodt-Harper Exhibit 32          17:49:57
3     marked for identification.)              17:49:46
4  QUESTIONS BY MR. KO:                        17:49:46
5     Q.    Okay.  I'm going to hand you a     17:49:46
6  copy of what's going to be marked as        17:49:52
7  Exhibit 32.                                 17:49:56
8         And for the record, this is --       17:49:59
9  ends in Bates 269399.                       17:50:02
10        Ms. Harper, do you recognize         17:50:17
11 this memo from Howard Davis to you dated     17:50:18
12 November 2, 2010?                           17:50:24
13    A.    I do.                              17:50:24
14    Q.    Okay.  And Howard Davis, as we     17:50:27
15 had discussed before, was a consultant you   17:50:29
16 had retained in connection with your SOM     17:50:31
17 program; is that correct?                   17:50:35
18    A.    Yes.                               17:50:36
19    Q.    Okay.  And Howard Davis was        17:50:37
20 ex-DEA?                                     17:50:40
21    A.    Yes.                               17:50:41
22    Q.    And I believe he was, in          17:50:41
23 particular, a DRM.                          17:50:43
24        Do I understand --                   17:50:45
25    A.    DPM.                               17:50:46

Page 432

1     Q.    Sorry, a DPM?                      17:50:47
2     A.    Yes.                               17:50:47
3     Q.    Do I understand correctly?        17:50:50
4     A.    Yes.                               17:50:50
5     Q.    And what does DPM stand for?      17:50:51
6     A.    Diversion program manager.        17:50:53
7     Q.    Okay.  And he had spent some      17:50:53
8  amount of years at the DEA as a DPM, correct?  17:50:55
9  And I believe in Atlanta?                   17:50:56
10    A.    He was in Atlanta when he          17:50:57
11 retired.  Prior to that, he was our group    17:51:01
12 supervisor in St. Louis, so I don't know the  17:51:03
13 date of his promotion.                      17:51:06
14    Q.    Okay.  So before -- are you       17:51:07
15 saying before he went to DEA, he was an      17:51:08
16 employee of Mallinckrodt?                   17:51:12
17    A.    No, I'm sorry.  I beg your        17:51:13
18 pardon.                                     17:51:15
19        For St. Louis DEA he was            17:51:16
20 diversion group supervisor, and then he was  17:51:18
21 promoted to diversion program manager and     17:51:20
22 went to Atlanta, but I'm not certain of      17:51:23
23 the -- the timing of his move to Atlanta.    17:51:25
24    Q.    I see.                             17:51:28
25        So this is in connection            17:51:30

Page 433

1  with -- this is when he was at DEA, correct?  17:51:31
2     A.    Yes, sir.                          17:51:33
3     Q.    Okay.  And at some point in the    17:51:34
4  2010 time period, Mallinckrodt retained      17:51:36
5  Mr. Davis, correct?                         17:51:39
6     A.    Yes.                               17:51:40
7     Q.    And they retained him             17:51:41
8  specifically to examine the then existing    17:51:43
9  suspicious order monitoring program?        17:51:47
10    A.    Yes.                               17:51:47
11    Q.    Okay.  And so I know he was        17:51:48
12 retained for a brief period of time, but do  17:51:53
13 you recall how long his engagement lasted?   17:51:58
14    A.    A couple of months, at most.      17:52:02
15    Q.    Okay.  Now, this memo, is it      17:52:07
16 accurate to describe it is his overview of    17:52:08
17 the suspicious order monitoring program based  17:52:17
18 on his review?  Is that fair to say?        17:52:19
19    A.    Yes, he was reviewing one         17:52:22
20 particular procedure.                       17:52:24
21    Q.    Okay.                              17:52:25
22    A.    Yes.                               17:52:25
23    Q.    And the procedure is consistent   17:52:25
24 with the formal documents we were referring  17:52:28
25 to earlier that you were in charge of        17:52:29

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1 drafting that outlined the policies and 17:52:32
2 procedures Mallinckrodt would follow to 17:52:37
3 identify potentially suspicious orders, 17:52:38
4 correct? 17:52:40
5     MR. O'CONNOR: Object to form. 17:52:40
6     THE WITNESS: Yes. 17:52:41
7 QUESTIONS BY MR. KO: 17:52:41
8     Q. Okay. And in his review of 17:52:41
9 this particular draft of the suspicious order 17:52:45
10 monitoring program -- actually, let's take a 17:52:50
11 step back. 17:52:57
12     During the time that you were 17:52:57
13 drafting and revising these policies, you had 17:53:01
14 previously testified that you were still 17:53:04
15 utilizing a suspicious order monitoring 17:53:08
16 program, correct? 17:53:10
17     A. Yes. 17:53:11
18     Q. And with the suspicious order 17:53:12
19 monitoring program being utilized during a 17:53:16
20 particular time period between 2008 and 2012, 17:53:19
21 would it be reflective of a draft policy that 17:53:23
22 you are writing or would it be reflective of 17:53:27
23 some other policy? 17:53:32
24     MR. O'CONNOR: Object to form. 17:53:34
25     THE WITNESS: We have a 17:53:34

Page 435

1     document management system, and 17:53:37
2     then -- so after all the approvals, 17:53:43
3     it's housed there and it's considered 17:53:45
4     a formal policy. However, DEA 17:53:47
5     compliance did not use that system. 17:53:50
6     So indeed this controlled 17:53:52
7     substance compliance 3.0 was in draft 17:53:55
8     form for a while, and I do not know if 17:53:57
9     it was finalized, but we were 17:54:00
10     operating by it. 17:54:02
11 QUESTIONS BY MR. KO: 17:54:02
12     Q. Right. Okay. And that's 17:54:03
13 helpful. 17:54:05
14     So as you prepared drafts, 17:54:05
15 whatever operative draft that you were 17:54:07
16 working on at the time was also the policy 17:54:10
17 that you would follow with respect to 17:54:15
18 Mallinckrodt's suspicious order monitoring 17:54:16
19 obligations, correct? 17:54:18
20     A. Correct. 17:54:19
21     Q. Okay. Now, he -- Mr. Davis 17:54:20
22 reports to you, as we had discussed before, 17:54:33
23 his evaluation of Mallinckrodt's suspicious 17:54:39
24 order monitoring program at the time. And in 17:54:44
25 particular, I want to focus on the portion in 17:54:45

Page 436

1 which he says, quote, "Federal Register 17:54:56
2 Notices published as early as 2007, 72 17:54:59
3 Federal Register 36487, state specifically 17:55:02
4 that using formulas that rely on percentages 17:55:05
5 or averages over time has been determined, by 17:55:07
6 the DEA, to be insufficient." 17:55:10
7     Did I read that correctly? 17:55:12
8     A. Yes. 17:55:14
9     Q. Okay. And the Federal Register 17:55:18
10 that he's referring to that's been published 17:55:21
11 as early as 2007, I believe that's also 17:55:24
12 reference to the Southwood notice; is that 17:55:26
13 correct? 17:55:27
14     A. I don't know for certain, but 17:55:27
15 if -- 17:55:29
16     Q. Okay. 17:55:30
17     A. Yes, if you say so, yes. 17:55:31
18     Q. Setting aside which particular 17:55:32
19 Federal Register that refers to, he reports 17:55:35
20 to you as of November 2, 2010, that it is in 17:55:37
21 fact his belief that a suspicious order 17:55:42
22 monitoring program that uses formulas to rely 17:55:48
23 on percentages or averages over time would be 17:55:49
24 insufficient, correct? 17:55:52
25     MR. O'CONNOR: Object to form. 17:55:53

Page 437

1     THE WITNESS: Those are the 17:55:54
2     statements he made, yes. 17:55:55
3 QUESTIONS BY MR. KO: 17:56:15
4     Q. Okay. He goes on to state that 17:56:15
5 "an order must not be processed and filled if 17:56:17
6 it is either suspicious or excessive." 17:56:21
7     Do you see that? 17:56:22
8     A. Yes. 17:56:23
9     Q. "The existing SOP excels to 17:56:23
10 meet this requirement through a specific 17:56:25
11 evaluation process; however, the numeric 17:56:28
12 formula is problematic. For example, should 17:56:32
13 an occasion arise where an order is three 17:56:32
14 times over the historical average for that 17:56:35
15 customer in item, or in a situation where the 17:56:36
16 order meets but does not exceed the 3X 17:56:38
17 criteria, it would theoretically be filled 17:56:42
18 through normal processing without further 17:56:44
19 question. In doing so, in certain cases and 17:56:46
20 as noted in recent immediate suspensions of 17:56:50
21 other large-scale DEA registrants, which are 17:56:53
22 all a matter of public record, Mallinckrodt 17:56:56
23 would be unnecessarily exposing itself to 17:56:58
24 potential liability." 17:57:00
25     Did I read that correctly? 17:57:02

Page 438

1    A.   Yes.                          17:57:02
2    Q.   Okay.  And the 3X criteria that    17:57:03
3  he's referring to here is the 3X metric that   17:57:05
4  we had discussed before, correct?      17:57:09
5    A.   Yes.                          17:57:10
6    Q.   Okay.  And is it accurate to    17:57:11
7  say that as of November 2, 2010, he is     17:57:14
8  expressing the view that reliance on a     17:57:17
9  numeric formula such as a 3X criteria could   17:57:20
10  potentially expose Mallinckrodt to a      17:57:24
11  liability?  Correct?                  17:57:27
12    A.   Yes.                        17:57:27
13    Q.   And in fact, in an example we    17:57:28
14  went over -- or an e-mail we went over     17:57:29
15  earlier today, we discussed the fact that   17:57:31
16  Mallinckrodt's 2X or 3X formula with respect   17:57:36
17  to Harvard or Sunrise did not necessarily   17:57:40
18  trigger a suspicious order, correct?     17:57:44
19         Because those orders did not --   17:57:48
20  were not triggered as a result of the     17:57:50
21  peculiar order system in place, correct?   17:57:53
22         MR. O'CONNOR:  Object to form.    17:57:54
23         THE WITNESS:  Correct.         17:57:54
24  QUESTIONS BY MR. KO:                    17:57:55
25    Q.   Okay.  And so it's safe to say    17:57:55

Page 439

1  that prior to the date of this memorandum   17:57:59
2  there were, in fact, instances in which you   17:58:03
3  later discovered that you may have been     17:58:05
4  shipping certain suspicious orders to      17:58:09
5  distributors because you were utilizing this   17:58:12
6  peculiar order algorithm?              17:58:16
7         MR. O'CONNOR:  Object to form.    17:58:18
8         THE WITNESS:  Can you restate     17:58:18
9    that question, please?              17:58:24
10  QUESTIONS BY MR. KO:                    17:58:25
11    Q.   Sure.  Let me try --            17:58:25
12    A.   Okay.                        17:58:27
13    Q.   -- again.                    17:58:27
14         Prior to November 2, 2010 --     17:58:29
15    A.   All right.                    17:58:33
16    Q.   -- it's safe to say that there    17:58:34
17  were instances in which you later discovered   17:58:37
18  that you have -- you were shipping suspicious   17:58:41
19  orders to distributors because you were    17:58:45
20  utilizing a 2X or 3X peculiar order       17:58:47
21  algorithm?                         17:58:51
22         MR. O'CONNOR:  Object to form.    17:58:52
23         THE WITNESS:  So the question    17:58:52
24    is, is that problematic?            17:58:55
25

Page 440

1  QUESTIONS BY MR. KO:                    17:58:58
2    Q.   I'm just simply asking whether    17:58:59
3  or not you determined that there were      17:59:00
4  instances, prior to 2000 -- November 2, 2010,   17:59:01
5  in which you discovered that you were      17:59:07
6  shipping suspicious orders based on a      17:59:09
7  peculiar order algorithm that was in place at   17:59:14
8  that time.                          17:59:17
9         MR. O'CONNOR:  Same objection.    17:59:18
10         THE WITNESS:  The algorithm      17:59:18
11    points to orders that need to be      17:59:20
12    investigated further and does not      17:59:23
13    necessarily conclude in and of itself   17:59:26
14    that the order is suspicious.         17:59:28
15  QUESTIONS BY MR. KO:                    17:59:30
16    Q.   Right.                       17:59:31
17         And I -- I see where the         17:59:31
18  confusion is, because I'm putting a label on   17:59:32
19  a particular order, so let me try it this   17:59:34
20  way.                               17:59:36
21    A.   All right.                    17:59:36
22    Q.   In the e-mail that you had       17:59:37
23  drafted to Eileen Spaulding that we went over   17:59:42
24  earlier today in which you said that no     17:59:45
25  orders -- no peculiar orders had risen to the   17:59:50

Page 441

1  level of suspicious, you also -- do you     17:59:53
2  recall also referencing Harvard and Sunrise?   17:59:56
3         MR. O'CONNOR:  Object to form.    17:59:58
4         THE WITNESS:  Yes.  Yes.         17:59:59
5  QUESTIONS BY MR. KO:                    17:59:59
6    Q.   And you specifically reference    18:00:00
7  Harvard and Sunrise because you are saying   18:00:02
8  that those were instances in which the     18:00:05
9  peculiar order algorithm did not flag orders   18:00:09
10  to them that were potentially suspicious.   18:00:13
11         Is that accurate to say?         18:00:18
12    A.   Correct.                     18:00:19
13    Q.   Okay.  And so applied to this     18:00:20
14  memorandum, I am asking you to confirm that   18:00:26
15  prior to November 2, 2010, there were in fact   18:00:29
16  instances in which you shipped potentially   18:00:36
17  suspicious orders because you were utilizing   18:00:38
18  a peculiar order algorithm that relied on the   18:00:41
19  numeric formula.                     18:00:45
20         MR. O'CONNOR:  Object to form.    18:00:47
21         THE WITNESS:  We shipped orders    18:00:48
22    that would have been further          18:00:53
23    investigated if the algorithm was      18:00:56
24    different, but I can't conclude that    18:00:58
25    we shipped suspicious orders because    18:01:00

Page 442

1    it's my belief that we have never          18:01:01
2    shipped a suspicious order.                18:01:05
3    QUESTIONS BY MR. KO:                       18:01:05
4        Q.   For what time period?             18:01:06
5        A.   Ever.                  18:01:07
6        Q.   Okay. So your testimony here      18:01:11
7    today is that you believe Mallinckrodt has 18:01:13
8    never shipped a suspicious order?          18:01:15
9        A.   Yes.                   18:01:16
10       Q.   Okay. And that's                  18:01:18
11   notwithstanding the settlement that        18:01:19
12   Mallinckrodt had entered into with the DOJ 18:01:22
13   regarding its suspicious order monitoring  18:01:24
14   activities?                    18:01:25
15       A.   Correct.               18:01:26
16       Q.   Okay. And that's                  18:01:31
17   notwithstanding the fact that the DOJ has  18:01:31
18   alleged, and Mallinckrodt has in fact      18:01:38
19   admitted in the DOJ agreement, that at     18:01:40
20   certain points in time in 2008 through 2012 18:01:43
21   Mallinckrodt did not have an adequate      18:01:46
22   suspicious order monitoring system?        18:01:49
23       MR. O'CONNOR:  Object to form.         18:01:49
24       THE WITNESS:  I -- I don't -- I        18:01:50
25   don't recall the MOA language.             18:01:56

Page 443

1    QUESTIONS BY MR. KO:                       18:01:57
2        Q.   I guess what I'm trying to ask    18:01:57
3    you is, I understand that -- well, let's take 18:01:59
4    a step back.                   18:02:03
5        I believe you testified earlier        18:02:04
6    today that at least prior to 2008 there were 18:02:05
7    at least ten instances, somewhere between one 18:02:09
8    and ten instances, in which suspicious orders 18:02:14
9    were reported to the DEA.                  18:02:17
10       Was that correct?              18:02:18
11       MR. O'CONNOR:  Object to form.         18:02:19
12       THE WITNESS:  Yes.             18:02:19
13   QUESTIONS BY MR. KO:                       18:02:21
14       Q.   So at least there were          18:02:22
15   somewhere north of one but south of ten     18:02:23
16   suspicious orders reported to the DEA?      18:02:25
17       A.   Yes.                   18:02:26
18       Q.   So that's more than the "none"    18:02:27
19   you just indicated to me; is that not       18:02:30
20   accurate?                      18:02:32
21       A.   You asked if we had shipped a     18:02:32
22   suspicious order.                 18:02:34
23       Q.   I see.                 18:02:35
24       A.   But the orders that we had        18:02:36
25   reported between one and ten to DEA were not 18:02:38

Page 444

1    subsequently shipped.                      18:02:41
2        Q.   Got it. Understood.             18:02:41
3        So from -- is it your testimony       18:02:43
4    today that from 2008 to present, Mallinckrodt 18:02:48
5    has not shipped a single suspicious order?  18:02:50
6        A.   Yes. When we talk about          18:02:54
7    suspicious orders, direct orders to our     18:02:56
8    customers.                     18:03:00
9        Q.   Okay. Let's take -- you can       18:03:00
10   set that aside.                   18:03:15
11       I hand you a copy of what will         18:03:19
12   be marked as Harper Exhibit 33.            18:03:20
13       MR. KO:  And for the record,          18:03:23
14   this is Bates -- ends in Bates 485740.      18:03:24
15       (Mallinckrodt-Harper Exhibit 33       18:03:28
16   marked for identification.)                18:03:29
17   QUESTIONS BY MR. KO:                       18:03:29
18       Q.   Do you recognize that e-mail,     18:03:41
19   Ms. Harper?                    18:03:44
20       A.   No, I don't, so I'm going to      18:03:45
21   read it, please --                18:03:52
22       Q.   Sure.                  18:03:52
23       A.   -- because -- yeah. Okay.        18:03:53
24       Q.   In terms of the September 9,      18:04:40
25   2010 e-mail that you drafted to James Parker, 18:04:47

Page 445

1    do you have any reason to doubt that you sent 18:04:51
2    that?                      18:04:53
3        A.   No.                    18:04:53
4        Q.   And who is James Parker?          18:04:53
5        A.   He was a -- I don't know his      18:04:55
6    title, unless it's on here. He was in our   18:05:01
7    operational excellence program.            18:05:03
8        Q.   Okay. Was he in senior           18:05:07
9    management?                    18:05:09
10       A.   No.                    18:05:10
11       Q.   Okay. And there's a reference     18:05:13
12   to Tom Berry as well, and that was at one    18:05:14
13   point your direct report, as you indicated   18:05:20
14   previously, correct?                18:05:21
15       A.   Yes, I reported to Tom.          18:05:22
16       Q.   Okay. And you indicate in this    18:05:24
17   e-mail -- the title of the e-mail is "DEA    18:05:30
18   mandated a suspicious order monitoring       18:05:34
19   program"; is that correct?                 18:05:35
20       A.   Yes.                   18:05:35
21       Q.   Okay. And you indicate, among     18:05:36
22   other -- well, you say, "Jim, I am working on 18:05:41
23   obtaining the number relating to potential   18:05:45
24   lost business and have assembled some        18:05:50
25   documentation around actual fines imposed for 18:05:51

Highly Confidential – Subject to Further Confidentiality Review

Page 446

1  regulatory noncompliance. I will work on the  18:05:54
2  chart and will have all of the above ready by  18:05:56
3  this weekend."  18:05:58
4      Did I read that correctly?  18:05:59
5    A.  Yes.  18:05:59
6    Q.  And then there's a portion  18:06:00
7  that's redacted, and then you go on to state,  18:06:02
8  "I don't ever want to be perceived as a  18:06:04
9  person who cried wolf by asking for a  18:06:07
10  presentation to the larger group and welcome  18:06:09
11  your feedback."  18:06:11
12    A.  Okay.  18:06:13
13    Q.  Did I read that correctly?  18:06:14
14    A.  Yes.  18:06:14
15    Q.  Okay. And again, the subject  18:06:15
16  of this e-mail is the SOM program.  18:06:16
17      Is it accurate to say that you  18:06:19
18  are at this point asking Jim, or James, for a  18:06:24
19  presentation to a larger group about  18:06:29
20  Mallinckrodt's SOM program?  18:06:31
21    A.  It appears that way. I  18:06:32
22  don't -- I do not remember these comments at  18:06:34
23  all about the presentation --  18:06:36
24    Q.  Sure.  18:06:37
25    A.  -- but I've refamiliarized  18:06:37

Page 447

1  myself with the rest of the e-mail.  18:06:39
2    Q.  Okay. And I'll ask you a few  18:06:41
3  questions about the previous e-mails.  18:06:44
4    A.  Certainly.  18:06:48
5    Q.  But do you recall what you are  18:06:48
6  referring to by the "presentation to the  18:06:53
7  larger group"?  18:06:55
8    A.  I don't.  18:06:55
9    Q.  Okay.  18:06:57
10    A.  I don't.  18:06:57
11    Q.  And when you are suggesting --  18:06:58
12  at the beginning of this e-mail when you are  18:07:01
13  saying you are working on the number relating  18:07:03
14  to potential lost business, are you referring  18:07:05
15  to the potential lost business of  18:07:08
16  Mallinckrodt -- well, strike that.  18:07:14
17      What are you referring to when  18:07:16
18  you're referring to the potential lost  18:07:19
19  business?  18:07:21
20    A.  We approached Jim Parker  18:07:21
21  because he was operational excellence. So  18:07:23
22  there is initiative in business Six Sigma.  18:07:26
23  It's a whole process of reviewing a program,  18:07:29
24  fishbone charts, a lot of data gathering  18:07:34
25  designed to improve a program.  18:07:38

Page 448

1      So we approached Jim Parker to  18:07:41
2  ask him if he would lend his operational  18:07:44
3  expertise to the suspicious order monitoring  18:07:47
4  program. And in order to do that, these  18:07:48
5  folks had to be chartered. So part of the  18:07:52
6  charter statement was, what's the potential  18:07:54
7  financial impact if we do not do -- perform  18:07:59
8  this project.  18:08:02
9      So that's why I'm referring to  18:08:03
10  this potential lost business and actual fines  18:08:05
11  which may be composed -- imposed for  18:08:09
12  regulatory noncompliance.  18:08:12
13    Q.  And regulatory noncompliance  18:08:13
14  with the CSA, correct?  18:08:15
15    A.  Yes.  18:08:17
16    Q.  Okay. And potential lost  18:08:17
17  business, are you referring to the potential  18:08:19
18  lost business from continuing to do business  18:08:21
19  with your distributors to distribute  18:08:24
20  prescription opioids?  18:08:26
21      MR. O'CONNOR: Objection to  18:08:27
22  form.  18:08:29
23      THE WITNESS: Yes.  18:08:29
24  QUESTIONS BY MR. KO:  18:08:33
25    Q.  Okay. And so in effect, you're  18:08:33

Page 449

1  doing -- you're asking -- or you are being  18:08:36
2  asked to do some sort of burden/benefit  18:08:39
3  analysis with respect to a more enhanced SOM  18:08:42
4  program relative to the value of the business  18:08:46
5  that Mallinckrodt has in distributing  18:08:51
6  prescription opioids to its distributors.  18:08:53
7      Is that accurate to say?  18:08:55
8      MR. O'CONNOR: Objection to  18:08:56
9  form.  18:08:57
10      THE WITNESS: In order to  18:08:57
11  complete this charter document and get  18:08:58
12  the resources from the operational  18:08:59
13  excellence group.  18:09:00
14  QUESTIONS BY MR. KO:  18:09:01
15    Q.  Okay. That's all the questions  18:09:01
16  I have on that.  18:09:04
17      Unfortunately, I just only have  18:09:06
18  one copy of this, so you will be the lucky  18:09:10
19  one to get it. But this is a copy of the  18:09:12
20  settlement agreement, the memorandum of  18:09:18
21  understanding between Mallinckrodt and the  18:09:23
22  DOJ, and it's previously been marked as  18:09:24
23  Ratliff Exhibit 41.  18:09:26
24      Does this document look  18:09:28
25  familiar to you?  18:09:29

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    A.    Yes.                    18:09:29
2    Q.    And I'd ask that you turn to    18:09:29
3  the --                          18:09:34
4        MR. KO:  Sorry, Andrew, but I    18:09:35
5  know that you are probably very    18:09:37
6  familiar with this, so --        18:09:39
7        MR. O'CONNOR:  I'll look over    18:09:40
8  her shoulder.                    18:09:42
9        THE WITNESS:  Do you want to    18:09:42
10  know the page number?           18:09:42
11  QUESTIONS BY MR. KO:            18:09:42
12    Q.    I just want to ask you to turn    18:09:43
13  to Section 4 --                 18:09:44
14    A.    All right.            18:09:44
15    Q.    -- of the agreement entitled    18:09:45
16  "Admission of Responsibility."    18:09:47
17    A.    Is that acceptance of    18:09:49
18  responsibility?                 18:09:51
19    Q.    Sorry, acceptance of    18:09:52
20  responsibility.  Thank you.    18:09:53
21    A.    All right.            18:09:55
22    Q.    Do you see that section?    18:09:55
23    A.    Yes.                  18:09:57
24    Q.    And I know that earlier we had    18:09:57
25  been discussing some specific language, and    18:10:20

Page 451

1  certainly didn't expect you to remember    18:10:24
2  specifically what was included.  But in that    18:10:25
3  section, there is reference made that during    18:10:29
4  the covered time period certain aspects of    18:10:33
5  Mallinckrodt's systems to monitor and detect    18:10:36
6  suspicious orders did not meet the standards    18:10:39
7  outlined in the DEA letters provided to you    18:10:41
8  in 2006 and 2007.  Is that accurate?    18:10:43
9    A.    Yes.                  18:10:47
10    Q.    Okay.  And do you -- sitting    18:10:52
11  here today, do you agree with that admission?    18:10:55
12    A.    We admitted no wrongdoing, but,    18:10:57
13  yes, I agree with the MOA -- the statement in    18:11:02
14  the MOA.                        18:11:06
15    Q.    Okay.  And the covered time    18:11:07
16  period, by the way, just so the record is    18:11:09
17  clear -- and you can take a look at the    18:11:10
18  document if you'd like.  But the covered time    18:11:12
19  period for the settlement agreement is from    18:11:15
20  January 1, 2008, through January 1, 2012,    18:11:16
21  correct?                        18:11:19
22    A.    So that's covered conduct, but    18:11:20
23  this paragraph relating to the admission of    18:11:33
24  guilt -- or acceptance of responsibility --    18:11:36
25  very poor choice of words on my part -- is    18:11:40

Page 452

1  talking about a covered time period,    18:11:42
2  January 1, 2012, until -- oh, prior to    18:11:44
3  January 1, 2012, yes.           18:11:55
4    Q.    Okay.  So the covered time    18:11:56
5  period -- and I believe there's --    18:12:00
6    A.    I'm sorry.            18:12:02
7    Q.    No, it's okay.  It's not your    18:12:03
8  fault.  I should have more -- more copies.    18:12:05
9        So there is a definition of the    18:12:10
10  covered time period in this agreement.    18:12:13
11    A.    All right.            18:12:15
12    Q.    And you can take a look at the    18:12:16
13  document, but I believe if my memory serves    18:12:19
14  me correct, that the covered time period    18:12:23
15  begins from January 1, 2008, through the date    18:12:25
16  of the signing of that agreement.    18:12:29
17    A.    So that's part of the    18:12:34
18  background.                     18:12:35
19    Q.    Right.                18:12:36
20    A.    Right.  It's part of the    18:12:39
21  background.                     18:12:40
22    Q.    And so I just want to make sure    18:12:41
23  the record is clear.            18:12:42
24        So for purposes of the    18:12:43
25  Section 4 that we were looking at -- we were    18:12:45

Page 453

1  just looking at the admission of    18:12:46
2  responsibility?                 18:12:48
3    A.    Yes.                  18:12:48
4    Q.    -- there is reference made to    18:12:48
5  the covered -- from the covered time period    18:12:50
6  to January 1, 2012, correct?    18:12:53
7    A.    Yes.                  18:12:56
8    Q.    And so the covered time period    18:12:58
9  begins on January 1, 2008, correct?    18:12:59
10    A.    Yes.                  18:13:02
11    Q.    Okay.  So --            18:13:04
12    A.    Sorry.                18:13:07
13    Q.    A lot of flipping back and    18:13:08
14  forth.                          18:13:11
15        But just so the record is    18:13:11
16  clear, the admission of responsibility    18:13:13
17  is that Mallinckrodt agrees that at certain    18:13:15
18  times from between January 1, 2008, through    18:13:18
19  January 1, 2012, certain aspects of    18:13:22
20  Mallinckrodt's system to monitor and detect    18:13:25
21  suspicious orders did not meet the standards    18:13:28
22  set forth in the DEA guidance letters,    18:13:30
23  correct?                        18:13:32
24        MR. O'CONNOR:  Object to form.    18:13:32
25        THE WITNESS:  Correct.    18:13:34

Page 454

1  QUESTIONS BY MR. KO:                    18:13:35
2      Q.   Okay.  And you would agree with    18:13:35
3  that statement, correct?                 18:13:36
4          MR. O'CONNOR:  Object -- same    18:13:37
5  objection.                               18:13:40
6          THE WITNESS:  Yes.               18:13:40
7          MR. O'CONNOR:  Counsel, I think  18:13:41
8  we're at time.                           18:13:42
9          MR. KO:  Well, perfect, because  18:13:43
10  I think that was my last question.       18:13:45
11         VIDEOGRAPHER:  Go off the         18:13:50
12  record?                                  18:13:52
13         MR. KO:  Yes.                     18:13:52
14         VIDEOGRAPHER:  We're going off    18:13:53
15  the record at 6:13 p.m.                  18:13:53
16      (Off the record at 6:13 p.m.)        18:13:56
17         VIDEOGRAPHER:  We are back on     18:26:44
18  the record at 6:26 p.m.                  18:26:52
19         DIRECT EXAMINATION               18:26:54
20  QUESTIONS BY MS. HERZFELD:              18:26:54
21      Q.   Okay.  Ms. Harper, we're back   18:26:55
22  after a break.  My name is Tricia Herzfeld,  18:26:57
23  and I'm an attorney representing the     18:27:00
24  Tennessee plaintiffs.                    18:27:02
25         Do you know anything about the    18:27:02

Page 455

1  Tennessee litigation?                    18:27:05
2      A.   Not specifically, no.           18:27:06
3      Q.   Okay.                           18:27:07
4          MS. HERZFELD:  Before we get     18:27:08
5  started, I just want to lodge the        18:27:08
6  standard objections we've lodged in      18:27:10
7  all of our Mallinckrodt depositions      18:27:12
8  about the lack of timely document        18:27:14
9  production and the unnecessary           18:27:17
10  narrowing of the time limitation for     18:27:19
11  questioning the witness.                 18:27:22
12         MR. O'CONNOR:  And I'll lodge     18:27:23
13  our usual objection to the objection.    18:27:25
14         MS. HERZFELD:  Wonderful.        18:27:27
15  Okay.  Moving on.                        18:27:30
16  QUESTIONS BY MS. HERZFELD:              18:27:33
17      Q.   Okay.  Ms. Harper, have you     18:27:33
18  ever been to Tennessee?                  18:27:36
19      A.   Yes.                           18:27:37
20      Q.   Okay.  And have you been for    18:27:37
21  business?                                18:27:41
22      A.   Yes.                           18:27:41
23      Q.   Okay.  And how many times?     18:27:42
24      A.   Twice.                         18:27:42
25      Q.   Okay.  And when were those two  18:27:42

Page 456

1  times?                                   18:27:43
2      A.   I don't recall the dates.       18:27:43
3      Q.   Do you recall roughly what      18:27:44
4  years?                                   18:27:46
5      A.   So I was at FedEx, but I don't  18:27:48
6  know -- I truly don't know the date.     18:27:50
7      Q.   Okay.                           18:27:54
8      A.   And I was at a small            18:27:54
9  distributor, and I cannot remember the name  18:27:56
10  or the date.                             18:27:59
11      Q.   Okay.  And when you were at     18:28:00
12  FedEx, what was the purpose of that?     18:28:03
13      A.   To watch their nighttime in and  18:28:04
14  out shift operation.                     18:28:08
15      Q.   Okay.  And did you find         18:28:08
16  anything deficient in observing that?    18:28:11
17      A.   No.                            18:28:14
18      Q.   And the small distributor that  18:28:14
19  you observed, that was during your time at  18:28:16
20  Mallinckrodt?                            18:28:17
21      A.   Yes.                           18:28:18
22      Q.   Okay.  And do you recall who    18:28:18
23  else was at that meeting?                18:28:19
24      A.   Bill Ratliff.                  18:28:20
25      Q.   Okay.  And it was a            18:28:21

Page 457

1  distributor, not a pharmacy?             18:28:25
2      A.   Yes.                           18:28:26
3      Q.   Okay.  And do you recall        18:28:27
4  finding anything deficient with the      18:28:28
5  operations of that distributor?          18:28:30
6      A.   No.                            18:28:31
7      Q.   Okay.  And would there be       18:28:32
8  documentation someplace of that trip that you  18:28:35
9  took with Mr. Ratliff?                   18:28:36
10      A.   Yes, at least a meeting notice.  18:28:37
11  I'm not certain, yes.                    18:28:43
12      Q.   Okay.  And do you know perhaps  18:28:45
13  if it was after the year 2005?          18:28:47
14      A.   Yes.                           18:28:50
15      Q.   Okay.  Do you think maybe it    18:28:52
16  was more recently than 2010?            18:28:53
17      A.   Yes.                           18:28:55
18      Q.   Okay.  So sometime between 2010  18:28:59
19  and -- do you think it was in the last three  18:29:01
20  or four years?                           18:29:03
21      A.   No.                            18:29:04
22      Q.   Okay.  So maybe sometime        18:29:05
23  between 2010 and 2015?                   18:29:06
24      A.   Yes.                           18:29:09
25      Q.   Okay.  Great.  Okay.           18:29:11

Page 458

1      And those are the only two      18:29:14
2  times you've been to Tennessee for business;  18:29:16
3  is that correct?                18:29:18
4      A.  Yes.                18:29:16
5      Q.  Okay.  Have you been for      18:29:18
6  pleasure?                    18:29:19
7      A.  No.                18:29:20
8      Q.  Okay.  Do you have any family    18:29:21
9  or relatives in Tennessee?          18:29:23
10      A.  No.                18:29:25
11      Q.  Okay.                18:29:25
12      A.  I stopped over in Tennessee --  18:29:25
13      Q.  Okay.                18:29:27
14      A.  -- once, so, sorry.          18:29:28
15      Q.  That's okay.            18:29:30
16      Were you driving somewhere?      18:29:30
17      A.  I was coming back from Gulf    18:29:31
18  Shores, and I stopped in Memphis to take a    18:29:33
19  rest, yes.                  18:29:36
20      Q.  Okay.  And when you say you    18:29:37
21  were coming from Gulf Shores, you meant from  18:29:38
22  Gulf Shores back here to St. Louis?      18:29:41
23      A.  Yes.                18:29:42
24      Q.  Okay.  Did you get to see      18:29:42
25  anything when you were in Memphis?        18:29:44

Page 459

1      A.  No.                18:29:45
2      Q.  Okay.  And do you have any      18:29:47
3  friends that live in Tennessee?        18:29:48
4      A.  No.                18:29:49
5      Q.  Okay.  And you said earlier    18:29:51
6  that you were aware of the opioid epidemic in  18:29:53
7  this country.                18:29:56
8      Do you recall that testimony?      18:29:56
9      A.  Yes.                18:29:57
10      Q.  Okay.  And are you aware of any  18:29:58
11  particular regions of the country where the  18:30:00
12  opioid epidemic seems to have hit harder than  18:30:02
13  others?                    18:30:06
14      MR. O'CONNOR:  Objection.      18:30:07
15  Form.                      18:30:08
16      THE WITNESS:  I read the press,    18:30:09
17  so Florida, Kentucky, Tennessee, yes,    18:30:11
18  I'm familiar with that -- that press.    18:30:18
19  QUESTIONS BY MS. HERZFELD:          18:30:20
20      Q.  Okay.  Okay.  And I think you  18:30:20
21  had already testified that you knew that    18:30:36
22  pills were going from Florida to other    18:30:38
23  states; is that correct, ma'am?        18:30:41
24      A.  Yes.                18:30:41
25      Q.  Okay.  And was -- did you      18:30:42

Page 460

1  understand Tennessee to be one of those    18:30:45
2  states where pills were going from Florida to  18:30:46
3  Tennessee?                  18:30:49
4      A.  Yes.                18:30:50
5      Q.  Okay.  And did you understand    18:30:50
6  that when those pills were going from Florida  18:30:54
7  to Tennessee, that they were ending up in the  18:30:56
8  illegal drug market in Tennessee?        18:30:58
9      MR. O'CONNOR:  Object to form.    18:31:01
10      THE WITNESS:  Yes.          18:31:01
11  QUESTIONS BY MS. HERZFELD:          18:31:03
12      Q.  Okay.  And you said before that  18:31:03
13  you'd heard of the Oxy Express.        18:31:06
14      Do you know if that could have    18:31:09
15  been highway I-75 that goes from Florida to  18:31:11
16  Ohio?                      18:31:13
17      A.  I'm sorry, I don't remember the  18:31:14
18  highway number.              18:31:16
19      Q.  Okay.  That's okay.        18:31:16
20      The highway that is the Oxy      18:31:17
21  Express, do you know if it goes through    18:31:21
22  Tennessee?                  18:31:23
23      A.  Yes, it does.            18:31:24
24      Q.  Okay.  Okay.  And have you ever  18:31:26
25  had any communication with any law      18:31:35

Page 461

1  enforcement in Tennessee?          18:31:36
2      A.  Yes.                18:31:37
3      Q.  Okay.  And can you tell me      18:31:38
4  roughly how many times?            18:31:40
5      A.  Me, once.              18:31:41
6      Q.  Okay.  And what was the time?  18:31:46
7      A.  I'm not -- I don't want -- I    18:31:49
8  don't want to swear to the year or attest to  18:31:55
9  the year.  I believe it was 2008.        18:31:58
10      Q.  Okay.  And do you recall who it  18:32:00
11  is you were speaking with?          18:32:05
12      A.  No.                18:32:06
13      Q.  Okay.  I'm going to show you    18:32:10
14  what we're going to have marked here as    18:32:11
15  Exhibit 34, which we're going to late file    18:32:14
16  with an e-mail.              18:32:16
17      MS. HERZFELD:  No objection    18:32:18
18  from defendants, yes?            18:32:18
19      MR. O'CONNOR:  Provided it's    18:32:19
20  the copy we see.            18:32:20
21      MS. HERZFELD:  Yes, sir.      18:32:22
22      (Mallinckrodt-Harper Exhibit 34  18:32:23
23  marked for identification.)        18:32:23
24  QUESTIONS BY MS. HERZFELD:          18:32:23
25      Q.  Okay.  And I am going to turn    18:32:24

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1 this around so you can just read it          18:32:24
2 yourself --                                  18:32:26
3      A.   Oh, great, because I just --       18:32:26
4      Q.   It's just --                       18:32:28
5      A.   I just had lens implants, so       18:32:28
6 thank you.                                   18:32:31
7      Q.   Oh, very good.                     18:32:31
8           And if you want to read down,      18:32:33
9 you can just use your finger, just, you know. 18:32:34
10     A.   Okay.                              18:32:38
11          All right.  I've reread, yes.      18:32:39
12     Q.   Okay.  Great.                      18:33:14
13          And you received this e-mail       18:33:15
14 from Bill Ratliff on Wednesday, July 8, 2009; 18:33:17
15 is that correct?                            18:33:21
16     A.   July 7, 2009.                      18:33:21
17     Q.   July 7th.  Okay.                   18:33:38
18     A.   Yes, ma'am.                        18:33:39
19     Q.   And does this e-mail describe a    18:33:43
20 communication that Mr. Ratliff had received 18:33:45
21 from an Officer Dwayne Collins in Morristown 18:33:47
22 talking about pills going from -- being found 18:33:50
23 in an illegal drug transaction in Tennessee 18:33:54
24 that were traced to Florida?                18:33:56
25     A.   Yes.                               18:33:58

Page 463

1      Q.   Okay.  And just for the record,    18:34:00
2 this is a three-page document that is labeled 18:34:03
3 MNK_TNSTA05123927.                          18:34:09
4           Okay.  Great.  Now we're done     18:34:15
5 with that complicated moment.               18:34:17
6           Okay.  And did you personally     18:34:26
7 speak to Officer Dwayne Collins; do you      18:34:27
8 recall?                                      18:34:32
9      A.   I believe the initial contact     18:34:32
10 to Mallinckrodt was to me.                  18:34:38
11     Q.   Okay.                              18:34:39
12     A.   And I immediately turn it over     18:34:39
13 to Bill Ratliff.                            18:34:40
14     Q.   Okay.  And once you turned it      18:34:41
15 over to Mr. Ratliff, did you have any further 18:34:43
16 involvement with that situation?           18:34:47
17     A.   Yes.                               18:34:48
18     Q.   Okay.  And what was your           18:34:48
19 involvement?                                18:34:49
20     A.   I helped Mr. Ratliff obtain the    18:34:49
21 reports he was requesting in terms of the   18:34:56
22 shipments of the particular drug product that 18:35:03
23 was the object of the investigation.        18:35:05
24     Q.   Okay.  And is there any other      18:35:07
25 involvement that you had with the situation 18:35:10

Page 464

1 in Morristown?                              18:35:13
2      A.   Only to the extent that the       18:35:14
3 situation in Morristown led us to review --  18:35:18
4 to go to Sunrise distributors.              18:35:24
5      Q.   Okay.  And then I think you've     18:35:26
6 already testified about your involvement with 18:35:27
7 Sunrise today.                              18:35:29
8      A.   Yes.                               18:35:30
9      Q.   Okay.  But other than that,       18:35:31
10 specifically with the Tennessee portion, you 18:35:32
11 didn't have any other involvement in that?  18:35:34
12     A.   There were some chargeback        18:35:37
13 reports --                                  18:35:39
14     Q.   Okay.                              18:35:39
15     A.   -- also, but those were           18:35:39
16 gathered to provide to Mr. Ratliff --      18:35:42
17     Q.   Okay.                              18:35:44
18     A.   -- again within the initial       18:35:45
19 course of his investigation.               18:35:47
20     Q.   Okay.                              18:35:48
21     A.   But, no, nothing else.            18:35:48
22     Q.   And do you know -- oh, go         18:35:52
23 ahead.                                      18:35:54
24     A.   I apologize.                      18:35:54
25     Q.   That's okay.                       18:35:55

Page 465

1      A.   I apologize.                      18:35:56
2           So we made the decision to go     18:35:56
3 to Sunrise and conduct an audit.  Mr. Ratliff 18:35:59
4 contacted Pete Kleissle, who was our        18:36:04
5 diversion group supervisor of DEA St. Louis. 18:36:06
6           Pete came to Mallinckrodt, and    18:36:10
7 we had an informal conversation about --    18:36:11
8 where Mr. Ratliff conveyed the circumstances 18:36:16
9 around the law enforcement investigation.   18:36:18
10 And Mr. Ratliff told Pete Kleissle that we  18:36:20
11 intended to go and conduct an audit of      18:36:23
12 Sunrise.  So I was present for that meeting. 18:36:26
13     Q.   Okay.  And so Tennessee was       18:36:29
14 brought up in the context of we received this 18:36:30
15 information from this individual in         18:36:33
16 Morristown?                                 18:36:34
17     A.   Yes.                               18:36:35
18     Q.   Okay.  And the chargeback         18:36:35
19 reports that you provided to Mr. Ratliff in  18:36:37
20 furtherance of his investigation in response 18:36:41
21 to this Morristown e-mail, do you recall     18:36:43
22 specifically what information was pulled in  18:36:46
23 those chargeback reports?                   18:36:47
24     A.   I don't know specifically what    18:36:48
25 the reports -- how they were tailored or    18:36:57

Page 466

1   customized.                          18:36:59
2       Q.    Okay.  Do you know where I    18:37:00
3   could locate those reports?          18:37:01
4       A.    I don't know.               18:37:03
5       Q.    Okay.  Would you have e-mailed  18:37:10
6   them to Mr. Ratliff?                 18:37:11
7       A.    They would have likely been  18:37:12
8   e-mailed from Eileen Spaulding.      18:37:14
9       Q.    Okay.                       18:37:19
10      A.    And potentially on the      18:37:19
11  chargebacks from Kate Muhlenkamp.    18:37:21
12      Q.    Okay.  And it would have been  18:37:25
13  to you and/or Mr. Ratliff?           18:37:29
14      A.    Yes.                        18:37:31
15      Q.    Okay.  And would it have been  18:37:32
16  around that time in 2009?            18:37:34
17      A.    Yes.                        18:37:36
18      Q.    Okay.  And the -- that's all  18:37:39
19  you remember about the chargeback data?  18:37:43
20          Is there anything else you    18:37:45
21  remember?                            18:37:46
22      A.    It was 2009 -- I'm sorry.    18:37:46
23      Q.    That's okay.                18:37:48
24      A.    That's the drug task force   18:37:49
25  officer call to Mallinckrodt.        18:37:51

Page 467

1       Q.    Yes, ma'am.                 18:37:52
2       A.    I'm sorry.                  18:37:53
3          So can you repeat the last     18:37:53
4   question?                            18:37:56
5       Q.    Sure.                       18:37:56
6          So when the chargeback data was  18:37:57
7   pulled, do you believe that would have been  18:37:58
8   in 2009?                             18:38:01
9       A.    Yes.                        18:38:01
10      Q.    Okay.  Okay.  Okay.  And I   18:38:03
11  think you testified earlier that as part of  18:38:25
12  your job, you were included on certain  18:38:26
13  LISTSERVS where you received news articles?  18:38:29
14      A.    Yes.                        18:38:30
15      Q.    Okay.  And those were the    18:38:31
16  NADDI; is that right?                18:38:34
17      A.    Yes.                        18:38:35
18      Q.    Okay.  Which is the National  18:38:35
19  Association of Drug Diversion Investigators?  18:38:39
20      A.    Yes.                        18:38:39
21      Q.    Okay.  And also RX News?     18:38:39
22      A.    Yes.                        18:38:42
23      Q.    Okay.  And then what is Mudri  18:38:43
24  and Associates?                      18:38:46
25      A.    So National Association of Drug  18:38:50

Page 468

1   Diversion Investigators, the title of their  18:38:55
2   newsletter is RX News.               18:38:56
3       Q.    Okay.                       18:38:57
4       A.    And a lot of them came       18:38:58
5   through -- it was called Mudri, or Mudri,  18:38:59
6   agency.                              18:39:02
7       Q.    Okay.                       18:39:03
8       A.    So it was all connected to   18:39:03
9   these NADDI reports.                 18:39:05
10      Q.    Okay.  So those are all      18:39:06
11  generally the same thing, even if they have  18:39:07
12  different names?                     18:39:09
13      A.    Yes.                        18:39:10
14      Q.    Okay.  Great.                18:39:11
15          And you received those reports  18:39:11
16  as part of your job; is that correct?  18:39:13
17      A.    Yes.                        18:39:15
18      Q.    Okay.  And then did          18:39:16
19  Mallinckrodt take that information and then  18:39:17
20  turn that into a controlled substances  18:39:20
21  compliance monthly newsletter?       18:39:23
22      A.    Yes.                        18:39:26
23      Q.    Okay.  And who was responsible  18:39:27
24  for doing that?                      18:39:28
25      A.    One of my colleagues.  Her name  18:39:29

Page 469

1   is Carrie Johnson, and she's at our Hobart,  18:39:32
2   New York, facility.                  18:39:36
3       Q.    Okay.  And basically in those  18:39:37
4   controlled substances compliance monthly  18:39:39
5   newsletters, it would summarize news articles  18:39:41
6   about controlled substances?         18:39:43
7       A.    Yes.  Well, the reports we had  18:39:44
8   obtained through RX News, yes.        18:39:47
9       Q.    Okay.  And does Mallinckrodt  18:39:49
10  still receive some kind of document that  18:39:53
11  aggregates news articles in that way?  18:39:56
12      A.    I don't know.  We have Google  18:39:58
13  Alerts set, but I don't know that we receive  18:40:03
14  RX News or if they still provide that  18:40:05
15  service.                             18:40:07
16      Q.    Google Alerts is definitely   18:40:08
17  pretty easy to do, right?            18:40:11
18      A.    Yes.                        18:40:12
19      Q.    Okay.  Do you know what words  18:40:12
20  are keyed in for Google Alerts?      18:40:13
21      A.    Yes.                        18:40:16
22      Q.    Could you tell me, please?   18:40:16
23      A.    "Oxycodone."  "Prescription  18:40:18
24  drug."  "Diversion."  "Pharmacy theft."  18:40:23
25  Those are some, but I don't know that's  18:40:28

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1  an all-inclusive list.                  18:40:30
2     Q.   Okay.  Thank you, ma'am.        18:40:32
3          Do you know if "pill mill" is   18:40:33
4  in there?                               18:40:34
5     A.   I believe so.                   18:40:35
6     Q.   Okay.  And one of the things    18:40:37
7  that you're monitoring is news about pill  18:40:39
8  mills?                                  18:40:42
9     A.   Yes.                            18:40:42
10    Q.   Okay.  And specifically pill    18:40:44
11 mills that are dealing in oxycodone?    18:40:45
12    A.   Yes.                            18:40:48
13    Q.   Okay.  And are you aware of     18:40:51
14 that there are pill mills in the state of  18:40:54
15 Tennessee?                              18:40:56
16    A.   I may have received articles to  18:40:56
17 that effect, but not -- no, I'm not -- it's  18:41:00
18 not in my sphere of awareness right now.  18:41:02
19    Q.   Okay.  I can show you some of   18:41:06
20 the articles if you'd like.             18:41:07
21    A.   No, I'll believe you.          18:41:08
22    Q.   Oh, well, I don't want to      18:41:10
23 testify to it.  I just need to know if you  18:41:11
24 were aware from your time at Mallinckrodt --  18:41:15
25    A.   Oh, yes.                        18:41:16

Page 471

1     Q.   -- that there are pill mills in  18:41:17
2  Tennessee.                              18:41:19
3     A.   Yes.  Yes.                      18:41:19
4     Q.   Okay.  Great, ma'am.  Thank     18:41:20
5  you.                                    18:41:22
6          And had you ever heard that     18:41:22
7  those pill mills, some of them had popped up  18:41:23
8  more after pill mills had closed in Florida?  18:41:26
9     A.   Yes.                            18:41:28
10         MR. O'CONNOR:  Object to form.  18:41:29
11 QUESTIONS BY MS. HERZFELD:              18:41:30
12    Q.   So if pill mills closed in      18:41:30
13 Florida, you heard that more had popped up in  18:41:32
14 Tennessee?                              18:41:34
15    A.   Yes, and surrounding states,    18:41:35
16 yes.                                    18:41:37
17    Q.   Okay.  Thank you, ma'am.        18:41:37
18         (Mallinckrodt-Harper Exhibit 35  18:42:59
19    marked for identification.)          18:43:00
20 QUESTIONS BY MS. HERZFELD:              18:43:00
21    Q.   Okay.  We'll mark this next     18:43:00
22 exhibit as number 35.                   18:43:01
23         Okay.  I've handed you what     18:43:17
24 we've marked as Exhibit 35.             18:43:40
25         For the record, it's Bates      18:43:42

Page 472

1  number MNK-T1_0007185722.               18:43:43
2          Okay.  What I've handed you     18:43:53
3  here is an e-mail that you received from   18:43:57
4  Eileen Spaulding dated August 11, 2016; is  18:43:59
5  that correct?                           18:44:03
6     A.   Yes, that's part of the chain.  18:44:03
7     Q.   Okay.  And then the subject is  18:44:05
8  re: Google Alert oxycodone; is that correct?  18:44:07
9     A.   Yes.                            18:44:09
10    Q.   Okay.  And so looking down      18:44:10
11 here, I'm mostly interested in -- who is   18:44:14
12 Heather McKenzie?                       18:44:17
13    A.   She was part of our group --    18:44:19
14 well, she's still part of the controlled   18:44:21
15 substances compliance group, but she for a  18:44:25
16 period of time worked more closely with    18:44:26
17 suspicious order monitoring.            18:44:29
18    Q.   Okay.  And was she working more  18:44:29
19 with suspicious order monitoring or        18:44:32
20 controlled substances compliance in August  18:44:34
21 of 2016?                                18:44:37
22    A.   Suspicious order monitoring.    18:44:37
23    Q.   Okay.  And so it looks to me    18:44:39
24 like Heather McKenzie set up her Google Alert  18:44:41
25 to her work e-mail address and is excited  18:44:44

Page 473

1  that it showed up.                      18:44:47
2          Does that look correct?         18:44:48
3     A.   Yes.  Yes.                      18:44:49
4     Q.   Okay.  And she's e-mailing that  18:44:50
5  to you.                                 18:44:51
6          Was that a direction from you   18:44:54
7  to her to set up the Google Alert?      18:44:55
8     A.   Yes.                            18:44:57
9     Q.   Okay.  And why was that?        18:44:58
10    A.   She was taking over the        18:44:58
11 responsibility being passed on from Carrie  18:45:00
12 Johnson.                                18:45:03
13    Q.   Okay.  Great.                   18:45:04
14         And then Eileen says, "It seems  18:45:04
15 like there's an awful lot of hits here.  Is  18:45:08
16 this what Jen used to receive?  Just make  18:45:11
17 sure we set up her Google Alerts correctly  18:45:13
18 for the right terms.  Eileen."          18:45:16
19         Do you see where it says that?  18:45:18
20    A.   Yes, and I'd like to clarify my  18:45:21
21 last answer.                            18:45:23
22    Q.   Sure.                           18:45:23
23    A.   So Carrie Johnson did the       18:45:24
24 Google Alerts, and then this prompted my   18:45:27
25 memory.  There was a woman named Jen Buist  18:45:31

Page 474

1   who did for them a while.                18:45:34
2       Q.   Okay.                         18:45:34
3       A.   Jen left the company, and then   18:45:36
4   they went to this Heather McKenzie.      18:45:37
5       Q.   Okay.  Great.                 18:45:40
6            And do you know if Heather does  18:45:40
7   them now?                               18:45:41
8       A.   She does not.                 18:45:42
9       Q.   Do you know who does?         18:45:42
10      A.   Yes.                          18:45:44
11      Q.   Who is it?                    18:45:44
12      A.   There's a controlled substances  18:45:45
13  compliance auditor analyst at our Hobart, New  18:45:48
14  York, facility who takes care of them.   18:45:52
15      Q.   And do you know his or her    18:45:53
16  name?                                   18:45:55
17      A.   She's very new.  Rochelle --  18:45:55
18  it's like MoQuay or Mokay.  I'm not certain.  18:46:00
19  She's within the past couple of weeks joined  18:46:03
20  our group.                              18:46:05
21      Q.   Oh, very new.                 18:46:05
22      A.   Yes.                          18:46:06
23      Q.   Okay.  Great.                 18:46:07
24           And in between Rochelle, has  18:46:07
25  Heather had the responsibility from that  18:46:10

Page 475

1   point?                                  18:46:12
2       A.   Yes.                          18:46:13
3       Q.   Okay.  So then Eileen says, as  18:46:16
4   we just said, going back to this, it looks  18:46:20
5   like basically there's a lot of hits there.  18:46:22
6   Is that usual.                          18:46:25
7            Did you respond to her?       18:46:26
8       A.   Yes.                          18:46:27
9       Q.   Okay.  And that's the next    18:46:28
10  e-mail chain here, Thursday, August 11th, at  18:46:29
11  8:56 a.m.; is that right?               18:46:34
12      A.   Yes.                          18:46:36
13      Q.   Okay.  And so in this e-mail  18:46:36
14  you say, "The amount of hits is correct;  18:46:38
15  however, important note:  Not all articles  18:46:40
16  require any kind of chargeback lookup    18:46:42
17  whatsoever."                            18:46:46
18           So let's back up a little bit  18:46:47
19  before we get there.                    18:46:48
20           So you say, "The amount is    18:46:49
21  correct."  Let's start with that.       18:46:51
22           There are, gosh, one, two --  18:46:54
23  nine and a half, roughly, pages of Google  18:47:05
24  hits here.                              18:47:07
25           Is that -- that's what was    18:47:08

Page 476

1   usual?                                  18:47:12
2       A.   So I'm looking to see, please,  18:47:12
3   if these are Google Alerts all from the same  18:47:14
4   day or if it's an accumulation of days.  I  18:47:17
5   cannot tell that by this document.       18:47:21
6       Q.   Okay.  And do you know if you  18:47:22
7   normally had your team running them, the  18:47:25
8   Google Alerts for oxycodone and the other key  18:47:27
9   words we had talked about, once a day or once  18:47:30
10  a week?                                 18:47:33
11      A.   So it's a passive process.  We  18:47:34
12  set up the Google Alerts, and then the Google  18:47:37
13  Alerts come to us automatically based upon  18:47:40
14  Google's search for these key terms.     18:47:43
15      Q.   Okay.  So you don't set the   18:47:45
16  frequency; Google does?                 18:47:47
17      A.   Correct.                      18:47:48
18      Q.   Okay.  Okay.  And so looking at  18:47:49
19  this basically nine and a half pages of hits,  18:47:53
20  that didn't seem unusual to you according to  18:47:55
21  this e-mail?                            18:47:56
22      A.   Correct.                      18:47:57
23      Q.   Okay.  And then when you said,  18:47:57
24  "Not all articles require any kind of    18:47:59
25  chargeback lookup whatsoever," typically did  18:48:02

Page 477

1   some article require chargeback lookup?  18:48:06
2       A.   Yes, if a pharmacy was named.  18:48:08
3       Q.   If a pharmacy was named.  Okay.  18:48:09
4            What about if a physician was  18:48:11
5   named?                                  18:48:12
6       A.   In -- at some point in our    18:48:13
7   program, yes, but not -- not at the current  18:48:21
8   time.                                   18:48:25
9       Q.   Okay.  And what was the period  18:48:26
10  of time that you would do a chargeback lookup  18:48:27
11  if a physician was named?               18:48:30
12      A.   I don't know -- I don't know   18:48:31
13  the span of time.                       18:48:33
14      Q.   Okay.  Do you know for how long  18:48:34
15  it was?  Months?  Years?  Weeks?        18:48:36
16      A.   Months.  I can't say years.   18:48:39
17  Months up to -- up to a year or so.      18:48:46
18      Q.   Okay.  But you don't remember  18:48:49
19  the time period when that happened?      18:48:50
20      A.   No.                           18:48:53
21      Q.   And do you know why that       18:48:53
22  practice was discontinued?              18:48:56
23      A.   The answer may require         18:48:58
24  privileged information.                 18:49:07
25           MR. O'CONNOR:  And of course  18:49:08

Page 478

1      I'll instruct the witness not to       18:49:10
2    answer to the extent it requires         18:49:11
3      revealing communications with a        18:49:13
4    lawyer.                                   18:49:14
5    QUESTIONS BY MS. HERZFELD:                18:49:15
6      Q.   Can you answer the question        18:49:16
7    without telling me what your lawyers told 18:49:17
8    you?                              18:49:20
9      A.   I cannot.                   18:49:20
10     Q.   Okay.  So I'll take it --   18:49:28
11     A.   I'm sorry.                   18:49:29
12     Q.   That's okay.                 18:49:29
13          So when I ask, at some point 18:49:29
14   did it change looking at chargeback       18:49:32
15   information when the mention of doctors were 18:49:34
16   in these Google hits or the Google news   18:49:37
17   alerts, you're asserting attorney-client  18:49:40
18   privilege to answer that question?        18:49:43
19     A.   Yes, I am.                    18:49:44
20     Q.   Okay.  And your attorney has 18:49:45
21   advised you to assert attorney-client     18:49:46
22   privilege to this question, and you're taking 18:49:49
23   his advice?                        18:49:53
24     A.   Correct.                     18:49:53
25     Q.   Okay.  Okay.  So there's no  18:49:54

Page 479

1    other way you could answer that without   18:49:55
2    telling me what your attorney said?       18:49:56
3      A.   No.                          18:49:58
4      Q.   Okay.  Do you know if the    18:50:00
5    decision to stop monitoring physicians for 18:50:04
6    chargeback data when you've gotten an alert 18:50:09
7    from Google, if that happened within the past 18:50:13
8    two years?                         18:50:15
9      A.   It did not.                   18:50:16
10     Q.   Okay.  Do you know if it     18:50:17
11   happened in the last five years?          18:50:18
12     A.   I'm aware that I'm under oath, 18:50:21
13   and I apologize, I'm just terrible with my 18:50:23
14   dates and years, as we've heard all day long. 18:50:25
15   So I can't -- you continue -- and I        18:50:28
16   appreciate you're trying to help me with a 18:50:32
17   frame of reference in time, but I can't    18:50:34
18   answer the question.               18:50:36
19     Q.   If you can't answer it, you   18:50:36
20   can't answer it.  I'm just trying to figure 18:50:39
21   out if it was very -- you know, at the     18:50:40
22   beginning, in like 2007, or if we're talking 18:50:42
23   in 2018.                          18:50:45
24     A.   It's not 2010; it's not 2018. 18:50:48
25     Q.   Okay.                         18:50:57

Page 480

1      A.   It's -- it was active in the  18:50:57
2    early part of 2012 --              18:51:02
3      Q.   Okay.                         18:51:03
4      A.   -- but I just don't know      18:51:04
5    specifically when it started before that or 18:51:06
6    ended after that.                  18:51:08
7      Q.   Okay.  Great.                 18:51:10
8          Okay.  So going back to what we 18:51:13
9    have here.  So you said pharmacy would    18:51:15
10   require a chargeback look.  If there was a 18:51:18
11   pharmacy name in Google Alert, that would 18:51:21
12   require a chargeback look from your team; is 18:51:24
13   that right?                        18:51:27
14     A.   Yes.                         18:51:27
15     Q.   Okay.  And if physician named, 18:51:27
16   for a short period of time you did a search 18:51:29
17   for physician information, if they were    18:51:33
18   named?                             18:51:36
19     A.   Yes.                         18:51:36
20     Q.   Okay.  And what type of search 18:51:37
21   would you do for physicians?       18:51:39
22     A.   So we were -- that was when we 18:51:41
23   were looking at IMS data.          18:51:43
24     Q.   Okay.                         18:51:45
25     A.   And an internal group provided 18:51:46

Page 481

1    us a list of physicians that were the highest 18:51:54
2    prescribers of oxycodone within the country. 18:51:56
3      Q.   Okay.  And you said an internal 18:51:58
4    group provided you that list of physicians. 18:52:01
5          What was the name of the       18:52:03
6    internal group?                    18:52:05
7      A.   Oh, gosh, I can't remember.    18:52:07
8      Q.   Okay.  Do you remember who was 18:52:09
9    on it?                             18:52:11
10     A.   Yes.                         18:52:12
11     Q.   Okay.  Could you tell me the  18:52:13
12   name?                              18:52:14
13     A.   Certainly.  There was a lady  18:52:14
14   named Tammy Fraley and a gentleman named  18:52:15
15   Jeremy Stammer.                    18:52:20
16     Q.   Okay.  And they would provide 18:52:23
17   you a list of the top prescribing oxycodone 18:52:26
18   physicians within the country?     18:52:30
19     A.   Yes.                         18:52:32
20     Q.   Okay.  And what would you do  18:52:33
21   with that list?                    18:52:34
22     A.   If we learned the name of a   18:52:35
23   physician for that period of time we were  18:52:39
24   conducting that activity through Google Alert 18:52:41
25   or when we were talking to our wholesaler and 18:52:44

Page 482

1  distributor customers about their due  18:52:49
2  diligence with the downstream registrants,  18:52:53
3  the pharmacies, sometimes they had gathered  18:52:55
4  information on who the top prescribers were  18:52:59
5  at a pharmacy.  18:53:02
6     Q.  Okay.  18:53:03
7     A.  So then we'd compare that name  18:53:03
8  to our list of top prescribers.  18:53:06
9     Q.  Okay.  And then if you found  18:53:08
10  that person on the list of top prescribers,  18:53:10
11  what, if anything, would you do?  18:53:13
12     A.  It was a -- pardon me.  18:53:14
13     Q.  It's okay.  18:53:16
14     A.  It was a contributing factor to  18:53:16
15  whether we -- it was another factor in  18:53:20
16  evaluating whether we would restrict the  18:53:23
17  payment of chargebacks to that pharmacy.  18:53:27
18     Q.  Okay.  So I just want to make  18:53:30
19  sure that I'm understanding this correctly.  18:53:31
20     So for a relatively short  18:53:33
21  period of time, somewhere maybe around  18:53:35
22  2012 --  18:53:37
23     A.  Yes.  18:53:39
24     Q.  Okay.  When you'd receive a  18:53:40
25  Google Alert or other information from a  18:53:42

Page 483

1  distributor's pharmacy or from their  18:53:48
2  information about a physician, you also had a  18:53:49
3  list from an internal group that was the  18:53:52
4  highest prescribers of oxycodone, and you  18:53:55
5  would compare the two and use those as a  18:53:57
6  factor in making a determination of whether  18:54:01
7  you were giving chargebacks?  18:54:02
8     MR. O'CONNOR:  Objection to  18:54:04
9  form.  18:54:05
10     THE WITNESS:  Paying  18:54:05
11  chargebacks, yes.  18:54:06
12  QUESTIONS BY MS. HERZFELD:  18:54:07
13     Q.  Okay.  Paying chargebacks --  18:54:07
14     A.  Yes, ma'am.  18:54:08
15     Q.  -- not giving chargebacks.  18:54:09
16     A.  Yes.  18:54:10
17     Q.  Okay.  I just wanted to make  18:54:10
18  sure I understood that.  18:54:12
19     But then that practice was  18:54:13
20  discontinued after a relatively short period  18:54:14
21  of time?  18:54:17
22     A.  Again, I don't know the stop  18:54:17
23  and the start date or how long we used that  18:54:19
24  as a component of our program.  I don't know.  18:54:22
25     Q.  But it was -- it was stopped  18:54:24

Page 484

1  in, you said you thought, a matter of months,  18:54:26
2  maybe a year.  It wasn't something that went  18:54:29
3  on for years and years?  18:54:30
4     A.  Yes, that's my approximation,  18:54:31
5  yes.  18:54:33
6     Q.  Okay.  Great.  18:54:33
7     Okay?  And you'd also said in  18:54:33
8  earlier testimony that someone from your team  18:54:39
9  or you would review the Federal Register  18:54:41
10  every day; is that correct?  18:54:46
11     MR. O'CONNOR:  Objection to  18:54:46
12  form.  18:54:47
13     THE WITNESS:  Yes.  18:54:47
14  QUESTIONS BY MS. HERZFELD:  18:54:47
15     Q.  Okay.  And in those Federal  18:54:49
16  Register updates, there are updates to the  18:54:53
17  Federal Codes of Regulations; is that right?  18:54:54
18     A.  Yes.  18:54:56
19     Q.  Okay.  And there are also, from  18:54:57
20  time to time, updates of, for example,  18:54:58
21  physicians who have been indicted; is that  18:55:00
22  correct?  18:55:02
23     A.  Yes.  18:55:02
24     Q.  Okay.  And so would you review  18:55:03
25  those Federal Register documents for  18:55:05

Page 485

1  physicians that had been indicted or arrested  18:55:10
2  for anything involving prescription opioids?  18:55:13
3     A.  Yes.  18:55:17
4     Q.  Okay.  And what would you do  18:55:18
5  with that information if you saw it?  18:55:20
6     A.  So that would have been during  18:55:21
7  the same amount of time.  18:55:26
8     Q.  Okay.  18:55:28
9     A.  If we're reviewing information  18:55:28
10  gathered by any source that named a  18:55:30
11  prescriber, we were -- we were comparing that  18:55:31
12  to the top prescriber listing of -- that had  18:55:34
13  been supplied to us.  18:55:38
14     Q.  Okay.  But once that -- that  18:55:39
15  short-term practice ended, did you continue  18:55:41
16  to do that?  18:55:44
17     A.  No.  18:55:45
18     Q.  Okay.  Okay.  And when you  18:55:46
19  would receive these Google Alerts and it  18:56:01
20  would talk about pharmacies, would you look  18:56:02
21  at the area that the pharmacy was in?  18:56:06
22     A.  Yes.  18:56:09
23     Q.  Okay.  And what information  18:56:11
24  would you gather about the area that the  18:56:12
25  pharmacy was in?  18:56:14

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    A.   So I'd like to clarify.  It was    18:56:14
2    more so the pharmacy name --           18:56:22
3    Q.   Okay.                             18:56:23
4    A.   -- and that would prompt us to    18:56:23
5    look through our chargebacks.  And if there    18:56:25
6    was a nexus of the city and states -- in the    18:56:30
7    case of Joe's Pharmacy, if the Google Alert    18:56:32
8    said the same city and state as was    18:56:34
9    referenced in our chargeback information, we    18:56:37
10   knew that there was a correlation.    18:56:40
11   Q.   Okay.  But if it said, for    18:56:41
12   example, Joe's Pharmacy in Rocky Top,    18:56:45
13   Tennessee, did you go and do any research on    18:56:50
14   Rocky Top, Tennessee, other than to verify    18:56:52
15   that Joe's Pharmacy was in Rocky Top,    18:56:55
16   Tennessee?                             18:56:57
17   A.   At times, yes.    18:56:58
18   Q.   Okay.  And what would prompt    18:56:58
19   you to do that?    18:57:01
20   A.   Some of the media alerts    18:57:01
21   contained things like statements that in a    18:57:04
22   certain region there was an issue, and so    18:57:09
23   then that would prompt us to look at the    18:57:13
24   chargebacks by -- in a specific geographic    18:57:15
25   area.    18:57:18

Page 487

1    Q.   Okay.  So let's finish up with    18:57:19
2    your e-mail here before we move on to the    18:57:24
3    next one.    18:57:25
4    A.   Okay.    18:57:25
5    Q.   So it says, "Google Alerts are    18:57:26
6    scanned quickly for any mention of a pharmacy    18:57:27
7    name or address.  If none are contained in    18:57:29
8    the article, an article is about perhaps new    18:57:33
9    legislation or drug takeback initiatives,    18:57:35
10   then no further action is taken."    18:57:39
11   Did I read that correctly?    18:57:41
12   A.   Yes.    18:57:41
13   Q.   Okay.  And is that true, if it    18:57:42
14   was about legislation or drug takeback    18:57:43
15   initiatives, you just skipped over it?    18:57:45
16   A.   Yes.    18:57:48
17   Q.   Okay.  Is there anything else    18:57:48
18   you looked for in those Google Alerts --    18:57:50
19   A.   No.    18:57:52
20   Q.   -- than what we've talked    18:57:53
21   about?    18:57:54
22   A.   No.    18:57:55
23   Q.   Okay.    18:57:55
24   A.   No.    18:57:56
25   Q.   Okay.  And then Eileen writes    18:57:58

Page 488

1    back and says, "Okay, thank you.  I didn't do    18:58:04
2    much with them, as Carrie started the project    18:58:06
3    and then Jen took it over and just wanted to    18:58:08
4    double-check."    18:58:11
5    That seems correct with your    18:58:11
6    memory?    18:58:13
7    A.   Yes.    18:58:13
8    Q.   Okay.  And so going back to the    18:58:14
9    section of the e-mail where you're talking    18:58:15
10   about the amount of hits is correct?    18:58:17
11   A.   Yes.    18:58:21
12   Q.   Yes.  Okay.    18:58:22
13   So when you respond to her    18:58:23
14   about we're looking at pharmacy name and    18:58:25
15   address, you don't mention physician or    18:58:26
16   location, those things we just talked about.    18:58:30
17   That's because that short-lived    18:58:32
18   initiative had already been terminated by    18:58:34
19   that point; is that right?    18:58:37
20   MR. O'CONNOR:  Objection to    18:58:37
21   form.    18:58:38
22   THE WITNESS:  So the physician    18:58:38
23   piece was not part of the program    18:58:42
24   then.  It was an error of omission in    18:58:45
25   the e-mail.  We would indeed do    18:58:48

Page 489

1    further review if a geographic area    18:58:52
2    was mentioned without the benefit of a    18:58:54
3    pharmacy name.    18:58:56
4    QUESTIONS BY MS. HERZFELD:    18:58:57
5    Q.   Okay.  So if a geographic area    18:58:57
6    was mentioned, you would --    18:58:59
7    A.   Yes.    18:59:01
8    Q.   -- but a physician at that    18:59:03
9    point was not in the program?    18:59:07
10   A.   Correct.    18:59:08
11   Q.   Okay.  I just wanted to make    18:59:09
12   sure I understood that.  Thank you.    18:59:11
13   A.   You're welcome.    18:59:11
14   Q.   You can put that aside.    18:59:11
15   Have you ever heard the term    18:59:12
16   "pillbillies"?    18:59:29
17   A.   No.    18:59:31
18   Q.   Have you ever heard the term    18:59:32
19   "blues," referencing Mallinckrodt oxycodone?    18:59:40
20   A.   Yes.    18:59:43
21   Q.   Okay.  What do you understand    18:59:44
22   it to be a term for?    18:59:45
23   A.   A street name for Mallinckrodt    18:59:46
24   oxycodone.    18:59:51
25   Q.   Okay.  And do you know if    18:59:53

Page 490

1  that's 15 or 30s?                        18:59:55
2      A.   I testified earlier, I'm        18:59:57
3  certain that the 30s are blue, but I don't  18:59:58
4  know for certain the color of the 15s.   19:00:00
5      Q.   Okay.  Was there ever any       19:00:03
6  discussion amongst you and your colleagues  19:00:11
7  about pill mills popping up in Tennessee?  19:00:13
8      A.   Yes.                            19:00:16
9      Q.   Okay.  And who did you have     19:00:19
10  that discussion with?                   19:00:20
11      A.   It would have been the team.   19:00:21
12  We have a suspicious order monitoring team  19:00:23
13  meeting approximately once a month.     19:00:26
14      Q.   Okay.  And when did you discuss  19:00:29
15  Tennessee?                              19:00:31
16      A.   I don't have a date.           19:00:31
17      Q.   Okay.  Do you know how many    19:00:34
18  times you discussed Tennessee?          19:00:34
19      A.   I do not.                      19:00:35
20      Q.   Okay.  Do you know if you      19:00:37
21  discussed Tennessee recently?           19:00:38
22      A.   I don't recall discussing it   19:00:40
23  recently.                               19:00:43
24      Q.   Okay.  Do you know what the    19:00:44
25  substance was of the conversations about  19:00:45

Page 491

1  Tennessee?                              19:00:47
2      A.   So we looked at chargebacks in  19:00:48
3  a number of ways, Google Alerts         19:00:56
4  notwithstanding.                        19:00:59
5      Q.   Okay.                          19:01:00
6      A.   And so the chargeback reports   19:01:00
7  were sorted by state, so that would prompt a  19:01:05
8  review of the distributions by our customers  19:01:11
9  to end -- end downstream registrants within  19:01:16
10  certain states if the numbers met a certain  19:01:20
11  criteria.                               19:01:24
12      Q.   Okay.  Okay.  I'll get back to  19:01:25
13  that in just one second, the state sorting of  19:01:28
14  the chargeback data.                    19:01:31
15      A.   Okay.                          19:01:32
16      Q.   Other than sorting the         19:01:32
17  chargeback data by state, do you recall any  19:01:34
18  other substantive conversations about pill  19:01:36
19  mills in Tennessee?                     19:01:38
20      A.   It was mentioned at DEA        19:01:39
21  conferences.  I don't specifically know which  19:01:42
22  one.                                    19:01:44
23      Q.   Okay.                          19:01:44
24      A.   But we would have brought that  19:01:44
25  back to the suspicious order monitoring team,  19:01:46

Page 492

1  as we would have all the notes that were  19:01:50
2  pertinent, and discussed it relative to  19:01:52
3  suspicious order monitoring.            19:01:55
4      Q.   Okay.  Do you recall when that  19:01:56
5  DEA conference was?                     19:01:57
6      A.   I do not.                       19:01:59
7      Q.   Okay.  But you think there      19:01:59
8  would have been notes on it?            19:02:01
9      A.   I do not know.                  19:02:02
10      Q.   Okay.  And do you recall what  19:02:05
11  they said about Tennessee at that DEA   19:02:08
12  conference?                             19:02:11
13      A.   Yes.                           19:02:11
14      Q.   What did they say?             19:02:12
15      A.   The DEA showed an interactive  19:02:13
16  map of the migration of the abuse or misuse  19:02:23
17  of oxycodone pills emanating from Florida and  19:02:28
18  moving throughout different states.     19:02:32
19      Q.   Okay.  Do you recall anything  19:02:33
20  else they said about Tennessee?         19:02:41
21      A.   No.                            19:02:42
22      Q.   Okay.  And other than what     19:02:43
23  we've discussed, do you recall any other  19:02:45
24  conversations substantively about pill mills  19:02:47
25  in Tennessee?                           19:02:50

Page 493

1      A.   No.                            19:02:50
2      Q.   Okay.  Okay.  And I think I     19:02:51
3  might have asked you this question before, so  19:03:12
4  if I did, just tell me that I did, and I  19:03:16
5  apologize for asking it before.         19:03:20
6           Other than the discussion we   19:03:20
7  had talked about, the communication with the  19:03:23
8  officer from Morristown and you and      19:03:23
9  Mr. Ratliff, have you ever communicated with  19:03:25
10  any other law enforcement from Tennessee?  19:03:27
11      A.   Not to my knowledge.           19:03:28
12      Q.   Okay.  And do you know if      19:03:29
13  anyone on your team ever did?           19:03:31
14      A.   So I'd like to clarify the     19:03:33
15  previous answer.                        19:03:34
16      Q.   Sure.                          19:03:34
17      A.   So law enforcement officers    19:03:35
18  from various jurisdictions were members of  19:03:38
19  this National Association of Drug Diversion  19:03:41
20  Investigators.                          19:03:44
21      Q.   Okay.                          19:03:44
22      A.   And so they came to conferences  19:03:44
23  with us.                                19:03:47
24      Q.   Okay.                          19:03:47
25      A.   So I may have had a discussion  19:03:47

Page 494

1  with them as a member of law enforcement, 19:03:50
2  particularly if we were speaking at the 19:03:52
3  conference and talking about our placebo 19:03:59
4  program for law enforcement. 19:04:01
5      Q.   Okay.  But do you recall any 19:04:02
6  specific conversations with anyone from 19:04:04
7  Tennessee? 19:04:05
8      A.   No. 19:04:05
9      Q.   Okay.  And other than that 19:04:06
10 conversation with the law enforcement officer 19:04:08
11 from Morristown about a specific 19:04:09
12 investigation, you don't recall any 19:04:12
13 communications about any other specific 19:04:14
14 investigations within Tennessee that you were 19:04:16
15 involved in? 19:04:18
16     A.   No. 19:04:19
17     Q.   Okay.  Or anybody from your 19:04:19
18 team for that matter? 19:04:21
19     A.   So I cannot speak -- I did 19:04:22
20 not -- I wasn't always privy. 19:04:25
21     Q.   Okay. 19:04:26
22     A.   If our security director, Bill 19:04:27
23 Ratliff, our current vice president of 19:04:31
24 security, John Gillies, was involved in an 19:04:33
25 investigation, but not to my knowledge. 19:04:36

Page 495

1      Q.   Okay.  Okay.  And have you ever 19:04:37
2  reported any Tennessee pharmacies to 19:04:41
3  Tennessee law enforcement? 19:04:45
4      A.   Not to my knowledge. 19:04:47
5      Q.   Okay.  Or to federal law 19:04:51
6  enforcement with jurisdiction over Tennessee? 19:04:54
7      A.   Well, when we restrict the sale 19:04:57
8  of the processing of chargebacks to 19:05:01
9  pharmacies, that's reported to all 19:05:04
10 distributors and to DEA. 19:05:07
11     Q.   Okay.  But other than the DEA, 19:05:09
12 you didn't reach out to anybody at the 19:05:10
13 US Attorney's Office for the Eastern District 19:05:12
14 of Tennessee or anything like that? 19:05:14
15     A.   No. 19:05:16
16     Q.   Okay.  Okay.  And what about 19:05:16
17 any prescribers?  Did you ever report any 19:05:20
18 Tennessee prescribers to any Tennessee law 19:05:22
19 enforcement? 19:05:24
20     A.   Not to my knowledge. 19:05:25
21     Q.   Okay.  What about any Tennessee 19:05:26
22 prescribers to federal law enforcement? 19:05:29
23     A.   Not to my knowledge. 19:05:31
24     Q.   Okay.  Do you know if 19:05:32
25 Mallinckrodt, you were involved at 19:05:39

Page 496

1  Mallinckrodt, with any Tennessee pharmacies 19:05:40
2  being reported to the DEA? 19:05:43
3      A.   Again, if I researched the 19:05:44
4  chargeback-restricted pharmacies, perhaps, 19:05:50
5  but I would not have had any other 19:05:53
6  conversation than that. 19:05:55
7      Q.   Okay.  Do you know how many 19:05:55
8  Tennessee pharmacies have been put on 19:06:05
9  chargeback restriction? 19:06:06
10     A.   I do not. 19:06:07
11     Q.   Okay. 19:06:07
12     A.   I'm saying no, I do not, again. 19:06:16
13          (Mallinckrodt-Harper Exhibit 36 19:06:24
14     marked for identification.) 19:06:25
15 QUESTIONS BY MS. HERZFELD: 19:06:25
16     Q.   Okay.  I'm going to mark this 19:06:25
17 as Plaintiff's Exhibit 36.  It's Bates number 19:06:26
18 MNK_TNSTA00609639. 19:06:28
19          That front page is just a 19:06:34
20 placeholder. 19:06:45
21          If you look at the second one, 19:06:46
22 I will represent to you that we have searched 19:06:48
23 the chargeback restriction database and 19:06:51
24 sorted it by Tennessee.  The title of the 19:06:53
25 document was "Mallinckrodt chargeback 19:07:01

Page 497

1  restriction, underscore, reinstatement list." 19:07:03
2          Are you familiar with a list 19:07:04
3  that's called that? 19:07:05
4      A.   Yes. 19:07:06
5      Q.   Okay.  And are you responsible 19:07:06
6  for creating it? 19:07:07
7      A.   No. 19:07:09
8      Q.   Are you responsible for 19:07:10
9  maintaining it? 19:07:11
10     A.   No. 19:07:11
11     Q.   Do you have input into its 19:07:12
12 creation? 19:07:14
13     A.   I have input into the 19:07:15
14 chargeback restriction or recisions. 19:07:20
15     Q.   Okay. 19:07:22
16     A.   And then someone else on our 19:07:22
17 team creates -- maintains the list. 19:07:23
18     Q.   Okay.  And you have access to 19:07:25
19 the list? 19:07:26
20     A.   Yes. 19:07:26
21     Q.   Okay.  Okay.  So looking at 19:07:27
22 this list, does it look like that is what it 19:07:28
23 is, Mallinckrodt chargeback restriction and 19:07:29
24 reinstatement list? 19:07:34
25     A.   Yes. 19:07:35

Page 498

1    Q.   And it shows one, two, three,    19:07:35
2  four, five, six, seven, eight, it looks like,    19:07:42
3  eight pharmacies that are on that list.    19:07:50
4        Does that look correct to you?    19:07:52
5    A.   Yes.    19:07:53
6    Q.   Okay.  And of that chargeback    19:07:55
7  list, it looks like five were reinstated; is    19:08:11
8  that correct?    19:08:14
9    A.   Yes.    19:08:14
10    Q.   Okay.  And if there were    19:08:15
11  pharmacies that were put on chargeback    19:08:18
12  restriction in Tennessee, they would appear    19:08:19
13  on this list; is that right?    19:08:21
14    A.   I'm assuming that the sort is    19:08:22
15  correct, but given that, yes, they would be    19:08:25
16  on this list.    19:08:27
17    Q.   Okay.  And each one of these    19:08:28
18  pharmacies that were put on chargeback    19:08:31
19  restriction would have been reported to the    19:08:32
20  DEA?    19:08:34
21    A.   Yes.    19:08:34
22    Q.   Okay.  You can set that one    19:08:35
23  aside, please, ma'am.    19:08:38
24        Ma'am, was someone on your team    19:09:12
25  responsible for checking with the Tennessee    19:09:14

Page 499

1  boards of medical examiners or the Tennessee    19:09:16
2  Board of Pharmacy about specific pharmacies?    19:09:19
3    A.   John Gillies, our vice    19:09:23
4  president of security, may have done that,    19:09:30
5  but I don't know -- he's retired from the    19:09:33
6  FBI, so he had different resources than the    19:09:39
7  rest of the team.  And some of his    19:09:42
8  contributions to the team we didn't under --    19:09:45
9  know his methodology or have that pathway.    19:09:51
10    Q.   Okay.  But to your knowledge,    19:09:55
11  he didn't routinely -- nobody routinely    19:09:56
12  checked with the various state boards of    19:10:00
13  licensing for pharmacies to find out what's    19:10:03
14  going on with pharmacies in a particular    19:10:05
15  state?    19:10:08
16    MR. O'CONNOR:  Object to form.    19:10:09
17    THE WITNESS:  Correct.    19:10:09
18  QUESTIONS BY MS. HERZFELD:    19:10:10
19    Q.   And what about the doctor    19:10:10
20  licensing boards for each state?  Was there    19:10:12
21  routine audit of the doctor licensing boards    19:10:14
22  of each state within your team, to your    19:10:17
23  knowledge?    19:10:20
24    A.   Not to my knowledge.    19:10:20
25    Q.   Okay.  And based on those    19:10:21

Page 500

1  Google Alerts and other information, you were    19:10:52
2  aware that doctors were being arrested in    19:10:54
3  Tennessee for improperly prescribing    19:10:57
4  oxycodone; is that correct?    19:11:01
5    A.   Yes.    19:11:02
6    Q.   Okay.  And based on those    19:11:07
7  Google Alerts and other information, you also    19:11:10
8  knew that some pharmacies were filling    19:11:11
9  improper prescriptions in Tennessee for    19:11:14
10  oxycodone; is that correct?    19:11:16
11    MR. O'CONNOR:  Objection to    19:11:17
12  form.    19:11:18
13    THE WITNESS:  Yes.    19:11:18
14  QUESTIONS BY MS. HERZFELD:    19:11:19
15    Q.   Okay.  Okay.  And when you    19:11:19
16  talked earlier about chargeback data, I just    19:11:22
17  want to make sure I understand that a little    19:11:24
18  bit.    19:11:27
19        You can sort chargeback data in    19:11:27
20  all sorts of different ways, right?    19:11:29
21    A.   Yes.    19:11:30
22    Q.   Okay.  So you can sort it, I    19:11:30
23  think we talked about, by state; is that    19:11:32
24  correct?    19:11:35
25    A.   Yes.    19:11:35

Page 501

1    Q.   Okay.  And can you sort it by    19:11:36
2  time -- various time periods?    19:11:39
3    A.   Yes.    19:11:41
4    Q.   Okay.  And can you sort it by    19:11:42
5  ZIP code?    19:11:44
6    A.   Yes.    19:11:45
7    Q.   Okay.  And you can sort it by    19:11:46
8  per capita?    19:11:49
9    MR. O'CONNOR:  Objection to    19:11:51
10  form.    19:11:53
11    THE WITNESS:  We did that for a    19:11:53
12  period of time.    19:11:55
13  QUESTIONS BY MS. HERZFELD:    19:11:57
14    Q.   Okay.    19:11:57
15    A.   We know -- I don't believe that    19:11:58
16  we currently use the per capita information.    19:11:59
17    Q.   Okay.  Do you know when you    19:12:01
18  stopped using the per capita information?    19:12:03
19    A.   I'm so sorry, I do not.    19:12:05
20    Q.   Okay.  Do you know why you    19:12:08
21  stopped using the per capita information?    19:12:08
22    A.   I do not.    19:12:10
23    Q.   Okay.  And you can sort it by    19:12:15
24  pharmacies; is that correct?    19:12:16
25    A.   Yes.    19:12:17

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1    Q.   Okay.  And I think you said        19:12:17
2  before if you wanted to, and for a period of   19:12:19
3  time you did, monitor physicians via IMS        19:12:23
4  data?                               19:12:27
5       MR. O'CONNOR:  Objection.          19:12:27
6       THE WITNESS:  Yes.               19:12:28
7       (Mallinckrodt-Harper Exhibit 37    19:13:25
8    marked for identification.)            19:13:26
9  QUESTIONS BY MS. HERZFELD:             19:13:26
10   Q.   Okay.  Ms. Harper, I am going      19:13:27
11 to mark you -- hand you what we will mark as    19:13:31
12 plaintiff's next exhibit, which is number 37.   19:13:33
13      For the record, it's             19:13:37
14 MNK_TNSTA05340154.  It is a two-page          19:13:43
15 document.                           19:13:50
16      You want to start from the back      19:14:01
17 forward.  Oh, you've got it.  Good.  Very     19:14:02
18 good.                               19:14:04
19   A.   Yes, ma'am.                    19:14:04
20   Q.   Great.  Thank you.              19:14:05
21      And take your time.  Read         19:14:07
22 through it.                         19:14:11
23      MR. O'CONNOR:  Counsel, can we      19:14:39
24 go off the record for a minute?             19:14:41
25      MS. HERZFELD:  Sure.              19:14:42

Page 503

1       VIDEOGRAPHER:  We are going off    19:14:43
2  the record at 7:14 p.m.                 19:14:44
3       (Off the record at 7:14 p.m.)      19:14:46
4       VIDEOGRAPHER:  We are back on      19:15:26
5  the record at 7:15 p.m.                 19:15:27
6       MR. O'CONNOR:  And, Counsel, as    19:15:29
7  we discussed, I'm going to object to      19:15:30
8  the use of this document.  It appears      19:15:33
9  to be protected by the attorney-client    19:15:34
10 privilege and was inadvertently          19:15:37
11 produced, and we'll be making a          19:15:37
12 clawback request to retrieve the          19:15:39
13 document.                           19:15:40
14      MS. HERZFELD:  Okay.  And we'll     19:15:41
15 discuss it at a later time.             19:15:43
16      I just have one question for       19:15:44
17 you, ma'am.                         19:15:46
18 QUESTIONS BY MS. HERZFELD:             19:15:46
19   Q.   Do you know if Tennessee was a    19:15:47
20 state that was specifically being monitored   19:15:47
21 as one of a number of states by Mallinckrodt   19:15:51
22 for high volume oxycodone sales?           19:15:54
23   A.   Yes.                         19:15:57
24   Q.   Okay.  Thank you very much.       19:15:57
25 You can move that aside.                19:15:59

Page 504

1       Do you know why Tennessee was      19:16:00
2  one of those states?                   19:16:01
3    A.   So our program monitors all      19:16:02
4  states, all 50 states.                 19:16:08
5    Q.   Okay.  But at some point were     19:16:10
6  Kentucky, Tennessee, Ohio, Florida and Texas   19:16:12
7  singled out for specific review?           19:16:20
8    A.   I don't recall.                 19:16:22
9       (Mallinckrodt-Harper Exhibit 38    19:16:22
10   marked for identification.)            19:16:59
11 QUESTIONS BY MS. HERZFELD:             19:16:59
12   Q.   Okay.  I'm going to hand you      19:16:22
13 what we will mark as Plaintiff's Exhibit 38.   19:16:57
14 It's MNK_TNSTA05337163.                19:17:00
15      Okay.  And is this an e-mail      19:17:07
16 that you sent on May 13, 2011?             19:17:36
17   A.   Yes.                         19:17:40
18   Q.   Okay.  And with it, it looks      19:17:43
19 like the attachments are oxy percentage of     19:17:45
20 sales by dist state master spreadsheet and     19:17:48
21 hydro percentage of sales by state master      19:17:52
22 spreadsheet.                        19:17:55
23      Do you see where I'm at?          19:17:55
24   A.   Yes.                         19:17:56
25   Q.   Okay.  And it says, "Georgia      19:17:57

Page 505

1  has been added to the statistics per Pat's     19:18:00
2  request."                           19:18:03
3       Did I read that correctly?         19:18:03
4    A.   Yes.                         19:18:04
5    Q.   Who's Pat?                     19:18:04
6    A.   She's one of our attorneys.       19:18:04
7    Q.   Okay.  And you know            19:18:07
8  Tennessee -- if you'll look with me to the     19:18:11
9  second page, you'll see a chart that talks     19:18:13
10 about the personnel of hydrocodone sales in    19:18:24
11 Tennessee from 10/2007 till 2/1/2011.         19:18:25
12      Do you see where I'm at?          19:18:31
13   A.   Yes.                         19:18:32
14   Q.   Okay.  Do you know why the       19:18:33
15 percentage of hydrocodone sales were being     19:18:34
16 monitored in Tennessee?                19:18:36
17   A.   So I'd like to note, please,      19:18:37
18 from where this graph came.  Was it part of    19:18:42
19 this packet?                        19:18:45
20   Q.   I believe so, yes, ma'am.  I     19:18:47
21 didn't create it.                    19:18:49
22   A.   Okay.  All right.              19:18:50
23      So will you please repeat the       19:18:52
24 question?  Sorry.                    19:18:54
25   Q.   Sure.  That's okay.            19:18:55

Page 506

1    Do you know why the percentage    19:18:56
2  of hydrocodone sales were being monitored in   19:18:57
3  Tennessee by Mallinckrodt?    19:18:59
4    A.    I do not know.    19:19:00
5    Q.    Okay.  But they were?    19:19:01
6    A.    Yes.    19:19:03
7    Q.    Okay.  And it was not    19:19:04
8  necessarily all 50 states that were pulled    19:19:07
9  out for these specific looks?    19:19:09
10    A.    I do not know that.    19:19:11
11    Q.    Okay.  Let's go through and    19:19:12
12  look.    19:19:13
13    So after this chart that you're    19:19:14
14  on, if you'll flip with me to the next page,    19:19:16
15  it says page 1 at the bottom?    19:19:18
16    A.    Yes.    19:19:20
17    Q.    Okay.  So looking at hydro    19:19:20
18  sales here, it looks like we're looking at    19:19:22
19  the state of?    19:19:25
20    A.    Florida.    19:19:26
21    Q.    Okay.  And two pages later, the    19:19:27
22  one that says page 3, it looks like we're    19:19:32
23  looking at the state of?    19:19:35
24    A.    Oh, I'm sorry.  Texas.    19:19:36
25    Q.    Okay.    19:19:36

Page 507

1    A.    Yes.    19:19:39
2    Q.    Okay.  And flip two more pages    19:19:40
3  with me to page 5.    19:19:42
4    Okay.  And that is the state    19:19:44
5  of?    19:19:45
6    A.    Ohio.    19:19:46
7    Q.    Okay.  Keep flipping.    19:19:46
8    Page 7.  That's the state of?    19:19:49
9    A.    Kentucky.    19:19:52
10    Q.    Okay.  And this is -- looks    19:19:54
11  like the percentage of hydro sales by    19:19:55
12  distributor; is that right?    19:19:57
13    A.    Yes.    19:19:58
14    Q.    Okay.  Keep flipping.    19:19:59
15    Page 9, and the state there is?    19:20:01
16    A.    Tennessee.    19:20:05
17    Q.    Tennessee.  There we go.    19:20:06
18    And that is the percentage of    19:20:08
19  sales by distributor on that chart; is that    19:20:09
20  correct?    19:20:15
21    A.    Yes, the chart states that.    19:20:15
22    Q.    Okay.  And the chart appears to    19:20:20
23  monitor this information from October 2007    19:20:21
24  through March of 2010 on this page going    19:20:24
25  through to the second page, all the way    19:20:27

Page 508

1  through March of 2011; is that right?    19:20:29
2    A.    Yes.    19:20:31
3    Q.    Okay.  And then on page 11, the    19:20:33
4  state is?    19:20:41
5    A.    Georgia.    19:20:42
6    Q.    Okay.  And those are the only    19:20:44
7  states that were included in this handout.    19:20:45
8    So do you know if there was    19:20:48
9  a -- do you know why those states were    19:20:50
10  particularly singled out to have these    19:20:52
11  reports run?    19:20:55
12    A.    I do not.    19:20:55
13    Q.    Okay.  Was there anything about    19:20:56
14  opioid sales to these states that was of    19:20:59
15  note?    19:21:01
16    A.    No.  And unfortunately I    19:21:02
17  don't -- I don't understand -- I don't recall    19:21:05
18  this report --    19:21:08
19    Q.    Okay.    19:21:08
20    A.    -- and I don't understand this    19:21:08
21  unit of measure, this percentage.    19:21:11
22    Q.    Okay.    19:21:13
23    A.    I just don't understand what    19:21:14
24  this page is telling --    19:21:15
25    Q.    Okay.    19:21:16

Page 509

1    A.    -- me.    19:21:17
2    Q.    But you don't doubt that you    19:21:17
3  sent the e-mail with the attachments?    19:21:18
4    A.    No, I don't doubt it.    19:21:21
5    Q.    Okay.  Okay.  So flipping    19:21:25
6  through to the next one, kind of leaving    19:21:26
7  where we -- stopping where we left off and    19:21:28
8  going back to where we were, if you'll just    19:21:31
9  keep going.    19:21:33
10    A.    What page?  Keep going?    19:21:33
11    Q.    Uh-huh.  I can help you out if    19:21:35
12  you want.    19:21:37
13    A.    Okay, certainly.    19:21:38
14    Q.    Yeah.  Yeah.  Make it a little    19:21:38
15  easier for you.  Keep you from paper cuts.    19:21:39
16  There we go.    19:21:45
17    Okay.  And then so -- then on    19:21:46
18  this chart, it looks like the second    19:21:47
19  attachment there is the percentage of    19:21:50
20  oxycodone sales for Tennessee.    19:21:52
21    Do you see that?    19:21:53
22    A.    Yes.    19:21:53
23    Q.    And that's broken down by    19:21:54
24  distributor from 10/1/2007 till 10/1/2011; is    19:21:56
25  that right?    19:22:02

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1   A.   Yes.                        19:22:02
2   Q.   Okay.  And I will posit to you,   19:22:02
3   and if we flip through, it's the same charts   19:22:06
4   breaking down the percentage of oxycodone for   19:22:09
5   various states by distributor for Florida,   19:22:13
6   Texas, Ohio, Kentucky, Tennessee and Georgia,   19:22:18
7   those same states.               19:22:33
8        Does that look to be correct?   19:22:35
9        MR. O'CONNOR:  You can answer   19:22:39
10  the question.                    19:22:39
11       THE WITNESS:  Yes.          19:22:40
12  QUESTIONS BY MS. HERZFELD:         19:22:40
13   Q.   Okay.  Yes?               19:22:41
14       MR. O'CONNOR:  Counsel, since   19:22:42
15  we just finished that page, I notice   19:22:43
16  there appears to be an unrelated   19:22:45
17  document attached to the back.     19:22:47
18       MS. HERZFELD:  I do see that.   19:22:48
19  I do.  That's interesting.         19:22:50
20       Okay.  Let's pull off this   19:22:51
21  unrelated document, because I think   19:22:55
22  that's supposed to be separate.    19:22:55
23       My apologies for having some   19:22:59
24  exhibit problems today.  You can tell   19:23:01
25  I'm having exhibit problems today.   19:23:04

Page 511

1        There we go.  Just make this   19:23:07
2   next one Exhibit 39.             19:23:08
3        (Mallinckrodt-Harper Exhibit 39   19:23:12
4   marked for identification.)        19:23:12
5        MS. HERZFELD:  And for those in   19:23:17
6   the cheap seats, it's            19:23:18
7   MNK-T1_0007026593.              19:23:22
8        Thank you for pointing that   19:23:27
9   out, Andrew.                     19:23:29
10       MR. O'CONNOR:  You're welcome.   19:23:31
11  QUESTIONS BY MS. HERZFELD:         19:23:32
12   Q.   Okay.  So looking at this next   19:23:36
13  document, this is an e-mail that you sent to   19:23:38
14  Anthony Rattini on 10/14/2013; is that   19:23:40
15  correct?                         19:23:45
16   A.   Yes.                      19:23:45
17   Q.   Okay.  And who is Anthony   19:23:47
18  Rattini?                         19:23:58
19   A.   He is, or was, a representative   19:23:58
20  we spoke to at Miami-Luken.        19:24:03
21   Q.   And Miami-Luken is what?     19:24:06
22   A.   It's a distributor.         19:24:09
23   Q.   Okay.  And do you know where   19:24:10
24  they're located?                 19:24:12
25   A.   I do not.                  19:24:12

Page 512

1    Q.   Do you know if they're located   19:24:13
2   in Miami?                        19:24:14
3    A.   I don't know.              19:24:15
4    Q.   Okay.  Flipping to the third   19:24:17
5   page that says MNK-T1_0007026595.  State   19:24:19
6   ranking for hydrocodone, total dosage units   19:24:26
7   sold to retail, January 1, 2010, through   19:24:30
8   December 31, 2011.               19:24:34
9        Do you see where I'm at?      19:24:35
10   A.   Yes.                      19:24:36
11   Q.   Could you tell me what number   19:24:37
12  Tennessee is, ma'am?             19:24:38
13   A.   Tennessee is the third ranking.   19:24:39
14   Q.   Okay.  Great.  Thank you very   19:24:46
15  much.                            19:24:47
16       And the next page, state   19:24:47
17  ranking for oxycodone.  This one ends with   19:24:49
18  6596.  Total dosage units sold to retail on   19:24:56
19  January 1, 2010, through December 31, 2011.   19:25:03
20       And do you see that what number   19:25:07
21  Tennessee is on this list, ma'am?   19:25:08
22   A.   It is -- I have a question   19:25:10
23  about the document, please.        19:25:11
24   Q.   Sure.                     19:25:12
25   A.   This says Drug Enforcement   19:25:12

Page 513

1   Administration.                  19:25:14
2    Q.   Yes, ma'am.                19:25:14
3    A.   So it's something DEA        19:25:14
4   published.                       19:25:16
5    Q.   Okay.                     19:25:16
6    A.   So that would include, am I   19:25:17
7   correct, all manufacturers of all products?   19:25:19
8    Q.   Ma'am, you're the one who   19:25:22
9   forwarded this, so I wouldn't know.   19:25:24
10   A.   Oh, we did?                19:25:25
11   Q.   Yeah, I'm going to back up.   19:25:27
12  Okay.  Let me ask this question first, and   19:25:29
13  then we'll back up so you clarify that.   19:25:30
14   A.   Okay.                     19:25:32
15   Q.   So what number is Tennessee on   19:25:32
16  this state ranking for oxycodone in 2011?   19:25:34
17   A.   Number 9.                  19:25:38
18   Q.   Okay.  And in 2000 -- okay.   19:25:39
19  Great.  Thank you.               19:25:49
20   A.   Okay.                     19:25:49
21   Q.   Okay.  Now going back to what I   19:25:49
22  think what was your concern.  If you back to   19:25:50
23  the very first page, which was the e-mail.   19:25:53
24       If you read the e-mail, it's an   19:25:55
25  e-mail from you, right?           19:25:56

Highly Confidential – Subject to Further Confidentiality Review

Page 514

1    A.   Yes.                    19:25:57
2    Q.   Okay.  It says, "Hi, Tony.  It    19:25:58
3  was very good to speak with you today, and    19:26:02
4  I'm looking forward to finally meeting you in    19:26:03
5  person next week at the DEA conference.  The    19:26:05
6  first PDF attached was pulled from the DEA    19:26:06
7  web page USDOJ.gov, a recent presentation    19:26:10
8  made to HDMA as indicated below.  The second    19:26:13
9  PDF was extracted from DEA web page also,    19:26:17
10 registrant population information pharmacy    19:26:19
11 registrations."              19:26:22
12     Did I read that correctly?    19:26:22
13     A.   Yes.                  19:26:23
14     Q.   Okay.  So it looks like you    19:26:23
15 attached both of these as attachments to the    19:26:25
16 e-mail you sent to Mr. Rattini; is that    19:26:28
17 correct?                     19:26:31
18     A.   Yes.                  19:26:31
19     Q.   Okay.  And what is HDMA?    19:26:32
20     A.   It's Healthcare Distribution    19:26:40
21 Management Association.           19:26:44
22     Q.   Okay.  Okay.  Moving on.  You    19:26:44
23 can get rid of that one.          19:26:55
24     Okay.  Was Mallinckrodt    19:26:57
25 concerned about the number of opioids that it    19:27:14

Page 515

1  was shipping to Tennessee?        19:27:16
2     MR. O'CONNOR:  Objection to    19:27:18
3  form.                        19:27:19
4     THE WITNESS:  It's a broad    19:27:20
5  question, so can you -- I'm sorry, I    19:27:26
6  can't answer.                 19:27:30
7  QUESTIONS BY MS. HERZFELD:         19:27:30
8     Q.   Sure.  Okay.  I'll try to --   19:27:31
9  I'll try to narrow it a little bit.    19:27:34
10     It looks like Tennessee,    19:27:35
11 according to some of the charts we've seen,    19:27:37
12 has been at the higher level of numbers of    19:27:38
13 opioids being shipped to it; is that correct?    19:27:43
14     MR. O'CONNOR:  Objection to    19:27:45
15 form.                        19:27:46
16     THE WITNESS:  Yes.          19:27:46
17 QUESTIONS BY MS. HERZFELD:         19:27:47
18     Q.   Okay.  And was that concerning    19:27:48
19 to Mallinckrodt, that Tennessee was -- or    19:27:49
20 concerning to you?  Was that concerning --    19:27:52
21 strike that.                 19:27:54
22     Was it concerning to you in    19:27:54
23 your position at Mallinckrodt that Tennessee    19:27:58
24 was amongst the higher numbers for opioid    19:28:00
25 sales by Mallinckrodt?           19:28:05

Page 516

1     MR. O'CONNOR:  Objection to    19:28:07
2  form.                        19:28:08
3     THE WITNESS:  So we reviewed    19:28:08
4  all the data for all the states, so it    19:28:09
5  was among those that were of concern.    19:28:13
6  QUESTIONS BY MS. HERZFELD:         19:28:16
7     Q.   Okay.  And why was that of    19:28:16
8  concern?                     19:28:18
9     A.   So which charts are we talking    19:28:18
10 about, these last ones from DEA?    19:28:21
11     Q.   Yes.                  19:28:23
12     A.   So I'd like to add that since    19:28:24
13 these were from DEA, all manufacturers -- and    19:28:29
14 there were certain areas of the country that    19:28:33
15 Mallinckrodt may have had zero of the market.    19:28:35
16 There are other hydrocodone manufacturers and    19:28:39
17 oxycodone manufacturers.  So, yes, we studied    19:28:42
18 these graphs as a tool within our program,    19:28:45
19 yes.                         19:28:48
20     Q.   Okay.  But if we go back to,    19:28:48
21 let's see, this one, I think.  Yeah,    19:28:51
22 Exhibit 35.                  19:28:59
23     You agreed with me before that    19:28:59
24 one of the states that Mallinckrodt was    19:29:01
25 monitoring was Tennessee; is that right?    19:29:02

Page 517

1     A.   Yes.  Yes.             19:29:03
2     Q.   Okay.  And so based on    19:29:03
3  Mallinckrodt's own documentation here in    19:29:05
4  Exhibit 35, you were monitoring Tennessee    19:29:08
5  specifically for opioid sales; is that    19:29:12
6  correct?                     19:29:15
7     A.   Yes.                  19:29:15
8     Q.   Okay.  Okay.  You can set that    19:29:19
9  aside.                       19:29:22
10     (Mallinckrodt-Harper Exhibit 40    19:29:29
11 marked for identification.)        19:29:30
12 QUESTIONS BY MS. HERZFELD:         19:29:30
13     Q.   Okay.  I'm going to hand you    19:29:30
14 what we'll mark as Exhibit 40.  And this is    19:29:33
15 MNK_TNSTA05126722 through 6735.  It's front    19:29:39
16 and back document.            19:29:53
17     That type is very, very small,    19:29:55
18 so we'll read through it together if you    19:30:24
19 don't mind.                  19:30:28
20     So the one that says page 1,    19:30:29
21 let's start there.  Okay.         19:30:30
22     At the very top line under    19:30:33
23 where it says A, B and C, what is the title    19:30:34
24 there?  Do you see it, line 1?    19:30:37
25     A.   Yes.                  19:30:39

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    Q.   What is it?                    19:30:39
2    A.   30-milligram oxy, sum of sales,   19:30:40
3 dosage units by state.                 19:30:45
4    Q.   Okay.  So looking at that, it   19:30:46
5 looks like Mallinckrodt was tracking the   19:30:49
6 oxy 30 sales by state in 2009, 2010 and 2011;   19:30:51
7 is that correct?                       19:30:58
8    A.   I see 2010 and I see 2000 --   19:30:58
9 2011.  I don't see 2009 on the chart.   19:31:14
10    Q.   Okay.  I'll show you right    19:31:16
11 here.                                  19:31:17
12    A.   Okay.                         19:31:17
13    Q.   Right under B?                19:31:18
14    A.   Okay.  I see it now, thank you,   19:31:25
15 yes.                                   19:31:26
16    Q.   2009, 2010, 2011.             19:31:26
17    A.   Yeah.                         19:31:26
18    Q.   Okay.  And what number is     19:31:29
19 Tennessee on this list?                19:31:30
20    A.   This list indicates --        19:31:31
21 Tennessee is seventh listed, but this is by   19:31:46
22 sales dollars, am I correct, not dosage   19:31:51
23 units?                                 19:31:54
24    Q.   It says -- it says sum of sales   19:31:54
25 dosage units by state, so...           19:31:56

Page 519

1         Okay.  So it says Tennessee is   19:32:08
2 number 7; is that right?               19:32:11
3    A.   Yes, it does say that.         19:32:12
4    Q.   And then if you go over        19:32:16
5 a couple blocks here, it has the various   19:32:17
6 numbers.  Then it says grand percent total,   19:32:22
7 3.64 percent.                          19:32:24
8         Do you see where that's at?    19:32:26
9    A.   I'm having a hard time tracking   19:32:28
10 you.                                   19:32:31
11    Q.   I know, it's so small.        19:32:32
12    A.   On the chart.                 19:32:33
13    Q.   Do you want to use a piece of   19:32:34
14 paper?                                 19:32:35
15    A.   Can you give me a column header   19:32:35
16 name?                                  19:32:37
17    Q.   Uh-huh, sure.  Okay.  So let's   19:32:39
18 look at -- we're at number 7, and G.  So 7 G.   19:32:40
19    A.   Okay.  Yes, I see it.         19:32:43
20    Q.   Okay.  And so it says grand    19:32:47
21 total percent is 3.64 percent; is that right?   19:32:48
22    A.   Yes.                          19:32:51
23    Q.   Okay.  And then it says 2010   19:32:51
24 increase.                              19:32:53
25         Can you read that next one for   19:32:53

Page 520

1 me, please?                            19:32:54
2    A.   Yes.  42 percent.              19:32:56
3    Q.   Okay.  And then 2011 increase?   19:32:57
4    A.   11 percent.                    19:33:00
5    Q.   Okay.  And then going over     19:33:03
6 exactly -- stay on that exact line and go   19:33:05
7 over one, and then we're at 15-milligram oxy,   19:33:07
8 sum of sales dosage units by state.  And   19:33:11
9 we're still at number 7 here, Tennessee.   19:33:13
10         Do you see that?              19:33:16
11    A.   I'd like to use a piece of    19:33:17
12 paper --                               19:33:18
13    Q.   Yeah, sure.  It will certainly   19:33:18
14 make it easier.                        19:33:20
15    A.   I'm sorry.  I just had eye     19:33:21
16 surgery.  I'm sorry.                   19:33:26
17    Q.   For sure.  And I'm not trying   19:33:28
18 to make this difficult on you.         19:33:30
19    A.   Okay.  I'm on line 7.         19:33:31
20    Q.   Okay.  And so it shows the 15   19:33:33
21 on line 7.  Then it says percentage of grand   19:33:35
22 total there under Q4, .49 percent; is that   19:33:37
23 right?                                 19:33:41
24    A.   Yes.                          19:33:41
25    Q.   Okay.  And then it says units   19:33:42

Page 521

1 per capita, 1.87; is that correct?     19:33:44
2    A.   Yes.                          19:33:47
3    Q.   Units per capita rank,         19:33:48
4 number 5; is that correct?             19:33:52
5    A.   Yes.                          19:33:53
6    Q.   Population rank, 17.           19:33:54
7         And then it goes through the   19:33:58
8 census population through 2010, 2000, 1990.   19:34:02
9         Do you see that?              19:34:06
10    A.   Yes.                          19:34:07
11    Q.   I want to make sure I am      19:34:07
12 staying on the right line.             19:34:09
13         And then it says percentage of   19:34:10
14 US total, 2.03 percent.                19:34:12
15         Do you see that?              19:34:15
16    A.   Yes.                          19:34:15
17    Q.   Okay.  Then if you go -- follow   19:34:15
18 that line all the way to the very end.  It   19:34:20
19 ranks by density and population, and then it   19:34:22
20 says units adjusted for density, 8.85.   19:34:26
21         Do you see that?              19:34:30
22    A.   Yes.                          19:34:31
23    Q.   Okay.  And did you create this   19:34:33
24 chart?                                 19:34:35
25    A.   I did not.  I don't understand   19:34:35

Page 522

1  it. I did not.                    19:34:38
2      Q.    Okay.                   19:34:39
3      A.    No.                     19:34:39
4      Q.    Does it appear to be on     19:34:39
5  monitoring chargeback data by state and    19:34:42
6  population?                       19:34:45
7      A.    I don't know. It's monitoring    19:34:45
8  by state and by population, but, again, is it    19:34:54
9  dosage units or dollars. I don't know the    19:34:58
10 units of measure for certain.         19:35:02
11     Q.    Okay. But other than that, not    19:35:04
12 knowing what the unit of measure is, you    19:35:06
13 recognize this as chargeback data by state    19:35:09
14 and population?                   19:35:11
15     A.    I don't recognize where the    19:35:13
16 data came from, I'm sorry.           19:35:17
17     Q.    Okay.                   19:35:18
18     A.    I just don't.            19:35:18
19     Q.    So have you seen this chart    19:35:19
20 before?                           19:35:21
21     A.    No.                     19:35:21
22     Q.    Have you -- did you have    19:35:22
23 reports run like this before?        19:35:24
24     A.    No.                     19:35:26
25     Q.    Do you know if anybody on your    19:35:26

Page 523

1  team did?                         19:35:27
2      A.    I do not know.           19:35:28
3      Q.    Okay. When you save things on    19:35:31
4  a computer in your team back in 2010, 2011,    19:35:34
5  would you have a share drive?        19:35:38
6      A.    Yes.                    19:35:40
7      Q.    Okay. Would it have certain    19:35:40
8  folders in it?                    19:35:43
9      A.    Yes.                    19:35:43
10     Q.    You put stuff in a folder?    19:35:44
11         Was there a folder for        19:35:45
12 suspicious order monitoring?         19:35:47
13     A.    Yes, and I do see the title.    19:35:47
14     Q.    Yes, ma'am.              19:35:49
15     A.    I see that.              19:35:50
16     Q.    Uh-huh.                  19:35:51
17     A.    And certainly I can read it,    19:35:52
18 but I -- I don't recall seeing or utilizing    19:35:54
19 this spreadsheet or requesting this    19:35:58
20 spreadsheet, although I do see that the file    19:36:00
21 name indicates that.               19:36:02
22     Q.    Okay.                   19:36:03
23     A.    Yes.                    19:36:03
24     Q.    Do you have any reason to think    19:36:04
25 that it's not accurate?             19:36:05

Page 524

1      A.    Well, I do not.          19:36:06
2      Q.    Okay. Okay. You can set it    19:36:14
3  aside. Thank you.                  19:36:15
4         MR. O'CONNOR: Counsel, as    19:36:19
5  we're getting close to the end here,    19:36:19
6  maybe it's time to take a break. I    19:36:21
7  think we've been going at it for quite    19:36:25
8  a while.                          19:36:27
9         MS. HERZFELD: How long have I    19:36:28
10 been going?
11        VIDEOGRAPHER: A little over an
12 hour. Hour and ten minutes.
13        MS. HERZFELD: Oh, we can take
14 a break, yeah, but -- yeah, sure,
15 okay. Yeah, we can take a break.
16        VIDEOGRAPHER: We are going off    19:36:33
17 the record at 7:36 p.m.            19:36:34
18     (Off the record at 7:36 p.m.)    19:36:35
19        VIDEOGRAPHER: We are back on    19:45:27
20 the record at 7:45 p.m.            19:45:28
21 QUESTIONS BY MS. HERZFELD:             19:45:30
22     Q.    Okay. Great.             19:45:30
23         Ms. Harper, we're back on the    19:45:31
24 record after a quick break. I have a couple    19:45:34
25 more questions for you. Hopefully we'll get    19:45:37

Page 525

1  you out of here relatively quickly.    19:45:39
2         I'm done with that exhibit, so    19:45:41
3  you can set it aside.              19:45:43
4         I have a question about the    19:45:45
5  branded side of Mallinckrodt.        19:45:51
6         Did you deal at all with them?    19:45:52
7      A.    On a fairly limited basis.    19:45:54
8      Q.    Okay. And what was your    19:45:56
9  involvement with the branded side?    19:45:58
10     A.    Only to the extent that they    19:46:00
11 sold branded products that were narcotics.    19:46:06
12     Q.    Okay. So like Exalgo or    19:46:10
13 Xartemis?                         19:46:13
14     A.    Yes.                    19:46:15
15     Q.    Okay. And so I'm going to ask    19:46:15
16 you some questions about that just to figure    19:46:18
17 out if there's -- what your role is.    19:46:19
18         Okay?                     19:46:20
19     A.    Okay.                   19:46:21
20     Q.    So the branded side had target    19:46:22
21 pharmacy lists; is that correct?     19:46:26
22     A.    I don't know.            19:46:27
23     Q.    Okay. Were you ever involved    19:46:28
24 in reviewing target pharmacy lists from the    19:46:30
25 branded sided?                    19:46:33

Page 526

1     A.    So I'm going to -- I'm going to    19:46:34
2  clarify my previous answer.                    19:46:36
3     Q.    Sure.                19:46:37
4     A.    Because, yes, I believe they    19:46:39
5  had -- I don't know what they were called --    19:46:42
6     Q.    Okay.                19:46:42
7     A.    -- but they -- did you say    19:46:44
8  pharmacies?                    19:46:45
9     Q.    Yes, ma'am.                19:46:45
10    A.    I'm not certain about that.    19:46:46
11    Q.    Okay.  What about physicians?    19:46:48
12    A.    Yes.                19:46:49
13    Q.    Okay.                19:46:50
14    A.    Yes.  Yes.                19:46:50
15    Q.    And do you -- what was your    19:46:51
16 involvement in reviewing those target    19:46:54
17 physician lists?                    19:46:56
18    A.    When we had -- when we were    19:46:57
19 using the top prescriber list from the IMS    19:47:02
20 data, we would vet that against the speakers    19:47:06
21 list.                    19:47:13
22    Q.    Okay.  And what's the speakers    19:47:13
23 list?                    19:47:18
24    A.    Those were speakers that -- and    19:47:18
25 I don't know very much about the program, but    19:47:21

Page 527

1  that Mallinckrodt employed to speak on our --    19:47:23
2  I don't know -- I don't know the arrangement,    19:47:28
3  but they spoke on behalf of Mallinckrodt for    19:47:30
4  Mallinckrodt products.  But I don't want to    19:47:33
5  reach too far into the brands because --    19:47:34
6  okay.                    19:47:37
7     Q.    Okay.  As long as I understand    19:47:37
8  your answer.                19:47:40
9     A.    Yeah.                19:47:41
10    Q.    Okay.  And so on -- do you know    19:47:41
11 on -- if -- when you looked at those top    19:47:44
12 prescriber lists, did you review those at all    19:47:47
13 from a suspicious order monitoring    19:47:51
14 perspective?                    19:47:53
15    A.    Yes.                19:47:54
16    Q.    Okay.  And what did you do for    19:47:56
17 that?                    19:47:58
18    A.    So that is when, in the    19:47:58
19 circumstance we spoke about before, if we    19:48:01
20 were reviewing a downstream registrant and    19:48:04
21 their due diligence with a particular    19:48:10
22 pharmacy, if the distributor's file contained    19:48:12
23 information about the top prescribers at    19:48:18
24 those pharmacies, we would vet that against    19:48:19
25 the list of the top prescribers per IMS.    19:48:22

Page 528

1     Q.    Okay.  And top prescribers for    19:48:27
2  Mallinckrodt products, those prescriptions    19:48:31
3  could have been legitimate; is that right?    19:48:32
4     A.    Yes.                19:48:34
5     Q.    Okay.  And those prescriptions    19:48:35
6  also could have been illegitimate?    19:48:37
7     A.    And I'd like to qualify that.    19:48:40
8     Q.    Yes, ma'am.                19:48:41
9     A.    So our top prescriber list --    19:48:42
10    Q.    Yes, ma'am.                19:48:44
11    A.    -- I don't know if that was    19:48:45
12 exclusive to Mallinckrodt product, but it was    19:48:46
13 for oxy 15 and oxy 30.                19:48:47
14    Q.    Okay.  So for the folks that    19:48:50
15 were the top prescribers of oxy 15 and    19:48:53
16 oxy 30, those could be legitimate doctors.    19:48:56
17 They could be at the top of the list; is that    19:48:58
18 right?                    19:49:01
19    A.    Correct.                19:49:01
20    Q.    Or those could be people who    19:49:01
21 were operating pill mills.  They could also    19:49:03
22 be at the top of the list?                19:49:05
23    A.    Potentially, yes.                19:49:06
24    Q.    Okay.  And did Mallinckrodt    19:49:07
25 have a way of figuring that out?    19:49:11

Page 529

1     A.    When we used that list and the    19:49:12
2  review with our distributors of their    19:49:18
3  downstream registrants, again, if they    19:49:20
4  provided us the names of the top prescribers    19:49:22
5  at the pharmacy, and if that coincided with    19:49:26
6  the top prescriber list we had within the    19:49:29
7  country, we would have a detailed    19:49:32
8  conversation with the distributor about the    19:49:34
9  fact that that prescriber appeared on the    19:49:37
10 list.                    19:49:40
11    Q.    So that they were a top    19:49:40
12 prescriber?                    19:49:43
13    A.    Yes.                19:49:43
14    Q.    Okay.  Okay.  And so do you    19:49:44
15 know if anyone from Mallinckrodt sales team    19:49:47
16 was supposed to report signs of diversion to    19:49:52
17 you?                    19:49:58
18    A.    We spoke before about the NAMs,    19:49:58
19 the narcotic -- national account managers.    19:50:00
20    Q.    Yes, ma'am.                19:50:02
21    A.    We asked them to be our    19:50:03
22 observers, and if they saw anything at any of    19:50:05
23 our customers that may appear to be a red    19:50:10
24 flag, that they would report to the company.    19:50:11
25    Q.    Okay.  And was that process the    19:50:13

Page 530

```
1   same for the sales team on the branded side?   19:50:15
2       A.   Not to my knowledge.          19:50:18
3       Q.   Okay.  Do you know if there was   19:50:21
4   any sort of suspicious order monitoring      19:50:23
5   training for the sales team on the branded   19:50:25
6   side?                            19:50:27
7       A.   I'm not certain.            19:50:27
8       Q.   Okay.  Do you know if you had a   19:50:28
9   counterpart, a suspicious order person, on   19:50:30
10  the branded side?                 19:50:35
11      A.   Did not.                 19:50:36
12      Q.   Okay.                   19:50:37
13           THE WITNESS:  I have a -- I'm   19:50:40
14  looking at the questioner's mouth a       19:50:42
15  lot, and this thing's in my way.  Can     19:50:46
16  we scoot it or something?  I'm sorry.     19:50:49
17  It's just helping me understand the      19:50:51
18  question.                       19:50:53
19           MS. HERZFELD:  That was very   19:50:54
20  thoughtful.  Thank you.              19:50:58
21           THE WITNESS:  Okay.        19:50:59
22  QUESTIONS BY MS. HERZFELD:             19:50:59
23      Q.   Did Mallinckrodt have a program   19:51:16
24  or procedure in place to connect problem    19:51:18
25  prescribers and problem pharmacies?      19:51:20
```

Page 531

```
1            MR. O'CONNOR:  Objection to   19:51:22
2   form.                           19:51:23
3            THE WITNESS:  Only to the     19:51:23
4   extent I previously described.  If we     19:51:28
5   were talking to a distributor about      19:51:30
6   their downstream sales, sales to a       19:51:33
7   downstream registrant, and if their      19:51:34
8   due diligence, the distributor's due     19:51:36
9   diligence, files contained a list of     19:51:38
10  top prescribers, we would reference      19:51:39
11  that against our listing of top         19:51:40
12  prescribers within the country.        19:51:43
13           (Mallinckrodt-Harper Exhibit 41   19:52:32
14  marked for identification.)           19:52:34
15  QUESTIONS BY MS. HERZFELD:             19:52:34
16      Q.   Okay.  I'm going to mark this   19:52:34
17  next one as Exhibit 41.  And this is     19:52:35
18  MNK-T1_0007704503.  I'm sorry, it's stapled   19:52:39
19  on the bottom.                    19:52:47
20           Take a minute to take a look at   19:53:27
21  this list.  I'll represent to you that the   19:53:31
22  path it says is -- the file name is DIRJ and   19:53:33
23  pill mill physicians list, 2012, something.   19:53:36
24  It looks like the date it was last modified   19:53:49
25  was 1/16/2012.                    19:53:52
```

Page 532

```
1       Have you seen this list before?     19:53:54
2       A.   No.                    19:53:55
3       Q.   Okay.  Do you know of any list   19:53:56
4   that was kept of pill mill physicians?    19:53:59
5       A.   No.                    19:54:04
6       Q.   Okay.  Do you know what DIRJ     19:54:05
7   stands for?                      19:54:08
8       A.   No.                    19:54:08
9       Q.   Okay.  Do you have any idea who   19:54:08
10  I might ask about this document?        19:54:28
11      A.   Perhaps someone on the branded   19:54:30
12  side.                           19:54:32
13      Q.   Okay.  You suspect this has     19:54:33
14  something to do with branded, perhaps?    19:54:34
15      A.   I suspect that, yes.        19:54:36
16      Q.   Okay.  Very good then.        19:54:37
17      A.   Okay.                   19:54:39
18      Q.   Set it aside.            19:54:39
19           Oh, you know what?  Actually if   19:54:48
20  you'll take it back for one second, it looks   19:54:49
21  like they stapled it all together again.  I   19:54:51
22  don't think we have to put it as a separate   19:54:53
23  exhibit.                         19:54:54
24      A.   So are we still on 41?  Is that   19:54:54
25  correct?                         19:54:56
```

Page 533

```
1       Q.   We are.                 19:54:57
2            If you'll look at the very last   19:54:58
3   page for me, if you flip it over one, I'll   19:54:59
4   represent to you that this list here is the   19:55:03
5   same list but sorted by Tennessee.  It's got   19:55:04
6   the same Bates number.              19:55:07
7            Do any -- looking at that, do   19:55:09
8   any of those names ring a bell to you for any   19:55:13
9   suspected pill mill operations in Tennessee?   19:55:18
10      A.   No.                    19:55:20
11      Q.   Okay.  That was my last        19:55:22
12  question.  Thank you, ma'am.           19:55:22
13           (Mallinckrodt-Harper Exhibit 42   19:55:28
14  marked for identification.)           19:55:30
15  QUESTIONS BY MS. HERZFELD:             19:55:30
16      Q.   Okay.  Mark this next one as    19:55:30
17  Exhibit 42.  It is MNK-T1_00005947296.     19:55:41
18           Okay.  The file name is "IMS    19:56:02
19  high oxy 30 prescribers in January 2013."  I   19:56:06
20  will represent to you that we have modified   19:56:11
21  this list to sort it just by Tennessee.  We   19:56:12
22  haven't changed the contents of it at all.   19:56:17
23           Do you recognize this list,     19:56:20
24  ma'am?                           19:56:21
25      A.   No.                    19:56:21
```

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1     Q.   Is this the IMS data you were      19:56:24
2  talking about earlier, perhaps, looking for  19:56:26
3  physicians?                    19:56:29
4     MR. O'CONNOR: Objection to        19:56:33
5  form.                      19:56:33
6     THE WITNESS: It states IMS       19:56:33
7  data, yes, so, yes.              19:56:34
8  QUESTIONS BY MS. HERZFELD:           19:56:37
9     Q.   Okay. Have you seen a chart    19:56:37
10 like this that you've consulted before?   19:56:39
11    A.   Perhaps.              19:56:41
12    Q.   Okay. Do you know if you did,  19:56:47
13 if it would have been on the branded side or 19:56:49
14 the generic side?               19:56:51
15    MR. O'CONNOR: Objection to        19:56:52
16 form.                      19:56:53
17    THE WITNESS: This would have     19:56:53
18 been the list of -- potentially the     19:56:56
19 list of high prescribers that we were    19:57:01
20 cross-referencing. However, I don't    19:57:04
21 recall that the list was this large or   19:57:07
22 this long.                   19:57:09
23 QUESTIONS BY MS. HERZFELD:           19:57:09
24    Q.   Okay. So -- okay. Very good.  19:57:10
25 Moving along.                  19:57:17

Page 535

1     (Mallinckrodt-Harper Exhibit 43   19:57:18
2  marked for identification.)         19:57:19
3  QUESTIONS BY MS. HERZFELD:           19:57:19
4     Q.   Next one is Exhibit 43,      19:57:22
5  MNK-T1_0007704471. And the title on this is 19:57:29
6  "IMS prescribers through January 2013," and 19:57:47
7  we have modified it just to show Tennessee.  19:57:51
8     Have you seen a chart like this   19:57:55
9  before, ma'am?                 19:58:20
10    A.   A similar chart with the high  19:58:21
11 prescribers throughout the country is all I 19:58:27
12 recall seeing.                 19:58:31
13    Q.   Okay. Okay. And if         19:58:32
14 something's in the network share drive, does 19:58:39
15 that mean it's open to everybody within the 19:58:42
16 suspicious order monitoring team to view?  19:58:44
17    A.   Yes.                 19:58:46
18    Q.   Okay. So you would have had  19:58:48
19 access to anything on the share drive?   19:58:49
20    A.   Yes.                 19:58:52
21    (Mallinckrodt-Harper Exhibit 44   19:58:57
22 marked for identification.)         19:58:57
23 QUESTIONS BY MS. HERZFELD:           19:58:57
24    Q.   Okay. Exhibit 44,          19:58:57
25 MNK-T1_0005947297. The file name on this is 19:59:07

Page 536

1  "Prescriber list." The date last modified is 19:59:23
2  2/1/2016 on the network share.         19:59:27
3     Have you seen this list before?   19:59:31
4     A.   No.                 19:59:32
5     Q.   Do you have any idea what it  19:59:33
6  is?                      19:59:34
7     A.   No.                 19:59:34
8     Q.   Okay. Do you know if it has to 19:59:35
9  do with suspicious order monitoring?    19:59:39
10    A.   No.                 19:59:43
11    Q.   Okay. I'm going to note here  19:59:43
12 on the page -- let's start with page 3, all 20:00:01
13 the way at the back.              20:00:05
14    The very top it says, "Alan      20:00:07
15 Pecorella," and the comments are "arrested on 20:00:11
16 8/23/13 on charge of possession of a    20:00:13
17 Schedule II with intent to distribute.   20:00:16
18 State, Tennessee. On target list, Q2013.  20:00:21
19 Specialty physician assistant."       20:00:25
20    Do you see where that's at?      20:00:27
21    A.   Yes.                 20:00:28
22    Q.   Okay. And if you keep going   20:00:31
23 through a bunch of these, it has various   20:00:33
24 criminal descriptions here.          20:00:37
25    You didn't create this?        20:00:42

Page 537

1     A.   No.                 20:00:42
2     Q.   Did you have someone on your  20:00:43
3  team create it?                20:00:44
4     A.   No.                 20:00:45
5     Q.   Okay. You can set that aside. 20:00:47
6     (Mallinckrodt-Harper Exhibit 45   20:01:11
7  marked for identification.)         20:01:12
8  QUESTIONS BY MS. HERZFELD:           20:01:12
9     Q.   Okay. Just a couple more.     20:01:13
10 Okay. I'm going to hand you what we've    20:01:22
11 marked as Plaintiff's Exhibit 45,      20:01:24
12 MNK_TNSTA02527616. And take a look at that 20:01:35
13 for me, please.                20:01:38
14    I will submit to you that we     20:01:44
15 took the information provided to us and   20:01:45
16 sorted by state, so it's Tennessee only.  20:01:47
17    Okay. And the title of this     20:02:02
18 document is "oxy 15," and then we'll do 30, 20:02:04
19 "sold via by month January through     20:02:08
20 December 2011." Run -- the run, I am    20:02:11
21 guessing, is report run, 2/15/2012.     20:02:13
22    Do you see that?            20:02:16
23    A.   Yes.                 20:02:17
24    Q.   Okay. So going through this,  20:02:19
25 I'm not going to ask you 800 million    20:02:21

Page 538

1   questions, but we've sorted it by Tennessee.   20:02:25
2   So if you will go with me to the very last   20:02:29
3   page.   20:02:42
4        A.   Page 17?   20:02:42
5        Q.   Page 17, yes, ma'am.   20:02:43
6        A.   All right.   20:02:43
7        Q.   All the way down to the very   20:02:45
8   bottom line that's open, sorting it by state   20:02:46
9   and then totaling the totals for 12 months,   20:02:49
10  can you please read that number in the   20:02:52
11  corner?   20:02:54
12       A.   4,071,300.   20:02:54
13       Q.   Okay.   And do you know if those   20:03:00
14  are sales of pills or bottles?   20:03:05
15       A.   These appear to be chargeback   20:03:12
16  reports --   20:03:19
17       Q.   Yes, ma'am.   20:03:19
18       A.   -- and it would have been   20:03:19
19  dosage units.   20:03:20
20       Q.   Dosage units?   20:03:21
21       A.   Yes.   20:03:22
22       Q.   Okay.   And what is a dosage   20:03:23
23  units?   20:03:24
24       A.   A pill.   20:03:24
25       Q.   Okay.   20:03:24

Page 539

1        A.   Or a tablet or a capsule, yes.   20:03:26
2        Q.   Okay.   So when we take the   20:03:29
3   total number here, 4,071,300, that would be   20:03:30
4   pills of oxy 15 shipped to Tennessee, January   20:03:36
5   through December 2011; is that right?   20:03:41
6        A.   So the front of the chart says   20:03:43
7   "oxy 15s and 30s."   20:03:51
8        Q.   Yes, ma'am.   20:03:53
9        A.   And I just don't see -- it says   20:03:53
10  it's on separate tabs, and I don't see --   20:03:54
11       Q.   Yeah.   So this one is the sheet   20:03:54
12  for oxy 15, and I'm going to show you the   20:03:56
13  next one for oxy 30.   20:03:58
14       A.   All right.   20:03:59
15       Q.   Okay?   20:03:59
16       A.   Got it.   20:04:00
17       Q.   Okay.   So I'm going to go back   20:04:00
18  and ask my question, just to make sure I   20:04:02
19  round that out.   20:04:04
20        So the total here, 4,071,300,   20:04:04
21  that would be the number of pills of oxy 15   20:04:08
22  shipped to Tennessee, January through   20:04:12
23  December of 2011, according to this   20:04:16
24  chargeback data; is that correct?   20:04:17
25       A.   Yes.   20:04:18

Page 540

1        Q.   Okay.   Thank you.   Okay.   20:04:19
2   Moving along.   20:04:22
3        (Mallinckrodt-Harper Exhibit 46   20:04:23
4   marked for identification.)   20:04:23
5   QUESTIONS BY MS. HERZFELD:   20:04:23
6        Q.   Okay.   It's a different tab of   20:04:28
7   the same Bates number, MNK_TNSTA02527616.   20:04:29
8   Okay.   Same chart but for -- the tab for   20:04:43
9   oxy 30.   We've modified this just to   20:04:48
10  Tennessee.   20:04:50
11        And if you'll flip with me to   20:04:51
12  the very last page, if you could read the   20:04:55
13  total for me there, ma'am.   20:05:00
14       A.   12,482,100.   20:05:02
15       Q.   Okay.   So same question on --   20:05:16
16  for this chargeback sheet for -- I want to   20:05:20
17  make sure I understand it.   20:05:28
18        So that's 12,482,100 pills of   20:05:29
19  oxy 30 that were sent to Tennessee, January   20:05:34
20  through December 2011, according to the   20:05:38
21  chargeback data; is that correct, ma'am?   20:05:41
22       A.   Yes.   20:05:42
23       Q.   Okay.   Thank you very much.   20:05:43
24  You can set that aside.   20:05:45
25        Okay.   So if you add those two   20:05:52

Page 541

1   numbers -- I'll submit that the total, so you   20:05:54
2   don't have to do the math, is 16,553,400   20:05:56
3   Mallinckrodt oxy 15 and 30-milligram pills   20:06:00
4   that ended up in Tennessee in one year.   20:06:02
5        Does that sound correct?   20:06:08
6        MR. O'CONNOR:   Objection to   20:06:09
7   form.   20:06:09
8        THE WITNESS:   Yes, based upon   20:06:09
9   these reports you've shown me, yes.   20:06:10
10  QUESTIONS BY MS. HERZFELD:   20:06:12
11       Q.   Okay.   And oxy 15 and oxy 30   20:06:12
12  are not the only oxycodone products that   20:06:16
13  Mallinckrodt manufactures; is that right?   20:06:18
14       A.   Yes.   20:06:20
15       Q.   Okay.   What other products are   20:06:21
16  there?   20:06:22
17       A.   There's oxycodone   20:06:23
18  acetaminophen --   20:06:25
19       Q.   Okay.   20:06:26
20       A.   -- tablets in various   20:06:26
21  strengths, but I don't know the list of   20:06:30
22  strengths.   20:06:31
23       Q.   Okay.   And other than the   20:06:32
24  oxycodone acetaminophen and the two branded   20:06:35
25  we've discussed, Exalgo and Xartemis, do you   20:06:37

Page 542

1  know any other opioid products that are          20:06:41
2  manufactured by Mallinckrodt?                     20:06:42
3      A.   I can't be certain.  Some of            20:06:44
4  the drug substances we distribute in an oral      20:06:47
5  formulation --                                    20:06:51
6      Q.   Okay.                                    20:06:52
7      A.   -- but I don't know if                   20:06:52
8  oxycodone is one of them.                          20:06:52
9      Q.   Okay.  But so far as you know,           20:06:54
10 for oxycodone we've talked about what we          20:06:57
11 have?                                             20:06:59
12     A.   Yes.                                     20:06:59
13     Q.   Okay.  So for the oxycodone             20:06:59
14 with acetaminophen, do you know if                20:07:01
15 spreadsheets like that, like we just looked       20:07:02
16 at, if those exist for the oxycodone with         20:07:04
17 acetaminophen?                                    20:07:07
18     A.   So the chargeback data exists           20:07:08
19 for all products, but the ones we focus on        20:07:10
20 are the oxy 15s, the oxy 30s and the hydro        20:07:15
21 10s.                                              20:07:20
22     Q.   Okay.  So there wouldn't have           20:07:21
23 been a chargeback report necessarily              20:07:23
24 regularly run for oxycodone acetaminophen?        20:07:25
25     A.   Correct.                                 20:07:27

Page 543

1      Q.   Okay.  And you mentioned the            20:07:27
2  hydrocodone -- I say hydrocodone; you say         20:07:32
3  hydrocodone.                                      20:07:34
4      A.   That's all right.                        20:07:35
5      Q.   I apologize for that.                    20:07:35
6          You mentioned the hydrocodone            20:07:37
7  10-milligram, you ran chargeback datas for        20:07:39
8  those two; is that correct?                       20:07:41
9      A.   Yes.                                     20:07:45
10         (Mallinckrodt-Harper Exhibit 47          20:07:46
11     marked for identification.)                   20:07:47
12 QUESTIONS BY MS. HERZFELD:                         20:07:47
13     Q.   Okay.  I marked this one as             20:07:53
14 Exhibit 47.  Okay.  And this is                   20:07:54
15 MNK_TNSTA02527625.                                20:08:06
16         If you look at the file name             20:08:13
17 here, it says "Hydro APAP 10 shipped to and       20:08:15
18 sold via W DEA by month, January 2012 through     20:08:20
19 December 2012, all APAP."                          20:08:27
20         Do you know what any of that             20:08:28
21 means?                                            20:08:30
22     A.   Yes.                                     20:08:30
23     Q.   Could you explain it to me,             20:08:31
24 please?                                           20:08:32
25     A.   So hydrocodone APAP, we sell            20:08:32

Page 544

1  that in various strengths.                         20:08:36
2      Q.   Uh-huh.                                   20:08:38
3      A.   Some of the products in our             20:08:40
4  line have 5 milligrams of hydrocodone, some      20:08:42
5  have 7 and a half milligrams of hydrocodone,     20:08:46
6  and in this case it's referencing                 20:08:49
7  10 milligrams of hydrocodone --                   20:08:52
8      Q.   Okay.                                    20:08:53
9      A.   -- per pill mixed -- or with            20:08:53
10 acetaminophen contained in the pill as well.     20:08:58
11     Q.   Okay.  And when it says, "W             20:09:00
12 DEA," is that with DEA?                            20:09:03
13         Do you know what that means?             20:09:06
14     A.   Yes, that's correct.                    20:09:06
15     Q.   What does that mean?                     20:09:07
16     A.   With DEA registration.                   20:09:07
17     Q.   Oh, with DEA registration.             20:09:08
18 Okay.                                             20:09:10
19         And is the reason that the               20:09:11
20 hydro APAP 10 S was monitored with reports        20:09:13
21 like this via chargeback data because it was      20:09:20
22 susceptible to diversion?                          20:09:23
23     MR. O'CONNOR:  Objection.                    20:09:25
24     Form.                                        20:09:26
25     THE WITNESS:  We were told that             20:09:26

Page 545

1  it was a drug of concern based upon              20:09:27
2  DEA information, yes.                             20:09:29
3  QUESTIONS BY MS. HERZFELD:                         20:09:30
4      Q.   Okay.  Thank you.                        20:09:31
5          Okay.  So looking at this                20:09:33
6  report, I want to make sure that I understand     20:09:35
7  this correctly.  And you've already answered      20:09:39
8  a lot of my questions, so that's great.           20:09:41
9          Okay.  If you'll go with the             20:09:43
10 total to this one on the very last page, that     20:09:45
11 total there reads -- is that -- could you          20:09:50
12 read it for me, please?                            20:09:53
13     A.   78,184,600.                             20:09:54
14     Q.   Okay.  And so that would be             20:10:00
15 10-milligram hydrocodone -- hydrocodone APAP      20:10:03
16 pills sold in Tennessee from January 2012 to      20:10:06
17 December 2012; is that correct?  That's what      20:10:11
18 this shows?                                       20:10:15
19     A.   The date at the top says '13.          20:10:16
20 Year 2013.                                        20:10:21
21     Q.   Well, I think that's the date,         20:10:21
22 not -- oh, where do you see?                       20:10:22
23     A.   Here.                                    20:10:24
24     Q.   Oh, it sure does.  Maybe it's          20:10:27
25 mislabeled.                                       20:10:29

Highly Confidential - Subject to Further Confidentiality Review

Page 546

1      Okay.  So 2013.  Make sure I've    20:10:30
2  got the right chart.                20:10:33
3      Well, it sure does say 2013.     20:10:46
4  Okay.  So I'm going to modify my question.    20:10:49
5      So that total there -- okay.     20:10:50
6  So that total there, 78,184,600, that is    20:10:59
7  hydro APAP pills sold in Tennessee during the    20:11:06
8  calendar year 2013.  Is that correct,    20:11:10
9  according to this chart?            20:11:11
10     A.   Those with 10 milligrams of    20:11:12
11  hydrocodone, yes.                  20:11:14
12     Q.   Okay.  Thank you.          20:11:15
13     Do you know why that number is    20:11:21
14  so large?                         20:11:25
15     A.   I don't have enough information    20:11:26
16  to determine whether this is a large number.    20:11:33
17     Q.   Okay.  Do you know how -- what    20:11:37
18  the average was of 10-milligram hydrocodone    20:11:40
19  pills being shipped to a state?     20:11:42
20     A.   No.                      20:11:44
21     Q.   Okay.  Do you know anything    20:11:47
22  about a Veterans Administration hospital in    20:11:48
23  Tennessee getting shipments of hydrocodone?    20:11:52
24     MR. O'CONNOR:  Objection to       20:11:54
25  form.                             20:11:55

Page 547

1      THE WITNESS:  Not specifically,    20:11:55
2  no.                                20:11:56
3  QUESTIONS BY MS. HERZFELD:          20:11:56
4      Q.   Okay.  Do you know if the VA    20:11:57
5  has a warehouse in Tennessee for medication?    20:12:05
6      A.   I do not know.            20:12:07
7      Q.   Okay.  Have you dealt with the    20:12:08
8  VA, Veterans Administration, at all in    20:12:12
9  supplying their medication?         20:12:15
10     A.   I know we supply the VA, but    20:12:16
11  I've not had any conversations with the VA.    20:12:18
12     Q.   Okay.  Was there a specific    20:12:21
13  person at Mallinckrodt whose job it would    20:12:23
14  have been to deal with the VA?      20:12:24
15     A.   Yes.                     20:12:26
16     Q.   Who would that have been?    20:12:27
17     A.   So she's no longer with the    20:12:28
18  company.                          20:12:30
19     Q.   Okay.                    20:12:31
20     A.   Her name is Trudy Nicholson.    20:12:32
21     Q.   Okay.  And what was Trudy    20:12:34
22  Nicholson's position?               20:12:36
23     A.   National account manager.    20:12:37
24     Q.   Okay.  And do you know what her    20:12:38
25  area was?                         20:12:40

Page 548

1      A.   VA and other government       20:12:41
2  entities.                          20:12:44
3      Q.   Okay.  And do you know what    20:12:45
4  year she left?                    20:12:50
5      A.   Within the past two years.    20:12:51
6      Q.   Okay.  Do you know if someone    20:12:53
7  has replaced her?                  20:12:54
8      A.   Yes.                     20:12:55
9      Q.   Do you know who it is?       20:12:56
10     A.   I -- there are several new    20:12:57
11  national account managers.  I barely know    20:13:00
12  their names, and I don't know their    20:13:05
13  territories.                      20:13:06
14     Q.   Okay.  Do you know what 867    20:13:07
15  data is?                          20:13:11
16     A.   I've heard the term, yes.    20:13:11
17     Q.   Okay.  Do you know what it is?    20:13:13
18     A.   It has to do with chargebacks,    20:13:14
19  but other than that, it's -- I don't know.    20:13:19
20     (Mallinckrodt-Harper Exhibit 48    20:14:15
21  marked for identification.)         20:14:16
22  QUESTIONS BY MS. HERZFELD:          20:14:16
23     Q.   Okay.  I'll show you what we'll    20:14:10
24  mark as Plaintiff's Exhibit 48.     20:14:14
25  Mallinckrodt -- sorry, it's         20:14:20

Page 549

1  MNK-T1_0007717730.                 20:14:23
2      Take a look at this.  My         20:14:31
3  question here is actually pretty simple if    20:14:41
4  you'll just take a look at it.      20:14:44
5      A.   All right.               20:14:45
6      Q.   Does this also appear to be a    20:14:47
7  chart of hydro APAP 10s sold for the calendar    20:14:48
8  year 2015 to the state of Tennessee?    20:14:51
9      A.   Yes.                     20:14:53
10     Q.   Okay.  That's my only question.    20:14:54
11     Okay.  And you could place any    20:14:55
12  pharmacy on the chargeback data restrictions    20:15:27
13  list; is that right?               20:15:29
14     MR. O'CONNOR:  Objection to       20:15:33
15  form.                             20:15:34
16     THE WITNESS:  Provided it was a    20:15:34
17  pharmacy that purchased through a    20:15:37
18  distributor who applied for a       20:15:39
19  chargeback reimbursement, yes.  Yes.    20:15:41
20  QUESTIONS BY MS. HERZFELD:          20:15:43
21     Q.   Okay.  And you didn't -- you    20:15:44
22  weren't required to fill any orders that    20:15:45
23  seemed suspicious?                 20:15:49
24     A.   Correct.                 20:15:49
25     Q.   Okay.  And were you involved at    20:15:50

Highly Confidential - Subject to Further Confidentiality Review

Page 550

1  all in the review of the distributors top 40    20:15:56
2  pharmacies that began somewhere around    20:15:58
3  October of 2011?    20:16:00
4        MR. O'CONNOR:  Objection to    20:16:02
5  form.    20:16:02
6        THE WITNESS:  Yes.    20:16:02
7  QUESTIONS BY MS. HERZFELD:    20:16:03
8     Q.   Okay.  And that was --    20:16:03
9  Mallinckrodt reviewed the top 20 pharmacies    20:16:05
10 in Florida and the top 20 pharmacies outside    20:16:07
11 of Florida; is that correct?    20:16:11
12    A.   Yes.    20:16:12
13    Q.   Okay.  And some of those    20:16:13
14 pharmacies that were on the 20 list outside    20:16:16
15 of Florida were in Tennessee; is that right?    20:16:18
16    A.   I don't -- I don't have the    20:16:20
17 list in front of me, but I don't dispute    20:16:24
18 that.    20:16:26
19    Q.   Okay.  And which distributors    20:16:27
20 did you review?    20:16:35
21        You were involved with the    20:16:36
22 Cardinal review?    20:16:37
23    A.   Yes.    20:16:37
24    Q.   Okay.  And if I understand    20:16:40
25 things correctly, one of the things that was    20:16:43

Page 551

1  asked of the distributors was to have them    20:16:50
2  fill out a pharmacy information sheet; is    20:16:52
3  that correct?    20:16:55
4     A.   Yes.  Yes.    20:16:55
5     Q.   Okay.  And were you involved in    20:16:56
6  helping to develop those pharmacy information    20:16:58
7  sheets?    20:17:01
8     A.   Yes.    20:17:01
9     Q.   Okay.  And who else was    20:17:03
10 involved in that?    20:17:05
11    A.   It was a team effort by    20:17:05
12 suspicious order monitoring team members at    20:17:10
13 that time.    20:17:12
14    Q.   Okay.  Okay.  I think we'll go    20:17:12
15 back in our questioning just a little bit    20:17:44
16 here.    20:17:48
17        (Mallinckrodt-Harper Exhibit 49    20:17:55
18    marked for identification.)    20:17:56
19 QUESTIONS BY MS. HERZFELD:    20:17:56
20    Q.   Mark this one as Plaintiff's    20:17:56
21 Exhibit 49.  This one is labeled    20:18:00
22 MNK-T1_0004592727.    20:18:15
23        Is this your handwriting,    20:18:17
24 ma'am?    20:18:23
25    A.   Yes.    20:18:23

Page 552

1     Q.   Okay.  And you recognize it as    20:18:26
2  your handwriting?    20:18:27
3     A.   Yes.    20:18:27
4     Q.   Okay.  Great.    20:18:28
5        And it looks like yet again we    20:18:29
6  have added another document to the back of    20:18:34
7  this, if you'll bear with me for just one    20:18:36
8  second.    20:18:38
9     A.   Oh -- oh.    20:18:39
10    Q.   Yeah, it looks like it got    20:18:44
11 copied on the second back, so we're going to    20:18:45
12 ignore those pharmacy information sheets for    20:18:48
13 a minute, okay?  My apologies.    20:18:50
14    A.   All right.    20:18:53
15    Q.   Okay.  So let's just look at    20:18:53
16 this document as it is.    20:18:55
17    A.   Which page, please?    20:18:56
18    Q.   The first page.    20:18:57
19    A.   This first page?  Okay.  Yes.    20:18:57
20 Got it.    20:18:59
21    Q.   Yes, the one that ends 2727.    20:18:59
22    A.   Got it.    20:19:02
23    Q.   Is this the Cardinal top 40    20:19:02
24 oxy 30 pharmacies as of March 2012?    20:19:04
25        MS. FIX MEYER:  Objection.    20:19:09

Page 553

1  Form.  Foundation.    20:19:10
2        MS. HERZFELD:  I'm going to    20:19:12
3     object to your objection because    20:19:12
4     you're not a party in our case.    20:19:13
5        MS. FIX MEYER:  Okay.    20:19:15
6        THE WITNESS:  Yes.    20:19:16
7  QUESTIONS BY MS. HERZFELD:    20:19:19
8     Q.   Okay?  And do you see Tennessee    20:19:20
9  pharmacies on this list?    20:19:21
10    A.   Yes.    20:19:22
11    Q.   Okay.  And which pharmacies do    20:19:23
12 you see that are located in Tennessee on this    20:19:26
13 list?    20:19:28
14    A.   I see Riggs Drug.    20:19:28
15    Q.   Yes, ma'am.    20:19:31
16    A.   And, oh, Riggs Drug again.    20:19:32
17    Q.   Yes, ma'am.    20:19:38
18    A.   And Kinser drugstore.    20:19:39
19    Q.   Okay.  And do you know what    20:19:41
20 that shaded area, pharmacy 90-day review from    20:19:42
21 previous meeting, means?    20:19:46
22    A.   Yes.    20:19:47
23    Q.   What does it mean?    20:19:48
24    A.   It means we had previously    20:19:49
25 spoken to the distributor about these    20:19:54

Page 554

1  pharmacies, and they were doing additional    20:19:57
2  review or performing due diligence or -- to    20:20:02
3  some extent, and that we were going to    20:20:06
4  revisit these pharmacies on our next    20:20:08
5  quarterly review.    20:20:10
6      MS. FIX MEYER:  Objection.    20:20:11
7  Form.  Foundation.    20:20:12
8      MS. HERZFELD:  Same objection.    20:20:13
9  QUESTIONS BY MS. HERZFELD:    20:20:14
10     Q.    Pharmacies to be reviewed in    20:20:14
11  quarter 3 CY '12 is that bottom group.    20:20:16
12     What does that mean?    20:20:21
13     MS. FIX MEYER:  Objection.    20:20:24
14  Form.  Foundation.    20:20:25
15     MS. HERZFELD:  Same objection.    20:20:25
16  I'm just going to have a    20:20:26
17  standing objection to any objections    20:20:27
18  from Cardinal's counsel.  Cardinal has    20:20:29
19  not cross-noticed us in this    20:20:31
20  deposition, nor is Cardinal part of    20:20:34
21  our case.  So our objection is    20:20:36
22  Cardinal doesn't have standing to    20:20:39
23  object.    20:20:40
24  QUESTIONS BY MS. HERZFELD:    20:20:41
25     Q.    You can go ahead.    20:20:41

Page 555

1      A.    So it means what it says.    20:20:42
2  These were the pharmacies that we would    20:20:45
3  discuss with Cardinal at that particular next    20:20:48
4  meeting.    20:20:52
5      Q.    Okay.  And what does your    20:20:53
6  handwriting here say?    20:20:56
7      A.    It says, "Riggs not related."    20:20:57
8      Q.    Okay.  And what does that mean?    20:20:59
9      A.    I do not know.    20:21:01
10     Q.    Okay.  And then what does your    20:21:04
11  handwriting down below say?    20:21:05
12     A.    "Cardinal owns SPS, Specialty    20:21:07
13  Pharmacy Services."    20:21:12
14     Q.    Okay.  And what does that mean?    20:21:12
15     A.    I don't know.    20:21:14
16     Q.    Okay.  Do you know what    20:21:14
17  Specialty Pharmacy Services is?    20:21:17
18     A.    No.    20:21:18
19     Q.    Okay.  And flip with me to the    20:21:19
20  next page.    20:21:27
21     Is that your handwriting on    20:21:28
22  this document as well?    20:21:29
23     A.    Yes.    20:21:30
24     Q.    Okay.  Then we'll keep flipping    20:21:36
25  to the next one, the one that looks like    20:21:38

Page 556

1  this.  This is the one that ends 59731.    20:21:40
2      Do you see that list?    20:21:47
3      A.    592731?    20:21:48
4      Q.    Yes, ma'am.    20:21:55
5      A.    Yes.    20:21:55
6      Q.    Okay.  And so this is Cardinal    20:21:56
7  oxycodone 30 multi-distributor pharmacies as    20:21:58
8  of March 2012.    20:22:02
9      Did I read that correctly?    20:22:04
10     A.    Yes.    20:22:06
11     Q.    Okay.  And is that your    20:22:08
12  handwriting to the right?    20:22:09
13     A.    Yes.    20:22:10
14     Q.    And what does that say?    20:22:11
15     A.    It says, "Rock 3 CAH," which is    20:22:12
16  the abbreviation for Cardinal Health,    20:22:20
17  "terminated December 2, 2011."    20:22:23
18     Q.    Okay.  And then underneath    20:22:25
19  that?    20:22:27
20     A.    "Bellco picked them up."    20:22:27
21     Q.    Okay.  Do you know what any of    20:22:30
22  that means?    20:22:31
23     A.    No.    20:22:32
24     Q.    Okay.  And then looking at this    20:22:33
25  list, it looks like there are one, two on    20:22:35

Page 557

1  this list that are in Tennessee.    20:22:40
2      Do you see that?    20:22:41
3      A.    Just a moment, please.    20:22:42
4      Q.    Yeah, sure.    20:22:44
5      A.    Yes.    20:22:45
6      Q.    Okay.  And those are Riggs in    20:22:47
7  La Follette, Tennessee, and Riggs Drug in    20:22:50
8  Powell, Tennessee; is that right?    20:22:53
9      A.    Yes.    20:22:54
10     Q.    And so they've been identified    20:22:54
11  as getting oxycodone 30 from multi --    20:22:56
12  multiple distributors; is that right?    20:22:59
13     A.    Yes.    20:23:02
14     Q.    Okay.  And so looking at the    20:23:02
15  Riggs Drug, the first one in La Follette,    20:23:04
16  according to this chart it says they were    20:23:07
17  receiving oxycodone 30 from Cardinal and    20:23:09
18  Masters.    20:23:11
19     MS. FIX MEYER:  Objection.    20:23:13
20  Form.    20:23:13
21  QUESTIONS BY MS. HERZFELD:    20:23:13
22     Q.    Do you see that?    20:23:14
23     MS. HERZFELD:  Standing    20:23:14
24  objection.    20:23:15
25     THE WITNESS:  Yes.    20:23:16

Highly Confidential - Subject to Further Confidentiality Review

| Page 558 | Page 560 |
|---|---|
| 1  QUESTIONS BY MS. HERZFELD:        20:23:16 | 1  QUESTIONS BY MS. HERZFELD:        20:25:13 |
| 2      Q.   And then Riggs Drug in Powell,  20:23:17 | 2      Q.   Can you take a look at it for  20:25:13 |
| 3  Tennessee, it says they were receiving  20:23:21 | 3  me, please?                          20:25:14 |
| 4  oxycodone 30 from Cardinal, Masters and  20:23:23 | 4          My first question on these is  20:25:20 |
| 5  HD Smith Wholesale.                  20:23:26 | 5  pretty simple.  Is this your handwriting?  20:25:21 |
| 6          MS. FIX MEYER:  Same objection.  20:23:28 | 6      A.   Yes.                          20:25:23 |
| 7          MS. HERZFELD:  Same objection.  20:23:29 | 7      Q.   Okay.  And when -- do you  20:25:23 |
| 8  QUESTIONS BY MS. HERZFELD:        20:23:31 | 8  recognize these to be pharmacy information  20:25:28 |
| 9      Q.   Am I reading that correctly?  20:23:31 | 9  sheets?                              20:25:30 |
| 10     A.   Yes.                          20:23:32 | 10     A.   Yes.                          20:25:30 |
| 11     Q.   Okay.  And was this report run  20:23:32 | 11     Q.   And these are all pharmacy  20:25:30 |
| 12 every year?                          20:23:40 | 12 information sheets for Riggs pharmacy?  20:25:32 |
| 13     A.   I'm not certain of the  20:23:41 | 13     A.   Yes.                          20:25:34 |
| 14 frequency.                          20:23:42 | 14     Q.   Okay.  Riggs --               20:25:37 |
| 15     Q.   Okay.  Okay.  Then the next  20:23:43 | 15     A.   Except the back --           20:25:37 |
| 16 one, unfortunately, is really supposed to be  20:23:48 | 16     Q.   Okay.                          20:25:38 |
| 17 another exhibit.                     20:23:49 | 17     A.   -- is some other chart.       20:25:39 |
| 18         MS. HERZFELD:  Should we just  20:23:52 | 18     Q.   Yeah, ignore that.            20:25:40 |
| 19 mark it separate?  Let's just mark it  20:23:53 | 19     A.   Okay.                          20:25:41 |
| 20 separate.                           20:23:56 | 20     Q.   Okay.  So that would be Riggs  20:25:42 |
| 21         (Mallinckrodt-Harper Exhibit 50  20:23:56 | 21 pharmacy in La Follette, Riggs pharmacy in  20:25:44 |
| 22 marked for identification.)          20:23:56 | 22 Jacksboro and Riggs pharmacy in Powell,  20:25:48 |
| 23         MS. HERZFELD:  Keep that.      20:23:56 | 23 Tennessee; is that right?             20:25:51 |
| 24 Okay, you can put that one to the    20:23:56 | 24     A.   Yes.                          20:25:52 |
| 25 side.  Then what we'll do is make this  20:24:20 | 25     Q.   Okay.  And looking at this,  20:25:53 |

| Page 559 | Page 561 |
|---|---|
| 1  the next exhibit.  Okay?            20:24:22 | 1  you've got your handwritten notes.  It goes  20:25:55 |
| 2          Okay.  So the next exhibit is  20:24:23 | 2  through, it looks like, portions of the  20:25:57 |
| 3  50.  Mark this one as Exhibit 50.    20:24:25 | 3  pharmacy information sheet.            20:25:59 |
| 4          MR. O'CONNOR:  Just to be  20:24:32 | 4          Where did you get this  20:26:00 |
| 5  clear, what's the Bates number on the  20:24:33 | 5  information?                          20:26:02 |
| 6  exhibit you're marking right now?    20:24:35 | 6      A.   In a conversation with a  20:26:06 |
| 7          MS. HERZFELD:  I'm going to  20:24:36 | 7  wholesaler.  It's not identified here.  20:26:09 |
| 8  tell you.  It's MNK-T1_0004592758 and  20:24:37 | 8      Q.   Okay.  And you would agree with  20:26:12 |
| 9  2756 and 2754 of this collective      20:24:49 | 9  me in those three pages of your handwritten  20:26:14 |
| 10 exhibit.                            20:24:53 | 10 notes about the various Riggs that not every  20:26:16 |
| 11         MR. O'CONNOR:  Just observe  20:24:53 | 11 section of your pharmacy information sheet is  20:26:21 |
| 12 that it appears to skip Bates numbers,  20:24:54 | 12 filled out; is that correct?          20:26:24 |
| 13 which suggests there might be pages  20:24:59 | 13     A.   Correct.                       20:26:24 |
| 14 missing from this document.          20:24:59 | 14     Q.   Okay.  And did Mallinckrodt, to  20:26:26 |
| 15         MS. HERZFELD:  It does, and I  20:25:00 | 15 your knowledge, ever do any site visits at  20:26:29 |
| 16 don't know why that is, but we'll just  20:25:02 | 16 any of these three Riggs pharmacies?  20:26:32 |
| 17 move along.                          20:25:03 | 17     A.   Not to my knowledge.          20:26:34 |
| 18         MR. O'CONNOR:  Well, I would  20:25:04 | 18     Q.   Okay.  And do you have any  20:26:34 |
| 19 just object to the extent this isn't a  20:25:04 | 19 recollection of any conversations about the  20:26:35 |
| 20 document that's --                   20:25:06 | 20 Riggs pharmacies at all?              20:26:37 |
| 21         MS. HERZFELD:  Yeah, objection  20:25:07 | 21     A.   This pharmacy information sheet  20:26:40 |
| 22 noted.                               20:25:08 | 22 would have been the product of a discussion.  20:26:42 |
| 23         MR. O'CONNOR:  As it's  20:25:08 | 23     Q.   Okay.  Other than what's  20:26:45 |
| 24 maintained.                          20:25:11 | 24 written down in your handwritten notes on  20:26:47 |
| 25 | 25 these pharmacy information sheets, do you  20:26:50 |

Page 562

1 recall anything about those Riggs pharmacies?  20:26:52
2    A.   No.                          20:26:54
3    Q.   Okay.                        20:26:55
4        (Mallinckrodt-Harper Exhibit 51  20:27:22
5    marked for identification.)       20:27:23
6 QUESTIONS BY MS. HERZFELD:           20:27:23
7    Q.   Okay.  I'm going to hand you    20:27:23
8 what we'll mark as Exhibit 51,       20:27:26
9 MNK_TNSTA05350336.                   20:27:36
10       Okay.  Do you recognize this    20:27:43
11 document?                           20:27:46
12   A.   Yes.                         20:27:46
13   Q.   What does it appear to       20:27:47
14 be?                                20:27:49
15   A.   Pharmacy information sheet on   20:27:49
16 Riggs Drug again.                   20:27:54
17   Q.   Okay.  And this is the Riggs    20:27:54
18 Drug in La Follette, Tennessee; is that  20:27:56
19 right?                             20:27:59
20   A.   Yes.                         20:27:59
21   Q.   Okay.  And that's date       20:27:59
22 10/12/11?                          20:28:02
23   A.   Yes.                         20:28:02
24   Q.   Okay.  And if you'll look down   20:28:03
25 here at the notes, it says, "Other notes:   20:28:04

Page 563

1 Explanation of 800 RX total per day.  PIC   20:28:06
2 said increases due to physicians switching   20:28:11
3 from hydrocodone APAP mix due to liver    20:28:13
4 concerns."                          20:28:17
5        Do you know where that       20:28:18
6 information was obtained?           20:28:19
7    A.   I do not know.              20:28:20
8        Well, the information would    20:28:25
9 have been provided by Cardinal Health.    20:28:28
10   Q.   Okay.  And did you do anything    20:28:30
11 to verify the information provided to you by   20:28:32
12 Cardinal Health?                   20:28:34
13   A.   No.                         20:28:35
14   Q.   Okay.  And did anyone in     20:28:37
15 Mallinckrodt, to your knowledge, do anything   20:28:39
16 to verify the information provided by    20:28:40
17 Cardinal Health?                   20:28:42
18   A.   No.                         20:28:42
19   Q.   Okay.  Okay.  So then the next   20:28:44
20 sentence says, "Near Riggs Medical Center and   20:28:46
21 St. Mary's Hospital."              20:28:49
22       Do you see where it says that?   20:28:52
23   A.   Yes.                         20:28:54
24   Q.   Okay.  You obtained that     20:28:54
25 information from Cardinal Health?   20:28:55

Page 564

1    A.   Yes.                          20:28:57
2    Q.   Okay.  Riggs Medical Center.    20:28:58
3 Do you know if a Riggs Medical Center exists?   20:29:03
4    A.   I do not.                    20:29:05
5    Q.   Okay.  Did you do anything to    20:29:06
6 verify whether a Riggs Medical Center exists?   20:29:08
7    A.   No.                         20:29:11
8    Q.   Okay.  What about St. Mary's    20:29:12
9 Hospital?  It says, "near Riggs Medical    20:29:15
10 Center and St. Mary's Hospital."     20:29:18
11       Do you know how near this      20:29:19
12 pharmacy was to St. Mary's Hospital?    20:29:21
13       MR. O'CONNOR:  Objection to    20:29:24
14   form.                           20:29:24
15       THE WITNESS:  No.            20:29:24
16 QUESTIONS BY MS. HERZFELD:           20:29:29
17   Q.   Okay.  Do you know where La    20:29:29
18 Follette, Tennessee, is?           20:29:32
19   A.   No.                         20:29:32
20   Q.   Do you know where St. Mary's    20:29:33
21 Hospital is?                       20:29:34
22   A.   No.                         20:29:34
23   Q.   If St. Mary's Hospital is     20:29:35
24 45 miles away in Knoxville from La Follette,   20:29:43
25 is that information you would have wanted to   20:29:47

Page 565

1 have known?                          20:29:49
2        MR. O'CONNOR:  Objection to    20:29:49
3   form.                           20:29:49
4        THE WITNESS:  It's a piece of    20:29:54
5   information, but I don't know how many   20:29:55
6   other medical centers, how many other    20:29:57
7   pharmacies, were within that 45 miles.   20:29:59
8   So it would have been an additional    20:30:03
9   piece of information, but not        20:30:05
10   conclusive.                      20:30:07
11 QUESTIONS BY MS. HERZFELD:           20:30:07
12   Q.   Okay.  But that's information    20:30:08
13 you would have liked to have had in    20:30:09
14 evaluating this pharmacy?           20:30:11
15       MR. O'CONNOR:  Objection to    20:30:12
16   form.                           20:30:13
17       THE WITNESS:  We -- it wasn't    20:30:13
18   always provided to us, the proximity    20:30:17
19   of the pharmacy to a hospital, so we    20:30:19
20   took this information as Cardinal     20:30:22
21   represented it to us.            20:30:25
22 QUESTIONS BY MS. HERZFELD:           20:30:27
23   Q.   When you hear "near Riggs     20:30:28
24 Medical Center and St. Mary's Hospital,"   20:30:33
25 would you consider near to be 45 miles away?   20:30:35

Page 566

1    MR. O'CONNOR: Objection to    20:30:37
2    form.    20:30:38
3    THE WITNESS: I don't know La    20:30:38
4    Follette, Tennessee, to know if -- in    20:30:41
5    Missouri, some of the health care    20:30:44
6    centers are hundreds of miles away    20:30:45
7    from where a patient may live and the    20:30:48
8    pharmacy from which they may obtain    20:30:52
9    their prescriptions, so I don't have    20:30:54
10    enough information to answer.    20:30:57
11   QUESTIONS BY MS. HERZFELD:    20:30:58
12    Q.    Okay.  But you didn't do    20:30:58
13   anything to check that out, did you?    20:30:59
14    A.    No.    20:31:00
15    Q.    Okay.  And then it says,    20:31:02
16   "Another Riggs drugstore is located in    20:31:03
17   Powell, Tennessee, with oxy 30 milligram    20:31:06
18   year-to-date of approximately 170,000."    20:31:09
19    Do you see that?    20:31:13
20    A.    Yes.    20:31:13
21    Q.    Okay.  Did that concern you at    20:31:16
22   all, that there was another Riggs pharmacy so    20:31:18
23   close with that number?    20:31:21
24    MR. O'CONNOR: Objection to    20:31:24
25    form.    20:31:25

Page 567

1    THE WITNESS: I don't see on    20:31:25
2    this pharmacy information sheet a    20:31:28
3    disposition in terms of whether we    20:31:30
4    restricted chargebacks to the sale    20:31:35
5    of -- of pharmaceuticals to any of    20:31:39
6    these Riggs Drug's facilities.    20:31:40
7    I can tell you it was a topic    20:31:43
8    of conversation with Cardinal, but I    20:31:45
9    don't know the disposition.    20:31:46
10   QUESTIONS BY MS. HERZFELD:    20:31:47
11    Q.    Okay.  If you look down at the    20:31:48
12   bottom there, it says, "Result, take off list    20:31:49
13   and honor chargebacks. Requested site visit    20:31:51
14   with 90 days.  Low CS percentage is    20:31:54
15   mitigating factor."    20:31:57
16    Do you see that?    20:31:58
17    A.    Yes.    20:31:59
18    Q.    Okay.  And so that would be the    20:31:59
19   result from the Mallinckrodt side; is that    20:32:02
20   correct?    20:32:04
21    MR. O'CONNOR: Objection to    20:32:04
22    form.    20:32:05
23    THE WITNESS: Yes.    20:32:05
24   QUESTIONS BY MS. HERZFELD:    20:32:09
25    Q.    Okay.  When it says "take off    20:32:09

Page 568

1   list," what does that mean?    20:32:13
2    A.    Well, I'd like to clarify the    20:32:15
3   previous information.    20:32:17
4    Q.    Yes, ma'am.    20:32:18
5    A.    I don't know who filled this    20:32:19
6   out.    20:32:19
7    Q.    Okay.    20:32:19
8    A.    I don't know if it was us or    20:32:20
9   Cardinal --    20:32:20
10    Q.    Okay.    20:32:20
11    A.    -- because Cardinal was a great    20:32:21
12   collaborative partner.  And so as time went    20:32:23
13   on, as opposed to us writing these things in    20:32:25
14   hand, Cardinal would come prepared to    20:32:28
15   conversations or meetings or tell -- or    20:32:30
16   transmit these pharmacy information sheets to    20:32:32
17   us.    20:32:35
18    Q.    Okay.    20:32:35
19    A.    So I don't know who typed this    20:32:36
20   disposition.    20:32:42
21    Q.    Okay.  Do you know if Riggs was    20:32:43
22   ever put on a chargeback list?    20:32:44
23    A.    I -- yes.    20:32:46
24    Q.    Why don't we look at the list.    20:32:49
25    A.    All right.    20:32:51

Page 569

1    Q.    I'll find it.    20:32:51
2    Would Cardinal have had the    20:32:53
3   ability to tell Mallinckrodt what to put on    20:32:55
4   or take off a chargeback list?    20:32:57
5    MS. FIX MEYER: Objection.    20:32:59
6    Form.    20:33:00
7    MR. O'CONNOR: Objection to    20:33:00
8    form.    20:33:01
9    MS. HERZFELD: Same objection.    20:33:01
10   QUESTIONS BY MS. HERZFELD:    20:33:06
11    Q.    Did Cardinal have that ability?    20:33:06
12    A.    They had -- no, not the    20:33:08
13   ability.    20:33:13
14    Q.    Okay.  Would they make    20:33:13
15   recommendations?    20:33:15
16    A.    Yes.    20:33:15
17    Q.    Okay.  And would you follow the    20:33:17
18   recommendations?    20:33:19
19    A.    Yes.    20:33:19
20    Q.    Would you do any independent    20:33:20
21   research to verify their recommendations?    20:33:25
22    A.    I don't -- it would have been    20:33:27
23   situational.    20:33:33
24    Q.    Okay.  I'm going to show you    20:33:35
25   Exhibit 36, which is the chargeback list, and    20:33:38

Page 570

1  please let me know if you see Riggs on there,  20:33:42
2  please.                                        20:33:44
3      A.   I do not.                             20:33:44
4      Q.   Okay.  So if Riggs was ever           20:33:47
5  placed on a chargeback list on                 20:33:49
6  Mallinckrodt -- by Mallinckrodt, it should     20:33:51
7  appear on the chargeback list; is that         20:33:52
8  correct?                                       20:33:54
9          MR. O'CONNOR: Objection to             20:33:54
10  form.                                         20:33:55
11         THE WITNESS:  Yes.                     20:33:55
12  QUESTIONS BY MS. HERZFELD:                     20:33:58
13     Q.   Okay.  Okay.  You can set that        20:33:58
14  aside.                                        20:34:07
15         (Mallinckrodt-Harper Exhibit 52        20:34:57
16  marked for identification.)                   20:34:57
17  QUESTIONS BY MS. HERZFELD:                     20:34:57
18     Q.   I'm going to show what we'll          20:34:58
19  mark as Exhibit 51?  2?                       20:35:00
20         MR. O'CONNOR: It's 52.                 20:35:03
21         MS. HERZFELD: 52?  Thank you.          20:35:06
22  QUESTIONS BY MS. HERZFELD:                     20:35:06
23     Q.   This is MNK_TNSTA05353270.            20:35:14
24  Take a look at that for me, please, ma'am.    20:35:26
25         Do you recognize this as the           20:35:45

Page 571

1  summary report for the Cardinal Health         20:35:46
2  suspicious order monitoring audit conducted    20:35:49
3  March 5th through 6th in 2012 in Ohio?         20:35:51
4      A.   Yes.                                  20:35:53
5      Q.   Okay.  Did you create this            20:35:54
6  document?                                      20:35:55
7      A.   I don't recall.                       20:35:55
8      Q.   Okay.  Looking through it, it         20:35:58
9  says on March 5th, a total of 19 pharmacies    20:36:02
10  located in Florida were reviewed.             20:36:04
11         If you look at the second page,        20:36:06
12  page ending in 53271, a total of 20           20:36:16
13  pharmacies located in non-Florida states were 20:36:22
14  reviewed.  Of the 20, 11 pharmacies have had  20:36:26
15  controlled substance sales restricted by      20:36:28
16  Cardinal.                                     20:36:28
17         Do you see where that is?              20:36:29
18     A.   Yes.                                  20:36:30
19     Q.   Okay.  And do you see the list        20:36:30
20  that says non-Florida, non-restricted?        20:36:36
21     A.   Yes.                                  20:36:41
22     Q.   And what is the one at the            20:36:41
23  bottom there?                                 20:36:42
24     A.   Riggs Drug.                           20:36:42
25     Q.   Okay.  And if you go up two,          20:36:43

Page 572

1  that's Max Pharmacy; is that right?            20:36:44
2      A.   Yes.                                  20:36:47
3      Q.   Do you know where that's              20:36:47
4  located?                                       20:36:48
5      A.   No.                                   20:36:48
6      Q.   Okay.  And then Kinser drug           20:36:49
7  store.                                         20:36:54
8          Do you see that?                       20:36:54
9      A.   Yes.                                  20:36:55
10     Q.   Okay.  And is Kinser drug store       20:36:55
11  listed in Tennessee?                          20:36:57
12     A.   I know the name came up within        20:36:59
13  the course of this deposition.  I'm getting   20:37:00
14  so muddled, I don't know.  I'm sorry.         20:37:02
15     Q.   That's fine.  Okay.  And I            20:37:04
16  think those are my only questions on that     20:37:06
17  document.                                     20:37:07
18     A.   Okay.                                 20:37:08
19     Q.   Let's put it aside.                   20:37:08
20         Okay.  We'll just go through           20:38:39
21  these next three pretty quickly.              20:38:42
22         (Mallinckrodt-Harper Exhibit 53        20:38:44
23  marked for identification.)                   20:38:44
24  QUESTIONS BY MS. HERZFELD:                     20:38:44
25     Q.   Number 53, MNK_TNSTA00612651.         20:38:44

Page 573

1          Do you recognize this document        20:39:05
2  as a pharmacy information sheet?               20:39:15
3      A.   Yes.                                  20:39:17
4      Q.   Do you know if it was filled         20:39:17
5  out by Mallinckrodt or by Cardinal?            20:39:18
6      A.   I do not know.                        20:39:21
7          MS. FIX MEYER: Objection.             20:39:22
8          MS. HERZFELD: Okay.  Same             20:39:23
9  standing objection.                           20:39:25
10  QUESTIONS BY MS. HERZFELD:                     20:39:25
11     Q.   Okay.  And it talks about the        20:39:26
12  volume of oxycodone sales to this location;   20:39:28
13  is that correct?                             20:39:30
14     A.   Yes.                                  20:39:30
15     Q.   Okay.  And then at the bottom        20:39:33
16  it says, "Describe physical location and     20:39:34
17  description of pharmacy.  Standalone building 20:39:37
18  on main two-lane road.  Services rural       20:39:40
19  community.  In residential town in Campbell  20:39:44
20  County."                                      20:39:46
21         Did I read that correctly?            20:39:46
22     A.   Yes.                                  20:39:47
23     Q.   Okay.  And did Mallinckrodt do       20:39:47
24  anything to verify that information?          20:39:50
25     A.   No.                                   20:39:51

Page 574

1     (Mallinckrodt-Harper Exhibit 54    20:39:53
2     marked for identification.)    20:39:53
3     QUESTIONS BY MS. HERZFELD:    20:39:53
4     Q.   Okay.  Okay.  I'm handing you    20:39:54
5     Exhibit 54, MNK_TNSTA00607869.    20:40:14
6          Do you recognize this as a    20:40:21
7     pharmacy information sheet dated 11/30/2012    20:40:23
8     for the Riggs Drug in La Follette, Tennessee?    20:40:29
9     A.   Yes.    20:40:33
10    Q.   Okay.  And do you know if    20:40:33
11    someone from Mallinckrodt filled this out or    20:40:35
12    somebody from Cardinal filled it out?    20:40:39
13         MR. O'CONNOR:  Objection to    20:40:41
14    form.    20:40:41
15         MS. FIX MEYER:  Objection.    20:40:43
16         THE WITNESS:  No.    20:40:43
17    QUESTIONS BY MS. HERZFELD:    20:40:43
18    Q.   Okay.  And could you please    20:40:43
19    read to me what it says and describe the    20:40:44
20    physical description and location of the    20:40:45
21    pharmacy?    20:40:46
22    A.   "La Follette, Tennessee, is a    20:40:48
23    small town of 7,926 located northwest of    20:40:50
24    Knoxville.  The pharmacy is located in a    20:40:55
25    spacious standalone building with a large    20:40:58

Page 575

1     parking area.  It shares a small amount of    20:41:01
2     space with a medical clinic, which is in the    20:41:03
3     process of moving to a larger building.  The    20:41:06
4     pharmacy is located on the primary business    20:41:10
5     street and the state highway through town."    20:41:13
6     Q.   Okay.  And down at the bottom,    20:41:16
7     the notes, could you read that for me,    20:41:18
8     please?    20:41:21
9     A.   Yes.    20:41:21
10    "All Riggs 15/30s capped.  Have    20:41:22
11    stopped prescribing for certain docs.  Per    20:41:28
12    Cardinal Health" -- that's the abbreviation    20:41:31
13    for Cardinal Health -- "they believe    20:41:38
14    Jacksboro store has made progress.  One store    20:41:42
15    fills 12,000 scripts per month, another fills    20:41:44
16    5,000."    20:41:48
17    Q.   Okay.  So the information    20:41:50
18    that's included in the physical location    20:41:51
19    about the size of La Follette, Tennessee, and    20:41:53
20    description of the building, that's    20:41:58
21    information that was known to Mallinckrodt;    20:41:59
22    is that correct?    20:42:02
23         MR. O'CONNOR:  Objection to    20:42:02
24    form.    20:42:03
25         THE WITNESS:  Yes.    20:42:03

Page 576

1     QUESTIONS BY MS. HERZFELD:    20:42:03
2     Q.   Okay.  And then when it says,    20:42:04
3     "notes, all Riggs have been capped," talking    20:42:06
4     about per Cardinal Health, they believe the    20:42:08
5     Jacksboro store has made progress, Cardinal    20:42:10
6     is being referred to as "they."    20:42:13
7          So do you believe that note was    20:42:14
8     made by somebody at Mallinckrodt?    20:42:16
9          MR. O'CONNOR:  Objection to    20:42:18
10    form.    20:42:19
11         THE WITNESS:  Yes.    20:42:19
12    QUESTIONS BY MS. HERZFELD:    20:42:19
13    Q.   Okay.  And so do you know    20:42:20
14    anything about Riggs 15 and 30s being capped?    20:42:23
15    A.   It says it here, but I don't    20:42:27
16    recall.    20:42:29
17    Q.   Okay.  And what does it mean to    20:42:29
18    cap someone at 15 and 30s?    20:42:30
19    A.   It means a limit was placed on    20:42:35
20    the amount of oxycodone 15s and 30s that a    20:42:38
21    particular pharmacy could receive from a    20:42:41
22    distributor.    20:42:45
23    Q.   Okay.  And why would -- why    20:42:45
24    would that happen?  Why would a cap be put    20:42:47
25    on?    20:42:49

Page 577

1     A.   So this is part of Cardinal's    20:42:49
2     program, and I can't answer the question.    20:42:53
3     Q.   Okay.  When it says, "They    20:42:55
4     believe the Jacksboro store has made    20:42:57
5     progress.  One store fills 12,000 scripts per    20:43:00
6     month, another fills 5,000," does that mean    20:43:03
7     that the numbers went down?    20:43:06
8          MR. O'CONNOR:  Objection to    20:43:07
9     form.    20:43:07
10         THE WITNESS:  I don't know.    20:43:07
11    QUESTIONS BY MS. HERZFELD:    20:43:08
12    Q.   Okay.  Do you know if you had a    20:43:08
13    concern about diversion from these Riggs    20:43:11
14    pharmacies in Campbell County?    20:43:15
15         MR. O'CONNOR:  Objection to    20:43:17
16    form.    20:43:18
17         THE WITNESS:  So by virtue of    20:43:18
18    the fact we had a pharmacy information    20:43:20
19    sheet, it means we discussed these    20:43:22
20    pharmacies with Cardinal and any other    20:43:25
21    distributor that was selling to them.    20:43:27
22    So it was a point of discussion for    20:43:29
23    further review.    20:43:34
24    QUESTIONS BY MS. HERZFELD:    20:43:34
25    Q.   Okay.  So there was discussion    20:43:35

Page 578

1　about whether there was potential diversion　20:43:37
2　at these Riggs pharmacies?　20:43:39
3　　　A.　Yes.　20:43:42
4　　　Q.　Okay.  And at no time did　20:43:43
5　Mallinckrodt do chargeback restrictions for　20:43:48
6　Riggs pharmacies, according to that chart we　20:43:51
7　saw; is that correct?　20:43:54
8　　　　MR. O'CONNOR:  Objection to　20:43:54
9　form.　20:43:55
10　　　　THE WITNESS:  So, yes, and I　20:43:55
11　misspoke when I said that we had.　20:43:57
12　According to that, Riggs　20:44:00
13　pharmacies were not restricted --　20:44:02
14　QUESTIONS BY MS. HERZFELD:　20:44:03
15　　　Q.　Okay.　20:44:03
16　　　A.　-- from chargeback processing.　20:44:04
17　　　Q.　Okay.  And so that means, to　20:44:05
18　your knowledge, Riggs pharmacies could　20:44:07
19　continue to receive oxycodone 15 and 30s?　20:44:09
20　　　A.　Yes.　20:44:13
21　　　Q.　Okay.  Thank you.　20:44:15
22　　　　(Mallinckrodt-Harper Exhibit 55　20:44:18
23　marked for identification.)　20:44:18
24　QUESTIONS BY MS. HERZFELD:　20:44:18
25　　　Q.　Okay.  55, marking Plaintiff's　20:44:42

Page 579

1　Exhibit 55 here.  It's MNK_TNSTA00612647.　20:45:06
2　Take a look at this for me, please.　20:45:15
3　　　　The file name for this document　20:45:44
4　is "Riggs pharmacies all sales run　20:45:45
5　11/30/2012"; is that correct?　20:45:49
6　　　A.　Yes.　20:45:50
7　　　Q.　Did you create this document?　20:45:51
8　　　A.　No.　20:45:52
9　　　Q.　Did you direct that it be　20:45:53
10　created?　20:45:56
11　　　A.　I'm not certain.　20:45:58
12　　　Q.　Okay.  Okay.  If you'll look　20:46:00
13　with me on page 3.　20:46:19
14　　　A.　I'm sorry.  Oh, yes.　20:46:24
15　　　Q.　Do you see that?　20:46:25
16　　　A.　Yes.  Yes.　20:46:26
17　　　Q.　Okay.  Does this appear to be a　20:46:27
18　report based on chargeback data to you,　20:46:28
19　ma'am?　20:46:30
20　　　A.　Yes.　20:46:30
21　　　Q.　Okay.  And it appears to be a　20:46:31
22　report about the Riggs Drug stores in -- the　20:46:32
23　Riggs Drug stores we were discussing; is that　20:46:39
24　correct?  Jacksboro, La Follette and Powell?　20:46:43
25　　　A.　So the cover says Riggs　20:46:48

Page 580

1　pharmacies, but I don't see that there's --　20:46:53
2　oh, yes, I do see an identifier on the　20:46:56
3　spreadsheet itself.  Yes, Riggs pharmacies.　20:46:59
4　　　Q.　Okay.  Great.　20:47:00
5　　　　In looking here, it's kind of　20:47:01
6　hard to review it all.  One, two -- if you　20:47:09
7　look on page 3, down at the bottom, the　20:47:12
8　orange line, it says, "Oxycodone 30-milligram　20:47:35
9　tablets."　20:47:38
10　　　　Do you see where I'm at?　20:47:39
11　　　A.　Yes.　20:47:40
12　　　Q.　Okay.  And it indicates that　20:47:41
13　Cardinal Health shipped 292,600 oxycodone　20:47:44
14　30-milligram tablets to Riggs Drug in La　20:47:52
15　Follette, Tennessee, in the calendar year　20:47:56
16　2012; is that correct?　20:48:00
17　　　A.　So the data began November　20:48:01
18　of 2011.　20:48:08
19　　　Q.　Oh, you are correct.　20:48:08
20　　　　So from November 2011 to　20:48:10
21　November 2012?　20:48:14
22　　　A.　Yes.　20:48:15
23　　　Q.　Okay.  And then it says　20:48:17
24　HD Smith shipped 30 milligrams of oxycodone　20:48:18
25　to that same Riggs location, 1,200 tablets.　20:48:24

Page 581

1　　　　Am I reading that correctly?　20:48:29
2　　　A.　Yes.　20:48:32
3　　　Q.　Okay.  Okay.  Staying on page 3　20:48:32
4　with me there, the last blue line, it says　20:49:02
5　oxycodone 15-milligram tablets here for the　20:49:07
6　same Riggs store in La Follette, Tennessee.　20:49:08
7　　　　Do you see where I am now?　20:49:10
8　　　A.　Yes.　20:49:12
9　　　Q.　Okay.  And it says that　20:49:12
10　Cardinal Health shipped 84,000 tablets during　20:49:13
11　that same time period; is that correct?　20:49:15
12　　　A.　Yes.　20:49:17
13　　　Q.　Okay.  So if you add those two　20:49:20
14　together, I submit to you that would be　20:49:27
15　377,600 Mallinckrodt-made oxycodone　20:49:31
16　15-milligram and 30-milligram tablets going　20:49:37
17　to that one pharmacy in that period of　20:49:39
18　November 2011 to November 2012.　20:49:43
19　　　　Does that sound correct?　20:49:46
20　　　　MR. O'CONNOR:  Objection to　20:49:47
21　form.　20:49:48
22　　　　THE WITNESS:  Yes.　20:49:48
23　QUESTIONS BY MS. HERZFELD:　20:49:48
24　　　Q.　Okay.  And that's just to one　20:49:49
25　pharmacy, not to what was sent to that　20:49:56

Page 582

1  county; is that right?                20:49:58
2        MR. O'CONNOR: Object to form.  20:49:59
3        THE WITNESS: Yes.               20:50:01
4  QUESTIONS BY MS. HERZFELD:            20:50:01
5     Q.  Okay.  Does that number seem   20:50:02
6  too high to you?                      20:50:05
7        MR. O'CONNOR: Object to form.  20:50:06
8        THE WITNESS: A number is one    20:50:07
9  of the indicators we use.  High?  I   20:50:10
10 don't have enough information to       20:50:16
11 compare other states to this           20:50:19
12 particular statistics or other         20:50:23
13 pharmacies, so I can't answer.         20:50:25
14 QUESTIONS BY MS. HERZFELD:            20:50:26
15    Q.  Okay.  So you'd have to have   20:50:27
16 that information in order to be able to make  20:50:28
17 a determination as to whether the number was  20:50:30
18 too high relatively?                   20:50:32
19    A.  Well, "too high" is a relative 20:50:33
20 term, again, so it would be a number that  20:50:37
21 merited further review.                20:50:41
22    Q.  Okay.                          20:50:43
23    A.  Potentially, yes.              20:50:43
24    Q.  And so the types of things that  20:50:44
25 you would want to know in order to make that  20:50:45

Page 583

1  determination would be population?    20:50:47
2     A.  That could be --               20:50:51
3        MR. O'CONNOR: Form.             20:50:52
4        THE WITNESS: -- one piece of    20:50:53
5  information.                          20:50:55
6  QUESTIONS BY MS. HERZFELD:            20:50:55
7     Q.  Okay.  And what about the      20:50:55
8  percent of an aging population of the area?  20:50:58
9     A.  No.                            20:51:02
10    Q.  That's not something you'd want  20:51:04
11 to consider?                          20:51:05
12    A.  Oh, I -- it wasn't a part of   20:51:05
13 our program.                          20:51:09
14    Q.  Okay.  What about nearness to  20:51:10
15 hospitals or other medical facilities; would  20:51:14
16 you want to know that information?     20:51:16
17    A.  Not routinely.                 20:51:18
18    Q.  Okay.                          20:51:22
19    A.  No.                            20:51:22
20    Q.  Okay.  So what types of other  20:51:23
21 information would you need besides just pure  20:51:25
22 number in order to be able to make a   20:51:27
23 determination if a pharmacy was -- was  20:51:30
24 processing suspicious orders?          20:51:33
25        MR. O'CONNOR: Objection to     20:51:34

Page 584

1  form.                                 20:51:35
2        THE WITNESS: So the factors     20:51:35
3  listed on the pharmacy information     20:51:38
4  sheet, oxycodone compared to other     20:51:40
5  opioids being dispensed, percent       20:51:46
6  oxycodone 15, 30, relative to other    20:51:50
7  oxy products, and the other factors,   20:51:52
8  including a physical and -- in a       20:51:56
9  physical location and a description of  20:52:02
10 the pharmacy.                          20:52:04
11 QUESTIONS BY MS. HERZFELD:            20:52:04
12    Q.  Okay.  And what types of       20:52:04
13 physical locations would cause you concern?  20:52:05
14        MR. O'CONNOR: Objection to     20:52:09
15 form.                                 20:52:11
16        THE WITNESS: I don't -- I      20:52:11
17 don't know offhand.                    20:52:15
18 QUESTIONS BY MS. HERZFELD:            20:52:15
19    Q.  Okay.  Okay.  So the things on  20:52:16
20 the list is what you would consider, on the  20:52:21
21 pharmacy information sheet checklist?  20:52:22
22    A.  Yes.                           20:52:24
23    Q.  Okay.  Is there anything       20:52:25
24 outside of the information, the questions  20:52:26
25 you've got contained in the pharmacy  20:52:29

Page 585

1  information sheet checklist, that you would  20:52:30
2  consider when determining whether a pharmacy  20:52:32
3  may be engaging in diversion?          20:52:35
4     A.  So a Google report would prompt  20:52:38
5  further review.  Those are the factors that  20:52:44
6  come to mind.                         20:52:46
7     Q.  Okay.  But a Google report, if  20:52:47
8  it comes up, right, it's generally going to  20:52:49
9  be when there's been a drug bust at a  20:52:52
10 pharmacy after the fact; is that right?  20:52:54
11        MR. O'CONNOR: Objection to     20:52:55
12 form.                                 20:52:56
13        THE WITNESS: Yes.  Yes.        20:52:56
14 QUESTIONS BY MS. HERZFELD:            20:53:00
15    Q.  Okay.  Okay.  If you'll take   20:53:01
16 the same sheet with me, we're going to just  20:53:07
17 spend another minute with it.  And if you'll  20:53:15
18 flip with me to the one that's page 4.  20:53:15
19        If you'll go down to the part  20:53:22
20 that's highlighted in orange.  I guess that's  20:53:24
21 orange.                               20:53:27
22    A.  Oh, I'm sorry.  I'm on the     20:53:28
23 wrong page.                           20:53:30
24    Q.  That's okay.  Page 4.          20:53:30
25    A.  All right.                     20:53:36

Case: 1:17-md-02804-DAP  Doc #: 3013-12  Filed: 12/18/19  149 of 158.  PageID #: 446225

Highly Confidential - Subject to Further Confidentiality Review

**Page 586**

1  Q.   At the top it should say Riggs   20:53:37
2  Drug in Jacksboro, Tennessee.   20:53:39
3       Do you see where I'm at?   20:53:42
4  A.   Yes.   20:53:43
5  Q.   Okay.  And then the orange all   20:53:44
6  the way down at the bottom.   20:53:46
7  A.   Yes.   20:53:47
8  Q.   Okay.  So it says oxycodone   20:53:47
9  30-milligram tablets, and then it would be   20:53:49
10  139,400 tablets were supplied to this   20:53:51
11  pharmacy, Riggs, in Jacksboro, Tennessee, by   20:53:56
12  Cardinal Health in the time period of   20:53:59
13  November 2011 through November of 2012.   20:54:01
14       Did I read that correctly?   20:54:04
15  A.   Yes.   20:54:05
16  Q.   Okay.  And if you go one line   20:54:06
17  up, it talks about oxycodone 15-milligram   20:54:09
18  tablets shipped to that Jacksboro Riggs.   20:54:12
19       That's 38,700; is that correct?   20:54:16
20  A.   Yes.   20:54:19
21  Q.   Okay.  And so if you total   20:54:20
22  that, that would be 178,100 Mallinckrodt   20:54:21
23  oxycodone pills going to that one pharmacy in   20:54:26
24  that time period; is that correct?   20:54:30
25  A.   Yes.   20:54:31

**Page 587**

1  Q.   Okay.  And the rest of these   20:54:33
2  numbers on there, those are the other   20:54:40
3  controlled substance Mallinckrodt products;   20:54:44
4  is that correct?   20:54:47
5  A.   Yes.   20:54:47
6  Q.   Okay.  And many of those are   20:54:48
7  opioids as well; is that right?   20:54:51
8  A.   Yes.   20:54:52
9  Q.   Is methylphenidate an opioid?   20:54:53
10  A.   Yes.   20:54:59
11  Q.   Okay.  So is everything on this   20:54:59
12  list an opioid?   20:55:01
13  A.   Yes.   20:55:02
14  Q.   Okay.  So if you total all of   20:55:02
15  the opioids then, the Mallinckrodt opioids,   20:55:03
16  sent to Riggs Drug in Jacksboro, Tennessee,   20:55:05
17  during this time period, that would be   20:55:07
18  279,570 Mallinckrodt opioids shipped to this   20:55:10
19  pharmacy during that period of time, I submit   20:55:14
20  to you.   20:55:17
21       Does that seem like a lot of   20:55:18
22  opioids to one pharmacy to you?   20:55:20
23  A.   So I'm sorry.  You're saying   20:55:23
24  that you did the math --   20:55:25
25  Q.   Yes, ma'am.   20:55:25

**Page 588**

1  A.   -- and added all these?   20:55:26
2  Q.   Yes, ma'am.   20:55:27
3  A.   Okay.  All right.   20:55:27
4  Q.   I'm not going to make you vouch   20:55:27
5  for my math.   20:55:29
6  A.   Okay.   20:55:30
7  Q.   But if I tell you that that   20:55:30
8  totals to 279,570 --   20:55:30
9  A.   Yes.   20:55:30
10  Q.   -- does that seem like a lot of   20:55:36
11  Mallinckrodt opioids to go to one pharmacy to   20:55:38
12  you?   20:55:39
13  A.   No, not necessarily.   20:55:39
14  Q.   You would want to look at the   20:55:40
15  factors that are on the pharmacy information   20:55:42
16  sheet; is that right?   20:55:44
17  A.   Yes.   20:55:44
18  Q.   And the Google Alerts; is that   20:55:44
19  right?   20:55:47
20  A.   Yes, and have a conversation   20:55:47
21  with the distributor, yes.   20:55:49
22  Q.   Okay.  Do you know anything   20:55:50
23  about Jacksboro, Tennessee?   20:55:51
24  A.   No.   20:55:53
25  Q.   Okay.  Do you know if Jacksboro   20:55:54

**Page 589**

1  and La Follette are in the same county?   20:56:01
2  A.   No.   20:56:02
3  Q.   What if I told you they are?   20:56:03
4  They're in Campbell County, Tennessee.   20:56:04
5       Have you ever heard of Campbell   20:56:06
6  County, Tennessee?   20:56:09
7  A.   No.   20:56:09
8  Q.   Okay.  Do you know anything   20:56:10
9  about Campbell County, Tennessee?   20:56:10
10  A.   No.   20:56:12
11  Q.   Has Campbell County, Tennessee,   20:56:12
12  ever been a topic of discussion during your   20:56:14
13  professional time at Mallinckrodt?   20:56:16
14  A.   Not that I recall.   20:56:17
15  Q.   Okay.   20:56:19
16       MR. O'CONNOR:  We're on the   20:56:38
17  12-hour mark.  Are you almost done?   20:56:39
18       MS. HERZFELD:  I am so almost   20:56:43
19  done.   20:56:44
20       MR. O'CONNOR:  Okay.   20:56:44
21       MS. HERZFELD:  I have, I   20:56:44
22  think -- I have two very quick charts   20:56:45
23  and then like three tiny things to ask   20:56:47
24  her about.  Like I'm probably ten   20:56:49
25  minutes.   20:56:51

Page 590

1    Do you want to take a break?    20:56:52
2        MR. O'CONNOR: Not if it's    20:56:54
3    going to be ten minutes.    20:56:55
4        MS. HERZFELD: I think it's    20:56:56
5    going to be ten minutes.    20:56:57
6        MR. O'CONNOR: Okay.    20:56:57
7        MS. HERZFELD: I think it's    20:56:57
8    going to be ten minutes. I will try    20:56:58
9    very hard not to lie to you. Okay.    20:56:59
10        MR. O'CONNOR: It's always    20:57:02
11    appreciated.    20:57:04
12        (Mallinckrodt-Harper Exhibit 56    20:57:05
13    marked for identification.)    20:57:06
14    QUESTIONS BY MS. HERZFELD:    20:57:06
15    Q.    I will hand you what I'm    20:57:07
16    marking as Plaintiff's Exhibit 56. This is    20:57:08
17    MNK_TNSTA25 -- I'm sorry, 02527616.    20:57:14
18        This is -- the title is "Oxy 15    20:57:23
19    and 30 shipped to and sold to via month,    20:57:28
20    January through December 2011." And it looks    20:57:31
21    like the report was run 2/15/2012.    20:57:34
22        I will submit to you that we    20:57:37
23    have condensed this just to Campbell County.    20:57:40
24        Okay. So if you take a look at    20:58:01
25    this list, I think you'll notice La Follette    20:58:03

Page 591

1    that we've been talking about and also    20:58:05
2    Jacksboro, which we've already discussed; is    20:58:06
3    that right?    20:58:09
4    A.    Yes.    20:58:09
5    Q.    Okay. And this chart appears    20:58:10
6    to show you chargeback data to the various    20:58:11
7    pharmacies during the period of January 2011    20:58:13
8    through December 2011; is that correct?    20:58:19
9    A.    Yes.    20:58:23
10    Q.    Okay. And we haven't talked at    20:58:26
11    all about a place called Jellico.    20:58:29
12        Have you ever heard of Jellico,    20:58:31
13    Tennessee?    20:58:32
14    A.    No.    20:58:33
15    Q.    Okay. Okay. On this list I    20:58:33
16    think you'll recognize we've got the three    20:58:39
17    Riggs Drugs right at the top, right?    20:58:41
18    A.    Yes.    20:58:42
19    Q.    Okay. Riggs Drug in La    20:58:43
20    Follette and Riggs Drug in Jacksboro.    20:58:46
21    A.    Yes.    20:58:53
22    Q.    Okay. Do you know how many    20:58:54
23    people live in Jellico, Tennessee?    20:59:07
24    A.    No.    20:59:10
25    Q.    Okay. And this spreadsheet is    20:59:11

Page 592

1    for the oxy 15s. Do you see that?    20:59:15
2        I'll show you the oxy 30s next.    20:59:19
3    A.    Yes.    20:59:22
4    Q.    Okay. And if you look at this    20:59:22
5    spreadsheet, you've got Jellico one, two,    20:59:24
6    three, four times.    20:59:27
7        Let's look at the first one.    20:59:27
8    Jellico Drugs.    20:59:30
9        Do you see that?    20:59:31
10    A.    Yes.    20:59:31
11    Q.    And it looks like Jellico Drugs    20:59:31
12    was getting stuff from AmerisourceBergen --    20:59:33
13    getting oxycodone 15 from AmerisourceBergen    20:59:35
14    and Masters; is that correct?    20:59:39
15    A.    Yes.    20:59:40
16    Q.    Okay. So during that time    20:59:46
17    period, it looks like Jellico Drugs received    20:59:48
18    14,400 oxycodone 15 tablets from Masters; is    20:59:51
19    that right?    20:59:57
20    A.    Yes.    20:59:57
21    Q.    And then 12,200 from    20:59:58
22    AmerisourceBergen?    21:00:00
23    A.    Yes.    21:00:01
24    Q.    Okay. And if you go down to    21:00:02
25    the others, you have the Rite Aid,    21:00:04

Page 593

1    number 1935 in Jellico. They received 2500    21:00:08
2    oxycodone 15; is that correct?    21:00:13
3    A.    Yes.    21:00:15
4    Q.    Okay. And then the last one is    21:00:19
5    the family drug center in Jellico by Cardinal    21:00:20
6    Health, and it looks like they received 300    21:00:23
7    oxy 15s; is that right?    21:00:28
8    A.    Yes.    21:00:29
9    Q.    Okay. So if you add all that    21:00:29
10    together, I'll submit to you that that's    21:00:31
11    about 29,400 oxycodone 15s for the town of    21:00:33
12    Jellico.    21:00:40
13        Does that sound right?    21:00:40
14    A.    I have not done the math, but    21:00:41
15    if you say it's true, we'll go with it.    21:00:45
16        (Mallinckrodt-Harper Exhibit 57    21:00:49
17    marked for identification.)    21:00:51
18    QUESTIONS BY MS. HERZFELD:    21:00:51
19    Q.    Okay. I'm going to hand you    21:00:51
20    what's marked as Plaintiff's Exhibit 56? 6?    21:00:53
21    A.    This was 56.    21:00:55
22    Q.    Oh, 57. I left my -- I'll just    21:00:56
23    do another one. 57.    21:01:03
24        Okay. This is the tab -- hold    21:01:04
25    on. It looks like I'm missing one, so you    21:01:13

Page 594

1 might have lucked out. Okay. It appears 21:01:27
2 that I'm missing the one for the oxy 30. 21:01:45
3 Okay. 21:01:51
4 Did you ever run the numbers 21:01:52
5 for the total number of Mallinckrodt 21:01:58
6 oxycodone products going to Campbell County, 21:02:00
7 Tennessee? 21:02:04
8 A. I do not know. 21:02:04
9 Q. Okay. I'm going to... 21:02:07
10 Okay. I'm going to mark you -- 21:02:45
11 I'm going to hand you what we've marked as 21:02:46
12 Plaintiff's Exhibit 57. 21:02:48
13 Okay. Could you read the file 21:02:50
14 name of this document for me, please, ma'am? 21:02:58
15 A. "Hydro APAP 10s shipped to and 21:03:00
16 sold via by month, January 2015 through 21:03:04
17 December 2015, 325 milligrams APAP." 21:03:08
18 Q. Okay. Great. 21:03:15
19 Okay. I'm going to back up for 21:03:15
20 a second, if you'll set this aside, and we'll 21:03:21
21 talk about it in just a second. I skipped 21:03:23
22 some questions. 21:03:25
23 Going back to our discussion 21:03:26
24 about Campbell County, do you know what 21:03:27
25 Campbell County's population was in 2010? 21:03:33

Page 595

1 A. No. 21:03:35
2 Q. Do you know if Mallinckrodt has 21:03:35
3 ever looked specifically at the number of 21:03:37
4 pills it sends to the various counties in 21:03:40
5 Tennessee? 21:03:42
6 MR. O'CONNOR: Objection. 21:03:42
7 Form. 21:03:43
8 QUESTIONS BY MS. HERZFELD: 21:03:43
9 Q. Have you looked by county? 21:03:44
10 A. I do not know. 21:03:45
11 Q. Okay. Did you run any 21:03:45
12 chargeback reports by county on a routine 21:03:49
13 basis with Tennessee? 21:03:50
14 A. No. 21:03:51
15 Q. Okay. What about towns? 21:03:51
16 A. The reports can be sorted by 21:03:54
17 towns -- 21:03:57
18 Q. Okay. 21:03:58
19 A. -- but not specific to 21:03:58
20 Tennessee towns. 21:04:02
21 Q. Okay. Okay. Had you -- were 21:04:03
22 you aware that in 2015 Campbell County 21:04:09
23 prescribed the third highest morphine 21:04:13
24 equivalent milligrams per capita annually in 21:04:17
25 the country? 21:04:19

Page 596

1 A. No. 21:04:19
2 Q. Is that a list that 21:04:19
3 Mallinckrodt would look at? 21:04:21
4 MR. O'CONNOR: Objection to 21:04:22
5 form. 21:04:24
6 THE WITNESS: Not within the 21:04:24
7 scope of suspicious order monitoring. 21:04:25
8 QUESTIONS BY MS. HERZFELD: 21:04:28
9 Q. Okay. So if the CDC lists 21:04:28
10 counties with the highest prescribing of 21:04:31
11 opioids per capita, is that something you 21:04:34
12 would consult in your job in suspicious order 21:04:36
13 monitoring? 21:04:38
14 A. No. 21:04:38
15 Q. Okay. Think it would be 21:04:40
16 helpful? 21:04:44
17 MR. O'CONNOR: Objection to 21:04:44
18 form. 21:04:45
19 THE WITNESS: We use various 21:04:45
20 pieces of information at various 21:04:46
21 times, so I can't compare and contrast 21:04:49
22 one thing is more helpful than the 21:04:53
23 other. 21:04:56
24 QUESTIONS BY MS. HERZFELD: 21:04:56
25 Q. Okay. I think you looked 21:04:57

Page 597

1 before at the chargeback data list, the 21:05:03
2 chargeback restriction list, Exhibit 36. 21:05:05
3 It's Mallinckrodt's chargeback restriction 21:05:09
4 list. If you would take a look at that for 21:05:10
5 me for one more second. 21:05:14
6 Are you aware of the number of 21:05:16
7 pharmacies that were on that list, how many 21:05:19
8 have been subject of law enforcement action? 21:05:21
9 A. No. 21:05:23
10 Q. Okay. Are you aware if any of 21:05:24
11 the reinstated pharmacies on that list have 21:05:26
12 been subject of law enforcement action? 21:05:31
13 A. No. 21:05:32
14 Q. Okay. And do you know if the 21:05:33
15 pharmacies on that list, that were placed on 21:05:35
16 that list, were placed on before or because 21:05:37
17 of -- I'm sorry, I'm going to back up. I'm 21:05:40
18 going to strike that question. We're going 21:05:43
19 to start over. 21:05:44
20 Do you know of the pharmacies 21:05:45
21 that were placed on that Mallinckrodt 21:05:48
22 chargeback restriction list, how many of 21:05:50
23 those restricted pharmacies were placed on 21:05:55
24 after law enforcement action? 21:05:58
25 A. No. 21:06:00

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1    Q.   Okay.  You can set it aside,      21:06:00
2    please.                                21:06:02
3         Have you ever heard of Clay       21:06:03
4    County, Tennessee?                     21:06:08
5    A.   No.                               21:06:09
6    Q.   Do you know what the population   21:06:09
7    is of Clay County, Tennessee?          21:06:10
8    A.   No.                               21:06:12
9    Q.   Okay.  Has there been any         21:06:12
10   discussion in your professional capacity at   21:06:15
11   Mallinckrodt having to do with Clay County,   21:06:16
12   Tennessee?                             21:06:19
13   A.   Not that I recall.                21:06:19
14   Q.   Okay.  If you'll take a look at   21:06:21
15   Exhibit 57 for me, please, ma'am.      21:06:23
16        Okay.  You've already            21:06:25
17   identified this document.  I will submit to   21:06:27
18   you that we've modified it to show only the   21:06:29
19   town of Celina, Tennessee.             21:06:33
20        If you'll flip to the page, do   21:06:34
21   you recognize this as chargeback data, ma'am?   21:06:37
22   A.   Yes.                              21:06:40
23   Q.   Okay.  Looking at this           21:06:40
24   chargeback data, does it indicate to you that   21:06:41
25   Rite Aid number 2494 in Celina, Tennessee,   21:06:43

Page 599

1    through McKesson, received 87,000      21:06:55
2    Mallinckrodt hydro APAP 10s?           21:06:59
3    A.   Yes.                              21:07:05
4    Q.   Okay.  And then Anderson         21:07:06
5    Hometown Pharmacy received 500 hydro APAP 10s   21:07:10
6    through McKesson; is that right?       21:07:14
7    A.   Yes.                              21:07:15
8    Q.   Okay.  And then Cumberland       21:07:15
9    River Hospital, also in Celina, Tennessee,   21:07:18
10   through Cardinal received 200 hydro APAP 10s;   21:07:21
11   is that right?                         21:07:24
12   A.   Yes.                              21:07:24
13   Q.   Okay.  And that shows, if you    21:07:25
14   total it -- and I think this math is a little   21:07:28
15   easier -- that's 87,700 hydro APAP 10s sent   21:07:30
16   to Celina, Tennessee, that were Mallinckrodt   21:07:38
17   between January 2015 and December of 2015; is   21:07:42
18   that correct?                          21:07:45
19   A.   Yes.                              21:07:45
20   Q.   Okay.  Did you know that the     21:07:47
21   town of Celina, Tennessee, is -- population   21:07:48
22   is 1,379 people?                       21:07:51
23   A.   No.                               21:07:54
24   Q.   Do you think that's an           21:07:55
25   appropriate number of hydro APAP 10s to be   21:07:56

Page 600

1    going to a town with 1,379 people?     21:08:01
2         MR. O'CONNOR:  Objection to      21:08:04
3    form.                                  21:08:05
4         THE WITNESS:  I don't have       21:08:05
5    enough information to answer.           21:08:06
6    QUESTIONS BY MS. HERZFELD:             21:08:09
7    Q.   Okay.  And the information that  21:08:09
8    you would want would be the information   21:08:11
9    that's contained on that pharmacy information   21:08:12
10   sheet that we talked about earlier?    21:08:14
11   A.   Part of the information, yes.    21:08:16
12   Q.   Okay.  And the other            21:08:20
13   information would be information that you get   21:08:21
14   from the Google Alerts; is that right?   21:08:23
15   A.   Potentially.                      21:08:25
16   Q.   Okay.  And is there any other    21:08:27
17   information you can think of that you'd want   21:08:28
18   to know to make that decision?         21:08:30
19   A.   So let's circle back, please.    21:08:31
20   Q.   Sure.                             21:08:33
21   A.   We're talking about Celina,      21:08:33
22   Tennessee.                             21:08:35
23   Q.   Yes, ma'am.                       21:08:35
24   A.   And what's -- what's the         21:08:36
25   question again, please?                21:08:37

Page 601

1    Q.   The question was if you thought  21:08:38
2    that was an appropriate number of hydro APAP   21:08:40
3    pills to be going to that town.        21:08:46
4    A.   Okay.  And I said I can't        21:08:48
5    answer.  I don't have enough information.   21:08:50
6    Q.   And so then I said you'd want    21:08:50
7    the information on the pharmacy information   21:08:51
8    sheet that we talked about before in order to   21:08:53
9    make that determination?               21:08:54
10   A.   Yes, as one of the factors,      21:08:55
11   yes.                                   21:08:59
12   Q.   And one of the other factors    21:08:59
13   would be the information that you gleaned   21:09:00
14   from Google Alerts?                    21:09:01
15   A.   Yes.                              21:09:02
16   Q.   Okay.  And is there any other    21:09:03
17   information that you would feel you need to   21:09:04
18   consult?                               21:09:08
19   A.   Any other information provided   21:09:08
20   to us by the distributors.             21:09:14
21   Q.   Okay.                             21:09:16
22   A.   But, no, nothing other than     21:09:16
23   that.                                  21:09:19
24   Q.   Okay.  You can set that aside,   21:09:20
25   please, ma'am.  Okay.  Done with charts.   21:09:21

Page 602

1      (Mallinckrodt-Harper Exhibit 58   21:09:26
2    marked for identification.)        21:09:27
3    QUESTIONS BY MS. HERZFELD:              21:09:27
4    Q.   Okay.  Number 58.  If you'll   21:09:35
5  take a look at this for me, please.     21:09:49
6         Could you please read the     21:09:59
7  title?                    21:09:59
8    A.   "DEA investigators seeking     21:10:00
9  answers in small Tennessee town."       21:10:05
10    Q.   And what does it say after     21:10:08
11  that?             21:10:10
12    A.   There's a header.         21:10:10
13    Q.   Yes, ma'am.         21:10:13
14    A.   Drug Enforcement          21:10:14
15  Administration.             21:10:15
16    Q.   Okay.  So this is a press     21:10:15
17  release coming from the Drug Enforcement   21:10:16
18  Administration?               21:10:18
19    A.   Yes.           21:10:18
20    Q.   Okay.  And then under that it   21:10:19
21  says, "Rural Clay County pharmacies 2017   21:10:26
22  purchases from distributors totaled more than  21:10:28
23  1 million pills."              21:10:30
24       Do you see that?         21:10:31
25    A.   Yes.           21:10:31

Page 603

1    Q.   Okay.  And then the date line,   21:10:32
2  what is the city and state that it indicates?  21:10:35
3    A.   Celina, Tennessee.        21:10:37
4    Q.   Okay.  And then if you could   21:10:39
5  read the first sentence for me, please?    21:10:40
6    A.   "DEA investigators this week   21:10:41
7  conducted inspections at several pharmacy    21:10:45
8  locations in the Clay County, Tennessee,    21:10:47
9  town" -- pardon me -- "of Celina following an   21:10:52
10  inquiry into irregular patterns of pill    21:10:56
11  purchases from drug distribution companies."  21:10:58
12    Q.   Okay.  You can stop there.     21:11:03
13       Were you aware of this DEA     21:11:05
14  investigation?               21:11:07
15    A.   No.           21:11:07
16    Q.   Okay.  Thank you, ma'am.  You   21:11:07
17  can set that aside.           21:11:09
18       Okay.  In 2017, did you start   21:11:20
19  working on pulling Tennessee order reports?   21:11:25
20       MR. O'CONNOR:  Objection.   21:11:27
21  Form.              21:11:28
22       THE WITNESS:  I don't know.   21:11:28
23       (Mallinckrodt-Harper Exhibit 59   21:11:35
24    marked for identification.)        21:11:36
25

Page 604

1  QUESTIONS BY MS. HERZFELD:             21:11:36
2    Q.   Okay.  I'm going to hand you   21:11:36
3  what I'm going to mark as Exhibit 59,    21:11:48
4  MNK-TN_000642 -- no, 6462195.       21:11:52
5       These all got jammed together,   21:12:01
6  guys.  Sorry.            21:12:05
7       If you'll look with me all the   21:12:07
8  way down to...             21:12:09
9       You don't have to read the     21:12:26
10  whole thing, but if you look where Tom --   21:12:30
11  Thomas Duffel -- three-quarters of the way   21:12:34
12  down the page?               21:12:35
13    A.   Yes.           21:12:36
14    Q.   And he, it looks like, sends an   21:12:36
15  e-mail to you on September 11, 2017, and    21:12:37
16  Debbie Dingle {sic}.          21:12:40
17       Do you see that?         21:12:42
18    A.   Yes.           21:12:42
19    Q.   And the subject is regarding   21:12:43
20  need listing of all current and past narcotic   21:12:46
21  SKUs.              21:12:48
22       Do you see that?         21:12:49
23    A.   Yes.           21:12:49
24    Q.   Okay.  And so his e-mail to you   21:12:50
25  and Debbie is, "Karen/Debbie, just to make   21:12:53

Page 605

1  sure, I'm sending a list of the items that we   21:12:57
2  used to pull the most recent Tennessee orders   21:13:00
3  report.  I'm assuming that the list will     21:13:02
4  remain constant as we have requests like    21:13:04
5  these.  Please let me know if there are any   21:13:07
6  issues.  Thank you."          21:13:09
7       Did I read that correctly?     21:13:13
8    A.   Yes.           21:13:13
9    Q.   Okay.  Do you know what he's   21:13:14
10  talking about?               21:13:16
11    A.   Yes.           21:13:16
12    Q.   Okay.  What he's talking about?   21:13:16
13    A.   He's determining that he has   21:13:17
14  the list of all opioid products to pull this   21:13:20
15  report and other reports.          21:13:22
16    Q.   For Tennessee orders?        21:13:24
17    A.   In this case, yes.       21:13:25
18    Q.   Okay.  And do you know why he   21:13:28
19  was pulling Tennessee orders?         21:13:29
20    A.   No.           21:13:30
21    Q.   You don't?         21:13:31
22    A.   No.           21:13:32
23    Q.   Okay.  Was -- did anybody ever   21:13:32
24  talk to you about pulling Tennessee orders?   21:13:36
25    A.   Clearly they did, but this    21:13:37

Page 606

1  could have been a request by -- by counsel.   21:13:41
2     Q.   Okay.  Can you think of any   21:13:51
3  other reason there would have been a request   21:13:53
4  to pull Tennessee numbers?   21:13:55
5     A.   A subpoena, request from   21:13:57
6  counsel, those type of things.   21:14:03
7     Q.   Okay.   21:14:04
8     A.   Yes.   21:14:04
9     Q.   Okay.   21:14:08
10        (Mallinckrodt-Harper Exhibit 60   21:14:17
11  marked for identification.)   21:14:21
12        MR. O'CONNOR:  For the record,   21:14:21
13  I think we're closing in on   21:14:22
14  20 minutes.   21:14:24
15        MS. HERZFELD:  Oh, my gosh,   21:14:24
16  really!  I thought I was doing so   21:14:25
17  well.  I'm so sorry.  So close.   21:14:28
18  QUESTIONS BY MS. HERZFELD:   21:14:32
19     Q.   Okay.  I'm going to hand you   21:14:34
20  60, and I think there's only one after this   21:14:35
21  one.   21:14:37
22        Okay.  I'm going to hand you   21:14:38
23  what's been marked as Plaintiff's Exhibit 60,   21:14:40
24  and that is MNK-T1_0007185456.  Okay.  It is   21:14:45
25  a two-page document.   21:15:03

Page 607

1        Do you recognize this as an   21:15:04
2  e-mail chain between you and David Widder?   21:15:05
3     A.   Yes.   21:15:08
4     Q.   Dated over the course of June   21:15:10
5  2017?   21:15:14
6     A.   Yes.   21:15:14
7     Q.   Okay.  Who is David Widder?   21:15:16
8     A.   He -- he was another person to   21:15:18
9  whom my group reported.   21:15:22
10     Q.   Okay.  What was his position?   21:15:24
11     A.   His title has changed over   21:15:25
12  time, but he's in -- supply chain is the name   21:15:28
13  of his group.   21:15:31
14     Q.   Okay.  And so if you'll go down   21:15:33
15  with me, it looks like David Widder is saying   21:15:35
16  to you in the second e-mail down, Wednesday,   21:15:38
17  June 14, 2017, "No worries.  If we can   21:15:43
18  complete by the end of the week, we'll be in   21:15:46
19  a good spot.  The DEA meeting prep and   21:15:47
20  Tennessee matter are both more pressing."   21:15:51
21        Do you see that?   21:15:53
22     A.   Yes.   21:15:54
23     Q.   And he is responding to you --   21:15:55
24  it's an e-mail, it looks like, earlier that   21:15:58
25  day?   21:16:03

Page 608

1     A.   Yes.   21:16:07
2     Q.   Okay.  "David, that will take   21:16:08
3  an additional day or two to complete.  You'll   21:16:13
4  have it no later than Friday COB.  I'm   21:16:14
5  waiting on slide input from David Hunter.   21:16:15
6  Don has slammed me last night and today with   21:16:18
7  work for the Tennessee matter and DEA meeting   21:16:19
8  prep.  Sorry."   21:16:21
9        What is the Tennessee matter?   21:16:22
10     A.   So I don't know specifically   21:16:24
11  what the Tennessee matter is or was.   21:16:27
12     Q.   Okay.  What was the DEA meeting   21:16:31
13  prep?   21:16:33
14     A.   I don't know.  I don't recall.   21:16:34
15     Q.   Okay.  All right.  And have you   21:16:36
16  read the complaint in the Tennessee matter?   21:16:48
17     A.   No.   21:16:50
18     Q.   Okay.  But it was sent to you;   21:16:51
19  is that right?   21:16:54
20     A.   I'm not certain of that.   21:16:54
21        (Mallinckrodt-Harper Exhibit 61   21:16:57
22  marked for identification.)   21:16:58
23  QUESTIONS BY MS. HERZFELD:   21:16:58
24     Q.   I'm going to give you our very   21:17:04
25  last exhibit, which is 61.  I'm handing you   21:17:05

Page 609

1  what is marked as Plaintiff's Exhibit 61.   21:17:17
2        Okay.  This appears to be an   21:17:19
3  e-mail from Don Lohman and John Gillies and   21:17:28
4  you dated June 14, 2017; is that right?   21:17:33
5     A.   Yes.   21:17:35
6     Q.   Okay.  And it says, filed   21:17:39
7  complaint 6/13/2017, and this was e-mailed to   21:17:42
8  you 6/14/2017; is that right?   21:17:47
9     A.   Yes, I see that.   21:17:48
10     Q.   Okay.  And I just copied the   21:17:49
11  first page of our complaint because it's   21:17:51
12  really super long.   21:17:52
13     A.   Okay.   21:17:53
14     Q.   Did you ever read it?   21:17:54
15     A.   No.   21:17:55
16     Q.   Okay.  You received it, but you   21:17:56
17  didn't read it?   21:17:58
18     A.   It's clear that I received it.   21:17:58
19  I don't recall receiving it, and I don't   21:18:00
20  recall reading it.   21:18:02
21     Q.   Okay.  And so when we were   21:18:03
22  talking before about the Tennessee matter,   21:18:04
23  could it have been the filing of our   21:18:06
24  complaint that was the matter?   21:18:09
25        MR. O'CONNOR:  Objection to   21:18:10

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1    form.                          21:18:10
2        THE WITNESS: I can't answer    21:18:10
3    that question.                  21:18:11
4    QUESTIONS BY MS. HERZFELD:          21:18:11
5        Q.   You can't answer because you   21:18:12
6    don't know or because it's privileged?   21:18:13
7        A.   Oh, because I don't know.    21:18:14
8        Q.   Oh, okay.  Very good.     21:18:16
9        Sorry.                       21:18:20
10       MS. HERZFELD: Okay.  I don't    21:18:27
11   think I have any other questions.    21:18:28
12       MR. O'CONNOR: Excellent. Can    21:18:30
13   we go off the record?           21:18:32
14       VIDEOGRAPHER:  We are going off   21:18:33
15   the record at 9:18 p.m.         21:18:34
16   (Off the record at 9:18 p.m.)       21:18:36
17       VIDEOGRAPHER:  We are back on    21:19:09
18   the record at 9:19 p.m.         21:19:15
19       CROSS-EXAMINATION               21:19:19
20   QUESTIONS BY MR. O'CONNOR:           21:19:19
21       Q.   Ms. Harper, considering the    21:19:20
22   hour, I'll keep this very brief.  Just a few   21:19:20
23   questions.                      21:19:23
24       Earlier today you testified      21:19:23
25   about the scope of information provided   21:19:25

Page 611

1    through chargeback requests.         21:19:27
2        Do you generally recall         21:19:28
3    testifying on that issue?           21:19:30
4        A.   Yes.                     21:19:31
5        Q.   I just want to ask a few      21:19:32
6    questions so the record is clear on this.    21:19:37
7        Does chargeback data allow       21:19:39
8    Mallinckrodt visibility into all the sales of   21:19:41
9    its products made by distributor customers?   21:19:43
10       A.   No.                      21:19:48
11       Q.   Do all distributor customers   21:19:48
12   submit chargeback information?       21:19:52
13       A.   Yes.                     21:19:53
14       Q.   Do all customers of         21:19:54
15   Mallinckrodt product submit chargeback   21:19:56
16   requests?                       21:19:59
17       A.   No.                      21:20:01
18       Q.   And of those Mallinckrodt    21:20:03
19   customers that do from time to time submit   21:20:05
20   chargeback requests, do they submit   21:20:08
21   chargeback requests for every order they   21:20:12
22   receive?                        21:20:16
23       MR. KO:  Object to the form.    21:20:16
24       THE WITNESS: I don't know the    21:20:17
25   answer.                         21:20:19

Page 612

1    QUESTIONS BY MR. O'CONNOR:           21:20:19
2        Q.   Okay.  For those companies that   21:20:20
3    submit chargeback requests, are all orders   21:20:22
4    that those companies receive reflected in   21:20:26
5    those requests?                 21:20:28
6        A.   No.                      21:20:30
7        Q.   Okay.  Mallinckrodt         21:20:32
8    manufactures methylphenidate, correct?   21:20:39
9        A.   Yes.                     21:20:44
10       Q.   Do you know what            21:20:45
11   methylphenidate is used to treat?    21:20:46
12       A.   Attention-deficit/hyperactivity   21:20:48
13   disorder.                       21:20:52
14       Q.   Okay.  Is it used to treat    21:20:52
15   pain, as far as you know?           21:20:54
16       A.   I do not know.             21:20:56
17       Q.   Okay.  Is methylphenidate an   21:20:56
18   opioid?                         21:21:00
19       A.   It's a, yes, a synthetic    21:21:01
20   opioid, yes.                    21:21:03
21       Q.   It's a synthetic opioid.  Okay.   21:21:03
22       And do you have any scientific    21:21:10
23   background on which you're basing that   21:21:11
24   statement?                      21:21:16
25       A.   No scientific background, no.   21:21:16

Page 613

1        Q.   Just a few minutes ago you    21:21:17
2    discussed with Ms. Herzfeld a number of   21:21:21
3    charts, including those labeled -- or marked   21:21:26
4    Exhibits 40 through 57, roughly.    21:21:30
5        Do you remember the charts I'm    21:21:33
6    referring to?                   21:21:34
7        A.   Yes.                     21:21:35
8        Q.   Okay.  And many of those charts   21:21:38
9    purported to reflect chargeback data; is that   21:21:44
10   your understanding?             21:21:47
11       A.   Yes.                     21:21:48
12       Q.   Do you have any independent   21:21:49
13   recollection of the chargeback numbers that   21:21:53
14   you saw in any of those charts?     21:21:58
15       A.   No.                      21:22:00
16       Q.   So from time to time when you   21:22:02
17   indicated to Ms. Herzfeld that you thought   21:22:07
18   certain numbers were correct, did you have   21:22:09
19   any basis for saying that other than seeing   21:22:11
20   those numbers on the page -- on the document   21:22:14
21   that she provided you?          21:22:17
22       MS. HERZFELD: Object to the    21:22:17
23   form.                           21:22:19
24       THE WITNESS: No.              21:22:19
25

Page 614

1  QUESTIONS BY MR. O'CONNOR:          21:22:20
2      Q.   With respect to any numbers     21:22:21
3  that you indicated to Ms. Herzfeld that were  21:22:24
4  correct, do you have any basis to believe   21:22:27
5  that they were correct aside from -- aside   21:22:29
6  from the numbers on the document?       21:22:31
7          MS. HERZFELD:  Object to the    21:22:33
8      form.                        21:22:34
9          THE WITNESS:  No.           21:22:34
10         MR. O'CONNOR:  What's the      21:22:35
11     objection?                   21:22:37
12         MS. HERZFELD:  It's convoluted.  21:22:38
13 QUESTIONS BY MR. O'CONNOR:          21:22:42
14     Q.   Okay.  Do you recall responding  21:22:42
15 to Ms. Herzfeld that certain numbers she   21:22:43
16 presented to you were -- appeared to be    21:22:47
17 correct?                      21:22:48
18     A.   Yes.                    21:22:49
19     Q.   With respect to those numbers,   21:22:49
20 do you have any independent basis to believe  21:22:52
21 they are correct?                  21:22:54
22     A.   No.                     21:22:55
23         MR. O'CONNOR:  Okay.  That's    21:22:58
24     all I have.                  21:22:58
25         MS. HERZFELD:  I have one      21:22:58

Page 615

1  question on redirect.              21:22:59
2          REDIRECT EXAMINATION         21:22:59
3  QUESTIONS BY MS. HERZFELD:          21:22:59
4      Q.   Based on those numbers we went   21:23:02
5  over, do you have any reason to think that   21:23:03
6  they'd be incorrect?               21:23:05
7      A.   I don't know the answer, no.    21:23:07
8          MS. HERZFELD:  Okay.  Thank     21:23:11
9      you.                      21:23:13
10         MR. KO:  I'm sorry, folks, but   21:23:13
11     I have one question, of course, in  21:23:14
12     light of your redirect, and I have to  21:23:18
13     use a document for it.           21:23:20
14         (Mallinckrodt-Harper Exhibit 62  21:23:26
15     marked for identification.)        21:23:27
16         REDIRECT EXAMINATION         21:23:27
17 QUESTIONS BY MR. KO:               21:23:28
18     Q.   So I'm going to hand you a copy  21:23:22
19 of what will be marked as -- I don't know   21:23:23
20 what exhibit we're on -- 63?  Oh, 62.  Okay,  21:23:25
21 62.                          21:23:38
22         And that's the --           21:23:38
23 unfortunately, that's the only copy of the   21:23:39
24 exhibit I have.                   21:23:41
25         MR. KO:  Tricia, do you mind --  21:23:45

Page 616

1          MS. HERZFELD:  I'll read the    21:23:49
2      number in.                  21:23:50
3          MR. KO:  Thank you.          21:23:50
4          MS. HERZFELD:  It's          21:23:51
5      MNK-T1_0000387492.            21:23:54
6  QUESTIONS BY MR. KO:               21:23:58
7      Q.   Ms. Harper, just a moment ago   21:24:03
8  Mr. O'Connor was asking you about whether or  21:24:05
9  not -- well, was asking you about chargeback  21:24:10
10 information.                    21:24:12
11         Do you recall that?          21:24:13
12     A.   Yes.                    21:24:13
13     Q.   And the document you have in    21:24:13
14 front of you is an e-mail that you sent to   21:24:17
15 someone at DEA regarding access and your    21:24:19
16 utilization of chargeback info; is that    21:24:24
17 correct?                      21:24:26
18     A.   Yes.                    21:24:26
19     Q.   And at the very end of that    21:24:26
20 e-mail, there's a portion that's underlined.  21:24:29
21 Would you mind reading that into        21:24:31
22 the record?                     21:24:33
23     A.   "That said, Mallinckrodt       21:24:33
24 assumes that most transactions would result  21:24:38
25 in a chargeback request."            21:24:40

Page 617

1      Q.   Okay.  And do you have any     21:24:42
2  reason to dispute that you wrote that     21:24:45
3  language to the DEA on November 1, 2010?   21:24:47
4      A.   No.                     21:24:50
5          MR. KO:  Okay.  That's all I    21:24:51
6      have.                     21:24:52
7          MR. O'CONNOR:  All right.  We   21:24:54
8      can go off the record.          21:24:55
9          VIDEOGRAPHER:  We are going off  21:24:56
10     the record at 9:24 p.m.          21:24:57
11 (Deposition concluded at 9:24 p.m.)       21:24:58
12         - - - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 618

## CERTIFICATE

1
2
3    I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5  of the examination, Karen Harper was duly
sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7    I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
11    I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
that I am not financially interested in the
14 action.
15
16
17    _____
CARRIE A. CAMPBELL,
18 NCRA Registered Diplomate Reporter
Certified Realtime Reporter
19 California Certified Shorthand
Notary Public
20 Dated: January 21, 2019
21
22
23
24
25

Page 619

## INSTRUCTIONS TO WITNESS

1
2
3    Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8    After doing so, please sign the
9  errata sheet and date it. You are signing
10 same subject to the changes you have noted on
11 the errata sheet, which will be attached to
12 your deposition.
13    It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you. If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

Page 620

## ACKNOWLEDGMENT OF DEPONENT

1
2
3
4    I,_____, do
hereby certify that I have read the foregoing
5  pages and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9    _____
10
11
12 _____
Karen Harper          DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 Notary Public
20
21
22
23
24
25

Page 621

1    _ _ _ _ _ _ _
## ERRATA
2    _ _ _ _ _ _ _
3  PAGE  LINE  CHANGE/REASON
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25 ____  ____  _____

Highly Confidential - Subject to Further Confidentiality Review

Page 622

```
1          _ _ _ _ _ _ _
           LAWYER'S NOTES
2          _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```