EXHIBIT 119

1
2      IN THE UNITED STATES DISTRICT COURT
3        FOR THE NORTHERN DISTRICT OF OHIO
               EASTERN DIVISION
4                  -   -   -
5

IN RE:  NATIONAL        :   HON. DAN A.
6   PRESCRIPTION OPIATE     :   POLSTER
    LITIGATION              :
7                           :
    APPLIES TO ALL CASES    :   NO.
8                           :   1:17-MD-2804
                            :
9

          - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                   -   -   -
12
              March 15, 2019
13
                   -   -   -
14
15          Videotaped deposition of
    STEPHEN C. MACRIDES taken pursuant to
16   notice, was held at the offices of
    McCarter & English, LLP, 1600 Market
17   Street, Philadelphia, Pennsylvania,
    beginning at 9:05 a.m., on the above
18   date, before Michelle L. Gray, a
    Registered Professional Reporter,
19   Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
20
                   -   -   -
21
22        GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

1    A.    There's growth.

2    Q.    Okay.  And let's see, how

3    did we do from 2000 to 2001, sir?

4         Doing better?

5         MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7    Q.    Selling more?

8         MS. VANNI:  Objection.

9         THE WITNESS:  We're shipping

10        more product to patients who need

11        them.

12   BY MR. BUCHANAN:

13   Q.    Okay.  500 plus million,

14   half a billion pills; is that right?

15   A.    516 million.

16   Q.    Okay.

17        MS. VANNI:  Also note my

18        objection that he is not a

19        30(b)(6) on sales history.

20   BY MR. BUCHANAN:

21   Q.    Okay.  I believe, in fact,

22   you are a designee on suspicious order

23   monitoring, correct?

24   A.    Correct.

1    Q.    Okay.  Each of the shipments

2    that are memorialized in shipping records

3    followed an order, right?

4              MS. VANNI:  Object to form.

5              THE WITNESS:  You need an

6         order to ship a product.

7    BY MR. BUCHANAN:

8         Q.    Understood.  Since the

9    beginning of Endo's existence, Endo has

10   been charged with maintain -- maintaining

11   effective controls against diversion,

12   correct?

13             MS. VANNI:  Object to form.

14             THE WITNESS:  The

15        regulations state that we need to

16        have controls to prevent

17        diversion.

18   BY MR. BUCHANAN:

19        Q.    Not just any controls,

20   right?

21        A.    Can you clarify what you

22   mean by that?

23        Q.    You have to have effective

24   controls, right?

1          A.     Yes.  We have to have

2    controls in place to prevent diversion.

3          Q.     You have to have -- what's

4    the word you dropped?

5                 MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7          Q.     Effective controls, right?

8          A.     That those controls should

9    be effective.

10          Q.     That's right.

11          A.     I don't disagree with you.

12          Q.     Okay.  So from the

13    beginning, from 1999 till today, Endo has

14    been responsible for ensuring it has

15    effective controls to prevent diversion,

16    correct?

17          A.     By the regulations, that's

18    what we need to do.

19          Q.     As a reasonable company,

20    that's what you need to do --

21                 MS. VANNI:  Object to form.

22    BY MR. BUCHANAN:

23          Q.     -- right?

24          A.     We have a responsibility to

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  There's an operating

2  company known as Endo, right?

3    A.    Right.

4    Q.    That line of business

5  includes the company's branded portfolio;

6  is that accurate?

7    A.    That would be accurate.

8    Q.    Okay.  There's an operating

9  company known as Par today?

10   A.    Correct.

11   Q.    Just owned by the Irish Endo

12 entity, correct?

13   A.    Correct.

14   Q.    Par today owns what used to

15 be Endo's generic business, as well as

16 what used to be called Qualitest's

17 business, correct?

18        MS. VANNI:  Object to form.

19        He's also not a corporate designee

20        on corporate structure, corporate

21        history.

22 BY MR. BUCHANAN:

23   Q.    And I'm really not trying to

24 do that, you know, for a legal purpose.

Highly Confidential - Subject to Further Confidentiality Review

1    I just want to make sure we're clear in

2    communicating today, because it could get

3    confusing.

4             A.    What I can tell you is Par

5    had a generics business.  Endo had a

6    generics business that it operated as

7    Qualitest.  Par and Qualitest were merged

8    into a single generics business that now

9    operates under the Par name.

10            Q.    Okay.  So the current -- the

11   current generics business is all under

12   the Par name.  Is it in the Par entity?

13                 MS. VANNI:  Object to form.

14                 THE WITNESS:  I'm not an

15        expert on our legal entity

16        structure.  Our generics business

17        operates under the Par name.

18   BY MR. BUCHANAN:

19            Q.    Okay.

20            A.    That's what I can tell you.

21            Q.    We have named Par and we

22   have named Endo.

23            A.    Right.

24            Q.    I want to know when I talk

1                    MS. VANNI:  Object to form.

2                    THE WITNESS:  There -- there

3          are other regulations, controls,

4          that we follow that would more be

5          under the category of suspicious

6          order monitoring when it comes to

7          DEA compliance, to ensure that

8          orders are properly reviewed,

9          investigated before they are

10         distributed.

11    BY MR. BUCHANAN:

12         Q.    Okay.  And that's what I

13    wanted to understand.

14              So the concern that you have

15    and the care you have to take with

16    handling this product in the warehouse or

17    handling this product in manufacturing

18    with your own employees, people who you

19    trust and hire, has to be exercised in

20    investigating, in reviewing, every single

21    order you receive, because that concern

22    doesn't stop in the warehouse, right?

23                   MS. VANNI:  Object to form.

24                   THE WITNESS:  The control --

Highly Confidential - Subject to Further Confidentiality Review

1       the proper control of these

2       products extends throughout the

3       supply chain.

4   BY MR. BUCHANAN:

5       Q.    Right.  So when the company

6   receives an order for one of its

7   controlled products, it has an obligation

8   to maintain effective controls against

9   diversion with regard to the orders it

10  receives, right?

11          MS. VANNI:  Object to form.

12          THE WITNESS:  We have a

13      responsibility under the

14      regulations to make sure that we

15      are reviewing orders, that we are

16      understanding any orders of

17      interest, we are investigating

18      those.  And if it comes to it, and

19      if we determine that the order is

20      suspicious, then not to ship that

21      order.

22  BY MR. BUCHANAN:

23      Q.    Okay.  So we were looking at

24  the Endo orders just a moment ago, just

1    to give us some context.  I believe it's

2    Exhibit 4.

3                    Let's look at 1999.  You

4    know, shipped -- shipped hundreds of

5    millions of opioid products in 1999.

6    Every one of those was by an order.

7                    And how many suspicious

8    orders did the company report to the DEA

9    in 1999 for Endo products, sir?

10                   MS. VANNI:  Object to form.

11         The colloquy.

12                   THE WITNESS:  I don't

13         believe we reported any suspicious

14         orders as an outcome of our

15         investigations.

16   BY MR. BUCHANAN:

17         Q.    Okay.  So in 1999 the

18   company reported no suspicious orders to

19   the DEA for Endo's orders?

20         A.    I don't believe we reported

21   any suspicious orders to the DEA in 1999

22   as a result of our investigations.

23         Q.    Okay.  How about in 2000,

24   we've got, you know, hundreds of millions

1  of pills again, 400 million plus.  I

2  guess that's also syrups, so dosage units

3  of syrups.

4        400-plus million pills and

5  dosage units all pursuant to orders.  And

6  how many suspicious orders did -- did

7  Endo report to the DEA for 2000?

8        MS. VANNI:  Object to form.

9        THE WITNESS:  I don't

10        believe we reported any suspicious

11        orders in 2000 as an outcome of

12        our investigations into anything

13        that was of interest.

14  BY MR. BUCHANAN:

15     Q.    Okay.  How about 2001, it

16  looks like -- well, sales are growing.

17  We talked about that a moment ago.

18  500-plus million pills and dosage units

19  for Endo in 2001.

20        How many suspicious orders

21  got reported to the DEA that year?

22        MS. VANNI:  Object to the

23        colloquy.  You can answer.

24        THE WITNESS:  I don't

1    believe we reported any suspicious

2    orders to DEA after the outcome of

3    our invest -- as an outcome of our

4    investigations into anything that

5    was of interest.

6  BY MR. BUCHANAN:

7        Q.    Oh.  Okay.  So thousands and

8  thousands and thousands of orders, right?

9        A.    We had orders.  I can't tell

10  you specifically how many orders we had.

11  But we had orders that represented these

12  quantities.

13        Q.    Okay.  That -- that on an

14  annual basis would give every American an

15  opioid, right?

16              MS. VANNI:  Object to form.

17              THE WITNESS:  We got

18        order -- we received orders for

19        opioids from our customers who in

20        turn sold them to patients who

21        needed them.

22  BY MR. BUCHANAN:

23        Q.    And not one suspicious order

24  was reported to the DEA in 2001?

1        A.      We did not report any

2   suspicious orders to DEA after

3   investigating internally any orders that

4   we deemed as of interest.

5        Q.      Okay.  How about 2002?

6   Sales still on the move.  Growing along,

7   I guess we can pull out our -- our death

8   map that we looked at a moment ago.  We'd

9   see the deep blue going to lighter blue,

10  going to tan and yellow, and more people

11  dying.

12              How many suspicious orders

13  did you report to the DEA in 2002?

14              MS. VANNI:  Objection.

15              THE WITNESS:  I don't

16        believe we reported any orders,

17        suspicious orders to DEA as an

18        outcome of our internal

19        investigations into any orders of

20        interest.

21  BY MR. BUCHANAN:

22       Q.      Okay.  2003, sales still on

23  the move, right?  We are back on

24  Exhibit 4.

1      800 million pills, opioids,

2   dosage units in 2003.  All pursuant to

3   orders the company received, right?

4      MS. VANNI:  Object to form.

5      THE WITNESS:  Yes.  We would

6      receive orders to represent those

7      quantities shipped.

8   BY MR. BUCHANAN:

9      Q.   Okay.  And how many of those

10   did the company identify as suspicious?

11      A.   I don't believe we reported

12   any suspicious orders to the DEA as an

13   outcome of our internal investigations

14   into any orders of interest.

15      Q.   Okay.  So you didn't report

16   any over this period of time as we just

17   looked at a five-year window.

18      How many did you not ship?

19      A.   I don't believe we

20   ultimately -- we ultimately shipped all

21   of these orders as an outcome of our

22   internal investigations into any orders

23   of interest.

24      Q.   Okay.  So you've got a drug

Highly Confidential - Subject to Further Confidentiality Review

1   issues through our suspicious order

2   monitoring system.  That's my answer.

3        Q.   Not a single one was ever

4   reported to DEA?

5        A.   If an order had been

6   determined to be suspicious, it would

7   have been reported to DEA.

8        Q.   As a numbers matter, sir,

9   just stay with my question.

10            Did the company ever report

11  any order that Endo received for any of

12  its opioid products over the period of

13  time, 1999 to present to the DEA as a

14  suspicious order?

15            MS. VANNI:  Object to form.

16            THE WITNESS:  If an order

17       was deemed suspicious --

18  BY MR. BUCHANAN:

19       Q.   Did the company ever do it?

20       A.   If the order was -- if an

21  order was deemed suspicious, it would

22  have been reported to the DEA.

23       Q.   It doesn't answer my

24  question.  I just want the fact.  Not an

1  BY MR. BUCHANAN:

2          Q.    I'm passing you, sir, what

3  we're marking as Exhibit 8 to your

4  deposition.

5                MS. VANNI:  Thank you.

6  BY MR. BUCHANAN:

7          Q.    Sir, you'll recall before

8  the break we were talking about your

9  awareness or not of Endo's products being

10  diverted.  Do you recall that?

11         A.    I recall that.

12         Q.    Okay.  Showing you what is

13  an e-mail from Mr. Barto to Ms. Connell

14  from 2003, subject revised DEA meeting

15  minutes.  Do you see that?

16         A.    I see it.

17         Q.    Okay.  Who's Mr. Barto?

18         A.    I believe he was a former

19  employee of Endo.

20         Q.    You recognize him as being

21  in regulatory affairs for Endo?

22         A.    It says here that he worked

23  in regulatory affairs.

24         Q.    Okay.  Ms. Connell, you

1    recognize her as being on the supply

2    chain side?

3              A.    I do.

4              Q.    Okay.  In connection with

5    your preparation, sir, were you aware

6    that the company sat down with the DEA in

7    2003 to discuss abuse and diversion

8    measures with regard to Endo's products?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  In 2003?

11   BY MR. BUCHANAN:

12             Q.    Mm-hmm.

13             A.    I was aware that Endo had

14   discussions with DEA during the time

15   period that we are talking about.

16             Q.    Okay.  I'll pass you, sir,

17   Exhibit 9 to your deposition.

18             (Document marked for

19             identification as Exhibit

20             Endo-Macrides-9.)

21   BY MR. BUCHANAN:

22             Q.    Is that a yes answer, that

23   you're aware that the company had

24   discussed abuse and diversion of Endo's

1   oxycodone/APAP.  All three of those are

2   essentially the same pharmaceutical

3   combination, they just get marketed in

4   different ways, right?

5               MS. VANNI:  Objection.

6        Beyond the scope.

7               THE WITNESS:  Some are

8        branded and some are generic.

9   BY MR. BUCHANAN:

10       Q.   Fair.  I mean, I wasn't

11  trying to be tricky with that.  I just

12  wanted to -- the company, for whatever

13  its business reasons over time, has used

14  different trade names or branded names

15  for the same pharmaceutical combination,

16  true?

17              MS. VANNI:  Object to form.

18              THE WITNESS:  The branded

19       name is Percocet.  And then there

20       are generics that go by different

21       names.

22  BY MR. BUCHANAN:

23       Q.   Okay.  All right, good.  So

24  Percocet in abuse and diversion was a big

Highly Confidential - Subject to Further Confidentiality Review

1    deal into the early 2000s; isn't that

2    right?

3                MS. VANNI:  Objection.

4                THE WITNESS:  I don't have

5        specific knowledge on Percocet

6        abuse because --

7    BY MR. BUCHANAN:

8        Q.    Sorry.

9        A.    Well, as I stated earlier,

10   if our products aren't properly

11   controlled, if they get out of the closed

12   system, then they have -- they can be

13   abused and diverted.

14       Q.    Okay.

15             MR. BUCHANAN:  Can we pull

16       up the chart for the first --

17       let's just say through 2003,

18       please.

19             There you go.

20   BY MR. BUCHANAN:

21       Q.    All right.  So we can see

22   that in fact Percocet, Endocet, and

23   oxycodone/APAP -- let's get the Percocet

24   up there.  Those are big movers for the

1    company in the early -- late '90s, early

2    2000s, right?

3              MS. VANNI:  Object to form.

4              THE WITNESS:  Can you

5         clarify what you mean by "big

6         mover"?

7    BY MR. BUCHANAN:

8         Q.    I guess, for simplicity,

9    two-thirds of your sales?

10        A.    We were shipping Percocet

11   and Endocet based on orders from our

12   customers based on patient demand.

13        Q.    I understand that, sir.  But

14   looking at the chart so we have some

15   rough sense of what the business

16   represented, about two-thirds of sales,

17   at least in terms of pills, was Percocet

18   or Percocet-like formulations, correct,

19   sir?

20             MS. VANNI:  Object to form.

21             THE WITNESS:  Yes, based

22        on -- if we're looking at 1999, a

23        majority of the tablets shipped

24        were Percocet or Endocet.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. BUCHANAN:

2         Q.    Right.  And roughly, what is

3    that, 260 million pills, Percocets,

4    versus a total of 360 or so?

5         A.    Right.

6         Q.    Okay.  And excuse my

7    rounding.  I'm just trying to make it

8    faster and simpler for both of us.

9              All right.  We go forward in

10   2000.  And you're, you know, again, at

11   roughly 340 million of 450 million pills

12   are the Percocet and Endocet drugs,

13   right?

14              MS. VANNI:  Object to form.

15              THE WITNESS:  That's what it

16   says.

17   BY MR. BUCHANAN:

18        Q.    Percocet was Endo's brand?

19        A.    Percocet was a branded

20   product or is a branded product.

21        Q.    But the brand Percocet, was

22   that Endo's brand name?

23        A.    It was.

24        Q.    They owned it?

Highly Confidential - Subject to Further Confidentiality Review

1    MS. VANNI:  Object to form.

2    THE WITNESS:  Correct.

3  BY MR. BUCHANAN:

4    Q.    So when the jury or consumer

5  hears Percocet, they should think of

6  Endo?

7    MS. VANNI:  Object to form.

8  BY MR. BUCHANAN:

9    Q.    Right?

10    A.    Percocet is the brand.

11    Q.    That's the name you marketed

12  it under, right?

13    A.    That's the name that Endo

14  marketed the product under, Percocet.

15    Q.    And if we looked at Percocet

16  pills shipped by Endo, we'd see a little

17  R with a circle around it, right?

18    It was your registered trade

19  name for it, correct?

20    A.    It was.

21    Q.    You had the exclusive right

22  to use that name, right?

23    MS. VANNI:  Object to form.

24    Beyond the scope.

1          THE WITNESS:  From a

2     regulatory perspective, yes.

3  BY MR. BUCHANAN:

4          Q.    Right.  So when the jury

5  hears Percocet it can think Endo, right?

6          MS. VANNI:  Objection.

7  BY MR. BUCHANAN:

8          Q.    It has your name?

9          MS. VANNI:  Objection.

10          THE WITNESS:  Percocet was

11     our branded product.  I will say

12     though, that as a strip that you

13     put on a cut, it's called a

14     Band-Aid, there is a branded

15     Band-Aid.  And there are a lot of

16     other kinds of band-aids.

17          There is a branded Percocet

18     product and there are a lot of

19     generic Percocet products.  Some

20     distributed by Endo, some

21     distributed not by Endo.

22          So there are a number of

23     products, generic products, that

24     get referred to as Percocet, that

1    may or may not be the branded

2    Percocet.

3    BY MR. BUCHANAN:

4         Q.    Fair point, sir.

5              And we see, in fact, you

6    sold a generic version of your own

7    branded product, right?

8         A.    We did.

9         Q.    Right.  Well, we can't

10   dispute that -- or you don't dispute, do

11   you, sir, that you sold a lot of

12   Percocet?

13             MS. VANNI:  Object to form.

14   BY MR. BUCHANAN:

15        Q.    And its generic equivalence?

16             MS. VANNI:  Object to form.

17             THE WITNESS:  We sold

18   Percocet.  I'm not disputing that.

19   BY MR. BUCHANAN:

20        Q.    Okay.  And as we see through

21   the years, certainly the early years

22   here, sir, Percocet is a big part of your

23   sales portfolio, right?

24             MS. VANNI:  Object to form.

1    THE WITNESS:  We sold the

2    quantities of Percocet that are

3    listed on this sheet.

4  BY MR. BUCHANAN:

5    Q.    Okay.  So by 2003, wow, you

6  have taken, with your Percocet and

7  Endocet brand, you've gone from, what,

8  about 260 million pills of Percocet and

9  Endocet in 1999, to, what is that, about

10  640 million pills, of Percocet and

11  Endocet for one year in 2003?

12    A.    About that.

13    Q.    Just about doubled, five

14  years.

15    A.    Right.  Reflecting the

16  demand for the product, for the patients

17  that need it.

18    Q.    A lot of growth, agreed?

19    MS. VANNI:  Object to form.

20  BY MR. BUCHANAN:

21    Q.    Doubled sales in five years

22  of Percocets?

23    A.    There's growth from 1999 to

24  2003 reflecting the increased demand for

1    specific input to challenge us and

2    to give us suggestions on how we

3    can improve.

4  BY MR. BUCHANAN:

5    Q.    Sure.

6    A.    In that context that's why

7  we -- that's how we would have --

8    Q.    And you invited them into

9  your shop, right?

10    MS. VANNI:  Object to form.

11  BY MR. BUCHANAN:

12    Q.    Per the 1056.3?

13    A.    I'm just looking this over.

14  Yes, it looked like there was a visit to

15  the facility.

16    Q.    Visit to the facility, short

17  review of documents, to provide findings

18  and recommendations back to the company,

19  correct?  We're going to 1056.10.

20    A.    1056.10?

21    Q.    Yes.  Is that correct?  You

22  called them in.  They looked at stuff.

23  They gave you a report and analysis back?

24  Fair, sir?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    It looked like they did an

2   audit and gave us some -- some findings.

3       Q.    Okay.  Let's go to Finding

4   Number 8.

5       A.    Are you on --

6       Q.    1056.10.

7       A.    Okay.

8       Q.    I'm sorry.

9             Finding Number 8, SOM,

10  below.  I guess there's two Finding

11  Number 8 -- Findings Number 8.

12            Finding Number 8, SOM.

13  Could you read that sentence for us, sir?

14      A.    "There is no suspicious

15  order monitoring program in place."

16      Q.    Okay.  Let's pause there.

17  As of 2010, the company is selling

18  controlled substances that it must keep

19  in a vault and in a cage in its warehouse

20  and production facilities, correct?

21            MS. VANNI:  Object to form.

22            THE WITNESS:  Par was

23        selling opioids that had certain

24        regulations on how they needed to

Highly Confidential - Subject to Further Confidentiality Review

1    be stored and controlled.

2    BY MR. BUCHANAN:

3         Q.    And there is a requirement?

4              MR. BUCHANAN:  Can we blow

5         that out?

6    BY MR. BUCHANAN:

7         Q.    Under 21 C.F.R. 1301.74(b).

8    Do you see that?  That the company must

9    maintain and operate a system to disclose

10   to the registrant suspicious orders of

11   controlled substances, right?

12              Do you see that?

13        A.    Yeah.  And if I could just

14   have a minute to read it.  Yes, this is

15   what the regulation says.

16        Q.    Okay.  And that regulation's

17   not a new one, right?

18        A.    No.

19        Q.    I mean, that regulation has

20   been around for as long as Endo has been

21   around, right?

22              MS. VANNI:  Objection.

23              THE WITNESS:  The

24        regulations has been in place for

1    whatever period of time they've

2    been in place.

3  BY MR. BUCHANAN:

4        Q.    Right.  And the Controlled

5  Substance Act actually has a provision

6  that manufacturers and distributors are

7  supposed to maintain effective controls

8  against diversion, right?  Are you aware

9  of that?

10       A.    I'm aware of that, yes.

11       Q.    Okay.  So as of 2010, sir,

12 there is no suspicious order monitoring

13 program in place.  That's what you're

14 told by the consultants you hired to look

15 at this issue, correct?

16       A.    That's what the report says.

17       Q.    Okay.

18       A.    So as I said earlier, we

19 hired --

20       Q.    That's my question sir.

21             Recommendation underneath,

22 "Although it was stated that sales are

23 mainly to large wholesalers" -- let's

24 pause.

Highly Confidential - Subject to Further Confidentiality Review

1           As a registrant, you have an

2    obligation to maintain a suspicious order

3    monitoring program, period, correct, sir?

4           MS. VANNI:  Object to form.

5           THE WITNESS:  We have an

6        obligation to do what it says here

7        in the regulations, to design and

8        operate a system to disclose to

9        the registrant suspicious orders

10        of controlled substances.

11   BY MR. BUCHANAN:

12        Q.    Right.

13        A.    That's what we have an

14   obligation to do.

15        Q.    Right.  It doesn't -- the

16   explanation given to your consultant that

17   well, we just sell to wholesalers, that

18   doesn't mean that you don't have to have

19   a suspicious order monitoring program,

20   right?

21           MS. VANNI:  Object to form.

22           THE WITNESS:  We have to --

23   BY MR. BUCHANAN:

24        Q.    You know better than that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Sitting here today, sir, you
 2    don't recall a single Par policy,
 3    procedure, or standard operating document
 4    prior to the date of this memo for
 5    suspicious order monitoring, correct,
 6    sir?
 7                   MS. VANNI:  Object to form.
 8                   THE WITNESS:  I do recall a
 9            suspicious order monitoring SOP.
10                   I do not recall the time
11            frame at which that was
12            implemented.
13    BY MR. BUCHANAN:
14              Q.    Okay.  Well, we'll look at
15    that.  Okay.
16                   Because the company, a few
17    years later, implements an SOP, right?
18                   MS. VANNI:  Object to form.
19    BY MR. BUCHANAN:
20              Q.    After it's been selling
21    opioids for years --
22                   MS. VANNI:  Objection.
23    BY MR. BUCHANAN:
24              Q.    -- right?
```

1      MS. VANNI:  Objection.

2      THE WITNESS:  As I said, our

3   programs were evolving in response

4   to increasing our diligence around

5   monitoring orders and ensuring

6   that we were doing everything we

7   could within the regulations to

8   prevent our abuse and diversion.

9      This step of bringing in a

10   consultant, which we do quite

11   frequently, to challenge us, to

12   help us raise the bar, to give us

13   their view on things.

14      MR. BUCHANAN:  Move to

15   strike.

16   BY MR. BUCHANAN:

17      Q.   My question was, the company

18   has been selling opioids for years prior

19   to the time it implements its first SOP.

20      Do you know that, sir?

21      MS. VANNI:  Objection.

22   Asked and answered.

23      THE WITNESS:  I have data

24   here that says the company was

Highly Confidential - Subject to Further Confidentiality Review

1    things, and delivered a report which said

2    there is no suspicious order monitoring

3    program in place as of this date in 2010,

4    correct, sir?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  As the

7         consultants define suspicious

8         order monitoring program, their

9         input was we needed to enhance

10        whatever we were doing in terms of

11        looking at orders and formalize

12        the program.  That's how I would

13        interpret their response here.

14   BY MR. BUCHANAN:

15        Q.    Okay.  And so the answer to

16   my question, sir, though about whether

17   you are aware of a standard operating

18   procedure for SOMs or a policy as of 2010

19   is still the same, you're not aware of

20   one, correct?

21              MS. VANNI:  Objection.

22        Misstates his testimony.

23              THE WITNESS:  I reviewed a

24        lot of documents.  I know I

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed documents, Par documents,

2    that were related to suspicious

3    order monitoring.

4          I don't remember -- I don't

5    recall the date.  I looked at a

6    lot of documents to prepare for

7    this.  I didn't commit them all to

8    memory.

9  BY MR. BUCHANAN:

10        Q.    Okay.  Let me show you the

11  first one we found, sir.  Okay.

12          MR. BUCHANAN:  Can I have

13    1839.

14          (Document marked for

15    identification as Exhibit

16    Endo-Macrides-12.)

17  BY MR. BUCHANAN:

18        Q.    I'm passing you, sir, what

19  we're marking as Exhibit 12.  This is an

20  e-mail from Ms. Feniger to Ms. Lipari and

21  some others on the team.  Suspicious

22  order monitoring.

23          SOM, do you see that?

24        A.    I see that.

1      Q.    Attachments SO002.  Do you
2  see that?
3      A.    I see that.
4      Q.    Okay.  The quality is
5  something we're both suffering with, sir.
6  I wish I could have given you a better
7  copy.
8            And so what we have here is
9  the SOM.  And it's SOP number SO002.0.
10 Do you see that?
11     A.    I see that.
12     Q.    And it says supersedes.
13 What does it say after that?
14           MR. BUCHANAN:  Can you go to
15      .2 please.
16           THE WITNESS:  I'm sorry.
17 BY MR. BUCHANAN:
18     Q.    I'm sorry.  It's the top of
19 the page, sir.  I know my question was
20 confusing.
21           We see the SOP number on the
22 right.  You recognize that companies like
23 yours number their SOPs?
24     A.    Right.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And they often put a version

2    number, a dot after to indicate an

3    incremental change to an SOP?

4    A.    Right.

5    Q.    Okay.  What's the title of

6    this particular SOP, sir?

7    A.    Suspicious order monitoring.

8    Q.    Okay.  And the SOP number

9    for it is SO002.0, correct?

10   A.    Correct.

11   Q.    Supersedes?

12   A.    It says not applicable.

13   Q.    What is the date, the

14   effective date of this SOP, sir?

15   A.    April 17th of 2012.

16   Q.    Okay.  And we've got

17   signatures and approvals written by,

18   checked by, approved by.

19        Do you see all that?

20   A.    I do.

21   Q.    Okay.  This was actually

22   written by the head of sales?

23   A.    Written by Patricia Lipari,

24   director of sales.

1        Q.     Okay.

2        A.     Sales operations.

3        Q.     Okay.  Sales ops.  And it

4    was checked by a technical writer in

5    documentation, right?

6        A.     Checked by, yeah, Angela

7    Feniger.

8        Q.     I can't read the approved by

9    name.  Do you know that name?

10        A.     Dino Taraban.

11        Q.     Okay.  And so, sir, this

12    is -- the .0 or the first version of

13    Par's SOM, suspicious order monitoring

14    SOP, correct, sir?

15        A.     Appears to be the first

16    specific SOP entitled suspicious order

17    monitoring.

18        Q.     Okay.  And --

19        A.     But I wouldn't interpret

20    that as suggesting that orders were not

21    being looked at in some capacity prior to

22    that.

23        Q.     Yeah, that wouldn't be

24    helpful, right?  That'd be a real

Highly Confidential - Subject to Further Confidentiality Review

1    problem?

2                MS. VANNI:  Object to form.

3    BY MR. BUCHANAN:

4         Q.    I mean, you had a consultant

5    come -- withdrawn.

6                You had a consultant come in

7    in 2010, in April, right?  The Buzzeo

8    group came in in April 2010?

9         A.    April.

10        Q.    We looked at that.

11        A.    Right.

12        Q.    They said, "There is no

13   suspicious order monitoring program," is

14   what they said, right?

15        A.    That was their observation.

16        Q.    Right.

17        A.    Those were their words.

18        Q.    They showed you the C.F.R.

19   They made a recommendation, right?  They

20   said, "You need an SOP," right?

21                MS. VANNI:  Object to form.

22           The document speaks for itself.

23                MR. BUCHANAN:  I'm happy to

24           let it speak for all of us.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  They said --

2    MR. BUCHANAN:  I told you

3    I'd allow that to happen.

4    THE WITNESS:  My

5    interpretation of what they said

6    is they said we need to improve

7    our program around order

8    monitoring.

9    BY MR. BUCHANAN:

10    Q.    What they said, "There is no

11    suspicious order monitoring program in

12    place."  You can agree that's what they

13    wrote and told the company in early 2010,

14    correct?

15    A.    That's what they said in

16    2010, based on the way they would define

17    suspicious order monitoring.

18    Q.    Right.  And -- well, they

19    said you had no suspicious order

20    monitoring program in place.  Yes or no?

21    A.    That's what it says here.

22    Q.    Thank you.  They quoted you

23    the regulation.  Yes or no?

24    A.    They quoted the regulation.

1    Q.    They said, "Although it was

2    stated" -- okay, do you understand that

3    to be referring to your people talking to

4    the Buzzeo folks, right?

5         MS. VANNI:  Object to form.

6    BY MR. BUCHANAN:

7    Q.    "Although it was stated that

8    sales are mainly to large wholesalers" --

9    is that your understanding, sir?

10   A.    Right.

11   Q.    The Buzzeo folks got that

12   information from your team at Par, right?

13   A.    Presumably yes, they were

14   speaking to people at Par.

15   Q.    Right.  "Although it was

16   stated that sales are mainly to large

17   wholesalers, a program must be instituted

18   based on customer sales, volumes,

19   seasonal fluctuations, et cetera, with a

20   firm statistical analysis as the basis

21   for such a program."

22        Did I read that correctly,

23   sir?

24   A.    You read -- that's what it

Highly Confidential - Subject to Further Confidentiality Review

1    says.

2         Q.    Okay.  "It is further

3    recommended that the basis for

4    conducting" -- what?  Due diligence.

5              Do you see that?

6         A.    I see that.

7         Q.    -- "of new and existing

8    customers and identifying and

9    investigating and clearing of reporting

10   suspicious orders be documented in an

11   SOP."

12             Did I read that correctly,

13   sir?

14        A.    You did.

15        Q.    Okay.  And so we have now,

16   the rest of 2010 passes without an SOP,

17   right?

18        A.    This appears to be the first

19   SOP that is specifically titled

20   "Suspicious Order Monitoring."

21        Q.    All of 2011 passes without

22   an SOP, right?

23        A.    As I said, this is the first

24   SOP that appears to be entitled

1    "Suspicious Order Monitoring."  That

2    doesn't mean that Par wasn't complying

3    with the registration around identifying

4    potentially suspicious orders --

5           Q.    And then in --

6           A.    -- in the 2010-2011 time

7    frame.

8           Q.    Then sometime around April

9    of 2012, you got around to getting an

10   SOP, huh?

11          MS. VANNI:  Object to form.

12   BY MR. BUCHANAN:

13          Q.    Do I have that right?

14          MS. VANNI:  Object to form.

15          THE WITNESS:  In April

16   of 2012, we published an SOP.

17   BY MR. BUCHANAN:

18          Q.    Okay.  And you published

19   that SOP, and, you know, we can agree

20   some 200 million units of pills and doses

21   and patches -- I guess it's not pills.

22   It's oral transmucosal fentanyl citrate

23   and syrups, are going out the door with

24   hydrocodone and fentanyl in 2010 and

1    2011, correct?

2                MS. VANNI:  Object to form.

3                MR. BUCHANAN:  Withdrawn.

4        Very confusing question.

5                MS. VANNI:  Very.

6    BY MR. BUCHANAN:

7        Q.    You told us earlier in

8    April 2012 you published that SOP.  Yet

9    in 2010 and 2011 some 200 million dosage

10   units of fentanyl citrate and hydrocodone

11   went out the door, correct?

12       A.    We sold those products in

13   2010 and 2011.

14       Q.    Okay.

15       A.    You're assuming that the

16   lack of -- the lack of an SOP meant that

17   those orders were not being looked at or

18   not being reviewed.

19       Q.    You have not been able to

20   highlight any written procedure, any

21   documentation for the company that

22   preceded the April 2012 SOP, correct,

23   sir?

24               MS. VANNI:  Object to form.

1          THE WITNESS:  I don't have a

2     document.

3 BY MR. BUCHANAN:

4          Q.    So could you describe for

5 us, sir, where in Exhibit 12 the company

6 describes how it's going to determine

7 what gets reported to the DEA?

8          A.    If you can give me a minute

9 to review this.

10         Q.    Sure.  Let's just -- let's

11 just go to 1839.2 real quick.

12         A.    1839.2.

13         Q.    We can agree under purpose,

14 policy, and responsibility, there's

15 nothing in here about reporting stuff to

16 the DEA, correct?

17         A.    It says, "Define process of

18 suspicious order monitoring as determined

19 by sales operations that we are in line

20 with DEA requirements."

21              So if -- if the order needs

22 to be reported to DEA, that would be in

23 line with DEA requirements.

24         Q.    Okay.  So what orders, then,

Highly Confidential - Subject to Further Confidentiality Review

1  are suspicious orders under your SOP for

2  suspicious order monitoring, sir?

3       A.    Orders that would be deemed

4  of interest.

5       Q.    Where are those?  You're

6  looking -- it sounds like you are not on

7  1839.2.  You are now on 18 point --

8       A.    I'm just reviewing the

9  document.

10      Q.    -- 1839.3.  We can agree

11 1839.2 doesn't identify what a suspicious

12 order is, correct?

13           MS. VANNI:  Object to form.

14 BY MR. BUCHANAN:

15      Q.    Characteristics, quality.

16 We could agree?

17      A.    It says, "Define a process

18 for suspicious order monitoring that's in

19 line with DEA requirements."  That's what

20 it says.

21      Q.    Okay.  Let's go to 1839.3.

22           So what were you telling

23 your sales operations folks was a

24 suspicious order on 1839.3?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    So what this is telling me

2   is that they're looking at orders that

3   are considered to be excessive.  "If

4   quantities are higher than the average

5   transmission, it is questioned."

6      Q.    Where are you, sir?

7      A.    I'm on -- under procedure.

8      Q.    Okay.  What paragraph?

9      A.    The second one.  "Weekly

10  replenishment purchase orders are

11  analyzed by account service executives

12  versus customer provided usages.  If

13  quantities are higher than the average

14  transmission it is questioned.

15           "The buyer is contacted to

16  review a written request, is asked as to

17  the reason for the increase.  It is

18  reviewed to ensure it is correct and

19  warranted."

20      Q.    Mm-hmm.  And then what gets

21  reported to the DEA?

22      A.    If there is not a reasonable

23  explanation for the order, and it was

24  deemed suspicious, then under the

1   regulations it would need to be reported

2   to DEA.

3           Q.    Okay.  And where is that?

4   I'm just trying to find that?

5               Can we agree, sir, nothing

6   in here spells out what and how it gets

7   reported to the DEA?

8           A.    It doesn't seem to describe

9   that exact process.  It seems to talk

10  more about monthly reports are generated

11  and sent to quality compliance for

12  submission to DEA on a quarterly basis.

13          Q.    Okay.  We can agree, sir, in

14  2010, I think your testimony was no

15  orders were identified as suspicious or

16  reported to DEA, correct?

17          A.    We did not submit any

18  suspicious orders based on our review of

19  the orders.

20          Q.    And not in 2011 or in 2012,

21  correct, sir?

22          A.    Not to my knowledge.

23          Q.    Okay.

24          A.    After review and

1    investigation.

2         Q.    Well, in fact, there was no

3    SOP in force until April of 2012,

4    correct?

5              MS. VANNI:  Object to form.

6              THE WITNESS:  Yes.  No SOP

7         specifically entitled "Suspicious

8         Order Monitoring."

9    BY MR. BUCHANAN:

10        Q.    Okay.  And, in fact, please

11   tell the jury who had a responsibility

12   for evaluating orders once you had an

13   SOP.

14             Let's go to 1839.2.  Do you

15   see the heading that says Responsibility?

16             Who had responsibility?

17        A.    "Sales" -- "sales

18   operations/account services to monitor

19   applicable Par trade customer purchase

20   orders."

21        Q.    Okay.  So the sales group?

22        A.    These aren't -- these aren't

23   salespeople.  These are -- these are

24   people that -- these are more clerical

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. BUCHANAN:

 2         Q.    This was put in force in

 3    October of 2012, correct?

 4         A.    That's what it says.

 5         Q.    Okay.  And then if we go to

 6    dot -- and again it was -- go back again,

 7    I'm sorry.

 8              Again, it was written by the

 9    same director of sales operations, right?

10         A.    Right.

11         Q.    And signed off by the --

12    excuse me, checked by the account

13    services executive, right?

14         A.    Right.

15         Q.    That's a different name than

16    last name.

17              And then we've got that same

18    Dino person, head of QA?

19         A.    Yeah, he was -- he was head

20    of compliance for the -- for Par.

21         Q.    Okay.

22         A.    All of compliance.

23         Q.    Okay.

24         A.    Quality and DEA compliance.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And well, let's look

2  at how this SOP evolved.

3            MR. BUCHANAN:  Can we go to

4        .3.

5  BY MR. BUCHANAN:

6    Q.    It says, "Reporting

7  suspicious criminal activities."

8            Do you see that?

9    A.    I see that.

10    Q.    Okay.  "If criminal activity

11  is suspected, report the following" --

12  "report the following to the state

13  agencies that are" -- "that license the

14  facility, e.g., board of pharmacy and

15  Food and Drug Administration, as well as

16  Drug Enforcement Administration for

17  controlled substances within three days

18  of suspecting criminal activity."

19            Do you see that, sir?

20    A.    I see that.

21    Q.    Okay.  We can agree, sir,

22  that your obligation and your promise as

23  a registrant, is to report orders of

24  unusual frequency, orders of unusual

1      A.    I am not aware of a

2   suspicious order that had been identified

3   that would subsequently have been

4   reported to DEA.

5      Q.    You're not aware of a single

6   order that was not shipped during this

7   period of time?

8      A.    I'm not aware of an order

9   that was identified as suspicious and was

10   not shipped.  That's not to say there

11   weren't any.  I'm not aware of them.

12           MR. BUCHANAN:  Let's take a

13      break.

14           THE VIDEOGRAPHER:  Off the

15      record at 3:13 p.m.

16           (Short break.)

17           THE VIDEOGRAPHER:  We are

18      back on the record at 3:32 p.m.

19   BY MR. BUCHANAN:

20      Q.    Okay.  Sir, I'm passing you

21   over a stack of exhibits.  We'll go

22   through them in sequence.  There's -- why

23   don't we start with what's been marked as

24   Exhibit Number 23.

Highly Confidential - Subject to Further Confidentiality Review

 1              (Document marked for

 2         identification as Exhibit

 3         Endo-Macrides-23.)

 4              MR. BUCHANAN:  Charles,

 5         could you pass a copy for defense

 6         counsel.

 7    BY MR. BUCHANAN:

 8         Q.    For the record, it's

 9    internally labeled as E-1051.  If we can

10    pull up that on the screen.  E-1051, sir,

11    is an e-mail to John Schultz, Mike

12    Reiney, Charles Propst, others.

13              Do you recognize any of

14    those names?

15         A.    I recognize most of the

16    names.

17         Q.    Okay.  And a Mr. Mapes, a

18    former DEA agent, conducted an audit of

19    your facility in 2008 and provided a

20    report of that back to Qualitest

21    Pharmaceuticals.

22              Do you see that?

23         A.    Right.  Michael Mapes was

24    brought in to do an audit.

1    what -- excuse me, in 2008, that this is

2    what was required, right?

3            A.    All companies were reviewing

4    the guidance by DEA to move in the

5    direction of statistical models --

6            Q.    You still have to answer my

7    question.

8            A.    -- to adapt their programs.

9            MS. VANNI:  Objection to

10           form.

11   BY MR. BUCHANAN:

12           Q.    You still have to answer my

13   question.  So my --

14           A.    Can you ask it again,

15   please.

16           Q.    Yeah.  My question to you,

17   sir, after you said, "In 2013, we engaged

18   with Cegedim to do that," I said, "So the

19   very consultant who told you in 2008 that

20   this is what was required was the

21   consultant you used in 2013 to implement

22   the statistically validated algorithm for

23   Qualitest, correct?"

24           A.    We worked with them in 2013

Highly Confidential - Subject to Further Confidentiality Review

1    to enhance the program and build us a,

2    you know, more advanced algorithm.

3           Q.    Right.  In fact you did that

4    after you sat down with the DEA in March

5    of 2013, correct?

6           A.    I think I testified earlier

7    that we had identified areas to improve

8    our program throughout that period but as

9    early as 2011 when we had engaged Tracey

10   Hernandez to lead our DEA compliance.

11          Q.    When did management first

12   approve and fund a statistically

13   validated algorithm to detect potentially

14   suspicious orders, sir?

15          MS. VANNI:  Objection.

16   BY MR. BUCHANAN:

17          Q.    Before or after the

18   March 2013 meeting with the DEA?

19          A.    In 2013 we engaged with

20   Cegedim to develop the algorithm.

21          Q.    After you met with the DEA,

22   correct?

23          A.    Subsequent to March of 2013.

24          Q.    Which means after, right?

1    that?

2         A.    I recall there was a

3    communication to DEA.

4         Q.    And after you cut off these

5    three retail pharmacies that you were

6    still selling to, Exhibits 33, 34, and

7    35, we can agree that you didn't report

8    them to the DEA, correct?

9              MS. VANNI:  Object to form.

10             THE WITNESS:  There's no

11        knowledge here that -- or

12        information that they were

13        reported to the DEA.

14   BY MR. BUCHANAN:

15        Q.    Because in fact, you were

16   the person selling to them?  You were

17   selling directly to people that were

18   problematic customers, right?

19             MS. VANNI:  Object to form.

20             THE WITNESS:  We were

21        selling to these customers.

22   BY MR. BUCHANAN:

23        Q.    Please look at Exhibit 41,

24   sir.

1              (Document marked for

2         identification as Exhibit

3         Macrides-41.)

4              THE WITNESS:  41?

5    BY MR. BUCHANAN:

6         Q.    Yeah.  Exhibit 41, sir, is

7    excerpted from the company's

8    interrogatories that were prepared by the

9    company and counsel and produced to us in

10   the last two weeks.

11             It says suspicious orders

12   and --

13             MS. VANNI:  This is a

14        demonstrative based on the --

15             MR. BUCHANAN:  It -- it's a

16        demonstrative.  But it is, in

17        fact, the entire chart as -- as

18        reflected in the interrogatory.

19   BY MR. BUCHANAN:

20        Q.    These are, in fact, either

21   suspicious orders or customers reported

22   to DEA by Par Pharmaceuticals, as

23   disclosed in discovery responses to us,

24   sir.

1          We could agree, sir, looking

2    at this list, that you don't see any

3    reports to the DEA of any suspicious

4    orders or any suspicious customers prior

5    to the meeting with the DEA in March of

6    2013, correct, sir?

7               MS. VANNI:  Objection.

8               THE WITNESS:  All these

9          dates are after March of 2013.

10               MS. VANNI:  I want to make

11          one more objection to the extent

12          that I don't -- I don't know

13          whether that interrogatory even

14          called for that information.

15               MR. BUCHANAN:  It does.  But

16          your objection is noted.

17               MS. VANNI:  I also object to

18          completeness.

19    BY MR. BUCHANAN:

20          Q.    We could also agree, sir,

21    that the pharmacies that were cut off by

22    the company in -- following the Texas

23    road trip, 33, 34 and 35, Big Tex,

24    Advanced Pharmacy, BZ Pharmacy, those are

1      ultimate end customer.

2  BY MR. BUCHANAN:

3      Q.    UPS didn't have a

4  relationship with your customers,

5  correct?

6      A.    UPS is our distribution

7  partner.

8      Q.    My question to you, sir, is,

9  UPS -- you were UPS's customer, correct?

10         MS. VANNI:  Object to form.

11         THE WITNESS:  UPS --

12      correct.  UPS is a third-party

13      distributor.

14  BY MR. BUCHANAN:

15      Q.    Right.  UPS did not have

16  visibility to your customers and did not

17  conduct due diligence of your customers,

18  correct, sir?

19         MS. VANNI:  Object to form.

20         THE WITNESS:  No UPS -- UPS

21      is the registrant for

22      distribution, for the distribution

23      license would be required to have

24      a suspicious order monitoring

1    program in place.

2    BY MR. BUCHANAN:

3         Q.    My --

4         A.    It would be the

5    responsibility of the client, in this

6    case Endo, to manage the customer

7    relationship.

8         Q.    For you to manage your

9    customer, your Morris and Dickson, your

10   FW Kerr, your Top Rx, your BZ Pharmacies.

11   Those were your customers?

12        A.    That's how -- yes, that's

13   how these relationships work.

14        Q.    Right.  And it was your job

15   to manage your -- and do -- manage and do

16   the due diligence on your customers,

17   correct?

18             MS. VANNI:  Object to form.

19             THE WITNESS:  The model here

20        is to outsource distribution.  The

21        customer relationship, the

22        customer diligence is with Endo in

23        that case.

24             Now UPS, given the fact that