EXHIBIT 129

Highly Confidential – Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL        : HON. DAN A. POLSTER
PRESCRIPTION OPIATE     :
LITIGATION              :
                        :
APPLIES TO ALL CASES    : NO.
                        : 1:17-MD-2804

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

JANUARY 16, 2019

- - -

Videotaped sworn deposition of

TRACEY L. NORTON, taken pursuant to

notice, was held at BEST WESTERN LEHIGH

VALLEY HOTEL & CONFERENCE CENTER, 300

Gateway Drive, Bethlehem, Pennsylvania,

beginning at 8:51 a.m., on the

abovedate, before Margaret M. Reihl, a

Registered Professional Reporter,

Certified Shorthand Reporter, Certified

Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential – Subject to Further Confidentiality Review

## Page 2

APPEARANCES:

SEEGER WEISS LLP
BY:  DAVID BUCHANAN, ESQUIRE
     ELINA RAKHLIN, ESQUIRE
     SCOTT SIEGEL, PARALEGAL
55 Challenger Road
Ridgefiled Park, New Jersey  07660
(212) 584-7732
erakhlin@seegerweiss.com
Representing the Plaintiffs

MORGAN & MORGAN
BY:  JAMES YOUNG, ESQUIRE
     RAYMOND TAMAYO, ESQUIRE (telephonic)
     TERESA DuBUISSON-MAI, ESQUIRE (telephonic)
     RENEE COOK, ESQUIRE (telephonic)
     SHAWRINA SHAW, ESQUIRE (telephonic)
     JENNIFER WILLIAMS, ESQUIRE (telephonic)
76 Laura Street, Suite 1100
Jacksonville, Florida  32202
(904) 398-2722
jyoung@forthepeople.com
Representing the Plaintiffs

MCCARTER & ENGLISH
BY:  AMY M. VANNI, ESQUIRE
1600 Market Street
Suite 3900
Philadelphia, Pennsylvania  19103
(215) 979-3848
avanni@mccarter.com
     - AND -
BY:  HAYLEY J. REESE, ESQUIRE
405 N. King Street, 8th Floor
Wilmington, Delaware  19801
(302) 984-6308
hreese@mccarter.com
Representing the Defendant Endo and
the witness

## Page 3

APPEARANCES: (cont'd)

KIRKLAND & ELLIS LLP
BY:  JENNIFER G LEVY, ESQUIRE
655 Fifteenth Street, N W
Washington, D C  20005
(202) 879-5211
jennifer.levy@kirkland.com
Representing the Defendant Allergan

REED SMITH LLP
BY:  LOUIS W SCHACK, ESQUIRE
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania  19103
(215) 851-8280
lschack@reedsmith.com
Representing the Defendant AmerisourceBergen

FOLEY & LARDNER LLP
BY:  KATY E KOSKI, ESQUIRE
111 Huntington Avenue
Boston, Massachusetts  02199-7610
(617) 342-4000
kkoski@foley.com
Representing the Defendant Anda

MORGAN LEWIS & BOCKIUS LLP
BY:  MARTHA A LEIBELL, ESQUIRE
200 South Biscayne Boulevard
Suite 5300
Miami, Florida  33131-2339
(305) 415-3387
martha.leibell@morganlewis.com
Representing the Defendant Teva

## Page 4

APPEARANCES: (cont'd)
JONES DAY
BY:  TAYLOR A. GOODSPEED, ESQUIRE
555 California Street, 26th Floor
San Francisco, California  94104-1500
(415) 626-3939
tgoodspeed@jonesday.com
Representing the Defendant Walmart

BARNES & THORNBURG
BY:  WILLIAM J. LEEDER, III, ESQUIRE
171 Monroe Avenue N.W.
Suite 1000
Grand Rapids, Michigan  49503-2694
bleeder@btlaw.com
Representing the Defendant H.D. Smith

ALSO PRESENT:

Sandra Di Iorio, Litigation Counsel
Endo

Kevin Frank, Videographer

Bradley Smith, Trial Technician

           - - -

## Page 5

TELEPHONIC APPEARANCES:

TUCKER ELLIS LLP
BY:  SAVANNAH M FOX, ESQUIRE
950 Main Avenue, Suite 1100
Cleveland, Ohio  44113
(216) 696-3950
savannah.fox@tuckerellis.com
Representing the Defendants
Janssen and J&J

WILLIAMS & CONNOLLY LLP
BY:  JOSEPH S BUSHUR, ESQUIRE
725 Twelfth Street, N W
Washington, D C  20005
(202) 434-5013
jbusher@wc.com
Representing the Defendant,
Cardinal Health

ALLEGAERT BERGER & VOGEL LLP
BY:  LUCY N ONYEFORO, ESQUIRE
111 Broadway, 20th Floor
New York, New York  10006
(212) 616-7050
callegaert@abv.com
Representing the Defendant,
Rochester Drug Co-operative, Inc

ALSTON & BIRD LLP
BY:  JENNY A HERGENROTHER, ESQUIRE
1201 West Peachtree Street NW
Atlanta, Georgia 30309
(404) 881-4977
jenny.hergenrother@alston.com
Representing the Defendant Noramco

Highly Confidential – Subject to Further Confidentiality Review

Page 6

I N D E X
WITNESS                              PAGE
TRACEY L. NORTON
    By Mr. Buchanan          13
    By Mr. Young             496

E X H I B I T S
NO.        DESCRIPTION              PAGE
Par-
Norton-1  Resume                    13

Par-
Norton-2  Charts, Par Total Pills
          Shipped 2008-2015
          [E1157 1 and 1157 2]      31
Par-
Norton-3  E-mail dated 10/15/14, with
          attachments
          [HDS_MDL_00404792 through
          4798]                     83
Par-
Norton-4  E-mail dated 9/30/14
          with attachment
          [PAR_OPIOID_MDL-0001059826
          through 9827]             122
Par-
Norton-5  E-mail string, top one
          dated 2/27/14, Subject
          FW: Bellco-Qualitest SOMS
          [ABDCMDL00337067 to 7073]  138
Par-
Norton-6  E-mail string, top one
          dated 7/16/13, Subject,
          FW: SOMS Customer Letter
          & Sales Rep Talking Points
          [PAR_OPIOID MDL_0000372485
          to 2492]                  172

Page 7

E X H I B I T S (cont'd)
NO.        DESCRIPTION              PAGE
Par-
Norton-7  Effective Controls Against
          Diversion of Controlled
          Substances, Meeting with
          Vintage Pharmaceuticals
          March 6, 2013
          [PAR_OPIOID_MDL_0002016179
          to 6588]                  177
Par-
Norton-8  E-mail string, top
          one dated 3/7/13,
          Subject, FW: Charts from
          DEA Meeting, with
          attachments
          [ENDO-OPIOID_MDL-02975958
          to 6118]                  208
Par-
Norton-9  E-mail string, top one
          dated 11/12/15, Subject
          FW: Information captured
          from DEA Meeting
          [PAR_OPI01D_MDL_0000006058
          to 6059]                  215
Par-
Norton-10 E-mail string, top one
          dated 6/23/17, Subject
          letter you ask for,
          with attached memorandum
          [PAR_OPI01D_MDL_000021619
          and PAR_OPI01D_MDL_0000216199
          to 6201]                  245
Par-
Norton-11 E-mail string, top one
          dated 11/12/15, Subject
          FW: DEA meeting notes
          3-6-13
          [PAR_OPIOID MDL_0000006053
          to 6057]                  262

Page 8

E X H I B I T S (cont'd)
NO.        DESCRIPTION              PAGE
Par-
Norton-12 E-mail dated 10/7/13
          with attachment produced
          natively, Subject,
          SOMS Info
          [PAR_OPIOID_MDL_0000018920] 269
Par-
Norton-13 E-mails dated 3/13/13,
          Subject, FW: Slide Deck
          for This Morning's Meeting,
          produced natively
          [PAR_OPIOID_MDL_0000365381] 312
Par-
Norton-14 E-mail dated 11/7/13,
          Subject SOMS Update
          with attached presentation
          produced natively
          [PAR_OPIOID MDL_0000376972] 333
Par-
Norton-15 E-mail string, top one
          dated 2/9/13, Subject,
          DEA Compliance Initiatives
          Presentation, attachments
          [PAR_OPIOID_MDL_0000034190
          and 0001424664 to 4667]   347
Par-
Norton-16 E-mail dated 2/9/13, Subject
          DEA Compliance Initiatives
          Presentation, with attachment
          [PAR_OPIOID_MDL_0000034190
          to 4215]                  374
Par-
Norton-17 E-mail dated 1/4/13, Subject
          Today's Meeting, with
          attachments, natively produced
          [PAR_OPIOID_MDL_0000363469] 385

Page 9

E X H I B I T S (cont'd)
NO.        DESCRIPTION              PAGE
Par-
Norton-18 E-mails dated 11/16/11,
          Subject, RE: DEA Inspection
          Wrap-Up in Charlotte
          (11/15/2011)
          [PAR_OPIOID MDL_0000039035
          to 0037]                  395
Par-
Norton-19 E-mail string, top one
          dated 9/13/12, Subject
          Re: DEA Revokes Two CVS
          Retailers' Ability To Sell
          Controlled Substances
          [PAR_OPI01D_MDL_0000397090
          to 7092]                  405
Par-
Norton-20 E-mail dated 9/4/08,
          Subject, Qualitest 08-2008 doc
          with attachment
          [PAR_OPIOID_MDL_0000076009
          to 6011]                  411
Par-
Norton-21 E-mail string, top one
          dated 10/21/14, Subject,
          RE: EXTERNAL: FW: Due
          Diligence and Revised SOM
          [PAR_OPIOID_MDL_0000001708
          to 1712]                  420
Par-
Norton-22 Qualitest letter dated
          11/25/13
          [PAR_OPIOID MDL_0000024197] 431
Par-
Norton-23 Qualitest letter dated
          11/25/13
          [PAR_OPIOID MDL_0000024197] 444

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1          E X H I B I T S (cont'd)
2   NO        DESCRIPTION              PAGE
3   Par-
    Norton-24 E-mail dated 11/21/14,
4       Subject, Secondary customers
        with attached letter
5       [ENDO_HSGAC_0015838 to 5840]    445
6   Par-
    Norton-25 E-mail dated 5/26/16,
7       Subject, FW: Minutes from
        the Anti-Diversion Working
8       Group Meeting - 10/8/2013
        with attachment
9       [PAR_OPIOID_MDL_0000009576
        to 9579]                        456
10
11  Par-
    Norton-26 DEA Compliance Trip Report
    11/14/13
12      [PAR_OPIOID_MDL_0001252760
        to 2765]                        470
13
14  Par-
    Norton-27 E-mail dated 10/28/14,
15      Subject, BuzzeoPDMA 9th
        Regional DEA Seminar -
16      Agenda and Presentations
        with attachments
17      [PAR_OPIOID_MDL_0000016438
        to 6639]                        480
18  Par-
    Norton-28 Project Initiation Form (PIF)
19      [HDS_Hernandez_00037 and
        HDS_MDL_00302301]               508
20
21  Par-
    Norton-29 H D Smith Meeting Minutes
    9/7/16
22      [H0S_MDL_00294884 to 4886]      528
23  Par-
    Norton-30 E-mail dated 2/3/15, Subject  539
24      CSOMP Analysis, with attachment
        [HDS_MDL_00407087 to 7088]

Page 11

1          THE VIDEOGRAPHER:  Good morning,
2   we are now on the record.  Today's date
3   is January 16, 2019.  The time is
4   approximately 8:51 a.m.  This is the
5   videotaped deposition of Tracey
6   Hernandez in the National Prescription
7   Opiate Litigation.  All counsel and
8   parties present will be noted on the
9   stenographic record.
10         Will the court reporter please
11  swear in the witness.
12         ... TRACEY L. NORTON, having been
13  duly sworn as a witness, was examined
14  and testified as follows:
15  BY MR. BUCHANAN
16      Q.    Good morning, ma'am.  I think we
17  just said this is the deposition of Tracey
18  Hernandez, but I see from your updated resume
19  that you're now Tracey Norton.
20      A.    Correct.
21      Q.    Please forgive me if at times I
22  refer to you as Ms. Hernandez, because I think
23  that's ingrained now in my mind, having looked
24  at some of your documents over the years.

Page 12

1   Congratulations, by the way?
2       A.    Thank you.
3       Q.    Have you ever been deposed
4   before?
5       A.    I have not.
6       Q.    Okay.  It's a Q and A.  I'm sure
7   you had a chance to meet with counsel before you
8   came in today.  It's, you know, a little more
9   formal.  Obviously, you see a videographer.  You
10  see a court reporter taking down everything that
11  we say together.  So it's going to be important
12  that I do my best to wait until you're done
13  answering to ask my questions and that you wait
14  until my question is done to start answering.
15  Fair?
16      A.    Absolutely.
17      Q.    Okay.  The way this goes is
18  there's going to be a written transcript, so if
19  you don't understand the question, but you
20  answer it anyway, the record is going to reflect
21  that you understood the question.  So if there's
22  confusion in my questions, and there might be,
23  I'm prone to confusing questions at times, just
24  ask me to clarify, and I'll do my best to make

Page 13

1   it better for you, okay?
2       A.    Okay, thank you.
3       Q.    Ms. Norton, I see that you are a
4   person who over the course of your 25-plus years
5   in the pharmaceutical industry have had a focus
6   on compliance and DEA compliance in particular,
7   is that fair?
8       A.    Yes, that's correct.
9             MR. BUCHANAN:  I've been handed
10  an updated copy of your resume we've
11  marked as Exhibit 1 to your deposition.
12            (Document marked for
13  identification as Par-Norton Deposition
14  Exhibit No. 1)
15            MR. BUCHANAN:  Pass a copy back.
16  Do you have one already, Counsel?
17            MS. VANNI:  I do, thank you.
18            MR. BUCHANAN:  There's one for
19  you all to share and one for my
20  colleague at the small table.
21  BY MR. BUCHANAN
22      Q.    Is this the current version of
23  your resume?
24      A.    Yes, it is.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1      Q.    You prepared it on your own?
2      A.    Yes.
3      Q.    Okay.  And you didn't have any
4   input from counsel into what to say and what not
5   to say?
6            MR. VANNI:  Object to form.
7            THE WITNESS:  No.
8   BY MR. BUCHANAN:
9      Q.    When I say you prepared it on
10  your own, maybe somebody looked it over for you
11  to help you --
12     A.    Years ago someone at like a
13  resume service helped with some of it, but it's
14  been modified several times by me since then.
15     Q.    Okay.  Okay.  They helped you get
16  the framework together, but you own it?
17     A.    Correct.
18     Q.    You are comfortable with it, fair
19  enough?
20     A.    Correct.
21     Q.    I want to focus with you
22  principally on your time while you were with the
23  Endo entities, I guess Qualitest and Endo,
24  depending on the timeline and maybe Par.

Page 15

1            You left in 2014, though,
2   correct?
3      A.    Correct.  I've never worked for
4   Par.
5      Q.    So we'll focus on Endo/Qualitest,
6   okay?
7            I understand, though, before you
8   joined Endo, you worked in the pharmaceutical
9   industries?
10     A.    Yes, that's correct.
11           MS. VANNI:  Object to form.
12  BY MR. BUCHANAN:
13     Q.    If we dial back in time, you've
14  got -- you've helpfully put some page numbers
15  page on there for us.  I see page 3, started off
16  with Novartis in '87.  Was that out of school or
17  out of high school?
18     A.    I worked out of high school and
19  then a bank and then to Novartis.  Actually,
20  it was Ciba-Geigy at the time.
21     Q.    Gotcha.  Okay.  And you worked
22  there over in New Jersey over the river about 45
23  minutes to an hour from here?
24     A.    About an hour and 15.

Page 16

1      Q.    And home -- just so we're clear,
2   home is Bethlehem, Pennsylvania?
3      A.    Bethlehem.
4      Q.    Looks like where you finished up
5   in Novartis, and let's just get the dates on
6   that, you were there from '87 to 2002?  I say
7   Novartis, Ciba-Geigy.
8      A.    Correct.
9      Q.    '87 to 2002, you finished up in
10  DEA, PDMA or in that department as a manager,
11  fair?
12     A.    Yes.
13     Q.    And what is DEA?
14     A.    DEA is Drug Enforcement
15  Administration.
16     Q.    And PDMA?
17     A.    Prescription Drug Marketing Act.
18     Q.    And you had some role for
19  regulatory compliance in that group?
20           MS. VANNI:  Object to form.
21           THE WITNESS:  Yes.
22  BY MR. BUCHANAN:
23     Q.    I see that you acted as a
24  consultant -- I'm looking at the second bullet

Page 17

1   point -- "acted as a consultant to the division
2   for issues associated with these regulations."
3            Would these be DEA regulations?
4      A.    Correct.
5      Q.    Okay.  "Quota, ARCOS,
6   import/export, 222 forms, in-transit
7   losses/thefts, returns/disposals, et cetera,"
8   correct?
9      A.    Yes.
10     Q.    Okay.  And you've got other
11  details on here as we go down, I think, to the
12  fourth, fifth, six, bullet, something like that.
13  "Supervised development of controlled drug
14  reporting systems."
15           Do you see that bullet?
16     A.    Correct, yes.
17     Q.    And these are systems that were
18  within the company that would then report events
19  or data to the various regulatory bodies,
20  correct?
21           MS. VANNI:  Objection.
22           THE WITNESS:  To DEA.
23  BY MR. BUCHANAN:
24     Q.    DEA, okay.  The first you list is

5 (Pages 14 to 17)

Highly Confidential – Subject to Further Confidentiality Review

Page 18

1    ARCOS; is that right?
2        A.   Yes.
3        Q.   That's a system that
4    manufacturers and the DEA communicate back and
5    forth about sales?
6        MS. VANNI:  Objection.
7        THE WITNESS:  And other things.
8    BY MR. BUCHANAN:
9        Q.   I'm sorry.  Yeah.  Could be the
10   acquisition of controlled substances?
11       A.   Yes.
12       Q.   The disposition of controlled
13   substances?
14       A.   It's all transactions -- or most
15   transactions with certain controlled substances.
16       Q.   Okay.  And -- or SOMs, what is
17   SOMs?
18       A.   Suspicious order monitoring.
19       Q.   And that term may come up today
20   more than ten times, so how do you use that
21   acronym?
22       A.   SOM.
23       Q.   You do?  Okay.  So you supervised
24   the development of controlled drug reporting

Page 19

1    systems such as we talked about ARCOS briefly
2    and then SOM.
3        So while you were at Ciba-Geigy,
4    you had responsibility for that system?
5        MS. VANNI:  Objection.  You can
6        answer.
7        THE WITNESS:  I'm not sure if --
8        when the transition occurred from
9        Ciba-Geigy to Novartis, so at
10       Ciba-Geigy, probably not.  I think that
11       was prior.  There was someone else in
12       the role as -- that would head up that
13       group, so I was provided input into it,
14       but I wasn't the main person championing
15       it.
16   BY MR. BUCHANAN:
17       Q.   Okay.  So you had visibility to
18   it, but not responsibility or exclusive
19   responsibility for it?
20       MS. VANNI:  Objection.
21       THE WITNESS:  Yes.  As you see
22       it, like when I started as a regulatory
23       analyst, that was basically at the time
24       Ciba-Geigy.  I don't know -- I don't

Page 20

1    recall exactly when it transitioned from
2    Ciba-Geigy to Novartis.  So when I was
3    the DEA PDMA manager, I had that
4    responsibility.
5    BY MR. BUCHANAN:
6        Q.   Okay.  So SOM was something that
7    you were engaged with maybe more tangentially
8    while you were at Ciba-Geigy/Novartis, fair?
9        MS. VANNI:  Objection.
10       THE WITNESS:  I'm sorry.
11   BY MR. BUCHANAN:
12       Q.   I'll let you describe it.  I'm
13   not trying to mischaracterize it in any way.  It
14   didn't sound like you had primary responsibility
15   for Novartis' SOM system, fair?
16       MS. VANNI:  Objection.
17       THE WITNESS:  It was -- Novartis'
18       SOM system was in place prior to my
19       coming, and I maintained it and may have
20       modified along the way, so yes.
21   BY MR. BUCHANAN:
22       Q.   Okay.  And when we talk about
23   SOMs, we're talking about a system for reporting
24   orders, orders of concern, suspicious orders to

Page 21

1    the DEA related to controlled substances, fair?
2        MS. VANNI:  Objection.
3        THE WITNESS:  Reporting
4        suspicious orders.
5    BY MR. BUCHANAN:
6        Q.   To the DEA, correct?
7        A.   Mm-hmm.
8        Q.   And there's been regulatory
9    frameworks around that for some time, true?
10       MS. VANNI:  Objection.
11       THE WITNESS:  Yes.
12   BY MR. BUCHANAN:
13       Q.   As a person in the industry for
14   at least 25 years or now 30 years now, you've
15   been aware of, if you will, statutory frameworks
16   and regulatory frameworks around manufacturer
17   and distributor obligations for suspicious order
18   monitoring, correct?
19       MS. VANNI:  Objection.
20       THE WITNESS:  It's changed
21       drastically over time, but, yes.  The
22       regulation itself has been the same, but
23       the interpretation and application has
24       changed drastically over the years.

6  (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  BY MR. BUCHANAN:
2      Q.    And we'll circle back on that
3  more specifically as we go through today, but to
4  start with, I mean, the statute has been the
5  same, correct?
6      A.    Yes.
7      Q.    And a manufacturer and
8  distributor has to maintain -- a manufacturer
9  and distributor of controlled substances has to
10  maintain effective controls against diversion,
11  correct?
12          MS. VANNI:  Objection.
13          THE WITNESS:  Registrants have to
14  maintain.
15  BY MR. BUCHANAN:
16      Q.    Fair enough.  And a registrant
17  who is a manufacturer, a registrant that is a
18  distributor has to maintain effective controls
19  against diversion, correct?
20      A.    Yes.
21      Q.    And I take it, then, during your
22  time with Novartis -- Novartis was a registrant?
23      A.    Correct.
24      Q.    Okay.  There are also obligations

Page 23

1  under the regulations that have been passed by
2  the DEA with regard to the monitoring and
3  reporting of suspicious orders, correct?
4          MS. VANNI:  Objection.
5          THE WITNESS:  Yes, there's a
6  regulation.
7  BY MR. BUCHANAN:
8      Q.    Okay.  And in your field, I've
9  seen at various times that you've been
10  characterized as a, quote, DEA compliance
11  manager; would that be fair?
12      A.    Yes.
13      Q.    And when you -- is compliance a
14  field?
15      A.    Yes.
16      Q.    Could you describe generally what
17  compliance is, as a field?
18      A.    Well, there's a lot of different
19  types of compliance.  Are you referring
20  specifically to DEA compliance?
21      Q.    I am.
22      A.    Okay.  The goal of individuals in
23  those positions is to become familiar with the
24  DEA regulations and to apply those regulations

Page 24

1  to the company and to work to -- work to improve
2  or to end ultimately to comply with those
3  regulations.
4      Q.    And some of the things that you
5  consider obviously as a compliance manager are
6  the regulations themselves, right?
7      A.    Yes.
8      Q.    You consider how the DEA is
9  applying or interpreting or enforcing those
10  regulations?
11          MS. VANNI:  Objection.
12          THE WITNESS:  Yes.  And the
13          reason I say yes is because different
14          local offices sometimes apply them
15          differently, but, yes, overall.
16  BY MR. BUCHANAN:
17      Q.    You go to industry conferences
18  and you hear what others have to say about what
19  they're doing to -- and how they're interpreting
20  the regulations to ensure compliance?
21          MS. VANNI:  Objection.
22          THE WITNESS:  Yes, to a certain
23          extent within confidentiality.
24  BY MR. BUCHANAN:

Page 25

1      Q.    And we'll probably have a chance
2  to talk about some of that today.  You've been
3  on various committees, antidiversion working
4  groups, various distributor associations,
5  various manufacturer associations where you've
6  gone and attended and received input as to I'll
7  say antidiversion and SOM practices, fair?
8          MS. VANNI:  Objection.
9          THE WITNESS:  Well,
10          antidiversion, yes, yes.
11  BY MR. BUCHANAN:
12      Q.    In fact, you've presented at
13  them, correct?
14      A.    Yes.
15      Q.    So that's one of the ways in
16  which those in the industry get information
17  about, if you will, state-of-the-art compliance,
18  state-of-the-art SOM practices, state-of-the-art
19  antidiversion practices, true?
20          MS. VANNI:  Objection.
21          THE WITNESS:  Yes and no.  A lot
22          of things aren't shared because of the
23          confidentiality, so I always say I want
24          to hear it from the horse's mouth, I

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1       want to hear it from DEA.  I do take
2    into consideration, but ultimately any
3    changes I implement would be based on
4    things that I would hear from the DEA.
5  BY MR. BUCHANAN:
6       Q.    And as a manufacturer, as a
7  distributor of controlled substances, there's
8  also just the general responsibility to ensure
9  that your product isn't getting to places where
10  it's not supposed to get, right?
11       MS. VANNI:  Objection.
12       THE WITNESS:  Yes.
13  BY MR. BUCHANAN:
14       Q.    And you recognize that?
15       MS. VANNI:  Objection.
16       THE WITNESS:  It's part of the
17    regulation.
18  BY MR. BUCHANAN:
19       Q.    And part of your obligation as
20  the manufacturer distributor?
21       MS. VANNI:  Objection.
22       THE WITNESS:  To follow the
23    regulations.
24  BY MR. BUCHANAN:

Page 27

1       Q.    Okay.  Let's look, then, at where
2  you went after -- after Novartis.  You went to
3  Watson; is that right?
4       A.    Yes, that's correct.
5       Q.    And if I understand correctly
6  during your time at Watson, there was an
7  acquisition of another company Anda?
8       A.    Anda, yes.
9       Q.    Is that how it's pronounced Anda,
10  it's not ANDA?
11       A.    Yeah.  ANDA would refer more to
12  an FDA acronym.
13       Q.    I thought that was why they did
14  that.  But okay.  It's Anda.  Thank you.
15       So Watson acquired Anda and
16  during your tenure at Watson?
17       A.    Yes.
18       Q.    Okay.  I just need to draw a
19  distinction between the companies.
20       With regard to Watson, did you
21  have a role in responsibility for DEA
22  compliance?
23       A.    Yes.
24       Q.    Okay.  Did you ever have any

Page 28

1  issues while you were at Watson with regard to
2  Watson's DEA compliance?
3       MS. VANNI:  Objection.
4       THE WITNESS:  Not that I can
5    recall.
6  BY MR. BUCHANAN:
7       Q.    Did you ever have any issues
8  while you were at Watson with regard to Anda's
9  compliance?
10       MS. VANNI:  Objection.
11       THE WITNESS:  I was not -- I
12    didn't have responsibility for Anda.  I
13    was consulted on occasion and did help
14    out at certain points, but it was not my
15    ultimate responsibility.
16  BY MS. DICKINSON:
17       Q.    I mean, they got called in to the
18  DEA for some issues, right?
19       A.    Yes.
20       Q.    Were you the one responsible for
21  the oversight of that problem before it was
22  brought to the DEA?
23       MS. KOSKI:  Object to form.
24       THE WITNESS:  No, I had no

Page 29

1  responsibility for Anda up until that
2    point.
3  BY MR. BUCHANAN:
4       Q.    Okay.  So as I understand the
5  timeline, you're at Watson from 2002 to 2009.
6  You finish as the director of controlled
7  substances compliance.  Within that function,
8  you had responsibility for suspicious order
9  monitoring for Watson, correct?
10       A.    Yes.
11       Q.    And then Watson at a point in
12  time acquired Anda, correct?
13       A.    Yes.
14       Q.    Anda got called in by the DEA for
15  some violations, fair?
16       MS. KOSKI:  Object to form.
17       THE WITNESS:  Not for violations,
18    no.
19  BY MR. BUCHANAN:
20       Q.    Okay.  They had a sit-down with
21  the DEA?
22       MS. KOSKI:  Object to form.
23       THE WITNESS:  It was part of the
24    distributor initiative.

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    BY MR. BUCHANAN:
2        Q.    And let's make sure we understand
3    your role in that.
4              Shortly after Watson purchased
5    Anda, Anda was summoned to the DEA as a result
6    of their lack of a robust SOM program, correct?
7              MS. KOSKI:  Object to form.
8              THE WITNESS:  No, that's not
9        correct.  DEA -- DEA was -- had
10       initiated what they termed a distributor
11       initiative, and they called all
12       distributors at different times to the
13       headquarters office to talk about sales
14       of their product.
15   BY MR. BUCHANAN:
16       Q.    Okay.  So I'm not sure that we
17   can pin down the date, or at least in my
18   examination we won't be pinning down the date,
19   but at a point in time when you were at Watson,
20   do you remember roughly when this was that you
21   got called in with Anda to meet with the DEA?
22             MS. KOSKI:  Object to form.
23             THE WITNESS:  I don't.  I would
24       assume closer to the time I left, but I

Page 31

1        don't know for sure.
2              (Document marked for
3        identification as Par-Norton Deposition
4        Exhibit No. 2.)
5    BY MR. BUCHANAN:
6        Q.    Ma'am, I'm passing over what
7    we're marking as Exhibit 2 to your deposition.
8    I have a few more questions before we get into
9    that, but you will have a chance to review that
10   at the appropriate time.
11             So you were at Watson, just to
12   confirm, until 2009?
13       A.    Yes.
14       Q.    And do you remember roughly how
15   soon before you left Watson that this -- or when
16   relative to your departure from Watson this
17   meeting with Anda and the DEA occurred?
18       A.    I do not recall.
19       Q.    Okay.  Let's look now at
20   Exhibit 2 to your deposition.  This is a
21   document during your time at Endo.  It was
22   produced to us by, I think, H.D. Smith.
23             MS. VANNI:  Counsel, I just want
24       to clarify she was not an Endo employee.

Page 32

1        She was a Qualitest employee.
2    BY MR. BUCHANAN:
3        Q.    Yeah, I'm thinking of you in the
4    Endo family of companies, Endo being -- Endo was
5    the owner of Qualitest?
6        A.    Endo was the owner, but there was
7    a separate business from Qualitest, and I was
8    not -- not responsible for that business.  I
9    handled just Qualitest really for the most part.
10       Q.    Okay.  All right, fair.  So this
11   is during your time at Qualitest, then, shortly
12   before you left.  And looks like about two
13   months before -- you left Qualitest in November
14   of 2014; is that right?
15       A.    Yes.
16       Q.    Okay.  It's an e-mail between
17   somebody in HR at H.D. Smith and yourself.
18   "Please call Tracey at the phone number at"
19   blank.  "She is expecting your call right now.
20   Thanks for the last minute."
21             There's two attachments.  One is
22   your resume.
23             Do you see that?
24       A.    Yes.

Page 33

1        Q.    Another is a document entitled
2    "SOMs Experience"?
3        A.    Mm-hmm.
4        Q.    Do you recognize this document
5    "Tracey Hernandez SOM Experience"?
6        A.    I do.  It was specifically
7    requested as part of the interview process.
8        Q.    Okay.  So you had to assemble
9    something to share with H.D. Smith as part of
10   this interview process?
11       A.    Yes, to prove my experience with
12   SOM.
13       Q.    Okay.  And so what you did in
14   doing so is you listed your relevant SOM
15   experience at various entities that you'd worked
16   with over the years, fair?
17       A.    Yes.
18       Q.    For example, with Ciba-Geigy, you
19   list that you reviewed and submitted monthly
20   suspicious order monitoring reports to the DEA
21   for review.  You note back then suspicious
22   orders were based solely on the customer's order
23   frequency pattern and volume, and then you
24   notified customer service based on the DEA

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 register notice or conversations if there were
2 customers that were high-risk customers, right?
3     A.    Yes.
4     Q.    And that was something that was
5 reasonable to do at that time, to comply with
6 your obligation as a manufacturer?
7         MS. VANNI: Object to form.
8         THE WITNESS: Yes, it was.
9 BY MR. BUCHANAN:
10     Q.    And so one of the things you were
11 doing while at Ciba-Geigy or Novartis was, you
12 know, monitoring customers to see if customers
13 were, in fact, high-risk customers, right?
14         MS. VANNI: Objection.
15         THE WITNESS: Monitoring
16         customers for suspicious orders.
17 BY MR. BUCHANAN:
18     Q.    Right. Which you note here in
19 your writing. And these are your words,
20 correct?
21     A.    Yes.
22     Q.    "If a customer was deemed a high
23 risk and should be discontinued."
24         Do you see that at the bottom?

Page 35

1     A.    On Ciba-Geigy?
2     Q.    Yes.
3     A.    Yes.
4     Q.    And so you understood, at least
5 during your time at Novartis and during your
6 time at Ciba-Geigy, that was one of the
7 obligations of a manufacturer distributor?
8         MS. VANNI: Objection.
9         THE WITNESS: To notify for
10         suspicious orders, yes.
11 BY MR. BUCHANAN:
12     Q.    And to monitor for customers that
13 were a high risk and who should be discontinued,
14 correct?
15         MS. VANNI: Object to form.
16         THE WITNESS: My definition of a
17         high risk would mean that they have
18         suspicious orders.
19 BY MR. BUCHANAN:
20     Q.    Okay. Well, in order to -- what
21 you say you are going to do here is notify
22 customer service based on -- I think you say DEA
23 Federal Register notices or conversations with
24 DEA if a customer was deemed high risk.

Page 36

1         Do you see that?
2     A.    So the Federal Registers would
3 be --
4     Q.    I'm sorry, I just need to make
5 sure that you --
6     A.    Yes, I see that.
7     Q.    Okay. And if you're -- what
8 you're doing there is you're looking to external
9 sources, in this case, the Federal Register
10 notices or conversations with the DEA to
11 determine and to ensure that your customers are
12 not high risk, right?
13         MS. VANNI: Objection.
14         THE WITNESS: Yes. If a customer
15         appeared in a Federal Register notice
16         and had a license suspended or had
17         action taken against them, I would
18         contact them to -- customer service to
19         make sure that they weren't, in fact, a
20         customer that we were shipping to.
21 BY MR. BUCHANAN:
22     Q.    Right. So when you became aware
23 that there were customers that were engaged in
24 problematic activities, you notified customer

Page 37

1 service so customer service ceases activity or
2 you got comfort that we weren't doing business
3 with them or Ciba-Geigy wasn't doing business
4 with them?
5         MS. VANNI: Objection.
6         THE WITNESS: Yes.
7 BY MR. BUCHANAN:
8     Q.    And for clarity, ma'am, what was
9 the period of time when you were working at
10 Ciba-Geigy and Novartis?
11     A.    From 1987 to 2002.
12     Q.    Okay. And you understood that
13 part of the role and obligation of Ciba-Geigy or
14 Novartis as a registrant was to maintain
15 effective controls against diversion, fair?
16     A.    Yes, that's --
17         MS. VANNI: Objection.
18         THE WITNESS: -- part of the DEA
19         regulation.
20 BY MR. BUCHANAN:
21     Q.    That's the statute, actually?
22     A.    Mm-hmm.
23     Q.    Yes?
24     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q.   Okay.  And one of the ways that
2   you did that at that point in time was by
3   notifying customer service of high-risk
4   customers, correct?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  Yes.  It was not a
7       requirement that I notify them, but,
8       obviously, I don't want to ship to
9       someone who has a suspended license or
10      has issues.
11  BY MR. BUCHANAN:
12     Q.   Whether it was a requirement or
13  not, that's what you did at that point in time
14  as part of you executing your role and function
15  in DEA compliance for Ciba-Geigy and Novartis,
16  fair?
17         MS. VANNI:  Objection.
18         THE WITNESS:  Yes, always tried
19      to go above and beyond, yes.
20  BY MR. BUCHANAN:
21     Q.   Okay.  And it was reasonable to
22  do that, right?
23         MS. VANNI:  Objection.
24         THE WITNESS:  Mm-hmm.

Page 39

1   BY MR. BUCHANAN:
2      Q.   Is that a yes?
3      A.   Yes.
4      Q.   Okay.  It looks like while you
5   were at Watson, you didn't have any interactions
6   concerning the SOM program in terms of
7   deficiencies in your SOM program relevant to the
8   Watson part of the business, fair?
9      A.   Yes.
10     Q.   Then you note "However, Watson
11  purchased Anda."
12         Do you see that in the middle of
13  the page, the middle of the Watson page?
14     A.   Yes.
15     Q.   It says "However, Watson
16  purchased Anda and shortly afterward, Anda was
17  summoned to DEA a result of their lack of a
18  robust SOM program."
19         Do you see that?
20     A.   Yes.
21     Q.   Okay.  And that was the reference
22  I mentioned five, ten minutes ago with regard to
23  why you went to see the DEA.
24         Do you see that, ma'am?

Page 40

1      A.   Yes.
2      Q.   Okay.  And those are your words
3   certainly in characterizing your experience at
4   Watson with regard to Anda and that particular
5   DEA interaction, correct?
6      A.   Yes.
7      Q.   And what you note after that, and
8   I think to -- well, I'll ask you this.  What you
9   note after that was "I did not support Anda from
10  a DEA perspective, as they had come to Watson
11  with their own DEA person.  However, I was asked
12  to be their DEA representative for the meeting
13  in HQ.  I went with legal and the individual who
14  at the time was the president of Anda.  DEA
15  presented and provided a binder, as they have
16  done for most companies at this point.  However,
17  in Anda's case, the DEA meeting was for cause,
18  and immediate action was required."
19         Did I read that correctly?
20     A.   Yes.
21     Q.   So this particular meeting
22  with regard to Anda was different than the other
23  meetings that you were aware that were happening
24  in the industry at that point in time, correct?

Page 41

1          MS. KOSKI:  Object to form.
2          THE WITNESS:  It was -- I'm
3       sorry, can you repeat that?
4   BY MR. BUCHANAN:
5      Q.   This particular meeting with
6   regard to Anda was different than the other
7   meetings that you were aware of that were
8   happening between DEA and the industry at that
9   point in time, correct?
10         MS. KOSKI:  Objection.
11         THE WITNESS:  It was the same
12      type of meeting.  It was a distributor
13      initiative.  They reviewed the same type
14      of data.  The individuals that we met
15      with presented it a little differently
16      than other meetings I had been at.
17  BY MR. BUCHANAN:
18     Q.   Okay.  This particular meeting as
19  you characterized it in summarizing your SOM
20  experience at and Watson -- and, again, we're
21  referring at the meeting with DEA and Anda --
22  you characterize it as a meeting for cause,
23  correct?
24     A.   I did characterize it that way.

11  (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    However, there was no DEA violation. There was
2    no action taken by DEA against Anda. It was a
3    meeting to share information, and that was also
4    my first experience with a distributor.
5    Everything up to that point had been more on the
6    manufacturing side, so to me at the time, it was
7    spun a little bit differently.
8        Q.    Okay. I understand that this
9    meeting was different than prior meetings you
10   had had kind of with your manufacturer hat on.
11       A.    Right.
12       Q.    But with regard to this meeting,
13   and you wrote this, to be clear, some five
14   years, six years after the meeting, right?
15       A.    Yes.
16       Q.    Okay. And the way you
17   characterized it with the benefit of hindsight
18   and looking backward was a meeting for cause
19   with immediate action required, correct?
20       A.    Yes. I think you need to take
21   into context the purpose of the document,
22   though. You know, I'm trying to get a job, so
23   obviously I'm trying to make myself look very
24   good to this company and to kind of put forth

Page 43

1    that, you know, this company needed me at this
2    time, and I stepped in and helped out and was
3    able to resolve an issue, so...
4        Q.    Well, yeah, and I suppose you,
5    know, thank you for, I would say, being candid
6    and reflecting the context in which this was
7    prepared, but you were also saying, weren't you,
8    that the problems that Anda had were not mine?
9             MS. KOSKI: Object to form.
10            THE WITNESS: They became mine.
11   BY MR. BUCHANAN:
12       Q.    Right. We could read this, and
13   it says "Watson had no issues with DEA regarding
14   their SOMs program during my seven-year tenure."
15       A.    Mm-hmm.
16       Q.    "However, Watson purchased Anda
17   and shortly afterward, Anda was summoned to DEA
18   as a result of their lack of a robust SOM
19   program."
20            Did I read that correctly?
21       A.    Yes.
22       Q.    Was that true that they did not
23   have a robust SOM program?
24            MS. KOSKI: Object to form.

Page 44

1            THE WITNESS: I actually don't
2    know what they had. What was -- and I
3    also didn't know their customer base.
4    Since I hadn't worked with them up to
5    that point, I was told that I, you know,
6    was not to handle Anda from a DEA
7    perspective, that was someone else's
8    responsibility. So I was pulled into
9    the meeting really without having any
10   background on the company.
11   BY MR. BUCHANAN:
12       Q.    Right. You are a DEA compliance
13   person. Watson has just acquired Anda. There's
14   a situation that has occurred that apparently is
15   being seen as a serious situation because the
16   president as a company knew, correct?
17       A.    He was very concerned, yes.
18       Q.    And Anda grabs you from the
19   Watson side, please come and sit next to us in
20   this meeting while we take the bullets we're
21   going to take on this?
22            MS. KOSKI: Object to form.
23            THE WITNESS: They actually asked
24   me to come because of my -- because I

Page 45

1    knew the people that had called them to
2    the meeting. I had interacted with them
3    previously on multiple occasions and
4    they had -- had reached out to me. So I
5    think they felt more comfortable that I
6    would, you know, have a good working
7    relationship with them and would --
8    would help the meeting to go smoothly.
9    BY MR. BUCHANAN:
10       Q.    Okay. And so in that context,
11   how you characterized it at least for purposes
12   of reflectively, looking back at that time, was
13   that they were summoned to the DEA as a result
14   of their lack of a robust SOM program and that
15   the DEA meeting was for cause and immediate
16   action was required, those were some reflections
17   that you noted on this particular meeting, fair,
18   ma'am?
19       A.    That's what I noted in the
20   document, yes.
21       Q.    And then you said after that, you
22   worked with the president and "we reviewed
23   numerous customers and cut many"; is that right?
24       A.    Yes, probably too many.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1      Q.    So during the time that you were
2    at Watson -- and you left there when, ma'am?
3      A.    2009.
4      Q.    So prior to 2009, during your
5    time with Watson in connection with your role
6    and oversight of Anda, when you started to work
7    with the president to actually look at the
8    customers in a manner like you had looked at
9    customers at Novartis and Ciba-Geigy, you cut
10   many customers, correct?
11          MS. KOSKI:  Object to form.
12          THE WITNESS:  It wasn't in the
13       same manner and, again, because I didn't
14       know their business, the president
15       really took it upon himself.  At that
16       meeting, DEA had -- one of the
17       individuals at DEA had thrown out a
18       number as far as dosage forms, and they
19       said that they felt that a pharmacy
20       should not receive more than this
21       amount, and that's what the president
22       worked with.  He really took it to the
23       extreme and was very concerned about it
24       and cut off a lot of customers as a

Page 47

1    result.
2          I think, unfortunately for Anda,
3    in doing that, the number was a -- kind
4    of an ad hoc number thrown out by DEA,
5    again, when the SOM program was
6    developing.  So they just cut based on
7    that number only, and they didn't look
8    at the customer's business and whether
9    that business actually required more
10   volume.
11         So, you know, they took a very,
12   very aggressive approach and were very
13   concerned about the information the DEA
14   had shared.
15   BY MR. BUCHANAN:
16     Q.    Right.
17         We can agree, certainly, that
18   prior to the point of time of that sit-down with
19   the DEA, Anda had not been looking at customers
20   in a manner that was looking for suspicious
21   orders, correct?
22          MS. KOSKI:  Object to form.
23          THE WITNESS:  I can't really say
24       that, again, because I didn't have

Page 48

1    responsibility for them, I don't really
2    know what they were doing.
3    BY MR. BUCHANAN:
4      Q.    Well, we know they didn't have a
5    robust SOM program, right?
6          MS. KOSKI:  Object to form.
7          THE WITNESS:  Well, that's
8       opinion-based, to be honest.
9    BY MR. BUCHANAN:
10     Q.    And certainly opinion-based four
11   years ago, right?
12          MS. KOSKI:  Object to form.
13          THE WITNESS:  Yes.
14   BY MR. BUCHANAN:
15     Q.    Nearer in time than today, right?
16     A.    I'm sorry?
17     Q.    Nearer in time to the events than
18   today, correct?
19     A.    Yes.
20     Q.    And a program that certainly
21   necessitated immediate action, fair?
22          MS. KOSKI:  Object to form.
23   BY MR. BUCHANAN:
24     Q.    That's what you wrote at a point

Page 49

1    in time nearer to today?
2      A.    Yes, that's what I wrote.
3      Q.    And you said some other things
4    that you implemented with them -- and this is
5    back in at least before 2009, "Prior to my
6    leaving," you said you were "instrumental in
7    convincing Watson to start looking at drug
8    combinations, i.e., Holy Trinity and to begin
9    customer visits for the purpose of SOM which I
10   believe they now contract out to a third party.
11         Did I read that correctly?
12     A.    Yes.
13     Q.    So during the time that you were
14   at Watson and I guess you were helping them to
15   further reshape their SOM program, is this
16   Watson/Anda or is this Watson?
17     A.    This is Watson.
18     Q.    So on the manufacturer side --
19   when we said Watson we're thinking manufacturer
20   and when we're thinking Anda you're thinking
21   more distributor; is that fair?
22     A.    Yes.
23     Q.    With regard to Watson as a
24   manufacturer back in 2009 they were starting to

13  (Pages 46 to 49)

Highly Confidential – Subject to Further Confidentiality Review

Page 50

1    implement customer visits but they were doing
2    with a third party?
3         A.    They were -- I have that, I
4    believe, they now contract out to a third party.
5    I don't know if they implemented that after I
6    left.
7         Q.    Okay.
8         A.    Watson was very -- very proactive
9    and it wasn't just based on my input, it was
10   really a team effort and customer service was
11   also very proactive in -- we worked together to
12   kind of go above and beyond.  There was no
13   requirement for Holy Trinity -- you know, to
14   look at Holy Trinity.  There was no requirement
15   for -- there were certain products that weren't
16   controlled yet, but that we had heard there was
17   an abuse potential that we added to the system,
18   so a lot of good things that were added above
19   and beyond.
20        Q.    Well, there is a requirement to
21   maintain effective controls against diversion,
22   true?
23        A.    Yes, within -- within the
24   regulations which apply.  When they're talking

Page 51

1    more about effective controls against diversion,
2    you know, reporting suspicious orders, it's
3    not -- it's not all-encompassing.  It includes a
4    security provision, accountability,
5    recordkeeping.
6         Q.    Let's just separate the two so
7    we're not kind of fusing them together.
8               The statutory obligation for
9    manufacturers and distributors who are
10   registrants, thank you for that clarification,
11   is to maintain effective controls against
12   diversion, fair?
13        A.    Is to make sure that you are
14   doing everything that you can to prevent your
15   product from being diverted into a list of
16   channels.
17        Q.    And one of the things that you
18   implemented or helped Watson implement during
19   your time there was expanding their
20   antidiversion controls to include looking at
21   drug combinations like Holy Trinity.  That was
22   one thing, correct?
23        A.    Yes.
24        Q.    To begin customer visits,

Page 52

1    correct?
2         A.    Again, not sure if that actually
3    came to fruition or not.
4         Q.    What you noted here --
5         A.    It was something we talked about.
6         Q.    -- "prior to my leaving, I was
7    instrumental" -- your words, correct,
8    "instrumental"?
9         A.    Mm-hmm.
10        Q.    -- "in convincing Watson to start
11   looking at drug combinations, i.e., Holy
12   Trinity, and to begin customer visits for the
13   purpose of SOM, which I believe they now
14   contract out to a third party."
15              Did I read that correctly?
16        A.    To start looking at beginning
17   customer visits, to start looking at.  There's a
18   difference between implementing versus start
19   looking at.  So doing research as to whether or
20   not they wanted to implement customer visits.
21   There's a lot involved in implementing that.
22        Q.    The jury has your words, but the
23   words you wrote was, "I was instrumental in
24   convincing Watson" -- and you list two things,

Page 53

1    right?
2               MS. VANNI:  Object to form.
3               THE WITNESS:  Mm-hmm.
4    BY MR. BUCHANAN:
5         Q.    "I was instrumental in convincing
6    Watson," and then you say the first one, "to
7    start looking at drug combinations," that is,
8    Holy Trinity.  That was the first item, correct?
9         A.    Yes.
10        Q.    Holy Trinity is what?
11        A.    It's a combination of
12   hydrocodone, carisoprodol and alprazolam.
13        Q.    In your field, and certainly in
14   DEA compliance, you understood that the Holy
15   Trinity, those three drugs, were often abused in
16   combination, fair?
17        A.    That's what I was told at
18   conferences, yes.
19        Q.    And so as far back as at this
20   point in time, sometime prior to 2009, when you
21   were at Watson, you were instrumental in
22   convincing Watson to start looking at that drug
23   combination as a combination of abuse, fair?
24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1      Q.    Okay.  And then you said there
2  was a second thing you were instrumental in,
3  correct?
4      A.    Mm-hmm.
5      Q.    You were instrumental in
6  "convincing Watson to begin customer visits for
7  the purpose of SOM, which I believe they now
8  contract out to a third party."
9           Did I read that correctly?
10     A.    Yes.
11     Q.    All right.  So that takes us
12 through your time at Watson.  Actually, let's go
13 up the page a little bit.
14           Characterizing some other things
15 that Watson was doing on the manufacturing side,
16 you list the way in which they handled SOM
17 during the seven years you were there.
18           Do you see that?
19     A.    Mm-hmm.
20     Q.    We can start at the beginning.
21 "Conducted audits as noted above, Watson already
22 utilized NTIS, but based on the requirements of
23 several states, added the process for collecting
24 customer state license information."

Page 55

1           NTIS, is that a way of
2  determining whether somebody is, in fact, a
3  registrant who is a customer of yours?
4      A.    It's National Technical
5  Information systems or Service, and it's a
6  government -- government-run tool that can be
7  purchased, and it helps you -- your licenses
8  typically expire yearly, but in this particular
9  case, if you have this tool, you can look at
10 licenses in between that yearly expiration to
11 determine -- catch licenses that might have been
12 suspended.
13     Q.    You would agree that it's an
14 important thing to make sure -- in a closed
15 system of controlled substance drug distribution
16 to make sure if you are a manufacturer
17 distributor that you are only selling drug to
18 people who are --
19           MS. LEIBELL:  Object to form.
20 BY MR. BUCHANAN:
21     Q.    -- permitted or licensed to
22 receive drug?
23     A.    Yes.
24     Q.    So one of the things Watson was

Page 56

1  doing and had implemented was they were doing
2  license checks in connection with each order,
3  correct?
4      A.    Mm-hmm, yes.
5      Q.    It was something that they were
6  already doing before you got there, right?
7      A.    Yes.
8      Q.    So if you were there from 2002 to
9  2009, they had already implemented as part of
10 their order flow a license check every time
11 somebody placed an order to ensure that the
12 customer was permitted to receive the product,
13 correct?
14     A.    Yes.
15     Q.    All right.  That was actually
16 something you implemented for Ciba-Geigy and
17 Novartis, right?
18     A.    Yes.
19     Q.    If we go up on the page --
20     A.    Mm-hmm.
21     Q.    -- it says "responsible for
22 conducting internal audits of customer service."
23           You talk about "to assure
24 customer licensing was obtained and verified."

Page 57

1           You see the first sentence of the
2  paragraph?
3      A.    Yes.
4      Q.    The section sentence says
5  "modified process to include the use of the NTIS
6  tape to assure license checks occurred at each
7  order rather than depending on customers to
8  provide new license at expiry."
9           And then you talk about increased
10 awareness and how you did the monthly monitoring
11 reports and various submissions around that,
12 correct?
13     A.    Yes.
14     Q.    But all the way back prior to
15 your time at Watson, even implementing
16 transaction-level order checks was something
17 that you thought was important and you
18 implemented, correct?
19           MS. VANNI:  Object to the form.
20           THE WITNESS:  Yes, certain --
21     certain types of checks, yes.
22 BY MR. BUCHANAN:
23     Q.    Am I correct, ma'am, that under
24 the Controlled Substance Act, it's supposed to

15  (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1   be a closed system of manufacturer,
2   distribution, prescription, et cetera?
3       A.   Yes, that's correct.
4       Q.   And so if there's any leak in
5   that system, in that -- in all the players in
6   that system, then there's diversion risk, fair?
7           MS. VANNI: Object to form.
8           THE WITNESS: Then there is a DEA
9   violation.
10  BY MR. BUCHANAN:
11      Q.   And diversion risk?
12          MS. VANNI: Object to form.
13          THE WITNESS: Potentially.
14  BY MR. BUCHANAN:
15      Q.   I mean, you understand that as
16  somebody in the -- in the industry; if drug is
17  being sold to somebody not permitted to get it,
18  by law, it's not a closed system, right?
19      A.   Yes.
20      Q.   And when you apply for a
21  registration, when a manufacturer distributor
22  applies for a registration, they apply for that
23  registration making the representation they're
24  going to do everything they can to maintain a

Page 59

1   closed system, right?
2           MS. VANNI: Object to form.
3           THE WITNESS: Yes.
4   BY MR. BUCHANAN:
5       Q.   And I mean, that's been true --
6   and that's not a change in the regulations,
7   that's been true for as long as you've been
8   involved with controlled substances, correct?
9           MS. VANNI: Object to form.
10          THE WITNESS: Yes.
11  BY MR. BUCHANAN:
12      Q.   So let's go back, if we could, to
13  Watson. I realize I'm hopping around. Sorry
14  about that.
15          We'll go back to Watson.
16          And then you note that during
17  your time at Watson, Watson was running shipping
18  history for certain customers of concern, right?
19      A.   Just trying to see where your --
20      Q.   Oh, I'm sorry, I realize I've
21  been hopping around.
22          "As part of the internal audits,
23  began to run shipping history for certain
24  customers of concern."

Page 60

1           Do you see that?
2       A.   Yes.
3       Q.   That was something you were
4   doing -- that was you who was doing that?
5       A.   Working with customer service.
6       Q.   And to run shipping history for
7   customers of concern?
8       A.   Mm-hmm.
9       Q.   Okay. And then you also had --
10  you. Bad word. Withdrawn.
11          Watson also had a suspicious
12  order monitoring system that included a
13  multiplier, and then you would adjust the
14  multiplier on a customer-to-customer basis,
15  correct?
16      A.   I don't believe we could adjust
17  it at a customer level. I think it was adjusted
18  overall for the class of trade.
19      Q.   So you had class-of-trade
20  adjustments at Watson?
21      A.   I believe it was by class of
22  trade. I'm not positive.
23      Q.   And class of trade, meaning
24  Watson could have clients who were distributors,

Page 61

1   correct?
2       A.   Wholesalers would be one class of
3   trade. It's basically, for the most part, DEA
4   license type.
5       Q.   Okay. And can you identify the
6   various classes of trade?
7       A.   Not all, but a wholesaler would
8   be one. A chain drug store might be another. A
9   physician, not necessarily for Watson, but if
10  we -- if you were to distribute to physicians,
11  that would be a class of trade, clinic or
12  hospital, long-term care.
13      Q.   And how about -- I'm sorry.
14      A.   Long-term care. There's quite a
15  few.
16      Q.   Okay. And how about just
17  independent pharmacy, is that a separate class
18  of trade?
19      A.   Yes.
20      Q.   And so during your time at
21  Watson, you were responsible for the multipliers
22  for the various class of trades, right?
23      A.   Yes.
24      Q.   And when you say multiplier, what

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   does that mean?
2       A.    It's really a part of the SOM
3   system, the percentage of orders that you would
4   look at.  So, for example, when you create the
5   system, you want to make sure that you're
6   catching orders that are legitimately of concern
7   from a quantity perspective, but you also want
8   to make sure it's not catching every single
9   order.
10          You know, you have to know --
11  it's almost like setting a threshold really.
12  You have to know what -- where you want to cut
13  that off.  So when you first set up your system,
14  it could stop everything if you don't have a
15  multiplier that would dial down to where you
16  think is reasonable orders that you would want
17  to investigate further.
18      Q.    So a system, essentially, that
19  would identify orders that are red flags to be
20  further investigated; would that be fair?
21      A.    Well, that's the SOM system, yes.
22      Q.    Okay.  And the way --
23      A.    This is one piece of -- I'm
24  sorry -- this is one piece of the SOM system.

Page 63

1       Q.    Got you.  So the multiplier was a
2   component of an order monitoring system, fair?
3       A.    Yes.
4       Q.    Okay.  And the multiplier was
5   used to set effectively where an order would get
6   flagged as an order to be investigated further,
7   fair?
8       A.    For Watson, yes.
9       Q.    Yes.
10          And this was happening on the
11  Watson, if you will, manufacturing side during
12  your entire tenure there?
13      A.    Yes.
14      Q.    Okay.
15      A.    It was part of Watson's system.
16  It may not be part of other systems, depending
17  on how it's developed.
18      Q.    Okay, yeah, and I was referring
19  to, you know, Watson had the system that you've
20  described in your testimony and in this writing
21  during the entire time you were there?
22      A.    Right.
23      Q.    Okay.  Then you talk about your
24  time at Qualitest, right?

Page 64

1       A.    Mm-hmm.
2       Q.    And what were the circumstances
3   of your -- you weren't brought in to take
4   responsibility for the SOM system for Qualitest,
5   right?
6           MS. VANNI:  Object to form.
7           THE WITNESS:  It was part of the
8       regulations, so ultimately I would have
9       responsibility for it.  There's nothing
10      that requires the things that I have
11      responsibility for to report in to me,
12      just more that I'm overseeing them.
13  BY MR. BUCHANAN:
14      Q.    When you arrived at Qualitest,
15  SOM was being handled by a different group,
16  right?
17      A.    Correct.
18      Q.    And that was true for several
19  years, right?
20          MS. VANNI:  Object to form.
21          THE WITNESS:  It became more of a
22      partnership.
23  BY MR. BUCHANAN:
24      Q.    In 2013, I think, after the

Page 65

1   meeting with the DEA, you were able to bring
2   that under your umbrella more directly, fair?
3           MS. VANNI:  Object to form.
4           THE WITNESS:  Not sure exactly
5       when it occurred, but I think it was
6       before then, I believe.
7   BY MR. BUCHANAN:
8       Q.    When you actually had
9   responsibility for it?
10      A.    Yes, I believe so.
11      Q.    Let's just get some -- some dates
12  kind of on a visual timeline, if you will.
13          You joined Qualitest in the
14  summer of 2011?
15      A.    Yes.
16      Q.    You had some interactions with
17  DEA on various matters through the years, but
18  then you have the meeting with the DEA in March
19  of 2013, right?
20          MS. VANNI:  Objection.
21          THE WITNESS:  There were several
22      meetings with DEA, I believe, on
23      different topics, but --
24  BY MR. BUCHANAN:

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1      Q.    There was one specific meeting of
2   note where they handed you a binder and similar
3   to the meeting --
4      A.    The distributor initiative.
5      Q.    Similar to a meeting that you had
6   had with Anda and Watson several years before?
7          MS. KOSKI:  Object to form.
8          MS. LEIBELL:  Object to form.
9          MS. VANNI:  Object to form.
10         THE WITNESS:  Yes, the
11         distributor initiative.
12  BY MR. BUCHANAN:
13     Q.    What you're calling the
14  distributor initiative was a sit-down -- in the
15  industry at that in time, you knew that DEA was
16  meeting with people, right?
17     A.    Yes.
18     Q.    In fact, you knew that firsthand
19  because you had gotten called in to talk to the
20  DEA for Anda and Watson, right?
21         MS. KOSKI:  Object to form.
22         THE WITNESS:  Yes.
23  BY MR. BUCHANAN:
24     Q.    And you knew what that meeting

Page 67

1   was about, right?
2      A.    Uh-huh.  Yes.
3      Q.    They were basically telling
4   people, manufacturers, distributors, you've got
5   to have effective controls against diversion,
6   and they got specific about some of the things
7   that had to be done, right?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  It was more of a
10         review.  It was more that I think they
11         had -- they realized they had a tool
12         that could be helpful to distributors in
13         the ARCOS data, and if they compiled it
14         in that way and showed it to us, it
15         would be helpful to us.
16         We did not have the capability to
17         see down to -- down beyond the customer
18         that we shipped to, and so that was
19         really, I think, the driver for their
20         meetings, the distributor initiatives.
21  BY MR. BUCHANAN:
22     Q.    Right, they had certain data that
23  you didn't have full visibility to?
24     A.    Correct.

Page 68

1      Q.    At least in that form, right?
2      A.    Correct.
3      Q.    You had certain information they
4   didn't have, right?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  Yes.
7   BY MR. BUCHANAN:
8      Q.    I mean, the manufacturer, of
9   course, has business relationships with its
10  various distributors and wholesalers, and under
11  those agreements, there are often chargeback
12  agreements, correct?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  Yes.
15  BY MR. BUCHANAN:
16     Q.    And those chargeback agreements
17  yield an exchange of information that provides
18  visibility to the manufacturer of the secondary
19  customers of the distributor, correct?
20         MS. VANNI:  Object to form.
21         THE WITNESS:  Sometimes.
22         Chargebacks are not a very -- not a very
23         dependable tool for multiple reasons.
24  BY MR. BUCHANAN:

Page 69

1      Q.    Well, they're certainly good
2   enough for people to exchange a lot of money
3   back and forth with, right?
4          MS. VANNI:  Objection.
5          THE WITNESS:  I don't know.  I
6          don't really know a lot about chargeback
7          data.
8   BY MR. BUCHANAN:
9      Q.    Well, you do know that
10  chargebacks are a means for which manufacturers
11  and distributors exchange big checks, right?
12         MS. VANNI:  Objection.
13         THE WITNESS:  I don't know.  I
14         know that it's a rebate type of program,
15         but other than that, I don't know
16         whether it's big or whether it's small.
17         I don't know a lot about the financial
18         aspects of it.
19  BY MR. BUCHANAN:
20     Q.    Right.  It's a system that's used
21  between manufacturers and distributors whereby
22  if a distributor ends up having to sell its
23  product to its end user pharmacies and customers
24  for less or at some type of discount relative to

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    what it paid for it, it can get money back from
2    the manufacturer, fair?
3              MS. VANNI:  Objection.
4              THE WITNESS:  From what I know,
5        yes.
6    BY MR. BUCHANAN:
7        Q.    That's a decent thumbnail sketch
8    of what we're talking about with the business
9    purpose -- primary business purpose of
10   chargeback data, correct?
11       A.    Yes.
12       Q.    And as part of that, the
13   distributor has got to come forward with its
14   sales information to its end user customers,
15   correct?
16       A.    Yes.
17             MS. VANNI:  Objection.
18             THE WITNESS:  Yes.
19   BY MR. BUCHANAN:
20       Q.    And so the manufacturers then, as
21   part of that reconciliation process, given end
22   user customer information as part of the
23   chargeback agreements, correct?
24             MS. VANNI:  Objection.

Page 71

1              THE WITNESS:  Yes, on some
2        customers.
3    BY MR. BUCHANAN:
4        Q.    Right, and some customers --
5        A.    Some don't participate.
6        Q.    Right.  Your larger wholesalers
7    and distributors have chargeback agreements with
8    the manufacturers, correct?
9              MS. VANNI:  Objection.
10             THE WITNESS:  I don't know.
11   BY MR. BUCHANAN:
12       Q.    Okay.  Well, during your time at
13   Qualitest, you did have access to chargeback
14   data, correct?
15       A.    I looked at the data.  I met with
16   financial individuals, and the data was not
17   helpful at that time.
18       Q.    Okay.  We'll highlight that
19   answer and we'll circle back at some point
20   during the day on that.
21       A.    Yes.
22       Q.    You would agree that during the
23   time that you were at Qualitest, the company
24   implemented a system to incorporate chargeback

Page 72

1    data as part of its suspicious order monitoring
2    tools, correct?
3              MS. VANNI:  Objection.
4              THE WITNESS:  The company
5        reviewed the potential of including
6        chargeback data.  At the time that I had
7        left, we had not implemented it.  I
8        don't know if it was implemented after.
9    BY MR. BUCHANAN:
10       Q.    Okay.  We'll talk about that in a
11   little more detail.
12       A.    Let me be clear, though.  There
13   is no -- there's no DEA regulation that requires
14   a company to include chargeback data in their
15   SOM program.
16       Q.    Qualitest at the point in time
17   when they implemented this -- and I guess
18   there's some debate between you and I at the
19   moment, and we'll just have to work through this
20   during the day, as to whether Qualitest ever
21   actually looked at chargeback data and used it
22   as part of its suspicious order monitoring
23   program.
24             Is it your contention, as least

Page 73

1    as you are sitting here now, you don't recall
2    Qualitest doing that for its customers?
3              MS. VANNI:  Object to form.
4              THE WITNESS:  When I was there,
5        we did not.
6    BY MR. BUCHANAN:
7        Q.    Okay.  Looking now to your
8    description -- it's 1146.3, those are numbers in
9    the top right corner, I'll reference them from
10   time to time, but it's Exhibit 2 for the
11   record -- this says "Upon arrival at Qualitest,
12   I did not have responsibility for SOMs."
13             Was there a particular DEA issue
14   that you were brought in to deal with in
15   Alabama?
16             MS. VANNI:  Object to form.
17             THE WITNESS:  I was brought in to
18        basically implement a DEA program
19        overall.  Wasn't SOM specific.
20   BY MR. BUCHANAN:
21       Q.    Who was the DEA compliance person
22   that you replaced?
23       A.    John Schultz.
24       Q.    Okay.  If I understand correctly,

Highly Confidential – Subject to Further Confidentiality Review

Page 74

1    historic files show that Qualitest had separate
2    incidents with DEA which caused a bit of a stir,
3    fair?
4              MS. VANNI:  Objection.
5              THE WITNESS:  Yes.
6    BY MR. BUCHANAN:
7         Q.    What were those?
8         A.    Well, we had multiple
9    interactions with DEA.  Are you referring to
10   prior to my coming?
11        Q.    Prior to your coming, yes, the
12   issues that you were aware of that created a bit
13   of a stir.
14             MS. VANNI:  Object to form.
15             THE WITNESS:  I was told that
16        there was a theft, and that that's why
17        Mr. Schultz was being let go.
18   BY MR. BUCHANAN:
19        Q.    Okay.  And was that in the
20   Charlottesville facility or in the Huntsville
21   facility?
22        A.    Huntsville.
23        Q.    Okay.  And what was the other
24   incident?

Page 75

1         A.    That's the -- that's the only one
2    I'm aware of prior to my coming.
3         Q.    Okay.  Are you aware of incidents
4    where the company was shipping products to
5    people who didn't have DEA licenses?
6              MS. VANNI:  Object to form.
7              THE WITNESS:  No, I'm not.
8    BY MR. BUCHANAN:
9         Q.    Not during your time nor before
10   your time, you're not aware of that?
11        A.    No, I'm not.
12        Q.    Okay.  And then you describe in
13   the middle, that you were "very concerned with
14   the status of the SOM program."
15             Do you recall that?
16        A.    Yes.
17        Q.    Not just writing it, but you
18   recall that?
19        A.    Yes.
20        Q.    You recall being very concerned
21   about where Qualitest was with regard to license
22   checks, for example?
23             MS. VANNI:  Object to form.
24             Counsel, can you point me to

Page 76

1    where you're referring to?
2              MR. BUCHANAN:  It's in this and
3    outside of this.
4              THE WITNESS:  License checks, I
5         was not concerned.  I know they were
6         checking the licenses.
7    BY MR. BUCHANAN:
8         Q.    On an order-by-order basis?
9         A.    I don't believe it was on an
10   order-by-order basis.  DEA required at the time
11   and still requires really that you check the
12   license when you get a copy of the customer's
13   license, and that license is good for a year.
14   There's no DEA requirement, in other words, to
15   purchase NTIS data.
16        Q.    Okay.  Fair enough.  But all the
17   way back in the '90s, I mean, when you were at
18   Ciba-Geigy, I mean, Ciba-Geigy had an NTIS data
19   stream that was checking orders as they were
20   placed, correct?
21        A.    It was available, yes, yes.
22        Q.    And that's how they were doing it
23   back in the '90s?
24             MS. VANNI:  Object to form.

Page 77

1              THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3         Q.    Okay.  And that's how Watson was
4    doing it before you -- before you got to Watson?
5         A.    Correct.  Yes.
6         Q.    And before you got to Qualitest,
7    it would be fair that you had to add the NTIS
8    and state license checks to the system, right?
9         A.    I didn't have to.  It was an
10   upgrade that I wanted to make.
11        Q.    Okay.  What you stated here was
12   you were very concerned with the status of the
13   program and began to work with sales, customer
14   service and IT to make improvements and with
15   your management to raise your concerns.
16             Would it be fair that you raised
17   concerns?
18             MS. VANNI:  Object to form.
19             THE WITNESS:  About the SOM
20        program?
21   BY MR. BUCHANAN:
22        Q.    Yes.
23        A.    The concerns I had with the SOM
24   program was that it was being handled by sales

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    and they were reviewing what they needed to. My
2    concern was the perception that sales was the
3    one handling it, and how that would be perceived
4    by others.
5       Q.    Right, because, I mean, you know
6    there's -- the salespeople are about selling,
7    right?
8          MS. VANNI: Object to form.
9          THE WITNESS: That's what people
10         would perceive, yes.
11   BY MR. BUCHANAN:
12      Q.    I mean, that's not an
13   unreasonable perception, right?
14         MS. VANNI: Object to form.
15         THE WITNESS: It is a perception
16         that's out there --
17   BY MR. BUCHANAN
18      Q.    Right.
19      A.    And regardless of how -- you
20   know, salespeople have integrity, too, believe
21   it or not.
22      Q.    Do you recall getting some
23   pushback from the sales side of Qualitest as you
24   started to implement and explore various SOMs

Page 79

1    initiatives --
2          MS. VANNI: Objection.
3    BY MR. BUCHANAN:
4       Q.    -- after your meeting with the
5    DEA?
6       A.    Questions from them? I think
7    that the education, we needed to educate a
8    little bit more. As far as how DEA looked at
9    the program -- not looked at the program, but
10   how they -- how the regulation had changed over
11   the years and how the perception of the
12   regulation and the things that DEA would like to
13   see changed over the years.
14      Q.    My question was simply whether
15   you got some -- some pushback from sales as you
16   were starting to implement, restrict and propose
17   terminating certain customers.
18         Do you recall that?
19         MS. VANNI: Objection.
20         THE WITNESS: I think you will
21         always get pushback from sales at any
22         company when you're cutting off a
23         customer, but when we gave information
24         as to why that customer needed to be cut

Page 80

1    off, they were on board anytime that I
2    interacted with them.
3    BY MR. BUCHANAN:
4       Q.    Right.
5          So once you showed them diligence
6    that you had done -- or investigation that had
7    been done, a review of data that had been
8    conducted, people were willing to accept the
9    conclusion, fair?
10      A.    Yes.
11      Q.    Okay. But you've got to do the
12   diligence, you've got to do the digging, you had
13   to make the case?
14         MS. VANNI: Object to form.
15         THE WITNESS: Yes. We're not
16         going to, you know, stop shipping to a
17         customer without justification, sure.
18   BY MR. BUCHANAN:
19      Q.    So it's really hard to develop
20   that justification if you're not doing due
21   diligence on customers, correct?
22         MS. VANNI: Object to form.
23         THE WITNESS: No, because sales
24         was contacting me. If they had a

Page 81

1          concern about a particular customer,
2          they were really, really good with
3          bringing things forward and asking
4          questions, and so we were working
5          together on it.
6    BY MR. BUCHANAN:
7       Q.    Okay. It says here in early 2013
8    you received a program -- you received approval
9    to move the SOM program into DEA compliance.
10         Do you see that?
11      A.    Yes.
12      Q.    Okay. Does that help refresh
13   your recollection as to when that came under
14   your umbrella?
15      A.    Yes, thank you.
16      Q.    Okay. So prior to that point in
17   time, it was a sales function, right?
18         MS. VANNI: Object to form.
19   BY MR. BUCHANAN:
20      Q.    Sales, customer service? Excuse
21   me.
22      A.    It was under the sales
23   department, managed by the sales department with
24   input.

Highly Confidential — Subject to Further Confidentiality Review

Page 82

1    Q.   Right, so --
2    A.   With compliance input.
3    Q.   And so in 2013, you brought it
4  into the DEA compliance group.
5        Were you the head of DEA
6  compliance at that point in time?
7    A.   Yes.
8    Q.   And that was the title you held
9  until you left?
10    A.   Yes.
11    Q.   Why did you leave?
12    A.   A better position, promotion.  I
13  went to H.D. Smith as the VP.
14    Q.   Okay.  There was a -- you left --
15  let's just look at Exhibit 2.  Exhibit 2 is
16  dated October 15th, 2014.
17        Two weeks before this, you got
18  that letter from the U.S. Attorney in Alabama
19  about egregious violations?
20    A.   Prior to me leaving?
21        MS. VANNI:  Object to form.
22  BY MR. BUCHANAN:
23    Q.   Yeah.  Do you recall that?
24    A.   We had -- we had inspections by

Page 83

1  DEA throughout my time at Qualitest.  I don't
2  know which -- what instance you are referring
3  to, but we did have occasions where we had
4  violation letters.
5    Q.   Okay.  And do you recall -- do
6  you recall getting a letter not from the DEA,
7  but from the U.S. Attorney directed to you,
8  telling you that there were egregious violations
9  and you had a week to sit down with them to talk
10  about your fine?
11        MS. VANNI:  Object to form.
12        THE WITNESS:  I don't recall
13  that.
14        THE VIDEOGRAPHER:  Counsel, could
15  we go off the record just momentarily?
16        MR. BUCHANAN:  Yeah.
17        THE VIDEOGRAPHER:  Going off the
18  record.  The time is now 9:53 a.m.
19        (Brief recess.)
20        THE VIDEOGRAPHER:  Back on the
21  record.  The time is 9:55 a.m.
22        (Document marked for
23  identification as Par- Norton Deposition
24  Exhibit No. 3)

Page 84

1  BY MR. BUCHANAN:
2    Q.   I'm passing you, Ms. Norton, a
3  copy of Exhibit 3 to your deposition.  This is a
4  letter from the U.S. Attorney, U.S. Department
5  of Justice, Joyce Vance, United States Attorney,
6  I guess for the Northern District of Alabama,
7  it's dated September 30, 2014, 1060.2.  If you
8  could pull it up, please.
9        And do you see before -- I guess
10  you read the content of it, ma'am, do you see
11  you're on this exchange?
12    A.   Yes, I do.
13    Q.   Okay.  You are the point of
14  contact from the Department of Justice on this
15  particular correspondence from the U.S.
16  Attorney's Office?
17    A.   Yes.
18    Q.   It says "Ms. Hernandez, please
19  find attached the Notice of Intent to Seek Civil
20  Penalties."
21        Do you see that on the cover, the
22  cover e-mail?
23    A.   Yes.
24    Q.   And this is September 30, 2014,

Page 85

1  it's a couple weeks, it looks like, before you
2  are engaging with H.D. Smith in your job search.
3        Do you see that?
4    A.   The date, yes, September 30.
5    Q.   Is that correct?
6    A.   Mm-hmm.
7    Q.   Okay.  So you get this letter.
8  Please feel free to look at it.  It's a
9  follow-up letter to a teleconference you had had
10  a week earlier on September 22, 2014.
11        Do you see that?
12    A.   Yes.
13    Q.   Okay.  It says, "The audit
14  revealed alarming deviations of Schedule II and
15  Schedule III controlled substances in violation
16  of 21 CFR 1304.21, other statutes, you failed to
17  account for and properly maintain records of the
18  following."
19        And then it's got a list of seven
20  items there.  And, I'm sorry, are you still
21  reading?
22    A.   Yes.
23    Q.   Okay.
24    A.   (Witness reviews document.)

Page 86

1    Q.    And can you highlight the items,
2    please.
3          So we see item one, Hydrocodone
4    10, 325 milligrams, that's Hydrocodone
5    10 milligrams, 325 milligrams of acetaminophen,
6    is that what that would be?
7    A.    Yes.
8    Q.    And so, you know, about roughly
9    1200 bottles unaccounted for, right?
10   A.    Mm-hmm.
11         MS. VANNI:  Objection to the
12         form.
13         THE WITNESS:  Doesn't necessarily
14         mean they were unaccounted for as much
15         as the recordkeeping of them.
16   BY MR. BUCHANAN:
17   Q.    Well, it says "GB," and GB is --
18   A.    Generics Bidco.
19   Q.    And Generics Bidco was one of the
20   operating entities of Qualitest, correct?
21   A.    Yes.
22   Q.    One of the registrants with the
23   DEA, correct?
24   A.    Yes.

Page 87

1    Q.    And there was another registrant
2    with the DEA that also operated under Qualitest,
3    correct?
4    A.    Yes.
5    Q.    And what was the entity's name?
6    A.    Vintage -- Vintage
7    Pharmaceuticals.
8    Q.    Right.
9          So what we see here are some 1200
10   bottles of Hydrocodone with 10 milligrams, 1300
11   bottles of hydrocodone seven and a half
12   milligrams, more in different -- in different
13   allocations.  816 bottles of Oxycodone.
14         What's Oxycodone 30 milligrams,
15   ma'am?
16   A.    What is it?
17   Q.    Yeah.
18   A.    I don't --
19   Q.    Is it a generic of Oxycontin?
20   A.    Yes.
21   Q.    Okay.  And then on the next page,
22   it says "The DEA's inspection revealed an
23   overall careless and haphazard recordkeeping
24   practice at GB" -- that's the Qualitest entity,

Page 88

1    correct?
2    A.    Mm-hmm.
3    Q.    -- "as demonstrated by, among
4    other things, deviations exceeding 9 million
5    tablets."
6          Did I read that correctly?
7    A.    Yes.
8    Q.    It continues, the follow on
9    paragraph, "GB's recordkeeping violations, in
10   particular, as evidenced by the several-million
11   tablet deviations are" -- and what did they say?
12   A.    I'm sorry, where are you looking?
13   Failure to maintain --
14   Q.    "GB's recordkeeping violations,
15   in particular" --
16   A.    Yes.
17   Q.    -- "as evidenced by the
18   several-million tablet deviation are," and what
19   do they say?
20   A.    -- "egregious and evidence a
21   complete disregard of GB's statutory and
22   regulatory obligations."
23   Q.    That's not good.
24         MS. VANNI:  Object to form.

Page 89

1          THE WITNESS:  The way the DEA
2          and/or the Attorney General words a
3          violation letter is meant to -- meant to
4          be exaggerated for impact.
5    BY MR. BUCHANAN:
6    Q.    "Egregious and evidence of a
7    complete disregard of your statutory and
8    regulatory obligation," that's not good, right?
9          MS. VANNI:  Object to form.
10         THE WITNESS:  It's not -- it's
11         not really descriptive of the situation.
12   BY MR. BUCHANAN:
13   Q.    It's certainly not the way a
14   company who is a registrant in a closed system
15   of controlled substance distribution should be
16   contacting itself, right?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  These letters are
19         also meant to point out violations --
20   BY MR. BUCHANAN:
21   Q.    Can you answer my question?
22   A.    I'm sorry, what was the question?
23   Q.    Yes.  It's not the way in which a
24   manufacturer and registrant of a controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    substance is supposed to be behaving, correct?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  You don't want any
4        violations.
5    BY MR. BUCHANAN:
6        Q.    Okay.  You certainly don't want
7    to engage in egregious and complete disregard of
8    your statutory and regulatory obligations, fair?
9            MS. VANNI:  Object to form.
10           THE WITNESS:  And we were not.
11   BY MR. BUCHANAN:
12       Q.    Okay.  And they said you had a
13   week to sit down with them to negotiate your
14   fine, right?
15       A.    Yes.
16       Q.    And were you part of those
17   discussions?
18       A.    I don't recall.
19       Q.    Because this is not -- this
20   wasn't just the first notice you had from the
21   U.S. Attorney, right?
22           MS. VANNI:  Object to form.
23           THE WITNESS:  I don't know
24       whether we had notices from the Attorney

Page 91

1        General or violation letters.  We did
2        have other violation letters, but I
3        don't know if the Attorney General was
4        involved.  Offhand, I don't recall.
5    BY MR. BUCHANAN:
6        Q.    Right.
7            You had a call with certainly the
8    U.S. Attorney a week before this, right?
9        A.    I don't know for sure.
10       Q.    First paragraph, last sentence.
11       A.    Yes.
12       Q.    Okay.  You had a call with the
13   U.S. Attorney before this?
14       A.    So the call would have been -- by
15   the looks of it here, the call would have been
16   to say do we want this sent by e-mail, do we
17   want it sent by mail, et cetera.
18           At that point, we probably would
19   not know the details of what was included in it
20   until it came.
21       Q.    And you would have had
22   interactions with the DEA on this before the
23   U.S. Attorney got it, right?
24       A.    This was a result --

Page 92

1            MS. VANNI:  Objection.
2            THE WITNESS:  -- of a DEA
3        inspection.
4    BY MR. BUCHANAN:
5        Q.    Right.  So you would have had
6    interactions with the DEA on this issue before
7    you got --
8        A.    The local office, yes.
9        Q.    And what fine did Qualitest pay
10   in connection with this?
11           MS. VANNI:  Object to form.
12           THE WITNESS:  I'm not sure.
13   BY MR. BUCHANAN:
14       Q.    Were you a part of those
15   discussions?
16       A.    No, I think I had left already.
17   I don't recall.
18       Q.    Okay.  What happened after this
19   letter?
20           MS. VANNI:  Object to form.
21           THE WITNESS:  After any letter --
22       and, again, I didn't recall this
23       instance offhand -- and I know that the
24       quantities that are listed here, the

Page 93

1        issues were surrounding complaint
2        samples which get returned to the
3        company from customers in various
4        conditions and, for example, you might
5        receive a liquid in -- that came in in a
6        bottle that the bottle is broken and
7        there's glass.
8            So, I mean, these are not liquid,
9        but the complaints that come back from
10       customers are not usually in very good
11       form, and that's what many of these were
12       related to, I believe.
13   BY MR. BUCHANAN:
14       Q.    9 million pills?
15       A.    Mm-hmm, yes.
16       Q.    9 million pills, you're claiming,
17   were cracked bottles?
18           MS. VANNI:  Object to form.
19           THE WITNESS:  No, no, these were
20       not bottle -- these, in particular, that
21       are listed here are not liquid, but I'm
22       giving an example of the condition that
23       complaints come back to us.
24   BY MR. BUCHANAN:

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    Q.    Okay.
2    A.    So partial tablets in
3    prescription bottles dumped into containers,
4    loose, you know, that's what we're dealing with
5    from a complaint perspective when those are
6    returned to us.
7    Q.    Okay.  Well, specifically on this
8    one, were you a part of the investigation around
9    this?
10    A.    I don't recall.
11    Q.    Who handled the investigation?
12    A.    I don't know.  It was for the
13    distribution, Generics Bidco, it would be for
14    the distribution center, so I would assume
15    someone in distribution, someone who had been
16    left on my team.  I don't know who else.
17    Q.    Okay.  And so after this
18    interaction at least -- and I haven't been able
19    to see -- withdrawn.
20         After you received this letter,
21    we certainly know you're in at least more -- you
22    send your resume out, you commence a screening
23    process with H.D. Smith to pursue employment
24    there, fair?

Page 95

1    A.    No, not fair.  This letter would
2    have nothing to do with me leaving the company.
3    After the amount of time that I have in a DEA
4    compliance role, a violation letter would not
5    cause me to leave a company.
6    Q.    And so -- that's what I'm trying
7    to understand.
8         We have this letter, you're not
9    involved in the investigation around the letter,
10    and you're the head of DEA compliance?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  I don't know if I
13    was or not.  I just don't recall it.
14         It's been a while.  I would assume --
15    BY MR. BUCHANAN:
16    Q.    You had some recollection, ma'am,
17    about, you know, getting the ANDA meeting with
18    the DEA back in 2008, 2009 -- or the Anda
19    meeting, excuse me, in 2008, 2009.  You don't
20    remember a letter from the U.S. Attorney saying
21    we've got to sit down and talk about potentially
22    millions of dollars in fines relating to
23    egregious, alarming, complete deviations and
24    failure to account for more than 9 million

Page 96

1    pills?  You don't remember that?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  I may have been
4    involved in it during my time there, but
5    I don't recall any of it.  I don't want
6    to miscomment on what I did or didn't
7    do.
8    BY MR. BUCHANAN:
9    Q.    As part of your separation with
10    the company in 2014, did you have interactions
11    with management in any way relating to this
12    particular event?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  I would have
15    interactions with management about any
16    violation that the company received, so
17    I would assume that I did.  Again, I
18    don't know who or -- I don't recall the
19    details of it.
20         MR. BUCHANAN:  You asked for a
21    five-minute break, and I'm good now,
22    thanks.
23         MS. VANNI:  Okay.
24         THE VIDEOGRAPHER:  Going off the

Page 97

1    record.  The time now is 10:06 a.m.
2         (Brief recess.)
3         THE VIDEOGRAPHER:  Now going back
4    on the record.  The time is 10:20 a.m.
5    BY MR. BUCHANAN:
6    Q.    As I said, you can set aside that
7    last exhibit.  You've worked for several
8    manufacturers, distributors who are the subject
9    of the litigation that brings us here today.
10         I'm focusing most of my questions
11    during your time on Qualitest, so I've got a
12    period of time to do that.  Other people may
13    have some questions about other points in time.
14    A.    Yes.
15    Q.    But you spent some time, I
16    assume, meeting with counsel before today to
17    kind of run through this?
18    A.    Yes, I did.
19    Q.    Okay.  Who -- who did you speak
20    with by the entity, counsel for?
21    A.    Counsel for Endo, counsel for
22    H.D. Smith and counsel for Watson.
23    Q.    Okay.  Separate counsel for Anda
24    or same counsel for both?

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    A.    Briefly for Anda.  Briefly for
2  Anda.
3    Q.    Okay.  And so that was separate
4  counsel for Anda?
5    A.    Yes.
6    Q.    Okay.  And all in one session or
7  in multiple sessions?
8         MS. VANNI:  Object to form.
9         THE WITNESS:  Multiple.
10 BY MR. BUCHANAN:
11   Q.    Okay.  When did you first start
12 meeting?
13   A.    About a month ago.
14   Q.    Okay.  And let's talk about kind
15 of in-person meetings first.
16         How many of those did you have?
17   A.    I think three with Endo, two with
18 H.D. Smith and one with Watson.
19   Q.    Each one of these several hours?
20        MS. VANNI:  Object to form.
21        THE WITNESS:  Yes.
22 BY MR. BUCHANAN:
23   Q.    Okay.  You don't currently work
24 for any of the firms whose counsel you met with,

Page 99

1  correct?
2    A.    No, I do not.
3    Q.    When I said firms, I mean either
4  Endo or H.D. Smith or Watson, correct?
5    A.    No, do not.
6    Q.    Was your current employer present
7  at any of those meetings?
8    A.    Yes.
9    Q.    Okay.  All of them?
10   A.    No.
11   Q.    Okay.  So that would be an
12 additional meeting or that person attended
13 certain of the meetings?
14   A.    Attended certain.
15   Q.    Okay.
16   A.    And there was an additional
17 meeting with them separately.
18   Q.    Okay.  And your current employer
19 I see from Exhibit 1 is Noramco.
20   A.    Yes, that's correct.
21   Q.    Out of █████████████?
22   A.    Yes.
23   Q.    Do you work in
24 ████████?

Page 100

1    A.    I do.
2    Q.    What is the business of Noramco?
3    A.    They are a chemical active
4  ingredient manufacturer.
5    Q.    So they make the API?
6    A.    Yes.
7    Q.    They make APIs that are
8  controlled substances?
9    A.    Yes.
10   Q.    And which ones do they make?
11   A.    They make several.  Hydrocodone,
12 oxycodone, Tapentadol.
13   Q.    And oxycodone would be the active
14 pharmaceutical ingredient in -- is API an active
15 pharmaceutical ingredient?
16   A.    Yes, it is.
17   Q.    Okay.  So oxycodone is the active
18 pharmaceutical ingredient in Oxycontin?
19   A.    Yes.
20   Q.    And hydrocodone would be an
21 active pharmaceutical ingredient in products
22 like Vicodin?
23   A.    Yes.
24   Q.    Okay.  And so we'll look at some

Page 101

1  documents today where they're referenced by
2  hydrocodone APAP or oxycodone.
3         When we see hydrocodone APAP, we
4  can think of that as Vicodin?
5         MS. VANNI:  Objection.
6         THE WITNESS:  Hydrocodone
7  acetaminophen, yes.
8  BY MR. BUCHANAN:
9    Q.    Okay.  APAP is an abbreviation in
10 the pharmaceutical industry for acetaminophen,
11 which would retail as Tylenol in its -- if it
12 was just acetaminophen, right?
13   A.    Yes.
14   Q.    Okay.  When you combine
15 essentially Tylenol with the controlled
16 substance hydrocodone, that goes by a brand name
17 of Vicodin, correct?
18   A.    Sometimes, yes.
19   A.    Well, Vicodin is hydrocodone and
20 acetaminophen combined, correct?
21   A.    Yes.
22   Q.    In one tablet?
23   A.    Yes.
24   Q.    Thank you.

26  (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1          And so the business of Noramco is
2    the manufacturer of the -- if you will, the
3    active controlled substance that gets ultimately
4    put into the tablets that are stamped by
5    manufacturers like Qualitest, correct?
6         A.    Yes, that's correct.
7              MS. HERGENROTHER: Objection.
8              MR. BUCHANAN: Who is on the line
9    and raising that objection for which
10   defendant?
11             MS. HERGENROTHER: It's Jenny
12   Hergenrother for Noramco, Inc.
13   BY MR. BUCHANAN:
14        Q.    All right.  So we were running
15   through these meetings you had, several hours,
16   several meetings, several hours at each meeting
17   for several meetings, correct?
18             MS. VANNI: Object to form.
19             THE WITNESS: Yes, correct.
20   BY MR. BUCHANAN:
21        Q.    All right.  Good.  I've got seven
22   meetings over the last month?
23        A.    Approximately.
24        Q.    Okay.  And these are

Page 103

1    face-to-face, right?
2              MS. KOSKI: Object to form.
3              THE WITNESS: Most, yes.
4    BY MR. BUCHANAN:
5         Q.    Okay.  And then you probably had
6    some video conference-type stuff where you
7    shared screens.  Did that happen, too?
8              MS. VANNI: Object to form.
9              THE WITNESS: No.
10   BY MR. BUCHANAN:
11        Q.    No?
12             Did you have some teleconferences
13   or phone calls?
14        A.    Yes.
15        Q.    Okay.  Did that start before the
16   last month?
17        A.    I'm not positive.
18        Q.    Okay.
19        A.    I don't think so.
20        Q.    Did you review some documents to
21   get ready for today?
22        A.    I was shown some documents, yes.
23        Q.    Help refresh your memory?
24        A.    Yes, in some cases, yes.

Page 104

1         Q.    And did it?
2         A.    Yes.
3         Q.    What were you shown?
4              MS. VANNI: Object to the form.
5    I'm going to instruct like her not to answer
6    as to what she was shown.  That's
7    clearly work product.
8              MR. BUCHANAN: It's actually not.
9    I mean, frankly, if you showed her
10   anything that refreshed her
11   recollection, I'm entitled under Rule
12   608 or 611, whatever it is, to copies of
13   whatever she was shown, so...
14             MS. VANNI: I'm going to instruct
15   her not to answer as exactly to what she
16   was shown.
17             You can ask her how her
18   recollection was refreshed or if her
19   recollection was refreshed, but -- or if
20   she remembers specific documents, but
21   she is not going to tell you specific
22   documents that she was shown.
23             MR. BUCHANAN: If the witness'
24   recollection was refreshed by documents

Page 105

1    that you showed her, I'm entitled to
2    have them so that I can appropriately
3    examine her on her refreshed
4    recollection.  That's the law.
5              MS. VANNI: Counsel, this -- you
6    know that the documents that she is
7    shown by counsel in preparation for
8    deposition are protected by
9    attorney-client and work product.
10             MR. BUCHANAN: We disagree.
11   Certainly where it refreshes your
12   recollection.
13   BY MR. BUCHANAN:
14        Q.    So please describe the subject
15   matter --
16             MR. BUCHANAN: You're instructing
17   her not to answer, correct?
18             MS. VANNI: I am as to what
19   specific documents she was shown.
20   BY MR. BUCHANAN:
21        Q.    Okay.  Let's talk about, then,
22   the areas in which you were shown documents.
23             You were shown documents
24   apparently by counsel for Endo, fair?

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1     A.   Yes.
2     Q.   Okay.  And what areas of subject
3  matter were those documents?
4     A.   Oh, gosh.  E-mails, inspection
5  information.
6     Q.   Documents you wrote?
7     A.   Yes.
8     Q.   Documents you received?
9     A.   In some cases, yes.
10     Q.   Documents that you don't appear
11  to have been copied on but were, nonetheless, in
12  your area of responsibility?
13     MS. VANNI:  Objection.
14     THE WITNESS:  Yeah, yes.
15  BY MR. BUCHANAN:
16     Q.   Okay.  Were you shown documents
17  by counsel for any of the other defendants?
18     A.   Other than Endo?
19     Q.   Yes.
20     A.   Yes.
21     Q.   Okay.  Which defendant?
22     A.   H.D. Smith.
23     Q.   And did those refresh your
24  recollection as well?

Page 107

1     A.   Yes.
2     Q.   Okay.  And what subject areas
3  were those?
4     A.   SOM.  I think that's -- mostly
5  SOM.
6     Q.   Okay.  And what documents were
7  you shown?
8     MR. LEEDER:  Objection?
9     MR. BUCHANAN:  We've already had
10  the instruction on the record.  You're
11  going to have to instruct the witness
12  not to answer.
13     MR. LEEDER:  I've already raised
14  this objection with Mr. Young, and I
15  will ask the witness not to answer the
16  question.
17     MR. BUCHANAN:  Unless he
18  instructs you not to answer the -- I
19  just -- I need to be clear, are you
20  instructing witness not to --
21     MR. LEEDER:  I'm instructing the
22  witness not to answer the question.
23  BY MR. BUCHANAN:
24     Q.   All right.  So after you left

Page 108

1  Endo, you went off to H.D. Smith?
2     A.   Yes.
3     Q.   Had a little consulting gig after
4  that, right?
5     MS. VANNI:  Object to form.
6     THE WITNESS:  I was consulting.
7  BY MR. BUCHANAN:
8     Q.   For nine months?
9     A.   Yes.
10     Q.   I didn't say that disparagingly.
11  I'm just trying to fill out your full history so
12  we can drill down a little bit.
13     You were at H.D. Smith from 2014
14  to 2016.  From 2016 to 2017, you remained
15  Pennsylvania based or came back here to
16  Pennsylvania --
17     A.   Yes.
18     Q.   -- and were a regulatory
19  consultant or compliance consultant from here,
20  correct?
21     A.   Correct.
22     Q.   Did you consult for any of your
23  former clients during that period of time?  I
24  shouldn't -- withdrawn.

Page 109

1     Did you consult for any of the
2  former employers we've already talked about
3  during that period of time?
4     A.   I did not.
5     Q.   Okay.  Since leaving Endo, have
6  you done consulting for Endo?
7     MS. VANNI:  Object to the form.
8     THE WITNESS:  No.
9  BY MR. BUCHANAN:
10     Q.   Since leaving H.D. Smith, have
11  you done consulting for H.D. Smith?
12     A.   No.
13     Q.   Since leaving -- I said Endo.  I
14  should have said Qualitest.
15     Since leaving Qualitest, have you
16  done work for Qualitest?
17     A.   No.
18     Q.   Okay.  So, too, for any of the
19  other manufacturers, distributors you've worked
20  for, correct?
21     A.   Correct.
22     Q.   Who did you work for, then, in
23  that period of time -- withdrawn.  Let me be
24  more precise.

28  (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1       Did you work for any
2   manufacturers of controlled substances or
3   distributors of controlled substances that you
4   believe are defendants in this case?
5       A.    No.
6       Q.    Okay.  Did you work for any
7   manufacturers or distributors of controlled
8   substances?
9       A.    Yes.
10      Q.    Who?
11      A.    For Neos Therapeutics.
12      Q.    Okay.  And they brought you on
13  board?
14      A.    Yes, they did.
15      Q.    Okay.  Texas was too far, so you
16  lasted for a year and then you came back here?
17      A.    No.
18      Q.    Okay.
19      A.    I did not relocate to Texas.  I
20  worked from -- from my home in Bethlehem and
21  went to Texas one week a month.
22      Q.    Okay.  All right.  So I think we
23  understand at this point, ma'am, to recap,
24  you've got about 30 years' experience dealing

Page 111

1   with controlled substances in some capacity or
2   another, fair?
3       A.    Yes.
4       Q.    At various points at time and at
5   times I'm going to drill down on in particular
6   during your time at Qualitest, you were the DEA
7   compliance manager, correct?
8       A.    The director of DEA compliance,
9   yes.
10      Q.    Okay.  You were the most senior
11  person on DEA compliance?
12      A.    Yes.
13      Q.    Okay.  I mean, there are org
14  charts, and we could look at them if we wanted
15  to just make a big pile of exhibits over there,
16  but there's org charts from your time at
17  Qualitest that reflect you reported directly to
18  the chief operating officer; is that correct?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  For a short period
21      of time, yes.
22  BY MR. BUCHANAN:
23      Q.    Okay.  And what was that period
24  of time?

Page 112

1       A.    Closer to -- closer to my
2   leaving, closer to the end of my work.  Mostly I
3   did not report to him for a long period of time.
4       Q.    Okay.  So you had different
5   people you reported to over time, but at the end
6   of your tenure at Qualitest, the person you
7   reported to is the chief operating officer,
8   correct?
9       A.    Yes.
10      Q.    Okay.  That person was for the
11  pharmaceutical division?
12      A.    Yes.
13      Q.    Okay.  And who was that person?
14      A.    Don Degoyler.
15      Q.    Okay.  And you had interactions
16  with him from time to time?
17          MS. VANNI:  Object to form.
18          THE WITNESS:  Occasionally.
19  BY MR. BUCHANAN:
20      Q.    Let's talk about Qualitest.
21          Qualitest is a manufacturer and
22  distributor of controlled substances, true?
23      A.    They were.
24      Q.    Among other things?

Page 113

1       A.    They were, yes.
2       Q.    Okay.  Roughly 70% of their
3   business was controlled substances, do you
4   remember that?
5           MS. VANNI:  Objection.
6           THE WITNESS:  If I had to guess,
7       yes, about that.
8   BY MR. BUCHANAN:
9       Q.    I mean, they made a lot of
10  controlled substances, true?
11      A.    Yes, they did.
12      Q.    Okay.  And they had these
13  facilities, what is it, in Huntsville, Alabama
14  and Charlottesville where they did all that
15  manufacturing?
16      A.    Charlotte, North Carolina.
17      Q.    I think I said Charlottesville.
18  That would be Virginia, right?
19      A.    Yes.
20      Q.    Charlotte, North Carolina.
21      A.    Correct.
22      Q.    Charlottesville, Virginia.  And
23  they don't have a place in Charlottesville,
24  Virginia, right?

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1      A.    They did not.
2      Q.    So Charlotte, North Carolina,
3   Huntsville, Alabama is where they're making all
4   these pills, correct?
5           MS. VANNI:  Object to form.
6           THE WITNESS:  That's where they
7       had facilities, yes.
8   BY MR. BUCHANAN:
9      Q.    Okay.  And to be clear, I mean,
10  billions and billions of pills, right?
11          MS. VANNI:  Object to form.
12          THE WITNESS:  I didn't keep track
13      of total quantities.
14  BY MR. BUCHANAN:
15     Q.    Do you have a -- do you have a
16  sense that they were making a lot of them?
17          MS. VANNI:  Object to form.
18          THE WITNESS:  There was a
19      diverse -- diverse range of products.
20  BY MR. BUCHANAN:
21     Q.    Okay.  I mean, you've been to the
22  manufacturing facilities, right?
23     A.    Mm-hmm.
24     Q.    Yes?

Page 115

1      A.    Yes.
2      Q.    Sorry.  We're kind of getting
3   loose there.
4           And I mean, these controlled
5   substances -- and let's dial back for a second.
6           The DEA framework makes it a
7   closed system, right?
8      A.    Correct.
9      Q.    And you've got a -- I mean,
10  there's so much concern about these drugs that
11  you've got to store them in vaults and in cages
12  and have special procedures around the incoming
13  shipments and the outcoming shipments to make
14  sure you're not losing pills anywhere in the
15  process, right?
16          MS. VANNI:  Objection.
17          THE WITNESS:  There is an entire
18      set of regulations governing the control
19      of them, yes.
20  BY MR. BUCHANAN:
21     Q.    But, I mean, you as somebody in
22  DEA compliance for companies that, you know,
23  deal in controlled substances over the years, I
24  mean, you recognize that these are dangerous

Page 116

1   drugs?
2           MS. VANNI:  Objection.
3           THE WITNESS:  I would not
4       classify them as dangerous.  When used
5       appropriately, they're products that are
6       approved by FDA for legitimate purposes.
7       I wouldn't necessarily characterize them
8       as dangerous.
9   BY MR. BUCHANAN:
10     Q.    Okay.  Got to keep them in
11  vaults, right?
12     A.    Yes.
13     Q.    Cages, right?
14     A.    Yes.
15     Q.    Two people watching everybody at
16  all times, right?
17          MS. VANNI:  Object to form.
18  BY MR. BUCHANAN:
19     Q.    Right?
20     A.    In some instances, two people.
21     Q.    Don't put on the outside of the
22  box what's on the inside of the box because
23  they're very prone to being stolen, diverted,
24  abused, right?

Page 117

1           MS. VANNI:  Object to form.
2           THE WITNESS:  There is a
3       diversion potential, abuse potential,
4       yes.
5   BY MR. BUCHANAN:
6      Q.    And that's not something you've
7   come to learn about in 2019; that's something
8   you've known about for 25 years, right?
9           MS. VANNI:  Object to form.
10          THE WITNESS:  I've learned more
11      over the years, yes.
12  BY MR. BUCHANAN:
13     Q.    Right, but I mean, these -- these
14  drugs, certainly if we're talking about
15  Oxycontin, these are Morphine derivatives,
16  right?
17          MS. VANNI:  Object to form.
18          THE WITNESS:  Yes.
19  BY MR. BUCHANAN:
20     Q.    Opiates have been around for a
21  long time, right?
22     A.    Yes.
23     Q.    Since before the Controlled
24  Substance Act, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.   Yes.
2    Q.   And there's stories -- did you go
3  and get a Master's in pharmacy?
4    A.   It's a Master's in pharmaceutical
5  policy and regulation.
6    Q.   So you learned the regulations,
7  you learned the case law I saw as well in your
8  resume, right?
9    A.   Yes, some.
10   Q.   And so you saw how the Controlled
11 Substances Act came about, correct?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  Yes.
14 BY MR. BUCHANAN:
15   Q.   You are aware that these drugs
16 have been drugs of abuse for a long time, right?
17      MS. VANNI:  Objection.
18      THE WITNESS:  The abuse of
19      controlled substances has changed
20      drastically over the years, different --
21      different products, different entities
22      at different times.
23 BY MR. BUCHANAN:
24   Q.   Right.

Page 119

1        And, for example, back in the
2  '70s, there was a drug known as oxymorphone.
3  Have you heard of oxymorphone?
4    A.   Yes.
5    Q.   Controlled substances?
6    A.   Yes.
7    Q.   Withdrawn from the market?
8       MS. VANNI:  Object to form.
9       THE WITNESS:  I'm not aware of
10      that.
11 BY MR. BUCHANAN:
12   Q.   Due to abuse?
13      Have you heard of numorphan?
14   A.   No.
15   Q.   You only -- when you were at
16 Qualitest, you only had exposure to the generic
17 products, not the branded products?
18   A.   Yes, for the most part.
19   Q.   Okay.  If I understand, your silo
20 of responsibilities with regard to DEA
21 compliance was strictly on the Qualitest side?
22   A.   I would be consulted occasionally
23 for the brand side, but my responsibilities were
24 directed at the generic side.

Page 120

1    Q.   Who was the head of DEA
2  compliance for Endo?
3    A.   There was -- there were several
4  people that handled DEA compliance.  They didn't
5  necessarily have that title, from what I can
6  recall.
7    Q.   Did -- Endo makes controlled
8  substances, right?
9    A.   Endo outsourced controlled
10 substances, so they didn't necessarily hold a
11 license.  They used contract manufacturers, so
12 the DEA person would really be at that contract
13 manufacturer for the most part.
14   Q.   Am I correct there is no head of
15 DEA compliance for Endo?
16      MS. VANNI:  Objection.
17      THE WITNESS:  Not that I knew of.
18 BY MR. BUCHANAN:
19   Q.   Okay.  If you were looking to
20 have a conversation with a counterparty at Endo
21 on DEA compliance issues, there was not a person
22 like yourself on the other side of the building?
23      MS. VANNI:  Objection.
24      THE WITNESS:  Not with that

Page 121

1  title, but the knowledge was there.
2  BY MR. BUCHANAN:
3    Q.   With who?
4    A.   Some with Jill Connell, who was
5  my boss when I started.  With Sanjay Patel, who
6  later came in.  With Lisa Walker.  Doug Felton
7  was another individual.
8        There was -- there was just a
9  good level of DEA knowledge, I think, at the
10 Endo headquarters from what I experienced.
11   Q.   So there wasn't a DEA compliance
12 person, per se, correct?
13      MS. VANNI:  Object to form.
14      THE WITNESS:  Correct.
15 BY MR. BUCHANAN:
16   Q.   In your resume, you talk about
17 having to comply with OIG orders and CIAs for
18 other manufacturers.
19      During your time at Qualitest,
20 were there any CIAs or other orders, regulatory
21 orders that you were charged with enforcing?
22   A.   I'm sorry, CIAs?
23   Q.   Agreements with the Department of
24 Justice resolving allegations, claims where the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    company committed to do things in a certain way.
2        A.    No.
3        Q.    Okay.  From a compliance
4    perspective at Qualitest, your compliance was
5    focused on the regulatory framework, the
6    statutory framework and, if you will, the
7    industry framework, correct?
8            MS. VANNI:  Object to form.
9            THE WITNESS:  Yes.
10   BY MR. BUCHANAN:
11       Q.    Okay.  All right.  So let's just
12   kind of put a fine point on Qualitest's
13   business.
14           (Document marked for
15           identification as Par-Norton Deposition
16           Exhibit No. 4.)
17   BY MR. BUCHANAN:
18       Q.    Passing you what's been marked as
19   Exhibit 4.  It's 1157.
20           MR. BUCHANAN:  Bradley, if you
21       could pull it up.
22           MS. VANNI:  Do you have a copy
23       for me?
24           MR. BUCHANAN:  Oh, I'm sorry.

Page 123

1            MS. VANNI:  Thank you.
2            MR. BUCHANAN:  I need one back,
3    actually.  Keep that in the folder.
4    BY MR. BUCHANAN:
5        Q.    We're marking as Exhibit 4 a
6    summary of Qualitest shipments.
7            MS. VANNI:  Counsel, I'm assuming
8        this is produced in native, but could
9        you read the Bates number into this.
10           MR. BUCHANAN:  Yeah, the Bates
11       number is -- so this -- we've asked you
12       for your shipping information, and
13       you've pointed us to this particular
14       document.  I guess I could ask the
15       witness to sum it, but that would be a
16       poor use of our day together, but the
17       Bates numbers at the top Par Opioid
18       MDL0001596805, Par Opioid
19       MDL00015968013-68019.  I believe these
20       are spreadsheets that you have produced
21       to us.
22           MS. VANNI:  And it's one page or
23       two?
24           MR. BUCHANAN:  Mine is two pages.

Page 124

1            Yours should be as well.
2    BY MR. BUCHANAN:
3        Q.    Do you have two pages, ma'am?
4        A.    Yes.
5        Q.    So on the screen, we see a chart,
6    and this chart was prepared by our office from
7    the spreadsheets that are referenced here and
8    using the data that your counsel has pointed us
9    to, to reflect the shipping data for Par
10   products.
11           Qualitest was ultimately -- I'm
12   sorry, Par was ultimately acquired by Endo, and
13   the Qualitest business went into Par.
14           Do you have that understanding?
15       A.    Yes.
16       Q.    Okay.  All right.  So this is
17   looking back in time, and there's a list of
18   products on the left.
19           Do you see those?
20       A.    Yes, I do.
21       Q.    Okay.  Some of these are
22   controlled substances and CS2, some are CS3,
23   some are Schedule I, right?
24       A.    There are no Schedule I.

Page 125

1        Q.    Oh, I don't see -- that would be
2    what, pseudoephedrine-type products?
3        A.    No, a Schedule I drug has no
4    medical use in the United States.  If you are
5    referring to pseudoephedrine, that's a List I
6    chemical.
7        Q.    Thank you.  That's what I was
8    trying to convey.
9            And we don't have List I
10   chemicals on here, correct?
11       A.    Correct.
12       Q.    So these are products.  Which of
13   these of Schedule II, ma'am?
14       A.    The Endocet, the Endodan,
15   hydrocodone products, ibudone I believe is
16   Schedule II.  Some of the ones in the middle,
17   Peritab I'm not sure of.  Morphine is Schedule
18   II.  Opana is Schedule II.  Oxycone,
19   oxymorphone, Percocet -- most of them are
20   Schedule II.
21           Meperidine, I believe, is
22   Schedule IV.
23       Q.    And then we can see at the bottom
24   of each of these the products of these various

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    products by year.  I guess if we looked over
2    time -- and we only have data going back to
3    2008, we don't have it past 2015.
4            So if we looked at oxycodone, for
5    example, and you told us before that was
6    Oxycontin, right?  That's the active
7    pharmaceutical ingredient?
8        A.    In the brand, in the brand.
9        Q.    In branded form, it's Oxycontin,
10   correct?
11       A.    Mm-hmm.
12       Q.    So, you know, roughly 2.8, 2.9,
13   is that million pills or billion pills, ma'am?
14   2.8 million?
15       A.    Yes.
16       Q.    It's billion, right?
17           MS. VANNI:  Where are you
18   looking?
19           THE WITNESS:  The total.
20   BY MR. BUCHANAN:
21       Q.    2.8 billion pills?
22       A.    Mm-hmm.
23       Q.    Wow.  That's a lot.
24           MS. VANNI:  Object to form.

Page 127

1    BY MR. BUCHANAN:
2        Q.    Could we agree?
3            MS. VANNI:  Objection.
4            THE WITNESS:  I don't know -- the
5    data that I'm looking at, I'm not sure
6    where it's coming from.  And when you're
7    talking shipments -- so a shipment in
8    DEA's mind could be a transfer from one
9    location to another.  It's not
10   necessarily a sale to a customer.  I
11   don't know which facility this is
12   referring to, which -- and, you know,
13   whether it's big or small is opinion.
14   So...
15   BY MR. BUCHANAN
16       Q.    Okay.  And we could fuss with the
17   data.  That would probably require me to fuss
18   with your counsel because this is what they've
19   pointed us to for the sales of the product.
20       A.    Mm-hmm.
21       Q.    Let's just talk about a number, I
22   guess.  If we're counting the zeros here right,
23   2.88 billion pills of oxycodone, one formulation
24   of the oxycodone, correct?

Page 128

1            MS. VANNI:  Object to form.
2            THE WITNESS:  It appears that
3    way.
4    BY MR. BUCHANAN:
5        Q.    Can we agree that's a lot?
6            MS. VANNI:  Objection.
7            THE WITNESS:  It depends on the
8    scenario.  I don't know what's a lot
9    versus a little.  It's not something
10   that I was involved in or --
11   BY MR. BUCHANAN:
12       Q.    I mean, close to ten pills for
13   every human being in the United States --
14           MS. VANNI:  Objection.
15   BY MR. BUCHANAN
16       Q.    -- over a seven-year period of
17   time --
18           MS. VANNI:  Objection.
19           THE WITNESS:  Mm-hmm.
20   BY MR. BUCHANAN:
21       Q.    -- does that qualify as a lot to
22   you --
23           MS. VANNI:  Objection.
24   BY MR. BUCHANAN:

Page 129

1        Q.    -- from one manufacturer?
2            MS. VANNI:  Objection.
3            THE WITNESS:  I can't make that
4    determination.
5    BY MR. BUCHANAN:
6        Q.    Okay.  And that's just one, one
7    item on this sheet.
8            We've got oxycodone APAP
9    combinations.  That's 533 million, right?
10       A.    Yes.
11       Q.    They're up to 3.3, 3.4 billion
12   pills of Oxycontin or Oxycontin combinations.
13           How about -- you talked about
14   Vicodin before, you said that's a schedule drug,
15   right?
16       A.    Yes.
17       Q.    Do you see the generic equivalent
18   of Vicodin on this sheet, ma'am?
19       A.    The Hydrocodone product?
20       Q.    Okay.  Let's look up there.
21           MR. BUCHANAN:  Can you highlight
22   the two hydrocodones.  There you go.
23   BY MR. BUCHANAN:
24       Q.    All right.  Is that 3 billion?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    That's 33 billion. 33 billion pills, right?
2    33 billion Vicodins Qualitest made and shipped
3    between 2008 and 2015?
4            MS. VANNI: Objection.
5            THE WITNESS: Again, I don't -- I
6        can't comment on this data. There's not
7        enough information here. I don't know
8        what the background is. I don't know
9        what's a lot and what's a small amount.
10       I mean, I'm not a physician, I'm not one
11       to make a determination of small versus
12       large.
13   BY MR. BUCHANAN:
14       Q.    A hundred Vicodin for every human
15   being of every age in the United States?
16           MS. VANNI: Objection.
17   BY MR. BUCHANAN:
18       Q.    Is that a lot to you?
19       A.    I don't know.
20           MS. VANNI: Objection.
21   BY MR. BUCHANAN:
22       Q.    Well, when you were the head of
23   DEA compliance for Qualitest, did you have the
24   sense, ma'am, that -- this company was pumping

Page 131

1    out controlled substances at this rate?
2            MS. VANNI: Objection.
3            THE WITNESS: We were a large
4        manufacturer and distributor of
5        controlled products. I'm sure there
6        were larger.
7    BY MR. BUCHANAN:
8        Q.    There's other people -- somebody
9    made -- this is just you, right? This is just
10   one manufacturer, Qualitest, right?
11       A.    And again --
12           MS. VANNI: Object to form.
13           THE WITNESS: -- you don't know
14       whether these are sales, whether these
15       are shipments for transfer. This is not
16       conclusive.
17   BY MR. BUCHANAN:
18       Q.    Well, so if we go to the next
19   sheet, the company gave us the dollars and the
20   sales for these; do you see that?
21       A.    Mm-hmm.
22       Q.    And they're telling us, if you
23   highlight those two hydrocodone lines, what is
24   that, looks like about $25 billion in sales.

Page 132

1            Am I doing my math right, ma'am?
2            MS. VANNI: Object to form.
3    BY MR. BUCHANAN:
4        Q.    Does that look right to you, 25,
5    $26 billion in just Vicodin?
6            MS. VANNI: Object to the form.
7    BY MR. BUCHANAN:
8        Q.    Right?
9        A.    Again, can't comment on the
10   financials. I didn't get involved with the
11   financials.
12       Q.    I mean, does this help clarify
13   for you, ma'am, this is actually sale and
14   shipping data?
15           MS. VANNI: Object to form.
16           THE WITNESS: No, because a sale
17       is also a transfer. When you're -- when
18       you're talking about a movement from a
19       distributor, you know, I don't know
20       whether this is a movement from
21       Qualitest distribution to a storage
22       location, if it's a movement from a
23       manufacturer to a distributor. I don't
24       have any -- and even if I did, I can't

Page 133

1        comment on whether that amount is large,
2        small. Not something that I dealt with.
3        I don't have anything to compare it to,
4        in other words.
5    BY MR. BUCHANAN:
6        Q.    Okay. I mean, did you have the
7    sense, though, ma'am, that the company during
8    your tenure was pumping out billions and
9    billions and billions of Vicodin every year?
10           MS. VANNI: Objection.
11           THE WITNESS: The company was an
12       ongoing manufacturer of controlled
13       substances.
14   BY MR. BUCHANAN:
15       Q.    Okay. And so very important, if
16   you're manufacturing enough Vicodin to give
17   every human being, living person in the United
18   States 100 pills from just your manufacturing
19   facility, very important if you're that type of
20   manufacturer to make sure you are maintaining a
21   closed system with effective controls against
22   diversion, true?
23           MS. VANNI: Objection.
24           THE WITNESS: Any -- any

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    controlled substance manufacturer, it's
2    important.
3    BY MR. BUCHANAN:
4        Q.   That's right.  Top to bottom, if
5    you're making a million, a million pills can
6    cause a lot of problems, right?
7            MS. VANNI:  Objection.
8            THE WITNESS:  If they make it out
9        of the legitimate channel.
10   BY MR. BUCHANAN:
11       Q.   Right.
12           I mean, if you're just a small
13   manufacturer, you still have to keep this stuff
14   in a vault, right?
15       A.   Schedule I and II, yes.
16           MS. VANNI:  Objection.
17   BY MR. BUCHANAN:
18       Q.   Schedule II, we're talking about
19   hydrocodone, right?
20       A.   Yes.
21       Q.   Hydrocodone is Schedule II?
22       A.   For part of the -- part of my
23   time at Qualitest, hydrocodone was Schedule III,
24   which would require it to be in a cage, not a

Page 135

1    vault, but that changed.
2        Q.   Right.
3            So that's what, 2013 or so, it
4    changed schedule from --
5        A.   2013, 2014.  I'm not exactly
6    sure.
7        Q.   Okay.  You still had to keep it
8    in the cage?
9            MS. VANNI:  Object to form.
10           THE WITNESS:  Yes.
11   BY MR. BUCHANAN:
12       Q.   Schedule II has to be in a vault,
13   a safe?
14       A.   Safe for small quantities, yes.
15       Q.   Right.  Right.
16           So even if you are a manufacturer
17   that's not putting out 35 billion pills of
18   Vicodin or selling $25 billion worth of it,
19   you've got to watch this stuff like a hawk,
20   right?
21           MS. VANNI:  Object to form.
22           THE WITNESS:  You have to follow
23       the regulations regardless of the
24       quantities.

Page 136

1    BY MR. BUCHANAN:
2        Q.   Make sure it's only getting to
3    customers who are getting it for legitimate
4    purposes, right?
5        A.   Yes.
6        Q.   Make sure that your customers
7    have processes in place so that they're using it
8    only for legitimate purposes, right?
9        A.   To the best of your ability, yes.
10       Q.   So that you maintain this closed
11   system of distribution because we know at some
12   point in time, it's not going to be in a safe,
13   right?
14           MS. VANNI:  Object to form.
15           THE WITNESS:  At the pharmacy
16       level, at the physician -- yes.
17   BY MR. BUCHANAN:
18       Q.   And, ultimately, these are drugs
19   that cause lots of problems, right?
20           MS. VANNI:  Object to form.
21           THE WITNESS:  These are drugs
22       that have a legitimate medical purpose
23       and serve a legitimate need when used
24       properly.

Page 137

1    BY MR. BUCHANAN:
2        Q.   These are drugs that wreak havoc
3    in our communities, would you agree?
4            MS. VANNI:  Objection.
5            THE WITNESS:  No, I would not
6        agree.
7    BY MR. BUCHANAN:
8        Q.   These are drugs that wreak havoc
9    and devastating consequences in our community,
10   do you agree, ma'am?
11           MS. VANNI:  Object to form.
12           THE WITNESS:  The drugs that were
13       manufactured at companies that I worked
14       for went to legitimate entities.
15   BY MR. BUCHANAN:
16       Q.   Pardon me for a moment.
17           Is there some debate in your
18   mind, ma'am, as to whether or not these drugs,
19   Oxycontin, oxycodone, oxymorphone, hydrocodone
20   wreak havoc in our communities?
21           MS. VANNI:  Object to form.
22           THE WITNESS:  The drugs do have
23       abuse potential.  What I'm saying is
24       that the products that were made at the

Golkow Litigation Services  - 877.370.3377

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    companies that I worked for were kept
2    under control and are not the
3    products -- well, not the tablets that
4    are wreaking havoc in the community, as
5    you put it.
6           (Document marked for
7    identification as Par-Norton Deposition
8    Exhibit No. 5.)
9           MR. BUCHANAN: Passing what we're
10   marking as Exhibit 5 to your deposition.
11          Copy for you, Counsel. Actually,
12   keep one, please. Make sure you keep
13   one.
14          MS. VANNI: Thank you.
15   BY MR. BUCHANAN:
16      Q.  We're calling this Exhibit 5.
17          Ma'am, this is a letter that you
18   put together in 2013; is that right?
19      A.  It is a letter I put together,
20   yes, 2013.
21      Q.  And this is after you had the
22   meeting with the DEA and --
23          MS. VANNI: Counsel, did this
24   come from Qualitest's file or ABC or --

Page 139

1    I'm just not understanding the
2    designation at the bottom.
3           MR. BUCHANAN: You know, that's a
4    good question. I believe if it says
5    ABDCMDL, I assume it's
6    AmerisourceBergen. For the record,
7    Exhibit 5 is Bates-stamped
8    ABDCMDL00337067.
9    BY MR. BUCHANAN:
10      Q.  Let's go to point 3. You see the
11   Qualitest letterhead?
12      A.  Yes.
13      Q.  This is, in fact, a letter from
14   you if you turn to the next page, right?
15      A.  Yes, it is.
16      Q.  You sent a letter out to your
17   customers, right?
18      A.  Yes, we did.
19      Q.  And this was before you were
20   going to have that follow-up meeting with the
21   DEA after your first meeting with the DEA on the
22   SOMs issues, correct?
23          MS. VANNI: Object to form.
24          THE WITNESS: The follow-up

Page 140

1    meeting wasn't a required meeting. It
2    was something that we requested.
3    BY MR. BUCHANAN:
4       Q.  And this was one of the things
5    you were doing in advance of that meeting, fair?
6       A.  This is something we were working
7    on making improvements to the SOM program before
8    we met with DEA.
9       Q.  All right. So what you wrote
10   here in October 18, 2013 -- go back to the first
11   page, please, Bradley.
12          "Dear valued customers, as you
13   may be aware, a large percentage of Qualitest
14   products are categorized as controlled
15   substances or listed chemicals."
16          True statement, right?
17      A.  Yes.
18      Q.  In fact, 70% were controlled
19   substances, right?
20      A.  Approximately, yes.
21      Q.  I mean, that was very much what
22   Qualitest's business was, was the manufacture
23   and sale of controlled substances, correct?
24          MS. VANNI: Object to form.

Page 141

1           THE WITNESS: Yes.
2    BY MR. BUCHANAN:
3       Q.  And these products, while
4    necessary for patients, can be targets for abuse
5    and diversion, right?
6       A.  Yes.
7       Q.  You had that knowledge certainly
8    in 2013, right?
9       A.  Yes.
10      Q.  And you knew that because you had
11   been working on it all the way back in your
12   Ciba-Geigy days, right?
13          MS. VANNI: Object to form.
14   BY MR. BUCHANAN:
15      Q.  True?
16      A.  Yes.
17      Q.  Right.
18          "As a result, certain Qualitest
19   products have become highly desirable to those
20   seeking to abuse or divert for profit."
21          Do you see that?
22      A.  Yes.
23      Q.  And so you certainly had that
24   knowledge as of 2013 that Qualitest's products,

36 (Pages 138 to 141)

Page 142

1    your products, were highly desirable to those
2    who were abusing or seeking to, you know, get
3    them out of the normal channels, right?
4            MS. VANNI:  Object to form.
5    BY MR. BUCHANAN:
6        Q.    Yes, ma'am?
7        A.    Yes.
8        Q.    Okay.  And you stated when your
9    products leave legitimate channels, they've been
10   manufactured to support, what did you say?
11       A.    "Heart-wrenching consequences
12   often occur."
13       Q.    Often occur, right?
14       A.    That's what we were being told by
15   DEA, yes.
16       Q.    You had that knowledge, right?
17       A.    From attending DEA conferences,
18   yes.
19       Q.    You didn't have to go to DEA
20   conferences.  You could read the New York Times,
21   you could read your local paper here in
22   Bethlehem, Pennsylvania and see that Congress is
23   holding hearings, that Purdue is getting
24   sanctioned to the tune of $650 million for its

Page 143

1    roles.  You had that knowledge, ma'am, as
2    somebody in the industry that these products are
3    dangerous, right?
4            MS. VANNI:  Objection.
5            THE WITNESS:  Again, products
6        that -- the products that we made at our
7        facilities were under our control.
8    BY MR. BUCHANAN:
9        Q.    Did you know there were
10   congressional hearings --
11       A.    I'm not saying -- I'm not saying
12   that hydrocodone is not a dangerous substance
13   when used improperly.
14            What I'm saying is that
15   hydrocodone did not come from Qualitest.
16       Q.    What do you mean?  We looked at
17   it, you sold 33 billion pills of hydrocodone
18   over seven years.
19       A.    Yes.
20       Q.    I mean, you were putting 100
21   pills per person in this country out into the
22   market.  I mean, Qualitest drugs, Qualitest
23   hydrocodone were in the market, true?
24            MS. VANNI:  Object to form.

Page 144

1            THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3        Q.    Is that a true statement?
4        A.    Yes.  Yes, it is.  And you know
5    what --
6        Q.    We know in the early 2000s --
7    sorry.  If you were going to add something --
8        A.    Okay.
9        Q.    Okay.  In the early 2000s, there
10   were congressional hearings about Oxycontin
11   abuse, do you remember that?
12            MS. VANNI:  Object to form.
13            THE WITNESS:  Vaguely, yes.
14   BY MR. BUCHANAN:
15       Q.    Oxycontin is oxycodone, correct?
16       A.    Yes.
17       Q.    If we went back to that slide --
18   jeez, or that exhibit, we don't have to, it's
19   Exhibit 4, you have it before you, ma'am, and
20   you can see it, I was asking the trial tech not
21   to go back to it, but we can see, you know, some
22   three-plus billion pills of oxycodone over a
23   seven-year period of time, and you knew
24   OxyContin was a drug of abuse, highly desirable

Page 145

1    to those in the community, right?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  Yes.
4    BY MR. BUCHANAN:
5        Q.    And that's what you were telling
6    the customers?
7        A.    Again, the sales do not -- the
8    sales do not mean prescriptions.
9        Q.    Okay.  Well, what you wrote here
10   is "certain Qualitest products have become
11   highly desirable to those seeking to abuse or
12   divert for profit," right?
13       A.    Yes.
14       Q.    Okay.  Certain Qualitest products
15   that have become highly desirable, we can agree
16   your hydrocodone preparations were highly
17   desirable and attractive to those seeking to
18   abuse or divert for profit, correct?
19       A.    Yes.
20       Q.    We can agree that your oxycodone
21   products were highly desirable to those seeking
22   to abuse or divert for profit, correct?
23       A.    Yes, and that's why we had
24   appropriate controls in place.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.   Right.
2         And that's why you're sending the
3    letter out to your customers here, right?
4    A.   Yes.
5    Q.   Okay.  And you thought this was a
6    responsible thing to do, I take it?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  We did.
9    BY MR. BUCHANAN:
10   Q.   Okay.  And you noted that when
11   the drugs leave legitimate channels, back to the
12   second paragraph, they've been manufactured to
13   support, heart-wrenching consequences often
14   occur.
15        I mean, you know what those
16   heart-wrenching consequences are, right?
17   A.   Yes.
18   Q.   Death, right?
19   A.   Yes.
20   Q.   These are drugs that if somebody
21   consumes too much, respiratory distress and
22   death can ensue, correct?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  Yes.

Page 147

1    BY MR. BUCHANAN:
2    Q.   I mean, there's a whole host of
3    other dangerous things that can happen because
4    of too much of these drugs other than death,
5    right?
6         MS. VANNI:  Object to form.
7         THE WITNESS:  Yes.
8    BY MR. BUCHANAN:
9    Q.   Whether it's work relationships,
10   family relationships, unproductivity, the full
11   panoply of side effects that are described with
12   these drugs when they're abused are
13   heart-wrenching, correct?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  Yes, and it's
16        documented on the label as such.
17   BY MR. BUCHANAN:
18   Q.   And as responsible corporate
19   citizens, this is what you wrote, right, and
20   this is what you were trying to do for Qualitest
21   at this point in time in 2013 was be a
22   responsible corporate citizen, correct?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  Yes.

Page 148

1    BY MR. BUCHANAN:
2    Q.   Okay.  "As a responsible
3    corporate citizen," you said, "individuals,
4    parents, friends, caregivers, relatives and
5    acquaintances, we need to do as much as we can
6    to prevent drug abuse and diversion in our
7    communities."
8         Did I read that correctly?
9    A.   Yes, you did.
10   Q.   And do you agree with that?
11   A.   Yes.
12   Q.   As a company who is selling
13   33 billion pills or making 33 billion
14   hydrocodone tablets or Vicodin equivalents, you
15   need to do as much as you can to prevent
16   diversion in your communities, fair?
17        MS. VANNI:  Object to form.
18        THE WITNESS:  That's how I feel,
19   yeah.
20   BY MR. BUCHANAN:
21   Q.   As a manufacturer making
22   3 billion oxycodone pills, you need to do as
23   much as you can to prevent diversion in your
24   community, right?

Page 149

1         MS. VANNI:  Object to form.
2         THE WITNESS:  And following the
3    regulations does that, yes.
4    BY MR. BUCHANAN:
5    Q.   And you said "we need to do as
6    much as we can."
7         Isn't that what you wrote?
8    A.   Yes.
9    Q.   Okay.  And you believed it then,
10   right?
11   A.   Yes.
12   Q.   And you believe it today, right?
13   A.   If we follow the regulations,
14   then we are doing what we can, yes.
15   Q.   Oh, no, ma'am, you can do a lot
16   more than the regulations.  Those are minimum
17   standards?
18   A.   And we have.
19   Q.   Right?
20   A.   Mm-hmm.
21        MS. VANNI:  Object to form.
22   BY MR. BUCHANAN:
23   Q.   And so when you say "we can do as
24   much as we can as responsible corporate

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    citizens," you are saying we need to do what we
2    can do, as much as we can to prevent diversion.
3    That's what you wrote, correct?
4         A.   Yes, that's what I wrote.
5         Q.   Okay. "Each company and
6    individual in the supply chain has that
7    responsibility," right?  Is that what you wrote?
8         A.   That's what I wrote.
9         Q.   Each company, each person has
10   that responsibility to do as much as they can to
11   prevent diversion, right?
12        A.   Yes.
13        Q.   Not just DEA regulations, as much
14   as they can to prevent diversion, right?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  That's what I
17   wrote, yes.
18   BY MR. BUCHANAN:
19        Q.   Because heart-wrenching
20   consequences can occur, correct?
21             MS. VANNI:  Form.
22             THE WITNESS:  That's what I
23   wrote, yes.
24   BY MR. BUCHANAN:

Page 151

1         Q.   "Everyone has that responsibility
2    to put adequate controls in place to discourage
3    and prevent the diversion of prescription
4    products for uses other than those for which
5    they were originally intended."
6              Your words, correct?
7         A.   Correct.
8         Q.   And not just your words, these
9    were the head of DEA compliance for Qualitest's
10   words, going out to all of its customers at this
11   point in time, correct?
12        A.   Yes.
13             MS. VANNI:  Object to form.
14   BY MR. BUCHANAN:
15        Q.   You had that responsibility,
16   everyone had that responsibility, right?
17             MS. VANNI:  Object to form.
18             THE WITNESS:  I like to think
19   that, yes.
20   BY MR. BUCHANAN:
21        Q.   And these were not just your
22   personal words, right?  This got reviewed at the
23   highest levels in the company, didn't it?
24             MS. VANNI:  Object to form.

Page 152

1              THE WITNESS:  I don't recall who
2    reviewed it, to be honest, but these
3    were my personal words to begin with,
4    and the intent of this letter was to
5    educate and to tease that we might be
6    asking to fill out a SOM questionnaire,
7    who maybe weren't as familiar with the
8    requirements.
9              And, also, since we were doing
10   this, I wanted them to have some
11   background as to why we were asking for
12   a questionnaire since we hadn't asked
13   for a questionnaire previously to this
14   extent.
15   BY MR. BUCHANAN:
16        Q.   You had it reviewed by legal
17   before it went out, right?
18             MS. VANNI:  Object to form.
19             THE WITNESS:  Probably, yes.
20   BY MR. BUCHANAN:
21        Q.   I mean, you wouldn't send a
22   letter out to all the company's customers
23   without having legal and sales and senior to you
24   review it, right?

Page 153

1              MS. VANNI:  Objection.
2              THE WITNESS:  I don't know who
3    reviewed it.
4    BY MR. BUCHANAN:
5         Q.   Okay.  I do have that for you.
6         A.   Okay.
7         Q.   See if I can find it.
8              Let's continue with the letter
9    while we're looking with the one to just firm up
10   that fact, okay?
11        A.   Okay.
12        Q.   Moving into the second paragraph,
13   you said you were going to be making some
14   changes that might impact your customers, right?
15             MS. VANNI:  Third paragraph.
16             MR. BUCHANAN:  I'm sorry, yeah, I
17   misspoke.  Thank you.
18             THE WITNESS:  Yes.
19   BY MR. BUCHANAN
20        Q.   Making some changes that could
21   impact your customers.  One, you were enhancing
22   your due diligence efforts when fulfilling
23   orders, right?
24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q.    You were looking to provide
2  greater assurance that your products are being
3  purchased by appropriate patients for prescribed
4  uses, right?
5    A.    To gather data for that, yes.
6    Q.    And as part of the enhanced
7  process, you were telling your customers you are
8  going to get some more frequent inquiries from
9  Qualitest regarding your own suspicious order
10 monitoring efforts, right?
11   A.    Yes.
12   Q.    You said if you are not able to
13 verify through inquiries and research that your
14 products are being used for legitimate purposes,
15 we may request an additional step of an on-site
16 visit of either your company or your customers,
17 right?
18   A.    Yes, there were a number of
19 improvements we were trying to make.
20   Q.    So, one, you wanted to ensure
21 that your customer was a legitimate customer,
22 that they were, in fact, a registrant, right?
23   A.    Well, we knew that already, but
24 yes.

Page 155

1    Q.    Two, you wanted to make sure that
2  they had protocols in place to monitor for
3  suspicious orders, right?
4    A.    Yes.
5    Q.    And you are going to start doing
6  due diligence visits, right?
7    A.    Yes.
8    Q.    Because, you know, if you go to a
9  pharmacy and there's no front-end merchandise
10 and there's a cage between the pharmacist and
11 the customers and there's a long line out the
12 front door, that starts to look a little
13 different than walking into your local -- your
14 local pharmacy that's got front-end merchandise,
15 a good balance of business and no lines out the
16 door, right?
17   A.    Yes.
18       MS. VANNI:  Object to form.
19 BY MR. BUCHANAN:
20   Q.    Okay.  And those are things you
21 can figure out just by walking in the door,
22 right?
23       MS. VANNI:  Object to form.
24       THE WITNESS:  I think for some,

Page 156

1  you really can't make a decision based
2  on one thing.  It's the overall -- it's
3  the overall assessment that you have to
4  consider.
5  BY MR. BUCHANAN:
6    Q.    Absolutely.  Got to be a
7  comprehensive look, right?
8    A.    Yes.
9    Q.    A thorough knowledge of your
10 customers, right?
11       MS. VANNI:  Object to form.
12       THE WITNESS:  Yes.
13 BY MR. BUCHANAN:
14   Q.    That's what's expected; know your
15 customer, correct?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  Yes.
18 BY MR. BUCHANAN:
19   Q.    Not only your customer, know your
20 customers' customer, right?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  To the extent you
23 can.
24 BY MR. BUCHANAN:

Page 157

1    Q.    Right.
2        And so, you know, understand are
3  these distributors who you are selling -- you
4  can't just turn a blind eye because you're
5  selling just to a distributor, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  Absolutely not.
8  BY MR. BUCHANAN:
9    Q.    Right.
10       I mean, you have to understand
11 whether that distributor is acquiring drug to go
12 to for a legitimate medical purpose at the end
13 of that process, correct?
14   A.    Yes.
15   Q.    They have to have a customer base
16 of sound customers, correct?
17   A.    Yes.
18   Q.    And they have to have suspicious
19 order monitoring practices to determine that,
20 right?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  Yes.
23 BY MR. BUCHANAN:
24   Q.    We can't just let somebody in the

Highly Confidential – Subject to Further Confidentiality Review

Page 158

1    supply chain put their head in the sand, right?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  Correct.
4    BY MR. BUCHANAN:
5        Q.    That's very, very dangerous,
6    right?
7            MS. VANNI:  Objection.
8            THE WITNESS:  Potentially, yes.
9    BY MR. BUCHANAN:
10       Q.    We can't have a closed system of
11   controlled substances if participants in that
12   closed system are going to put their head in the
13   sand, correct?
14           MS. VANNI:  Object to form.
15           THE WITNESS:  Yes.
16   BY MR. BUCHANAN:
17       Q.    And so one of your jobs and what
18   you're saying in this letter is we're no longer
19   going to put our head in the sand, right?
20           MS. VANNI:  Objection.
21           THE WITNESS:  No, that's not what
22   we're saying at all.
23   BY MR. BUCHANAN:
24       Q.    You are saying we're going to

Page 159

1    start doing some due diligence on you, right?
2            MS. VANNI:  Objection.
3            THE WITNESS:  We are saying we're
4        making improvements to our existing
5        program.
6    BY MR. BUCHANAN:
7        Q.    Okay.  And we'll talk about what
8    the old program looked like versus what the new
9    program looked like.  But you are going to start
10   doing site visits, right?
11       A.    Yes.
12       Q.    You are going to start seeing
13   whether they've got lines out the door at the
14   pharmacies, right?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  Again, these are
17       things that DEA --
18   BY MR. BUCHANAN:
19       Q.    Could you answer my question
20   first?
21       A.    Yes.
22       Q.    Okay.
23       A.    Again, these are things that DEA
24   was talking about over time.  They were not part

Page 160

1    of the original regulation or the original SOM
2    requirements, and they're still not requirements
3    today.
4        Q.    As a manufacturer of 35 billion
5    pills who has got a responsibility to do
6    everything they can to ensure that their product
7    stays in the appropriate channels, you would
8    agree with me, ma'am, that it is reasonable to
9    do inspections of your customers, due diligence
10   visits, correct?
11           MS. VANNI:  Object to form.
12           THE WITNESS:  In some -- of your
13       direct customers, yes.
14   BY MR. BUCHANAN:
15       Q.    It is further reasonable to
16   ensure that your customers are doing the same
17   thing with their customers, right?
18           MS. VANNI:  Object to form.
19           THE WITNESS:  Not necessarily.
20   BY MR. BUCHANAN:
21       Q.    Okay.  When your customers are
22   wholesalers or distributors, you certainly want
23   to make sure that they've got suspicious order
24   monitoring protocols in place because they've

Page 161

1    got a wide customer base rate?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  I would want them
4        to have some program.  The details of
5        that program can vary, depending on what
6        they choose to implement and how
7        effective it is.
8    BY MR. BUCHANAN:
9        Q.    So as a manufacturer, you knew
10   certainly during your time at Qualitest you just
11   couldn't ship it to somebody who was going to
12   just put their head in the sand, right?
13           MS. VANNI:  Objection.
14           THE WITNESS:  Yes.
15   BY MR. BUCHANAN:
16       Q.    You couldn't ship it to somebody
17   who didn't have suspicious order monitoring
18   practices right?
19           MS. VANNI:  Objection.
20           THE WITNESS:  Yes.
21   BY MR. BUCHANAN:
22       Q.    That would be a problem?
23           MS. VANNI:  Objection.
24   BY MR. BUCHANAN:

41 (Pages 158 to 161)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

```
1        Q.    Not a reason --
2        A.    It could be, yes.
3        Q.    Not a reasonable thing to do,
4   that's for sure, right?
5             MS. VANNI:  Object to form.
6             THE WITNESS:  It could be a
7        problem.
8   BY MR. BUCHANAN:
9        Q.    And certainly not something a
10  responsible company would do or a responsible
11  corporate citizen as you've listed here,
12  correct?
13            MS. VANNI:  Object to form.
14            THE WITNESS:  Again, the company
15       is required to abide by the DEA
16       regulations.  That's the only
17       obligations of the company.  Because I
18       held the company to a different standard
19       is not -- it's not what's required by
20       the company.
21  BY MR. BUCHANAN:
22       Q.    What you said, ma'am, was as
23  responsible corporate citizens, we have a
24  responsibility to do what you set forth in this
```

Page 163

```
1   letter, correct?
2             MS. VANNI:  Object to form.
3             THE WITNESS:  That is my
4        individual belief, yes.
5   BY MR. BUCHANAN:
6        Q.    That was your belief, that was
7   Qualitest's belief, as reflected in the letter
8   it authorized you to send, correct?
9             MS. VANNI:  Object to form.
10            THE WITNESS:  Depending on the
11       approvals, yes.
12  BY MR. BUCHANAN:
13       Q.    Yeah.  I mean, this wasn't
14  some -- this wasn't some off-the-book thing you
15  did, right?
16            MS. VANNI:  Object to form.
17            THE WITNESS:  No.
18  BY MR. BUCHANAN:
19       Q.    We're not looking at just a side
20  e-mail, you know, my personal view is this,
21  right?
22            MS. VANNI:  Object to form.
23  BY MR. BUCHANAN:
24       Q.    This is a letter that went to
```

Page 164

```
1   your full customer base, correct?
2        A.    Yes.
3        Q.    You remember this, right?
4        A.    I do.
5        Q.    It was the responsible and right
6   thing to do, right?
7        A.    It was the requirement to
8   notify -- not the requirement.  It was the
9   desire to notify the customer that their orders
10  might be held and they might be questioned more
11  than -- they might be asked to fill out a
12  questionnaire that was different than what they
13  had filled out in the past.
14       Q.    And you were putting them on
15  notice that they have a responsibility; they,
16  too, have a responsibility --
17       A.    Yes.
18       Q.    -- in this system to do all they
19  can.  That's what you told them, right?
20       A.    Yes.
21       Q.    Does this refresh your
22  recollection, though, ma'am, that these drugs
23  can lead to heart-wrenching problems in our
24  communities?
```

Page 165

```
1             MS. VANNI:  Object to form.
2             THE WITNESS:  These drugs
3        generally, hydrocodone, oxycodone, yes.
4        Again, these drugs did not come from
5        Qualitest.
6   BY MR. BUCHANAN:
7        Q.    I don't know what you mean by
8   that, ma'am.  I don't know what you mean,
9   because we've looked at the stat that said
10  33 billion, and the schedule that counsel has
11  told us is where we go to find out what they
12  shipped and the sales of what they've sold of
13  these drugs.  We've looked where Qualitest sold
14  33 billion Vicodins and three-plus billion
15  oxycodone, enough to fill medicine cabinets
16  throughout this country, many bottles over, and
17  you're telling us that that's not your drug
18  you're talking about when you write that letter?
19            MS. VANNI:  Objection.
20            THE WITNESS:  I'm telling you
21       that it's not our drug that's out there
22       causing havoc, as you put it.
23            We had appropriate controls in
24       place.  And, again, a shipment -- this
```

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    does not mean a sale to a customer.
2    This does not mean a prescription.
3         There are controls in place with
4    DEA. We can't -- we can't receive
5    permission to manufacture these drugs
6    unless there's a proven medical need for
7    the drug.
8    BY MR. BUCHANAN:
9         Q.    Yeah, I'm just -- I guess we're
10   just disconnecting because we know -- let's just
11   see if we can get agreement on small parts,
12   okay.
13        We know that Qualitest made
14   30-plus billion, according to the schedules that
15   counsel has pointed us to, Vicodin over a
16   seven-year period of time. You would agree
17   that's what the schedule reflects, correct?
18        MS. VANNI: Object to form.
19        THE WITNESS: I agree, I guess,
20   yes.
21   BY MR. BUCHANAN:
22        Q.    You would agree that the schedule
23   reflects that Qualitest, over that seven-year
24   period of time, made some 7 billion-plus pills

Page 167

1    of -- I'm sorry, three-plus billion pills --
2    withdrawn.
3         You would agree over the same
4    seven-year period of time that there were some
5    three-plus billion OxyContin generic equivalents
6    made by Qualitest, correct?
7         MS. VANNI: Object to form.
8         THE WITNESS: If that's the
9    quantity that's here, yes.
10   BY MR. BUCHANAN:
11        Q.    Okay. We can agree that your
12   letter which we've marked as Exhibit 5 says a
13   large percentage of your products are
14   characterized as controlled substances? It says
15   that, correct?
16        A.    Yes.
17        Q.    And I think you told us 70%
18   sounds right to you, right?
19        A.    It does.
20        Q.    And that these patient -- these
21   products, while necessary for patients, can be
22   targets for abuse and diversion.
23        These products that you are
24   referring to in that sentence is referring to

Page 168

1    the Qualitest products in the prior sentence?
2         A.    Can be.
3         Q.    Right?
4         A.    Not are. There's a difference.
5         Q.    Oh, we already looked, ma'am, at
6    9 million pills that were unaccounted for in the
7    letter before the last break.
8         Do you recall that?
9         MS. VANNI: Object to form.
10        THE WITNESS: Yes, a
11   recordkeeping error is different than
12   product not being there.
13   BY MR. BUCHANAN:
14        Q.    Product not accounted for?
15        A.    Not accounted for can also mean
16   that the records did not accurately reflect that
17   quantity.
18        Q.    The letter says not accounted for
19   9 million pills, true?
20        MS. VANNI: Object to form.
21        THE WITNESS: Deviations
22   exceeding 9 million tablets in seven of
23   eight of the audited controlled
24   substances.

Page 169

1         Deviations, a difference from the
2    record versus what's there.
3    BY MR. BUCHANAN:
4         Q.    Okay. So what you're recalling,
5    a record that U.S. Attorney is giving you one
6    week to negotiate a fine that is potentially
7    millions of dollars, correct?
8         MS. VANNI: Object to form.
9         THE WITNESS: I don't know what
10   the fine is or was.
11        I'm saying that it's a failure --
12   if you read the first item, failure to
13   maintain --
14   BY MR. BUCHANAN:
15        Q.    Just stay with me on my point
16   and -- I'll withdraw the last question, okay, so
17   I don't cut off your answer in fairness to you.
18   So there's not a question pending, I'll ask a
19   fresh one.
20        A.    Okay.
21        Q.    The next paragraph, ma'am, states
22   that GB -- which we understand to be the
23   subsidiary of Qualitest, correct?
24        A.    Generics Bidco.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1        Q.    -- is potentially subject to
2  civil penalties that may amount to millions of
3  dollars.
4            Did I read that correctly?
5        A.    Yes.
6        Q.    Millions of dollars' unaccounted
7  deviations exceeding 9 million tablets, correct?
8        A.    The DEA has the capability of
9  fining $10,000 for every recordkeeping
10 violation.
11       Q.    Do you remember what it was?
12       A.    The violation?
13       Q.    We talked about this letter
14 before, and you said you didn't have a memory of
15 it.
16       A.    I don't, but it says right
17 here --
18            MS. VANNI:  Let him finish his
19 question.  Go ahead.
20            THE WITNESS:  Okay.
21 BY MR. BUCHANAN:
22       Q.    You don't have a recollection of
23 this event, correct?
24       A.    Not fully, no.

Page 171

1        Q.    Okay.  So you don't know whether
2  or not there are 9 million tablets unaccounted
3  for, whether forms weren't filled out correctly
4  or whether it's some combination of both, fair?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  No, not fair.
7  BY MR. BUCHANAN:
8        Q.    Okay.  Go ahead.
9        A.    I do know that we had controls in
10 place that 9 million tablets would not have
11 walked out the door.
12       Q.    Okay.  We do know that you've got
13 deviations exceeding 9 million tablets, as noted
14 in this notice from the U.S. Attorney that
15 followed a DEA inspection that followed a
16 conversation with the U.S. Attorney, correct?
17            MS. VANNI:  Object to form.
18            THE WITNESS:  Yes.
19 BY MR. BUCHANAN:
20       Q.    Thank you.
21            MR. BUCHANAN:  So -- can I have
22 586, please.  I think this is Exhibit 6.
23            (Document marked for
24 identification as Par-Norton Deposition

Page 172

1  Exhibit No. 6.)
2  BY MR. BUCHANAN:
3        Q.    Passing you what we're marking as
4  Exhibit 6 to your deposition, ma'am.
5            MR. BUCHANAN:  Here you go.
6            MS. VANNI:  Thanks.
7  BY MR. BUCHANAN:
8        Q.    This follows -- withdrawn.
9            Exhibit 6, ma'am, is an e-mail
10 exchange with an attachment.  The attachment
11 appears to be a draft of your "dear valued
12 customer" letter.  The "dear valued customer"
13 letter starts on point 3.
14            MR. BUCHANAN:  Could you go
15 there, Bradley.  586.3.  Thanks.
16 BY MR. BUCHANAN:
17       Q.    Does that look familiar to you,
18 ma'am?
19       A.    Yes, it does.
20       Q.    An earlier version of the letter
21 that was ultimately sent?
22       A.    Yes.
23       Q.    Okay.  And this is an e-mail from
24 you to -- attaching that letter to a handful of

Page 173

1  people, Mike Reiney, Trey Propst, Margaret
2  Richardson and Sandra Parker.
3            Do you see that?
4        A.    Yes, I do.
5        Q.    And you CC a couple of your
6  colleagues, right?
7        A.    Yes.
8        Q.    Okay.  And, first of all, who is
9  Mike Reiney?
10       A.    Mike Reiney is sales.
11       Q.    Propst?
12       A.    Also sales.
13       Q.    Ms. Richardson?
14       A.    Legal.
15       Q.    And Sandra Parker?
16       A.    Also legal.
17       Q.    Okay.  So you had this letter
18 that was transmitted to sales and legal, was
19 transmitted to them, I think you say, for their
20 review, correct?
21       A.    Yes, it was a -- for the sales
22 team, it was a courtesy review, and for legal,
23 it was a normal legal review of a document.
24       Q.    Okay.  So the letter that was

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  ultimately sent by the company, and it looks
2  like you are asking for comments if we turn to
3  the next page, .2, you are looking for comments
4  by, you know, July 23rd.
5        Didn't quite happen that fast, I
6  guess, that you got it out, right?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  Not sure.  No, I'm
9        not sure when the comments were received
10       back, but it didn't go out until
11       October.  Agreed.
12 BY MR. BUCHANAN:
13       Q.    And you put cautions in your
14 transmittal.  Well, first of all, you say,
15 "Please review the letter, give me comments."
16 At a high level, that's what you're saying,
17 right?
18       A.    Yes.
19       Q.    Okay.  So you wanted comments
20 from your sales colleagues because this would be
21 going to their customers, fair?
22       A.    Yes.
23       Q.    And you wanted comments from
24 legal because this was a company correspondence,

Page 175

1  an official company correspondence?
2        A.    Correct.
3        Q.    Okay.  The letter is subsequently
4  finalized and distributed in the form that we
5  looked at earlier, I think it's the prior
6  exhibit, Exhibit 5, correct?
7        A.    Yes.
8        Q.    Okay.  And you put cautions in
9  there that, you know, this is a letter that's
10 going to be going to your customers who may
11 further distribute the document to their
12 customers, some of whom may even be patients.
13 Do you see that?
14       A.    Yes.
15       MS. VANNI:  Object to form.
16 BY MR. BUCHANAN:
17       Q.    586.2?
18       A.    Yes.
19       Q.    Then you say "Ultimately the
20 letter could also be viewed by competitors or
21 regulators, so it's important that the content
22 describe that can be expected without providing
23 information that may be misinterpreted or
24 proprietary."

Page 176

1        Do you see that?
2        A.    Yes.
3        Q.    So you are flagging for them,
4  hey, take this seriously, this is an important
5  letter, it could add implications, fair?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  Yes.
8  BY MR. BUCHANAN:
9        Q.    And the letter that was
10 ultimately revised and sent is the one that we
11 looked at in the prior exhibit, correct, ma'am?
12       A.    Yes.
13       Q.    Okay.  From your perspective
14 sitting here today, you endorsed its content,
15 correct?
16       A.    I did.
17       Q.    And you understood from the
18 people who reviewed it they endorsed its content
19 as well?
20       MS. VANNI:  Object to form.
21       THE WITNESS:  Yes.
22 BY MR. BUCHANAN:
23       Q.    You certainly didn't send it out
24 on your own without higher-level approval?

Page 177

1        A.    I did not.
2        Q.    What I would like to do is talk
3  with you about the meeting with the DEA in March
4  of 2013.
5        A.    Okay.
6        MR. BUCHANAN:  Can I have,
7        please, 1117.
8        (Document marked for
9        identification as Par-Norton Deposition
10       Exhibit No. 7.)
11 BY MR. BUCHANAN:
12       Q.    Passing you, ma'am, what we're
13 marking as Exhibit 7 to your deposition.
14       MR. BUCHANAN:  Do we have a copy
15       for counsel?  I apologize, Counsel, if
16       we get into a subschedule.  We may have
17       to share the one over there.  That's
18       unintentional.  I'm sure we'll find a
19       way to fix that.
20 BY MR. BUCHANAN:
21       Q.    Before you, ma'am, is Exhibit 7
22 to your deposition.
23       Is this a copy of a binder that
24 you received at a meeting with the DEA in March

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    of 2013?
2         A.   Yes, it is.
3         Q.   Okay.  We were talking about your
4    experience at Watson earlier and Anda when you
5    went in for that meeting.
6         A.   Yes.
7         Q.   Do you recall that?
8         A.   I do.
9         Q.   You had a similar binder when you
10   went in with them?
11        A.   I did.
12        Q.   Okay.  This was something the DEA
13   was doing from time to time with its
14   registrants, fair?
15        A.   For all distributors, yes.
16        Q.   There are hundreds and hundreds
17   and hundreds of registrants; is that fair?
18             MS. VANNI:  Object to form.
19             THE WITNESS:  Yes.
20   BY MR. BUCHANAN:
21        Q.   There are hundreds and hundreds
22   of registrant that are distributors, there are
23   hundreds that are manufacturers, fair?
24        A.   Yes.

Page 179

1         Q.   And there's, of course,
2    prescribers --
3         A.   Millions of prescribers, yes.
4         Q.   So but some distributors are
5    bigger than others, right?
6         A.   Yes.
7         Q.   Some manufacturers are larger
8    than others?
9         A.   Yes.
10        Q.   Are you aware of other
11   manufacturers that made more hydrocodone than
12   you?
13             MS. VANNI:  Object to form.
14             THE WITNESS:  That would be
15        confidential information.  I wouldn't
16        have access to that.
17   BY MR. BUCHANAN:
18        Q.   You can't figure that out using
19   IMS data?
20             MS. VANNI:  Object to form.
21             THE WITNESS:  I've never looked
22        at it for that --
23   BY MR. BUCHANAN:
24        Q.   You don't know whether you could

Page 180

1    or couldn't?
2             MS. VANNI:  Object to form.
3             THE WITNESS:  I don't know.
4    BY MR. BUCHANAN:
5         Q.   Okay.  All right.  So this is the
6    binder that you all were given.  I guess you
7    went in -- you got called in, right?
8             MS. VANNI:  Object to the form.
9             THE WITNESS:  Yes.
10   BY MR. BUCHANAN:
11        Q.   This isn't like they just popped
12   into Huntsville, Alabama, right?
13        A.   No.
14        Q.   And Huntsville is where you were
15   at the time?
16        A.   Yes, it is.
17        Q.   That was the physical location
18   that you called your office every day when you
19   went to work?
20        A.   Yes.
21        Q.   DEA compliance had an office --
22   DEA compliance or Qualitest had an office in
23   Huntsville?
24        A.   Yes, it did, and we also had a

Page 181

1    person in Charlotte.
2         Q.   Okay.  So you get word that
3    you're getting called to D.C., right?
4         A.   Yes.
5             MS. VANNI:  Object to form.
6    BY MR. BUCHANAN:
7         Q.   You had a sense of what was
8    coming?
9             MS. VANNI:  Object to form.
10            THE WITNESS:  Yes.
11   BY MR. BUCHANAN:
12        Q.   You had been through this rodeo
13   before?
14            MS. VANNI:  Object to form.
15            THE WITNESS:  I've been to the
16        distributor meetings before, yes.
17   BY MR. BUCHANAN:
18        Q.   Okay.  Apart from the one you
19   went in with Anda, had you been to any other
20   distributor meetings?
21        A.   I think I have.  I'm not 100%
22   sure, but I believe so.  I believe I went to one
23   for Watson.  I'm not sure.
24        Q.   Okay.  Qualitest was both a

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  manufacturer and a distributor, right?
2      A.  Yes.
3      Q.  Had two registrations?
4      A.  Correct.  Well, they had more --
5  more than that.  We had lab and import-export,
6  research.
7      Q.  They had a distributor
8  registration and a manufacturer registration?
9      A.  Yes.
10     Q.  Okay.  And that's an annual
11  process, you've got to renew that?
12     A.  It is.
13     Q.  Okay.  And every time you renew
14  it, you are making a promise you are going to
15  abide by the regulation and the statute with
16  regard to antidiversion, right?
17         MS. VANNI:  Objection.
18         THE WITNESS:  Technically, yes.
19  It's not written on there, but yes.
20  BY MR. BUCHANAN:
21     Q.  That is the -- that is the
22  implied commitment on the part of the
23  registrants, correct?
24         MS. VANNI:  Objection.

Page 183

1         THE WITNESS:  Yes.
2  BY MR. BUCHANAN:
3      Q.  I'm asking for permission to make
4  controlled substances, I will abide by the
5  statute, I will abide by the regulations.
6  That's part of the process, correct?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  Yes, it is.
9  BY MR. BUCHANAN:
10     Q.  I would like to direct you to
11  hopefully pages your counsel has.
12         And I guess let's set the table a
13  little bit with what happened that day.
14         So you go up in person, you went
15  with a few other folks from Qualitest?
16     A.  I was -- I believe there was a
17  snowstorm, and we did go with -- there were
18  other people that were going to be in the room
19  that didn't make it in, but there was at least
20  one other person, I believe, with me.
21     Q.  Okay.  So you go in, and the DEA
22  starts to give you the presentation, I guess,
23  that you've heard before, certainly the general
24  portion of it, correct?

Page 184

1      A.  To a certain extent, yes.  Yes.
2      Q.  For example, if you go to 1117.4,
3  they start to tell you about the statute that
4  you operate under, right?
5      A.  Yes.
6      Q.  The Comprehensive Drug Abuse
7  Prevention and Control Act as amended created a
8  system for the legitimate manufacturing,
9  distribution and prescribing dispensing of
10  controlled substances.
11         The next bullet states, "Each
12  registrant within the closed system of
13  distribution has defined privileges and
14  responsibilities in which they must operate."
15         Do you see that?
16     A.  Yes.
17     Q.  And you had that understanding,
18  correct?
19     A.  I did.
20     Q.  And you didn't need the DEA to
21  tell you that, correct?
22     A.  Not at that point, no.
23     Q.  In fact, you had been working in
24  this framework for 20 years at that point,

Page 185

1  right?
2      A.  Yes.
3      Q.  Okay.  When a registrant -- next
4  slide, the bottom, "When a registrant fails to
5  adhere to their responsibilities, those
6  violations represent a danger to the public and
7  jeopardize the closed system of distribution."
8         Do you see that?
9      A.  I do.
10     Q.  Do you agree with that?
11     A.  Yes.
12     Q.  And, again, this is on the slide
13  that says closed system, something you
14  understood as of that point in time, correct?
15     A.  Yes.
16     Q.  And something that you echoed to
17  your customers when you wrote a letter out to
18  them, correct?
19     A.  Correct.
20     Q.  To the extent others didn't know
21  it, you were telling them the same thing, right?
22     A.  Yes.
23     Q.  We all have a responsibility,
24  correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1          MS. VANNI:  Object to form.
2          THE WITNESS:  Yes, that's what I
3    was telling them.
4    BY MR. BUCHANAN:
5         Q.    And that's the regulatory
6    framework that we were just talking about, and
7    then there's also -- excuse me, that's the
8    statutory framework, right?
9         A.    Mm-hmm.
10        Q.    And then we go forward to
11   suspicious orders, there's a particular
12   regulation specific to suspicious orders,
13   correct?
14        A.    130174.
15        Q.    Great.  We'll go to 1117.9.
16              And that regulation requires
17   that -- and it says "suspicious orders" on the
18   side.  I'm sorry, the one at the bottom.
19              MR. BUCHANAN:  Thank you,
20        Bradley.  Since there's a few documents
21        on the table, I'll try to keep you in
22        sync.
23   BY MR. BUCHANAN:
24        Q.    The heading on the side is

Page 187

1    "Suspicious Orders."  The regulation you just
2    stated from memory, ma'am, is listed on the
3    slide, right?
4         A.    Yes.
5         Q.    A regulation you've known about
6    for a long time, right?
7         A.    Yes.
8         Q.    I mean, you've known about that
9    regulation because that's been around since
10   before your time at Ciba-Geigy?
11        A.    Correct.
12        Q.    And you've heard about that
13   regulation at distributor conferences and
14   manufacturer conferences, correct?
15        A.    Yes.
16        Q.    Okay.  21 CFR 1301.74 requires
17   that registrants design and operate a system to
18   identify suspicious orders.
19              Do you see that?
20        A.    Yes.
21        Q.    "Report suspicious orders to
22   DEA," what does it say?
23        A.    "When discovered."
24        Q.    Okay.  And then it goes through

Page 188

1    and it elucidates us further with your due
2    diligence responsibility on E 1117.11.  "Due
3    diligence" know your customers.
4              Do you see that?
5         A.    Yes.
6         Q.    "Prior to filing an order, the
7    distribute should review the following:  Unusual
8    frequency of orders, unusual size of orders,
9    deviating substantially from a normal pattern,"
10   and then it lists the regulation there.
11              You see that?
12        A.    Yes.
13        Q.    And then it continues with due
14   diligence below, "Range of products being
15   purchased, methods of payment (cash, insurance,
16   Medicaid), locations and hours of operation,
17   percent controlled versus percent noncontrolled,
18   customer pickup at distributorship."
19              Do you see that?
20        A.    Yes, I do.
21        Q.    "Other aspects of due diligence,"
22   correct?
23              MS. VANNI:  Object to form.
24              THE WITNESS:  Other guidances

Page 189

1    from DEA as to what to look at.
2    BY MR. BUCHANAN:
3         Q.    Right.
4              I mean, look, the DEA doesn't --
5    and the FDA doesn't tell you how to promote your
6    drug to make the most sales, right?  Companies
7    figure that out on their own, right?
8              MS. VANNI:  Object to form.
9              THE WITNESS:  They do tell you
10        how to promote your drug and how not to
11        promote.
12   BY MR. BUCHANAN:
13        Q.    They tell you how you can't do
14   it?
15        A.    Yes.
16        Q.    I mean, companies are pretty
17   crafty when it comes to figuring out marketing
18   that can be effective, to figure out educational
19   seminars that might educate physicians depending
20   on how you determine the word "educate" and
21   other ways to grow a market for their product.
22   There's marketing departments that are built to
23   do those types of things, fair?
24              MS. VANNI:  Object to form.

48  (Pages 186 to 189)

Highly Confidential – Subject to Further Confidentiality Review

Page 190

1      THE WITNESS: Yes, but I think
2   it's a little bit different.
3   BY MR. BUCHANAN:
4      Q.   You agree that as it relates to
5   marketing and promotion, companies have
6   departments built to do that, right?
7      A.   Yes.
8      Q.   Okay.  There's also a regulation
9   that says that if you're going to seek our
10  permission -- or a statute that says if you are
11  going to seek permission to operate in this
12  closed system that you have to have effective
13  controls against diversion, right?
14     A.   Yes.
15     Q.   And companies certainly can, as
16  you have from time to time done, can employ
17  their own tools and techniques to maintain
18  effective controls against diversion, right?
19     MS. VANNI:  Object to form.
20     THE WITNESS:  Yes.
21  BY MR. BUCHANAN:
22     Q.   There are minimum ways to do it
23  and there's a suspicious order monitoring
24  regulation that says something about that,

Page 191

1   correct?
2      A.   Correct.
3      Q.   But ultimately the manufacturers
4   and distributors have a statutory obligation to
5   maintain effective controls against diversion,
6   correct?
7      MS. VANNI:  Object to form.
8      THE WITNESS:  Yes.
9   BY MR. BUCHANAN:
10     Q.   Would it be fair to say, ma'am,
11  in the time that you've spent at Qualitest, the
12  group that handled -- would you say the
13  marketing group was bigger than the DEA
14  compliance group?
15     A.   Actually, no.
16     Q.   The sales group?
17     A.   Oh, I don't know.  I don't know
18  about out in the field.  Maybe, but I don't
19  know.
20     Q.   Because in your DEA compliance
21  group before you brought in the people you
22  brought in, when you started there, how many
23  people were in DEA compliance?
24     A.   There were two and the one that

Page 192

1   was let go.
2      Q.   Okay.  Two people who had the
3   title of DEA compliance, or at least under that
4   umbrella, to maintain effective controls against
5   diversion?
6      MS. VANNI:  Object to form.
7      THE WITNESS:  Yes.  However, it's
8   not -- it's not just those two people's
9   responsibility.
10  BY MR. BUCHANAN:
11     Q.   It should go --
12     A.   That's why we train -- yeah.
13     Q.   It should go throughout the
14  organization, that responsibility, right?
15     A.   Correct.
16     Q.   And that was one of the things in
17  2013 after you had this meeting that you set out
18  to implement, correct?
19     A.   To enhance.
20     Q.   Okay.  And we'll talk about what
21  it was before versus what it was later?
22     A.   Yes.
23     Q.   Because ultimately it's a
24  company-wide obligation to maintain effective

Page 193

1   controls against diversion, correct?
2      MS. VANNI:  Object to form.
3      THE WITNESS:  Just like it's a
4   company-wide obligation to make your
5   product safe and effective.
6   BY MR. BUCHANAN:
7      Q.   Right, right.
8      Because if you're making
9   controlled substances, you've made that
10  commitment, you've made that commitment to get
11  the permission slip to make the drug that you're
12  going to maintain effective controls against
13  diversion, fair?
14     A.   The quota, yes.
15     MS. VANNI:  Object to form.
16  BY MR. BUCHANAN:
17     Q.   Right?
18     So as a company, the company must
19  be committed to maintain effective controls
20  against diversion, right?
21     MS. VANNI:  Object to form.
22     THE WITNESS:  The company
23  can't -- the individuals at the company
24  are not -- they're not experienced in

49 (Pages 190 to 193)

Highly Confidential – Subject to Further Confidentiality Review

Page 194

1    a -- what gets diverted and what doesn't
2    or in additional controls that they can
3    put in place.
4          We learn that from DEA.  We learn
5    that from the guidances and from the
6    presentations that they give.  We're
7    not -- most people in the company are
8    not -- they don't have law enforcement
9    backgrounds, they don't have medical
10   backgrounds.
11   BY MR. BUCHANAN:
12   Q.    Right.
13         So education is an important
14   component?
15   A.    It is, from DEA, yes.
16   Q.    Within a company certainly,
17   right?
18   A.    Yes.
19   Q.    Within a company, a company has
20   got to educate its employees company-wide on how
21   to maintain effective controls against
22   diversion, right?
23         MS. VANNI:  Object to form.
24         THE WITNESS:  To abide by the DEA

Page 195

1    regulations, yes.
2    BY MR. BUCHANAN:
3    Q.    And if you're going to -- if
4    you're going to sell controlled substances and
5    if you are going to make the promise to the
6    government that you're going to maintain
7    effective controls against the government, you
8    certainly should, right?
9          MS. VANNI:  Object to form.
10         THE WITNESS:  Do training.
11   BY MR. BUCHANAN:
12   Q.    You certainly -- if you are
13   saying you are going to maintain effective
14   controls against diversion to get that
15   registration, you would agree that you certainly
16   should implement effective controls to prevent
17   diversion, fair?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  Yes.
20   BY MR. BUCHANAN:
21   Q.    That's -- that's the promise,
22   right?
23   A.    Yes, it's a privilege to have a
24   license.

Page 196

1    Q.    Okay.  We see the DEA showing
2    examples on 1117.12 of kind of -- it's not the
3    best picture, but you've probably seen this
4    picture a few times, haven't you?
5    A.    Yes.
6    Q.    It's shown up in DEA
7    presentations and other presentations?
8    A.    Yes, it has.
9    Q.    It's representing really what you
10   can see when you actually go and see your
11   customer, right?
12         MS. VANNI:  Object to form.
13   BY MR. BUCHANAN:
14   Q.    Something that you could see in a
15   customer, right?
16   A.    Potentially.
17   Q.    Right, lines --
18   A.    Hopefully not.
19   Q.    -- people sitting on the floor --
20   I mean, would it surprise you to know that you
21   had customers like this?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  I would be
24   surprised in -- from a Qualitest

Page 197

1    perspective, yes, I would be very
2    surprised.
3    BY MR. BUCHANAN:
4    Q.    Well, Qualitest had direct
5    pharmacy customers, correct?
6          MS. VANNI:  Object to form.
7    BY MR. BUCHANAN:
8    Q.    Do you recall that?
9    A.    I don't believe so.
10   Q.    Okay.  Maybe we'll have a chance
11   to talk about that at risk of going down too
12   many different forks in the road to actually get
13   there, but hopefully we'll have a chance.
14         So these are the types of things
15   that the DEA is saying to look for.  A lot of
16   cash transactions, right?  Why could that be a
17   sign?  Has that been associated with illicit use
18   of drugs?
19   A.    That's what DEA says, yes --
20         MS. VANNI:  Object to form.
21         THE WITNESS:  There's no
22   traceability.
23   BY MR. BUCHANAN:
24   Q.    Right.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    And, I mean, the use of cash for
2 drugs was not something that was new in 2011,
3 right?
4         MS. VANNI:  Object to form.
5         THE WITNESS:  Yeah, should not
6 happen.
7 BY MR. BUCHANAN:
8    Q.   No, that shouldn't happen.
9 That's kind of a commonsense thing, right?
10   A.   Yes.
11   Q.   If a pharmacy or a customer is
12 doing, you know, 70, 80% of their business or
13 50% of their business in controlled substances,
14 and the national average is 13%, that might be
15 something of a red flag, right?
16   A.   It would be something --
17        MS. VANNI:  Object to form.
18        THE WITNESS:  -- to look into
19 further, yes.
20 BY MR. BUCHANAN:
21   Q.   Right.
22        If the pharmacy itself has the
23 cage, no front-end merchandise, that would be
24 something to consider, right?

Page 199

1    A.   It would be.
2    Q.   Something that you can see when
3 you go and do the due diligence on your
4 customers, right?
5    A.   Yes.
6    Q.   I think you talked about Watson
7 actually is a manufacturer starting to implement
8 customer visits as part of their SOM program at
9 your urging, I can't remember whether you were
10 instrumental or what word you used in your
11 summary, but at your urging, essentially, before
12 you left in 2009, true?
13        MS. LEIBELL:  Object to form.
14        THE WITNESS:  We did talk about
15 it obviously, yes.
16 BY MR. BUCHANAN:
17   Q.   And then we got to the meat of
18 the -- they sent you a bunch of decisions?
19   A.   Yes.
20   Q.   Probably some that you learned
21 about in your pharmacy classes in Florida,
22 right?
23   A.   And I had a practice of reading
24 the Federal Registers or skimming them for

Page 200

1 things like this.
2         MR. BUCHANAN:  And I'm sorry,
3 Counsel, this one is not in yours.  I
4 can see it.  We're not going to
5 substantively discuss it.
6 BY MR. BUCHANAN:
7    Q.   They sent you a decision from the
8 Supreme Court from 1943, right, Direct Sales
9 versus United States?
10   A.   Mm-hmm.
11   Q.   And they brought a series of
12 cases and regulatory actions to your attention
13 about the types of things that are really
14 problematic and what you got to be doing and
15 what to watch out for.
16        MS. VANNI:  Object to form.
17        THE WITNESS:  They very much
18 skimmed over the cases.  They didn't go
19 into them in a lot of detail, but they
20 were presented, yes.
21 BY MR. BUCHANAN:
22   Q.   Right.
23        And I suppose if you were not a
24 person who was generally reading that kind of

Page 201

1 thing, maybe somebody else on your team or maybe
2 from another manufacturer, they may have found
3 that new and enlightened, but you are saying you
4 were aware of this already?
5         MS. VANNI:  Object to form.
6         THE WITNESS:  Not all of them,
7 but some of them, yes.
8 BY MR. BUCHANAN:
9    Q.   Okay.  And then towards the back,
10 in kind of more the meat of this is a series of
11 charts.
12        Can you pull up so counsel can
13 see it, I don't want to talk about it if she
14 can't see it, 1117.232.  And it's on your screen
15 as well, ma'am.
16        Do you recall the DEA presenting
17 charts like these to you at this meeting in
18 2011?
19   A.   I do.
20   Q.   Do you recall the DEA presenting
21 charts like these to you when you were with Anda
22 in 2008 or '9?
23   A.   I do.
24        MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    BY MR. BUCHANAN:
2        Q.    That was -- the DEA was
3    presenting to the various distributors and
4    manufacturers when it got to them information
5    concerning what they saw about their
6    customers -- about their sale transactions,
7    correct?
8            MS. VANNI:  Object to form.
9            THE WITNESS:  And their
10           customer's customer.
11   BY MR. BUCHANAN:
12       Q.    Thank you.  I'm going to get
13   there.  You don't have to anticipate it for me,
14   though.
15       A.    Okay.
16       Q.    They were presenting, first of
17   all, your volume -- "your" meaning Qualitest's
18   volume of this particular dosage of oxycodone,
19   we're at 1117.232, and those two companies there
20   under Alabama Vintage Pharmaceuticals and
21   Generics Bidco, those are both Qualitest
22   affiliates, correct?
23       A.    Yes.
24       Q.    They were their registrants that

Page 203

1    manufactured or distributed Qualitest products,
2    right?
3        A.    I believe the first one is the
4    manufacturer and the second is the distributor.
5        Q.    Right.
6            So we have, you know, some
7    100-plus million pills of oxycodone
8    15 milligrams in hundred-count bottles, that's
9    what's reflected on this sheet, right?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  Yes.
12   BY MR. BUCHANAN:
13       Q.    And then as you go through the
14   sheets, you can see that the DEA presented to
15   you other dosages, you know, 30-milligram
16   tablets, other bottle counts, and they were
17   calling out to you what you were reporting to
18   the DEA and they were also calling out to you
19   information they were learning about the end
20   recipient of your product in terms of the
21   pharmacies, correct?
22           MS. VANNI:  Object to form.
23           THE WITNESS:  Correct.
24   BY MR. BUCHANAN:

Page 204

1        Q.    Also distributors, right?
2        A.    Yes.
3        Q.    So we see distributors that were
4    traced to your production and we see end
5    pharmacies that were traced to the production in
6    the charts that the DEA gave you that day, fair?
7            MS. VANNI:  Object to form.
8            THE WITNESS:  Yes.
9    BY MR. BUCHANAN:
10       Q.    Okay.  And the DEA, as part of
11   this, said you're not doing enough, right?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  Not necessarily,
14   no.  No, they did not say that.
15   BY MR. BUCHANAN:
16       Q.    They said your system was
17   inadequate?
18       A.    They said that we want you to be
19   aware, we're having these meetings so that
20   you're aware of where your product is going
21   further down the supply chain, and we want to
22   work with you to basically help prevent the
23   product from getting into the wrong hands, and
24   we're asking you and all other distributors to

Page 205

1    see if you can make improvements to help -- to
2    help make sure the product stays within the
3    closed loop.
4            MR. BUCHANAN:  Can I have Exhibit
5    575, please.  How are we doing as a time
6    check?  How long have we been going?
7            THE VIDEOGRAPHER:  Two hours, 40
8    minutes, approximately.
9            MR. BUCHANAN:  Let me just mark
10   this document and I'll take a short
11   break.  I don't know how long we've been
12   going.  I lost track.
13           MS. VANNI:  I lost track, too.
14   It's quarter to 12.
15           MR. BUCHANAN:  Can we just mark
16   this one real quick just so your counsel
17   has it.
18           THE WITNESS:  Yeah.
19           MR. BUCHANAN:  It will include
20   the schedules.
21   BY MR. BUCHANAN:
22       Q.    Ma'am, while we're waiting for
23   that, we'll talk more about your interactions
24   with DEA that day, what they told you about your

52  (Pages 202 to 205)

Page 206

1    systems and your self-assessment of the
2    inadequacies in your SOM system at that point in
3    time.
4              Do you have a recollection,
5    though, that in your eyes, Qualitest SOM
6    practices at that point in time, as of the time
7    of the DEA meeting, were inadequate?
8              MS. VANNI:  Object to form.
9              THE WITNESS:  I would not say
10             that they were inadequate.  I would say
11             that we needed to make improvements, and
12             I would have come back and presented it
13             in a way that -- you know, there's a lot
14             going on at a pharmaceutical company and
15             for -- for this to -- for any
16             improvements that I wanted to make to
17             get the right -- to basically -- what --
18             to get the attention that it needed, you
19             have to make things a little more urgent
20             than they may actually be, so I'm sure
21             you'll see that in my -- in my e-mails.
22   BY MR. BUCHANAN:
23        Q.    Getting management buy-in can be
24   a challenge at a pharmaceutical company?

Page 207

1              MS. VANNI:  Object to form.
2              THE WITNESS:  Not so much -- not
3              so much getting their buy-in, but making
4              them aware of the urgency surrounding
5              it, that it's not just, you know, Tracey
6              wants to make improvements.  That
7              there's an impact to making improvements
8              and that there's things that -- you
9              know, things that we can do better.
10   BY MR. BUCHANAN:
11        Q.    Right.
12             I mean, when you're talking about
13   controlled substances and the heart-wrenching
14   havoc that they can wreak in the communities,
15   responsible companies act to try and minimize
16   that risk by maintaining effective controls
17   against diversion, you agree?
18             MS. VANNI:  Object to form.
19             THE WITNESS:  I think the company
20             has to follow the DEA regulations, and
21             if you do that, then ultimately you will
22             be preventing that from happening.
23   BY MR. BUCHANAN:
24        Q.    And what you wrote certainly and

Page 208

1    what you told your customers is that as a
2    responsible company, you had the obligation to
3    do what was in your letter, and they had the
4    same obligation, that's what you told your
5    customers, right?
6         A.    The customers, yes.  The
7    customers needed a heads-up to -- needed
8    education on what was changing.
9              (Document marked for
10             identification as Par-Norton Deposition
11             Exhibit No. 8.)
12             MR. BUCHANAN:  I'm passing you,
13             ma'am, what we're marking as Exhibit 8
14             to your deposition.  There we go.
15             MS. VANNI:  Thanks.
16   BY MR. BUCHANAN:
17        Q.    And this is really more for the
18   benefit of counsel so they have the charts that
19   I was referring to.
20             After you got back from the
21   meeting -- this is March 6, 5:58 p.m., you tore
22   off the schedules and you sent them around
23   within the company, right?
24             MS. VANNI:  Object to form.

Page 209

1              THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3         Q.    And what you're doing is -- who
4    is Peter Bigelow, by the way?
5         A.    He was actually -- at one point,
6    he was my supervisor, but he was actually
7    over -- I think he was over Denise and Sanjay at
8    the time.
9         Q.    Senior vice president?
10        A.    Sanjay was my supervisor.
11        Q.    Okay.  Senior vice president?
12        A.    Yes.
13        Q.    Yes, okay.
14             And what was his -- you know,
15   senior vice president for sales, drug safety?
16        A.    No.
17             MS. VANNI:  Objection.
18             THE WITNESS:  He was kind of like
19             over the COO, I guess.  He was
20             contract -- I think he was a contractor
21             that was brought in, so he was kind of
22             assisting the plant manager.
23   BY MR. BUCHANAN:
24        Q.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    A.  He had a couple of different
2  roles, I believe, while he was there.
3    Q.  Senior person?
4    A.  Yes.  Senior person.
5    Q.  Senior to your immediate boss?
6    A.  Yes.
7    Q.  Okay.  Senior to the chief
8  operating officer?
9    A.  Yes.
10   Q.  Okay.  All right.  So you get
11 back, you tear off the schedules and you send
12 them up the corporate ladder to a senior vice
13 president, fair?
14      MS. VANNI:  Object to form.
15      THE WITNESS:  Mm-hmm.
16 BY MR. BUCHANAN:
17   Q.  Okay.  And you say, "Attached are
18 the charts that the DEA reviewed with us at the
19 meeting today."
20      And then you say, "As we
21 expected," and then you describe them, right?
22   A.  Yes.
23   Q.  And so this was not news to you?
24      MS. VANNI:  Object to form.

Page 211

1      THE WITNESS:  No, having attended
2    other distributor initiatives, it was
3    not news.
4  BY MR. BUCHANAN:
5    Q.  Right, that not only are you
6  supposed to look at your customers, but also
7  your customers' customers, right?
8      MS. VANNI:  Object to form.
9      THE WITNESS:  When you can, when
10   you have the information to do so.
11 BY MR. BUCHANAN:
12   Q.  And when you can generate it,
13 right?
14   A.  To my knowledge at that time, we
15 didn't have that capability, but yes.
16   Q.  But certainly you had the ability
17 for any of your customers to say, hey, I'm going
18 to stop by today?
19      MS. VANNI:  Object to form.
20      THE WITNESS:  To our customers?
21 BY MR. BUCHANAN:
22   Q.  Sure.
23   A.  Yeah.
24   Q.  Right, I mean, you can --

Page 212

1    A.  If they allowed it.
2    Q.  And if they didn't, you don't
3  have to do business with them?
4      MS. VANNI:  Object to form.
5      THE WITNESS:  Yes, correct.
6  BY MR. BUCHANAN:
7    Q.  Because ultimately, to secure the
8  supply chain, to ensure that everyone views
9  things the way you did, the way Qualitest did,
10 to maintain effective controls against
11 diversion, we have to do everything we can to
12 ensure that your customers felt the same way,
13 you could just not sell it to them if they
14 wouldn't give you the information, right?
15      MS. VANNI:  Objection.
16      THE WITNESS:  We could.
17 BY MR. BUCHANAN:
18   Q.  And there's no obligation for you
19 to sell to people, right?
20      MS. VANNI:  Objection.
21      THE WITNESS:  Correct.
22 BY MR. BUCHANAN:
23   Q.  It's a choice?
24      MS. VANNI:  Objection.

Page 213

1      THE WITNESS:  Yes.
2  BY MR. BUCHANAN:
3    Q.  And so to get information about
4  your customers, you can do this, you can send
5  letters and ask for information back, as you did
6  in October of 2013, correct?
7    A.  Yes.
8    Q.  And let's just be clear, is that
9  the first time that Qualitest ever sent a
10 request to any of its customers for their SOM
11 program?
12      MS. VANNI:  Object to form.
13      THE WITNESS:  I don't know.  It
14   was the first time during my tenure that
15   we asked for something and called it
16   SOMs-related, so there is other
17   information that's gathered about
18   customers as well.
19 BY MR. BUCHANAN:
20   Q.  Is it the first time that you can
21 remember as a systemic matter that you asked for
22 the assurance from all of your customers that
23 they had SOM programs and that you talked about
24 potentially coming out and seeing their

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    facilities?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  SOM programs, yes.
4    Seeing their facilities, no.  There were
5    others that did visit customers.  It
6    might not have been called a SOMs visit,
7    but it did satisfy, you know, most of --
8    most or all of the requirements.
9    BY MR. BUCHANAN:
10        Q.    Right.
11        So as you're saying -- I'm
12   hearing what you're saying is you made it a DEA
13   compliance matter in October of 2013?
14        A.    Yes.
15        Q.    As of October 2013, DEA
16   compliance implemented a SOM program and then
17   memorialized it with SOPs and formalized it with
18   some activity to --
19        A.    We -- I'm sorry, go ahead.
20        Q.    -- to formally implement a know
21   your customer and know your customers' customer
22   program, fair?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  No, not fair.  We

Page 215

1    improved upon the existing program.
2         MR. BUCHANAN:  It's as good a
3    time as any for a break.
4         MS. VANNI:  It"s 10 of 12.  You
5    want to take a lunch break?  What do you
6    want to do?
7         THE VIDEOGRAPHER:  Let's go off
8    the record.  The time is 11:51 a.m.
9         (Luncheon recess.)
10        (Document marked for
11   identification as Par-Norton Deposition
12   Exhibit No. 9.)
13        THE VIDEOGRAPHER:  We're now
14   going back on the record.  The time is
15   12:45 p.m.
16   BY MR. BUCHANAN:
17        Q.    Good afternoon, Ms. Norton.
18   After lunch but you're still under oath, you're
19   good?
20        A.    Yes.
21        Q.    Okay.  Passing you what we're
22   marking as Exhibit 9 to your deposition.  We
23   were talking, just to reorient you before the
24   break, we were looking at that period of time in

Page 216

1    March of 2013, you got the call, come to DC?
2         A.    Mm-hmm.
3         Q.    DEA wants to have a chat with
4    you, right?
5         A.    Yes.
6         Q.    Okay.  DEA gives you the binder,
7    I think it's still under your hand.
8         A.    It is.
9         Q.    A binder like that which you
10   received from Anda several years before,
11   correct?
12        A.    Yes.
13        Q.    The Anda binder obviously had --
14        MS. KOSKI:  Objection.
15        MR. BUCHANAN:  Every Anda
16   objection is presumably coming from --
17   BY MR. BUCHANAN:
18        Q.    And they gave you a binder that
19   also contained information about Anda's business
20   and Anda's customers, correct?
21        A.    Correct.
22        Q.    Okay.  And we looked at an e-mail
23   that you sent, a separate e-mail, where you
24   forwarded the schedules upstream to a senior

Page 217

1    vice president at Qualitest at the time for his
2    information, and you noted that, as we expected,
3    we were at the DEA, they gave us this stuff on
4    our customers, right?
5         MS. VANNI:  Object to form.
6         THE WITNESS:  Yes.
7    BY MR. BUCHANAN:
8         Q.    Okay.  All right.  So here's more
9    of a -- if you will, a bullet point summary you
10   sent around to some other people in the group?
11        A.    Mm-hmm.
12        Q.    Not to the senior vice president.
13   This is -- looks like more your working group on
14   compliance issues and DEA stuff?
15        A.    It's my boss, my boss's boss and
16   then his boss.
17        Q.    Okay.  We're looking at Exhibit
18   657 from March 7, 2013, and I'm a little
19   confused on my dates here.  Is this the same day
20   as the meeting or the next day?  You have the
21   binder right before you?
22        A.    This is March 7th versus this is
23   the day after the meeting.
24        Q.    Got you.  Okay.  So March 7th,

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  the next night you're 5:00, I guess late
2  afternoon, you're sending around your notes, and
3  you note that you were not really in a position
4  to be taking the notes yourself.  You were kind
5  of doing your best to be engaged with the DEA
6  when they were talking to you, right?
7       A.   Yes, to listen.
8       Q.   Okay.  So this is kind of your
9  notes after you reflected on it and you just had
10  a day and you kind of noted down some takeaways,
11  fair?
12       MS. VANNI:  Object to form.
13       THE WITNESS:  Yes.
14  BY MR. BUCHANAN:
15       Q.   Okay.  If we scroll down and we
16  looked at a chart of the production of the
17  company's -- I don't know the number of pills,
18  hydrocodone and oxycodone that were made over
19  the years.
20       Do you recall us looking at that
21  chart earlier today?
22       A.   I recall looking at it, yes.
23       Q.   Yeah, and when I say the chart, I
24  mean the one that we generated from the

Page 219

1  spreadsheets counsel told us to look at.
2       A.   Yes.
3       Q.   And that's where we got the
4  33 million tablets of the Vicodin generic
5  equivalent, and we got the 3 plus million
6  tablets of oxycodone.
7       Do you recall that discussion?
8       A.   Yes.
9       Q.   Okay.  And so what you heard was
10  that these products, the one identified in the
11  first bullet, hydrocodone and oxycodone products
12  are being abused and diverted, right?
13       MS. VANNI:  Object to form.
14       MR. BUCHANAN:  Could you
15  highlight, please, the first bullet.
16       THE WITNESS:  It says DEA is
17  looking at top manufacturers of
18  hydrocodone and oxycodone.
19  BY MR. BUCHANAN:
20       Q.   That's right.  And then we go to
21  the third bullet, and they say, "these products
22  are being abused and diverted."
23       Do you see that?
24       A.   Yes.

Page 220

1       Q.   And then what did they say about
2  prescription abuse?
3       A.   "Prescription abuse of these two
4  items is worse than addiction to heroin and
5  cocaine."
6       Q.   Okay.  And that was true, to your
7  knowledge, at that point in time, right?
8       MS. VANNI:  Object to form.
9       THE WITNESS:  That's really
10  something that I wouldn't know.  I was,
11  you know, getting that from DEA.
12  BY MR. BUCHANAN:
13       Q.   I mean, you weren't following the
14  public discussion and the congressional hearings
15  and everything that was going on really outside
16  the walls of Qualitest with regard to the
17  epidemic of opioid abuse?
18       MS. VANNI:  Objection.
19       THE WITNESS:  I couldn't put a
20  number on it or compare it to heroin or
21  cocaine without the details coming from
22  DEA.
23  BY MR. BUCHANAN:
24       Q.   Okay.  Suffice it to say, without

Page 221

1  the DEA telling you that, you still knew it was
2  a big problem at that point in time?  You knew
3  there were congressional hearings going on,
4  right?
5       MS. VANNI:  Objection.
6       THE WITNESS:  I knew that
7  hydrocodone and oxycodone was being
8  abused.
9  BY MR. BUCHANAN:
10       Q.   Okay.  You knew that they were
11  also being diverted, right?
12       A.   Yes.
13       Q.   Okay.  They say here 85% of
14  oxycodone 30 milligrams sent to Florida is
15  diverted, right?
16       A.   That's what DEA told us, yes.
17       Q.   So what's happening is customers,
18  distributors, wholesalers buying the drug in
19  Florida or customers of their customers bringing
20  the drug into Florida, that drug is then leaving
21  Florida and going elsewhere in the country,
22  right?
23       MS. VANNI:  Object to form.
24       THE WITNESS:  I don't know if

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1     they were saying it was leaving Florida.
2     They were just saying that it was being
3     diverted.  It wasn't getting to a
4     legitimate channel somewhere down the
5     line.
6  BY MR. BUCHANAN:
7       Q.     Fair enough, okay.  Got it.  So
8  if -- whether it stayed in Florida or whether it
9  left Florida, it wasn't landing in the channel
10 where it was supposed to land, right?
11      A.     Correct.
12      Q.     Fair enough, okay.  Then it said,
13 the "US uses 90-95% of the hydrocodone produced"
14 worldwide.  It doesn't say worldwide, but you
15 understood that from your meeting, right?
16             MS. VANNI:  Object to form.
17             THE WITNESS:  Yes.
18 BY MR. BUCHANAN:
19      Q.     Okay.  So of all of the people in
20 the world with all of their maladies and all of
21 their pain and all of their conditions, this
22 country uses 90 to 95% of all the hydrocodone
23 produced in the world, right?
24             MS. VANNI:  Object to form.

Page 223

1             THE WITNESS:  That was my
2      understanding from what they were
3      saying, yes.
4  BY MR. BUCHANAN:
5       Q.     Would it be fair to say, ma'am,
6  that we don't have 90 to 95% of the world's
7  population?
8             MS. VANNI:  Object to form.
9             THE WITNESS:  I'm not sure.  I
10     guess you could say that.  I don't know.
11     I don't know what the population is in
12     every country.
13 BY MR. BUCHANAN:
14      Q.     Well, worldwide, internationally,
15 there are organizations that monitor the use of
16 opioids country by country, right?
17      A.     Mm-hmm.  What it tells me is that
18 we're more humane in the United States and we
19 treat pain as compared to some third world
20 countries, for example.
21      Q.     There's another part of that,
22 right?
23      A.     Mm-hmm.
24      Q.     We abuse opioids more than other

Page 224

1  people in other countries, right?
2             MS. VANNI:  Object to form.
3             THE WITNESS:  I don't know if you
4      could make that assumption.
5  BY MR. BUCHANAN:
6       Q.     You're not aware of that?
7       A.     No, I'm not.
8       Q.     You're not aware that --
9       A.     I don't have any knowledge of
10 what goes on in other countries.
11      Q.     But as a person engaged in DEA
12 compliance, I mean, do you look to see, I mean,
13 what the trends are with regard to the use of
14 the products that your manufacturers or
15 distributors are making or distributing?
16      A.     I look at some data, but a lot of
17 data is not -- not represented well, I don't
18 think, and it doesn't have the level of detail
19 that it needs to accurately focus or address the
20 problem.
21      Q.     Well then, certainly, you'd want
22 to be really cautious, right?
23             MS. VANNI:  Object to form.
24             THE WITNESS:  Yes.

Page 225

1  BY MR. BUCHANAN:
2       Q.     And you'd be -- want to be really
3  cautious because if we're talking about products
4  that have to be kept in cages or have to be kept
5  in vaults or have to be handled by two people at
6  the same time because we can't really trust one
7  person or the other not to take this and divert
8  it, we've got to be really cautious in how we
9  distribute or sell these types of drugs, fair?
10            MS. VANNI:  Objection.
11            THE WITNESS:  Yes, and we were.
12 BY MR. BUCHANAN:
13      Q.     And I move to strike the end.  If
14 you could stay with my question, ma'am.
15            It says, "you need to visit your
16     customers."
17            That was a takeaway, right?
18      A.     Yes.
19      Q.     Okay.  That was what they told
20 you.  The "you" is Qualitest being told by the
21 DEA that you need to visit your customers,
22 right?
23            MS. VANNI:  Object to the form.
24            THE WITNESS:  Yes.

57  (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  BY MR. BUCHANAN:
2      Q.    And they told you, "we have a
3  problem with companies using" who?
4      A.    "Their sales force to conduct
5  visits."
6      Q.    Right.  Because the sales force
7  have a conflict or a perceived conflict because
8  sales is trying to sell, right?
9          MS. VANNI:  Object to form.
10         THE WITNESS:  Yes.
11  BY MR. BUCHANAN:
12     Q.    So you were told that the DEA had
13  a problem with companies using their sales force
14  to conduct visits, and they said, as we looked
15  on the slide, we "must have a closed system,"
16  right?
17     A.    Yes.
18     Q.    Told that in 2013, but, frankly,
19  as somebody in this space for 25 years, you
20  didn't need to hear that from the DEA, right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  I guess not, but
23      it's always good to, you know, make sure
24      they haven't changed anything around,

Page 227

1      yes.
2  BY MR. BUCHANAN:
3      Q.    Right.  I mean, that's part of
4  the registration process we talked about that
5  every registrant in this system has got to do
6  their job, right?
7      A.    Yes.
8      Q.    Okay.  "At customer locations,
9  look for," and what do they tell you to look
10  for?
11     A.    Location of pharmacy, lines going
12  out the door, cars with out-of-state license
13  plates, doctors who prescribe the same NDC,
14  patients who get the same script, "everybody has
15  lower back pain."
16     Q.    Okay.  And why look for those
17  things?
18     A.    They're indicators of
19  potential -- potential pill mills or diversion.
20     Q.    Right.  And these are things that
21  you see when you actually go -- you can see, are
22  capable of seeing when you actually put boots on
23  the ground and go to see customers, right?
24         MS. VANNI:  Object to form.

Page 228

1          THE WITNESS:  Not -- not all of
2      them, no.
3  BY MR. BUCHANAN:
4      Q.    Well, okay.  I mean, if they're
5  engaging in this, if they're pharmacies, for
6  example, the only way you're going to see it is
7  if you go, right?
8      A.    Yes.
9      Q.    Okay.  They said Georgia,
10  Tennessee, Kentucky and Ohio is now a problem,
11  right?
12     A.    Yes.
13     Q.    Did you have that understanding,
14  ma'am, that Ohio was also a problem?
15     A.    Not until I was told by DEA.
16     Q.    So as some -- we could agree that
17  during your entire time at Qualitest, the
18  company was selling drugs into the Ohio
19  community, true?
20         MS. VANNI:  Object to form.
21         THE WITNESS:  The company sold
22      drugs into a lot of states.
23  BY MR. BUCHANAN:
24     Q.    Every state, as far as you know,

Page 229

1  right?
2      A.    As far as I know, yes.
3      Q.    Okay.  So, certainly, selling the
4  drug directly into Ohio or to Ohio distributors
5  or wholesalers, right?
6      A.    Yes.
7      Q.    And certainly wouldn't be
8  surprised if the drug that Qualitest was making
9  was landing in Ohio pharmacies, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  Potentially, yes.
12  BY MR. BUCHANAN:
13     Q.    And could you tell the jury,
14  please, when was the first time that Qualitest
15  conducted a due diligence visit on an Ohio
16  pharmacy?
17     A.    I cannot tell you right now.  I'm
18  not sure off the top of my head.
19     Q.    Are you aware of any prior to
20  2013, ma'am?
21     A.    We would have had due diligence
22  visits conducted.  It would have been by the
23  sales team.  I'm not sure if they were in Ohio
24  or not.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1      Q.    Are you aware of any visits into
2   Ohio by the sales team or otherwise prior to
3   2013?
4      A.    I would not know, since I wasn't
5   there.
6      Q.    And, frankly, if it happened
7   prior to 2013, you're saying I'd have to go talk
8   to a sales rep?
9      A.    Not a sales rep.
10        MS. VANNI:  Object to form.
11        THE WITNESS:  One of the more --
12     the sales team that would be internal,
13     not necessarily a sales rep outside.
14  BY MR. BUCHANAN:
15     Q.    Well, certainly, the company and
16  its compliance -- this was a compliance function
17  you're saying was happening?
18     A.    The visits?
19     Q.    Mm-hmm.
20     A.    It was a compliance function
21  later, after we -- after we had the personnel
22  and we started doing them.
23     Q.    Okay.  Well, I just want to
24  understand the -- kind of the visits you're

Page 231

1   saying may have served the same function at
2   earlier points in time that you're not sure
3   actually happened in Ohio.
4        Was that being done as, you know,
5   as a know your customer anti-diversion effort;
6   is that what you're saying?
7        MS. VANNI:  Object to the form.
8        THE WITNESS:  I really don't
9     know.  I can't comment since I wasn't
10    there.
11  BY MR. BUCHANAN:
12     Q.    Well, surely if this was being
13  done as part of a compliance function, you'd
14  maintain records of due diligence visits like
15  that, right?
16        MS. VANNI:  Object to form.
17        THE WITNESS:  Not necessarily.
18    DEA didn't -- they didn't really talk
19    about documenting your due diligence
20    until more recent -- you know, not more
21    recent like this year but, you know,
22    till later on.  As I said, the program,
23    the SOM program changed over time so...
24  BY MR. BUCHANAN:

Page 232

1      Q.    Right.
2        So let's -- I just want to
3   understand whether these visits by salespeople
4   that may or may not have happened, I mean, was
5   that being done as a formal compliance effort,
6   where you were generating due diligence files?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  I can't say if they
9     were or not.
10  BY MR. BUCHANAN:
11     Q.    Are you aware of any that
12  happened prior to 2013?
13     A.    I don't know either way.
14     Q.    Okay.  All right.  So what the
15  DEA is telling you or at least your takeaway
16  from this meeting in March is, one, you've got
17  to get to know your customers, right?
18     A.    Yes.
19     Q.    And they also told you you got to
20  get to know your customers' customers, right?
21     A.    To the extent you can, yes.
22     Q.    They told you Ohio is a problem,
23  Florida is a problem, right?
24        MS. VANNI:  Object to form.

Page 233

1        THE WITNESS:  Yes.
2   BY MR. BUCHANAN:
3      Q.    You had that knowledge, though,
4   that Florida today was an issue even before the
5   DEA told you, right?
6      A.    Mainly because of seeing it on
7   presentations that they had given, yes.
8      Q.    Right.  I mean, you knew that
9   licenses were getting suspended of
10  distributorships and pharmacies were getting
11  shuttered in -- I shouldn't say shuttered -- the
12  DEA was taking their license, right?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  Yes.
15  BY MR. BUCHANAN:
16     Q.    I guess they could continue to
17  sell noncontrolled substances and chewing gum
18  and milk and stuff, but they couldn't sell
19  controlled substances after that point, right?
20     A.    Yes.
21     Q.    And hefty fines were levied,
22  right?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    BY MR. BUCHANAN:
2        Q.    Okay.  They then tell you that
3    "keep a filing system on customers reported to
4    DEA and a database on due diligence."
5        Do you see that?
6        A.    That's --
7        Q.    Database on due diligence?
8        A.    Yes, that's exactly where they
9    started talking about writing, documenting your
10   due diligence.
11       Q.    And we'll look at some of your
12   earlier documents that precede this meeting.  I
13   mean, you knew about the DEA's know your
14   customer initiative well before March of 2013,
15   didn't you, ma'am?
16           MS. VANNI:  Object to form.
17           THE WITNESS:  Prior to this
18       meeting, I'm sure it was mentioned at
19       conferences, know your customer.
20   BY MR. BUCHANAN:
21       Q.    Right.  And this, as you said, as
22   expected, and the other e-mail and then you
23   described what happened at the meeting.
24           Do you recall that?

Page 235

1        A.    I do.
2        Q.    Yes.  So what's happening here,
3    and I guess you got some visibility in the
4    charts as to your customers' customers and what
5    their transactions were?
6        A.    Yes.
7        Q.    But you were aware that the DEA
8    had a know your customer expectation before this
9    meeting, right?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  Yes.
12   BY MR. BUCHANAN:
13       Q.    Okay.  And they said average
14   customer purchases, 15% controlled substances --
15   excuse me.
16       "Average customer purchases 15%
17   controlled substances and 85% noncontrolled; IMS
18   shows an average of 13.8% controlled
19   substances."
20           So what's going on there?
21       A.    Those were numbers that were
22   provided by DEA as guidance as to the split that
23   customers should have between controlled and
24   noncontrolled, and it doesn't say it here, but I

Page 236

1    believe they were referring to pharmacies at
2    that point.
3        Q.    Okay.  And so one of the things
4    you could do is you could look through IMS data
5    or you could look through prescription level
6    data if you got it through questionnaires or
7    through dispensing histories from pharmacies or
8    you could get it from your distributor customers
9    if they provided it to you, you could see the
10   relative balance of controlled substances versus
11   noncontrolled substances, right?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  Absolutely not.  So
14       as a manufacturer, we were not entitled
15       to dispensing data, for one.  We would
16       not be getting dispensing data.  It
17       would be a HIPAA violation if it wasn't
18       cleansed from patient information for
19       one.
20   BY MR. BUCHANAN:
21       Q.    Okay.  Maybe my question was
22   confusing then.
23           And we'll look at this, provided
24   I still have time, the company after it

Page 237

1    implemented its revised SOMS actually requested
2    from its customers and from some of its
3    customers' customers dispensing data that showed
4    aggregate purchases of controlled substances
5    versus noncontrolled substances, correct?
6           MS. VANNI:  Object to form.
7           THE WITNESS:  I don't know
8       after -- I'm not sure.  I don't believe
9       so.
10   BY MR. BUCHANAN:
11       Q.    While you were there it happened.
12           Do you recall that?
13       A.    I recall looking at IMS data for
14   the national averages.  I don't recall actually
15   getting dispensing data.
16       Q.    We'll see if we can fill
17   in that -- your memory on that if we have time.
18       A.    Okay.
19       Q.    But one of the things you can do,
20   obviously, is you can see is this pharmacy
21   behaving like a pharmacy.  Is it purchasing
22   roughly 13 to 15% controlled substances, or is
23   it doing something different?  Is it buying 30,
24   40, 50%, right?

Highly Confidential — Subject to Further Confidentiality Review

Page 238

```
1              MS. VANNI:  Object to form.
2              THE WITNESS:  Yes, and it's a
3      guidance.
4      BY MR. BUCHANAN:
5          Q.   Right, because it could be that
6      there's a unique circumstance for that
7      particular pharmacy.  It might be a small one.
8      It might have a particular reason why it's 16%
9      rather than 13%, whatever the numbers are?
10         A.   Correct.
11         Q.   So you've got to think, right?
12             MS. VANNI:  Object to form.
13             THE WITNESS:  Yes.
14     BY MR. BUCHANAN:
15         Q.   So you get red flags -- well,
16     let's take a step back.
17             The process, as I understand it
18     is, one, we should get information, right;
19     that's what you're being told?
20         A.   Yes.
21         Q.   As a participant in this closed
22     system, you have an obligation to get
23     information on your customers, correct?
24             MS. VANNI:  Object to form.
```

Page 239

```
1              THE WITNESS:  Correct.
2      BY MR. BUCHANAN:
3          Q.   And you have an obligation to get
4      information on your customers' customers, right?
5              MS. VANNI:  Object to form.
6              THE WITNESS:  To the extent you
7      can, yes.
8      BY MR. BUCHANAN:
9          Q.   Right.  And so, look, you could
10     have difficult customers who don't cooperate,
11     that's one thing, correct?
12         A.   Mm-hmm, yes.
13         Q.   And you can choose not to do
14     business with them?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  Yes.
17     BY MR. BUCHANAN:
18         Q.   Every manufacturer, every
19     distributor has that choice, correct?
20             MS. VANNI:  Object to form.
21             THE WITNESS:  That's rare.
22     That's rare, but...
23     BY MR. BUCHANAN:
24         Q.   Well, you have a choice.  That's
```

Page 240

```
1      not rare that you have choice?
2              MS. VANNI:  Object to form.
3              THE WITNESS:  No, I'm saying it's
4      rare that a customer would not cooperate
5      but...
6      BY MR. BUCHANAN:
7          Q.   Right, right.  So we will see
8      some examples.  You recall some customers who
9      didn't cooperate?
10         A.   Yes.
11         Q.   Some distributors who didn't
12     cooperate, right?
13             MS. VANNI:  Objection.
14             THE WITNESS:  I don't believe so,
15     but...
16     BY MR. BUCHANAN:
17         Q.   Some distributors who didn't give
18     you their SOM information or had no SOM program.
19             Do you recall that?
20             MS. VANNI:  Objection.
21             THE WITNESS:  I do not.
22     BY MR. BUCHANAN:
23         Q.   Because that would be a concern,
24     right, if it --
```

Page 241

```
1          A.   Yes.
2          Q.   Somebody you were selling drug to
3      didn't have a SOM program, right?
4              MS. VANNI:  Objection.
5      BY MR. BUCHANAN:
6          Q.   When I say "SOM," I mean a
7      distributor.
8          A.   It would depend on controls they
9      have in place, other controls that -- maybe
10     they're not calling it a SOMS program, but they
11     have some things in place.  It depends on the
12     situation.
13         Q.   Okay.  So let's take the -- let's
14     take the name off of it, whether they call it a
15     SOM program.  It would be of concern to you,
16     ma'am, if somebody in this field, if a customer
17     of a manufacturer, a distributor or a wholesaler
18     didn't have a program, whether by name or
19     function, to serve SOM purposes, correct?
20             MS. VANNI:  Object to form.
21             THE WITNESS:  Yes.
22     BY MR. BUCHANAN:
23         Q.   In fact, I mean, you identified
24     that as a concern at various points in time
```

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1   after you implemented SOPs at Qualitest,
2   correct?
3       A.   Yes.
4       Q.   That if somebody doesn't give you
5   SOM information, we should not be selling to
6   them, right?
7           MS. VANNI:  Object to form.
8           THE WITNESS:  Again, depending on
9       the scenario, the situation.
10  BY MR. BUCHANAN:
11      Q.   Do you recall giving that
12  guidance?
13      A.   Yes.
14      Q.   Because if your customers don't
15  have SOM programs in place, there can be no
16  assurance that you're living up to your promise
17  to get your registration that you're going to
18  maintain effective controls against diversion,
19  right?
20          MS. VANNI:  Object to form.
21          THE WITNESS:  Again, it depends
22      on the controls that the customer has in
23      place and the situation.
24  BY MR. BUCHANAN:

Page 243

1       Q.   Well, the controlled system
2   doesn't work if you sell it to people who are
3   putting their head in the sand; we can agree on
4   that?
5       A.   Yes.
6           MS. VANNI:  Object to form.
7   BY MR. BUCHANAN:
8       Q.   And the system doesn't work if
9   you're selling to people who don't have by name
10  or function suspicious order monitoring
11  programs, correct?
12          MS. VANNI:  Object to form.
13          THE WITNESS:  Yes.
14  BY MR. BUCHANAN:
15      Q.   Okay.  And suspicious order
16  monitoring programs have been either statutorily
17  or regulatory required for as long as you've
18  been in dealing with controlled substances,
19  correct?
20      A.   Yes.
21      Q.   And that takes us back to the
22  late '80s?
23      A.   Yes.
24      Q.   Okay.  So next bullet was --

Page 244

1   getting back to it, I'm sorry, 657.1, we're
2   going to go to "If we decide to terminate a
3   customer, we should let both the local and HQ
4   offices of DEA know."
5           Do you see that?
6       A.   Yes.
7       Q.   Do you agree with that, that's
8   something you should do?
9       A.   It depends on, again, on the
10  situation.  If we're terminating a customer for
11  a -- for a reason that isn't causing any
12  diversion or abuse or we don't have a suspicion
13  about that customer, then no there's no reason
14  to let DEA know.
15      Q.   Right.  I mean, if you're
16  terminating a customer because you believe
17  they're either a suspicious customer or they've
18  -- their orders are suspicious, you got to let
19  the DEA know, right, no question?
20          MS. VANNI:  Object to form.
21          THE WITNESS:  The regulation is
22      you notify them of suspicious orders.
23      It's not -- the regulation doesn't
24      require you to notify them if you just

Page 245

1   terminate them as a customer.
2   BY MR. BUCHANAN:
3       Q.   Okay.  So these were your high
4   level takeaways from the meeting the next day?
5       A.   Yes.
6       Q.   And then I know you implemented a
7   process, and we'll talk about that in a moment,
8   about what you started to do to kind of bring
9   Qualitest SOMS procedures in line, fair?
10          MS. VANNI:  Objection to form.
11          THE WITNESS:  No, not fair.  It
12      was --
13  BY MR. BUCHANAN:
14      Q.   Okay.  We'll see whether it's
15  fair in a moment, so let's pause.
16          (Document marked for
17      identification as Par-Norton Deposition
18      Exhibit No. 10.)
19          MR. BUCHANAN:  I'm going to pass
20      you what we're marking -- it's 1044,
21      Scott -- next in order is Exhibit 10,
22      ma'am.
23  BY MR. BUCHANAN:
24      Q.   Aimee Cooper was someone who

62  (Pages 242 to 245)

Page 246

1    worked in your organization in compliance?
2           MS. VANNI:  Can I have a copy?
3           THE WITNESS:  Yes.
4           MR. BUCHANAN:  Oh, sorry.  It
5    should have gone to you first.
6           MS. VANNI:  Thank you.
7    BY MR. BUCHANAN:
8       Q.    All right.  So Aimee Cooper was
9    with you.  I guess this is from 2017, but she's
10   forwarding along in the minutes from the
11   March 27 meeting?
12      A.    Mm-hmm.
13      Q.    I'm sorry, not the March 27
14   meeting.  The minutes are stamped March 27,
15   2013.
16           You see the memorandum on the
17   next page?
18      A.    Yes.
19      Q.    And so what's happening here is I
20   guess at a later point in time in 2017, there's
21   a need to look back at the -- what happened in
22   March of 2013, and they're being forwarded
23   along.
24           Do you recognize the format of

Page 247

1    the memo that's reflected on page 2?
2           MS. VANNI:  Object to the
3           colloquy.
4           THE WITNESS:  I recognize the
5           format.  I'm not sure if I had a copy
6           before I left.  This appears to be an
7           internal DEA document.
8    BY MR. BUCHANAN:
9       Q.    Okay.
10      A.    So it may have been obtained
11   through Freedom of Information, I'm not sure.
12      Q.    So manufacturers can request
13   information from the DEA through informal
14   process and also formal process, right?
15      A.    Through formal process and at
16   this point it takes years to get it, so, yeah.
17      Q.    Okay.  So we have here the
18   minutes from the DEA of the meeting, and let's
19   pull those up.
20           It's from a Barbara Boockholdt,
21   chief regulatory section ODG, Office of
22   Diversion Control to a Joseph Rannazzisi, deputy
23   assistant administrator, Office of Diversion
24   Control.

Page 248

1           Ms. Boockholdt was at the
2    meeting?
3       A.    I believe so, yes.
4       Q.    Do you know how to pronounce her
5    name?
6       A.    Boockholdt.
7       Q.    Boockholdt, thank you.
8           And she's with the Office of
9    Diversion Control, and she's writing to I guess
10   one of her colleagues?
11      A.    Rannazzisi was in charge of DEA.
12      Q.    And who is he -- oh, in charge of
13   DEA?
14      A.    Yes.
15      Q.    Okay.  And he had been talking
16   and writing and speaking about diversion,
17   anti-diversion, suspicious order monitoring for
18   some time, fair?
19           MS. VANNI:  Object to form.
20           THE WITNESS:  I would assume,
21           yes.
22   BY MR. BUCHANAN:
23      Q.    Well, you've been in this space
24   for a while, right?

Page 249

1       A.    Yes.
2       Q.    Okay.  "Space" meaning suspicious
3    order monitoring, DEA compliance, right?
4       A.    Correct.
5       Q.    You remember in the mid-2000s
6    receiving letters from Mr. Rannazzisi, right?
7           MS. VANNI:  Object to form.
8           THE WITNESS:  I remember
9           receiving letters.  I don't recall if
10          they came from Mr. Rannazzisi, but, yes,
11          we did receive letters.
12   BY MR. BUCHANAN:
13      Q.    Okay.  Letters concerning either
14   manufacturers' obligations or distributor
15   obligations with regard to maintaining effective
16   controls against diversion?
17      A.    Yes.
18      Q.    Okay.  And so that's all
19   information that you as somebody in regulatory
20   compliance take into consideration in designing
21   programs to maintain effective controls against
22   diversion, true?
23           MS. VANNI:  Object to form.
24           THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    BY MR. BUCHANAN:
2         Q.    Okay.  So let's look at this one.
3    This is a recap of the meeting from the
4    perspective of the DEA.  Can we scroll down.
5    Probably the second paragraph is where we get
6    into the meat of it.
7              Do you see that?
8         A.    Okay.
9         Q.    Okay?
10        A.    "SC Levin opened."
11        Q.    SC Levin, do you know SC Levin?
12        A.    Yes.
13        Q.    What's that C stand for?
14        A.    Special -- staff coordinator.
15        Q.    Got you.  Staff coordinator
16   Levin, somebody with the DEA?
17        A.    Yes, headquarters.
18        Q.    And just to orient us, where --
19   this is a summary of, I guess, Barbara
20   Boockholdt of what happened at the meeting three
21   weeks earlier with you?
22        A.    I believe so, yes.
23        Q.    Okay.  SC Levin opened the
24   meeting by stating the purpose was both

Page 251

1    educational and informative.  SC Levin stated he
2    would discuss Qualitest's responsibilities under
3    the Controlled Substances Act, their suspicious
4    order monitoring system, their procedures
5    concerning due diligence, knowing their
6    customers, who their customers sell to and
7    graphs depicting the pharmacies and
8    practitioners where oxycodone in various
9    formulations and hydrocodone in various
10   formulations were ultimately dispensed from.
11             Do you see that, ma'am?
12        A.    Yes.
13        Q.    And as an encapsulation, is that
14   a good high level summary of what happened
15   during the meeting?
16             MS. VANNI:  Object to form.
17             THE WITNESS:  Yes.
18   BY MR. BUCHANAN:
19        Q.    Okay.  It states that in the next
20   paragraph, after summarizing Qualitest, I think
21   it's the third sentence or fourth sentence, it
22   says Ms. Hernandez -- well, let's read it.  "SC
23   Levin asked Ms. Hernandez to talk briefly about
24   Qualitest, their product line and their

Page 252

1    suspicious order monitoring system."
2              Do you see that, ma'am?
3         A.    Yes.
4         Q.    Okay.  And it talks about
5    Qualitest and its locations and then there's a
6    sentence attributed to you.
7              Ms. Hernandez was aware of the
8    chargeback system utilized by manufacturers,
9    including Qualitest, but stating that the firm
10   has not reviewed it.
11             Do you see that?
12        A.    Yes.
13        Q.    Do you recall discussing that
14   with the DEA?
15        A.    Yes, I do.
16        Q.    Okay.  And that accurately sets
17   forth at least that portion of the discussion,
18   right?
19        A.    Yes.
20        Q.    Okay.  "Ms. Hernandez stated the
21   firm's suspicious order monitoring system is a
22   work in progress."
23             Do you see that?
24        A.    Yes.

Page 253

1         Q.    "And it is currently based on
2    historical purchases by an individual customer
3    (thresholds)."
4              Did I read that correctly?
5         A.    Yes, you did.
6         Q.    Okay.  Stated that you do not
7    routinely visit customers to determine who they
8    are selling to and "Qualitest does not visit
9    their pharmacies or practitioners who dispense
10   their product."
11             Do you see that?
12        A.    Yes.
13        Q.    Do you recall discussing that
14   with the DEA?
15        A.    I do.
16        Q.    So you don't dispute the
17   characterization of the meeting?
18        A.    No.
19        Q.    Okay.  "Ms. Hernandez stated the
20   only individuals who visit their customers are
21   from the sales force and not compliance."
22             Do you see that?
23        A.    Yes.
24        Q.    It notes that you're currently

64  (Pages 250 to 253)

Page 254

1    seeking to update your computer system and to
2    improve the suspicious order monitoring system.
3         Do you see that?
4         A.   Yes, I do.
5         Q.   Okay.  Apparently, you presented
6    some organizational structure of Endo and the
7    subsidiaries, and then you "stated that over 50
8    percent of the firm's sales are controlled
9    substances."
10        Do you see that?
11        A.   Yes.
12        Q.   I want to focus on the next
13   paragraph.
14        "SC Levin stated that 80 percent
15   of all controlled substances manufactured in the
16   world are prescribed and consumed in the United
17   States."
18        Do you recall this discussion?
19        A.   Yes.
20        Q.   Okay.  SC Levin stated that the
21   abuse and diversion of oxycodone 15 and
22   30-milligram tablets is a major problem.
23        Do you recall that?
24        A.   Yes.

Page 255

1         Q.   Do you recall that being a major
2    problem at this point in time?
3         MS. VANNI:  Object to form.
4         THE WITNESS:  I recall him saying
5         it was a major problem, yes.
6    BY MR. BUCHANAN:
7         Q.   Okay.  "SC Levin discussed the
8    pain clinic issues found in Florida, as well as
9    other drug abuse trends across the country.  SC
10   Levin outlined the methods of diversion of these
11   products and advised that Qualitest is
12   responsible for monitoring and reviewing their
13   suspicious order monitoring system, assuring
14   Qualitest is reporting to ARCOS correctly,
15   visiting and knowing their customers,
16   maintaining a due diligence file on their
17   customers, and knowing where their products are
18   ending up."
19        Let's pause for a moment.  First,
20   did I read that correctly?
21        A.   Yes.
22        Q.   And you recall that discussion?
23        A.   Yes.
24        Q.   Okay.  And then some of that's

Page 256

1    reflected in your takeaway bullet points, fair?
2         A.   Yes.
3         Q.   Okay.
4         A.   He's basically going over the
5    regulations in general and the things that
6    they're seeing.
7         Q.   Okay.  Also says, you know, you
8    should be reviewing what the DEA has done, our
9    investigations, things that you read more
10   publicly on websites concerning customers and
11   customers of customers, fair?
12        A.   Yes.
13        Q.   And then it talks about the
14   PowerPoint that he presented and some bullets
15   that we don't need to revisit in great depth
16   but, again, echoing this concept that closed
17   system of controlled substance distribution,
18   correct?
19        MS. VANNI:  Object to form.
20        THE WITNESS:  Yes.
21   BY MR. BUCHANAN:
22        Q.   And then it notes what the graphs
23   depicted at the end of the first page, yes.  The
24   graphs depicted or the graphs revealed several

Page 257

1    pharmacies purchasing large quantities of
2    oxycodone and hydrocodone products from
3    Qualitest's customers.  The graph showed the
4    pharmacies in Florida purchased very large
5    quantities of Qualitest's oxycodone products.
6    Also, the graphs show that pharmacies in Texas
7    and California purchased large quantities of
8    Qualitest's hydrocodone products.
9    Ms. Hernandez, Ms. Hudson and Ms. Patel were
10   completely unaware of where Qualitest products
11   were ending up.
12        As of that point in time, ma'am,
13   were you completely unaware of where Qualitest's
14   products were ending up?
15        A.   No.  What this refers to is that
16   we were unaware of the secondary customers.  So
17   we ship to the customers and we were aware who
18   we were shipping to and, you know, the
19   information for them, but we did not have
20   visibility of the customers that they then
21   shipped to.
22        Q.   Right, as of that point in time,
23   ma'am, you were not looking at really the
24   customers of customers in terms of what they

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    were receiving, right?
2         A.    Correct.  We didn't have data
3    available to us.
4         Q.    Well, there is chargeback data
5    that the company ultimately looked at, fair?
6              MS. VANNI:  Object to form.
7              THE WITNESS:  Yes, that gave
8         us --
9    BY MR. BUCHANAN:
10        Q.    In fact, the DEA told you
11   need to be looking at that, right?
12             MS. VANNI:  Object to form.
13             THE WITNESS:  The DEA told us
14        that we should look at it because that's
15        what they were hearing from other
16        manufacturers, that they were looking
17        into that and trying to see if they
18        could get data from it.
19   BY MR. BUCHANAN:
20        Q.    And, in fact, you contracted to
21   after this meeting and started to implement a
22   process where you reviewed and considered
23   chargeback data, correct?
24        A.    Yes, we did try.

Page 259

1         Q.    Okay.  You, in fact, did
2    implement the consideration of chargeback data
3    as part of your SOMS process, correct?
4         A.    Not while I was at Qualitest.  It
5    was something -- I don't know if anything was --
6    happened afterwards, but while I was there, we
7    were not able to get any good data out of it.
8         Q.    Okay.  Let's pause and see if I
9    can refresh your memory on that during our
10   examination today.
11        A.    Sure.
12        Q.    It then continues that "SC Levin
13   stated that Qualitest must review the chargeback
14   information which they have access to,
15   immediately address deficiencies in their
16   suspicious order monitoring system, have
17   compliance people visit their customers to
18   review their suspicious order monitoring system
19   and review the top customers of their customers
20   and pay visits to pharmacies that purchase their
21   products.  SC Levin advised Ms. Hernandez that
22   Qualitest must know their customers and maintain
23   a due diligence file on them.  SC Levin stated
24   Qualitest's current system as explained to him

Page 260

1    and as seen in their ARCOS data," is what, what
2    did he say?
3         A.    He said "inadequate to say the
4    least."
5         Q.    Do you recall this discussion
6    with the DEA in March of 2013?
7         A.    I don't recall it being said to
8    us as being inadequate during the meeting.
9              I do recall us telling them of
10   some of the things that we were looking at and
11   wanted to implement and them stating that that
12   was good, that they, you know, supported that
13   and that we should move forward with taking
14   those additional steps.
15        Q.    And they gave you a window of
16   time to do this, and they were going to come
17   back and talk to you to make sure you had done
18   it, right?
19             MS. VANNI:  Object to form.
20             THE WITNESS:  I don't believe --
21        I don't believe there was a must
22        follow up with us type of mentality.  I
23        think that was us saying we wanted to go
24        back and talk to DEA and show them the

Page 261

1    things we had implemented.
2    BY MR. BUCHANAN:
3         Q.    It stated that "SC Levin stated
4    that should Qualitest or any firm who had been
5    briefed was found to have violated the CSA
6    pertaining to what was discussed during the
7    course of the meeting, DEA could seek
8    administrative or civil action to remedy the
9    violation."
10             Did I read that correctly?
11        A.    Yes.
12        Q.    Okay.  You were further guided, I
13   think it's the last sentence here.  SC Levin
14   told Ms. Hernandez to educate Qualitest
15   employees who have access to controlled
16   substances on what they discussed today -- or
17   what was discussed today and communicate with
18   her local DEA office, should she have any
19   questions.
20             Did I read that correctly?
21        A.    Yes.
22        Q.    Okay.  Well, let's talk -- let's
23   talk about the implementation steps.  Oh,
24   actually, one more document to complete this.

66 (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1           MR. BUCHANAN:  619, please.
2           (Document marked for
3       identification as Par-Norton Deposition
4       Exhibit No. 11.)
5   BY MR. BUCHANAN:
6       Q.   I guess before we move off the
7   last exhibit, that generally reflects the
8   meeting and refreshes your recollection what
9   occurred that day?
10          MS. VANNI:  Object to form.
11          THE WITNESS:  Generally, yes.
12      I'm sure that every distributor had
13          almost word for word the same minutes.
14  BY MR. BUCHANAN:
15      Q.   In other words, this was a
16  meeting that was a meeting that was being had
17  generally; is that what you're saying?
18      A.   Correct.  I mean, it was -- DEA
19  was doing the same meeting with all distributors
20  and basically providing the same message.
21      Q.   And so you had that same type of
22  meeting with that same type of message with Anda
23  or Anda back in 2009 or whenever that meeting
24  occurred?

Page 263

1           MS. KOSKI:  Object to form.
2           MR. SCHACK:  Objection.
3           THE WITNESS:  Yes.
4           MR. BUCHANAN:  Thank you.
5           Passing over what we're marking
6       as Exhibit 11.  Can we pull up 619 on
7       the screen.
8   BY MR. BUCHANAN:
9       Q.   Okay.  This is an e-mail from
10  Ms. Hudson to several of the same people we've
11  been talking about, including yourself, Ms.
12  Connell and Sanjay Patel.
13          Do you see that?
14      A.   Yes.
15      Q.   Denise Hudson worked in your
16  group?
17      A.   Denise was -- there was Denise
18  and then Jill and then Sanjay and then myself.
19      Q.   Okay.  And then the written
20  record won't reflect what you just did, so
21  maybe --
22      A.   Sorry.
23      Q.   -- you can verbalize that, if you
24  can.

Page 264

1       A.   So I reported to Sanjay, who
2   reported to Jill who reported to Denise.
3       Q.   Thank you.
4       A.   Sorry.
5       Q.   So Ms. Hudson was not able to
6   attend the meeting in person, she participated
7   by phone and took notes while you all were in
8   this discussion with the DEA, fair?
9       A.   Yes, with a very bad connection.
10      Q.   Okay.  All right.  Well, let's go
11  midway on point two.  What's reflected here in
12  the middle, "Tracey: we were looking at our SOM
13  program just before Lenny called us."
14          You see that in the middle of the
15  page, just kind of a back-and-forth, SOM
16  program?
17      A.   Mm-hmm, yes.
18      Q.   There's a question about whether
19  you're looking at chargeback data to help you
20  understand what your customers' customers are
21  doing.  You respond, "we were looking at our SOM
22  program just before Lenny called us."
23          Do you see that?
24      A.   Yes.

Page 265

1       Q.   Lenny was the local DEA agent?
2       A.   Lenny was at headquarters.
3       Q.   And Lenny is the one who called
4   you to say we need you to come to DC?
5       A.   Yes.
6       Q.   Got you, okay.
7           Then you were asked -- you asked
8   to see what your customer SOM program is
9   relative to your products, you responded "Right
10  now, our sales team is visiting our customers."
11          Do you see that?
12      A.   Yes.
13      Q.   Okay.  And then it says, you
14  really need to know who your customers are
15  selling to."
16          Do you see that in the beginning
17  of the next page?
18      A.   I do.
19      Q.   Okay.  And DEA told you, as
20  reflected in Ms. Hudson's notes, "We like to
21  differentiate between salespeople and DEA
22  compliance people."
23          Do you see that?
24      A.   Yes.

67  (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1      Q.   Do you recall that discussion, at
2  least when you were with the DEA?
3      A.   I do.
4      Q.   Okay.  And then she characterized
5  the discussion this way in the middle of that
6  paragraph, "We want you to look at this, decide
7  what to do about it.  If we show up at your
8  facility in 6 to 9 months, we want to see some
9  improvement.  We need a good SOM program that is
10  adequate for the type of business we are in.  We
11  are responsible for these products.  DEA is not
12  interested in interfering with legitimate needs
13  of patients."
14      Do you see that?
15      A.   Yes.
16      Q.   Did I read that correctly?
17      A.   Yes, you did.
18      Q.   Okay.  And you recall that as
19  being a component of your discussion with the
20  DEA that day?
21      A.   I think it's interspersed with
22  some of her opinion as well, but generally, yes.
23      Q.   Okay.  But you do recall that, in
24  general, that the DEA told you that when we come

Page 267

1  back to you in six to nine months, we need
2  improvement?
3      MS. VANNI:  Object to form.
4      THE WITNESS:  I don't recall.
5  BY MR. BUCHANAN:
6      Q.   Okay.  It says, "We need a good
7  SOM program that is adequate for the type of
8  business we are in."
9      Do you see that sentence?
10      A.   I do.
11      Q.   Do you agree, ma'am, as a general
12  matter, that a company needs a SOM program that
13  is adequate for the type of business that it's
14  in?
15      A.   Yes.
16      Q.   And so if a company is in the
17  business of predominantly making and selling
18  controlled substances, it's got to have a robust
19  SOM program?
20      MS. VANNI:  Object to form.
21      THE WITNESS:  Yes.
22  BY MR. BUCHANAN:
23      Q.   If it's selling 33 billion pills
24  of Vicodin over seven years, it's got to have a

Page 268

1  robust SOM program?
2      MS. VANNI:  Object to form.
3      THE WITNESS:  Actually, I don't
4  feel -- I don't feel the quantity is a
5  factor.
6  BY MR. BUCHANAN:
7      Q.   Okay.  A company should have a
8  robust SOM program and strong measures to
9  prevent diversion regardless of the quantity,
10  correct?
11      MS. VANNI:  Object to form.
12      THE WITNESS:  Yes.
13  BY MR. BUCHANAN:
14      Q.   But, certainly, if a company's
15  entire business, to the tune of billions and
16  billions of pills and many billions of dollars
17  in sales is with controlled substances, they
18  should invest the resources in a robust SOM
19  program; you could agree with me, right?
20      MS. VANNI:  Object to form.
21      THE WITNESS:  Yes.
22      MR. BUCHANAN:  So let's -- one
23  other document.  Can I have 581.
24      THE VIDEOGRAPHER:  Counsel, can

Page 269

1  we go off the record momentarily.  I do
2  apologize, just going off the record
3  momentarily.  The time is 1:25 p.m.
4      (Pause.)
5      THE VIDEOGRAPHER:  Back on the
6  record, the time is 1:28 p.m.
7      (Document marked for
8  identification as Par-Norton Deposition
9  Exhibit No. 12.)
10      MR. BUCHANAN:  Ma'am, passing you
11  what we marked as Exhibit 12.  Do we
12  have a copy for counsel yet?  It's --
13  for the record, it's E606 and it's
14  PAR_OPIOID_MDL 18920.
15      MS. VANNI:  Thank you.
16  BY MR. BUCHANAN:
17      Q.   This is a document from October
18  of 2013, this is some five, six months after
19  your meeting with the DEA, right?
20      A.   Yes.
21      Q.   Six months to the day almost,
22  right?  Mr. Brantley worked in your group?
23      A.   He did.
24      Q.   Mr. Shaffer worked in your group?

68  (Pages 266 to 269)

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1     A.   Yes.
2     Q.   So you were the head of DEA
3  compliance.  You hired Mr. Brantley into your
4  group, correct?
5     A.   Yes.  I hired Larry first,
6  Mr. Shaffer and then later hired Eric.
7     Q.   When did you bring in Mr. -- is
8  it Shaffer or Shaffer?
9     A.   Shaffer.
10    Q.   It's the two Fs that are throwing
11  me there.
12    A.   I'm not sure exactly when.
13    Q.   I assume his e-mail address is
14  spelled right.  All right.  So when did you hire
15  him, by the way?
16    A.   I'm not sure on exact -- the
17  exact date, but he was, I believe, my first
18  hire.
19    Q.   After the meeting with the DEA?
20    A.   No.  After getting to Qualitest.
21    Q.   Okay.  And he was, if I
22  understand right, he was more in this quota
23  management function, right?
24    A.   He was at the company, however,

Page 271

1  he actually had a -- he had handled suspicious
2  order monitoring previously.
3     Q.   Got you.
4          All right.  So let's look at
5  this.  This is an e-mail from Mr. Shaffer to
6  Mr. Brantley early October 2013, subject SOMS
7  info, right?
8     A.   Yes.
9     Q.   SOMS violations as a spreadsheet,
10  SOMS doc from 2013 and a SOMS presentation,
11  right?
12    A.   Yes.
13    Q.   Okay.  Do you remember during
14  your time at the company one of the things you
15  were tracking was who was getting in trouble?
16         MS. VANNI:  Object to form.
17         THE WITNESS:  Yes.
18  BY MR. BUCHANAN:
19    Q.   And you had an Excel spreadsheet
20  that you put together and kind of tracked what
21  was happening with different registrants who was
22  getting gigged and written up with big fines and
23  stuff like that, right?
24         MS. VANNI:  Object to form.

Page 272

1         THE WITNESS:  Yes.
2  BY MR. BUCHANAN:
3     Q.   Gigged is a confusing term.
4          Getting, what, registrations
5  pulled, fined, civil actions, suspension orders,
6  all that kind of stuff?
7     A.   Yes, we were tracking it.
8     Q.   Okay.  And so one of the things a
9  reasonable company does, and I guess this was a
10  responsible thing to do?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  I think so.  I
13         think it helped to -- it helped to teach
14         others in the company what ramifications
15         there were if something were to go
16         wrong.
17  BY MR. BUCHANAN:
18    Q.   And that's something that you
19  have in a compliance department as a bit of an
20  issue from time to time, right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  No company is
23         perfect.
24  BY MR. BUCHANAN:

Page 273

1     Q.   Certainly not, certainly not, and
2  nor are people.
3          But one of the issues you have in
4  a compliance department is sometimes some
5  tension between compliance with what a
6  responsible company would do or reasonable
7  company would do or the regulations require and
8  what the business people want, right?
9         MS. VANNI:  Objection.
10         THE WITNESS:  I wouldn't
11         necessarily say that there's tension
12         from the aspect of, you know, everybody
13         knows that you have to comply with the
14         DEA regulations.  It's a matter of
15         education, it really is.
16  BY MR. BUCHANAN:
17    Q.   And so one of the things you did
18  was compile a list of all the bad things that
19  could happen to us as a business with 70%
20  controlled substances if we don't comply, right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Yes.
23  BY MR. BUCHANAN:
24    Q.   Because this, you know, this is a

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    -- this could be a devastating consequence if we
2    don't comply, right?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  Yes.
5    BY MR. BUCHANAN:
6        Q.    Fair, yeah.
7            So one of the things that's
8    helpful in certainly getting management's
9    attention is you should know distribution
10   facilities have been closed, right?
11       A.    Mm-hmm.
12       Q.    That's a yes answer?
13       A.    Yes.  Sorry.
14       Q.    You should know that tens of
15   millions of dollars in fines have been imposed
16   against certain distributors, right?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Yes.
19   BY MR. BUCHANAN:
20       Q.    You should know that we have a
21   distributor license, right?
22       A.    Yes.
23       Q.    And if we're not doing our job,
24   this could be devastating, right?

Page 275

1            MS. VANNI:  Object to form.
2            THE WITNESS:  Well, it could
3    impact the business, yes.
4    BY MR. BUCHANAN:
5        Q.    Certainly.
6            And so you bring these items to
7    the attention of people above you to say, look,
8    this could affect our pocketbook, right?
9            MS. VANNI:  Objection.
10           THE WITNESS:  Actually, no.  The
11   reason that we use these was because I
12   knew that the electronic system that I
13   wanted to implement was very expensive,
14   and I needed to have adequate
15   justification to support that system
16   because -- because we did have something
17   in place, so I knew that the feedback I
18   would get is that we were complying with
19   the regulation.  So I wanted to show
20   them some of the things that the other
21   companies were doing that DEA
22   categorized as not enough.
23   BY MR. BUCHANAN:
24       Q.    Right.  I mean, basically, you're

Page 276

1    saying I needed to make sure I could get some
2    budget to make this happen, so I had to show the
3    other side of not doing it?
4            MS. VANNI:  Object to form.
5            THE WITNESS:  I was expecting
6        more resistance, yes.
7    BY MR. BUCHANAN:
8        Q.    Okay.  And so you put together
9    this schedule, and let's look at the -- let's be
10   clear, I guess, because I may not have time to
11   come back to this today.
12           Some of what we see here in the
13   SOMS violations are, for example, we see a
14   reference to Walgreens.
15           MR. BUCHANAN:  Could we go to
16   606.4.  Can you blow up this one right
17   here, if you can see my finger.  Thank
18   you, yeah.  My eyes are failing me,
19   guys.  Sorry about that.
20           MR. SCHACK:  Counsel, do you have
21   any other copies of this exhibit that
22   you can share?
23           MR. BUCHANAN:  There's an extra
24   floater if somebody can pass the floater

Page 277

1        down.
2            MR. SCHACK:  Thank you.
3    BY MR. BUCHANAN:
4        Q.    Okay.  All right.  So this is
5    suspension order that you tracked, a suspension
6    of a DEA license relating to a Walgreens
7    distribution center in Jupiter, Florida.
8            Do you remember that?
9        A.    Yes.
10       Q.    Do you remember -- you were aware
11   of that when it happened in 2012, right, as
12   somebody who reads the Federal Register, as
13   somebody who attends DEA conferences?
14       A.    Yes.
15       Q.    Okay.  And then off to the right
16   we see really what you guys were doing, right,
17   and this is your drug that was being shipped in
18   to Florida, right?
19           MS. VANNI:  Object to the form.
20           THE WITNESS:  I can't read it.
21   BY MR. BUCHANAN:
22       Q.    Yeah, it's a challenge with, I
23   don't know, spreadsheets.  There's a
24   heading that's --

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1              MR. BUCHANAN:  Bradley, I'm
2       sorry, I think it's confusing for people
3       if you do it the way you've done it,
4       because at the top it says "Violation."
5    BY MR. BUCHANAN:
6       Q.    Let's just read across the top
7    together, ma'am.  You see Violation For --
8    there's Date, Violation For: Company, Violation,
9    Penalty, a web link, What they did, and What we
10   are doing.
11             Do you see that?
12      A.    Yes.
13      Q.    Okay.  So then there's that
14   reference for the Walgreens facility that we
15   were just looking at, and you see there's a
16   narrative description of what happened with that
17   one?
18      A.    Yes.
19             MR. BUCHANAN:  And then I need
20       you to blow up, if you could, Bradley,
21       the units all the way to the right.
22       Keep going.  Can you make the box a
23       little bigger so we don't clip off the
24       top.  Thanks.

Page 279

1    BY MR. BUCHANAN:
2       Q.    Okay.  All right.  It doesn't get
3    any bigger, but at least it's a little more in
4    focus for you.
5             So what we see here is Walgreens
6    has a situation with their distribution center
7    severe enough that their license is suspended
8    for that particular distribution facility.
9             Do you recall that?
10      A.    Yes.
11      Q.    Okay.  And then what you did is
12   you looked at, hey, what are we doing with them,
13   right?
14             MS. VANNI:  Object to form.
15   BY MR. BUCHANAN:
16      Q.    Do you see that?
17      A.    Mm-hmm.
18      Q.    And it shows here that over the
19   same period of time, or I guess really from
20   2009, 2010, 2011, your company, Qualitest
21   shipped how many pills, 83 million pills, right?
22             You see that?
23      A.    Yes.
24      Q.    Shipped 83 million pills to that

Page 280

1    particular distribution facility that had its
2    license suspended in 2012, correct?
3       A.    Yes, looks that way.
4       Q.    Of 2009 there were 11 million
5    dosage units, right, Walgreens Jupiter, and you
6    know I think I misspoke.  Let me restate this,
7    okay.
8             What's at the top, I believe, are
9    the dosage units shipped into Florida.
10             Do you see that?
11      A.    Yes.
12      Q.    83 million dosage units shipped
13   into Florida, right?  Am I reading it correctly?
14      A.    I can't see.
15      Q.    I wish I could do more to help
16   you on that.
17      A.    Yes, it states that 83,000 --
18   83 million doses were sent to Florida in the
19   same time frame.
20      Q.    And then in 2009 you shipped
21   11.6 million dosage units to the Jupiter
22   facility of Walgreens, right?
23      A.    Yes.
24      Q.    In 2010 you shipped 7 million to

Page 281

1    that one?
2       A.    Yes.
3       Q.    And then apparently in 2011 they
4    went to another facility, right?
5       A.    Yes.
6       Q.    Okay.  So over those two years
7    that we have data for, it doesn't go back prior
8    to 2009, there's some, you know, 18 million,
9    19 million, 18 and a half million, I guess to be
10   precise, dosage units of controlled substances
11   going to the facility that the DEA suspended its
12   license in 2012, correct?
13      A.    Yes.
14             MS. VANNI:  Object to form.
15   BY MR. BUCHANAN:
16      Q.    Okay.  And the allegation of the
17   DEA was that that facility and the reason for
18   the suspension of a license was that they failed
19   to maintain effective controls against diversion
20   of controlled substances, right?
21      A.    Yes.
22      Q.    And so prior to -- prior to 2013,
23   ma'am, I take it are you aware of any site
24   visits to Walgreens Jupiter?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    A.    Again, I don't know what the
2  sales team did, so I don't know if they went to
3  -- went there or not.
4    Q.    We know the DEA's conclusion, at
5  least as reflected here, was that they failed to
6  be -- they were not maintaining effective
7  controls against diversion, right?
8    A.    Yes.
9    Q.    Okay.  And had you asked for
10  copies of their suspicious order monitoring
11  protocols prior to 2013?
12    A.    Again, I don't know.
13    Q.    Okay.  I mean, there's a list of
14  violations that are noted over several years in
15  this spreadsheet, correct?
16    A.    Yes.
17    Q.    For various entities, some are
18  retail pharmacies, some are distributors,
19  correct?
20    A.    Yes, mm-hmm.
21    Q.    And these are all obviously
22  events that have happened prior to the time of
23  this PowerPoint, right?
24    A.    Yes, they are.

Page 283

1    Q.    And we could agree, couldn't we,
2  ma'am, that you're not aware of any request to
3  any of the entities on this sheet for request
4  for their suspicious order monitoring program or
5  practices prior to the times of these
6  violations, correct?
7    MS. VANNI:  Objection.
8    THE WITNESS:  I'm not sure.  I
9  don't know.
10  BY MR. BUCHANAN:
11    Q.    You don't have any information,
12  sitting here today, that you did so?
13    MS. VANNI:  Objection.
14    THE WITNESS:  Right, or did not.
15  BY MR. BUCHANAN:
16    Q.    You have no information either
17  way?
18    A.    Correct.
19    Q.    Fair enough.  Okay.
20    So let's go back to this
21  document.  And so tab one was -- I'm sorry, at
22  606.4 we were just looking at violations, what
23  the allegations were, the consequences were and
24  then really where you were shipping product.

Page 284

1    Do you see that there is
2  information for other entities had their
3  registrations pulled or suspended or there were
4  allegations against with regard to effective
5  controls against diversion on this sheet?
6    MS. VANNI:  Object to the
7  colloquy.
8    THE WITNESS:  Yes, that's what --
9  I mean, there are -- that's what this is
10  a list of violations, yes.
11  BY MR. BUCHANAN:
12    Q.    There's too many for us to read
13  and it's almost too challenging to put on the
14  screen but --
15    A.    Yes.
16    Q.    -- just for the jury's benefit,
17  there are other manufacturers, other
18  distributors, other pharmacies referenced,
19  correct?
20    MS. VANNI:  Object to form.
21    THE WITNESS:  Yes.
22  BY MR. BUCHANAN:
23    Q.    Okay.  And there are other areas
24  where it is listed that you are, in fact,

Page 285

1  shipping into that particular customer or
2  community.  Do you see the column "What are we
3  doing" on page 606.5 and 606.4?
4    A.    I do, yes.
5    Q.    And there are other customers
6  that you were, in fact, fulfilling orders for
7  that had their licenses suspended or other
8  consequences?
9    A.    Yes.
10    MS. VANNI:  Object to form.
11    THE WITNESS:  Keep in mind as
12  well that when -- when there is a -- a
13  letter of admonition or issued by DEA
14  for not conducting due diligence, for
15  example, that doesn't mean they're not
16  conducting due diligence on every
17  customer that they have.  That means the
18  DEA found an example of that.  If the
19  license is getting suspended, they've
20  probably found quite a few of them.
21  However, that license was also
22  reinstated, I believe, at a later date
23  by DEA.  So at some point DEA felt that
24  they did have controls and gave them

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    back their license, basically.
2    BY MR. BUCHANAN:
3         Q.    Right.  I mean, but the concern,
4    obviously, and you've talked about it in your
5    own writings, we've seen it from the DEA
6    presentation, we have it in your oral testimony
7    today is a closed system, right?
8         A.    Yes.
9              MS. VANNI:  Object to form.
10   BY MR. BUCHANAN:
11        Q.    So if we don't have a closed
12   system at a particular point in time, and I
13   think we looked at that spreadsheet where, I
14   mean, there were billions of pills being made
15   every year of controlled substances by
16   Qualitest, you'd agree?
17             MS. VANNI:  Object to form.
18             THE WITNESS:  Again, I can't
19        speak to those -- those numbers.
20   BY MR. BUCHANAN:
21        Q.    I'll represent to you that the
22   data that's been produced to us reflects that
23   there were billions of pills of controlled
24   substances for hydrocodone and oxycodone that

Page 287

1    were being shipped every year, okay, accepting
2    that representation, if a manufacturer -- if
3    anyone in this chain has their head in the sand
4    or isn't doing their job, then we don't have a
5    closed system?
6              MS. VANNI:  Object to form.
7              THE WITNESS:  Yes, however, a
8         violation from DEA --
9    BY MR. BUCHANAN:
10        Q.    That's my question.
11        A.    -- a letter of admonition does
12   not mean that somebody had their head in the
13   sand.  Again, people make mistakes.  Mistakes do
14   occur.
15        Q.    Okay, okay.  And so when mistakes
16   occur, okay, when there's negligence and --
17   withdrawn.
18             Let's go back to 606.14.
19             This document, again, just to
20   reorient the jury, because we've been hoping
21   around, at 606.1, this is the e-mail from
22   Mr. Shaffer to Mr. Brantley, people obviously in
23   your DEA compliance group, fair?
24        A.    Yes.

Page 288

1         Q.    Okay.  At 606.14 there's a
2    summary of the current SOMS process.
3              Do you see that?
4         A.    Yes, I do.
5         Q.    Okay.  And this would be the SOMS
6    process for Qualitest as of -- prior to the
7    revamping, right?
8         A.    Prior to the upgrades, yes.
9              MS. VANNI:  Object to form.
10   BY MR. BUCHANAN:
11        Q.    Okay.  So the current SOMS
12   process is that -- was really directed at the
13   retail pharmacies, right?
14             MS. VANNI:  Object to form.
15             THE WITNESS:  Yes.
16   BY MR. BUCHANAN:
17        Q.    Okay.  So prior to revamping,
18   SOMS procedures and monitoring of the orders was
19   not tied into the wholesale and distributor
20   customers, correct?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  No, I would
23        disagree with that from the aspect of
24        there was visibility -- in some cases

Page 289

1         visibility to the inventories at the
2         wholesale level, so I think that
3         there -- they were being monitored, just
4         not part of this process.
5    BY MR. BUCHANAN:
6         Q.    Well, without trying to
7    kind of look backwards and figure out how maybe
8    that could have been done, what was reflected on
9    this particular document, 606.14, as Qualitest's
10   current SOMS practices are these four bullet
11   points, correct?
12        A.    Yes.
13        Q.    Does the -- does this document
14   describe anything being done with wholesalers?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  This document does
17        not.
18   BY MR. BUCHANAN:
19        Q.    Okay.  Retail pharmacies, so one
20   of the items is retail pharmacies under the
21   current SOMS process are based on a product
22   threshold amount, correct?
23        A.    Correct.
24        Q.    "Retail pharmacy threshold

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    amounts can be changed by the sales department,"
2    right?
3        A.    Yes.
4        Q.    And the threshold amounts are set
5    by the sales department, right?
6        A.    Yes.
7        Q.    And then the system holds the
8    order until reviewed, right?
9        A.    Yes.
10       Q.    Okay.  And so this is the SOMS
11   process as memorialized by Qualitest as of this
12   point in time, correct?
13       A.    Correct.
14       Q.    Okay.  The next page sets forth
15   the issues with that process, right?
16       A.    The improvements that we'd like
17   to make.
18       Q.    Well, what's written here is and
19   before somebody was asked to testify about it --
20       A.    Wording.
21       Q.    Yes, issues with the current
22   process, right?
23           MS. VANNI:  Object to the
24   colloquy.

Page 291

1           THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3        Q.    Okay.  Issues with the process.
4    The current "system only addresses retail
5    pharmacy by looking at product thresholds."
6           Do you see that?
7        A.    I do.
8        Q.    "Other COTs are not evaluated for
9    SOMS."
10          Do you see that?
11       A.    Yes.
12       Q.    Other classes of trade, that's
13   what COTs means right?
14       A.    Yes, it is.
15       Q.    And you broke down for us earlier
16   what classes of trades are, right?
17       A.    Yes.
18       Q.    Classes of trades could be
19   distributors and wholesalers, right?
20       A.    Yes.
21       Q.    Hospitals, right?
22       A.    Yes.
23       Q.    What were the other big ones?
24       A.    Clinics, long-term care.

Page 292

1        Q.    Okay.  And so as of this point in
2    time, as of September 2013, this is some five
3    months after your meeting with the DEA, these
4    other classes of trades were not evaluated for
5    SOMS, correct?
6        A.    Correct, not through the SOMS
7    program.  Through the threshold program.
8        Q.    We can agree that the people in
9    the DEA compliance group who are at this point
10   in time trying to respond to criticisms and
11   concerns concerning the SOMS program are
12   identifying issues with the process, right?
13          MS. VANNI:  Object to form.
14          THE WITNESS:  We're saying what's
15   wrong with the current process in order
16   to get improvements made.
17   BY MR. BUCHANAN:
18       Q.    Okay.  Well, I mean, it wasn't
19   false when they wrote it, was it?  They wouldn't
20   be lying to their boss about it, right?
21          MS. VANNI:  Object to form.
22          THE WITNESS:  No.
23   BY MR. BUCHANAN:
24       Q.    Okay.  So we can agree that these

Page 293

1    were, in fact, issues with the then current
2    process prior to the revamping of the system in
3    2013, right?
4        A.    They were gaps that we internally
5    wanted to improve upon.
6        Q.    Right, I mean, look, especially
7    if you're selling 33 billion pills of
8    hydrocodone, it's a pretty big gap not to be
9    looking at wholesalers and distributors for
10   SOMS, right?
11          MS. VANNI:  Objection.
12          THE WITNESS:  Really the
13   wholesalers and distributors are not --
14   they weren't the problem.  The retail
15   pharmacies were the problem.
16   BY MR. BUCHANAN:
17       Q.    Right, but --
18       A.    So we were glad that we were
19   looking at retail pharmacies versus wholesalers.
20       Q.    Well, you knew from the DEA back
21   all the way for years -- when you were at
22   Watson, you were looking at wholesalers?
23       A.    They look at wholesalers on the
24   sale side separate from SOMS.  If they weren't

74  (Pages 290 to 293)

Page 294

```
 1   looking at the quantities they were sending to
 2   wholesalers, they would be sending all their
 3   product to one wholesaler and that could cause
 4   problems.  It's more from an order management
 5   system, that's why it's not detailed in SOMS.
 6        Q.   Well, we know from this that an
 7   issue before somebody who was asked to testify
 8   about it with the current process was that other
 9   classes of trades were not being evaluated for
10   SOMS, right?
11        MS. VANNI:  Objection.
12        THE WITNESS:  Other classes of
13        trades were not part of the SOMS
14        program.
15   BY MR. BUCHANAN:
16        Q.   What this writes --
17        A.   They were part of OMS, which is
18   not what this document is talking about.
19        Q.   The way this is written, ma'am,
20   is other classes of trades are not evaluated for
21   SOMS.  That's the way it's written, correct?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  That is the way
24        it's written.
```

Page 296

```
 1        A.   Yes.
 2        Q.   Okay.  And so compliance can be
 3   bad for dollars or compliance can be bad for
 4   sales, right?
 5        MS. VANNI:  Object to form.
 6        THE WITNESS:  I'm sorry?  What
 7        did you say?
 8   BY MR. BUCHANAN:
 9        Q.   Compliance can be bad for dollars
10   and it can be bad for sales, right?
11        MS. VANNI:  Objection.
12        THE WITNESS:  There is a cost to
13        compliance, yes.
14   BY MR. BUCHANAN:
15        Q.   Further issue with the current
16   process is that once a customer hit their
17   threshold, they could just call up or send an
18   e-mail and request a threshold increase, right?
19        A.   Yes.
20        Q.   Hey, I know we hit our cap last
21   month, we need more, right?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  Not without
24        justifiable reason.
```

Page 295

```
 1   BY MR. BUCHANAN:
 2        Q.   What are SOMS, suspicious order
 3   monitoring?
 4        A.   That's what the system is, yes.
 5        Q.   "Retail pharmacy review and
 6   approval is handled by the sales department,"
 7   right?
 8        A.   Yes.
 9        Q.   And you knew from the DEA that's
10   not good, right?
11        MS. VANNI:  Object to form.
12        THE WITNESS:  Yes, that's not
13        what DEA wanted to see, not required by
14        the regulation, but not what they wanted
15        to see.
16   BY MR. BUCHANAN:
17        Q.   Well, and the DEA viewed this as
18   a conflict of interest and considered the sales
19   department as the department that is driven by
20   what?
21        A.   Driven by dollars.
22        Q.   Driven by sales?
23        A.   Mm-hmm.
24        Q.   Right?
```

Page 297

```
 1   BY MR. BUCHANAN:
 2        Q.   Right, the sales department was
 3   handling the threshold increases, right?
 4        A.   Yes.
 5        Q.   That was one of the issues with
 6   the current process as framed out in this
 7   October 2013 presentation, right?
 8        A.   And, again, our sales department,
 9   we had people who had good integrity, and it
10   wasn't an issue that it was part of the sales
11   department, with the exception of the
12   perception.
13        Q.   And that's something that you
14   hope but cannot know, ma'am?
15        MS. VANNI:  Object to form.
16        THE WITNESS:  It's something that
17        I did know based on the calls that were
18        made to me and the questions that were
19        asked.
20   BY MR. BUCHANAN:
21        Q.   Okay.  We know that you did not
22   visit or your sales team didn't visit every
23   customer, right?
24        A.   Don't know that.  I wasn't there.
```

Highly Confidential – Subject to Further Confidentiality Review

Page 298

1    Q.    We know after some visits started
2  to occur that you did find some of those
3  pharmacies like the pictures we looked at,
4  right?
5        MS. VANNI:  Object to form.
6        THE WITNESS:  Don't know about
7    that, but...
8  BY MR. BUCHANAN:
9    Q.    ███████████████████████
   ██████████████████████████
   █████████████████████
13   Q.    Pharmacies that you had to cut
14 off?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  Pharmacies -- there
17   were customers that we reported to DEA,
18   I'm sure.
19 BY MR. BUCHANAN:
20   Q.    There were customers after you
21 implemented a revised SOMS program that you had
22 to cut off, right?
23   A.    I believe so.
24   Q.    Are you aware of any customer

Page 299

1  that you cut off in the two years prior to
2  implementing the new SOMS program?
3    A.    None that I can name, but I know
4  that there were some then as well.
5    Q.    Sitting here today, can you name
6  one?
7    A.    I cannot.
8    Q.    It states that there was "no
9  separate/unbiased check of order quantity
10 outside of the sales and marketing departments."
11       Do you see that?
12   A.    Yes.
13   Q.    There was no unbiased check of
14 the orders outside of the sales and marketing
15 group, that was an issue with the current
16 process as of October 2014, correct, ma'am --
17 2013, correct?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  I'm not quite sure
20   what that bullet means actually at this
21   point, but that's what it says, yes.
22 BY MR. BUCHANAN:
23   Q.    "No check for order frequency and
24 pattern discrepancies."

Page 300

1        Do you see that, ma'am?
2    A.    Yes.
3    Q.    And that was an issue with the
4  current process as of October 2013?
5    A.    The system didn't stop an order
6  because of an out of frequency or out of
7  pattern.  However, part of looking at a
8  threshold quantity is to look at the history of
9  the account, which would give you the order
10 frequency and pattern.  So it wasn't picked up
11 by the system automatically, but it was
12 reviewed.
13   Q.    Well, as of this point in time,
14 we know you weren't reviewing other classes of
15 trade, right?
16   A.    We were not as part of SOMS.
17   Q.    We know, at least what's written
18 here, ma'am, is that there was "no check for
19 order frequency and pattern discrepancies,"
20 correct?
21   A.    Not by the initial electronic
22 system.
23   Q.    Not by the system that could be
24 reviewing the thousands and thousands of orders

Page 301

1  or line items that a company is getting, right?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  No, the system
4    would have been reviewing those line
5    items, but it would have been stopping
6    the orders based on quantity, and then
7    after quantity, after the orders stopped
8    based on quantity, it would have been
9    reviewed for pattern and frequency.
10 BY MR. BUCHANAN:
11   Q.    Okay.  Well, we know as of this
12 point in time, certainly what's stated here is
13 there was no check for order frequency and
14 pattern discrepancy, that's what was written by
15 your colleagues in the DEA compliance group,
16 correct?
17   A.    By the electronic system.
18   Q.    That does not say that; can we
19 agree on that?
20       MS. VANNI:  Object to form.
21       THE WITNESS:  That's how you're
22   interpreting it, so...
23 BY MR. BUCHANAN:
24   Q.    Well, I'm asking can we agree it

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    doesn't say what you just said?
2        A.    It does not say.
3        Q.    Thank you.  It says the "system
4    does not allow for" what?
5        A.    "Know Your Customer."
6        Q.    Okay.  And so the "Requirements
7    for Improvement" are listed on the next page,
8    right?
9            Do you see that?
10       A.    Yes.
11       Q.    These are things you have to do,
12   right?
13           MS. VANNI:  Object to form.
14           THE WITNESS:  Things we wanted to
15   do.
16   BY MR. BUCHANAN:
17       Q.    It says requirements, right?
18       A.    Things we want to do.  It's a
19   play on words but...
20       Q.    Well, okay.  What's written here
21   while you're -- before somebody was sitting in
22   this seat to reinterpret the words was
23   "Requirements for Improvement," agreed?
24           MS. VANNI:  Object to form.

Page 303

1            THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3        Q.    Thank you.
4            The first bullet as a requirement
5    is a system to look at all class of trades and
6    customers.
7            Do you see that?
8        A.    Yes.
9        Q.    And the classes of trades and
10   customers are wholesalers, distributors,
11   manufacturers, et cetera, right?
12       A.    Yes.
13       Q.    Not just look at pharmacies or
14   retail pharmacies, right?
15       A.    To include these other customers
16   as part of SOMS, yes.
17       Q.    A system to look at all classes
18   of trades and customers.
19           Do you see that?
20       A.    I do.
21       Q.    Okay.  A system to look at all
22   controlled substances.
23           Do you see that?
24       A.    Yes, and listed chemicals, which

Page 304

1    is above the regulation.
2        Q.    Okay.  Something a responsible
3    company should do, right?
4            MS. VANNI:  Object to form.
5            THE WITNESS:  Possibly, yes.
6    BY MR. BUCHANAN:
7        Q.    I mean, you list it as a
8    requirement, right?
9        A.    Right, another example of
10   something that's not a requirement but that's
11   listed, yes.
12       Q.    Okay.  I guess if you're going to
13   make a promise to maintain effective controls of
14   diversion, you should do whatever you can do to
15   make sure these things don't leave the channel
16   of trade, right?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Yes.
19   BY MR. BUCHANAN:
20       Q.    And stay in the closed system,
21   yes?
22           MS. VANNI:  Object to form.
23           THE WITNESS:  Yes.
24   BY MR. BUCHANAN:

Page 305

1        Q.    Thank you.
2            It says, and there's a number of
3    items here, but I'm getting notes that I need to
4    move more quickly.  Let's head down to the third
5    bullet from the bottom.
6            You see that, requirement for
7    improvement, "Access to chargeback data and 3rd
8    party data i.e. IMS."
9            Do you see that?
10       A.    Yes, I do.
11       Q.    Okay.  So one of the requirements
12   for improvement was implementing chargeback data
13   as part of your process, right?
14       A.    One of the things we wanted to
15   do, yes.
16       Q.    Okay.  And you say "wanted," this
17   says requirements, right?
18           MS. VANNI:  Object to form.
19           THE WITNESS:  The document says
20   requirements.  That's not what this is,
21   but yes.
22   BY MR. BUCHANAN:
23       Q.    Okay.  And then -- well, you were
24   also told by the DEA in your meeting, you got to

77 (Pages 302 to 305)

Highly Confidential – Subject to Further Confidentiality Review

Page 306

1  start looking at chargeback data, right?
2          MS. VANNI:  Object to form.
3          THE WITNESS:  It's not a
4      regulation.
5  BY MR. BUCHANAN:
6      Q.    Well, didn't they tell you you
7  need to do that?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  They said you
10      should look at it.  There's a difference
11      between should and must.
12  BY MR. BUCHANAN:
13      Q.    Okay.  And you'd agree, ma'am, as
14  a company that has been given a permission slip
15  by the U.S. government to stamp apparently
16  billions of pills every year, that you've got to
17  act consistent with the terms of that permission
18  slip, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  Yes, with the
21      regulations.
22  BY MR. BUCHANAN:
23      Q.    And the law, the statute, right?
24      A.    Yes.

Page 307

1      Q.    Which says you must maintain
2  effective controls against diversion, right?
3      A.    Yes.
4      Q.    Okay.  And so one of the tools of
5  information -- one of the classes of information
6  available to manufacturers for many of its
7  customers is chargeback data, right?
8      A.    That's what DEA believes, yes.
9      Q.    Another category of information
10  that's available to manufacturers is IMS data,
11  right?
12      A.    Yes.
13      Q.    And using IMS data, you can see
14  in percentage terms quantities that end user
15  pharmacies might be acquiring, whether they're
16  consistent with national averages, whether
17  they're above national averages or whether
18  they're below, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  Yes.
21  BY MR. BUCHANAN:
22      Q.    And that can raise red flags as
23  to whether a pharmacy, for example, is above
24  what you know the national average to be for

Page 308

1  particular product lines, right?
2          MS. VANNI:  Object to form.
3          THE WITNESS:  It's one piece of a
4      -- of an investigation, yes.
5  BY MR. BUCHANAN:
6      Q.    Okay.  We see in this next page
7  -- I'm sorry -- 1000 -- 606.18.
8          We saw a memo from Mr. Rannazzisi
9  or to Mr. Rannazzisi relating to your DEA
10  interaction in March of 2013.
11          Do you remember that?  Ma'am, I'm
12  probably confusing you by showing you the page
13  first.
14          Do you remember we were just
15  looking at a memo to Mr. Rannazzisi from the DEA
16  officer who was at the meeting you were in in
17  March of 2013?
18      A.    Yes.
19      Q.    Okay.  In this presentation, it
20  says "DEA's Attempted Elucidation of SOMS
21  Requirement."
22          Do you see that?
23      A.    Yes.
24      Q.    And this is a 2007 letter from

Page 309

1  the DEA to you, correct?
2      A.    Yes.
3      Q.    And you were aware of this
4  document, correct?
5          MS. VANNI:  Object -- just --
6      when you say "you," that's vague and
7      ambiguous, and she wasn't at the company
8      at the time in 2007.
9  BY MR. BUCHANAN:
10      Q.    Well, I mean, this is a
11  PowerPoint from -- this is a PowerPoint from
12  2013, correct, ma'am?
13      A.    Yeah, but this is just including,
14  I think, the general letter that DEA sent out to
15  registrants.  I have to read it to see.
16      Q.    Oh, okay.  Let me but -- do you
17  recall that the DEA sent out a letter to
18  registrants in 2007?
19      A.    Yes.
20      Q.    You were working at a registrant
21  at that point in time?
22      A.    Yes.
23      Q.    You got a copy of it while you
24  were at that company, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    A.    Every entity, so, yes, that's
2    what this is.
3        Q.    Okay.  So this is a letter from
4    DEA to the company in 2007 saying you've got
5    obligations, you've got to maintain effective
6    controls against diversion, you've got to have
7    suspicious order monitoring systems, a routine
8    threshold is not enough, you've got to do more,
9    right?
10       MS. VANNI:  Object to form.
11       THE WITNESS:  Yes.
12   BY MR. BUCHANAN:
13       Q.    Okay.  And I just was -- I just
14   wanted to confirm that, you know, you were
15   certainly aware of that letter as of 2013, but
16   it sounds like you were aware of the equivalent
17   letter from your prior work with other
18   manufacturers, correct?
19       A.    Yes, yes, I was, mm-hmm.
20       Q.    Okay.  So you know the DEA had
21   spoken about this certainly prior to 2013?
22       A.    Yes.
23       Q.    And you had obviously had that
24   sit-down you had with Watson and Anda prior to

Page 311

1    that, right?
2        A.    Yes.
3        Q.    Okay.  So this is a letter that's
4    being called out to the attention of -- in the
5    PowerPoint from 2007 from Mr. Rannazzisi.
6            Then you also identify examples
7    of repercussions.
8            Do you see that?
9        A.    Yes.
10       Q.    And this is again -- was this
11   part of trying to get that kind of management
12   buy-in to -- whether it was increase head count
13   or increase budget to improve the SOM system?
14       MS. VANNI:  Object to form.
15       THE WITNESS:  And education, yes.
16       MS. VANNI:  Counsel, when you get
17   a normal stopping break, can we just
18   have a break, use the ladies room.
19       MR. BUCHANAN:  That's fine.  I
20   may be just about done with this
21   document.
22       MS. VANNI:  That's fine.
23       MR. BUCHANAN:  It's good.  We can
24   go off the record.

Page 312

1            THE VIDEOGRAPHER:  Going off the
2    record.  The time now is 2:02 p.m.
3            (Brief recess.)
4            (Document marked for
5    identification as Par-Norton Deposition
6    Exhibit No. 13.)
7            THE VIDEOGRAPHER:  We're now
8    going back on the record.  The time is
9    2:24 p.m.
10   BY MR. BUCHANAN:
11       Q.    Ma'am, I'm passing you over
12   another exhibit in this 2013 period.  This one
13   is from March of 2013.  Looks like it's a
14   PowerPoint that you put together for a meeting
15   you were going to have?
16       A.    Mm-hmm.
17       Q.    You see March 13, 2013, it's
18   E581, and we've marked it as Exhibit 13 to your
19   deposition.
20       A.    Okay.
21       Q.    You forward it to a distribution
22   list Ms. Hudson, Ms. Bigelow -- I'm sorry --
23   Mr. Bigelow, Mr. Propst, Sanjay Patel, Margaret
24   Richardson, Mike Reiney and Jill Connell, cc'd

Page 313

1    Sue Dear and Patricia Simmet.
2            You see that?
3        A.    Yes.
4        Q.    Slide deck for this morning's
5    meeting, right?
6        A.    Mm-hmm.
7        Q.    Is this your group and people
8    that are in management either aligned with your
9    group or they could be affected by what you're
10   being -- what you're proposing?
11       A.    It's not my group, it's the
12   management team.
13       Q.    I see.  This was --
14       A.    Some of the management team.
15       Q.    So this is some folks from your
16   group and some folks from the management team?
17       A.    Yes.
18       Q.    Or just the management team?
19       A.    When you say "my group," my boss
20   and boss's boss, yes.
21       Q.    Okay.  But not those who worked
22   for you?
23       A.    Correct.
24       Q.    Understood.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1        So this is kind of a high level
2   deck, right?
3        MS. VANNI:  Object to form.
4        THE WITNESS:  Yes.
5   BY MR. BUCHANAN:
6        Q.   High level meeting?
7        A.   Mm-hmm.
8        Q.   That's yes?
9        A.   Yes.
10       MS. VANNI:  I'll objection to
11  form.
12  BY MR. BUCHANAN:
13       Q.   So after you get back from the
14  DEA in March of 2013, we saw your e-mail where
15  you did some quick thoughts, we've seen the
16  DEA's kind of summary of that meeting and
17  Ms. Hudson's summary of that meeting.
18       You recall us discussing that
19  today?
20       A.   Yes.
21       Q.   Okay.  And this is your
22  PowerPoint that you put together for the
23  management team, right?
24       A.   Yes.

Page 315

1        Q.   Okay.  And DEA SOMS action plan,
2   right?
3        A.   Mm-hmm.
4        Q.   March 13, 2013?
5        A.   Yes.
6        Q.   And this was something you put
7   together?
8        A.   Yes, Sanjay had some input into
9   it as well, my boss.
10       Q.   Your boss did, okay.
11       Was your boss at the meeting?
12       A.   At the DEA meeting, I think he --
13  he was not, but I think he was supposed to be
14  originally.  I think he was missed because of
15  the snow.
16       Q.   Okay.  And on this slide it says
17  "Core Elements of DEA Compliance Team," and then
18  there's this kind of chart in the middle, kind
19  of a working framework for your presentation,
20  "Critical Elements of DEA Compliance."
21       Do you see that?
22       A.   Yes.
23       Q.   And one of the critical elements
24  of DEA compliance is "Data Integrity &

Page 316

1   Reporting," right?
2        A.   Correct.
3        Q.   Another is "Manufacturing Site
4   Compliance," right?
5        A.   Yes.
6        Q.   This is vaults and fences and
7   monitors and making sure two people are watching
8   at all times, that type of stuff?
9        MS. VANNI:  Object to form.
10       THE WITNESS:  Yes.
11  BY MR. BUCHANAN:
12       Q.   There's this "Quota Grant
13  Process" on the left, top left, do you see that?
14       That's a component of DEA
15  compliance, right?
16       A.   Yes, it is.
17       Q.   Okay.  Making sure that you're
18  only asking what you need for legitimate medical
19  purposes, right?
20       MS. VANNI:  Object to form.
21       THE WITNESS:  Correct.
22  BY MR. BUCHANAN:
23       Q.   And because, frankly, your quotas
24  are supposed to be based on what's needed for

Page 317

1   legitimate medical use, right?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  Yes.
4   BY MR. BUCHANAN:
5        Q.   Okay.  And then there's this
6   component off to the right, as a critical
7   element of DEA compliance "Suspicious Order
8   Monitoring," correct?
9        A.   Correct.
10       Q.   So --
11       A.   Excuse me.  May I just go back to
12  the quota process?
13       Q.   If I could move forward, I am
14  time limited.  If it's important enough, feel
15  free to discuss with your counsel, and she'll
16  call it out on direct.
17       A.   Okay.
18       Q.   Suspicious order monitoring and
19  we've spent some time talking about that today,
20  right?
21       A.   Yes.
22       Q.   And what it says here is a
23  critical element of DEA compliance is to
24  "Implement a solution that proactively discloses

Highly Confidential – Subject to Further Confidentiality Review

Page 318

1    suspicious orders based on unusual size, order
2    pattern, deviation and unusual frequency,"
3    correct?
4         A.    That's what it says, yes.
5         Q.    And then the DEA SOMS feedback
6    you got on the next page, 581.6, was that "You
7    need to differentiate between the sales team
8    role and the DEA compliance role", right?
9         A.    Yes, that's what it says.
10        Q.    "You need to visit your
11   customers," right, and then this is an
12   exclamation point, right?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  That's what it
15   says, yes.
16   BY MR. BUCHANAN:
17        Q.    You got to put boots on the
18   ground from compliance with customers, right?
19        MS. VANNI:  Object to form.
20        THE WITNESS:  Yes, that's what
21   DEA would like to see.
22   BY MR. BUCHANAN:
23        Q.    I'm assuming you put an
24   exclamation point in there for emphasis, right?

Page 319

1         A.    Yes.
2         Q.    Okay.  We have a problem, I guess
3    "we" there is the DEA -- are you using we to
4    refer to the DEA?
5         A.    We to refer to our company.
6         Q.    Well, it says, we have a problem
7    with companies using their sales team to conduct
8    these site visits.
9         A.    Oh, I'm sorry, it is DEA.
10        Q.    In that instance, you were using
11   the term we to refer to the DEA?
12        A.    Yes.
13        Q.    Right, and you understood the DEA
14   had a problem with companies using sales teams
15   to conduct the site visits, right?
16        MS. VANNI:  Object to form.
17        THE WITNESS:  They had a concern,
18   yes.
19   BY MR. BUCHANAN:
20        Q.    Then it says you need to use the
21   chargeback data to understand what your
22   customers' customers are doing.
23        Did I read that correctly?
24        A.    Yes.

Page 320

1         Q.    And that was one of your
2    takeaways from this meeting with the DEA, right?
3         MS. VANNI:  Object to form.
4         THE WITNESS:  Yes, it was one of
5    their feedback points.
6    BY MR. BUCHANAN:
7         Q.    And the reference to you there,
8    as you're kind of rephrasing and recasting what
9    happened at the DEA meeting, was Qualitest,
10   Qualitest needs to use the chargeback data to
11   understand what Qualitest customers' customers
12   are doing, right?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  Yes, that was a
15   suggestion by DEA.
16   BY MR. BUCHANAN:
17        Q.    And the way you framed it is you
18   need to, right?
19        A.    I'm just documenting what DEA
20   told us during the meeting.
21        Q.    Right.
22        And in terms of further
23   documenting what the DEA told you, the DEA told
24   you you must know the customers you are selling

Page 321

1    to, right?
2         A.    Yes.
3         Q.    "You need to track your product
4    from the time it is manufactured to when it is
5    sold to the patient."
6         Did I read that correctly?
7         A.    To the best of your ability.
8    Yes, you did read it correctly.
9         Q.    The way you wrote it was, and you
10   didn't put to the best of your ability, but the
11   way you wrote it was you need to track your
12   product from the time it is manufactured to when
13   it is sold to the patient, correct?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  Yes, that's how
16   it's written.
17   BY MR. BUCHANAN:
18        Q.    "Need to have the best possible
19   systems to know what is happening with your
20   product," right?
21        A.    That's what it says, yes.
22        Q.    That's what you wrote.
23        And this was your DEA feedback
24   that you were recounting to senior management at

81  (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    Qualitest, correct?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  Correct.
4    BY MR. BUCHANAN:
5        Q.    You "need to have a good SOM
6    program that is adequate for the business you
7    are in," right?
8        A.    Yes, that's what it says.
9        Q.    Okay.  Then says "look at the
10   charts provided," and I guess you're saying that
11   was what the DEA told you, look at the charts
12   provided, right?
13       A.    Yes.
14       Q.    Remember we looked at those
15   graphs that had vintage and Generic Bidco, I
16   think was the other one?
17       A.    Yes, we did.
18       Q.    Okay.  Those were the charts you
19   got from the DEA?
20       A.    Yes.
21       Q.    All right.  And so you're saying
22   the DEA told you to look at the charts provided
23   and we will visit your site and we will want to
24   see improvements in when?

Page 323

1        A.    In six months.
2        Q.    Right.  In six months.
3            So we've been looking at some
4    dialogue that was happening in October,
5    September of 2013.
6            You recall that?
7        A.    Yes.
8        Q.    You brought Mr. Brantley in in
9    September of 2013, roughly about six months
10   after this, right?
11       A.    Yes.
12       Q.    You sent your dear customer
13   letter out in mid-October of 2013, right?
14       A.    Yes.
15       Q.    And you sat down with the DEA
16   again couple weeks after your dear customer
17   letter went out, right?
18           MS. VANNI:  Object to form.
19           THE WITNESS:  Yes, I believe so.
20   BY MR. BUCHANAN:
21       Q.    Okay.  "We will not look the
22   other way if someone screws up.  Possible
23   actions include suspension or revocation of
24   license, civil and criminal ramifications,"

Page 324

1    right?
2        A.    Yes, that's what it says.
3        Q.    That's what you wrote?
4        A.    Yes.  It's all things that DEA
5    commented on or suggested during their meeting.
6        Q.    Right.  I mean, all things that
7    you thought were important enough to relay to
8    senior management, correct?
9            MS. VANNI:  Object to form.
10           THE WITNESS:  Yes.
11   BY MR. BUCHANAN:
12       Q.    Okay.  Further, that "You need to
13   visit your customer's customers and document
14   your findings," right?
15       A.    Yes.
16       Q.    That's what it says?
17       A.    That's what it says.
18       Q.    Not just your customers, right?
19       A.    It says "your customer's
20   customers."
21       Q.    Right.  So you need to visit not
22   just your customers but your customers'
23   customers, right?
24           MS. VANNI:  Object to form.

Page 325

1            THE WITNESS:  Yes.
2    BY MR. BUCHANAN:
3        Q.    And document your findings; is
4    that right?
5        A.    Yes, which would not be
6    permitted.
7        Q.    And you -- I'm sorry?
8        A.    Which would not be permitted.
9    You can't visit your customers' customers.
10   They're not your customer.
11       Q.    You can go to any pharmacy you
12   want and walk into, right?
13       A.    Not to do a SOM visit, not to ask
14   questions about their business and their
15   program.  That's your customer's job to ask
16   questions about their customer.  So you can't
17   skip a line -- a link in the supply chain and go
18   to that next level --
19       Q.    Well, we can agree you didn't
20   tell the DEA that in March 2013, did you, ma'am?
21           MS. VANNI:  Object to form.
22           THE WITNESS:  We didn't get into
23   that level of detail in the
24   conversation.

82  (Pages 322 to 325)

Highly Confidential – Subject to Further Confidentiality Review

Page 326

1  BY MR. BUCHANAN:
2      Q.   Right, and what the --
3      A.   We were more listening.
4      Q.   What the DEA told you was you
5  need to visit your customers' customers and
6  document your findings, right?
7      A.   That's what the document says,
8  yes.
9      Q.   And "you must provide documented
10 evidence of these assessments," right?
11     A.   Yes, and, again, none of this is
12 in the regulations.
13     Q.   Ma'am, just stay with my
14 questions, okay.
15     A.   Yes.
16     Q.   We could agree this is what you
17 were told to do, correct?
18         MS. VANNI:  Object to the form.
19         THE WITNESS:  This is -- these
20     are the suggestions we received, the
21     feedback we received at that meeting.
22 BY MR. BUCHANAN:
23     Q.   Well, you're saying suggestions.
24 It says you need to, right?

Page 327

1      A.   If we needed to, there would have
2  been a violation coming as a result of not
3  having it.
4      Q.   Well, let's not recast.  How did
5  you write it?
6          MS. VANNI:  Object to the
7      colloquy.
8          THE WITNESS:  It's written as the
9      feedback that we received from the DEA.
10 BY MR. BUCHANAN:
11     Q.   Let's stay on this bullet, ma'am.
12 What did you write, "you need to"?
13     A.   "You need to visit your
14 customer's customers and document your
15 findings."
16     Q.   Next sentence.
17     A.   You must.
18     Q.   You must, must, right?
19     A.   Yes.
20     Q.   Okay.  Next "you cannot sell the
21 products until you have satisfactorily closed
22 out the investigation," right?
23     A.   Yes.
24     Q.   That was the information you

Page 328

1  received, right, "you cannot sell," correct?
2          MS. VANNI:  Object to the form.
3          THE WITNESS:  That was the
4      feedback we received, yes.
5  BY MR. BUCHANAN:
6      Q.   You must alert us of suspicious
7  orders, right?
8      A.   Yes.
9      Q.   And if you don't adhere to your
10 responsibilities, and, again, everything that
11 we've just identified was information you
12 received from DEA at that meeting, right?
13     A.   Yes.
14     Q.   And here you say, "If you fail to
15 adhere to your responsibilities," you understood
16 these to be your responsibilities, right?
17         MS. VANNI:  Object to the form.
18         THE WITNESS:  It's your
19     responsibility to comply to the
20     regulation.
21 BY MR. BUCHANAN:
22     Q.   What you wrote here is, "If you
23 fail to adhere to your responsibilities," and we
24 could agree that above that is one, two, three,

Page 329

1  four, five, six, seven, eight, nine items, and
2  the jury will have the document, but there's
3  nine items where you identified you need to, we
4  must, you need to, you must know, you need to
5  have the best possible, you need to have a good
6  SOM program, we will visit your site to confirm
7  improvements, we will not look the other way,
8  you need to visit, need, need, need,
9  requirements, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  These are all
12     things that DEA suggested during the
13     meeting.
14 BY MR. BUCHANAN:
15     Q.   "If you fail to adhere to your
16 responsibilities, you present" what, ma'am?
17     A.   "A danger to the public," that
18 was words from DEA.
19     Q.   Okay.  Closed system, right?
20     A.   Yes.
21     Q.   Your obligation to maintain a
22 closed system, right?
23         MS. VANNI:  Object to form.
24         THE WITNESS:  To abide by the

Highly Confidential — Subject to Further Confidentiality Review

Page 330

1    regulations and maintain.
2    BY MR. BUCHANAN:
3        Q.    To maintain a closed system?
4        A.    Yes, and we did.
5        Q.    Move to strike, ma'am.  Stay with
6    my question.
7            Your obligation, I'm not asking
8    what happened.  Somebody else will decide
9    whether it complied or didn't comply.
10       A.    Yes.
11       Q.    Your obligation is to maintain
12   that closed system, correct?
13           MS. VANNI:  Object to form.
14           THE WITNESS:  Yes.
15   BY MR. BUCHANAN:
16       Q.    Your obligation in maintaining
17   that closed system is to sell to people who,
18   based on your due diligence and investigation,
19   will likewise maintain that closed system,
20   right?
21       A.    Yes.
22       Q.    And to conduct due diligence to
23   assure that their customers have processes in
24   place to maintain the closed system, correct?

Page 331

1            MS. VANNI:  Object to form.
2            THE WITNESS:  The suggestion is
3    to know your customer.  The suggestion
4    is not to know your customer's customer.
5    BY MR. BUCHANAN:
6        Q.    It's not a suggestion, ma'am.
7            What you took away from that
8    meeting is you must know the customers you're
9    selling to first, right?
10       A.    Mm-hmm, yes.
11       Q.    And we looked at your document
12   earlier today where you recounted it as you must
13   also know your customers' customers, correct?
14       A.    Yes, to the best of your ability
15   when you can.
16       Q.    The best of your ability, right?
17       A.    Yes.
18       Q.    What every reasonable
19   manufacturer should do, right?
20           MS. VANNI:  Objection to form.
21           THE WITNESS:  If the information
22   is available to you.
23   BY MR. BUCHANAN:
24       Q.    Right.  And, certainly, if

Page 332

1    information can't be discerned, if you can't go
2    and visit a facility, if you can't look at
3    chargeback data, I mean, all you can do is your
4    best, right?
5        A.    Correct.
6        Q.    But you've got to try to do your
7    best, right?
8            MS. VANNI:  Object to form.
9            THE WITNESS:  Yes.
10   BY MR. BUCHANAN:
11       Q.    Okay.  "People are dying; kids
12   are born addicted."
13           You see that?
14       A.    Yes.
15       Q.    That was a true statement
16   certainly as of 2013, right?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Yes.
19   BY MR. BUCHANAN:
20       Q.    "These people would not have the
21   drugs if it weren't for the manufacturers and
22   distributors."
23           Do you see that?
24       A.    That's what DEA said.

Page 333

1        Q.    Okay.  And something that you
2    thought worthy of --
3        A.    Disagree.
4        Q.    You disagree?
5        A.    I disagree, yes.
6        Q.    Well, I mean, you'd agree that
7    you made 33 billion pills of Vicodin, right?
8        A.    I would --
9            MS. VANNI:  Object to form.
10           THE WITNESS:  -- agree if I knew
11   where those numbers came from.
12   BY MR. BUCHANAN:
13       Q.    Well, you know, all I can do is
14   work with what your former employer gives me,
15   and that's what they've told us it is.
16           MS. VANNI:  Object to colloquy.
17           MR. BUCHANAN:  Let's move forward
18   to exhibit internal number 588.  You can
19   set that one aside, ma'am.
20           (Document marked for
21   identification as Par-Norton Deposition
22   Exhibit No. 14.)
23   BY MR. BUCHANAN:
24       Q.    Passing you next in order is

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  Exhibit Number 14. There you go. Copy for
2  counsel, please.
3           Next in order, ma'am, is a SOMS
4  update. Do you see you scheduling a conference
5  call to update folks?
6       A.    Yes.
7       Q.    We don't have the --
8       A.    Not sure who, yeah.
9       Q.    I was just going to say, we don't
10  know who the invitees are. This is just the way
11  we get them. They're already printed out and
12  stamped when we get them, for the most part.
13  Some of these come to us natively, but you will
14  see that on the next page.
15           This is from November of 2013.
16           MR. BUCHANAN: What did we call
17  this, 14? Exhibit 14. Can we put it up
18  on the screen? Bradley, let's go to the
19  third -- fourth page.
20  BY MR. BUCHANAN:
21       Q.    "SOMS Program Update, November 7,
22  2013." This is a presentation you pulled
23  together for a teleconference or a meeting?
24       A.    Yes, looks that way.

Page 335

1       Q.    Okay. And you broke down what
2  was happening with regard to the SOMS program
3  into multiple phases, right?
4       A.    Yes.
5       Q.    You had steps that you were going
6  to implement as you tried to revamp things,
7  right?
8           MS. VANNI: Object to form.
9           THE WITNESS: Yes.
10  BY MR. BUCHANAN:
11       Q.    Okay. Phase I, your first step
12  was to implement a basic SOMS program, right?
13       A.    No. The first step was to
14  implement the basic SOMS program with
15  statistical algorithm, that's the rest of the
16  sentence there.
17       Q.    Well, actually, it's not. If you
18  want to read the full sentence, I'm happy to.
19  It's "Implementation of a basic
20  SOMS program for all customers," right?
21       A.    All controlled substances and
22  pseudoephedrine products based on statistical
23  algorithm.
24       Q.    Right.

Page 336

1           And so we know, ma'am, that you
2  had received a letter by 2007 -- and I guess you
3  weren't at Qualitest then, but you were at
4  Watson or Anda, where manufacturers and
5  distributors received a letter concerning
6  maintenance of effective controls against
7  diversion.
8           Do you recall that?
9       A.    Yes.
10           MS. KOSKI: Object to form.
11           MS. LEIBELL: Object to form.
12  BY MR. BUCHANAN:
13       Q.    And the obligation -- the
14  obligation that manufacturers and distributors
15  had to maintain effective controls against
16  diversion, right?
17       A.    Yes.
18       Q.    Okay. And what this is saying as
19  of the fall of 2013 is that Phase I of this
20  revamp is to implement a basic SOMS program for
21  all of your customers, right; that's one part,
22  correct?
23           MS. VANNI: Object to form.
24           THE WITNESS: That's what it

Page 337

1  says.
2  BY MR. BUCHANAN:
3       Q.    For all controlled substances,
4  correct?
5       A.    That's what it says, yes.
6       Q.    With a statistical algorithm?
7       A.    Yes, that's correct.
8       Q.    Okay. And so one of the things
9  you were doing then to implement this for all
10  classes of trade and all customers and for all
11  controlled substances in the fall of 2013 is you
12  hired this company, Cegedim -- am I pronouncing
13  that right?
14       A.    Yes.
15       Q.    Is it Cegedim?
16       A.    Cegedim.
17       Q.    Cegedim, okay. You hired Cegedim
18  to help you put together an algorithm that would
19  do what's reflected here, right?
20       A.    Yes.
21       Q.    And to implement it not just for
22  some customers, but to implement it for all
23  classes of trade and all customers, right?
24           MS. VANNI: Object to form.

85 (Pages 334 to 337)

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    THE WITNESS:  Basically to
2  automate the program, yes.
3  BY MR. BUCHANAN:
4    Q.    Phase II is to "Hire individuals
5  to support the program," right?
6    A.    Yes.
7    Q.    Okay.  Well, let's go back, I'm
8  sorry, to Phase I.  You said to automate the
9  program.
10    We've looked at documents today,
11  you agree we've looked at documents where the
12  company is saying it was only looking at retail
13  pharmacies as a class of trade.
14    Do you recall looking at those
15  documents, ma'am, yes or no?
16    A.    Yes, we were only looking at
17  retail customers for the SOMS program, not the
18  OMS program.
19    Q.    Thank you.
20    "Phase II, Hire individuals to
21  support the program," right?  588.6, that's on
22  the screen to your -- we put one to your left
23  too.  That may not be the most optimal location.
24    A.    Yes, I see it.  This is good.

Page 339

1    Q.    Okay.  So, certainly, if you're
2  going to have an effective program, you've got
3  to have people as part of this process, right?
4    MS. VANNI:  Object to form.
5    THE WITNESS:  We had people as
6    part of the process.  They were just in
7    sales and the perception was not good,
8    so we moved them into compliance.
9  BY MR. BUCHANAN:
10    Q.    Right.
11    And you're going to have to put
12  boots on the ground too and do due diligence
13  visits and do all kinds of stuff, right?
14    MS. VANNI:  Object to form.
15    THE WITNESS:  So that sales
16    doesn't have to do it, yes.
17  BY MR. BUCHANAN:
18    Q.    Well, one of things we know you
19  did is you brought in Mr. Brantley, right?
20    A.    Yes, I did.
21    Q.    I mean, you needed -- I mean,
22  what was his title?
23    A.    He was a manager of the SOM
24  program.

Page 340

1    Q.    Was there a manager of the SOM
2  program in title, prior to that point in time?
3    A.    Not that title, no.
4    Q.    Right.
5    There was no manager of the SOM
6  program in Qualitest prior to September of
7  2014 -- 2013, excuse me?
8    A.    Yes, that's correct.  Doesn't
9  mean it wasn't being done.
10    Q.    All right.  So -- and someone
11  else is going to decide that, ma'am, so let's --
12  can we agree there was nobody at Qualitest who
13  had that title prior to September of 2013?
14    A.    Not that title, correct.
15    Q.    Okay.  And what you noted here is
16  you're going to hire individuals to support the
17  program, right?
18    A.    Yes.
19    Q.    One of the things you did was you
20  hired somebody as director of SOMS,
21  Mr. Brantley?
22    A.    Manager of SOMS, yes.
23    Q.    There you go.
24    "All individuals on board and

Page 341

1  actively working on other aspects of the
2  program," right?
3    A.    Yes.
4    Q.    One of things you needed was
5  personnel training, right?
6    A.    Yes.
7    Q.    You had to implement SOPs, right?
8    A.    Yes.
9    Q.    You had to develop
10  questionnaires, distribute questionnaires, get
11  responses from questionnaires for their customer
12  SOMS data, right?
13    A.    Yes.
14    Q.    Okay.  You had to create customer
15  boundaries, that was one of the things you were
16  going to do, right?
17    MS. VANNI:  Object to form.
18    THE WITNESS:  That was using the
19    IMS data.
20  BY MR. BUCHANAN:
21    Q.    Okay.  So to create as part of
22  this individual customer boundary so that you'd
23  have flags as to unusual order sizes when they
24  went beyond boundaries for various classes of

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    trade, right?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  Yes, for the
4        automated system, yes.
5    BY MR. BUCHANAN:
6        Q.    And the next thing here that you
7    were going to implement is due diligence visits,
8    right?
9        A.    Yes, by someone with compliance.
10       Q.    And it sounds, ma'am, like what's
11   happening is -- withdrawn.
12           Phase III, next page.  588.7.
13       A.    Yes.
14       Q.    "Develop capability to easily
15   access, trend and sort chargeback data,"
16   correct?
17       A.    Yes.
18       Q.    You worked with the vendor from
19   IQ2020, or you worked with a vendor called
20   IQ2020.
21           Do you recall that?
22       A.    We gave a demo.  I had seen a
23   demo from them previously, and we shared that
24   demo with the finance folks.

Page 343

1        Q.    Okay.  And so a demo was given to
2    the finance folks.  You said an agreement was
3    reached with them, right?
4        A.    Yes.
5        Q.    IT resources were implemented to
6    capture the feed, right?
7            MS. VANNI:  Object to form.
8            THE WITNESS:  Yes.
9    BY MR. BUCHANAN:
10       Q.    And then you're going to plan to
11   further develop this with leadership, I guess
12   that's Mike and Trey?
13       A.    That's the sales team.
14       Q.    Got you.
15           That was Phase III, right, and
16   that's chargeback data?
17       A.    Yes.
18       Q.    That was another new addition to
19   the program, right?
20           MS. VANNI:  Object to form.
21           THE WITNESS:  That was one new
22       addition to the program, one improvement
23       to the existing program, yes.
24   BY MR. BUCHANAN:

Page 344

1        Q.    All right.  And we've talked
2    about what the old program was, and this talked
3    about what it covered, and now we're talking
4    about your various phases for revamping it,
5    right?
6        A.    Yes, the enhancements to the
7    existing program.
8        Q.    Okay.  Next, Phase IV, boots on
9    the ground, right?
10       A.    Yes.
11       Q.    Okay.  "Customer Due Diligence
12   Visits," right, know your customer?
13       A.    Yes, correct.
14       Q.    Okay.  Because there were some
15   direct customers that were in the DEA binder,
16   you know, some big distributors, right?
17       A.    Yes.
18       Q.    There were six, I think, charts
19   that reflected McKesson.  There were five that
20   reflected CVS.  There were two that reflected HD
21   Smith, right?
22       A.    Our intent was to target the
23   customers that were identified in there first,
24   yes.

Page 345

1        Q.    Right.  And these have been
2    called out in the DEA binder as, hey, these are
3    people that you're buying they're well above the
4    norms, right?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  They had large
7        quantities that needed to be researched
8        or DEA thought they were large
9        quantities, yes.
10   BY MR. BUCHANAN:
11       Q.    Right.  So you were going to put
12   boots on the ground first to customers that had
13   been flagged, right?
14           MS. VANNI:  Object to form.
15   BY MR. BUCHANAN:
16       Q.    In that DEA presentation, right?
17       A.    Yes.
18       Q.    But you also sent out a dear
19   valued customer to every customer, correct?
20       A.    Correct.
21       Q.    That was the October 18 letter
22   that we looked at earlier today, correct?
23       A.    The October, yes, 2013.
24       Q.    I meant October 18, 2013 letter,

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    thank you.
2        A.    Yes.
3        Q.    And you sent a notice to your
4    direct customers that there were customers of
5    their customers -- customers of that customer
6    that had been flagged as part of that DEA
7    presentation, correct?
8        A.    Yes.
9        Q.    Okay.
10       A.    We couldn't contact them
11   directly, so we went through the direct
12   customer.
13       Q.    Okay. "SOMS Brand Business
14   Analysis," is it correct, ma'am, that you did
15   not have responsibility in your DEA compliance
16   role for what was happening on the branded side,
17   and we'll just call that Endo?
18       A.    Yes, that's correct.
19       Q.    Okay. Now, before the DEA told
20   you that your current SOMS system was
21   inadequate, you had been told that by other
22   people, right?
23             MS. VANNI:  Object to form.
24             THE WITNESS:  DEA actually didn't

Page 347

1             tell us it was inadequate.
2    BY MR. BUCHANAN:
3        Q.    Well, we have the -- we have the
4    discussion --
5        A.    We have the discuss --
6        Q.    -- and the jury can characterize
7    those findings, and we have your words on it as
8    well from that time, but let's -- before that
9    meeting in March, you had had interactions with
10   the company -- with consultants concerning your
11   SOMS system, correct?
12       A.    I don't recall who.
13       Q.    Okay. Let's start with --
14             MR. BUCHANAN:  Can I have 1052.
15             (Document marked for
16        identification as Par-Norton Deposition
17        Exhibit No. 15.)
18   BY MR. BUCHANAN:
19       Q.    Passing you, ma'am, what we're a
20   marking as Exhibit 15 to your deposition.
21             You had some of these folks from
22   Cegedim and Buzzeo come in and to look at your
23   system in 2013, right?
24             MS. VANNI:  Object to form.

Page 348

1             THE WITNESS:  Yes, I believe so.
2             MR. BUCHANAN:  Okay.  Could we
3        pull it up on the screen.
4    BY MR. BUCHANAN:
5        Q.    This is an e-mail from yourself
6    to Ms. Connell.  She was -- was she your boss?
7        A.    She was my boss at the time.
8        Q.    Okay.  "Subject:  DEA Compliance
9    Initiatives Presentation," and there's a
10   PowerPoint that's attached entitled "DEA
11   Compliance Initiative" from February 9, 2013.
12             Do you see that, ma'am?
13       A.    Yes.
14       Q.    Okay.  At 1052.3 there's a
15   summary of this particular meeting with Buzzeo
16   PDMA.
17             Do you see that at the top?
18       A.    Yes.
19       Q.    "On January 16th and 17th, 2013,
20   a review of our Suspicious Order Monitoring
21   System was conducted by external consultants
22   working for Buzzeo PDMA."
23             Do you see that?
24       A.    Yes, I do.

Page 349

1        Q.    Okay.  The paragraph in the
2    middle begins, "The consultants concluded."
3             Do you see that?
4        A.    I do.
5        Q.    Can you read that into the
6    record, ma'am?
7        A.    "The consultants concluded that
8    our current SOM program, systems and procedures
9    do not meet the regulatory requirements."
10       Q.    Let's pause there.
11       A.    Mm-hmm.
12       Q.    This is -- of course, just to
13   orient ourselves in time, this is two months
14   prior to sitting down with the DEA, correct?
15       A.    Correct.
16       Q.    And what your consultants told
17   you as of this point in time and before the time
18   with the DEA is that your current SOM program,
19   systems and procedures do not even meet the
20   regulatory requirements, right?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  Right, because if
23        they met the regulatory requirements,
24        they wouldn't be able to charge us large

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    sums to implement a new program.
2   BY MR. BUCHANAN:
3        Q.   Well, certainly, ma'am, before
4   somebody had to sit in this chair and talk about
5   this document --
6        A.   Whether somebody sat in this
7   chair or not.
8        Q.   Well, you certainly didn't write
9   that, right?
10       MS. VANNI:  Object to form.
11       THE WITNESS:  We wrote what this
12   is. It's minutes.
13   BY MR. BUCHANAN:
14       Q.   I invite you to review this and
15   say -- and see if at any point in time you wrote
16   here, we have to take this all with a grain of
17   salt because they're just trying to make money?
18       MS. VANNI:  Object to form.
19   BY MR. BUCHANAN:
20       Q.   In words or substance?
21       A.   I actually didn't write this.
22       Q.   Okay.  Can we see in there
23   anywhere where the author of this characterized
24   in words or substance they're just trying to

Page 351

1   make money off us?
2        MS. VANNI:  Object to the form.
3        THE WITNESS:  They wouldn't put
4        that in here because they're trying --
5        we're trying to bring this company on to
6        make improvements to the system.
7   BY MR. BUCHANAN:
8        Q.   Right.
9             So what they wrote is the
10   consultants concluded that our current -- and
11   they spent two days with you, right?
12       A.   I'm not sure.  It says, "Tracey
13   was not able to participate due to an
14   unannounced DEA inspection."
15       Q.   Right.
16            So we have Aimee Cooper, Bambi
17   McGaha, Ricky Richardson, Larry Shaffer and
18   Jeremy Tatum, correct?
19       A.   Yes.
20       Q.   And we talked about Mr. -- I
21   pronounced it Shaffer again.
22       A.   Shaffer.
23       Q.   Mr. Shaffer was in your
24   organization?

Page 352

1        A.   Yes.
2        Q.   Okay.  And so the consultants
3   concluded that your current systems, procedures
4   and program for SOM did not meet the regulatory
5   requirements, and then they made specific
6   recommendations, correct?
7        A.   Yes, that's what it says.
8        Q.   Okay.  And one of the
9   recommendations they made was increase the
10   amount of initial due diligence to include on
11   site meetings with customers to assure they have
12   controls in place to safeguard against
13   diversion.
14            Do you see that?
15       A.   Yes.
16       Q.   Okay.  That's what the DEA talked
17   to you about two months later, right?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  Yes.
20   BY MR. BUCHANAN:
21       Q.   Okay.  Let's go to item 2,
22   "Remove the Sales & Marketing and Customer
23   Service functions from the SOM decision-making
24   process as conducting this review is contrary to

Page 353

1   their primary mission of helping accounts with
2   their current business and encouraging new
3   business," right?
4        A.   That's what the minutes say, yes.
5        Q.   Right.  And, in fact, I mean, you
6   heard the same thing from the DEA in March,
7   right, that you got to take customer service and
8   sales out of the site inspection and out of that
9   process, correct?
10       A.   Yes.
11       MS. VANNI:  Object to form.
12       THE WITNESS:  The perception is
13       there.
14   BY MR. BUCHANAN:
15       Q.   Well, in fact, these consultants,
16   not just the DEA, these consultants who you
17   called in to do an inspection of your system,
18   told you that you got to get customer service
19   and sales and marketing out of the SOM process,
20   right?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  Yes, they had that
23       perception too.
24   BY MR. BUCHANAN:

Page 354

1     Q.   Okay.  They raised a concern
2 about your "Retail thresholds appear to be based
3 upon perceived abuse potential and might be
4 characterized as arbitrary."
5      Do you see that?
6     A.  Yes.
7     Q.   And one of the things you did
8 after the DEA presentation in March of 2013 was
9 develop a different algorithm to develop your
10 thresholds, correct?
11      MS. VANNI:  Object to form.
12      THE WITNESS:  We developed an
13    algorithm to build pattern and frequency
14    into the initial check.
15 BY MR. BUCHANAN:
16     Q.  Okay.  So that your system, the
17 system for suspicious order monitoring, I'm up
18 to 5 on the next page, just trying to move
19 quickly, ma'am, "System should be tested,
20 validated and statistically defensible."
21      Do you see that?
22     A.  Yes.
23     Q.  Do you agree with that?
24     A.  Yes, that's their standard

Page 355

1 wording for that particular vendor, that's their
2 standard wording, yes.
3     Q.  But do you agree, I mean, if
4 you're going to have a system for detecting
5 suspicious orders, that it should be tested,
6 validated and defensible?
7     A.  Any computer system should be
8 validated.  It's an FDA requirement, yes.
9     Q.  Well, I'm not talking about FDA
10 requirements, ma'am.
11      I just want to know do you agree
12 with regard to suspicious order monitoring, the
13 system should be tested, validated and
14 defensible?
15     A.  Yes.
16     Q.  Okay, good.  Statistically
17 defensible, you agree?
18     A.  Yes.
19     Q.  Okay.  And they advised further
20 that you should not provide customers for the
21 reason their orders are held or pended as this
22 may result in customers working to avoid the one
23 item that caused the order to be declined.
24      Do you see that?

Page 356

1     A.  That's correct.
2     Q.  Do you agree that --
3     A.  That's common sense.
4     Q.  Yeah, I mean, because if you
5 share with customers what the thresholds are
6 that you've set, they can structure their orders
7 in a way so that they stay below the thresholds
8 all the time but get to the same place in a
9 different way?
10     A.  Right, which is why we didn't
11 share those.
12     Q.  Right.  So sharing thresholds,
13 bad practice, right?
14     A.  Yes.
15     Q.  Okay.  Working with orders to --
16 working with customers to structure their orders
17 so they stay within thresholds is not a good
18 practice?
19     A.  No, it's not.
20      MS. VANNI:  Object to form.
21 BY MR. BUCHANAN:
22     Q.  I mean, the manufacturer or the
23 distributor should not be working with its
24 primary customer to structure its order in a way

Page 357

1 to stay within whatever the red flag thresholds
2 are, right?
3      MS. VANNI:  Object to form.
4      THE WITNESS:  No, that defeats
5    the purpose of the program.
6 BY MR. BUCHANAN:
7     Q.  Right.
8      That's a very bad practice,
9 right?
10     A.  Yes.
11     Q.  And if you're doing that kind of
12 practice and you're certainly not maintaining
13 effective controls against diversion, right?
14      MS. VANNI:  Object to form.
15      THE WITNESS:  That's correct.
16    However, customers can, over time, if
17    they're a regular customer, kind of
18    figure out what your threshold is.  You
19    don't communicate it to them, but if
20    they're smart and they keep track of it,
21    they can technically figure it out.
22 BY MR. BUCHANAN:
23     Q.  But as a manufacturer, you need
24 to be vigilant to make sure your customers are

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    not structuring transactions to evade --
2        A.    Absolutely, yes.
3        Q.    -- these type of limits, correct?
4            MS. VANNI:  Object to form.
5            THE WITNESS:  Yes.
6    BY MR. BUCHANAN:
7        Q.    And then you go through to
8    summarize in your PowerPoint, ma'am, and this is
9    a PowerPoint that you obviously endorsed, right?
10           MS. VANNI:  Object to the form.
11           THE WITNESS:  I don't know if I
12   created it.
13   BY MR. BUCHANAN:
14       Q.    Well, if we go back to 1052.1.
15   This is a PowerPoint you forwarded to your boss,
16   right?
17       A.    Yes.
18       Q.    Okay.  Ms. Connell was your boss
19   at that point in time?
20       A.    Correct.
21       Q.    So, obviously, if you forwarded
22   this, you, obviously, endorsed its content,
23   right?
24       A.    Yes.

Page 359

1            MS. VANNI:  Object to the form.
2    BY MR. BUCHANAN:
3        Q.    And you forwarded along the
4    Cegedim report and conclusions and
5    recommendations, right?
6        A.    Yes, looks like I did.
7        Q.    And so the PowerPoint begins on
8    -- I'm sorry, 1052.7.
9            MR. BUCHANAN:  If you can go
10   there, please, Bradley, for everyone's
11   benefit.
12   BY MR. BUCHANAN:
13       Q.    And you've got your agenda on the
14   next page and an overview of the Cegedim report,
15   right?
16       A.    Yes.
17       Q.    And then you've got the first
18   bullet on page 1052.10.
19       A.    Yes.
20       Q.    Called out for your boss, right?
21       A.    Yes.
22       Q.    Okay.  No qualifiers, right?
23           MS. VANNI:  Objection.
24           THE WITNESS:  Just repeating what

Page 360

1    the consultant said.
2    BY MR. BUCHANAN:
3        Q.    Right.  And so you certainly in
4    passing along the information you received from
5    the consultant, forwarded along their top level
6    conclusion, right?
7            MS. VANNI:  Object to form.
8            THE WITNESS:  I was not at the
9        meeting with the consultant, so I was
10       just going by what the individual told
11       me was said at the meeting and just
12       communicating that information.
13   BY MR. BUCHANAN:
14       Q.    And for the benefit of your
15   boss --
16       A.    It does not --
17       Q.    -- in passing this along, top
18   level conclusion that you passed along, "The
19   consultants concluded that our current SOM
20   program, systems and procedures do not meet the
21   regulatory requirements," correct?
22       A.    That's what it says, yes.
23       Q.    And that was point one
24   substantively that you conveyed to your boss,

Page 361

1    right?
2            MS. VANNI:  Object to form.
3            THE WITNESS:  That doesn't mean I
4        agreed with it, but yes.
5    BY MR. BUCHANAN:
6        Q.    Okay.  Well, you certainly didn't
7    put any qualifiers in what you sent to her,
8    right?
9            MS. VANNI:  Object to form.
10           THE WITNESS:  I wouldn't have put
11       it in writing if I'm giving her what
12       they said.  We would have had a side
13       conversation.
14   BY MR. BUCHANAN:
15       Q.    Okay.  Specifically, they
16   recommended we make the following changes,
17   increase the amount of initial due diligence
18   with customers, right?
19       A.    Yes.
20       Q.    To assure our customers have
21   controls in place to safeguard against
22   diversion, right?
23       A.    Yes, that's what it says.
24       Q.    To ensure or to assure our

Page 362

```
 1   customers have their own robust SOMS program,
 2   right?
 3       A.   Yes.
 4       Q.   So it's being recommended and
 5   what you're communicating to your boss is having
 6   due diligence that's going to confirm that your
 7   customers have robust SOMS programs, right?
 8           MS. VANNI:  Object to form.
 9           THE WITNESS:  There's all the
10       recommendations of the Cegedim report,
11       yes.
12   BY MR. BUCHANAN:
13       Q.   Right.  And this is months before
14   the DEA meeting, right?
15       A.   Yes.
16       Q.   Okay.  Review their SOPs and
17   orders themselves, correct?
18       A.   Yes.
19       Q.   I mean, let me restate that.
20           "Increase the amount of initial
21   due diligence with customers to assure our
22   customers have their own robust SOMS program,"
23   correct?
24       A.   Yes, that's what it says.
```

Page 363

```
 1       Q.   That's what you wrote.
 2           "(Review of their SOPs and orders
 3   they themselves have reported to DEA)," correct?
 4       A.   Yes.
 5       Q.   "Our process should include
 6   on-site meetings (audits) for both Corporate
 7   Offices and Distribution Centers," right?
 8       A.   That's what they said, yes.
 9       Q.   And that's what you communicated
10   to your boss, right?
11           MS. VANNI:  Object to form.
12           THE WITNESS:  Word for word what
13       the consultant reported.
14   BY MR. BUCHANAN:
15       Q.   That's not quite word for word,
16   but you've recast it and put it in this form --
17       A.   Yes.
18       Q.   -- for your boss, right?
19           MS. VANNI:  Object to form.
20   BY MR. BUCHANAN:
21       Q.   This is how you understood their
22   recommendation, correct?
23       A.   This is what was told to me of
24   their recommendation.  Again, I was not at that
```

Page 364

```
 1   meeting.
 2       Q.   Okay.  "Remove the Sales &
 3   Marketing and Customer Service functions from
 4   the SOM decision-making process," right?
 5       A.   Yes.
 6       Q.   Okay.  And you note, "The DEA
 7   Compliance Department is best suited for this
 8   purpose as DEA compliance personnel have a
 9   singular mission of protecting the firm from
10   regulatory issues and should be assigned the
11   primary role of conducting due diligence,
12   evaluating pended or possibly suspicious orders,
13   and clearing accounts or reporting the records
14   to DEA."
15           Did I read that correctly?
16           MS. VANNI:  Object to form.
17           THE WITNESS:  Quoted, yep, word
18       for word --
19   BY MR. BUCHANAN:
20       Q.   Makes perfect sense.
21       A.   -- by the consultant, yes.
22           MS. VANNI:  Object to form.
23   BY MR. BUCHANAN:
24       Q.   Makes perfect sense?
```

Page 365

```
 1       A.   These are their opinions, yes.
 2       Q.   Okay.  Well, I mean, look you
 3   pay -- you brought them in, right?
 4       A.   Yes, they have --
 5       Q.   You brought them in for the
 6   experience they could bring to the evaluation to
 7   evaluate your system and give you
 8   recommendations, right?
 9       A.   I brought them in for their
10   electronic monitoring system, which was the best
11   in the industry at the time.
12       Q.   You brought them in to conduct an
13   audit of your suspicious order monitoring
14   system, correct?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  I didn't need them
17       to conduct an audit.  I'm capable of
18       conducting an audit myself.
19   BY MR. BUCHANAN:
20       Q.   Okay.  So you're saying this was
21   all known to you then as of this point in time,
22   correct?
23           MS. VANNI:  Object to form.
24           THE WITNESS:  I did not agree --
```

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    BY MR. BUCHANAN:
2         Q.    You were aware of all these
3    points?
4         A.    I did not agree with their
5    recommendations.  I knew the condition of our
6    current SOM program, and I knew I wanted to make
7    improvements.
8         Q.    The further recommendation is
9    "Discontinue the use of thresholds and forecasts
10   as part of the SOMS model," correct?
11        A.    That's what the recommendation
12   was, yes.
13        Q.    Telling you that "All customers
14   orders must be evaluated in real time against
15   quantity, frequency and pattern and compared to
16   orders of others in the same class of trade,"
17   right?
18        A.    Yes.
19        Q.    And then it goes through other
20   details, some of which we've discussed, right?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  Yes.
23   BY MR. BUCHANAN:
24        Q.    And you're saying this is one of

Page 367

1    the things you were looking for from them,
2    right?  They had a system that would do this and
3    you wanted to implement that system?
4         A.    The electronic system that would
5    tie into our order system, yes.
6         Q.    Okay.  They further recommended
7    to evaluate orders based on active ingredient
8    quantity rather than by dose count, right?
9         A.    Yes.
10        Q.    They recommended to you to
11   utilize chargeback data, right?
12             MS. VANNI:  Object to form.
13             THE WITNESS:  Where are you
14        seeing that?
15   BY MR. BUCHANAN:
16        Q.    I'm on 1052.12.  Evaluate orders
17   based on active ingredient quantity rather than
18   by dose count within a specific product family.
19   The second bullet says, "Utilize chargeback data
20   to evaluate downstream distribution of our
21   products."
22             Do you see that?
23        A.    Yes.
24        Q.    So that wasn't just DEA telling

Page 368

1    you that, that was, in fact, the consultants you
2    hired and paid good money to come in and assess
3    your system?
4              MS. VANNI:  Object to form.
5              THE WITNESS:  The consultants
6         that got it from DEA, yes.
7    BY MR. BUCHANAN:
8         Q.    Okay.  The "System should be
9    tested validated and statistically defensible,"
10   right?
11        A.    Yes.
12        Q.    And, again, you echoed upstream
13   that should not be telling your customers the
14   reason their orders are pended, right?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  Yes.
17   BY MR. BUCHANAN:
18        Q.    And so you then come forward with
19   a phased implementation process around these
20   very recommendations, right?
21        A.    Similar, yes.
22        Q.    Well, DCT is you, right?
23        A.    Yes.
24        Q.    That's your group?

Page 369

1         A.    Drug compliance group, yes.
2         Q.    And this is your PowerPoint,
3    right?
4         A.    It is, mm-hmm.
5         Q.    Sent upstream to your boss,
6    right?
7         A.    Yes.
8         Q.    Okay.  First, let's talk about
9    Phase I.  Obviously, you're going to bring in
10   somebody that's going to help strengthen your
11   system of evaluating orders, right?
12             MS. VANNI:  Object to form.
13             THE WITNESS:  To implement the
14        electronic system, yes.
15   BY MR. BUCHANAN:
16        Q.    Cegedim, right?
17        A.    Yes.
18        Q.    You're going to bring them in,
19   right?
20        A.    Correct.
21        Q.    Okay.  Two, you're going to
22   update the SOMS SOP to reflect the new process?
23        A.    Right.
24        Q.    You're going to review and lay

Page 370

1 out plans to integrate system requirements
2 between the order system and the Cegedim system
3 for order monitoring, right?
4       A.    Yes.
5       Q.    Okay.  Further, in this phased
6 approach, Phase II, you're going to look at all
7 products, not just some products, right?
8       A.    We were adding the chemicals
9 which are not required to be regulated to be
10 handled in that way by DEA, but we were adding
11 them.
12       Q.    You're going to start doing
13 search trending, right?
14       A.    Search --
15       Q.    Sales trending?
16       A.    Sales trending.
17       Q.    Yes.
18             MS. VANNI:  Object to form.
19             THE WITNESS:  Yes.
20 BY MR. BUCHANAN:
21       Q.    You're going to start doing sales
22 trending to assist with discovery of customer
23 ordering patterns, frequencies and sizes, right?
24       A.    Yes.

Page 371

1       Q.    Including geographical
2 distributions.  These are your recommendations
3 before the DEA ever sat down with you, right?
4       A.    Right, the geographical, mm-hmm,
5 yes.
6       Q.    As somebody in the industry with
7 experience in SOMS and also anti-diversion
8 efforts, right?
9       A.    And sitting at DEA conferences,
10 yes.
11       Q.    Okay.  And Phase III, you're
12 going to start doing on-site customer
13 evaluations, right?
14       A.    Yes.
15       Q.    That was before you met with the
16 DEA, right?
17       A.    Those were things we were --
18       Q.    On-site customer evaluations?
19       A.    Things we were moving towards,
20 yes.
21       Q.    1052.15, right?
22       A.    Yes.
23       Q.    And things that were not
24 happening before?

Page 372

1       A.    Right.
2             MS. VANNI:  Form.
3             THE WITNESS:  Things that were
4 not happening by the compliance team or
5 things that I wanted to improve.
6 BY MR. BUCHANAN:
7       Q.    Right.
8             Well, certainly, here it doesn't
9 note that our sales force is doing on-site
10 customer evaluations for compliance, right?
11       A.    Didn't need to be.  It was an
12 internal document, and that was well known.
13       Q.    And next you proposed as Phase
14 III accessing chargeback data, correct, ma'am?
15       A.    Yes.
16       Q.    Before the DEA ever even told
17 you, right?
18       A.    Correct.  It was brought up at
19 other conferences.
20       Q.    Right.  So you didn't need this
21 meeting with the DEA in March to know that,
22 right?
23       A.    Well, I know that other
24 manufacturers --

Page 373

1             MS. VANNI:  Object to form.
2             THE WITNESS:  -- were using
3 chargeback data, and it was something
4 that I was looking into.
5 BY MR. BUCHANAN:
6       Q.    Right.  So one of the things you
7 were going to do is you're going to start
8 accessing chargeback data and also third party
9 data sources, right?
10       A.    IMS, yes.
11       Q.    IMS, right.
12             This provides visibility of
13 product flow down the customer stream and allows
14 for enhanced compliance for the "Know Your
15 Customer" requirement of the DEA, correct?
16       A.    I thought it would, yes.
17       Q.    Right.
18             And so as of 2013, before you
19 ever met with the DEA, you were aware of the
20 know your customer obligation, correct?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  Yes.
23 BY MR. BUCHANAN:
24       Q.    You were aware of the

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    availability of chargeback data because you were
2    going to start to access it, right?
3         MS. VANNI:  Object to form.
4         THE WITNESS:  We were looking
5         into it to see if it really provided
6         what DEA thought it did.
7    BY MR. BUCHANAN:
8         Q.    And what you wrote here was Phase
9    III was to access chargeback data and third
10   party data, right?
11        A.    Yes.
12        Q.    And we can agree this is two
13   months before you melt with the FDA -- excuse
14   me -- DEA?
15        A.    Yes.
16        Q.    Thank you.  You can set that
17   aside.
18        (Document marked for
19        identification as Par-Norton Deposition
20        Exhibit No. 16.)
21   BY MR. BUCHANAN:
22        Q.    Passing you, ma'am, what we're
23   marking as 1071 to your deposition -- I'm sorry.
24   That's false.  I'm passing you what we're

Page 375

1    marking as Exhibit 16.  I've got a separate
2    number on mine.
3         MR. BUCHANAN:  Could we pull up
4         1071 on the screen.
5         This is an e-mail exchange --
6         excuse me.  What exhibit did I pass you,
7         on the top right corner, is it 1052?
8         MS. VANNI:  No, 1071.1.
9         MR. BUCHANAN:  Okay.  It should
10        be 1071.  Are we on the same page?  We
11        are, good.
12        THE WITNESS:  1071.
13   BY MR. BUCHANAN:
14        Q.    Okay.  This is Exhibit 16 to your
15   deposition.  It's an e-mail exchange between
16   yourself and Ms. Connell again, DEA Compliance
17   Initiative Presentation.  This is from 2/9, and
18   the attachment is "DEA Compliance Improvement
19   Initiative."
20        Do you see that?
21        A.    Yes.
22        Q.    Contents are on page 1071.3.
23   Executive summary, SWOT analysis, DEA compliance
24   team and then action summaries and other things.

Page 376

1         If we can go to 1071.5.  We have
2    the same graphic off to the right.
3         Do you see that?
4         A.    I do.
5         Q.    Where you've got the Quota Grant
6    Process, the Manufacturing Site Compliance, Data
7    Integrity and Suspicious Order Monitoring as
8    critical elements of DEA compliance?
9         A.    Correct.
10        Q.    Correct?  Suspicious order
11   monitoring we talked about that and your phrase
12   here mirrors the one in the other document,
13   correct?
14        A.    Yes.
15        Q.    Implement a solution and
16   implement a solution, correct?
17        A.    Implement a solution is what it
18   says, you must implement one.
19        Q.    "Implement a solution that
20   proactively discloses suspicious orders based on
21   unusual size, order pattern, deviation and
22   unusual frequency," correct?
23        A.    Yes.
24        Q.    Okay.

Page 377

1         A.    This is not talking about the
2    current state of the business.  It's talking
3    about the requirements for DEA.
4         Q.    Let's go to 1071.8.
5         There's an analysis of current
6    weaknesses, right?
7         A.    Yes.
8         Q.    Okay.  Weaknesses and there's
9    strengths and opportunities and threats and all
10   kinds of things.  I'm not going to have time to
11   go through all of this with you.
12        One of the weaknesses at this
13   point in time was you had a lack of resources,
14   right?
15        A.    Yes.
16        Q.    Limited talent pool and limited
17   investments in the group, right?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  I'm not sure what
20        the investments means, to be honest, but
21        the talent pool, yes.
22   BY MR. BUCHANAN:
23        Q.    Another weakness you had was a
24   "lack of training & compliance first culture,"

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  right?
2      A.    Yes.
3      Q.    Compliance first culture meaning
4  we got to do this, it's really important that we
5  do it, right?
6          MS. VANNI: Object to form.
7          THE WITNESS: I'm again not sure
8      what first culture means. Some of those
9      words, I have a feeling Sanjay
10     participated in this.
11 BY MR. BUCHANAN:
12     Q.    Okay. And what's the next
13 weakness?
14     A.    "Inadequate SOMS."
15     We wanted it to be stronger.
16     Q.    Let's be clear, the words you
17 wrote were "inadequate SOMS," correct, ma'am?
18     A.    Correct. Current program is not
19 adequate for my standards.
20     Q.    Okay. And what we're looking at
21 here is could you remind us, ma'am, is this
22 before or after you sat down with the DEA?
23     A.    This is before.
24     Q.    Okay. So even before you sat

Page 379

1  down with the DEA and spent the three hours in
2  DC with them, I mean, you knew you had
3  inadequate SOMS, right?
4          MS. VANNI: Object to form.
5          THE WITNESS: I knew I had
6      improvements that I wanted to make.
7  BY MR. BUCHANAN:
8      Q.    I understand that's how it's
9  characterized here in the record, ma'am, but
10 what you wrote to your boss is we have
11 inadequate SOMS correct?
12         MS. VANNI: Objection.
13         THE WITNESS: That's what the
14     document says versus what is --
15 BY MR. BUCHANAN:
16     Q.    And that's what you put into it?
17     A.    Yeah.
18     Q.    Okay. And what you forwarded up
19 the food chain in Qualitest at that point in
20 time, correct?
21         MS. VANNI: Objection.
22         THE WITNESS: Correct, because
23     improvements we wanted to make.
24 BY MR. BUCHANAN:

Page 380

1      Q.    Well, we can agree it doesn't say
2  that?
3      A.    We can agree you can interpret it
4  however you would like, but that's not what it
5  meant.
6      Q.    What you wrote was "inadequate
7  SOMS," correct?
8      A.    That's what's stated there,
9  correct.
10     Q.    Okay. And SOMS are suspicious
11 order monitoring systems?
12     A.    Yes. Inadequate means you have
13 one, you just want to improve it.
14     Q.    Okay. So --
15     A.    It doesn't say nonexisting.
16     Q.    Inadequate means not adequate,
17 right?
18     A.    Not adequate by whose standards?
19 By mine in this case.
20     Q.    Not adequate, correct?
21     A.    By my standards, yes.
22     Q.    That's what -- you were the head
23 of DEA compliance as of this point in time,
24 correct?

Page 381

1          MS. VANNI: Object to form.
2          THE WITNESS: And I had very high
3      goals and standards.
4  BY MR. BUCHANAN:
5      Q.    And we can agree not only your
6  standards that was inadequate by but inadequate
7  by the consultants who you met with, correct?
8          MS. VANNI: Object to form.
9          THE WITNESS: Because they wanted
10     the business, yes.
11 BY MR. BUCHANAN:
12     Q.    Okay. We can agree before the
13 DEA told you that your SOMS system was
14 inadequate, you had concluded it was inadequate,
15 correct?
16         MS. VANNI: Object to form.
17         THE WITNESS: DEA did not say the
18     SOMS system was inadequate. If they
19     found it to be inadequate, we would have
20     gotten violations. We did not get
21     violations for our SOM system.
22         MR. BUCHANAN: Move to strike.
23 BY MR. BUCHANAN:
24     Q.    Okay. We have the DEA statements

96 (Pages 378 to 381)

Highly Confidential – Subject to Further Confidentiality Review

Page 382

1  with regard to your system.
2      A.    You have them.
3      Q.    And we have your statements with
4  regard to the SOM system before you sat with the
5  DEA, correct?
6      A.    Yes.
7      Q.    And you noted you had an
8  inadequate SOM system, correct?
9            THE WITNESS:  That's what's
10  written.
11          MS. VANNI:  Object to form.
12  BY MR. BUCHANAN:
13      Q.    We know that you met with -- you
14  had consultants that came and then looked at
15  your system in 2013, right?
16      A.    Yes.
17      Q.    Before you met with the DEA
18  right?
19      A.    Yes.
20      Q.    And they said it was inadequate,
21  correct?
22      A.    Inadequate by -- yes.
23      Q.    Okay.  Let's go forward to
24  1071.20.  And, regrettably, I'm not going to

Page 383

1  have time to go through all of this with you,
2  but I'd like to focus on action area suspicious
3  order monitoring system.
4            Again, we see phases of the
5  "Proposed Next Steps," correct?
6      A.    Correct.
7      Q.    The purpose to implement a robust
8  system to guarantee reliability and legit -- in
9  the legitimacy of our customer base, right?
10      A.    Yes.
11      Q.    And I'm just going to call to
12  your attention "Phase III: Utilize chargeback
13  and IMS data to 'know your customer's
14  customer,'" correct?
15      A.    That's what it says, yes.
16      Q.    Before you sat with the DEA?
17      A.    Yes.
18          MS. VANNI:  Object to form.
19  BY MR. BUCHANAN:
20      Q.    One of the things in your phase
21  planned approach here was to utilize chargeback
22  and IMS data so that you could know your
23  customer's customer, correct?
24          MS. VANNI:  Object to form.

Page 384

1            THE WITNESS:  That was the goal,
2  yes.
3  BY MR. BUCHANAN:
4      Q.    Okay.  One of your other Phase
5  III items was to implement, those were the words
6  you used, right, implement?
7            You see that?
8      A.    Yes.
9      Q.    On-site customer audits, correct?
10      A.    Correct.
11      Q.    Utilizing an external audit team,
12  correct?
13      A.    That's what it says, yes, by
14  compliance.
15      Q.    You can set that aside.
16          MR. BUCHANAN:  Do you mind if we
17  take an earlier break?  How many minutes
18  are we?  Can we just take a break.  I
19  just need to shuffle some papers so I
20  provide appropriate time for my
21  co-counsel.
22          MS. VANNI:  That's fine.
23          THE VIDEOGRAPHER:  Off the record
24  now, it's 3:15 p.m.  Off the record.

Page 385

1            (Brief recess.)
2            THE VIDEOGRAPHER:  We're now back
3  on the record.  The time is 3:39 p.m.
4            (Document marked for
5  identification as Par-Norton Deposition
6  Exhibit No. 17.)
7  BY MR. BUCHANAN:
8      Q.    Ma'am, I'm passing you over what
9  we're marking as Exhibit 17 to your deposition.
10          Are you miked up, ma'am?
11      A.    Yes.
12      Q.    You are.  Okay.  Better than I.
13          It's a document from early 2013,
14  right?
15      A.    Yes.
16      Q.    An e-mail from yourself to Sanjay
17  Patel?
18      A.    Yes, correct.
19      Q.    Copied to your boss, Jill
20  Connell?
21      A.    Yes.
22      Q.    Was Sanjay also your boss?
23      A.    He was when Jill left the
24  company, Sanjay was my boss.

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    Q.    Okay.  This is today's meeting,
2   and then it's got a list of action items.
3          Do you see that?
4    A.    Yes, I do.
5    Q.    Okay.  Let's roll forward to the
6   body of this, and it's January 4, 2013, just to
7   orient ourselves in time.  This would have been
8   prior to the meeting with DEA when you got that
9   thick binder that we spoke about, right?
10   A.    Yes.
11   Q.    This would have been prior to the
12  interactions you had with the Buzzeo group in
13  mid-January 2013, right?
14   A.    Yes.
15   Q.    Okay.  Let's go forward to -- if
16  we could, page 574.24, right.
17          So prior to this meeting and this
18  audit you had with Buzzeo, you were categorizing
19  potential failure modes and effects, visibility
20  rating, severity rating, et cetera, right?
21   A.    Yes.
22   Q.    Okay.  And so with regard to your
23  suspicious order monitoring system, you note
24  that it was built in pieces and only applies to

Page 387

1   the retail side of the business, correct, ma'am?
2    A.    SOMS does, yes.
3    Q.    Okay.  The "suspicious order
4   monitoring program was built in pieces and only
5   applies to the retail side of the business."
6          Did I read that correctly?
7    A.    You did.
8    Q.    DEA requires it to apply to all
9   customers.
10          Do you see that?
11   A.    Correct, which is what we had --
12   Q.    Your words, right?
13   A.    Yes.
14   Q.    Okay.  "In addition, the current
15  system has had two issues in the past year that
16  resulted in controlled product being released
17  that should not have been."
18          Do you see that?
19   A.    Yes, I do.
20   Q.    That's not good, right?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  That's what it
23  says, yes.
24  BY MR. BUCHANAN:

Page 388

1    Q.    Not good, right?
2        MS. VANNI:  Objection.
3        THE WITNESS:  Not good.
4   BY MR. BUCHANAN:
5    Q.    Okay.  "The system needs to be
6   revamped," right?
7    A.    Yes.
8    Q.    Remember we talked earlier about
9   the system needing to be revamped?
10   A.    Yes, improvements needed to be
11  made.
12   Q.    And what you wrote was revamped,
13  right?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  Yes.
16  BY MR. BUCHANAN:
17   Q.    First, all customers have to be
18  added, right?
19   A.    Yes.
20   Q.    "IMS data and chargeback data
21  incorporated," correct?
22   A.    That's what it says, yes.
23   Q.    "And eventually a contracted
24  customer assessment firm hired or an on-site

Page 389

1   SOMS specific individual to perform these
2   assessments."
3          Did I read that correctly?
4    A.    Yes, you did.
5    Q.    You knew all of that on your own
6   without having to go up to DC and meet with the
7   DEA, right?
8        MS. VANNI:  Object to form.
9        THE WITNESS:  Yes, we were trying
10  to make a lot of improvements before DEA
11  even got involved.
12  BY MR. BUCHANAN:
13   Q.    How to revamp it, right?
14   A.    How to make improvements.
15   Q.    Okay.  And previously you
16  characterized the old system as inadequate,
17  correct?
18        MS. VANNI:  Object to form.
19        THE WITNESS:  Yes.
20  BY MR. BUCHANAN:
21   Q.    Okay.  Then we look at visibility
22  rating and severity rating, right?
23   A.    Yes.
24   Q.    You've been in corporate land for

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1  a while, right?
2       MS. VANNI:  Object to form.
3       THE WITNESS:  Yes.
4  BY MR. BUCHANAN:
5       Q.    This is one way you do a risk
6  assessment, right?
7       A.    Yes.
8       Q.    Look at the visibility of the
9  problem, look at the severity of the problem and
10  then give it a risk score, right?
11       A.    Correct.
12       Q.    And the risk score you gave this
13  for visibility was a 5, right?
14       A.    Yes.
15       Q.    And severity was a 5, right?
16       A.    Yes.
17       Q.    And the total risk rating was 25,
18  right?
19       A.    Yes.
20       Q.    Highest of anything -- highest of
21  any risk, right?
22       MS. VANNI:  Objection.
23       THE WITNESS:  Twenty-five was the
24       highest in the document, mm-hmm.

Page 391

1  BY MR. BUCHANAN:
2       Q.    Thank you.
3       Let's go to 574.28.  Potential
4  failure mode and effect, "No mandatory, routine
5  DEA training exists for employees handling
6  controlled substances."
7       Did I read that correctly?
8       A.    Yes.
9       Q.    And, again, 70% of the business
10  of Qualitest was controlled substances, right?
11       MS. VANNI:  Object to form.
12       THE WITNESS:  Yes.
13  BY MR. BUCHANAN:
14       Q.    "Knowledge of DEA regulations is
15  not incorporated into employee's job
16  descriptions or performance reviews," correct?
17       A.    Correct.
18       Q.    At this point in time, resources
19  were prohibitive to train all employees, right?
20       A.    Yes.
21       Q.    Okay.  And one of the things you
22  were doing was to look for some funding so you
23  could train your people, right?
24       A.    Yes.

Page 392

1       Q.    And not just your people, I mean
2  all Qualitest employees?
3       A.    To train the company.
4       Q.    Right.
5       A.    It wasn't that they hadn't
6  received any training, there just wasn't any
7  training that was mandated by the company for
8  employees and nothing on a routine basis.
9       Q.    574.29, additional failure modes
10  and effects, again, with regard to controlled
11  substances, this relates to checking
12  registrations on orders.
13       Do you see that?
14       A.    Yes.
15       Q.    Okay.  Currently, the
16  registrations are checked when somebody becomes
17  a new customer, right?
18       A.    Yes.
19       Q.    And when I say "currently," I
20  mean when you were writing this in early 2013?
21       A.    Yes, that's correct.
22       Q.    Okay.  And then they were only
23  done every year after that, correct?
24       A.    Correct.

Page 393

1       Q.    And what was the industry
2  standard at that point in time, ma'am?
3       A.    I don't know.  I don't think
4  everybody was using NTIS, but I don't know for
5  sure.
6       Q.    Well, let's see what you wrote.
7       What did you write the industry
8  standard was at that point in time?
9       A.    "Industry standard is now to
10  check the DEA license at each purchase since
11  shipping to an entity that has an expired or
12  invalid license is a $10,000 fine."
13       Q.    Okay.  And then you note, "The
14  capability exists to automate this check at the
15  weekly level (NTIS Tape or Database)" and "We
16  need to check registrations more frequently,"
17  right?
18       A.    Yes, that's what I wanted.
19       Q.    Does this refresh your memory as
20  to what you characterized the industry standard
21  to be?
22       A.    It does, yes.
23       Q.    Okay.  And, in fact, when you
24  were back at Ciba-Geigy and Novartis and they

99 (Pages 390 to 393)

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1    were already using the NTIS data, right --
2        A.    They did.
3        Q.    -- back in the '80s and '90s?
4        A.    They did.
5        Q.    And when you were at Watson, they
6    were using, it right?
7        A.    Yes.
8        Q.    And in this 2012, 2013 period you
9    had the situation where controlled substances
10   were released to customers who should not -- who
11   they should not have been released to, correct?
12       MS. VANNI:  Object to form.
13       THE WITNESS:  That was not -- I
14       don't believe that was in relation to
15       their license.
16   BY MR. BUCHANAN:
17       Q.    Oh, okay.  What was it in
18   relation to?
19       A.    I don't know if it was -- I don't
20   know why.  I need to go back to see it.
21       Q.    Sitting here, do you have a
22   recollection?
23       A.    I do not.
24       Q.    If you don't, I'm sorry, I'm just

Page 395

1    going to do my best to move along.
2        A.    Okay.
3        Q.    Because I try not to go down too
4    many forks in the road, if you don't mind.
5        A.    Got it.
6        Q.    All right.  So let's dial back
7    the clock, if we could.
8        MR. BUCHANAN:  Could I have 567.
9        (Document marked for
10       identification as Par-Norton Deposition
11       Exhibit No. 18.)
12   BY MR. BUCHANAN:
13       Q.    Passing you what we're marking as
14   Exhibit 18 to your deposition, ma'am.  It's an
15   exchange, it looks like right after you get to
16   the company in 2011.  It's 567.  It should be on
17   the screen, hopefully.
18       You see this e-mail exchange
19   between yourself and others relating to a DEA
20   inspection at one of your facilities.
21       A.    Yes, I do.
22       Q.    Okay.  Let's -- I'd like to
23   direct your attention -- this is one of the
24   things you would do with DEA compliance.  You

Page 396

1    might be there when there's a DEA inspection of
2    a manufacturing facility, for example, right?
3        A.    Correct, and I would summarize
4    each day.
5        Q.    Right.  And so you'd send around
6    a report to the team or management about the
7    results of the inspection, right?
8        A.    Yes.
9        Q.    Okay.  And so this was an
10   inspection of a manufacturing facility as the
11   primary purpose, correct?
12       A.    In Charlotte, yes.
13       Q.    And you'd had an issue with
14   Charlotte previously, right?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  Yes, it was
17       manufacturing.
18   BY MR. BUCHANAN:
19       Q.    And, basically, you had raw
20   material that was unaccounted for.
21       Do you remember that?
22       MS. VANNI:  Object to form.
23       THE WITNESS:  I do not, but if
24       you give me a minute, I'll look at this.

Page 397

1    BY MR. BUCHANAN:
2        Q.    Okay.  Let me just try to keep us
3    focused, I'm sorry, if that's going to require
4    you to go elsewhere.
5        A.    Okay.
6        Q.    567.2, middle of the second page,
7    and there's this discussion here with the
8    paragraph beginning he noted about, you know,
9    material not being accounted for, you know, if
10   you have .15% that's not accounted for, given
11   the volume of controlled substances y'all were
12   making and that turns into 130 pounds worth of
13   raw material, controlled substances, right?
14       MS. VANNI:  Object to form.
15       THE WITNESS:  Mm-hmm.
16   BY MR. BUCHANAN:
17       Q.    So you've got 130 pounds of raw
18   materials that aren't accounted for, and you
19   guys need to tighten up your process to make
20   sure 130 pounds of -- this says 64 kilograms,
21   that's, you know -- that's about 130 pounds,
22   right?
23       A.    Calculation.
24       Q.    Okay.  135, something like that?

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    A.   Mm-hmm.
2    Q.   Okay.  He went on to say that
3  "manufacturers are making larger batch sizes and
4  greater quantities of controlled product than in
5  years past," right?
6    A.   Yes.
7    Q.   I mean, you guys were making a
8  lot of pills, no debate about that, right?
9        MS. VANNI:  Object to form.
10        THE WITNESS:  That is what it
11  says.
12  BY MR. BUCHANAN:
13    Q.   It says, "DEA is seeing a much
14  higher rate of prescription drug abuse and
15  diversion as compared to illicit drugs now."
16        Do you see that?
17    A.   Yes.
18    Q.   Higher rate of prescription drug
19  abuse and diversion as compared to illicit drugs
20  now, and now being 2011, right?
21    A.   Yes.
22    Q.   And this is a couple years
23  before --
24    A.   Yes.

Page 399

1    Q.   Thank you.
2        It's a couple years before you
3  had that sit down with the DEA where you got
4  called into DC, right?
5    A.   Yes.
6        MS. VANNI:  Object to form.
7  BY MR. BUCHANAN:
8    Q.   Okay.  So you had that knowledge
9  certainly in 2011, right, ma'am?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  Yes.
12  BY MR. BUCHANAN:
13    Q.   Okay.  He stated -- he states,
14  "Yet, in his opinion, nothing has changed on the
15  manufacturer's side in regards to the way we do
16  reconciliations."
17        Do you see that?
18    A.   Yes, I do.
19    Q.   "He stated that we have the
20  public's trust in our hands and we need to be
21  sure we are staying ahead of the curve by
22  monitoring current diversion trends and
23  tightening our processes."
24        Do you see that?

Page 400

1    A.   I do.
2    Q.   And do you agree, ma'am, that as
3  a registrant manufacturer and a registrant
4  distributor that you have the public's trust in
5  your hands?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  We have a
8  responsibility to abide by the
9  regulations, the DEA regulations.
10  BY MR. BUCHANAN:
11    Q.   Right.  You have a responsibility
12  under the statute to maintain effective controls
13  against diversion?
14    A.   Right.
15    Q.   And would you fault people of the
16  public, knowing that you have that obligation,
17  for assuming that you were going to do
18  everything in your power to maintain effective
19  controls against diversion?
20        MS. VANNI:  Objection.
21        THE WITNESS:  That is what we
22  did.
23  BY MR. BUCHANAN:
24    Q.   Would you fault people for

Page 401

1  expecting that of you?
2        MS. VANNI:  Objection.
3        THE WITNESS:  No.
4  BY MR. BUCHANAN:
5    Q.   That's what you should do, right?
6        MS. VANNI:  Objection.
7        THE WITNESS:  Yes.
8  BY MR. BUCHANAN:
9    Q.   And let's turn now to the next
10  page, point three, it says, "DEA then spoke
11  about SOMS at length and also discussed the need
12  to monitor customers (wholesalers in
13  particular), including our wholesaler's
14  customers, through periodic audits or on-site
15  visits," correct?
16    A.   Yes.
17    Q.   "This is not something we are
18  currently doing and another item we will need to
19  work on improving."
20        Did I read that correctly?
21    A.   You did.
22    Q.   And so two years or so before
23  back in 2011, before -- long before you sat down
24  with the DEA in DC, you were told you got to

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1  monitor your customers, wholesalers in
2  particular, but including your wholesaler's
3  customers, right?
4       MS. VANNI: Object to form.
5       THE WITNESS: Yes, and we were
6       not as part of SOMS, we were as part of
7       OMS, at least the wholesalers.
8  BY MR. BUCHANAN:
9       Q.   Okay. And it would be fair to
10 say, ma'am, sitting here today, you're not aware
11 of a single site visit report of wholesaler that
12 was done through OMS, right?
13      MS. VANNI: Objection.
14      THE WITNESS: I am not, but that
15      doesn't mean they didn't occur.
16 BY MR. BUCHANAN:
17      Q.   Okay. And we looked at the
18 inadequate -- the inadequacies of the system --
19      A.   We looked at --
20      Q.   -- in your earlier documents. Do
21 you recall looking at that?
22      MS. VANNI: Object to form.
23      THE WITNESS: The improvements
24      we'd like to make, yes.

Page 403

1  BY MR. BUCHANAN:
2       Q.   I think you called them
3  inadequacies, right?
4       A.   In the document.
5       Q.   Yes.
6       A.   But it means improvements.
7       Q.   Well, let's not talk about what
8  you say it means today. Let's talk about what
9  you wrote.
10      You wrote inadequate, correct?
11      MS. VANNI: Objection.
12      THE WITNESS: I did.
13 BY MR. BUCHANAN:
14      Q.   Thank you.
15      And you said this is not
16 something we are currently doing, right?
17      A.   Not in SOMS.
18      Q.   What you wrote here, ma'am, after
19 the DEA spoke about SOMS at length and also
20 discussed the need to monitor customers,
21 wholesalers in particular, including our
22 wholesaler's customers --
23      A.   Yes.
24      Q.   -- through periodic audits and

Page 404

1  on-site visits that this is not something you
2  were currently doing, right?
3       A.   Not something we were currently
4  doing under SOMS.
5       Q.   That's not what you wrote. We
6  can agree on that, right?
7       MS. VANNI: Objection.
8       THE WITNESS: That's not what's
9       written.
10 BY MR. BUCHANAN:
11      Q.   And what you follow with that is
12 "another item we will need to work on
13 improving."
14      Did I read that correctly?
15      A.   You did.
16      Q.   An item you will need to work on
17 improving. Not that we're doing it through
18 customer service, right?
19      MS. VANNI: Objection.
20      THE WITNESS: No, that's not what
21      it says. I didn't elaborate.
22 BY MR. BUCHANAN:
23      Q.   Not that you were doing it
24 through sales?

Page 405

1       MS. VANNI: Objection.
2       THE WITNESS: This group is the
3       manufacturing group. I would not have
4       gone into detail about our SOM program
5       with that group.
6  BY MR. BUCHANAN:
7       Q.   Right, and, certainly, what you
8  said was it's not something you're currently
9  doing? We could agree that's what you wrote,
10 correct?
11      A.   That is what it says.
12      MS. VANNI: Objection, asked and
13      answered now about ten times.
14      MR. BUCHANAN: Okay. Let's go
15      to -- I don't think it was ten, but it
16      may have been more than one.
17      THE WITNESS: Nine and a half.
18      MR. BUCHANAN: Let's go to 1046.
19      (Document marked also
20      identification as Par-Norton Deposition
21      Exhibit No. 19.)
22 BY MR. BUCHANAN:
23      Q.   Passing you Exhibit 19. I
24 probably should have done this -- kind of I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1  working back in time, if you can follow where
2  we're going, ma'am.  We first -- we just looked
3  at an early 2013 exchange where you had a 25
4  risk assessment for your SOMS program.
5          Do you recall that?
6      A.    Yes.
7      Q.    Twenty-five being the worst,
8  right?
9      A.    Being -- yes, the highest
10  priority --
11          MS. VANNI:  Object to form.
12          THE WITNESS:  -- that I want to
13  work on.
14  BY MR. BUCHANAN:
15      Q.    Yeah, and then we also looked at
16  kind of that -- your closeout memo from that DEA
17  inspection in Charlotte.  That was 2011, right?
18      A.    Mm-hmm, yes.
19      Q.    Yes?
20      A.    Yes.
21      Q.    I'm a little out of sequence
22  here.  This one is September 2012.  For the
23  record, I think we're on Exhibit 19.
24          And this is an e-mail from

Page 407

1  yourself to Eric Bonner.  Who is Eric Bonner?
2      A.    That's our -- was the plant
3  manager.
4      Q.    Okay.  And there's a press
5  release that's out there about CVS retailers and
6  their ability to sell controlled substances,
7  right?
8      A.    Yes.
9      Q.    Okay.  And you're directing them
10  to take -- make sure that they get taken out of
11  the order system, okay?
12      A.    Right.
13      Q.    Because they don't have licenses
14  anymore, right?
15      A.    That's what we would do if DEA
16  had an issue with a customer, yes.
17      Q.    Right.  So now you couldn't
18  legally sell to somebody who doesn't have a
19  registration, right?
20      A.    That's true.
21      Q.    Okay.  And then up top you say,
22  we need our due diligence to find out what
23  happens to our product beyond the first level of
24  the supply chain.

Page 408

1          Did I read that correctly?
2      A.    "We just need to do our due
3  diligence to find out what happens," yes.
4      Q.    Right.  "We just need to do our
5  due diligence to find out what happens to our
6  product beyond the first level of the supply
7  chain," right?
8      A.    For this particular customer,
9  yes, that's what I'm referring to.
10      Q.    So your supply chain, your supply
11  chain first level would be wholesalers
12  distributors, right?
13      A.    Yes.
14      Q.    Supply chain beyond the first
15  level would be the people they sell to, right?
16      A.    Correct.
17      Q.    People they sell to might be
18  pharmacies, might be hospitals, any number of
19  places, right?
20      A.    Yes.
21      Q.    And so with this saying you got
22  to do your due diligence to find out what
23  happens to your product beyond the first level
24  of the supply chain, right?

Page 409

1      A.    Yes.
2      Q.    Because the DEA is no longer
3  buying that it's not you?
4          MS. VANNI:  Object to form.
5  BY MR. BUCHANAN:
6      Q.    Right?
7      A.    I'm not getting what you're
8  referring to.
9      Q.    Withdrawn, okay.
10          The DEA is no longer buying what
11  you all have been selling for years, right?
12          MS. VANNI:  Objection.
13          THE WITNESS:  No.
14  BY MR. BUCHANAN:
15      Q.    What you all have been selling
16  for years was it wasn't us, it was our customer?
17      A.    We don't sell --
18          MS. VANNI:  Objection.
19          THE WITNESS:  -- anything to DEA.
20  BY MR. BUCHANAN:
21      Q.    Well, I'm saying -- okay.  Let's
22  look at what you wrote, ma'am.
23      A.    Are you referring to
24  manufacturers in general?  I mean, that's an odd

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1  statement.
2      Q.  I'm referring to what you wrote
3  in the middle, September 12, 2012, if we ship to
4  a distribution center -- that's what DC means,
5  right?
6      A.  Yes.
7      Q.  Okay.  "That then further
8  distributes to these registrants, we are still
9  shipping to an entity that is contributing to
10  diversion and abuse as evidenced by DEA pulling
11  their license."
12      Did I read that correctly?
13      A.  Yes.
14      Q.  "DEA is no longer buying the" --
15  and then you put in quotes -- "it wasn't us, it
16  was our customer philosophy," right?
17      A.  Yes, and that's --
18      Q.  I'm sorry.  That's what you
19  wrote, correct?
20      A.  Yes, that's what I wrote.
21      MR. BUCHANAN:  Can I have 1051,
22  please.
23      (Document marked for
24      identification as Par-Norton Deposition

Page 411

1      Exhibit No. 20.)
2  BY MR. BUCHANAN:
3      Q.  And that was 2011 -- 2012, excuse
4  me?
5      A.  2012.
6      Q.  So, again, once again, before you
7  met with the DEA and had that sit down, right?
8      A.  Yes, to individuals that wouldn't
9  understand the SOM program.  These are basically
10  operations people, so that's why it was worded
11  that way.
12      Q.  Passing you, ma'am, what we've
13  marked as Exhibit 20 to your -- I'm sorry, is
14  this 20?  Twenty.  Let me read your sticker on
15  the bottom right, ma'am.
16      A.  Exhibit 20.
17      Q.  I did do that right.  Exhibit 20.
18      MS. VANNI:  I just want to lodge
19  an objection to the use of this exhibit
20  as it's before Endo's acquisition of
21  Qualitest.
22      MR. BUCHANAN:  Okay.
23      THE WITNESS:  Yeah, and before my
24  time at Qualitest as well.

Page 412

1  BY MR. BUCHANAN:
2      Q.  Okay.  So, as I understand it,
3  Qualitest was acquired by Endo, correct?
4      A.  Correct.
5      Q.  You joined Qualitest in 2011?
6      A.  Yes.
7      Q.  As part of your evaluation and
8  role -- I'm sorry -- as part of your role in DEA
9  compliance, did you look to see -- did you
10  evaluate the department?
11      A.  Yes.
12      MS. KOSKI:  Object to form.
13      THE WITNESS:  To what extent?
14      What are you referring to specifically
15      did I evaluate?
16  BY MR. BUCHANAN:
17      Q.  Well, would it surprise you that,
18  in fact, Qualitest had other consultants come in
19  years before you arrived and look at their
20  suspicious order monitoring system?
21      MS. VANNI:  Objection.
22      THE WITNESS:  I don't know.
23  BY MR. BUCHANAN:
24      Q.  Okay.  Here's a -- here is one

Page 413

1  such evaluation from 2008.  Do you know John
2  Schultz?
3      A.  Yes.
4      Q.  Who is John?
5      A.  He had the position before me.
6      Q.  Okay.  So he was predecessor.  He
7  didn't have the name of head of DEA compliance,
8  but he had a similar function?
9      MS. VANNI:  Object to form.
10      THE WITNESS:  I'm not sure his
11      title.
12  BY MR. BUCHANAN:
13      Q.  Okay.  "All, attached is Mike's
14  audit report from his visit.  We will need to
15  formulate a response and implement the
16  corrective actions.  Please provide comment on
17  the observations with suggested corrective
18  actions."
19      Did I read that correctly?
20      A.  Yes.
21      Q.  Okay.  And, time permitting, we
22  would get more deeply into this, but let's focus
23  on the thread we're now talking about, 1051.2.
24      Under the "Details" at the

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1  bottom, the issues that were noted during the
2  review were, and then it's got paragraphs
3  similar to what you've seen in the Buzzeo one
4  from during your time, right?
5        MS. VANNI: Objection.
6        THE WITNESS: Okay.
7  BY MR. BUCHANAN:
8        Q.   The issues that were noted during
9  the review were, "1. Reporting of Suspicious
10  Orders to DEA, in addition to reporting
11  Suspicious Sales."
12        Do you see that?
13        A.   I do.
14        MR. BUCHANAN: Sorry, Bradley,
15  you have to be on 1051.2.
16        TRIAL TECHNICIAN: I am.
17        MR. BUCHANAN: And scroll down to
18        the issues that were noted during the
19        review were 1, I'm sorry, above. There
20        you go. Thanks. We're going to scroll
21        down.
22  BY MR. BUCHANAN:
23        Q.   It continues now on the body
24  under details, "A check with Mr. Schultz showed

Page 415

1  that in the past eight months no reports of
2  suspicious orders were sent to DEA," correct?
3        A.   That's what it says, yes.
4        Q.   And we looked at that chart
5  earlier concerning product that was shipped, and
6  do you still have Exhibit 4 in the general
7  vicinity over there, ma'am?
8        A.   Exhibit 4?
9        Q.   Looks like -- yeah, looks like in
10  2008 --
11        A.   The quantities.
12        Q.   -- Qualitest shipped, and this is
13  from 2008, right?
14        MS. VANNI: Is this your
15        demonstrative?
16        MR. BUCHANAN: It is. Well, it's
17        what you've pointed us to.
18  BY MR. BUCHANAN:
19        Q.   Looking at 2008 we see some,
20  what, 1.7 billion pills of hydrocodone products,
21  right?
22        A.   That's what your document says,
23  but, again, I don't know where those numbers
24  come from or what detail.

Page 416

1        Q.   And oxycodone -- there's a
2  reference to where they come from. They come
3  from the company's files.
4        MS. VANNI: Objection.
5  BY MR. BUCHANAN:
6        Q.   And then there's, what, about
7  89 million oxycodone pills, right?
8        A.   That's what it says, yes.
9        Q.   So enough to give a handful of
10  controlled substances to every human being in
11  the United States of America, right?
12        MS. VANNI: Objection.
13        THE WITNESS: I don't know.
14  BY MR. BUCHANAN:
15        Q.   Okay. During this period of
16  time, you were told the Qualitest system for
17  reporting suspicious orders to DEA needs to be
18  improved, right?
19        MS. LEIBELL: Object to form.
20        THE WITNESS: This is before I
21        got there. I was not told anything
22        about this.
23        MS. VANNI: Are you referring to
24        the 2008 period?

Page 417

1        MR. BUCHANAN: I am. So I'm
2        referring to the 2008, the inspection
3        and report, okay.
4        MS. VANNI: So it was prior to
5        Endo's acquisition and prior to the
6        witness' employment with Qualitest.
7        THE WITNESS: Right.
8        MS. VANNI: Just note my
9        objection.
10        MR. BUCHANAN: Those are points
11        that you can note, certainly. I don't
12        think they impede or otherwise undermine
13        the relevancy.
14  BY MR. BUCHANAN:
15        Q.   On the bottom of 1051.3 it says,
16  "It is important to Qualitest to work with all
17  controlled substance customers, including those
18  who will further distribute Qualitest products
19  to other DEA registrants, to assure that the
20  controlled substances are distributed only to
21  customers who have systems in place to assure
22  that the controlled substances will be used for
23  legitimate medical purposes."
24        Do you see that, ma'am?

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1     A.   I see it.
2     Q.   And this is 2008, correct?
3     A.   That's the date on it.
4     Q.   You can set that aside.
5     A.   Again, I had no knowledge of it
6   and wasn't involved.
7     Q.   Okay.  And, again, we looked at a
8   letter from Mr. Rannazzisi in a PowerPoint.
9          Do you recall that?
10    A.   Yes.
11    Q.   That was from 2007?
12    A.   Correct.
13    Q.   Okay.  Let's try and move
14  forward.
15         In late 2013 the company revamped
16  its SOMS process and implemented new SOPs, fair?
17         MS. VANNI:  Object to form.
18         THE WITNESS:  Upgraded the
19         program, yes.
20  BY MR. BUCHANAN:
21    Q.   And I don't think we'll have time
22  to go through those SOPs with you, but I would
23  like to talk to you about some of the responses
24  you received to the dear customer letter, the

Page 419

1   responses you didn't receive, okay?
2     A.   Okay.
3          MR. BUCHANAN:  Can I have 1075,
4     please.
5   BY MR. BUCHANAN:
6     Q.   Who is Preferred Pharmaceuticals?
7     A.   I don't recall.
8     Q.   Does the name ring a bell to you?
9     A.   No, it does not.
10    Q.   Okay.  Let's kind of reorient
11  ourselves.
12         In 2013 after everything we've
13  discussed, after the risk assessment you set
14  forward, after some meetings with management,
15  after procuring some resources and getting
16  consent from others, you sent a letter out to
17  customers, right?
18    A.   Yes.
19    Q.   Those customers included
20  distributors, those customers included some end
21  user pharmacies that were dealing direct with
22  the company, and you got responses from many of
23  those customers, right?
24    A.   Yes.

Page 420

1          (Document marked for
2          identification as Par-Norton Deposition
3          Exhibit No. 21.)
4   BY MR. BUCHANAN:
5     Q.   Passing you what we're marking as
6   Exhibit 21 to your deposition, ma'am, it's an
7   exchange with you and your SOMS coordinator,
8   Mr. Brantley.
9     A.   Okay.
10    Q.   This is from late 2014 or October
11  of 2014, and I guess if you start back forward,
12  you'll see an exchange between Mr. Brantley and
13  Mr. Kent with his att net e-mail address for
14  Preferred Pharmaceuticals in response to
15  Mr. Brantley's inquiries.
16         Do you see that?
17    A.   I do.
18    Q.   Okay.
19         MR. BUCHANAN:  Please, Bradley,
20         go to 1075.4, just so we're following
21         each other on the screen.
22  BY MR. BUCHANAN:
23    Q.   All right.  There we go, we see
24  the e-mail from Mr. Kent for Preferred

Page 421

1   Pharmaceuticals, and Mr. Brantley is having a
2   back-and-forth with them concerning his -- part
3   of the due diligence process that's described in
4   your revamped SOPs, correct?
5     A.   Yes.
6     Q.   Part of what you implemented in
7   late 2013, correct?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  I'm sorry?  I'm
10         sorry, I was reading.
11  BY MR. BUCHANAN:
12    Q.   You know what, fair.
13         So in late 2013 you revamped your
14  SOMS process, correct?
15         MS. VANNI:  Form.
16         THE WITNESS:  We made upgrades to
17         it starting --
18  BY MR. BUCHANAN:
19    Q.   Letters went out, correct?
20    A.   Letters went out then, yes.
21    Q.   Mr. Brantley conducted some due
22  diligence visits, correct?
23    A.   Yes.
24    Q.   Mr. Brantley also engaged with

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1   customers to get verification that they actually
2   had a SOM program, right?
3       A.   Yes.
4       Q.   Because this was close --
5       A.   All ongoing.
6       Q.   This closed system doesn't work
7   if the people you're selling to really aren't
8   watching their customers, right?
9           MS. VANNI: Object to form.
10          THE WITNESS: Yes.
11  BY MR. BUCHANAN:
12      Q.   Okay. So Mr. Brantley sent some
13  follow-up questions to Mr. Kent, and he sends to
14  you 1075.2. "Tracey, please see the response
15  below from Preferred Pharmaceuticals."
16          Do you see that, 1075.2? That's
17  also on the screen, if that's easier for you.
18      A.   No, it's okay.
19          Yes.
20      Q.   Okay. And then you send a
21  response back to Mr. Brantley, and that's at the
22  bottom of 1075.1.
23      A.   Okay.
24      Q.   Subject: external, Due Diligence

Page 423

1   and Revised SOM. "Have him provide proof of
2   recent (last two years) training in either SOMS
3   diversion or abuse."
4           Do you see that?
5       A.   Yes.
6       Q.   Okay. And these are your
7   instructions back to your employee,
8   Mr. Brantley, correct?
9       A.   Yes.
10      Q.   "Also, the 'new software' he
11  refers to still does not sound like it evaluates
12  the order ████████████████████████
13  █████
14      A.   Yes.
15      Q.   "That function should not be done
16  manually."
17          Do you see that?
18      A.   Ideally, yes.
19      Q.   That's what you wrote, right?
20      A.   Yes.
21      Q.   Okay. "Please push him for
22  additional information on that; maybe he is just
23  unsure what we are looking for."
24          Did I read that correctly?

Page 424

1       A.   You did.
2       Q.   Okay. So you're getting
3   information from a customer who is a smaller
4   distributor, right?
5       A.   Mm-hmm.
6       Q.   Certainly one that didn't come
7   front of mind when I mentioned it to you,
8   Preferred Pharmaceuticals?
9       A.   No, it did not. I mean, Eric was
10  really the main customer facing person.
11      Q.   I understand, but, you know, a
12  distributor that's working with smaller volumes,
13  right, correct?
14      A.   I believe. I don't know if
15  they're a distributor, a pharmacy, I'm not sure.
16      Q.   █████████████████████████████
17  █████████████████████████?
18      A.   I have one -- I have high
19  expectations for the customer as well as us,
20  yes.
21      Q.   Right, right, and, in fact, we
22  could agree that as it related to the other
23  classes of trade, ma'am, prior to revamping the
24  inadequate SOM system at Qualitest in 2013,

Page 425

1   other classes of trade, if they were being done
2   ██████████████████████████?
3           MR. SCHACK: Objection.
4           MS. VANNI: Objection.
5           THE WITNESS: No. It would have
6       been done by our OMS program.
7   BY MR. BUCHANAN:
8       Q.   Okay. Evaluating frequency, size
9   and volume?
10      A.   ████████████████████████████████
11  ████
12      Q.   Right. And so one of the things
13  you're calling out your customer for in 2014 is
14  it's got to evaluate frequency, size and volume,
15  correct?
16      A.   It needs to address it so --
17      Q.   ████████████████████████████████
18  ████████████████████████████
19      A.   Right.
20      Q.   Please push him for additional
21  information on that, right?
22      A.   What he -- it looks like --
23      Q.   Is that what you --
24      A.   And I haven't had time to read

107 (Pages 422 to 425)

Highly Confidential - Subject to Further Confidentiality Review



Page 426

1    the full thing, but it looks like what he's
2    saying is that
3
4           Q.
5           A.


9           Q.    Okay.  Your system, as it related
10   to other classes of trade, ma'am, was not
11   looking at the other two, correct?
12          MS. VANNI:  Object to form.
13          THE WITNESS:  It was, just the
14      system, the electronic computerized
15      system was

18   BY MR. BUCHANAN:
19          Q.    You'd agree, ma'am, that a
20   company that was making billions and billions
21   and billions of pills was getting many more line
22   items of orders from its customers than a
23   company like Preferred Pharmaceuticals?
24          MS. VANNI:  Objection.

Page 427

1           THE WITNESS:  I don't know
2      Preferred Pharmaceuticals' quantities to
3      convey that.
4    BY MR. BUCHANAN:
5           Q.    Okay.  And then you said, please
6    provide proof -- I'm sorry -- have him provide
7    proof you said, right?
8           You see that?
9           A.    Yes.
10          Q.    Of recent last two years training
11   in either SOMS diversion and abuse or abuse.
12          Do you recall that?
13          A.    Yes.
14          Q.    And we saw your assessment from
15   2013.  Another of your risk areas was a lack of
16   education within Qualitest?
17          MS. VANNI:  Objection.
18          THE WITNESS:  That was not
19      related to SOMS.
20   BY MR. BUCHANAN:
21          Q.    Okay.
22          A.    That training was overall general
23   DEA requirements, more recordkeeping, security
24   and accountability based.

Page 428

1           Q.    It states, my concern is with the
2    lack -- up top now, I'm sorry.
3           Okay.  "My concern is with the
4    lack of a program that reviews order frequency,
5    pattern and volume.  If he can't prove it to us,
6    how will he prove it to DEA?"
7           Do you see that?
8           A.    Yes.
9           Q.    Okay.  And so this is the process
10   the company was undergoing, and you brought in
11   Mr. Brantley in September of 2013, correct?
12          A.    Yes.
13          Q.    Going out to its customers and
14   saying what are the processes you have in place,
15   customer, correct?
16          A.    Correct.
17          Q.    We're going to make sure, as best
18   we're able at this point in time --
19          A.    Yes.
20          Q.    -- to figure out whether you've
21   got your head in the sand or whether you
22   actually have a suspicious order monitoring
23   program, right?
24          MS. VANNI:  Objection.

Page 429

1           THE WITNESS:  Right.
2    BY MR. BUCHANAN:
3           Q.    Okay.  And that's necessary if
4    we're going to maintain this closed system,
5    right?
6           MS. VANNI:  Objection.
7           THE WITNESS:  Yes.
8    BY MR. BUCHANAN:
9           Q.    Okay.
10          A.    The level that we were asking for
11   was not necessarily necessary, but to have a
12   SOMS system was necessary.
13          Q.    Well, what you said was you
14   wanted proof, right?  After that DEA meeting --
15          A.    There's several things.
16          Q.    -- in March of 2013, you wanted
17   proof that he'd had it, right?
18          MS. VANNI:  Object to form.
19          THE WITNESS:  There are several
20      things in here that I was asking for.
21   BY MR. BUCHANAN:
22          Q.    Yeah, and, in fact, there'd been
23   -- and we don't have time to go through it,
24   there had been a back-and-forth with Preferred

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1   Pharmaceuticals for -- this is about, what, a
2   year after, this is a year after your first
3   letter went out, right?
4       A.   Uh-huh.
5       Q.   So a year after your first letter
6   goes out, you're still going back and forth with
7   Preferred Pharma about whether they've got
8   programs in place, right?
9           MS. VANNI:  Object to form.
10          THE WITNESS:  Well, keep in mind
11      too when you send out a letter --
12  BY MR. BUCHANAN:
13      Q.   Is that correct?
14      A.   -- you don't know -- I don't know
15  how long this went on.
16      Q.   Well, I'm sorry.  This is --
17      A.   I mean, this is 2014, but I don't
18  know what happened from the time of the letter
19  to this.
20      Q.   October 21, 2014 --
21      A.   Correct.
22      Q.   -- correct, that's your last
23  e-mail?  You're still not satisfied that they've
24  got programs in place to keep this closed

Page 431

1   system, right?
2       A.   I mean, you're making the
3   assumption that they were a customer when the
4   letter originally went out too.  I don't even
5   know that.
6       Q.   That's a discernable fact, and we
7   don't have time to root through the documents
8   with you today, but that can be determined.
9       A.   Right.
10      Q.   I'll represent to you I -- I
11  won't make a representation.  I'll do that at
12  another time.
13          But this is a year after your
14  letter went out, right?
15      A.   Yes.  And it's an ongoing thing,
16  and the letter might not have gone to the right
17  person in the company to start with either.  It
18  might have had to have gone through, you know,
19  several people once it got there, so a lot of
20  logistics in the process.
21          MR. BUCHANAN:  Can I have 1145.
22          (Document marked for
23      identification as Par-Norton Deposition
24      Exhibit No. 22.)

Page 432

1   BY MR. BUCHANAN:
2       Q.   We could agree, ma'am, that from
3   the perspective of maintaining a closed system
4   and having effective controls against diversion,
5   it's not appropriate to sell drug to people that
6   don't have suspicious order monitoring in place,
7   right?
8           MS. VANNI:  Object to form.
9           THE WITNESS:  To have controls in
10      place to make sure it doesn't go out the
11      door --
12  BY MR. BUCHANAN:
13      Q.   Right.
14      A.   -- to illegitimate channels.
15      Q.   And what you were asking for were
16  their SOM programs, correct?
17      A.   Yes.
18      Q.   That's what you asked for as part
19  of your due diligence information in October of
20  2013, right?
21      A.   Correct.
22      Q.   And if the company was shipping
23  drug to people who didn't have programs in
24  place, that would be improper, right?

Page 433

1           MS. VANNI:  Objection.
2           MR. LEEDER:  Objection.
3           THE WITNESS:  Depending on what
4       else they had in place.
5   BY MR. BUCHANAN:
6       Q.   If they didn't have programs in
7   place to ensure the effective control against
8   diversion, it would be improper for you to be
9   selling to them, right?
10          MS. VANNI:  Objection.
11          THE WITNESS:  If it's -- they
12      don't have to have something they call
13      SOMS, so they have to have appropriate
14      controls, yes.
15  BY MR. BUCHANAN:
16      Q.   Okay.  I mean, they certainly
17  can't -- well, let's take a look at some.
18          Did you form a SOMS advisory team
19  in late 2013, early 2014?
20      A.   Yes, we did.
21      Q.   Mr. Brantley was a member of
22  that?
23      A.   Yes, he was.
24      Q.   Were you a member of that?

Highly Confidential — Subject to Further Confidentiality Review

Page 434

1         A.    I think I was a member when Eric
2    wasn't there, I believe.  I'm not sure if I was
3    actually on it or I stepped in when he wasn't
4    there.
5         Q.    So one of the things that started
6    to happen after this is you got those resources
7    provisioned internally within Qualitest right?
8              MS. VANNI:  Object to form.
9              THE WITNESS:  Yes.
10   BY MR. BUCHANAN:
11        Q.    You had a SOMS compliance
12   manager, right, Mr. Brantley?
13        A.    Yes.
14        Q.    Went out and started visiting
15   customers, right?
16        A.    Yes.
17        Q.    And one of the things, lo and
18   behold, you started to figure out when you
19   started to look at the information in due
20   diligence is that some of these customers are
21   really doing some fishy stuff, right?
22             MS. VANNI:  Objection.
23             THE WITNESS:  I'm sure there are
24        customers that we had concerns with,

Page 435

1         sure.
2    BY MR. BUCHANAN:
3         Q.    And so this is a report of
4    November 25, 2013 by Mr. Brantley concerning the
5    Artemis Pharmacy in Houston, Texas right?
6         A.    Yes.
7         Q.    According to the questionnaire it
8    says in the middle paragraph, we're just going
9    to have to move through it quickly, "According
10   to the questionnaire, Artemis Pharmacy fills 600
11   prescriptions monthly, with ███ of the
12   prescriptions filled for controlled substances,"
13   right?
14        A.    Yes.
15        Q.    Do you see that?
16        A.    I do.
17        Q.    And, I mean, that's what they —
18   you sent out a questionnaire to customers in or
19   around October 2013, correct?
20        A.    Yes.
21        Q.    And they provided information
22   back to you in the questionnaire, correct?
23        A.    Correct.
24        Q.    And so what they told you in the

Page 436

1    questionnaire was that 30% of the prescriptions
2    were for controlled substances, right?
3         A.    Yes.
4         Q.    But also you got dispensing
5    history, right?
6         A.    Yes.
7         Q.    Do you recall our discussion, it
8    was probably in the first hour this morning,
9    about whether you got dispensing histories from
10   customers?
11        A.    Yes, I do.
12        Q.    Does this refresh your
13   recollection as part of the due diligence when
14   you actually started to look into your customers
15   that you did get dispensing histories?
16        A.    He's calling it dispensing
17   history.  I don't recall the level of detail
18   around it, but, yes, that's what's mentioned
19   here.
20        Q.    Okay.  And, in fact, and the ███
21   ████████████████████████████████
22   DEA told you was an average in the country,
23   right?
24             MS. KOSKI:  Objection.

Page 437

1    BY MR. BUCHANAN:
2         Q.    13% to 15% I think they said,
3    right?
4         A.    It was a guide, yes.
5         Q.    Right, and so they answered the
6    questionnaire and said ███ right?
7         A.    Correct.
8         Q.    And when you actually got the
9    dispensing history, lo and behold, it was what?
10        A.    ████████████████
11        Q.    ████████████████
12        A.    I'm sure most of the dispensing
13   history was for a snapshot of time.  It looks
14   like this is 12 months.
15        Q.    Yeah, so a 12-month dispensing
16   history, correct?
17        A.    Yes.
18        Q.    ███ controlled substances, right?
19        A.    Yes.
20        Q.    Again, we got a bunch of that
21   hydrocodone in there, and we've talked about the
22   billions of pills that y'all were making during
23   this period of time, right?
24             MS. VANNI:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1        THE WITNESS:  Yes.
2   BY MR. BUCHANAN:
3        Q.   Okay.  And then there's that
4   other drug you mentioned carisoprodol?
5        A.   Carisoprodol.
6        Q.   Thank you.  You got two of the
7   Holy Trinity in the mix, right?
8        MS. VANNI:  Objection.
9        THE WITNESS:  Yes.
10  BY MR. BUCHANAN:
11       Q.   Okay.  Drugs of abuse, right?
12       MS. VANNI:  Objection.
13       THE WITNESS:  Drugs that have a
14       legitimate use.
15  BY MR. BUCHANAN:
16       Q.   And then "According to the
17  questionnaire, ▓ of all prescriptions were
18  paid in cash," right?
19       A.   Yes.
20       Q.   Another red flag, right?
21       MS. VANNI:  Objection.
22       THE WITNESS:  Depending on the
23       business type, yes.
24  BY MR. BUCHANAN:

Page 439

1        Q.   And so this is the type of
2   information the company was getting when it
3   started to do the due diligence and it had the
4   resources that it applied to it in 2013, right?
5        A.   Yes.
6        Q.   And the recommendation of
7   Mr. Brantley was?
8        A.   To discontinue shipments.
9        Q.   Stop selling, right?
10       A.   Yes.
11       Q.   Right.
12            This one presented unreasonable
13  risk of diversion, right?
14       A.   It presented issues with the
15  volumes, the percentages of controlled to
16  noncontrolled and the cash, so items of concern,
17  definitely.
18       Q.   Okay.  Did they have front-end
19  merchandise?
20       A.   According to this, no, they did
21  not.
22       Q.   Okay.  So that means you didn't
23  even need to ask for the information from them,
24  you could have just gone down there, walked in

Page 440

1   and seen this is a place where people are going
2   in, whipping out wads of cash and getting drugs?
3        MS. VANNI:  Objection.
4        THE WITNESS:  You couldn't have
5        -- you couldn't have determined that
6        just by walking in.
7   BY MR. BUCHANAN:
8        Q.   Well, you could have sat there
9   and seen people pulling cash out of their
10  pocket, no front-end merchandise, right?
11       MS. VANNI:  Objection.
12       THE WITNESS:  You're not really
13       going to go and like just stand there
14       and watch people pay for their
15       prescriptions all day.  Photographs
16       would have told, did tell, obviously,
17       that they had very little front-end
18       merchandise.  Any one of those things is
19       not the be all to end all.  It's the
20       combination of things in this case.
21  BY MR. BUCHANAN:
22       Q.   Okay.  And, certainly, as part of
23  this process, I mean, you didn't even need to
24  look at chargeback data.  I mean, frankly, you

Page 441

1   sent -- you requested a dispensing history, you
2   got it.  You sent a questionnaire, you got it.
3   Mr. Brantley made the assessment, this is a
4   problem, no more business, boom?
5        A.   In this particular case.
6        MS. VANNI:  Objection.
7        THE WITNESS:  Yes.
8   BY MR. BUCHANAN:
9        Q.   Yeah, and there's several that
10  when you actually put boots on the ground and
11  you actually looked at who you were selling
12  drugs to were problem customers, right?
13       MS. VANNI:  Objection.
14       THE WITNESS:  Possibly, yes.
15  BY MR. BUCHANAN:
16       Q.   And let's not make this
17  challenging.  We agree, don't we, ma'am, that
18  that is an important thing to do?
19       MS. VANNI:  Objection.
20       THE WITNESS:  To visit your
21       customers?
22  BY MR. BUCHANAN:
23       Q.   Yes.
24       A.   It's a good addition to a DEA to

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    the DEA required SOM program, yes.
2         Q.    Okay.  And, I mean, you learned
3    that, frankly, you're doing business with people
4    you really shouldn't be, right?
5              MS. VANNI:  Objection.
6              THE WITNESS:  We learned that
7         there's customers that we don't want to
8         do business with.
9    BY MR. BUCHANAN:
10        Q.    You learned there were customers
11   in October of 2013 that when you asked for their
12   SOM program they said what's that?
13             MS. VANNI:  Objection.
14   BY MR. BUCHANAN:
15        Q.    Right?  Do you remember that?
16        A.    There were probably some, yes.
17   And a lot of customers didn't refer to it as SOM
18   either.  You know, the DEA regulation doesn't
19   call it a SOM either, so that's -- that part is
20   understandable.
21        Q.    But let's be clear, every
22   customer who you would be dealing with all the
23   way down to the pharmacy level, okay, they've
24   got to register with the DEA right?

Page 443

1         A.    Yes, they do.
2         Q.    Okay.  They've got to make the
3    same promise you're making, right?
4         A.    Yes.
5         Q.    To maintain effective controls
6    against diversion, right?
7         A.    Correct.
8         Q.    To have a suspicious order
9    monitoring program, right?
10             MS. VANNI:  Objection.
11             THE WITNESS:  Yes.  To have
12        controls in place.
13   BY MR. BUCHANAN:
14        Q.    Right.  Okay.
15             I would love to go through a few
16   more of these.  I'm being told that I am clock
17   limited.
18             MR. BUCHANAN:  Can I have 1101,
19        please.
20   BY MR. BUCHANAN:
21        Q.    Do you remember the interaction
22   you all had with FW Kerr?
23             MS. VANNI:  Object to form.
24             THE WITNESS:  The name is

Page 444

1    familiar, but I don't remember the
2    interaction.
3    BY MR. BUCHANAN:
4         Q.    Do you remember having problems
5    for a long time getting evidence they even had a
6    SOM program or something that served that
7    purpose?
8              MS. VANNI:  Object to form.
9              THE WITNESS:  I don't remember
10        customer specific.  If you have
11        information.
12             (Document marked for
13        identification as Par-Norton Deposition
14        Exhibit No. 23.)
15   BY MR. BUCHANAN:
16        Q.    Passing you what we're marking
17   Exhibit 23.
18             FW Kerr is a distributor, right?
19        A.    I believe they are.  I'm not
20   positive, but I think they are.
21             MS. VANNI:  It's 24.
22             THE WITNESS:  Should be 24.
23             MR. BUCHANAN:  Which number is
24        that one?

Page 445

1              THE WITNESS:  This is 22, 21.
2              MR. BUCHANAN:  What that means is
3         that --
4              THE WITNESS:  This is 23 that you
5         just handed me.
6              MS. REESE:  You gave us 23.
7         We're up to 24.
8              MR. BUCHANAN:  We are up to 24,
9         okay.  I'll trust everyone else is
10        paying better attention than me.  Thank
11        you.  For posterity, we're marking this
12        as 24, and I shouldn't say -- for all
13        purposes this is 24.
14             (Document marked for
15        identification as Par-Norton Deposition
16        Exhibit No. 24.)
17   BY MR. BUCHANAN:
18        Q.    Passing you Exhibit 24, ma'am,
19   this is an interaction your team, Mr. Brantley
20   had with Mr. Young from FW Kerr in November 21
21   or in November 2014.
22             Do you see that?
23        A.    Yes.
24        Q.    Okay.  And there's further back

112  (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1   and forth with FW Kerr trying to find some SOMS,
2   to see if they've got anything, they're doing
3   anything.
4           Do you recall getting some
5   pressure from the sales department about cutting
6   FW Kerr because they didn't have a SOMS program?
7           MS. VANNI:  Objection.
8           THE WITNESS:  I do not recall
9       that.
10  BY MR. BUCHANAN:
11      Q.   That would not be appropriate,
12  would it, ma'am?
13          MS. VANNI:  Objection.
14  BY MR. BUCHANAN:
15      Q.   For the sales department to
16  interfere with the compliance function out of
17  concern for sales?
18          MS. VANNI:  Objection.
19          THE WITNESS:  The sales
20      department would, would push back if
21      we're looking to take action against a
22      customer from a compliance perspective.
23      If they didn't, they wouldn't be sales
24      at any company, I would expect that, but

Page 447

1       the -- any time that we had that,
2       usually once we gave them the
3       information, they came around.
4   BY MR. BUCHANAN:
5       Q.   Okay.  Well, let's be clear just,
6   so we take a step back.
7           Maintenance of the closed system
8   of distribution for controlled substances should
9   be maintained at all costs, right?
10          MS. VANNI:  Objection.
11          THE WITNESS:  It should be
12      maintained.
13  BY MR. BUCHANAN:
14      Q.   And it shouldn't yield to sales
15  concerns, right?
16          MS. VANNI:  Objection.
17          THE WITNESS:  Sales, once we took
18      over the controlled substance monitoring
19      program, sales would not be the
20      decision-maker.
21  BY MR. BUCHANAN:
22      Q.   Okay.  The time when you took
23  over the controlled substance monitoring program
24  or the SOMS for Qualitest that was in -- we

Page 448

1   established after the -- in this 2013 timeline,
2   correct?
3       A.   That was when we implemented the
4   changes, the modifications.
5       Q.   And we looked at a PowerPoint, I
6   think, from the first quarter of 2013 where you
7   were going to bring that program into your
8   group.
9           Do you remember that?
10      A.   Yes.
11      Q.   Does that help firm up the time?
12      A.   Yes.
13      Q.   So FW Kerr is getting a letter
14  from Mr. Brantley, head of SOM compliance,
15  right?
16      A.   Yes.
17      Q.   Does this refresh your
18  recollection, ma'am, that during the time there,
19  the company, in fact, did utilize chargeback
20  data as part of identifying secondary customers
21  that were problematic?
22      A.   I think this was after I left.
23          MS. VANNI:  I would note that the
24      -- she is not a recipient of this

Page 449

1   e-mail.
2           THE WITNESS:  December.
3   BY MR. BUCHANAN:
4       Q.   Okay.  Well, let's reorient
5   ourselves to what's happening here.
6           Mr. Young of Frank Kerr is
7   getting a letter from Mr. Brantley of Qualitest,
8   your report, correct?
9       A.   Yes.
10      Q.   Okay.  In the middle it says, "On
11  March 18, 2014, you were sent a list of
12  customers identified while reviewing chargeback
13  data and asked for due diligence information for
14  these customers."
15          Do you see that?
16      A.   I do.
17      Q.   "To date we have not received a
18  response from you."
19          Do you see that?
20      A.   Yes.
21      Q.   And so that would be, you know,
22  seven months later?  Do I have the timing right,
23  March to November, that's about seven months?
24      A.   Yes.

113  (Pages 446 to 449)

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    Q.    Okay. So you send your initial
2    customer letter in October of 2013 saying we
3    need information on you.
4          And then as part of your SOMS
5    process here in 2014, the company is looking at
6    chargeback data, correct?
7          MS. VANNI: Object to form.
8          THE WITNESS: It says that.
9    BY MR. BUCHANAN:
10   Q.    Well, Mr. Brantley is in an
11   outside correspondence with the distributor
12   saying we've looked at the due diligence
13   information you gave us, we've looked at
14   chargeback data, correct?
15   A.    That's what he is saying, yes.
16   Q.    Right. And he's saying he has
17   identified a number of customers of concern,
18   right?
19   A.    For Frank Kerr, yes.
20   Q.    Okay. "To date we have not
21   received a response from you," correct?
22   A.    Yes.
23   Q.    And what Mr. Brantley is now
24   telling him six months after he hasn't gotten a

Page 451

1    response, given the absence of a response from
2    you, we're asking you to immediately cease
3    distribution in selling Qualitest hydrocodone to
4    those people, right?
5    A.    Yes.
6    Q.    Those companies, right?
7    A.    Mm-hmm.
8    Q.    Okay. Because continued sales
9    represent what, an undue risk?
10   A.    Yes.
11   Q.    Okay. In addition, you're
12   reducing what you're willing to sell to that
13   customer, right?
14   A.    Yes.
15   Q.    Okay. So what we see here is in
16   2014 we see as a result of some of the
17   individual boots on the ground going to
18   pharmacies and collecting due diligence on them,
19   identifying problematic customers and cutting
20   them off, right?
21   A.    Yes.
22   Q.    We also see that when you look at
23   customers of customer data through chargeback
24   data that you can identify problematic secondary

Page 452

1    customers as evidenced in this exhibit, correct?
2          MS. VANNI: Object to form.
3          THE WITNESS: That's what it
4    says, yes.
5    BY MR. BUCHANAN:
6    Q.    And what's happening here is
7    you're cutting them off because you're dealing
8    with people who you have no evidence they've got
9    a proper medical purpose that are buying from FW
10   Kerr, right?
11   A.    I don't think we have no medical
12   -- no proof of medical evidence. We have
13   concerns about the quantities that they were
14   buying or that they were shipping to these
15   customers.
16   Q.    Right.
17   A.    And what we would have done is
18   told Frank Kerr to do research on these
19   customers. We want to know if you've visited
20   them or done research.
21   Q.    Right. So, in other words, the
22   measures that were implemented as part of the
23   revamped SOM program in late 2013 and now into
24   2014 included looking at chargeback data, and we

Page 453

1    saw that was one of the phases in your
2    multi-phased approach to revamping the system,
3    right?
4    A.    Yes.
5    Q.    And looking at chargeback data
6    and what it could reveal was customers of
7    customer's utilization or acquisition of
8    Qualitest product, right?
9    A.    Yes.
10   Q.    And so from that chargeback data,
11   these eight pharmacies were identified as
12   customers of interest, given the size and the
13   order nature, correct?
14         MS. VANNI: Object to form.
15         THE WITNESS: Customers of
16   interest, yes.
17   BY MR. BUCHANAN:
18   Q.    And you asked for more
19   information from your direct customer, didn't
20   receive it in April, right?
21   A.    Right.
22   Q.    Didn't receive it in May, didn't
23   receive it for six months, right?
24   A.    That wouldn't be unusual from the

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1    aspect of if you're asking that customer to give
2    you data on all of these customers, if they
3    haven't visited all of them, they're going to
4    need time to set those visits up and to do their
5    due diligence.
6         Q.   I understand.
7              But from the time you sent your
8    letter, your letter --
9         A.   Yes.
10        Q.   -- from October 18 of 2013 to the
11   time of these customers and the quotas being
12   reduced to this particular distributor, FW Kerr,
13   it's about a year or more, right, 13 months?
14        A.   Yes.
15        Q.   Okay.  And we can agree that this
16   letter reflects that the way in which these
17   customers of your customer FW Kerr were
18   identified, as reflected in this letter, is
19   through the use of chargeback data, correct?
20             MS. VANNI:  Object to the form.
21             THE WITNESS:  That's what it
22        says, but I don't recall us using the
23        chargeback data during my time with
24        Qualitest.  We tried, we tried to use

Page 455

1         it, but the data that we were getting
2         was not -- it didn't show us anything we
3         needed to, so that's why I'm surprised
4         to see chargeback data.
5    BY MR. BUCHANAN:
6         Q.   And I'll represent to you, ma'am,
7    that we have letters for other distributors who
8    the company was dealing with identifying
9    problematic customers identified through
10   chargeback data?
11        A.   Okay.
12        Q.   I mean, you're not -- you don't
13   have any evidence, sitting here today, to
14   dispute Mr. Brantley's letters that he says he
15   used chargeback data, right?
16             MS. VANNI:  Object to form.
17             THE WITNESS:  No, I do not.
18   BY MR. BUCHANAN:
19        Q.   Okay.  And we can agree the
20   letter actually reflects that they used
21   chargeback data or that Qualitest used
22   chargeback data to identify problematic
23   secondary customers, true?
24        A.   That's what it says, yes.

Page 456

1         Q.   Okay.  I have one last area,
2    please, counsel, if you'll indulge me a few
3    minutes.  Do you need a moment?  Because we're
4    going to have change the hot seat in a second on
5    my side.
6         A.   We're good.
7         Q.   I see from your CV that you were
8    a member of a number of industry groups; is that
9    fair?
10        A.   Yes.
11             MR. BUCHANAN:  Could we go off
12        the record.
13             THE VIDEOGRAPHER:  Going off the
14        record, the time is 4:33 p.m.
15             (Pause.)
16             THE VIDEOGRAPHER:  Back on the
17        record, 4:35 p.m.
18             MR. BUCHANAN:  Okay.  Let's see
19        if we can bring this in for a landing,
20        with me.
21             (Document marked for
22        identification as Par-Norton Deposition
23        Exhibit No. 25.)
24   BY MR. BUCHANAN:

Page 457

1         Q.   Passing you what we're marking as
2    Exhibit 25, I think we're back on track with the
3    exhibit numbers.  Copies for counsel, please.
4             MR. BUCHANAN:  Can we pull up
5        E630, please, Bradley.  Thank you.
6    BY MR. BUCHANAN:
7         Q.   I saw in your resume, ma'am, I
8    don't think we have time to pull it back up, but
9    you list in your resume old one, new one,
10   various forms your involvement and engagement
11   with various industry working groups, right?
12        A.   Correct.
13        Q.   These are the minutes from an
14   industry working group, anti-diversion working
15   group meeting from 2013.
16             Do you see that?
17        A.   Yes, I do.
18        Q.   Okay.  Something you sent around
19   after I guess you went to the meeting to
20   Mr. Brantley?
21        A.   Yes.
22        Q.   This is October 11, 2013.  Can
23   you -- there we go.
24             MR. BUCHANAN:  Thank you,

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    Bradley.
2  BY MR. BUCHANAN:
3    Q.    And then you've got your DEA
4  compliance trip report, right?
5    A.    Yes.
6    Q.    Did you put this together?
7    A.    Yes, I did.
8    Q.    And it accurately reflected what
9  happened, as best you were able to determine?
10   A.    Yes.
11   Q.    Okay.  And so this is a meeting
12 of the Anti-Diversion Industry Working Group
13 held in Chicago, right?
14   A.    Correct.
15   Q.    And you've got -- you've got some
16 folks from manufacturers, Mallinckrodt, right?
17   A.    Yes.
18   Q.    You've got HD Smith and
19 AmerisourceBergen, right?
20   A.    Yes.
21   Q.    McKesson dialing in, right?
22   A.    Yes.
23   Q.    AmerisourceBergen there in
24 person?

Page 459

1    MR. SCHACK: Objection.  What are
2  you looking at?  Sorry, I don't have it.
3    MR. BUCHANAN:  Can we get the
4  630.2.
5    MS. KOSKI:  It took our screen
6  away too.
7    MR. SCHACK:  Yeah, I can't see
8  the --
9    MR. BUCHANAN:  Just turn the one
10 right there.  Okay.  I can't solve for
11 that, I'm sorry.  630.2.
12 BY MR. BUCHANAN:
13   Q.    At the top we have a list of
14 attendees at the meeting, and you were the
15 Qualitest attendee, correct?
16   A.    Yes, I was.
17   MR. BUCHANAN: Does everybody
18 have a way to get an angle on this right
19 now?  If someone needs to stand up over
20 my shoulder, they're welcome to do that.
21   MR. SCHACK:  What exhibit number,
22 Exhibit 25?
23   MR. BUCHANAN:  Yeah.
24   MR. SCHACK:  All right.

Page 460

1  BY MR. BUCHANAN:
2    Q.    Okay.  And so Anti-Diversion
3  Industry Working Group, that was a group of
4  industry participants that came together from
5  time to time, right?
6    A.    Not -- we really didn't meet a
7  lot.  It was more for one purpose.
8    Q.    Okay.  And this notes it's the
9  second meeting of the group, correct?
10   A.    Yes.
11   Q.    Okay.  And then you had some
12 folks from Quarles & Brady, those are lawyers?
13   A.    Yes.
14   Q.    Okay.  So you had lawyers, you
15 had distributors, you had manufacturers all kind
16 of in this group together, right?
17   MS. VANNI:  Object to form.
18   THE WITNESS:  Correct.
19 BY MR. BUCHANAN:
20   Q.    All right.  And then maybe we'll
21 have time to call out some of these.  Carmen is
22 a person who spoke that day.  You see at the
23 bottom of the first page, Carmen Catizone?
24   A.    Yes.

Page 461

1    Q.    And she gave some background on
2  NAPB, right?
3    A.    He.  He was the executive
4  director of NAPB.
5    Q.    NAPB is what?
6    A.    National Association of Boards of
7  Pharmacy.
8    Q.    Okay.  And Carmen is providing
9  information on wholesalers or secondary
10 wholesalers being a diversion risk, correct?
11   A.    Second -- that's what he's
12 saying, yes.
13   Q.    I'm sorry.  It's the last
14 paragraph.
15   A.    Yes, that's what he's saying.
16   Q.    First page.  Okay.
17   And then there's some member
18 presentations that occur?
19   A.    Yes.
20   Q.    Right.  And the members would be
21 all these folks that are identified other than
22 the outside speakers, right?
23   A.    Yes.
24   Q.    Okay.  And one of the team

116  (Pages 458 to 461)

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1  members, and you don't identify that person, is
2  that just some code of conduct or something when
3  you go to these meetings, you're not allowed to
4  say who said what?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  No.
7  BY MR. BUCHANAN:
8      Q.  I don't know, you didn't?
9      A.  No, it was just one of the team
10  members.  I don't recall which one it was, but
11  one of them presented IMS data.
12      Q.  Okay.  Well, for the outside
13  presenter, you identify them by name and then
14  for the other people you attribute them as team
15  members, right?
16          MR. SCHACK:  Object to form.
17          THE WITNESS:  No reason.
18  BY MR. BUCHANAN:
19      Q.  Okay.  "Member Presentation
20  (Based on IMS data).  One of the team members
21  has purchased the upgraded IMS subscription and
22  using the data IMS provides, presented a heat
23  map of the US showing the top prescribers for
24  oxycodone and hydrocodone from 2010 - 2013,"

Page 463

1  right?
2      A.  Yes.
3      Q.  And it showed the following
4  states in this heat map.
5          You see this?
6      A.  I do.
7      Q.  Yeah, and you identify several --
8  for hydrocodone you've got Ohio, California,
9  Texas, you see Florida in there, other states in
10  the mix, right?
11      A.  Yes.
12      Q.  Okay.  You've got them also for
13  the seven and a half milligrams hydrocodone,
14  also for 10 milligrams, correct?
15      A.  Yes.
16      Q.  All right.  And so these are
17  states that are popping up on this heat map,
18  right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  That's what it was
21      showing, yes.
22  BY MR. BUCHANAN:
23      Q.  Okay.  Did you go back to the
24  company after you went to this and said, hey,

Page 464

1  you know, there's this IMS data with a heat map?
2      A.  I did.  It's not standard
3  information to get.  It's extremely, extremely
4  costly, in the millions, from what I was told to
5  get that information.  So it wasn't something
6  that we wanted to do at that time.  It gave us
7  some information, but DEA was presenting similar
8  things at conferences, so it wasn't something
9  that we pursued.
10      Q.  Okay.  Well, I mean, you could
11  drill down, right, using these heat maps?
12          MS. VANNI:  Object to form.
13          THE WITNESS:  I don't know if we
14      could in this case or not.  The
15      presentation wasn't -- it wasn't --
16      like, it wasn't -- they didn't spend a
17      long time on it.  It was just here's
18      something out there.  The whole purpose
19      of the group was to try to do anything
20      that we could to help with the abuse and
21      diversion, and so this was presented as
22      a tool that one company had that -- just
23      to educate people that it was out there
24      on the team.

Page 465

1  BY MR. BUCHANAN:
2      Q.  All right.  I mean, what they
3  said you could see was you could see a map of
4  the US showing the top prescribers for oxycodone
5  and hydrocodone, right?  That's what it showed,
6  the heat map?
7      A.  I don't know if it drilled down
8  to the actual names of prescribers or anything
9  like that.
10      Q.  Well, you were sufficiently
11  impressed, you say --
12      A.  I was.
13          MS. VANNI:  Object to form.
14          THE WITNESS:  I was.  It was
15      interesting information.
16  BY MR. BUCHANAN:
17      Q.  Not only interesting, you said we
18  need to get it?
19      A.  I wanted to get it if it was
20  reasonable and was something that we could use
21  on a regular basis, yeah.
22      Q.  Well, in the context of billions
23  and billions of pills that you're selling and
24  the tens of thousands of people that are

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1    overdosing each year, I mean, how many millions
2    of dollars is too much to spend to acquire data
3    to help prevent diversion?
4         A.    I don't think --
5              MS. VANNI:  Objection, form.
6              THE WITNESS:  I don't think that
7         this data would have been -- it was
8         informative more than it was helpful in
9         preventing diversion.
10   BY MR. BUCHANAN:
11        Q.    What you wrote here was that "we
12   need to obtain this data"?
13        A.    That's what I wanted to do, yes.
14        Q.    This was as of --
15        A.    Because I always want to improve
16   upon our compliance and the tools that are
17   available to us and to what we're doing.
18        Q.    Okay.  Do you remember how much
19   it was?  I would like to know how much --
20        A.    I don't remember.
21        Q.    -- was too much for Qualitest?
22        A.    I don't remember, to be honest.
23              MS. VANNI:  Objection.
24              THE WITNESS:  I don't remember.

Page 467

1    BY MR. BUCHANAN:
2         Q.    Okay.  And then there's some
3    discussion on other key topics, how to best
4    assure success of the team partnering with the
5    DEA.
6              Do you see that?  It's the first
7    bullet under "Other Key Topics Discussed."
8         A.    Yes, how best to assure the
9    success in partnering to fight drug diversion.
10        Q.    Right.  And so the "team felt we
11   should evaluate the HDMA's actions."
12              Do you see that?
13        A.    Yes, I do.
14        Q.    Okay.  And who is the HDMA?
15        A.    Healthcare Distributor Management
16   Association.
17        Q.    And were those meetings that you
18   also attended?
19        A.    They had a conference once a
20   year.  I attended one, but at this point I had
21   not -- I have attended one in the past, but at
22   this point I had never attended any.
23        Q.    Okay.  And so you'd go to these
24   meetings and as part of these meetings, you'd

Page 468

1    get information that could be relevant to you,
2    in your view?
3              MS. VANNI:  Object to form.
4    BY MR. BUCHANAN:
5         Q.    As part of your role and
6    function?
7         A.    I don't know if it was really
8    anything new compared to what DEA was putting
9    out there.  Again, at that point I hadn't
10   attended it, so it's probably more helpful to a
11   wholesaler, HDMA.
12        Q.    Okay.  I was more generalizing.
13   I mean, this particular working group, I mean,
14   getting together with others in the industry,
15   collaborating, understanding what's happening,
16   data sources that might be available, that was
17   information that you brought back to incorporate
18   in your practice?
19              MS. VANNI:  Object to form.
20              THE WITNESS:  It was information
21        that I brought back and made the team
22        knowledgeable of, and, ultimately, the
23        goal and the end result of this team was
24        the red flags video that NABP still

Page 469

1         today has on their website.
2    BY MR. BUCHANAN:
3         Q.    The red flags video being signs
4    for pharmacies, signs for pharmacists, et
5    cetera?
6         A.    Signs for -- yes, it was
7    educational for pharmacists to show them some of
8    the things to look for that we thought would be
9    helpful.
10        Q.    How about a video for any of your
11   customers, your distributors, one that would
12   show them, hey, these are what problematic
13   pharmacies look like and lines out the door and
14   red flags and other things that would help them?
15              MS. VANNI:  Objection.
16              THE WITNESS:  They were, as part
17        of the -- you know, as part of NABP,
18        they would have been seeing that, that
19        video anyway.
20   BY MR. BUCHANAN:
21        Q.    Like FW Kerr would have been
22   seeing that?
23              MS. VANNI:  Objection.
24              THE WITNESS:  They could have.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 470

1    It's public knowledge.  It's publicly on
2   the website today.
3        MR. BUCHANAN:  Okay.  Can I have
4   1153.
5        (Document marked for
6   identification as Par-Norton Deposition
7   Exhibit No. 26.)
8   BY MR. BUCHANAN:
9    Q.    These are minutes of another DEA
10  compliance trip report.  This is from the same
11  window of time, fall 2013?
12   A.    Mm-hmm.
13   Q.    I noticed, just from looking
14  through your file, ma'am, that in this 2013
15  period, you're going to outside industry
16  functions and sending -- and memorializing them
17  in trip reports and sending them out to your
18  team when you get back; is that fair?
19   A.    Something that I've always done,
20  not just in 2013.
21   Q.    So this is of the New Jersey
22  Pharmaceutical Industry Group meeting from
23  November of 2013, correct?
24   A.    Yes.

---

Page 471

1    Q.    Hosted at Novartis, correct?
2    A.    Yes, this particular one was.
3    Q.    It's got a bunch of
4   manufacturers.  It's got J&J, it's got Novartis,
5   it's got Purdue.
6    A.    Yeah.
7    Q.    You're in there, we've got
8   Watson.
9    A.    Yes, a lot of attendees.
10   Q.    We see distributors there as
11  well, correct?
12   A.    Yes.
13   Q.    AmerisourceBergen, correct?
14   A.    Yes.
15   Q.    And so this is another one of
16  those settings where people would all get
17  together, exchange ideas, exchange insights,
18  collaborate?
19        MS. VANNI:  Objection.
20        THE WITNESS:  This is a
21  different -- different type of meeting
22  than the anti-diversion.  This meeting
23  was really bringing people together to
24  share experiences to -- for benchmarking

---

Page 472

1   kind of thing, not really a
2   collaboration, not really a
3   collaboration.  There wasn't -- there
4   was no direct outcome of this meeting,
5   like the anti-diversion group meetings,
6   and this was actual -- this group was
7   actually started by Gerry McAleer, the
8   local special agent in charge of the DEA
9   office in Newark, New Jersey.
10  BY MR. BUCHANAN:
11   Q.    Okay.  Is he in attendance at
12  this?
13   A.    I don't think he's in attendance
14  at this one.  He was in attendance and spoke at
15  the first one --
16   Q.    Okay.  So what --
17   A.    -- and he was invited to other
18  meetings.  Other members of DEA were invited to
19  meetings afterwards.
20   Q.    Well, we could agree he's not at
21  this one, correct?
22   A.    I wouldn't know without reading
23  the whole thing, but I don't think so.
24   Q.    Okay.  Well, certainly, with

---

Page 473

1   regard to the additional attendees, do you see
2   any notation of a DEA attendee?
3    A.    No.
4    Q.    Okay.  And there's a listing of
5   the general meeting charter, correct?  The
6   purpose of the New Jersey Pharmaceutical
7   Industry Group meeting was to discuss education
8   and other industry practices regarding DEA
9   compliance.  Let's pause on that for a moment.
10       You were not an attendee at this
11  meeting; is that right?
12   A.    I believe I was; otherwise, I
13  wouldn't be doing a trip report on it.
14  Qualitest attendee was Rohit, Rohit Sutaria was
15  my person in Charlotte.  It looks like he was
16  the only attendee.
17   Q.    Okay.  And would you have
18  received compliance trip reports from your team?
19   A.    Yes.
20   Q.    Okay.
21   A.    I would ask --
22   Q.    So you don't doubt that you
23  received this, right?
24   A.    No, I don't doubt that.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1    Q.   Sure.
2         Next paragraph, "The goal of the
3    NJPIG is to increase compliance with DEA
4    requirements through the shared knowledge and
5    experience of the group members."
6         Do you see that?
7    A.   Yes.
8    Q.   Okay.  And was that one of -- was
9    that something that was happening at these
10   meetings; y'all were sharing your experiences
11   back and forth?
12   A.   Yes.  I mean, there were some
13   members that were more senior, others were newer
14   to DEA compliance.  There was a fine line
15   because there's a lot of things that we couldn't
16   speak about from confidentiality perspective,
17   because we were also competitors, but there was
18   information sharing to the extent that it could
19   be.
20   Q.   Okay.  Let's go to 1153.2.  It
21   talks about 2014 quota letters.  Do you see
22   that?
23   A.   Yes.
24   Q.   And quota letters are the

Page 475

1    manufacturers will send in a request for
2    permission to make a certain quantity of
3    controlled substance?
4    A.   Yes, it's based on sales data.
5    It's based on IMS data, prescriptions written.
6    DEA takes a lot of other factors into
7    consideration, meet with FDA, et cetera.
8    Q.   And members here are expressing
9    surprise to receive the quota letter for 2014.
10   Do you see that?
11   A.   Yes.
12   Q.   And some members said it was
13   because of the reason that GAO is reviewing last
14   two years of quota issued by DEA, right?
15   A.   Yes, that's what it says.
16   Q.   Okay.  Was one of the things that
17   industry would discuss at these meetings what
18   participants were doing with regard to their
19   quota letters?
20   MR. LEEDER:  Objection.
21   THE WITNESS:  They would never
22   discuss quota amounts.  They would talk
23   about the delays in getting responses
24   from DEA.  So a standard -- for example,

Page 476

1    a standard turnaround might be eight to
2    ten weeks, and in one instance that I
3    can recall it was taking DEA upwards of
4    24 weeks to respond to a quota letter,
5    which, as you can see from the comment
6    there, it had an impact on drug supply
7    and created drug shortages.
8    BY MR. BUCHANAN:
9    Q.   Okay.  And strategies for dealing
10   with them, right?
11   A.   Not really strategies.  I mean --
12   MS. VANNI:  Objection.
13   THE WITNESS:  -- there's
14   nothing -- not much that companies can
15   do.  If DEA wants to take longer, they
16   take longer, you know.
17   BY MR. BUCHANAN:
18   Q.   Let's then turn to 1153.4, also
19   discussing SOM programs, right?
20   A.   Yes.
21   Q.   And question being put out to
22   everybody at the meeting, "Is anyone auditing
23   customers?"
24   MS. VANNI:  Object to form.

Page 477

1    THE WITNESS:  Correct, because it
2    was something that --
3    BY MR. BUCHANAN:
4    Q.   So just let's pause on that.
5    A.   Okay.
6    Q.   I mean, that's what it reflects,
7    right, "Is anyone auditing customers?"
8    A.   Yes.
9    Q.   Okay.  "Computerized statistical
10   models?"  Right?
11   A.   Yes.
12   Q.   Okay.  And so this was a vehicle,
13   this New Jersey Pharmaceutical Industry Group to
14   exchange information about what people were
15   doing on auditing, what people were doing on
16   SOMS, what people were doing with statistical
17   models, right?
18   A.   To a certain extent.  So you
19   might get an answer to this question like a yes
20   or no, but you wouldn't necessarily get a lot of
21   detail because that was confidential to the
22   company.
23   Q.   And, right, and we see actually
24   some of the manufacturers sharing information by

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1   name as reflected in Rohit's memo.  Teva is
2   replying that they do customer audits, sending
3   regular questionnaires and how they're going
4   about it, right?
5       A.    Yes.
6       Q.    The representative for Watson
7   said how they do the risk assessment based on
8   sales history and quotas, correct?
9       A.    Yes, that's what it says.
10      Q.    Customers have to fill out
11  questionnaires, and they described their process
12  at the meeting, right?
13      A.    Looks that way, yes.
14      Q.    AmerisourceBergen is a
15  distributor and they're sharing what they're
16  doing at that point in time, right?
17          MR. SCHACK:  Objection.
18          THE WITNESS:  It does talk to
19  AmerisourceBergen, yes.
20  BY MR. BUCHANAN:
21      Q.    Okay.  It further notes there was
22  a "general discussion included an important
23  point for companies involved in SOMS program
24  should document their thought process," right?

Page 479

1       A.    Yes, that's what it says.
2       Q.    And these are just general
3   discussions and suggestions from company to
4   company about how to manage their SOMS program,
5   right?
6           MS. VANNI:  Object to form.
7           THE WITNESS:  I don't know
8   exactly what it means.  I would assume
9   docu -- you know, document your due
10  diligence.
11  BY MR. BUCHANAN:
12      Q.    Right.
13          Additionally, general discussion
14  included an important point, right?
15          You see that?
16      A.    Mm-hmm, yes, that's what it says.
17      Q.    For companies involved in SOMS
18  programs to document their thought process.
19          Did I read that correctly?
20      A.    Yes, that's what it says.
21      Q.    Apart from your attendance at
22  industry meetings, the New Jersey Pharmaceutical
23  Industry Group and the anti-diversion working
24  group, did you attend other groups like this

Page 480

1   industry association meetings concerning SOMS
2   and anti-diversion efforts?
3       A.    Those are the only two that I can
4   recall.
5       Q.    Okay.
6       A.    Other than conferences, you know,
7   industry conferences.
8       Q.    My last document for you today.
9           MR. BUCHANAN:  Do I have a few
10  more minutes.  How much time have I
11  used?
12          THE VIDEOGRAPHER:  Six hours, six
13  minutes.
14          MR. BUCHANAN:  Okay.
15          (Document marked for
16  identification as Par-Norton Deposition
17  Exhibit No. 27.)
18  BY MR. BUCHANAN:
19      Q.    Passing you, ma'am, Exhibit 27.
20  Exhibit 27 is a PowerPoint you put together in
21  2014.  I guess this is shortly before you move
22  on to HD Smith, right?
23      A.    Yes.
24      Q.    Okay.  Attached you'll find

Page 481

1   presentation from the recent Buzzeo PDMA
2   seminar.
3           Do you see that?
4       A.    Yes.
5       Q.    Okay.  Is this a presentation you
6   prepared?
7       A.    Not this entire thing, no.
8       Q.    Oh, fair enough.  I mean,
9   there's -- this is a compilation of
10  presentations from that day, but this looks like
11  it's the seminar book, right?
12      A.    Yes.
13      Q.    Okay.  Let me take you to where I
14  think yours is and you can confirm that for us.
15  It's 1059.290.
16      A.    Yes, that's correct.
17      Q.    Okay.  And so this is you
18  presenting at the consultant -- the conference
19  for one of the consultants who came and did the
20  inspection at your facility earlier, right?
21      A.    This particular consultant has a
22  regular conference.  A lot of times they have
23  DEA actually attend their conference.  In this
24  particular instance, they did not, and I was

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1   asked to speak at it.
2      Q.   And what you wrote here is
3   "Developing a robust suspicious order monitoring
4   program," right?
5      A.   Yes.
6      Q.   And did you deliver this
7   presentation?
8      A.   I did.
9      Q.   And this was a presentation to
10  manufacturers, wholesalers, distributors, people
11  in the industry concerning controlled
12  substances?
13     A.   A very small group of them, yes.
14     Q.   Okay.  And where was it?
15     A.   I believe it was in Florida.
16     Q.   Okay.
17     A.   I'm not positive.  Actually, it
18  might have been in Maryland.
19     Q.   Okay.  At page 291, suspicious
20  order monitoring, you again note "DEA's Closed
21  Loop Distribution System," right?
22     A.   Yes.
23     Q.   It's got to be a "Legitimate
24  Medical Need, by an Individual Practitioner

Page 483

1   Acting in the Usual Course of His or Her
2   Professional Practice," right?
3      A.   Yes.
4      Q.   You also note "Being a Good
5   Corporate Citizen," right?
6      A.   Yes, because that's how I look at
7   things, yes.
8      Q.   Doing everything in our power to
9   prevent abuse and diversion, right?
10         MS. VANNI:  Objection.
11         THE WITNESS:  Always looking to
12     improve and do more is what my goal is
13     personally.
14  BY MR. BUCHANAN:
15     Q.   And what the company's statement
16  about its corporate responsibility through your
17  letter in October of 2018 was we have to do
18  everything we can, right?
19         MS. VANNI:  Objection.
20         THE WITNESS:  I believe so.
21  BY MR. BUCHANAN:
22     Q.   "Reducing Risk," that's good,
23  right?
24     A.   Yes.

Page 484

1      Q.   Reducing Risk.
2           Protecting Reputation, that's
3   another reason to do it, I guess, right?
4      A.   Yes.
5           MS. VANNI:  Object to form.
6           THE WITNESS:  Basically, you
7      don't want to have any DEA violations.
8   BY MR. BUCHANAN:
9      Q.   "Preventing Violations"?
10     A.   Mm-hmm.
11     Q.   "Guarding Your Company & Your
12  License," right?
13     A.   The wording with guarding was
14  talking about building in layers of security
15  into your program.
16     Q.   And I mean how about, you know,
17  making sure that we don't fuel the second
18  epidemic anymore; that would be a good reason to
19  do it, right?
20         MS. VANNI:  Objection.
21         THE WITNESS:  Not the case, but,
22  yes.
23  BY MR. BUCHANAN:
24     Q.   Not the case, that's not a good

Page 485

1   reason?
2           MS. VANNI:  Objection.
3           THE WITNESS:  No, it's not the
4      case as to what the company was doing.
5   BY MR. BUCHANAN:
6      Q.   Okay.  And then 1059.296, you
7   talk about "Robust Data Analysis Tool," right?
8      A.   Yes.
9      Q.   One of the things you do is
10  "Receive Regular Data Feeds," right?
11     A.   Yes.
12     Q.   Those data feeds should be the
13  sales to direct customer, first one, right?
14     A.   Correct.
15     Q.   Next thing is to "Chargeback
16  Data," right?
17     A.   Yes, that's what it says.
18     Q.   This is what you're teaching
19  people, right?
20     A.   Yes.
21         MS. VANNI:  Object to form.
22         THE WITNESS:  To look at this.
23  BY MR. BUCHANAN:
24     Q.   At this industry meeting, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1      A.   To look at this, yes.
2      Q.   To look at chargeback data so you
3   can, what, one, know your customer, right?
4      A.   Yes.
5      Q.   And their customer, right?
6      A.   Correct.
7      Q.   And their customer, right?
8         MS. VANNI:  Object to form.
9         THE WITNESS:  That's what it
10   says.
11   BY MR. BUCHANAN:
12      Q.   That's what you wrote.
13      A.   Know as much as you can based on
14   the data that's available to you.
15      Q.   It's what you wrote and what you
16   presented, ma'am, correct?
17      A.   Yes.
18      Q.   Chargeback data, to know your
19   customer and their customer and their customer,
20   correct?
21      A.   Yes.
22      Q.   "Dispensing Data," another
23   category, right?
24      A.   That's what I wrote, yes.

Page 487

1      Q.   These are the information feeds
2   that the company should be taking in for
3   suspicious order monitoring system, correct?
4         MS. VANNI:  Object to form.
5         THE WITNESS:  These are
6      suggestions to companies for things that
7      they can add to their suspicious order
8      monitoring program.
9   BY MR. BUCHANAN:
10      Q.   And with regard to dispensing
11   data, what you told people, look at national
12   average or actual cleansed dispensing data,
13   right?
14      A.   Yes.
15      Q.   And use that to help set a
16   standard for long-term levels, correct?
17      A.   That's what it says, yes.
18      Q.   Can we go to the next page.
19         Customer due diligence visits,
20   right?
21      A.   Yes.
22      Q.   Okay.  This is the next thing
23   you're telling people that they should do,
24   right?

Page 488

1      A.   Right.
2      Q.   And you've got the -- I guess the
3   cute cartoon, I don't know if that's Sherlock
4   Holmes or someone there on the right?
5      A.   Look to your customer.
6      Q.   There you go.
7      A.   Look at your customer closely.
8      Q.   Know your customer again, right?
9      A.   Yes.
10      Q.   And so, first, know your customer
11   by virtue of data feeds, that was your prior
12   slide, correct?
13      A.   Correct.
14      Q.   Next, know your customer by
15   on-site visits, right?
16      A.   Right.  And all this is
17   repetitive of things that DEA -- suggestions
18   that they were making.
19      Q.   This is a presentation you're
20   making outside the company to those in industry,
21   fair?
22      A.   Yes.
23      Q.   And you thought these were
24   important points to highlight, fair?

Page 489

1      A.   To reiterate what I had heard DEA
2   say, yes.
3      Q.   And, really, we had seen those in
4   your own writings well before the meeting in
5   March of 2013, correct?
6      A.   Yes, the improvements that I
7   wanted to make.
8      Q.   That's a yes answer, ma'am?
9      A.   Yes.
10      Q.   Those are the -- you knew that
11   these were important components as part of a SOM
12   process even before you sat down with the DEA in
13   March of 2013, correct?
14      A.   Again --
15         MS. VANNI:  Object to form.
16         THE WITNESS:  -- they aren't
17      required, they aren't required by DEA.
18      They are suggested improvements.
19         MR. BUCHANAN:  Move to strike.
20   BY MR. BUCHANAN:
21      Q.   You knew they were important
22   components of a SOM program before you sat with
23   the DEA in March of 2013, we looked at your
24   documents, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1              MS. VANNI:  Object to form.
2              THE WITNESS:  They were my
3     suggestions for improvement.
4     BY MR. BUCHANAN:
5         Q.    In fact, these were items that
6     were listed under a risk assessment of 25, 25,
7     the most severe --
8         A.    Yes.
9         Q.    -- risk because you didn't have
10    these elements in place prior to November of
11    2013, right?
12        A.    They're not required by DEA.
13        Q.    Not a matter of whether they're
14    required, ma'am.
15        A.    It is.
16        Q.    The statute, the statute states
17    you must maintain effective controls against
18    diversion, correct?
19        A.    And we did, yes.
20        Q.    Just answer my question.
21        A.    Yes.
22        Q.    That's what the statute says?
23        A.    Yes.
24        Q.    Not and we did?

Page 491

1         A.    And we did.
2              MS. VANNI:  Objection.
3     BY MR. BUCHANAN:
4         Q.    That's not the question.  The
5     statute says you must maintain effective
6     controls against diversion, correct?
7              MS. KOSKI:  Object to form.
8              THE WITNESS:  Yes.
9     BY MR. BUCHANAN:
10        Q.    Before the DEA sat with you in
11    March of 2013, you, as the head of DEA
12    compliance with oversight of SOM by early 2013,
13    had outlined a number of things the company
14    needed to do to revamp its SOM, correct?
15             MS. VANNI:  Object to form.
16             THE WITNESS:  I had outlined a
17    number of things I wanted to improve.
18    BY MR. BUCHANAN:
19        Q.    Fair enough.  And what you did
20    here in 2014 is you went out and told industry,
21    peers, distributors, others, these are the
22    elements of an effective program, correct?
23             MS. VANNI:  Object to form.
24             THE WITNESS:  No.  These are --

Page 492

1     BY MR. BUCHANAN:
2         Q.    Is this being presented in
3     November of 2014?
4         A.    It is what I presented.
5         Q.    Okay.
6         A.    And it was presented as
7     suggestions, and that's how I was asked to
8     present it as well.
9         Q.    And what we have here are, look
10    in the parking lot, right?
11        A.    Again, all things that DEA said
12    during conferences as suggestions for companies.
13        Q.    These are your words, right?
14        A.    Yes.
15             MS. VANNI:  Object to form.
16             THE WITNESS:  Suggestions, yes.
17    BY MR. BUCHANAN:
18        Q.    These are your words, correct?
19             MS. VANNI:  Object to form.
20             THE WITNESS:  This is my guidance
21    to industry for suggestions of things
22    that they can look at to add to what's
23    required by the regulation.
24    BY MR. BUCHANAN:

Page 493

1         Q.    So let's look at this one.
2     "Observe parking lot for suspicious activity,
3     license plates from multiple states, long lines,
4     security guards, etc.," right?
5         A.    Yes.
6         Q.    If pharmacy, are most controlled
7     product prescriptions written by a handful of
8     physicians?  Same prescription?  Same
9     combination?  Do they follow up with physicians?
10    All reasonable things to do, right?
11             MS. VANNI:  Object to form.
12             THE WITNESS:  All good
13    suggestions, yes.
14    BY MR. BUCHANAN:
15        Q.    All things that you thought
16    worthy to highlight in your presentation about
17    this topic for a robust suspicious order
18    monitoring system in November of 2014, correct?
19             MS. VANNI:  Object to form.
20             THE WITNESS:  Ways to enhance the
21    program, yes.
22             MR. BUCHANAN:  I think I'm off,
23    so with that, let me just check with my
24    colleagues.  I've gone over my allotted

Highly Confidential - Subject to Further Confidentiality Review

---

Page 494

1    time, ma'am.  I would have loved to have
2    spent more time with you.
3        THE WITNESS:  I'm sure.
4        MR. BUCHANAN:  Maybe we'll have a
5    chance to talk further.  Thank you very
6    much.
7        THE VIDEOGRAPHER:  Going off the
8    record, 5:03 p.m.
9        (Brief recess.)
10       THE VIDEOGRAPHER:  We're now
11   going back on the record.  The time is
12   5:39 p.m.
13   BY MR. YOUNG:
14       Q.   Hi, Ms. Norton.  My names is
15   James Young, and I'll try to speak quickly since
16   we only have 45 minutes, though intelligibly.
17        I'm going to talk to you about
18   your experience at HD Smith.  So and you have
19   different counsel with you now, who is actually
20   representing HD Smith, Mr. Leeder.
21       A.   Yes.
22       Q.   So at some point in time, you
23   went to work for HD Smith, I take it?
24       A.   Yes, I did.

---

Page 495

1        Q.   Do you recall the date that you
2    began employment there?
3        A.   2014 through 2016.
4        Q.   How is it that you came to be
5    employed at HD Smith?  Did you answer an ad,
6    were you recruited, did you talk to somebody
7    about a job?
8        A.   I believe I got a call from a
9    recruiter and applied, was interested in
10   Illinois.  My husband worked for AbbVie, and
11   they had a facility in Illinois, so was looking
12   to kind of have two of us in one place for a
13   change and also for the promotion.
14       Q.   And I wanted to ask you about
15   that.  You mentioned on your earlier testimony
16   that it was actually a promotion from your
17   current job at Qualitest.
18        Do you mean that in title or in
19   salary or both?
20       A.   In both.
21       Q.   Okay.  What was your salary at
22   Qualitest, when you left?
23       A.   I believe it was 172.
24       Q.   And what was your starting salary

---

Page 496

1    at HD Smith?
2        A.   Approximately 190.
3        Q.   Okay.  And your title changed
4    from director to vice president?
5        A.   Correct.
6        Q.   Were your job duties essentially
7    the same at both Qualitest and HD Smith, or was
8    there some distinction?
9        A.   There were definite differences
10   since it was a manufacturer versus a wholesaler.
11       Q.   You testified earlier with regard
12   to Exhibit Number 2, which is the summary of the
13   suspicious order monitoring experience that I
14   think you prepared, I think you testified
15   earlier that some of the representations in here
16   were slightly embellished or not exactly
17   accurate because you were trying to get the job
18   at HD Smith.
19        Do you recall that testimony?
20        MR. LEEDER:  Object to form.
21        THE WITNESS:  Yes, I do recall
22   that testimony.
23   BY MR. YOUNG:
24       Q.   And do you know of the top of

---

Page 497

1    your head which portions or provisions of this
2    summary in Exhibit 2 were -- are not completely
3    accurate?
4        MR. LEEDER:  Can you provide her
5    a copy.
6        THE WITNESS:  Yeah, not without
7    reviewing.
8        MR. YOUNG:  It's Exhibit 2.  It
9    wasn't my exhibit.
10       MR. LEEDER:  Here, I can share
11   it.
12       MR. YOUNG:  I just happen to have
13   this.
14   BY MR. YOUNG:
15       Q.   So and I guess I'll direct your
16   attention to a couple specific things.  On the
17   Qualitest section which begins, in my version at
18   least, on page 2, there is reference in here to
19   using sales and chargeback data, it's in the
20   second full paragraph, in the middle.  It says,
21   "Sales and chargeback data are both used," and I
22   think on earlier examination you hedged a bit
23   and suggested that chargeback data may not have
24   been used during your tenure at Qualitest?

---

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1          MR. LEEDER:  Object to form.
2          THE WITNESS:  I know that we used
3     -- we did look into sale -- to
4     chargeback data.  I don't recall when it
5     was actually implemented, if it was
6     implemented before I left or if it was
7     implemented after I left.  I don't
8     recall exactly.  I know there were
9     struggles with getting the data and
10    getting it in a format that we could
11    use.
12    BY MR. YOUNG:
13         Q.    This document was prepared while
14    you were still employed at Qualitest, correct?
15         A.    Yes.
16         Q.    And the specific language is
17    sales and chargeback data are both used,
18    correct?
19         A.    Yes.
20         Q.    And that would suggest to me
21    that, in fact, both sales and chargeback data
22    are used at Qualitest?
23         A.    Agreed.
24         Q.    Okay.  But is it your reflection

Page 499

1     and recollection today that either sales or
2     chargeback data was not used by Qualitest during
3     your tenure there?
4          MS. VANNI:  Objection to form.
5          THE WITNESS:  I wouldn't have
6     lied about that in this document, so it
7     must have been in use before I left, but
8     I didn't recall it being used at the
9     time.  I thought -- I thought that it
10    was still under research when I left for
11    some reason, I had that in my head.
12    BY MR. YOUNG:
13         Q.    Okay.  There's also reference in
14    the first full paragraph, the very last sentence
15    under Qualitest, it says that you gained
16    additional diversion information through
17    conferences and through your position as a board
18    member for the Partnership for a Drug Free
19    Community in Huntsville/Madison County.  I'm
20    sorry.  It's not the last sentence, it's the
21    second to last sentence.
22         A.    Yes, that's correct.
23         Q.    What led you to join the board of
24    the Partnership for Drug Free Community in

Page 500

1     Huntsville/Madison County?
2          A.    I was actually contacted by them.
3     They were really looking for a donation from
4     Qualitest.  That was their initial goal.  They
5     were calling all local companies and asking for
6     donations, and the woman asked me if I would
7     like to attend one of their meetings, and I did
8     and found it to be very informative.  Local
9     police officers were presenting on things they
10    were seeing in the community, and, basically,
11    that's how I got into the group.
12         Q.    And so you put it to this
13    document that you gained diversion information
14    through your -- both your NADDI/DEA conferences
15    and through this position as a board member.
16    What type of information were you exposed to as
17    a board member of that organization, diversion
18    specific information?
19         A.    I mean, more just things that
20    were being abused or seen in the area, in the
21    very local area, because it was a township
22    organization, so just things that the local
23    police and the narcotics task force were seeing
24    being abused or diverted, so marijuana even they

Page 501

1     talked about, some of the things that they were
2     seeing that were more gang related, that type of
3     thing.
4          Q.    Do you recall whether any of the
5     items that were being diverted were the items
6     that Qualitest manufactured or distributed at
7     that time, for example, Vicodin?
8          A.    I think that there was mention of
9     those products, not necessarily the Qualitest
10    brand, but those products generally.
11         Q.    Did you ever take any information
12    from that organization and go back to Qualitest
13    and investigate or research whether or not there
14    were issues relating to diversion of Qualitest
15    products?
16         MS. VANNI:  Object to form.
17         THE WITNESS:  I presented that
18    information, some of the information
19    that I received at some of our
20    operations leadership team meetings.  I
21    think one meeting, maybe two I presented
22    at, but I wasn't going back and looking
23    for diversion because we didn't have --
24    I didn't see any gap that this could

126 (Pages 498 to 501)

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1      have gone out of.
2   BY MR. YOUNG:
3      Q.   Okay.  On earlier testimony you
4   talked about towards the end of your tenure at
5   Qualitest there was an issue -- I shouldn't say
6   an issue -- there was an inquiry or
7   investigation by the DEA and U.S. Attorney's
8   Office.
9          Do you recall that testimony?
10     A.   Yes.
11     Q.   That happened right as you were
12  ending your employment with Qualitest.
13         Did you share information about
14  that issue with HD Smith upon joining HD Smith?
15         MR. LEEDER:  Object to form.
16         THE WITNESS:  I don't believe so.
17  BY MR. YOUNG:
18     Q.   Did it ever come up at HD Smith
19  during your employment with HD Smith about this
20  U.S. Attorney DEA investigation at Qualitest?
21     A.   I don't believe so.
22     Q.   How long did you work for HD
23  Smith?
24     A.   For a little over a year.

Page 503

1      Q.   And what led you to leave your
2   employment with HD Smith?
3      A.   Basically, there was a -- I was
4   let go.
5      Q.   Were you let go, or were you
6   terminated?
7      A.   Well, I got a severance, so I
8   guess I would call that let go.  Terminated
9   usually means no severance and you're gone.
10     Q.   Walk me through the events that
11  led to your departure from HD Smith.  Did
12  someone approach you and say we're going to have
13  to cease your employment?
14     A.   I was basically walked into a
15  conference room thinking I was going to a
16  meeting, and when I got into the meeting, my
17  boss was there, HR was there, and there was
18  outside counsel on the phone, and I was told
19  that I wasn't a good fit for the company.  I
20  asked repeatedly for reasons and was not given
21  any reasons, was told the circumstances of
22  severance, that was explained to me.  I was
23  interviewed by the attorney afterwards, asked
24  all kinds of questions, SOMS related, license

Page 504

1   related, basically about my time at the company
2   and was never given a reason.
3      Q.   Did you have an exit interview
4   from HD Smith?
5      A.   No.  That was basically the only
6   meeting that I had.
7      Q.   Were any of the comments either
8   made to you during that meeting or made by you
9   at that meeting memorialized in writing?
10         MR. LEEDER:  Object to form.
11         THE WITNESS:  I don't know.
12  BY MR. YOUNG:
13     Q.   Do you have a copy of the
14  severance agreement that you were provided?  Do
15  you currently maintain --
16     A.   I had, I don't know if I have it
17  currently.
18     Q.   How much were you paid in
19  severance?
20     A.   I don't know offhand.
21     Q.   And were you walked out of the
22  building?  Was it like your last day?
23     A.   It was, yes.
24     Q.   Did you have an opinion or theory

Page 505

1   as to why you were being let go from HD Smith at
2   that time?
3          MR. LEEDER:  Object to form.
4          THE WITNESS:  The only -- the
5      only opinion that I could give was a
6      license related issue.  We were
7      outsourcing licensing at the time, and I
8      had some challenges with the company
9      that was handling the licensing.  We had
10     some gaps in licensing that basically
11     when I investigated the company that was
12     handling the licensing, I provided a
13     presentation to my supervisor suggesting
14     that we should not use them any longer.
15     He disagreed.  We continued to use them,
16     and we had a state license that expired.
17     That happened right before I was let go,
18     so I made an assumption that that could
19     be what it was, but it was never
20     confirmed.
21  BY MR. BUCHANAN:
22     Q.   Who was that company that you
23  outsourced to?
24     A.   SLS, State Licensing Services.

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1    Q.    Were you critical of HD Smith's
2 compliance program during your tenure at HD
3 Smith?
4           MR. LEEDER:  Object to form.
5           THE WITNESS:  I would not say
6     that I was critical so much as, again, I
7     was looking for improvements to the
8     program, as with anyplace that I go and,
9     you know, handle compliance.  So there
10    were improvements that I wanted to make,
11    yes.
12 BY MR. YOUNG:
13    Q.    How about specifically with
14 regard to the suspicious order monitoring system
15 or program that HD Smith had in place, when you
16 first began your employment with HD Smith, what
17 was your opinion or assessment of their SOMS
18 program?
19    A.    When I first came on, I was very
20 impressed with the level of knowledge that the
21 employees had with their backgrounds, the ones
22 that were, you know, people that were
23 investigating the orders and that were out in
24 the field.  I also thought that there were very

Page 507

1 good tools that we had available to us.  We had
2 dispensing data that was scrubbed from patient
3 information -- of patient information removed,
4 and we had people that were really good from an
5 IT perspective that were able to put that data
6 in a fashion that was really usable.
7    Q.    The system that was in place for
8 suspicious order monitoring on your first day,
9 did you ever make a determination as to whether
10 or not that system was in compliance or out of
11 compliance with the legal and regulatory
12 requirements of the Controlled Substances Act?
13           MR. LEEDER:  Objection to form.
14           THE WITNESS:  Yes, I basically
15    felt that it was -- it did meet the
16    regulation, but it was similar.  It
17    basically looked at threshold amount and
18    then pattern and frequency afterwards,
19    and I wanted it to meet pattern and
20    frequency from an electronic
21    perspective.
22 BY MR. YOUNG:
23    Q.    Okay.  So your opinion at the
24 time that you began with HD Smith was that the

Page 508

1 system in place was compliant with the CSA?
2    A.    Yes, that's correct.
3    Q.    And if that system continued
4 without any changes or modifications that
5 wouldn't be an issue from a legal or regulatory
6 basis, correct?
7           MR. LEEDER:  Object to form.
8           THE WITNESS:  Not from a legal or
9    regulatory basis, I didn't believe that
10    was the case.
11 BY MR. BUCHANAN:
12    Q.    Okay.  Did you engage in a
13 project to evaluate and improve the -- what's
14 called the CSOMP program, the SOMS program?
15    A.    Absolutely, yes, I did.
16    Q.    Okay.  I'm going to show you I
17 think we're on Exhibit 28, and it is going to be
18 my internal Exhibit 12.  Put a label on it here
19 for you.
20           (Document marked for
21    identification as Par-Norton Deposition
22    Exhibit No. 28.)
23 BY MR. YOUNG:
24    Q.    That's called or it's captioned a

Page 509

1 "Project Initiation Form."
2           Does that look familiar to you?
3    A.    Yes, it does.
4    Q.    And it has a date on it revised
5 June 30th, 2015.
6           Do you see that?
7    A.    Yes.
8    Q.    Okay.  What do you recall about
9 this particular document, Project Initiation
10 Form?
11    A.    This was the form that was used
12 to start an IT project at the company, so these
13 were things that I wanted to add to our program
14 to enhance it, and these were -- it's detailed
15 on here.
16    Q.    Okay.  In the middle of this
17 first page, there is a section that says "Impact
18 if project not performed," and there's some
19 numbered items underneath there.
20           Can you read for me what number 1
21 is under impact?
22    A.    Yes.  "Significant Regulatory
23 Risk.  Current program does not meet minimum DEA
24 requirements (especially Pattern & Frequency)."

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1      Q.    Okay.  So let's just go back for
2   a second.  I just asked you before whether or
3   not the current program met the minimum DEA
4   requirements from a legal and regulatory
5   perspective, and I believe your answer was, yes,
6   it did?
7      A.    Yes.
8      Q.    Here is a document that I believe
9   you prepared or at least you were the project
10  lead on?
11     A.    Yes.
12     Q.    And it says quite the opposite,
13  correct?
14     A.    Yes.
15     Q.    So which one of these is correct,
16  your prior testimony or this document?
17        MR. SCHACK:  Objection.
18        THE WITNESS:  So the DEA reg had
19     the requirement for orders, order
20     quantity, you know, frequency and
21     pattern.  I knew we were doing pattern
22     and frequency as well when the order
23     pended, but I was worried about being
24     able to defend that if -- I think in

Page 511

1     most cases we would be able to because
2     we had -- we had proof that the pattern
3     and frequency was being looked at after
4     the fact, but the pattern and frequency
5     was not what was stopping the order
6     initially, and so I wanted to be 100%
7     sure that it wasn't something.  And,
8     again, because different DEA offices,
9     different DEA investigators can
10     interpret things differently, I wanted
11     to make sure that if someone were to
12     look at the system, it would be spelled
13     out clearly up front that it looks at
14     pattern, frequency and volume, and I
15     knew we were doing it behind the scenes,
16     but it wasn't spelled out up front.  It
17     didn't stop based on that.
18  BY MR. YOUNG:
19     Q.    And so when you determined that
20  the current system at HD Smith did not account
21  for pattern and frequency identification of
22  suspicious orders, is that part of what drove
23  this project or was it a subset of some other
24  evaluation or audit?

Page 512

1      A.    This real --
2        MR. LEEDER:  Object to form.
3        THE WITNESS:  This was part of
4     the improvement project.  We had also
5     implemented the company had implemented
6     SAP prior to my arrival, and so there
7     were still some -- some challenges, some
8     bugs being worked out of the system
9     because it was so new, the integration
10     with SAP, so I wanted to address those
11     items as well.
12  BY MR. YOUNG:
13     Q.    Number 2 on this list of impact
14  if this project was not performed is -- can you
15  read that for us number 2, not the bullet but
16  the actual number 2.
17     A.    "Risk to the Company Reputation
18  and patients if product is distributed to
19  illegitimate sources."
20     Q.    So walk me through the risk to
21  patients if the product is distributed to
22  illegitimate sources, what would the risk be to
23  patients?
24     A.    If the product, and this was

Page 513

1   general -- generally if product goes to an
2   illegitimate source and is repackaged, my
3   thinking was if that illegitimate source were to
4   repackage that product, they might repackage it
5   without the appropriate expiration dating,
6   without the appropriate risk information, so,
7   you know, there is counterfeit product out
8   there.  That was kind of my thinking around that
9   line.
10     Q.    How about abuse and misuse,
11  overdose, death, any of those, would those have
12  been contemplated in the risk to patients if
13  product is distributed to illegitimate sources?
14        MR. LEEDER:  Object to form.
15  BY MR. YOUNG:
16     Q.    That's not what you were
17  thinking?
18     A.    It would be -- no.  It would be a
19  risk, but not to patients.  Patients I thought
20  of getting it legitimately.  So I was looking at
21  that more from somebody who -- when I say
22  illegitimate, somebody who is doing something
23  with the product they shouldn't be.
24     Q.    Is diversion an illegitimate

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1    thing to do with a controlled substance?
2         A.    Yes.
3         Q.    And you weren't contemplating
4    diversion of product in to people that shouldn't
5    have the controlled substances here; that's your
6    testimony today?
7              MR. LEEDER:  Object to form.
8              THE WITNESS:  That's not what
9         this meant.  I mean, obviously, if you
10        ship it to somebody who is not
11        registered and not doing their due
12        diligence then, yes, you could have
13        diversion or you could have abuse, but
14        that's not what this bullet was
15        referring to.
16   BY MR. YOUNG:
17        Q.    Aside from these two functions
18   that were absent in the CSOMP system, the
19   pattern and frequency, were there other flaws or
20   holes in the CSOMP system at HD Smith that gave
21   you concern?
22             MR. LEEDER:  Object to form.
23             THE WITNESS:  There were other
24        things that needed -- that I wanted to

Page 515

1         improve upon.
2    BY MR. YOUNG:
3         Q.    And I want to really put a fine
4    point on this because I think you went through
5    this in your earlier testimony suggesting that
6    these are improvements.  In fact, your
7    handwriting -- your words here are "current
8    program does not meet minimum DEA requirements."
9    That's not an improvement.  That's it either
10   meets or does not meet, so I need to be really
11   clear with you here right now.
12             Did the program, at the time you
13   wrote Project Initiation Form, this document
14   here, did the program meet the DEA requirements
15   or not?
16        A.    Yes.
17        Q.    So when you said "current program
18   does not meet minimum DEA requirements," you
19   were wrong?
20        A.    No.  If I had have said that it
21   met regulatory requirements, the project
22   probably wouldn't have gotten the priority that
23   it did, and it wouldn't have moved forward.
24        Q.    So this is an example of you

Page 516

1    overstating the severity of the situation in
2    order to get buy-in from senior management?
3              MR. LEEDER:  Objection to form.
4              THE WITNESS:  To a certain
5         extent, yes.
6    BY MR. YOUNG:
7         Q.    Okay.  If we can could pull out
8    of that zoom-in and look at Project Objectives,
9    which is the top middle, there's another -- so
10   the very first item on here of the objectives is
11   "Add Pattern & Frequency."  We talked about
12   that.
13             The second one is assess by DEA
14   number rather than account number.  What's that
15   referring to?
16        A.    So the current -- the system at
17   the time kept track of customers and pended
18   orders by account number, and a customer could
19   have more than one account number, so I wanted
20   to do it by DEA number because it was more
21   specific to customer and customer location.
22        Q.    In fact, didn't HD Smith
23   determine that there were several instances in
24   which the same customer had multiple account

Page 517

1    numbers and thereby received multiple
2    thresholds?
3              MR. LEEDER:  Object to form.
4              THE WITNESS:  I don't recall any
5         specific ones, but it was a practice at
6         HD Smith to assign multiple account
7         numbers to customers.
8    BY MR. YOUNG:
9         Q.    Okay.  In that aspect of the
10   CSOMP program, do you feel that that was in or
11   out of compliance with the expectations of the
12   legal and regulatory requirements of the CSA?
13             MR. LEEDER:  Object to form.
14             THE WITNESS:  The regulation does
15        not go to that level of detail.
16   BY MR. YOUNG:
17        Q.    Was that an effective system to
18   prevent diversion, allowing one customer to have
19   multiple account numbers --
20             MR. LEEDER:  Object to form.
21   BY MR. YOUNG:
22        Q.    -- and receive multiple shipments
23   of controlled substances?
24        A.    It basically meant that the

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1  compliance people had to do more work. That's
2  really the impact of that.
3       Q.   How many compliance people did HD
4  Smith have at the time that you began your
5  employment there?
6       A.   We had five, five or six.
7       Q.   And when you began your
8  employment with HD Smith, did you feel that the
9  staffing and resources were sufficient to handle
10 the legal and regulatory compliance work that
11 needed to be done at HD Smith?
12      MS. KOSKI:  Object to form.
13      THE WITNESS:  I was worried about
14      backups to people.
15 BY MR. YOUNG:
16      Q.   Did you complain to senior
17 management or your supervisors that you didn't
18 have enough people to do the current job and you
19 couldn't take on new tasks?
20      MR. LEEDER:  Object to form.
21      THE WITNESS:  No.  I did ask for
22      additional head count.  I didn't say I
23      couldn't take on more tasks.
24 BY MR. YOUNG:

Page 519

1       Q.   Did you receive additional head
2  count when you asked for it?
3       A.   I did.
4       Q.   Each and every time?
5       A.   Yes.
6       Q.   Did you ever ask for additional
7  resources or access to data or services or
8  outside vendors in compliance and were denied
9  that request by HD Smith?
10      MR. LEEDER:  Object to form.
11      THE WITNESS:  None that I can
12      recall.
13 BY MR. YOUNG:
14      Q.   So your recollection today is
15 that everything at HD Smith from a compliance
16 perspective was perfectly in compliance with the
17 Controlled Substances Act expectations and
18 regulations and law?
19      MR. LEEDER:  Same objection.
20      THE WITNESS:  It did meet the
21      regulation.
22 BY MR. YOUNG:
23      Q.   You have no critical recollection
24 of your time at HD Smith today?

Page 520

1       A.   I have recollection of items that
2  I wanted to improve.
3       Q.   And were not able to?
4       A.   No.  We were working towards it.
5  This project was working towards it.
6       Q.   Did this project complete prior
7  to your departure from HD Smith?
8       A.   It did not.
9       Q.   Do you know whether or not this
10 project was ever finally implemented?
11      A.   I'm not sure.  That occurred --
12 would have occurred after I left.
13      Q.   Do you know who you replaced at
14 HD Smith in the head of compliance?
15      A.   Yes, George Euson.
16      Q.   Do you have a opinion on the
17 ability and efficacy of George Euson to be the
18 chief compliance officer or senior compliance
19 department person for HD Smith?
20      MR. LEEDER:  Object to form.
21      THE WITNESS:  Absolutely.  He's
22      one of the best.
23 BY MR. YOUNG:
24      Q.   One of the best in the business?

Page 521

1       A.   Yes.
2       Q.   Is George as capable and
3  qualified as you, more so or less so?
4       MR. LEEDER:  Object to form.
5       THE WITNESS:  I can't really say
6       that one way or the other.
7  BY MR. YOUNG:
8       Q.   Do you know George's background?
9       A.   I believe he was law enforcement,
10 ex-law enforcement.  I'm not positive, but I
11 think that was his background.
12      Q.   Do you know if he has any
13 advanced degrees, such as yourself, in the
14 pharmaceutical sector?
15      A.   I don't know.
16      Q.   The second to last bullet point
17 is distinguish primary versus secondary account
18 when an order pends.
19      Can you explain what's meant by
20 that objective?
21      A.   Primary meant that we were the
22 primary supplier for that account versus
23 secondary meant there were other wholesalers
24 that also supplied the account, which was

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    common.
2        Q.    And is HD Smith more typically a
3    secondary supplier or a primary supplier?
4        A.    They were more of a secondary
5    supplier when I was there.
6        Q.    Okay.  And did HD Smith have the
7    ability during your tenure to identify the
8    controlled substance utilization of a pharmacy
9    from its primary supplier when you were the
10   secondary supplier?
11       MR. LEEDER:  Object to form.
12       THE WITNESS:  They -- we had that
13           question on our customer questionnaire,
14           and we utilized that to make a
15           determination.
16   BY MR. YOUNG:
17       Q.    Was there any other means or
18   method that you could determine the extent of
19   controlled substance purchases by a pharmacy's
20   primary supplier when you were the secondary
21   supplier?
22       A.    Through the dis --
23       MR. LEEDER:  Object to form.
24       THE WITNESS:  Yes, through the

Page 523

1    dispensing data.
2    BY MR. YOUNG:
3        Q.    Okay.  And how often did you
4    obtain dispensing date from customers?
5        A.    Usually if the customer pended,
6    we would look at everything that was available
7    to us and if a decision couldn't be made one way
8    or the other, we would get dispensing data.
9        Q.    I asked this question of other HD
10   Smith witnesses, so I'm compelled to ask you,
11   why didn't HD Smith obtain utilization data or
12   DUR data from all pharmacy customers?  Why did
13   you only obtain it after an order was pending?
14   Wouldn't it be best practices to obtain all the
15   information that you can about a customer?
16       MR. LEEDER:  Object to form.
17       MR. SCHACK:  Object to form.
18       THE WITNESS:  I think it would be
19           very difficult for every single
20           customer.  There's over -- I don't know
21           as far as number of DEA -- of customers
22           for HD Smith, but there's over a million
23           pharmacy registrants in the United
24           States, and the dispensing data covered

Page 524

1    one month -- a one month period of time.
2    BY MR. YOUNG:
3        Q.    When you -- when HD Smith takes
4    on an initial customer as a new customer, I
5    think you mentioned that you have them complete
6    a new customer profile form?
7        A.    Yes.
8        Q.    Why doesn't HD Smith obtain the
9    one-month DUR report on a new customer when
10   they're bringing them on board when they're on
11   boarding a new customer?
12       MR. LEEDER:  Object to form.
13   BY MR. YOUNG:
14       Q.    Why don't they do that?
15       A.    I don't know.
16       Q.    Would it make sense to you now,
17   sitting here today, in light of this litigation
18   and everything that you know for a distributor
19   to obtain a DUR report for a customer as it
20   brings them on, would that be a beneficial piece
21   of information to have to evaluate the risk?
22       MR. SCHACK:  Objection.
23       MR. LEEDER:  Object to form.
24       THE WITNESS:  I don't think it

Page 525

1            would be beneficial at that point.  They
2            haven't received any of our products.
3    BY MR. YOUNG:
4        Q.    When HD Smith terminates a
5    relationship with a customer, a pharmacy
6    customer, obviously, that pharmacy is going to
7    seek its purchases elsewhere.
8            Does HD Smith inform other
9    distributors that it ceased doing business with
10   a particular pharmacy?
11       MR. LEEDER:  Object to form.
12       THE WITNESS:  I don't recall
13           having done that; however, other
14           wholesale -- well, I don't know.  I
15           don't know if we did or not, to be
16           honest.
17   BY MR. YOUNG:
18       Q.    Do you know whether or not HD
19   Smith has received information from other
20   distributors about pharmacies that they've
21   ceased doing business with?
22       A.    I did receive a couple of
23   inquiries while I was there.
24       Q.    Through any of the trade

Highly Confidential – Subject to Further Confidentiality Review

Page 526

1    associations or working groups or Listservs or
2    any of the other various pharmaceutical
3    distributor or wholesaler organizations, do you
4    know whether or not such information is shared
5    among distributors of bad actor pharmacies or
6    suspicious pharmacies?
7          A.    No, I mean, that would be
8    competitive information, so they wouldn't share
9    that.
10         Q.    Do you know whether or not the
11   DEA or any state board of pharmacy has ever
12   shared with you information about suspicious
13   pharmacies that it was investigating or that it
14   had concerns about?
15         MR. LEEDER:  Object to form.
16         THE WITNESS:  Not on their own.
17   If we conveyed to DEA that we were
18   looking at a particular pharmacy or if
19   we reported that pharmacy to DEA, they
20   have on occasion made comment about
21   looking into that particular customer as
22   well.  It was infrequent because it's
23   not like DEA to share that information,
24   but the people that I had working for me

Page 527

1    had -- some of them, a couple of them
2    had very good working relationships with
3    DEA.
4    BY MR. YOUNG:
5          Q.    When HD Smith takes on a new
6    customer, how does it know how to set the
7    threshold or URL I think is what HD Smith calls
8    unit reportable level, how does it know how to
9    set the threshold or URL for a new customer?
10         A.    I know we had a plant URL that
11   was an automatic number that was set, so it
12   basically got the plant URL.
13         Q.    Did you have an opinion when you
14   joined HD Smith, based on your prior experience
15   in the industry or your prior education and
16   training, about the particular way in which HD
17   Smith established its URLs for new customers?
18         MR. SCHACK:  Objection.
19         THE WITNESS:  No I thought the
20   information was -- was pretty well
21   orchestrated as far as that goes.
22   BY MR. YOUNG:
23         Q.    Did you ever either yourself or
24   have your -- the folks in your compliance

Page 528

1    department conduct investigations in order to
2    determine whether or not -- or I should say
3    conduct analysis or investigations in order to
4    determine whether or not the establishment of
5    the initial URLs were sufficient to identify
6    suspicious orders?
7          MR. LEEDER:  Objection.
8          THE WITNESS:  Yes, they were
9    conducting analysis on a daily basis.
10   They were constantly looking at
11   customers and numbers.
12         MR. YOUNG:  I want to show you --
13   this is going to be number 14 in your
14   book.  It's going to Exhibit 29.  I do
15   have copies for you guys.  I'm sorry.
16   Just trying to get this done as quick as
17   possible.
18         (Document marked for
19   identification as Par-Norton Deposition
20   Exhibit No. 29.)
21   BY MR. YOUNG:
22         Q.    This is captioned "Meeting
23   Minutes."
24         Do you recognize this document?

Page 529

1          MR. LEEDER:  I just want to note
2    for the record that this is after her
3    departure from the company.
4    BY MR. YOUNG:
5          Q.    Have you ever seen this document,
6    though?
7          A.    No.  I've seen the template used
8    previously, but I haven't seen this.
9          Q.    Okay.  I just want to walk
10   through this document with you to see -- get
11   your reflection on some of the information in
12   here.  Can we go to page 2, under Number 9 under
13   the Agreement, section E, "customers with less."
14         MR. SCHACK:  Can you identify it
15   for the record with a Bates number on
16   there.
17         MR. YOUNG:  Oh, I just handed you
18   -- oh, I'm sorry.  I just handed it to
19   him.  Yeah, the Bates range is -- boy,
20   if I could read that.
21         MR. LEEDER:  It's 294884 through
22   294886.
23   BY MR. YOUNG:
24         Q.    And it says in Number 9,

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1    "Customers with less than 4 months of sales
2    history will not be checked for pattern and
3    frequency, per Kyle," and I just wanted to get
4    your reflection on during the -- I know this is
5    after your tenure, but while you were at HD
6    Smith, was this the case also that new customers
7    with less than four months sales history would
8    not be checked for pattern and frequency under
9    the CSOMP program?
10          MR. LEEDER: Object to form.
11          THE WITNESS: No. While I was
12          there if the customer order pended, they
13          would automatically check for pattern
14          and frequency as well.
15   BY MR. YOUNG:
16       Q.    And I need to clean that up.
17   What you're referring to when you say the order
18   pended is under the CSOMP program at the time,
19   the only criteria that caused an order to pend
20   was the size of the order, right, whether it
21   exceeded the URL?
22          MR. LEEDER: Objection to form.
23          THE WITNESS: Yes.
24

Page 531

1    BY MR. YOUNG:
2        Q.    Correct, okay.
3            So if a pharmacy changed
4    substantially its ordering pattern and its
5    ordering frequency but didn't exceed the URL,
6    that would not be caught by the system and not
7    investigated by compliance, correct?
8            MR. SCHACK: Objection.
9    BY MR. YOUNG:
10       Q.    So long as the order didn't
11   breach the URL in total, that order would not be
12   evaluated by the CSOMP program?
13          MR. LEEDER: Objection.
14          MR. SCHACK: Objection.
15          THE WITNESS: It's hard to say
16          because it could be caught in other
17          ways.
18   BY MR. YOUNG:
19       Q.    Okay. The question is
20   specifically in the CSOMP program, is it your
21   testimony today that the CSOMP program would
22   catch on pattern and frequency during your
23   tenure at HD Smith if an order did not hit its
24   URL?

Page 532

1            MR. LEEDER: Objection to form.
2            MR. SCHACK: Objection to form.
3    BY MR. YOUNG:
4        Q.    Just the CSOMP?
5        A.    Just the electronic system. It
6    pended based on order quantity, and then they
7    looked at pattern and frequency.
8        Q.    Yeah, so --
9        A.    So the first pend would be order
10   quantity.
11       Q.    And absent that, there would be
12   no evaluation in CSOMP, correct?
13          MR. SCHACK: Objection.
14          MR. LEEDER: Objection to form.
15          THE WITNESS: There would be
16          other things that were investigated that
17          might pick it up.
18   BY MR. YOUNG:
19       Q.    In CSOMP? Give me the factors in
20   CSOMP that would cause an order to be picked up
21   that didn't exceed its URL?
22          MR. SCHACK: Objection.
23          THE WITNESS: When you say "in
24          CSOMP," it wouldn't pend based on it,

Page 533

1            but it would be -- there were other
2            things that the group was doing to check
3            for things like that.
4    BY MR. YOUNG:
5        Q.    Explain that to me. Walk me
6    through the process that compli -- we don't have
7    a lot of time, but this is vital to the case to
8    understand this.
9            MR. SCHACK: Objection to the
10          colloquy.
11   BY MR. YOUNG:
12       Q.    Go ahead.
13       A.    Basically running reports, we
14   would sort the data in all kinds of ways all the
15   time.
16       Q.    What are the names of the reports
17   that you would run?
18       A.    I don't think they really had
19   names.
20       Q.    Nameless reports, okay.
21          Who ran these reports?
22          MR. SCHACK: Objection.
23          THE WITNESS: Usually Kyle.
24   BY MR. YOUNG:

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1    Q.    Kyle?
2    A.    Kyle Rieger.
3    Q.    Rieger.
4          How often were these reports run?
5    A.    Sporadically.  It wasn't -- it
6  wasn't a set time, so they would be run, you
7  know.
8    Q.    So nameless, random reports would
9  capture pattern and frequency deviations
10 sufficient to meet the CSA requirements?
11         MR. SCHACK:  Objection.
12         MR. LEEDER:  Objection to form.
13         MR. SCHACK:  Completely
14         inappropriate.
15         THE WITNESS:  Not every one.
16 BY MR. YOUNG:
17    Q.    Okay.  So the CSOMP program was
18 an automated program, right?
19    A.    Yes.
20    Q.    Is there some functionality in
21 the CSOMP program, to your knowledge, today,
22 during your tenure with HD Smith or prior to
23 that that would have captured pattern and
24 frequency without pending for size of the order?

Page 535

1          MR. LEEDER:  Objection to form
2          and foundation.
3          MR. SCHACK:  Objection.
4          THE WITNESS:  When I was there,
5    no.  But prior to that, I don't know.  I
6    know there was a different system.  I
7    don't know the details of that system.
8  BY MR. YOUNG:
9    Q.    Do you know what HD Smith did
10 prior to implementation of its CSOMP in order to
11 identify and report suspicious orders?
12    A.    I do not.
13    Q.    You're wholly unaware of that?
14         MR. SCHACK:  Objection.
15         THE WITNESS:  Yes.
16 BY MR. YOUNG:
17    Q.    Do you know whether or not --
18    A.    Prior to my coming to the
19 company, I know there was a system, I don't know
20 the details of it, because it was prior to SAP,
21 and when I came, they already had SAP.
22    Q.    Do you know how the company
23 handled the reporting to the DEA of suspicious
24 orders prior to George Euson taking his

Page 536

1  position?
2    A.    I know that there was -- the
3  reporting to DEA happened by e-mail usually
4  and -- all the time it happened by e-mail.
5    Q.    Do you know how often those would
6  be reported, the frequency?
7    A.    It wasn't a set -- I mean,
8  sometimes it could be one in a month and
9  sometimes it could be four in a month, you know,
10 it varied.
11    Q.    And do you know who identified
12 the suspicious orders, which particular --
13    A.    We had people in the field that
14 basically would go in to audit those customers,
15 and the dispensing data would be run as part of
16 that audit, and that's really where it would
17 be -- they would be identified.
18    Q.    In the CSOMP system, do you
19 recall Z5 hold on orders?  Does that -- does the
20 term Z5 mean anything to you?
21    A.    It does sound familiar, yes.
22 It's one of the holds.  I'm not sure which one.
23    Q.    Okay.  And what's a hold in the
24 CSOMP system?

Page 537

1    A.    It could be a hold for a credit
2  reason.  It could be a hold for a SOM reason.
3  There were several different types of holds that
4  the system could have.
5    Q.    Do you recall during your tenure
6  as head of compliance at HD Smith identifying an
7  issue with the Z5 hold release?
8    A.    Not specifically.
9    Q.    Do you recall identifying that
10 too many people in the company had the ability
11 to release a Z5 CSOMP hold?
12         MR. LEEDER:  Objection to form.
13         THE WITNESS:  Yes, it was one of
14         the things that we looked at.
15 BY MR. YOUNG:
16    Q.    Do you know how many people in
17 the company when you looked at it you found out
18 had the ability to release a Z5 CSOMP hold?
19         MR. LEEDER:  Objection.
20         THE WITNESS:  I know that there
21         were many.  We were -- I was very
22         pleased to find out that none of them
23         had.  Most of them didn't even know they
24         had that capability, but there were

Highly Confidential - Subject to Further Confidentiality Review

Page 538

1 quite a few. It was a flaw from SAP.
2 BY MR. YOUNG:
3 Q. Do you know was it more than 100
4 people?
5 A. I don't recall.
6 Q. Does 448 ring a bell?
7 A. Possibly it could have been that
8 many, yes.
9 Q. Do you know whether or not the HD
10 Smith CSOMP systems were always operational, or
11 was there a point in time during your tenure
12 that the CSOMP systems failed or were
13 inoperable?
14 A. There were -- as I said earlier,
15 there were some bugs with SAP that needed to be
16 worked out, and that's one of the things that
17 were included -- was included in the projects.
18 There was an occasion where orders that should
19 have pended didn't pend and our group went back
20 and ran reports and did extensive research on
21 those orders.
22 Q. Do you recall reviewing
23 spreadsheets of orders that exceeded a URL but
24 did not go through CSOMP and did not pend?

Page 539

1 MR. LEEDER: Object to form.
2 BY MR. YOUNG:
3 Q. Do you recall that project?
4 A. I recall looking at -- I'm not
5 sure of the exact details, but I recall looking
6 at some orders that -- that that did occur with.
7 Q. All right. I'm going to quickly
8 direct your attention to my Exhibit 18. It will
9 be this deposition's Exhibit 30.
10 (Document marked for
11 identification as Par-Norton Deposition
12 Exhibit No. 30.)
13 BY MR. YOUNG:
14 Q. It's a -- it's a one page e-mail
15 with a colored spreadsheet behind it. I got a
16 copy for you coming.
17 Do you recall this cover e-mail?
18 A. I do.
19 Q. And you were cc'd on this. This
20 is from Kyle Rieger to Durga -- I don't know how
21 you pronounce it, I say Jarugula, kind of like
22 the lettuce?
23 A. Yes.
24 Q. And the subject is CSOMP

Page 540

1 analysis, and it's dated February 3rd of 2015.
2 Can you read for me what Kyle
3 Rieger writes to Durga here?
4 A. "Durga, see the attached
5 spreadsheet. I came up with this summary based
6 on the October 2014 date that you sent to
7 Tracey. I wanted to touch base with you on this
8 and see if there is an easier way to get to this
9 information. Manually breaking down the report
10 you sent is extremely time consuming.
11 Essentially, I'm looking for a list of DU's
12 shipped over the URL where the account also had
13 some orders that did not go through CSOMP. I
14 don't think I need individual order detail just
15 as long as we can see what their total number of
16 DU's shipped vs. their URL."
17 Q. Okay. And the attachment behind
18 it is a spreadsheet, and I'm not going to have
19 you -- we don't have the time to go through it,
20 but can you take a look quickly at the
21 spreadsheet at the top of the titles of the
22 columns. Does it look familiar to you?
23 The first page of this just
24 happens to be pharmacies that are in Ohio,

Page 541

1 northern Ohio or a pharmacy in northern Ohio,
2 this is just an example, but what I'm interested
3 in is the pink highlighted row H.
4 Do you see that?
5 A. Yes.
6 Q. So where it says "Shipped Over
7 URL," what do you understand that to mean?
8 MR. LEEDER: Objection to form.
9 THE WITNESS: Those are over
10 the -- over the plant -- plant assigned
11 limit.
12 BY MR. YOUNG:
13 Q. So let's just take the 4200
14 number in row 34 there. It says "Shipped Over
15 URL 4200." What is 4200, is that DUs?
16 A. Dosage units.
17 Q. Okay. And can you tell, I don't
18 know if you recall from this, what drug we're
19 referring to where it says family 220?
20 A. I don't recall.
21 Q. And then there's a column next to
22 it that says, "Did any orders bypass CSOMP?"
23 And the answer in this case is?
24 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 542

1  Q.   Yes.  And in the entire
2  spreadsheet, in fact, the answer is yes; is that
3  correct?
4          MR. LEEDER:  Objection to form.
5          THE WITNESS:  Yes, that's
6  correct.
7  BY MR. YOUNG:
8  Q.   I don't know if there's a -- on
9  the next page of that spreadsheet, is there a
10  total number of DUs?  I don't know if it totals
11  it at the top?  It might not.  Maybe the last
12  page of it, does it total it on the last page?
13  A.   Yes.
14  Q.   Can you read for me what that
15  total number of DUs is for this one month in
16  2014 that shipped from HD Smith over the URL?
17  A.   530,282.
18  Q.   Dosage units?
19  A.   Yes.
20  Q.   In one month?
21  A.   Yes.
22  Q.   Does that seem like a lot of
23  controlled substance to go out the door without
24  being investigated under the CSOMP?

Page 543

1          MR. LEEDER:  Where are we on
2  time, I'm sorry, but -- it's 7:00?
3          MR. YOUNG:  Are you ceasing the
4  depo now?
5          MR. LEEDER:  That's fine, she can
6  answer the question.
7          THE WITNESS:  I can't answer a
8  lot.  That's subjective.
9          MR. YOUNG:  Okay.  At this point
10  counsel is directing we've run out of
11  time in the examination, so I don't have
12  any further questions for you.
13          THE VIDEOGRAPHER:  This concludes
14  the deposition, going off the record at
15  6:25.  This concludes this portion of
16  the deposition at 6:25 p.m.  Going off
17  the record.
18          (Off the video record.)
19          MS. VANNI:  We are keeping the
20  deposition open until tomorrow in that
21  defendants want to conduct direct
22  examinations of the witness followed by
23  cross.  And cross-examination for today
24  is done, and we will start with directs

Page 544

1  tomorrow 8:30 a.m.
2          MR. BUCHANAN:  We've confirmed
3  that we're commencing at 8:30 and we'll
4  conclude by noon.  So defendants will
5  keep their examinations tailored and
6  breaks tailored to accommodate that
7  timing, and plaintiffs will do so as
8  well.
9          (Witness excused.)
10              ---
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 545

1  C E R T I F I C A T I O N
2          I, MARGARET M. REIHL, a
3  Registered Professional Reporter,
4  Certified Realtime Reporter, Certified
5  Shorthand Reporter, Certified LiveNote
6  Reporter and Notary Public, do hereby
7  certify that the foregoing is a true and
8  accurate transcript of the testimony as
9  taken stenographically by and before me
10  at the time, place, and on the date
11  hereinbefore set forth.
12          I DO FURTHER CERTIFY that I
13  am neither a relative nor employee nor
14  attorney nor counsel of any of the
15  parties to this action, and that I am
16  neither a relative nor employee of such
17  attorney or counsel, and that I am not
18  financially interested in the action.
19
20
21  ------------------------------
    Margaret M. Reihl, RPR, CRR, CLR
22  CSR #XI01497  Notary Public
23
24

137  (Pages 542 to 545)

Highly Confidential – Subject to Further Confidentiality Review

Page 546

```
1        - - - - - -
2       E R R A T A
3        - - - - - -
4   PAGE  LINE  CHANGE
5   ___  ___  _____
6   REASON: _____
7   ___  ___  _____
8   REASON: _____
9   ___  ___  _____
10  REASON: _____
11  ___  ___  _____
12  REASON: _____
13  ___  ___  _____
14  REASON: _____
15  ___  ___  _____
16  REASON: _____
17  ___  ___  _____
18  REASON: _____
19  ___  ___  _____
20  REASON: _____
21  ___  ___  _____
22  REASON: _____
23  ___  ___  _____
24  REASON: _____
```

Page 547

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3        I, TRACEY L. NORTON, do hereby
4   certify that I have read the foregoing
5   pages, and that the same is a correct
6   transcription of the answers given by me
7   to the questions therein propounded,
8   except for the corrections or changes in
9   form or substance, if any, noted in the
10  attached Errata Sheet.
11
12
13
    _____
14  TRACEY L. NORTON          DATE
15
    Subscribed and sworn to before me this
16
    _____ day of _____, 2018.
17
    My commission expires:_____
18
19  _____
    Notary Public
20
21
22
23
24
```