EXHIBIT 238

```
1                 UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION
3    IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
4    LITIGATION               )   Case No. 1:17-MD-2804
                              )
5                             )   Hon. Dan A. Polster
     THIS DOCUMENT RELATES TO )
6    ALL CASES                )
                              )
7
8
9                          __ __ __
10                 Thursday, January 10, 2019
                           __ __ __
11
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12                 CONFIDENTIALITY REVIEW
                           __ __ __
13
14
15
16        Videotaped Deposition of GARY HILLIARD,
     held at Winstead PC, 2728 N. Harwood St.,
17   Dallas, Texas, commencing at 9:06 a.m. on the
     above date, before Susan Perry Miller,
18   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Realtime
19   Captioner, and Notary Public.
20
21
                           __ __ __
22
               GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | fax 917.591.5672
                    deps@golkow.com
24
25
```

Page 2

```
 1  A P P E A R A N C E S:
 2
 3  LEVIN PAPANTONIO THOMAS MITCHELL
    RAFFERTY PROCTOR, P.A.
 4  BY:  BRANDON L. BOGLE, ESQUIRE
       bbogle@levinlaw.com
 5  316 South Baylen Street
    Pensacola, Florida 32502
 6  (850) 435-7000
    Counsel for Plaintiffs
 7
 8
 9  COVINGTON & BURLING LLP
    BY:  CHRISTOPHER K. EPPICH, ESQUIRE
       ceppich@cov.com
10  1999 Avenue of the Stars
    Los Angeles, California 90067-4643
11  (424) 332-4764
    Counsel for McKesson Corporation and
12  the Witness
13
14  COVINGTON & BURLING LLP
    BY:  KEVIN M. KELLY, ESQUIRE
15     kkelly@cov.com
    One City Center
16  850 Tenth Street, N.W.
    Washington, D.C. 20001
17  (202) 662-6000
    Counsel for McKesson Corporation and
18  the Witness
19
20  WILLIAMS & CONNOLLY LLP
    BY:  JULI ANN LUND, ESQUIRE
21     jlund@wc.com
    725 Twelfth Street, N.W.
22  Washington, D.C. 20005
    (202) 434-5000
23  Counsel for Cardinal Health, Inc.
24
25
```

Page 3

```
 1  A P P E A R A N C E S, Continued:
 2
 3  JONES DAY
    BY:  RICHARD M. BRODSKY
 4     rbrodsky@jonesday.com
    150 W. Jefferson Street, Suite 2100
 5  Detroit, Michigan 48226-4438
    (313) 733-3939
 6  Counsel for Walmart
 7
 8  REED SMITH LLP
    BY:  STAN PERRY, ESQUIRE
 9     sperry@reedsmith.com
    811 Main Street, Suite 1700
10  Houston, Texas 77002
    (713) 469-3800
11  Counsel for AmerisourceBergen Drug
    Corporation
12
13
14  ARNOLD & PORTER KAYE SCHOLER LLP
    BY:  JOHN D. LOMBARDO, ESQUIRE
15     john.lombardo@arnoldporter.com
       (via teleconference)
16  777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844
17  (213) 243-4000
    Counsel for Endo Health Solutions
18  Inc., Endo Pharmaceuticals Inc., Par
    Pharmaceutical, Inc. and Par
    Pharmaceutical Companies, Inc.
19
20
21  COLLINSON DAEHNKE INLOW & GRECO
    BY:  LAURA S. LUCERO, ESQUIRE
22     laura.lucero@cdiglaw.com
       (via teleconference)
23  2110 East Flamingo Road, Suite 305
    Las Vegas, Nevada 89119
24  (702) 979-2132
    Counsel for C&R Pharmacy
25
```

Page 4

```
 1  A P P E A R A N C E S, Continued:
 2
 3  MARCUS & SHAPIRA LLP
    BY:  ELLY HELLER-TOIG, ESQUIRE
 4     ehtoig@marcus-shapira.com
    One Oxford Center, 35th Floor
 5  301 Grant Street
    Pittsburgh, Pennsylvania 15219
 6  (412) 471-3490
    Counsel for HBC
 7
 8
 9  ALLEGAERT BERGER & VOGEL LLC
    BY:  JOHN S. CRAIG, ESQUIRE
10     jcraig@abv.com
       (via teleconference)
11  111 Broadway, 20th Floor
    New York, New York 10006
12  (212) 571-0550
    Counsel for Rochester Drug
13  Cooperative, Inc.
14
15  BAILEY & WYANT PLLC
    BY:  HARRISON M. CYRUS, ESQUIRE
16     hcyrus@baileywyant.com
       (via teleconference)
17  500 Virginia Street East, Suite 600
    Charleston, West Virginia 25301
18  (304) 345-4222
    Counsel for West Virginia Board of
    Pharmacy
19
20
21  FOX ROTHSCHILD LLP
    BY:  EILEEN O. MUSKETT, ESQUIRE
22     emuskett@foxrothschild.com
       (via teleconference)
23  1301 Atlantic Avenue
    Atlantic City, New Jersey 08401-7212
24  (609) 572-2355
    Counsel for Validus Pharmaceuticals
25
```

Page 5

```
 1  A P P E A R A N C E S, Continued:
 2
 3
 4  TRIAL TECHNICIAN:
 5     RICHARD RIENSTRA,
       Complete Litigation Support
 6
 7  VIDEOGRAPHER:
 8     BRIAN BOBBITT,
       Golkow Litigation Services
 9
10
11  ALSO PRESENT:
12     RICHARD WOODS, Paralegal, Levin
       Papantonio
13        --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

1                INDEX
2                          Page
3    APPEARANCES                    2
4
5    EXAMINATION OF GARY HILLIARD:
6    BY MR. BOGLE................................. 14
7    BY MR. EPPICH.............................. 318
8    BY MR. BOGLE.............................. 340
9
10
11   CERTIFICATE                   352
12   ACKNOWLEDGMENT OF DEPONENT          353
13   ERRATA              354
14   LAWYER'S NOTES             355
15
...
24          --oOo--
25

**Page 7**

1     Index of Media
2     File 1              12
3     File 2              72
4     File 3             162
5     File 4             208
6     File 5             281
...
12         --oOo--

**Page 8**

1     E X H I B I T   I N D E X
2            Description              Page
     McKesson-      E-mail from Walker,      35
     Hilliard       5/2/2012, with
3    Exhibit 1      Attachment(s)
4                   P1.1651
5                   MCKMDL00498169 - 498183
6    McKesson-      U.S. House of        40
     Hilliard       Representatives
7    Exhibit 2      Committee on Energy and
8                   Commerce Memo dated May
                    4, 2018
9                   P1.264
                    (9 pages, no Bates)
10   McKesson-      U.S. Department of      53
     Hilliard       Justice Drug Enforcement
11   Exhibit 3      Administration Letter
                    dated September 27,
12                  2006, from Joseph T.
                    Rannazzisi
13                  P1.1464
                    MCKMDL00478906 - 478909
14
15   McKesson-      DEA Memorandum dated Oct   79
     Hilliard       20, 2005, Subject:
16   Exhibit 4      Internet Presentation
                    with McKesson Corp. on
17                  September 1, 2005
                    P1.1946
18                  MCKMDL00496859 - 496875
19   McKesson-      DEA Memorandum dated Jan   107
     Hilliard       23, 2006, Subject:
20   Exhibit 5      Meeting Between Office
                    of Diversion Control
21                  (OD) and McKesson Corp.
                    on January 3, 2006
22                  P1.1789
                    MCKMDL00496876 - 496878
23   McKesson-      DEA List of Pleadings in   124
     Hilliard       Order to Show Cause Re
24   Exhibit 6      McKesson Corporation
                    P1.1943
25                  MCKMDL00496306 - 496525

**Page 9**

1    McKesson-      Chart and Table,      145
     Hilliard       "McKesson hydrocodone
2    Exhibit 7      sales for October 1,
3                   2005 through
                    January 31, 2006"
4                   P1.1947
                    MCKMDL00497154 - 497155
5    McKesson-      "Pharmacy Rankings for   152
     Hilliard       Hydrocodone, October 1,
6    Exhibit 8      2005 to January 31, 2006"
                    P1.1951
7                   MCKMDL00496536 - 496549
8    McKesson-      Drug Operations Manual   164
     Hilliard       Section 55-Controlled
9    Exhibit 9      Substances
                    P1.1555
10                  MCKMDL00346554 - 346690
11   McKesson-      McKesson DU45 Report,    169
     Hilliard       Date 04/03/07
12   Exhibit 10     P1.2100
13                  MCKMDL00660789 - 661435
14   McKesson-      Summary of the DEA-HDMA   187
     Hilliard       Meeting on Suspicious
15   Exhibit 11     Orders, Meeting Date:
                    Sept. 7, 2007
16                  P1.1823
17                  MCKMDL00574906 - 574907
18   McKesson-      E-mail Chain ending with  195
     Hilliard       E-mail from Gustin,
19   Exhibit 12     2/4/2011
                    P1.1667
20                  MCKMDL00510747 - 510752
21   McKesson-      Settlement and Release   210
     Hilliard       Agreement and
22   Exhibit 13     Administrative
                    Memorandum of Agreement
23                  between DEA and
                    McKesson, May 2, 2008
24                  P1.889
25                  MCKMDL00337001 - 337024

Page 10

McKesson-Hilliard Exhibit 14    Presentation, "Lifestyle Drugs & Internet Pharmacies"   P1.1830   MCKMDL00403340 - 403348    215

McKesson-Hilliard Exhibit 15    Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit   P1.1887   MCKMDL00591949 - 591953    225

McKesson-Hilliard Exhibit 16    Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, Landover, Maryland DC   P1.1901   MCKMDL00591841 - 591844    235

McKesson-Hilliard Exhibit 17    McKesson Operations Manual for Pharma Distribution, Lifestyle Drug Monitoring Program   P1.1255   MCKMDL00330211 - 330216    239

McKesson-Hilliard Exhibit 18    Lifestyle Drug Program, McKesson U.S. Pharma - DEA Licensure Audit, So Cal DC   P1.1918   MCKMDL00591858 - 591861    242

McKesson-Hilliard Exhibit 19    McKesson Internal Audit, Audit Report, DEA Licensure Compliance and LDMP Audit, U.S. Pharmaceuticals   P1.1917   MCKMDL00591251 - 591262    244

McKesson-Hilliard Exhibit 20    E-mail Chain ending with E-mail from Hilliard, 12 Sep 2007, RE: Mapes and ABC presentation notes   P1.2002   MCKMDL00622532 - 622534    248

Page 11

McKesson-Hilliard Exhibit 21    E-mail Chain ending with E-mail from Hilliard, 10/18/2009   P1.1856   MCKMDL00573535 - 573539    259

McKesson-Hilliard Exhibit 22    E-mail Chain ending with E-mail from Walker, 4/7/2008   P1.1962   MCKMDL00543610 - 543615    272

McKesson-Hilliard Exhibit 23    E-mail Chain ending with E-mail from Pacheco, 11/3/2006   P1.1804   MCKMDL00543971 - 543973    278

McKesson-Hilliard Exhibit 24    E-mail Chain ending with E-mail from Hilliard, 27 Aug 2008, RE: CSMP Suspicious Transaction Reporting to the DEA   P1.1917   MCKMDL00623568 - 623589    288

McKesson-Hilliard Exhibit 25    DEA Letter to Geoffrey Hobart dated November 4, 2014   P1.1443   MCKMDL00409453 - 409458    300

McKesson-Hilliard Exhibit 26    United States Department of Justice Letter to Geoffrey E. Hobart dated November 6, 2013   P1.1432   MCKMDL00409048 - 409049    309

--oOo--

Page 12

(Thursday, January 10, 2019, 9:06 a.m.)

THE VIDEOGRAPHER: All right, stand by. We are now on the record. My name is Brian Bobbitt. I'm a videographer for Golkow Litigation Services. Today's date is January 10th, 2019, and the time is 9:06 a.m.

This video deposition is being held in Dallas, Texas, in the National Prescription Opiate Litigation, MDL No. 2804. The deponent is Gary Hilliard.

Would counsel like to identify themselves for the record.

MR. BOGLE: Brandon Bogle representing the plaintiffs. He's my paralegal.

MS. HELLER-TOIG: Elly Heller-Toig from Marcus & Shapira for HBC Service Company.

MR. PERRY: Stan Perry for AmerisourceBergen.

MR. BRODSKY: Richard Brodsky from Jones Day on behalf of Walmart.

Page 13

MS. LUND: Juli Ann Lund from Williams & Connolly on behalf of Cardinal Health.

MR. KELLY: Kevin Kelly of Covington & Burling on behalf of McKesson.

MR. EPPICH: Chris Eppich of Covington & Burling on behalf of McKesson and the witness.

THE REPORTER: Thank you. Would those on the phone announce, please?

MR. LOMBARDO: Good morning. John Lombardo with Arnold & Porter for the Endo and Par defendants.

MS. LUCERO: Good morning. Laura Lucero from Collinson Daehnke on behalf of C&R Pharmacy.

MS. MUSKETT: Good morning. Eileen Muskett from Fox Rothschild on behalf of Validus.

THE REPORTER: Anyone else?

(No response.)

(Witness sworn by the reporter.)

Page 14

P R O C E E D I N G S

GARY HILLIARD,

having taken an oath to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

QUESTIONS BY MR. BOGLE:

Q.  Good morning.

A.  Good morning.

Q.  Can I get your full name, please?

A.  Gary Lawrence Hilliard.

Q.  And, Mr. Hilliard, my name is Brandon Bogle. I'm going to be asking you some questions today. Before we get into the substance, though, have you ever had your deposition taken before?

A.  I have not.

Q.  Okay. Just a few ground rules to hopefully make things go as smoothly as possible for us. I'm going to ask questions and I'd ask that you wait till I finish my question before you provide an answer, number one, to make sure you understand my question; number two, to allow the court reporter to

Page 15

more easily transcribe things.

Does that make sense?

A.  Yes, it does.

Q.  Okay. And if at any point in time you want to take a break, just let me or your counsel know. I'm happy to do that. It's not an endurance contest.

The other thing is if I ask a question that you don't hear or don't understand, please ask me to repeat it or rephrase it and I will do so. Otherwise, I assume if you're answering my question that you understood it. Is that fair?

A.  Yes.

Q.  Okay. Where are you currently employed, sir?

A.  Tech Data Corporation.

Q.  Where is that located?

A.  The corporate office is in Clearwater, Florida.

Q.  Are you out of Clearwater or somewhere else?

A.  I'm out of a Fort Worth facility.

Q.  Give me just a general sketch

Page 16

of what you do at Tech Data. What is your job?

A.  I'm a dangerous goods safety advisor, so my role is to manage hazardous materials for our company in the United States, Canada and Mexico.

Q.  Okay. Does Tech Data in any way, shape or form sell, distribute or deal in opioids?

A.  No. It's all electronics.

Q.  All electronics, okay.

When did you start working for Tech Data?

A.  In September 2016.

Q.  Okay. And prior to working at Tech Data, were you employed at McKesson?

A.  I was.

Q.  Okay. Can you give me the span of time that you worked for McKesson?

A.  From 1997 till 2016.

Q.  Okay. And why did you leave McKesson?

A.  I was part of a workforce reduction.

Q.  Okay. Were you given the

Page 17

opportunity to transfer to another department or just outright told that they were eliminating your position and there was no other position for you?

A.  Outright elimination.

Q.  Okay. Now, the time from 1997 to 2016 while you were at McKesson, during that entire span, were you a director of regulatory affairs?

A.  I started as a manager of regulatory affairs.

Q.  Okay. So tell me what time period you were the manager.

A.  It was approximately a year, so approximately '97-98.

Q.  Okay.

A.  I don't remember the exact time frame.

Q.  That approximation is good enough. So approximately 1998 you take over as director of regulatory affairs. Do you hold that position until 2016 when you leave?

A.  That's correct.

Q.  Okay. Do you know what month in 2016 you left?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.    July, I believe.
2    Q.    Okay.  So give me a sense,
3 while you were at McKesson working at
4 director of regulatory affairs, what your
5 general job responsibilities were.
6    A.    My role changed over the years,
7 but as I started, I had responsibility for
8 DEA compliance for our pharma distribution
9 centers within the U.S.  I was over 30
10 facilities, I don't recall exactly, but...
11 so that entailed things such as the
12 management of the SOP, the audit, ARCOS, loss
13 and theft, any issue resolution; I would
14 assist with fiscal DEA audits, also with
15 corrective actions if there were any
16 corrective actions with that; the suspicious
17 order program that was in place at the time.
18    Q.    Okay.
19    A.    And then additionally I also
20 had responsibility for HAZMAT, hazardous
21 materials.  I also had responsibility for EPA
22 environmental issues, waste disposal.  I also
23 had responsibility for DEA registrations,
24 state licensure.  I was also active with the
25 industry association with NWDA on working

Page 19

1 committees for both federal and state.
2    Q.    Is that the -- I'm sorry, go
3 ahead.  Keep going.
4    A.    And did some work on the OSHA
5 side as well for safety.
6    Q.    Okay.
7    A.    Also, I had responsibility for
8 FDA actions for -- as it related to our
9 operations.
10    Q.    Okay.  I've got a few follow-up
11 questions for you.  Are you done?  I want to
12 make sure you're done.
13    A.    That's fine.
14    Q.    Good.  Okay.  A few follow-up
15 questions for you on a couple of these points
16 you gave me.  You said you were responsible
17 for the SOP.  What SOP are you referring to?
18    A.    Section 55 is what we referred
19 it to when we started.  It was already in
20 place when I arrived at McKesson, and follow
21 up on that until a migration took place,
22 changes took place in the 2006 time frame.
23    Q.    Okay.  Because you guys went
24 from Section 55 to approximately 2007, you go
25 to the LDMP, the Lifestyle Drug Management

Page 20

1 Program?  True?
2    A.    True.
3    Q.    Okay.  And then in
4 approximately 2008, you go to the Controlled
5 Substances Monitoring Program, otherwise
6 known as the CSMP.  True?
7    A.    True.
8    Q.    Okay.  So did you have
9 responsibility for -- let's do one by one.
10 So the Section 55 component, you had
11 responsibility for Section 55 in what
12 respect?
13    A.    Updates and adherence for our
14 operations to the policy.
15    Q.    For what period of time did you
16 have that responsibility?
17    A.    From '97 till 2006.
18    Q.    Okay.  Let's talk about the
19 LDMP.  Did you have any responsibility
20 related to the LDMP?
21    A.    I helped create that LDMP
22 process.
23    Q.    Okay.  So after it was created,
24 what was your responsibility in relationship
25 to that program?

Page 21

1    A.    I worked with our team to
2 ensure compliance with that program and to
3 develop it.
4    Q.    Okay.  What about the CSMP?
5 What involvement did you have with the CSMP?
6    A.    I also helped write that SOP as
7 well.
8    Q.    What sort of experience did you
9 have with drafting SOPs prior to drafting the
10 LDMP, for example?
11    A.    I had drafted SOPs in the past
12 with my previous employers as well, so no
13 formal training, if you will, for SOPs.  But
14 just -- when something needed to be revised
15 or something wasn't in place and needed to be
16 created, then I would work on the SOPs for
17 that.
18    Q.    Okay.  Prior to drafting the
19 LDMP, had you had any experience drafting any
20 SOPs that related to suspicious order
21 monitoring for controlled substances?
22    A.    Just the experience from what
23 we gained from the original Section 55, and
24 then the changes that were necessary as we
25 developed that program.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  Q.  Okay.  And where did you work
2  before you came to McKesson?
3      A.  FoxMeyer Drug Company.
4      Q.  What did you do for them just
5  generally?
6      A.  Same thing, manager of
7  regulatory affairs.
8      Q.  How long were you with them?
9      A.  Approximately two years.
10     Q.  Immediately before McKesson?
11     A.  Immediately before.  McKesson
12  acquired FoxMeyer so it was part of the
13  acquisition.
14     Q.  Gotcha.
15         Did you have any sort of
16  regulatory job prior to working at FoxMeyer?
17     A.  I did.  I worked regulatory for
18  a reverse distributor of pharmaceuticals.
19     Q.  Can you say that again?  I'm
20  sorry.
21     A.  A reverse distributor.
22     Q.  Reverse distributor.
23     A.  RDS was the name, Reverse
24  Distribution Services.
25     Q.  How long did you work for them?

Page 23

1      A.  Two years.
2      Q.  Immediately preceding FoxMeyer?
3      A.  Correct.
4      Q.  Any other regulatory position
5  that you held prior to joining McKesson?
6      A.  I worked in environmental, and
7  so I gained an environmental background
8  through waste management, Chemical Waste
9  Management to be more specific, so we were
10  trained in EPA requirements and Department of
11  Transportation, FAA requirements as well.
12     Q.  What company are you referring
13  to there?
14     A.  Chemical Waste Management.
15     Q.  Chemical Waste Management.
16         Okay.  Any others prior to
17  McKesson that are regulatory-related?
18     A.  No.
19     Q.  All right.  So a couple of
20  other follow-ups.  You mentioned, while at
21  McKesson, having responsibility related to
22  audit processes.  In what respect were you
23  responsible for audit processes at McKesson?
24     A.  I would update the audit as
25  necessary and then I'd go out to our

Page 24

1  facilities and conduct audits.
2      Q.  Okay.  You're talking about a
3  specific SOP that you would update for
4  audits, or what are you referring to by
5  "update the audit"?
6      A.  There was an audit that was
7  already written and it correlated to
8  Section 55, and I audited against that.
9      Q.  Okay.  How long did you have
10  responsibility for audits?
11     A.  From '97 till approximately
12  2014.
13     Q.  Okay.  Just from prior
14  depositions, I understand that Tracy Jonas
15  also had some responsibility for audits.  How
16  did your responsibility for audits compare to
17  his?
18     A.  So when the audit was changed
19  to -- we referred to it as a STARs audit, and
20  so we co-wrote good portions of those audits,
21  and then he ultimately took over facilitation
22  of the audit program.
23     Q.  Okay.  And that would have been
24  in 2014, you're saying?
25     A.  I'm not sure when -- the STARs

Page 25

1  audit took place probably before 2014, but
2  I'm not exactly sure of the date.
3      Q.  Okay.  All right.  You
4  mentioned responsibilities related to
5  suspicious order -- I think "purchasing" was
6  the term you used.  Maybe you used a
7  different term, but something related to
8  suspicious order monitoring or purchasing.
9      A.  Monitoring.
10     Q.  What was your responsibility
11  there?
12     A.  To -- adherence to our SOP.
13     Q.  Okay.  Going back to
14  Section 55, the LDMP and the CSMP?
15     A.  Correct.
16     Q.  During what time period did you
17  have those responsibilities?
18     A.  1997 until -- again, I'm not
19  sure when the STARs ended.  It was handed off
20  to Dave Gustin.  I don't know, 2013 -- 2014,
21  maybe.
22     Q.  An approximation is fine.
23     A.  I'm not sure.
24     Q.  I'm not going to hold you to an
25  exact date.  I just want to get a sense of

Page 26

1   what the scope is here.
2           You also said you handled DEA
3   registrations and state licensure?
4       A.   Correct.
5       Q.   For what time period did you
6   have those responsibilities?
7       A.   '97 till 2016.
8       Q.   Okay.  You mentioned being
9   actively involved in the -- I think it was
10  NWMA?  Is that right?
11      A.   HDMA.
12      Q.   Right.  I think you mentioned
13  the predecessor term.
14      A.   NWDA, National Wholesale Drug
15  Association.
16      Q.   Which then became the HDMA,
17  right?
18      A.   And now is NDA, I believe, yes.
19      Q.   I think maybe HDA.
20      A.   HDA.
21      Q.   I think so.  It doesn't matter.
22      A.   Okay.
23      Q.   Okay.  What sort of committees
24  were you on at NWDA?
25      A.   I was on the federal committees

Page 27

1   in reference to DEA, also state committee,
2   pharmaceutical waste management committee,
3   transportation committee.
4       Q.   Okay.  Let's talk about the
5   federal DEA committee.  What did you do --
6   what was your involvement with that
7   committee?  What did you do?
8       A.   We would meet typically
9   annually and with our counterparts from other
10  wholesalers and sometimes manufacturers, and
11  we would discuss issues that were happening,
12  proposed regulations that were coming up.
13  That's primarily it.
14      Q.   Okay.  And so this NWDA was a
15  trade association for pharmaceutical
16  distributors primarily, correct?
17      A.   That's correct.
18      Q.   Okay.  And so as part of that
19  association, as a member of that association,
20  you would have interactions with other
21  employees of other pharmaceutical
22  distributors.  Is that fair?
23      A.   That's correct.
24           MR. EPPICH:  Object to the
25      form.

Page 28

1           Give me a minute to object, if
2       you don't mind.
3   QUESTIONS BY MR. BOGLE:
4       Q.   How frequently would you attend
5   meetings for NWDA, approximately?
6       A.   Approximately twice a year.
7       Q.   Okay.  Would those meetings
8   generally be attended by employees of other
9   pharmaceutical distributors as well?
10      A.   That's correct.
11      Q.   Okay.  You also mentioned
12  having responsibility for ARCOS.  Can you
13  tell me what you did related to ARCOS?
14      A.   I would train our employees at
15  our facilities when they needed training.  I
16  would assist in problems that they may have
17  understanding what types of code assignments
18  would be associated with a type of
19  transaction.  If they had error reports that
20  they needed assistance with, and any
21  communications from ARCOS corporate, then I
22  would typically work with them on that.
23      Q.   Okay.  And when it came to the
24  ARCOS training you're referring to, are you
25  talking about training people at the

Page 29

1   distribution centers?
2       A.   That's correct.
3       Q.   All right.  So from 1997 to
4   2007, would you have had responsibility for
5   regulatory compliance for all of McKesson's
6   distribution centers?
7       A.   For the pharmaceutical
8   division.
9       Q.   Okay.  Well, let me rephrase it
10  because I think that's a fair clarification.
11          So from 1997 to 2007, would you
12  have had responsibility for compliance with
13  the Controlled Substances Act as it pertained
14  to all of McKesson's distribution centers?
15      A.   That would be correct.
16      Q.   Okay.  And, now, in 2008, as I
17  understand it, there were some additional
18  people added to McKesson's regulatory team.
19  Is that true?
20      A.   That's correct.
21      Q.   Okay.  And so when that change
22  occurred and additional people were added, as
23  I understand it, you would then have not been
24  responsible for all of those distribution
25  centers when it pertains to Controlled

Page 30

1 Substance Act compliance. True?
2 MR. EPPICH: Object to the
3 form.
4 A. There were regional directors
5 and I did not have a region. So the regional
6 directors specifically worked with the new
7 programs that were being developed, whereas I
8 worked on other operational aspects.
9 QUESTIONS BY MR. BOGLE:
10 Q. Okay. From the information
11 that I've looked at from the time period of
12 1997 to 2007, when it came to Controlled
13 Substances Act compliance at McKesson, you
14 guys had a three-person team which consisted
15 of Donald Walker, yourself, and Bruce
16 Russell. Is that true?
17 A. When I started, there was -- I
18 reported to Dan White, who was a VP of
19 regulatory, and I reported to -- I'm sorry,
20 not reported. I also had a colleague that
21 was a director of regulatory affairs, Rolly
22 Blythe.
23 Q. Okay. When did Mr. White leave
24 the company, roughly?
25 A. He transitioned to a different

Page 31

1 role, and I do not recall the date.
2 Q. The other name was Rolly White,
3 I believe you gave me?
4 A. Blythe.
5 Q. Oh, Blythe, I'm sorry. When
6 did that individual cease working in
7 regulatory affairs, roughly?
8 A. He retired, and again, I don't
9 recall the exact time frame, but it was
10 probably a few years, three, four years, in.
11 Q. To your tenure?
12 A. Correct.
13 Q. What did Rolly Blythe, what did
14 that person generally do during that time
15 period that they were there?
16 A. The same role, so he was my
17 predecessor, and he managed the DEA
18 compliance.
19 Q. Okay. And Mr. White, what was
20 his role?
21 A. He oversaw the regulatory
22 department, which included DEA compliance.
23 Q. So would he have been --
24 Mr. White been in that role during the same
25 time that Donald Walker was working in

Page 32

1 regulatory affairs?
2 A. No.
3 Q. No. So did Mr. Walker sort of
4 take his role over?
5 A. Mr. Walker took over SVP of
6 operations, and then I started reporting up
7 through him.
8 Q. Okay.
9 A. Again, I don't remember the
10 exact time frame.
11 Q. That's fine.
12 Do you agree that there is an
13 ongoing opioid epidemic in this country?
14 A. I don't know about opioid
15 epi- -- sorry, epidemic, in those term- -- in
16 that terminology.
17 Q. Okay. Do you believe there's
18 any sort of problem in this country as it
19 relates to opioids?
20 MR. EPPICH: Object to the
21 form.
22 MR. PERRY: Object to form.
23 A. I don't know.
24 QUESTIONS BY MR. BOGLE:
25 Q. You don't know, okay.

Page 33

1 Did you ever receive any
2 training, formal or informal, about a
3 potential epidemic in this country while at
4 McKesson?
5 MR. EPPICH: Object to the
6 form.
7 QUESTIONS BY MR. BOGLE:
8 Q. Related to opioids?
9 MR. EPPICH: Object to the
10 form.
11 A. I don't know.
12 QUESTIONS BY MR. BOGLE:
13 Q. Did you ever have any
14 discussions with any of your colleagues at
15 McKesson about a potential opioid epidemic in
16 this country?
17 A. Not that I recall in that
18 frame -- of that terminology.
19 Q. Okay. Any other sort of
20 terminology that you would utilize that you
21 did have such a discussion?
22 MR. EPPICH: Object to the
23 form.
24 A. There were presentations that
25 we saw for training after some of the

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  communications took place between McKesson
2  headquarters and DEA headquarters.
3  QUESTIONS BY MR. BOGLE:
4      Q.    Okay.  Do you recall what
5  presentations you received in that regard?
6      A.    There was a DEA conference
7  where they had a presentation and they were
8  talking about the levels of opioids that were
9  being used out -- illegitimately.  I don't
10  recall the exact details of it, but they had
11  a presentation --
12      Q.    Okay.
13      A.    -- at a national conference.
14      Q.    Okay.  Would that have been a
15  conference you attended in 2007?
16      A.    I don't recall the exact date
17  of that conference.
18      Q.    Okay.  Did you ever have any
19  personal concern while you were at McKesson
20  that there was an opioid epidemic ongoing?
21      A.    No, I didn't.
22          MR. EPPICH:  Object to the
23      form.
24  QUESTIONS BY MR. BOGLE:
25      Q.    Okay.  Are you familiar with

Page 35

1  the term "diversion"?
2      A.    I am.
3      Q.    What do you understand that
4  term to mean?
5          MR. EPPICH:  Object to the
6      form.  Calls for a legal conclusion.
7      A.    Controlled substance
8  pharmaceuticals being utilized outside the
9  course of legal requirements under the CSA.
10  QUESTIONS BY MR. BOGLE:
11      Q.    And while you were at McKesson,
12  did you see any instances of diversion of
13  McKesson-supplied opioids?
14          MR. EPPICH:  Object to the
15      form.
16      A.    Not that I recall.
17  QUESTIONS BY MR. BOGLE:
18      Q.    All right.  I'm going to hand
19  you what I'm marking as Exhibit 1.1651, which
20  is also Exhibit 1 to your deposition, and
21  that's MCKMDL00498169.
22          (McKesson-Hilliard Exhibit 1
23      was marked for identification.)
24  QUESTIONS BY MR. BOGLE:
25      Q.    There you go, sir.

Page 36

1          Okay, Mr. Hilliard.  What I've
2  handed you as Exhibit 1 you see is an e-mail
3  on the first page and then sort of a
4  PowerPoint slide deck behind it.
5          Do you see that?
6      A.    I see that.
7      Q.    Okay.  And starting with the
8  e-mail on the first page, you see that's an
9  e-mail from Donald Walker dated May 2, 2012,
10  to several individuals, including yourself,
11  right?
12      A.    I see that.
13      Q.    Okay.  And the subject is Know
14  Your Customer.
15          Do you see that subject line?
16      A.    Yes, I see that.
17      Q.    He says there in the first line
18  in the body:  On Monday I will be making a
19  presentation to the ISMC sales force at NSC
20  around Know Your Customer.
21          What was Know Your Customer?
22      A.    It's the name of the
23  presentation.
24      Q.    Okay.  Are you aware of any
25  program that McKesson implemented at any

Page 37

1  point in time to know their customers as it
2  related to opioid purchases?
3          MR. EPPICH:  Object to the
4      form.
5      A.    I don't recall it in that
6  specifics.
7  QUESTIONS BY MR. BOGLE:
8      Q.    Okay.  The next sentence in the
9  e-mail says:  This is intended to be an
10  awareness awakening session that we as a
11  regulatory team will follow up on during the
12  upcoming year.
13          Do you see that?
14      A.    I see that.
15      Q.    Okay.  And then if you look,
16  I'm on page .5, the page numbers at the top
17  right.  That says there Government's View of
18  the Problem at the top of that slide.
19          Do you see that?
20      A.    I see that.
21      Q.    Okay.  And in the box on the
22  left it says:  Alarming rate of increase of
23  prescription drug abuse beginning
24  approximately five years ago, especially
25  hydrocodone (Vicodin) and opioid pain drugs

Page 38

1 (Oxycontin and Oxycodone).
2         Do you see that?
3     A.   I see that.
4     Q.   Okay.  And on the right it
5 says, the first bullet point:  CDC currently
6 classifies prescription drug abuse as an
7 epidemic.
8         Do you see that?
9     A.   I see that.
10    Q.   Does this jog your memory about
11 receiving any information about a potential
12 opioid epidemic while you were at McKesson?
13        MR. EPPICH:  Object to the
14    form.  Misstates the document.
15    A.   I vaguely recall the
16 presentation.  I don't recall the details of
17 the presentation but this would have been
18 considered a training document.
19 QUESTIONS BY MR. BOGLE:
20    Q.   Okay.  Is this a document you
21 would have reviewed as a matter of course
22 when you received it?
23    A.   I don't recall receiving it,
24 but it does -- it does seem familiar, so
25 probably in the normal course I would review

Page 39

1 it.
2     Q.   Okay.  Let's take a look at the
3 second bullet point here.  It says:  27,000
4 died from prescription drug overdoses in
5 2007, a five fold increase since 1990.
6         Do you see that?
7     A.   I see that.
8     Q.   Okay.  And the next bullet
9 point says:  During the same time period ten
10 fold increase in medical use of painkillers
11 such as oxycodone and hydrocodone.
12        Do you see that there?
13    A.   I see that.
14    Q.   Okay.  Do you ever recall
15 becoming aware that there was a, during that
16 1990-2007 time frame, a ten-fold increase in
17 the use of painkillers like oxycodone and
18 hydrocodone?
19        MR. EPPICH:  Object to the
20    form.
21    A.   I don't recall.
22 QUESTIONS BY MR. BOGLE:
23    Q.   And the next bullet point says:
24 Today number of overdose deaths involving
25 prescription pain medication exceeds deaths

Page 40

1 from heroin and cocaine combined.
2         Do you see that?
3     A.   I see that.
4     Q.   And the last bullet point said:
5 In some states death from prescription
6 painkiller overdoses surpass those from
7 traffic accidents.
8         Do you see that?
9     A.   I see that.
10    Q.   Is that information you recall
11 being aware of while you were at McKesson?
12    A.   Again, I don't recall the
13 details of this.
14    Q.   Are you aware that there have
15 been congressional hearings in the last
16 couple of years related to the opioid
17 epidemic?
18    A.   I am.
19    Q.   You are, okay.
20        I'm going to hand you what I'm
21 marking as Exhibit 2 to your deposition,
22 which is Exhibit 1.264.  This is a public
23 document so no Bates numbers.
24        (McKesson-Hilliard Exhibit 2
25    was marked for identification.)

Page 41

1 QUESTIONS BY MR. BOGLE:
2     Q.   Okay.  You see here this is a
3 document from the U.S. House of
4 Representatives Committee on Energy and
5 Commerce from May 4, 2018.
6         Do you see that?
7     A.   I see that.
8     Q.   Okay.  And it's -- the
9 regarding line says:  Hearing entitled
10 "Combatting the Opioid Epidemic:  Examining
11 Concerns About Distribution and Diversion."
12        Do you see that there?
13    A.   I do see that.
14    Q.   Okay.  Have you followed the
15 outcomes of any of these congressional
16 hearings on the opioid epidemic?
17    A.   I have not.
18    Q.   You said you were aware of
19 them, right?
20    A.   I am aware of them but I have
21 not followed them.  I've been out of
22 pharmaceuticals for a while now.
23    Q.   If you look at the second page
24 of this document, underneath the chart it
25 says:  The U.S. continues to experience an

Page 42

1 opioid epidemic, which has worsened over the
2 last two decades. Opioid-involved overdose
3 deaths are the leading cause of injury death
4 in the U.S. and take the lives of 115
5 Americans per day.
6        Is that a statistic you've seen
7 before?
8        MR. EPPICH: Objection,
9    foundation.
10    A.   It is not.
11 QUESTIONS BY MR. BOGLE:
12    Q.   "According to a recent report
13 issued by the Centers for Disease Control and
14 Prevention (CDC), prescription or illicit
15 opioids were involved in nearly two-thirds of
16 all drug overdose deaths in the U.S. during
17 2016 - a 27.7 percent increase from 2015. In
18 total, more than 351,000 people have died
19 since 1999 due to an opioid-involved
20 overdose."
21        And then it says: The crisis
22 has become so severe that the average life
23 expectancy declined in 2016 from the previous
24 year, largely because of opioid overdoses.
25        Do you see that?

Page 43

1        MR. EPPICH: Objection,
2    foundation.
3    A.   I see it on the page.
4 QUESTIONS BY MR. BOGLE:
5    Q.   Okay. And the information I
6 read to you, those last three sentences
7 there, any of that information you were aware
8 of prior to today?
9    A.   I was not.
10    Q.   And so from our discussion at
11 the beginning of the deposition, you worked
12 at McKesson for, what, just shy of 20 years,
13 right?
14    A.   Correct.
15    Q.   Okay. And so during that time
16 period, did you have the belief that
17 protecting the health and safety of the
18 public should be the most important
19 consideration for a pharmaceutical
20 distributor like McKesson?
21        MR. EPPICH: Object to the
22    form.
23    A.   I don't know.
24 QUESTIONS BY MR. BOGLE:
25    Q.   Okay. Did you ever consider

Page 44

1 what sort of considerations should be most
2 important for your job as you performed it?
3        MR. EPPICH: Object to the
4    form.
5    A.   We complied with the CSA
6 requirements.
7 QUESTIONS BY MR. BOGLE:
8    Q.   Okay. Did you ever consider
9 why those requirements existed?
10        MR. EPPICH: Object to the
11    form.
12 QUESTIONS BY MR. BOGLE:
13    Q.   What their purpose was?
14        MR. EPPICH: Object to the
15    form.
16    A.   Protection of the supply chain
17 under controlled substances.
18 QUESTIONS BY MR. BOGLE:
19    Q.   When you mean -- when you say
20 "protection of the supply chain," what do you
21 mean by that?
22    A.   Controlled substances stay in
23 legitimate markets.
24    Q.   And why would it be important
25 for controlled substances to stay in

Page 45

1 legitimate markets --
2        MR. EPPICH: Object to the
3    form.
4 QUESTIONS BY MR. BOGLE:
5    Q.   -- from your understanding?
6        MR. EPPICH: Object to the
7    form. Foundation.
8    A.   It's a requirement of the CSA.
9 QUESTIONS BY MR. BOGLE:
10    Q.   Okay. Anything beyond that?
11        MR. EPPICH: Same objections.
12    A.   I don't know.
13 QUESTIONS BY MR. BOGLE:
14    Q.   Okay. While you were with
15 McKesson, the company was a distributor of
16 controlled substances, right?
17    A.   That's correct.
18    Q.   Okay. And those controlled
19 substances included opioid products, right?
20    A.   That's correct.
21    Q.   Okay. And opioid products are
22 generally in the class of drugs known as
23 narcotics, right?
24        MR. EPPICH: Object to the
25    form; foundation.

Page 46

1    A.   Some of them can be.
2    QUESTIONS BY MR. BOGLE:
3    Q.   Okay.  Are you aware of any
4    opioids that are nonnarcotic?
5         MR. EPPICH:  Same objections.
6    A.   Not that I recall.
7    QUESTIONS BY MR. BOGLE:
8    Q.   We talked about this a little
9    bit at the beginning of the deposition, but
10   in your role as manager and then director of
11   regulatory affairs, you would have had
12   responsibility for having understanding of
13   the Controlled Substances Act, right?
14   A.   Correct.
15   Q.   And the Controlled Substances
16   Act itself, you understand, is designed to
17   prevent the diversion of controlled
18   substances like opioids, right?
19        MR. EPPICH:  Object to the
20   form.  Calls for a legal conclusion.
21   A.   I don't know.
22   QUESTIONS BY MR. BOGLE:
23   Q.   Okay.  Do you have any sense as
24   to what the purpose of the Controlled
25   Substances Act was while you worked at

Page 47

1    McKesson?
2    A.   To prevent diversion.
3    Q.   Okay.  And under the Controlled
4    Substances Act while you were with McKesson,
5    one of McKesson's responsibilities was to
6    have effective controls against diversion,
7    right?
8    A.   That's correct.
9         MR. EPPICH:  Object to the
10   form.  Calls for a legal conclusion.
11   QUESTIONS BY MR. BOGLE:
12   Q.   Another responsibility under
13   the Controlled Substances Act while you were
14   with McKesson would be to monitor for
15   suspicious controlled substances orders,
16   right?
17        MR. EPPICH:  Object to the
18   form.  Calls for a legal conclusion.
19   A.   We followed the processes and
20   procedures that we had in place that were to
21   comply with the CSA requirements.
22   QUESTIONS BY MR. BOGLE:
23   Q.   Okay.  But did you have an
24   understanding while you were at McKesson that
25   the company had a responsibility to monitor

Page 48

1    for suspicious orders --
2         MR. EPPICH:  Same objections.
3    QUESTIONS BY MR. BOGLE:
4    Q.   -- for controlled substances?
5    A.   We did monitor for controlled
6    substance orders.
7    Q.   Okay.  Did you know where that
8    responsibility came from?
9    A.   CSA requirements.
10   Q.   Okay.  And while you were at
11   McKesson, did you also understand that there
12   was a responsibility to report suspicious
13   orders when they were detected to the DEA?
14        MR. EPPICH:  Object to the
15   form.  Calls for a legal conclusion.
16   A.   The process was to report
17   controlled substances orders according to the
18   SOP.
19   QUESTIONS BY MR. BOGLE:
20   Q.   Okay.  And the SOP required
21   that if suspicious orders were detected, they
22   were to be reported to the DEA, correct?
23        MR. EPPICH:  Object to the
24   form.
25   A.   They were reported to the DEA.

Page 49

1    QUESTIONS BY MR. BOGLE:
2    Q.   Okay.  When you say "they,"
3    we're talking about suspicious orders, right,
4    for controlled substances?
5    A.   That's correct.
6    Q.   Okay.  And did you also
7    understand while you were at McKesson that
8    the company was to block any orders that it
9    deemed suspicious?
10        MR. EPPICH:  Object to the
11   form.
12   A.   That was not a requirement of
13   the CSA.
14   QUESTIONS BY MR. BOGLE:
15   Q.   Okay.  At any point in time
16   while you were at the company?
17        MR. EPPICH:  Object to the
18   form.  Calls for a legal conclusion.
19   A.   We made changes, developed
20   changes to our processes, and -- with the
21   CSMP program, and so with the CSMP program
22   that program did block.
23   QUESTIONS BY MR. BOGLE:
24   Q.   Okay.  Do you have an
25   understanding as to why the CSMP blocked

Page 50

1 suspicious orders?
2 　　　MR. EPPICH: Object to the
3 form.
4 QUESTIONS BY MR. BOGLE:
5 　　Q.　Why that was a component of it?
6 　　　MR. EPPICH: Object to the
7 form.
8 　　A.　A guidance document provided by
9 Rannazzisi.
10 QUESTIONS BY MR. BOGLE:
11 　　Q.　And do you recall when you
12 first saw that guidance document?
13 　　　MR. EPPICH: Object to the
14 form.
15 　　A.　Approximately 2006.
16 QUESTIONS BY MR. BOGLE:
17 　　Q.　Okay. And so prior to
18 receiving that document in approximately
19 2006, it was your personal belief that there
20 was no responsibility for McKesson to block
21 suspicious orders. Is that true?
22 　　　MR. EPPICH: Object to the
23 form. Calls for a legal conclusion.
24 　　A.　It was not a requirement of the
25 CSA.

Page 51

1 QUESTIONS BY MR. BOGLE:
2 　　Q.　Okay. And so if I'm
3 understanding your testimony correctly, prior
4 to the implementation of the CSMP in 2008, it
5 was not McKesson's policy to block suspicious
6 orders. Is that true?
7 　　　MR. EPPICH: Object to the
8 form.
9 　　A.　Blocking of the orders was not
10 a requirement under the CSA.
11 QUESTIONS BY MR. BOGLE:
12 　　Q.　Yeah. I'm just asking whether
13 it was a company policy to block suspicious
14 orders prior to 2008. I'm not asking about
15 the CSA right now.
16 　　　MR. EPPICH: Object to the
17 form.
18 　　A.　We complied with requirements
19 under the CSA.
20 QUESTIONS BY MR. BOGLE:
21 　　Q.　Yeah. I'm just asking whether
22 prior to 2008 when the CSMP was implemented,
23 was it McKesson's policy to not block
24 suspicious orders when they were detected?
25 　　　MR. EPPICH: Object to the

Page 52

1 form.
2 　　A.　We complied with the CSA
3 requirements.
4 QUESTIONS BY MR. BOGLE:
5 　　Q.　Okay. I guess I don't
6 understand how that applies to my question.
7 I'm just asking if you guys blocked
8 suspicious orders prior to 2008.
9 　　　MR. EPPICH: Object to the
10 form.
11 　　A.　Blocking was not a requirement.
12 QUESTIONS BY MR. BOGLE:
13 　　Q.　So the answer is no, that that
14 wasn't done --
15 　　　MR. EPPICH: Object to the
16 form.
17 QUESTIONS BY MR. BOGLE:
18 　　Q.　-- prior to 2008?
19 　　A.　We complied with the CSA
20 requirements.
21 　　Q.　Okay. I got that that's your
22 answer, but I'm trying to just get a specific
23 answer to a specific question, which is to
24 nail down in time when McKesson, to your
25 understanding, started blocking suspicious

Page 53

1 orders for controlled substances. Can you
2 tell me when that started occurring?
3 　　A.　The CSMP, which was about 2008.
4 　　Q.　Okay. I'm going to hand you
5 what I'm marking as Exhibit 3, which is
6 1.1464, and that's MCKMDL00478906.
7 　　　(McKesson-Hilliard Exhibit 3
8 　　was marked for identification.)
9 QUESTIONS BY MR. BOGLE:
10 　　Q.　And you see this is a letter
11 from the U.S. Department of Justice Drug
12 Enforcement Administration dated
13 September 27, 2006.
14 　　　Do you see that?
15 　　A.　I see that.
16 　　Q.　Is this the guidance document
17 from Mr. Rannazzisi that you were referring
18 to a minute ago?
19 　　A.　Yes, it is.
20 　　Q.　Okay. So you've seen this
21 document before. True?
22 　　A.　Yes.
23 　　Q.　Okay. I want to look at a
24 couple of components of this letter. It
25 says, in the first line: This letter is

Page 54

1  being sent to every commercial entity in the
2  United States registered with the Drug
3  Enforcement Administration (DEA) to
4  distribute controlled substances.  The
5  purpose of this letter is to reiterate the
6  responsibilities of controlled substance
7  distributors in view of the prescription drug
8  abuse problem our nation currently faces.
9        Do you see that?
10       A.   I see that.
11       Q.   The term "reiterate" is used
12  there in that sentence.  What do you
13  understand the term "reiterate" to mean?
14            MR. EPPICH:  Object to the
15       form.  Foundation.
16       A.    This is written by
17  Mr. Rannazzisi.  I don't know what he's
18  referring to, reiterate.
19  QUESTIONS BY MR. BOGLE:
20       Q.   I'm just asking if you
21  understand what the term "reiterate" means.
22            MR. EPPICH:  Asked and
23       answered.
24       A.   I don't know.
25            --oOo--

Page 55

1  QUESTIONS BY MR. BOGLE:
2       Q.   You don't know what the term
3  "reiterate" means in general use?
4            MR. EPPICH:  Object to the
5       form.  Foundation.
6       A.   I don't know.
7  QUESTIONS BY MR. BOGLE:
8       Q.   Okay.  Going down to the third
9  paragraph in this letter, I'm looking at the
10  sentence that starts with "Distributors are,
11  of course."
12        Do you see that in the middle
13  of the paragraph?
14       A.   Third paragraph?  Yes, I see
15  that now.
16       Q.   All right.  It says:
17  Distributors are, of course, one of the key
18  components of the distribution chain.  If the
19  closed system is to function properly as
20  Congress envisioned, distributors must be
21  vigilant in deciding whether a prospective
22  customer can be trusted to deliver controlled
23  substances only for lawful purposes.
24        Do you see that?
25       A.   Yes, I see that.

Page 56

1       Q.   Okay.  Do you agree with that
2  sentence?
3            MR. EPPICH:  Object to the
4       form.  Foundation.
5       A.   I don't know.
6  QUESTIONS BY MR. BOGLE:
7       Q.   You don't have an opinion one
8  way or the other whether that's an accurate
9  statement?
10       A.   No, I don't.
11       Q.   Okay.  Do you have any opinion
12  as to whether McKesson should have at all
13  times been vigilant in deciding which
14  customers got controlled substances from
15  them?
16            MR. EPPICH:  Object to the
17       form.
18       A.   I don't know.
19  QUESTIONS BY MR. BOGLE:
20       Q.   Okay.  And it says -- it goes
21  on:  This responsibility is critical, as
22  Congress has expressly declared that the
23  illegal distribution of controlled substances
24  has a substantial and detrimental effect on
25  the health and general welfare of the

Page 57

1  American people.
2        Do you see that?
3       A.   Yes, I see that.
4       Q.   Okay.  Do you agree that
5  illegal distribution of controlled substances
6  has a substantial and detrimental effect on
7  the health and general welfare of the
8  American people?
9            MR. EPPICH:  Object to the
10       form.  Foundation.
11       A.   I don't know.
12  QUESTIONS BY MR. BOGLE:
13       Q.   Okay.  Is that something you
14  ever considered while you were at McKesson,
15  that concept?
16            MR. EPPICH:  Object to the
17       form.
18       A.   I don't recall.
19  QUESTIONS BY MR. BOGLE:
20       Q.   Okay.  Going to the second page
21  here of the letter, the third paragraph that
22  starts with "The statutory factors."
23        Do you see that?
24       A.   Yes, I see that.
25       Q.   It says there:  The statutory

Page 58

1 factors DEA must consider in deciding whether
2 to revoke a distributor's registration are
3 set forth in 21 U.S.C. 823(e). Listed first
4 among these factors is the duty of
5 distributors to maintain effective controls
6 against diversion of controlled substances
7 into other than legitimate medical,
8 scientific, and industrial channels.
9        Do you see that?
10    A.    Yes, I see that.
11    Q.    And you're familiar with that
12 portion of the regulations, right?
13        MR. EPPICH:  Object to the
14 form.
15    A.    I don't recall.
16 QUESTIONS BY MR. BOGLE:
17    Q.    Okay.  If you go to the next
18 paragraph, it starts with:  The DEA
19 regulations require all distributors to
20 report suspicious orders of controlled
21 substances.
22        Do you see that?
23    A.    Yes, I see that.
24    Q.    Okay.  And you understand that
25 at all times that you were with McKesson that

Page 59

1 the DEA regulations did require distributors
2 to report suspicious orders of controlled
3 substances?
4        MR. EPPICH:  Object to the
5 form.  Calls for a legal conclusion.
6    A.    It was under the CSA.
7 QUESTIONS BY MR. BOGLE:
8    Q.    Right.  So you knew that's
9 something that McKesson was supposed to do
10 under the CSA, right?
11        MR. EPPICH:  Same objections.
12    A.    Yes, I recall.
13 QUESTIONS BY MR. BOGLE:
14    Q.    Okay.  The next paragraph that
15 starts with "It bears emphasis," do you see
16 that?
17    A.    Yes, I see that.
18    Q.    It says:  It bears emphasis
19 that the foregoing reporting requirement is
20 in addition to, and not in lieu of, the
21 general requirement under 21 U.S.C. 823(e)
22 that a distributor maintain effective
23 controls against diversion.
24        Do you see that sentence?
25    A.    Yes, I see that.

Page 60

1    Q.    Were you aware while you were
2 at McKesson that these were two different
3 concepts and that there was a reporting
4 requirement and a separate requirement to
5 maintain effective controls against
6 diversion?
7        MR. EPPICH:  Object to the
8 form.  Calls for a legal conclusion.
9    A.    I don't recall.
10 QUESTIONS BY MR. BOGLE:
11    Q.    Okay.  While you were working
12 at McKesson, did you operate as if there were
13 two separate requirements, a reporting
14 requirement and also a requirement to have
15 effective controls against diversion?
16        MR. EPPICH:  Object to the
17 form.
18    A.    I don't recall.
19 QUESTIONS BY MR. BOGLE:
20    Q.    Okay.  It goes on and says:
21 Thus, in addition to reporting all suspicious
22 orders, a distributor has a statutory
23 responsibility to exercise due diligence to
24 avoid filling suspicious orders that might be
25 diverted into other than legitimate medical,

Page 61

1 scientific, and industrial channels.
2        Do you see that?
3    A.    I see that.
4    Q.    Okay.  And that's referring to
5 the requirement to block suspicious orders
6 when they're detected, right?
7        MR. EPPICH:  Object to the
8 form.  Foundation.
9    A.    I'm not sure.
10 QUESTIONS BY MR. BOGLE:
11    Q.    Okay.  What do you think that
12 refers to, then?
13    A.    I don't know.
14    Q.    Okay.  So do you have any
15 understanding of what that -- what he's
16 getting at there in that sentence?
17    A.    I don't know.
18    Q.    Okay.  Do you recall ever
19 asking any of your colleagues to help you
20 understand what Mr. Rannazzisi was saying in
21 that sentence that I just read?
22    A.    Not that I recall.
23    Q.    Okay.  Do you ever recall
24 reaching out to anyone at the DEA asking them
25 to explain to you what was meant by the

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 sentence I just read?
2     A.    Not that I recall.
3     Q.    Okay.  That would have fallen
4 within your purview, though.  If the DEA's
5 view is that this is part of McKesson's
6 responsibilities under the Controlled
7 Substances Act in 2006 time frame, that would
8 have been within your purview of your
9 responsibilities, right?
10         MR. EPPICH:  Object to the
11     form.  Assumes facts not in evidence.
12     A.    I don't recall.
13 QUESTIONS BY MR. BOGLE:
14     Q.    Okay.  I think we talked about
15 earlier in the deposition that compliance
16 with the Controlled Substances Act would have
17 been part of your responsibilities in this
18 time frame, right?
19     A.    That's correct.
20     Q.    Okay.  So if the DEA --
21 Mr. Rannazzisi from the DEA is indicating
22 here that there's a requirement here, a
23 regulatory requirement, to avoid filling
24 suspicious orders of controlled substances,
25 would that not have fallen within your

Page 63

1 purview to make sure that McKesson complied
2 with that portion of the regulations?
3         MR. EPPICH:  Object to --
4     object to the form.
5     A.    We worked within the
6 requirements of CSA, and based on the
7 guidance document, we developed the LDMP
8 program, then into the CSMP program that did
9 block the orders.
10 QUESTIONS BY MR. BOGLE:
11     Q.    Well, LDMP did not have a
12 blocking mechanism to it, did it?
13     A.    No.
14     Q.    Okay.  So I guess what I'm
15 trying to understand is if you didn't
16 understand what was meant by this sentence
17 from Mr. Rannazzisi's letter, how could you
18 properly develop a program to address what
19 he's asking you to do?
20         MR. EPPICH:  Object to the
21     form.  Misstates prior testimony.
22     A.    I don't recall the
23 circumstances that took place.
24 QUESTIONS BY MR. BOGLE:
25     Q.    Okay.  But I guess what I'm

Page 64

1 asking you is, if you were unclear as to what
2 Mr. Rannazzisi was saying here about avoiding
3 filling suspicious orders, how could you
4 design a regulatory program to meet this
5 demand?
6         MR. EPPICH:  Object to the form
7     and to the extent it misstates any
8     prior testimony.
9     A.    I don't -- I don't recall.
10 QUESTIONS BY MR. BOGLE:
11     Q.    Okay.  The next paragraph down
12 says:  In a similar vein, given the
13 requirement under Section 823(e) that a
14 distributor maintain effective controls
15 against diversion, a distributor may not
16 simply rely on the fact that the person
17 placing the suspicious order is a DEA
18 registrant and turn a blind eye to the
19 suspicious circumstances.  Again, to maintain
20 effective controls against diversion as
21 Section 823(e) requires, the distributor
22 should exercise due care in confirming the
23 legitimacy of all orders prior to filling.
24         Do you see that?
25     A.    Yes, I see that.

Page 65

1     Q.    The last sentence I just read
2 there, what do you understand that to mean?
3         MR. EPPICH:  Objection to the
4     form; foundation.
5     A.    I'm not sure what it means.
6 QUESTIONS BY MR. BOGLE:
7     Q.    Okay.  So while you were
8 working at McKesson after you read this
9 letter, you were unclear on what was meant by
10 that last sentence there about confirming the
11 legitimacy of all orders prior to filling?
12         MR. EPPICH:  Object to the
13     form.  Misstates prior testimony.
14     A.    I don't recall what I thought
15 at that time.
16 QUESTIONS BY MR. BOGLE:
17     Q.    Okay.  But as you read it here
18 today, you're not sure what is meant by that.
19 Is that true?
20         MR. EPPICH:  Same objections.
21     A.    I don't recall.
22 QUESTIONS BY MR. BOGLE:
23     Q.    No.  I'm asking what you think
24 today.
25     A.    I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1   Q.   Okay.  You don't have an
2  opinion about what that means?
3       A.   No.
4       Q.   Okay.  But we can agree that
5  you did perform regulatory compliance,
6  including for the Controlled Substances Act
7  for McKesson, all the way up until about two
8  years ago, right?
9       A.   That's correct.
10      Q.   Okay.  And we can also agree
11 this is a letter that you would have read in
12 your course of employment at McKesson, right?
13      A.   That's correct.
14      Q.   Did you follow up with anyone
15 at DEA about any of -- anything in this
16 letter that you were unclear on?
17      A.   Not that I recall.
18      Q.   Did you follow up with any of
19 your colleagues at McKesson about anything in
20 this letter that you felt you were unclear
21 on?
22      A.   I don't recall.
23      Q.   But I think you said earlier
24 that upon reading this letter, the takeaway
25 from McKesson was that the company needed to

Page 67

1  start blocking suspicious orders of
2  controlled substances when they were
3  detected.  True?
4       MR. EPPICH:  Objection to the
5  form.  Misstates prior testimony.
6       A.   I said that this is when we
7  started developing the new CSMP program which
8  blocked the orders.
9  QUESTIONS BY MR. BOGLE:
10      Q.   Right.  So this was the impetus
11 for creating a program that would block
12 suspicious orders, right?
13      MR. EPPICH:  Objection to the
14 form.  Asked and answered.
15      A.   I don't recall the details
16 around what preempted the development, but
17 this is about the same time frame.
18 QUESTIONS BY MR. BOGLE:
19      Q.   Okay.  I think you said earlier
20 it was this guidance letter that did prompt
21 the creation of the blocking mechanism in the
22 CSMP.
23      Did I misunderstand you there?
24      A.   As I recall, this was about the
25 same time frame and this is when we started

Page 68

1  the development of the CSMP.
2       Q.   Okay.  But the actual CSMP
3  itself did not go into effect until
4  approximately May 2008, right?
5       A.   That sounds about correct.
6       Q.   Okay.  So just shy of two years
7  after this letter, correct?
8       MR. EPPICH:  Object to the
9  form.
10      A.   That is the date listed.
11 QUESTIONS BY MR. BOGLE:
12      Q.   Okay.  Do you recall there
13 being any meetings with yourself and other
14 people at the regulatory department at
15 McKesson to sort of walk through this letter
16 we're looking at here in Exhibit 3?
17      MR. EPPICH:  Object to the
18 form.
19      A.   I really don't recall.
20 QUESTIONS BY MR. BOGLE:
21      Q.   Do you agree that properly
22 reporting suspicious orders when they are
23 detected gives DEA the ability to investigate
24 those orders?
25      MR. EPPICH:  Object to the

Page 69

1  form.  Foundation.
2       A.   I don't know.
3  QUESTIONS BY MR. BOGLE:
4       Q.   You don't know, okay.
5       Do you agree that blocking
6  suspicious orders is important to ensure that
7  diversion can be prevented?
8       MR. EPPICH:  Object to the
9  form.  Foundation.
10      A.   That is one element that can
11 assist.
12 QUESTIONS BY MR. BOGLE:
13      Q.   Okay.  And in the concept of
14 having effective controls against diversion
15 which we just looked at in this letter, can
16 you think of any better way to have effective
17 controls against diversion other than
18 blocking suspicious orders --
19      MR. EPPICH:  Objection.
20 QUESTIONS BY MR. BOGLE:
21      Q.   -- of controlled substances?
22      MR. EPPICH:  Object to the
23 form; foundation, and incomplete
24 hypothetical.
25      A.   I don't know.

Page 70

QUESTIONS BY MR. BOGLE:
Q. Okay. Well, do you think that blocking orders of suspicious controlled substances orders is a good way to have effective controls against diversion?
MR. EPPICH: Object to the form. Asked and answered.
A. That's one method.
QUESTIONS BY MR. BOGLE:
Q. Okay. Can you think of a better method?
MR. EPPICH: Object to the form. Foundation.
A. I don't know.
QUESTIONS BY MR. BOGLE:
Q. Okay. Well, having done this sort of job for 20 years, relying on that experience, does any other better method come to mind right now that you could cite for us?
MR. EPPICH: Object to the form; foundation; asked and answered.
A. I don't know.
QUESTIONS BY MR. BOGLE:
Q. Okay. When you say you don't know, I mean, it seems like either you have a

Page 71

better method you could tell us now or you don't. So I'm just asking if you do or you don't.
MR. EPPICH: Object to the form. Asked and answered.
A. I don't know.
QUESTIONS BY MR. BOGLE:
Q. You don't know if you do or you don't?
A. I have no comment.
Q. Okay. Well, I would ask if -- this is kind of important to me here, so if you think during the deposition of any way that would be better to have effective controls against diversion other than blocking suspicious orders, can you let me know?
A. I can.
Q. Okay.
MR. EPPICH: Is this a good time to take a break?
MR. BOGLE: Sure.
THE VIDEOGRAPHER: Off the record at 10:01.
(Recess taken, 10:01 a.m. to

Page 72

10:16 a.m.)
THE VIDEOGRAPHER: All right, stand by. The time is 10:16, back on the record. Beginning of File 2.
QUESTIONS BY MR. BOGLE:
Q. Mr. Hilliard, I want to go back just a step here and talk a little bit about sort of the hierarchy of the regulatory department while you were at McKesson. So let's focus on while you were director of regulatory affairs, which I think you told me was roughly 1998 to 2016.
So during that time frame, as director of regulatory affairs, who would have been your superiors in the regulatory department?
A. Dan White, and when I started in '97 to -- again, I don't remember the exact time frame, a couple of years; and then Ron Bone.
Q. What was his title?
A. SVP, operations.
Q. And that's senior vice president?
A. Yes, correct.

Page 73

Q. All right. Of operations?
A. Correct.
Q. Okay.
A. Regulatory rolled up under that.
Q. Okay.
A. Don Walker after that. And then at some point there, Bruce Russell came in between us and I reported directly to Bruce instead of Don.
Q. Okay.
A. And then it was back to Don directly, and then finally to Krista Peck.
Q. What was her job title?
A. SVP of regulatory department.
QUESTIONS BY MR. BOGLE:
Q. 
A. That's not the exact -- correct title, but SVP of regulatory.
Q. And again, when you say "SVP," it means senior vice president.
A. Senior vice president.
Q. I just want to make sure the record is clear. I think I know what you mean but I want to make sure it's clear.

Page 74

1    Okay.  Let me ask it to you
2 this way just so I understand.  So at all
3 times from 1998 to 2016, would there have
4 only been one position in the regulatory
5 department higher than yours on the corporate
6 ladder?
7    A.    No, because at the time point
8 for which I reported to Bruce Russell, he
9 would have been a VP, and then Bruce would
10 have reported to Don, so there would have
11 been one additional level there.
12    Q.    Okay.  So in what time period
13 would that have been where there was two
14 levels above yours?
15    A.    I would say 2000, early --
16 first part of the 2000s.  I'm not sure how
17 far that goes into.
18    Q.    Okay.
19    A.    I don't remember when Bruce
20 retired.
21    Q.    Okay.
22    A.    I want to say 2014, he retired,
23 approximately.
24    Q.    Okay.  So from this time period
25 from 1998 to 2016, there were points in time

Page 75

1 where there's one person, one position higher
2 than yours in the regulatory department, and
3 some points in time where there's two
4 positions higher than yours in the regulatory
5 department.  Am I understanding that right?
6    A.    That's correct.
7    Q.    Okay.  So as director of
8 regulatory affairs, then, from '98 to 2016,
9 were there positions below yours in the
10 regulatory department, people that reported
11 to you?
12    A.    I had one direct report.
13    Q.    Okay.  And during what time
14 period?
15    A.    Approximately 2013 to 2016.
16    Q.    Okay.  Who was that?
17    A.    Cynthia.  My mind is going
18 blank on her last name.  All she managed was
19 licensure for our facilities.
20    Q.    Okay.  All right.  Shifting
21 gears a little bit, then -- actually, strike
22 that.
23      Again, when we started the
24 deposition, you listed off quite a few
25 different areas of responsibility that you

Page 76

1 had over time in the regulatory department.
2 Did you consider each of the areas that you
3 had responsibility for to be important areas,
4 important things to you?
5    MR. EPPICH:  Object to the
6 form.
7    A.    My job was important to me.
8 QUESTIONS BY MR. BOGLE:
9    Q.    Okay.  And did you feel that
10 you had an important job for McKesson
11 generally, that you held an important role at
12 the company?
13    MR. EPPICH:  Object to the
14 form.
15    A.    In my opinion, I felt worthy
16 and important to the company.
17 QUESTIONS BY MR. BOGLE:
18    Q.    Okay.  I guess my question is a
19 little different.  Did you feel like your
20 position itself was an important position to
21 the company, that it performed important
22 functions to the company?
23    MR. EPPICH:  Object to the
24 form.
25    A.    In my opinion, I felt it was

Page 77

1 important.
2 QUESTIONS BY MR. BOGLE:
3    Q.    Okay.  Beginning in 2005, do
4 you recall the DEA beginning to question the
5 distribution practices of the Lakeland
6 distribution center specifically?
7    MR. EPPICH:  Object to the
8 form.
9    A.    I don't recall specifically the
10 Lakeland facility.
11 QUESTIONS BY MR. BOGLE:
12    Q.    You do or you do not?
13    A.    I do not.
14    Q.    Do not, okay.
15      Do you recall the DEA in 2005
16 questioning the distribution practices of
17 McKesson generally as it pertained to opioid
18 products?
19    MR. EPPICH:  Object to the
20 form.
21    A.    No, I do not.
22 QUESTIONS BY MR. BOGLE:
23    Q.    Okay.  And do you recall the
24 Lakeland distribution center at all, that it
25 existed?

Page 78

1    A.   Yes, I do.

2    Q.   Okay. And during 2005, you

3 would have been responsible for regulatory

4 compliance for that distribution center,

5 right?

6    A.   DEA responsibilities were held

7 by DC management for their facilities, and I

8 would be brought in for questions,

9 assistance, SOP compliance; but the DC

10 managers had their -- were responsible for

11 the compliance in their four walls.

12    Q.   Okay. And during that time

13 period in '05, that would have been William

14 Mahoney, true?

15    A.   That's correct.

16    Q.   For Lakeland?

17    A.   Yes, that's correct. Yep.

18    Q.   Do you recall being in any

19 meetings with the DEA in 2005 and 2006 where

20 they raised concerns about McKesson's supply

21 of hydrocodone to internet pharmacies?

22      MR. EPPICH: Object to the

23   form.

24    A.   I attended a meeting in 2005.

25 We were asked to participate in a

Page 79

1 presentation on internet pharmacies and we

2 attended that meeting there at DEA

3 headquarters.

4 QUESTIONS BY MR. BOGLE:

5    Q.   Okay. Do you recall any of the

6 substance of that meeting?

7    A.   They provided a presentation to

8 us.

9    Q.   Anything else beyond that that

10 you recall?

11    A.   They brought to our attention a

12 couple of pharmacies that we needed to look

13 into.

14    Q.   Okay. Do you remember any of

15 those pharmacies, which ones they were?

16    A.   Not by name.

17    Q.   Okay. I'm going to hand you

18 what I'm marking as Exhibit 4, which is

19 1.1946, and that's MCKMDL00496859.

20      There you go, sir.

21      (McKesson-Hilliard Exhibit 4

22   was marked for identification.)

23 QUESTIONS BY MR. BOGLE:

24    Q.   Okay. And just to generally

25 orient ourselves here, Mr. Hilliard, you see

Page 80

1 in Exhibit 4 we've got a memorandum from the

2 FDA -- I'm sorry, the DEA, Mr. Mapes at the

3 DEA to Mr. Rannazzisi at the DEA, and also

4 attached is some PowerPoint slides, right?

5    A.   Yes, that's correct.

6    Q.   Okay. And just looking here,

7 the subject of this memorandum says "Internet

8 Presentation with McKesson Corp. on

9 September 1, 2005."

10      Do you see that?

11    A.   Yes, I see that.

12    Q.   Okay. And then in the first

13 paragraph it notes who was present, and you

14 would agree with me that you're listed as one

15 of the people that was present for this

16 meeting, right?

17    A.   I am listed.

18    Q.   Okay. And you were present,

19 right?

20    A.   That's correct.

21    Q.   Okay. And the last sentence of

22 the first paragraph says: The purpose of the

23 meeting was to address the illegal domestic

24 Internet pharmacy problem and their source of

25 supply.

Page 81

1      Do you see that?

2    A.   Yes, I see that.

3    Q.   And then after that, it says:

4 Mr. Mapes -- who is with the DEA, right?

5    A.   That's correct.

6    Q.   -- opened the meeting by

7 presenting to the representatives of McKesson

8 Corp. a PowerPoint briefing which explained

9 the common characteristics of Internet

10 pharmacies and why their activities are

11 illegal.

12      Do you see that?

13    A.   Yes, I see that.

14    Q.   And then skipping on down to

15 the next full paragraph where it says, "After

16 the presentation."

17      Do you see where I'm at there?

18    A.   Yes, I do.

19    Q.   Okay. It says: After the

20 presentation, Mr. Mapes presented to

21 representatives of McKesson Corp. specific

22 customers of McKesson Corp., who have ordered

23 substantial quantities of hydrocodone

24 products. These specific customers of

25 McKesson Corp. were: And then it lists

Page 82

1  United Prescription Services and Ninth Avenue
2  Pharmacy.
3        Do you see that?
4    A.   Yes, I see that.
5    Q.   And so as this letter
6  indicates, those were two pharmacies that
7  were called out and discussed during this
8  meeting, right?
9    A.   Yes, that's correct.
10   Q.   Okay.  Then it continues:
11 Mr. Mapes finalized the presentation by
12 advising the representatives of McKesson
13 Corp. that they needed to thoroughly review
14 the materials which had been presented to
15 them and review in depth the purchasing
16 patterns and quantities of their customers.
17 Representatives of McKesson Corp.
18 acknowledged understanding of the material
19 presented.
20       Do you see that?
21   A.   Yes, I see that.
22   Q.   Okay.  Do you recall you and
23 your colleagues present at the meeting
24 acknowledging understanding of the materials
25 that were presented here?

Page 83

1        MR. EPPICH:  Object to the
2    form.
3    A.   I don't -- I don't recall
4  specifically what we agreed to at that
5  meeting.
6  QUESTIONS BY MR. BOGLE:
7    Q.   Okay.  Do you recall leaving
8  this meeting personally feeling that you
9  didn't understand what was presented to you?
10   A.   I recall getting a new
11 understanding for the trend of internet
12 pharmacies based on the presentation they
13 provided.
14   Q.   Okay.  You said "new
15 understanding of the trend with internet
16 pharmacies."  Is internet pharmacy something
17 that was on McKesson's radar from a
18 regulatory perspective prior to this meeting?
19       MR. EPPICH:  Object to the
20   form.
21   A.   Not that I recall.
22 QUESTIONS BY MR. BOGLE:
23   Q.   Okay.  I want to look at a
24 couple of slides in the presentation.  So if
25 you go first to the third page of the

Page 84

1  document, .3, you see there the first slide
2  is "Internet Pharmacy Data, Meeting with
3  McKesson Corporation, DEA Headquarters,
4  September 1, 2005."
5        Do you see that?
6    A.   Yes, I see that.
7    Q.   Okay.  And then if you go to
8  page .4, there's a slide that says "Issues to
9  Consider."
10       Do you see where I'm at?
11   A.   Yes, I do.
12   Q.   Okay.  The first bullet point
13 says "Frequency of Orders."  The second
14 bullet point says "size of Orders."  The
15 third bullet point says "Range of Products
16 Purchased."  The fourth bullet point says
17 "Payment Method."  The fifth says "Pharmacy
18 Location."  The sixth says "% Controlled vs.
19 % Noncontrolled."  And the last says
20 "Customer pick up at distributor."
21       Do you see that?
22   A.   Yes, I see that.
23   Q.   Okay.  So these were issues
24 that DEA was telling you to consider when
25 trying to determine whether potential

Page 85

1  diversion was occurring at these internet
2  pharmacies, right?
3        MR. EPPICH:  Object to the
4    form.
5    A.   I don't recall the exact
6  contents of this slide.
7  QUESTIONS BY MR. BOGLE:
8    Q.   Okay.  Well, let me ask you
9  this.  These issues to consider, were there
10 any of these issues that McKesson was not
11 able to evaluate when selling a product to a
12 customer at that point in time?
13       MR. EPPICH:  Object to the
14   form.
15   A.   These were areas that would be
16 looked at and considered for potential for
17 suspicious orders.  I don't recall the
18 percent versus non-percent controlled
19 substance aspect of it at that point in time.
20       But certainly things like
21 payment methods, if someone is trying to
22 offer you cash and such, you know, that's not
23 something that's acceptable.
24 QUESTIONS BY MR. BOGLE:
25   Q.   Okay.  So specifically, though,

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  the percentage of controlled versus
2  percentage of noncontrolled, McKesson had a
3  report that it could run as of 2005 that
4  would give that information regarding any
5  sales of any prescription products, right?
6       MR. EPPICH: Object to the
7    form. Assumes facts not in evidence.
8       A.  I don't recall when the
9  reporting capabilities were available.
10 QUESTIONS BY MR. BOGLE:
11      Q.  Okay. Are you familiar with
12 the term I think used internally was the
13 Volakos report?
14      A.  Yes.
15      Q.  And that's what this report
16 would be, the percentage of controlled versus
17 noncontrolled, right?
18      MR. EPPICH: Object to the
19   form.
20      A.  I don't recall what that
21 report -- it had different elements to it,
22 different reporting capabilities. I don't
23 recall what those capabilities were and I
24 don't recall the exact time frame when that
25 started being used.

Page 87

1  QUESTIONS BY MR. BOGLE:
2       Q.  Okay. Is there any reason, to
3  your understanding, in 2005, why McKesson
4  could not look at the percentage of
5  controlled versus noncontrolled substances
6  that it sold to any of its customers?
7       MR. EPPICH: Object to the
8    form.
9       A.  That capability may have been
10 there. I just don't recall, you know, how --
11 when it was there or how it was used.
12 QUESTIONS BY MR. BOGLE:
13      Q.  Okay. Well, let me ask you
14 this way: During 2005, McKesson certainly
15 could run a report showing what controlled
16 substances it had sold to a customer, right?
17      A.  Correct.
18      Q.  Track the transactions, right?
19      A.  Correct.
20      Q.  Okay. It could also run a
21 report showing the noncontrolled substances
22 it sold to any customer, right?
23      A.  Correct.
24      Q.  Okay. Because it tracked those
25 transactions as well, right?

Page 88

1       A.  Correct.
2       Q.  Okay. In 2005, what mechanism
3  did McKesson utilize to evaluate the
4  frequency of the order -- controlled
5  substances orders to determine whether they
6  were suspicious?
7       MR. EPPICH: Object to the
8    form.
9       A.  I don't recall how frequency
10 was determined.
11 QUESTIONS BY MR. BOGLE:
12      Q.  Okay. Are you aware -- let's
13 just say from 1998 to 2007 -- of any reports
14 that were run examining frequency of orders
15 for controlled substances at McKesson?
16      MR. EPPICH: Object to the
17   form.
18      A.  The DU45 suspicious order
19 report ran nightly and monthly, provided to
20 the DEA. I don't recall that it had -- it
21 showed from day to day the transactions that
22 occurred, the sales that occurred.
23      As far as a "frequency" aspect
24 of it, I don't know how that would have
25 frequency to it, so I'm not sure.

Page 89

1  QUESTIONS BY MR. BOGLE:
2       Q.  Okay. Well, the DU45 report --
3  and we'll talk about this a little more
4  later -- but the DU45 report was a volume
5  report meaning that a customer for a
6  controlled substance didn't appear on that
7  report until they ordered three times the
8  monthly average for that controlled
9  substance, right?
10      MR. EPPICH: Object to the
11   form.
12      A.  That's correct.
13 QUESTIONS BY MR. BOGLE:
14      Q.  So that's more of a volume
15 report, right? When you reach a certain
16 volume, you get on that report.
17      MR. EPPICH: Object to the
18   form.
19 QUESTIONS BY MR. BOGLE:
20      Q.  True?
21      A.  Once you exceed a certain
22 threshold under the three-time factor, then
23 you'll show up on that report.
24      Q.  Right. And so the DU45
25 specifically didn't have any mechanism to it

Page 90

1 that pulled an order on to it as being on the
2 report strictly based on frequency alone, did
3 it?
4        MR. EPPICH:  Object to the
5 form.
6    A.    I don't recall a frequency
7 basis.
8 QUESTIONS BY MR. BOGLE:
9    Q.    Okay.  All right.  Let's go to
10 page .9 of the PowerPoint.
11        The bottom slide there is
12 titled Suspicious Orders.
13        Do you see that?
14    A.    I see that.
15    Q.    Okay.  The first bullet point
16 lists the C.F.R.  The second bullet point
17 says:  Requires that registrants design and
18 operate system to identify suspicious orders.
19        Do you see that?
20    A.    Yes, I see that.
21    Q.    And the last bullet point says:
22 Report suspicious orders to DEA when
23 discovered.
24        Right?
25    A.    Yes, I see that.

Page 91

1    Q.    Okay.  And you knew in 2005
2 that that was part of McKesson's obligations
3 were to report suspicious orders of
4 controlled substances when they were -- to
5 the DEA when they were discovered, right?
6        MR. EPPICH:  Object to the
7 form.  Calls for a legal conclusion.
8    A.    We provided the suspicious
9 order reports to the DEA, again, nightly as
10 well as monthly, so that they had the report
11 for their review.
12        MR. BOGLE:  Okay.  Move to
13 strike as nonresponsive.
14 QUESTIONS BY MR. BOGLE:
15    Q.    My question simply was:  You
16 understood at this point in 2005, by
17 September 2005, that there was an obligation
18 for McKesson to report suspicious orders to
19 the DEA when they were discovered.  True?
20        MR. EPPICH:  Object to the
21 form.  Foundation.
22    A.    McKesson did report suspicious
23 orders to the DEA.
24 QUESTIONS BY MR. BOGLE:
25    Q.    Okay.

Page 92

1        MR. BOGLE:  Move to strike as
2 nonresponsive.
3 QUESTIONS BY MR. BOGLE:
4    Q.    My question was simply:  You
5 did have an understanding as of 2005 that
6 there was an obligation for McKesson to
7 report suspicious orders to the DEA when they
8 were discovered.  True?
9        MR. EPPICH:  Object to the
10 form; calls for a legal conclusion,
11 asked and answered.
12    A.    We submitted the reports to the
13 DEA for the controlled substance suspicious
14 order reports.
15 QUESTIONS BY MR. BOGLE:
16    Q.    Okay.  And why would you do
17 that, then?
18    A.    That was the agreed reporting
19 mechanism for the suspicious order that was
20 created from the Suspicious Order Task Force
21 that DEA had agreed was the methodology.
22    Q.    What time period are you
23 referring to?
24    A.    Approximately '95.
25    Q.    Okay.  So before you were with

Page 93

1 the company.
2    A.    That's correct.
3    Q.    Okay.  So you were not a member
4 of any such task force, right?
5    A.    That's correct.
6    Q.    Okay.  And so anything that you
7 would know about the task force came to you
8 from somebody other than yourself, right?
9 You don't have any firsthand knowledge of
10 that.
11        MR. EPPICH:  Object to the
12 form.
13 QUESTIONS BY MR. BOGLE:
14    Q.    True?
15    A.    I was not there.
16    Q.    Right.  So you don't have any
17 firsthand knowledge of it, true?
18        MR. EPPICH:  Object to the
19 form.
20    A.    I was not at the meeting.
21 QUESTIONS BY MR. BOGLE:
22    Q.    Okay.  So therefore you could
23 not have any firsthand knowledge, right?
24        MR. EPPICH:  Object to the
25 form.

Page 94

1    A.    I was not -- I did not attend
2  the meeting of the task force.
3  QUESTIONS BY MR. BOGLE:
4    Q.    Okay.  Do you know of anyone
5  from McKesson that did?
6    A.    I don't recall.
7    Q.    Okay.  Did you keep any written
8  documentation from the DEA that would have
9  come from this task force you're referencing
10 that says, you know, the DEA -- this is our
11 stamp of approval that this is the mechanism
12 that we approved to report suspicious orders?
13         MR. EPPICH:  Objection --
14 QUESTIONS BY MR. BOGLE:
15   Q.    Did you keep a file like that?
16         MR. EPPICH:  Object to the
17 form.
18   A.    I don't recall if there was a
19 form associated with the outcome of that
20 meeting.
21 QUESTIONS BY MR. BOGLE:
22   Q.    Okay.  I'm just asking if you
23 had any sort of documentation that you kept
24 for yourself to make sure that you felt
25 comfortable that that was the proper

Page 95

1  reporting mechanism.
2         MR. EPPICH:  Object to the
3  form.  Vague.
4    A.    Through my career, whenever I
5  had information from the DEA, then I would
6  maintain copies of it.
7  QUESTIONS BY MR. BOGLE:
8    Q.    Okay.  So if you had any
9  correspondence from the DEA that said that
10 this was a reporting mechanism they signed
11 off on, you would have kept that, right?
12         MR. EPPICH:  Object to the
13 form.
14   A.    I wasn't at the meeting, so I
15 don't have -- I didn't have any documentation
16 on that, I don't recall having documentation
17 on that.
18         But as I said, throughout the
19 course of my career, if I did receive some
20 type of letter, like an extension to DEA
21 registrations, then we would maintain that
22 letter.
23 QUESTIONS BY MR. BOGLE:
24   Q.    So let's go to page .10 then.
25 There's another slide on suspicious orders at

Page 96

1  the top there.
2         Do you see that?
3    A.    I see that.
4    Q.    That bullet point says:
5  Reporting a suspicious order to DEA does
6  NOT -- and "not" is in all caps -- relieve
7  the distributor of the responsibility to
8  maintain effective controls against
9  diversion.
10        Do you see that?
11   A.    I see that.
12   Q.    What did you understand that to
13 mean when that was presented to you in 2005?
14   A.    We had other controls around
15 ensuring -- to prevent against diversion, and
16 so we had to ensure that we had other
17 controls, you know, that kept a controlled
18 substance within the legitimate registration.
19   Q.    When you say "other controls,"
20 you're talking about other controls other
21 than just reporting the suspicious order,
22 right?
23   A.    Correct.
24   Q.    Okay.  What were those controls
25 in 2005?

Page 97

1    A.    We only serviced DEA-registered
2  facilities and also state-licensed
3  facilities.  Some states required a
4  controlled substance license, so there was
5  license validation checks that would take
6  place.  Also D&B creditworthiness aspects for
7  them.
8         We also had delivery systems
9  that -- couriers that delivered only to these
10 registered locations.  We supplied ARCOS
11 records to the DEA monthly on all of our
12 transactions so that DEA had that as well.
13 We reported loss and thefts, as required.
14        We had security vaults and
15 cages within our facilities to comply with
16 the security requirements for protecting the
17 controlled substances; numerous paperwork
18 requirements, including the 222 forms for the
19 transactions for Schedule IIs.  There were
20 many different other controls.
21   Q.    Those controls in 2005 would
22 not have included blocking orders as we
23 talked about before, right?
24         MR. EPPICH:  Object to the
25 form.

Page 98

1  QUESTIONS BY MR. BOGLE:
2      Q.    Blocking suspicious orders.
3          MR. EPPICH:  Object to the
4  form.
5      A.    Blocking suspicious orders took
6  place in the CSMP program.
7  QUESTIONS BY MR. BOGLE:
8      Q.    Right.  So in 2005, that would
9  not have been in place, right?
10      A.    That was not in place in 2005.
11      Q.    All right.  The second slide
12  here on that page, the second bullet point
13  says:  Distributor must determine which
14  orders are suspicious and make a sales
15  decision.
16          Do you see that?
17      A.    I see that.
18      Q.    Okay.  Okay.  Let's go to
19  page .14.  You see there's a summary slide
20  there at the bottom, and the last bullet
21  point says:  Not limited to Internet
22  pharmacies.
23          Do you see that?
24      A.    Yes, I see that.
25      Q.    Okay.  So you understood that

Page 99

1  this presentation that was provided to you
2  and the information conveyed to you, from the
3  DEA's perspective, at least, was not limited
4  to just internet pharmacies, right?
5          MR. EPPICH:  Object to the
6  form.
7  QUESTIONS BY MR. BOGLE:
8      Q.    They're providing you guidance
9  beyond just for internet pharmacies, true?
10          MR. EPPICH:  Object to the
11  form.  Calls for speculation.
12      A.    I don't recall what all was
13  said and portrayed through this presentation.
14  QUESTIONS BY MR. BOGLE:
15      Q.    Okay.  Did you walk away from
16  the presentation believing that the things
17  the DEA told you in this PowerPoint
18  presentation just pertained to internet
19  pharmacies?
20          MR. EPPICH:  Object to the
21  form.
22      A.    My personal opinion, I walked
23  away with the belief that we had a
24  collaborative working arrangement here, that
25  they were helping us to identify pharmacies

Page 100

1  and they were going to going to continue to
2  help us to identify pharmacies that we needed
3  to investigate, and the internet pharmacy
4  aspect of it for me was a really emerging
5  trend and something that we had to go back
6  and take a look at.
7  QUESTIONS BY MR. BOGLE:
8      Q.    You would agree with me that
9  the primary responsibility for investigating
10  suspicious orders or suspicious customers or
11  suspicious activity for a customer falls on
12  McKesson, right?  For any product it's
13  selling.
14          MR. EPPICH:  Object to the
15  form; foundation.  Calls for a legal
16  conclusion.
17      A.    Okay.  Restate the question.
18  QUESTIONS BY MR. BOGLE:
19      Q.    Sure.
20          You would agree the primary
21  responsibility for investigating suspicious
22  orders or suspicious activity of a customer
23  of McKesson's falls primarily on McKesson,
24  right?
25          MR. EPPICH:  Object to the

Page 101

1  form.  Foundation.  Calls for a legal
2  conclusion.
3      A.    I'm not sure.
4  QUESTIONS BY MR. BOGLE:
5      Q.    Okay.  Is that not the way that
6  you performed your job, with that sort of
7  belief in mind?
8          MR. EPPICH:  Object to the
9  form.  Foundation.  Calls for a legal
10  conclusion.
11      A.    I don't know.
12  QUESTIONS BY MR. BOGLE:
13      Q.    You don't know?  Okay.
14          So when you came in to work
15  every day as director of regulatory affairs,
16  would you or would you not have the mindset
17  that the primary responsibility to make sure
18  that we're not putting out suspicious orders
19  of controlled substances falls on us as
20  McKesson?
21          MR. EPPICH:  Object to the
22  form.
23      A.    DC management teams managed the
24  controlled substance aspect and their
25  customers along with themselves.  I would be

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  brought in whenever we had issues that we
2  needed to discuss.
3  QUESTIONS BY MR. BOGLE:
4      Q.    Yeah, I guess I'm asking the
5  question a little differently than that,
6  though.  What I'm asking is:  When you came
7  to work every day from 1997 to 2016 and were
8  director of regulatory affairs at McKesson,
9  with what you've said is an important job,
10  did you take that job to mean that the
11  primary responsibility for making sure that
12  suspicious orders didn't go out to customers
13  fell on McKesson as opposed to somebody else?
14      MR. EPPICH:  Object to the form
15      to the extent it calls for a legal
16      conclusion.
17      A.    I don't recall what I thought
18  when I walked into the office each day.
19  QUESTIONS BY MR. BOGLE:
20      Q.    Okay.  Do you ever recall a day
21  at work where you sat down and said, "I've
22  got to make sure, as director of regulatory
23  affairs, that suspicious orders do not go to
24  customers from McKesson when it comes to
25  controlled substances"?

Page 103

1      MR. EPPICH:  Object to the
2      form.
3      A.    I don't recall what I thought
4  when I sat down each day.
5  QUESTIONS BY MR. BOGLE:
6      Q.    Okay.  Any day, that thought
7  cross your mind that you can think of?
8      MR. EPPICH:  Object to the
9      form; asked and answered.
10      A.    Not from 10 years ago.
11  QUESTIONS BY MR. BOGLE:
12      Q.    What about from two years ago?
13      A.    I wasn't involved in the DRA
14  CSMP process at that point in time.
15      Q.    What about five years ago?
16      MR. EPPICH:  Same objections.
17      Asked and answered.
18      A.    I don't recall.
19  QUESTIONS BY MR. BOGLE:
20      Q.    All right.  We'll look at
21  page .15 here on this as well.  Another
22  summary slide at the top says:  A pattern of
23  drugs being distributed to pharmacies who are
24  diverting controlled substances demonstrates
25  the lack of effective controls against

Page 104

1  diversion by the distributor.
2      Do you see that?
3      A.    Yes, I see that.
4      MR. BOGLE:  If we can put it on
5      mute on the phone, somebody's got some
6      background noise.
7  QUESTIONS BY MR. BOGLE:
8      Q.    The second summary slide there,
9  the first bullet point says:  Any distributor
10  who is selling controlled substances that are
11  being dispensed outside the course of
12  professional practice must stop immediately.
13      Do you see that?
14      A.    Yes, I see that.
15      Q.    Okay.  And that specific
16  statement there, did you personally take that
17  statement seriously when you received it from
18  DEA?
19      MR. EPPICH:  Object to the
20      form.
21      A.    I don't recall what was thought
22  at that point in time.
23  QUESTIONS BY MR. BOGLE:
24      Q.    Okay.  Well, as a course of
25  common practice for you at that point in time

Page 105

1  in 2005, when the DEA says something like
2  "Any distributor who is selling controlled
3  substances that are being dispensed outside
4  the course of professional practice must stop
5  immediately," would it be your common
6  practice to take a statement like that
7  seriously?
8      MR. EPPICH:  Object to the
9      form.  Asked and answered.
10      A.    We complied with the CSA
11  requirements for DEA.
12      MR. BOGLE:  Move to strike as
13      nonresponsive.
14  QUESTIONS BY MR. BOGLE:
15      Q.    My question was, that statement
16  there that I just read for you twice, would
17  it be your common practice in 2005 when you
18  received that statement to take that
19  statement seriously --
20      MR. EPPICH:  Object to the
21      form.
22  QUESTIONS BY MR. BOGLE:
23      Q.    -- as Gary Hilliard --
24      MR. EPPICH:  Object to the
25      form; asked and answered.

Page 106

QUESTIONS BY MR. BOGLE:

Q.    -- director of regulatory affairs at McKesson?

MR. EPPICH:  Same objections.

A.    I don't know.

QUESTIONS BY MR. BOGLE:

Q.    Don't know, okay.

During this presentation in September 2005 that you were present for, was there anything about that presentation that you thought was unclear as far as what the DEA was asking of you guys?

MR. EPPICH:  Object to the form.

A.    Not that I recall.

QUESTIONS BY MR. BOGLE:

Q.    Okay.  But you do recall a meeting just a couple months thereafter where the DEA made pretty clear that they felt you didn't take them very seriously in that meeting, right?

MR. EPPICH:  Object to the form.

A.    We did attend a meeting a couple of months thereafter for which

Page 107

Rannazzisi came in and wanted to do a show-cause.

QUESTIONS BY MR. BOGLE:

Q.    Right.  Because he felt you weren't taking them very seriously, right?

MR. EPPICH:  Object to the form.  Calls for speculation.

A.    I don't know what the perception was.

QUESTIONS BY MR. BOGLE:

Q.    Okay.  I'm going to hand you what I'm marking as Exhibit 5, which is 1.1789, and that's MCKMDL00496876.

(McKesson-Hilliard Exhibit 5 was marked for identification.)

QUESTIONS BY MR. BOGLE:

Q.    Okay.  Looking at Exhibit 5 here, this is another memorandum, the subject being a Meeting Between the Office of Diversion Control and McKesson Corp. on January 3, 2006.

Do you see that?

A.    Yes, I see that.

Q.    Okay.  And the second paragraph, I'm not going to read off all the

Page 108

attendees, but I just want to confirm you see your name there as being one of the attendees, right?

A.    That's correct.

Q.    And that's true, right, you attended this meeting?

A.    That is correct.

Q.    Okay.  And looking down on this page about three-quarters of the way down, you see where it says, "Mr. Mapes opened"?

A.    Yes, I do.

Q.    It says: Mr. Mapes opened the meeting by making introductions and covering the background of previous meetings and telephonic conversations between OD and McKesson Corp.  Specifically addressed were the following:

And the first bullet says:  A meeting between McKesson Corp. and E-Commerce Section was held September 1, 2005, at which time McKesson Corp. was given a full detailed briefing of the OD's Distributors Initiative to address the Internet pharmacy problem.

Do you see that?

A.    Yes, I see that.

Page 109

Q.    And that September 1 meeting in 2005 was the one we just were talking about, right?

A.    That's correct.

Q.    Okay.  The second-to-last bullet point on this page said:  Pharmacies of particular concern were located in Florida, Texas, and Colorado.

Do you see that?

A.    Yes, I see that.

Q.    And that's again referring back to the discussion that was had back in September 1, '05, right?

MR. EPPICH:  Object to the form; foundation.

A.    No.  The notifications occurred after that meeting.

QUESTIONS BY MR. BOGLE:

Q.    Okay.  Does this letter indicate that there's any other date and time when that occurred?  It was all after the discussion starting on September 1, 2005, right?

MR. EPPICH:  Object to the form.

Page 110

1    A.    I don't recall the other states
2  other than what was listed in the other
3  letter.
4  QUESTIONS BY MR. BOGLE:
5    Q.    Okay.  Well, we looked at
6  Exhibit 4 a minute ago.  One of the
7  pharmacies listed there was United
8  Prescription Services.
9          You recall that?
10   A.    Yes.
11   Q.    You know that's a Florida
12 pharmacy, right?
13         MR. EPPICH:  Object to the
14   form.  Calls for speculation.
15   A.    That's my recollection.
16 QUESTIONS BY MR. BOGLE:
17   Q.    Okay.  We'll look at it in a
18 minute.  I mean, if you don't know, I can
19 show you.
20         The next bullet point actually
21 says:  Specifically addressed concerns with
22 United Prescription Services, a current
23 customer of McKesson's.
24         Do you see that?
25   A.    Yes, I see that.

Page 111

1    Q.    And we do know that was covered
2  in the September 1, 2005 meeting, right?
3    A.    Agreed.
4    Q.    Their concerns about that
5  pharmacy?
6    A.    Agreed.
7    Q.    Okay.  It continues:  On
8  October 6, 2005, Mr. Mapes called Mr. Gilbert
9  to discuss comments the E-Commerce Section
10 had received that McKesson Corp. was not
11 taking the Internet pharmacy problem
12 seriously.  Mr. Mapes was assured by
13 Mr. Gilbert that McKesson Corp. was taking
14 the matters seriously and working to change
15 their procedures.
16         Do you see that?
17   A.    Yes, I see that.
18   Q.    Who is Mr. Gilbert?
19   A.    Outside counsel.
20   Q.    So he's you guys' lawyer,
21 right?
22   A.    Correct.
23   Q.    Okay.  And that's on October
24 5th.
25         And the next entry is on

Page 112

1  October 10.  It says:  On October 10, 2005, a
2  DEA investigator from the Tampa District
3  Office contacted Bill Mahoney at the McKesson
4  Distribution Center in Lakeland, Florida, and
5  expressed concerns of hydrocodone sales to
6  United Prescription Services.
7          Do you see that?
8    A.    I see that.
9    Q.    Okay.  Then the next entry
10 says:  The E-Commerce Section retrieved ARCOS
11 data which revealed that between October 10
12 and October 21, 2005, the following alleged
13 Internet pharmacies received the identified
14 quantities of hydrocodone.
15         And then there's one, two,
16 three, four, five, six pharmacies listed,
17 right?
18   A.    Yes, that's what's listed here.
19   Q.    Okay.  And for this 11-day
20 period, it's noted in this letter that United
21 Prescription Services received 252,100 dosage
22 units of hydrocodone from McKesson, right?
23         MR. EPPICH:  Object to the
24   form.  Foundation.
25   A.    That's what's stated on the

Page 113

1  document.
2  QUESTIONS BY MR. BOGLE:
3    Q.    Okay.  And that Universal Rx
4  received 254,700 dosage units during this
5  11-day period from McKesson of hydrocodone,
6  right?  That's what the letter states.
7          MR. EPPICH:  Object to the form
8    and foundation.
9    A.    That's listed on this letter,
10 yes.
11 QUESTIONS BY MR. BOGLE:
12   Q.    Okay.  And that Bi-Wise
13 Pharmacy received 158,400 dosage units of
14 hydrocodone during this 11-day period, from
15 McKesson, right?
16         MR. EPPICH:  Object to the
17   form; foundation.
18 QUESTIONS BY MR. BOGLE:
19   Q.    That's what the letter states.
20   A.    That's what the letter states.
21   Q.    The letter also states that
22 Avee Pharmacy received 220,200 dosage units
23 of hydrocodone from McKesson in this 11-day
24 period, right?
25         MR. EPPICH:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  form; foundation.
2  QUESTIONS BY MR. BOGLE:
3      Q.   That's what the letter states.
4      A.   That's what the letter states.
5      Q.   The letter also states that
6  Medipharm Rx received 500,900 dosage units of
7  hydrocodone in 11 days from McKesson, right?
8          MR. EPPICH:  Object to the
9      form; foundation.
10     A.   That's what the letter states.
11 QUESTIONS BY MR. BOGLE:
12     Q.   And finally, Accumed Pharmacy
13 received 404,400 dosage units of hydrocodone
14 from McKesson in 11 days, right?
15         MR. EPPICH:  Object to the form
16     and foundation.
17     A.   That's what the letter states.
18 QUESTIONS BY MR. BOGLE:
19     Q.   It continues thereafter and
20 says: Mr. Rannazzisi then addressed the
21 representatives of McKesson Corp. and
22 informed them that it was his concerted
23 opinion based on the information presented,
24 the DEA needed to ask for the surrender of
25 McKesson's Lakeland Distribution Center

Page 115

1  registration or DEA would pursue an Order to
2  Show Cause against the DEA registration of
3  the McKesson facility in Lakeland, Florida.
4          Do you see that?
5      A.   Yes, I see that.
6      Q.   So having a DEA registration
7  surrendered or having an Order to Show Cause
8  brought against a distribution center, those
9  are serious enforcement actions, right?
10         MR. EPPICH:  Object to the
11     form.
12     A.   They are serious.
13 QUESTIONS BY MR. BOGLE:
14     Q.   Okay.  And in fact, the DEA did
15 file for an Order to Show Cause against
16 Lakeland after this point in time, right?
17     A.   Yes, they did.
18     Q.   Okay.  Continuing on down in
19 this letter, I'm skipping that paragraph and
20 going to the next one that says, "Through the
21 course of the above."
22         Do you see that?
23     A.   Yes, I see that.
24     Q.   It says: Through the course of
25 the above discussion, McKesson Corp., by

Page 116

1  their own admission, was unable to provide a
2  plausible explanation for the sale of over
3  2 million dosage units of hydrocodone in a
4  21-day period to pharmacies previously
5  identified by DEA to McKesson Corp.
6          Do you see that?
7      A.   Yes, I see that.
8      Q.   Okay.  And then the last
9  paragraph on the bottom of this page
10 references you and says:  After the
11 conclusion of this meeting, it was learned
12 from Gary Hilliard of McKesson Corp. that one
13 of the reasons they were not able to realize
14 the full volume of hydrocodone product going
15 out to the Florida pharmacies was that their
16 reports only included the name brand
17 hydrocodone products distributed and was
18 not -- and was leaving out the generic
19 products.  It was only after realizing that
20 the generic were not being reported was
21 McKesson Corp. able to see the large
22 quantities that DEA was bringing to
23 McKesson's attention.
24         Do you see that?
25     A.   Yes, I see that.

Page 117

1      Q.   Okay.  And you recall making
2  that statement to somebody at the DEA that
3  after the meeting, you recognized that the
4  reports you guys ran to track controlled
5  substances purchases like this weren't
6  picking up the generic products?
7          MR. EPPICH:  Object to the
8      form.
9      A.   That's my recollection.
10 QUESTIONS BY MR. BOGLE:
11     Q.   That is your recollection?
12 Okay.
13         And what sort of report were
14 you referring to?
15     A.   I don't recall the report, but
16 it was based on item number or SKU number, so
17 the identification of the items left out the
18 generic items because it was in error.
19     Q.   Okay.  So was the report for
20 these pharmacies in Florida run any
21 differently than the reports for any other
22 pharmacies around the country in tracking
23 hydrocodone purchases?
24         MR. EPPICH:  Object to the
25     form.  Calls for speculation.

Page 118

1   A.   I don't recall.
2   QUESTIONS BY MR. BOGLE:
3       Q.    You were responsible for the
4   reports at that time, right?
5           MR. EPPICH:  Object to the
6   form.
7       A.    No, I did not generate the
8   reports.  Again, the DC manager would have
9   these reports and it would be utilized -- Don
10  Walker may have looked at them at that point
11  in time.  I just don't really know.
12  QUESTIONS BY MR. BOGLE:
13      Q.    But you were asked to
14  investigate the specific issue that we just
15  read here, right, for these pharmacies?
16          MR. EPPICH:  Object to the
17  form.  Calls for speculation.
18      A.    I don't recall what the
19  specific actions I was directed to take, but
20  we realized that the reporting had an error
21  in it and that's what provided the
22  information stated above.
23  QUESTIONS BY MR. BOGLE:
24      Q.    When you looked at the
25  reporting here, did you confirm that the way

Page 119

1   the reporting was done for these six
2   pharmacies was any different than the
3   reporting done for any other pharmacies at
4   that point in time?
5           MR. EPPICH:  Object to the
6   form.
7       A.    I don't recall.
8   QUESTIONS BY MR. BOGLE:
9       Q.    Okay.  Did you look to see if,
10  hey, there's something about the reports for
11  these six pharmacies that's different than
12  the way we're doing reports for anybody else?
13          MR. EPPICH:  Object to the
14  form.
15      A.    Again, I don't recall.
16  QUESTIONS BY MR. BOGLE:
17      Q.    Okay.  Would there be any
18  reason for the reports for these six
19  pharmacies in this time frame, for controlled
20  substances monitoring to be done any
21  differently than any other pharmacies?  Is
22  there anything special about these pharmacies
23  for why the reports would be different than
24  any others?
25          MR. EPPICH:  Object to the

Page 120

1   form; calls for speculation.
2       A.    I really don't recall.
3   QUESTIONS BY MR. BOGLE:
4       Q.    Okay.  So can you tell our
5   jury, then, that when you did this
6   investigation in 2006, that you were able to
7   confirm in your mind that this was not an
8   issue with all controlled substance reports
9   that were being run up to that date and time?
10          MR. EPPICH:  Object to the
11  form.
12      A.    I don't recall what the
13  conclusion was.  We identified these -- this
14  error on the reporting and corrected it.
15  QUESTIONS BY MR. BOGLE:
16      Q.    Okay.  So can you specifically
17  tell our jury and reassure our jury that this
18  wasn't an issue with all reports being run up
19  to this point in time tracking controlled
20  substances?
21          MR. EPPICH:  Object to the
22  form.  Calls for speculation.
23      A.    I really don't recall.
24  QUESTIONS BY MR. BOGLE:
25      Q.    Okay.  But I'm asking, can you

Page 121

1   specifically say, "I looked at this and I can
2   reassure you that this was a one-off issue
3   and it wasn't a systemic issue for all
4   controlled substance tracking prior to this
5   date and time in January 2006"?
6           MR. EPPICH:  Object to the
7   form; calls for speculation, asked and
8   answered.
9       A.    I don't recall.
10  QUESTIONS BY MR. BOGLE:
11      Q.    Okay.  I'm just asking if
12  you -- you say you don't recall.  I'm asking
13  the question differently.
14          Can you specifically say to our
15  jury, under oath, that prior to this point in
16  time when you did this investigation in 2006,
17  that all reports tracking controlled
18  substances before that date were done
19  differently than the reports for these six
20  pharmacies?  Can you make that affirmative
21  statement?  Yes or no?
22          MR. EPPICH:  Object to the
23  form.  Asked and answered.  Calls for
24  speculation.
25      A.    I don't recall.

Page 122

1  QUESTIONS BY MR. BOGLE:
2      Q.   You don't recall if you can
3  make that statement?
4      A.   I don't recall.
5      Q.   I'm asking if you can make that
6  statement today, not whether you recall then.
7          MR. EPPICH:  Same objections.
8  QUESTIONS BY MR. BOGLE:
9      Q.   I don't think you're answering
10 my question.
11         MR. EPPICH:  Same objections.
12     A.   What I'm answering is, I don't
13 recall the reports, the detail of the report
14 or how the report was used.  I recall that
15 there was an issue with the report that it
16 didn't contain all the SKU numbers, and
17 particularly for the generic items.  And when
18 we identified that, we corrected it.
19 QUESTIONS BY MR. BOGLE:
20     Q.   Okay.  So can you provide any
21 specific reassurance that any reports
22 generated prior to the date when you did this
23 investigation in early 2006 did not suffer
24 from the same flaw?
25         MR. EPPICH:  Object to the

Page 123

1  form.  Calls for speculation.  Asked
2  and answered five times.
3      A.   I don't recall.
4  QUESTIONS BY MR. BOGLE:
5      Q.   Okay.  So -- and if you could
6  provide such reassurance, you would, right?
7      A.   That's correct.
8          MR. EPPICH:  Object to the
9  form; foundation, calls for
10 speculation.
11 QUESTIONS BY MR. BOGLE:
12     Q.   Okay.  I want to talk a little
13 bit more about the Order to Show Cause
14 proceedings for Lakeland that occurred
15 thereafter.
16         MR. BOGLE:  Let me get my
17 copies here, sorry.  Slight delay.
18 I'm emptying boxes.
19         MR. EPPICH:  I'm going to stand
20 up for this one.
21 QUESTIONS BY MR. BOGLE:
22     Q.   All right.  I'm handing you
23 what I'm marking as Exhibit 6, which is
24 1.1943, MCKMDL00496306.
25         (McKesson-Hilliard Exhibit 6

Page 124

1  was marked for identification.)
2  QUESTIONS BY MR. BOGLE:
3      Q.   Okay, Mr. Hilliard, just to
4  generally orient you here, this was produced
5  to us by McKesson in this litigation and is a
6  listing of all the pleadings for the Order to
7  Show Cause proceeding with Lakeland
8  Distribution Center.  Okay?
9      A.   Okay.
10     Q.   All right.  We're going to look
11 at -- obviously it's several hundred pages.
12 I'm not going to go through every page with
13 you, I promise, but there's a few aspects
14 that I want to talk to you about.
15         So if you look, first of all --
16 and on this one I'm going to use the Bates
17 number at the bottom.  Sorry to change it up
18 on you but I don't have all the numbers that
19 are at the bottom for myself, so I'm at page
20 ending 6309.
21     A.   I see that.
22     Q.   And you see this is titled
23 Order to Show Cause, August 4, 2006, in the
24 matter of McKesson Corporation.
25         Do you see that?

Page 125

1      A.   I see that.
2      Q.   Okay.  Second sentence -- or
3  second paragraph there says:  Notice is
4  hereby given to afford McKesson Drug Company
5  of Lakeland, Florida (McKesson-Lakeland), an
6  opportunity to Show Cause before the Drug
7  Enforcement Administration (DEA) at a place
8  and time to be determined, as to why the DEA
9  should not revoke its Certificate of
10 Registration -- then it lists the number --
11 as a distributor of controlled substances,
12 and deny any applications for renewal or
13 modification of such registration pursuant to
14 21 U.S.C. Sections 824(a)(4) and 823(b) and
15 (e), for reason that its registration is
16 inconsistent with the public interest, as
17 that term is used in 21 U.S.C. 823(b) and
18 (d), as evidenced by, but not limited to, the
19 following.
20         And then it proceeds from
21 there.  Do you see that?
22     A.   I see that.
23     Q.   Let's look at the list that
24 follows.  I want to look at item number 12,
25 which is on page ending 6311.  Number 12

Page 126

1  says: DEA investigators later commenced an
2  analysis of all reported purchases and
3  purchase records of controlled substances to
4  establish percentages of sales for the seven
5  pharmacies. For the month of January 2006,
6  the percentage of sales that were hydrocodone
7  sales for these seven pharmacies were as
8  follows: Accumed-77.7%; Avee-79.7%;
9  Bi-Wise-83.3%; Medipharm-87.6%;
10  Trelles-41.3%; United-90.1%; and
11  Universal-77%.
12      Then they say: These
13  percentages of hydrocodone sales are clearly
14  indicative of a large-scale internet
15  dispensing activity, and are far beyond the
16  hydrocodone sale activities of a true walk-in
17  pharmacy or mail-order pharmacy.
18      Do you see that?
19      A.   Yes, I see that.
20      Q.   Okay. Just looking at, for
21  example, United with 90.1% of their sales
22  from McKesson to them being for hydrocodone,
23  that's a very high percentage being
24  hydrocodone of the overall sales to that
25  pharmacy, right? We can agree on that.

Page 127

1      MR. EPPICH: Object to the
2      form; foundation.
3      A.   I don't know what the
4  percentage accuracy should be for a
5  particular pharmacy.
6  QUESTIONS BY MR. BOGLE:
7      Q.   Okay. So during your time in
8  20 years as director of regulatory affairs,
9  you can't tell us whether 90.1% of a
10  pharmacy's purchases being hydrocodone are --
11  is a red flag, for example?
12      MR. EPPICH: Object to the
13      form; foundation.
14      A.   It could be a red flag for
15  something to -- for investigation for that
16  pharmacy.
17  QUESTIONS BY MR. BOGLE:
18      Q.   Okay. And the same would be
19  true, for example, for all these other
20  numbers as well, right? 41.3% is even a red
21  flag as far as hydrocodone sales for overall
22  sales, right?
23      MR. EPPICH: Object to the
24      form. Foundation.
25      A.   It could be one of many

Page 128

1  different red flags that would be reviewed.
2  QUESTIONS BY MR. BOGLE:
3      Q.   Okay. And you've seen this
4  Order to Show Cause petition before, right?
5      A.   I have seen it.
6      Q.   Yeah. So when you saw these
7  numbers, you personally, did you -- did that
8  cause you to be concerned that you guys
9  missed something here?
10      MR. EPPICH: Object to the
11      form.
12      A.   I don't recall what I thought
13  when I first saw this.
14  QUESTIONS BY MR. BOGLE:
15      Q.   What about when you see it now?
16      MR. EPPICH: Object to the
17      form.
18      A.   I think it's a red flag that
19  should have had investigation.
20  QUESTIONS BY MR. BOGLE:
21      Q.   And one wasn't done, was it --
22      MR. EPPICH: Object to the
23      form.
24  QUESTIONS BY MR. BOGLE:
25      Q.   -- prior to these sales being

Page 129

1  made?
2      MR. EPPICH: Object to the form
3      to the extent it calls for
4      speculation.
5      A.   I'm not sure what was done.
6  QUESTIONS BY MR. BOGLE:
7      Q.   Okay. Well, you do know that
8  you personally were listed as a potential
9  witness in this proceeding, right?
10      A.   Yes, I was listed.
11      Q.   Okay. And that proposed
12  testimony was provided by McKesson that they
13  anticipated you would provide, right?
14      A.   I didn't play any part in the
15  preparation of that document, but I later
16  became aware that I was listed there.
17      Q.   Okay. And so if you look, for
18  example -- let's go to that proposed
19  testimony section. Let me find it for you.
20      If you'd go to page ending 6347
21  in this document. You see here this page is
22  the pre-hearing statement of McKesson
23  Corporation.
24      Do you see that?
25      A.   I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 Q. And the drafter is indicated to
2 be the same Mr. John Gilbert that we talked
3 about as being your outside counsel, right?
4 A. That's correct.
5 Q. Okay. And then if you go to
6 the next page, 6348, there starts a witness
7 list.
8 Do you see that?
9 A. Yes, I see that.
10 Q. And that's proposed testimony
11 and then there's a witness list.
12 Do you see that?
13 A. I do.
14 Q. Okay. And if you go to the
15 next page on that witness list, you're listed
16 as the number 6 witness there.
17 A. Yes, I am.
18 Q. Okay. And then what follows
19 is, as McKesson's counsel filed it, the
20 proposed testimony for each of these
21 witnesses. So I want to look at the proposed
22 testimony for you, which starts on page 6364.
23 You see there three-quarters of
24 the way down the page, it says "Proposed
25 Testimony of Gary Hilliard."

Page 131

1 You see that?
2 A. I see that.
3 Q. Okay. So you're saying when
4 this was drafted, your outside counsel didn't
5 consult you at all as to whether these things
6 are actually things you would say. Is that
7 what you're saying?
8 A. That's correct.
9 MR. EPPICH: Object to the
10 form. Misstates prior testimony.
11 QUESTIONS BY MR. BOGLE:
12 Q. Okay. Looking in the first
13 paragraph, middle of the way through, it
14 says, "For the last nine years."
15 Do you see that that sentence?
16 A. I see that.
17 Q. For the last nine years
18 Mr. Hilliard has been the Director of
19 Regulatory Affairs for McKesson Corporation.
20 He is responsible for regulatory compliance
21 for 35 DEA registered DCs.
22 Do you see that?
23 A. Yes, I see that.
24 Q. Is that an accurate statement
25 at that point in time, that you would have

Page 132

1 been responsible for regulatory compliance
2 for 35 DEA registered DCs?
3 MR. EPPICH: Objection,
4 foundation. Form.
5 A. I had DEA oversight for our
6 operations in pharma.
7 QUESTIONS BY MR. BOGLE:
8 Q. Okay. Do you have any reason
9 to think that that's not an accurate
10 statement at that point in time?
11 MR. EPPICH: Object to the
12 form; foundation.
13 A. Again, I had DEA
14 responsibilities for our pharma distribution
15 centers.
16 QUESTIONS BY MR. BOGLE:
17 Q. Okay. And it continues, the
18 next sentence: He provides support to the
19 DCs -- which is distribution centers, right?
20 A. That's correct.
21 Q. Okay. -- on all federal
22 regulatory requirements and state
23 requirements including boards of pharmacy and
24 departments of health.
25 Right?

Page 133

1 MR. EPPICH: Objection to the
2 form; foundation.
3 QUESTIONS BY MR. BOGLE:
4 Q. That's what it says.
5 MR. EPPICH: Foundation.
6 A. That's what it states.
7 QUESTIONS BY MR. BOGLE:
8 Q. All right. So now let's go to
9 page 6370 in this document. It's still part
10 of your testimony, proposed testimony.
11 The last paragraph reads:
12 Mr. Hilliard will testify that McKesson did
13 not immediately focus on Florida pharmacies
14 after the September 1, 2005 meeting because
15 it appeared from the data provided to
16 McKesson that Colorado was the immediate
17 problem.
18 Do you see that statement?
19 A. Yes, I see that.
20 Q. Okay. Is that accurate?
21 MR. EPPICH: Objection to the
22 form; foundation.
23 A. I don't recall. They provided
24 us the names of the pharmacies and we went
25 and acted on those.

Page 134

1 QUESTIONS BY MR. BOGLE:
2 Q. Okay. Well, one pharmacy name
3 that was provided was a Florida pharmacy,
4 United Prescription Services, right?
5 A. Correct.
6 Q. Okay. So I'm asking, this
7 statement here that proposed testimony for
8 you at this hearing, is that accurate? Would
9 you have said that on the stand?
10 MR. EPPICH: Objection to the
11 form; foundation.
12 A. I didn't prepare this or
13 have -- I don't recall having any
14 conversations with Mr. Gilbert or my superior
15 on this, so I don't recall having any
16 agreement that this is what I would have
17 stated on the stand.
18 QUESTIONS BY MR. BOGLE:
19 Q. Right. So that's why I'm
20 asking you. You've seen it now. Would you
21 have said that?
22 MR. EPPICH: Object to the
23 form; foundation.
24 A. I don't know without
25 conversation -- prior conversations.

Page 135

1 QUESTIONS BY MR. BOGLE:
2 Q. Is that true? Is it true that
3 McKesson did not immediately focus on Florida
4 pharmacies after the September 1, 2005
5 meeting because it appeared from the data
6 provided to McKesson that Colorado was the
7 immediate problem? Is that a true statement
8 in your mind?
9 MR. EPPICH: Object to the
10 form.
11 A. I don't recall.
12 QUESTIONS BY MR. BOGLE:
13 Q. Okay. Do you specifically
14 recall anything that would indicate that
15 statement is untrue by your counsel?
16 MR. EPPICH: Object to the
17 form.
18 A. I recall that we looked at the
19 pharmacies' nature --
20 MR. EPPICH: Hold on. Hold on.
21 Let me pause here. I just caution
22 the witness that if this question is
23 seeking anything that's any
24 discussions or conferences with
25 counsel, that those would be

Page 136

1 privileged discussions and I'd
2 instruct the witness not to answer.
3 MR. BOGLE: I think it's waived
4 to the extent that you're providing
5 his proposed testimony. I'm just
6 asking if he would have said that and
7 if that was an incorrect statement.
8 MR. EPPICH: No, you actually
9 delved a little bit further than that,
10 Brandon. I'm happy to have you ask
11 questions about what's stated in the
12 document, but when you ask him about
13 what was discussed with counsel in
14 relation to these statements, that's
15 where we have to draw the line.
16 MR. BOGLE: Okay. Well,
17 I'll reask it. I don't think that's
18 what I was getting at. The question
19 is already gone now, so I don't know
20 if that's what I said or not, but
21 let's reask it.
22 QUESTIONS BY MR. BOGLE:
23 Q. Let me ask you this: You can
24 read the statement now, right?
25 A. Correct.

Page 137

1 Q. And you have read the statement
2 now, right?
3 A. Correct.
4 Q. Do you need more time to read
5 it now?
6 A. No.
7 Q. Okay. Is there anything about
8 this sentence that I read to you, which
9 states: Mr. Hilliard will testify that
10 McKesson did not immediately focus on Florida
11 pharmacies after the September 1, 2005
12 meeting because it appeared from the data
13 provided to McKesson that Colorado was the
14 immediate problem, that statement, anything
15 about that statement as you sit here today
16 that you're willing to stand up and say
17 that's not true?
18 MR. EPPICH: Object to the
19 form.
20 A. I don't recall enough about the
21 minute details of which steps we took at that
22 time to comment in depth on this.
23 QUESTIONS BY MR. BOGLE:
24 Q. Sir, you say "minute details."
25 I mean, this is more than 2 million doses of

Page 138

1  hydrocodone in 11 days. Is that a minute
2  detail to you, whether you'd investigate that
3  promptly?
4       MR. EPPICH: Object to the
5       form. Argumentative.
6  QUESTIONS BY MR. BOGLE:
7       Q.   I'm a little confused by that
8  statement, sir. Is that a minute detail to
9  you?
10      MR. EPPICH: Object to the
11      form. Argumentative.
12      A.   So which -- the exact which
13 step was taken before the second step, I
14 don't have that recollection of what pharmacy
15 was looked at prior to another pharmacy.
16 QUESTIONS BY MR. BOGLE:
17      Q.   Okay. When the DEA listed for
18 you what appears to be two pharmacies on
19 September 1, 2005, was there a lack of
20 resources at McKesson to start investigating
21 both of those immediately --
22      MR. EPPICH: Object to the
23      form.
24 QUESTIONS BY MR. BOGLE:
25      Q.   -- at that point in time? Did

Page 139

1  you guys not have the resources to look at
2  two pharmacies immediately?
3       MR. EPPICH: Object to the
4       form. Argumentative.
5       A.   My recollection is that those
6  pharmacies were acted on after that meeting.
7  QUESTIONS BY MR. BOGLE:
8       Q.   Okay. But you don't know
9  exactly when, right?
10      A.   I don't recall.
11      Q.   Okay. Let's go back to
12 page 6325. You see here this is part of
13 DEA's proposed testimony, and the top here is
14 from Diversion Investigator Shirley Scott.
15      Do you see that name?
16      A.   I see the name.
17      Q.   Okay. Three-quarters of the
18 way down this page, it says: She will
19 testify that Accumed dispensed more than 50
20 times as much hydrocodone as the average
21 Florida retail pharmacy.
22      Do you see that?
23      A.   No, I do not.
24      Q.   You don't see that statement?
25      A.   Where are you at, please?

Page 140

1       Q.   Yeah. If you want to look at
2  my finger here, I'm on 6325.
3       A.   I'm sorry, at the bottom.
4       Q.   Yeah.
5       A.   Okay.
6       Q.   I'll read it again just so
7  we're clear.
8       A.   Thank you.
9       Q.   It says -- and this is related
10 to investigator Shirley Scott -- she will
11 testify that Accumed dispensed more than 50
12 times as much hydrocodone as the average
13 Florida retail pharmacy.
14      Do you see that?
15      A.   I see that.
16      Q.   A pharmacy dispensing 50 times
17 the average for the state they're in, you
18 would agree with me that's a red flag, right,
19 for potential diversion?
20      MR. EPPICH: Objection,
21      foundation, form; calls for a legal
22      conclusion.
23      A.   I don't know.
24 QUESTIONS BY MR. BOGLE:
25      Q.   You don't know? So if somebody

Page 141

1  in 2005 that worked for McKesson came to you
2  and said, "Listen, I've got information that
3  a pharmacy that we're providing hydrocodone
4  to is dispensing 50 times more than the
5  average for their state," what would you have
6  done --
7       MR. EPPICH: Objection.
8  QUESTIONS BY MR. BOGLE:
9       Q.   -- from a due diligence
10 perspective?
11      MR. EPPICH: Objection, form.
12      Incomplete hypothetical.
13      A.   I don't recall specifics. The
14 due diligence would have reviewed the
15 registration and the business activities.
16 QUESTIONS BY MR. BOGLE:
17      Q.   Okay. But certainly if
18 somebody came to you internally at McKesson
19 and said, "Listen, I've got information that
20 says Accumed Pharmacy is dispensing 50 times
21 more hydrocodone than the average Florida
22 pharmacy," that's something that would have
23 been of interest to you from a due diligence
24 perspective, right?
25      MR. EPPICH: Objection to the

Page 142

1  form.  Foundation.
2      A.    It could have been of interest
3  to me.
4  QUESTIONS BY MR. BOGLE:
5      Q.    Okay.  Can you give me any
6  reason why that wouldn't have mattered to
7  you?
8          MR. EPPICH:  Objection to the
9      form.
10      A.    I don't have knowledge of it
11  right now.
12  QUESTIONS BY MR. BOGLE:
13      Q.    Okay.  Let's go to page 6328.
14  And the third paragraph here -- actually,
15  it's the second full paragraph where it says
16  "Mr. Mapes will testify."
17          Do you see that?
18      A.    I see that.
19      Q.    And I'll tell you this relates
20  to Mr. Mapes' proposed testimony at DEA,
21  where it says:  Mr. Mapes will testify that
22  he concludes that seven Tampa, Florida area
23  internet pharmacy operations have been
24  distributing controlled substances in
25  violation of Title 21 United States Code,

Page 143

1  Sections 829 and 841(a)(1) in that the
2  owners, pharmacists and employees all have
3  direct knowledge that there is no legitimate
4  physician/patient relationship established
5  between the purported prescribing physician
6  and the customers who order controlled
7  substances directly through their websites.
8  Each of these pharmacies received hydrocodone
9  distributions from McKesson Lakeland.
10          Do you see that?
11      A.    I see that.
12      Q.    And you've seen that conclusion
13  before today, right?
14          MR. EPPICH:  Objection,
15      foundation.  Form.
16      A.    I don't recall seeing this
17  exact paragraph.
18  QUESTIONS BY MR. BOGLE:
19      Q.    All right.  You know that was
20  the DEA's opinion, though, right?  Mr. Mapes'
21  opinion specifically, right?
22          MR. EPPICH:  Objection,
23      foundation.  Calls for speculation.
24      A.    I'm not sure what Mr. Mapes'
25  opinion is.

Page 144

1      Q.    Okay.  Now, these seven
2      Q.    Okay.  Now, these seven
3  pharmacies that McKesson was distributing to
4  in Florida that were the subject of this
5  Order to Show Cause proceeding, McKesson did
6  not shut off sales to these seven pharmacies
7  in 2006, did it?
8          MR. EPPICH:  Objection to form.
9      Calls for speculation.
10      A.    I don't know when the sales of
11  pharmaceuticals was stopped to these
12  pharmacies.
13  QUESTIONS BY MR. BOGLE:
14      Q.    You do have an understanding in
15  your involvement in this proceeding that
16  these seven pharmacies were purchasing very
17  large amounts of hydrocodone from McKesson
18  from October 2005 to January 2006, for
19  example, right?
20          MR. EPPICH:  Objection to form.
21  QUESTIONS BY MR. BOGLE:
22      Q.    You've seen that data, haven't
23  you?
24          MR. EPPICH:  Objection to form.
25      Calls for speculation.

Page 145

1      A.    I've seen what's stated on the
2  documents.
3  QUESTIONS BY MR. BOGLE:
4      Q.    Okay.  And what you've seen on
5  those documents are very large distributions
6  of hydrocodone from McKesson in that
7  three-month window of time, right?
8          MR. EPPICH:  Objection to form
9      and characterization.
10      A.    I'm not sure what their
11  appropriate levels should have been.
12  QUESTIONS BY MR. BOGLE:
13      Q.    Even today you don't know what
14  they should have actually gotten from you
15  guys?
16          MR. EPPICH:  Object to the
17      form.
18      A.    I don't know.
19  QUESTIONS BY MR. BOGLE:
20      Q.    Okay.  Let's look at
21  Exhibit 1.1947, which is Exhibit 7 to your
22  deposition, and that's MCKMDL00497154.
23          (McKesson-Hilliard Exhibit 7
24      was marked for identification.)
25          --oOo--

Page 146

QUESTIONS BY MR. BOGLE:
Q.    Okay.  And what I've handed you, sir, is another document produced to us by McKesson related to this Order to Show Cause proceeding.  And you see there's a government exhibit sticker number 38 for this one.
Do you see that at the bottom?
A.    Yes, I see that.
Q.    Okay.  And so this data, I'll represent to you, matches up with their exhibit numbers they list in the Order to Show Cause pleadings we just looked at, okay?
A.    Okay.
Q.    If you have any reason to disagree with me, let me know.  But I looked at it.
And so if you look here, this actually has McKesson hydrocodone sales for October 1, 2005 through January 31, 2006.
Do you see that?
A.    Yes, I see that.
Q.    And there's a pie chart there, right?
A.    Yes, I see that.

Page 147

Q.    And so, for example, for Avee Pharmacy, it notes 1,754,800 doses during this October 1, 2005 to January 31, 2006 period of time for McKesson hydrocodone sales.
Do you see that?
MR. EPPICH:  Object to the form.  Misstates the document.
A.    I see what's stated on the document.
QUESTIONS BY MR. BOGLE:
Q.    Okay.  Do you have any reason to think that's not what that's referring to?
A.    I don't know enough about this document to know otherwise.
Q.    Okay.  And it lists there for example, as well, Medipharm, 1,252,000 doses of hydrocodone from October 1, 2005 to January 31, 2006.
Do you see that in the chart?
A.    Yes, I see it on the chart.
Q.    And, for example, if you go to the second page here, so further discussion on this, and they actually compared these seven pharmacies to 299 other pharmacies.

Page 148

Do you see the data there?
MR. EPPICH:  Objection to form. Foundation.
A.    I see what's stated.
QUESTIONS BY MR. BOGLE:
Q.    Okay.  And that chart is titled McKesson Hydrocodone distributions October 1, 2005 through January 31, 2006.
Do you see that title?
MR. EPPICH:  Objection to form; foundation.
A.    I see what's stated on the document.
QUESTIONS BY MR. BOGLE:
Q.    Okay.  And there's a sum of dosage units, and for 299 other pharmacies the DEA lists 10,767,050 doses of hydrocodone for 299 pharmacies, right?
MR. EPPICH:  Objection to the form.
QUESTIONS BY MR. BOGLE:
Q.    That's the data provided here.
MR. EPPICH:  Objection, foundation.
A.    That's what's stated on the

Page 149

document.
QUESTIONS BY MR. BOGLE:
Q.    Okay.  And they compare that to these other seven pharmacies, and just doing the rough math for these other seven pharmacies during this three-month period in time, four-month period in time, there's almost 7 million doses of hydrocodone to these seven pharmacies, right?  As compared to these 299 other pharmacies.
MR. EPPICH:  Object to form; foundation.
QUESTIONS BY MR. BOGLE:
Q.    You see that math, right?
MR. EPPICH:  Object to form; foundation.
A.    I see what's listed on the document.
QUESTIONS BY MR. BOGLE:
Q.    Okay.  And that's the math, right?
MR. EPPICH:  Object to the form and foundation.
A.    I see what's written on the document for the total.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

QUESTIONS BY MR. BOGLE:

Q. Okay. And the grand total is 17,136,250, which counts the 299 pharmacies plus the other seven pharmacies subject to the Order to Show Cause, right?

MR. EPPICH: Objection, foundation.

A. I see what's stated on the form.

QUESTIONS BY MR. BOGLE:

Q. And that's what's stated, right?

A. That's what's listed on the form.

Q. Okay. Have you ever reviewed this exhibit before?

A. In the preparing, pre-deposition.

Q. Okay. And while you guys were getting ready for the Order to Show Cause hearing, I didn't see it in the pleadings -- let me know if you see it anywhere -- was there any submission by McKesson saying this data is wrong that the DEA is submitting here that I just reviewed with you?

Page 151

MR. EPPICH: Object to form; foundation. Calls for speculation.

A. I don't know anything about it.

QUESTIONS BY MR. BOGLE:

Q. Okay. Well, again, you've got the pleadings in front of you. If you happen to see anything that shows that you guys contested that -- I didn't find anything. If you find anything that shows that you guys contested that, let me know during the deposition, okay?

MR. EPPICH: Object to the form; calls for speculation.

QUESTIONS BY MR. BOGLE:

Q. And these seven pharmacies during this period of time, late October to -- '05 -- strike that.

These pharmacies from October '05 to January '06 were also some of the biggest purchasing pharmacies for hydrocodone in the country, right?

MR. EPPICH: Objection, foundation.

QUESTIONS BY MR. BOGLE:

Q. You know that, don't you?

Page 152

MR. EPPICH: Foundation, calls for speculation. Form.

A. I don't know.

QUESTIONS BY MR. BOGLE:

Q. Never heard that before?

MR. EPPICH: Objection, form. Calls for speculation.

A. I don't recall.

QUESTIONS BY MR. BOGLE:

Q. Okay. Let me hand you another DEA exhibit for the Order to Show Cause hearing marked as Exhibit 10, which is 1.1951, Bates number is MCKMDL00496536.

THE REPORTER: 10?

MR. BOGLE: Did I skip one? I'm sorry, let me get that number back. I may have skipped -- missing some stickers here. Oh, I buried it. Okay. Sorry.

(McKesson-Hilliard Exhibit 8 was marked for identification.)

QUESTIONS BY MR. BOGLE:

Q. So it's actually Exhibit 8 is Exhibit 1.1951, so correcting the number. Same document, just correcting the exhibit

Page 153

number.

Okay. And this again has a government exhibit number, number 3. You see that stamp on there?

A. Yes, I see that.

Q. Okay. And this document is titled Pharmacy Rankings for Hydrocodone, October 1, 2005 to January 31, 2006.

Do you see that?

A. Yes, I see that.

Q. Okay. And again, it lists these same seven pharmacies that we've been talking about, right?

MR. EPPICH: Object to the form; foundation.

A. I see what's listed here.

QUESTIONS BY MR. BOGLE:

Q. Which is the names of the same seven pharmacies, right?

MR. EPPICH: Objection to the form; foundation.

A. They appear to be the same names.

QUESTIONS BY MR. BOGLE:

Q. Okay. And, for example, if we

Page 154

1  look at a couple of these, Medipharm, their
2  U.S. ranking for hydrocodone from this
3  four-month window is number 3 in the United
4  States.
5        Do you see that?
6        MR. EPPICH:  Objection to the
7  form; calls for speculation.
8  QUESTIONS BY MR. BOGLE:
9    Q.    That column?
10   A.    I see what's stated under U.S.
11 ranking in that column.
12   Q.    And what's stated is number 3,
13 right?
14       MR. EPPICH:  Objection to the
15 form; foundation, calls for
16 speculation.
17   A.    3 is noted on that column yes,
18 for Medipharm.
19 QUESTIONS BY MR. BOGLE:
20   Q.    State ranking is number 1,
21 right?
22       MR. EPPICH:  Objection to the
23 form; foundation, calls for
24 speculation.
25   A.    Number 1 is listed for state

Page 155

1  ranking.
2  QUESTIONS BY MR. BOGLE:
3    Q.    Avee Pharmacy, for example,
4  their U.S. ranking is listed as number 6
5  during this time period for hydrocodone,
6  right?
7        MR. EPPICH:  Object to the
8  form; foundation, calls for
9  speculation.
10   A.    That's what's stated here.
11 QUESTIONS BY MR. BOGLE:
12   Q.    State ranking is number 2,
13 right?
14       MR. EPPICH:  Object to the
15 form; foundation, calls for
16 speculation.
17   A.    It's what's stated here.
18 QUESTIONS BY MR. BOGLE:
19   Q.    Have you ever seen this
20 document before?
21   A.    During prep, preparation for
22 the deposition.
23   Q.    Not in preparation for the
24 Order to Show Cause hearing?
25   A.    Correct.

Page 156

1    Q.    Any reason why you wouldn't
2  have looked at the actual exhibits the DEA
3  was going to use to try to revoke a
4  registration or suspend a registration of one
5  of your distribution centers in preparation
6  for that hearing?
7        MR. EPPICH:  Object to form,
8  calls for speculation, and to the
9  extent it calls for any privileged
10 communications.
11   A.    I wasn't part of the settlement
12 agreement.  It was handled by corporate.
13 QUESTIONS BY MR. BOGLE:
14   Q.    But you were listed as a
15 witness that was going to defend the company,
16 right?
17       MR. EPPICH:  Objection to the
18 form; asked and answered.
19   A.    I was listed but I was never
20 brought in to be prepared or have discussions
21 on it.
22 QUESTIONS BY MR. BOGLE:
23   Q.    Okay.  So again, I think you
24 said when they put down this proposed
25 testimony for you, they didn't ask you if you

Page 157

1  agreed with any of it, right?
2        MR. EPPICH:  Objection.  I
3  think that we are now on the edge of
4  seeking attorney-client
5  communications.
6        MR. BOGLE:  I'm just asking him
7  whether the communication occurred,
8  not the substance of it.
9  QUESTIONS BY MR. BOGLE:
10   Q.    I'm asking whether or not --
11       MR. EPPICH:  And I think --
12 QUESTIONS BY MR. BOGLE:
13   Q.    -- the testimony was shown to
14 you and were asked whether you agreed with
15 it.
16       MR. EPPICH:  And I think asking
17 for that communication you're dealing
18 with communications with counsel.
19       MR. BOGLE:  I don't agree.
20 This was filed as a public document,
21 as a pleading.  I'm just asking him
22 whether he was asked whether it was
23 true.
24       MR. EPPICH:  You're asking him
25 for the substance of an

Page 158

1 attorney-client communication,
2 Brandon.
3 QUESTIONS BY MR. BOGLE:
4    Q.    Was there a communication, not
5 the substance of it, was a communication had
6 between you and McKesson's counsel as to
7 whether you agreed with the substance of what
8 they put down as your proposed testimony?
9         MR. EPPICH: I'm going to
10 instruct the witness not to answer
11 that question. You're treading on
12 that line again. You may ask him if
13 he had a communication with his
14 counsel about the document.
15        MR. BOGLE: I think that's what
16 I just asked.
17        MR. EPPICH: No, you stepped
18 over the line.
19 QUESTIONS BY MR. BOGLE:
20    Q.    All right. We can agree that
21 the testimony wasn't run by you, was it?
22        MR. EPPICH: Objection to the
23 form.
24    A.    I do not recall having
25 conversations.

Page 159

1 QUESTIONS BY MR. BOGLE:
2    Q.    Okay. And in these DEA
3 exhibits that we've just gone through, these
4 two, for example, were not shown to you
5 related to the Order to Show Cause hearing,
6 right?
7    A.    That's not my recollection of
8 seeing them.
9    Q.    Your recollection is not having
10 seen them, right?
11    A.    I don't recall seeing them.
12    Q.    Okay. Would you have testified
13 in favor of the company had you seen the two
14 we just looked at?
15        MR. EPPICH: Objection to the
16 form; calls for speculation.
17    A.    I would have testified to the
18 best of my knowledge.
19 QUESTIONS BY MR. BOGLE:
20    Q.    Okay. And would that have
21 included defending these hydrocodone sales
22 that were made to these seven pharmacies by
23 McKesson in that four-month period of time?
24        MR. EPPICH: Objection to the
25 form; calls for speculation.

Page 160

1    A.    I don't have -- I don't recall
2 the details of the scenarios in order to
3 comment on that today.
4 QUESTIONS BY MR. BOGLE:
5    Q.    Okay. Well, we just reviewed
6 the discussion of what was dispensed at the
7 January 2006 meeting. I've shown you some
8 data that the DEA was planning to use against
9 you guys at the Order to Show Cause hearing.
10        What else would you need to see
11 to say whether you would or would not have
12 defended these sales as being the right thing
13 to do?
14        MR. EPPICH: Objection to the
15 form; calls for speculation.
16 QUESTIONS BY MR. BOGLE:
17    Q.    Because I may have it. Let me
18 know. I'll try to find it. Tell me what you
19 would like to see to tell us one way or the
20 other whether you would have defended the
21 company as to these sales for these four
22 months for hydrocodone?
23        MR. EPPICH: Objection to the
24 form. Argumentative.
25    A.    I would have responded in

Page 161

1 accordance with what we did truthfully and
2 honestly.
3 QUESTIONS BY MR. BOGLE:
4    Q.    Did you guys do the right
5 thing --
6        MR. EPPICH: Object to the
7 form. Argumentative.
8 QUESTIONS BY MR. BOGLE:
9    Q.    -- for these sales?
10        MR. EPPICH: Object to the
11 form. Argumentative.
12    A.    I have no comment on that.
13 QUESTIONS BY MR. BOGLE:
14    Q.    You don't have an opinion one
15 way or the other as to whether you guys
16 should or should not have dispersed that much
17 hydrocodone in a four-month period to these
18 seven pharmacies? Is that your testimony,
19 you don't have an opinion one way or the
20 other --
21        MR. EPPICH: Object to the
22 form.
23 QUESTIONS BY MR. BOGLE:
24    Q.    -- as you sit here today?
25        MR. EPPICH: Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  form.  Argumentative.
2      A.   I don't have a comment.
3  QUESTIONS BY MR. BOGLE:
4      Q.   Okay.  Do you have an opinion?
5      MR. EPPICH:  Object to the
6  form; argumentative; asked and
7  answered.
8      A.   No.
9      MR. EPPICH:  Brandon, let's go
10 ahead and take a break.
11     MR. BOGLE:  Okay.
12     THE VIDEOGRAPHER:  Off the
13 record at 11:34.
14     (Recess taken, 11:34 a.m. to
15 11:45 a.m.)
16     THE VIDEOGRAPHER:  All right,
17 stand by.  The time is 11:45, back on
18 the record.  Beginning of File 3.
19 QUESTIONS BY MR. BOGLE:
20     Q.   All right, Mr. Hilliard, I want
21 to shift gears to a different topic here with
22 you.  We talked a little bit earlier just
23 briefly about the DU45 report.
24     Do you recall that discussion
25 generally?

Page 163

1      A.   Yes.
2      Q.   Okay.  And also talked a little
3  bit about Section 55 generally.
4      Do you recall that discussion?
5      A.   Yes.
6      Q.   Okay.  So Section 55 was the
7  standard operating procedure that was in
8  place when you joined McKesson that was meant
9  to be the Suspicious Order Monitoring Program
10 for the company.  True?
11     MR. EPPICH:  Object to the
12 form.
13     A.   There was a section within
14 Section 55 that contained that type of
15 information.
16 QUESTIONS BY MR. BOGLE:
17     Q.   Okay.  So it was included
18 within Section 55.  True?
19     A.   Correct.
20     Q.   Okay.  I think you told me, I
21 just want to make sure I understand.  When
22 you joined the company in 1997, Section 55,
23 and specifically the components with the
24 suspicious order monitoring provisions, were
25 already in place.  True?

Page 164

1      A.   Correct.
2      Q.   Okay.  And the DU45 was one of
3  the reports listed in Section 55 that would
4  be produced and submitted to the DEA,
5  correct?
6      A.   That's correct.
7      Q.   Okay.  I'll take a look at a
8  few components of Section 55 here.  So I'm
9  going to hand you what I'm marking as
10 Exhibit 9, which is 1.1555.  The Bates number
11 is MCKMDL00346554.
12     (McKesson-Hilliard Exhibit 9
13 was marked for identification.)
14 QUESTIONS BY MR. BOGLE:
15     Q.   When I read all those Bates
16 numbers, you can ignore me.  I'm supposed to
17 do that, unfortunately.  I won't be asking
18 you Bates number quizzes, I can promise you
19 that.
20     A.   Thank you.
21     Q.   Okay.  What I've handed you
22 here is the Drug Operations Manual,
23 Section 55, dated July 2000, correct?
24     A.   That is correct.
25     Q.   Okay.  And again, I think you

Page 165

1  said this, but you're familiar with this
2  manual, correct?
3      A.   Yes, I am.
4      Q.   All right.  Let's go to -- ah
5  jeez, wrong page number.  Page .29.  Sorry.
6      A.   I'm sorry, repeat that?
7      Q.   .29?
8      A.   .29.
9      Q.   Yes, sir.
10     Okay.  On this page, you see
11 there's a section (c) titled Daily Controlled
12 Substance Suspicious Order Warning Report,
13 and then it's listed a bunch of other stuff,
14 but including DU45L500.
15     Do you see that?
16     A.   Yes, I see that.
17     Q.   Okay.  So this section here
18 talks about the daily version of the DU45
19 report.  True?
20     A.   Yes.
21     Q.   Okay.  And if you go down to
22 the next paragraph, it says:  The same
23 factors that are used for the Customer Recap
24 Variance -- and then it gives a description
25 of the report -- are also used for the Daily

Page 166

1  Controlled Substance Suspicious Order Warning
2  Report.
3      Then it says: 3X monthly
4  average for Schedule II and Schedule III
5  reportables and 8X/monthly averages for
6  IIIN-V.
7      Do you see that?
8      A.    Yes, I see that.
9      Q.    Okay.  So I want to break that
10  down and make sure it's clear on what that
11  means.  So both for the DU45 reports run
12  daily and monthly, an order would appear on
13  the report for any controlled substance
14  that's in Schedule II or Schedule III if the
15  order was three times the average for
16  customers of McKesson for that product.
17  True?
18      MR. EPPICH:  Object to the
19  form.
20      A.    It was three times the monthly
21  average for 12-month sales and it was for
22  Schedule II and III narcotics.
23  QUESTIONS BY MR. BOGLE:
24      Q.    Okay.  So included within that
25  would be opioids, right?

Page 167

1      A.    Correct.
2      Q.    Okay.  So you said a 12-month
3  history, so let's talk about how that worked.
4  Was it a 12-month same customer history that
5  this number would be derived from?
6      A.    Yes, that's correct.
7      Q.    Okay.  So, for example, you
8  would look at the 12 months for X pharmacy,
9  the prior 12 months, and you would do what
10  with that data to determine how the three
11  times average would be generated?
12      MR. EPPICH:  Object to the
13  form; foundation.
14  QUESTIONS BY MR. BOGLE:
15      Q.    Walk me through that process.
16      A.    The system is taking 12 months'
17  worth of sales history based on that item and
18  then adds a factor of three times, I'm sorry,
19  three times the average, and if the orders
20  exceed that threshold then it shows up on the
21  report.
22      Q.    Okay.  And so an average is
23  generated from the prior 12 months.  Does
24  that roll over every month so it's looking at
25  a new 12-month period?

Page 168

1      MR. EPPICH:  Object to the
2  form.
3      A.    As I recall, it's a rolling
4  12-month period.
5  QUESTIONS BY MR. BOGLE:
6      Q.    Right.  So we'll walk through
7  this just to make sure it's clear.  So let's
8  say, for example, we're in February 2007.
9  The prior 12 months' data that would be
10  looked at for February 2007 would be the 12
11  months prior to that month.  True?
12      A.    Correct.
13      Q.    Okay.  So, for example, when
14  you go to March 2007, that would then include
15  the February 2007 data and the first month
16  from the prior 12 months would drop off the
17  analysis.  True?
18      A.    I believe that to be correct.
19      Q.    Okay.  So if a customer's
20  orders for a given month did not exceed three
21  times their prior 12-month average, they
22  would not appear on the DU45 report.  True?
23      A.    That's correct.
24      Q.    Okay.  Were there any other
25  calculations that went into the DU45 report

Page 169

1  other than the prior 12 months' average and
2  looking at three times that average, if it
3  hits that, it gets kicked to the report?  Any
4  other variables?
5      MR. EPPICH:  Object to the
6  form.
7      A.    Not to my knowledge.
8  QUESTIONS BY MR. BOGLE:
9      Q.    Okay.  All right.  I want to
10  look at a DU45 report that was produced to
11  us.  You may want to keep this exhibit kind
12  of just near you, but I want to look at a
13  sample DU45 with you.
14      All right.  I'm going to hand
15  you what I'm marking as Exhibit 10, which is
16  1.2100.  Bates number is MCKMDL00660789.
17      (McKesson-Hilliard Exhibit 10
18  was marked for identification.)
19  QUESTIONS BY MR. BOGLE:
20      Q.    Here's your version.  I
21  shouldn't say "version," they're all the
22  same, but your copy.  It's beefy.
23      Okay.  And what I've handed
24  you, Mr. Hilliard, I'll represent to you was
25  produced to us as part of this litigation as

Page 170

1  being a DU45 report from -- I believe it's
2  the Oklahoma City distribution center.  I
3  think you can determine that on the second
4  page of the document, that that's the
5  distribution center this pertains to.  Let me
6  know if you disagree with that.
7      A.    Yes.  This does appear to come
8  from the Oklahoma City distribution center.
9      Q.    Okay.  And going back to the
10  first page, this is noted to be a monthly
11  report that I'm showing you here, right?
12      A.    That is correct.
13      Q.    Okay.  And it's dated
14  April 3rd, 2007.  That's the date on the
15  first page, right?
16      A.    That's what's stated on the
17  first page.
18      Q.    Okay.  So you obviously have an
19  understanding and knowledge of DU45 reports.
20  Is what I'm showing you here consistent with
21  what a DU45 report would look like, a monthly
22  report?
23      A.    Yes.
24      Q.    Okay.  Now, these would -- so
25  this would be submitted to the DEA on a

Page 171

1  monthly basis, correct?  This version.
2      A.    That's correct.
3          MR. EPPICH:  Object to the
4      form.
5  QUESTIONS BY MR. BOGLE:
6      Q.    And just looking, for example,
7  at a few of these pages, I'm looking at the
8  second page, which is Bates ending 0790,
9  there's three fentanyl orders listed here for
10  this customer, right?
11          MR. EPPICH:  Objection,
12      foundation.
13      A.    Fentanyl is listed here, yes.
14  QUESTIONS BY MR. BOGLE:
15      Q.    Okay.  Fentanyl being an opioid
16  product, right?
17          MR. EPPICH:  Objection,
18      foundation.
19      A.    Yes, it is.
20  QUESTIONS BY MR. BOGLE:
21      Q.    Okay.  And go to the next page,
22  for example, there's an order listed for this
23  customer for oxycodone, an oxycodone
24  combination product, right?
25      A.    That's what's stated, yes.

Page 172

1      Q.    Okay.  Again, another opioid,
2  right?
3      A.    Yes, that's correct.
4      Q.    Okay.  If you flip over to the
5  next page, Bates page ending 0792, there are
6  what I count to be 11 separate orders here
7  for this customer, again, all for various
8  opioid products, right?
9          MR. EPPICH:  Objection,
10      foundation.
11      A.    That is what's listed here.
12  QUESTIONS BY MR. BOGLE:
13      Q.    Okay.  And I'm not going
14  through every page here, but just one more
15  just to show you.
16          Page 0793, for this customer,
17  there are -- looks like nine different orders
18  for either hydrocodone or oxycodone listed
19  here, right?
20      A.    That is what's listed.
21      Q.    Okay.  And so what's listed in
22  this report, for example, at this time
23  period, April 2007, would have been orders
24  that were placed by a customer, filled by
25  McKesson, and then appeared on this report

Page 173

1  thereafter and sent to the DEA, right?
2          MR. EPPICH:  Object to the
3      form.  Calls for speculation.
4      A.    That would have been the
5  process.
6  QUESTIONS BY MR. BOGLE:
7      Q.    Right.  Because these are all
8  sales.  This product was provided to the
9  customers, right?  Everything listed in this
10  report.
11          MR. EPPICH:  Object to the
12      form, the characterization.
13      A.    That is my recollection.
14  QUESTIONS BY MR. BOGLE:
15      Q.    Right.  So the DU45 report is
16  listing sales, not just the order prior to
17  the sale, right?
18          MR. EPPICH:  Object to the
19      form, characterization.
20      A.    My recollection is it contains
21  the sales.
22  QUESTIONS BY MR. BOGLE:
23      Q.    Right.  And, for example, if
24  you see on 0793 in the left-hand column,
25  there's actually invoice numbers and invoice

Page 174

1  dates for each of these, right?
2      A.    Yes, there is.
3      Q.    And you invoice at the time of
4  sale, right?
5          MR. EPPICH:  Objection;
6      foundation, calls for speculation.
7      A.    I don't recall if it was the
8  time of sale or date of shipment.
9  QUESTIONS BY MR. BOGLE:
10     Q.    Or of shipment, okay.
11     A.    Shipment date.
12     Q.    All right.  So, for example,
13 what we've got here as Exhibit 10 is, I
14 believe, about 600-plus pages of what
15 McKesson deemed for this month to be
16 suspicious Schedule II or Schedule III
17 controlled substance orders, right?
18         MR. EPPICH:  Objection to the
19     form.
20     A.    These are what showed up on our
21 suspicious order report as -- and then
22 reported to the DEA.
23 QUESTIONS BY MR. BOGLE:
24     Q.    Right.  But what the whole
25 purpose of this was, you're providing 600 --

Page 175

1  in this instance, 600-plus pages to the DEA
2  for this month of suspicious controlled
3  substance sales that McKesson had made from
4  the prior month, right?
5          MR. EPPICH:  Objection to the
6      form and the characterization.
7      A.    They were submitted for DEA to
8  review.  The report is titled "suspicious"
9  but it's orders that need to be reviewed and
10 they were supplied to DEA for review.
11 QUESTIONS BY MR. BOGLE:
12     Q.    Okay.  So let me make sure I
13 understand that.  So when these reports would
14 have been submitted to the DEA, it was not
15 the intent of the regulatory department for
16 the conclusion to be drawn that McKesson
17 believed these were suspicious orders.  Is
18 that true?
19         MR. EPPICH:  Object to the
20     form; calls for speculation.
21     A.    This was part of the Suspicious
22 Order Task Force.  This was the format for
23 which industry came to the conclusion to
24 provide this information to the DEA and DEA
25 was good with it.  There was DEA inspections

Page 176

1  that had occurred in our facilities and there
2  was never an issue with that.  So this is the
3  format for which the original documentation
4  was supplied to DEA.
5          MR. BOGLE:  I move to strike as
6      nonresponsive.
7  QUESTIONS BY MR. BOGLE:
8      Q.    My question was simply that
9  during the time that you were with McKesson
10 in the regulatory department, was it your
11 understanding that the intent was when a DU45
12 report like the one we're looking at here was
13 supplied to the DEA, was that -- was that
14 intended to or not intended to be what
15 McKesson deemed to be suspicious orders from
16 the prior month?
17         MR. EPPICH:  Object to the
18     form.  It calls for speculation; asked
19     and answered.
20     A.    Yeah.  Again, it was -- this is
21 what needed to be reviewed.  This was not
22 specifically a suspicious order.
23 QUESTIONS BY MR. BOGLE:
24     Q.    Okay.  So the view during this
25 time period when DU45s were used were that

Page 177

1  this is not specifically a suspicious order
2  report.  Am I understanding you right?
3          MR. EPPICH:  Object to the
4      form.  Misstates prior testimony.
5  QUESTIONS BY MR. BOGLE:
6      Q.    If I'm misstating it, let me
7  know.  I'm trying to understand.
8      A.    The title was Suspicious Order
9  Report or Suspicious Purchase Report, but
10 this -- with the vast quantity of orders that
11 are conducted on a daily and nightly basis,
12 this provides a threshold for which to
13 review.
14         And so reviews would be
15 conducted nightly on the reports and they'd
16 be flagged and then submitted to the DEA, and
17 then the report in its entirety would be
18 provided to the DEA on a monthly basis.  So
19 they would have all this information.
20     Q.    Right.  I'm asking about from
21 McKesson's perspective, though, not DEA's
22 perspective.  So from McKesson's perspective
23 as you understood it in the regulatory
24 department -- strike that, let me make it
25 even easier.

Page 178

1 Your perspective while you were
2 in the regulatory department when the DU45s
3 were used, did you understand these reports
4 to be suspicious order reports from the prior
5 month?
6 MR. EPPICH: Objection to the
7 form. Calls for a legal conclusion.
8 Asked and answered.
9 A. Again, this was a -- an
10 identifier for review. This didn't mean that
11 every order on here was suspicious.
12 QUESTIONS BY MR. BOGLE:
13 Q. Okay. So I think we talked
14 about this earlier, but you do understand
15 that during this time period, 2007, for
16 example, that the Controlled Substances Act
17 did require distributors to report suspicious
18 orders, right?
19 A. Correct.
20 Q. Okay. And so what's noted in a
21 report like the one we're looking at here at
22 Exhibit 10, was any sort of further
23 investigation done by McKesson to determine
24 if the orders were truly suspicious versus
25 just meeting this algorithm?

Page 179

1 MR. EPPICH: Object to the
2 form. Calls for speculation.
3 A. There was a due diligence
4 process, so nightly a supervisor would review
5 the nightly report. If they identified a
6 particular order, then it would be reviewed.
7 The customer would be contacted, ask them if
8 they, you know, made a mistake in this order,
9 did they intend to place this order. So
10 additional due diligence could be followed
11 up.
12 QUESTIONS BY MR. BOGLE:
13 Q. Okay. So was there any sort of
14 standard operating procedure that existed as
15 far as the due diligence to be done at the
16 distribution center level after a customer
17 appeared on the DU45 report?
18 MR. EPPICH: Object to the
19 form.
20 A. I don't recall exactly what it
21 stated in Section 55 in regards to the due
22 diligence process.
23 QUESTIONS BY MR. BOGLE:
24 Q. Okay. To your knowledge and
25 recollection, when the DU45 report was being

Page 180

1 utilized, was the review by the distribution
2 center supposed to entail anything beyond
3 order error as far as data entry on the order
4 itself, meaning the customer ordered more
5 than they meant to?
6 MR. EPPICH: Object to the
7 form. Asked and answered.
8 A. Again, they would be reviewed
9 nightly by a supervisor. If they saw an
10 anomaly on an order, then they could flag it
11 and then it would be reviewed the following
12 day. A manager would get a copy of it and
13 review it as well and they get a copy of the
14 final monthly document for review at the end
15 of the month.
16 QUESTIONS BY MR. BOGLE:
17 Q. Would -- during the time the
18 DU45s were utilized, was there a separate
19 reporting process for true suspicious orders
20 that were identified outside of just this
21 meeting this algorithm in the DU45?
22 MR. EPPICH: Object to the
23 form, characterization. Calls for
24 speculation.
25 A. If the DCM -- if something was

Page 181

1 identified and DCM felt that there was an
2 issue with it, then they would contact their
3 local DEA office.
4 QUESTIONS BY MR. BOGLE:
5 Q. Okay.
6 A. And there was a notification
7 log that they would fill out.
8 Q. Okay. So that would be
9 documented if such a contact was made, right?
10 MR. EPPICH: Object to the
11 form.
12 A. That is correct.
13 QUESTIONS BY MR. BOGLE:
14 Q. Okay. And so if -- was there
15 any involvement with the regulatory
16 department during this time period to assist
17 in that review to determine if there's
18 something truly suspicious going on with an
19 order outside of it just meeting this
20 algorithm?
21 MR. EPPICH: Object to the
22 form.
23 QUESTIONS BY MR. BOGLE:
24 Q. Or was that strictly by the
25 distribution center itself?

Page 182

1    MR. EPPICH: Object to the
2  form.
3    A.   It was by the distribution
4  center and if there was an issue where they
5  needed to have discussions, then they would
6  contact regulatory.
7  QUESTIONS BY MR. BOGLE:
8    Q.   Okay.  Would you be one of the
9  people they would contact?
10   A.   I would be one of the persons
11 they could contact.
12   Q.   Okay.  How frequently would you
13 be contacted while the DU45 was being used to
14 say, "Hey, I think we've got something
15 outside of just an algorithm breach"?
16       MR. EPPICH: Object to the
17 form.
18   A.   I really don't recall the
19 frequency of contacts from those discussions.
20 QUESTIONS BY MR. BOGLE:
21   Q.   Okay.  And again, we're looking
22 at a report here from 2007.  You're aware
23 that in that same year, in 2007, the DEA made
24 clear that the DU45 reports, in their view,
25 were not sufficient to satisfy suspicious

Page 183

1  order monitoring and reporting requirements,
2  right?
3        MR. EPPICH: Object to form.
4  Assumes facts not in evidence.  Calls
5  for speculation.
6    A.   There were comments -- there
7  were times where the DEA would tell us to
8  stop faxing the reports.  They were
9  frustrated with the frequency and size of the
10 reports that would come in and asked us to
11 stop clogging up the fax machines, and since
12 it was part of the SOP which was based off
13 the original Suspicious Order Task Force
14 agreement, we would have to try to get
15 something in writing or document something in
16 order to stop those fax communications.
17 QUESTIONS BY MR. BOGLE:
18   Q.   So when you received
19 communications from the DEA that these were,
20 I guess, basically too large and clogging up
21 the fax machines, was there any response from
22 anybody at regulatory at McKesson saying,
23 "Hey, we can filter this down to something
24 smaller to make it easier for you to review,
25 do some more due diligence before we dump

Page 184

1  this on you"?
2        MR. EPPICH: Object to the form
3  and characterization.
4    A.   The nightly review or if
5  something came up on the nightly reviews,
6  then those would still be faxed if there was
7  a concern with an order.  Those would be
8  addressed with the DEA and typically a DCM
9  would contact DEA to discuss that.
10 QUESTIONS BY MR. BOGLE:
11   Q.   Yeah, but I guess what I'm
12 asking is different than that.  So do you
13 recall at any point in time anyone at the
14 regulatory department at McKesson, when they
15 received that sort of feedback from DEA,
16 saying, "We can filter this down to what we
17 truly feel is suspicious rather than just
18 giving you something based on an algorithm"?
19       MR. EPPICH: Objection to the
20 form and the characterization.
21 Assumes facts not in evidence.
22   A.   Again, it was filtered down by
23 providing the notations on the reports that
24 would be reviewed on the daily reports so
25 that they weren't getting this large volume;

Page 185

1  they were getting, you know, an isolated
2  customer that needed -- that was identified
3  that needed further review.  So that reduced
4  the submissions.  They still did, of course,
5  get the monthly file at the end of the month.
6  QUESTIONS BY MR. BOGLE:
7    Q.   Okay.  And so, again, to the
8  extent that that was done, that the orders
9  were individually flagged as suspicious
10 orders during this time frame, that would
11 have been documented, right?
12       MR. EPPICH: Object to the
13 form.
14 QUESTIONS BY MR. BOGLE:
15   Q.   That wasn't done verbally.
16       MR. EPPICH: Object to the
17 form.
18 QUESTIONS BY MR. BOGLE:
19   Q.   Was it?
20   A.   I don't recall.  It could have
21 been done both.
22   Q.   Okay.  But there was a
23 requirement specifically to document anything
24 that you deem a suspicious order report when
25 you sent it to the DEA, right?

Page 186

1 　　　MR. EPPICH: Object to the
2 form. Calls for a legal conclusion.
3 　　　A. I don't know what each of them
4 did after they conducted that report to the
5 DEA. I don't know what they kept on file.
6 There was a notification log for
7 documentation that they did maintain.
8 QUESTIONS BY MR. BOGLE:
9 　　　Q. Okay. So, again, so to the
10 extent that was done, there should be a log
11 out there that shows it was done, right?
12 　　　MR. EPPICH: Object to the
13 form. Calls for speculation.
14 　　　A. Part of the SOP was for them to
15 fill out a log whenever they made contact to
16 DEA.
17 QUESTIONS BY MR. BOGLE:
18 　　　Q. Okay. So going back to the
19 question I asked a couple minutes ago, in
20 2007, the DEA specifically notified
21 McKesson's regulatory department that the
22 DU45 report, in its view, was not sufficient
23 to satisfy the requirements of reporting
24 suspicious orders, right?
25 　　　MR. EPPICH: Object to the

Page 187

1 form. Calls for speculation.
2 　　　A. I don't recall the exact
3 verbiage of what was requested.
4 QUESTIONS BY MR. BOGLE:
5 　　　Q. Okay. Do you remember any
6 discussion along those lines, that the DU45
7 wasn't gonna cut it?
8 　　　MR. EPPICH: Object to the form
9 and the characterization.
10 　　　A. I don't recall exactly what was
11 requested.
12 QUESTIONS BY MR. BOGLE:
13 　　　Q. Okay.
14 　　　(McKesson-Hilliard Exhibit 11
15 was marked for identification.)
16 QUESTIONS BY MR. BOGLE:
17 　　　Q. I'm going to hand you what I'm
18 marking as Exhibit 1.1823, which is
19 Exhibit 11 to your deposition, and that's
20 MCKMDL00574906. And this is titled Summary
21 of DEA-HDMA Meeting on Suspicious Orders,
22 Meeting Date: September 7, 2007.
23 　　　Do you see that?
24 　　　A. Yes, I see that.
25 　　　Q. And you would have been a

Page 188

1 member of HDMA at this point in time, right?
2 　　　A. I was a member during this
3 time.
4 　　　Q. Okay. What does HDMA stand
5 for?
6 　　　A. Healthcare Distribution
7 Management Association.
8 　　　Q. And again, that was y'all's
9 trade association, right?
10 　　　A. That's correct.
11 　　　Q. Okay. So looking at this
12 document, it notes that there are attendees
13 at this meeting from both HDMA and DEA,
14 right, at the top?
15 　　　A. Yes, that's what's stated.
16 　　　Q. And one of the DEA attendees is
17 a person we talked about before, Mr. Mike
18 Mapes, right?
19 　　　A. Yes, it is.
20 　　　Q. Okay. And if you go to the
21 second page of this document, the top bullet
22 point says: DEA also does not want to
23 receive suspicious order reports that merely
24 reflect volumes that went over a threshold;
25 they wanted reports that are "true"

Page 189

1 suspicious orders. Similarly, they do not
2 want to receive what they called "excessive
3 purchase" reports which had been used in the
4 past.
5 　　　Do you see that?
6 　　　A. I see that.
7 　　　Q. Okay. And were you aware of
8 this discussion that went on with your trade
9 association and DEA in September 2007?
10 　　　A. I recall that there was a
11 meeting.
12 　　　Q. Okay. And so this information
13 I just read to you about the DEA's
14 expectations, that would have been conveyed
15 to you and your regulatory team, right?
16 　　　MR. EPPICH: Object to the
17 form. Misstates prior testimony.
18 　　　A. I don't recall specifically
19 receiving it, but it is likely that I did.
20 QUESTIONS BY MR. BOGLE:
21 　　　Q. Okay. And I think I can
22 represent to you this came out of McKesson's
23 files, so at least somebody at McKesson got
24 this.
25 　　　And so what they're referencing

Page 190

¹ there, that they don't want to receive
² suspicious order reports that merely reflect
³ volumes that went over a threshold, that's
⁴ what a DU45 report is, right?
⁵         MR. EPPICH:  Object to the
⁶     form.  Foundation.  Calls for
⁷     speculation.
⁸     A.    It could be considered that,
⁹ but I don't know what all the other members
¹⁰ were considering their reports to be referred
¹¹ to as excessive purchase or what have you as
¹² well.  So it's a generalization.
¹³ QUESTIONS BY MR. BOGLE:
¹⁴     Q.    Yeah.  I guess what I'm -- I'm
¹⁵ not asking you to speak for other
¹⁶ distributors.  I don't think that's within
¹⁷ your purview and I'm not asking you that.
¹⁸ I'm asking you about McKesson.
¹⁹         So the description that I just
²⁰ read for you from this bullet point would be
²¹ consistent with the DU45 report, right?
²²         MR. EPPICH:  Objection,
²³     foundation.  Calls for speculation.
²⁴     Form.
²⁵     A.    I'm not sure.

Page 191

¹ QUESTIONS BY MR. BOGLE:
²     Q.    Okay.  Well, when you received
³ this information from your trade association
⁴ from this meeting with the DEA, did the
⁵ regulatory team at McKesson take this to mean
⁶ that the DU45 was not good enough to show
⁷ suspicious order reporting?
⁸         MR. EPPICH:  Objection, form.
⁹     Calls for speculation.  Misstates
¹⁰     prior testimony.
¹¹     A.    I don't recall exactly what was
¹² discussed with the regulatory department at
¹³ that time.  We were in the processes to
¹⁴ develop new programs, LDMP, in 2007, which
¹⁵ was conducted in addition to the DU45.
¹⁶         So the DU45, I don't remember
¹⁷ when it stopped being completely submitted,
¹⁸ but it was still being submitted and then we
¹⁹ were developing additional programs.
²⁰ QUESTIONS BY MR. BOGLE:
²¹     Q.    Okay.  So I guess my question
²² was, is it your -- after receiving this
²³ information, did the regulatory department at
²⁴ McKesson conclude that the DU45 report was
²⁵ not going to be sufficient to report

Page 192

¹ suspicious orders?
²         MR. EPPICH:  Objection to the
³     form.
⁴ QUESTIONS BY MR. BOGLE:
⁵     Q.    Yes or no?
⁶         MR. EPPICH:  Foundation.
⁷     Misstates prior testimony.
⁸     A.    I don't recall what decision
⁹ was made after receiving this document.
¹⁰ QUESTIONS BY MR. BOGLE:
¹¹     Q.    Okay.
¹²     A.    What I can tell you, as I
¹³ already have, is we were in development of
¹⁴ enhanced programs.
¹⁵     Q.    Okay.  Well, as you read this
¹⁶ information today, as you sit here today,
¹⁷ having worked at McKesson as a director of
¹⁸ regulatory affairs for nearly 20 years, do
¹⁹ you understand this language I read to you to
²⁰ mean in plain terms that reports like the
²¹ DU45 report were not going to be sufficient
²² to report suspicious orders?
²³         MR. EPPICH:  Objection to the
²⁴     form.  Foundation.
²⁵     A.    Again, I don't recall what was

Page 193

¹ decided at this point in time when we
² received this document.
³ QUESTIONS BY MR. BOGLE:
⁴     Q.    I'm asking you as you read it
⁵ today, not what was decided at the time.
⁶         MR. EPPICH:  Same objections.
⁷     A.    I've been out of it for a long
⁸ time.  I'm not sure what correlation that
⁹ would have.
¹⁰ QUESTIONS BY MR. BOGLE:
¹¹     Q.    Okay.  So you don't have an
¹² opinion one way or the other whether the
¹³ bullet point we read would indicate to you
¹⁴ today that the DU45 like we just looked at is
¹⁵ not going to be sufficient to report
¹⁶ suspicious orders?  Is that your testimony?
¹⁷         MR. EPPICH:  Objection.  Asked
¹⁸     and answered.  Form.
¹⁹     A.    We enhanced what we were
²⁰ providing by developing new programs.  We
²¹ continued to supply this in addition.
²² QUESTIONS BY MR. BOGLE:
²³     Q.    Yeah, that's just not what I
²⁴ asked you.  So we'll get to what you did on
²⁵ the LDMP and the CSMP, I promise you that.

Highly Confidential – Subject to Further Confidentiality Review

Page 194

1     What I'm asking you right now
2 is about the DU45. As you sit here reading
3 this today, having worked as a director of
4 regulatory affairs for 20 years and just
5 concluded that practice two years ago, do you
6 read this as you sit here today as being a
7 clear indication that the DU45 report was not
8 sufficient to report suspicious orders?
9     MR. EPPICH: Objection to the
10     form; asked and answered, calls for a
11     legal conclusion.
12     A.   I don't know.
13 QUESTIONS BY MR. BOGLE:
14     Q.   You don't know. Okay.
15     You've seen -- strike that.
16     You've been involved in e-mail
17 discussions while you were at McKesson where
18 conclusions by other members of the
19 regulatory team that you were involved in
20 were that the DU45 was not a suspicious order
21 report, right?
22     MR. EPPICH: Objection to the
23     form. Calls for speculation.
24 QUESTIONS BY MR. BOGLE:
25     Q.   Do you recall those

Page 195

1 discussions?
2     A.   I don't recall offhand.
3     Q.   Okay. I'll hand you what I'm
4 marking as Exhibit 12, which is 1.1667, and
5 that's MCKMDL00510747.
6     (McKesson-Hilliard Exhibit 12
7     was marked for identification.)
8 QUESTIONS BY MR. BOGLE:
9     Q.   All right. And we're going to
10 walk through from back to front here, but
11 just starting at the front, you see that top
12 e-mail there is one that you're copied on,
13 right?
14     A.   Yes, I am copied on it.
15     Q.   And you understand sort of how
16 e-mails work; once you appear on this e-mail,
17 the ones prior to it, you would also have
18 been able to view, right?
19     A.   Okay.
20     Q.   So let's start back at the
21 first e-mail, page .6. All right. So the
22 bottom e-mail there is from a Tyra Williams
23 to a Craig Vanderburg, subject: Variance and
24 Suspicious Reports, dated December 16, 2010.
25     Do you see that?

Page 196

1     A.   I see that.
2     Q.   And the statement there is:
3 Craig, please do not forget that these
4 reports must be sent to the State. We have
5 not sent the reports for the last 6 months.
6     Do you see that reference?
7     A.   I see that.
8     Q.   Craig Vanderburg, would he have
9 been a distribution center manager at this
10 time?
11     A.   That's my recollection.
12     Q.   All right. So let's now flip
13 over to page .5. I'm looking at the e-mail
14 at the top there from Tom McDonald,
15 December 16, 2010, same title. Mr. McDonald,
16 he was in the regulatory department at that
17 time, right?
18     A.   Yes, he was.
19     Q.   He was another director of
20 regulatory affairs, right?
21     A.   Yes, he was.
22     Q.   Okay. He says there: I don't
23 believe you have identified a suspicious
24 order or customer within the last six months,
25 have you? It is still part of our process to

Page 197

1 report all suspicious orders to the DEA and
2 to the state board when they are discovered.
3 Our current process better identifies
4 suspicious orders rather than orders of
5 interest. One man's opinion.
6     Do you see that?
7     A.   Yes, I see that.
8     Q.   Okay. And then finally, going
9 to the e-mail back on the first page by Dave
10 Gustin -- now, Dave Gustin is another
11 director of regulatory affairs at the time
12 the e-mail is sent, February 4, 2011, right?
13     A.   That is correct.
14     Q.   Okay. And as we talked about a
15 minute ago, you're involved in the e-mail
16 chain at this point as being copied, right?
17     A.   That's correct.
18     Q.   Okay. Here, in the second
19 paragraph, he says: It is my opinion that
20 the previous reports were not the exclusive
21 and proper response to this regulation.
22     And if you look above, the
23 regulation he's citing to is the one about --
24 from the Controlled Substances Act about
25 reporting suspicious orders, right?

Page 198

1    A.    That's what's listed, yes.
2    Q.    Okay.  Then he says:  We have
3  an obligation to report "suspicious orders."
4  With no clear definition of what constitutes
5  a suspicious order we must rely on our own
6  judgment as to what it is.  If we report
7  anything we believe to be truly suspicious we
8  will be meeting the spirit and letter of the
9  regulation.  Simply reporting
10 larger-than-usual orders does not when there
11 are so many plausible and routine reasons for
12 orders to be "larger than normal."
13       And then he lists some reasons.
14       I would wait until someone
15 misses the report before seeking someone out
16 to give them something that I do not agree
17 meets their needs or requirements.
18       Do you see that?
19    A.    Yes, I see that.
20    Q.    And a report that simply
21 reports orders that are larger than
22 usual, that's exactly what the DU45 report
23 is, right?
24       MR. EPPICH:  Objection;
25    foundation, calls for speculation.

Page 199

1    A.    They're orders that exceed the
2  threshold based on the parameters of that
3  report.
4  QUESTIONS BY MR. BOGLE:
5    Q.    Right.  So what's usual in that
6  context is defined by the prior 12 months'
7  sales, right, for the DU45?
8       MR. EPPICH:  Objection, form.
9  Foundation.
10    A.    It's an average.
11 QUESTIONS BY MR. BOGLE:
12    Q.    Right.  And then again, to
13 appear on the report you have to go three
14 times above that average, right?
15    A.    Correct.
16    Q.    Okay.  And so let me ask you
17 this:  Do you agree or disagree that simply
18 reporting larger-than-usual orders does not
19 meet the spirit of the regulation about
20 suspicious order reporting?
21       MR. EPPICH:  Object to the
22    form.
23    A.    I don't know what all Dave is
24 trying to communicate here.  There are other
25 factors that go into reviewing orders and

Page 200

1  that's probably what he's alluding to.
2  QUESTIONS BY MR. BOGLE:
3    Q.    Yeah.  I'm just asking whether
4  you agree or disagree that simply reporting
5  larger-than-usual orders does not meet the
6  spirit and letter of the suspicious order
7  reporting regulation.  Agree or disagree?
8       MR. EPPICH:  Object to the
9    form; asked and answered.
10    A.    Yeah.  Again, I'm not familiar
11 with the contents -- the context of all of
12 the communications that took place here.  I
13 know I was copied on it but I don't recall
14 the specific e-mail.  There are other factors
15 that go into orders that are larger than
16 normal.
17 QUESTIONS BY MR. BOGLE:
18    Q.    Okay.  You've read the e-mail
19 here today.  You were copied on it back in
20 2011.  So as you read it here today, the
21 premise being submitting orders that are
22 larger than usual, does that or does that
23 not, in your view, meet the spirit and letter
24 of the regulation requiring the reporting of
25 suspicious orders?

Page 201

1       MR. EPPICH:  Object to form;
2    asked and answered.
3  QUESTIONS BY MR. BOGLE:
4    Q.    What's your opinion on that
5  today?
6       MR. EPPICH:  Calls for a legal
7    conclusion.
8    A.    I don't know what the context
9  of this e-mail was, so I don't have all the
10 facts to supply an answer.
11 QUESTIONS BY MR. BOGLE:
12    Q.    Okay.  Well, do you want to
13 look at the -- I'm happy to give you whatever
14 time you need to look at the full e-mail
15 chain.  I'm not trying to take anything out
16 of context for you here.  Feel free.  Let's
17 do that.
18       Let's take -- take a minute.
19 It's, I think, seven pages or eight pages --
20 six pages.  Let me know when you're done
21 reading the six pages, but that's my question
22 that I'm going to ask you again.  Let me know
23 when you're ready.
24       (Document review by witness.)
25    A.    Restate your question.

Page 202

1 QUESTIONS BY MR. BOGLE:
2     Q.   Yep.  So do you agree or
3 disagree that simply reporting
4 larger-than-usual orders does not meet the
5 suspicious order reporting requirements of
6 the Controlled Substances Act?
7         MR. EPPICH:  Objection to the
8     form.  Foundation.  Calls for a legal
9     conclusion.  Asked and answered.
10     A.   We were providing information
11 based on what we believed complied with the
12 CSA and what came out of the Suspicious Order
13 Task Force, and other additional information
14 is provided to the DEA to supplement that,
15 such as the notations on the report nightly.
16       So there is more that goes
17 along with than just this one report
18 that has higher-than-threshold levels of
19 transactions listed on it.
20         MR. BOGLE:  Move to strike as
21     nonresponsive.
22 QUESTIONS BY MR. BOGLE:
23     Q.   Let me reask my question
24 because I think it's very straightforward.
25       My question is, simply:  Do you

Page 203

1 agree or disagree that, standing alone,
2 providing a report that simply lists
3 larger-than-usual orders does not comply with
4 the suspicious order reporting requirements
5 of the Controlled Substances Act?
6         MR. EPPICH:  Object to the
7     form.
8 QUESTIONS BY MR. BOGLE:
9     Q.   I'm not asking about additional
10 stuff.  I'm asking whether you think that
11 alone is good enough to meet that regulation.
12 Yes or no?
13         MR. EPPICH:  Object to form;
14     asked and answered, calls for a legal
15     conclusion.
16 QUESTIONS BY MR. BOGLE:
17     Q.   We'll talk about the rest of it
18 later, I promise you.
19         MR. EPPICH:  He's answered this
20     question three times now.
21         MR. BOGLE:  He hasn't come
22     close.  I mean, I'd love it if he had.
23         MR. EPPICH:  You're looking for
24     a yes-or-no answer.  He's given you
25     the answer.  It may not be the answer

Page 204

1 you want --
2         MR. BOGLE:  He hasn't said yes
3     or no.
4         MR. EPPICH:  -- but he has
5     answered the question.
6 QUESTIONS BY MR. BOGLE:
7     Q.   Listen, here's what we can do.
8 You can say yes or no and then provide
9 whatever response thereafter you want.
10         MR. EPPICH:  I said you're
11     looking for a yes-or-no answer but
12     he's not providing that to you.
13     That's why you're upset, Brandon.
14         MR. BOGLE:  Right, because I
15     just want him to answer my question.
16     That does upset me, you're right.
17     You're right.  That's frustrating.
18         MR. EPPICH:  I'll allow him to
19     answer your question again.
20 QUESTIONS BY MR. BOGLE:
21     Q.   Can you just answer -- I mean,
22 I think it's a very straightforward question.
23     A.   We provide the report that was
24 based off the Suspicious Order Task Force
25 report that we believe complied with the CSA

Page 205

1 requirements, and in addition, we developed
2 additional reporting tools to provide better
3 notifications to DEA.
4     Q.   Okay.  So the DU45 by itself,
5 would you agree, was not sufficient to
6 satisfy the suspicious order reporting
7 requirements of the CSA?
8         MR. EPPICH:  Objection, calls
9     for a legal conclusion.  Form,
10     foundation, and asked and answered.
11     Six times now.
12     A.   We provided the information for
13 the DU45 based on the Suspicious Order Task
14 Force that we believe complied with the CSA.
15 We supplemented that with additional
16 information that would give better
17 information to the DEA through these reports
18 and additional reporting tools.
19         MR. BOGLE:  Move to strike as
20     nonresponsive.
21 QUESTIONS BY MR. BOGLE:
22     Q.   Okay.  Let me ask it a
23 different way.  You've read the six pages of
24 e-mails, correct?
25     A.   That's correct.

Highly Confidential – Subject to Further Confidentiality Review

Page 206

1     Q.   Okay. And you know that they
2 were specifically talking about the DU45
3 report, right?
4       MR. EPPICH: Objection,
5 foundation.
6 QUESTIONS BY MR. BOGLE:
7     Q.   It's referenced by name, isn't
8 it?
9       MR. EPPICH: Objection,
10 foundation.
11     A.   I believe it was stated in the
12 e-mail trail.
13 QUESTIONS BY MR. BOGLE:
14     Q.   All right. So now that you
15 have a chance to review the full context of
16 this entire e-mail chain, do you agree or
17 disagree with Mr. Gustin's following
18 statement: Simply reporting
19 larger-than-usual orders does not, when there
20 are so many plausible and routine reasons for
21 orders to be larger than normal -- and "does
22 not," he's referring to meeting the spirit
23 and letter of the regulation for reporting
24 suspicious orders.
25       Agree or disagree or no opinion

Page 207

1 on Mr. Gustin's statement there?
2       MR. EPPICH: Objection to the
3     form; calls for a legal conclusion.
4     A.   I don't have an opinion on
5 his -- on his statement.
6 QUESTIONS BY MR. BOGLE:
7     Q.   Okay. And I looked to see if
8 you responded with disagreement to the
9 statement. I didn't find anything. Do you
10 have any specific recollection of you
11 disagreeing with his statement here?
12       MR. EPPICH: Objection to the
13     form. Calls for speculation.
14     A.   I don't recall the specifics of
15 this e-mail.
16 QUESTIONS BY MR. BOGLE:
17     Q.   Okay. Again, I think my
18 question is different than that.
19       Do you have a specific
20 recollection of disagreeing with his e-mail
21 in writing?
22       MR. EPPICH: Objection to the
23     form.
24     A.   I do not have a recollection of
25 reviewing this e-mail or making a response to

Page 208

1 the e-mail.
2       MR. BOGLE: Okay. I'm going to
3     something else, so if you want to take
4     it now or I can plug along if you
5     want.
6       MR. EPPICH: That's fine, let's
7     take a lunch.
8       THE VIDEOGRAPHER: Off the
9     record at 12:31.
10       (Recess taken, 12:31 p.m. to
11     1:17 p.m.)
12       THE VIDEOGRAPHER: Stand by.
13     The time is 1:17 p.m. Back on the
14     record, beginning of File 4.
15 QUESTIONS BY MR. BOGLE:
16     Q.   All right, Mr. Hilliard. Just
17 to reorient ourselves here, earlier in the
18 deposition, you recall discussing with me the
19 DEA's investigation of the Lakeland
20 distribution center regarding distribution of
21 hydrocodone to seven Florida pharmacies?
22     A.   That's correct.
23     Q.   Okay. And you're aware after
24 that investigation, the DEA also began
25 investigating some other distribution centers

Page 209

1 within McKesson as to their distribution of
2 opioids?
3       MR. EPPICH: Object to the
4     form.
5     A.   Yes. There was additional
6 investigations.
7 QUESTIONS BY MR. BOGLE:
8     Q.   Okay. And ultimately those
9 investigations culminated in McKesson
10 entering into a settlement agreement with the
11 DEA in 2008, right?
12       MR. EPPICH: Object to the
13     form.
14     A.   There was a settlement
15 agreement in 2008.
16 QUESTIONS BY MR. BOGLE:
17     Q.   Okay. And you're aware that
18 occurred, right? That settlement occurred
19 in 2008?
20     A.   Yes, I am.
21     Q.   Okay. And you're aware that
22 settlement pertained to allegations from the
23 DEA that McKesson violated the Controlled
24 Substances Act in distributing opioids from
25 several of its distribution centers, right?

Page 210

1    A.    Correct.
2    Q.    Okay.  Have you seen the
3  settlement agreement itself?
4    A.    I have seen it at one time.
5    Q.    Okay.  All right.  I'm going to
6  hand you what I'm marking as Exhibit 13,
7  which is also 1.889, and that's
8  MCKMDL00337001.
9          (McKesson-Hilliard Exhibit 13
10         was marked for identification.)
11 QUESTIONS BY MR. BOGLE:
12   Q.    Here you go, sir.
13         Okay.  What I've just handed
14 you, Mr. Hilliard, as Exhibit 13 is titled at
15 the top Settlement and Release Agreement and
16 Administrative Memorandum Agreement dated in
17 the first paragraph May 2nd, 2008.
18         Do you see that?
19   A.    Yes, I see that.
20   Q.    Okay.  And do you recognize
21 this to be the settlement agreement we just
22 referenced from 2008?
23   A.    Yes.
24   Q.    Okay.  And if we'd go
25 specifically to -- let's see, my page numbers

Page 211

1  are different here.  There's an Appendix B
2  about halfway through the document that
3  starts the actual settlement agreement.  Do
4  you see where I'm at there?  Sorry, my page
5  numbers don't match yours on this so I can't
6  give you a specific number.  I'm sorry, I
7  would if I could.  For reason -- but that's
8  what the page looks like right there.
9          MR. EPPICH:  I think it's on
10         Bates 337012.
11 QUESTIONS BY MR. BOGLE:
12   Q.    It says Appendix B at the top
13 left, Settlement Agreement at the top middle.
14         See where I'm at?
15   A.    Found it.
16   Q.    All right.  So this starts the
17 actual settlement agreement.  So I
18 want to go to the next page that talks about
19 the covered conduct in the agreement, which
20 is number 8 in the middle of the page.
21         Do you see where I'm at?
22   A.    Yes, I do.
23   Q.    Okay.  And A there says:
24 Within the District of Maryland:  From
25 January 2005 through October 2006,

Page 212

1  McKesson-Landover sold approximately
2  3 million dosage units of hydrocodone to
3  NewCare Pharmacy in Baltimore, and failed to
4  report these sales as suspicious orders to
5  DEA when discovered, as required by and in
6  violation of -- and then it lists the C.F.R.
7  and the U.S.C.
8          And then it says:  Further,
9  from August 2006 to February 2007,
10 McKesson-Landover sold large quantities of
11 phentermine-based products to Smeeta Pharmacy
12 in Highland, Maryland, and failed to report
13 these sales as suspicious orders to DEA when
14 discovered, as required by and in violation
15 of -- and again it lists the statutes.
16         Do you see where I'm reading
17 there?
18   A.    I see that.
19   Q.    Okay.  Were you involved at all
20 in investigating whether the allegations the
21 DEA was making here was making here accurate or not?
22   A.    Not that I recall.
23   Q.    Okay.  Then if you see in
24 section B, and I wasn't going to read this
25 whole section but you can look at it here for

Page 213

1  yourself, this talks about the conduct that
2  we actually covered for the seven
3  pharmacies -- seven Florida pharmacies that
4  were handled by the Lakeland distribution
5  center, right?
6    A.    Yes.  It's listed here.
7    Q.    And that's the same conduct we
8  talked about before, right?  That's what they
9  discuss here.
10   A.    Yes.
11   Q.    Okay.  And then in letter C:
12 Within the Southern District of Texas, it
13 says:  From February to September 2007,
14 McKesson-Conroe sold approximately 2.6
15 million dosage units of hydrocodone to
16 Mercury Drive Pharmacy and Maswoswe's
17 Alternative Pharmacy and failed to report
18 these sales as suspicious orders to DEA when
19 discovered, as required by and in violation
20 of -- and again it lists the statutes.
21         You see that there?
22   A.    I see that.
23   Q.    And on the next page, it
24 continues with letters D, E and F.  Letters D
25 involve allegations of large quantities of

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  hydrocodone sent to three Colorado pharmacies
2  out of the McKesson-Aurora distribution
3  center from September 2005 to November 2007,
4  right?
5      A.    I see that.
6      Q.    E involves McKesson-Salt Lake
7  and distribution of 824,000 units of
8  hydrocodone, oxycodone, fentanyl and
9  methadone to the Blackfeet Clinic in
10  Browning, Montana from January 2005 to
11  October 2007.
12         Do you see that?
13      A.    I see that.
14      Q.    Okay.  And then finally, there
15  is, from McKesson-West Sacramento,
16  allegations of theft or significant loss of
17  controlled substances on 28 separate
18  occasions that were not reported timely to
19  the DEA.
20         Do you see that?
21      A.    I see that.
22      Q.    Okay.  And you know that for
23  this covered conduct, there was a fine paid
24  of $13.25 million by McKesson, right?
25      A.    Correct.

Page 215

1      Q.    Okay.  And as a result of these
2  investigations by DEA in 2005 and 2006, in
3  addition to entering the settlement
4  agreement, McKesson modified its Suspicious
5  Order Monitoring Program to shift to the
6  Lifestyle Drug Monitoring Program, right?
7      MR. EPPICH:  Object to the
8      form.  Calls for speculation.
9      A.    The Lifestyle Drug Monitoring
10  Program was developed in the 2007 time frame.
11  QUESTIONS BY MR. BOGLE:
12      Q.    Okay.  We'll take a look at a
13  few things related to the LDMP -- you're okay
14  with me calling it LDMP?
15      A.    Please.
16      Q.    Okay.  I think we're talking
17  about the same thing there.
18         All right.  So I'm going to
19  hand you what I'm marking as Exhibit 1.1830,
20  which is Exhibit 14 to your deposition, and
21  that is, for those keeping track of these
22  things, MCKMDL00403340.
23         (McKesson-Hilliard Exhibit 14
24      was marked for identification.)
25         --oOo--

Page 216

1  QUESTIONS BY MR. BOGLE:
2      Q.    There's yours, sir, and there's
3  yours.
4         All right.  I've handed you a
5  PowerPoint deck titled Lifestyle Drugs &
6  Internet Pharmacies.
7         Do you see that?
8      A.    I see that.
9      Q.    Okay.  And it's noted to be, in
10  the slide at the far right there, it says
11  National Operations Conference 2007.
12         Do you see that reference?
13      A.    I see that.
14      Q.    Okay.  Have you seen this slide
15  deck before?
16      A.    I have seen it before.
17      Q.    Okay.  And it's noted to be
18  created by Donald Walker, who we've talked
19  about a little bit earlier, right?
20      A.    That's correct.
21      Q.    Okay.  And if you go here to
22  page .3, there's a slide on this PowerPoint
23  deck titled Public Health Issues.
24         Do you see where I'm at?
25      A.    I see that.

Page 217

1      Q.    Okay.  The first bullet point
2  there says:  Abuse of prescription drugs has
3  risen 66% since 2000.
4         Do you see that reference?
5      A.    I see it.
6      Q.    And the third bullet point
7  says:  Opioid painkillers kill more than
8  cocaine and heroin combined.
9         Do you see that as well?
10      A.    I see that.
11      Q.    Okay.  Do you know in what
12  context this information was presented, like
13  where it was presented?
14      A.    It was an operations
15  conference.  I don't recall if I was there or
16  not.  I was not always invited to them, but I
17  could have been there.
18      Q.    And then if we go to the next
19  page, page .4, it says DEA Focus is the title
20  of this slide.
21         Do you see where I'm at?
22      A.    I see that.
23      Q.    Okay.  And it says -- you see
24  where it says, "DEA expects"?
25      A.    I see it.

Page 218

1    Q.    Under that it says:  We "know
2  our customers."
3          Do you see that reference?
4    A.    I see that.
5    Q.    The Know Your Customer tag line
6  here, are you familiar with what that refers
7  to?
8    A.    I am.
9    Q.    Okay.  What does it refer to?
10   A.    Understanding our customers'
11 business.
12   Q.    Okay.  The second bullet point
13 says: Wholesalers accountable for
14 controlling quantities shipped.
15         Do you see that reference?
16   A.    I see that.
17   Q.    And the last bullet point says:
18 5,000 dose units is "average."
19         Do you see where that's at?
20   A.    I see that.
21   Q.    Okay.  The 5,000 dosage units
22 as average is in reference to the DEA's
23 expectation that the average dosage unit for
24 controlled substances would be 5,000 for a
25 pharmacy at that point in time, right?

Page 219

1          MR. EPPICH:  Objection,
2    foundation.
3    A.    I'm not sure what the -- what
4  Don is trying to convey on what is average
5  from this slide.
6  QUESTIONS BY MR. BOGLE:
7    Q.    Okay.  Do you have any
8  recollection of the 5,000 number being
9  discussed around this time frame as an
10 average for controlled substances purchases
11 for pharmacies?
12         MR. EPPICH:  Object to the
13   form.
14   A.    There was comments of the 5,000
15 dosage units for the -- for lifestyle drug
16 controlled substances.  That's the only
17 reference that I remember for this quantity.
18 QUESTIONS BY MR. BOGLE:
19   Q.    Okay.  And those would be --
20 let me see if I can find it, one second --
21 oxycodone, hydrocodone, phentermine and
22 alprazolam, right?
23   A.    That sounds correct.
24   Q.    And those are the four drugs
25 that were included in the LDMP, right?

Page 220

1    A.    That's correct.
2    Q.    Okay.  So now if you go to
3  page .7 in this slide deck, this actually
4  refers to the LDMP and it says "Starts
5  May 1st."
6          Would that be May 1st of 2007?
7  Does that sound right to you?
8    A.    That sounds correct.
9    Q.    And it says, "Focus on
10 four drugs," which again, I think are the
11 four drugs we just talked about, right?
12   A.    Right.
13         MR. EPPICH:  Objection,
14   foundation.
15 QUESTIONS BY MR. BOGLE:
16   Q.    And it says: Establish
17 threshold for excessive quantities - 8,000
18 dose units.
19         Do you see that reference?
20   A.    I see the reference.
21   Q.    Okay.  Now, I think we talked
22 about at the beginning of the deposition that
23 you were actually the drafter of the LDMP,
24 right?
25   A.    I helped to draft it.

Page 221

1    Q.    Helped draft it.  Okay.
2          Who helped you draft it?
3    A.    I believe Tracy was involved
4  with it as well.
5    Q.    Jonas?
6    A.    Yeah, sorry, Tracy Jonas.  But
7  I don't recall specifically.
8    Q.    Okay.  Well, let me ask you
9  this:  Since you were involved in the
10 drafting of the LDMP, why was 8,000 dose
11 units set as the threshold for excessive
12 quantities in the LDMP?  How was that number
13 chosen?
14         MR. EPPICH:  Object to the
15   form.
16   A.    I don't recall how that number
17 came about.  This would have been through
18 discussions with Don Walker.
19 QUESTIONS BY MR. BOGLE:
20   Q.    Okay.  Because we just saw a
21 minute ago another slide where DEA is noting
22 5,000 dosage units to be average.  So why not
23 just set it at 5,000?
24         MR. EPPICH:  Object to the
25   form; foundation.

Page 222

1    A.    Again, I don't recall how that
2 number came about.  This would have gone
3 through a directive with Don Walker.
4 QUESTIONS BY MR. BOGLE:
5    Q.    Okay.  Do you recall any
6 specific discussions about, "Hey, let's pick
7 8,000 rather than five"?  Were you involved
8 in any such discussions?
9    A.    I may have been.  I don't
10 recall.
11    Q.    But we can agree that 8,000
12 dosage units was the number selected for the
13 LDMP, right --
14        MR. EPPICH:  Object to the
15    form.
16 QUESTIONS BY MR. BOGLE:
17    Q.    -- for these four drugs?
18    A.    For the four drugs.
19        MR. EPPICH:  Object to the
20    form.
21 QUESTIONS BY MR. BOGLE:
22    Q.    And then the additional bullet
23 point here says, below that:  Thorough due
24 diligence of customers exceeding threshold.
25        And that was what was intended

Page 223

1 to happen under that program, right?
2        MR. EPPICH:  Object,
3    foundation.
4    A.    That's my recollection.
5 QUESTIONS BY MR. BOGLE:
6    Q.    Okay.  Then it says below that:
7 Reducing orders to customers.
8        So the plan under the LDMP was
9 to make a concerted effort to reduce orders
10 to customers.  Is that fair?
11        MR. EPPICH:  Objection,
12    foundation.
13 QUESTIONS BY MR. BOGLE:
14    Q.    For these four drugs.
15    A.    I'm not entirely sure what
16 Don's conveying from the reducing orders to
17 customers.
18    Q.    Okay.  The last bullet point
19 says:  Documentation and reporting to DEA.
20        Do you have an understanding of
21 what's being referred to there as far as
22 reporting to DEA?
23    A.    Again, I'm not real sure which
24 part Don is referring to here on the reports.
25    Q.    Okay.  Now, the LDMP was only

Page 224

1 around for approximately a year, right?
2    A.    Yes, that is correct.
3    Q.    Okay.  Why did you guys get rid
4 of it after a year?
5        MR. EPPICH:  Object to the
6    form.
7    A.    We were developing better
8 analytical tools.
9 QUESTIONS BY MR. BOGLE:
10    Q.    Okay.  Were any of those
11 analytical tools not available in 2007?
12    A.    My recollection is yes.  I
13 mean, there was reports and analytics that --
14 from system development that had to be done
15 for the CSMP process.
16    Q.    Okay.  What specific reports
17 are you referring to?
18    A.    Again, it would be analytical
19 tool -- analytical reporting, so I can't
20 specifically tell you what the names of them
21 are.  I don't remember offhand.
22    Q.    Okay.  You were actually
23 involved in auditing the Lifestyle Drug
24 Monitoring Program in 2007, right?
25    A.    I don't recall specifically

Page 225

1 what was in the audit at that time, but it's
2 possible.
3    Q.    Okay.  And you recall that
4 during that 2007 audit process, there were
5 some significant shortcomings found with the
6 program, right?
7        MR. EPPICH:  Objection, form.
8    A.    I don't recall.
9        MR. EPPICH:  Assumes facts not
10    in evidence.
11 QUESTIONS BY MR. BOGLE:
12    Q.    Okay.  I'm going to hand you
13 what I'm marking as Exhibit 15, which is
14 1.1887, MCKMDL00591949.
15        (McKesson-Hilliard Exhibit 15
16    was marked for identification.)
17 QUESTIONS BY MR. BOGLE:
18    Q.    You'll see this document is
19 titled Lifestyle Drug Program, McKesson U.S.
20 Pharma - DEA Licensure Audit.
21        Do you see that?
22    A.    I see that.
23    Q.    Okay.  And you're noted to be
24 the process owner here, right?
25    A.    Yes, I am listed here.

Page 226

1    Q.    What does "process owner" mean?
2    A.    The person to discuss the
3 processes around the LDMP.
4    Q.    Okay.  And the last revised
5 date noted on this document is July 27, 2007.
6          Do you see that?
7    A.    Yes, I do.
8    Q.    Okay.  In the first line there,
9 in Overview, it says:  The Lifestyle Drug
10 Program is a response to the DEA's
11 requirement to monitor the ordering/sales of
12 DEA identified "Lifestyle Drugs" and to "know
13 our customer."
14          Do you see that reference?
15    A.    I see it.
16    Q.    It says:  A legitimate
17 patient/doctor relationship is required to
18 dispense all drugs containing any of the
19 substances on the DEA Lifestyle Drug list.
20 The need for a Lifestyle Drug Monitoring
21 Program originated from issues with
22 illegitimate internet pharmacies.
23          Do you see where I'm reading
24 there?
25    A.    I do.

Page 227

1    Q.    And then the next paragraph
2 references a roll-out of the program in
3 May 2007.
4          Do you see that reference?
5    A.    I see that.
6    Q.    And let's go to the second page
7 of the document, please.  Do you see there
8 there's a Section 1.1, the Daily Dosage
9 Summary Report?
10          Do you see that section?
11    A.    I see that.
12    Q.    And the Daily Dosage Summary
13 Report was the report utilized under the LDMP
14 to assess when a customer exceeded the 8,000
15 unit threshold, right?
16    A.    That's my recollection.
17    Q.    Okay.  And as it's noted here,
18 the 8,000 threshold was based on doses rather
19 than ordering units, right?
20    A.    That's what's stated, yes.
21    Q.    Meaning for each pill counts
22 one, right?
23    A.    Correct.
24    Q.    Is that a fair statement?
25    A.    Fair.

Page 228

1    Q.    Okay.  So in the last two
2 sentences on this page, it says:  The sales
3 quantity is measured by dose rather than
4 ordering unit and the current volume
5 threshold is 8,000 doses.  The threshold was
6 determined by the Regulatory Department.
7          Do you see that reference?
8    A.    I see that.
9    Q.    Okay.  And the regulatory
10 department at that time -- there's actually a
11 chart there above -- is you, Don Walker,
12 Bruce Russell, right?
13    A.    That's correct.
14    Q.    Okay.  And as we turn to the
15 next page, it says, on the top there, first
16 line:  Because the list of products being
17 monitored was determined by Business
18 Intelligence, it is possible not all products
19 containing one of the generic ingredients
20 were included.  It is possible that the
21 controlled substances being monitored are
22 being underreported.
23          Do you see that?
24    A.    I see that.
25    Q.    Okay.  Do you recall that

Page 229

1 finding --
2    A.    I do not.
3    Q.    -- being made?
4    A.    I do not.
5    Q.    Okay.  Was any further
6 investigation done as to whether in fact
7 there was underreporting under the LDMP?
8    A.    There may have been, but I
9 don't recall it.
10    Q.    Okay.  That's a significant
11 issue, though, right?  If there is
12 underreporting occurring, then the thresholds
13 wouldn't be -- the determination of when
14 somebody met a threshold wouldn't be
15 accurate, right?
16          MR. EPPICH:  Objection,
17 foundation.  Calls for speculation.
18    A.    We want accurate data, so...
19 QUESTIONS BY MR. BOGLE:
20    Q.    Right.  And if there's
21 underreporting occurring, the data wouldn't
22 be accurate, right?
23          MR. EPPICH:  Objection,
24 foundation.  Calls for speculation.
25    A.    Yeah.  It's a possibility.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  QUESTIONS BY MR. BOGLE:
2      Q.   Right.  And that's why it's
3  listed here as a possibility, right?
4          MR. EPPICH:  Objection,
5  foundation.
6      A.   Yeah.  That's what the auditor
7  states.
8  QUESTIONS BY MR. BOGLE:
9      Q.   Okay.  And if you'd go to the
10 third paragraph on this page, it says:
11 Although McKesson typically directs customers
12 to order from only one DC, it's possible for
13 a customer to order product from multiple
14 DCs.  Since the Daily Dosage Summary Report
15 is organized by DC, a customer may be on
16 multiple DC reports.  In that case, the Data
17 Analyst coordinates with the two DCMs to
18 determine which will handle the customer
19 review.
20         On the other hand, situations
21 where a customer is using more than one DC
22 and the sales of "Lifestyle Drugs" at either
23 DC is not greater than 8,000 doses but the
24 total sales is greater than 8,000 doses would
25 be missed by the current process.

Page 231

1          Additionally, customers with
2  multiple accounts at a single DC with
3  aggregate sales exceeding the thresholds are
4  being missed by the current process.
5          Do you see that?
6      A.   I see that.
7      Q.   Do you recall this deficiency
8  being pointed out in this audit?
9      A.   I don't recall.  Customers were
10 assigned to a specific location usually based
11 on geographic regions, so it would be unusual
12 if this occurred.  I don't specifically
13 recall it.
14     Q.   Okay.  Do you recall any
15 investigation being done after this to
16 determine if there were customers that were
17 being handled by multiple distribution
18 centers, to address this concern?
19     A.   Not that -- not that I recall.
20     Q.   What about customers with
21 multiple accounts at one distribution center,
22 as is outlined here?  Do you recall that
23 being investigated after this audit?
24     A.   I don't recall.
25     Q.   Okay.  You would agree with me,

Page 232

1  though, that either of those circumstances --
2  well, let's handle them one by one so strike
3  that.
4          A circumstance where a customer
5  is being handled by multiple distribution
6  centers under the Lifestyle Drug Monitoring
7  Program, if the report is handled by
8  distribution center, they could exceed the
9  8,000 threshold without the company knowing
10 it, right?
11         MR. EPPICH:  Objection,
12 foundation.  Calls for speculation.
13     A.   There could be other analytical
14 tools that were being used in addition to
15 this.  So, again, I wasn't familiar -- I
16 don't remember this occurring because
17 customers were assigned to a geographic
18 region, assigned to a distribution center.
19         So I don't specifically
20 remember this scenario.
21 QUESTIONS BY MR. BOGLE:
22     Q.   Since you were the process
23 owner, would you have had an ability to
24 review this report before it was finalized?
25     A.   Are you referring to the

Page 233

1  internal audit document?
2      Q.   This audit report, yeah.
3      A.   No.  Because this is -- this is
4  not an audit I conducted.  This is an audit
5  that was conducted by internal audit.
6      Q.   Okay.  So the auditor here was
7  Sandy Campbell.  Do you know -- I don't know
8  if it's a him or a her.
9      A.   I don't know Sandy.
10     Q.   Okay.  Internal audit at
11 McKesson during this time period, were their
12 conclusions, from your perspective, generally
13 accurate?
14     A.   I have no reason to think
15 otherwise.  Internal audit a lot of times was
16 a third party that McKesson would hire.  But
17 I have no reason to believe there was an
18 issue with them.
19     Q.   Okay.  And the other situation
20 described here where one customer has
21 multiple accounts with a single distribution
22 center, do you have any reason to disagree,
23 if that were the case for any customer, that
24 they could circumvent the process that was
25 established under the LDMP?

Page 234

1  MR. EPPICH: Objection;
2  foundation, calls for speculation.
3  A.  Again, I don't recall the --
4  this situation occurring. If it's stated, it
5  may have occurred, but I don't know.
6  QUESTIONS BY MR. BOGLE:
7  Q.  Okay. Well, is it your view
8  that that's an unfounded concern being raised
9  by the auditor there?
10  MR. EPPICH: Objection;
11  foundation, calls for speculation.
12  A.  I don't know.
13  QUESTIONS BY MR. BOGLE:
14  Q.  The next paragraph said --
15  says: The DCs are burdened by the amount of
16  information on one report. Meaning, a
17  customer that has already been reviewed and
18  the sales quantity determined to be
19  legitimate will continue to be included on
20  the report as long as the volume is above the
21  threshold. Also, it is not possible to tell
22  from the report what stage of review the
23  customer is in. If the DCs become
24  overwhelmed by the LDMP, something will be
25  missed.

Page 235

1  Do you see that?
2  A.  I see that.
3  Q.  And certainly, you guys didn't
4  want anything to be missed under the LDMP,
5  right?
6  MR. EPPICH: Objection, form.
7  A.  We wanted accurate data and
8  reporting.
9  QUESTIONS BY MR. BOGLE:
10  Q.  Were you involved in the
11  auditing of individual distribution centers
12  with their compliance with the LDMP?
13  A.  As I said earlier, I don't
14  recall specifically what aspects of LDMP were
15  integrated into the preexisting audit at that
16  time. This was only in existence for about a
17  year before it was migrated into a more
18  robust program of CSMP.
19  Q.  All right. I'm going to hand
20  you Exhibit 1.1913, also marked as
21  Exhibit 16.
22  (McKesson-Hilliard Exhibit 16
23  was marked for identification.)
24  QUESTIONS BY MR. BOGLE:
25  Q.  Do you see here this is a

Page 236

1  Lifestyle Drug Program, McKesson U.S.
2  Pharma - DEA Licensure Audit of Landover,
3  Maryland DC.
4  Do you see that?
5  A.  I see that.
6  Q.  Okay. The date on this one is
7  August 17, 2007 is the last revised date.
8  Do you see that there?
9  A.  I see that.
10  Q.  Okay. And I want to ask you
11  about Section 1.1, which is on page 2.
12  MR. LOMBARDO: Excuse me, does
13  this exhibit have a Bates number?
14  MR. BOGLE: MCKMDL00591841.
15  QUESTIONS BY MR. BOGLE:
16  Q.  All right. Section 1.1 says
17  right under that: The Distribution Center
18  Manager for Landover and the local Sales Team
19  has met and collaborated on how to handle the
20  Lifestyle Drug Monitoring Program. There
21  were two incidents in the past 2-3 years that
22  proved it necessary to take more interest in
23  reviewing narcotics/controlled substance
24  purchases and buying activity for customers.
25  During the interview with IA -- which is

Page 237

1  internal audit, right?
2  A.  That's correct.
3  Q.  Okay.
4  -- the DCM noted that the
5  current monitoring program at Landover does
6  not include any MHS accounts.
7  MHS is the hospital accounts?
8  A.  That's correct.
9  Q.  -- or Retail National Accounts.
10  Those are the large chain
11  pharmacies, right?
12  A.  Also correct.
13  Q.  Okay. The accounts being
14  monitored are primarily the Retail
15  Independent accounts.
16  Those are the smaller
17  independent pharmacies, right?
18  A.  Correct.
19  Q.  Okay. So the goal of the
20  Lifestyle Drug Monitoring Program was that
21  all pharmacies were to be monitored, right?
22  It wasn't just for independent pharmacies,
23  was it?
24  MR. EPPICH: Objection. Calls
25  for speculation. Foundation.

1    A.   I don't recall what was stated
2  in the SOP for that part.
3  QUESTIONS BY MR. BOGLE:
4    Q.   Okay.  Can you think of any
5  reason why you would have drafted an SOP to
6  just apply to the independent pharmacy
7  customers?
8    A.   Well, what I do recall is the
9  independent pharmacies were a focus of the
10 DEA.  That's what was presented to us.  And
11 so that was a key focus.  You know, this was
12 a new program and in development, so --
13 again, I don't recall specifically what was
14 listed in the SOP, that it would say it
15 excludes it or not.
16      But I do recall the DEA telling
17 us the focus as being the independent
18 accounts.
19    Q.   Well, you would agree that it's
20 not just about what the DEA tells you; it's
21 about, you know, doing everything you can as
22 a good company to make sure that suspicious
23 orders aren't being filled, right?
24      MR. EPPICH:  Object to the
25 form.

1    A.   We were working on developing
2  better and better programs, and to enhance
3  the original DU45, this was the next learning
4  curve in a program that we were trying to get
5  out and it was a large initiative.  I don't
6  recall if it was a phased approach or how
7  that worked, but I just recall the
8  independents were a key focus.
9  QUESTIONS BY MR. BOGLE:
10   Q.   Okay.  Well, let's take a look
11 at the SOP itself on this issue, then, so we
12 can sew that up.  It's 1.1333, Exhibit 17 to
13 your deposition, which is MCKMDL00330211.
14      (McKesson-Hilliard Exhibit 17
15      was marked for identification.)
16 QUESTIONS BY MR. BOGLE:
17   Q.   Okay.  What I've handed you is
18 from the McKesson Operations Manual titled
19 Lifestyle Drug Monitoring Program.
20      Do you recognize this document?
21   A.   Yes, I do.
22   Q.   Okay.  This is the SOP, right,
23 for LDMP?
24   A.   Correct.
25   Q.   Okay.  I just want to address

1  the issue we were talking about with Landover
2  about whether MHS, which is the hospital
3  accounts, and the retail national accounts,
4  were supposed to be monitored under this
5  program.  So if you take a look at the last
6  paragraph on the first page where it says,
7  "If the account."
8      Do you see that reference?
9    A.   I see that.
10   Q.   It says:  If the account is a
11 large customer that McKesson expects to
12 purchase in large quantities, for example:
13 Institutional, warehouse accounts, government
14 or mail-order, then you'll generally only
15 have to perform a Level I review.  However,
16 large spikes of any customer, including
17 hospitals, warehouse accounts, or government
18 accounts, must be evaluated.
19      Do you see that?
20   A.   I see it.
21   Q.   Okay.  So does this indicate to
22 you that it wasn't just the small independent
23 chains that were supposed to be evaluated in
24 this program?
25   A.   Yes.  So the expectation is the

1  larger accounts, government accounts, mail
2  orders, they are going to have the large
3  quantities.  But, yes, it does list the
4  hospitals and warehouse accounts.
5    Q.   Just looking at the LDMP
6  itself, it does not on its face limit itself
7  to independent pharmacies, does it?
8    A.   Not that I recall.
9    Q.   And not that you see here
10 either, right?
11   A.   Right.
12   Q.   Now, the due diligence required
13 under the LDMP was supposed to be conducted
14 by the distribution center as soon as the
15 customer hits the 8,000 number, right?  Due
16 diligence was supposed to be instituted
17 immediately thereafter, right?
18      MR. EPPICH:  Object to form.
19   A.   I believe that's what was
20 stated.
21 QUESTIONS BY MR. BOGLE:
22   Q.   Okay.  And I'm going to hand
23 you next, then, what I'm marking as
24 Exhibit 18, which is 1.1918, and that's
25 MCKMDL00591858.

Highly Confidential – Subject to Further Confidentiality Review

Page 242

1    (McKesson-Hilliard Exhibit 18
2    was marked for identification.)
3  QUESTIONS BY MR. BOGLE:
4    Q.    There you go, sir.
5    And this is another Lifestyle
6  Drug Program, McKesson U.S. Pharma - DEA
7  Licensure Audit, this time for the Southern
8  California distribution center.
9    Do you see that?
10   A.    I see that.
11   Q.    This one's last revised date is
12  August 23, 2007.
13   Do you see where that's
14  referenced?
15   A.    I see that.
16   Q.    Okay.  I want to look at
17  Section 1.1 again.  And again, that first
18  paragraph under 1.1 says:  The Distribution
19  Center Manager for So Cal DC and the local
20  Sales Team has met and collaborated on how to
21  handle the Lifestyle Drug Monitoring Program.
22  During the interview with IA -- which again,
23  is internal audit, right?
24   A.    Correct.
25   Q.    -- the DCM noted that the

Page 243

1  current monitoring program at So Cal does not
2  include any MHS accounts or Retail National
3  Accounts.  The accounts being monitored are
4  primarily the Retail Independent accounts.
5    Do you see where that's stated?
6    A.    I see that.
7    Q.    And if you can go to page .3.
8  I'm on Section 1.4, where it says:  DC's
9  Observation of the LDMP.
10   Do you see that section?
11   A.    I see that.
12   Q.    The second sentence in the
13  second paragraph under that says:  Marc
14  states that in his opinion, the monitoring
15  done by Jan Phillips is done "after the fact"
16  and should be initiated sooner from her
17  level.
18   Do you see that?
19   A.    I see that.
20   Q.    And Marc is the distribution
21  center manager for that distribution center,
22  right?
23   A.    Correct.
24   Q.    Okay.  And "the monitoring" is
25  talking about the monitoring under the LDMP,

Page 244

1  right?
2    MR. EPPICH:  Objection,
3    foundation.  Calls for speculation.
4    A.    That's what's stated here.
5  QUESTIONS BY MR. BOGLE:
6    Q.    And again, the purpose of the
7  LDMP was not to do the review after the fact
8  but to do it as soon as possible once they
9  hit the 8,000 number, right?
10   MR. EPPICH:  Objection,
11   foundation, form.
12   A.    That's my recollection.
13  QUESTIONS BY MR. BOGLE:
14   Q.    All right.  I just want to show
15  you one more of these audits, which is
16  Exhibit 1.1917, marked as Exhibit 19 to your
17  deposition, and that's MCKMDL00591251.
18   (McKesson-Hilliard Exhibit 19
19   was marked for identification.)
20  QUESTIONS BY MR. BOGLE:
21   Q.    And this is an Audit Report,
22  DEA Licensure Compliance and LDMP Audit, U.S.
23  Pharmaceuticals.
24   Do you see that at the top?
25   A.    I see that.

Page 245

1    Q.    And this is sent to both
2  yourself and Bruce Russell, right?
3    A.    That is correct.
4    Q.    Okay.  And it says the date
5  audit completed here was August 31, 2007.
6    Do you see that reference?
7    A.    Yes, I see that.
8    Q.    The rating here is green.  What
9  does that color represent in this auditing
10  scheme?
11   A.    Satisfactory.
12   Q.    Okay.  Let's go to page .7 of
13  this document.  Under number 1, under the
14  Issue/Observation column, you see where it
15  says Lifestyle Drugs Monitoring Program?
16   A.    Yes, I do.
17   Q.    Okay.  The first bullet point
18  below that says:  Account reps and/or the
19  Customer Care groups associated with Retail
20  National Accounts and Hospital accounts are
21  unaware of the directive to monitor Lifestyle
22  Drugs and are not performing this task.
23   Do you see that?
24   A.    I see that.
25   Q.    Okay.  And there's actually a

Page 246

1  Risk column to the right of that for this
2  specific issue, right?
3      A.   Yes, there is.
4      Q.   Okay.  And under Significance
5  for Risk related to this issue, it's noted to
6  be moderate, right?
7      A.   Correct.
8      Q.   And the actual risk outlined
9  is:  Differences in the LDMP execution will
10 lead to inefficiencies as it relates to
11 compliance with the DEA expectations.
12         Do you see that statement?
13     A.   I see that.
14     Q.   Do you agree with that
15 statement, if there's differences in LDMP
16 execution it's going to lead to
17 inefficiencies with compliance?
18     A.   Yes.  That could happen.
19     Q.   And then I want to look at one
20 more thing here on the next page.  The top
21 bullet point here under Issues/Observations
22 says:  Provide structured training to DC
23 personnel or other functions that provide
24 input to the DEA process.  Compliance
25 regulations are not reinforced or

Page 247

1  periodically revisited for updates relative
2  to DEA changes or mandates.
3          Do you see that reference?
4      A.   I see the reference.
5      Q.   Okay.  And then related to that
6  bullet point, there's a risk of:  Lack of
7  process oversight could lead to
8  noncompliance.
9          Do you see that?
10     A.   I see that.
11     Q.   Okay.  Do you agree that lack
12 of process oversight with any measure in
13 regulatory affairs could lead to
14 noncompliance?
15         MR. EPPICH:  Objection to the
16     extent it misstates the document.
17     A.   Process oversight should occur
18 to ensure compliance with the LDMP program
19 that was implemented.
20 QUESTIONS BY MR. BOGLE:
21     Q.   Okay.  Okay.  We touched on
22 this a little bit before, but I want to get
23 more specific with you as far as the size and
24 scope of the regulatory department at various
25 points in time at McKesson.

Page 248

1          So prior to 2008, so let's talk
2  1997 to 2008, the regulatory department at
3  McKesson for pharmaceuticals generally
4  consisted of three people, right?
5      A.   Correct.
6      Q.   All right.  That's you, Don
7  Walker, Bruce Russell.  True?
8      A.   Generally speaking, yes.
9      Q.   Okay.  And do you recall
10 attending a DEA conference in 2007 that
11 raised concerns for you that three people was
12 insufficient resources to do what you needed
13 to do as far as regulatory compliance at
14 McKesson?
15         MR. EPPICH:  Object to the
16     form.
17     A.   Yeah, I don't recall attending
18 a conference that stated we didn't have
19 enough people in our department.
20 QUESTIONS BY MR. BOGLE:
21     Q.   All right.  Let's take a look
22 at Exhibit 1.2002, which is Exhibit 20 to
23 your deposition.
24         (McKesson-Hilliard Exhibit 20
25     was marked for identification.)

Page 249

1  QUESTIONS BY MR. BOGLE:
2      Q.   All right.  And here we've got
3  a series of e-mails and we're going to walk
4  through a couple of portions here with you.
5  This is MCKMDL00622532.
6          Let's start by looking at an
7  e-mail from you in the middle of the page
8  there on September 11, 2007, at 3:25 p.m.
9          Do you see where I'm at?
10     A.   I see that.
11     Q.   Okay.  It's an e-mail from you
12 to Donald Walker, Ina Trugman -- what does
13 Ina Trugman do at this time for the company?
14     A.   She was McKesson counsel.  She
15 worked for McKesson.
16     Q.   Legal counsel?
17     A.   Correct.
18     Q.   CC'ing Tom McDonald, Bruce
19 Russell and Sheila Pacheco.  I don't know if
20 I got that right, but I tried.
21     A.   That's right.
22     Q.   The subject is:  Mapes and ABC
23 presentation notes.
24         Do you see that subject?
25     A.   I see that.

Page 250

1    Q.   Okay. And you say here in the
2 body of the e-mail: Don, I am attending the
3 DEA Pharmaceutical Conference today. Mike
4 Mapes (30 days until retirement) and Chris
5 Zimmerman, VP Corporate Security and
6 Regulatory Affairs, ABC, spoke on Drug
7 Diversion.
8      Do you see that sentence?
9    A.   I see that.
10    Q.   ABC, is that AmerisourceBergen?
11    A.   That's correct.
12    Q.   In my opinion, this could be
13 the "time bomb" you referenced. ABC's
14 program appears to be more robust in the
15 following areas. I expect Mapes to define
16 this as the standard.
17      Do you see that?
18    A.   I see that.
19    Q.   So you're talking about a time
20 bomb there. What are you talking about?
21    A.   I don't recall. I'm referring
22 to something that Don must have said. I
23 don't recall what the context was.
24    Q.   Okay. And then you list the
25 following areas in which you've concluded

Page 251

1 ABC's Suspicious Order Monitoring Program is
2 more robust than McKesson's at this point in
3 time, right?
4    A.   That's what's stated, yes.
5    Q.   Okay. The first is: Four
6 dedicated Regulatory Directors for their
7 diversion program.
8      Do you see that as number 1?
9    A.   Yes, I do.
10    Q.   Okay. And at this point in
11 time, in September 2007, it was just you as
12 far as being a director of regulatory
13 affairs, right?
14    A.   For the field, yes.
15    Q.   All right. Number 2 says:
16 Dedicated regulatory FTE at each DC.
17      What does "FTE" mean?
18    A.   Full-time employee.
19    Q.   Okay. Works on this program as
20 well as other regulatory functions.
21      So at this point in time, in
22 September 2007, did McKesson have any
23 full-time regulatory employees working at
24 each distribution center?
25      MR. EPPICH: Objection,

Page 252

1 foundation.
2    A.   Not in the same context. There
3 were full-time employees that worked -- we
4 called them ARCOS clerks. There could be
5 other titles that they may have in the
6 warehouse where they perform DEA functions,
7 whether it's reviewing DU45s, ARCOS reports,
8 inventories, things of that nature.
9 QUESTIONS BY MR. BOGLE:
10    Q.   Okay. But was there a
11 dedicated regulatory full-time staffer at
12 each distribution center in this time frame
13 doing that?
14      MR. EPPICH: Objection, asked
15    and answered.
16    A.   They performed regulatory
17 functions. Their titles may not have stated
18 "regulatory."
19 QUESTIONS BY MR. BOGLE:
20    Q.   Okay. Number 3 says:
21 Monitoring All -- and all is in caps --
22 controlled substances and list I drugs under
23 this program.
24      Do you see that?
25    A.   I see that.

Page 253

1    Q.   Number 4 says: Regulatory
2 control's approval for new accounts.
3      Do you see that reference?
4    A.   I see that.
5    Q.   Okay. And so at this point in
6 time in September 2007, ABC's program was
7 more robust than McKesson's in that regard
8 because regulatory did not approve new
9 accounts at that point, right?
10    A.   Not to my recollection.
11    Q.   Okay. 5 says: Orders are held
12 for on-site review and approval. Realtime
13 review prior to release of order. Escalated
14 as necessary to regional directors.
15      Do you see that?
16    A.   I see that.
17    Q.   Okay. And realtime review
18 being done prior to release of orders was not
19 being -- was not the standard practice at
20 McKesson at this point in time, was it?
21    A.   It was not.
22    Q.   Then you say: In conversation
23 with Cardinal, they have three dedicated
24 persons working their diversion control
25 program beyond the DC's participation.

Highly Confidential – Subject to Further Confidentiality Review

Page 254

1        Do you see that?
2        A.    Yes, I see that.
3        Q.    Okay.  So again, that's more
4   people than McKesson had working in that
5   regard at that point in time, right?
6        A.    Yes.
7        Q.    And then so Donald Walker
8   responds to your e-mail above that, and he
9   says: Gary, thank you, I think, for this
10   information.  Based on this I would expect
11   DEA would see as not being serious.  I will
12   begin putting some contingencies together.
13        Do you see that?
14        A.    I see that.
15        Q.    Okay.  So there were concerns
16   at this point in time that based on this
17   presentation that DEA would have seen from
18   ABC that they would view McKesson as not
19   being serious in their suspicious order
20   monitoring practices, right?
21        MR. EPPICH:  Objection;
22   foundation, calls for speculation.
23        A.    That was a concern.
24   QUESTIONS BY MR. BOGLE:
25        Q.    Then you respond up above

Page 255

1   that -- I'm looking at the second sentence
2   there in that response, where you say: Steve
3   Reardon mentioned that Mapes had contacted
4   him prior to the meeting wanted him to go
5   back to Washington to discuss some accounts.
6   Steve asked him who they were so he could
7   check into it.  He got the accounts and
8   verified they had already discontinued
9   business with them.  Mapes asked him why he
10   didn't inform Kyle Wright or himself.  No
11   reason.  Mapes requested that he do so in the
12   future.  We have not been notifying Mapes or
13   Wright either.  Based on the information I am
14   pulling together, we should notify them as
15   well on our closed accounts.
16        Do you see those references?
17        A.    I see that.
18        Q.    Okay.  So at this point in time
19   in 2007, when McKesson would close an account
20   for any concerns with suspicious activity,
21   there was no notification being sent to the
22   DEA at that point.  That's what you're
23   referencing, right?
24        MR. EPPICH:  Objection to the
25   form.

Page 256

1        A.    My recollection was that
2   accounts were closed for numerous reasons and
3   some of those reasons could have been in
4   relation to the LDMP level reviews and that
5   if we just decided to discontinue business
6   with them, based on those reviews or anything
7   else, they weren't getting reported to the
8   DEA, which DEA may perceive that we're not
9   actively working on the accounts.
10   QUESTIONS BY MR. BOGLE:
11        Q.    Okay.  And plus, if you report
12   a customer to the DEA as being someone that
13   you've -- you're no longer willing to do
14   business with, that would allow the DEA to be
15   aware of that and investigate that
16   themselves, right?
17        MR. EPPICH:  Objection; calls
18   for speculation.
19        A.    Just because we decide not to
20   do business with them didn't mean they were a
21   bad player.  There may just not have been
22   enough green lights to check off to say that
23   we're willing to do business with them.
24   QUESTIONS BY MR. BOGLE:
25        Q.    But what would be the harm in

Page 257

1   letting the DEA know that, to let them make
2   their own decision?
3        MR. EPPICH:  Objection; calls
4   for speculation.
5        A.    Yeah, it's -- that's why I
6   pointed out here that it's probably best
7   that, since Mapes had responded to Cardinal,
8   that -- to inform them, that it would be in
9   our best interest also to inform them, and
10   that way they'd know that we were actively
11   working on these.
12   QUESTIONS BY MR. BOGLE:
13        Q.    But why would you need to hear
14   that from Mr. Mapes?  I mean, wouldn't it be
15   common sense that if you cut a customer off
16   altogether and aren't willing to sell them
17   controlled substances because you have some
18   concern about them, that that would be
19   important to notify the DEA about?  Why would
20   you need the DEA to tell you that?
21        MR. EPPICH:  Objection to form;
22   calls for speculation, assumes facts
23   not in evidence.
24        A.    Just because we decided to do
25   business with them again for various reasons,

Page 258

1  it was not initially apparent that we needed
2  to notify them.
3  QUESTIONS BY MR. BOGLE:
4      Q.    Okay.  So that's not something
5  that dawned on you guys until this reference
6  was made.  True?
7          MR. EPPICH:  Objection; calls
8      for speculation.  Misstates prior
9      testimony.
10     A.    This is when I pointed it out.
11  I don't know if there's any other discussion
12  that took place on it.
13  QUESTIONS BY MR. BOGLE:
14     Q.    Okay.  To your knowledge, this
15  was not something that -- well, strike that.
16         This was not something that
17  dawned on you as being something that needed
18  to be reported until you heard this
19  discussion in September 2007, right?
20         MR. EPPICH:  Objection to the
21     form; misstates prior testimony,
22     misstates the document.
23     A.    You know, it came to my
24  conclusion based on these conversations.  I
25  brought it up to my senior manager and -- so

Page 259

1  it could be addressed.
2  QUESTIONS BY MR. BOGLE:
3      Q.    Do you recall going back to
4  another DEA conference a couple of years
5  later where you left with similar concerns
6  that McKesson was understaffed when it came
7  to suspicious order monitoring?
8          MR. EPPICH:  Objection, form.
9      Vague.
10     A.    I may have, but I don't
11  specifically remember.
12  QUESTIONS BY MR. BOGLE:
13     Q.    Okay.  Let's take a look at
14  what I'm marking as Exhibit 21, which is
15  1.1856, and that's MCKMDL00573535.
16         (McKesson-Hilliard Exhibit 21
17     was marked for identification.)
18  QUESTIONS BY MR. BOGLE:
19     Q.    All right.  I want to take a
20  look at the e-mail, middle of the first page,
21  from Tom McDonald to what I believe is a
22  regulatory e-mail group.  Is that right?  Is
23  that the regulatory e-mail group?
24     A.    That's correct.
25     Q.    Okay.  So you would have been

Page 260

1  included in that group, right?
2      A.    That's correct.
3      Q.    Okay.  And this is from
4  October 16, 2009, with a subject "DEA Meeting
5  in Portland (Recap)."
6          Do you see that?
7      A.    I see that.
8      Q.    So Mr. McDonald says
9  thereafter:  Gary and I attended the DEA
10  Pharmaceutical Industry Conference in
11  Portland this week.  Although the meeting was
12  generally a rehash of the last industry
13  conference we attended in Houston a couple of
14  years ago, it does appear that the DEA is
15  trying to promote an image of collaboration.
16         Do you see that?
17     A.    I see that.
18     Q.    And the Gary he's referencing
19  here that went to this conference with him
20  would be you, right?
21     A.    Correct.
22     Q.    I want to look at the second
23  page here of this document.  This is a
24  continuation of that same e-mail.  The first
25  full paragraph there that starts with "Chris

Page 261

1  Zimmerman."
2          Do you see that?
3      A.    I see that.
4      Q.    It says:  Chris Zimmerman
5  shared ABC's approach to controlled substance
6  monitoring briefly.  It appears that they
7  employ more people in support of this process
8  than we do.  Chris has a centralized staff of
9  people that investigates all new customers.
10  He has a full-time analyst crunching data
11  daily to look for trends.  They not only look
12  at controls, but corresponding drug trends.
13  He used stool softeners as an example with
14  certain pain meds that generate constipation.
15  It sounds like he has a full-time person at
16  each facility reviewing all controlled
17  substance orders daily prior to shipping.
18         Do you see that reference?
19     A.    I see that.
20     Q.    Okay.  And again, these were
21  concerns from a meeting you attended with
22  Mr. McDonald that he's raising that, at least
23  in his view, ABC is putting more resources to
24  suspicious order monitoring than McKesson was
25  at the time, right?

Page 262

1    MR. EPPICH: Objection;
2  foundation, calls for speculation.
3    A.    These are Tom's comments.
4  QUESTIONS BY MR. BOGLE:
5    Q.    Okay. But those -- his
6  comments are along those lines, right?
7    MR. EPPICH: Objection;
8  foundation, calls for speculation.
9    A.    I don't know everything that
10 Tom was thinking here. This is what he
11 states is the employees that
12 AmerisourceBergen has, so...
13 QUESTIONS BY MR. BOGLE:
14   Q.    And, you see, you actually do
15 respond to his e-mail thereafter, right?
16   A.    Okay. Yes.
17   Q.    Do you see that there?
18   A.    Yes.
19   Q.    Okay. And your response
20 doesn't include any statement from you that
21 you disagree with anything he said in the
22 e-mail below, right, or correcting anything
23 that you saw at the meeting?
24   A.    I made no comments to Tom's
25 e-mail below.

Page 263

1    Q.    Right. You make no corrections
2  based on what you perceived at that meeting,
3  did you?
4    A.    I did not comment on his
5  meeting notes.
6    Q.    Okay. But you're aware that
7  significant additions to McKesson's
8  regulatory team did not occur, in fact, until
9  the 2013-2014 time frame, right?
10   MR. EPPICH: Object to the
11   form.
12   A.    There were -- we doubled in
13 size when the regional DRAs came aboard, so
14 that was a major change from that aspect.
15 There were certainly much larger numbers that
16 came onboard as the department developed.
17 QUESTIONS BY MR. BOGLE:
18   Q.    Right. But we just looked at
19 this discussion from 2009. So it wasn't --
20 after 2009, it wasn't until late 2013, early
21 2014, that significant additions were made as
22 far as staffing in the regulatory department
23 of McKesson, right?
24   MR. EPPICH: Objection to form;
25   asked and answered.

Page 264

1    A.    I'm not sure exactly on the
2  dates. We doubled in size in the 2009 time
3  frame, and at this point and juncture of 2013
4  and such, I'm no longer working actively in
5  the CSMP program. But there were
6  additional -- significant additional head
7  count that was produced to the department. I
8  just don't know exact dates when that
9  occurred.
10 QUESTIONS BY MR. BOGLE:
11   Q.    When you say you doubled in
12 size in around 2009, that's doubling from
13 three people to six people, right?
14   A.    Four more were added, so it's
15 from three to seven.
16   Q.    Three to seven people, okay.
17   A.    Yeah.
18   Q.    And that's to cover, again,
19 what is approximately 30 distribution
20 centers, right?
21   A.    Correct.
22   Q.    Okay. And you're aware of --
23 well, strike that.
24       Not only 30 distribution
25 centers, but supplying a large portion of the

Page 265

1  pharmaceutical products that people utilize
2  in this country, right?
3    MR. EPPICH: Object to the
4    form. Calls for speculation.
5    A.    I didn't have any control on
6  the head count in the department. That would
7  be our -- Don Walker's position to decide
8  what type of head counts we needed to cover
9  the area. Again, I wasn't assigned to a
10 region for those processes.
11 QUESTIONS BY MR. BOGLE:
12   Q.    Okay. So additional staffing
13 wouldn't have been your call. Is that what
14 you're saying?
15   A.    That's correct.
16   Q.    We touched on this a little
17 bit, but I want to talk more specifically
18 about it. In 2008, following the settlement
19 we saw with the DEA, the CSMP was
20 implemented, right?
21   A.    Correct.
22   Q.    Okay. And under the CSMP,
23 there were thresholds established for
24 controlled substances for customers, right?
25   A.    There were thresholds, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  Q.  Okay.  And those controlled
2  substances included opioid products, right?
3  A.  Yes, they did.
4  Q.  Okay.  And when those
5  thresholds were initially set in 2008, they
6  were done by looking at the prior 12 months'
7  usage, taking the highest month of use in the
8  last 12 months, and adding a 10% buffer,
9  right?
10  MR. EPPICH:  Objection, form.
11  Foundation, calls for speculation.
12  A.  I didn't -- I recalled being in
13  the discussions, but I didn't actually do the
14  thresholds.
15  QUESTIONS BY MR. BOGLE:
16  Q.  Okay.  Do you not have any
17  knowledge that that's how they were set?
18  A.  That seems to seem familiar,
19  but I don't recall specifically.
20  Q.  Okay.  Thresholds themselves
21  could be increased, though, by a process
22  called a Threshold Change Request, right?
23  A.  That's correct.
24  MR. EPPICH:  Object to the
25  form.

Page 267

1  QUESTIONS BY MR. BOGLE:
2  Q.  After the CSMP was established
3  in 2008, there was a general view expressed
4  at McKesson that the intent was, even though
5  the CSMP was being established, McKesson
6  intended it be for business as usual for its
7  pharmacy customers, right, as far as it
8  pertained to them getting controlled
9  substances?
10  MR. EPPICH:  Object to the
11  form; calls for speculation.
12  A.  In any implementation case, you
13  always want to not disrupt operations or
14  disrupt customers.  So implementation of a
15  new program, whether it's a system upgrade
16  or, in this case, a new program, the purpose
17  would be to make it as least painful for your
18  customers as possible.
19  QUESTIONS BY MR. BOGLE:
20  Q.  But the primary purpose in
21  establishing the CSMP would need to be making
22  sure that there's proper monitoring and
23  reporting of controlled substance purchases,
24  right?  That's the ultimate goal, right?
25  MR. EPPICH:  Object to the

Page 268

1  form.  Calls for speculation.
2  A.  The goal is to ensure the
3  proper delivery of controlled substances to
4  customers.  That doesn't mean it has to be
5  painful for them.
6  QUESTIONS BY MR. BOGLE:
7  Q.  Okay.  But we looked at the
8  2008 settlement agreement where there were --
9  there was a $13.25 million fine paid for
10  conduct related to various distribution
11  centers for distribution of opioids.
12  In your view, after that, was
13  there not some reason to change the course of
14  conduct at McKesson as it pertained to
15  controlled substance distribution?
16  MR. EPPICH:  Objection to the
17  form; calls for speculation.
18  Foundation.
19  A.  McKesson, we worked to develop
20  new and enhanced programs that demonstrates
21  activity that occurred after that agreement.
22  QUESTIONS BY MR. BOGLE:
23  Q.  Okay.  But with the conduct
24  that we looked at in that settlement
25  agreement, do you agree or not agree that

Page 269

1  changes needed to be made in the controlled
2  substance monitoring practices at McKesson?
3  MR. EPPICH:  Object to form.
4  A.  There were changes made.
5  That's how we came to develop the LDMP and
6  then developed the more robust CSMP program.
7  QUESTIONS BY MR. BOGLE:
8  Q.  And if those changes are going
9  to be meaningful, then it shouldn't be
10  business as usual for customers, should it?
11  It should be more difficult for customers to
12  get controlled substances, right?
13  MR. EPPICH:  Object to the
14  form.  Vague.
15  A.  You can work collaboratively
16  with your customers and not make it painful
17  for them, so, you know, it's -- business
18  doesn't have to be painful.  Changing
19  processes, enhancing programs, working
20  collaborative with customers, is what was
21  needed and what we developed and it could
22  enhance the program.
23  QUESTIONS BY MR. BOGLE:
24  Q.  Okay.  So then when the CSMP
25  was developed, was it your understanding that

Page 270

1 the ultimate goal was to make sure that
2 customers stayed happy and kept getting the
3 product that they wanted to get?
4          MR. EPPICH:  Object to the
5     form; vague, misstates prior
6     testimony.
7     A.    Obviously that wasn't the
8 purpose.
9 QUESTIONS BY MR. BOGLE:
10    Q.    Okay.  So is it an accurate
11 statement that the goal was to make sure that
12 there was no disruption in the business
13 activities of any McKesson customer?
14          MR. EPPICH:  Objection to the
15     form; misstates prior testimony.
16     Calls for speculation.
17     A.    As stated before, there were
18 customers that we discontinued doing business
19 with.  So in some cases, customers would be
20 unhappy.  But that doesn't mean that all
21 customers are going to get discontinued
22 business.  They're all going to get reviewed,
23 and again, it doesn't mean it has to disrupt
24 the business between the companies.
25          --oOo--

Page 271

1 QUESTIONS BY MR. BOGLE:
2     Q.    But if it becomes more
3 difficult for customers to get opioid
4 products, isn't that justified if you're
5 facing an epidemic?
6          MR. EPPICH:  Objection to the
7     form.  Vague.  Calls for speculation.
8     A.    I don't know what that would
9 affect to the customer.  Just because you're
10 doing a review and you're knowing your
11 customer, you're making sure they obtain the
12 amount of product that they need for
13 legitimate purposes.  That's not painful for
14 a customer.
15 QUESTIONS BY MR. BOGLE:
16    Q.    Okay.  So it's your testimony,
17 then, that -- I'm trying to make sure I
18 understand what you're saying here.  So the
19 business-as-usual attitude did exist in
20 creation of the CSMP, right?
21          MR. EPPICH:  Objection.
22 QUESTIONS BY MR. BOGLE:
23    Q.    Am I understanding you
24 correctly?
25          MR. EPPICH:  Objection, form.

Page 272

1     Misstates prior testimony.
2     A.    No.  We put together processes
3 and our functions changed.  We had different
4 procedures that we had to comply with and
5 that also meant working with customers.
6 QUESTIONS BY MR. BOGLE:
7     Q.    Okay.  I'm handing you what I'm
8 marking as Exhibit 22 to your deposition,
9 which is Exhibit 1.1962, and that's
10 MCKMDL00543610.
11          (McKesson-Hilliard Exhibit 22
12     was marked for identification.)
13 QUESTIONS BY MR. BOGLE:
14    Q.    We see here this is a series of
15 e-mails with an attached flier titled
16 McKesson Controlled Substances Monitoring
17 Program, Program Guide for Pharmacies.
18          Do you see that on the third
19 page?
20    A.    I see that.
21    Q.    Okay.  And the e-mail that
22 attaches this, if you go back to the first
23 page, is from April 17, 2008.
24          Do you see that?
25    A.    I see that.

Page 273

1     Q.    This is right around the time
2 the CSMP was being launched, right?
3     A.    That sounds correct.
4     Q.    Okay.  Looking at the flier on
5 the third page here, you see where it says
6 "Program details"?
7     A.    I'm sorry, where, on the third
8 page?
9     Q.    Yes, sir.  "Program details,"
10 kind of --
11    A.    I see that now.
12    Q.    All right.  It says:  All U.S.
13 drug wholesalers have always been required by
14 DEA to monitor the ordering of controlled
15 substances.  Those regulations have not
16 changed, but the extent to which wholesalers
17 are now required to monitor and enforce the
18 legitimate use of controlled substances has.
19 While we trust and respect our customers'
20 integrity and professionalism, we must
21 cooperate with these mandates from the DEA.
22          Do you see that?
23    A.    I see that.
24    Q.    Okay.  And then below that it
25 says:  Therefore, beginning this month,

Page 274

1  McKesson will implement the CSMP.  Here's how
2  the program works.
3       And there's multiple bullet
4  points below that, right?
5       A.    I see that.
6       Q.    Okay.  And the next-to-last one
7  says:  Customers will be alerted in advance
8  of meeting or exceeding their thresholds.
9       Do you see that reference?
10      A.    Yes, I see that.
11      Q.    Okay.  And that was a process
12  known as a Threshold Warning Report, right?
13          MR. EPPICH:  Object to the
14  form.
15      A.    That's my recollection.
16  QUESTIONS BY MR. BOGLE:
17      Q.    Okay.  And basically, the
18  concept being that once the customer met a
19  certain percentage of their threshold, they
20  would be notified that they were approaching
21  their threshold for a controlled substance,
22  right?
23          MR. EPPICH:  Object to the
24  form.
25      A.    That's also my recollection.

Page 275

1  QUESTIONS BY MR. BOGLE:
2       Q.    Okay.  And the last bullet
3  point on that page says:  Customers can apply
4  for threshold adjustments if their business
5  is changing or they anticipate needing to
6  place a larger order.
7       Do you see that there?
8       A.    Yes, I see that.
9       Q.    Okay.  Then if you go to the
10  next page, there's a section that says
11  "Communicating anticipated order increases."
12      Do you see that?
13      A.    I see that.
14      Q.    The second sentence there says:
15  McKesson has developed a Threshold Change
16  Request process, allowing you to communicate
17  your needs in advance so we can accommodate
18  them in advance of any delays or disruptions
19  in delivery.
20      Do you see that?
21      A.    Yes, I see that.
22      Q.    Okay.  And then the last thing
23  I want to talk about is the gray box below
24  that.  The second sentence there says:  This
25  program addresses the DEA's requirements to

Page 276

1  ensure controlled substances are used in the
2  way they were intended, but it also ensures
3  that you as a McKesson customer can continue
4  with business as usual.
5       Do you see that?
6       A.    Yes, I do.
7       Q.    Okay.  Now, I want to talk to
8  you a little bit more about the Threshold
9  Warning Report concept.  The purpose of the
10  Threshold Warning Reports was to make sure
11  that the customer was aware when they were
12  approaching a threshold so they could ask for
13  an increase before their supply got cut off,
14  right?
15          MR. EPPICH:  Object to the
16  form; calls for speculation.
17      A.    That's my recollection.
18  QUESTIONS BY MR. BOGLE:
19      Q.    Okay.  And also to make sure
20  that, quite frankly, McKesson didn't lose
21  those sales, right?
22          MR. EPPICH:  Object to the
23  form.  Argumentative.
24      A.    No.  It would be so that due
25  diligence could be conducted to determine if

Page 277

1  they needed additional threshold increase.
2  QUESTIONS BY MR. BOGLE:
3       Q.    Okay.  So in your view, then,
4  it wasn't to ensure that McKesson didn't lose
5  sales of controlled substances.  Is that your
6  testimony?
7          MR. EPPICH:  Object to the
8  form; asked and answered.
9       A.    It was to conduct additional
10  due diligence to see if they could get a
11  threshold increase.
12  QUESTIONS BY MR. BOGLE:
13      Q.    And not any concern at all
14  about potentially losing sales?
15          MR. EPPICH:  Objection to form;
16  asked and answered twice.
17      A.    It was to do due diligence to
18  see if they needed a threshold change.
19  QUESTIONS BY MR. BOGLE:
20      Q.    Okay.  Do you recall being
21  involved in any discussions about the need to
22  set up a Threshold Warning Report for the
23  very specific purpose of making sure McKesson
24  didn't lose sales of controlled substances?
25          MR. EPPICH:  Objection to the

Highly Confidential – Subject to Further Confidentiality Review

Page 278

1 form; misstates prior testimony.
2     A.    No.
3         MR. EPPICH:  Assumes facts not
4 in evidence.
5     A.    No, I do not recall ever having
6 any conversations of that nature.
7 QUESTIONS BY MR. BOGLE:
8     Q.    Okay.  I'm going to hand you
9 what I'm marking as Exhibit 23, which is
10 1.1804, and that's MCKMDL00543971.
11        (McKesson-Hilliard Exhibit 23
12     was marked for identification.)
13 QUESTIONS BY MR. BOGLE:
14     Q.    There you go, sir.
15        All right.  Let's start at the
16 last page of the document, .3.  There's an
17 e-mail at the bottom from you, October 23,
18 2006, to a Sharon Mackarness.
19        Do you see that?
20     A.    I see that.
21     Q.    Okay.  There you say:  McKesson
22 will establish a monthly threshold of 10,000
23 dosage forms of hydrocodone for all customers
24 at each of its facilities.  Customers
25 requesting to purchase more than this amount

Page 279

1 will be required to provide additional
2 information on its dispensing practices to
3 justify amounts above this threshold.  Such
4 information will be reviewed by McKesson
5 Regulatory Affairs before a customer will be
6 authorized to purchase more than 10,000
7 dosage forms per month.  McKesson will also
8 establish thresholds for other controlled
9 substances purchases.
10        Do you see that e-mail?
11     A.    I see that.
12     Q.    Okay.  So then if you go to
13 page .2, I'm looking at the e-mail from
14 Sharon Mackarness back to you, October 26,
15 2006, at 3:44 p.m.
16        Do you see that?
17     A.    Yes, I see that.
18     Q.    Okay.  The second paragraph she
19 says to you:  JB -- JD brought up a valid
20 point in the meeting.  We are in the business
21 to sell product.  If we could produce a
22 report (you may already have one) that warned
23 a customer's approach to the threshold, say
24 at 85% of their 10,000 dosages, work could
25 begin on justifying an increase in threshold

Page 280

1 prior to any lost sales.
2        Do you see that?
3     A.    I see that.
4     Q.    Okay.  And do you see your
5 response above in the second sentence in your
6 next e-mail, and what is that?
7     A.    "I think JD's idea is good."
8     Q.    Okay.  And that's the idea
9 you're referencing, the one I just read
10 about, right?
11     A.    The one stated in Sharon's
12 e-mail, yes.
13     Q.    Right, okay.  Which talks about
14 being in the business to sell product and
15 coming up with a threshold warning style
16 report that would allow customers to justify
17 an increase prior to McKesson losing sales,
18 right?
19     A.    That's what's stated, yes.
20     Q.    Okay.
21        MR. EPPICH:  Are you at a good
22 place to take another break?
23        MR. BOGLE:  Yeah, I was
24 actually about to say the same thing.
25 You read my mind.

Page 281

1        MR. EPPICH:  Let's go ahead and
2 go off the record.
3        THE VIDEOGRAPHER:  Off the
4 record at 2:34.
5        (Recess taken, 2:34 p.m. to
6 2:50 p.m.)
7        THE VIDEOGRAPHER:  Stand by.
8 The time is 2:50.  Back on the record,
9 beginning of File 5.
10 QUESTIONS BY MR. BOGLE:
11     Q.    All right, Mr. Hilliard.  You
12 recall earlier in the deposition we talked
13 about the PowerPoint that was presented by
14 Mr. Mapes at the September 1, 2005 meeting
15 with McKesson?  Do you recall discussing that
16 generally?
17     A.    Yes, I do.
18     Q.    Okay.  If we can pull that back
19 out, which I believe is Exhibit 4, and I want
20 to go back to page .9.  We talked about this
21 a little bit before, but that bottom slide
22 there titled Suspicious Orders, the last
23 bullet point says:  Report suspicious orders
24 to DEA when discovered.
25        Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 A. I see that.
2 Q. Okay. And then on the next
3 page we talked about the last slide there,
4 the bottom slide there on that page, the
5 second bullet point, which says: Distributor
6 must determine which orders are suspicious
7 and make a sales decision.
8 Do you see that?
9 A. Yes, I see that.
10 Q. Okay. So between these two
11 bullet points, and quite frankly, the rest of
12 the discussion here, what's being conveyed,
13 among other things, is that McKesson is
14 expected to report suspicious orders, not
15 suspicious sales after the fact, right?
16 MR. EPPICH: Object to the
17 form; calls for speculation.
18 A. The slide states "suspicious
19 orders."
20 QUESTIONS BY MR. BOGLE:
21 Q. Right. And the second
22 reference we just read talks about
23 determining which orders are suspicious and
24 making a sales decision, right?
25 A. That's what's stated.

Page 283

1 Q. Okay. Again, that indicates
2 that the DEA is expecting you guys to make a
3 decision whether something is suspicious
4 before you make the sale, right?
5 MR. EPPICH: Object to the
6 form; calls for speculation.
7 A. I don't know specifically what
8 the intention or their thought from this
9 slide was.
10 QUESTIONS BY MR. BOGLE:
11 Q. Okay. Well, did you walk away
12 from this meeting thinking that the DEA's
13 expectations were for McKesson to report
14 suspicious sales after the fact rather than
15 orders when they were placed?
16 MR. EPPICH: Object to the
17 form; calls for speculation, asked and
18 answered.
19 A. I don't recall what I thought
20 after this meeting.
21 QUESTIONS BY MR. BOGLE:
22 Q. Okay. Regardless, on .9,
23 though, we can agree that there's no
24 reference to reporting suspicious sales;
25 rather, the reference is to reporting

Page 284

1 suspicious orders, right?
2 MR. EPPICH: Object to the
3 form. The document speaks for itself.
4 A. The document says "suspicious
5 orders."
6 QUESTIONS BY MR. BOGLE:
7 Q. Okay. And that was the
8 presentation from September 1, 2005, right?
9 A. That's correct.
10 Q. Okay. Then if we go back to
11 Exhibit 3, which is the Rannazzisi letter
12 from September 27, 2006, you recall
13 discussing this letter with me earlier today,
14 right?
15 A. Yes, I do.
16 Q. Okay. If we go to the second
17 page of the letter, there is a paragraph
18 about three-quarters of the way down that
19 says, "Thus, in addition to."
20 Do you see that?
21 A. Yes, I do.
22 Q. It says: Thus, in addition to
23 reporting all suspicious orders, a
24 distributor has a statutory responsibility to
25 exercise due diligence to avoid filling

Page 285

1 suspicious orders that might be diverted into
2 other than legitimate medical, scientific,
3 and industrial channels.
4 Do you see that?
5 A. I see that.
6 Q. Okay. And the next paragraph
7 down that we read before talks about the
8 distributor needing to exercise due care in
9 confirming the legitimacy of orders prior to
10 filling.
11 Do you see that reference in
12 the last sentence?
13 A. Yes, I see that now.
14 Q. Okay. So, again, this letter
15 from September 27, 2006, you would agree with
16 me makes clear that the expectation is that
17 McKesson will be reporting suspicious orders
18 and not filling them if it deems them
19 suspicious, right?
20 MR. EPPICH: Object to the
21 form. The document speaks for itself.
22 A. That's what's stated on here.
23 QUESTIONS BY MR. BOGLE:
24 Q. Okay. And so the idea, then,
25 is not to report suspicious sales, because

Page 286

1  you're not supposed to make the sale if the
2  order is suspicious, right?
3          MR. EPPICH:  Object to the
4      form.  Calls for speculation.
5      A.    It states "suspicious orders."
6  QUESTIONS BY MR. BOGLE:
7      Q.    And not "suspicious sales,"
8  right?
9          MR. EPPICH:  Object to the
10      form; calls for speculation.
11      A.    I don't recall seeing "sales"
12  listed here.
13  QUESTIONS BY MR. BOGLE:
14      Q.    Okay.  And if you can pull back
15  out Exhibit 20.  And this was a document we
16  discussed from the 2007 DEA conference.
17          Do you recall that?
18      A.    Yes, I do.
19      Q.    Okay.  And specifically, the
20  e-mail that you -- I want to go back to the
21  e-mail that you wrote September 11, 2007, which is
22  the middle of the first page.
23          You with me?
24      A.    Yes, I am.
25      Q.    Okay.  We didn't read the

Page 287

1  bottom portion of this e-mail on this page
2  where you actually also summarize another
3  presentation by Mr. Mapes.
4          Do you see where that summary
5  begins?
6      A.    Yes, I do.
7      Q.    Okay.  First bullet point there
8  says:  The requirement is to report
9  suspicious orders, not suspicious sales after
10  the fact.
11          Right?
12      A.    That's what's stated, yes.
13      Q.    Okay.  That's what you wrote,
14  right?
15      A.    Correct, based on his
16  presentation.
17      Q.    Summarizing his presentation,
18  right?
19      A.    Yes.
20      Q.    Okay.  And then going five
21  bullet points down from there where it says
22  "Registrants"?
23      A.    I see that.
24      Q.    Registrants that routinely
25  report suspicious orders yet fill these

Page 288

1  orders with reason to believe they are
2  destined for the illicit market, and failing
3  to maintain effective controls -- and failing
4  to maintain effective controls against
5  diversion.
6          Do you see that?
7      A.    I see that.
8      Q.    And again, that's your summary
9  of what Mr. Mapes presented that day, right?
10      A.    That's correct.
11      Q.    And the last bullet point below
12  that says:  Registrant should make informed
13  decisions -- and then it's all caps -- BEFORE
14  making the sale.
15          Do you see that?
16      A.    I see that.
17      Q.    And again, that's your summary
18  of his presentation that day, right?
19      A.    That's correct.
20      Q.    All right.  I'm going to hand
21  you now what I'm marking as Exhibit 24, which
22  is 1.1937, and that's MCKMDL00623568.
23          (McKesson-Hilliard Exhibit 24
24      was marked for identification.)
25              --oOo--

Page 289

1  QUESTIONS BY MR. BOGLE:
2      Q.    I put the sticker at the top so
3  we don't cover up the writing.  Okay.  This
4  is a series of e-mails, and again we're going
5  to kind of work our way earliest in time to
6  newest -- closest in time.
7          So the bottom e-mail on the
8  first page is one from Jenny Melton,
9  August 26, 2008, again, sent to that
10  regulatory e-mail group, right?
11      A.    Yes, it is.
12      Q.    That I think we agreed earlier
13  you're a part of.  True?
14      A.    That's correct.
15      Q.    Okay.  What was Jenny Melton's
16  role with the company at this point?
17      A.    Project manager.
18      Q.    Okay.  She worked in regulatory
19  affairs?
20      A.    She routinely worked with
21  regulatory affairs on projects.
22      Q.    Okay.  The subject of her
23  e-mail there on August 26, 2008, is:  CSMP
24  Suspicious Transaction Reporting to the DEA.
25          Do you see that?

Page 290

1   A.   I see that.
2   Q.   And she lists there, carrying
3  over to the next page, six different subjects
4  under that heading.
5        Do you see that?
6   A.   I see that.
7   Q.   Going to number 5 which is on
8  the second page here, she says:  The
9  suspicious designation will not be
10 systematically determined.  Don or the DRAs
11 will determine whether a transaction is
12 deemed to be suspicious and the DRA will log
13 into BI and flag the transaction as a
14 suspicious transaction.
15        Do you see that?
16  A.   I see that.
17  Q.   Okay.  You respond to her
18 e-mail on the same day, August 27, 2008.  Do
19 you see where you respond right above that?
20  A.   I see that.
21  Q.   Okay.  You say:  Question.  I
22 thought the requirement was raw data sales.
23 As you have outlined, wouldn't this be
24 customer "orders" and not McKesson sales?  If
25 a transaction/order is suspicious, we are not

Page 291

1  to fulfill the order, thus nothing to
2  transmit.
3        Do you see that?
4   A.   I see that.
5   Q.   Okay.  Then Tracy Jonas
6  responds above and says:  I agree, Gary.  I
7  was under the impression that this was merely
8  a "data dump" in a format that the DEA could
9  utilize.
10        Do you see that there?
11  A.   I see that.
12  Q.   Okay.  Then Sheila Pacheco
13 responds and says, on the same day:  The DEA
14 is asking for two different things on one
15 file.  You're correct about the "data dump"
16 as you call it.  Subsequently though, they
17 are also asking for us to flag suspicious
18 orders.  Those will be determined by you and
19 there should be very few.  You will need to
20 work together to identify what you might
21 define as suspicious.
22        Do you see that?
23  A.   I see that.
24  Q.   Okay.  And then you respond
25 again in the top e-mail, same day, and you

Page 292

1  say:  That certainly complicates the
2  transaction reporting.  This would mean, 1,
3  regulatory reviews every controlled substance
4  order daily (filled or not); or, 2, the
5  system is programmed to notify regulatory for
6  orders meeting a "suspicious" criteria.
7  (define suspicious; some form of DU45); or,
8  3 -- and you list three question marks there,
9  right?
10  A.   Yes.
11  Q.   And you say:  I agree there
12 will be very few, but I expect the DEA will
13 want to know how (SOP) we are evaluating the
14 data.
15        Do you see that?
16  A.   I see that.
17  Q.   So in this e-mail chain, you --
18 initially, in your August 27, 2008 first
19 response there, were operating under the
20 understanding that the DEA wanted suspicious
21 sales, not orders, right?  That's what you
22 say.
23        MR. EPPICH:  Object to the
24 form.
25  A.   I say it:  As you have

Page 293

1  outlined, wouldn't this be customer "orders"
2  and not McKesson sales.
3  QUESTIONS BY MR. BOGLE:
4   Q.   Right.  Then you say:  If a
5  transaction/order is suspicious, we are not
6  to fulfill the order, thus nothing to
7  transmit.
8        Right?
9   A.   That's what's stated, yes.
10  Q.   But as we just looked at in the
11 prior three documents, starting in
12 September 2005 all the way up to your last
13 e-mail in September 2007, three different
14 occasions where it's documented that the DEA
15 wants reports of suspicious orders, not
16 suspicious sales.  Right?
17        MR. EPPICH:  Object to the
18 form.  Vague.
19  A.   They stated the orders.
20 QUESTIONS BY MR. BOGLE:
21  Q.   Right.  Not sales.
22  A.   And this is discussions for
23 creating the CSMP program in CSMP, so this is
24 development discussions to get to what
25 eventually becomes the CSMP program.

Page 294

1  There was some collaboration or
2  agreement that took place whereas we were
3  sending information directly to DEA based on,
4  I think, the agreement from 2008.
5  Q.    But if you go down to your
6  e-mail, your first e-mail response towards
7  the bottom of the first page, you
8  specifically say:  If a transaction/order is
9  suspicious, we're not to fulfill the order,
10 thus nothing to transmit.
11      Right?
12 A.    That was the discussion point.
13 Q.    Right.  But that's exactly the
14 opposite of what Mr. Mapes told you
15 September 11, 2007, when he's saying
16 specifically to report suspicious orders.  To
17 stop the order, to block the order, and
18 report it, right?
19      MR. EPPICH:  Objection.
20 QUESTIONS BY MR. BOGLE:
21 Q.    You're saying here in the same
22 vein there would be nothing to transmit if
23 that happened.
24      MR. EPPICH:  Object to the
25 form.  Misstates the document.

Page 295

1  A.    This was developmental
2  discussions in regards to what -- what and
3  how things would populate on reports and
4  transmits, and I honestly don't recall the
5  specifics or the outcome of this other than
6  what we were discussing in this
7  communication.
8  QUESTIONS BY MR. BOGLE:
9  Q.    Okay.  But three -- more than
10 three years after this first presentation
11 from Mr. Mapes in September 2005, you guys
12 are now in August 2008 and you're still not
13 clear on how to report suspicious orders that
14 you didn't fill?  That's what this indicates,
15 right?
16      MR. EPPICH:  Object to the
17 form.  Calls for speculation,
18 misstates the document.
19 A.    I don't recall what all
20 additional conversations are outside of this
21 one e-mail communication.  But again, this
22 was our work that we were trying to work
23 towards obtaining a better program, which was
24 a CSMP program.
25      So this was just an element of

Page 296

1  that development and discussions on how to
2  get there, and, again, I don't know what else
3  was communicated.
4  QUESTIONS BY MR. BOGLE:
5  Q.    But when you go back to the top
6  e-mail that you wrote, you're actually
7  discussing the potential options of how you
8  might report a suspicious order, right?
9       MR. EPPICH:  Object to the
10 form.
11 QUESTIONS BY MR. BOGLE:
12 Q.    How you would even do that.
13      MR. EPPICH:  Object to the
14 form.  Misstates the document.
15 A.    Again, this is bouncing ideas
16 off of each other, coming up with development
17 on how these reports would work.
18 QUESTIONS BY MR. BOGLE:
19 Q.    I guess my question is simply
20 that we've looked at three documents from
21 September 2005 to September 2007 where
22 members of the DEA are expressing that
23 suspicious orders need to be blocked and
24 reported when they are blocked.
25      How could it be possible that

Page 297

1  three years later you guys still don't know
2  how to do that?
3       MR. EPPICH:  Object to the
4  form.  Misstates the document.
5  Argumentative.
6  A.    The process was difficult.  The
7  process took time.  It took time to
8  implement, it took time for development.
9       Again, this is just one piece
10 of that project review and trying to get to a
11 better program.
12 QUESTIONS BY MR. BOGLE:
13 Q.    Was it so complicated that it
14 took more than three years to develop how to
15 report a suspicious order if it's been
16 blocked?
17      MR. EPPICH:  Objection to the
18 form; misstates the document, assumes
19 facts not in evidence.
20 A.    Again, it took time for the
21 development.  We were working towards doing
22 the blocking of the transactions and this was
23 just part of that development process.
24 QUESTIONS BY MR. BOGLE:
25 Q.    Okay.  But, again, we looked at

Page 298

1  three documents; Exhibit 4, Exhibit 3, and
2  Exhibit 20, all where the DEA is saying make
3  a sales decision, block a sale, report
4  suspicious orders when they're blocked.  Yet
5  we're looking now in August 2008 and you guys
6  still don't know how to do that, right?
7          MR. EPPICH:  Objection to the
8      form; misstates the document, assumes
9      facts not in evidence, and asked and
10     answered.
11     A.    It took us until the
12  implementation of the CSMP in order to get
13  our systems to where they could appropriately
14  conduct the blocking.
15  QUESTIONS BY MR. BOGLE:
16     Q.    And the reporting, it appears
17  like, too, right?  Because you're saying if
18  they block it, you thought in August 27, 2008
19  there would be nothing to transmit, no report
20  to make if you blocked it.
21         MR. EPPICH:  Object to the
22     form.  Misstates the document.
23  QUESTIONS BY MR. BOGLE:
24     Q.    Isn't that what you're saying
25  here?

Page 299

1          MR. EPPICH:  Same objections.
2      A.    I don't recall the context of
3  this document.
4  QUESTIONS BY MR. BOGLE:
5      Q.    Okay.  Well, I'm looking at
6  your own statement.  I'm not asking you to
7  interpret anybody else's.  You say, on
8  August 27, 2008, at 5:51 a.m.:  If a
9  transaction/order is suspicious, we're not to
10  fulfill the order, thus nothing to transmit.
11         That's exactly what you said,
12  right?
13         MR. EPPICH:  Objection to the
14     form; argumentative, asked and
15     answered, misstates the document.
16  QUESTIONS BY MR. BOGLE:
17     Q.    Did I read any of that
18  incorrectly?
19     A.    This was the discussion in 2008
20  10 years ago.  I don't recall what all the
21  other discussions that were going on.  This
22  was us working on the development process.
23     Q.    My question was simply did I
24  read any portion of that sentence wrong?
25         MR. EPPICH:  Objection to the

Page 300

1  form.
2      A.    You read the e-mail.
3  QUESTIONS BY MR. BOGLE:
4      Q.    Correctly, right?
5          MR. EPPICH:  Objection to the
6      form.
7      A.    You read the e-mail.
8  QUESTIONS BY MR. BOGLE:
9      Q.    I'm just asking if you think I
10  read something wrong there.
11     A.    Not that I'm aware of.
12     Q.    Okay.  And even after this
13  discussion in August 2008, there were
14  systematic failures at McKesson in reporting
15  suspicious orders, weren't there?
16         MR. EPPICH:  Objection to the
17     form; calls for speculation, assumes
18     facts not in evidence.
19     A.    Not that I recall.
20  QUESTIONS BY MR. BOGLE:
21     Q.    Okay.  All right.  Let me hand
22  you what I'm marking as Exhibit 25.  It's
23  1.1443.  It's also MCKMDL00409453.
24         (McKesson-Hilliard Exhibit 25
25     was marked for identification.)

Page 301

1  QUESTIONS BY MR. BOGLE:
2      Q.    You see what I've got here is a
3  letter from November 4, 2014, from the U.S.
4  Department of Justice, Drug Enforcement
5  Administration.
6          Do you see that?
7      A.    I see that.
8      Q.    And it's to a Geoffrey Hobart
9  at Covington & Burling.
10         Do you see that being the
11  recipient?
12     A.    I see that.
13     Q.    And the re: line is
14  Registration Consequences for McKesson
15  Corporation for Violations of the Controlled
16  Substances Act.
17         Do you see that reference?
18     A.    I see that.
19     Q.    Okay.  Let's take a look at a
20  couple of things here in the letter.  If
21  you'd go to the second page, and I'm looking
22  at the third paragraph here where it says:
23  That having been said, we remain concerned
24  that McKesson fails to appreciate the serious
25  and systemic nature of the CSA-related

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 problems that DEA has observed in its several
2 investigations into your client's operations.
3 　　　Do you see that?
4 　　A.　I see that.
5 　　Q.　You were provided this letter
6 while you were at McKesson?
7 　　A.　No, I was not.
8 　　Q.　Okay.  The last sentence -- the
9 last few sentences in that paragraph say:
10 The loss of business that McKesson may
11 experience as a result of surrendering DEA
12 CORs --
13 　　　What are CORs?
14 　　MR. EPPICH:  Objection,
15 　　foundation.  Calls for speculation.
16 　　A.　I don't know, actually.
17 QUESTIONS BY MR. BOGLE:
18 　　Q.　If you go back to the first
19 page, you see where it says "DEA Certificate
20 of Registration" and it's a COR?
21 　　A.　Yes, I see that now.
22 　　Q.　All right.  Let's go on back to
23 the sentence I was reading from:  The loss of
24 business that McKesson may experience as a
25 result of surrendering DEA CORs is a

Page 303

1 justified and appropriate consequence that is
2 consistent with the public interest.  Among
3 other reasons, we hope that McKesson
4 distribution centers that maintain DEA
5 registrations after a global settlement will
6 take their responsibilities under federal law
7 more seriously than they did after the 2008
8 settlement.
9 　　　Do you see that?
10 　　A.　Yes, I see that.
11 　　Q.　Then it continues:  In order to
12 release all McKesson-owned DEA registrants
13 from administrative liability as you have
14 requested, the agreed-upon registration
15 consequences must reflect not only the
16 gravity of the offenses, but national scope
17 of McKesson's failure to report suspicious
18 orders and to maintain effective controls
19 against diversion.
20 　　　Do you see that?
21 　　A.　Yes, I see that.
22 　　Q.　Were you aware that McKesson
23 was being investigated by the DEA at this
24 time in 2014?
25 　　MR. EPPICH:  Objection to the

Page 304

1 form; foundation.
2 　　A.　Not that I recall.  This is the
3 first time I've seen the form.
4 QUESTIONS BY MR. BOGLE:
5 　　Q.　Let's go to the next page,
6 page .3.  The first sentence there says:
7 Like its Colorado counterpart, McKesson's
8 Distribution Center at 38220 Plymouth Road,
9 Livonia, Michigan -- it gives a DEA
10 registration number -- reported no suspicious
11 orders for approximately five years after
12 McKesson's settlement with DOJ.  McKesson
13 Livonia remained silent even as it supplied
14 26 pharmacies that were utilized in a drug
15 trafficking conspiracy that has since
16 resulted in the criminal conviction of the
17 owner of three pharmacies -- and it's
18 Babubhai Patel, and dozens of other
19 participants.
20 　　　Do you see that?
21 　　A.　I see that.
22 　　Q.　Were you aware of that
23 allegation that McKesson didn't report any
24 suspicious orders from Livonia for five years
25 after the 2008 settlement?

Page 305

1 　　MR. EPPICH:  Objection; calls
2 　　for speculation.  Form.
3 　　A.　No, I wasn't aware.  I was not
4 really associated with the CSMP process at
5 that point.
6 QUESTIONS BY MR. BOGLE:
7 　　Q.　From 2008 to 2013?
8 　　A.　This is a 2014 document that
9 we're looking at, and, no, I don't recall
10 them not reporting anything.
11 　　Q.　From 2008 to 2013?
12 　　A.　I don't recall them reporting
13 anything.
14 　　Q.　You don't recall them --
15 　　A.　I don't recall whether they
16 reported anything or not.
17 　　Q.　Okay.  So you don't have any
18 specific information to say that's wrong,
19 that in fact, they did report a bunch of
20 suspicious orders in that five-year period,
21 do you?
22 　　MR. EPPICH:  Objection, form.
23 　　Calls for speculation.
24 　　A.　I don't recall having knowledge
25 of this, no.

Page 306

1 QUESTIONS BY MR. BOGLE:
2     Q.    Okay.  Let's go down.  They
3 keep talking here about -- the next paragraph
4 is about Washington Court House.  They say:
5 McKesson's systemic failures were also
6 evident at its distribution center at
7 3000 Kenskill Avenue, Washington Court House,
8 Ohio.  Here again, McKesson did not report
9 any orders as suspicious for years after the
10 2008 settlement with DOJ and DEA.
11        Do you see that?
12     A.    I see that.
13     Q.    When DEA began to investigate
14 this silence, McKesson's Regional Director of
15 Regulatory Affairs told DEA investigators
16 that he did not know what a suspicious order
17 was and protested that DEA had not adequately
18 defined the term.
19        Do you see that?
20     A.    I see that.
21     Q.    Was that you that said that?
22        MR. EPPICH:  Objection; calls
23     for speculation, foundation.
24     A.    No.  I was not a regional
25 director.

Page 307

1 QUESTIONS BY MR. BOGLE:
2     Q.    Okay.  All right.  So if we go
3 now to page .4, the first full paragraph
4 says:  McKesson's system to detect suspicious
5 orders also fell short at the distribution
6 center at 1515 Kendrick Lane, Lakeland,
7 Florida.  Once again, in derogation of its
8 responsibilities under the CSA and the 2008
9 MOA, McKesson Lakeland failed to report and
10 suspicious orders to DEA for a five-year
11 period.
12        Do you see that?
13     A.    I see that.
14 QUESTIONS BY MR. BOGLE:
15     Q.    Okay.  Do you have any
16 knowledge, personal knowledge, that that's an
17 inaccurate statement?
18        MR. EPPICH:  Objection to the
19     form.  Calls for speculation.
20     A.    I have no knowledge of this,
21 no.
22 QUESTIONS BY MR. BOGLE:
23     Q.    Okay.  They go on in the next
24 paragraph to talk about another distribution
25 center.  It says:  McKesson also remained

Page 308

1 silent about suspicious orders received by
2 its distribution center at 9 Aegean Drive,
3 Methuen, Massachusetts.  As with other
4 distribution centers McKesson operated,
5 McKesson failed to report any suspicious
6 orders from May 2008 through November 2013,
7 though it sold increasing amounts of
8 oxycodone during the same time period, with
9 little to no investigation.
10        Do you see that?
11     A.    Yes, I see that.
12     Q.    Again, do you have any
13 knowledge to the contrary that, in fact,
14 Methuen did report suspicious orders during
15 that time period?
16        MR. EPPICH:  Objection to the
17     form; calls for speculation.
18     A.    I have no knowledge of it.  I
19 wasn't a regional director.
20 QUESTIONS BY MR. BOGLE:
21     Q.    The last thing I want to look
22 at here is on page .5.  The first full
23 paragraph says -- starts with "As noted
24 above."
25        Do you see that paragraph?

Page 309

1     A.    Yes, I see that.
2     Q.    It says:  As noted above, the
3 above examples are illustrative, not
4 exhaustive.  They are meant to illustrate
5 what we mean when we say that we will be
6 driven by the evidence that we could present
7 in administrative proceedings against these
8 registrants.  We have attempted to highlight
9 this evidence in the hopes that you and your
10 client can fully understand why DEA believes
11 that the failings at McKesson were as
12 systemic as they were serious.
13        Do you see that?
14     A.    I see that.
15     Q.    These are serious allegations,
16 right?
17        MR. EPPICH:  Objection; calls
18     for speculation.  Form.
19     A.    It appears to be.
20 QUESTIONS BY MR. BOGLE:
21     Q.    Okay.  I'm going to hand you
22 now what I'm marking as Exhibit 26, which is
23 1.1432, and that's MCKMDL00409048.
24        (McKesson-Hilliard Exhibit 26
25     was marked for identification.)

Page 310

1  QUESTIONS BY MR. BOGLE:
2      Q.   Okay.  This is another letter
3  from the U.S. Department of Justice, this one
4  dated November 6, 2013.
5          Do you see that?
6      A.   Yes, I see that.
7      Q.   Again sent to Geoffrey Hobart
8  at Covington & Burling regarding Claims
9  Against McKesson Corporation.
10         Do you see that title?
11     A.   Yes, I see that.
12     Q.   Okay.  The third paragraph
13  there says:  You are, no doubt, aware that
14  McKesson entered into a Settlement Agreement
15  with the United States in May of 2008.  The
16  Settlement Agreement covered the same type of
17  conduct described in the preceding paragraph.
18  The settlement included conduct that occurred
19  at Landover distribution facility.  Between
20  May 2008 and November 15, 2011, McKesson did
21  not submit any suspicious order reports
22  relating to orders filled by the Landover
23  facility.
24         Do you see that reference?
25     A.   I see that.

Page 311

1      Q.   Again, do you have any personal
2  knowledge that that's incorrect regarding the
3  suspicious orders for Landover for that time
4  period?
5          MR. EPPICH:  Object to the
6      form; calls for speculation.
7      A.   I don't have any specific
8  knowledge.
9  QUESTIONS BY MR. BOGLE:
10     Q.   And you know these
11  investigations that we're looking at here in
12  the letters from 2013 and 2014 ultimately
13  culminated in another settlement that
14  McKesson entered into with the DEA/DOJ,
15  right?
16         MR. EPPICH:  Objection; calls
17     for speculation.  Object to the form.
18     A.   I wasn't part of the settlement
19  agreement.  I'm not sure what all was
20  included in that.
21  QUESTIONS BY MR. BOGLE:
22     Q.   Okay.  I'm just asking if you
23  know one was entered.
24     A.   Yes, I know that one was
25  entered.

Page 312

1      Q.   Okay.  Where there was a
2  $150 million fine assessed?
3          MR. EPPICH:  Objection; calls
4      for speculation.
5      A.   That was my understanding.
6  QUESTIONS BY MR. BOGLE:
7      Q.   Okay.  And do you also
8  understand that as a part of that settlement
9  agreement, McKesson accepted responsibility
10  for failing to report suspicious orders?
11         MR. EPPICH:  Objection to the
12     form; calls for speculation.
13     A.   No, I'm not aware of that.  I
14  don't think I was with McKesson when that was
15  finalized.
16  QUESTIONS BY MR. BOGLE:
17     Q.   Well, do you think from the
18  time the settlement agreement was entered in
19  2008 to the time you left the company that
20  the company had a systemic failure to report
21  suspicious orders of controlled substances?
22         MR. EPPICH:  Objection to the
23     form.  Foundation.  Calls for
24     speculation.
25     A.   I don't know.  The regional

Page 313

1  directors handled the process and reviews and
2  the systems were developed to become better
3  and better.  I'm not aware of the specifics
4  of the allegation.
5  QUESTIONS BY MR. BOGLE:
6      Q.   Did you ever check in with any
7  of your other directors of regulatory affairs
8  after 2008 to make sure they were reporting
9  suspicious orders?
10         MR. EPPICH:  Object to the
11     form.
12     A.   I don't recall.
13  QUESTIONS BY MR. BOGLE:
14     Q.   Okay.  Can you think of an
15  instance where you specifically did do that?
16         MR. EPPICH:  Object to the
17     form.
18     A.   I don't recall.
19  QUESTIONS BY MR. BOGLE:
20     Q.   All right.  We'll mark for you
21  Exhibit 27, which is 1.88.  That's
22  MCKMDL00355350.  And what I've handed you,
23  sir, is the Administrative Memorandum
24  Agreement that accompanied the 2017
25  settlement between DOJ and McKesson, okay?

Page 314

1    A.    Yes, I have it.
2    Q.    Okay.  And I want to just point
3  you to one specific passage here, and it's
4  on .3.  Number 2 says "Acceptance of
5  Responsibility."
6          Are you with me there?
7    A.    Yes, I am.
8    Q.    It says:  On or about
9  September 27, 2006, February 7, 2007, and
10  December 27, 2007, DEA's Deputy Assistant
11  Administrator, Office of Diversion Control,
12  sent letters to every entity in the United
13  States that was registered with DEA to
14  manufacture or distribute controlled
15  substances, including McKesson.
16          Now, the September 27, 2006
17  letter, that's one that we've actually
18  reviewed here today, right?
19    A.    The Rannazzisi?
20    Q.    Yes, sir.
21        MR. EPPICH:  Objection to the
22  form; foundation.
23  QUESTIONS BY MR. BOGLE:
24    Q.    You recall reading that letter
25  with me?

Page 315

1    A.    The Rannazzisi letter, yes.
2    Q.    Okay.  And again, that was a
3  letter that you received, right?
4        MR. EPPICH:  Objection to the
5  form; foundation.
6    A.    I did receive it at some point,
7  yes.
8  QUESTIONS BY MR. BOGLE:
9    Q.    Okay.  It continues here:  The
10  DEA Letters contained, among other things,
11  guidance for the identification and reporting
12  of suspicious orders to DEA as required by
13  21 C.F.R. Section 1301.74(b).  McKesson
14  acknowledges that, at various times during
15  the time period from January 1, 2009 up
16  through and including the Effective Date of
17  this Agreement (the "Covered Time Period"),
18  it did not identify or report to DEA certain
19  orders placed by certain pharmacies which
20  should have been detected by McKesson as
21  suspicious based on the guidance contained in
22  the DEA Letters about the requirements set
23  forth in 21 C.F.R. 1301.74(b) and
24  21 U.S.C. Section 842(a)(5).
25          Do you see that?

Page 316

1    A.    I see that.
2        MR. EPPICH:  Objection;
3  foundation.
4  QUESTIONS BY MR. BOGLE:
5    Q.    And again, do you have any
6  personal knowledge that from January 1, 2009,
7  up to when this was executed in January 2017,
8  that McKesson in fact did report suspicious
9  orders properly?
10        MR. EPPICH:  Objection to form.
11  Object to the characterization.
12    A.    Programs were put in place to
13  manage to this.  I don't have specific
14  knowledge of a particular instance where a
15  report was done.
16  QUESTIONS BY MR. BOGLE:
17    Q.    Okay.  While you were with
18  McKesson, did you have a sense -- I mean, you
19  were there for nearly 20 years.  Did you have
20  a sense and feeling that McKesson would
21  accept responsibility for things that it
22  didn't do?
23        MR. EPPICH:  Object to the
24  form; calls for speculation.
25    A.    I wasn't part of the agreement

Page 317

1  and I'm not familiar with this document, so I
2  don't know.
3  QUESTIONS BY MR. BOGLE:
4    Q.    I'm not specifically asking you
5  about the document right now.  I'm saying,
6  during your 20 years spent at McKesson, do
7  you have a belief that McKesson would accept
8  responsibility for things that it didn't do?
9        MR. EPPICH:  Object to the
10  form; calls for speculation.
11    A.    I don't know.
12  QUESTIONS BY MR. BOGLE:
13    Q.    Okay.  And can you think of any
14  other instance in the 20 years you were at
15  McKesson where the company paid anything
16  approaching a $150 million fine for something
17  it didn't do?
18        MR. EPPICH:  Object to the
19  form; calls for speculation.
20    A.    I don't know.
21  QUESTIONS BY MR. BOGLE:
22    Q.    Can you think of any off the
23  top of your head?
24        MR. EPPICH:  Same objections.
25    A.    I'm not aware of any.

Page 318

1   MR. BOGLE: Okay. No further
2   questions for you, sir.
3   THE WITNESS: Thank you.
4   MR. EPPICH: Let's go ahead and
5   take a break and go off the record.
6   THE VIDEOGRAPHER: Off the
7   record at 3:25.
8   (Recess taken, 3:25 p.m. to
9   3:46 p.m.)
10  THE VIDEOGRAPHER: All right,
11  stand by. The time is 3:46. Back on
12  the record.
13  EXAMINATION
14  QUESTIONS BY MR. EPPICH:
15  Q.    Good afternoon, Mr. Hilliard.
16  My name is Chris Eppich, and I'm just going
17  to ask a few questions of you this afternoon.
18  A.    Okay.
19  Q.    I know it's been a long day so
20  I'll keep it pretty short.
21  You testified earlier today
22  that you joined McKesson in 1997. Is that
23  right?
24  A.    That's correct.
25  Q.    And can you briefly describe

Page 319

1   for us your duties as director of regulatory
2   affairs from 1997 to, say, 2006?
3   A.    Well, from '97 to
4   approximately '98, the title was manager of
5   regulatory affairs. Still carried the same
6   job functions when I went to director of
7   regulatory affairs.
8   I had DEA oversight in regards
9   to compliance with DEA's Section 55, which
10  was the operating procedures for all things
11  DEA, and so that also included the suspicious
12  order monitoring program within it as well,
13  which was based on the previous working group
14  from the Suspicious Order Task Force that
15  McKesson was involved with prior to my
16  arrival. So that product, that result of
17  that meeting was developed into the
18  Section 55.
19  So I worked with our DC
20  managers to ensure that they were in
21  compliance with the Section 55 requirements,
22  including the suspicious order aspect of it.
23  I audited them as well and worked with them
24  with any issues that they may bring to my
25  attention, and I also worked on the ARCOS

Page 320

1   part of it and training the associates there
2   at the facilities in theft and loss reports
3   and sometimes investigations.
4   Also, I mentioned the audits, I
5   conducted the DEA audits as well as other
6   regulatory audits for the operations. In
7   addition to the DEA responsibilities, I also
8   had responsibilities under the waste
9   management or environmental aspect of it for
10  EPA, also for hazardous materials for DOT and
11  FAA transportation aspects of it; for
12  registrations, including the DEA
13  registrations for our facilities, and our
14  state licensures and state-controlled
15  substance licensures for our facilities.
16  I also worked with FDA
17  compliance for our facilities as well, and
18  that carried up to about 2006.
19  Q.    Now, you recall your testimony
20  earlier about Form DU45?
21  A.    Yes.
22  Q.    Now, Form DU45, that was a
23  reporting form that McKesson submitted to the
24  DEA, correct?
25  A.    That's correct.

Page 321

1   MR. BOGLE: Object to form.
2   QUESTIONS BY MR. EPPICH:
3   Q.    Now, the DU45, was that a
4   requirement under Section 55, McKesson's Drug
5   Operations Manual?
6   A.    Yes. That was part of the
7   operating manual.
8   Q.    And tell me, how did DU45 come
9   into existence? How was it developed, to
10  your knowledge?
11  A.    That was the development or the
12  product from the Suspicious Order Task Force
13  that industry, including McKesson, came
14  together, and my understanding, with DEA and
15  formulated this reporting mechanism which was
16  a -- a customer report that shows their
17  12-month sales for a given item, and then
18  they agreed to a factor based on the
19  schedule, whereas the opioid products had a
20  three times the average factor and the other
21  controlled substances had an eight times
22  factor associated with them.
23  And so that report was to be
24  delivered to the DEA upon -- nightly, like I
25  said it would be delivered, and then also

Page 322

1  they were summarized and provided on a
2  monthly basis.
3       Q.   Do you recall your testimony
4  earlier with Mr. Bogle relating to an Order
5  to Show Cause for the Lakeland facility of
6  McKesson?
7       A.   Yes, I do.
8       Q.   And if you wouldn't mind
9  pulling out Exhibit 6.  It should be in front
10 of you still.
11      THE REPORTER:  They're in
12 order, sir.
13 QUESTIONS BY MR. EPPICH:
14      Q.   Now, if you recall, Mr. Bogle
15 asked you a few questions about Exhibit 6.
16      Do you remember that?
17      A.   Yes, I do.
18      Q.   I'd like you to turn to
19 page .17 -- or actually .16, which is Bates
20 ending 496321.
21      A.   I'm sorry, could you repeat the
22 Bates number?
23      Q.   It's 496321 on the bottom
24 right.
25      Are you there, sir?

Page 323

1       A.   Yes, I am.
2       Q.   Now, if you'd turn to page 5 of
3  this document, which is Bates number 496325.
4  Are you there, sir?
5       A.   Yes, I am.
6       Q.   Do you recall providing some
7  testimony, answering some questions from
8  Mr. Bogle on this page?
9       A.   Today, yes.
10      Q.   Before your deposition today,
11 Mr. Hilliard, had you ever seen this document
12 before, this government's pre-hearing
13 statement?
14      A.   Not this, no.
15      Q.   And if you'd turn to page 10 of
16 this pre-hearing statement, which is Bates
17 496328.
18      Do you see that, sir?
19      A.   I see that.
20      Q.   Had you ever seen this page of
21 this document before your deposition today?
22      A.   No, I haven't.
23      Q.   Okay.  Well, let's turn to
24 Bates number 496347, which is Plaintiff's
25 Exhibit .42, if that's easier, in the upper

Page 324

1  right corner.
2       A.   .42.
3       Q.   And you recall Mr. Bogle asked
4  you some questions about this document, in
5  particular about some proposed testimony that
6  you were to make, which starts on page --
7  you'll have to excuse me -- it starts on
8  page --
9       A.   18?
10      Q.   18, yes, sir.
11      Now, before preparing for your
12 deposition today, sir, had you seen this
13 pre-hearing statement before?
14      A.   I had not.
15      Q.   Now, I interrupted you when you
16 were talking about your responsibilities as
17 the director of regulatory affairs.  What
18 were your responsibilities between the years
19 2006 to 2008?
20      A.   I still had the same
21 responsibilities, with additional
22 responsibilities as it related to working
23 with our DC managers on identified customers
24 by the DEA and then starting to develop the
25 LDMP processes and crafting the SOP, which

Page 325

1  then developed into the CSMP.
2       Q.   So you worked on the
3  development of the LDMP and then the
4  development of the CSMP.  Is that right?
5       A.   Correct.
6       Q.   Now, that -- and do you recall
7  when the CSMP was released?
8       A.   I believe it was 2008.
9       Q.   Okay.  And after 2008, after
10 the release of the CSMP, what were your
11 responsibilities as a director of regulatory
12 affairs at McKesson?
13      A.   I still helped to work with the
14 SOPs, but the regional directors came onboard
15 and so they managed the correlation with the
16 DCs, their respective DCs in those regions as
17 it relates to the CSMP processes and
18 procedures, and I still continued with --
19 again, with the normal DEA audits and then
20 also continued with my other responsibilities
21 under FDA and HAZMAT and EPA.
22      Q.   Now, do you recall -- do you
23 recall who your supervisors were?  Let's go
24 ahead and take it back in time.  Let's take
25 it from about 1997 to the 2006 time period.

Page 326

1 Do you recall who your supervisors were?
2     A.     So when I joined in '97, Dan
3 White was my boss and he was a VP of
4 regulatory.  And then after Dan White, I
5 believe it was Don Walker.  Again, I don't
6 remember the exact dates.  I believe it was
7 Don Walker, and then to Ron Bone.  I know I
8 was reporting to Ron Bone in the 2005-2006
9 time frame.
10          Ron left and then I was
11 reporting to Bruce and -- Bruce Russell and
12 Don Walker; and then once Bruce retired, it
13 was directly to Don Walker.  And then finally
14 I reported to Krista Peck.
15     Q.     You testified earlier today
16 that you were familiar with the Controlled
17 Substances Act.
18          Do you remember that testimony?
19     A.     Yes, I do.
20     Q.     Now, during -- and you
21 testified that you were in the regulatory
22 affairs department at McKesson from 1997 all
23 the way to 2016, correct?
24     A.     That's correct.
25     Q.     Now, during your time at

Page 327

1 McKesson, are you aware of any changes to the
2 Controlled Substances Act?
3     A.     No, I'm not.
4     Q.     The CSA didn't change at all
5 during your tenure at McKesson?
6          MR. BOGLE:  Object to form.
7     A.     That's correct.
8 QUESTIONS BY MR. EPPICH:
9     Q.     Now, have directives from the
10 DEA changed over that period?
11     A.     Yes, they have.
12     Q.     Can you provide us any examples
13 of how DEA directives have changed while you
14 were at McKesson?
15          MR. BOGLE:  Object to form.
16     A.     The meetings that we
17 accompanied at headquarters with Rannazzisi
18 so that kind of was the dividing line.  I
19 think we had a pretty good relationship with
20 DEA before 2006.  I mean, we worked with
21 them.
22          We would have routine fiscal
23 audits.  The fiscal audits were not, you
24 know, argumentative and such.  They were
25 typically ran very well.  Many times they

Page 328

1 were very collaborative.
2          We also worked with DEA in
3 respects where our DC managers would have a
4 relationship with the local DEA offices, so
5 if they needed assistance with something,
6 emergency delivery orders, natural disasters
7 occurring, you know, they were able to reach
8 out and obtain assistance from their local
9 agents.
10          We also worked integral as part
11 of the CSOS implementation.  We were the --
12 McKesson, myself and Jenny Melton, we worked
13 with CSOS, with DEA and DEA's partners that
14 they -- third-party partners that came in to
15 help design the CSOS program, and so we
16 worked throughout that development process
17 with DEA, very collaborative meetings and
18 work to establish that.
19          We also worked with them on
20 methadone restrictions.  They came in -- they
21 asked us to come in and discuss it with them.
22 And so I think we had a lot of collaboration
23 that took place.  You know, they have
24 industry association meetings or conferences
25 that DEA would hold pharmaceutical one year,

Page 329

1 alternate year would be at least one.
2          So there were, you know,
3 training -- the industry, essentially,
4 working with the industry, providing
5 information to the industry.
6          2006, after the meeting with
7 Rannazzisi, there was a different directive
8 before that.  There was new requirements or
9 new interpretations that came out of that,
10 more right -- understanding your customer and
11 blocking orders.  And so these were things
12 that weren't part of the CSA but were now
13 coming out.
14          And even when we left the
15 meeting for the internet pharmacy
16 discussions, it seemed collaborative because
17 they were going to assist us by providing us
18 with customers that we could go out and
19 investigate.
20          So they had the data from the
21 ARCOS and such and they knew the players that
22 needed to be looked at and they were giving
23 us the names, and that was very collaborative
24 for them to do that.  And then that kind of
25 stopped for some reason.

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    But it seemed to be around
2  2006, after that Rannazzisi discussions, that
3  that occurred.
4       MR. BOGLE:  Object as improper
5  narrative.
6  QUESTIONS BY MR. EPPICH:
7       Q.    And so what was your
8  understanding of McKesson's relationship with
9  the DEA after the meetings in 2006 with
10  Mr. Rannazzisi?
11       MR. BOGLE:  Object to form.
12       A.    The -- we expected to still,
13  you know, get correspondence from them in
14  regards to pharmacies that we needed to look
15  into.  Again, that stopped, and when we went
16  back and we did have that meeting with
17  Rannazzisi, that meeting is not how -- what
18  we expected when we walked into it.
19       It wasn't until we got into the
20  meeting that -- when Rannazzisi came in that
21  things changed, and that was the show-cause
22  proposal that he was making.
23       So this is -- and then the
24  letter that he had sent out to all
25  registrants as a guidance document, you know,

Page 331

1  in regards to blocking orders, it really
2  just -- the different understanding of
3  getting behind the counter to know your
4  customers, your business, you know, that was
5  a different philosophy, I think, than what it
6  had been in the past.
7  QUESTIONS BY MR. EPPICH:
8       Q.    Mr. Hilliard, are you familiar
9  with the ARCOS reporting system?
10       A.    Yes, I am.
11       Q.    What is the ARCOS reporting
12  system?
13       A.    It's a reporting system that's
14  put in place way past when I started in the
15  industry, that the DEA runs.  It's run out of
16  headquarters and it's a reporting system for
17  manufacturers and distributors.
18       So manufacturers and
19  distributors have to submit essentially all
20  the raw data for their transactions for
21  Schedule IIs and Schedule III narcotics, and
22  this included all the sales receipts,
23  returns, theft/loss, no activity, if you had
24  no activity for a registrant during the
25  month.

Page 332

1       So it had monthly reporting
2  requirements for every registrant that's a
3  manufacturer or distributor.
4       Q.    So McKesson has to submit its
5  sales data to the DEA as a part of this ARCOS
6  reporting requirement?  Is that correct?
7       MR. BOGLE:  Object.  Object to
8  form.
9       A.    That's correct.
10  QUESTIONS BY MR. EPPICH:
11       Q.    And do other distributors have
12  to similarly report their sales data for
13  controlled substances to this ARCOS reporting
14  system?
15       MR. BOGLE:  Object to form.
16       A.    That's correct.
17  QUESTIONS BY MR. EPPICH:
18       Q.    Does McKesson have access to
19  other distributors' data that's reported to
20  ARCOS?
21       A.    No, they don't.  We asked for
22  it.
23       Q.    Who has access to the ARCOS
24  reporting data?
25       A.    Only the DEA.

Page 333

1       Q.    Did McKesson have the ability
2  to know -- let me strike that.
3       During your time at McKesson,
4  did McKesson have the ability to know how
5  many opioids it was providing to pharmacies
6  in a given city?
7       A.    The ARCOS transactions don't
8  record by city, but there was probably a
9  reporting mechanism where they could look
10  that up.
11       Q.    Did McKesson know how many
12  opioids other distributors were providing
13  pharmacies in a given city?
14       MR. BOGLE:  Object to form.
15       A.    No.  They're not allowed to do
16  that.
17  QUESTIONS BY MR. EPPICH:
18       Q.    You may recall a few moments
19  ago Mr. Bogle asked you some questions about
20  Exhibit 27.  Do you have Exhibit 27 in front
21  of you?
22       A.    Yes, I do.
23       Q.    Now, Exhibit 27 is titled the
24  Administrative Memorandum of Agreement.
25       Do you see that?

Page 334

1    A.    I see it.
2    Q.    Mr. Bogle had you turn to
3  page 3 of this document, which is Bates
4  ending 355352.
5    A.    I see that.
6    Q.    Do you remember that, sir?
7    A.    Yes, I do.
8    Q.    And he read Section 2,
9  Acceptance of Responsibility, to you.
10        Do you remember that testimony?
11    A.    Yes, I do.
12    Q.    Now, about halfway down this
13  paragraph, the paragraph reads:  McKesson
14  acknowledges that, at various times during
15  the period from January 1, 2009, up through
16  and including the Effective Date of this
17  Agreement, it did not identify or report to
18  DEA certain orders placed by certain
19  pharmacies which should have been detected by
20  McKesson as suspicious based on the guidance
21  contained in the DEA Letters and -- about the
22  requirements set forth in 21 C.F.R.
23  1307.174(b) and 21 U.S.C. 842(a)(5).
24        Do you see that, sir?
25    A.    Yes, I see it.

Page 335

1    Q.    Now, before your deposition
2  today, had you ever seen Exhibit 27?
3    A.    No, I haven't.
4    Q.    And while you were at McKesson,
5  did anyone ask you to investigate any of the
6  pharmacies' alleged activity that's described
7  in this document for this period January 1,
8  2009, to the date of this agreement?
9    A.    No.
10    Q.    Do you have any knowledge about
11  the allegations described in Exhibit 27?
12    A.    Not that I recall.
13    Q.    If you could turn to
14  Exhibit 26.  Mr. Bogle introduced Exhibit 26
15  to you.
16        Do you remember that?
17    A.    Yes, I do.
18    Q.    Exhibit 26 is a November 6,
19  2013 letter to Mr. Geoff Hobart.
20        Do you see that?
21    A.    Yes, I see that.
22    Q.    Before the deposition today,
23  had you ever seen Exhibit 26 before?
24    A.    No, I haven't.
25    Q.    Have you ever been asked to

Page 336

1  provide any insights or investigation work
2  into any of the allegations provided or any
3  statements provided in Exhibit 26?
4    A.    Not that I can -- not that I
5  recall.
6    Q.    If we could turn to Exhibit 25.
7  Do you have that one in front of you?
8    A.    Yes, I do.
9    Q.    Now, Exhibit 25 is a
10  November 4, 2014 letter from the DOJ to Geoff
11  Hobart.
12        Do you see that?
13    A.    Yes, I see that.
14    Q.    Before your deposition today,
15  had you ever seen Exhibit 25 before?
16    A.    No, I haven't.
17    Q.    Did anyone at McKesson ever ask
18  you to investigate any of the allegations you
19  reviewed with Mr. Bogle earlier today on
20  Exhibit 25?
21    A.    No, not that I recall.
22    Q.    Thank you.
23        We mentioned -- you discussed
24  earlier, testified earlier with Mr. Bogle
25  about the LDMP and the CSMP program.

Page 337

1        Do you remember that testimony?
2    A.    Yes, I do.
3    Q.    Now, under the CSMP, the
4  CSMP -- did the CSMP block all orders that
5  exceeded an established threshold for that
6  particular base code and company?
7    A.    Yes, they did.
8        MR. BOGLE:  Object to form.
9  QUESTIONS BY MR. EPPICH:
10    Q.    And at McKesson, in your time
11  at McKesson, have all orders that have
12  exceeded a given threshold for a base code
13  for a given company been blocked under the
14  CSMP program?
15        MR. BOGLE:  Object to form.
16    A.    Yes, to my knowledge.
17  QUESTIONS BY MR. EPPICH:
18    Q.    You talked briefly earlier
19  about the evolution of the CSMP.
20        Do you remember that testimony?
21    A.    I believe so.
22    Q.    Can you talk to us a little
23  bit, describe the evolution of the CSMP since
24  it was implemented in 2008 to the time you
25  left the company in 2016?

Page 338

1    A.    The big thing about CSMP was it
2  ran off of the base code ingredient, so it
3  accumulated all the like chemistries
4  together.  It also was based off of
5  thresholds that would block orders for all
6  controlled substances as opposed to just the
7  lifestyle ones in the previous program.
8         And I know as it progressed --
9  again, I wasn't part of the work effort on
10  it, but I know that they worked with the
11  company AIG and developed these algorithms
12  that provided better threshold data, and I
13  believe it even manages -- the system manages
14  the thresholds and reduces the thresholds as
15  necessary based on the statistics that were
16  listed in the algorithm.
17    Q.    Thank you, Mr. Hilliard.
18         Mr. Hilliard, you worked at
19  McKesson for over 20 years.  How would you
20  describe McKesson's culture in the area of
21  compliance and regulatory affairs?
22    A.    I enjoyed working at McKesson
23  and working with my colleagues.  I know that
24  myself and my colleagues always worked with
25  the utmost integrity and always believed in

Page 339

1  what we were doing and strived to do the
2  right thing, and as they brought new folks in
3  and I worked with some of them, they too were
4  on the same page and had the same goals that
5  we had.
6    Q.    Thank you, Mr. Hilliard.
7         MR. EPPICH:  I have no further
8  questions.
9         MR. BOGLE:  I've just got a few
10  follow-ups.  It's your call,
11  Mr. Hilliard.  If you're okay looking
12  straight ahead, I've probably got like
13  six or seven questions for you.
14         THE WITNESS:  That's fine.
15         MR. BOGLE:  If you want me to
16  move back over there, I really don't
17  care.
18         THE WITNESS:  That's fine.
19         MR. BOGLE:  You good?  Okay.
20  Just -- Chris is going to tell you to
21  look straight ahead.  Don't look at
22  me, which is probably easy for you to
23  do.
24         All right.  I'm ready.
25              --oOo--

Page 340

1         FURTHER EXAMINATION
2  QUESTIONS BY MR. BOGLE:
3    Q.    Okay.  Following up kind of
4  where you left off there, you mentioned some
5  work that McKesson has done with AGI in
6  recent years?  Do you recall talking about
7  that a minute ago?
8    A.    Yes, I do.
9    Q.    Okay.  And you had no direct
10  involvement in any work with AGI and
11  McKesson, right?
12    A.    That's correct.
13    Q.    You have no firsthand knowledge
14  of what AGI has done work-wise for McKesson,
15  right?
16    A.    Not specifically.
17    Q.    Okay.  And you said, to your
18  knowledge, all orders have been blocked under
19  the CSMP once the client reaches a -- set
20  threshold.
21         Do you recall saying that a
22  minute ago?
23    A.    Yes, I do.
24    Q.    Okay.  Have you actually
25  specifically tracked that over time from 2008

Page 341

1  to 2016, the blocking of orders under the
2  CSMP for specific customers?
3    A.    I personally haven't because
4  that's what the other regional directors' job
5  functions entail was managing that program.
6  I just worked on the SOPs and updates to
7  assist where I could --
8    Q.    Okay.
9    A.    -- administratively.
10    Q.    And you said that in regard to
11  the CSMP blocking all orders once a threshold
12  is reached, that would occur unless a
13  Threshold Change Request was requested and
14  granted, right?
15    A.    I'm sorry, repeat the question.
16         MR. EPPICH:  Object to the
17  form.
18  QUESTIONS BY MR. BOGLE:
19    Q.    Yeah, so let me reask it.
20         If a customer reaches a
21  threshold, that threshold can be increased
22  through a Threshold Change Request, right?
23         MR. EPPICH:  Object to the
24  form.
25    A.    There was a process in place

Page 342

1  through a Threshold Change Request form that
2  would require the due diligence to
3  substantiate any changes to the thresholds.
4  QUESTIONS BY MR. BOGLE:
5     Q.    Right.  But a threshold could
6  be changed using the Threshold Change Request
7  process under the CSMP.  True?
8        MR. EPPICH:  Object to the
9  form.
10    A.    That was part of the process
11  through substantiation.
12  QUESTIONS BY MR. BOGLE:
13    Q.    Okay.  And you mentioned that
14  McKesson would not know whether its customers
15  were getting controlled substances from other
16  distributors.
17       Do you recall that?
18    A.    Yes, I do.
19    Q.    Okay.  Is there anything
20  specifically prohibiting McKesson from asking
21  their customers for that information?
22       MR. EPPICH:  Object to the
23  form.  Calls for speculation.
24    A.    There's some legal requirements
25  there that -- for sharing customer

Page 343

1  information that two companies are not
2  allowed to conspire.
3  QUESTIONS BY MR. BOGLE:
4     Q.    Oh.  So you're saying that
5  McKesson is not allowed under the law to ask
6  its customers if they're receiving opioids
7  from other distributors?
8        MR. EPPICH:  Object to the
9  form.  Misstates prior testimony,
10       calls for a legal conclusion.
11    A.    Your original question, I
12  believe, was whether or not we asked our
13  competitors for their sales information.  So
14  as far as asking customers, I'm not sure.
15  QUESTIONS BY MR. BOGLE:
16    Q.    Okay.  If I asked it otherwise.
17  I was -- meant to be talking about your
18  customers, not your competitors.
19    A.    Yeah, I'm not sure.
20    Q.    Okay.  But you're not aware of
21  any specific prohibition for McKesson asking
22  its customers whether it's purchasing opioids
23  from other distributors, do you?
24    A.    I don't know.
25       MR. EPPICH:  Object to the

Page 344

1        form; calls for speculation.
2  QUESTIONS BY MR. BOGLE:
3     Q.    You said that in 2006, there
4  were some new things coming from the DEA, new
5  directives, one you listed as blocking
6  orders.  Do you recall mentioning that, that
7  was a new directive in the 2006 time frame?
8        MR. EPPICH:  Object to the
9  form.
10    A.    Yes, I do.
11  QUESTIONS BY MR. BOGLE:
12    Q.    Okay.  You think it would be a
13  bad corporate policy for McKesson prior to
14  2006 to be blocking orders that it deemed
15  suspicious for opioids?
16       MR. EPPICH:  Object to the
17       form; calls for speculation.
18    A.    I don't know.  We were working
19  under the Suspicious Order Task Force
20  product, if you will, that came out of that
21  meeting that other industry players were also
22  conducting, and we were complying with the
23  CSA requirements with that.
24  QUESTIONS BY MR. BOGLE:
25    Q.    Yeah, so I'm not asking you

Page 345

1  specifically about the task force or the CSA
2  requirements.  I'm talking about what a good
3  company would do, and I'm asking you:  Do you
4  have a specific opinion that McKesson, in
5  attempting to be a good corporate citizen,
6  would be doing a bad thing in blocking orders
7  it deemed suspicious for opioids prior to
8  2006?
9        MR. EPPICH:  Object to the
10       form; calls for speculation.
11    A.    I don't know.
12  QUESTIONS BY MR. BOGLE:
13    Q.    Okay.  Now, you also mentioned
14  it was a new thing in 2006, the "Know Your
15  Customer" directive from DEA, right?  That
16  that was a new thing.
17       MR. EPPICH:  Object to form.
18    A.    The way it was -- the way it
19  was structured or the way it was being
20  presented differently from that aspect.
21  QUESTIONS BY MR. BOGLE:
22    Q.    You think it would ever be a
23  bad thing, prior to 2006, for McKesson to
24  know what its customers were doing with the
25  opioids it was providing to them?

Page 346

1 MR. EPPICH: Object to the
2 form; calls for speculation.
3 Foundation.
4 A. The "Know Your Customer"
5 terminology was not a term prior to that. We
6 had procedures in place to understand our
7 customer business activity and to vet the
8 customers out.
9 But the change in 2006 was in
10 regards to really digging in deep into their
11 business activities, and I always called it
12 getting behind the counter.
13 MR. BOGLE: Okay. Move to
14 strike as nonresponsive.
15 QUESTIONS BY MR. BOGLE:
16 Q. My question was simply: Do you
17 think it would have been a bad thing, prior
18 to 2006, for McKesson to know what its
19 customers were doing with the opioids that
20 McKesson was distributing to them?
21 MR. EPPICH: Object to form;
22 asked and answered.
23 A. Again, we were doing what we
24 believed was the correct thing under the CSA
25 with the process and procedures that we had

Page 347

1 in place.
2 QUESTIONS BY MR. BOGLE:
3 Q. Yeah. So I'm not talking about
4 the CSA. I'm talking about, again, what a
5 good company would do.
6 Do you think it would be a bad
7 thing for McKesson, in an attempt to be a
8 good corporate citizen, to at all times know
9 what its customers were doing with the
10 opioids it was distributing to them?
11 MR. EPPICH: Object to the
12 form; asked and answered.
13 A. We had processes in place to
14 comply with the CSA, and I can't specifically
15 speak to everybody in McKesson.
16 QUESTIONS BY MR. BOGLE:
17 Q. Okay. And I'm not -- okay.
18 Let me ask it to you this way: Do you think,
19 as Gary Hilliard, director of regulatory
20 affairs for nearly 20 years at McKesson,
21 that -- is your personal belief that it would
22 be a bad thing for McKesson to know what its
23 customers were doing with opioids McKesson
24 was distributing to them? What is your
25 personal opinion?

Page 348

1 MR. EPPICH: Object to the
2 form; asked and answered.
3 A. As I say, we believed that we
4 were doing what was required, and we had
5 means to investigate and look into our
6 customers and their business activities.
7 QUESTIONS BY MR. BOGLE:
8 Q. Would it be a bad thing to know
9 what your customer is doing with the opioids
10 you're giving them? That's my question.
11 MR. EPPICH: Objection, form.
12 Asked and answered.
13 A. Our customers were registered
14 with the DEA. We serviced our customers that
15 had DEA registrations and were receiving
16 prescriptions from DEA-registered physicians.
17 We believed we were complying with the CSA
18 requirements.
19 QUESTIONS BY MR. BOGLE:
20 Q. Okay. So as long as they were
21 registered with the DEA, that was all you
22 needed to know about your customer, right?
23 MR. EPPICH: Objection.
24 Misstates the prior testimony. Form.
25 A. Again, we were doing what we

Page 349

1 believed was correct under the CSA.
2 QUESTIONS BY MR. BOGLE:
3 Q. Which was if they had a
4 registration, they were good to go, right?
5 MR. EPPICH: Objection to form;
6 asked and answered.
7 A. That was only one element of
8 the processes in place at McKesson for
9 servicing our customers.
10 QUESTIONS BY MR. BOGLE:
11 Q. You mentioned, again, that your
12 understanding is the DU45 was developed from
13 some DEA task force meeting.
14 Do you recall talking about
15 that?
16 MR. EPPICH: Objection to the
17 form, vague.
18 QUESTIONS BY MR. BOGLE:
19 Q. I'm just trying to orient you
20 to the prior question. Do you recall talking
21 about that with your counsel?
22 A. Yes.
23 Q. Okay. And again, you weren't
24 present for any such task force meeting,
25 right?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1      MR. EPPICH:  Objection to the
2  form.
3      A.    Correct, I was not at the task
4  force.
5  QUESTIONS BY MR. BOGLE:
6      Q.    So you have no firsthand
7  knowledge about what actually happened at
8  that task force meeting, do you?
9      MR. EPPICH:  Objection to the
10  form.
11      A.    I read the documents that came
12  out of that.  The Section 55 information and
13  reports that were created for the processes
14  that McKesson had were based on that output.
15  QUESTIONS BY MR. BOGLE:
16      Q.    Do you have any documents that
17  came out of that meeting?
18      A.    I do not currently.
19      MR. BOGLE:  Okay.  No further
20  questions.
21      MR. EPPICH:  Thank you.
22      Before we get off the record,
23  let me designate the transcript as
24  highly confidential, and we'll read
25  and sign.

Page 351

1      THE REPORTER:  Thank you, sir.
2      MR. EPPICH:  Thank you.
3      THE VIDEOGRAPHER:  Off the
4  record at 4:20.
5      (Deposition recessed at
6  4:20 p.m.)
7          --oOo--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 352

CERTIFICATE

1
2
3      I, SUSAN PERRY MILLER, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter, Certified Court Reporter and Notary
   Public, do hereby certify that prior to the
5  commencement of the examination, GARY
   HILLIARD was duly sworn by me to testify to
6  the truth, the whole truth and nothing but
   the truth;
7      That pursuant to Rule 30 of the
   Federal Rules of Civil Procedure, signature
8  of the witness was reserved by the witness or
   other party before the conclusion of the
9  deposition;
10      That the foregoing is a verbatim
   transcript of the testimony as taken
11  stenographically by and before me at the
   time, place and on the date hereinbefore set
12  forth, to the best of my ability.
13      I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
   that I am not financially interested in the
16  action.
17
18
19
20  _____
   Susan Perry Miller
   CSR-TX, CCR-LA, CSR-CA-13648
   Registered Diplomate Reporter
21  Certified Realtime Reporter
   Certified Realtime Captioner
22  NCRA Realtime Systems Administrator
   Notary Public, State of Texas
23  My Commission Expires 03/30/2020
24
   Dated: 14th of January, 2019
25

Page 353

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4      I, GARY HILLIARD, do hereby
   certify that I have read the foregoing pages
5  and that the same is a correct transcription
   of the answers given by me to the questions
6  therein propounded, except for the
   corrections or changes in form or substance,
7  if any, noted in the attached
   Errata Sheet.
8
9
10
11
12  _____
   GARY HILLIARD                 DATE
13
14
15
16
17
18  Subscribed and sworn
   to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
   _____
22  Notary Public
23
24
25

Page 354

1     — — — — — —
2              ERRATA
              — — — — — —
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6   REASON: _____
7   ____  ____  _____
8   REASON: _____
9   ____  ____  _____
10  REASON: _____
11  ____  ____  _____
12  REASON: _____
13  ____  ____  _____
14  REASON: _____
15  ____  ____  _____
16  REASON: _____
17  ____  ____  _____
18  REASON: _____
19  ____  ____  _____
20  REASON: _____
21  ____  ____  _____
22  REASON: _____
23  ____  ____  _____
24  REASON: _____
25        — — — — — —

Page 355

1            LAWYER'S NOTES
            — — — — — —
2
3   PAGE   LINE
4   ____   ____   _____
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24
25