EXHIBIT 241

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


------------------------------x

IN RE: NATIONAL PRESCRIPTION    ) Case No.

OPIATE LITIGATION               ) 1:17-MD-2804

APPLIES TO ALL CASES            ) Hon. Dan A. Polster

------------------------------x

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF BLAINE M. SNIDER


WASHINGTON, D.C.


THURSDAY, NOVEMBER 8, 2018


8:34 A.M.


Reported by: Leslie A. Todd

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1        Deposition of BLAINE M. SNIDER, held at the

2     offices of:

3

4

5                    COVINGTON & BURLING, LLP

6                    One City Center

7                    850 10th Street, N.W.

8                    Washington, DC 20001-4956

9

10

11

12

13        Pursuant to notice, before Leslie Anne Todd,

14     Court Reporter and Notary Public in and for the

15     District of Columbia, who officiated in

16     administering the oath to the witness.

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 3

```
 1                   A P P E A R A N C E S

 2

 3     ON BEHALF OF PLAINTIFFS:

 4          BRANDON BOGLE, ESQUIRE

 5          WESLEY BOWDEN, ESQUIRE

 6          LEVIN PAPANTONIO THOMAS MITCHELL

 7            RAFFERTY & PROCTOR, PA

 8          316 S. Baylen Street, Suite 600

 9          Pensacola, Florida 32502

10          (850) 435-7043

11

12     ON BEHALF OF McKESSON CORPORATION:

13          KEVIN B. COLLINS, ESQUIRE

14          WEISS NUSRATY, ESQUIRE

15          COVINGTON & BURLING, LLP

16          One CityCenter

17          850 Tenth Street, N.W.

18          Washington, D.C. 20001-4956

19          (202) 662-5598

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 4

```
 1      APPEARANCES (Continued):

 2

 3      ON BEHALF OF DEFENDANT CVS:

 4           DANIEL P. MOYLAN, ESQUIRE

 5           ZUCKERMAN SPAEDER, LLP

 6           100 East Pratt Street, Suite 2440

 7           Baltimore, Maryland 21202-1031

 8           (410) 949-1159

 9

10      ON BEHALF OF DEFENDANT WALMART:

11           SARAH G. CONWAY, ESQUIRE

12           JONES DAY

13           555 South Flower Street

14           Fiftieth Floor

15           Los Angeles, California 90071-2300

16           (213) 489-3939

17

18      ON BEHALF OF DEFENDANT HBC CO.:

19           SCOTT D. LIVINGSTON, ESQUIRE

20           MARCUS & SHAPIRA, LLP

21           One Oxford Centre, 35th Floor

22           301 Grant Street

23           Pittsburgh, Pennsylvania 15219-6401

24           (412) 338-4690
```

Highly Confidential - Subject to Further Confidentiality Review

Page 5

```
 1    APPEARANCES (Continued):

 2    ON BEHALF OF DEFENDANT CARDINAL HEALTH:

 3         MIRANDA PETERSEN, ESQUIRE

 4         WILLIAMS & CONNOLLY, LLP

 5         725 Twelfth Street, N.W.

 6         Washington, D.C. 20005

 7         (202) 434-5000

 8

 9    ON BEHALF OF ENDO PHARMACEUTICALS, INC. and

10        ENDO HEALTH SOLUTIONS, INC.:

11         JOHN D. CELLA, ESQUIRE

12         ARNOLD & PORTER KAYE SCHOLER, LLP

13         601 Massachusetts Avenue, N.W.

14         Washington, D.C. 20001-3743

15         (202) 942-6771

16

17    ON BEHALF OF AMERISOURCEBERGEN BERGEN:

18         MOLLY Q. CAMPBELL, ESQUIRE

19         REED SMITH, LLP

20         1301 K Street, N.W.

21         Suite 1000 - East Tower

22         Washington, D.C. 20005

23         (202) 414-9173

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
                                                    Page 6

 1      APPEARANCES (Continued):

 2

 3      ON BEHALF OF ALLERGAN FINANCE:

 4           MICHAEL LeFEVOUR, ESQUIRE (Telephonically)

 5           KIRKLAND & ELLIS, LLP

 6           300 North LaSalle

 7           Chicago, Illinois 60654

 8           (312) 862-2000

 9

10      ON BEHALF OF PRESCRIPTION SUPPLY, INC.:

11           ERIC J. WILLIAMS, ESQUIRE (Telephonically)

12           PELINI, CAMPBELL & WILLIAMS, LLC

13           Bretton Commons - Suite 400

14           8040 Cleveland Avenue NW

15           North Canton, Ohio 44720

16           (330) 305-6400

17

18      ALSO PRESENT:

19           RICHARD WOODS, Paralegal

20           DANIEL HOLMSTOCK, Videographer

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                        C O N T E N T S

2    EXAMINATION OF BLAINE M. SNIDER                PAGE

3          By Mr. Bogle                       17, 489

4          By Mr. Collins                     453, 514

5

6

7

8                        E X H I B I T S

9                  (Attached to transcript)

10   MCKESSON-SNIDER DEPOSITION EXHIBITS           PAGE

11   No. 1     Drug Operations Manual, Exhibit

12             P1.1555 through P1.1555.137          35

13   No. 2     E&C U.S. House of Representatives

14             Committee on Energy and Commerce,

15             Exhibit P1.264 though P1.264.9       59

16   No. 3     Letter from Drug Enforcement

17             Administration, September 27,

18             2006, Exhibit P1.1464 through

19             P1.1464.4                            73

20   No. 4     Beyond Boundaries, National

21             Operations Conference 2007,

22             Exhibit P1.1830 through P1.1830.9    83

23   No. 5     E-mail re November LDMP, Exhibit

24             P1.1864 through P1.1864.3            90

Highly Confidential - Subject to Further Confidentiality Review

Page 8

```
 1              E X H I B I T S   C O N T I N U E D

 2                   (Attached to transcript)

 3       MCKESSON-SNIDER DEPOSITION EXHIBITS           PAGE

 4       No. 6     McKesson Operations Manual for

 5                 Pharma Distribution, Exhibit

 6                 P1.1333 through P1.1333.6            117

 7       No. 7     E-mail string re CSMP contribution,

 8                 DCM call, Tightening up our

 9                 increase process, Exhibit P1.1679

10                 through P1.1679.3                    133

11       No. 8     McKesson's Controlled Substance

12                 Monitoring Program, Regulatory

13                 Affairs Training, Exhibit P1.795

14                 through P1.795.51                    137

15       No. 9     Document re "Understand ARCOS Data,"

16                 Exhibit P1.1568 through P1.1568.2    149

17       No. 10    Letter from Hyman, Phelps &

18                 McNamara to Linden Barber, Exhibit

19                 P1.1829 through P1.1829.7            156

20       No. 11    McKesson CSMP "Red Flags," Exhibit

21                 P1.1146 through P1.1146.8            163

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 9

```
 1            E X H I B I T S   C O N T I N U E D

 2                (Attached to transcript)

 3     MCKESSON-SNIDER DEPOSITION EXHIBITS          PAGE

 4     No. 12    Letter from the House of

 5               Representatives, Committee on

 6               Energy and Commerce to John H.

 7               Hammergren, dated February 15,

 8               2018, Exhibit P1.44 through P1.44.14 180

 9     No. 13    Documents re Mace's Pharmacy,

10               Exhibit P1.1824 through P1.1824.91   188

11     No. 14    U.S. Census Bureau 2010 Demographic

12               Profile Data, Exhibit P1.1892

13               through P1.1892.5                    199

14     No. 15    Threshold Change Forms, Exhibit

15               P1.1782 through P1.1782.8            221

16     No. 16    Documents re Best Care Pharmacy,

17               Exhibit P1.1812 through P1.1812.72   229

18     No. 17    Document re Weston, West Virginia,

19               Exhibit P1.1909                      232

20     No. 18    Documents re Lumberport Pharmacy,

21               Exhibit P1.1821 through P1.1821.20   267

22     No. 19    Document re Lumberport, West

23               Virginia, Exhibit P1.1908            272

24
```

Golkow Litigation Services - 877.370.DEPS

Page 10

```
 1            E X H I B I T S   C O N T I N U E D

 2                  (Attached to transcript)

 3     MCKESSON-SNIDER DEPOSITION EXHIBITS          PAGE

 4     No. 20   Documents re Belington Pharmacy,

 5              Exhibit P1.1822 through P1.1822.18   286

 6     No. 21   Press release titled Pharmacist

 7              Charged with Illegal Distribution

 8              of Painkillers, Exhibit P1.1251

 9              through P1.1251.2                    296

10     No. 22   McKesson Northeast Region-Buffalo/

11              New Castle, June 2014 Monthly

12              Report, Exhibit P1.1794 through

13              P1.1794.5                            309

14     No. 23   E-mail string re Status of

15              Threshold Change Request for

16              Martella's Pharmacy (Conemaugh/

17              Martella's), Exhibit P1.1900

18              through P1.1900.3

19     No. 24   (number not used)

20     No. 25   (number not used)

21     No. 26   E-mail string re Account #861446

22              Account Name Martella's Pharmacy,

23              Exhibit P1.1842 through P1.1842.2    313

24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 11

1              E X H I B I T S   C O N T I N U E D

2                  (Attached to transcript)

3    MCKESSON-SNIDER DEPOSITION EXHIBITS          PAGE

4    No. 27    E-mail string re Status of

5              Threshold Change Request for

6              Martella's Pharmacy, Exhibit

7              P1.1843 through P1.1843.2          319

8    No. 28    E-mail string re Status of

9              Threshold Change Request for

10             Martella's Pharmacy, Exhibit

11             P1.1901 through P1.1901.2          332

12   No. 29    McKesson's Controlled Substance

13             Monitoring Program Regulatory

14             Investigative Report, Exhibit

15             P1.1902 through P1.1902.5          335

16   No. 30    Press Release entitled Johnstown

17             Pharmacist Charged in 109-Count

18             Indictment with Illegally

19             Creating Bogus Prescriptions and

20             then Dispensing the Drugs, Exhibit

21             P1.1905 through P1.1905.2          340

22   No. 31    Indictment in re United States of

23             America v. Joseph M. Martella,

24             Exhibit P1.1904 through P1.1904.10   343

Highly Confidential - Subject to Further Confidentiality Review

Page 12

1              E X H I B I T S   C O N T I N U E D

2                 (Attached to transcript)

3      MCKESSON-SNIDER DEPOSITION EXHIBITS          PAGE

4      No. 32    E-mail re 2014 NSC Regulatory

5                Update to DC Ops, Exhibit P1.1434

6                through P1.1434.30                  349

7      No. 33    E-mail string re New Pharmacy,

8                Stowe, OH, Exhibit P1.1896 through

9                P1.1896.5                           354

10     No. 34    E-mail string re Summit Pain

11               Specialists, Exhibit P1.1877

12               through P1.1877.2                   359

13     No. 35    E-mail string re CSMP - Acme,

14               Exhibit P1.1870 through P1.1870.4   361

15     No. 36    E-mail string re Acme 1/11/13

16               CSMP, Exhibit P1.1874 through

17               P1.1874.2                           375

18     No. 37    Chart, Exhibit P1.1907             378

19     No. 38    McKesson's Controlled Substance

20               Monitoring Program Regulatory

21               Investigative Report, Exhibit

22               P1.1899 through P1.1899.13          383

23

24

Page 13

1              E X H I B I T S   C O N T I N U E D

2                   (Attached to transcript)

3      MCKESSON-SNIDER DEPOSITION EXHIBITS            PAGE

4      No. 39    Akron Beacon Journal/Ohio.com

5                article, Stow pain clinic closing

6                after court upholds sexual

7                imposition conviction against

8                doctor accused of abusing patients,

9                Exhibit P1.1895 through P1.1895.2     388

10     No. 40    Google page showing Acme Pharmacy,

11               Exhibit P1.1911 through P1.1911.2     391

12     No. 41    Documents re Giant Eagle Pharmacy,

13               Exhibit P1.1814 through P1.1814.7     394

14     No. 42    Documents re Giant Eagle 0217,

15               Exhibit P1.1827 through P1.1827.16    402

16     No. 43    Documents re Giant Eagle 0357,

17               Exhibit P1.1811 through P1.1811.13    406

18     No. 44    E-mail string re Giant Eagle CSMP

19               Thresholds, Exhibit P1.1866 through

20               P1.1866.14                            411

21     No. 45    Documents re Giant Eagle 0465,

22               Exhibit P1.1777 through P1.1777.24    418

23     No. 46    Documents re Giant Eagle 0230,

24               Exhibit P1.1816 through P1.1816.5     423

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1               E X H I B I T S   C O N T I N U E D

2                   (Attached to transcript)

3       MCKESSON-SNIDER DEPOSITION EXHIBITS            PAGE

4       No. 47    Documents re Giant Eagle 4030,

5                 Exhibit P1.1839 through P1.1839.5     427

6       No. 48    Documents re Giant Eagle 0209,

7                 Exhibit P1.1817 through P1.1817.8     431

8       No. 49    E-mail string re Pain mgt, Exhibit

9                 P1.1841 through P1.1841.4             433

10      No. 50    E-mail string re Suspicious Order

11                Monitoring Awareness Training,

12                Exhibit P1.1775 through P1.1775.2     439

13      No. 51    E-mail string re Monthly Drug Usage

14                Report - March, Exhibit P1.1876

15                through P1.1876.2                     443

16      No. 52    McKesson DEA Tri-annual checklist,

17                Bates MCK_00002614 through 00002617   459

18      No. 53    Photograph, Bates MCKMDL00649081      464

19      No. 54    Photograph, Bates MCKMDL00649080      464

20      No. 55    Photograph, Bates MCKMDL00649077      464

21      No. 56    Photograph, Bates MCKMDL00649075      464

22      No. 57    Photograph, Bates MCKMDL00649074      464

23      No. 58    Photograph, Bates MCKMDL00649073      464

24      No. 59    Photograph, Bates MCKMDL00649071      464

Highly Confidential - Subject to Further Confidentiality Review

Page 15

1            E X H I B I T S   C O N T I N U E D

2                 (Attached to transcript)

3      MCKESSON-SNIDER DEPOSITION EXHIBITS          PAGE

4      No. 60    Photograph, Bates MCKMDL00649076    464

5      No. 61    Photograph, Bates MCKMDL00649072    464

6      No. 62    Photograph, Bates MCKMDL00649070    464

7      No. 63    McKesson Operations Manual, DEA

8                General Policies / Requirements,

9                Bates MCKMDL00534074 through

10               00534091                            476

11     No. 64    Controlled Substance Compliance

12               Processes (CSCP), Bates

13               MCKMDL00531288 through 00531302     478

14     No. 65    McKesson Operations Manual,

15               ARCOS Reporting, Bates MCKMDL00354474

16               through 00354491                    483

17     No. 66    McKesson Operations Manual,

18               ARCOS/Controlled Drug Inventory

19               Procedures, Bates MCKMDL00329091

20               through 00329111                    484

21     No. 67    DEA letter to Covington & Burling,

22               dated November 4, 2014, Bates

23               MCKMDL00409453 through 00409458     493

24

Highly Confidential - Subject to Further Confidentiality Review

Page 16

1          E X H I B I T S   C O N T I N U E D

2              (Attached to transcript)

3      MCKESSON-SNIDER DEPOSITION EXHIBITS        PAGE

4      No. 68     E-mail string re Missing HBC Tote,

5                 Bates MCKMDL00598574 through

6                 00598578                        497

7      No. 69     Documents re Summit County, Exhibit

8                 P1.1889 through P1.1889.31       509

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 17

```
1                   P R O C E E D I N G S

2                   ------------------

3              THE VIDEOGRAPHER:  We are now on the

4   record.  My name is Daniel Holmstock.  I am the

5   videographer for Golkow Litigation Services.

6   Today's date is November 8, 2018, and the time on

7   the screen is 8:34 a.m.

8              This deposition is being held at the law

9   offices of Covington & Burling, LLP, at 850

10  10th Street, Northwest, in Washington, D.C., in

11  the matter of In Re: National Prescription Opiate

12  Litigation.  It is pending before the United

13  States District Court for the Northern District of

14  Ohio, Eastern Division.

15             The deponent today is Mr. Blaine Snider.

16             Counsel will be noted on the

17  stenographic record.  The court reporter is Leslie

18  Todd, who will now administer the oath.

19                   BLAINE M. SNIDER,

20           and having been first duly sworn,

21           was examined and testified as follows:

22                   CROSS EXAMINATION

23  BY MR. BOGLE:

24        Q    Can I get your full name, sir?
```

Page 18

1        A     Blaine Matthew Snider.

2        Q     And am I correct that you're currently

3    employed with McKesson?

4        A     Yes.

5        Q     Okay.  And have you ever been deposed

6    before?

7        A     No.

8        Q     Okay.  Just a few basic ground rules

9    that might help both of us here today.  I'm going

10   to be asking you some questions, and if you don't

11   understand the question I ask or don't hear it,

12   it's perfectly okay for you to ask me to repeat or

13   rephrase the question.  Okay?

14       A     Okay.

15       Q     If you need a break at any point in

16   time, just let me know or your counsel know.

17   Happy to take a break whenever you need it.  All

18   I'd ask is if I've got a question pending, that

19   you answer that question, and then we can break

20   for whenever you want.

21             And also I'm going to ask you questions,

22   you're going to provide answers.  I'd ask that we

23   try not to talk over each other.  So I'll ask my

24   question, try to give you ample opportunity to

Page 19

1    answer before I ask my next question.  Is that
2    fair?
3         A    Okay.
4         Q    Okay.  And how long have you been with
5    McKesson?
6         A    Almost 40 years.
7         Q    Okay.  Am I correct that you currently
8    hold the director of operations position at the
9    New Castle Distribution Center?
10        A    Yes.
11        Q    Okay.  How long have you held that
12   specific position?
13        A    Eighteen -- eighteen years.
14        Q    Okay.  What was your job at McKesson
15   prior to that?
16        A    I was distribution center manager in
17   Sewickley, Pennsylvania, and North Canton, Ohio.
18        Q    Okay.  How long did you have that role?
19        A    About three years.
20        Q    How about prior to that?
21        A    I was operations manager in Cincinnati,
22   Ohio, and North Canton previous to that.
23        Q    How long did you hold that position?
24        A    Oh, I can't remember now.  Eight, ten

Highly Confidential - Subject to Further Confidentiality Review

Page 20

1    years, I guess.

2         Q    Okay.  What was your job prior to that

3    at McKesson, just the title?

4         A    I started as a supervisor almost 40

5    years ago.

6         Q    Okay.  So would it be fair to say, just

7    doing the rough math here, that you have nearly 30

8    years of experience as a distribution center

9    operations manager at McKesson?

10        A    Yes.

11        Q    Okay.  Now, McKesson itself as an entity

12   has, as I understand it, 37 distribution centers

13   around the country; is that right?

14             MR. COLLINS:  Objection to the form.

15             THE WITNESS:  I can't answer to -- it

16   sounds like you're including med-surg or something

17   else.  I know there's 28 distributions centers for

18   U.S. pharma.

19   BY MR. BOGLE:

20        Q    Okay.  And New Castle is one of those 28

21   distribution centers for U.S. pharma, correct?

22        A    Yes.

23        Q    And just so I understand, as director of

24   operations for New Castle, it would be your

Highly Confidential - Subject to Further Confidentiality Review

Page 21

1    general responsibility to run the day-to-day

2    operations for the facility, correct?

3              MR. COLLINS:  Objection.  Form.

4              THE WITNESS:  I'm in charge of the

5    facility, yes.

6    BY MR. BOGLE:

7         Q    Right.  So it's fair to say that you're

8    the highest ranking McKesson employee at New

9    Castle that has responsibility exclusive to that

10   distribution center, right?

11             MR. COLLINS:  Objection to form.

12             THE WITNESS:  Well, I'm not sure.  I

13   have a VP/GM I report to, but I run the

14   distribution center.

15   BY MR. BOGLE:

16        Q    Who do you report to?

17        A    Brian Ferreira, the VP/GM.

18        Q    When it comes to decisions specific to

19   the operations of New Castle, would it be fair to

20   say that the buck stops with you?

21             MR. COLLINS:  Objection to form, vague.

22             THE WITNESS:  I don't think so.

23   BY MR. BOGLE:

24        Q    Okay.  Who do you think the buck stops

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    with at New Castle?

2                MR. COLLINS:  Same objection.

3                THE WITNESS:  I don't know the buck.  I

4    know I'm in charge of the distribution center

5    operations, and I have a boss who is the VP/GM.

6    BY MR. BOGLE:

7         Q    Okay.  When you say you're responsible

8    for distribution center operations, what do you

9    think that that -- that entails?

10        A    In charge of the distribution center and

11   the employees, and the pick, pack and ship of that

12   operations.

13        Q    When you say "pick, pack and ship," what

14   does that mean?

15        A    The day-to-day filling of orders for our

16   customers out of the New Castle DC.

17        Q    Okay.  And when it comes to pills that

18   are distributed from New Castle, you would agree

19   with me that it's your ultimate responsibility to

20   make sure that those go to the proper customers

21   for the proper purpose.

22                MR. COLLINS:  Objection.  Compound,

23   form.

24                THE WITNESS:  We make sure the orders

Highly Confidential - Subject to Further Confidentiality Review

Page 23

1    are correct, accurate, billed correctly, shipped

2    correctly, on time.

3    BY MR. BOGLE:

4         Q    And your job responsibilities also

5    include, when it comes to controlled substances,

6    making sure that the customers purchasing are

7    purchasing for a legitimate medical purpose,

8    correct?

9              MR. COLLINS:  Objection.  Form, calls

10   for a legal conclusion, lacks foundation.

11             THE WITNESS:  I can't say for the

12   customers all the time.  I can say that I follow

13   the Code of Federal Regulations.

14   BY MR. BOGLE:

15        Q    Okay.  And part of the Code of Federal

16   Regulations, when it comes to the Controlled

17   Substances Act, talks about the distributor's

18   responsibility to ensure that they're supplying

19   drugs to customers who are buying it for a

20   legitimate medical purpose, right?

21             MR. COLLINS:  Objection.  Form, asked

22   and answered --

23             THE WITNESS:  Can you repeat that?

24             MR. COLLINS:  -- calls for a legal

Page 24

1    conclusion.

2              Please let me finish my objections.

3    BY MR. BOGLE:

4         Q    When it comes to the Controlled

5    Substances Act, you understand that part of that

6    act requires that controlled substances that are

7    distributed to customers are being provided for a

8    legitimate medical purpose, correct?

9              MR. COLLINS:  Objection.  Form, calls

10   for a legal conclusion.

11             THE WITNESS:  I can't --

12             MR. COLLINS:  Foundation.

13             THE WITNESS:  I can't say a legitimate

14   medical purpose.  I don't know that phrase.  I'm

15   sorry.

16   BY MR. BOGLE:

17        Q    You've never heard that phrase?

18        A    No.

19        Q    Okay.  You're a member of management at

20   the distribution center for New Castle, right?

21        A    Yes.

22             MR. COLLINS:  Objection to form.

23   BY MR. BOGLE:

24        Q    And the distribution center management

Page 25

1    at McKesson has the full responsibility for

2    ensuring the proper distribution of controlled

3    substances, correct?

4              MR. COLLINS:  Objection to form, calls

5    for a legal conclusion, vague.

6              THE WITNESS:  Can you repeat the

7    question, please?

8              MR. BOGLE:  Can you repeat back, Court

9    Reporter?

10             (Whereupon, the requested record

11             was read.)

12             MR. COLLINS:  Same objections.

13             THE WITNESS:  I believe so, yes.

14   BY MR. BOGLE:

15       Q    Okay.  And that's a job you take

16   seriously, right?

17       A    Yes.

18       Q    Okay.  Just make sure you speak up a

19   little bit.  I'm having sometimes a little trouble

20   hearing you.

21       A    Okay.

22       Q    Is that "yes"?

23       A    Yes.

24       Q    Okay.  Your pay structure at McKesson,

Page 26

1    do you receive bonuses?

2          A      Yes.

3          Q      Okay.  How are those bonuses determined?

4    What criteria is used?

5                 MR. COLLINS:  Objection to form.

6                 THE WITNESS:  It's based on operational

7    performance and employee engagement.

8    BY MR. BOGLE:

9          Q      Okay.  When it comes to operational

10   performance, does that include the amount of

11   products sold by the distribution center during a

12   year?

13                MR. COLLINS:  Objection to form, vague.

14                THE WITNESS:  No.

15   BY MR. BOGLE:

16         Q      Okay.  What's included?

17         A      It would be productivity, quality,

18   on-time delivery, customer satisfaction, employee

19   engagement, as I mentioned before, and then those

20   are rounded together.

21         Q      What's included within productivity?

22                MR. COLLINS:  Objection to form.

23                THE WITNESS:  There's lines per hour, we

24   call it.

Highly Confidential - Subject to Further Confidentiality Review

Page 27

1                    THE REPORTER:  Lines?

2                    THE WITNESS:  Lines per hour.  Sorry.

3    BY MR. BOGLE:

4         Q    What does "lines per hour" mean?

5         A    How many lines we do in an hour, and

6    then there's quality defects per million

7    opportunities to make sure we have an accurate

8    order, filled complete and -- and accurately.

9         Q    So is it your testimony that total

10   revenues for the distribution center play no role

11   in your bonus?

12                   MR. COLLINS:  Objection to form.

13   Foundation.

14                   THE WITNESS:  Correct.

15   BY MR. BOGLE:

16        Q    You would agree with me that protecting

17   the health and safety of the public is the most

18   important consideration for any distributor of

19   pharmaceutical products, correct?

20                   MR. COLLINS:  Objection.  Form,

21   foundation, calls for a legal conclusion, argue --

22                   MR. BOGLE:  I believe you're supposed to

23   just --

24                   MR. COLLINS:  Argumentative.

Highly Confidential - Subject to Further Confidentiality Review

Page 28

```
 1              MR. BOGLE:  -- stick to form objections.
 2      You're going beyond that considerably here.
 3              MR. COLLINS:  No, my objection is
 4      legitimate.  Your question wasn't.  So my
 5      objection stands.  It's the form, calls for a
 6      legal conclusion --
 7              MR. BOGLE:  I believe the protocol calls
 8      for just form objections.  Not speaking objections
 9      beyond that.
10              MR. COLLINS:  We have a phone here if
11      you want to make a call to the special master.
12              MR. BOGLE:  Well, we can see if this
13      continues.  We may have to.
14              MR. COLLINS:  Listen, it's a proper
15      objection.  Your question wasn't.
16              MR. BOGLE:  I don't want to stop ten
17      minutes in.
18      BY MR. BOGLE:
19          Q    I'll ask my question again.
20              Do you believe that protecting the
21      health and safety of the public is the most
22      important consideration for a distributor of
23      pharmaceutical products?
24              MR. COLLINS:  Same objections.  Form,
```

Page 29

1    calls for a legal conclusion, foundation.

2              THE WITNESS:  I can't answer to all the

3    health and safety of the public.  I can answer to

4    the Code of Federal Regulations and my duties.

5    BY MR. BOGLE:

6         Q    Okay.  So do you believe that compliance

7    with the Federal Regulations is the most important

8    consideration for a distributor of pharmaceutical

9    products like McKesson?

10             MR. COLLINS:  Objection to form.

11             THE WITNESS:  I think it's a part of it.

12   BY MR. BOGLE:

13        Q    Okay.  Any more important part that you

14   can think of?

15             MR. COLLINS:  Same objections.  Form,

16   foundation.

17             THE WITNESS:  Well, people.

18   BY MR. BOGLE:

19        Q    People, what do you mean by that?

20        A    My employees.

21        Q    Okay.  What about the people that you're

22   supplying the controlled substances to ultimately,

23   the end user?

24             MR. COLLINS:  Object --

Page 30

```
 1    BY MR. BOGLE:

 2         Q    Do you think you have any responsibility

 3    to those people?

 4              MR. COLLINS:  Objection.  It's a

 5    mischaracterization, lacks foundation, form.

 6              THE WITNESS:  I mentioned before about

 7    on-time, accurate delivery to my customers.

 8    BY MR. BOGLE:

 9         Q    Okay.  So you think you have any

10    responsibility to the -- the end user, the person

11    who's purchasing from your customer?

12              MR. COLLINS:  Objection to form, calls

13    for speculation.

14              THE WITNESS:  I think I mentioned that

15    before.  Yes.

16    BY MR. BOGLE:

17         Q    Okay.  And as to the ultimate purchaser,

18    the person who's going to go to your -- to the

19    pharmacy and purchase the drug, do you think that

20    McKesson has a responsibility to protect the

21    health and safety of those people?

22              MR. COLLINS:  Same objections.  Asked

23    and answered, form.

24              THE WITNESS:  I can't answer for all of
```

Highly Confidential - Subject to Further Confidentiality Review

Page 31

1    McKesson.  I can just answer for New Castle.

2    BY MR. BOGLE:

3         Q    Sure.  Then I'll rephrase it that way.

4    Do you think New Castle has such a responsibility?

5              MR. COLLINS:  Same objections.

6              THE WITNESS:  I don't -- can you repeat

7    the question?

8    BY MR. BOGLE:

9         Q    Sure.

10             Do you think New Castle has a

11   responsibility for the health and safety of the

12   end user purchasing controlled substances

13   distributed by McKesson?

14             MR. COLLINS:  Objection to form.

15             THE WITNESS:  I can't say that I can

16   control that.

17   BY MR. BOGLE:

18        Q    Okay.  I didn't ask if control.  I asked

19   if you had responsibility.

20             MR. COLLINS:  Objection to form.

21             THE WITNESS:  I can't be responsible for

22   someone that purchases drugs.

23   BY MR. BOGLE:

24        Q    Okay.  So you think you have no

Page 32

1    responsibility for ensuring that people are

2    purchasing for legitimate medical purposes?

3              MR. COLLINS:  Objection to form,

4    argumentative.  Calls for a legal conclusion.

5              THE WITNESS:  I can't answer to that.

6    BY MR. BOGLE:

7        Q    You don't know?

8        A    I can't answer to that.

9        Q    Okay.  When you say you can't answer

10   that, what -- what's keeping you from answering

11   that?

12       A    I don't know.

13       Q    Okay.  Have you heard of the term

14   "diversion" when it comes to controlled

15   substances?

16       A    Yes.

17       Q    What does that term mean to you?

18       A    It's in the supply chain where the

19   product could be diverted.  Like inbound trucks

20   that come in, sometimes those are hijacked, or in

21   the building to make sure security is there.

22   There's a chance for diversion there.  And in the

23   truck drivers, there's a chance for diversion

24   there.  And to make sure that that supply chain is

Page 33

1    intact.

2         Q    Okay.  So you talked about ways that

3    diversion can occur, but before we get there, what

4    do you understand the term "diversion" to mean?

5    When somebody diverts something when it comes to

6    controlled substances, what does that mean to you?

7         A    Loss of controlled substance.

8         Q    Loss of product?

9         A    Yes.

10        Q    Okay.  Have you ever heard the term

11   "diversion" used to mean the use of a controlled

12   substance for an illegitimate purpose?

13        A    No.

14        Q    Never heard of that concept?

15        A    No.

16        Q    Okay.  You've talked a couple of times

17   about compliance with Federal Regulations, and

18   that you're familiar with the Controlled

19   Substances Act, correct?

20             MR. COLLINS:  Objection.  Lacks

21   foundation, calls for a legal conclusion.

22             THE WITNESS:  Is that the Code of

23   Federal Regulations?

24   BY MR. BOGLE:

Page 34

1          Q     I'm just asking if you're familiar with

2     the Controlled Substances Act.

3          A     I'm not sure.

4          Q     You're not -- have you ever heard that

5     phrase used, Controlled Substances Act?

6          A     No.

7          Q     Never heard that?

8          A     No.

9          Q     Okay.  So is that -- have you ever read

10    any portion of that act in conjunction with your

11    responsibilities at McKesson?

12         A     I would have to see it.  I'm not sure it

13    was called the Controlled Substance Act.  I just

14    know the Code of Federal Regulations.

15         Q     Okay.  Do you have any familiarity as to

16    whether the Controlled Substances Act was -- was

17    and is designed to prevent diversion of controlled

18    substances like opioids?

19              MR. COLLINS:  Objection.  Calls for a

20    legal conclusion, form.

21              THE WITNESS:  I can't answer to that.  I

22    don't know.

23    BY MR. BOGLE:

24         Q     Are you familiar with SOP 55?  Ever

Page 35

1    heard of that?

2         A    No.

3         Q    Okay.  And SOP, I'm referring to

4    Standard Operating Procedure, 55.  Does that help

5    at all?

6         A    I don't call it that.

7         Q    Okay.

8         A    I'm not familiar with that.

9         Q    Okay.  I'm going to hand you what I'm

10   marking as -- it's labeled as Exhibit 1.1555,

11   being marked as Snider Exhibit 1.

12              (Snider Exhibit No. 1 was marked

13              for identification.)

14              MR. BOGLE:  There's yours, and there's

15   an extra there too.

16   BY MR. BOGLE:

17        Q    Okay.  Do you see at the top here, it

18   says "Drug Operations Manual 55/Controlled

19   Substances"?

20              Do you see that at the top?

21        A    Yes.

22        Q    Okay.  And below that it's got some

23   text.  I want to read from the very beginning

24   under A where it says "General."

Page 36

1             Do you see that section?

2        A    Yes.

3             MR. COLLINS:  I'm sorry.  Can you --

4             THE WITNESS:  At the top?

5    BY MR. BOGLE:

6        Q    Yes.  Correct.

7             It says below that -- well, actually,

8    before we get there, does this jog your memory at

9    all about SOP 55 within McKesson?

10            MR. COLLINS:  Objection to form.

11            THE WITNESS:  No.  We don't call it

12   that.

13   BY MR. BOGLE:

14       Q    Okay.

15       A    It's the Drug Operations Manual.

16       Q    Okay.  So you're familiar with the Drug

17   Operations Manual?

18       A    Yes.

19       Q    Okay.  So have you seen this document

20   before?

21       A    Yes.

22       Q    You have.  Okay.

23            Now, it says below "General":  "The aim

24   of the Controlled Substances Act is to prevent

Page 37

1    diversion of abusable substances into the illicit

2    traffic while ensuring their availability for

3    legitimate medical purposes."

4              Do you see that?

5    A     Yes.

6        Q    Do you agree with that statement?

7              MR. COLLINS:  Objection.  Form.

8              THE WITNESS:  I see it.  I agree that

9    it's there.

10   BY MR. BOGLE:

11       Q    Okay.  Do you have an understanding as

12   to whether that's a correct statement?

13   A     I can't answer --

14             MR. COLLINS:  Object -- I'm sorry,

15   please let me object.

16             Assumes facts not in evidence,

17   foundation, form.

18   BY MR. BOGLE:

19       Q    You don't know whether that's a correct

20   statement or not; is that your testimony?

21   A     I can't --

22             MR. COLLINS:  Same objections.

23             THE WITNESS:  I can't answer to that.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1        Q    Why?  Is it because you don't know?

2              MR. COLLINS:  Objection.  Argumentative,

3     form.

4     BY MR. BOGLE:

5        Q    I'm just trying to understand why you

6     can't answer.

7        A    I don't understand the question.

8        Q    Okay.  So I read the first sentence here

9     to you, and my question was, do you think that's

10    an accurate statement as to the aim of the

11    Controlled Substances Act?

12             MR. COLLINS:  Objection.  Form,

13    foundation.

14             THE WITNESS:  I see it on there, and I

15    see -- think it's accurate on 7/2000.

16    BY MR. BOGLE:

17       Q    Okay.  Do you think that's an accurate

18    statement today as to the Controlled Substances

19    Act?

20       A    I don't know that.

21       Q    You don't know either way?

22       A    I don't know.  I can't answer to how the

23    change -- how it's changed.  It's an evolving

24    program, and this was -- the Drug Operations

Page 39

1    Manual was trained and evolved over time to meet

2    the needs and changes of the regulations.

3         Q    So looking at that paragraph, the last

4    sentence there says:  "It is extremely important

5    that McKesson employees comply fully with the

6    regulations and the following guidelines," and

7    then there is a discussion of the guidelines

8    thereafter.

9              Do you see that sentence?

10        A    Yes.

11        Q    Okay.  Do you agree that it's extremely

12   important for McKesson to comply specifically with

13   the Controlled Substances Act?

14             MR. COLLINS:  Objection.  Form,

15   foundation, calls for a legal conclusion.

16             THE WITNESS:  I agree that it's

17   extremely important that McKesson employees comply

18   fully with the regulations and the following

19   guidelines, yes.

20   BY MR. BOGLE:

21        Q    Okay.  And those regulations include the

22   Controlled Substances Act, right?

23             MR. COLLINS:  Objection.

24   Mischaracterization, form.

Highly Confidential - Subject to Further Confidentiality Review

Page 40

1           THE WITNESS:  Yes.

2    BY MR. BOGLE:

3       Q    Do you have an understanding that

4    McKesson's responsibilities under the Controlled

5    Substances Act include having effective controls

6    against diversion?

7           MR. COLLINS:  Objection to form,

8    foundation.

9           THE WITNESS:  In my distribution center,

10   yes, we had effective controls against diversion.

11          MR. BOGLE:  Move to strike as

12   nonresponsive.

13   BY MR. BOGLE:

14      Q    That's not my question.  We'll get

15   there.  I'm asking you questions that I think is

16   before we get there.

17          My question is, do you agree that

18   McKesson's responsibilities under the Controlled

19   Substances Act include having effective controls

20   against diversion?

21          MR. COLLINS:  Objection.  The question

22   was just asked.  He just answered.  He's not here

23   as a 30(b)(6) witness, so he is not answering on

24   behalf of McKesson.

Page 41

1    BY MR. BOGLE:

2         Q    You can answer.

3         A    I can answer for my distribution center,

4    and it stands, yes.

5         Q    Okay.  Yes, that you understand that

6    your responsibilities at New Castle include having

7    effective controls against diversion, right?

8         A    Yes.

9         Q    Okay.  And part of having effective

10   controls against diversion include monitoring for

11   suspicious controlled substance orders, right?

12        A    Depends on what period and what you're

13   calling "monitoring."

14        Q    Okay.  Well, we'll start with a period.

15             What period of time do you think that

16   the responsibilities at New Castle did not include

17   monitoring for suspicious controlled substances

18   orders?

19             MR. COLLINS:  Objection.  Form.

20   Mischaracterization.

21             THE WITNESS:  I can't answer that for my

22   40 years.  I didn't always know that when I first

23   started.  So I think your question has to be more

24   specific so I can respond to it.

Page 42

1    BY MR. BOGLE:

2         Q    Okay.  Well, you've been director of

3    operations at New Castle you said for 18 years,

4    right?

5         A    Yes.

6         Q    So let's focus on those 18 years.

7         A    Okay.

8         Q    So from 2000 to 2018, is there any point

9    in time in that 18-year window where you believe

10   that New Castle's responsibilities did not include

11   monitoring for suspicious controlled substance

12   orders?

13        A    No.

14        Q    Okay.  So we can agree during that

15   window those responsibilities existed at your

16   facility, right?

17        A    What's the question, please?  I'm sorry.

18        Q    That your responsibilities from 2000 to

19   2018 at New Castle included monitoring for

20   suspicious orders, that was part of your job too,

21   right?

22        A    Yes.

23        Q    And part of your job from 2000 to 2018

24   at New Castle also included reporting orders to

Page 43

1    the DEA that were deemed to be suspicious, right?

2        A    Yes.

3        Q    And if a suspicious order was identified

4    during that 18-year time period, it was not

5    supposed to be shipped, right?

6              MR. COLLINS:  Objection.  Form, legal

7    conclusion, foundation.

8              THE WITNESS:  Can you repeat the

9    question?

10   BY MR. BOGLE:

11       Q    Sure.

12       A    Because there's different forms of the

13   Controlled Substance Monitoring Program.

14       Q    Okay.  Well, I'll make it as specific as

15   possible.  From 2000 to 2018 at New Castle, if you

16   identified a suspicious order for an opioid

17   product, you would agree with me that that order

18   should not be shipped, right?

19             MR. COLLINS:  Objection.  Form,

20   foundation, assumes facts not in evidence, and

21   calls for a legal conclusion.

22             THE WITNESS:  I can't answer that.

23   BY MR. BOGLE:

24       Q    You don't know at all?

Page 44

1          A      I don't know.

2          Q      Okay.  Is that not part of your job?

3               MR. COLLINS:  Objection.  Argue --

4     BY MR. BOGLE:

5          Q      During that time period?

6               MR. COLLINS:  Objection.  Argumentative

7     and compound.  Form.

8               THE WITNESS:  Is what not part of my

9     job?

10    BY MR. BOGLE:

11         Q      For ensuring that suspicious orders were

12    not shipped.

13              MR. COLLINS:  Objection.  Calls for a

14    legal conclusion, asked and answered.

15              THE WITNESS:  Yes, my job was to follow

16    the regs here.

17    BY MR. BOGLE:

18         Q      Right.  I'm talking about a specific

19    portion of those, which is that suspicious orders

20    should not be shipped.

21              MR. COLLINS:  Object --

22    BY MR. BOGLE:

23         Q      And my question was simply, from 2000 to

24    2018 as director of operations for New Castle, you

Page 45

```
 1    would agree with me that if you guys found a
 2    suspicious order for a controlled substance, you
 3    weren't supposed to ship it, right?
 4              MR. COLLINS:  Objection.  Argumentative,
 5    assumes facts not in evidence.  It's a
 6    mischaracterization of this document.
 7              MR. BOGLE:  I'm not talking about the
 8    document -- just to be clear, I'm not talking
 9    about this document.
10              MR. COLLINS:  Oh, I'm sorry.
11              MR. BOGLE:  I'm talking generally.
12              MR. COLLINS:  Objection to form.
13              THE WITNESS:  I can't answer that, no.
14    BY MR. BOGLE:
15         Q    You don't know?
16         A    No.
17         Q    Okay.  So as you sit here today, if you
18    identify a suspicious order at New Castle, do you
19    ship it for a controlled substance?
20              MR. COLLINS:  Objection.  Calls for a
21    hypothetical.
22              THE WITNESS:  I can't answer that.  I
23    don't know what I'd do today.  What -- I don't
24    understand suspicious order, what you're --
```

Page 46

1    BY MR. BOGLE:

2          Q    You don't --

3          A    No, you're -- you're generalizing, and I

4    can't answer a general question about every order

5    that we've shipped.

6          Q    I'm not asking about every order that

7    you've shipped.  I'm asking about suspicious

8    orders.

9               Have you ever heard the term "suspicious

10   order" as it pertains to controlled substance?

11         A    Yes.

12         Q    What do you understand that to mean?

13         A    An order that has -- over time it's

14   evolved to what it means according to the DEA.  So

15   at first it was an order above an average or a

16   norm.  That's what I understand it -- understood

17   it to be in the year 2000.

18         Q    Okay.  And how has that understanding

19   evolved from your perspective?  What do you

20   understand that to mean?

21              MR. COLLINS:  Objection.  Vague, form.

22              THE WITNESS:  To report unusual or

23   suspicious orders.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 47

1          Q     Right.  And also to not ship them.  Just

2     to report them is not enough, right?

3                MR. COLLINS:  Objection.  Argumentative,

4     asked and answered, calls for a legal conclusion,

5     and it's a mischaracterization of his prior

6     testimony.

7                THE WITNESS:  No.

8     BY MR. BOGLE:

9          Q     You can answer.  "No" to what?

10         A     Your question.

11         Q     Okay.  So if you find a suspicious order

12    at New Castle, you understand that at all points

13    in time from 2000 to 2018, you weren't supposed to

14    ship it, right?

15               MR. COLLINS:  Objection.  Asked and

16    answered.

17               Do you have another line of questioning?

18               MR. BOGLE:  I haven't got --

19               MR. COLLINS:  This has been asked and

20    answered multiple times.

21               MR. BOGLE:  You can state a form

22    objection.  That's what you're allowed to state.

23               MR. COLLINS:  Listen, I'm trying to --

24               MR. BOGLE:  I'm going to ask my

Highly Confidential - Subject to Further Confidentiality Review

Page 48

1    question.  He can answer my question.  There's a

2    question pending.

3            MR. COLLINS:  I'm going to finish my

4    objection, if you don't mind.

5            Objection to form, calls for a legal

6    conclusion, asked and answered, and

7    mischaracterization.

8    BY MR. BOGLE:

9        Q    You can answer.

10       A    Can you repeat the question?

11       Q    Sure.  From 2000 to 2018, if you

12   identified a suspicious order at New Castle, you

13   would agree with me that your responsibility was

14   not to ship that order, right?

15           MR. COLLINS:  Same objections.  Lack of

16   foundation, form, assumes facts not in evidence,

17   calls for a legal conclusion.

18           THE WITNESS:  I would not agree with

19   you.

20   BY MR. BOGLE:

21       Q    Okay.  So you think it's okay to ship a

22   suspicious order once you've identified it?

23           MR. COLLINS:  Objection.  Argumentative.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 49

1          Q     I'm just trying to make sure I

2    understand your testimony.

3                MR. COLLINS:  Objection.

4    Mischaracterization.

5                THE WITNESS:  Can you repeat the

6    question, please?

7    BY MR. BOGLE:

8          Q     Okay.  From 2000 to 2018, was there ever

9    a point in time that you felt it was okay to ship

10   a suspicious order that you identified at New

11   Castle?

12               MR. COLLINS:  Objection.  Form, calls

13   for a legal conclusion, foundation.

14               THE WITNESS:  It depends on the context

15   of the program.

16   BY MR. BOGLE:

17         Q     How?

18         A     It -- it's the unusual purchase

19   notification program.  At the early stages, it was

20   an average -- it was evolved over time.  So I

21   can't say that something was identified as -- I

22   believe in here it was called unusual purchases,

23   that we didn't ship it but we notified the DEA.

24         Q     Okay.  And I guess I'm still not clear

Page 50

1    on -- on where you stand on this point.

2              Can you identify me any point in time

3    from 2000 to 2018 where you feel that at New

4    Castle it was okay to ship an order you had

5    identified as suspicious?

6              MR. COLLINS:  Objection to form, vague,

7    calls for a legal conclusion, mischaracterization,

8    and asked and answered.

9              THE WITNESS:  If the format of 2000 to,

10   I believe, 2006, we identified unusual purchases

11   to the DEA, and then shipped it after notifying

12   the DEA.

13   BY MR. BOGLE:

14        Q    Okay.  And starting in 2006, did you

15   continue shipping suspicious orders that you had

16   identified?

17        A    No.

18        Q    Okay.  And why did that change in 2006

19   at New Castle?

20        A    We develop -- I think it was 2006 or '7,

21   we developed a new program.  Because on this

22   program, 2000 to 2006, we faxed unusual purchases

23   to the DEA every day so they could look at it, and

24   we sent monthly programs to them.  And in 2006 or

Page 51

1    '7, I don't remember which, the program even got

2    more robust and data driven.

3         Q    Where did you have the understanding

4    that from 2000 to 2006 it was okay to ship

5    suspicious orders that you had identified?

6              MR. COLLINS:  Objection to form.  Calls

7    for a legal conclusion.

8              THE WITNESS:  I think you're putting

9    words into my mouth, which you're calling unusual

10   or suspicious purchases.  We notified the DEA that

11   something was above the average.

12   BY MR. BOGLE:

13        Q    Well, I'm sorry, I wasn't trying to put

14   words in your mouth.  I thought that's what you

15   just said.

16        A    I -- I --

17        Q    Okay.  So from 2000 to 2006 -- I'll ask

18   it again to make sure we're on the same page.

19        A    Okay.

20        Q    From 2000 to 2006, if at your New Castle

21   facility you identified a suspicious order, did

22   you -- were you under the understanding it was

23   okay to ship that order?

24             MR. COLLINS:  Objection to the use of

Page 52

1    the word "okay."  Calls for a legal conclusion,

2    and asked and answered.

3                 THE WITNESS:  No.

4    BY MR. BOGLE:

5         Q    It was not okay to do that.

6         A    No.

7         Q    Okay.  So -- and when it comes to due

8    diligence at the distribution center level at New

9    Castle, you understand that the distribution

10   center had the responsibility to investigate and

11   review thoroughly threshold change requests,

12   right?

13                MR. COLLINS:  Objection.  Form, vague,

14   time frame, calls for a legal conclusion.

15                THE WITNESS:  What -- I'm sorry.  What

16   was the question?  What years?

17   BY MR. BOGLE:

18        Q    At all points in time, from 2000 to

19   2018, at the distribution center level --

20   actually, strike that.  Let me back up.

21                Threshold change requests, that process

22   was developed starting in '07, right?

23        A    Yes.

24        Q    Okay.  So let me rephrase the time

Highly Confidential - Subject to Further Confidentiality Review

Page 53

1    period.

2                  From '07 to present, at the distribution

3    center level, there was -- there was and is a

4    responsibility to thoroughly investigate and

5    review threshold change requests, right?

6                  MR. COLLINS:  Objection.  Form, calls

7    for a legal conclusion, foundation.

8                  THE WITNESS:  The threshold change

9    requests were handled by -- we did the independent

10   in the distribution center from 2006 to '7, and

11   then the national accounts handled the thresholds

12   for national accounts, and sometimes we did the

13   hospitals also or long-term care.

14   BY MR. BOGLE:

15        Q    Okay.  You recall my question?

16        A    Did I review thresholds was I thought

17   your question.

18        Q    Thoroughly investigate and review --

19                  MR. COLLINS:  Objection.

20   BY MR. BOGLE:

21        Q    -- from '07 to 2018.

22                  MR. COLLINS:  Objection.  Form,

23   argumentative, calls for a legal conclusion,

24   foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1          THE WITNESS:  I did not thoroughly

2     investigate all, and I mentioned the national

3     accounts and some of the hospitals.

4     BY MR. BOGLE:

5          Q    Okay.  So you mentioned independent

6     pharmacies, I think, were within the distribution

7     center purview when it comes to threshold change

8     requests, right?

9          A    Yes.

10          Q    Okay.  So when I asked you about

11     thoroughly investigating and reviewing threshold

12     change requests, certainly for any pharmacy that

13     was within the DC's responsibility, you would

14     thoroughly investigate and review those, right?

15          MR. COLLINS:  Objection to form.  Calls

16     for a legal conclusion.

17          THE WITNESS:  I think you're twisting

18     it.  I said "independent," and it's kind of coming

19     out national and the hospital, and I didn't always

20     investigate those because we had national accounts

21     and hospital experts, and the DRAs did those.

22     BY MR. BOGLE:

23          Q    I'm just asking as to any accounts that

24     you were responsible for reviewing at the

Page 55

```
 1    distribution center level, would you thoroughly

 2    investigate and review those threshold change

 3    requests?

 4         A     Yes.

 5         Q     Okay.  And you understand that was part

 6    of your responsibility, right?

 7         A     Yes.

 8         Q     Okay.  And you understand from the New

 9    Castle's perspective from 2000 to 2018 that your

10    distribution center had a responsibility not just

11    to monitor but to also prevent diversion of

12    opioids, right?

13              MR. COLLINS:  Objection.  Form.  Legal

14    conclusion.

15              THE WITNESS:  We prevented diversion of

16    all our controlled substances.

17    BY MR. BOGLE:

18         Q     You knew that was your responsibility,

19    right?

20         A     Can you repeat the question?  I --

21         Q     Right.  From 2000 to 2018, you knew at

22    all times that your distribution center had

23    responsibility for not just monitoring but also

24    preventing diversion of controlled substances,
```

Page 56

1    right?

2         A    Yes.

3         Q    Okay.  And you would agree that during

4    that time period, you, as a distribution center,

5    had to be proactive in carrying out that

6    responsibility, right?

7              MR. COLLINS:  Objection to the form,

8    vague, calls for a legal conclusion.

9              THE WITNESS:  I'm always trying to be

10   proactive in all the business dealings and

11   everything I do.  That's kind of a general

12   statement, but I hope I'm proactive.

13   BY MR. BOGLE:

14        Q    And you understood that's what was

15   expected of your distribution center and all

16   distribution centers by the DEA, right?

17             MR. COLLINS:  Objection.  Foundation,

18   form, vague.

19             THE WITNESS:  Well, I understand my

20   distribution center, it was based on "know your

21   customer," and -- and I did that.

22   BY MR. BOGLE:

23        Q    And the "know your customer" program is

24   part of being proactive in trying to prevent

Page 57

1    diversion, right?  Getting out there and getting

2    to know your customer, completing questionnaires

3    and knowing what activities your customer was

4    engaged in, right?

5        A    As much as possible, yes.

6        Q    And you have an understanding that

7    diversion of controlled substances, including

8    opioids, can be prevented by way of compliance

9    with the Controlled Substances Act, right?

10             MR. COLLINS:  Objection.  Form, calls

11   for a legal conclusion.

12             THE WITNESS:  I think it helps.

13   BY MR. BOGLE:

14       Q    Okay.  So would you agree that if New

15   Castle complies with the Controlled Substances

16   Act, that goes a long way in preventing diversion

17   of opioids, right?

18             MR. COLLINS:  Objection to the form,

19   vague, calls for a legal conclusion.

20             THE WITNESS:  I think it helps.

21   BY MR. BOGLE:

22       Q    Do you agree there is currently an

23   opioid epidemic in this country?

24       A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1          Q    And do you agree that the diversion of

2     controlled substances is a cause of that epidemic?

3               MR. COLLINS:  Objection.  Calls for a

4     legal conclusion.  Foundation.

5               THE WITNESS:  You keep using the word

6     "diversion."  In the control of McKesson New

7     Castle, I believe if there were diversion, that

8     would not help the opioid crisis.

9     BY MR. BOGLE:

10         Q    All right.  And the opioid crisis that

11    we are dealing with today, do you understand was

12    caused, in part, by diversion of controlled

13    substances?

14              MR. COLLINS:  Objection.  Form, calls

15    for a legal conclusion, lack of foundation.

16              THE WITNESS:  I don't know that.

17    BY MR. BOGLE:

18         Q    You don't know.

19              Are you aware that opioid overdoses are

20    the leading cause of injury-related death in the

21    United States?

22              MR. COLLINS:  Objection.  Form.

23              THE WITNESS:  No, I'm not.

24    BY MR. BOGLE:

Page 59

```
 1          Q     Okay.  I'm going to hand you what I'm
 2     marking as Exhibit 1.264, also marked as Snider
 3     Exhibit 2.
 4                  (Snider Exhibit No. 2 was marked
 5                  for identification.)
 6                  MR. COLLINS:  Thank you.
 7     BY MR. BOGLE:
 8          Q     Do you see here, to introduce the
 9     document, at the top it says "E&C, U.S. House of
10     Representatives, Committee on Energy and
11     Commerce."
12                  Do you see that?
13          A     Yes.
14          Q     And it's dated May 4, 2018?
15          A     Yes.
16          Q     And do you -- below that it says:
17     "Regarding hearing entitled 'Combatting the Opioid
18     Epidemic,' examining concerns about distribution
19     and diversion."
20                  Do you see that?
21          A     Yes.
22          Q     Okay.  And if you go to the second page
23     of this document, the paragraph below the chart
24     that starts with "The U.S. continues."  Do you see
```

Page 60

1    that?

2         A    Yes.

3         Q    It says:  "The U.S. continues to

4    experience an opioid epidemic which has worsened

5    over the last two decades.  Opioid-involved

6    overdose deaths are the leading cause of injury

7    death in the U.S. and take the lives of 115

8    Americans per day."

9              Do you see that?

10        A    Yes.

11        Q    Have you ever seen or heard of that stat

12   before?

13             MR. COLLINS:  Objection.  Foundation.

14             THE WITNESS:  No.

15   BY MR. BOGLE:

16        Q    Any reason to dispute that?

17             MR. COLLINS:  Objection.  Foundation,

18   form, asked and answered.

19             THE WITNESS:  I couldn't say.

20   BY MR. BOGLE:

21        Q    Okay.  It goes on to say:  "According to

22   a recent report issued by the Centers for Disease

23   Control and Prevention, prescription or elicit

24   opioids were involved in nearly two-thirds of all

Highly Confidential - Subject to Further Confidentiality Review

Page 61

1    drug overdose deaths in the U.S. during 2016, a

2    27.7 percent increase from 2015."

3              Do you see that?

4        A    Yes.

5        Q    And it says:  "In total, more than

6    351,000 people have died since 1999 due to an

7    opioid-involved overdose.  The crisis has become

8    so severe that the average life expectancy

9    declined in 2016 from the previous year largely

10   because of opioid overdoses."

11             Do you see that?

12       A    Yes.

13       Q    Okay.  Have you ever heard that before,

14   that the life expectancy in this country has

15   declined largely because of opioid overdoses?

16             MR. COLLINS:  Objection.  Form,

17   foundation.

18             THE WITNESS:  No.

19   BY MR. BOGLE:

20       Q    That's news to you?

21             MR. COLLINS:  Objection.  Argumentative.

22             THE WITNESS:  Yes.

23   BY MR. BOGLE:

24       Q    Let's go back to Exhibit 1 of the Drug

Page 62

1    Operations Manual.  Now, this manual you

2    understand was put in place in the year 2000,

3    right?

4          A    Yes.

5          Q    Okay.  And it existed until 2007, when

6    the Lifestyle Drug Monitoring Program went into

7    place, right?

8          A    Yes.

9          Q    Okay.  And just to finish working

10   through that calendar, the Lifestyle Drug

11   Monitoring Program existed for about a year, from

12   2007 to 2008, right?

13         A    Yes.

14         Q    Okay.  In 2008, McKesson employs the

15   Controlled Substances Monitoring Program, which

16   has existed in some form from 2008 to today,

17   right?

18         A    Yes.

19         Q    Okay.  When you worked at other

20   distribution centers prior to 2000, was there any

21   standard operating procedure in place for the

22   monitoring of controlled substances at McKesson?

23         A    I don't remember --

24         Q    Okay.

Page 63

1       A     -- in the North Canton or Cincinnati.

2       Q     Okay.

3       A     We thought of diversion as loss within

4   the distribution center, doctor adulteration or

5   that kind of thing.

6       Q     So prior to 2000 when you worked at

7   other distribution centers, the notion of

8   individuals abusing opioids was not something that

9   was a consideration from diversion; is that true?

10      A     Hadn't really heard much about it that I

11   knew of.

12      Q     Okay.  Now, the Drug Operations Manual

13   and the portions that pertained to controlled

14   substances, it was mandatory for McKesson

15   employees, including yourself, to comply with all

16   aspects of that manual, correct?

17      A     Yes.

18      Q     Now, during the time that -- from 2000

19   to 2007, would the New Castle Distribution Center

20   receive what were called suspicious order warning

21   reports?

22      A     Yes.  It was either unusual purchase

23   order reports or suspicious, I don't remember

24   which.

Page 64

```
 1          Q    Okay.  And just so we're -- we're

 2    speaking the same language here, if you can go in

 3    Exhibit 1 to page 0.29.

 4               MR. COLLINS:  I'm sorry.  Can you give

 5    that to me again?

 6               MR. BOGLE:  .29.  Should be a number.

 7               MR. COLLINS:  Where are you reading?

 8               MR. BOGLE:  .29 is at the top right.

 9               MR. COLLINS:  Oh, at the top right.

10               MR. BOGLE:  Yeah.

11    BY MR. BOGLE:

12          Q    Are you there, Mr. Snider?

13          A    I can't see it.  Can someone help me get

14    that?

15               THE WITNESS:  Sorry.

16               MR. COLLINS:  That's all right.

17    BY MR. BOGLE:

18          Q    We're going to blow it up on the screen

19    here too as much as we can, if that helps.  You

20    obviously don't have to utilize the screen, but

21    it's there if you need --

22          A    I got it.  1555.29.

23          Q    Yes, sir.

24          A    Okay.
```

Page 65

1         Q    So I just want to make sure we're

2    speaking the same language as far as terms, and

3    we'll talk in more detail about these in a minute.

4              But you see in the middle of the page, a

5    little past the middle, there's a letter C, and it

6    says:  "Daily Controlled Substance Suspicious

7    Order Warning Report," and it's referred to as

8    DU45L500.

9         A    Yes.

10        Q    Do you see that?

11        A    Yes, I do.

12        Q    Okay.  So you understand from 2000 to

13   2007, that was one of the reports that you would

14   have received at your distribution center, right?

15        A    Yes.

16        Q    Okay.  And if you go to the next page,

17   letter -- letter D refers to a "Monthly Controlled

18   Substance Suspicious Purchases Report," also

19   DU45L, this time 650.  Do you see that?

20        A    Yes.

21        Q    Okay.  That again would be another

22   report that you would have received at your

23   distribution center during the 2000 to '07 time

24   period, right?

Page 66

1         A     Yes.

2          Q     Okay.  And do I understand correctly

3    that reports -- or strike that.

4              Do I understand correctly that orders

5    would show up as -- on these suspicious order

6    warning reports if the orders were three times the

7    value that you would see from customers in your

8    distribution center?

9              MR. COLLINS:  Objection.  Vague.

10             THE WITNESS:  I don't remember at this

11   time how many times it was, but they did -- orders

12   did show up for a certain number of above a norm.

13   BY MR. BOGLE:

14        Q     Okay.  So go back to page .29, and I'm

15   in letter c.

16             And in that first paragraph, again we

17   read the title of the report.  It says:  "When an

18   order is entered through the central system (EOE

19   or CRT), controlled substance items are extracted

20   (after passing through front end order processing)

21   and compared in a subroutine to the purchases

22   month-to-date by customer/customer average

23   purchases, average purchases by customer class and

24   product."

Highly Confidential - Subject to Further Confidentiality Review

Page 67

1            And then it goes on and says:  "The same

2    factors that are used for the customer recap

3    variance," and it references this -- the report,

4    "are also used for the daily controlled substance

5    suspicious order warning report," and then it

6    says:  "3X monthly average for Schedule II and III

7    reportables and 8X monthly averages for IIIN to

8    Schedule V."

9            Do you see that?

10   A    Yes.

11      Q    Okay.  So, first of all, opioid

12   products have always been either Schedule II or

13   Schedule III, right?

14   A    Yes.

15      Q    Okay.  So does this refresh your

16   recollection that when it comes to the suspicious

17   order warning reports you received from 2000 to

18   2007, a customer would show up on that report if

19   they were at three times the monthly average for

20   other customers at your distribution center?

21   A    Yes.

22      Q    Okay.  And that was true for the -- for

23   the monthly report as well.  That was the same

24   criteria that was used, right?

Page 68

1        A      I would think.  I'm not sure.

2        Q      Okay.

3        A      If -- if it's in here, I would -- I

4    would agree with it.

5        Q      Well, let me ask you this:  During the

6    2000 to 2007 time period, were there any other

7    reports that you would have reviewed to determine

8    whether an order was potentially suspicious for a

9    controlled substance, other than these two reports

10   we talked about?

11                MR. COLLINS:  Objection.  Vague, form.

12                THE WITNESS:  No, not a report.  I just

13   remember the daily one.

14   BY MR. BOGLE:

15        Q      I'm sorry.  I don't think I understand.

16        A      The daily report and the monthly.

17        Q      Right, right.

18        A      And then we reported all ARCOS

19   transmissions also.

20        Q      Right.  And we'll get to that.

21                But as far as reports go, we've talked

22   about the daily and monthly suspicious order

23   reports.  Those would be the two reports you would

24   utilize from 2000 to 2007 to potentially detect

Highly Confidential - Subject to Further Confidentiality Review

Page 69

1    suspicious orders, right?

2         A    Yes.

3         Q    Okay.  Now, when a customer showed up on

4    the suspicious order warning report from 2000 to

5    2007, it was McKesson's practice at New Castle to

6    still ship those orders, right?

7              MR. COLLINS:  Objection.  Form, asked

8    and answered.

9              THE WITNESS:  Yes.

10   BY MR. BOGLE:

11        Q    And going back to Exhibit 1, I'm at page

12   .30 now.  About two-thirds of the way down the

13   page, there's a big B that says "Reporting."  Do

14   you see that?

15        A    Yes.

16        Q    Okay.  And below that it says:  "With

17   the release of the daily controlled substance

18   suspicious order warning report, there are several

19   significant advantages to enhance our compliance

20   efforts."

21             And I'm looking -- the second paragraph

22   below that, it says:  "It does not rely on an

23   individual's judgment or knowledge to determine

24   reporting appropriateness but, rather, on

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1     statistical fact."

2               Do you see that?

3        A     Is that -- I'm sorry.  I --

4               MR. COLLINS:  I don't see it.

5               THE WITNESS:  I did not see that.

6               MR. COLLINS:  Where are you?  I'm sorry.

7               THE WITNESS:  Oh, you skipped down to

8     the last paragraph in B?

9               MR. BOGLE:  Correct.

10              MR. COLLINS:  Okay.  Neither he or I

11    knew where you were quoting from.

12              THE WITNESS:  Yes, I see that.

13    BY MR. BOGLE:

14       Q     Okay.  So, and -- and what's being

15    referred to there is the suspicious order warning

16    report, the benefit of that was felt to be that if

17    you were at three times the average and you showed

18    up on the report, it would not require judgment to

19    assess whether those reports needed to be provided

20    to the DEA, right?

21              MR. COLLINS:  Objection.  Form.

22    Mischaracterization.

23              THE WITNESS:  They were sent, yes.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 71

1        Q    Okay.

2        A    The judgment was, yes, to send the

3    report.

4        Q    Okay.  And the reports were sent, but as

5    we talked about, the orders were sent as well,

6    right?

7        A    Yes.

8             Can I add something to that?

9        Q    Go ahead.

10        A    The orders sometimes were marked down

11    and not completely sent, if we felt it was

12    suspicious and we could check on that.  For

13    instance, customers may order 33 of something, and

14    it would show up on the report, and they had -- we

15    called them fat fingers, and it was just three,

16    and we knew that because we knew the customer.

17        Q    Okay.  That's a -- that's a policy

18    that's been changed, though, right?  You can't

19    modify orders --

20        A    Right.

21        Q    -- from the forms anymore, right?

22        A    Right, back then.  So we'd sign off on

23    the report and look at it, and if there were

24    errors on it, that we did mark down.

Highly Confidential - Subject to Further Confidentiality Review

Page 72

1          Q     Okay.  So there were blocked order

2     reports provided to us in this litigation -- and

3     we can talk about it in more detail later, but I

4     want to make sure of your understanding first --

5     that tend to indicate that from New Castle, at

6     least for pharmacies in Summit and Cuyahoga

7     County, that there were no reports provided to the

8     DEA of blocked orders until August of 2013.

9               Is that your understanding?

10              MR. COLLINS:  Objection.

11              THE WITNESS:  No.

12    BY MR. BOGLE:

13         Q     Okay.  It's your understanding that you

14    provided blocked order reports to the DEA --

15         A     I --

16         Q     -- prior to that?

17         A     I don't know a blocked order report.

18    I'm sorry.

19         Q     That's how it was phrased and how it was

20    given to us.  You never heard of that term?

21         A     No.

22         Q     Okay.  When you decided not to ship an

23    order to a customer, reports were not provided to

24    the DEA along those lines until about August 2013

Page 73

1    as it pertains to New Castle's customers in Summit

2    and Cuyahoga County, right?

3                   MR. COLLINS:  Objection.  Foundation.

4                   THE WITNESS:  No.

5    BY MR. BOGLE:

6          Q    That's not right?

7          A    No.

8          Q    Okay.  Actually, strike that.  We'll

9    come back to that later.

10                   Do you recall getting information from

11    the DEA in 2006 stating that if a suspicious order

12    was detected that it should not be shipped and

13    should be reported to the DEA?

14                   MR. COLLINS:  Objection.  Form.

15                   THE WITNESS:  I don't remember that,

16    2006.

17    BY MR. BOGLE:

18          Q    I'm going to hand you what I'm marking

19    as Exhibit 1.1464, also marked as Exhibit 3.

20                   (Snider Exhibit No. 3 was marked

21                   for identification.)

22    BY MR. BOGLE:

23          Q    This is a letter from the U.S.

24    Department of Justice, Drug Enforcement

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Administration, September 27, 2006.

2                Do you see that?

3        A    Yes.

4        Q    Okay.  Have you ever seen this letter

5    before?

6        A    No, I haven't.

7        Q    You have not.  Okay.

8                Communications from the DEA regarding

9    your responsibilities at New Castle, do those

10   generally not make their way to you?

11               MR. COLLINS:  Objection.  Assumes facts

12   not in evidence, argumentative, foundation, form.

13               THE WITNESS:  Yes, they made their way

14   to us, and we would adopt -- adapt the manual and

15   follow the SOPs and new procedures.

16   BY MR. BOGLE:

17       Q    Okay.  But you've never seen this

18   letter?

19       A    No, I'm sorry, I don't remember seeing

20   it.

21       Q    Well, let me ask you about a couple of

22   things in here.

23               To start, it says:  "This letter is

24   being sent to every commercial entity in the

Page 75

1    United States registered with the Drug Enforcement

2    Administration to distribute controlled

3    substances.  The purpose of this letter is to

4    reiterate the responsibilities of controlled

5    substance distributors in view of the prescription

6    drug abuse problem our nation currently faces."

7            Do you see that?

8        A    Yes.

9        Q    Okay.  And then the third paragraph on

10   the first page which starts with "Distributors

11   are," do you see that sentence?  It's the second

12   sentence in that paragraph.

13           MR. COLLINS:  Third paragraph, the

14   second sentence.

15           THE WITNESS:  Oh, okay.

16   BY MR. BOGLE:

17       Q    It says:  "Distributors are of course

18   one of the key components of the distribution

19   chain.  If the closed system is to function

20   properly as Congress envisioned, distributors must

21   be vigilant in deciding whether a prospective

22   customer can be trusted to deliver controlled

23   substances only for lawful purposes."

24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 76

1          A     Yes.

2               Q     Do you agree with that statement?

3                     MR. COLLINS:  Objection.  Form.

4     Foundation.

5                     THE WITNESS:  Yes.

6     BY MR. BOGLE:

7               Q     It says:  "This responsibility is

8     critical as Congress has expressly declared that

9     the illegal distribution of controlled substances

10    has a substantial and detrimental effect on the

11    health and general welfare of the American

12    people."

13                    Do you see that?

14         A     Yes.

15              Q     If you go to the second page here, I'm

16    about three-quarters of the way down the page, the

17    paragraph starting with "Thus."  Do you see that?

18         A     Yes.

19              Q     It says:  "Thus, in addition to

20    reporting all suspicious orders, a distributor has

21    a statutory responsibility to exercise due

22    diligence to avoid filling suspicious orders that

23    might be diverted into other than legitimate

24    medical, scientific and industrial channels."

Highly Confidential - Subject to Further Confidentiality Review

Page 77

1             Do you see that?

2        A    Yes.

3        Q    Okay.  But in 2006, I think we just

4   talked about the fact that when a suspicious order

5   was detected at your facility at least, it was

6   filled, right?

7             MR. COLLINS:  Objection.  Form,

8   foundation.

9             THE WITNESS:  Not always.

10  BY MR. BOGLE:

11       Q    Okay.

12       A    I testified that not always.  We would

13  cut orders down on occasion.

14       Q    When you thought they had fat fingers.

15  I think that was the term you used.

16       A    Or they -- yeah, or they made a mistake.

17       Q    Right.  But if you thought that they

18  were ordering what they were -- intended to order,

19  that order was filled, even though you're saying

20  that a suspicious order report would have been

21  provided to the DEA, right?

22            MR. COLLINS:  Objection.  Form.

23            THE WITNESS:  If the definition is off

24  of that report, three times or the eight times,

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    yes.

2    BY MR. BOGLE:

3         Q    Then it would have been filled, right?

4         A    Yes.

5         Q    Okay.  And this letter from the DEA

6    indicates that you shouldn't be filling those kind

7    of prescriptions, right?

8              MR. COLLINS:  Objection.

9    BY MR. BOGLE:

10         Q    If you've identified them as suspicious.

11             MR. COLLINS:  Objection.  Foundation,

12   compound, argumentative, calls for a legal

13   conclusion.

14             THE WITNESS:  I don't see it that way.

15   BY MR. BOGLE:

16         Q    You don't think that's what that says?

17         A    No.

18         Q    Okay.  And the responsibility to avoid

19   shipment of orders deemed suspicious by a

20   distributor, that policy has always been in effect

21   since the Controlled Substances Act was enacted in

22   1970, right?

23             MR. COLLINS:  Objection.  Form, assumes

24   multiple facts, legal conclusion.

Highly Confidential - Subject to Further Confidentiality Review

Page 79

1          THE WITNESS:  I can't say that.  1970,

2     I -- I don't know that.

3     BY MR. BOGLE:

4          Q    Well, do you think this -- this sentence

5     I read to you here about avoiding filling

6     suspicious orders was something new that was added

7     to the regulations in '06?

8          MR. COLLINS:  Objection.  Calls for a

9     hypothetical, speculation.

10          THE WITNESS:  I don't know.

11          MR. COLLINS:  Calls for a legal

12     conclusion.

13     BY MR. BOGLE:

14          Q    You don't know?

15          A    No.

16          Q    And the next paragraph down, the last

17     sentence says:  "Again, to maintain effective

18     controls against diversion, as Section 823(e)

19     requires, the distributor should exercise due care

20     in confirming the legitimacy of all orders prior

21     to filling."  Right?

22          A    Yes.

23          Q    Okay.  And you know that's not a new

24     policy either, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 80

1              MR. COLLINS:  Objection.

2     BY MR. BOGLE:

3          Q    In '06.

4              MR. COLLINS:  Objection.  Vague, calls

5     for a legal conclusion.

6              THE WITNESS:  I don't know that.

7     BY MR. BOGLE:

8          Q    Okay.  Do you have any disagreement that

9     that's what the law required in '06?

10             MR. COLLINS:  Objection.  Calls for

11    speculation, legal conclusion, asked and answered.

12             THE WITNESS:  I have no disagreement

13    with that it's -- that it's written there.

14    BY MR. BOGLE:

15         Q    Okay.  And would you agree with the

16    notion that reporting a suspicious order to the

17    DEA and not filling it gives the DEA the

18    opportunity to investigate that order without

19    having the potential of getting into the public

20    for potential diversion?

21             MR. COLLINS:  Objection, if that's a

22    question.  Calls for a legal conclusion, it's

23    compound, it's vague.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 81

1        Q     You can answer.

2              MR. COLLINS:  And it calls for

3     speculation.

4              THE WITNESS:  I can't answer to that.  I

5     don't know.

6     BY MR. BOGLE:

7        Q     Okay.  Do you think the DEA has the same

8     ability to investigate and prevent diversion after

9     you've filled the order versus if you hadn't

10    filled it at all?

11             MR. COLLINS:  Objection.  Foundation,

12    argumentative, compound.

13             THE WITNESS:  I know in New Castle, we

14    had a relationship with the DEA, and I talked to

15    them, they called me.  At one point the DEA agent

16    in charge was my neighbor, so I knew them, and I

17    knew if there was a problem, they would let me

18    know.

19             MR. BOGLE:  Move to strike as

20    nonresponsive.

21    BY MR. BOGLE:

22       Q     My -- my question simply was, if you

23    fill an order that you deem suspicious, then it

24    naturally is going to be harder to the DEA to

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    prevent diversion from that suspicious order as

2    opposed to if you had reported it and not filled

3    it at all, right?

4            MR. COLLINS:  Objection.  Closing

5    argument.  Assumes facts not in evidence, calls

6    for speculation, form, compound, vague.

7            THE WITNESS:  I don't know that.

8    BY MR. BOGLE:

9        Q    You don't know.

10       A    No.

11       Q    Okay.  Are you aware that in 2006 the

12    DEA began investigating McKesson concerning its

13    diversion practices as it pertains to controlled

14    substances?

15            MR. COLLINS:  Objection.  Form,

16    foundation.

17            THE WITNESS:  I'm aware now.  Yes.

18    BY MR. BOGLE:

19       Q    When you say "now," when did you become

20    aware of that?

21       A    I'm not sure.

22       Q    Okay.  What -- what caused you to become

23    aware of that?

24       A    McKesson.  My bosses.

Highly Confidential - Subject to Further Confidentiality Review

Page 83

1        Q    Okay.  Do you have any idea what year

2   even you were made aware of that?

3        A    No, I'm not sure.  I can't remember.

4        Q    Okay.  I'm going to hand you what I'm

5   marking as Exhibit 1.1830, Exhibit 4 to your

6   deposition.

7             (Snider Exhibit No. 4 was marked

8             for identification.)

9             MR. COLLINS:  Thank you.

10  BY MR. BOGLE:

11       Q    And you see this is a PowerPoint titled

12  "Lifestyle Drugs and Internet Pharmacies" from the

13  National Operations Conference 2007.  Do you see

14  that?

15       A    Yes.

16       Q    And the author is noted to be Donald

17  Walker, Senior Vice President, Distribution

18  Operations, right?

19       A    Yes.

20       Q    Are you familiar with Mr. Walker?

21       A    Yes, I am.

22       Q    And his role in this point in time in

23  2007 would be to oversee the operations of all the

24  distribution centers within U.S. pharma, right?

Page 84

1            MR. COLLINS:  Objection.  Foundation,

2      vague, calls for a legal conclusion.

3            THE WITNESS:  Yeah, operationally.

4      BY MR. BOGLE:

5         Q    Yeah.  And if you go to page .3, the

6      slide is titled "Public Health Issues," and it

7      says -- the first bullet point below that says:

8      "Abuse of prescription drugs has risen 66 percent

9      since 2000."  And the third bullet point says:

10     "Opioid painkillers kill more than cocaine and

11     heroin combined."

12            Do you see that?

13        A    Yes.

14        Q    Is that a statistic you were familiar

15     with in 2007?

16            MR. COLLINS:  Objection.  Form.

17            THE WITNESS:  I -- I was there I believe

18     at the -- his meeting.

19     BY MR. BOGLE:

20        Q    Okay.  So you would have been made aware

21     of that statistic at that meeting?

22        A    Yes.

23        Q    Okay.  So you were -- you were present

24     when this was actually presented, this PowerPoint

Page 85

1    deck, right?

2         A     I believe so, yes.

3         Q     Okay.  Where was it presented?

4         A     At a national meeting, I believe.  I

5    don't know the date -- what's the date here?

6         Q     It just says 2007, I think.

7         A     It would have to be that -- I'd have to

8    check the date, depending -- I can't remember

9    where I was.

10        Q     Okay.  And if you go to .4, the next

11   slide says "DEA Focus."  And under "Wholesalers,"

12   it says "DEA Expects."  Do you see that?

13        A     Yes.

14        Q     And it says:  "We know our customers."

15   That's the first bullet point.

16        A     Yes.

17        Q     The second bullet point is "Wholesalers

18   accountable for controlling quantities shipped."

19   Right?

20        A     Yes.

21        Q     Okay.  You understand that concept to

22   mean the DEA expected you guys to not ship

23   suspicious orders, right?

24                    MR. COLLINS:  Objection.

Page 86

```
 1    Mischaracterization.  Form.  Calls for a legal

 2    conclusion.

 3              THE WITNESS:  Right here it talks about

 4    knowing our customers.  Wholesaler accountable for

 5    controlling quantities, and then I remember

 6    talking about the internet pharmacies.

 7    BY MR. BOGLE:

 8         Q    Okay.  So --

 9         A    Or the rogue pharmacies that were -- we

10    didn't have any of those.

11         Q    It's your understanding that leading up

12    to 2006, that McKesson was not supplying any

13    controlled substances to rogue internet

14    pharmacies?

15              MR. COLLINS:  Objection.  Form.

16              THE WITNESS:  It was my understanding,

17    yes.

18    BY MR. BOGLE:

19         Q    Okay.  Is that still your understanding?

20         A    I don't know that now, no.

21         Q    Okay.  The last bullet point here under

22    "DEA Expects" says:  "5,000 dose units is,

23    quote/unquote, "average."  Do you see that?

24         A    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 87

1          Q     You see that reference there?

2          A     Yeah.

3          Q     Okay.  And they're talking again about

4     controlled substances, right?

5          A     Yes.

6          Q     That's what they felt the averages were

7     at that point in time, right?

8                MR. COLLINS:  Objection.  Foundation.

9                THE WITNESS:  Yes.

10     BY MR. BOGLE:

11          Q     Okay.  And what ends up happening in

12     2007, we mentioned this briefly, is the Lifestyle

13     Drug Monitoring Program comes into place, right?

14          A     Yes.

15          Q     Okay.  And that's the first time in

16     which there are actually thresholds established

17     for, for example, hydrocodone and oxycodone,

18     right?

19          A     Yes, that I can recall.

20          Q     Okay.

21          A     Except for the thresholds on the unusual

22     purchase report.

23          Q     Right.  But those weren't hard and fast

24     thresholds that were the same across the board,

Highly Confidential - Subject to Further Confidentiality Review

Page 88

 1    right?

 2                MR. COLLINS:  Objection.  Vague.

 3                THE WITNESS:  I'm not sure I understand.

 4    BY MR. BOGLE:

 5         Q    Let me rephrase it.

 6                So in 2007, the Lifestyle Drug

 7    Monitoring Program established

 8    8,000-dose-unit-a-month thresholds for oxycodone

 9    and hydrocodone, right?

10         A    Yes.

11         Q    Okay.  And that's around the same point

12    in time where the DEA, at least what's being

13    conveyed here by Mr. Walker, is that 5,000 dose

14    units is average, right?

15         A    Yes.

16         Q    Okay.  And again, under the Lifestyle

17    Drug Monitoring Program, if a customer exceeded

18    that 8,000 threshold in a month, their orders

19    would not be blocked; they would still be shipped,

20    right?

21                MR. COLLINS:  Objection.  Compound,

22    lacks foundation, form, speculative.

23                THE WITNESS:  I don't remember that, if

24    they were cut off or shipped systematically.  I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 89

1    sorry.

2    BY MR. BOGLE:

3         Q    Okay.

4              MR. COLLINS:  Are you moving on to

5    something else?

6              MR. BOGLE:  Yeah.

7              MR. COLLINS:  Can we take a short break?

8    We've been going 70 minutes.

9              MR. BOGLE:  That's fine.

10             THE VIDEOGRAPHER:  The time is 9:42 a.m.

11   We're going off the record.

12             (Recess.)

13             THE VIDEOGRAPHER:  The time is 9:55 a.m.

14   We're back on the record.

15   BY MR. BOGLE:

16        Q    Okay.  Mr. Snider, just to reorient to

17   where we were at, I had asked you whether during

18   the time period that the Lifestyle Drug Monitoring

19   Program was in place, when a customer exceeded the

20   8,000 unit threshold for hydrocodone and

21   oxycodone, that those orders were not blocked

22   thereafter, correct?

23             MR. COLLINS:  Objection.  Vague.

24             THE WITNESS:  I don't remember that.

Page 90

1    BY MR. BOGLE:

2         Q    Okay.  Now, I'm going to hand you what

3    I'm marking as 1.1864, and Exhibit 5 to your

4    deposition.

5              (Snider Exhibit No. 5 was marked

6              for identification.)

7              MR. COLLINS:  Thank you.

8    BY MR. BOGLE:

9         Q    If you look at the bottom e-mail on the

10   first page here, do you see it's an e-mail from

11   Diane Martin to several individuals that you're

12   cc'd on, right?

13        A    To Diane, copy Blaine Snider and Brian

14   Ferreira, yes.

15        Q    No, I'm looking at the bottom e-mail on

16   the first page, not the top one.

17        A    Oh.  It's from Diane Martin to Lisa,

18   Jim, John, and Alex, copy Blaine.

19        Q    Right.  And this is from December 7,

20   2007, right?

21        A    Okay.  Yes.

22        Q    You see that?

23        A    Yeah.

24        Q    And the subject is "November LDMP."  Do

Page 91

1      you see that as well?

2          A    Yes.

3          Q    Okay.  And then there's a list that

4      extends a little more than a page of customers at

5      New Castle for the month of November 2007 that had

6      exceeded their 8,000 unit threshold for

7      hydrocodone, oxycodone, and alprazolam.

8                 Do you see that?

9                 MR. COLLINS:  Objection.  Form.

10                THE WITNESS:  Let me take a look at it

11     here.  (Peruses document.)

12                It looks like that, yes.

13     BY MR. BOGLE:

14         Q    Okay.  And I want to look at a couple of

15     these customers so we can understand what we're

16     seeing here.

17                So if you turn to point 2, the second

18     page of the document, do you see three customers

19     down, there's Franklin Pharmacy HM?  Do you see

20     that?

21         A    Yes, I see that.

22         Q    Are you familiar with Franklin

23     Pharmacy --

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 92

1      Q    -- as a customer that New Castle has

2    serviced over time?

3      A    Yes.

4      Q    And there is oxycodone referenced there

5    as to Franklin Pharmacy.  Do you see that?

6      A    Yes.

7      Q    And it's noted that on November 13,

8    2007, they would have exceeded their threshold for

9    oxycodone, right?

10            MR. COLLINS:  Objection.  Foundation.

11            THE WITNESS:  If I'm -- if I'm reading

12    this correctly, number of doses at the end of the

13    month, and then 9,733, it looks like -- it looks

14    like that's what it says.

15    BY MR. BOGLE:

16      Q    Okay.  Let me walk step by step so this

17    is clear.

18            Just talking about the date first, based

19    on this column, which is the column that says

20    "Date threshold exceeded," for Franklin Pharmacy,

21    it would note on that November 13, 2007, was the

22    date that their threshold was exceeded for

23    oxycodone, right?

24      A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 93

1          Q    And then the next column says "Number of

2     doses on date doses exceeded the limit," and

3     there's 97 -- 9,733 doses as of November 13, 2007,

4     right, for oxycodone?

5               MR. COLLINS:  Objection.  Foundation.

6               THE WITNESS:  Yes.

7     BY MR. BOGLE:

8          Q    Okay.  And it indicates, the next

9     column, "Number of doses at end of month."  And

10    for Franklin Pharmacy for oxycodone that month,

11    it's noted 22,250 doses provided to them by the

12    end of the month.  Right?  That's what this chart

13    indicates.

14              MR. COLLINS:  Objection.  Foundation.

15              THE WITNESS:  It looks like that.

16    BY MR. BOGLE:

17         Q    Okay.  So this would indicate as to

18    Franklin Pharmacy that in November of 2007, while

19    the LDMP was in place, they exceeded their

20    threshold, but their orders that exceeded the

21    8,000 unit threshold for oxycodone were not

22    blocked and went all the way up to 22,250 doses

23    for that month, right?

24              MR. COLLINS:  Objection.  Compound.

Page 94

1    Foundation.

2                THE WITNESS:  I don't know that they

3    weren't blocked, and that a Level II could have

4    been done on that customer, which I believe was

5    done.  I'd have to check on that.

6    BY MR. BOGLE:

7        Q    Okay.  So if you look at the e-mail

8    above that from three days later, December 10,

9    2007, the first line pertains to Franklin

10   Pharmacy.  Do you see that?

11               MR. COLLINS:  Objection.  Foundation.

12               THE WITNESS:  Yes.

13   BY MR. BOGLE:

14       Q    It says:  "Franklin appeared new last

15   month for oxycodone.  The Level II review is

16   almost complete.  Blaine got Frank's signature on

17   the declaration, and I'm finishing up the survey

18   questionnaire."

19               Do you see that?

20       A    Yes.

21       Q    Okay.  So three days after the report we

22   just looked at, the Level II for Franklin was not

23   yet complete, right?

24               MR. COLLINS:  Objection.  Foundation,

Highly Confidential - Subject to Further Confidentiality Review

Page 95

1    calls for speculation.

2    BY MR. BOGLE:

3         Q    That's what this says.

4              MR. COLLINS:  Foundation.

5              THE WITNESS:  According to Diane.

6    BY MR. BOGLE:

7         Q    It -- and that's actually according to

8    Alexandra, right?

9         A    Or Alex -- Alexandra, yes.

10        Q    Okay.  What did she do at McKesson at

11   that point in time?  What was her job?

12        A    Sales.

13        Q    Okay.  When Alexandra said something,

14   was it generally accurate?

15             MR. COLLINS:  Objection.  Calls for

16   speculation.

17   BY MR. BOGLE:

18        Q    Did you find her to be inaccurate

19   frequently in her e-mails?

20             MR. COLLINS:  Objection.  Speculation.

21             THE WITNESS:  I can't -- I can't respond

22   to her accuracy on e-mails.

23   BY MR. BOGLE:

24        Q    Well, do you have any specific reason to

Page 96

1    disagree that for Franklin Pharmacy, they exceeded

2    their threshold on November 13, 2007 for

3    oxycodone, and continued to be supplied the drug,

4    up to 22,250 doses for that month?

5              MR. COLLINS:  Objection.  Foundation.

6    Mischaracterization of prior testimony.

7              THE WITNESS:  I don't know that they

8    didn't have a Level II already done.  The DRA had

9    looked at it, and they had a new business or

10   whatever.  I don't know that here.

11             MR. BOGLE:  Move to strike as

12   nonresponsive.

13   BY MR. BOGLE:

14        Q    All I asked you at this point was, what

15   this chart indicates is that Franklin Pharmacy

16   received 22,250 doses of oxycodone after exceeding

17   their threshold on November 13, 2007, right?

18             MR. COLLINS:  Objection.  Foundation,

19   argumentative, compound.  Mischaracterizes his

20   prior answer, which was appropriate.

21             THE WITNESS:  I don't know.  It's what

22   you say is on the chart.

23   BY MR. BOGLE:

24        Q    Well, that's what the chart says, right?

Page 97

1               MR. COLLINS:  Objection.  Vague, form.

2               THE WITNESS:  I don't know that for

3     sure.

4     BY MR. BOGLE:

5          Q    You don't know that that's what the

6     chart says right here?

7               MR. COLLINS:  Objection.  Foundation.

8               THE WITNESS:  Yes.

9     BY MR. BOGLE:

10         Q    Yes, you don't know?

11         A    Yes.

12         Q    Okay.  Have you read charts like these

13    before in your job at McKesson?

14         A    Yes.

15         Q    Okay.  When you got this e-mail in

16    December 2007, did you write back and say, What is

17    this chart?  I don't know what this means?

18              MR. COLLINS:  Objection.  Calls for

19    speculation, foundation.

20              THE WITNESS:  I don't know from 2007.

21    BY MR. BOGLE:

22         Q    Okay.  Well, I can tell you I looked,

23    and I didn't see any e-mail from you that said, I

24    don't understand what this chart means, guys.  Can

Highly Confidential - Subject to Further Confidentiality Review

Page 98

```
1    somebody explain this to me?  I didn't see an

2    e-mail like that.  I'm sure if your counsel has

3    got one, they'll show it to you in his exam.

4              MR. COLLINS:  You don't have to answer.

5    That's not a question.

6    BY MR. BOGLE:

7         Q    Do you have any reason to testify under

8    oath today that you sent a response saying you

9    don't understand what this chart means?

10             MR. COLLINS:  Objection.  Argumentative.

11             THE WITNESS:  I don't know what it means

12   specifically.  I see what it says.

13   BY MR. BOGLE:

14        Q    Okay.

15        A    I can't remember from 2007.

16        Q    And what it says about whether a

17   Level II had been done for Franklin, which is

18   another thing you referenced, is that it was not

19   yet complete as of three days of you receiving

20   this chart in December 2007, right?

21             MR. COLLINS:  Lack of foundation as to

22   this entire inquiry.  It's not been established

23   what this document means.  Given that this one --

24   this witness wasn't the author of the document.
```

Page 99

1          MR. BOGLE:  You're not -- you're making

2     speaking objections clearly now.

3          MR. COLLINS:  No, this is an entirely

4     improper line of inquiry.

5          MR. BOGLE:  It's not.  He's on the

6     e-mail.  He's saying he doesn't understand it.

7     I'm trying to figure out why he doesn't understand

8     it.

9          MR. COLLINS:  Because he didn't write

10    the e-mail.

11          THE WITNESS:  I don't know that it

12    wasn't done.

13    BY MR. BOGLE:

14        Q    Okay.  So --

15        A    If Alex -- you mentioned Alex.  I don't

16    know if she was right or not.

17        Q    Okay.  So -- but do you have any

18    specific reason, as you sit here today, that when

19    she wrote her e-mail on December 10, 2007, saying

20    that the Level II review was not done yet, that

21    she was wrong?

22          MR. COLLINS:  Objection.  Calls for

23    speculation.

24          THE WITNESS:  I don't know that.

Page 100

1    BY MR. BOGLE:

2         Q    Okay.  Well, let's look at some of the

3    other pharmacies here on this chart.

4              Do you see Mace's Pharmacy on there as

5    well for oxycodone and hydrocodone?

6         A    Yes.

7         Q    Do you see for hydrocodone, it's noted

8    on this chart that they exceeded their threshold

9    on November 8, 2007, right?

10             MR. COLLINS:  Objection.  Lack of

11   foundation.

12             THE WITNESS:  That's what it says here.

13   BY MR. BOGLE:

14        Q    Okay.  And it's noted they were provided

15   28,100 doses of hydrocodone that month, right?

16             MR. COLLINS:  Objection.  Lack of

17   foundation, mischaracterization, assumes facts not

18   in evidence or testified to by this witness.

19             THE WITNESS:  It's under "Number of

20   doses at the end of the month."  I can't remember

21   if they had exceeded it.

22   BY MR. BOGLE:

23        Q    Well, we know the threshold at this

24   point in time would have been 8,000, right?

Page 101

 1          A     Yes.

 2          Q     Okay.  And so 28,100 is more than 8,000,

 3     right?

 4          A     Yes.

 5          Q     Okay.  And we know that's how much they

 6     got that month per this chart, right?

 7                MR. COLLINS:  Objection.

 8     BY MR. BOGLE:

 9          Q     "Number of doses at end of month,"

10     that's what that means, doesn't it?

11                MR. COLLINS:  Objection.  Lack of

12     foundation.  This witness hasn't testified to

13     firsthand knowledge as to what this chart means.

14     BY MR. BOGLE:

15          Q     I'm asking you, that's what that means,

16     doesn't it?

17                MR. COLLINS:  Same objection, and lack

18     of foundation.

19                THE WITNESS:  I don't know that.

20     BY MR. BOGLE:

21          Q     You don't know if that's what that

22     means?

23          A     Correct.

24          Q     You have no idea what "Number of doses

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    at end of month" means?

2                    MR. COLLINS:  Objection.  Foundation.

3                    THE WITNESS:  Yes.  Yes.

4    BY MR. BOGLE:

5         Q    Yes what?

6         A    I don't know what that means.

7         Q    Okay.  Do you have any understanding of

8    what it could possibly mean other than that's how

9    many doses they got that month?

10        A    I don't know if that means there was a

11   Level II done or --

12        Q    That's not my question, sir.

13                    MR. COLLINS:  He's -- I'm sorry.

14                    MR. BOGLE:  Not my question.

15                    MR. COLLINS:  The witness is entitled to

16   respond.

17                    Please finish your answer, Mr. Snider.

18                    THE WITNESS:  I don't know that a

19   Level II was done.  I don't know -- I don't have

20   the information about the account.  If Mace's got

21   long-term care facilities, if they had a hospital

22   account connected to it, I don't know that.

23                    MR. BOGLE:  Move to strike as

24   nonresponsive.

Highly Confidential - Subject to Further Confidentiality Review

Page 103

1    BY MR. BOGLE:

2         Q    My only question, sir, was that Mace's

3    Pharmacy for hydrocodone, based on this chart,

4    received 28,100 doses by the end of the month.

5    True or false?

6              MR. COLLINS:  Objection.  Assumes facts

7    not in evidence.  It's certainly not testified to

8    by this witness, and this witness has clearly

9    stated he has no firsthand knowledge about the

10   chart.

11             THE WITNESS:  False.  I don't know that

12   for sure.

13   BY MR. BOGLE:

14        Q    Okay.  Do you see Town & Country on

15   there as well, Town & Country Pharmacy?

16        A    Yes.

17        Q    It's noted per this chart that for

18   hydrocodone, they exceeded their threshold

19   November 12, 2007, right?

20             MR. COLLINS:  Assumes facts not in

21   evidence, mischaracterization of the document.

22             THE WITNESS:  That's what the chart

23   says.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 104

1         Q     And under the column "Number of doses at

2    end of month," it says what, sir?

3         A     8,700.

4         Q     For hydrocodone, Town & Country?

5         A     12,017.

6         Q     I think you're looking at Troutman.

7         A     Oh, I'm sorry.

8         Q     Do you see where it says 28,900 --

9         A     I -- I apologize.  If you'll slow down a

10   little bit.

11             Did you say Town -- Town & Country

12   you're looking at?

13        Q     Yes, sir.

14        A     Okay.  What -- what's the question

15   again?

16        Q     For the column "Number of doses at end

17   of month," what is the number for hydrocodone for

18   Town & Country Pharmacy?

19        A     28,932.

20        Q     What is the number for oxycodone for

21   Town & Country Pharmacy for that month?

22        A     15,783.

23        Q     And you don't have any reason to dispute

24   these are all customers serviced by New Castle, do

Highly Confidential - Subject to Further Confidentiality Review

Page 105

1    you?

2        A    No.

3        Q    Okay.

4        A    I know those customers.  I actually

5    visited those customers.

6        Q    Okay.  And for any of these customers,

7    if McKesson at New Castle wanted to block those

8    orders, that was within your authority to do so,

9    right?

10            MR. COLLINS:  Objection.  Calls for

11   speculation, legal conclusion.

12            THE WITNESS:  Can you repeat the

13   question, please?

14   BY MR. BOGLE:

15       Q    Sure.  If you wanted to block the orders

16   for any of these pharmacies we just talked about,

17   Town & Country, Franklin's, Mace's, for the month

18   of November 2007, after they got over 8,000 doses,

19   that was within your authority as director of

20   operations to say, no more for them that month,

21   right?  You're not getting any more.

22            MR. COLLINS:  Objection.

23   BY MR. BOGLE:

24       Q    You could have done that, true?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1          MR. COLLINS:  Object --

2          THE WITNESS:  I believe I did it --

3          MR. COLLINS:  I'm sorry.

4          THE WITNESS:  Sorry.

5          MR. COLLINS:  Please let me make my

6     objection.

7          The question was compound in multiple

8     ways, and it's vague.

9     BY MR. BOGLE:

10         Q    You had authority to stop any of the

11    pharmacies we just talked about from getting more

12    than 8,000 doses in November 2007, true?

13         A    Yes.

14         Q    Okay.  Because as director of

15    operations, the license given to McKesson for New

16    Castle to distribute controlled substances is

17    ultimately your responsibility to keep, right?

18         A    Yes.

19         Q    Right?

20         A    And I knew those customers, and actually

21    visited those customers and did threshold visits.

22         MR. BOGLE:  Move to strike everything

23    after "yes."

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 107

1       Q    That was within your authority, true?

2                 MR. COLLINS:  Objection.  Asked and

3       answered.

4                 THE WITNESS:  Yes.

5       BY MR. BOGLE:

6       Q    Okay.  And the same is true from 2008 --

7       2000 to 2018, if at any point in time you had a

8       concern as director of operations about opioids

9       being supplied to a customer for New Castle, you

10      had the ultimate authority to say, They're not

11      getting these pills, true?

12                MR. COLLINS:  Objection.  Vague.  Calls

13      for a legal conclusion.

14                THE WITNESS:  No.

15      BY MR. BOGLE:

16      Q    You couldn't stand up and say, I'm

17      against this.  I don't want them getting these

18      pills.  This is my license.  I have control over

19      this distribution center?

20                MR. COLLINS:  Objection.  Incomplete

21      hypothetical to a fact witness.

22                THE WITNESS:  You -- you asked about

23      ultimate authority.  I'm sorry.  Can you define

24      that?

Highly Confidential - Subject to Further Confidentiality Review

Page 108

1    BY MR. BOGLE:

2        Q    Let me ask you this:  If you had

3    concerns about controlled substances going, and

4    specifically opioids, going to a New Castle

5    customer from 2000 to 2018, it was, first of all,

6    your responsibility to raise that concern, right?

7            MR. COLLINS:  Objection.  Compound.

8    Assumes facts not in evidence.

9            THE WITNESS:  Yes.

10   BY MR. BOGLE:

11       Q    Okay.  You knew that was your job,

12   right?

13       A    Yes.

14       Q    Okay.  And ultimately, if you raised

15   that concern, you were in a position of management

16   at the DC when you did so, right?

17       A    Yes.

18       Q    Okay.  You're somebody that people

19   listen to, right?

20       A    I can't answer that.  I don't know.

21       Q    You don't know if people listen to you?

22       A    I'm sure they do.  Some do, some don't.

23       Q    Okay.  As to Franklin's Pharmacy, for

24   example, you never stood up and said, I don't -- I

Page 109

1    don't want these people getting more opioids from

2    my distribution center, did you?

3        A    Yes.

4        Q    You did?

5        A    Yes.

6        Q    Okay.  When was that?

7        A    I don't recall the time.

8        Q    Okay.

9        A    But, yes, Frank Manios was not able to

10   get any more opiates.

11       Q    But that wasn't at your direction, was

12   it?

13       A    Yes, it was.

14       Q    Okay.  All right.  We'll take a look at

15   that momentarily then.

16       A    Okay.

17       Q    For Mace's, you could have stood up at

18   any point in time and said, No more oxycodone or

19   hydrocodone for you, Mace's.  I think that what

20   you're doing is suspicious.  Right?  You had that

21   authority.

22       A    Yes.

23       Q    Okay.  Let's go back to Exhibit 1.1830,

24   I think it's Exhibit 4 to the deposition.  We were

Page 110

1    talking about this --

2              MR. COLLINS:  I'm sorry, hold on a

3    second.

4              MR. BOGLE:  Yeah, it's the PowerPoint

5    deck you have right next to you, the Lifestyle

6    Drug.

7    BY MR. BOGLE:

8         Q    We were talking about this a few moments

9    ago.  I want to go to page .7 in this slide deck.

10             It's noted here, the slide is titled

11   "Lifestyle Drug Monitoring Program," and it says

12   "Focus on four drugs."  Do you see that?

13        A    Yes.

14        Q    Two of those four drugs that were the

15   focus in the Lifestyle Drug Monitoring Program

16   were hydrocodone and oxycodone, right?

17        A    Yes, I believe so.

18        Q    Okay.  And the third bullet point, we

19   talked about this a little bit, established

20   threshold for excessive quantities, 8,000 dose

21   units.  Do you see that?

22        A    Yes.

23        Q    And that threshold was established for

24   all customers as it pertained to hydrocodone and

Highly Confidential - Subject to Further Confidentiality Review

Page 111

1     oxycodone, right?

2             MR. COLLINS:  Objection.  Form, vague.

3             THE WITNESS:  Yes.

4     BY MR. BOGLE:

5        Q    Okay.  And the next bullet point says:

6     "Thorough due diligence of customers exceeding

7     threshold."  Do you see that?

8        A    Yes.

9        Q    Okay.  And that due diligence was done

10    through a sort of three-level process, right?

11       A    As I recall.

12       Q    Okay.  For example, Level I, when a

13    customer exceeded the threshold, a Level I review

14    meant you kind of -- "you" meaning the management

15    of the distribution center was responsible for

16    evaluating that customer to assess whether you

17    thought the orders were suspicious, right?

18            MR. COLLINS:  Objection.  Form.

19            THE WITNESS:  Yes.

20    BY MR. BOGLE:

21       Q    Okay.  And then if you -- it was

22    inconclusive, you went to Level II, right?

23       A    Yes.

24       Q    Okay.  And at Level II, that involved,

Highly Confidential - Subject to Further Confidentiality Review

Page 112

1    first of all, the distribution center management,

2    including yourself, right?

3         A    Yes.

4         Q    Okay.  And that included going out and

5    visiting the customer and sometimes having a

6    questionnaire completed by them, right?

7         A    Well, Level I was the visit that I would

8    do.  Level II was usually done by a DRA and the

9    salesperson.

10         Q    Okay.  So you weren't involved in the

11    Level II reviews at all under the lifestyle drug

12    management program?

13         A    Not that I recall.

14         Q    Okay.  What about under the CSMP,

15    Level IIs?

16         A    I don't think so.

17         Q    Okay.  Just Level I is your testimony is

18    all you would have been involved in?

19         A    That's all I remember.

20         Q    Okay.  And you were also involved in

21    reviewing threshold request increases and signing

22    off on those if you felt appropriate, right?

23              MR. COLLINS:  Objection to form, to the

24    word "signing off," vague, calls for a legal

Page 113

1    conclusion.

2              THE WITNESS:  I would push it up to the

3    director of Regulatory Affairs, yes, for their

4    review.

5    BY MR. BOGLE:

6        Q    But ultimately on many of the threshold

7    requests -- strike that.

8              On the threshold request approvals, the

9    DRA, the regulatory individual, and yourself or

10   somebody you designated at your distribution

11   center, would sign off on those threshold

12   increases for anything that went out of New

13   Castle, right?

14             MR. COLLINS:  Objection to the use of

15   the term "sign off."  Form.

16             THE WITNESS:  I wanted to make clear if

17   I sign off, it's to go to the director of

18   Regulatory Affairs.  That's what "sign off" meant

19   to me.

20   BY MR. BOGLE:

21       Q    But your authority had to matter too,

22   right?  You would sign -- literally sign those

23   forms too, right?

24             MR. COLLINS:  Objection.  Form,

Page 114

1    foundation.

2              THE WITNESS:  I would sign off to

3    proceed to send it to the director of Regulatory

4    Affairs --

5    BY MR. BOGLE:

6         Q    And if --

7         A    -- and ask for their expertise.

8         Q    And if you thought that, based on your

9    expertise and review, that a threshold increase

10   was not appropriate, you would not put your

11   signature on that, would you?

12        A    Not necessarily.

13        Q    Well, would you sign threshold

14   increase -- to approve threshold increases in

15   situations where you felt that was not

16   appropriate?

17             MR. COLLINS:  Objection to the term

18   "approve."

19             THE WITNESS:  I would send it up to the

20   correct -- the director of Regulatory Affairs for

21   their expertise.

22   BY MR. BOGLE:

23        Q    Okay.  But you would actually sign these

24   forms too, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 115

1          A       Yes.

2              Q     Okay.  And so in signing that form, that

3      requires you to literally put your signature on

4      the page approving that request, right?

5                  MR. COLLINS:  Objection.

6      BY MR. BOGLE:

7              Q     From your perspective.

8                  MR. COLLINS:  Objection.

9      Mischaracterization.  It's been asked and

10     answered.

11                 THE WITNESS:  From my perspective, it

12     was clear I was submitting it to the director of

13     Regulatory Affairs so they could review it and do

14     the proper due diligence on usually a Level II.

15     BY MR. BOGLE:

16             Q     So if we see your signature on any

17     threshold increase requests under the approval

18     section, we should not interpret that to mean that

19     you were approving anything.  Is that your

20     testimony?

21         A       I'm approving it to go to the director

22     of Regulatory Affairs for their perusal, and then

23     they have to approve -- I can't do it on my own.

24     I cannot increase a threshold.

Highly Confidential - Subject to Further Confidentiality Review

Page 116

1          Q     But if you had concerns about a

2    threshold being increased, you certainly had the

3    authority and ability to raise that objection,

4    correct?

5          A     I would raise that objection.

6          Q     And if you had an objection, you

7    wouldn't sign the threshold increase form, would

8    you?

9          A     From -- if I knew something, that I

10   would let the director of Regulatory Affairs know.

11         Q     Right.  And you wouldn't sign a

12   threshold increase approval form if you had such

13   concerns, right?

14         A     I would not.

15         Q     Right.  Going back to the slide deck in

16   Exhibit 4, on the same page, it says "Reducing

17   orders to customers" is the next bullet point.  Do

18   you see that?

19         A     Yes.

20         Q     And that was part of establishing

21   this -- these thresholds was an effort to try to

22   reduce the overall purchases of these four

23   specific products, right?

24                   MR. COLLINS:  Objection.  Calls for a

Page 117

1    legal conclusion, foundation.

2              THE WITNESS:  It was to make sure

3    they're going to the right customers.

4    BY MR. BOGLE:

5         Q    Right.  And the last reference here says

6    "Documentation and reporting to DEA."  Do you see

7    that?

8         A    Yes.

9         Q    Meaning if you've got a suspicious order

10   you've identified, you report it, correct?

11             MR. COLLINS:  Objection.  Calls for a

12   legal conclusion.  Form.

13             THE WITNESS:  Yes.

14   BY MR. BOGLE:

15        Q    Okay.  And -- strike that.

16             (Snider Exhibit No. 6 was marked

17             for identification.)

18   BY MR. BOGLE:

19        Q    I'm going to hand you -- I'm marking as

20   Exhibit 1.1333, Exhibit 6 to your deposition.

21             Do you see this is a copy of the

22   Lifestyle Drug Monitoring Program?  Do you see

23   that?

24        A    Yes.

Page 118

1          Q     Okay.  You've seen this document before,

2     right?

3          A     Yes, I have.

4          Q     Okay.  And this is the document you

5     would utilize when you were conducting due

6     diligence during the 2007 into 2008 time frame,

7     right?

8          A     It was the MOM -- we called it the MOM

9     or the SOPs, standard operating procedures, and it

10    was McKesson's operation manual.

11         Q     Right.  And this is what you had to

12    comply with when you were conducting due diligence

13    as it related to, for example, oxycodone and

14    hydrocodone during the '07 into '08 time frame,

15    right?

16               MR. COLLINS:  Objection to form.

17               THE WITNESS:  I believe so, yes.

18    BY MR. BOGLE:

19         Q     Okay.  And if you look at the first

20    page, in the middle, the four drugs are listed

21    there that the 8,000 unit threshold would be

22    applied to.

23               Do you see that?

24         A     Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 119

1          Q     Okay.  So it says there above those four

2     drug listings:  "This reporting process is

3     targeting controlled substances that the DEA

4     considers lifestyle drugs.  These drugs are highly

5     abused and are commonly found in illegal internet

6     pharmacies.  Currently the controlled substances

7     being monitored by these reports are," and it

8     lists the four.

9               The first of the two is oxycodone, the

10     second is hydrocodone, correct?

11          A     Yes.

12          Q     And if you go down a little further on

13     that page, you see where it says "Daily Dosage

14     Summary Report"?

15          A     Yes.

16          Q     Okay.  It says:  "This report will

17     summarize customers who have purchased quantities

18     of all products containing the identified base

19     code in excess of the threshold for the item."

20               Do you see that?

21          A     Yes.

22          Q     Okay.  So that sentence in and of itself

23     indicates that the 8,000 unit threshold was not a

24     hard stop, meaning that in a given month a

Page 120

1    customer could order more than 8,000 without

2    having their orders blocked, right?

3              MR. COLLINS:  Objection.  Form, vague.

4              THE WITNESS:  I'm not sure.  If you

5    could rephrase that.

6    BY MR. BOGLE:

7         Q    Well, as it indicates in this sentence,

8    this Daily Dosage Summary Report was used to

9    identify customers who had already ordered more

10   than 8,000 units, right?

11        A    Yes.

12        Q    Okay.  Meaning if you've already ordered

13   more than 8,000, you've already exceeded the

14   established threshold, right?

15        A    Yes.

16        Q    And it says:  "For example, all sales

17   and credits of McKesson items containing

18   hydrocodone will be added together and reported if

19   the total doses exceed 8,000 unit.  The daily

20   report will systemically be sent via e-mail to the

21   DCM" -- what does DCM stand for?

22        A    Distribution center manager.

23        Q    And that was you; is that right?

24        A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 121

1      Q    Okay.  Director of operations is another

2  way to say distribution center manager.  Those are

3  used interchangeably at McKesson, right?

4      A    Yes.

5      Q    -- "and their -- their designee, Sales

6  Management, and regulatory department.  It will be

7  the DCM's responsibility to review and act on the

8  reports according to the processes listed below."

9           Do you see that?

10     A    Yes.

11     Q    And again, that's you.  The DCM for New

12  Castle, that's you, right?

13     A    Yes.

14     Q    Okay.  And then you talked a little bit

15  before about Level I reviews.

16          Do you remember talking about that

17  generally with me?

18     A    Yes.

19     Q    Okay.  And Level I reviews will be

20  triggered when a customer exceeded this 8,000 unit

21  threshold, right?

22     A    Not necessarily.

23     Q    Okay.  What would be triggered then?

24     A    We were -- at the distribution center in

Page 122

1    New Castle, we had a goal to go through all

2    independent pharmacies and do a Level I review,

3    part of "know your customer."

4              So starting then, we would schedule all

5    the customers, sometimes prioritizing these, but

6    we would try to get a Level I review with every

7    independent customer that we serviced.

8        Q    Okay.  But my question was more specific

9    to you.  If a customer appears on this Daily

10   Dosage Summary Report as being over 8,000 units,

11   for example, for oxycodone or hydrocodone, that

12   would trigger a Level I review, right?  That was

13   the SOP?

14             MR. COLLINS:  Objection to the form.

15             THE WITNESS:  Not necessarily.

16   Sometimes we already had one.

17   BY MR. BOGLE:

18       Q    Okay.  So if you already had one and

19   they appeared on a subsequent report, you would

20   not redo the Level I review; is that your

21   testimony?

22             MR. COLLINS:  Objection.

23   Mischaracterization.

24             THE WITNESS:  I don't know specifically

Highly Confidential - Subject to Further Confidentiality Review

Page 123

1    which customer you're talking about, but sometimes

2    we would ask for a Level II.

3    BY MR. BOGLE:

4         Q    Yeah, I'm just asking about the general

5    procedures followed at New Castle.  I'm not

6    talking about any specific customer right now.

7         A    Oh, I'm sorry, I completely

8    misunderstood your question then.

9         Q    I'm saying --

10        A    If you could start over.

11        Q    Yeah.  If a customer shows up on this

12   Daily Dosage Summary Report, while the lifestyle

13   drug management program was in place, that, under

14   the standard operating procedure here, would

15   trigger automatically a Level I review, correct?

16             MR. COLLINS:  Objection.  Form.

17             THE WITNESS:  I don't know that.  I

18   would have to read through it again.  It's been 10

19   or 12 years.

20   BY MR. BOGLE:

21        Q    As you sit here today, you don't know

22   either way.  Is that your testimony?

23        A    Yes.

24        Q    Okay.  And let's look at Level I review.

Page 124

1    It's on page .2, the next page.

2              Under 1.1, it says:  "If the customer

3    appears on a previous month's report for the same

4    item," and then it kind of gives you some -- some

5    criteria to evaluate, right?  Below that.

6         A    I'd have to look.  If I could -- could I

7    look?

8         Q    Sure.  I'm just talking about 1.1 right

9    now.

10        A    (Peruses document.)

11             Okay.  What was your question?

12        Q    Yeah.  I'm just kind of orienting you at

13   this point.  You said you wanted to look at it, so

14   I didn't really have one.  I was trying to orient

15   you to where we were at.

16        A    Okay.

17        Q    Okay.  So below that, it says:

18   "Evaluate the customer's purchases relative to the

19   past three months' purchases.  The evaluation

20   should include, but not necessarily be limited to,

21   the following criteria," and then below that there

22   are five bullet points.

23             Do you see that?

24        A    Yes, I do.

Page 125

```
 1        Q    Okay.  Now, these five bullet points, is
 2    that the criteria that you would apply in doing a
 3    Level I review?
 4        A    Yes, at that time.
 5        Q    Were there any other criteria that you
 6    applied that are not listed here?
 7        A    I don't -- there were more.  Yes.
 8        Q    Yeah, so what -- what other criteria
 9    would you apply during this time period?
10        A    I remember looking for red flags.  If
11    there were people -- out-of-state licenses in the
12    parking lot, we would look for that.  We were
13    trained if there wasn't any signage on the
14    building, that that was a red flag.  We were asked
15    about internet pharmacies, because that was a red
16    flag that usually would push it up to Level II.
17    And we looked at just lines of pharmacies.  And
18    then we would get sales data and look at that.  I
19    believe three months of sales data.
20        Q    Okay.  And the red flags that you refer
21    to here -- actually, strike that.  We'll get to
22    that in a minute.
23             You would also have responsibility as
24    the distribution center manager or director of
```

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    operations for doing site examinations and

2    interviews with the customer under the Level II

3    phase as well, right?

4        A     Not usually, no.

5        Q     You have no role in that process?

6        A     Not that I recall.

7        Q     Okay.  You're saying that's just

8    regulatory that would do that, right?

9        A     Usually regulatory, yes.

10       Q     Now, there's also a Level III identified

11   here under the Lifestyle Drug Monitoring Program.

12   And I looked during the period of time the

13   documents that were produced for customers of New

14   Castle and Level III reviews.  I could not find

15   any.

16           That's -- there were actually no

17   Level III reviews done under the Lifestyle Drug

18   Monitoring Program for New Castle customers, were

19   there?

20           MR. COLLINS:  Objection.  Assumes facts

21   not in evidence.

22           THE WITNESS:  I don't know that.

23   BY MR. BOGLE:

24       Q     Okay.  So, again, assuming that all the

Page 127

1    documents that need to be produced have been

2    produced here, me not finding any, you would agree

3    with me, is indicative of the fact that there were

4    no Level III reviews done during this time period,

5    were there?

6               MR. COLLINS:  Objection.  Assumes facts

7    not in evidence.

8               THE WITNESS:  I can't agree with that.

9    BY MR. BOGLE:

10       Q    You don't know one way or the other; is

11   that true?

12       A    I don't recall a Level III right now,

13   no.

14       Q    You can't recall as you sit here any

15   specific Level III reviews that were done, can

16   you?

17       A    What period of time, please?

18       Q    2007 to 2003 under the LDMP.

19       A    Not that I remember, no.

20       Q    Now, let's talk about for a few minutes

21   the Controlled Substances Monitoring Program.

22   That went into effect in 2008, right?

23       A    I believe so, yes.

24       Q    Okay.  And there was a separate

Highly Confidential - Subject to Further Confidentiality Review

Page 128

1     threshold system applied under the CSMP, right,

2     different than the LDMP?

3         A     I believe so, yes.

4         Q     Okay.  And that system for existing

5     customers was based on looking at the last six

6     months of sales data for controlled substances,

7     taking the highest months of sales during that

8     period and adding 10 percent to it, and that was

9     the threshold, right?

10                MR. COLLINS:  Objection.  Form.

11                THE WITNESS:  I don't know specifically

12    about the 10 percent, but I do know it was based

13    on sales.

14    BY MR. BOGLE:

15        Q     Okay.  Any reason to disagree that that

16    was the process employed?

17                MR. COLLINS:  Objection.  The question

18    is vague.

19                THE WITNESS:  I don't know.

20    BY MR. BOGLE:

21        Q     You don't know?

22                Did you ever -- so you would have to

23    review threshold request increases.  Those came to

24    you and -- both you and the regulatory individual

Page 129

1    responsible for New Castle, right?

2         A    Yes.

3         Q    Okay.  So when you were reviewing those,

4    you had no concept of how the threshold was set to

5    begin with?

6              MR. COLLINS:  Objection.  Form,

7    argumentative.

8              THE WITNESS:  I said I don't remember.

9    I don't remember that it was 10 percent.  It

10   doesn't state that in what I remember.  I'm sorry.

11   BY MR. BOGLE:

12        Q    Let's talk about how threshold increases

13   were dealt with under the CSMP.  Let's start in

14   2008 when the program was launched.

15             From 2008 to present, in order to

16   increase a threshold, a customer had to document a

17   legitimate business reason for increasing that

18   threshold, right?

19        A    They had to give us a reason or the DRA,

20   national accounts, et cetera.

21        Q    But there was a specific requirement

22   that the business reason needed to be documented,

23   right?

24        A    It should be.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1          Q    Okay.  For example, if a customer tells

2     you that their business is increasing without

3     providing any documentation to support that and to

4     support that increase is legitimate, the threshold

5     increase should not be approved, should it?

6                    MR. COLLINS:  Objection.  Calls for a

7     legal conclusion and form.

8                    THE WITNESS:  They would usually supply

9     data for that salesperson or the DRA to push it up

10    the line.

11    BY MR. BOGLE:

12         Q    Okay.  My question was simply that if a

13    customer doesn't provide data to support both the

14    business increases occurring and that it's

15    legitimate, then a threshold increase should not

16    be approved under the CSMP, right?

17                   MR. COLLINS:  Objection.  Incomplete

18    hypothetical, form.

19                   THE WITNESS:  That data wasn't always

20    supplied to me.  It would be supplied to the DRA

21    who approved.

22                   MR. BOGLE:  Move to strike as

23    nonresponsive.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 131

    1          Q     I'm just asking about the process.

    2     So --

    3          A     I'm sorry, I misunderstood.

    4          Q     Yeah.  So when an increase is requested,

    5     the increase needs to be documented and justified

    6     with supporting documentation showing the reason

    7     for the increase and that it's legitimate, right?

    8                 MR. COLLINS:  Objection.  Calls for a

    9     legal conclusion.  Form.  Incomplete hypothetical.

   10                 THE WITNESS:  Can you repeat the

   11     question?  I'm sorry.

   12     BY MR. BOGLE:

   13          Q     Sure.  Well, I'll rephrase it to help

   14     you out here.

   15                 So if a customer under the CSMP requests

   16     a threshold increase based on increased business,

   17     they have to supply documentary support for that

   18     request, true?

   19          A     Yes, a legitimate reason for the

   20     increase.

   21          Q     Right.  They can't simply say, My

   22     business is increasing, and you guys take their

   23     word for it and increase the thresholds, right?

   24     That would not be appropriate under the protocols.

Highly Confidential - Subject to Further Confidentiality Review

Page 132

1            MR. COLLINS:  Objection to the form.

2            THE WITNESS:  I would not always know

3    what the increase was, like in national accounts,

4    but they would supply that.

5            MR. BOGLE:  Move to strike as

6    nonresponsive.

7    BY MR. BOGLE:

8       Q    So my question is simply --

9       A    I didn't understand.

10      Q    -- a customer saying, My business is

11   increasing, without any documentary support, is

12   not a legitimate reason under the CSMP to increase

13   a threshold, true?

14           MR. COLLINS:  Objection to the use of

15   the legalese, "legitimate," so it calls for a

16   legal conclusion.  Incomplete hypothetical.

17           THE WITNESS:  Can you repeat the

18   question again?  I'm sorry.

19   BY MR. BOGLE:

20      Q    Sure.  A customer saying that their

21   business is increasing, without documentary

22   support for that increase, does not provide a

23   legitimate reason to increase the threshold under

24   the CSMP, true?

Page 133

1                MR. COLLINS:  CS -- same objections.

2                THE WITNESS:  I would not -- I would not

3        provide an increase for that.

4        BY MR. BOGLE:

5            Q     Okay.  Because that would not be

6        appropriate under the Controlled Substances

7        Monitoring Program, right?

8            A     It wouldn't be my job to do that.  It

9        would be the DRA's.

10           Q     My question simply is -- I mean you have

11       an understanding of the Controlled Substances

12       Monitoring Program, right?  You sign off on

13       threshold increases, true?

14               MR. COLLINS:  Objection.  We've been

15       over this.  Asked and answered,

16       mischaracterization of his prior testimony.

17               THE WITNESS:  I send them up to the DRA

18       so they can do the due diligence, which we do.

19       BY MR. BOGLE:

20           Q     I'm going to hand you what I'm marking

21       as Exhibit 1.1679, also Exhibit 7.

22               (Snider Exhibit No. 7 was marked

23               for identification.)

24       BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1          Q     Are you familiar with Dave Gustin?

2          A     Yes.

3          Q     Okay.  He was in the regulatory

4     department at McKesson, right?

5          A     Yes.

6          Q     Okay.  I want to take a look at page .2

7     here, the second page.

8               MR. COLLINS:  I'm sorry.  If you need to

9     take more time to review it to familiarize

10    yourself with the document, please do.

11    BY MR. BOGLE:

12         Q     There's an e-mail from Dave Gustin,

13    looking at the bottom e-mail on that page, from

14    April 15, 2011, to a big group of people.  Do you

15    see that?

16         A     I see it, yes.

17         Q     Okay.  He says there in that e-mail:

18    "My contribution to today's call centers around

19    how we, through the CSMP, will meet the

20    expectations of the program itself and, more

21    urgently, the DEA under the terms of the agreement

22    of May '08.  The expectation is that we know our

23    customer and their customers too, at least to the

24    point where we are seeing and responding to any

Page 135

```
 1    diversion that may be taking place, if not

 2    preventing it up front."

 3              Do you see that?

 4       A    Yes.

 5       Q    Okay.  And he wrote this, by the way, in

 6    an e-mail, April 15, 2011.  Do you see that?

 7    That's the date of the e-mail?

 8              MR. COLLINS:  Objection.  Foundation.

 9              THE WITNESS:  Yes.

10    BY MR. BOGLE:

11       Q    Okay.  And then it goes on in the next

12    paragraph -- you see where it says "What I

13    believe" in the second sentence?

14              It says:  "What I believe needs to be

15    tightened up are the follow-up visits to our

16    accounts that have undergone significant changes

17    in their controls purchases in either volume or

18    percentage.  We also need to tighten up the

19    process regarding granting increases.  We have

20    gotten to a point where a certain percentage of

21    increase are almost automatic, and we are too

22    easily accepting of reasons like," quote/unquote,

23    "business increase for raising thresholds by small

24    amounts.  The SOP says clearly that this is not an
```

Highly Confidential - Subject to Further Confidentiality Review

1    acceptable reason unless sales data supports it."

2              Do you see that?

3         A    Yes.

4         Q    And you agree that granting threshold

5    increases based on business increases without

6    supporting data is not appropriate under the

7    Controlled Substances Monitoring Program, right?

8              MR. COLLINS:  Objection.  Form,

9    incomplete hypothetical.

10             THE WITNESS:  I believe exactly what

11   he's saying here.

12   BY MR. BOGLE:

13        Q    Okay.  So you agree with that statement,

14   what I just read about --

15        A    I agree that Dave said it to -- to that

16   group, yes.

17        Q    Do you think that's an accurate

18   statement?

19        A    I can't testify --

20        Q    That the SOP says clearly it's not an

21   acceptable reason for business increase unless

22   data supports it?

23        A    Yes.

24        Q    Okay.  I'm also going to hand you what

Highly Confidential - Subject to Further Confidentiality Review

Page 137

1      I'm marking as 1.795, Exhibit 8 to your

2      deposition.

3                  (Snider Exhibit No. 8 was marked

4                  for identification.)

5      BY MR. BOGLE:

6           Q    So this is a PowerPoint deck titled

7      "McKesson's Controlled Substances Monitoring

8      Program," and the metadata indicates this is from

9      2015.

10                 Do you see that title there?

11          A    I'm sorry, what's the date, please?

12          Q    It doesn't have one on the document.

13     I'm saying the data as provided to us indicated

14     it's 2015.

15                 MR. COLLINS:  Objection.  Foundation.

16                 THE WITNESS:  Okay.

17     BY MR. BOGLE:

18          Q    Do you see the title of the document --

19          A    Yes.

20          Q    -- "McKesson's Controlled Substances

21     Monitoring Program"?

22          A    Yes.

23          Q    Did you ever receive training materials

24     like this on the Controlled Substances Monitoring

Page 138

```
1       Program to tell you how to implement your portions

2       of it?

3           A       We received training, yes.

4           Q       Okay.  If you go to page .37 in this

5       PowerPoint deck.  It's titled "General Principles

6       for Threshold Increases," and in the middle, there

7       is a bubble that says "Approved Threshold

8       Increases."

9                   Do you see that?

10          A       Yes.

11          Q       And around it, it says "Customer

12      Generated Request."  That -- that's a general

13      principle surrounding threshold increases is that

14      they should be customer generated, right?

15                  MR. COLLINS:  Objection.  Form.

16                  THE WITNESS:  Okay.

17      BY MR. BOGLE:

18          Q       Is that your understanding?

19                  MR. COLLINS:  Objection.

20      Mischaracterization.

21                  THE WITNESS:  Okay.

22                  MR. COLLINS:  Foundation.

23      BY MR. BOGLE:

24          Q       Do you understand that to be the case?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 139

1            MR. COLLINS:  Objection.  The question

2     is vague.

3     BY MR. BOGLE:

4          Q    Is that threshold increases should be

5     customer generated?

6          A    Yes.

7          Q    Okay.  Threshold increases should also

8     be for a legitimate business justification, right?

9            MR. COLLINS:  Objection.  Vague.

10            THE WITNESS:  Yes.

11    BY MR. BOGLE:

12         Q    Threshold increases should be made only

13    after the appropriate level of diligence, right?

14            MR. COLLINS:  Objection.  Calls for a

15    legal conclusion.

16            THE WITNESS:  Yes.

17    BY MR. BOGLE:

18         Q    And threshold increases should be well

19    documented, right?

20         A    Yes.

21         Q    Okay.  And that's been true the entire

22    time the threshold increase system has been in

23    place at McKesson, right?

24            MR. COLLINS:  Objection.

Page 140

1    BY MR. BOGLE:

2        Q    Those principles?

3             MR. COLLINS:  Objection to the form.

4             THE WITNESS:  I don't know.  I know this

5    was the -- you said, what date was this?

6    BY MR. BOGLE:

7        Q    The document is from 2015.

8        A    Yeah, I don't know if I've ever seen

9    this.  It was directed to the DRAs.

10       Q    Okay.

11       A    But we documented thresholds whenever we

12   went to it, and then after that, the thresholds

13   were only increased by the DRAs, and it was an

14   automated system.  So I couldn't do it just

15   myself.

16       Q    And that started just in the last couple

17   years, right?

18            MR. COLLINS:  Objection.  Vague.

19            THE WITNESS:  I don't remember exactly.

20   '13?

21   BY MR. BOGLE:

22       Q    It's a recent change, right?

23            MR. COLLINS:  Objection.  Vague.

24            THE WITNESS:  Well, it depends on what

Page 141

1    you call recent.  It's been a while that we've had

2    it that way.

3    BY MR. BOGLE:

4         Q    These general --

5         A    After the lifestyle drugs, then the DRA

6    automatically has to approve and get the

7    documentation.

8         Q    These general principles for threshold

9    increases that we've reviewed, the

10   well-documented, customer-generated, legitimate

11   business justification, appropriate level of

12   diligence, any of those principles that you think

13   should not have been followed since the launch of

14   the CSMP in 2008?  Any of those principles you

15   think that are not appropriate, don't matter?

16              MR. COLLINS:  Objection.  The question

17   is confusing, compound, vague.

18              THE WITNESS:  Those are the general

19   principles.

20   BY MR. BOGLE:

21        Q    Okay.  And have always been, right?

22        A    I can't answer to that.

23        Q    You don't know?

24        A    I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1          Q    And when a threshold increase is

2    requested, there's a form that has to be

3    completed, right?

4          A    Yes.  A form or a SharePoint site.

5          Q    Okay.  And the SharePoint site, there's

6    dropboxes that you complete and documentation that

7    is attached, right?

8          A    That's what I recall.

9          Q    Okay.  And those forms or the SharePoint

10   information is supposed to be completed at the

11   time the threshold request is made, not at some

12   time thereafter, right?

13              MR. COLLINS:  Objection.  Vague.

14              THE WITNESS:  It could be after the

15   request, because they were doing the due

16   diligence.  So I can't honestly say I put one in

17   if I thought there was more due diligence to be

18   done.

19   BY MR. BOGLE:

20         Q    Okay.  But it would not be appropriate

21   to increase a threshold, supply product to a

22   customer before a threshold request increase form

23   had been completed, true?

24              MR. COLLINS:  Objection.  The question

Page 143

1     is vague.

2              THE WITNESS:  Well, from 2000 to 2006,

3     we usually reported those, but we already shipped

4     them.  I didn't get the report till afterwards.

5     After the lifestyle drugs, it was more proactive

6     in that I could get the data and send it to them

7     electronically for them to review and then

8     approve.  So it may take some time.

9     BY MR. BOGLE:

10         Q     Let me make sure that my question is

11    clear.

12              From 2008 on, under the Controlled

13    Substances Monitoring Program when a threshold

14    increase was requested, the drug should not be

15    shipped under that increased amount without a

16    form -- threshold increase form having already

17    been completed, true?

18         A     Yes.

19         Q     Okay.  You mentioned red flags from a

20    due diligence perspective a moment ago, and I want

21    to ask you something about that.  One sort of red

22    flag aspect of the McKesson system has been

23    setting the threshold number, whether it be 8,000

24    under the Lifestyle Drug Monitoring Program or

Highly Confidential - Subject to Further Confidentiality Review

Page 144

1    based on the last six months of sales, that's been

2    a red flag -- if you go above that number, that's

3    a red flag that requires due diligence, right?

4        A    Well, we didn't call that a red flag.

5    By red flags, I meant customers that we did

6    Level I visits on.

7        Q    Okay.  But do you consider a customer

8    going over their threshold number a red flag that

9    requires due diligence?

10       A    Can you define "red flag"?

11       Q    How would you define it?  You used the

12   term earlier in the deposition.

13       A    But I used it in the context of Level I,

14   red flags to know your customer.  So when we did

15   the visit, we would make sure they met all the

16   criteria, et cetera.

17       Q    Okay.  So would you consider a customer

18   exceeding their threshold for hydrocodone or

19   oxycodone as being something that requires due

20   diligence to assess whether that was legitimate

21   for them to do so?

22            MR. COLLINS:  Objection.  Form, vague,

23   and calls for a legal conclusion.

24            THE WITNESS:  Yes, there would be some

Highly Confidential - Subject to Further Confidentiality Review

Page 145

1    kind of due diligence.

2    BY MR. BOGLE:

3        Q    And another mechanism that's been

4    employed more recently at McKesson to assess red

5    flags for customers is looking at the percentage

6    of controlled substances a customer purchases

7    versus their overall prescription purchases,

8    right?

9        A    Yes, the DRAs do the -- some analysis.

10   There is a lot of data-driven analysis that's

11   evolved, and I know Izzy and those guys do a good

12   job of that.

13       Q    And that's not something that was done

14   until the 2014, 2015 time frame, right, doing that

15   sort of analysis?

16              MR. COLLINS:  Objection.  Vague.

17              THE WITNESS:  I don't know.  If they did

18   it in 2008 or not, I don't know -- I don't know

19   that.

20   BY MR. BOGLE:

21       Q    That's an important metric, though, to

22   look at to assess whether a customer's orders are

23   suspicious or not is to look at whether the

24   percentages of controlled substances versus

Page 146

1    overall purchases exceeds a normal level, right?

2              MR. COLLINS:  Objection.  Vague, calls

3    for a legal conclusion.

4              THE WITNESS:  And that's what the DRAs

5    did.

6    BY MR. BOGLE:

7         Q    I'm asking whether you think that's

8    something that's useful.

9              MR. COLLINS:  Objection.  Asked and

10   answered, form.

11             THE WITNESS:  The DRAs found it very

12   useful, I'm sure.

13   BY MR. BOGLE:

14        Q    And another mechanism that can be

15   utilized is to look at the percentage of

16   controlled substances by category, meaning what

17   percentages the oxycodone purchases are over their

18   overall prescriptions, right?  You've heard of

19   that too?

20             MR. COLLINS:  Objection.  Form,

21   speculation, vague.

22   BY MR. BOGLE:

23        Q    You've heard of that concept?

24        A    I've heard of that.

Highly Confidential - Subject to Further Confidentiality Review

Page 147

1          Q     Okay.  And from the 2008 to 2013 time

2     frame, that's not something, to your

3     understanding, that was utilized at McKesson,

4     using those sort of percentages of controlled

5     versus overall purchases and looking at specific

6     percentages of controlled purchases for drugs,

7     right?

8                MR. COLLINS:  Objection.  Form, vague,

9     compound.

10               THE WITNESS:  My understanding was it

11    probably was used.  That's my recollection.

12    BY MR. BOGLE:

13         Q     Okay.  Did you ever look at any kind of

14    data or ask for any data like that?

15         A     Yes.

16         Q     You did?

17         A     Yes.

18         Q     Okay.  In the 2008 to 2013 time frame?

19         A     I can't recall specifically.

20         Q     Okay.  And we looked earlier at the

21    PowerPoint slide deck from 2007 for Mr. Walker

22    where the DEA indicated that 5,000 dosage units

23    was average.  Do you recall that reference for

24    controlled substances?

Page 148

```
 1          A      No, I don't, but --

 2           Q      Okay.  You want to go back and look at

 3     it?

 4          A      Yeah.

 5           Q      It's 1.1830, Exhibit 4.  It's the one

 6     that looks like this (indicating) on the front.

 7     Yep.  And so it was specifically page .4.

 8                   And it's under "DEA Expects," and it

 9     talks about 5,000 dose units is average,

10     quote/unquote.  Do you see that?

11          A      I see that.

12           Q      Okay.  And at points after 2007, the

13     DEA did provide information to McKesson about

14     controlled substances averages so that McKesson

15     could utilize that in their due diligence

16     processes, right?

17                   MR. COLLINS:  Objection.  Lack of

18     foundation, calls for speculation.

19                   THE WITNESS:  I'm sorry --

20                   MR. COLLINS:  Calls for a legal

21     conclusion.

22                   THE WITNESS:  I'm sorry, I don't recall

23     that.  Did --

24     BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 149

1          Q    Okay.  I'm going to hand you what I'm

2     marking as Exhibit 1.1568, as Exhibit 9.

3               (Snider Exhibit No. 9 was marked

4               for identification.)

5     BY MR. BOGLE:

6          Q    Okay.  Do you see here this is titled

7     "Understand ARCOS Data"?  Do you see that?

8          A    Yes.

9          Q    Okay.  Below that, it says, and this is

10    a point later in time than the 2007 reference we

11    looked at:  "According to the DEA's 2012 ARCOS

12    data, the following are a few commonly abused

13    drugs with the annual average -- averages number

14    of dosage units purchased by a retail pharmacy for

15    each of the following drugs."

16               And then you see there is hydrocodone,

17    oxycodone, methadone, morphine, hydromorphone and

18    oxymorphone.

19               Do you see those listed?

20         A    Yes.

21         Q    And then there is an annual average

22    provided for each.  Do you see that?

23         A    I see the numbers, yes.

24         Q    Okay.  And then there's a reference

Page 150

1    below that says:  "Diversion can occur in

2    purchases below the DEA national averages."

3                 Do you see that?

4        A    I see that.

5        Q    Okay.  And if you go to the next page of

6    this document, it says:  "McKesson Regional

7    Statistical Norms."  Do you see that?

8        A    Yes.

9        Q    Okay.  And I want to look at your

10   region, which is under the Northeast.  Do you see

11   that for New Castle there under Northeast?

12       A    Yes.

13       Q    And it says total prescription

14   percentage of which controlled substances should

15   be, the norm is 19 percent in your region.

16               Have you seen that number before?

17               MR. COLLINS:  Objection.  Lack of

18   foundation.

19               THE WITNESS:  No.

20   BY MR. BOGLE:

21       Q    You've never seen that reference before?

22       A    No.

23       Q    Okay.  Then it lists out the norms for

24   various other controlled substances specifically.

Highly Confidential - Subject to Further Confidentiality Review

Page 151

1    Do you see that?

2              MR. COLLINS:  Objection.  Lack of

3    foundation.

4              THE WITNESS:  What is a norm?  I'm not

5    sure.  You'll have to help me with this.

6    BY MR. BOGLE:

7         Q    Well, the document is titled "McKesson

8    Regional Statistical Norms."  Do you see that?

9         A    Yes.

10             MR. COLLINS:  Objection.  There's been

11   no testimony this witness has any firsthand

12   knowledge of this document.  Lack of foundation.

13   BY MR. BOGLE:

14        Q    So for oxycodone, it says --

15             MR. COLLINS:  I'm sorry.  Please let me

16   finish my objection.

17   BY MR. BOGLE:

18        Q    -- 5 percent of the total prescriptions

19   for oxycodone is a regional statistical norm for

20   your region.  Do you see that?

21             MR. COLLINS:  Objection.  Lack of

22   foundation.  No firsthand knowledge has been

23   established this witness has any knowledge of this

24   document.

Highly Confidential - Subject to Further Confidentiality Review

Page 152

1          THE WITNESS:  It says, "Percent of

2     total, plus or minus .25 percent."  I see that.

3     BY MR. BOGLE:

4          Q    Right.  And it's 5 percent listed there

5     of oxycodone.  The 5 percent of oxycodone -- 5

6     percent of the total purchases is the regional

7     norm for oxycodone in your region.  Do you see

8     that?

9          MR. COLLINS:  Objection.  Lack of

10    foundation.

11         THE WITNESS:  I'm sorry, I don't

12    understand the regional norm that you're saying.

13    BY MR. BOGLE:

14         Q    Have they ever shown this document to

15    you?

16         A    I don't remember seeing this.

17         Q    McKesson?  Anybody?  So nobody has ever

18    talked to you about what the regional norms are

19    for your -- the region that your distribution

20    center covers --

21         MR. COLLINS:  Objection --

22    BY MR. BOGLE:

23         Q    -- for these controlled substances?

24         MR. COLLINS:  Objection.  The question

Page 153

1    is compound and argumentative.

2                  THE WITNESS:  No, I've never seen the

3    Northeast for all these DCs:  Boston, New Castle,

4    Rockhill, Buffalo.

5    BY MR. BOGLE:

6         Q    Okay.  You see this is an internal

7    McKesson document, right?

8                  MR. COLLINS:  Objection.  Lack of

9    foundation.

10   BY MR. BOGLE:

11        Q    It says "McKesson" on it.

12        A    I don't -- I don't have any knowledge.

13        Q    It's got a Bates stamp produced from

14   defense counsel for McKesson, coming from

15   McKesson's files.  Do you see that?

16                  MR. COLLINS:  Objection.  If you're

17   testifying to that, that's fine.  He doesn't have

18   any knowledge of that.

19   BY MR. BOGLE:

20        Q    Do you see that?

21        A    I'm sorry.  Can you --

22        Q    First of all, McKesson, you see that?

23                  MR. BOGLE:  Can we highlight that?

24                  THE WITNESS:  I think I'll testify that

Page 154

1      I've never seen this document before.

2      BY MR. BOGLE:

3          Q    Yeah, I'm just asking.

4               So the annual data from 2012, the ARCOS

5      data, the averages, nobody has ever told you about

6      that -- those numbers either?

7          A    I've never seen this document.

8          Q    Outside of this document, anybody ever

9      talk to you about what the averages are nationally

10     for any of these drugs?

11         A    No, not nationally.

12         Q    No.  Or regionally?

13         A    No.

14              MR. COLLINS:  Objection to the word

15     "regionally."

16     BY MR. BOGLE:

17         Q    When you're out there conducting reviews

18     of customers, your due diligence component of --

19     of your job, you would agree with me that

20     assessing whether the customer has significant

21     business coming from pain clinics is relevant in

22     assessing whether to increase an opioid threshold,

23     right?

24              MR. COLLINS:  Objection.  Form,

Page 155

```
1    foundation.

2              THE WITNESS:  I would assess all aspects

3    of the customer.

4    BY MR. BOGLE:

5         Q    Right.  And specifically, whether they

6    do substantial business with pain clinics is

7    relevant to consider whether to increase an opioid

8    threshold, right?

9         A    I'm not sure.

10        Q    You don't know whether that's a red

11   flag?

12        A    Yes, if it's over.  But I've seen

13   customers supply to pain clinics and they aren't

14   over the threshold.

15        Q    Okay.  So I'm talking about increasing a

16   customer's threshold.  You would agree with me

17   that one thing to look for that would be a

18   potential red flag is doing substantial business

19   with a pain clinic.  Right?

20             MR. COLLINS:  Objection.  Form, the

21   question is vague.

22             THE WITNESS:  It would be a red flag

23   only if it exceeded the thresholds by large

24   amounts and they couldn't substantiate it.  And it
```

Page 156

1    would also depend on the era that we're talking

2    about.  I don't know if I -- 2000 to 2006, I

3    would -- I would necessarily know that.

4    BY MR. BOGLE:

5         Q    Okay.  Well, let me hand you what I'm

6    marking as Exhibit 1.1829, Exhibit 10.

7              (Snider Exhibit No. 10 was marked

8              for identification.)

9              MR. COLLINS:  Thank you.

10   BY MR. BOGLE:

11        Q    You see here this is a letter from a law

12   firm, Hyman, Phelps and McNamara, April 25, 2007.

13   Do you see that?

14        A    Yes.

15             MR. COLLINS:  Objection.  Lack of

16   foundation.

17   BY MR. BOGLE:

18        Q    And they're sending this to Linden

19   Barber, Associate Chief Counsel for the DEA.  Do

20   you see that?

21        A    Yes.

22        Q    Okay.  And if you look at this letter,

23   specifically page .3, number 5 says:  "The

24   McKesson DC management or regulatory staff, where

Highly Confidential - Subject to Further Confidentiality Review

Page 157

1     appropriate, will conduct a further review to

2     verify information provided by its customers.  For

3     example, if a pharmacy claims that it is receiving

4     increased prescriptions from a pain clinic,

5     McKesson will attempt to verify such information

6     with the clinic as well as request further

7     documentation that the clinic is issuing

8     prescriptions in the course of legitimate medical

9     practice."

10            Do you see that?

11        A    Yes.

12        Q    Do you see the statement was provided to

13    the DEA in April 25, 2007?

14            MR. COLLINS:  Objection.

15    BY MR. BOGLE:

16        Q    Do you see that's the date?

17            MR. COLLINS:  Objection.  Lack of

18    foundation.  This witness hasn't testified he has

19    any knowledge of this letter, nor to establish

20    that.

21            THE WITNESS:  I have no knowledge of

22    this.  I can't testify -- only to what it says

23    here on the document.

24    BY MR. BOGLE:

Page 158

1          Q    That's where we're starting.  I'm going

2      from there.

3          A    Okay.

4          Q    So that's what it says, right?

5          A    I'm sorry, you asked me if it was

6      supplied to the DEA or to -- from the DEA.  I

7      don't know that.

8          Q    We know this letter was written to the

9      DEA, to Chief Counsel of the DEA.  That's what it

10     says, right?

11              MR. COLLINS:  Objection.  You haven't

12     established that.

13              THE WITNESS:  I don't know.

14     BY MR. BOGLE:

15         Q    Okay.  Well, let's establish that.  By

16     facsimile confirmation by mail, a copy by mail,

17     "Linden Barber, Associate Chief Counsel, Diversion

18     and Regulatory Litigation Section, Drug

19     Enforcement Administration."

20              Do you see that?

21         A    I see that.

22         Q    Okay, thank you.

23              Now, going back to the sentence that I

24     read to you --

Highly Confidential - Subject to Further Confidentiality Review

Page 159

1           MR. COLLINS:  I'm sorry, that hasn't

2      established anything.

3      BY MR. BOGLE:

4           Q    -- did anyone tell you in --

5           MR. COLLINS:  I'm sorry, let me --

6           MR. BOGLE:  I'm asking a question.

7      BY MR. BOGLE:

8           Q    Did anyone tell you in 2007 --

9           MR. COLLINS:  I'm sorry, I need -- let

10     me finish my objection, please.

11     BY MR. BOGLE:

12          Q    Did anyone tell you in 2007 that part of

13     your responsibilities as DC management included

14     when a customer requested a threshold increase, to

15     assess whether they have significant business from

16     a pain clinic and to verify the legitimacy of that

17     business?  Did anyone ever tell you to do that?

18          MR. COLLINS:  Objection.  The question

19     is compound in multiple ways.  So it's vague.

20          THE WITNESS:  I don't recall

21     specifically, but the director of Regulatory

22     Affairs would in fact get that information.

23     BY MR. BOGLE:

24          Q    It says -- let's go back to number 5.

Page 160

1    "The McKesson DC management or regulatory staff,"

2    we'll start with that.  Do you see that?

3         A     Yeah, I don't know what this document

4    even is.  I have to apologize.

5         Q     I'm asking you a question.  Okay.  Just

6    listen to my question.

7         A     Okay.

8         Q     When McKesson DC management or

9    regulatory staff -- so DC management, that's you,

10   right?

11             MR. COLLINS:  Objection.  You haven't

12   established this witness has any firsthand

13   knowledge of this document.

14             MR. BOGLE:  That's the whole purpose is

15   that if he doesn't, that's a big problem.

16             MR. COLLINS:  The witness has already

17   testified, and you're testifying as to what the

18   contents are.  Typically it goes question and

19   answer where you elicit information from a

20   witness.

21             MR. BOGLE:  You're -- you're -- you're

22   not even objecting.  You're just talking.

23             MR. COLLINS:  No, no, because you're

24   ignoring the objection.  The witness has no

Page 161

1    firsthand knowledge about the document.

2    BY MR. BOGLE:

3         Q    "For example, if the pharmacy claims it

4    is receiving increased prescriptions from a pain

5    clinic, McKesson will attempt to verify such

6    information with the clinic as well as request

7    further documentation that the clinic is issuing

8    prescriptions in the course of legitimate medical

9    practice."

10              Do you see that sentence?

11        A    I see it.

12        Q    That's something that you and the

13   regulatory staff should have been doing when

14   assessing threshold increases for your customers,

15   true?

16              MR. COLLINS:  Objection.  Lack of

17   foundation, lack of establishing the witness's

18   firsthand knowledge of this document or the

19   question or the foundation for it.

20              THE WITNESS:  I don't know this document

21   at all.  I'm sorry.

22   BY MR. BOGLE:

23        Q    Is that -- is that something that you

24   should have been doing?

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1           MR. COLLINS:  Objection.  Form.

2           THE WITNESS:  Not in 2000 to 2006, and

3      the DRAs did that, I'm sure.

4      BY MR. BOGLE:

5           Q    What about from 2007 on?

6           A    The DRAs did that.

7           Q    Okay.  So nobody ever told you --

8      because DC management is also referenced here,

9      nobody ever told you you had any role in that

10     process?

11          A    I did the Level Is and I did the

12     threshold increases.  It was handled by the DRA

13     whether it was approved or not.  I couldn't do it

14     on my own unilater -- unilateral.

15          Q    So is it your testimony that for New

16     Castle at least after 2007, that this assessment

17     that's talked about in this sentence I read to you

18     was actually done for the New Castle customers?

19          A    As part of the SOP, I believe it was

20     done by the DRA, yes.

21          Q    Okay.  Your testimony is it was done for

22     New Castle customers.

23          A    For the -- yes, by the DRA.

24          Q    Okay.  Have you reviewed the Controlled

Page 163

1    Substances Monitoring Program that was -- that has

2    been in place since 2008, the various versions of

3    it?

4                 MR. COLLINS:  Objection.  Vague.

5                 THE WITNESS:  Yes.

6    BY MR. BOGLE:

7         Q    Have you read the SOPs itself?

8         A    Yes.

9         Q    Okay.  And you know starting in 2015 the

10   Controlled Substances Monitoring Program included

11   a specific section talking about red flags, right?

12        A    I don't recall that.  If you could show

13   me, I would be more inclined to remember.

14               Q    All right.

15               MR. BOGLE:  What number are we on?

16               MR. COLLINS:  11, I think.

17               (Snider Exhibit No. 11 was marked

18               for identification.)

19               MR. COLLINS:  Are you okay?

20               THE WITNESS:  Yeah.

21   BY MR. BOGLE:

22        Q    All right.  I'm handing you Exhibit 11,

23   which is also Exhibit 1.1146.  This is titled

24   "McKesson CSMP Red Flags, May 2015."

Highly Confidential - Subject to Further Confidentiality Review

Page 164

1           Do you recall ever seeing this portion

2    of the Controlled Substances Monitoring Program?

3           A     I do recall.

4           Q     You do?

5           A     Yes.

6           Q     Okay.  And I want to look at a couple of

7    aspects of this here.  Under that, it says:

8    "McKesson CSMP has identified certain,"

9    quote/unquote, "red flags that are indicators or

10   areas of possible concern regarding shipments of

11   controlled substances.  Additionally, the red

12   flags discussed herein are not intended to be all

13   inclusive as they can change over time depending

14   on a variety of factors, e.g., new regulations,

15   new drugs coming to market or advancements of

16   technology."

17          Do you see that?

18          A     Yes.

19          Q     In the second paragraph, the last

20   sentence, it says:  "Nevertheless, it is important

21   that when red flags are identified, they are

22   reviewed to ensure appropriate due diligence."

23          Do you see that?

24          A     Yes.

Page 165

1         Q     Okay.  And below that, it says:  "This

2    document is designed to separate red flags into

3    two categories.  The first section, apparent red

4    flags, list those that are readily identifiable."

5              Do you see that?

6         A     Yes.

7         Q     Okay.  I want to look at a couple of

8    those.  Section 1 says "Apparent red flags."  Do

9    you see that section?

10        A     Yes.

11        Q     It says:  "Below is a list of examples

12   of the more readily identifiable red flags.  These

13   do not require expertise or extensive analysis in

14   order to identify them."

15             Do you see where I read that?

16        A     Yes.

17        Q     Okay.  And if you go to page .3, this is

18   under the section "Responses in the customer

19   questionnaire," do you see letter M says:  "The

20   pharmacy's primary business model involves filling

21   prescriptions for or dispensing directly to pain

22   clinics."

23             Do you see that?

24        A     Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1        Q     Okay.  So that's identified as one of

2    the apparent red flags, right?

3        A     Yes.

4        Q     Okay.  And that's something, quite

5    frankly, that as we saw back in 2007, was already

6    identified as a red flag of something McKesson

7    should be concerned about, right?

8        A     Yes.  I believe it said internet

9    pharmacy on the Level I questionnaire.

10       Q     Okay.  I'm talking -- this talks about

11   pain clinics.  Do you see that, though?

12       A     Oh, yes.

13       Q     Okay.  And business with pain clinics

14   has long been identified as a potential red flag

15   at McKesson, right?

16              MR. COLLINS:  Objection.  Vague.  Form.

17              THE WITNESS:  At least that's down here,

18   yes.

19   BY MR. BOGLE:

20       Q     At least as 2007, the document we saw

21   that was sent by counsel for McKesson to the DEA

22   identified this as something that was going to be

23   investigated back in 2007, right?

24              MR. COLLINS:  Objection.  Assumes facts

Page 167

1    not in evidence.  The witness has no firsthand

2    knowledge of that letter, as we've already

3    established.

4                    THE WITNESS:  I don't have any knowledge

5    of that.

6    BY MR. BOGLE:

7        Q    Do you have any reason to think that the

8    primary business model involving filling

9    prescriptions for or dispensing directly to pain

10   clinics is a red flag that could not have been

11   identified prior to 2015?

12                   MR. COLLINS:  Objection.  The question

13   is compound, it's vague.

14                   THE WITNESS:  I have no reason to

15   believe.

16   BY MR. BOGLE:

17       Q    Okay.  Let's look at Q.  It says:  "The

18   pharmacy's business model centers on controlled

19   substances where the pharmacy is planning to

20   expand its controlled substance business."

21                   Do you see that?

22       A    Yes.

23       Q    That's a common sense red flag, right?

24   That makes logical sense.

Page 168

1            MR. COLLINS:  Objection.  Form.

2     Compound.

3            And I'm sorry, is that a question?

4            MR. BOGLE:  Yeah.

5     BY MR. BOGLE:

6        Q    Does that make common sense to you that

7     that would be a red flag?

8        A    That would be --

9            MR. COLLINS:  Objection.  Vague.

10           THE WITNESS:  That would be something I

11    would look at or the DRA would look at.

12    BY MR. BOGLE:

13       Q    Okay.  Because that's a potential red

14    flag, right?

15           MR. COLLINS:  Objection to form.

16    BY MR. BOGLE:

17       Q    Yes or no, sir?

18       A    Okay.  Yes.

19       Q    Section 2 -- I'm on page .4 now -- talks

20    about detailed red flags.  And under

21    "Nonstatistical red flags," the first is

22    geographic location.  Do you see that?

23       A    Yes.

24       Q    And it says under A there:  "The

Highly Confidential - Subject to Further Confidentiality Review

Page 169

1    pharmacy located in a geographic area known or

2    suspecting -- suspected of having higher than

3    normal prescription drug diversion or level of

4    prescribing.  This would include areas where

5    diversion schemes are known to be centrally

6    located."

7              Do you see that?

8        A    Yes.

9        Q    Do you think that makes sense as a

10   common sense red flag?

11             MR. COLLINS:  Objection.  Vague.  Form.

12             THE WITNESS:  It would make sense to me.

13   BY MR. BOGLE:

14       Q    Okay.  Let's go to under number 2.  Do

15   you see where it says "Pharmacy's business model"

16   on that page?

17       A    Yes.

18       Q    And then on the next page, continuing

19   that section, letter D says:  "There is a pain

20   clinic located inside of or is part of the

21   pharmacy."

22             Do you see that?

23       A    Yes.

24       Q    Do you think that's a common sense red

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1     flag?

2           A     It would be something to look at, yes.

3           Q     Okay.  Number 3 says:  "Governmental

4     information/inquiry."  Letter A says:

5     "Inquiry/subpoena by government agency regarding

6     customer."

7                 Do you see that?

8                 MR. COLLINS:  Objection.  Vague.

9     BY MR. BOGLE:

10          Q     Do you -- do you agree that's a common

11    sense red flag for McKesson?

12                MR. COLLINS:  Objection.  Vague as to

13    time frame.

14                THE WITNESS:  It's something to inquire,

15    I agree with that.

16    BY MR. BOGLE:

17          Q     And that's something if you got a

18    subpoena from a governmental agency regarding your

19    customer and their dispensing of opioids back in

20    2008, that would be a red flag too, right?

21                MR. COLLINS:  Objection.  Vague.  Form.

22                THE WITNESS:  If I -- if I got the

23    subpoena?

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 171

1        Q     Yeah.

2        A     Yes, that's something I would know and

3   look at.

4        Q     Okay.  Number 4 says:  "Integrity

5   concerns," and specifically under E, it says:

6   "Discipline of any pharmacy employee by a state

7   licensing authority or other regulatory agency

8   within the past 10 years."

9             Do you see that?

10       A     Yeah -- yes.

11       Q     And at all times that you've been

12  director of operations at New Castle, that would

13  be a common sense red flag to be investigated,

14  right?

15             MR. COLLINS:  Objection.  Form.

16             THE WITNESS:  I remember I didn't know

17  that until the internet searches, probably 2006 or

18  '7.

19  BY MR. BOGLE:

20       Q     Okay.  So starting in 2006, 2007, to you

21  going forward, that would be a common sense red

22  flag if you saw that, that needed investigating,

23  right?

24       A     Yes.

Page 172

1          Q     And then the last couple I want to do

2     here, and then we can take a -- a break if you

3     need to.

4                Number 5 on page .6, talks about other

5     distributors.  Do you see that?

6          A     Yes.

7          Q     And A, it says:  "Pharmacy purchases

8     controlled substances from other distributors."

9                Do you see that?

10         A     Yes.

11         Q     Okay.  Is that something that you would

12    investigate when evaluating a customer's opioid

13    purchases going back even to 2006 to present?

14                MR. COLLINS:  Objection.  Form.  Vague.

15                THE WITNESS:  I couldn't always

16    investigate, but it would be something I think

17    they ask on the questionnaire.  And then later on,

18    now we have software that's involved that we

19    can -- I think the DEA has provided that, that we

20    can see all of the wholesaler purchases.  So the

21    DRA can take a look at that.  I'm not privy to

22    that, but the DRAs know that information.

23    BY MR. BOGLE:

24         Q     But that's the sort of information that

Page 173

1    would be useful to know, especially when trying to

2    decide whether to increase the threshold for

3    opioids, right?

4              MR. COLLINS:  Objection to the form.

5    The question is vague, incomplete.

6              THE WITNESS:  Okay.  I'm sorry, can you

7    repeat the --

8    BY MR. BOGLE:

9         Q    Sure.

10             Whether the pharmacy purchases from

11   multiple distributors would at all times be

12   something that would be important for McKesson to

13   know when considering whether to increase a

14   threshold for opioids, for example?

15             MR. COLLINS:  Objection to the form, the

16   use of --

17   BY MR. BOGLE:

18        Q    Do they buy opioids from another

19   distributor?

20             MR. COLLINS:  Objection to the question

21   to the extent it references "at all times."

22             THE WITNESS:  I would like to know that.

23   BY MR. BOGLE:

24        Q    All right.  B says:  "Other distributors

Page 174

```
1    have restricted or ceased selling controls to the

2    customer or potential customer in the past five

3    years."

4              Do you see that?

5    A    Yes.

6         Q    And again, from the period of time that

7    you started as director of operations in 2000 to

8    present, that's something you think is reasonable

9    for McKesson to want to know, right?

10             MR. COLLINS:  Objection to the form,

11   compound, calls for a legal conclusion.

12             THE WITNESS:  I'd like to know why.

13   BY MR. BOGLE:

14        Q    Okay.  But you can't know why unless you

15   know if, right?

16             MR. COLLINS:  Objection.  The question

17   is vague.

18             THE WITNESS:  That's vague to me.  Can

19   you restate that, please?

20   BY MR. BOGLE:

21        Q    Yeah.  You can't ask why if you don't

22   know whether it's happened, right?

23             MR. COLLINS:  Same objection.

24             THE WITNESS:  Okay.  I'm not sure --
```

Page 175

 1    BY MR. BOGLE:

 2         Q    Do you agree with that premise?

 3              MR. COLLINS:  The question doesn't make

 4    any sense.  Objection to form.

 5    BY MR. BOGLE:

 6         Q    You can't ask why another distributor

 7    cut off or restricted or ceased selling controls

 8    to a customer unless you've asked whether that

 9    actually has occurred, right?

10         A    Yes.

11         Q    Okay.  And then the last one under

12    "Statistical red flags," under A, and this is what

13    we looked at a minute ago, it says:  "A customer's

14    control/Rx ratio, when compared to similar

15    customers serviced by the same distribution

16    center seems unusually high.  As a benchmark, DEA

17    has previously stated that an average retailer

18    pharmacy's controls/prescription ratio is

19    approximately 20 to 25 percent."

20              Do you see that?

21         A    Yes.

22         Q    I think you said earlier that's not a

23    concept that you were familiar with before today,

24    right?

Page 176

```
1              MR. COLLINS:  Objection.  Form.
2              THE WITNESS:  I don't remember
3    testifying to that.
4    BY MR. BOGLE:
5         Q    Okay.  We looked at the DEA document
6    where they provided these kind of averages.
7              MR. COLLINS:  Objection.  Lack of
8    foundation.
9              THE WITNESS:  I'm not sure that I
10   testified to that.
11   BY MR. BOGLE:
12        Q    Okay.  Well, is this something you're
13   familiar with prior to today?
14        A    Yes.
15        Q    Okay.  And do you agree that that's a
16   reasonable red flag that requires further due
17   diligence?
18             MR. COLLINS:  Objection.  The question
19   is vague as to time frame.
20             THE WITNESS:  Yes.  I agree that when
21   that data became available, that that was a part
22   of the due diligence.
23   BY MR. BOGLE:
24        Q    Well, it's always been available.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 177

1      McKesson just never asked for it until the last

2      few years, right?

3                  MR. COLLINS:  Objection.

4      Mischaracterization.

5                  THE WITNESS:  I don't agree with that.

6      BY MR. BOGLE:

7          Q     Okay.  So are you saying McKesson was

8      unable to, say, for example, in 2009, ask for the

9      complete dispensing data from a -- from a customer

10     and then run the numbers?

11         A     I don't know that.

12         Q     Okay.  Have you ever asked a customer

13     for complete dispensing data so an analysis could

14     be done as to how much of those purchases were

15     controlled substances?

16         A     Between what years, please?

17         Q     2008 to 2013.

18         A     Have I?

19         Q     Sure.

20         A     No.  That's usually the DRA.

21         Q     Have you ever seen a DRA do it during

22     that five-year time frame for a New Castle

23     customer?

24         A     What five years?

Page 178

1          Q    2008 to 2013.

2          A    Yes.

3          Q    You've seen them do this specific

4     analysis?

5          A    Yes.

6          Q    Okay.  So you know it can be done.

7          A    Yes.

8          Q    Okay.  And it's a reasonable analysis to

9     conduct, right?

10              MR. COLLINS:  Objection.  Vague, form.

11              THE WITNESS:  If you can, I think it

12     would be a good idea.

13              MR. BOGLE:  Yeah.  Let me look real

14     quick.  I think -- yeah.  We can take a break now

15     is good.

16              MR. COLLINS:  Yep.

17              THE VIDEOGRAPHER:  The time is

18     11:14 a.m.  We're going off the record.

19              (Recess.)

20              THE VIDEOGRAPHER:  The time is 11:29

21     a.m., and we're back on the record.

22     BY MR. BOGLE:

23          Q    All right.  Mr. Snider, the -- your New

24     Castle Distribution Center is in -- located in

Highly Confidential - Subject to Further Confidentiality Review

Page 179

1    Pennsylvania, right?

2         A    Yes.

3         Q    Okay.  But you guys service customers

4    outside of the state of Pennsylvania, correct?

5         A    Yeah -- oh, yes.

6         Q    For example, you service customers in

7    Ohio, right?

8         A    Yes.

9         Q    You service customers in West Virginia,

10   right?

11        A    Yes.

12        Q    Okay.  And we talked a little bit about

13   the opioid epidemic earlier in your deposition,

14   but you understand that West Virginia is one of

15   the states that's been hit hardest by the opioid

16   epidemic, right?

17        A    Yes.

18        Q    And In fact, there have been

19   congressional investigations into McKesson's

20   conduct specific to pharmacies supplied in West

21   Virginia.

22             Do you understand that?

23             MR. COLLINS:  Objection.  Form.

24             THE WITNESS:  I don't know that.  I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 180

1     sorry.

2     BY MR. BOGLE:

3          Q    Okay.  You've never been told that?

4          A    No.

5          Q    Okay.

6               (Snider Exhibit No. 12 was marked

7               for identification.)

8     BY MR. BOGLE:

9          Q    I'm going to hand you 1.44, Exhibit 12

10    to your deposition.

11              Okay.  This is noted at the top to be

12    from the House of Representatives, Congress of the

13    United States, February 15, 2008.  Do you see

14    that?

15         A    Yes.

16         Q    Okay.  And it's a letter sent to

17    Mr. John Hammergren.  That's the CEO of McKesson,

18    right?

19              MR. COLLINS:  Objection.  Lack of

20    foundation.

21              THE WITNESS:  Yes.

22    BY MR. BOGLE:

23         Q    Do you see where it's -- he's noted to

24    be the recipient, "Dear Mr. Hammergren"?

Page 181

1          A     I would think he got it.

2                MR. COLLINS:  Objection.

3     BY MR. BOGLE:

4          Q    Do you see that this was designed to be

5     sent to him, right?

6                MR. COLLINS:  Objection.  The witness

7     has no firsthand knowledge.

8                THE WITNESS:  I don't know anything

9     about this document, so I can't answer to that.

10    BY MR. BOGLE:

11         Q    All right.  But you see it says, "Dear

12    Mr. Hammergren," right?  Do you see that on the

13    first page?

14         A    Yeah, I see that.

15         Q    You see that?

16         A    Yeah.

17         Q    Okay.  And so if you look at the first

18    page of this document, it says in the second

19    paragraph, "As part of our investigation."  Do you

20    see that?

21         A    Yes.

22         Q    It says:  "As part of our investigation,

23    the Committee wrote to you on May 8, 2017,

24    regarding your distribution practices generally,

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    and in particular with respect to West Virginia.

2    As we mentioned in the letter, the opioid epidemic

3    has been particularly devastating to West

4    Virginia.  For example, in 2015, West Virginia had

5    the highest opioid overdose death rate in the

6    nation."

7            And then it goes on, the last sentence

8    in that paragraph says:  "Court filings also

9    indicate that between 2007 and 2012, McKesson

10   distributed 46,179,600 doses of hydrocodone and

11   54,304,980 doses of oxycodone, meaning that

12   McKesson shipped a total of 100,484,580 doses to

13   West Virginia during this time period."

14           Have you ever seen that kind of data

15   talking about the number of hydrocodone and

16   oxycodone pills McKesson distributed to West

17   Virginia during this time frame?

18       A    No, I haven't.

19       Q    Okay.  You know that a fair amount of

20   those pills that are being referenced here came

21   from your distribution center, right?

22           MR. COLLINS:  Objection.  Lack of

23   foundation.  Lack of firsthand knowledge.

24           THE WITNESS:  I don't know that.

Page 183

1    BY MR. BOGLE:

2          Q    Okay.  Well, you know from 2007 to 2012

3    that -- that the New Castle Distribution Center

4    was sending hydrocodone and oxycodone to

5    pharmacies in West Virginia, right?

6          A    Yes.

7          Q    Okay.  So, therefore, you must present

8    some of this number coming from New Castle, right?

9               MR. COLLINS:  Objection.  The question

10   is vague.

11              THE WITNESS:  If I could answer that,

12   the DEA has done audits on us.  We've never been

13   found to do anything wrong.  New Castle has an

14   exemplary record.

15              MR. BOGLE:  Move to strike as

16   nonresponsive.

17   BY MR. BOGLE:

18         Q    My question simply was, of these 100

19   million plus doses referenced here, you know that

20   a portion of those came from your distribution

21   center --

22              MR. COLLINS:  Objection.

23   BY MR. BOGLE:

24         Q    -- during this time frame, correct?

Page 184

1              MR. COLLINS:  The question was asked and

2     answered last -- a moment ago.

3     BY MR. BOGLE:

4          Q    Correct?

5              MR. COLLINS:  Same -- same objection.

6     Asked and answered.

7              THE WITNESS:  A -- a portion probably

8     did.

9     BY MR. BOGLE:

10         Q    Well, you know they did, right?  From

11    2007 to 2012, you know that the New Castle

12    Distribution Center was servicing West Virginia

13    pharmacies, right?  So it has to be part of this

14    number, true?

15             MR. COLLINS:  Objection.

16    BY MR. BOGLE:

17         Q    You know that.

18             MR. COLLINS:  Objection.  The question

19    is compound three different ways.  It's

20    argumentative.  It's been asked and answered.

21    BY MR. BOGLE:

22         Q    You know that, don't you?

23             MR. COLLINS:  Objection.  Form.

24             THE WITNESS:  I've never seen this

Page 185

```
1    document.  And we do have customers in West

2    Virginia.

3    BY MR. BOGLE:

4         Q    Okay.  But you know that -- okay.  I

5    think the document speaks for itself.

6              Now, specifically in West Virginia,

7    Mace's is one of the pharmacies that New Castle

8    has serviced over time, right?

9         A    I believe so.

10        Q    Okay.  You recall we saw Mace's Pharmacy

11   referenced in that 2007 chart which indicated them

12   exceeding their thresholds in opioids in November

13   2007.  Do you recall discussing that?

14             MR. COLLINS:  Objection.

15   Mischaracterization, lack of foundation, lack of

16   knowledge.

17             THE WITNESS:  I do recall seeing the

18   document.  I believe Mace's was on it.

19   BY MR. BOGLE:

20        Q    Okay.  Now, at your distribution center

21   for the conduct that occurred prior to McKesson

22   switching over to SharePoint, you actually have

23   hard copy files for many of the pharmacies that

24   you serviced, right?
```

Page 186

1            MR. COLLINS:  Objection.  The question

2     is vague.  In multiple ways it's vague.

3            THE WITNESS:  We have Level I visits

4     documented.  I believe I sent that data in.

5     BY MR. BOGLE:

6         Q    As well as threshold request increases

7     prior to you guys going to SharePoint, right?

8         A    Yes.

9         Q    Okay.  In addition, you've got any

10    documentation that was sent to you by the pharmacy

11    to review the Level Is or threshold request

12    increases during that time frame, right?

13           MR. COLLINS:  Objection.  The question

14    is vague.

15           THE WITNESS:  I don't know that.

16    BY MR. BOGLE:

17        Q    Okay.  Well, you keep -- you tried to

18    keep a complete file during that time frame,

19    right?

20           MR. COLLINS:  Objection.  The question

21    is vague.

22           THE WITNESS:  What's complete?

23    BY MR. BOGLE:

24        Q    You tell me.

Highly Confidential - Subject to Further Confidentiality Review

Page 187

1            MR. COLLINS:  Wait a second.

2     BY MR. BOGLE:

3        Q    You try to keep everything that a

4     customer gives you to support any threshold

5     increase that you would have approved, right?

6            MR. COLLINS:  Same objection.  The

7     question is vague as to time frame.  Are you

8     talking about present possession of documents?

9            THE WITNESS:  E-mails or phone calls, I

10     couldn't -- I couldn't tell you.

11     BY MR. BOGLE:

12        Q    Okay.  But we can agree that from the

13     time period when the CSMP was implemented in 2008

14     until you guys went to SharePoint, which I believe

15     was sometime in 2010, during that two or so year

16     window, there's hard copy files kept of due

17     diligence related documents at New Castle for your

18     customers, right?

19            MR. COLLINS:  Objection.  Assumes facts

20     not in evidence.

21            THE WITNESS:  I don't have those files

22     anymore, no.

23     BY MR. BOGLE:

24        Q    You turned them over for this

Highly Confidential - Subject to Further Confidentiality Review

Page 188

1    litigation, though, didn't you?

2         A    Yes.

3         Q    Okay.  All right.  I'm going to hand

4    you -- marking as Exhibit 13, also Exhibit 1.1824.

5              (Snider Exhibit No. 13 was marked

6              for identification.)

7    BY MR. BOGLE:

8         Q    Okay.  And you see this is a document;

9    the first page entitled "Mace's Pharmacy"; do you

10   see that?

11        A    Yes.

12        Q    Okay.  Thereafter, this is all provided

13   to us as one document.

14             Does this look like your file from

15   Mace's Pharmacy for 2008 to 2010?

16             MR. COLLINS:  Objection.

17             THE WITNESS:  I don't know all of it.

18   BY MR. BOGLE:

19        Q    You don't -- excuse me?

20        A    I don't know all of it.  I haven't seen

21   it yet.

22        Q    Okay.  Let's take a look at it.

23        A    I'd have to go through them.

24        Q    Okay.  Let's take a look at it.  First

Highly Confidential - Subject to Further Confidentiality Review

Page 189

1    of all, if you go to page .11, do you see there's

2    a pharmacy questionnaire there dated June 4, '07?

3    Do you see that?

4         A    Yes.

5         Q    Okay.  And you see you actually signed

6    off on this questionnaire.  You're the third

7    signature down --

8              MR. COLLINS:  Objection.

9    BY MR. BOGLE:

10        Q    -- right?

11             MR. COLLINS:  Objection to the term

12   "signed off."

13   BY MR. BOGLE:

14        Q    Is that your signature, "Blaine Snider,

15   DO"?

16        A    Yes.

17        Q    Okay.  So this is obviously something

18   you've seen before, right, this questionnaire for

19   this pharmacy?

20        A    Yes.

21        Q    Okay.  And if you go to the next

22   page .12, number 8 on the questionnaire asks:

23   "How many prescriptions for the following products

24   does the pharmacy fill on a daily basis?"

Page 190

1            And the information conveyed for

2    hydrocodone was 15 and oxycodone .41, and then

3    it's noted, "Less than half a person, OxyContin

4    only."

5            Do you see those two?

6        A    Yes.

7        Q    Okay.  And you recall that pretty

8    quickly after this questionnaire was completed in

9    June 2007, you specifically had concerns about

10   whether Mace's was diverting opioids, correct?

11       A    I don't remember.

12       Q    Okay.  Well, let's take a like at

13   page .49 in this document.

14            I'm looking at the e-mail on the bottom

15   of this page that carries over to the next page.

16   It's from you, October 9, 2007, to a Jim

17   Gavatorta, cc Brian Ferreira.

18            Do you see that?

19       A    Yes.

20       Q    Entitled "Mace's Hydrocodone."

21       A    Yes.

22       Q    Okay.  And who is -- who is Jim

23   Gavatorta?  What did he do?

24       A    He was the executive salesperson.

Page 191

1          Q     Okay.  And Brian Ferreira, I think you

2     said was vice president/general manager?

3          A     Yes.

4          Q     What sort of oversight did Brian

5     Ferreira provide for you?

6          A     He was in charge of the distribution

7     center over all the operations, my boss, and Jim

8     reported to him directly.

9          Q     Reported to him, you said?

10         A     Yeah.

11         Q     Okay.  All right.  Let's go to the next

12    page for the substance of the e-mail.

13               You say:  "Jim, let me know re Mace's.

14    Could be a good candidate for a Level II,"

15    question mark.  "They, 868673, had 10,764 doses of

16    hydrocodone in July.  In August it was 27,716,

17    possibly due to duplicate T&T orders.  The account

18    still had 26,464 doses in September.  Can you look

19    into?  This customer and Town & Country are the

20    only two retail accounts that have over 20,000

21    doses in any of the lifestyle drugs this month."

22               Do you see that?

23         A     Yes.

24         Q     Okay.  And Mace's was a -- is a pharmacy

Page 192

1    in West Virginia, right, just so we're clear?

2         A    Yes.

3         Q    Okay.  And what ended up happening

4    thereafter is another visit and another

5    questionnaire was completed in December 2007

6    related to Mace's, right?

7              MR. COLLINS:  Objection.  Lack of

8    foundation.

9    BY MR. BOGLE:

10        Q    To investigate your concerns here.

11             MR. COLLINS:  Objection.  Lack of

12   foundation.

13             THE WITNESS:  I'm sorry, I'd have to

14   look through it.

15   BY MR. BOGLE:

16        Q    Okay.

17        A    You want me to do that?

18        Q    We're going to go there.  I'm just

19   asking your recollection first.

20             But, actually, before we go there, this

21   e-mail was sent October 9, 2007, and references

22   purchases from July, August, and September of 2007

23   for hydrocodone, right?

24             MR. COLLINS:  Objection.  Form.

Page 193

1    BY MR. BOGLE:

2         Q    That's what you say.

3         A    Yeah, as part of the Level I to get a

4    three-month purchase report.

5         Q    Right.  And so at this point in time, we

6    can see that for July, August and September of

7    2007, Mace's did end up actually filling more than

8    8,000 doses for hydrocodone, right, based on your

9    e-mail here?

10        A    Okay.  (Peruses document.)

11             I see August, September.  I'm not sure

12   of July, but --

13        Q    July says 10,764 doses.

14        A    Okay.

15        Q    That's your first or your second --

16        A    Oh, yeah, I see that now.  Yep.

17        Q    Okay.  So we can agree at least for

18   those three months in 2007, per your e-mail,

19   you're saying they got more than 8,000 doses of

20   hydrocodone in those months, right?

21        A    I would say yes.

22        Q    Okay.  Let's look at --

23        A    Now, I just want to make clear that

24   trade and travel order, or the T&T, that could be

Page 194

1    a duplicate that they returned.  You don't know

2    the credit.  It's not in here either.

3         Q    But we do know that you don't raise that

4    concern for September, right, in your e-mail?

5    That was only as to August.

6         A    Right.  Right.

7         Q    Okay.  So let's go to the -- the

8    pharmacy questionnaire from December 2007, which

9    is page .60.

10              And you see here there's "Mace's

11   Pharmacy, December 10, 2007, Pharmacy

12   Questionnaire."  Do you see that?

13        A    Yes.

14        Q    And again, your signature appears on

15   this page, right?

16        A    Yes.

17        Q    If we go to the next page, page .61, it

18   says in number 8, which is the same question you

19   asked a few months earlier of them:  "How many

20   prescriptions for the following products does the

21   pharmacy fill on a daily basis?"

22              Do you see here they've said, 475

23   prescriptions for hydrocodone; 103 for oxycodone?

24              Right?

Highly Confidential - Subject to Further Confidentiality Review

Page 195

1          A     Yes.

2              Q     That's what the form indicates.

3          A     Yes.

4              Q     Which is, you would agree with me, a

5     huge increase from what they told you four months

6     earlier in June 2007, right?

7                    MR. COLLINS:  Objection to the form.

8                    THE WITNESS:  I wouldn't agree that it's

9     a huge increase unless I knew what kind of

10    business they gained.

11    BY MR. BOGLE:

12             Q     Okay.  But we can agree that in

13    June 2007, on page .12, they tell you 15

14    prescriptions of hydrocodone a day and .41 for

15    oxycodone.  Right?

16         A     Yes, as I recall.

17             Q     And October the same year, that number

18    has risen to 475 a day for hydrocodone and 103 a

19    day for oxycodone, right?  We can agree those are

20    the numbers.

21         A     Yes.

22             Q     All right.  Did you investigate what was

23    causing that increase?

24         A     I don't remember.

Page 196

1          Q     Okay.

2          A     Yes, it looks like I sent it -- just

3     from what the documents show, that we did a

4     Level I, a Level II, and then sent that up to the

5     DRA for review, and they took it from there.

6          Q     Okay.  My question is, in 2007, did you

7     personally investigate what was causing such a

8     significant increase over a four-month period of

9     time in hydrocodone and oxycodone prescriptions?

10               MR. COLLINS:  Objection.  Asked and

11     answered.

12               THE WITNESS:  I don't remember.

13     BY MR. BOGLE:

14          Q     Okay.  And if you do the math, for

15     example, on hydrocodone, at 475 prescriptions a

16     day with an average of 30 pills a prescription, an

17     average of 30 days, that's actually 427,500 doses

18     a month.

19               Do you want to do the math on that?

20          A     No, I don't.

21          Q     Okay.  So if you guys are giving them

22     20,000 or so doses a month based on your prior

23     e-mail, how do you explain how they're prescribing

24     this much?

Page 197

1          A     I would have to go through the due

2     diligence that was done here.

3          Q     Okay.

4          A     As you can see, there's quite a bit of

5     documentation on this that we did for that.  I

6     don't recall everything, but I'm sure --

7          Q     Wouldn't that raise a red flag --

8               MR. COLLINS:  I'm sorry.

9     BY MR. BOGLE:

10         Q     -- that they're using other

11    distributors?

12              MR. COLLINS:  I'm sorry.  Please let the

13    witness finish his answer before you cut him off.

14    I've let you do that a couple of times.  I'm going

15    to insist the witness answer.

16              Finish your answer.

17    BY MR. BOGLE:

18         Q     Go ahead.

19         A     I sent this up to the DRA for review.

20    You can tell that.  So I don't know what their

21    result was.  I don't know if we cut them off or --

22    or what right now.  I would have to go through

23    this.

24         Q     Would that math indicate to you a

Page 198

1    potential red flag that they're using more

2    distributors than just McKesson for hydrocodone

3    and oxycodone?

4                    MR. COLLINS:  Objection.  Form.

5                    THE WITNESS:  The increase would cause

6    concern that I would push it up to the DRA.

7    BY MR. BOGLE:

8        Q    Okay.  Now, Mace's -- let's take a look

9    at -- find the spot here -- the threshold change

10   request that was submitted December 16th, 2008,

11   which is .63 in this document.

12                   MR. COLLINS:  Any time you want to

13   review the document, go ahead.

14                   THE WITNESS:  Okay.

15   BY MR. BOGLE:

16       Q    Okay.  You see here this is a threshold

17   change form for Mace's Pharmacy in -- hope I'm

18   pronouncing this correctly -- Philippi, West

19   Virginia.

20                   Do you see that?

21       A    Yes.

22       Q    Do you know about how many people live

23   in Philippi, West Virginia?

24       A    I don't.

Page 199

1          Q    Is that something you guys would look at

2     back in 2008 when evaluating a request like this?

3          A    I can't --

4               MR. COLLINS:  Object -- objection to the

5     term we -- "you would look at."

6     BY MR. BOGLE:

7          Q    Would you?

8          A    No, I don't know.

9          Q    Okay.

10         A    I can't speculate on that.

11         Q    Okay.  So if, for example, the city of

12    Philippi, West Virginia, had fewer than 3,000

13    people in it around this time frame, would that

14    raise concerns to you about how much hydrocodone

15    you're giving this company -- this pharmacy?

16              MR. COLLINS:  Objection.  Assumes facts

17    not in evidence, lack of foundation.

18              MR. BOGLE:  Let's put it into evidence.

19    Exhibit 14, 1.1892.

20              (Snider Exhibit No. 14 was marked

21              for identification.)

22    BY MR. BOGLE:

23         Q    Here is the Census Bureau data for

24    Philippi, West Virginia, from 2010.  Do you see

Page 200

1    there's a total population there noted to be 2,966

2    people in 2010?

3              MR. COLLINS:  Objection.  Lack of

4    foundation.  You haven't established this witness

5    has any knowledge of this.

6              MR. BOGLE:  I think that's the problem.

7    BY MR. BOGLE:

8         Q    Do you not -- did you not know that?

9         A    I did not --

10             MR. COLLINS:  Object --

11             THE WITNESS:  Sorry.

12             MR. COLLINS:  I'm sorry.  Please let me

13   object.

14             Argumentative.  Object to the theatrics.

15             THE WITNESS:  I did not know there were

16   2,966 people in the Philippi -- is that the whole

17   area or is that just the town?

18   BY MR. BOGLE:

19        Q    It's the city.

20        A    Okay.

21        Q    You didn't know that.

22        A    No.

23        Q    Okay.  Let's go back and look at the

24   threshold change form request from December 16,

Highly Confidential - Subject to Further Confidentiality Review

Page 201

1    '08, for Mace's.

2              Do you see here they're requesting to

3    increase their amount 20 percent for hydrocodone,

4    and their current threshold is set at 34,000 doses

5    a month?  Do you see that?

6        A    Yes.

7        Q    Okay.  And the reason for change that's

8    given here, it says:  "Threshold is set too low

9    for this customer.  Their monthly purchases are

10   400,000 a month.  We need to increase the

11   hydrocodone family amount by 6800 units."

12             Do you see that?

13       A    Yes.

14       Q    There's no other reason given here for

15   this increase, is there?

16       A    No.

17       Q    Okay.  And you, in fact, signed off on

18   this increase, right, under "Approved by DCM

19   Blaine Snider, 12/16/08."  That's your signature,

20   right?

21             MR. COLLINS:  Objection.  The question

22   is compound.  I object to the term "signed off."

23   We've gone over and over this again.

24   Mischaracterization of his prior testimony.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

```
 1              MR. BOGLE:  Yeah, I'm sorry.  I'll --
 2    I'll withdraw the question.
 3    BY MR. BOGLE:
 4         Q    Do you see where it says "Approved by"
 5    on that form?
 6         A    Yes.
 7         Q    Okay.  Who's that below that that's
 8    noted?
 9         A    Michael Oriente.  He's the director of
10    Regulatory Affairs.
11         Q    You skipped your signature, didn't you?
12         A    Oh, I thought you meant who was below my
13    name.  I apologize.
14         Q    Your name is there right below "Approved
15    by," isn't it?
16         A    Yep.
17         Q    Okay.  That's your signature, true?
18         A    To go up to the DRAs, that was the
19    process.
20         Q    That's your signature, true?
21              MR. COLLINS:  Please let the witness
22    finish his answer.
23              THE WITNESS:  It's true it was to go up
24    to the DRA.  Also there's attachments in here.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 203

1      You don't know what that was.

2      BY MR. BOGLE:

3          Q    Oh, I looked at them.  I've looked at

4      them.

5          A    Okay.

6          Q    So what's noted here is that you

7      approved these to go -- as you say, to go to

8      Mr. Oriente, right?

9          A    Yes, the --

10         Q    You didn't raise any concerns that this

11     wasn't appropriate, did you?

12             MR. COLLINS:  Objection.  Argumentative.

13             THE WITNESS:  I'm sure I talked to him.

14     BY MR. BOGLE:

15         Q    Did -- ultimately you put your signature

16     on this line under "Approved by," right?

17         A    Yes.

18         Q    Not disagrees with.  "Approved by,"

19     right?

20         A    Yes.

21         Q    Okay.  So after these concerns are

22     raised by you in 2007, and the subsequent

23     questionnaire was completed in December 2007 that

24     shows a huge spike in hydrocodone and oxycodone

Highly Confidential - Subject to Further Confidentiality Review

Page 204

1    prescriptions being written, you guys -- you and

2    Mr. Oriente actually approve an additional

3    threshold increase for hydrocodone; is that right?

4            MR. COLLINS:  Objection.

5    Mischaracterization, assumes facts not in

6    evidence.

7            You're testifying to that.  He has no --

8    he said he has no knowledge of this, and he needs

9    to look at the documents.  So --

10   BY MR. BOGLE:

11       Q    Take a look at it.  You see your

12   signature?

13           MR. COLLINS:  You don't have all the

14   documents here, he just pointed out.

15   BY MR. BOGLE:

16       Q    This is the whole file.

17       A    I keep trying to tell you my signature

18   represents that it went to Michael Oriente, who

19   was the director of Regulatory Affairs, who could

20   look at all the data, make a judgment.  Also he

21   could call the customer or he could check with the

22   federal regs or the State Board of Pharmacy.

23       Q    But I believe you told me earlier you

24   wouldn't put your signature on something approving

Page 205

1    a threshold increase request if you thought it was

2    inappropriate, right?

3         A    If I knew it was inappropriate, I

4    wouldn't put it on there.

5         Q    Right.  Let's go to page .66 on this

6    document.

7              See this is another threshold change

8    form from January 28, '09, for Mace's, and this

9    pertains to their thresholds for oxycodone, right?

10        A    Yes.

11        Q    Okay.  And you see the current threshold

12   is noted to be 13,000 at this point in time,

13   right?

14        A    I'm sorry.  Yes.

15        Q    Okay.  And there's an increase approved

16   here to increase their oxycodone threshold by

17   20 percent, right?

18        A    I'm sorry, I'm not seeing the 20.

19        Q    See where it says "Increase amount,

20   20 percent"?

21        A    Oh, yes.

22        Q    Okay.  And then for reason for change,

23   it says:  "Threshold is set too low for this

24   customer.  Their monthly purchases are 400,000 a

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    month.  We need to increase the oxycodone family

2    amount by 2500 units."

3            Right, that's the reason given on this

4    form?

5        A    Yes.

6        Q    Okay.  And then there's a different

7    signature on this.  It says "BPM," and then

8    there's some -- a signature after that.  Do you

9    know who that is?

10       A    Yes.  Dale Nusser.

11       Q    I'm sorry?

12       A    Dale Nusser, my -- one of my managers.

13       Q    Okay.  So Dale Nusser worked underneath

14   you at your direction, right?

15       A    Yes.

16       Q    Okay.  And this indicates it was also

17   approved by Michael Oriente in Regulatory, right?

18       A    Oh, yes.

19       Q    Okay.  All right.  Let's go to page .80.

20           You see here this is another threshold

21   change form, December 30, 2009, for Mace's.  Do

22   you see that?

23       A    Yes.

24       Q    Okay.  And at this point 9143 is the

Highly Confidential - Subject to Further Confidentiality Review

Page 207

1    code.  That's for oxycodone, correct?

2         A    I don't remember.  I'm sorry.

3         Q    Okay.  It says -- well, first of all,

4    you see that under "Reason for requested change,"

5    it says:  "Tom Dadisman, pharmacist, has requested

6    an increase of 10 percent on oxycodone due to

7    increased number of prescriptions received per

8    category from local doctors who are changing

9    patients from morphine-based items to oxycodone-

10   based items."

11              Do you see that?

12        A    Yes.

13        Q    Okay.  So this would indicate that this

14   is related to oxycodone based on the --

15        A    Yes.

16        Q    -- request, right?  Okay.

17              And that's the only information

18   supporting this request that's located here,

19   right?

20              MR. COLLINS:  Objection.  Form.

21              THE WITNESS:  That I can see, yes.

22   BY MR. BOGLE:

23        Q    Okay.  And if you see anything else,

24   please let me know.

Highly Confidential - Subject to Further Confidentiality Review

Page 208

1          A      Okay.

2          Q      This is noted to be a permanent change,

3      right?

4          A      Yes.

5          Q      Increasing their threshold from 17,600

6      doses a month by 10 percent, right?

7          A      Yes.

8          Q      Okay.  Submitted by you, right?  That's

9      your signature.  Right?

10          A      Yes.

11          Q      Okay.  And also John Kuczynski of sales

12      and approved by Michael Oriente, right?

13          A      Yes.

14          Q      Okay.  Do you see any evidence from

15      around this time frame in December 2009 in this

16      file that you actually got any prescription data

17      to support this?

18          A      I don't know.  I'd have to go through

19      it.

20          Q      Yeah.

21                 MR. BOGLE:  Let's go off the record.

22      You can go through it.

23                 MR. COLLINS:  No, no, we're going to

24      stay on the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 209

1          MR. BOGLE:  We don't need to stay on the

2     record.  If he wants time to look at it, he can,

3     but don't stay on the record.  There's no such

4     requirement.

5          MR. COLLINS:  Well, listen, to go off

6     the record, you need an agreement.  So if you want

7     to have him start leafing through documents, we're

8     staying on the record.

9          MR. BOGLE:  Okay.  That's fine.  We'll

10    do that.

11    BY MR. BOGLE:

12         Q    You can't point me to anything that

13    shows that you requested any prescription data,

14    can you?

15         MR. COLLINS:  He just asked to go

16    through documents.  You want him to go through

17    documents --

18         MR. BOGLE:  He's not going to blow

19    through hours of my time looking at something that

20    he should already be familiar with.

21         MR. COLLINS:  Well, no, he -- this isn't

22    a 30(b)(6) deposition.

23         MR. BOGLE:  Doesn't have to be.

24         MR. COLLINS:  This is in his personal

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    capacity.  So, listen, if you want him to look

2    through documents, he will do it for you, but it's

3    on your time.

4              Take as much time as you want.

5              THE WITNESS:  (Peruses document.)

6    BY MR. BOGLE:

7         Q    We're in December 2009.

8         A    (Peruses document.)

9              On the questionnaire on page .13, Dale

10   reviewed the scripts.

11        Q    .13?

12        A    Yes.

13        Q    So that's from June 2007, right?

14        A    Yes.

15        Q    Okay.  We're talking about December

16   2009.

17        A    Oh.

18        Q    And a specific increase that they're

19   saying -- in request in December 2009.

20        A    (Peruses document.)

21        Q    All right.  I've got too many documents

22   to go through.  I'll strike the question and keep

23   going.

24              Let's look at page .84.

Highly Confidential - Subject to Further Confidentiality Review

Page 211

1            You see there's another threshold change

2    request.  This looks like it's done through

3    SharePoint, 10/28/2010 for oxycodone.  Do you see

4    that?

5        A    Yeah, I'm not familiar with these.  I

6    don't get these copies like this.  This is for the

7    director of Regulatory Affairs.  It says

8    "Pharmacy Regulatory Affairs."

9        Q    You guys keep these files in your

10    distribution center, though, don't you?

11        A    I do not.

12        Q    You don't?

13        A    I do not.

14        Q    Okay.  That's where it's been

15    represented this came from, but okay.

16        A    It's -- it's on SharePoint.

17        Q    Okay.  So supporting information, it

18    says:  "Competitor down the street does not order

19    controls, which elevates their business."

20            And the request is for a permanent

21    increase due to business growth of 600 doses for

22    oxycodone for Mace's.  Do you see that?

23        A    Yes.

24        Q    Okay.  And it shows that, on the next

Highly Confidential - Subject to Further Confidentiality Review

Page 212

1    page, that request was approved by Dale Nusser,

2    who I think you indicated works for you, and

3    Michael Oriente.  Do you see that?

4         A    I see it was approved by Michael

5    Oriente, the director of Regulatory Affairs, and

6    the change was made.

7         Q    Do you see it says "Dale Nusser,

8    approved 10/28/2010" right above that?

9         A    By approved, Dale was one of my

10   managers.  He sent it up to the director of

11   Regulatory Affairs so he could run the scripts and

12   the numbers.

13        Q    So he sent it up there 10/28/2010 at

14   3:19 p.m.  Three minutes later it was approved by

15   Mr. Oriente.  That's what this indicates?

16             MR. COLLINS:  Objection.  Lack of

17   foundation.  Lack of witness's knowledge.

18             THE WITNESS:  I -- it may indicate phone

19   calls, conversations and data, especially the

20   script data.

21   BY MR. BOGLE:

22        Q    What this document says is:  "DC

23   approval date, Dale Nusser, 10/28/2010, 3:19,"

24   right?  That's what the document says.

Highly Confidential - Subject to Further Confidentiality Review

Page 213

1          A      That's what it says.

2                 MR. COLLINS:  Objection.

3     BY MR. BOGLE:

4          Q      Okay.  And it says approval date for

5     Mr. Oriente, 10/28/2010, 3:22 p.m.  That's what

6     the document says, right?

7          A      Yes.  It's through SharePoint, so it's

8     an automated system.

9          Q      Right.  But it's an automated system

10    that can keep track of time, can't it?

11         A      Yes.  But it doesn't keep track of the

12    time that they did the due diligence.

13         Q      Right.  Well, it shows that three

14    minutes after this was sent to Mr. Oriente --

15         A      It doesn't show --

16         Q      -- he approved it.

17         A      It doesn't show the time between what

18    Dale did and what Michael did on -- look at the

19    scripts or whatever, it does not show that.

20         Q      What it show is it was sent to

21    Mr. Oriente, and three minutes later he approved

22    it.  That's what it shows.

23                MR. COLLINS:  Objection.

24    Mischaracterization.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1        MR. BOGLE:  It's what the document says.

2    The document speaks for itself.

3        MR. COLLINS:  Objection.

4    Mischaracterization --

5        MR. BOGLE:  You can put whatever you

6    want on top if it, that's what the document says.

7        THE WITNESS:  I just want to put on the

8    record that you don't know the due diligence

9    there.

10   BY MR. BOGLE:

11       Q    Right.  But the due diligence that --

12   would be in this file, wouldn't it?

13       MR. COLLINS:  Objection.  The witness

14   has testified --

15   BY MR. BOGLE:

16       Q    And our jury can look at that and decide

17   for themselves, right?

18       A    Not necessarily.  Michael --

19       Q    Okay.

20       A    Michael could have done that on the

21   internet, had the scripts.  It may not -- it

22   wouldn't be in my file.

23       Q    But you don't have any idea whether he

24   actually did that, do you?  You're just saying he

Highly Confidential - Subject to Further Confidentiality Review

Page 215

1    may have.

2         A     I don't know.

3         Q     Right.  What we do know is this was

4    approved, right, 10/28/2010, increasing the

5    oxycodone threshold, right?

6         A     Yes.  It says, "Approved, Michael."

7         Q     And the reason for TCR, as noted on

8    page .84, is noted as business growth, right?

9         A     It says:  "Competitor down the street

10   does not order controls, which elevates their

11   business."  And they -- they were one of our

12   largest customers.

13        Q     Stay with me.  "Reason for TCR" --

14        A     Oh, sorry.

15        Q     -- it says "Permanent business growth,"

16   right?

17        A     I was going --

18              MR. COLLINS:  It says more than that.

19   I'm sorry.

20   BY MR. BOGLE:

21        Q     It should be supported by corresponding

22   sales increase.

23        A     You aren't telling the whole story.

24   Supporting information is there too.

Page 216

```
 1        Q     For this increase?

 2        A     That's important.  Yes.

 3        Q     That their competitor doesn't sell

 4   controls, right?

 5        A     Yes.

 6        Q     Okay.  But it says:  "Business growth

 7   should be supported by corresponding sales

 8   increase."  Right?  That's what it says.

 9        A     It says that also, yes.

10        Q     All right.  So that should be somewhere

11   that we can locate, right, that such documentation

12   exists to support that statement, right?

13              MR. COLLINS:  Objection.  Assumes facts

14   not in evidence.  Assumes it's reflected in

15   documents.

16   BY MR. BOGLE:

17        Q     True?

18        A     I don't know that.

19        Q     But we know it should be supported by a

20   corresponding sales increase, right?

21        A     I can't testify to what I don't know.

22        Q     Okay.  But you do know, as we talked

23   about before, that when a request is made for a

24   TCR increase based on business growth, you have to
```

Highly Confidential - Subject to Further Confidentiality Review

Page 217

1    have supporting documentation for that, right?

2         A     The director of Regulatory Affairs had

3    the supporting documentation, and the program

4    changed 2007 on.

5              MR. BOGLE:  Move to strike as

6    nonresponsive.

7    BY MR. BOGLE:

8         Q    My question simply was, under the CSMP,

9    you must have supporting documentation to support

10   a threshold increase based on business growth,

11   true?

12        A     It depends on the era.  2000 to 2006, I

13   did not have supporting document.

14        Q    Okay.  What about 10/28/2010, you should

15   have documentation to support that?

16        A     I don't necessarily have it.

17        Q    Okay.  That should be in the McKesson

18   file, shouldn't it?

19        A     I don't know.

20        Q    Okay.  But you do know the CSMP requires

21   that, right, documentation?

22        A     Not on my file, no.

23        Q    That's not my question, sir.

24              The CSMP requires documentation

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    supporting any change made to a threshold based on

2    business growth, right?

3              MR. COLLINS:  Objection.  Assumes facts

4    not in evidence.

5    BY MR. BOGLE:

6         Q    We just looked at this a few minutes

7    ago.

8              MR. COLLINS:  Objection.  Show it to him

9    again.

10   BY MR. BOGLE:

11        Q    You don't recall that?

12        A    I'm sorry.  I don't -- you'll have to

13   repeat the question.

14        Q    My question was, to support a threshold

15   change based on business growth, supporting

16   documentation is required under the CSMP, right?

17             MR. COLLINS:  Objection.  Assumes --

18   BY MR. BOGLE:

19        Q    As of 10/2010?

20             MR. COLLINS:  Objection.  Assumes facts

21   not in evidence.

22             THE WITNESS:  I don't know that that

23   wasn't provided.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 219

1          Q    Not my question, sir.  That was

2     required, wasn't it?

3               MR. COLLINS:  Objection.  Form.

4     BY MR. BOGLE:

5          Q    Yes or no?

6               MR. COLLINS:  Objection.

7     BY MR. BOGLE:

8          Q    Or you don't know?

9               MR. COLLINS:  Objection to form.

10              THE WITNESS:  I don't know.

11    BY MR. BOGLE:

12         Q    You don't know if that was required?

13         A    It was required for Michael maybe, but

14    not for me.

15         Q    Okay.  So you -- so for Dale Nusser to

16    sign off on his portion, he didn't need any

17    documentation to support this.

18         A    Correct.

19         Q    Okay.  But Michael, you understand,

20    Oriente would?

21         A    Yes.

22         Q    Okay.  So in the McKesson files that

23    have been produced to us pertaining to this

24    increase, we should find some supporting

Highly Confidential - Subject to Further Confidentiality Review

Page 220

1    documentation if the CSMP was followed, right?

2    I'm not saying in your files or whose files.  It

3    should be in somebody's files.

4         A    I don't know that.

5         Q    You don't know.

6         A    I can't testify to what's in their

7    files.

8         Q    I didn't ask -- I didn't say "is it."  I

9    said "should it be."

10        A    I can't --

11             MR. COLLINS:  Objection.  Calls for a

12   legal conclusion.

13             THE WITNESS:  I can't testify.  It was

14   electronic.

15   BY MR. BOGLE:

16        Q    Okay.  Was there a policy at McKesson in

17   2010 to destroy evidence of due diligence review?

18             MR. COLLINS:  Objection.  Argumentative.

19   Object to the theatrics.

20   BY MR. BOGLE:

21        Q    There's a question.

22        A    Can you repeat the question?

23        Q    Was there a policy written or unwritten

24   at McKesson in October 2010 to destroy evidence of

Highly Confidential - Subject to Further Confidentiality Review

Page 221

 1    due diligence review?

 2               MR. COLLINS:  Object to the theatrics

 3    and the argument.

 4               THE WITNESS:  No.

 5    BY MR. BOGLE:

 6        Q    Okay.  Target, that's another -- that's

 7    another large customer for McKesson over time,

 8    right?

 9               MR. COLLINS:  Objection.  Form, vague.

10               THE WITNESS:  They aren't our customer

11    anymore.

12    BY MR. BOGLE:

13        Q    Okay.  Back in 2008, they were, right?

14        A    I would -- I would think, yes.

15        Q    Okay.  Let's take a look at Exhibit 15,

16    which is 1.1782.

17               (Snider Exhibit No. 15 was marked

18               for identification.)

19        Q    All right.  This is another file that

20    was produced to us.  You see it's pertaining to

21    Target No. 2231.  Do you see that?

22        A    Yes.

23        Q    Okay.  Let's start back at page .7.

24    There's an e-mail chain there.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1           And do you see the e-mail at the bottom

2    of that page from Dave Gustin to Michael Bishop

3    dated September 16, 2008, titled "Could you do me

4    a favor?"  Do you see that?

5         A    Yes.

6         Q    Okay.  It says there:  "I just need a

7    TCR form you signed and dated the 30th.  I will

8    use it for the 30 percent increases I made for the

9    RNAs that day after you e-mailed me all those

10   reports."

11           Do you see that?

12        A    Yes.

13        Q    And then Mr. Bishop responds:  "This is

14   the Thanksgiving increases," question mark.

15           Do you see that?

16        A    Yes.

17        Q    Okay.  And if you follow the e-mail

18   chain to the next page, Mr. Gustin says:  "Yep,

19   11/28."

20           Do you see that?

21        A    Yes.

22        Q    Okay.  Then if you go to page .5, it's

23   another e-mail from Dave Gustin to several

24   individuals, December 17, 2008.  It says:  "All:

Highly Confidential - Subject to Further Confidentiality Review

Page 223

1    On November 28, I was sent requests by Michael for

2    over 200 thresholds to get 30 percent increases

3    for various national accounts.  The attached TCR

4    form covers all RNA increases made that date.

5    Please sign and file."

6               Do you see that?

7         A    Yes.

8         Q    Okay.  And if you go to page .4, it's a

9    threshold change form from 11/28/08, the same day.

10   Do you see that?  It's referenced earlier by

11   Mr. Gustin.

12        A    Yes.

13        Q    And it's noted to be for various

14   controlled substances, right?

15        A    Yes.

16        Q    And a 30 percent increase.  Do you see

17   that?

18        A    Yes.

19        Q    What's the reason for the change given

20   there on the form?

21        A    Thanksgiving holiday.

22        Q    Okay.  Do -- was it a McKesson policy in

23   2008 to give permanent threshold increases based

24   on holidays?

Highly Confidential - Subject to Further Confidentiality Review

Page 224

1      A    Yes, it was.  Sometimes the vendors --

2   like I just got a notice today, the vendors close

3   during the holidays and product is unavailable.

4   And my customers know that too, hospitals, nursing

5   homes, pharmacies.  So at that time they want to

6   make sure they get it before the pharmacy closes.

7      Q    And that's a justification to increase

8   30 percent permanently?

9      A    I believe so.  It looks like it was

10  approved.

11     Q    Okay.  So each time that a big holiday

12  would come, thereafter you get 30 more percent

13  increase permanently?

14          MR. COLLINS:  Objection.

15  BY MR. BOGLE:

16     Q    Is that what you're saying?

17          MR. COLLINS:  Objection.

18  Mischaracterization.

19          THE WITNESS:  I did not say that.

20  BY MR. BOGLE:

21     Q    Okay.  Well, you're saying the 30

22  percent increase here was justified by the fact

23  that it was a Thanksgiving holiday and that could

24  justify a permanent increase, right?

Page 225

1          MR. COLLINS:  Objection.

2     Mischaracterization.

3          THE WITNESS:  I don't know the due

4     diligence that Dave did, but he was the national

5     acts DRA and he justified it.

6     BY MR. BOGLE:

7      Q    Okay.  Well, the reason for change given

8     here is what we just read, increase due to

9     Thanksgiving holiday, 30 percent increase, right?

10     A    That's what -- did I say that?

11     Q    That's what's stated here for reason for

12     change, right?  It's what the form says.

13     A    Who -- oh, the form, yes.

14     Q    Right.

15     A    Okay.

16     Q    And under "Approved by," whose signature

17     is that?

18     A    Blaine Snider.  "B. Snider."

19     Q    That's you, right?

20     A    Yep.

21     Q    And if we go to page .2, this is another

22     threshold change form from 11/28/08 for the Target

23     store in Triadelphia, West Virginia.  Do you see

24     that?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1          A     Yes.

2              Q     Okay.  And this is for a 30 percent

3      increase to their morphine thresholds, and under

4      "Reason for change," you would agree with me there

5      is nothing listed there, right?

6          A     Yes.

7              Q     Okay.  And again, under "Approved by,"

8      that's your signature, isn't it?

9          A     That I sent it to Regulatory, if I did.

10             Q     That's your signature, isn't it?

11         A     Yes.

12             Q     Okay.  Did you raise any questions as to

13     why there was no reason given to you here?

14         A     I don't even know that it was -- the

15     threshold was increased.

16             Q     Well, it says "Approved by."

17             MR. COLLINS:  Objection.  We've been

18     over this --

19     BY MR. BOGLE:

20             Q     Right?

21             MR. COLLINS:  -- a dozen times.

22     Objection.  Mischaracterization.

23     BY MR. BOGLE:

24             Q     Right?

Highly Confidential - Subject to Further Confidentiality Review

Page 227

1        A       That does not mean I approved it.  I

2    cannot send a -- make a threshold change.  I can't

3    do it.

4        Q       But you didn't raise any concerns at

5    this point in time about forwarding this on to --

6        A       There's nothing on this paper --

7        Q       -- approve it, correct?

8        A       There's nothing on this paper that says

9    he approved it or raised any concerns.

10       Q       There's nothing on this paper that

11   indicates that you raised any concerns or in this

12   file that indicates that you raised any concerns

13   about this threshold change form, does it?

14       A       I don't know if it even was complied

15   with.

16            MR. BOGLE:  Okay.  Not my question, sir.

17   Move to strike as nonresponsive.

18   BY MR. BOGLE:

19       Q       There's nothing in this file that

20   indicates you raised concerns about the lack of

21   reason for threshold increase in this form, is

22   there?

23            MR. COLLINS:  Objection.  Foundation,

24   form.

Page 228

1           THE WITNESS:  I don't know that.

2    BY MR. BOGLE:

3         Q    You don't know if there's any reason

4    listed?

5         A    Correct.

6         Q    Okay.  Can you see the form?

7         A    Yes.

8         Q    Okay.  Do you see any indication on this

9    form that you disapproved this request with zero

10   information provided for a reason?

11          MR. COLLINS:  Object to the terminology,

12   "disapproved" and "approved."

13          THE WITNESS:  I dispute that there

14   was -- wasn't any evidence of that.

15   BY MR. BOGLE:

16        Q    Well, we've got the file right here.

17   This one -- this one's shorter, so this is eight

18   pages.  I'd like you to show me where in this file

19   there is specific documentary evidence showing why

20   a Target in West Virginia needed a 30 percent

21   increase on this date.

22        A    Okay.  On page .6.

23        Q    .6.  Okay.

24        A    There was an e-mail on December 17th

Page 229

1    about a -- with an attachment threshold change

2    form, that could have had the reason on it.  I

3    don't know.  It's -- it's not here.

4         Q    Okay.  This is what was produced to us.

5    Can you point to anything that was produced to us

6    in this file that indicates a reason for this

7    threshold change increase?

8              MR. COLLINS:  Objection.  Asked and

9    answered.

10             THE WITNESS:  Not to my knowledge.

11   BY MR. BOGLE:

12        Q    Okay.  Best Care Pharmacy, are you

13   familiar with them?

14        A    I -- I do know them, yes.

15        Q    It's another one of New Castle's former

16   customers in West Virginia, right?

17        A    Yes.

18        Q    Okay.  And actually, Best Care actually

19   operated multiple pharmacies in West Virginia,

20   didn't they?

21        A    As I recall.

22             (Snider Exhibit No. 16 was marked

23             for identification.)

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 230

```
 1          Q    Okay.  I'm going to hand you what is
 2    marked as 1.1812, Exhibit 16.
 3               You see here this is another document,
 4    file folder document with the name "Best Care" on
 5    the front.
 6               Do you see that?
 7          A    Yes.
 8          Q    Okay.  And if we go to page .10, do you
 9    see this is your signature related to an approval
10    that a questionnaire has been completed and
11    affidavit signed for this customer, right?
12          A    It's a -- I testified that it's a
13    Level I observation form.
14          Q    No, .10.
15          A    I testified that that's a Level I
16    observation form.
17          Q    We may be on different pages.
18               Do you see what's pulled up here on the
19    screen?
20          A    Yes.
21          Q    Okay.  That's your signature related to
22    Best Care Pharmacy, you are saying for, what, a
23    Level I observation?
24          A    Yes.  It says "CSMP Observation Level I
```

Highly Confidential - Subject to Further Confidentiality Review

Page 231

1      Documentation Form."

2            Q     On this page?

3                  MR. COLLINS:  Page 9.

4                  THE WITNESS:  Oh, I'm sorry.  It's a --

5      it's a continuation of that.

6      BY MR. BOGLE:

7            Q     Okay.  Well, let's look at the pharmacy

8      questionnaire that follows thereafter.

9            A     Okay.

10           Q     You see this customer is noted to be a

11     new customer as of October 1, 2009, right?

12           A     Yes.

13           Q     And it's for Best Care Pharmacy in

14     Weston, West Virginia.  Do you see that?

15           A     Yes.

16           Q     Okay.  Do you know about how many people

17     lift in Weston, West Virginia?

18           A     A lot more than Philippi.

19           Q     Think so?

20           A     Yes.

21           Q     Okay.  Would it surprise you that it's

22     fewer than 5,000 people?

23           A     In that area?

24           Q     In Weston, West Virginia.

Highly Confidential - Subject to Further Confidentiality Review

Page 232

1         A     Yes.

2             Q     That would surprise you?

3         A     Yes.

4                 (Snider Exhibit No. 17 was marked

5                 for identification.)

6     BY MR. BOGLE:

7             Q     I hand you Exhibit 1.1909 marked as

8     Exhibit 17.

9                 It says:  "Population data for Weston,

10    West Virginia," indicated to have a population of

11    4,085 people.  Do you see that?

12                MR. COLLINS:  Objection.  Lack of

13    foundation, lack of authentication, lack of

14    knowledge.

15                THE WITNESS:  What year is this, please?

16    BY MR. BOGLE:

17            Q     This is the current data.

18                MR. COLLINS:  Yeah, I mean -- it's the

19    internet, it's accurate.

20                THE WITNESS:  What's that?

21                MR. BOGLE:  Well, I'm sure you guys are

22    going to produce census data that shows otherwise,

23    so we'll just wait to see that.

24                MR. COLLINS:  I'll withdraw my

Highly Confidential - Subject to Further Confidentiality Review

Page 233

1    objection.

2                 MR. BOGLE:  I would hope so.

3                 MR. COLLINS:  It's a lack of foundation,

4    lack of knowledge.

5    BY MR. BOGLE:

6         Q    4,085 people, right?  That's what it

7    says.

8         A    That's what it says right here.

9         Q    Right.  That's wrong; is that your

10   testimony?

11                MR. COLLINS:  Objection.  Lack of

12   foundation.  You haven't established the witness

13   has any knowledge about this issue.

14                MR. BOGLE:  Well, he said he thought it

15   was wrong.

16                THE WITNESS:  I said I was surprised,

17   and I am.  I'm sorry.

18   BY MR. BOGLE:

19        Q    You're surprised?

20        A    Yes.

21        Q    Okay.  All right.  Let's go back to

22   Exhibit 1.1812, back on .11.  See the pharmacist's

23   name there is a Matthew Genin.  Do you see that?

24        A    Yes.

Page 234

1          Q    Okay.  And further on in this form,

2     page .14, under "Purchasing Information," it's

3     asked what percentage of their purchases are

4     controlled substances, and they indicate 40

5     percent.  Right?

6                MR. COLLINS:  Sorry.  Where are you?

7     BY MR. BOGLE:

8          Q    Page .14 under Section IV(c).

9               Right?

10     A    Yes.

11         Q    And this was, if you look at the next

12     page, as of October 2009.  Do you see that's when

13     all this form was signed?

14     A    Yes.

15         Q    Okay.  That in and of itself would be

16     a red flag for potential diversion, right, that

17     40 percent of their purchases are controlled

18     substances?

19                MR. COLLINS:  Objection.  Form.

20                THE WITNESS:  I would have sent this up

21     to the DRA to make sure they vet it out.

22     BY MR. BOGLE:

23         Q    I'm asking your opinion, though, sir.

24     40 percent, is that a red flag to you?

Page 235

1      A      And my opinion is I definitely would

2   send this up to the DRA so they can vet it out,

3   yes.

4         Q      Because that's a concern, right, 40

5   percent?

6      A      I would send it to the DRA so they could

7   vet it out for sure.

8         Q      Because that's a concern.  40 percent of

9   their purchases being controlled substances, that

10  is a concern, a potential red flag, right?

11     A      At the time I don't remember, but I know

12  I sent it up to the DRA for vetting out.

13        Q      Okay.  My question was simply whether

14  that would be concerning to you in October 2009,

15  when you signed this form.

16     A      I don't know that --

17        Q      When you read this form, you don't know?

18     A      I don't know that when I signed that.

19        Q      Okay.

20     A      There's documentation as to why, and

21  then they do their due diligence.  That's part of

22  the process of that year also.

23        Q      But 40 percent is a high figure, right,

24  for controlled substances?

Page 236

1              MR. COLLINS:  Objection.  Asked and

2     answered.

3              THE WITNESS:  It depends on their

4     business.

5     BY MR. BOGLE:

6        Q    Okay.  That's -- that's well above the

7     norm, isn't it?

8        A    It's above the average, yes.

9        Q    Yeah.  If you go to the next page,

10    page .15, they provide more detail on their

11    controlled substance purchases.  They indicate

12    6,199 doses dispensed per month for hydrocodone.

13    Do you see that?

14       A    Yes.

15       Q    And 4,905 doses of oxycodone per month

16    is what they are telling you, right, as of this

17    time?

18       A    Yes.

19       Q    Okay.  And there's a request for

20    anything over 5,000 to provide a reason, which is

21    indicated as -- they underlined "Frequent

22    referrals from pain clinics," et cetera.  Do you

23    see that?

24       A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 237

1        Q    Okay.  Again, that's a potential red

2   flag if they're getting frequent referrals from

3   pain clinics, right?  We talked about that

4   earlier.

5              MR. COLLINS:  Objection.  Form,

6   compound.

7              THE WITNESS:  That one I would do the

8   due diligence on for sure.

9   BY MR. BOGLE:

10       Q    Right.

11       A    And send it up to the director of

12  Regulatory Affairs, yes.

13       Q    And you would hope that they would vet

14  that closely, right?

15       A    Yes.

16       Q    That issue.

17             All right.  Let's go to page .43.

18             So you've got a threshold change form

19  here from -- dated October 9, 2009.  Do you see

20  that?

21       A    Yes.

22       Q    Okay.  And this is for a permanent

23  change regarding 9193, which I will represent is

24  hydrocodone.  That's y'all's code for hydrocodone.

Page 238

1           Do you see that code listed there?

2      A    Where is that listed?

3      Q    "CS requested" -- 9191 is slashed

4  through and 9193 is written.

5      A    Oh, on the left.  I'm sorry.

6      Q    Yeah.  Do you see that?

7      A    9193, yes.

8      Q    Okay.  And if you see here, the current

9  threshold at this point in time in October 2009 is

10  8,000, and they're requesting an increase by

11  12,000 additional doses.

12           Do you see that?

13     A    Sorry.  It says 5,000.

14           MR. COLLINS:  I'm -- I'm confused, and I

15  think the witness is too.

16  BY MR. BOGLE:

17     Q    Current threshold, 8,000.  Do you see

18  that?

19     A    No, I don't see 8,000.

20           MR. COLLINS:  I don't see it either.

21  BY MR. BOGLE:

22     Q    On .43.  Let me check my page here.

23           All right.  So, I'm sorry.  Actually,

24  it's .44.  My fault.

Highly Confidential - Subject to Further Confidentiality Review

Page 239

1           A       Okay.

2                Q     All right.  So this is -- let's go back

3       and make sure we're talking about the same thing.

4                      October 9, 2009, threshold change form,

5       right?

6           A       Yes.

7                Q     For Best Care, right?

8           A       Yes.

9                Q     9193 is the base code entered, which

10      again I'll represent to you is hydrocodone.

11      That's how you guys code that.

12          A       Yes.

13               Q     Okay.  And you see the current threshold

14      is at 8,000.

15          A       Yes.

16               Q     It's a permanent -- request for a

17      permanent increase, right?

18          A       Yes.

19               Q     Increase by 12,000 units, right?

20          A       Yes.

21               Q     And this threshold change request was

22      submitted on October 9, 2009, by you, correct?

23          A       Yes.

24               Q     Okay.  And under "Reason for requested

Page 240

1    change," what's provided there?

2         A    Nothing.  Just the date.

3         Q    And if we go then to the next form --

4         A    If I could say on there, also it says

5    "Question of declaration on file:  Yes, dated

6    10/1/09."  So someone was just in there nine days

7    before this threshold request.

8              MR. BOGLE:  Move to strike as

9    nonresponsive.

10   BY MR. BOGLE:

11        Q    I asked you what was written there under

12   "Reason for requested change" section.

13             MR. COLLINS:  His answer is what it is.

14   BY MR. BOGLE:

15        Q    All right.  Let's go to Bates page

16   ending 4225, since my pages are wrong on this

17   document, which is bottom right, 4225.

18             It's another threshold change form,

19   October 26, 2009, for a permanent change for

20   hydrocodone for Best Care.

21             Do you see that?

22        A    Yes.

23        Q    Okay.  And at this point because the

24   threshold has just been increased a couple of

Page 241

1    weeks earlier, which we just saw, now their

2    current threshold is at 20,000, right?

3         A    I don't remember when the other one was.

4         Q    Sure.  We just looked at it.  We can

5    look at it again.

6         A    If you can just give me the date, I

7    would be fine.

8         Q    It was October 9, 2009 is what we just

9    looked at.  I can take you back to that page if

10   you want.

11        A    Okay.  And this one is --

12        Q    So here you go, page -- Bates page

13   ending 4227, two pages later as the one we just

14   looked at.

15        A    Yes.

16        Q    Okay.  We see hydrocodone, there's a

17   requested increase from 8 to 20.

18        A    Yes.

19        Q    Okay.  Which was submitted by you that

20   day.  So we're now a couple of weeks later, same

21   product, we show the threshold is 20,000, which

22   you indicated it was approved previously, right?

23        A    Yes.

24        Q    Okay.  And now there's a request for an

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1      additional 5,000 dosage units for hydrocodone,

2      right?

3           A     Yes.

4           Q     Okay.  And is there any specific reason

5      for the requested change given here?

6           A     It says questionnaire declaration was

7      done two weeks previously, or a week and a half.

8      And it was a new customer.

9           Q     Okay.  My question was, under "Reason

10     for requested change," what's the reason provided

11     there?

12               MR. COLLINS:  Asked and answered.

13               THE WITNESS:  Only that I referenced the

14     questionnaire and declaration on file.

15     BY MR. BOGLE:

16          Q     Right.  You don't give any specific

17     reason for the change that's being requested, do

18     you?

19               MR. COLLINS:  Objection.

20     Mischaracterization, asked and answered.

21               THE WITNESS:  Only that I would

22     reference the questionnaire.

23     BY MR. BOGLE:

24          Q     Right.  There's no documented reason why

Highly Confidential - Subject to Further Confidentiality Review

Page 243

1    there's an increase here, especially given that

2    you've already increased it just two weeks before.

3    Right?

4                    MR. COLLINS:  Objection.  It's a

5    mischaracterization of the document and his prior

6    testimony.

7                    MR. BOGLE:  So I'll strike that.

8    BY MR. BOGLE:

9         Q    We can agree this was increased just two

10   weeks prior, right?

11        A    Yes.

12        Q    Okay.  And we can agree there's an

13   additional request being submitted two weeks later

14   without any additional documentation supporting

15   why they would need 5,000 more doses a month just

16   two weeks later, is there?

17                   MR. COLLINS:  Objection.

18   Mischaracterization of the document and his prior

19   testimony.

20                   THE WITNESS:  I would have to reference

21   the questionnaire and the visit.

22   BY MR. BOGLE:

23        Q    Right.  So -- but for the reason for

24   requested change, we can agree there is zip

Highly Confidential - Subject to Further Confidentiality Review

Page 244

1    written there, nothing, right?

2              MR. COLLINS:  Object.  That's a

3    mischaracterization of the document and his

4    testimony.

5              THE WITNESS:  The document says:  "Refer

6    to questionnaire or -- and declaration on file

7    10/1/09."  So that was within nine days.

8    BY MR. BOGLE:

9         Q    No, this is now three weeks, and you

10   already increased it after that.

11        A    Right.

12        Q    What I'm saying, though, this whole

13   "Reason for requested change" section is supposed

14   to be completed, right?  You don't just refer to a

15   declaration.  That's the whole purpose of this,

16   right, you document your reason for the business

17   change?

18             MR. COLLINS:  Objection.

19   BY MR. BOGLE:

20        Q    You don't say "See declaration."

21             MR. COLLINS:  Objection.

22   BY MR. BOGLE:

23        Q    Right?

24             MR. COLLINS:  There's about four

Page 245

1    questions within one.  Compound, form, asked and

2    answered.

3    BY MR. BOGLE:

4        Q    Sure, I'll reask it.

5             The reason for requested change

6    is supposed to be -- there's supposed to be a

7    written reason documented as to why this change is

8    needed, right?

9        A    In totality, I would have to refer to

10   the questionnaire on file.

11            MR. BOGLE:  Move to strike as

12   nonresponsive.

13   BY MR. BOGLE:

14       Q    "Reason for requested change, be

15   specific."

16            MR. COLLINS:  If that's --

17   BY MR. BOGLE:

18       Q    That's what it says, right?

19            MR. COLLINS:  If that's a question,

20   objection.  Asked and answered.

21   BY MR. BOGLE:

22       Q    Does it say "Be specific"?

23            MR. COLLINS:  Objection.  Asked and

24   answered multiple times.

Page 246

1    BY MR. BOGLE:

2         Q    Does it say "Be specific"?

3         A    And I had the same response:  Be

4    specific, and refer to the questionnaire and

5    declaration on file.

6         Q    Does it say, "Be specific, please refer

7    to questionnaire"?  Does that say that's good

8    enough?

9         A    It's right underneath that.

10        Q    No, you -- it says "Questionnaire or

11   declaration."  It just asks whether it's there.

12   It doesn't say that that's sufficient, does it?

13        A    It's -- it's --

14             MR. COLLINS:  Objection.  Argumentative.

15   I would ask you to move on to something else.

16   BY MR. BOGLE:

17        Q    So is it your testimony that your

18   understanding that as of 2009, you could simply

19   put "See questionnaire," and that was fine?

20             MR. COLLINS:  Objection.

21   BY MR. BOGLE:

22        Q    Or "See declaration," and that was --

23   that was justified to increase any threshold based

24   on that?

Highly Confidential - Subject to Further Confidentiality Review

Page 247

1           MR. COLLINS:  Object --

2    BY MR. BOGLE:

3           Q    Is that your testimony?

4           MR. COLLINS:  Objection.  The question

5    is compound.  It's about three or four questions.

6    It's been asked and answered.

7    BY MR. BOGLE:

8           Q    Is that your testimony?

9           MR. COLLINS:  It's been asked and

10   answered.  It's a mischaracterization of his

11   testimony.

12          THE WITNESS:  No, my testimony is that I

13   did the due diligence and sent it up to Michael

14   Oriente, the director of Regulatory Affairs.

15   BY MR. BOGLE:

16          Q    You're saying you did your due diligence

17   because there was a questionnaire and declaration

18   on file, right?

19          A    Yes.  You can see quite a bit of

20   information on the store for Best Care, and sales

21   data and vetting out the store.  And I -- I'm

22   sorry, it was 10/26, so it was done on 10/1.

23          Q    Right.  Which we already discussed

24   that -- and you've already increased it --

Highly Confidential - Subject to Further Confidentiality Review

Page 248

1          A     I did.

2          Q     -- requested increase 10/9?

3          A     And it's a new customer, yes.

4          Q     Okay.  But this is the second increase

5     in a month.

6          A     Yes.

7          Q     And there's -- you would agree with me,

8     other than saying "Questionnaire and declaration

9     on file, yes," there's no written justification

10    here provided, right?

11              MR. COLLINS:  Objection.

12    Mischaracterization.  It's been asked and

13    answered.

14              THE WITNESS:  I would agree to reference

15    the questionnaire and also the DRA's approval.

16    BY MR. BOGLE:

17         Q     So the questionnaire, which tells us how

18    much they're dispensing of controlled substances,

19    and the declaration that they claim they're doing

20    everything above board, that's good enough, right?

21              MR. COLLINS:  Objection.  Argumentative.

22    BY MR. BOGLE:

23         Q     Right?

24         A     I don't know that.

Highly Confidential - Subject to Further Confidentiality Review

Page 249

```
 1          Q     Okay.  Okay.  Let's take a look at Bates
 2     page ending 4234.
 3                See it's another threshold change form
 4     for Best Care, 11/24/09, right?
 5          A     Yes.
 6          Q     This time the request is to increase the
 7     oxycodone threshold from 8,000 to 12,000, right?
 8          A     Yes.
 9          Q     Permanently, right?
10          A     Yes.
11          Q     And the reason for change provided here
12     is:  "Store business warrants increase to 12,000,"
13     right?
14          A     Yes.
15          Q     And that would have been provided by
16     you, that information, right?
17                MR. COLLINS:  Objection.  Form.
18                THE WITNESS:  I don't know that.
19     BY MR. BOGLE:
20          Q     Your name appears under "Approved by,"
21     right?
22          A     Yes.
23                MR. COLLINS:  Objection.  Asked and
24     answered, mischaracterization.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    BY MR. BOGLE:

2         Q    That's what it says, right?

3         A    Yes.

4         Q    Okay.  And is there any other reason

5    listed for the change other than "Store business

6    warrants increase to 12,000" --

7         A    No.

8         Q    -- provided on this form?

9              MR. COLLINS:  Objection.  Objection.

10   Mischaracterization.

11   BY MR. BOGLE:

12        Q    If we go to Bates page ending 4239.

13             So this has indicated a Level I review

14   for hydrocodone from June 2010.  Do you see that?

15        A    Yes.

16        Q    And it's noted that they've omitted for

17   hydrocodone, right?

18             It says "EOM omit" under "Supporting

19   Information" -- or next to "Supporting

20   Information."

21        A    Yes.  I'm sorry, I'm not familiar with

22   these.  These are only documents the DRA has

23   knowledge of.

24        Q    What is an omit?

Highly Confidential - Subject to Further Confidentiality Review

Page 251

1          A     It means something wasn't filled.

2          Q     Okay.  And one way in which somebody can

3     omit is because they've reached their threshold,

4     right?

5          A     Yes.

6          Q     Okay.  If you go to the next page here,

7     do you see where it says "Supporting Information"?

8                Do you see that, the next page, Bates

9     page ending 4240?

10         A     Yes.

11         Q     Okay.  "Supporting Information" says:

12    "Due to an increase in local prescriptions for

13    hydrocodone, Matt has requested we raise his

14    threshold on this item."

15               Do you see that?

16         A     Yes.

17         Q     And the reason for TCR, two below that,

18    says:  "Business growth should be supported by

19    corresponding sales increase."

20               Do you see that?

21         A     Yes.

22         Q     Okay.  And the specific request is to

23    increase the number of hydrocodone doses by 5,000

24    units, right?  5,000 doses.

Highly Confidential - Subject to Further Confidentiality Review

Page 252

1          A     Yes.

2             Q     Okay.  And you see the next page, there

3     are approvals from Dale Nusser and Michael Oriente

4     on July 8, 2010, right?

5          A     Yes.

6             Q     Okay.  And Dale Nusser, I think we

7     talked about earlier works -- worked beneath you

8     at this point in time, right?

9          A     Yes.

10            Q     So to approve this based on business

11    growth, you would agree there should be some

12    supporting documentation somewhere to support

13    that, right, that their business has in fact grown

14    legitimately?

15         A     I don't know that.

16            Q     You don't know whether that should be

17    there?

18         A     I don't know if Mike got that or not.

19            Q     I'm asking whether it should be there.

20    I'm not asking whether it is there.

21         A     I don't know.

22            Q     You don't know whether that should be

23    there or not?

24         A     That would be up to Michael.

Page 253

1              Q    Okay.

2         A    I don't know if he had to keep that or

3    he disposed of it.  I don't know.

4              Q    You don't in fact know whether they got

5    it, do you?

6                   MR. COLLINS:  Objection.  Calls for

7    speculation.

8                   THE WITNESS:  I'll testify that I never

9    saw this document, and I'm not responsible for the

10   document, but it's Michael Oriente that had the

11   document.

12   BY MR. BOGLE:

13             Q    Okay.  Do you see page 4242 in this

14   document?

15                  It's another threshold change request,

16   this time from July 23rd, 2010.  Do you see that?

17   The date's on the second page.

18        A    Oh, thank you.

19             Q    Do you see that date on there?

20        A    Yes.

21             Q    Okay.  And this is to increase

22   hydrocodone doses by 5,000 doses at this point in

23   time, right?

24                  MR. COLLINS:  Objection.  Lack of

Page 254

1    foundation.

2              THE WITNESS:  Yes.

3    BY MR. BOGLE:

4         Q    Okay.  And the reason cited is again

5    business growth, right?

6         A    It says -- if I could interject, it

7    says:  "Should be supported by corresponding sales

8    increase."

9         Q    Yeah.  That's what it says, right?

10        A    Yes.

11        Q    And then "Supporting Information," it

12   says:  "The account opened last October 2009.  The

13   new owner is trying to increase his business in

14   the area and reestablish the pharmacy.  He has

15   increased a number of prescriptions and requesting

16   another increase for hydrocodone.  He was already

17   given an increase of 5,000 on the 8th of this

18   month."

19             Do you see that?

20        A    Yes.

21        Q    So, again, whoever is approving this,

22   Michael Oriente or otherwise, should be requesting

23   documentation to support that increase, right?

24             MR. COLLINS:  Objection.  Form.

Page 255

1          THE WITNESS:  I don't know.  He may have

2    it.

3    BY MR. BOGLE:

4         Q    Should he?  Should he, right?  He

5    should.

6          MR. COLLINS:  Objection.  Calls for a

7    legal conclusion.

8          THE WITNESS:  He may have it.  I don't

9    know.

10   BY MR. BOGLE:

11        Q    Right.  My question is, should he?

12         MR. COLLINS:  Same objection.  Calls for

13   a legal conclusion.

14         THE WITNESS:  I don't know that he

15   doesn't have that.

16   BY MR. BOGLE:

17        Q    That, sir, was not my question.  I'm

18   asking should he have requested it.  I'm not

19   asking whether he did or whether he's got it or

20   what happened to it.  I'm just asking if he

21   should.

22        A    I don't know that.

23         MR. COLLINS:  I'm sorry --

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 256

1          Q     You don't know if he should have?

2                MR. COLLINS:  Let me object.  Lack of

3     foundation, lack of firsthand knowledge, calls for

4     a legal conclusion.

5     BY MR. BOGLE:

6          Q     You see on the next page, page 4243,

7     this was approved by Michael Oriente and Duane

8     McPherson.  Do you see that?

9          A     Yes.

10         Q     Does Duane McPherson work at your

11    distribution center?

12         A     Yes.

13         Q     Okay.  Works beneath you?

14         A     Yes.

15         Q     We'll look at another one from the same

16    month for oxycodone, July 2010, which is page

17    4244.

18                Do you see they've omitted here for

19    oxycodone, July 2010?  Do you see that?

20                MR. COLLINS:  Objection.  Lack of

21    foundation.  The witness hasn't testified he has

22    firsthand knowledge of this.

23                THE WITNESS:  Yeah, I don't know what

24    this is.  If it doesn't respond to another

Page 257

1    threshold change request earlier, is this the same

2    one we went over?

3    BY MR. BOGLE:

4         Q    We're about to walk through that.  Just

5    bear with me.

6         A    Okay.

7         Q    What it says here is an oxycodone omit,

8    July 2010, right?

9              MR. COLLINS:  Objection.  Lack of

10   foundation.  Lack of firsthand knowledge.

11             THE WITNESS:  This document is new to

12   me, but that's what it says.

13   BY MR. BOGLE:

14        Q    And it notes a Level I review, right?

15             MR. COLLINS:  Objection.  Lack of

16   foundation.

17             THE WITNESS:  Yes, it says "Document

18   type."

19   BY MR. BOGLE:

20        Q    Yep, Level I review.  And Level I

21   reviews at this point in time in 2010 were to be

22   done by you or your designee at the distribution

23   center, right?

24        A    Or director of regular -- Regulatory

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    Affairs, either of -- either of them.

2         Q    Okay.  But there's a -- the CSMP spells

3    out involvement for the distribution center in

4    that process, right?

5         A    I can't remember 2010.  I apologize.  I

6    just don't know.

7         Q    You don't know.  Okay.

8              Do you see here then, if you go to the

9    next page, this is again related to Best Care,

10   where they're requesting an additional threshold

11   increase for hydrocodone, right, 2,000 doses?

12             MR. COLLINS:  Objection.  Lack of

13   foundation, lack of firsthand knowledge.

14   BY MR. BOGLE:

15        Q    It's what the document indicates, right?

16             MR. COLLINS:  Same objections.

17             THE WITNESS:  I don't know if this is

18   Michael's document, but I see it.

19   BY MR. BOGLE:

20        Q    Okay.

21        A    It says, "Amount, 2,000."

22        Q    And the reason for the request is noted

23   to be business growth, should be supported by

24   corresponding sales increase, right?

Page 259

```
 1              MR. COLLINS:  Same objections.  Lack of
 2      foundation, lack of firsthand knowledge.
 3              THE WITNESS:  Yes.
 4      BY MR. BOGLE:
 5          Q    Okay.  And then "Supporting Information"
 6      says:  "This account's purchases are up overall.
 7      A review and site visit was done by Dale Nusser
 8      and Jim Gavatorta in the fall of 2009."
 9              Right?
10              MR. COLLINS:  Objection.  Foundation.
11              THE WITNESS:  Yes.
12      BY MR. BOGLE:
13          Q    Okay.  And that's the same one you
14      referred to having occurred a year earlier, right?
15      That we looked at earlier, sorry.
16              MR. COLLINS:  Objection.  Form.
17      BY MR. BOGLE:
18          Q    Do you recall when we started looking
19      through this document?
20          A    Yes.
21          Q    The first documentation, the first
22      questionnaire related to a site visit was from the
23      fall of 2009?
24          A    Are you referencing the Level I
```

Page 260

```
 1    questionnaire?

 2          Q    I'm referencing what they're talking

 3    about, a review and site visit.

 4                MR. COLLINS:  Objection.  Lack of

 5    foundation.

 6                THE WITNESS:  By "site visit," can you

 7    be more specific?

 8    BY MR. BOGLE:

 9          Q    I'm talking about what's in this

10    document.  If you don't know, that's fine.  We'll

11    keep going.

12                But if you see here, this -- this

13    threshold increase request from August 2010,

14    approved by Diane Martin and Michael Oriente,

15    right?

16                MR. COLLINS:  Objection.  Lack of

17    foundation.

18    BY MR. BOGLE:

19          Q    Do you see that on the next page?

20          A    That's what it says here.

21          Q    All right.  Diane Martin, is that

22    someone that worked for you as well?

23          A    Yes.

24          Q    Okay.  What was your oversight of the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 261

1      people that worked for you when they're -- they're

2      signing off and approving these sort of requests?

3      When you say you're not involved, what was your

4      oversight of people like Mr. McPherson and

5      Mrs. Martin when they're approving these?

6                    MR. COLLINS:  Objection.  Lack of

7      foundation, form, vague, confusing.

8                    THE WITNESS:  I didn't testify that I

9      wasn't involved.  I testified that they worked for

10     me.

11     BY MR. BOGLE:

12          Q    Mm-hmm.  Yeah, I'm asking what your

13     level of oversight was in this process.

14                    MR. COLLINS:  Objection.  Form, vague,

15     assumes facts not in evidence.

16                    THE WITNESS:  To make sure that they did

17     the proper procedure and SOPs for New Castle.

18     BY MR. BOGLE:

19          Q    Okay.  Okay.  Let's go to page -- Bates

20     page ending 4249 in this document.

21                    You see here is another threshold change

22     request for oxycodone requesting a temporary

23     increase by 50.  Do you see that?

24          A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

                                                    Page 262

1          Q    Okay.  And a reference is made back to,

2     again, the site visit from more than a year prior,

3     right, October 1, 2009?

4               MR. COLLINS:  Objection.  Lack of

5     foundation, lack of firsthand knowledge.

6               THE WITNESS:  Can you repeat that

7     question for me, please?

8     BY MR. BOGLE:

9          Q    Yeah.  They refer back to a site visit

10    from October 2009 for this request in December

11    2010, right?

12              MR. COLLINS:  Objection.  Lack of

13    foundation, lack of firsthand knowledge.

14              THE WITNESS:  It says "Temporary."  I

15    don't know if it was increased or not by this

16    document.

17    BY MR. BOGLE:

18         Q    We'll get there.  The reason for TCR

19    noted on this page is increase in scripts, right?

20         A    That's what it says, yes.

21         Q    Okay.  And the next page notes that it

22    was approved by Joel Zwick and Michael Oriente,

23    December 16, 2010.

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 263

1                MR. COLLINS:  Objection.  Lack of

2      foundation.

3                THE WITNESS:  Yes.  Yes, DRA.

4      BY MR. BOGLE:

5           Q    Joel Zwick is somebody that also worked

6      for you at this point in time?

7           A    Yes.  Yes.

8           Q    Okay.  The last one I want to look at

9      for Best Care is on page 40 -- Bates page 4253.

10               And you see here this is a threshold

11     change request related to oxycodone and

12     hydrocodone from January 2011.

13               Do you see that?

14          A    Yes, I do.

15          Q    Okay.  They're requesting 8,000

16     additional doses for oxycodone and 5,000

17     additional doses for hydrocodone, right?

18               MR. COLLINS:  Objection.  Foundation.

19               THE WITNESS:  Yes, but it says threshold

20     wasn't reached.

21     BY MR. BOGLE:

22          Q    Yeah, I'm just asking what request

23     they're making here.

24          A    Yes, but I don't know how much it is.

Page 264

1    I'm sorry.

2         Q    Right, but they're asking to increase

3    the amount of doses for oxycodone by 8,000 and

4    hydrocodone by 5,000, right?

5              MR. COLLINS:  Objection.  Foundation.

6    BY MR. BOGLE:

7         Q    That's what the document says, right?

8              MR. COLLINS:  Same objection.  Same

9    foundation objection.

10             THE WITNESS:  That's what the DRA's

11   document says.

12   BY MR. BOGLE:

13        Q    And "Supporting Information," it says:

14   "Best Care has a new pain clinic, Edita Milan,

15   that it services."  Do you see that?

16        A    Yes.

17        Q    Okay.  And you agree when there's a

18   reference to a pain clinic, that's something that

19   somebody needs to investigate, right?

20             MR. COLLINS:  Objection.

21   BY MR. BOGLE:

22        Q    As a potential red flag.

23             MR. COLLINS:  Objection.  Form, calls

24   for a legal conclusion.

Highly Confidential - Subject to Further Confidentiality Review

Page 265

 1              THE WITNESS:  I don't know about Eda --

 2      Edita Milan, but that is something that Michael

 3      would have vetted out.

 4      BY MR. BOGLE:

 5          Q    Okay.  Something that should be

 6      investigated, right?

 7          A    That I think was.

 8          Q    Okay.  Do you have any proof here that

 9      that was investigated?

10          A    Not with this document.  I'm not

11      familiar with this.

12          Q    Okay.  So you have no reason to

13      specifically say that Mr. Oriente vetted this

14      because you don't have any documentary support of

15      that, do you?

16              MR. COLLINS:  Objection.

17      Mischaracterization, argumentative.

18              THE WITNESS:  I can't speak to what

19      Michael did.

20      BY MR. BOGLE:

21          Q    Right.  And the reason for the TCR is:

22      "Business growth should be supported by

23      corresponding sales increase."  Right?

24              MR. COLLINS:  Objection.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1              THE WITNESS:  That's what it says there.

2    BY MR. BOGLE:

3         Q    And this was one approved January 27,

4    2011, by Diane Martin and Michael Oriente.  Do you

5    see that, the next page?

6         A    Yes.  Michael's director of Regulatory

7    Affairs.

8         Q    Also approved by Diane Martin, as

9    indicated on that form, right?

10        A    She evidently put it in.

11        Q    Right.  Do you recall another location

12   of Best Care being in Lumberport, West Virginia?

13             MR. COLLINS:  Are you -- I'm sorry.

14   We've been going 70 minutes.  Is this a good time

15   to break?

16             MR. BOGLE:  That's fine.  I'm moving to

17   a different pharmacy.  That's fine.

18             THE VIDEOGRAPHER:  The time is 12:47

19   p.m.  We're going off the record.

20             (Lunch recess.)

21             THE VIDEOGRAPHER:  The time is

22   1:35 p.m., and we're back on the record.

23   BY MR. BOGLE:

24        Q    All right, Mr. Snider, we're back from

Page 267

1    lunch.  I wanted to pick up from where we were

2    talking about before we broke.

3              So we were talking about Best Care

4    Pharmacy.  You recall that generally?

5         A    Yes.

6         Q    Okay.  And I want to talk to you about

7    their pharmacy in Lumberport, West Virginia.  Are

8    you familiar with that pharmacy?

9         A    A little bit, yeah.

10        Q    Okay.  And that's a pharmacy that New

11   Castle has serviced historically, right?

12        A    Yes.  It -- I believe it -- the

13   documents show 2009, was it, it went onboard.

14        Q    Okay.  Yeah.  So I want to take a look

15   at some documents related to that location.

16             (Snider Exhibit No. 18 was marked

17             for identification.)

18   BY MR. BOGLE:

19        Q    I'm going to hand you Exhibit 1.1821,

20   also marked as Exhibit 18 to your deposition.

21             All right.  This is another one of these

22   files, and you see the name on the outside is

23   "Lumberport."

24             Do you see that?

Page 268

1          A      Yes.

2            Q      Okay.  And I want to walk through, first

3      of all, the pharmacy questionnaire when they were

4      onboarded.

5                  So if you go to page .2, you see there's

6      a signature there on that page from you.  Do you

7      see that?

8          A      Yes.

9            Q      Okay.  Related to Lumberport Pharmacy.

10     And would this be you signing off on the pharmacy

11     questionnaire that follows?

12         A      Yes.  And the affidavit was signed by

13     the pharmacist, I believe.

14           Q      Okay.  So let's go to the questionnaire

15     that starts on page .3.  And you see there,

16     they're noted to be a new customer going live

17     October 1, 2009.  Do you see that?

18         A      Yes.

19           Q      Okay.  And the pharmacist's name there

20     is a Matt Genin.  Do you see that at the bottom?

21         A      Yes.

22           Q      Okay.  You recognize that is the same

23     name we just saw going through the Best Care

24     Pharmacy at Weston, West Virginia.  Do you recall

Page 269

1    that name?

2         A     I don't remember, but it could be.

3         Q     Okay.  Well, I can show you if you want

4    to refresh on it.  Let me -- give me one second to

5    find that document.

6                MR. COLLINS:  I honestly don't remember

7    it, but --

8                MR. BOGLE:  It's not a huge point, but I

9    decided I wanted to make it, so we're --

10               MR. COLLINS:  Fine.  Fair enough.  It's

11   your depo.

12   BY MR. BOGLE:

13        Q     All right.  So it's 1.1812, which I

14   believe would be Exhibit 17 as well, the Best Care

15   document we looked at right before lunch.  I think

16   it's the one you've got in your hand right there.

17               MR. COLLINS:  That's 16.

18               MR. BOGLE:  Oh, is it 16?  Okay.  Then

19   that's the one I want, 16.

20               MR. COLLINS:  What page?  I'm sorry.

21   BY MR. BOGLE:

22        Q     So if you go to page on this one .11.

23   It's again the pharmacy questionnaire.

24               Do you see the pharmacist's name there?

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1          A     Yes.

2             Q     Do you see it's the same individual

3     we're talking about there?

4          A     Yes.   Same license.

5             Q     Yeah, same license number as well.

6     Okay.

7                  So we're dealing with the same

8     pharmacist involved with this Lumberport location

9     here.  So in looking further, he's also noted on

10    .4 as the owner of the pharmacy.

11                 Do you see that?

12         A     I believe the owner, it says Bob Reep.

13            Q     Are you at -- are you back on

14    Exhibit 18?  Because I'm looking at page .4.

15         A     Well, I'm not sure who's the owner.   Is

16    it Bob Reep or Matt Genin?

17            Q     Well, let's look at .4, and we can take

18    a look at that first.

19         A     Okay.

20            Q     So on .4, it says "Ownership/business

21    history," and it says "Owner's name:  Matt Genin,

22    dba," which I believe means doing business as,

23    "Best Care Pharmacy."

24                 Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 271

1          A     Yes.

2            Q     Okay.  And it's actually got the Weston

3      address of the Best Care Pharmacy we just looked

4      at, right?

5          A     Yes.

6            Q     And continuing further on in this

7      questionnaire, page .7, and you see here again

8      they're outlining their controlled substances

9      purchases as of October 2009, and they note 80

10     percent of the controlled substances purchases

11     were for hydrocodone.

12              Do you see that?

13         A     Yes.

14           Q     Okay.  And you would agree 80 percent of

15     their controlled substances purchases being

16     hydrocodone is a potential red flag that needs to

17     be reviewed from the perspective of diversion,

18     right?

19         A     I would agree that the director of

20     Regulatory Affairs would have to look at that.

21           Q     Okay.  It's something that should be

22     looked at.  I'm not saying -- again, I'm not

23     saying necessarily that it's you on the front

24     lines looking at that, but that should be

Page 272

1    investigated, correct?

2       A    It's something that I think the director

3    of Regulatory Affairs should look at.

4       Q    All right.  Now, Lumberport, you

5    understand that's another very small city, right?

6          MR. COLLINS:  Objection.

7    BY MR. BOGLE:

8       Q    In West Virginia.

9          MR. COLLINS:  Objection to form.

10         THE WITNESS:  I don't remember.

11    BY MR. BOGLE:

12      Q    Okay.  Have you ever been to Lumberport?

13      A    No, I don't remember being there.

14      Q    Okay.

15         (Snider Exhibit No. 19 was marked

16         for identification.)

17    BY MR. BOGLE:

18      Q    I hand you Exhibit 19.

19         Actually, let me ask you this:  If the

20    census data indicated there were fewer than a

21    thousand people living in Lumberport, would you

22    have reason to dispute that?

23         MR. COLLINS:  Again, foundation.

24         THE WITNESS:  I wouldn't know.  I'd have

Page 273

1    no reason to dispute it.

2    BY MR. BOGLE:

3         Q    Okay.  Let's just take a look real quick

4    then.  Exhibit 19, also marked as 1.1908, is what

5    I'm handing you.

6              All right.  It's another printout with

7    population and other data.  You see it's for

8    Lumberport, West Virginia?

9         A    Yes, I see.

10        Q    And this is the most current data that I

11   was able to obtain.  The population noted here for

12   Lumberport is 881 people.  Do you see that?

13        A    Yes.

14        Q    Okay.  Do you have any specific

15   knowledge that would contradict that being the

16   most current population data for Lumberport?

17             MR. COLLINS:  Objection.  Foundation.

18             THE WITNESS:  I don't have any knowledge

19   of the surrounding area of Lumberport.

20   BY MR. BOGLE:

21        Q    Okay.  All right.  So let's go back to

22   Exhibit 1.1821, and I want to specifically look at

23   .19 is the page.

24        A    Can you give me that exhibit again?

Page 274

1          Q     It's 1.1821, the page is .19.  The page

2     should look like this (indicating).

3               MR. COLLINS:  He's referring to the

4     numbers at the top.

5               THE WITNESS:  Oh, 1821.19, okay.

6     BY MR. BOGLE:

7          Q     Yeah.

8          A     Thank you.

9          Q     Are you at that page?

10         A     Yes.

11         Q     Okay.  And you see here this is for

12    threshold change form, October 19, 2009, for a

13    permanent threshold change.  Do you see that?

14              MR. COLLINS:  Objection.  Form.

15              THE WITNESS:  I don't know if it's to

16    start them.  It looks like the day we opened them.

17    BY MR. BOGLE:

18         Q     Yeah, I'm just saying the date is

19    October 19, 2009, right?

20         A     Yes.

21         Q     Okay.  And it's a threshold change form

22    requesting a permanent threshold change, right?

23         A     Yes, but I think it's the start of their

24    ownership.  I'm not sure because I'm -- we had a

Highly Confidential - Subject to Further Confidentiality Review

Page 275

1    Level I questionnaire on that date.

2         Q    Okay.  But all I'm --

3         A    So I'm --

4         Q    Okay.  All I'm asking, though, is it's

5    indicated to be a permanent change being

6    requested, right?

7         A    Yes.

8         Q    Okay.  And this is related to 9193,

9    which I believe is hydrocodone.  Do you see that?

10        A    Yes.

11        Q    And the current threshold is noted to be

12   8,000 at this point in time, right?

13        A    Yes.

14             MR. COLLINS:  Objection.

15   Mischaracterization.

16   BY MR. BOGLE:

17        Q    And there is a request to increase that,

18   to double that, to 16,000 doses per month, right?

19             MR. COLLINS:  Objection.  Foundation.

20             THE WITNESS:  Well, I'd have to -- oh,

21   plus -- plus 8,000.

22   BY MR. BOGLE:

23        Q    Right.

24        A    Yes.

Page 276

1        Q    They're asking to add 8,000 to the

2    existing threshold, right?

3        A    Yes.

4        Q    Okay.  So -- and it says for -- the

5    reason for the requested change -- actually,

6    strike that.

7            When it's noted to increase a threshold,

8    and we talk about by a certain number of doses, a

9    dose when it comes to hydrocodone or oxycodone is

10   a pill, right?

11       A    Usually a pill or an ounce.

12       Q    All right.  When it comes in pill form,

13   it's going to be a single pill, right?

14       A    Usually, yes.

15       Q    Okay.

16       A    That I know of.

17       Q    Okay.  And the reason noted for the

18   requested change here is:  "Brand new account.

19   Family threshold is set too low."  Do you see

20   that?

21       A    Yes.

22       Q    Okay.  And this was submitted by you on

23   October 20th, 2009, right?

24       A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 277

1          Q    And in addition, from sales, Jim

2     Gavatorta; approved by Michael Oriente, right?

3          A    Yes.

4          Q    Okay.  And to establish that the

5     threshold is too low for the specific product, you

6     would need to be able to look at the prescription

7     data for hydrocodone and the overall prescription

8     data to indicate whether this is too low.

9               You agree with that, right?

10              MR. COLLINS:  Objection.  Form.

11              THE WITNESS:  I would not have to look

12     at that.  I'd look at the --

13              What year was this, please?

14     BY MR. BOGLE:

15          Q    October 2009.

16          A    I believe I would get the sales and the

17     director of Regulatory Affairs or the -- or Jim

18     would have gotten the script information.

19          Q    Right.  But my question simply was,

20     to -- whoever is making this determination at

21     Regulatory would need to look at how much they're

22     selling of hydrocodone and how that compares to

23     their overall prescription sales at that time,

24     right?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1        A     Yes.  It says "80 percent,

2    Medicare/Medicaid."  They would verify that too.

3        Q     Okay.  So looking at this file,

4    though -- again, it's a fairly small file -- I did

5    not see any indication of such data being attached

6    to this form or in this file.  Am I missing

7    something here?

8        A     On the questionnaire of the same day, it

9    says:  "Call doctors to verify."  So I don't know

10   what all due diligence was done on that.  There's

11   no record of a call.

12       Q     Right.  And there's also no new actual

13   documentation of their prescription sales either

14   for hydrocodone or overall sales in this packet,

15   is there?

16       A     I don't see it.

17       Q     Okay.  And I want to look at the next

18   threshold change request, which is page .13.  Do

19   you see here this is a threshold change request

20   that was approved July 19, 2010, by Duane

21   McPherson and Michael Oriente?

22              Do you see that --

23              MR. COLLINS:  Object --

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

                                                    Page 279

1          Q     -- on page .14?

2                MR. COLLINS:  Objection.  Foundation.

3                THE WITNESS:  I see those names on

4     there.

5     BY MR. BOGLE:

6          Q     Okay.  And it's noted to be approved as

7     the approval status for both, right?

8          A     I'm not familiar with this document.  It

9     went to the Pharmacy Regulatory Affairs.

10         Q     Okay.

11         A     So I wouldn't have seen this before.

12         Q     But for Mr. McPherson, it says:  "DC

13    approval status, approved," right, next to it?

14         A     That's what it says.

15         Q     What the document says.

16         A     Yes.

17         Q     Same for Mr. Oriente, where it says "DRA

18    approval status," next to it, it says "Approved,"

19    right?

20         A     It says DR -- is this number 13?

21         Q     This is .14.

22         A     Sorry.

23         Q     The -- this document starts .13.  I was

24    trying to give you the sense of both pages of it.

Page 280

1    A    Okay.  I didn't see the second page, I'm

2    sorry.  It has "DC approver, Duane" on it, and

3    "DRA, Michael Oriente" on it.

4         Q    Okay.  And then going back to .13 to see

5    what request was made here, this is a request for

6    an increase for hydrocodone by 5,000 doses.

7              Do you see that?

8    A    Yes.

9         Q    And for "Supporting Information," it

10   says:  "Account purchase are up overall for the

11   month due to an increase in local prescriptions."

12             Do you see that as the supporting

13   information?

14        A    I see that as under that column, yeah.

15        Q    Okay.  And the reason for TCR is the

16   same one we've seen several times today, "Business

17   growth should be supported by corresponding sales

18   increase."

19             Do you see that reference?

20        A    Yes, but I don't know that isn't on the

21   original TCR or that he didn't have that.  I can't

22   answer to that.

23        Q    Yeah, just -- I'm just -- right now I'm

24   just saying that's what the document says, and I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 281

1    going to get to my next question.  Just bear with

2    me.

3              That's what it says, first of all.

4    That's the reason for TCR that's listed here,

5    right?  "Business growth should be supported by

6    corresponding sales increase."

7        A    What's your question, please?

8        Q    That's what it says, right?

9        A    Under "Reason for TCR" --

10       Q    Yes, sir.

11       A    -- yes.  Yes.

12       Q    Okay.  And we just talked about -- in

13   the file that was provided here for this pharmacy,

14   there are -- there's no purchase data included

15   here, is there, documentary purchase data?

16             MR. COLLINS:  Objection.  Form.

17             THE WITNESS:  I don't -- I don't see

18   that.  I do see an attachment on October 20th from

19   Michael.

20   BY MR. BOGLE:

21       Q    Attachment of what?

22       A    It doesn't say.  A Word document.

23       Q    Okay.  All right.  But to my -- do you

24   recall my question, though?  Do you see anything

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    that indicates an attachment here, there's actual

2    physical documentation attached here showing

3    purchase data?

4                    MR. COLLINS:  Objection.  Form.

5                    THE WITNESS:  I don't see anything

6    except that Word document attachment that's not

7    attached here.

8    BY MR. BOGLE:

9         Q    Okay.  And how do you know that's not

10   attached?

11        A    I don't see it.

12        Q    Okay.  Do you see there's a -- on that

13   same day -- I think you're looking at page .20.

14        A    Yes.

15        Q    Okay.  And that references a Lumberport

16   TCF, hydrocodone, 10/19/09, right?

17        A    I don't know.

18        Q    So the document -- that's what it says,

19   the attachment, right, that you're referring to?

20        A    Yes.  Yeah.

21        Q    Okay.  And you see the previous page,

22   10/19/09, I believe is the one we just looked at a

23   minute ago, same date, hydrocodone, increase

24   request?

Page 283

1              MR. COLLINS:  Objection.  Form.

2              THE WITNESS:  I -- I --

3              MR. COLLINS:  What's the question?

4              THE WITNESS:  I see it.

5      BY MR. BOGLE:

6          Q    It's the same date and for the same

7      product that you're refer- -- that's being

8      referenced in the attachment there, right?  And

9      the same pharmacy.

10         A    Yes, it is.

11         Q    Okay.  And TCF is threshold change,

12     right, form?

13         A    Yes.  That's usually what we refer to.

14         Q    All right.  Let's go to next page .15 in

15     this document.

16              And on .15 and .16 is an additional

17     threshold change request for hydrocodone for an

18     additional 2,000 doses.

19              Do you see that?

20              MR. COLLINS:  Objection.  Foundation.

21              THE WITNESS:  Yeah, this is a Pharmacy

22     Regulatory Affairs document.  I didn't always see

23     these, and I didn't see this.

24     BY MR. BOGLE:

Page 284

1          Q     Okay.  Do you see that there, though,

2     the request for 2,000 additional doses for

3     hydrocodone?

4                MR. COLLINS:  Same objections.

5                THE WITNESS:  It's what it looks like,

6     yes.

7     BY MR. BOGLE:

8          Q     And on .16, this was approved by Diane

9     Martin at your facility and Michael Oriente,

10    October 26, 2010 -- or August 26, 2010, right?

11               MR. COLLINS:  Objection.  Foundation.

12               THE WITNESS:  That would mean Diane

13    would have sent it in to the director of

14    Regulatory Affairs.

15    BY MR. BOGLE:

16         Q     Right.  But what's noted in the document

17    is approval dates, August 26, 2010, for both of

18    them, right?

19         A     I believe that's when Diane sent it in,

20    yes.

21         Q     Okay.  And what's noted here, if you go

22    back to page .15 for supporting information, it

23    says:  "This accounts purchases are up overall.  A

24    review and visit were done by Dale Nusser and Jim

Page 285

1    Gavatorta in the fall of 2009."

2               Do you see that?

3        A    Yes.

4        Q    Okay.  So that's a full year prior to

5    this request when this review was done, right?

6               MR. COLLINS:  Objection.  Misstates the

7    document.

8               THE WITNESS:  I would think that's

9    reasonable.

10   BY MR. BOGLE:

11       Q    Okay.  So the supporting information for

12   this increase in August 2010 is that there had

13   been a review and site visit nearly a year before,

14   right?

15       A    I don't know what else was included with

16   Michael's DRA due diligence.

17       Q    But that's what's indicated here for

18   supporting information on this form, right?

19       A    The form says that, yes.

20       Q    Right.  And it's for a permanent

21   request, again based on "Business growth should be

22   supported by corresponding sales increase."

23   That's what's indicated on the form, right?

24              MR. COLLINS:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1              THE WITNESS:  That's what it says on the

2     form.  I don't know that he doesn't have that.

3     BY MR. BOGLE:

4          Q    Right.  You don't know either way,

5     right?

6          A    No.

7          Q    And for Lumber -- I'm sorry, strike

8     that.

9              For Best Care, they also had a pharmacy

10    in Belington, West Virginia, right?  Do you recall

11    that, servicing that pharmacy too?

12         A    Yes, I do.

13         Q    Okay.  And Belington, West Virginia, do

14    you know anything about the population for that

15    city?

16         A    No, I don't.  I don't.  I don't think I

17    remember being there.

18         Q    Okay.  Any reason to dispute they have

19    about 2,000 people in Belington, West Virginia?

20              MR. COLLINS:  Objection.  Foundation.

21              THE WITNESS:  I wouldn't dispute that.

22    I don't know.

23              (Snider Exhibit No. 20 was marked

24              for identification.)

Page 287

1    BY MR. BOGLE:

2         Q    Okay.  And I want to look at some of the

3    documentation on the Belington location.  I hand

4    you Exhibit 20, also marked as Exhibit 1.1822.

5              All right.  We see here, we start with

6    page .5.  It's a threshold change form from

7    August 20, 2009.  Do you see that?

8         A    It's a Level I documentation, yes.

9         Q    Right.  You say Level I documentation.

10   I'm looking at the threshold change form.  Are we

11   looking at something different?

12        A    Oh, I'm sorry.  Yeah, .5?

13        Q    Yes.  Yes, sir.

14        A    I apologize, I was.

15        Q    That's all right.

16             Okay.  You see -- you see August 20,

17   2009, there on that one, right?

18        A    Yes.

19        Q    Where it says "Belington Prescription in

20   Belington, West Virginia."

21        A    Yes.

22        Q    Do you see that name?

23        A    Yep.

24        Q    And the current threshold noted here for

Page 288

1    them on hydrocodone is 12,000.  Do you see that?

2         A     Increase amount 2,000 -- current

3    threshold, 12, yes.

4         Q     Right.  And they're asking for 2,000

5    more, right?

6         A     Yes.

7         Q     Okay.  And the reason for change noted

8    here is:  "Increase in business, stopped buying

9    from competitor Bellco.  All hydrocodone bought

10    from McKesson."

11              Do you see that as the reason noted?

12         A     I see that, yes.

13         Q     Okay.  When customers tell you that

14    they've stopped buying from one of your

15    competitors, that's something you would ask for

16    them to substantiate, right, to prove that?

17         A     That's something Michael would ask to

18    substantiate that so he could get the data.

19         Q     And that -- that should be confirmed,

20    right?

21              MR. COLLINS:  Objection.  Form.

22              THE WITNESS:  I can't answer if he did

23    or didn't.

24    BY MR. BOGLE:

Page 289

1          Q    I didn't ask you that.  That should be
2     confirmed, right?
3               MR. COLLINS:  Objection.  Calls for a
4     legal conclusion.  Form.  Foundation.
5               THE WITNESS:  I can't answer if he did
6     or didn't.
7     BY MR. BOGLE:
8          Q    Okay.  Listen to my question.
9               That should be confirmed, right?  I
10    didn't ask you whether he did confirm.  I'm
11    asking, that's something that should be confirmed
12    when a customer tells you that?
13              MR. COLLINS:  Objection.  Calls for a
14    legal conclusion, form, foundation.
15              THE WITNESS:  I answered.  I can't --
16    I'm not sure if he did or didn't.
17    BY MR. BOGLE:
18         Q    Right.  But should he have, from your
19    perspective?
20         A    I can't answer for him, sir.
21         Q    Okay.  And this is noted as being
22    approved by both yourself and Michael Oriente on
23    August 20, 2009, right?
24              MR. COLLINS:  Objection to the term

Page 290

```
 1    "approved."

 2              THE WITNESS:  I signed the threshold

 3    change request to be put through.

 4    BY MR. BOGLE:

 5        Q    Right.  This says "Approved by," and

 6    there's your name and there's Michael Oriente's

 7    name, right?

 8              MR. COLLINS:  Objection.

 9    Mischaracterization.

10              THE WITNESS:  I signed it to be sent to

11    the Regulatory Affairs director.

12    BY MR. BOGLE:

13        Q    And if you go to page .11.

14              MR. BOGLE:  .11 and .12, can we just

15    pull those up side by side on the screen?  Thanks.

16    BY MR. BOGLE:

17        Q    Do you see this is a threshold change

18    request for hydrocodone for Belington approved

19    August 16, 2010?  Do you see that?

20              MR. COLLINS:  Objection.  Foundation.

21              THE WITNESS:  I didn't -- I don't know

22    this document.  I'm sorry.  Can you go through it

23    again?

24    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 291

1          Q     Yeah.  You see on page .12, "DC approval

2      status:  Approved Duane McPherson, August 16,

3      2010."  Right?

4                    MR. COLLINS:  Objection.  Foundation.

5                    THE WITNESS:  Yes.

6      BY MR. BOGLE:

7          Q     And "DRA approval status:  Approved by

8      Michael Oriente," three minutes later, "August 16,

9      2010."  Right?

10                    MR. COLLINS:  Objection.  Foundation.

11                    THE WITNESS:  I already testified to how

12      it works.  I don't know what due diligence was

13      done before or after the call.

14      BY MR. BOGLE:

15          Q     Right.  I'm just asking if that's --

16      that's what is indicated here.

17          A     You said three minutes.

18          Q     Yeah, 10:59 to 11:02.

19          A     Correct.

20          Q     And then -- so going back to .11,

21      they're requesting here an increase of 4,000 doses

22      for hydrocodone, a permanent increase, right?

23          A     It looks like this form says it was

24      increased.

Highly Confidential - Subject to Further Confidentiality Review

Page 292

1      Q    Right.  That's what they were

2  requesting, and that's what they got, right?

3      A    Well, I don't see the TCR with this, but

4  I do see this form.

5      Q    Okay.  And "Supporting Information"

6  says:  "Belington was recently sold to Best Care

7  Pharmacy Group in May 2010.  New scripts from this

8  acquisition has caused a need for an increase in

9  their hydrocodone threshold."

10              Do you see that?

11      A    Yes.

12      Q    Okay.  And again, business growth is the

13  reason provided, right?

14      A    No, it was sold.

15      Q    Right.  But the reason for TCR, it says:

16  "Business growth should be supported by

17  corresponding sales increase."  Right?

18              MR. COLLINS:  Objection.  Lack of

19  foundation.

20              THE WITNESS:  Yeah, supporting

21  correspondence above, yes.

22  BY MR. BOGLE:

23      Q    Okay.  And so, again, if there's an

24  acquisition which has caused an increased need,

Page 293

1    that's again something that would need to be

2    confirmed with documentation, right?

3                  MR. COLLINS:  Objection.  Calls for a

4    legal conclusion.

5                  THE WITNESS:  I don't know.  It could

6    have been done with a phone call or a check of the

7    pharmacy license or a call to the State Board of

8    Pharmacy.

9    BY MR. BOGLE:

10       Q    But just the purchase itself doesn't

11   mean they need more pills, right?  You would need

12   to show a business need documented beyond just the

13   purchase itself, right?

14                 MR. COLLINS:  Objection.  Calls for a

15   legal conclusion, foundation, form.

16                 THE WITNESS:  I don't know what Michael

17   did to show on that.

18   BY MR. BOGLE:

19       Q    Okay.  All right.  So let's go to

20   page .13 and .14.

21                 Do you see here this is another

22   threshold change request for hydrocodone

23   requesting a temporary increase of 9,000 doses?

24   Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1        A     Yes.

2           Q     This was approved by Joel Zwick and

3     Michael Oriente, November 15, 2010, right?

4        A     Joel sent it to Michael.

5           Q     The note is approving on November 15 --

6        A     Oh, I'm sorry, I correct myself.

7              Dale Nusser sent it to Michael.

8           Q     Right.  .14 indicates that Joel Zwick

9     and Michael Oriente both noted as approving this

10    on November 15, 2010, right?

11              MR. COLLINS:  Objection.  Lack of

12    foundation, lack of firsthand knowledge.

13              THE WITNESS:  Joel sent it, yes.  I

14    believe.  I don't know this form.  But it shows

15    that Joel sent it, and then above here, it says

16    "Submitter name:  Dale Nusser."

17    BY MR. BOGLE:

18           Q     And it does show it was approved, right?

19              MR. COLLINS:  Objection.  Form.

20              THE WITNESS:  The way I see it, I don't

21    see a signature, but the -- the -- Michael

22    Oriente's name is on the -- this document.

23    BY MR. BOGLE:

24           Q     And it says "Approved," right?

Page 295

1              MR. COLLINS:  Objection.  Form.

2     BY MR. BOGLE:

3          Q     On .14.

4              MR. COLLINS:  Objection.  Form.

5              THE WITNESS:  "DRA approval status:

6     Approved."

7     BY MR. BOGLE:

8          Q     Yep.  And for "Supporting Information"

9     on this one, it says:  "The customer was robbed on

10    Sunday.  All hydrocodone products were stolen

11    except for two bottles of Vicodin 5/500.  Customer

12    to send a copy of police report when received."

13              Do you see that?

14         A     Yes.

15         Q     Do you see a copy of the police report

16    here in this file?

17              MR. COLLINS:  Objection.  Foundation.

18              THE WITNESS:  I don't know that that's

19    in here.  I don't see it in what you gave me.

20    BY MR. BOGLE:

21         Q     Okay.  This is the document as produced.

22    I'm giving you what was produced to us.

23              Do you see it in this?

24         A     I didn't produce it.

Page 296

1          Q     Huh?

2          A     I didn't produce it.  I don't know.

3          Q     I'm just asking you if you see the

4     police report in this packet related to this

5     pharmacy.

6                MR. COLLINS:  Objection.  Argumentative.

7                THE WITNESS:  I don't see it in here.

8     BY MR. BOGLE:

9          Q     Okay.  Are you aware that ultimately one

10    of the owners of Best Care was prosecuted for

11    illegally diverting opioids?

12         A     I am aware that an owner of Best Care

13    was prosecuted, and we cut them off.

14         Q     Well, you're aware that there was a --

15    there was an arrest and a prosecution for one of

16    the owners of Best Care for diversion of opioid

17    products, right?

18               MR. COLLINS:  Objection.  Foundation.

19               THE WITNESS:  I was aware that he was

20    arrested.  That's all.

21               (Snider Exhibit No. 21 was marked

22               for identification.)

23    BY MR. BOGLE:

24         Q     Okay.  Let me hand you 1.1251,

Page 297

```
 1    Exhibit 21.

 2              This is a news release from the U.S.

 3    Department of Justice, June 3rd, 2014, titled

 4    "Pharmacist charged with illegal distribution of

 5    painkillers."

 6              Do you see that?

 7       A    Yes.

 8       Q    Have you ever seen this press release

 9    related to Best Care?

10       A    No, I haven't.

11       Q    Okay.  How did you become aware of the

12    arrest then?

13       A    I don't remember.  Probably the DRA.

14       Q    Okay.  And if you look in the press

15    release, it says:  "A West Virginia pharmacist has

16    been indicted on charges that he dispensed

17    prescription painkillers outside the scope of his

18    professional practice."

19              And then it says:  "United States

20    Attorney William Ihlenfeld, II, announced that

21    Mario Blount, 51, of Bridgeport, West Virginia,

22    was arrested this morning on charges of conspiracy

23    to possess and distribute Schedule II controlled

24    substances, distribution of oxycodone and a
```

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    failure to report the filling of a prescription."

2               Do you see that?

3        A     Yes.

4        Q     And it says:  "Blount, who was employed

5    by Best Care Pharmacy, is alleged to have

6    conspired with two other individuals over the last

7    three years to distribute prescription painkillers

8    for non-legitimate medical purposes."

9               Do you see that reference?

10       A     Yes.

11       Q     Okay.  And skip a paragraph, the next

12   one says:  "The Greater Harrison County Drug Task

13   Force executed search warrants in October 2013 at

14   Best Care Pharmacy locations in the West Virginia

15   towns of Bridgeport, Lumberport and Belington."

16              Do you see that?

17       A     Yes.

18       Q     And that's the three facilities we've

19   just been looking at over the last hour or so,

20   right?

21       A     Yes.

22       Q     And then the last paragraph on this page

23   says:  "Mr. Blount abused the trust of the

24   citizens of Bridgeport and the customers of Best

Page 299

1    Care Pharmacy.  These arrests serve as a warning

2    that the illicit distribution of controlled

3    substances will not be tolerated in Harrison

4    County, said Karl C. Colder, Special Agent in

5    Charge, Drug Enforcement Administration,

6    Washington, D.C. Field Division.  Over

7    approximately three years, Mr. Blount illegally

8    dispensed over 11,000 oxycodone and oxymorphone

9    pills."

10              Do you see that?

11       A    I see that, yes.

12       Q    And you know McKesson was the supplier

13   of those pills, right?

14              MR. COLLINS:  Objection.  Assumes facts

15   not in evidence, foundation.

16              THE WITNESS:  I don't know that.

17   BY MR. BOGLE:

18       Q    Well, your New Castle facility was

19   supplying Best Care with those very drugs during

20   that very time period, right?

21              MR. COLLINS:  Objection.  Argumentative,

22   assumes facts not in evidence.

23              THE WITNESS:  I don't know that.

24   BY MR. BOGLE:

Page 300

1          Q     You don't know if you were supplying

2     them?

3          A     No.

4                MR. COLLINS:  Objection.

5     BY MR. BOGLE:

6          Q     You don't know if Best Care Pharmacy was

7     a customer of yours for 2010 to 2014?

8                MR. COLLINS:  Objection.  Argumentative.

9     BY MR. BOGLE:

10         Q     I'm just asking if you know or not.

11               MR. COLLINS:  Objection.  You just asked

12    the same -- you've asked the same question two or

13    three times.

14               THE WITNESS:  I don't know.

15    BY MR. BOGLE:

16         Q     You don't know?

17               Okay.  We just saw from all three of

18    those facilities threshold change requests

19    approved for some of these very drugs covering all

20    the way up until 2011, and it's your -- that came

21    from your facility at New Castle, and it's your

22    testimony that after seeing all that, you don't

23    know if you supplied them with any oxycodone or

24    oxymorphone pills?

Page 301

1              MR. COLLINS:  Objection.  Assumes facts

2      not in evidence.  The question is compound.

3              THE WITNESS:  I don't -- I don't know

4      that.  He could have other wholesalers.  I don't

5      know that.

6      BY MR. BOGLE:

7          Q    You don't even know if he had other

8      wholesalers?

9          A    I don't remember that, no.

10         Q    Okay.

11         A    No.

12         Q    Isn't that something you would need --

13     that you would want to know?

14             MR. COLLINS:  Objection.  Calls for a

15     legal conclusion, argumentative.

16             THE WITNESS:  I would want the director

17     of Regulatory Affairs to know that.

18     BY MR. BOGLE:

19         Q    You would want him to know that.  It's

20     okay, as the guy who is responsible for making

21     sure that the New Castle isn't involved in

22     diversion, you don't care if you know that or not?

23             MR. COLLINS:  Objection.  Argumentative.

24     Object to the theatrics.

Page 302

1          THE WITNESS:  Can you restate the

2     question, if you want?

3     BY MR. BOGLE:

4          Q    Well, I don't think there's anything

5     wrong with that question.

6          MR. COLLINS:  Objection.  It's --

7          THE WITNESS:  Can you repeat it then?

8     BY MR. BOGLE:

9          Q    Yeah.

10          You don't think that as the individual

11     or director of operations for New Castle

12     responsible for making sure that facility isn't

13     involved in diversion, you don't think it's

14     important for you to know whether you were the

15     only supplier of these pills to this -- these

16     pharmacies or whether somebody else was too?

17          MR. COLLINS:  Objection.  Argumentative,

18     compound, object to the theatrics, asked and

19     answered.

20          THE WITNESS:  I don't know.

21     BY MR. BOGLE:

22          Q    You don't know whether that's something

23     you should know?

24          A    I've already answered that.  You keep

Highly Confidential - Subject to Further Confidentiality Review

Page 303

1    asking me.  I don't know.  He could have had

2    another wholesaler.  I don't know that.  I don't

3    remember.

4         Q    But you know you were one -- that your

5    facility at New Castle certainly was one of the

6    wholesalers, right?

7              MR. COLLINS:  Objection.

8    BY MR. BOGLE:

9         Q    We've seen documentary support for that.

10             MR. COLLINS:  Objection.  The

11   question --

12   BY MR. BOGLE:

13        Q    Right?

14             MR. COLLINS:  Well, the question is now

15   compound three times.

16             THE WITNESS:  I -- I answered that, yes.

17   BY MR. BOGLE:

18        Q    Yes, you were.  Okay.

19             And you said this pharmacy was cut off.

20   They were cut off for about two weeks, right, Best

21   Care?

22             MR. COLLINS:  Objection.  Assumes facts

23   not in evidence, foundation.

24             THE WITNESS:  I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

Page 304

1    BY MR. BOGLE:

2          Q     You don't remember?

3          A     No.

4          Q     Okay.

5          A     That would be the director of Regulatory

6    Affairs.

7          Q     Well, the pills come out of your

8    facility, right?

9               MR. COLLINS:  Objection.

10              THE WITNESS:  I don't know that.  I

11   answered to that.

12   BY MR. BOGLE:

13         Q     Does -- does Regulatory Affairs run your

14   facility?

15              MR. COLLINS:  Objection.  Form.  The

16   question is vague.

17   BY MR. BOGLE:

18         Q     I mean, do you defer all responsibility

19   for the pills that go out of New Castle to

20   Regulatory Affairs?

21              MR. COLLINS:  Objection.  Argumentative.

22              THE WITNESS:  No.

23   BY MR. BOGLE:

24         Q     Okay.  Because that's -- it's your job,

Highly Confidential - Subject to Further Confidentiality Review

Page 305

1     right?

2               MR. COLLINS:  Objection.

3               THE WITNESS:  What's my job, please?

4     I'm not sure --

5     BY MR. BOGLE:

6          Q    To know what's leaving your facility and

7     to whom it's going to and whether they can be

8     trusted.

9          A    I didn't --

10              MR. COLLINS:  Objection.  The question

11    is compound, it's vague, calls for a legal

12    conclusion, lacks foundation.

13    BY MR. BOGLE:

14         Q    I think it's a good question, so go

15    ahead.

16              MR. COLLINS:  My objections stand.

17              THE WITNESS:  I stand by my record and

18    what I do at the facility.

19    BY MR. BOGLE:

20         Q    That's -- that's not my question, sir.

21         A    That's the best I can answer.

22         Q    My question is, is it your testimony

23    that your responsibilities as director of

24    operations at New Castle does not include knowing

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    who you're selling to and what purpose they're

2    using those pills for?

3              MR. COLLINS:  Objection.  Argumentative,

4    compound, vague, calls for a legal conclusion.

5              THE WITNESS:  Can you repeat the

6    question?

7    BY MR. BOGLE:

8         Q    Right.  Is it your testimony here today

9    that it's not your responsibility as director of

10   operations for New Castle to know who you're

11   selling to and what they're using the products for

12   that you're selling them?

13             MR. COLLINS:  Objection.  Calls for a

14   legal conclusion.  It's compound and it's also

15   vague.

16             THE WITNESS:  The best I can answer that

17   is I know my customers, and when I don't, I make

18   sure the DRA and the VP/GM know.

19   BY MR. BOGLE:

20        Q    Okay.  So you knew -- you knew the folks

21   at Best Care then, right?

22             MR. COLLINS:  Objection.  Assumes facts

23   not in evidence.

24             THE WITNESS:  Not personally, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 307

1    BY MR. BOGLE:

2         Q    You say it's your responsibility to know

3    the customer or the DRA knows them, so either you

4    knew them or the DRA knew them.  Who knew them?

5              MR. COLLINS:  Objection.  Argumentative,

6    compound.

7              THE WITNESS:  I can't answer that for

8    the DRA or the VP/GM.

9    BY MR. BOGLE:

10        Q    What about you, did you know them?

11        A    I didn't --

12             MR. COLLINS:  Objection.  Question is

13   compound.

14             THE WITNESS:  -- know them personally.

15   BY MR. BOGLE:

16        Q    Did you find them trustworthy to give

17   them all those pills?

18             MR. COLLINS:  Objection.

19             THE WITNESS:  I didn't know --

20             MR. COLLINS:  I'm sorry.  Please let me

21   finish my objection.

22             THE WITNESS:  Sorry.

23             MR. COLLINS:  These questions are vague,

24   compound, argumentative.

Highly Confidential - Subject to Further Confidentiality Review

Page 308

1    BY MR. BOGLE:

2        Q    Did you trust them to let those pills

3    out of your facility that ultimately they were --

4    one of their owners was arrested for diverting?

5            MR. COLLINS:  Objection.  The question

6    is vague, "them."

7            THE WITNESS:  I wouldn't trust an owner

8    that was arrested for diversion, no.

9    BY MR. BOGLE:

10       Q    But you did trust that owner.

11           MR. COLLINS:  Objection.  Argumentative.

12   BY MR. BOGLE:

13       Q    Right?

14           MR. COLLINS:  Objection.  Argumentative.

15           THE WITNESS:  I protest to the word

16   "trust."  I didn't know him.

17   BY MR. BOGLE:

18       Q    Okay.  Do you know anybody that did at

19   McKesson?

20       A    Yeah, Jim --

21       Q    That did know that customer?

22       A    Yeah, Jim Gavatorta did, and so did

23   Brian.

24       Q    Brian Ferreira?

Page 309

1          A     Yeah.

2          Q     Okay.  So they would be the ones to say

3     whether they were trustworthy prior to this arrest

4     being made, right?

5          A     I can't answer to that.  I just know

6     they knew them.

7          Q     Okay.  I'm going to hand you what I'm

8     marking as Exhibit 1.1794, also marked as

9     Exhibit 22.

10               (Snider Exhibit No. 22 was marked

11               for identification.)

12    BY MR. BOGLE:

13         Q     All right.  And you see this is a

14    monthly report from a Tim Foster to an Andrew

15    Moore, June 2014 monthly report.

16               Do you see that?

17               MR. COLLINS:  Objection.  Found- --

18    BY MR. BOGLE:

19         Q     First page.

20               MR. COLLINS:  Objection.  Foundation.

21               THE WITNESS:  It looks like it.  I'm not

22    familiar with this document.

23    BY MR. BOGLE:

24         Q     Okay.  Well, let me ask you, on page 2,

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    I think it references something on Best Care.  I

2    want to know if you knew this independent of this

3    document.

4              It says on point 2, it's the -- one,

5    two, three, four, five, six -- sixth bullet point

6    that starts with "Mario Blount."  Do you see that

7    paragraph?

8         A    Yes.

9         Q    Okay.  It says:  "Mario Blount, partial

10   owner of the Best Care Group, was arrested in

11   early June on numerous narcotics charges, several

12   in relation to drug overdose deaths.  As a result,

13   we shut off all narcotics at both Best Care

14   locations, Bridgeport and Lumberport, on Friday,

15   6/6.  After a review of their dispensing and

16   surveys, we were unable to turn narcotics back on

17   because Blount was still listed as a 10 percent

18   owner.  As of 6/20, Blount was bought out of the

19   group, and we were able to review them again.  On

20   6/24, Drew Schwichow did site visits and will make

21   a determination from there, and from that, they

22   were turned on 6/26."

23             Do you see that?

24        A    I do.

Page 311

1        Q    Twenty days that you guys weren't

2    providing them narcotics, right?

3             MR. COLLINS:  Objection.  Assumes facts

4    not in evidence, lack of foundation.

5    BY MR. BOGLE:

6        Q    6/6 to 6/26, that's 20 days that you

7    guys stopped providing them narcotics, including

8    opioids, right?

9             MR. COLLINS:  Objection --

10   BY MR. BOGLE:

11       Q    Based on this document.

12            MR. COLLINS:  Objection.  Compound,

13   argumentative, assumes facts not in evidence,

14   lacks foundation.

15            THE WITNESS:  I can't say to what Tim

16   put in this document.

17   BY MR. BOGLE:

18       Q    Okay.

19       A    I don't know that.

20       Q    Do you recall ceasing sales to any of

21   these Best Care locations for more than 20 days?

22       A    I don't recall how many days we ceased

23   sales of any controls.

24       Q    Okay.  And the next bullet point says:

Page 312

1    "Rich Mace, owner of Mace's Pharmacies, purchased

2    the Best Care Belington location and closed on

3    this sale on May 16th."

4              Do you see that?

5      A      Yes.

6        Q    Okay.  And Mace's Pharmacy, that's

7    another one we discussed earlier and reviewed some

8    TCRs for, right?  Remember talking about that

9    earlier today with me?

10     A      Yes, I do.  Yes.

11       Q    Okay.  Same guy, right, Mace's?

12             MR. COLLINS:  Objection.  Foundation.

13   BY MR. BOGLE:

14       Q    Mace's Pharmacy, do you remember talking

15   about that?

16             MR. COLLINS:  What's the question?

17             THE WITNESS:  I answered that "yes."

18   BY MR. BOGLE:

19       Q    Okay.  Are you familiar with Martella's

20   Pharmacy in Pennsylvania?

21     A      Yes.

22       Q    And that's a pharmacy that the New

23   Castle Distribution Center has serviced over the

24   years, right?

Page 313

1           A      Yes.

2              Q      Okay.  And when they were brought on as

3      a new customer in late 2010, they immediately

4      began requesting threshold increases for opioids,

5      right?

6           A      I don't recall that.

7              Q      You don't know.  Okay.

8              Do you recall them in 2010 threatening

9      to go to another distributor if those increases

10     weren't approved?

11          A      No.

12             (Snider Exhibit No. 23 was marked

13             for identification.)

14     BY MR. BOGLE:

15             Q      There's Exhibit 2- --

16             Do you need to --

17          A      No.

18          Q      Exhibit 23, also marked as 1.1900.

19             MR. COLLINS:  This is 23?

20             MR. BOGLE:  Yeah.

21     BY MR. BOGLE:

22             Q      Okay.  It's a string of e-mails here,

23     but I want to start with the threshold change

24     request e-mail, which is the last one in the

Page 314

 1    document on page .2.

 2              Do you see it's from SharePoint,

 3    October 19, 2010?

 4         A    Yes.

 5         Q    To Dale Nusser, cc'ing other

 6    individuals, including you?

 7         A    Yes.

 8         Q    Okay.  And this relates to threshold

 9    increases that were approved for multiple drugs,

10    including increasing the oxycodone threshold to

11    12,000 doses on this date, right?

12         A    That's what it says, yes.

13         Q    Okay.  And it says in the paragraph

14    above the three drugs that are noted to be

15    increased:  "New customer load.  Customer was

16    loaded to the lower thresholds than expected."

17              Do you see that?

18         A    Yes.

19         Q    Okay.  And so if you go up to the

20    e-mails that follow, going up from there, there's

21    an e-mail from Dale Nusser to John Kuczynski,

22    October 19, 2010 thereafter.

23              Do you see that e-mail?

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 315

1          Q    Okay.  There Dale says:  "John,

2     Martella's is ready to go for ordering.  Michael

3     approved the TCR with no questions."

4               Do you see that?

5          A    Sorry.

6          Q    The e-mail starts on point -- the first

7     page and carries over to the second.

8               MR. COLLINS:  If you need a moment to

9     review it, why don't you review it.

10              THE WITNESS:  I'm sorry.  Where is that,

11    please?  What part of that first page?

12    BY MR. BOGLE:

13         Q    So the bottom of the first page just

14    introduces the e-mail.  The text I just read you

15    is on the top of page 2.

16         A    Oh, okay.  Yeah, I see that now.

17         Q    Okay.  Now, John Kuczynski, he's in

18    what, sales?

19         A    Yes.

20         Q    Okay.  So John responds back to Dale and

21    says:  "What about the overall thresholds?  Is he

22    adjusting everything?"

23              And the response by Dale to that on the

24    next e-mail is:  "Michael didn't say.  I will keep

Page 316

1    a close eye on them.  If they do happen to show up

2    on the 80 percent report, I will do the TCR

3    immediately, if you don't mind."

4              And then John responds:  "Waiting for an

5    item to show up at 80 percent isn't going to work.

6    They omitted on an item yesterday before the 80

7    percent report came out.  We need to adjust their

8    numbers across the board.  Please work with

9    Michael to get this issue resolved.  We can't be

10   in a reactionary mode right now with them."

11             Do you see that?

12   A     Yes.

13   Q     Okay.  This 80 percent report, that

14   references customers at this point in time in

15   2010, once they had reached a certain percentage,

16   in this instance 80 percent, there would be a

17   report sent to the folks at McKesson, which would

18   then trigger them to reach out to the customer and

19   see if they wanted to increase their thresholds,

20   right?

21             MR. COLLINS:  Objection.  Form, lack of

22   foundation, assumes facts not in evidence.

23             THE WITNESS:  No, they wouldn't -- we

24   wouldn't call that.  They would call us when it

Page 317

1 was over the threshold.

2 BY MR. BOGLE:

3   Q So you're saying that in this time frame

4 in October 2010, McKesson would not call on

5 customers and say, Hey, you've hit your 80 percent

6 mark; do you want more?

7     MR. COLLINS:  Objection.

8 BY MR. BOGLE:

9   Q Do you want to increase your threshold?

10     MR. COLLINS:  Objection.  Form, vague.

11     THE WITNESS:  Not that I know of, no.

12 BY MR. BOGLE:

13   Q Okay.  Do you recall ever being copied

14 on e-mails where customers were notified that they

15 had reached 75 or 80 percent of their threshold

16 and asked whether they want to increase it?

17   A I don't recall that, no.

18   Q Okay.  So you don't know what this

19 80 percent report is that's being referenced here?

20   A I didn't say that.  I do know what it

21 is.

22   Q What's the 80 percent report then?

23   A That they reached 80 percent of their

24 threshold.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

 1          Q     Right.  And that the customer will be

 2     notified of that, right?

 3          A     No, I already testified that that wasn't

 4     the way I did it.

 5          Q     And that's not how that would be done

 6     for any customers of New Castle.  Is that your

 7     testimony?

 8          A     Not that I know of, no.

 9          Q     Okay.

10          A     I also wanted to add that it says here:

11     "Please attach usage report provided by customers

12     for all products as a part of the due diligence."

13          Q     Okay.  But there's no report attached to

14     the document provided to us, right?

15          A     But it says it in the e-mail, so --

16          Q     It asks for it to be attached, right?

17               MR. COLLINS:  Objection.

18     Mischaracterization.

19     BY MR. BOGLE:

20          Q     There's no report attached.  That's all

21     I can say.  I mean, I see -- I hear what you're

22     adding here.

23          A     Yeah.

24          Q     But it's not here.

Highly Confidential - Subject to Further Confidentiality Review

Page 319

```
 1                MR. COLLINS:  Objection.  It's a
 2    mischaracterization of the exact language in the
 3    document.
 4    BY MR. BOGLE:
 5         Q    Is there any usage report attached to
 6    this e-mail chain?
 7         A    I don't see that you have it here.
 8         Q    Okay.  I have what was given to me.
 9                And I want to look at some further
10    information on Martella's in this request for
11    threshold increases.  The threshold increase that
12    were being requested in October of 2010, you're
13    the one that ultimately approved those, right?
14                MR. COLLINS:  Objection to the form.
15                THE WITNESS:  No.
16    BY MR. BOGLE:
17         Q    You weren't?  Okay.
18                (Snider Exhibit No. 26 was marked
19                for identification.)
20    BY MR. BOGLE:
21         Q    I hand you Exhibit 26, also marked as
22    1.1842.
23                All right.  So looking -- I want to
24    start by looking at an e-mail on the first page in
```

Highly Confidential - Subject to Further Confidentiality Review

Page 320

1    the middle.  Do you see it's an e-mail from

2    Jennifer -- Jennifer Melvin to you and several

3    others?  Do you see that, October 21, 2010?

4         A    Yes.

5         Q    And this references Martella's Pharmacy,

6    right?

7         A    Yes.

8         Q    And it says:  "ServiceFirst" --

9              What is ServiceFirst?

10        A    It's a customer care center.

11        Q    Okay.  Part of McKesson?

12        A    Yes.

13        Q    -- "has began calling on all of the NE

14   regions CSMP 85 to 99.99 percent threshold calls

15   this month."

16             Do you see that?

17        A    Yes.

18        Q    "Evidently, Martella's was called by the

19   sales rep last month, and then both ServiceFirst

20   and the sales rep this month, and is upset that

21   his thresholds are not where he feels they should

22   be.  Today ServiceFirst called on hydrocodone, the

23   account was at 91.58 percent, so they also would

24   have received a notice on their invoice."

Page 321

1              And then it says:  "ServiceFirst only

2      makes one call per month to the account.  We

3      wanted you to know that the account was very

4      unhappy and threatened to pull his business from

5      McKesson.  Please review and see if there's

6      anything else that may need to be looked at

7      regarding his thresholds."

8              Do you see that e-mail?

9      A     Yes.

10       Q    Okay.  And so this indicates that

11     ServiceFirst and the sales rep responsible for

12     this account were certainly calling this customer

13     once -- in this instance, they reached the 85

14     percent mark, right?

15             MR. COLLINS:  Objection.

16     BY MR. BOGLE:

17       Q    Of the threshold.

18             MR. COLLINS:  Objection to the form.

19             THE WITNESS:  I don't know if it doesn't

20     mean that they called them because they were over

21     the threshold or that they called them first, but

22     I don't recall ServiceFirst doing this.

23     BY MR. BOGLE:

24       Q    Well, you see the sentence that says:

Page 322

1    "Today ServiceFirst called on the hydrocodone, the

2    account was at 91.85 percent."

3            So that indicates a call was made before

4    they had reached the threshold, right?  They're 91

5    percent.

6            MR. COLLINS:  Objection to the form.

7            THE WITNESS:  I think that's what

8    Jennifer is trying to say here.

9    BY MR. BOGLE:

10       Q    Right.  So that's news to you that those

11   kind of calls were being made before a threshold

12   was reached?

13       A    I did not remember that.

14       Q    Okay.  It's your --

15       A    Or like I say, I can't testify that they

16   weren't called because the previous month they

17   went over the threshold or that the customer

18   called them already.  I don't know that.

19       Q    What we do know here indicated from

20   Jennifer, she is saying ServiceFirst called them

21   on hydrocodone, at the very least, before the

22   threshold was reached.

23       A    For whatever reason.

24            MR. COLLINS:  Objection to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 323

1    BY MR. BOGLE:

2        Q    All right.  And then so John Kuczynski

3    responds to that e-mail on October 22, 2010, the

4    second paragraph, he says:  "I'm meeting with

5    Martella's in about an hour, and I'm going to

6    reassure him that we are addressing this issue.

7    Please make sure every effort is made to adjust

8    their threshold levels prior to them hitting the

9    85 percent level to prevent omits or SF from

10   calling them."

11           SF being ServiceFirst, right?

12       A    I would think.

13       Q    Okay.  Do you see that reference there?

14       A    Yes.

15       Q    Okay.  And so this -- strike that.

16           So the hydrocodone increase in October

17   2010 that's being referenced here potentially, you

18   didn't approve that ultimately?

19           MR. COLLINS:  Object.

20   BY MR. BOGLE:

21       Q    Is that your testimony?

22           MR. COLLINS:  Objection to the form.

23           THE WITNESS:  No.  I -- I don't know.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 324

1          Q     You don't know?

2          A     No, I don't remember from this e-mail.

3          Q     Okay.  But you wouldn't have approved it

4     anyway, right, because you don't -- you don't

5     approve threshold increases, right?

6          A     I submit them and let the DRA, which I

7     think was Michael at the time, vet it out fully.

8          Q     But you don't approve them yourself.

9     That's been your testimony throughout this

10    deposition, right?

11         A     I submit them.

12         Q     Right.  But you don't approve them,

13    right?

14         A     I submit them.

15         Q     Okay.  Well, I'm asking you, do you

16    approve them?  Did you approve them in 2010?

17              MR. COLLINS:  Objection to the form.

18    It's vague.

19              THE WITNESS:  I submitted them.

20    BY MR. BOGLE:

21         Q     Okay.  Is there a difference in your

22    mind between submitting and approving a threshold

23    increase?

24         A     Yes.  The way you put the words, it's

Highly Confidential - Subject to Further Confidentiality Review

Page 325

1     like I can make a threshold happen, and I'm trying

2     to testify that I cannot of and on my own put a

3     threshold through.

4                (Snider Exhibit No. 27 was marked

5                for identification.)

6     BY MR. BOGLE:

7          Q    Okay.  I'm handing you what's marked as

8     1.1843, Exhibit 27.

9                This is a continuation of the discussion

10    regarding Martella's.  And you see here the last

11    e-mail, it's another SharePoint e-mail from

12    October 25, 2010, noting that the threshold

13    increase has been approved by you and Michael

14    Oriente for five drugs, including hydrocodone and

15    methadone, right, for Martella's?

16                MR. COLLINS:  Objection to form.

17                THE WITNESS:  That's what this e-mail

18    says from SharePoint.

19    BY MR. BOGLE:

20         Q    And the hydrocodone increase was by

21    20 percent is what's indicated, right?

22         A    Yes.

23         Q    Methadone by 20 percent, right?

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

```
1          Q    Okay.  And the change type is noted to

2     be permanent.  Right?

3          A    Yes.

4          Q    And this was approved without dispensing

5     data, wasn't it?

6               MR. COLLINS:  Objection.  Assumes facts

7     not in evidence, form.

8               THE WITNESS:  I -- I disagree with that.

9     BY MR. BOGLE:

10         Q    Okay.  You see where it says "DRA

11    approval comments" at the bottom, "Completed.

12    Please secure from customer hydrocodone dispensing

13    data ASAP."  Do you see that?

14         A    I see it.

15         Q    Okay.  So you're saying he already had

16    it, but for some reason he -- Mr. Oriente wanted

17    to get it again?

18               MR. COLLINS:  Objection.  Argumentative,

19    form.

20               THE WITNESS:  I can't answer to what he

21    meant, but he -- he could have meant it was -- we

22    have the data.

23    BY MR. BOGLE:

24         Q    It could have meant he -- you had the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 327

1    data when he said you need to get the data.  Is

2    that your testimony?

3              MR. COLLINS:  Objection.  Form,

4    argumentative.  Calls for speculation as to what

5    this witness thought somebody other -- somebody

6    else meant when they wrote something.

7              THE WITNESS:  I can't answer to what

8    Michael meant on that e-mail.

9    BY MR. BOGLE:

10        Q    Okay.  Well, let's keep looking at this

11   e-mail chain.

12             You then say on the next e-mail,

13   October 25, 2010, at 1:52, to John Kuczynski:

14   "John, when can you get the usage?"

15             Do you see that?

16        A    Yes.

17        Q    Okay.  Then your next e-mail to John on

18   October 26 says again:  "Can you get what Michael

19   requested?  The usage was incomplete.  I believe

20   Dale said something," question mark.  "I've upped

21   them to about the highest I've ever done anyone as

22   per previous e-mails.  Will you be able to call to

23   discuss?"

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 328

1         A      I'm sorry, I skipped the -- I was
2    looking at the one before that.  "I met with Joel
3    Martella," you want the one above that?
4         Q      I'm reading the e-mail that you sent on
5    October 26, 2010.
6              MR. COLLINS:  Objection.  The witness is
7    confused and lost.  If you could direct him to
8    where you're --
9    BY MR. BOGLE:
10        Q      Sure.  October 26, 2010, second e-mail
11   on the page from you to John Kuczynski.  I'll read
12   it again.
13             "Can you get what Michael requested?
14   The usage was incomplete.  I believe Dale said
15   something?  I upped them to about the highest I've
16   ever done anyone as per previous e-mails."
17             That's what you said to Mr. Kuczynski,
18   right?
19        A      Yes.
20        Q      You didn't say that Michael Oriente
21   upped them; you said you upped them, right?
22        A      Yes, but I can't do that myself.  I
23   can't put a threshold through without DRA
24   approval.

Highly Confidential - Subject to Further Confidentiality Review

Page 329

```
 1          Q    But what you say here is that you upped
 2     them, right?  And you were a little concerned
 3     about that, right --
 4               MR. COLLINS:  Object --
 5     BY MR. BOGLE:
 6          Q    -- because you didn't have the usage
 7     data?
 8               MR. COLLINS:  If that's a question, I
 9     object.  It's compound multiple ways.  It's
10     argumentative.
11               THE WITNESS:  I asked the DRA to do his
12     due diligence, which he did.  The pharmacy had
13     trouble with the usage data, and I said it was
14     incomplete.  And I can't make it up them at any
15     point in time.  I can't do that.
16     BY MR. BOGLE:
17          Q    It was --
18          A    I can't even do it in the system.
19          Q    It was incomplete, but the threshold was
20     approved, right?
21               MR. COLLINS:  Objection.
22     BY MR. BOGLE:
23          Q    And you're still concerned the next day
24     where is the data, right?  That's what you're
```

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    talking about here, isn't it?

2              MR. COLLINS:  Objection.  It's three

3    questions.  Compound.  It's argumentative.  It's

4    been asked and answered.

5    BY MR. BOGLE:

6         Q    You're still looking for the data the

7    next day, aren't you?

8         A    I'm making sure the due diligence is

9    done.  I don't know what Michael had.

10        Q    Well, you know that you had said that

11   you upped it, and you wanted to see the data,

12   right, because you didn't have it?

13             MR. COLLINS:  Objection.  The question

14   is compound again.

15   BY MR. BOGLE:

16        Q    Would you ask to see data that you had?

17        A    I didn't ask to see it.

18        Q    You didn't.  You said:  "Can you get

19   what Michael requested?"

20        A    Yes.

21        Q    "I upped them to about the highest I've

22   ever done anyone."

23        A    Right.  That doesn't mean I did it

24   because I can't.  That's the point I'm trying to

Page 331

1    make:  I can't up a threshold myself.

2            Q    Okay.  So that just wasn't true when you

3    said that.

4                MR. COLLINS:  Objection.  Argue- --

5    BY MR. BOGLE:

6            Q    Right?  That's a false statement?

7                MR. COLLINS:  Objection.  Argumentative.

8                You don't have to answer that.

9    BY MR. BOGLE:

10           Q    True?

11               Yeah, you do.

12               MR. COLLINS:  No, you don't.

13    BY MR. BOGLE:

14           Q    That was a false statement when you made

15    it in the e-mail --

16               MR. COLLINS:  Object.

17    BY MR. BOGLE:

18           Q    -- is that your testimony?

19               MR. COLLINS:  Objection.  Argumentative.

20    BY MR. BOGLE:

21           Q    You can answer it.

22               MR. COLLINS:  Argumentative.  Object to

23    the theatrics.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 332

1        Q    Sir, was that a false statement when you
2    made it in the e-mail?
3             MR. COLLINS:  Objection.  Calls for
4    speculation, argumentative.
5             THE WITNESS:  No.
6    BY MR. BOGLE:
7        Q    Okay.  And there were additional
8    threshold increases approved for Martella's for
9    hydrocodone after this date, right?
10            MR. COLLINS:  Objection.  Assumes facts
11   not in evidence.  Lack of --
12   BY MR. BOGLE:
13       Q    Do you know?
14            MR. COLLINS:  Lack of foundation.
15            THE WITNESS:  I don't know.
16            (Snider Exhibit No. 28 was marked
17            for identification.)
18   BY MR. BOGLE:
19       Q    All right.  Let's take a look at
20   Exhibit 28, 1.1901.
21            This is the following month, the first
22   e-mail at the bottom from SharePoint, November 23,
23   2010, to Joel Zwick, cc'ing several individuals,
24   including you, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 333

 1        A      I'm sorry.  It's from -- oh, to Joel

 2     Zwick?

 3          Q      Yeah.

 4        A      Yeah.

 5          Q      Cc'ing multiple people, including you,

 6     right?

 7        A      Yes.

 8          Q      And this relates to a threshold change

 9     for Martella's in November 2010, right?

10        A      Yes.

11          Q      Okay.  And this notes that Dale Nusser

12     and Michael Oriente approving a 2,000 dose

13     increase for hydrocodone for Martella's on

14     November 23rd, right?

15                MR. COLLINS:  Objection.  Foundation.

16                THE WITNESS:  The director of Regulatory

17     Affairs approved it.  I don't see the -- the

18     record of it, but it looks like he says he

19     approved it.  I'm not sure.

20     BY MR. BOGLE:

21          Q      Okay.  Well, the -- okay.

22                And in the paragraph -- the second sort

23     of paragraph there notes "Change type:

24     Permanent," right?

Page 334

1      A      Yes, that's right.

2          Q      And the reason again being:  "Business

3      growth should be supported by corresponding sales

4      increase."

5              The same thing we've seen throughout the

6      deposition, right?

7      A      It says:  "New customer still adjusting

8      thresholds to accommodate purchases.  Also, there

9      are four accounts under this DEA number.  The

10     number of scripts have increased for all four

11     pharmacies."

12         Q      Okay.  Do you see that there?

13     A      Yes.

14         Q      Okay.  Do you see any proof of their

15     purchases attached to this e-mail?

16     A      No.

17         Q      And Dale Nusser responds to this e-mail

18     to John Kuczynski saying:  "John, they are

19     approved and ready to order for tomorrow."

20              Do you see that?

21     A      Yes.

22         Q      And in 2016, you actually received a

23     subpoena from the DEA for information about

24     controlled substances that McKesson -- that the

Highly Confidential - Subject to Further Confidentiality Review

Page 335

1    New Castle center supplied to Martella's, right?

2              MR. COLLINS:  Objection.  Foundation.

3              THE WITNESS:  I would have to see that.

4    BY MR. BOGLE:

5         Q    You don't remember that?

6              (Snider Exhibit No. 29 was marked

7              for identification.)

8    BY MR. BOGLE:

9         Q    All right.  Exhibit 29, also

10   Exhibit 1.1902.

11             Okay.  We see this is McKesson's

12   Controlled Substance Monitoring Program,

13   Regulatory Investigative Report dated December 15,

14   2016.

15             Do you see that?

16        A    Yes.

17        Q    Related to customer's name, Martella's

18   Pharmacy, right?

19        A    Yes.

20        Q    And in the first paragraph under

21   "Details," it says:  "This report is in reference

22   to a DEA administrative subpoena received on

23   December 13, 2016, for all invoicing records for

24   Martella's Pharmacy from January 1, 2015, through

Highly Confidential - Subject to Further Confidentiality Review

Page 336

1    November 30, 2016."

2              And then it provides the location for

3    Martella's, and it says it's currently serviced

4    out of the New Castle No. 8772 Distribution

5    Center.

6              That's the number for New Castle, right?

7    A    Yes.

8    Q    "The DEA subpoena was faxed to director

9    of operation for New Castle DC, Blaine Snyder."

10             That's you, right?

11   A    Yes.  It's spelled wrong, but that's me.

12   Q    I figured there is not another Blaine

13   Snider.

14             And if you go to .3, page .3 in this

15   document, third page, there's a purchase history

16   review section in the middle, and it says:

17   "Current solver information for fiscal year '17,

18   Quarter 2, revealed that the business control

19   ratio is 21.17 percent.  This is above the mean

20   for control prescriptions in the New Castle DC."

21             Do you see that?

22   A    Yes, I see it.

23   Q    So you see this is identifying a

24   potential red flag with a ratio of the number of

Highly Confidential - Subject to Further Confidentiality Review

Page 337

1    controlled substances versus total purchases,

2    right?

3        A    I can testify that I don't know this

4    document and I've never seen this.

5        Q    Okay.  So you don't know what that means

6    when he says that?

7        A    I can't speculate on that.

8        Q    Okay.  Well, you did receive the

9    subpoena, you don't dispute that when it says that

10   in this document?

11       A    No, I got -- if it says I did, I'm sure

12   I got it --

13       Q    Okay.

14       A    -- and passed it on to Aaron.

15       Q    And Martella's orders were not blocked

16   for controlled substances after the subpoena was

17   received, right?

18            MR. COLLINS:  Objection.  Foundation.

19            THE WITNESS:  I don't know.

20   BY MR. BOGLE:

21       Q    You don't know if your distribution

22   center kept giving them pills?

23       A    I don't remember when they were blocked.

24   I apologize.  I just don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1          Q     Okay.  You know, though, that just last

2     week the owner of Martella's was indicted on 109

3     counts of diversion of controlled substances,

4     right?

5          A     Yes, I read that.  Izzy sent that to me.

6          Q     Okay.  Sent it to you when?

7          A     Tuesday or Wednesday.

8          Q     Okay.  So you've seen that recently,

9     right?

10         A     Yes.

11         Q     Okay.  And you know that that indictment

12    pertains to controlled substances that were

13    provided to Martella's by your distribution

14    center, right?

15              MR. COLLINS:  Objection.  Lack of

16    foundation, assumes facts not in evidence.

17              THE WITNESS:  I don't know if it says

18    that.  I did not read that.

19    BY MR. BOGLE:

20         Q     Do you know, though?  I mean, when you

21    got this just a couple of days ago, did you look

22    and say, Boy, was my distribution center the one

23    giving them stuff?

24              MR. COLLINS:  Objection.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

Page 339

```
 1   speculation.  Foundation.

 2              THE WITNESS:  I read it.

 3   BY MR. BOGLE:

 4       Q    Okay.  But, again, you didn't follow up

 5   to see if you guys were the ones supplying them?

 6       A    I will say this:  It was in Izzy's hands

 7   and the director of Regulatory Affairs.  We used

 8   to call it a Level III.

 9       Q    Okay.  But you do know as of 2016, with

10   this DEA subpoena, and going back as far as 2010

11   in the documents we looked at, during that time

12   period certainly McKesson and your distribution

13   center specifically was supplying Martella's,

14   right?

15              MR. COLLINS:  Objection.  The question

16   is vague.  Form.

17              THE WITNESS:  I don't know if we were

18   supplying all of his controls or pharmaceuticals.

19   BY MR. BOGLE:

20       Q    I didn't ask you if you were supplying

21   all.  I said that you were supplying him, right?

22       A    Some.

23       Q    He was a customer.

24              MR. COLLINS:  Objection.  Form.
```

Page 340

1    BY MR. BOGLE:

2         Q    He was a customer of McKesson's New

3    Castle Distribution Center --

4         A    Yes.

5         Q    -- during that time frame, right?

6              MR. COLLINS:  Objection.

7              THE WITNESS:  Yes, he was.

8              MR. COLLINS:  Objection.  The question

9    is --

10   BY MR. BOGLE:

11        Q    And as we just saw from the e-mails we

12   just -- the e-mail and the investigative report

13   from 2016, those purchases included four opioids,

14   right?

15             MR. COLLINS:  Objection.  Assumes facts

16   not in evidence.

17             THE WITNESS:  I don't know the subpoena,

18   but he did have opioid purchases.

19             (Snider Exhibit No. 30 was marked

20             for identification.)

21   BY MR. BOGLE:

22        Q    Okay.  I'm going to hand you what's

23   marked as Exhibit 30, 1.1905.

24             Do you see it's another DOJ press

Highly Confidential - Subject to Further Confidentiality Review

Page 341

1    release from November 2nd, 2018, just a few days

2    ago.  And the title is "Johnstown pharmacist

3    charged with -- charged in 109-count indictment

4    with illegally creating bogus prescriptions and

5    then dispensing the drugs."

6                Do you see that title?

7        A    Yes, I do.

8        Q    Okay.  Thereafter it says:  "A

9    Johnstown, PA, pharmacist has been indicted by a

10   federal grand jury in Pittsburgh on charges of

11   dispensing and distributing controlled substances

12   and conspiring to distribute and dispense

13   controlled substances, by United States Attorney

14   Scott W. Brady announced today."

15               Then it says:  "The 109-count indictment

16   returned on October 30th named Joseph M. Martella,

17   53, of Johnstown, Pennsylvania."

18               Then it says:  "According to the

19   indictment presented to the court, Martella owned

20   and operated Martella's Pharmacy located on

21   Franklin Street in Johnstown.  The indictment

22   alleges that Martella, a pharmacist, conspired

23   with Dr. Peter James Ridella, who previously

24   pleaded guilty, and with an individual known as JR

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    to create and submit unlawful prescriptions for

2    oxycodone; oxycodone and acetaminophen, also known

3    as Percocet; oxymorphone, also known as Opana;

4    morphine sulfate, also known MS Contin; and

5    hydrocodone and acetaminophen, also known as

6    Vicodin, and then unlawfully dispensed those

7    controlled substances to other persons."

8              Do you see that?

9       A    I see that, yeah.

10      Q    Okay.  And have you done any sort of

11   investigation in the last week as to the time

12   period covered in this indictment when these

13   alleged violations occurred?

14             MR. COLLINS:  Objection.  The question

15   is vague.  It's compound.

16             THE WITNESS:  No, I actually didn't see

17   this article, but Izzy sent me another article

18   about the newspaper.

19   BY MR. BOGLE:

20      Q    Okay.  So --

21      A    And --

22      Q    I'm sorry, go ahead.

23      A    I was told by the manager, Izzy's boss,

24   to make sure I cut off Franklin Street Pharmacy,

Highly Confidential - Subject to Further Confidentiality Review

Page 343

1     and I did.  Oh, he does that.  I just make sure

2     there was no will-calls or anything.

3          Q    That was after the indictment, though,

4     right?

5          A    Yes.  Well, I believe so.  It was, I

6     believe, Sunday or Monday.  I don't remember which

7     day.

8          Q    Okay.

9               (Snider Exhibit No. 31 was marked

10              for identification.)

11    BY MR. BOGLE:

12         Q    I'm handing you Exhibit 31 to your

13    deposition, 1.1904.

14              This is the actual indictment for

15    Martella's.  And if you look to the point I just

16    asked you about the covered period for this

17    conduct, on page 10, do you see the paragraph

18    starts there "From in and around"?

19              MR. COLLINS:  I'm sorry.  Can I have a

20    proffer as to the relevance of this?  It certainly

21    doesn't involve Summit County, it doesn't involve

22    Cuyahoga County, it doesn't involve the cities of

23    Cleveland or Canton.  Can I have a proffer as to

24    the relevance?

Highly Confidential - Subject to Further Confidentiality Review

Page 344

1              MR. BOGLE:  No.

2              MR. COLLINS:  Okay.

3              MR. BOGLE:  You're entitled to nothing

4     of the sort.

5              MR. COLLINS:  Okay.  Well --

6     BY MR. BOGLE:

7         Q    "From in and around April 2011 and

8     continuing thereafter to in and around June 2016

9     in the Western District of Pennsylvania, the

10    Defendant Joseph M. Martella," and it goes on to

11    repeat sort of the allegations I talked about as

12    far as the diversion of controlled substances,

13    including opioids.

14              Do you see that?

15        A    Yes, I see it.

16        Q    Okay.  So the time period April 2011

17    to June 2016 -- first of all, April 2011, that's

18    just a few months after you noted in an e-mail

19    that you approved a threshold increase as high as

20    you had ever done, right?

21              MR. COLLINS:  Objection.

22    BY MR. BOGLE:

23        Q    Do you remember that e-mail?

24              MR. COLLINS:  Objection.  The question

Page 345

1    is compound.  It's actually three questions.  It's

2    also vague.

3    BY MR. BOGLE:

4         Q    Do you remember the e-mail?  We can pull

5    it back out.

6         A    I sent --

7         Q    I'm happy to pull it back out.

8         A    I sent a threshold.  That's what I

9    testified to.

10         Q    All right.  Let's pull it back out.

11              1.1843, Exhibit 27.  Do you have that

12    e-mail?

13              MR. COLLINS:  Can you give an exhibit

14    number?

15              MR. BOGLE:  27.

16    BY MR. BOGLE:

17         Q    Do you recall looking at this e-mail,

18    the one on the first page here, the second e-mail

19    on the page from October 26, 2010, where you tell

20    John Kuczynski:  "I upped them to about the

21    highest I've ever done anyone as per previous

22    e-mails"?  Do you see that?

23         A    I see this.

24         Q    And that involved threshold increases

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1      for drugs including methadone and hydrocodone,

2      right?

3                    MR. COLLINS:  Objection.  Lack of

4      foundation.

5      BY MR. BOGLE:

6           Q    That's what the form says on the second

7      page.

8                    MR. COLLINS:  Objection.  Foundation.

9      Vague.  Argumentative.

10                   THE WITNESS:  Yes.  I see that Michael

11     approved that.

12     BY MR. BOGLE:

13          Q    Okay.  You also see your e-mail where

14     you say you upped it, right?

15          A    I already discussed that.  I didn't up

16     it.  I sent the threshold request.  I keep saying

17     that.

18          Q    Right, right.

19                   Some few -- just a few months before the

20     covered period of conduct discussed in the

21     indictment we just looked at, right?

22                   MR. COLLINS:  Objection.  Compound.

23                   THE WITNESS:  I don't know.

24                   MR. COLLINS:  Lack of foundation.

Page 347

```
 1    BY MR. BOGLE:

 2         Q    The covered period starting April 2011?

 3              MR. COLLINS:  I'm sorry.  The question

 4    is irrelevant to this litigation.

 5              MR. BOGLE:  I doubt that.

 6    BY MR. BOGLE:

 7         Q    Do you see that?

 8              MR. COLLINS:  I'm sorry.  What's the

 9    question?

10    BY MR. BOGLE:

11         Q    Back to -- back to Exhibit 1.1904,

12    Exhibit 31, covered period beginning April 2011.

13              MR. COLLINS:  What's the --

14    BY MR. BOGLE:

15         Q    Just a few months after the -- you

16    granting them the biggest increase you had ever

17    done.

18              MR. COLLINS:  What's the question?

19    BY MR. BOGLE:

20         Q    Do you see that?

21              MR. COLLINS:  I'm sorry.  That's not a

22    proper question.  You need to ask a legitimate,

23    proper question.

24              MR. BOGLE:  No, I'm good with that one.
```

Page 348

1      BY MR. BOGLE:

2           Q    Do you see that?

3                MR. COLLINS:  See what?

4      BY MR. BOGLE:

5           Q    See that in the indictment?  The covered

6      period was just a few months after the threshold

7      that you said you upped.

8                MR. COLLINS:  Objection.

9      Mischaracterization.

10     BY MR. BOGLE:

11          Q    For hydrocodone and methadone for this

12     pharmacy.

13               MR. COLLINS:  Objection.  The question

14     is compound.  It's also argumentative.

15               THE WITNESS:  I see what it says now.

16               MR. BOGLE:  I'm moving to a whole other

17     topic area.  If we can take a break, and we'll

18     reload documents.

19               THE VIDEOGRAPHER:  The time is 2:47 p.m.

20     We're going off the record.

21               (Recess.)

22               THE VIDEOGRAPHER:  The time is 3:03 p.m.

23     We're back on the record.

24     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 349

1            Q     All right.   Mr. Snider, I want to shift

2       gears to a different topic area.

3                  We talked about earlier that Ohio was

4       one of the states that customers -- that your New

5       Castle Distribution Center services, right?

6            A     Yes.

7            Q     And you know that Ohio in recent years

8       has had a high level of abuse and diversion of

9       opioids within that state, right?

10                 MR. COLLINS:  Objection.  Form.

11      Foundation.

12                 THE WITNESS:  I know it's in the papers,

13      yes.

14      BY MR. BOGLE:

15           Q     Okay.  And you've read those stats,

16      right?

17           A     Yes.

18           Q     On that topic.

19                 MR. COLLINS:  Objection.  Form.

20                 THE WITNESS:  Yeah.

21      BY MR. BOGLE:

22           Q     Okay.  I want to hand you what I'm

23      marking as Exhibit 1.1434, so Exhibit 32.

24                 (Snider Exhibit No. 32 was marked

Page 350

1              for identification.)

2      BY MR. BOGLE:

3          Q    This is an e-mail from Krista Peck to a

4      large group of individuals, June 10, 2014.  Do you

5      see that?

6              MR. COLLINS:  Objection.  Foundation.

7              THE WITNESS:  Yes.  It looks --

8      BY MR. BOGLE:

9          Q    Okay.  And noted in the e-mail, it says:

10     "Attached is the regulatory presentation to the DC

11     Ops team at National Sales Conference (NSC) in

12     May."

13             Do you see that?

14         A    Yes.

15         Q    So the DC ops is DC operations,

16     distribution center operations?

17         A    Yes.

18         Q    Okay.  So that's a meeting you would

19     have attended, right?

20         A    What year is it?

21             MR. COLLINS:  Objection.

22     BY MR. BOGLE:

23         Q    2014.

24             MR. COLLINS:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 351

1           THE WITNESS:  I don't know if I attended

2      that one.

3      BY MR. BOGLE:

4           Q    Okay.  Is that a meeting you generally

5      would attend?

6           A    Normally, I do.  I'm not sure, in 2014,

7      I was exempted because I believe I was -- that's

8      when I was putting up a new distribution center in

9      Delran.

10          Q    Okay.  Would you have -- if you did not

11     attend this specific session, would you generally

12     have requested the materials that were passed

13     out --

14          MR. COLLINS:  Objection.

15     BY MR. BOGLE:

16          Q    -- so you could catch up to speed?

17          MR. COLLINS:  Objection.  Form.

18          THE WITNESS:  I certainly would think

19     so, yes.

20     BY MR. BOGLE:

21          Q    Okay.  So I want to look at the -- just

22     one slide from this PowerPoint deck that was

23     presented in 2014.  If you go to page .13.

24          Do you see there is a slide titled

Page 352

1    "Current Rx Drug Diversion Trends"?  Do you see

2    that?

3         A    Yes.

4         Q    Okay.  And then it lists various states

5    and various opioid products, right?

6         A    Yes.

7         Q    Okay.  And for oxycodone, for example,

8    Ohio is ranked as number 5 for drug diversion,

9    right?

10              MR. COLLINS:  Objection.  Foundation.

11    BY MR. BOGLE:

12         Q    As of 20 -- as of 2013 is what it

13    indicates there.

14         A    That's I think what it indicates.

15         Q    Okay.  Hydrocodone -- Ohio is listed as

16    number 7 in drug diversion for hydrocodone, right?

17         A    That's what it looks like, yes.

18         Q    Hydromorphone, number 8 for Ohio, right?

19         A    Yes.

20         Q    And for oxymorphone, number 7 for the

21    state of Ohio as far as drug diversion.

22         A    Yes.  I don't know the quantification

23    for drug diversion, but I see the slide for sure.

24         Q    And then as far as the authority for

Highly Confidential - Subject to Further Confidentiality Review

Page 353

1    this, it's noted below the chart:  "States with

2    highest pharmacy dispensing data 2012.  Source:

3    DEA Distributors Conference, October 2013."

4              Do you see that as the reference?

5         A    I see that.

6         Q    Okay.  As far as Ohio pharmacies go,

7    Acme Pharmacy was a pharmacy that you guys

8    serviced out of the New Castle Distribution

9    Center, right?

10        A    Can you say that again?

11        Q    Acme, A-C-M-E.

12        A    I'm sorry, I don't remember that.

13        Q    You don't remember Acme?

14        A    No.

15        Q    Okay.  Specifically, Acme in Summit

16   County, does that ring a bell at all?

17        A    No.  I'm sorry.

18        Q    Okay.  That's fair.  That's fine.

19              How about Summit Pain Specialists, do

20   you recall hearing them, that name?

21        A    No, I don't.

22        Q    Okay.  Were you ever made aware that in

23   2010, Summit Pain Specialists reached out to

24   McKesson for assistance in opening up its own

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    pharmacy?

2         A    No, I was not aware of that.

3         Q    Okay.  I'm handing you what I'm marking

4    as Exhibit 33, 1.1896.

5              (Snider Exhibit No. 33 was marked

6              for identification.)

7    BY MR. BOGLE:

8         Q    I want to start with the e-mail that

9    starts on page .4 at the bottom, from Becky Suglio

10   to a Kim Diemand, October 18, 2010.

11             Do you see that e-mail at the very

12   bottom?

13        A    Yes.

14        Q    Okay.  It says -- in the second

15   sentence, it says:  "I am the administrator of

16   Summit Pain Specialists, and I'm considering

17   putting some type of pharmacy within the pain

18   center.  The physicians write for approximately

19   500 scripts per day, 3,000 per week."

20             And skipping a sentence, it says:  "With

21   this type of volume and professionalism and

22   respect of this practice, I am certain that a

23   pharmacy that would just serve their patients

24   would be profitable for all parties."

Highly Confidential - Subject to Further Confidentiality Review

Page 355

1              And skipping a sentence thereafter, it

2    says:  "I think this would be an opportunity for

3    McKesson to get involved in some type of

4    ownership/partnership with the physicians and

5    agree to put forth the meds until the pharmacy has

6    cash flow 45 to 60 days out.  What are your

7    thoughts?"

8              Do you see that e-mail?

9        A    I see that e-mail, yeah.

10       Q    Okay.  And then going up, there's a

11   response from Kim Diemand, November 2nd, 2010,

12   that copies a few more people within McKesson.

13             The second sentence she says:  "This is

14   a pain clinic with five doctors that write around

15   3,000 scripts a week."

16             Do you see that?

17             MR. COLLINS:  Objection.  Lack of

18   foundation, lack of firsthand knowledge.

19             THE WITNESS:  I see that.

20   BY MR. BOGLE:

21       Q    Okay.  And then following up there,

22   there's a response from Dave Gustin that starts at

23   the bottom of .3 and carries over on November 2nd,

24   2010.

Page 356

1                He says:  "How many days a week would

2       this thing operate?  If you do the math, you would

3       have 600 scripts a week per doctor.  That's 100 a

4       day in a six-day week and 120 per day per doctor

5       in a five-day.  How much face time would each

6       patient be getting and does it pass the sniff test

7       with the BOP?"

8                What's BOP, do you know?

9       A     Board of Pharmacy, I would guess.

10      Q     Okay.  "I am assuming they would be

11      getting all licenses and that it would be all

12      above board, but I'm curious as to how they handle

13      that volume and extend the right time/care to each

14      patient.  I would also want to know how the DEA or

15      BOP views the potential for a built-in conflict of

16      interest by having a financial benefit for doctors

17      and/or the owner of the pain clinic implied in

18      writing more, not fewer, scripts.  Do you know

19      what I mean?"

20               And he says:  "We are not in a position

21      to advise the customer, but certainly they will

22      need to cross every T and dot every I."

23               Do you see that e-mail?

24               MR. COLLINS:  Objection.  Lack of

Highly Confidential - Subject to Further Confidentiality Review

Page 357

1    foundation.  Lack of firsthand knowledge.

2              THE WITNESS:  I see the e-mail.

3    BY MR. BOGLE:

4         Q    Okay.  And you would agree that a doctor

5    writing a hundred scripts a day for controlled

6    substances, that's a -- that's a high number,

7    isn't it?

8              MR. COLLINS:  Objection.  Vague, form,

9    calls for speculation.

10             THE WITNESS:  I can't answer to this

11   e-mail what happened.  I wasn't involved.

12   BY MR. BOGLE:

13        Q    I'm not asking you what happened.  I'm

14   asking a hundred scripts a day for controlled

15   substances by one -- per doctor, do you think

16   that's a high number?

17        A    I'm not sure.

18        Q    You don't know.  Okay.

19             And then if you go to the first page of

20   this e-mail chain, the top e-mail from John

21   Kuczynski, November 4, 2010, third paragraph he

22   says:  "We are definitely going to have to do some

23   serious diligence on this.  Dave's point regarding

24   the math not adding up to proper doctor/patient

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    relationship is a serious concern.  Also of

2    concern, physicians owning the pharmacy may not be

3    against the law in Ohio but raises the questions

4    of conflict of interest.  The more you write, the

5    more you make."

6              And it says:  "One of their primary

7    offices seems to be in Cuyahoga Falls, close to

8    Klein's."

9              Klein's is a customer of New Castle as

10   well, right?

11        A    Oh, Yes.

12        Q    Okay.  "I believe it opened within the

13   last year and has caused Klein's to request CSMP

14   threshold increases due to scripts coming from the

15   clinic."

16             Do you see that?

17        A    I see that, yes.

18        Q    Okay.  And shortly after these

19   communications went back and forth in late 2010,

20   you were looped in to the concerns about Summit

21   Pain Specialists and their prescribing practices,

22   right?

23             MR. COLLINS:  Objection.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 359

1          Q     Do you recall that?

2                MR. COLLINS:  Objection.  Foundation.

3                THE WITNESS:  No.

4    BY MR. BOGLE:

5          Q     Okay.

6                (Snider Exhibit No. 34 was marked

7                for identification.)

8    BY MR. BOGLE:

9          Q     Let's take a look at Exhibit 34, 1.1877.

10               First of all, we're going to start from

11   the earliest e-mail in time, but the top e-mail,

12   which includes all of the e-mails before it, do

13   you see it's from Michael Oriente to you, June 16,

14   2011, right?  At the top.

15         A     Yes.

16         Q     Okay.  Let's go back and look at the

17   e-mails that come before that.  So it starts at

18   the bottom of the first page from Steve Kravec,

19   June 14, 2011.  And the substance of the e-mail is

20   on the second page.

21               It says there:  "I just got off the

22   phone with Dr. James Bressi and Becky Suglio from

23   Summit Pain Specialists.  The bulk of the

24   conversation was over their ability to utilize

Page 360

1    Access Health for contract management, but they

2    are looking at taking their business model

3    national."

4              And the last paragraph says, to somebody

5    named Chris:  "As we discussed, Dr. Bressi is

6    talking about taking his concept national and

7    asked if we had people who helped to open new

8    pharmacies.  That's where I thought you would come

9    in.  He wants to get his pharmacy opened and then

10   take it to his peers, whom he says represent 45

11   percent of the pain market."

12             Do you see that?

13        A    Yes.

14        Q    Okay.  And then going up from there, the

15   next e-mail is from you forwarding that e-mail

16   below to Mr. Oriente, correct?  You say "FYI."

17        A    Yes.

18        Q    Okay.  Then he responds back to you with

19   the e-mail from June 16, 2011, that says:  "Some

20   comments from patients.  One not so good.  His

21   brother OD'd, and the last comment says how busy

22   they are.  I think we would need a closer physical

23   visit."

24             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 361

1          A      Yes.

2          Q      Okay.  So does this jog your memory at

3     all about any discussions about Summit Pain

4     Specialists?

5          A      No.  I don't even know if we put them on

6     as a customer, and I don't know Kim Diemand or

7     Steve Kravec was a sales exec.  I don't really

8     know him very well.

9          Q      Okay.  And you said Acme Pharmacy

10    doesn't ring a bell for you either, huh?

11         A      No, I'm sorry.

12         Q      Okay.

13         A      We don't have them now, I know that.

14         Q      I agree with that.

15                (Snider Exhibit No. 35 was marked

16                for identification.)

17    BY MR. BOGLE:

18         Q      Well, let's take a look then at the next

19    exhibit, 1.1870, which is also Exhibit 35.

20                MR. COLLINS:  What number?

21                MR. BOGLE:  Exhibit 35.

22                MR. COLLINS:  Thank you.

23    BY MR. BOGLE:

24         Q      Okay.  And you see this is an e-mail

Page 362

1    chain that pertains to Acme Pharmacy No. 30.  Do

2    you see that generally?

3         A    I see "Topco" on here.  It says "Acme"

4    at the top.  Yes.

5         Q    Okay.  So let's start with the e-mails

6    on page .2 and work our way back towards the

7    front.

8              The bottom e-mail on .2 says -- it's

9    from Denise Joslyn to Joe Lahovich, December 5,

10   2010, entitled "CSMP Acme."  Do you see that?

11        A    Yes, on December 5th?

12        Q    Yep.  And she says there:  "Joe, I'm not

13   sure who this should be sent to.  Please let me

14   know if this account needs an increase to the

15   threshold below.  Please provide a business reason

16   for this request."

17             And it lists -- Acme Pharmacy No. 30,

18   oxycodone, lists their current monthly threshold

19   as 16,000.  Do you see that?

20        A    I see that.

21        Q    Okay.  And then the next e-mail up

22   says -- from Joe, December 5, 2012, says:  "Acme

23   Pharmacy No. 30 is located in the local hospital

24   systems medical building.  The local hospitals'

Page 363

1    facility is Akron General Wellness Center.  Within

2    the building is a large pain management practice,

3    which the pharmacy serves its patients.  Due to

4    the practice, Acme Pharmacy No. 30 dispenses a

5    large quantity of oxycodone and other pain

6    medications."

7            Do you see that reference?

8        A    I see that sentence.

9        Q    Okay.  And then there's a discussion

10   with Denise Joslyn asking the pharmacy:  "Based on

11   the below, how much do we need to increase?"

12           MR. COLLINS:  Objection.

13   BY MR. BOGLE:

14       Q    Do you see that e-mail?

15           MR. COLLINS:  Objection.  Foundation.

16           THE WITNESS:  I don't know what that is.

17   I don't know Denise.  It says "Joe."  I'm not sure

18   who this could be sent to.

19   BY MR. BOGLE:

20       Q    All right.  Well, let's take a look.

21   The response from December 6, 2012, at the top of

22   the e-mail from Joe Lahovich, his e-mail is noted

23   to be Acme Stores, right?  At the top of .2, the

24   top e-mail.

Page 364

1                    MR. COLLINS:  Objection.

2                    THE WITNESS:  Acmestores.com.

3                    MR. COLLINS:  I'm sorry.  Objection.

4          BY MR. BOGLE:

5              Q    Acmestores.com, right?

6                    MR. COLLINS:  Objection.  Form, lack of

7          foundation.

8          BY MR. BOGLE:

9              Q    Do you see that?

10             A    I see it on here, yes.

11             Q    Okay.  So -- and this is who she sent

12         the initial e-mail to, so again this would

13         indicate that the thresholds at least for Acme,

14         when they were reaching a certain percentage, were

15         being sent to them.  They were at 88.13 percent

16         when they were notified about their oxycodone

17         threshold, the first e-mail we looked at, right?

18                   MR. COLLINS:  Objection.  Total lack of

19         foundation for this entire line of inquiry.  Lack

20         of firsthand knowledge.  You can testify to it.

21         This witness hasn't.

22                   MR. BOGLE:  He's on the whole -- he's

23         copied on the whole e-mail chain.

24                   MR. COLLINS:  You haven't established

                                                Page 365

1    this witness has any firsthand knowledge of this.

2              MR. BOGLE:  We're getting there, man.

3              MR. COLLINS:  Well, establish it first

4    and then we have a foundation.

5              MR. BOGLE:  Well, we'll get there.

6              THE WITNESS:  I'm sorry.

7    BY MR. BOGLE:

8         Q    Okay.  So my question was, the bottom

9    e-mail I looked at with you first because you --

10   you said before that customers don't get notified

11   of their thresholds prior to reaching them.  Do

12   you remember that testimony?

13        A    Yes.  I don't remember the context,

14   though.

15        Q    Yeah.  Well, you see here the first

16   e-mail that I looked at with you from Denise

17   Joslyn to Joe Lahovich at Acme, she's literally

18   listing out his monthly threshold and telling him

19   exactly how much they've used for that month,

20   right?

21        A    I have no recollection of ever seeing

22   this e-mail.

23        Q    You see it now, don't you?

24        A    I see what Joe and Denise were talking

Page 366

1    about, yes.

2         Q    Right.  And what they're talking about

3    are the specific thresholds for Acme Pharmacy for

4    oxycodone, right?

5              MR. COLLINS:  Objection.  Lack of

6    foundation.

7    BY MR. BOGLE:

8         Q    That's what the chart says, doesn't it?

9              MR. COLLINS:  Object.

10             THE WITNESS:  I cannot testify to that.

11   BY MR. BOGLE:

12        Q    You don't know what that says?

13        A    I can't testify what it says.

14        Q    Okay.  All right.  Let's go back up

15   then, the top of this -- the top e-mail on this

16   page where Joe says:  "70,000 per oxycodone

17   products."  And he says:  "Query from No. 30

18   e-mailed.  The warehouse says my oxycodone 30

19   milligram limit is 4,000, not 8,000.  My limit is

20   16,000 total oxycodone.  Of that 4,000 can be

21   oxycodone, 30 milligrams.  I need at least 10,000

22   generic Percocet, 10/325 alone to make it a month.

23   I figure a limit of 70,000 is needed to safely get

24   through a month with all oxycodone products."

Highly Confidential - Subject to Further Confidentiality Review

Page 367

1               Do you see that?

2        A     I see what this Joe said.  I don't know

3    him.

4        Q     Yeah.  And 70,000 doses a month for

5    oxycodone is a huge number, isn't it?

6        A     For Joe, it might be.  I don't know.  I

7    can't testify to what Joe was doing there.

8        Q     What about for the oxycodone that you

9    historically distributed from New Castle, how does

10   70,000 a month for oxycodone fit?  Is that about

11   right?  Is that normal?

12             MR. COLLINS:  Objection.  The question

13   is inherently vague.

14   BY MR. BOGLE:

15       Q     I'm asking you if 70,000 seems high to

16   you.  This is what you do every day.

17       A     I can't --

18             MR. COLLINS:  Objection to the form.

19             THE WITNESS:  I can't testify that this

20   person got 70,000.  I've never seen this e-mail

21   before.

22   BY MR. BOGLE:

23       Q     Do you think he didn't?

24       A     I don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 368

1          Q    Okay.  Well, if you go back to

2    Exhibit 1.1568, which is Exhibit 9.  Keep that one

3    out there with the 70,000 doses.

4          A    That what, keep --

5          Q    Keep that next to you, but I want you to

6    pull this one out too, Exhibit 9.

7          A    Nine?

8          Q    Yeah.

9               MR. COLLINS:  I think they should be in

10   order.

11              THE WITNESS:  Well, kind of.

12              MR. COLLINS:  Let me get mine.

13   BY MR. BOGLE:

14         Q    You got Exhibit 9?

15         A    Yes.

16         Q    Okay.  So this was the "Understand

17   ARCOS" dated document talking about, on the first

18   page, the 2012 DEA ARCOS average numbers per

19   dosage units for various opioids, and if you look

20   at oxycodone, the annual average per the DEA in

21   2012 was 75,584 doses a year.  Do you see that?

22         A    (The witness nods.)

23         Q    Yes?

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 369

1          Q    Okay.  And what Acme is requesting here

2     is just about that much per month.  Right?

3               MR. COLLINS:  Objection.  Lack of

4     foundation.

5     BY MR. BOGLE:

6          Q    They're asking for 70,000 doses a month,

7     right?

8               MR. COLLINS:  Objection.  Compound, lack

9     of foundation, lack of firsthand knowledge.

10              THE WITNESS:  I'm not aware of anything

11    except this e-mail right here.  I can't testify to

12    what he's asking for or if he's a hospital or

13    anything else.  I'm not --

14    BY MR. BOGLE:

15         Q    Well, you see that it says that they're

16    a pharmacy located in a medical building that's

17    affiliated with a pain medication facility.

18    That's what it says and what we just read, right?

19              MR. COLLINS:  Objection.  Lack of

20    foundation.  You haven't established this witness

21    had any knowledge of this.

22              THE WITNESS:  I'm not even familiar if

23    we ever put this customer onboard.  I'm sorry.

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1      Q    Okay.  Well, you're copied on this whole

2    e-mail chain, right?

3      A    I don't remember.

4      Q    Look at the top e-mail from Denise

5    Joslyn to Michael Oriente, copying you.  Do you

6    see that?  The top e-mail of the document.

7      A    Yes.

8      Q    Okay.  And you understand that when you

9    get copied on something, you get included on the

10   whole -- you get to see the whole chain before it,

11   right?

12            MR. COLLINS:  Objection to the form.

13   BY MR. BOGLE:

14     Q    That's how e-mails work, right?

15     A    I do know how e-mails work --

16     Q    Right.

17     A    -- but I don't remember this e-mail

18   ever.

19     Q    Okay.  That's fair.

20            But my simple question to you was, since

21   you were copied on this e-mail chain, you've seen

22   this e-mail before.  Whether you read it, I don't

23   know.  But 70,000 doses a month is what Acme is

24   requesting, which is nearly the national average

Page 371

1      per year for oxycodone for pharmacies at that

2      point in time.

3                  Do you see that reference at least?

4                  MR. COLLINS:  Object -- the question is

5      objectionable on multiple grounds.  It assumes

6      that he read the e-mail, which is what your

7      question said.  You haven't established that.

8      Lack of foundation.  Lack of firsthand knowledge.

9      BY MR. BOGLE:

10         Q    Okay.  So do you see they were

11     requesting 70,000 doses of oxycodone a month,

12     compare -- and you compare that to the DEA

13     national average annually for pharmacies, which

14     was 75,584 a year was the average in 2012.  Do you

15     see that?

16         A    I can't testify to this.  I've never

17     seen this before.

18         Q    Okay.  Well, you're on the e-mail chain,

19     right?  You're saying you never read this e-mail

20     chain?

21         A    I don't remember reading it, no.

22         Q    Okay.  But are you saying you didn't

23     read it definitively?

24                 MR. COLLINS:  Objection.  Argumentative.

Highly Confidential - Subject to Further Confidentiality Review

Page 372

1          THE WITNESS:  I'll testify that I don't

2    remember reading it.  I don't even remember the

3    Acme.

4    BY MR. BOGLE:

5          Q    Do you typically not read e-mails

6    you're -- you're copied on?

7          MR. COLLINS:  Objection.  Argumentative.

8          THE WITNESS:  I can't say typically.

9    BY MR. BOGLE:

10         Q    Okay.  But what you can say is that what

11   they're asking for per month is just shy of the

12   average per year for pharmacies in this country in

13   2012, right?  We can agree on that.

14         MR. COLLINS:  Objection.  Assumes facts

15   not in evidence.  It hasn't even been established.

16         MR. BOGLE:  It's right here, Exhibit 9.

17   Just talked about it.

18         MR. COLLINS:  Because -- because it's in

19   a document, it's established?

20         MR. BOGLE:  Well, that's what -- I mean,

21   if you dispute that's what the DEA says, I guess

22   we can deal with that later, but --

23         MR. COLLINS:  Objection.

24   BY MR. BOGLE:

Page 373

1          Q    Do you see that in Exhibit 9?  75,584 a

2     year was the average in 2012.

3               MR. COLLINS:  Objection.  The entire

4     line of question lacks foundation.

5     BY MR. BOGLE:

6          Q    Do you see that?

7          A    Yes.

8          Q    Okay.  All right.  Well, let's see --

9     let's see what you guys did do with this.

10              So, going back to Exhibit 1.1870, I'm

11    going to the first page now, it's the second

12    e-mail in the chain down from Michael Oriente to

13    Denise Joslyn, copying you and Joe Lumpkin,

14    December 6, 2012.

15              He says:  "Denise, submit a threshold

16    change for a 25 percent increase.  A 70,000-dose

17    threshold is more than most of our customers.

18    This account will be under Joe Lumpkin out of New

19    Castle.  He will have the final say.  I will

20    approve a 25 percent for the month until Joe can

21    get there for a visit for such a threshold review.

22    We'll want the top five prescribers that are

23    writing scripts that are being filled at this

24    location and dispensing data minus any patient

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    info for the last three months for all

2    oxycodone-based products."

3            Do you see that?

4    A    I see that.

5    Q    So on an e-mail you're copied on here,

6    you can at least see that a 25 percent increase

7    was approved without any further data being

8    provided, right?

9            MR. COLLINS:  Objection.  Foundation.

10           THE WITNESS:  I cannot answer to that.

11   BY MR. BOGLE:

12   Q    Okay.

13   A    I don't know.

14   Q    Do you see any reference to any data

15   that he's reviewed?  In fact, he's asking for data

16   after he's already approved it, right?

17           MR. COLLINS:  Objection.  Foundation,

18   form.

19           THE WITNESS:  I don't know that.

20   BY MR. BOGLE:

21   Q    Do you see any indication that he says,

22   I've reviewed data already to support this 25

23   percent increase?

24           MR. COLLINS:  Objection.  Calls for

Highly Confidential - Subject to Further Confidentiality Review

Page 375

1    speculation, form, foundation.

2    BY MR. BOGLE:

3        Q    If you see it in the e-mail, feel free

4    to point it out to me.

5        A    I can't respond to that.  I don't know

6    what he did.

7        Q    Right.  I'm asking in the e-mail does he

8    reference that he's reviewed any data to support

9    that increase?

10       A    I don't know that.

11       Q    You don't know if the e-mail says that

12   one way or the other?

13       A    Yes.

14       Q    Okay.

15            (Snider Exhibit No. 36 was marked

16            for identification.)

17   BY MR. BOGLE:

18       Q    All right.  Let's take a look at

19   Exhibit 36, 1.1874.

20            All right.  Here's another series of

21   e-mails, this now from -- we're into -- from

22   December now into January.

23            It's an e-mail from Denise Joslyn again

24   to Joe Lahovich at Acme, January 11, 2013, saying:

Highly Confidential - Subject to Further Confidentiality Review

Page 376

```
 1      "Please let me know if we need to make any

 2      changes.  If you need an increase, please provide

 3      a business reason."

 4                  Again, similar chart except this time

 5      showing a monthly threshold of 35,000 for

 6      oxycodone.  Do you see that?

 7                  MR. COLLINS:  Objection.  Foundation.

 8                  THE WITNESS:  I see what Denise wrote,

 9      yes.

10      BY MR. BOGLE:

11          Q    Okay.  And you see that in the chart,

12      right?

13          A    I see it now.

14          Q    And you see Joe's response in the e-mail

15      above says:  "Please increase the threshold to

16      70,000 units for this product class.  Their limit

17      was 46,000 last month.  They need a limit of

18      70,000 to meet the needs of the patients of Summit

19      Pain Management Practice in the pharmacy's medical

20      building."

21                  Do you see that?

22          A    Yes, I see that.

23          Q    And prior to today, do you have any

24      awareness that Summit Pain Management was actually
```

Highly Confidential - Subject to Further Confidentiality Review

Page 377

1      located in the same building as Acme Pharmacy?

2          A      No.

3          Q      Were you aware that they were providing

4      almost a hundred percent of the prescriptions for

5      Acme Pharmacy that they were filling for

6      controlled substances?

7                  MR. COLLINS:   Objection.   Form,

8      foundation.

9                  THE WITNESS:   No, I testified that I

10     don't remember anything about Acme Pharmacy and

11     wasn't on this e-mail.

12     BY MR. BOGLE:

13         Q      Okay.  So you don't know the

14     relationship between the two entities at all.   Is

15     that your testimony?

16         A      I do not remember.

17         Q      Okay.  Now, the increase to 70,000 doses

18     for oxycodone in January 2013, that was approved,

19     right?

20                  MR. COLLINS:   Object --

21     BY MR. BOGLE:

22         Q      You know that.

23                  MR. COLLINS:   Objection.   Assumes facts

24     not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1              THE WITNESS:  I do not know that.

2     BY MR. BOGLE:

3          Q     You don't know that?

4              MR. COLLINS:  Mischaracterization of his

5     prior testimony.

6     BY MR. BOGLE:

7          Q     You don't know that your distribution

8     center started shipping them out 70,000 doses a

9     month of oxycodone --

10              MR. COLLINS:  Objection.

11     BY MR. BOGLE:

12          Q     -- starting in January 2013?

13              MR. COLLINS:  Objection.  Assumes facts

14     not in evidence.  Lack of foundation.

15              THE WITNESS:  I testified that I did not

16     remember this customer.

17     BY MR. BOGLE:

18          Q     All right.  Well, what we got produced

19     to us in this case was the threshold history

20     reports for all Summit and Cuyahoga pharmacies,

21     and I'm going to hand you the one for Acme here.

22              (Snider Exhibit No. 37 was marked

23              for identification.)

24     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 379

1         Q    It's Exhibit 37, also marked as 1.1907.

2              And you see here in the middle of this

3    chart -- do you see where I'm at, TCR 1/14/13.  Do

4    you see that date?

5         A    Yes.

6         Q    Related to oxycodone?

7         A    Yes --

8         Q    Okay.

9         A    -- I see the chart.

10        Q    You see that's the same date as the

11   e-mail we just looked at from Joe Lahovich where

12   he asks for an increase from thirty-five to

13   70,000, right?

14        A    I can't testify what this is.  I don't

15   know Joe Lahovich, and I don't know what this

16   chart is.  I'm sorry.

17        Q    Okay.  Well, let's -- let's take a look

18   at the chart and see.  I've got some questions for

19   you on it.

20        A    Okay.

21        Q    In that same column, it says "TCR

22   1/14/13, 35K to 70K.  JL 1/14/13, Topco store,

23   business growth new."

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 380

1          A     Yes, I do.

2              Q     Okay.  So you weren't aware that once

3     this threshold increase was approved to 70,000

4     doses for oxycodone, that your distribution center

5     started giving them about that much every month?

6              MR. COLLINS:  Objection.  Assumes facts

7     not in evidence, lack of foundation.

8              This witness has testified he has no

9     idea what this is, and you're testifying to facts

10    that aren't -- haven't been established.

11    BY MR. BOGLE:

12             Q    So you don't know when your distribution

13    center sends out 70,000 doses a month to a

14    customer for oxycodone?  That can go on without

15    you even knowing it?

16             MR. COLLINS:  Objection.  Argumentative.

17    Form.

18    BY MR. BOGLE:

19             Q    I'm a little baffled by that, sir.

20             MR. COLLINS:  Objection.  Compound,

21    form, argumentative.  Closing argument.

22             THE WITNESS:  Well, I --

23    BY MR. BOGLE:

24             Q    Is that your testimony?

Highly Confidential - Subject to Further Confidentiality Review

Page 381

1     A     Yes, I can understand what you're

2     saying, but I don't know anything about this, and

3     it's -- plus I don't know if you have the right

4     account.  It says Topco.

5         Q    They're one of the -- in the Topco

6     Group.

7         A     Okay.

8         Q    Sir, this was provided to us.  I can

9     tell you -- if it's wrong, I guarantee you your

10    counsel will establish it's wrong.  It ain't

11    wrong.  Okay?

12                  This is Acme Pharmacy.  This was

13    provided to us from your counsel coming from

14    McKesson's files.

15        A     I'm --

16                  MR. COLLINS:  Objection.

17    BY MR. BOGLE:

18        Q    Okay.  So my question to you, though,

19    is -- because I just want to make sure I

20    understand this.

21                  So a customer like Acme Pharmacy can get

22    70,000 doses a month of oxycodone from your

23    distribution center, and you don't even know it?

24                  MR. COLLINS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1    BY MR. BOGLE:

2          Q    Is that your testimony?

3          MR. COLLINS:  Objection.  I'm sorry, let

4    me finish my objection, sir.

5          Objection.  Assumes facts not in

6    evidence.  You haven't established that.  This

7    witness has testified over and over again he has

8    no knowledge of that, and so this is just legal

9    argument that's improper at a deposition.

10   Typically lawyers ask questions, witnesses provide

11   testimony.  Not the other way around.

12         MR. BOGLE:  You're just kind of

13   complaining now.  You're not objecting.

14         MR. COLLINS:  No, no, I am objecting.  I

15   mean, this is just total argument.  It's not a

16   question.

17         MR. BOGLE:  No, it's not.  It's not

18   argument.  It is a question.

19   BY MR. BOGLE:

20         Q    Can that go on at your distribution

21   center and you not know about it?

22         MR. COLLINS:  Objection for all the

23   reasons I just stated.

24         THE WITNESS:  I don't remember this

Page 383

1      account.

2      BY MR. BOGLE:

3          Q    Right.  So it obviously can go on and

4      you not know about it, right?

5              MR. COLLINS:  Objection.

6      Mischaracterization, argumentative, form.

7      BY MR. BOGLE:

8          Q    Right?

9      A    Can you repeat the question, please?

10         Q    A customer like Acme Pharmacy can get

11     70,000 doses a month of oxycodone from your

12     distribution center and you not even know it,

13     right?

14     A    I don't remember that.

15         Q    Right, that's my point.

16     A    I don't know what this form is, and I

17     wasn't on the e-mails.  I testified to that.

18              (Snider Exhibit No. 38 was marked

19              for identification.)

20     BY MR. BOGLE:

21         Q    All right.  Let's take a look at

22     Exhibit 38, 1.1899.

23              You see here this is a regulatory

24     investigative report from March 2nd, 2015, related

Page 384

1    to Acme Fresh Markets Pharmacy No. 30.

2                    Do you see that?

3         A    Yes.

4         Q    Okay.  And in the "Detail" section

5    there, the middle of that first paragraph, it

6    says:  "There is a pain management clinic, Summit

7    Pain Specialists, located within Akron General

8    Hospital medical building that the pharmacy is

9    located in."

10                   Again, that's news to you today, right?

11        A    I testified I don't remember this

12   account.  I'm sorry.

13        Q    Okay.  Let's continue a few more

14   sentences down.  It says:  "The majority of the

15   prescriptions that are filled at the pharmacy are

16   being written at Summit Pain Specialists.  For the

17   period of 7/1/14 to 10/28/14, 89 percent of the

18   scripts filled by Acme 30 were from the pain

19   clinic."

20                   Do you see that?

21                   MR. COLLINS:  Objection.  Foundation.

22                   THE WITNESS:  I see this -- this e-mail.

23   I've never seen this before.

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 385

```
 1          Q    This is a report created by Michael

 2     Oriente.  That's what is indicated, right?

 3               MR. COLLINS:  Objection.  Lack of

 4     foundation, lack of firsthand knowledge.

 5     BY MR. BOGLE:

 6          Q    Where it says "By"?

 7          A    It says "By" --

 8               MR. COLLINS:  Objection.  Form,

 9     foundation.

10     BY MR. BOGLE:

11          Q    And, you know, there were some questions

12     raised about whether you guys actually did provide

13     anything approaching 70,000 doses of oxycodone a

14     month to this Acme Pharmacy, so let's take a look

15     at that.

16               On page .3, there is a purchase history

17     review.  So for -- if you see there, for

18     oxycodone, it provides the number of doses that

19     were provided to Acme Pharmacy over a period

20     covering January 2014 to January 2015, right?

21               MR. COLLINS:  Objection.  Lack of

22     foundation, lack of firsthand knowledge.

23               THE WITNESS:  I do not know this chart.

24     I see the dates and I see the doses, but I've
```

Page 386

1    never seen this before.

2    BY MR. BOGLE:

3        Q    So for June 2014, they got 69,504 doses.

4    July 2014, 70,000 doses.  August 2014, 69,900

5    doses.  September 2014, 69,900 doses.  October

6    2014, 67,300 doses.  And November 2014, 67,600

7    doses of oxycodone right here.  That's what it

8    says, right?

9            MR. COLLINS:  Objection.  Form,

10    foundation, lack of firsthand knowledge.

11            THE WITNESS:  I cannot and won't testify

12    that that's what it says.  I don't know.

13    BY MR. BOGLE:

14        Q    You won't?  You can't?  You can't read

15    that?

16        A    I can read that, you know that.  I can't

17    testify that I understand that's what it is.

18        Q    Okay.  So you don't --

19        A    I've never seen this before, this

20    document.

21        Q    Okay.  So, again, your -- your

22    distribution center services this area of Ohio,

23    right?

24        A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 387

1        Q    Okay.  And so 70,000 doses of oxycodone

2   can go out for multiple months or near it in 2014,

3   and you don't even know, right?

4             MR. COLLINS:  First of all, totally

5   incorrect.  Mischaracterization of his prior

6   testimony.

7             MR. BOGLE:  Well, if he knows, he can

8   certainly correct me.

9             MR. COLLINS:  I'm sorry.  Let me finish

10   my objection.  Lack of foundation.  Lack of

11   firsthand knowledge.  Mischaracterization.  Object

12   to the form.  Otherwise, it's a fine question.

13             THE WITNESS:  I don't know this account.

14   I'm sorry.  It was handled by the national

15   accounts and the director of Regulatory Affairs,

16   and they vetted it out.

17   BY MR. BOGLE:

18        Q    So if national accounts handles it, but

19   you distribute it at your facility, you're hands

20   off; is that right?

21        A    No.

22        Q    Okay.  It's still your pills coming out

23   of your facility, right?

24        A    I protect the supply chain.  I do my job

Page 388

1    on that, and it's very important to me that I do

2    that.  This was vetted out by someone else, and a

3    director of Regulatory Affairs and his boss also,

4    I see.

5         Q    Are you aware that both Summit Pain

6    Specialists and Acme No. 30 are both closed now?

7         A    I'm not aware of that.

8         Q    Not aware of that?

9              I hand you what I'm marking Exhibit 39,

10   Exhibit 1.1895.

11             (Snider Exhibit No. 39 was marked

12             for identification.)

13   BY MR. BOGLE:

14        Q    This is an article from the Akron Beacon

15   Journal/Ohio.com titled "Stow Pain Clinic closing

16   after court upholds sexual imposition conviction

17   against doctor accused of abusing patients,"

18   posted August 11, 2016.  Do you see that?

19        A    I see that, yes.

20        Q    Okay.  The first sentence says:  "Summit

21   Pain Specialists in Stow is permanently closed

22   Monday after years of wrangling over a sex abuse

23   scandal involving a doctor there."

24             Do you see that?

Page 389

```
 1        A     I see that, yes.
 2        Q     The third paragraph there says:  "But
 3   the Ohio Supreme Court on August 3 upheld the
 4   Summit County Common Pleas Court conviction a
 5   former doctor James Bressi, who once co-owned the
 6   business with former doctor Robert Stephen
 7   Geiger."
 8              Do you see that?
 9        A     No.  Can you tell me where you are?
10   I -- I was under what prompted the clinic to
11   close.
12        Q     Right here, sir, if you look at my
13   finger.
14        A     I'm sorry.  You skipped around.  I
15   didn't see that.
16        Q     You want me to reread that for you?
17        A     Please.
18        Q     So you can follow along.
19        A     Please.
20        Q     That's fair.
21              The portion I read says:  "But the Ohio
22   Supreme Court on August 3 upheld the Summit County
23   Common Please Court conviction of former
24   doctor James Bressi, who once co-owned the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 390

```
 1    business with former doctor Robert Stephen Geiger.

 2    The clinic's troubles started in 2012 when

 3    patients began calling Stow police reporting they

 4    had been sexually abused by Bressi inside the pain

 5    clinic.  Stow police ultimately took reports from

 6    about 95 patients, including some in their 70s,

 7    who made similar claims according to a detective's

 8    court testimony."

 9              Do you see that?

10    A     I see that, yes.

11       Q     And Dr. James Bressi, that's the same

12    doctor that had reached out to McKesson to begin

13    with about their assistance in opening the

14    pharmacy that ultimately became Acme Pharmacy,

15    right?

16              MR. COLLINS:  Objection to form, lack --

17    BY MR. BOGLE:

18       Q     Do you remember his name?

19    A     No.

20              MR. COLLINS:  Objection to the form,

21    lack of foundation.

22              THE WITNESS:  I don't.

23    BY MR. BOGLE:

24       Q     You don't?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 391

1          A      No.

2              Q      Okay.  Do you have any reason to dispute

3      that pretty quickly after Summit Pain Specialists

4      closed so did Acme 30?

5                    MR. COLLINS:  Objection.  Foundation,

6      form.

7                    THE WITNESS:  I do not know or remember

8      any of that.  I'm sorry.

9      BY MR. BOGLE:

10             Q      Okay.  Well, let's just close the loop

11     here.

12                   (Snider Exhibit No. 40 was marked

13                   for identification.)

14     BY MR. BOGLE:

15             Q      Exhibit 40, 1.1911.  I pulled this off

16     of Google before I came, pertaining to Acme

17     Pharmacy in Stow, Ohio.  Same address as we just

18     saw in the investigative report.

19                   Do you see it's noted to be permanently

20     closed?

21                   MR. COLLINS:  Objection.  Foundation.

22                   THE WITNESS:  If you say -- I don't see

23     where it says that.  Please point to it.

24     Permanently closed, yes.

Page 392

1    BY MR. BOGLE:

2         Q    Okay.  But again, this is not a customer

3    you ever even recall dealing with at all, right?

4         A    I don't think I was in New Castle at the

5    time.  I was in Delran, New Jersey.

6         Q    You weren't in New Castle at all from

7    when you -- this account started getting serviced

8    in 2012 to 2016 when that -- it closed?

9         A    I was there in 2012, yes.

10        Q    Okay.  For what period of time were you

11   not at New Castle then?

12        A    '14 and '15 or '15, '16.  I don't

13   remember.

14        Q    Who was running New Castle while you

15   were gone?

16        A    Andrew Moore, the VP/GM.

17        Q    Andrew Moore?

18        A    Yes.

19        Q    Okay.  Did you have any communications

20   concerning New Castle during that time period that

21   you were in Delran?

22        A    Not too many.

23        Q    Okay.  There are many Giant Eagle

24   Pharmacies that -- in Summit and Cuyahoga County

Page 393

1      that New Castle supplies opioids to, correct?

2           A     Supplied.  We don't have them any

3      longer.

4           Q     Okay.  When did you stop?

5           A     About a year ago -- less than a year

6      ago.

7           Q     Okay.  Do you know why you stopped

8      providing to them out of New Castle?

9           A     They got another wholesaler.

10          Q     Okay.  Who?

11          A     Cardinal.

12          Q     Okay.  All right.  So prior to losing

13     that business, you said about a year ago, that was

14     one of the larger customers you had in Summit and

15     Cuyahoga counties, right?

16          A     Yes.

17                MR. COLLINS:  Are we done with these?

18                MR. BOGLE:  Yeah.

19     BY MR. BOGLE:

20          Q     We talked about earlier in the

21     deposition that documentation is required to

22     establish claims of business growth when you're

23     reviewing a threshold increase, right?

24          A     Yes, we did.

Page 394

1          Q     As a general principle, that's what's

2     required, right?

3          A     We talked about that, yes.

4          Q     That wasn't historically done for Giant

5     Eagle Pharmacies at Summit and Cuyahoga County,

6     though, was it?

7          A     I don't know that.  I know that was

8     handled by national accounts, and it depends on

9     the time period.  But national accounts and DRAs

10    handled Giant Eagle.

11         Q     Okay.  So if -- if the drugs were coming

12    out of your distribution center, and you believe

13    that anyone handling national accounts wasn't

14    complying with the Controlled Substances

15    Monitoring Program, you think you had an

16    obligation to say something about that?

17              MR. COLLINS:  Objection.  Calls for a

18    legal conclusion.

19              THE WITNESS:  If I knew wrongdoing was

20    happening, I would report it to McKesson or my

21    boss.

22    BY MR. BOGLE:

23         Q     All right.

24              (Snider Exhibit No. 41 was marked

Highly Confidential - Subject to Further Confidentiality Review

Page 395

1                  for identification.)

2      BY MR. BOGLE:

3          Q    We're going to look at a few of the

4      Giant Eagle stores in Summit and Cuyahoga County

5      here.  I hand you 1.1840, Exhibit 41.

6          A    Thank you.

7          Q    So it's another one of the hard copy

8      file productions.  You see it's "Giant Eagle 4009"

9      on the front page, right?

10         A    Yes.

11         Q    Okay.  And let's take a look at the

12     e-mail starting on page .4.

13              The bottom e-mail there is an e-mail

14     from Dave Gustin, May 28, 2008, to several

15     individuals, including you.

16              Do you see that?

17         A    Yes.

18         Q    Regarding New Castle CSMP Report, 75

19     percent plus, 5/28/08.

20              And Mr. Gustin there says:  "Rex, I

21     await your input.  I can bump it if you agree to a

22     small bump."

23              Do you see that there?

24         A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 396

1          Q    Do you understand he's agreeing to --

2     he's talking about bumping up thresholds, right?

3               MR. COLLINS:  Objection.  Form.

4     Speculation.

5               THE WITNESS:  I don't know that, but I

6     could guess.

7     BY MR. BOGLE:

8          Q    Okay.  No, we can keep going.  I think

9     it establishes it going forward.

10              First of all -- well, hold on.  I'll

11     strike that.

12              The next e-mail is a response from Rex

13     Catton, May 28, 2008, where he says:  "Yes, please

14     bump it up."

15              What was Rex Catton's job in May 2008 at

16     McKesson?

17          A    He was vice president of national

18     accounts.

19          Q    Okay.  On the sales side or regulatory

20     side?

21          A    Sales side.

22          Q    Okay.  Then Dave Gustin responds to that

23     e-mail and says:  "The list, by the way, is a long

24     one.  I need a reason to go in and bump all

Highly Confidential - Subject to Further Confidentiality Review

Page 397

1    these -- all those stores' thresholds.  They are

2    all purchasing at well past their historic trends

3    or they would not be on the report."

4              Do you know what report is being

5    referenced here?  The CSMP report?

6        A    I don't know the specific one.

7        Q    Okay.  And it's embedded there in the

8    title "Threshold" -- "CSMP Threshold Warning

9    Report."  Are you familiar with that report?

10       A    Yes, I am.

11       Q    What is that report?

12       A    I think it -- it prints out -- I believe

13   we discussed that, but it depends on -- when was

14   this, please?  2008?

15       Q    Right.

16       A    It would print out -- I think it was

17   when it was 85 percent or over the threshold.

18   That's what I recall.

19       Q    Okay.  All right.  And if we keep going

20   in the e-mail chain.  I'm now on page .3.

21             It's an e-mail from Diane Martin,

22   September 22nd, 2008, to Dave Gustin, copying you

23   and Rex Catton.  It says:  "Since these were

24   bumped up without a TCR in late May, what is the

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    reason for the increase in dosages?"

2              Dave Gustin responds:  "Reason:  RNA

3    reasonable request for a small increase per Rex

4    Catton."

5              Do you see that?

6         A    Yes.

7         Q    Okay.  Now, I think we talked about this

8    before, but when a threshold increase is

9    requested, a form has to be completed prior to

10   that increase being approved, right?

11        A    Yes.

12        Q    Okay.  But you see here in September,

13   Diane Martin is talking about increases that were

14   made in May without a TCR.  And she's talking

15   about that in September, right?

16             MR. COLLINS:  Objection.  Lack of

17   foundation.

18             THE WITNESS:  She doesn't see there's a

19   TCR, yes.

20   BY MR. BOGLE:

21        Q    Okay.  Well, let's take a look then at

22   page .2.  And this is the threshold change form

23   that's being referenced here for Giant Eagle 4009,

24   hydrocodone.  Now, it's dated May 28, 2008.  Do

Page 399

1      you see that?

2           A     Yes.

3           Q     And the reason for the change is noted

4      "RNA reasonable request for a small increase per

5      Rex Catton."

6                 Do you see that?

7           A     Yes.

8           Q     But that specific information, that

9      language specifically wasn't provided until

10     September 22nd by Dave Gustin, was it?

11                MR. COLLINS:  Objection.

12     Mischaracterization of the document, assumes facts

13     not in evidence.

14                THE WITNESS:  I don't know when that was

15     done.  I assume 5/28/08.  It also doesn't include

16     the increase amount, which is unusual.

17     BY MR. BOGLE:

18          Q     Right, I was going to get to that next.

19                But if you look back at the e-mail from

20     Dave Gustin, September 22nd, 2008, the very same

21     language we just read from the form, identical, is

22     what appears on the May 28, 2008 change form,

23     right?

24                MR. COLLINS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 400

1      Mischaracterization.

2                  THE WITNESS:  Yes.  And I don't know

3      what -- retail national accounts, yes.

4      BY MR. BOGLE:

5          Q     Yeah.  And that seems consistent with

6      what Diane Martin says in September 22nd, which is

7      that this TCR was approved in May without a form,

8      right?

9          A     Yes.

10         Q     And this information was added in

11     September.

12                 MR. COLLINS:  Objection.  That's a total

13     mischaracterization, assumes facts not in

14     evidence.

15     BY MR. BOGLE:

16         Q     How do you explain the very same

17     language, word for word, that first appears in a

18     September e-mail being put in there in May?

19                 MR. COLLINS:  Object --

20     BY MR. BOGLE:

21         Q     How did he get that right?

22                 MR. COLLINS:  Objecting to the form,

23     compound, assumes facts not in evidence.

24                 THE WITNESS:  I can't explain why that

Highly Confidential - Subject to Further Confidentiality Review

Page 401

1    was in there exactly as they repeated it, but it

2    may have been something they did before.

3    BY MR. BOGLE:

4         Q    Okay.  So you think that Diane was

5    mistaken when she said that this request was

6    actually approved in May without a TCR, right?

7         A    Yeah.  I don't know if she didn't find

8    one or she was doing an audit of them or what.

9         Q    And as you noted, the form that is

10   attached here doesn't include even an increased

11   amount, does it?

12        A    No.

13        Q    But it is noted to be approved by you,

14   right?

15        A    Yes.

16        Q    And Dave Gustin.

17        A    Yes.

18        Q    And the pharmacy at issue here is Giant

19   Eagle 4009, which is in Parma, Ohio, and you

20   understand that's in Cuyahoga County?

21        A    Yes.

22        Q    Have you ever been to that pharmacy to

23   visit there?

24        A    No, I don't think so.

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1        Q    Are you aware that there were actually

2   multiple Giant Eagles approved at this very same

3   time for threshold increases for various opioid

4   products that include the same exact language on

5   the same exact date?  Are you aware of that?

6        A    No, I'm not.

7        Q    Okay.

8             (Snider Exhibit No. 42 was marked

9             for identification.)

10  BY MR. BOGLE:

11       Q    1.1827, which is Exhibit 42.

12            We put together a compilation of these.

13  We're just going to look at a couple of them.

14            MR. COLLINS:  Do you have another copy

15  or no?

16            MR. BOGLE:  Yeah, I think I actually do.

17            MR. COLLINS:  Thank you.  42?

18            MR. BOGLE:  Yeah.

19  BY MR. BOGLE:

20       Q    So I don't want to reread all of the

21  e-mails, but you see the e-mails on page .15 and

22  .16, that's the same e-mail chain we just

23  reviewed.

24       A    It looks like the same one, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 403

1          Q     Right.  Okay.

2                And then if you see what follow -- or

3     what's before that in this packet, there are --

4     one, two, three -- four hydrocodone threshold

5     increases from the same date with the same

6     description as for the reason for the change, all

7     without increased amounts.

8                Do you see those forms?

9          A     Let me -- can I check --

10         Q     Yeah, yeah.  I don't want you to take my

11    word for it.

12         A     Yes.  I don't know the amounts, though.

13    It's not complete.

14         Q     Right.  None of them include amounts, do

15    they?

16         A     No, they don't.

17         Q     But all of them show as approved by both

18    you and Dave Gustin, don't they?

19         A     They show me submitting it to Dave

20    Gustin, yes, national account.

21         Q     And his name appears there too under

22    "Approved by," right?

23         A     Yes.

24         Q     Okay.  All dated May 28, '08, and all go

Page 404

1    back to the same e-mail chain from September where

2    Diane Martin is telling everyone that threshold

3    change request forms weren't actually completed in

4    May, right?

5                    MR. COLLINS:  Objection.

6    Mischaracterization, assumes facts not in

7    evidence.

8                    THE WITNESS:  I can't testify that they

9    all did.  You have included this, but I don't have

10   the list.

11   BY MR. BOGLE:

12       Q    And they all include for the reason for

13   the change the same exact language that was first

14   introduced in the e-mail chain on September 22nd,

15   2008, correct?

16                    MR. COLLINS:  Objection.  Foundation,

17   form.

18                    THE WITNESS:  They include that, but

19   like I say, I don't know if it wasn't included on

20   5/28.

21   BY MR. BOGLE:

22       Q    You're supposed to list the actual

23   increased amount on the threshold --

24       A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 405

1          Q    -- change request form, right?

2          A    Yes.

3          Q    Okay.  And reasonable request for a

4     small increase, is that documented proof of a

5     legitimate business reason?

6          A    I don't think that's a good enough

7     reason.  I don't know what the DRA vetted out on

8     that.

9          Q    Oh, I'm sorry.  One more thing on that

10    compilation I just gave you, and you can take

11    whatever time you need to look at this.

12              But all the pharmacies listed here,

13    we'll get there one by one, page .2, Middleburg

14    Heights, that's in Cuyahoga County, right?

15              MR. COLLINS:  Give him a second.

16              MR. BOGLE:  Sure.

17              THE WITNESS:  Yeah, I believe that's

18    south of Cleveland.

19    BY MR. BOGLE:

20         Q    Okay.  Page .6, Garfield Heights, that's

21    Cuyahoga County, right?

22         A    Yes.

23         Q    Page .10, Cuyahoga Falls, Cuyahoga

24    County as well, right?

Page 406

1          A      No.

2            Q      No?

3          A      That's Summit County.

4            Q      Summit, you're right.  You're right.

5    Fair clarification.  Thank you.  Summit County.

6                  .14, this pharmacy is in Cleveland,

7    Ohio, right?

8          A      Yes, at Lorraine Road.

9            Q      Okay.  All right.  We're done with that.

10                 MR. COLLINS:  When would be a good time

11   to take a break?

12                 MR. BOGLE:  It's fine now.  Yeah, if he

13   needs it, that's fine.

14                 THE VIDEOGRAPHER:  The time is 3:56 p.m.

15   We're going off the record.

16                 (Recess.)

17                 THE VIDEOGRAPHER:  The time is 4:08 p.m.

18   We're back on the record.

19   BY MR. BOGLE:

20           Q    Okay, Mr. Snider, we had stopped --

21   broken after talking about some of the Giant Eagle

22   Pharmacies, and I want to talk about a couple more

23   of those from Summit and Cuyahoga County.

24                 (Snider Exhibit No. 43 was marked

Highly Confidential - Subject to Further Confidentiality Review

Page 407

1              for identification.)

2    BY MR. BOGLE:

3         Q    I'm going to hand you what's marked as

4    1.1811, Exhibit 43.

5              Okay.  This is a file pertaining to

6    Giant Eagle 0357.  Do you see that?

7         A    Yes.

8         Q    Okay.  All right.  If you can go to

9    page .2, do you see there's a threshold change

10   form for Giant Eagle 0357 from Parma, Ohio?  Do

11   you see that?

12        A    Yes.

13        Q    That's in Cuyahoga County, right?

14        A    Yes.

15        Q    Okay.  Requested on July 17, 2008.  Do

16   you see that date?

17        A    Yes.

18        Q    And the request is for a 20 percent

19   increase of the hydrocodone thresholds for that

20   pharmacy, right?

21        A    Yes.

22        Q    Okay.  Now, the current threshold is not

23   actually noted here at all, is it?

24        A    No.

Highly Confidential - Subject to Further Confidentiality Review

Page 408

1       Q    Okay.  And the reason for change that is

2   noted, it says:  "This store volume is up over 55

3   percent with additional scripts for hydrocodone."

4            Do you see that?

5       A    Yes.

6       Q    Okay.  And this was noted -- under

7   "Approved by," there's your signature, dated

8   7/18/08, right?

9       A    Yes.

10      Q    Okay.  In this file for this Giant Eagle

11   Pharmacy, I did not see any prescription data

12   associated with this or any other threshold change

13   for this store in this packet.  I mean, feel free

14   to look.  Do you see any -- any data, purchase

15   data that's designated?

16      A    Let me check.  (Peruses document.)

17            No, I don't see it in this packet.

18      Q    Okay.  And if you go to .5, which is

19   another threshold change form for the same store,

20   dated October 2nd, 2008, do you see that?

21      A    October 7th, was it?  Oh, I see that

22   it's 2.  Yeah, okay.

23      Q    Yeah.  Your signature is the 7th, we'll

24   get there, but the form is dated October 2nd,

Highly Confidential - Subject to Further Confidentiality Review

Page 409

1    right?

2           A     Yes.

3           Q     Okay.  And so this is some, less than,

4    three months after the prior request for a

5    hydrocodone increase was requested and approved,

6    right?

7           A     I believe so, yes.

8           Q     Right.  Let me --

9           A     I actually remember that, yeah.

10          Q     So this again is for hydrocodone

11    requesting a 10 percent increase for this store,

12    right?

13          A     In Parma, yes.

14          Q     Right.  And again, there's no current

15    threshold listed here either, is there?

16          A     No.

17          Q     Okay.  It is noted to be a permanent

18    change request, right?  I'm right here if it

19    helps.

20          A     Yeah, thank you.  Yes.

21          Q     Okay.  And the reason for change noted

22    there is "Per Donald M. -- I don't know if it's

23    Casar or Sasar (phonetic), I'm not sure how you

24    say that, but "RPH manager, quality assurance and

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1    compliance."  "Please increase due to the business

2    has increased substantially over the last few

3    months."

4              Do you see that?

5         A    Yes.

6         Q    Okay.

7         A    It's their security manager.

8         Q    All right.  And so, again, for this

9    request, there's no dispensing data in this

10   packet, right?

11             MR. COLLINS:  Objection.

12   Mischaracterization.

13             THE WITNESS:  I wouldn't see that.

14   BY MR. BOGLE:

15        Q    Okay.  Do you see that in this packet?

16        A    No.  No.

17        Q    Okay.  And -- well, let me ask you this:

18   For Giant Eagle specifically, and during this time

19   period, 2008 time period, for a larger pharmacy

20   like that, would you not require them to produce

21   dispensing data to support their request?

22        A    I would not.

23        Q    You would not?  Okay.

24        A    No, the director of Regulatory Affairs

Highly Confidential - Subject to Further Confidentiality Review

Page 411

1    would.

2             Q    Okay.  A fair clarification.

3             Do you know if it was policy within the

4    company to request dispensing data for larger

5    pharmacies like Giant Eagle when they made

6    requests like this?

7        A    I'm not sure what year, but I know at

8    one point on the CSMP, they did ask for data.

9    Previously, on Lifestyle, I think we asked for

10   three months sales.

11        Q    Right.  So either way you're asking for

12   some sort of data to support this kind of change,

13   right?

14        A    The DRA is, yes.

15        Q    All right.

16             (Snider Exhibit No. 44 was marked

17             for identification.)

18   BY MR. BOGLE:

19        Q    I'm going to hand you what's marked as

20   1.1866, Exhibit 44 to your deposition.

21             Okay.  This is a series of e-mails with

22   some threshold change forms attached to them.  So

23   let's start by looking at the e-mails.

24             On the bottom of the first page there,

Highly Confidential - Subject to Further Confidentiality Review

Page 412

1    there's an e-mail from Sabrina Cook to Gregory

2    Carlson, October 22nd, 2008.

3              Do you see that?

4         A    Yes.

5         Q    She notes:  "Below are stores that are

6    at least 80 percent or above their thresholds.

7    Please review and let me know if there is a

8    business reason for an increase."

9              Do you see that statement?

10        A    Yes.

11        Q    Okay.  And this e-mail does include

12   various thresholds for Giant Eagle Pharmacies for

13   controlled substances including opioids, right?

14        A    I don't know what that is.  It --

15        Q    Do you see where it lists monthly

16   thresholds and has numbers below?

17        A    Yes.  And then it's blank where it says

18   "Threshold percent."  Month-to-date accumulator, I

19   don't really know what that is.

20        Q    Yeah, I'm just asking if the monthly

21   threshold amounts were provided in this e-mail to

22   Gregory Carlson at Giant Eagle.

23             MR. COLLINS:  Objection.  Foundation.

24             THE WITNESS:  It says Sabrina -- it

Page 413

1   says:  "Below are other stores that are -- that

2   are at least 80 percent or above."  I don't know

3   if Greg asked for it or not.

4   BY MR. BOGLE:

5        Q    Yeah, let me rephrase.  I wasn't asking

6   if he asked for it.

7             I'm saying Sabrina Cook, that's what

8   she's giving him are the monthly thresholds for

9   these stores for opioid products and other

10  controlled substances.  Correct?

11       A    She's giving him these list of stores

12  that are at least 80 percent or above.

13       Q    Right.  And the monthly threshold is

14  provided for each in the chart, right?

15       A    I would guess.  I'm not sure what that

16  is.

17       Q    Okay.  We see where it says "Monthly

18  threshold" and there's numbers below it, right?

19       A    Yes.

20       Q    Okay.  There's a response from Gregory

21  Carlson, October 22nd, 2008, saying:  "We need to

22  bump stores 4078, 6537, 2108, 4075, 6523, and 6513

23  up by 20 percent due to high volume growth.  These

24  are all either new stores or stores running

Page 414

1    promotions causing increased volume."

2              Do you see that?

3      A     Yes.

4        Q    And then the very top e-mail is an

5    e-mail from Bill de Gutierrez-Mahoney saying:

6    "Done.  Jim, Blaine, please file for your

7    records."

8              Do you see that?

9      A     Yes.

10       Q    And Bill Mahoney was another DRA, right?

11     A     Yes.

12       Q    And if you look, the -- look at a couple

13   of these, there's actually the threshold change

14   forms attached to the e-mails here, they're being

15   discussed.

16              So, for example, on page .3, on that

17   same day, October 22, 2008, where the request is

18   made by Giant Eagle, you see a 20 percent increase

19   amount request for 9193, which is hydrocodone,

20   right?

21     A     Yes.

22       Q    Okay.  And this is from Groveport, Ohio.

23   Do you know where that's at?

24     A     I think it's by the river.

Highly Confidential - Subject to Further Confidentiality Review

Page 415

1        Q     Okay.  In which county, do you know?

2        A     No, I don't.

3        Q     You don't know.  Okay.

4              You see here the reason for change is

5   basically just copied from the e-mail that Gregory

6   Carlson sent.  It says:  "Per Gregory Carlson,

7   Director of Pharmacy Sourcing," and it gives his

8   number, "Please increase due to running promotions

9   causing increased volume."  Right?

10             MR. COLLINS:  Objection.  Form.

11   BY MR. BOGLE:

12        Q     Is that what it states?

13        A     Can you restate that, please?

14        Q     Yeah.

15             So the reason for change noted in this

16   form is, "Per Gregory Carlson, Director of

17   Pharmacy Sourcing:  Please increase due to running

18   promotions causing increased volume?"

19             That's the reason stated on the actual

20   form.  Right?

21        A     Yes.

22        Q     Okay.  And again, in this packet of

23   threshold change forms, there's no dispensing data

24   attached, is there?

Highly Confidential - Subject to Further Confidentiality Review

Page 416

1              MR. COLLINS:  Objection.  Form.

2              THE WITNESS:  And I -- what year is

3    this, please?

4    BY MR. BOGLE:

5         Q    2008.

6         A    I don't know if we asked for that in

7    2008.  That was Lifestyle.

8         Q    October 2008, you think was Lifestyle?

9         A    It may have been.  I don't remember.

10        Q    Okay.  So if it was under the Lifestyle

11   Drug Monitoring Program, you wouldn't have asked

12   for dispensing data at all.  Is that's what you're

13   saying?

14        A    I wouldn't have asked for national

15   account dispensing data at any time.  That was

16   handled by the director of Regulatory Affairs and

17   Bill de Gutierrez-Mahoney.  But he says he

18   attaches them, but I'm not sure if this was what

19   was attached.  If it was, it wasn't completed.

20        Q    Okay.  So -- yeah, and again, I'm just

21   giving you what was produced to us.  This -- this

22   e-mail and attachments to the e-mail, these

23   threshold change forms, you would agree with me

24   there is no dispensing data included in here for

Highly Confidential - Subject to Further Confidentiality Review

Page 417

1    any of these stores, right?

2        A    I don't normally get that ever.

3        Q    I'm not asking if you get it.  I'm

4    asking, is it attached to this e-mail chain?

5        A    No.

6        Q    Do you see it?

7        A    I don't see it here.

8        Q    Okay.  All right.  And -- strike that.

9            Do you see there are multiple other --

10   actually, we'll go through a couple more.

11           There is one on .5 asking for a 20

12   percent increase for a Giant Eagle in Berea, Ohio.

13   Do you see that?

14       A    Berea.

15       Q    Berea.  Okay.  What county is that in?

16       A    That's Cuyahoga.

17       Q    And that's for a 20 percent increase for

18   hydrocodone, right?

19       A    Yes.  That has a lot of population area.

20       Q    Okay.  And again, the same reason for

21   change is provided there as was in the last

22   threshold change form, right?

23       A    Yes.

24       Q    Okay.  Is there any indication here of

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    Giant Eagle providing you, McKesson, with the

2    actual promotion they were even running that was

3    causing this increased volume?

4         A    I wouldn't know that.

5         Q    Right.  I'm asking, is it -- do you see

6    that anywhere in the packet of information or the

7    e-mails?

8         A    You haven't included it in this packet.

9    I don't see anything.

10        Q    I haven't -- I have included what was

11   given to us.

12        A    Okay.

13        Q    Okay.  So --

14        A    Then -- then you or us haven't included

15   that.

16        Q    Do you have any independent recollection

17   that that information was even provided for these

18   change requests?

19        A    No, I don't.  I don't.

20        Q    Okay.  I'm going to hand you what I'm

21   marking as 1.1777, also Exhibit 45 to your

22   deposition.

23             (Snider Exhibit No. 45 was marked

24             for identification.)

Page 419

1    BY MR. BOGLE:

2         Q    Do you see this file pertains to Giant

3    Eagle 0465?  Do you see on the first page?

4         A    Yes.

5         Q    Okay.  And if you look, there's some

6    threshold change requests attached here.

7              First of all, if you can go to page .10.

8    Do you see this is a threshold change request made

9    May 28, 2008, for a Giant Eagle in Brook Park,

10   Ohio?

11        A    Yes.

12        Q    Okay.  And that's in Cuyahoga County,

13   right?

14        A    Yes.

15        Q    Okay.  And this is another one of those

16   stores that in May 2008 had their thresholds

17   increased for hydrocodone, the reason being

18   "Reasonable request for a small increase," per Rex

19   Catton.  Do you see that?

20        A    Yes.  I think that's the same date.

21        Q    Yeah, it is.

22             All right.  Let's go a couple of months

23   later for the same pharmacy.  I'm on page .2.

24   This is a threshold change form for hydrocodone

Highly Confidential - Subject to Further Confidentiality Review

Page 420

1     from July 31, '08, right?

2          A     What was the other one?  I'm sorry, I

3     forgot.

4          Q     May 28, '08.

5          A     Thank you.

6          Q     This is July 31 on this one, '08, right?

7          A     Yes.

8          Q     Okay.  Again, requesting an increase for

9     hydrocodone, this time by 5 percent, right?

10         A     Yes.

11         Q     And the noted reason for change is:

12    "Threshold adjustment is being requested due to

13    high growth rate.  Please increase by 5 percent."

14               Do you see that reference?

15         A     Yes, I do.

16         Q     Okay.  And this was noted -- signed by

17    you, August 1, 2008, right?

18         A     It was, yes.

19         Q     So in the packet of information for this

20    pharmacy, do you see any dispensing data that

21    would support this request?

22         A     I never see that.  It's a national

23    account.  They do the vetting.

24         Q     I'm asking whether you see it in this

Page 421

1    packet.

2          A     I -- no.

3          Q     Okay.  So let's fast-forward to the same

4    pharmacy to October 2nd, 2008, page .13.

5                Are you there?

6          A     Yes.

7          Q     Okay.  This is a threshold change

8    request dated October 2nd, 2008, for the same

9    Giant Eagle Pharmacy, right?

10         A     Yes.

11         Q     Also for hydrocodone, this time to

12   increase by 35 percent, right?

13         A     Yes.

14         Q     Okay.  And the reason for the change is

15   noted per Gregory Carlson, Director of Pharmacy

16   Sourcing:  "Please increase due to volume growth."

17   Right?

18         A     Yes.

19         Q     And this was sent -- signed and sent by

20   you, October 7, 2008, correct?

21         A     Yes, but sent -- I -- I don't know if I

22   sent this to Regulatory or they sent it to me.

23   I'm not sure which.

24         Q     Okay.  Fair enough.

Page 422

1              Again, no dispensing data attached to

2      support the volume growth?

3          A     I -- I would not and do not see that.

4          Q     Okay.  Let's go to page .18.

5              So this is a couple of weeks later,

6      October 23rd, 2008.  There's an e-mail from

7      Sabrina Cook at the bottom of this page to Gregory

8      Carlson saying:  "Below are stores that are above

9      80 percent of their thresholds.  The thresholds

10     will be reset in six business days.  Let me know

11     if there is a business reason for the increase --

12     for an increase."

13             Gregory Carlson responds the same day

14     saying:  "Go ahead and bump 482, 1475 and 465 due

15     to increased volume.  I would say 20 percent for

16     each."

17             Do you see those references?

18         A     I do.

19         Q     Okay.  And if you go to page .16, you

20     see there there's the threshold change request for

21     this store that corresponds to that e-mail

22     requesting a 20 percent increase for hydrocodone,

23     right?

24             MR. COLLINS:  Objection.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 423

1        THE WITNESS:  Yes, it's the one that
2    says per Greg Carlson with his phone number.
3    BY MR. BOGLE:
4        Q    Right.  And this relates to the e-mail
5    we just looked at, October 23, 2008, where he
6    makes the request for multiple stores, including
7    465, to get a 20 percent increase for hydrocodone,
8    right?
9        A    I would guess that, yes.
10        Q    That's the next day, right?
11        A    Well, I would -- your answer is I would
12    guess that.
13        Q    Okay.  And it's the same reason for
14    change provided that he provides in the e-mail,
15    volume growth, right?
16        A    I'm sorry.  Per -- per Gregory Carlson:
17    "Please increase due to volume growth."  Yeah, it
18    has the phone number and everything on it too.  I
19    don't know why that's different, but...
20        Q    And that's for the same Giant Eagle
21    Pharmacy at Brook Park, Ohio, that we looked at
22    for the last few change requests, right?
23        A    Yes.
24        (Snider Exhibit No. 46 was marked

Highly Confidential - Subject to Further Confidentiality Review

Page 424

1           for identification.)

2      BY MR. BOGLE:

3           Q     Okay.  I'm going to hand you Exhibit 46,

4      which is Exhibit 1.1816.

5                 It's a file for Giant Eagle 0230.  Do

6      you see that?

7           A     Yes.

8           Q     Okay.  If you go to .2 -- actually, I'm

9      sorry, let's go to .4 first.  My apologies.

10                There is an e-mail there in the middle

11     of the page from Sabrina Cook to the same two

12     individuals at Giant Eagle on November 20, 2008,

13     saying:  "Please see below for the stores that hit

14     above 80 percent of their thresholds.  If there's

15     a business reason for an increase, please let us

16     know."

17                Do you see that?  And there's a chart

18     below with Giant Eagle 488 for oxycodone, Giant

19     Eagle 230 for hydrocodone, and Giant Eagle 224 for

20     oxycodone in that chart.

21          A     Yes.

22          Q     Gregory Carlson then responds the same

23     day in the next e-mail above saying:  "All need to

24     be increased by 20 percent.  These stores are all

Highly Confidential - Subject to Further Confidentiality Review

Page 425

1    experiencing high volume.  488 have significantly

2    grown due to a remodel, and the other two are in

3    Cleveland, which is a high growth market for us."

4              Do you see that?

5        A     I see that.

6        Q     Did you have an understanding that in

7    late 2008 that Cleveland was a high growth market

8    for controlled substances for Giant Eagle?

9              MR. COLLINS:  Objection.  Form.

10             THE WITNESS:  No, I didn't.  I know --

11   can you rephrase that?  I apologize.

12   BY MR. BOGLE:

13       Q     Yeah.  Did you know in late 2008 that

14   Cleveland was a high growth market for Giant Eagle

15   for controlled substances?

16       A     No, not for controlled substances, but I

17   know their volume increased.  Whereas a typical

18   pharmacy might be eighty to 100,000, these guys

19   were three to 400,000 and doing multiple scripts.

20   It was a high density area.  I do know that.

21       Q     Okay.  So, in his e-mails indicated

22   here, it was a -- what they called a high growth

23   market, right?

24       A     That's what he says here.

Page 426

1           Q    All right.  And then if you see on

2     page .2, here's the threshold increase form that

3     corresponds with that request dated November 21,

4     2008, for the Giant Eagle 230 in Cleveland, Ohio.

5     Do you see that?

6           A    Yes.

7           Q    It's for a 20 percent increase for

8     hydrocodone, right?

9           A    I'm sorry, I can't -- yes.

10          Q    And again, the same reason for change

11    was given here that we've seen in the prior

12    threshold change forms, which is volume growth,

13    right?

14          A    Yes, with Greg's phone number.

15          Q    All right.  And there's no -- again, in

16    this packet of information for this pharmacy that

17    we obtained, there is no dispensing data attached,

18    is there?

19          A    I'm not privy to -- to any of that.  I

20    don't see it here at all.

21          Q    Okay.  And your signature on this

22    document appears on November 21, '08, right?

23          A    Yes.

24          Q    I'm going to hand you what I'm marking

Highly Confidential - Subject to Further Confidentiality Review

Page 427

1    Exhibit 47, also noted as 1.1839.

2              (Snider Exhibit No. 47 was marked

3              for identification.)

4    BY MR. BOGLE:

5         Q    This information relates to Giant Eagle

6    4030.  Do you see that?

7         A    Yes.

8         Q    Okay.  And if you look here on page .4,

9    there is an e-mail at the bottom of the page from

10   Gregory Carlson to Telisca Lindsay, July 29, '09,

11   where he says:  "Telisca, please increase the

12   following stores these percentages based on

13   reasons listed" --

14        A    Excuse me, hold on one second.  Could

15   you tell me where you're at?

16        Q    Yeah.

17        A    What page?

18        Q    It says .4 on the very --

19        A    Sorry.  Thank you.

20        Q    -- bottom.  Yeah.

21             Let me know when you get there, and I'll

22   reread it --

23        A    I'm there.

24        Q    -- so we'll be on the same page

Page 428

1    literally.

2         A    I'm on it.

3         Q    Okay.  So it says on this e-mail from

4    July 29, 2009, from Gregory Carlson:  "Please

5    increase the following stores these percentages

6    based on reasons listed.  Thanks."

7              And you see specifically as to the store

8    this packet pertains to, Giant Eagle 4030, there's

9    a request for a 10 percent increase for oxycodone,

10   and the reason given is "volume up."  Do you see

11   that?

12        A    4030.  Yes.

13        Q    Okay.  And then if you go to the actual

14   form, which is page .2, you see here's the form

15   from July 29, 2009, for the Giant Eagle in

16   Tallmadge, Ohio.  Do you see that?

17        A    Yes.

18        Q    And that's in Summit County, right?

19        A    Yeah, I think it is.  It's on the edge.

20   I think so.

21        Q    All right.  And you see the reason given

22   here for the change is volume growth.  Do you see

23   that?

24        A    I'm sorry.

Page 429

1        Q    I'm just looking at "Reason for

2    requested change."

3        A    Oh, thank you.  Yes, I see it now.

4        Q    Okay.  And what's noted here, though, is

5    a 20 percent increase for this store for

6    oxycodone, right?

7        A    Yes.

8        Q    They only actually requested 10, though,

9    right?

10            MR. COLLINS:  Objection.  Foundation.

11            THE WITNESS:  Can you help me out?

12   BY MR. BOGLE:

13       Q    Yep.  So if you go back to .5, the chart

14   provided by Gregory Carlson, for Giant Eagle 4030,

15   he's asking for a 10 percent increase for

16   oxycodone.  Do you see that in the middle of the

17   chart?

18       A    It looks like it, yes.

19       Q    Okay.  But on the threshold change form

20   completed the same day and signed by you, there's

21   a 20 percent increase approved, right?  Which is

22   also signed off on by Regulatory.

23            MR. COLLINS:  Objection.  Form.

24            THE WITNESS:  Yes, Regulatory would have

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    vetted it out.

2    BY MR. BOGLE:

3         Q     Right.  But you see that there is a

4    20 percent increase approved for oxycodone whereas

5    they asked for 10?

6              MR. COLLINS:  Objection.  Foundation.

7    BY MR. BOGLE:

8         Q     On the same day.

9         A     I don't know all the information that

10   went to vet that out by the director of Regulatory

11   Affairs.  I believe it was Dave Gustin.

12        Q     Okay.  But --

13        A     It doesn't say that in the e-mail.

14        Q     Yeah, but you see here that we just

15   looked at the request being made for 10 percent

16   and granted at 20 percent, right?

17             MR. COLLINS:  Objection.

18   Mischaracterization, lacks foundation.

19             THE WITNESS:  I see what they put in the

20   e-mail, yes.

21   BY MR. BOGLE:

22        Q     And you see what's in the threshold

23   change form, right?

24        A     Yes, I do.

Page 431

1          Q     Okay.  One says 10, the other says 20,

2     right?

3          A     This e-mail says 10, the other says 20.

4     I don't know what else was vetted out by Dave and

5     with the customer.

6          Q     All right.  I'm handing you what I'm

7     marking as Exhibit 1.1817, which is also marked as

8     Exhibit 48.

9               (Snider Exhibit No. 48 was marked

10              for identification.)

11    BY MR. BOGLE:

12         Q     This packet pertains to Giant Eagle

13    2029.  Do you see that on the first page?

14         A     Yes.

15         Q     Okay.  If you can go to page .7.

16    Looking at the e-mail from -- sorry, e-mail from

17    Sabrina Cook, the bottom e-mail on the page, to

18    Gregory Carlson and Donald Casar, December 19,

19    2008, where she says:  "The below stores have hit

20    above 80 percent.  Please let me know if there is

21    a business reason for an increase."

22              Gregory Carlson responds the same day in

23    the e-mail above:  "All the hydrocodones need to

24    be bumped by 25 percent."  It says:  "All due to

Highly Confidential - Subject to Further Confidentiality Review

Page 432

1      out-of-stock situation on the Vicodin from last

2      month filling owes.  Also bump the two with the

3      oxycodone.  4012 had a recent acquisition, so

4      their volume is way up, and 5863 is experiencing

5      greater than average growth.  Increase 4012 by

6      25 percent and 5863 by 20 percent."

7              Do you see that?

8      A      I see it.

9      Q      Okay.  And if you look, the form appears

10     on page .2.  This is the form for hydrocodone

11     related to that request, and this pharmacy is

12     located in Bedford, Ohio.  Do you see that?

13     A      Yes.

14     Q      It's another Cuyahoga County pharmacy,

15     right?

16     A      Yes.  It's where I bought my car.

17     Q      Okay.  And the request here is for the

18     25 percent increase to hydrocodone, right?

19     A      Yes.

20     Q      Which was submitted by you December 19,

21     2008, correct?

22     A      Yes.

23     Q      And again, in this packet of

24     information, no dispensing data to support the

Page 433

1    growth, right?

2              MR. COLLINS:  Objection.  Foundation.

3              THE WITNESS:  I don't know what due

4    diligence did -- they did with the RNA.

5    BY MR. BOGLE:

6         Q    I'm just asking if in the packet of

7    materials here we've got dispensing data.

8         A    I don't see it in this packet, no.

9              (Snider Exhibit No. 49 was marked

10              for identification.)

11   BY MR. BOGLE:

12        Q    All right.  I'm going to hand you

13   1.1841, which is marked as Exhibit 49.

14              Okay.  Let's start on page .2 at the

15   bottom.  Do you see an e-mail from October 29,

16   2010, from pharmacy team leader to Gregory

17   Carlson, copying Michael Chappell, at the very

18   bottom?

19        A    Yes.

20        Q    It says there:  "Greg, just received our

21   order from McKess, and we did not get the Endocet

22   and Roxicet that we need desperately.  We have

23   increased our business, and with a pain management

24   specialist in town and several terminal patients,

Page 434

1      we are seeing a rise in these products.  According

2      to McKesson, we are limited to 9,900 tablets, and

3      they recommend 12,000 units.  We need to get these

4      medications or lose our customers.  Can anything

5      be done?"

6                  Do you see that e-mail?

7      A      Yes, I see it.

8      Q      Okay.  And then the next e-mail up in

9      the chain, there's an e-mail from Randy Heiser at

10     Giant Eagle to a Jeff Wallace saying:  "Jeff, we

11     are currently evaluating pain management as a

12     corporate business opportunity.  Looking at the

13     Cleveland marketplace to begin.  Already in

14     conversation with the Cleveland Clinic.  Please

15     give me a call this week to discuss."

16                 Do you see that?

17     A      Yes.

18     Q      Did you know that around this time in

19     2010 that Giant Eagle was looking at pain

20     management clinics as a corporate business

21     opportunity?

22                 MR. COLLINS:  Objection.  Foundation.

23                 THE WITNESS:  I don't remember that.

24     BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 435

```
 1        Q    Okay.

 2        A    That was 2010.  I -- I do know Jeff

 3   Wallace.  He was the account manager.  So I don't

 4   remember this e-mail in particular.

 5        Q    Well, you see, though, the next e-mail

 6   up, Jeff does copy you on it.

 7        A    Yes.

 8        Q    So you would have seen this e-mail that

 9   I just read to you, right?

10             MR. COLLINS:  Objection.  Foundation.

11             THE WITNESS:  He sends it back to me

12   just saying, "I will call Randy," yes.

13   BY MR. BOGLE:

14        Q    Right.  So this is an e-mail, the one I

15   just read to you about the pain management as

16   being a corporate business opportunity for Giant

17   Eagle, is one you would have received, right?

18             MR. COLLINS:  Objection.  Foundation.

19             THE WITNESS:  I did not receive it.  I

20   was copied --

21   BY MR. BOGLE:

22        Q    You didn't receive --

23        A    I was copied on it.

24        Q    Right.  So when you're copied on it, you
```

Page 436

1    get to see it, right?

2              MR. COLLINS:  Objection.  Lacks

3    foundation.

4              THE WITNESS:  Yes.  And I just -- Jeff

5    said, I'm going to call Randy on this, and so if I

6    saw that, I don't recall specifically from 2010.

7    BY MR. BOGLE:

8         Q    Okay.  So do you recall any other

9    discussions with Giant Eagle that -- about pain

10   management clinics being a business opportunity

11   for them?

12        A    No.  I try to make it clear that it's

13   regarding the national accounts, they're vetted

14   out by our national accounts folks and the

15   directors of Regulatory Affairs.  So I wouldn't

16   have had that discussion at my level, no.

17        Q    So if Giant Eagle was looking at pain

18   management clinics as a business opportunity in

19   the Cleveland market, even though that's a market

20   that you service with your distribution center,

21   you don't think you would be aware of that?

22        A    I think I would be aware that it's been

23   fully vetted by the director of Regulatory Affairs

24   and our national accounts folks.

Highly Confidential - Subject to Further Confidentiality Review

Page 437

1        Q    So you would totally defer to them as to

2    whether that was a business opportunity that

3    McKesson should participate in.  Is that fair?

4              MR. COLLINS:  Objection.

5    Mischaracterization.  Foundation.

6              THE WITNESS:  I would defer to their

7    data and expertise, especially in the 2010 time

8    frame, yes.

9    BY MR. BOGLE:

10       Q    Okay.  But you don't recall being made

11   aware of it around that time frame, though?

12       A    No.

13       Q    Other than being copied on that e-mail.

14       A    No.  I know who Randy Heiser is and I

15   know who Jeff Wallace is.  And I -- my due

16   diligence was to send it to two Regulatory people

17   to make sure they're aware.

18       Q    Do you recall receiving correspondence

19   in late 2013 regarding the subject of enhanced

20   controlled substance monitoring by McKesson?

21       A    I do recall a change in 2013 to enhance

22   it, yes.

23       Q    And you're aware that that change was

24   prompted by renewed investigations by the

Highly Confidential - Subject to Further Confidentiality Review

Page 438

```
1    Department of Justice and DEA as to McKesson's

2    practices, right?

3              MR. COLLINS:  Objection.  Foundation.

4              THE WITNESS:  I don't remember that.  I

5    would have to see what the correspondence said.  I

6    don't remember that.

7    BY MR. BOGLE:

8         Q    You do know that McKesson ultimately in

9    2016 paid a $150 million fine for violations of

10   the Controlled Substances Act, right?

11             MR. COLLINS:  Objection.  Calls for a

12   legal conclusion.

13   BY MR. BOGLE:

14        Q    Do you know whether that occurred?

15             MR. COLLINS:  I'm sorry.  Lack of

16   foundation.  Form.

17   BY MR. BOGLE:

18        Q    Do you know that?

19        A    I heard it was a settlement with the

20   DEA.

21        Q    Okay.  Do --

22        A    And that's what I was told.

23        Q    You weren't told how much?

24        A    I was told it was --
```

Highly Confidential - Subject to Further Confidentiality Review

Page 439

```
 1        Q    For how much or for what for?

 2        A    I was told it was a settlement for

 3   $150 million.

 4        Q    Okay.  But you didn't -- you never asked

 5   what for?

 6        A    I'm sure I did.

 7        Q    Okay.  Do you remember being told what

 8   it was for?

 9        A    Not the people that know, no.

10        Q    Okay.  I'm going to hand you --

11   actually, strike that -- 1.1775, which I'm marking

12   as Exhibit 50.

13             (Snider Exhibit No. 50 was marked

14             for identification.)

15   BY MR. BOGLE:

16        Q    Okay.  And do you see here on the first

17   page, there's an e-mail from 10/24/13 sent by Elie

18   Rio, the subject being "Suspicious order

19   monitoring awareness training."

20             Do you see that?

21        A    Yes.

22        Q    Okay.  And if you go to the second page,

23   required attendees, there's a list there, and in

24   the second row names, you see -- you see you?
```

Highly Confidential - Subject to Further Confidentiality Review

Page 440

1        A      Yes.

2          Q      Okay.  Do you recall attending this

3     training?

4        A      I think it was a Webex.

5          Q      Okay.

6        A      And I don't recall specifically, but I'm

7     sure I was there.

8          Q      Okay.  Pertaining to this training, it's

9     stated here:  "Team" -- sent on behalf of Don

10    Walker -- "As you are aware, we are in the process

11    of implementing an enhanced suspicious order

12    monitoring program.  As a pharmaceutical

13    distributor, McKesson has a responsibility to

14    ensure pharmaceutical controlled substances are

15    not diverted for nonmedical or other illegal

16    purposes.  To that end, we are further enhancing

17    our controlled substances distribution policies

18    and procedures."

19            Do you see that?

20       A      Yes.

21         Q      Okay.  McKesson's responsibility is to

22    ensure that controlled substances are not diverted

23    for nonmedical or other illegal purposes.  You

24    understand that McKesson has had that

Page 441

1    responsibility since you've been running the

2    distribution center in New Castle in 2000, right?

3                    MR. COLLINS:  Objection to the form.

4                    THE WITNESS:  I don't know if that was

5    the language.

6    BY MR. BOGLE:

7        Q    Okay.  Do you have an understanding that

8    that was the general responsibility from 2000 to

9    present?

10                   MR. COLLINS:  Objection to the form.

11                   THE WITNESS:  I know the SOPs that

12   McKesson had, and I tried to follow those.

13   BY MR. BOGLE:

14       Q    Okay.  So you have no opinion one way or

15   the other whether that was McKesson's

16   responsibility from 2000 to present while you were

17   distribution center manager?

18                   MR. COLLINS:  Objection.  Vague, form.

19                   THE WITNESS:  I don't know if those

20   words were used.

21   BY MR. BOGLE:

22       Q    Okay.  Those words do not look familiar

23   to you?

24                   MR. COLLINS:  Objection.  Argumentative.

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1             THE WITNESS:  I can't answer that.  I

2    don't know.

3    BY MR. BOGLE:

4        Q    Okay.  So -- but after this enhanced

5    suspicious order monitoring program was

6    implemented, your distribution center began

7    looking closer at its customers to see if any of

8    their orders were out of the ordinary, right?

9        A    I would say that the director of

10   Regulatory Affairs took that over in 2013 because

11   they could get the data, and it was more of a

12   data-driven evolving of it.  So they would get the

13   script data, and they would do the searches for

14   it.

15       Q    Okay.  You were involved in actually

16   vetting the customers as well, though, right?

17           MR. COLLINS:  Objection.  Form.

18   BY MR. BOGLE:

19       Q    In 2013.

20           MR. COLLINS:  Objection.  Form.

21           THE WITNESS:  I don't remember if we

22   still did Level I observations or the DRAs did it.

23   BY MR. BOGLE:

24       Q    Okay.  Let's take a look here then.

Highly Confidential - Subject to Further Confidentiality Review

Page 443

1              (Snider Exhibit No. 51 was marked

2              for identification.)

3    BY MR. BOGLE:

4        Q    I hand you Exhibit 51, also marked as

5    1.1876.

6              Do you see here this is an e-mail from

7    you, April 17, 2013, to several individuals?  Do

8    you see that?

9        A    Yes.

10       Q    Titled "Monthly Drug Usage Report,

11   March."  Do you see that there?

12       A    Yes.

13       Q    And you say:  "John, Alex and Kim:  We

14   are going to set up CSMP visits for all of the

15   accounts below.  This is based on Joe Lumpkin's

16   monthly reports attached.  The first column

17   represents higher than normal controls percent to

18   total purchases.  This would be ISMC over 25

19   percent.  The second column represents high

20   oxycodone purchases to control purchases.  This is

21   over 25 percent.  Based on this data, it's

22   recommended that we do CSMP visits, with usage and

23   questionnaires completed within the next 60 to 90

24   days."

Highly Confidential - Subject to Further Confidentiality Review

Page 444

1                Do you see that?

2       A     Yes.

3       Q     Okay.  So you have familiarity and

4    experience looking at this ratio we talked about

5    before, the controls percentage versus the overall

6    percentage of prescriptions filled, right?

7       A     This data was given to me, yes.

8       Q     Right.  And you actually describe the

9    data in pretty good detail there in the e-mail I

10   just read, right?

11              MR. COLLINS:  Objection.  Vague.

12              THE WITNESS:  Joe sent this on April

13   2013, so I scheduled due diligence to get the

14   salesperson and Dale to do an observation or

15   Level I at each one of these stores.

16   BY MR. BOGLE:

17      Q     Okay.  My question was simply --

18      A     Sorry.

19      Q     -- what I just read is your recitation

20   which provides your understanding of what this

21   data actually even means, right?

22              MR. COLLINS:  Objection.  Vague.

23              THE WITNESS:  Recitation.  Please, I

24   don't -- can you rephrase that?

Highly Confidential - Subject to Further Confidentiality Review

Page 445

1    BY MR. BOGLE:

2         Q    What I just read -- I'm trying to avoid

3    reading the whole thing to you again -- but the

4    highlighted information on the screen here for you

5    is your specific understanding of what the ratios

6    of controlled substance purchases to overall

7    prescription purchases means in addition to

8    OxyContin prescription of controls purchase data,

9    which we talked about before.

10        A    This shows, yes, that Joe Lumpkin sent

11   me information, so I scheduled within 60 days a

12   visit to all these stores.

13        Q    And your discussion specifically of your

14   understanding of what that data means, right?

15             MR. COLLINS:  Objection.  Form.

16             THE WITNESS:  I do remember most of it,

17   yes.

18   BY MR. BOGLE:

19        Q    Okay.  And I just want to look at a

20   couple of these here.

21             So there's Best Care of Bridgeport, the

22   second pharmacy listed, you see there at this

23   point in time, March 2013, their controls

24   percentage to overall prescription purchases was

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1    53.97 percent.

2            Do you see that?

3    A    Yes.

4    Q    Okay.  You know that's very high, right?

5    A    I also know I don't know how many

6    wholesalers they had or what they were buying from

7    other pharmaceuticals.  So that is higher than the

8    norm, and I would have scheduled a visit there.

9    Q    Okay.  And their -- their sales of

10   oxycodone and hydrocodone had been high for years

11   leading up to 2013.  We looked at that earlier in

12   the deposition.  You recall that, don't you?

13           MR. COLLINS:  Object -- objection.

14   Argumentative, compound, assumes facts not in

15   evidence, lack of foundation.

16           THE WITNESS:  I don't remember when we

17   required a -- you would have to refresh me on that

18   again.

19   BY MR. BOGLE:

20   Q    You don't recall looking at all the

21   pharmacy information on Best Care earlier today?

22   A    I meant I didn't require -- I didn't

23   remember when we acquired Best Care.

24   Q    Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 447

1        A      So --

2            Q      You don't remember at all?

3        A      I don't remember what year.

4            Q      Okay.  So, now the information about

5    whether they had another distributor is

6    information that you should have been aware of at

7    this point in time, right?

8                    MR. COLLINS:  Objection.

9    BY MR. BOGLE:

10           Q      In April 2013, you should have already

11   known that, right?

12                  MR. COLLINS:  Objection.  That's

13   multiple questions.  It's compound.  Foundation.

14                  THE WITNESS:  No, I didn't have that

15   information.

16   BY MR. BOGLE:

17           Q      You didn't ask that?

18       A      I may have --

19                  MR. COLLINS:  Objection.  Vague.

20                  THE WITNESS:  I may have asked that, but

21   it asks that in the Level I questionnaire, and

22   that's not attached.

23   BY MR. BOGLE:

24           Q      Okay.  So -- but for Best Care, for

Highly Confidential - Subject to Further Confidentiality Review

Page 448

1     example, you wouldn't have already known when you

2     completed this e-mail and attached the chart

3     whether they had another distributor?

4                MR. COLLINS:  Objection to the form.

5                THE WITNESS:  No.

6     BY MR. BOGLE:

7          Q    You wouldn't know that?

8          A    No.

9          Q    If you can go back to Exhibit 9 real

10    quick.  And keep this one I'm looking at with you

11    out too, but...

12         A    Eight.

13               MR. COLLINS:  One more.  Getting warmer.

14               THE WITNESS:  10.

15               MR. COLLINS:  Getting warmer.

16               THE WITNESS:  11.  Sorry.  Where is 9?

17    It has to be behind there.  I'm sorry.  15.  I

18    don't see 9 here.  Let me look at that other --

19    BY MR. BOGLE:

20         Q    You can follow me up on the screen if

21    you want.  It doesn't matter to me.

22               MR. COLLINS:  It's got to be in this

23    stack.

24               THE WITNESS:  If it's okay with you, I

Highly Confidential - Subject to Further Confidentiality Review

Page 449

1    will go ahead and follow it here.

2    BY MR. BOGLE:

3         Q    This is the last document I want to

4    cover with you, so I'm just trying to -- so if you

5    look -- if we can turn to the second page of the

6    document, you see here -- you remember us talking

7    earlier about this regional statistical norms

8    chart?

9         A    Yes.

10        Q    Okay.  And we talked about New Castle,

11   the controlled substances to total prescription

12   norm was 19 percent.  Do you see that in the

13   Northeast chart there?

14        A    That's not New Castle.  That's all the

15   distribution centers combined.

16        Q    Right.  That applies to all of them in

17   the Northeast.  You understand that, right?

18        A    Yes.  Yes, I understand that.

19        Q    And New Castle is included there, right?

20        A    Yes.  Yes.

21        Q    Okay.  So with a 19 percent controlled

22   substances to overall prescription purchases norm,

23   you would agree with me that Best Care of

24   Bridgeport is multiple times over that number,

Page 450

1    right, in 2013?

2              MR. COLLINS:  Objection to form,

3    foundation.

4              THE WITNESS:  Yes, that number is higher

5    than that.

6    BY MR. BOGLE:

7         Q    Right.  Significantly higher, right?

8              MR. COLLINS:  Objection.  Vague.

9              THE WITNESS:  Two-and-a-quarter times.

10   BY MR. BOGLE:

11        Q    Okay.  And the last one I want to look

12   at here is, for oxycodone for your region, 5

13   percent is noted to be the regional norm of total

14   prescriptions should be oxycodone.  That's the

15   regional norm.  Do you see that?

16             MR. COLLINS:  Objection.  Lack of

17   foundation.

18             THE WITNESS:  These numbers are not

19   guidelines for appropriate dispensing.  They are

20   simply national average derives from McKesson

21   data.  Yes, I see that.

22   BY MR. BOGLE:

23        Q    You see where it says --

24        A    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 451

1          Q     -- "Diversion can occur in purchases

2     below these statistical norms"?

3          A     Yes.

4          Q     I think you missed that sentence.

5          A     Yes.

6          Q     Okay.  And then so if you look here for

7     Martella's, which is another pharmacy we just --

8     we talked about earlier.  Do you recall them?

9          A     Yes.

10          Q     Okay.  So the oxy percentage of controls

11     purchased, they have three different listings.

12     They're between 37 and 57 percent for their three

13     different DEA numbers.  Do you see that on this

14     chart from 1.1876?

15          A     Yeah, but I see -- I think the 19 refers

16     to our controls percent of Rx purchase, doesn't

17     it?  Or am I wrong on that?

18          Q     19?  I'm not sure I'm following you.

19          A     On the chart before.

20          Q     Can we go back to the other chart?

21               MR. COLLINS:  Yeah, we've got a copy of

22     it.  Hold on one second so he can see it.

23               MR. BOGLE:  We'll go back to the chart

24     either way on the screen.

Highly Confidential - Subject to Further Confidentiality Review

Page 452

1          MR. COLLINS:  Well, here, I'm going to

2     hand it to him so he can look at it.

3          THE WITNESS:  Thank you.

4          MR. BOGLE:  Yeah, that's fine.

5          THE WITNESS:  It says 19 percent of

6     total Rx, so that refers to controls percent to Rx

7     purchase line.

8     BY MR. BOGLE:

9          Q    Right.  And for oxycodone specifically,

10    that's noted to be 5 percent.  Do you see that for

11    your region?

12         A    You said percent of total Rx, yes.

13         Q    Right.  And so that's the same sort of

14    calculations that are being run here in

15    Exhibit 1.1876, and for Martella's, for their

16    three different DEA numbers, they're coming out at

17    between 37 and 57 percent, right?

18         A    Correct.

19         MR. COLLINS:  Object to the form.

20         MR. BOGLE:  No further questions at this

21    time.

22         MR. COLLINS:  Why don't we take five

23    minutes?  I have some redirect.

24         THE VIDEOGRAPHER:  The time is 4:59 p.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 453

1    We're going off the record.

2              (Recess.)

3              THE VIDEOGRAPHER:  The time is 5:12

4    p.m., and we're back on the record.

5                   REDIRECT EXAMINATION

6    BY MR. COLLINS:

7         Q    Good afternoon, Mr. Snider.

8         A    Good afternoon.

9         Q    I'm Kevin Collins.

10        A    Yes.

11        Q    Where do you currently live?

12        A    I currently live in -- south of

13   Youngstown, Ohio -- Poland, Ohio.

14        Q    Can you keep your voice up.  I know it's

15   been a long day.  One more time?

16        A    Poland, Ohio.

17        Q    Okay.  And what county is that?

18        A    It's Mahoning County.

19        Q    All right.  And where is that county

20   related to Summit and Cuyahoga counties?

21        A    It's about three or four counties over

22   east, directly east towards the PA line.

23        Q    And how long have you resided there?

24        A    Twenty -- 18 years.

Page 454

1          Q    All right.  Where were you born and

2      raised?

3          A    I was born in Coshocton, Ohio, and was

4      raised in Cuyahoga Falls in Summit County.

5          Q    Where did you go to high school?

6          A    Cuyahoga Falls High School.

7          Q    What did you do after high school?

8          A    I went to Kent State University.

9          Q    And after Kent State, when did you

10     graduate?

11         A    I graduated in -- I'm sorry -- 1978.

12     Sorry.  That's a long time ago.

13         Q    Okay.  And when did you start working

14     for McKesson?

15         A    I believe '79, '80.

16         Q    Can you briefly describe the positions

17     you've held, starting from your earliest position

18     at McKesson to your current position and where --

19     where you were located.

20         A    Okay.  Sure.  Started in North Canton,

21     Ohio.  I don't remember exactly how long, but I

22     was first a trainee for a couple of months, and

23     then a night supervisor after that couple of

24     months of -- in there.  And then I did that for

Page 455

1    quite a few years, and then I got promoted to

2    operations manager there, and I'm not sure what

3    year that was.  It would be on -- probably on my

4    resume, but I don't remember.

5              And then after that, we built a new

6    facility in Cincinnati, Ohio.  Fairfield, Ohio, to

7    be exact.  And I ran -- I went there as the

8    operations manager.  And I --

9         Q    What year was that?

10        A    1978.  No, '75.  I think so.

11        Q    Would it be --

12        A     No, no.  No, no.  I'm sorry.  I have the

13   wrong -- '95 or '6.  Sorry about that.

14        Q    I'm sorry.  Where did you go after that?

15        A     After Cincinnati, I went back to North

16   Canton, and then they promoted me to distribution

17   center manager over in Sewickley, Pennsylvania,

18   and after that I was promoted to manager over

19   Sewickley and North Canton.  And we had closed

20   Cincinnati, and then we closed North Canton, which

21   was in Stark County, and we combined it into New

22   Castle in 2000, and I was made the director of

23   operations there.

24        Q    So is it true that the New Castle

Highly Confidential - Subject to Further Confidentiality Review

Page 456

1     facility opened in 2000?

2          A     Yes.  May of 2000.

3          Q     And when it opened, what was your title?

4          A     I don't remember if it was DCM or DO,

5     but it was one of those, and I ran the

6     distribution center.  We got -- started it up, and

7     then I'm still there.  So I've always been in the

8     Ohio/PA market.

9          Q     What geographic territory does the New

10    Castle distribution service -- distribution center

11    service?

12         A     Our distribution center services -- if I

13    could say what towns, you might know, but on the

14    east is State College, which is the -- central PA;

15    on the north is Erie, Pennsylvania, which is the

16    north side; northwest is -- is Cleveland; and then

17    southwest would be down to the Zanesville area;

18    and then south would be -- I believe it was

19    Morgantown, Weston; and then back up to New

20    Castle.  So we're in the geographic center.

21         Q     How many employees do you manage?

22         A     About 133 right now.

23         Q     And how many employees are direct

24    reports to you?

Highly Confidential - Subject to Further Confidentiality Review

Page 457

1          A     About ten.

2          Q     In your almost 19 years of managing the

3     New Castle Distribution Center, how would you

4     describe the performance of the distribution

5     center?

6                MR. BOGLE:  Object to form, vague and

7     ambiguous.

8                THE WITNESS:  The distribution center

9     won the DC of the year seven times, and that's

10    twice as many as any other distribution center has

11    received that, and that's based on the quality and

12    the performance of the distribution center.

13    BY MR. COLLINS:

14         Q     Are there ever any internal audits

15    performed about the operations of the distribution

16    center at New Castle?

17         A     Yes.  We have four or five kinds of

18    audits.  The first kind is called a STARS audit

19    that we do internally to match our SOPs to our

20    performance.  And that's done -- right now it's

21    done by an accounting team.  But before that, all

22    those years, it was done by McKesson Regulatory

23    Affairs folks.

24                Then we have a specific --

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1         Q    I'm sorry.  Can you tell me how often

2    that's done?

3         A    Every two, two-and-a-half years.

4         Q    Okay.  And the next -- the other audit

5    you were going to describe?

6         A    Yes.  Sorry.  The next audit is the DEA

7    cyclic audit or any DEA unannounced audit.  So

8    we've had cyclic audits average two-and-a-half

9    years.  They try to do them every two years,

10   but -- so I believe there were four audits at the

11   distribution center by the DEA, and they've all

12   came out as -- a hundred percent as exemplary.  So

13   that was one of the other audits.

14              And then monthly, we did the triannual

15   report, which was a DEA SOPs.  And then also we

16   did a VAWD audit, which is the National Wholesale

17   Association.  We do that every two to five years

18   depending on our licensure.  We were one of the

19   first DCs to get VAWD accreditation.

20              So when the DEA or we do our audits, we

21   check our licensing and numerous other things, but

22   the DEA has been in there a few times, and they've

23   always had exemplary comments for New Castle and

24   our team.

Page 459

1          (Snider Exhibit No. 52 was marked

2          for identification.)

3    BY MR. COLLINS:

4         Q    I'm going to hand you what's been

5    premarked as Exhibit 52.

6              Mr. Snider, can I ask you to identify

7    what is Exhibit 52?

8         A    This is the triannual checklist in the

9    McKesson operations manual.

10        Q    And what's the purpose of this document?

11        A    It's to do a -- every -- every

12   quarter -- every four months, I'm sorry, do a

13   DA -- DEA triannual checklist, and there's a group

14   of questions to ask to make sure we're complying

15   with supply chain and SOPs.

16        Q    Has the DEA ever complained to you about

17   your operations at the New Castle Distribution

18   Center?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  No.  They've always

21   said -- I know Kurt Dittmer, who was there before.

22   Patty Robson is there right now as interim agent

23   in charge, and before that we had -- I knew Jim

24   Crawford, and all of them have given us exemplary

Highly Confidential - Subject to Further Confidentiality Review

Page 460

1    records.

2    BY MR. COLLINS:

3         Q    Have you ever received -- or has the

4    distribution center ever received any kind of

5    minor infraction or citation from the DEA?

6                   MR. BOGLE:  Object to form.

7                   THE WITNESS:  Never.

8    BY MR. COLLINS:

9         Q    In terms of the New Castle Distribution

10   Center operations, on average, what's the volume

11   of the pharmaceuticals that you distribute per

12   day?

13        A    We do about 150,000 pieces a day to

14   200,000, depending on the day.

15        Q    And when you say "pieces," what do you

16   mean?  Is that -- is that a tablet or --

17        A    A bottle or pill, or even sometimes a

18   case.  It depends on the selling unit.

19        Q    150,000 pieces?

20        A    Minimum.

21        Q    And how many -- what portion of that is

22   controlled substances?

23        A    About fourteen to 15,000.  Total for

24   Class II, III, IV and V.

Page 461

1          Q     And in terms of opioids, what's the

2     percentage of the product that is moved out of the

3     distribution center each day that is an opioid?

4               MR. BOGLE:  Object to form as to time,

5     vague and ambiguous.

6               MR. COLLINS:  And I -- fair enough.  I

7     will -- Mr. Bogle's objection is well founded.

8     BY MR. COLLINS:

9          Q     Over the course of the last 20 years,

10     can you tell me how the volume of opioids, what

11     it's been relative to the rest of the product

12     that's been moved?

13               MR. BOGLE:  Object to form.

14               THE WITNESS:  Two percent.

15     BY MR. COLLINS:

16          Q     What other products besides controlled

17     substances does the distribution center

18     distribute?

19          A     We sell pharmaceuticals, legend drugs,

20     over-the-counter merchandise, some medical

21     devices, everything from syringes to -- we used to

22     sell wheelchairs and that, but we got out of that

23     business locally.  But we would sell anything you

24     would see in a pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1          Q     How significant in terms of the

2     resources are controlled substance to your daily

3     distribution needs?

4               MR. BOGLE:  Object to form.

5               THE WITNESS:  Currently we have about 10

6     or 12 people that do nothing but the controls.  I

7     have two clerks that do nothing but the paper 222

8     forms or sorting those out, and I have one that

9     answers the phone and balances those edits.  We

10     send an edit every day to the DEA, electronically.

11     I believe it's the Philadelphia office.

12     BY MR. COLLINS:

13          Q     Let's take an opioid that is received in

14     your distribution center, and I'd like you to

15     describe how it's received, how it's handled, how

16     it's stored, and how it's then further

17     distributed.

18               MR. BOGLE:  Objection.  Form, compound.

19               THE WITNESS:  We receive it several

20     ways.  Directly from a vendor or FedEx or what we

21     call our national redistribution center.  So I'll

22     take the national redistribution center.

23               They send a notice to us that something

24     is coming.  The minute it hits the door, it's got

Highly Confidential - Subject to Further Confidentiality Review

Page 463

1    an electronic threshold report that I actually get

2    an e-mail or text that I have to have it in the

3    cage or the vault within one-half hour.  If that

4    doesn't happen, then the text happens to my

5    managers to go out and see what's wrong.

6            And of that, we check it in.  We open it

7    up under camera every -- every box.  And then the

8    receiver checks it in, puts it in a holding cage

9    and rolls it over, just about every hour or two

10   hours, to the cage or the vault.  And then that

11   person double-checks and opens it up under camera,

12   and then we have a record of that that keeps

13   for -- with our system now at least 60 days.  And

14   that's part of it.  Everything is double-checked

15   by at least two people.

16   BY MR. COLLINS:

17       Q    I'm going to hand you a series of

18   photographs and ask you to identify them for me.

19       A    Okay.

20       Q    They've been premarked as Exhibits 2

21   through -- 2 through 11.  So I'm going to hand you

22   each of those, and I want you to tell me -- I'll

23   hand them to you.  You can have a seat.

24            I'm sorry, 53 through 62.

Page 464

```
 1              (Snider Exhibits No. 53 through 62

 2              were marked for identification.)

 3    BY MR. COLLINS:

 4         Q    So I'm handing you 53.  Do you recognize

 5    what's depicted in Exhibit 53?

 6         A    Yes.

 7         Q    What is it?

 8         A    This is our control substance cage for

 9    Class III, IV and V merchandise.

10         Q    And where is that perspective from?

11         A    It's from the mezzanine level looking

12    down.

13         Q    And does that fairly and accurately

14    depict the cage --

15         A    Yes.

16         Q    -- in its current state?

17         A    Yeah, the bottom right is our

18    self-closing door.  And then I'll -- which has a

19    scanner on it so we know only people can enter

20    that are accessed to that.  And there's quite a

21    bit of -- well, you don't see the security here,

22    but there's quite a bit there.

23         Q    Let me hand you what's been premarked as

24    Exhibit 54.  Can you identify what's depicted in
```

Page 465

1   Exhibit 54?

2       A    Yes.  That's Jeff inside the cage

3   showing our radio frequency Accumax unit that we

4   barcode scan the product so we have an accurate

5   order and -- and know what's in the tote.

6            And what he's doing is put away, and on

7   the left you see the scanner above the fire

8   extinguisher for our -- that opens the door,

9   allows you access if you have a badge that's

10  authorized.  He's been background checked.  I

11  actually know him from my North Canton days.

12           And then the middle of that is the

13  authorization list of the people that can enter

14  that area and have access.  And then if there's a

15  visitor, like my boss or whatever, it's put on the

16  restricted area, authorized personnel only log.

17  And they have to be accompanied.

18           You can see the -- up above some of the

19  cameras, et cetera.  And that door is

20  electronically self-closing.

21      Q    Does that fairly and accurately depict

22  the area that you just described?

23      A    Yes.

24      Q    I'm going to hand you what's been

Page 466

1    premarked as Exhibit 55.  Describe what -- tell me

2    if you identify -- can identify what's in that

3    picture.

4         A    Yes.  That's the back area of the cage.

5    There is an I-Wash station there too, but above

6    that is the motion detectors that go 360 -- well,

7    I'm sorry, 180, around, and we have those on every

8    corner.  And we alarm test every month, and

9    everything is brazed bolts.  There's a lot of DEA

10   regs on that.

11        Q    Let me show you what's been -- I'm going

12   to -- actually, does that fairly and accurately

13   depict the area that you just described?

14        A    Yes.

15        Q    I'm going to hand you what's been

16   premarked as Exhibit 56.

17        A    Thank you.

18        Q    Do you recognize what's depicted in

19   Exhibit 56?

20        A    Yes, I do.

21        Q    What is it?

22        A    That's our fairly new vault that we put

23   in for Class II product.  This was approved by the

24   DEA, and it's a two-story vault and it's got

Highly Confidential - Subject to Further Confidentiality Review

Page 467

1    cement panels.  I don't know if they weld them or

2    whatever, but that area has secure steel doors.

3    It's a combination lock, self-closing doors.  It

4    just shows you part of the supply chain that we

5    have to make sure everything is secure.  So no one

6    can go in there unless they're authorized.  It has

7    the same lists and card readers there.

8         Q    You -- you indicated this -- well, does

9    this fairly and accurately depict the area you

10   just described?

11        A    Yes.

12        Q    You indicated this is relatively recent.

13   What did you have there before?

14        A    We had two smaller vaults, one story, so

15   they were a little tight.  And so we upgraded to

16   this, and added all kinds of security cameras and

17   motion.  There's noise sensors.  There's heat

18   sensors.  There's everything we can do to make

19   sure that we aren't broken into.

20        Q    What's the purpose of the heat sensors?

21        A    Just to make sure if a body is on the

22   top, you can detect them.  There is a space in

23   between there.  That's how we test the alarm

24   system every month.  And when the DEA comes, they

Page 468

1    walk through and test every -- every point.

2         Q    Let me show you what's been premarked as

3    Exhibit 57, and ask you to tell me whether you can

4    identify that.

5         A    That's just the side of the vault, and

6    it just shows you some of the conduit for the

7    security system.  Up above there is one of the

8    sensors, and I think that's what that depicts

9    there.

10         Q    Does it fairly and accurately depict

11    that area you just described?

12         A    Yes.

13         Q    I want to show you -- hand you what's

14    been premarked as Exhibit 58.  Ask you to identify

15    or tell me whether you can identify that.

16         A    Yeah, this is the first access door to

17    the Class II narcotic vault.  It just shows the

18    steel doors and some of the product inside that

19    vault.

20         Q    Does it fairly and accurately depict the

21    area you just described?

22         A    Yes.

23         Q    What is kept in that vault?

24         A    Class II narcotic substances.  And I

Highly Confidential - Subject to Further Confidentiality Review

Page 469

1    believe the hydrocodone was put in there about '13

2    or '14, as I recall.

3         Q    And when you say '13 or '14, 2013 and

4    2014?

5         A    Yes.

6         Q    And who has access to this area?

7         A    The managers.  There's a list on the day

8    gate, so you have to access that too, and they are

9    all self-closing.  So there is a list of managers

10   and employees, and they're background checked

11   every year.

12        Q    In the almost 20 years that you've

13   managed this distribution center, have you ever

14   had any theft of opioids?

15        A    Yes, I have.

16        Q    When?

17        A    We had some in 2010, '10 -- '10 to '11.

18   And it was a long-term employee, and we called

19   security, the DEA, let the police know and

20   everything else, and she was terminated.

21        Q    And what was the volume of product that

22   was missing?

23        A    I -- I never found out exactly.  I just

24   know we had three 106s, as I recall, for

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    hydrocodone.

2         Q    And what are 106s?

3         A    106 is a loss form that we report to the

4    DEA, not just with our ARCOS, but we also call

5    them and talk to them about it and then send it

6    electronically.

7         Q    Let me show you what's been premarked as

8    Exhibit 59.  Can you identify what's in Exhibit 59

9    for me?

10        A    Yes.  This just shows the backside.  So

11   you're looking at the opposite side of the vault,

12   so you get a little idea of the distance.  And

13   then there's sensors on there, and these are the

14   two roll-about cages that a receiver would put

15   product in and then roll it into the vault area to

16   be double-checked under camera.

17        Q    Does this fairly and accurately depict

18   the area you just described along with these

19   cages?

20        A    Yes.

21        Q    I show you what's been premarked as

22   Exhibit 60.  Ask you to identify what's depicted

23   there, if you can.

24        A    That's some of our security cameras that

Page 471

1    was -- Dale took that picture.  It just shows some

2    of our -- I believe they're called 360s.  I'm not

3    an expert.  But these cameras would show if there

4    is any pilferage or tampering, et cetera.  Also

5    shows if there's a problem with something, so I

6    would see that with these cameras, and we keep

7    that data.

8         Q    And where exactly are we looking?  Is

9    this --

10        A    This is just down one aisle of the cage.

11   So you didn't see that from up top, but this is

12   one aisle in the cage probably as you came in,

13   past where Jeff was on the other picture.

14        Q    And does it fairly and accurately depict

15   the area you just described?

16        A    Yes, it does.

17        Q    I'm showing you what's been premarked as

18   Exhibit 61.  Please tell me whether you can

19   identify this area for me.

20        A    This shows some of the security inside

21   the vault.  So I'll just direct your attention to

22   the automation that shows a tote is sealed under

23   camera.  And every controlled substance goes into

24   a security bag that's sealed under camera.  So

Page 472

1    every tote has a security bag sealed to avoid

2    tampering, and then that tote is tied with a

3    plastic tote tie, here in the vault, and it's sent

4    out into the shipping areas and it's commingled,

5    so you really don't know what a controlled

6    substance is inside.  So all that's scanned.

7    Also I can tell realtime every tote and every

8    piece that is scanned on my system.

9         Q    What do you mean by a tote?

10        A    That's the container for the controlled

11   substances.

12        Q    And I don't recall if I already asked

13   you, but does this fairly and accurately depict

14   the area you just described?

15        A    Yes.

16        Q    I'm showing you what's been premarked as

17   Exhibit 62.  Ask you to identify what's depicted

18   in Exhibit 62.

19        A    Yeah, this is our MAXPRO camera system.

20   It's just a typical view for our security system.

21   So it's important that we have access anywhere we

22   have a laptop availability, and we have access to

23   this.  There's over 130 cameras in the

24   distribution center, and we do a report out as

Page 473

1    part of our auditing for scope and purpose, and

2    then that's reviewed by the DEA.

3              So this was, I believe, Dale's laptop.

4    So there's a lot more camera footage you can tell.

5    Even the parking lot is -- is -- we have a fence

6    around the outside of the parking lot, and we have

7    badge access only, so we know who came and went,

8    and et cetera.

9         Q    Other than that one occasion I think you

10   said in 2010 where you had an employee that was

11   involved in some theft, have you ever had any

12   other type of incident at your distribution

13   center?

14        A    Yes, we had -- up in Cleveland, someone

15   approached one of the drivers with a gun, and he

16   actually yelled for them to get out, and they

17   actually did.  But they asked him to open the back

18   of his truck, which is always locked, and produce

19   the totes.  And he actually used to run a

20   Mini-Mart is how he did that.

21             And I know that because our delivery

22   service has worked for me for almost 40 years, and

23   it's a dedicated delivery service, and no other

24   wholesaler has that.  And these guys carry

Page 474

1    scanners so they can scan the totes.  We know when

2    they bring them back how many totes were

3    delivered.  They call if there's an error, they

4    had ten instead of nine.  So we investigate that,

5    et cetera.  But the drivers have been dedicated

6    service only for McKesson totes, which I think is

7    a differentiator for us.

8         Q    Do you see any totes in this Exhibit --

9    is it 62?

10        A    Yes.  That top left, you see -- I can't

11   tell if that's the bio box or the -- yeah, it is

12   the bio.  There's totes lined up there that are

13   getting ready to fill orders.  So they're maroon

14   totes, and they're all sealed with -- bless you --

15   they're sealed with a plastic heat strap.

16        Q    And does this fairly and accurately

17   depict the -- sort of the various views of the

18   cameras?

19        A    Yes.

20        Q    How long has the distribution center had

21   cameras?

22        A    Since our inception.  And we've had four

23   iterations of the security system and updated our

24   DVRs.  For instance, just last week, we updated

Page 475

1    for the WannaCry virus.  I don't know what that

2    is, but they had to update so that coordinates

3    with our security.

4              And we have a separate McKesson, it's

5    called GSOC, which is a company that monitors our

6    building, and the in-and-out doors, especially on

7    the weekends, we call them before we come in to

8    make sure everything is secure, because we do --

9    there have been hostage situations with other

10   wholesalers.

11       Q    Do your employees have to be screened to

12   handle controlled substances?

13       A    Yes.  They're background checked, and

14   it's a preemployment drug test.

15       Q    Are they --

16       A    Every year.

17       Q    I'm sorry.  So preemployment, are they

18   given background checks every year then?

19       A    If they have access to controls, they

20   are.

21       Q    Are there standard operating procedures

22   that -- that the distribution center complies with

23   in its handling of controlled substances?

24       A    Yes.  We have SOPs that we work with,

Page 476

1    and you saw it on some of the audits.  The first

2    one was called the DOM or -- we call it even

3    before that Section 55, but we've always had SOPs

4    for handling of controlled substances.

5                   (Snider Exhibit No. 63 was marked

6                   for identification.)

7    BY MR. COLLINS:

8         Q    I'm going to hand you what's been

9    premarked as Exhibit 63.  Ask you to identify that

10   for me.

11        A    This is the McKesson operations

12   manager -- I think I -- we had this before.

13        Q    And approximately what period of time

14   was this in effect?

15        A    This was -- let me see.  I'm not sure.

16   I'd have to look here.  Just a second.  (Peruses

17   document.)

18                   I'm going to guess.  My memory was 2000

19   to 2006.  It might have been changed after that.

20   I'm not sure.

21        Q    Do your employees undergo any kind of

22   training for handling of controlled substances?

23        A    Yeah, we do.  We do SOPs, and then we

24   document the training for everything from door

Highly Confidential - Subject to Further Confidentiality Review

Page 477

1    checks -- that they're going to have a door check

2    to the walk test every month, and that they could

3    be searched, et cetera.

4              So we also go to SOPs for the handling

5    of every controlled substance, how they have to

6    keep it under camera, and they actually have a

7    camera right above them when they fill or dispense

8    product into the security bag.  So that helps us

9    to make sure the right product is in that bag.

10       Q    Does the distribution center communicate

11   with local DEA?

12       A    Yes.

13       Q    How often?

14       A    Not as much right now, but they will

15   call me.  I talked to Patty Robson last week.  And

16   I also used to talk to Kurt Dittmer quite a bit

17   before he retired.  And I've known these folks for

18   a long time, and I would probably say at least

19   twice a month there was some contact.

20       Q    Has the DEA -- the local DEA ever given

21   you a complaint about the operation of the

22   distribution center?

23              MR. BOGLE:  Object to form.

24              THE WITNESS:  They've never.

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    BY MR. COLLINS:

2         Q    I'm sorry?

3         A    No, they have never.

4         Q    In earlier questioning by Mr. Bogle, he

5    mentioned a settlement agreement with the -- the

6    Justice Department.  Do you recall that?

7         A    Yes.

8         Q    Do you know if the New Castle

9    Distribution Center was mentioned in that

10   settlement agreement?

11        A    I know it was not.

12             (Snider Exhibit No. 64 was marked

13             for identification.)

14   BY MR. COLLINS:

15        Q    I'm going to show you what's been

16   premarked as Exhibit 64.

17             Do you recognize that document?

18        A    Yes.

19        Q    What is it?

20        A    It's the controlled substance compliance

21   process.

22        Q    And what's the purpose of this document?

23        A    To make sure the SOPs are followed under

24   the MOM or manual on the handling of controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 479

1    substances.  So this would be how to fill out the

2    daily transmission to the DEA, how to file the

3    ARCOS month end, how to do counts.

4              We count the product every day if it

5    doesn't match inventory numbers, and we also count

6    the product every month, and twice a year we count

7    every piece, including Class IV through V in

8    there.  We just do our biannual inventory last

9    month.

10              So it tells us how to do that.  It also

11   tells us how to fill out or how to properly fill

12   out and check a 222 form, which is what a percent

13   of our customers still use.  It's a three-part

14   form, and it tells how to do that and how to void

15   that.  We spend a lot of time with that.  I prefer

16   the electronic version called CSOS, but this

17   explains how to do all of that.

18        Q    I want to talk about the suspicious

19   order reporting programs you've had in place at

20   the New Castle Distribution Center.  Can you

21   describe what process you followed starting in

22   2000 to report suspicious orders?

23              MR. BOGLE:  Object to form.  Vague and

24   overbroad.

Highly Confidential - Subject to Further Confidentiality Review

Page 480

1                    THE WITNESS:  Yes.  Briefly, the first

2        part, 2000 to 2006, we would fax the DEA unusual

3        purchase notification log, I think is what the

4        full name was, DU45.  And then we would transmit a

5        monthly ARCOS, and we've been doing that for all

6        of my 40 years.  So we transmit ARCOS to the DEA.

7        That's every transaction, automated reporting of

8        control order system.  And we --

9        BY MR. COLLINS:

10            Q    I'm sorry.  How often is that done or

11       was that done?

12            A    Once a month.

13            Q    And the DU45s, how often were they

14       transmitted to the DEA?

15                    MR. BOGLE:  Object to form.

16                    THE WITNESS:  In 2000 to 2006, it was

17       daily.  And then we also sent it monthly, and we

18       put it in the audit box for the DEA, and retained

19       it for two years also.  So we had that data for

20       them to look at when they did the audit, and they

21       did.

22       BY MR. COLLINS:

23            Q    I want to make sure I'm clear.  So you

24       mentioned basically three reports, correct?

Page 481

```
 1          A      Yes.

 2           Q      The monthly ARCOS data.

 3          A      Yes.

 4           Q      Every transaction reported to the DEA.

 5          A      Yes.

 6           Q      Daily DU45.

 7          A      Yes.

 8           Q      Suspicious order reports faxed to the

 9     DEA.

10          A      Yes.

11           Q      And then monthly, the same thing.

12          A      Monthly suspicious order reports that

13     were sent.  I think --

14                 MR. BOGLE:  Object as leading.

15     BY MR. COLLINS:

16           Q      Let me -- in terms of the timing of

17     filling orders versus faxing DU45s, can you

18     explain that, how that occurred?

19          A      Yeah.  The early part of the program, it

20     was kind of reactive.  So the order would already

21     get there.  Sometimes we would have it filled and

22     on the cross dock truck, and then we would get the

23     DU45 and look at that.  So we couldn't be as

24     proactive, so we sent it to the DEA after the
```

Page 482

1    order was filled.

2            And then after that, 2007 on, it was

3    more proactive was -- was the way I looked at it,

4    so that we could maybe stop and take a look at it

5    and have the DRAs in place.  But during that first

6    part of the time, it was -- the data would only

7    come after we did the last pull of orders, and we

8    may have shipped it, especially if our early

9    trucks went out at midnight.

10       Q    Did there ever come a time where the DEA

11   told you to stop sending these daily DU45 reports?

12           MR. BOGLE:  Object to form.  Hearsay.

13           THE WITNESS:  Yes.  They asked us to

14   stop faxing them after a little bit.  Kurt Dittmer

15   called me.  And I asked him to put it in writing,

16   because I knew that, and he did send me an e-mail

17   about that.  He said the monthly suspicious order

18   reports were enough, and he would accept that.

19   BY MR. COLLINS:

20       Q    And do you remember approximately when

21   that occurred?

22       A    No, I don't.  2004, 2005.  I'm not sure.

23       Q    And what was his explanation?

24       A    That they had enough data --

Page 483

1          MR. BOGLE:  Object to form.

2          THE WITNESS:  -- with the monthly

3    suspicious order reports.

4          (Snider Exhibit No. 65 was marked

5          for identification.)

6    BY MR. COLLINS:

7      Q    I'm going to hand you what's been marked

8    as Exhibit 65, and ask you to identify it for me,

9    please.

10     A    It's a MOM manual.

11     Q    I'm sorry.  Can you -- can you explain

12    that?

13     A    McKesson Operation Manual from, it looks

14    like, 2013.  We did an update.

15     Q    What's the purpose?

16     A    This changed the way we did the -- not

17    the daily ARCOS procedure, but the month end and

18    the DEA error report notices, and I believe that

19    sent it all electronic.  And some of this is a

20    little bit technical, but we would send every day

21    the reports to the DEA.

22     Q    When did you start doing it daily?

23     A    Well, this says 2013, electronically,

24    but I'm not sure.

Highly Confidential - Subject to Further Confidentiality Review

Page 484

1          Q    When the New Castle Distribution Center

2    first became operational in 2000, did you have

3    access to customer information in terms of who

4    else was supplying them?

5          A    No, I didn't.

6               MR. BOGLE:  Object to form.

7    BY MR. COLLINS:

8          Q    Do you have that now?

9          A    The DRAs have all the access to that,

10   yes.

11         Q    And when did that start?

12         A    I'm -- I'm not sure if that was 2008,

13   but -- with the Lifestyle drugs, but I know that

14   the fact that they could see the wholesalers'

15   information, I think Izzy told me it was just

16   within the last few years.

17               (Snider Exhibit No. 66 was marked

18               for identification.)

19   BY MR. COLLINS:

20         Q    I'm going to show you what's been now

21   premarked as Exhibit 66, and ask you to identify

22   it for me.

23               What is Exhibit 66?

24         A    It looks like an update of the ARCOS

Page 485

1    manual, 2014.  I'm not sure of that date, but

2    that's what it looks like.  This shows how to

3    count the ARCOS.

4         Q    Can you tell me how your role as a

5    manager or director of operations of a

6    distribution center has changed since the opening

7    of the distribution center over time with respect

8    to handling and monitoring of controlled

9    substances?

10              MR. BOGLE:  Object to form, vague and

11    ambiguous.

12              THE WITNESS:  Just some of the things

13    that I can mention.  We've upgraded all the

14    security systems.  We've actually changed the way

15    we do totes.  We used to identify them as a

16    controlled substance and put them on the back of

17    the truck, and we stopped doing that years ago.

18              And also as far as the way we handle

19    controls, it's a lot more data driven.  The

20    director of Regulatory Affairs, especially for

21    national accounts, because I wasn't always privy

22    to that data, so they had a lot of data that they

23    could see, and when they started getting the

24    script information, it was very helpful to them to

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    make the decision on the customer.

2    BY MR. COLLINS:

3         Q     What do you mean by "script

4    information"?

5         A     That was part of the -- after the LDMP,

6    the CSMP, to get script information from the

7    customer for, I think it was, three months.

8    Without the HIPAA or the people's information,

9    just the amounts.  So it would actually say what

10   kind of doctor -- what doctor prescribes what --

11   what pills.

12        Q     You've mentioned the director of

13   Regulatory Affairs a number of times.  What's his

14   or her role?

15             MR. BOGLE:  Object to form.

16             THE WITNESS:  They're vetting out the

17   regulations and the customers that we either

18   onboard or sell to.

19   BY MR. COLLINS:

20        Q     Given your almost four decades of

21   experience with McKesson, including almost 20

22   years as the director of operations of the New

23   Castle Distribution Center, what do you think

24   about all of these allegations about McKesson

Highly Confidential - Subject to Further Confidentiality Review

Page 487

1    fueling the opioid crisis?

2              MR. BOGLE:  Object to form.

3              THE WITNESS:  I spent most of my life in

4    Summit County.  I know Cuyahoga County.  I'm

5    probably the last Browns' fan you'll ever meet.

6    So it means a lot to me, and I would never do

7    anything willingly to create an opiate crisis.

8    I -- I feel it is terrible and I feel bad for it,

9    but I don't say that I caused it at -- at New

10   Castle.

11   BY MR. COLLINS:

12        Q    Besides your handling of distribution of

13   pharmaceuticals in a routine way, are you aware of

14   any other things that you've done as a head of

15   operations at the distribution center --

16             MR. BOGLE:  Object.

17   BY MR. COLLINS:

18        Q    -- that would impact the community?

19             MR. BOGLE:  Object to form.

20             THE WITNESS:  Yeah, I guess that's where

21   I say about some of the things we do.

22             I know in -- I think it was Summit

23   County, Stark County, there was a meningitis

24   outbreak several years ago, and one of the high

Highly Confidential - Subject to Further Confidentiality Review

Page 488

1    school kids, one or two of them died, and so we

2    had to provide the antidote or the medicine for

3    that.  And I called in helicopters, and they

4    landed in the parking lot and they distributed to

5    the County Board of Health, I believe it was, and

6    one of the hospitals.  And that's kind of what we

7    do.

8              I also -- just recently one of my

9    managers from UPMC Pittsburgh Hospital, they had a

10   snake bite, and they must have been in central PA.

11   I'm not sure how that happened.  But we -- he

12   didn't know if the courier could get there quick

13   enough, so he grabbed it and drove it down

14   himself, and that saved the kid.

15             And then we were in McKesson Today for

16   New Castle recently for the Washington Courthouse

17   distribution center in Ohio that we provided and

18   had a life-saving medicine, and my manager drove

19   it halfway, they had someone pick it up, and it

20   saved the patient.  It was a mother who was

21   pregnant and needed this medicine to save the

22   baby, and I know that's what we did.

23             It was written up in the McKesson Today,

24   et cetera, and Bev did most of the work.  I just

Page 489

1    was standing there.  But that's the kind of thing

2    we do that I wanted to make sure I got on the

3    record.

4              MR. COLLINS:  I have no further

5    questions.  You want to switch?

6              MR. BOGLE:  Yeah, just give me a couple

7    of minutes.

8              THE VIDEOGRAPHER:  The time is 5:55 p.m.

9    We're going off the record.

10             (Recess.)

11             THE VIDEOGRAPHER:  The time is 6:02

12   p.m., and we're back on the record.

13                  RECROSS-EXAMINATION

14   BY MR. BOGLE:

15        Q    All right.  Mr. Snider, I have a few

16   follow-up questions for you.

17             You made reference to opioids being

18   2 percent of the overall volume at your

19   distribution center.  Do you recall that

20   testimony?

21        A    Yes.  At one time, yes.

22        Q    Yeah, that number has not been stagnant,

23   right?  For example, when you started in 2000,

24   that number increased over time, didn't it?

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1           MR. COLLINS:  Objection.  Vague.

2           THE WITNESS:  Over time, yes, it did.

3    BY MR. BOGLE:

4        Q    Right.  So when you say that opioids

5    were 2 percent of the total volume at New Castle,

6    you're not representing to our jury that that was

7    true for the entire period of 2008 -- or 2000 to

8    present, right?

9        A    No.  I just got the data from present.

10       Q    From today?

11       A    Recently.

12       Q    Right.  So, for example, you have the

13   2018 data is what you're talking about.

14       A    Yes.

15       Q    Okay.  And it was higher than that, for

16   example, in 2010.

17       A    I don't -- I don't know that, what it

18   was.

19       Q    You don't know.  So you didn't check

20   anything other than 2018.

21       A    Correct.

22       Q    Okay.  You provided some -- some

23   testimony about -- to the effect that the DEA has

24   never had any complaints about any activities

Page 491

1    involving New Castle.  Is that right?

2         A    Yes.

3         Q    Okay.  Have you reviewed any of the DEA

4    and DOJ letters that led to the -- the $150

5    million settlement agreement?

6         A    I looked at them, yes, briefly.

7         Q    Did you just look at the settlement

8    agreement, or did you look at any of the internal

9    letters that led up to that?

10        A    I looked at the distribution centers

11   listed.

12        Q    Okay.  Did you review the letters in

13   detail beyond that?

14        A    No.

15        Q    Okay.  So, for example, if the -- some

16   of the letters from the DEA indicate that they

17   found nationwide and systemic violations regarding

18   controlled substance monitoring at McKesson,

19   that's something you were not aware of when you

20   provided that testimony, right?

21             MR. COLLINS:  Objection.  Assumes facts

22   not in evidence.  Lack of foundation.

23   BY MR. BOGLE:

24        Q    Right?

Highly Confidential - Subject to Further Confidentiality Review

Page 492

1          A     Can you ask me -- I'm not sure what you

2      mean by --

3          Q     Sure.

4          A     -- "provided that testimony."

5          Q     You provided testimony there's been no

6      complaints about -- about New Castle from the DEA.

7          A     Yes.

8          Q     And my question to you was, did you

9      review any of these letters from the DEA to assess

10     whether they made any comments about the fact that

11     they found nationwide and systemic violations as

12     to McKesson's suspicious order monitoring

13     programs?

14              MR. COLLINS:  Object to form.

15              THE WITNESS:  I did not discuss it with

16     the DEA.

17     BY MR. BOGLE:

18          Q     No, I'm talking about in the letters.

19     Did you see that in the letters anywhere?

20              MR. COLLINS:  Objection.  I'm not

21     sure --

22     BY MR. BOGLE:

23          Q     All right.  Let's just take a look at

24     one.

Page 493

1          A     No, I didn't.

2            Q     Okay.  Let's take a look at one.

3          A     I thought you said did I review it with

4     the DEA.  That's what I heard.

5            Q     All right.  That's fine.

6            (Snider Exhibit No. 67 was marked

7            for identification.)

8     BY MR. BOGLE:

9            Q     Exhibit 67, I'm going to hand you here,

10     also marked as 1.1443.

11            This is a letter from U.S. Department of

12     Justice, Drug Enforcement Administration, dated

13     November 4, 2014.  Do you see that?

14          A     Yes, I do.

15            Q     Okay.  It's sent to a Geoffrey Hobart at

16     Covington & Burling.  Do you see that?

17          A     Yes.

18            Q     Okay.  And that's the same firm that's

19     also representing you here today, right?

20          A     Yes.

21            Q     Okay.  And if you look at this letter,

22     I'm going to page 2 in the letter.  And I'm on the

23     fourth paragraph.

24            And it says:  "In order to release all

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1    McKesson-owned DEA registrants from administrative

2    liability as you have requested, the agreed-upon

3    registration consequences must reflect not only

4    the gravity of the offenses but the nationwide

5    scope of McKesson's failure to report suspicious

6    orders and to maintain effective controls against

7    diversion."

8              Do you see that?

9        A    Yes.

10       Q    Okay.  When you looked through the DEA

11   correspondence prior to testifying today, do you

12   recall reading that statement?

13             MR. COLLINS:  Objection.  Lack of

14   foundation.  Form.

15             THE WITNESS:  No, I don't.

16   BY MR. BOGLE:

17       Q    You don't.  Okay.

18             And if you go to page 5 of the letter,

19   the first full paragraph, it says:  "As noted

20   above, the above examples are illustrative, not

21   exhaustive.  They are meant to illustrate what we

22   mean when we say that we will be driven by the

23   evidence that we could present in administrative

24   proceedings against these registrants.  We have

Page 495

1    attempted to highlight this evidence in hopes that

2    you and your client can fully understand why DEA

3    believes that the failings at McKesson were

4    system -- systemic as they were serious."

5              Do you see that?

6        A    Yes.

7         Q    Okay.  Do you recall seeing that in the

8    letter that you reviewed?

9              MR. COLLINS:  Objection.  Asked and

10   answered.

11             THE WITNESS:  No.

12   BY MR. BOGLE:

13        Q    You reviewed quite a few photos of the

14   New Castle Distribution Center.  Do you recall

15   that?

16       A    Yes.

17        Q    Okay.  Now, those photos all pertain to

18   security measures contained within your facility

19   at New Castle, right?

20       A    Yes.

21        Q    Okay.  None of those photos pertain to

22   anything that involved trying to make sure that

23   the controlled substances once they are sold get

24   into the right hands, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 496

1        A     No.   Except for the security bags and

2     the sealed totes.

3        Q     To make sure your drivers don't get

4     robbed, right?

5        A     Or to make sure that the pharmacist

6     opens it behind the pharmacy and scans the product

7     with -- to make sure it's the right stuff.

8        Q     To make sure the pharmacist doesn't get

9     robbed.

10       A     Or make sure it doesn't get pilfered.

11       Q     When you say "pilfered," what do you

12    mean?

13       A     The stuff is in a security bag from us,

14    and I just wanted to make that clear that it's

15    another layer of security that we put in there so

16    that the pharmacist has to open the bag.  It can't

17    be tampered with.

18       Q     You talked too about these -- these

19    totes that the controlled substances are carried

20    in.  Do you recall discussing that generally?

21       A     Yes.

22       Q     And I think you said something about

23    having dedicated drivers delivering these totes,

24    and that was something that you thought

Highly Confidential - Subject to Further Confidentiality Review

Page 497

1    differentiated McKesson from other wholesalers.

2    Am I summarizing that fairly?

3         A    Yes.

4         Q    Okay.  Now, you've had at New Castle

5    problems with lost totes that carried controlled

6    substances in them, right?

7              MR. COLLINS:  Objection.  Form.

8              THE WITNESS:  No.

9    BY MR. BOGLE:

10        Q    You've never lost a tote?

11        A    I didn't say that.  We don't have a

12   problem with it.

13        Q    Okay.  Well, we talked about Giant

14   Eagle, for example, earlier, right, and you recall

15   back in 2014 losing several totes that included

16   controlled substances for deliveries to Giant

17   Eagle, right?

18        A    No, I don't.

19        Q    You don't?

20        A    Nope.

21        Q    Okay.  All right.

22              (Snider Exhibit No. 68 was marked

23              for identification.)

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1          Q    I'm going to hand you Exhibit 68, also

2     marked as 1.1878.

3               Looking at the e-mail on the bottom

4     of the first page, it's from a Barbara Simpson,

5     April 23rd, 2014, to several individuals,

6     including you, right?

7          A    Yes.

8          Q    Titled "Missing HBC Tote."  Do you see

9     that?

10         A    Yes.

11         Q    What is HBC?

12         A    That's not our tote.  That's a Giant

13    Eagle tote that the delivery service delivers for

14    them, and we don't handle it.  It's the -- it's

15    their warehouse.

16         Q    So you guys deliver for HBC for their

17    materials, is that what you're saying?

18         A    I don't.  The delivery service does.

19         Q    Right.  So -- so the delivery service,

20    you're saying -- your testimony is that they've

21    lost HBC's totes but not McKesson's?

22         A    I don't even know that they lost an HBC

23    tote.  It doesn't say whose fault it was.  But

24    this wasn't our tote.  It was a Giant Eagle tote.

Page 499

1   They have their own warehouse, and they have their

2   own control system, et cetera, and I'm --

3       Q    These are the same --

4       A    -- I'm not involved with it.

5       Q    Sorry.  These are the same delivery

6   drivers that deliver McKesson totes, right?

7            MR. COLLINS:  Objection.  Misrep- --

8   mischaracterization.

9            THE WITNESS:  Yes, they deliver for

10  Giant Eagle.

11  BY MR. BOGLE:

12      Q    And you're aware of the circumstance

13  back in 2014 where two totes were lost, right?

14      A    No.

15      Q    That contained controlled substances.

16      A    If you give me time to read it, I will.

17  I'm not -- it's HBC --

18      Q    Sure.  It's a one-page e-mail.  Go

19  ahead.

20      A    Sorry, there's other pages here.  Okay.

21  (Peruses document.)

22            This -- this doesn't record that the

23  delivery service lost any totes.  It's recording

24  that this -- Giant Eagle reported missing.  So

Highly Confidential - Subject to Further Confidentiality Review

Page 500

```
 1    their manifest wasn't correct on that.

 2         Q    Okay.  It does report missing totes,

 3    right?

 4              MR. COLLINS:  Objection.

 5    Mischaracterization of his --

 6              THE WITNESS:  It does not.

 7              MR. COLLINS:  -- testimony.

 8    BY MR. BOGLE:

 9         Q    It does not report where the totes are

10    missing?

11         A    No.

12         Q    Okay.  So when the e-mail talks about

13    missing HBC totes, they're not talking about

14    missing totes?

15         A    They're talking about missing totes, but

16    it doesn't report it.  This isn't a 106 or a lost

17    form to the DEA.

18         Q    Right.  But this whole e-mail discussion

19    is about missing totes, right?

20              MR. COLLINS:  Objection.  Lack of

21    foundation.

22              THE WITNESS:  Yes, from -- from someone

23    else.

24    BY MR. BOGLE:
```

Highly Confidential - Subject to Further Confidentiality Review

Page 501

1          Q    Right.  But it's -- it's certainly these

2     delivery drivers -- either delivery drivers or HBC

3     that lost these totes.  We can agree on that,

4     right?

5          A    Yes.

6          Q    Okay.

7          A    Also there's no manifest to show that.

8     So the -- I'm sure that Greg Carlson and the Giant

9     Eagle folks reported that to the DEA, that they

10    have missing totes, or I don't even know that they

11    found them at another store or where --

12         Q    Right.  You don't know either way,

13    right?

14         A    No.

15         Q    But you do agree with me this discusses

16    missing totes?

17              MR. COLLINS:  Objection.  The question

18    is vague.

19    BY MR. BOGLE:

20         Q    Right?

21         A    Yeah.

22              MR. COLLINS:  The question is vague.

23    BY MR. BOGLE:

24         Q    Now, you talked about McKesson always

Page 502

1    having standard operating procedures for

2    controlled substances.

3             Do you recall testifying to that a few

4    minutes ago?

5        A    Yes.

6        Q    Okay.  And so I think I asked you a

7    similar question in my exam.  You have no idea

8    what was in place prior to 2000, do you?

9             MR. COLLINS:  Objection.  Vague, form.

10            THE WITNESS:  I don't recall.  There was

11   a 55 manual, Section 55.  That's what I recall.

12   BY MR. BOGLE:

13       Q    Right.  And we looked at that actually

14   at the very beginning of the exam that was dated

15   July 2000, right?

16       A    Yes.

17       Q    So you have no idea whether any standard

18   operating procedure existed prior to that manual

19   in July of 2000, do you?

20            MR. COLLINS:  Objection.  Asked and

21   answered.

22            THE WITNESS:  I know there was one in

23   '97 for sure.

24   BY MR. BOGLE:

Page 503

1          Q     There was one in '97?

2          A     Yes.  That's what I recall.

3          Q     Okay.  And how did that differ from the

4     2000 version?

5          A     I don't know.

6          Q     Okay.  What was that one titled?

7          A     Probably DOM or Operations Manual.  We

8     didn't use the word SOPs back then.

9          Q     Okay.  Have you seen any copies of that

10    SOP?  Because we've asked for all of them and we

11    didn't get anything prior to 2000.

12         A     No, I didn't.

13         Q     Okay.  Now, you said that there were

14    reports sent to the DEA, unusual order reports, I

15    think you called them, from 2000 to 2006.  Do you

16    recall that?

17         A     Yes.

18         Q     Do you have any documentary proof of

19    that at this point in time?

20         A     No.

21         Q     And you also said that at some point in

22    time, the D -- a DEA agent told you on the phone

23    that he didn't want daily unusual reports anymore.

24    Do you recall that?

Page 504

1      A     Yes.

2         Q    Do you have any documentary proof of

3    that today?

4      A     I don't have the e-mail.  He actually

5    put it in writing for me.

6         Q    But you don't have that, right?

7      A     No, not from two -- whatever year that

8    was.

9         Q    So we don't have any way to verify by

10   documentation either of those statements, do we?

11            MR. COLLINS:  Objection.  It's a

12   mischaracterization.  You can ask the DEA.

13            THE WITNESS:  From Kurt Dittmer would be

14   the only way to verify that.

15   BY MR. BOGLE:

16        Q    We don't have any documentary evidence

17   that you can provide us as to providing reports

18   from 2000 to 2006, number one, right?

19        A    Number one?

20        Q    First thing.  You can't point me to any

21   documents that show that you actually did what you

22   said you did?

23        A    No, I don't have those e-mails from 2004

24   or whatever year it was.

Page 505

1          Q     And you don't -- and you don't have any

2     e-mail that you can show me or to the jury or to

3     anybody else about the DEA agent specifically

4     calling you and telling you that you didn't need

5     to provide daily reports anymore, correct?

6          A     I don't have that.

7          Q     You were asked about obtaining data from

8     other -- strike that.

9                You talked about being able to obtain

10    data regarding your customers receiving controlled

11    substances from other manufacture -- other --

12    other wholesalers.  Do you recall that?

13         A     Yes.

14         Q     And you talked about when you thought

15    that was available, and I won't go back into the

16    exact years, but you recall talking about a

17    timeline --

18         A     Yes.

19         Q     -- when you thought that was available,

20    right?

21         A     Yes.

22         Q     The bottom line is, McKesson at all

23    times was able to ask the customer for that data,

24    right?

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1             MR. COLLINS:  Objection.  Compound,

2      argumentative.

3             THE WITNESS:  I don't know that.

4      BY MR. BOGLE:

5         Q    You don't know whether McKesson at all

6      times could ask their own customers, Listen, give

7      me all of the drugs that you're getting from all

8      the wholesalers, give me proof of that, I want to

9      see?

10        A    From 2000 on, I don't know that -- if

11     that was legally feasible.

12        Q    Legally feasible?

13        A    Yeah, I don't know --

14        Q    You've asked --

15        A    -- if we could legally give them the

16     other wholesalers' information.

17        Q    Do you recall anybody ever asking, that

18     you were aware of?

19            MR. COLLINS:  Objection to form.

20            THE WITNESS:  Yes.

21     BY MR. BOGLE:

22        Q    You recall somebody asking for it?

23        A    Yes.

24        Q    And somebody saying that was legally not

Highly Confidential - Subject to Further Confidentiality Review

Page 507

1    possible?

2        A    No.

3        Q    Okay.  So -- but what you do know is you

4    guys can get it today, right?

5        A    I -- yes, as he showed me.

6        Q    Any -- are you aware of any changes to

7    the laws that would allow it today that didn't

8    exist before?

9            MR. COLLINS:  Objection.  Calls for a

10    legal conclusion, among other things.

11            THE WITNESS:  I don't know anything

12    about the laws, no, right now on that.

13    BY MR. BOGLE:

14        Q    Okay.  Well, you talked about the fact

15    that you guys could get it.  I'm just trying to

16    follow up on that.

17        A    It depends --

18            MR. COLLINS:  I'm sorry, is that -- I'm

19    not sure that's a question.

20            MR. BOGLE:  No, it's not.  It's just a

21    comment.

22    BY MR. BOGLE:

23        Q    Now, you talked about blocked orders and

24    suspicious order reports generally.  Do you recall

Highly Confidential - Subject to Further Confidentiality Review

Page 508

1    that?

2          A     Yes.

3          Q     Okay.  Now, the fact of the matter is

4    for Summit County, there were no blocked orders

5    from January 2006 to May 2008 for McKesson for

6    Summit County pharmacies, were there?

7                MR. COLLINS:  Object to the term

8    "blocked orders."  Vague.  Form.

9                THE WITNESS:  Can you explain "blocked

10   orders"?  Unusual purchases?

11   BY MR. BOGLE:

12         Q     No, what I'm asking is, if a customer

13   from 2006 to mid-2008 from Cuyahoga County made an

14   order for a controlled substance, they got that

15   order, and those orders were not stopped or

16   blocked or ceased, right?

17         A     No -- no, they were blocked, stopped or

18   ceased.

19         Q     Okay.  Well, let's take a look at Summit

20   County here.

21                This is a summary of -- on the first

22   page -- of the information that's been provided to

23   us about blocked orders from Summit County.

24   Exhibit 69.

Highly Confidential - Subject to Further Confidentiality Review

Page 509

1              (Snider Exhibit No. 69 was marked

2              for identification.)

3       BY MR. BOGLE:

4         Q    So this is what was produced to us as

5       far as blocked orders from Summit County or

6       stopped orders.

7              Do you see on the first page -- this is

8       from January 1, 2006, on.  Do you see the first

9       blocked or stopped order that appears on this

10      spreadsheet on page 2 is from June 18, 2008, for a

11      Summit County pharmacy?  Do you see that?

12        A    Yes.  I have no idea what this document

13      is.  It doesn't even have attribution.

14        Q    This is what was provided to us when we

15      asked for evidence of stopped orders.  This is

16      what was provided by McKesson.

17        A    I don't -- I don't know that.

18        Q    Okay.  So you're saying this is wrong?

19        A    No.

20             MR. COLLINS:  No.  Objection.  That's a

21      total mischaracterization of his answer.  He said

22      he doesn't know what this document is.

23             THE WITNESS:  I don't know anything

24      about this document.

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1    BY MR. BOGLE:

2         Q    Okay.  So if what was produced to us

3    supports the notion that there were no blocked

4    or stopped orders from January 1, 2006, until

5    June 17, 2008, into Summit County from McKesson,

6    do you have any reason to dispute the accuracy of

7    that finding?

8              MR. COLLINS:  Objection.  Assumes facts

9    not in evidence, lack of foundation.

10             THE WITNESS:  Yes, I don't know.

11   BY MR. BOGLE:

12        Q    You don't know.

13        A    Correct.

14        Q    Okay.  So -- and this report as well

15   indicates that the first report to the DEA of a

16   blocked order occurred August 1st, 2013, for a

17   Summit County pharmacy, and that's on page .10.

18             You see there's a "DEA reported date"

19   column there, and you see it's blank on all pages

20   leading up to .10 until you get to August 1, 2013.

21        A    I can testify --

22             MR. COLLINS:  I'm sorry.  I'm not sure

23   if there's a question.  He's just --

24   BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 511

1          Q      Yeah, I'm introducing the information to

2     you.

3          A      Okay.

4          Q      You see there's a "DEA reported date"

5     column.  The first date entry is on page 10 for a

6     blocked order that was reported to the DEA,

7     August 1st, 2013, for a Summit County pharmacy.

8     Do you see that?

9          A      I don't know what that is, and I don't

10    know -- it doesn't say blocked order.  It says

11    Acme Pharmacy.

12         Q      This was represented to us by McKesson

13    this was their blocked order reports for Summit

14    County.

15              MR. COLLINS:  Objection.  Lack of

16    foundation what this --

17    BY MR. BOGLE:

18         Q      So you don't know what this report is

19    even about?

20              MR. COLLINS:  I'm sorry, let me finish

21    my objection.  Lack of foundation.  You haven't

22    established this witness's knowledge as to what

23    this document --

24    BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 512

1          Q    Geez, it should, man.  I mean, you don't
2     know when orders were blocked from your
3     distribution center?
4               MR. COLLINS:  You don't have to answer
5     that.
6     BY MR. BOGLE:
7          Q    No, you do.  You don't know that?
8               MR. COLLINS:  Actually -- actually, lack
9     of foundation.  You haven't established this
10    witness has any knowledge about this document.  He
11    keeps telling you he doesn't know anything about
12    the document, and you keep asking him questions
13    about a document he doesn't know anything about.
14              THE WITNESS:  I don't know anything
15    about this document, and you say it's a blocked
16    item document, and this cover page is on it, but
17    I've never seen this before.
18    BY MR. BOGLE:
19         Q    I put the cover page on there.
20    Everything else --
21         A    Oh --
22         Q    -- is provided to us by --
23         A    -- I did not know that.
24         Q    That's a summary of the data included in

Page 513

1      there.

2          A      If you say so, but I don't -- can't

3      testify to that.

4          Q      Okay.  You have no reason to dispute the

5      accuracy of either of those statements, do you, on

6      the first page?

7              MR. COLLINS:  Objection.  Lack of

8      foundation.

9      BY MR. BOGLE:

10         Q      Do you?

11             MR. COLLINS:  Objection.  Lack of

12     foundation.

13             THE WITNESS:  I don't trust what you put

14     on here.

15     BY MR. BOGLE:

16         Q      You don't trust what I put on there?

17         A      No.

18         Q      Show me where I'm wrong in the document.

19         A      I don't know the document.

20         Q      Okay.  You don't have any idea, right?

21             MR. COLLINS:  Objection.  Argumentative.

22             MR. BOGLE:  No further questions.

23             MR. COLLINS:  Actually I have a couple

24     of follow-ups.

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1                    REDIRECT EXAMINATION

2     BY MR. COLLINS:

3          Q     Exhibit 67, can you pull it out.

4                Mr. Bogle asked you about this

5     correspondence between the DEA and Mr. Hobart.

6     Can you look through it and see if you see the

7     New Castle name mentioned anywhere in this

8     document?

9          A     I was kind of looking through that.  I

10    think I saw Colorado.  I didn't see New Castle

11    anywhere.

12         Q     All right, Exhibit 68, Mr. Bogle

13    questioned you about this allegedly lost tote.

14                Did McKesson ever lose any totes in

15    connection with servicing whatever customer this

16    is?

17         A     No.

18         Q     Do you have any idea what this -- what

19    is being discussed in this e-mail?

20         A     This is --

21                MR. BOGLE:  Object to form.

22                THE WITNESS:  This is their Giant Eagle

23    warehouse that they contracted with SSD to fill --

24    to deliver orders, and their due diligence would

Page 515

1    have been their manifest.

2           But Barb is trying to find out because

3    she's doing due diligence to make sure controls

4    don't get out on the street.

5    BY MR. BOGLE:

6           Q     Does this document reflect that McKesson

7    lost totes?

8           A     No.

9           MR. BOGLE:  Object to form.

10          MR. COLLINS:  No further questions.

11          MR. BOGLE:  All right, we're done.

12          THE VIDEOGRAPHER:  All right.  The time

13   is -- sorry, anything else?

14          MR. BOGLE:  No, I'm good.

15          MR. COLLINS:  We're good.

16          THE VIDEOGRAPHER:  Anybody on the phone

17   either?

18          I just want to make sure --

19          MR. COLLINS:  I didn't even know -- was

20   there anybody participating by phone?

21          THE VIDEOGRAPHER:  The time is

22   6:23 p.m., November 8, 2018.

23          Going off the record, completing the

24   videotaped deposition.

Page 516

1                    (Whereupon, the deposition of

2                    BLAINE M. SNIDER was concluded

3                    at 6:23 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 517

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2              The undersigned Certified Shorthand Reporter

3    does hereby certify:

4              That the foregoing proceeding was taken before

5    me at the time and place therein set forth, at

6    which time the witness was duly sworn; That the

7    testimony of the witness and all objections made

8    at the time of the examination were recorded

9    stenographically by me and were thereafter

10   transcribed, said transcript being a true and

11   correct copy of my shorthand notes thereof; That

12   the dismantling of the original transcript will

13   void the reporter's certificate.

14             In witness thereof, I have subscribed my name

15   this date:  November 13, 2018.

16

17                     _____

18                     LESLIE A. TODD, CSR, RPR

19                     Certificate No. 5129

20   (The foregoing certification of

21   this transcript does not apply to any

22   reproduction of the same by any means,

23   unless under the direct control and/or

24   supervision of the certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1                    INSTRUCTIONS TO WITNESS

2          Please read your deposition over carefully and

3     make any necessary corrections.  You should state

4     the reason in the appropriate space on the errata

5     sheet for any corrections that are made.

6     After doing so, please sign the errata sheet

7     and date it.

8          You are signing same subject to the changes

9     you have noted on the errata sheet, which will be

10    attached to your deposition.  It is imperative

11    that you return the original errata sheet to the

12    deposing attorney within thirty (30) days of

13    receipt of the deposition transcript by you.  If

14    you fail to do so, the deposition transcript may

15    be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 519

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4      PAGE LINE CHANGE

 5      ____ ____ _____

 6      REASON: _____

 7      ____ ____ _____

 8      REASON: _____

 9      ____ ____ _____

10      REASON: _____

11      ____ ____ _____

12      REASON: _____

13      ____ ____ _____

14      REASON: _____

15      ____ ____ _____

16      REASON: _____

17      ____ ____ _____

18      REASON: _____

19      ____ ____ _____

20      REASON: _____

21      ____ ____ _____

22      REASON: _____

23      ____ ____ _____

24      REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

Page 520

1                    ACKNOWLEDGMENT OF DEPONENT

2            I,_____, do hereby

3      certify that I have read the foregoing pages, and

4      that the same is a correct transcription of the

5      answers given by me to the questions therein

6      propounded, except for the corrections or changes

7      in form or substance, if any, noted in the

8      attached Errata Sheet.

9

10     _____

11     BLAINE M. SNIDER                        DATE

12

13

14     Subscribed and sworn to

15     before me this

16     _____day of_____,20____.

17     My commission expires:_____

18     _____

19     Notary Public

20

21

22

23

24