EXHIBIT 246

Highly Confidential - Subject to Further Confidentiality Review

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF OHIO

3          EASTERN DIVISION

4             - - -

5

6  IN RE:  NATIONAL     :  HON. DAN A.
PRESCRIPTION OPIATE   :  POLSTER
LITIGATION            :

7                   :
APPLIES TO ALL CASES  :  NO.

8                   :  1:17-MD-2804
                   :

9

        - HIGHLY CONFIDENTIAL -

10

  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12            - - -

13      November 28, 2018

14            - - -

15      Videotaped deposition of
WILLIAM DE GUTIERREZ-MAHONEY, taken

16  pursuant to notice, was held at the law
offices of Covington & Burling, LLP, The

17  New York Times Building, 620 Eighth
Avenue, New York, New York, beginning at

18  9:08 a.m., on the above date, before
Michelle L. Gray, a Registered

19  Professional Reporter, Certified
Shorthand Reporter, Certified Realtime

20  Reporter, and Notary Public.

21            - - -

22      GOLKOW LITIGATION SERVICES
    877.370.3377 ph | 917.591.5672 fax

23        deps@golkow.com

24

Page 2

APPEARANCES:

LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, PA
BY: BRANDON L. BOGLE, ESQ.
BY: WESLEY BOWDEN, ESQ.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
(888) 435-7001
bbogle@levinlaw.com
wbowden@levinlaw.com
Representing the Plaintiffs

COVINGTON & BURLING, LLP
BY: PAUL W. SCHMIDT, ESQ.
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
Pschmidt@cov.com
- and -
COVINGTON & BURLING, LLP
BY: LAUREN C. DORRIS, ESQ.
850 10th Street, NW
Washington, DC 20001
(202) 662-6000
ldorris@cov.com
Representing the Defendant, McKesson
Corporation and the Witness

WILLIAMS & CONNOLLY, LLP
BY: COLLEEN MCNAMARA, ESQ.
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
Cmcnamara@wc.com
Representing the Defendant, Cardinal
Health

Page 3

APPEARANCES: (Cont'd.)

MARCUS & SHAPIRA, LLP
BY: SCOTT D. LIVINGSTON, ESQ.
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
(412) 338-4683
livingston@marcus-shapira.com
Representing the Defendant, HBC
Service Company

JACKSON KELLY, PLLC
BY: GRETCHEN M. CALLAS, ESQ.
500 Lee Street East
Suite 1600
Charleston West Virginia 25301
(304) 340-1169
Gcallas@jacksonkelly.com
Representing the Defendant,
AmerisourceBergen

JONES DAY
BY: LAURA JANE DURFEE, ESQ.
2727 North Harwood Street
Dallas, Texas 75201
(214) 220-3939
Ldurfee@jonesday.com
Representing the Defendant, Walmart

PELINI CAMPBELL & WILLIAMS, LLC
BY: PAUL B. RICARD, ESQ.
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Pbricard@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

Page 4

TELEPHONIC APPEARANCES:

ALLEGAERT, BERGER & VOGEL, LLP
BY: LUCY N. ONYEFORO, ESQ.
111 Broadway, 20th Floor
New York, New York 10006
(212) 616-7060
Lonyeforo@abv.com
Representing the Defendant,
Rochester Drug Corporation

KIRKLAND & ELLIS, LLP
BY: PRATIK K. GHOSH, ESQ.
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-2595
Pratik.ghosh@kirkland.com
Representing the Defendant, Allergan

FOX ROTHSCHILD, LLP
BY: EILEEN OAKES MUSKETT, ESQ.
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, New Jersey 08401
(609) 348-4515
Emuskett@foxrothschild.com
Representing the Defendant, Validus
Pharmaceuticals

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
Henry Marte

LITIGATION TECHNICIAN:
Mike Kutys

Page 5

- - -
I N D E X
- - -

Testimony of:
WILLIAM DE GUTIERREZ-MAHONEY

By Mr. Bogle          20, 550

By Mr. Bowden          301

By Mr. Schmidt          483, 599


- - -
E X H I B I T S
- - -

NO.     DESCRIPTION          PAGE
MCK
Mahoney-1     DEA Letter, 9/27/06   43
              MCKMDL00478906-09
              P1.1464

MCK
Mahoney-2     Memo, 5/4/18          55
              Subject, Hearing
              Entitled Combating
              The Opioid Epidemic
              P1.264

Page 6

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

MCK
Mahoney-3    State of        61
            Prescription Drug
            Abuse
            (Boggs)
            MCKMDL00336833-86
            P1.851

MCK
Mahoney-4    Slide Deck        70
            McKesson's
            Regulatory Program
            Lakeland ISMC Meeting
            8/2014
            MCKMDL00651331-69
            P1.1968

MCK
Mahoney-5    E-mail Thread      81
            6/10/14
            Subject, 2014 NSC
            Regulatory Updates to
            DC Ops
            MCKMDL00403517
            P1.1434

MCK
Mahoney-6    Prescription Drug    87
            Abuse
            The National
            Perspective
            MCKMDL00407451-75
            P1.1355

Page 7

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

MCK
Mahoney-7    Memo, 10/20/05      91
            Subject, Internet
            Presentation with
            McKesson Corp on
            9/1/05
            MCKMDL00496859-75
            P1.1946

MCK
Mahoney-8    Memo, 1/23/06      112
            Subject, Meeting
            Between OD and McKesson
            Corp on 1/3/06
            MCKMDL00496876-78
            P1.1789

MCK
Mahoney-9    E-mail 1/18/06     125
            Subject, Letter to
            DEA Re Internet
            Pharmacies
            MCKMDL00571360-65
            P1.1963

MCK
Mahoney-10   Pleadings        131
            Volume I
            MCKMDL-00496306-525
            P1.1943

MCK
Mahoney-11   McKesson        159
            Hydrocodone Sales
            For 10/1/05 - 1/31/06
            MCKMDL00497154-55
            P1.1947

Page 8

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

MCK
Mahoney-12   Pharmacy Rankings    165
            For Hydrocodone
            10/1/05 - 1/31/06
            MCKMDL00496536-49
            P1.1951

MCK
Mahoney-13   Accumed ARCOS      178
            Purchases from
            McKesson
            MCKMDL00496550-63
            P1.1952

MCK
Mahoney-14   Avee ARCOS        182
            Purchases from
            McKesson
            MCKMDL00496564-73
            P1.1953

MCK
Mahoney-15   MediPharm ARCOS    184
            Purchases from
            McKesson
            MCKMDL00496608-11
            P1.1958

MCK
Mahoney-16   The Ledger        186
            Pharmacy Raided
            By DEA Agents
            P1.1970

Page 9

E X H I B I T S (Cont'd.)

NO.        DESCRIPTION        PAGE

MCK
Mahoney-17   2 Pasco Deputies    190
            Face Drug Charges
            P1.1969

MCK
Mahoney-18   E-mail 9/25/07     199
            Subject, DEA Notes
            & DEA Notes
            MCKMDL00536448-50
            P1.1997

MCK
Mahoney-19   Settlement and     213
            Release Agreement
            & Administrative
            Memorandum of Agreement
            MCKMDL00337001-71
            P1.889

MCK
Mahoney-20   E-mail 3/7/08      219
            Subject, Regulatory
            Meeting 3/5 & 3/6
            MCKMDL00545048-55
            P1.1950

MCK
Mahoney-21   Presentation to the  233
            US Attorney's Office
            3/12/14
            MCKMDL00409116-73
            P1.1675

Page 10

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| MCK Mahoney-22 | E-mail Thread 6/12/08 Subject, CSMP MCKMDL00535705-06 P1.1960 | 240 |
| MCK Mahoney-23 | E-mail Thread 6/10/10 Subject, Clarifying The Partial Issue in CSMP MCKMDL00633917-20 P1.1942 | 252 |
| MCK Mahoney-24 | McKesson's Controlled Substance Monitoring Program Regulatory Affairs Training MCKMDL00336532-82 P1.795 | 271 |
| MCK Mahoney-25 | E-mail Thread 4/17/08 Subject, New DEA Ordering Standards MCKMDL00543610-15 P1.1962 | 287 |

Page 11

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| MCK Mahoney-26 | E-mail Thread 11/1/13 Subject, Reference Documents NC Region Suspicious Order Monitoring Awareness Training MCKMDL00516749-65 P1.1743 | 294 |
| MCK Mahoney-27 | E-mail Thread 4/15/11 Subject, CSMP Contribution, DCM Call MCKMDL00507221-23 P1.1680 | 304 |
| MCK Mahoney-28 | E-mail Thread 4/20/11 Subject, Internal Audit Report Confidential MCKMDL00498057-89 P1.1783 | 314 |
| MCK Mahoney-29 | E-mail Thread 10/23/08 Subject, Giant Eagle CSMP Thresholds MCKMDL00628660-73 P1.1866 | 328 |

Page 12

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| MCK Mahoney-30 | E-mail Thread 7/27/12 Subject, Threshold Change Requests MCKMDL00633455 P1.1936 | 347 |
| MCK Mahoney-31 | E-mail, 4/27/12 Subject, Target CSMP 4/27/12 MCKMDL00513320-23 P1.1979 | 354 |
| MCK Mahoney-32 | Validating Customer Authorization To Purchase Methadone 40mg MCKMDL00522686-87 P1.1845 | 372 |
| MCK Mahoney-33 | Methadone Block Activation Timeline MCKMDL00522685 P1.1848 | 374 |
| MCK Mahoney-34 | E-mail, 8/24/11 Subject, STARS Validations Methadone Clinics MCKMDL00497934-38 P1.1959 | 387 |

Page 13

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| MCK Mahoney-35 | E-mail Thread 11/3/11 Subject, Just Had a Call with Bill Ratliff MCKMDL00497904-05 P1.1697 | 401 |
| MCK Mahoney-36 | E-mail Thread 10/26/11 Subject, Rite Aid 3182 MCKMDL00632916-17 P1.1990 | 414 |
| MCK Mahoney-37 | E-mail Thread 3/11/13 Subject, HDMA Notes MCKMDL00545341-47 P1.1941 | 424 |
| MCK Mahoney-38 | E-mail Thread 2/28/12 Subject, HDMA CSMP Guidelines MCKMDL00545132-34 P1.1806 | 432 |

Page 14

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
MCK
Mahoney-39   E-mail Thread        439
             7/23/14
             Subject, Wegmans TCR
             Request for Base
             Codes
             MCKMDL00411372-76
             P1.1971

MCK
Mahoney-40   US DOJ Letter        455
             8/13/14
             Subject, Possible
             Civil Action Against
             McKesson
             MCKMDL00409224-46
             P1.1433
Mahoney-41   UD DOJ Letter        461
             11/4/14
             Subject, Registration
             Consequences for
             McKesson
             Corporation
             MCKMDL00409453-58
             P1.1443

MCK
Mahoney-42   Administrative       474
             Memorandum of
             Agreement
             MCKMDL00355350-63
             P1.88

Page 16

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
MCK
Mahoney-51   Controlled           578
             Substance Monitoring
             Program
             Delran Facility
             Overview
             11/6/08
             MCKMDL00545075-94

Page 15

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
MCK
Mahoney-43   E-mail Thread        511
             12/10/07
             Subject, November
             LDMP
             MCKMDL00540033-35
             P1.1864
MCK
Mahoney-44   Skipped

MCK
Mahoney-45   Skipped
MCK
Mahoney-46   Skipped

MCK
Mahoney-47   Skipped
MCK
Mahoney-48   Skipped

MCK
Mahoney-49   Skipped
MCK
Mahoney-50   Memo, 3/16/07        517
             To Boggess
             From Mahoney
             MCKMDL00497638-39

Page 17

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked

PAGE   LINE
None.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1          THE VIDEOGRAPHER:  We are
2    now on the record.  My name is
3    Henry Marte, the videographer with
4    Golkow Litigation Services.
5          Today's date is November 28,
6    2018.  And the time is 9:08 a.m.
7          This videotaped deposition
8    is being held at Covington and
9    Burling LLP, located at 620 Eighth
10   Avenue, New York, New York, in the
11   matter of National Prescription
12   Opiate Litigation.
13         The deponent today is
14   William de Gutierrez-Mahoney.
15         Counsel, please introduce
16   themselves for the record, which
17   after the court reporter will
18   administer the oath to the
19   witness.
20         MR. BOGLE:  Brandon Bogle on
21   behalf of plaintiffs.
22         MR. BOWDEN:  Wes Bowden on
23   behalf of plaintiffs.
24         MR. LIVINGSTON:  Scott

Page 19

1    Livingston on behalf of Defendant,
2    HBC.
3          MR. RICARD:  Paul Ricard on
4    behalf of Prescription Supply.
5          MS. DURFEE:  Laura Jane
6    Durfee on behalf of Walmart.
7          MS. McNAMARA:  Colleen
8    McNamara, on behalf of Cardinal
9    Health.
10         MS. CALLAS:  Gretchen Callas
11   on behalf of AmerisourceBergen.
12         MS. DORRIS:  Lauren Dorris
13   on behalf of McKesson.
14         MR. SCHMIDT:  Paul Schmidt
15   on behalf of McKesson.
16         And let me just say, if I
17   may, I don't know what the prior
18   practice has been, I meant to
19   check this, but my understanding
20   is that everyone in the room and
21   everyone on the phone is
22   subjective to the protective order
23   and the deposition will be covered
24   by the confidentiality provisions

Page 20

1    of the protective order.  But if
2    that's not true as to anyone,
3    please correct me.
4          MR. BOGLE:  I think that's
5    accurate.
6          MS. MUSKETT:  Michelle, did
7    you get Fox Rothschild.
8          MS. ONYEFORO:  Lucy Onyeforo
9    of Allegaert, Berger & Vogel is on
10   the phone as well for Rochester
11   Drug Corporation.
12              - - -
13         ... WILLIAM DE GUTIERREZ-MAHONEY,
14   having been first duly sworn, was
15   examined and testified as follows:
16              - - -
17         EXAMINATION
18              - - -
19   BY MR. BOGLE:
20   Q.   Good morning, Mr. Mahoney.
21   How are you doing?
22   A.   Good morning.  Good.
23   Q.   My name is Brandon Bogle,
24   I'm going to be asking you some questions

Page 21

1    today.
2          Just starting out for the
3    record, can I get your full name, please?
4    A.   William de
5    Gutierrez-Mahoney.
6    Q.   Okay.  And have you ever had
7    your deposition taken before?
8    A.   I've been deposed in other
9    matters, but not with opioids.
10   Q.   Right.  And I'm talking
11   generally in this sense.  So how many
12   times have you been deposed in any sort
13   of matter prior to today?
14   A.   Once. Once.
15   Q.   Once.  What was the general
16   subject matter in that deposition?
17   A.   It was -- it was a murder
18   case, and the question was about chain of
19   custody.
20   Q.   Okay.  Were you testifying
21   in some law enforcement capacity?
22   A.   It was a criminal case.  And
23   the state wanted to know if the product
24   that had been used in the crime had come

Page 22

1  from McKesson.
2      Q.   Okay.  So you were working
3  for McKesson at that point in time?
4      A.   Yes.
5      Q.   Okay.  So just to kind of
6  refresh you a little bit on a deposition,
7  just sort of the basics, I'm going to ask
8  you some questions today.  I'll do my
9  very best to ask my question, give you
10  every opportunity to answer before I ask
11  my next question.
12          I'll also ask that even if
13  you think you know where I'm going, if
14  you can let me get my full question out
15  there before you answer so that we don't
16  step on each others' toes, I think that
17  the court reporter will appreciate that.
18  Is that fair?
19      A.   Yes.
20      Q.   Okay.  And you can take a
21  break whenever you want.  It's not an
22  endurance contest.  Just tell myself or
23  your own counsel here.  The only thing I
24  ask is if I've got a question pending, if

Page 23

1  you could answer that question and we can
2  break for whenever -- however you want.
3          And the last thing is if you
4  don't understand or don't hear something
5  that I say, ask me to repeat or rephrase.
6  I'll do my best to make it clear to you.
7  But if you answer my question, I'm going
8  to assume that you understood it.  Is
9  that fair?
10      A.   Yes.
11      Q.   Okay.  Where are you
12  currently employed?
13      A.   At McKesson.
14      Q.   Okay.  And how long have you
15  been with McKesson?
16      A.   I've been with McKesson for
17  17-plus years.
18      Q.   Okay.  So starting
19  approximately 2001; is that right?
20      A.   Yes.
21      Q.   Okay.  What was your job in
22  2001 when you started, job title?
23      A.   I joined McKesson as a
24  business process manager.

Page 24

1      Q.   Was that at Lakeland?
2      A.   Our facility in Florida at
3  that time was in Tampa.
4      Q.   Okay.  How long did you have
5  that position?
6      A.   I think I had it between
7  let's say one year and two years.
8      Q.   Okay.  What was your next
9  job at McKesson after that?
10      A.   It was assistant
11  distribution center manager.
12      Q.   Was it in the Tampa
13  facility?
14      A.   Yes.
15      Q.   How long did you have that
16  job?  Just the years is fine.
17      A.   Until '04.
18      Q.   Okay.  And beginning in '04,
19  it's my understanding that you took the
20  role as distribution center manager for
21  the Lakeland facility; is that right?
22      A.   Yes.
23      Q.   Okay.  And you held that
24  position from 2004 until approximately

Page 25

1  December 2007; is that right?
2      A.   Yes.
3      Q.   Beginning in January 2008
4  you took over as director of regulatory
5  affairs for the southeast region, fair?
6      A.   Yes.
7      Q.   Okay.  Has that been your
8  job title from January 2008 to the
9  present?
10      A.   Yes.
11      Q.   Okay.  Now, just so I
12  understand, when we talk about the
13  southeast region, can you give me a sense
14  of what that encompasses, whether it be
15  states or distribution centers or however
16  that's divided out at McKesson.
17      A.   Initially, I was responsible
18  for six distribution centers, in
19  Lakeland; Atlanta; Birmingham, Alabama;
20  Memphis, Tennessee; Conroe, Texas; and
21  Oklahoma City.
22      Q.   Okay.  And you said
23  initially.  So at some point in time, did
24  that change?

Page 26

1  A.  Yes.
2  Q.  When did that change?
3  A.  We brought on another person
4  in 2013.  And at that point I was
5  responsible for Birmingham, Lakeland, and
6  Atlanta.
7  Q.  Who is the person that was
8  brought on in 2013?
9  A.  Linda Martin.  There's been
10  a subsequent change too.
11  Q.  Okay.  What was that?  First
12  of all, when did that subsequent change
13  occur?
14  A.  I believe it happened in the
15  middle of 2014.
16  Q.  Okay.  What changed?
17  A.  Jerry Carmack joined.  And
18  he picked up Memphis and Birmingham.
19  Linda moved to Texas and Oklahoma City,
20  and I was responsible for Atlanta and
21  Lakeland.
22  MR. SCHMIDT:  And I
23  apologize.  I can appreciate if
24  you were running something off the

Page 27

1  screen.  Do you have a copy of
2  whatever you're running?
3  MR. BOGLE:  I haven't marked
4  anything yet.  I'm not -- we can
5  take that down.  I haven't marked
6  anything yet.  It's not supposed
7  to be on the screen yet.  Yeah, we
8  certainly will when we go through
9  it.
10  MR. SCHMIDT:  I understand.
11 BY MR. BOGLE:
12  Q.  Okay.  So I didn't catch the
13  last part there.  So I apologize.  I'm
14  going to repeat part of this so I
15  understand.  I want to know from your
16  perspective in mid-2014, which facilities
17  you were responsible for from a
18  regulatory perspective?
19  A.  From then on --
20  Q.  Yes, sir.
21  A.  -- I became responsible for
22  Atlanta and Lakeland.
23  Q.  Atlanta and Lakeland.  Has
24  that been true from mid-2014 to present?

Page 28

1  A.  Yes.
2  Q.  Now, going back to the time
3  that you were distribution center manager
4  for Lakeland, would that have encompassed
5  running the day-to-day operations for the
6  distribution center?
7  A.  Yes.
8  Q.  Okay.  And can you just give
9  me a general sense, again, as a
10  distribution center manager for Lakeland,
11  what your general job responsibilities
12  were?
13  A.  I was responsible for hiring
14  and enabling the distribution center to
15  service its customer base.  We would
16  receive product from manufacturers, stock
17  the shelves, and process orders in the
18  evening for delivery the following day.
19  Q.  Okay.  And the time period
20  that you had that role from '04 to '07,
21  there would also have been
22  responsibilities under the Controlled
23  Substances Act that would have fallen
24  within your purview, right?

Page 29

1  A.  Yes.
2  Q.  Okay.  That would include,
3  for example, suspicious order monitoring
4  for controlled substances, right?
5  A.  Yes.
6  Q.  Okay.  And can you give me a
7  sense of what your role during that time
8  period would have been from that
9  perspective of suspicious order
10  monitoring?
11  A.  Was responsible for
12  management of the cage and vault.  And we
13  had a system that we used to compare
14  orders of controlled substances with a
15  moving average of their prior orders on
16  an item basis for those products.
17  Q.  Okay.  And it's my general
18  understanding that what you're talking
19  about here is that during the time period
20  of '04 to '07 when you had that role,
21  there would be a report called a DU-45
22  report generated which told you whether
23  the -- for a Schedule II or Schedule III
24  controlled substance the customer was

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 three times or more above their average
2 purchases, right?
3     A.   Yes.
4     Q.   And are you also familiar
5 with, at that point in time, DR-46
6 report?
7     A.   Not -- I don't recall that
8 specifically.  I may understand it if I
9 see it.
10     Q.   Sure.  No, and right now I'm
11 just asking your recollection.  So if you
12 don't recall, that's fine.
13     A.   Right.
14     Q.   Okay.  The Lakeland
15 distribution center, we'll start with '04
16 to '07 time frame, what -- geographically
17 what states did that cover as far as a
18 customer base?
19     A.   In '04, I think we covered
20 actually some portions -- the geography
21 that we covered moved between '04 and
22 '06 --
23     Q.   Okay.
24     A.   -- because of the Florida

Page 31

1 pedigree law.
2     Q.   Okay.
3     A.   And the decision was made to
4 basically make Lakeland the primary with
5 only one -- one or two backups, vehicle
6 for delivering -- acquiring and
7 delivering pedigree product to conform
8 with the Florida pedigree law.
9     Q.   When you say pedigree
10 product, I want to make sure that our
11 jury understands what that means.  What
12 is a pedigree product?
13     A.   Because of investigations
14 which observed that there is companies or
15 entities were counterfeiting product or
16 repackaging it in a way that undermined
17 its efficacy and whether it was safe for
18 the public, Florida implemented the
19 Florida pedigree law.  And initially they
20 chose 30 drugs that they viewed as being
21 subject to diversion that way.
22           And they required a pedigree
23 on who had bought the various
24 transactions which took place between the

Page 32

1 manufacturer and -- or actually the
2 distributor who bought it from the
3 manufacturer and the pharmacy or entity
4 to which it was sold.
5     Q.   Would it be fair to say that
6 it's sort of similar to what you
7 mentioned before in the respect that you
8 testified before, sort of a chain of
9 custody throughout the lifecycle of the
10 product to establish at all times it was
11 a legitimate product?
12     A.   Right.
13     Q.   Okay.  And let me ask my
14 other question maybe a different way.
15 From 2004 to present, has the Lakeland
16 distribution center serviced customers in
17 the State of Florida?
18     A.   Yes.
19     Q.   Okay.  You mentioned the
20 term "diversion" in your answer just a
21 minute ago.  What do you understand the
22 term "diversion" to mean?
23     A.   Where a product is
24 inappropriately taken out of the normal

Page 33

1 supply chain.  In this case, one of the
2 modes was that customers would buy a
3 product and then attempt to return
4 altered or not pedigree product into the
5 supply chain.
6     Q.   Okay.  And the concept of
7 diversion is -- it can be broader than
8 that, right?
9     A.   Sure, sure.
10     Q.   Okay.  Are there any other
11 examples of diversion that you can think
12 of?
13     A.   Yeah.  There is -- I guess,
14 not chain.  There's diversion that used
15 to take place between closed door
16 pharmacies and independent retail
17 pharmacies in which pricing which was
18 offered to closed door pharmacies would
19 be diverted into the normal chain of
20 independent flow, at which it would be
21 able to be sold for higher prices.  That
22 was something that the manufacturers
23 really clamped down on.
24           And then there's diversion

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 of controlled substances.
2    Q.   Okay.  And the concept of
3 diversion, as I read it, is sort of
4 generally defined as the use of a drug
5 for an illegitimate medical purpose.  Do
6 you think that's a fair general
7 statement?
8    A.   Particularly in the case of
9 controls.
10   Q.   Right.  Is that a fair
11 general statement for controlled
12 substances?
13   A.   Yes.
14   Q.   Okay.  So prior to taking on
15 your role as director of regulatory
16 affairs in 2008, did you have any prior
17 experience working in a regulatory
18 capacity for any company?
19   A.   No.
20   Q.   Okay.  What kind of training
21 did you get when you came on to sort of
22 learn your regulatory responsibilities?
23   A.   There was training
24 associated with our responsibilities,

Page 35

1 with the CSA.  We had training on a new
2 system that we were using to help us
3 administer our controlled substances
4 monitoring program.
5    Q.   Okay.  And you said CSA.
6 And, again, I just want to make sure
7 we're clear on what everything means
8 here.  That's the Controlled Substance
9 Act?
10   A.   Yes, sir.
11   Q.   Okay.  I saw a reference
12 somewhere to you previously working for
13 Cardinal Health; is that right?
14   A.   I worked -- yes.
15   Q.   Okay.  What period of time
16 did you work there?
17   A.   I worked for Cardinal from
18 March of '98 to the summer of 2000.
19   Q.   Okay.  What did you do
20 generally for Cardinal?
21        First of all, what was your
22 job title?  Let's start there.
23   A.   Job title was director of
24 operations.

Page 36

1    Q.   Was that for a distribution
2 center?
3    A.   Yes.
4    Q.   Where?
5    A.   In Lakeland.
6    Q.   Okay.  Were your job
7 responsibilities similar there to what
8 they were at McKesson when you were
9 distribution center manager?
10   A.   Yes.
11   Q.   Okay.  You worked for --
12 did -- had you worked for any other
13 pharmaceutical distributors prior to
14 working for Cardinal?
15   A.   No.
16   Q.   And McKesson is a
17 distributor of pharmaceutical products,
18 right?
19   A.   Yes.
20   Q.   And you would agree that a
21 distributor of pharmaceutical products,
22 the most important consideration for a
23 company like that should be protecting
24 the health and safety of the public,

Page 37

1 right?
2    A.   Yes.
3    Q.   And obviously the deposition
4 today is going to focus largely on opioid
5 products.  You understand that, right?
6    A.   Yes.
7    Q.   That's what we're here to
8 talk about?
9    A.   Yes.
10   Q.   And you are familiar with
11 opioids, right?
12   A.   Yes.
13   Q.   Okay.  And McKesson has
14 distributed opioids during the time that
15 you've worked with the company, right?
16   A.   Yes.
17   Q.   And opioids are a controlled
18 substance, right?
19   A.   Yes.
20   Q.   And opioids are -- fall into
21 the category of a narcotic drug, right?
22   A.   Yes.
23   Q.   And you mentioned the
24 Controlled Substance Act.  During the

Highly Confidential - Subject to Further Confidentiality Review

Page 38

¹ time that you've been with McKesson, the
² Controlled Substances Act has been on the
³ book so to speak, right?  It's something
⁴ the company has had to comply with,
⁵ right?
⁶      A.   Yes.
⁷      Q.   And I assume that that's a
⁸ statute you're familiar with, right?
⁹      A.   Yes.  The company has boiled
¹⁰ down if you will the -- the relevant
¹¹ aspects of the CS, the Controlled
¹² Substance Act into policies and
¹³ procedures that we follow within the DC.
¹⁴      Q.   Okay.  And one of those
¹⁵ policies and procedures, at least
¹⁶ starting in 2008, was the controlled
¹⁷ substance monitoring program, right?
¹⁸      A.   Yes.
¹⁹      Q.   Okay.  And the controlled
²⁰ substance monitoring program was
²¹ generally designed so that the company
²² could comply with the requirements of the
²³ Controlled Substances Act, right?
²⁴      A.   Yes.

Page 39

¹      Q.   And the Controlled
² Substances Act generally is designed to
³ prevent diversion of controlled
⁴ substances, right, that's the purpose of
⁵ it?
⁶      A.   Of the -- of the Controlled
⁷ Substances Act?
⁸      Q.   Yes, sir.
⁹      A.   Yes.  Among other things.
¹⁰      Q.   Okay.  That's included
¹¹ within its purposes, fair?
¹²      A.   Yes.
¹³      Q.   Okay.  And from your
¹⁴ perspective as an employee at McKesson,
¹⁵ you would agree that compliance with the
¹⁶ Controlled Substances Act is important,
¹⁷ right?
¹⁸      A.   Yes.
¹⁹      Q.   In fact, it's been mandatory
²⁰ at the company since you've been there,
²¹ right?
²²      A.   Yes.
²³      Q.   And so I just want to kind
²⁴ of walk through some of the, as you would

Page 40

¹ understand it, requirements of McKesson
² under the Controlled Substances Act.
³      One of those would be to
⁴ have effective controls against
⁵ diversion, right?
⁶      A.   Yes.
⁷      Q.   Another would be monitoring
⁸ for suspicious controlled substance
⁹ orders, right?
¹⁰      A.   Yes.
¹¹      Q.   Another would be reporting
¹² suspicious orders to the DEA when those
¹³ are detected by the company, right?
¹⁴      A.   Yes.
¹⁵      Q.   And another would be
¹⁶ blocking suspicious orders, meaning not
¹⁷ supplying them to the customer, when
¹⁸ McKesson detected a suspicious order,
¹⁹ right?
²⁰      MR. SCHMIDT:  Objection.
²¹ Foundation.
²² BY MR. BOGLE:
²³      Q.   You can still answer unless
²⁴ he tells you not to answer.

Page 41

¹      A.   Okay.  Can you repeat that?
²      Q.   Sure, I can.
³      One of the requirements
⁴ since you've been with McKesson under the
⁵ Controlled Substances Act has been to
⁶ block, meaning not ship, suspicious
⁷ orders when the company detected them?
⁸      MR. SCHMIDT:  Same
⁹ objection.
¹⁰      THE WITNESS:  There has been
¹¹ a clarification certainly since
¹² 2004, but I think before 2008, in
¹³ terms of that requirement to block
¹⁴ the suspicious orders.
¹⁵ BY MR. BOGLE:
¹⁶      Q.   Okay.  I want to make sure I
¹⁷ understand what you're saying there then.
¹⁸      So is it your understanding
¹⁹ that prior to 2008 that McKesson did not
²⁰ have the obligation to block suspicious
²¹ orders when detected?
²²      A.   We -- we reported suspicious
²³ orders as detected by the DU-45 at that
²⁴ point.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.   Right.  I think my question
2  is a little -- a little more narrow than
3  that.  My question was simply, did you
4  have an understanding in your role at
5  McKesson that the company had an
6  obligation under the Controlled
7  Substances Act prior to 2008 to block
8  suspicious orders when the company found
9  them?
10   A.   If we found that a customer
11 was operating suspiciously, we would
12 disengage with that customer and not sell
13 them controlled substances.
14   Q.   Okay.  So to make sure I
15 understand here.  So, is it your
16 understanding from when you started at
17 the company -- we'll start from 2002 when
18 you took over as assistant district -- or
19 assistant distribution center manager.
20        From 2002 to present, was
21 there any period of time where it was
22 your understanding that the company did
23 not have an obligation to block
24 suspicious orders when detected?

Page 43

1    A.   No.
2        MR. SCHMIDT:  Objection.
3  Form.
4        (Document marked for
5        identification as Exhibit
6        MCK-Mahoney-1)
7  BY MR. BOGLE:
8    Q.   Okay.  I'm going to hand you
9  what's marked as Exhibit 1.1464.  Also
10 marked as Exhibit 1 to your deposition.
11 And the beginning Bates number is
12 MCK_MDL_00478906.
13        Here's your copy.  And this
14 is a long table, sir, so I'm not trying
15 to throw stuff at you, I swear.
16        Okay.  So looking at
17 Exhibit 1 here.  Let me introduce it and
18 then I want to ask you some questions
19 about it.
20        Do you see this is a letter
21 from the U.S. Department of Justice Drug
22 Enforcement Administration dated
23 September 27, 2006.  Do you see that?
24   A.   Yes.

Page 44

1    Q.   Okay.  Have you seen this
2  letter before today?
3    A.   Yes.
4    Q.   Okay.  Did you see it in and
5  around 2006?
6    A.   Yes.
7    Q.   Okay.  How was it -- how did
8  you come to see it in and around 2006?
9    A.   It may have been addressed
10 to me at the DC.  But I also saw it via
11 e-mail internally.
12   Q.   Okay.  All right.  So I want
13 to discuss a few portions of this letter.
14        The first paragraph there
15 says, "This letter is being sent to every
16 commercial entity in the United States
17 registered with the Drug Enforcement
18 Administration to distribute controlled
19 substances.  The purpose of this letter
20 is to reiterate the responsibilities of
21 controlled substance distributors in view
22 of the prescription drug abuse problem
23 our nation currently faces."
24        Do you see that?

Page 45

1    A.   Yes.
2    Q.   Okay.  And McKesson in 2006
3  was registered with the DEA to distribute
4  controlled substances, right?
5    A.   Yes.
6    Q.   And if you go down to the
7  third paragraph on the first page.  And
8  I'm in the -- let's start with the first
9  sentence.  It says, "The CSA was designed
10 by Congress to combat diversion by
11 providing for a closed system of drug
12 distribution in which all legitimate
13 handlers of controlled substances must
14 obtain a DEA registration, and as a
15 condition of maintaining such
16 registration, must take reasonable steps
17 to ensure that their registration's not
18 being utilized as a source of diversion.
19 Distributors are, of course, one of the
20 key components of the distribution chain.
21 If the closed system is to function
22 properly as Congress envisioned,
23 distributors must be vigilant in deciding
24 whether a prospective customer can be

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  trusted to deliver controlled substances
2  only for lawful purposes."
3       Did I read that correctly?
4    A.   Yes.
5    Q.   Okay.  There's a reference
6  here to a closed system in this regard.
7  What do you understand a closed system to
8  mean?
9    A.   A closed system is a system
10 in which the -- the drugs are initiated
11 at a manufacturer, usually acquired by
12 distributor.  Could be sent to another
13 distributor, or to a pharmacy.
14      The prescription is
15 initiated with the -- the doctor.  And
16 the distributor delivers the drugs to the
17 pharmacy, and the pharmacy fills scripts
18 which are initiated by the doctor.
19   Q.   And in a closed system in --
20 in the concept of controlled substances
21 means that essentially you have to have
22 this DEA registration in order to be able
23 to prescribe or distribute or manufacture
24 controlled substances, right?

Page 47

1    A.   Yes.
2    Q.   Okay.  Okay.  Look at the
3  next sentence here.  It says, "This
4  responsibility is critical as Congress
5  has expressly declared that the illegal
6  distribution of controlled substances has
7  a substantial and detrimental effect on
8  the health and general welfare of the
9  American people."
10      Do you see that?
11   A.   Yes.
12   Q.   Do you agree with that
13 sentence?
14      MR. SCHMIDT:  Objection.
15 Foundation.
16      THE WITNESS:  Yes.
17 BY MR. BOGLE:
18   Q.   And turning to the second
19 page of this document, one more section
20 that I wanted to look at with you.
21      You see in the middle of the
22 page there where it says the DEA
23 regulations require?  Do you see that?
24   A.   Yes.

Page 48

1    Q.   It says, "The DEA
2  regulations require all distributors to
3  report suspicious orders of controlled
4  substances.  Specifically the regulations
5  state in 21 C.F.R. 1301.74(b), "The
6  registrant shall design and operate a
7  system to disclose to the registrant
8  suspicious orders of controlled
9  substances.  The registrant shall inform
10 the field division office of the
11 administration in his area of suspicious
12 orders when discovered by the registrant.
13 Suspicious orders include orders of
14 unusual size, orders deviating
15 substantially from a normal pattern, and
16 orders of unusual frequency."
17      Do you see that?
18   A.   Yes.
19   Q.   And that paragraph I just
20 read that's from the C.F.R., that's a
21 paragraph that you're familiar with,
22 right?
23   A.   Yes.
24   Q.   And then it goes on to say,

Page 49

1  "It bears emphasis that the foregoing
2  reporting requirement is in addition to,
3  and not in lieu of, the general
4  requirement under 21 U.S.C. 823(e) that a
5  distributor maintain effective controls
6  against diversion.  Thus, in addition to
7  reporting all suspicious orders, a
8  distributor has statutory responsibility
9  to exercise due diligence to avoid
10 filling suspicious orders that might be
11 diverted into other than a legitimate
12 medical, scientific, and industrial
13 channels."
14      Do you see that?
15   A.   Yes.
16   Q.   And these -- this additional
17 duty to avoid filling here, that's what
18 we talked about earlier which is the duty
19 to block suspicious orders when they're
20 detected, right?
21   A.   Yes.
22   Q.   Okay.  And would you agree
23 that reporting suspicious orders to the
24 DEA is important because it allows the

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  DEA to decide whether it wants to
2  investigate whether diversion is
3  occurring as to the order you're
4  reporting?
5      MR. SCHMIDT:  Objection.
6  Foundation.
7      THE WITNESS:  I'm not sure
8  what the DEA used the information
9  that we sent to them for.
10 BY MR. BOGLE:
11     Q.   Okay.  Did you have a sense,
12 during your time with McKesson, as to why
13 you guys do -- I guess do that, why you
14 report suspicious orders?
15     A.   Because it's required by the
16 statute.
17     Q.   Okay.  Anything beyond that?
18     A.   Well, in the times that I've
19 tried to share information with the DEA,
20 I haven't really gotten much feedback.
21 And when we -- over time, we've reported
22 suspicious orders in different ways and
23 really don't see much of a correlation
24 between whether or how much reporting

Page 51

1  takes place and activity, you know, from
2  the DEA.
3      Q.   Okay.  So do you have a
4  sense as to whether -- actually, strike
5  that.
6      Would you agree with me that
7  blocking a suspicious order is important
8  because it ensures that potential
9  diversion does not occur with that order?
10     MR. SCHMIDT:  Same
11     objection.  Foundation.
12     THE WITNESS:  That's the
13     intent, yes.
14 BY MR. BOGLE:
15     Q.   Okay.  And diversion of
16 controlled substances, including opioids
17 can be prevented by compliance with the
18 Controlled Substance Act, right?
19     MR. SCHMIDT:  Same
20     objection.
21     THE WITNESS:  I think there
22     are a lot of different
23     participants.  And even if
24     Controlled Substance Act is

Page 52

1  complied with by a majority of the
2  participants, diversion can still
3  occur.
4  BY MR. BOGLE:
5      Q.   Okay.  So you would not
6  agree then that diversion of opioids
7  specifically can be prevented through
8  compliance with the Controlled Substance
9  Act?
10     MR. SCHMIDT:  Same
11     objection.
12     THE WITNESS:  Are you
13     talking about relative to
14     distributors?
15 BY MR. BOGLE:
16     Q.   Yeah.  We can start there.
17     A.   Okay.  Can you repeat the
18 question?
19     Q.   Sure.  Do you agree or
20 disagree that compliance with the
21 Controlled Substance Act by distributors
22 like McKesson is important to prevent
23 diversion?
24     A.   Yes.

Page 53

1      Q.   Okay.  Do you agree that
2  there is an ongoing opioid epidemic in
3  the United States?
4      A.   Yes.
5      Q.   And that epidemic has been
6  going on for more than a decade in this
7  country, right?
8      MR. SCHMIDT:  Objection.
9  Foundation.
10     THE WITNESS:  I'm not sure
11     exactly when it began.
12 BY MR. BOGLE:
13     Q.   Okay.  Well, when do you
14 first recall any -- just a year would be
15 fine, when do you first recall being made
16 aware at McKesson that there was an
17 opioid epidemic?
18     A.   I'm not sure.
19     Q.   Okay.  Any sense of a
20 general time frame?
21     A.   Well, in this letter, he
22 refers to --
23     Q.   Are you back at Exhibit 1?
24     A.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.   Okay.  That's fine.  Say
2    what you want to say.  Just making sure.
3        A.   I'm just saying that it's
4    identified as substantial and detrimental
5    effect on the health and general welfare
6    of the U.S. people.
7        Q.   Right.
8        A.   But it wasn't termed "opioid
9    epidemic" at that point.
10       Q.   Okay.  So I guess going back
11   to my prior question then, do you have
12   any general recollection of when you may
13   have became aware at McKesson that there
14   was an opioid epidemic in this country?
15       A.   Again, the characterization,
16   I'm not sure if that entered my
17   awareness -- 2008, 2010.  Somewhere in
18   there.
19       Q.   Somewhere in that time
20   frame.  Okay.  And are you aware that
21   opioid overdoses are the leading cause of
22   injury-related death in the United
23   States?
24       A.   I'm not sure about that.

Page 55

1        Q.   Okay.
2        A.   I've heard that for
3    different age groups and that kind of
4    thing.  But I'm not sure.
5        Q.   Okay.  Why don't we take a
6    look at something here with you on that
7    point.  I'm going to hand you 1.264,
8    which is marked as Exhibit 2.
9            (Document marked for
10           identification as Exhibit
11           MCK-Mahoney-2.)
12   BY MR. BOGLE:
13       Q.   This is a public document.
14   So no Bates numbers.
15           MR. SCHMIDT:  You can throw
16       it.  I know you're not being rude.
17       It's a big table.
18   BY MR. BOGLE:
19       Q.   Okay.  Mr. Mahoney, what
20   I've handed you -- here again, I'll
21   introduce it, and we'll kind of go from
22   there -- is a document from May 4, 2018,
23   from the U.S. House of Representatives
24   Committee on Energy and Commerce.

Page 56

1        Do you see that?
2        A.   Mm-hmm.
3        Q.   Okay.  Have you seen this
4    document before?
5        A.   I don't think I've seen this
6    document.
7        Q.   Okay.  Do you see that the
8    line at the top notes, "Regarding hearing
9    entitled 'Combatting the Opioid Epidemic:
10   Examining Concerns About Distribution and
11   Diversion.'"
12       Do you see that?
13       A.   Yes.
14       Q.   Okay.  And if you look here,
15   on that first page, there's a section
16   that lists witnesses for the hearing
17       A.   Yes.
18       Q.   Do you see that section?
19       A.   Mm-hmm.
20       Q.   And you see the third person
21   listed there is a John H. Hammergren --
22       A.   Yes.
23       Q.   -- president and CEO of
24   McKesson.  Do you see that?

Page 57

1        A.   Mm-hmm.
2        Q.   Okay.  And you are familiar
3    with Mr. Hammergren, right?
4        A.   Yes.
5        Q.   Okay.  I mean, you know who
6    he is, right?
7        A.   Yeah.
8        Q.   Okay.  Were you aware that
9    he testified before Congress in 2018?
10       A.   Yes.
11       Q.   Yes.  What information were
12   you provided about his testimony?
13       A.   I believe I watched it.
14       Q.   Okay.  So you did watch at
15   least portions of this hearing that we're
16   talking about here?
17       A.   Yes.
18       Q.   Okay.  So going to the
19   second page of this document, and I'm
20   looking at the paragraph below the chart
21   that says, "The U.S. continues."
22       A.   Okay.
23       Q.   Do you see that?
24       It says, "The U.S. continues

Page 58

1 to experience an opioid epidemic which
2 has worsened over the last two decades.
3 Opioid-involved overdose deaths are the
4 leading cause of injury death in the U.S.
5 and take the lives of 115 Americans per
6 day.  According to a recent report issued
7 by the Centers For Disease Control and
8 Prevention, CDC, prescription or illicit
9 opioids were involved in nearly
10 two-thirds of all drug overdose deaths in
11 the U.S. during 2016, a 27.7 percent
12 increase from 2015.
13      "In total, more than 351,000
14 people have died since 1999 due to an
15 opioid-involved overdose.  The crisis has
16 become so severe that the average life
17 expectancy declined in 2016 from the
18 previous year largely because of opioid
19 overdoses."
20      Do you see that there?
21   A.   Yes.
22   Q.   Okay.  Prior to looking at
23 this today, were you aware that the life
24 expectancy, at least in 2016, had

Page 59

1 declined largely because of opioid
2 overdoses?
3      MR. SCHMIDT:  Objection.
4   Foundation.
5      THE WITNESS:  I had heard
6   that life expectancy had gone
7   down.  But I hadn't attributed it
8   necessarily to just opioids.
9      Suicide, depression.  There
10   were a lot of different things in
11   what I had seen.
12 BY MR. BOGLE:
13   Q.   Okay.  But you've never seen
14 the reference similar to the one here
15 that decline, at least from 2016 versus
16 2015, was largely because of opioid
17 overdoses?
18   A.   I hadn't seen that sentence,
19 no.
20   Q.   Any reason to dispute that
21 finding?
22   A.   No.
23      MR. SCHMIDT:  Same
24   objection.

Page 60

1 BY MR. BOGLE:
2   Q.   We talked a little bit
3 earlier about your involvement at the
4 Lakeland distribution center, initially
5 as the assistant distribution center
6 manager -- I think that was the title
7 that you gave me -- then distribution
8 center manager, and then as director of
9 regulatory affairs responsible for
10 Lakeland.  We talked about that earlier,
11 right?
12   A.   Yes.
13   Q.   Okay.  So Florida -- let me
14 back up.  Strike that.
15      Do you live in Florida?
16   A.   I do.
17   Q.   Okay.  How long have you
18 lived in Florida?
19   A.   About 20 years.
20   Q.   Okay.  So being a Florida
21 resident in addition to being an employee
22 of McKesson in the capacities that we've
23 discussed, you understand that Florida
24 has been hit very hard by the opioid

Page 61

1 epidemic, correct?
2   A.   Yes.
3   Q.   Are you familiar with Gary
4 Boggs at McKesson?
5   A.   Yes, mm-hmm.
6   Q.   Did you know him in any
7 capacity prior to him joining the
8 company?
9   A.   I may have met him before.
10 But I didn't know him.
11   Q.   Okay.  You do know that he
12 was with the DEA prior to joining
13 McKesson, right?
14   A.   Yes.
15   Q.   And he works in the
16 regulatory affairs department at McKesson
17 presently, right?
18   A.   Yes.
19   Q.   And has for the past five
20 years or so, right?
21   A.   Yes.
22      (Document marked for
23   identification as Exhibit
24   MCK-Mahoney-3.)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

BY MR. BOGLE:

Q. I'm going to hand you what I'm marking Exhibit 1.851, also marked as Exhibit 3.

MR. SCHMIDT: Bill, when you're done with the exhibits, I'll just put them here. If we need to go back to any earlier ones --

MR. BOGLE: Yeah, we may bounce a little back and forth. But --

MR. SCHMIDT: I'll help you with that, which should be terrifying to everyone in the room. I'll do my best.

BY MR. BOGLE:

Q. All right. So Exhibit 3 here, also marked as 1.851, is a PowerPoint slide deck titled "State of Prescription Drug Abuse." The author is noted to be Gary Boggs.

Do you see that?

A. Yes.

Page 63

Q. Have you seen this slide deck before?

A. Yes, I believe I have.

Q. In what context have you seen it before today?

A. I -- I think I was at -- if it is what I think it is, he presented this I think in October of 2013 at Olive Branch.

Q. Okay. So is that before or after he joined the company, do you know?

A. I'm not sure if he had joined or not. But he had committed to joining the company.

Q. Understood. Okay. I want to look at a couple aspects of this document with you. If you can turn to Page .18. The page -- point pages are at the top right, if that helps you.

A. Okay.

Q. And the title of this slide is Florida Pill Mills Resulting, and some quotes, "Oxy Spill."

Do you see that?

Page 64

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. I'm sorry, I'm not trying to be rude, just want to make sure --

A. No, I understand -- understand.

Q. The concept of a pill mill, what does that mean to you?

A. The way I envision the pill mill is a doctor, doctor or doctor's office, in which people are seeing the doctor and getting opioids on the way out.

Q. Okay.

A. So from my exposure or things that I've seen, it would be a high volume-type operation.

Q. Okay. In the term "pill mill" as used generally in -- strike that.

The term "pill mill" when you are talking about the sales of controlled substances is -- has a

Page 65

negative connotation to it, right?

A. Yes.

Q. Okay. Looking at this slide here it says 2009 and 2010. The first bullet point says, "Average purchase of oxycodone products by a pharmacy, 63,294 DU per year."

Do you see that?

A. Yes.

Q. Okay. What is DU, do you know what that stands for?

A. Dosage units.

Q. Okay. And then it says the next bullet point, "In Florida, the top 100 pharmacies each purchased more than 1,226,460 DU per year."

Do you see that?

A. Yes.

Q. Okay. So as I would understand it and correct me if I'm wrong, what's being conveyed here is that, in Florida, the purchases of at least oxycodone in 2009 and 2010 were significantly higher in the state of

Page 66

1 Florida than the country generally,
2 right?
3          MR. SCHMIDT:  Objection.
4     Foundation.
5          THE WITNESS:  I'm not sure
6     what the -- what the numbers would
7     be for another -- another state.
8 BY MR. BOGLE:
9     Q.   Okay.  When it says average
10 purchase of oxycodone products to a
11 pharmacy, what geographic region do you
12 think that pertains to?
13     A.   I guess I attribute it to
14 being Florida.  But I'm not sure if
15 that's accurate anymore.
16     Q.   Okay.  The next bullet that
17 we just read talks specifically about
18 Florida, right, the 1.226,460 dosage
19 units?
20     A.   Okay.  Right.
21     Q.   Right?
22          So you understand that
23 that's generally a comparison of Florida
24 to the average as a whole of the country.

Page 67

1 Do you see that?
2     A.   Okay.  Yep.
3     Q.   Okay.  And then below that
4 it says, "44 percent of all oxycodone
5 30-milligram products were distributed to
6 Florida in each year."
7          Do you see that?
8     A.   Mm-hmm.
9     Q.   Okay.  Is that a yes?
10     A.   Yes.
11     Q.   And the oxycodone
12 30 milligrams, those are one of the most
13 highly abused and diverted forms of
14 opioids on the market, right?
15     A.   Okay.
16     Q.   No, I'm asking whether you
17 agree or disagree with that.
18     A.   It's among them.
19     Q.   Okay.
20     A.   I -- I know that OxyContin
21 and Percocet.  But oxycodone 30-milligram
22 is, I think, the highest generic strength
23 available.
24     Q.   Right.  And you guys at

Page 68

1 McKesson actually created a separate base
2 code at a point in time for oxy
3 30 milligrams specifically to track the
4 purchases of that dosage because of that
5 concern, right?
6     A.   Yes.
7     Q.   That the -- the higher rate
8 of abuse, right?
9     A.   Yes.  Mm-hmm.
10     Q.   And so this reference here
11 to 44 percent of all oxycodone being
12 distributed to Florida specifically, you
13 would agree that's a high percentage of
14 the national volume of oxycodone
15 30 milligrams being distributed
16 specifically to Florida, right?
17     A.   Yes.
18     Q.   If you go to the next page,
19 .19.
20     A.   Mm-hmm.
21     Q.   It says, "Oxycodone deaths
22 in Florida rose from 340 in 2005 to 1,516
23 in 2010, a 346 percent increase."
24          Do you see that reference?

Page 69

1     A.   Yes.
2     Q.   And you've seen that
3 reference before today, right?
4     A.   I believe so.
5     Q.   Okay.  As part of
6 reviewing -- seeing this deck, right?
7     A.   Right.
8     Q.   And you would agree with me,
9 that's a -- that's a very large increase
10 over that period of time, right?
11     A.   Yes.
12     Q.   And if we can go next to
13 Page .37.
14          This -- this slide is titled
15 Distributors Have Great Power.  Do you
16 see that?
17     A.   Mm-hmm.
18     Q.   And it says, "individually
19 and collectively."  And it references
20 your DEA registration.  Next bullet point
21 says, "Ensure timely distribution to
22 prevent an uninterrupted supply."  And
23 the third bullet point, "You control the
24 supply to downstream customers."

Page 70

1    Do you see that?

2    A.  Yes.

3    Q.  Okay.  Would you agree that

4  distributors like McKesson have great

5  power over the distribution of controlled

6  substances because, in fact, they do

7  control the supply to downstream

8  customers?

9        MR. SCHMIDT:  Objection.

10    Vague.

11        THE WITNESS:  The customer

12    doesn't push the product.  It's

13    pulled by the scripts and pharmacy

14    orders.

15  BY MR. BOGLE:

16    Q.  Understood.  But McKesson

17  ultimately has the decisionmaking power

18  and the responsibility to decide who to

19  sell those controlled substances to,

20  right?

21    A.  Yes.

22    Q.  There's no legal obligation

23  that you fill every single order that you

24  get, right?

Page 71

1    A.  Correct.

2        (Document marked for

3    identification as Exhibit

4    MCK-Mahoney-4.)

5  BY MR. BOGLE:

6    Q.  I'm going to hand you next

7  what I'm marking as Exhibit 1.1968, also

8  marked as Exhibit 4 to your deposition.

9        And the start date here is

10  MCK_MDL_00651331.

11        Okay.  So what I've given

12  you here is Exhibit 4.  The title is

13  McKesson's Regulatory Program, Lakeland

14  ISMC Meeting, August 2014.  Do you see

15  that?

16    A.  Yes.

17    Q.  Are you familiar with this

18  PowerPoint deck?

19    A.  I believe so.

20    Q.  Okay.  And before we get

21  into it, I have a few questions about it,

22  but before we get there, ISMC, what does

23  that stand for at McKesson?

24    A.  Independent and small and

Page 72

1  medium chain.

2    Q.  Okay.

3    A.  So it's a segment of the

4  retail marketplace.

5    Q.  Okay.  It's a type of

6  pharmacy customer; is that fair?

7    A.  Yeah.

8    Q.  Did you -- were you the one

9  that put together this slide deck?

10    A.  I may have been.  I'd have

11  to take a look at it.

12    Q.  Yeah, take just a minute.

13  That -- that's my only question so far,

14  is whether you think you are the one that

15  drafted this.

16    A.  I don't -- I don't believe

17  that I was the author, no.

18    Q.  Okay.  But as director of

19  regulatory affairs covering Lakeland

20  during this time period, I think you said

21  you probably would have seen this before,

22  right?

23    A.  I believe so.  Mm-hmm.

24    Q.  Okay.  Do you know who did

Page 73

1  draft it?

2    A.  I don't, actually.

3    Q.  Okay.  That's fair.  All

4  right.  Let's go to Page .12.

5        This slide is titled

6  Legislative Actions Can Impact Us and Our

7  Customers.

8        And below that it says,

9  "State of Florida."

10        Do you see that?

11    A.  Yes.

12    Q.  Okay.  And then -- and I'm

13  not going to go through every bullet

14  point here.  But what generally is

15  discussed on this slide is legislative

16  changes in the state of Florida that

17  impacted the ability of pain clinics to

18  distribute controlled substances, right?

19    A.  To dispense them, yeah.

20    Q.  Right.  And this was done as

21  discussed in this slide starting in 2010,

22  right?

23    A.  Yes.

24    Q.  Okay.  And you are familiar

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 with those legislative changes, right?

2    A.   Yes.

3    Q.   Okay.  And going back to the

4 title of the slide, it says, "Legislative

5 actions can impact us and our customers."

6       In fact, many of these pain

7 clinics prior to 2010 were McKesson's

8 customers, right?

9       MR. SCHMIDT:  Objection.

10 Foundation.

11      THE WITNESS:  You are

12 talking about doctors who were

13 dispensing?

14 BY MR. BOGLE:

15   Q.   Correct.

16   A.   I'm not sure.  I'm not aware

17 of that.

18   Q.   Okay.  Do you know whether

19 prior to 2010 McKesson supplied

20 controlled substances to any pain clinics

21 in the state of Florida?

22   A.   My understanding is that a

23 division of McKesson, medical-surgical,

24 had -- their -- their customers at that

Page 75

1 time included both hospitals and doctors.

2 And there were some doctors to whom they

3 were selling some controls.

4    Q.   And another component of it

5 would be that prior to 2010, even after

6 2010, McKesson would sell controlled

7 substances to pharmacies that the pain

8 clinics would buy, the pain clinics would

9 buy from the pharmacies, right, as well?

10   A.   I'm not aware of it.

11   Q.   Not aware of that?  Okay.

12   A.   You're saying that we would

13 sell to a pharmacy and then they would

14 distribute it to a doctor?

15   Q.   Sell to the pain clinics,

16 right, so the pain clinic could dispense

17 to their patients?

18   A.   I'm not aware of that.

19   Q.   So specific to Florida,

20 prior to 2010, what was your

21 understanding of where these pain clinics

22 were getting the drugs from to distribute

23 them -- dispense them?  I'm sorry,

24 dispense.

Page 76

1    A.   From wholesalers,

2 manufacturers.

3    Q.   Okay.  But not from

4 McKesson, just from the manufacturers?

5 I'm trying to make sure we're speaking

6 the same language here.

7    A.   Well, with the

8 implementation of the pedigree law, there

9 were strong limitations that were put on

10 pharmacies how they could distribute --

11 distribute drugs, both Rx and controls.

12 They were limited by the DEA to 5 percent

13 of the overall volume.  But they had to

14 have a specific special license in order

15 to distribute at all.  And many of the

16 people who initially said, yeah, for 100

17 bucks I'll become a distributor, once

18 they recognized how onerous the

19 requirements were, they basically handed

20 it back to the State of Florida and said

21 we don't want to be in that business.

22      So I don't believe that our

23 customers, our pharmacy customers were

24 distributing controls to doctors and pain

Page 77

1 clinics.

2    Q.   Okay.  What about McKesson,

3 distributing directly to the pain clinics

4 that were dispensing?  In Florida, let's

5 talk about Florida, because I'm not

6 trying to get outside of your region

7 here --

8    A.   Right.

9    Q.   -- prior to 2010.

10      MR. SCHMIDT:  Let me just

11 say, I think there was an issue in

12 one of the earlier depositions

13 about geographic focus

14 restriction.  We're, I think, well

15 outside of it with Florida.  I'd

16 ask you to kind of focus on what's

17 at issue geographically.  And if

18 not, we'll obviously preserve our

19 objection and maybe seek relief on

20 that basis.

21      MR. BOGLE:  Yeah, I mean,

22 you're certainly entitled to

23 object, but there's no geographic

24 restrictions as to what I can ask.

Page 78

1    I'm aware of nothing of the sort.
2        MR. SCHMIDT:  I don't think
3    we understand that in that way in
4    terms of the judge ordering -- the
5    special master ordering that
6    discovery should be focused on the
7    jurisdictions that would be
8    subject to the first trial.
9    BY MR. BOGLE:
10       Q.   My question stands.  Do you
11   recall my question?
12       A.   Can you repeat it, please?
13       Q.   Yeah.  So prior to 2010 in
14   the State of Florida, was it your
15   understanding that McKesson was not
16   distributing to pain clinics that were
17   then dispensing the controlled
18   substances?
19       A.   Medical Surgical had some
20   customers who were receiving controls for
21   whom McKesson-Lakeland was actually doing
22   the pick, pack and ship for.
23       Q.   Okay.  And if we go to the
24   next page, .13.  Do you see the title

Page 79

1    slide is titled "Reaction."  And it
2    says -- the first bullet point says,
3    "Shift from dispensing physicians to
4    prescribing physicians."
5        Second bullet point says,
6    "Pill mill problem became a retail
7    pharmacy problem."
8        What do you understand that
9    second bullet point to mean?
10       A.   I think what it's saying is
11   because of the change in the law, which
12   basically prevented doctors from
13   dispensing controls, they started writing
14   scripts that were filled by pharmacies.
15       Q.   All right.  And as the next
16   bullet point notes, because of that in
17   the state of Florida, new pharmacy
18   applications increased dramatically
19   following the implementation of that law
20   in 2010, right?
21       A.   Yes.
22       Q.   And so when there's an
23   increase dramatically in pharmacies in
24   the State of Florida, that means that

Page 80

1    you're going to have specifically at
2    McKesson for the State of Florida, more
3    pharmacies that you've got to monitor and
4    operate due diligence for, right?
5        MR. SCHMIDT:  Objection.
6    Foundation.
7        THE WITNESS:  I believe so.
8    BY MR. BOGLE:
9        Q.   Okay.  And in fact that
10   happened, right?  There became more
11   pharmacies that the Lakeland distribution
12   center sold controlled substances to in
13   the State of Florida, because of this
14   increase in new pharmacies in 2010,
15   right?
16       A.   I'm not aware of the
17   specific numbers, but I imagine that was
18   the trend.
19       Q.   Okay.  And Florida
20   specifically, is it your understanding,
21   has historically had one of the highest
22   rates of diversion of opioids in the
23   country?
24       A.   Let me see.  Historically?

Page 81

1        Q.   Yeah.  So, well let me ask
2    you.  Here, we'll just look at the
3    document.  We'll cut to it.
4        (Document marked for
5        identification as Exhibit
6        MCK-Mahoney-5.)
7    BY MR. BOGLE:
8        Q.   I'll hand you what's marked
9    as Exhibit 1.1434, also marked as
10   Exhibit 5, and start with Bates
11   MCKMDL00403517.
12       That's as far as I can get
13   it.
14       Okay.  We'll start with the
15   e-mail just to introduce the document.
16   It's an e-mail from Krista Peck, June 10,
17   2014.
18       Do you see that?
19       A.   Yes.
20       Q.   On the first page?
21       And there are many
22   recipients.  I'm not going to go through
23   all of them.  But you see the second name
24   listed is yours, right?

Page 82

1    A.   Yes.
2    Q.   Okay.  And it says -- first
3 line says, "Attached is the regulatory
4 presentation to the DC ops team at
5 national sales conference in May."
6         Do you see that?
7    A.   Yes.
8    Q.   Okay.  This is a conference
9 that you would have attended, correct?
10   A.   I don't believe I was there.
11   Q.   But you were certainly
12 provided with the deck, at least
13 afterwards, right, based on this e-mail?
14   A.   Yes.
15   Q.   Okay.  If you look here on
16 page -- I believe it's .13.  The slide is
17 titled "Current Rx Drug Diversion
18 Trends."
19        Do you see that?
20   A.   Okay.
21   Q.   Do you see where I'm at?
22   A.   Yes, I do.
23   Q.   Okay.  And for oxycodone,
24 for example, in this chart, Florida is

Page 83

1 ranked number one for current Rx drug
2 diversion trends as of the data in 2013
3 based on the source?
4    A.   I think it actually says
5 highest dispensing, not diversion.
6    Q.   Okay.  The slide is titled
7 "Current Rx Drug Diversion Trends,"
8 right?
9    A.   That may be a misnomer.
10   Q.   Okay.  But we'll start with
11 that.  That's what the slide says, right?
12   A.   Yeah.
13   Q.   Okay.  And Florida is ranked
14 number one on this list per the data from
15 the DEA in 2013, right?
16   A.   Yes.
17   Q.   And for hydrocodone, Florida
18 is number five, right?
19   A.   Yes.
20   Q.   For hydromorphone, Florida
21 is number two, right?
22   A.   Yes.
23   Q.   And for oxymorphone, Florida
24 is number six, correct?

Page 84

1    A.   Yes.
2    Q.   Those are all opioid
3 products, right?
4    A.   Yes.
5    Q.   Okay.  This is a chart that
6 you've seen prior to today?
7    A.   Yes.  I mean -- okay.
8    Q.   Are you familiar with the
9 concept known as migration when it comes
10 to controlled substances?
11        MR. SCHMIDT:  Objection.
12   Vague.
13        THE WITNESS:  I have -- I'm
14   not sure.
15 BY MR. BOGLE:
16   Q.   Okay.  Not sure if you ever
17 heard that term used in the context of
18 controlled substances?
19   A.   I may have heard about it in
20 various modes or forms.
21   Q.   Okay.  Do you have any sense
22 of what that means, again focused on
23 controlled substances?
24   A.   I think that one of the

Page 85

1 things, for example, that was seen was
2 that as the states were doing their part
3 to fight the system, they were making
4 more tools available to doctors and
5 pharmacists that they could track what
6 their patients were doing.
7         So state by state, they were
8 implementing prescription monitoring
9 programs.  And some states were early to
10 embrace them, and some were later.
11        And I think that one of the
12 things that was observed was that that
13 was a strong tool that caused abuse to
14 move to states that did not have those
15 kinds of systems.
16        So as they were
17 implemented -- and I don't know when the
18 first one was implemented.  But they may
19 have moved from states where they were
20 implemented.  Maybe Kentucky and Ohio
21 were among the early ones.  And abuse
22 moved to states where there were less --
23 less strong monitoring programs.
24   Q.   Okay.  Have you heard of the

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 concept of migration used in the sense of
2 when controlled substances or even
3 illegal -- applies equally to illegal
4 drugs -- are supplied to a market,
5 oversupplied to a market, when that
6 market is oversupplied, the excess will
7 tend to migrate somewhere else?
8        MR. SCHMIDT:  Objection.
9   Vague.
10 BY MR. BOGLE:
11    Q.   Are you familiar with that
12 kind of concept, migration?
13    A.   I can understand --
14        MR. SCHMIDT:  Same
15 objection.
16        Go ahead.
17        THE WITNESS:  I understand
18 what you're saying.
19 BY MR. BOGLE:
20    Q.   Okay.  Does that make sense
21 to you?
22        MR. SCHMIDT:  Same
23 objection.  Vague.
24        THE WITNESS:  It sounds like

Page 87

1     it makes sense.
2 BY MR. BOGLE:
3    Q.   Okay.  And specifically
4 talking about the State of Florida, there
5 has been significant migration of drug
6 diversion out of the State of Florida up
7 to the east coast and the Midwest, right?
8    A.   I'm not sure.
9        (Document marked for
10       identification as Exhibit
11       MCK-Mahoney-6.)
12 BY MR. BOGLE:
13    Q.   I'm going to hand you what
14 I'm marking as Exhibit 1.1355, also
15 marked as Exhibit 6.  And it's Bates
16 Number MCKMDL00407451.
17        And, Mr. Mahoney, you see
18 this slide deck is titled "Prescription
19 Drug Abuse, the National Perspective."
20 And there's a date at the bottom of 2014.
21        Do you see that?
22    A.   Yes.
23    Q.   Okay.  Are you familiar with
24 this slide deck?

Page 88

1    A.   I'm not sure.
2    Q.   Okay.  Let me take a look
3 at -- there's one slide that I want to
4 look at here, and you can tell me whether
5 you're familiar with this slide.  Let's
6 go to .15.
7    A.   Okay.
8    Q.   And you see here, there's --
9 the slide is titled "Drug Diversion,
10 Migration Out of Florida."  And then
11 there's a map of the United States below
12 it.
13        Do you see that?
14    A.   Okay.  Yeah, mm-hmm.
15    Q.   You've seen this slide
16 before?
17    A.   Yeah, I've seen this before.
18 It may have had another title.  But --
19    Q.   Okay.  And you see here
20 what's depicted as the migration of
21 controlled substances out of Florida,
22 specifically in this depiction going up
23 through Georgia, Kentucky, Ohio and then
24 Missouri.

Page 89

1        Do you see that?
2    A.   Okay.
3    Q.   Do you see where I'm
4 referencing here?
5    A.   Yes, the little arrow train.
6    Q.   And this concept of
7 migration specifically out of the state
8 of Florida, of controlled substances into
9 the Midwest is something you've heard of
10 prior to today, right?
11    A.   Yes.
12    Q.   Okay.
13    A.   And again, I think this is
14 related to the enactment of those
15 prescription monitoring programs.
16        I think Missouri may have
17 been one of the last ones to implement.
18    Q.   Okay.
19        MR. BOGLE:  This is a decent
20 breaking point if you don't mind.
21 Quick break, I'll reset my
22 documents.
23        MR. SCHMIDT:  Okay.
24        THE VIDEOGRAPHER:  Remove

Page 90

1  your microphones.  The time is
2  10:12 a.m.  Going off the record.
3      (Short break.)
4      THE VIDEOGRAPHER:  We are
5  back on the record.  The time is
6  10:27 a.m.
7  BY MR. BOGLE:
8      Q.   All right, Mr. Mahoney.
9  While you were distribution center
10 manager for Lakeland distribution center,
11 it was -- you had ultimate responsibility
12 for every pill that left the distribution
13 center, correct?
14     A.   Yes.
15     Q.   And beginning in late 2005,
16 the DEA specifically began questioning
17 the distribution practices of the
18 Lakeland distribution center when it came
19 to opioids, right?
20     A.   Okay.
21     Q.   Do you recall that?
22     A.   Yes.  The timing, a lot of
23 that information, I believe, was conveyed
24 via a meeting that I wasn't in, so...

Page 91

1      Q.   Okay.  But it would have
2  been conveyed to you thereafter because
3  it pertained to your distribution center,
4  right?
5      A.   Yes, although I don't recall
6  it being immediately after.  I think
7  there may have been some analysis and
8  that kind of thing that was done in the
9  interim.
10     Q.   Okay.  We'll take a look at
11 it.  I've got documents for just about
12 all of it.  So that may help.
13     A.   Okay.
14     Q.   Do you recall, before we get
15 into the documents, that the DEA's
16 concerns beginning in late 2005 as to the
17 Lakeland distribution center focused
18 largely to the distribution of
19 hydrocodone to internet pharmacies?
20     A.   Yes.
21     Q.   I'm going to hand you what
22 I'm marking as Exhibit 1.1946, also
23 marked as Exhibit 7 to your deposition.
24     (Document marked for

Page 92

1  identification as Exhibit
2  MCK-Mahoney-7.)
3  BY MR. BOGLE:
4      Q.   And the start Bates number
5  is MCKMDL00496859.
6      You don't need to worry
7  about those numbers.  They just tell me
8  that I have to read them off.
9      Okay.  So Exhibit 7 to
10 introduce this, is a memorandum from the
11 DEA regarding an internet presentation
12 with McKesson Corp. on September 1, 2005.
13     Do you see that?
14     A.   Yes.
15     Q.   Okay.  And there's a
16 discussion thereafter.  But -- and I
17 believe this may be the meeting that you
18 were talking about that you weren't
19 present for.
20     A.   Right.
21     Q.   There's a listing of people
22 who were present.  Your name is not on
23 that list here, right?
24     A.   Right.

Page 93

1      Q.   Okay.  But thereafter, you
2  were made aware of the findings and
3  specifically what the DEA conveyed to the
4  people at McKesson who were there, right?
5      A.   Yes.
6      Q.   Okay.  All right.  Let's
7  take a look at this here.  It says, the
8  end of the first paragraph, "The purpose
9  of the meeting was to address the illegal
10 domestic internet pharmacy problem and
11 their source of supplies."
12     And it says, "Mr. Mapes
13 opened the meeting by presenting to the
14 representatives of McKesson Corp. a
15 PowerPoint briefing which explained the
16 common characteristics of internet
17 pharmacies and why their activities are
18 illegal."
19     Do you see that?
20     A.   Yes.
21     Q.   And Mr. Mapes, that's
22 Michael Mapes at the DEA, right?
23     A.   Yes.
24     Q.   Okay.  And there's bullet

Page 94

1 points below that. The next to the last
2 one says, "A review of the suspicious
3 order requirements, Title 21 Code of
4 Federal Regulations."
5         Do you see that?
6     A.   Yes.
7     Q.   Okay. So that was a part of
8 the PowerPoint briefing as described
9 here, right?
10    A.   Apparently.
11    Q.   Okay. And thereafter, the
12 next paragraph, it says, "After the
13 presentation, Mr. Mapes presented to the
14 representatives of McKesson Corp.
15 specific customers of McKesson Corp. who
16 have ordered substantial quantities of
17 hydrocodone products. These specific
18 customers of McKesson Corp. were" -- and
19 it lists United Prescription Services and
20 Ninth Avenue Pharmacy.
21        Do you see those two names?
22    A.   Yes.
23    Q.   And United Prescription
24 Services specifically was a customer of

Page 95

1 Lakeland at that time, right?
2     A.   Yes.
3     Q.   Okay. And it says,
4 "Mr. Mapes finalized the presentation by
5 advising the representatives of McKesson
6 Corp. that they needed to thoroughly
7 review the materials which had been
8 presented to them and review in depth the
9 purchasing patterns and quantities of
10 their customers. Representatives of
11 McKesson Corp. acknowledged understanding
12 of the material presented."
13        Do you see that reference?
14    A.   Yes.
15    Q.   Okay. And then if you go
16 into the third page of this document,
17 there is actually the PowerPoint
18 presentation here which I believe is
19 referred to on the first page.
20        Do you see that?
21    A.   Okay. Mm-hmm.
22    Q.   It says there, the first
23 slide, "Internet pharmacy data. Meeting
24 with McKesson Corporation, DEA

Page 96

1 headquarters. September 1, 2005."
2         And this PowerPoint slide
3 specifically is one that you've seen
4 before today, right, or this PowerPoint
5 deck, right?
6     A.   I'm not sure that I have.
7     Q.   Okay. This was not passed
8 on to you after this meeting?
9     A.   I -- I don't recall.
10    Q.   Okay. Let's take a look at
11 the next page. There's a slide there
12 that says, "Issues to consider."
13        Do you see that slide?
14    A.   Yes.
15    Q.   It says, "Frequency of
16 orders, size of orders, range of products
17 purchased."
18        Do you see those first three
19 bullet points?
20    A.   Yes.
21    Q.   Okay. And we're talking
22 about issues to consider. This is issues
23 to consider when trying to assess whether
24 an order is suspicious, right?

Page 97

1     A.   Right.
2     Q.   Okay. And then the
3 next-to-last bullet point says,
4 "Percentage controlled versus percentage
5 non-controlled."
6         Do you see that reference?
7     A.   Yes.
8     Q.   And that's talking about,
9 again, when you're doing suspicious order
10 monitoring, assessing the percentage of
11 controlled substances a customer is
12 purchasing versus the percentage of
13 non-controlled substances that same
14 customer is purchasing, right?
15    A.   Yeah. I guess in -- an
16 order would have multiple lines. Okay.
17 And I guess they say that each or -- each
18 line is an order. But yes, there are
19 multiple -- multiple lines with each
20 order typically.
21    Q.   Right. And specifically,
22 though, when you're assessing the
23 percentage of controlled substance
24 purchases versus the percentage of

Page 98

1 non-controlled, that's a way to assess
2 whether the percentage of controlled
3 substances is suspicious because it's
4 very high compared to the percentage of
5 non controlled for a customer, right?
6    A.   Yes.
7    Q.   Okay.  And that's one -- one
8 component of suspicious order monitoring
9 that can be done, right?
10   A.   Yes.
11   Q.   Okay.  And in fact,
12 that's -- there's a report called the --
13 at one point in time that was called the
14 Volakos report at McKesson that produced
15 exactly that kind of data, right?
16   A.   Yes.
17   Q.   Okay.  So when we're talking
18 about, at this point in time in late
19 2005, McKesson did have the ability, and
20 specifically at your distribution center,
21 to assess the percentage of controlled
22 substances versus non-controlled
23 substances being purchased by a McKesson
24 customer, right?

Page 99

1    A.   The percentage reports that
2 I had available to me in 2005 that were
3 controls to Rx were on a dollarized
4 basis.
5    Q.   Okay.
6    A.   So they didn't really
7 consider effectively whether something
8 was generic or brand.
9    Q.   Okay.  And that's certainly
10 a deficiency when it comes to being able
11 to monitor the controlled substances
12 versus non-controlled to detect whether
13 an order is potentially suspicious,
14 right?
15       MR. SCHMIDT:  Object to
16   characterization.
17       THE WITNESS:  That was the
18   method that we used when we were
19   discussing controls to Rx.
20 BY MR. BOGLE:
21   Q.   I understand that's the way
22 you're saying the report existed at that
23 point in time.  But let me ask sort of
24 two questions.  First of all, the data as

Page 100

1 to how much a customer had purchased from
2 McKesson, controls and non-controls, that
3 data existed within the company, right,
4 at that point in time?
5    A.   Yeah.  We had records on
6 customer purchases.
7    Q.   Right.  Right.  And so
8 that's something that -- I understand the
9 report that you were given, dollarized it
10 rather than listing how many specific
11 purchases were made.  But the actual
12 purchase information as to how many
13 purchases were made, was information that
14 was kept within the company, right, you
15 keep track of the sales?
16   A.   Yes.
17   Q.   And what's bought.  Okay.
18   A.   And -- excuse me?  The
19 last --
20   Q.   And what was bought.
21   A.   Yes.
22   Q.   Okay.  And so in 2005 then
23 in the September 2005 time frame, I think
24 you said it was dollarized, meaning you

Page 101

1 can tell how much the customer spent on
2 controls versus noncontrols, but not how
3 many specific items they purchased,
4 that's not -- that wasn't given to you in
5 the report, right?
6       MR. SCHMIDT:  Objection.
7   Characterization.
8       THE WITNESS:  Correct.
9 BY MR. BOGLE:
10   Q.   Okay.  Now, you would agree
11 with me that actually knowing a quantity
12 of how much was purchased, controls
13 versus noncontrols, is an easier way to
14 assess whether an order for controlled
15 substances is suspicious than looking
16 just at the dollar values, right?
17   A.   You know, I wish we had that
18 kind of information back then.  But the
19 way we had it to look at was either
20 dollarized or take a look at the -- the
21 listing of the orders that were put out
22 there.
23   Q.   So -- so my question simply
24 though was, because I think now, now you

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 can specifically look at the quantity of
2 item purchased, right?
3     A.   Yes.
4     Q.   Not just the dollarized?
5     A.   Yeah.
6     Q.   And you would agree with me
7 that that system is a better system as
8 far as detecting suspicious orders than
9 just looking at the dollar values, right?
10    A.   A lot of things we do today
11 is better than what we used to.
12    Q.   Okay.  That would be one,
13 right?
14    A.   Yes.
15    Q.   Okay.  And -- but going back
16 to what we talked about before though,
17 the specific amount of items, quantity of
18 items purchased, controls versus
19 noncontrols, that information existed in
20 McKesson's files in 2005, right?
21    A.   Yes.
22    Q.   And specifically when you're
23 looking at dollar values of purchases,
24 even in 2005, there was a component of

Page 103

1 opioid products that were generic, right?
2     A.   Yes.
3     Q.   And generic products
4 generally are cheaper, right?
5     A.   Yes.
6     Q.   And so if you're looking
7 just at the dollar values when a fair
8 component of the purchases for controlled
9 substances may be generic, you may get a
10 lower dollar value even though the
11 quantity is higher, right?
12    A.   Yes.  Yes.
13    Q.   In '05, hydrocodone for
14 example, some of the formulations of that
15 were generic, right?
16    A.   Yes.
17    Q.   Same is true for oxycodone,
18 right?
19    A.   Yes.  I think.
20    Q.   Going back to the slide deck
21 here.  I'm on Page .9.
22        There's a slide -- oh, I'm
23 sorry.
24        There's a second slide

Page 104

1 there, it's titled Suspicious Orders.  Do
2 you see that?
3     A.   Yes.
4     Q.   And the second bullet point
5 says, "Requires that registrants design
6 and operate system to identify suspicious
7 orders."
8        And that's similar to what
9 we saw in the letter from Mr. Rannazzisi
10 at the beginning of the deposition,
11 right?
12    A.   Yes.  We -- we were
13 supporting suspicious orders via a method
14 that -- that DU-45, which had been done
15 in conjunction with the DEA task force.
16    Q.   Yeah, I guess my question
17 was, this -- this bullet point reference
18 here is similar to what we saw in the
19 2006 letter from the DEA as far as
20 suspicious order monitoring, a component
21 of that was --
22    A.   Yes.
23    Q.   -- a requirement to design
24 and operate a system to identify

Page 105

1 suspicious orders, right?
2     A.   Yes.
3     Q.   Okay.  And the next bullet
4 point says, "Report suspicious orders to
5 DEA when discovered," right?
6        Do you see that reference?
7     A.   Mm-hmm, mm-hmm.
8     Q.   And again, in 2005, you knew
9 that was part of the regulatory
10 responsibility, right?
11    A.   Yes.
12    Q.   The next page, it continues,
13 another slide on suspicious orders.  It
14 says, "Reporting a suspicious order to
15 DEA does not relieve the distributor of
16 the responsibility to maintain effective
17 controls against diversion."
18        Do you see that?
19    A.   Yes.
20    Q.   What do you understand that
21 to mean?
22    A.   So --
23        MR. SCHMIDT:  Objection.
24 Just a second.  Sorry.

Page 106

1    Objection.  Foundation.
2    THE WITNESS:  So it says
3 that if -- if you report a
4 suspicious order, you're still
5 responsible to maintain effective
6 controls against diversion.
7 BY MR. BOGLE:
8    Q.   Right.  And what that really
9 means is, it's not enough just to report,
10 you've also got to try to stop the
11 diversion by not giving them the product
12 if you think the order is suspicious,
13 right?
14    A.   Right.
15    MR. SCHMIDT:  Objection.
16 Foundation.
17 BY MR. BOGLE:
18    Q.   And finally if we can go to
19 Page .15.  First slide is titled Summary.
20 And it says, "A pattern of drugs being
21 distributed to pharmacies who are
22 diverting controlled substances
23 demonstrates the lack of effective
24 controls against diversion by the

Page 107

1 distributor."
2    And then it says, "The DEA
3 registration of the distributor could be
4 revoked under public interest grounds."
5    Did I read those correctly?
6    A.   Yes.
7    Q.   Okay.  And in the next slide
8 continues and says, "Any distributor who
9 is selling controlled substances that are
10 being dispensed outside the course of
11 professional practice must stop
12 immediately."
13    Do you see that reference?
14    A.   Yes.
15    Q.   Okay.  So in this slide, you
16 would agree with me the DEA is conveying
17 some serious concerns about the potential
18 for diversion of controlled substances to
19 McKesson, right?
20    A.   Yes.
21    MR. SCHMIDT:  Object to the
22 characterization.  You've got to
23 give me just a second to lodge an
24 objection.

Page 108

1    THE WITNESS:  Okay.  Sorry.
2    MR. SCHMIDT:  That's okay.
3 BY MR. BOGLE:
4    Q.   And after this presentation,
5 those concerns would have been conveyed
6 to you as a distribution center manager,
7 right?
8    A.   I believe they would have.
9    Q.   Okay.
10    A.   I'm not sure exactly when
11 they were.
12    Q.   Okay.  Do you have any
13 reason to think there was some
14 substantial delay after this meeting
15 before you received word that DEA has
16 come and talked to us and they are
17 concerned about diversion of controlled
18 substances?
19    MR. SCHMIDT:  Object to the
20 characterization.
21    THE WITNESS:  My
22 recollection in the wake of this
23 was that there had been a meeting,
24 and I believe that it would have

Page 109

1 been Gary Hilliard who I think had
2 been one of the attendants --
3 attendees.
4 BY MR. BOGLE:
5    Q.   Do you want to look on the
6 first page, the attendees are there?
7    A.   Yes.  Gary Hilliard.
8    Q.   Okay.
9    A.   And I knew Gary.  He was the
10 director of regulatory affairs.  And he
11 didn't -- he didn't express it like that.
12 Rather, he was asking me some questions.
13    Q.   What questions did he ask
14 you?
15    A.   I don't recall exactly what
16 they were.  But they were -- they were
17 not -- they were not directly -- they --
18 they weren't direct, or specific.  He was
19 asking questions about what we were
20 seeing.
21    Q.   Okay.  So after this
22 presentation in September, did
23 Mr. Hilliard talk to you specifically
24 about United Prescription Services, which

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 is one of the pharmacies we talked about?
2     A.   I don't recall having a
3 specific conversation about United with
4 Gary.
5     Q.   Okay.  So you said he asked
6 you some specific questions.  I
7 understand it's more than ten years ago,
8 and you don't understand the specific
9 questions he asked.
10     But are you saying that he
11 did not convey to you at that point in
12 time that the DEA came to us and had
13 serious concerns about diversion of
14 controlled substances?
15     A.   I think -- I think the way
16 it was expressed to me was that the DEA
17 had meetings with McKesson and other
18 distributors.  And that there were some
19 issues that were raised to them.
20     Q.   Okay.  But you don't recall
21 them telling you, Mr. Hilliard or anybody
22 else telling you specifically what those
23 issues were, is that fair?
24     A.   Not -- not immediately after

Page 111

1 the --
2     Q.   When you say not immediately
3 after, do you recall a specific point in
4 time that you were made aware of these
5 concerns?
6     A.   I remember speaking with --
7 with Gary and -- and Don Walker I
8 believe, in October, November, December,
9 about what we were seeing and what we
10 were going to do with regard to it.
11     Q.   Okay.  October, November,
12 December of 2005?
13     A.   Yeah.
14     Q.   Okay.  All right.  So -- but
15 we can agree in looking at this
16 PowerPoint deck that the DEA is pretty
17 clearly conveying that distributors like
18 McKesson need to have a heightened watch
19 for potential diversion of controlled
20 substances, right?
21     A.   Yes.
22     MR. SCHMIDT:  Object to the
23 characterization.
24 BY MR. BOGLE:

Page 112

1     Q.   And pretty quickly after
2 this meeting in September 2005, there
3 were some additional concerns expressed
4 by the DEA about continued distribution
5 of controlled substances out of Lakeland
6 that they felt were indicative of
7 diversion, right?
8     MR. SCHMIDT:  Objection.
9 Characterization.
10     THE WITNESS:  I'm not sure
11 exactly when or how you're talking
12 about.
13 BY MR. BOGLE:
14     Q.   Okay.  I'm going to hand you
15 what I'm marking as 1.1789.  Also marked
16 as Exhibit 8.
17     Start Bates Number is
18 MCK_MDL_00496876.
19     (Document marked for
20     identification as Exhibit
21     MCK-Mahoney-8.)
22 BY MR. BOGLE:
23     Q.   Okay.  And you see this is
24 another memorandum from Michael Mapes at

Page 113

1 the DEA.  This time referencing a meeting
2 between Office of Diversion Control and
3 McKesson Corp. on January 3, 2006.
4     Do you see that?
5     A.   Yes.
6     Q.   Okay.  And in the second
7 paragraph of the letter you see that you
8 were one of the people present at this
9 meeting, right?
10     A.   Yes.
11     Q.   Okay.  Do you recall this
12 meeting?
13     A.   Yes.
14     Q.   Okay.  And going down
15 further on this page, do you see where it
16 says Mr. Mapes opened the meeting?  That
17 reference.
18     A.   Yes.
19     Q.   Three-quarters -- "Mr. Mapes
20 opened the meeting by making
21 introductions and covering the background
22 of previous meetings and telephonic
23 conversations between OD and McKesson
24 Corp.  Specifically addressed were the

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 following."
2        And the first bullet point
3 says, "A meeting between McKesson Corp.
4 and E-commerce section was held
5 September 1, 2005, at which time McKesson
6 Corp. was given a full detailed briefing
7 of the OD's distributors initiative to
8 address the internet pharmacy problem."
9        Do you see that?
10    A.    Yes.
11    Q.    And that's referencing the
12 meeting we just reviewed a moment ago,
13 right?
14    A.    I understand.
15    Q.    Okay.  And then the next to
16 last bullet point on that page says,
17 "Pharmacies of particular concern were
18 located in Florida, Texas and Colorado."
19        Do you see that?
20    A.    Yes.
21    Q.    And then the next bullet
22 point said -- and this is referring back
23 to that September 1, 2005 meeting, right?
24    A.    Okay.

Page 115

1    Q.    Do you see that?  These
2 bullet points are all below that, that
3 reference?
4    A.    I thought it refers to the
5 January 3rd meeting.
6    Q.    Okay.  Let's go back then.
7        Where I started it says,
8 "Mr. Mapes opened the meeting by making
9 introductions and covering the background
10 of previous meetings" --
11    A.    Right.
12    Q.    -- "and telephonic
13 conversations between OD and McKesson
14 Corp.  Specifically addressed were the
15 following:"
16        And then all of these bullet
17 points are below that.
18        Do you see that?
19    A.    Yes.
20    Q.    Okay.  So this -- that would
21 indicate to you that he's talking about
22 meetings prior to this January 3rd of '06
23 meeting, right?
24        MR. SCHMIDT:  Object to the

Page 116

1 characterization.
2        THE WITNESS:  So he's
3 talking about the September
4 meeting in the first bullet,
5 right?
6 BY MR. BOGLE:
7    Q.    Correct.
8    A.    And then there are other
9 things that are discussed in this
10 meeting.
11    Q.    Right.  But I'm talking
12 about just these bullet points on this
13 page right here.  These are all bullet
14 points giving a background of previous
15 meetings prior to the one in January 3 of
16 '06.
17        You see that, right?
18        MR. SCHMIDT:  Same
19 objection.
20        THE WITNESS:  Okay.
21 BY MR. BOGLE:
22    Q.    Do you have any reason to
23 disagree with that?
24        MR. SCHMIDT:  Same

Page 117

1 objection.
2        THE WITNESS:  So you're
3 saying that the first -- the first
4 bullet refers to the September
5 meeting.  And then the next four
6 all refer to that?
7 BY MR. BOGLE:
8    Q.    That's my reading of this
9 document.  I'm asking you if you have any
10 reason to think that reading is wrong.
11        MR. SCHMIDT:  Objection.
12 Foundation.
13        THE WITNESS:  No.
14 BY MR. BOGLE:
15    Q.    Okay.  And so looking back
16 to the next-to-last bullet point on the
17 first page.  It says, "Pharmacies of
18 particular concern were located in
19 Florida, Texas, and Colorado."
20        Then it says, the bullet
21 point below that, "Specifically addressed
22 concerns with United Prescription
23 Services, a current customer of
24 McKesson."

Page 118

1     Do you see that?
2     A.   Yes.
3     Q.   And we know from looking at
4  the prior memo from the September meeting
5  there were concerns specifically
6  addressed in that meeting about United
7  Prescription Services, right?
8     A.   Yes.
9     Q.   We can pull it back up if
10 you need to.
11    A.   No, I understand.
12    Q.   Okay.  So then if you go --
13 we're on Page 2 now.  Here he's outlining
14 things that happened after that meeting.
15 He says in the next bullet point, "On
16 October 6, 2005, Mr. Mapes called
17 Mr. Gilbert to discuss comments the
18 E-commerce section had received that
19 McKesson Corp. was not taking the
20 internet pharmacy problem seriously.
21 Mr. Mapes was assured by Mr. Gilbert that
22 McKesson Corp. was taking the matters
23 seriously and was working to change their
24 procedures."

Page 119

1     Do you see that?
2     A.   Yes.
3     Q.   Okay.  Who is Mr. Gilbert?
4     A.   He's -- he is a lawyer.
5     Q.   One of McKesson's counsel at
6  the time?
7     A.   Yes.
8     Q.   Okay.  And then -- go ahead.
9     A.   He's an external lawyer.
10    Q.   Okay.  Outside counsel?
11    A.   Yes.
12    Q.   Fair.  So the next bullet
13 point -- now we are in October 10, 2005,
14 "A DEA investigator from the Tampa
15 district office contacted Bill Mahoney at
16 the McKesson distribution center in
17 Lakeland, Florida and expressed concerns
18 of hydrocodone sales to United
19 Prescription Services."
20    Do you see that?
21    A.   I see it.
22    Q.   You know that reference is
23 to you, right?  That Bill Mahoney there
24 is you?

Page 120

1     A.   Yes.
2     Q.   Okay.
3     A.   I don't recall that contact
4  specifically.  But I see it.
5     Q.   Okay.  Are you saying that
6  that contact did not occur on that day?
7     A.   No.
8     Q.   You're not saying that?
9     A.   Right.  I don't have a
10 recollection.
11    Q.   You don't recall either way,
12 but do you have any reason to dispute
13 this reference --
14    A.   No.
15    Q.   -- that that contact was
16 made to you?
17    A.   No.
18    Q.   The next bullet point says,
19 "The E-commerce section retrieved ARCOS
20 data which revealed that between
21 October 10 and October 21, 2005, the
22 following alleged internet pharmacies
23 received the identified quantities of
24 hydrocodone."  And then it lists six

Page 121

1  pharmacies below that.
2     Do you see those?
3     A.   Yes.
4     Q.   Okay.  The first is United
5  Prescription Services, which we talked
6  about before, that during this 11-day
7  period received 252,100 dosage units of
8  hydrocodone.
9     Do you see that?
10    A.   Yes.
11    Q.   Okay.  And this is all
12 talking about from McKesson, right?
13    A.   Yes.
14    Q.   And below that is Universal
15 Rx during that same 11-say period,
16 receiving 254,700 dosage units of
17 hydrocodone.
18    Do you see that?
19    A.   Yes.
20    Q.   The next is Bi-Wise
21 Pharmacy, 158,400 dosage units of
22 hydrocodone on during that 11-day period.
23    Do you see that?
24    A.   Yes.

Page 122

1  Q.   Then there's Avee Pharmacy,
2  520,200 dosage units of hydrocodone
3  during that 11-day period from McKesson.
4        Do you see that?
5  A.   Yes.
6  Q.   And then there's
7  MediPharm-Rx, 500,900 dosage units of
8  hydrocodone in 11 days.
9        Do you see that?
10  A.   Yes.
11  Q.   And the last one is Accumed
12  Pharmacy, 404,400 dosage units of
13  hydrocodone in that same 11-day period.
14        Do you see that?
15  A.   Yes.
16  Q.   And these are all -- this is
17  all information that you've seen before
18  today, right?
19  A.   Yes.
20  Q.   Okay.  And then it goes on
21  in the letter, it says, "Mr. Rannazzisi
22  then addressed the representatives of
23  McKesson Corp. and informed them that it
24  was his concerted opinion, based on the

Page 123

1  information presented, the DEA needed to
2  ask for the surrender of McKesson's
3  Lakeland distribution center registration
4  or DEA would pursue an order to show
5  cause against the DEA registration of the
6  McKesson facility in Lakeland, Florida."
7        Do you see that?
8  A.   Yes.
9  Q.   Okay.  And before we go on
10  further on that.  These six pharmacies
11  were all customers of the Lakeland
12  distribution center, right?
13  A.   Yes.
14  Q.   Okay.  And so we understand,
15  when he -- Mr. Rannazzisi references an
16  order to show cause, that's an
17  administrative proceeding where the DEA
18  can file to have McKesson, in this
19  circumstances, DEA registration to sell
20  controlled substances either suspended or
21  revoked, right?
22  A.   Yes.
23  Q.   And if that happens, you
24  can't sell controlled substances during

Page 124

1  that period.  Or if it's revoked, you
2  can't sell them at all, right?
3  A.   Correct.
4  Q.   Okay.  And ultimately, as to
5  Lakeland here, the DEA did file for an
6  order to show cause against the Lakeland
7  distribution center, right?
8  A.   Yes.
9  Q.   And going on in this letter
10  a little further down on the page, do you
11  see where it says, "Through the course of
12  the above discussion"?
13  A.   Mm-hmm.
14  Q.   It says, "Through the course
15  of the above discussion, McKesson Corp.
16  by their own admission was unable to
17  provide a plausible explanation for the
18  sales of over two million dosage units of
19  hydrocodone in a 21-day period to
20  pharmacies previously identified by DEA
21  to McKesson Corp."
22        Do you see that?
23  A.   Yes.
24  Q.   Okay.  After this meeting in

Page 125

1  January 2006, were you aware that
2  Mr. Gilbert, outside counsel for
3  McKesson, wrote the DEA requesting that
4  the DEA not proceed with these order to
5  show cause proceedings?  Were you aware
6  of that?
7  A.   I believe so.
8        (Document marked for
9     identification as Exhibit
10     MCK-Mahoney-9.)
11  BY MR. BOGLE:
12  Q.   I'm going to hand you what
13  I'm marking as Exhibit 1.1963, also
14  marked as Exhibit 9.  Bates Number
15  MCKMDL00571360.
16        What we see here -- I'll
17  introduce the e-mail first, then we'll go
18  into the letter.  It's from a Sherry
19  Cameron, January 18, 2006.  Do you see
20  that, the date on the e-mail there?
21  A.   Yes.
22  Q.   Okay.  And one of the
23  recipients -- I'm not going to read all
24  of them.  But one of the recipients is

Page 126

1 you, right?

2    A.   Yes.

3    Q.   Okay.  And the subject is,

4 "Letter to DEA regarding internet

5 pharmacies."  And then it's noted,

6 "Attached is a copy of the letter that

7 went out to DEA today."

8       Do you see that?

9    A.   Okay, yeah.

10    Q.   Let's take a look at a

11 couple components of this letter.  First

12 let's go to Page .3.

13       The second sentence in this

14 paragraph says, "After the September

15 meeting with DEA, senior management

16 responsible for all McKesson distribution

17 centers were provided with a summary of

18 the issues raised by DEA about internet

19 pharmacies and DEA's view of what

20 constitutes an illegal internet

21 pharmacy."

22       Do you see that?

23    A.   Yes.

24    Q.   So at least what Mr. Gilbert

Page 127

1 is representing here, is the materials

2 that we looked at from September 2005

3 from that DEA meeting, that at least a

4 summary of that had been provided to

5 people like you prior to January 18,

6 2006, right?

7    A.   I'm not sure if I'm included

8 in senior management.  But I may have

9 seen -- I'm sure I saw some information

10 on internet pharmacy.

11    Q.   Okay.  Do you think -- do

12 you think you should have been provided

13 that information?

14       MR. SCHMIDT:  Objection.

15    Foundation.

16       THE WITNESS:  I believe I

17    was in some format.

18 BY MR. BOGLE:

19    Q.   Okay.  If you go to the next

20 page -- I'm looking at the next-to-last

21 sentence on Page .4.

22       And Mr. Gilbert writes

23 here -- he says, "For example, the

24 Lakeland DC serves about 1,700 customers

Page 128

1 and more than 1,400 purchased controlled

2 substances from the facility.  DEA has

3 stated that monthly sales of over 5,000

4 dosage units of hydrocodone should be

5 used as a flag to as to whether the

6 pharmacy is dispensing legitimate

7 prescriptions.  However, excluding the

8 six pharmacies identified by DEA, more

9 than 85 other pharmacy customers order

10 more than 5,000 dosage forms of

11 hydrocodone per month from this

12 facility."

13       Do you see that?

14    A.   Yes.

15    Q.   Okay.  And so what's being

16 referenced here -- first of all, this

17 reference to anything more than 5,000

18 dosage units of hydrocodone being a

19 potential flag, that's something that

20 you've seen before today, right?

21    A.   Yes.

22    Q.   Okay.  And on a monthly

23 basis, that's what's being referred to,

24 right?

Page 129

1    A.   Yes.

2    Q.   Okay.  And so what

3 Mr. Gilbert is indicating here is, it's

4 not just the six pharmacies, but 85 other

5 ones at your Lakeland facility at this

6 point in time, they're getting more than

7 5,000 dosage units of hydrocodone per

8 month, right?  That's what he's saying

9 there?

10    A.   Yes.

11    Q.   Okay.  And that would have

12 been while you were the distribution

13 center manager, right?

14    A.   Yes.

15    Q.   Okay.  So after being made

16 aware that the DEA's view was that

17 anything over 5,000 dosage units a month

18 for hydrocodone was a potential flag, did

19 you or anyone at McKesson go back and

20 look at these other 85 pharmacies and

21 assess whether they should be cut off,

22 have their orders blocked?

23    A.   I believe we did some

24 review.  I'm not sure exactly how it was

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 conducted.

2     Q. Okay. Would you have been
3 involved in conducting it?

4     A. I believe so.

5     Q. Okay. And so these other 85
6 pharmacies, we'll talk about the other
7 six as we go along, but he references 85
8 other ones. None of those other
9 customers were cut off, were they?

10     MR. SCHMIDT: Objection.
11 Foundation.

12     THE WITNESS: I'm not sure.

13 BY MR. BOGLE:

14     Q. Okay. Can you recall as you
15 sit here today, any one customer out of
16 those 85 that was cut off?

17     A. Between October and January?

18     Q. Let's say at any point in
19 time in 2006 or 2005.

20     A. I'm not -- I'm not sure
21 about dates. But I know that I did cut
22 off some customers, certainly 2006.

23     Q. Okay. Out of those 85 here?

24     A. I'm not sure. I don't have

Page 131

1 a list of the 85.

2     Q. Okay. But going forward
3 after this -- after January 2006, 5,000
4 dosage units per month was not used as
5 any sort of hard cut-off for customers,
6 was it, for hydrocodone?

7     A. No, I don't believe so.

8     Q. Okay. We talked about the
9 fact, a moment ago, that the DEA did
10 proceed with order to show cause
11 proceedings against McKesson as to the
12 Lakeland distribution center. I just
13 want to take a look at some more
14 information related to that.

15     I'm going to hand you what
16 I'm marking as Exhibit 1.1943, which is
17 also Exhibit 10.

18     (Document marked for
19 identification as Exhibit
20 MCK-Mahoney-10.)

21     MR. BOGLE: Start Bates is
22 MCK_MDL_00496306.

23 BY MR. BOGLE:

24     Q. Okay. Start by sort of

Page 132

1 orienting you to this document since it's
2 a larger one here. You see on the front
3 page there is a list of pleadings from
4 the order to show cause proceedings
5 involving Lakeland. Do you see that
6 generally?

7     A. Yes.

8     Q. Okay. Have you seen this
9 before, this document?

10     A. I'm not sure.

11     Q. Okay. All right. Let's
12 take a look first at, looking at the
13 Bates numbers, it's 6309, excuse me.

14     I think it's the third page,
15 or the fourth page of the document?

16     A. Mm-hmm.

17     Q. And you see this is the
18 actual order to show cause that was filed
19 by the DEA, do you see that?

20     A. Yes.

21     Q. Okay. And you've seen this
22 before, right?

23     A. Yes.

24     Q. Okay. And what was being

Page 133

1 requested here was an order to show cause
2 to McKesson to explain why its license to
3 sell controlled substances should not be
4 revoked at the Lakeland distribution
5 center, right?

6     A. Yes.

7     Q. Okay. Which is -- that's
8 serious, right? That's a serious thing
9 to happen, isn't it?

10     A. Absolutely.

11     Q. Okay. That's not a measure
12 that DEA takes very frequently, do they?

13     A. No.

14     Q. And looking at the order to
15 show cause here, under Number 3, it says,
16 "In an April 27, 2001 policy statement
17 entitled Dispensing and Purchasing
18 Controlled Substances Over the Internet,"
19 and it gives the reference, "DEA
20 delineated certain circumstances in which
21 prescribing over the internet is
22 unlawful."

23     Do you see that?

24     A. Yes.

Page 134

1   Q.   Have you ever seen that
2 policy statement before, from '01?
3   A.   I've seen reference to it.
4 I am not sure if I've seen the statement
5 itself.
6   Q.   Okay.  So when you got this,
7 this order to show cause and saw this
8 reference, did you make an effort to try
9 to track that actual policy statement
10 down to review it to make sure you
11 understood it?
12   A.   I'm not sure.
13   Q.   Okay.
14   A.   I think I may have seen
15 information which was a distillation of
16 it.
17   Q.   Okay.  Around this time
18 period, in '06, or some other time
19 period?
20   A.   I assume so.
21   Q.   Well, that -- sorry.  Let me
22 ask it different -- go ahead.
23   A.   Well, you were saying that,
24 based on this, did that trigger me to go

Page 135

1 look at it.
2   Q.   Correct.
3   A.   Okay.  And I think that I
4 acquired in some form, but I'm not sure
5 exactly if I saw that itself.
6   Q.   Okay.  So when you saw this
7 reference in the order to show cause in
8 2006 and you inquired, is that because
9 you had not heard of that policy before?
10   A.   No, I think I had heard of
11 it.  But maybe I looked at it closer.
12 You know, to try to understand more
13 specifically what all was included.
14   Q.   Okay.  So the next sentence
15 where we left off says, "Many internet
16 pharmacies bypass a legitimate
17 doctor/patient relationship usually by
18 use of a cursory online questionnaire or
19 perfunctory telephone consult with a
20 doctor who has a contractual arrangement
21 with the online pharmacy and is often
22 paid on the basis of prescriptions
23 issued.  When the established safeguards
24 of an authentic doctor/patient

Page 136

1 relationship are lacking, controlled
2 substance prescription drugs cannot only
3 be misused, but also potentially" --
4 "also present potentially serious health
5 risks to patients.  Such rogue internet
6 pharmacies facilitate the easy
7 circumvention of legitimate medical
8 practice and dispense quantities of
9 controlled substances far beyond what
10 normal walk-in or mail-order pharmacies
11 dispense."
12       Do you see that?
13   A.   Yes.
14   Q.   This term "rogue internet
15 pharmacies," what do you understand that
16 to mean?
17   A.   I understand it to mean
18 illegal -- pharmacies that are acting
19 illegally to sell hydrocodone or
20 oxycodone or other -- other products.
21   Q.   Okay.
22   A.   In some cases I think it was
23 Viagra and Cialis and that kind of thing.
24   Q.   Okay.  And -- but

Page 137

1 specifically in the order to show cause
2 in Lakeland it was hydrocodone?
3   A.   Right.  Yes.
4   Q.   I understand that you're
5 talking more generally and that's fine.
6   A.   Right.
7   Q.   So let's go to Number 5 on
8 the order to show cause.
9   A.   Page 5?
10   Q.   No.  I'm sorry, it's
11 Number 5.
12   A.   Oh, okay.
13   Q.   Yeah, I thought that might
14 be easier to...
15   A.   Yeah.
16   Q.   It says, "Subsequently," and
17 this is subsequent to the September 1,
18 2005 meeting.  Do you see that, that's
19 the prior paragraph?
20   A.   Yes.
21   Q.   "Subsequently DEA officials
22 reviewed ARCOS reports for the period
23 October 1, 2005 to January 31, 2006, and
24 found that seven Florida pharmacies were

Page 138

1 still acquiring extraordinary quantities
2 of hydrocodone. Despite its knowledge of
3 suspicious internet practices,
4 McKesson-Lakeland was engaged in a
5 continuing practice of supplying
6 hydrocodone to these seven pharmacies."
7      Do you see that?
8      A.   Yes.
9      Q.   You've seen that allegation
10 before today, right?
11      A.   Yes.
12      Q.   And then they go on to talk
13 about some of the specific pharmacies. I
14 wanted to look at Number 8 here on the
15 list. It says, "A further review of
16 ARCOS data for the full year 2005
17 indicated that MediPharm and Universal
18 ranked sixth and ninth respectively in
19 the nation for hydrocodone purchases.
20 Furthermore, for the full year 2005,
21 MediPharm, Universal, Avee and United
22 ranked Number 1 through 4 for purchases
23 of hydrocodone in the state of Florida."
24      Do you see that?

Page 139

1      A.   Yes.
2      Q.   Okay. And McKesson at this
3 point in time in 2005 had the ability to
4 see how much a customer was purchasing
5 from McKesson, hydrocodone specifically,
6 versus other customers of McKesson,
7 right? You can rank your own customers
8 as far as what they were purchasing?
9      MR. SCHMIDT: Objection.
10 BY MR. BOGLE:
11      Q.   Right?
12      MR. SCHMIDT: Object to
13 form. Compound.
14      THE WITNESS: I'm not sure
15 if I saw that kind of a ranking
16 internally.
17 BY MR. BOGLE:
18      Q.   Yeah, so -- and I'll
19 rephrase the question, because maybe it
20 was a little -- a bad question.
21      McKesson in 2005 had the
22 ability to assess how much a specific
23 customer was purchasing of hydrocodone
24 versus other McKesson customers, right?

Page 140

1      A.   Yes.
2      Q.   Now I'm doing Number 10
3 here. It says, "An analysis of ARCOS
4 data regarding purchases made during the
5 four-month period, October 2005 through
6 January 2006, indicated that the national
7 average and Florida average hydrocodone
8 purchases was approximately 24,000
9 tablets per pharmacy."
10      Do you see that?
11      A.   Yes.
12      Q.   Okay. And then it says,
13 "Over that same four-month period, the
14 seven internet pharmacies received
15 between 245,000, and 3.5 million tablets.
16 Most of these hydrocodone tablets were
17 acquired from McKesson-Lakeland."
18      Do you see that?
19      A.   Yes.
20      Q.   Okay. And that's an
21 accurate statement, right, as far as how
22 much -- that most of those hydrocodone
23 pills for these seven pharmacies were
24 obtained from McKesson-Lakeland, right?

Page 141

1      A.   I -- I'm not sure what the
2 ratio was, but I don't have any reason to
3 disagree.
4      Q.   Okay. And the last thing I
5 want to look at on the order to show
6 cause is Number 12.
7      It says, "DEA investigators
8 later commenced an analysis of all
9 reported purchases and purchase records
10 of controlled substances to establish
11 percentages of sales for the seven
12 pharmacies. For the month January 2006,
13 the percentage of sales that were
14 hydrocodone sales for these seven
15 pharmacies were as follows: Accumed,
16 77.7 percent."
17      Do you see that?
18      A.   Yes.
19      Q.   That, that ratio of
20 hydrocodone versus overall purchases
21 would be a red flag, right?
22      MR. SCHMIDT: Objection.
23 Foundation.
24      THE WITNESS: Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

BY MR. BOGLE:

Q. Okay. I mean that's a very high number, we can agree on that, right?

A. Yes.

Q. And then Avee is listed at 79.7 percent. Bi-Wise, 83.3 percent. MediPharm, 87.6 percent. Trelles, 41.3 percent. United, 90.1 percent. And Universal, 77 percent.

And that's hydrocodone, be the percentage of hydrocodone of their overall purchases. Do you see that?

A. On a -- on a dosage unit basis?

Q. Right.

A. Okay.

Q. Percentage of sales is what it says -- I'm sorry. That's the reference. Dollarized?

A. Okay. I agree that they are high percentages.

Q. Okay. All right. You don't have any reason to disagree that all of those numbers would present red flags for

Page 143

potential diversion, right?

MR. SCHMIDT: Objection. Foundation.

THE WITNESS: I would agree that they're high.

BY MR. BOGLE:

Q. Right. And when you see a number -- numbers that are that high, there is concern for potential diversion, right?

A. Concern, yeah, right.

Q. Do you know what the averages were at this point in time, 2005, 2006 the DEA provided as far as percentages of hydrocodone versus overall purchases?

A. I don't.

Q. But you know all these numbers were well above what even a McKesson customer would even average during that time frame, right?

A. I imagine --

MR. SCHMIDT: Objection. Foundation.

Page 144

BY MR. BOGLE:

Q. I'm sorry?

A. I imagine they were.

Q. Okay. And then the next sentence where we left off says, "These percentages of hydrocodone sales are clearly indicative of a large scale internet dispensing activity and are far beyond the hydrocodone sales activities of a true walk-in pharmacy or mail order pharmacy."

Do you see that?

A. I see it.

Q. Do you have any reason to dispute the accuracy of that statement, that sentence?

MR. SCHMIDT: Objection. Foundation.

THE WITNESS: I'm not sure. I went to multiple pharmacies listed here, and I didn't see anything that told me that it was a rogue operation.

BY MR. BOGLE:

Page 145

Q. Okay. You went at what point in time, before or after this order to show cause? We'll start there.

A. Oh, before the order, yeah.

Q. So you went -- so could you recall which of these seven pharmacies you visited?

A. I know I visited Avee, Bi-Wise, MediPharm.

Q. When you say visited, you're talking about actually -- you're talking about going to the pharmacy itself, right?

A. Went to the site, yeah.

Q. As part of those visits, did you ask for them to tell you which doctors were doing the prescribing of hydrocodone for what they were filling?

A. In the wake of the earlier activity, we had implemented a questionnaire system. And I used that as the basis for some of my discussion with them. I don't think that I asked specifically who the doctor was that was

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 prescribing the scripts that they were
2 filling.
3     Q.   Okay.  That's something that
4 you guys do now though, right, when
5 there's concerns about potential
6 diversion?
7     A.   Sometimes, yes.
8     Q.   Okay.  Because looking at
9 the doctors that are prescribing can give
10 you more information about whether there
11 is concerns about those doctors, right?
12     A.   Yeah.  If certain parameters
13 are met, then we do request information
14 about the doctors who are the leading
15 prescribers.
16     Q.   Do today, right?
17     A.   Yes.
18     Q.   But not in 2005 or 2006,
19 right?
20     A.   No, I don't believe we were.
21     Q.   Okay.  We can go now to
22 Bates page ending 6326 on this document.
23          And I just want to start
24 here to introduce what this is referring

Page 147

1 to.  Do you see the title here,
2 "Diversion investigator Michael Mapes
3 proposed testimony."
4     A.   Yes.
5     Q.   Do you see that reference?
6     A.   Mm-hmm.
7     Q.   And again, Michael Mapes was
8 one of the DEA agents that we saw
9 earlier, right, head of the E-commerce
10 section at that time, right?
11     A.   Right.
12     Q.   And so going a couple more
13 pages in to his proposed testimony -- I'm
14 looking at Page 6328.  And the paragraph
15 in the middle that says, "Mr. Mapes will
16 testify."
17          Do you see that?
18     A.   Mm-hmm.
19     Q.   It says, "Mr. Mapes will
20 testify that he concludes that seven
21 Tampa, Florida area internet pharmacy
22 operations have been distributing
23 controlled substances in violation of
24 Title 21 United States Code Sections 829

Page 148

1 and 841(a)(1) in that the owners,
2 pharmacists, and employees all have
3 direct knowledge that there's no
4 legitimate physician/patient relationship
5 established between the purported
6 prescribing physician and the customers
7 who ordered controlled substances
8 directly through the websites.  Each of
9 these pharmacies received hydrocodone
10 distribution is from McKesson-Lakeland."
11          Do you see that?
12     A.   Mm-hmm.
13     Q.   And that's the same seven
14 pharmacies that we just looked at a
15 moment ago, right?
16     A.   Yes.
17     Q.   And those were the seven
18 pharmacies that were at issue in the
19 order to show cause, right?
20     A.   Yes.
21     Q.   Now, in and around the 2006
22 time frame, McKesson-Lakeland had sales
23 of controlled substances of about --
24 strike that.

Page 149

1          In and around the 2006 time
2 frame, controlled substances accounted
3 for about 15 percent of the overall sales
4 at Lakeland, right?
5     A.   I'm not sure of the exact
6 number.
7     Q.   Okay.  All right.  Let's
8 take a look at Page 6350 in this
9 document.  And here there's a summary of
10 proposed testimony, and the first person
11 listed is you.
12          Do you see that?
13     A.   Yes.
14     Q.   Okay.  And this is, I'll
15 represent to you, McKesson disclosing
16 what they think you are going to testify
17 to --
18     A.   Yes.
19     Q.   -- in this proceeding.
20          And you would have been
21 involved in drafting this, right, what
22 you proposed you were going to say?
23     A.   I imagine.
24     Q.   Okay.  And the last sentence

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 on this page says, "The Lakeland DC
2 distributes to customers nationwide, but
3 primarily to customers in Florida,
4 Georgia and Alabama."
5    A.   I'm lost here.
6    Q.   Yeah.
7    A.   So the last line?
8    Q.   The very last, yeah.  I'll
9 start back over so you're with me.  It
10 says, "The Lakeland DC distributes to
11 customers nationwide" --
12    A.   Right.
13    Q.   -- "but primarily to
14 customers in Florida, Georgia, and
15 Alabama."  That's a true statement at
16 that point in time, right, in 2006?
17    A.   Yes.
18    Q.   Okay.  Then it says, "The
19 average monthly sales of healthcare
20 products for this facility exceeds $250
21 million.  About 15 percent of these sales
22 involves controlled substances."
23       Do you see that?
24    A.   I see it.

Page 151

1    Q.   Any reason to believe those
2 numbers are inaccurate at that point in
3 time?
4    A.   No.  Although I think it may
5 be dollarized as opposed to dosage units.
6 I'm not sure.
7    Q.   Okay.  15 percent of the
8 dollar sales, you're saying?
9    A.   That's what I'm inferring.
10    Q.   Okay.  And so after this --
11 strike that.
12       In late 2005, for these
13 seven customers, your distribution center
14 did establish a reduced daily allotment
15 of hydrocodone initially for these
16 customers, correct?
17    A.   Yes.
18    Q.   Do you recall that?
19    A.   Mm-hmm.
20    Q.   And initially it was at 300
21 dosage units of hydrocodone per day, is
22 what you capped them at, right?
23    A.   I believe so.
24    Q.   Okay.  And if it helps you,

Page 152

1 Page 6359 in this document, I'll take you
2 to it so you don't have to guess.
3       This is a continuation of
4 what McKesson proposes that you're going
5 to testify to.
6    A.   Okay.
7    Q.   It says -- I'm looking at
8 the bottom full paragraph.
9    A.   Okay.
10    Q.   It says, "Mr. Mahoney will
11 testify that on November 22, 2005, as a
12 result of a decision made by Donald
13 Walker, senior vice president of
14 distribution operations, the Lakeland DC
15 dramatically reduced sales to six
16 pharmacies.  Mr. Mahoney will testify
17 that he was aware that DEA had provided
18 the names of the six pharmacies to
19 McKesson as pharmacies of concern through
20 outside counsel.  Initially, these
21 pharmacies were reduced to only 300
22 dosage units of hydrocodone per day."
23       Do you see that?
24    A.   Yes.

Page 153

1    Q.   So we go 30 days in a month,
2 300 doses a day, what, 9,000 doses a
3 month?
4    A.   Yes.
5    Q.   Okay.  That's still double,
6 almost double what the DEA said would be
7 considered a red flag at 5,000, right?
8    A.   Yes.
9    Q.   Okay.  And -- but if you
10 look here, that was on November 22nd,
11 2005.
12       And then on the next page
13 which is a continuation of your proposed
14 testimony, the bottom paragraph says,
15 "Mr. Mahoney will also testify that on
16 November 29, 2005, the Lakeland DC
17 received a report from Pete Pardo, a
18 senior sales representative, about some
19 of the pharmacies in question.  Pete
20 Pardo had conducted a due diligence audit
21 at five of the six pharmacies where the
22 Lakeland DC had reduced sales of
23 hydrocodone."
24       Do you see that?

Page 154

1    A.   Yes.

2    Q.   So Pete Pardo, it references

3  him as a senior sales representative.

4  Did he work specifically for your

5  distribution center?

6    A.   Yes.

7    Q.   Okay.  Did you send him out

8  there to do that?

9    A.   I was involved with that,

10 yeah.

11   Q.   As we continue on, it says,

12 "Mr. Pardo had used the internet

13 questionnaire developed by McKesson as

14 well as additional questions provided by

15 McKesson about its business.  Based on

16 these responses, Mr. Walker agreed to

17 increase the daily sales to these

18 customers to 2,000 dosage units."

19      Do you see that?

20   A.   Yes.

21   Q.   So again, just rough math,

22 2,000 dosage units of hydrocodone per day

23 at 30 days in a month, that's 60,000

24 dosage units per month is what they would

Page 155

1  still be allowed to purchase, right?

2    A.   Yes.

3    Q.   Okay.  Which, again, we

4  talked about earlier, the DEA said

5  anything over -- around the same time

6  frame, anything over 5,000 dosage units

7  for hydrocodone was a potential flag for

8  diversion, right?

9      MR. SCHMIDT:  Objection.

10 Foundation.

11      THE WITNESS:  Potential

12   flag, yeah.

13 BY MR. BOGLE:

14   Q.   Right.

15   A.   Mm-hmm.

16   Q.   And the main reason that

17 McKesson -- actually, strike that.

18      So after the DEA let you

19 know that there are potential concerns

20 about these pharmacies, you guys didn't

21 cease to provide hydrocodone to these

22 customers, did you?

23   A.   No.

24   Q.   That's something that you

Page 156

1  could have done, right?

2    A.   Correct.

3    Q.   And the fact of the matter

4  is, the main reason these customers

5  weren't cut off is because they were

6  purchasing a lot from McKesson, right?

7    A.   I don't believe that was the

8  motivation.

9    Q.   Okay.  The fact of the

10 matter is they were purchasing a lot of

11 hydrocodone from your distribution

12 center, right, during this time frame?

13 Just sheer quantities, we can agree on

14 that, right?

15   A.   I see that.

16   Q.   The more pills you sell, the

17 more money McKesson makes.  That's just a

18 fact, correct?

19   A.   Not always, but I understand

20 what you're saying.

21   Q.   Okay.  That's how business

22 in the pharmacy distribution business

23 works, right?  The more pills you sell --

24 the idea is the more pills you sell, the

Page 157

1  more you distribute, the more money is

2  made, right?

3      MR. SCHMIDT:  Objection.

4  BY MR. BOGLE:

5    Q.   That's how the general

6  business operates, right?

7      MR. SCHMIDT:  Objection.

8  Foundation.

9      THE WITNESS:  I wasn't -- I

10   wasn't really trying to maximize

11   sales.  I was trying to control

12   these things in an appropriate

13   way.

14 BY MR. BOGLE:

15   Q.   Yeah, but that -- my

16 question was simply that that's how the

17 business, the pharmacy distribution

18 business works, right, the more you sell,

19 the more you make, right?

20      MR. SCHMIDT:  Same

21   objection.  Foundation.

22 BY MR. BOGLE:

23   Q.   True?

24   A.   I'm not sure if that's true.

Page 158

1    Q.   Okay.  So these 2-plus
2  million doses over this three-month
3  period of time to these seven pharmacies,
4  it's your testimony that had you guys
5  sold zero to them, you would have made as
6  much or more?
7    A.   I -- I didn't say that.
8    Q.   Okay.  Well, then that's my
9  question then.  Do you think had you sold
10  zero hydrocodone to these seven
11  pharmacies in that three-month period of
12  time, rather than 2-plus million doses,
13  that you would have made just as much
14  money?
15          MR. SCHMIDT:  Objection.
16  Foundation.
17          THE WITNESS:  I -- I agree
18    with what you're saying.
19  BY MR. BOGLE:
20    Q.   Okay.  In fact, from
21  October 2005 to January 2006, these seven
22  customers comprised almost 50 percent of
23  the hydrocodone sold by McKesson
24  nationwide, didn't they?

Page 159

1          MR. SCHMIDT:  Objection.
2  Foundation.
3          THE WITNESS:  I'm not sure
4    about that.
5  BY MR. BOGLE:
6    Q.   Okay.  I'm going to hand you
7  what I'm marking as Exhibit 1.1947.
8  Exhibit 11.  Start Bates is
9  MCK_MDL_00497154.
10          (Document marked for
11    identification as Exhibit
12    MCK-Mahoney-11.)
13          MR. SCHMIDT:  Are you done
14    with this one?
15          MR. BOGLE:  I'm done for
16    now, but it's one we'll come back
17    to at some point.  So however you
18    want to deal with that.
19          MR. SCHMIDT:  I'll dig it
20    out when we come back to it.
21          MR. BOGLE:  It's an easy one
22    to find.
23  BY MR. BOGLE:
24    Q.   Okay.  So I want to

Page 160

1  introduce this document to you here.  Oh,
2  sorry.
3          This is another government
4  Exhibit 38.  Do you see that little stamp
5  there?
6    A.   Yes.
7    Q.   Okay.  And I'll represent to
8  you this is another exhibit from the DEA
9  to be utilized in the order to show cause
10  proceeding.  Have you ever seen this
11  document before?
12    A.   I'm not sure that I have.
13    Q.   Okay.  We see it's titled at
14  the very top, McKesson Hydrocodone Sales
15  For October 1, 2005, Through January 31,
16  2006, Ran June 1, 2006.
17          Do you see that?
18    A.   Yes.
19    Q.   That title?
20          Okay.  Let's go to the
21  second page here.
22          There's a chart that says
23  McKesson Hydrocodone Distributions,
24  October 1, 2005, through January 31,

Page 161

1  2006.  And it lists the seven pharmacies
2  we've been talking about, Accumed, Avee,
3  Bi-Wise, MediPharm, Trelles, United
4  Prescription, Universal Rx.  Do you see
5  those listed?
6    A.   Yes.
7    Q.   Okay.  And then it lists 299
8  other pharmacies for hydrocodone.
9          And it combines the two for
10  a grand total of 17, 136,250 doses during
11  that time frame.  Do you see that?
12    A.   Yes.
13    Q.   Okay.  And of those
14  17 million plus doses, approximately
15  7 million of the 17 million come from
16  those seven pharmacies, right?
17    A.   Okay.
18    Q.   Do you see that?
19    A.   Yeah.
20    Q.   Okay.  So that's
21  40ish percent of the overall hydrocodone
22  sales to the seven pharmacies during that
23  three months --
24          MR. SCHMIDT:  Objection.

Page 162

1   Foundation.
2   BY MR. BOGLE:
3       Q.   -- versus the 299 other
4   pharmacies that McKesson distributed to?
5           MR. SCHMIDT:  Objection.
6   Foundation.
7           THE WITNESS:  There are more
8       than 299 pharmacies in Florida,
9       much less nationwide that we
10      distributed hydrocodone to.
11  BY MR. BOGLE:
12      Q.   Okay.  So you think this was
13  from the Lakeland distribution center
14  only?
15      A.   I don't know.  I don't know
16  what 299 pharmacies you're talking about.
17      Q.   Okay.  Well, it certainly
18  lists here 299 pharmacies where 10 --
19  10,767,050 doses of hydrocodone were
20  provided during this time frame,
21  juxtaposed to seven pharmacies that
22  received almost 7 million.  Do you see
23  that?
24      A.   Yes.

Page 163

1       Q.   Okay.  And you would agree
2   with me that those seven pharmacies, when
3   compared to the other 299, received a
4   disproportionate amount of hydrocodone
5   during this period of time?
6       A.   Yeah, a high concentration.
7       Q.   Okay.  And --
8       A.   Is this DEA generated?
9       Q.   Yes, this is an exhibit to
10  the show cause proceeding.  That's why it
11  says Government 38.
12      A.   Okay.
13      Q.   And during this same time
14  frame, October 2005 to January of '06,
15  these seven pharmacies were some of the
16  highest purchasing pharmacies in the
17  country for hydrocodone, right?
18          MR. SCHMIDT:  Objection.
19  Foundation.
20          THE WITNESS:  I don't know.
21  BY MR. BOGLE:
22      Q.   You don't know?
23      A.   When you said that two of
24  them were in the top -- top 10, 6 and 9

Page 164

1   for --
2       Q.   Which is pretty high, right?
3       A.   Yeah.  But it's -- that's
4   two out of the ten.
5       Q.   Seven.  There's seven
6   pharmacies we are talking about.
7       A.   Okay.  But you are talking
8   about the top ten nationwide?
9       Q.   No, I said some of the top I
10  believe is what I said.
11      A.   Okay.
12      Q.   Were some of the highest
13  purchasing pharmacies for hydrocodone in
14  the country.  That was my question.
15      A.   Okay.  Can you repeat the
16  question?
17      Q.   Sure.  These seven
18  pharmacies were some of the highest
19  purchasing pharmacies for hydrocodone in
20  the nation from October 2005 through
21  January of '06, true?
22          MR. SCHMIDT:  Objection.
23  Foundation.
24          THE WITNESS:  You are

Page 165

1   talking about for McKesson?
2   BY MR. BOGLE:
3       Q.   Yeah.
4           MR. SCHMIDT:  Same
5   objection.
6           THE WITNESS:  I believe so.
7   BY MR. BOGLE:
8       Q.   Okay.  All right.  I'm going
9   to hand you what I'm marking as
10  Exhibit 12, which is also marked as
11  1.1951.
12          (Document marked for
13      identification as Exhibit
14      MCK-Mahoney-12.)
15          MR. BOGLE:  Bates number
16  MCKMDL00496536.
17          MR. SCHMIDT:  While he's
18  looking at that I think we're
19  about an hour.  Maybe after this
20  document, can we take a break?
21          MR. BOGLE:  Yeah, we can
22  take one now if you want.
23          MR. SCHMIDT:  No, if you
24  want to go through the document.

Page 166

1    I don't want you to get --
2  BY MR. BOGLE:
3    Q.   Well, I'll hand you -- all
4  right.  And again, this is government
5  Exhibit 3.  Do you see that statement on
6  it there?
7    A.   Mm-hmm.
8    Q.   And I'll represent to you
9  this came from McKesson as being part of
10  the show cause exhibits for the Lakeland
11  show cause proceeding that was given to
12  us.
13    A.   Mm-hmm.
14    Q.   You see there's actually a
15  stamp at the bottom, Drug Enforcement
16  Administration.
17    A.   Right.
18    Q.   Right?  Do you see that?
19    A.   Mm-hmm.
20    Q.   Okay.  So you have seen this
21  data before, these pharmacy rankings?
22    A.   I don't think so actually.
23    Q.   Okay.  Says at the top,
24  "Pharmacy rankings for hydrocodone,

Page 167

1  October 1, 2005, through January 31,
2  2006."
3    And for example, there's
4  Avee Pharmacy.  U.S. ranking Number 6.
5  State ranking in Florida, Number 2.  Do
6  you see that?
7    A.   Yes.
8    Q.   Okay.  MediPharm, another
9  one we've been talking about.  U.S.
10  ranking for hydrocodone, Number 3 in the
11  country, Number 1 in the state.  And for
12  MediPharm, 3,565,400 dosage units of
13  hydrocodone during this period of time.
14  Do you see that?
15    A.   Mm-hmm.
16    Q.   Is that a yes?
17    A.   Yes.
18    Q.   Okay.  And for example,
19  Universal Rx, Number 9 in the country,
20  Number 4 in the state for hydrocodone
21  during this time period.  Do you see
22  that?
23    A.   Yes.
24    Q.   And then I wanted to look at

Page 168

1  a couple of the charts that came with
2  this.
3    So if you go to Bates page
4  ending 6538.
5    A.   8?
6    Q.   6538, sir.
7    This title says, "Comparison
8  of hydrocodone purchases by pharmacies,"
9  and it talks about Avee Pharmacy
10  specifically?
11    A.   Okay.
12    Q.   So this chart says,
13  "Comparison of hydrocodone purchases by
14  pharmacies, October 1, 2005, to
15  January 31, 2006."  And do you see this
16  references Avee Pharmacy, right?
17    A.   Yes.
18    Q.   That's what the first block
19  is.
20    A.   I see.
21    Q.   And it's 1,955,700 doses
22  during that time period.  Do you see
23  that?
24    A.   Yes.

Page 169

1    Q.   The DEA lists the Florida
2  average and the U.S. average as well in
3  comparison, do you see that?
4    A.   Yes.
5    Q.   Florida average being 23,850
6  during that time frame.  U.S. average
7  being 24,227.  Do you see that?
8    A.   Yes.
9    Q.   Okay.  So we can agree that
10  Avee Pharmacy during this time period was
11  substantially higher than both the U.S.
12  and Florida averages for hydrocodone,
13  right?
14    MR. SCHMIDT:  Objection.
15  Foundation.
16    THE WITNESS:  Yes.
17  BY MR. BOGLE:
18    Q.   Okay.  Did McKesson at this
19  point in time in '05 or '06 run any sort
20  of comparisons like this on its customers
21  to say how does this customer compare to
22  our average customer?
23    A.   I don't know if this all
24  came from McKesson that you're talking

Page 170

1 about here. But I don't think that we
2 had this -- the metrics that we do now in
3 terms of how they rank relative to other
4 pharmacies.
5     Q.   Okay.  And so specifically
6 going back to my question though, would
7 McKesson in '05 or '06 look at how a
8 specific customer compared for
9 hydrocodone purchases versus all the
10 other customers for McKesson?
11     A.   '05 or '06.  I'm sure that
12 there were some analyses done.  That
13 information would probably have been
14 shared with me.
15     Q.   Okay.  So before these sales
16 were made by McKesson to these seven
17 pharmacies, you would have looked at that
18 to see how they compared to your other
19 customers?
20     A.   No, I think it was done
21 after the fact.
22     Q.   Okay.  So -- and you said
23 that you're not sure whether all of this
24 was purchased from McKesson.  The fact of

Page 171

1 the matter is, from 2005 and 2006,
2 McKesson also wasn't asking its customers
3 how much they were purchasing from other
4 distributors either, were they?
5     A.   I'm not sure -- I'm not sure
6 if that was included in the
7 questionnaire.
8     Q.   Okay.  Do you specifically
9 recall having asked any of these seven
10 pharmacies before --
11     A.   How much they were buying
12 from other people?
13     Q.   Yes, sir.  Hydrocodone
14 specifically.
15     A.   I don't believe so.
16     Q.   All right.  There's one more
17 page on this and then we can take a
18 break.
19         Sorry, I lost my place.
20         If you look, there's a
21 similar chart on Page 6544 for Universal
22 Rx.  So from October 1, 2005, to
23 January 31, '06, for Universal Rx, it's
24 noted that for hydrocodone they purchased

Page 172

1 1 -- 1,622,900 doses.  Do you see that?
2     A.   I see it.
3     Q.   Compared to the, again, the
4 Florida and the U.S. averages, Florida
5 being 23,850 and the U.S. average isn't
6 listed there, but we saw earlier that was
7 24,227.  Do you see that?
8     A.   Yes.
9     Q.   Okay.  Again, you can agree
10 with me that's substantially higher than
11 both of those averages, right?
12     A.   Yes.
13         MR. BOGLE:  Okay.  We can
14 take a break now.
15         THE VIDEOGRAPHER:  Stand by
16 please.  Remove your microphones.
17 The time is 11:35 a.m.  Going off
18 the record.
19         (Short break.)
20         THE VIDEOGRAPHER:  Okay.  We
21 are back on the record.  The time
22 is 11:55 a.m.
23 BY MR. BOGLE:
24     Q.   Okay.  Mr. Mahoney, if we

Page 173

1 can start by going back to Exhibit 7.
2 It's the one that looks like this on the
3 front.  The September 1, 2005, memorandum
4 and slide deck.
5     A.   Okay.
6     Q.   If you can go back to
7 Page .4 on this document.  Do you recall
8 we talked earlier about, as part of this
9 September 1, 2005, presentation from DEA
10 to folks at McKesson, there was a slide
11 about issues to consider at the bottom
12 here.  Do you see that?
13     A.   Yes.
14     Q.   And one of the things from a
15 suspicious order monitoring perspective
16 the DEA said McKesson should consider, is
17 the percentage of controlled versus
18 noncontrolled purchases for a customer,
19 right?
20     A.   Yes.
21     Q.   You recall we talked about
22 that a little bit earlier, right?
23     A.   Yes.
24     Q.   Okay.  And if such an

Page 174

1  evaluation had been done on these seven
2  pharmacies we've been talking about that
3  were subject to the Lakeland show cause
4  proceeding, it would have been pretty
5  clear there were red flags present about
6  the percentage of controlled substance
7  purchases, specifically hydrocodone,
8  versus noncontrolled purchases at these
9  seven pharmacies, right?
10      MR. SCHMIDT: Objection.
11  Characterization.
12      THE WITNESS: I'm not sure
13   if that's true. Because the way
14   we were looking at it at the time
15   was on a dollarized basis.
16  BY MR. BOGLE:
17      Q.  Okay. But what the -- the
18  DEA is talking about here is, percentages
19  of sales, not dollars in sales, right?
20      A.  Yes.
21      Q.  Okay. So had you looked at
22  it from the basis of percentages prior to
23  these sales beginning in October '05 and
24  January '06, those percentages would have

Page 175

1  been indicative of red flags for
2  diversion for these seven pharmacies,
3  true?
4      MR. SCHMIDT: Same
5   objection. Characterization.
6      THE WITNESS: And I'm not
7   sure if you understand what I'm
8   saying. If you dollarize those
9   and then do the controls to Rx on
10   a dollarized basis, I'm not sure
11   what numbers you'd come up with.
12  BY MR. BOGLE:
13      Q.  No, I think I am
14  understanding what you're saying.
15      A.  Okay.
16      Q.  Looking at this PowerPoint
17  the DEA presented a month before the
18  sales in question in October of '05, the
19  DEA is saying, looking at percentages of
20  controlled versus noncontrolled, not
21  comparing the dollar values between the
22  two, right, that's what the slide deck
23  refers to here?
24      A.  I understand that.

Page 176

1      MR. SCHMIDT: Objection.
2      THE WITNESS: But, when --
3   when the question of controls to
4   Rx was asked in that -- in that
5   time frame, it was in the context
6   of it being dollarized sales.
7  BY MR. BOGLE:
8      Q.  That's what you guys were
9  looking at internally at McKesson, right?
10      A.  Yes.
11      Q.  But what I'm talking about
12  is what the DEA is conveying in
13  September 1, 2005, in this slide deck.
14      A.  Okay.
15      Q.  So what I'm talking about
16  and what we're looking at here is
17  percentages, right? We can agree that's
18  what this slide says, right?
19      A.  Yes.
20      Q.  Okay. And had McKesson, and
21  you specifically at the Lakeland
22  distribution center, looked at the
23  percentages of hydrocodone sales versus
24  overall sales to these seven pharmacies,

Page 177

1  there would have been a red flag that
2  would have popped up, right?
3      MR. SCHMIDT: Objection.
4  Characterization.
5      THE WITNESS: I still don't
6   think you understand what I'm
7   saying in terms of percentages on
8   a dollarized basis. You can look
9   at percentages of one to another
10   on a dosage unit basis or on a
11   dollars basis.
12  BY MR. BOGLE:
13      Q.  But -- no, I think I do
14  understand what you're saying. But what
15  we talked about earlier is when opioids
16  specifically, hydrocodone and oxycodone,
17  many of them are generic, the dollar
18  values are going to be lower in
19  proportion to the quantities being
20  purchased, right?
21      A.  Well, in that time frame, a
22  lot of them were not generics. And they
23  were relatively expensive to a lot of
24  generics that were being sold by us. So

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 I'm not sure what the ratio would have
2 been, and it might surprise you the
3 differences on a dosage unit versus a
4 dollarized basis.
5     Q.   Okay.  Did you guys run any
6 calculations like that for these seven
7 pharmacies before you started supplying
8 them in October 2005?
9     A.   I don't think we did.
10     Q.   Okay.  So let's look at what
11 the DEA put together as far as
12 percentages for some of these pharmacies.
13 I'm going to hand you what I'm marking as
14 Exhibit 13, also marked as 1.1952.
15         (Document marked for
16         identification as Exhibit
17         MCK-Mahoney-13.)
18 BY MR. BOGLE:
19     Q.   This is another exhibit to
20 the Lakeland show cause proposed
21 proceeding from the DEA.  You see it's
22 government Exhibit 4 here.
23         Do you see that on the first
24 page?

Page 179

1     A.   On the first page?
2     Q.   Yes, sir.
3     A.   Okay, yeah.
4     Q.   This says -- this is for
5 Accumed Pharmacy.  Accumed ARCOS
6 purchases from McKesson.  So you see this
7 is specific to McKesson.
8     A.   Right.
9     Q.   October 1, 2005, through
10 January 31, 2006, the same time frame
11 that we've been talking about, right?
12     A.   Yes.
13     Q.   And what they actually look
14 at here is the specific percentage of
15 hydrocodone versus other controls, right?
16 Do you see that measurement here?
17     A.   I'm looking at the first
18 page?
19     Q.   Yeah, the chart on the first
20 page.  You see hydrocodone here, October,
21 November, December, January of '06.  And
22 then that same time frame, other ARCOS
23 drug.
24         Do you see that?

Page 180

1     A.   Okay.
2     Q.   Okay.
3     A.   Yeah.
4     Q.   So other ARCOS drug meaning
5 other drugs the DEA monitors, right?
6         MR. SCHMIDT:  Objection.
7     Foundation.
8         THE WITNESS:  ARCOS would be
9     II's and some III's.
10 BY MR. BOGLE:
11     Q.   Okay.  Meaning they're
12 scheduled controlled substances, correct?
13     A.   Not all scheduled.  But
14 Schedule II and some III's.
15     Q.   Okay.  And so what the DEA
16 does here is just pulls out hydrocodone
17 versus the other Schedule II and III that
18 they monitor.  And if you go to the
19 second page of this document, in that
20 analysis, for hydrocodone, for October
21 through January, Accumed has 1,110,900
22 doses of hydrocodone during that time
23 period from McKesson.
24         Do you see that?

Page 181

1     A.   Yes.
2     Q.   Okay.  And in looking at all
3 other drugs that the DEA monitors
4 combined during that same time period,
5 they come up with 47,630.
6         Do you see that?
7     A.   Yes.
8     Q.   Okay.  So again, looking at
9 it even this way, just looking at
10 controlled substances, not even having to
11 look at all the drugs that are being
12 purchased, this is indicative of
13 diversion for hydrocodone, is it not?
14         MR. SCHMIDT:  Objection.
15     Foundation.  Characterization.
16         THE WITNESS:  It's on one of
17     the flags that the DEA says in
18     terms of concentration, if you
19     will.
20 BY MR. BOGLE:
21     Q.   Right.  If you saw these
22 kind of numbers today, you would be
23 alarmed, would you not?
24     A.   I would be concerned and

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 investigate, yes.
2     Q.   Right.  And what this shows
3 is this is what the numbers of doses of
4 hydrocodone McKesson actually did ship to
5 this pharmacy, right?
6     A.   Yes.
7     Q.   Okay.  I'm going to hand you
8 now what I'm marking as Exhibit 14.  Also
9 numbered as 1.1953.
10     (Document marked for
11     identification as Exhibit
12     MCK-Mahoney-14.)
13 BY MR. BOGLE:
14     Q.   You see this is a similar
15 assessment involving Avee Pharmacy, which
16 is one of the other seven we've been
17 talking about.
18          Do you see that?
19     A.   Yes.
20     Q.   Okay.  And same sort of
21 chart.  This was Exhibit 5 to the DEA's
22 submission.
23          If you go to Page 2 here for
24 Avee, it notes that during this time

Page 183

1 period of October to January of --
2 October of '05 to January of '06 for
3 hydrocodone, McKesson sold Avee Pharmacy
4 1,754,800 doses.
5          Do you see that?
6     A.   Yes.
7     Q.   Comparing that to all other
8 drugs that the DEA monitors during that
9 time frame is 19,870, right?
10     A.   Yes.
11     Q.   So you see these kind of
12 numbers today, you're doing some serious
13 investigation as to what's going on,
14 right?
15          MR. SCHMIDT:  Object to
16          characterization.
17          THE WITNESS:  Yes.
18 BY MR. BOGLE:
19     Q.   Okay.  But, again, what
20 we're looking at here is actual sales
21 that had already been made by McKesson to
22 this pharmacy, right?
23     A.   Correct.
24          MR. SCHMIDT:  Same

Page 184

1 objection.  Foundation.
2 BY MR. BOGLE:
3     Q.   We'll look at one more of
4 these for MediPharm Pharmacy.
5 Exhibit 15, also marked as 1.1958.
6          (Document marked for
7          identification as Exhibit
8          MCK-Mahoney-15.)
9 BY MR. BOGLE:
10     Q.   Do you see again this is
11 another similar chart to what we've been
12 looking at, this time for MediPharm
13 Pharmacy.
14          Do you see that?
15     A.   Yes.
16     Q.   Noted to be Government
17 Exhibit Number 10 to the proceeding.  Do
18 you see that stamp?
19     A.   Yes.
20     Q.   Okay.  If you go to the
21 second page of this one, the DEA does the
22 same analysis.  Looks at hydrocodone sold
23 by McKesson to MediPharm, October of '05
24 to January of '06.  Comes up with

Page 185

1 1,250,300 doses during that time frame.
2          Do you see that?
3     A.   Yes.
4     Q.   Okay.  And they do again
5 same comparison to other DEA monitored
6 drugs, and during that same time frame,
7 32,200 doses sold by McKesson for all
8 other drugs being monitored by the DEA.
9          Do you see that?
10     A.   Yes.
11     Q.   And these are similar to the
12 numbers we saw from the other two
13 pharmacies we just looked at, right?
14     A.   Yes.
15     Q.   And these seven pharmacies,
16 they were all located in the State of
17 Florida, right?
18     A.   Yes.
19     Q.   Okay.  And they in fact were
20 all rogue pharmacies, right?
21          MR. SCHMIDT:  Object to the
22          characterization.
23          THE WITNESS:  I'm not sure
24          if they were.

Page 186

BY MR. BOGLE:

Q. You're not sure. Okay.

Do you know how many of these pharmacies were subsequently shut down by the -- by the DEA?

A. I don't.

Q. I'm going to hand you what I'm marking as Exhibit 16. Also marked as 1.1970.

(Document marked for identification as Exhibit MCK-Mahoney-16.)

BY MR. BOGLE:

Q. This is an article that I pulled off the internet from the Ledger titled "Pharmacy Raided by DEA Agents," posted November 17, 2006.

Do you see that?

A. Yes.

Q. Okay. And it says -- and from Lakeland, "A local pharmacy's license was suspended Thursday after it was raided by agents from the U.S. Drug Enforcement Administration."

Page 187

MR. SCHMIDT: Can I just have an ongoing, running objection to the questions on this document, this unauthenticated document?

MR. BOGLE: Okay.

BY MR. BOGLE:

Q. "Federal agents, with help from local law enforcement agencies, seized several boxes of prescription drugs from Medcenter Pharmacy located at" -- and it provides the address in Lakeland. And it says, "Agents also raided a sister store at 4607 Clark Avenue in Tampa that operated under the name MediPharm-Rx, Inc."

Do you see that?

A. Yes.

Q. And that's the same MediPharm that we've been talking about that was subject to the Lakeland show cause proceeding, right?

A. Yes.

Q. Okay. Were you aware of this, that they were raided in late 2006?

Page 188

A. I believe I was aware. Not specifically of the timing.

Q. Okay. But you were aware they were raided at some point in time by the DEA?

A. Yes.

Q. And it says, "Both pharmacies are owned by a Robert L. Caddick, whose last known address was in Oviedo," also in Florida, right?

A. Oviedo? Yeah.

Q. And then it says, "Jeannette Moran, spokeswoman for the DEA's Miami field office, said that both pharmacies' licenses to sell controlled substances have been suspended." And then it goes on to say, "She said the DEA considers the operation as a whole to be an imminent danger to public health and safety."

Do you see that reference?

A. Yes.

Q. And she says -- "She said agents pulled 635,000 doses of

Page 189

prescription medicines from the Tampa location. Most of those medicines were hydrocodone, sold as Vicodin, and alprazolam sold as Xanax."

Do you see that?

A. Yes.

Q. So hydrocodone again is the very drug sold by McKesson to this pharmacy that we've been talking about as part of the Lakeland show cause proceedings, right?

A. Yes.

Q. Okay. The gentleman who owned these pharmacies, Mr. Caddick, had you ever met him?

A. No, I don't believe so.

Q. No? So when you went to the store, he wasn't somebody that you would have talked to?

A. A lot of times the owners are not the pharmacists.

Q. But the owners don't -- at these smaller pharmacies don't tend to show up and talk to you when you show up?

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    A.   Usually when I make a
2  pharmacy visit, I don't necessarily
3  announce that I'm going there.
4    Q.   Okay.
5    A.   I want to see what's going
6  on in the operation.
7    Q.   Now, Mr. Caddick, were you
8  aware that he was ultimately arrested for
9  conspiracy to possess hydrocodone?
10    MR. SCHMIDT:  Objection.
11  Foundation.
12    THE WITNESS:  No, I wasn't
13  aware of that.
14  BY MR. BOGLE:
15    Q.   Okay.  I'm going to hand you
16  what I'm marking as 1.1969, also marked
17  as Exhibit 17.
18    (Document marked for
19  identification as Exhibit
20  MCK-Mahoney-17.)
21    MR. SCHMIDT:  Same running
22  objection on the authenticity of
23  this.
24    MR. BOGLE:  Okay.

Page 191

1  BY MR. BOGLE:
2    Q.   You see this is an article
3  from the Tampa Tribune published
4  March 17, 2008.
5    Do you see that?
6    A.   Yes.
7    Q.   Okay.  On the second page,
8  in the middle, I'll kind of point to it
9  if it helps you.  It says, "The DEA also
10  arrested."
11    A.   Okay.
12    Q.   It says, "The DEA also
13  arrested two men tied to a Tampa pharmacy
14  the agency had targeted in
15  November 2006."  That's the time frame we
16  just looked at, right, where they were
17  raided; is that right?
18    A.   Yes.
19    Q.   Okay.  And it lists the
20  first person's name.  The second name is
21  "Robert Caddick, 51, of 1007 Eagens
22  Creek, Oviedo, were arrested on federal
23  charges of conspiracy to possess with
24  intent to distribute hydrocodone, an

Page 192

1  opiate nearly equivalent to morphine for
2  pain relief."
3    And it's noted further on
4  down there that Mr. Caddick was the owner
5  registered agent of MediPharm-Rx.  Do you
6  see that?  It's a couple sentences down
7  from there.
8    A.   I see it.  Yes.
9    Q.   Okay.  This is not something
10  that you were aware of prior to today,
11  that he ultimately was arrested in 2008
12  for charges related to hydrocodone?
13    A.   I don't think so.  No.
14    Q.   And we talked about the fact
15  that the DEA filed for an order to show
16  cause against Lakeland in 2006.  We
17  talked about these seven pharmacies.  But
18  a significant aspect of the reason why
19  they were seeking a suspension or
20  revocation of the Lakeland license was
21  the continued distribution of opioids by
22  the Lakeland distribution center even
23  after January 2006 in ways that were
24  indicative of diversion, right?

Page 193

1    MR. SCHMIDT:  Object to
2  characterization.
3    THE WITNESS:  In the chart
4  that you showed me, there was a
5  dramatic falloff after November.
6  BY MR. BOGLE:
7    Q.   So make sure I'm -- I'll
8  rephrase the question.  We talked about
9  those seven pharmacies.
10    A.   Okay.
11    Q.   The DEA also raised concerns
12  of continued suspicious sales by McKesson
13  to other pharmacies from the Lakeland
14  distribution center after January 2006,
15  right?
16    A.   Okay.
17    Q.   Do you recall that?
18    MR. SCHMIDT:  Object to the
19  characterization.
20    THE WITNESS:  That was in
21  the order to show cause you're
22  saying?
23  BY MR. BOGLE:
24    Q.   Yes, it was an aspect of the

Page 194

1 order to show cause, yes.
2     A.   Can I see it?
3     Q.   Sure.  We'll take a look at
4 it.  So, yeah, I'll give you the number.
5 I'm going to guide you.  So it should be
6 Exhibit 10.
7     A.   10.
8     Q.   It's the biggest one.
9     A.   Right.
10        MR. SCHMIDT:  It's the big?
11        MR. BOGLE:  The biggest
12    document.  1943.
13        MR. SCHMIDT:  I just wanted
14    to get that on the record twice.
15    No, the second part.  Go ahead.
16    I'm giving you a hard time.
17        MR. BOGLE:  No problem.
18    It's easy to do.
19 BY MR. BOGLE:
20    Q.   All right.  So let's go to
21 Page 6444, on the Bates numbers on the
22 left.  I think this will address what you
23 want to look at.
24        Okay.  And this is some

Page 195

1 additional proposed testimony from Joseph
2 Rannazzisi.  Do you see that at the top?
3     A.   Yes.
4     Q.   Okay.  And he was with the
5 DEA at the time, true?
6     A.   Yes.
7     Q.   Okay.  And it says there,
8 below that, "Mr. Rannazzisi will testify
9 regarding his professional background and
10 experience and the following."  And then
11 it lists five little areas he's going to
12 talk about, right?
13    A.   Okay.
14    Q.   Okay.  So if you look at
15 Number 3, "But after the January 2006
16 meeting, McKesson continued to distribute
17 controlled substances under circumstances
18 that were indicative of diversion."
19        Do you see that?
20    A.   Yes.
21    Q.   Okay.  Do you recall those
22 specific allegations being made by the
23 DEA that even after January 2006 there
24 were instances indicative of diversion

Page 196

1 still going on at the Lakeland
2 distribution center?
3     A.   I wasn't aware of other
4 pharmacies that there were questions
5 about.
6     Q.   Okay.  Well, let's take a
7 look then, as this goes on.  You see
8 under proposed testimony, the DEA has
9 actually listed you at the bottom of the
10 page.  Do you see that?
11    A.   Okay.
12    Q.   So if you -- showed you
13 where that's at.  Go to the next page
14 where your proposed testimony continues.
15    A.   Mm-hmm.
16    Q.   The last few sentences it
17 says there, "He will testify that after
18 McKesson" -- do you see that?  I'm right
19 here.
20    A.   Okay.  Okay.
21    Q.   This is talking about you.
22 "He will testify that after McKesson
23 received the order to show cause, that it
24 distributed a large amount of hydrocodone

Page 197

1 to YPM under suspicious circumstances."
2        Does that jog your memory
3 about the DEA having concerns about YPM
4 Pharmacy as well?
5     A.   I remember the name YPM.
6 But I wasn't aware of this part of it.
7     Q.   Okay.  Well, it continues.
8 It says, "He will testify that he became
9 aware of DEA's suspension of a major
10 distributor in Central Florida in
11 April 2007."
12        Do you know what distributor
13 they are referring to there?
14    A.   I can't recall at this
15 point.
16    Q.   Okay.  Then it says,
17 "Notwithstanding his knowledge" -- and
18 the his here is you, right, that's who
19 we're talking about?
20    A.   Right, yeah.
21    Q.   "McKesson supplied an
22 unusually large amount to hydrocodone to
23 Mai Pharmacy, M-A-I, in June and July of
24 2007 and later determined that McKesson

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 should no longer cell to Mai Pharmacy."
2        Do you remember Mai
3 Pharmacy?
4        A.   I believe so.
5        Q.   Okay.  Do you recall that
6 being a pharmacy of concern for the DEA
7 around this time period as well?
8        A.   I remember that they were
9 concerned about it.
10        Q.   And do you recall the DEA
11 specifically talking to you in 2006 about
12 these two pharmacies, YPM and Mai?
13        A.   No, I don't remember them
14 talking to me about it.
15        Q.   Okay.  Do you recall being
16 involved in additional meetings with the
17 DEA focused on YPM and Mai Pharmacy?
18        A.   I'm sorry, say that again.
19        Q.   Yeah.  Do you recall being
20 involved in additional meetings with
21 members of the DEA regarding specifically
22 YPM and Mai Pharmacy around this time
23 frame?
24        A.   2007?

Page 199

1        Q.   I believe that's right.  Let
2 me get the date here.  Yeah, 2007.
3        A.   I don't remember meetings
4 with the DEA.
5        Q.   Okay.  I'm going to hand
6 you -- excuse me.
7        Let me hand you what I'm
8 marking as Exhibit 1.1997, also marked as
9 Exhibit 18.
10        (Document marked for
11        identification as Exhibit
12        MCK-Mahoney-18.)
13        MR. BOGLE:  I think I only
14        have three of these instead of
15        four.  I apologize for that.
16 BY MR. BOGLE:
17        Q.   You see here this is an
18 e-mail from September 25 of '07 from
19 Latoya Jackson to Donald Walker.  And
20 it's referenced DEA notes, do you see
21 that?
22        A.   Yes.
23        Q.   Okay.  And the notes
24 actually start on the next page?

Page 200

1        A.   And I wasn't here.
2        Q.   I -- I just saw that.  So I
3 recognize that you were not listed as a
4 participant.
5        A.   Okay.
6        Q.   Still -- still involves
7 Lakeland so I've got a couple of
8 questions as to what was conveyed to you.
9        A.   I understand.
10        Q.   But yes, I do acknowledge
11 that.
12        So this is a meeting from
13 September 19, 2007.  Do you see that on
14 the second page?
15        A.   Yes.
16        Q.   And one of the participants,
17 first of all, was -- was Gary Boggs.  Do
18 you see that?
19        A.   Yes.
20        Q.   It indicates that he was
21 actually with DEA at that point in time,
22 right?
23        A.   Yes.
24        Q.   And the two McKesson --

Page 201

1 well, one McKesson person was Donald
2 Walker and then your outside counsel was
3 also there, right?
4        A.   Right.
5        Q.   Okay.  And under Letter A
6 there on that page it says, "DEA reviewed
7 their position on three areas that would
8 be critical in any settlement of Lakeland
9 show cause administrative action."
10        And then under Number 3 it
11 says suspension.  Do you see that?
12 Bottom of the page?
13        A.   Oh, oh, okay.  Yes, sir.
14        Q.   It says, "DEA is proposing a
15 suspension of license, specifically
16 suspension of shipping hydrocodone in the
17 Lakeland and Conroe DCs.  This is based
18 on their view that there is an immediate
19 threat to safety.  DEA identified
20 specific customers that subsequent to the
21 original six customers in Lakeland had
22 received large quantities of hydrocodone
23 from McKesson and those orders were not
24 for legitimate medical purposes."

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1  And then it lists the
2  Lakeland customers below that. Do you
3  see that?
4      Now I'll go through each of
5  them. I just want -- do you see where
6  that's referenced, Lakeland customers?
7      A.  Yes.
8      Q.  Okay. The first one is
9  customers of McKesson that received
10 orders from Southwood Pharmacy. Do you
11 see that?
12     A.  Yeah. Southwood was not a
13 Lakeland customer.
14     Q.  Okay. It's listed here as a
15 Lakeland customer in the letter, right?
16     Do you know whose customer
17 it was, let me ask you that?
18     A.  I believe it's located in
19 California. Or was located in
20 California. But I'm not 100 percent
21 sure.
22     Q.  Okay. Do you know which
23 McKesson distribution center serviced
24 Southwood, customers of Southwood?

Page 203

1      A.  Which McKesson DC serviced
2  customers of Southwood.
3      Q.  Right. It says customers of
4  McKesson that received orders from
5  Southwood Pharmacy. That's the
6  reference. So you said that you didn't think
7  that was a Lakeland customer. So my
8  question is, whose customer was it during
9  that time frame, at McKesson?
10     MR. SCHMIDT: Objection.
11     THE WITNESS: I'm confused
12     by this here.
13 BY MR. BOGLE:
14     Q.  Okay. My question is which
15 distribution center did service Southwood
16 Pharmacy, if not Lakeland?
17     MR. SCHMIDT: Objection.
18     Foundation.
19     THE WITNESS: I -- I don't
20     know.
21 BY MR. BOGLE:
22     Q.  Okay. Well, let's take a
23 look at the other ones referenced here.
24 The next one is YPM Pharmacy. We just

Page 204

1  talked about that, right?
2      A.  Right.
3      Q.  Okay. And that was
4  certainly a Lakeland customer, right?
5      A.  Yes.
6      Q.  And then Mai Pharmacy also a
7  Lakeland customer, right?
8      A.  Yes.
9      Q.  Okay. So you do see here
10 that certainly an aspect of the reason
11 why the DEA was seeking a suspension of
12 the license of Lakeland was not just the
13 seven pharmacies we looked at earlier,
14 but also at the very least YPM and Mai
15 Pharmacy that Lakeland was also servicing
16 after January 2006, true?
17     MR. SCHMIDT: Objection.
18     Foundation.
19     THE WITNESS: Can you say
20     that again, please?
21 BY MR. BOGLE:
22     Q.  Sure.
23     That based on this document,
24 and what we saw from the order to show

Page 205

1  cause that we just looked at --
2      A.  Right.
3      Q.  -- a component of the reason
4  why the FDA was -- excuse me, why the DEA
5  was seeking a suspension of the Lakeland
6  registration was not only the seven
7  internet pharmacies that we talked about
8  earlier, but also at the very least these
9  two additional customers that were being
10 serviced after January 2000 --
11     A.  Okay. I see that. Yes.
12     Q.  -- true? Okay.
13     And we talked a couple times
14 about Mr. Boggs. And we actually looked
15 at a PowerPoint of his earlier. I want
16 to go back to it. It's Exhibit 3. It's
17 the one, state of prescription drug abuse
18 on the front.
19     Okay. And I think I asked
20 you a few minutes ago whether you were
21 aware that the seven pharmacies subject
22 to the Lakeland show cause proceeding
23 were in fact rogue internet pharmacies.
24 I think your answer was you were not

Highly Confidential – Subject to Further Confidentiality Review

Page 206

1  aware one way or another.  Is that true?
2      A.   Correct.
3      Q.   Okay.  Let's take a look at
4  what Mr. Boggs discusses along those
5  lines in this deck.  It's on Page .15.
6          So he says here, the slide
7  is titled "Purchases of Hydrocodone By
8  Known Or Suspected Rogue Internet
9  Pharmacies, 2006."
10         And the first pharmacy
11  MediPharm-Rx, that was one of the seven
12  that we talked about in the show cause
13  proceeding, right?
14     A.   Right.
15     Q.   That's ranked Number 1 on
16  his list, 15 million-plus dosage units.
17         Do you see that?
18     A.   Yes.
19     Q.   Number 2, Avee Pharmacy,
20  also on the Lakeland show cause list,
21  true?
22     A.   Yes.
23     Q.   Okay.  And Number 3, Accumed
24  Rx, also on the Lakeland show cause list,

Page 207

1  right?
2      A.   Yes.
3      Q.   Number 7, Universal Rx, also
4  on the Lakeland show cause list, right?
5      A.   Yes.
6      Q.   Number 9, United
7  Prescription Services, also on the
8  Lakeland show cause list, right?
9      A.   Yes.
10     Q.   Number 19, Bi-Wise Drugs,
11  also on the Lakeland show cause list,
12  right?
13     A.   Yes.
14     Q.   Number 32, Trelles Pharmacy,
15  that was also one of the seven subject to
16  the Lakeland show cause, right?
17     A.   Yes.
18     Q.   And then Number 23 is YPM,
19  which is one of the two pharmacies that
20  we just talked about that McKesson
21  serviced post-January 2006, right?
22     A.   Yes.
23     Q.   Okay.  And we talked about
24  these -- initially these seven

Page 208

1  pharmacies, plus the two additional ones
2  just in the last few minutes and the
3  supply of hydrocodone to these
4  pharmacies.
5          And you know that the
6  consequences of supplying such high
7  amounts of hydrocodone to pharmacies is
8  that people get addicted to these drugs
9  and people die, right?
10         MR. SCHMIDT:  Objection.
11     Speculation.
12         THE WITNESS:  I -- I don't
13     know if that happens in all cases.
14  BY MR. BOGLE:
15     Q.   I didn't say all cases.  I
16  said that is a consequence of that kind
17  of conduct, right?
18         MR. SCHMIDT:  Same
19     objection.  Speculation.
20         THE WITNESS:  I guess it can
21     happen.
22  BY MR. BOGLE:
23     Q.   I'm sorry?
24     A.   I guess it can happen.

Page 209

1      Q.   All right.  And specifically
2  if we go back into Mr. Boggs' deck here,
3  Page .19.  We talked about this earlier,
4  where he's -- literally, this is a photo
5  of body bags, dead people in body bags,
6  right?
7      A.   Where are they from?
8      Q.   Presumably Florida, because
9  the title -- the slide says, "Oxycodone
10  deaths in Florida rose from 340 in 2005
11  to 1516 in 2010, a 346 percent increase."
12         Do you see that?
13         MR. SCHMIDT:  I'll object to
14     the speculation.
15         THE WITNESS:  I see what it
16     says.  But I doubt that these are
17     body bags related to --
18  BY MR. BOGLE:
19     Q.   Certainly that's the point
20  that he's trying to make --
21     A.   I understand that.
22     Q.   -- is what happened in
23  Florida results in deaths, right?  That's
24  what he's clearly trying to convey here,

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 right?
2     A.    It's a stock photo, right?
3     Q.    I don't know.
4     A.    Okay.  I understand what
5 you're saying.
6     Q.    But that's the message that
7 he's trying to convey here, right?
8         MR. SCHMIDT:  Objection.
9     Vague.
10        THE WITNESS:  We do take it
11    seriously.
12 BY MR. BOGLE:
13    Q.    That's not my question, sir.
14 That's the message that he's trying --
15 that's what you understand this to mean,
16 right?
17        MR. SCHMIDT:  Same
18    objection.  Vague.
19 BY MR. BOGLE:
20    Q.    Is that the oxycodone deaths
21 in Florida went up substantially from '05
22 to 2010, right?  That's what he's trying
23 to convey here?
24    A.    Yes.  I agree.

Page 211

1     Q.    All right.  And beyond just
2 oxycodone, he also talks about opioid
3 overdose deaths generally and their
4 increase over time.  If we can go to Page
5 .7.
6         You see here this chart
7 shows the line at the top, "Opioid sales
8 from '99 to 2010."
9         Do you see that, that line?
10    A.    The top one?
11    Q.    The top one.  Do you see
12 that?
13    A.    Mm-hmm.
14    Q.    Okay.  And that, you would
15 agree with me, from '99 to 2010, opioid
16 sales continue to rise, right?
17    A.    Yes.
18    Q.    Okay.  And so do opioid
19 deaths, right, the middle line?
20    A.    Okay.
21    Q.    Do you see that?
22    A.    Yes.
23    Q.    And again, the time frame
24 that we've been talking about, '05 and

Page 212

1 2006 and 2007, fall right square in the
2 middle of this graph where opioid deaths
3 are increasing substantially, correct?
4     A.    Yes.
5     Q.    Okay.  Ultimately McKesson
6 reached a settlement with the DEA
7 regarding the Lakeland show cause
8 proceedings, right?
9     A.    Yes.
10    Q.    Okay.  And you are aware
11 that settlement occurred in 2008, true?
12    A.    Yes.
13    Q.    Okay.  And as part of that
14 settlement, McKesson agreed to multiple
15 things, but one was to pay a fine of
16 $13,250,000, right?
17    A.    Yes.
18    Q.    Okay.  And in fairness to
19 the Lakeland distribution center, it was
20 for conduct not just involving Lakeland
21 but involving other distribution centers
22 too, right?
23    A.    Correct.
24    Q.    I'm sorry?

Page 213

1     A.    Yes.
2     Q.    Okay.  Have you seen the
3 settlement agreement from the 2008
4 settlement?
5     A.    Yes.
6     Q.    You have?  Okay.
7         I want to take a look at a
8 couple aspects of that with you here.
9         I'll hand you what I'm
10 marking as Exhibit 19, also marked as
11 Exhibit 1.889.
12        (Document marked for
13    identification as Exhibit
14    MCK-Mahoney-19.)
15 BY MR. BOGLE:
16    Q.    This is titled "Settlement
17 and Release Agreement and Administrative
18 Memorandum of Agreement" dated, on the
19 first page, 2nd day of May, 2008.
20        Do you see that?
21    A.    Yes.
22    Q.    Okay.  So this is a document
23 that you've seen before, true?
24    A.    I believe so.

Page 214

1　Q.　Okay.　Do you want to -- if
2　you want to look at something first, just
3　let me know.
4　A.　Yeah, let me just take a --
5　Q.　Yeah, go ahead.　Just let me
6　know when you're ready.
7　A.　Okay.
8　Q.　Are you familiar with this
9　document?
10　A.　Yes.
11　Q.　And so just to sort of
12　orient ourselves here.　Under the
13　background section, first paragraph says,
14　"Whereas, on August 4, 2006, DEA by its
15　deputy assistant administrator Joseph T.
16　Rannazzisi issued an order to show cause,
17　Order Number 1, to McKesson with respect
18　to its Lakeland distribution center," and
19　then it lists the address.
20　Do you see that?
21　A.　Right.
22　Q.　Okay.　And that's the order
23　to show cause that we've been talking for
24　the last hour and a half or so, right?

Page 215

1　A.　Yes.
2　Q.　Okay.　So then if we can
3　take a look at Bates page ending 1052, do
4　you see that toward the top, there's a
5　little H?
6　A.　Yes.
7　Q.　It says, "McKesson agrees to
8　pay civil penalties to the United States
9　of America under 21 U.S.C. 842(c) for
10　violations of 21 U.S.C. 842-A(5) in the
11　amount of $13,250,000 in settlement of
12　claims or potential claims made by the
13　United States of America for failing to
14　report suspicious orders of controlled
15　substance and for failing to report
16　thefts or significant losses of
17　controlled substances."
18　Do you see that?
19　A.　Yes.
20　Q.　Okay.　You have a general
21　understanding that that's why -- those
22　are the reasons why the fine was incurred
23　by McKesson, right?
24　A.　Yes.

Page 216

1　MR. SCHMIDT:　Object to the
2　characterization.
3　BY MR. BOGLE:
4　Q.　And then if you go back to
5　Page 1060, you see there's a section
6　towards the middle of the page, it says,
7　"The covered conduct shall mean the
8　following alleged conduct."
9　Do you see that?
10　A.　Yes.
11　Q.　And first of all, I don't
12　want to go through all six of them.　You
13　would acknowledge there are six different
14　sections here talking about six different
15　distribution centers at McKesson, true?
16　MR. SCHMIDT:　I'm sorry.
17　What page are you on?
18　MR. BOGLE:　Yeah, 1060
19　carrying over to 1061.
20　MR. SCHMIDT:　Thank you.
21　BY MR. BOGLE:
22　Q.　My question was simply that
23　six distribution centers are covered here
24　in the covered conduct section?

Page 217

1　A.　Yes.
2　Q.　Okay.　So I want to focus
3　the one that we've been talking about,
4　which is Lakeland.　So that's letter B.
5　A.　Mm-hmm.
6　Q.　So it says, "In
7　October 2005, McKesson-Lakeland sold
8　approximately 2.1 million dosage units of
9　hydrocodone to seven pharmacies in the
10　Tampa area."　And then it lists them out.
11　Do you see that?
12　A.　Yes.
13　Q.　Those are same seven this
14　we've been talking about, true?
15　A.　Right.
16　Q.　Okay.　"And failed to report
17　these sales as suspicious orders to the
18　DEA when discovered as required by and is
19　a violation of 21 C.F.R. 1301.74(b) and
20　21 U.S.C. Section 842-A(5)."
21　Do you see that?
22　A.　Yes.
23　Q.　Okay.　And this is a portion
24　of the settlement agreement that you're

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 familiar with too, right?

2     A.   Yes.

3     Q.   Okay. And this fine of

4 $13,250,000, more than half of that was

5 related to the conduct at Lakeland,

6 right?

7     A.   Yes.

8     Q.   And specifically, Page 1062,

9 I think, outlines the numbers.

10      So under terms and

11 conditions, Letter B, it says, "McKesson

12 shall pay the sum of $7,456,000. Payment

13 shall be made by electronic funds." And

14 it goes on. And that's related to the

15 conduct at Lakeland, right, the

16 $7,456,000 fine, right?

17     A.   Yes.

18     Q.   Which we can agree is more

19 than half of the overall fine, right?

20     A.   Yes.

21     Q.   Also the highest fine

22 allocated to any specific distribution

23 center, right?

24     A.   Yes.

Page 219

1     Q.   And there was also a

2 temporary suspension of Lakeland's

3 controlled substance registration that

4 was part of the settlement agreement too,

5 right?

6     A.   Related to specific base

7 codes.

8     Q.   You're right. So any sort

9 of hydrocodone or combination products,

10 and alprazolam?

11     A.   Yes.

12     Q.   Right? Okay.

13      And you recall during this

14 2008 time frame there being discussions,

15 that I believe you were party to, that

16 the fines McKesson paid here in 2008

17 could have been much higher, right? Do

18 you recall that discussion?

19     A.   I don't recall that.

20     Q.   Okay. Let me hand you what

21 I'm marking as Exhibit 20, also marked as

22 1.1950.

23      (Document marked for

24     identification as Exhibit

Page 220

1     MCK-Mahoney-20.)

2 BY MR. BOGLE:

3     Q.   We'll start with the e-mail.

4 There's attached notes. But we'll start

5 with the e-mail.

6      It's from Michael Oriente,

7 March 7, 2008, to Donald Walker. And

8 then there is this PGRDRC e-mail.

9 What -- do you know what that is?

10     A.   That was a distribution

11 center list.

12     Q.   Okay. Were you included on

13 that?

14     A.   I am a part of it. Yes.

15     Q.   All right. And it

16 references a regulatory meeting March 5th

17 and March 6th. Do you see that? It's in

18 the subject line.

19     A.   Yes.

20     Q.   Okay. And he says, "Team,

21 here are the notes from our meeting." I

22 want to take a look at the notes. First

23 of all, the next page there's a list of

24 attendees. Do you see that there?

Page 221

1     A.   Yes.

2     Q.   And you are one of the

3 attendees listed, right?

4     A.   Yes.

5     Q.   Okay. Do you recall this

6 meeting?

7     A.   Yes.

8     Q.   Okay. It appears it

9 occurred in Carrolton. Is that in Texas?

10     A.   Yes.

11     Q.   Okay. And if you look here

12 on the first page of the notes, the

13 second bullet point says, "Memorandum of

14 agreement."

15      Do you see that?

16     A.   Mm-hmm.

17     Q.   Okay. Is that a yes?

18     A.   Yes.

19     Q.   Okay. And it lists the

20 covered conduct three points below that.

21 Do you see that?

22     A.   Okay.

23     Q.   Few bullet points down?

24     A.   Yes.

Page 222

1   Q.   So the covered comments, and
2  this is talking about the -- the 2008
3  settlement agreement, right?
4   A.   I believe so.
5   Q.   Okay.  And the first bullet
6  point under covered conduct three points
7  says, "Failure to maintain adequate
8  controls against diversion."
9       Do you see that?
10   A.   Okay.  Yes.
11   Q.   And then the third bullet
12  point says, "Failure to detect and report
13  suspicious orders of controlled
14  substances."
15       Do you see that as well?
16   A.   Yes.
17   Q.   Okay.  And we just talked
18  about from the memorandum of agreement,
19  those are two of the reasons listed as to
20  why the DEA said the agreement was being
21  entered into, right?
22   A.   Yes.
23   Q.   Okay.  And so then if you go
24  to the next page, Bates ending 5050.

Page 223

1  Middle of the page it lists civil
2  penalties.  Do you see that section?
3   A.   Yes.
4   Q.   Okay.  And it says
5  13.25 million, which we talked about,
6  that was the ultimate amount, right?
7   A.   Yes.
8   Q.   And then it notes, "Fine
9  could have been as high as 46 million."
10       Do you see that?
11   A.   Yes.
12   Q.   Okay.  Do you recall that
13  discussion, that there was a potential
14  for the fine to be as high as
15  $46 million?
16   A.   Perhaps.  I don't remember
17  that number specifically, but I trust
18  that it was discussed.
19   Q.   Okay.  All right.  And then
20  it references six DCs involved, one of
21  which is Lakeland, right?
22   A.   Mm-hmm.
23   Q.   True?
24   A.   Yes.

Page 224

1   Q.   Okay.  And then below that
2  it says, "Factors influencing DEA civil
3  penalty."
4       Do you see that section?
5   A.   Yes.
6   Q.   Okay.  There it says, "There
7  were many factors influencing the
8  decision.  It involved multiple DCs,
9  estimated to be over 4,600 violations.
10  DEA looked at multiple time periods.
11  Shipments to pharmacies that turned out
12  to be internet pharmacies.  Shipping
13  millions of dosages to a couple of
14  pharmacies that later were indicted."
15       Do you see that?
16   A.   Yes.
17   Q.   Okay.  And do you recall the
18  specific discussion about the DEA
19  estimating they found more than 4600
20  violations of these distribution centers?
21   A.   Yes.
22   Q.   That's a lot of violations,
23  right, we can agree on that?
24       MR. SCHMIDT:  Objection.

Page 225

1  Foundation.
2       THE WITNESS:  I think that
3  they -- the include some
4  reductions that we had thought
5  would -- were aligned with what
6  the DEA was expecting back in the
7  time frame when we reduced the
8  shipments to those pharmacies
9  dramatically to those lower
10  levels.
11  BY MR. BOGLE:
12   Q.   Okay.  Including the one
13  where they were reduced for seven days
14  and then these group of seven had their
15  allotments increased seven days later, up
16  to about I think 60,000 doses a month for
17  hydrocodone, right?
18       MR. SCHMIDT:  Object to the
19  characterization.
20       THE WITNESS:  Well, I
21  believe that Don -- Don was in
22  conversation with the DEA when he
23  was assessing these reactions I
24  believe.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

BY MR. BOGLE:

Q.   Okay.  So is it your testimony that the DEA specifically approved of an allotment of 60,000 doses of hydrocodone for those pharmacies?

A.   I wasn't privy to it.  And I'm not saying that that's what happened.

Q.   Okay.  But you recall us reading, as part of the show cause document, that there was initially a reduction --

A.   Yes.

Q.   -- and that lasted for seven days and it was bumped back up to 60,000 doses a month.

MR. SCHMIDT:  Object to the characterization.

BY MR. BOGLE:

Q.   Do you recall that?

A.   It was 300 per day, and then 2,000 per day.

Q.   Right.  And I'm just -- I'm breaking that down by month.

A.   Yes.

Page 227

Q.   Okay.  So it went from 9,000 a month to 60,000 a month in a matter of a week after some completion of a questionnaire, right?

A.   Yes.

Q.   Okay.  So going back to my initial question.  Over 4600 violations, I mean, we can agree that's a lot of violations, right?

MR. SCHMIDT:  Objection. Characterization.

THE WITNESS:  I don't know how they were distributed or what they were for.

BY MR. BOGLE:

Q.   Okay.  Do you know how many were for Lakeland specifically, how many violations they found?

A.   I don't.

Q.   And last thing I want to look at here is on the next page, Bates ending 5051.

And I'm looking at where it says, "Our documentation of must be in

Page 228

order."  Towards the top of the page, do you see that?

A.   Yes.

Q.   Okay.  It says, "Our documentation of must be in order."

And then it's bolded, capped, and underlined.  "We cannot have a repeat occurrence."

Do you see that?

A.   Yes.

Q.   Okay.  And ultimately there was a repeat occurrence, right, as far as an additional settlement that was entered into between McKesson and the DEA for additional violations of the Controlled Substances Act in 2017, right?

MR. SCHMIDT:  Object to the characterization.

THE WITNESS:  There was another settlement.

BY MR. BOGLE:

Q.   Right.  And with it saying we cannot have a repeat occurrence, that's what they are talking about,

Page 229

right, what you guys are talking about?

MR. SCHMIDT:  Object to the characterization.

THE WITNESS:  I believe so.

BY MR. BOGLE:

Q.   Okay.

MR. BOGLE:  I'm actually switching to a whole other topic area.  This might be a decent time to break for lunch if you guys are okay with it.

MR. SCHMIDT:  Sure.

How much time have we been on the record for?

THE VIDEOGRAPHER:  Sure. We've used up 2 hours 58 minutes.

The time is 12:42 p.m. Going off the record.

- - -

(Lunch break.)

- - -

THE VIDEOGRAPHER:  We are back on record.  The time is 1:40 p.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

- - -

2  A F T E R N O O N   S E S S I O N

- - -

4  EXAMINATION (Cont'd.)

- - -

6  BY MR. BOGLE:

7  Q. Okay. Mr. Mahoney, we are

8  back from lunch. I wanted to shift gears

9  a little bit to another topic. We talked

10  about earlier in the deposition that you

11  became the director of regulatory affairs

12  in January 2008, true?

13  A. Yes.

14  Q. Okay. And that's around the

15  same period of time that McKesson and DEA

16  are trying to work out the issues

17  regarding the Lakeland show cause issues,

18  right?

19  A. Yes.

20  Q. Okay. And was that a

21  promotion for you to move from

22  distribution manager to director of

23  regulatory affairs?

24  A. It was a lateral move.

Page 231

1  Q. Lateral move. Okay. Was

2  there any increase in pay associated with

3  it?

4  A. I don't believe so.

5  Q. Okay. And the regulatory

6  department at McKesson before you moved

7  into the director of regulatory affairs

8  role in 2008 was a small department

9  right?

10  A. Yes.

11  MR. SCHMIDT: Object to the

12  characterization.

13  BY MR. BOGLE:

14  Q. Three people?

15  A. It was --

16  MR. SCHMIDT: Go ahead. I

17  cut off your question. You might

18  want to --

19  MR. BOGLE: Yeah, let me

20  re-ask the question.

21  BY MR. BOGLE:

22  Q. So the first question was,

23  before you got there in January 2008, the

24  regulatory affairs department at McKesson

Page 232

1  was a small department, true?

2  MR. SCHMIDT: And that's

3  where I object to the

4  characterization.

5  THE WITNESS: There were

6  several people in it.

7  BY MR. BOGLE:

8  Q. Okay. Based on my count

9  there were three, right?

10  A. I'm not sure.

11  Q. Don Walker, Bruce Russell,

12  and Gary Hilliard, true?

13  A. Okay.

14  Q. Are you aware of any other

15  people working in the regulatory --

16  regulatory department at McKesson prior

17  to January 2008?

18  A. I don't have recollection

19  specifically of the department before I

20  joined it.

21  Q. Okay. So when you did join

22  in January 2008, were there other people

23  that came onto the regulatory department

24  at that same time?

Page 233

1  A. Yes.

2  Q. Who else?

3  A. Michael Oriente, Tony -- or

4  Tracy Jonas, and Dave Gustin.

5  Q. All of you guys came on as

6  the same title, director of regulatory

7  affairs, right?

8  A. Yes.

9  Q. Okay. I'm going to hand you

10  what's being marked as Exhibit 1.1675,

11  also marked as Exhibit 21.

12  (Document marked for

13  identification as Exhibit

14  MCK-Mahoney-21.)

15  BY MR. BOGLE:

16  Q. Okay. So to orient you to

17  the document first, and we'll go from

18  there. The first page is titled

19  "Presentation to the U.S. Attorney's

20  Office, Northern District of West

21  Virginia, and DEA, March 12, 2014."

22  Do you see that?

23  A. Yes.

24  Q. And on top of that, it says

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 McKesson Corporation.
2       Do you see that?
3    A.   Right.
4    Q.   Okay.  And if you look here,
5 on Page .7 of the document.
6    A.   Okay.
7    Q.   You see here, this slide is
8 titled "McKesson's Regulatory Affairs
9 Team Presettlement Discussions."
10       MR. SCHMIDT:  Sorry.  Go
11 ahead.
12 BY MR. BOGLE:
13    Q.   You see there are three
14 people listed there:  Don Walker, Bruce
15 Russell, and Gary Hilliard.  True?
16    A.   Yeah.
17       MR. SCHMIDT:  Can I say
18 given the header on this, I don't
19 know how -- I think this has been
20 used in prior depositions.
21       MR. BOGLE:  I think it has.
22       MR. SCHMIDT:  I don't know
23 how we've been using it.  I'm just
24 going to make an objection and

Page 235

1    I'll ask it be a running objection
2    given that this was prepared for
3    settlement purposes.  I don't know
4    that we've sorted that issue out.
5    I think we can sort it out later.
6    If I could make a running
7    objection on that.
8       MR. BOGLE:  That's fine.
9 BY MR. BOGLE:
10    Q.   Let me get back to the
11 question and make sure we are on the same
12 page.  So this is noted presettlement
13 discussions.  These are the three people
14 in the regulatory affairs team, right?
15 That's what the slide indicates, true?
16    A.   I see that it says that.  It
17 seems -- it confused me based on the
18 dating of March 12, 2014.
19    Q.   I'm going to walk you to a
20 place that I don't think is going to be
21 confusing.  So I have to kind of set the
22 table here.
23    A.   Sure.
24    Q.   So if you go to the next

Page 236

1 page of the slide deck, Page .8.  You see
2 here it's sort of walking through the
3 chronology in time.  And here it says,
4 "McKesson regulatory affairs team, 2007
5 to 2012," and there are more people than
6 the three that we previously referenced,
7 right?
8    A.   I see.
9    Q.   Including many of the names
10 that you just gave me?
11    A.   Right.
12    Q.   Okay.  Looking at these two
13 slides together.  This would indicate,
14 would it not, that prior to this 2007
15 time period that the three people in the
16 regulatory affairs team were the three we
17 talked about, Don Walker, Bruce Russell,
18 Gary Hilliard, right?
19    A.   Yes.
20    Q.   Okay.  And you were part of
21 this team that's discussed on .8 that was
22 added in late 2007 or early 2008, right?
23    A.   Right.
24    Q.   Okay.  And these additional

Page 237

1 people, including yourself, were being
2 added to meet the requirements of -- to
3 better meet the requirements of the
4 Controlled Substance Act, correct?
5    A.   I believe so.
6    Q.   And in fact, as well it was
7 outlined in the 2008 settlement
8 agreement, specific parameters McKesson
9 had to meet going forward as far as due
10 diligence went, right?
11    A.   Yes.
12    Q.   Okay.  And part of the
13 reason why people -- these people were
14 brought on, including you, was to attempt
15 to meet the requirements of the
16 settlement agreement and the Controlled
17 Substance Act, right?
18    A.   Yes.
19    Q.   Okay.  After you were
20 brought on in late 2007, early 2008, a
21 few months thereafter, the controlled
22 substance monitoring program was
23 finalized.  Does that sound accurate
24 timewise to you?

Page 238

1   A.   Can you say that again,
2  please?
3   Q.   Sure.  A few months after
4  you were added onto the regulatory
5  affairs team, the controlled substance
6  monitoring program was finalized, true?
7   A.   I'd say it was initiated.
8  But yeah.
9   Q.   That's a fair clarification.
10 So in and around mid-2008, the controlled
11 substances monitoring program was
12 launched at McKesson, right?
13  A.   Yes.
14  Q.   Okay.  And you're familiar
15 with that program, right?
16  A.   Yes.
17  Q.   Okay.  The fact that you've
18 had responsibilities for complying with
19 the provisions of the controlled
20 substance monitoring program since it was
21 launched in 2008, right?
22  A.   Yes.
23  Q.   At least for the customers
24 you are responsible for, true?

Page 239

1   A.   Yes.
2   Q.   And that was actually -- the
3  controlled substance monitoring program
4  was drafted to replace the lifestyle drug
5  monitoring program which had been in
6  place previously, right?
7   A.   Yes.
8   Q.   And you are generally
9  familiar with that program too, right?
10  A.   Yes.
11  Q.   Okay.  Now, the -- we'll
12 call it the CSMP.  You understand what
13 that means?
14  A.   Yes.
15  Q.   Controlled substances
16 monitoring program.  That wasn't created
17 because there was any change in the
18 Controlled Substances Act, right?
19  A.   No.
20  Q.   It was -- it was created as
21 part of the 2008 settlement agreement,
22 right?
23  A.   Yes.
24  Q.   And after the program, the

Page 240

1  CSMP was launched in 2008, do you recall
2  there being some confusion within people
3  at McKesson as to how to actually comply
4  with the CSMP itself?
5       MR. SCHMIDT:  Object to
6    characterization.
7       THE WITNESS:  I think the
8    CSMP was outlined and how it --
9    how it worked in practice was
10    something that we were all getting
11    used to.
12 BY MR. BOGLE:
13  Q.   Okay.  I'm going to hand you
14 what I'm marking as 1.1960, also
15 Exhibit 22 to your deposition.
16       (Document marked for
17    identification as Exhibit
18    MCK-Mahoney-22.)
19 BY MR. BOGLE:
20  Q.   Okay.  This is a string of
21 e-mails, we're going to start at the
22 bottom.  And actually I think it's all
23 pretty much on the first page.
24  A.   Okay.

Page 241

1   Q.   Just a telephone number on
2  the second page.  So I'm looking at the
3  bottom e-mail on the first page.  It's an
4  mile from Steve Miller to Donald Walker.
5  And you are one of the people cc'd.  Do
6  you see that?
7   A.   Yes.
8   Q.   Okay.  And this was sent
9  June 12, 2008, do you see that date?
10  A.   Yes.
11  Q.   Okay.  Steve Miller is noted
12 to be VPDO of the south region.  Do you
13 know what VPDO stands for?
14  A.   Yes.
15  Q.   What does that stand for?
16  A.   Vice president distribution
17 operations.
18  Q.   Okay.  Would that be sort of
19 one step below Don Walker on the
20 hierarchy at McKesson on the operation
21 side?
22  A.   He -- he reported to Don.
23  Q.   Okay.  And he was VPDO for
24 the south region which was the same

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  region you had regulatory responsibility
2  for during this time, right?
3      A.   Yes.
4      Q.   Okay.  So in this e-mail
5  Mr. Miller says, "I would like to discuss
6  further CSMP.  We are not aligned as to
7  what documentation/responsibility we need
8  in each DC.  I am very concerned as we
9  can expect DEA to visit to check out our
10  processes, and in listening to the
11  DOOs/DCMs, we are very unclear as to the
12  correct process."
13         What is DOO/DCM, who are
14  those people?
15      A.   I think those are the
16  director of operations and the
17  distribution center managers.
18      Q.   Okay.  And then it says, "I
19  have asked Bill to audit each DC for
20  compliance, but we are unclear as to what
21  compliance means.  Attached is the latest
22  SOP documentation that was sent to us
23  from Bill this week.  Please advise.
24  Thanks."

Page 243

1         Do you see that?
2      A.   I see it.
3      Q.   And the Bill being
4  referenced there, I -- is you, right?
5      A.   Yes.
6      Q.   Okay.  And when he puts --
7  when Mr. Miller puts audit, the term
8  "audit" in quotations, what is he
9  referring to that you were going to be
10  quote-unquote auditing at each DC?
11      A.   I think the process is that
12  they were -- they were planning on doing
13  to meet the local requirements of the
14  CSMP system.
15      Q.   Okay.  So did you ultimately
16  end up doing audits of various
17  distribution centers around this time in
18  2008?
19      A.   I believe that I had --
20  immediately we had meetings with
21  operational folks and described to them
22  what they would need to do.  Later on we
23  did go around and do some audits on what
24  the -- the DCs were doing.

Page 244

1      Q.   Okay.  When you say we, who
2  are you referring to?
3      A.   My -- myself and often
4  another DRA, especially initially we
5  would go to a DC.  And we would look at
6  multiple areas of regulatory compliance,
7  including DEA.  But also FDA and HAZMAT
8  and DOT-type stuff.
9      Q.   Now, McKesson at this point
10  in 2008 had a separate audit department,
11  true -- as well, right?
12      A.   Yes.
13      Q.   Okay.  So would you do this
14  in conjunction with the audit department
15  or separate from that?
16      A.   It was something that was
17  set up as kind of a regulatory audit.  So
18  it was separate.
19      Q.   Okay.  Okay.  For example,
20  I've seen references to STARS audits?
21      A.   Right.
22      Q.   This is different than STARS
23  audit?
24      A.   No, that's what the STARS

Page 245

1  audit was.
2      Q.   Okay.  So what you're doing,
3  what's being referenced here is you doing
4  STARS audits?
5      A.   Yes.  And there -- there are
6  multiple different kinds of STARS on it.
7  I don't -- I don't even remember what the
8  acronym stands for.  But they were
9  inventory, operations, and that kind of
10  thing would have been one STARS audit,
11  and then there was a regulatory
12  component.  And that would have been a
13  separate occasion, and it would be me,
14  sometimes alone, and sometimes with
15  another DRA.
16      Q.   Okay.  So around this time
17  period in 2008 when you were conducting
18  these audits, was this typical to see
19  individuals in the operations side having
20  concerns about not knowing what
21  compliance meant under the CSMP?
22         MR. SCHMIDT:  Object to the
23      characterization.
24         THE WITNESS:  We had a

Page 246

1 rollout where we were doing
2 presentation of -- of the CSMP and
3 how it worked.
4        But that was -- that was
5 PowerPoint and a discussion about
6 the intent and how things worked.
7 But then when it came time to
8 actually show them, there were
9 other classes associated with
10 that.
11 BY MR. BOGLE:
12    Q.   Okay.  So at this point in
13 time would those classes have already
14 been conducted?
15    A.   In June I'm not sure.
16    Q.   Okay.  All right.  But
17 Mr. Miller, based on what he's conveying
18 to Don Walker, you and others, is that at
19 least from his perspective, he was
20 unclear as to what compliance meant under
21 the CSMP, right?
22    A.   Right.
23    Q.   Now big picture as to the
24 CSMP.  One thing that was included within

Page 247

1 it was sort of a three-level suspicious
2 order investigation process, right?
3    A.   Yes.
4    Q.   Okay.  And level -- what was
5 called a Level 1 review -- strike that.
6        And these reviews were
7 triggered when a customer would meet
8 their established threshold for a
9 controlled substance, right?
10    A.   Yes.  There would be an
11 omit, yeah.
12    Q.   Right.  So basically for
13 example, if a customer had a 10,000-dose
14 unit per month threshold for hydrocodone,
15 once they got to that number in a given
16 month and their orders would be omitted,
17 then it would trigger this Level 1,
18 potentially 2 or 3 process, right?
19    A.   Right.
20    Q.   Okay.  Now, the Level 1
21 investigative process was headed up by
22 the distribution center management team,
23 right?
24    A.   Right.

Page 248

1    Q.   Okay.  Level 2 was done with
2 the regulatory team with assistance of
3 distribution center management, right?
4    A.   Yes.
5    Q.   Collaborative effort so to
6 speak?
7    A.   Mm-hmm, mm-hmm.
8    Q.   And then if you reach a
9 Level 3 review, more senior individuals
10 like Mr. Walker and others would be
11 brought in to weigh in and assist, right?
12    A.   Yes.
13    Q.   Okay.  And an order would be
14 reported as suspicious only if the review
15 got to Level 3, right?
16    A.   Right.  The omit would kick
17 it off.  And then we would do some
18 assessment to determine whether it was
19 truly suspicious.
20    Q.   Right.  And one option under
21 this Level 1, 2, and 3 review is you
22 could actually increase the threshold so
23 that the orders would stop omitting,
24 right, that was an option?

Page 249

1    A.   That could happen after it
2 had hit Level 2.
3    Q.   Yeah, as part of this
4 process, this Level 1, 2, 3 process, one
5 option was to increase the threshold so
6 that the omit would stop, right?
7    A.   To enable the customer to
8 get more of that particular base code.
9    Q.   Right.
10    A.   Yes.
11    Q.   And in talking about the
12 thresholds that were established under
13 the CSMP, they were generally established
14 for customers looking at the prior
15 12 months of sales to that customer,
16 right, that was what you looked at
17 initially?
18    A.   I think typically, yeah.
19    Q.   Okay.  And the formula was
20 typically to take the highest purchasing
21 month from the prior 12 months and add a
22 10 percent buffer and that was the
23 threshold for the customer, true?
24    A.   I'm not sure exactly what

Highly Confidential – Subject to Further Confidentiality Review

Page 250

1 the buffer was, but it was something like
2 that.
3      Q.   Okay.  But you've heard --
4 you've --
5      A.   Yeah.
6      Q.   Were you aware that this was
7 generally how this stuff was set up?
8      A.   Yes.
9      Q.   Okay.  And have you seen and
10 heard reference to -- let's just focus on
11 the 2008-2009 time frame, because I know
12 that the systems are different now.
13          But in that general time
14 frame there, 2008-2009, when a threshold
15 was set, there was a buffer added to the
16 threshold after looking at the prior
17 12 months sales, were you aware of that?
18      A.   Yes.
19      Q.   Okay.  And do you have any
20 reason to dispute that 10 percent was the
21 number generally used as the buffer?
22      A.   No.  And I believe that
23 those kind of buffers were established
24 for selected base codes and then there

Page 251

1 were default levels for many of the other
2 base codes.  I understand what you're
3 saying, and I agree that there was a
4 buffer.
5      Q.   Okay.  Well, let's -- let's
6 maybe hone that in a little bit to make
7 sure we are speaking the same language.
8 So let's talk about hydrocodone and
9 oxycodone for example.
10      A.   Okay.
11      Q.   Those base codes.
12      A.   Okay.
13      Q.   Those would be under the --
14 looking at 12 months sales, take the
15 highest 12 months, add 10 percent model,
16 right?
17      A.   Yes.
18      Q.   Okay.  There was an
19 understanding that in setting the
20 thresholds this way for products like
21 hydrocodone and oxycodone, that very few
22 customers would actually reach their
23 threshold amount in a given month, right?
24      MR. SCHMIDT:  Object to

Page 252

1 characterization.
2      THE WITNESS:  I really don't
3 know what our expectation was.
4 BY MR. BOGLE:
5      Q.   Okay.  Were you ever
6 involved in any discussions along those
7 lines about, if we set it this way, you
8 know, we think a lot of people or not a
9 lot of people are going to hit the
10 threshold?
11      A.   Well, we -- it varies,
12 because there were different pharmacies
13 that may have been growing at different
14 rates and that kind of thing.
15          So I think that that was
16 perceived to be an appropriate level.
17      Q.   Okay.  Let me ask you this.
18 Were you involved in creating that
19 methodology for setting thresholds?
20      A.   I think I was more on the
21 executional end of that.
22      Q.   Okay.  Who created the
23 methodology?  Do you know?
24      A.   I believe that Bruce

Page 253

1 Russell, I think, spearheaded it under
2 Don's oversight.
3      Q.   Don, you mean Don Walker?
4      A.   Don Walker.
5      Q.   Okay.  I'm going to hand you
6 what I'm marking Exhibit 1.1942, also
7 marked as Exhibit 23.
8          (Document marked for
9          identification as Exhibit
10          MCK-Mahoney-23.)
11 BY MR. BOGLE:
12      Q.   This is another series of
13 e-mails.  Again, we're going to start
14 from the back --
15      A.   Okay.
16      Q.   -- and go towards the front.
17      A.   Okay.
18      Q.   Okay.  So first, if we look
19 at, there's an e-mail, I don't know why
20 the text is grayer here.  I have no idea.
21 But there's an e-mail from Don Walker,
22 June 3rd, 2010, to a group of individuals
23 including you.
24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    A.   Yes.

2    Q.   I'm on Page 3919, Bates

3 ending.

4    A.   Right.

5    Q.   Okay.  So -- and if you look

6 at that e-mail, he talks about various

7 changes that are going to occur under the

8 CSMP, right?

9    A.   Yes.

10    Q.   Okay.  And under what's

11 changing, I want to look at Bullet Point

12 Number 3.  He says, "There will no longer

13 be, quote-unquote, partial omits on

14 controlled substances or List 1

15 chemicals.  If a customer exceeds their

16 threshold on a certain item, the entire

17 item order will not be shipped."

18       Do you see that?

19    A.   Yes.

20    Q.   And I just kind of want to

21 unpack this concept for a second to make

22 sure it's clear.  So prior to this point

23 in time in 2010, if a customer for

24 example had a 10,000-dose-unit threshold

Page 255

1 for hydrocodone, they were at 8,000,

2 placed an order for 4,000 doses.  Then

3 the fill would be made at 2,000 to stop

4 them at 10,000 and not give them the

5 other 2,000, right?

6    A.   Yes.

7    Q.   And that's a partial fill.

8 That's what he's talking about.

9    A.   Right.

10    Q.   So what's being done here in

11 2010 is a change to the policy so that

12 under that same circumstance, the entire

13 order would be voided out and not filled?

14    A.   Yes.

15    Q.   And they would still be at

16 8,000, right?

17    A.   Yes.

18    Q.   Okay.  And then -- so if we

19 move to Bates ending 3918 of the

20 document.  There's an e-mail at the

21 bottom there from a Dave Morrissey, this

22 one just to Tom McDonald on June 10,

23 2010.

24       Do you see that?

Page 256

1    A.   Yeah.

2    Q.   Mr. Morrissey, who's noted

3 to be the vice president and general

4 manager, says, "Is there any special

5 reason for the change in this partial

6 shipment?  I do not see it below.  Under

7 the example below, if the customer had a

8 threshold of 5,000 and their accumulation

9 was only at 2,500, and then they ordered

10 three bottles of 1,000, we would cut the

11 entire order.  Is this more of a system

12 problem, or is there another reason for

13 the change?"

14       Do you see that reference

15 there?

16    A.   Yeah.  Yeah.

17    Q.   And then Mr. McDonald's

18 response is above, and he actually copies

19 that same larger e-mail group that I

20 think you said you were a part of, the

21 PGRDRC group, right?

22    A.   Right.

23    Q.   He said there, "Dave, the

24 reason for the change is regulatory in

Page 257

1 nature.  The wholesalers'

2 responsibilities include identifying and

3 reporting suspicious orders.  The purpose

4 of the CSMP is to identify suspicious

5 orders prior to shipping the order.

6 Filling part of a suspicious order online

7 does not conform to the compliance

8 requirement based on our interpretation.

9 The change allows for that compliance."

10       Do you see that?

11    A.   Yes.

12    Q.   Okay.  So then if you

13 follow, now I'm on the first page.

14 There's an e-mail in this chain from a

15 Tom Smith.  What did Tom Smith -- what

16 was his role at McKesson in 2010?

17    A.   Tom was the vice

18 president/general manager in Birmingham.

19    Q.   Okay.  The term vice

20 president and general manager, what does

21 that person generally do at McKesson?

22 What is that role meant to do?

23    A.   He is -- the director of

24 operations would report to him as well as

Page 258

1 the sales personnel.
2     Q.   So that position is more on
3 the -- on the -- it's sort of a mix
4 between the operation and sales side?
5     A.   Yes.
6     Q.   So Mr. Smith in his e-mail
7 in June 10, 2010, says -- I forgot my
8 place here.
9     I'm looking at the last
10 paragraph in his e-mail. He says, "How
11 in the world do we expect customers to
12 keep up with their exact threshold on
13 each item? By the way, many times the
14 smaller unit sale creates a better profit
15 margin for us."
16     Do you see that?
17     A.   I'm lost on it.
18     Q.   The last two sentences in
19 his e-mail.
20     A.   Okay. Okay.
21     Q.   Okay. And then there's a
22 response again from Mr. McDonald, which
23 again, you would have been copied on
24 based on the e-mail group. He says,

Page 259

1 "Tom, thanks for the question. I
2 understand your frustration. Remember
3 our thresholds are set up with buffers to
4 allow for variance. In order for a
5 customer to breach a threshold set in the
6 system, they will have to exceed their
7 highest month's usage by 10 percent. The
8 vast majority of customers never approach
9 this number."
10     Do you see that?
11     A.   Yes.
12     Q.   Okay. Was that your
13 experience by this point in time as well
14 in 2010, that the vast majority of
15 customers never approached that number
16 under that model?
17     A.   I'm not sure about that. I
18 would have expected that at some point
19 most customers might approach the number.
20     Q.   Okay. So that would be
21 inconsistent with your experience that
22 the vast majority of customers never
23 approached that number?
24     A.   Well, it depends too on if

Page 260

1 you're including all base codes, all base
2 code threshold combinations, when I think
3 that would be true. But if you're
4 talking about opioids, it's probably -- I
5 think particularly for oxycodone and
6 hydrocodone, many customers came in part
7 because they were being set up initially
8 at levels that were close to where they
9 had been.
10     Q.   Okay. Levels that were
11 highest in the last 12 months' sales plus
12 10 percent, right?
13     A.   Yes.
14     Q.   And so if I'm
15 understanding you correctly, you're
16 saying that customers for opioid products
17 would more frequently reach their
18 threshold numbers in a given month versus
19 non-opioid products. Is that a fair
20 assessment?
21     MR. SCHMIDT: Object to
22     characterization.
23     THE WITNESS: I would think
24     that certain base codes, including

Page 261

1     some opioids were more -- more the
2     subject of omits than others that
3     were not.
4 BY MR. BOGLE:
5     Q.   Okay. Would those base
6 codes include those for hydrocodone and
7 oxycodone?
8     A.   Yes, I believe so.
9     Q.   Okay. Now, when a customer
10 wanted to increase their threshold on a
11 controlled substance, including opioids,
12 they would have to initiate that process
13 through a threshold change request form,
14 right?
15     A.   Yes.
16     Q.   Okay. And for a threshold
17 change request form, those were reviewed
18 and approved by director of regulatory
19 affairs like yourself, right?
20     A.   Yes.
21     Q.   Okay. And generally
22 speaking, those threshold change requests
23 had to be supported by documentation,
24 right?

Page 262

1    A.   Yes.
2    Q.   Meaning under the CSMP, you
3  weren't supposed to just take the
4  customer's word for it when they said
5  they needed more pills, right?
6    A.   They were -- the customers
7  were supposed to provide a business
8  reason that was driving the need.
9    Q.   Right.  And that business
10 reason was supposed to be documented,
11 right?
12   A.   Yeah.  It was supposed to be
13 on a TCR form.
14   Q.   Right.  I guess what I'm
15 saying is a customer simply telling a
16 director of regulatory affairs like
17 yourself, you know, listen, I need more
18 hydrocodone because my business is
19 growing, for example, would not be enough
20 without documentation to support that
21 business growth, right?
22       MR. SCHMIDT:  Object to
23   characterization.
24       THE WITNESS:  I think

Page 263

1    that -- you know, we're doing
2    customer visits and meeting with
3    these people.  So I'm discussing
4    with them trends that they were
5    seeing.
6        And if I had been to a
7    pharmacy and the pharmacist was
8    saying that he was growing, and I
9    could see that it was growing,
10   then that would be weighed in the
11   evaluation of the TCR.
12 BY MR. BOGLE:
13   Q.   When you say "see that he's
14 growing," the way to see that is to look
15 at documentation, specifically order
16 information, show me that your orders are
17 increasing, right?
18       MR. SCHMIDT:  Object to
19   characterization.
20       THE WITNESS:  Right.
21 BY MR. BOGLE:
22   Q.   And in business, growth has
23 historically been the most frequently
24 used reason to request a threshold change

Page 264

1  increase, right?
2        MR. SCHMIDT:  Objection.
3    Foundation.
4        THE WITNESS:  There were a
5    variety of different things that
6    could be bona fide reasons for an
7    increase.
8  BY MR. BOGLE:
9    Q.   Okay.  One of which is
10 business growth or increase in sales?
11   A.   It could be an increase in
12 sales or it could be a practitioner, a
13 certain type of practitioner that was
14 proximate, or a change in, in some cases,
15 what the formulary was for a given
16 insurance at the end of the year.
17   Q.   Okay.  During your time as
18 director of regulatory affairs you've
19 certainly seen threshold change requests
20 which were based solely on claims of
21 business growth, right?
22   A.   I believe so.
23   Q.   Okay.  And when assessing
24 whether business growth warranted a

Page 265

1  threshold increase that was being
2  requested, similar to what we saw with
3  the DEA recommendation previously, you
4  looked at -- supposed to look at growth
5  of controlled substances, and also growth
6  of noncontrolled substances to see
7  whether, you know, they were -- they were
8  equivalent, whether they made sense and
9  weren't suspicious, right?
10       MR. SCHMIDT:  Objection.
11   Foundation.
12       THE WITNESS:  We -- we
13   would -- we had access to reports
14   that we could use to see what
15   dosage units had been purchased,
16   both opioids and nonopioids.
17 BY MR. BOGLE:
18   Q.   Right.  And that's something
19 that, when looking at specifically
20 somebody requesting a threshold increase
21 for business growth, you're supposed to
22 look at, okay, I'm going to look at that
23 growth and see how that growth is
24 occurring both from controlled substances

Page 266

1 and noncontrolled substances, right?
2         MR. SCHMIDT:  Same -- same
3     objection.  Asked and answered.
4         THE WITNESS:  That was the
5     method.  We -- we had a variety of
6     reports and we would assess them.
7 BY MR. BOGLE:
8     Q.   Okay.  And -- because for
9 example if the growth is only occurring
10 with opioids and with no other products
11 that the pharmacy is purchasing, that's a
12 potential red flag that needs to be
13 investigated, right?
14        MR. SCHMIDT:  Objection.
15     Foundation.
16        THE WITNESS:  Again, there
17     could be a variety of reasons that
18     would cause certain types of
19     growth.
20 BY MR. BOGLE:
21     Q.   Yeah.  My question simply
22 is, if -- if a customer asks for a
23 threshold increase for oxycodone and when
24 you assess their business growth, you

Page 267

1 only see a growth in oxycodone purchases
2 and then nothing else, that's a potential
3 red flag that needs to be investigated
4 further, right?
5         MR. SCHMIDT:  Objection.
6     Foundation.
7         THE WITNESS:  I think if
8     there was a threshold change
9     request for oxycodone, we would
10     take a look at that and other
11     factors.
12 BY MR. BOGLE:
13     Q.   And what report would you
14 specifically look at to assess controls
15 versus noncontrolled percentages and
16 purchases?
17     A.   We had what -- we had some
18 what we called BW reports.
19     Q.   BW you said?
20     A.   Yeah, business warehouse.
21     Q.   Okay.
22     A.   So that would be a report
23 that we could run on a pharmacy and take
24 a look at history.

Page 268

1     Q.   Okay.  And when you are
2 looking at a threshold increase request
3 based on business growth and you look at
4 this report, it would be your practice to
5 save whatever you looked at so that if
6 somebody came back and looked later, they
7 could see what Mr. Mahoney looked at to
8 justify granting an increase, right?
9         MR. SCHMIDT:  Objection.
10     Foundation.
11        THE WITNESS:  I would run
12     some reports and not include all
13     of them into the final
14     determination.
15 BY MR. BOGLE:
16     Q.   Was there any protocol under
17 the CSMP to save documentation that
18 you're using to justify a threshold
19 increase?
20     A.   I'm not sure.
21     Q.   Not sure.  Okay.
22     A.   I mean, times have changed
23 dramatically in terms of our ability to
24 do -- cut a quick little snippet out from

Page 269

1 a report and include that into an
2 evaluation, and we didn't have that
3 capability back then.
4     Q.   Was there any requirement
5 under the CSMP to document at least what
6 you had looked at?  For example I had
7 looked at BW report, it justifies this
8 increase?
9     A.   I'm not sure.
10     Q.   Okay.  Is there any such
11 requirement now that you specifically lay
12 out what you looked at to justify a
13 threshold increase approval?
14     A.   We -- we do a write-up which
15 talks about a review of purchase history
16 and dispensing history.  The various
17 regulatory licensure issues, OIG,
18 exclusion reports, doing internet
19 searches, that kind of thing.
20     Q.   So focusing in on the 2008
21 to 2013 time frame, was there any
22 prohibition on a director of regulatory
23 affairs like yourself summarizing the
24 data that you had reviewed to justify a

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 threshold increase approval?

2     A. Can you say that again?

3 What were the time frames?

4     Q. 2008 to 2013.

5     A. 2013. Was there a

6 prohibition against it?

7     Q. Right.

8     A. No.

9     Q. Okay. And would you agree

10 that that would be a good practice to

11 document that what you had done was

12 justified?

13     MR. SCHMIDT: Objection.

14     Vague.

15     THE WITNESS: I think that a

16     lot of what we were doing, we're

17     receiving paper documentation, and

18     there were other times where it

19     was in another system. And for

20     the paper request, I would often

21     write in handwriting what was --

22     you know, part of my evaluation.

23 BY MR. BOGLE:

24     Q. Okay. You'd write that on

Page 271

1 the TCR form itself, is that what you're

2 saying?

3     A. Sometimes.

4     Q. Okay. Where else would you

5 write if not on the TCR form?

6     A. There were -- I forget the

7 name of the program, it's a Microsoft.

8     Q. SharePoint?

9     A. Yeah, in SharePoint. We

10 might put some notes in there in terms of

11 what we had looked at, evaluated.

12     Q. Okay. All right.

13     Okay. I'm going to hand you

14 what's marked as 1.7195, also marked as

15 Exhibit 24.

16     (Document marked for

17     identification as Exhibit

18     MCK-Mahoney-24.)

19 BY MR. BOGLE:

20     Q. And this is a PowerPoint

21 deck titled McKesson's Controlled

22 Substance Monitoring Program, Regulatory

23 Affairs Training. Do you see that?

24     A. Yes.

Page 272

1     Q. Okay. You would attend

2 regulatory affairs training sessions like

3 these, right?

4     A. Yes, I believe.

5     Q. Okay. Okay. I want to look

6 at Page .37 of the document. And this

7 slide is titled General Principles For

8 Threshold Increases. Do you see that?

9     A. Yes.

10     Q. Okay. And it's got -- have

11 you seen this depiction before for

12 describing what should be done to review

13 a threshold change?

14     A. I believe I have.

15     Q. Okay. Well, let's take a

16 look at it real quick. In the top bubble

17 there it says, "Customer generated

18 request."

19     Do you see that?

20     A. Mm-hmm.

21     Q. And that's -- that's been a

22 requirement since the launch of the CSMP,

23 that a threshold change request should be

24 customer generated, not McKesson

Page 273

1 generated, right?

2     A. I believe so.

3     Q. And then it says, going

4 around the circle towards the right,

5 "Legitimate business justification."

6     Do you see that?

7     A. Yes.

8     Q. And again under the CSMP,

9 that's always been a requirement, that to

10 grant a threshold increase you need a

11 legitimate business justification, right?

12     A. Yes.

13     Q. Then continuing around it

14 says, "Appropriate level of diligence."

15 And that would be diligence conducted by

16 people like you, directors of regulatory

17 affairs, right?

18     A. Yes.

19     Q. Okay. And then the last

20 reference on the circle is well

21 documented. Do you see that?

22     A. Yes.

23     Q. And you agree that since the

24 launch of the CSMP in 2008, threshold

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1 increase requests have been required to
2 be well documented, right?
3     A.   No.  This is quite different
4 with Gary Boggs leading the process in
5 2013 and 2014.
6     Q.   Okay.
7     A.   There were dramatic
8 differences in let's say the schematic
9 here and also the types of documentation
10 that were expected.  So when we went over
11 the things that we did before and I
12 talked about OIG and some of the other
13 attributes, those were enhancements and
14 kind of best practices, part of our
15 continue -- continuing to improve to
16 ensure that our processes are getting
17 better and better at discriminating
18 between these grey areas.
19     Q.   Okay.  So the principles
20 outlined here of, that a threshold
21 increase would be well documented, you're
22 saying that's -- that's a newer
23 requirement?  Was it Gary Boggs'
24 requirement?

Page 275

1         MR. SCHMIDT:  Object to
2     characterization.
3         THE WITNESS:  I think -- I
4     think that with Gary's arrival,
5     there was a much more structured
6     system for what's included in
7     these kinds of evaluations.
8 BY MR. BOGLE:
9     Q.   Okay.  Yeah, I'm just trying
10 to understand the testimony here.  So the
11 reference to being well documented.
12 Prior to Gary Boggs' arrival in 2013, was
13 that not a requirement, that threshold
14 increases needed to be well documented to
15 be justified?
16     A.   I believe that we would --
17 we would investigate it based on the
18 reports and access to information that we
19 had.  And then we would make a decision.
20     Q.   Okay.  But as far as the
21 documentation requirements go, I think
22 you referenced that -- that that changed
23 when Gary Boggs came onto McKesson,
24 right?

Page 276

1     A.   Right.
2     Q.   Okay.  And changed in the
3 sense that he ultimately required
4 substantially more documentation to
5 justify a threshold increase request than
6 had been required before, right?
7     A.   There was a lot more
8 structure in the reports that he
9 required.
10     Q.   A lot more structure.  Okay.
11 So when you say a lot more structure,
12 meaning he gave clearer detail as to what
13 specifically he felt was required to
14 justify an increase being well
15 documented, right?
16     A.   Yes.
17     Q.   Okay.  Now, what was the
18 minimum documentation requirements that
19 was acceptable for you in your practice
20 prior to Mr. Boggs' arrival?
21     A.   I think that we would fill
22 out a questionnaire -- or not a
23 questionnaire.  But we would -- we would
24 fill out the TCR --

Page 277

1     Q.   Okay.
2     A.   -- and complete the
3 documentation either in SharePoint or on
4 the paperwork.
5     Q.   Okay.  So when you're saying
6 the documentation, you are talking about
7 the completion of the TCR form itself?
8     A.   Right.
9     Q.   Okay.  So when this
10 references a TCR being well documented,
11 prior to 2013, did that in your practice
12 include additional documentation beyond
13 the TCR form itself?
14     A.   In many cases, but not all.
15     Q.   You say in many cases.  In
16 those cases, what additional
17 documentation would we be talking about,
18 for your practice?  I'm not asking you to
19 speculate about other people's practices.
20 I want to know about yours.
21     A.   Well, sometimes,
22 particularly if there were, like, say,
23 higher levels of specific drugs, we would
24 try to get information on the doctors who

Page 278

1 were prescribing them, maybe pull their
2 DEA registration, look at their state
3 licensure to see if there was an issue or
4 a problem.
5     Q.   Okay.  Prior to Mr. Boggs'
6 arrival, when you identified these sort
7 of doctors, would you actually reach out
8 to them?
9     A.   I don't believe I called the
10 doctors themselves.
11     Q.   Okay.  That's done on
12 occasion now, though, isn't it, if
13 there's concerns about a doctor?
14     A.   You're saying to call the
15 doctor?
16     Q.   Mm-hmm.
17     A.   It may be.  I -- not in my
18 experience though.
19     Q.   Okay.
20     A.   If -- if there is a question
21 and we're talking about one of the highly
22 diverted products being high relative to
23 statistical norms, we will ask that
24 information.  We'll take a look at the

Page 279

1 licensure, see if there's an issue, kind
2 of verify whether the pharmacist is aware
3 of those kinds of issues, to verify that
4 they are doing their corresponding
5 responsibility.
6         But I don't, as the DRA,
7 make a decision about whether the
8 pharmacist is correct in his judgment of
9 the doctor.
10        I mean, I've seen issues
11 where a doctor may have had some kind of
12 disciplinary action.  I talked to the
13 pharmacist.  In some cases, they're quite
14 aware of it.  They -- they do, however,
15 let's say, know the doctor and believe
16 that his prescribing is correct.  I'll
17 document that kind of a conversation and
18 submit it where it's reviewed, and it's
19 part of the evaluation.
20     Q.   Has there ever been any
21 prohibition, as far as McKesson policies
22 go, to speaking with doctors that you're
23 potentially concerned about?
24     A.   Prohibition?

Page 280

1     Q.   Right.  Meaning any McKesson
2 policy that says, even if you're
3 concerned about a doctor's prescribing
4 practices, do not contact them?
5     A.   No, I don't think so.
6         I would say that part of --
7 when you say prohibition, I think that
8 since Gary has gotten there, I think that
9 we -- we've been instructed to -- to do
10 our diligence, but it's not our
11 responsibility.  That's getting into the
12 pharmacist's corresponding
13 responsibility.  So for me to interview a
14 doctor about what he's doing or how he's
15 prescribing, I'm not a practitioner, so I
16 don't know.  It's much more within the
17 parameters of the responsible behavior of
18 a pharmacist than it would be for me
19 calling from Lakeland and asking the
20 doctor about those kind of things.
21     Q.   Is there anybody on
22 McKesson's regulatory team that does have
23 that sort of medical background?
24     A.   Someone who's a doctor?

Page 281

1     Q.   Or even a pharmacist?
2     A.   We have a couple people who
3 are pharmacists on our team.
4     Q.   Okay.  So those people that
5 are pharmacists, they're not used to
6 assess doctors of concern?
7     A.   I don't think that's
8 generally what they do, no.
9     Q.   Okay.  In any -- are there
10 any medical doctors on the regulatory
11 team since the launch of the CSMP in
12 2008?
13     A.   I'm not aware of any.
14     Q.   Okay.  Any medical doctors
15 involved in the broader CSMP program
16 since it's launched in 2008, even people
17 outside of regulatory affairs that are
18 responsible for compliance?
19     A.   I'm not aware of any.
20     Q.   Okay.
21     A.   There -- McKesson may have
22 some medical doctors on some of its
23 larger opioid task force systems or
24 programs.  But that's really above what I

Page 282

1  do in regulatory.
2      Q.  I'm sorry.  I didn't mean to
3  step on your toes.  When you say larger
4  task force, I'm not sure what you're
5  talking about.  Can you explain that?
6      A.  I know that McKesson has
7  engaged internally and externally to do
8  additional education on the opioid
9  epidemic.  And I believe that we may
10 have -- we may have a medical doctor who
11 is involved in that end of it.
12     Q.  Okay.  But that's not on the
13 suspicious order monitoring side; that's
14 on the education side, true?
15     A.  Correct.
16     Q.  And that would have been in
17 the last couple years, right?
18     A.  I believe so.
19     Q.  Okay.  When the CSMP was
20 launched in 2008, another facet of the
21 program was that customers would be
22 contacted once they reached a certain
23 percentage of their threshold in a given
24 month, like 80 percent, for example,

Page 283

1  right?
2          MR. SCHMIDT:  Objection.
3      Foundation.
4          THE WITNESS:  I'm not sure
5      exactly how that was done in
6      practice.
7  BY MR. BOGLE:
8      Q.  Okay.  Are you familiar with
9  the concept, though, of customers being
10 contacted once they reached a specific
11 percentage of their threshold in a given
12 month?
13     A.  I know that there were some
14 reports that were generated that sales
15 managers, both hospital and retail, could
16 reach out to their customers to see if
17 there was a need to consider a threshold
18 change request.
19     Q.  Okay.  So you're familiar
20 with the practice generally; is that
21 fair?
22         MR. SCHMIDT:  Object to
23     characterization.
24         THE WITNESS:  I think that

Page 284

1  initially on the invoice, for
2  example, there was a line that
3  might say, you know, you're
4  approaching your threshold limit.
5  BY MR. BOGLE:
6      Q.  Okay.  And the follow-up
7  that was done when customers were
8  approaching their thresholds, did
9  regulatory have any involvement in that
10 follow-up?
11     A.  The approach to the
12 customer?
13     Q.  Right.
14     A.  So if there were some
15 outreach to the customer and a threshold
16 request was generated, then yes, we would
17 get involved.
18     Q.  Okay.  But the notification
19 to the customer themselves was done by
20 sales, right, people in sales?
21         MR. SCHMIDT:  Objection.
22     Foundation.
23         THE WITNESS:  I believe that
24     the outreach may have been done by

Page 285

1      sales or like an administrator or
2      something like that within the DC.
3  BY MR. BOGLE:
4      Q.  Now, the whole concept of
5  notifying a customer in advance of them
6  reaching their threshold, you understood
7  that to be part of a general effort to
8  make sure that the customers' business
9  was not disrupted, right?
10     A.  Well, I think that the
11 effort to do some evaluation in that kind
12 of a situation was made to avoid
13 situations in which patients were left
14 without needed meds.  And hospitals were
15 key in that area as well.
16     Q.  Okay.  It wasn't just
17 hospitals that were contacted though,
18 right?
19     A.  I believe so.  That is
20 correct.
21     Q.  Okay.  So for -- the idea
22 when the CSMP was launched and this
23 warning system was created, it was to
24 ensure that as much as possible, it was

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 business as usual for the pharmacies,
2 right?
3          MR. SCHMIDT:  Object to
4     characterization.
5          THE WITNESS:  I think -- I
6     think that there was an effort,
7     and I believe it was changed about
8     the same time, although I'm not
9     sure, where -- about the same time
10    where we stopped the partial
11    fills, we made changes so that
12    less information was getting out
13    to customers, both on the invoice
14    and via other means as well.
15 BY MR. BOGLE:
16    Q.   Yeah.  And I'm going to get
17 to that time period in just a moment.
18 But let's -- I'm kind of focusing on the
19 launch of the CSMP in 2008 --
20    A.   Okay.
21    Q.   -- and the few years
22 thereafter.
23          The notion of contacting a
24 pharmacy before their threshold had been

Page 287

1 met to let them know that was an effort
2 to ensure that the pharmacy could operate
3 business as usual as much as possible,
4 right?
5          MR. SCHMIDT:  Object to
6     characterization.  Asked and
7     answered.
8          THE WITNESS:  I don't think
9     that's the case.
10 BY MR. BOGLE:
11    Q.   Okay.  I'm going to hand you
12 what I'm marking as Exhibit 25.  Also
13 marked as 1.1962.
14          (Document marked for
15     identification as Exhibit
16     MCK-Mahoney-25.)
17 BY MR. BOGLE:
18    Q.   You see this is an e-mail
19 chain, and then with a document attached
20 to it.  First of all, looking at the
21 first e-mail, top e-mail on the first
22 page, you see it's an e-mail from Donald
23 Walker to you April 17th, 2008.  Do you
24 see that?

Page 288

1    A.   Yes.
2    Q.   Okay.  What I really want to
3 look at, I just want to show that you
4 received this.  But what I want to look
5 at is the attachment to the e-mail which
6 starts on the third page.
7    A.   Okay.
8    Q.   Are you there?
9    A.   .3.
10    Q.   This document is titled
11 "McKesson Controlled Substances
12 Monitoring Program, Program Guide For
13 Pharmacies."
14          Do you see that?
15    A.   Yes.
16    Q.   Have you ever seen this
17 document before?
18    A.   I'm not sure.  Do you have a
19 date on this?
20    Q.   It was circulated April 17,
21 2008.  So at least it was in existence.
22 Beyond that, I couldn't tell you.
23    A.   This was an attachment,
24 right?

Page 289

1    Q.   It was, yes.
2          So this, under program
3 details on this first page here says,
4 "All U.S. drug wholesalers have always
5 been required by the DEA to monitor the
6 ordering of controlled substances.  Those
7 regulations have not changed.  But the
8 extent to which wholesalers are now
9 required to monitor and enforce the
10 legitimate use of controlled substances
11 has.  While we trust and respect our
12 customers' integrity and professionalism,
13 we must cooperate with these mandates
14 from the DEA."
15          Do you see that?
16    A.   Yeah.
17    Q.   Okay.  So this -- this is a
18 document that the audience is to pharmacy
19 customers, right?
20    A.   Yes.
21    Q.   Okay.  And below that it
22 says, "Therefore, beginning this month,
23 McKesson will implement the CSMP.  Here
24 is how the program works."

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 And we look at the bottom
2 two bullet points there on that page. It
3 says -- the next to last one says,
4 "Customers will be alerted in advance of
5 meeting or exceeding their thresholds."
6 Do you see that?
7 A. Mm-hmm.
8 Q. Is that yes?
9 A. Yes.
10 Q. Below that it says,
11 "Customers can apply for threshold
12 adjustments if their business is changing
13 or they anticipate needing to place a
14 larger order."
15 Do you see that?
16 A. Yes.
17 Q. Okay. And then it continues
18 on the next page. Do you see where it
19 says, "Notification system"?
20 A. Mm-hmm.
21 Q. The second sentence under
22 that says, "McKesson's CSMP works with
23 your regular ordering system processes to
24 deliver communications in plenty of time

Page 291

1 for your pharmacy to take corrective
2 action, helping head off any potential
3 disruptions in supply."
4 Do you see that?
5 A. Yes.
6 Q. Okay. And then there's a
7 section that says, "Communicating
8 anticipated order increases." Do you see
9 that section?
10 A. Yes.
11 Q. Okay. The second sentence
12 there says, "McKesson has developed a
13 threshold change request process,
14 allowing you to communicate your needs in
15 advance so we can accommodate them in
16 advance of any delays or disruptions in
17 delivery."
18 Do you see that?
19 A. Yes.
20 Q. Okay. And the last thing I
21 want to look at here is that sort of dark
22 grey box below it.
23 A. Mm-hmm.
24 Q. It says, "McKesson values

Page 292

1 you and your business and is committed to
2 working closely with you to ensure that
3 your pharmacy continues to be
4 successful."
5 Then it says, "This program
6 addresses the DEA's requirements to
7 ensure controlled substances are used in
8 the way they were intended, but it also
9 ensures that you as a McKesson customer
10 can continue with business as usual."
11 Do you see that?
12 A. Yes.
13 Q. Okay. And you ever seen
14 that reference there, you know, that one
15 of the goals of the CSMP was to ensure
16 that McKesson customers can operate with
17 business as usual?
18 MR. SCHMIDT: Object to
19 characterization.
20 THE WITNESS: I think we
21 were getting a lot of pushback
22 from pharmacies as we were rolling
23 this out. And they were saying
24 why are you doing this. You have

Page 293

1 no -- no right to be asking me all
2 these questions.
3 And I think that McKesson
4 was saying we have to do this,
5 but, you know, it shouldn't affect
6 how we -- how we operate.
7 BY MR. BOGLE:
8 Q. Right. So you are
9 ultimately sort of reassuring the
10 pharmacies that it would be business as
11 usual, right, that's what this document
12 indicates --
13 MR. SCHMIDT: Object to
14 characterization.
15 BY MR. BOGLE:
16 Q. -- true?
17 A. Well, I think business as
18 usual means that it's not going to be --
19 it's not going to be a big problem to
20 doing business with McKesson.
21 Q. Now, I think you made a
22 reference to this a moment ago, but the
23 threshold warning system was abandoned by
24 McKesson in around 2013, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 MR. SCHMIDT: Object to
2 characterization.
3 THE WITNESS: You mean in
4 terms of --
5 BY MR. BOGLE:
6 Q. You stopped doing it?
7 A. -- putting it on the invoice
8 you said?
9 Q. Stopped contacting customers
10 in advance of them reaching their
11 thresholds.
12 A. You said 2013?
13 Q. Correct.
14 A. I -- I know that it was --
15 it did occur. I guess I've seen a couple
16 of references to it. But I'm not sure
17 exactly the time frame or that it was
18 quote-unquote abandoned.
19 Q. Okay. Well, maybe we'll
20 narrow down a few of those issues then.
21 I'll mark as Exhibit 26, also marked as
22 Exhibit 1.1743.
23 (Document marked for
24 identification as Exhibit

Page 295

1 MCK-Mahoney-26.)
2 BY MR. BOGLE:
3 Q. This is another e-mail with
4 a PowerPoint attached to it.
5 A. Yes.
6 Q. Actually a couple e-mails.
7 So let's start on the second
8 page. Sort of a little past middle,
9 there's an e-mail from an Ellie Rio,
10 October 24, 2013, do you see that?
11 A. Mm-hmm.
12 Q. Okay. And it's sent to a
13 lot of people.
14 A. Right.
15 Q. And if you carry over to the
16 next page, the substance of it, it says,
17 "As you are aware, we are in the process
18 of implementing an enhanced suspicious
19 order monitoring program. As a
20 pharmaceutical distributor, McKesson has
21 a responsibility to ensure pharmaceutical
22 controlled substances are not diverted
23 for nonmedical or other illegal purposes.
24 To that end, we are further enhancing our

Page 296

1 controlled substances distribution
2 policies and procedures."
3 Do you see that?
4 A. Yes.
5 Q. Okay. Now, were these
6 enhancements done around the time that
7 Mr. Boggs came on board with the company?
8 A. I would say yeah.
9 Q. Was this his initiative,
10 these enhancements?
11 A. I'd have to take a look.
12 Q. Okay. Yeah, take a minute
13 to look, see if it refreshes. There's a
14 PowerPoint deck behind that. I don't
15 know if that refreshes you or not, but
16 whatever you want to look at. Just tell
17 me when you're ready to talk about it.
18 A. Okay.
19 Okay. Yeah, I would say
20 that they are concurrent with Gary Boggs'
21 arrival.
22 Q. Okay. And -- all right.
23 Let's look then next at Page .4, just to
24 introduce the -- the deck here. It says,

Page 297

1 "Controlled Substance Compliance Program,
2 November 1, 2013."
3 Do you see that?
4 A. Yes.
5 Q. And then if you go to
6 Page .7. The slide is titled Controlled
7 Substance Monitoring Program, Significant
8 Enhancements to CSMP. Do you see that?
9 A. Yes.
10 Q. And there's two different
11 boxes. Looking at the box on the right
12 where it says, "Key enhancements
13 underway," the second bullet point down
14 to the far left says, "More rigorous
15 process for threshold change requests.
16 Changes are the exception, not the rule."
17 Do you see that?
18 A. Yes.
19 Q. Okay. And that was a change
20 here in 2013, right? Because prior to
21 that, they had essentially been the rule,
22 not the exception, right?
23 A. There had been more
24 threshold changes before then, yes.

Page 298

1    Q.   Right.  They were -- it was
2   easier to get thresholds increased prior
3   to this point in time when these
4   enhancements were made, right?
5    A.   Yes.  Although we had made
6   some unilateral reductions and that kind
7   of thing in the interim.
8    Q.   Okay.  But as a -- as a
9   practical matter, the reason these
10  enhancements were necessary is because
11  there was a feeling that it was too easy
12  to get thresholds increased at McKesson,
13  right?
14          MR. SCHMIDT:  Objection.
15  Foundation.
16          THE WITNESS:  I think this
17          was an effort to ensure that
18          the -- the process was more
19          consistent and more rigorous.
20  BY MR. BOGLE:
21   Q.   And then if you look at
22  Page .10, you see here there's a memo to
23  sales associates.  And it says what, at
24  the top.  It says, "Script and talking

Page 299

1   points regarding retail controlled
2   substance threshold inquiries or
3   threshold changes being made."
4          Do you see that?
5    A.   Yes.
6    Q.   Okay.  And then the last
7   bullet point on the bottom says,
8   "Customer requests to know their exact
9   monthly threshold."
10          Do you see that?
11   A.   Yes.
12   Q.   And it says there below
13  that, "We are not communicating specific
14  thresholds or providing threshold warning
15  reports.  We believe this is a better
16  practice.  Thresholds are not intended to
17  allow customers to manage against a
18  number.  We strongly believe that
19  customers should exercise their
20  corresponding responsibility one
21  prescription at a time.  Prescription
22  drug abuse is an epidemic and we all must
23  do our part to fight this nationwide
24  problem."

Page 300

1          Do you see that?
2    A.   Yes.
3    Q.   Okay.  So this was a change
4   that was being made in that these
5   threshold warning reports, and giving out
6   specific thresholds, was no longer going
7   to be permitted starting at this point in
8   time, right?
9    A.   Yes.
10   Q.   Okay.  For the reasons that
11  we just read in this paragraph, right,
12  because it was believed it was a better
13  practice?
14   A.   Yes.
15   Q.   Okay.
16          MR. BOGLE:  I'm done with my
17  questions.  Mr. Bowden is going to
18  have some additional follow-up.
19  Maybe we can take a break and
20  switch around.  I'm done with
21  mine.
22          MR. SCHMIDT:  Are we at four
23  hours now?
24          THE VIDEOGRAPHER:  We are at

Page 301

1   4 hours and 3 minutes.
2          Shall we go off the record.
3          MR. BOGLE:  Yes.
4          THE VIDEOGRAPHER:  The time
5   2:45 p.m.  Going off the record.
6          (Short break.)
7          THE VIDEOGRAPHER:  We are
8   back on the record.  The time is
9   3:04 p.m.
10          - - -
11          EXAMINATION
12          - - -
13  BY MR. BOWDEN:
14   Q.   Good afternoon, Mr. Mahoney.
15   A.   What's going on?
16   Q.   My name is Wes Bowden.  I'm
17  going to ask you a couple questions and
18  finish out your deposition.
19   A.   Okay.
20   Q.   Before we left off the break
21  you talked with my partner about some of
22  the larger issues with the CSMP.
23          And one thing that I was
24  going to ask you about -- trying to get

Page 302

1 my computer booted up here. You had
2 talked about some of the documentation
3 requirements as it relates to the CSMP.
4 And you said that prior to Mr. Boggs
5 coming on board with McKesson, that the
6 minimum documentation requirements that
7 you felt were necessary were to simply
8 fill out the TCR itself, and that's the
9 threshold change request form; is that
10 right?
11          MR. SCHMIDT: Object to the
12     characterization.
13          THE WITNESS: I think that
14     that was how the customer got it
15     kicked off.
16 BY MR. BOWDEN:
17     Q.   Okay.
18     A.   I mean, for example when
19 Mr. Boggs came on board, based on this,
20 you'd see that we, I guess, systemized
21 the dispensing report. So it became a
22 more regular part of any TCR, was three
23 months' dispensing data from the customer
24 which enabled us to get a better current

Page 303

1 snapshot of what was happening at the
2 customer's --
3     Q.   Right. And Mr. Boggs came
4 aboard in the 2014 time period?
5     A.   2013.
6     Q.   2013?
7     A.   I'd say, I think I met him
8 at Olive Branch on about October 1st or
9 2nd of 2013.
10          MR. SCHMIDT: Can I just
11     remind the folks on the phone to
12     go on mute, including people who
13     are typing and shuffling papers.
14 BY MR. BOWDEN:
15     Q.   All right. Before Mr. Boggs
16 came on board in 2013, internally there
17 were discussions about what the necessary
18 documentation would consist of, right?
19     A.   Right.
20     Q.   Okay. I'm going to hand you
21 what I will mark as Exhibit 27. It's
22 RP-1.1680.
23          MR. SCHMIDT: Again, can I
24     ask people on the phone to go on

Page 304

1 mute, including whoever was just
2 typing.
3          (Document marked for
4     identification as Exhibit
5     Mahoney-27.)
6 BY MR. BOWDEN:
7     Q.   I apologize. I did not put
8 the sticker on yours. I'll take that
9 back from you.
10          I'll take you to Page 3, the
11 last page of this document first. You
12 see this is an e-mail from Dave Gustin.
13 And in 2011, he was one of the directors
14 of regulatory affairs along with
15 yourself, right?
16     A.   Yes.
17     Q.   And the body -- the subject
18 of this e-mail says "CSMP contribution,
19 DCM call, tightening up our increase
20 process."
21          Do you see that?
22     A.   Yes.
23     Q.   This is NC CSMP -- that
24 would be north central?

Page 305

1     A.   Yes.
2     Q.   Which his region -- there's
3 four at the time. His region was north
4 central. Yours was southeast, right?
5     A.   Yes.
6     Q.   Okay. And he writes here,
7 "My contribution to today's call centers
8 around how we, through the CSMP, will
9 meet the expectations of the program
10 itself, and more urgently the DEA, under
11 the terms of the agreement of May 2008."
12          Do you see where that's
13 written?
14     A.   Yes.
15     Q.   And so three years has gone
16 by since that 13 and a half million
17 dollars fine and agreement that you
18 entered into in May of 2008 -- you being
19 McKesson, right?
20     A.   Yes.
21     Q.   And here he's saying, "The
22 expectations that we know our customer
23 and their customers too, at least to the
24 point where we are seeing and responding

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 to any diversion that may be taking
2 place, if not preventing it upfront."
3         Do you see where that's
4 written?
5     A.   Yes.
6     Q.   And so at least according to
7 the other directors of regulatory affairs
8 throughout that time period, 2008 to 2014
9 you were making an effort to prevent
10 diversion if you could; is that right?
11     A.   Yeah.  That was always a
12 part of our intent.
13     Q.   Right.  And he says, "A
14 difficult and sometimes nearly impossible
15 task."
16         Do you see where that's
17 written?
18     A.   Yes.
19     Q.   Do you agree that was a
20 difficult and nearly impossible task?
21     A.   I think that there are a lot
22 of factors that we try to account for and
23 examine as we engage with the pharmacies.
24 But there are a lot of things that we

Page 307

1 don't see either.  I mean, we don't see
2 the transaction take place.  We don't
3 know where the customers are coming from,
4 aside from when we ask the pharmacist.
5     Q.   Right.
6     A.   We can't --
7     Q.   I'm sorry.
8     A.   We can't see if there are
9 four people in a single card getting the
10 same script altogether.
11         We see a bigger picture
12 vision of the pharmacy, but we are not
13 present for every transaction.
14     Q.   And I understand that.  And
15 part of it, if I heard you correctly, was
16 that you're only aware of the information
17 that you ask for from the pharmacy,
18 correct?
19         MR. SCHMIDT:  Object to
20     characterization.
21         THE WITNESS:  We're -- we're
22     aware of what we can observe.
23 BY MR. BOWDEN:
24     Q.   Sure.

Page 308

1     A.   In the short time that we
2 may be there.
3     Q.   Right.
4     A.   We can take a look at the
5 data.  We can ask questions about them
6 and their processes.
7     Q.   And he continues on in the
8 next sentence here, if you read with me.
9 "To that end, we have gone to great
10 lengths to vet each of our accounts, ISMC
11 and others, over time and put photos
12 search engine result, screen prints,
13 dispensing data, questionnaires, TCRs,
14 Level 1 interview notes in the file."
15 And that's along the level of what you
16 were just describing to us, right?  Those
17 are examples --
18     A.   Examples, yes.
19     Q.   -- of documentation that you
20 might use.  And he's talking about the
21 context of typing up the increase
22 process, which would be the threshold
23 increases, correct?
24     A.   I think we would review

Page 309

1 these.  And there are notes and so forth
2 on the various documents that I would
3 have been working with.
4     Q.   I'm sorry.  Can you say that
5 again.  I didn't hear you.
6     A.   I tend to do handwritten
7 notes sometimes on the TCR, let's say, if
8 I got it.
9     Q.   Okay.  And part of the
10 concern during this time period in 2011,
11 if you go to the second page, is that the
12 threshold increases are a bit lax.  Is
13 that fair to say?
14         MR. SCHMIDT:  Object to the
15     characterization.
16         THE WITNESS:  What area are
17     you talking about?
18 BY MR. BOWDEN:
19     Q.   I'm just asking you
20 generally, part of the concern that
21 Mr. Gustin was raising during this time
22 period was that in his view and in
23 discussions with you too, that the
24 threshold increases had been a bit lax,

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 that they had been using reasons such as
2 increase in business for example, to
3 justify threshold change?
4          MR. SCHMIDT:  Object to the
5      characterization.
6          THE WITNESS:  I don't know
7      exactly what he considered
8      appropriate for a valid increase.
9      But I assessed the increases based
10     on my knowledge of the pharmacy,
11     if I had been there, data that I
12     was looking at.
13 BY MR. BOWDEN:
14     Q.   Okay.  Let's go down to the
15 bottom e-mail there.  It says -- do you
16 see where it says team?  You with me?
17     A.   Yeah.
18     Q.   The second line there says,
19 "The DEA has taken a very active and
20 detailed interest in CSMP.  It looks as
21 though they will be stepping up their
22 follow-up on the agreement of 2008."
23         That's three years now after
24 the agreement was put into place, right,

Page 311

1 and the concern was coming down that you
2 need to tighten up the process, true?
3     A.   I have no idea --
4         MR. SCHMIDT:  Object to the
5     characterization.
6         THE WITNESS:  -- I have no
7     idea what he's referring to there.
8 BY MR. BOWDEN:
9     Q.   Okay.  All right.  Two more
10 lines down, "Just a word to encourage you
11 to be vigilant and to communicate the
12 absolute need for the corporate offices
13 of our RNA to be tight in their processes
14 as stated below.  CVS was fined
15 $75 million for being lax and it wasn't
16 even controls.  That was a warning shot
17 across our collective bows."
18         Do you see that?
19     A.   I see it.
20     Q.   And if you go up, you are
21 actually copied on this e-mail, the
22 first -- there right there.  You are
23 brought onto this e-mail on April 15,
24 2011, do you see that?

Page 312

1     A.   Yes.
2     Q.   And it says, "Team, I
3 communicated the sense of urgency we are
4 feeling to our RNA partners.  They may
5 also need to step up the vigilance and
6 documentation."
7         Do you see that there?
8     A.   I see it.
9     Q.   And so part of the concern
10 here was not just for the DRA, but for
11 the people underneath them, providing
12 information about threshold limit
13 increases, that there needs to be better
14 documentation, right?
15         MR. SCHMIDT:  Object to
16     characterization.
17         THE WITNESS:  Well, I think
18     that down below where you see
19     Elaine Thomet and Michael Bishop
20     and Darlene Ray.  They were in a
21     group of sales managers, retail --
22     or RNA sales managers that would
23     interact with the retail national
24     accounts which would include, as

Page 313

1 mentioned here, CVS, Walmart,
2 Publix was one of mine, Winn-Dixie
3 was one of mine.
4         So when they put together
5 the documentation that was
6 required for a TCR for the RNA,
7 they would be interacting
8 primarily with the -- the people,
9 let's say the CSMP people from
10 corporate offices or maybe
11 regional offices of some of these
12 RNA accounts.  And they would pull
13 this into the documentation for
14 such an increase.
15         So Dave had had a
16 conversation with that RNA team.
17 And he was, I guess, letting us
18 know about it.
19 BY MR. BOWDEN:
20     Q.   But you understood that part
21 of the issue is that the RNA teams were
22 not consistently following the SOPs and
23 protocols in terms of documenting when
24 thresholds would be increased, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1     MR. SCHMIDT:  Objection.
2  Foundation.
3     THE WITNESS:  I'm not sure
4  exactly how that worked for the
5  other RNA accounts.  But I believe
6  that it was followed for the RNA
7  accounts that I was working with.
8  BY MR. BOWDEN:
9     Q.   You believe it was followed
10  with the RNA accounts that we were
11  working on.  Is that what you said?
12     A.   Right.
13     Q.   Going to mark for you, this
14  will be Exhibit 28 to your deposition.
15  It's our P-1.1783.
16     (Document marked for
17     identification as Exhibit
18     Mahoney-28.)
19  BY MR. BOWDEN:
20     Q.   Do you remember getting this
21  document?  This is a week after that
22  e-mail we just reviewed.  You were
23  provided with an internal audit report.
24  Do you recall reading this?

Page 315

1     A.   I'd have to take a look at
2  it.
3     Q.   Okay.  And we're going to go
4  through it.
5     A.   Okay.
6     Q.   But this is from Donald
7  Walker at the top to yourself.  And to
8  some of the other DRAs, right?
9     A.   Yes.
10     Q.   And you can see here, he
11  says, "I've attached the distribution
12  center audit just completed by internal
13  audit.  I share this with you as I have
14  done in the past so you have a detailed
15  view of what the audit found.  The three
16  major areas centered around secondary
17  wholesalers, pedigree, licensing, and, 3,
18  consistently following SOPs including
19  documentation."
20     Do you see that there?
21     A.   Yes.
22     Q.   And if you go down a little
23  bit more it says actions.  "I'm" -- "I'm
24  certain that if we picked four different

Page 316

1  DCs we would find the same issues so we
2  should assume this is a networkwide
3  concern."
4     Do you see where that's
5  written?
6     A.   Yes.
7     Q.   And in this internal audit,
8  part of the discussion I was just asking
9  you about, was that -- why don't you just
10  go ahead -- strike that.
11     Turn to Page 6 with me if
12  you will.
13     At the top it says
14  overall -- Page 6.  "Overall conclusion.
15  Yellow needs improvement.
16     "Based on the testing
17  performed to meet our audit
18  objectives" -- "audit objectives, we
19  conclude the controls related to
20  regulatory compliance, operations and
21  system access need to be strengthened and
22  enhanced."
23     Do you see where that's
24  written?

Page 317

1     A.   Yes.
2     Q.   "While the U.S. Pharma
3  distribution network maintains a robust
4  controlled environment and stringent
5  standard operating procedures, overall
6  results of the audit indicate that the
7  distribution centers are not consistently
8  completing and maintaining the required
9  documentation associated with certain
10  SOPs."
11     And that was part of your
12  understanding at the time, right, that
13  there were distribution center problems
14  where the SOPs weren't being followed,
15  proper documentation wasn't being filled
16  out --
17     MR. SCHMIDT:  Objection.
18  BY MR. BOWDEN:
19     Q.   -- and maintained the way it
20  was supposed to be, correct?
21     MR. SCHMIDT:  Objection.
22  Foundation.
23     THE WITNESS:  I'm not sure
24  exactly which SOPs weren't being

Page 318

1  followed.

2 BY MR. BOWDEN:

3  Q.  Okay.  Well, they actually
4 attach some of the observations and
5 support for the overall conclusions in
6 this audit, don't they?

7  Start at Page 14.  I'll help
8 speed this up for you.  14.

9  This is a chart that's
10 attached for the internal audit.  It says
11 "Issue observation" at the top.

12  A.  Yes.

13  Q.  And then Issue Number 11,
14 threshold change request.  "Per the MOM,
15 the DC is required to perform a review of
16 the monthly threshold change and omit
17 reports to monitor customer orders and
18 purchases of DEA controlled substances.
19 Distribution center manager or designated
20 manager will sign, date and retain the
21 required documentation in the CSMP file."

22  And we've got underneath
23 there, the four different, continuing
24 onto the next page, distribution centers

Page 319

1 that were subject to this internal audit:
2 Delran, New Castle, Washington
3 Courthouse, and on the following page is
4 Conroe, correct?

5  A.  Yes.

6  Q.  And Conroe at the time, when
7 we first started the deposition, you had
8 listed six different distribution centers
9 in which you were overseeing.  And Conroe
10 was one of them, right?

11  A.  Yes.  Yes.

12  Q.  And so in the 2011 time
13 period when this internal audit took
14 place, this was one of the distribution
15 centers over which you had
16 responsibility, right?

17  A.  Yes.

18  Q.  Okay.  So let's go back to,
19 if you can, the -- go back to the prior
20 page, please.

21  And underneath the column
22 that says risk, do you see where it says,
23 "Significance, moderate"?

24  A.  That's on 14?

Page 320

1  Q.  Yes, sir.  14.

2  A.  Yes.

3  Q.  And I'm blowing it up here
4 on the screen for you too.  Might be
5 easier up there.

6  "Risk:  Failure to follow
7 established controlled substance customer
8 monitoring procedures could impact the
9 effectiveness of the DEA required
10 suspicious order monitoring system,"
11 right?

12  A.  Yes.

13  Q.  And the point here is that
14 if you're not doing the proper
15 documentation, you might not see the red
16 flags for diversion, you might not see
17 the red flags for whether an increase is
18 appropriate, correct?

19  A.  I understand what you're
20 saying there.

21  Q.  Do you agree with what I've
22 said?

23  A.  Yes.

24  Q.  Under Delran, the first

Page 321

1 column, you see the internal audit based
2 on our review of 103 threshold change
3 request forms for July and November of
4 2010 -- they pulled two months -- we know
5 38 out of the 66 forms were not on file
6 for the month of November.

7  Do you see that?

8  A.  Yes.

9  Q.  And that would be a
10 shortcoming per McKesson SOPs, right, to
11 not maintain files, the documents, for
12 the threshold change forms, right?

13  A.  Yes.

14  Q.  In addition, DC management
15 did not sign and date the threshold
16 adjustment report for July and November
17 as required by the policy.

18  New Castle.  One threshold
19 change request form was not on file to
20 support a change in the customer's
21 controlled substance threshold.  In
22 addition, one of the TCRs reviewed did
23 not contained the required information,
24 for example base code, increase amount,

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1 increase reason, et cetera, right?
2     A.   Okay.
3     Q.   So as part of McKesson's due
4 diligence process, those are things that
5 should be checked on, for example what
6 the base code is of the specific drug,
7 the increase amount and the increase
8 reason, correct?
9     A.   Yes.
10     Q.   And it would have been part
11 of your personal -- well, strike that.
12        If someone had given you a
13 TCR that did not contain those, would you
14 kick it back to them?
15     A.   I believe so.
16     Q.   Conroe, on the following
17 page, two threshold change request forms
18 for July and November 2010 were not on
19 file at the -- at the distribution
20 center.  In addition the threshold
21 adjustment report was not signed and
22 dated by the DC management for July and
23 November 2010 as required by the policy.
24        Do you see where that's

Page 323

1 written?
2     A.   Yes.
3     Q.   And was this the first time
4 you had been made aware of these
5 deficiencies for distribution centers
6 over which you had responsibility?
7     A.   I'm not sure.  I -- I think
8 that the audit team was invited in just
9 to see how the CSMP system was working.
10 And this may have been the first audit
11 level review of it that I had seen.
12     Q.   Okay.  That you had seen.
13 But there had been some done in the past,
14 correct?
15     A.   I'm not sure about that.
16     Q.   Okay.  Let's go back to the
17 first page.  So Mr. Walker is writing to
18 you and others in the second sentence.
19 It says, "I share this with you as I have
20 done in the past, so you have a detailed
21 view of what the audit found."
22     A.   Okay.
23     Q.   Does that refresh your
24 memory, have you -- have you received

Page 324

1 these audits reports in the past or you
2 simply don't recall as you sit here
3 today?
4     A.   That -- that would imply
5 that I had received it before.  I -- I
6 don't recall it being a regular event,
7 you know, based on, you know, every other
8 year, or anything like that.  I'm not
9 sure.
10     Q.   Do you know how much time
11 would have gone by between individual
12 internal audits, best estimate you can
13 give us?
14     A.   I don't.
15     Q.   Well, when you started as
16 a -- in regulatory affairs in 2008 until
17 this time period in 2011, how many of
18 these internal audit reports do you
19 recall receiving?  Is this the only one?
20     A.   I'm not sure.
21     Q.   In 2011, how many
22 distribution centers did McKesson have?
23     A.   I'm not sure.
24     Q.   You think about 30?

Page 325

1     A.   Approximately 30.  I would
2 say 28 to 30.
3     Q.   28 to 30.  And of those 28
4 or 30, you reviewed four in this internal
5 audit report, right?
6     A.   Excuse me?
7     Q.   Of those 28 or 30, four of
8 the distribution centers were looked at
9 for this internal audit report, correct?
10     A.   Okay, yes.
11     Q.   And the conclusions they
12 drew were that the SOPs weren't being
13 followed.  We just went through those
14 examples like those four where there was
15 problems and deficiencies in the TCRs
16 themselves, right?
17        MR. SCHMIDT:  Object to the
18     characterization.
19        THE WITNESS:  I don't know
20     what situation on the Conroe one,
21     in which I would have been
22     involved in.  I'm not sure what
23     the situation was.  I'm not sure
24     if I received a subsequent

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    clarification on that or not.
2    BY MR. BOWDEN:
3        Q.   Gotcha.  But after you
4    reviewed this document, you're not aware
5    of them going out and auditing the other
6    24 or 26 distribution centers after
7    completing this internal audit, right?
8        A.   I don't know how many audits
9    they did.  I have no idea.
10       Q.   The assumption here was
11   that, if you see it consistently with
12   these four distribution centers, we can
13   assume that it's a networkwide concern,
14   right?
15           MR. SCHMIDT:  Objection.
16           THE WITNESS:  I think the
17       reason it was done was to take a
18       sample and to say, "You guys can
19       do better here," and the
20       expectation was that we would do
21       better after that.
22   BY MR. BOWDEN:
23       Q.   What was Mr. Walker's
24   position in the company?  He was a senior

Page 327

1    vice president, right?
2        A.   Yes.
3        Q.   And he was the person that
4    you answered to?
5        A.   Yes.
6        Q.   And in his e-mail he says,
7    "I am certain that if we pick four
8    different distribution centers, we would
9    find the same issues, so we should assume
10   this is a networkwide concern," right?
11       A.   Yes.
12       Q.   So senior management is
13   saying that we're not going to look at
14   the other 24 or 26 distribution centers,
15   we have enough information here to assume
16   that it's a network wide issue, right?
17       A.   Well, I think he's trying to
18   say that, you know, if your DC isn't
19   here, don't assume that everything is
20   great.  This is a representative sample,
21   and it's something that we need to make
22   sure that we are dotting the I's and
23   crossing the T's on, throughout the
24   network.

Page 328

1        Q.   You said that you were
2    responsible for some of the retail
3    accounts, right?
4        A.   Yes.
5        Q.   The national retail
6    accounts?
7        A.   For a time period, I guess
8    until Gary Boggs' arrival, or maybe 2014.
9        Q.   Okay.  And one of those
10   changes was the Giant Eagle stores in
11   Ohio, right?
12       A.   Yes.  And Pennsylvania.
13       Q.   Ohio and Pennsylvania,
14   right.  I'm handing you what I'm marking
15   as Exhibit 29 to your deposition.
16           (Document marked for
17       identification as Exhibit
18       Mahoney-29.)
19   BY MR. BOWDEN:
20       Q.   And so, on the national
21   retail chains that you were responsible
22   for, was it your decision to raise and to
23   increase thresholds?  Was that your
24   responsibility?

Page 329

1        A.   Yes.  I mean, it was
2    initiated by the sales team with the
3    customer.
4        Q.   Right.  And we had talked a
5    little bit about before the break, you
6    had been discussing about whether there
7    was a change at some point about reaching
8    out to the customers about what their
9    threshold were, to then limiting that
10   information to the customers.
11           Do you recall that
12   discussion?
13       A.   Yes, yes.
14       Q.   And so I want to direct your
15   attention to the bottom of the first page
16   here.
17           And Sabrina Cook is listed
18   as an account manager, RNA support
19   solutions.  That would be the customer
20   service person you were talking about?
21       A.   Yes.
22       Q.   That type position?
23           And you can see that
24   Ms. Cook is reaching out directly to Greg

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 Carlson in the "to" line.
2      Do you see that?
3      A.   Yes.
4      Q.   And Mr. Carlson, he was
5 actually with Giant Eagle, right?
6      A.   I believe so.
7      Q.   Okay.  And it says down
8 here, "Greg, below are stores that are at
9 least 80 percent or above their
10 thresholds."  Excuse me.  Let me restate
11 that.
12      It says, "Below are stores
13 that are at least 80 percent or above
14 their thresholds.  Please review and let
15 me know if there is a business reason for
16 the increase."
17      Do you see that?
18      A.   Yes.
19      Q.   And it says, "We have seven
20 business days before all the thresholds
21 would be reset."
22      So essentially they're
23 three-quarters of the way through the
24 month, and they're tracking above what

Page 331

1 their threshold would be, they'll meet
2 their threshold if they continue -- the
3 sales continue the way they are, right?
4 That's what she was saying?
5      A.   Yes.
6      Q.   There's a concern --
7 McKesson is reaching out to the customer
8 saying, "We are concerned that you're
9 going to reach your threshold.  And in
10 order to avoid an omit, can you give us a
11 reason as to why we should increase your
12 threshold?"
13      MR. SCHMIDT:  Objection.
14 Foundation.
15 BY MR. BOWDEN:
16      Q.   Is that correct?
17      A.   I think there was --
18      MR. SCHMIDT:  Same
19 objection.
20      THE WITNESS:  I think there
21 was a working relationship between
22 this account manager and the RNA
23 account.  And there was
24 communication back and forth in

Page 332

1 terms of what was required in
2 order to go ahead and do an
3 increase.  And I think that we saw
4 earlier documents that said that
5 this kind of information was going
6 to stop at a certain time.  It was
7 not only presented this way, but
8 on our invoicing as well.
9 BY MR. BOWDEN:
10      Q.   Right.  And we just -- you
11 and I had just looked at a couple of
12 documents where there were concerns about
13 the documentation that was going into the
14 file before a threshold increase was
15 granted, right?  We just saw that with
16 example of four different distribution
17 centers as well as the internal
18 discussion from Mr. Gustin, right?
19      A.   You're talking about the
20 e-mail from Gustin to these folks?
21      Q.   Let me strike that and make
22 it simpler for you.
23      This is dated in October of
24 2008, right?

Page 333

1      A.   I see that.
2      Q.   This is after the DEA
3 settlement of May of 2008 where they are
4 making you enter into the CSMP program,
5 right?
6      A.   Yes.
7      MR. SCHMIDT:  Object to the
8 characterization.
9 BY MR. BOWDEN:
10      Q.   And as part of that CSMP
11 program, it's going to require that you
12 get to know your customer, right?
13      A.   Yes.
14      Q.   And it's going to require
15 that you get additional documentation and
16 do interviews, Level 1 reviews, do
17 follow-up phone calls before you can
18 justify a threshold increase, correct?
19      A.   We would do that kind of
20 information.  In fact, I would typically
21 speak to one of the people at the chain
22 in order to understand what was going on.
23      Q.   Okay.  Let's look at this
24 one here.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    So Ms. Cook reached out to
2 Giant Eagle and said that there's going
3 to be -- some stores are going to be
4 going through their thresholds.  The
5 response from Giant Eagle says, "Sabrina,
6 we need to bump stores" -- and he lists
7 out six stores -- "up by 20 percent due
8 to high volume growth.  These are all
9 either new stores or stores running
10 promotions causing increased volume."
11 Right?
12    A.    Yes.
13    Q.    And we know that at some
14 point in 2011, at least by then, that the
15 internal discussion is that increases in
16 business alone are not sufficient to
17 justify changes to the thresholds, right?
18         MR. SCHMIDT:  Object to the
19    characterization.
20         THE WITNESS:  Well, you have
21    to understand too that our
22    relationship with the RNAs was
23    that in many cases, they -- they
24    might source some of the controls

Page 335

1 through their own warehouses, in
2 some cases acquire them through
3 the manufacturer.
4    And there was a limited
5 opportunity for us to understand
6 the bigger picture with regard to
7 the RNAs because of the way the
8 sourcing reflected their
9 purchasing versus their -- overall
10 Rx versus controls.
11 BY MR. BOWDEN:
12    Q.    All right.  So I'm just
13 trying to understand this here.  So
14 you're telling me that for the national
15 retail accounts, that some of the
16 controls were sourced through their own
17 warehouses, right?
18    A.    Yes.
19    Q.    And because of that it made
20 it difficult for you to understand how
21 much of the product they were actually
22 using, or purchasing on a monthly basis?
23 Is that what you're saying?
24         MR. SCHMIDT:  Object to

Page 336

1 characterization.
2         THE WITNESS:  I think that
3    we would see what we were selling
4    to them.  But we didn't have their
5    dispensing information.
6 BY MR. BOWDEN:
7    Q.    Okay.  And you didn't ask
8 for it, in this case, right, for Giant
9 Eagle?
10    A.    We -- we generally did not
11 have access to the overall dispensing of
12 the RNAs.
13    Q.    But you also didn't ask for
14 it, correct?
15    A.    It was not something that --
16 I think there were agreements at Don's
17 level on how that process would be
18 effected.
19    Q.    Okay.  Ms. Cook then
20 forwards this e-mail on to you, and says,
21 "Bill, please see attached increase" --
22 "threshold increase forms.  Thanks."  You
23 respond back the next day simply stating,
24 "Done.  Jim, Blaine, please file for your

Page 337

1 records.  Bill."
2         Do you see that at the very
3 top?
4    A.    Yes.
5    Q.    And you agree with me that
6 there's -- there's no e-mail here from
7 you asking for additional information,
8 right?
9    A.    Right.
10    Q.    There's no e-mail here from
11 you asking for a follow-up or additional
12 prescription data, anything that would
13 help you do a further analysis, correct?
14    A.    Right.
15    Q.    You make your decision
16 solely upon the TCR forms that are
17 attached to Ms. Cook's e-mail, correct?
18         MR. SCHMIDT:  Objection.
19    Foundation.
20         THE WITNESS:  I'm not sure
21    what else I might have done.  I
22    might have reached out to Greg
23    Carlson.  I'm not sure if I did.
24 BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q.   You're not sitting here
2  telling me today that's what you did?
3    A.   I'm not saying that I know
4  what I did that day.
5    Q.   Okay.  And we've already
6  covered previously in your deposition
7  that what documentation you relied upon,
8  you didn't -- you didn't actually keep
9  that in the file either.  If the
10  documentation doesn't exist, you don't
11  keep a list of what you actually would
12  have done to approve or deny a TCR form,
13  correct?
14       MR. SCHMIDT:  Objection.
15  Compound.  Characterization.
16  BY MR. BOWDEN:
17    Q.   Isn't that what you
18  testified to earlier?
19    A.   Could you repeat that?
20       MR. SCHMIDT:  Same
21    objection.
22  BY MR. BOWDEN:
23    Q.   We have no way of verifying
24  that you did that?

Page 339

1    A.   I know I spoke to Greg
2  Carlson.  I'm not sure if I spoke to him
3  at this point.
4    Q.   Right.  But what we do know
5  is that on October 22nd at 5:12 p.m.,
6  Ms. Cook sends to you these TCR forms and
7  says, "Bill, please see attached."  And
8  the next morning you respond, "Done,"
9  right?  That's what the document says,
10  correct?
11    A.   Yes.  I see that.
12    Q.   And so if we turn to the
13  third page of this document, we are going
14  to see those TCR forms for these six
15  stores.  So if you'll go to the third
16  page, please.
17    A.   .3?
18    Q.   Yes.  This says, "Threshold
19  change form.  Controlled substance
20  request 9193.  Increase amount
21  20 percent."
22       Do you see that?
23    A.   Yes.
24    Q.   And it says, "Reason for

Page 340

1  change.  Per Greg Carlson, director of
2  pharmacy sourcing, please increase due to
3  running promotions causing increased
4  volume," right?
5    A.   Yes.
6    Q.   Another way of saying an
7  increase in business, right?
8    A.   I believe so.
9    Q.   Okay.  "McKesson use only."
10       Do you see where that's
11  written underneath?
12    A.   Yes.
13    Q.   "Date of last visit site" --
14  "date of last visit site observation."
15       What does it say there?
16    A.   It's blank.
17    Q.   "Questionnaire and
18  declaration on file."
19       What does it say there?
20    A.   It's blank.
21    Q.   "Permanent or temporary
22  threshold change."
23       What did you put down?
24    A.   It says permanent.

Page 341

1    Q.   "Has threshold change" --
2  "been changed on the same product within
3  the last three months?"
4       What does it say there?
5    A.   It's blank.
6    Q.   Current threshold.  Is there
7  any information there?
8    A.   No.
9    Q.   Approved by date, has any of
10  that been completed for this store
11  either?
12    A.   No.
13    Q.   And so can you please tell
14  us what promotions in your mind would be
15  valid for increasing oxycodone
16  thresholds?
17    A.   I don't know.
18    Q.   Can you name any?
19    A.   Hydrocodone or oxycodone?
20    Q.   Opioids in general.  I'm
21  asking a general statement to you.  What
22  promotion could a pharmacy be running
23  which in your mind would justify a
24  threshold increase for that pharmacy?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1   A.   I'm not sure.  They might be
2 experiencing higher -- a higher store
3 volume.
4   Q.   So people would come in,
5 higher store volume, for opioid
6 prescriptions?
7   A.   No, I mean just overall
8 customer volume.
9   Q.   Okay.  And that would
10 typically reflect in overall prescription
11 volume going up as well, correct?
12   A.   I would think so.
13   Q.   Right.  But that's not
14 something you asked for in this case, to
15 see if that, in fact, was occurring,
16 right?
17   MR. SCHMIDT:  Objection.
18   Foundation.
19   THE WITNESS:  I don't see
20   where I did ask for it.
21 BY MR. BOWDEN:
22   Q.   Okay.  Let's turn to .5.
23   There's a threshold change
24 form for another one of the six stores,

Page 343

1 right?
2   A.   Yes.
3   Q.   Would you agree with me that
4 it appears to simply be copy and pasted
5 from the prior one?
6   The only substantive
7 information filled out is, "Per Greg
8 Carlson, please increase due to running
9 promotions causing increased volume."
10   Right?
11   A.   I see that.
12   Q.   And we -- we've already
13 covered that you don't know what those
14 promotions were, correct?
15   A.   I don't.
16   Q.   Okay.  And if you go to .7.
17 I'm going to ask you to flip through them
18 with me.  .7, .9, .11, .13.
19   Do you agree with me that
20 for each of these six stores it's the
21 same information provided to you?
22   A.   Yes.
23   Q.   And not a single one of
24 these stores do you note that McKesson

Page 344

1 had done a site visit observation, right?
2   MR. SCHMIDT:  Object to the
3   characterization, foundation.
4 BY MR. BOWDEN:
5   Q.   Have I misstated that?  Is
6 there a single one of these stores in
7 this exhibit that we're going through
8 where McKesson said they have made a last
9 site visit observation?
10   A.   I don't see it documented
11 here.
12   Q.   Or where there's a
13 questionnaire or declaration on file.  Do
14 you see that?
15   MR. SCHMIDT:  Object to the
16   characterization.
17   THE WITNESS:  I believe for
18   the RNAs the -- the questionnaire
19   was completely corporately.
20 BY MR. BOWDEN:
21   Q.   Okay.  So if it's a -- if
22 it's an ISMC for example, a small
23 independent or medium-size store, would
24 those be completed on an individual store

Page 345

1 basis?
2   A.   The questionnaire?
3   Q.   Mm-hmm.
4   A.   I believe so.
5   Q.   But an exception's made if
6 they become a national retail account?
7   A.   The national retail accounts
8 had corporate oversight of controls
9 monitoring.  And those were the people
10 with whom we typically interacted with
11 when it came to the request and
12 consideration of threshold changes.  So I
13 typically would not call the PIC at a
14 given store and ask.  It was based on our
15 relationship with, in this case Giant
16 Eagle, and how we interacted with them.
17   Q.   So based on the relationship
18 that you had with Giant Eagle, when they
19 reached out to you and said, "We need a
20 20 percent increase due to high volume
21 growth," meaning business increase, that
22 was sufficient reason for you to grant
23 it, right?
24   MR. SCHMIDT:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1 characterization.
2 THE WITNESS: I think that I
3 had talked with -- I have
4 interactions with both Sabrina and
5 with the RNA VP of what was going
6 on here. I had been introduced to
7 Carlson. I had interaction with
8 him.
9 BY MR. BOWDEN:
10 Q. You're telling me overnight
11 you had interaction with him?
12 A. No --
13 MR. SCHMIDT: Just a second.
14 Were you finished with your
15 answer?
16 THE WITNESS: No, not yet.
17 BY MR. BOWDEN:
18 Q. I'm sorry, go ahead, sir.
19 A. I was -- I had conversations
20 with Carlson and other Giant Eagle people
21 in which we -- we took a look at patterns
22 and evaluated it. I'm not sure if we did
23 it as early as 2008. But it was
24 something that we did do.

Page 347

1 Q. Okay. But in -- in this
2 example of these six stores in 2008, when
3 you are reviewing it, all you took was at
4 face value they had a business increase
5 and you approved the 20 percent increase
6 in the threshold as a result; is that
7 correct?
8 MR. SCHMIDT: Object to
9 characterization.
10 THE WITNESS: Based on the
11 TCRs that I got we did go ahead
12 and provide them with an increase.
13 BY MR. BOWDEN:
14 Q. Okay. You can go ahead and
15 set that one aside, sir.
16 I'm going to mark for you
17 what will be Exhibit Number 30 to your
18 deposition. Going to be P-1.1936.
19 (Document marked for
20 identification as Exhibit
21 Mahoney-30.)
22 BY MR. BOWDEN:
23 Q. And this is an e-mail from
24 2012. You see there at the bottom, Tom

Page 348

1 McDonald is sending this out to PGRDRC.
2 Are you a part of that list, sir?
3 A. Yes.
4 Q. Okay. So this is an e-mail
5 that you got and the subject is threshold
6 change requests. And it says, "I have
7 noticed a trend with TCR that needs to be
8 addressed. The information submitted on
9 the TCR is extremely important to our
10 documentation process. When I screen the
11 TCR I'm assuming some steps have been
12 completed. First and foremost is direct
13 contact with the customer. The contact
14 is required. Be sure you are noting who
15 you spoke with when completing the
16 documentation portion. Ask for a
17 specific reason for the increase in
18 usage. Business growth should be
19 accompanied by specific examples of what
20 is generating that growth. For instance,
21 a competitor, Tom's Drug, went out of
22 business and was located in the area.
23 Another example was a new doctor, with
24 their DEA number, is in the building and

Page 349

1 writing a high volume of oxycodone
2 scripts. General terms like 'business
3 growth' or 'customer hit their
4 thresholds' are not acceptable."
5 Do you see where that is?
6 A. Yes.
7 Q. And now this is 2012, which
8 would have been before Mr. Boggs came on
9 board. Had there been anything that
10 changed in the CSMP program between 2008
11 and 2012 that would make that a new
12 requirement?
13 A. This appears to be an e-mail
14 that he was sending to the sales team out
15 in the west. So I'm not sure what he was
16 observing from the TCRs that he was
17 reviewing that caused him to do this,
18 but --
19 Q. Okay. Based on that
20 standard though, the one that we just
21 reviewed, the Giant Eagle ones, of which
22 you approved, they would not -- they
23 would not be acceptable, right, those TCR
24 forms, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    A.   I think that the general
2  terms, especially with the RNA, was
3  something that maybe we accepted early on
4  but not later on.
5    Q.   I'm not sure that answers my
6  question though.  They are saying
7  business growth or customer hit their
8  threshold, those are not acceptable
9  reasons for approving a TCR form.  That's
10  exactly what we just saw in the Giant
11  Eagle TCR forms that you just approved,
12  correct, in 2008?
13        MR. SCHMIDT:  Object to the
14    characterization.
15        THE WITNESS:  I think that
16    what he's saying here is that we
17    need more specific information
18    related to things like business
19    growth.
20  BY MR. BOWDEN:
21    Q.   Right.  More specific
22  information than what was contained in
23  the TCR forms of which you were
24  approving, correct?

Page 351

1        MR. SCHMIDT:  Object to the
2    characterization.
3        THE WITNESS:  For example,
4    some of the -- some of the
5    enhanced data, if you will, what
6    we would get would be, okay, we
7    had been doing 100 scripts a day
8    in such and such a time frame.
9    But in the last three months we
10    have risen to 130 scripts per day.
11    That -- that kind of
12    characterization, rather than just
13    a generic business growth.
14  BY MR. BOWDEN:
15    Q.   Right.  And that -- that
16  type of generic business growth is the
17  only reason you had for approving the
18  Giant Eagle increases, true?
19        MR. SCHMIDT:  Object to
20    characterization.
21        THE WITNESS:  I think -- I
22    think with Giant Eagle we had an
23    ongoing relationship with the --
24    the team at Giant Eagle.  They

Page 352

1    were making requests based on what
2    they were seeing and we -- I -- I
3    did grant those requests.
4  BY MR. BOWDEN:
5    Q.   Okay.  Okay.  And at the top
6  you can see where Dave Gustin responds,
7  including you individually, it says, "May
8  I suggest a name and someone to channel
9  through, so we don't have things being
10  shared that may not be agreed upon by the
11  rest of the team (unlike the below which
12  is something we all agreed upon),"
13  correct?
14        That's what it says?
15    A.   That's what it says.
16    Q.   And you agree with that,
17  what was stated below in that e-mail,
18  correct?
19    A.   Well, yeah.  We -- we always
20  need to make sure that we are
21  characterizing or quantifying the
22  information to the best of our ability.
23    Q.   Did you also have Target as
24  one of your national accounts?

Page 353

1    A.   I may have at one point.
2  But not for a long period of time.
3    Q.   So as part of the CSMP
4  process, you guys spent a lot of money on
5  getting a software program in place to
6  track thresholds, right?
7    A.   I'm not sure what you're
8  talking about.
9    Q.   Let me restate that then.
10  So as part of the CSMP program or CSMP
11  process, you had computer programs that
12  would track customers, how much they were
13  getting filled, and whether or not they
14  were approaching their thresholds, right?
15    A.   Yes.
16    Q.   Okay.  And there were some
17  problems with that program, right?
18    A.   I -- there were at times.
19    Q.   And that always wasn't
20  accurate, right?  It would lead to people
21  getting fills over and beyond their
22  thresholds, correct?
23        MR. SCHMIDT:  Object to the
24    characterization.

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 THE WITNESS: I'm curious
2 about what you're referring to.
3 BY MR. BOWDEN:
4 Q. Okay. You don't recall any
5 instances in which thresholds were filled
6 or gone above -- customers went above
7 their thresholds due to deficiencies in
8 the tracking software you used?
9 A. I can't recall specifically
10 aside from a couple of events.
11 Q. Okay. I'll hand you what
12 I'm marking Exhibit 31. It's P1.1979.
13 (Document marked for
14 identification as Exhibit
15 Mahoney-31.)
16 BY MR. BOWDEN:
17 Q. Why don't you go ahead and
18 flip to the last page of this document.
19 This is an e-mail from Edwin Cabrera.
20 Are you with me on the last page, sir?
21 A. Yes.
22 Q. And at the bottom it says
23 that he's an account manager, RNA support
24 solutions. Again, that customer service

Page 355

1 team, right?
2 A. Yes.
3 Q. And he's reaching out to
4 Connie Chai, and -- who's at Target,
5 correct?
6 A. Apparently.
7 Q. It says, "Connie, please let
8 us know if any increases are necessary.
9 Thanks, Edwin."
10 Do you see that?
11 A. Yes.
12 Q. And so this is again an
13 example of where McKesson is reaching out
14 proactively to see if the customer needs
15 to have their threshold increased, not
16 the other way, the customer reaching out
17 to have their threshold increased, right?
18 MR. SCHMIDT: Objection.
19 Foundation.
20 THE WITNESS: I think he's
21 providing the customer with some
22 information and offering them an
23 opportunity to do a TCR.
24 BY MR. BOWDEN:

Page 356

1 Q. Okay. So he's -- this is
2 McKesson reaching out to ask the customer
3 to complete a TCR?
4 MR. SCHMIDT: Objection.
5 Foundation.
6 THE WITNESS: Can you repeat
7 that again?
8 BY MR. BOWDEN:
9 Q. Sure. Let's just turn to
10 the third page. Go back. Edwin is now
11 writing to Dave Gustin, who is one of
12 your DRA counterparts, right? He says,
13 "Good morning, Dave. The CSMP report is
14 showing that some Target stores are able
15 to purchase product above their threshold
16 limits. Doesn't the system prevent a
17 store once they hit 100 percent?"
18 Do you see that?
19 A. I do.
20 Q. And then Dave forwards it on
21 to the internal team, right, that PGRDRC,
22 which you're a member of that Listserv.
23 It says, "Team, anyone else seeing this?"
24 And your response is, "Keith

Page 357

1 shared with me earlier in the month that
2 it is the result of a timing conversion
3 issue related to the new Virginia
4 distribution center."
5 Do you see that?
6 A. Yes.
7 Q. So this was an issue that
8 you were aware of. This is your -- your
9 response is dated April 27th. And you're
10 saying that you were made aware of it
11 earlier in the month, right?
12 A. Yes.
13 Q. Okay. And so, in fact, you
14 actually respond within an hour of Dave
15 sending out his e-mail when he asks, "Has
16 anyone else seen this?" You were already
17 aware of the issue, correct? You had
18 been informed of it earlier that month,
19 right?
20 A. But I think this was
21 coincident with the launch of a new
22 distribution center in Fredericksburg,
23 Virginia. So the migration may have --
24 may have caused some reset issues with

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 relationship to the thresholds.
2    Q.   Okay.  I see.  So we were
3 talking earlier, during the 2011 audit
4 you said there was about 28 distribution
5 centers throughout the U.S., correct?
6    A.   Approximately.
7    Q.   How many distribution
8 centers are there as we sit here today?
9    A.   My estimate would be around
10 28 plus or minus one or two.
11    Q.   Okay.  So you're opening up
12 a new distribution center in 2012.  And
13 you were made aware earlier in that month
14 that the opening of that new distribution
15 center may result in pharmacies being
16 able to fill orders above their threshold
17 limits, correct?
18    A.   I don't know the context of
19 everything.  But I saw this.  I'd had a
20 conversation with Keith, a technical guy
21 on our team.  He had mentioned that there
22 might be some issues.
23    Q.   Okay.  Well, I see that your
24 response is that you're aware of it.  But

Page 359

1 I don't see anything that says that we
2 shouldn't fill these orders, right?
3    A.   I'm not sure of the context
4 of -- what the entire thing is or even
5 whether they received more than the 60
6 it's reflecting.
7    Q.   Okay.  Let's go on to Page 2
8 of this e-mail.
9       You see where Michael
10 Oriente -- am I pronouncing that --
11    A.   Correct.
12    Q.   Oriente.  Another one of the
13 directors of regulatory affairs says,
14 "The first week of April was not captured
15 in CSMP for the VA" -- Virginia --
16 "distribution center.  IT went back and
17 captured what was shipped and dumped it
18 in.  If what was purchased during the
19 first week and what they had purchased
20 the next two weeks was greater than the
21 threshold, the percentage went over
22 100 percent."
23       Do you see that?
24    A.   I do.

Page 360

1    Q.   And so that was an issue
2 that you knew was going to occur -- you,
3 individually, as well as at least Michael
4 Oriente another one of the --
5    A.   What makes -- why would you
6 say that I would know?
7    Q.   You said that you knew.
8       MR. SCHMIDT:  Object to the
9 characterization.
10       THE WITNESS:  Well, I think
11 what happened here, which Michael
12 just explains, is that they
13 reached those amounts because the
14 first week hadn't been captured,
15 effectively.  They did it so that
16 the system would reflect it, but
17 when they did for these particular
18 base codes and customers, they
19 already exceeded and they wouldn't
20 be able to order any more.
21 BY MR. BOWDEN:
22    Q.   Right.  But Target, on the
23 second e-mail that -- second e-mail on
24 this chain that we read, Target is

Page 361

1 actually reaching out to McKesson and
2 saying, "How is this possible?  If they
3 reached their threshold, wouldn't they be
4 cut off?"  And then internally, the
5 discussion is, "Oh, no, they wouldn't be
6 cut off, at least during this transition
7 process.  And we know the reason why is
8 that the first week of information wasn't
9 being captured," right?  That's what's
10 being said there?
11    A.   And then it was added, and
12 that's why the accumulated quantities
13 reached those levels.
14    Q.   Right.  But as part of your
15 due diligence process, you didn't tell
16 them to stop, to not fill it.  You simply
17 had a discussion internally saying, "I'm
18 aware of the issue," correct?
19    A.   I was just trying to
20 contribute to the understanding of what
21 was going on.  I think, was it Dave or
22 Edwin, and the customer pointed it out.
23 I think that Michael -- I think that Dave
24 was saying, "Has anyone seen this?  Do we

Page 362

1 know what the cause is?"  And I
2 contributed what I knew.  Michael had
3 more information.  That was his DC.
4         So he -- he was aware of it.
5 And it's an example of one of the few
6 things where there were glitches in the
7 system.
8     Q.   There's glitches in the
9 system would mean that OxyContin or
10 opioids in general, more than what a
11 company or a pharmacy was allowed to
12 get -- strike that.
13         These glitches in the system
14 meant that some pharmacies were able to
15 fill over and beyond what their threshold
16 limits were, correct?
17         MR. SCHMIDT:  Objection.
18     Characterization.
19         THE WITNESS:  They're
20     glitches they are enumerated in
21     the 2017 agreement that
22     acknowledge that system glitches
23     can happen.
24 BY MR. BOWDEN:

Page 363

1     Q.   We're going to cover that in
2 a little bit.
3     A.   Okay.
4     Q.   But the end result of that
5 is that these glitches means more drugs
6 getting to the pharmacy level and more
7 drugs potentially being diverted,
8 correct?
9         MR. SCHMIDT:  Objection.
10     Speculation.
11         THE WITNESS:  I'm not sure
12     exactly what happened.  I do see
13     that the accumulation for those
14     months was in excess of the
15     threshold.
16 BY MR. BOWDEN:
17     Q.   Okay.  Why don't you go to
18 the first page.  And this is Edwin
19 talking with Dave Gustin and Kathie
20 Oliverson.  It says, "Dave, thanks for
21 the information.  I pulled a purchase
22 history for the Target account.  I'm
23 still confused because the CSMP report
24 shows 8,844 units purchased, which is

Page 364

1 already 844 units above their monthly
2 allocation.  The BO reports showed a
3 total of 11,757 units purchased.  I
4 wanted to make sure that you were aware."
5         Do you see where that's
6 written?
7     A.   I see it.
8     Q.   And so if the CSMP are
9 showing 8,844 units when they have a
10 threshold of 8,000, that would be 10
11 percent above their threshold, right?
12 That would throw -- should throw a red
13 flag by itself, right?
14     A.   Normally the system would
15 not permit the sale or the processing of
16 an addition above the threshold limit.
17     Q.   And the threshold limit that
18 you had set -- not you individually but
19 McKesson had set internally was 10
20 percent, right?
21         MR. SCHMIDT:  Objection.
22     Vague.
23         THE WITNESS:  I think what
24     you're trying to say is the

Page 365

1     buffer.
2 BY MR. BOWDEN:
3     Q.   The buffer, yes, sir.  I'm
4 sorry.  So the buffer that you had set --
5 that McKesson had set for the thresholds
6 was 10 percent in this time period 2012,
7 right?
8     A.   I'm not sure -- I'm not sure
9 exactly what was done with RNA.  But
10 there was a buffer included in the
11 initial calculation of thresholds.
12     Q.   Okay.  Were RNAs given a
13 larger buffer?
14     A.   I don't believe so.
15     Q.   So maybe I'm just mishearing
16 you.  It sounds like you keep carving out
17 RNA as a special -- special type of
18 account.  I know they're a national
19 retail account, large chain stores.  Was
20 the buffer applied consistently across
21 all customers, or were there exceptions
22 made for retail accounts -- national
23 retail accounts?
24         MR. SCHMIDT:  Objection.

Page 366

1    Object to characterization.  I'll
2    move to strike the preamble.
3        THE WITNESS:  What's the
4    question?
5    BY MR. BOWDEN:
6    Q.   I'll rephrase it since
7    there's an objection.
8        The buffer of 10 percent
9    applied uniformly across the board for
10   all customers?
11   A.   I believe so.
12   Q.   Would it be appropriate if a
13   customer was a national retail account to
14   make an exception for them to have a
15   larger buffer?
16       MR. SCHMIDT:  Objection.
17   Foundation.
18       THE WITNESS:  Generally, I
19   don't believe so.
20   BY MR. BOWDEN:
21   Q.   And going back to this
22   e-mail, Edwin is telling the regulatory
23   affairs that the CSMP report is showing
24   8,844 units, and the BO report is showing

Page 367

1    11,757 units, correct?
2    A.   Apparently.
3    Q.   Yeah, and so there's a --
4    there's a variance there, a swing, if you
5    will, from the 8,800 to 11,700 of, what,
6    roughly 40 percent?
7    A.   I'm not sure what the
8    calculation is.
9    Q.   Sure.  The point being that
10   the system, the information that they
11   have, the tools available to determine
12   how much OxyContin or opioids are going
13   out, you are not aware based on that
14   system of what the true number is going
15   out to Target at that time, correct?
16       MR. SCHMIDT:  Objection.
17   Characterization.
18       THE WITNESS:  I'm not sure.
19   I don't see the rest of the report
20   over here.  This is something that
21   Edwin ran, and I'm not sure -- I
22   don't see the quantities so...
23   BY MR. BOWDEN:
24   Q.   When a new distribution

Page 368

1    center is opened, are glitches expected?
2    A.   I think that -- I'm not sure
3    exactly when the other ones that have
4    been opened were opened.  But I think
5    there's always a break-in period.  You
6    know, not only from a systems
7    perspective, but operationally as well.
8    Q.   Okay.  And do you find that
9    acceptable, the break-in period where
10   there might be glitches, is that -- is
11   that just a part of ordinary business for
12   McKesson?
13       MR. SCHMIDT:  Object to
14   characterization.
15       THE WITNESS:  I think that
16   there is -- there is always a
17   learning curve.  When you use new
18   equipment, when you have a new DC.
19   It's -- it's -- it's part of the
20   way operations improves.
21       MR. BOWDEN:  I'm about to
22   switch gears.  Do you want to take
23   a break?  We went 56 minutes.
24       MR. SCHMIDT:  Yeah, I just

Page 369

1    figure -- don't want to be here
2    late into the night.
3        MR. BOWDEN:  That's fine.  I
4    just want to get some water.
5        THE VIDEOGRAPHER:  Okay.
6    Stand by, please.  The time is
7    4:01 p.m.  Going off the record.
8        (Brief recess.)
9        THE VIDEOGRAPHER:  We are
10   back on the record.  The time is
11   4:16 p.m.
12   BY MR. BOWDEN:
13   Q.   All right, Mr. Mahoney.
14   When we left off, we were talking about a
15   system glitch.  Now I want to switch
16   gears and move into a different section.
17       Were there times during your
18   employment at McKesson or while you were
19   there in 2008 time period where McKesson
20   rushed to fill orders prior to the
21   enactment of new controls being in place?
22   Do you recall anything like that?
23   A.   Rushed to fill orders prior
24   to new controls being put in place?

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1   Q.   Right.
2   A.   I'm having a hard time
3 imagining what you're talking about.
4   Q.   Okay.  Well, just in
5 general, though, having controls in place
6 to make sure that opioids get into the
7 right hands is a good thing, right?
8   A.   Yes.
9   Q.   It's a good thing because
10 opioids can have a dramatic impact on
11 people's lives, addiction, injury,
12 potentially death, right?
13   A.   I have used opioids myself
14 to good effect.
15   Q.   Right.  But that's not what
16 the DEA was concerned with, was it?  It
17 wasn't people such as yourself who might
18 take it for a brief period of time and
19 then let go of it.  It was for the
20 epidemic that had been brewing since the
21 2000s, right?
22   MR. SCHMIDT:  Objection.
23   THE WITNESS:  I've had
24   interactions actually recently

Page 371

1   with the DEA around Hurricane
2   Michael in which they wanted to
3   make sure that people had access
4   to their opioids.
5 BY MR. BOWDEN:
6   Q.   Okay.  And -- okay.  But
7 you're talking about something that's
8 going to be an act of God or a natural
9 disaster, making sure that the support is
10 there so that people get medication who
11 were prescribed medication and should be
12 legitimately taking it, right?
13   A.   I'm sorry.  Can you repeat
14 the last --
15   Q.   What you're talking about
16 anecdotally is that there might be very
17 narrow circumstances in which the DEA
18 might want drugs to go out there to make
19 sure that people with legitimate medical
20 needs, that their needs are met, correct?
21   A.   I think -- I think that the
22 DEA understands that it's gray in terms
23 of determining, especially from a
24 distributor's point of view, how hard it

Page 372

1 is to determine whether something is for
2 legitimate medical purpose or it's for
3 some other illicit purpose.  And that's
4 why we do what we do.
5   Q.   Okay.  Well, I'm going to
6 hand you what I've marked as Exhibit 32
7 to your deposition.  This would be
8 P1.1845.
9   (Document marked for
10   identification as Exhibit
11   Mahoney-32.)
12 BY MR. BOWDEN:
13   Q.   And you know that McKesson
14 also distributes methadone, right?
15   A.   Yes.
16   Q.   And in 2008, McKesson was
17 distributing methadone, right?
18   A.   Yes.
19   Q.   Okay.  And early in that
20 year, you were informed that the DEA was
21 going to be issuing specific guidelines
22 on who could purchase methadone, right?
23   A.   I'm a little bit confused
24 here, because I think that what you're

Page 373

1 talking about -- okay, yes.
2   Q.   Okay.  So let's start off on
3 P1.1845.  If you can pull the first full
4 paragraph there, under validating
5 customers.  In fact, let's get the title
6 up there too.
7   A.   Yes.
8   Q.   It says, "Validating
9 customer authorization to purchase
10 methadone, 40 milligrams.  The DEA has
11 specific guidelines detailing who can
12 purchase methadone, 40 milligrams.  Due
13 to the potential for abuse and the number
14 of deaths due to overdose associated with
15 this drug, it can only be sold to
16 customers who are designated as hospitals
17 or methadone treatment centers, also
18 known as MTP, chemical abuse, or detox
19 centers."
20   Do you see where that's
21 written?
22   A.   Yes.
23   Q.   Okay.  And so you would
24 agree with me that methadone is one of

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 those drugs that can also lead to -- has
2 potential for abuse and can lead to death
3 due to overdose, correct?
4     A.   Yes.
5     Q.   Okay.  And McKesson was told
6 that DEA guidelines are coming out that
7 are going to limit the people that you
8 provide these to, correct?  The types of
9 customers, I should say, that you'll be
10 able to fill methadone orders for, right?
11     A.   I'm not sure of the date of
12 it.  But I remember it happening in
13 pretty short order when it did happen.
14     Q.   Right.  So let me hand you
15 what I'm marking as Exhibit 33, which
16 will be P1.1848.
17         (Document marked for
18         identification as Exhibit
19         Mahoney-33.)
20         MR. SCHMIDT:  Can we put
21         this to the side, or do you want
22         him to keep it?
23         MR. BOWDEN:  He can probably
24         put it to the side.  That's fine.

Page 375

1 BY MR. BOWDEN:
2     Q.   Now, in January of 2008,
3 were you still the distribution center
4 manager for Lakeland, Florida?
5     A.   We -- we -- I was actually
6 doing both jobs at the time.
7     Q.   Okay.  So you were filling a
8 dual -- dual capacity?
9     A.   Well, they had announced who
10 the new DCM was in Lakeland.  But he was
11 in the process of coming --
12     Q.   Was it still your
13 responsibility -- were you still
14 responsibile for every pill that left the
15 distribution center in January 2008?
16     A.   I was helping with
17 transition.  The person who succeeded me
18 was actually the responsible party.
19     Q.   Okay.  All right.  So let's
20 take a look at this document.  At the top
21 you can see where it says, "Methadone
22 block activation timeline."
23         Do you see that?
24     A.   Yes.

Page 376

1     Q.   And it says Friday,
2 January 4, 2008.  Does that help you
3 remember the time in which the methadone
4 block was coming out?
5     A.   Yeah, it does actually.
6     Q.   I figured it would.  All
7 right.  So it says, "10:30 a.m., Pacific
8 standard time, regional regulatory
9 directors notified of activation.
10         "12:00 a.m., John Bonner
11 updates methadone items in DITM.
12         "10:30 p.m., orders
13 submitted after this time will be subject
14 to blocking."
15         Do you see that?
16     A.   Yes.
17     Q.   And so you understand that
18 to be, as a person who was running a
19 distribution center at that time, that
20 orders submitted after that time would be
21 subject to blocking, right?
22     A.   Yes.
23     Q.   And so it says, "Saturday,
24 January 5th, 2008, any orders that were

Page 377

1 transmitted before the Friday,
2 January 4th, 10:30 p.m. cutoff may have
3 methadone in them and can be filled
4 regardless of eligibility."
5         Do you see that?
6     A.   Yeah.
7     Q.   Okay.  And we understand --
8 you understand from looking at that last
9 document --
10         MR. BOWDEN:  In fact,
11         Michael, can we do a split screen
12         with the top paragraph of the last
13         document?
14         If you can put underneath
15         that, if yeah, put that at the top
16         for our witness to see.
17         And then can you pull out
18         Monday, Tuesday and special
19         consideration on the other one?
20         That's fine for right now.
21 BY MR. BOWDEN:
22     Q.   So I want you to look along
23 with me here.  As the timeline is going
24 on, it says Monday, January 7, 2008, "Any

Highly Confidential – Subject to Further Confidentiality Review

Page 378

1 orders that were transmitted before
2 Friday cutoff may have methadone in them
3 and can be filled regardless of
4 eligibility.
5 "Customers who ordered after
6 10:30 on Friday will be subject to
7 blocking and may be rejected if
8 ineligible."
9 Do you see that?
10 A. Yes.
11 Q. "All orders will be flushed
12 through and we should be filling only
13 eligible customers."
14 That's what it says for
15 Tuesday, right?
16 A. Yes.
17 Q. Then it says special
18 considerations.
19 MR. BOWDEN: And can you put
20 the block quote from the other
21 paragraph from the other exhibit
22 above this one, please? Above
23 special considerations?
24 That's good enough.

Page 379

1 BY MR. BOWDEN:
2 Q. While he's doing that we'll
3 go ahead and read it.
4 "Special considerations. If
5 transmitted orders are held over from
6 block" -- "from before the blocking, they
7 may still have methadone on them in error
8 when they are released for filling. Go
9 ahead and fill these orders regardless of
10 eligibility."
11 Do you see that there?
12 A. I see that.
13 Q. And so what's being said
14 here internally at McKesson is go ahead
15 and fill orders, even if they have
16 methadone in them in error. And that's
17 in response to this block activation
18 timeline, right? There's a hard cutoff,
19 Friday night, but go ahead and fill it,
20 regardless of eligibility, right?
21 MR. SCHMIDT: Objection.
22 Compound.
23 BY MR. BOWDEN:
24 Q. That's what this document

Page 380

1 says?
2 A. I think what's happened --
3 MR. SCHMIDT: Same
4 objection.
5 THE WITNESS: I believe what
6 it says is that if there is an
7 order in the queue as of Friday,
8 then those are eligible to be
9 filled.
10 BY MR. BOWDEN:
11 Q. I see.
12 A. And that includes ones that
13 may not have been filled on Monday, but
14 instead were filled on Tuesday.
15 Q. Okay. So going back to
16 P-1.1845, that top paragraph. You
17 understand that the -- the purpose of
18 this methadone block was due to the
19 potential for abuse and the number of
20 deaths due to the overdose associated
21 with this drug, and because of that,
22 they're saying it can only be sold to
23 customers who are designated as hospitals
24 or methadone treatment centers, right?

Page 381

1 You understand that's the
2 purpose underlying this activation
3 timeline, correct?
4 A. I see that.
5 Q. Okay. And the special
6 considerations here for McKesson is fill
7 as many orders as you can so long as we
8 can say that they were in before the
9 cutoff timeline, right?
10 MR. SCHMIDT: Objection to
11 the characterization.
12 THE WITNESS: I don't see
13 where -- I don't see where it says
14 fill as many orders as you can.
15 BY MR. BOWDEN:
16 Q. Well, that is the net effect
17 of this, right? You could say that any
18 order that hasn't shipped as of Friday at
19 10:30 p.m. is not going to be filled, is
20 not going to be shipped out even if it's
21 in error --
22 MR. SCHMIDT: Object to --
23 object to the characterization.
24 BY MR. BOWDEN:

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1    Q.   -- correct?
2    A.   The block of methadone 40 is
3 a voluntary thing which is done by the
4 registrant, the distributors in order to
5 address the issues that the DEA was
6 concerned about.  I think the exact
7 timing in terms of the bits and bites and
8 how the last orders flow, I mean that
9 is -- it's the way operations is in the
10 real world.  I mean...
11    Q.   I see.  So the way
12 operations work for McKesson in the real
13 world is to have all the orders filled so
14 long as they were received inhouse before
15 10:30 p.m. on Friday, right?
16    A.   I think that's the process
17 that is set here.
18    Q.   Okay.
19    A.   If the customer orders it
20 before a certain time, then the
21 expectation is that it would be filled.
22    Q.   Right.  But one of the
23 concerns here is that McKesson could be
24 filling orders for people who shouldn't

Page 383

1 be recipients of it.  Customers who
2 shouldn't be getting these methadone
3 pills because they weren't customers who
4 were designated as hospitals or methadone
5 treatment centers, right?  That was one
6 of the concerns?
7       MR. SCHMIDT:  Object to the
8    characterization.
9       THE WITNESS:  We were
10    complying with the -- the DEA
11    thrust here.  And this here is
12    just the nose-on-the-ground level
13    of how this is executed.
14 BY MR. BOWDEN:
15    Q.   Okay.  So the DEA thrust, if
16 I'm hearing you correctly, is methadone
17 can be addictive, and because of that, we
18 want to make sure that it's only into the
19 hands of the proper parties.  If I've
20 stated that correctly, is your
21 understanding?
22    A.   When you say methadone
23 generically like that, we still sell
24 methadone to all sorts of RNA independent

Page 384

1 retail.  It's only in this disc format --
2    Q.   Okay.
3    A.   -- that is -- it's intended
4 for detox.  And we agreed with the DEA's
5 request to go ahead and limit it to those
6 recipients.
7    Q.   Okay.  Is it true at that
8 time that McKesson was filling orders for
9 people who did not meet what the DEA felt
10 were the proper customers, that being
11 other hospitals or methadone treatment
12 centers?
13    A.   I have no idea.
14    Q.   And you say you have no
15 idea, is that because McKesson didn't
16 have a system in place to track that?
17    A.   Were there individual
18 customers which were permitted to receive
19 methadone?
20    Q.   Right.
21    A.   Were, in fact, receiving
22 40 milligrams or not?
23    Q.   No, whether those were the
24 actual proper customers to be receiving

Page 385

1 it, whether they were methadone clinics,
2 whether they were hospitals.
3       MR. SCHMIDT:  Objection.
4    Form.
5       THE WITNESS:  I'm confused
6    to where you are going or what --
7    what your point is.
8 BY MR. BOWDEN:
9    Q.   I'm asking you, as a person
10 who was a director of regulatory affairs
11 and a person who used to be in charge of
12 the Lakeland distribution center, whether
13 McKesson had in place a system that was
14 robust enough to track whether methadone
15 40 milligrams was going to just hospitals
16 and just methadone clinics as of
17 January 2008?
18    A.   Yes, we did.
19    Q.   So if that's the
20 case, why would there be a special
21 consideration to fill orders containing
22 methadone that may be in error?
23       MR. SCHMIDT:  Object to
24    characterization.

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    THE WITNESS:  Again I think
2  this is a transitional explanation
3  for the people who have questions
4  at the DC level of what to do with
5  orders as received and processed
6  in the middle of the night.
7  BY MR. BOWDEN:
8    Q.   Okay.  So the direction to
9  DC, the distribution centers, is that if
10  you have a concern, if you think there
11  may be an error about whether this is a
12  customer who should be receiving
13  methadone 40 milligrams, so long as that
14  order came in before 10:30 p.m. on
15  Friday, go ahead and fill it, even if it
16  might be in error.  That was the message?
17    MR. SCHMIDT:  Object to
18  characterization.
19    THE WITNESS:  I think first
20  off if you look at the document
21  here it says completed by
22  December 31st -- or January 31st.
23    So we -- we were doing this
24  proactively in order to comply

Page 387

1  with a DEA request to -- to limit
2  these orders to retail accounts.
3  And we did it, you see here, it is
4  detailed on how that is
5  accomplished.
6  BY MR. BOWDEN:
7    Q.   Okay.  All right.  I'm going
8  to hand you what I will mark as 34,
9  Exhibit 34 to your deposition.  That will
10  be P-1.1959.
11    (Document marked for
12  identification as Exhibit
13  Mahoney-34.)
14    MR. SCHMIDT:  Sorry.
15    MR. BOWDEN:  No problem.
16  BY MR. BOWDEN:
17    Q.   You had talked previously
18  earlier in the day about STARS, right?
19  Can you explain to us again what that is?
20    A.   STARS is an audit process
21  whereby the DRAs would go to the DCs
22  typically within their operating area and
23  do audits of DC's adherence to the
24  requirements.

Page 388

1    Q.   Okay.  And that would help
2  also to identify customers who may be
3  considered high risk; is that right?
4    A.   It was not
5  customer-oriented.  It was more
6  DC-oriented.
7    Q.   Okay.
8    A.   Internal processes.
9    Q.   Okay.  So DCs that may be at
10  high risk due to lax adherence to
11  protocols, would that be an example?
12    MR. SCHMIDT:  Object to
13  characterization.
14    THE WITNESS:  It was a
15  check, not risk-based.  But the
16  expectation was that I would go to
17  all the DCs within my area.
18  BY MR. BOWDEN:
19    Q.   Okay.  Let's turn to the
20  last page of this document.  This is an
21  August 5, 2011, e-mail from Tracy Jonas.
22  The subject is STARS validations.
23    And says, "Team, over the
24  next few weeks you will be contacted by

Page 389

1  the RCG group to discuss STARS
2  validations regarding your STARS issues
3  rated as 'high' risk from previous
4  audits.  As you may recall, all high risk
5  STARS issues require validation of
6  completion by a third party in order to
7  be marked as completed on the issues
8  list."
9    Did I read that correctly?
10    A.   Yes.
11    Q.   And this is actually one of
12  the STARS audit processes that you were
13  personally involved in, right?
14    A.   Yes.
15    Q.   And this is also dealing
16  with the Lakeland distribution center,
17  right?
18    A.   Let me take a look.
19    Q.   Let me direct your -- your
20  attention to the -- if you go back one
21  prior page.  You see the e-mail from
22  Benjamin Coppolo there, in the middle of
23  the page?
24    A.   This 4, Page 4?

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1   Q.   Yes.
2   A.   Okay.
3   Q.   It's on the screen for you
4 as well.
5   A.   Okay.
6   Q.   And it says, "We closed out
7 the CSMP question back in March.  It must
8 have been missed when the spreadsheets
9 were going back and forth.  We have that
10 one completed.  The methadone clinic
11 question is not one that we have a solid
12 way to enforce.  There is no systematic
13 way to identify the methadone clinics
14 that are serviced by the distribution
15 centers nor is there a way to track the
16 signatures through the system.  We are
17 going to accept the failure on this since
18 the risk of this process is so low and we
19 are not out of compliance."
20      Do you see where that's
21 written?
22   A.   I see it.
23   Q.   Mr. Bryant forwards on to
24 Ms. Jonas above that -- or Mr. Jonas,

Page 391

1 above that, "Tracy, FYI the Lakeland DC
2 has elected to accept the failure on the
3 methadone clinic issue.  Still working on
4 other issues at Lakeland."
5      Do you see where that's
6 written?
7   A.   I see that.
8   Q.   And if you continue on to --
9 go back to Page three, you're brought
10 into the discussion.
11      Do you see where that's
12 written?
13   A.   Mm-hmm.
14   Q.   Tracy Jonas is writing to
15 you, says, "Bill, I want to bring this to
16 your attention.  The Lakeland DC failed
17 the methadone clinic component on a STARS
18 audit.  Subsequently, it was noted as a
19 high risk given the issues that McKesson
20 has had in the past."
21      She is referring to 2008
22 settlement there?
23   A.   Excuse me?
24   Q.   What issues in the past do

Page 392

1 you understand her to be referencing
2 there?
3   A.   I'm not sure.  Tracy is a
4 guy, by the way.
5   Q.   I'm sorry.  What issues do
6 you understand him to be referencing in
7 the past there?
8   A.   I would assume it would be
9 related to the 2008 settlement.
10   Q.   Right.  Subsequently --
11 excuse me.  "This then required a
12 third-party validation in order to clear
13 the STARS audit issues list.  You can see
14 the response from Ben below when asked to
15 validate completion.  This would seem
16 unacceptable to me.  Were you aware of
17 it?"
18      Do you see that?
19   A.   I see it.
20   Q.   And you respond back,
21 saying, "I'm just finding out about this.
22 Will follow up.  I will agree with you."
23 Or, "I agree with you."  Right?
24   A.   Yes.

Page 393

1   Q.   And so what's going on here
2 is that the issue has been raised that
3 there is no systematic way at the
4 Lakeland DC to identify the methadone
5 clinics that were being serviced, right?
6   A.   Well, there were two
7 methadone clinics that were being
8 serviced.
9   Q.   And there's no way to track
10 the signatures through the system, right?
11 And the failures, they were just going to
12 accept them, correct?
13   A.   I'm not sure if I recall
14 that they were ordering much in the way
15 of methadone.  I think that by this time,
16 the clinics had moved mostly to
17 buprenorphine.
18   Q.   That's not my question.  My
19 question to you earlier is whether you
20 felt that you had a system in place that
21 was robust enough to identify proper
22 customers.  And now we have Mr. Coppolo
23 saying that there's no systematic way to
24 identify the methadone clinics that are

Page 394

¹ serviced by a distribution center, nor is
² there a way to track the signatures
³ through the system. They're trying to
⁴ fix it. He says, "We're simply going to
⁵ accept the failure on this." Right?
⁶     A.   I know these are two detox
⁷ clinics.
⁸     Q.   Okay.
⁹     A.   There is a system whereby we
¹⁰ get a signature that -- of a responsible
¹¹ party who is authorized to receive the
¹² product. And that is what's done at a
¹³ DC. I'm not sure exactly what the
¹⁴ situation was in 2011.
¹⁵     Q.   All right. So if you go to
¹⁶ the first page. You have actually noted
¹⁷ some more of these system glitches,
¹⁸ correct? You write, "Given the
¹⁹ incomplete schedule report is confounded
²⁰ by the use of DEA numbers for contract
²¹ pricing, would use the" -- "would the use
²² of the NTIS report this way, i.e., to
²³ filter on the DEA business class for
²⁴ compounder/maintenance and detox and

Page 395

¹ detoxification, give us a quick and
² thorough way to evaluate all customers
³ for which a DC needs to adhere to this?"
⁴ And this being the procedure per Section
⁵ 55, right?
⁶         MR. SCHMIDT: Objection.
⁷     Compound.
⁸         THE WITNESS: What's the
⁹     question?
¹⁰ BY MR. BOWDEN:
¹¹     Q.   I'm asking if, in your
¹² review of this when you got these e-mails
¹³ from your colleagues, if you identified
¹⁴ another one of those system glitches, as
¹⁵ you described earlier, that would inhibit
¹⁶ a distribution center from adequately
¹⁷ identifying the methadone clinics?
¹⁸     A.   No. We knew exactly who the
¹⁹ methadone clinics were. What we -- what
²⁰ we were required to do is to have a
²¹ record of the signature of the authorized
²² person to receive it at the other end.
²³ And we put that in place, but it's a
²⁴ manual -- it's not a system glitch issue.

Page 396

¹ It's a manual process.
²     Q.   Okay. That's not something
³ that you felt that failure was acceptable
⁴ on?
⁵     A.   No, I didn't feel like the
⁶ failure was acceptable. I don't think we
⁷ were failing it either.
⁸     Q.   Was this the first time that
⁹ you were made aware of an issue in
¹⁰ tracking the required documentation with
¹¹ the methadone clinic through the Lakeland
¹² distribution center?
¹³     A.   I'm not sure.
¹⁴     Q.   How many times do you think
¹⁵ that they had a failure without you
¹⁶ knowing about it?
¹⁷         MR. SCHMIDT: Object to
¹⁸     speculation.
¹⁹         THE WITNESS: I don't know.
²⁰ BY MR. BOWDEN:
²¹     Q.   As part of your review
²² process here, did you look into it?
²³     A.   Yes.
²⁴     Q.   And clearly they thought at

Page 397

¹ that time, at least at the distribution
² center level, that taking the fail was an
³ option, right?
⁴     A.   I'm not sure what that
⁵ gentleman was thinking.
⁶     Q.   Well, he said, "We're going
⁷ to accept the failure on this," correct?
⁸     A.   I see that.
⁹     Q.   Okay. And so clearly at the
¹⁰ distribution center level, they felt that
¹¹ taking the failure was an option instead
¹² of fixing the problem and complying,
¹³ correct?
¹⁴     A.   I'm not sure what he was
¹⁵ thinking, but I agreed with Tracy and
¹⁶ what he was saying.
¹⁷     Q.   You can set that one aside.
¹⁸ Now, earlier when we were talking about
¹⁹ the CSMP process generally, you also get
²⁰ information occasionally from the actual
²¹ producers of opioids, correct, in terms
²² of pharmacies to look out for, doctors to
²³ look out for, correct?
²⁴     A.   A lot of times, they have

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1 inquiries on the pharmacies.
2     Q.   They might share with
3 McKesson pharmacies or pain clinics that
4 would be cause for concern, true?
5     A.   I think that the
6 manufacturers have different ways of
7 doing it.  But yeah, I think that they
8 would raise questions on various
9 customers of ours.
10     Q.   Okay.  And they would share
11 that with McKesson on a frequent basis?
12     A.   I think that the typical
13 channel was for them to communicate with
14 Don.  And then for him to -- Don Walker,
15 and for him to request that we do some
16 diligence on customers that they
17 expressed interest in.
18     Q.   Okay.  And did Don, when he
19 shared that information with you or other
20 directors of regulatory affairs, did he
21 expect you to take that into
22 consideration and act upon it in terms of
23 denying or blocking orders from going out
24 of a distribution center?

Page 399

1     MR. SCHMIDT:  Objection.
2 Foundation.
3     THE WITNESS:  No, I don't
4     think that was -- that was what he
5     was doing.
6     When he did that, he was
7     asking for more information on
8     those customers.
9 BY MR. BOWDEN:
10     Q.   Okay.  Let me rephrase it
11 here.  Maybe I can clarify it to the
12 extent it was confusing.
13     If a manufacturer reached
14 out to McKesson and said, "We're aware of
15 the following clinics or the following
16 pharmacies that we believe are cause for
17 concern, that perhaps you shouldn't be
18 filling orders submitted by these
19 pharmacies."  Is that information that
20 would have been shared with you?
21     A.   I think that they -- I think
22 those manufacturers would see information
23 that caused them to be curious about what
24 was going on, so they would pass that

Page 400

1 along to Don.
2     Q.   Right.
3     A.   He would ask for more
4 information on those.  From us.
5     Q.   Okay.  All right.  So that
6 would go on to Don.  And Don would ask
7 for more information.  And then depending
8 on what he got back, would he ever share
9 that information with -- with the
10 regulatory affairs department?
11     A.   So Don Walker would ask for
12 information from us.  We would do
13 research and/or visit or interview the
14 customer, make a determination, and give
15 it back to him.
16     Q.   I see.
17     A.   And he would -- he would
18 meet with that person.
19     Some -- there was occasion
20 when I met with a couple of people on my
21 DCs.
22     Q.   Okay.  All right.  So the
23 information that you're talking about
24 that was being sought by Don was

Page 401

1 information being sought by the directors
2 of regulatory affairs, not necessarily
3 from the manufacturer, correct?
4     A.   Let's say Mallinckrodt
5 observes that a customer which hadn't
6 prior been ordering oxycodone from them,
7 all of the sudden is ordering oxycodone
8 from them.  And they're trying to
9 understand what's going on.  And it may
10 have been that their version of it was
11 included in someone's formulary, and that
12 caused an ongoing demand for oxycodone to
13 be shifted from one manufacturer to
14 another, but their overall dispensing may
15 not have changed.
16     Q.   Gotcha.  You mentioned
17 Mallinckrodt.  I'm going to show you
18 P-1.1697.
19     (Document marked for
20     identification as Exhibit
21     Mahoney-35.)
22 BY MR. BOWDEN:
23     Q.   That should be Exhibit
24 Number 35, which is P-1.1697.

Page 402

1  You can see at the bottom of
2  this document, this is an e-mail from
3  Michael Oriente to Don Walker copying you
4  on here.  It says, "I just got a call
5  from Bill Ratiliff with Mallinckrodt."
6  And that is a manufacturer of opioids,
7  correct?
8      A.   Mallinckrodt, yes.
9      Q.   Okay.  And they're a
10 supplier -- or rather, McKesson is a
11 purchaser of Mallinckrodt opioids,
12 correct, for distribution?
13     A.   Yes.
14     Q.   It says here, "Don, I just
15 received a call from Bill Ratiliff and
16 the woman that met with Bill.  He was
17 very accusatory toward our due diligence
18 and the tone he was using I found to be
19 insulting."
20         Do you have a recollection
21 of this meeting?
22     A.   I think he's talking about a
23 meeting that he had or a call that he
24 had.

Page 403

1      Q.   Okay.
2      A.   So Michael Oriente is
3  relaying information that he had, I
4  guess, on a phone call with this guy,
5  Bill Ratiliff and -- I think her name was
6  Karen.  I can't remember her name
7  offhand.
8      Q.   So Bill and his colleague,
9  though, are people -- excuse me.  Bill
10 Ratiliff and his colleague were people
11 whom you had previously met with
12 yourself?
13     A.   I'm not sure about the
14 timing relative to this, but I think some
15 time in this, either before or after, I
16 had met with them when they came to the
17 Lakeland DC.
18     Q.   Right.  And Michael
19 continues on.  "He was abrupt after my
20 answers when they were not what he wanted
21 to hear.  He asked how many customers I
22 had on the list, and I told him 15 of the
23 20.  He asked me if I had finished the
24 sheets and I told him I completed eight

Page 404

1  and planned to finish today.  He asked
2  why did we continue to fill for these
3  customers if a doctor was identified, and
4  I told him that the doctor was reported
5  to the DEA as a doctor they may want to
6  look at.  He said we should have stopped
7  shipping if a doctor is identified as
8  being a high prescriber, again subjective
9  as what is high.  He mentioned he is
10 ex-law enforcement and he differed on my
11 opinion.  I told him no increases were
12 made to accounts that we felt were at a
13 threshold that we felt should not be
14 raised.  He felt we should have stopped
15 shipping to a few customers altogether."
16         Do you see where that's
17 written?
18     A.   I do.
19     Q.   And -- excuse me.  So what's
20 happening here is Mallinckrodt is
21 reaching out saying that you guys are
22 filling orders, you being McKesson, that
23 they've identified those orders shouldn't
24 be filled based on the customers they are

Page 405

1  going to, right?
2      A.   I don't think so.  I think
3  they were doing some verification.  I had
4  a similar meeting, I guess, with these
5  guys and I found -- I didn't find them to
6  be rude or abrupt at all.  I thought it
7  was a good meeting.
8      Q.   Okay.  Well, what's
9  happening at least according to Michael
10 in his e-mail to Don and copying you on
11 it, is he's relaying that the
12 manufacturers have looked into the
13 doctors, right, and they are taking issue
14 with McKesson filling orders to those
15 doctors, right?
16     A.   I think, specifically to
17 Michael on this, apparently.
18     Q.   And so the response was that
19 what McKesson had done is while the
20 manufacturers' opinion is they shouldn't
21 fill it, McKesson simply said we forward
22 that information on to the DEA but
23 continued to fill the orders, right?
24     A.   I -- I don't know the

Page 406

1 context of the situation with Michael
2 Oriente there.
3     Q.   Okay.  So were there
4 occasions when manufacturers would reach
5 out to you or others at McKesson and say
6 we feel that you should not fill orders
7 to these customers and McKesson filled
8 the orders anyway?
9     A.   I don't recall them saying
10 that to me.
11     Q.   Okay.  But that's what that
12 says on this e-mail, correct?
13        MR. SCHMIDT:  Objection.
14     Asked and answered.
15        THE WITNESS:  I don't see
16     where it says what you're saying,
17     especially as it relates to me.
18 BY MR. BOWDEN:
19     Q.   Okay.  So it -- would it
20 have been the practice of McKesson to
21 defer to the DEA to take action against
22 doctors instead of McKesson not filling
23 an order?
24        MR. SCHMIDT:  Objection.

Page 407

1     Vague.
2        THE WITNESS:  The -- the
3     context is hard to understand, you
4     know.
5 BY MR. BOWDEN:
6     Q.   I'm just asking you
7 independent of this e-mail here.  So long
8 as McKesson didn't feel they were blowing
9 through a threshold, did McKesson feel
10 that it was okay to fill orders to
11 doctors and pharmacies for which concerns
12 had been raised by manufacturers and
13 those manufacturers were saying you
14 should not be filling these orders?
15        MR. SCHMIDT:  Objection.
16     Vague.
17        THE WITNESS:  I think you're
18     misunderstanding in terms of the
19     doctor being the writer or the
20     dispenser.
21        We weren't -- we weren't
22     selling to dispensing physicians.
23     Okay?
24        So I think Michael may have

Page 408

1     done some research which
2     identified a doctor who was still
3     licensed, still registered with
4     the DEA, and he was writing some
5     portion of the scripts that this
6     pharmacy was filling.
7 BY MR. BOWDEN:
8     Q.   Right, I was combining the
9 two so let me rephrase it.  I think
10 you're -- fair distinction.
11        Would you -- my question to
12 you then is did McKesson feel that it was
13 appropriate to fill orders for a
14 pharmacy, when one of the customers of
15 the pharmacy was a doctor who had been
16 identified by the manufacturer as someone
17 who should not be having orders filled?
18     A.   You're saying the doctor was
19 a customer of the pharmacy.
20     Q.   Is that not what this says?
21        He asked why did we continue
22 to fill it for these customers if a
23 doctor was identified.  And I told him
24 the doctor was reported to the DEA as a

Page 409

1 doctor they may want to look at.
2     A.   Okay.
3     Q.   So instead of stopping the
4 flow of pills to the pharmacy, what
5 happened was McKesson simply informed the
6 DEA, this might be something that the DEA
7 wants to look into, correct?
8        MR. SCHMIDT:  Objection.
9     Foundation.
10        THE WITNESS:  I don't -- I
11     don't know what Michael -- what
12     information he had about a
13     particular doctor.  But I think
14     that he -- again, you are
15     misunderstanding the -- the flow
16     of the product and who is writing
17     it.
18        I guess my -- my
19     interpretation is that the doctor
20     was writing scripts that were
21     being filled by this pharmacy,
22     okay.
23        And for whatever reason,
24     Michael had some information about

Page 410

1  the doctor that I think he shared
2  with the DEA, okay.
3       The doctor was licensed.
4  The doctor was registered.
5       I'm not sure if he shared
6  the information with the pharmacy.
7  You know, I don't know. This is
8  third party, you're asking me to
9  comment on -- on what happened.
10  But it's not consistent with my
11  experience with Bill Ratiliff and
12  Karen.
13  BY MR. BOWDEN:
14      Q.   That would give rise to the
15  concern of divergence, correct, if there
16  was a doctor identified as a high
17  prescriber or writing prescriptions to
18  people who may not be in medical need of
19  the prescriptions, that could be an
20  example of divergence, correct?
21       MR. SCHMIDT:  Objection.
22  Foundation.
23       THE WITNESS:  I -- and I
24  think --

Page 411

1  BY MR. BOWDEN:
2      Q.   I'm not asking the context
3  of this e-mail.
4       MR. SCHMIDT:  Let him finish
5  his answer, please. I think he
6  gets to answer your question.
7       You can answer the question.
8       THE WITNESS:  I'm -- I'm
9  just saying that our ability to
10  affect the actions of others based
11  on observation of -- which is --
12  is probably anecdotal based on
13  what I'm seeing, is quite limited.
14  So I think -- I think Michael was
15  trying to do the right thing, but
16  I don't have -- I don't think I
17  ever had that kind of information
18  about doctors.
19  BY MR. BOWDEN:
20      Q.   Okay. I think I may have
21  misspoke there. But that could be an
22  example of diversion, correct?
23       MR. SCHMIDT:  Objection.
24  Vague.

Page 412

1       THE WITNESS:  Are you
2  talking about doctors who are
3  writing excessive prescriptions?
4  BY MR. BOWDEN:
5      Q.   Correct.
6      A.   That would be an example of
7  diversion.
8      Q.   Right. And some of the ways
9  that you could become aware of diversion
10  is either conducting your own
11  investigation, correct, that would be one
12  way you can find out about it?
13      A.   About that kind of
14  diversion?
15      Q.   Yeah. There's nothing that
16  prohibits McKesson, if -- if someone
17  gives them a tip that says this is a
18  doctor you might want to be concerned
19  about, from picking up the phone and
20  talking to the doctor or doing research
21  to see if they have a DEA license, what
22  their customer base is, picking up the
23  phone and asking, there's nothing that
24  prohibits you from doing that, correct?

Page 413

1      A.   Calling the doctor?
2      Q.   I'm asking you, are there
3  steps that McKesson could take to
4  investigate a doctor themselves?
5      A.   I think that that's outside
6  of McKesson's obligation as a distributor
7  to set up effective systems.
8      Q.   Okay.
9      A.   I'm not sure if collecting
10  an aggregation of a doctors prescribing
11  is -- is something we even have access
12  to.
13      Q.   Okay. When someone raises
14  it to the attention of McKesson directly,
15  do you feel that McKesson has no
16  obligation to conduct site visits with
17  the pharmacy, conduct interviews, or is
18  their obligation merely to inform the
19  DEA?
20      A.   About a doctor?
21      Q.   About an issue where --
22      A.   We do do site visits at the
23  pharmacy. I don't see us doing a site
24  visit at a doctor who may be a prescriber

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1 that the pharmacy is filling.
2         Part of what we're trying to
3 do is get customers to fulfill their
4 corresponding responsibility. That's
5 where a lot of our questioning comes
6 from.
7     Q.   Okay.  Switching over to --
8 I'll hand you what I'm marking as
9 Exhibit Number 36.  P-1.1990.
10         (Document marked for
11         identification as Exhibit
12         Mahoney-36.)
13 BY MR. BOWDEN:
14     Q.   Part of what we discussed
15 earlier was the fact that TCR is
16 requesting to be well documented, right,
17 and that was true in 2011 as well as it
18 is today, correct?
19         MR. SCHMIDT:  Object to
20         characterization.
21 BY MR. BOWDEN:
22     Q.   Why don't you take a look at
23 this e-mail at the bottom from Dave
24 Gustin.  Was Rite Aid one of your

Page 415

1 accounts?
2     A.   No.
3     Q.   It was not?  Okay.  But
4 would it be common for you to be copied
5 on correspondence dealing with other
6 people's national accounts?
7     A.   Not typically.
8     Q.   Would it only be typical if
9 there was an issue to be decided such as
10 a major threshold increase?
11     A.   I'm not sure.
12     Q.   Let's read it here.  It
13 says, "Michael, you left this one from
14 yesterday.  I can see it may be an issue.
15 This account already got an increase of
16 oxy of 4,000 doses a week, and now wants
17 a 15 percent increase.  This will take
18 them from 27.5000 to 36,000, 33 percent
19 more so, in two steps in the same month.
20 I will leave this one to you to decide
21 unless Jenna can give me assurances that
22 Rite Aid Corp. has taken a hard look at
23 this and the pain doctor and insists they
24 want this increase."

Page 416

1         Do you see that there?  Do
2 you see where that --
3     A.   I see it there.
4     Q.   You would agree with me that
5 when there are threshold changes
6 requested that it would be appropriate in
7 some circumstances, or that McKesson has
8 the ability to reach out to the pharmacy
9 and ask for assurances that the pain
10 doctor is -- strike that.
11         You'd agree with me that
12 McKesson has the ability to conduct its
13 own investigations and to ask for
14 follow-up information with pharmacies
15 when they have new doctors such as pain
16 clinics placing large orders through them
17 or filling prescriptions through them,
18 correct?
19     A.   I'll agree with you what?
20 I'm sorry.
21     Q.   Are you having trouble
22 hearing me or just understanding the
23 question?
24     A.   It was a long question and I

Page 417

1 lost the train.
2     Q.   All right.  I'll break it
3 down for you.
4         You see this e-mail is Rite
5 Aid asking for a 33 percent increase in
6 their threshold, right?
7     A.   Right.  Mm-hmm.
8     Q.   And that would be a
9 33 percent increase in the same month,
10 right?
11     A.   Yes.
12     Q.   That's what this says.  And
13 what's happening here is Dave Gustin, one
14 of the directors of regulatory affairs,
15 is saying that he needs more information.
16 They need assurances, correct, in order
17 to make this threshold increase?
18     A.   I think he's trying to
19 understand more about the situation.
20     Q.   And so what happens in the
21 follow-up in this e-mail that you're
22 copied on, is that Jenna Nichols says, "I
23 just sent a note to Rite Aid's director
24 of loss prevention to bring this to her

Page 418

1 attention and confirm if she feels the
2 increase is warranted."
3       Do you see that?
4    A.   Yes.
5    Q.   Is that the level of
6 diligence that McKesson would go through,
7 say, go back to the customer, to say, "Is
8 this increase actually warranted," in
9 order to complete a TCR?
10    A.   I think this is definitely
11 evidence of pushback.  I'm not sure what
12 eventually happened with this.  It may
13 well have met with the loss prevention
14 director's agreement that this shouldn't
15 be filled.  I don't know.
16    Q.   But my question to you is
17 more general.  If a 33 percent increase
18 is requested, is it sufficient due
19 diligence simply to ask the pharmacy if
20 they really want the increase?
21    A.   No.  That didn't -- that
22 didn't result in it being completed.
23    Q.   Okay.  You can set that one
24 aside.

Page 419

1       MR. BOWDEN:  Off the record
2 real quick.  Can you say the time.
3       THE VIDEOGRAPHER:
4 44 minutes on the record.  And
5 total 5 hours and 46 minutes.
6       MR. SCHMIDT:  That's not
7 correct.  We've been going since
8 4:01.
9       THE VIDEOGRAPHER:  You mean
10 time on the record?
11       MR. SCHMIDT:  This last
12 break, we've been going since
13 4:01.  It was the wrong time down.
14       MR. BOWDEN:  I just wanted
15 to use full time.  I'm not asking
16 to take a break.
17       MR. SCHMIDT:  Maybe I wrote
18 down the wrong time.  But I
19 thought we'd been going for six
20 hours.
21       THE VIDEOGRAPHER:  We've
22 been on the record for 45 minutes.
23 And the record on the camera is
24 five hours and 46 minutes.

Page 420

1       Should I stop the camera?
2       MR. SCHMIDT:  No, let's stay
3 on the record.  Unless you want
4 to --
5       MR. BOWDEN:  No, I just
6 asked to go off to get a count.
7       MR. SCHMIDT:  I might
8 have -- just to be clear, I might
9 have written down the wrong time.
10       THE VIDEOGRAPHER:  No
11 problem.
12       MR. SCHMIDT:  It's just the
13 extra 15 minutes at this time of
14 day, it felt like it crushed my
15 soul.  So I had to react.
16       MR. BOWDEN:  I'll withhold
17 the comments on the soul.
18       MR. SCHMIDT:  That comes in
19 spades, my friend.
20       MR. BOWDEN:  I'll tell you
21 what, let's pause for a second.
22 I'm cutting down some documents.
23 Not to -- I'm not going to leave
24 or anything.  Go off the record

Page 421

1 for a second.
2       THE VIDEOGRAPHER:  The time
3 is 5:02 p.m.  Off the record.
4       (Short break.)
5       THE VIDEOGRAPHER:  The time
6 is 5:05 p.m.  Back on the record.
7 BY MR. BOWDEN:
8    Q.   Sir, you're familiar with
9 the HDMA, correct?
10    A.   Yes.
11    Q.   And that was an industry
12 organization in which McKesson was a
13 member?
14    A.   Yes.
15    Q.   All right.  And that
16 industry trade group -- is that fair to
17 call it an industry trade group?
18    A.   Yes.
19    Q.   -- helped to develop or had
20 developed its own guidelines for
21 monitoring of suspicious ordering; is
22 that right?
23    A.   I think they had worked with
24 members in order to collect some best

Page 422

1 practices, that kind of thing.
2     Q.   Okay.  And McKesson itself
3 had agreed to follow the HDMA guidelines,
4 right?
5     A.   I'm not sure about that.
6     Q.   All right.  Well, McKesson
7 as a member, did it participate in the
8 drafting of those guidelines, or do you
9 know?
10     A.   I don't know.
11     Q.   Are the HDMA guidelines
12 something that you followed as a
13 distribution center manager and/or -- and
14 as director of regulatory affairs?
15     A.   I'm not sure -- are you
16 talking about specific guidelines or --
17     Q.   Yeah.  Specific guidelines
18 for suspicious order monitoring?
19     A.   I know that they issued
20 some.  I don't have them.
21     Q.   Okay.  Would you agree with
22 me that the monitoring of suspicious
23 orders and sending that information to
24 the DEA is important?

Page 423

1     A.   Yes.
2     Q.   It's important to help
3 curtail the opioid epidemic, right?
4 Epidemic.
5     A.   It's a part of our
6 obligation under the CSA.
7     Q.   Right.  And beyond just
8 having a legal obligation, it's something
9 that should be important to McKesson,
10 right?
11     A.   We do what we -- we report
12 the suspicious orders as defined right
13 now.
14     Q.   You do what you're now --
15 you said that, the reporting of
16 suspicious orders, that didn't exist just
17 as a result of the 2017 agreement, right?
18     A.   No.
19     Q.   It came about as a result of
20 the May 2008 settlement agreement, right?
21     A.   Right.  And what we did was
22 an omit would kick off the process to a
23 Level 1, which would go to Level 2.  And
24 if we determined that it was suspicious

Page 424

1 at Level 3, we would shut the customer
2 down and report it to the DEA.
3     Q.   I'm going to hand you what
4 I'm marking as Exhibit Number 37,
5 P1.1941.
6         (Document marked for
7         identification as Exhibit
8         Mahoney-37.)
9 BY MR. BOWDEN:
10     Q.   This is an e-mail from you,
11 March 11, 2013, to Don Walker, Bruce
12 Russell, and Gary Hilliard.
13         Do you see that?
14     A.   Yes.
15     Q.   And the subject is "HDMA
16 notes," right?
17     A.   Yes.
18     Q.   And it says, "Gary and I
19 attended the HDMA conference last week.
20 These are my notes.  Perhaps the most
21 surprising revelation was Steve Reardon
22 and Gilberto Quintero saying Cardinal
23 does not report suspicious orders to the
24 DEA, no upside."

Page 425

1         Do you see where that's
2 written?
3     A.   I do.
4     Q.   Do you agree that there's no
5 upside to reporting suspicious orders to
6 the DEA?
7     A.   You know, I think I --
8         MS. McNAMARA:  Objection to
9 form.
10         MR. SCHMIDT:  You can still
11     answer.  Go ahead.
12         THE WITNESS:  I believe that
13     in my writing this, I misspoke.
14     And I was referring to when they
15     shut customers down because they
16     were suspicious customers.
17 BY MR. BOWDEN:
18     Q.   When did you come up with
19 that belief?  Is that recent?
20     A.   I saw that -- I said
21 suspicious orders.  That isn't what they
22 said.  What we do -- what we did was to
23 write a letter to the DEA when we were
24 shutting a customer down.  And they said

Page 426

1 they don't do that.
2 Q. Okay. Well, if Cardinal
3 were not reporting suspicious orders,
4 would you agree -- strike that.
5 It would be inappropriate to
6 not report suspicious orders, true?
7 A. Like I said, I misspoke
8 here.
9 Q. I'm not asking you about the
10 context of this e-mail. I'm asking you,
11 it would be inappropriate -- it would be
12 a violation of the CSMP not to report
13 suspicious orders, correct?
14 A. It's part of our CSMP to
15 report suspicious orders.
16 Q. What are the upsides for
17 reporting suspicious orders to the DEA?
18 A. Notify them of orders that
19 have reached their -- our thresholds for
20 the customers.
21 Q. Okay. What other upsides
22 would there be? What are the practical
23 implications of that?
24 A. Can let the DEA see where --

Page 427

1 where customers are hitting the
2 thresholds.
3 Q. When you wrote this
4 statement, "Cardinal does not report
5 suspicious orders to the DEA, no upside,"
6 did you make that statement to anyone
7 else beyond McKesson?
8 A. I don't know, but I don't
9 believe so.
10 Q. For example, did you share
11 with the DEA that Cardinal told you they
12 had not reported suspicious orders to the
13 DEA?
14 MR. SCHMIDT: Object to
15 characterization.
16 THE WITNESS: I don't think
17 I had -- I don't think I had a
18 discussion with the DEA on
19 Cardinal at all.
20 BY MR. BOWDEN:
21 Q. Is it McKesson's obligation
22 to report suspicious orders whenever they
23 observe them?
24 MR. SCHMIDT: Objection.

Page 428

1 Form.
2 THE WITNESS: We report them
3 automatically when customers hit
4 their -- their threshold.
5 BY MR. BOWDEN:
6 Q. Go to the second page of
7 that document if you will. At the bottom
8 of this, these are your -- your memo
9 notes, right, your meeting minutes from
10 HDMA, from the conference you had?
11 A. Yes.
12 Q. Right?
13 And at the bottom of the
14 second page where it says, "Later had
15 dinner with the group." Do you see that?
16 A. Yes.
17 Q. "Later had dinner with the
18 group. Interesting gossip came from
19 Reardon/Quintero who relate that Cardinal
20 is not reporting suspicious orders to the
21 DEA on advice of outside counsel.
22 Appears to be Linden Barber. Quote, we
23 don't get any credit for doing it,
24 appears there is no upside."

Page 429

1 Do you see that there?
2 A. I see it.
3 Q. And you didn't make that
4 statement to the DEA yourself, right,
5 that you had this discussion with
6 Cardinal, right?
7 A. Not that I know of, no.
8 Q. All right. And --
9 A. And again I misspoke in this
10 thing. And it was my description of how
11 we write a letter to DEA to notify them,
12 when we shut customers down. They said
13 they don't do it.
14 Q. So you misspoke in the
15 e-mail to your colleagues and you
16 misspoke when you were summarizing the
17 minutes from the dinner, correct?
18 A. Apparently.
19 Q. Okay. Anywhere else that
20 you misspoke in this document?
21 A. I don't know.
22 MR. SCHMIDT: Do you want to
23 review it?
24 THE WITNESS: Yeah, let me

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1  review.
2  BY MR. BOWDEN:
3      Q.   Let me know when you get to
4  Page 5.
5      A.   I'm on Page 5.
6      Q.   Okay, great.  I want you to
7  look at where it says, "Understand your
8  role."
9          Do you see that there?
10     A.   Yes.
11     Q.   "Discuss suspicious orders,
12 stop suspicious orders, report suspicious
13 orders," right?  Those are the HDMA
14 guidelines in summary, correct?
15     A.   I think this was part of
16 Linden Barber and Larry Côté's
17 presentation.
18     Q.   Okay.  Do you agree that the
19 role of the distributor should be to
20 discover suspicious orders, stop
21 suspicious orders and report them?
22     A.   Yes.
23     Q.   And you agree that if --
24 failing to do that would result in harm

Page 431

1  to the public or could result in harm to
2  the public?
3      A.   It could.
4      Q.   Okay.  And reporting it
5  could actually draw scrutiny on a
6  distributor, right, reporting could --
7  could invite the DEA to look and see what
8  other suspicious orders may have been
9  noted and not reported, right?
10         MR. SCHMIDT:  Objection.
11         Speculation.
12         THE WITNESS:  I'm not sure.
13     I haven't noticed the DEA to react
14     one way or the other when we
15     report suspicious orders.
16 BY MR. BOWDEN:
17     Q.   Is that a reason for --
18 would that provide you in your mind a
19 reason not to report suspicious orders,
20 because you haven't in your view seen the
21 DEA react?
22     A.   No.  You were discussing
23 what the value is.  And I was saying I
24 haven't observed that they have.  But we

Page 432

1  still do, because it's required.
2      Q.   You do because it's
3  required.  Is that what you said?
4      A.   It's one of the requirements
5  of the distributor.
6      Q.   Okay.  I'm going to hand you
7  what I will mark as Exhibit Number 38,
8  which is P-1.1806.
9          (Document marked for
10         identification as Exhibit
11         Mahoney-38.)
12 BY MR. BOWDEN:
13     Q.   This is an e-mail from you
14 dated February 28, 2012, to Don Walker
15 and others.  And the subject is HDMA CSMP
16 guidelines.  Do you see that?
17     A.   Mm-hmm.
18     Q.   Says, "Recently had a
19 customer asking if we were planning on
20 following these and it occurred to me as
21 I read today's USA Today, that we may not
22 be following our own guidelines."
23         Do you see that?
24     A.   I see that.

Page 433

1      Q.   And when you say we, you are
2  talking about McKesson, correct?
3      A.   I believe so.
4      Q.   And the concern you're
5  raising that McKesson may not be
6  following its own guidelines as part of
7  the industry trade group HDMA, right?
8      A.   Yeah, in reference to HDMA's
9  publication.
10     Q.   Right.  And so it says here,
11 "Know your customer, due diligence," and
12 then in this e-mail you've actually
13 highlighted certain provisions, right?
14     A.   Apparently.
15     Q.   Yeah.  And so these may be
16 some of the guidelines that McKesson was
17 not following, right, in your view?
18     A.   Well --
19         MR. SCHMIDT:  Objection to
20     the characterization.
21         THE WITNESS:  -- I would say
22     for example, that where it says
23     the questionnaire and the
24     signature, which must be

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1  notarized, or accompanied by a
2  statement, we stopped doing that
3  because we were advised by our
4  counsel that it had no effect.
5  BY MR. BOWDEN:
6      Q.  Okay.
7      A.  So there -- there are things
8  that people said, hey, this is a good
9  idea.  But were later decided to be
10  either ineffective or cumbersome or not
11  adding value to what we were trying to
12  find out.
13      Q.  Okay.  So some of the
14  criteria McKesson used as to whether they
15  were going to follow these guidelines are
16  whether it was ineffective, cumbersome or
17  not adding value, right?
18      A.  When I say adding value, I
19  mean contributing to the detection of
20  what you're talking about.
21      Q.  Gotcha.  So let's look at
22  some of these highlights here.  One of
23  the things you highlight towards the
24  bottom of the page, it says, "Average

Page 435

1  number of prescriptions filled each day,"
2  right?
3      A.  Mm-hmm.
4      Q.  "Average number of
5  controlled substance item prescriptions
6  filled each day.  Percentage of
7  controlled substance purchases compared
8  to overall purchases.  Verification of
9  physical security controls for CS storage
10  and questions based on DEA guidance and
11  communications," right?
12      A.  That's right.
13      Q.  So some of the things that
14  you weren't following were questions that
15  were based on DEA guidance as of 2012,
16  right?
17          MR. SCHMIDT:  Object.
18  Object to characterization.
19  BY MR. BOWDEN:
20      Q.  Things that you noted?
21          MR. SCHMIDT:  Object to
22  characterization.
23          THE WITNESS:  I see that I
24  highlighted some questions.  And I

Page 436

1  note that we -- in improving our
2  systems, we are able now with our
3  dispensing reports to determine
4  the average number of
5  prescriptions filled each day,
6  controlled substances
7  prescriptions the same way.
8          And I'm not sure exactly
9  what all the -- the things that
10  are referred to in verification of
11  physical security controls for CS
12  storage.
13  BY MR. BOWDEN:
14      Q.  Sure.
15          And what we had discussed
16  earlier today was that some of this data,
17  for example the prescriptions filled each
18  day, the percentage of controlled
19  substance compared to overall purchases,
20  that was data that was available to
21  McKesson as far back as 2008, but may not
22  have been data that was actually put into
23  a report for your review, right?
24          MR. SCHMIDT:  Object to

Page 437

1  characterization.
2          THE WITNESS:  In terms of
3  scripts, we -- we have to request
4  that from the customer.  The
5  customer is the one who manages
6  the prescriptions.  We don't do
7  that.
8  BY MR. BOWDEN:
9      Q.  Right.  And this was --
10  these are examples of things that could
11  throw up a red flag that could be
12  tantamount to a suspicious order, right?
13  Or could be used in identifying
14  suspicious orders, right?
15          MR. SCHMIDT:  Objection.
16  Speculation.
17          THE WITNESS:  They help us
18  understand -- get to know our
19  customers better.
20  BY MR. BOWDEN:
21      Q.  Okay.  Do you feel that
22  those were unnecessary data points to
23  look at?
24      A.  We didn't have access to it

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1  at the time that this was discussed.
2      Q.   Did you ask for access?
3      A.   We developed it in the wake
4  of it.
5      Q.   And you developed in the
6  wake of the DEA May 2008 action, correct?
7      A.   We were collecting
8  information on the dispensing data that
9  customers were giving us.  We demanded it
10  in a different format in 2012 and 2013,
11  and that gave us better insight into what
12  the entire picture was.  Eventually DEA
13  helped us in terms of understanding
14  how -- how many other distributors might
15  be servicing different base codes for
16  customers.  But we had resolved that
17  problem years before.
18          We were always looking for
19  as much information about the customer as
20  we could find.
21      Q.   Okay.  So when you say
22  you're looking for as much information
23  about the customer as you can find,
24  you're telling me -- or you're telling

Page 439

1  our jury that as of February 2012, that
2  when you had noticed that "we may not be
3  following our own guidelines," and you
4  identified some of the guidelines that
5  you weren't following, that changes were
6  made to make sure that you incorporated
7  those and took those into consideration
8  when adjusting things such as thresholds,
9  right?
10          MR. SCHMIDT:  Objection.
11      Mischaracterization.
12          THE WITNESS:  I think I
13      looked at the article on USA Today
14      or HDMA publication and I just had
15      questions in terms of the totality
16      of everything they were saying was
17      best practice.
18  BY MR. BOWDEN:
19      Q.   All right.  Sir, I will hand
20  you what I will mark as Exhibit Number 39
21  to your deposition.  P-1.1971.
22          (Document marked for
23      identification as Exhibit
24      Mahoney-39.)

Page 440

1  BY MR. BOWDEN:
2      Q.   Was Wegmans one of your
3  national accounts?
4      A.   I believe it was.
5      Q.   And --
6      A.   I'm not sure if it was in
7  2014.
8      Q.   Okay.  I want you to turn to
9  the last page of this document.  And
10  before I start asking you questions on
11  the document itself?
12      A.   This is the part of the
13  chain?
14      Q.   Correct.  The first part.
15  We had discussed earlier that the base
16  buffer that you would use was 10 percent
17  for all stores in setting a threshold,
18  correct?
19          MR. SCHMIDT:  Objection to
20      form.
21          THE WITNESS:  That's what
22      you said.  I wasn't sure exactly
23      what the level was.
24  BY MR. BOWDEN:

Page 441

1      Q.   Okay.  Well, as a DRA, as
2  someone who was approving thresholds and
3  initial thresholds, was it your customary
4  practice to apply the maximum --
5          (Brief white noise
6      interference.)
7          MR. SCHMIDT:  I think the
8      reporter may not have gotten it.
9          THE COURT REPORTER:  Yeah, I
10      didn't want to ask you to repeat.
11          MR. SCHMIDT:  And I wasn't
12      jumping on your question, but I
13      could just see...
14          MR. BOWDEN:  That's okay.
15      Let me re-ask it then.
16  BY MR. BOWDEN:
17      Q.   In your employment at
18  McKesson, you yourself approve or set
19  initial thresholds for customers,
20  correct?
21      A.   I was presented with a
22  spreadsheet that showed the customers
23  along with history and other calculations
24  that proposed an initial threshold.

Page 442

1    Q.   Right.  And you were the one
2  who had to sign off on the initial
3  thresholds --
4    A.   Yes.
5    Q.   -- for some customers, true?
6    A.   Yes.
7    Q.   Okay.  And when you were
8  signing off for thresholds for customers,
9  did you have a policy in mind as to what
10  an acceptable formula approach to setting
11  a threshold would be?
12    A.   I think that the guideline
13  was determined by Bruce Russell, and we
14  were asked to review them to see if there
15  was anything that looked out of bounds or
16  strange.  And we did that.
17    Q.   Okay.  And in your -- when
18  you were approving initial thresholds for
19  customers or approving increases, did you
20  feel that 10 percent was appropriate as a
21  buffer?
22    A.   I'm not sure.  I mean...
23    Q.   I'm asking you as a person
24  who --

Page 443

1      MR. SCHMIDT:  Let him finish
2    his answer, please.
3      THE WITNESS:  It depends on
4    the context and what the threshold
5    is and what 10 percent is.  I
6    mean, if a threshold is at
7    36 percent -- or threshold is at
8    3,600, and it's asked, is it --
9    well, when we set the threshold,
10    we set it to the requested level
11    or usually some level below that.
12  BY MR. BOWDEN:
13    Q.   Okay.  So let's just walk
14  through this document quickly, and then
15  we're almost at the end here.
16      In 2012, Wegmans was one of
17  the customers that McKesson was
18  servicing, correct?
19    A.   2012 or '14?
20    Q.   2014, excuse me.  2014.
21    A.   Yes.
22    Q.   And one of the things that
23  they were doing was they were going to be
24  moving some of their orders over to

Page 444

1  McKesson instead of getting them filled
2  from another competitor, right?
3    A.   Yes.
4    Q.   And so one thing that had to
5  be evaluated when that was happening was
6  increasing the threshold, right?  That
7  was the business decision that was being
8  made by McKesson?
9    A.   We were trying to
10  accommodate what we had experienced as
11  valid dispensing by a customer that had
12  been our customer for a while.
13    Q.   Sure.
14    A.   And they were changing their
15  supply chain.
16    Q.   Right.  And so when you say
17  you were trying to accommodate, what you
18  were trying to do is make sure that they
19  could still procure -- get the product
20  they needed without exceeding their
21  threshold, right?
22    A.   Based on the fact that they
23  were adjusting the direction that they
24  were getting product through the supply

Page 445

1  chain, we wanted to ensure that their
2  existing customer base was not adversely
3  affected by that change in the supply of
4  the product that they were already
5  receiving.
6    Q.   Okay.  So let's look at the
7  first page, from Nathan Hartle.
8    A.   Page --
9    Q.   At the bottom, the first
10  page.
11    A.   Yes.
12    Q.   At the bottom there, this is
13  to you and to Bernard Martin, right?
14    A.   Mm-hmm.
15    Q.   It says, "Hi, guys.  I look
16  at" -- "I took a look this morning and
17  have a few questions/comments.  Do we
18  really want to be lowering thresholds
19  right now if the current ones are still
20  within normal levels; i.e., oxy as a
21  percentage of prescriptions?"
22      Do you see that?
23    A.   I see that.
24    Q.   It says, "With thresholds

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1 barely above the average and sometimes
2 lower than the max, this may cause issues
3 like unnecessary omits," right?
4     A.   Okay.
5     Q.   And so what he's saying here
6 is that if we lower the thresholds, it
7 may cause orders to go unfilled, right,
8 or to be blocked?
9     A.   Unnecessarily would indicate
10 that something was blocked when it was
11 for a valid legitimate prescription.
12    Q.   The third one says, "I was
13 thinking" -- "I was thinking we would do
14 something more like we did with Rite Aid
15 recently.  For example, we used total Rx
16 times the DC norm, for example, hydro,
17 and added a buffer.  In Wegmans case we
18 could probably start with a buffer on top
19 of their max amount and then calculate
20 the percent oxy over prescriptions, and
21 if that is below reasonable norm, for
22 example 4 to 5 percent, we should be okay
23 with it.  See an example below."  Right?
24       So what you did was you

Page 447

1 developed a methodology to set a
2 threshold for this individual client,
3 right?
4     A.   I think that with -- Nate
5 came aboard with McKesson sometime in
6 2014.  And I think that he was trying to
7 take a statistical approach to the
8 appropriateness of the thresholds that
9 were being calculated for a customer for
10 whom we had not been supplying the entire
11 opioid component.  And he was trying to
12 apply 4 or 5 percent being the percentage
13 of oxycodone to total Rx, and calculating
14 what might be an appropriate -- an
15 appropriate threshold, which is really
16 what we do with our automated system
17 these days in part.
18    Q.   Okay.  And the logic that he
19 puts in here underneath that says, "Take
20 the max and add a buffer, 20 percent.
21 Round up to the nearest 500.  Use a
22 threshold and total Rx to calculate oxy
23 over Rx.  If the percent is below a
24 reasonable norm, 4 to 5 percent, then we

Page 448

1 would be good with the increase.  This
2 way it allows room for growth.  And even
3 if they hit the threshold, they would
4 still be at a reasonable norm."
5     Do you see where that's
6 written?
7     A.   I see.
8     Q.   And so you're setting a
9 threshold here, according to his logic,
10 that would be such a threshold that they
11 wouldn't be expected to exceed, right?
12    A.   Well, he's the senior
13 director for RNA.  And this is an RNA
14 account.  So he's taking them on.  And I
15 think he's just bouncing information and
16 an approach off me and another -- a
17 senior director with regard to that
18 customer.
19    Q.   Right.  And the approach
20 that he's trying to talk about, what
21 you're talking about is the approach to
22 set that initial threshold, correct?
23    A.   Right.  Yeah.
24    Q.   You actually follow up and

Page 449

1 say, "I agree.  I don't see any
2 oxycodone/prescription ratios that seem
3 out of line.  Would tend to accommodate
4 and continue to evaluate."
5     Right?
6     A.   Right.
7     Q.   So you agree with his
8 approach of taking the max -- I'm
9 assuming max month to date and add a
10 20 percent buffer to set a threshold?
11    MR. SCHMIDT:  Objection to
12    the assumption.
13    THE WITNESS:  Again, I don't
14    know what the max refers to.  I'm
15    not sure if they're now supplying
16    us with all the oxycodone or how
17    that is being calculated.  My
18    recollection is that Wegmans was
19    relatively low in terms of
20    controls to Rx and oxycodone to
21    Rx, which is what that would
22    imply, based on my saying that on
23    a percentage basis, they don't
24    seem to be out of line.

Page 450

1  BY MR. BOWDEN:
2      Q.   Right.  So if you flip to
3  the top of the second page, you can see
4  how this formula plays out for Wegmans.
5  Pull up that spreadsheet at the top.
6  Store, Wegmans.  You have prescription
7  quantity for three months.
8  2,069,378 units.
9          Do you see that?
10     A.   Yes.
11     Q.   Oxy has a percentage of
12  total prescriptions of 1.59 percent,
13  right?
14     A.   Right.
15     Q.   They multiply that together
16  to get the max per month of 11,800,
17  right?
18     A.   You're saying 2.06 --
19  2.07 million times 1.5 percent?
20     Q.   I'm sorry.  The max per
21  month of 11,800, right?
22     A.   Right.  I think that's the
23  calculation as he was saying relative to
24  prior experience.

Page 451

1      Q.   Correct.  I'm sorry.  Yeah,
2  the total prescription quantity for three
3  months, if calculated out, the oxycodone
4  percentage as a total of the -- total
5  prescriptions, right, that's the
6  1.59 percent, correct?
7      A.   Yeah.  I think that's the
8  average of those three months.
9      Q.   Right.  And then they have a
10  max a month of 11,800, right?
11     A.   I believe so.
12     Q.   And to set the threshold,
13  they've taken that -- they've added to
14  the maximum amount a buffer of
15  20 percent, and it says in the first
16  step, 14,160, right?
17     A.   Okay.
18     Q.   And then they round it up,
19  pursuant to his logic as detailed on the
20  first page, to 14,500, right?
21     A.   Okay.
22     Q.   Are you with me?
23     A.   Yeah.
24     Q.   All right.  So the logic

Page 452

1  that was presented to you, and the one
2  that you agreed with, is when you have a
3  pharmacy coming over to you with a
4  maximum --
5      A.   They were an existing
6  pharmacy.
7      Q.   That was moving more of
8  the --
9      A.   Right.
10     Q.   -- purchases over to you --
11     A.   Right.
12     Q.   -- that has a maximum of
13  11,800, you've come up with a formula
14  that would then set their new threshold
15  at 14,500, right?
16     A.   I see that.
17     Q.   And the intention --
18     A.   Given that they're
19  1.59 percent, which is relatively low in
20  the scheme of things, though.
21     Q.   I understand what you're
22  saying.  But that is how you guys came up
23  with the 14,500.  You used a 20 percent
24  buffer, and you rounded up to the nearest

Page 453

1  500?
2      A.   Okay.
3      Q.   And that took their maximum
4  per month that you had collected on your
5  data of 11,800, and you've established a
6  threshold now moving forward of 14,500,
7  correct?
8      A.   Those were all Nate's
9  calculations.
10     Q.   I understand.  But these are
11  ones that you agree with.  The very next
12  e-mail on the chain, you say, "I agree."
13     A.   I do.
14     Q.   And then Bernard responds
15  above that and says, "I also agree with
16  Nate's approach for oxy.  How about oxy
17  30?  Michael raised a good question.  Do
18  you want to impose a 50 percent of oxy 30
19  or total oxy ratio threshold?  Would
20  impact only one store."
21         Do you see that?
22     A.   I see that.
23     Q.   And you respond back, "I
24  think the ratio is a standard and we can

Highly Confidential – Subject to Further Confidentiality Review

Page 454

1 evaluate the reasons for the variance and
2 post a 50 percent and ask about the
3 exception," right?
4         That's what you write back?
5     A.   I see that.
6     Q.   Yeah.  And so what you're
7 saying here is that I agree with that
8 approach, this ratio is -- those are the
9 standard ratios that we use.  And what
10 we're going to do is we've developed a
11 threshold that means that only one other
12 store would be concerned, we'll approve
13 it and then ask about the exception,
14 correct?
15         MR. SCHMIDT:  Object to the
16     characterization.
17         THE WITNESS:  Well, I mean
18     at the end of the day, basically
19     since then, we don't -- we don't
20     have a threshold for oxycodone
21     30-milligram.  So that was
22     obviated shortly after this.
23 BY MR. BOWDEN:
24     Q.   What's happening in this

Page 455

1 e-mail though, is you're coming up with a
2 formula to set a threshold for a customer
3 knowing that the threshold you're setting
4 isn't going to ever be exceeded by any of
5 their stores, right?
6         MR. SCHMIDT:  Objection to
7     the characterization.
8         THE WITNESS:  I'm not sure
9     that's true.
10 BY MR. BOWDEN:
11     Q.   That's the expectation here,
12 right?  It allows room for growth and
13 they won't hit the threshold?
14     A.   I don't know what Nate was
15 thinking when he said that.
16     Q.   Okay.  And the way he got to
17 that was by using a 20 percent buffer as
18 one of the variables, correct?
19     A.   I see that.
20     Q.   I'll hand you what I'll mark
21 as Exhibit Number 40.
22         (Document marked for
23     identification as Exhibit
24     Mahoney-40.)

Page 456

1         MR. BOWDEN:  Let me find an
2     extra copy here.  I only have the
3     one.
4         MR. SCHMIDT:  You don't
5     have more?
6         Thank you.  Appreciate it.
7 BY MR. BOWDEN:
8     Q.   And so that last document
9 that they were looking at, the Wegmans
10 Pharmacy, that was from July of 2014,
11 right?
12     A.   Yes.
13     Q.   And the very next month,
14 McKesson gets a letter from DEA, right,
15 advising them that they are being
16 investigated for possible civil actions
17 and violations of the CSA, right?  You
18 are aware of that?
19     A.   I think, yeah.
20     Q.   Okay.  And so, what I want
21 you to do is turn to Page 11 of
22 Exhibit 40.  And underneath Section 1
23 where it says, "McKesson-Aurora
24 manipulated and circumvented thresholds,"

Page 457

1 do you see where I'm at, sir?
2     A.   Oh yeah.  Okay.
3     Q.   Okay.  That second paragraph
4 down -- well, let's -- let's do the first
5 paragraph together.
6         "Thresholds were supposed to
7 be the linchpin in McKesson's compliance
8 program.  But McKesson-Aurora manipulated
9 customers' threshold levels in numerous
10 ways to avoid rigorous internal review."
11         Do you see that?
12     A.   Yes.
13         MR. SCHMIDT:  Did you mean
14     to give him a highlighted copy?
15         MR. BOWDEN:  Absolutely not.
16         MR. SCHMIDT:  Okay.  I just
17     saw that.  Why don't we just move
18     the sticker over if you want.  You
19     can give me a clean copy because I
20     already started writing on mine.
21         Do you have a clean copy
22     that you can give us back?
23         MR. BOWDEN:  I appreciate
24     the candor.

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    MR. SCHMIDT:  All right.  He
2  was on Page 11.
3    MR. BOWDEN:  Thank you.
4  BY MR. BOWDEN:
5    Q.  So let me -- let me re-read
6  that to you.  We are on Page 11.
7  Underneath Section 1 it says, "Thresholds
8  were supposed to be the linchpin of
9  McKesson's compliance program, but
10  McKesson-Aurora manipulated customers'
11  threshold levels in numerous ways to
12  avoid rigorous internal review."
13    It continues on.  "First,
14  McKesson-Aurora set its initial
15  thresholds for its pharmacy customers
16  very high.  McKesson-Aurora review
17  process was not even triggered until an
18  individual pharmacy sold more than
19  10 percent of that pharmacy's average
20  volume for a 12-month period from 2007 to
21  2008, a year in which McKesson had
22  settled claims because diversion was
23  flourishing at McKesson-supplied
24  pharmacies."

Page 459

1    Do you see where that's at?
2    A.  Yes.
3    Q.  And so one of the things DEA
4  is criticizing at McKesson on in August
5  of 2014, is that McKesson was using a
6  buffer of 10 percent on top of the
7  average volume, right?
8    A.  I'm not sure if I read that
9  that way.
10    Q.  Okay.  Well, so it says
11  "until an average pharmacy sold more than
12  10 percent of that pharmacy's average
13  volume from a 12-month period," right?
14    A.  Think about that.  I mean,
15  10 percent of that pharmacy's average
16  volume from a 12-month period?
17    It doesn't make sense to me.
18    Q.  Oh, I'm sorry.  Perhaps I am
19  misstating it here.  It says, "The
20  average plus the 10 percent volume,"
21  right?
22    The average plus the
23  10 percent buffer?
24    A.  I'm not sure what he meant,

Page 460

1  but that's not what he wrote.
2    Q.  Going down to the fourth
3  paragraph down.  "In some cases,
4  McKesson-Aurora set some thresholds so
5  high at the outset that the pharmacy
6  customer would never exceed it and thus
7  never trigger any review as to whether an
8  order was indeed suspicious."
9    Do you see that?
10    A.  I see it.
11    Q.  And so part of what the DEA
12  is criticizing McKesson for is that in
13  the outset, thresholds were being set so
14  high that either the pharmacies will
15  never reach it, or two, is using metrics
16  for establishing the thresholds that are
17  inappropriate such as average volume plus
18  a 10 percent buffer, right?
19    MR. SCHMIDT:  Object to the
20  characterization.
21    THE WITNESS:  I think back
22  at the time we had indicated to
23  the -- I'm not sure who we may
24  have indicated.  But our default

Page 461

1  was for 8,000 doses to be the
2  default for a retail pharmacy for
3  hydrocodone.
4  BY MR. BOWDEN:
5    Q.  That's not my question
6  though.  My question is that the DEA is
7  criticizing McKesson for the way in which
8  it's establishing its initial thresholds,
9  right?
10    A.  I understand that.  I see
11  that.
12    Q.  That's a correct statement,
13  true?
14    A.  Yes, he is.
15    Q.  Set that aside.
16    I'll hand you what I'm
17  marking as Exhibit Number 41.  This will
18  be P-1.1443.
19    (Document marked for
20  identification as Exhibit
21  Mahoney-41.)
22  BY MR. BOWDEN:
23    Q.  Is that a question for your
24  counsel or for me?

Page 462

1    A.   Just curious.
2    Q.   In follow-up to that
3  August 2014 letter, the DEA sent another
4  letter in November of 2014 talking about
5  registration consequences for McKesson
6  for violations of the Controlled
7  Substances Act, right?
8    A.   Okay.
9    Q.   You are aware of that
10 letter, aren't you?
11   A.   I'm not sure if I've seen
12 this one.
13   Q.   Okay.  Well, let's go ahead
14 and look at -- if you'll flip to the
15 second page.
16   A.   Is this a letter from DEA to
17 Covington?
18   Q.   Mm-hmm.  I'll ask you --
19   A.   I guess I have seen this.
20 Yeah, I have seen it.
21   Q.   You have seen this letter?
22   A.   Yeah.
23   Q.   All right.  So turn to the
24 second page.  And the third paragraph

Page 463

1  down says that "having been said, we
2  remain concerned that McKesson fails to
3  appreciate the serious and systemic
4  nature of the CSA-related problems that
5  DEA has observed in its several
6  investigations into your clients'
7  operations."
8       Do you see where that's
9  written?
10   A.   Yes.
11   Q.   And ultimately what they are
12 doing here is they are going to be
13 revoking -- excuse me.  Strike that.
14      Continues on at the bottom
15 of that paragraph.  "The loss of business
16 that McKesson may experience as a result
17 of surrendering DEA CORs is a justified
18 and appropriate consequence that is
19 consistent with the public interest.
20 Among other reasons, we hope that
21 McKesson's distribution centers will
22 maintain DEA registration after a global
23 settlement, will take their
24 responsibilities under federal law more

Page 464

1  seriously than they did after the 2008
2  settlement," right?
3       And so the time frame
4  they're talking about when they are
5  hoping that McKesson will take the
6  responsibilities under federal law more
7  seriously, is the time frame from 2008 to
8  2014, correct?
9    A.   Apparently, yeah.
10   Q.   The paragraph after that.
11 "In order to" -- "in order to release all
12 McKesson-owned DEA registrants from
13 administrative liability as you have
14 requested, the agreed-upon registration
15 consequences must reflect not only the
16 gravity of the offenses but nationwide
17 scope of McKesson's failure to report
18 suspicious orders and maintain effective
19 controls against diversion."
20      Do you see where that's
21 written?
22   A.   Yes.
23   Q.   And do you agree that the --
24 that the procedures that McKesson had in

Page 465

1  place or at least the way in which
2  McKesson was acting upon those procedures
3  was ineffective against diversion during
4  that time period, correct?
5    A.   I think that we -- we used a
6  different method.  We were using the
7  Level 1, Level 2, Level 3.
8    Q.   And so in using that method
9  that you are talking about, the DEA went
10 on in this letter to identify numerous
11 distribution centers which had not sent
12 any suspicious order reports to DEA,
13 right?
14   A.   He alludes to that.
15   Q.   Right.  And in the last
16 paragraph on that page, "As we discussed
17 previously, McKesson-Aurora lacked a
18 functional suspicious order reporting
19 system for approximately five years.
20 McKesson-Aurora reported a total of 16
21 orders as suspicious in one batch
22 occurring in one quarter related to one
23 recently terminated pharmacy, while it
24 processed a total of 1.6 million orders

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1 for controlled substances from 2008
2 through 2012. This alone demonstrates
3 that it is not operating with any
4 functional system to disclose suspicious
5 orders of controlled substances. The
6 fact that this occurred after McKesson
7 had entered into a settlement agreement
8 with the Department of Justice and DEA in
9 which McKesson committed to report
10 suspicious orders makes the ensuing five
11 years' silence particularly egregious."
12        Do you see where that's
13 written?
14     A.   I do.
15     Q.   Now, what they are talking
16 about here is the manipulation of
17 thresholds, right?
18        MR. SCHMIDT:  Objection.
19 Foundation.
20 BY MR. BOWDEN:
21     Q.   That was one of the ways in
22 which McKesson was not flagging anything
23 as a suspicious order report?
24        MR. SCHMIDT:  Objection.

Page 467

1     Characterization.
2        THE WITNESS:  I'm not sure
3     that's the linkage.
4 BY MR. BOWDEN:
5     Q.   Let's continue on then to
6 Page 3 here.
7        If you look down about
8 halfway through that first paragraph.
9 Actually, let's read from the top.  "Like
10 its Colorado counterpart, McKesson
11 distribution center at Plymouth, Rhode
12 Island" -- "Plymouth Road" -- "Livonia
13 reported no suspicious orders for
14 approximately five years after McKesson's
15 settlement with DOJ."
16        Do you see where that's
17 written?
18     A.   I see it.
19     Q.   "McKesson" -- how do you
20 pronounce that distribution center name?
21     A.   Livonia.
22     Q.   Livonia.  "McKesson Livonia
23 remained silent even as it supplied 26
24 pharmacies that were utilized in a drug

Page 468

1 trafficking conspiracy that has since
2 resulted in a criminal conviction of the
3 owner of these pharmacies."
4        Do you see where that's
5 written?
6     A.   Mm-hmm.
7     Q.   Continues on that,
8 "McKesson's system to disclose suspicious
9 orders of controlled substances
10 identified none, even when one of Patel's
11 pharmacies, Preferred Care Pharmacy, for
12 example, went from ordering less than
13 4,000 dosage units of hydrocodone
14 products in March and April of 2010 to
15 regularly ordering 16,000 dosage units a
16 month in August 2010 to regularly
17 ordering more than 20,000 dosage units a
18 month in 2011.
19        "The threshold that was
20 supposed to trigger review for suspicious
21 ordering to McKesson instead prompted
22 efforts by McKesson to reset the
23 threshold to enable ever increasing
24 hydrocodone sales."

Page 469

1        Do you see where that's
2 written?
3     A.   Yes.
4     Q.   Go down another line.  "Of
5 course, McKesson's failure to detect
6 suspicious orders was not confined to
7 pharmacies in the Patel criminal
8 conspiracy."
9        Do you agree with that
10 statement?
11     A.   I am not sure.  I don't know
12 anything about Livonia.
13     Q.   Let's go down to the next
14 paragraph.  "McKesson's systemic failures
15 were also evident at the distribution
16 center at Washington Courthouse, Ohio."
17        Was that underneath your
18 purview?
19     A.   No.
20     Q.   "Here again, McKesson did
21 not report any orders as suspicious for
22 years after 2008 settlement with the DOJ
23 and DEA.  When DEA began to investigate
24 the silence, McKesson regional director

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1 of regulatory affairs told DEA
2 investigators that he did not know what a
3 suspicious order was and protested that
4 DEA had not adequately defined the term."
5      Do you see where that's
6 written?
7      A.   I see.
8      Q.   Do you agree that McKesson
9 didn't know what a suspicious order was
10 at that time?
11      A.   I think that we -- we were
12 using the Level 1, Level 2, Level 3
13 system before we reported to the DEA.
14      Q.   Right.  And in using that
15 system, there are very few suspicious
16 orders actually being transmitted to the
17 DEA, correct?
18      A.   I see that.
19      Q.   Okay.  If you flip forward
20 to Page 4.  The first paragraph is,
21 "McKesson's system to detect suspicious
22 orders also fell short at the
23 distribution center at Lakeland,
24 Florida."

Page 471

1      And that was one of the
2 distribution centers in which you had
3 responsibilities for, right?
4      A.   Yes.
5      Q.   "McKesson-Lakeland, once
6 again in derogation of its
7 responsibilities under the CSA and the
8 2008 MOA, McKesson-Lakeland failed to
9 report and suspicious orders to DEA for a
10 five-year period."
11      Do you see where that's
12 written?
13      A.   I see what -- a word's
14 missing, I guess.
15      Q.   Yeah, there was a word that
16 was odd there.  But it did -- I read it
17 correctly in that, "Once again in
18 derogation of its responsibilities under
19 the CSA and the 2008 MOA,
20 McKesson-Lakeland failed to report and
21 suspicious orders to DEA for a five-year
22 period?"
23      A.   I see it.
24      Q.   Would you agree with me

Page 472

1 between 2008 and 2013, that's a five-year
2 period that they're talking about, right?
3      A.   Yes.
4      Q.   "Further, as an example,
5 McKesson-Lakeland's conduct with regard
6 to two of its pharmacy customers
7 establishes lack of maintenance of
8 effective controls against diversion."
9 Right?
10      A.   I see that.
11      Q.   And do you agree with that,
12 that at the time McKesson-Lakeland's
13 controls to prevent diversion were
14 insufficient?
15      A.   I visited both these
16 pharmacies, and I did not observe any
17 activity that caused me to believe that
18 there was suspicious activity going on.
19 I was at Oviedo several times, in fact.
20      Q.   You disagree?
21      A.   I'm just saying what I saw
22 is a very good example of why it's hard
23 for a DC to see the same things in terms
24 of diversion with the data that we have

Page 473

1 available to us including customer
2 visits, discussions with PIC and other
3 tracking information.
4      Q.   If you go on to Page 5, the
5 first full paragraph, "As noted above."
6 You with me?
7      A.   "As noted above."
8      Q.   "As noted above, the
9 examples are illustrative, not
10 exhaustive.  They are not meant to
11 illustrate what we mean" -- "what we mean
12 when we say that we will be driven by the
13 evidence that we could present in
14 administrative proceedings against these
15 registrants.  We have attempted to
16 highlight this evidence in hopes that you
17 and your client fully understand why DEA
18 believes that the failings of McKesson
19 were as systematic as they were serious."
20      Do you see that?
21      A.   I see it.
22      Q.   And this is in 2014, right?
23      A.   Yes.
24      Q.   And one of the examples that

Page 474

1  they illustrate is that thresholds and
2  lack of SORs being reported to the DEA,
3  right?
4      A.   When you say thresholds,
5  what you mean by that?
6      Q.   Manipulation of thresholds,
7  correct?
8          MR. SCHMIDT:  Object to the
9      characterization.
10         THE WITNESS:  Yeah, I see
11     that.
12 BY MR. BOWDEN:
13     Q.   Set that one aside.  And
14 ultimately, these systematic
15 shortcomings, they resulted in a
16 settlement in 2017, right?
17     A.   Yes.
18     Q.   I'm going to hand you what
19 I'll mark as Exhibit Number 42.
20         (Document marked for
21     identification as Exhibit
22     Mahoney-42.)
23 BY MR. BOWDEN:
24     Q.   On the first page, you can

Page 475

1  see this is the administrative memorandum
2  of agreement.  It's between the DEA and
3  McKesson Corporation, right?
4      A.   Yes.
5      Q.   And in the background
6  section, in Section Number 5, you can see
7  that there were -- read that together.
8  "Between March 2013 and the present, DEA
9  executed one additional AIW and served
10 numerous administrative subpoenas and
11 conducted a number of cyclic inspections
12 at various McKesson U.S. pharmaceutical
13 distribution centers Nationwide,
14 including McKesson Washington Courthouse,
15 Ohio, distribution center, McKesson
16 Livonia, Lakeland, and Aurora."
17         Do you see that?
18     A.   Yes.
19     Q.   On Page 2, you see Bullet
20 Point Number 7?
21     A.   Page 2, Number 7.
22     Q.   It cites that, "On" -- "On
23 or about November 14, 2014, McKesson
24 received a letter dated November 4, 2014,

Page 476

1  from the DEA stating the DEA was
2  separately pursuing administrative action
3  against McKesson-Aurora for the conduct
4  outlined in the August 13, 2014, letter."
5          Do you see that?
6      A.   Yes.
7      Q.   And they go --
8      A.   The prior letter?
9      Q.   Right.
10     A.   Okay.
11     Q.   Again, here they're talking
12 about how the failure to design and
13 operate a system to disclose to the
14 registrant's suspicious orders of
15 controlled substances was national in
16 scope, correct?
17     A.   National in scope?
18     Q.   Right.  What they're
19 describing here, again, is the
20 shortcomings that were national in scope
21 for McKesson.  These were systemic issues
22 that applied to all the distribution
23 centers, correct?
24     A.   I'm not sure about all of

Page 477

1  them, but more than -- more than a few.
2      Q.   Go on to Page 3.  As part of
3  this agreement, McKesson did accept
4  responsibility.  You're aware of that,
5  right?
6      A.   I'm not sure the details of
7  the settlement.
8      Q.   Well, let's look at
9  bullet --
10     A.   You're talking about Number
11 2 there?
12     Q.   Right.  Number 2, acceptance
13 of responsibility.
14     A.   Mm-hmm.
15     Q.   The -- halfway down, it
16 says, "McKesson acknowledges that at
17 various times during the period from
18 January 1, 2009, up through and including
19 the effective date of this agreement, it
20 did not identify or report to DEA certain
21 orders placed by certain pharmacies which
22 should have been detected by McKesson as
23 suspicious based on the guidance
24 contained in the DEA letters about the

Page 478

1 requirements set forth in the CSA, right?
2   A.   Yes.
3   Q.   Underneath that on or
4 about -- excuse me.  Strike that.
5       So you understand as you sit
6 here today that some of the issues that
7 we've been covering, those systemic
8 failures, were systemic failures that you
9 had some responsibility for as well,
10 right?
11       MR. SCHMIDT:  Object to the
12   characterization.
13       THE WITNESS:  I think what
14   they're saying is that our Level
15   1, Level 2, Level 3 system was --
16   was not working and that they
17   wanted us to report in a different
18   way, and we're doing that now.
19 BY MR. BOWDEN:
20   Q.   Right.  And the system that
21 has been set up for establishing
22 thresholds, that was a system that was
23 resulting in too high of thresholds being
24 set in the first place, was one of the --

Page 479

1 one of the issues they took, right?
2       MR. SCHMIDT:  Object to the
3   characterization.
4       THE WITNESS:  I notice that
5   in that other one, the guy said
6   that it was set at 8,000 when
7   their average was much lower.  I
8   saw that.
9 BY MR. BOWDEN:
10   Q.   Right.  And there was other
11 instances in which initial thresholds
12 were set so high that customers would
13 never reach the thresholds.  And that was
14 another issue they had, correct?
15       MR. SCHMIDT:  Object to the
16   characterization.
17       THE WITNESS:  I agree with
18   what you're saying about the
19   concern about thresholds that were
20   too high being expressed in that
21   letter.
22 BY MR. BOWDEN:
23   Q.   Right.  And as a result of
24 that, and in part as a result of the

Page 480

1 threshold -- the relation of thresholds,
2 SORs were not issued and given to the
3 DEA, right?
4       MR. SCHMIDT:  Object to the
5   characterization.
6       THE WITNESS:  Suspicious
7   order reports?
8 BY MR. BOWDEN:
9   Q.   Correct.
10       MR. SCHMIDT:  Same
11   objection.
12       THE WITNESS:  Can you repeat
13   the question?
14 BY MR. BOWDEN:
15   Q.   Sure.  Another item they
16 took issue with was the fact that
17 McKesson should have been reporting
18 suspicious orders and was failing to do
19 so, right?
20   A.   Yes.
21   Q.   And if you go down to the
22 bottom of Page 3, says, "McKesson failed
23 to maintain effective controls against
24 diversion of particularly controlled

Page 481

1 substances into other legitimate medical,
2 scientific, and industrial channels by
3 sales of certain" -- "by sales to certain
4 of its customers in violation of the CSA
5 and the CSA implementing regulations."
6       Do you see that?
7   A.   Yes.
8   Q.   And then it gives a list of
9 some of those distribution centers that
10 failed to maintain effective controls
11 against diversions, right?
12   A.   Yes.
13   Q.   And Lakeland, Florida, is
14 one of those distribution centers, right?
15   A.   I see that.
16   Q.   And Lakeland, Florida, was
17 one of the distribution -- distribution
18 centers of which you had responsibility
19 for during that time period, right?
20   A.   Yes.
21   Q.   In fact, during that entire
22 time period from 2008 up until this
23 agreement was signed in 2017, you had
24 responsibility for Lakeland, Florida,

Page 482

1  right?
2      A.   From a regulatory
3  perspective?
4      Q.   Correct.
5      A.   Yes.
6      Q.   Now, as a result of this
7  action, if you turn to Page 7, bullet
8  point G.  G, yes.
9          "McKesson agrees that its
10 authority to distribute controlled
11 substances containing the drug code for
12 Schedule II hydromorphone products, that
13 is DEA drug code 9150 from its
14 McKesson-Lakeland distribution center,
15 DEA certificate of registration
16 PM0000771, will be suspended for a period
17 of one year commencing from the effective
18 date of the agreement except for orders
19 placed by permitted registrants."
20         Do you see that there?
21     A.   I do.
22     Q.   So as part of the penalty
23 for Lakeland distribution center not
24 appropriately sending suspicious order

Page 483

1  reports to the DEA, their license to
2  distribution center Schedule II products
3  was suspended for a period of one year,
4  right?
5          MR. SCHMIDT:  I'll object to
6      the characterization.
7          THE WITNESS:  Hydrocodone,
8      or hydromorphone?
9  BY MR. BOWDEN:
10     Q.   Hydromorphone.
11     A.   Was suspended for one year.
12 So that was a very narrow -- that's --
13 that's one base code.
14     Q.   Right.  And that has a -- a
15 direct impact on McKesson's sales,
16 correct?
17     A.   Yes.
18     Q.   Okay.  And ultimately, as a
19 result of the settlement agreement,
20 McKesson agreed to pay $150 million fine,
21 correct?
22     A.   Yes.
23         MR. BOWDEN:  Take a break.
24         THE VIDEOGRAPHER:  Remove

Page 484

1  your microphones.  The time is
2  6:02 p.m.  Going off the record.
3      (Short break.)
4          THE VIDEOGRAPHER:  We are
5  back on the record.  The time is
6  6:14 p.m.
7          - - -
8          EXAMINATION
9          - - -
10 BY MR. SCHMIDT:
11     Q.   Mr. Mahoney, my name is Paul
12 Schmidt.  I represent McKesson in this
13 case.  We've been here for a very long
14 day.  We're now into the evening, and
15 upside, so I'm going to be targeted in my
16 questions to you.
17         Can you tell the jury how
18 long you have been at McKesson.
19     A.   Almost 18 years.  17 to
20 18 years.
21     Q.   And what is it about your
22 work at McKesson that's made you stay
23 there for that period of time?
24     A.   Has good culture, and I

Page 485

1  think the mission is something that I
2  enjoy, empowering healthcare.
3      Q.   Can you describe for the
4  jury the role that McKesson
5  Pharmaceutical place in how prescription
6  medicines get from the companies that
7  make them to patients?
8      A.   McKesson buys
9  pharmaceuticals from lots of different
10 manufacturers and brings them into our
11 local DC where customers, i.e.,
12 pharmacies and hospitals, are able to
13 order them for next-day delivery so they
14 have them when they need them.
15     Q.   Does McKesson
16 Pharmaceutical's work focus on
17 interacting directly with doctors?
18     A.   Not generally, no.
19     Q.   Do you have an understanding
20 of -- about whether when McKesson ships a
21 prescription medicine to a pharmacy, a
22 patient is only able to get that medicine
23 from the pharmacy if they've seen a
24 doctor and the doctor has made a judgment

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1  that that patient should get a
2  prescription for that medicine?
3        MR. BOGLE:  Object to form.
4        THE WITNESS:  McKesson
5    provides the supply for pharmacies
6    who are responding to scripts that
7    patients bring them generated by a
8    doctor.
9  BY MR. SCHMIDT:
10   Q.   If a physician is writing
11 more prescriptions for opioids, does that
12 increase the overall distribution level
13 for opioids?
14       MR. BOGLE:  Object to form.
15       THE WITNESS:  Can you repeat
16   that.
17 BY MR. SCHMIDT:
18   Q.   Yeah, if physicians write
19 more prescriptions for opioids, does that
20 increase the overall level of
21 distribution of opioids?
22   A.   Yes.
23       MR. BOGLE:  Object to form.
24 BY MR. SCHMIDT:

Page 487

1    Q.   Does your level of
2  distribution follow from what
3  prescriptions do, or do you actually
4  influence what prescriptions -- what
5  physicians do?
6        MR. BOGLE:  Object to form.
7  BY MR. SCHMIDT:
8    Q.   And let me re-ask it.  I
9  think I misspoke in my question.
10       Does your level of
11 distribution follow from decisions that
12 physicians make, or do you actually
13 influence the decisions physicians
14 make --
15       MR. BOGLE:  Object to form.
16 BY MR. SCHMIDT:
17   Q.   -- in terms of prescribing
18 medicines?
19   A.   In the distribution center
20 we don't have any influence on
21 prescribing habits.  We are just
22 responding to what is pulled from us by
23 the pharmacies.
24   Q.   Is this role that you've

Page 488

1  been talking about true for opioids as
2  well as other prescription medicines that
3  McKesson distributes?
4    A.   Yes.
5    Q.   And can you give us a sense
6  of whether, from your experience, opioids
7  are a substantial majority, a majority, a
8  minority, a substantial minority of the
9  medicines that McKesson distributes?
10       MR. BOGLE:  Object to form.
11       THE WITNESS:  Substantial
12   minority.
13 BY MR. SCHMIDT:
14   Q.   Do you have an understanding
15 of the responsibility that a pharmacy has
16 in terms of when they pass along an
17 opioid to a patient that they have
18 purchased from McKesson?
19   A.   Do I --
20       MR. BOGLE:  Object to form.
21 BY MR. SCHMIDT:
22   Q.   Do you understand the
23 responsibility that a pharmacy has when
24 they pass along an opioid purchased from

Page 489

1  McKesson to a patient?
2    A.   Yes.  They have
3  corresponding responsibility.
4    Q.   Is part of your work -- does
5  part of your work involve trying to
6  identify where pharmacies might not be
7  meeting their responsibilities in terms
8  of whether you interact with those
9  pharmacies?
10   A.   Yes.
11   Q.   And you've discussed
12 McKesson's regulatory programs today.  Am
13 I understanding correctly from your
14 testimony over the course of the day that
15 McKesson's programs for doing diligence
16 into pharmacies have changed over time?
17   A.   Yes.
18   Q.   Have developed?
19   A.   Yes.
20   Q.   What are those changes made
21 in response to?
22   A.   They've been made to give us
23 greater granularity of what we see in a
24 pharmacy as they are buying from us and

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1 dispensing to their patients.
2 Q. Are those changes made as
3 you develop more information about
4 practices with regards to opioids,
5 concerns about diversions, information
6 you get from your diligence, things like
7 that?
8 MR. BOGLE: Object to form.
9 THE WITNESS: Yes.
10 BY MR. SCHMIDT:
11 Q. Have some of the changes
12 included better ways of tracking data;
13 that is, you learn what is important with
14 regard to opioids?
15 A. Yes.
16 Q. Do you have a view as to
17 whether that's a good thing to try to
18 improve your processes over time?
19 MR. BOGLE: Object to form.
20 THE WITNESS: It's
21 absolutely a good thing.
22 BY MR. SCHMIDT:
23 Q. Let's take one example. You
24 have Exhibit 26, please.

Page 491

1 MR. BOGLE: Can you give me
2 the corresponding -- the other
3 exhibit number at the bottom?
4 MR. SCHMIDT: The Bates
5 number?
6 MR. BOGLE: No.
7 MR. SCHMIDT: It's 1743, I
8 think you're thinking of.
9 MR. BOGLE: Yeah.
10 BY MR. SCHMIDT:
11 Q. And if you look at Page 26
12 of this exhibit.
13 A. 26?
14 Q. I'm sorry. Page 7 of this
15 exhibit. This is a page that you were
16 asked about. It's a slide showing
17 significant enhancements to CSMP.
18 Do you see that?
19 A. Yes.
20 Q. And you were asked about the
21 fact that at this time, around 2013,
22 there were key enhancements underway.
23 Do you see that?
24 A. Yes.

Page 492

1 Q. Okay. On the right -- on
2 the left-hand side -- strike that.
3 Is that a good thing, to
4 have enhancements over time, in your
5 view?
6 MR. BOGLE: Object to form.
7 THE WITNESS: Yes.
8 BY MR. SCHMIDT:
9 Q. On the left-hand side, it
10 says, "Core elements remain the same."
11 Did I read that correctly?
12 A. Yes.
13 Q. One of those core elements
14 that remains the same is customer
15 diligence.
16 Did I read that correctly?
17 A. Yes.
18 Q. Another one is monitoring
19 against suspicious orders.
20 Did I read that correctly?
21 A. Yes.
22 Q. Have those always been core
23 parts of McKesson's work in your
24 experience at McKesson?

Page 493

1 A. Yes.
2 Q. In talking about how your
3 processes have developed over time, has
4 the guidance from the DEA that you have
5 received changed over time?
6 MR. BOGLE: Object to form.
7 THE WITNESS: Yes.
8 BY MR. SCHMIDT:
9 Q. Let's look at an example of
10 that. Could you take a look at
11 Exhibit 25, which is 1962. If you look
12 at Page 3 of 235, this is a page that you
13 were asked about by the plaintiffs'
14 attorneys that says, "Program Guide For
15 Pharmacies."
16 Do you have Page 3 in front
17 of you there?
18 A. Yes.
19 Q. Under program details, the
20 second sentence says, "Those regulations
21 have not changed, but the extent to which
22 wholesalers are now required to monitor
23 and enforce the legitimate use of
24 controlled substances has."

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1      Did I read that correctly?
2      A.   Yes.
3      Q.   Is that your experience,
4  that the regulations haven't changed, but
5  the directives that you've received from
6  DEA in terms of requirements to monitor
7  and enforce the legitimate use of
8  controlled substances has changed over
9  time?
10         MR. BOGLE:  Object to form.
11         THE WITNESS:  Yes.
12  BY MR. SCHMIDT:
13     Q.   Does this document get at
14  this idea we were talking about?  Does it
15  speak to this idea we were talking about,
16  about even though the regulations don't
17  change, the direction you're getting from
18  DEA has changed over time?
19         MR. BOGLE:  Object to form.
20         THE WITNESS:  Yes.
21  BY MR. SCHMIDT:
22     Q.   Let me focus on some of your
23  work as a director of regulatory affairs
24  or a DRA.  As part of your work as a DRA,

Page 495

1  do you conduct diligence on McKesson's
2  customers?
3      A.   Yes.
4      Q.   And just so we have it, are
5  McKesson customers pharmacies?
6      A.   Yes.
7      Q.   How often --
8      A.   In my sphere, yes.
9      Q.   How often do you conduct
10  diligence on McKesson's customers?
11         MR. BOGLE:  Object to form.
12         THE WITNESS:  It's part of
13     my everyday job.
14  BY MR. SCHMIDT:
15     Q.   Has the amount of diligence
16  consistent with what we've been talking
17  about grown over time?
18     A.   Yes.
19     Q.   Why is that?
20     A.   Multiple additions in terms
21  of adding best practice to the diligence
22  that we do.
23     Q.   Do you have colleagues who
24  help with that diligence?

Page 496

1      A.   Yes.
2      Q.   Has the number of colleagues
3  grown over time?
4      A.   Yes.
5      Q.   And why is that?
6      A.   Better coverage, and also
7  there's a lot more analytic firepower
8  that's devoted to the tools that we use.
9      Q.   Can you give us a sense of
10  some of the steps that you take as part
11  of diligence into your customers?
12     A.   Yeah.  We establish what the
13  background is of the situation.  We take
14  a look at licensure and registration,
15  capturing all the information related to
16  the pharmacy, not just the PIC for
17  example, but the techs, the other
18  pharmacists, the owner.
19         We do some documentation on
20  if they are excluded from the OIG, do
21  some internet checks.  We talk to them
22  about their corresponding responsibility,
23  how they -- how they do -- what they do
24  when they see a sample transaction.  What

Page 497

1  they do if they see a doctor that has a
2  problem.  That kind of thing.
3         We take a look at both the
4  purchase and the dispensing history.  And
5  we try to put them together and make sure
6  that they -- they make sense to us.
7      Q.   Has that level of diligence
8  grown over time?
9      A.   Yes.
10     Q.   In your experience when
11  you're evaluating a pharmacy, is it a
12  black-and-white question as to whether
13  the pharmacy's practices are problematic?
14         MR. BOGLE:  Object to form.
15         THE WITNESS:  It's -- it's
16     great.  It's hard to -- to see
17     sometimes.
18  BY MR. SCHMIDT:
19     Q.   Tell me what you mean by
20  that in terms of your evaluation of
21  pharmacies.
22     A.   When we look at a pharmacy,
23  we can see the big picture view, some
24  statistical information.  But, you know,

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1 I think as we've discussed before, we
2 can't see the transaction as it's taking
3 place. The context of the people
4 arriving, where they are coming from, a
5 variety of other factors. And we can't
6 look at the scripts the same way the DEA
7 can if they make a visit or a state
8 inspector.
9         And that would be valuable
10 information to have. But we take the
11 information that's available to us and
12 digest it as well as we can.
13     Q. Let me give you an example.
14 You were asked earlier about a point in
15 time where DEA raised the question of a
16 flag marker of 5,000 per month. Do you
17 remember being asked questions --
18     A. For hydrocodone?
19     Q. Yeah.
20     A. Yeah.
21     Q. Okay. Do you remember being
22 asked questions about that by the
23 plaintiff lawyer?
24     A. Yes.

Page 499

1     Q. Is that a realistic marker
2 for all pharmacies?
3         MR. BOGLE: Object to form.
4 BY MR. SCHMIDT:
5     Q. In your view?
6     A. I think there are a lot of
7 factors that -- that contribute to the
8 picture that we're looking at. Including
9 size, location, the venue. What might be
10 next door. That kind of thing.
11     Q. So in your experience can
12 you take a one size fits number like that
13 and apply it to all pharmacies?
14         MR. BOGLE: Object to form.
15         THE WITNESS: I don't think
16 so.
17 BY MR. SCHMIDT:
18     Q. And, in fact, did you have
19 occasions over time where the DEA gave
20 you different numbers --
21         MR. BOGLE: Object to form.
22 BY MR. SCHMIDT:
23     Q. -- than 5,000 per month?
24     A. Depending on the time frame,

Page 500

1 I think we did see different numbers.
2     Q. Were they higher or lower?
3     A. I think for hydrocodone they
4 tend to be higher.
5     Q. Let me talk about some of
6 the specifics of work that you do in your
7 diligence. Are there instances where you
8 investigate a pharmacy before you do
9 business with them and you decline -- you
10 ultimately decline to do business with
11 them?
12     A. Yes.
13     Q. Can you give us a sense of
14 how often that happens across -- has
15 happened across your career, just
16 ballpark?
17     A. I don't know, 50 or 100
18 times.
19     Q. Okay. Are there instances
20 where you're doing business with a
21 pharmacy and you make the judgment that
22 you should not continue to do business
23 with them?
24     A. Yes.

Page 501

1     Q. Can you give us a sense of
2 how often that's happened over the course
3 of your career?
4     A. A hundred.
5     Q. You talked about -- you were
6 asked some questions about blocking
7 orders. Do you remember being asked
8 questions about blocking orders?
9     A. I believe so.
10     Q. Have you, as part of your
11 work at McKesson, been involved in orders
12 that are blocked from going out?
13     A. Omitted. Yeah. Yeah.
14 Absolutely.
15     Q. Can you give us a sense of
16 how many that's been?
17     A. I think that with our omits
18 and -- over -- tens of thousands.
19     Q. And in some instances do you
20 conduct diligence and determine that
21 further sales are appropriate with those
22 blocked orders?
23     A. If the customer submits a
24 TCR.

Page 502

1   Q.   Okay.  And in other
2 instances does the product never go out?
3        MR. BOGLE:  Object to form.
4        THE WITNESS:  Yes, it does
5 not.
6 BY MR. SCHMIDT:
7   Q.   Do you have Exhibit 1 handy?
8 Do you remember being asked questions
9 about this 2006 letter from the DEA by
10 the plaintiff lawyer?
11   A.   Yes.
12   Q.   And if you look at the
13 second page of this letter -- it's 1464.
14 If you look at the second page of this
15 letter, about halfway down the letter,
16 before and after the block quote is
17 language getting at this idea of blocking
18 orders.  Do you see that?  Do you
19 remember being asked questions about
20 that?
21   A.   Yes.
22   Q.   When the DEA started raising
23 questions with you in 2006 about blocking
24 orders, in addition to reporting

Page 503

1 suspicious orders, was -- was that idea
2 of being required to block orders new to
3 you?
4        MR. BOGLE:  Object to form.
5        THE WITNESS:  Yes.  I think
6   we'd been reporting typically.
7 BY MR. SCHMIDT:
8   Q.   How so, tell me about that.
9   A.   Via the DU-45.
10   Q.   Okay.  Tell me about the
11 blocked order piece of that.
12   A.   The -- in 2006 or -- 2006?
13   Q.   Mm-hmm.
14   A.   We -- the DU-45 was a report
15 that was generated based on the order
16 pattern up to that point in the month.
17 And what had happened, it hadn't been
18 filled.
19   Q.   Okay.
20   A.   And we didn't -- we didn't
21 have the same ability systemically to
22 block an order.
23   Q.   When DEA told you in 2006
24 that they wanted you to start blocking

Page 504

1 orders, did McKesson start to put in
2 place systems to be able to do that?
3   A.   Yes.
4   Q.   And does McKesson do that
5 now, block orders?
6   A.   Yes.  We did it first
7 manually.  And then automated via the
8 CSMP system.
9   Q.   Okay.  Is that an example of
10 what we were talking about a few minutes
11 ago with the rules don't change but
12 sometimes what DEA tells you about them
13 changes?
14        MR. BOGLE:  Object to form.
15        THE WITNESS:  Yes.
16 BY MR. SCHMIDT:
17   Q.   You were asked some
18 questions about documentation you might
19 generate in connection with a TCR.  Do
20 you remember that?
21   A.   Yes.
22   Q.   When you would make a
23 judgment on a TCR, you would have a form
24 and we looked at a few examples of those.

Page 505

1   A.   Yes.
2   Q.   Do you remember that?
3   A.   Yes.
4   Q.   Would you limit yourself to
5 that form or would you draw on all the
6 information you had about the pharmacy?
7        MR. BOGLE:  Object to form.
8        THE WITNESS:  In making a
9   decision, I would -- it would be
10   based on what I know about the
11   pharmacy, other conversations I
12   might have had, either with the
13   rep, with the pharmacist themselves,
14   and other information or reports
15   that I could have seen.
16 BY MR. SCHMIDT:
17   Q.   Would that -- would your
18 decision on a TCR consider or not
19 consider information you had from prior
20 interactions and prior diligence
21 regarding that pharmacy?
22        MR. BOGLE:  Object to form.
23        THE WITNESS:  I think that
24   there would be -- there would be

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1    consideration of the context, my
2    experience.
3    BY MR. SCHMIDT:
4        Q.   Okay.  So let's take one of
5    the examples that you were shown or maybe
6    the example you were shown, Exhibit 29
7    which was the Giant Eagle one.  1866.
8            First of all, where did this
9    fit timingwise in terms of your CSMP
10   program?
11       A.   This is very early.  I'd say
12   within the first eight or ten months.
13       Q.   In an instance like this,
14   where you had these TCR requests, would
15   you limit your consideration to just what
16   was on the face of the page that you were
17   given?
18       A.   No.  No.  I'm not sure about
19   the timing.  But I had had a number of
20   conversations with -- with Greg Carlson
21   and other people from Giant Eagle.
22       Q.   In the time that you've
23   served as director of regulatory affairs,
24   am I correct that your territory is

Page 507

1    focused on the Southeastern United
2    States?
3        A.   That's true.
4        Q.   Have you, other than filling
5    in for people or doing backup duty,
6    has -- has the primary focus of your work
7    ever been on Ohio?
8        A.   Well --
9        Q.   On Cuyahoga County or Summit
10   County in Ohio?
11       A.   Not specifically.  Although
12   my RNA coverage at the time included
13   Giant Eagle.
14       Q.   Did you have primary
15   responsibility for opening or closing any
16   pharmacies in Cuyahoga or Summit County?
17       A.   No, I didn't.
18       Q.   You talked about something
19   called ARCOS, the ARCOS reporting system,
20   and I want to ask you a couple questions
21   about that.
22           What is the ARCOS reporting
23   system?
24       A.   It's an automated system

Page 508

1    that we use to report to the DEA all of
2    our purchases and distributions from the
3    DC.  We do it on a monthly basis.
4        Q.   Okay.  And is it your
5    understanding from your work at McKesson
6    that McKesson has, in fact, done that,
7    reported all of its opioid sales to the
8    ARCOS system?
9            MR. BOGLE:  Object to form.
10           THE WITNESS:  Yeah.
11   BY MR. SCHMIDT:
12       Q.   If -- if an order is not
13   separately flagged as suspicious, does it
14   still get reported to the ARCOS reporting
15   system?
16       A.   Yes.  All C-IIs and some
17   C-IIIs are required.
18       Q.   Do you have an understanding
19   as to whether other distributors are
20   similarly required to report their data
21   to ARCOS?
22       A.   Yes, they are.
23       Q.   Do you have access to that
24   data regarding what the other

Page 509

1    distributors submit to ARCOS?
2        A.   No.
3        Q.   Who does have access to that
4    data?
5        A.   The DEA.  I think some
6    states demand that kind of information
7    from distributors now, but the DEA has
8    had it.
9        Q.   So in your position at
10   McKesson, do you have a ready way to
11   determine how many opioids are going into
12   a given jurisdiction or location --
13           MR. BOGLE:  Object to form.
14   BY MR. SCHMIDT:
15       Q.   -- among distributors?
16           MR. BOGLE:  Object to form.
17           THE WITNESS:  A given
18   pharmacy?
19   BY MR. SCHMIDT:
20       Q.   No, a given area.  A state
21   or a city or something like that?
22           MR. BOGLE:  Object to form.
23   BY MR. SCHMIDT:
24       Q.   So let me re-ask the

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1 question.
2      In your position at
3 McKesson, do you know how many opioids
4 you are providing in a given city,
5 correct?
6      A.   Correct.
7      Q.   Do you know how many other
8 distributors are providing?
9      A.   No.
10      Q.   Let's talk about suspicious
11 order reporting.
12      You've referred a couple
13 times to something called DU-45.  Tell us
14 what DU-45s do with respect to suspicious
15 order reporting.
16      A.   It was a system that was
17 developed between the DEA -- a task force
18 including DEA people and various
19 distributors, and it compares purchases
20 for a pharmacy with their historic moving
21 average and records and reports them at
22 different levels for submission to the
23 DEA.
24      Q.   And was there a period of

Page 511

1 time where you would regularly submit
2 those to the DEA?
3      A.   Yes.
4      Q.   Roughly speaking, what --
5 when was that?
6      A.   Since I started to -- I
7 believe it was around '08 or '09.
8      MR. SCHMIDT:  Does someone
9      have the last exhibit number?
10      I'll call this Exhibit 50.
11      (Document marked for
12      identification as Exhibit
13      Mahoney-50.)
14 BY MR. SCHMIDT:
15      Q.   I've marked as Exhibit 50 a
16 document --
17      MR. SCHMIDT:  I'll pass it
18      down.  I'm sorry, I need that
19      back.  Apologies.
20 BY MR. SCHMIDT:
21      Q.   I've marked as Exhibit 50 a
22 document that is from you to Kenneth
23 Boggess at the DEA.  Do you see that?
24      A.   Yes.

Page 512

1      Q.   Is this, in fact, a memo you
2 prepared to Mr. Boggess of the DEA in
3 March of 2007?
4      A.   Yes.
5      Q.   You write in the second
6 line -- well, in the first line you said,
7 "The monthly report that McKesson uses in
8 scanning incoming orders for suspicious
9 orders employs the original guidelines
10 framed by the DEA's suspicious orders
11 task force."
12      Do you see that?
13      A.   Yes.
14      Q.   Does that relate to DU-45s
15 at all?
16      A.   Yes.
17      Q.   And what is the
18 relationship?
19      A.   It provides the basis under
20 which we do a calculation against the
21 average and submit those orders that
22 doesn't exceed the established threshold
23 at the time.
24      Q.   "Because the volume of

Page 513

1 references that this criteria has
2 generated in the past, DEA requested that
3 we refrain from overloading the office
4 with indiscriminate faxes."
5      Do you see that?
6      A.   Yes.
7      Q.   Was that feedback that you
8 had from the DEA?
9      A.   Yes, based on the
10 conversation I had with Kevin Boggess.
11      Q.   And do you understand that
12 to relate to the DU-45s you were
13 submitting?
14      A.   Yes.
15      Q.   And then you say, "We have
16 alternative methods and screening
17 criteria, and we're determining these
18 methods to determine which method may
19 identify truly suspicious orders."
20      Do you see that?
21      A.   Yes.
22      Q.   Do you -- so am I
23 understanding this correct that you're
24 getting feedback they don't want all

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1 these DU-45s?
2     A.   I think his feedback
3 basically said that they don't do
4 anything with it.
5     Q.   Okay.
6     A.   It's too much.  They
7 couldn't tell the forest from the trees.
8     Q.   And you're looking for an
9 alternative way to report?
10     MR. BOGLE:  Object to form.
11 BY MR. SCHMIDT:
12     Q.   Were you looking for an
13 alternative way to report?  Is that what
14 you're expressing in this memo?
15     A.   Yes.
16     Q.   Did you get any feedback
17 from Mr. Bogus as to what would be the
18 right alternative way to report?
19     A.   No.
20     Q.   Was that unusual?
21     A.   No.
22     Q.   Was it often the case or
23 rare that you might reach out to the DEA
24 for information on reporting or on

Page 515

1 pharmacies or something else and not get
2 information?
3     MR. BOGLE:  Object to form.
4 BY MR. SCHMIDT:
5     Q.   How common was that?
6     A.   That was the rule rather
7 than the exception.
8     Q.   That you might ask for
9 information and --
10     A.   And not get anything.
11     MR. BOGLE:  Object to form.
12     THE WITNESS:  Correct.
13 BY MR. SCHMIDT:
14     Q.   When you talk in this memo
15 about identifying an alternate way to
16 identify truly suspicious orders, what
17 was the policy of the program that your
18 company actually settled on that
19 specified how you were going to report
20 suspicious orders around this time
21 period?
22     A.   I think at this time we were
23 in the process of developing the LDMP,
24 actually, which did calculations, and

Page 516

1 rather than just summing up the orders
2 for specific SKUs or items, it would
3 aggregate them into the base code.
4     Q.   What followed the LDMP, what
5 program?
6     A.   Later on we had the CSMP.
7     Q.   Do you remember when that
8 was, roughly?
9     A.   The implementation of the
10 CSMP was in spring of 2008.
11     Q.   Okay.  Did you -- did
12 this -- I think you covered this in your
13 discussion with the plaintiff lawyers.
14 But did you -- did the CSMP specify how
15 you would count something as suspicious
16 and when you would report it as
17 suspicious?
18     A.   We created a Level 1, Level
19 2, Level 3 structure.
20     Q.   Did that guide suspicious
21 order reporting?
22     A.   Yes.
23     Q.   Marked as Exhibit 1, did you
24 share that information and your

Page 517

1 experience with DEA that this is how you
2 would be reporting suspicious orders?
3     A.   Yes.
4     Q.   I've marked as Exhibit 51 --
5     MR. SCHMIDT:  Thank you.
6     (Document marked for
7     identification as Exhibit
8     Mahoney-51.)
9 BY MR. SCHMIDT:
10     Q.   -- a slide presentation --
11     MR. SCHMIDT:  You lost a
12     couple pages.
13 BY MR. SCHMIDT:
14     Q.   -- that says, "Controlled
15 substance monitoring program, Delran
16 facility overview, November 6, 2008."
17     Do you see that?
18     A.   Yes.
19     Q.   And if you look at the third
20 page, it refers to McKesson attendees.
21 Do you see yourself at this meeting?
22     A.   Yes.
23     Q.   Do you recall being at this
24 meeting?

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1	A.	Yes.
2	Q.	Was -- were DEA officials at
3	this meeting?
4	A.	Yes.
5	Q.	And if you flip ahead to
6	Page 16 of this document.  Tell me when
7	you're there.
8	A.	16 in the slide?
9	Q.	4832 at the bottom?
10	A.	Yes.
11	Q.	Does this set forth that
12	Level 1, Level 2, Level 3 review process?
13	A.	Yes.
14	Q.	And under Level 3 review, is
15	that where it specifies that if something
16	reaches that level, it will be reported
17	to DEA as suspicious?
18	A.	Yes.
19	Q.	Did there -- did there come
20	a time after this where you learned that
21	DEA wanted different suspicious order
22	reporting than set forth in this policy
23	that you presented to the DEA?
24	A.	Yes.

Page 519

1	Q.	Roughly speaking, when was
2	that?
3	A.	2013.
4	Q.	Okay.  And did you believe
5	up until that time that you were
6	reporting as DEA wanted, consistent with
7	their roles?
8		MR. BOGLE:  Object to form.
9		THE WITNESS:  Yes.
10	BY MR. SCHMIDT:
11	Q.	Was that the start of that
12	2013 discussion with -- that you're
13	referencing, was that the start of the
14	process that led to the 2017 settlement
15	that you were shown?
16	A.	I believe so, yeah.
17	Q.	And just to be clear on that
18	point, you were shown a couple of letters
19	related -- in the lead-up to that
20	settlement.  I think there were Exhibits
21	40 and 41 where different allegations
22	were made against the company.
23		Do you remember that?
24	A.	That was from the DEA to

Page 520

1	Covington and Burling?
2	Q.	Yes.
3	A.	Okay.  Yes.
4	Q.	Do you remember those
5	letters where there are allegations made
6	on behalf of DEA or by the DEA against
7	the company --
8	A.	Yes.
9	Q.	-- leading up to the 2017
10	settlement?
11	A.	Yes.
12	Q.	Did you agree with all the
13	allegations made in those letters?
14		MR. BOGLE:  Object to form.
15	BY MR. SCHMIDT:
16	Q.	Against the company on the
17	points where you had firsthand knowledge?
18	A.	Yeah, I wasn't aware of a
19	lot of it, but I didn't necessarily agree
20	with what I did know.
21	Q.	Did you adjust your policies
22	in 2013 when you heard those comments
23	from the DEA at that point in time, to
24	try to address those comments?

Page 521

1	A.	Yes.  I believe we started
2	sending all of our omit data as
3	suspicious order reports.
4	Q.	Let's talk about Lakeland a
5	little bit.  You were asked some
6	questions about Lakeland leading up to
7	the agreement in 2008 regarding Lakeland.
8		First off, prior to 2006,
9	was Lakeland responsible for supplying
10	opioids to Summit County, Ohio or
11	Cuyahoga County, Ohio?
12	A.	No.
13	Q.	There was discussion in the
14	documents you were shown by the
15	plaintiffs' lawyers about Lakeland about
16	internet pharmacies.  Do you remember
17	that?
18	A.	Yes.
19	Q.	Did you know that the DEA
20	had concerns about internet pharmacies?
21		MR. BOGLE:  Object to form.
22	BY MR. SCHMIDT:
23	Q.	Before those discussions
24	about Lakeland started in late 2005 and

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1 early 2006?
2    A.   Yes.
3    Q.   Did you believe that you
4 were addressing those concerns?
5        MR. BOGLE:  Object to form.
6        THE WITNESS:  Yes.
7 BY MR. SCHMIDT:
8    Q.   Tell me about that.  Tell me
9 how you thought you were addressing
10 concerns about internet pharmacies before
11 2005 and 2006.
12    A.   Based on the descriptions
13 that we had of what kind of a mode an
14 internet pharmacy took, and these were
15 both DEA communications as well as
16 internal presentations and PowerPoints,
17 that kind of thing, kind of viewed it as
18 something that wasn't really a standard
19 pharmacy, that it was more like a
20 warehouse or something like that where
21 that kind of activity would take place.
22    Q.   Were you conducting
23 diligence during that time period on the
24 pharmacies that you were dealing with?

Page 523

1    A.   What time frame are we
2 talking about?
3    Q.   Prior to 2005, 2006?
4    A.   We were -- we were
5 collecting information on licensure,
6 registration, financials, that kind of
7 thing.
8    Q.   And did you believe that was
9 meaningful information?
10    A.   Yes.
11    Q.   Were you tracking sales to
12 individual pharmacies in that time
13 period?
14    A.   All sales?
15    Q.   Yes.
16    A.   Yes.
17    Q.   Were you reporting
18 suspicious orders through those DU-45
19 reports that you were talking about to
20 DEA?
21        MR. BOGLE:  Object to form.
22        THE WITNESS:  Yes.
23 BY MR. SCHMIDT:
24    Q.   Were you reporting all of

Page 524

1 your sales to the ARCOS reporting system?
2    A.   Yes.
3    Q.   And would you -- were there
4 occasions during that time when you would
5 cooperate on ad hoc basis with DEA as
6 they were investigating issues?
7    A.   Yes.
8    Q.   Let's look at some of the
9 documents related to Lakeland.  Could you
10 put Exhibit 8 in front of you, please.
11 That's the letter from January 2006 that
12 you were asked some questions about,
13 1789.
14    A.   Yes.
15    Q.   Do you remember being asked
16 questions about this?
17    A.   Yes.
18    Q.   Who -- was this written by
19 McKesson or DEA?
20    A.   I believe this is Mapes from
21 DEA.
22    Q.   Can you vouch for all of the
23 information contained in here?  For
24 example, there are numbers and

Page 525

1 allegations and things like that.  Are
2 you in a position to vouch for all of
3 that?
4    A.   No.
5    Q.   If I look at Page 2 of this
6 letter, the third paragraph from the
7 bottom states, "Through the course of the
8 above discussion, McKesson Corp. by their
9 own admission was unable to provide a
10 plausible explanation."
11        Do you see that?
12    A.   I see that, yeah.
13    Q.   Do you recall that being
14 said by anyone at McKesson, "We can't
15 provide a plausible explanation"?
16        MR. BOGLE:  Object to form.
17        THE WITNESS:  I don't recall
18 it.
19 BY MR. SCHMIDT:
20    Q.   You were asked about a call
21 that's referenced in some of these
22 communications about an individual
23 pharmacy, and there was a suggestion, and
24 it's documented, it's reflected in this

Page 526

1 letter that the call related to United
2 Prescription Services. Do you remember
3 being asked that question?
4      A.   I see that, yeah.
5      Q.   I think you said that you
6 didn't remember receiving a call about
7 United Prescription Services; is that
8 correct?
9      A.   I don't recall receiving a
10 call from United Prescription Services.
11      Q.   Do you recall getting
12 feedback from the DEA during this time
13 period about any specific pharmacy?
14           MR. BOGLE:  Object to form.
15           THE WITNESS:  I believe --
16 BY MR. SCHMIDT:
17      Q.   Or about another specific
18 pharmacy?
19      A.   Yeah there was Lexus --
20 Lexus Drugs that one of the DIs had
21 called about.
22      Q.   And what did you do based on
23 that?
24      A.   She suggested that they were

Page 527

1 engaged in some kind of suspicious
2 activity. And we just declined to
3 onboard them.
4      Q.   Let's look at Exhibit 9,
5 which is the response letter back to
6 Exhibit 8 from McKesson to DEA.
7           Do you see that?
8      A.   Yes.
9           MR. BOGLE:  What's the --
10 what's the number?
11           MR. SCHMIDT:  1963.
12 BY MR. SCHMIDT:
13      Q.   Do you see that,
14 Mr. Mahoney?
15      A.   Yes.
16      Q.   If we look at Page 4, the
17 first full paragraph, it states that
18 McKesson is required to keep government
19 contact sheets.
20           Do you see that?
21      A.   Yes.
22      Q.   And it says that they don't
23 reflect a call regarding prescription
24 services but they do reflect a call

Page 528

1 regarding Lexus Drugs.
2           Do you see that?
3      A.   I do.
4      Q.   And is that consistent with
5 your -- with your recollection?
6           MR. BOGLE:  Object to form.
7           THE WITNESS:  Yes, I recall
8      the Lexus discussion.
9 BY MR. SCHMIDT:
10      Q.   Let's look at Exhibit 10,
11 please. You were asked questions about
12 some of these order to show cause
13 documents. I want to ask you to look at
14 Page 6350. Starting on this page and
15 continuing for a number of pages, it has
16 proposed testimony of William Mahoney.
17           Do you see that?
18      A.   Yes.
19      Q.   And have you had a chance to
20 look at this again more recently, just
21 the proposed testimony portion, beginning
22 at the top of 6350?
23      A.   I see it. And --
24      Q.   But you had a chance to look

Page 529

1 at this more recently?
2      A.   Yes, I have.
3      Q.   Do you stand behind this
4 proposed testimony today?
5           MR. BOGLE:  Object to form.
6           THE WITNESS:  Yes.
7 BY MR. SCHMIDT:
8      Q.   Just for example, if we look
9 at Page 6353?
10      A.   Yes.
11      Q.   Do you see where it talks
12 about how you verified customers at this
13 point in time?
14      A.   Yes.
15      Q.   Further down, do you see
16 where it talks about your recordkeeping
17 and reporting systems?
18      A.   Yes.
19      Q.   And then on 6358 and 6359
20 there's a discussion about that Lexus
21 pharmacy call. Do you see that?
22      A.   Yes.
23      Q.   If you go to 6359. It
24 states you will also testify that Ms.

Page 530

1   Butcher -- she is from the DEA, right?
2       A.   Yeah.  She -- she had called
3   me on Lexus.
4       Q.   Right.  "He" -- "he will
5   also testify that Ms. Butcher later
6   notified the Lakeland DC that Lexus had
7   agreed to stop the offensive behavior and
8   the DEA had no objections to Lakeland DC
9   doing business with them."
10          Do you see that?
11      A.   Yes.
12      Q.   Is that consistent with your
13  recollection?
14          MR. BOGLE:  Objection to
15      form.
16          THE WITNESS:  I believe so,
17      yeah.
18  BY MR. SCHMIDT:
19      Q.   McKesson declined to open
20  the account.  Is that what happened?
21      A.   Yes.
22      Q.   On 6361, a few pages ahead,
23  you were asked about this instance where
24  you lowered the pharmacies and then you

Page 531

1   put them back up to 2,000 dosage units.
2   Do you see that language?
3       A.   Yes.
4       Q.   Do you remember being asked
5   questions by the plaintiff lawyer about
6   that?
7       A.   Yes.
8       Q.   I want to read you the next
9   sentence that he didn't read you when he
10  asked you these questions.  It states,
11  "This amount was still significantly
12  lower than the prior purchases by these
13  pharmacies."
14          Did I read that correctly?
15      A.   Yes.
16      Q.   Was that accurate?
17      A.   Yes.
18      Q.   Were you being transparent
19  with the government in telling them this
20  information?
21          MR. BOGLE:  Object to form.
22          THE WITNESS:  Yes.
23  BY MR. SCHMIDT:
24      Q.   Look with me if you would at

Page 532

1   6444 to 6455.
2       A.   6444.  Yes.
3       Q.   Do you see that this has
4   proposed testimony from William Mahoney?
5       A.   Yes.
6       Q.   But this time it's being
7   submitted by the government.  Do you see
8   that?
9       A.   Yes.
10      Q.   And you were asked some
11  questions about this testimony.  Do you
12  see that -- do you remember that?
13      A.   Yes.
14      Q.   Did you sign off on the
15  specific substance of this before the
16  government submitted it, did they give
17  this to you so you could read it and say
18  I agree with all this?
19      A.   I don't believe -- I don't
20  think so.
21      Q.   Let me ask you about a
22  couple other exhibits.  Exhibit 11,
23  please.
24          Do you have that in front of

Page 533

1   you?
2           MR. BOGLE:  What's the
3       cross-reference?
4           MR. SCHMIDT:  1947.
5   BY MR. SCHMIDT:
6       Q.   The plaintiff lawyer
7   represented that this was a government
8   document.  Do you have any way to vouch
9   for the numbers in this document or the
10  accuracy of them?
11      A.   No.
12      Q.   Take a specific example, if
13  we look at the second page where it talks
14  about the 299 other pharmacies.  Do you
15  see that?
16      A.   Yeah.
17      Q.   Do you know how DEA chose
18  those 299 other pharmacies?
19      A.   No idea.
20      Q.   Do you know whether -- where
21  they were located?
22      A.   No.
23      Q.   Do you know if they were
24  average, above average, below average?

Page 534

1         MR. BOGLE:  Object to form.
2         THE WITNESS:  No.
3  BY MR. SCHMIDT:
4     Q.   Do you know?
5     A.   No idea, no.
6     Q.   Can you -- if you look at
7  the numbers that are reported for those
8  299 other pharmacies, is it -- is it
9  possible to do the math and figure out
10 what their monthly levels are, these
11 pharmacies that the government is citing
12 as a comparison?
13    A.   Sure.
14    Q.   How do you do that?
15    A.   So October through the end
16 of January is five months.  Five times
17 299 would be the denominator and then
18 divide the 10.7, 6, 7 million by the 1495
19 I guess.
20    Q.   And -- okay.  Let me turn to
21 Exhibits 12, 13 and 14, please.  And 15.
22 These are other documents that were shown
23 to you.
24        Do you remember being shown

Page 535

1  these documents?  I think they were also
2  represented as being government
3  documents?
4     A.   Yes.
5     Q.   Do you have any way to vouch
6  for the accuracy of the data in these
7  documents or the rankings that they have?
8     A.   No.
9     Q.   And if we just look at one
10 of them, the first one, does that appear
11 to you to include data on all
12 distributors, not just McKesson, in the
13 number of scripts on the first one,
14 Exhibit 12?
15    A.   All?  I think this is not
16 just McKesson sales.  It's all their
17 purchases, yeah.
18    Q.   Do you have Exhibit 16 and
19 17 in front of you?
20    A.   Yes.
21    Q.   These are, I believe, web
22 page articles that the plaintiff lawyer
23 said he pulled down and asked you
24 questions about.  Do you have any way to

Page 536

1  vouch for the accuracy of what they
2  report?
3     A.   I don't.
4     Q.   Let's look -- let's go back
5  to when DEA raised these concerns with
6  you about these specific pharmacies in
7  Florida.  How did you respond to them,
8  were there steps you took in response?
9         MR. BOGLE:  Object to form.
10 BY MR. SCHMIDT:
11    Q.   Strike that.
12        Were there steps you took in
13 response to the DEA's concerns that were
14 raised to you?
15        MR. BOGLE:  Same objection.
16 BY MR. SCHMIDT:
17    Q.   Regarding Lakeland in 2005
18 and 2006 in terms of these pharmacies?
19    A.   We were concerned about what
20 they were saying about internet pharmacy,
21 and we asked them to fill out -- fill out
22 questionnaires that were based on some of
23 the questions that DEA said were
24 pertinent to this kind of evaluation.

Page 537

1     Q.   Was that an example of what
2  we were talking about before, developing
3  your processes over time?
4     A.   Yes.
5         MR. BOGLE:  Object to form.
6  BY MR. SCHMIDT:
7     Q.   Do you have in front of you
8  Exhibit 19, the agreement in 2008?
9     A.   Yes.
10    Q.   Look with me if you would at
11 Page 2 of the document.  It's 889.  Do
12 you see where it says, "No admission or
13 concession"?
14    A.   Yes.
15    Q.   Tell me if I read this
16 correctly:  "This agreement is neither an
17 admission by McKesson of liability or of
18 any allegations made by DEA in the orders
19 and investigations nor a concession by
20 DEA that its allegations in the orders of
21 investigations are not well founded."
22        Did I read that correctly?
23    A.   Yes.
24    Q.   If you look at Page 0714 of

Highly Confidential – Subject to Further Confidentiality Review

Page 538

1 this document. Down below. 14 at the
2 top?
3     A.   That's easier.
4     Q.   I'm going to read
5 Paragraph 9 and ask you if I've read this
6 correctly. "By entering into this
7 agreement McKesson does not admit to the
8 violations alleged as a result of any DEA
9 investigation or to any violation of law,
10 liability, fault, misconduct or
11 wrongdoing. McKesson explicitly denies
12 any allegations of violations of the CSA
13 or DEA regulations and represents that
14 the company has defenses to the
15 violations alleged by the government."
16     Did I read that correctly?
17     A.   Yes.
18     Q.   Did you understand that to
19 be a term of this 2008 agreement
20 regarding Lakeland?
21     A.   Yes.
22     MR. BOGLE:  Object to form.
23 BY MR. SCHMIDT:
24     Q.   Just a few more.

Page 539

1     Do you have exhibit -- do
2 you have Exhibit 3 in front of you?  851.
3     A.   Yes.
4     Q.   Turn with me if you would to
5 Page 18.  Do you remember being called --
6 asked questions about this slide deck?
7     A.   18, 19?
8     Q.   Yeah.  Do you remember being
9 asked questions about this slide deck?
10     A.   Yes.
11     Q.   If you look at Page 18,
12 there's data on a slide titled Florida
13 Pill Mills.  Do you see that?
14     A.   Yes.
15     Q.   Do you know if that data
16 pertains to only McKesson-supplied
17 pharmacies, no McKesson-supplied
18 pharmacies, a combination?
19     MR. BOGLE:  Object to form.
20     THE WITNESS:  Do I know?  I
21     don't.
22 BY MR. SCHMIDT:
23     Q.   Okay.  You don't know if
24 it's McKesson pharmacies or not; is that

Page 540

1 correct?
2     MR. BOGLE:  Object to form.
3     THE WITNESS:  I assume it's
4     all of Florida.
5 BY MR. SCHMIDT:
6     Q.   And would the same be
7 true -- do you know if there's any
8 linkage, if we look at 19, between the
9 deaths referenced on 19 and any
10 McKesson-supplied pharmacies?
11     A.   No, I don't.
12     Q.   Look with me if you would
13 at -- at Slide 37.  You were asked about
14 this slide.  Do you remember that?
15     A.   Yes.
16     Q.   And one of the bullets is,
17 "You control the supply to downstream
18 customers."
19     Do you see that?
20     A.   Yes.
21     Q.   The second bullet is,
22 "Ensure timely distribution to prevent an
23 uninterrupted supply."
24     Do you see that?

Page 541

1     A.   Yes.
2     Q.   What do you understand that
3 to mean?
4     A.   I think what it's saying is
5 that we -- part of our function in the
6 whole process is to make sure that the
7 healthcare supply chain works and that
8 the drugs are available where needed,
9 when they are needed.
10     Q.   Is that important?
11     A.   Yeah.
12     MR. BOGLE:  Object to form.
13 BY MR. SCHMIDT:
14     Q.   In your view?
15     A.   Yes.
16     Q.   Does that balance against --
17 is that something that factors into a
18 decision about whether and when you can
19 cut a pharmacy off, this concern about
20 ensuring the timely distribution that
21 prevented uninterrupted supply?
22     MR. BOGLE:  Object to form.
23     THE WITNESS:  Does it affect
24     whether we cut someone off or not?

Page 542

1  BY MR. SCHMIDT:
2      Q.   Does it enter into an
3  evaluation, is it something you need to
4  balance when you are a making a decision
5  about whether or not to supply a
6  pharmacy?
7      A.   If we determine that a
8  pharmacy is not performing its
9  corresponding responsibility or we see
10  other information that leads us to stop
11  selling them controls, it's regardless
12  of -- of -- there are other alternatives.
13      Q.   Fair point.  Let's look at
14  Exhibit 6, please.  Do you remember being
15  asked questions about this slide deck?
16      MR. BOGLE:  Sorry, what was
17     the cross-reference?
18      MR. SCHMIDT:  1355.
19      THE WITNESS:  Yes.
20  BY MR. SCHMIDT:
21      Q.   Look with me, if you would,
22  at the map on 15.
23      Do you see that?
24      A.   Yes.

Page 543

1      Q.   The arrow that starts in
2  Florida, goes to Georgia, goes to
3  Tennessee, then Kentucky, then Ohio, then
4  Missouri.
5      Do you see that?
6      A.   Yes.
7      Q.   What's your understanding of
8  what that map represents and the arrows
9  represent?
10      A.   I -- I think that what this
11  is showing is where -- where they're
12  saying the diversion problem was taking
13  place.
14      Q.   Okay.  Is it specific drugs
15  going from one of those locations to the
16  other, to your understanding?
17      MR. BOGLE:  Object to form.
18      THE WITNESS:  No.  No.  My
19     belief is that this is a reaction
20     in part to states implementing
21     prescription monitoring.
22  BY MR. SCHMIDT:
23      Q.   Tell me what you mean by
24  that.

Page 544

1      A.   So a pharmacist or doctor
2  who can access a PMP can see the history,
3  the controls history of a patient, and
4  say, "You just got filled, you know, last
5  week.  I'm not going to fill your order."
6  And those were implemented at different
7  times, Florida before Georgia.  And I'm
8  not sure of the timing of the other
9  pharmacies -- or the other states.
10      But I think that was a great
11  tool for pharmacies that was implemented,
12  you know, after 2008 which helped stamp
13  out a lot of the diversion that was going
14  on.
15      Q.   You've been shown various
16  slide decks.  This is Exhibit 6.  You
17  were shown Exhibits 3, 4 and 5 from
18  McKesson's files.  Are those examples of
19  McKesson trying to understand the opioid
20  problem and address it?
21      MR. BOGLE:  Object to form.
22      THE WITNESS:  Three, four
23     and five?
24  BY MR. SCHMIDT:

Page 545

1      Q.   Yeah.  They're right there
2  if you want to look at them quickly.
3      A.   Okay.
4      Q.   Are those all slide decks
5  that are examples of McKesson trying to
6  understand the opioid problems and look
7  for ways to address it?
8      MR. BOGLE:  Object to form.
9      THE WITNESS:  Yes.
10  BY MR. SCHMIDT:
11      Q.   Look at Exhibit 28, if you
12  would.  This is the audit document.  Do
13  you recall being asked questions about
14  this audit document?
15      A.   Yes, yes.
16      Q.   Do you have an understanding
17  as to whether these kind of audits were
18  periodically done?
19      A.   I'm not sure of the
20  frequency, but audits are something that
21  are done to -- I think they're really a
22  tool of the board to ensure that we're
23  doing what we need to to protect the
24  company's interests.

Page 546

1  Q.   Okay.  Let's look at Pages
2  14 and 15, which is what you were asked
3  about.  I'll just ask you a couple quick
4  questions on those.  Do you remember
5  being asked questions about the findings
6  regarding specific facilities?
7  A.   Yes.
8  Q.   For example, on Page 15, you
9  were asked about the findings of the
10 Conroe facility where two T -- threshold
11 change requests forms were not on file.
12     Do you see that?
13 A.   Yes.
14 Q.   Does that mean that they
15 were never completed?
16     MR. BOGLE:  Object to form.
17     THE WITNESS:  I don't think
18 so, no.
19 BY MR. SCHMIDT:
20 Q.   Why do you say that?
21 A.   It was a paper system.  I'm
22 not sure where the forms might have been.
23 But they weren't available when the
24 auditors were looking for them.

Page 547

1  Q.   Is -- is the purpose of an
2  audit like this to try to have
3  100 percent compliance with every one of
4  your policies?
5  A.   Yeah.
6  Q.   Is that a good thing?
7  A.   Yes.
8  Q.   And would you act on the
9  results of these audits to try to get as
10 close to 100 percent compliance as you
11 could in all instances?
12 A.   Yes.
13 Q.   Exhibit 31 was the -- what I
14 think was described as a software glitch
15 regarding --
16 A.   Yes.
17 Q.   -- target and thresholds.
18 Do you remember being asked questions
19 about that?
20 A.   Yes.
21 Q.   Do you know how this was
22 resolved?
23 A.   I don't actually.
24 Q.   Do you know if, at the end

Page 548

1  of the day when the problem was fixed, if
2  averaged out over the months any one of
3  these pharmacies actually exceeded their
4  threshold on an average basis?
5      MR. BOGLE:  Object to form.
6  Calls for speculation.  Lacks
7  foundation.
8      THE WITNESS:  I don't know.
9  BY MR. SCHMIDT:
10 Q.   Last one, Exhibit 38.  You
11 were asked about HDMA guidelines.  Do you
12 remember being asked about that?
13 A.   Mm-hmm.
14 Q.   Were those, like, binding on
15 companies?
16     MR. BOGLE:  Object to form.
17     THE WITNESS:  No.
18 BY MR. SCHMIDT:
19 Q.   Did you view them as --
20 every single one of them as realistic and
21 valuable to use them in all
22 circumstances?
23     MR. BOGLE:  Object to form.
24     THE WITNESS:  No.

Page 549

1  BY MR. SCHMIDT:
2  Q.   Okay.
3  A.   Primarily because I think
4  this was a committee, and it was a
5  brainstorming-type thing.  They were
6  trying to determine what various people
7  do.  And this is different tools that
8  different people were using.
9  Q.   Okay.  And you gave one
10 example when you were answering questions
11 about a notarization requirement.  Is
12 that something you had looked at and made
13 a judgment about whether it actually had
14 value?
15     MR. BOGLE:  Object to form.
16     THE WITNESS:  Well, we did
17 in fact initially require a signed
18 questionnaire and document by the
19 customer.
20     And eventually, it was
21 determined that they didn't hold
22 any effect.  And we never did
23 actually do the notarization.
24 BY MR. SCHMIDT:

Page 550

1    Q.   Were there ever guidelines
2  given to you by DEA that you understood
3  but chose not to follow?
4        MR. BOGLE:  Object to form.
5  BY MR. SCHMIDT:
6    Q.   With regard to suspicious
7  orders?
8        MR. BOGLE:  Object to form.
9        THE WITNESS:  I don't think
10 so.  I don't think so.
11       MR. SCHMIDT:  That's all I
12 have, Mr. Mahoney.  Thank you.
13       MR. BOGLE:  I've got some
14 follow-up, and you guys have a
15 chance to ask questions if you
16 want.  I just want to mark the
17 time.  Let's go off the record.
18       THE VIDEOGRAPHER:  Sure.
19 Okay.  The time is 7:05 p.m.
20 Going off the record.
21       (Short break.)
22       THE VIDEOGRAPHER:  We are
23 back on the record.  The time is
24 7:09 p.m.

Page 551

1        - - -
2        EXAMINATION
3        - - -
4  BY MR. BOGLE:
5    Q.   Mr. Mahoney, I have a few
6  follow-up questions for you.  I know you
7  probably want to get out of here.  So you
8  were asked some questions about when
9  McKesson supplies drugs to pharmacies.  I
10 think you provided testimony along the
11 lines of that McKesson only distributes
12 when there's a prescription from a
13 doctor, right?
14   A.   I think what I was saying is
15 that we -- we don't -- we don't push the
16 drugs.  We respond to orders from
17 pharmacists who are filling scripts from
18 doctors.
19   Q.   Okay.  It wouldn't have been
20 your testimony then that McKesson
21 historically has only filled orders that
22 came from valid prescriptions from
23 doctors, right?
24   A.   Say that again.

Page 552

1        MR. SCHMIDT:  Objection.
2  BY MR. BOGLE:
3    Q.   It wouldn't have been your
4  testimony then that McKesson only
5  historically has provided opioids
6  specifically to customers that have valid
7  prescriptions from doctors, right?
8        MR. SCHMIDT:  Objection.
9  Foundation.
10       THE WITNESS:  I think I've
11 talked today about how hard it is
12 to -- through even the tools that
13 we have today, to know what is
14 going on in the pharmacy for every
15 specific transaction.
16 BY MR. BOGLE:
17   Q.   Okay.  I just want to make
18 sure that my question is clear.  It would
19 not have been your testimony then when
20 you said that McKesson only supplies
21 drugs in response to a prescription, that
22 historically McKesson has only supplied
23 opioids in response to valid
24 prescriptions from medical doctors?

Page 553

1        MR. SCHMIDT:  Objection.
2  Form.
3        THE WITNESS:  I'm not sure
4  if I testified to that.
5  BY MR. BOGLE:
6    Q.   No.  That's what I'm asking
7  you.  I'm asking you if we should
8  interpret your testimony to mean that
9  McKesson historically has only provided
10 opioids in response to valid medical
11 prescriptions from doctors.  That's my
12 question.
13       MR. SCHMIDT:  Objection.
14 Form.
15       THE WITNESS:  We do our best
16 to ensure that we're selling to
17 pharmacies that are exercising
18 their corresponding
19 responsibility.  And part of that
20 is to ensure that they are for a
21 legitimate medical purpose.  I
22 can't -- I can't say absolutely
23 that there has never been a
24 diversion based on a doctor

Page 554

1  writing an invalid prescription.
2  BY MR. BOGLE:
3      Q.   Sir, we know because we
4  talked about this for quite a bit this
5  morning, that McKesson-Lakeland
6  specifically, while you were the
7  distribution center manager, provided
8  more than 2 million prescriptions to
9  seven internet pharmacies over a
10 three-month period of time?
11     A.   2 million doses.
12     Q.   Right.
13     A.   Okay.  Yeah.
14     Q.   Yeah.  I'm sorry, 2 million
15 doses, you're right, of hydrocodone.  You
16 recall that discussion, right?
17     A.   Yes.
18     Q.   Okay.  And ultimately it was
19 the belief of the DEA that those were not
20 valid prescriptions, right?
21     MR. SCHMIDT:  Objection.
22 Characterization.
23     THE WITNESS:  That was their
24 allegation, yes.

Page 555

1  BY MR. BOGLE:
2      Q.   And Mr. Boggs, even in his
3  presentation after he was hired on by
4  McKesson, reached the same conclusion,
5  right?
6      MR. SCHMIDT:  Objection.
7  BY MR. BOGLE:
8      Q.   You recall that discussion,
9  don't you?
10     MR. SCHMIDT:  Objection.
11 Characterization.
12     THE WITNESS:  I remember the
13 package but I'm not sure exactly
14 what you're talking about.
15     The big presentation at
16 Olive Branch?
17 BY MR. BOGLE:
18     Q.   Yeah.  I mean you recall --
19 I'll take you back to it.  It's 1.851,
20 Exhibit 3.
21     And if you go to
22 specifically Page .15.  We've got it up
23 on the screen too.
24     A.   Gotcha.

Page 556

1      Q.   And I'm not going to rehash
2  all the things we talked about before on
3  this.  But just to -- just to refresh
4  you, the title of the slide is Purchases
5  of Hydrocodone By Known Or Suspected
6  Rogue Internet Pharmacies, 2006.
7      And this list ranked 1 to
8  34, we read off eight different
9  pharmacies on here that were either the
10 subject of the Lakeland show cause
11 proceedings in 2006 or were discussed in
12 a later letter from the DEA where they
13 felt diversion had occurred, right?
14     A.   Yes.
15     MR. SCHMIDT:  Objection to
16 the characterization.
17 BY MR. BOGLE:
18     Q.   You recall that discussion,
19 don't you?
20     A.   Yes, I recall that
21 discussion.
22     Q.   And this is Mr. Boggs'
23 conclusion, who is now the senior
24 director of regulatory affairs at your

Page 557

1  company where he concluded these were
2  known or suspected rogue internet
3  pharmacies, right?
4      A.   I see that, yes.
5      Q.   Okay.  And while we are
6  talking about the Lakeland show cause
7  proceedings, we talked earlier that --
8  that there was a substantial fine paid,
9  more than $7 million related to that
10 activity with these internet pharmacies,
11 right?
12     A.   Yes.
13     Q.   Okay.  And you were asked
14 some questions about the 2008 settlement
15 agreement and whether McKesson accepted
16 liability or responsibility for those
17 actions outlined in the agreement.  Do
18 you recall that?
19     A.   Yes.
20     Q.   Okay.  I believe you
21 testified that there was no admission of
22 guilt.  Something to that effect, right?
23     A.   That was just asked, right?
24     Q.   Right, right.  By your

Highly Confidential - Subject to Further Confidentiality Review

Page 558

1  counsel.
2      A.   Right.
3      Q.   And so, listen, in your
4  experience at 18 years at McKesson, does
5  the company routinely pay
6  $13-plus-million fines for things that
7  they didn't do?
8          MR. SCHMIDT:  Objection.
9      Foundation.
10         THE WITNESS:  I don't
11     believe so.
12 BY MR. BOGLE:
13     Q.   Okay.  And you have an
14 understanding because you were involved
15 in the preparation for these order to
16 show cause proceedings that there is a
17 procedure by which McKesson can contest
18 the allegations against -- made by the
19 DEA, right?
20     A.   Yes.
21     Q.   They don't have to roll over
22 and just say we quit, right?
23         MR. SCHMIDT:  Objection.
24     Foundation.  Calls for a legal

Page 559

1      conclusion.
2  BY MR. BOGLE:
3      Q.   You understand that in
4  preparation for the order to show cause
5  hearing, when you were asked to provide
6  proposed testimony, that that was being
7  done in preparation for a legal fight,
8  right?
9      A.   Apparently, yes.
10     Q.   Right.  And McKesson quit on
11 that fight, right?
12         MR. SCHMIDT:  Object to
13     characterization.
14         THE WITNESS:  There was a
15     settlement.
16 BY MR. BOGLE:
17     Q.   Right.  $13-plus-million
18 settlement, right?
19         MR. SCHMIDT:  Objection.
20     Asked and answered.
21         THE WITNESS:  Yes.
22 BY MR. BOGLE:
23     Q.   And you do have a general
24 understanding in your involvement in

Page 560

1  preparation for those proceedings that
2  just like every other aspect of our legal
3  system in this country, McKesson had an
4  ability to defend and fight against those
5  allegations, right?
6          MR. SCHMIDT:  Objection,
7      calls --
8  BY MR. BOGLE:
9      Q.   They didn't have to settle?
10         MR. SCHMIDT:  Objection.
11     Calls for a legal conclusion.
12 BY MR. BOGLE:
13     Q.   True?
14     A.   That's my understanding.
15     Q.   Okay.  And you provided
16 testimony along the lines the fact that
17 McKesson only fills orders that are made
18 to the company, correct?  Responds to
19 orders, right?
20     A.   Right.
21     Q.   Okay.  But I think we can
22 agree that McKesson has no obligation to
23 fill every order that's presented to it,
24 right?

Page 561

1      A.   I agree.
2      Q.   Okay.  In fact, it has an
3  obligation not to fill orders that it
4  deems suspicious, right, when it comes to
5  controlled substances?
6      A.   Yes.
7      Q.   You were asked -- I'm trying
8  to find the exhibit number.  1.1962 which
9  is Exhibit 25.  If you can track that one
10 down.
11         You were asked specifically
12 about the third page of the document
13 which is the first page of the program
14 guide for pharmacies?
15     A.   Yes.
16     Q.   And specifically asked about
17 the second sentence.  "Those regulations
18 have not changed but the extent to which
19 wholesalers are now required to monitor
20 and enforce legitimate use of controlled
21 substances has."
22         Do you recall talking about
23 that sentence and what you thought that
24 meant, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 562

1     A.   Yes.
2     Q.   Okay.  Now, as an individual
3 who has worked in the regulatory
4 department for McKesson for -- for ten
5 years approximately, you understand that
6 since the regulations haven't changed
7 over time, it's impossible for the
8 company's duties to have changed either,
9 right?
10         MR. SCHMIDT:  Objection.
11 Foundation.
12         THE WITNESS:  I'm not -- I'm
13     not sure if Don Walker was talking
14     about that time frame.  But he was
15     talking about an evolution in
16     terms of the things that we would
17     be looking for.
18 BY MR. BOGLE:
19     Q.   Right.  I understand that.
20 I think we are talking about two
21 different things though.  You are talking
22 about an evolution at what McKesson
23 decides to look at.  I'm talking about an
24 evolution of the regulation itself.

Page 563

1         But we can agree based on
2 this document, as it's stated, the
3 regulations have not changed one bit, had
4 they?
5         MR. SCHMIDT:  Object to the
6     preamble; move to strike the
7     preamble.  Object to form.
8 BY MR. BOGLE:
9     Q.   That's what this document
10 says, 1.1962, Exhibit 25.  The
11 regulations have not changed, right?
12     A.   I read that.
13     Q.   And the regulation
14 specifically referenced here is the
15 Controlled Substances Act, right?
16     A.   Yes.
17     Q.   Okay.  And so, while
18 McKesson may have changed its processes
19 over time, if the regulations haven't
20 changed, sir, how could the duties
21 changed that you guys had?
22         MR. SCHMIDT:  Objection to
23     form.
24         THE WITNESS:  I think that

Page 564

1 there are all kinds of tools that
2 we have added to our tool kit
3 which enable us to get a better --
4 better perception of what is
5 inherently a grey process.
6 BY MR. BOGLE:
7     Q.   Okay.  But just because
8 McKesson presently decides to do more
9 than it had in the past, doesn't mean
10 that less was necessarily required of it
11 in the past, does it?
12         MR. SCHMIDT:  Objection to
13     form.
14         THE WITNESS:  I think that
15     there are new -- new ways at
16     trying to get to the information
17     that the DEA says will help us
18     identify whether something is a
19     legitimate script or not.
20 BY MR. BOGLE:
21     Q.   Can you point our jury to
22 one passage of the Controlled Substances
23 Act which has changed which you believe
24 modified McKesson's duties at some point

Page 565

1 in time?
2     A.   I can't.
3     Q.   For example, under the
4 Controlled Substances Act there was
5 always a duty of McKesson to monitor for
6 suspicious orders of controlled
7 substances, right?
8     A.   Yes.
9     Q.   Always a duty to report
10 suspicious orders of controlled
11 substances, right?
12     A.   Yes.
13     Q.   And always a duty to prevent
14 diversion, right, of controlled
15 substances?
16     A.   Establish effective controls
17 against diversion.
18     Q.   Right.  And the only way to
19 have effective controls against diversion
20 is to also block those orders and make
21 sure they don't get to customers who
22 might divert them, right?
23         MR. SCHMIDT:  Objection.
24 Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 566

1       THE WITNESS:  Say that
2   again.
3   BY MR. BOGLE:
4       Q.   How do you make sure that a
5   customer doesn't divert a product if
6   you're giving it to them?
7       MR. SCHMIDT:  Objection.
8   Vague.
9       THE WITNESS:  I am not sure
10  I understand.
11  BY MR. BOGLE:
12      Q.   Okay.  So let me ask you
13  this way.  In order to have effective
14  controls against diversion, you have to
15  block orders that you deem are
16  suspicious, right?
17      MR. SCHMIDT:  Objection.
18  Form.
19      THE WITNESS:  We now block
20  orders that get omitted, when they
21  hit a threshold that's
22  established.
23  BY MR. BOGLE:
24      Q.   I'm talking about at all

Page 567

1   times, sir.  I'm not talking about now.
2       The only way to have
3   effective controls against diversion, to
4   prevent it from occurring in the first
5   place, is not to give an order to a
6   customer that you think is suspicious,
7   right?
8       MR. SCHMIDT:  Objection.
9   Form.
10      THE WITNESS:  To a customer
11  who is suspicious?
12  BY MR. BOGLE:
13      Q.   Whose order you think is
14  suspicious.
15      A.   We're always working to try
16  to determine whether orders are
17  suspicious.
18      Q.   Sir, that's not my question.
19      The only way to have
20  effective controls against diversion is
21  to ensure that suspicious orders don't
22  make their way to customers to begin
23  with, true?
24      MR. SCHMIDT:  Objection.

Page 568

1   Form.  Vague as to time.
2   BY MR. BOGLE:
3       Q.   Any time.
4       MR. SCHMIDT:  Objection to
5   form.
6   BY MR. BOGLE:
7       Q.   Any time since you've been
8   with the company.
9       A.   We've -- we've reported
10  suspicious orders via the DU-45 based on
11  the guidance that was given to us at the
12  time.
13      Q.   Sir, that's just simply not
14  my question.
15      The only way to have
16  effective controls against diversion is
17  to ensure that suspicious orders don't
18  make their way to customers to begin
19  with, right?
20      MR. SCHMIDT:  Objection.
21  Asked and answered three or four
22  times now.
23      THE WITNESS:  That -- that
24  is the objective.

Page 569

1   BY MR. BOGLE:
2       Q.   Right.  And that is the
3   objective because that's the easiest way
4   to make sure something doesn't get
5   diverted, right, is don't give it to them
6   to begin with, true?
7       MR. SCHMIDT:  Objection.
8   Form.  Foundation.
9   BY MR. BOGLE:
10      Q.   Can you think of an easier
11  way to prevent diversion than not to give
12  it to someone who you think is going to
13  divert it?
14      MR. SCHMIDT:  Objection
15  form.  Foundation.
16      THE WITNESS:  Can I think of
17  an easier way to what?
18  BY MR. BOGLE:
19      Q.   Prevent diversion than
20  preventing giving it to somebody you
21  think might divert it.  What's an easier
22  way than that?
23      A.   It sounds pretty easy if --
24      Q.   I agree.

Highly Confidential - Subject to Further Confidentiality Review

Page 570

1    MR. SCHMIDT:  Let him finish
2    his answer, please.
3    THE WITNESS:  It's hard to
4    understand what a customer is
5    going to do with what we do.
6  BY MR. BOGLE:
7    Q.   Sir, that's not my question.
8  My question is, can you tell our jury of
9  a way that's easier to prevent diversion
10  of a suspicious order than never giving
11  that order to the customer to begin with?
12  Can you think of an easier way?
13    MR. SCHMIDT:  Objection.
14    Form.  Asked and answered.
15    THE WITNESS:  Our objective
16    is prevention.
17  BY MR. BOGLE:
18    Q.   And how do you prevent?  You
19  don't give it to them, right?
20    A.   We try to assess our
21  customers to ensure that they're doing
22  their corresponding responsibility.  And
23  when we were comfortable with the
24  customers that way, we can be confident

Page 571

1  that they are being used for legitimate
2  purpose.
3    Q.   If you are not comfortable,
4  those customers should never get the
5  product, should they?
6    MR. SCHMIDT:  Objection.
7    Foundation.  Vague as to time.
8  BY MR. BOGLE:
9    Q.   Anytime.
10    MR. SCHMIDT:  Objection.
11    Foundation.  Asked and answered.
12    THE WITNESS:  I think our
13    tools have evolved over time
14    because the environment has
15    changed dramatically.
16  BY MR. BOGLE:
17    Q.   Sir, I haven't asked you a
18  question about tools.  I'm asking you,
19  and I've asked you three or four
20  different ways, and you still haven't
21  answered it.  I would like for you to
22  tell our jury, if you think there is one,
23  of one easier way for ensuring that a
24  customer doesn't divert a controlled

Page 572

1  substance when you think they've made a
2  suspicious order than ensuring they don't
3  get the substance to begin with?
4    MR. SCHMIDT:  I'll just
5    object to the lecturing of the
6    witness.  It's not inappropriate.
7    I'll move to strike the preamble.
8    Asked and answered.  Form.
9    THE WITNESS:  What we've
10    been doing since 2013 is to
11    report -- report orders that hit
12    our threshold.  And that is
13    apparently sufficient in terms of
14    reporting those suspicious orders.
15    When they do hit the
16    threshold, we block those orders.
17  BY MR. BOGLE:
18    Q.   Since 2013?
19    A.   Yes.
20    Q.   Okay.  So I'm not talking
21  about since 2013.  Let me back up then.
22  So that you consider to be a good
23  practice today, right?
24    A.   We've sent thousands of

Page 573

1  suspicious -- suspicious orders when they
2  hit the threshold to the DEA.
3    Q.   Since 2013?
4    A.   Yes.
5    Q.   Okay.  You think -- well,
6  back up.  Let me strike that.
7    Those orders that, you said,
8  since 2013 have also been blocked, right?
9    A.   Yes.
10    Q.   And you block them as a way
11  to have effective controls against
12  diversion, right?
13    A.   Yes.
14    Q.   And is it your testimony
15  that prior to 2013, McKesson was
16  incapable of blocking an order they
17  deemed suspicious?
18    A.   We blocked orders and then
19  did investigation on the order to try to
20  determine whether it was suspicious and
21  merited reporting to the DEA, at which we
22  would shut the customer down.
23    Q.   Okay.  So McKesson was fully
24  capable at all times that you've been

Highly Confidential - Subject to Further Confidentiality Review

Page 574

1 with the company of blocking an order it
2 deemed suspicious, true?
3        MR. SCHMIDT:  Object to
4    characterization.
5        THE WITNESS:  In 2008 we
6    implemented the CSMP.  CSMP
7    automatically blocks orders that
8    exceed the threshold.  And we --
9    that was cause for us to
10   investigate the orders and to try
11   to make a judgment as to whether
12   the customer was suspicious, and
13   if so, to stop selling controls to
14   them.
15 BY MR. BOGLE:
16   Q.   Is it your testimony in 2005
17 when you were the distribution center
18 manager at Lakeland, you were incapable
19 of blocking an order that you found to be
20 suspicious?
21   A.   I didn't have a lot of the
22 tools that I have today.  I wish I did.
23 I wish I had tools that I have today to
24 make decisions back in 2005.

Page 575

1    Q.   Did you ask for any of those
2 tools back in '05 to make sure that you
3 were blocking orders that you found were
4 suspicious?
5    A.   The tools that I -- the
6 onboarding review that we were doing is
7 quite different.  And I think that we
8 were perhaps naively relying on the state
9 sanction via licensure and registration
10 to help us in evaluating our customers.
11   Q.   Yeah, my question was only
12 whether in 2005 or anytime prior to 2008
13 you ever asked for additional tools from
14 the company in order to block suspicious
15 orders.
16   A.   I think I had discussions
17 with the regulatory department and
18 management to see if -- see how to do
19 what we need to do with regard to
20 customers.
21   Q.   Did they give you any tools
22 while you were distribution center
23 manager at Lakeland to block orders that
24 you asked for, any tools that you asked

Page 576

1 for?
2    A.   We developed the LDMP.
3    Q.   The LDMP didn't block
4 suspicious orders, did it?
5    A.   It identified them so that
6 we could instruct the nightshift don't
7 fill decisional hydrocodone for a
8 specific customer.
9    Q.   When orders exceeded their
10 thresholds under the LDMP, they weren't
11 blocked, were they?
12   A.   It was -- there wasn't a
13 threshold, per se.  But there was a
14 designated level above which we would do
15 the investigation.
16   Q.   There was an 8,000-unit --
17 dosage unit monthly threshold for
18 hydrocodone and oxycodone in the LDMP,
19 right?
20   A.   I don't think it was called
21 the threshold at that point.  It may have
22 been.  But it was a level when a customer
23 reached that, it became a level that we
24 would assess the customer for.

Page 577

1    Q.   But you wouldn't assess the
2 customer until the end of the month,
3 meaning they would exceed the threshold
4 during the month and you wouldn't take a
5 look at them until the end of the month,
6 right?  That's how the process worked?
7    A.   No, no.  The LDMP was
8 periodically within the month.
9    Q.   You received, when you were
10 distribution center manager, monthly
11 reports when the LDMP was in place that
12 told you when -- which customers exceeded
13 the 8,000-unit allocation, right?
14   A.   We were doing those reports.
15   Q.   Right.  You received those
16 reports?
17   A.   Ed Volakos worked for me.
18 We developed what was going on.
19   Q.   I'm going to hand you --
20       MR. BOGLE:  How much time
21    have I used?
22       THE VIDEOGRAPHER:
23    20 minutes.
24 BY MR. BOGLE:

Page 578

1  Q.   I'm going to hand you what
2  I'm marking as Exhibit 43.  Also marked
3  as 1.1864.
4        (Document marked for
5        identification as Exhibit
6        Mahoney-43.)
7  BY MR. BOGLE:
8        Q.   Take a look at this here.
9  This is an e-mail at the bottom of the
10 first on the first page from December 7,
11 2007.  Do you see that?
12       MR. SCHMIDT:  I'm just going
13       to enter an objection on the
14       scope.  I think this is well
15       outside the scope of anything that
16       I did.  If I could have a running
17       objection.
18       MR. BOGLE:  He raised the
19       issue.  I wasn't going to go here,
20       but he raised the issue.
21       MR. SCHMIDT:  I still think
22       it's outside the scope.  May I
23       have a running objection?
24       MR. BOGLE:  Sure.

Page 579

1  BY MR. BOGLE:
2        Q.   See here in this e-mail from
3  December 7th of '07, subject "November
4  LDMP."
5        Do you see that?
6        A.   Yes.
7        Q.   And there's a chart that
8  starts on that page and goes into the
9  next page.  You've seen charts like this
10 at the end of the month when the LDMP was
11 in place, right?
12       A.   I believe so.
13       Q.   Okay.  And if you look here,
14 I'll show you a couple of these.  On the
15 second page, for example, there's a
16 Franklin Pharmacy, four down.  Oxycodone
17 hit their threshold November 13, 2007.
18 By the end of the month they received
19 22,250 doses of oxycodone.
20       Do you see that?
21       A.   Yes.
22       Q.   Okay.  And if you look on
23 the -- back to the first page,
24 December 10, 2007, which we can agree

Page 580

1  which is ten days back to the end of the
2  month that we were just looking at,
3  November of '07, right?
4        A.   Yes.
5        Q.   You see for Franklin
6  Pharmacy, where there's a reference to,
7  "Appeared new last month for oxycodone.
8  Level 2 review is almost complete.
9  Blaine got Frank's signature on the
10 declaration, and I'm finishing up the
11 survey questionnaire."
12       Do you see that?
13       A.   Yes.
14       Q.   So this is a full ten days
15 after the end of the month where the
16 threshold is reached.  In fact, the
17 threshold was surpassed on the 13th of
18 the previous month, and they still
19 haven't finished the review, have they?
20       MR. SCHMIDT:  Object to the
21       characterization.  Foundation.
22 BY MR. BOGLE:
23       Q.   Nearly 30 days later?
24       MR. SCHMIDT:  Same

Page 581

1  objection.
2        THE WITNESS:  I see -- I see
3        what you're saying.
4  BY MR. BOGLE:
5        Q.   That's what that shows,
6  right?
7        MR. SCHMIDT:  Object to
8        foundation.
9  BY MR. BOGLE:
10       Q.   Nearly 30 days later, they
11 say it's almost complete?
12       MR. SCHMIDT:  Object to
13       foundation.
14       THE WITNESS:  I'm not sure
15       what other interim reports may
16       have looked like.
17 BY MR. BOGLE:
18       Q.   We know at the end of the
19 month they got to 22,250 doses, and we
20 know that nearly 30 days after they
21 surpassed the 8,000 number, the Level 2
22 review was almost complete.  We can --
23 you can glean that from this document.
24       A.   No, I --

Page 582

1    MR. SCHMIDT:  Objection.
2    Foundation.
3 BY MR. BOGLE:
4    Q.   Is that the kind of realtime
5 review you're talking about?
6    MR. SCHMIDT:  Same
7 objection.
8 BY MR. BOGLE:
9    Q.   Under the LDMP?
10    MR. SCHMIDT:  Same
11 objection.
12    THE WITNESS:  One of the
13 things that causes --
14    MR. SCHMIDT:  Compound.
15    THE WITNESS:  We implemented
16 the CSMP because it was hard and
17 it was automated.
18 BY MR. BOGLE:
19    Q.   Okay.  I'm talking about the
20 LDMP right now because you raised that
21 issue.
22    A.   I understand.
23    Q.   So this is an example for
24 one where these weren't being reviewed

Page 583

1 and reviews being completed prior to the
2 customer exceeding the 8,000 allocation,
3 right?
4    MR. SCHMIDT:  Object.
5 BY MR. BOGLE:
6    Q.   We can see that?
7    MR. SCHMIDT:  Object to
8 characterization.  Foundation.
9    THE WITNESS:  In my
10 experience, I recall sending
11 directions to the computer room,
12 the cage and the vault, saying not
13 to -- not to fill orders for these
14 customers for drugs that were on
15 the LDMP based on the reports that
16 we were getting in the middle of
17 the month.
18 BY MR. BOGLE:
19    Q.   Until these reviews were
20 completed, right, these Level 1, 2, or 3
21 reviews?
22    MR. SCHMIDT:  Objection.
23 Characterization.
24    THE WITNESS:  No.  Level --

Page 584

1 level -- no.  Well, what we would
2 do would be to say that they had
3 gotten to their -- the level, and
4 then we would try not to fill any
5 more.
6    And it was -- it was not
7 absolute, and it was -- that was
8 one of the reasons we wanted to go
9 to the automation and the CSMP.
10 BY MR. BOGLE:
11    Q.   Okay.  It wasn't absolute
12 meaning that there was no -- it was up to
13 the distribution center itself to decide
14 whether they wanted to fill above the
15 8,000 level.  There was no hard blocking,
16 right?
17    A.   There was no hard blocking.
18    MR. SCHMIDT:  Object to the
19 characterization.
20 BY MR. BOGLE:
21    Q.   You were asked about
22 Exhibit 1.1464, which was Exhibit 1 to
23 the deposition.  It's the September 27,
24 2006, letter from Mr. Rannazzisi.  You

Page 585

1 again talked about the reference to
2 potentially blocking orders being new in
3 this letter.  Do you recall saying that?
4    A.   Yes.
5    Q.   Okay.  Can you name a time
6 prior to this letter in September 2006
7 where anybody at the DEA told you or
8 anybody at McKesson that you're aware of
9 that you didn't need to block orders?
10    MR. SCHMIDT:  Objection.
11 Foundation.
12 BY MR. BOGLE:
13    Q.   That you specifically don't
14 need to block orders, let them go?
15    A.   No, I don't recall them.
16    Q.   Okay.  You were asked about
17 whether McKesson can impact the flow of
18 drugs into a specific area or region.  Do
19 you recall talking about that?
20    A.   I believe it was about the
21 awareness of the totality of drugs that
22 were going to a specific location.
23    Q.   Okay.  Well, you're familiar
24 with the statistic I believe that's even

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1 on McKesson's website that one-third of
2 all pills distributed in the United
3 States come from your company, right?
4 Are you familiar with that stat?
5        A.   I'm not sure that I've seen
6 it on the website.  But I know that our
7 market share is roughly in line with
8 that.
9        Q.   Right.  So to say that you
10 guys at McKesson don't have an impact on
11 the amount of pills, and specifically
12 controlled substances that might appear
13 in any region in this country, is a bit
14 overstated if you guys, in fact, supply
15 one out of every three pills in the
16 United States, right?
17            MR. SCHMIDT:  Objection.
18        Characterization.
19            THE WITNESS:  I think that
20        an expression of our market share
21        in saying that one out of every
22        three opioids, I don't see the
23        linkage there necessarily as cause
24        and effect.

Page 587

1 BY MR. BOGLE:
2        Q.   Oh, okay.  So if you supply
3 one out of every three pills you don't
4 think if you're doing a bad job at
5 deciding what should be supplied, that it
6 has no impact?
7            MR. SCHMIDT:  Objection.
8        Foundation.
9            THE WITNESS:  In my
10        experience there are multiple
11        sources for controls or other
12        products in our industry.
13 BY MR. BOGLE:
14        Q.   I don't believe you answered
15 my question, sir.
16            If McKesson is supplying one
17 out of every three pills in this country,
18 if they are doing a bad job at deciding
19 with controlled substances what should be
20 provided to customers, is it your
21 testimony that has no impact on potential
22 diversion?
23            MR. SCHMIDT:  And I think he
24        did answer your question.  Asked

Page 588

1 and answered.
2 BY MR. BOGLE:
3        Q.   Your testimony has no
4 impact?
5            MR. SCHMIDT:  Objection.
6        Mischaracterizes testimony.
7 BY MR. BOGLE:
8        Q.   That was my question.  Yes
9 or no, no impact, or yes, it does have an
10 impact?
11            MR. SCHMIDT:  Objection.
12        Compound.  And form.
13            THE WITNESS:  Our role as a
14        third of the total market share,
15        clearly there is -- we're part of
16        the system and --
17 BY MR. BOGLE:
18        Q.   A substantial part of the
19 system, right?
20        A.   Yes, yes.
21        Q.   And you were asked -- you
22 mentioned the DU-45 report a few times.
23 I think you referenced that as a
24 suspicious order report.  Do you recall

Page 589

1 saying that?
2        A.   I believe so.
3        Q.   You know that's not, in
4 fact, what it is, right, it's not a
5 suspicious order report, is it?
6            MR. SCHMIDT:  Objection.
7        Objection.  Argumentative.
8            THE WITNESS:  That was the
9        terminology that we used.  It was
10        on the top of the green bar and
11        it's what we submitted to DEA.
12 BY MR. BOGLE:
13        Q.   DEA took issue with that
14 being termed a suspicious order report,
15 didn't they?
16            MR. SCHMIDT:  Objection.
17        Foundation.
18            THE WITNESS:  In 2005 or '6
19        or whatever, yes.
20 BY MR. BOGLE:
21        Q.   Yeah.  They told you that
22 these DU-45 reports you're giving us are
23 not suspicious orders, they don't
24 establish compliance with the Controlled

Page 590

¹ Substances Act, right?
²          MR. SCHMIDT:  Objection.
³     Foundation.
⁴          THE WITNESS:  We had been
⁵     submitting the DU-45.  Said
⁶     suspicious order report on it from
⁷     the time I began until we received
⁸     the letter from Rannazzisi.
⁹ BY MR. BOGLE:
¹⁰     Q.   What I'm asking you though
¹¹ is the DEA made very clear to McKesson
¹² and you are aware of the fact, that fact,
¹³ that the DU-45 did not constitute a
¹⁴ suspicious order report under the
¹⁵ Controlled Substances Act, correct?
¹⁶          MR. SCHMIDT:  Objection to
¹⁷     characterization.
¹⁸          THE WITNESS:  I remember
¹⁹     seeing that in a letter.
²⁰ BY MR. BOGLE:
²¹     Q.   Okay.  And merely labeling
²² something a suspicious order report
²³ doesn't make it one, right?  Just
²⁴ slapping that title on it doesn't make it

Page 591

¹ a suspicious order report?
²          MR. SCHMIDT:  Objection.
³     Form.
⁴          THE WITNESS:  That -- that
⁵     title had been on it for years,
⁶     before Rannazzisi sent us the
⁷     letter that you're talking about.
⁸     It was -- it was the terminology
⁹     that we were using.
¹⁰ BY MR. BOGLE:
¹¹     Q.   Right.  But you can call it
¹² whatever you want.  That doesn't make it
¹³ a suspicious order report, right?
¹⁴          MR. SCHMIDT:  Objection.
¹⁵     Argumentative.
¹⁶          THE WITNESS:  I understand.
¹⁷     Respective of time it's very
¹⁸     helpful in terms of what we --
¹⁹     what we could have done.
²⁰ BY MR. BOGLE:
²¹     Q.   Well, you -- along those
²² lines, you talked about Exhibit 51.  This
²³ meeting that you said you had with some
²⁴ people at the DEA where you outlined the

Page 592

¹ CSMP Level 1, 2, and 3 process?
²     A.   Delran, yeah.
³     Q.   You recall the -- I'm sorry,
⁴ that's the only copy I have.
⁵     A.   Yeah, I see.
⁶     Q.   Okay.  And I think you said
⁷ that the DEA was aware of the CSMP
⁸ processes based on this presentation,
⁹ right?
¹⁰     A.   We -- we had presented that
¹¹ at multiple locations.  And the -- the
¹² content was largely similar.
¹³     Q.   Okay.  But you know it's not
¹⁴ the DEA's role or responsibility to sign
¹⁵ off on any specific suspicious order
¹⁶ monitoring program for a company, right?
¹⁷          MR. SCHMIDT:  Objection.
¹⁸     Foundation.
¹⁹          THE WITNESS:  I have seen
²⁰     that expressed.
²¹ BY MR. BOGLE:
²²     Q.   They -- the DEA told you
²³ guys that multiple times, right?
²⁴     A.   I read that, yeah.

Page 593

¹     Q.   Both before and after this
² presentation, right?
³          MR. SCHMIDT:  Objection.
⁴     Foundation.
⁵          THE WITNESS:  We -- our
⁶     presentation wasn't seeking
⁷     approval.
⁸ BY MR. BOGLE:
⁹     Q.   Okay.  So you're just
¹⁰ letting them know what you were doing,
¹¹ right?
¹²     A.   As part of the memorandum of
¹³ agreement in 2008, that was a condition
¹⁴ in which we were sharing our proposed
¹⁵ system.
¹⁶     Q.   Okay.  But our jury
¹⁷ shouldn't take from your testimony on
¹⁸ Exhibit 51 that the DEA signed off
¹⁹ specifically in saying that this CSMP
²⁰ program was sufficient to meet your
²¹ obligations under the Controlled
²² Substances Act, should they?
²³          MR. SCHMIDT:  Objection.
²⁴     Foundation.  Characterization.

Page 594

1        THE WITNESS:  The DEA, as
2    far as I know, has always
3    expressed that they don't -- they
4    don't approve or sign off on those
5    kind of systems.
6  BY MR. BOGLE:
7        Q.   Correct.  You talked a
8    little bit too, about conducting due
9    diligence on internet pharmacies.  Do you
10   recall that, in conjunction with the
11   discussion of the Lakeland show cause
12   proceeding?
13       A.   Yes.
14       Q.   Do you recall specifically
15   talking about the fact that you guys --
16   and you specifically at the Lakeland
17   distribution center -- did conduct due
18   diligence on internet pharmacies, right?
19       A.   Yes.
20       Q.   Okay.  And so despite that
21   due diligence, as we looked at multiple
22   times here today, despite the due
23   diligence that you've referenced, these
24   seven pharmacies in the state of Florida

Page 595

1    that Lakeland was supplying did, in fact,
2    still receive more than 2 million dosage
3    units of hydrocodone in a three-month
4    period of time, right?
5        MR. SCHMIDT:  Objection.
6    Asked and answered.
7  BY MR. BOGLE:
8        Q.   You don't dispute that you
9    guys gave them those pills, correct?
10       MR. SCHMIDT:  Objection.
11   Asked and answered.
12       THE WITNESS:  No, I don't.
13  BY MR. BOGLE:
14       Q.   Okay.  And that was even
15   considering that you were doing due
16   diligence?
17       A.   In the wake of the
18   information that we received, we
19   implemented a questionnaire on internet
20   pharmacy.
21       Q.   Okay, okay.  So maybe I
22   misunderstood.
23       MR. SCHMIDT:  Were you --
24   were you finished with your

Page 596

1    answer?
2        THE WITNESS:  And I also
3    visited several of the pharmacies
4    as a result.
5  BY MR. BOGLE:
6        Q.   I'm sorry, I misunderstood.
7        So the due diligence that
8    you were talking about with your counsel
9    was after the DEA pointed out that you'd
10   given more than 2 million pills to these
11   seven pharmacies, right?
12       MR. SCHMIDT:  Object to
13   characterization.
14       THE WITNESS:  I think if
15   you -- if you look at the dates on
16   the questionnaires, they are, you
17   know, after -- they are in
18   November I think.
19  BY MR. BOGLE:
20       Q.   Right.  And the sales
21   started -- the DEA notified you of their
22   concerns back in September of 2005,
23   right?
24       A.   Notified McKesson?

Page 597

1        Q.   Yes.
2        A.   Yes.
3        Q.   And you were asked too
4    about, with the internet pharmacies after
5    these questionnaires were completed, the
6    decision to increase the thresholds or
7    the allotments I think is the term you
8    used, to up to 60,000 hydrocodone doses
9    per month.  Do you recall that?
10       A.   Yes.
11       Q.   Okay.  And now, the DEA
12   never specifically signed off on you guys
13   increasing the allotment back to 60,000
14   doses for any of those pharmacies, did
15   they?
16       A.   I -- I was working in
17   concert with Don Walker.
18       Q.   Right.
19       A.   He had communications with
20   the DEA of which I had no knowledge.
21       Q.   Okay.  So to your
22   knowledge -- and I'll rephrase it then.
23   To your knowledge you can't point to our
24   jury anybody at the DEA that said

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1  60,000-dosage allotment for hydrocodone
2  per month for these seven pharmacies,
3  A-OK by us, right?
4      A.   Not that I'm aware of.
5      Q.   Okay.  And the last thing
6  that I want to talk to you about, you
7  said that there was never a point in time
8  where there were DEA guidelines that
9  McKesson did not follow.
10       Did I -- did I write that
11  down correctly?
12         MR. SCHMIDT:  Objection.
13  Characterization.
14  BY MR. BOGLE:
15      Q.   If I didn't just tell me.
16      A.   I'm not sure what the
17  context of that comment was.  But where
18  the DEA for example warned us of
19  pharmacies and that kind of thing, we --
20  we were inclined to listen to them.
21      Q.   Okay.  So let me ask you the
22  question a little differently to make
23  sure we're clear.  Is it your testimony
24  today that McKesson at all points in time

Page 599

1  when you were with the company was in
2  full compliance with the Controlled
3  Substances Act?
4      A.   I -- I think the agreements,
5  the settlement that we had, would
6  indicate that the DEA did not think that
7  we were in compliance.
8      Q.   And specifically in the 2017
9  settlement, McKesson agreed, right?
10         MR. SCHMIDT:  Objection.
11  Characterization.
12  BY MR. BOGLE:
13      Q.   They accepted responsibility
14  for those failures, didn't they?
15      A.   I remember that segment,
16  yeah.
17      Q.   Right.  You recall that,
18  don't you?
19      A.   Yes.
20         MR. BOGLE:  No further
21  questions.
22         MR. SCHMIDT:  I just need a
23  minute.
24         THE VIDEOGRAPHER:  Off the

Page 600

1  record, right?  The time is
2  7:46 p.m.  Going off the record.
3      (Short break.)
4         THE VIDEOGRAPHER:  The time
5  is 7:49 p.m.  Back on the record.
6      - - -
7      EXAMINATION
8      - - -
9  BY MR. SCHMIDT:
10      Q.   Mr. Mahoney, before you
11  received the letter from the DEA in 2006
12  that we discussed that was marked as
13  Exhibit 1.  Did you understand that you
14  had a responsibility not only to report
15  suspicious orders but block suspicious
16  orders?
17         MR. BOGLE:  Object to form.
18         THE WITNESS:  No, I don't
19  think so.
20  BY MR. SCHMIDT:
21      Q.   At that point in time,
22  before receiving that letter, you were
23  asked some questions about what's the
24  best way to prevent diversion.  Do you

Page 601

1  remember being asked those questions?
2      A.   Yes.
3      Q.   Did you think the best way
4  to prevent diversion was to say to the
5  United States government, and
6  specifically the Drug Enforcement
7  Administration, "Hey, these are
8  suspicious orders"?
9         MR. BOGLE:  Object to form.
10         THE WITNESS:  Yes.
11         MR. SCHMIDT:  Thank you.
12  That's all.
13         MR. BOGLE:  Got nothing.
14         THE VIDEOGRAPHER:  Okay.
15  Stand by, please.  This marks the
16  end of today's deposition.  The
17  time is 7:50 p.m.  Off the record.
18      (Excused.)
19      (Deposition concluded at
20  approximately 7:50 p.m.)
21
22
23
24

Page 602

```
 1
 2              CERTIFICATE
 3
 4
 5        I HEREBY CERTIFY that the
    witness was duly sworn by me and that the
 6  deposition is a true record of the
    testimony given by the witness.
 7
          It was requested before
 8  completion of the deposition that the
    witness, WILLIAM DE GUTIERREZ-MAHONEY,
 9  have the opportunity to read and sign the
    deposition transcript.
10
11
12  _____
    MICHELLE L. GRAY,
13  A Registered Professional
    Reporter, Certified Shorthand
14  Reporter, Certified Realtime
    Reporter and Notary Public
15  Dated:  December 3, 2018
16
17
18        (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24
```

Page 604

```
 1          - - - - - -
             E R R A T A
 2          - - - - - -
 3
 4  PAGE LINE  CHANGE
 5  ____  ____  _____
 6    REASON: _____
 7  ____  ____  _____
 8    REASON: _____
 9  ____  ____  _____
10    REASON: _____
11  ____  ____  _____
12    REASON: _____
13  ____  ____  _____
14    REASON: _____
15  ____  ____  _____
16    REASON: _____
17  ____  ____  _____
18    REASON: _____
19  ____  ____  _____
20    REASON: _____
21  ____  ____  _____
22    REASON: _____
23  ____  ____  _____
24    REASON: _____
```

Page 603

```
 1     INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition
 4  over carefully and make any necessary
 5  corrections.  You should state the reason
 6  in the appropriate space on the errata
 7  sheet for any corrections that are made.
 8        After doing so, please sign
 9  the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24
```

Page 605

```
 1
 2     ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5  hereby certify that I have read the
 6  foregoing pages, 1 - 606, and that the
 7  same is a correct transcription of the
 8  answers given by me to the questions
 9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  WILLIAM DE GUTIERREZ-MAHONEY    DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24
```

Page 606

1       LAWYER'S NOTES

2 PAGE  LINE

3 ____ ____ _____

4 ____ ____ _____

5 ____ ____ _____

6 ____ ____ _____

7 ____ ____ _____

8 ____ ____ _____

9 ____ ____ _____

10 ____ ____ _____

11 ____ ____ _____

12 ____ ____ _____

13 ____ ____ _____

14 ____ ____ _____

15 ____ ____ _____

16 ____ ____ _____

17 ____ ____ _____

18 ____ ____ _____

19 ____ ____ _____

20 ____ ____ _____

21 ____ ____ _____

22 ____ ____ _____

23 ____ ____ _____

24 ____ ____ _____