EXHIBIT 295

Highly Confidential - Subject to Further Confidentiality Review

```
 1           IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4                      -   -   -
 5

     IN RE:  NATIONAL           :   MDL NO. 2804
 6   PRESCRIPTION OPIATE        :
     LITIGATION                 :
 7                              :
     ------------------------------------------------
 8   THIS DOCUMENT RELATES TO   :  CASE NO.
     ALL CASES                  :  1:17-MD-2804
 9                              :
                                :  Hon. Dan A.
10                              :  Polster
11                      -   -   -
12              February 8, 2019
13                      -   -   -
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14              CONFIDENTIALITY REVIEW
15
16              Continued videotaped deposition
     of STEPHEN MAYS taken pursuant to notice, was
17   held at the law offices of Reed Smith LLP, Three
     Logan Square, 1717 Arch Street, Suite 3100,
18   Philadelphia, Pennsylvania, beginning at 11:12
     a.m., on the above date, before Ann Marie
19   Mitchell, a Federally Approved Certified Realtime
     Reporter, Registered Diplomate Reporter,
20   Registered Merit Reporter and Notary Public.
21
                        -   -   -
22

             GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

**Page 2**

1 APPEARANCES:
2
3   BARON & BUDD, P.C.
    BY: MARK PIFKO, ESQUIRE
4   15910 Ventura Boulevard
    Suite 1600
5   Encino, California 91436
    (818) 839-2333
6   mpifko@baronbudd.com
    Representing the Plaintiffs
7
8
9   BARON & BUDD, P.C.
    BY: WILLIAM POWERS, ESQUIRE
10  600 New Hampshire Avenue NW
    The Watergate, Suite 10-A
11  Washington, DC 20037
    (202) 333-4562
12  wpowers@baronbudd.com
    Representing the Plaintiffs
13
14  REED SMITH LLP
    BY: SHANNON E. McCLURE, ESQUIRE
15  BY: JEFFREY R. MELTON, ESQUIRE
    BY: ABIGAIL M. PIERCE, ESQUIRE
16  Three Logan Square
    1717 Arch Street, Suite 3100
17  Philadelphia, Pennsylvania 19103
    (215) 851-8100
18  smcclure@reedsmith.com
    jmelton@reedsmith.com
19  abigail.pierce@reedsmith.com
    Representing AmerisourceBergen Drug
20  Corporation
21
22
23
24

**Page 3**

1 APPEARANCES (cont.'d):
2
3   JONES DAY
    BY: ADAM HOLLINGSWORTH, ESQUIRE
4   North Point
    901 Lakeside Avenue
5   Cleveland, Ohio 44114
    (216) 586-3939
6   ahollingsworth@jonesday.com
    Representing Walmart
7
8
9   COVINGTON & BURLING, LLP
    BY: MEGHAN E. MONAGHAN, ESQUIRE
10  One City Center, 850 Tenth Street, NW
    Washington, DC 20001
11  (202) 662-5272
    mmonaghan@cov.com
12  Representing McKesson Corporation
13
14  WILLIAMS & CONNOLLY LLP
    BY: KATELYN ADAMS, ESQUIRE
15  725 Twelfth Street, N.W.
    Washington, DC 20005
16  kadams@wc.com
    (202) 434-5000
17  Representing Cardinal Health
18
19
20
21
22
23
24

**Page 4**

1 APPEARANCES VIA TELEPHONE/STREAM:
2
3   BARON & BUDD, P.C.
    BY: W. SCOTT SIMMER, ESQUIRE
4   BY: GRETCHEN KEARNEY, ESQUIRE
    600 New Hampshire Avenue NW
5   The Watergate, Suite 10-A
    Washington, DC 20037
6   (202) 333-4562
    ssimmer@baronbudd.com
7   gkearney@baronbudd.com
    Representing Plaintiffs
8
9   BARON & BUDD, P.C.
10  BY: STERLING CLUFF, ESQUIRE
    BY: JAY LICHTER, ESQUIRE
11  15910 Ventura Blvd
    Suite 1600
12  Encino, California 91436
    (818) 839-2333
13  cluff@baronbudd.com
    jlichter@baronbudd.com
14  Representing the Plaintiffs
15
16  GREENE KETCHUM FARRELL BAILEY & TWEEL LLP
    BY: PAUL THOMAS FARRELL JR., ESQUIRE
17  419 Eleventh Street
    Huntington, West Virginia 25701
18  (304) 525-9115
    Representing the Plaintiffs
19
20
21  THE LANIER LAW FIRM
    BY: EVAN M. JANUSH, ESQUIRE
22  Tower 56
    126 East 56th Street, 6th Floor
23  New York, New York 10022
    (212) 421-2800
24  evan.janush@lanierlawfirm.com
    Representing the Plaintiffs

**Page 5**

1 APPEARANCES VIA TELEPHONE/STREAM (cont.'d):
2
3   BLASINGAME, BURCH, GARRARD & ASHLEY, P.C.
    BY: ALEXANDRA K. HUGHES, ESQUIRE
4   440 College Avenue
    Suite 320
5   Athens, Georgia 30601
    (706) 744-4135
6   ahughes@bbga.com
    Representing the Plaintiffs
7
8
9   BAILEY & WYANT, PLLC
    BY: HARRISON M. CYRUS, ESQUIRE
10  500 Virginia Street East
    Suite 600
11  Charleston, West Virginia 25301
    (304) 345-4222
12  hcyrus@baileywyant.com
    Representing the West Virginia Board of Pharmacy
13
14  REED SMITH LLP
    BY: ANNE E. ROLLINS, ESQUIRE
15  Three Logan Square
    1717 Arch Street, Suite 3100
16  Philadelphia, Pennsylvania 19103
    (215) 851-8100
17  arollins@reedsmith.com
    Representing AmerisourceBergen Drug
18  Corporation
19
20  ROPES & GRAY LLP
    BY: LUKE D. RILEY, ESQUIRE
21  Prudential Tower
    800 Boylston Street
22  Boston, Massachusetts 02199
    (617) 951-7000
23  luke.riley@ropesgray.com
    Representing Mallinckrodt
24

Page 6

1  APPEARANCES VIA TELEPHONE/STREAM (cont.'d):
2
3  ARNOLD & PORTER KAYE SCHOLER LLP
   BY: ZENO HOUSTON, ESQUIRE
4  250 West 55th Street
   New York, New York 10019
5  (212) 836-8000
   zeno.houston@arnoldporter.com
6  Representing Endo Health Solutions; Endo
   Pharmaceuticals, Inc.; Par Pharmaceutical
7  Companies, Inc. f/k/a Par Pharmaceutical
   Holdings, Inc.
8
9
   BARNES & THORNBURG LLP
10 BY: MONIQUE HANNAM, ESQUIRE
   11 South Meridian Street
11 Indianapolis, Indiana 46204
   (317) 236-1313
12 monique.hannam@btlaw.com
   Representing HD Smith
13
14
   VIDEOGRAPHER:
15 DAVID LANE
16
   TRIAL TECHNICIAN:
17 ZACH HONE
18
19 ALSO PRESENT:
   CHRISTOPHER CASALENUOVO, ESQUIRE
20 AmerisourceBergen Drug Corporation
21
22 ALSO PRESENT VIA TELEPHONE/STREAM:
23
   TIFFANY ELLIS
24 Weitz & Luxenberg P.C.

Page 7

1
   JOSH GAY
2  Levin Papantonio Thomas Mitchell
   Rafferty Proctor P.A.
3
4  EMMA KABOLI
   Baron & Budd, P.C.
5
6  ALEX SHERMAN
7
8        - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1        - - -
2      I N D E X
3        - - -
4
5  Testimony of: STEPHEN MAYS
6  By Mr. Pifko            12
7
8        - - -
9
10
11 EXHIBITS
9        - - -
10
11 NO.        DESCRIPTION        PAGE
12 Mays V2-1  Order to Show Cause and    17
            Immediate Suspension of
13          Registration, Bates
            stamped ABDCMDL00269383
14          through ABDCMDL00269387
15 Mays V2-2  Email chain, top one dated  91
            3 Mar 2013, Bates stamped
16          ABDCMDL00378483 through
            ABDCMDL00378488
17
18 Mays V2-3  Email chain, top one dated  99
            2/6/2008, Bates stamped
19          CAH_MDL2804_01364805
            through
20          CAH_MDL2804_01364809
21
22
23
24

Page 9

1        - - -
2  DEPOSITION SUPPORT INDEX
3        - - -
4
   Direction to Witness Not to Answer
5
   Page Line
6
7
8
9  Request for Production of Documents
10        Page Line
11
12
13
   Stipulations
14
   Page Line
15
16
17
18
   Question Marked
19
   Page Line
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1     THE VIDEOGRAPHER: We're now on
2 the record. My name is David Lane,
3 videographer for Golkow Litigation
4 Services. Today's date is 11:12 a.m.
5 This deposition is taking place in
6 Philadelphia, Pennsylvania in the matter
7 of National Prescription Opiate
8 Litigation MDL.
9     Our deponent today is Steve Mays.
10 All counsel will be noted on the
11 stenographic record.
12     The court reporter is Ann Marie
13 Mitchell, who will now swear in our
14 witness.
15     - - -
16     STEPHEN MAYS, after having been
17 duly sworn, was examined and testified as
18 follows:
19     - - -
20     THE VIDEOGRAPHER: Please begin.
21     MR. PIFKO: Could we get everyone
22 to state their appearance, or did people
23 already do that?
24     Mark Pifko from Baron & Budd on

Page 11

1 behalf of the plaintiffs and the PEC.
2     MR. POWERS: Will Powers, also
3 from Baron & Budd.
4     MS. McCLURE: Shannon McClure on
5 behalf of ABDC.
6     MR. MELTON: Jeffrey Melton on
7 behalf of ABDC.
8     MR. CASALENUOVO: Chris
9 Casalenuovo with ABDC.
10     MS. PIERCE: Abigail Pierce,
11 Reed.
12     MS. MONAGHAN: Meghan Monaghan
13 for McKesson.
14     MS. ADAMS: Kate Adams for
15 Cardinal Health.
16     MR. HOLLINGSWORTH: Adam
17 Hollingsworth on behalf of Walmart.
18     THE VIDEOGRAPHER: Counsel on the
19 phone?
20     MS. HANNAM: This is Monique
21 Hannam on behalf of HD Smith.
22     MR. RILEY: Luke Riley on behalf
23 of Ropes & Gray.
24     MR. HOUSTON: Zeno Houston from

Page 12

1 Arnold & Porter on behalf of Endo and
2 Par.
3     MR. FARRELL: Paul Farrell on
4 behalf of the PEC.
5     COURT REPORTER: Counsel?
6     MS. McCLURE: Paul? Hey, Paul,
7 you're going to have to restate that. I
8 could hear your name vaguely, but the
9 court reporter and the videographer could
10 not hear you.
11     MR. FARRELL: This is Paul
12 Farrell, Jr., for the PEC. And I will be
13 on for portions of today but not the
14 entire duration.
15     MR. PIFKO: All right.
16
17     - - -
18     EXAMINATION
19     - - -
20 BY MR. PIFKO:
21     Q. Ready to begin?
22     A. Yes, sir.
23     Q. You understand that you're under
24 oath.

Page 13

1     A. Yes, sir.
2     Q. Correct?
3     Okay. And that means that you
4 are under penalty of perjury. And if you are
5 intentionally dishonest or misleading, that you
6 could be subject to penalties from the court.
7     Do you understand that?
8     A. I understand.
9     Q. Okay. Is there any reason why
10 you're unable to give truthful and accurate
11 testimony today?
12     A. No.
13     Q. Are you undergoing any medical
14 treatment or taking any medications that would
15 impact your ability to tell the truth?
16     A. No.
17     Q. Are you undergoing any treatment
18 or taking any medication that would impact your
19 memory?
20     A. No.
21     Q. Is there any reason why this
22 deposition shouldn't go forward, as far as you
23 know?
24     A. As far as I know.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   Okay.  So you were deposed a few
2  months ago or so in this case.
3        Do you recall?
4    A.   I do.
5    Q.   Okay.  One of the things we
6  discussed in your prior deposition was your work
7  history with your current employer.
8        Do you recall that?
9    A.   Yes.
10   Q.   During your last deposition, we
11  discussed how one of the things that you did was
12  you established the Orlando facility for the
13  company.
14        Do you recall that discussion?
15        MS. McCLURE:  Objection to form.
16        THE WITNESS:  I didn't establish
17      it alone.  I was the operations manager.
18  BY MR. PIFKO:
19   Q.   Okay.
20   A.   When it was opened, yes.
21   Q.   But you were one of the people
22  who was responsible for establishing the Orlando
23  facility.  Correct?
24   A.   That's right.

Page 15

1        MS. McCLURE:  Objection to form.
2  BY MR. PIFKO:
3    Q.   You moved from, I believe you
4  were in Kentucky or Tennessee?
5    A.   Tennessee.
6    Q.   Okay.  Tennessee.  You moved from
7  there to Orlando in order to help establish the
8  Orlando facility.  Correct?
9    A.   That's correct.
10   Q.   And then you -- what was your
11  first role at the Orlando facility?
12        MS. McCLURE:  Objection, asked
13      and answered.
14        THE WITNESS:  I was the
15      operations manager.
16  BY MR. PIFKO:
17   Q.   And did you have that role the
18  whole time that you were there?
19   A.   Not the whole time, no.
20   Q.   What was your most senior role
21  when you left the Orlando facility?
22        MS. McCLURE:  Objection, asked
23      and answered, form.
24        THE WITNESS:  Operations manager

Page 16

1  was the most senior role.
2  BY MR. PIFKO:
3    Q.   And then later you became an
4  auditor.  Correct?
5    A.   Yes.
6    Q.   And part of your responsibilities
7  involved auditing the facilities, including the
8  Orlando facility.  Correct?
9    A.   Originally not the Orlando
10  facility.
11   Q.   But ultimately you did have
12  responsibilities that included auditing the
13  Orlando facility.  Correct?
14   A.   I believe --
15        MS. McCLURE:  Objection, asked
16      and answered.
17        THE WITNESS:  I believe that was
18      in my area of responsibility, yes.
19  BY MR. PIFKO:
20   Q.   Are you familiar with the order
21  to show cause that was issued concerning the
22  Orlando facility?
23   A.   Yes.
24        MS. McCLURE:  Objection, asked

Page 17

1  and answered.
2        Are we doing a continuation of
3      the exhibit numbering?
4        MR. PIFKO:  We're calling it
5      Volume 2.
6        MS. McCLURE:  Thank you.
7        - - -
8        (Deposition Exhibit No. Mays
9      V2-1, Order to Show Cause and Immediate
10      Suspension of Registration, Bates stamped
11      ABDCMDL00269383 through ABDCMDL00269387,
12      was marked for identification.)
13        - - -
14  BY MR. PIFKO:
15   Q.   I'm handing you what's marked as
16  Exhibit 1.  Volume 2, Exhibit 1.
17        For the record, it's a letter
18  from the DEA dated April 19, 2007, Bates labeled
19  ABDCMDL00269383 through 387.
20        Have you seen this exhibit
21  before?
22        MS. McCLURE:  The document or the
23      exhibit?
24        THE WITNESS:  I've seen this

Page 18

1     document before, yes.
2 BY MR. PIFKO:
3     Q.   Can you tell me what this is?
4     A.   It is an order to show cause and
5 immediate suspension of the Orlando registration.
6     Q.   When was the last time you saw
7 this document?
8     A.   I can't recall.
9     Q.   Is this something that you
10 reviewed in preparing for your deposition?
11     A.   No.
12     Q.   Okay. Do you believe you saw
13 this on or around the time it was issued in April
14 of 2007?
15     MS. McCLURE: Objection to form.
16     THE WITNESS: Sometime after the
17     suspension. I didn't see it immediately.
18 BY MR. PIFKO:
19     Q.   Okay. But sometime on or
20 around -- it was -- after it was issued, it was
21 provided to you. Correct?
22     A.   That's correct.
23     Q.   Who would have provided it to
24 you?

Page 19

1     MS. McCLURE: Objection to form.
2     THE WITNESS: I don't recall.
3 BY MR. PIFKO:
4     Q.   Were you part of discussions
5 about what was going to be done to respond to
6 this order to show cause?
7     MS. McCLURE: Objection to form.
8     THE WITNESS: Internally or with
9     DEA?
10 BY MR. PIFKO:
11     Q.   Internally.
12     A.   Internally. Yes. I was part of
13 some discussions, yes.
14     Q.   Who did you discuss this order to
15 show cause with?
16     A.   My boss, Chris Zimmerman.
17     Q.   Anyone else?
18     A.   Not that I remember.
19     Q.   What was the nature of your
20 discussion with Mr. Zimmerman?
21     A.   I don't recall exactly.
22     Q.   Did you discuss that you were
23 going to make any changes to the operations at
24 the Orlando facility as a result of seeing this

Page 20

1 order to show cause?
2     MS. McCLURE: Objection to form.
3     THE WITNESS: I'm not sure what
4     that -- I'm not sure what you mean by
5     changes operationally.
6 BY MR. PIFKO:
7     Q.   Well, let's go through and see --
8 let's look at Exhibit 1 and see what the
9 Department of Justice said to AmerisourceBergen
10 in this letter.
11     It said, "Respondent" -- you see
12 on the first page here, there's a number of
13 paragraphs, starting about halfway down.
14     It says, "Respondent has failed
15 to maintain effective controls against diversion
16 of particular controlled substances into other
17 than legitimate medical, scientific and
18 industrial channels, in violation of 21 U.S.C.
19 Sections 823(b)(1) and (e)(1)."
20     Do you see that?
21     A.   I do.
22     Q.   Did I read that correctly?
23     A.   I believe you did.
24     Q.   And then it says, "From January

Page 21

1 1, 2006, through January 31, 2007, Respondent
2 distributed over 3.8 million dosage units of
3 combination hydrocodone products to customers
4 that it knew or should have known were diverting
5 the hydrocodone into other than legitimate
6 medical, scientific and industrial channels."
7     Do you see that?
8     A.   Yes, I do.
9     Q.   Did I read that correctly?
10     A.   I think you did.
11     Q.   Did you understand at the time
12 that that was a concern raised by the Department
13 of Justice with respect to AmerisourceBergen?
14     A.   Yes, I understand that.
15     MS. McCLURE: Objection to the
16     form.
17 BY MR. PIFKO:
18     Q.   Did you have an understanding
19 about what the specific basis was for that
20 concern?
21     MS. McCLURE: Objection to the
22     form.
23     THE WITNESS: Can you repeat that
24     question again?

Page 22

BY MR. PIFKO:

1 Q.   So it says here that
2 AmerisourceBergen failed to maintain effective
3 controls against diversion.  And then it says
4 that AmerisourceBergen distributed over
5 3.8 million dosage units of combination
6 hydrocodone products to customers that it knew or
7 should have known were diverting them.
8         Did I read that -- summarize it
9 correctly?
10      A.   I just asked you to repeat the
11 question.
12      Q.   Yeah.  Did I summarize that
13 correctly?
14      A.   I think you did.
15      Q.   Okay.  So my question is, do you
16 have an understanding about the specific basis of
17 why the Department of Justice said that?
18      A.   Yes.
19      Q.   Okay.  What is your
20 understanding?
21      A.   That the Department of Justice
22 felt like we were shipping a large quantity to --
23 of hydrocodone combination products to customers

Page 23

1 in Florida, in their opinion.
2      Q.   Were you in fact shipping the
3 quantities that they said you were shipping?
4      A.   I can't verify that to the
5 number.
6      Q.   Do you recall ever --
7      A.   I'm sure -- go ahead.
8      Q.   Do you recall ever disputing
9 that the numbers that they were providing were
10 incorrect?
11         MS. McCLURE:  Objection to form.
12         THE WITNESS:  I don't recall that
13     we disputed it, no.
14 BY MR. PIFKO:
15      Q.   So to your recollection, you
16 never told the Department of Justice their
17 numbers were wrong.  Agreed?
18         MS. McCLURE:  Objection to form.
19         THE WITNESS:  I wasn't involved
20     in the discussions with the Department of
21     Justice.
22 BY MR. PIFKO:
23      Q.   Okay.  But to your knowledge, no
24 one at AmerisourceBergen told the Department of

Page 24

1 Justice they were wrong.  Correct?
2         MS. McCLURE:  Objection to form.
3         THE WITNESS:  I don't know.
4 BY MR. PIFKO:
5      Q.   Sitting here today, you're not
6 aware of anyone responding to the Department of
7 Justice in connection with this and saying the
8 sales figures you're providing in your letter are
9 incorrect.
10         Would you agree with that?
11         MS. McCLURE:  Objection to form.
12         THE WITNESS:  Again, I don't know
13     what was said.
14 BY MR. PIFKO:
15      Q.   What was your title at this time?
16      A.   2007, I would have -- I believe I
17 was director of regulatory affairs.
18      Q.   Were the policies and procedures
19 at the Orlando facility consistent with the
20 company's policies around the country?
21         MS. McCLURE:  Objection to form.
22         THE WITNESS:  Yes, they were.
23 BY MR. PIFKO:
24      Q.   So with respect to diversion

Page 25

1 control, there was nothing different going on at
2 the Orlando facility than there was at any other
3 facility.  Correct?
4         MS. McCLURE:  Objection to form.
5         THE WITNESS:  Not that I know of.
6 BY MR. PIFKO:
7      Q.   Do you know why you said earlier
8 that the Department of Justice was concerned
9 about the volume of these products, these
10 hydrocodone combination products, that were being
11 sold to customers?  Agreed?
12         MS. McCLURE:  Objection to form.
13         THE WITNESS:  I agree that
14     they -- I would assume they were
15     concerned or they wouldn't have suspended
16     the registration.
17 BY MR. PIFKO:
18      Q.   Why were they concerned about
19 these volumes?
20         MS. McCLURE:  Objection to form.
21         THE WITNESS:  I don't know.
22 BY MR. PIFKO:
23      Q.   You have no idea why this was a
24 concern?

Page 26

1        MS. McCLURE:  Same objection.
2        THE WITNESS:  I didn't have any
3    conversations with DEA about it, so I
4    don't know how they formed that opinion.
5 BY MR. PIFKO:
6    Q.    Well, let's go to the second page
7 here.
8        Again, there's numbered
9 paragraphs.  There's a paragraph number 5 at the
10 bottom there.
11    A.    Okay.
12    Q.    I'm going to read it to you, and
13 tell me if I read it correctly.
14        It says, "On August 10, 2005, DEA
15 personnel met with Steve Mays, Respondent's
16 Director of Regulatory Affairs, to inform him
17 about the common characteristics of pharmacies
18 that divert large amounts of controlled
19 substances by filling invalid prescriptions
20 obtained by customers using the Internet."
21        Do you see that?
22    A.    Yes, I do.
23    Q.    Did I read that correctly?
24    A.    Yes, you did.

Page 27

1    Q.    Do you recall having a meeting
2 with DEA personnel on August 10, 2005?
3        MS. McCLURE:  Objection, asked
4    and answered.
5        THE WITNESS:  I don't recall if
6    that was the exact date, but I do recall
7    the meeting, yes.
8 BY MR. PIFKO:
9    Q.    Does this refresh your
10 recollection about what your title was on or
11 around this time?
12    A.    Yes.
13    Q.    Okay.  So when it says here that
14 you were director of regulatory affairs, is that
15 correct?
16    A.    That's correct.
17    Q.    Was that your title on or around
18 the time that this order to show cause was
19 issued?
20        MS. McCLURE:  Objection, asked
21    and answered.
22        THE WITNESS:  I think so, yes.
23 BY MR. PIFKO:
24    Q.    So you recall having this meeting

Page 28

1 with the DEA, correct --
2    A.    Yes, I do.
3    Q.    -- in 2005?
4        MS. McCLURE:  Objection, asked
5    and answered.
6 BY MR. PIFKO:
7    Q.    Who was present at this meeting?
8        MS. McCLURE:  Objection, asked
9    and answered.
10        THE WITNESS:  Myself and Mike
11    Mates (ph) from DEA.  And then there was
12    an attorney there, counsel, that I don't
13    recall his name.
14 BY MR. PIFKO:
15    Q.    Attorney for the Department of
16 Justice?
17    A.    Yes.  Or for DEA.
18    Q.    Okay.  Was there anyone else from
19 AmerisourceBergen who was present at this
20 meeting?
21        MS. McCLURE:  Objection, asked
22    and answered.
23        THE WITNESS:  No, there wasn't.
24 BY MR. PIFKO:

Page 29

1    Q.    Do you agree with the
2 characterization in this letter that at that
3 meeting they informed you about the common
4 characteristics of pharmacies that divert large
5 amounts of controlled substances by filling
6 invalid prescriptions obtained by customers using
7 the internet?
8    A.    Yes.
9    Q.    It says, going on to page 3, "DEA
10 personnel reminded Respondent that under 21
11 U.S.C. Sections 823(b)(1) and (e)(1), Respondent
12 was responsible to prevent the diversion of
13 controlled substances."
14        Do you see that?
15    A.    I see that, yes.
16    Q.    Did I read that correctly?
17    A.    Yes, you did.
18    Q.    Do you recall the DEA informing
19 you during that meeting that AmerisourceBergen
20 was responsible for preventing diversion of
21 controlled substances?
22        MS. McCLURE:  Objection to form.
23        THE WITNESS:  I don't recall that
24    specifically.

Page 30

BY MR. PIFKO:

Q. How about generally?

MS. McCLURE: Same.

THE WITNESS: Same.

BY MR. PIFKO:

Q. Do you recall during that meeting the DEA discussing AmerisourceBergen's responsibilities under the Controlled Substances Act?

MS. McCLURE: Objection to form.

THE WITNESS: Not specifically.

BY MR. PIFKO:

Q. How about generally, do you remember --

A. That was 12 years ago.

Q. Okay. How about generally, do you remember them discussing any expectations about what AmerisourceBergen was supposed to do with respect to complying with the Controlled Substances Act?

MS. McCLURE: Objection to form.

THE WITNESS: Not specifically.

BY MR. PIFKO:

Q. How about generally?

Page 31

MS. McCLURE: Same objection.

THE WITNESS: Not -- not generally.

BY MR. PIFKO:

Q. So you don't have any recollection of whether you discussed the Controlled Substances Act at that meeting?

MS. McCLURE: Objection, asked and answered.

THE WITNESS: Not specifically.

BY MR. PIFKO:

Q. When you left that meeting, you reported back to Chris Zimmerman. Correct?

MS. McCLURE: Objection, asked and answered.

THE WITNESS: I don't recall that I did.

BY MR. PIFKO:

Q. Did you tell anybody about that meeting?

MS. McCLURE: Same objection.

THE WITNESS: Not -- I don't recall specifically. I'm sure I did, but I don't recall specifically.

Page 32

BY MR. PIFKO:

Q. Who would you have told if you told someone?

MS. McCLURE: Objection to form, calls for speculation.

THE WITNESS: I would have to speculate. I don't know. I couldn't tell you for sure. Again, that was 12 years ago.

BY MR. PIFKO:

Q. Okay. Next sentence here, "Notwithstanding the information provided to Respondent, after the August 10, 2005 meeting, Respondent sold over 5.2 million dosage units of hydrocodone to pharmacies that bore the characteristics that DEA described in the August 10, 2005 meeting."

Do you see that?

A. Yes, I do.

Q. Did I read that correctly?

A. I believe you did.

Q. Do you agree with that statement?

MS. McCLURE: Objection to form.

THE WITNESS: I can't verify the

Page 33

quantities.

BY MR. PIFKO:

Q. Other than verifying the quantities, do you agree with that statement?

MS. McCLURE: Same objection.

THE WITNESS: I can't really agree with it because I don't -- I don't know. I don't recall.

BY MR. PIFKO:

Q. You don't know either way?

A. No.

Q. Do you have any reason to dispute that AmerisourceBergen sold over 5.2 million dosage units of hydrocodone products to pharmacies that bore the characteristics discussed at this August 10, 2005 meeting?

MS. McCLURE: Objection to form.

THE WITNESS: I don't have any specific reason to dispute it, no.

BY MR. PIFKO:

Q. Do you remember the DEA discussing specific characteristics of hydrocodone products during the August 10, 2005 meeting?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    MS. McCLURE: Objection to form,
2 asked and answered.
3    THE WITNESS: Characteristics of
4 hydrocodone products? Not that I recall.
5 BY MR. PIFKO:
6    Q.   How about do you recall DEA
7 describing certain characteristics of sales to
8 certain types of pharmacies?
9    MS. McCLURE: Objection to form.
10    THE WITNESS: I recall that, yes.
11 BY MR. PIFKO:
12    Q.   What specifically do you recall
13 about that?
14    A.   We discussed characteristics of
15 internet pharmacy and what to look for.
16    Q.   What specifically were you
17 supposed to look for with respect to internet
18 pharmacies?
19    MS. McCLURE: Objection to form.
20    THE WITNESS: I don't recall
21 everything. A few things. I can tell
22 you what I do remember.
23 BY MR. PIFKO:
24    Q.   Yeah, that's what I'm asking.

Page 35

1    A.   Okay. I'm trying to recall.
2    To look for like FedEx boxes or
3 UPS boxes piled up in the pharmacy that would
4 indicate they're shipping drugs other than just
5 filling them at the store. Other than that, I
6 can't remember the specifics.
7    Q.   When you came back to this
8 meeting, did you instruct anyone at
9 AmerisourceBergen to look for those type of
10 characteristics?
11    MS. McCLURE: Objection to form.
12    THE WITNESS: I don't recall
13 specifically.
14 BY MR. PIFKO:
15    Q.   How about generally?
16    MS. McCLURE: Same.
17    THE WITNESS: I'm sure I did, I
18 just don't recall.
19 BY MR. PIFKO:
20    Q.   Who would you have told?
21    MS. McCLURE: Objection to form.
22    THE WITNESS: Don't recall
23 specifically.
24 BY MR. PIFKO:

Page 36

1    Q.   Do you recall writing anything
2 down to change AmerisourceBergen's procedures
3 with respect to the due diligence it may perform
4 with respect to customers after you had this
5 meeting?
6    MS. McCLURE: Objection to form.
7    THE WITNESS: I don't recall
8 writing things down.
9 BY MR. PIFKO:
10    Q.   Do you recall changing any
11 policies or procedures in order to look for the
12 criteria that the Department of Justice
13 identified to you during this meeting?
14    MS. McCLURE: Objection to form,
15 assumes facts not in evidence,
16 foundation.
17    THE WITNESS: I don't recall
18 specifically.
19 BY MR. PIFKO:
20    Q.   How about generally?
21    MS. McCLURE: Same.
22    THE WITNESS: Generally, I know
23 we made some changes.
24 BY MR. PIFKO:

Page 37

1    Q.   What changes did you make?
2    A.   In -- we started conducting due
3 diligence of customers --
4    Q.   What was --
5    A.   -- that had the parameters of our
6 program --
7    Q.   Any other things --
8    A.   -- on the reports.
9    Q.   Anything else that you changed?
10    A.   I can't recall specifically.
11    Q.   What was the nature of the due
12 diligence that you started performing at that
13 time?
14    A.   We started using a questionnaire
15 in the due diligence.
16    Q.   Was there a name for the
17 questionnaire?
18    A.   A name of it? Can't recall
19 specifically what the name was.
20    Q.   Who was supposed to fill out this
21 questionnaire?
22    MS. McCLURE: Objection to form.
23    THE WITNESS: The
24 AmerisourceBergen sales representative,

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    along with the customer.
2  BY MR. PIFKO:
3      Q.    And then what would you do with
4  that questionnaire?
5          MS. McCLURE:  Objection to form.
6          THE WITNESS:  Well, we would
7      review that to see if they answered the
8      questions adequately to -- so we could
9      ensure that they weren't engaged in that
10     type of activity.
11 BY MR. PIFKO:
12     Q.    Did you do anything else?
13     A.    Not specifically.  I don't know
14 what you're asking.
15     Q.    What was the nature of your
16 review to determine if the customer adequately
17 provided information?
18     A.    I'm not sure what you're asking.
19     Q.    You said you would review the
20 question to see if the -- they were adequately
21 filled out so you could ensure that they weren't
22 engaged in that type of activity.
23     A.    Right.
24     Q.    So I'm asking, what was the

Page 39

1  nature of your review to conduct that analysis?
2          MS. McCLURE:  Form.
3          THE WITNESS:  We would verify as
4      much of the information as they gave us.
5  BY MR. PIFKO:
6      Q.    How would you verify it?
7      A.    I can't remember specifically.
8  You know, if they gave us a website or something
9  like that, we would verify that website, to make
10 sure that they weren't filling prescriptions
11 based on the questionnaire.
12     Q.    Did the questionnaire include any
13 photographs?
14         MS. McCLURE:  Objection, form.
15         THE WITNESS:  I can't remember in
16     the beginning if we required photographs,
17     but I know at some point we required
18     the -- whoever went on site, typically it
19     was a salesperson, to take photographs
20     inside and outside of the building.
21 BY MR. PIFKO:
22     Q.    Did you ask people to look for
23 FedEx packages?
24         MS. McCLURE:  Objection, asked

Page 40

1  and answered.
2          THE WITNESS:  I don't recall
3      specifically, but I believe that was part
4      of the questionnaire.
5  BY MR. PIFKO:
6      Q.    Let's go back to Exhibit 1 here.
7          On the third page of the exhibit,
8  tell me when you're there.
9      A.    Oh.  I thought that's where we
10 were.
11     Q.    Yeah, we were.
12     A.    Okay.
13     Q.    It's got a bunch of -- well,
14 remember we just read a sentence in the top of
15 the first paragraph.
16     A.    Uh-huh.
17     Q.    Starting where we left off, it
18 says, "Respondent continued to sell controlled
19 substances to Grand, Discount Mail Meds and" Med
20 Assistant "even though Respondent knew, or should
21 have known, that these pharmacies were diverting
22 controlled substances into other than legitimate
23 medical, scientific and industrial channels."
24         Do you see that?

Page 41

1      A.    Yes, I see that.
2      Q.    Did I read that correctly?
3      A.    Yes, you did.
4      Q.    If you go back to page 2,
5  paragraph 3, it talks about how AmerisourceBergen
6  distributed approximately a million dosage units
7  of hydrocodone products to Grand Pharmacy.
8          Do you see that?
9          MS. McCLURE:  Objection to form.
10         THE WITNESS:  I do.
11 BY MR. PIFKO:
12     Q.    Did I read that correct -- did I
13 summarize that correctly?
14     A.    I believe you did.
15     Q.    Okay.  And then in paragraph 4,
16 it talks about supplying hydrocodone products to
17 a number of other pharmacies.
18         Do you see that?
19     A.    Yes, I do.
20     Q.    And then it says in paragraph 4
21 that the distribution of those was under
22 circumstances that should have alerted
23 AmerisourceBergen that the pharmacies were
24 diverting hydrocodone.

Page 42

1    Do you see that?
2    A.    You said paragraph 4?
3    Q.    Yeah.  The last sentence in the
4 bottom of that first paragraph there.
5    A.    Okay.  I see it.
6    Q.    Did I read that correctly?
7    A.    Yes, sir.
8    Q.    Okay.  Do you believe that the
9 policies and procedures that you implemented
10 after this August 2005 meeting were sufficient to
11 detect diversion?
12    MS. McCLURE:  Objection, form.
13    THE WITNESS:  I believe that the
14    actions that we took enabled us to
15    identify internet pharmacies.  And I
16    think we ceased distributing to some of
17    these.  I can't tell you exactly which
18    ones, but I believe we cut those off.
19 BY MR. PIFKO:
20    Q.    After you received this letter?
21    A.    No.  I think some of these were
22 cut off before this action was taken.  I can't --
23 I don't remember specifically which ones, but I
24 do recall that when this happened, some of these

Page 43

1 customers that were mentioned, we had cut off
2 before the suspension.
3    Q.    Did receiving this letter cause
4 AmerisourceBergen to be concerned that it wasn't
5 doing enough to comply with diversion control
6 laws and regulations?
7    MS. McCLURE:  Objection to form.
8    THE WITNESS:  I couldn't tell you
9    what the company thought.
10 BY MR. PIFKO:
11    Q.    How about you?  You were
12 regulatory affairs manager.
13    A.    Director.
14    Q.    Director.
15    A.    Uh-huh.
16    Q.    Did you feel like the company was
17 doing enough to prevent diversion when you
18 received this order to show cause?
19    MS. McCLURE:  Objection, form.
20    THE WITNESS:  Yes, I did.
21 BY MR. PIFKO:
22    Q.    So even though the Department of
23 Justice said that you were distributing
24 substances to customers when you knew or should

Page 44

1 have known that they were diverting them to
2 illegitimate channels, you still feel like the
3 company was doing enough, as the director of
4 regulatory affairs?
5    MS. McCLURE:  Objection, form.
6    THE WITNESS:  I felt like we were
7    doing the best we could as a distributor
8    to comply with the regulations.  And we
9    took steps to improve our due diligence
10    and our monitoring of our customers.
11 BY MR. PIFKO:
12    Q.    Do you believe you took adequate
13 steps to improve your due diligence and monitor
14 customers?
15    MS. McCLURE:  Objection, form.
16    THE WITNESS:  Yes.
17 BY MR. PIFKO:
18    Q.    Going to page 3 here, it says, in
19 the middle of the second paragraph -- tell me
20 when you're there -- "it is my preliminary
21 conclusion that Respondent's continued
22 registration while these proceedings are pending
23 would constitute an imminent danger to the public
24 health and safety because of the substantial

Page 45

1 likelihood that Respondent will continue to
2 supply pharmacies that divert large quantities of
3 controlled substances."
4    Did I read that correctly?
5    A.    Yes, you did.
6    Q.    Upon receiving that, did that
7 give you, as the director of compliance and
8 regulatory issues, concern about whether the
9 company's practices were sufficient?
10    MS. McCLURE:  Objection to form.
11    THE WITNESS:  No.
12 BY MR. PIFKO:
13    Q.    Did you think the Department of
14 Justice's conclusions were wrong?
15    A.    I think so, yeah.  They weren't
16 completely accurate, in my opinion.
17    Q.    Why do you say that they weren't
18 completely accurate?
19    A.    I can't really say.  I just don't
20 think they were completely accurate.  I felt like
21 we were doing the best we could to monitor the
22 distribution of these drugs.
23    Q.    Do you have any factual basis to
24 challenge that Department of Justice's conclusion

Page 46

1  there?
2           MS. McCLURE:  Objection to form,
3       asked and answered.
4           THE WITNESS:  Not today I don't,
5       no.
6  BY MR. PIFKO:
7       Q.    Do you know what happened after
8  you received -- the company received this letter?
9           MS. McCLURE:  Form.
10          THE WITNESS:  What do you mean,
11      what happened?
12 BY MR. PIFKO:
13      Q.    The Orlando facility did get its
14 registration suspended.  Correct?
15      A.    Yes, that's correct.
16      Q.    And you had to halt shipments of
17 product for some time period from that facility.
18 Correct?
19          MS. McCLURE:  Objection, form.
20          THE WITNESS:  Ask the question
21      again, please, I'm sorry.
22 BY MR. PIFKO:
23      Q.    You had to halt shipments of
24 product from that facility for some period of

Page 47

1  time after that.  Correct?
2           MS. McCLURE:  Objection, form.
3           THE WITNESS:  We had to halt
4       shipments of controlled substances from
5       the facility.
6  BY MR. PIFKO:
7       Q.    Do you know how long that was in
8  place, where you weren't allowed to ship
9  controlled substances from that facility?
10      A.    I couldn't tell you exactly, but
11 it was about three months.
12      Q.    Some years later, the Houston
13 facility also almost lost its registration.
14 Correct?
15          MS. McCLURE:  Objection to form.
16          THE WITNESS:  I don't know what
17      you're talking about.
18 BY MR. PIFKO:
19      Q.    You don't have any recollection
20 of the DEA almost suspending the registration of
21 the Houston facility?
22          MS. McCLURE:  Objection to form.
23          THE WITNESS:  I have no
24      knowledge.  No knowledge of that.

Page 48

1  BY MR. PIFKO:
2       Q.    Are you aware of any other
3  actions where the DEA was investigating the
4  company for potential violations of diversion
5  control laws?
6       A.    I -- actions -- I mean, I can't
7  recall specifics.
8       Q.    How about generally?
9       A.    There's always investigations.
10 They inspect our facilities frequently, and there
11 could -- there's always -- I shouldn't say
12 always, but often there's minor violations that
13 are part of their investigation, part of the
14 Controlled Substances Act and the regulations.
15      Q.    Do you recall any criminal
16 investigations that were occurring with respect
17 to AmerisourceBergen's diversion control
18 practices?
19      A.    I assume if the New Jersey case
20 is considered a criminal action, yes.
21      Q.    Okay.  What do you know about the
22 New Jersey case?
23          MS. McCLURE:  Objection to form.
24          THE WITNESS:  I just know that

Page 49

1       it's a -- that it was a criminal case
2       that I think began in 2012, I believe.
3  BY MR. PIFKO:
4       Q.    Did it concern the company's
5  diversion control practices?
6       A.    I believe so.
7       Q.    When did you first learn about
8  that?
9       A.    I learned about that because I
10 was the person they called to ask where to send
11 the initial subpoena.  So it was sometime in
12 2012, I believe.
13      Q.    So the Department --
14      A.    I'm sorry.  When I say "they,"
15 New York US -- I don't know if it was US Attorney
16 or New York AG.  I can't remember.
17      Q.    Okay.  So someone from a
18 government enforcement agency contacted you and
19 said they were going to send a subpoena to the
20 company and asked where to send it?
21      A.    That's what I recall, yes.
22      Q.    Okay.  What did you do when you
23 received that inquiry?
24          MS. McCLURE:  Objection to form.

Page 50

1      THE WITNESS: I don't remember
2   exactly. I'm sure I gave it to legal.
3 BY MR. PIFKO:
4     Q.   Okay. Did you discuss that with
5 Mr. Chris Zimmerman?
6     A.   I'm sure I would have. He's my
7 boss, yes.
8     Q.   And he had responsibility for
9 diversion control issues as well. Correct?
10     MS. McCLURE: Objection to form.
11     THE WITNESS: He's our department
12 head, so he's got high level
13 responsibility for all that.
14 BY MR. PIFKO:
15     Q.   Did you ever speak to anyone at
16 the DEA or the US Attorney's Office in connection
17 with that investigation?
18     A.   No, I don't believe so.
19     Q.   Did you compile documents to
20 respond to the subpoena?
21     MS. McCLURE: Objection to form.
22     THE WITNESS: Personally, I don't
23 think so, no.
24 BY MR. PIFKO:

Page 51

1     Q.   Did you ever personally receive
2 the subpoena that the call was about?
3     MS. McCLURE: Objection to form.
4     THE WITNESS: I can't remember if
5 they sent it -- I can't remember if it
6 came directly to me or not.
7 BY MR. PIFKO:
8     Q.   Do you recall discussing the
9 investigation with any other members of the
10 diversion control team?
11     A.   Not specifically.
12     Q.   How about generally?
13     A.   Generally, I'm sure, yes.
14     Q.   Do you know who Mr. Tomkiewicz
15 is?
16     A.   Yes.
17     Q.   Did you discuss the Department of
18 Justice investigation with Mr. Tomkiewicz?
19     A.   No, not specifically. I don't
20 think he was with us at the time.



Page 52

Page 53

Page 54

BY MR. PIFKO:

Q. Did you make any changes to the company's practices after learning about that investigation?

MS. McCLURE: Objection to form.

THE WITNESS: I don't recall making any changes.

BY MR. PIFKO:

Q. Were you concerned at the time that there were criminal investigations of AmerisourceBergen that were occurring?

MS. McCLURE: Objection to form.

THE WITNESS: Oh, yes, I was concerned. Yes.

BY MR. PIFKO:

Q. Why were you concerned?

A. Because we were being investigated.

Q. Why did being investigated give you cause for concern?

A. That's always a concern. If you're being investigated, that's a concern.

Q. Do you know what the ultimate outcome of that investigation was?

Page 55

A. No, I don't.

Q. Okay.

A. My understanding, it's still ongoing.

MR. PIFKO: Let's take a short break.

THE VIDEOGRAPHER: Going off the record at 11:50 a.m.

- - -

(A recess was taken from 11:50 a.m. to 12:07 p.m.)

- - -

THE VIDEOGRAPHER: Back on the record at 12:07 p.m.

BY MR. PIFKO:

Q. I want to bring your attention back to Exhibit 1.

A. Okay.

Q. All right. So I just want to confirm, as we discussed before we went on the break, there was nothing different about the procedures at the Orlando facility as opposed to any other facility, any other distribution facility ran by AmerisourceBergen. Correct?

Page 56

MS. McCLURE: Objection, asked and answered.

THE WITNESS: Would that be prior to the suspension?

BY MR. PIFKO:

Q. Yes.

A. Is that what you're asking?

Q. Yes.

A. As I recall, it would be the same as any of the other facilities.

Q. Okay. So at the time this letter was sent, AmerisourceBergen's diversion control systems were the same at all of its distribution centers. Correct?

MS. McCLURE: Objection to form.

THE WITNESS: That's what I recall, yes.

BY MR. PIFKO:

Q. So anything occurring at this Orlando facility could be occurring at any other distribution center. Correct?

MS. McCLURE: Objection, form.

THE WITNESS: I disagree.

BY MR. PIFKO:

Page 57

Q. What do you disagree?

A. Because they're a different customer base, different region of the country.

Q. But with respect to AmerisourceBergen's procedures, the same things that are occurring at this facility are the same thing that are occurring at other facilities. Correct?

MS. McCLURE: Objection to form.

THE WITNESS: As far as our procedures and how -- our policies and procedures, yes, they're -- they would be the same for all of the distribution centers.

BY MR. PIFKO:

Q. Okay. Did AmerisourceBergen employ any sort of different system to monitor internet pharmacies as opposed to retail pharmacies or chain pharmacies?

MS. McCLURE: Objection, form.

THE WITNESS: No. As far as a system itself, no.

BY MR. PIFKO:

Q. So AmerisourceBergen's system

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  used to monitor internet pharmacies was the same
2  system that it used to monitor retail and chain
3  pharmacies. Correct?
4         MS. McCLURE: Objection, form.
5         THE WITNESS: Well, we weren't
6      specifically monitoring internet
7      pharmacies. We were monitoring our
8      customers, our pharmacy customers.
9  BY MR. PIFKO:
10     Q.    And that system that was used was
11 the same for all customers, regardless of the
12 type of customers. Correct?
13        MS. McCLURE: Objection to form,
14     asked and answered.
15        THE WITNESS: As I recall, yes.
16 BY MR. PIFKO:
17     Q.    Let's go to page 2 of Exhibit 1.
18     A.    Okay.
19     Q.    So looking at paragraph 4, it
20 says, the bottom of paragraph 4, "Respondent
21 distributed hydrocodone under the following
22 circumstances that should have alerted Respondent
23 that the pharmacies were diverting hydrocodone."
24        Do you see that?

Page 59

1     A.    Yes, I do.
2     Q.    Did I read that correctly?
3     A.    Yes, you did.
4     Q.    Then it's got subparts A through
5  D.
6         Do you see those?
7     A.    Yes, I do.
8     Q.    Part A says, "Respondent
9  distributed hydrocodone to each of the named
10 pharmacies, and others, in amounts that far
11 exceeded what an average pharmacy orders to meet
12 the legitimate needs of its customers."
13        Do you see that?
14    A.    Yes, I do.
15    Q.    Did I read that correctly?
16    A.    Yes, you did.
17    Q.    "Respondent knew that orders of
18 an unusual size were 'suspicious' as that term is
19 used in 21 C.F.R. section 1301.74(b)."
20        Did I read that correctly?
21    A.    Yes, you did.
22    Q.    What was AmerisourceBergen's
23 system that was in place to monitor the amounts
24 that its customers ordered --

Page 60

1         MS. McCLURE: Objection.
2  BY MR. PIFKO:
3     Q.    -- at that time?
4         MS. McCLURE: Asked and answered.
5         THE WITNESS: As I recall, it was
6  a system that generated a report that
7  indicated any orders that were above
8  certain parameters looking back over that
9  customer's average purchases. And they
10 would be flagged on that report if they
11 exceeded that average or that parameter.
12 BY MR. PIFKO:
13    Q.    So you agree here that the DEA is
14 saying in this letter that AmerisourceBergen
15 nevertheless distributed hydrocodone to
16 pharmacies even though the amounts exceeded what
17 an average pharmacy would order for legitimate
18 needs.
19        Do you see that?
20        MS. McCLURE: Objection, form.
21        THE WITNESS: You're on the
22     subparagraph A?
23 BY MR. PIFKO:
24    Q.    Yes.

Page 61

1     A.    I agree that that's what DEA is
2  saying, yes.
3     Q.    So did AmerisourceBergen at this
4  time not have a way of monitoring what a
5  customer's volume was with -- as compared to what
6  an average pharmacy would need to meet legitimate
7  needs of its customers?
8         MS. McCLURE: Objection, form.
9         THE WITNESS: I don't recall the
10     specific algorithms of that program.
11 BY MR. PIFKO:
12    Q.    You believe there was a program
13 that had algorithms?
14    A.    I'm sorry?
15    Q.    You believe there was a program
16 that had some algorithm?
17    A.    I don't know if algorithm is a
18 correct word, but it had a formula built into the
19 system, a certain percentage. And it basically
20 looked at that customer's purchases over, I
21 believe it was -- I believe it was a rolling
22 three-month average. And if it exceeded that by
23 a certain amount, then it would be flagged on
24 this report as a possible excessive order.

Page 62

1     Q.   But according to DEA, you failed
2 to alert DEA and you failed to prevent orders of
3 unusual size from being shipped to customers.
4 Correct?
5       MS. McCLURE: Objection to form.
6       THE WITNESS: Can you repeat that
7    again? I'm sorry.
8 BY MR. PIFKO:
9     Q.   Yes. So in A here it's saying
10 that you nevertheless shipped orders beyond what
11 an average pharmacy needed?
12       MS. McCLURE: Objection, form.
13       THE WITNESS: I don't know what
14    an average pharmacy needed.
15 BY MR. PIFKO:
16     Q.   Okay.
17     A.   So...
18     Q.   So at the time AmerisourceBergen
19 had no way of evaluating what an average pharmacy
20 needed; is that correct?
21       MS. McCLURE: Objection, form.
22       THE WITNESS: We only had the
23    ability to know what our customers were
24    purchasing.

Page 63

1 BY MR. PIFKO:
2     Q.   Did you take any steps to know
3 what the average pharmacy within your own
4 customers would need to fill legitimate needs of
5 its customers?
6       MS. McCLURE: Objection, form.
7       THE WITNESS: I don't recall.
8 BY MR. PIFKO:
9     Q.   Would you agree that there was a
10 failure of AmerisourceBergen's system that led to
11 the receipt of this order to show cause?
12       MS. McCLURE: Objection, form.
13       THE WITNESS: No, I don't agree
14    that there was a failure to our system.
15 BY MR. PIFKO:
16     Q.   Going to page 3 here, the top
17 paragraph. We looked at this earlier.
18     A.   Uh-huh.
19     Q.   It said that AmerisourceBergen
20 shipped over 5.2 million dosage units of
21 hydrocodone to pharmacies that had certain
22 characteristics that were discussed in your
23 August 10, 2005 meeting.
24       Do you see that?

Page 64

1       MS. McCLURE: Objection, asked
2    and answered.
3       THE WITNESS: I see that in
4    general, yes.
5 BY MR. PIFKO:
6     Q.   And if you go on the first page
7 here, it says that, in paragraph 1, "Respondent
8 distributed over 3.8 million dosage units of
9 combination hydrocodone products to customers
10 that it knew or should have known were diverting
11 the hydrocodone into other than legitimate
12 medical, scientific and industrial channels."
13       Do you see that?
14       MS. McCLURE: Objection, form.
15       THE WITNESS: I see that.
16 BY MR. PIFKO:
17     Q.   And so my question to you is,
18 there's a failure of AmerisourceBergen to catch
19 this volumes that the Department of Justice
20 identified. Correct?
21       MS. McCLURE: Objection, form.
22       THE WITNESS: In their opinion,
23    yes.
24 BY MR. PIFKO:

Page 65

1     Q.   What I'm trying to understand is
2 where -- what occurred to result in that failure?
3       MS. McCLURE: Objection to form.
4       THE WITNESS: I didn't say there
5    was a failure.
6 BY MR. PIFKO:
7     Q.   Did you not know that those
8 volumes of hydrocodone products were being
9 shipped to AmerisourceBergen customers?
10     A.   I didn't know personally, no.
11     Q.   Was the company doing anything to
12 monitor the potentially significant volumes of
13 hydrocodone products that were being shipped to
14 its customers?
15       MS. McCLURE: Objection, form.
16       THE WITNESS: We had a suspicious
17    order monitoring program.
18 BY MR. PIFKO:
19     Q.   Okay. So did the system just not
20 catch these orders?
21       MS. McCLURE: Objection, form.
22       THE WITNESS: I couldn't tell you
23    that.
24 BY MR. PIFKO:

Page 66

1    Q.    Do you know if the system caught
2 these orders and then they were simply released?
3         MS. McCLURE:  Objection, form.
4         THE WITNESS:  If these orders
5    were suspicious, they would have been on
6    that report and they would have been
7    reported to DEA as suspicious.
8 BY MR. PIFKO:
9    Q.    The DEA here is saying these
10 orders are suspicious.
11        Do you agree?  Let's look at page
12 2, paragraph 4a.
13        MS. McCLURE:  Objection.
14 BY MR. PIFKO:
15    Q.    "Respondent knew that orders of
16 an unusual size were 'suspicious' as that term is
17 used in 21 C.F.R. Section 1301.74(b)."
18        MS. McCLURE:  What's the
19    question?
20        THE WITNESS:  Yeah.
21 BY MR. PIFKO:
22    Q.    My question to you was, the DEA
23 was saying these orders were suspicious.
24 Correct?

Page 67

1         MS. McCLURE:  Objection.
2    Objection, form.
3         THE WITNESS:  I don't see where
4    DEA says those orders were suspicious.
5 BY MR. PIFKO:
6    Q.    Well, it's saying each of these
7 pharmacies and others where you distributed
8 hydrocodone products to them in amounts that far
9 exceeded what an average pharmacy orders to meet
10 the legitimate needs of its customers.
11        Do you see that?
12    A.    Yes, I see that.
13    Q.    Okay.  And it's talking about
14 orders that AmerisourceBergen shipped to its
15 customers.  Correct?
16    A.    Yes, yes, that's correct.
17    Q.    And then it says, you knew that
18 orders of an unusual size were suspicious.
19        Do you see that?
20    A.    I see that.
21    Q.    Did you not know that the orders
22 that exceeded what an average pharmacy would need
23 were suspicious?
24        MS. McCLURE:  Objection to form.

Page 68

1         THE WITNESS:  Again, I don't know
2    what an average pharmacy's purchases
3    were.
4 BY MR. PIFKO:
5    Q.    Okay.  So AmerisourceBergen had
6 no steps to monitor what an average pharmacy's
7 needs were at that time.
8         MS. McCLURE:  Objection.
9 BY MR. PIFKO:
10    Q.    Is that correct?
11    A.    That's --
12        MS. McCLURE:  Objection, form,
13    asked and answered and misstates the
14    witness's prior testimony.
15        You may answer.
16        THE WITNESS:  I disagree.  We
17    have a suspicious order monitoring
18    program.
19 BY MR. PIFKO:
20    Q.    Okay.  But you just said, I don't
21 know what an average pharmacy would need.
22    A.    That's correct.
23    Q.    Did AmerisourceBergen have any
24 policies or procedures in place to evaluate what

Page 69

1 an average pharmacy might need?
2         MS. McCLURE:  Objection, form.
3         THE WITNESS:  We have a
4    suspicious order monitoring program to
5    monitor our own customers.  We don't
6    know -- we didn't know what an average
7    pharmacy purchased, what the quantities
8    were for an average pharmacy.
9 BY MR. PIFKO:
10    Q.    So at that time, there was
11 nothing in AmerisourceBergen's system to evaluate
12 what an average pharmacy might need for its
13 legitimate needs for its customers.  Correct?
14        MS. McCLURE:  Objection, form.
15        THE WITNESS:  Not other than our
16    own customers.  That's the only data we
17    have or that we had at that time.
18 BY MR. PIFKO:
19    Q.    But you were saying, under
20 AmerisourceBergen's systems in place at that
21 time, it only monitored the average of each
22 customer against its own orders at that time.
23 Correct?
24        MS. McCLURE:  Objection, form,

Page 70

1    THE WITNESS:  That's what I
2 recall, yes.
3 BY MR. PIFKO:
4    Q.    You weren't undertaking any
5 effort to compare a pharmacy's orders compared to
6 another pharmacy's orders at that time.  Correct?
7    MS. McCLURE:  Objection to form.
8    THE WITNESS:  Not that I know of.
9 BY MR. PIFKO:
10    Q.    Let's go to paragraph 4b.
11    A.    Okay.
12    Q.    It says, "Respondent distributed
13 hydrocodone to each of the named pharmacies, and
14 others, even though the pharmacies ordered small
15 amounts of other drug products relative to the
16 pharmacies' hydrocodone purchases from
17 Respondent."
18    Do you see that?
19    A.    Yes, I do.
20    Q.    "Respondent knew orders for large
21 amounts of hydrocodone in combination with small
22 amounts of other drug products deviated from the
23 normal pattern of orders placed by pharmacies."
24    Do you see that?

Page 71

1    A.    I see that.
2    Q.    Did you know, as the head of
3 regulatory and compliance issues for diversion
4 control at that time, that an order for large
5 amounts of hydrocodone as compared to other drug
6 products was something that deviated from the
7 normal pattern of ordering for a pharmacy?
8    MS. McCLURE:  Objection, form.
9    THE WITNESS:  Repeat the
10 question, please?
11 BY MR. PIFKO:
12    Q.    Did you know, as the head of
13 regulatory and compliance issues for diversion
14 control issues at that time, that an order for
15 large amounts of hydrocodone, as compared to
16 other drug products, was something that deviated
17 from the normal pattern of ordering for a
18 pharmacy?
19    MS. McCLURE:  Objection to form.
20    THE WITNESS:  We were -- we
21 monitored the purchases of that customer,
22 compared to their previous purchases, is
23 the way our system worked.
24 BY MR. PIFKO:

Page 72

1    Q.    Okay.  Did you have any system in
2 place to monitor its purchasing of Schedule II or
3 III controlled substances as it compared to other
4 types of substances?
5    A.    Not that I know of.
6    Q.    Let's go to paragraph 4c.
7    It says, "Respondent distributed
8 hydrocodone to each of the named pharmacies, and
9 others, even though the pharmacies ordered
10 hydrocodone much more frequently than
11 Respondent's other pharmacy customers."
12    Do you see that?
13    A.    Yes, I do.
14    Q.    Did you read that correctly?
15    A.    Yes, you did.
16    Q.    It says, "Respondent knew that
17 orders of unusual frequency were 'suspicious' as
18 that term is used in 21 C.F.R. Section
19 1301.74(b)."
20    Did I read that correct?
21    A.    That's correct.
22    Q.    Did AmerisourceBergen have any
23 system in place at that time to evaluate the
24 frequency of orders of controlled substances

Page 73

1 placed by its customers?
2    MS. McCLURE:  Objection to form.
3    THE WITNESS:  Not that I know of.
4 BY MR. PIFKO:
5    Q.    You said something earlier
6 about -- that after the 2005 meeting with DEA
7 that's referenced in here --
8    A.    Uh-huh.
9    Q.    And let's be specific, the one
10 that's referenced in paragraph 5 of Exhibit 1.
11    A.    Okay.
12    Q.    You said that after that meeting,
13 you initiated some sort of due diligence process.
14 Correct?
15    MS. McCLURE:  Objection, form.
16    THE WITNESS:  That's correct.
17 BY MR. PIFKO:
18    Q.    Prior to that time, did you have
19 no due diligence process in place?
20    MS. McCLURE:  Objection to form.
21    THE WITNESS:  Yes, we had due
22 diligence.  Yes.
23 BY MR. PIFKO:
24    Q.    What due diligence process was in

Page 74

1 place before that meeting?
2    A.    The same due diligence that we
3 had had in place for years.
4    Q.    And what was it --
5    A.    Do you want me to describe it?
6    Q.    Yes.
7    A.    Our responsibility was to make a
8 good faith effort to make sure that that
9 customer's properly licensed with the state and
10 registered with DEA.
11    Q.    Anything else?
12    A.    No.
13    Q.    So at that time of the meeting in
14 2005, the only due diligence that was in place
15 was a process to make sure that the customer was
16 properly licensed; is that correct?
17       MS. McCLURE:  Objection, form.
18       THE WITNESS:  Properly licensed
19    by the state and registered with DEA.
20    That was our requirement under the
21    federal regulations.
22 BY MR. PIFKO:
23    Q.    How is it that AmerisourceBergen
24 missed these millions of orders in its suspicious

Page 75

1 order monitoring system, as discussed here in
2 Exhibit 1?
3       MS. McCLURE:  Objection, form,
4    foundation.
5       THE WITNESS:  I'm not sure we
6    missed them.  I believe they were
7    reported to DEA as suspicious orders.
8 BY MR. PIFKO:
9    Q.    It's your testimony that these
10 orders were picked up by the suspicious order
11 monitoring system and reported to DEA?
12    A.    I'm not saying every one.  I'm
13 just -- I know that, from what I recall, some of
14 these customers that were mentioned in here, as I
15 recall, had orders that were reported to DEA as
16 suspicious.
17    Q.    Do you have any sense of the
18 percentage of the orders, if any, that were
19 caught?
20    A.    No, I do not.
21    Q.    If you reported these orders to
22 DEA, do you have any understanding as to why DEA
23 issued this order to show cause?
24       MS. McCLURE:  Objection, form.

Page 76

1       THE WITNESS:  No, I don't.
2 BY MR. PIFKO:
3    Q.    Did you do anything other than
4 report these orders to -- some of the orders that
5 you discussed to DEA to prevent diversion?
6       MS. McCLURE:  Objection, form.
7       THE WITNESS:  Yes.
8 BY MR. PIFKO:
9    Q.    What did you do?
10    A.    We cut off -- I believe we cut
11 off some of these pharmacies, if not all of them.
12 I can't recall exactly which ones.
13    Q.    Do you know how many you cut off?
14    A.    Couldn't -- don't recall.
15    Q.    Do you know when you cut them
16 off?
17    A.    Either prior to the suspension or
18 after.
19    Q.    So you cut some of them off maybe
20 after the suspension order?
21       MS. McCLURE:  Objection, form.
22       THE WITNESS:  Well, it would have
23    been prior, because we weren't able to
24    ship after -- after the suspension order.

Page 77

1    So it would have been prior to that.
2 BY MR. PIFKO:
3    Q.    Would that be contained in any
4 document?
5       MS. McCLURE:  Objection, form.
6       THE WITNESS:  I'm sure -- no, I
7    don't want to speculate.  I don't know.
8 BY MR. PIFKO:
9    Q.    Based on your -- you've been with
10 the company for over 30 years.  Right?  Longer?
11    A.    Longer.
12    Q.    40 years?
13    A.    Yes.
14    Q.    Based on your knowledge of the
15 company's practices and procedures, if you cut
16 off a customer, where would that be documented?
17       MS. McCLURE:  Objection, form.
18       THE WITNESS:  It depends on what
19    system we're using to document things at
20    a specific time.  We've changed
21    documentation processes over the years
22    many times.
23 BY MR. PIFKO:
24    Q.    At the time of this order to show

Page 78

1 cause.
2          MS. McCLURE:  Objection, form.
3          THE WITNESS:  Again, I'm not sure
4      where it would have been documented.
5 BY MR. PIFKO:
6      Q.    You don't know if it would have
7 been documented at all?
8          MS. McCLURE:  Objection, form,
9      misstates the witness's prior testimony.
10          THE WITNESS:  I don't recall
11      exactly.
12 BY MR. PIFKO:
13      Q.    How about generally?
14      A.    Generally --
15          MS. McCLURE:  Same objection.
16          THE WITNESS:  Generally, I would
17      say that they were documented somewhere.
18 BY MR. PIFKO:
19      Q.    Did you review anything in
20 preparing for your deposition that would have
21 discussed the company's shipments or orders
22 from -- with respect to the pharmacies in
23 Exhibit 1?
24          MS. McCLURE:  Objection, form.

Page 79

1          THE WITNESS:  No, no.
2 BY MR. PIFKO:
3      Q.    If you were going to do that, how
4 would you do that?
5          MS. McCLURE:  Objection, form.
6          THE WITNESS:  How would I do
7      what?
8 BY MR. PIFKO:
9      Q.    If you were going to research the
10 order history --
11      A.    Uh-huh.
12      Q.    -- and shipments made to any of
13 the customers discussed in Exhibit 1, how would
14 you go about doing that?
15          MS. McCLURE:  Objection, form.
16          THE WITNESS:  I would go back to
17      find out whatever system we were using to
18      document and look through that and do a
19      search.
20 BY MR. PIFKO:
21      Q.    It's true that today you can log
22 on to AmerisourceBergen's system and look back at
23 customer histories and correspondence.  Correct?
24          MS. McCLURE:  Objection, form.

Page 80

1          THE WITNESS:  I can't.
2 BY MR. PIFKO:
3      Q.    You're unable to do that?
4      A.    Login to, which system are you
5 talking about?  Our business system?
6      Q.    AmerisourceBergen's diversion
7 control systems.
8          MS. McCLURE:  Objection, form.
9          THE WITNESS:  No.  I don't login
10      to that.
11 BY MR. PIFKO:
12      Q.    Do members of your team login to
13 that?
14          MS. McCLURE:  Objection, form.
15          THE WITNESS:  Not on my team, no.
16 BY MR. PIFKO:
17      Q.    Do you know who Eric Cherveny is?
18      A.    Yes, I do.
19      Q.    Is he someone that was under your
20 team at any point?
21          MS. McCLURE:  Objection, form.
22          THE WITNESS:  He was under my
23      team back in, you know, I can't
24      remember -- in the 2005 to 2010, sometime

Page 81

1      in that area.
2 BY MR. PIFKO:
3      Q.    If he testified that you could go
4 back and look into AmerisourceBergen's systems
5 and get ordering information and information
6 about a customer's history going back at least as
7 early as 2000, would you have any reason to
8 disagree with him?
9          MS. McCLURE:  Objection, form.
10          THE WITNESS:  I'm not sure how
11      you would, but maybe he can.
12 BY MR. PIFKO:
13      Q.    With respect to these orders, you
14 would have reported them after you shipped them.
15 Correct?
16          MS. McCLURE:  Objection, form.
17          THE WITNESS:  Which orders are
18      you talking about specifically?
19 BY MR. PIFKO:
20      Q.    The 5.2 million orders of
21 hydrocodone products or dosage units discussed in
22 Exhibit 1.
23          MS. McCLURE:  Objection to form.
24          THE WITNESS:  At that time, they

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 would have been reported after.
2 BY MR. PIFKO:
3     Q.    None of these orders would have
4 been reported prior to shipment.  Correct?
5     A.    That's correct.
6     Q.    And all of these orders would
7 have been shipped without any due diligence.
8 Correct?
9         MS. McCLURE:  Objection, form.
10        THE WITNESS:  That's incorrect.
11 BY MR. PIFKO:
12    Q.    Other than checking their
13 registration?
14        MS. McCLURE:  Objection, form.
15        THE WITNESS:  Checking the
16    registration, the licensing and all the
17    other due diligence that we do on
18    customers, whether it's credit, their
19    ability to pay and whatever else that
20    our -- there's different -- other parts
21    of our due diligence that are done.  But
22    as far as controlled substances, it was
23    the licensing.
24 BY MR. PIFKO:

Page 83

1     Q.    Okay.  So the orders of the
2 5.2 million dosage units that are discussed in
3 Exhibit 1, the only due diligence with respect to
4 diversion control that would have been performed
5 on those would have been checking the licensing?
6         MS. McCLURE:  Objection, form,
7     misstates the witness's prior testimony.
8         THE WITNESS:  Well, let me take
9     you back, because actually, since 2005,
10    after that meeting with DEA, we did put
11    the due diligence process in place with
12    questionnaires.  And probably I'm sure a
13    lot of these pharmacies had been -- had a
14    due diligence investigation, had a
15    questionnaire and a site visit.
16 BY MR. PIFKO:
17    Q.    But that's something you
18 conducted -- it's static.
19    You conduct the -- you collect
20 the questionnaire, and it sits in a file.
21 Correct?
22        MS. McCLURE:  Objection, form.
23        THE WITNESS:  No.  It gets
24    reviewed.  It would be reviewed, and a

Page 84

1 decision would be made about that
2 customer based on that due diligence.
3 BY MR. PIFKO:
4     Q.    Right.  But my point is, there's
5 no specific due diligence that you conduct with
6 respect to an order?
7     A.    To each order?
8         MS. McCLURE:  Objection to form.
9 BY MR. PIFKO:
10    Q.    Right.
11    A.    Not -- not for each specific
12 order, no.
13    Q.    Okay.  So the only due diligence
14 that would have been conducted would have been a
15 collecting of a form and reviewing that form and
16 deciding as a general matter whether to do
17 business with that customer.  Correct?
18        MS. McCLURE:  Objection, form.
19        THE WITNESS:  That's -- that's
20    incorrect.  That's not correct.
21 BY MR. PIFKO:
22    Q.    What's incorrect about my
23 statement?
24    A.    Well, the due diligence is

Page 85

1 just -- that due diligence questionnaire is just
2 part of the process.  So any -- an order that
3 would have shown up on that suspicious order
4 report would have prompted a due diligence
5 investigation --
6         MS. McCLURE:  Objection.  Sorry.
7         THE WITNESS:  -- and a site
8     visit.
9 BY MR. PIFKO:
10    Q.    So I'm getting mixed statements
11 from you.
12    You said that there was no
13 specific due diligence with respect to an order;
14 is that correct?
15    A.    Well, that due diligence could
16 have been prompted by an order.
17    Q.    Explain that to me.
18    A.    Okay.  So when we -- when we
19 started doing the questionnaires, the basis for
20 doing those questionnaires would have been that
21 possible excessive and suspicious order report,
22 and that's when that would prompt that
23 questionnaire.  So it is related to -- it would
24 have been related to an order.

Page 86

1    Q.    How frequently --
2    A.    Or a customer's history.
3    Q.    How frequently would you collect
4  this form from a customer?
5         MS. McCLURE:  Objection, form.
6         THE WITNESS:  I don't know.
7  BY MR. PIFKO:
8    Q.    For every single order that they
9  would place that would be suspicious, you would
10 collect another form?
11        MS. McCLURE:  Objection, form.
12        THE WITNESS:  I don't know.
13 BY MR. PIFKO:
14   Q.    Was it -- well, you were in
15 charge of diversion control practices at the
16 time.  Correct?
17        MS. McCLURE:  Objection, form.
18        THE WITNESS:  I oversaw that
19    area.  That's part of regulatory at the
20    time, yes.
21 BY MR. PIFKO:
22   Q.    And you don't know how the due
23 diligence process worked?
24        MS. McCLURE:  Objection, form,

Page 87

1    asked and answered.
2        THE WITNESS:  Yes.  I already
3    explained that to you.
4  BY MR. PIFKO:
5    Q.    Well, I'm asking you questions,
6  and you're saying you don't know.
7    A.    Well, I don't know if it was done
8  on every single order.
9    Q.    Okay.
10   A.    I couldn't tell you.  It may have
11 been.
12   Q.    But that's something that you
13 don't seem to know about the system.  Agree?
14        MS. McCLURE:  Objection, form.
15        THE WITNESS:  Ask the question
16    again?  I'm sorry.
17 BY MR. PIFKO:
18   Q.    Well, I'm trying to understand if
19 AmerisourceBergen had an order that was
20 suspicious, whether that order triggered a
21 specific due diligence inspection of the order.
22   A.    If it -- if that -- if that order
23 showed up on a suspicious order report, it would
24 have triggered a due diligence investigation.

Page 88

1    Q.    Every time?
2    A.    I'm assuming it would, yes.
3    Q.    So every time AmerisourceBergen
4  had a suspicious order at the time of the
5  issuance of this order to show cause and before,
6  every single time, for every customer, it would
7  have triggered a due diligence investigation?
8    A.    I don't know that.  I don't know
9  that for sure.
10   Q.    You don't know that?
11   A.    I don't know that.
12   Q.    Do you have any specific
13 understanding of how AmerisourceBergen's due
14 diligence process worked --
15        MS. McCLURE:  Objection to form.
16 BY MR. PIFKO:
17   Q.    -- at that time and before?
18   A.    I've already answered that.
19   Q.    Well, I'm trying to understand
20 what would trigger a due diligence investigation.
21 You don't seem to know.
22        MS. McCLURE:  Objection,
23    misstates the witness's testimony, asked
24    and answered, form.

Page 89

1        THE WITNESS:  As I recall, a due
2    diligence investigation would have been
3    prompted by customers showing up on that
4    suspicious order report, that possible
5    excessive and suspicious orders I think
6    is what it's called.  That would prompt
7    that due diligence to be done.
8        Would it be done every single
9    time an order would hit that?  I don't
10   know.  I don't recall.
11 BY MR. PIFKO:
12   Q.    Would you have investigated that
13 order specifically, or would you just look at the
14 customer?
15        MS. McCLURE:  Objection to form.
16        THE WITNESS:  We mainly would
17   look at the customer.
18 BY MR. PIFKO:
19   Q.    And what would the nature of your
20 customer inquiry be?
21        MS. McCLURE:  Objection, form.
22        THE WITNESS:  The nature would be
23   a site visit and completion of a
24   questionnaire.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

BY MR. PIFKO:

Q. So did this prompt any changes to AmerisourceBergen's suspicious order monitoring system?

MS. McCLURE: Objection, form.

THE WITNESS: Did what prompt?

BY MR. PIFKO:

Q. This order to show cause.

A. Oh, yes, yes.

Q. That resulted in a settlement agreement with DEA. Correct?

MS. McCLURE: Objection, asked and answered.

THE WITNESS: Yes.

BY MR. PIFKO:

Q. What were the nature of the changes that you instituted after this?

MS. McCLURE: Objection, form. And objection, asked and answered.

THE WITNESS: We enhanced our suspicious order monitoring program at the direction of DEA. They wanted us to develop a system that would stop and hold an order and determine whether it was

Page 91

suspicious before shipping it.

- - -

(Deposition Exhibit No. Mays V2-2, Email chain, top one dated 3 Mar 2013, Bates stamped ABDCMDL00378483 through ABDCMDL00378488, was marked for identification.)

- - -

BY MR. PIFKO:

Q. Handing you what's marked as Mays Volume 2, Exhibit 2.

For the record, it's an email thread labeled ABDCMDL00378483 through 88.

Let me know when you're done, take a moment to review that.

A. (Reviewing document.)

Okay.

Q. Right. If you go to the second to last page here.

A. Okay.

Q. It's the start of -- well, it's an email -- that part of the header is on the prior page, but it's an email from you to people at Cardinal Health, McKesson and HD Smith.

Page 92

Do you see that?

A. Yes, I do.

Q. You are talking about attending an HDMA conference. Agreed?

A. Agree.

Q. It says, "The HDMA DMC agenda."

Do you see that?

A. Yes, I do.

Q. What's the HDMA DMC?

A. HDMA DMA is a distribution management conference. It's an annual conference that HDMA conducts.

Q. The subject of this email is "'Big Four' DEA Strategy Discussion 2."

Do you see that?

A. Yes.

Q. So you're reaching out to, at this time, people from McKesson, Cardinal Health and HD Smith to have a big four DEA strategy discussion. Correct?

MS. McCLURE: Objection, form.

THE WITNESS: It's what it says, yeah, yeah.

BY MR. PIFKO:

Page 93

Q. Why were you reaching out to representatives from this company -- these companies to have a DEA strategy discussion at this time?

A. I think we would typically get together sometime around those -- those conferences, because it was about the only time of the year we had face-to-face time. And we would just talk about common concerns and issues that we have and do some benchmarking, share ideas about how we can improve our programs.

Q. When you say programs and concerns, you're talking about specifically in the diversion control area. Correct?

A. No. It could be anything regulatory, not just diversion. It could be things about, you know, sometimes we would talk about DEA inspections and how they -- how they're handled, just to get some -- help each other out.

Q. Okay. But what I'm trying to ask is, when you were talking about concerns and benchmarking and programs, you're talking about programs that relate to DEA compliance. Correct?

A. I think for the most part. It's

Page 94

```
 1  basically anything regulatory that we could talk
 2  about.
 3      Q.    And these other people at
 4  McKesson, Cardinal Health and HD Smith, they all
 5  had similar responsibilities for regulatory and
 6  compliance issues like you did?
 7          MS. McCLURE:  Objection to form.
 8          THE WITNESS:  For the most part
 9          as I recall, yes.
10  BY MR. PIFKO:
11      Q.    So this was -- this specific
12  subject line says, "Strategy Discussion 2."
13          Do you see that?
14      A.    Yeah.
15      Q.    So this was -- and as you just
16  testified, this was something that you regularly
17  did in connection with HDMA meetings that
18  occurred annually?
19          MS. McCLURE:  Objection to form.
20          THE WITNESS:  Not always.  I
21          think we'd met before.  Might not have
22          been at an HDA meeting.
23  BY MR. PIFKO:
24      Q.    But you had, with some degree of
```

Page 95

```
 1  regularity, meetings with these people to discuss
 2  regulatory and compliance issues?
 3          MS. McCLURE:  Objection, form.
 4          THE WITNESS:  I wouldn't say
 5          regularity.  We only met like that maybe
 6          two or three times.
 7  BY MR. PIFKO:
 8      Q.    When was the first time you had
 9  such a meeting like that?
10      A.    I can't remember if it was before
11  this one or after this one.  We met in Chicago at
12  the airport one time.  And I think Cardinal
13  hosted that meeting.
14      Q.    Do you have a rough idea about
15  when that was?
16          MS. McCLURE:  Objection.
17          THE WITNESS:  No, I don't.
18          MS. McCLURE:  Asked and answered.
19  BY MR. PIFKO:
20      Q.    But it was a meeting in Chicago
21  at the airport?
22      A.    I believe it was, yeah.
23      Q.    Was that in connection with an
24  HDMA conference?
```

Page 96

```
 1      A.    No, I don't believe it was.
 2      Q.    What was your recollection that
 3  brought you all to Chicago?
 4      A.    I think it had been after, you
 5  know, the companies -- you know, we had had
 6  action taken against us and I think Cardinal and
 7  I'm not sure if McKesson had at the time.  And I
 8  think the idea was just to get together and see
 9  how we could do things better.
10      Q.    You think that would have been in
11  2007 or '8?
12          MS. McCLURE:  Objection.
13          THE WITNESS:  I don't think so.
14          I think it might have been after that.  I
15          don't know.
16  BY MR. PIFKO:
17      Q.    What action had been taken
18  against you that you're recalling?
19      A.    The suspension that we were
20  previously talking about.
21      Q.    And you recall that Cardinal had
22  had some action taken against it around the time
23  of this meeting as well?
24      A.    Yeah.
```

Page 97

```
 1      Q.    What specifically was the nature
 2  of your understanding about the action taken
 3  against Cardinal at that time?
 4      A.    The one -- the meeting in
 5  Chicago?  That was when -- because I remember the
 6  guy was at that meeting, Michael Mone from
 7  Cardinal.  And he got called during the meeting,
 8  and he had to leave.  And I think it was when
 9  they had their -- one of their registrations
10  suspended or something and he had to leave.  We
11  didn't know what it was about, but he had to just
12  leave all of a sudden.
13      Q.    Okay.  Do you have a rough idea
14  on or around the time that was?
15      A.    No, I don't.
16      Q.    Did that -- your recollection
17  lead to a fine against Cardinal Health?
18          MS. McCLURE:  Objection, form.
19          THE WITNESS:  I think it did
20          after that, but I'm not -- I don't --
21          because it seems like they had a couple.
22          And I'm not sure if both resulted in
23          fines.
24  BY MR. PIFKO:
```

Page 98

1 Q. Okay. And then you know you had
2 this meeting that's reflected in Exhibit 2.
3 Correct?
4 A. Uh-huh.
5 Q. And then you believe there was
6 another meeting that you recall. Correct?
7 A. The one at HDA, the one at HDMA
8 and then the one in Chicago. I think that was
9 all. There may have been another one.
10 Q. You think there was another one?
11 MS. McCLURE: Objection to form.
12 THE WITNESS: I may be thinking
13 about the same one, the one at the HDA
14 meeting, that -- it's the two that I can
15 recall specifically, yeah.
16 BY MR. PIFKO:
17 Q. This meeting reflected in
18 Exhibit 2, this was a meeting that was ultimately
19 held. Correct?
20 A. You know, I don't remember the
21 meeting itself, whether we actually had it or
22 not. I'm -- I don't want to assume, but --
23 Q. Where was this?
24 A. -- it looks like we planned to

Page 99

1 get together, but I just don't remember the
2 meeting specifically.
3 Q. Where was this meeting?
4 A. I saw something in the email
5 about me having tickets to Phillies spring
6 training, so I believe that was when the
7 conference was in Tampa.
8 Q. Okay.
9 A. The HDA conference was in Tampa.
10 Q. And then you talk about in this
11 email about scheduling a dinner with them as
12 well?
13 MS. McCLURE: Objection to form.
14 THE WITNESS: Yeah. I just don't
15 recall who went to dinner or not. I just
16 don't remember that.
17 BY MR. PIFKO:
18 Q. Do you think that you had other
19 meetings with these individuals in subsequent HDA
20 conferences?
21 A. I don't recall.
22 - - -
23 (Deposition Exhibit No. Mays
24 V2-3, Email chain, top one dated

Page 100

1 2/6/2008, Bates stamped
2 CAH_MDL2804_01364805 through
3 CAH_MDL2804_01364809, was marked for
4 identification.)
5 - - -
6 BY MR. PIFKO:
7 Q. Handing you what's marked as Mays
8 Volume 2 Exhibit 3.
9 For the record, this is a
10 Cardinal Health document Bates labeled
11 CAH_MDL2804_01364805 to 809.
12 Take a moment to review this and
13 let me know when you're ready.
14 A. Okay.
15 (Reviewing document.)
16 Okay.
17 Q. Have you seen this before?
18 A. I don't recall it.
19 Q. You see at the top it's an email
20 from you to Steve Reardon?
21 A. Yes, I do.
22 Q. Dated February 6, 2008?
23 A. Yes, I see that.
24 Q. It's discussing a Bloomberg story

Page 101

1 about McKesson negotiating shipping restrictions
2 as part of a DEA probe. Agree?
3 A. Yeah. Yes, I agree.
4 Q. You forwarded this article to
5 Steve Reardon at Cardinal Health. Agree?
6 A. That's what it looks like, yes.
7 Q. Who is Steve Reardon?
8 A. He was my counterpart at Cardinal
9 at the time.
10 Q. And you thought that he would be
11 interested to see this article about McKesson?
12 MS. McCLURE: Objection, form.
13 THE WITNESS: I would think so.
14 That would be the only reason I would
15 have sent it to him.
16 BY MR. PIFKO:
17 Q. You had a practice of exchanging
18 information with Mr. Reardon about diversion
19 control issues?
20 MS. McCLURE: Objection, form.
21 THE WITNESS: No.
22 BY MR. PIFKO:
23 Q. Why do you believe you would have
24 shared this with him on this occasion?

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1       MS. McCLURE: Objection to form.
2       THE WITNESS: I don't recall.
3   This was 11 years ago. I don't remember
4   why I sent it to him.
5   BY MR. PIFKO:
6       Q.   Did you have regular
7   communications with Steve Reardon?
8       MS. McCLURE: Objection, form.
9       THE WITNESS: Well, how -- define
10  regular. Every day, every week, every
11  month, every year?
12  BY MR. PIFKO:
13      Q.   With any degree of regularity.
14      MS. McCLURE: Objection to the
15  definition.
16      THE WITNESS: What's regularity?
17  BY MR. PIFKO:
18      Q.   What's regular to you?
19      A.   Regular would be every day.
20      Q.   Did you talk to Steve Reardon
21  with some frequency?
22      MS. McCLURE: Objection to form.
23      THE WITNESS: I would say
24  occasionally, at HDA calls, HDA meetings,

Page 103

1   things like that. Not a lot of back and
2   forth, no.
3   BY MR. PIFKO:
4       Q.   From time to time you would share
5   information, though, with him about issues in the
6   drug distribution business. Correct?
7       A.   Yes. As long as it was not
8   proprietary information from ABC.
9       MR. PIFKO: Go off the record for
10  a minute.
11      THE VIDEOGRAPHER: Going off the
12  record, 12:56 p.m.
13      - - -
14      (A recess was taken from
15  12:56 p.m. to 1:00 p.m.)
16      - - -
17      THE VIDEOGRAPHER: Back on record
18  at 1:00 p.m.
19      MR. PIFKO: All right. We don't
20  have any further questions at this time.
21      MS. McCLURE: No further -- no
22  questions.
23      THE VIDEOGRAPHER: This ends
24  today's deposition. We're going off the

Page 104

1   record at 1:00 p.m.
2       (Witness excused.)
3       (Deposition concluded at
4   approximately 1:00 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 105

1
2           CERTIFICATE
3
4
5       I HEREBY CERTIFY that the witness
    was duly sworn by me and that the deposition is a
6   true record of the testimony given by the
    witness.
7
        It was requested before
8   completion of the deposition that the witness,
    STEPHEN MAYS, have the opportunity to read and
9   sign the deposition transcript.
10
11
12
13
        _____
14  ANN MARIE MITCHELL, a Federally
    Approved Certified Realtime
15  Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and
16  Notary Public
17
18
19      (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24

Page 106

## INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10          You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13          It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you. If you fail to
17  do so, the deposition transcript may be deemed to
18  be accurate and may be used in court.
19
20
21
22
23
24

Page 107

1          - - - - - -
               E R R A T A
2          - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____ ____ _____
6     REASON: _____
7  ____ ____ _____
8     REASON: _____
9  ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____

Page 108

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I,_____, do
5  hereby certify that I have read the foregoing
6  pages, 1 - 108, and that the same is a correct
7  transcription of the answers given by me to the
8  questions therein propounded, except for the
9  corrections or changes in form or substance, if
10  any, noted in the attached Errata Sheet.
11
12
13  _____
14  STEPHEN MAYS                    DATE
15
16
17  Subscribed and sworn
    to before me this
18  _____ day of _____, 20____.
19  My commission expires:_____
20
    _____
21  Notary Public
22
23
24