EXHIBIT 302

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                       :  Polster
10                     -  -  -
            Saturday, August 4, 2018
11                     -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                       -  -  -
14
              Videotaped deposition of
15   DAVID MAY, taken pursuant to notice, was
     held at the law offices of Reed Smith,
16   LLP, Three Logan Square, 1717 Arch
     Street, Philadelphia, Pennsylvania 19103,
17   beginning at 9:01 a.m., on the above
     date, before Amanda Dee Maslynsky-Miller,
18   a Certified Realtime Reporter.
19                     -  -  -
20
21
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph| 917.591.5672 fax
               deps@golkow.com
24
```

Page 2

1  APPEARANCES:
2
3      BARON & BUDD P.C.
       BY: MARK PIFKO, ESQUIRE
4      BY: STERLING CLUFF, ESQUIRE
       15910 Ventura Boulevard
5      #1600
       Encino, California 91436
6      (818) 839-2333
       mpfiko@baronbudd.com
7      Scluff@baronbudd.com
8      - and -
9      BY: SCOTT SIMMER, ESQUIRE
       Washington, D.C.
10     (202) 333-4562
       Ssimmer@baronbudd.com
11     Representing the Plaintiffs
12
13     REED SMITH, LLP
       BY: ROBERT A. NICHOLAS, ESQUIRE
14     BY: JOSEPHY J. MAHADY, ESQUIRE
       BY: JEFFREY R. MELTON, ESQUIRE
15     BY: SHANNON E. MCCLURE, ESQUIRE
       BY: THOMAS H. SUDDATH JR., ESQUIRE
16     Three Logan Square
       1717 Arch Street
17     Philadelphia, PA 19103
       (215) 851-8100
18     Rnicholas@reedsmith.com
       jmahady@reedsmith.com
19     Jmelton@reedsmith.com
       Smcclure@reedsmith.com
20     Tsuddath@reedsmith.com
       Representing the Defendant,
21     Amerisource Bergen Drug
       Corporation
22
23
24

Page 3

1  APPEARANCES: (Continued)
2
3      COVINGTON & BURLING LLP
       BY: EMILY KVESELIS, ESQUIRE
4      850 Tenth Street, NW
       Suite 856N
5      Washington, DC 20001
       202.662.5000
6      ekveselis@cov.com
       Representing the Defendant,
7      McKesson Corporation
8
9
       MARCUS & SHAPIRA LLP
10     BY: JAMES F. ROSENBERG, ESQUIRE
       One Oxford Centre
11     35th Floor
       Pittsburgh, PA 15219
12     412.338.4683
       rosenberg@marcus-shapira
13     Representing the Defendant,
       HBC Service Company
14
15
16     JONES DAY
       BY: SARAH G. CONWAY, ESQUIRE
17     555 South Flower Street
       Los Angeles, California 90071
18     (213) 489-3939
       sgconway@jonesday.com
19     Representing the Defendant,
       Walmart
20
21
22
23
24

Page 4

1  APPEARANCES: (Continued)
2
3      PELINI CAMPBELL & WILLIAMS, LLC
       BY: ERIC J. WILLIAMS, ESQUIRE
4      8040 Cleveland Avenue NW
       Suite 400
5      North Canton, OH 44720
       330.305.6400
6      ejwilliams@pelini-law.com
       Representing the Defendant,
7      Prescription Supply, Inc.
8
9      WILLIAMS & CONNOLLY, LLP
       BY: MATTHEW C. MONAHAN, ESQUIRE
10     725 Twelfth Street, N.W.
       Washington, DC 20005
11     202.434.5000
       mmonahan@wc.com
12     Representing the Defendant,
       Cardinal Health
13
14
       ARNOLD & PORTER KAYE SCHOLER LLP
15     BY: SAMUEL LONERGAN, ESQUIRE
       250 West 55th Street
16     New York, New York 10019
       (212) 836-8000
17     samuel.lonergan@arnoldporter.com
       Representing the Defendant,
18     Endo Pharmaceuticals
19
20     BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
       BY: SHARON DESH, ESQUIRE
21     Courthouse Place
       54 West Hubbard Street, Suite 300
22     Chicago, Illinois 60654
       (312) 494-4400
23     sharon.desh@bartlit-beck.com
       Representing the Defendant,
24     The Walgreens Company

Page 5

1  APPEARANCES: (Continued)
2
       VIA TELECONFERENCE:
3
4
       LOCKE LORD LLP
5      BY: BRANDAN MONTMINY, ESQUIRE
       2200 Ross Avenue
6      Suite 2800
       Dallas, Texas 75201
7      (214) 740-8000
       brandan.montminy@lockelord.com
8      Representing the Defendant,
       Henry Schein Medical Systems, Inc.
9
10     ROPES & GRAY LLP
       BY: JESSICA SORICELLI, ESQUIRE
11     BY: FEIFEI (ANDREA) REN, ESQUIRE
       1211 Avenue of the Americas
12     New York, New York 10036
       (212) 596-9000
13     Jessica.Soricelli@ropesgray.com
       Andrea.Ren@ropesgray.com
14
15     - and -
16     BY: WILLIAM T. DAVISON, ESQUIRE
       Prudential Tower
17     800 Boylston Street
       Boston, Massachusetts 02199
18     (617) 951-7000
       William.Davison@ropesgray.com
19     Representing the Defendant,
       Mallinckrodt
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

| | Page 6 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | VIA TELECONFERENCE: |
| 3 | |
| 4 | MORGAN LEWIS & BOCKIUS, LLP<br>BY: ELLIOT E. BROWN, ESQUIRE |
| 5 | 1111 Pennsylvania Ave. NW<br>Washington, D.C. 20004 |
| 6 | (202) 739-3000<br>elliott.brown@morganlewis.com |
| 7 | - and - |
| 8 | BY: MONICA C. PEDROZA, ESQUIRE<br>77 West Wacker Drive |
| 9 | Chicago, Illinois 60601<br>(312) 324-1000 |
| 10 | Monica.pedroza@morganlewis.com |
| 11 | Representing the Defendants,<br>Teva Pharmaceuticals, Inc., |
| 12 | Cephalon, Inc., Watson<br>Laboratories, Actavis LLC, and |
| 13 | Actavis Pharma, Inc |
| 14 | |
| 15 | JACKSON KELLY PLLC |
| 16 | BY: SAMANTHA M. D'ANNA, ESQUIRE<br>500 Lee Street East |
| 17 | Suite 1600<br>Charleston, WV 25301 |
| 18 | (304) 340-1347<br>samantha.danna@jacksonkelly.com |
| 19 | Representing the Defendant,<br>Miami-Luken, Inc. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 7 |
|---|---|
| 1 | APPEARANCES: (Continued) |
| 2 | VIA TELECONFERENCE: |
| 3 | |
| 4 | ZUCKERMAN SPAEDER LLP<br>BY: VANESSA I. GARCIA, ESQUIRE |
| 5 | 485 Madison Avenue<br>10th Floor |
| 6 | New York, New York 10022<br>( 212) 704-9600 |
| 7 | vgarcia@zuckerman.com<br>Representing the Defendant, |
| 8 | CVS Pharmacy |
| 9 | |
| 10 | |
| 11 | ALSO PRESENT:<br>David Lane, Videographer |
| 12 | Zac Hone, Trial Technician |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

| | Page 8 |
|---|---|
| 1 | - - - |
| 2 | I N D E X |
| 3 | - - - |
| 4 | |
| | Testimony of: DAVID MAY |
| 5 | |
| 6 | By Mr. Pifko                13 |
| 7 | |
| 8 | - - - |
| 9 | E X H I B I T S |
| 10 | - - - |
| 11 | |
| 12 | NO.        DESCRIPTION        PAGE |
| 13 | AmerisourceBergen-May<br>Exhibit-1   ABDCMDL 151803-804        13 |
| 14 | AmerisourceBergen-May |
| 15 | Exhibit-2   Masters Pharmaceutical Versus<br>DEA Court Opinion, |
| 16 | 861.F. 3rd, 206, 2017 from<br>The DC Circuit        39 |
| 17 | AmerisourceBergen-May |
| 18 | Exhibit-3   ABDCMDL 00156582-84        45 |
| 19 | AmerisourceBergen-May |
| 20 | Exhibit-4   ABDCMDL 00274105-118        116 |
| 21 | AmerisourceBergen-May<br>Exhibit-5   ABDCMDL 00250024-063        153 |
| 22 | AmerisourceBergen-May<br>Exhibit-6   ABDCMDL 00158544        159 |
| 23 | AmerisourceBergen-May |
| 24 | Exhibit-7   ABDCMDL 00168453-455        178 |

| | Page 9 |
|---|---|
| 1 | - - - |
| 2 | E X H I B I T S |
| 3 | - - - |
| 4 | |
| 5 | NO.        DESCRIPTION        PAGE |
| 6 | AmerisourceBergen-May<br>Exhibit-8   ABDCMDL 00158342        196 |
| 7 | AmerisourceBergen-May |
| 8 | Exhibit-9   ABDCMDL 00216332-33        182 |
| 9 | AmerisourceBergen-May<br>Exhibit-10   ABDCMDL 00159072        248 |
| 10 | AmerisourceBergen-May |
| 11 | Exhibit-11   ABDCMDL 00140843-44        268 |
| 12 | AmerisourceBergen-May<br>Exhibit-12   ABDCMDL 00159415-16        270 |
| 13 | AmerisourceBergen-May |
| 14 | Exhibit-13   Tab Printout;<br>    Sales Assignment        277 |
| 15 | AmerisourceBergen-May |
| 16 | Exhibit-14   ABDCMDL 00002232        285 |
| 17 | AmerisourceBergen-May |
| 18 | Exhibit-15   Tab Printout        314 |
| 19 | AmerisourceBergen-May<br>Exhibit-16   ABDCMDL 00156364        320 |
| 20 | AmerisourceBergen-May |
| 21 | Exhibit-17   Tab Printout        322 |
| 22 | AmerisourceBergen-May<br>Exhibit-18   Tab Printout        322 |
| 23 | |
| 24 | |

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1              - - -
 2          E X H I B I T S
 3              - - -
 4
    NO.      DESCRIPTION        PAGE
 5
    AmerisourceBergen-May
 6  Exhibit-19   ABDCMDL 00159841      325
 7  AmerisourceBergen-May
    Exhibit-20   ABDCMDL 00142341-345   342
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
 1              - - -
 2      DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  Page  Line      Page Line      Page Line
 7  76    7
    122   1
 8  123   21
    220   17
 9
10  Request for Production of Documents
11  Page Line    Page Line    Page Line
12  None
13
14
15  Stipulations
16  Page Line    Page Line    Page Line
17  10    1
18
19
20  Question Marked
21  Page Line    Page Line    Page Line
22  None
23
24
```

Page 12

```
 1              - - -
 2          (It is hereby stipulated and
 3  agreed by and among counsel that
 4  sealing, filing and certification
 5  are waived; and that all
 6  objections, except as to the form
 7  of the question, will be reserved
 8  until the time of trial.)
 9              - - -
10          VIDEO TECHNICIAN:  We are
11  now on the record.  My name is
12  David Lane, videographer for
13  Golkow Litigation Services.
14  Today's date is August 4th, 2018.
15  Our time is 9:01 a.m.
16          This deposition is taking
17  place in Philadelphia,
18  Pennsylvania, in the matter of
19  National Prescription Opiate
20  Litigation.  Our deponent today is
21  David May.
22          Our counsel will be noted on
23  the stenographic record.  The
24  court reporter today is Amanda
```

Page 13

```
 1  Miller and will now swear in our
 2  witness.
 3              - - -
 4          DAVID MAY, after having been
 5  duly sworn, was examined and
 6  testified as follows:
 7              - - -
 8          VIDEO TECHNICIAN:  Please
 9  begin.
10              - - -
11          EXAMINATION
12              - - -
13  BY MR. PIFKO:
14      Q.   Good morning, Mr. May.
15      A.   Good morning.
16      Q.   My name is Mark Pifko.  I'm
17  an attorney for the plaintiffs in this
18  matter.  I'm handing you what's marked as
19  Exhibit Number 1.
20              - - -
21          (Whereupon,
22  AmerisourceBergen-May Exhibit-1,
23  ABDCMDL 151803-804, was marked for
24  identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1             - - -
2    BY MR. PIFKO:
3        Q.   This is an e-mail, Bates
4    labeled ABDCMDL 151803 through 804.
5        There's various exchanges;
6    you're one of the people on the
7    exchanges.  They are dated January 14th,
8    2016.
9            Please take a minute to
10   review that and let me know when you're
11   done.
12       A.   Sure.  Thank you.
13       Q.   Have you seen this before?
14       A.   I have.
15       Q.   When was the last time you
16   saw this?
17       A.   It would have been on the
18   date that is indicated by the e-mail,
19   which would be, I guess, January 14th,
20   2016.
21       Q.   Do you recall this
22   discussion?
23       A.   I recall this exchange, yes.
24       Q.   Is this a true and correct

Page 15

1    copy of the communications reflected
2    here?
3        A.   Yes, it is.
4        Q.   I'd like to direct your
5    attention to the first page.  About
6    halfway down the page, there's an e-mail
7    from you.  It says, 3:16 p.m. to Sharon
8    Hartman.
9            Do you see that part?
10       A.   I do.
11       Q.   There's a line you say right
12   there, If an order is deemed suspicious,
13   it can never be shipped.
14           Do you see that?
15       A.   I do.
16       Q.   Why do you say that?
17           MR. NICHOLAS:  Object to the
18       form.
19           Go ahead.
20           THE WITNESS:  Under our
21       program and our policy and our
22       understanding of the regulation,
23       and what the regulator expects
24       from us, is when we declare an

Page 16

1    order as suspicious, it's
2    permanently rejected and never
3    shipped.
4    BY MR. PIFKO:
5        Q.   So if you -- it's based on
6    your understanding of the legal
7    requirements that if you identify an
8    order as suspicious, you cannot ship it,
9    correct?
10           MR. NICHOLAS:  Object to the
11       form.
12           THE WITNESS:  It's my
13       understanding of the law and the
14       regulation and the expectation of
15       the regulator.
16   BY MR. PIFKO:
17       Q.   To be clear, that if an
18   order is suspicious, you cannot ship it,
19   correct?
20       A.   Correct.
21       Q.   Do you know what these
22   direct shipments are?
23       A.   I have some knowledge of the
24   direct shipments.

Page 17

1            In reading the back -- or,
2    actually, the beginning of the e-mail
3    chain, there is a refresher on here that
4    explains what direct ships are.
5        Q.   This is a situation where
6    the order goes through
7    AmerisourceBergen's order process but
8    it's shipped directly from the
9    manufacturer to the customer, correct?
10       A.   Actually, my understanding
11   of the direct ship is an order is placed
12   by the customer directly to the
13   manufacturer, AmerisourceBergen has no
14   visibility to the placement of that
15   order.
16           The order is then shipped
17   from the manufacturer directly to the
18   customer, and we have no visibility of
19   that process.
20           What we do have visibility
21   into is the financial transaction after
22   it's completed.  And our role in the
23   process is simply billing the
24   transaction.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

Page 20

1  quantities.
2      Q.   Right.  So that tells you
3  about the pharmacy's dispensing of all
4  products, irrespective of the distributor
5  from whom they obtained those products,
6  correct?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  That's
10     correct.
11 BY MR. PIFKO:
12     Q.   So by obtaining a
13 utilization report, AmerisourceBergen can
14 see all the activity for the period in
15 the report, regardless of who sold the
16 customer the product, correct?
17         MR. NICHOLAS:  Object to the
18     form.
19         THE WITNESS:  Utilization
20     reports would give us visibility
21     to all of the products that the
22     pharmacy provides sales data for.
23 BY MR. PIFKO:
24     Q.   And what do you mean all of

Page 19

Page 21

1  the products for the -- that the pharmacy
2  provides sales data for?
3      A.   Pharmacies have different
4  recordkeeping systems and -- that are
5  diverse.  And so if we ask for a
6  utilization report, we accept what the
7  pharmacy gives us as the utilization
8  report, that it accurately represents all
9  of what is being dispensed from the
10 pharmacy.
11     Q.   But when you make the
12 request, you request all of their
13 activity, you're not just requesting some
14 portion of it?
15         MR. NICHOLAS:  Object to the
16     form.
17         THE WITNESS:  When we make
18     the request, we request a
19     utilization report.
20 BY MR. PIFKO:
21     Q.   The pharmacy is obligated to
22 provide the utilization report to you
23 upon request?
24         MR. NICHOLAS:  Object to the

14 BY MR. PIFKO:
15     Q.   Have you heard of the term
16 "utilization report"?
17     A.   I have.
18     Q.   What's a utilization report?
19     A.   So a utilization report is a
20 report that we would request from a
21 pharmacy customer.  And that utilization
22 report would contain summary data from
23 the pharmacy about all of that pharmacy's
24 dispensing, in terms of products and



Page 22

1  form.
2      THE WITNESS:  The pharmacy
3  is not obligated.
4  BY MR. PIFKO:
5      Q.   They're not obligated?
6      A.   They're not.
7      Q.   Do you have a contractual
8  ability to require them to do so?
9      MR. NICHOLAS:  Object to the
10  form.
11      THE WITNESS:  I'm probably
12  not the best person to respond
13  relative to the contractual
14  relationships we establish with
15  our customers.
16  BY MR. PIFKO:
17      Q.   Do you have familiarity with
18  the company's practice of obtaining
19  utilization reports from pharmacy
20  customers?
21      A.   Yes.
22      Q.   Is that a normal part of
23  AmerisourceBergen's process, to obtain
24  those reports?

Page 23

1      A.   No.
2      Q.   What are occasions that give
3  rise to requesting a utilization report?
4      A.   So to clarify a little bit
5  on this, I think we may be talking about
6  a couple of different things here.
7      We request, when I say "we,"
8  the diversion control team, we request
9  dispensing data from the pharmacy as
10  opposed to utilization report, from time
11  to time as needed.
12      Dispensing data reveals
13  different information than what a
14  utilization report would reveal.  And
15  that's why we request dispensing data
16  reports versus utilization data reports.
17      Not to say that we've never
18  requested utilization reports, but if
19  we're involved in a due diligence
20  investigation of a customer, we would
21  request dispensing data reports.
22      MR. NICHOLAS:  Before we go
23  on, I just want to make clear for
24  the record that -- or confirm that

Page 24

1  we're talking about the period
2  from 2015 forward; is that
3  correct?
4      MR. PIFKO:  I'll get into
5  some dates.  I'm going to ask him.
6  BY MR. PIFKO:
7      Q.   What is --
8      MR. NICHOLAS:  I know.  But
9  I just want to make sure the
10  testimony --
11      MR. PIFKO:  The record is it
12  is.  You can't go back, he's
13  already answered the question.
14      MR. NICHOLAS:  It's unclear
15  and that's why I'm trying to
16  clarify.
17      MR. PIFKO:  Well, it is what
18  it is.  We can't fix it
19  retroactively.
20      MR. NICHOLAS:  Sure we can.
21      MR. PIFKO:  No, we can't.
22      MR. NICHOLAS:  You don't
23  want to.
24  BY MR. PIFKO:

Page 25

1      Q.   So what is a dispensing
2  report?
3      MR. NICHOLAS:  Objection.
4  Please clarify what period of time
5  we're going to be talking about as
6  we go forward.
7      THE WITNESS:  So a
8  dispensing report is a report
9  furnished by the pharmacy.  And we
10  ask for that report in a specific
11  format, which we provide to the
12  pharmacy.  And it gives us patient
13  de-identified data relative to all
14  of the dispensing that takes place
15  at the pharmacy of controlled
16  substances.
17      And, typically, we would
18  request that data for a period of
19  90 days.
20  BY MR. PIFKO:
21      Q.   You understand that you're
22  designated to be the company's
23  representative to testify about certain
24  topics today, correct?

Page 26

1    A.   I do.
2    Q.   And there's a time period
3  for which you're designated to provide
4  company testimony, correct?
5    A.   Yes.
6    Q.   And that's 2015 to what?
7    A.   The present.
8    Q.   Okay.  So with respect to
9  the time period for which you're
10 designated to provide company testimony,
11 can you tell me what the occasions are
12 where you would request a dispensing
13 report from a pharmacy customer?
14   A.   There may be three time
15 periods where we would request that, or
16 three situations.
17       The first would be, and most
18 importantly and, actually, most commonly,
19 is if we were involved in a due diligence
20 investigation of a pharmacy customer
21 where we saw certain red flags through
22 some of the analytics that we run.  It
23 may cause us to intervene with a customer
24 to mitigate those red flags.

Page 27

1        And during that process, we
2  may, during this process, if we feel it's
3  necessary, if we feel it would help to
4  mitigate the red flags, we may request
5  that dispensing data for that exercise.
6        Also during that period of
7  time, if a customer was being onboarded,
8  taking on a new customer, and if it's an
9  existing pharmacy that's switching
10 suppliers and that customer wanted to
11 furnish us with data that would allow us
12 to properly set the size of the customer
13 within our order monitoring program, they
14 can send us verifiable data.
15       Well, that verifiable data
16 could be previous consumption data from
17 their former supplier or it could be
18 dispensing data.  So that would be
19 another occasion where it would be
20 collected, generally speaking.
21       A third occasion would be
22 when we conduct a consumption review for
23 a customer.  So within the operation of
24 our order monitoring program, if a

Page 28

1  customer requests changes to established
2  parameters within the program, and if the
3  drug family that is the focus of that
4  consumption review is a Schedule II drug,
5  then we would ask that the customer
6  furnish, in addition to the request
7  itself, dispensing data for a period of
8  90 days.
9        Those would be the
10 situations.
11   Q.   I'm asking you this in your
12 individual capacity now.
13       You understand that you're
14 also called for a deposition today as an
15 individual as well as to provide
16 testimony for the company?  Do you
17 understand that?
18   A.   I do.
19   Q.   I'm asking you this specific
20 question as an individual.
21       Do you have knowledge as to
22 whether the company obtained -- I just
23 forgot the word that we're using -- the
24 dispensing reports, do you have knowledge

Page 29

1  as to whether the company obtained
2  dispensing reports prior to 2015?
3    A.   The company may have
4  collected dispensing reports.  To the
5  best of my recollection, I remember
6  instances of reviewing prior materials
7  where it may have been collected.
8    Q.   Do you know how far back the
9  company may have collected dispensing
10 reports?
11   A.   I can't say specifically.
12   Q.   When you joined the company,
13 you took it upon yourself to familiarize
14 yourself with certain past practices of
15 the company?
16   A.   I did.
17   Q.   I'm handing you now what was
18 marked yesterday as Exhibit Zimmerman-1.
19       It is a copy of the first
20 30(b)(6) notice in this case to
21 AmerisourceBergen.  Take a minute to
22 review that and let me know when you're
23 ready to discuss it.
24       I just have a couple of

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 simple questions, but take your time.
2        MR. NICHOLAS:  While he's
3    looking at the document, just to
4    clarify the record, Mr. May is
5    designated as a 30(b)(6) witness
6    to testify through May 29th of
7    2018.
8        THE WITNESS:  Okay.
9  BY MR. PIFKO:
10    Q.   Okay.  If you'd go to Page
11  6.  Tell me when you're there.
12    A.   Yes, I'm there.
13    Q.   It's got some letters, A,
14  and it continues on through the next
15  page, A through O.
16    A.   Yes.
17    Q.   Have you reviewed these
18  topics?
19    A.   I have.
20    Q.   When was the first time that
21  you saw these topics?
22    A.   They were presented to me by
23  counsel.
24    Q.   When was the first time?

Page 31

1    A.   Oh, when?  Three weeks ago,
2  possibly, approximately.
3    Q.   And do you understand that
4  you're designated to speak on all of
5  these topics from January 1st, 2015 to
6  May 29th, 2018?
7        MR. NICHOLAS:  We covered
8    yesterday that that's with the
9    exception of letter O.
10        THE WITNESS:  Yes.
11  BY MR. PIFKO:
12    Q.   With the exception of letter
13  O, you're not here to testify about that?
14        MR. NICHOLAS:  Well, we've
15    agreed that he's not here to
16    testify about that.
17        MR. PIFKO:  I'm asking the
18    witness.
19        MR. NICHOLAS:  Then I'll
20    object to the question.
21        THE WITNESS:  Well,
22    apparently there's an agreement,
23    so I won't be talking about O.
24  BY MR. PIFKO:

Page 32

1    Q.   Did you undertake any effort
2  to familiarize yourself with the topics
3  in O?
4    A.   I have not.
5    Q.   But you are prepared to talk
6  about A through N today, from the time
7  period from January 1st, 2015 to May
8  29th, 2018?
9    A.   I am.
10    Q.   You were a DEA employee for
11  some period of time, correct?
12    A.   Yes.
13    Q.   How long did you work for
14  the DEA?
15    A.   I started working for DEA
16  while I was in college, so over 30 years.
17    Q.   What -- when did you first
18  start?  What was the date when you first
19  started working for the DEA?
20    A.   It was approximately June of
21  1982, as a student intern.  And I started
22  my career as an agent in 1985, and was
23  employed as an agent until I retired in
24  2014.

Page 33

1    Q.   When you retired in 2014,
2  what was the position you held at the
3  DEA?
4    A.   I was the assistant special
5  agent in charge of the Atlanta field
6  division.
7    Q.   Was that the highest
8  position that you held when you were at
9  the DEA?
10    A.   I had an equivalent grade
11  but with a different title, assistant
12  regional director in Europe, Africa and
13  the Middle East.  I also had a temporary
14  grade at the same level while assigned to
15  DEA headquarters as an acting section
16  chief of our Europe and Middle Eastern
17  section.
18    Q.   When were you acting section
19  chief?
20    A.   It was during my assignment
21  to DEA headquarters.  So that would have
22  been upon my return from Paris.  I have
23  to sort the years out.
24        So '86 to '91, I was

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 assigned to the New York field division;
2 from '91 to '93, I was assigned to the
3 Marseilles resident office in France;
4 from '93 to '96, I was assigned to the
5 Paris country office. From 1996 to 1999,
6 I was assigned to DEA headquarters, that
7 was the acting section chief; from 1999
8 to 2002, I was handed a program, a
9 congressionally funded program, targeting
10 drug trafficking organizations across the
11 country. That ended in 2002, where I
12 became the head of the drug task force in
13 the city of Charlotte, North Carolina.
14 From that, I was assigned Rome, as
15 assistant regional director. And then
16 finally to Atlanta.
17     Q.    And after concluding your
18 employment with the DEA in 2014, you then
19 went to join AmerisourceBergen, correct?
20     A.    Correct.
21     Q.    And what was your title when
22 you joined AmerisourceBergen?
23     A.    Senior director of diversion
24 control.

Page 35

1     Q.    What's your title now?
2     A.    Vice president of diversion
3 control and security.
4     Q.    Did you have any positions
5 in between those two positions?
6     A.    I did not.
7     Q.    Were your job
8 responsibilities essentially the same in
9 those two positions?
10     A.    They are slightly different.
11     Q.    What are the differences?
12     A.    I assumed the security and
13 investigations profile in addition to the
14 diversion control profile within
15 corporate security and regulatory
16 affairs.
17     Q.    Based on your experience
18 with the DEA, does the DEA tell companies
19 it regulates whether their practices are
20 in compliance with the law?
21         MR. NICHOLAS:  Object to the
22     form.  Object to the scope.
23         THE WITNESS:  I have seen
24     statements by DEA where they

Page 36

1 specifically say that they will
2 not approve any specific programs
3 being run by regulators.
4 BY MR. PIFKO:
5     Q.    And what do you mean by
6 that?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  In terms of
10     the --
11         MR. NICHOLAS:  And to the
12     scope.
13         Go ahead.
14         THE WITNESS:  In terms of
15     the context to your question, I've
16     seen written documents by DEA,
17     including in their guidance
18     letters around the 2006, 2007 time
19     frame, where they say that they
20     will not approve specific systems
21     or programs that regulators have
22     in place.
23         That's my only context for
24     that question.

Page 37

1 BY MR. PIFKO:
2     Q.    You said that they won't
3 approve specific systems or programs that
4 regulators have in place.
5         Do you mean that the
6 regulated have in place?
7     A.    I do.
8     Q.    So what you're saying is the
9 DEA does not approve the specific system
10 or program that a company may implement
11 in connection with regulations that DEA
12 enforces, correct?
13         MR. NICHOLAS:  Object to the
14     form.  Object to the scope.
15     You're outside of the witness's
16     time frame here, by a lot.
17         THE WITNESS:  Again, the
18     only context I can put around this
19     is my review of documents from DEA
20     where -- and I will rely upon what
21     the document says, in terms of
22     what my understanding is, that
23     DEA -- DEA's position around this
24     issue.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

BY MR. PIFKO:

Q.   Okay.  And what is your understanding about what DEA's position is?

MR. NICHOLAS:  Object to the form.  Object to the scope.  Same objections.

THE WITNESS:  Again, I would rely upon the content of that written guidance specifically that DEA has in those documents that they released; it was either 2006 or 2007.  I believe it was actually a 2007 document, where they make a statement relative to their not approving specific programs of the regulated community.

BY MR. PIFKO:

Q.   In your experience as a DEA agent for -- how many years?

A.   Approximately 30.

Q.   -- for 30 years, did you ever tell a company, or somebody that was

Page 39

within your regulatory authority, that what they were doing was approved?

MR. NICHOLAS:  Object to the form.  Object to the scope.

THE WITNESS:  So the majority of my career, almost all of my career, was on the enforcement side of the agency.  And I had little to no interaction with the regulated community.

BY MR. PIFKO:

Q.   You were out there chasing drug dealers?

A.   I was out there investigating drug trafficking organizations, yes.

- - -

(Whereupon, AmerisourceBergen-May Exhibit-2, Masters Pharmaceutical Versus DEA Court Opinion, 861 F.3d 206, 2017 from the DC Circuit, was marked for identification.)

- - -

Page 40

BY MR. PIFKO:

Q.   I'm handing you what's marked as Exhibit-2.

MR. PIFKO:  He's going to hand it to you in just a second.

For the record, it's a copy of the Masters Pharmaceutical versus DEA court opinion, 861 F.3d 206, 2017, from the DC circuit.

BY MR. PIFKO:

Q.   It's got a couple paragraphs highlighted that we wanted to call your attention to.  But take a minute to review it.

Just, my first question would just be that, have you seen this opinion before?

MR. NICHOLAS:  Can I just -- what we're looking at on the screen is not the same as what's in front of him.

MR. PIFKO:  It should be.

MR. NICHOLAS:  It looks like a different document.

Page 41

MR. PIFKO:  Let's go off the record while we fix this.

VIDEO TECHNICIAN:  Going off the record.  9:33 a.m.

- - -

(Whereupon, a discussion off the record occurred.)

- - -

VIDEO TECHNICIAN:  We're back on record.  The time is 9:35 a.m.

BY MR. PIFKO:

Q.   Okay, Mr. May, we've resolved, and it appears that you have a complete copy of the Masters Pharmaceutical decision in front of you.

Please take a moment to review it and let me know when you're done.

My first question is just if you've seen this before?

A.   Yes, I've seen this before.

Q.   When was the first time you saw this?

Page 42

1    A.   I've seen it recently in
2  preparation for today.  And I may have
3  seen it at other times during the course
4  of my work, but I don't recall
5  specifically when that was.
6    Q.   Okay.  I'd like to direct
7  you to Page 7, if you use the very bottom
8  of the page.  There's a paragraph with a
9  bracketed 2 there.
10        Do you see that paragraph at
11 the bottom on the right?
12   A.   I do.
13   Q.   If you go a little bit down
14 it says -- there's a sentence that says,
15 The security requirement.
16        Do you see that part?
17   A.   I do.
18   Q.   I'm going to read that to
19 you.
20        The security requirement, in
21 quotes, at the heart of this case
22 mandates that distributors, quote, design
23 and operate a system to identify
24 suspicious orders of controlled

Page 43

1  substances and report those orders to DEA
2  (the reporting requirement) 21CFR Section
3  1301.74(b).
4        Do you see that?
5    A.   I do.
6    Q.   Do you understand that
7  AmerisourceBergen is bound by the
8  reporting requirement?
9        MR. NICHOLAS:  Object to the
10 form.
11       THE WITNESS:  So I
12 understand that AmerisourceBergen,
13 as a wholesale distributor,
14 registered as a wholesale
15 distributor, is bound by certain
16 provisions of The Controlled
17 Substances Act, as well as the
18 implementing regulations.
19       And so in terms of any
20 requirements imposed upon us, I
21 would refer to the CFR as well as
22 The Controlled Substance Act.
23 BY MR. PIFKO:
24   Q.   As the vice president of

Page 44

1  diversion control at the company, you're
2  responsible for the company's diversion
3  control efforts?
4    A.   I am.
5    Q.   Do you understand that
6  the -- in discharging your duties, that
7  the company is bound by the law as set
8  forth in this decision?
9        MR. NICHOLAS:  Object to the
10 form.
11       THE WITNESS:  I understand
12 in my role and my responsibility
13 is one to meet the requirements of
14 The Controlled Substances Act in
15 implementing regulations that are
16 relevant to the wholesale
17 distributor.  And I rely upon
18 those, as opposed to this
19 particular case.
20 BY MR. PIFKO:
21   Q.   But you took it upon
22 yourself, in connection with your role as
23 the head of the diversion control
24 division of the company, to familiarize

Page 45

1  yourself with this case when it came out?
2        MR. NICHOLAS:  Object to the
3  form.
4        THE WITNESS:  At one point I
5  reviewed this document, and more
6  recently I reviewed it again.
7        - - -
8        (Whereupon,
9  AmerisourceBergen-May Exhibit-3
10 ABDCMDL 00156582-84, was marked
11 for identification.)
12       - - -
13 BY MR. PIFKO:
14   Q.   I'm handing you what has
15 been marked as Exhibit-3.  Please take a
16 minute to look at this and let me know
17 when you're done.
18       For the record, it's some
19 e-mails dated August 2nd, 2017.  It's
20 Bates labeled ABDCMDL 00156582 through
21 84.
22   A.   Okay.
23   Q.   Are you familiar with this
24 document?

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1     A.   I am.
2     Q.   Is this a true and correct
3 copy of the discussion reflected in this
4 document?
5     A.   Yes, it is.
6     Q.   The first e-mail at the
7 bottom is dated July 13th -- sorry, to be
8 clear, so you know where I'm talking,
9 it's on the 156583. It's an e-mail from
10 you to Ruth Miller and Kristin Freitas,
11 dated July 13, 2017.
12      Do you see that?
13     A.   I do.
14     Q.   The subject of the -- the
15 substance. The e-mail is on the next
16 page, but do you see the header on the
17 page I just referenced?
18     A.   Yes.
19     Q.   Looking back to Exhbit-2,
20 the Masters decision, you see that on the
21 first page it was decided on June 30th,
22 2017.
23      Do you agree?
24     A.   I'm sorry. You just lost

Page 47

1 me.
2     Q.   Go back to Exhibit-2, the
3 decision.
4     A.   Yes. Thank you.
5     Q.   You see that it was
6 decided -- on the first page on the left,
7 it was decided June 30th, 2017. Agreed?
8     A.   I see that. Thank you.
9     Q.   And so you write to Ruth
10 Miller and Christine Freitas or Kristin
11 Freitas about two weeks later, agree?
12     A.   Yes.
13     Q.   And you say, Ruth, Kristin,
14 sorry I could not be on the RAC call
15 today, as I was traveling.
16      RAC is regulatory affairs
17 committee, correct?
18     A.   I'm not precisely certain
19 what it stands for.
20     Q.   That's a committee that you
21 serve on?
22     A.   I don't actually serve on
23 this committee.
24     Q.   It's an had committee?

Page 48

1     A.   I'm familiar with the term.
2 I just don't know precisely what -- the
3 initials.
4     Q.   But that's a committee
5 that's affiliated with the Healthcare
6 Distribution Alliance, correct?
7     A.   Yes, yes.
8     Q.   And you have some
9 involvement in interacting with the
10 Healthcare Distribution Alliance?
11     A.   I do.
12     Q.   Okay. Going back to this
13 e-mail, you say, I have been meaning to
14 reach out to you, as I am concerned with
15 some of the language and reasoning found
16 in the appellate court's recent decision
17 in the Masters case, particularly
18 surrounding suspicious orders.
19      Do you see that?
20     A.   I do.
21     Q.   What were your concerns
22 about the appellate court's recent
23 decision in the Masters case with respect
24 to suspicious orders?

Page 49

1     A.   To the best of my
2 recollection, without seeing any other
3 documents, other than what's in front of
4 me here, there was information that was
5 new information in the appellate court
6 decision.
7      There was some terminology
8 which I had never seen before in any of
9 the regulations or in The Controlled
10 Substance Act. And that caused me to be
11 concerned that there was this new
12 language that wasn't in the law or
13 regulation. And that was a general
14 description of my concern.
15     Q.   What language was that?
16     A.   There was language relative
17 to shipping requirement. And I had never
18 seen the term, in all of my work at ABC,
19 up until that point in my review of the
20 regulation and the law, anything about
21 shipping requirement.
22      So that would be just an
23 example. There may have been other
24 concerns that I had.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1   Q.   And it was your concern
2 because you had never seen the phrase
3 "shipping requirement"?
4        MR. NICHOLAS:  Object to the
5   form.  Asked and answered.
6        THE WITNESS:  My concern was
7   that I had never seen the term
8   "shipping requirement" in the
9   applicable regulations or the law.
10   And that its first appearance that
11   I recall seeing was in the
12   decision.
13 BY MR. PIFKO:
14   Q.   I'm going to hand you
15 another document that was marked
16 yesterday Exhibit-6.
17        For the record, it's a
18 series of letters from the Department of
19 Justice, DEA administration, which we
20 call the Dear Registrant letters.
21        Take a minute to review
22 those.
23        MR. NICHOLAS:  While he's
24 reviewing them, just so the record

Page 51

1   is clear, since you're about to
2   ask him about documents that
3   precede the period for which he is
4   designated to testify as a
5   30(b)(6) witness, he is now
6   testifying in his individual
7   capacity.
8        MR. PIFKO:  We have to make
9   that judgment based on the
10   question.  But your position is
11   noted.
12 BY MR. PIFKO:
13   Q.   Are you familiar with these
14 letters?
15   A.   I am.
16   Q.   If I call them the Dear
17 Registrant letters, is that a term that
18 you're familiar with?
19   A.   Yes.
20   Q.   Okay.  When was the first
21 time that you've seen these letters?
22   A.   I'm not precisely sure I
23 could provide you a date.  It's been some
24 time.

Page 52

1   Q.   Did you review these letters
2 upon joining AmerisourceBergen?
3   A.   Yes.
4   Q.   And that was part of your
5 effort to familiarize yourself with
6 activity governing the diversion control
7 department for which you were
8 responsible?
9        MR. NICHOLAS:  Object to the
10   form.
11        THE WITNESS:  Yes.
12 BY MR. PIFKO:
13   Q.   So there's four letters in
14 this packet.  I want to turn your
15 attention to the earliest of these
16 letters, dated September 27th, 2006.
17        For the record, that letter
18 covers ABDCMDL 00269691 through 694.
19        Tell me when you're there.
20   A.   I'm there, yes.
21   Q.   Are you familiar with this
22 letter?
23   A.   Yes.
24   Q.   Let's turn to the second

Page 53

1   page of this letter.
2        About two-thirds of the way
3   down it says, Thus, in addition to
4   reporting all suspicious orders, a
5   distributor has a statutory
6   responsibility to exercise due diligence
7   to avoid filling suspicious orders that
8   might be diverted into other than
9   legitimate medical, scientific and
10   industrial channels.
11        Do you see that?
12   A.   I do.
13   Q.   Failure to exercise such due
14 diligence could, as circumstances
15 warrant, provide a statutory basis for
16 revocation or suspension of a
17 distributor's registration.
18        Do you see that?
19        MR. NICHOLAS:  Is that a
20   question?
21        THE WITNESS:  I do see it,
22   yes.
23 BY MR. PIFKO:
24   Q.   Do you have an understanding

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 that that is saying, if you identify an
2 order as suspicious, you should not ship
3 it?
4        MR. NICHOLAS:  Object to the
5     form.  In addition to which the
6     witness is being asked about a
7     topic for which he has not been
8     designated as a 30(b)(6) deponent.
9        So I'll permit him to
10     answer, but he's only answering in
11     his individual capacity.
12        THE WITNESS:  Could you
13     repeat your question?
14 BY MR. PIFKO:
15    Q.   The sentence I just read --
16    A.   Yes.
17    Q.   -- my question is, do you
18 understand this to be saying that if you
19 identify an order as suspicious, you
20 cannot ship it?
21        MR. NICHOLAS:  Same
22     objection.
23        THE WITNESS:  So in current
24     state, under our program, if we

Page 55

1     identify an order as suspicious,
2     we don't ship.  It's rejected,
3     it's not shipped and it's reported
4     to DEA.
5 BY MR. PIFKO:
6    Q.   Okay.  I didn't ask you
7 about what your program was.  I'm asking
8 you about this letter right now.
9        And my question is, do you
10 understand this language here to be
11 saying that if an order is deemed to be
12 suspicious, it cannot be shipped?
13        MR. NICHOLAS:  Same
14     objection.
15        THE WITNESS:  And, again, I
16     view these letters not as I view
17     the law and the regulation.  It's
18     additional information that's
19     provided by DEA.
20        My understanding of the law
21     and regulation says that if we
22     identify an order as suspicious,
23     we should reject it and report it.
24     That's what we do at

Page 56

1     AmerisourceBergen.
2 BY MR. PIFKO:
3    Q.   And I just want to know if,
4 when you see this language, you
5 understand that that's what this language
6 is saying?  It's saying, if you identify
7 an order as suspicious, do not ship it.
8        MR. NICHOLAS:  Object to the
9     form.  Same objection.  Third time
10     you've asked it.
11        THE WITNESS:  The law and
12     the regulation requires us to
13     reject or report suspicious
14     orders.  They are, thereby, not
15     shipped.
16        If this says the same thing,
17     that -- and it agrees with the law
18     and the regulation, then I would
19     let the document stand on its own.
20 BY MR. PIFKO:
21    Q.   That's your understanding of
22 the document?
23        MR. NICHOLAS:  Object to the
24     form.  He's answered the question

Page 57

1     four times.
2        MR. PIFKO:  It's been asked.
3     It hasn't been answered.
4        MR. NICHOLAS:  No, it has
5     been answered.
6 BY MR. PIFKO:
7    Q.   I'm just trying to get --
8 sir, I'm just trying to get your
9 understanding of the document.  I
10 appreciate your explanation of the law.
11        I'm just trying to get --
12 when you read this sentence, do you agree
13 that that's what it says?  That's all I'm
14 asking you.
15        MR. NICHOLAS:  Object to the
16     form.  Object to the repeated
17     question, since he's answered it.
18        THE WITNESS:  And, again, my
19     response would be the same.
20        That I rely on the
21     regulation and the law in terms of
22     how we carry out our
23     responsibility relative to
24     suspicious orders.  And at

Page 58

1    AmerisourceBergen, when we
2    identify a suspicious order, it's
3    rejected and reported to DEA.
4    BY MR. PIFKO:
5        Q.   When you read this
6    sentence -- can you read this sentence to
7    me out loud, please?
8        A.   Sure.
9        Q.   I mean, that paragraph.
10       A.   Sure.
11           MR. NICHOLAS:  Can I have
12   the question repeated, please?
13   I'm sorry.
14           MR. PIFKO:  I just asked him
15   to read the paragraph aloud.
16           MR. NICHOLAS:  Okay.  You
17   want him to read it out loud.
18           Go ahead.
19           THE WITNESS:  Thus, in
20   addition to reporting all
21   suspicious orders, a distributor
22   has a statutory responsibility to
23   exercise due diligence to avoid
24   filling suspicious orders that

Page 59

1    might be diverted into other than
2    legitimate, medical, scientific
3    and industrial channels.  Failure
4    to exercise such due diligence
5    could, as circumstances warrant,
6    provide a statutory basis for
7    revocation or suspension of a
8    distributor's registration.
9    BY MR. PIFKO:
10       Q.   What does that mean to you?
11           MR. NICHOLAS:  Object to the
12   form.  Asked and answered five
13   times.  Outside the scope.
14           THE WITNESS:  Again, I
15   don't -- I don't think I'm the
16   right person to try to interpret
17   what the meaning is of this
18   sentence that was written by
19   somebody else.
20           And I would rely upon my
21   previous answer relative to
22   suspicious orders.
23   BY MR. PIFKO:
24       Q.   You're unable to tell me

Page 60

1    what this means?
2            MR. NICHOLAS:  Object to the
3    form.
4            THE WITNESS:  Again, in
5    terms of suspicious orders, my
6    understanding of the law and
7    regulation requires us to reject
8    them, cancel them, and report them
9    to DEA.
10   BY MR. PIFKO:
11       Q.   And that's what this is
12   saying here, correct?
13           MR. NICHOLAS:  Object to the
14   form.  The witness has answered
15   this a number of times.  Now
16   you're just trying to put words in
17   his mouth.  So I'll object.
18           THE WITNESS:  Again, I rely
19   on the law and the regulation
20   relative to suspicious orders.
21           MR. PIFKO:  The record will
22   reflect that the witness is
23   unwilling to answer my question.
24           MR. NICHOLAS:  Let the

Page 61

1    record reflect that the witness
2    has answered the question.  And
3    the commentary about it is totally
4    inappropriate.
5    BY MR. PIFKO:
6        Q.   Staying on this document, I
7    want to direct your attention to the
8    letter dated December 27th, 2007.  That's
9    ABDCMDL 00269685.
10           Are you there?
11       A.   Yes.
12       Q.   Second paragraph, at the
13   bottom, it says, Accordingly, DEA does
14   not approve or otherwise endorse any
15   specific system for reporting suspicious
16   orders.  Past communications with DEA,
17   whether implicit or explicit, that could
18   be construed as approval of a particular
19   system for reporting suspicious orders
20   should no longer be taken to mean that
21   DEA approves a specific system.
22           Do you see that?
23       A.   I do.
24       Q.   When I asked you earlier

Page 62

1 about DEA approving conduct by regulated
2 entities, is that what you were referring
3 to?
4     A.   Yes.
5     Q.   And that's consistent with
6 your understanding of the DEA's policy?
7          MR. NICHOLAS:  Object to the
8     form.  Outside the scope.  He's
9     testifying as an individual.
10         THE WITNESS:  Relative to it
11     being consistent with DEA policy,
12     I would have to say that I'm not
13     familiar with DEA's specific
14     written policy around this issue.
15         And I -- my context of my
16     response was strictly relative to
17     this particular statement.
18 BY MR. PIFKO:
19     Q.   When you joined
20 AmerisourceBergen and reviewed these
21 letters to familiarize yourself with
22 them, did you understand this to be DEA's
23 position concerning the activities of
24 preventing diversion?

Page 63

1          MR. NICHOLAS:  Object to the
2     form.  Outside the scope.
3          THE WITNESS:  I'm not sure I
4     understand your question.  If you
5     wouldn't mind repeating it, thank
6     you.
7 BY MR. PIFKO:
8     Q.   I'm just asking, basically,
9 when you came into the company in 2014 --
10 and you reviewed these letters, correct?
11     A.   Yes.
12     Q.   Okay.  And you saw this,
13 this provision, right?
14     A.   Yes.
15     Q.   And you understood, when you
16 joined the company, that this was the
17 DEA's position, correct?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  Again, I
21     familiarized myself with all of
22     these documents, including this
23     one statement.  And I would let
24     the statement speak for itself.

Page 64

1 BY MR. PIFKO:
2     Q.   But you understood it,
3 correct?
4          MR. NICHOLAS:  Object to the
5     form.
6          THE WITNESS:  I read all of
7     the documents.
8 BY MR. PIFKO:
9     Q.   Did you understand them?
10         MR. NICHOLAS:  Object to the
11     form.
12         THE WITNESS:  I'm not sure I
13     understand your question.
14         Did I understand the written
15     documents?
16 BY MR. PIFKO:
17     Q.   Yes.
18     A.   To the extent that I can
19 read the documents, yes, I can read the
20 documents.
21     Q.   And you understood them when
22 you read them?
23         MR. NICHOLAS:  Object to the
24     form.

Page 65

1          THE WITNESS:  I believe I
2     can read the documents, yes.
3 BY MR. PIFKO:
4     Q.   And when you read them, you
5 can understand them?
6     A.   I have a reading
7 compensation, I guess.
8          MR. NICHOLAS:  Hold on.
9     Object to the form.
10 BY MR. PIFKO:
11     Q.   You read them and understand
12 them, correct?  That's all I'm trying to
13 get -- you're saying "I read them."  But
14 I just want to be clear that -- reading
15 and understanding are different things.
16         So when you read them, you
17 understood what you read?
18         MR. NICHOLAS:  Object to the
19     form.
20         THE WITNESS:  So when I read
21     a document, for reading
22     comprehension, I understand the
23     document.  I guess that's why I
24     was a little confused.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

BY MR. PIFKO:

Q. No problem. It's part of the deposition process that we have to be clear about our words sometimes.

A. Sure. I appreciate it.

Q. So you had reading comprehension with respect to these documents? I just want to confirm that.

A. Correct. Yes. Thank you.

Q. Okay. Let's go back to Exhibit-3. I want to go to Page 156584.

Tell me when you're there.

A. I am there.

Q. You say, I have had discussions at my company and we think it would be a good idea to have a meeting with DEA to raise our concerns and get further clarification from them, particularly as it relates to reporting suspicious orders.

Do you see that?

A. I do.

Q. What did you mean by that?

A. Again, to the best of my

Page 67

recollection, and seeing no other documents, other than this particular e-mail chain -- and I would refer back to my prior response on a similar question, and that is, I was seeing language in the decision that I had not seen before in the regulation and the law.

And that's -- without being more specific than that, that was what my -- what I recall to be my general concern at that time.

Q. What did you want to get clarification from the DEA about?

MR. NICHOLAS: Objection. Asked and answered. Object to the form.

THE WITNESS: Again, just to repeat myself, where I saw that there were new language or different language than the regulation or the laws, I thought that having a meeting with DEA, we could address those issues.

BY MR. PIFKO:

Page 68

Q. What specifically did you want to address with the DEA?

MR. NICHOLAS: Objection. Asked and answered several times now.

THE WITNESS: Again, it was the shipping requirement statement, to my recollection at this point, that was what I was concerned with. There may have been other things that, looking at the -- just at this e-mail that -- that I could have had a concern with.

But at this time, looking at this, that was my major concern.

BY MR. PIFKO:

Q. So we have the opinion in front of you, Exhibit-2.

Can you direct me to the portion of the opinion that you're saying that you were concerned about?

MR. NICHOLAS: Well --

BY MR. PIFKO:

Page 69

Q. Take your time.

MR. NICHOLAS: -- I'll object to the form. But now he's going to have to read the entire opinion while we sit here.

Is that what you want him to do?

BY MR. PIFKO:

Q. Are you able to direct me to the portion of the opinion that you were concerned about?

A. I can flip through the document and try to find it, or I can read the whole document. I'm happy to flip through it to try to find the reference to shipping requirement.

Q. Well --

A. If I don't find it by flipping through it, I'll have to read the whole document.

Q. We had attempted to give you a highlighted version, but let's go back to Page 7.

A. I am on Page 7.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q.   Okay.  There's a section
2 there, The reporting requirement.
3        Do you see that?  We read
4 that?
5    A.   In Paragraph 2?
6    Q.   Yes.  On the bottom there.
7    A.   Yes.
8    Q.   Okay.  If you turn to the
9 next page, continuing through that
10 paragraph, it says, Once a distributor
11 has reported a suspicious order, it must
12 make one of two choices:  Decline to ship
13 the order, or conduct some due diligence.
14 And if it is able to determine that the
15 order is not likely to be diverted into
16 illegal channels, ship the order (the
17 shipping requirement).
18        Do you see that?
19    A.   Yes, I do.
20    Q.   Is this what you were
21 talking about?
22        MR. NICHOLAS:  Object to the
23 form.
24        Go ahead.

Page 71

1        THE WITNESS:  It is.
2 BY MR. PIFKO:
3    Q.   What, specifically, was your
4 concern with this language?
5        MR. NICHOLAS:  Object to the
6 form.  Asked and answered.
7        THE WITNESS:  It's
8 contradictory.  And it's
9 contradictory to my understanding
10 of what the regulation, the
11 regulations require.
12        As I stated, when
13 AmerisourceBergen determines,
14 after reviewing an order, that
15 it's suspicious, it's forever
16 rejected and it's reported to DEA.
17        So under our program, there
18 is no other choice.  If that order
19 is deemed suspicious, then it's
20 reported to the DEA and it's
21 rejected.
22        And, here, that -- there
23 seems to offer another alternative
24 where you can treat a suspicious

Page 72

1 order somehow differently.  And
2 that would be -- that was part of
3 my concern.
4 BY MR. PIFKO:
5    Q.   And in what way do you mean
6 you could "treat it differently"?
7        MR. NICHOLAS:  Object to the
8 form.
9        THE WITNESS:  It suggests
10 that you can determine an order
11 suspicious, I guess, and then
12 determine it's not suspicious and
13 ship it.
14        And, again, that's a
15 contradiction to what my
16 understanding of what the
17 regulation and the law requires.
18 BY MR. PIFKO:
19    Q.   Because it's your
20 understanding that once an order is
21 suspicious, it cannot be shipped,
22 correct?
23        MR. NICHOLAS:  Object to the
24 form.

Page 73

1        THE WITNESS:  Under ABC's
2 program, which is designed to meet
3 the requirements of the law and
4 the regulation, once we identify
5 an order as suspicious, it's
6 rejected and reported as
7 suspicious.
8 BY MR. PIFKO:
9    Q.   Let's go back to -- just to
10 be clear, does that summarize your
11 concerns that we were just talking about
12 when we were looking at the e-mail?
13        MR. NICHOLAS:  Object to the
14 form.  It mischaracterizes the
15 testimony as well.
16        THE WITNESS:  Again, in the
17 context of this one e-mail, with
18 no other context and based upon my
19 recollection of the e-mail events,
20 that's one of the concerns.
21        There may have been others
22 that I'm not recalling at this
23 time.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1     Q.  Understood.  Going back to
2 the e-mail, Exhibit-3, you say, I have
3 not yet approached my colleagues at
4 Cardinal or McKesson yet, but I am
5 confident we all share similar concerns.
6        Do you see that?
7     A.  I'll try to get to that.  Is
8 that on the first --
9     Q.  It's on the last page.
10     A.  Last page.  Okay, yes.  I
11 see that.
12     Q.  Did you discuss this issue
13 with people at Cardinal and McKesson?
14        MS. KVESELIS:  Objection.
15        THE WITNESS:  In the context
16     of this MDL, I've been provided
17     the opportunity to meet with my
18     colleagues at Cardinal and
19     McKesson where we discussed
20     general topics related to
21     diversion control.
22 BY MR. PIFKO:
23     Q.  Well, let's back up.  I'm
24 just talking about the time period of --

Page 75

1 specifically of this e-mail, not as a
2 general matter.
3       So my question is, you wrote
4 them -- you wrote this e-mail in July
5 13th, 2017 and you talk about approaching
6 colleagues at those two companies.  And
7 my question is more specific than that,
8 in that on or around that time did you
9 specifically reach out to anyone at
10 Cardinal or McKesson to discuss the
11 Masters decision?
12     A.  Not --
13        MS. KVESELIS:  Objection.
14        THE WITNESS:  Not to my
15     recollection, no.
16 BY MR. PIFKO:
17     Q.  At some point later did you
18 reach out to people at Cardinal and
19 McKesson to discuss this?
20        MR. NICHOLAS:  I'm going to
21     interpose, not just an objection
22     but an instruction not to respond
23     to this, to the extent it involves
24     the attorney-client privilege,

Page 76

1 meaning communications that
2 included attorneys or
3 communications that were -- and,
4 additionally, that may have been
5 communications that may have been
6 court sanctioned or court ordered.
7     So I will instruct you not
8 to answer to the extent -- to the
9 extent there were attorneys
10 involved, attorney communications
11 involved.
12     MS. KVESELIS:  Objection to
13 form.
14     MR. PIFKO:  You can only
15 have one objection for you guys,
16 so you're going to have to pick
17 who is making the objections.
18     MR. NICHOLAS:  It's mine.
19     MR. PIFKO:  Okay.
20     MS. KVESELIS:  You can
21 object on privilege grounds and
22 I'm objecting on form.
23     MR. PIFKO:  You can't.  You
24 can't.  Only one -- the protocol

Page 77

1 is clear, only one objection
2 stands.  Tell me which of your --
3 which objection stands.
4     MR. NICHOLAS:  Well, she's
5 counsel for another party.
6     MR. PIFKO:  It doesn't
7 matter.  The protocol is specific,
8 it says only one objection.  Pick
9 one.
10     MR. DAVISON:  That's not
11 correct.
12     MR. NICHOLAS:  I didn't
13 think that's what the protocol
14 said.  That's why I'm asking.  We
15 can look it up, though.
16     MR. PIFKO:  This isn't a big
17 deal.  Next time we take a break,
18 we'll get it clarified.
19     MR. NICHOLAS:  Well, if
20 you'd like, if it will make
21 everyone feel better, I will add
22 an objection to the form to my
23 objection.
24     MR. PIFKO:  Done.

Page 78

1      MR. NICHOLAS:  And scope.
2   BY MR. PIFKO:
3      Q.   Now that we've had all of
4   this discussion, let's get back to the
5   question.  And I'll ask it in a different
6   way so we can get clarity.
7          My question was, aside from
8   communications where counsel was present,
9   did you reach out to McKesson or Cardinal
10  to discuss the Masters decision?
11         MS. KVESELIS:  Objection to
12     form.
13         THE WITNESS:  I did not
14     reach out, to the best of my
15     recollection, to Cardinal or
16     McKesson.  In fact, this meeting
17     with DEA that was anticipated and
18     discussed never took place.
19  BY MR. PIFKO:
20     Q.   Let's go to the first page
21  of the e-mail, 156582.
22         Are you there?
23     A.   I am.
24     Q.   You say, I have reached out

Page 79

1   to McKesson and will do the same with
2   Cardinal and will get back to you when I
3   have their responses.
4          Do you see that?  Sorry, on
5   the top of the e-mail.
6      A.   Yes, I'm just trying to read
7   that specific e-mail.
8          Okay.  I see that.
9      Q.   It says, I have reached out
10  to McKesson -- we just read that, okay?
11     A.   Yes.
12     Q.   Who did you reach out to at
13  McKesson?
14         MS. KVESELIS:  Objection to
15     form.
16         THE WITNESS:  And, again, I
17     don't have a recollection of
18     specifically reaching out to
19     McKesson to set up any meeting.
20     And no meeting ever took place.
21  BY MR. PIFKO:
22     Q.   Understood.  But you say
23  here that you reached out to McKesson,
24  agree?

Page 80

1      A.   Yes, I agree.
2      Q.   Is there someone at McKesson
3   that you typically would -- your main
4   contact you would reach out to, if you
5   were going to call them?
6          MR. NICHOLAS:  Object to the
7      form.
8          THE WITNESS:  Again, I don't
9      have any recollection of reaching
10     out.  So I haven't -- I have --
11     don't know who that would have
12     been a reference to, if, in fact,
13     I reached out.
14  BY MR. PIFKO:
15     Q.   Do you interact with
16  McKesson in connection with the had?
17         MS. KVESELIS:  Objection to
18     form.
19         THE WITNESS:  There are
20     phone calls with the had that the
21     distributors participate in,
22     including myself.  And there are
23     other representatives from other
24     wholesalers, including McKesson

Page 81

1   and Cardinal.
2   BY MR. PIFKO:
3      Q.   Do you know any of the other
4   representatives from McKesson and
5   Cardinal who participate?
6          MS. KVESELIS:  Objection to
7      form.
8          THE WITNESS:  I do know some
9      individuals who I've met at
10     McKesson, but don't know
11     specifically who was on those
12     phone calls.  And it changes from
13     time to time.
14  BY MR. PIFKO:
15     Q.   Who have you met from
16  McKesson?
17         MS. KVESELIS:  Objection to
18     form.
19         THE WITNESS:  A couple of
20     individuals.  Gary Boggs being one
21     of them.
22  BY MR. PIFKO:
23     Q.   He's another DEA agent,
24  correct?  Former DEA agent?

Page 82

1  A.  He is.
2  Q.  Do you know him from working
at the DEA?
4  A.  Never met him before until
5  we both were working at these companies.
6  Q.  Anyone else from McKesson
7  that you've met?
8  MS. KVESELIS:  Objection to
9  form.
10  THE WITNESS:  During the
11  course of the last four and-a-half
12  years at the various had meetings,
13  I'm sure I've met other Cardinal,
14  McKesson representatives.
15  But I couldn't list all
16  their names, no.
17  BY MR. PIFKO:
18  Q.  Can you identify any
19  Cardinal representatives that you've met?
20  A.  I would respond the same
21  way.  I've met several over time and at
22  different meetings.  I don't have all
23  their names off the top of my head.
24  Q.  Okay.  You say in the same

Page 83

1  portion of the e-mail, I don't want to
2  wait too long to make the specific
3  request (and want it on the record, in
4  quotes, that we are seeking clarification
5  in this area).
6  Do you see that?
7  A.  I do.
8  Q.  Why did you want it on the
9  record that you were seeking
10  clarification in this area?
11  A.  I thought the subject was
12  important enough to be raised with the
13  DEA.  And so having it as documentation
14  because of its importance, I thought,
15  would be important.
16  Q.  You wanted it documented
17  because you wanted it clear that the
18  company was reaching out to seek
19  clarification?
20  MR. NICHOLAS:  Object to the
21  form.
22  THE WITNESS:  I wanted it to
23  be documented because I thought it
24  was an important matter.

Page 84

1  BY MR. PIFKO:
2  Q.  You mention Demetra Ashley
3  here.
4  Do you see that?
5  A.  I do.
6  Q.  Who is she?
7  A.  She was, at that time, I
8  believe, working as the acting deputy
9  administrator for diversion control.
10  Q.  Can you read the first
11  sentence of that first paragraph in your
12  3:11 p.m. e-mail aloud, please?
13  A.  So where it starts, I know
14  Demetra?
15  Q.  Exactly, yes.
16  A.  I know Demetra and, quite
17  frankly, I would prefer to wait until
18  Administrator Rosenberg names a
19  replacement for Millione to have the
20  meeting.
21  Q.  What did you mean by that?
22  A.  Having someone in an acting
23  capacity at DEA, they don't always have
24  the authority of the position itself.

Page 85

1  And I felt that it would be more
2  appropriate to talk to a
3  permanent-position employee that was
4  occupying that particular position as
5  opposed to somebody that maybe didn't
6  carry the full weight of the office.
7  MR. PIFKO:  With that, we
8  can take a break.
9  VIDEO TECHNICIAN:  Going off
10  the record.  10:19 a.m.
11  - - -
12  (Whereupon, a brief recess
13  was taken.)
14  - - -
15  VIDEO TECHNICIAN:  We're
16  back on the record.  The time is
17  10:40 a.m.
18  BY MR. PIFKO:
19  Q.  We didn't discuss this
20  before we started, but under the rules of
21  law governing this case, you are not
22  permitted to discuss the substance of
23  your deposition during breaks.
24  During the last break, did

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 you discuss the substance of your
2 deposition with counsel?
3     A.   No.
4     Q.   And we have an agreement
5 that you're not going to be doing that
6 going forward either?
7     A.   Yes.
8     Q.   Do you have an understanding
9 of the purpose --
10     MR. NICHOLAS:  Somebody is
11     not on mute on the phone, if you
12     guys could just mute your phone.
13     Thanks.
14 BY MR. PIFKO:
15     Q.   Let me restart that.
16     You understand that
17 AmerisourceBergen is a registrant under
18 The Controlled Substances Act, correct?
19     A.   Yes.
20     Q.   And you understand that, as
21 a registrant, AmerisourceBergen has a
22 duty to prevent -- to maintain effective
23 controls to prevent diversion, correct?
24     MR. NICHOLAS:  Object to the

Page 87

1     form.
2     THE WITNESS:  Yes.
3 BY MR. PIFKO:
4     Q.   Do you understand why the
5 law wants you to maintain effective
6 controls to prevent diversion?
7     MR. NICHOLAS:  Object to the
8     form.  Outside the scope.
9     I assume you're asking him
10     this question as an individual at
11     this point, in any event.  But I
12     object to the form of the
13     question.
14     THE WITNESS:  Could you
15     repeat your question, please?
16 BY MR. PIFKO:
17     Q.   What's diversion?
18     MR. NICHOLAS:  Object to the
19     form.
20     THE WITNESS:  Diversion in
21     the context of the pharmaceutical
22     industry?
23 BY MR. PIFKO:
24     Q.   Yes.

Page 88

1     A.   There are a couple different
2 types of diversion.
3     We're not talking about
4 contract diversion here, we're talking
5 about diversion of controlled substances?
6     Q.   Correct.
7     A.   Really, in a very general
8 description, I would say that diversion
9 takes place any time the legitimate
10 intended -- the legitimate intended
11 prescribing and use of a controlled
12 substance is not met, that somehow the
13 controlled substance is not used for the
14 legitimate medical purposes for what it
15 is intended, in a very general way.
16     Q.   Do you understand the
17 concept, under The Controlled Substances
18 Act, of the closed system of
19 distribution?
20     A.   I do.
21     Q.   What is your understanding
22 of that?
23     A.   With the passage of the
24 Controlled Substance Act, there was the

Page 89

1 design of a closed system of distribution
2 of controlled substances.  And the system
3 would be closed effectively by requiring
4 anybody within that system to have a DEA
5 registration; so whether you're a
6 manufacturer, a distributor,
7 practitioner, pharmacist.
8     The goal of -- the goal of
9 the closed system is to create this body
10 of registered entities that, by getting
11 that registration, would give you the
12 authority and permission to carry out
13 whatever that function was that you had
14 within that registrant community.
15     Q.   And you understand that
16 along with authority to carry out that
17 function, you also have certain legal and
18 regulatory obligations that you must
19 comply with, correct?
20     MR. NICHOLAS:  Object to the
21     form.
22     THE WITNESS:  That
23     AmerisourceBergen has, as a
24     registrant, wholesale distributor,

Page 90

1  has certain requirements imposed
2  upon it, yes.
3  BY MR. PIFKO:
4      Q.  As a result of being a
5  registrant?
6      A.  Yes.
7      Q.  And one of those
8  requirements is to maintain effective
9  controls to prevent diversion, correct?
10      MR. NICHOLAS:  Object to the
11  form.
12      THE WITNESS:  Yes.
13  BY MR. PIFKO:
14      Q.  Let's just -- are you
15  familiar with the scheduling of
16  prescription drugs or drugs in general,
17  substances?
18      MR. NICHOLAS:  Object to the
19  form.  Outside the scope.
20      THE WITNESS:  Referring to
21  the DEA scheduling?
22  BY MR. PIFKO:
23      Q.  Yes.
24      A.  Yes.  I'm generally familiar

Page 91

1  with it.
2      Q.  Do you know what -- a
3  substance that's classified as a Schedule
4  II, what's that mean?
5      MR. NICHOLAS:  Same
6  objection.
7      THE WITNESS:  Generally,
8  looking at the scheduling of
9  controlled substances, generally
10  speaking, the design of the
11  schedule takes into effect -- or
12  takes into consideration whether a
13  product has some medical value and
14  it takes in the potential of abuse
15  of a product.
16      And so moving from the lower
17  schedule to a higher schedule, you
18  would generally see a higher abuse
19  potential of the products within
20  those different schedules.  And,
21  conversely, you would see less
22  medical use and more medical use
23  as you increase in schedules.
24      That's a general

Page 92

1  description.
2  BY MR. PIFKO:
3      Q.  Do you understand a Schedule
4  I substance has -- the U.S. government
5  has said it has no legitimate medical
6  purpose?  Do you understand that?
7      MR. NICHOLAS:  Objection.
8  Outside the scope.
9      THE WITNESS:  I'm familiar
10  with some of the substances within
11  Schedule I that are illegal drugs.
12  BY MR. PIFKO:
13      Q.  Well, let's focus on
14  Schedule II substances.
15      Do you understand that the
16  litigation for which we're here today
17  concerns opioid products?
18      A.  Yes.
19      Q.  Can you tell me what an
20  opioid product is?
21      A.  Again, there is -- there are
22  opioids and there are opiates.  There
23  tends to be some confusion.  I think most
24  people today generally refer to opioids.

Page 93

1      Opiates would be those
2  products that have the natural derivative
3  coming from a natural plant, whereas
4  opioids would have a synthetic creation
5  and resemble the natural ingredient.
6      And so talking about
7  opioids, you would be talking about
8  oxycodone, for example.  And talking
9  about opiates, you would be talking about
10  opium.  But there's been some mixing of
11  some of this terminology.
12      Q.  An opiate is derived from
13  the poppy plant, correct?
14      A.  Yes.
15      Q.  You mentioned hydrocodone --
16  I mean, you mentioned oxycodone as an
17  opioid, correct?
18      A.  Yes.
19      Q.  What about hydrocodone, do
20  you know what that is?
21      A.  Opioid, yes.
22      Q.  Are there any other opioid
23  products you can identify?
24      A.  Fentanyl would be an opioid

Page 94

1 product. And there's a pretty long list.
2 And to be clear, I'm not a pharmacist.
3     Q.   Understood.
4     A.   I want to make sure that's
5 clear for the record.
6     Q.   Do you understand that those
7 substances are Schedule II substances?
8     A.   Yes.
9     Q.   And do you understand --
10     A.   I'm sorry, just for the
11 record.
12         Oxycodone and hydrocodone?
13     Q.   Yes.
14     A.   Yes.
15     Q.   And fentanyl?
16     A.   Yes.
17         MR. NICHOLAS:  What time
18     period are we talking about?
19         THE WITNESS:  Again, there
20     was a rescheduling of hydrocodone
21     where it was relatively recently
22     put in II, Schedule II.
23 BY MR. PIFKO:
24     Q.   In 2014 it moved from

Page 95

1 Schedule III to Schedule II, correct?
2     A.   Yes, sir.
3     Q.   You understand that a
4 product that is a Schedule II substance
5 has been deemed, under the laws, to have
6 a high potential for abuse, correct?
7         MR. NICHOLAS:  Object to the
8     form.
9         THE WITNESS:  Yes, generally
10     speaking.
11 BY MR. PIFKO:
12     Q.   So when we talk about
13 preventing diversion, why do we want to
14 prevent Schedule II products from being
15 diverted?
16         MR. NICHOLAS:  Object to the
17     form. Object to the scope.
18         THE WITNESS:  I'm not sure I
19     understand the question.
20 BY MR. PIFKO:
21     Q.   It's your job at
22 AmerisourceBergen to run its efforts to
23 prevent diversion, correct?
24     A.   Correct. It's to oversee

Page 96

1 our diversion control program, yes.
2     Q.   Okay. And beyond complying
3 with the legal requirements, do you
4 understand why you want to prevent
5 Schedule II substances from getting into
6 illegitimate hands?
7         MR. NICHOLAS:  Object to the
8     form. Object to the scope.
9         THE WITNESS:  I'm still not
10     sure I understand the question.
11 BY MR. PIFKO:
12     Q.   You testified earlier that
13 the idea of preventing diversion is to
14 prevent products from getting into
15 illegitimate medical use, correct?
16         MR. NICHOLAS:  Object to the
17     form. Object to the scope.
18         THE WITNESS:  In part, yes.
19 BY MR. PIFKO:
20     Q.   And what I'm trying to
21 understand is if you have an
22 understanding as to why we want to do
23 that.
24         MR. NICHOLAS:  Object to the

Page 97

1     form. Object to the scope.
2         THE WITNESS:  Again, as
3     you've stated, as a registrant, we
4     have certain requirements imposed
5     upon us. And I oversee the
6     programs at ABC that we utilize to
7     adhere to those requirements.
8         In terms of why do we want
9     to prevent diversion, I can offer
10     my individual view. But, again,
11     that would be not responding to
12     your -- not being responsive as
13     the company representative.
14 BY MR. PIFKO:
15     Q.   I'd like you to give me your
16 view, however we're going to hear it.
17         MR. NICHOLAS:  Object to the
18     form. Object to the scope.
19         Go ahead.
20         THE WITNESS:  So, again,
21     with that caveat in mind that I
22     mentioned, we have anti-diversion
23     programs in place to prevent the
24     misuse and abuse of controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  substances.
2  BY MR. PIFKO:
3      Q.   So if we are not effective
4  in preventing diversion, we can have
5  misuse of controlled substances, agree?
6          MR. NICHOLAS:  Object to the
7      form.  Object to the scope.
8          THE WITNESS:  So, again,
9      here there is conjecture in your
10     question about if we -- I'm not
11     sure who the "we" is, but
12     AmerisourceBergen has effective
13     controls in place to prevent
14     diversion.
15         So I guess that would be my
16     response.
17 BY MR. PIFKO:
18     Q.   Maybe it was a bad question
19 by me using the term "we," so I'll ask it
20 again in a different way.
21     A.   Sure.
22     Q.   And maybe we can work
23 through that.
24         If any registrant, not

Page 99

1  speaking about any specific one, who has
2  a duty to maintain effective controls to
3  prevent diversion, does not maintain
4  effective controls to prevent diversion,
5  we can have drug abuse, correct?
6          MR. NICHOLAS:  Object to the
7      form.  Object to the scope.
8          THE WITNESS:  So two things.
9      Again, if -- starting your
10     question having some conjecture
11     there, I really can't respond to
12     conjecture.  And also would not
13     respond to other registrants'
14     duties and requirements.  I'll
15     respond to ABC's.
16         And, again, my response
17     would be that we have effective
18     controls in place to prevent
19     diversion.
20 BY MR. PIFKO:
21     Q.   Let me ask you this way:  If
22 AmerisourceBergen did not have effective
23 controls to prevent diversion, do you
24 believe that drug abuse could occur as a

Page 100

1  result?
2          MR. NICHOLAS:  Object to the
3      form.  Object to the scope.  Asked
4      and answered.
5          THE WITNESS:  Again, the
6      conjecture there, I can't respond
7      to a situation where there's not a
8      factual bases.
9          So I'll just rely upon my
10     previous response that
11     AmerisourceBergen has effective
12     controls in place to prevent
13     diversion.
14 BY MR. PIFKO:
15     Q.   In carrying out your efforts
16 to prevent diversion, are you trying to
17 prevent drug abuse?
18         MR. NICHOLAS:  Object to the
19     form.  Object to the scope.
20         He's here to answer factual
21     questions today.
22         THE WITNESS:  So on the
23     first part, we have effective
24     controls in place to prevent

Page 101

1  diversion.
2          On the second part of that
3      question, I believe I provided my
4      view relative to drug abuse.
5  BY MR. PIFKO:
6      Q.   Forgive me, but I don't
7  understand.
8          So I'm just asking you --
9  when you say you provided your view, I
10 don't understand the answer yet.  So I
11 just would like you to express it again.
12         MR. NICHOLAS:  Well,
13     obviously, in the form of that
14     question it's clear that it's been
15     asked and answered.  Object to the
16     form.  Object to the scope.  Asked
17     and answered.
18         THE WITNESS:  Maybe we can
19     go back to the question, and we'll
20     start again.
21 BY MR. PIFKO:
22     Q.   Of course.  I'll try to ask
23 it a different way.
24         Do you believe there's a

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 linkage between drug abuse and
2 maintaining controls to prevent
3 diversion?
4         MR. NICHOLAS:  Object to the
5 form.  Object to the scope.
6         THE WITNESS:  And, again,
7     the question would call for my
8     personal opinion.
9         And to that, I would only
10     say that I oversee programs at ABC
11     that are effective in terms of
12     preventing diversion.
13 BY MR. PIFKO:
14     Q.   That's not my question.  And
15 I understand that you're trying to speak
16 to an issue.  But you really need to
17 answer the question.
18         And my question is if you
19 believe there's a linkage between drug
20 abuse and maintaining controls to prevent
21 diversion?
22         I don't want an answer about
23 what the policies are or procedures are,
24 that's not what I'm asking.  I'm simply

Page 103

1 asking if you believe there's a linkage
2 between drug abuse and maintaining
3 effective controls to prevent diversion.
4         MR. NICHOLAS:  Hold on.
5 BY MR. PIFKO:
6     Q.   Do you understand the
7 question?
8         MR. NICHOLAS:  Hold on.
9     I'll object to the form.  I'll
10     object to the scope.  The question
11     has been asked a number of times.
12         He's not a social scientist.
13     He's not an epidemiologist.
14         THE WITNESS:  So I'd go back
15     to my response, and that is that
16     when it comes to our requirements
17     at ABC to have effective controls
18     in place to prevent diversion, we
19     meet those requirements.
20 BY MR. PIFKO:
21     Q.   The record is clear that
22 you're not giving an answer to the
23 question.  I didn't ask you if you meet
24 the requirements or anything about

Page 104

1 AmerisourceBergen's procedures in this
2 question.
3         I'm simply asking if you
4 understand that there's a linkage between
5 effective controls to prevent diversion
6 and drug abuse?
7         MR. NICHOLAS:  Same
8     objection.  All of my same
9     objections.
10         THE WITNESS:  And I would
11     rely upon my previous response.
12 BY MR. PIFKO:
13     Q.   Your previous response is
14 insufficient.  You have not answered the
15 question.
16         Sir, do you understand that
17 you are legally obligated to answer my
18 questions, unless he instructs you not to
19 answer; and he has to have a valid basis.
20 You need to answer my questions.  You
21 cannot refuse to answer the questions,
22 okay?  Do you understand that?
23         MR. NICHOLAS:  He's not
24     refusing to answer the questions.

Page 105

1         MR. PIFKO:  He is.
2         MR. NICHOLAS:  He's
3     answering the questions.
4         MR. PIFKO:  No.  In
5     giving --
6         MR. NICHOLAS:  He's
7     answering the question.
8         MR. PIFKO:   In giving
9     evasive answers --
10         MR. NICHOLAS:  You can't --
11         MR. PIFKO:  -- and speaking
12     about something that's not
13     responsive to my question is not
14     answering.  It's not cooperative.
15     And we will address it.
16 BY MR. PIFKO:
17     Q.   You're a man of the law, I
18 don't need to explain that to you.  You
19 understand.
20         We need your cooperation.
21 This is a serious matter.  You need to
22 answer the question, okay?
23         MR. NICHOLAS:  Hold on.
24 BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   And if I ask you a question
2  that's a yes-or-no question, you can't go
3  and start meandering about the policies
4  and procedures, okay?  You need to think
5  about what I'm asking and you need to
6  answer it.
7         Do you understand?
8         MR. NICHOLAS:  That's a
9     lecture.  He doesn't need a
10    lecture.  It's inappropriate.
11 BY MR. PIFKO:
12    Q.   Do you understand what I'm
13 telling you, sir?
14        MR. NICHOLAS:  And you can't
15    talk over me.
16        MR. PIFKO:  I can.  You're
17    not objecting.
18        MR. NICHOLAS:  Then you'll
19    keep talking and I'll keep
20    talking.  You're talking over me.
21    You're lecturing him, you're
22    bullying him and harassing.
23        MR. PIFKO:  Because he's not
24    cooperating.

Page 107

1         MR. NICHOLAS:  I'm not
2  instructing him not to answer.
3         MR. PIFKO:  He's not
4  complying with the rules.
5         MR. NICHOLAS:  He's answered
6  the question about eight times.
7         MR. PIFKO:  He's not.
8  And --
9         MR. NICHOLAS:  As you said
10 in the Merrill --
11        MR. PIFKO:  -- the record is
12 clear.
13        MR. NICHOLAS:  As you said
14 in the Merrill Gordon deposition,
15 he's entitled to answer the
16 deposition.  Your witness is
17 entitled --
18        MR. PIFKO:  You can do your
19 lawyering all you want, but he's
20 not cooperating.
21        MR. NICHOLAS:  I disagree.
22        MR. PIFKO:  Okay.
23 BY MR. PIFKO:
24    Q.   Sir, do you understand what

Page 108

1  I just said to you about the instructions
2  about complying about this deposition?
3     A.   Yes.
4     Q.   Do you intend to comply?
5     A.   I have been complying.
6     Q.   I disagree with you,
7  respectfully.  I am asking you very
8  specific questions, and you are not
9  responding to my questions.
10        Do you intend to provide
11 accurate questions -- or answers that
12 respond to exactly what I ask you?
13        MR. NICHOLAS:  Object to the
14    form.
15        THE WITNESS:  I intend to
16    answer your questions accurately,
17    yes.
18 BY MR. PIFKO:
19    Q.   Do you intend to respond to
20 the questions that I ask you?
21        MR. NICHOLAS:  Object to the
22    form.
23        THE WITNESS:  Yes.
24 BY MR. PIFKO:

Page 109

1    Q.   If I ask you what your
2  favorite color is, I don't want to hear
3  what you had for dinner.
4         Do you understand that?
5         MR. NICHOLAS:  Object to the
6     form.  Pretty obnoxious.  No need
7     for that kind of thing.
8         Right?
9  BY MR. PIFKO:
10    Q.   Do you understand that?
11        MR. NICHOLAS:  Object to the
12    form.
13        THE WITNESS:  Yes.
14 BY MR. PIFKO:
15    Q.   So let's try this again.
16        Do you understand there to
17 be a linkage between preventing diversion
18 and drug abuse?
19        MR. NICHOLAS:  Object to the
20    form.  All the same objections.
21        THE WITNESS:  Again, the
22    question has been asked several
23    times and the question concerns
24    having effective controls.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    And I've responded several
2 times relative to the issue of
3 effective controls that we have in
4 place at ABC to prevent diversion.
5    I would rely upon that
6 response again.
7 BY MR. PIFKO:
8    Q.   That's not the question I've
9 asked you.  You're not answering.  You're
10 not cooperating, okay?
11    I'm going to bring you back
12 here, we're going to go all day here, and
13 I'm going to ask you all the questions I
14 want to ask you.  And we're going to have
15 to bring you back here, and we're going
16 to have to get some more answers because
17 you're not cooperating, okay?  I want you
18 to understand that.
19    MR. NICHOLAS:  Object to the
20 form.  Object to the speech.
21    What he's saying isn't true.
22    Go on.
23 BY MR. PIFKO:
24    Q.   If AmerisourceBergen does

Page 111

1 not maintain effective controls to
2 prevent diversion, do you believe that
3 drug abuse can occur?
4    MR. NICHOLAS:  Object to the
5 form.  Outside the scope.
6    THE WITNESS:  Again, you've
7 asked me this question in several
8 different formats and, again,
9 you're asking with this conjecture
10 if we didn't have them in place.
11    And my only response to that
12 is, we have them in place,
13 effective controls, to prevent
14 diversion.  And so I can't respond
15 to a question relative to
16 conjecture.
17 BY MR. PIFKO:
18    Q.   If you fail to prevent
19 diversion, do you believe that drugs can
20 get into illegitimate channels?
21    MR. NICHOLAS:  Object to the
22 form.
23    THE WITNESS:  I've responded
24 to the question.

Page 112

1 BY MR. PIFKO:
2    Q.   You haven't.  Please answer.
3    MR. NICHOLAS:  Object to the
4 form.
5    THE WITNESS:  If we fail to
6 have effective controls in place,
7 is a question that doesn't state
8 facts.  It states conjecture.
9    And I can't respond relative
10 to conjecture.  I can respond
11 relative to the facts of the
12 matter around effective controls.
13 We have effective controls in
14 place to prevent diversion --
15 BY MR. PIFKO:
16    Q.   In joining --
17    A.   -- at ABC.
18    Q.   In joining AmerisourceBergen
19 in 2014, did you review the company's
20 prior practices and procedures regarding
21 diversion?
22    A.   Yes.
23    Q.   How far back did you
24 familiarize yourself with the company's

Page 113

1 practices and procedures concerning
2 diversion?
3    A.   I don't know that I can
4 assign a specific year.  I would say
5 looking back several years, more than two
6 or three.
7    Q.   Are you familiar with the
8 company's practices and procedures prior
9 to 2007?
10    MR. NICHOLAS:  Object to the
11 scope.  This is way outside the
12 scope of his 30(b)(6) domain.
13    THE WITNESS:  I may have
14 some limited knowledge relative to
15 the practices prior to 2007.
16 BY MR. PIFKO:
17    Q.   You testified as the
18 corporate representative in litigation
19 brought by the West Virginia Attorney
20 General on behalf of AmerisourceBergen,
21 correct?
22    A.   Yes.
23    Q.   And you testified about the
24 company's policies and procedures,

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  correct? Concerning diversion?
2      A.   Yes.
3      Q.   How far back were you
4  familiar with the company's policies in
5  connection with your testimony in that
6  case?
7          MR. NICHOLAS:  Object to the
8      form.
9          THE WITNESS:  To my
10     recollection, the stated time
11     period was some time in 2007, if I
12     recall correctly.
13 BY MR. PIFKO:
14     Q.   So you have some
15 familiarity, from testifying in that
16 litigation, with the company's practices
17 going back to 2007?
18         MR. NICHOLAS:  Object to
19     the form. Object to the form.
20     Object to the scope. He's now
21     testifying individually.
22         THE WITNESS:  Yes.
23 BY MR. PIFKO:
24     Q.   Do you believe that, in

Page 115

1  2007, AmerisourceBergen's policies and
2  procedures for preventing diversion were
3  appropriate?
4          MR. NICHOLAS:  Object to the
5      form. Object to the scope.
6          THE WITNESS:  Yes.
7  BY MR. PIFKO:
8      Q.   Has anyone ever told you
9  that you have problems with your
10 diversion control program?
11         MR. NICHOLAS:  Object to the
12     form. And scope.
13         THE WITNESS:  I would say it
14     would be helpful to narrow the
15     question, because anyone is --
16     that's quite broad. And I would
17     say in the broad context, the
18     answer would be no.
19 BY MR. PIFKO:
20     Q.   No one has ever told you
21 that AmerisourceBergen's program has gaps
22 with respect to maintaining effective
23 controls against diversion?
24         MR. NICHOLAS:  Object to the

Page 116

1      form. Object to the scope.
2          THE WITNESS:  Again, I'd
3      have to ask you to qualify it
4      more, because that's quite broad
5      of a question.
6          So perhaps it would be -- I
7      could be more responsive if the
8      question was narrowed down some.
9              - - -
10         (Whereupon,
11     AmerisourceBergen-May Exhibit-4,
12     ABDCMDL 00274105-118, was marked
13     for identification.)
14             - - -
15 BY MR. PIFKO:
16     Q.   I'm handing you what is
17 marked as Exhibit-4.
18         For the record, this is a
19 report. The metadata reflects that it's
20 dated August 28th, 2015. It's entitled,
21 FTI Consulting, Inc., Health Solutions
22 Practice. It's Bates labeled ABDCMDL
23 00274105 through 118.
24         Take a moment to review this

Page 117

1  and let me know when you're ready to
2  discuss it.
3      A.   Okay.
4      Q.   Have you seen this document
5  before?
6      A.   I have.
7      Q.   When was the last time you
8  saw this document?
9      A.   In the last couple of weeks.
10     Q.   This is something you
11 reviewed in preparing for your
12 deposition?
13     A.   Yes.
14     Q.   When was the first time you
15 saw this document?
16     A.   I saw this document, or
17 portions of the document, back when it
18 was being produced.
19     Q.   And as I told you, the
20 electronic data that came with the
21 production reflects that its date is
22 August 28th, 2015.
23         Does that sound familiar
24 with when it would have been produced?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.   Yes.
2    Q.   And you recall receiving it
3  on or around that time?
4    A.   Yes.
5    Q.   Can you tell me what this
6  document is?
7    A.   This document is a summary
8  report that was provided by FTI
9  Consulting, an outside contract
10 consultant, who did a review of various
11 program areas at CSRA.
12   Q.   And one of the program areas
13 was the diversion control team, correct?
14   A.   Correct.
15   Q.   That's the team that you
16 head up, correct?
17   A.   Yes.
18   Q.   And you headed that team up
19 at the time this report was commissioned,
20 correct?
21   A.   Correct.
22   Q.   Did you have any involvement
23 in commissioning this report?
24   A.   No.

Page 119

1    Q.   Do you know who did
2  commission this report?
3    A.   It would have been Chris
4  Zimmerman and -- possibly in concert with
5  legal.
6    Q.   Did you discuss the
7  commissioning of this report with Mr.
8  Zimmerman?
9    A.   I don't recall.
10   Q.   Do you have an understanding
11 about why this report was commissioned?
12   A.   At this time, I don't have a
13 specific recollection as to why it was
14 commissioned.
15   Q.   Did anyone ever tell you
16 they were concerned about the diversion
17 control team's ability to comply with
18 their responsibilities --
19       MR. NICHOLAS:  Object to the
20 form.
21 BY MR. PIFKO:
22   Q.   -- and that's why -- and
23 that's why this report was commissioned.
24       MR. NICHOLAS:  Same

Page 120

1  objection.
2        THE WITNESS:  So, again, for
3  the first part of that, did anyone
4  in the universe indicate any
5  concerns?  It's really broad.
6  Perhaps you could narrow that down
7  for me.
8  BY MR. PIFKO:
9    Q.   Fair enough.  Maybe that was
10 a bad question.
11       I'm just trying to
12 understand if anyone ever told you that
13 they wanted to have a consultant come in
14 and review the diversion control team's
15 practices and procedures because they
16 were concerned about its functioning.
17       MR. NICHOLAS:  Object to the
18 form.  And I think it
19 mischaracterizes prior testimony.
20       But go ahead.
21       THE WITNESS:  In the context
22 of this report and what I have in
23 front of me, and at the time that
24 this report was compiled, we were

Page 121

1  engaged with FTI specifically
2  regarding some work around the
3  order monitoring program.
4        But in terms of this
5  particular effort, I don't have
6  any specific recollection of the
7  motivation of compiling this
8  report.
9  BY MR. PIFKO:
10   Q.   What's your understanding of
11 what FTI's engagement was with respect to
12 the order monitoring program at this
13 time?
14       MR. NICHOLAS:  Hold on.  Let
15 me object, just to interpose an
16 instruction not to answer -- I'm
17 permitting him to answer questions
18 about this document.
19       I'm not going to permit him
20 to answer questions with regard to
21 any aspects of work with FTI that
22 may have involved attorney
23 direction or the attorney-client
24 privilege.

Page 122

1    So I'm not saying you can't
2 talk to him about this document,
3 but I think that question, I have
4 to instruct him not to answer.
5    MR. PIFKO:  Just for clarity
6 of the record, you're asserting
7 privilege over FTI's work with the
8 order monitoring program that he
9 just referred to?
10    MR. NICHOLAS:  I'm asserting
11 privilege over -- to the extent
12 that there's work done involving
13 FTI that involved the
14 attorney-client privilege,
15 attorney supervision, attorney
16 involvement.
17    So I think you should just
18 ask your questions and -- but
19 that's the instruction.  That's
20 the instruction to the witness.
21    MR. PIFKO:  And in the
22 interest of time, I'm just trying
23 to understand.  So you would
24 object to any questions about this

Page 123

1 engagement that he referred to
2 between FTI and AmerisourceBergen
3 concerning the order monitoring
4 program?
5    MR. NICHOLAS:  Your question
6 is assuming that -- your question
7 has assumptions in it as to
8 whether there's one engagement or
9 multiple engagements.
10    I'm just saying, I'm going
11 to permit him to answer questions
12 about this document and probably
13 you should just go ahead and do
14 that.
15 BY MR. PIFKO:
16    Q.   What work has FTI been
17 engaged to provide for AmerisourceBergen?
18    MR. NICHOLAS:  Well, now
19 you're trying to snatch defeat
20 from the jaws of victory here.
21    I'm letting you talk about
22 this document.  I'm instructing
23 him not to answer that question.
24 BY MR. PIFKO:

Page 124

1    Q.   You said there was other
2 work that AmerisourceBergen had engaged
3 FTI to perform.  And I'm just trying to
4 understand what that other work was, sir.
5    MR. NICHOLAS:  Yes.  And I
6 am asserting privilege in response
7 to that question.
8    You can ask questions about
9 the -- about this work, the work
10 that was done here contained in
11 this document.
12 BY MR. PIFKO:
13    Q.   Let's go to -- sorry, which
14 exhibit is this again, 4?  Let's go back
15 to Exhibit-4, turn to Page 8.
16    Let me know when you're
17 there.
18    A.   I'm there.
19    Q.   For housekeeping, in
20 reviewing Exhibit-4, you agree this is a
21 true and correct copy of the report that
22 FTI prepared for you at this time?
23    MR. NICHOLAS:  Object to the
24 form.

Page 125

1    THE WITNESS:  Yes.
2 BY MR. PIFKO:
3    Q.   So going to Page 8, it says,
4 A large volume of work and responsibility
5 falls to CSRA with respect to managing
6 regulatory compliance and security
7 activities.  And some team members
8 indicated that it is difficult to keep up
9 with the demands.  This may be because
10 they have not received adequate training
11 or because the team is not sufficiently
12 staffed with the necessary resources or
13 expertise.
14    Do you see that?
15    A.   I do.
16    Q.   Do you agree with this
17 finding in the report?
18    MR. NICHOLAS:  Object to the
19 form.
20    THE WITNESS:  Well, my first
21 comment would be, in the context
22 of this report, this doesn't look
23 like a finding.  It looks like a
24 comment, not a finding.

Page 126

BY MR. PIFKO:

Q.   Okay.  Well, whatever it is, we don't have to argue about what it is.

Do you agree with this statement that I just read from the report?

MR. NICHOLAS:  Object to the form.

THE WITNESS:  Again, in the context of the report, it's a statement by the outside consultant where they're making -- or reporting some information.

In terms of agreeing or disagreeing, what precisely would I be agreeing or disagreeing to?  Because, again, there's several, I guess, points in here.

BY MR. PIFKO:

Q.   Well, do you agree that at this time, some CSRA team members had indicated that it was difficult to keep up with the demands of their jobs?

MR. NICHOLAS:  Object to the

Page 127

form.

THE WITNESS:  I would say that, again, FTI looks like they're reporting on comments that some team members made relative to the demands.

To the extent that FTI is accurately reporting those comments, I wouldn't disagree that they're not accurately reporting the comments.

In terms of the actual issue relative to some members not being able to keep up with certain demands, I have no -- I don't -- at the time that this report was taken, if there were some people that were doing that, that indicated they weren't keeping up, I don't have any knowledge about that.

BY MR. PIFKO:

Q.   Moving to the next paragraph it says, For the most part, CSRA team

Page 128

members do not receive much in the way of formal training and instead are, in the best case, provided informal training by being paired with a more experienced resource for a brief onboarding period.

Do you see that?

A.   I do.

Q.   Do you agree with that statement?

A.   Again, it's pretty broad.  I'm not sure what period of time is involved here.

If the report was purposed in 2015, and the state of training relative to CSRA team members at that time, I would disagree with that conclusion.  I believe that -- it was my view that, generally speaking, CSRA team members were receiving training that was sufficient for them.

Q.   Did you -- at the time this report came out, did you discuss your disagreement with that statement with anyone?

Page 129

A.   Again, in the context of this report, which is several pages long, I don't have any specific memories about conversations relative to all of the commentary in this section.

Q.   It says, after that sentence, As a result, some CSRA personnel feel overwhelmed by the volume of activities they are required to perform, the administrative demands of their position and the lack of direction that they are provided.

Do you see that?

A.   I do.

Q.   Did you have any understanding that the CSRA personnel, under your team, felt overwhelmed by the volume of the activities they were required to perform, the administrative demands of their position and the lack of direction they were provided?

A.   Again --

MR. NICHOLAS:  Object to the form.

Page 130

1  THE WITNESS: A couple of
2  points.
3  First, my team, you know,
4  CSRA is the overall umbrella. I
5  have the diversion control team at
6  that time. Within CSRA, there are
7  several other -- there are a
8  couple of other sections.
9  So these comments generally
10  appear to be talking about CSRA in
11  general. I'm not precisely clear
12  on that. But I just wanted to
13  address that, because you just
14  specifically said was I aware, in
15  terms of the diversion control
16  team, as this being an issue.
17  And, again, the context of a
18  report -- I don't -- I, at that
19  time in August of '15, and I was
20  really engaged in all of the work
21  that we were doing at that time, I
22  didn't think that this was an
23  issue.
24  And so when I see that some

Page 131

1  people feel overwhelmed, I'm not
2  sure that -- again, looking at
3  this document now in 2018, I'm not
4  really sure where I would agree
5  with that as well.
6  BY MR. PIFKO:
7  Q. Did you, at this time,
8  undertake any efforts to respond to these
9  potential concerns identified in this
10  report that we just read?
11  A. So there may be specific
12  items in this report relative to
13  diversion control, specific to diversion
14  control, that, at one point, we may have
15  taken actions relative to identified
16  issues specific to diversion control that
17  may not even have been directed related
18  to this report.
19  But the fact that they were
20  items that may have been identified
21  that -- where we later took action, there
22  could have been items like that under
23  diversion control.
24  Q. Let me ask you a more

Page 132

1  specific question.
2  In response to seeing the
3  statements in here that some team members
4  indicated it was difficult to keep up
5  with demands and that some CSRA personnel
6  felt overwhelmed, did you reach out to
7  anyone who was under your direction in
8  diversion control to discuss those
9  concerns? I'll say this, in the
10  A. I'll say this, in the
11  context of this report, in terms of
12  resources and the work that's being done
13  by the different teams under my
14  responsibility, one of the things that I
15  do is I keep a close eye on the work that
16  we're doing to make sure that we have the
17  necessary resources to do our job.
18  That's one of the things that's important
19  to me.
20  And so outside of the
21  context of this, I communicate with team
22  members relative to their ability to get
23  the work done. We've added resources to
24  the program over time, based upon some of

Page 133

1  that feedback.
2  And so I guess I just want
3  to make sure that I'm clear that I
4  address that issue, not necessarily in
5  the context of this report. Did that
6  contribute to my thinking? Maybe at some
7  point. I can't say specifically now.
8  But resources and how hard
9  and how much our people are working is
10  always a concern to me.
11  Q. Going a little further down
12  this page, there's a statement, There is
13  also an impression that The Specialty
14  Group and sister companies do not
15  recognize CSRA as an authoritative body
16  and do not have any meaningful contact or
17  communications with CSRA.
18  Do you see that?
19  A. I do.
20  Q. Do you know what that's
21  about?
22  MR. NICHOLAS: Object to the
23  form. Outside the scope. It is
24  not talking about ABDC.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    You can answer.
2    THE WITNESS:  Thank you.
3    And, again, I'm not sure who
4  is providing the responses here,
5  and so there's not a lot of
6  context for me.
7    I mean, I know who The
8  Specialty Group is referring to
9  and I know that, from my
10 perspective, the compliance
11 managers that are working now in
12 this legacy specialty area, there
13 is communication with them.  And I
14 don't think there's any serious
15 issue there.
16    Again, that's providing my
17 understanding of the relationship
18 and the communication, you know,
19 outside of this commentary.
20 BY MR. PIFKO:
21    Q.   Did you work with any of the
22 people at FTI who were doing this report?
23    A.   I worked with the people at
24 FTI, but I did not assist with the

Page 135

1  composition of this report.
2    Q.   What I'm trying to get at
3  is -- that was a foundational question.
4    A.   Sure.
5    Q.   Do you know who wrote this
6  report at FTI?
7    A.   I believe it was, to the
8  best of my recollection, Caroline
9  Conneely.
10    Q.   Do you know if she had other
11 team members she was working with to
12 write this report?
13    MR. NICHOLAS:  Object to the
14 form.
15    THE WITNESS:  I don't know
16 if she had other team members that
17 assisted her.
18 BY MR. PIFKO:
19    Q.   You never interacted with
20 anyone else besides her?
21    MR. NICHOLAS:  Object to the
22 form.
23    THE WITNESS:  I may have.  I
24 just don't recall specifically,

Page 136

1  relative to this report, you know,
2  who I had conversations with.
3  BY MR. PIFKO:
4    Q.   Do you know which CSRA
5  employees were interviewed in connection
6  with this report?
7    A.   I do not.
8    Q.   Did you ever see any
9  interview notes from any interviews that
10 were conducted in connection with this
11 report?
12    A.   I don't recall seeing any
13 interview notes.
14    Q.   When it says The Specialty
15 Group, you said you knew who that was.
16    Who is that?
17    MR. NICHOLAS:  Objection.
18 We're going pretty far outside the
19 scope here.
20    THE WITNESS:  Referring to
21 the -- we now call it Legacy
22 Specialty because the company has
23 undergone some reorganization.
24    But it would be nondrug

Page 137

1  company entities.
2  BY MR. PIFKO:
3    Q.   What does that mean?  Sorry.
4  I don't understand that.
5    MR. NICHOLAS:  Same
6  objection.  We're well outside the
7  scope.
8    THE WITNESS:  There are a
9  group of businesses that are
10 nondrug company entities that we
11 refer to as Specialty Group; for
12 example, a business called
13 Oncology Supply would be part of
14 The Specialty Group.
15    And the reason they're
16 specialty, because they really
17 focused on very specific patient
18 programs.  Oncology Supply caters
19 to independent oncology
20 specialists across the country.
21 And that's the focus of their
22 business.
23 BY MR. PIFKO:
24    Q.   Did FTI interview you in

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 connection with this report?
2     A.   They may have.  They may
3 have.
4          Again, I was communicating
5 with them very frequently during this
6 time period.  Were some of those
7 communications -- the majority of which
8 of those communications were outside of
9 this.  But does that mean I didn't have
10 discussions or take questions with them
11 relative to this review?  I don't
12 specifically recall.
13     Q.   Do you know if they
14 interviewed anyone from the
15 investigations team in connection with
16 this report?
17     A.   I don't know who
18 specifically they interviewed.
19     Q.   Let's go to the bottom of
20 this page.
21          Going from the third line
22 down, partially into the sentence, it
23 says, It does indicate, especially with
24 the run of acquisitions, that compliance

Page 139

1 responsibilities are too diffuse or their
2 ownership is unclear.  That creates the
3 potential that compliance activities are
4 not occurring because the left hand
5 doesn't know what the right hand is doing
6 or because there's an assumption that
7 someone else in the organization is
8 taking care of it.
9          Do you see that?
10          MR. NICHOLAS:  Object to the
11     form of the question.  At the very
12     least, since you read nine-tenths
13     of the sentence, you could read
14     the first phrase in the question
15     so that the record is complete.
16 BY MR. PIFKO:
17     Q.   Do you see that portion of
18 the document, sir?
19          MR. NICHOLAS:  Objection to
20     the form.  Same objection.
21          THE WITNESS:  So if you
22     don't mind, I'll take a moment --
23 BY MR. PIFKO:
24     Q.   Yes.

Page 140

1     A.   -- and look at this.  And
2 then you can ask me the question again.
3          Okay.
4     Q.   When you saw this report,
5 did you discuss with anybody a concern
6 about this idea that the left hand
7 doesn't know what the right hand is doing
8 and that somebody might be assuming
9 something is being done when it's really
10 not?
11          MR. NICHOLAS:  Object to the
12     form, for the reason I just stated
13     in response to the previous
14     question.  Outside the scope.
15          THE WITNESS:  And, again, I
16     keep going back to the context
17     and, you know, picking out certain
18     parts of the report.  I would say
19     a couple of things.
20          The first being, I don't
21     agree with the statement here.  It
22     mentions acquisitions and
23     compliance responsibilities that I
24     was involved with during this time

Page 141

1 period, and I would say that we
2 were completing all of our
3 requirements and that we were
4 doing so very systematically and
5 correctly.  And so I disagree with
6 this kind of characterization.
7          And I guess, going back to
8 the beginning of the statement,
9 where it says that infrastructure
10 is in place to perform
11 compliance-related activities,
12 that was my understanding at the
13 time, that's my understanding of
14 how it is today.
15          And, again, I just don't
16 agree with the overall statement.
17 BY MR. PIFKO:
18     Q.   Let's go on to Page 9 here.
19          It says, third paragraph
20 down, CSRA is very reactive to
21 situations, with certain team members
22 describing their job as constantly
23 putting out fires.  Being in a perpetual
24 state of reacting to situations makes it

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 difficult to implement and sustain
2 organizational improvements and prevents
3 resources from focusing on assigned
4 projects.
5     Do you see that?
6     A.  I do.
7     Q.   Did you believe that CSRA
8 had an issue with -- specifically in the
9 diversion control program, had an issue
10 with the team being reactive and feeling
11 like they were constantly putting out
12 fires?
13     MR. NICHOLAS:  Object to the
14 form.
15     THE WITNESS:  Again, in the
16 context of this report provided by
17 an outside consultant that
18 essentially did a snapshot into
19 the work that CSRA was
20 performing -- I was on the ground
21 performing that work every single
22 day.  And I don't agree with the
23 characterizations in the report.
24     Clearly, work is work and we

Page 143

1 have a lot of it.  But as I
2 mentioned, we do a lot to make
3 sure that we manage it
4 appropriately.  And so to the
5 extent that these statements are
6 made that, you know, we have
7 challenges in our work, constantly
8 putting out a fire, what does that
9 mean exactly?  Do we have
10 challenges in our daily work?  We
11 absolutely have challenges for
12 your daily work.  Whether you're
13 at a law firm or
14 AmerisourceBergen, that's a
15 reality of work.
16     And so -- and I don't mean
17 to be in any way flip, but this is
18 work.  And so it's a
19 characterization.  I believe that
20 we were getting our jobs done.
21     Some days are longer than others.
22 BY MR. PIFKO:
23     Q.   Let's go to the section
24 about diversion control.

Page 144

1     That's your area, correct?
2     A.   Yes.
3     Q.   Let's go to the bottom of
4 this page here.  There's a Heading 1,
5 Diversion Control.
6     Do you see that?
7     A.   Page 10?
8     Q.   Yes.
9     A.   Yes.
10     Q.   Okay.  Second paragraph, it
11 says, Orders that exceed established
12 parameters are held in the system and
13 identified for investigation prior to
14 adjudication of the order.  ABC does not
15 have a policy to determine which
16 associates at the distribution center are
17 responsible for reviewing orders.
18     Do you see that?
19     A.   Yes.
20     Q.   Then it says, Although all
21 associates who have access to the OMP
22 system are required to be trained in
23 reviewing orders, there is no consistency
24 with respect to who is reviewing these

Page 145

1 orders.  This presents a significant risk
2 area because the company needs to be
3 compliant with DEA regulations and able
4 to explain and defend their decisions.
5     Do you see that?
6     A.   I do.
7     Q.   Did you have an
8 understanding that the consultant was
9 concerned about AmerisourceBergen's
10 training and making sure that there was
11 consistency with respect to the
12 distribution center personnel who were
13 reviewing orders that exceeded the
14 company's parameters?
15     MR. NICHOLAS:  Object to the
16 form.
17     THE WITNESS:  So, again, in
18 the context of this document, I
19 think it's pointed out early on in
20 the document here, in the very
21 first paragraph, that we were
22 engaged in implementing a number
23 of process and system
24 improvements.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1   That aside, the fact -- the
2   statement that associates who have
3   access to the OMP system are not
4   trained, I disagree with.  And,
5   again, at that time when this
6   report was composed, we had
7   designated distribution center
8   personnel who we referred to as
9   RPICs, or responsible persons in
10  charge, they were designated.
11      And so people who are not
12  designated as RPICs did not have
13  this duty.  And those designated
14  people received training and
15  training that was updated
16  subsequently, there was testing
17  materials.
18      And so to the extent that
19  this statement says that there was
20  no policy or practice around who
21  was reviewing orders at the
22  distribution center, I disagree
23  with.
24      But I also would like to add

Page 147

1   that we did do some work in that
2   area relative to RPICs,
3   specifically around updating
4   training and testing.
5   BY MR. PIFKO:
6       Q.   I've got two questions for
7   you after that.
8       This RPIC program, or the
9   idea of having a responsible party in
10  charge to review orders that exceeded the
11  company's parameters, do you know when
12  that was first instituted?
13      A.   I do not precisely know.
14      Q.   Was that a system that was
15  in place when you joined the company?
16      MR. NICHOLAS:  Objection.
17  Scope.
18      THE WITNESS:  I believe it
19  was in place.
20  BY MR. PIFKO:
21      Q.   Did you take any action to
22  attempt to improve the policies and
23  procedures concerning reviewing orders
24  and training the distribution centers in

Page 148

1   response to this report?
2       MR. NICHOLAS:  Object to the
3   form.
4       THE WITNESS:  I engaged in
5   reviewing all of our policies and
6   procedures that were in place when
7   I arrived at the company regarding
8   diversion control.
9       I then subsequently,
10  actually after this time, and I
11  believe it was in 2016, rewrote
12  and published a new set of
13  policies and procedures
14  specifically around diversion
15  control.  That included policies
16  and procedures relative to order
17  monitoring and suspicious order
18  reporting.
19      The distribution centers
20  also have their own sets of
21  policies and procedures, some of
22  which relate to diversion control
23  and some that do not, some that
24  relate to things that are unique

Page 149

1   to the distribution centers.
2       And so the answer to your
3   question, did I make changes to
4   policies and procedures as a
5   result of this document is no.
6       Did I make changes to
7   policies and procedures?  Yes, as
8   a -- which was part of my overall
9   work that I performed after I
10  arrived at the company, including
11  in this area of responsible
12  persons in charge; continued to
13  make changes in that area up until
14  even recently.
15  BY MR. PIFKO:
16      Q.   Do you update your
17  discussion of making changes to the
18  company's policies and procedures, you
19  did that in 2016?
20      MR. NICHOLAS:  Object to the
21  form.
22  BY MR. PIFKO:
23      Q.   You said -- I think that's
24  what you said.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   To my recollection, they
2  were published in 2016, if I have my
3  timing -- if I have my timing correct.
4    Q.   Did you implement those
5  changes in response to any legal
6  enforcement action from the Department of
7  Justice/Drug Enforcement Administration?
8        MR. NICHOLAS:  Ob --
9        THE WITNESS:  No.
10       MR. NICHOLAS:  Well, okay.
11       THE WITNESS:  Sorry.
12 BY MR. PIFKO:
13   Q.   Did you implement those
14 changes in response to any changes in The
15 Controlled Substances Act?
16       MR. NICHOLAS:  Object to the
17   form.
18       THE WITNESS:  I'm not
19   familiar with any changes in The
20   Controlled Substances Act.
21 BY MR. PIFKO:
22   Q.   There were no changes, so
23 you didn't make any changes as a result
24 of such changes; is that what you're

Page 151

1  trying to say?
2        MR. NICHOLAS:  Object to the
3    form.
4        THE WITNESS:  I am not
5    familiar with any changes, and I
6    didn't make any changes
7    specifically related to The
8    Controlled Substance Act.
9  BY MR. PIFKO:
10   Q.   Did you identify -- in
11 developing the changes that were
12 implemented in 2016, did you identify any
13 deficiencies with respect to the
14 company's policies and procedures prior
15 to that time?
16       MR. NICHOLAS:  Object to the
17   form.  Outside the scope.
18       THE WITNESS:  Again, in
19   putting this discussion in
20   context, because we're reviewing
21   this document, and I joined the
22   company in 2014 and after joining
23   the company, engaged in a review
24   of the overall program, all

Page 152

1  aspects of the program, which
2  includes policies and procedures.
3        And based upon that review,
4  we made changes.  And were the
5  changes as a result of
6  deficiencies?  No.  The changes
7  were a result of my view on areas
8  where we could make improvements.
9  And that's a process we continue
10 and that I continue.
11       It's an evolution.  And I
12 think that probably the regulators
13 expect us, with a compliance
14 program, to constantly evaluate
15 what we're doing and how we're
16 doing it.
17       And so I guess to put the
18 discussion around policies and
19 procedures in context, it was
20 not -- of course I'm aware of this
21 document, I'm aware of the content
22 of the document.  Obviously, I
23 disagree with some of the
24 conclusions in the document.

Page 153

1        All that aside, I conducted
2    my own review and we made changes
3    to the program.
4  BY MR. PIFKO:
5    Q.   I'm going to hand you a
6  document that goes with this.
7            - - -
8        (Whereupon,
9    AmerisourceBergen-May Exhibit-5,
10   ABDCMDL 00250024-063, was marked
11   for identification.)
12           - - -
13 BY MR. PIFKO:
14   Q.   I'm handing you what is
15 marked as Exhibit-5.
16   A.   Thank you.
17   Q.   For the record, it's a
18 document Bates labeled ABDCMDL 00250024
19 through 250063.
20       Let me know when you're done
21 reviewing the document.
22   A.   I'm done.
23   Q.   Have you seen this before?
24   A.   I have.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1     Q.  Do you know what this is?

2     A.  Again, it's a related

3 report, findings matrix, related to the

4 report composed by FTI.

5     Q.  I'll represent to you that

6 the electronic data that accompanies this

7 reflects that you were the custodian of

8 this document and that its date was

9 September 2nd, 2015.

10     Does that sound right?

11     A.  I've seen the document.

12 I've had the document in my possession,

13 so that sounds right.

14     Q.  Did you work with FTI on

15 this matrix?

16     MR. NICHOLAS: Object to the

17    form.

18     THE WITNESS: I was provided

19    the matrix. In terms of the

20    content of the matrix, I did

21    not -- I did not compose this

22    content. Presumably, it's

23    composed by FTI.

24 BY MR. PIFKO:

Page 155

1     Q.  And just to be clear, can

2 you tell me what this is?

3     A.  So I'm going to rely upon

4 the title up top, CSRA Process Review

5 Findings Matrix.

6     It's a matrix of findings

7 and observations and potential gaps and

8 risks.

9     Q.  And I'll represent to you

10 that the file name for this document,

11 it's a Word document, and it's 8.17.15

12 FTI Findings Matrix_V4.

13     Does that refresh your

14 recollection about what this document is?

15     A.  The title that you just

16 recited doesn't help me at all. I mean,

17 I've seen the document. The title --

18     Q.  Well, let's look at this

19 first page here --

20     A.  Sure.

21     Q.  -- ABDCMDL 00250024.

22     It says -- for this

23 particular row of the matrix, it says

24 it's assigned to David May.

Page 156

1     That's you, correct?

2     A.  Yes.

3     Q.  You see that part?

4     A.  I do.

5     Q.  Findings and observations.

6 It says, There are inconsistencies with

7 respect to who is reviewing and

8 adjudicating orders held by the OMP at

9 the distribution center. At some

10 facilities, it is the warehouse managers

11 and supervisors; at others, it is the

12 cage and vault clerks or the compliance

13 clerks; and at others, it is the data

14 process team.

15     Do you see that?

16     A.  I do.

17     Q.  Then it says, Gaps and

18 risks. One of the gaps and risks is

19 regulatory obligations related to

20 diversion control.

21     Do you see that?

22     A.  I do.

23     Q.  Did you understand that FTI

24 had identified a gap and risk being

Page 157

1 regulatory obligations related to

2 diversion control?

3     MR. NICHOLAS: Object to the

4    form.

5     THE WITNESS: Again, and

6    I'll go back and mirror my

7    comments from the previous

8    document.

9     FTI did a cursory review of

10    our distribution centers over a

11    short period of time, and they

12    established -- or they composed

13    certain findings and observations

14    and identified potential gaps and

15    risks.

16     As I stated in the

17    discussion of the previous

18    document, I disagree with this

19    finding. And as of the

20    composition of this report, no

21    further action required, that was

22    because I disagreed with the

23    finding.

24     As I said, there were RPICs

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 that were assigned at the
2 distribution center that were
3 trained to review orders.  The
4 fact that at some distribution
5 centers they occupied different
6 roles, they all occupied different
7 roles, but they were still
8 assigned as RPICs and were trained
9 so.
10 So, again, my understanding
11 of how the program was working,
12 and I was involved with the
13 program day in and day out, versus
14 the consulting company's view of
15 the distribution centers in their
16 opinions, and so I concluded that
17 there was consistency.  There was
18 not a problem.
19 That said, advancing down
20 the road somewhat, I did
21 provide -- or we did create
22 additional training programs for
23 our RPICs and testing materials to
24 solidify some of that training.

Page 159

1 And we've made other changes to
2 the RPICs, some of those very
3 recent.
4 - - -
5 (Whereupon,
6 AmerisourceBergen-May Exhibit-6,
7 ABDCMDL 00158544, was marked for
8 identification.)
9 - - -
10 BY MR. PIFKO:
11 Q.   I'm handing you what is
12 marked as Exhibit-6.
13 For the record, it's a
14 one-page document, ABDCMDL 00158544.
15 It's a document -- it's an e-mail from
16 you to Steve Mays, Eric Cherveny, Chris
17 Zimmerman, dated July 23rd, 2015.
18 Take a minute to review it
19 and let me know when you're done.
20 A.   Sure.
21 Q.   Have you seen this document
22 before?
23 A.   It was an e-mail, so I have,
24 yes.

Page 160

1 Q.   When is the last time you
2 think you saw it?
3 A.   Probably around July 23rd.
4 Q.   When you sent it?
5 A.   Yes.
6 Q.   Do you recall sending this
7 document -- sending this e-mail?
8 A.   I recall the content of this
9 document.
10 Q.   Is this a true and correct
11 copy of the e-mail you sent?
12 A.   Yes.
13 Q.   It says here, Steve, early
14 on in the process of organizing and
15 developing future communications relative
16 to customer OMP inquiries (think, where
17 is my order) we learned that there were
18 not uniform practices that were being
19 followed among the different compliance
20 managers.  For example, at some
21 distribution centers, the compliance
22 managers were actively communicating with
23 customers when orders were held or
24 cancelled due to OMP, while others were

Page 161

1 not.  None of this was considered
2 negative by me except for the fact that
3 we didn't have uniform practices in
4 place.
5 Do you see that?
6 A.   I do.
7 Q.   Do you recall being
8 concerned about a lack of uniform
9 practices with respect to this issue at
10 the distribution centers?
11 MR. NICHOLAS:  Object to the
12 form.
13 THE WITNESS:  So I guess in
14 answering your question in the
15 context of the earlier document
16 that you just provided me, the one
17 immediately preceding this one,
18 there's discussion around RPICs',
19 responsible persons in charge, at
20 the distribution centers,
21 inconsistencies.
22 This topic here is in no
23 way, form, related to this
24 discussion.  Here, the discussion

Page 162

1 concerns compliance managers.
2 They are -- it's a different role.
3 We have a compliance manager at
4 each and every one of our
5 distribution centers. And the
6 issue here concerned
7 communications with customers
8 around OMP.
9     So if, for instance, a
10 customer had a question about an
11 order that was not showing up, at
12 that time, there was different
13 communication that was happening,
14 some from the distribution center,
15 some through customer care folks.
16     But if I'm correct in your
17 question -- where you're going
18 with the question, is that this is
19 a completely different set of
20 facts.
21 BY MR. PIFKO:
22     Q.   I'm just asking if you were
23 concerned about the lack of uniform
24 practices occurring at the distribution

Page 163

1 centers?
2     MR. NICHOLAS:  Object to the
3 form.
4     THE WITNESS:  So to your
5 very specific question, you're
6 referring to this particular issue
7 here, in terms of who would field
8 a customer question?  So we're not
9 discussing the prior document?
10 BY MR. PIFKO:
11     Q.   I'm asking you about this
12 exhibit, right.
13     A.   So this exhibit, I thought
14 that we needed a uniform process for
15 responding to our customer inquiries
16 about orders.  And that was the purpose
17 of this.
18     And we actually did address
19 this issue relative to customer
20 communications, where it is now uniform.
21     Q.   Do you believe that the
22 practices with respect to the order
23 monitoring program at the distribution
24 center should be uniform?

Page 164

1     MR. NICHOLAS:  Object to the
2 form.
3     THE WITNESS:  I think, in
4 terms of this specific issue that
5 we just discussed, customer
6 communications, it's important
7 that it's uniform.  I think,
8 generally speaking, having
9 training that's consistent across
10 the distribution centers for
11 personnel engaged in order
12 monitoring is important.  And so
13 to that extent -- to that extent,
14 we have that consistency.
15 BY MR. PIFKO:
16     Q.   Let's go back to the matrix.
17     MR. PIFKO:  Sorry, which
18 exhibit is that?
19     MR. CLUFF:  Five.
20 BY MR. PIFKO:
21     Q.   Let's go back to Exhibit-5.
22 Turn back to the second page -- going
23 back to the first page.
24     On the bottom here it says,

Page 165

1 Discussion notes, 1, no further action
2 required.
3     Do you see that?
4     A.   I do.
5     Q.   Is that a conclusion that
6 you reached with respect to this issue on
7 the first page?
8     MR. NICHOLAS:  Object to the
9 form.
10     THE WITNESS:  I think I was
11 involved in the process of
12 deciding what actions would be
13 taken.  And so I would have been
14 involved in some of this feedback.
15     Ultimately, who decided
16 about the action, I could make a
17 recommendation.  At least my
18 recommendation at the time was
19 that there was consistency.
20     How is that?
21 BY MR. PIFKO:
22     Q.   In the recommendation
23 section on the right of the first page,
24 in that column, the second paragraph

Highly Confidential - Subject to Further Confidentiality Review

---

Page 166

1 says, In theory, the first-line reviewer
2 should not be within CSRA because they
3 are responsible for auditing the process.
4 Do you see that?
5 A. I do.
6 Q. Do you agree with that
7 conclusion?
8 MR. NICHOLAS: Object to the
9 form.
10 THE WITNESS: I'm not sure I
11 understand the context of this.
12 When they say CSRA would be
13 responsible for the auditing of
14 the process, I'm not sure if
15 they're talking about the OMP
16 process here. It's a little bit
17 unclear to me, this statement.
18 BY MR. PIFKO:
19 Q. What about the idea that if
20 the CSRA people are responsible for
21 ensuring compliance with the order
22 monitoring program, should they be the
23 same ones performing the reviews?
24 A. Again --

---

Page 167

1 MR. NICHOLAS: Object to the
2 form.
3 THE WITNESS: Excuse me.
4 Again, I think that here,
5 within corporate CSRA, we have a
6 team that's assigned to review
7 orders. And so this process --
8 this matrix and this process is
9 specifically referring to those
10 processes we have at our
11 distribution centers.
12 And the fact that -- again,
13 I'm not completely clear in terms
14 of the context here, but RPICs
15 could have been drawn within the
16 compliance team. And, again, I'm
17 making a little bit of a -- of an
18 assumption there.
19 So I really can't speak
20 to -- I'm really not sure that,
21 number one, I understand the
22 statement.
23 And, number two, program
24 design current day, this isn't an

---

Page 168

1 issue.
2 BY MR. PIFKO:
3 Q. It says, after that,
4 Ultimately, this responsibility should
5 fall to a salaried employee due to the
6 importance of the function.
7 Do you see that?
8 A. I do.
9 Q. At this time, the
10 distribution center order monitoring
11 process review was not being handled by
12 salaried people?
13 MR. NICHOLAS: Object to the
14 form.
15 THE WITNESS: I cannot say
16 definitively if all of the RPICs,
17 that's what we're talking about,
18 if the RPICs was salary or
19 non-salary, was it a combination
20 of salary and non-salary. I just
21 don't have that information. I
22 guess that's number one.
23 And, number two, I don't
24 necessarily agree with the

---

Page 169

1 conclusion that you cannot have a
2 trained hourly person to review
3 orders. I think that we can have
4 a trained hourly person to review
5 orders.
6 BY MR. PIFKO:
7 Q. Let's go to the next page.
8 Findings and observation.
9 Again, this is a thing
10 that's assigned to you. Do you see that?
11 You agree?
12 A. Yes.
13 Q. For the record, 25055.
14 Findings and observation column.
15 It says, There is currently
16 a lack of visibility to the process and
17 rationale for adjudicating orders held
18 for review. While both the corporate and
19 distribution center personnel reviewing
20 orders provide comments, there is no
21 standard set of defined reasons to
22 support those decisions.
23 Do you see that?
24 A. I do.

---

Page 170

1   Q.   Do you have an understanding
2   of what that finding and observation was
3   about?
4          MR. NICHOLAS:  Object to the
5   form.
6          THE WITNESS:  So, again, I
7   think the focus here, if my
8   recollection is correct, was on
9   the distribution center order
10  process.  And I believe that's the
11  process that they're referring to.
12         As we had it, there were two
13  possibilities for reviewing
14  orders.  Orders could be reviewed
15  at the distribution center level
16  or at the corporate level,
17  depending upon the circumstances.
18         And so I assume that's what
19  this is referring to.
20  BY MR. PIFKO:
21  Q.   Do you disagree that there
22  was no set of defined reasons to support
23  the decision with respect to the
24  rationale for adjudicating orders for

Page 171

1   review?
2          MR. NICHOLAS:  Object to the
3   form.
4          THE WITNESS:  I disagree
5   with that.
6          And I guess I'll refer back
7   down to now, Notes, Number 1, no
8   further action required.  There is
9   complete visibility in the
10  process, training and rationale.
11         I think that -- again, I
12  refer to further documentation
13  exists within the policies and
14  procedures.  There was a time
15  where we made changes to the RPIC
16  monitoring at the distribution
17  center level.
18         In terms of the specific
19  finding, I disagree and -- but, as
20  you read down further, there were
21  things that we did later, in terms
22  of actions that we took related to
23  some of this.  It's not entirely
24  clear that it all is matching up

Page 172

1   precisely.
2          But in terms of your
3   question about a standard set of
4   reasons to support, we did have
5   training that we provided to the
6   RPICs in their review of orders.
7   BY MR. PIFKO:
8   Q.   It says Gaps and risks here.
9   Again, regulatory obligations related to
10  diversion control.
11         Do you see that?
12  A.   I do.
13  Q.   Do you understand the
14  connection between having a defined set
15  of reasons for adjudicating orders held
16  for review and the company's regulatory
17  obligations related to diversion control?
18         MR. NICHOLAS:  Object to the
19  form.  Object to the scope.
20         THE WITNESS:  So, again, I
21  would say going back to the
22  finding and observation, I
23  disagree.  And when it says gaps
24  and risk, I think, my

Page 173

1   understanding of how this matrix
2   works, these are potential gaps
3   and risks.
4          Any gaps and risks that I
5   was aware of, if any, I would have
6   addressed.  And at this time, I
7   didn't see a problem with how we
8   were doing things at the
9   distribution centers; with the
10  caveat being we did go in and do
11  additional training, as I
12  mentioned in our previous
13  discussion.
14  BY MR. PIFKO:
15  Q.   Do you know what the time
16  frame was for FTI's review?
17         MR. NICHOLAS:  Asked and
18  answered.  Objection.
19         THE WITNESS:  Just a little
20  clarity on your question.  The
21  time frame when this all occurred
22  or how much time they took to do
23  the review?
24  BY MR. PIFKO:

Page 174

1    Q.   The time frame of what --
2 what was the time frame of the practices
3 and procedures that they were reviewing?
4       MR. NICHOLAS:  Object to the
5    form.  And scope.
6       THE WITNESS:  It would have
7    been those that were in place at
8    the time of the composition of
9    this report, which I believe we
10   said was during the August time
11   frame of 2015.
12 BY MR. PIFKO:
13   Q.   Looking at this page on
14 250025, it's got other notes.  And you
15 mentioned that there were actions taken.
16      You see here it says, To
17 develop a more robust messaging system
18 for the customer that would support
19 decisions made regarding OMP.
20      Do you see that?
21   A.   I do.
22   Q.   Do you believe that there
23 was a lack of robustness regarding this
24 area?

Page 175

1       MR. NICHOLAS:  Object to the
2    form.
3       THE WITNESS:  So, again, we
4    reviewed the messaging system for
5    the customer relative to OMP.  But
6    it had nothing to do with
7    decisions regarding OMP, in terms
8    of supporting decisions.
9       The issue, as I know it,
10   that we're discussing here about
11   messaging involved situations
12   where a customer's order would be
13   held and the customer wouldn't
14   know why.  And that's what this
15   refers to.
16      It has nothing to do with
17   supporting decisions.  Why that
18   reads like supporting decisions,
19   I'm not sure.  It's probably an
20   oversight in the writing of the
21   report.
22 BY MR. PIFKO:
23   Q.   Do you believe that if the
24 company discloses its policies and

Page 176

1 procedures for how the order monitoring
2 program functions, it can defeat the
3 effectiveness of the program?
4       MR. NICHOLAS:  Object to the
5    form.  As well as scope.  But
6    certainly object to the form of
7    that question.
8       THE WITNESS:  Again, you're
9    asking me for a question that
10   involves conjecture about
11   releasing policies and procedures.
12      I guess, with no other
13   context, how would I respond is I
14   think there's proprietary
15   information regarding order
16   monitoring that we would try to
17   limit distribution to our
18   customers.  To the extent that
19   policy and procedure revealed some
20   specific proprietary information,
21   that could be a concern.
22      But, again, I have no
23   context surrounding.
24 BY MR. PIFKO:

Page 177

1    Q.   What I'm asking you is, just
2 simply, if people know how the program
3 works, do you think that they can adjust
4 their activity to circumvent the program?
5       MR. NICHOLAS:  Object to the
6    form.
7       THE WITNESS:  Again, it's a
8    question that involves conjecture.
9    If something exists, would a
10   customer act this way.  I just
11   can't respond to that.
12      I don't know what the
13   customer would do based upon
14   conjecture.  I have no idea.
15 BY MR. PIFKO:
16   Q.   In designing the OMP
17 program, do you think it's necessary to
18 maintain some degree of confidentiality
19 with respect to how the program
20 functions?
21   A.   I do.
22   Q.   And why is that?
23   A.   I think that -- I think that
24 the regulator would have that expectation

Page 178

1 that we would try to protect some
2 proprietary information. If we had
3 customers that wanted to defeat our
4 programs for nefarious purposes, we
5 certainly don't want to provide the
6 information to them that would enable
7 them to do that, to the extent possible
8 that we can prevent it.
9      Q.   I'm just going to hand you
10 one more document, and we can talk about
11 that and then take a lunch break.
12           - - -
13      (Whereupon,
14 AmerisourceBergen-May Exhibit-7
15 ABDCMDL 00168453-455, was marked
16 for identification.)
17           - - -
18 BY MR. PIFKO:
19      Q.   This is Exhibit-7. Take a
20 moment to review that and let me know
21 when you're done.
22      For the record, it's some
23 e-mails, Bates labeled ABDCMDL 00168453
24 through 455.

Page 179

1      And I really just want to
2 ask you about the e-mail you wrote in the
3 middle of the page of the first page of
4 the document.
5      A.   Sure.
6      Q.   It states --
7      MR. NICHOLAS:  Hold on. Let
8      him complete his review of the
9      entire document first.
10      THE WITNESS:  Okay.
11 BY MR. PIFKO:
12      Q.   It states here on the first
13 page, We just want to avoid any sharing
14 of information that may make it to the
15 customers that may result in manipulation
16 of the program by the customers.
17      Do you see that?
18      A.   Yes.
19      Q.   Do you agree with that?
20      A.   That's what I stated in my
21 previous response.
22      Q.   And that was -- so you agree
23 with that, yes?
24      A.   To the extent that, yes, it

Page 180

1 agrees with my previous response, in
2 terms of which was, perhaps, a little bit
3 different; if you want to read my
4 previous response, I think I added
5 additional information.
6      Q.   That was going to be my next
7 question.
8      Was this consistent with
9 what you just testified to that you don't
10 want any aspects of the program to be
11 disclosed that would allow it to be
12 manipulated by customers, agree?
13      A.   Again, there's going to be
14 aspects of the program that, by the very
15 nature of what we do, our customers are
16 going to have to know. They're going to
17 have to know that their orders are
18 subject to some sort of review by us.
19 They are going to have to know that some
20 orders will be held and some orders will
21 be released.
22      I don't believe our
23 customers need to know some of the
24 proprietary information that's sensitive

Page 181

1 around the program. And, again, the
2 reason being is, if there was a customer
3 that wanted to defeat it, we want -- to
4 the extent possible that we can prevent
5 that from happening, we want to do that.
6      Q.   In that regard, do you think
7 it's appropriate to allow customers to
8 know what their thresholds are?
9      MR. NICHOLAS:  Object to the
10      form. Scope as well.
11      THE WITNESS:  So, again, in
12      terms of thresholds, under the
13      program that we administer now, we
14      refer to those as parameters.
15      I think that it would be
16      more appropriate if customers did
17      not know what their former
18      thresholds were or what their
19      current parameters are, yes.
20      MR. PIFKO:  Okay. We can
21      take a lunch break. Thank you.
22      VIDEO TECHNICIAN:  Going off
23      the record. 12:24 p.m.
24           - - -

Page 182

1      (Whereupon, a luncheon
2   recess was taken.)
3         - - -
4      VIDEO TECHNICIAN: We're
5   back on the record. The time is
6   1:06 p.m.
7 BY MR. PIFKO
8      Q.  I'm handing you what's
9 marked as Exhibit-9. I skipped one, I'll
10 come back to it.
11        - - -
12      (Whereupon,
13 AmerisourceBergen-May Exhibit-9
14 ABDCMDL 00216332-33, was marked
15 for identification.)
16        - - -
17 BY MR PIFKO:
18      Q.   Take a moment to review that
19 and let me know when you're done.
20      For the record, it's a
21 document Bates labeled ABDCMDL 00216232
22 through 33.
23      Are you ready?
24      A.  Yes.

Page 183

1      Q.   Have you seen this document
2 before?
3      A.  I have.
4      Q.  Do you know what this is?
5      A.  It's an e-mail from Caroline
6 Conneely to myself and others.
7      Q.  What was the last time you
8 saw this?
9      A.  Date of the e-mail, March
10 15th, 2016.
11      Q.  Is this a true and correct
12 copy of the communications reflected in
13 this e-mail?
14      A.  Yes.
15      Q.  So this is an e-mail, on the
16 first page, it's from Caroline Conneely,
17 dated Tuesday, March 15th, 2016, to you,
18 Eric Cherveny, Sharon Hartman. The
19 subject is OMP reason codes.
20      The first question, Caroline
21 Conneely, she's the consultant who
22 prepared that report?
23      MR. NICHOLAS: Object to the
24 form.

Page 184

1      THE WITNESS: Could you
2   refer me to the report? The FTI
3   Consulting report?
4 BY MR PIFKO:
5      Q.   Correct. Exhibit-4 to be --
6      A.  I believe she prepared that
7 report, yes.
8      Q.  This is later -- as we
9 discussed, that report was dated in 2015.
10  Do you recall?
11      A.  Yes.
12      Q.  So now, later, in March
13 2016, she's writing you. And she says,
14 One of the things we've been discussing
15 through the course of the OMP
16 enhancements effort is better consistency
17 and transparency to the rationale for the
18 decisions related to orders held for
19 review.
20      Do you see that?
21      A.  I do.
22      Q.  So you were discussing
23 enhancements to the OMP program with Ms.
24 Conneely in 2016?

Page 185

1      A.  Yes.
2      Q.  What was the nature of your
3 discussions with her?
4      A.  I had many and numerous
5 discussions with Caroline Conneely, from
6 FTI, relative to the order monitoring
7 program and the development of the
8 enhanced program. Those conversations
9 took place over the course of several
10 months.
11      So it would be difficult to
12 provide any specific commentary around
13 what all of those discussions included.
14 I'm happy to respond to questions
15 relative to this particular discussion.
16      Q.  Here she's talking about
17 providing consistency with respect to the
18 reasons for identifying orders held for
19 review, agree?
20      MR. NICHOLAS: Object to the
21   form.
22      THE WITNESS: Actually, as
23   she states in her e-mail, she uses
24   the word "better" consistency.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  So this is a discussion
2  around documenting rationale; to
3  be very specific, documenting
4  around rationale relative to the
5  decisions that we make within the
6  program.
7  BY MR PIFKO:
8  Q.  Prior to this time, was
9  there any documentation of the rationale
10  with respect to decisions related to
11  orders held for review?
12  MR. NICHOLAS:  Object to the
13  form.  Scope.
14  THE WITNESS:  What would be
15  the defined time period?
16  BY MR PIFKO:
17  Q.  Well, this is dated March
18  15, 2016.
19  So I'm asking, are you aware
20  if, before this time, there was any
21  documentation regarding the decisions
22  related to orders held for review?
23  MR. NICHOLAS:  Same
24  objection.

Page 187

1  THE WITNESS:  So there was
2  the ability to document
3  decision-making via some -- via --
4  including notes relative to the
5  orders.  And that existed prior to
6  this discussion here.  So there
7  was the capability to provide
8  notes.
9  BY MR PIFKO:
10  Q.  Based on your understanding
11  of the system, do you know if that --
12  those notes fields you're talking about,
13  you used the word "capability," were
14  those notes fields used as a requirement
15  for people making decisions regarding
16  orders held for review?
17  MR. NICHOLAS:  Object to the
18  form.  And scope.
19  THE WITNESS:  To the best of
20  my recollection, it was not a
21  requirement.
22  BY MR PIFKO:
23  Q.  And so there are orders that
24  would be held or released and there may

Page 188

1  be no -- there may or may not be any
2  documentation as to why; is that correct?
3  Prior to this time?
4  MR. NICHOLAS:  Object to the
5  form.  And the scope.
6  THE WITNESS:  There may or
7  may not be notes relative to the
8  decision-making of individual
9  order reviews.
10  BY MR PIFKO:
11  Q.  So at this point, you're
12  still discussing implementing a
13  procedure, specifically they're talking
14  about putting a drop-down list of reason
15  codes.
16  Do you see that?
17  A.  I do.
18  Q.  At this time, there still
19  was no set procedure; is that correct?
20  MR. NICHOLAS:  Object to the
21  form.  And the scope.
22  THE WITNESS:  I don't recall
23  precisely when we instituted the
24  requirement, but it would have

Page 189

1  coincided with the development of
2  the drop-down codes, which is what
3  we're discussing and working on
4  here at this time period.  So it
5  would have been -- the requirement
6  would have been instituted after
7  the capability was built, without
8  knowing the precise dates.
9  BY MR PIFKO:
10  Q.  Is it your understanding
11  that there was -- the capability was
12  being added on or around this time, in
13  the first quarter of 2016?
14  A.  Yes.  I'm sorry, with one --
15  again, with the caveat, I think we always
16  had the ability to insert notes.  The
17  capability that was being developed was
18  this notion of developing codes within
19  the SAP structure.
20  Q.  So with respect to
21  transparency to the rationale for the
22  decisions related to orders for review,
23  she says, This is critical not just to
24  the operationalization -- I don't know if

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 that's a word.
2     A.  Operationalization.
3     Q.  -- operationalization of the
4 methodology changes but also to the
5 ability to explain those decisions,
6 should they be questioned at some point
7 in the future.
8     Do you see that?
9     A.  I do.
10     Q.  Do you agree with her
11 statement?
12     MR. NICHOLAS:  Object to the
13 form.
14     THE WITNESS:  In terms of
15 operationalizing the methodology,
16 it wasn't required to
17 operationalize the methodology.
18 The methodology had already been
19 put in place and was being used.
20     So I'm not sure, in the
21 context of this e-mail, what she
22 meant by that.
23     In terms of the ability to
24 explain decisions should they be

Page 191

1 questioned, her view and her
2 opinion aside, my own view was
3 that we needed more documentation
4 around that issue.
5 BY MR PIFKO:
6     Q.  Because if you don't have
7 documentation, you don't know why an
8 order was released or not, correct?
9     MR. NICHOLAS:  Object to the
10 form.
11     THE WITNESS:  So that's not
12 correct.  What is correct --
13 because there could be rationale,
14 it's just not properly documented.
15     So my effort here was to
16 improve our efforts around
17 documentation.
18 BY MR PIFKO:
19     Q.  I didn't ask if there was
20 any rationale.
21     I asked -- I said if there
22 was no documentation, you don't know what
23 the rationale is for why an order was
24 released, correct?

Page 192

1     MR. NICHOLAS:  Object to the
2 form.
3     THE WITNESS:  So perhaps you
4 can ask the question again,
5 because how you just repeated it,
6 perhaps I misunderstood it.  So
7 maybe you can ask it again.
8 BY MR PIFKO:
9     Q.  No problem.
10     So I'm just saying, absent
11 documentation in the system for why an
12 order is released, you don't know why
13 it's released, correct?
14     MR. NICHOLAS:  Object to the
15 form.
16     THE WITNESS:  So absent
17 documentation, there still may be
18 the possibility, I suppose,
19 through conversations with folks
20 that reviewed orders, the ability
21 to determine that information.
22     But bottom line, I also
23 believe that better documentation
24 was required.

Page 193

1 BY MR PIFKO:
2     Q.  So what you're saying is,
3 other than talking to someone, you'd have
4 no way of knowing why an order was
5 released, if there's no documentation,
6 agree?
7     MR. NICHOLAS:  Object to the
8 form.
9     THE WITNESS:  So no.  I
10 mentioned that there was also the
11 notes capability.  And in some
12 cases, there would be notes around
13 that rationalization.
14 BY MR PIFKO:
15     Q.  Okay.  Aside from the notes
16 and talking to someone, you'd have no way
17 of knowing what the rationalization was
18 for making decisions related to
19 whether -- to release an order, agree?
20     MR. NICHOLAS:  Object to the
21 form.
22     THE WITNESS:  I would agree
23 that it would be difficult to
24 determine, absent notes and absent

Page 194

1 conversations, specific rationale
2 relative to order adjudication.
3 BY MR PIFKO:
4 Q. She says, Dave, would you
5 feel comfortable explaining orders to the
6 regulators based on this level of detail
7 (recognizing there would also be comments
8 available to expand upon individual
9 circumstances).
10 It appears she's asking,
11 based on the drop-down menu, if you would
12 be comfortable explaining orders based on
13 that kind of detail.
14 Is that what you understand
15 she's asking here?
16 A. Based upon the context of
17 this e-mail, I would agree that she's
18 asking, would I feel comfortable
19 explaining orders with the level of
20 detail that is being contemplated in the
21 drop-down menus, yes.
22 Q. And what is your answer?
23 Are you comfortable with that level of
24 detail?

Page 195

1 A. Absolutely. And that's why
2 we proceeded in implementing those
3 drop-down menus.
4 Q. I want to explore the scope
5 of some privilege assertions that were
6 made with respect to FTI's work.
7 Do you know if there were
8 any projects that AmerisourceBergen
9 engaged FTI to work on that were not at
10 the direction of attorneys?
11 A. When I joined the company in
12 2014, FTI had already been engaged by
13 legal. All of the work that I did with
14 them was pursuant to that engagement
15 around OMP and diversion control.
16 There may be work that
17 they've done for the company that I'm not
18 aware of that I can't comment on.
19 - - -
20 (Whereupon,
21 AmerisourceBergen-May Exhibit-8,
22 ABDCMDL 00158342, was marked for
23 identification.)
24 - - -

Page 196

1 BY MR PIFKO:
2 Q. I'm handing you what is
3 marked as Exhibit-8.
4 Please take a moment to
5 review that and let me know when you're
6 ready.
7 The document is Bates
8 labeled ABDCMDL 00158342. The electronic
9 data accompanying the document reflects
10 that you were the custodian and that it's
11 dated July 2nd, 2014.
12 And the file name for the
13 document is 2014 Thought Spot Diversion
14 Control Training PowerPoint.
15 MR. NICHOLAS: Just before
16 we go into questioning on this
17 document, a reminder, or whatever
18 you want to call it, that the
19 witness is designated as a
20 30(b)(6) deponent for the period
21 of time from 2015 to May of 2018.
22 So to the extent we're
23 embarking on questions about prior
24 information or prior materials,

Page 197

1 he's testifying as -- in his
2 individual capacity.
3 BY MR PIFKO:
4 Q. Let me know when you're
5 ready to talk.
6 A. Thank you.
7 I'm ready.
8 Q. Do you recognize this
9 document?
10 A. I do.
11 Q. Can you tell me what this
12 is?
13 A. This is a PowerPoint
14 presentation that was put together for a
15 sales meeting, where I was doing some
16 training to our sales staff in the
17 beginning of August 2014.
18 Q. Is this a true and correct
19 copy of a presentation that you gave at
20 this conference?
21 A. Yes.
22 Q. It says the conference
23 occurred from July -- I'm looking at the
24 first page of the document -- from July

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  30th to August 2nd, 2014 at the MGM Grand
2  in Las Vegas; is that correct?
3      A.   Correct.
4      Q.   And you attended this
5  conference during that time period?
6      A.   Yes.
7      Q.   And what day was this
8  presented on?
9      A.   I'm not sure at this time.
10  I'd have to consult my calendar.
11      Q.   And the conference was held
12  at the MGM Grand casino in Las Vegas?
13      A.   Yes.
14      Q.   What's Thought Spot?
15      A.   What is Thought Spot?  It's
16  the name of the conference.  It's where
17  we bring in many of our independent
18  retail pharmacy customers, together with
19  our community and specialty sales staff,
20  and they spend time together during the
21  conference.
22      Q.   When was the last time you
23  saw this document?
24      A.   I believe I saw this

Page 199

1  document last week.  I reviewed several
2  PowerPoint presentations, I believe this
3  was among them, in preparation for today.
4      Q.   Prior to that when was the
5  last time you saw this?
6      A.   It would have been at the
7  time of presentation.
8      Q.   So let's go to Page 6.
9          So we've got the slides
10  here, these are -- if we look just
11  generally at the format of the document.
12          At the top half of the page,
13  it's the slides that you presented at the
14  conference?
15      A.   Yes.
16      Q.   And then on the bottom are
17  notes that you made to yourself?
18      A.   Yes.
19      Q.   This slide is entitled,
20  National Abuse Facts, correct?
21      A.   Yes.
22      Q.   Your notes say, The
23  statistics overwhelmingly demonstrate
24  that we have a terrible prescription drug

Page 200

1  abuse problem in the U.S. and,
2  tragically, people are dying.
3          Do you see that?
4      A.   I do.
5      Q.   Do you agree with that?
6      A.   Yes.
7      Q.   What was the basis for that
8  conclusion that you wrote there that I
9  just read?
10      A.   The statistics.
11      Q.   Like the items referenced up
12  here, the 38,329 unintentional drug
13  overdose deaths in 2010?
14      A.   Yes.  And other data that I
15  was familiar with.
16          But these are two of the
17  statistics that would support that
18  statement.
19      Q.   We talked, I believe, that
20  you joined AmerisourceBergen in 2014.
21          Do you remember the month?
22      A.   I believe it was right
23  around the 1st of March, within a week.
24      Q.   So this is only a few months

Page 201

1  after you had been at the company?
2      A.   Based upon the dates here,
3  yes.
4      Q.   At this time, did you have a
5  belief that members of the pharmaceutical
6  industry, be it manufacturers and/or
7  distributors, had any role in
8  contributing to the prescription drug
9  abuse problem in the U.S. that you
10  reference here?
11          MR. NICHOLAS:  Object to the
12      form of the question.  I'll
13      reiterate the scope objection as
14      well.  But I object to the form of
15      the question.
16          THE WITNESS:  At that time,
17      I have no specific memory of any
18      conclusions that I may have drawn
19      relative to the prescription drug
20      abuse problem.
21  BY MR PIFKO:
22      Q.   Do you believe that we still
23  have a prescription drug problem in the
24  United States?

Page 202

1    A.   I believe that we've made
2  great advancements in the last several
3  years.  I still believe there is work to
4  be done.
5    Q.   Have you heard the term
6  "opioid crisis"?
7    A.   I have.
8    Q.   Do you believe that we're
9  still in the opioid crisis?
10   A.   I do.
11   Q.   Do you presently have a view
12 as to whether manufacturers and
13 distributors of opioid products
14 contributed to the opioid crisis?
15       MR. NICHOLAS:  Object to the
16 form.  Outside the scope.
17       THE WITNESS:  I don't have
18 an opinion relative to
19 manufacturers and distributors.
20       I can respond in terms of
21 AmerisourceBergen.  And I do not
22 believe they contributed to the
23 opioid crisis.
24 BY MR PIFKO:

Page 203

1    Q.   Do you believe that as a --
2  let me back up.
3        Do you have a sense of what
4  market share of the United States
5  distribution of opioid products
6  AmerisourceBergen has presently?
7        MR. NICHOLAS:  Objection.
8  Outside the scope.
9        THE WITNESS:  I'm probably
10 not the best person to talk about
11 market share.
12 BY MR PIFKO:
13   Q.   Have you previously heard
14 that AmerisourceBergen, Cardinal Health,
15 and McKesson have approximately 80 to 90
16 percent of the market share of
17 distribution of pharmaceuticals in the
18 United States?
19       MR. NICHOLAS:  Objection.
20 Object to the form.  Outside the
21 scope.
22       THE WITNESS:  Again, I'm
23 probably not the best person to
24 talk about market share.

Page 204

1        I know that
2  AmerisourceBergen delivers
3  medications every day to people
4  who need them, life-saving
5  medications, the majority of which
6  is non-controlled.
7        And in terms of the market
8  share of total medicine delivered,
9  non-controlled and controlled,
10 which is a much smaller aspect of
11 our business as a percentage, I'd
12 have to leave those specific
13 responses to somebody -- somebody
14 else that has that information.
15 BY MR PIFKO:
16   Q.   So you believe that -- have
17 you heard the term the "three big three,"
18 with respect to McKesson, Cardinal and
19 AmerisourceBergen, in terms of their role
20 as distributors in the pharmaceutical
21 industry in the United States?
22       MR. NICHOLAS:  Object to the
23 form.
24       THE WITNESS:  I've seen

Page 205

1  publications and documents that
2  contain that reference.
3  Specifically what those
4  publications are, I couldn't say.
5  BY MR PIFKO:
6    Q.   Do you believe that as major
7  entities in the closed system of
8  distribution of controlled substances,
9  Cardinal, AmerisourceBergen and McKesson
10 have the ability to beneficially impact
11 the opioid crisis through their
12 practices?
13       MR. NICHOLAS:  Object to the
14 form.  Objection on scope as well.
15       THE WITNESS:  You know, in
16 the context of your question, I
17 would say that every registrant
18 has the potential to have an
19 impact, large or small;
20 distributor, practitioner,
21 pharmacy, manufacturer.
22       And, again, my concern is
23 AmerisourceBergen and what we do
24 there every day to fulfill our

Page 206

1 obligations. And that's what my
2 focus is.
3 BY MR PIFKO:
4 Q. Do you believe that
5 AmerisourceBergen has a responsibility to
6 take actions to reduce the impacts of the
7 opioid crisis?
8 MR. NICHOLAS: Objection to
9 the form. Objection as to scope
10 as well.
11 THE WITNESS: I believe that
12 AmerisourceBergen has various
13 requirements that are imposed upon
14 it, as a registrant, through the
15 laws and regulations.
16 BY MR PIFKO:
17 Q. Do you believe that by
18 preventing diversion AmerisourceBergen
19 can make a positive impact on the opioid
20 crisis?
21 MR. NICHOLAS: Object to the
22 form. Objection as to scope.
23 THE WITNESS: I think if
24 AmerisourceBergen fulfills its

Page 207

1 requirements under the
2 regulations, it will accomplish
3 what it's required to do.
4 BY MR PIFKO:
5 Q. And what is it required to
6 do?
7 MR. NICHOLAS: Object to the
8 form. Object -- let me start that
9 again.
10 Objection as to form.
11 Objection as to scope.
12 THE WITNESS: Again, as a
13 registrant and a wholesale
14 distributor, we have certain
15 requirements imposed upon us in
16 the closed system of distribution
17 that you've alluded to.
18 Within the closed system,
19 there are different requirements
20 based upon where you sit. The
21 practitioner certainly has a
22 different requirement,
23 establishing a patient/doctor
24 relationship, for example, that we

Page 208

1 do not have as a wholesale
2 distributor.
3 And generally speaking, I
4 think that if all registrants of
5 all types fulfill their legal
6 obligations, that would -- that
7 would have a positive impact.
8 BY MR PIFKO:
9 Q. On the opioid crisis?
10 A. On the opioid crisis.
11 MR. NICHOLAS: Object to the
12 form.
13 THE WITNESS: Yes.
14 BY MR PIFKO:
15 Q. Do you believe that by
16 following its obligation to prevent
17 diversion, AmerisourceBergen can prevent
18 opioid pills from falling into the hands
19 of the black markets?
20 MR. NICHOLAS: Objection as
21 to form. Objection as to scope.
22 THE WITNESS: So, again, you
23 know, you're asking now inserting
24 conjecture. And I have no

Page 209

1 response to a set of facts that
2 aren't real. I can't -- I can't
3 respond to a question that's
4 conjecture. I can respond to a
5 question, you know, where there
6 are facts associated with the
7 question.
8 So as I said before, when it
9 comes to our regulatory
10 requirements at AmerisourceBergen,
11 we meet them. We're constantly
12 evaluating how our performance is
13 and how we're meeting them. We
14 are constantly evaluating things
15 that we could possibly do
16 differently to continuously
17 analyze the results of our work,
18 all in an effort to do everything
19 that we can to meet our
20 requirements.
21 BY MR PIFKO:
22 Q. Do you believe that one of
23 the things that you are striving to do,
24 as the senior-most person in the

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 diversion control department, is to
2 prevent pills from getting into illegal
3 markets?
4         MR. NICHOLAS:  Objection as
5 to form.  Objection as to scope.
6         THE WITNESS:  Again, I view
7     my role, as the senior person over
8     our diversion control efforts, as
9     one to make sure that we, as a
10     company, day in and day out,
11     fulfill all of our legal
12     obligations.  That's my number one
13     priority.
14         And when I come to work each
15     day, that's what I try to do.
16 BY MR PIFKO:
17     Q.   In carrying out your duties
18 as the head of the diversion control
19 program for AmerisourceBergen, do you
20 believe that -- is it important to you to
21 prevent pills from falling into the hands
22 of someone who could suffer an overdose?
23         MR. NICHOLAS:  Objection as
24     to form.  Objection as to scope.

Page 211

1         THE WITNESS:  Again, I think
2     I've been pretty clear in terms of
3     what I hope to accomplish and what
4     I believe to be my
5     responsibilities are at
6     AmerisourceBergen.
7         I'm happy to repeat those.
8 BY MR PIFKO:
9     Q.   Do you hope to accomplish a
10 reduction of overdose deaths?  Is that
11 something that you seek to accomplish?
12         MR. NICHOLAS:  Objection as
13     to form.  Objection as to scope.
14         THE WITNESS:  Again, as I've
15     outlined, I think that there are
16     various requirements imposed upon
17     different registrants within the
18     system.  And I think if, that, all
19     registrants concentrate on their
20     requirements and carry out those
21     duties, it will have a positive
22     impact on prescription drug abuse.
23         That's a personal view --
24 BY MR PIFKO:

Page 212

1     Q.   Is that the company's view,
2 too?
3         MR. NICHOLAS:  Objection as
4     to form.  Objection as to scope.
5         THE WITNESS:  -- I think
6     that the company has stated
7     publicly that they recognize the
8     opioid abuse problem and want to
9     do everything they can to
10     contribute to solutions.
11 BY MR PIFKO:
12     Q.   Let's go to Page 9 of this
13 document.
14         Are you there?
15     A.   I am.
16     Q.   It says, More recently, DEA
17 has shifted an increasingly large number
18 of their special agents who are
19 investigating criminal drug trafficking
20 organizations to newly created tactical
21 diversion squads.  And part of their
22 mandate is to use their law enforcement
23 skills at developing criminal
24 investigations, which lead to indictments

Page 213

1 and arrests, of all DEA registrants that
2 are members of the closed system,
3 including manufacturers, distributors,
4 doctors, pharmacies.  These criminal
5 charges may be brought against the
6 organizations themselves and/or the
7 organization's employees.
8         Do you see that?
9     A.   I do.
10     Q.   What was the basis of making
11 that statement?
12         MR. NICHOLAS:  Object to the
13     form.
14         THE WITNESS:  That statement
15     was made in the context of this
16     entire presentation.  It was
17     intended to inform our sales
18     folks, educate our sales folks, in
19     a very general way, about facets
20     of diversion control and our
21     obligations.
22         So there's no specific
23     intent of this statement, other
24     than to say, this is part of the

Page 214

1     regulatory environment, as well as
2     these other things.
3 BY MR PIFKO:
4     Q.   How did you know that there
5 were these newly created tactical
6 diversion squads?
7       MR. NICHOLAS: Objection as
8     to form. Objection as to scope.
9       THE WITNESS: Through my
10     work and experience at DEA. I
11     oversaw one of these DEA tactical
12     diversion squads.
13 BY MR PIFKO:
14     Q.   You oversaw one of these
15 tactical --
16     A.   Yes.
17     Q.   -- diversion squads?
18       In what part of your career
19 did you oversee one of these tactical --
20     A.   When I was in Atlanta.
21     Q.   What was the -- was the task
22 of the tactical diversion squad
23 consistent with what's reflected here?
24       MR. NICHOLAS: Object to the

Page 215

1     form. Scope.
2       THE WITNESS: Yes, generally
3     speaking.
4 BY MR PIFKO:
5     Q.   What were you seeking to do
6 as part of that task force -- sorry,
7 tactical diversion squad?
8       MR. NICHOLAS: Object to the
9     form. Object as to scope. And I
10     just want to make it clear that
11     the witness is not speaking as a
12     representative of the DEA or
13     purporting to represent any DEA
14     positions.
15       THE WITNESS: I'm sorry,
16     what was the question?
17 BY MR PIFKO:
18     Q.   I was asking what the
19 purpose -- you said you ran one of these
20 tactical diversion squads, correct?
21     A.   To be specific, I had a
22 group supervisor who reported directly to
23 me who was the direct supervisor of the
24 tactical diversion squad.

Page 216

1     Q.   What was the purpose of the
2 tactical diversion squad that you
3 oversaw?
4       MR. NICHOLAS: Object as to
5     form and scope. And with the same
6     caveat that I just interposed a
7     minute ago.
8       Go ahead.
9       THE WITNESS: And, again,
10     beyond -- going beyond the
11     description I've provided here, I
12     probably would prefer not to talk
13     about DEA operations that were
14     ongoing at that time.
15 BY MR PIFKO:
16     Q.   Well, you've disclosed it
17 here.
18     A.   I've disclosed that general
19 information there.
20     Q.   Did you oversee any efforts
21 by the tactical diversion squad to
22 investigate a manufacturer for diversion
23 violations?
24       MR. NICHOLAS: Object as to

Page 217

1     form. Object as to scope.
2       Hold on one second.
3       I'm going to instruct the
4     witness not to answer, only so
5     that -- well, I'll let you answer
6     the question, and then we'll see
7     if we need a break so that -- go
8     ahead.
9       MR PIFKO: To avoid this,
10     I'm not going to ask you about any
11     specifics, the identity of who you
12     might have been targeting. I'm
13     just asking you general questions
14     right now.
15 BY MR PIFKO:
16     Q.   And the specific question I
17 asked you was whether you oversaw any
18 efforts by the tactical diversion squad
19 to investigate a manufacturer for
20 diversion violations?
21       MR. NICHOLAS: I'll permit
22     him to answer as long as it
23     doesn't implicate any restrictions
24     that he has with regard to his

Page 218

1 prior position. That's my only
2 concern here.
3 THE WITNESS: I was not
4 involved in any investigations of
5 any manufacturers during that time
6 period.
7 BY MR PIFKO:
8 Q. How about distributors?
9 A. Same response.
10 Q. How about doctors?
11 A. I'm not going to comment
12 further on any other investigative
13 activity.
14 Q. I'm not asking you to
15 identify a doctor or identify a specific
16 defendant.
17 MR. NICHOLAS: I think what
18 we're hearing is that the witness
19 may be uncomfortable in terms of
20 his legal obligations and
21 limitations having come out of the
22 DEA.
23 So I'm going to -- I'm going
24 to suggest that you not try to

Page 219

1 pursue this. Otherwise, I'm going
2 to have to instruct him not to
3 answer, I guess.
4 MR PIFKO: We can meet and
5 confer about it later, but I might
6 have to bring you back to ask
7 questions about this topic.
8 MR. NICHOLAS: About this
9 particular topic, you would bring
10 him back? Okay. You can go ahead
11 and try to do that. But for now,
12 let's move on. I think that's
13 kind of silly, but let's move on
14 because you're just putting him in
15 an awkward position for no
16 particular good reason.
17 MR PIFKO: Believe me, I
18 represent the city of Cleveland,
19 I'm familiar with the law
20 enforcement privileges. And I
21 don't think that I'm asking
22 anything that's violating a
23 privilege.
24 And if you're going to

Page 220

1 assert it, that's fine. But if we
2 have a dispute, I'm going to seek
3 to bring him back so that --
4 MR. NICHOLAS: Unless you
5 represent the DEA, then I don't
6 think you really have a good feel
7 for this.
8 So in any event, I think we
9 should move on.
10 BY MR PIFKO:
11 Q. Just to be clear for the
12 record, you're unwilling, at this time,
13 to answer any further questions about
14 your oversight of any actions by the
15 tactical diversion squad, as mentioned in
16 this slide here?
17 MR. NICHOLAS: Hold it.
18 I'll object to the form of the
19 question. I'll instruct him not
20 to answer. He's not unwilling --
21 he is or isn't unwilling, but I'm
22 instructing him not to answer at
23 this point. He does not have to
24 answer that question.

Page 221

1 BY MR PIFKO:
2 Q. Let's go to Slide 16 -- or
3 Page 16, it says Slide 17.
4 Are you there?
5 A. Yes, sir.
6 Q. Okay. It says, What's being
7 diverted?
8 Do you see that?
9 A. Yes.
10 Q. The biggest threat for
11 diversion is our opioids.
12 Do you see that?
13 A. Yes.
14 Q. Do you agree with that
15 statement?
16 MR. NICHOLAS: Object to the
17 form.
18 THE WITNESS: I agree.
19 BY MR PIFKO:
20 Q. You see here it says, So it
21 happens frequently that you will see
22 someone who was prescribed hydrocodone
23 following an injury or medical
24 intervention for legitimate medical

Page 222

1  purposes but then continues to use and
2  abuse the drug long after the legitimate
3  medical need has passed.
4        Do you see that?
5     A.   I do.
6     Q.   Do you agree with that
7  statement?
8     A.   I believe that could occur,
9  yes.
10    Q.   Do you believe that in
11 trying to prevent diversion, you're
12 trying to prevent that from occurring?
13       MR. NICHOLAS:  Object to the
14    form.  Object as to scope as well.
15       THE WITNESS:  So as a
16    wholesale distributor in the
17    environment in which we work and
18    the things that we can and cannot
19    do, I cannot, as a wholesale
20    distributor, prevent a
21    practitioner from continually
22    writing a hydrocodone prescription
23    for a patient who suffered an
24    injury a long time ago but

Page 223

1     continues to write those.  There
2     is nothing -- I have no visibility
3     to that patient.  I have no
4     visibility to that practitioner.
5        Likewise, I don't see that
6     patient when he walks through the
7     doors at the pharmacy and he
8     interacts with the pharmacist.
9     And I don't see the information
10    that the pharmacy has at their
11    disposal, the pharmacist, in terms
12    of the diagnostic code on that
13    prescription.  Of course, there
14    are HIPAA concerns there as well.
15       So our role in the supply
16    chain is fairly limited.  I can
17    monitor the orders being placed by
18    that pharmacy, and I can look for
19    orders that meet the definition of
20    suspicious.  And if I find those,
21    I can report those to DEA.  But to
22    make a connection between that
23    sort of work and me being able to
24    prevent overprescribing and

Page 224

1     potential misuse and abuse,
2     there's clearly things, as a
3     wholesale distributor, that we can
4     and cannot do.
5        And that clinical process
6     and that overprescribing, to the
7     extent that we can impact that by
8     identifying suspicious orders, we
9     do that.  But beyond that, there's
10    nothing we can do.
11 BY MR PIFKO:
12    Q.   So in identifying suspicious
13 orders, to the extent you can have an
14 impact on that, you try to do that?
15       MR. NICHOLAS:  Object to the
16    form.  And scope.  Object to the
17    form.
18       THE WITNESS:  Again, as a
19    wholesale distributor, we have a
20    view into the data that that
21    pharmacy, the consumption data,
22    the products that that pharmacy is
23    ordering from us.  And based upon
24    that data, we can make a

Page 225

1     determination if an order is
2     suspicious.
3        But to be clear, even an
4     order that's found to be
5     suspicious and rejected by us,
6     there is not an equation between
7     finding an order suspicious and
8     diversion.  They're separate.
9     They're separate concepts.  There
10    could be an order that we find as
11    suspicious where there's
12    absolutely no diversion taking
13    place.
14       And so, again, as a
15    wholesale distributor, our
16    capabilities are somewhat narrow
17    in this respect.
18 BY MR PIFKO:
19    Q.   The first question here on
20 this note here says, And what's being
21 diverted?
22       Agree?
23    A.   Yes.
24    Q.   And the heading of the

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 slide, Is Most Commonly Diverted Drugs,
2 right?
3     A.    Yes.
4     Q.    You're talking about
5 diverted drugs, right, in this slide?
6     A.    We're talking about the most
7 commonly diverted drugs, yes.
8     Q.    And then you're talking
9 about the biggest threat for diversion
10 are opioids.
11         Do you see that?
12     A.    Yes.
13     Q.    So you then make the
14 linkage, you talk about -- you then
15 present the sentence I just read, about
16 someone who is prescribed hydrocodone
17 following an injury or medical
18 intervention for medical -- legitimate
19 medical purposes but then continues to
20 use and abuse the drug long after the
21 legitimate medical need has passed.
22         Why did you feel that you
23 wanted to communicate that information to
24 the people at this conference in

Page 227

1 connection with the discussion of
2 commonly diverted drugs?
3         MR. NICHOLAS:  Object to the
4     form.  Objection as to scope.
5         THE WITNESS:  Again, this is
6     one slide of many where my goal
7     here was to inform and educate our
8     sales staff.  And so that was the
9     intent of this presentation, to
10     make our sales staff aware, who
11     may not be aware, of some of the
12     finer points around diversion.
13     Maybe they read about opioid
14     abuse, maybe there's some other
15     general knowledge they have.
16         Here is simply an attempt by
17     me to describe some of the drugs
18     that are abused, and also a
19     possible scenario on how that
20     abuse might occur.  There could be
21     many other scenarios.  But this
22     was the goal and the intent and
23     the reasons behind the statement.
24 BY MR PIFKO:

Page 228

1     Q.    Let's go to the next page.
2         The next page and then the
3 slides that follow after, the section is
4 called, Red Flags of Diversion.
5         Do you see that?
6     A.    I do.
7     Q.    What are red flags of
8 diversion?
9         MR. NICHOLAS:  Objection as
10     to form and scope.
11         But go ahead.
12         THE WITNESS:  So we've
13     talked about, as a wholesale
14     distributor, we have a system in
15     place to identify and report
16     suspicious orders.  We do that
17     through our order monitoring
18     program.
19         We also have this notion and
20     this concept where, parallel to
21     our OMP, we run analytics.  And
22     these analytics are designed to
23     identify red-flag behavior.  So
24     that's one example of the

Page 229

1 definition of what would be a red
2 flag.
3         And what are some of these
4 analytics that might be revealed
5 to us through these programs that
6 ■ ██████████████████████████████
7 ■ ██████████████████████████
8 ■ ████████████████████
9 ■ ███████████████████████████
10 ■ ████████
11 ■ ███████████████So that would
12 be a red flag that we developed
13 through analytics.
14         There are other red flags
15 that are more physical.  And these
16 red flags have been shared with
17 distributors by regulators.  An
18 example of one that would be more
19 visible would be a lot of people
20 congregating outside of a pharmacy
21 in long lines.  That might be a
22 physical red flag.
23         And in terms of the audience
24 here, which is salespeople who are

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  visiting all of these locations on
2  regular bases, we want to alert
3  them to those sorts of physical
4  signs of red flags.
5      But I just want to
6  differentiate between the two,
7  some that we use internally within
8  the team and others that are more
9  physical.
10 BY MR PIFKO:
11     Q.   When you talk about the
12 analytical system that is -- I don't
13 remember exactly the word you used, but
14 adjacent to the OMP program --
15     A.   We run parallel to the OMP.
16     Q.   -- when was that added to
17 the program?
18     A.   When we completed the work
19 at enhancing our OMP, as we were going
20 through the work, we worked with our
21 outside consultant and developed these
22 dashboards that we would have available
23 for our folks on the team so that they
24 could have recent, readily available data

Page 231

1  in analytical formats to aid in their
2  decision-making.  So those were developed
3  then, in terms of the computer versions.
4      In the legacy program prior
5  to that enhancement, we did run more
6  manual spreadsheets which contained
7  similar information, which was relied
8  upon by the team as they were doing their
9  order monitoring, evaluating customers in
10 terms of ongoing due diligence.
11     But specifically these
12 dashboards that I referred to were
13 developed with the assistance of FTI
14 during the same time period that we
15 enhanced the OMP.
16     Q.   And that's around what year?
17     A.   So the work began -- well,
18 the work had already begun when I joined
19 the company in March, let's say March
20 1st, 2014.
21     We worked, really, for the
22 better -- almost two years before we
23 started rolling out the advanced -- the
24 enhanced OMP, starting around June or

Page 232

1  July of 2015.  And it took us about six
2  months to roll those out to all of our 26
3  distribution centers across the country.
4      Q.   When we talked about some of
5  these red flags of diversion, I want to
6  elaborate on some of them.
7      A.   Sure.
8      Q.   Okay.  So you made a
9  distinction between physical red flags
10 and data-driven red flags, agree?
11     A.   I did.



Page 233



Page 234

Page 235

Page 236

¹ reliever, an anti-anxiety medicine and a
² muscle relaxant.  Typically, so you would
³ have an opioid, hydrocodone or oxycodone,
⁴ with alprazolam, and then carisoprodol is
⁵ the muscle relaxant.

Page 237

¹⁶ BY MR PIFKO:
¹⁷    Q.   What about the -- have you
¹⁸ heard of the concept Holy Trinity?
¹⁹    A.   Yes, I have.
²⁰    Q.   What is that?
²¹    A.   That's a combination of
²² controlled substances that has been or
²³ may be dispensed to a single patient.
²⁴ And it would be a combination of a pain

¹² BY MR PIFKO:
¹³    Q.   And that type of data is
¹⁴ data that you can request, we talked
¹⁵ about that earlier?
¹⁶    A.   I described, yes, when we
¹⁷ collect dispensing data, I drew the
¹⁸ distinction between, you know, the
¹⁹ dispensing data and utilization report.
²⁰        The dispensing data is
²¹ something that we would, you know,
²² collect under certain conditions.  And I
²³ described those, primarily, three
²⁴ conditions.

Page 238

1    Q.   Let's talk about the
2  physical red flags of diversion.  Go to
3  the next page.
4          It shows a long line of
5  people outside a pharmacy.
6          Why is that a red flag?
7    A.   Again, we've all been to
8  pharmacies and have picked up
9  prescriptions; and any prescription that
10  I've ever picked up, I don't recall
11  seeing a long line of patrons outside.
12  So just for the sheer fact alone that
13  it's something that you wouldn't
14  typically see.
15          That being said, again, this
16  presentation is a little dated.  I think
17  that some of these red flags were
18  probably more relevant some time ago.  I
19  don't think that -- that sort of activity
20  there would even be more rare in these
21  days.
22    Q.   The next slide has some
23  license plates, and it talks about --
24  well, you say, I was always amazed, in my

Page 239

1  former position with DEA in Atlanta, when
2  we would be observing the activities at a
3  particular pharmacy and you would see
4  vehicles from Tennessee, West Virginia
5  and Virginia show up at the pharmacy,
6  typically with more than one person in
7  the vehicle, where the occupants of the
8  vehicle would go in, fill a prescription,
9  and then head right back to the highway
10  in the direction of their home state.
11          Do you see that?
12    A.   I do.
13    Q.   That's a red flag of
14  diversion?
15          MR. NICHOLAS:  Object to the
16  form.
17          THE WITNESS:  Yes.
18  BY MR PIFKO:
19    Q.   And why is that?
20    A.   So when I go to fill a
21  prescription, you know, unless there's
22  some hard-to-receive medication, I'm
23  going to go to a place that's convenient
24  to my home or my office.

Page 240

1          For people to travel great
2  distances to receive -- or to have
3  prescriptions filled would, therefore, be
4  a red flag.
5    Q.   And in giving this
6  presentation and making these examples,
7  these are things that you wanted the
8  salespeople who are visiting the
9  pharmacies in connection with their jobs,
10  you wanted them to be able to observe
11  these things so they could report it back
12  to the company?
13          MR. NICHOLAS:  Object to the
14  form.
15          THE WITNESS:  We wanted them
16  to be knowledgeable about the red
17  flags.  We wanted them to, if they
18  were to make these observations or
19  other observations that somehow
20  seemed unusual to them, we wanted
21  them to collect that information
22  and pass it back to us in the
23  diversion control section so that
24  we could follow up, yes.

Page 241

1  BY MR PIFKO:
2    Q.   And you believe that by them
3  presenting that information, it can aid
4  the company in preventing diversion,
5  correct?
6          MR. NICHOLAS:  Object to the
7  form.
8          THE WITNESS:  By training
9  our diversion -- I mean, by
10  training our sales staff, I'm
11  sorry, this was just another step
12  that we took that we felt was
13  required to fulfill our
14  responsibilities under the
15  regulations.
16  BY MR PIFKO:
17    Q.   Is this a step that was
18  added to your process?
19          MR. NICHOLAS:  Object to the
20  form.
21          THE WITNESS:  There was some
22  training that took place of our
23  sales staff.  I believe I saw, in
24  the past, other PowerPoints that

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1  were presented. But I can't talk
2  about the specifics in terms of
3  who and when that was done.
4  BY MR PIFKO:
5  Q.   Well, when you came into the
6  position, you undertook an effort to
7  become familiar with what the protocols
8  and processes were, correct?
9       MR. NICHOLAS:  Object to the
10  form.  Asked and answered a number
11  of times.
12      THE WITNESS:  When I joined,
13  I tried to become aware of as much
14  as I could around the entire
15  diversion control program.
16  BY MR PIFKO:
17  Q.   And was there any effort in
18  2015 -- or, sorry, 2014, when you joined
19  the company, to collect that kind of
20  information and put it in a usable form?
21      MR. NICHOLAS:  Objection.
22  Outside the scope.
23      THE WITNESS:  Could you
24  define your question a little bit

Page 243

1  more?  Because it's a little bit
2  open-ended.
3  BY MR PIFKO:
4  Q.   These red flags of diversion
5  we're talking about, and specifically
6  we're talking about the training that was
7  done and how sales associates can make
8  observations that could help the company
9  in its efforts to prevent diversion.
10      And what I'm asking you is
11  whether you're -- if you're aware of
12  whether the company had any processes or
13  procedures to obtain and use that
14  information, in 2014, to prevent
15  diversion?
16      MR. NICHOLAS:  Objection.
17  Form.  And outside the scope.
18      THE WITNESS:  So I guess I'm
19  a little confused, because this
20  would be an example of the
21  training that we provided to our
22  sales staff.
23      And maybe I'm missing
24  something.  I'm still not

Page 244

1  completely understanding.
2       Did the company have other
3  information like this that it
4  shared with its sales executives?
5  BY MR PIFKO:
6  Q.   It's okay.  Sorry that you
7  don't understand.
8  A.   Sure.  Thanks.
9  Q.   This is after you joined the
10  company, right?
11  A.   Yes.
12  Q.   You gave this presentation?
13  A.   I did.
14  Q.   You had never given this
15  presentation before, right?
16  A.   Correct.
17  Q.   So my question is, before
18  you had given this presentation, were you
19  aware of whether there was any effort by
20  the company to obtain this type of
21  red-flag information from sales
22  associates and use it in their efforts to
23  prevent diversion?
24      MR. NICHOLAS:  Well,

Page 245

1  objection to the form.  And to the
2  scope.  And I think it's a
3  misleading question in light of
4  what the witness has just said
5  back to you.
6       THE WITNESS:  As I responded
7  previous, there was some training
8  that was done, prior to my
9  arrival, of the sales staff.  And
10  I remember seeing some
11  documentation, whether it was a
12  PowerPoint presentation, I don't
13  recall specifically what that was,
14  where similar training was
15  provided to our sales staff.
16      I can't really comment on
17  the specific content at this
18  point, because it was something
19  that I viewed among everything
20  else around our diversion control
21  program when I walked through the
22  doors.
23  BY MR PIFKO:
24  Q.   Do you know if there were

Page 246

1 any systems in place to collect
2 information and use it at the time that
3 you joined, that type of information?
4         MR. NICHOLAS:  Objection.
5     Form.  Scope.  And there was
6     questioning on this yesterday of a
7     witness for whom this was within
8     the scope of his 30(b)(6)
9     deposition.
10        THE WITNESS:  Again, collect
11     this type of information.  So
12     diversion red flags for sales
13     executives.  Again, my response
14     would be the same.  I recall some
15     training that was given.  The
16     content of the training, I
17     don't -- I don't recall.
18 BY MR PIFKO:
19     Q.   My question is not about the
20 training.  It's about whether there was
21 processes and protocols in place to use
22 information that sales associates might
23 have provided from these red flags of
24 diversion.  That's what I'm asking you.

Page 247

1         MR. NICHOLAS:  Objection.
2 BY MR PIFKO:
3     Q.    And to be clear, I'm asking
4 you in your personal capacity.
5         MR. NICHOLAS:  Okay.
6     Objection.  Asked and answered a
7     number of times.  This is
8     repetitive.
9         THE WITNESS:  In terms of
10     the latter part of your question,
11     whether there were protocols in
12     place, I don't know.
13        MR PIFKO:  Let's take a
14     break.
15        VIDEO TECHNICIAN:  Going off
16     record.  2:17 p.m.
17            - - -
18     (Whereupon, a brief recess
19 was taken.)
20            - - -
21        VIDEO TECHNICIAN:  We're
22     back on record.  The time is 2:32
23     p.m.
24            - - -

Page 248

1         (Whereupon,
2     AmerisourceBergen-May Exhibit-10,
3     ABDCMDL 00159072, was marked for
4     identification.)
5            - - -
6 BY MR PIFKO:
7     Q.   I'm handing you what's
8 marked as Exhibit-10.  Sorry, I handwrote
9 the date on the copy, I thought it was
10 mine.  That's the only writing that's on
11 there.
12        For the record, this is a
13 document Bates labeled ABDCMDL 00159072.
14 Take a moment to review this
15 and let me know when you're done.
16        For the record, it's dated
17 October 6th, 2016.  The custodian is
18 David May.  The file name is NADDI
19 slides.
20     A.   Okay.
21     Q.   Have you seen this before?
22     A.   I recognize the content as
23 content that I delivered to a NADDI
24 training conference, NADDI being National

Page 249

1 Association of Drug Diversion
2 Investigators.
3     Q.   What was the purpose of this
4 presentation?
5     A.   Again, it was intended to be
6 educational for the law enforcement
7 community about who wholesale
8 distributors were and how we could assist
9 them in their efforts.
10     Q.   This is a presentation that
11 you gave to that organization on or
12 around October 2016?
13     A.   So I've given two
14 presentations.  I believe this is the
15 first presentation, yes.
16     Q.   And you believe it was some
17 time in October 2016?
18     A.   I don't have anything that's
19 dated, but -- I'd have to actually
20 confirm the date unless there's some
21 other document you can point me to that I
22 can confirm the date.
23     Q.   I can just tell you that the
24 data associated with the document said

Page 250

1 that it was dated October 6th, 2016.
2     A.   So let's assume it's around
3 that time period.
4     If I created the document,
5 then, presumably, it would have been in
6 relation time-wise to when I gave the
7 presentation.
8     Q.  Let's go to -- well, the
9 first slide.
10     Do you see the language on
11 the first page here in the notes,
12 McKesson, Cardinal and AmerisourceBergen
13 have a combined market share in excess of
14 90 percent?
15     A.  Yes.
16     Q.  Do you agree with that
17 statement?
18     MR. NICHOLAS:  Object to the
19 form.
20     THE WITNESS:  Again, I would
21     have researched that at that time
22     period and derived information
23     from others at the time period
24     when this was given.

Page 251

1     I recognize that the
2     information I received, I assume
3     that it was correct, that was
4     provided to me.  And it's a
5     general estimate.
6 BY MR PIFKO:
7     Q.  Do you recall before we were
8 talking about market share?
9     A.  I do.
10     Q.  And I had a question about
11 whether if you believed that the three
12 distributors with almost all of the
13 market share played any role in the
14 opioid epidemic.
15     Do you recall that
16 discussion?
17     A.  I do.
18     Q.  So now seeing the data, do
19 you believe that the entities who
20 controlled 90 percent of the
21 pharmaceutical distribution market had an
22 ability to take actions that would have
23 reduced the impact on the opioid crisis?
24     MR. NICHOLAS:  Object to the

Page 252

1 form.  Objection to the scope.
2 Asked and answered.
3     THE WITNESS:  And I would
4 rely upon my previous response as
5 well.  And restate it.
6     I can't sit here and speak
7 to the programs or market share
8 relative to Cardinal and McKesson.
9 I can say that, regardless of
10 market share, regardless of being
11 AmerisourceBergen or one of the
12 other 800 wholesale distributors,
13 it's not about market share, it's
14 really about everyone doing what
15 they're supposed to be doing.
16 BY MR PIFKO:
17     Q.  And that's how we prevent
18 diversion and prevent the opioid crisis?
19     MR. NICHOLAS:  Object to the
20 form.  Object to the scope.
21     THE WITNESS:  I'll rely on
22 my previous response.
23 BY MR PIFKO:
24     Q.  Well, you said regardless of

Page 253

1 market share, regardless of being
2 AmerisourceBergen or one of the other 800
3 wholesale distributors, it's not about
4 market share, it's about, really,
5 everyone doing what they're supposed to
6 be doing.
7     What's everybody supposed to
8 be doing?
9     MR. NICHOLAS:  Object to the
10 form.  Object to the scope.
11 Object to the cross-examination of
12 the witness by his very last
13 answer.  I'll object.
14     THE WITNESS:  Again, from
15 your question, I understand you to
16 mean that, because of market
17 share, that that market share
18 somehow gives us some influence
19 over the opioid issue.  And my
20 statement is that it's not a
21 question of market share.  And at
22 AmerisourceBergen, we have
23 requirements that are put upon us
24 and we fulfill those requirements.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

¹ BY MR PIFKO:
² Q. And if everybody is doing
³ what they can be doing, that's how you
⁴ impact the crisis, correct?
⁵ MR. NICHOLAS: Well, object
⁶ to the form. Object to the scope.
⁷ Object to the fact that you've
⁸ asked the question about seven or
⁹ eight times, probably more,
¹⁰ probably fifteen or twenty times
¹¹ today. Asked and answered.
¹² THE WITNESS: I think I
¹³ responded several times to this.
¹⁴ And, again, I would just
¹⁵ emphasize that throughout the
¹⁶ closed system, there are different
¹⁷ requirements imposed upon
¹⁸ different registrants. And, yes,
¹⁹ if all registrants comply with
²⁰ their requirements, then it would
²¹ have a positive effect on
²² diversion control.
²³ BY MR PIFKO:
²⁴ Q. Let's go to Slide 5, which

Page 255

¹ is on Page 5.
² Are you there?
³ A. Yes.
⁴ Q. There's a picture of a form
⁵ and then a discussion below about the
⁶ information you collect from your
⁷ customers pursuant to the "know your
⁸ customer" requirement.
⁹ A. Yes.
¹⁰ Q. Do you see that?
¹¹ Is this the Form 590?
¹² A. Yes.
¹³ Q. And let's go up to the
¹⁴ previous slide. Page 4.
¹⁵ You have a comment here that
¹⁶ says, You don't see specific reference to
¹⁷ knowing your customer in the law and
¹⁸ regulations, but you do see repeated
¹⁹ references to the concept in the final
²⁰ decisions and orders issued relative to
²¹ actions taken by DEA against registrants,
²² as well as in public training sessions by
²³ DEA.
²⁴ Do you see that?

Page 256

¹ A. I do.
² Q. Do you agree with that
³ statement?
⁴ MR. NICHOLAS: Object to the
⁵ form.
⁶ THE WITNESS: I do agree
⁷ with that statement in the context
⁸ of this training. I would also
⁹ say that you see reference to due
¹⁰ diligence in other areas as well;
¹¹ namely being the limited guidance
¹² DEA has furnished in the form of
¹³ those memorandum that were shared.
¹⁴ BY MR PIFKO:
¹⁵ Q. And you believe knowing your
¹⁶ customer and due diligence is part of the
¹⁷ requirement to maintain effective
¹⁸ controls to prevent diversion?
¹⁹ MR. NICHOLAS: Object to the
²⁰ form. Object to the scope.
²¹ THE WITNESS: I'm so sorry,
²² can you repeat your question,
²³ please?
²⁴ BY MR PIFKO:

Page 257

¹ Q. Do you believe that knowing
² your customer and due diligence is part
³ of the requirement to maintain effective
⁴ controls to prevent diversion?
⁵ MR. NICHOLAS: Object to the
⁶ form. Object to the scope.
⁷ THE WITNESS: I believe that
⁸ knowing your customer and due
⁹ diligence is an aspect of
¹⁰ AmerisourceBergen's program to
¹¹ satisfy their requirements.
¹² BY MR PIFKO:
¹³ Q. Do you believe that knowing
¹⁴ your customer is required under the law?
¹⁵ MR. NICHOLAS: Object to the
¹⁶ form. Object to the scope. And
¹⁷ he's not a lawyer.
¹⁸ THE WITNESS: Again, without
¹⁹ giving a legal opinion, we have,
²⁰ as part of our program that we
²¹ administer, our diversion control
²² program, a "know your customer"
²³ component, which we exercise in
²⁴ order to accomplish due diligence.

Page 258

BY MR. PIFKO:

Q. Do you believe that's a necessary component of the program in order for it to be effective?

MR. NICHOLAS: Object to the form. Object to the scope.

THE WITNESS: I believe that it's a requirement that we have at AmerisourceBergen, and it's one that we've had in place and it's part of our program.

BY MR PIFKO:

Q. You don't have a position about whether it's required?

MR. NICHOLAS: Object to the form. Object to the scope. Asked and answered.

THE WITNESS: So, again, I can't furnish a legal opinion.

What I can say is that I believe we have and should have a "know your customer" component; and we do have a "know your customer" component at our company

Page 259

as part of the diversion control program.

BY MR PIFKO:

Q. Let's go to Page 19.

Are you there?

A. I am.

Q. So the notes that you wrote here say, Final point, we must be mindful of our actions in addressing the epidemic of prescription drug abuse. I will use the relationship between prescription opioids and heroin as an example. When I was overseeing the drug task force in Charlotte ten years ago, there was a rise in the influence of Mexican DTOs in growing the heroin market. The issue was overwhelming and the cross-culture of people that were using heroin amazed me. Over the last couple of years, the overall tightening of the prescription opioid market has led to increased heroin abuse. Having confronted both issues, I believe that our chances for success are much better in the public arena working

Page 260

with pharmacists and doctors.

Do you see that?

A. I do.

Q. Did I read that correctly?

A. You did.

Q. Is that a statement that you made at the time?

A. It was.

Q. Did you present this to the -- at the conference, did you make that statement at the conference?

A. I don't know if I made that precise statement. These are notes that I used.

Q. Do you believe these statements to be true?

MR. NICHOLAS: Object to the form.

But go ahead.

THE WITNESS: I do.

BY MR PIFKO:

Q. When you say "the overall tightening of the prescription opioid market has led to increased heroin

Page 261

abuse," what do you mean by that?

A. I think there's been several actions that have been taken where it's becoming more difficult for people to receive prescription opioids over time. And there are a number of different reasons why.

I think that people who may be addicted and can no longer get a prescription opioid, can that cause them to then go to the illegal market? I think it can. Has that caused folks to do that? I think it has.

I guess my only caveat here is, I can't estimate to what extent that this is -- where this is prevalent.

Q. You thought this was a significant enough point to make the conclusion of your presentation, agree?

MR. NICHOLAS: Object to the form.

THE WITNESS: I think it was one of many points I made during the presentation.

Page 262

BY MR PIFKO:

Q. This was an impactful point you wanted to make at the end of the presentation, agree?

MR. NICHOLAS: Object to the form.

THE WITNESS: I think all of the information I provided during the presentation was important for the audience, including this information.

BY MR PIFKO:

Q. Mexican DTO, that just means drug trafficking organization?

A. Correct.

Q. Do you know who the sponsors of NADDI are?

A. Not off the top of my head, I do not.

Q. Do you know if prescription drug manufacturers participate in that organization?

MR. NICHOLAS: Object to the form. Objection. Asked and

Page 263

answered.

THE WITNESS: I know that there are participants both from the private and public sector.

BY MR PIFKO:

Q. Let's go back to Slide 5. This is the Form 590.

Is the Form 590 an important part of AmerisourceBergen's diversion control program?

MR. NICHOLAS: Object to the form. Objection as to scope.

THE WITNESS: I would say that all aspects of our program are important. I couldn't -- I couldn't categorize this as more or less important than other facets of our program. It's another facet of our program.

BY MR PIFKO:

Q. So this talks about the types of information that are sought in the form.

Do you see that?

Page 264

A. I do.

Q. In the interest of time, I won't necessarily read over all of it.

A. Okay.

Q. But what does the company do with this information?

MR. NICHOLAS: Object as to form. And scope.

THE WITNESS: So when we are onboarding a customer, this information is collected during a site visit. And then a member of the team will receive this information and they'll go through the form. We have a related form that's a checklist. We'll validate, to the extent possible, the contents of the form.

And so we would validate licenses, where we ask the questions. We would collect information relative to certain estimates of drug usage. We would ask about prior disciplinary

Page 265

action. And we would then, you know -- again, use public resources to collect and validate the information that's on the form, wherever possible; go to the various boards, Board of Pharmacy, boards of medicine, if we have physician information, check for prior disciplinary action.

And after that process is complete, we would make a decision whether we wanted to continue with the onboarding of the prospective customer.

BY MR PIFKO:

Q. Is there any effort, within the time frame that you're the 30(b)(6) witness, to update that information after a customer is onboarded?

A. There are times that we update this information, yes. There may be changes at the location. If there is a change of address, of course that would affect the license of the location, so we

Page 266

1 would need to update that information.
2 If there was a change of
3 ownership and the location didn't move,
4 but we needed to get the new information
5 on ownership. And we would also do it on
6 an as-needed bases. For example, if we
7 were involved with the customer, in terms
8 of trying to mitigate some red flag
9 information, we may request an updated
10 form.
11 Q. Let's turn to Slide 17.
12 I'll read you from the notes
13 here. This is -- the image on Slide 17
14 is an image of The Controlled Substances
15 Act closed system of distribution, agree?
16 A. Yes.
17 Q. You have a statement here
18 that says, I truly believe that if we all
19 live up to our individual
20 responsibilities and obligations, we will
21 collectively have a huge, positive impact
22 on the prescription abuse issue. On the
23 other hand, any weak links in the system
24 will cause all of us to become less

Page 267

1 effective.
2 Do you see that?
3 A. I do.
4 Q. Do you agree with that
5 statement?
6 MR. NICHOLAS: Object to the
7 form.
8 THE WITNESS: I do. And I
9 guess in the context, again, of
10 this meeting, if we start to make
11 this a full statement, and, I
12 guess, just as a point of
13 demonstrating our consistency, you
14 know, we all -- registrants have
15 regulations from requirements
16 imposed upon us by virtue of our
17 role in the system. I think I've
18 answered that several times today.
19 And I believe that if we all
20 live up to those roles, we'll
21 collectively have a positive
22 impact. I believe that to be
23 true, and I think I've been pretty
24 consistent about that.

Page 268

1 BY MR PIFKO:
2 Q. You then say, To that end, a
3 wholesaler is responsible for knowing the
4 customer and monitoring the controlled
5 substances and listed chemicals shipped
6 to that customer, rejecting and reporting
7 suspicious orders.
8 Do you see that?
9 A. I do.
10 Q. Do you agree with that
11 statement?
12 MR. NICHOLAS: Object to the
13 form.
14 THE WITNESS: I agree with
15 the statement.
16 - - -
17 (Whereupon,
18 AmerisourceBergen-May Exhibit-11
19 ABDCMDL 00140843-44, was marked
20 for identification.)
21 - - -
22 BY MR. PIFKO:
23 Q. I'm handing you what is
24 marked as Exhibit-11. For the record,

Page 269

1 it's a two-page document, Bates labeled
2 ABDCMDL 00140843 through 44.
3 Have you seen this before?
4 A. Not directly on here. But I
5 am included on distribution to CSRA OMP,
6 and so I have some recollection of this
7 e-mail.
8 Q. Well, let's just talk
9 generally. You can put this document
10 aside for a minute.
11 A. Sure.
12 Q. Do you recall there being
13 issues with deficiencies with the Form
14 590s?
15 A. I do recall, generally
16 speaking, there have been some occasions
17 where we'll have forms where they are not
18 completely legible, and there may have
19 also been occasions where not all of the
20 responses were provided.
21 Q. And the company was
22 undertaking efforts to try to address
23 these deficiencies in 2016; is that
24 correct?

Page 270

1    MR. NICHOLAS:  Object to the
2  form of the question, as it wasn't
3  his testimony.
4    Go ahead.
5    THE WITNESS:  Again, I guess
6  I'll comment that, generally
7  speaking, we're always trying to
8  be vigilant to maintain our
9  processes.  So I wouldn't identify
10  it as any particular time.  It's
11  an ongoing process.
12    - - -
13    (Whereupon,
14  AmerisourceBergen-May Exhibit-12,
15  ABDCMDL 00159415-16, was marked
16  for identification.)
17    - - -
18  BY MR PIFKO:
19    Q.  I'm handing you what's
20  marked as Exhibit-12.  This document is
21  Bates labeled ABDCMDL 00159415 and 16.
22    Have you seen this document
23  before?
24    And you can continue to

Page 271

1  review it, I'm just trying to speed
2  things along for everybody.
3    A.  I have, yes.
4    Q.  Do you know what this is?
5    A.  It's an e-mail string
6  regarding the CSRA 590 validation
7  project.
8    Q.  And the e-mail in the bottom
9  of the first page, you are cc'd on there,
10  correct?
11    A.  Yes.
12    Q.  It's dated August 5th, 2016,
13  correct?
14    A.  Correct.
15    Q.  Do you recall receiving this
16  e-mail?
17    A.  I recognize the content and
18  recall the e-mail.
19    Q.  When was the last time you
20  saw this e-mail?
21    A.  I haven't seen it recently.
22  Probably at that time.
23    Q.  Is this a true and correct
24  copy of the e-mail?

Page 272

1    A.  Yes.
2    Q.  It says here that, Over the
3  past several months, the CSRA diversion
4  control team -- that's your team,
5  correct?
6    A.  Yes.
7    Q.  -- has been working on the
8  CSRA 590 validation project.  This
9  project was initiated to validate that
10  all current ABDC customers authorized to
11  purchase controlled substances have the
12  required due diligence documentation in
13  file.
14    Do you see that?
15    A.  Yes.
16    Q.  Do you agree that that was
17  what the project was?
18    MR. NICHOLAS:  Object to the
19  form.
20    THE WITNESS:  Yes.
21  BY MR PIFKO:
22    Q.  It says, The first phase of
23  this project was to conduct a full review
24  of every ABDC customer authorized to

Page 273

1  purchase controlled substances and
2  identify any with deficiencies.
3    Did I read that right?
4    A.  Yes.
5    Q.  This initial phase has been
6  completed, and a substantial number of
7  customers have been identified who will
8  be required to have their 590
9  documentation updated.  See attached
10  spreadsheet.
11    Do you see that?
12    A.  I do.
13    Q.  Then you write back
14  approximately a year later.
15    Do you see the top e-mail
16  from you dated July 7th, 2017?
17    A.  Yes.
18    Q.  And you say, All, I wanted
19  to check in with you on the progress
20  being made on this project.
21  Unfortunately, as of this writing, we
22  have only received about 10 percent of
23  the required customer due diligence
24  documents.  If you recall, we originally

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  set a June 30th -- set June 30th as a
2  completion date for the continued -- let
3  me start over on that sentence.
4         If you recall, we originally
5  set June 30th as a completion date and
6  the continued deficiency puts us at risk
7  with regulators.
8         Do you see that?
9     A.   I do.
10    Q.   Do you agree with that
11 statement?
12        MR. NICHOLAS:  Object to the
13    form.
14        THE WITNESS:  Yes.
15 BY MR PIFKO:
16    Q.   And you wrote that in this
17 e-mail?
18    A.   Yes.
19    Q.   Do you know how many 590
20 forms were missing or had missing
21 information?
22    A.   I believe there was
23 approximately 3,000.
24        But I do want to get back to

Page 275

1  one thing while you were reading there.
2  You stated, when you started reading the
3  second part of this e-mail, that almost a
4  year later I responded.  And I just want
5  to address that.
6         This was an e-mail that was
7  sent to sales executives.  I don't want
8  to leave you with the impression that
9  there were not other multiple e-mails
10 related to this e-mail and dispel that
11 notion that there was this one e-mail and
12 then there was this one e-mail to these
13 sales executives.
14        I don't know what other
15 e-mails are out there, but I know that
16 there was a lot of communication relative
17 to this project.
18    Q.   Okay.  Understood.
19        All I wanted to point out
20 with the year date difference is that
21 we're a year later, and that a year later
22 after sending the original e-mail about
23 this project, only 10 percent of the
24 required documents had been obtained,

Page 276

1  agree?
2         MR. NICHOLAS:  Object to the
3     form as to his agreeing as to what
4     you were trying to point out.
5         THE WITNESS:  I understood
6     that part of your question.
7         But I didn't want to, again,
8     leave the impression that an
9     e-mail was sent on August 5th and
10    then I didn't respond until a year
11    later.
12 BY MR PIFKO:
13    Q.   I didn't think that that was
14 the case.
15              - - -
16        (Whereupon,
17    AmerisourceBergen-May Exhibit-13,
18    Tab Printout; Sales Assignment,
19    was marked for identification.)
20              - - -
21 BY MR PIFKO:
22    Q.   I just put in front of you
23 Exhibit-13.
24        You see that this e-mail

Page 277

1  references having an attachment of a 590
2  validation master spreadsheet --
3     A.   Yes.
4     Q.   -- dated July 28th, 2016?
5         Do you see that?  You've got
6  to go to Exhibit-12, if you look at the
7  header of the e-mail.
8     A.   Yes.  Attachment.  I see it.
9     Q.   So if you go over to
10 Exhibit-13, there were three tabs in the
11 document, or four tabs.  This is one of
12 the tabs, it's called, Sales Assignment.
13        Do you know what this tab
14 reflects?
15        MR. NICHOLAS:  Where is the
16    tab?  I'm sorry.
17        MR PIFKO:  It was produced
18    natively, but what we do when we
19    produce these is Bates label -- to
20    use it as an exhibit, the Bates
21    label is at the top and the tab is
22    on a footer on the bottom.
23        THE WITNESS:  Again, in the
24    context of this e-mail, and this

Page 278

1 being represented as one of the
2 attachments, this appears to be a
3 list, in the left column, customer
4 DEA number. And we tracked the
5 DEA registration.
6 And then it tells the
7 various sales folks that are
8 assigned to the registration. And
9 that would have been produced to
10 help us organize this work.
11 BY MR PIFKO:
12 Q. And this is a list of all
13 the customers whose Form 590 was missing,
14 correct, or --
15 MR. NICHOLAS: Object to the
16 form.
17 BY MR. PIFKO:
18 Q. -- had deficient
19 information?
20 MR. NICHOLAS: Object to the
21 form.
22 THE WITNESS: Again, I know
23 we compiled the list. I know we
24 keep a spreadsheet of it. I'm not

Page 279

1 sure, in looking at this, you
2 know, multi-page document, if this
3 is an accurate description.
4 I guess what I'll say is
5 that -- well, a couple of things
6 that I want to put in context
7 here.
8 First, in terms of this work
9 itself, and maybe I misinterpreted
10 your question, but this would
11 represent -- this project would
12 represent cases where we could not
13 locate due diligence files, in
14 terms of our customer base, and as
15 a result of that, where we could
16 not locate those due diligence
17 files, we initiated this project.
18 And I guess that's
19 important, I guess, to realize
20 as -- I don't want to leave the
21 impression that we didn't have due
22 diligence for these customers. I
23 want to make sure that we all
24 understand that this project

Page 280

1 revolved around finding situations
2 where we didn't have the
3 documentation in the file. And
4 that's what was the focus of the
5 file.
6 So that's the first --
7 BY MR PIFKO:
8 Q. What's the difference
9 between not having the information and it
10 not being in the file?
11 MR. NICHOLAS: Object to the
12 form.
13 BY MR PIFKO:
14 Q. If it's not in the file, you
15 don't have the information, agree?
16 If I don't have anything in
17 my hand, I don't have anything in my
18 hand.
19 A. So --
20 MR. NICHOLAS: Object to the
21 form.
22 THE WITNESS: So, again, I
23 just want to make sure that we
24 understand the context of the

Page 281

1 project.
2 And that is that we
3 identified a number of accounts
4 where we couldn't locate the
5 information.
6 My point there is I'm not
7 acknowledging that there were not
8 due diligence efforts made in
9 documentation collected. At the
10 time of this review, we couldn't
11 find that information. And that's
12 what this project involved.
13 So that's just to put this
14 in context.
15 The second part, again, do
16 these represent a part of or the
17 totality of those accounts, I
18 can't say by looking at this
19 stack.
20 BY MR PIFKO:
21 Q. Is that stack pretty large?
22 MR. NICHOLAS: Object to the
23 form.
24 THE WITNESS: Again, I think

Page 282

1  you asked a question about how
2  many accounts there were. I
3  think, to my recollection, there
4  were roughly 3,000 when we
5  initiated that, to the best of my
6  recollection.
7  BY MR PIFKO:
8  Q. That stack of customers,
9  though, how thick is that in front of
10 you?
11     MR. NICHOLAS: Well, object
12 to the form.
13 BY MR PIFKO:
14 Q. Can you hold it up?
15 A. It's about an inch thick, I
16 guess.
17 Q. Can you hold it up?
18 A. Sure.
19     MR. NICHOLAS: Objection.
20 Object to the form.
21 BY MR PIFKO:
22 Q. Thank you.
23     MR. NICHOLAS: Showboating.
24 BY MR PIFKO:

Page 283

1  Q. If I tell you that the
2  number of files where you could not
3  obtain the due diligence information as
4  of 2016, the number of customers was
5  3,285, would you agree with me?
6     MR. NICHOLAS: I'll object
7  to the form. The witness has
8  already given testimony on this.
9  But I'll object to the form of the
10 question.
11     THE WITNESS: My response
12 was I think there was
13 approximately 3,000, so I think
14 that's pretty consistent.
15 BY MR PIFKO:
16 Q. So did you continue to
17 obtain this -- attempt to obtain this
18 information over the years?
19 A. Yes.
20 Q. Do you know what the status
21 of this project was as of 2017?
22 A. I cannot say definitively
23 what the status was in 2017.
24 Q. Do you know if these

Page 284

1  deficiencies have been remedied as of May
2  29th, 2018?
3     MR. NICHOLAS: Object to the
4  form.
5     THE WITNESS: I think the
6  project, in terms of its
7  completion -- and, again, I have
8  to estimate this -- is in the 60
9  percent range of completion, but
10 that's the best of my knowledge,
11 just sitting here today with no
12 documentation.
13 BY MR PIFKO:
14 Q. At the present time, your
15 estimate, based on your involvement with
16 the project, is that there's still about
17 40 percent of them that have not been
18 rectified yet?
19     MR. NICHOLAS: Object to the
20 form.
21     THE WITNESS: That's my best
22 estimate, based upon my
23 recollection.
24 BY MR PIFKO:

Page 285

1  Q. Thank you.
2  A. But I think I'm in the
3  ballpark.
4  Q. Do you know when the Form
5  590 process was implemented?
6  A. Not precisely when.
7  Approximately when, I believe it was
8  around 2007, in terms of that particular
9  form. There may have been predecessors
10 that I can't comment on.
11     I'm not the best person to
12 talk about what the due diligence efforts
13 looked like prior to then.
14     - - -
15     (Whereupon,
16 AmerisourceBergen-May Exhibit-14,
17 ABDCMDL 00002232, was marked for
18 identification.)
19     - - -
20 BY MR PIFKO:
21 Q. I'm handing you what's
22 marked as Exhibit-14.
23     For the record, this is a
24 one-page document Bates labeled ABDCMDL

Page 286

1 00002232. It's some e-mails dated
2 December 9th, 2016.
3 　　　Let me know when you're done
4 reviewing this.
5 　　A.　Okay.
6 　　Q.　Have you seen this e-mail
7 before?
8 　　A.　I have, during -- I guess it
9 would be December 9th, 2016.
10 　　Q.　Do you recall the discussion
11 in this e-mail?
12 　　A.　Generally, based upon the
13 content.
14 　　Q.　Is this a true and correct
15 copy of the e-mail?
16 　　A.　Yes.
17 　　Q.　Can you tell me about what's
18 discussed in the e-mail here?
19 　　　MR. NICHOLAS:　Object to the
20 form.
21 　　　THE WITNESS:　You know,
22 　　according to the content here that
23 　　I'll rely upon, it's an exchange
24 　　between a member of Purdue's

Page 287

1 　　compliance group and Eric
2 　　Cherveny, who works on our
3 　　diversion control team, about
4 　　media reports relative to
5 　　physicians.
6 BY MR PIFKO:
7 　　Q.　Eric says, FYI, Purdue
8 Pharma sends me this list periodically.
9 It's a list that Purdue maintains
10 regarding prescriber action.  Not sure
11 how they collect the data.  Yellow
12 highlighting indicates new action since
13 the last submission.  Blue highlighting
14 indicates a physician who has had
15 subsequent action.  We need to discuss if
16 we're going to use this list and, if so,
17 how.
18 　　　Do you see that?
19 　　A.　I do.
20 　　Q.　Do you recall getting this
21 list from Purdue Pharma?
22 　　A.　I do not recall whether we
23 did or did not get that list from Purdue

Page 288

1 Pharma.  And I'm guessing, from the
2 context here I'm seeing as you just read
3 it, Eric is stating that he doesn't know
4 how they provide the information.  But
5 from the lower e-mail, it looks like it's
6 generated from media reporting.
7 　　Q.　Do you recall getting this
8 list and doing anything with it?
9 　　　MR. NICHOLAS:　Object to the
10 　　form of the question.  Asked and
11 　　answered.
12 　　　THE WITNESS:　So, yeah, just
13 　　to repeat my response, I don't
14 　　know whether we did or did not get
15 　　a copy of that list.
16 　　　I do know, as part of our
17 　　program, we do maintain a -- what
18 　　we refer to as a suspect
19 　　subscriber list, which is distinct
20 　　from this list.  I don't know if
21 　　Eric added this information to
22 　　that list or not at this point.
23 BY MR PIFKO:
24 　　Q.　The suspect subscriber list,

Page 289

1 can you tell me what that is?
2 　　A.　Again, when we receive
3 information relative to doctors, we
4 receive the DEA reports, the register
5 reports, as they come out, where DEA
6 announces their actions they've taken
7 against practitioners.
8 　　　So if we were to receive one
9 of those reports where they've taken an
10 action against a practitioner, we would
11 add that information to the list so that
12 in doing our due diligence, if we came
13 across those doctors, we would have that
14 information.
15 　　Q.　Does AmerisourceBergen --
16 sorry.
17 　　　With respect to the suspect
18 subscriber list, do you know when that
19 effort to collect that list was
20 initiated?
21 　　　MR. NICHOLAS:　Objection
22 　　only as to scope.
23 　　　THE WITNESS:　Previous to my
24 　　arrival.  It was -- to my

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  recollection, it existed when I
2  arrived.
3  BY MR PIFKO:
4    Q.  With respect to the suspect
5  subscriber list, do you know if it was
6  AmerisourceBergen's practice to inform
7  customers in the area where the suspect
8  prescribers were about these physicians
9  and that they shouldn't fill
10 prescriptions from them if they had their
11 licenses revoked?
12       MR. NICHOLAS:  Objection as
13    to scope.
14       THE WITNESS:  Well, the
15    answer is no.  And I'm not even
16    sure how we would do that.
17 BY MR PIFKO:
18    Q.  How about with respect to
19 this list that Purdue Pharma sent you,
20 was there ever any effort to communicate
21 the company's knowledge of these
22 prescribers of concern identified by
23 Purdue to customers in the area where
24 these physicians were?

Page 291

1        MR. NICHOLAS:  Objection to
2    the form of the question.  The
3    witness has twice said he doesn't
4    know whether they received the
5    list or not.  So I don't want
6    there to be a misleading record
7    here.
8        THE WITNESS:  Same response.
9    I'm not sure what the outcome of
10   this e-mail string was relative to
11   the list provided by Purdue at
12   this time.
13 BY MR PIFKO:
14    Q.  Well, if there was a
15 practice of sharing it with your
16 customers, you would be aware of that,
17 right?
18       MR. NICHOLAS:  Object to the
19    form.
20       THE WITNESS:  I'm not
21    aware -- again, I've answered the
22    question.
23       But I'm not aware of us
24    sharing information, through some

Page 292

1  broadcasting, to our customers in
2  particular areas.  Again, I don't
3  even know how we would do that.
4        And I guess along that
5  point, the obligation of the
6  pharmacist really is preeminent
7  when it comes to knowing the
8  physicians for whom he's filling
9  prescriptions under his
10 corresponding responsibility.
11       So, again, that would be an
12 area that, as a wholesale
13 distributor, you know, that's --
14 that's within the responsibility
15 of the pharmacist, in my view.
16 BY MR PIFKO:
17    Q.  Going back to Exhibits-12
18 and 13 -- do you have 12 in front of you?
19    A.  I have 12, yes.  And 13,
20 yes.
21    Q.  You said in your e-mail here
22 that, Continued deficiency puts us at
23 risk with regulators.
24       Do you see that?

Page 293

1    A.  Yes.
2    Q.  Did you ever notify
3  regulators that there were deficiencies
4  with your 590 forms?
5        MR. NICHOLAS:  Object to the
6    form.  Object to the question.
7        THE WITNESS:  I have not --
8    or we have not identified any
9    deficiencies to the regulators.
10       To the extent where
11   regulators have arrived at our
12   distribution centers and have
13   requested due diligence files and
14   we've supplied those, we've
15   satisfied their requirement.
16       If, when they've requested
17   due diligence files and we could
18   not locate one, that's also been
19   identified through them, in terms
20   of offering an explanation.
21       As I've stated here today,
22   perhaps we had the file, we can't
23   locate the file for myriad of
24   reasons.

Page 294

1    So short answer is, we have
2  not gone to the regulator and say,
3  we have a deficiency.  I don't
4  believe we have a deficiency.
5    The other part of that,
6  again, is, we have had
7  conversations with the regulators;
8  when we have not had that file,
9  that has been identified to them.
10   And it's been a rarity.
11  It's not been -- it's not been a
12  common occurrence.
13 BY MR PIFKO:
14   Q.   Well, we know there's 3,200
15 where your company identified them to be
16 deficient, agree?
17     MR. NICHOLAS:  Object to the
18  form.  Object to the arguing.
19     THE WITNESS:  Again, I think
20  that -- I think that we identified
21  the issue as a team.  Then we set
22  about a plan to put corrective
23  action in place.  And we've been
24  working that plan to have that

Page 295

1  corrective action completed.
2     MR. PIFKO:  We're going to
3  take a short break.
4     VIDEO TECHNICIAN:  Going off
5  the record.  3:30 p.m.
6       - - -
7     (Whereupon, a brief recess
8  was taken.)
9       - - -
10     VIDEO TECHNICIAN:  We're
11  back on record at 3:44 p.m.
12     MR. NICHOLAS:  There was
13  testimony in the previous set of
14  questions about a list of --
15  concerning a list of due diligence
16  files that were missing or not
17  available.  And there was
18  testimony about the fact that
19  there was approximately 3,000 such
20  documents -- 3,000 such files.
21     There was also testimony
22  about the fact that these files
23  were contained or illustrated or
24  displayed on three different tabs,

Page 296

1  or maybe it was four different
2  tabs.
3     MR. CLUFF:  I believe it's
4  four tabs.
5     MR. NICHOLAS:  Okay.  We
6  have gone back, on the break, we
7  have not talked to the witness
8  about this, and checked the tabs
9  and checked the stack of -- the
10  stack of -- that you displayed,
11  that you gave him, that purports
12  to represent the 3,000 files.
13     This stack is a stack of
14  approximately 13,000 files.  It is
15  not -- it does not display the
16  3,000 that you discussed.  The
17  3,000 that you discussed are
18  contained in Tabs 1 and Tabs 2,
19  which are identified as a red tab
20  and a blue tab.  If you print
21  those out and add them up, it does
22  appear to be about 3,000 or so.
23     So what I'm seeing is that
24  you gave him a list -- a stack of

Page 297

1  13,000, which does not represent
2  what you said it did; you asked
3  him questions about it; and then
4  you even had him hold it up on
5  camera.
6     Now, I'm going to ask you to
7  withdraw the line of questioning.
8     MR. PIFKO:  I will not
9  withdraw the line of questioning.
10     MR. NICHOLAS:  And I will
11  ask you to correct the record.
12     MR. PIFKO:  We can meet and
13  confer about it after this
14  deposition.
15     MR. NICHOLAS:  Wait a
16  minute.  Hold on.
17     MR. PIFKO:  I do not know
18  the facts that you are
19  representing to be true.
20     MR. NICHOLAS:  We can check
21  right now.  We have it right here.
22  I can show it to you in two
23  seconds.  I have the tabs.
24     MR. PIFKO:  We can do it off

Page 298

1   the record.  I'll be happy to look
2   at it off the record.
3       If you want to go off the
4   record, I can take a look.
5       MR. NICHOLAS:  Let's go off
6   the record, and you'll take a look
7   and then you tell me what you want
8   to do about it.
9       VIDEO TECHNICIAN:  Going off
10  the record.  3:46 p.m.
11          - - -
12      (Whereupon, a discussion off
13  the record occurred.)
14          - - -
15      VIDEO TECHNICIAN:  We're
16  back on record at 3:58 p.m.
17      MR. PIFKO:  Let me represent
18  that when we went off the record,
19  counsel for defendants is stating
20  things to be facts, based on their
21  research of documents, in front of
22  the witness and trying to
23  influence the outcome of this
24  deposition and making accusations

Page 299

1   about improper conduct that we, in
2   his mind, allegedly did.
3       I can assure you that we had
4   no intention to misrepresent a
5   document or the record.  We asked
6   the witness what it was.
7       And to be frank with you, if
8   you want to cross -- or if you
9   want to direct examine your
10  witness about something
11  afterwards, that is the
12  appropriate way to handle it.
13      And what you've done by
14  making these statements about what
15  facts you believe to be true in
16  front of the witness and in front
17  of all counsel here in the room is
18  you have tainted the process and
19  you testified and you created
20  facts.
21      And that -- you are done
22  with this whole thing.  You lost
23  your opportunity to get the
24  witness to say, on his own

Page 300

1   volition, what it is or isn't.
2       MR. NICHOLAS:  Okay.  Let's
3   make sure the record is clear.
4       MR. PIFKO:  It's -- I'm
5   taking this deposition.  You're
6   not talking anymore.
7       MR. NICHOLAS:  No, no.  I'm
8   going to talk, okay?
9   BY MR. PIFKO:
10      Q.   Sir, I'm going to hand you
11  Exhibit --
12      MR. NICHOLAS:  I'm going to
13  talk.  Because you haven't let
14  me -- we went off the record so
15  you --
16      MR. PIFKO:  No.  No.  We're
17  done.  You are not talking during
18  this deposition.  I am taking this
19  deposition, okay?
20      MR. NICHOLAS:  We went off
21  the record so we could show you
22  the basis for why I'm saying --
23      MR. PIFKO:  And you did not
24  show an adequate basis.

Page 301

1       MR. NICHOLAS:  Well, that's
2   what you say.  You looked at it.
3       Now, what you're telling
4   me --
5       MR. PIFKO:  And did all of
6   this in front of the witness.
7   This is totally improper.
8       MR. NICHOLAS:  I'm going to
9   ask you --
10      MR. PIFKO:  I'm not
11  listening to you.  It's my
12  deposition.  You need to be quiet.
13      If you want to meet --
14      MR. NICHOLAS:  Hold on.
15  Hold on.
16      MR. PIFKO:  If you want to
17  meet and confer with me about
18  something after this deposition,
19  I'll be happy to listen to you.
20      MR. NICHOLAS:  Listen to
21  your question before you say that.
22  Listen to the question you asked
23  on the record.
24      MR. MAHADY:  Question:  And

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  this is a list of all --
2      MR. PIFKO:  You're
3  continuing to influence the
4  process --
5      MR. MAHADY:  -- incorrect or
6  deficient --
7      MR. NICHOLAS:  I'll read it.
8      Question by you, Mr. Pifko:
9  And this is all -- and this is a
10  list of all the customers whose
11  Form 590 was missing, correct?  Or
12  had deficient information?
13      MR. PIFKO:  And then I asked
14  him, is that true?
15      And he can say whatever he
16  can say.  If I'm wrong, I'm wrong.
17  He can say whatever he said.  He
18  answered.
19      I didn't -- I can't put
20  facts into his mind.
21      MR. NICHOLAS:  You
22  deliberately --
23      MR. PIFKO:  I did not
24  deliberately do anything.

Page 303

1      MR. NICHOLAS:  Not only did
2  you deliberately print the wrong
3  list, but then you had him hold
4  the list up.
5      MR. PIFKO:  You have no
6  evidence I deliberately printed
7  anything.
8      MR. NICHOLAS:  Are you
9  denying it?
10      MR. PIFKO:  Yes.  I did not
11  deliberately --
12      MR. NICHOLAS:  Are you
13  denying that you did not know --
14  you did not know this is the wrong
15  list?
16      MR. PIFKO:  I did not
17  deliberately do anything here.
18      MR. NICHOLAS:  Do you agree
19  this is the wrong list?
20      MR. PIFKO:  No.  Based on
21  what you've shown, I do not know
22  that that's the wrong list.
23      MR. MAHADY:  So you skipped
24  the first three tabs, went to Tab

Page 304

1  4 and ignored the summary?
2      MR. PIFKO:  We had the
3  summary.  And I just read him the
4  summary, and I asked him if that
5  was the number.  I read the exact
6  number, you all heard it, 3,285.
7  That was the number.  I asked him
8  if that was the number.
9      MR. NICHOLAS:  Yes.  We're
10  all agreeing that there were
11  approximately -- the record says
12  what it says --
13      MR. PIFKO:  Right.  So
14  there's no --
15      MR. NICHOLAS:  -- which is
16  approximately 3,000 files.
17      MR. PIFKO:  So there's no --
18  there's no problem with the
19  record.
20      MR. NICHOLAS:  You gave him
21  a stack of 13,000 --
22      MR. PIFKO:  There's no
23  problem with the record.
24      MR. NICHOLAS:  -- and asked

Page 305

1  him if that is the list of 3,000.
2      MR. CLUFF:  Let me just ask
3  one question here.
4      Do you agree that that is a
5  tab from the spreadsheet in
6  question?
7      MR. NICHOLAS:  It is the
8  wrong -- no.
9      MR. CLUFF:  I'm asking just
10  for foundation.
11      That's not in the tab?
12      MR. NICHOLAS:  No.
13      MR. CLUFF:  That's not in
14  the spreadsheet?
15      MR. MAHADY:  It's in the
16  spreadsheet and there's a summary.
17      MR. NICHOLAS:  There were --
18      MR. PIFKO:  That's what I'm
19  asking, it was in the spreadsheet.
20      MR. NICHOLAS:  -- four tabs.
21  There were four tabs.
22      MR. PIFKO:  It doesn't
23  matter --
24      MR. NICHOLAS:  There were

Page 306

1  four tabs.  And you gave him the
2  wrong one.
3      MR. CLUFF:  And we printed
4  all four of them.
5      MR. NICHOLAS:  And you're
6  taking the wrong one --
7      MR. CLUFF:  We were prepared
8  to ask the witness further
9  questions --
10     MR. NICHOLAS:  You
11 deliberately --
12     MR. CLUFF:  You told us that
13 that was not the list.  You did
14 not tell us that was not the list.
15 That's the record.
16     MR. MAHADY:  You skipped the
17 first three --
18     MR. CLUFF:  You say what you
19 want.
20     MR. MAHADY:  -- tabs and
21 went right to Tab 4.
22     MR. CLUFF:  This is
23 discovery, Zach.
24     MR. MAHADY:  If you have the

Page 307

1  other three, show him the list.
2  If you have the other three tabs,
3  show him the other three tabs.
4      MR. CLUFF:  You are free to
5  show him the other tabs.  We asked
6  him a line of questions about the
7  tab that we wanted to talk about
8  to begin with.
9      His testimony was that was
10 the tab, when he was asked, of the
11 customers.
12     MR. NICHOLAS:  You poisoned
13 the record.
14     MR. PIFKO:  No, you did,
15 okay?
16     MR. NICHOLAS:  You poisoned
17 the record.  You guys poisoned the
18 record by deliberately giving him
19 the wrong thing.
20     MR. PIFKO:  If it makes you
21 feel better, I will hand him the
22 other tabs.  I was honestly trying
23 to be quick.  You've mentioned on
24 multiple occasions that you want

Page 308

1  to get out of here.  It's a
2  Saturday --
3      MR. NICHOLAS:  No, I know we
4  are going seven hours, there's no
5  question about that.  We went
6  seven hours yesterday and we're
7  going seven today.
8      I'm not trying to harass --
9      MR. PIFKO:  If I go seven
10 hours, that's my right, okay?  I'd
11 like to be done as soon as I can
12 as well, okay?  And this time
13 arguing does not count towards the
14 record.
15     If it would make you feel
16 better, I would be happy to show
17 him the other tabs.  The numbers
18 he discussed are the numbers.
19 That's the fact.
20     MR. NICHOLAS:  I'm not --
21     MR. PIFKO:  So it doesn't
22 make any difference.
23     MR. NICHOLAS:  -- saying
24 anything about the numbers.  I'm

Page 309

1  talking about this BS display that
2  you made to the jury.
3      MR. PIFKO:  That's not -- do
4  you agree or disagree that that is
5  a document that was attached to
6  that e-mail?  Did we misrepresent
7  that that's part of the e-mail,
8  that that's part of the
9  attachment?
10     MR. NICHOLAS:  Mark, there's
11 an unlimited number of documents
12 in the world, you can throw to
13 someone.  So what?  You have --
14     MR. PIFKO:  Is that --
15     MR. NICHOLAS:  You gave him
16 the wrong document.  And you did
17 it on purpose.
18     MR. PIFKO:  Is that a
19 document that was attached from
20 that spreadsheet; yes or no?
21     MR. NICHOLAS:  It's the
22 wrong spreadsheet, as you well
23 know.
24     MR. CLUFF:  It's not the

Page 310

1  wrong spreadsheet.
2      MR. PIFKO:  No, it's not the
3  wrong spreadsheet.
4      MR. NICHOLAS:  It's the
5  wrong part of the spreadsheet,
6  which you knew.
7      MR. PIFKO:  It's part of the
8  spreadsheet --
9      MR. NICHOLAS:  Look, guys,
10  you do you agree that this list of
11  13,000 -- 13,000 files is not the
12  list of the 3,000 you were asking
13  him about?
14      MR. PIFKO:  You
15  completely --
16      MR. NICHOLAS:  Right?
17      MR. PIFKO:  You
18  completely --
19      MR. NICHOLAS:  You know
20  this, why don't you just correct
21  the record?
22      MR. PIFKO:  You completely
23  bungled the attempt to correct the
24  record by disclosing all of this

Page 311

1  in front of the witness.
2      MR. NICHOLAS:  I don't think
3  so, Mark.
4      MR. PIFKO:  Yes, you did.
5  We could have fixed it.  But you
6  screwed it all up, and now we
7  can't do it because you disclosed
8  it in front of the witness.
9      MR. NICHOLAS:  We can fix
10  it.  You can --
11      MR. PIFKO:  No.
12      MR. NICHOLAS:  It's very
13  easy to fix.  You show him the
14  correct -- show him the correct
15  spreadsheets, and you say, I
16  showed you the wrong spreadsheet
17  before, I'd like --
18      MR. PIFKO:  Again, now
19  you're telling him what to say.
20  You're walking us through the
21  conversation in front of the
22  witness.
23      MR. NICHOLAS:  No, no, no.
24  I'm telling you what to say, so

Page 312

1  you make an honest record.
2      You're big on let's have a
3  clean record, let's get answers to
4  questions.
5      MR. PIFKO:  I am.
6      MR. NICHOLAS:  Do you want
7  real answers?
8      MR. PIFKO:  Your witness has
9  been dodging the questions all
10  day.
11      MR. NICHOLAS:  Do you want
12  straight stuff or not?
13      MR. PIFKO:  I do.
14      MR. NICHOLAS:  Do you want
15  to be straight or not?
16      MR. PIFKO:  I do.
17      MR. NICHOLAS:  This is
18  not --
19      MR. PIFKO:  I do want to be
20  straight.
21      MR. NICHOLAS:  -- playing it
22  straight.  This is not just
23  playing it straight, guys, and you
24  know it.

Page 313

1      MR. PIFKO:  We're going to
2  move on.
3      MR. NICHOLAS:  So you're not
4  going to do anything?  You're not
5  going to correct the record?
6      MR. PIFKO:  I'm going to
7  move on and ask the questions that
8  I want to ask.  This is my
9  deposition.
10  BY MR. PIFKO:
11      Q.   I'm handing you what is
12  marked --
13      MR. NICHOLAS:  So for the
14  record --
15  BY MR. PIFKO:
16      Q.   -- Exhibit-15.
17      MR. NICHOLAS:  For the
18  record, counsel is refusing to
19  correct the record, knowing that
20  it's inaccurate and knowing --
21      MR. PIFKO:  I do not have
22  any information --
23      MR. NICHOLAS:  Knowing that
24  he put an inaccurate document

Page 314

1 that's not only misleading, but a
2 wrong document, in front of the
3 witness.
4     - - -
5     (Whereupon,
6 AmerisourceBergen-May Exhibit-15,
7 Tab Printout, was marked for
8 identification.)
9     - - -
10 BY MR. PIFKO:
11     Q.   Sir, I want to direct you
12 back --
13     MR. NICHOLAS:  We reserve
14 all rights on this.
15 BY MR. PIFKO:
16     Q.   I want to direct you back to
17 Exhibit-14, which was the prescriber
18 action document that Purdue sent to
19 AmerisourceBergen.
20     Do you recall discussing
21 that?
22     A.   Yes.
23     Q.   And your counsel, again,
24 trying to influence the proceedings

Page 315

1 improperly, made some objections about
2 whether there even was such a list.
3     Well, I've just handed you
4 what's marked as Exhibit-15, a copy of
5 the list, which if you look at
6 Exhibit-14, it says, Attachment
7 prescriber action weekly grid.
8 Exhibit-15 is a printout of that grid.
9     MR. NICHOLAS:  I object to
10 the form.
11 BY MR. PIFKO:
12     Q.   It's Bates labeled --
13     MR. NICHOLAS:  I object to
14 the characterization.
15 BY MR PIFKO:
16     Q.   -- ABDCMDL 00002239.
17     MR. NICHOLAS:  What's your
18 question?
19 BY MR PIFKO:
20     Q.   Take your time to review the
21 document, sir.
22     MR. NICHOLAS:  So we don't
23 have a repetition of what happened
24 last time, in case anyone asks the

Page 316

1 witness to hold this up --
2     MR PIFKO:  Stop making false
3 accusations.
4     MR. NICHOLAS:  In case
5 anyone asks the witness to hold up
6 this stack of paper, half of it is
7 blank.  Half of these page are
8 blank.
9 BY MR PIFKO:
10     Q.   Have you seen this -- have
11 you seen this document before,
12 Exhibit-15?
13     A.   I'm not familiar with this
14 document.
15     Q.   You were -- you did receive
16 the e-mail attaching it, correct?  We
17 established that earlier?
18     MR. NICHOLAS:  Object to the
19 form.  You're representing that
20 this was attached to the e-mail.
21 He just said he's never seen the
22 document.
23     MR. PIFKO:  Again, you're
24 coaching the witness.

Page 317

1     MR. NICHOLAS:  No, now I
2 have to be this way because of
3 what you did the last time with
4 that stack of documents that was
5 so inaccurate.  Now I have no
6 choice.
7     MR PIFKO:  You have no right
8 to be this way.  You're coaching
9 the witness.  You've been doing it
10 yesterday and today.
11     MR. NICHOLAS:  No, I --
12     MR. PIFKO:  All day long.
13     MR. NICHOLAS:  -- really
14 haven't.
15     MR PIFKO:  Yes, you have.
16     MR. NICHOLAS:  No, I
17 haven't.
18     THE WITNESS:  So I have this
19 list in front of me.  I don't
20 recognize this list.  I see there
21 was an attachment on the e-mail
22 sent to me.  I don't recall
23 specifically opening the
24 attachment, but I don't recall not

Page 318

1  opening the attachment.
2      MR PIFKO:  Clearly, your
3  counsel has influenced your
4  testimony.  And that is wholly
5  inappropriate.
6      Move to strike that
7  response.
8  BY MR. PIFKO:
9      Q.   You talk --
10     MR. NICHOLAS:  Object to the
11  form.
12  BY MR PIFKO:
13     Q.   You talk, in the --
14     MR. NICHOLAS:  Object to the
15  form.
16  BY MR PIFKO:
17     Q.   -- in Exhibit-14 about, We
18  could add this to our due diligence list
19  on the S drive.
20     Do you see that?
21     A.   I do.
22     Q.   What is the S drive?
23     A.   It is a common, when I say
24  "common," a shared drive, S being for

Page 319

1  shared, on our computer.
2      Q.   What is the S drive -- what
3  purpose does it serve for the diversion
4  control division?
5      A.   It's used for various
6  departments at the company and CSRA --
7  it's just a common depository for
8  documents.
9      Q.   Can you turn to the last
10  page of Exhibit-15?
11     There's a column on the
12  left -- so there's a Column A, with news
13  date.  And then there's a column on the
14  left -- I didn't make this list, but it
15  looks like the numbers jump around.
16     So I was going to ask you
17  how many entries are on here, but I don't
18  know that we can see that from this
19  printed-out copy, we have to look at the
20  electronic copy.
21     So you don't know if the
22  company did anything with this list,
23  correct?
24     A.   I do not.

Page 320

1      MR. NICHOLAS:  Object to the
2  form.
3          - - -
4      (Whereupon,
5  AmerisourceBergen-May Exhibit-16,
6  ABDCMDL 00156364, was marked for
7  identification.)
8          - - -
9  BY MR PIFKO:
10     Q.   Despite the false accusation
11  of your counsel, I have zero interest in
12  creating a false record in this
13  proceeding.
14     I'm going to show you the
15  other three tabs of the spreadsheet that
16  we previously discussed that your counsel
17  is jumping up and down about.
18     Is that 16, Mr. May?
19     A.   Yes.
20     Q.   You have what's in front of
21  you as Exhibit-16.
22     Do you know what that is?
23     A.   This is a spreadsheet that
24  appears to represent various assignments

Page 321

1  according to sales, regarding the
2  discussed due diligence files that we
3  were missing.
4      Q.   And what is the number of
5  due diligence files that are missing or
6  reflected on that exhibit that you're
7  looking at?
8      A.   Grand total?
9      Q.   It's on the bottom right.
10     A.   Yes.
11     3,285.
12     Q.   Can you look at the next
13  exhibit I put in front of you?
14         - - -
15     (Whereupon,
16  AmerisourceBergen-May Exhibit-17,
17  Tab Printout, was marked for
18  identification.)
19         - - -
20     (Whereupon,
21  AmerisourceBergen-May Exhibit-18,
22  Tab Printout, was marked for
23  identification.)
24         - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 322

BY MR PIFKO:

Q.   That's another tab from the spreadsheet.

Do you recognize that document?

A.   Again, it's a little bit small here to read, but it appears to contain customer names, sales assignments and diversion control team member names.

Q.   With these three tabs from that document in front of you, is there anything you wish to change about your prior testimony concerning that document?

MR. NICHOLAS:  Why don't you ask him about the other document you showed him?

MR. CLUFF:  That's not the exhibit.

MR. NICHOLAS:  I understand.

THE WITNESS:  So, again, I want to be perfectly clear, it's a little difficult, with all of these documents, to ascertain from, you know, the e-mail where

Page 323

it has various attachments and tabs unless they are all together.

But I would represent that we say there's approximately 3,000 accounts, we have the precise number here, where we're lacking documentation.

And if this list represents about 3,000, then I would represent that that is accurate to this number.

BY MR PIFKO:

Q.   Okay.  Thank you.

MR. NICHOLAS:  Can you ask him to hold that list up in contrast to the one --

MR. PIFKO:  I'm not going to ask him --

MR. NICHOLAS:  -- you mistakenly held up.

MR PIFKO:  You're trying to testify for him, stop.

MR. NICHOLAS:  No, you said you wanted --

Page 324

MR PIFKO:  Stop.

MR. NICHOLAS:  You said you wanted --

MR. PIFKO:  I asked him if there was anything he wanted to do, and now you're trying to tell him what to do.  Stop.

MR. NICHOLAS:  You said you wanted to correct the record.

MR. PIFKO:  I asked him -- I gave him a full opportunity.

MR. NICHOLAS:  You said you wanted to correct it.

MR. PIFKO:  I'm moving on.

MR. NICHOLAS:  Do you want to correct it or not?  Ask him to hold them both up.

MR PIFKO:  You're coaching him.  No.

MR. NICHOLAS:  I'm not coaching him.  I'm asking him to hold -- you asked him to hold up something and I'm asking him to hold up something.

Page 325

MR PIFKO:  You need to stop talking.  Seriously, we're going to go to court on you.

MR. NICHOLAS:  If we go to court on this, that's probably something you want to do.

MR. PIFKO:  I feel fine.  I've done nothing wrong.

MR. NICHOLAS:  Doubt it.

- - -

(Whereupon, AmerisourceBergen-May Exhibit-19, ABDCMDL 00159841, was marked for identification.)

- - -

MR. PIFKO:  I want to make one other comment about that document.  It also had hidden tabs that our review team had to -- hidden columns in the spreadsheet that our review team had to unhide.

So your production of the document was not a fair production

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1   that allowed us to review it in a
2   proper way.
3          MR. MAHADY:  It was produced
4   in a native format.
5          MR. NICHOLAS:  It was
6   produced --
7   BY MR. PIFKO:
8      Q.   I'm handing you --
9          MR. NICHOLAS:  -- the way it
10  was supposed to be produced, which
11  was in native format.
12  BY MR PIFKO:
13     Q.   I've handed you what has
14  been marked as Exhibit-19.  It's a
15  PowerPoint presentation marked ABDCMDL
16  00159841.  I'll represent to you that the
17  metadata from that document states that
18  you are the custodian.  It's a file
19  called CSRA Diversion Control General
20  Awareness Training, Draft.  And the
21  document is dated April 20th, 2016.
22         Please review that and let
23  me know when you're done.
24     A.   Okay.

Page 327

1      Q.   Have you seen this document
2   before?
3      A.   Yes.
4      Q.   This is a presentation that
5   you made?
6      A.   Yes.
7      Q.   What was this for?
8      A.   To the best of my
9   recollection, this was to our compliance
10  managers during our annual training
11  process for compliance managers.  And we
12  held this training conference at our
13  corporate headquarters.
14     Q.   And this is -- do you agree
15  that this presentation was made in April
16  2016, as it states here?
17     A.   Correct.
18         I guess the only caveat here
19  is, you mentioned that it said draft.
20  There may have been a final copy of this.
21  But, generally, that would represent
22  here, in draft form, at least, what I
23  presented.
24     Q.   Do you recall making this

Page 328

1   presentation?
2      A.   I do generally recall.
3      Q.   I want to direct your
4   attention to Page 4, which is also Slide
5   4.
6      A.   Yes.
7      Q.   Can you tell me what this
8   slide reflects?
9      A.   Again, this was an effort by
10  me to sensitize the compliance managers
11  to certain data relative to the opioid
12  problem.
13     Q.   Why did you want to
14  sensitize them to this data?
15     A.   General awareness training
16  for diversion.
17     Q.   Why would you want to make
18  them aware of this information?
19         MR. NICHOLAS:  Object to the
20  form.  Asked and answered.
21         THE WITNESS:  Again, it was
22  a diverse group of people, and I'm
23  not sure of everyone's level of
24  knowledge relative to some of the

Page 329

1   issue, in a very general way.
2          So it's just my attempt to
3   provide information, share
4   information and educate and inform
5   people.
6   BY MR PIFKO:
7      Q.   As the head of the diversion
8   control division, you wanted other people
9   in the company to be aware of the
10  diversion and prescription drug abuse
11  statistics that are provided here --
12         MR. NICHOLAS:  Objection.
13  BY MR. PIFKO:
14     Q.   -- is that correct?
15         MR. NICHOLAS:  Object to the
16  form of that question.
17         THE WITNESS:  Again, my
18  response is the entire
19  presentation was intended to --
20  again, General Awareness was the
21  title.
22         And not knowing everyone's
23  level of information relative to
24  diversion control, and even some

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  of the things that we do in the
2  diversion control team versus
3  maybe some of their
4  responsibilities at the
5  distribution center, it's an
6  effort to educate and inform
7  everybody.
8  BY MR PIFKO:
9     Q.   What does this timeline
10 reflect on this slide?
11        MR. NICHOLAS:  Object to the
12    form.
13 BY MR PIFKO:
14    Q.   While you're reviewing it,
15 on the left of the timeline, it says,
16 1983, Vicodin becomes available as a
17 generic.
18        1986, published paper
19 concludes that opioid pain killers could
20 be prescribed safely on a long-term
21 basis.
22        1995, OxyContin receives
23 approval from FDA.  American Pain Society
24 introduces a campaign entitled, quote,

Page 331

1  Pain is the Fifth Vital Sign, end quote.
2        1996, Purdue Pharma begins
3  multiyear educational programs promoting
4  long-term use of opioid pain killers.
5        2000s, physicians expand
6  their treatment of pain through use of
7  the growing number of approved
8  prescription opioids.  Prescription pain
9  killers flood the market.
10       2014, four times annual
11 increase in prescriptions from 1999 to
12 2014.  Five times annual increase in
13 overdose deaths related to opioids.
14    Did I read that correctly?
15    A.   You did.
16    Q.   What is this timeline
17 intended to reflect?
18       MR. NICHOLAS:  Object to the
19    form.  You just read it.
20       THE WITNESS:  So this
21    timeline -- I can't tell you the
22    source.  I acquired it from
23    somewhere, some sort of public
24    document.  And I inserted it in

Page 332

1  here as part of the training
2  program.
3  BY MR PIFKO:
4     Q.   What did you want people to
5  see when you -- by putting this in here?
6  What were you trying to communicate?
7        MR. NICHOLAS:  Object to the
8     form.  You just read it.
9        THE WITNESS:  The timeline
10    represents certain information
11    relative to the opioid
12    prescribing, with dates associated
13    with it.
14       And, again, other than it
15    offering background and a timeline
16    and information relative to dates,
17    it was intended to be educational.
18    That was my intent.
19 BY MR PIFKO:
20    Q.   Is it intended to educate
21 people about the relevant milestones with
22 respect to the opioid crisis, agree?
23       MR. NICHOLAS:  Objection to
24    the form of the question.

Page 333

1        THE WITNESS:  And, again,
2     going back to my related response,
3     all of this was intended to be
4     general training and information
5     purposes for our compliance
6     managers around the issue of
7     opioids.
8  BY MR PIFKO:
9     Q.   Right.  And this timeline --
10 by showing this timeline, you were
11 intending to educate people of the
12 relevant milestones with respect to the
13 opioid crisis; is that correct?
14       MR. NICHOLAS:  Object to the
15    form of the question.  Asked and
16    answered at least twice.
17       THE WITNESS:  Again, it
18    was -- I had no specific goal
19    relative to the content or the
20    dates.  It was part of general
21    awareness training, sharing that
22    information that I saw, as well as
23    all this other information as part
24    of the general awareness training.

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    I did not have a specific
2  objective in mind with sharing
3  this particular part of the
4  training, beyond my general
5  awareness and education intent.
6  BY MR PIFKO:
7    Q.   Let's go to the next page,
8  Page 5.
9    This slide says, Causes,
10  with a subheading, Driving factors behind
11  diversion and prescription drug abuse.
12    Can you tell me what's
13  reflected here?
14    A.   Again, information that I've
15  gathered through my own experience and
16  exposure to various data and stories and
17  content.  I put together this general
18  PowerPoint bullet/slide.
19    Q.   And it's your view that
20  these are driving factors behind
21  diversion and prescription drug abuse; is
22  that correct?
23    MR. NICHOLAS:  Object to the
24  form.

Page 335

1    THE WITNESS:  These are some
2  of the factors behind diversion
3  and prescription drug abuse.
4  BY MR PIFKO:
5    Q.   You don't have any actions
6  committed by distributors here; is that
7  correct?
8    MR. NICHOLAS:  Object to the
9  form.
10    But go ahead.
11    THE WITNESS:  I do not.
12  BY MR PIFKO:
13    Q.   Let's go to the next slide.
14    It says, Trends, diversion
15  and substance abuse statistics.
16    Do you see that?
17    A.   I do.
18    Q.   And then it's got a chart,
19  Prescription painkiller sales and
20  age-adjusted rates for drug poisoning
21  deaths by drug -- by type of drug, United
22  States, 2000 to 2014.
23    Do you see that?
24    A.   I do.

Page 336

1    Q.   What's reflected here?
2    MR. NICHOLAS:  Object to the
3  form.
4    THE WITNESS:  I would rely
5  upon the description here.  Again,
6  this was -- this was content,
7  public content, that I took from
8  somewhere and put it on this
9  slide.
10    I see 2016 PDMP report on
11  the bottom.  I'm not sure why it
12  would say that if they're talking
13  about -- if it purports to be
14  national rates.  I'm not sure,
15  quite frankly.
16    I would rely upon what's on
17  there as --
18  BY MR PIFKO:
19    Q.   This chart shows sales of
20  opioids -- what does it show, do you
21  know?
22    MR. NICHOLAS:  Object to the
23  form.  And I'll object to the
24  scope of this line of questioning

Page 337

1  in general.
2    THE WITNESS:  Again, I'm
3  just looking at the title,
4  Prescription Painkiller Sales and
5  Age-Adjusted Rates For Drug
6  Poisoning Tests By Type of Drug.
7    But it doesn't really give
8  you by type of drug, other than
9  saying opioid analgesics versus
10  heroin deaths, and then sales.
11    So, again, it's a little bit
12  hard to decipher at this point.  I
13  probably, at the time of the
14  presentation, was more familiar
15  with where it was derived from and
16  could speak to it.  But at this
17  point --
18  BY MR PIFKO:
19    Q.   Let's go to the next page,
20  Slide 7.
21    The slide says, What is
22  diversion control.
23    Correct?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q.   And the speaker notes on the
2  bottom, it says, So what is diversion?
3  In my own words, diversion is any
4  activity, including negligence, which
5  results in a prescription drug being
6  removed from its intended, legitimate
7  medical use.  Diversion can take place
8  anywhere along the closed system path,
9  from manufacturer, to distributor,
10  prescriber, dispenser and end user.
11       Do you see that?
12    A.   I do.
13    Q.   Do you agree with that?
14       MR. NICHOLAS:  Object to the
15    form.
16       THE WITNESS:  Again --
17       MR. NICHOLAS:  Object to the
18    scope as well.
19       Go ahead.
20       THE WITNESS:  I do agree
21    with it, in terms of it -- of the
22    definition.
23       But I do want to point out
24    it's in my own words.  You know,

Page 339

1    words, it should be.  It says "in
2    my own works" there, but it's my
3    own words.
4       So this was my, kind of
5    off-the-top-of-my-head definition.
6  BY MR PIFKO:
7    Q.   But you believe this to be
8  true?
9       MR. NICHOLAS:  Object to the
10    form.  Object to the scope.  Asked
11    and answered.
12       THE WITNESS:  I generally
13    believe this to be true, yes.
14  BY MR PIFKO:
15    Q.   Let's go to the next page.
16       The heading of the slide is,
17  Commonly Diverted Drugs.
18       Do you see that?
19    A.   I do.
20    Q.   And it says, Misuse of pain
21  killers represents three-quarters of
22  overall prescription drug abuse.
23       Do you see that?
24    A.   I do.

Page 340

1    Q.   Do you agree with that
2  statement?
3       MR. NICHOLAS:  Object to the
4    form.
5       THE WITNESS:  I agree to
6    that statement at that time and,
7    presumably, I did the -- my own
8    due diligence before I included a
9    statement like that at that time.
10  BY MR PIFKO:
11    Q.   The speaker notes below say,
12  And what's being diverted?  The biggest
13  threat for diversion continues to be
14  opioids.  Unfortunately, these drugs have
15  very addictive qualities.  So it happens
16  frequently that you will see someone who
17  was prescribed hydrocodone following an
18  injury or medical intervention for
19  legitimate medical purposes, but then
20  continues to abuse and abuse the drug --
21  use and abuse the drug long after the
22  legitimate medical need has passed.
23       Do you see that?
24    A.   Yes.

Page 341

1    Q.   Did I read that correctly?
2    A.   Yes.  I used that more than
3  once, that example.
4    Q.   I was going to say, we saw
5  that in another one of your presentations
6  earlier, right?
7    A.   Yes.
8    Q.   And you agree with that
9  statement?
10       MR. NICHOLAS:  Object to the
11    form.
12       THE WITNESS:  I generally
13    agree that could be one example of
14    how abuse could take place.
15       - - -
16    (Whereupon,
17    AmerisourceBergen-May Exhibit-20,
18    ABDCMDL 00142341-345, was marked
19    for identification.)
20       - - -
21  BY MR PIFKO:
22    Q.   I'm handing you what is
23  marked as Exhibit-20.
24       Take a moment to review that

Page 342

1 and let me know when you're done.
2          For the record, Exhibit-20
3 is Bates labeled ABDCMDL 00142341 through
4 2345.
5          MR. NICHOLAS:  I'm going to
6 interpose an objection to the
7 questioning on this document on
8 two grounds, before we proceed.
9          The first is that it appears
10 to pertain to a pharmacy and
11 information that is not contained
12 in the Track 1 jurisdictions.  It
13 looks like it's a Pennsylvania
14 situation.
15          And, secondly, which takes
16 us out of his, I believe, the
17 30(b)(6) testimony.  And to the
18 extent you're asking him
19 individual questions, he's not on
20 large portions of this document.
21 He's not copied on large portions
22 of this document.
23          So for those two reasons, I
24 object to the use of the document.

Page 343

1 BY MR. PIFKO:
2          Q.    Are you done reviewing it?
3          A.    Yes, yes.
4          Q.    Do you know what this
5 document is?
6          A.    It's an e-mail string.
7          Q.    I just wanted to ask you a
8 simple question about this document.
9          If you'd go to the second
10 page, ABDCMDL 00142342.
11          Are you there?
12          A.    Yes.
13          Q.    About a third of the way
14 down, there's an e-mail from Eric
15 Cherveny, dated January 17th, 2017, at
16 6:02 p.m.
17          Do you see that?
18          A.    Yes.
19          Q.    He says, I don't see the
20 need to order a dispensing report here
21 due to their extreme low volume and high
22 controls.  They're clearly using us as
23 secondary for controls.
24          Do you see that?

Page 344

1          A.    I do.
2          Q.    Do you have an understanding
3 about what's being discussed there?
4          MR. NICHOLAS:  Objection for
5 the reasons I stated in my prior
6 objection.
7          THE WITNESS:  So I'm happy
8 to talk about this a little bit.
9 It's always a little bit difficult
10 when addressing specific
11 customers.  But I think I can talk
12 a little bit about the theme here.
13 BY MR PIFKO:
14          Q.    And that's what I'm trying
15 to get at.
16          A.    And so, I guess, to this
17 commentary here, one of the challenges
18 that we face, as a wholesale distributor,
19 is the lack of visibility, in terms of
20 customers who are utilizing two, three,
21 four different distributors.
22          And there are times when we
23 can see, simply from the data, and
24 it's -- again, I'm going to speak

Page 345

1 generally here, because you can't even
2 read the volumes on this first page.  But
3 simply from the data, it becomes clear
4 that the customer is using us for the
5 purchase of controls versus their total
6 purchasing, which may be a perfectly
7 legitimate reason by the pharmacy.  If
8 I'm an independent pharmacist and I can
9 buy and shop among three or four
10 distributors and get controls at certain
11 prices, then they're going to do that.
12 That's perfectly legitimate.
13          Sometimes it's not
14 legitimate.  Sometimes we're being used
15 to supplement other purchasing where a
16 pharmacy may have a distributor that is
17 holding them to certain levels.
18          And so that's a general
19 challenge that we face as a wholesale
20 distributor.  And so what is the -- how
21 do we handle those situations?  And,
22 again, in speaking generally, when the
23 data is very apparent that the customer
24 is using us just to purchase controls,

Page 346

1  well, we may just make the decision, hey,
2  you know, we're not going to assume all
3  that risk, even though you may have a
4  legitimate reason for doing so, it
5  doesn't make sense for us to assume all
6  that risk. So you know what, we're just
7  going to terminate the relationship with
8  you.
9       And we would just send them
10  a letter to say that, you know -- and we
11  would provide them that reason, that
12  we're not going to assume risk on a
13  secondary basis here.
14       And so that's a general
15  theme. And without seeing, before and
16  after, what occurred here, that's my
17  general theme explanation.
18   Q.  That's helpful. Thank you.
19  That's what I was getting at.
20       So I understand a little bit
21  more, when you talk about this risk, I
22  completely understand that you don't know
23  for sure what the reason is, there could
24  be a legitimate reason.

Page 347

1       But the risk is that there's
2  a potential illegitimate reason that
3  maybe they're -- someone else had a
4  threshold for them and they've gotten to
5  it, and they're coming to you to get
6  more.
7       And that's the concern that
8  potentially that could be happening; is
9  that correct?
10       MR. NICHOLAS: Object to the
11  form.
12       THE WITNESS: Yes. There is
13  a concern that they could be
14  getting controls from multiple
15  sources.
16  BY MR PIFKO:
17   Q.  And as of 2017, when this
18  e-mail was written, that's not a risk
19  that the company wanted to take on, like
20  you said?
21       MR. NICHOLAS: Object to the
22  form.
23       THE WITNESS: Again, we
24  handle these similar scenarios on

Page 348

1  a case-by-case basis, not knowing
2  the complete context there.
3       And when the data is evident
4  to us that it's a secondary
5  situation and there's risk
6  involved relative to the
7  customer's activity, we may make
8  the decision we're not even going
9  to pursue the relationship any
10  longer, for the sheer fact that
11  there's risk involved with the
12  customer. And we would make that
13  decision.
14       I'm not sure that that
15  ultimately was the case here.
16  That's --
17  BY MR PIFKO:
18   Q.  We can put that aside.
19       When you talk about that
20  risk, what do you mean? What kind of
21  risk do you mean?
22       MR. NICHOLAS: Object to the
23  form. And scope.
24       THE WITNESS: So the data,

Page 349

1  in and of itself, presents a red
2  flag. Because you have a
3  customer, like in this case, has a
4  high percentage of controls.
5  That's risk. And that -- because
6  of that risk, we may make that
7  decision.
8  BY MR PIFKO:
9   Q.  When you say "red flag,"
10  that's a red flag for diversion, like we
11  saw in the presentation?
12       MR. NICHOLAS: Object to the
13  form.
14       THE WITNESS: There are
15  several red flags that we monitor
16  for, that we investigate. I don't
17  believe I said for diversion, I
18  believe I said there's just red
19  flags relative to their ordering
20  activity that we investigate, if I
21  recall correctly.
22  BY MR PIFKO:
23   Q.  But I was just trying to
24  understand, is a red flag indicia of what

Page 350

1 something that gives rise -- your
2 division is diversion control?
3 MR. NICHOLAS: Hold on. Is
4 that a question? It isn't a
5 question yet.
6 BY MR PIFKO:
7 Q. My question is, what is it a
8 red flag for? And you were about to
9 answer it.
10 MR. NICHOLAS: Object to the
11 form.
12 THE WITNESS: So, again,
13 it's a -- we establish red flag
14 analytics around the ordering
15 behavior of our customers. And
16 I've identified some of those to
17 you.
18 Does a red flag equate with
19 diversion? No. A red flag is
20 what it is, suspect ordering
21 behavior that we need to review,
22 investigate, understand, mitigate.
23 MR PIFKO: We can take a
24 break.

Page 351

1 VIDEO TECHNICIAN: Going off
2 the record. 4:35 p.m.
3 - - -
4 (Whereupon, a brief recess
5 was taken.)
6 - - -
7 VIDEO TECHNICIAN: We're
8 back on record at 4:48 p.m.
9 BY MR PIFKO:
10 Q. Can you get Exhibits-16 and
11 18 and 17 and 13 in front of you again?
12 - - -
13 (Whereupon, a discussion off
14 the record occurred.)
15 - - -
16 BY MR. PIFKO:
17 Q. Specifically, I want you to
18 look at 13.
19 Can you tell me what 13 is?
20 And you can refer, remember, this is an
21 attachment to Exhibit-12, if you want to
22 look at the one-page e-mail.
23 So there's a lot of numbers
24 in front of you. Take your time to get

Page 352

1 what you need to look at this.
2 MR. NICHOLAS: What are you
3 asking him?
4 MR PIFKO: I'll get there.
5 THE WITNESS: Okay. I have
6 12 and I have 13.
7 BY MR PIFKO:
8 Q. And I want you to have 16,
9 18 and 17 in front of you as well.
10 A. 16, 18, and 17, okay.
11 Things aren't very well organized over
12 here, so.
13 Q. Same on my side.
14 MR. NICHOLAS: Is that what
15 you want, 16, 17, 18 and 13?
16 MR PIFKO: He needs to look
17 at the official copies.
18 MR. NICHOLAS: Then he has
19 to find them. It's these. 16,
20 17, 18, 13.
21 THE WITNESS: So do I have
22 them all together, then?
23 So I have 12, 13, 16, 17 and
24 18.

Page 353

1 BY MR PIFKO:
2 Q. Do you have -- it looks
3 like, in front of you, you just have two
4 documents.
5 You've got to use your
6 copies. You've got to use the official
7 exhibits.
8 A. I don't have them.
9 Q. They've got to be there
10 somewhere. They're not those. So you
11 can put them -- I'm not talking about --
12 maybe they're in that stack there.
13 A. No, I went through this
14 already.
15 MR. NICHOLAS: I don't care
16 if he uses these.
17 MR PIFKO: It's concerning
18 to me that -- there they are.
19 They are in front of you, Bob.
20 Stolen exhibits.
21 - - -
22 (Whereupon, a discussion off
23 the record occurred.)
24 - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1    THE WITNESS:  I have 12 and
2  13 now.  18 and 17.  So,
3  apparently, 16 I'm missing now.
4  BY MR PIFKO:
5    Q.  All right.  You've got
6  everything in front of you now?
7    A.  I do, yes.
8    Q.  So we have the e-mail, which
9  is 12, and then we have the attachment,
10  which is Exhibit-16, 18, 17 and 13.
11    So 16, 18, 17 and 13, I
12  believe, are the tabs of the attachment
13  to Exhibit-12, which was the document
14  entitled, Copy of 590 Validation Master
15  Spreadsheet, 7/28/16, okay?
16    A.  Yes.
17    Q.  So 13, can you put that in
18  front of you?
19    A.  13 is in front of me.
20    Q.  Do you know what that is?
21    MR. NICHOLAS:  Object to the
22  form.
23    THE WITNESS:  So, again,
24  here is a little bit of my

Page 355

1  challenge now.  And I'll talk
2  through this a little bit.
3    I have the paper e-mail in
4  front of me.  The paper e-mail
5  says there's an attachment.  These
6  four documents, 18, 17, 16 and 13,
7  purport to be the attachment,
8  except with different tabs.
9    Am I --
10  BY MR. PIFKO:
11    Q.  They are.
12    A.  Do we all agree on that?
13    Q.  You have the Bates label on
14  the top of your spreadsheet printouts.
15  And you have the tab name on the bottom
16  of those.  16, 18, 17 and 13.
17    A.  So because this is the paper
18  copy, I am going to assume that these are
19  the tabs, because I have no --
20    Q.  And they are.  That's the
21  printouts of the tabs.
22    MR. NICHOLAS:  Object to the
23  form.  He's stated his assumption.
24    THE WITNESS:  And so -- now

Page 356

1  that as -- we assume that's the
2  tab, then I acknowledge that these
3  are the separate tabs within the
4  attachment.
5    And, again, I've looked at
6  these documents before.  So now
7  we've established that.
8    What's the question, please?
9  BY MR PIFKO:
10    Q.  So I want you to tell me
11  what Exhibit-13 is.
12    MR. NICHOLAS:  If he knows.
13    THE WITNESS:  So 13 is one
14  of the tabs which contains
15  numerous pages of DEA registration
16  numbers, as well as sales
17  assignments.
18  BY MR PIFKO:
19    Q.  Does Exhibit-13 have a
20  column with sequential numbering?
21    MR. NICHOLAS:  Object to the
22  form.
23    THE WITNESS:  There is page
24  numbers.

Page 357

1  BY MR PIFKO:
2    Q.  Okay.  Don't worry about it.
3    Do you know how many
4  customers AmerisourceBergen had as of
5  July 7th, 2017?
6    A.  In our entire customer base?
7    Q.  Yes.
8    A.  No, I don't know
9  definitively how many customers we had.
10    Q.  Can you estimate?
11    MR. NICHOLAS:  Object to the
12  form.  I'll just caution the
13  witness not to speculate.  Also
14  outside the scope.
15    THE WITNESS:  Generally,
16  ballpark, I believe we had around
17  21,000 DEA registrations who were
18  purchasing controls.  So that's a
19  very general ballpark number.
20  BY MR PIFKO:
21    Q.  Thank you.
22    And so if we go back to the
23  exhibits in front of you -- not that one.
24  Keep going.

Page 358

1      A.   18?

2      Q.   I believe it's the summary

3  one, right there.  That one.  Yeah.

4      Which one is that?

5      A.   This is 16.

6      Q.   Okay.  And that reflects the

7  number of accounts with 590 deficiency,

8  correct?

9      MR. NICHOLAS:  Object to the

10  form.

11      THE WITNESS:  This document

12  represents those number of

13  accounts where we did not have due

14  diligence documentation on file.

15  BY MR PIFKO:

16      Q.   And my question is, what

17  percentage do you believe that is of your

18  total accounts at the time that this was

19  printed in July 7th, 2017?

20      MR. NICHOLAS:  Object to the

21  form.  Outside the scope.

22      THE WITNESS:  Generally

23  speaking, really, and this is a

24  very ballpark figure, 13, 14

Page 359

1  percent.

2      MR PIFKO:  I don't know if

3  AmerisourceBergen's counsel has

4  any questions for you, but if they

5  do, I may have some additional

6  questions for you.

7      And if additional documents

8  may be produced in this case, I

9  may seek to call you back, at

10  which time I would confer with

11  AmerisourceBergen's counsel.

12      Subject to that, I don't

13  have any further questions of you

14  at this time.

15      MR. NICHOLAS:  I have no

16  questions at this time.  Thank

17  you.

18      Thank you, Mr. May.

19      VIDEO TECHNICIAN:  This ends

20  today's deposition.  We're going

21  off the record.  The time is 4:57

22  p.m.

23      - - -

24      (Whereupon, the deposition

Page 360

1  concluded at 4:57 p.m.)

2      - - -

Page 361

1      CERTIFICATE

2

3

4      I HEREBY CERTIFY that the

5  witness was duly sworn by me and that the

6  deposition is a true record of the

7  testimony given by the witness.

8

9

10

      Amanda Maslynsky-Miller

11      Certified Realtime Reporter
      Dated:  August 7, 2018

12

13

14

15

16

17      (The foregoing certification

18  of this transcript does not apply to any

19  reproduction of the same by any means,

20  unless under the direct control and/or

21  supervision of the certifying reporter.)

22

23

24

Page 362

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.
10       You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 364

ACKNOWLEDGMENT OF DEPONENT

1
2
3        I,_____, do
    hereby certify that I have read the
    foregoing pages,  1 - 360, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.
7
8   _____
    DAVID MAY              DATE
9
10
    Subscribed and sworn
11  to before me this
    _____ day of _____, 20____.
12
    My commission expires:_____
13
14  _____
    Notary Public
15
16
17
18
19
20
21
22
23
24

Page 363

1        - - - - - -
         E R R A T A
2        - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6      REASON: _____
7   ____  ____  _____
8      REASON: _____
9   ____  ____  _____
10     REASON: _____
11  ____  ____  _____
12     REASON: _____
13  ____  ____  _____
14     REASON: _____
15  ____  ____  _____
16     REASON: _____
17  ____  ____  _____
18     REASON: _____
19  ____  ____  _____
20     REASON: _____
21  ____  ____  _____
22     REASON: _____
23  ____  ____  _____
24     REASON: _____

Page 365

LAWYER'S NOTES

1
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____