EXHIBIT 306

Highly Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : | MDL No. 2804 |
| | : | Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : | Hon. Dan A. Polster |

- - -

Wednesday, February 27, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of JAMES T. SCHOEN, held at the Hilton Garden Inn, Perrysburg, Ohio, commencing at 12:59 p.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

A P P E A R A N C E S:

On behalf of the Plaintiffs:
MCHUGH FULLER LAW GROUP
BY: LANCE REINS, ESQUIRE
lance@mchughfuller.com
ALLAN (A.J.) L. ELKINS, ESQUIRE
allan@mchughfuller.com
(via teleconference)
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
601-261-2220

On behalf of AmerisourceBergen Corporation (via teleconference and text/video streaming):
JACKSON KELLY PLLC
BY: SANDRA K. ZERRUSEN, ESQUIRE
skzerrusen@jacksonkelly.com
50 South Main Street, Suite 201
Akron, Ohio 44308
330-252-9060

On behalf of HBC (via teleconference and text/video streaming):
MARCUS & SHAPIRA LLP
BY: ELLY HELLER-TOIG, ESQUIRE
ehtoig@marcus-shapira.com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

On behalf of Walmart (via teleconference and text/video streaming):
JONES DAY
BY: PATRICIA OCHMAN, ESQUIRE
pochman@jonesday.com
901 Lakeside Avenue East
Cleveland, Ohio 44114
216-586-3939

On behalf of Prescription Supply, Inc.
FOX ROTHSCHILD LLP
BY: JAMES C. CLARK, ESQUIRE
jclark@foxrothschild.com
STEPHAN A. CORNELL, ESQUIRE
scornell@foxrothschild.com
(via teleconference and text/video streaming)
2700 Kelly Road, Suite 300
Warrington, Pennsylvania 18976-3624
215-345-7500

On behalf of Johnson & Johnson and Janssen Pharmaceuticals:
TUCKER ELLIS LLP
BY: JEFFREY M. WHITESELL, ESQUIRE
jeffrey.whitesell@tuckerellis.com
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
216-592-5000

On behalf of McKesson (via teleconference and text/video streaming):
COVINGTON & BURLING LLP
BY: MARY YANG, ESQUIRE
myang@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-5110

On behalf of HBC:
MARCUS & SHAPIRA LLP
BY: MOIRA CAIN-MANNIX, ESQUIRE
cain-mannix@marcus-shapira.com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

ALSO PRESENT:
Michael Newell, Videographer
Zachary Hone, Trial Technician

- - -

VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN

INDEX TO EXAMINATION

| WITNESS | PAGE |
|---|---|
| JAMES T. SCHOEN | |
| CROSS-EXAMINATION BY MR. REINS: | 9 |
| REDIRECT EXAMINATION BY MR. CLARK | 143 |
| RECROSS-EXAMINATION BY MR. REINS: | 144 |

VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN

INDEX TO EXHIBITS

| PSI - J. SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| PSI - J. Schoen 1 | DEA Notice of Inspection of Controlled Substances, Bates-stamped PSI-0000077 | 124 |
| PSI - J. Schoen 2 | State of Ohio Board of Pharmacy, Written Responses for Prescription Supply, Inc., Wholesaler/ Manufacturer, Category Three, Wholesale Distributor Inspection, October 25, 2017, Bates-stamped PSI0000007 through 83 | 142 |

- - -

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER: We are now on the record. My name is Michael Newell and I'm a videographer for Golkow Litigation Services.

Today's date is February 27th, 2019, and the time is 12:59 p.m.

This video deposition is being held in Perrysburg, Ohio, in the Matter of National Prescription Opiate Litigation for the Northern District of Ohio, Eastern Division.

The deponent today is James Schoen.

Will counsel please identify themselves.

MR. REINS: Lance Reins with McHugh Fuller Law Group on behalf of the Plaintiff.

MR. CLARK: Jim Clark with Fox Rothschild on behalf of

Prescription Supply.

MR. WHITESELL: Jeff Whitesell of Tucker Ellis on behalf of Johnson & Johnson and Janssen.

MS. OCHMAN: Patricia Ochman, Jones Day, for Walmart.

MS. HELLER-TOIG: Elly Heller-Toig for HBC Services Company from Marcus & Shapira.

MS. YANG: Mary Yang with Covington Burling for McKesson.

MR. ELKINS: A.J. Elkins, McHugh Fuller Law Group, Plaintiffs.

MR. CORNELL: Stephan Cornell, Fox Rothschild, for Prescription Supply.

MS. ZERRUSEN: Sandy Zerrusen from Jackson Kelly for AmerisourceBergen.

THE VIDEOGRAPHER: The court reporter today is Carol Kirk and will now swear in the witness.

- - -

JAMES T. SCHOEN

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

EXAMINATION

BY MR. REINS:

Q. Good afternoon.
A. Hi.
Q. Could you please tell us your name.
A. James T. Schoen.
Q. And have you been through a deposition before?
A. Years ago with an auto accident. I think I was maybe 18.
Q. Got it. The reason I ask is I'm just going to go over some of the ground rules for depositions. Your counsel has probably advised you, but better safe than sorry.

So, obviously, I'm going to be taking down -- I'm going to be asking the questions here today. We have a court reporter who types everything that we say. Because of that, if you could please verbalize all your answers, no huh-uhs, um-hmms, or head nods

because those can't be taken down, okay?
A. Okay.
Q. If you do so, I may say "Is that a yes or is that a no," because I'm looking for a verbal response. All right?
A. Okay.
Q. Please let me finish my question before you begin answering. Let me add a caveat to that.
Your counsel is going to object to some my questions. So after I finish my question, if you could just wait a moment, allow him to object, and then you can respond. That way we're not talking over one another, okay?
A. Okay.
Q. Lastly, if you answer my question, I'm going to assume that you are doing two things. One, you understand the question, and, two, most importantly, you're telling the truth; is that fair?
A. Yes.
Q. If you don't know something or you don't understand my question, just let me know and I'll rephrase.

A. Okay.
Q. If you need a break for any reason, just let me know. It's not a marathon. We'll take a break when you need to, okay?
A. Fine.
Q. Can you please tell me what you do for a living.
A. I work at Prescription Supply. I'm presently the controlled substance manager.
Q. And what is Prescription Supply, Inc. in the business of doing?
A. We're a pharmaceutical wholesaler.
Q. And you distribute or provide medications to what type of customers?
A. Mostly independent pharmacies, some doctors, and some outpatient pharmacies that are in hospitals.
Q. And how long have you worked with the company?
A. Since like 1986.
Q. Was your grandfather the founder?
A. Yes.
Q. What was his name?
A. Clarence J. Schoen.

Q. Do you know what year he started the company?
A. 1955.
Q. Your dad is now the president?
A. Yes.
Q. His name is?
A. Thomas G. Schoen.
Q. And he runs the company along with his sister?
A. Yes.
Q. And what's her name?
A. Jacquelyn Harbauer.
Q. Do you know what her position is?
A. Secretary.
Q. How long have you held the position as controlled substance manager?
A. Around 20 years.
Q. Can you tell for us what that means to be the controlled substance manager for PSI?
MR. CLARK: Objection; form.
Q. What are your duties and responsibilities?
A. What are my duties and

responsibilities? Pick and fill orders that come in, okay. Look at sales history. I do inventory. A lot of different things.
Q. That's okay.
A. I put in orders also, okay, and I release orders that come in that go to hold. All the C-IIs go to holds. So I have to release those.
Q. PSI deals in the business of distributing narcotics; is that correct?
A. That's some of our business, correct.
Q. Are you aware of the risks and dangers associated with narcotics in our society?
MR. CLARK: Objection to form.
A. Can you repeat?
Q. Sure.
Are you aware that there are certain narcotics that you're distributing that are highly addictive?
MR. CLARK: Objection. Form.
A. I've heard that.

Q. What have you heard?
MR. CLARK: Objection to form.
A. That on some of the labels, it says they can be addictive.
Q. Which ones?
MR. CLARK: Objection to form.
A. I think OxyContin was one and maybe hydrocodone.
Q. And your company distributes both of those?
MR. CLARK: Objection to form.
A. Yes.
Q. I've asked this question of, I think, two of your other family members, whether there has ever been any internal meetings regarding the addictive nature of oxycodone specifically, and I've been told there has not been.
Do you agree with that?
A. Yes.
Q. Would you agree with me, though,

that we are in the middle of an opioid epidemic and/or crisis right now?
MR. CLARK: Objection to form.
A. I -- I see that in the news. I've never been affected, but I don't know anybody that has, you know, a problem with addiction.
Q. I think -- is Candace your aunt?
A. My cousin.
Q. Cousin. I'm sorry. She said she's seen it on the news.
Have you seen it on the news, that it's a problem?
MR. CLARK: Objection to form.
A. Have I seen -- yes, I've seen stuff on the news regarding opioids.
Q. Have you ever attended any seminars, lectures, or meetings outside of your company regarding the addictive nature of oxycodone?
A. No.
Q. Have you ever read any of the congressional hearings or reports regarding the

addictive nature of oxycodone?
MR. CLARK: Objection to form.
A. No.
Q. Other than the news, have you educated yourself as to the risks and dangers of oxycodone?
MR. CLARK: Objection to form.
A. Have I --
Q. Educated yourself on what the risks and/or dangers might be.
MR. CLARK: Same objection.
A. No.
MR. REINS: Did you get the answer "I don't know"?
THE COURT REPORTER: Yes.
BY MR. REINS:
Q. All right. Sir, based on the fact that your company does distribute narcotics which have been certified or identified by the government, are you aware that there's federal regulations governing the distribution of the products that you sell?

A. Yes.
Q. Okay. So, for instance, you're aware of the Controlled Substances Act, I would presume?
A. I'm aware of it, yes.
Q. Okay. Specifically -- specifically, are you aware that distributors of controlled substances and Schedule I or II, the Attorney General shall register an applicant to distribute a controlled substance in Schedule I or II unless he determines that the issuance of such registration is inconsistent with the public interest.
In determining the public interest, the following factors shall be considered: Maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels.
Do you agree that PSI has the duty to maintain effective controls against diversion?
MR. CLARK: Objection. Form.
A. No. The DEA issues us a license.

Q. Yes, sir, and that's fair. But do you agree that your company is responsible for coming up with effective plans to prevent drug diversions of the products that you distribute?

MR. CLARK: Objection to form.

A. That's what the law is.

Q. Yes, sir. And the law is also that any suspicious orders, pursuant to the federal regulations, include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency shall be reported, correct?

MR. CLARK: Objection to form.

A. That's what the law says.

Q. Yes, sir. And I believe I asked your dad about this. This is going to be in his deposition when he was taken specifically as the 30(b), which means a corporate representative of PSI speaking on behalf of the company.

And this is going to be on page 59 of that deposition, specifically line 11.

Your father was asked, as the

president -- let me restate that -- as the 30(b) representative of PSI:

"What is your understanding of the shipping requirement? And, quite honestly, it shouldn't be the shipping requirement. It should be the anti-shipping requirement, right?"

"Answer: That's correct."

"Okay. And is it your understanding that the shipping requirement means that if we have a suspicious order, we need not to ship it?"

"Answer: Yes."

"And that has been the obligation not just upon PSI, but all the distributors, to your understanding, since 1971 when this regulation was passed?"

Answer on the next page at line 2, "Yes."

You understand as -- you understand that that not only is the law but has been the law since 1971, correct?

MR. CLARK: Objection to form.

Q. And I can show you the regulations

when these were passed in 1970 and '71, respectively.

MR. CLARK: Same objection.

Q. Did your father testify honestly and truthfully?

MR. CLARK: Objection to form. There's a question pending. I don't think he answered the prior question.

Q. Okay.

A. I'm not sure if I really understand what you want.

Q. Yes, sir. I'm just saying, you agree with your father, who is also the 30(b) representative, that there's a requirement that suspicious orders, specifically regarding preventing diversion into our society of narcotics, that that shipping requirement requires that suspicious orders not be shipped, correct?

MR. CLARK: Objection to form.

Q. You're aware of that?

A. They should -- suspicious orders

should not be shipped.

Q. Yes, sir. The law has been that way since these Acts. These laws were enacted in the early '70s, correct?

MR. CLARK: Objection.

Q. As your father testified?

MR. CLARK: Objection. Same objection.

Q. Correct?

MR. CLARK: Same objection.

A. Okay. Ask the second -- ask the second question again.

Q. Of course. Yes.

I'm saying you're aware that these regulations that I read to you that we spoke about were enacted in the early '70s; did you know that?

A. Yes.

Q. Okay. And so the shipping requirement that I'm speaking to you about has been in place since the early '70s?

A. Correct.

Q. Okay. Now I want to talk to you about -- you mentioned the DEA. Before we get

to that, let's cover some basic principles.
It appears that you have been or are the one responsible for establishing thresholds for varying families of narcotics for some time; is that fair?
MR. CLARK: Objection to form.
A. Yes.
Q. I'd like you to take a moment and describe for us the process and how you go about establishing a threshold?
A. Okay. I go about that by -- a lot of things determine that. How many orders they do per day, how many scripts they fill. They fill out my questionnaire and I go off of that, okay?
So I read the questionnaire, okay? And that's basically the basis point of how I determine what they -- you know, what they receive.
Q. Okay.
A. Okay. And I also, you know, check -- I can check the population around them, you know. They have to be a customer for a

little while before they get controls.
Q. All right. Take that one at a time, if you don't mind. Let's start with the questionnaire.
Did you come up with the questionnaire?
A. I helped.
MR. CLARK: Objection to form.
Go ahead.
A. I helped with it, yes.
Q. Okay. And this questionnaire is going to be asking what types of questions?
A. It asks pharmacy information, if they're affiliated with any other pharmacies, how long they've been in business, what are their store hours and what days are they open a week, what is the percentage of controls to non-controls they plan on purchasing, also what they dispense, the amount of cash for controlled substance prescriptions compared to credit cards, insurance, Medicaid.
It asks certain questions about certain items, all right? If they plan on

dispensing more than a certain number of -- phentermine is one of them, hydrocodone, oxycodone. Fentanyl is on there, prometh with codeine. Tramadol is on there. Carisoprodol is on there.
Q. And you have them fill out this questionnaire when you first start doing business with them?
A. It's before we do business -- when they fill out their application, that is filled out if they want -- if they expect to get controls. Only about maybe 30 percent of our customers get controls.
Q. Okay.
A. So not everybody fills one out. In order to get controls, it must be filled out and completed.
Q. Will the questionnaire also have -- will it ask them kind of their -- well, let me just ask it this way: You maintain all these questionnaires for your customers?
MR. CLARK: Objection to form.
Q. You keep them?

A. They're in a customer file, correct.
Q. And based off the answers to those questions, if I'm hearing you right, from that, you come up with a threshold?
MR. CLARK: Objection to form.
A. That's very helpful. Yes.
Q. Okay. You said -- one of the things you said, it's the population around the area. Do you look at that every time you set a threshold?
A. Not every time. If it's somebody new and it's an area I'm not familiar with, I will.
Q. Okay. Any other information? Does anyone -- let me ask you that. Any other information you look at beyond the questionnaire and potentially the population surrounding the area if it's an area you're not familiar with?
A. I sometimes will call the police department and ask them if there's any areas of concerns with controlled substances in that area.

Q. All right. Do you document those -- the steps that you take in setting the threshold?
MR. CLARK: Objection to form.
Q. Like will you keep a file and say, "Hey, I called the police department," or, you know, "I've reached out, got some statistics on the population"?
A. No.
MR. CLARK: Just let me -- objection to form.
Go ahead.
Q. I didn't hear your answer. I'm sorry.
A. No. No.
Q. All right. Any other information that goes into your analysis?
A. I sometimes will look to see how many other pharmacies are in the immediate area also.
Q. Okay. Anything else?
MR. CLARK: Objection to form.

Q. I'm not suggesting there is. I'm just asking. Does that cover it?
A. Not that I can think of.
Q. Fair enough.
Do you take the duty and responsibility of setting a threshold seriously, especially when it comes to narcotics -- well, do you only set thresholds for narcotics?
A. No.
MR. CLARK: Objection.
A. No.
Q. What other medications?
A. We have -- phentermine is on there, carisoprodol, tramadol, prometh with codeine. That is, codeine is an opioid, so narcotics, yes.
Q. Okay. So the setting of the threshold, is that a duty and responsibility you take very seriously?
A. Yes.
Q. And do you put the time and the effort in there in order to ensure you perform the due diligence to come up with what you believe to be an accurate threshold?

MR. CLARK: Objection to form.
A. Yes.
Q. Why have a threshold?
A. Why have a threshold?
Q. Yeah. Why have one, specifically for opioids?
MR. CLARK: Objection to form.
A. Okay. Well, a threshold is very important.
Q. Why?
A. If somebody tells me they only -- you know, dispense so many tablets a month, okay, and I set the threshold at that amount, I'm more aware, all right, when they reach that amount, if they do reach that amount. It's just very important to our use.
Q. Why not just have unlimited opioids flowing into society? Why have a limit?
MR. CLARK: Objection to form.
A. That's not the right thing to do.
Q. Why?

MR. CLARK: Same objection.
A. Because they have to be prescribed for a legitimate purpose and it's -- you know.
Q. Let me show you what -- your father's words. This is going to be on page 28 of his deposition as a 30(b) rep, line 4.
"Tell us, tell the jury why we want to prevent diversion of controlled substances."
"Well, as it states, we -- it can be dangerous. People can die. People can have bad effects and they can be abused. None of that is something that we want to happen. We want the good effects, not the bad effects."
Do you agree?
MR. CLARK: Objection to form.
A. I agree that's his opinion.
Q. Not yours?
MR. CLARK: Same objection.
A. I agree it could be dangerous, yes.
Q. People can die, right?
MR. CLARK: Same objection.

A. It's a possibility.
Q. Does that play into why you want to set a threshold, so that you can control the amount of opioids that are flowing into specific geographical areas of our country?
MR. CLARK: Objection to form.
A. Well, I set a threshold by what the customer tells me.
Q. What do you mean, what they tell you?
A. On their questionnaire.
Q. You're the one that decides, though, right? Ultimately.
MR. CLARK: Objection to form.
A. How do I say -- I don't know if I totally agree with that, but ...
Q. But you do know that the law puts the duty on your shoulders as the distributor to ensure that there aren't unusual amounts or frequency of amounts into society, right?
MR. CLARK: Objection to form.

A. That's what the law says, yes.
Q. And you're required to abide by the law, right?
MR. CLARK: Objection to form.
A. Yes.
Q. Let's talk about what you do if someone meets their thresholds on an opioid. They've reached their limit, so to speak. What is your process in order to determine -- well, what is your process when that happens?
And I want to be clear. If that's changed in the last -- let's say since 1996. If your process has changed, let me know.
But if somebody hits their limit, I'm told you're notified; is that accurate?
A. The computer, yes, lets me know, yes, correct.
Q. Yes, sir. And then I want to be in your shoes in that chair when that happens. What do you do?
MR. CLARK: Objection to form.
A. Okay. So the thresholds don't go

back to '96.
Q. Okay. Fair enough. Let's deal with that. Okay. When were the thresholds set?
A. 2008.
Q. Okay. You didn't have thresholds before then?
MR. CLARK: Objection. Asked and answered.
Q. And I'm not here to confuse you. I know that in 2008 you instituted a program that did a stop based on the thresholds. I understand that and I'm not here -- I'm not here to trick you or anything. But I believe I've seen documentation that there were thresholds set before then, even though they may have been handled differently.
So before 2008 and after 2008 may be how we tackle this.
Before 2008, when you had the stop shipment threshold system -- am I right? You had a threshold system implemented in 2008?
MR. CLARK: Objection to form.
A. In 2008, yeah.

Q. Yes, sir.
A. Yes.
Q. And so before that, did you have thresholds on opioids or not?
MR. CLARK: Same objection.
A. I can't recall.
Q. Okay. I know you've worked there for some time now, but you don't recall whether there were thresholds on opioids before 2008?
A. Before 2008, a lot of people sent C-II forms in, all right, and I was able to put orders in. I could look at history, and that's how I, you know, was able to determine if somebody was buying more than what they usually did. So it was a sales history tool I used at that time.
Q. All right.
A. And I still use that today.
Q. Let's talk about that process before 2008 as best you can recall, okay?
A. Uh-huh.
Q. All right. So would you still be notified if somebody hit their threshold before 2008?

MR. CLARK: Objection to form.
A. I don't believe there was a threshold.
Q. Okay.
A. I would -- you know, if a customer sent me in a form, okay, I'd put the order in the computer.
Q. Right.
A. And as I'm putting it in by items, I can go back and look at sales history to determine what they bought, you know, in the past.
Q. I see.
A. Okay? And that's how I determined a lot of -- you know, how I could tell where they were at for the month and what they were buying and if it was unusual.
Q. I got it. And you're right. There wasn't a quote/unquote "threshold" before 2008 established by your company, correct?
MR. CLARK: Objection to form.
Q. Not that you didn't review things.

I'm not disputing what you just told me. But there wasn't a number-of-pills threshold established by you before 2008, correct?
MR. CLARK: Same objection.
A. Not one that was set in the computer.
Q. Right.
A. So --
Q. Did you have one not set in the computer?
A. No. No.
Q. Okay. All right. And then 2008, that's when you established the threshold system and you established thresholds, and you did it the way you just described to me, correct?
MR. CLARK: Objection to form.
Q. Questionnaire and the other information you may review, right?
A. That's -- yes.
Q. But before that time, you basically -- you would get the orders coming in and you would see what's being filled and what's being -- you would monitor it, I guess, more

with your eyeball with the sales history; is that fair to say?
MR. CLARK: Objection to form.
A. No. I monitor it with the computer. The computer told me that, you know, what they bought in the past of those particular items, yes.
Q. So you would look at that when you were filling new orders?
A. That's correct.
Q. Got it.
2008 forward, how would you determine whether to raise a threshold?
A. The questionnaire, okay, how many scripts they do, all right, a day, the type of business they are, okay, if -- just the type of pharmacy.
Q. That sounds like -- correct me if I am wrong. That sounds like the same information you would use to set the actual initial threshold.
MR. CLARK: Objection to form.

Q. When I asked you how you would establish a threshold initially with these folks, I thought you said those very same things; is that right?
A. That's correct, yes.
Q. So the same information would allow you to raise the threshold?
A. Are you asking about raising?
Q. Yeah.
MR. CLARK: I think you misunderstood. He said "raise" versus "set."
A. Okay. All right.
Q. I did.
A. Okay.
Q. So let me go ahead and ask it again, fair?
A. Yes.
Q. Will you please let me know, if you would, 2008 moving forward to present day, what type of information you would review in order to raise that initial threshold?
A. Okay. So the initial thresholds sometimes are set lower because it's a newer

customer, okay?
Q. Okay.
A. And as they get established with me, I know more about the buying pattern, okay, communication with the pharmacy. I call the pharmacies a lot, talk to the pharmacist. I have paperwork they fill out that asks them questions about why they would want an increase on a particular item.
Q. And so what type of paperwork would that be that you would provide to them?
A. I have -- when I call them on the phone, I will let them know there's an increase -- there's a paperwork where they can get -- they can ask for an increased amount of a particular product they are in need of.
Q. Okay.
A. Okay.
Q. So you'll look at that form?
A. I'll fax it to them or it goes with the driver to them and gets dropped off after I call them, okay. And then when I get it back, that's when I review it, yes.
Q. What in your mind are legitimate

reasons for increasing a threshold based on their filling out of that paperwork?
MR. CLARK: Objection to form.
A. There could be many things. A pharmacy in the area could have closed.
Q. Okay.
A. There may be new doctors in that particular area. Population growth. Maybe they're getting more patients now.
There's a lot of reasons that come into play that --
Q. Any others that you can think of? And I know you're not doing an exhaustive list, but any others you can think of?
MR. CLARK: Objection to form.
A. Sometimes the pharmacy will call and let me know that if a pharmacist is going to be off, okay, if the main pharmacist or the pharmacist in charge is going to be off and somebody else is there who has not the capability to buy -- purchase controls, they'll ask me, okay, if I can raise it for them for

that time so that they can put an order in, because they'll be on vacation for a week or so, just so they have the stock.
Q. All right. I want to show you a document. So this is going to be PSI 30(b)-301-001.
You're looking at a letter that was issued to Cardinal September 27th, 2006, and I'll tell you that it's basically been stipulated that all the distributors got a letter such as this, similar to this, and I think your dad and your cousin, Candace, has already testified to that.
Do you remember seeing this letter? Not this letter, but obviously a similar letter.
MR. CLARK: Objection to form.
Q. And you can take a moment to look it over. I'm not trying to rush you.
You don't have to read the whole thing.
A. I don't recall. I don't recall it, no.

Q. Fair enough.
So I do want to talk to you a little bit about kind of some of the things that are brought up in this letter, see if these are concepts that you recall. So we'll talk about the first paragraph, if you don't mind.
It says, "This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Administration to distribute controlled substances."
That would certainly be PSI, correct?
A. Yes.
Q. "The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."
Under "Background," it says, "As each of you is undoubtedly aware, the abuse, non-medical use, of controlled prescription drugs is a serious and growing health problem in this country. DEA has an obligation to combat

Page 42

this problem as one of the agency's core functions is to prevent the diversion of controlled substances into illicit channels."

You're aware that that's one of their duties and responsibilities, the DEA?

A. Yes.

Q. "Congress assigned DEA to carry out this function through enforcement of the Controlled Substance Act and DEA regulations that implement the Act."

Specifically, on the second page, middle part there, I want to talk to you about where it says, "The DEA regulations require all distributors to report suspicious orders of controlled substances." Specifically, the regulations state in 21 C.F.R. 1301.74(b), "The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in this area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern,

Page 43

and orders of unusual frequency."

Are you aware that your company, PSI, specifically submitted reports in writing every month from approximately 1997 to 2013?

MR. CLARK: Objection to form.

A. There was a variance report, yes. I did look at that too.

Q. Okay. And you're aware that the law requires a suspicious order report be submitted?

A. Yes.

MR. CLARK: Objection. Form.

Q. And that qualified, pursuant to PSI, as meeting your responsibilities under the federal law, specifically the one that you're looking at right here in that regard; fair to say?

MR. CLARK: Objection to form.

A. No, I don't agree with that. That didn't meet suspicious order monitoring.

Q. Okay. You had a different monitoring system?

Page 44

A. That wouldn't meet -- if there was a suspicious order, I would have sent them information separate from this.

Q. Separate from that?

A. That's right, yes. That's correct.

Q. We'll talk about the report specifically, but why don't you tell me what type of information you would send to the DEA before 2008, when you initiated the -- specifically, the threshold system.

MR. CLARK: Objection to form.

Q. What did you send?

A. Okay. Can you repeat that?

Q. Sure. Yeah. Your -- Kirk, do you know who Kirk is?

A. Yes, I do.

Q. He testified here today he was the IT guy and he would do these reports pursuant to these rules and submit those reports every month.

A. Yes.

Q. Okay. As part of the suspicious

Page 45

order monitoring requirement under the federal regulations, but you're saying no --

MR. CLARK: Objection to form. Misstates prior testimony.

Q. You're saying no, he wasn't doing it pursuant to the regulations; is that right?

MR. CLARK: Same objection.

A. No. No. These were sent, but this didn't -- just because this was sent doesn't constitute those as suspicious orders. There could have been a suspicious order that wouldn't show up on that report.

Q. That wouldn't have shown up?

A. Yeah. It's possible, yes.

Q. For example?

MR. CLARK: Objection to form.

A. I -- I -- I never had one, but, you know, it would be possible. This report was a variance report which just said, you know, if somebody bought more than what the average was we sold per month.

Q. All right. So you did not -- your testimony here today is that report was not in

fulfillment of the duties and responsibilities of the Code of Federal Regulations, correct?
MR. CLARK: Objection to form.
A. I can't answer that. I don't know -- I mean, it requires more than that.
MR. CLARK: Objection. Calls for legal conclusion.
Q. You said, "We sent" -- "I sent other reports." What other reports did you send?
MR. CLARK: Objection. Misstates his testimony.
A. Yeah. I didn't say I sent reports.
Q. All right. What did your company do, PSI, in regards to -- well, first of all, let's get on the same page. What's a suspicious order? How do you define a suspicious order?
A. How do I define -- a suspicious order to me is if I contact the customer after an order goes on hold that I'm curious about, an order of interest, and I don't get an answer that I believe I can be comfortable with, then

that is a suspicious order.
Q. All right. Let's baby-step that. So a suspicious order for you isn't a significant variance of what they've ordered before, right?
A. That can be part of it.
Q. It can be part of it.
So the suspicious order, if I'm hearing you right, you are the only one in the company that can determine what a suspicious order is?
MR. CLARK: Objection to form.
Q. Is that right?
MR. CLARK: Same objection.
A. I -- that's my job.
Q. All right. Well, I'm glad you're here.
So tell me the criteria for you being the sole person responsible for knowing what a suspicious order is for PSI. What qualifies as a suspicious order pursuant to you?
MR. CLARK: Objection to form.

Q. What is the criteria?
MR. CLARK: Same objection.
Q. One at a time, if you don't mind.
A. Okay. So what's the first question?
Q. I want you to define a suspicious order since you're the only one that can do that for PSI.
MR. CLARK: Objection to form. Asked and answered.
A. Okay. So a suspicious order to me is --
Q. Yeah, what defines as a -- well, let me say this: Can you and I agree that the law defines what a suspicious order is, right?
MR. CLARK: Objection to form.
A. That's what the law is, yes.
Q. Unusual size, orders deviating substantially from a normal pattern, an order of unusual frequency. That is a suspicious order, correct?
MR. CLARK: Objection to form.

A. According to the law, correct.
Q. According to the law?
A. Yes.
Q. Do you have a different understanding in PSI?
A. No. I go -- do I have a different understanding? No.
Q. Okay. So my understanding is, is that you came up with -- or Online Systems or Services, Inc. came up with a reporting mechanism for your company in May of 1997 with the help of the DEA to fulfill this requirement.
MR. CLARK: Objection to form.
A. I wasn't -- I was not part of that.
Q. Do you have an understanding of why those reports that were submitted from May of 1997 to 2013, what the purpose of those reports were, or did you even know they were submitting reports?
MR. CLARK: Hold on a second. Let me get my objection.
Objection to form.

Page 50

Go ahead.
Q. You knew they were submitting them --
THE COURT REPORTER: I didn't hear the answer.
Q. What is your understanding of what the purpose of those forms are?
MR. CLARK: Objection to form.
A. Okay. So those forms were -- that report gave the average amount of what we sold to all of our customers for that month, okay? And anybody that went above that average showed up on the report that was submitted to the DEA.
Q. That is, by definition, orders that deviate according to this rule, right?
MR. CLARK: Objection to form.
Q. Let me strike that.
Why was that the system that was developed with the help of the DEA? What was your understanding of the purpose of working with the DEA to submit those reports that were specifically called suspicious order monitoring

Page 51

reports?
You're aware they're called that?
A. Yes.
MR. CLARK: Objection to form. Objection; argumentive.
You can answer.
Q. But it's your testimony today, is they were not suspicious order monitoring reports?
MR. CLARK: Objection to form.
A. That's what they were called.
Q. Were they misleading?
MR. CLARK: Objection to form. Objection; argumentative.
A. I wasn't involved -- I wasn't involved in naming the report.
Q. Do you believe the DEA was misled into what that report -- the purpose of what that report was for?
MR. CLARK: Objection to form.
A. No.
Q. Do you believe that Kirk, who

Page 52

testified here today what he thought the purpose was for, knew what the purpose of the form was for?
MR. CLARK: Objection to form. Objection; argumentative.
Let me get my objections in before you answer, Jim.
A. Are you asking me Kirk's opinion?
Q. Do you think Kirk knew what his job was?
MR. CLARK: Objection to form. Objection; argumentative.
A. Yes.
Q. Okay. Let's go beyond Kirk. Let's go beyond his testimony. Let's talk about the company's policies and procedures.
Are you aware there's policies and procedures?
MR. CLARK: Objection to form.
A. Yes.
Q. Okay. All right. We're going to look -- the first one is going to be called the Controlled Substances, which was initiated or

Page 53

effective date of 2000, June of 2000.
All right. This is the policy specifically dealing with controlled substances for your company.
MR. CLARK: Do you have a copy of that?
MR. REINS: I told you I was going to reuse it, what we used earlier.
MR. CLARK: I'm sorry. Yeah.
BY MR. REINS:
Q. "Regarding controlled substances, Prescription Supply, Inc. will maintain proper security, document and monitor all transactions according to state and federal regulations."
The scope of this will apply to several folks, including yourself and the IT manager, correct?
MR. CLARK: Objection. Form.
Q. Under "Scope," second paragraph?
A. Okay. So what was your -- I see that.
Q. Under "Responsibilities," it says, third paragraph, "IT manager shall compile

Page 54

reports monthly regarding purchases of controlled substances threshold limits and suspicious order monitoring."

Do you see that?

A. Yes.

Q. Okay. If you go on the next page, it says on the first full paragraph, "IT manager shall compile reports monthly regarding purchases of controlled substances, threshold guidelines, and suspicious order monitoring. Reports are to automatically be forwarded to relevant agencies and DEA as appropriate."

Kirk, who is the IT manager -- can we agree on that?

A. Yes.

Q. -- talks about that these reports were the reports that he forwarded in compliance with the federal regulations and the company's policies and procedures regarding suspicious order monitoring, to be clear, the suspicious order monitoring reports.

Are you testifying here today that in contradiction to Kirk, the policy, procedure, federal regulation, that those reports were not

Page 55

submitted for that purpose?

MR. CLARK: Objection to form. Objection to speech. Objection; misstates Kirk's prior testimony.

You can answer.

A. No, they were part of that.

Q. Okay.

A. They were part of the submittal, yes.

Q. All right. Now, the next part -- actually, forgive me. The next paragraph says -- or actually, the last sentence, it says, "Copies are to be given to DR/DR supervisor with all concerns discussed."

Who would that be, the DR/DR supervisor?

A. My dad saw those, Thomas Schoen.

Q. Fair enough.

A. And I also reviewed them.

Q. You reviewed it as well?

A. Yes.

Q. Okay. It says, "DR/DR supervisor shall review all relevant purchase and sales

Page 56

agreements" -- "reports," I'm sorry -- "consult with IT manager for necessary changes, and handle any concerns or problems as they arise. Notification of appropriate agencies is to be done in the event of concern regarding any suspicious order."

You've read this policy before today, right?

A. Yes. It's been a while. Yes.

Q. All right. Now we're going to look at -- oh, and I'm sorry. I don't know if I -- for the record, that was PSI653 and 654.

We're going to now look -- yeah. We're going to now look at another policy and procedure, PSI, starting with 84, and this is Inventory Controls.

I think I might have an extra copy of this one. Yep.

A. Thanks.

Q. Yes, sir.

Now, have you seen this policy before?

A. Yes.

Q. It says, "Prescription Supply,

Page 57

Inc. will monitor inventory for cyclical accounts, suspicious purchases and losses, theft, or otherwise missing products."

And this was effective again in June of 2000, correct?

MR. CLARK: Objection to form.

A. That's what it says, yes.

Q. Are you aware of any policies and procedures that were enacted regarding controlled substances and/or inventory controls before 2000?

A. Ask that one more time.

Q. Are you aware of any policies and procedures that came before these in 2000 dealing with the issues we're discussing here today?

MR. CLARK: Objection to form.

A. I can't remember.

Q. Fair enough.

"Policy: Prescription Supply, Inc. will monitor inventory for" -- I'm sorry. Forgive me. This applies again to a number of

Page 58

folks, including you and the IT manager.

I want to talk to you about "Responsibilities" at the bottom of the page. "IT managers shall be responsible for suspicious order monitoring reports and sharing concerns with DR/DR supervisor. He/she is responsible for sending all reports to DEA and governing state agencies and maintaining records for at least six years as required by law."

And you understand that at least from 1997 to 2013, according to Kirk's testimony, these were the only reports that were submitted during that time period? You're aware of that, correct?

MR. CLARK: Objection to form.

A. Yes.

Q. Okay. Now, next paragraph, "Controlled substance handler shall be responsible for monitoring all controlled drug purchases in coordination with IT manager. He/she shall report any unaccounted losses or problems to DR/DR supervisor, and when delegated, to appropriate authority, Northwood

Page 59

Police/DEA. Controlled substances handlers shall also document all transactions and communications, holding copies of all paperwork as required by law for at least six years."

We talked about establishing the thresholds, right? I think I asked you, you did not create any documentation when you established the initial threshold. Did you create any documentation when you raised thresholds?

MR. CLARK: Objection to form.

A. What do you mean, "create"?

Q. Did you create a form? Did you have any documentation to show why you raised it, what your thought processes were?

MR. CLARK: Objection to form.

A. I have the paper that is the increase for the customer that I give them.

Q. Yeah. I got it; you get the questionnaire back. But do you create any paperwork justifying the raising of a threshold that you initially set?

Page 60

MR. CLARK: Objection to form.

A. Not the question -- this is separate from the questionnaire, after the fact, after I have talked and spoken to the pharmacy.

Q. What do you create? What's the document?

MR. CLARK: Objection to form.

A. It's an increased controlled substance purchase form they fill out.

Q. Do you specify the reasons for which you approve the increase of the threshold?

A. I ask the pharmacist for the reasons why they want an increase.

Q. Right. But the form that you fill out, you fill out the form, right?

A. No. The pharmacy fills out the form.

Q. Okay. What I'm asking you, is there any documentation that you create for justifying the increase of a threshold that you document, that you create?

MR. CLARK: Objection to

Page 61

form.

A. No.

Q. Okay. Do you still have that letter from the DEA?

MR. CLARK: The one you showed him here?

MR. REINS: Yes.

MR. CLARK: It's a broad question.

A. The Cardinal Health one?

Q. The one I handed you, yes, sir.

A. Yes.

Q. The one dated September 27, 2006?

A. Yes.

Q. We kind of got a little off track through my fault, but what I want to talk to you about -- I think we got through the regulation.

You agree that the increasing of a threshold is an important responsibility?

You've got to be careful before you increase a threshold, right?

MR. CLARK: Objection to form.

A. I have to verify with the customer

the reasoning for that.
Q. Right. Is it more than just a phone call and taking their word, though?
A. Yes. I have paperwork I give them.
Q. Right. For instance --
A. Yes.
MR. CLARK: Go ahead. Do you have something you want to say?
A. It is more than that. It is the relationship I've established with the customer, how long I've been dealing with them. A lot of things take place.
Q. Sure. Especially if they've been ordering a consistent amount of narcotics, and then after all these years of a relationship, they ask for more, right?
MR. CLARK: Objection to form.
Q. That would be something you'd consider, right?
MR. CLARK: Objection to form.
A. What do you mean?

Q. That's okay. I'll ask it differently.
Look at page 3, if you don't mind, on the DEA letter.
A. Okay.
Q. Can you and I agree that a pharmacist -- or a customer, let me just say, requesting more than the threshold that you established, is suspicious?
MR. CLARK: Objection to form.
A. No.
Q. Okay. All right. I'd like to talk to you about -- so on this page, it says, "Circumstances that might be indicative of diversion. DEA investigations have revealed that certain pharmacies engaged in dispersing" -- "dispensing controlled substances for other than a legitimate medical purpose often display one or more of the following characteristics in their pattern of ordering controlled substances: "1. Ordering excessive quantities of a limited variety of controlled substances, ergo ordering only" -- do you know

the name of that first medicine, narcotic?
A. Phentermine.
Q. And then what's the next one?
A. Hydrocodone.
Q. And then the last one?
A. Alprazolam.
Q. "While ordering few, if any, of other drugs."
Would you agree that that is potentially indicative of diversion, that behavior?
MR. CLARK: Objection to form.
Q. Number 1.
A. No, not always.
Q. No. I'm just asking you if that's a circumstance that might be indicative of diversion.
MR. CLARK: Objection to form.
A. That's a circumstance why I may want to call the pharmacy, yes.
Q. Well, you'd definitely want to call the pharmacy --

MR. CLARK: Objection to form.
Q. -- at a minimum, right?
MR. CLARK: Objection to form.
A. Yes, I'd do that.
Q. "2. Ordering a limited variety of controlled substances in quantities disproportionate to the quantity of non-controlled medications ordered."
Would you agree that could raise a red flag?
A. At times, yes.
Q. "3. Ordering excessive quantities of a limited variety of controlled substances in combination with excessive quantities of lifestyle drugs."
Would that raise a concern?
A. What's a lifestyle drug? Can you explain it to me, what they mean by that?
Q. Did you ever ask the DEA what they meant by that?
MR. CLARK: Objection to form.

A. No.
Q. "4. Ordering the same controlled substance from multiple distributors."
That would certainly raise a flag, right?
MR. CLARK: Objection to form.
A. Yeah. That's very hard to tell. I can't tell if people do that, but I do ask that question on the questionnaire.
Q. And that's fair. You put a lot of weight in the questionnaire. Do you believe these pharmacists are all -- do you believe there's a high level of honestly in the completion of these questionnaires that you give them?
MR. CLARK: Objection to form.
A. When I get the questionnaires?
Q. Yeah. Do you believe they're being honest with you?
MR. CLARK: Objection to form.
A. I've had questionnaires that have

been falsified, yes, that I've identified.
Q. So you know that that can happen, right?
A. Yes.
Q. Meaning just because they say it doesn't mean it's necessarily true, right?
MR. CLARK: Objection to form.
A. Possibly, yes.
Q. So it says, "A distributor" -- underneath that -- "seeking to determine whether a suspicious order is indicative of diversion of controlled substances to other than legitimate medical channels may wish to inquire with the ordering pharmacy about the following: 1, what percentage of the pharmacy's business does dispensing controlled substances constitute?"
You agree that's a legitimate question?
MR. CLARK: Objection to form.
A. Yes.
Q. Is that a question --
A. Yes, I do. Yes.

Q. Sorry. Is that a question that you should ask if they -- before raising a threshold? Or actually, even before establishing a threshold, right?
MR. CLARK: Objection to form.
A. You mean before establishing as a customer?
Q. Yes.
A. Yeah, I ask that on the questionnaire. I do ask this question. And they will -- I will get a dispensing report too that I will sometimes try to match up with what they tell me on their purchases.
Q. What is a dispensing report?
A. Pharmacy, a dispensing report -- you know, it's what they dispense, all the medications they dispense for the month.
Q. Okay.
"2. Is the pharmacy complying with the laws of every state in which it is dispensing controlled substances?"
Is that something you ask?
A. I ask what they're licensed in.

Q. Okay. Do you ask if they're compliant with the laws?
A. Do I ask that on the questionnaire?
Q. Or when you pick up the phone?
MR. CLARK: Objection to form.
A. I believe that question is on the questionnaire.
Q. "3. Is the pharmacy soliciting buyers of controlled substances via the Internet or is the pharmacy associated with an Internet site that solicits orders for controlled substances?"
Is that on your questionnaire?
A. Yes. We do ask if it's an Internet pharmacy, if that's what you're asking.
Q. Yes.
A. Yes. We've never dealt with an Internet pharmacy.
Q. You don't?
A. Never.
Q. Okay. Do you deal with a pharmacy -- so you don't deal with any

pharmacies that solicit via the Internet?
MR. CLARK: Objection to form.
A. We don't deal with any pharmacies that are Internet pharmacies at all. You have to walk into the pharmacy to pick up your prescription.
Q. I know, but can a pharmacy solicit Internet business, even if it's a bricks and mortar?
MR. CLARK: Objection.
A. They can have a website.
Q. Right. And can they solicit business that way?
MR. CLARK: Objection to form.
A. Solicit business?
Q. Yes, via the Internet.
MR. CLARK: Same objection.
A. They can make people aware they are there.
Q. "4. Does the pharmacy or Internet site affiliated with the pharmacy offer to facilitate the acquisition of a prescription for

a controlled substance from a practitioner with whom the buyer has no preexisting relationship?"
Do you ask that question?
A. Which page is that?
Q. Number 4. Do you ask that?
A. We ask that question, yes.
Q. Okay. "5. Does the pharmacy fill prescriptions issued by practitioners based solely on an online questionnaire without a medical examination or bona fide doctor/patient relationship?"
Do you ask that question, if you know?
A. Okay. We don't ask that specific question, no.
Q. Seem like a good question to ask?
MR. CLARK: Objection to form.
A. So that question is asking if they just -- they don't see the patient?
Q. Right.
A. It's just online?
Q. Right.
A. Well, I don't believe that's

appropriate.
Q. Okay. And you would be nervous if a pharmacy filled scripts that way, right?
MR. CLARK: Objection to form.
A. I would not be comfortable with that.
Q. May be a good question to ask them in the future?
MR. CLARK: Objection to form.
A. Yeah.
Q. "6. Are the prescribing practitioners licensed to practice medicine in the jurisdictions to which the controlled substances are being shipped, if such a license is required by state law?"
Do you ensure or do you require that you get a license -- proof of license of all the pharmacists?
A. Yes, of the pharmacists, yes.
Q. Is that going to be in your file?
MR. CLARK: Objection to form.

A. We ask for the license number and stuff like that, and we review them and we go online to make sure they're still active.
Q. Has it come to your attention that some of the pharmacists you supplied were not licensed in the state they represented?
MR. CLARK: Objection to form.
A. Say that one more time.
Q. Have you ever found out that any of the pharmacists were unlicensed?
MR. CLARK: Objection to form.
A. No.
Q. You don't remember any investigations into that?
A. I don't recall, no.
Q. "7. Are one or more of the practitioners writing a disproportionate share of the prescriptions for controlled substances being filled by the pharmacy?"
Is that a question you ask?
A. Yes.
Q. "8. Does the pharmacy offer to

Page 74

sell controlled substances without a prescription?"

Do you ask that?

A. No, we do not ask that.

Q. "9. Does the pharmacy charge reasonable prices for controlled substances?"

Do you ask that?

A. No.

Q. "10. Does the pharmacy accept insurance payment for purchases of controlled substances made via the Internet?"

Do you ask that question?

A. Yes.

Well, wait. Does the pharmacy accept insurance payment on purchases of controlled substances made via the Internet? I don't deal with pharmacies that -- explain -- okay. So does the pharmacy show ... I don't ask that question.

Q. Let me just step back. Let's just step back and take a breath.

If you've set a threshold with a company and you put the time and the effort into setting that threshold and they want to raise

Page 75

it -- and I understand there's paperwork that's required -- you're going to do your due diligence, right, before you raise the threshold; fair to say?

MR. CLARK: Objection to form.

A. Yes.

Q. You're going to ask all the questions. You're going to make sure they fill out that form. If there's areas you're going to inquire, any of these questions, you're going to do all of that; is that fair to say?

MR. CLARK: Objection to form.

A. All of these questions (indicating)?

Q. Well, you're going to do -- you're going to do -- I mean, it may not be every one of these, but you're going to investigate and ensure, before you raise a threshold, that it's a safe practice to do so, right?

MR. CLARK: Objection to form.

A. Yes.

Page 76

Q. And that takes time, right?

MR. CLARK: Objection to form.

A. Yes.

Q. How much time does it take?

MR. CLARK: Objection to form.

A. That can vary.

Q. What would it vary between?

MR. CLARK: Objection to form.

A. There's just a lot of reasons. Sometimes it could take a day or two.

Q. Okay. Take longer?

A. Not usually.

Q. In that day or two that you take, are these all the inquiries that you should be making?

MR. CLARK: Objection to form.

A. It wouldn't be inquiries.

Q. What satisfies you before you raise a threshold again?

Because here's why I'm asking.

Page 77

You told me you put a lot of time and effort into that initial threshold, and you do your research, you do your due diligence, you come up with a number.

So if somebody wants to elevate that number after you take those steps, sitting here I'm thinking that's kind of a big deal, because you've done the work on the front end, right?

MR. CLARK: Objection to form.

Q. Correct?

A. I've done some work, yes. The pharmacy can change, though. I mean, you know.

Q. Right.

A. I'm very conservative on what I set my thresholds at. Not everybody is set at the same limit.

Q. If someone wanted to look at you and you raised a threshold -- let's say you raised a threshold and they want to ask you and they want to say, "Hey, why did you do that?" Do you have any supporting documentation?

You said -- you gave me a few

reasons why you may do that. Do you have any supporting documentation that shows why you would have allowed that to happen?
MR. CLARK: Objection to form.
Q. Other than the paperwork I think that you said you make them fill out, right?
MR. CLARK: Same objection.
A. Uh-huh.
Q. That's a "yes"? You just need to verbalize the answer.
A. Okay. Ask the question again.
Q. The only documentation I recall you saying that you get before you raise a threshold, if I heard you correctly, is you make them, you fax them, or you give them a document for the increase and they need to fill it out, the reason why they need an increase, correct?
MR. CLARK: Objection to form.
A. That is a lot of it, yes.
Q. And then if that satisfies you, then you feel comfortable raising it, correct?
MR. CLARK: Objection to

form.
A. Yes.
Q. And then if they want to raise it again in the same month, you're going to require that document to be filled out again, right?
MR. CLARK: Objection to form.
A. I've never had anybody ask me for twice in the same month.
Q. Okay. That would be alarming, wouldn't it?
MR. CLARK: Objection to form.
A. I -- no.
Q. It would not be alarming?
A. Not alarming.
Q. Concerning?
MR. CLARK: Objection to form.
A. I would ask a lot more questions, yes.
Q. How about if they asked you to do it a third time?
MR. CLARK: Same objection.

Q. Would that be alarming?
A. That would be very unusual.
Q. Yes, sir.
THE VIDEOGRAPHER: We're going off the record at 2:03.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 2:11.
BY MR. REINS:
Q. You discussed with us today about the setting of the threshold limits and then the elevating or raising of those limits.
Are there any policies and procedures within PSI which provides some guidance or parameters for doing either of those tasks?
MR. CLARK: Objection to form.
Q. That you've seen.
A. No.
Q. So not to oversimplify it, it really comes down to your discretion, right?
MR. CLARK: Objection to form.

A. Yes.
Q. Based on the things you've already talked to us about?
MR. CLARK: Same objection.
Q. The criteria you said?
A. And my experience.
Q. Yeah.
I'm going to now show you a chart, and this is a summary which we have created from PSI600, which is transactional data that PSI has produced to us. So we're going to look at that real quick.
MR. REINS: I have an extra copy for you, but I'm going to have to use it from the last deposition, which I believe it was Number 6. So the witness can have one.
BY MR. REINS:
Q. All right. So I tell you where it comes from so that you understand where it comes from, okay? So what we've done is we've isolated some transactions in certain periods of time. And if you zoom in to the top left there column, there's a pharmacy.

Are you familiar with this pharmacy?
A. Yes.
Q. And you can see the screen in front of you it may be helpful because this is small.
A. Yes.
Q. Do you know when you started doing work with them? Is it Kahler Pharmacy?
A. Kahler Pharmacy.
Q. My question is, do you know when you started a relationship with them?
A. I believe it was in the 1980s.
Q. Okay. So a long time --
A. Maybe earlier. Correct.
Q. So a pharmacy you're pretty familiar with?
A. Yes, sir.
Q. Okay. Because sometimes, in fairness to you, and -- you know, you may set a threshold and it's just a new customer and you may not know kind of the traffic or the business, right, that they may have?
MR. CLARK: Objection to

form.
Q. Is that a yes? She just needs a verbal answer.
A. Yes.
Q. All right. So when we look at this one, we look at -- if you branch it out a little bit. So we've got this particular pharmacy. If you look at the dates --
MR. REINS: If you could highlight just the March dates there.
BY MR. REINS:
Q. All right. So we've got -- this is, it looks like, March 5th through March 30th.
MR. CLARK: It's up here on the screen. It's a little bit easier.
MR. REINS: It may be easier.
MR. CLARK: I'm going to put on the record that the hard-copy document is difficult.
MR. REINS: It's super small. I agree with you. But I have a magnifying glass. But hopefully

this -- blowing it up will make it easier for you.
But don't answer anything if you can't read it, okay?
MR. CLARK: Just one other clarification. Blowing it up makes it easier to see different parts, but when blown up, it's difficult to see the document in its entirety.
MR. REINS: I can't argue with that.
BY MR. REINS:
Q. All right. So we've got -- but you can reference, we've got -- obviously, this is for -- the month of March is what I want to focus on. We want to focus on Kahler Pharmacy.
Do you know this Walter or Jim, the order takers?
A. Yes.
Q. Okay. You've known them, I guess, for a long time?
A. I'm Jim.
Q. Oh, you're the order taker. Who's

Walter?
A. He's my -- he helps me in the cage.
Q. Got it. Okay. So that means you actually got the order when it says "Jim," right?
A. Correct. Yes.
Q. But we know that, based on your position, all of the orders you review, correct?
A. Yes.
Q. And you're the only one that can elevate the thresholds; is that right?
A. Yes.
Q. All right. So if we go over to the right a little more, this is dealing with oxycodone, and specifically, what is Endocet?
A. Endocet is the -- it's a generic for Percocet. It's the same as the oxycodone 10/325. It's just a different brand.
Q. Got it.
And then we've got varying strengths over here. And then if we now go to this side, we've got the size and number of units and some information, and then if we keep

going, we've got the total units sold this month and the max units per month.

The max units per month is the threshold, right?

A. Uh-huh.

Q. Yes?

MR. CLARK: You've got to verbalize.

Q. Say it out loud.

A. Yes.

Q. So it looks like at the beginning of the month, which would be March, there was a 7,000 threshold, right, of pills?

MR. CLARK: Objection to form.

A. Yes.

Q. All right. And they ordered 6,100, no problem. But then in --

MR. REINS: And I don't know if we can split-screen it and show the dates so he can see the dates along with it? Or maybe just that way, yeah.

BY MR. REINS:

Q. So that's on March 5th, and then on March 7th, it looks like we got two orders, which got us to 12,000, correct?

MR. CLARK: Objection to form.

A. That's what it shows, yes.

Q. All right. And assuming this is accurate, of course.

So in response to that order, the threshold was raised from 7,000 to 12,000, correct?

A. Yes.

Q. And you would have obviously had to approve that?

A. Yes.

Q. All right. And I think you've told us pretty honestly here today there's not going to be documentation to support that, but obviously you felt it was okay.

MR. CLARK: Objection to form.

Q. Or you wouldn't have done it, right?

MR. CLARK: Same objection.

A. There was a reason.

Q. There was a reason. And the reason should be -- there should be the due diligence of all the things you talked to me about, all the questions should have been asked, the form would have been filled out and refilled out regarding the questionnaire, correct?

MR. CLARK: Objection to form.

A. Can I tell you what this was?

Q. Sure.

A. Okay. I believe -- Brent Kahler passed away, okay, and this was owned by -- a new pharmacist purchased it, okay? So here was a new customer for whoever -- whatever wholesalers is going to be primary for. They would not allow him to buy this -- buy controls without establishing a relationship, okay?

So at the time, he was not able to buy them from his primary. He turned to me to get his controlled substances. It's a very big pharmacy, had been around for years, and they do a lot of scripts a day.

Q. You're going to need to just break it down so we can verify that, okay?

First of all, you know this to be true?

MR. CLARK: Objection to form.

A. I spoke to the pharmacist.

Q. Okay. So tell me -- I'm sorry. That was a little fast and I didn't quite get it all. So why don't we just baby-step what you just said.

You said, After I know what this is. Say it, and I may interrupt you. What happened?

MR. CLARK: Asked and answered.

Go ahead.

A. Okay.

Q. So this -- let's start with the basics, which is this is -- this is -- this pharmacy, is it Kahler Pharmacy?

A. Correct.

Q. Is that a standing building?

A. Yes.

Q. And where is it located? Oh, we've got the address.
A. Toledo, Ohio, on Airport Highway.
Q. So this is a standalone pharmacy, correct?
A. Correct.
Q. Which you've been dealing with since the '80s?
A. If not longer, yes.
Q. If not longer.
A. Yes.
Q. Okay. And you're saying, "Here's what happened," and then I just got lost. So a little slower, if you don't mind.
MR. CLARK: Objection. Asked and answered.
Q. I'm just trying to understand what happened. I didn't understand what you were saying.
MR. CLARK: We could have the court reporter read it back.
Q. Well, I mean, did someone buy the pharmacy, you said?
MR. CLARK: Objection to

form. Go ahead.
A. Yes.
Q. Okay. Someone bought the -- the guy you've been dealing with's pharmacy since the '80s, someone bought it in 2013?
A. A pharmacist that was working there, correct.
Q. Bought it?
A. Yeah. I don't know when he bought it. It was in 2013, because this is 2012.
Q. Okay. I'm sorry. 2012. So in 2012, there was a pharmacist that you dealt with since the '80s before that?
MR. CLARK: Objection to form.
A. There was a pharmacist that owned that pharmacy, yes.
Q. Okay. And what was his name or her name?
A. Brent Kahler.
Q. Brent. Can you spell the last name? Kahler is going to be --
A. Same as the pharmacy.
Q. Okay. Brent Kahler owned it until

2012?
A. Well, he passed away, so you know.
Q. When did he pass away?
A. I can't exactly remember.
Q. Before this or at this time?
MR. CLARK: Objection to form.
A. I can't remember that. I don't know that answer.
Q. Okay. So the gentleman -- the pharmacist that owned it passed way, and you don't know if that was in 2000 or 2010 or 2011?
A. I can't recall what year.
Q. Okay. All right. So he passed away at some point in the last decade?
MR. CLARK: Objection to form.
A. Yes.
Q. Okay. And then there was a new owner of the pharmacy?
A. Correct.
Q. What is the name of the new owner?
A. Nick. I'm not sure of the last name.

Q. All right. So Nick -- whatever last name -- buys the pharmacy, right? Yes?
A. Correct.
Q. Okay. And you had established these thresholds for Brent, right?
MR. CLARK: Objection to form.
Q. When he owned it.
A. I would assume he was part of it.
Q. Well, I mean, you had -- there was a threshold here at the beginning of the month of 7,000. You had established that, correct?
A. Yes.
Q. And you're saying, "Brent died so we had a whole new business on our hands."
Is that what you're saying?
MR. CLARK: Objection to form.
A. No.
Q. Okay.
A. No. No. Brent died, okay? And the pharmacist that has worked there for a while bought the pharmacy, okay?
Q. Okay.

A. He -- he switched his primary wholesaler to somebody else. They had no history with him, sales history.
Q. I'm going to stop you because I don't want -- if you don't mind, I'm just going to stop so I can digest it.
A. Okay.
Q. So Nick, the new owner, along with some other pharmacists, bought the place?
A. Nick bought the place.
Q. Nick bought the place?
A. I --
MR. CLARK: Let him ask the question.
Q. All right. And they -- and they had -- and you said the primary wholesaler -- which they wanted to deal with?
A. They switched primary wholesalers.
Q. Okay. And what happened?
MR. CLARK: Objection to form.
A. So the new pharmacist -- you know, the new primary wholesaler had no sales history with that pharmacy or very little sales history.

Q. Okay.
A. So they will not sell until they get an establishment with that pharmacy over a certain amount of controlled substances.
Q. Okay. So you filled it?
MR. CLARK: Objection to form.
A. I was the one that filled, correct, at that time.
Q. Do you know Nick?
A. Yes, I've met Nick. I've been to this pharmacy numerous times.
Q. Okay. But before you -- before this month of March, had you met Nick; do you know?
MR. CLARK: Objection to form.
A. Yes. I actually went to the pharmacy and talked to Nick.
Q. Okay.
A. Okay, about this.
Q. And when did that happen; do you know?
A. It would have been in March,

during this time.
Q. Okay. So you went and spoke to Nick. Is that -- did you know Nick before that, or is that the first time you met him?
A. I've met him before, yes.
Q. Okay. Do you remember his last name?
A. I think it's Tabb, T-a-b-b.
Q. All right. So the reason you go meet him is why?
MR. CLARK: Objection. Form.
A. I went to see him to ask him about the increases in his purchases, okay, and him wanting more. That's why I went personally to the pharmacy, to talk to him and get an explanation --
Q. Okay.
A. -- for this reasoning.
Q. Okay. So the prior owner, Brent, was he dealing with a wholesaler?
A. Yes. I was a secondary for them.
Q. Okay.
A. Okay.
Q. Do you know -- did you do your due

diligence and find out how much Brent was getting from the wholesaler versus what he was getting from you?
MR. CLARK: Objection to form.
A. I asked Nick what his purchases were before, okay?
Q. Did you see any documentation to support that?
A. It was patient information. I couldn't see it.
Q. You could see the ordering sheets, though, right, with the names redacted?
MR. CLARK: Objection to form.
A. What do you mean, "ordering sheets with names" --
Q. Well, I mean, you're saying there's no way for you to verify that information, what their prior orders were, without seeing patients' names?
MR. CLARK: Objection to form.
Q. You couldn't look at documents

like this?
MR. CLARK: Objection to form.
A. I couldn't fulfill them because I didn't have, you know, that history from them either, okay? I went on where they're located, okay, how many scripts they do a day, you know, how big they are.
I've been dealing with them for years. There's no new pharmacies in the area. They were in a neighborhood.
Q. The variable for you that you were sufficient with is this guy says to you, "The wholesaler won't deal with us because we're so new, we don't have a relationship. Will you provide all of our narcotics?"
Is that right?
MR. CLARK: Objection to form.
A. He wanted me to -- he wanted me, yes, to provide, you know, certain narcotics for him, that's correct.
Q. Other than what he told you, did you see any documentation or --

A. I can't --
MR. CLARK: Wait for his question.
Q. -- is there anything else you did other than meet with him?
MR. CLARK: Objection to form.
Go ahead.
A. I can't recall.
Q. Any other proof of any sort that you can recall seeing other than meeting him at the store and him saying he needs you to supply him?
MR. CLARK: Objection to form.
A. I can't remember.
Q. Did you call the wholesale retailer and verify that they wouldn't deal with him?
MR. CLARK: Objection to form.
A. No, but I've heard that before.
Q. So based on that conversation with Nick, you went from a 7,000 threshold to a

31,000 threshold; is that right?
MR. CLARK: Objection to form.
A. That was the conversation, yeah. It was helpful.
Q. That's not my question. My question is, you went from a 7,000 threshold to a 33,000 threshold.
MR. CLARK: Objection to form.
Q. Right?
A. That's what I --
MR. CLARK: I think he's highlighting here. Just use that in the document.
A. Yeah, yeah, that's correct.
Q. Almost five times the amount of your initial threshold, right?
A. Correct.
Q. And that threshold was raised from 7 to 12 to 18 to 22 to 25 to 26 to 29 to 33?
A. Uh-huh.
MR. CLARK: You've got to answer.

Q. Is that a yes?
A. Yes.
Q. Is that unusual?
MR. CLARK: Objection to form.
A. Not when I did my due diligence.
Q. Tell me about your due diligence. Other than meeting with Nick and having a conversation with him, tell me what else you did.
A. Well, I have a longstanding relationship with that pharmacy. It's a very big pharmacy. They do a lot of scripts.
Q. No doubt.
A. They've been around for years, have a good reputation.
Q. But you didn't know Nick.
MR. CLARK: Objection to form. Misstates his testimony.
Q. Did you know Nick before that?
A. I've met Nick before that, yes.
Q. You didn't know him, though, did you?
MR. CLARK: Objection to

form.
A. I've spoken to him on the phone too.
Q. Anything else, sir, you can point to, to your quote/unquote "due diligence," other than speaking with Nick?
MR. CLARK: Objection to form.
A. Not that I can recall.
Q. That's a hell of an increase, isn't it?
MR. CLARK: Objection to form. Objection; argumentative.
Q. That is one heck of an increase, isn't it, sir?
MR. CLARK: Same objection.
A. That's an increase, yes.
Q. All right. And, again, in the family of PSI, you can do this on your own without any procedures and any oversight of anybody else being involved, right?
MR. CLARK: Objection to form.
A. I do discuss these with my father,

Tom.
Q. Do you remember discussing it with him?
MR. CLARK: Objection to form.
A. I cannot recall that, no.
Q. You and I can agree on one thing: That's a heck of a lot of Oxy for that community, right?
MR. CLARK: Objection to form.
Q. I'll rephrase.
So if I wanted any documentation to support this decision-making by you, there wouldn't be any, right?
MR. CLARK: Objection to form.
A. I -- I just can't recall.
Q. Okay.
A. I know I went to the store to talk to him, spoke to him on the phone a few times.
Q. All right. Moving along. Let's go back to the policy dealing with inventory controls.

Well, before we do that, you understand we talked in the very beginning of this deposition about you don't want to ship a suspicious order.
Are you aware -- is there any policy or procedure regarding when an order should not be shipped? Is there a policy on that?
A. Yes.
Q. There is? What is it called?
MR. CLARK: Objection to form.
A. It's -- I don't know what it's called, you know.
Q. Let me --
MR. CLARK: Were you done answering?
MR. REINS: I think he was done.
THE WITNESS: Yes.
BY MR. REINS
Q. Let's look at this one, and this may be what you're talking about. Again, I'm not here to trick you or anything.

The inventory control one, let's go to -- this is going to be PSI86 on that document, on the bottom there. It says, "IT manager shall be responsible for running suspicious order monitoring reports."
We've covered that, right?
"Automatically sending all reports to DEA and governing state agencies as required. He or she shall share the information with the DR/DR supervisor each month."
That was Candace and your dad, right?
A. Correct.
Q. "IT manager shall stay current of changing regulations and requirements for reporting and system adjustments to meet these requirements. Our suspicious ordering system prevents Prescription Supply, Inc. from shipping a suspicious order or an excessive order if a customer exceeds a present limit in eight specific families of drugs."
So is that telling us that back in 2000, when this policy was created, that if somebody ordered or sought to order an exceed of

their threshold, that the order would be stopped from shipping?

MR. CLARK: Objection to form.

Q. Let me rephrase it.

What does that mean, "Our suspicious ordering system prevents Prescription Supply, Inc. from shipping a suspicious order or an excessive order if a customer exceeds a present limit in eight specific families of drugs."

What do you understand that to mean?

A. Okay. So that would not have been 2000.

Q. Yeah.

A. There would have been a revision on this.

Q. Nope. If you look on the front page there -- I can't make this stuff up -- June of 2000 is the effective date.

A. But there were revision dates too.

Q. Oh, do you believe this was not the policy back when it was started?

A. That, I don't know. But there were revisions to this.

Q. I'm not arguing with you, and that's a fair point.

Is it your testimony you believe -- you just said it wasn't this way in 2000. You believe that policy was enacted in 2008?

A. Okay.

MR. CLARK: Objection to form.

A. Well, the eight families would have been in 2008.

Q. Got it. That's helpful.

So that addition or that revision would have been added to this policy, to the best of your knowledge and belief, in 2008, then?

A. From what I see.

Q. All right. Then that makes it a little bit easier, the transitional question, because that's when you established your threshold system, correct?

A. Correct.

Q. Which did the automatic stop when someone tried to order more than their threshold, right?

A. Correct.

Q. However, that's where you come back in. If they try to order more than the threshold, you have the ability -- you alone is my understanding -- to raise that threshold like you did for that pharmacy, right?

MR. CLARK: Objection to form.

A. For Kahler, yes.

Q. Yeah.

A. That is my responsibility.

Q. So here's what I want to know, if you know. My understanding is there's a log, a log created when someone tries to order more than their threshold.

Do you understand that?

MR. CLARK: Objection to form.

A. There is a log, yes.

Q. And then do you get -- after 2008, would you get something pop up on your screen or

an e-mail letting you know someone tried to do that?

MR. CLARK: Objection to form.

A. What do you mean?

Q. I'm just wondering if you're notified somehow, like a notification pops up, "Hey, Kahler wants another 10,000 pills"? Like do you get a pop-up or something?

A. Yeah.

MR. CLARK: Objection to form.

A. Yeah. It's on an ordering screen.

Q. Okay.

A. Like every C-II is stopped, okay? So on our ordering screen, if somebody is trying to order more than what I have established with this threshold, okay, it will -- let's say they tried to order five bottles, okay? The threshold is 4,900, okay, and they tried to order five bottles of 100 count. They're only allowed to order one, okay, because that would meet the threshold. Underneath that would be an "M," which would identify that as a threshold

was met. So, yes, I do see that.
Q. And then is your process then the same in order to decide whether you're going to let that go through or not?
MR. CLARK: Objection to form.
Q. We talked about raising thresholds and what your criteria is. I'm not here to make you say it for a third time.
Would your process when that hits your screen be the same as what you've described to me before, on whether you don't ship it, on whether you report it, or on whether you fulfill or allow it to go through?
MR. CLARK: Objection to form.
A. What I do is I'll look in the sales history. I'll do my due diligence on the customer. Okay. I'll look at sales history, see if he purchases that particular product, okay.
There's different forms of oxycodone with different -- you know, there's some with acetaminophen, some with ibuprofen, a

bunch of different forms, okay? So I look at sales history, find out what he's been buying, okay? And, you know, that's -- I call him and do my due diligence.
Q. Due diligence is kind of that word that's kind of a loaded word. So other than calling and looking at sales history, is there anything else you do?
MR. CLARK: Objection to form.
A. Well, I do the paperwork, okay.
Q. What does that mean?
A. The increased, you know, sales, you know, request.
Q. You send them the form which they complete, identifying why they want an increase?
A. That's -- yes, part of it, yes.
Q. Part of it?
A. Yeah.
Q. The other part of it is you talk to them or -- do you talk to everybody in that situation or do you talk to --
A. Yes, I do.
Q. Okay.

MR. CLARK: Let him finish his question. Let me get my objection. Objection to form.
Go ahead.
Q. So you give him a call. You get them to complete the form, why they want an increase. You look at their sales history.
Anything else that qualifies as your due diligence, so to speak?
MR. CLARK: Objection to form.
A. Yes. I also would go back and look at their questionnaire.
Q. The initial questionnaire?
A. Correct.
Q. Right, because you initially set a threshold, right, so you want to see what they put initially, right?
A. I want to see what they put on that form that says how many they dispense per month.
Q. Anything else you do other than that?
MR. CLARK: Objection to

form.
A. I -- there's just all kinds of stuff that -- I don't know. There is.
Q. They're what?
A. There is stuff I do, yes.
Q. Tell me. This is my one chance.
A. Okay. So like I said, I look at the questionnaire. If it says they dispense 12,000 a month, okay, that doesn't mean I set the threshold at 12,000. I could set the threshold at 4,000. Just because they dispense that much a month doesn't mean they're going to purchase all that from me, okay? I also look to see the percentage of non-controls to controlled substances they're buying.
Q. That's on the questionnaire?
A. Yes. And I look it up in sales history too. There's a graph that I can look at, okay, that tells me -- like a piechart that tell me what the percentages of non-controls and controls is.
Plus I can go back and look at every order individually for that customer, go back two, three months, and I can look at every

single order they've ordered, comparing non-controlled to controls --
Q. Got it.
A. -- what their pattern is, what type of medications they buy, okay. There's a really lot involved.
Q. It sounds like it.
And then are there times where you have not increased the threshold?
A. Yes.
Q. If I wanted to verify that, no offense, how would I verify that?
MR. CLARK: Objection to form.
Q. I think I know. The log information which shows that they attempted and then the sales history to see that you shut it down, right?
MR. CLARK: Objection to form.
A. As far as I know, that's the way to tell, yes.
Q. In fairness, though, that's the only way I think I could be able to tell, right?

MR. CLARK: Same objection.
A. Yes.
Q. Yeah?
A. Yeah.
Q. All right. Sitting here today, can you testify under oath that you recall how many times you refused to raise a threshold since 2008?
MR. CLARK: Objection to form.
Q. If you know.
A. I have no idea.
Q. Got it.
Can you tell me -- now, let's say you do that analysis, okay, and then you go -- well, let's just say this: You do that analysis. When if ever -- because after 2013 you all stopped sending those forms monthly.
So when, if ever, after 2013, when those forms stopped, would you report a quote/unquote "suspicious order"? Since then, how many times?
MR. CLARK: Objection to form.

A. Zero.
Q. Zero. All right.
Now, when we were talking about policies, we looked at that part -- and I appreciate that. That was on PSI86. You said, "Look, this is something that we revised."
Is this what you meant by the policy on dealing with shipments when I asked you about that earlier, that revision in there?
MR. CLARK: Objection to form.
A. For the families?
Q. Yes, sir. You said there is a policy on stopping shipments and we went through that paragraph, if you remember, this one right here (indicating).
Is that what you recall the policy being?
A. That would be part of it.
Q. Moving back for one moment. Since 2013, I know you said you can't remember the number, but when somebody gives you their explanations and you decided -- you said, "You know what? I'm not going to increase your

threshold."
Have you done that at all?
A. I'm sure I have, yes.
Q. Do you recall ever doing that? I don't want you to guess, but can you testify here today under oath that you have a recollection of doing that?
MR. CLARK: Objection to form.
A. I -- I don't -- I really don't know.
Q. Okay. That's okay.
Hypothetically, if you did refuse to raise the threshold because you weren't satisfied, can you and I agree that would be, by definition, a suspicious order?
MR. CLARK: Objection to form. Objection; calls for speculation.
A. Okay. So there are reasons that I would not, okay, increase somebody, okay?
Q. Okay.
A. And my thresholds are set very conservatively, all right? I might not have a

good enough establishment with that customer, okay, where I'm just not comfortable. Until I'm comfortable with that customer, I will not change a threshold, all right?

And that would deal with sales history, the percentage of non-controls to controls they buy, what particular controls they're buying, what particular item they're buying, and what particular item they want, okay?

A suspicious order would not have to hit a threshold to be suspicious to me, you know.

Q. You said you have to be comfortable?

A. Yes.

Q. You were comfortable with Nick when you went from 7,000 to 31,000 in less than three weeks?

A. Yes.

MR. CLARK: Objection to form.

Q. All right.

A. At least comfortable with that

pharmacy, yes.

Q. Sure. All right. We're going to talk about another DEA letter.

All right. And this is after the other one. This is going to be PSI 30(b)-301-001. This is dated December 27th, 2007. Again, this letter was sent to all the distributors.

It says, "This letter is being sent to every entity in the United States registered with the Drug Enforcement Administration, DEA, to manufacture or distribute controlled substances.

"The purpose of this letter is to reiterate the responsibilities of the controlled substance manufacturers and distributors to inform DEA of suspicious orders in accordance with 21 C.F.R. 1301.74(b).

"In addition to and not in lieu of the general requirement of 21 USC 23 that managers and distributors maintain effective controls against diversion, DEA regulations require all manufacturers and distributors to report suspicious orders of controlled

substances.

"The regulation also requires that the registrant inform the local DEA division office of suspicious orders when discovered by the registrant."

Is that what you understand the rules to include?

MR. CLARK: Objection to form.

Q. That when you get a suspicious order, you should let them know when you receive it, correct?

MR. CLARK: Objection to form.

A. I've heard different things with that from DEA.

Q. You have?

A. Yes.

Q. What else have you heard?

A. I went to a wholesaler -- DEA wholesaler meeting -- I believe it was in Indianapolis -- where the DEA has representatives there and they talk to the wholesalers and keep us updated on the laws and

regulations.

One of the attorneys that works for DEA had said that do our due diligence first and then, you know, make that judgment. So she was an attorney that worked for DEA.

Q. "Make that judgment," meaning what?

A. On if it's a suspicious order or not.

Q. Okay. And if you think it's a suspicious order, you should report it immediately, correct?

A. Yes.

MR. CLARK: Objection to form.

Q. Okay. All right.

"Filing a monthly report of completed transactions ergo excessive purchase report or high unit purchases does not meet the regulatory requirement to report suspicious orders."

Sitting here today, you're aware that the reporting you guys did from 2000 -- I'm sorry -- from 1997 to 2013, that that monthly

report that Kirk did, that was after those had all been shipped; you're aware of that, right?

MR. CLARK: Objection to form.

A. Yes, on the report, correct.

Q. "Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels."

Sitting here today, do you know if you ever stopped a shipment because you thought it was suspicious?

MR. CLARK: Objection to form.

A. So -- I've never shipped a suspicious order.

Q. I asked you a little bit differently, which is, have you ever stopped a shipment that you thought was suspicious?

MR. CLARK: Objection to

form.

A. Have I ever stopped a shipment that I thought was suspicious?

Q. Yeah.

A. No.

Q. Okay. All right. I'll take that back from you.

I've got a document here, and I'm sorry, I don't have extra copies. I just don't know what it is. We'll make it Plaintiffs' Exhibit Number 1, I guess. I haven't been marking a bunch because we've used the same documents.

So I'll show it to your attorney first, if you don't mind, and then I'm just going to have you identify what that is.

A. It's a DEA inspection.

Q. Okay. And you're signing off that you're aware that there's an inspection, I guess, in the building? Strike that.

What is the purpose of this form, if you know?

MR. CLARK: Objection to form.

Q. Just that you acknowledge that they're there?

MR. CLARK: Same objection.

A. They always give me this form and I always sign it, okay, when they come in, all right.

Q. Okay.

A. You know, I have no reason not to sign it. They're there for an inspection. I'm fine with that.

Q. Okay.

A. I'm not sure why they give you this paper. I'm not with DEA.

Q. Fair enough. Can I see it back if you don't mind. We'll just mark that.

- - -

(PSI - J. Schoen Exhibit 1 marked.)

- - -

Q. Do you remember a Thomas Ohliger, I guess, a pharmacist?

A. Ohliger Pharmacy, yes.

Q. Yeah. Do you remember the situation with him?

MR. CLARK: Objection to

form.

A. Yes.

Q. Tell me what you recall.

A. He was a customer of ours, okay. I believe the State -- State Board of Pharmacy came into his pharmacy and there was an argument. I guess he hit the guy. That's what I've heard.

Q. Okay. Do you remember the issue was a laptop, stealing a laptop?

MR. CLARK: Objection to form.

A. I don't really know.

Q. Was that someone that you were familiar with? I know you had personal relationships. Was he someone you had a personal relationship with?

A. I've probably spoken to him on the phone.

Q. Okay. Now, you were investigated by the Ohio Pharmacy Board. Do you remember that in 2017?

MR. CLARK: Objection to form.

A. It was an inspection.
Q. Inspection?
A. Yes.
Q. And --
A. Yes, I do remember that.
Q. And there was an inspection and then you guys had to fill out a written response.
Do you recall that?
A. Yes.
Q. Okay. You can't give these back.
(Discussion held off the record.)
Q. All right. So we're looking at this document. Were you involved in the completion of this?
A. Yes.
Q. Okay. Tell me what you -- before we talk about the nuts and bolts of it, tell me what you recall about this.
MR. CLARK: Objection; form.
A. Okay. So the State Board of Pharmacy came to do an inspection, okay?
Q. Yes.
A. They completed their inspection.

They left. I believe a couple months later they wanted to ask some additional questions. I believe they e-mailed this to us to ask us some additional questions on some customers we had.
Q. Okay.
A. So we completed this and sent it back to them.
Q. All right. Do you remember the -- do you remember the gist of the allegations?
MR. CLARK: Objection to form.
Q. Let's go through it. If you don't mind, we'll look at the -- I believe it's -- so this is PSI Number 9, which is the third page of the document?
A. Okay. I don't believe they were allegations. What I believe is they just wanted to make sure I was doing my due diligence with my customers.
Q. Gotcha.
So it says, "The facility has a system in place to identify and report suspicious orders for drugs to the Ohio State Board of Pharmacy. Written response required."

It says, "Observation 1: An inspection was performed by agents with the Ohio State Board of Pharmacy on May 22nd, 2017. During that inspection, agents asked a Prescription Supply representative for their policies and procedures on reporting suspicious orders to the Ohio State Board of Pharmacy.
"Prescription Supply provided the agents the following suspicious order monitoring statement and retail pharmacy questionnaire 2016. However, Prescription Supply has not reported a suspicious drug order to the Ohio State Board of Pharmacy during at least the years of 2014, '15, '16, and '17."
Corresponds with your memory, right?
A. Yes.
Q. "Therefore, it appears that Prescription Supply does not have a suspicious order reporting process compliant with Rule 4729-9-16(H)(1)(e)(i), which states in part: Wholesale drug distributors shall establish and maintain inventories and records of all transactions regarding the receipt and

distribution or other disposition of dangerous drugs. These records shall include but shall not be limited to the following information: A system shall be designed and operated to disclose orders for controlled substances and other dangerous drugs subject to abuse. Wholesalers shall inform the State Board of Pharmacy of suspicious orders for drugs when discovered. Suspicious orders are those which in relation to the wholesaler's records as a whole are of unusual size, unusual frequency, or deviate substantially from established buying patterns."
Let me ask you. If you report one of your customers for attempting a suspicious order, do you think they'll like that?
MR. CLARK: Objection to form.
A. If they're attempting a suspicious order?
Q. Yeah. Do you think they'll appreciate if you report them, one of your customers?
MR. CLARK: Objection to

form.
A. It doesn't really matter to me if they're happy with it or not.
Q. Got it. It could affect your business, though, right?
MR. CLARK: Objection to form.
A. If it's a bad customer, somebody is doing somebody wrong, I don't want them as a customer.
Q. But you haven't lost any business for reporting a suspicious order because you've never reported any, right?
MR. CLARK: Objection to form.
A. I haven't reported any suspicious orders.
Q. So you haven't lost business over that reporting?
MR. CLARK: Were you done answering?
THE WITNESS: Yes.
Q. So you've never lost a customer because you reported them, obviously?

MR. CLARK: Objection to form.
A. I've never had anybody with a suspicious order, though.
Q. Right. No, I'm with you. In your whole career?
MR. CLARK: Objection to form.
A. I wouldn't say in my whole career, no.
Q. Have you ever?
A. Yes.
Q. When?
A. A long time ago.
Q. How many years ago?
MR. CLARK: Objection to form.
A. I'm not sure.
Q. Like in the '70s or '80s?
MR. CLARK: Objection to form.
A. No.
Q. 2000s?
A. Good possibility, yes.

Q. Do you remember, did you talk -- did you report that one?
A. I would assume, yes. It was on Tussionex.
Q. Do you remember reporting it?
A. Yes. Yeah, it was on Tussionex, yeah.
Q. It was on Tussionex?
A. Yes. I may have just called. I'm not sure, though. But it was an issue with Tussionex.
Q. Is that the only one you ever remember reporting?
MR. CLARK: Objection to form.
A. That I can recall.
Q. Okay. And you've been doing this for how many years?
A. Right around 20.
Q. Twenty.
What is Tussionex?
A. It's a -- I believe it's used for colds. It has hydrocodone in it.
Q. Gotcha.

A. It was a Class III at the time.
Q. What was it about that one time that set you off?
MR. CLARK: Objection to form.
A. Somebody was ordering it that, as far as I can recall, was ordering more than I usually see from anyone else.
Q. Okay. Do you know who that pharmacy was?
A. No idea. I can't recall.
Q. You don't remember how long ago, but it was some time ago?
A. Correct.
Q. On the second page, at the top, it says, "A subsequent review of wholesale data reported to the Ohio State Board of Pharmacy for drugs containing oxycodone 10 milligrams and oxycodone 30 milligrams indicated many sales appeared to be of unusual size, unusual frequency, or that deviate substantially from established buying patterns, but were not reported to the Board of Pharmacy as suspicious orders. Specifically, we observed spikes in

sales for specific months and sales that seemed to steadily increase or spike and then abruptly stop."

Do you know that Kahler is one of the pharmacies they looked at?

A. Yes.

MR. CLARK: Objection to form.

Q. Was that with Nick still or no, or a different owner?

A. I believe that was Nick.

Q. Nick.

If you go to PSI65, which is more than halfway through, on the bottom right-hand side. Take your time.

A. Is it this page (indicating)?

MR. CLARK: 65.

A. Okay.

Q. This is a form called "Increased Purchase Request for Controlled Substances." Earlier you testified that when someone wants to increase beyond the threshold, you would require this form to be filled out.

Is this the form you were speaking

of?

A. Yes, sir.

Q. Okay. So let me ask you, like, if they don't actually fill out answers, is that concerning to you? Like this person didn't answer 1 through 3. Is that concerning?

1 is "Has the pharmacy prescription count increased?" 2, "Did the pharmacy change its business activities?" 3, "Has there been an increase in prescribers? Yes or no." And they just left it blank.

Should that concern you before you approve a threshold increase?

MR. CLARK: Objection to form.

A. Not when the reason they gave me for the increase was that their primary was out of stock.

Q. Okay.

A. So there were no changes, so --

Q. So how do you verify if Cardinal was actually out of stock? Is there a way to verify, or no?

A. It's really hard, really hard.

Q. Okay. All right. I'm going to go to 67, if you don't mind. This is Shaffer Pharmacy. They want some more Oxy, and the reason is "Supplier mentioned an industry short supply. New" -- is that MOK?

A. M.D.

Q. Oh, I'm sorry. "M.D. moved in building." So they're saying, "Hey, supplier mentioned that there's a short supply and we've got a new doctor."

Is that satisfactory to you?

MR. CLARK: Objection to form.

Q. As an explanation to increase Oxy?

MR. CLARK: Same objection.

A. This particular case, he didn't meet his threshold.

Q. Okay.

A. Okay? I called him because I wasn't used to what he was ordering at the time. This did not meet his threshold, okay?

Q. Forget about threshold. It was --

MR. CLARK: Were you still answering?

A. Yes.

So I had called him to find out why he was ordering this particular item, because it was unusual for him to do, okay? So I called Tom and talked to him personally and asked him about it, okay? He told me that his supplier was short, his primary, and that he had two new doctors move in, okay? So this form was sent to him and returned to me.

Q. That is by definition -- the unusual pattern which you just described, that is, by definition, a suspicious order, right?

MR. CLARK: Objection to form.

A. I did my investigating and determined it was not, though.

Q. Well, it was suspicious and then you made the phone call, right?

MR. CLARK: Objection to form.

A. No. It wasn't what he usually ordered from me.

Q. It was unusual?

A. So I made the call.

Page 138

Q. Right. It was unusual?
MR. CLARK: Objection to form.
A. It was -- it was -- yeah, it was unusual, yes.
Q. And so "Supplier mentioned" -- did you fill this out or did he?
A. The pharmacist fills this out, yeah.
Q. "Supplier mentioned an industry short supply." What would the supplier be?
A. His primary wholesaler.
Q. Do we know who that is or --
MR. CLARK: Objection to form.
A. No.
Q. Okay. Did you verify two physicians moved into the building?
A. At the time, no, I did not, no.
Q. Okay.
A. No. He's in a doctors' building, multiple doctors' buildings, and I've had a relationship with him for -- probably since he's opened the pharmacy.

Page 139

Q. I'm just saying, you know, hypothetically, you could have two leave and two come in, like two replace two. That would be something you'd want to know, right?
MR. CLARK: Objection to form.
Q. Two doctors leave, two come in, shouldn't affect the numbers that much, right?
MR. CLARK: Same objection.
A. It depends on what the specialty is.
Q. Okay. Did you ask them what their specialties are?
MR. CLARK: Same objection.
A. I can't recall.
Q. Okay. All right. And then we've got 69. Tabb Enterprises, Inc. Is that Nick, Nick Tabb, right?
A. Yes.
Q. Okay. So they wanted more, and this is going to be in 2015. This is years after the event we looked at earlier, right? That was 2012, I guess?
A. Correct.

Page 140

Q. All right. And what does Nick say? Why do they need an increase here?
A. He said they have a prescription count increase, and on -- it says they have 110 new scripts per month, okay, for the last six months.
Q. That's a reason? That's good enough?
MR. CLARK: Objection to form.
A. With my relationship with him and knowledge of that store?
Q. Yeah. I'm asking.
A. I believe, yeah, that's -- yeah. And I did call him. Before I send these out, I call them.
Q. Sure.
A. I call and talk to them. Because if I just send these out, they're not going to know what this is. So I call and talk to the pharmacist.
Q. Do you know that part of the -- part of the issue with the abuse of getting Oxy is more scripts are being written?

Page 141

MR. CLARK: Objection to form.
Q. For a period of time?
MR. CLARK: Same objection.
Q. And the fact that there's more scripts doesn't mean there's not a problem, right?
MR. CLARK: Objection.
Q. That's actually part of the problem, isn't it?
MR. CLARK: Same objection.
A. But the 110 could be scripts just in general, not scripts for a particular item. I think he's referring to 110 additional scripts per month on this, you know, overall. Not that I believe --
Q. You said it's overall?
A. Yeah, not on what I believe is a certain item.
Q. Do you remember talking to him about that?
MR. CLARK: Objection to form.
A. I remember calling him, yes.

Page 142

Q. Do you remember --
A. I would have called him. I don't know if I remember it, but I would have called him to get this paperwork.
Q. I'm not doubting that you called him, but do you remember the conversation?
A. I can't be sure, no.
MR. REINS: Mark that as Plaintiffs' Exhibit Number 2.
- - -
(PSI - J. Schoen Exhibit 2 marked.)
- - -
MR. CLARK: Are we continuing from Kirk or are these new?
MR. REINS: They're new, but I'll tell you what I've done here. I've gotten really revolutionary. I've identified a number of the documents that have been exhibits in other depos by Bates numbers so we know what they are, but I haven't attached them all again because, frankly, I have one copy left.

Page 143

MR. CLARK: That's fine.
MR. REINS: Okay.
THE WITNESS: Are we done with this, then?
MR. REINS: Yes, sir, we are. And honestly, we're going to take a quick break because I may be done.
THE VIDEOGRAPHER: We're going off the record at 3:04.
(Recess taken.)
THE VIDEOGRAPHER: We're back on the record at 3:14.
MR. REINS: I have no more questions.
- - -
REDIRECT EXAMINATION
BY MR. CLARK:
Q. I just want to ask you one question, Mr. Schoen. I want to clarify something that Mr. Reins asked you about earlier on and just make sure that we get this right.
Have you stopped orders before?
A. Yes. From going out? Yes.
Q. Okay. So it is not as if you've

Page 144

allowed every order that has come into Prescription Supply to be filled in the way that it came in; is that right?
A. No.
Q. And you've stopped many orders?
A. Yes.
Q. Okay. And over your 20 years, there have been many orders that you did not allow to go out?
A. Correct. Yes.
Q. I just wanted to clarify that one point.
A. Yes, sir.
MR. CLARK: Okay. I have nothing further.
- - -
RECROSS-EXAMINATION
BY MR. REINS:
Q. Here's what I understood you to say earlier, if I understood you.
You said to me, you said, "Hey, man, there's a bunch of reasons why I may not ship something," and you gave me multiple examples.

Page 145

I believe I then asked you at some point later in the questioning if you had ever stopped a shipment or prevented a shipment from going out because you thought it was suspicious, and your answer was "No, I have not."
Now, I understand you've stopped orders and I respect that, and I understood those to be consistent, but are you now telling me that you have -- is it your testimony -- and I don't think it's different than what your counsel just asked you. I understand you've stopped orders.
But are you testifying here today that you've stopped shipments of orders from going out or getting completed because they were quote/unquote "suspicious"?
MR. CLARK: Objection to form.
Q. Because I believe you testified earlier you have not.
MR. CLARK: Same objection.
Q. Or you couldn't recall ever doing that is what I recall, actually.
MR. CLARK: Same objection.

A. Possible. You know, I've stopped lots of orders.

Q. I don't doubt that. But my question to you was, did you -- can you recall specifically here today stopping an order or not shipping an order because it was suspicious, and I believe your testimony was "I just don't recall."

MR. CLARK: Objection to form.

Q. Is that accurate?

A. Well, I would have stopped them if they were suspicious or not suspicious if I didn't feel comfortable with that order going out.

Q. I'm not arguing with you. I'm just asking you here today, here today, under oath, based on what you can recall, based on what you can remember -- I'm not saying it didn't happen, but can you testify here today you remember stopping a shipment because you thought the order was suspicious?

MR. CLARK: Objection to form.

Q. Can you remember that?

MR. CLARK: Same objection.

Q. I'm not saying it didn't happen, but do you have a recollection?

MR. CLARK: Same objection.

A. I've stopped orders because I just wasn't comfortable with them, for whatever reason that may be, okay? Lots of orders.

Q. Have you ever -- I understand, but can you testify here today -- do you remember when we talked about this earlier?

MR. CLARK: Objection to form.

Q. I know there has been a lot of questions.

A. There has been a lot of questions so ...

Q. I get it.

MR. CLARK: And I'm just going to put a standing objection down to the extent that this calls for a legal conclusion over the definition of suspicious.

Q. Part of your job is to not ship

suspicious orders, correct? That's your job?

MR. CLARK: Objection to form.

Q. Right?

A. That's part of my job.

Q. Darn right, and you need to know what "suspicious" means in order to do your job, right?

MR. CLARK: Same objection.

Q. That's okay.

A. I agree with that.

Q. Yeah. All right. All I'm asking you is this: And I'm not -- this isn't some kind of trick like I'm getting you to say you've never held an order. I know you've held orders. I get it. And I'm not disputing that.

But what I believe you testified earlier is, when I said "Can you recall stopping a shipment because you thought the order was suspicious, that one reason, do you remember doing it?"

Do you remember doing it?

MR. CLARK: Objection.

Q. And that's what I'm asking.

MR. CLARK: Objection to form.

A. Because it was suspicious?

Q. Yes. That you can recall.

MR. CLARK: Objection to form.

A. That one with the Tussionex, yes.

Q. Fair enough. Any others that you can recall?

A. I recall the Tussionex.

Q. And that's fair. And I'll even be more of what I hope is fair to you, which is, if we look at the log and we see the log triggered -- and we see a sales history, and we see that it was triggered and then it wasn't shipped, that's something else that you and I spoke about that we can look at, even if you don't remember it here today, right?

MR. CLARK: Objection to form.

Q. Correct?

A. Yeah.

Q. Now, the Tussionex -- and I thought I covered it -- you said that that

Page 150

particular order you were uncomfortable with because it was very much unusual from what that person had ordered before, right?

MR. CLARK: Objection to form.

A. No. From what other people have ordered from me.

Q. Okay.

A. Okay?

Q. Now, did you --

A. Yes.

Q. Sorry.

Did you pick up the phone and talk to that pharmacy? Did you send them the form?

MR. CLARK: Objection to form.

A. That was before the form. That was a long time -- I can't recall when that was.

Q. That was a long time ago?

A. Yes.

MR. REINS: Gotcha.

I have no more questions. Thanks for your time.

MR. CLARK: Nothing further.

Page 151

THE VIDEOGRAPHER: We're going off the record at 3:20 p.m.

(Signature not waived.)

\- - -

Thereupon, at 3:20 p.m., on Wednesday, February 27, 2019, the deposition was concluded.

\- - -

Page 152

CERTIFICATE

STATE OF OHIO :
SS:
COUNTY OF _________:

I, JAMES T. SCHOEN, do hereby certify that I have read the foregoing transcript of my cross-examination given on February 27, 2019; that together with the correction page attached hereto noting changes in form or substance, if any, it is true and correct.

____________________________
JAMES T. SCHOEN

I do hereby certify that the foregoing transcript of the cross-examination of JAMES T. SCHOEN was submitted to the witness for reading and signing; that after he had stated to the undersigned Notary Public that he had read and examined his cross-examination, he signed the same in my presence on the _______ day of ________________________, 2019.

____________________________
NOTARY PUBLIC - STATE OF OHIO

My Commission Expires:
________________, ______.

Page 153

CERTIFICATE

STATE OF OHIO :
SS:
COUNTY OF FRANKLIN :

I, Carol A. Kirk, a Registered Merit Reporter and Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named JAMES T. SCHOEN was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the deposition then given by him was by me reduced to stenotype in the presence of said witness; that the foregoing is a true and correct transcript of the deposition so given by him; that the deposition was taken at the time and place in the caption specified and was completed without adjournment; and that I am in no way related to or employed by any attorney or party hereto or financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio on this 4th day of March 2019.

____________________________
CAROL A. KIRK, RMR
NOTARY PUBLIC - STATE OF OHIO
My Commission Expires: April 9, 2022.

\- - -

DEPOSITION ERRATA SHEET

I, JAMES T. SCHOEN, have read the transcript of my deposition taken on the 27th day of February 2019, or the same has been read to me. I request that the following changes be entered upon the record for the reasons so indicated. I have signed the signature page and authorize you to attach the same to the original transcript.

Page Line Correction or Change and Reason:

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

___ ____ ________________________________________

Date ______________ Signature ________________________