EXHIBIT 307

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      - - -
 5   IN RE:  NATIONAL            :
     PRESCRIPTION                :  MDL No. 2804
 6   OPIATE LITIGATION           :
     _____ :  Case No.
 7                               :  1:17-MD-2804
     THIS DOCUMENT RELATES       :
 8   TO ALL CASES                :  Hon. Dan A. Polster
 9                      - - -
10          Wednesday, February 27, 2019
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12
                        - - -
13

         Videotaped deposition of KIRK HARBAUER,
14

     held at the Hilton Garden Inn, Perrysburg, Ohio,
15

     commencing at 9:02 a.m., on the above date, before
16

     Carol A. Kirk, Registered Merit Reporter and Notary
17

     Public.
18
19                      - - -
20
21            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
22               deps@golkow.com
23
24
```

Page 2

```
 1        A P P E A R A N C E S:
 2  On behalf of the Plaintiffs:
 3     MCHUGH FULLER LAW GROUP
        BY: LANCE REINS, ESQUIRE
 4        lance@mchughfuller.com
        ALLAN (A.J.) L. ELKINS, ESQUIRE
 5        allan@mchughfuller.com
           (via teleconference)
 6     97 Elias Whiddon Road
        Hattiesburg, Mississippi 39402
 7     601-261-2220
 8
 9  On behalf of AmerisourceBergen Corporation (via
    teleconference and text/video streaming)
10     JACKSON KELLY PLLC
        BY: SANDRA K. ZERRUSEN, ESQUIRE
11        skzerrusen@jacksonkelly.com
        50 South Main Street, Suite 201
12     Akron, Ohio 44308
        330-252-9060
13
14  On behalf of HBC (via teleconference and text/video
    streaming):
15
       MARCUS & SHAPIRA LLP
16      BY: ELLY HELLER-TOIG, ESQUIRE
          ehtoig@marcus-shapira.com
17      One Oxford Center, 35th Floor
        301 Grant Street
18      Pittsburgh, Pennsylvania 15219-6401
        412-338-3345
19
20  On behalf of Walmart (via teleconference and
    text/video streaming):
21
       JONES DAY
22      BY: PATRICIA OCHMAN, ESQUIRE
          pochman@jonesday.com
23      901 Lakeside Avenue East
        Cleveland, Ohio 44114
24      216-586-3939
```

Page 3

```
 1  On behalf of Prescription Supply, Inc.
 2     FOX ROTHSCHILD LLP
        BY: JAMES C. CLARK, ESQUIRE
 3        jclark@foxrothschild.com
        STEPHAN A. CORNELL, ESQUIRE
 4        scornell@foxrothschild.com
           (via teleconference and text/video
 5          streaming)
        2700 Kelly Road, Suite 300
 6     Warrington, Pennsylvania 18976-3624
        215-345-7500
 7
 8  On behalf of Johnson & Johnson and
 9  Janssen Pharmaceuticals:
       TUCKER ELLIS LLP
10      BY: JEFFREY M. WHITESELL, ESQUIRE
          jeffrey.whitesell@tuckerellis.com
11      950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113
12     216-592-5000
13
14  On behalf of McKesson (via teleconference and
    text/video streaming):
15     COVINGTON & BURLING LLP
        BY: MARY YANG, ESQUIRE
16        myang@cov.com
        One CityCenter
17     850 Tenth Street, NW
        Washington, DC 20001
18     202-662-5110
19
20  On behalf of HBC:
       MARCUS & SHAPIRA LLP
21      BY: MOIRA CAIN-MANNIX, ESQUIRE
          cain-mannix@marcus-shapira.com
22      One Oxford Center, 35th Floor
        301 Grant Street
23      Pittsburgh, Pennsylvania 15219-6401
        412-338-3345
24
```

Page 4

```
 1  ALSO PRESENT:
 2     Michael Newell, Videographer
        Zachary Hone, Trial Technician
 3
 4          - - -
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1     VIDEOTAPED DEPOSITION OF KIRK HARBAUER
 2          INDEX TO EXHIBITS
 3  WITNESS                    PAGE
 4  KIRK HARBAUER
 5     CROSS-EXAMINATION BY MR. REINS        9
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 6

1    VIDEOTAPED DEPOSITION OF KIRK HARBAUER
2              INDEX TO INDEX
3  PSI - K. HARBAUER  DESCRIPTION       PAGE
4  PSI - K. Harbauer 1  Letter to Ms. Massey from    24
                      Mr. Harbauer, dated March
5                     25, 1996, Bates-stamped
                      PSI-1012.5
6
    PSI - K. Harbauer 2  Document titled        80
7                     "Suspicious Order
                      Monitoring System, System
8                     Documentation,
                      Introduction and Table of
9                     Contents," Bates-stamped
                      PSI-72519 through 72530
10
    PSI - K. Harbauer 3  Letter to Ms. Margreta       84
11                    from Mr. Harbauer, dated
                      May 28, 1997, Bates-
12                    stamped PSI-166566
13  PSI - K. Harbauer 4  Suspicious Order        111
                      Monitoring Report,
14                    Bates-stamped PSI-158967
                      through 159013
15
    PSI - K. Harbauer 5  Document titled         126
16                    "Controlled Substances,"
                      Bates-stamped PSI-0000653
17                    and 654
18  PSI - K. Harbauer 6  Spreadsheet Bates-stamped  145
                      PSI-1011.1 and 2
19
    PSI - K. Haubauer 7  Prescription Supply       155
20                    Maximum Monthly Units for
                      OLS Systems, Bates-
21                    stamped PSI-0000274
                      through 297
22
23
24

## Page 7

1              - - -
2         P R O C E E D I N G S
3              - - -
4         THE VIDEOGRAPHER:  We are now
5  on the record.  My name is Michael
6  Newell.  I'm the videographer for
7  Golkow Litigation Services.
8  Today's date is February 27th,
9  2019, and the time is 9:02 a.m.
10 This video deposition is being held
11 in Perrysburg, Ohio in the matter
12 of National Prescription Opiate
13 Litigation for the Northern
14 District of Ohio, Eastern Division.
15 The deponent today is Kirk
16 Harbauer.
17         Will counsel please identify
18 themselves.
19         MR. REINS:  Lance Reins for
20 the Plaintiff.
21         MR. CLARK:  Jim Clark of Fox
22 Rothschild for Prescription Supply.
23         MR. WHITESELL:  Jeff
24 Whitesell from Tucker Ellis for

## Page 8

1  Johnson & Johnson and Janssen.
2         THE COURT REPORTER:  On the
3  phone?
4         MS. OCHMAN:  Patricia Ochman,
5  Jones Day, for Walmart.
6         MS. ZERRUSEN:  Sandy
7  Zerrusen, Jackson Kelly, for
8  AmerisourceBergen.
9         MR. CORNELL:  Stephan
10 Cornell, Fox Rothschild, for
11 Prescription Supply.
12         MS. YANG:  Mary Yang with
13 Covington on behalf of McKesson.
14         MR. ELKINS:  A.J. Elkins,
15 McHugh Fuller Law Group, for the
16 Plaintiffs.
17         THE VIDEOGRAPHER:  The court
18 reporter today is Carol Kirk and
19 will now swear in the witness.
20              - - -
21         KIRK HARBAUER
22 being by me first duly sworn, as hereinafter
23 certified, deposes and says as follows:
24         CROSS-EXAMINATION

## Page 9

1  BY MR. REINS:
2     Q.   Good morning.
3     A.   Good morning.
4     Q.   Can you please introduce yourself.
5     A.   Yeah.  My name is Kirk Harbauer.
6     Q.   And, Mr. Harbauer, have you been
7  through a deposition before?
8     A.   Never have.
9     Q.   Okay.  I'm sure your counsel has
10 probably advised you, but I'll just go over a
11 few basic ground rules for today's deposition,
12 okay?
13    A.   Okay.
14    Q.   All right.  Clearly I'm going to
15 be asking you some questions here today.
16 Because we have a court reporter taking down
17 everything we say, I'm going to need you to
18 please verbalize all of your answers.  No
19 "huh-uhs," "uh-huhs" or head nods because those
20 can't be taken down, okay?
21    A.   Very good.  I'll do the best I
22 can.
23    Q.   Absolutely.
24    A.   That's all I can do.  I've never

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1 given a deposition, so ...
2 Q. If you hear me say something like,
3 "Is that a yes," "Is that a no," that's kind of
4 a clue to you that you might have nodded your
5 head, okay?
6 A. Okay.
7 Q. All right. For the very same
8 reasons, if you could please let me finish my
9 question before you begin your answer. If we
10 talk over one another, it makes it very
11 difficult for her to do her job, okay?
12 A. Okay.
13 Q. All right. And, lastly, if you
14 answer my question, I'm going to assume you
15 understood it and you're telling the truth; is
16 that fair?
17 A. Yes.
18 Q. All right. Now, if you don't
19 understand my question, let me know and I'll
20 rephrase it. Or if you don't know something,
21 you can simply let me know, okay?
22 A. Okay.
23 Q. Any questions before we get
24 started?

Page 11

1 A. No. I'm ready to go.
2 Q. All right. Your counsel probably
3 advised you as well, this is not meant to be
4 a -- some form of torture, so if you've got to
5 use the restroom or you need a drink or
6 something, you just let us know, okay?
7 A. Okay. Very good.
8 Q. All right. Sir, are you currently
9 employed?
10 A. Yes, I am.
11 Q. And who do you work for?
12 A. Prescription Supply.
13 Q. And what do you do for
14 Prescription Supply?
15 A. I'm the vice president of
16 information systems. I wear a lot of hats, but
17 that's the main thing I do.
18 Q. How long have you held that
19 position?
20 A. Over 20 years.
21 Q. Have you had the same position the
22 entire time?
23 MR. CLARK: Objection to
24 form.

Page 12

1 A. No, I have not. This is --
2 this -- I've worked there for over 40 years.
3 Q. What does Prescription Supply,
4 Inc. do?
5 A. We supply pharmaceuticals to
6 independent drugstores and some -- a little
7 hospital business.
8 Q. And you said you began there
9 40 years ago; is that right?
10 A. That's correct.
11 Q. What was your first position?
12 A. Well, I worked in receiving.
13 Q. And what does that mean?
14 A. Just receiving product in the back
15 door through the warehouse, unloading trucks,
16 putting away stock. It's a family organization,
17 so I pretty well have worked almost -- a lot --
18 a lot of the jobs all the way through the
19 operation.
20 Q. And the president is Mr. Thomas
21 Schoen; is that right?
22 A. Correct.
23 Q. And what's your relationship with
24 him?

Page 13

1 A. He is my uncle.
2 Q. And is your mother also involved
3 in the company?
4 A. Yes, she is.
5 Q. What's her position?
6 A. She's the secretary/treasurer.
7 Q. And what's her name?
8 A. Jacquelyn Harbauer.
9 Q. And you have a sister that's works
10 for the company?
11 A. Yes.
12 Q. Who's that?
13 A. Candace Harbauer.
14 Q. And what does she do?
15 A. She is the point DR -- or she's
16 the -- she has a lot of regulatory stuff. I
17 don't know what her exact title is, though.
18 Q. Do you know what her duties and
19 responsibilities as "regulatory stuff" means?
20 MR. CLARK: Objection to
21 form.
22 A. Yes, I do.
23 Q. Tell me, if you don't mind.
24 A. Basically going through anything

Highly Confidential – Subject to Further Confidentiality Review

Page 14

1 that the company needs to do legalize --
2 legal-wise. Helps us go through all kinds of
3 audits and regulatory -- any kind of regulatory
4 affairs.
5     Q. And I believe you have several
6 cousins that work in the business?
7     A. Yes, I do.
8     Q. And who would that be?
9     A. All of my cousins?
10     Q. How many do you have working for
11 the company?
12     A. Well, there's probably five of us,
13 I think, or six of them.
14     Q. Okay. And who are they and what
15 do they do?
16     MR. CLARK: Objection to
17     form.
18     A. Well, Wendy Schoen, which is Tom's
19 daughter. Chris Schoen. Rob -- Chris Schoen is
20 a sales manager.
21     Q. What does Wendy do?
22     A. Warehouse employee. Rob Schoen,
23 he's the warehouse manager. Jim Schoen is the
24 controlled substance manager. And I think

Page 15

1 that's it.
2     Q. Okay. Obviously you've worn a lot
3 of different hats over the years.
4     A. That's correct.
5     Q. I don't want to --
6     MR. CLARK: Let him finish
7     his --
8     A. Oh, sorry.
9     Q. That's okay. Sometimes you'll
10 know exactly where I'm going.
11     Obviously you've worn a lot of
12 different hats over the years, 40-year
13 experience. You've been working -- or the head
14 of information services. How long have you held
15 that position?
16     MR. CLARK: Objection to
17     form.
18     A. I've been doing it for the last 20
19 at least.
20     Q. Okay. And you made it sound like
21 you wear a lot of hats even within that
22 position. What types of things are you
23 responsible for?
24     MR. CLARK: Objection; form.

Page 16

1     A. Well, I also am an EDI
2 coordinator. I do a lot of that with EDI, AS2,
3 web development, systems analysis, and really
4 I'm an RPG programmer is what I do. I'm a
5 maintenance programmer, and working on the IBM
6 environment.
7     Q. All right. That's maybe second
8 language to you, but I'm going to need some help
9 explaining some of those things.
10     Let's start with the EDI
11 coordinator. What does that mean?
12     A. I'm responsible for electronic
13 data interchange for all the documents that
14 trade hands between Prescription Supply and all
15 our vendors --
16     Q. Okay.
17     A. -- as well as some of our
18 customers. They -- you know, a normal document
19 basically can be converted into an EDI document.
20 There's numbers for them and there's
21 specifications for each one. You know, an
22 invoice, a purchase order, any of the documents,
23 you know, chargeback.
24     Q. What's a chargeback?

Page 17

1     A. A chargeback is -- Prescription
2 Supply may pay a price for an item, okay, with
3 the vendors, and with that chargeback being --
4 then there are certain group purchasing
5 organizations that can petition or work with the
6 vendors for special pricing. So they may be
7 able to buy a product below cost.
8     And a chargeback is one that goes
9 back to the manufacturer where the process of
10 where Prescription Supply would bill back to the
11 manufacturer for an item or a sale that we made.
12 If we paid a dollar for something, for example,
13 and they may have negotiated a price of
14 80 cents, a chargeback would be for the
15 difference of that.
16     Q. Is there a particular system that
17 you use?
18     A. We use Extol.
19     Q. How do you spell that?
20     A. E-x-t-o-l. It's a translator.
21 Now, you say "system." Are you talking about
22 the hardware, or are you talking about the
23 software?
24     Q. Hardware.

Page 18

1    A.   Okay.  Hardware is an IBM
2 System i.
3    Q.   And when you say use this as a
4 communication tool with your vendors, with your
5 customers, how do you actually transfer
6 documentation?
7        MR. CLARK:  Objection to
8    form.
9    A.   Through various means.  We use VAN
10 connection, which is a value-added network,
11 which works like a mailbox.  We use AS2, which
12 is functionality that uses the Internet over
13 with PKI encryption where there's certificates
14 involved with each trading partner, and they
15 verify that the -- the thing goes across
16 encrypted, the document.
17       (Reporter clarification.)
18   A.   Oh, the document goes across
19 encrypted.  I'm sorry.  I'm slow down.  Just
20 nervous.  I found something I can answer.
21   Q.   Don't get excited.  We're not
22 going to stay here long.
23   A.   This is the life I live, okay, so
24 I work --

Page 19

1    Q.   I feel like I'm in a Peanuts
2 cartoon right now.
3    A.   No.  No.  I didn't mean to bring
4 it up if -- you know, unless you need me to.
5    Q.   No.  It's fine.  You're answering
6 my question.
7        Moving along, though, AS -- you
8 said A52 web developer, what does that mean?
9        MR. CLARK:  Objection to
10   form.
11   A.   I'm sorry.  What's the question?
12   Q.   You said another function that you
13 do -- I thought -- I wrote down A52 web
14 development.  Is that correct or no?
15   A.   That's -- I don't believe I said
16 that.
17   Q.   Okay.
18   A.   Okay.  So I said, I'm a web
19 developer.  I work on web applications that
20 Prescription Supply may use with their
21 operations.
22   Q.   Got it.
23   A.   And I think what you said was AS2.
24 AS2 is our form of encryption that we use to

Page 20

1 communicate between vendors --
2    Q.   Got it.
3    A.   -- over the Internet.
4    Q.   And do you actually maintain the
5 website?
6    A.   Not always.  We have other sources
7 that do that.
8    Q.   Okay.  Systems analyst?
9    A.   Yeah, which I interpret that as
10 being -- taking care of day-to-day things,
11 functions that happen within Prescription
12 Supply.  I've grown up with these -- these
13 applications, so we've -- you know, I make sure
14 that the orders are processing and we're, you
15 know, filling orders and -- you know, all the --
16 all the -- any system that's on the AS400, I
17 kind of oversee to make sure that they run and
18 the tools are provided for the individuals that
19 need them.
20   Q.   And is all the information backed
21 up?  Do you have a --
22   A.   Yes, we do.
23   Q.   Okay.
24       MR. CLARK:  Note my

Page 21

1 objection.  Form.
2    Q.   Do you have a retentions policy or
3 backup policies or anything like that?
4    A.   Well --
5        MR. CLARK:  Objection to
6    form.
7    A.   Okay.  So, yes, there is -- we
8 normally keep two years worth of stuff.  I have
9 sales history going back to 1997.
10   Q.   Okay.
11   A.   Some of the data may take -- you
12 know, there's a lot of volume.  So some of the
13 stuff, as far as EDI documents that go out, I
14 can recreate them.  You know, we don't save
15 those, you know, over 90 days or a year.
16   Q.   I'm sorry.  May be a dumb
17 question, but the sales history that you can go
18 back to 1997, through what program would that
19 be?
20       MR. CLARK:  Objection to
21   form.
22   A.   Through what program?  Well, we
23 have -- the data is stored in a DB2 database.
24   Q.   Okay.

Page 22

1    A.   And a DB2 database is the form of
2  physical files that reside on the IBM system
3  that we have.  And so we can use any means of
4  software.  We can use SQL.  We can use -- we
5  have RPG, which is what I write in, to retrieve
6  that information.
7    Q.   And would that include all the
8  detailed data involving the sales?
9        MR. CLARK:  Objection to
10  form.
11    A.   Yes, yes.
12    Q.   All right.  We went through a
13  number of your hats.  Any that we haven't
14  discussed yet?
15    A.   Well, that's the main ones.
16    Q.   All right.  Obviously one of the
17  things we're going to talk about here today is
18  you were responsible for complying with the
19  federal regulations regarding suspicious order
20  monitoring.
21        MR. CLARK:  Objection to
22  form.
23    Q.   Is that accurate?
24        MR. CLARK:  Same objections.

Page 23

1    A.   I'm responsible for the software
2  and the -- and giving the tools made available
3  to Jim Schoen so that we can comply, yes.
4    Q.   Understood.  And did you actually
5  develop that software?
6    A.   I had -- I guess in all parts, no,
7  not all of the software, but I have a hand in a
8  lot of it.
9    Q.   Okay.
10    A.   I guess it really depends on --
11  I'm sorry.  Can I clarify?
12    Q.   Yeah, of course.
13    A.   When you say "develop," what do
14  you mean by develop the software?  Do you mean
15  write it from scratch or -- I did not write it
16  from scratch, but I'm a maintenance programmer,
17  kind of, where I'll maintain the programs in the
18  event that there's a change that needs to be
19  made, or I worked with the DEA to streamline
20  some processes, I would work on those
21  modifications.
22    Q.   Okay.  Probably a good time to go
23  through the history of how you guys did things
24  for various time periods.  So the first thing

Page 24

1  we're going to look at is PSI-1012.  It's going
2  to be page 5.
3        And for the record purposes, this
4  is going to be PSI-66568.
5    A.   Okay.
6        (Discussion held off the record.)
7        ---
8    (PSI - K. Harbauer Exhibit 1 marked.)
9        ---
10  BY MR. REINS:
11    Q.   All right.  So we're now looking
12  at correspondence here.  Can you see it okay?
13    A.   Yes, I can.
14    Q.   All right.  And specifically this
15  is a letter on the letterhead of Prescription
16  Supply, Inc.  I'm going to say PSI for short.
17  You're going to know what I mean, right?
18    A.   Yes.
19    Q.   Yes, sir.  And then we've got this
20  is March 25th, 1996.  And this is to Ms. Massey.
21  Do you -- this is someone that you would have
22  coordinated with at the DEA; is that right?
23    A.   Correct.  She was an agent at the
24  Cleveland office.

Page 25

1    Q.   Okay.  So we'll kind of zero in on
2  that first paragraph.  And of course you
3  authored this letter, correct?
4        MR. CLARK:  Objection to
5  form.
6    A.   Correct.
7    Q.   "Previous to this time," it says,
8  "Prescription Supply, Inc.'s suspicious order
9  monitoring system has been a manual one."
10        Obviously this was written in
11  March of 1996.  Can you elaborate what that
12  means?
13        MR. CLARK:  Objection to
14  form.
15    A.   A manual one, I guess, as -- I
16  was -- I was referring to the previous modes of
17  what we would do to monitor these suspicious
18  orders, which were reports ran in-house that we
19  would review looking at sales history.
20        We didn't have a "suspicious order
21  monitoring" system in-house.  This was in '95,
22  so -- so I guess that's really what I meant by
23  that.  I was trying to introduce -- well, that's
24  not the question, but I was trying to introduce

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 this new report that we had.

2     Q.    And it looks like --

3     A.    System.

4     Q.    Yes, sir.  It looks like -- we're

5 going to get to this.  It looks like it was

6 really developed around this 1996 time frame; is

7 that right?

8     A.    Yes.

9         MR. CLARK:  Objection to

10     form.

11     Q.    And so the question I have for

12 you, it looks like, obviously based on that and

13 what we're looking at, that there really wasn't

14 a system before 1996, right?

15         MR. CLARK:  Objection; form.

16     A.    I guess your term of "system" and

17 mine, I know that we were constantly aware of

18 our customers.  There -- I mean, there was a

19 manual process, I guess, if I say manual, maybe

20 that was a poor choice of words.  But they were

21 constantly reviewing customers, getting to know

22 their customers.  They knew who they were

23 selling to.  They were looking at sales on a

24 monthly basis.  Whereas nothing formal going to

Page 27

1 the DEA, outside of ARCOS reporting.

2     Q.    So let's break that down, if we

3 can.

4     A.    Okay.

5     Q.    Was there any type of -- and even

6 if it was handwritten, was there any type of

7 reporting, that you were aware of, that was

8 being compiled on a monthly or annual or

9 quarterly basis before your system was put in

10 place?

11         MR. CLARK:  Objection to

12     form.

13     A.    I believe there was -- yes, there

14 was.  I mean, our ARCOS submission report would

15 be one of them.  That was reviewed on a monthly

16 basis.

17     Q.    Tell me what that is, the ARCOS

18 submission report.

19     A.    When we would supply ARCOS data,

20 it would -- we would also have a submission

21 report where it would show all the ARCOS sales

22 or any controlled substance sales, for that

23 matter.  I can remember a string of queries that

24 I would run that would do controlled substance

Page 28

1 and ARCOS items, which would be C-IIs and

2 narcotics, basically.  We would separate those.

3 I would break down -- I would run month end

4 reports basically and break sales down just to

5 recap them.

6     Q.    Do you have access to these

7 reports, again, before this date?

8     A.    No, I don't.

9         MR. CLARK:  Objection to

10     form.

11     A.    No, I don't.

12     Q.    Is it your testimony here today

13 that you submitted those reports monthly to the

14 DEA?

15         MR. CLARK:  Objection to

16     form.

17     A.    We submitted the ARCOS data

18 monthly.

19     Q.    And the ARCOS data, in what format

20 would you submit it?

21     A.    I think -- this is going back to

22 floppy disk.  In and five-and-a-half-inch floppy

23 disk, we would submit that.  I can't tell you

24 the year exactly when as the evolution of the

Page 29

1 computer -- you know, we were taking orders back

2 on an XT IBM machine, a small XT personal

3 computer at one time.  So ...

4     Q.    So this manual process you're

5 talking about, you believe you would send a

6 floppy disk every month to the DEA?

7     A.    Oh, yes, yeah.

8         MR. CLARK:  Let him finish.

9     Q.    Did you keep files or any records

10 or any backups or anything of those -- that

11 information?

12         MR. CLARK:  Objection to

13     form.

14     A.    No.

15     Q.    Do you have any substantiating

16 evidence or proof that that was done on a

17 monthly basis?

18         MR. CLARK:  Same objection.

19     A.    We kept our DEA license.  If I had

20 not been doing it on a monthly basis, they would

21 have pulled our license or we would have been

22 under indictment.  We have not had any

23 infractions with the DEA.

24     Q.    Well, you have been audited,

Page 30

1 right?
2     A.    Yes, sir.
3         MR. CLARK:  Objection to
4     form.
5     Q.    And they have made corrections on
6 how you guys report, correct?
7         MR. CLARK:  Same objection.
8     A.    Corrections how we report?  Yes,
9 we've modified that -- our reporting --
10    Q.    Based on what the DEA --
11    A.    -- over the years.
12    Q.    Sorry.  Based on what the DEA
13 suggested, correct?
14    A.    Yes.
15    Q.    I guess my question to you is, if
16 I said, listen, before 1996, can you come
17 forward with any evidence or any proof
18 whatsoever, that you have, that you've
19 maintained over the years, to show that you
20 actually reported before that time period, the
21 answer is you do not have anything, correct?
22        MR. CLARK:  Objection to
23    form.
24    A.    If -- I guess no.

Page 31

1     Q.    Okay.  Now, when did you start
2 this floppy disk reporting?  Do you know what
3 year?
4     A.    Well, I --
5         MR. CLARK:  Objection to
6     form.
7     A.    Floppy disk reporting, that was
8 all -- when I first started working with the
9 company, we were on a -- that was the way to
10 transfer data at that time.  So it was -- it was
11 long before the process had been in play before
12 I even came into my own working there,
13 Prescription Supply.  I can only answer for when
14 I was there.
15    Q.    Fair enough.  So would that have
16 been through -- you believe it would have been
17 throughout the '70s and '80s up until '96?
18        MR. CLARK:  Objection to
19    form.
20    A.    Whenever the hardware permitted
21 it, I believe it was, yes.
22    Q.    Is there a way we could find out
23 when the hardware was permitted, date specific?
24    A.    I don't recall the dates.

Page 32

1     Q.    Okay.
2     A.    I mean ...
3     Q.    Do you know what type of data
4 specifically was being submitted, i.e. were
5 there variances reported in the customer's
6 ordering regarding frequency, amounts, things of
7 that nature?
8         MR. CLARK:  Objection to
9     form.
10    Q.    Let me rephrase.  Do you know if
11 any -- if it actually would identify suspicious
12 orders, meaning orders of unusual size,
13 deviating substantially from a normal pattern,
14 or orders of unusual frequency, do you know if
15 that was identified in those prior reports?
16        MR. CLARK:  Objection to
17    form.  I'm just going to note my
18    objection on the record to the time
19    period we're talking about here
20    being outside the bounds of Special
21    Master Cohen's rulings on what
22    we're allowed to be asking about.
23        MR. REINS:  Okay.
24    A.    Okay.  Can you restate the

Page 33

1 question now so I get it right?
2     Q.    I just wanted to finish this line
3 of inquiry as to what type of information would
4 be inquired --
5     A.    Okay.
6     Q.    -- would be identified in the
7 report.
8         MR. CLARK:  Same objection.
9     A.    What would be reported would be
10 sales, okay?  What submission -- any kind of
11 sales that we submitted that went to the DEA.
12 Any -- I'm sorry.  Excuse me.  I'm a little
13 nervous here.  Just our sales for controlled
14 substances would be reported --
15    Q.    Okay.
16    A.    -- through ARCOS data.
17    Q.    Total sales?
18    A.    Yeah.
19    Q.    All right.  So now getting back to
20 this correspondence.
21    A.    Okay.
22    Q.    This will be Plaintiff's Exhibit
23 Number 1.  Next line says, "We have recently
24 completed the necessary updates to transfer this

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  function to our computer system."
2  　　　　Can you explain what was done?
3  　　　　MR. CLARK:  Objection to
4  　　form.
5  　　A.　Well, at that time Prescription
6  Supply was on a different piece of hardware.
7  They were on a MAI Basic Four system.  It was a
8  different operating system, different hardware,
9  and we had made a switch to the IBM platform,
10 and I think it was an IBM System/38, which later
11 migrated to an AS400.
12 　　　　So at that time, we had gone on
13 the new computer system and we were able to
14 incorporate all of these new -- some -- we went
15 with Online Solutions.  So that was accounts
16 payable, general ledger, inventory control.  All
17 the functionality that we would have, we were
18 able to incorporate into all these -- all the
19 business modules that -- for Prescription
20 Supply.
21 　　　　Suspicious order monitoring was
22 one of those functions that we wanted to build
23 into.  So that's what we did.
24 　　Q.　And whose idea was it, if you

Page 35

1  know?
2  　　　　MR. CLARK:  Objection to
3  　　form.
4  　　A.　Well, I would say Tom Schoen would
5  be the decision-maker at that time.
6  　　Q.　Next paragraph says, "Prescription
7  Supply, Inc.'s suspicious ordering monitoring
8  system (SOM) is designed to satisfy the Drug
9  Enforcement Administration's requirements that
10 the wholesalers monitor orders from their
11 customers and forward a report to your office.
12 This is patterned after the National Wholesale
13 Drug Association (NWDA) SOM program."
14 　　　　Did you actually develop this
15 program?
16 　　　　MR. CLARK:  Objection; asked
17 　　and answered.
18 　　A.　No.  I installed it.
19 　　Q.　Who developed it, if you know?
20 　　A.　A gentleman probably named -- his
21 name was Don Magdantz from Online Solutions.
22 　　Q.　Can you spell his last name?
23 　　A.　M-a-g-d-a-n-t-z.
24 　　Q.　Do you -- did you --

Page 36

1  　　A.　But I can't -- I can't say he
2  developed -- I'm sorry.
3  　　Q.　No, you're fine.
4  　　A.　I'd love to finish.  Yeah.  I
5  can't say he developed it.  I mean, I don't
6  know.  His company did, okay?
7  　　Q.　Fair.
8  　　A.　Online Solutions.
9  　　Q.　I guess, though, the
10 implementation of using the NWDA as the guide
11 for the development of this reporting, whose
12 idea was that, if you know?
13 　　A.　Well, we are -- we were members of
14 the National Wholesale Drug Association, so that
15 organization was really kind of an organization
16 put together for best of practice within the
17 industry.
18 　　　　I believe Tom Schoen met Online
19 Solutions at one of those meetings in regards to
20 best practices.  So that's what we tried to do,
21 is produce best practices.  And, you know, there
22 was things that we needed to do as a company to
23 grow.  Electronic ordering.  There was many
24 functions, thing like that.  I think mainly the

Page 37

1  electronic ordering function we wanted to get
2  installed.  And that was one of his -- that was
3  one of his options.
4  　　　　So -- so that's how I think we --
5  that's why I reference that, because that -- I
6  think it was patterned after the guidelines put
7  forth by the NWDA.
8  　　Q.　And I don't want to oversimplify
9  this, but when I hear you speak to me, it sounds
10 like a modernization of your company's computer
11 systems across the board, right?
12 　　　　MR. CLARK:  Objection to
13 　　form.
14 　　A.　Modernization.  Yes, I guess we're
15 keeping up with times, yes.
16 　　Q.　Yeah.
17 　　A.　If that's modernization, yes.
18 　　Q.　Well, and I did -- and the second
19 part of that is, with purchasing, with
20 receivables, with all of the functions of the
21 business?
22 　　A.　Inventory control.
23 　　　　MR. CLARK:  Objection to
24 　　form.

Page 38

1    Give me a second to object
2  and then you can answer.
3    THE WITNESS:  Sorry.
4    MR. CLARK:  I know it's
5  tough.  You're doing fine.
6    Objection to form.
7    Go ahead.
8    A.   I kind of forgot the question.
9    Q.   That's okay.  So -- and that's
10 probably something I should probably add to
11 my -- so your counsel has the opportunity to
12 object to the form of my question.  It's a legal
13 objection preserving it for a date and time to
14 deal with the Judge later, potentially.  It is
15 not meant to distract you or inhibit the
16 deposition process.
17   A.   Am I allowed to answer if he
18 objects then?
19   Q.   You are.
20   MR. CLARK:  Unless I tell
21 you -- instruct you not to answer.
22   A.   Okay.
23   Q.   Without question, you're allowed
24 to answer unless you're told specifically not

Page 39

1  to.
2    A.   Okay.
3    Q.   But because there are some -- a
4  frequency to the objections, maybe just wait a
5  moment, let him object, and then -- and then
6  answer.
7    A.   Okay.
8    Q.   Make sense?
9    A.   Yes.  Thank you.
10   Q.   Okay.  And let me rephrase the
11 question.
12   We're talking about this updating
13 of the system around 1996.  I say "update."  It
14 really is the development of the computerization
15 of the -- all of the job functions, frankly, of
16 PSI, right?
17   MR. CLARK:  Objection to
18 form.
19   Q.   Let me do this:  I have you here,
20 so you can say it better.  Tell me exactly what
21 was -- this computer systems that you were
22 implementing, what was the goal and the purpose?
23   MR. CLARK:  Objection to
24 form.

Page 40

1    A.   Okay.  Prescription Supply
2  originally was on another computer system.  It
3  wasn't that they were manual processes.  They
4  were -- it was a fully functioning computer
5  system.  I believe what it was, we were on Basic
6  Four.  Now, I spent ten years writing code in
7  Business Basic, okay?
8    I went to -- I took a lot of
9  classes on business basic and I wrote -- at that
10 time there wasn't a lot of manufacturers or
11 software writers producing software for a drug
12 wholesaler in the industry, okay?  And so we had
13 made a choice to go with Basic Four because of
14 the fact that we could build basic languages and
15 we could do what we needed to get done and
16 actually write code for it.
17   So Prescription Supply purchased
18 this.  There was a -- and I believe it was a --
19 it was another package that was man -- it was a
20 manufacturing package that was -- that was
21 adapted to use as a drug wholesaler, okay?  It
22 fit the bill most of the way.  As with any
23 software, it may fit 80 percent of what you need
24 to get done.  The other 20 percent you -- you

Page 41

1  have to either modify or make it your own.
2    So we felt that we -- it was to
3  our advantage at that time to move down the line
4  and to move into an IBM environment, being with
5  what software was available.  Some of the
6  limitations on the system that -- it's not that
7  system was bad.  We were still able to query and
8  run -- I ran Basic Four programs.
9    This is going back to '97 and this
10 is a lot of code.  I don't recollect every
11 program I wrote.  I will tell you that I've -- I
12 wrote several programs that recap -- that's all
13 I did was -- there's not a lot to do in -- we
14 had a lot of sales up, basically, and we had
15 devised, you know -- and whatever, but not a lot
16 to do there -- well, strike that.  I just don't
17 want to say I -- not a lot to do, but it's --
18 it's pretty boring.  It's not moving pixels
19 across the screen.  It's really just tabulating
20 sales and keeping inventory.
21   But getting back to what I said,
22 so we went on from the Basic Four and we evolved
23 and went into the System i or the AS400 -- might
24 have been System/38 at that time and went to an

Page 42

1 AS400, in which case we started, you know, to
2 adapt these new software modules. And we still
3 had the ability to have the source code where we
4 could tweak it to make our systems run to meet
5 our needs.
6          And I'm not sure if that's the
7 question you asked exactly, but if you could go
8 back on it, I'll try to fill you in the best I
9 can.
10    Q.   No. That was great.
11    A.   Okay.
12    Q.   What did the new system -- I guess
13 the driving force, what was the driving force of
14 wanting the new system?
15          MR. CLARK: Objection to
16 form.
17    A.   I think I pretty well answered
18 that. Just to keep the system current and --
19 and try to fill the needs that were put forth in
20 front of us in Prescription Supply.
21    Q.   Did the new system allow you to do
22 things with suspicious order monitoring
23 requirements pursuant to federal law that you
24 couldn't do before?

Page 43

1          MR. CLARK: Objection to
2 form.
3    A.   I wouldn't say no, that we
4 couldn't do before. We were doing them. I
5 think it just made it easier to do.
6    Q.   Okay. Now, I guess this one
7 line -- because I don't want to oversimplify.
8    A.   Right.
9    Q.   You're really the IT
10 informations --
11    A.   This is --
12          MR. CLARK: Hold on. Let
13 him --
14          THE WITNESS: Oh, I'm sorry.
15          MR. CLARK: I know it's a
16 little bit unnatural, but let
17 him --
18          THE WITNESS: I know. I'm
19 sorry.
20          MR. CLARK: You're doing
21 fine.
22          THE WITNESS: I'm doing the
23 best I can. I am, honest.
24

Page 44

1 BY MR. REINS:
2    Q.   I guess the line that I want to
3 talk about is, "This is patterned after the
4 National Wholesale Drug Association SOM
5 program."
6          I'm guessing, from learning about
7 you and your job, that that was not the call
8 that you made; am I right --
9          MR. CLARK: Objection to
10 form.
11    Q.   -- to pattern this reporting after
12 the -- specifically the NWDA SOM program?
13          MR. CLARK: Same objection.
14    Q.   SOM, yeah.
15    A.   Well, I'm -- I guess this is --
16 there's a lot of emphasis being put on this
17 letter. This was something -- this letter was,
18 in pretext, was really just an introduction to
19 Prescription Supply producing a report that we
20 needed to submit on a monthly basis to stake --
21 you know, to be in compliance, all right.
22          This probably was a replacement of
23 other reports that went out. I can't say what
24 exactly. My memory doesn't true me what we did

Page 45

1 before that. This program used the DEA's
2 base -- I guess you're not asking me about this
3 program, but the suspicious order monitoring
4 program basically used the DEA's drug code file,
5 ARCOS file, and would break that -- those
6 sales -- basically it allowed us to tabulate
7 orders by base ingredients, and then we could
8 pull a variance report and produce this report.
9          And that's what this letter was
10 all about, just introducing it to Genora Massey,
11 which was who our agent was, and this was
12 something that I had in my notes that it got
13 pulled anyway. Okay.
14    Q.   All right. I guess what I'm
15 saying is, did you come up with the formula --
16          MR. CLARK: Objection to
17 form.
18    Q.   -- for what should be reported?
19          MR. CLARK: Same objection.
20    A.   No.
21    Q.   Who did?
22    A.   Who came up with the formula on
23 what should be reported? This was the software,
24 the -- I don't know. I couldn't tell you.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    Q.   Okay.  That's fair.  All right.
2  If we can step out of there.
3         MR. CLARK:  Are you done with
4    that?
5         MR. REINS:  Yeah, I think so.
6         MR. CLARK:  Did you mark it?
7         MR. REINS:  I marked it as 1.
8         MR. CLARK:  Okay.
9         MR. REINS:  So I need to --
10   yeah.  Can I grab that?  Thanks.
11        A.   You know, I'd like to say, I
12  couldn't tell you who came up with the formula.
13  Rethinking that, the DEA came up with the
14  formula, right.  The HDA -- or the DEA came up
15  with this formula, right?
16        Q.   Well, let me ask you.  Do you
17  believe that DEA had a specific formula which
18  mandated the reporting of suspicious orders
19  monitoring back in 1996 or thereafter?
20        A.   A specific --
21        MR. CLARK:  Objection to
22    form.
23        A.   A specific formula, no.  I'd say
24  guidelines.  They produced guidelines.  That's

Page 47

1  all they did, was produce guidelines.  And we
2  have to try to adhere to those guidelines the
3  best the law says.
4         Q.   And I guess -- but I had asked you
5  about the formula.  You're not suggesting that
6  the DEA gave you a formula back then, did they?
7         A.   No, I guess not.
8         Q.   So -- yeah.  So my question was,
9  was who within the company came up with the
10  formula, which we will be talking about in a
11  moment, which might be a better time.  Maybe
12  that will jog your memory.  Let's do it now,
13  actually.
14        So we have been produced some
15  information.  And this is going to be PSI-1013.
16        For record purposes, it's going to
17  be produced as PSI-72519 through 72530.
18        MR. CLARK:  Lance, do you
19    have a copy of that for me?
20        MR. REINS:  I do, actually.
21        MR. CLARK:  Thank you.
22        MR. REINS:  You're welcome.
23        Actually, before we get to
24    that, can you pull up PSI-1008.

Page 48

1  BY MR. REINS:
2         Q.   We're going to look for a moment
3  now at -- there's what's called discovery
4  responses.  That's where the company has
5  provided some discovery responses to questions
6  that we had posed regarding these types of
7  issues, reporting specifically.
8         A.   Okay.
9         Q.   And this is going to be
10  Prescription Supply, Inc.'s Second Amended
11  Objections and Responses to Plaintiffs' First
12  Combined Discovery Request.  If we can look at
13  page 2.  And if we can look in the second
14  paragraph kind of midway through.
15        And there's kind of some
16  historical regarding prior responses, but really
17  what I want to focus on, it says, "PSI states
18  that in January 1996 PSI introduced its
19  suspicious order monitoring system 'designed to
20  satisfy the DEA's requirements that wholesalers
21  monitor orders from their customers and send
22  reports of suspicious orders to the DEA.'
23        "This system utilized the DEA's
24  ARCOS NDC file, which contained item's base

Page 49

1  ingredients and gram weight.  PSI would print an
2  SOM variance report showing all customers whose
3  average monthly usage of base ingredients
4  exceeded the average monthly usage multiplied by
5  the variance factor for all customers in the
6  same customer class.  A copy of this report was
7  submitted to the DEA monthly."
8         As you can see, there are what's
9  called Bates numbers on the bottom there, which
10  are the documents we are about to look at.
11  That's how we got here, okay?
12        A.   Okay.
13        Q.   All right.
14        A.   True statement.
15        Q.   That was going to be my first
16  question.  Do you stand by everything that's put
17  in that response as being accurate?
18        A.   Yes.
19        Q.   Okay.  Yes?
20        A.   Yes.
21        Q.   Okay.  Anything you'd like to
22  change, edit or modify?
23        A.   No.
24        Q.   Okay.  Your answer lacks

Page 50

1 confidence.
2      MR. CLARK:  Objection; form.
3 Objection; argumentative.
4      MR. REINS:  I'll withdraw.
5      A.   Well, it's just some of the terms.
6 I mean, when you say "DEA requirements," it's
7 really their guidelines.
8      Q.   Sure.  Is there a difference, sir,
9 in your mind, between requirements and
10 guidelines?
11      MR. CLARK:  Objection to
12 form.
13      A.   Well, the requirement is really,
14 this is what must be done, and a guideline is
15 what should be done also.  It's -- I guess
16 there's a difference, I would say, but still
17 general form to be followed.
18      Q.   You understood at this point in
19 time -- or did you understand that it was the
20 federal law which required this mandatory
21 reporting; that it was not a suggestion, it was
22 the law?
23      MR. CLARK:  Objection to
24 form.  Calls for a legal

Page 51

1      conclusion.
2      Q.   Would you agree with that?
3      MR. CLARK:  Objection to
4 form.
5      A.   Yes.  If that was the law, we
6 followed it.
7      Q.   Did you know that was the law
8 before I just said that?
9      MR. CLARK:  Objection to
10 form.
11      A.   Yes.
12      Q.   I'm not the first one to tell you
13 that, right?
14      A.   Right.
15      MR. CLARK:  Same objection.
16      Q.   In fact, specifically under the
17 Code of Federal Regulations, did you know that
18 suspicious orders, including orders of unusual
19 size, orders deviating substantially from a
20 normal pattern, and orders of unusual frequency
21 should be reported since 1971?
22      MR. CLARK:  Objection to
23 form.
24      Is that a question?

Page 52

1      MR. REINS:  Yeah.  I think I
2 started with "did you know."
3      A.   Yes.
4      Q.   All right.  Now, I'm going to show
5 you or direct you, if you don't mind, to -- you
6 see the numbers on the bottom right-hand side of
7 the document in front of you?
8      A.   Yes.
9      Q.   If you could go to 72529, which is
10 going to be 11th page for our purposes.
11      All right.  This is called the
12 "Suspicious Order Monitoring System Operator
13 Instructions Introduction."
14      A couple questions.  One, before
15 1996, was there a policy and procedure, or more
16 importantly, I guess I should say, instructions
17 on how to report to comply with the federal
18 regulations?
19      MR. CLARK:  Objection to
20 form.
21      Q.   If you know.
22      A.   Before when?
23      Q.   Before this time period that we're
24 speaking about when you switched over to the

Page 53

1 computerized reporting.
2      A.   I know --
3      MR. CLARK:  Same objection.
4      A.   I'm sure there was, but maybe I
5 did not personally know it in '91 when I started
6 or working on the system, I didn't know it.  I'm
7 sure there was, though.  You're asking me
8 something that I can't really answer at this
9 point in time.
10      Q.   So just to be clear, if you don't
11 know something or you don't recall, you can
12 simply tell me.  But I --
13      A.   Okay.  I don't recall.
14      Q.   Fair enough.  But you pointed out
15 something that I do think is worth mentioning.
16 This instruction is dated 3/26/91.
17      A.   Right.
18      MR. CLARK:  Objection to
19 form.
20      Q.   The discovery responses that we
21 just went through said that this was implemented
22 in January --
23      A.   '95.  I'm sorry.
24      Q.   That's okay.  It takes a little

Page 54

1 getting used to.
2 It says it was implemented in
3 January of 1996. Based on your inability to
4 recall, can you testify here today, under oath,
5 that this policy and procedure or this
6 instruction was in place before 1996, as the
7 response suggests?
8 MR. CLARK: Objection to
9 form.
10 A. In my power of recall, I believe
11 it was. It may not have used this particular
12 system, but there were policies in play.
13 Suspicious orders were reported. I mean, it may
14 have been a telephone call. It may have been to
15 the DEA. It could have been -- there could be
16 other methods.
17 Q. So the "could have" and "I thinks"
18 are what makes me have to follow up. Before you
19 testified, the best of your ability you could
20 recall, you would send total sales information
21 pursuant to the ARCOS database on a floppy disk,
22 as best you could recall.
23 Now you're saying you remember
24 people making phone calls. Do you remember ever

Page 55

1 making a phone call to anybody with the DEA
2 reporting a suspicious order?
3 MR. CLARK: Objection to
4 form. Objection; argumentative.
5 And I just want to note a standing
6 objection to the time period of
7 anything that predates 1996 as it
8 relates to suspicious order
9 monitoring and the areas and time
10 period that Special Master Cohen
11 has allowed us to ask questions
12 about.
13 With that, you can answer.
14 A. Okay. Ask that question again.
15 Q. Did you ever make a phone call
16 before January of 1996 to report a suspicious
17 order?
18 A. I did not. That was not my
19 responsibility. As far as in my text, I was --
20 I'm a data guy. I'm a computer programmer is
21 what I did.
22 Q. Just so you --
23 A. I was not the control manager.
24 Q. I understand. And I only ask you

Page 56

1 that because you had volunteered that
2 information. So did you ever hear anybody make
3 a phone call before 1996?
4 MR. CLARK: Objection to
5 form.
6 A. I believe there were calls made,
7 yes. The specifics I can't answer to.
8 Q. Sitting here today, do you recall
9 anyone specifically making a phone call before
10 1996 reporting a suspicious order?
11 A. To the DEA, yes.
12 Q. Who?
13 A. Yes. Tom Schoen.
14 Q. Okay. You recall here today,
15 under oath, Mr. Schoen making a phone call to
16 the DEA before 1996?
17 MR. CLARK: Objection; asked
18 and answered. Objection;
19 argumentative.
20 Q. You recall that, is what I'm
21 asking.
22 A. I believe yes. Yes.
23 Q. Okay. So was that the method,
24 then, phone calls, before 1996?

Page 57

1 MR. CLARK: Objection to
2 form.
3 A. Before 1996, the DEA agents
4 themselves would come in. There could be -- it
5 could have been a method then. As far as him
6 reporting, I know that there was reports made.
7 Q. All right. Let's go -- let's just
8 move forward, because really all I'm trying to
9 establish is the pattern and how things changed
10 in the reporting process for PSI over the years.
11 Really I'm not trying to get into specific
12 information, but let me finish my question.
13 So from this point forward, there
14 was a system that was established, correct?
15 A. Yes.
16 Q. All right. Now, if you could look
17 through this document and basically -- so
18 this -- this particular instruction that we're
19 looking at, it says -- do you know where this
20 came from?
21 A. This is the system documentation
22 from Online Solutions. This basically talks
23 about as far as the software itself.
24 Was there a question?

Page 58

1  Q.  Yeah, I think you just answered
2 it.
3  A.  Oh.
4  Q.  So you did not come up with this?
5  A.  No.
6  Q.  All right.  So it says, "The
7 Suspicious Order Monitoring System has the
8 following functions:  One, "Prints the SOM
9 Variance Report, which shows all customers whose
10 average monthly usage or current monthly usage
11 of a base ingredient exceeds the average monthly
12 usage times a variance factor for all customers
13 in the same customer class."
14      Do you know what that variance
15 factor was?
16  A.  The variance factor, I believe,
17 was, as far as strength of some of the products
18 where there could be -- some products would be
19 valued with a different higher factor than
20 others, as far as their base ingredient.
21  Q.  So is there -- do you know what
22 variance factor would associate with which base
23 ingredient, or would that be written down
24 somewhere?

Page 59

1      MR. CLARK:  Objection to
2     form.
3  A.  I really wouldn't know right now.
4 I don't remember.
5  Q.  Do you --
6  A.  Not that -- what base
7 ingredient -- I guess what's the question again?
8 You're asking me about the base ingredient?
9  Q.  I said what would the variance
10 factor set -- what would the variance factor be,
11 and I thought you said it depends on the base
12 ingredient?
13  A.  Well, not the base ingredient.
14 Maybe it's the strength of the base ingredient.
15 Maybe it's something that is --
16      MR. CLARK:  Go ahead.
17  A.  -- twice as powerful or twice
18 as -- as far as the strength being unusually
19 high on a product as opposed to -- so it may be
20 a 1 and 1.5.
21  Q.  Is there a way we can answer that
22 question specifically, meaning how the variance
23 factor was decided based on what strength and/or
24 base ingredient?  Would there be a policy?

Page 60

1 Would there be something or someone that could
2 tell us that?
3      MR. CLARK:  Objection to
4     form.
5  Q.  And if you know.
6  A.  Not on this system from '91.
7  Q.  Well, this is '96, right?
8  A.  '96.
9  Q.  Is that your answer?
10  A.  The question is?
11  Q.  Yeah.  Is there a way to find out
12 how to determine the variance factor?
13  A.  Not at this time.
14  Q.  All right.  And if you look at the
15 next page -- well, actually, let's go back.  I'm
16 sorry.  The second bullet point says --
17      MR. CLARK:  Still on --
18      MR. REINS:  Still on 72529.
19      MR. CLARK:  All right.
20  A.  We're still on 29?
21  Q.  Yeah.  We'll do the last line in
22 that first bullet point there.  It says, "One
23 copy of this report is sent to the DEA at the
24 end of each reporting period, i.e., monthly.

Page 61

1 Another copy is saved for 24 months."
2      So when it says the DEA would get
3 a copy of the report, that would be after --
4 that would be at the end of the month, correct?
5  A.  Yes.  That would be after the sale
6 is made.
7  Q.  Meaning after they were shipped?
8  A.  Yes.
9  Q.  Okay.  Are you aware if in this
10 time period there was any system in place during
11 this time period where suspicious orders would
12 not be shipped?
13      MR. CLARK:  Objection to
14     form.
15  Q.  If you recall and can testify here
16 today under oath.
17      MR. CLARK:  Same objection.
18  A.  Say that again.  Can you rephrase
19 that or ...
20  Q.  Sure.  Are you aware if during
21 this period of time -- this was implemented,
22 according to the discovery responses, January of
23 1996, correct?
24  A.  Yes.

Page 62

1 Q. Okay. Are you aware of any
2 policies and procedures and/or instructions
3 regarding not shipping or stopping shipments of
4 suspicious orders?
5 MR. CLARK: Objection to
6 form.
7 A. Yes, I am aware of orders that
8 were not shipped.
9 Q. Different question.
10 A. Oh.
11 Q. I'm saying, was there a policy,
12 was there a procedure, was there instruction on
13 when not to ship an order based on it being
14 quote/unquote suspicious --
15 MR. CLARK: Objection to
16 form.
17 Q. -- in this time frame?
18 MR. CLARK: Objection to
19 form.
20 A. That's beyond the scope of my
21 interaction with this program. I basically ran
22 the reports, made the tools available to the
23 controlled substance officers so they could
24 do -- well, controlled substance officer being

Page 63

1 Tom Schoen at that time. This is back in '95,
2 so ...
3 Q. Great point. And let's go ahead
4 and round that circle now to get it out of the
5 way.
6 A. Great.
7 Q. You were responsible for compiling
8 the information, reporting the data, pursuant to
9 the program, but you were not personally
10 involved in the stopping of any shipments,
11 correct?
12 MR. CLARK: Objection to
13 form.
14 A. Correct.
15 Q. At that point in time --
16 A. Correct. Sorry.
17 Q. That's okay.
18 At that point in time, it was
19 Thomas Schoen, correct?
20 MR. CLARK: Objection to
21 form.
22 A. Yes.
23 Q. And later it became Jim Schoen,
24 correct?

Page 64

1 MR. CLARK: Same objection.
2 A. Yes, yes.
3 Q. Do you know when that was, when it
4 changed?
5 A. I can't recall.
6 Q. Furthermore, you were not
7 responsible in setting the thresholds for
8 certain customers; is that correct?
9 MR. CLARK: Objection to
10 form.
11 A. Correct.
12 Q. Initially, that was Thomas Schoen,
13 correct?
14 MR. CLARK: Same objection.
15 A. Yes.
16 Q. And then became Jim Schoen,
17 correct?
18 MR. CLARK: Same objection.
19 A. Yes.
20 Q. You were not responsible for the
21 development of any policies and procedures
22 regarding the stopping of shipments or setting
23 thresholds, correct?
24 A. Yes.

Page 65

1 Q. To be clear, when we leave each
2 other here today you were responsible for the
3 reporting of information; however, the
4 decision-making on what to do with that
5 information specifically was in the hands of
6 others?
7 MR. CLARK: Objection to
8 form.
9 A. Yes.
10 Q. Including when to change the
11 policies and procedures or the way in which PSI
12 was reporting the information, correct?
13 MR. CLARK: Objection to
14 form.
15 Q. Let me rephrase the question. I
16 know the answer. It's okay.
17 All right. So if we look at this
18 report, if you go on -- and what I want you to
19 do is just take a moment, because what it looks
20 like is like the first group of pages is really
21 regarding the process of this reporting. And I
22 believe -- like if we look at the first page.
23 Let's do that. 72519. You've got an
24 introduction. You've got kind of this different

Page 66

1  categories here.
2          In the top left we've got Online
3  Solutions, Inc.  From speaking with you now, it
4  looks like it's a company that you consulted
5  with that helped you implement this system; fair
6  to say?
7          MR. CLARK:  Objection to
8      form.
9      A.   Yes.  And I will also testify too
10 that I see some notes here that -- we had
11 another programmer that worked for Prescription
12 Supply prior to me, okay?  And I see his notes
13 here.  So he was probably the one that did the
14 installation of this.
15     Q.   Got it.
16     A.   Okay.
17     Q.   And for record purposes, the
18 second page is 72520.  There are handwritten
19 notes on the left-hand margin under "List of
20 Programs," and there are circles.  And you
21 believe that was a programmer other than
22 yourself?
23     A.   I'm sorry.  Which one was that?
24         MR. CLARK:  Second page of

Page 67

1      the document.
2          THE WITNESS:  Okay.
3      A.   I can tell you my handwriting.
4  Yeah, that's -- I'm sure that's probably Jim
5  Bishop's, our other prior programmer.
6      Q.   So I guess that leads me to, were
7  you actually involved in the installation of
8  this program, if you recall?
9          MR. CLARK:  Objection to
10     form.
11     A.   I was more of an operational -- in
12 fact, on this program, I was involved as this
13 program was progressed, as it moved forward, as
14 it was modified to streamline for the DEA.
15     Q.   Okay.  So if we go forward now, so
16 if we go to 72530, which is page 12 of the
17 document, there's like a formula there.  And I
18 will quickly let you get out of this area if
19 this is --
20     A.   72530 it looks like.
21     Q.   Yeah.
22     A.   Okay.
23     Q.   Yeah.  So what we're looking at
24 here is called the base ingredient file

Page 68

1  maintenance.  This is the operator instruction.
2  Basically gives an equation regarding the base
3  ingredient.  It's a formula.
4          Do you have any personal knowledge
5  about what this means?
6          MR. CLARK:  Objection to
7      form.
8      A.   Okay.  What this is, it's not a
9  formula.  It's basically a screenshot of a
10 maintenance program that would basically take
11 the base code of the product and the product
12 name.  The data that was populated in this file
13 came from the DEA ARCOS file.  So that would
14 come in directly into the -- we would take it
15 on -- I remember it was on reel-to-reel tape at
16 the time when I would get it.  It was an 8-inch
17 reel-to-reel tape, and I would play a role of
18 loading that file.
19     Q.   Okay.
20     A.   And that would populate.  And this
21 was just one of the screens for the program that
22 would allow you to maintain -- say the
23 ingredient name was -- had to be modified or of
24 some sort, whether it was active or inactive.

Page 69

1      Q.   Okay.
2          MR. CLARK:  Lance, we've been
3  going for about an hour --
4          MR. REINS:  Take a break?
5  Sure, yeah, of course.
6          THE VIDEOGRAPHER:  Going off
7  the record at 9:59.
8          (Recess taken.)
9          THE VIDEOGRAPHER:  We're back
10 on the record at 10:09.
11 BY MR. REINS:
12     Q.   All right, sir.  Looking at the
13 document that's in front of you, which we've
14 already -- which we started talking about.  I
15 want to kind of look through the whole
16 document real quick.
17         Have you had an opportunity on our
18 break to do so?
19     A.   I looked through it.  Scanned
20 through it, yeah.
21     Q.   Okay.  So it looks like -- and
22 again, we looked at the front pages and it has,
23 you know, this Online Solutions, Inc., who you
24 consulted with, and it kind of has the

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 screenshots and it has some guidance on how the
2 program is going to work, right?
3          Is that fair to say?
4          A.   Yes.
5          Q.   Then if you go to -- for instance,
6 it has an example of the -- of a report on
7 72534, which is 16, right?
8          A.   It is an example of a report, yes.
9          Q.   Okay.  And is this an example of
10 the type of reporting you did after you changed
11 the system in January of 1996?  Is this how you
12 reported?
13          MR. CLARK:  Objection to
14 form.
15          Q.   If you recall.
16          A.   This is a report of just the
17 ingredients that are in the file.  This is a
18 report out of -- if I believe so, this is the
19 scheduled item ingredient report.  This is not a
20 sales recap report.
21          Q.   Agreed.  And, listen, I'm not
22 hiding anything.  In May of '97, after working
23 with the DEA, you modified the system and it
24 stayed that way for some time.

Page 71

1          A.   Yes.
2          Q.   But I'm just dealing with this
3 period of time before May 1st.  And so what I'm
4 trying to ask you is, is this how you reported
5 pursuant to the --
6          MR. CLARK:  Would the people
7 on the phone please mute.
8          UNIDENTIFIED SPEAKER:  I'm
9 sorry.
10          MR. CLARK:  Want to restart?
11          MR. REINS:  Yeah, I think
12 I'll --
13          A.   Yeah, rephrase that question.
14          MR. REINS:  That was my
15 co-counsel.
16          MR. CLARK:  She's helping
17 you.
18          MR. REINS:  I need it.
19 BY MR. REINS:
20          Q.   So during that window of time, so
21 you know exactly what I'm talking about, between
22 January of '96 through May of 1997, my
23 understanding this is the reporting mechanism,
24 this base ingredient formula that we've spent a

Page 72

1 little bit of time talking about.
2          Does that sound accurate?
3          MR. CLARK:  Objection to
4 form.
5          A.   This was the system we used.
6          Q.   Yes.
7          A.   This is not a report that we would
8 send to the DEA on this particular one that you
9 referenced on this page.
10          Q.   That is exactly what I was trying
11 to ask you --
12          A.   Okay.
13          Q.   -- which is, what type of --
14 before May of '97 now -- we're going to get
15 there, and I have those other reports from that
16 time period.  I mean, we have this manual, we
17 have this system, we have these samples, but
18 you're saying that --
19          A.   Well --
20          MR. CLARK:  Let him finish
21 his question.
22          Q.   -- that is not how you reported.
23 So the question I have for you is, how did you
24 report before you made additional changes in May

Page 73

1 of '97?
2          MR. CLARK:  Objection to
3 form.
4          A.   Okay.  The page that you've shown
5 me is just a base ingredient report.  It would
6 show what items were in the -- in the drug file
7 and what ingredients were there and how much
8 their gram weights were for each product.
9          Q.   Right.
10          A.   That's not what we would report.
11          Q.   Okay.
12          A.   And you asked me if this was our
13 reporting mechanism.  This was not our reporting
14 mechanism.
15          Q.   Okay.  So if you look at -- if you
16 look throughout this document, for instance,
17 72537, or look throughout the document, if you
18 see a sample of how you reported or the format
19 for which you reported, take your time, let me
20 know, and we'll identify for the record.
21          A.   Both pages, 72537, I think that's
22 by item.
23          Q.   Okay.
24          A.   By base ingredient.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Q.    Okay.
2    A.    And then 72538 is by customer or
3    by the -- by this -- the person, and then the
4    contributing drugs that they purchased
5    underneath each one.  So it was by customer.
6    Q.    Which is --
7    A.    The one -- 72538.
8    Q.    Okay.
9    A.    And that's the suspicious order
10   monitoring detail report that would go to the
11   DEA.
12   Q.    That's how you did it?
13   A.    Yes.
14   Q.    Okay.  If I wanted -- do you have
15   the ability to go back to 1996 and 1997 and pull
16   those reports?
17         MR. CLARK:  Objection to
18   form.
19   A.    I believe no, I don't.
20   Q.    Have you tried?
21   A.    Yes, I did.
22   Q.    Okay.  Why can't you?
23   A.    The -- this was in '90 -- around
24   '97 or '98 is when we started to keep our

Page 75

1    records on a -- I'm trying to think of the name
2    of the system, but we started using -- it's a
3    coin system.  It was a way to keep reports that
4    were like green bar screen reports or green bar
5    reports on an optical disk format, and that's
6    when we started to archive our inventory.  But
7    we didn't keep records past that, going back
8    further.  This is 20 years --
9    Q.    Understood.
10   A.    -- so -- yeah.
11   Q.    So I just want to make it clear,
12   just before we leave each other today, because
13   you are the one to ask --
14   A.    Right.
15   Q.    -- that if we wanted these reports
16   which you say mimicked 72538, that you've tried
17   and you're unable to do so?
18         MR. CLARK:  Objection to
19   form.
20         Go ahead.
21   A.    I believe I submitted everything
22   that I could find, and I was unable to -- going
23   prior to this, no, I was not able to retrieve
24   any.

Page 76

1    Q.    Or during this -- not really
2    prior, but after -- this was implemented in
3    January of '96 until May of 1997.  You can't
4    access those reports, correct?
5         MR. CLARK:  Same objection.
6    A.    I don't recall whether I found an
7    instance of this report.  I know going
8    forward -- I reported everything I could.
9    Everything I could retrieve, I gave you
10   everything.  I don't recall whether or not I
11   found one copy of this report or not.  If I did,
12   it was submitted as record.  And if it's there,
13   it's there.
14   Q.    Yeah.  This is not an attacking
15   question --
16   A.    No, I'm not trying to -- I'm just
17   trying to answer your question fully.  I don't
18   recall whether or not you have -- I don't know
19   exactly when the reports that I retrieved
20   were -- what was submitted as evidence or as a
21   response to your -- to the request.
22   Q.    Right.  I don't believe I have any
23   for that time period, is my recollection.  And I
24   just want to establish with you that you've

Page 77

1    tried and you don't --
2    A.    Yes, I did try.
3         MR. CLARK:  Let him finish
4    his question.  I know it's
5    difficult.
6         THE WITNESS:  I'm sorry.
7    Q.    But just to be clear, because
8    there is -- let's go to 72542, because -- I'm
9    sorry, 72541.  And that's going to take this
10   document to the very end of the document, which
11   is 7255 [sic].  And do you know what this
12   information is in these pages?
13   A.    Okay.  This is a field layout for
14   a file.  Now, this is -- let me look this over,
15   because I'm not sure if these were -- these kind
16   of -- are these from our later system?  That's
17   what I wanted to verify.  Okay.  So you're
18   asking me what 72541 is?
19   Q.    Onwards, yes, to the end of the
20   document --
21   A.    Okay.  That is -- I'm sorry.
22   Q.    Go ahead.
23   A.    That's a database description.
24   Basically it tells what buckets of data are

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 stored on the system to make the operating
2 system work. The programs interact with these
3 files.
4     Q.  Can you dummy that up a little
5 bit --
6         MR. CLARK:  Objection to
7     form.
8     Q.  -- for me?  What do you mean?
9         MR. CLARK:  Same objection.
10    Go ahead.
11    A.  I believe I've answered that.
12 This is a -- this is a field -- this is a
13 database description, 72541 is a database
14 description of the DEA ARCOS dictionary file.
15 These fields -- the data that I would receive
16 from the DEA ARCOS file would be downloaded via
17 one of our programs into this file.
18    Q.  Got it.
19    A.  And these fields in here tell
20 where -- it's just basically a layout of what
21 the data could be found at in what locations in
22 the file.
23    Q.  Got it.  Is this -- I don't want
24 to oversimplify it, but is this basically a

Page 79

1 how-to manual from online services on how this
2 program is going to work --
3         MR. CLARK:  Objection.
4     Q.  -- and how it should look, this
5 document?
6     A.  It's the system documentation
7 of -- basically tells the -- main parts of
8 the system, yes.
9     Q.  Okay.
10    A.  How-to, I wouldn't say how-to.
11 It's basically a system documentation.  I don't
12 know.
13    Q.  But it is instructional?
14    A.  Yes, optionally, yes.
15    Q.  Yeah.  The reason I ask you is
16 because referring to that discovery response
17 before, it says, "A copy of this report was
18 submitted to the DEA monthly."  The way I think
19 we can look at that, what that means is the
20 reports were submitted, to the best of your
21 knowledge.  We just simply can't get our hands
22 on them, right?
23         MR. CLARK:  Objection to
24     form.

Page 80

1     Go ahead.
2     A.  Yes.
3     Q.  Okay.  All right.  Moving along.
4     A.  Oh, take that away.  All right.
5         MR. REINS:  Thanks.  We'll
6     make that Number 2.
7             - - -
8     (PSI - K. Harbauer Exhibit 2 marked.)
9             - - -
10 BY MR. REINS:
11    Q.  All right.  We're going to now
12 look at PSI-1012, page 3.  For record purposes,
13 PSI-66566.
14        Moving forward.  So we've covered
15 now the January.  We've covered through 1996.
16 Here we are in May of 1997.  You're writing a
17 letter to Janice -- Ms. Janice Margreta.
18    A.  Margreta.
19    Q.  Okay.  And specifically if we
20 looks, it says, "Dear Ms. Margreta, thank you
21 for taking time during your last audit to speak
22 with me concerning PS, Prescription Supply's,
23 suspicious order monitoring report."
24        Do you remember her visit?

Page 81

1     A.  Yes, I do.
2     Q.  Tell me what you recall about it.
3     A.  I recall that when the -- well,
4 the DEA agents, when they came in, Janice was
5 there and she wanted to talk specifically about
6 the suspicious order monitoring report that we
7 had been submitting over the prior time.
8        And if I remember, she said, "What
9 is this thing?"  It's a big thick report.  It
10 would show -- it would break down all the sales.
11 It was hard to read.  I think she wanted it
12 simplified and streamlined.
13        So we were able to work together
14 and come up with a report that streamlined this
15 process a little bit.  We basically used the --
16 we were also a member of Medi-Span and we used
17 the GPI equivalencies code, which -- anyway, we
18 used the GPI equivalency code to cross-reference
19 items of like items.  And what we would do is we
20 added those items up and come up with an average
21 to get a variance.  And that's basically what it
22 was, it was a variance report that we created.
23    Q.  Best you can recall, which was
24 different from your prior report, which was

Page 82

1 instituted in this January '96 to May of '97
2 time frame, different in what way?  I understand
3 you just said it included a lot more data, but
4 can you be a little bit more specific?
5      A.   How was this report different?
6      Q.   Yes, sir.
7      A.   I believe it was more concise.  It
8 would -- it would produce the sales.  It was
9 able -- it was a lot less data to weed through,
10 wasn't so much space in between the pages.  I
11 think she was able to read the report.  It was
12 more effective.
13      Q.   And you said you worked together.
14 Did -- literally you and Ms. Margreta?
15      A.   Yes, yes.  She told me what she
16 wanted.  I was there.  I took some notes.  I
17 programmed it.  I was able to produce it while
18 she was there for the audit.  They continued the
19 audit.  I think she was -- I think it was a two-
20 or three-day audit that they were there.  By the
21 end of that report day or that third day when I
22 left, they had a copy of that report.  And she
23 was very happy with it.
24      Q.   Okay.  So basically the finished

Page 83

1 product was a -- combined efforts of yourself
2 with Ms. Margreta?
3      A.   Right.
4      Q.   Okay.  So second paragraph, "I
5 have been able to complete the program variance
6 modifications as we discussed.  However, I have
7 made one significant change.  I realized, after
8 testing, that if there is only one store
9 purchasing a product, their total sales would
10 become the average.  Therefore, these sales
11 would have been omitted from the report.
12      "As this is a potential problem, I
13 have simply included in the report all
14 single-store purchases totaling greater than
15 three.  Should this change not meet with your
16 approval, please contact me.  I will be most
17 happy to discuss this with you."
18      I have the report.  We're about to
19 get there.  Three is the variable.  Where did
20 that number come from?
21      MR. CLARK:  Objection to
22 form.
23      A.   I believe it was given to me by
24 her in our prior discussions.  And this was an

Page 84

1 attempt to get any outliers that would be -- if
2 there was only one customer buying the product,
3 I wanted to make sure it appeared on the report
4 to document the sale.
5      Q.   Got it.  Let's go ahead and talk
6 about the report because that's probably --
7 we'll just explain it through that process.
8      This will be Plaintiff's Exhibit
9 Number 3, this correspondence.
10      - - -
11      (PSI - K. Harbauer Exhibit 3 marked.)
12      - - -
13      MR. CLARK:  Is it 4?
14      MR. REINS:  I think it's 3.
15      MR. CLARK:  It is 3?  Okay.
16      MR. REINS:  We may not have
17 marked 1 which caused confusion.
18      (Discussion held off the record.)
19 BY MR. REINS:
20      Q.   So now what I'm going to hand you
21 is this is going to be, what I believe, this
22 modified new reporting mechanism.  And, listen,
23 I'm not going to go through all of them.  I
24 grabbed a month.  So we'll look and kind of

Page 85

1 identify the varying information on that and how
2 to hopefully interpret it.
3      I guess to start off on the same
4 ground, is this the report ultimately that was
5 modified as of May of 1997?
6      A.   Yes.  This is an example of one of
7 the outputs, yep.
8      Q.   You say "example," but it's really
9 actually one of them, right?
10      A.   Yes.
11      Q.   Okay.
12      A.   This is from November of '98.
13      Q.   Okay.  What we're going to do
14 now -- and please just be patient with me, but
15 it's important to what we're doing -- is kind of
16 walk through all the information contained on
17 here and what it means.
18      A.   Great.
19      Q.   Okay.  So let's go ahead and
20 start.  So, again, I represented in this --
21 hopefully it's accurate there.  We've got
22 November of 1998.  So let's go ahead and focus
23 on the top part.  Prescription Supply, Inc.
24 we'll bring out, if you don't mind -- yep, that

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  top portion.
2       All right.  So Prescription
3  Supply, Inc. DEA -- that's the DEA number --
4  suspicious order monitoring report.  You and I
5  can agree from this point forward this was PSI's
6  suspicious order monitoring report pursuant to
7  the federal regulations as required, correct?
8       MR. CLARK:  Objection to
9  form.
10      A.   Yes.
11      Q.   And so it says -- I don't need to
12  worry about that.  It says, "Purchases averages
13  reflect total purchases of equivalent items
14  divided by number of stores who bought."
15      Can you explain that for us?
16      A.   It's -- basically it is all of --
17  okay.  So we have grouped the sales by like
18  items using an equivalency code from Medi-Span,
19  and so those sales are reflective in this report
20  by -- okay.  So this report is by equivalency
21  item number, and those like items are all
22  grouped together, and we take the total sales,
23  total pieces of -- quantities sold during that
24  month time, and then we divide it by the number

Page 87

1  of stores who purchased.
2       We would come up with an average.
3  Any store that purchased above that average
4  would show up on the report.  And any outlier
5  that would be there, which would be the -- if
6  only one store purchased the product, we bought
7  greater than three.
8       Q.   Okay.  When I look at -- strike
9  that.
10      Looking at the report, it appears
11  to only have single stores throughout.  Is that
12  incorrect?
13      MR. CLARK:  Objection to
14  form.
15      Q.   I say that to you because each
16  entry which you look at has a particular
17  address.
18      MR. CLARK:  Same objection.
19      A.   This report is by the equivalent
20  item number.  So each sale that would -- by item
21  would be there.  So that's -- I mean, that's the
22  interpretation.  So that store's -- I guess
23  what's the question about --
24      Q.   The question is, is that --

Page 88

1       A.   -- the customer name, the address?
2  These are the addresses that they purchased.
3       Q.   The question is -- and maybe it's
4  better just to start going through them one by
5  one.  But it appears that each entry where we're
6  dealing with like items is dealing with one
7  specific store.
8       A.   Each entry, yes, where there is a
9  store, every time there's a customer number or
10  customer number and address, then the sales
11  would immediately follow.
12      Q.   All right.  I guess another way to
13  ask the question I did a poor job on is, I don't
14  see that multiple stores are being looked at
15  here.
16      MR. CLARK:  Objection to
17  form.
18      Q.   Let me rephrase.  So let's just go
19  through it.  I think that's the easiest thing.
20      So let's take the first entry, and
21  it's a little difficult to read so maybe the
22  screen will be helpful.  So the first thing we
23  have is the -- you mentioned one thing, though,
24  before I missed.  You said equivalency code

Page 89

1  from -- what group gave you that?
2       A.   Medi-Span.
3       Q.   Medi-Span.  Tell me what that
4  means, equivalency code.
5       A.   Like items.
6       Q.   Fair enough.
7       A.   Used for equivalency where, for
8  example, Valium is a branded name and Diazapam
9  is the generic equivalent, so they would be
10  grouped together.
11      Q.   Understood.  All right.  So let's
12  go ahead, and the nice thing is we don't have
13  to -- once we do one, we'll probably have a good
14  feel for it.  So equivalent product number,
15  you've described that.
16      Next is size.  What does that
17  mean?
18      A.   Can you point to what you're --
19  what are we --
20      MR. CLARK:  If you look on
21  the screen here, Kirk, he's going
22  to highlight, I think.
23      A.   Okay.  You have Medi-Span
24  highlighted.  So that --

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.   Yeah.  So what we'll do is --
2    A.   Okay.
3    Q.   -- we'll break out of here and
4 start this over.  So we're going to be on the
5 very top left.
6         MR. REINS:  If you want to
7    get rid of those highlights we've
8    got, Zach.
9 BY MR. REINS:
10   Q.   Very top left it says "equivalent
11 product number," we just covered, very top.  And
12 right next to it on the right is "size," is what
13 we're looking at next.
14   A.   Right.
15   Q.   Tell me what "size" means.
16   A.   The size of the package.
17   Q.   For laypeople -- you know, these
18 come in, what, different doses, different amount
19 of pills?
20   A.   Different size, number of pills,
21 number of ounces, grams.
22   Q.   Got it.  Average pieces sold, how
23 do you come up with that number?
24   A.   I think I've answered that

Page 91

1 already.  Basically, the customers -- all the
2 customers that purchased that item during the
3 month, then we take that and we divide the
4 customers by that, by those numbers, to come up
5 with an average purchase.
6    Q.   Okay.  All right.  And then
7 customer name, pretty self-explanatory.
8 Customer address, pretty self-explanatory.
9         And then we got the item number,
10 what is that?
11   A.   That's Prescription Supply's item
12 number.
13   Q.   Okay.  NDC number?
14   A.   Yep.
15   Q.   What is that?
16   A.   National drug code for the
17 product.
18   Q.   Is that different -- description.
19 I'm sorry.  What is that?
20   A.   That's the description of the item
21 that tells what the product is.
22   Q.   All right.  And then we've got
23 transaction date.
24   A.   Yep.

Page 92

1    Q.   Is that when --
2    A.   Year year, month month, day day
3 format.  That's when the sale occurred.
4    Q.   Would that mean it will be shipped
5 that day as well?
6    A.   Yes.
7    Q.   Transaction number, every
8 transaction has its own number?
9    A.   Right.  That was an invoice
10 number.
11   Q.   Quantity would be the amount of
12 that?
13   A.   The quantity purchased.
14   Q.   Okay.  Narcotic blank number?
15   A.   Okay.  If it was a narcotic item,
16 if it was a C-II and it required a narcotic
17 blank, then there would be a narcotic blank
18 number listed there.
19   Q.   DEA registry?
20   A.   That is the customer's DEA number.
21   Q.   All right.  So, again, I
22 appreciate your patience.  We're going to go
23 through a real example now, okay?
24   A.   Okay.

Page 93

1    Q.   We'll do the first one for ease.
2 So we've got the product number there, and I
3 don't want to say it all, but we can look at it
4 ending in 1220, correct?
5    A.   Yes.
6    Q.   All right.  Sorry.  Go ahead.
7    A.   I'm just -- yes.
8    Q.   Okay.  And then we have -- is that
9 the average -- I'm sorry.  What's the 480 there?
10   A.   That's the size.
11   Q.   Meaning what?
12   A.   That is the syrup.  It's 480 --
13 it's ounces or grams or cc's or whatever it is.
14   Q.   Got it.  Then we have average
15 pieces sold.
16   A.   Three.
17   Q.   So that would be -- so here's
18 where I just want to ask you.  I see Stevens --
19 if we look at the name underneath there,
20 Stevensons Drugstore, Inc.  I see an address of
21 26 West Main Street, Shelby, Ohio.  Am I
22 correct?
23   A.   Correct.
24   Q.   This is a single store, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    A.   Right.

2    Q.   So that would mean that there

3 would be -- would that be the average or did you

4 just use the variable --

5    A.   This is any --

6         MR. CLARK:  Objection to

7    form.

8    A.   Which -- what are you referring to

9 as the "average"?

10   Q.   It says "average pieces sold."  I

11 believe there's a three designated.

12   A.   Correct.

13   Q.   What does that mean?

14   A.   That's the average pieces sold to

15 our stores.  So we may have sold other stores

16 sales that were under quantities of three.

17   Q.   Got it.  So the average for the

18 month of November, for that particular store,

19 was three bottles of 480 milligrams, grams,

20 whatever that might be --

21   A.   Right, of that product, yes.

22   Q.   -- of that product; is that

23 correct?

24   A.   Yes.

Page 95

1    Q.   And the three is looking at the

2 average for that month, the prior month, the

3 year before or how does that --

4    A.   Just that month.

5         MR. CLARK:  Object to form.

6    Q.   That month.  All right.  We get

7 to -- underneath we got the item number.  We got

8 the NDC number.  We got the description, which

9 is what?  Codamine syrup?

10   A.   Yes.

11   Q.   And then we've got the transaction

12 date of 11/2/98.  We've got the transaction

13 number, and we've got that they ordered four; is

14 that right?

15   A.   Yes.

16   Q.   And we've got the customer

17 subtotal at -- because there was only one order,

18 at the bottom that says "customer subtotal

19 four."  So for the month of November, they

20 ordered four?

21   A.   Correct.

22   Q.   Different than the average of

23 three?

24   A.   Right, over.

Page 96

1    Q.   Over.  This is where I think it

2 got a little confusing with the two of us.  The

3 average must come from a different place than

4 the actual order for November because the

5 numbers are different, right?

6         MR. CLARK:  Objection to

7    form.

8    Q.   So the average must be calculated

9 in some other manner other than the actual.  Do

10 you know how the average pieces sold is

11 calculated?

12        MR. CLARK:  Same objection.

13   A.   Yes, I know how it's calculated.

14   Q.   How?

15   A.   We would add the total for that

16 item up, total pieces sold, and then divide it

17 by the number of stores who purchased.

18   Q.   This is one store, though,

19 correct?

20   A.   Divided by all the stores that

21 purchased.  If we had three stores that

22 purchased, then we would -- we would use that as

23 a divisor.

24   Q.   Got it.

Page 97

1    A.   Okay.

2    Q.   I apologize if I missed that.

3    A.   Okay.

4    Q.   That's probably my fault.

5         Now, when you say all the stores

6 that purchased that product, you mean all the

7 stores who purchased that product for the month

8 of November?

9    A.   Correct.

10   Q.   When you say "all the stores," do

11 you mean legitimately all of the stores that you

12 provide that product to, all of them?

13        MR. CLARK:  Objection to

14   form.

15   A.   Any of the customers that

16 purchased that product in that classification,

17 that's what I mean by all stores --

18   Q.   And the reason I ask --

19   A.   -- for that month.

20   Q.   And it may have sounded like a

21 dumb question.  Not broken down by region or

22 state.  It's all of your customers that

23 purchased that product, that's how you derived

24 the average?

Page 98

1    A.   Correct, correct.
2    Q.   Including that customer,
3  obviously?
4    A.   Yes.
5    Q.   Okay.  All right.  It makes this
6  report if it is above the average; is that
7  correct?
8        MR. CLARK:  Objection to
9    form.
10   A.   Yes.
11   Q.   Okay.  I believe we've covered
12 this before, but to be very clear, your job is
13 to assimilate, gather this data, then submit it
14 at the end of the month.  You are not the one,
15 if there is a variance, regardless of what the
16 variance is, to make the determination to stop
17 the shipment, correct?
18       MR. CLARK:  Objection to
19   form.
20       Go ahead.
21   A.   Correct.
22   Q.   And this is a look-back report,
23 meaning that all of these sales have already
24 occurred, meaning the shipments have already

Page 99

1  taken place, correct?
2    A.   Correct.
3    Q.   Okay.  Are you aware if there is a
4  variance level which would trigger a stop
5  shipment?  Are you aware?  Meaning, "Hey, this
6  one is one above, but if it's this many above or
7  if there is this many a percentage above, we
8  stop automatically"?  If you know.
9        MR. CLARK:  Objection to
10   form.
11   A.   I am not aware of one.
12   Q.   Okay.  So, for instance, if you go
13 to, on the bottom right-hand number 158988,
14 which is going to be, for us, page 22, and if we
15 look at -- if you look at the second full entry
16 there dealing with Duragesic.
17       Do you see that?
18   A.   Uh-huh.
19   Q.   Is that a "yes"?
20   A.   Oh, yes.
21   Q.   Hey, listen, you had a good run.
22       It says the average is 7.  The
23 actual is 32 of what was actually sold.  You and
24 I can agree, without being math guys, that's a

Page 100

1  significant variance from the average --
2        MR. CLARK:  Objection to
3    form.
4    Q.   -- right?
5        MR. CLARK:  Same objection.
6    A.   Significant variance.  Yes.
7    Q.   And let me ask you this:  The
8  controlled substance -- what's the title for
9  that person?  I know it went from Mr. Thomas
10 Schoen to Jim.  It's controlled substance
11 manager or overseer or --
12   A.   Controlled substance officer, I
13 would say.
14   Q.   They get these reports --
15   A.   Compliance officer I guess it
16 would be.
17   Q.   Yes, sir.
18   A.   Yeah.
19   Q.   Do they get these reports?
20   A.   Yes, but not in this format also.
21   Q.   How do they get them?
22   A.   We also produced -- I actually
23 produced two reports.  The DEA wanted it by
24 equivalent item, and I also re-sorted it by

Page 101

1  customer so we could see the customers that
2  hit -- we could look at the customer overall for
3  that month to see what all his purchases were,
4  not only just by one item.
5        So we produced this by customer
6  also.  Same data, it was just in a different
7  format.  It was sorted differently.
8    Q.   You could do that for us as well?
9        MR. CLARK:  Objection to
10   form.
11   A.   Yes.
12   Q.   And is it your testimony that
13 the -- whether it be Tom or Jim -- forgive me,
14 they've got the same last name --
15   A.   Right.
16   Q.   -- that they would get that report
17 only, or would they get both --
18       MR. CLARK:  Objection to
19   form.
20   Q.   -- if you know.  There's two
21 reports.  I think this one that we're looking at
22 is -- and let's go ahead and -- what is this
23 called?  This is a suspicious order report,
24 right?

Page 102

1  A.  Yes, it's a suspicious order --
2  what I know now, it could be more of a variance
3  report, but it is a suspicious order monitoring
4  report.
5        They -- now, you asked me, as far
6  as Tom, would he get this report.  He wouldn't
7  get this exact report.  He would get the same
8  data on another report sorted by customer.  So
9  he would look at that customer, and they would
10 overview that every month.  I would run a
11 month-end report.
12     Q.  You would give both Jim and Tom
13 that report?
14     A.  Yes.
15     Q.  What's it called?
16        MR. CLARK:  Objection to
17     form.
18     A.  It's the same report, except it
19 would say, instead of "sorted by equivalent
20 product" at the top, it says "sorted by
21 customer."
22     Q.  Got it.  Would it show the
23 variances for the equivalent product, the other
24 report?

Page 103

1        MR. CLARK:  Objection to
2     form.
3     A.  Absolutely.  Yes, it would.  It
4  would have all the same data but it just allowed
5  us to look at the customer as a whole, not just
6  one particular item.
7     Q.  I understand, but would it break
8  down -- underneath the customer, would it break
9  down the equivalent narcotics?
10    A.  Yes.
11    Q.  By group?
12    A.  Yes --
13    Q.  Meaning --
14    A.  Yes.
15    Q.  Meaning --
16    A.  Yes.
17    Q.  So good a question you had to say
18 "yes" three times.
19    A.  I didn't know if you heard me.
20    Q.  Meaning that this exact
21 information for this particular customer would
22 be shown, meaning average 7, they got 32, but it
23 would also show the other variances for the
24 other medications --

Page 104

1        MR. CLARK:  Objection to
2     form.
3     Q.  -- if there are any?
4     A.  Yes.
5     Q.  Got it.  And this is where I'm
6  going to pull you out.  And what they did with
7  that information or what they were required to
8  do, you were not involved in, correct?
9     A.  Correct.
10    Q.  Okay.  You just know that's the
11 report they wanted?
12        MR. CLARK:  Objection to
13     form.
14        MR. REINS:  Did you get the
15     answer?
16    Q.  I believe you said "yes," correct?
17    A.  Yes.
18    Q.  All right.  Go to page 30 of that
19 document, which is going to be -- for you, sir,
20 it's going to be 158996.
21        So, for instance, that report
22 would have shown, if we look on the bottom
23 there, this particular Drug Corner, Inc.,
24 according to the average, OxyContin, we've got

Page 105

1  80 milligrams, that's the dosage here.  The
2  average order would be 5.  And this particular
3  customer, at this particular building, received
4  10 for the month of November; is that right?
5        MR. CLARK:  Objection to
6     form.
7     A.  You're looking at the other page?
8     Q.  Yes, sir.  It carries over.
9  Sorry.
10    A.  Correct, correct.
11    Q.  Okay.  And that would be more than
12 double, correct?
13    A.  Yes.
14    Q.  All right.  And then, what they
15 did with it, meaning the due diligence
16 requirement, any investigation, any picking up
17 the phone and calling and finding out, you were
18 not privy to that, correct?
19    A.  Correct.
20        MR. CLARK:  Objection to
21     form.
22    A.  Correct.
23    Q.  Any policies that, "Hey, you're
24 already over the average, we're going to not

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  ship this," any of those safety mechanisms,
2  you're not familiar with those, correct?
3        MR. CLARK: Same objection.
4    A.  Yes.
5    Q.  Okay.  Now, my understanding is
6  this is how you reported, the format we just
7  looked at, until 2013; is that right?
8    A.  Yes.
9    Q.  And then in 2013, what happens?
10       MR. CLARK: Objection to
11  form.
12   A.  The DEA had an audit.  They came
13  in and did a periodic audit of us, and Janice
14  Margreta -- or I'm sorry, Angie Frances, was
15  our -- she's out of the Detroit office.  Between
16  this time, we switched to the Detroit office.
17  They switched us.
18       So Angie Frances was there and she
19  said she didn't want to see that report anymore.
20  Stop sending it to her, is what she told me.
21   Q.  Okay.  So Angie Frances worked out
22  of what office?
23   A.  The Detroit office.
24   Q.  The Detroit office.  And who did

Page 107

1  she relay those words to?
2    A.  Myself.
3        MR. CLARK: Objection to
4  form.
5    A.  Myself.
6    Q.  Okay.  And was it a phone call or
7  in person?
8    A.  It was in person.
9    Q.  Okay.  She does an audit at
10  your -- at your building.  Would you get
11  audited -- how often?
12       MR. CLARK: Objection to
13  form.
14   A.  It could be at any time.  They
15  could come in and -- it was always a surprise
16  when they walked in the door.  I would say every
17  four years or so on average.  I don't know.
18  Maybe more.  Maybe less.  I can't say for sure.
19   Q.  Got it.  And then so she comes in.
20  Tell me as best you can recall -- sorry, there
21  might be some redundancy.  She comes into your
22  office or -- you have a conversation with her
23  and she says what exactly, that you can recall?
24   A.  If I remember correctly, we were

Page 108

1  discussing -- okay.  We have a threshold system
2  in place that we put in, and we were discussing
3  that.  And, you know, I keep sending her these
4  suspicious order monitoring variance reports.  I
5  kept sending those to her as well.
6        And she -- as best I can recall,
7  what she said was, "Stop sending those to me,"
8  because the emphasis was on orders being stopped
9  prior to their shipment as opposed to reporting
10  after the fact that the orders are sold.
11   Q.  Got it.  Let's talk about that.
12       So did the threshold system --
13  which sounds like it was a system that allowed
14  for some reporting.
15       MR. CLARK: Objection to
16  form.
17   Q.  She said, "I don't need the
18  threshold system reports as well as these
19  reports."
20       So she was getting threshold
21  reports, right?
22       MR. CLARK: Objection to
23  form.
24   A.  We were talking about the

Page 109

1  threshold system itself, about the holding of
2  orders is what we were doing.
3    Q.  Are there reports generated
4  regarding that?
5        MR. CLARK: Same objection.
6    A.  There are no reports from the
7  threshold system.
8    Q.  Okay.
9    A.  There are audits.  I mean, there
10  are log files that are generated but no reports.
11   Q.  Okay.  Tell me about the threshold
12  system.
13       MR. CLARK: Objection to
14  form.
15   A.  Can I rephrase something?  I
16  just -- can we go back to that question?
17   Q.  No way.
18   A.  Please.
19   Q.  No.  It's too late.
20   A.  When I tell you there was no
21  reports, we were constantly pawing through this
22  data and reporting -- recapping and reporting.
23  As far as going to the DEA, we may not have
24  generated a monthly report as far as the

Page 110

1 threshold system, but we did -- you know, we
2 kept -- continued on, and that's what that
3 conversation was about, us ceasing the -- or the
4 shipment of the suspicious order monitoring
5 variance report.
6        Q.   All right.  Let's just tie a bow
7 on that.  So I asked you to --
8        A.   Okay.  I'm sorry.
9        Q.   No, no.  Don't -- no, no.  I'm
10 not --
11            MR. CLARK:  He's asking a
12    question.
13        Q.   You didn't do anything wrong.
14    I want you to clarify, to be
15 clear.  It's important we get it right.
16        2013 forward until here we are
17 sitting here today, 2019, no reports have been
18 submitted since that time; is that right?
19            MR. CLARK:  Objection to
20    form.
21        Q.   Let me be more specific.  The
22 report that we just went over in detail,
23 specifically -- and that's going to be -- sorry.
24 Plaintiffs' Exhibit Number 4.

Page 111

1            - - -
2    (PSI - K. Harbauer Exhibit 4 marked.)
3            - - -
4 BY MR. REINS:
5        Q.   That report specifically that we
6 just looked at -- you know, what I'm talking
7 about?
8        A.   Yes.
9        Q.   Yeah, the suspicious order
10 monitoring report, that stopped in 2013?
11        A.   Correct.
12        Q.   We've established that?
13        A.   Correct.
14        Q.   You haven't done it since then,
15 correct?
16        A.   Correct.
17        Q.   All right.  Now, I think what I
18 asked you is, are there any other type of
19 reports that you've submitted since 2013, and I
20 think what you're saying is, "Hey, we have
21 dialogue, but there are no written reports that
22 we've submitted since that time period"; is that
23 accurate or inaccurate?
24            MR. CLARK:  Objection to

Page 112

1    form.
2        A.   Not on a periodic timetable --
3        Q.   Okay.
4        A.   -- submitting reports.
5        Q.   What type of reports have you
6 submitted even though they're non-periodic?
7            MR. CLARK:  Same objection.
8        A.   Anywhere from sales recaps of
9 certain stores.  You know, I know there's -- as
10 far as reports, you're talking about just data
11 reports.  Anything as far as recapping certain
12 stores, sales purchases -- you know, it may be
13 about a specific store or whatever, but there
14 may be phone calls generated.
15        Q.   Let's stick with reports for now,
16 if you don't mind.
17        A.   Okay.
18        Q.   This type of information that you
19 just identified to me, do you keep a log, do you
20 have a record of what you've submitted since
21 2013 regarding these particular items?
22            MR. CLARK:  Objection to
23    form.
24        Q.   Meaning if I wanted to see them,

Page 113

1 "Hey, what have you sent, I'd like to see what
2 you've sent."  Do you have access to that?
3            MR. CLARK:  Same objection.
4        A.   I guess some of those reports --
5 yes, because the other things that I was talking
6 about, ARCOS reporting.  We would do ARCOS
7 reporting as well as -- so we have all those.
8 Anything we've submitted electronically to the
9 DEA we should be able to produce.
10        Q.   Okay.
11        A.   And I think we did, as far as
12 three -- we did go through all of that.  We did
13 send all that in.
14        Q.   Okay.  What would trigger those
15 reports?  Would it be a phone call from them?
16 Would it be some internal system that would say,
17 "We need to send this in"?  What would trigger
18 the items that you just said were reported post
19 --
20        A.   Probably --
21            MR. CLARK:  Hold on.  Let him
22    finish his question.
23            THE WITNESS:  All right.  I'm
24    sorry.

Page 114

BY MR. REINS:

Q. Go ahead.

MR. CLARK: Let me add my objection. Objection to form. Now go.

A. Can you start the question over and just --

Q. Yeah. I was just trying to say, what would trigger that type of information from -- to be reported? Would it be a phone call? What would trigger these types of things being reported in 2013 forward?

MR. CLARK: Objection to form.

A. Depending on the report type. Some -- I guess ARCOS we report every -- on an every -- I guess a monthly -- I told you that they weren't monthly, but the ARCOS reports are. I want to qualify that. It could be a phone call from the DEA. It could be a form of an e-mail sent from a DEA agent or the Detroit office or someone. It could be an e-mail requesting data.

Q. Do you keep all the e-mail

Page 115

correspondence from the DEA?

A. We do not.

Q. Did you ever get anything in writing substantiating you're no longer required to report suspicious order monitoring reports anymore?

MR. CLARK: Objection to form.

A. No.

Q. Okay. Do you still work with -- I'm sorry. I forgot her name.

A. Angie Frances.

Q. Is she still the one that oversees --

A. She has passed away or I think she has health reasons. I don't think she's our covering agent anymore.

Q. Do you know who is now?

A. I don't know the current one. I want to say Alan Drumheller, but I know he's there. There's several agents they deal with, but I couldn't tell you the current agent's name, no, because I haven't had a chance to really work them on a one-on-one basis to know.

Page 116

Q. I apologize in advance. I remember asking you about your threshold system, but I don't remember your responses.

How does your threshold system work?

A. Our threshold system that we put in 2008? Okay. So the threshold system works -- just give me a second here. In the threshold, basically what that does is caps sales by -- by the quantities per store. Basically -- I'm drawing a blank here. I'm sorry.

Q. That's all right.

A. But -- okay. The -- so our threshold system that's there, basically will -- we take the product that comes in. There's thresholds and we divide it up in family, drug family names, and we try to adhere to an industry guideline, the NWDA or HDMA guidelines, to -- that's what this system was created as. And it breaks the families down -- drugs into families.

And we can set thresholds in there for the customer specific on any purchases that

Page 117

go on. If the order is -- comes in and it's above the threshold, it stops the order before it goes out.

Q. A couple questions.

A. Yeah.

Q. One, who sets the threshold?

A. Jim Schoen.

Q. Two, can it be overridden, if you know?

A. Yes.

Q. Who has the power to do that?

A. Jim Schoen.

Q. You said it was implemented in 2008?

A. Yes.

Q. Was there any type of a comparable system before 2008?

MR. CLARK: Objection to form.

A. Comparable threshold system, no.

Q. How did it work before then, if you know?

MR. CLARK: Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  Q.  Here's what I'm asking.  It's a
2  little confusing.  There were thresholds.  I
3  know there were because I see them in the
4  documents.  I understand that's why Jim's still
5  involved in that.  I guess what I'm saying is,
6  there wasn't a system in place to stop the sales
7  from being shipped prior to 2008, as best you
8  recall; fair to say?
9      MR. CLARK:  Objection to
10  form.
11  A.  When you say "system," every order
12  that comes through Prescription Supply is held
13  for -- any controlled substance, any C-II
14  actually gets held at the system.  It doesn't
15  matter if the order comes in via EDI, electronic
16  inventory, website, CRT order entry, doesn't
17  matter.  Okay.  Those orders come in and they're
18  held.  It goes to a review right there at that
19  point.  He has to choose whether or not he's
20  going to fill or not fill that order.
21  Q.  "He" being Jim?
22  A.  Jim Schoen, yes.
23  Q.  So he overseas every narcotic
24  order?

Page 119

1  A.  Yes, he does.
2  Q.  Tell me how the system changed,
3  then, in 2008.
4      MR. CLARK:  Objection to
5  form.
6  A.  In 2008, that system, what it did,
7  is basically it holds the order -- it will -- if
8  a customer hits a threshold, it will -- it will
9  change the ship code specifically and the order.
10  It will change -- it will stop.  It says
11  "maximum quantity exceeded."  Okay.
12      So this system allows us to have
13  the ability to set certain thresholds in pill
14  counts or by relevance factor, how many pills
15  that store can buy for a particular drug family.
16  So it allows us to stop the orders before they
17  even happen.
18  Q.  Is that a safer practice, in your
19  opinion?
20  A.  I believe so.
21      MR. CLARK:  Objection to
22  form.
23  A.  I believe so, yes.
24  Q.  Tell me why.

Page 120

1      MR. CLARK:  Objection to
2  form.
3  A.  Well, I think that it's -- the
4  orders will not get shipped and it's not --
5  you're not chasing your tail or recapping sales
6  that have already gone out.
7  Q.  Fair answer.
8      Someone says, "Why did it take so
9  long" --
10      MR. CLARK:  Objection to
11  form.
12  Q.  -- what would you say to that?
13      MR. CLARK:  Objection to
14  form.
15  A.  Why did what take so long?
16  Q.  Let me rephrase the question.  Why
17  was that implemented in 2008 and not before
18  then, if you know?
19      MR. CLARK:  Object to form.
20  A.  In 2008 we had a meeting with the
21  DEA.  There was an emphasis on stopping the
22  orders before they were shipped.  At that time
23  we -- we got into the threshold.  We set up a
24  threshold system just to do that.  Now, this

Page 121

1  system is in other wholesalers also.  Online --
2  this is Online Solutions as well.
3  Q.  Do you know if other companies had
4  the system in place before you guys did?
5      MR. CLARK:  Objection to
6  form.
7  Q.  If you know.
8  A.  I don't believe so.  I think they
9  all went in pretty much the same time because
10  there was a push by the DEA to do so.
11  Q.  Was there something within your
12  operation that the DEA -- that triggered the DEA
13  to focus on that with your operations, if you
14  know?
15      MR. CLARK:  Objection to
16  form.
17  A.  I don't think it was our
18  operations.  I think it was a -- as a matter of
19  fact, as an audit.  They came in as a review.
20  Q.  And listen, you've been doing this
21  40 years.
22  A.  Yeah.
23  Q.  You seem like a common sense kind
24  of fellow.  It makes sense when the duty is to

Page 122

1  try and prevent these types of narcotics --
2  which you understand we're in an opioid crisis,
3  right?
4          MR. CLARK:  Objection to
5      form.
6      A.   Yes.
7      Q.   It makes sense to stop opioids
8  from getting into the marketplace as opposed to
9  learning that they got into the marketplace
10 after the fact?  It makes more sense to focus on
11 the prevention, right?
12         MR. CLARK:  Objection to
13     form.
14     A.   I agree.
15     Q.   And the reason why is because if
16 they're already in the marketplace, there's
17 little that can be done to prevent the
18 diversion, right?
19         MR. CLARK:  Objection to
20     form.
21     A.   I don't know what you mean by
22 that, as far as preventing the diversion.  Once
23 they're in the marketplace, once they're sold,
24 yes, I don't think you can stop it if they're --

Page 123

1  if they're getting diverted somewhere.
2      Q.   And you as a distributor have the
3  ability -- and this program in 2008 that was
4  implemented shows that -- the ability to stop
5  suspicious orders or orders that may be leading
6  to diversion before they get into the
7  marketplace; we can agree on that, right?
8      A.   Yes.
9          MR. CLARK:  Objection to
10     form.  Let me get my objection in
11     before you answer.
12         THE WITNESS:  Fine.
13     Q.   Which makes it safer for
14 everybody, right?
15         MR. CLARK:  Same objection.
16     A.   Yes.
17     Q.   Now, who from the DEA made the
18 suggestion to your company that, "Hey, this
19 would be a better approach."
20         MR. CLARK:  Objection to
21     form.
22     Q.   If you recall.
23         MR. CLARK:  Same objection.
24     A.   I believe it was Angie Frances,

Page 124

1  our DEA agent.
2          Now, also, through HDA, through
3  the industry guidelines that we belong as a
4  member.  I think there was a whole switch.  The
5  whole paradigm had changed at that time through
6  the -- through the whole industry.
7      Q.   Do you know -- do you know when
8  OxyContin hit the marketplace?
9          MR. CLARK:  Objection to
10     form.
11     A.   No, I do not.
12     Q.   Do you remember ever having any
13 meetings with any of upper management regarding
14 the addictive and destructive nature of Oxy?
15         MR. CLARK:  Objection to
16     form.
17     A.   No, I do not.
18     Q.   Were there any meetings
19 regarding -- you're aware of the opioid crisis?
20 I think your sister said she's seen it on the
21 news.  Was there any internal meetings or
22 investigations or things that were passed out to
23 read saying, "Hey, this abuse and addiction to
24 OxyContin, this is a real, real problem"?

Page 125

1          MR. CLARK:  Objection to
2      form.
3      A.   From our internal company, no.
4      Q.   I assume you have seen it on the
5  news?
6      A.   Absolutely.
7      Q.   At least from your news viewing,
8  you're aware that it affects communities
9  throughout this country?
10         MR. CLARK:  Objection to
11     form.
12     A.   Yes, yes.
13     Q.   All races, all genders?
14         MR. CLARK:  Same objection.
15     Q.   Correct?
16     A.   Yes.
17     Q.   All economic levels of this
18 society, correct?
19         MR. CLARK:  Same objection.
20     A.   Yes.
21     Q.   All right.  Are you doing okay?
22     A.   Yeah, I'm fine.
23         - - -
24 (PSI - K. Harbauer Exhibit 5 marked.)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

```
1              ---
2       Q.   All right.  Moving along.  I'm
3  going to have you out of here by noon.
4       All right.  If we could look at --
5  this is going to be PSI-653.  All right, sir.  I
6  know from talking to you, you are not involved
7  in the development and/or the implementation of
8  policies and procedures, if I understood you
9  correctly.
10          MR. CLARK:  Objection; form.
11      Q.   Correct?
12      A.   Correct.
13      Q.   All right.  But have you -- have
14 you read them?
15          MR. CLARK:  Same objection.
16      A.   Yes, I've been through them.  Yes,
17 I've read them before.
18      Q.   Some questions may seem silly but
19 I have to ask them.
20      So we're going to look at this.
21 It's a Prescription Supply, Inc. policy and
22 procedure.  This is controlled substances, and
23 this was implemented, effective date of
24 June 2000.
```

Page 127

```
1          MR. CLARK:  Lance, do you
2     have an extra copy?
3          MR. REINS:  I do.  I'm sorry.
4          MR. CLARK:  Thank you.
5  BY MR. REINS:
6       Q.   All right.  Sir, you've read this
7  before?
8       A.   I believe so, but I'd like to look
9  it over.
10      Q.   Of course you can.
11      A.   Okay.
12      Q.   All right.  So the policy says,
13 "Regarding controlled substances, Prescription
14 Supply, Inc., will maintain proper security,
15 document, and monitor all transactions according
16 to state and federal regulation."
17      And specifically this applies to
18 "Controlled Substance Handler," which I believe
19 in 2000 -- was it Jim by that point in time?
20      A.   Yes.
21      Q.   All right.  "Receiving Manager,"
22 who was that -- or is that, I should say?
23          MR. CLARK:  Objection to
24      form.
```

Page 128

```
1       Q.   That's okay.
2          "IT Manager," that would be you,
3  correct?
4       A.   Correct.
5       Q.   "DR/DR Supervisor," that would
6  be -- would that be your sister, or would that
7  be Tom's?
8       A.   Candy and then probably Tom Schoen
9  would be the DR supervisor, I believe.
10      Q.   Got it.  So "Responsibilities,"
11 we'll focus on you there, the third paragraph,
12 "IT Manager shall compile reports monthly
13 regarding purchases of controlled substances,
14 threshold limits and suspicious order
15 monitoring."
16      That's of June of 2000.
17      A.   Okay.
18      Q.   "Purchases of controlled
19 substances."  What reports monthly would there
20 be, what we haven't discussed already?
21          MR. CLARK:  Objection to
22      form.
23      A.   I guess I'd want to qualify that
24 statement there, because I don't think that's
```

Page 129

```
1  true.  The IT manager.  I don't -- I don't set
2  threshold limits, but basically I do the
3  reporting and put the tools in place so that Jim
4  can make those decisions.
5       Q.   And I'll tell you that's how I
6  read it, to be fair.
7       A.   Okay.
8       Q.   This is not --
9       A.   Yeah, I'm just worried if it's a
10 word -- guide word.  Okay.  Go ahead.
11      Q.   You've been clear, but I think
12 what this says, the way I took it is that you're
13 going to be the one that simply compiles the
14 reports, which I think you've testified
15 truthfully you do, right?
16      A.   Yes.
17          MR. CLARK:  Objection to
18      form.
19      Q.   So my question to you is, other
20 than the reports we've talked about, which is
21 the -- we've talked about the suspicious order
22 monitoring report.  We talked about the version
23 that would include the customer view you told me
24 about, which is a different setting.
```

Page 130

1    A.   Uh-huh.

2    Q.   Are there any other reports, other

3 than those two, or other views of those reports,

4 let me say, that we haven't discussed regarding

5 controlled substances?

6         MR. CLARK:  Objection to

7    form.

8    Q.   Other than the sales themselves,

9 of course.

10   A.   Yes.  There's other reports that

11 we would run.  You know, in the -- when it came

12 down to setting up the thresholds, for example,

13 our threshold reports, we looked at sales over a

14 yearly time, a three-month period, a one-month

15 period.  I ran recaps for them, "them" being Jim

16 Schoen and Tom Schoen.

17        So there's reports there that run.

18 We have analysis -- we have customer analysis on

19 our system where they can look to see -- you

20 know, he can look at a customer's buying

21 patterns, what they're buying, you know, as far

22 as the system being generated giving back

23 information to their previous sales.

24        What other reports?  I mean,

Page 131

1 there's -- sales recaps we do all the time.

2    Q.   But the other one, you could

3 actually view the specific narcotic, what that

4 customer has purchased in the three months, six

5 months, year previously to see if there's any

6 patterns there, right?

7         MR. CLARK:  Objection to

8    form.

9    A.   Yes, by drug family.

10   Q.   Got it.  All right.  And then

11 you -- this says, "Reports regarding threshold

12 limits."  Threshold -- I think you said

13 threshold reports.  Forgive me.  I don't

14 remember discussing those reports.  What reports

15 would those be?

16        MR. CLARK:  Objection; form.

17   A.   Well, I was just thinking -- just

18 a recap of where -- okay.  It's either a report

19 form or it's a screenshot where they can drill

20 into a customer -- Jim can, at any time, look on

21 the system and see where the customer is at,

22 where his threshold is set and what he -- what

23 he's purchased in the past.

24   Q.   Understanding that, are there

Page 132

1 reports that are generated monthly, though, like

2 these other reports we've discussed?

3         MR. CLARK:  Objection to

4    form.

5    A.   I don't know about monthly, but on

6 demand.

7    Q.   Okay.  So you can get realtime

8 where a customer is in relation to the

9 thresholds?

10   A.   Yes.

11   Q.   Okay.  But you don't run those as

12 a matter of course?

13        MR. CLARK:  Objection to

14   form.

15   Q.   Just when asked?

16        MR. CLARK:  Same objection.

17   A.   Right.  Yes.

18   Q.   And then "suspicious order

19 monitoring," I think we've covered those

20 reports, right?

21        MR. CLARK:  Same objection.

22   Q.   Are there any other reports that

23 we haven't talked about here today?

24        MR. CLARK:  Same objection.

Page 133

1    A.   I guess I want to say that I can

2 remember.  There's a lot of reports.  We run a

3 lot of reports.

4    Q.   Right, but regarding the --

5    A.   Relative to this, I'll say yes.

6    Q.   Regarding specifically suspicious

7 order monitoring, can you think of any other

8 reports that we haven't discussed?

9    A.   Not right now, I can't remember if

10 there are.

11   Q.   Maybe the better question is, the

12 one report that you have, you said you can run

13 it by store based on the drug equivalency, and

14 then we have the customer.  Are there any other

15 views that you can look at for that report --

16        MR. CLARK:  Objection to

17   form.

18   Q.   -- other than by store and by

19 customer?

20        MR. CLARK:  Same objection.

21   A.   I can run a report on any field.

22 I can query any field that I need to.  Are there

23 ones that generally -- I guess the question

24 you're asking me is, other than customer or

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 by -- I mean, I can run it by route.  I can run
2 it by phone number.  I can run it by Zip Code,
3 you know, if I need to.
4      Q.   Yeah, I think the better question
5 would have been, what fields are available to
6 you?
7      A.   Okay.
8      Q.   Which are route, phone number, Zip
9 Code.  Any others?
10      A.   Any field in our customer master,
11 which any -- any field that's relative to a
12 customer that we have in our database, I can run
13 a report by.
14      Q.   And then you can break out the
15 drug families?
16      A.   Sure, sure.
17      Q.   All right.  On the second page of
18 that document, first full paragraph, it says,
19 "IT Manager shall compile reports monthly
20 regarding purchases of controlled substances,
21 threshold guidelines and suspicious order
22 monitoring.  Reports are to automatically be
23 forwarded to relevant agencies and DEA as
24 appropriate.  Copies are to be given to DR/DR

Page 135

1 supervisor with all concerns discussed."
2           My understanding from spending
3 time with you here today is you talked to me
4 about the suspicious order monitoring reports
5 that you gave the DEA at the end of the month,
6 and then you talked to me about the way that you
7 gave it to the DR supervisor, right, which would
8 be a different view, correct --
9           MR. CLARK:  Objection to
10 form.
11      Q.   -- based on customer?
12           MR. CLARK:  Same objection.
13      A.   Yes.
14      Q.   All right.  And then after -- and
15 then -- go ahead.
16      A.   After when?  I mean, are you
17 giving me a specific time frame or what?  Can
18 you rephrase your question?
19      Q.   Sure.  I think that's -- unless I
20 misunderstand you, that's the way you did it
21 from 1997 to 2013.
22           MR. CLARK:  Objection to
23 form.
24      Q.   You would give the DEA those

Page 136

1 reports that we looked at?
2      A.   Right.
3      Q.   And then you would do the similar
4 report, but with a customer view, to your
5 supervisor?
6      A.   Yes.
7           MR. CLARK:  Objection to
8 form.
9      A.   Yes.  Yes, sir.
10      Q.   But I think your point is a good
11 one.  After 2013, when you stopped reporting to
12 the DEA, which I understand, you've -- we've
13 talked about that.  Did you still give those
14 reports reviewing the customers and family drugs
15 to your supervisor --
16           MR. CLARK:  Objection to
17 form.
18      Q.   -- or did that stop?
19      A.   I have ran them, okay, after the
20 fact.  We didn't hand them off to the DEA.  Not
21 every month, but I have ran them.  Our threshold
22 system also will generate a log file that we
23 monitor and look at.
24      Q.   I'm so glad you brought that up.

Page 137

1 I totally forgot about that.
2           What does a log file show?
3           MR. CLARK:  Objection to
4 form.
5      A.   Okay.  We have a log file, and as
6 part of our threshold system that any time --
7 any time a customer reaches a maximum order
8 quantity, which means a threshold that's been
9 set, it will generate a record in the log file.
10      Q.   You maintain those?
11      A.   Yes.
12      Q.   Back to 1997?
13           MR. CLARK:  Objection to
14 form.
15      Q.   Oh, no, never mind.  2008, right?
16      A.   Correct, 2008.
17      Q.   Yes, sir.  Because before 2008,
18 I'm not oversimplifying it, but Jim would be
19 involved or would get notice of orders, but
20 there wasn't this stop ship program, correct?
21           MR. CLARK:  Objection to
22 form.
23      Q.   Forget it.  You've explained it.
24 I'll withdraw.

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1     All right.  Sir, I think we're
2  done with -- are there any other reports that
3  are generated by the threshold system, other
4  than the log file that we just discussed?
5     MR. CLARK:  Objection to
6  form.
7     A.   Reports, no.  When you say
8  reports --
9     Q.   No, no.  I'm laughing because I
10  didn't ask a good question.
11     Are there any other triggers
12  and/or documents that are -- and/or e-mails that
13  are triggered from the threshold system?
14     MR. CLARK:  Objection to
15  form.
16     A.   Triggering -- you asked me if we
17  trigger e-mails from the threshold system?  No,
18  we do not.
19     Q.   Right.  Like, let's say I'm Jim
20  Schoen and somebody hits their threshold.
21     A.   Okay.
22     Q.   Am I going to get notification?
23     MR. CLARK:  Objection to
24  form.

Page 139

1     A.   Okay.  What would happen then,
2  okay, to the best of my ability --
3     Q.   Yes, sir.
4     A.   -- is that he will -- okay.  Every
5  order that hits our system -- and if it would go
6  to a threshold, that order stops.  Okay?
7     Q.   I understood that.
8     A.   He has to review at that time.  He
9  would look at that order and warrant its merit.
10  He may call the customer, try to verify, "Hey,
11  what's going on?"  And the customer could tell
12  him what his reasons were or he may request
13  additional documentation or something along that
14  line.
15     Q.   I get what you're saying.  My
16  question is, how does he know about it?  Is it
17  an e-mail or is it like a notification?
18     A.   As he -- okay.  Jim also fills the
19  orders that come through our system.  So he --
20  so as the order hits, he's constantly reviewing
21  his screen for any in-bound orders that --
22  they're held.  He has to -- he has to either key
23  a narcotic blank number in on it, or he has to
24  actually oversee that order.

Page 140

1     So he has to make a decision on
2  that order at that time, and either he's calling
3  the store or whatever.  But then he has to fill
4  the order himself.
5     Q.   Got it.
6     A.   We're not a big operation, so --
7  but we all wear a lot of hats and that's what he
8  does.  So he's aware of every order that goes
9  out of Prescription Supply.
10     Q.   Got it.
11     MR. CLARK:  Lance, I know
12  you're close to the end.  Can we
13  get a five-minute restroom break.
14     MR. REINS:  Yeah, of course.
15     THE VIDEOGRAPHER:  We're
16  going off the record at 11:18.
17     (Recess taken.)
18     THE VIDEOGRAPHER:  We're back
19  on the record at 11:27.
20  BY MR. REINS:
21     Q.   We have discussed the log file
22  created as part of the threshold system.  Would
23  that log file information ever be shared with
24  the DEA?

Page 141

1     A.   It could be.
2     Q.   Was it sent periodically?
3     A.   No, it was not.
4     Q.   Would the log file show when a
5  customer hit a threshold?  Correct?
6     MR. CLARK:  Objection to
7  form.
8     A.   The log file would show any time a
9  customer tried to order beyond his threshold.
10  Now, any order that was above threshold would go
11  for review at that time.  So if the order came
12  in electronically via an Internet source or
13  whatever, at that time that order stopped, I
14  mean, on that process, and that order would be
15  reviewed.
16     At that time, you know, and it's
17  only a matter if they hit the thresholds.  I
18  know that Jim and Tom, when they were
19  determining thresholds, tried to be on the -- I
20  think the reserve side on some of the
21  thresholds.  When they tried to figure out these
22  maximum order quantities, I believe they tried
23  to not ship -- I mean, they actually reduced
24  those quantities quite a bit from what other

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 peers were using.
2      MR. REINS: I'm going to move
3 to strike as nonresponsive.
4    Q. My question to you is, would the
5 log files show when a customer, I guess,
6 attempts to order beyond their threshold?
7      MR. CLARK: Objection to
8 form.
9    A. Yes.
10    Q. You were not part of the
11 conversations with Jim and Tom when they set
12 thresholds, were you?
13      MR. CLARK: Objection to
14 form.
15    A. Outside of just running the
16 reports.
17    Q. Right.
18    A. That's the only part -- way I was.
19    Q. Right. How they did it,
20 specifically the criteria they used, all of the
21 methodology that went into it, they would be the
22 best ones to ask, right?
23    A. Yes.
24    Q. Now, if somebody tried to order

Page 143

1 beyond their threshold, could Jim raise the
2 threshold?
3    A. Yes, he could.
4    Q. And did --
5      MR. CLARK: Objection to
6 form.
7    Q. -- if you know.
8    A. I could tell from that record
9 where his threshold was and where -- if the
10 threshold was raised at that point. It keeps
11 track of what he's set at, and I can keep track
12 of where he's at. That's one of the things that
13 it logs.
14    Q. Does it look like this
15 (indicating)?
16      MR. CLARK: Objection to
17 form.
18      MR. REINS: I'm going to
19 identify -- I'll do all that if
20 this gets me anywhere.
21      MR. CLARK: Objection to
22 form. Be specific about what the
23 "it" is.
24      MR. REINS: I know. I know,

Page 144

1 but if he says no, it's a loser,
2 so ...
3    A. This is -- yes, but there's other
4 fields here that are not in the log file.
5    Q. All right. What is the number on
6 the bottom right?
7    A. There is no number on the bottom
8 right.
9    Q. There's no PSI?
10    A. No.
11    Q. Okay.
12    A. So that --
13    Q. What fields are missing?
14      MR. REINS: I'll attach it.
15 We'll make it Plaintiffs' Exhibit
16 Number 5 [sic].
17    A. What fields are missing? No. I
18 think there's more fields here than are in the
19 log file.
20    Q. Okay. But it looks generally like
21 that?
22      MR. CLARK: Objection to
23 form.
24    A. This -- this spreadsheet was used

Page 145

1 using the log file, but it doesn't have all the
2 data the log file -- this spreadsheet has more
3 data in it besides what's on the log file, okay?
4    For example, we may have a
5 customer number in the file. We don't have the
6 customer name. That would be retrieved from the
7 customer master file. So -- and I think this
8 was just a recap of the file to show that we
9 were logging these since 2008 when we started.
10    Q. That's when it started, right?
11    A. Yeah.
12      MR. REINS: We'll make it
13 Exhibit 5 [sic].
14      - - -
15    (PSI - K. Harbauer Exhibit 6 marked.)
16      - - -
17 BY MR. REINS:
18    Q. You said you could give it to the
19 DEA, but you did not periodically give it to the
20 DEA, correct?
21      MR. CLARK: Objection to
22 form.
23    Q. The log file.
24      MR. CLARK: Same objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.   I think what Jim would do, it
2  would instigate a call, he would review that
3  order.  Because just because it's on the log
4  file doesn't necessarily mean it's a suspicious
5  order.
6    Q.   Right.  Well, after 2013, you
7  weren't using your old system anymore,
8  suspicious ordering, so this threshold system
9  became your new system apparently, right?
10    MR. CLARK:  Objection to
11  form.
12    A.   Yes.
13    Q.   So under the new system, the
14  suspicious -- I mean, you're still required to
15  do suspicious order monitoring, correct?
16    A.   And I can tell that you we are
17  doing that.
18    Q.   Using the threshold system?
19    A.   Yes.
20    Q.   But you're not using the old
21  system of pharmacies ordering more than the
22  averages anymore, are you?
23    A.   No.
24    MR. CLARK:  Objection to

Page 147

1  form.
2    Q.   You stopped doing that in 2013?
3    A.   Correct.  Correct.
4    MR. CLARK:  Let him finish
5  his question.  Give me an
6  opportunity to object.
7    Q.   So if I'm hearing you correctly,
8  your system now, if I came in and wanted to
9  audit you and look at the documents to see
10  variances in what is out of the norm or unusual
11  frequency or unusual quantity or all the things
12  that the regulations require, I would need to
13  look at the log file, correct?
14    MR. CLARK:  Objection to
15  form.
16    A.   That would be part of what you
17  would look at.
18    Q.   What else would I look at?
19    A.   I think you would use the customer
20  master.  You would look at sales history.  That
21  log file that contains that is really just any
22  time it hits a threshold, it doesn't mean that
23  that order was sent out or overridden.  We would
24  have to compare it to sales record.  All the

Page 148

1  data in that -- in there would have to be
2  compared to sales history to see if that order
3  ever really was shipped.  It doesn't show that
4  in the log file.
5    Q.   Do you understand, sitting here
6  today, that suspicious order is really regarding
7  the order, not the shipment?
8    MR. CLARK:  Objection to
9  form.
10    Q.   It's the order that's the focus,
11  right?
12    MR. CLARK:  Objection to
13  form.
14    Q.   Someone trying to order
15  medications beyond their threshold or beyond the
16  averages, which is unusual or increased
17  frequency and/or quantity?
18    A.   Yes, I --
19    MR. CLARK:  Objection to
20  form.
21    A.   Yes, I understand.
22    Q.   So the shipment is not.  The key
23  indicator is the DEA has educated your company,
24  it's the order, right?

Page 149

1    MR. CLARK:  Same objection.
2    A.   Correct, correct.
3    Q.   So you're saying now under the new
4  system post 2013, you would need to look at the
5  log file, the customer master, and the sales
6  history for trends as to that customer's
7  ordering pattern, correct?
8    MR. CLARK:  Objection to
9  form.
10    A.   No, I didn't -- I didn't say that.
11  I said that if there was a particular entry in
12  the log file, if I could tell that -- I would
13  have to go out and look at sales history for
14  that day, for that customer, for that item to
15  see if he ever shipped that order.  Those
16  orders -- most of those orders are blocked.  You
17  know, they were -- you know, they're blocked.
18    And then whether or not he
19  overrode -- you asked me about him overriding
20  the limits.  You know, he may have a reason.
21  That order may sit out there on the system and
22  there may be redundant entries there until -- if
23  Jim was waiting on, for example -- say he was
24  waiting on paperwork from the customer before he

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  would ship it. Maybe it wasn't a suspicious
2  order at that time. Just because he hit that
3  maximum, I don't think that determines that
4  makes it a suspicious order.
5      But that's not my determination to
6  make, but I don't believe that -- that wouldn't
7  have called it the DEA -- he wouldn't have
8  called DEA right away just because he over -- he
9  hit one of his maximums. Because I believe he
10 used -- Jim used that as a tool, as one of his
11 tools, to determine whether or not this guy
12 was -- an order was suspicious, the order coming
13 through was suspicious.
14     Q.   If we wanted to know whether that
15 order -- an order over their threshold was
16 actually shipped --
17     A.   Yes.
18     Q.   -- what would we need to look at?
19     MR. CLARK: Objection the to
20 form.
21     A.   We would look at the sales
22 history.
23     Q.   What does the customer master
24 show?

Page 151

1      A.   Customer master would show all the
2  relevant things about that particular store, DEA
3  number, customer, address.
4      Q.   History of purchases?
5      MR. CLARK: Were you done
6  answering?
7      A.   That -- that's fine. I'm done
8  answering, yeah.
9      Q.   History of purchases?
10     MR. CLARK: Objection to
11 form.
12     A.   Not on a detail level. Sales
13 history would have that information.
14     Q.   And whether Jim overrode the
15 initial threshold, what would show that?
16     A.   We could tell from the log file
17 and the -- well, a combination of the log file
18 and the sales history. So if there was an
19 entry, then he could see where that order was
20 shipped.
21     Q.   Perfect. It sounds like --
22 correct me if I'm wrong, Kirk. I hope you don't
23 mind me calling you Kirk.
24     A.   That's my name, Kirk.

Page 152

1      Q.   Correct me if I am wrong, but it
2  sounds like post 2013, the duty of reporting to
3  the DEA suspicious order monitoring requirements
4  kind of shifted from you and the way you guys
5  did it to really more Jim?
6      MR. CLARK: Objection to
7  form.
8      A.   More of a -- yeah, before the
9  order happens, before the order was ever shipped
10 as opposed to after. Did it shift to Jim? I
11 would think so, yes, on that. He's always had
12 that responsibility.
13     Q.   Right. But you were doing
14 periodic reports before 2013 and then it shifted
15 from no more periodic reporting to a
16 case-by-case basis is what the company did,
17 right?
18     MR. CLARK: Objection to
19 form.
20     A.   Yes.
21     Q.   If I wanted to know what orders
22 were not shipped based on their suspicious
23 nature, what would show that?
24     MR. CLARK: Objection to

Page 153

1  form.
2      A.   The same two files, the log file
3  and the sales history system.
4      Q.   So if we have those, we can see
5  what was shipped, whether it was shipped,
6  whether it was overridden, the threshold, we can
7  see what -- how it was handled?
8      A.   Yes.
9      MR. CLARK: Same objection.
10     Q.   Do you still have the capability
11 of running these reports that we looked at
12 earlier with the averages for each of these
13 stores 2013 forward -- do you still have the
14 capability of running those reports?
15     MR. CLARK: Objection to
16 form.
17     A.   Yes.
18     Q.   If I -- okay. Are you able to
19 tell me pre-2013 whether the reports that you
20 were running at that time, that we went over
21 today -- are you with me, the averages and the
22 items sold and all that; remember?
23     MR. CLARK: Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1       A.   The suspicious order variance
2 reports --
3       Q.   Yes, sir.
4       A.   -- that we went through?
5       Q.   Yes, sir.
6       A.   Okay. The ones that we modified
7 after with Janice Margreta?
8       Q.   Yes, sir. Exactly.
9       A.   Okay.
10       Q.   So those reports, can we tell
11 what, if any of those -- well, no, we know.
12 Never mind.
13       Can we tell from 1997 through
14 2013, if we wanted to see any shipments that
15 were stopped for a suspicious nature, would the
16 sales history report show that?
17       MR. CLARK: Objection to
18       form.
19       A.   Not if it was stopped. It would
20 not generate records in sales history.
21       Q.   Back then?
22       A.   Quantities would be zero shipped,
23 okay?
24       Q.   And there wasn't a log before

Page 155

1 then, correct, before 2008?
2       MR. CLARK: Objection to
3       form.
4       A.   Correct.
5       Q.   All right. I have a document I
6 want to talk to you about because you're
7 probably the person to explain it, hopefully.
8       - - -
9       (PSI - K. Harbauer Exhibit 7 marked.)
10       - - -
11 BY MR. REINS:
12       Q.   So this is going to be -- we'll
13 mark it as Plaintiffs' Exhibit Number 6 [sic].
14       Does it look familiar to you?
15       A.   Yes, sir.
16       Q.   Okay. Tell me what we're looking
17 at here.
18       A.   This is basically our threshold
19 system. It's a maximum order quantity system by
20 Online Solutions.
21       Q.   Okay. PSI --
22       A.   Documentation for the software.
23 Sorry.
24       Q.   No, don't be.

Page 156

1       PSI starting with number 274
2 through 297. So is this kind of like what we
3 looked at earlier, the Online Solutions, kind of
4 their guide, so to speak, of how the system is
5 going to work?
6       MR. CLARK: Objection; form.
7       A.   Correct. This is a guideline for
8 me to -- yeah, how the system is going to work.
9 We're designing the system at this point.
10       Q.   Okay. Now, there's some
11 handwriting on the first page there. Is that
12 your handwriting?
13       A.   Yes, it is.
14       Q.   What does it say?
15       A.   Where it's crossed off or "product
16 mix"?
17       Q.   "Product mix."
18       A.   Okay. "Product mix, class versus
19 non-class purchases."
20       Q.   What does that mean?
21       A.   This system will allow -- you can
22 look at dollar amounts of products missed,
23 whether a customer is buying -- is he buying
24 other things besides just controls. Is he just

Page 157

1 coming in to buy controls, and has the ability
2 to enforce that by dollar amount. So you can
3 look at the mix. Jim has an ability to bring
4 that up on a screen and he can see the product
5 mix --
6       Q.   Okay.
7       A.   -- for a customer.
8       Q.   Is that what we talked about
9 earlier?
10       MR. CLARK: Objection to
11       form.
12       Q.   The different class of drugs for
13 each customer?
14       MR. CLARK: Same objection.
15       A.   We talked about a lot --
16       Q.   I know, I know. I think you
17 explained it. That's fine.
18       So if we go to the next page
19 there, "Maximum" -- it's on the bottom. "Maximum
20 Units per Month for Customer Data -- Customers
21 Data. The Maximum Units per Month File would
22 consist of the following fields." One,
23 "Medication family;" two, "Customer No.: If
24 zero, all customers.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    "Minimum Sales Dollars per Month
2 for this Level; normally zero if customer number
3 is not zero.
4    "Maximum Units per Month for
5 greater than the Minimum Sales Dollars but less
6 than the first larger Minimum Sales Dollars per
7 Month for this Medication Family and Customer
8 Number.
9    "New Customer Flag, which
10 identifies this record to be used for a Customer
11 that has no sales in prior months.  Only one per
12 customer number and Medication Family."
13    Is that how yours is structured?
14    A.   Yes.
15    Q.   And what is that document called?
16 Is that --
17    MR. CLARK:  Objection to
18    form.
19    A.   The document here in -- what is
20 this document?
21    Q.   No.  What do you call it
22 internally, this -- what shows this information?
23 Is this the log?
24    A.   No.  This is just a maximum units

Page 159

1 per month file.  It's a data file that
2 contains -- basically what it's summaring [sic],
3 there's a way to set up a record in the file
4 that -- say it's hydrocodone and that's a drug
5 family.  So we could have that -- that drug
6 family's hydrocodones.  And we could have a zero
7 out there, which is saying right here zero if
8 it's all customers, which would be a default
9 amount.
10    And then each individual customer,
11 you could put a customer number record in there
12 with that drug family name, and you could set
13 individually those thresholds.  You could move
14 them up or down, wherever you want to, is what
15 it's saying.
16    Q.   Okay.  How are you -- and I guess
17 I should ask this.  How were your thresholds
18 set?
19    MR. CLARK:  Objection to
20    form.
21    A.   How were they set?
22    Q.   Like what was the threshold, the
23 number of what?
24    MR. CLARK:  Objection; form.

Page 160

1    A.   It's a number of pills, basically.
2    Q.   Okay.
3    A.   Pills or it could be liquid form
4 too.
5    Q.   And how would this, what we just
6 went through, play into that, if at all --
7    MR. CLARK:  Objection; form.
8    Q.   -- in your system?
9    MR. CLARK:  Same objection.
10    A.   What this is is basically on the
11 customer's side what -- basically it's a -- it's
12 a setting for a per customer basis.  So there
13 would be an entry for -- either it would default
14 or it would go to an individual customer where
15 he could have a -- set a minimum or a maximum
16 quantity, I mean.  Not a minimum.
17    Q.   But the overview, when we look at
18 the first page, first paragraph, it says -- the
19 overview, it says, "The wholesaler determines
20 the amount of certain medication families for a
21 month and stops shipments of items in that
22 medication family to a customer that makes the
23 amount exceed the maximum."
24    This is the threshold system you

Page 161

1 spoke to me about, correct?
2    A.   Correct.
3    Q.   And there's a line through the
4 first sentence that says, "The DEA is requiring
5 wholesalers to limit the sales of certain
6 medication families to customers."
7    Did you draw a line through that?
8    A.   Yes, I did.
9    Q.   Why?
10    A.   When we reviewed this with the
11 DEA, and we went through it with the agent,
12 she -- she said we are not -- this is not our
13 requirement.  And at that time I drew a line
14 through it.  That was in the documentation for
15 this.  This is what I got from Online Solutions.
16 And they didn't want to go on record stating
17 that they're requiring us to limit the sale of
18 certain medication families to customers.
19    Q.   Okay.
20    A.   So I drew a line through that.
21    Q.   So is this -- when you start
22 getting into the PSI-277, there's a chart up
23 there.  It says, "Here's an example of the
24 maximum units per month file."

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    Is that how you guys do it?
2    A.    "Here's an example of the maximum
3  units per month file."  Okay.
4    Q.    You guys don't use dollars, it
5  doesn't look like?
6    A.    No, we're not -- we're not based
7  by dollars at all.  We don't --
8    Q.    You're based on pills?
9    A.    We make sure -- we're looking at
10  the quantities they're buying.  We're not really
11  relevant -- dollars aren't a big factor.
12  Outside that, you know, is this guy just coming
13  in to buy controls and -- and that would tip a
14  flag off right there, and we probably
15  wouldn't -- we would not sell to them.
16    Q.    It sounds like there's a lot of
17  effort, from speaking with you, into setting the
18  threshold.  I mean, that's not something done
19  willy-nilly, right?  There's a lot of --
20    A.    Absolutely.
21    MR. CLARK:  Objection to
22  form.
23    Q.    You said "absolutely."  What do
24  you mean?

Page 163

1    A.    I believe there is, yeah, a lot of
2  thought goes into it.
3    Q.    All right.  On the next page
4  there, 278.  It kind of talks about, there in
5  the middle, it says, "For the above example, the
6  units shipped is 1,100."
7    When you look at this page and
8  it's doing the mathematical equations, but is it
9  basically saying, "Hey, once you hit your -- if
10  you have 10,000 and you're at 8,000, well then
11  your threshold limit is 2,000," right?  I mean,
12  is that essentially what we're doing here with
13  the math?
14    MR. CLARK:  Objection to
15  form.
16    A.    If they're set at 10,000 pills and
17  they have 8,000 -- currently already purchased
18  8,000 pills at that time.  So they really are --
19  only can buy 2,000 pills more.
20    Q.    That's right.
21    A.    So if they put an order in for
22  greater than that amount, it definitely would
23  stop the order right there and then.
24    Q.    Let me ask you a question.  If

Page 164

1  they put in an order for 3,000, what would
2  happen?
3    A.    It would stop the order, and it
4  would generate a record in the log file.
5    Q.    All right.  If you can go to 280.
6  Maximum Monthly Quantity Prescription Supply.
7  What are we looking at here?
8    MR. CLARK:  Objection to
9  form.
10    A.    Okay.  This is an e-mail from -- I
11  believe this came directly from Don Magdantz
12  from Online Solutions --
13    Q.    Okay.
14    A.    -- to me in regards to the
15  modifications we needed to make to our system,
16  which is Online Solutions, and discussed what
17  work would be done by them and us.  And this is
18  basically the things that we needed to add to
19  our system to implement their system, the fields
20  we needed to add.
21    For example, on the customer
22  master file, there's a flag out there, the
23  CINFO, which is a one character field that would
24  be added to the customer master.  And then

Page 165

1  medication families, that's the new -- there's a
2  new file there.  So this entire one is the
3  medication family file that you -- that we
4  discussed earlier on the one page.
5    The maximum -- there's a new file
6  out there, that's the log file -- or the log
7  file is down below.  FM maximum monitor is
8  another file out there.  It has to do with
9  dollars.  But that's what these are.  And this
10  last, this is a log file.
11    So FGMMXLOG is the file, the new
12  file.  That's the log file.  This is what's in
13  the log file, and it continues on to the next
14  page.
15    Q.    Okay.  This is everything that's
16  in the log file?
17    A.    Yeah.  Those are all the
18  information or the fields or price buckets or --
19  you'd say, or different things that -- it just
20  tells where they are located in the file.
21    And then after that, order
22  processing system, these are modifications to
23  our order entry system.  OP170W is our CRT order
24  entry.  That's our telemarketers and anybody

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  that we would hand key an order in that they
2  take on the phone, for example.  And these are
3  the modifications that would be in here.
4       Relatively the main -- the
5  important thing on this one is, if they try to
6  buy a quantity, they'll get a message that says,
7  "Quantity order exceeds maximum quantity per
8  month."  It displays it and stops the order and
9  changes a shipped code to an M.  And that's just
10  in order processing.
11       And then I don't know how far you
12  want to go through this.
13     Q.  No, I don't.
14     A.  Because this other -- oh, okay.
15  Anyway.
16     Q.  Yeah, I mean, just generally, I
17  mean, it's just --
18     A.  These are the screenshots of the
19  software, yeah.
20       MR. CLARK:  Let him ask a
21  question.
22     Q.  The -- yeah, I mean, let's finish
23  it up, because, you know, it may be a little
24  over my head, but other people -- so the

Page 167

1  screenshots, what page are you on?  I'm sorry?
2     A.  This is 282.
3     Q.  Yes, sir.  Okay.  And what are
4  those screenshots showing?
5     A.  These are just basically what a
6  screen would look like in -- this is kind of
7  pseudocode, basically, for a programmer, I guess
8  I would say, where a numeric field, it looks
9  like it's a 6666, you can see that's a numeric
10  field.  O -- anything that says like "shipped to
11  customer," well, that's a numeric field.  The
12  customer number would be there.
13       And then after that all the O,
14  that's an output field.  It's probably read from
15  the customer master.  So that would be the
16  customer's name.  And it's basically a way for
17  him to convey to me what these screens look
18  like.
19     Q.  That's exactly what I thought.
20     A.  Okay.  This is what I do.  And I
21  love talking about it.  And I'll be happy to
22  talk about that.
23     Q.  No, that's okay.
24       Let me kind of shift.  I do want

Page 168

1  to talk about the document behind it in a
2  minute, but before we do that, I want to shift
3  because I want to make sure I have an
4  understanding, because I get one shot with you.
5       After 2013 -- I know what you did
6  before that.  But after 2013, there was no --
7  you were not involved in the periodic reporting
8  of suspicious orders.  We've covered that,
9  correct?
10       MR. CLARK:  Objection to
11  form.
12     Q.  Meaning the monthly reports which
13  you had been doing previously, right?
14       MR. CLARK:  Same objection.
15     A.  I did not produce the same reports
16  I did prior to 2013, yes.
17     Q.  And if I understood you right, you
18  did not produce -- there was no periodic
19  reporting, meaning you did not submit a
20  different kind of report every month, correct?
21     A.  To the DEA?
22     Q.  Correct.
23       MR. CLARK:  Same objection.
24       Go ahead.

Page 169

1     A.  To the DEA?
2     Q.  Yes, sir.
3     A.  No, I did not.
4     Q.  Okay.  Now, do you know if any
5  suspicious report monitoring or any variance
6  reports or things of that nature were submitted
7  after 2013?
8       MR. CLARK:  Objection to
9  form.
10     Q.  Do you know?
11       MR. CLARK:  Same objection.
12     A.  I guess the similar of that
13  nature, reports maybe not from me, but I know
14  that -- well, I know that I -- I have recapped
15  sales on certain customers if they would e-mail
16  me or in regards to that.  Would you call that a
17  suspicious order monitoring report?  Usually
18  there's -- you know, the DEA, they're doing an
19  audit or something or an agent there wants to
20  know what this guy's purchases are, so I would
21  submit those, but ...
22     Q.  That would be at the request of
23  the DEA?
24     A.  At the request of the DEA.

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    Q.    Yes, sir.
2    A.    As far as you say or other, I know
3  that if there was an issue, Jim would have
4  picked up the phone -- and he was probably on
5  that first basis.  He would pick up the phone
6  and talk to the DEA agent himself.
7    Q.    So I want to stick with you --
8    A.    Okay.
9    Q.    -- because I don't want --
10   A.    I can only answer for me.  That's
11  true.
12   Q.    That's my point, and I'm not --
13  I'm not saying your wrong, but I only want you
14  to answer for you.
15        So after 2013, after the reports,
16  which we went over in depth before, you did not
17  submit anything other than in response to
18  queries from the DEA, correct?
19        MR. CLARK:  Objection to
20  form.
21   A.    Correct.
22   Q.    Now, what Jim did or didn't do
23  from that point forward to now, he'd be the best
24  one to ask?

Page 171

1    A.    Yeah, right.  Yes.
2    Q.    Now, and I don't mean that
3  flippantly, I mean, were you -- if you were in
4  the room or if he CC'd you on it or if there
5  were real -- you had personal knowledge of these
6  things, you can tell me, but I'm trying to keep
7  you out of things that you think may have
8  happened as opposed to you knew they happened.
9        MR. CLARK:  Objection to
10  form.
11   Q.    Make sense?
12   A.    Yes.
13   Q.    Okay.  So Jim would be the best
14  one to ask?
15   A.    Yes.
16   Q.    All right.  Did the policy -- did
17  anybody ever talk about -- because all the
18  policies talk about your duties and
19  responsibilities as the IT manager.  When there
20  was this shift in how you guys did things in
21  2008, was there ever any talk about updating or
22  revising the policies regarding stopping
23  shipments and/or who is now responsible for
24  reporting?

Page 172

1        MR. CLARK:  Objection to
2  form.
3    A.    Well, Candy, my sister, she would
4  be in charge with the regulatory, and she's the
5  one that sets up these procedures.  And we try
6  to come up with policies, and, you know, we are
7  VAWD accredited.  You know, we try to do what
8  the DEA is requesting us to do.  You know, to
9  the best of our abilities, we try to follow the
10  law.  And that's what she does.
11        Now, as far as the policies, if
12  she -- you know, I guess the question is what?
13  Can you rephrase that?  I kind of lost myself
14  here on that.
15   Q.    That's okay.  I think what you're
16  saying is your sister would be the most
17  knowledgeable person about policies?
18   A.    Right.
19   Q.    Yep.  We've talked about post
20  2013, that the sales history, coupled with the
21  log, would show when a shipment was stopped due
22  to a quote/unquote suspicious nature.  We talked
23  about that, correct?
24        MR. CLARK:  Objection to

Page 173

1  form.
2    Q.    If someone reached their
3  threshold.
4        MR. CLARK:  Same objection.
5    A.    Say that again.
6    Q.    Sure.  I asked you earlier, if I
7  wanted to know whether somebody who had reached
8  their threshold, whether the order was stopped
9  or whether it was shipped, you said the sales
10  history, coupled with the log, would show us
11  that?
12   A.    Yes.
13   Q.    Before 2013, what would you look
14  at?
15        MR. CLARK:  Objection to
16  form.
17   Q.    Same things?  Well, not the same
18  things.
19   A.    Sales history.
20   Q.    Yeah.  Which document Number 5
21  includes that information, correct?
22        MR. CLARK:  Objection to
23  form.
24   A.    This is from the log file.  That

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 would be after 2008.
2     Q.   Gotcha.  Before that it was
3 just --
4     A.   And I don't know if that is --
5     Q.   It's a compilation.
6     A.   Okay.  Yeah, that log file that
7 you're looking at there, I don't know what that
8 is exactly.  It's a spreadsheet --
9     Q.   Right.
10     A.   -- that I created.
11     Q.   Exactly right.  All right.  Moving
12 on to 286.  So this looks like -- and it's part
13 of this package.  Do you know why this is in
14 here?
15     A.   No, I do not.
16     Q.   Okay.
17     A.   Monthly quantity, that would be
18 the end of that.
19     Q.   Any other system changes in how
20 you guys reported how you guys -- strike that.
21        Any other systems changes in your
22 databases, your computer software, all those
23 things we've touched on today, that we haven't
24 talked about, specifically regarding suspicious

Page 175

1 order monitoring and/or shipments or stopping
2 shipments, things of that nature?
3        MR. CLARK:  Objection to
4     form.
5     A.   That really covers a lot, what you
6 just said, and I guess I am constantly in a
7 state of change all the time.
8     Q.   Sure.
9     A.   I'm constantly upgrading and
10 upgrading.  Can I say, the system basically is
11 working the way it was there.  I haven't -- I
12 haven't made any major modifications, that I
13 know of.  There may be an adjustment to a screen
14 or something along that nature, but I would say
15 there has been no changes to that.  But I'm
16 constantly working on programs of all types, as
17 far as sales history and all that.
18     Q.   Understood.  But how you track,
19 monitor narcotics, report suspicious orders,
20 stop shipments, raise thresholds, we've covered
21 all of your knowledge base on those issues; fair
22 to say?
23        MR. CLARK:  Objection to
24     form.

Page 176

1     A.   Yes.
2        MR. REINS:  Thank you for
3 your time.  I don't have any more
4 questions.
5        THE WITNESS:  Thank you, sir.
6        MR. CLARK:  I have no
7 questions.
8        THE VIDEOGRAPHER:  We're
9 going off the record at 12:00 p.m.
10        (Recess taken.)
11        MR. REINS:  Just for
12 clarification in the deposition,
13 the summary chart that was
14 referenced was identified as
15 Exhibit Number 5.  It's actually
16 Exhibit Number 6 when we were
17 talking about the log-in and
18 similar type information.
19        And Exhibit Number 7 is the
20 Prescription Supply maximum monthly
21 units form, which is Bates numbered
22 274 through 297.
23        (Signature not waived.)
24            - - -

Page 177

1        Thereupon, at 12:00 p.m., on Wednesday,
2 February 27, 2018, the deposition was concluded.
3            - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 178

```
 1              CERTIFICATE
 2  STATE OF OHIO        :
              SS:
 3  COUNTY OF _____:
 4
 5       I, KIRK HARBAUER, do hereby certify that I
 6  have read the foregoing transcript of my
 7  cross-examination given on February 27, 2018; that
 8  together with the correction page attached hereto
 9  noting changes in form or substance, if any, it is
10  true and correct.
11       _____
              KIRK HARBAUER
12
13       I do hereby certify that the foregoing
14  transcript of the cross-examination of KIRK HARBAUER
15  was submitted to the witness for reading and signing;
16  that after he had stated to the undersigned Notary
17  Public that he had read and examined his cross-
18  examination, he signed the same in my presence on the
19  _____ day of _____, 2019.
20
       _____
21          NOTARY PUBLIC - STATE OF OHIO
22
23  My Commission Expires:
24  _____, _____.
```

Page 179

```
 1              CERTIFICATE
 2  STATE OF OHIO        :
              SS:
 3  COUNTY OF FRANKLIN  :
 4       I, Carol A. Kirk, a Registered Merit
        Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
        certify that the within-named KIRK HARBAUER was by me
 6  first duly sworn to testify to the truth, the whole
        truth, and nothing but the truth in the cause
 7  aforesaid; that the deposition then given by him was
        by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
        transcript of the deposition so given by him; that the
 9  deposition was taken at the time and place in the
        caption specified and was completed without
10  adjournment; and that I am in no way related to or
        employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
        nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
        28(D).
13
         IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
        on this 4th day of March 2019.
15
16
17
18       _____
            CAROL A. KIRK, RMR
19          NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21            ---
22
23
24
```

Page 180

```
 1          DEPOSITION ERRATA SHEET
 2  I, KIRK HARBAUER, have read the transcript
    of my deposition taken on the 27th day of February
 3  2019, or the same has been read to me.  I request that
    the following changes be entered upon the record for
 4  the reasons so indicated.  I have signed the signature
    page and authorize you to attach the same to the
 5  original transcript.
 6  Page  Line  Correction or Change and Reason:
 7  ___ ____ _____
 8  ___ ____ _____
 9  ___ ____ _____
10  ___ ____ _____
11  ___ ____ _____
12  ___ ____ _____
13  ___ ____ _____
14  ___ ____ _____
15  ___ ____ _____
16  ___ ____ _____
17  ___ ____ _____
18  ___ ____ _____
19  ___ ____ _____
20  ___ ____ _____
21  ___ ____ _____
22  ___ ____ _____
23  ___ ____ _____
24  Date _____ Signature _____
```