EXHIBIT 310

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5

     IN RE NATIONAL PRESCRIPTION  | Case No. 17-MD-2804

 6                                |

     OPIATE LITIGATION            | Hon. Dan A. Polster

 7                                |

     APPLIES TO ALL CASES         |

 8

 9                        - - -

10            Thursday, November 15, 2018

11                        - - -

12

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

13

                    CONFIDENTIALITY REVIEW

14

                        - - -

15

16

17

          Videotaped deposition of JEFF ABERNATHY,

18   held at the offices of Mitchell Williams,

     4206 South J.B. Hunt Drive, Suite 200, Rogers,

19   Arkansas, commencing at 9:37 a.m., on the above

     date, before Susan D. Wasilewski, Registered

20   Professional Reporter, Certified Realtime

     Reporter and Certified Realtime Captioner.

21

22

23                        - - -

24            GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

25                  deps@golkow.com
```

## Page 2

1  APPEARANCES:
2  CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO
   BY: ZACHARY S. BOWER, ESQUIRE
3      MICHAEL A. INNES, ESQUIRE
   5 Becker Farm Road
4  Roseland, New Jersey 07068
   (973) 994-1700
5  zbower@carellabyrne.com
   minnes@carellabyrne.com
6  Representing Plaintiffs
7
   JONES DAY
8  BY: PETER J. MAZZA, ESQUIRE
   4655 Executive Drive, Suite 1500
9  San Diego, California 92121
   (858) 314-1200
10 pmazza@jonesday.com
   Representing Walmart
11
12 JONES DAY
   BY: SCOTT B. ELMER, ESQUIRE
13 77 West Wacker
   Chicago, Illinois 60601
14 (312) 782-3939
   selmer@jonesday.com
15 Representing Walmart
16
   PELINI CAMPBELL & WILLIAMS LLC
17 BY: CRAIG M. EOFF, ESQUIRE
   8040 Cleveland Avenue NW, Suite 400
18 North Canton, Ohio 44720
   (330) 305-6400
19 ceoff@pelini-law.com
   Representing Prescription Supply Inc.
20
21 BARBER LAW FIRM
   BY: M. EVAN STALLINGS, ESQUIRE
22 425 West Capitol Avenue, Suite 3400
   Little Rock, Arkansas 72201
23 (501) 372-6175
   estallings@barberlawfirm.com
24 Representing Cardinal Health
25

## Page 3

1  APPEARANCES VIA TELEPHONE AND STREAM:
2  REED SMITH LLP
   BY: ABIGAIL PIERCE, ESQUIRE
3  1717 Arch Street, Suite 3100
   Philadelphia, Pennsylvania 19103
4  (215) 241-7909
   Abigail.pierce@reedsmith.com
5  Representing AmerisourceBergen Drug Corporation
6
   MARCUS & SHAPIRA LLP
7  BY: DARLENE NOWAK, ESQUIRE
   One Oxford Centre, 35th Floor
8  Pittsburgh, Pennsylvania 15219
   (412) 471-3490
9  nowak@marcus-shapira.com
   Representing HBC Service Company
10
11 MORGAN, LEWIS & BOCKIUS LLP
   BY: JAMES A. NORTEY, II, ESQUIRE
12 1000 Louisiana Street, Suite 4000
   Houston, Texas 77002-5005
13 (713) 890-5000
   james.nortey@morganlewis.com
14 Representing Rite Aid
15
   ROPES & GRAY LLP
16 BY: TORRYN TAYLOR, ESQUIRE
   Three Embarcadero Center
17 San Francisco, California 94111
   (415) 315-6300
18 torryn.taylor@ropesgray.com
   Representing Mallinckrodt
19
20 BARTLIT BECK LLP
   BY: ALEX HARRIS, ESQUIRE
21 1801 Wewatta Street, Suite 1200
   Denver, Colorado 80202
22 (303) 592-3100
   alex.harris@bartlit-beck.com
23 Representing Walgreens
24 ALSO PRESENT:
   DAN LAWLOR, Videographer
25 PAUL D. MORRIS, ESQUIRE, Walmart Legal

## Page 4

1         - - -
2      I N D E X
3         - - -
4  Testimony of: JEFF ABERNATHY          Page
5    DIRECT EXAMINATION BY MR. BOWER................  8
6    CROSS-EXAMINATION BY MR. MAZZA................ 275
7    REDIRECT EXAMINATION BY MR. BOWER............. 278
8
9       E X H I B I T S
10      (Attached to transcript)
10 JEFF ABERNATHY DEPOSITION EXHIBITS          PAGE
11
   Walmart-  07-6045 Pharmacy Logistics    21
12 Abernathy  Organizational Chart
   Exhibit 1  WMT_MDL_000012771
13
   Walmart-  Pharmacy Distribution     37
14 Abernathy  WMT_MDL_000012752
   Exhibit 2  Health & Wellness Distribution
15         WMT_MDL_000012737
16 Walmart-  E-mail - Subject: CII Limits    48
   Abernathy  WMT_MDL_000009319 and 9320
17 Exhibit 3
18 Walmart-  E-mail - Subject: CII Ordering   63
   Abernathy  07/23/12
19 Exhibit 4  WMT_MDL_000009321 through 9323
20 Walmart-  E-mail - Subject: Over 20 Report  76
   Abernathy  2.12.13
21 Exhibit 5  WMT_MDL_000009423 and 9424
22 Walmart-  E-mail - Subject: Over 20 Report  82
   Abernathy  7.3.13
23 Exhibit 6  WMT_MDL_000009987 through 9989
24
25

## Page 5

1       E X H I B I T S
2      (Attached to transcript)
3  JEFF ABERNATHY DEPOSITION EXHIBITS          PAGE
4
   Walmart-  E-mail - Subject: Meeting Notes -   90
5  Abernathy  Please Review
   Exhibit 7  WMT_MDL_000009872 through 9875
6
   Walmart-  E-mail - Subject: Agenda      104
7  Abernathy  WMT_MDL_000009838 through 9840
   Exhibit 8
8
   Walmart-  E-mail - Subject: Reddwerks Order  112
9  Abernathy  Alerts
   Exhibit 9  WMT_MDL_000017565 through 17569
10
   Walmart-  E-mail - Subject: Over 20 Report  117
11 Abernathy  4.3.14
   Exhibit 10  WMT_MDL_000009397 and 9398
12
   Walmart-  E-mail - Subject: Over 20 Report  123
13 Abernathy  8.14.14
   Exhibit 11  WMT_MDL_000009393 and 9394
14
   Walmart-  E-mail - Subject: Policy to be    129
15 Abernathy  Covered in Today's Call
   Exhibit 12  WMT_MDL_000017510 through 17514 and
16         19182 through 19184
17 Walmart-  E-mail - Subject: Over 20/50 Report 139
   Abernathy  WMT_MDL_000009807 and 9808
18 Exhibit 13
19 Walmart-  E-mail - Subject: SOM Interim    159
   Abernathy  Process - Launch Oct 27
20 Exhibit 14  WMT_MDL_000011656 through 11659
21 Walmart-  E-mail - Subject: Logistics SOM   176
   Abernathy  webform
22 Exhibit 15  WMT_MDL_000016261 through 16263
23 Walmart-  E-mail - Subject: Control Drug    179
   Abernathy  Monitoring
24 Exhibit 16  WMT_MDL_000009075
25

| | Page 6 |
|---|---|
| 1 | E X H I B I T S |
| 2 | (Attached to transcript) |
| 3 | JEFF ABERNATHY DEPOSITION EXHIBITS        PAGE |
| 4 | Walmart-    E-mail - Subject:  Quantity Cuts      181 |
|   | Abernathy    WMT_MDL_000009277 |
| 5 | Exhibit 17 |
| 6 | Walmart-    E-mail - Subject:  405 report DC      185 |
|   | Abernathy    6045- Sept. |
| 7 | Exhibit 18   WMT_MDL_000042782 and 42783 |
| 8 | Walmart-    E-mail - Subject:  SOM web forms      188 |
|   | Abernathy    WMT_MDL_000016313 |
| 9 | Exhibit 19 |
| 10 | Walmart-    E-mail - Subject:  Over 20 Report     203 |
|   | Abernathy    WMT_MDL_000030175 through 30177 |
| 11 | Exhibit 20 |
| 12 | Walmart-    E-mail - Subject:  Over 20 Report     203 |
|   | Abernathy    WMT_MDL_000030184 through 30186 |
| 13 | Exhibit 21 |
| 14 | Walmart-    Health &Wellness POM Alerts Guide     212 |
|   | Abernathy    3/31/2016 |
| 15 | Exhibit 22   WMT_MDL_000034340 |
| 16 | Walmart-    E-mail - Subject:  Oxy List Update     234 |
|   | Abernathy    WMT_MDL_000008070 and 8071 |
| 17 | Exhibit 23 |
| 18 | Walmart-    E-mail - Subject:  H&W Weekly Update   254 |
|   | Abernathy    Week 2 |
| 19 | Exhibit 24   WMT_MDL_000001004 and 1005 |
| 20 | Walmart-    E-mail - Subject:  MCKESSON AGREES     243 |
|   | Abernathy    TO PAY RECORD $150 MILLION |
| 21 | Exhibit 25   SETTLEMENT FOR FAILURE TO REPORT |
|   |            SUSPICIOUS ORDERS OF PHARMACEUTICAL |
| 22 |            DRUGS |
|   |            WMT_MDL_000002729 through 2731 |
| 23 | |
| 24 | |
| 25 | |

| | Page 7 |
|---|---|
| 1 | E X H I B I T S |
| 2 | (Attached to transcript) |
| 3 | JEFF ABERNATHY DEPOSITION EXHIBITS        PAGE |
| 4 | |
|   | Walmart-    E-mail - Subject:  Control Flow       247 |
| 5 | Abernathy    WMT_MDL_000034546 and 34547 |
|   | Exhibit 26 |
| 6 | |
|   | Walmart-    Drug Diversion Review Documents       261 |
| 7 | Abernathy    WMT_MDL_000045963 through 46007 |
|   | Exhibit 27 |
| 8 | |
|   | Walmart-    Walmart Inc.'s Amended and           257 |
| 9 | Abernathy    Supplemental Objections and |
|   | Exhibit 28   Responses to Plaintiffs' First Set |
| 10 |            of Interrogatories to Wal-Mart Inc. |
| 11 | Walmart-    E-mail - Subject:  WV call follow up   269 |
|   | Abernathy    WMT_MDL_000011626 through 11629 |
| 12 | Exhibit 29 |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 8 |
|---|---|
| 1 | - - - |
| 2 | THE VIDEOGRAPHER:  We are now on the record. |
| 3 | My name is Dan Lawlor.  I'm a videographer with |
| 4 | Golkow Litigation Services.  Today's date is |
| 5 | November 15th, 2018, and the time is 9:37 a.m. |
| 6 | This video deposition is being held in |
| 7 | Rogers, Arkansas, in the matter of |
| 8 | National Prescription Opiate Litigation MDL |
| 9 | Number 2804. |
| 10 | The deponent today is Jeff Abernathy.  The |
| 11 | counsel will be noted on the stenographic record. |
| 12 | The court reporter is Susan Wasilewski and |
| 13 | will now swear in the witness. |
| 14 | THE COURT REPORTER:  Sir, would you raise |
| 15 | your right hand? |
| 16 | Do you solemnly swear or affirm the |
| 17 | testimony you're about to give will be the truth, |
| 18 | the whole truth, and nothing but the truth? |
| 19 | THE WITNESS:  Yes. |
| 20 | THE COURT REPORTER:  Thank you. |
| 21 | JEFF ABERNATHY, called as a witness by the |
| 22 | Plaintiffs, having been duly sworn, testified as |
| 23 | follows: |
| 24 | DIRECT EXAMINATION |
| 25 | BY MR. BOWER: |

| | Page 9 |
|---|---|
| 1 | Q.  Good morning, Mr. Abernathy.  How are you |
| 2 | today? |
| 3 | A.  Good. |
| 4 | Q.  Thank you for being here.  We appreciate it. |
| 5 | A.  Thank you. |
| 6 | Q.  Have you ever been deposed before? |
| 7 | A.  No, sir. |
| 8 | Q.  No, sir.  So just -- before we get started, |
| 9 | let me go over a few important rules.  I think the |
| 10 | most important of which is make sure you understand |
| 11 | my questions.  So I would ask that at any point |
| 12 | during the day you don't understand the question, |
| 13 | will you let me know and I'll try to rephrase so you |
| 14 | understand it. |
| 15 | Do you understand that? |
| 16 | A.  Yes. |
| 17 | Q.  And if you don't ask me, if you don't let me |
| 18 | know, I'll expect that you do understand the |
| 19 | question. |
| 20 | A.  Okay. |
| 21 | Q.  Okay?  And perhaps the most other important |
| 22 | rule is that you do not answer with a shaking your |
| 23 | head or a nod.  You must answer verbally yes or no. |
| 24 | Okay? |
| 25 | A.  Yes, sir. |

Highly Confidential – Subject to Further Confidentiality Review

| Page 10 | Page 12 |
|---|---|
| 1     MR. MAZZA: Mr. Bower, can I ask, are we -- | 1   there is a dispute about that, and you've been in |
| 2   are we going to enter our appearances on the | 2   communication with Ms. Fulmerton from our office. |
| 3   record? | 3   But I can represent that all the documents that |
| 4     THE COURT REPORTER: They'll be noted on the | 4   Mr. Abernathy reviewed have been produced. |
| 5   stenographic record. | 5     MR. BOWER: Okay. |
| 6     MR. MAZZA: Okay. Thanks. | 6 BY MR. BOWER: |
| 7 BY MR. BOWER: | 7   Q. And when did you meet with outside counsel? |
| 8   Q. Mr. Abernathy, you understand you're under | 8   A. During the same time. |
| 9   oath today, correct? | 9   Q. Same time. Was outside counsel present for |
| 10   A. Yes, sir. | 10 all those meetings? |
| 11   Q. Okay. Are you taking any medication or is | 11   A. Yes, sir. |
| 12 there any other reason that would interfere with | 12   Q. Other than the attorneys that sit here |
| 13 your ability to testify truthfully today? | 13 today, any other outside counsel that was present? |
| 14   A. No. | 14   A. There were some other outside counsel that, |
| 15   Q. Okay. Have you ever testified in any other | 15 like I said, they came in and out as well. |
| 16 type of legal proceeding other than a deposition? | 16   Q. Okay. So the folks who came out -- in and |
| 17   A. No. | 17 out were outside counsel or Walmart counsel? |
| 18   Q. How did you prepare for today's deposition? | 18   A. They were both. |
| 19   A. I met with some Walmart legal people and | 19   Q. Okay. Do you know the names of any of those |
| 20 some outside counsel this week. | 20 folks? |
| 21   Q. Who did you meet with at Walmart? | 21   A. One of them, her name was Tina. |
| 22   A. Paul was there. There were some other -- | 22   Q. Okay. Any other names you recall? |
| 23 other guys that came in and out. I don't -- I don't | 23   A. No, sir. |
| 24 know who they were. | 24   Q. Can you briefly describe for us your |
| 25   Q. Okay. Approximately how many people did you | 25 education post high school? |

| Page 11 | Page 13 |
|---|---|
| 1 meet with? | 1   A. I have a bachelor's degree in finance from |
| 2   A. There was probably five or six people in | 2 the University of Louisiana at Monroe. |
| 3 there, most of the day. | 3   Q. What year did you graduate? |
| 4   Q. Okay. Were they all attorneys, do you know? | 4   A. 1997. |
| 5   A. I believe they were. | 5   Q. Since 1997, have you received any other |
| 6   Q. Do you know whether they were or not? | 6 educational -- formal educational training? |
| 7   A. I don't know that they were. I -- I just -- | 7   A. No. |
| 8 I assumed they were. They were counsel, is what | 8   Q. Have you received any training in your |
| 9 they said, so -- | 9 lifetime regarding suspicious order monitoring for |
| 10   Q. About how long did you meet with them? | 10 controlled substances? |
| 11   A. We met about probably six hours on Tuesday | 11   A. I have received training, you know, just |
| 12 and about the same amount of time on Wednesday. | 12 on-the-job training and those types of things. |
| 13   Q. Did you review any documents during these | 13   Q. Well, when you say "training," what are you |
| 14 meetings? | 14 referring to, other than on-the-job training? |
| 15   A. I saw a few documents. | 15   A. Just people showing me, "This is what you |
| 16   Q. Did any of those documents refresh your | 16 should look for, these are the things that we look |
| 17 recollection for today's testimony? | 17 for," then just the policies and procedures that we |
| 18   A. No, sir. | 18 have at the DC, following those, and those types of |
| 19   Q. Do you know whether all of those documents | 19 things. |
| 20 have been produced in this litigation? | 20   Q. And when you say "at the DC," you're |
| 21   A. I don't know. | 21 referring to DC6045? |
| 22   Q. Do you understand that to the extent that | 22   A. Yes, sir. |
| 23 those documents were not produced, you should have | 23   Q. Okay. So you graduated from college in |
| 24 brought them with you here today? | 24 1997, correct? |
| 25     MR. MAZZA: I object. I understand that | 25   A. Yes, sir. |

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    Q.   And then can you describe your job history
2    post graduating from college?
3    A.   So I became an assistant manager in Walmart
4    stores in 1997.  I then moved to the -- to the home
5    office in Bentonville in 2000 and took a job at --
6    with internal audit.
7        Then in 2006, I took the role as the
8    operations manager for the returns process at 6045.
9        And in 2007, I moved over to become an
10   operations manager for the C2 -- the C2 side of the
11   business, the C2 distribution.
12       And in 2016, I took a position at the home
13   office with our pharmacy -- pharmacy order
14   monitoring team.  I did that for a year.
15       And then in 2017, I moved back as the
16   operations manager for the C2 distribution.
17   Q.   So in your answer -- we can appreciate you
18   providing us that background -- you used -- I just
19   want to make sure we're talking about the same
20   thing.  You used "the C2 side of the business" and
21   "the C2 distribution."  Are those the same things?
22   A.   Yes.  Yes.  I was the operations manager for
23   the C2 distribution warehouse.
24   Q.   So you had that position from 2007 to 2016,
25   correct?

Page 15

1    A.   Yes, sir.  And --
2    Q.   And then again from 2016 to --
3    A.   2017 to present.
4    Q.   Okay.  Can you -- I don't want to spend too
5    much time on this, but can you just spend -- or
6    describe for us briefly what you did as the
7    assistant manager for Walmart stores?
8    A.   Sure.  Just a management position covering
9    all different departments.  I was responsible for
10   the opening and the closing of the store, you know,
11   financial -- you know, financially, you know, what
12   am I going to need for people, what's my payroll
13   going to be next month, those types of financial
14   things.
15       Also, ordering, receiving, stocking, those
16   types of things.
17       And then just the management of people as
18   well.
19   Q.   During that time period, did you have any
20   involvement with the pharmacy side of the business?
21   A.   Not involvement.  We had a pharmacy in the
22   store.  I was, you know, friends with the
23   pharmacist.  I knew the pharmacy managers who would
24   come in and visit, those types of things; but as far
25   as any operational things, we didn't -- or I didn't.

Page 16

1    Q.   And you mentioned the pharmacy managers
2    would come in and visit.  Who were the pharmacy
3    managers?
4    A.   Like their district managers, regional
5    managers, those types of people, upper level
6    management.
7    Q.   And do they have management over the
8    individual stores' pharmacies?
9    A.   Yes.  Like we were not -- we were not over
10   the pharmacy.  They had their own management
11   structure.
12   Q.   Okay.  And then in 2000, when you moved over
13   to the home office, can you just describe briefly
14   what you did between 2000 and 2006?
15   A.   Sure.  I was a -- I was just a staff auditor
16   to begin with.  I was responsible for doing
17   inventory audits where we would travel out to the
18   stores.  We would manage the inventory process that
19   each store went through once a year.  We were the --
20   basically the liaison between the independent
21   third-party company actually counting the
22   merchandise in the store and the management staff of
23   the store, and we made sure that the counts went
24   right and correct.
25       And then we also looked at financial things

Page 17

1    to essentially, at the end of the day, come out with
2    this is how much product they counted, this is how
3    much they say they have, and what's the difference
4    between the two.
5    Q.   Did that -- did your role at that time
6    regarding inventory and counting the merchandise
7    involve any type of controlled substances?
8    A.   It -- it did include the pharmacy inventory,
9    but we didn't -- there were -- the independent
10   third-party company counted that, and we only looked
11   at the financial records for the pharmacy.  Those
12   counts were included in the inventory, the C2
13   counts; but as far as my dealings with the pharmacy,
14   that's all they were.
15   Q.   And what do you mean by the "independent
16   third party"?  Who was that?
17   A.   There were two companies.  We used RGIS and
18   Washington.
19   Q.   And what did you use them for?
20   A.   We paid them to physically come in and count
21   every item in the store.
22   Q.   And that would include controlled
23   substances?
24   A.   Yes.
25   Q.   Do RGIS and Washington still do that today?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.  I don't know.  I've not done it in a long
2  time, so I don't know if they do or don't.
3    Q.  Do you know what -- do you know whether they
4  were still doing it in 2010?
5    A.  I don't know.  We still do an inventory
6  process, but I don't know who does it or how it's
7  done.
8    Q.  Were they responsible for doing the
9  inventory process at the -- at the DC6045?
10    A.  No, sir.
11    Q.  Okay.  Who was responsible for that process
12  in 2007?
13    A.  So we didn't do the same process in the
14  distribution center.  Part of our process was to --
15  we did inventory every day on the C2s.
16    Q.  All right.  We'll get more into that --
17    A.  Okay.
18    Q.  -- detail later.  Okay?  And then in 2006,
19  you became the operations manager for the returns
20  process; is that correct, at 6045?
21    A.  Yes, sir.
22    Q.  And you held that position for approximately
23  one year?
24    A.  Yes, sir.
25    Q.  And what -- what were your duties and

Page 19

1  responsibilities at that position?
2    A.  So DC6045 at that time had two different
3  processes:  There -- one part of it was the C2
4  distribution side; then there was a completely
5  different side in which they would receive outdated
6  returns, drugs, from the stores.  We would then
7  process those by the manufacturer, and we would send
8  those back to the manufacturer to get credit if
9  credit was available.
10    Q.  Does DC6045 still have those two processes?
11    A.  The only process they have now is the C2
12  distribution side; however, we do not distribute the
13  actual bottles anymore.  We still have the
14  electronic 222 system that we -- that we monitor and
15  do.
16    But -- but that's the only -- after -- after
17  2006, starting in 2007, they took that return
18  process and turned it over to a third-party company.
19  I don't remember the name, but they handled all of
20  the returns for the stores.
21    Q.  Okay.  And when -- when did Walmart cease
22  distributing C2?
23    A.  April of this year, 2018.
24    Q.  And what was your exact title in 2007?
25    A.  Operations manager.

Page 20

1    Q.  Is that the complete title?
2    A.  As far as I know it is.  I mean, that's what
3  I've been called.
4    Q.  Okay.  Okay.
5    A.  Yeah.
6    Q.  I just want to be sure, because before you
7  mentioned operation manager C2 -- for the C2
8  business.
9    A.  Yes.  I was -- so I was an operations
10  manager for the returns side.  Once that business
11  went away, they transitioned me to the operations
12  manager for the C2 side.
13    Q.  So could you describe then in 2007, when you
14  took on that role, what were your duties and
15  responsibilities?
16    A.  It was to -- to fulfill orders that came in
17  to us every day, make sure those orders were filled
18  accurately, and to make sure they were distributed
19  or sent to the stores in a very secure manner, and
20  to make sure -- you know, just to make sure the
21  safety of the building, the product, and my people.
22    There were some financial forecasting that I
23  helped with.  We also had the 222 form side, where
24  ordering of the 222 forms from the DEA, tracking
25  those forms, filling out those forms; and then, of

Page 21

1  course, the inventory process at the end of the day
2  to make sure that, you know, we can account for all
3  of the bottles.
4    (Abernathy Exhibit 1 was marked for
5  identification.)
6    MR. MAZZA:  Can you read that?
7    THE WITNESS:  Yes, sir.
8  BY MR. BOWER:
9    Q.  Sir, you've been handed what's been marked
10  as Exhibit 1 for today's deposition, which is --
11  believe the earliest organizational chart, earliest
12  in time, organizational chart we've received in this
13  case.
14    If you see the date on the bottom there, it
15  has a revised date of 5/2007.  Do you see that?
16    A.  No, sir.
17    Q.  Kind of in the middle of the page right
18  under the chart.
19    A.  Oh, okay.  Yes, sir.
20    Q.  And I apologize for the size.  This is kind
21  of the format we printed it out in, so I think it
22  was this size as it was produced to us, too, so --
23    A.  Okay.
24    Q.  You see there you're reflected there, right?
25  Your title is leads operations manager.

Page 22

1     Do you see that?
2     A.   Yes.
3     Q.   And you reported to Mike Mullin at the time?
4     A.   Yes, sir.
5     Q.   Okay.  And then kind of to the right on that
6 chart is Jimmie Sherl.  Do you see that?
7     A.   Yes, sir.
8     Q.   And then to the left is Sharon Morton?
9     A.   Yes, sir.
10     Q.   Okay.  Did any of the folks under you --
11 under you on that chart report to you, either during
12 that time period or after?
13     A.   So all of the people under my name reported
14 to me.
15     Q.   Okay.  Did you report directly to Mike
16 Mullin in 2007?
17     A.   Yes, sir.
18     Q.   Okay.  And how long did you report to Mike
19 Mullin?
20     A.   I reported to him until he left.  I don't
21 remember what year that was.  And then I reported to
22 the next GM that came in.
23     Q.   And who was that?
24     A.   James Greer.
25     Q.   Do you see under Jimmie Sherl's name, it

Page 23

1 has -- it references "Operations Manager" and then
2 "C2 Compliance and Security."  Do you see that?
3     A.   Yes, sir.
4     Q.   Okay.  Do you have any idea what that
5 references, "C2 compliance"?
6     A.   I'm not sure.  I'm not sure as far as the
7 title and the reference.  I mean, Jimmie was also
8 our asset protection manager as well.
9     Q.   So were you aware in 2007 that as a
10 distributor of controlled substances, Walmart had
11 certain legal obligations?
12     A.   I mean, I under --
13         MR. MAZZA:  Object as to form.
14         Sorry.  Go ahead.
15     A.   I mean, I understand that we had policies
16 and procedures and those types of things that we had
17 to follow concerning the product that we had.
18     Q.   And you had those policies and procedures in
19 place in 2007?
20     A.   We had policies and procedures in place,
21 yes.
22     Q.   And what policies and procedures did you
23 have in place in 2007?
24     A.   There were lots of those.  I mean, I don't
25 know specifically which one.

Page 24

1     Q.   Okay.  Let's talk specifically about
2 distribution of controlled substances.
3     A.   Okay.
4     Q.   Okay?  What policies and procedures did you
5 have specifically regarding the distribution of
6 controlled substances in 2007?
7     A.   Well, I guess I don't understand because
8 there were policies and procedures regulating, you
9 know, how -- you know, how we picked those items and
10 how we printed 222 forms, and I don't -- I mean, I
11 don't have those in front of me.  I mean, we had
12 policies and procedures to follow, I know that, and
13 those were set there because of the product we
14 carried.
15     Q.   Sir, were you aware in 2007, that Walmart,
16 as a distributor of controlled substances, had an
17 obligation to monitor for suspicious orders?
18     A.   I wouldn't -- I don't know that I was aware
19 of an obligation.  We did -- we did monitor for --
20 we did monitor orders, so --
21     Q.   Can you be more specific when you say "we
22 did monitor orders"?
23     A.   I mean, we -- we would print 222 forms every
24 day in this time frame.  So we would pull those 222
25 forms for however many stores we needed that day,

Page 25

1 and we would print those 222 forms.  And the ladies
2 who were physically printing those forms, they
3 looked at those orders; and if they saw something
4 that maybe looked like it was kind of high, just
5 based on their knowledge of what they were doing,
6 they would -- they would let us know.
7         And we also -- that's just the most
8 prominent one I can think of, you know.
9     Q.   Do you recall the names of any of these
10 ladies who would do this, who would look at those
11 orders and determine whether they -- something was
12 kind of high?
13     A.   It changed daily.  And, you know, as people
14 left and were hired, I mean, it changed throughout
15 that time.
16     Q.   Okay.  Well, what's -- what are some names
17 as you sit here today that you can recall?
18     A.   Let's see.  Rita Callahan, Gloria -- I can't
19 remember her last name.
20     Q.   Sir, are any of those positions reflected on
21 Exhibit 1 that you're referring to who would review
22 those 222 reports?
23     A.   Yes.  Under "Vault Input."
24     Q.   Okay.  So we're looking at Exhibit 1 which
25 is Walmart MDL000012771.  And your testimony, sir,

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1    is that the folks under this "Vault Input" were
2    responsible for reviewing 222 reports and
3    determining whether the orders were high; is that
4    correct?
5        MR. MAZZA:  Object as to form.
6        A.    They looked at the orders, and they alerted
7    us if something seemed a little high.  I don't -- I
8    mean, that -- I mean, that's what they did as far
9    as -- that was just something that they did.  It
10   was --
11       Q.    Okay.  Well, do you know how they were
12   supposed to determine whether something was high?
13   Were there any written policies or procedures at
14   that time?
15       A.    As far as quantity or something, I don't
16   think so.  If they saw something that most all other
17   stores were getting, you know, 10 bottles or whatever
18   it may be and they saw something that was, you know,
19   a whole lot higher than that, they may say, "Hey,
20   this looks a little strange," or -- so -- so --
21       Q.    And who would they say that to?
22       A.    It would -- mostly it was Sharon; or if I
23   was around, she -- they would tell us --
24       Q.    Okay.
25       A.    -- and tell me, tell a member of management.

Page 27

1        Q.    And this is in 2007, correct?
2        A.    Uh-huh.
3        Q.    And what would happen if they told you that
4    an order looked high?  What would you do?
5        A.    Typically, I'd go call the store and ask
6    them, "Hey, I saw this order, is this correct?  Is
7    this what you wanted," or --
8        Q.    And then what would happen?
9        A.    Just listen to what they said.  A lot of
10   times it was -- and I would say more times than not
11   it was that they were ordering by the pill rather
12   than the bottle a lot of times.  They would get
13   confused in that.  So they may only want, you know,
14   a bottle of 100, they may want 100 pills, so they
15   would input 100, when really they just wanted one
16   bottle.  So, you know, we would see stuff like that.
17       Q.    And if that happened, what would you do?
18       A.    I would talk to the pharmacist and confirm
19   the order.  And if that's what the reasoning was,
20   and he said, "No, I don't want that many, this is
21   what I wanted," then we would correct that order.
22       Q.    And what do you mean you "would correct the
23   order"?
24       A.    Well, we would --
25       Q.    Would you cut the order?

Page 28

1        A.    Yeah, we'd cut it to what he wanted.
2            MR. MAZZA:  Objection to form.
3        Q.    Okay.  Would you report that order to the
4    DEA?
5        A.    I didn't report it to the DEA.
6        Q.    Did anybody report it to the DEA?
7        A.    I don't know.
8        Q.    Well, who would know that?
9        A.    I mean, I don't know.
10       Q.    Sir, you were the operations manager for
11   this DC, right?
12       A.    Yes, sir.
13       Q.    Okay.  You don't know who would have
14   reported it?
15       A.    I don't know.
16       Q.    Do you know whether it was reported?
17       A.    I don't know if it was reported.
18       Q.    Do you have any reason to believe that it
19   was reported?
20       A.    I don't know if it was reported.  I didn't
21   report it, so I don't know what happened to it after
22   that.
23       Q.    Do you have any reason to believe that it
24   was reported?
25       A.    I -- I can't answer that question because I

Page 29

1    don't know.
2        Q.    Have you ever seen a report to the DEA made
3    by Walmart of an order that was cut?
4        A.    I've never -- no, because I've never
5    reported anything to the DEA.
6        Q.    Do you know whether anyone at Walmart has
7    ever reported anything to the DEA?
8        A.    I know that our home office, Health &
9    Wellness Logistics staff, they do report stuff to
10   the home office; but I don't know what they report,
11   but I do know they are in communication with them.
12       Q.    Sir, I just want to make sure your answer is
13   clear for the record.  You said, "I know that our
14   home office, Health & Wellness Logistics staff, they
15   do report stuff to the home office."
16           Do you mean they do report stuff to the DEA?
17       A.    I'm sorry.  Can you repeat that?
18           MR. BOWER:  Can you just --
19           THE COURT REPORTER:  Sure.
20           MR. BOWER:  -- read back my question, I
21   guess?
22           THE COURT REPORTER:  I'll read it a little
23   bit slower.
24           MR. BOWER:  I warned you.  I apologize.
25           (Discussion off the record.)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    THE COURT REPORTER:  Do you want his answer
2  or his question -- your question?
3    MR. BOWER:  Just read his answer back and --
4    THE COURT REPORTER:  Okay.
5    MR. BOWER:  -- just make sure.  See if he
6  wants to clarify that for the record.
7    THE COURT REPORTER:  Okay.
8    (The answer was read by the reporter.)
9  A.  I mean --
10  BY MR. BOWER:
11  Q.  Is that an accurate statement, sir?
12  A.  That's accurate.
13  Q.  So the home office Health & Wellness
14  Logistics staffs, they report the stuff to the home
15  office?
16  A.  To -- I think -- I'm confused because you
17  said that they -- do they report stuff to the home
18  office.
19  Q.  That's your testimony, sir.  Is that
20  accurate?
21  A.  Our Health & Wellness Logistics home office
22  team reports -- I know that they report stuff to the
23  DEA, but I don't think that's what you said, though.
24  You said does that team report to the home office.
25  Q.  I think the record is clear now, so I

Page 31

1  appreciate that.
2  A.  Okay.
3  Q.  How do you know that they report stuff to
4  the DEA?
5  A.  I -- I mean I know that they are in
6  communication with them.  I thought that's what they
7  were doing.
8  Q.  And how do you know that?
9  A.  Just if we have questions about stuff and we
10  call and ask them, they would say, "Well, let me get
11  with someone at the DEA and ask," so --
12  Q.  Well, my question is on reporting, sir.
13  A.  Okay.
14  Q.  Do you know whether anyone at Walmart
15  reports orders that have been cut to the DEA?
16  A.  I don't know who reports to the DEA, if any.
17  I personally don't know.
18  Q.  So the answer to my question is no, you
19  don't know whether Walmart reports those cuts,
20  correct?
21  A.  Correct.
22  Q.  Sir, before we were talking about your
23  discussions with the stores regarding their orders,
24  if you had to call them up.
25    Do you recall that discussion?

Page 32

1  A.  Yes, sir.
2  Q.  And one of the reasons you mentioned was
3  that they may have ordered incorrectly, correct?
4  A.  Yes, sir.
5  Q.  Any other reasons that you recall where the
6  stores would have provided a justification for an
7  order that required you to call them?
8  A.  No, sir.  That's the one I remember.  I
9  mean, I don't -- I mean, there's been thousands of
10  orders.  There may have been other reasons.  That's
11  just the one that happened most commonly.  That's
12  just the one I know of.
13  Q.  So as you sit here today, no other -- you
14  can't recall any other reason why a store would have
15  had an order that required you to call them?
16  A.  No, sir.
17  Q.  And when you say there -- there were
18  thousands of orders; is that correct, sir?
19  A.  (Nodding head.)
20  Q.  How many orders were there per day?
21  A.  What time frame?
22  Q.  In 2007 time frame for C2 controlled
23  substances.
24  A.  At the time -- we serviced all the Walmart
25  facilities at the time.  We serviced each facility

Page 33

1  one time a week.  We had a four-day operation, so it
2  was roughly around probably 800 to 900 orders a day.
3  Q.  So there were thousands of orders a week,
4  correct?
5  A.  Yeah.
6  Q.  And these folks on Exhibit 1, under the
7  "Vault" and at "Vault Input" box, those folks were
8  responsible for reviewing all those orders; is that
9  correct?
10  A.  They -- yes.  They pulled the forms and
11  printed the forms for those orders.
12  Q.  Are you aware of any written policies or
13  procedures that they were to use to monitor those
14  orders in 2007?
15  A.  No.
16  Q.  Sir, were you aware that in 2007, the nation
17  was undergoing an opioid epidemic?
18  A.  No, sir.
19  Q.  And when did you -- are you -- as you sit
20  here today, are you aware that the nation is
21  undergoing an opioid epidemic?
22  A.  I mean, yes, from what I've seen on TV.
23  Q.  Okay.  When was the first time you became
24  aware of it?
25  A.  I don't -- I don't know a date.  I mean --

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 Q. Approximately?
2 A. Probably a year or so ago.
3 Q. Of 2017?
4 A. 2016, like during the campaigns for
5 presidency, you know, it seems like it came up.
6 Q. You never -- never talked about it at work
7 before that, correct?
8 A. I mean, no.
9 Q. Never seen any correspondence from the DEA
10 regarding the opioid epidemic before 2017, correct?
11 A. No, sir.
12 Q. Have you -- as you sit here today, have you
13 seen any -- from any government agency regarding the
14 opioid epidemic?
15 A. No, sir.
16 Q. And all the opioids prior to April 2008 that
17 were sold at Walmart pharmacies went through 6045,
18 correct?
19 A. Can you repeat that? I'm sorry.
20 Q. Sure. Is that --
21 MR. BOWER: Can you read back my question?
22 THE COURT REPORTER: No. Sorry.
23 MR. BOWER: That's fine.
24 BY MR. BOWER:
25 Q. Sir, prior to April 2018 --

Page 35

1 A. Okay.
2 Q. -- okay, were all the opioids that Walmart
3 dispensed from its pharmacies distributed by 6045?
4 A. No.
5 Q. Okay. Where else would Walmart pharmacies
6 get opioid products?
7 A. The pharmacies could get product from
8 McKesson and AmerisourceBergen.
9 Q. Do you know what time period the pharmacies
10 could get products from McKesson?
11 A. Since I've been there, they've been able to
12 do that.
13 Q. Okay. And is that continuously since --
14 from 2006 through today?
15 A. Through 2000 --
16 MR. MAZZA: Object to form.
17 Go ahead.
18 A. Since 2007, when I was a part of the C2
19 distribution side.
20 Q. So you don't know what was happening in
21 2006, correct?
22 A. No. I was in a different operation.
23 Q. And the same for AmerisourceBergen, 2007
24 through today?
25 A. I can't -- I don't know exactly about

Page 36

1 AmerisourceBergen. I'm not sure -- I know that our
2 Sam's Clubs get their stuff through
3 AmerisourceBergen, so --
4 Q. Sam's Clubs also get their Controlled 2
5 substances from 6045, correct?
6 A. They -- they switched solely to
7 AmerisourceBergen, but I can't remember the time
8 frame that they did that; but prior to that, they
9 did.
10 Q. Okay. Do you remember approximately when
11 they made that switch?
12 A. I don't. I don't.
13 Q. Sir, have you -- what -- strike that.
14 What's your current title, sir?
15 A. Operations manager.
16 Q. Have you ever seen a written description of
17 the duties and responsibilities for that position?
18 A. I mean, to my knowledge, no. I mean, I
19 don't -- I mean, I don't recall seeing something.
20 Q. When you took that position, you didn't
21 receive any paperwork stating what the position
22 required and what your -- what the expectations
23 were?
24 A. It -- I believe on the job description, it
25 was on there.

Page 37

1 Q. Did you receive a written job description?
2 A. When I took the position, yes, I think it
3 was part of that.
4 (Abernathy Exhibit 2 was marked for
5 identification.)
6 MR. MAZZA: Thanks.
7 BY MR. BOWER:
8 Q. Sir, you've been handed what's been marked
9 as Exhibit 2 for today's deposition. This is just a
10 two-page exhibit, Bates numbers ending in 12752 and
11 12737. It appears to be two organizational charts:
12 One for the pharmacy distribution group or division,
13 and one for the Health & Wellness Distribution group
14 or division.
15 Do you see that, sir?
16 A. Yes, sir.
17 Q. Have you seen these documents before today?
18 A. No, sir.
19 Q. Was there a point in time when you were made
20 aware that you were part of the pharmacy
21 distribution operations at Walmart?
22 A. I mean, when I applied for the job, I knew
23 that's what I was applying for.
24 Q. Okay. So if you compare this Exhibit 2 to
25 Exhibit 1, does the -- did that -- did the

Page 38

1  organizational structure of 6045 fit within this
2  larger pharmacy distribution operations, or were
3  they separate groups, in your mind?
4      I'm just trying to get a sense of how 6045
5  fits within this first page of Exhibit 2 here, if at
6  all?
7      MR. MAZZA:  Object to form.
8      A.  Well, this was from 2007, you said, and this
9  is from 20- -- I mean from 2010.
10     Q.  Correct.  Well, let me ask it a different
11 way if you're having -- if that doesn't make sense
12 in your mind.
13     Were there any changes in the structure of
14 the distribution side of the business between 2007
15 and 2010?
16     A.  2010?  So, I mean, I know that we reported
17 to Tim Harris.  So my boss, Mike, he would report to
18 Tim, so --
19     Q.  Was that also the case in 2007?
20     A.  I'm trying to remember back.  I'm not sure
21 if it's the same in 2007 as it was in 2010.
22     Q.  And what about if you turn to Page 2 of that
23 exhibit, sir, now we're into 2011, do you see the
24 date under "Health & Wellness Distribution" there,
25 "Fourth Quarter 2011"?

Page 39

1      A.  Yes, sir.
2      Q.  Okay.  Do you recall a structural change
3  during this time period?  And by that, I mean
4  between 2010 and 2011 where the pharmacy
5  distribution was in some way changed or reorganized
6  to Health & Wellness Distribution?
7      A.  I mean, I don't -- I don't remember any
8  changes, I mean, structurally.
9      Q.  There were no changes during this time
10 period that impacted your duties and
11 responsibilities; is that correct?
12     A.  I mean, I don't remember anything.
13     Q.  Let's look -- if you could for me, turn back
14 to the first page of Exhibit 2.  During this time
15 period in 2010, can you identify for us the folks on
16 this page that may have been responsible for
17 suspicious order monitoring for controlled
18 substances?
19     A.  2010.  I'm trying to remember back to 2010.
20     Q.  Well, can you recall generally what the
21 procedure was for suspicious order monitoring in
22 2010 for controlled substances?
23     A.  We -- it was -- it was the same as I had
24 mentioned before.  You know, if we saw an order or
25 something that looked not like the rest of them, we

Page 40

1  asked questions about that.
2      I don't know that there was a specific
3  person.  I mean, we just -- I mean, everybody just
4  wanted to make sure that the order was correct.
5      Q.  Well, in 2010, was anyone on this page
6  responsible for reviewing those orders?  Did anyone
7  have that specific responsibility?
8      MR. MAZZA:  Object to form.
9      A.  I mean, no, sir, not specifically do this,
10 no, sir.  We just -- that's just what we did.
11     Q.  And can you describe what you mean when you
12 say "that's just what we did"?  What does that mean?
13     A.  Well, we just -- when we were printing the
14 forms and looking at the orders, we just, like I
15 said, if a quantity stood out that seemed to be not
16 normal or what they perceived as normal, they would
17 report that to one of the managers, and we would
18 call the store and ask about, "Is the order correct?
19     Q.  And we're talking about 700 to 800 orders
20 per day, correct?
21     A.  Yes, sir.
22     Q.  Would you yourself review 700 to 800 orders
23 each day?
24     A.  I personally would not.
25     Q.  Okay.  How many orders would you review?

Page 41

1      A.  I didn't review any orders.  I just, if they
2  brought something to me, I went and called the
3  store.
4      Q.  Okay.  And when you say when "they brought
5  something to me," are those people who could have
6  brought them to you reflected on Exhibit 2?
7      A.  "Hourly associates" under the 6045.  I mean,
8  that's who those people were.
9      Q.  Okay.  So during this time period, Walmart
10 had hourly associates reviewing 700 to 800 orders
11 per day for purposes of carrying out its suspicious
12 order monitoring; is that correct?
13     A.  Those associates reviewed those orders.  I
14 mean, if there was something wrong with them, they
15 let us know and we called the store to find out if
16 that was correct.
17     Q.  And how would they let you know?  Would they
18 give you a call?  Would they send you an e-mail?
19 What would they physically do?
20     A.  Typically, it was a pretty small building.
21 They would just come over and just say, "Hey, this
22 doesn't look right," or, "This looks high," or,
23 "Just something about this, can you check on it?"
24     "Yeah.  Sure.  I'll call and find out."
25     Q.  Other than whether something was high or

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  not, would they look for anything else, for example,
2  unusual patterns?
3     A.  So they could -- there were times when they
4  may say, yes, "It looks like this -- each store is
5  getting, you know, more bottles than we normally see
6  of this item," you know.  It seems like that's
7  happening a lot today.
8        Or the associates who were picking those
9  products and putting them in the box, they may say,
10  "I'm picking -- normally I only pick one or two
11  bottles of this for a store, but today it seems like
12  I'm picking up four and five.  That just -- that
13  just seems odd."
14        So, you know, we would, you know, contact
15  maybe our replenishment team at the home office and
16  say, "Hey, is something going on?  It just seems
17  like a lot of stores are getting this."
18        And they would research and find out, so --
19     Q.  So now we're talking about a different
20  process, correct?  The picking folks weren't
21  responsible for monitoring the orders; is that
22  correct?
23     A.  So the picking folks were responsible for
24  filling the order that came to them, yes.
25     Q.  And Walmart, in 2010, had a policy in place

Page 43

1  where the folks who were responsible for picking the
2  orders would also report to you if they saw anything
3  suspicious?
4     A.  I can't say that there was a policy stating
5  that.  They -- they would just do that.
6     Q.  And what would you have done if someone
7  provided you that information?
8     A.  Then I would start researching or trying to
9  find the people who could help me understand it or
10  let people know, "Hey, there may be a problem with
11  the order or with the ordering system," or whatever
12  it needed to be.
13     Q.  So while you were doing that, what was
14  happening with the order that they were filling?
15     A.  Well, we would continue to process the
16  order, and then, you know, wait to hear back what
17  the answer was; or, you know, it just depended on
18  whatever happened after that.
19        I mean, like, if I, you know, would call and
20  report that and just say, you know, to the
21  replenishment team, "Hey, there may be something
22  wrong with the ordering system," or whatever, they
23  would research it and then we would go on as normal.
24        If they -- I mean, I don't -- I don't
25  remember specifics, times as to what would happen;

Page 44

1  but, I mean, we would generally try to wait and see
2  if there was something we needed to do with the
3  order.  If we did not hear back or did not -- we
4  would send the order on.
5     Q.  Under this scenario, would you keep a file
6  for these orders that were investigated?
7     A.  No, sir.
8     Q.  And why not?  No one told you to do that?
9     A.  No, sir.
10        MR. MAZZA:  Object to form.
11     Q.  Did anyone tell you to keep a file when you
12  investigated an order in 2010?
13     A.  No.
14     Q.  If you go on back to Exhibit 2, sir, for a
15  minute, you compare the first and second page.  The
16  first page, your position is reflected as being
17  under Mr. Sherl and Ms. Morton.  Do you see that?
18  And the second page, it's above them, too.  Does
19  that reflect a change in the reporting structure?
20     A.  No, sir.
21     Q.  Okay.  Does that reflect any change that was
22  made between 2010 and 2011?
23     A.  No, sir.
24        MR. BOWER:  Why don't we take a quick break?
25  We've been going about an hour.

Page 45

1        MR. MAZZA:  Okay.
2        MR. BOWER:  Just like five minutes.
3        MR. MAZZA:  Sure.
4        THE VIDEOGRAPHER:  Going off record.  The
5  time is 10:29.
6        (Recess from 10:29 a.m. until 10:42 a.m.)
7        THE VIDEOGRAPHER:  We're going back on the
8  record, beginning of Media File Number 2.  The
9  time is 10:42.
10  BY MR. BOWER:
11     Q.  I have just a couple of hopefully short
12  follow-up questions from the discussion before the
13  break and then we'll move on to some more recent
14  time period where we have some more documents that
15  we can talk more specific about.  Okay?
16        You testified that during this time period,
17  when a picker or one of the hourly associates would
18  notify you of an order that needed to be checked or
19  reviewed, you would call the store, correct?
20     A.  Correct.
21     Q.  Is there anything else that you would do?
22     A.  Well, you know, if one of the pickers showed
23  me that, "Hey, this seems to be picking heavy
24  today," I wouldn't necessarily call the store.  I
25  would call maybe someone on our replenishment team,

Page 46

1  because they would deal more with that than the
2  store would since it was occurring over multiple
3  stores.
4      But then after that, I would just, you know,
5  go ahead and fill the order, call the store.  If I
6  needed to cut the order to make it correct, that's
7  what I would do.
8      Q.  And you didn't keep a log of these
9  investigations, correct?
10     A.  No, sir.
11     Q.  And you didn't keep a log of the orders that
12  were cut or changed, correct?
13     A.  No, sir.
14     Q.  And you didn't keep a log of the orders that
15  may have been canceled, correct?
16     A.  No, sir.
17     Q.  And if an order was, for example, cut or
18  changed, would you tell anybody?
19     A.  I mean, I would let my general manager know
20  that this happened and this is what we did.
21     Q.  And how would you let them know?  Would it
22  be verbal communication or written?
23     A.  Verbal.
24     Q.  Okay.  Is there a reason that you wouldn't
25  provide them written communication?

Page 47

1      A.  I mean, no, sir.
2      Q.  And your general manager during this time
3  period was who?
4      A.  Mike Mullin.
5      Q.  Mullin.
6          Do you have any understanding what
7  Mr. Mullin may have done with that information?
8      A.  No, sir.
9      Q.  Did anyone ever tell you to provide him a
10  written communication that an order had been cut or
11  changed?
12     A.  I don't recall anyone telling me to do that.
13     Q.  These orders, this policy we've been talking
14  about, the procedure, that include -- would include
15  opioids, correct, sir?
16         MR. MAZZA:  Object to form.
17     A.  They refer to all C2 drugs.
18     Q.  So it would include OxyContin, for example,
19  correct?
20     A.  Yes.
21     Q.  And you also testified, sir, that during
22  certainly part of the time frame for AB -- ABDC and
23  most of the time frame for McKesson, pharmacies
24  could also get controlled substances from those
25  distributors, correct?

Page 48

1      A.  Yes, sir.
2      Q.  Okay.  Did those -- did the products it
3  could get from those distributors include opioid
4  products, such as OxyContin?
5      A.  Yes, sir.
6      Q.  Okay.  Sir, do you have any idea
7  approximately in what time period the pharmacy order
8  monitoring team was formed?
9      A.  2015.
10         (Abernathy Exhibit 3 was marked for
11  identification.)
12  BY MR. BOWER:
13     Q.  Sir, you've been handed what's been marked
14  as Exhibit 3 to today's deposition.  Just take a
15  moment, please review that e-mail string.  I can
16  tell you I will have -- I will have the question
17  starting from the first e-mail in the string through
18  the last.
19         Have you had a chance to review it, sir?
20     A.  Yes, sir.
21     Q.  My first question is:  Do you have any idea
22  what the reference to "C2 limits" in the subject
23  line means -- would have meant during the 2012 time
24  period?
25     A.  I'm sorry.  I didn't hear, say that again.

Page 49

1      Q.  I'll rephrase the question.  Do you see in
2  the e-mail to you, the one at the top from Ramona to
3  the DC team, including yourself, Jimmie Sherl, and
4  Mike Mullin, do you see that?
5      A.  Yes, sir.
6      Q.  And the subject has a forward and then "CII
7  Limits."
8          Do you see that?
9      A.  Yes.
10     Q.  Do you know what "CII Limits" refers to?
11     A.  From the document, it looks like when we
12  would cut oxycodone 30 to 20 bottles.
13     Q.  Prior to receiving this e-mail, was that the
14  policy?
15     A.  No, sir.
16     Q.  Okay.  Was the policy, as you've already
17  explained today, the existing policy up until
18  approximately July of 2012?
19     A.  We were not cutting at 20 prior to this.  I
20  mean, there was -- that didn't stop us from looking
21  at orders that -- again, that may be odd, but we
22  didn't have direction at that point to do that.
23     Q.  Going down a bit, if you look down in the
24  e-mail, the e-mail from Ramona to Brandon.  Who was
25  Brandon Worth, do you know?

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A. I know he's someone on the operations side.
2 I don't -- I don't know him.
3    Q. Do you know who the reference -- his e-mail
4 to Ramona references "Bart's data." Do you see
5 that?
6    A. Yes.
7    Q. Do you know what that reference is?
8    A. I don't know.
9    Q. Do you know who Bart is?
10    A. No, sir. I know -- I've heard his name
11 mentioned as far as replenishment stuff, but I don't
12 know him or what he does.
13    Q. Well, you see, though, that based on that
14 data, the suggestion was to put a max limit of 20
15 bottles for oxy-30s. Do you see that?
16    A. Yes.
17    Q. And then it says: "After two weeks, we will
18 then visit on what our next step of drugs to focus
19 on will be."
20    Do you see that?
21    A. Yes.
22    Q. And then it says: "Time to lock down the
23 process at the DC."
24    Do you see that?
25    A. Yes.

Page 51

1    Q. And when you received this e-mail, do you
2 have any understanding what that meant, what "time
3 to lock down the process at the DC" meant?
4    MR. MAZZA: Object to form.
5    A. I don't -- I don't know what was meant by
6 that.
7    Q. Well, when you received this e-mail, what
8 did you think?
9    A. When I received this e-mail, we were
10 supposed to -- any order of oxy-30 over 20 to cut
11 that to 20.
12    Q. If you cut an order to 20, would you do
13 anything else? Would you report that order, for
14 example?
15    A. We -- we did report that to the --
16 compliance team, the global investigation team, our
17 asset protection team, and my general manager.
18    Q. And how was that reporting done?
19    A. We sent it in an e-mail every day.
20    Q. So a daily e-mail was sent to those four
21 buckets of people that you just mentioned; is that
22 correct?
23    A. Yes.
24    Q. Okay. And who would send that e-mail?
25    A. It was the responsibility of whichever

Page 52

1 manager came in first that day. That was Jimmie
2 Sherl's typical job. He came in first. On occasion
3 I would do it if I was covering for a vacation or
4 something like that.
5    Q. So the typical process was Jimmie Sherl
6 would come in every day, review all the orders for
7 C2 controlled substances, correct?
8    A. Yes.
9    Q. Okay. And then for any order of oxy-30s
10 that was over 20, you would automatically cut them,
11 correct?
12    A. Yes.
13    Q. And for all of those orders that were cut,
14 he would send an e-mail to the compliance team, the
15 global investigations team, the asset protection
16 team, and the general manager, correct?
17    A. Yes.
18    Q. Okay. Is that a written policy?
19    A. That was following what -- the e-mail we had
20 from Ramona.
21    Q. Okay. Other than this e-mail, was there a
22 written policy?
23    A. I don't know of any.
24    Q. Have you ever seen one?
25    A. I haven't seen one.

Page 53

1    Q. The second sentence kind of that e-mail to
2 the DC team, it says: "I will be sending Reddwerks
3 an e-mail to make the appropriate change to the
4 order level alert parameter screen."
5    Do you see that?
6    A. Yes.
7    Q. What does that refer to?
8    A. I don't -- I don't know right off the top of
9 my head.
10    Q. Sir, there's -- there's -- right, there's
11 three people responsible for this, right? Yourself,
12 Mr. Sherl, and Mr. Mullin, right?
13    A. Right.
14    MR. MAZZA: Object to form.
15    Q. Right. And the policy -- let me strike
16 that.
17    During 2000 -- at this time period in 2012,
18 was there an order level alert in place for DC6045?
19    A. Well, we would pull the orders, and we would
20 search for oxy-30s that were over 20 and pull those
21 out, and then we would cut those to 20.
22    Q. But you wouldn't do that until you -- until
23 after receiving this e-mail, correct?
24    A. Correct.
25    Q. At the time of receiving this e-mail, was

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  there an order level alert parameter screen already
2  in place? Do you see the e-mail reference is "the
3  order alert parameter screen."
4      Do you see that?
5  A.  I do see that.
6      MR. MAZZA:  Object -- sorry.
7      Objection as to form.
8  Q.  What does that refer to?
9  A.  I don't remember seeing an alert parameter
10 screen.  I don't know -- I don't remember that.  So
11 I'm not -- I'm just saying I know that we would pull
12 the orders.  We -- we had a process that we followed
13 to pull those orders.  I don't know -- I can't
14 remember a certain screen called "parameter screen."
15 Q.  Well, prior to receiving this e-mail, would
16 you yourself pull the orders?
17 A.  No.
18 Q.  That was hourly associates, correct?
19 A.  Yes.
20 Q.  After receiving this e-mail, was that
21 responsibility shifted from the hourly associates to
22 Mr. Sherl and potentially yourself?
23 A.  Yes.
24 Q.  Was there a written policy or procedure put
25 in place to make that change?

Page 55

1  A.  I don't -- I didn't see a written policy to
2  do that.
3  Q.  Did anyone ever explain to you why that
4  change was being made?
5  A.  No, sir.
6  Q.  Did you ever have any questions about why
7  that change was being made?
8  A.  No, sir.
9  Q.  You just did what you were told?
10 A.  I followed the policy and the procedures
11 that were given to me.
12 Q.  Right.  And all those policies and
13 procedures, sir, are reflected in this e-mail,
14 correct, with respect to this monitoring for
15 oxycodone, correct?
16     MR. MAZZA:  Object; form.
17 A.  I -- I don't -- I can't speak to policy or
18 procedure.  I was told, "This is what you need to
19 do," so that's what I did.
20 Q.  And this is specific to the oxycodone
21 30 mgs.  Do you see that?
22 A.  Yes, sir.
23 Q.  Was there anything -- anything being done
24 for other strengths of oxycodone?
25 A.  We were also looking at orders that were

Page 56

1  over 50 for all other C2s that were not
2  oxycodone 30.
3  Q.  And when did that start?
4  A.  It's around this same time period, 2012.
5  Q.  Sir, you said you were also looking at
6  orders that were over 50.  What would you do if an
7  order was over 50?
8  A.  We would report those same orders to the
9  people I listed, the compliance team, the global
10 investigations team, and the AP team.
11 Q.  Can we just talk for a minute, then, about
12 what the ordering and filling process was?  Can you
13 just describe how that worked generally?
14 A.  So the system would go out and grab the
15 orders for a particular store for whatever day they
16 were scheduled to pick on.  Those orders would then
17 come into the building.
18     Let me ask time frame because, you know,
19 it's changed.  So are you talking about 2012?
20 Q.  Yes, I appreciate that.  Thank you.  Yes,
21 2012?
22 A.  Okay.  So in 2012, they would come in, and
23 those would be dropped into a pick-to-light system
24 we had called Reddwerks, and those orders would come
25 in.  And then we had inside the vault where our C2s

Page 57

1  were, we had pick bays; and in those pick bays, it
2  would have lights in front of each slot.
3      And as we scanned a bar code that would
4  print out saying this is the order for Store 1 and
5  it would be a bar code, we would scan that bar code.
6  And in the first bay, it would light up and it would
7  tell the associate, "Pick two of this one, pick one
8  of this one," whatever in their bay they were
9  supposed to pick.
10     Once they picked it, they would hit the
11 light, the light would go off.  They would pass it
12 to the next person.  The next person would scan that
13 bar code, and it would tell them what to pick in
14 their bay.  And this process happened for about five
15 bays, and they would pass it on.
16     As it was -- as it was done, completed being
17 picked, we -- it would go to what we call a QC
18 station or a quality control station.  It was a --
19 it was a system still built by Reddwerks in which it
20 would do a blind QC, meaning the associate scanning
21 the drugs did not know what was supposed to be in
22 that order.
23     So they would scan the bar code to tell the
24 computer what store or order they were working on.
25 They would scan each bottle in that order.  Once

Page 58

1  they were done, they would hit a reconcile button.
2      And then the system would say, "Yes, that
3  order is correct," or, "No, the order is not
4  correct.  You have too many of this one, you have
5  one of this one you shouldn't have, or you don't
6  have this one."
7      So we would then stop and we would go
8  correct that order, get the bottle we need, put the
9  bottle back we don't need, whatever the situation
10 was.
11     Then that person would then rescan that
12 order again.  Until they got a complete scan that
13 was correct, the system would not let it move on to
14 the next section.
15     Once the --
16 Q.  I don't want to cut you off.
17 A.  Once the system was completed and it was
18 correct, then it was sent around to a shipping area
19 where -- I'm sorry.  Let me back up.
20     It was put into a sealed bag at the QC
21 station, like a Ziploc bag but it had a control seal
22 on it.  That was sent around to our shipping area
23 where that bag was put into a box and sealed with
24 the shipping information put on it.
25     At that point, we would scan that bar code

Page 59

1  again to bill the store for what was in that box.
2  And then it would move out to the Fed Ex cage that
3  we had dedicated just for Fed Ex for shipment.
4  Q.  Okay.  I appreciate that explanation.  Thank
5  you.
6      So during this time period in 2012, let's
7  say an order for oxy 5 milligram comes in on a
8  Monday for 51 bottles.  Okay?
9  A.  For which drug?
10 Q.  Oxy 5 milligrams.
11 A.  Okay.
12 Q.  Okay?  You're supposed to have a process in
13 place, right, where you look at orders over 50,
14 correct?
15 A.  Yes.
16 Q.  Okay.  And what was the expectation as to --
17 with respect to when that order would be filled and
18 shipped, if the order came in on a Monday?
19 A.  So Monday morning, typically when Jimmie
20 came in, since he was the first one in, before we
21 started the pick process, he would pull all of those
22 orders and export it to a spreadsheet and then we
23 would, you know, sort those to show me orders or in
24 the order column, show me everything over 50, show
25 me all the oxy's over 30, and we would filter it out

Page 60

1  that way so that we could see here is all of my
2  oxy-30s that were over 20 and here's all the other
3  drugs that were over 50.
4  Q.  And if another dosage of oxycodone was over
5  50, what would you do?
6      MR. MAZZA:  Object; form.
7  Q.  I'll strike that.
8      If another order came in for another dosage
9  of oxycodone that was not oxy-30s, it was oxy-10s or
10 oxy-5s, that was over 50 bottles -- we're talking
11 bottles, correct?
12 A.  Yes.
13 Q.  Okay.  What would you do?
14 A.  So I guess I don't understand when you say
15 "another order."  Like the next store in line?
16 Q.  Well, let's -- let's take a step back.  All
17 right.
18 A.  Okay.
19 Q.  Go back to my first example, right.  A store
20 orders 51 bottles of oxy-5 milligrams on Monday.
21 A.  Okay.
22 Q.  The order comes in on Monday.  You get your
23 printout of that order.  Then what happens?
24 A.  So then we would send that over to the team,
25 the teams I spelled out, and we would say, "This

Page 61

1  store for this product ordered 51 bottles."
2  Q.  And from your perspective, what would happen
3  next?
4  A.  Then we would wait.  If they would send us
5  back whatever communication or if we needed to do
6  something with the order, we would just wait for
7  that.
8  Q.  And how would they inform you of what to do
9  with the order?
10 A.  E-mail.
11 Q.  And that's what happened on a daily basis,
12 correct?
13 A.  Yes, sir.
14 Q.  During this time period, when would you have
15 expected to hear back from them regarding what to do
16 with the order?
17 A.  So we shipped every day at 3:00 p.m.  I mean
18 we had had discussion, that's the -- that's the time
19 we ship.  They had known that.  So if we didn't hear
20 anything back by 3:00 p.m., then we went ahead and
21 shipped the item.
22 Q.  Okay.  And let me -- and let me direct your
23 attention then to that second -- the first line, the
24 second paragraph of that e-mail to the DC team.
25     MR. MAZZA:  We're on Exhibit 3, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Q.   Yeah, sorry.  Still on Exhibit 3 there.  I
2  just -- I just want to know what the reference to
3  the "regional" is, end of the first line:  "Direct
4  them to their regional."
5       Do you know what that refers to?
6       MR. MAZZA:  That.
7    A.   Yes, sir.  I -- I mean, since -- I mean, I
8  didn't write it, but I'm going to -- I'm going to
9  say that she meant her regional manager or their
10 regional manager.
11   Q.   Are these the same managers we -- managers
12 we asked about earlier, the pharmacy managers?  Or
13 is this a different regional manager?
14   A.   This would have been the store's regional
15 manager.
16   Q.   So not a pharmacy-specific manager?
17   A.   Not a Health & Wellness Logistics manager.
18 It would have been a pharmacy regional manager.
19   Q.   And on the next line there, it references a
20 "web form."  What is that?
21   A.   So at this time, in 2012, we shipped to each
22 store one day a week.  So if a store needed an order
23 outside of their normal order schedule, they could
24 fill out a form.  It's like a generic e-mail web
25 form that they would send to our associates in the

Page 63

1  office to let those associates know that they needed
2  additional drugs or product of a -- whatever they
3  needed, and then they would go into the system and
4  physically key the order in.
5       So the web form was to tell us that, you
6  know, you need to take this store who is not going
7  to pick on this day and put them in that pick batch
8  so that the system will go out and grab those
9  orders.
10      Now, the web form was for three different
11 items and only two bottles of each item.  So it was
12 designed so that -- to get them to their next order
13 day was what it was set up to do.
14      (Abernathy Exhibit 4 was marked for
15 identification.)
16 BY MR. BOWER:
17   Q.   Sir, you've been handed what's been marked
18 Exhibit 4, ending in Bates Number 9321.  It's an
19 e-mail chain from Ms. Sullins to Mr. Sherl,
20 yourself, and a few others.  Take a moment to review
21 that and let me know when you've had a chance to
22 take a look.
23   A.   Okay.
24   Q.   All right, sir.  You've had a chance to
25 review the document?

Page 64

1    A.   Yes, sir.
2    Q.   Okay.  Is this an example of the daily
3  process at 6045 with respect to C2 orders?
4    A.   Yes, sir.
5    Q.   This would happen how many times a week,
6  approximately, during this time frame?
7    A.   Every day.
8    Q.   So five times a week --
9    A.   Yes.
10   Q.   -- or seven?
11   A.   We -- we picked four days a week.  However,
12 on Fridays, should a store call in with a web form
13 order, we would pick maybe five or six stores on a
14 Friday if that's -- was the case.  So we didn't pick
15 always on a Friday, but sometimes.
16   Q.   All right.  So other than web form orders,
17 this was the process?
18   A.   Yes.
19   Q.   And, Mr. Sherl -- if you go to the first
20 e-mail in the chain, Mr. Sherl's e-mail on Monday,
21 July 23rd at 9:33 a.m., 2012, he sends an e-mail to
22 Mr. Mullin and Ramona Sullins cc'ing yourself and
23 Teresa Miller.  Do you see that?
24   A.   Yes, sir.
25   Q.   Okay.  And at this point in the day, at

Page 65

1  9:38 a.m., had he already reviewed that day's
2  orders?
3    A.   Yes, sir.
4    Q.   And he had decided to cut some orders,
5  correct?
6    A.   Yes, sir.
7    Q.   And he had decided to not cut other orders,
8  correct?
9    A.   Yes, sir.
10   Q.   Okay.  Had he -- had -- strike that.
11      For the orders that he decided to cut, what
12 would be the basis for that decision?
13      MR. MAZZA:  Object; foundation.
14   A.   I -- I don't know.  I mean --
15   Q.   Well, sir, you also had -- this was also
16 your responsibility at the time period, correct?
17   A.   It was my responsibility if I came in first
18 that day.
19   Q.   Right.  So what was the criteria for
20 cutting?
21   A.   If anything over 20 bottles of oxycodone-30,
22 cut it to 20.
23   Q.   What about for, for example, an order here
24 of -- the one towards the bottom that's in bold, 48
25 bottles of oxycodone/APAP 5/324.  Is there any

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 policy or procedure as to what to do with that
2 order?
3     A.  I'm sorry, which one?  The --
4     Q.  The -- sorry.  Going up from the bottom, the
5 third bullet point up from the bottom, and it has --
6 I'll just read for it the record.
7         2929 is a reference to the store number,
8 correct, sir?
9     A.  Yes, sir.
10    Q.  It says:  "2929 has 48 bottles of oxyco/APAP
11 5/325."
12        Do you see that?
13    A.  Yes, sir.
14    Q.  Was there any policy in place as to how to
15 deal with that order?
16    A.  No, sir.
17    Q.  So do you see that that store, Store 2929
18 had a high volume at 659,000 for the months of June.
19 Do you see that?
20    A.  I see that it's written on here.
21    Q.  Well, do you have any reason to doubt that
22 that's accurate, sir?
23    A.  I mean, I -- like I said, I don't know -- I
24 couldn't testify or say that it was right or wrong.
25    Q.  Well, do you have any reason to doubt the

Page 67

1 accuracy of that information, sir?
2     A.  I don't -- I mean -- I can't answer that.  I
3 don't know.  I couldn't -- like I said, I didn't
4 write this, so I don't know.
5     Q.  And I'm not asking you to testify that it's
6 accurate.  I'm asking you whether you have any
7 reason to doubt it?  Did you and Mr. Sherl at this
8 time period have access to the monthly purchases
9 from the stores?
10    MR. MAZZA:  Object; form.
11    A.  I don't remember looking at that.
12    Q.  Well, it appears that Mr. Sherl was looking
13 at that, correct?
14    A.  Yes, sir.
15    Q.  Not something you would have considered at
16 that time?
17    A.  I don't remember doing it, no, sir.
18    Q.  659,000 sounds like a lot per month,
19 correct?
20    A.  Again, I don't know if that's a high amount
21 or not.
22    Q.  Well, he says it right there, doesn't he?
23 He says:  "A high volume store."
24        Do you see that?
25    A.  I mean, that's what it says, yes, sir.

Page 68

1     Q.  And there's Store 225, going up a couple --
2 2555, a couple of bullet points up, is also a high
3 volume store, correct?  495,000 for the month of
4 June, right?
5     MR. MAZZA:  I'm sorry.  Oh, okay, never
6 mind.  Sorry.
7     A.  Yeah.  I don't know if he's talking about
8 bottles or prescriptions or what.
9 BY MR. BOWER:
10    Q.  So it's your testimony, sir, he could have
11 been referring to 495,000 bottles?
12    A.  I don't have the information here to know if
13 that's what he was referring to.
14    Q.  What information would you need to know to
15 answer that question?  Sorry.  Strike that.
16        What information would you need to have to
17 answer that question?
18    A.  I'd probably need to ask Jimmie, "What were
19 you talking about for 659,000."
20    Q.  You would want to ask him, correct?
21    A.  Yeah.
22    Q.  Do you have any idea what data he was
23 looking at during this time period?
24    A.  I don't.
25    Q.  Going back to that -- my example of

Page 69

1 Store 2929, do you see that, in Hope Mills, North
2 Carolina?
3     A.  Yes, sir.
4     Q.  Do you see that?
5         It says in the parenthesis at the end:
6 "June SD405-1, Number 6 on oxyco/AP 5/35."
7         Do you see that?
8     A.  Yes, sir.
9     Q.  Do you know what that refers to?
10    A.  I know that Jimmie had a report that he
11 looked at monthly that was a 405 report.  So, I
12 mean, that -- he did do that.
13    Q.  And what was on that monthly 405 report?
14    A.  It was a report that he requested every
15 month and it had, like, information about stores.  I
16 don't know.
17        I don't ever really remember seeing the
18 report.  He handled that.  I don't know what was on
19 it.  I just know that it would show, like, for the
20 month what stores sold or -- I don't know if it was
21 dollar amount or what it was, but he -- that was his
22 405 report.
23    Q.  Was that a report you received monthly?
24    A.  I don't -- I don't know that he received it.
25 He asked for it to be printed every month.  I think

Page 70

1 it was available; but for us to get it at the DC, he
2 had to request for it to be printed.
3 Q. Do you know if others at the home office
4 received that monthly report?
5 A. I don't know if they received it or not.
6 Q. Do you know who he would ask to print it?
7 A. I don't -- I don't know who he would ask to
8 print it. I mean, again, it was something he did
9 for the AP side of stuff, so --
10 Q. Can you -- what do you mean by "the AP side
11 of stuff"?
12 A. The asset protection.
13 Q. Okay. Well, sir, it appears here that he
14 says SD405, the store, right, Number 6 on the list.
15 Do you see that? And Store 1935 is Number 15 on the
16 oxycodone-30. Do you see that? It appears he's
17 ranking the stores, correct?
18 MR. MAZZA: Object; form.
19 A. I don't know what -- I honestly don't know
20 what those numbers mean.
21 Q. Well, it appears he's ranking the stores
22 based on their purchases of oxycodone products,
23 correct?
24 A. I don't know.
25 Q. We'd have to ask him?

Page 71

1 A. Yes.
2 Q. Go up, if you would, please, to the bullet
3 point above Store 2525, the one that starts with
4 "1935." Do you see that?
5 A. Yes, sir.
6 Q. It says: "1935 has various strength of
7 oxycodone ordered on 7/23/12 or 86 bottles."
8 Do you see that?
9 A. Yes, sir.
10 Q. Would that order have been subject to a
11 threshold cut?
12 A. The oxycodone-30, if it were over 20, would
13 be --
14 Q. Well, sir, that doesn't describe what level
15 of oxycodone is being purchased, correct? It just
16 says "oxycodone"; is that correct?
17 A. Yes.
18 Q. All right. So we don't know whether it's
19 oxy-30s or other strengths, correct?
20 A. Correct.
21 Q. So from looking at this document, can you
22 tell whether the order was cut? He doesn't say it
23 was cut, correct?
24 MR. MAZZA: Objection; form.
25 Q. I'll strike that.

Page 72

1 It appears from this document that Mr. Sherl
2 did not cut that order, correct?
3 A. Again, I didn't write this, so I don't know
4 if he cut it or not.
5 Q. Well, sir, if you turn to the e-mail above
6 that from Ramona, do you see that, sir? It says:
7 "Which orders were cut?" Right?
8 Did you see: "Cut the orders for the stores
9 highlighted in red below"?
10 Do you see that?
11 A. Yes, sir.
12 MR. MAZZA: And, just for the record, the
13 copy I have doesn't have any highlights on it.
14 MR. BOWER: And that's correct. I don't
15 believe the copy we received does either.
16 BY MR. BOWER:
17 Q. That's my question. If we could have that
18 copy in red, we could tell which orders were cut,
19 correct, sir?
20 A. Yes.
21 Q. And I believe I may have asked this, but
22 maybe this refreshes your recollection. Do you see
23 the e-mail from Brandon Worth to Ms. Sullins and
24 Ms. Hiland?
25 A. Yes, sir.

Page 73

1 Q. Do you recall what his position was or role
2 was in suspicious order monitoring at this time?
3 A. No, sir.
4 Q. Okay. And then finally, going up to the top
5 there, in the e-mail from Ramona to Jimmie, cc'ing
6 yourself and Mr. Mullin again. Do you see that?
7 A. Yes, sir.
8 Q. It says: "Jimmie, Per our phone
9 conversation, please put together a daily
10 spreadsheet with essential information needed to
11 report any stores that order more than 20 bottles of
12 oxy-30s."
13 Do you see that?
14 A. Yes, sir.
15 Q. Was this simply reinforcing the policy we
16 discussed earlier?
17 MR. MAZZA: Objection to form.
18 A. I -- it -- this was in -- this was
19 referencing the e-mail you showed me earlier, so
20 yes, sir.
21 Q. And that e-mail is all the written policy we
22 have, correct?
23 A. That's -- I mean, that was my direction.
24 Q. Right. Do you know who the -- going back to
25 Brandon's e-mail below that -- the operators refers

Page 74

1  to?
2      THE COURT REPORTER:  Operator?
3      MR. BOWER:  "Operators."
4  BY MR. BOWER:
5      Q.  Brandon writes to Ramona:  "Love the
6  visibility here.  Please provide daily in Excel
7  format so we can share with operators."
8          Do you see that?
9      A.  I don't know who he's referring to.
10      Q.  Did you receive these reports daily during
11  the 2012 time period?
12      A.  I mean, I think Jimmie would typically CC
13  the other management team on it.
14      Q.  That would include yourself, correct?
15      A.  Yes.
16      Q.  So these orders that Mr. -- that Ms. Sullins
17  refers to as "being cut by the DC," sir, were those
18  orders -- an order comes into the DC, correct?  If
19  the DC determined whether the order was too large,
20  correct?
21      A.  Yes.
22      Q.  The DC cut the order, correct?
23      A.  On oxycodone-30, if it was over 20, yes,
24  sir, we cut it to 20.
25      Q.  And then DC would then ship the order,

Page 75

1  correct?
2      A.  Yes, sir.
3      Q.  In other words, the DC was shipping a
4  portion of the order, correct?
5      A.  We were shipping 20 bottles to the -- if
6  they had ordered more than that, we only shipped
7  them 20.
8      Q.  So if they ordered 30, you would ship 20,
9  correct?
10      A.  Yes.
11      Q.  Which would be a portion of 30, right?
12      A.  Well, yes.
13      Q.  Did you have any understanding during any
14  time period, either 2012 or since, of why the focus
15  was on oxy-30s?
16      A.  No, sir.
17      Q.  Did you ever ask about why not other
18  strengths of oxy?
19      A.  No, sir.
20      Q.  You weren't aware of the epidemic, correct?
21      MR. MAZZA:  Objection; form.
22      A.  No, sir.
23      Q.  How many pharmacies did Walmart have
24  nationwide in 2012?
25      A.  In 2012?

Page 76

1      Q.  Approximately.
2      A.  Approximately 4,000.  I mean, that's -- I
3  mean, that's about as close as I could guess.  I
4  don't know the exact amount.
5      Q.  And it was up to you, Mr. Sherl, and
6  Mr. Mullin to review these orders daily, right?
7      A.  Yes.
8      Q.  No one else is reviewing the opioid orders
9  for Walmart, correct?
10      A.  Not to my knowledge, no, sir.
11      Q.  So -- strike that.
12      MR. MAZZA:  Interpose a form objection to
13  that last question.
14      (Abernathy Exhibit 5 was marked for
15  identification.)
16  BY MR. BOWER:
17      Q.  Sir, you've been handed what's been marked
18  Exhibit 5.  It's an e-mail from yourself to
19  Mr. Dean, Mr. Chapman, Ms. Auldridge and Mr. Mullin,
20  ending in Bates number 9423.  The subject is "Over
21  20 Report," and the attachment is Bates number
22  9242, which is the report, correct, sir?
23      A.  This -- I'm sorry.  What?  What were you
24  asking?
25      Q.  Is the attachment to this e-mail the -- you

Page 77

1  see it has a cover sheet because it was produced in
2  native, right?
3      A.  Okay.
4      Q.  And then does that appear to you to be an
5  Over 20 Report?
6      A.  Yes.
7      Q.  Okay.  So just take a moment, then, and
8  review that and let me know when you've had a chance
9  to take a look.
10          Have you had a chance to review it, sir?
11      A.  Yes.
12      Q.  This is an example of a situation where you
13  may have been in the office before Mr. Sherl?
14      A.  Yes, sir.
15      Q.  Okay.  Had there been any change since the
16  prior e-mail we looked at in July of 2012 with
17  respect to who is responsible for these daily 20
18  reports?
19      A.  No, sir.
20      Q.  It was still whoever got into the office
21  first?
22      A.  Yes, sir.
23      Q.  If you got in the office first, would you
24  work on the reports together or was it your
25  responsibility to complete the report?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.   It was my responsibility.
2    Q.   So let's say you got in the office first.
3  And what would Mr. Sherl be doing with his day if he
4  wasn't reviewing the reports?
5    A.   Typically, he wouldn't be there.
6    Q.   And then the vice versa, what if it was a
7  day when he got in first and what was your -- what
8  would you do if you weren't doing the reports?
9    A.   Whatever other duties I had to do that day.
10  You know, checking on my associates, you know,
11  planning for events if that was something that was
12  going on, whatever my general manager asked me to
13  do, making sure that the process was running
14  smoothly, were the systems up and working, those
15  types of things.
16    Q.   So if Mr. Sherl is there, you have no
17  responsibility for these daily reports, correct?
18    A.   I did -- if he came in first, he did them,
19  so --
20    Q.   Okay.  So on this example on 2/12/13 we're
21  looking at here, it was your decision whether to cut
22  any orders, correct?
23    A.   Yes.
24    Q.   And you did not cut any orders, correct?
25    A.   According to the e-mail, I didn't.

Page 79

1    Q.   Well, do you have any reason to believe the
2  e-mail is inaccurate?
3    A.   No, but I don't -- I mean that was a long
4  time ago.  I mean, if that's what the e-mail says,
5  so --
6    Q.   In reviewing these orders, sir, what
7  criteria would you have used to determine whether to
8  cut an order?
9    A.   So if it was an oxy-30 over 20, I would cut
10  it to 20; and then anything over 50, I sent it to
11  Greg, George, Donna, and Mike; and then, you know,
12  waited to hear a response from them, if there was
13  something I needed to do with it.  If I didn't hear
14  a response, we sent it to the store.
15    Q.   And anything under 50, you would have just
16  sent it?
17    A.   Yes.
18    Q.   No review?
19    A.   Except for oxycodone 30, we would cut that;
20  but for all other than that, yes.
21    Q.   Would you have considered, for example,
22  whether a store ordered different strengths of oxy
23  that would have been summed to over 50?  For
24  example, 29 oxy-10s and 29 oxy-5s?
25    A.   I didn't look at it based on that.  I just

Page 80

1  looked on -- at each item in their bottle.
2    Q.   And that was because Walmart had a strict
3  policy that was based on a threshold number,
4  correct?
5    A.   The direction given to me was to cut
6  anything Over 20 bottles on the 30, report anything
7  over 50 bottles of anything else.
8    Q.   And therefore the direction was to not
9  report any order under 50 bottles unless it was
10  oxy-30, correct?
11    A.   Not to report anything under 50 for anything
12  other than oxy-30, yes, sir.
13    Q.   And when you say report, what do you mean?
14    A.   To notify these people on this list.
15    Q.   So it would be notify and either wait and
16  notify, and if you didn't hear anything, then to
17  ship?
18    A.   To notify and wait and if I didn't hear
19  anything, I just shipped.  I didn't notify that I
20  shipped it.
21    Q.   During this time period, 2013 time period,
22  about how often would you be responsible for the
23  daily Over 20 Reports?
24    A.   I don't recall.  I don't know.
25    Q.   Do you recall it being once a week, once a

Page 81

1  month?
2    A.   I mean, I don't recall doing it a lot, but I
3  don't know.
4    Q.   When you did happen to do one of these
5  reports, would you save the report anywhere?
6    A.   We would save the spreadsheet into a file.
7    Q.   Do you recall where that file is located?
8  Was it a centrally located file, for example?
9    A.   It was -- yeah, it was just in a folder that
10  we could all get to on the system.
11    Q.   And your instructions were to save the
12  reports in that file, correct?
13    A.   To save the spreadsheets, yes.
14    Q.   Do you know whether those spreadsheets are
15  still available?
16    A.   I -- I mean, I think they are.  I haven't
17  looked.
18    Q.   But you would assume they would be, correct?
19    A.   Yes.
20    Q.   No reason to delete them, right?
21    A.   I haven't deleted them, no.
22    Q.   Have you been asked about them in connection
23  with this case?
24        MR. MAZZA:  I would caution the witness not
25  to disclose any communications that he's had with

Page 82

1    counsel.
2    BY MR. BOWER:
3        Q.  It's just a yes-or-no question.  You can
4    answer the question.
5        A.  I have been asked about them, but I don't
6    know what in regards to.
7           (Abernathy Exhibit 6 was marked for
8    identification.)
9    BY MR. BOWER:
10       Q.  Before I -- before you get to this document,
11   who asked you about them?
12       A.  I don't remember.
13       Q.  Do you remember whether it was an attorney?
14       A.  No, I don't remember.
15       Q.  Do you remember approximately when you were
16   asked about them?
17       A.  It's been a while ago.
18       Q.  More than a month?
19       A.  It's been more than a month.
20       Q.  More than a year?
21       A.  I don't remember.  I don't --
22       Q.  Do you think it was over the summer?  Does
23   that help at all?
24       A.  It seems like it was before that, but I
25   don't know.

Page 83

1        Q.  But it would have been your expectation that
2    these reports still exist, correct?
3        A.  Yes.
4        Q.  You've been handed what's been marked as
5    Exhibit 6, an e-mail from yourself to Mr. Beam,
6    Mr. Chapman, Ms. Auldridge, Mr. Mullin and
7    Ms. Spruell ending in 9987.
8           It appears to be another Over 20 Report, and
9    the report is attached.  So just take another moment
10   to review this and let me know when you've had a
11   chance to complete your review.
12          Have you had a chance to review it, sir?
13       A.  Yes, sir.
14       Q.  Let me know if you need another minute.  I
15   don't mean to rush you.
16       A.  Yes, sir, that's fine.
17       Q.  Okay.  This is another example of a day when
18   you were responsible for the Over 20 Report,
19   correct?
20       A.  Yes, sir, this is -- would -- yes, sir.
21       Q.  Okay.  And in the summary you provide, it
22   appears that you provide an excerpt from some
23   spreadsheet.
24          Do you see that?
25       A.  Yes, sir.

Page 84

1        Q.  Do you know where you would have pulled that
2    data from?
3        A.  We would have pulled that from our Reddwerks
4    system, the system that holds our orders.
5        Q.  Do you know how far back that Reddwerks has
6    data from?
7        A.  I don't know.  It -- we had immediate access
8    to it for about 15 days back.  We had another --
9    there was a -- that was immediately within the
10   system.
11          There was -- we could go back I think three
12   years.  If we accessed a different place in the
13   Reddwerks system, it would allow us to go back and
14   look at that.
15       Q.  In the third bullet point, you referenced
16   the stores ordered since March 2013.
17          Do you see that?
18       A.  Yes.
19       Q.  Is that something you reviewed in
20   considering whether to cut the order?
21       A.  No, sir.
22       Q.  Is there a reason you're including that in
23   the e-mail?
24       A.  I believe it was asked by our global
25   investigations team to add that information in

Page 85

1    there.  So when we sent this over, I believe they
2    were using that information.  They -- know they
3    were -- it had to be in a specific format because
4    they were taking that information and putting it in
5    something, and it had to be in a special format.
6           But I believe they asked us for that
7    information because they didn't have the access to
8    the Reddwerks system.
9        Q.  Do you know who was on that global
10   investigations team during this time period?
11       A.  Greg Beam is the person we sent it to.
12       Q.  Here, you have an example of an order with
13   50 bottles, correct, of oxycodone 15 mg.  Do you see
14   that second bullet point there says Store 2113,
15   Phoenix, Arizona, ordered 50 bottles of oxycodone
16   15mg.
17       A.  Yes.
18       Q.  Do you see that?
19          You decided not to cut that order, correct?
20       A.  Correct.
21       Q.  What criteria did you use to determine
22   whether that order should be cut or not?
23       A.  I didn't -- I didn't determine whether it
24   should be cut or not.  I was just providing that
25   information to the global investigations team.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   Q.  So because it was 50 bottles and not 51, you
2  had no ability to cut the order, correct?
3   A.  I didn't -- I didn't cut an order unless
4  they told me to cut it.
5   Q.  Unless it was an oxy-30?
6   A.  Unless it was the direction given.
7   Q.  So even if this order had been an order for
8  70 bottles, you yourself wouldn't have been the one
9  to decide whether to cut it, correct?
10   A.  No, sir.
11   Q.  That would have been the other folks on this
12  e-mail, correct?
13   A.  Yes, sir.
14   Q.  If they hadn't gotten back to you, you would
15  have shipped the order, correct?
16   A.  Yes, sir.
17   Q.  I just have a few questions on the
18  spreadsheet itself.
19   A.  Okay.
20   Q.  A few of the columns -- let me ask you this
21  question.
22     These columns at the top, starting with
23  "Store" all the way on the left and ending with "Web
24  Form" on the right -- do you see that?
25     MR. MAZZA:  Mr. Bower, I assume the column

Page 87

1  headers in your copy are also cut off, right?
2     MR. BOWER:  Oh, no, they're not.  We'll get
3  a clean copy for the record.
4     MR. MAZZA:  Take a look at it.  You can make
5  out the bottom half of it.  So it might be
6  helpful if you just walk through it is.
7     MR. BOWER:  Okay.  Sure, yeah, I apologize
8  for that.  It's a copying error.
9  BY MR. BOWERS:
10   Q.  The columns, I will just read them out so
11  that we can all be on the same page.  They are
12  Store, City, State, Item Number, and NDC,
13  description, quantity ordered -- sorry, not quantity
14  ordered -- it's QTY Order, QTY Sent, Four Week,
15  Total and Web Form.
16     I don't need to go through each one of
17  those.  I just want to ask if you recall whether
18  there were other column headings in the Reddwerks
19  system that may not appear on this printout.
20   A.  No, sir.
21   Q.  And when you were deciding or reviewing
22  these orders, did you ever consider whether one
23  store may have ordered -- had multiple orders on
24  this list?
25     MR. MAZZA:  Object; form.

Page 88

1  BY MR. BOWERS:
2   Q.  For example, if you look at the column all
3  the way on the left, Store 842, in Pueblo, do you
4  see that one?
5   A.  Yes, sir.
6   Q.  It appears the first time for oxycodone 15
7  mgs and oxycodone/APAP5.
8     Do you see that?
9   A.  Yes.
10     MR. MAZZA:  I'm sorry, Mr. Bower, I see
11  the -- maybe I'm --
12     MR. BOWER:  842.
13     MR. MAZZA:  I've got it.  Sorry.
14  BY MR. BOWER:
15   Q.  I'm wondering, in reviewing these orders,
16  whether you considered whether that store, for
17  example, had multiple orders Over 20 in considering
18  whether to cut any orders or to report any orders.
19   A.  So I didn't cut them.  I just reported that
20  this is what they had.  So that's what this was.
21   Q.  Was there ever a circumstance in your
22  experience where, other than with oxy-30s, where an
23  order under 50 bottles was cut?
24   A.  I mean, I don't recall any but, I mean,
25  there was -- there's a lot of orders.  I don't -- I

Page 89

1  mean I wasn't there every day.
2     MR. MAZZA:  Interpose a form objection to
3  that last question.
4  BY MR. BOWER:
5   Q.  I appreciate your answer.  I'm not asking --
6  I'm just asking if you recall it ever happening.
7   A.  I don't recall.
8     MR. MAZZA:  Same objection.
9   Q.  Sir, as you sit here today, can you explain
10  to us how long Walmart followed this policy of
11  preparing the Over 20 Reports?
12   A.  Seems like we started in 2012, and we did
13  that until 2013 or '14.  Our Reddwerks system was
14  able to flag those orders for us, so we didn't -- we
15  didn't have to do the process we were doing.
16   Q.  So at some point in 2013 and 2014 the
17  Reddwerks system was used to automatically cut any
18  oxy-30 orders Over 20; is that correct?
19   A.  I don't -- I don't think it automatically
20  cut those.  It just flagged them for us to send to
21  people to review.
22   Q.  Okay.  So how -- how did that represent a
23  change, then, in your experience?
24   A.  Before, we were taking the orders for the
25  day and we were exporting those to a spreadsheet.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 The change occurred when there was a place put into
2 Reddwerks that -- those same criteria we were
3 filtering for, it would automatically flag those for
4 us.
5    Q.  Okay. I think I understand. So it just
6 saved you a step, correct?
7    A.  Yes.
8    Q.  But the information that you were reviewing
9 didn't change, correct?
10    A.  Correct.
11    Q.  Policy didn't change, right?
12    A.  Correct.
13    Q.  Has the policy changed since 2012?
14    A.  So what the system allowed us to do, I don't
15 feel that it changed because it just made it so that
16 instead of me filtering and sending a spreadsheet to
17 the people that needed to see it, the system
18 automatically flagged those and then we just
19 through -- electronically through the system sent
20 those to the people who needed to see that, so it
21 didn't change.
22    (Abernathy Exhibit 7 was marked for
23 identification.)
24 BY MR. BOWER:
25    Q.  Sir, you've been handed what's been marked

Page 91

1 as Exhibit 7, an e-mail from yourself to others,
2 including Ms. Spruell, Ms. Auldridge, Jason Wyrick,
3 and Edward O'Brian, ending in Bates number 9872.
4 The e-mail is dated October 14th, 2013.
5    Take a moment to review the e-mail if you
6 would, and then I can tell you my first question
7 will be: What is an Over 40 Report.
8    Have you had a chance to review it, sir?
9    A.  I just need to read the top part.
10    Q.  Oh, sure. Apologize.
11    A.  Okay.
12    Q.  All right, sir. Thank you.
13    What process are you describing in your
14 e-mail to Donna?
15    A.  It looks like the process for our Over 20
16 Report.
17    Q.  And that process is Walmart's policy and
18 procedure for suspicious order monitoring for C2
19 narcotics, correct?
20    MR. MAZZA: Objection; form.
21    A.  That's the process that, from the direction
22 we were given in the e-mail from Ramona, to list
23 those and cut anything of oxy-30, 20 or more back to
24 20.
25    Q.  And other than what you describe in this

Page 92

1 e-mail, was there any part of Walmart's suspicious
2 order monitoring process that you were aware of?
3    A.  No, sir.
4    Q.  I just want to see if we can break down some
5 of this so we can understand what -- how this
6 process worked. Okay?
7    What does WPM refer to?
8    A.  WPM is our Reddwerks system.
9    Q.  So that's Reddwerks. Okay. That's helpful.
10    And what is the historical items data tab in
11 COSOS?
12    A.  Historical items data is a tab that would be
13 in our controlled substance ordering system, where
14 we would go back to get the historical data that I
15 had talked about earlier, where we would have to go
16 somewhere else to get that.
17    Q.  Okay. So the -- and you refer to it in here
18 as CSOS, correct?
19    A.  CSOS, yes, sir.
20    Q.  And that system is different that Reddwerks,
21 correct?
22    A.  It's by the same company as Reddwerks but a
23 different application.
24    Q.  And it's different data, correct?
25    A.  It deals with the electronic 222 forms.

Page 93

1    Q.  And then Number 2, you describe a process
2 for the identification of unusual orders, correct?
3    A.  Yes, sir.
4    Q.  You say: We look at the -- I believe that's
5 supposed to be quotes -- the Over 20 Report, and any
6 order with more than 50 bottles we look at the
7 store's history to see if the amount is within their
8 normal ordering pattern.
9    Do you see that?
10    A.  Yes, sir.
11    Q.  What criteria would you use to determine
12 whether the order was within their normal ordering
13 patterns?
14    A.  We would look at, like, their four-week
15 average and just see, I mean, does it seem to be
16 within that.
17    Q.  That was something you were doing, correct?
18    A.  We would look at it, yes, sir.
19    Q.  You and Mr. Sherl were making that -- either
20 you or Mr. Sherl would make that decision on a daily
21 basis, correct?
22    MR. MAZZA: Objection; form.
23    A.  We weren't making any decisions. We were
24 just looking at it.
25    Q.  You were determining whether those orders

Page 94

1 were within their normal ordering patterns, correct?
2 A. Yes.
3 Q. You were doing that, right?
4 A. On the days I did that, yes.
5 Q. And were there any written criteria you used
6 to make those decisions?
7 A. I don't remember looking at any, no.
8 Q. Well, how would you determine whether an
9 order was within a normal ordering pattern?
10 A. Just from my experience.
11 Q. What experience is that, sir?
12 A. Well, working with the C2 drugs and the
13 distribution of those, just looking at orders and
14 just, you know, if something looked unusual, then
15 that's what I looked at.
16 Q. Sir, were you aware by this time in 2013 the
17 country was in the middle of an opioid epidemic?
18 A. No, sir.
19 Q. Did you ever look at ordering patterns in
20 1997, 1998?
21 A. No, sir, I was --
22 Q. What ordering patterns were you looking at?
23     MR. MAZZA: Objection; form.
24 A. I was looking at the information we had
25 available to us.

Page 95

1 Q. And what information did you have available
2 to you? How far back did it go?
3 A. The four-week --
4     MR. MAZZA: Same objection.
5 A. The four-week report that we would go back
6 and look at or that we would run through Reddwerks.
7 Q. So your reference here to normal ordering
8 patterns refers to the prior four weeks; is that
9 correct?
10 A. Yes.
11 Q. You didn't have access to anything else,
12 right?
13 A. I didn't look at anything else.
14 Q. And then step three, sir, you say: Once we
15 identify an unusual order -- correct? That's you
16 again, correct? You or Mr. Sherl, correct? -- you
17 contact the RX manager, correct?
18     MR. MAZZA: Same objection.
19 BY MR. BOWER:
20 Q. These are your words, correct, sir?
21 A. This is the e-mail I typed.
22 Q. Who is the "we" there? Does that refer to
23 yourself and Mr. Sherl?
24 A. Yes.
25 Q. Does it refer to anybody else?

Page 96

1 A. We, whoever was doing the report that day.
2 Q. Either you or Mr. Sherl, correct?
3 A. (Nodding head.)
4 Q. And who was the RX manager? Is that the
5 individual pharmacies?
6 A. Yes.
7     MR. MAZZA: Mr. Bower, could you just slow
8 just a bit?
9     MR. BOWER: Sure.
10     MR. MAZZA: Thank you.
11 BY MR. BOWER:
12 Q. Did you have a list of questions that you
13 would ask them to determine whether the amount
14 requested was really needed or an ordering mistake?
15 A. I didn't have a set list I asked. I just
16 asked questions about the order.
17 Q. What sorts of questions would you ask?
18 A. Well, primarily did you mean to order this
19 many? Is this correct? Depending on their answer,
20 however the conversation went after that. I mean,
21 it wasn't scripted or anything like that.
22 Q. And you say: If needed, what is the reason
23 for the increase?
24     Do you see that?
25 A. Yeah.

Page 97

1 Q. What did -- in your judgment would have been
2 a valid reason for an increase during this time
3 period?
4     MR. MAZZA: Objection; form.
5 BY MR. BOWER:
6 Q. Strike that.
7     During this time period, in making a
8 decision, how would you have determined whether the
9 reason for the increase justified the order?
10 A. I don't think I was gathering it to make a
11 decision. I was gathering it and asking the
12 questions so that I could pass that along to other
13 people.
14 Q. Well, you say in the next sentence here, you
15 say: Depending on the answers.
16     Correct?
17 A. Yes.
18 Q. So in some circumstances you would not
19 involve other people, correct?
20 A. To cut it, no.
21 Q. What do you mean by that?
22 A. Well, I wouldn't cut the order unless
23 someone told me, hey, to cut that.
24 Q. Well, what -- what if you called the RX
25 manager and they said the order was an error? Would

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  you cut it?
2      MR. MAZZA:  Objection; form.
3      A.  We would let the people know -- we would
4  send that off and say this is why the order was that
5  high; do we need to cut it?
6      Q.  And which people would you let know?
7      A.  I would typically call our home office team
8  or -- that's where I started, you know, and talked
9  to Ramona or one of those people.
10     Q.  Would you call them or would you e-mail
11 them?
12     A.  Typically, I would call them, because I --
13 because we were filling the orders, I wanted to make
14 sure that we took care of the order, you know, in a
15 timely manner so that, you know, at the end of the
16 day we weren't waiting or holding anything that
17 needed to be shipped, that we could fix it while we
18 had it in our possession.
19     Q.  But that was your priority, right, to fix it
20 in a timely manner, correct?
21     MR. MAZZA:  Objection to form.
22 BY MR. BOWER:
23     Q.  You wanted to get these shipped that day,
24 right?
25     A.  I -- I wanted to -- I wanted to make sure

Page 99

1  the order was correct and accurate, so --
2      Q.  Right.
3          These are orders that have already been
4  flagged, correct?  Your first -- first number there
5  says:  We currently are not using the flagged order
6  items in WPM.
7          These are other items that have been
8  flagged?
9      MR. MAZZA:  Objection; form.
10     Q.  In other words -- I'll strike that.
11         In other words, these are items you are
12 reviewing because they have been flagged by
13 Walmart's policy, correct?
14     A.  Yes.
15     Q.  You say you involve other people, from the
16 marketing manager to HO Health & Wellness managers.
17         Do you see that?
18     A.  Yes, sir.
19     Q.  Who would you decide who to involve?  Strike
20 that.
21         How would you decide who to involve?
22     A.  Again, I think it would depend on the
23 conversation that I had as to who I needed to talk
24 to to get the direction that I needed to get.
25     Q.  So under what circumstance would you contact

Page 100

1  the market manager?
2      A.  Maybe if I couldn't contact a pharmacy
3  manager.  Sometimes, when we called, the pharmacy
4  manager was off that day and, you know, it was a
5  pharmacist who was filling in from another store to
6  cover, they wouldn't know anything about the order.
7  So I would try to contact the market manager to find
8  out what I needed to do with -- you know, ask the
9  questions about the order.
10     Q.  Sir, that's not what you're writing here.
11 You're stating:  Depending on the answers from the
12 RX manager, you're contacting the market manager,
13 right?  You're not writing if I can't contact the RX
14 manager, I'll contact the market manager, right?
15         So which one is it?
16     MR. MAZZA:  Objection; form.
17     A.  I mean --
18     Q.  I'm just trying to understand what the
19 policy was.  What was your policy and procedure?
20     A.  It was to, you know, for the orders that we
21 had that showed up, we would try to call and get
22 answers to make sure the order is accurate, so, you
23 know, if -- depending on the situation as to who I
24 had to call or contact or get ahold of.
25         I mean, it was -- it was all very based on

Page 101

1  what the situation was that day, and I believe what
2  she was -- I was trying to do was reflect that in my
3  e-mail, to show, you know, this is what we do, you
4  know.  But situations are different each time, so I
5  couldn't write every situation down.
6      Q.  I appreciate that.
7          And so it's really a matter of you trying to
8  deal with the situation you're faced with, right?
9      A.  Yes, sir.
10     Q.  Trying to get the orders cleared and
11 shipped, right?
12     A.  Yes, sir.
13     Q.  Again, just going back to this issue, if you
14 contacted someone and they didn't get back to you,
15 you would ship the order, correct?
16     A.  Yes, sir.
17     Q.  Okay.  And you would ship that day,
18 right?
19     A.  Yes, sir.
20     Q.  Okay.  And indeed I think part of what
21 you're saying is reflected in 4 where you say:
22 Other unusual orders are cut only after talking to
23 the RX operation and HO managers, correct?
24     A.  Yes, sir.
25     Q.  So only if they affirmatively told you to

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 cut an order would you do so, right?
2 　A.　Yes, sir.
3 　Q.　Otherwise they would be shipped?
4 　A.　Yes, sir.
5 　Q.　Do you know whether during this time any
6 orders that -- -- strike that.
7 　　　Do you know whether during this time if an
8 order was cut whether it was reported to the DEA?
9 　A.　No, sir.
10 　Q.　No, you don't know; or no, you don't believe
11 it was reported?
12 　A.　No, sir, I don't know.
13 　Q.　Do you know, if it was reported, who would
14 have done the reporting?
15 　A.　No, sir, I don't know.
16 　Q.　Do you know who would know the answer to
17 that question?
18 　A.　No, sir.
19 　Q.　The document -- the last document in that
20 exhibit -- in Exhibit 7, ending in Bates number
21 9875, is this kind of a step-by-step procedure that
22 you put together to put in writing how you would
23 prepare the reports?
24 　A.　It looks like a step-by-step process, yes,
25 sir.

Page 103

1 　Q.　And -- I didn't mean to cut you off.
2 　　　And in looking at the attachment, it
3 references an Over 40 Report doc.
4 　　　Do you see, going back to the first page,
5 the attachment line?
6 　　　Is this -- did you mean to be Over 20
7 Report, or is this intentionally referring to an
8 Over 40 Report?
9 　A.　It must be -- I may have hit 40. I don't
10 know of on Over 40. It would have been Over 20.
11 　Q.　And this is the process you would have used
12 in the Reddwerks system?
13 　A.　Yes, sir.
14 　Q.　Were the pharmacies aware of the thresholds
15 for oxy-30?
16 　A.　Not that I'm aware of.
17 　Q.　They would have been aware if they had made
18 an order for over the threshold, though, correct?
19 They would have been aware the order was cut,
20 correct?
21 　A.　They would have known when they only got 20
22 bottles they would have known, but I don't know
23 who -- if it was communicated, who would have done
24 that.
25 　Q.　Did anyone ever communicate to you as to why

Page 104

1 those orders were cut?
2 　A.　No.
3 　Q.　None of your conversations with the
4 pharmacies did anyone ever ask you that question?
5 　A.　Not to my knowledge.
6 　Q.　If a pharmacy's orders for oxy-30 was cut by
7 Walmart, could they have placed an order with
8 McKesson to get that product?
9 　A.　I believe they had ways to place orders with
10 McKesson.
11 　Q.　There was nothing from Walmart preventing
12 them from doing that, correct?
13 　A.　Not to my knowledge.
14 　Q.　And the same for ABDC, sir?
15 　A.　Yes, sir.
16 　　　(Abernathy Exhibit 8 was marked for
17 identification.)
18 　　　MR. MAZZA:　Do you want to --
19 　　　MR. BOWER:　Let's do.
20 　　　MR. BOWER:　Can we go off the record for a
21 minute.
22 　　　(Discussion off the record.)
23 BY MR. BOWER:
24 　Q.　All right, Mr. Abernathy, you've been handed
25 what's been marked as Exhibit 8. It's just a cover

Page 105

1 e-mail with an attachment, and the attachment is
2 from Ms. Spruell to Nick Tallman, yourself, and
3 Jason Wyrick.
4 　　　Do you see that?
5 　A.　Yes, sir.
6 　Q.　If you look at the attachment, it refers to
7 "Suspicious Order Monitoring Program."
8 　　　Do you see that?
9 　A.　Yes, sir.
10 　Q.　Under that, it says: "Work Group Progress
11 Report."
12 　　　Do you see that, sir?
13 　A.　Yes, sir.
14 　Q.　Do you know what this refers to?
15 　A.　I -- I don't. I'd like a chance to read it,
16 if I could.
17 　Q.　Sure. That's -- why don't we do this, then.
18 Why don't we take lunch now.
19 　　　MR. MAZZA:　And come back here?
20 　　　MR. BOWER:　Come back and start here since
21 it seems to be a new area.
22 　　　THE VIDEOGRAPHER:　Going off the record.
23 The time is 12:12.
24 　　　(Recess from 12:12 p.m. until 12:53 p.m.)
25 　　　THE VIDEOGRAPHER:　We're back on the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1   Beginning of Media File Number 3.  The time is
2   12:53.
3   BY MR. BOWER:
4      Q.   We're back on the record, Mr. Abernathy.
5        You understand you're still under oath, sir?
6      A.  Yes.
7      Q.  Why don't we take a moment on the record to
8   review Exhibit Number 8, which is in front of you,
9   which is where we left off before lunch.  And I just
10  want to get a general sense what this program or
11  project was about that's reflected in the
12  attachment.
13     Q.  Have you had a chance to review the
14  document, sir?
15     A.  Yes, sir.
16     Q.  Okay.  Do you need a few more minutes or
17  you're --
18     A.  I'm good.
19     Q.  Okay.  So this -- the attachment was sent by
20  Ms. Spruell to Nick Tallman, yourself, and Jason
21  Wyrick.
22        Do you see that?
23     A.  Yes, sir.
24     Q.  Just generally speaking, do you have a
25  recollection as to what this program or project was?

Page 107

1      A.  I believe it -- it looks like it was the
2   process of working up to more automation of our
3   Reddwerks application for flagging orders.
4      Q.  So this is part of the movement we discussed
5   earlier, from when you would run the report to
6   yourself to have Reddwerks automate the report; is
7   that correct?
8      A.  Yes, sir.  That's what it looks like.
9      Q.  So I just have a couple more specific
10  questions, then, with that understanding.
11        You see under the first kind of title there
12  in bold, underlined, "Overall Something Project
13  Update"?  Top of the page.
14        Do you see that?
15     A.  Yes, sir.
16     Q.  The first bullet point says:  "Project has
17  been Socialized with Leadership."
18        Do you know what that means?
19     A.  I mean, from what it says here, it would be
20  that they discussed it with leadership.
21     Q.  And do you know who that leadership would
22  refer to?
23     A.  No, sir.
24     Q.  Well, there is only three, four people at
25  these meetings, correct, at this point?

Page 108

1   Ms. Spruell, Mr. Tallman, yourself and Mr. Wyrick,
2   right?
3      A.  I mean, it looks like she sent it to us,
4   yes.
5      Q.  Were you a part of this meeting?
6      A.  No, sir.
7      Q.  No?  Okay.
8        Were you familiar with the plan to have
9   Reddwerks automate the reporting?
10     A.  I was -- yes, sir, they would, you know, ask
11  us questions about how it works now.  And it seems
12  like they would, like, ask us for input to ideas or
13  whatever.
14     Q.  Do you have any recollection as to when the
15  process actually became automated at Reddwerks?
16     A.  I don't -- I don't remember the exact --
17  like an exact date.  It does seem like it was in
18  that '13 -- 2013 or 2014 time period.
19     Q.  Okay.  Okay.  So under the process, then, it
20  refers to Jason, Jeff and Ed.
21        Do you see that?
22     A.  Yes, sir.
23     Q.  That refers to yourself, correct?
24     A.  Yes, sir.
25     Q.  And who is Jason?

Page 109

1      A.  If it's the same Jason on the front, Jason
2   Wyrick, he was the operations manager for 6001.
3      Q.  And Ed?
4      A.  Again, if it's -- well --
5      Q.  Did Nick Tallman go by Ed?
6      A.  No.
7      Q.  That was one of my questions.  Do you know
8   who Ed refers to?  Is he possibly in charge of
9   another process in another DC?
10     A.  There was an Ed who was an ops manager at
11  6046, but I don't know if that's who she was talking
12  about.
13     Q.  Did you know at this time -- this is in
14  October 2013 -- if either Jason or Ed had
15  responsibility for monitoring orders of hydrocodone?
16     A.  At this time, I don't know what -- what they
17  monitored as far as hydrocodone.  It wasn't a C2 at
18  the time, so I don't know what they monitored.
19     Q.  Do you know if hydrocodone was being
20  monitored at all at this time?
21     A.  I don't know.
22     Q.  So in the top of the next page -- and this
23  is part of what I wanted to clear up today -- was
24  the first bullet point references "Data
25  Process-Possible Approach."

Page 110

1    Do you see that?
2    A.  Yes, sir.
3    Q.  The first bullet point says: "Turn Off
4  Reddwerks Order Alerts."
5    Do you see that?
6    A.  Yes, sir.
7    Q.  That suggests to me, at least, that
8  Reddwerks order alerts have been already turned on.
9    Is that not consistent with your
10  recollection?
11    MR. MAZZA:  Objection; form.
12  BY MR. BOWER:
13    Q.  I'll strike that.  That's a poor question.
14    Does this refresh your recollection as to
15  whether the Reddwerks order alerts had been turned
16  on by this date?
17    A.  It doesn't, no.
18    Q.  Is it your recollection that during this
19  time period either you or Mr. Sherl would have been
20  still running the daily 20 reports?
21    A.  According to the date, we would have been
22  still running those.
23    Q.  Okay.  And then at the bottom it says:
24  Tim --
25    Is it Koch, under people there?

Page 111

1    A.  I think it's Koch.
2    Q.  -- Koch will be responsible for making all
3  required suspicious order reports to DEA.
4    Do you see that?
5    A.  Yes, sir.
6    Q.  Okay.  After you received this document, did
7  you begin to provide Mr. Koch with orders that you
8  would be cutting because, for example, if they were
9  oxy-30 orders that were over the threshold?
10    A.  I don't remember doing that.  I mean, we
11  sent the -- whatever the process was at the time, we
12  continued that, sending it to the Global
13  Investigation Team and the Asset Protection Team, my
14  general manager and the compliance team.
15    Q.  And just so the record is clear, you sent
16  them every time an order was cut, correct?  You sent
17  them an e-mail?
18    A.  We sent them one every day, yes, with what
19  happened that day, yes.
20    Q.  All right.
21    Q.  Well, do you know as you sit here today
22  whether Mr. Koch was on any of those e-mail lists
23  that you've just described, whether Asset Protection
24  Team, general manager or the compliance team or the
25  Global Investigation Team?

Page 112

1    A.  I don't know.
2    Q.  So you don't know as you sit here today
3  whether Mr. Koch was getting those cut reports,
4  correct?
5    A.  Yes, sir, I don't -- I don't know.
6    (Abernathy Exhibit 9 was marked for
7  identification.)
8  BY MR. BOWER:
9    Q.  Sir, you've been handed what's been marked
10  as Exhibit 9.  It's an e-mail chain, the first page
11  is ending in Bates number 17565.
12    Just take a moment to review that.  You
13  weren't on the entirety of this chain, so my
14  questions will focus on sort of where -- before you
15  fall off, which starts with the e-mail from Ms. Gan
16  on the second page of your attachment.
17    Have you had a chance to read the document,
18  sir?
19    A.  Yes.
20    Q.  I just want to know if we can start maybe on
21  the second page of the exhibit, Ms. Gan -- it's an
22  e-mail to Ms. Spruell, Mr. Mullin, yourself, Ramona
23  Sullins, Ava Thomas and a person at Reddwerks.
24    Do you see that?
25    She says:  Good morning.  Thank you for a

Page 113

1  productive meeting yesterday.
2    A.  Yes, sir.
3    Q.  Were you part of that meeting?
4    A.  I mean, I don't remember.
5    Q.  Do you recall during this general time frame
6  in February 2014 discussions regarding enhancing the
7  SOM process?
8    A.  I don't remember any specific meeting.  I
9  mean, during this time frame, I would be involved in
10  some of the meetings; some of the meetings I would
11  not; some I didn't attend.  So I don't know.  I
12  don't remember being at a meeting discussing SOW
13  preparations.
14    Q.  Do you know what SOW stands for?
15    A.  I don't know what it means.
16    Q.  Statement of work, potentially?
17    A.  I mean --
18    Q.  You don't know.  You don't know, right?
19    A.  Right.
20    Q.  What about ISD?
21    A.  ISD is our information systems department.
22    Q.  Okay.  Did they have to approve initiatives
23  for suspicious order monitoring?
24    A.  Anything with the ISD department, I don't
25  know.  It was -- I mean, outside of what I've done.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 I mean, I don't -- I didn't have any contact with
2 ISD or what their job was on this project.
3 Q. Well, do you know why Miranda is engaging
4 the ISD team?
5 MR. MAZZA: Objection; form.
6 Go ahead.
7 A. I don't know. I mean, Miranda would be the
8 one who would be communicating to the ISD team for
9 the project. She would be the one doing that. I
10 don't know.
11 Q. You don't know why she's doing that?
12 A. No, sir.
13 Q. Okay. But you did understand when you
14 received this e-mail that you couldn't move forward
15 until that team was engaged, correct?
16 A. Yes, sir.
17 Q. All right. Well, do you know what was
18 supposedly moving forward? What was going to
19 happen?
20 A. I believe it might have been to -- for
21 the -- for the automated way we were going to do
22 monitor orders in Reddwerks.
23 Q. Well, sir, if you turn to the last page -- I
24 believe the second to the last page of the exhibit,
25 ending in 17568.

Page 115

1 A. Yes, sir.
2 Q. Do you see that? The first line of the
3 e-mail from Miranda to Kristy that's attached to the
4 e-mail that includes you refers to our enhanced SOM
5 process. Do you see that? SOMP process. Sorry.
6 A. I'm sorry. I guess I don't -- which page?
7 Q. Sorry. The page ending in 17568. Right.
8 A. Yes, sir.
9 A. It says Miranda. That e-mail says:
10 "Miranda, During our last call with Reddwerks, I
11 promised to write out what I need Reddwerks to do to
12 support our enhanced SOMP processes."
13 Do you see that?
14 A. Yes, sir.
15 Q. Do you know what "enhanced SOMP processes"
16 refers to?
17 A. No, sir.
18 Q. There was -- during this time period, was
19 there a discussion at Walmart or at your DC facility
20 regarding enhancing the suspicious order monitoring
21 process?
22 A. We were enhancing our order monitoring
23 process. That's what I knew it as.
24 Q. Did you know it as -- those enhancements to
25 include quantity level specific to each store?

Page 116

1 A. Yes.
2 Q. Okay. And including item combinations?
3 A. Yes.
4 Q. Okay. Did you know that Reddwerks would
5 track specific order levels and trigger an order
6 alert if the cumulative order amount of a store and
7 item combination reaches a determined threshold?
8 A. I knew the thresholds were set based on item
9 and -- item level, order level. I don't -- I mean,
10 I -- that doesn't sound familiar --
11 Q. Well, what was --
12 A. -- the way it was read.
13 Q. Well let me ask you this: Was the -- we
14 spent some time today talking about the Over 20
15 Reports, correct? Was this process ever implemented
16 that altered that reporting process?
17 A. It created a way for us not to have to
18 manually create the spreadsheet and physically sort
19 those in an Excel document. It flagged those orders
20 for us in -- in the Reddwerks system and allowed us
21 to then electronically send those orders over to the
22 home office for review.
23 Q. Did that new process incorporate these
24 enhanced criteria here, including quantity level
25 specific to each store and item combination?

Page 117

1 A. Yes.
2 Q. They did?
3 So is it your understanding that after this
4 date, those Over 20 Reports included these enhanced
5 criteria?
6 A. Yes. We moved away from the Over 20 Report
7 into this new enhanced version of the Reddwerks.
8 (Abernathy Exhibit 10 was marked for
9 identification.)
10 BY MR. BOWER:
11 Q. Sir, you've been handed what's been marked
12 as Exhibit 10, which is another Over 20 Report dated
13 3/24/13.
14 Take a moment to review that, if you would.
15 I would note that it's approximately 20 days after
16 Exhibit 9.
17 My question -- my first question to you will
18 be whether this report, in fact, incorporates those
19 enhanced Reddwerks criteria we just discussed.
20 A. No, sir. This is the way -- this is the way
21 we were continuing -- we were doing it at the time.
22 Q. That's what I just wanted to clear up.
23 So it appears at least as of this date the
24 new Reddwerks enhanced process hasn't been
25 implemented yet, correct?

Page 118

1    A.  Correct.
2    Q.  Do you have any idea as to approximately
3  when it, if ever, was implemented?
4    A.  I do know it was implemented.  I don't know
5  an exact time or date that it was.  I know it was
6  in -- it was about in this time frame that we
7  switched to that.
8    Q.  Do you know why you were switching?
9    A.  No, sir.  Just to make it more automated so
10  we didn't have to continue to do -- you know, pull
11  the orders and sort them like we were doing.
12    Q.  Well, the switch was also enhancement,
13  right?  It was considering more criteria, right?
14  More data?
15    A.  Yes.
16    Q.  Do you know why you were considering more
17  data?
18    A.  No, sir.
19    Q.  Do you know why you were considering store
20  and item combinations?
21    A.  No, sir.
22    Q.  Did you ever ask?
23    A.  No, sir.
24    Q.  Did you have any concerns it was because of
25  the growing epidemic?

Page 119

1    A.  I -- I didn't know there was an epidemic.
2    Q.  Do you think anyone at Walmart knew?
3      MR. MAZZA:  Objection; form.
4    A.  I don't know.
5    Q.  No one ever talked about it?
6    A.  I didn't hear anybody talk about it.
7      MR. MAZZA:  Same objection.  Sorry.
8      Go ahead.
9  BY MR. BOWER:
10    Q.  If you look at the Over 20 Report that's
11  attached to this exhibit, you will see the four-week
12  total.
13      Is there a reason the four-week average
14  isn't on this one?
15    A.  Is there -- I'm sorry.  Repeat the question.
16    Q.  A few of the other Over 20 Reports, if you
17  recall, included a four-week total and a four-week
18  average.  I noted that this one doesn't include a
19  four-week average.
20    A.  Okay.
21    Q.  Was there a certain point in time where you
22  decided to no longer consider the average and just
23  look at the total?
24    A.  I'm not sure.  I don't know.
25    Q.  Did you consider the total in running these

Page 120

1  reports?
2    A.  We gathered the totals -- I'm sorry.
3      We gathered the totals to send to the
4  global -- the Global Investigation Group.  We
5  provided them with that information, so that's why I
6  was gathering that data.
7    Q.  So if I --
8      MR. MAZZA:  I'm sorry, Mr. Bower, can you
9  just clarify?  Which exhibit are you referring to
10  when you say the one previous with the four-week
11  average?
12      MR. BOWER:  I know the other Over 20 Reports
13  included the four-week average.  I don't know if
14  we used them.
15      MR. MAZZA:  Oh, okay.  I thought you were
16  saying among the exhibits we've looked at.
17      MR. BOWER:  Thank you.  Let me clarify the
18  record, then.
19  BY MR. BOWER:
20    Q.  Sir, you're familiar that at least some Over
21  20 Reports included a column of four-week average,
22  correct?
23    A.  It's been a while since I've done one.  I'm
24  trying to remember if we --
25    Q.  Sir, did you review those -- any of those in

Page 121

1  preparation for your deposition today?
2    A.  No.  I mean --
3    Q.  Did you review any policies and procedures
4  in preparation for your deposition?
5      MR. MAZZA:  I'm going to object.  It calls
6  for protected work product.  Instruct the witness
7  not to answer.
8  BY MR. BOWER:
9    Q.  Did you review any documents on your own,
10  outside the presence of your counsel in preparation
11  for your deposition?
12    A.  No, sir.
13    Q.  Did you talk to anybody in preparation for
14  your deposition, other than counsel?
15    A.  I'm sorry.  Say that again.
16    Q.  Other than counsel, your attorneys here
17  today and the attorneys at Walmart, did you talk to
18  anybody else in preparation for your deposition?
19    A.  No, sir.
20    Q.  Okay.  When did you stop preparing Over 20
21  Reports?
22    A.  2014, 2015, I believe.
23    Q.  So is it fair to say that you spent
24  approximately four to five years preparing those
25  reports?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  A.  Yeah, 2011 to 2014, somewhere in that time
2  frame.
3  Q.  And if had you to estimate how many reports
4  in total you prepared during that four- to five-year
5  time frame, what would you -- what would you put
6  that number at?
7  A.  Personally that I did?  I -- I mean, I
8  really -- I really wouldn't know, like, an amount
9  that I would have done.  I went in and did it on the
10  days, like I said, that Jimmy wasn't there, but I
11  don't know how many those were.
12  Q.  If I wanted to know whether -- you noted in
13  your cover e-mail that the DC did not cut any
14  orders.
15      Do you see that?
16  A.  Yes, sir.
17  Q.  If I wanted to know if, in fact, any of the
18  orders had been cut by someone else, how would I do
19  that?
20  A.  Well, we would have been the ones to cut
21  them at the DC.
22  Q.  Okay.  So if the DC didn't cut them, no one
23  else was cutting them, right?
24  A.  For the time period that we were doing the
25  Over 20 Report?

Page 123

1  Q.  Right.
2  A.  We would be the ones cutting them at the DC.
3  Q.  And someone --
4  A.  If we were instructed to do that.
5  Q.  Right.
6      And how would -- how would -- how would of
7  those -- those instructions come to you, via e-mail
8  or telephone?
9  A.  E-mail.
10  Q.  Do you recall an instance -- any instance
11  where you got an e-mail to cut an order?
12  A.  I don't remember any given instance to --
13  that we did that.
14  Q.  Do you remember that ever happening in this
15  four- to five-year time frame?
16  A.  In this time frame for the Over 20 Report, I
17  don't remember -- I don't remember me getting any
18  kind of a phone call or an e-mail to cut an order.
19  Q.  So you guys were running these reports daily
20  for four to five years, and you never recall
21  receiving any direction to cut an order; is that
22  correct?
23  A.  I don't remember -- I don't remember getting
24  one.
25      (Abernathy Exhibit 11 was marked for

Page 124

1  identification.)
2  BY MR. BOWER:
3  Q.  You've been handed what's been marked
4  Exhibit 11, sir, and this is another Over 20 Report,
5  dated 8/14/14.
6      Do you see that?
7  A.  Yes, sir.
8  Q.  I just wanted to, for the record, include a
9  report that has the four-week average.
10      Do you see that on there, sir?
11  A.  Yes, sir.
12  Q.  So in some circumstances you did look at the
13  four-week average, correct?
14  A.  Some instances we added the four-week
15  average, yes, sir.
16  Q.  And why would you sometimes include the
17  four-week average and other times not include it?
18  A.  I believe we -- all this information you see
19  here was requested by us to include.
20  Q.  Well, we just looked at a report that didn't
21  have the four-week average --
22  A.  Yes, sir.
23  Q.  -- correct?
24      So were you supposed to include it or not?
25  A.  I don't know why I wouldn't have included

Page 125

1  it, but the information we provided to them, this is
2  what they asked for, so this is what we provided
3  them.
4  Q.  When you say "this is what they asked for,"
5  what do you -- what do you mean?
6  A.  The Global Investigation Team, this was
7  information that they asked us to send them.
8  Q.  In other words, they asked you to include
9  the four-week average?
10  A.  I mean, since it's on here, I would say they
11  asked us to add that on there.  That's why it was on
12  there.
13  Q.  And I note that on here, it has:  Ordered
14  and sent.
15      Right?
16  A.  Yes, sir.
17  Q.  So does that mean at the time this report
18  was prepared, those orders were already sent out?
19  A.  Yes, sir.
20  Q.  Okay.  So what is the point of providing
21  this order to these folks in the "to" column?  What
22  was the reason?
23  A.  Providing the ordered quantity.  Is that
24  what you're asking?
25  Q.  Yeah.  I mean, we talked about that you

Page 126

1  would provide these Over 20 Reports, I thought,
2  earlier so that they could be reviewed and any cuts
3  could be made, correct?
4     A.  Correct.
5     Q.  But it appears here that these orders have
6  already been sent, correct?
7     A.  Yes.
8     Q.  So who decided to send the Over 20s in this
9  example?
10        MR. MAZZA:  Objection to form.
11  BY MR. BOWER:
12     Q.  I'll strike that.
13        Who made the decision to approve the orders
14  of Over 20 for shipment as reflected on the
15  attachment to Exhibit 11?
16     A.  So -- so the direction given to me was to
17  send orders anything -- oxy-30 over 20, cut it to
18  20; anything -- any other drug over 50, report that,
19  send the order unless it was over 20, cut oxy-30,
20  20 -- cut it to 20; and then if we heard back from
21  anybody on this group to do something else with
22  another order, then we would process that and fix
23  that order to what they wanted it to be.
24     Q.  So let me see if I can clear that up a
25  little bit, because let's look at Store Number 308

Page 127

1  here, okay?  Do you see it on there?  Manchester,
2  Tennessee?
3     A.  Yes, sir.
4     Q.  It says ordered 55, right?
5     A.  Yes.
6     Q.  Same 55?
7     A.  Yes.
8     Q.  So at this point that order has already been
9  sent, right?
10     A.  Well, at the time of the e-mail it was still
11  sitting in our building.
12     Q.  Okay.  So you're telling me that the reason
13  for this e-mail is to let -- alert Gregory Beam,
14  George Chapman, Donna Auldridge, Kristy Spruell and
15  Mike Mullin and give them an opportunity to cut that
16  order before it actually goes out the door?
17     A.  If we heard them -- if that's what they
18  wanted to do with it, yes, sir.  It was -- we sent
19  this over to them for review, and if we did not hear
20  anything back, we sent the order.
21     Q.  What time would those orders be sent?  What
22  time of day?
23     A.  They didn't leave the building until after
24  3:00 p.m.
25     Q.  So this was at 1:14, correct?

Page 128

1     A.  Yes, sir.
2     Q.  So they had approximately two hours to
3  review these orders, decide whether they should be
4  cut or --
5     A.  Yes, sir.
6     Q.  -- or any other changes should be made
7  before they were shipped?
8     A.  I mean, that's when we sent it to them, yes,
9  sir.
10     Q.  And you see, looking again at that
11  Manchester, Tennessee, order, that four-week total
12  is zero, right?
13     A.  Yes.
14     Q.  The four-week average is zero, right?  And
15  they ordered 55 bottles, right?
16     A.  Yes, sir.
17     Q.  100 pills per bottle?
18     A.  I'm not sure.
19     Q.  Do you know how many pills were in a bottle?
20     A.  Not off the top of my head.
21     Q.  Do you know what the potential ranges were?
22     A.  As far as C2s go?
23     Q.  As far as this product here.
24     A.  No, sir, not off the top of my head, I don't
25  know.

Page 129

1     Q.  Okay.  You believe this order was shipped or
2  do you think that it was shipped?
3     A.  I believe it was shipped.
4        (Abernathy Exhibit 12 was marked for
5  identification.)
6  BY MR. BOWER:
7        MR. MAZZA:  These are getting thicker.
8        MR. BOWER:  I'm trying to avoid the thick
9  ones.  We're unfortunately going to have a few.
10  BY MR. BOWER:
11     Q.  You've been handed what's been marked as
12  Exhibit 12, which is an e-mail and an attachment.
13  The Bates number of the cover e-mail is 17510, and
14  the last page of the document -- of the exhibit is
15  19184, although --
16        MR. MAZZA:  Zach --
17        MR. BOWER:  Yes, that's going to be my first
18  question, whether this is, in fact, 21402 and
19  when it was implemented.
20        MR. MAZZA:  Well, the question I was going
21  to ask you is the Bates are not consecutive, so I
22  just wanted to confirm that we're dealing with an
23  attachment to the e-mail.
24        MR. BOWER:  Well, there may be -- right.
25  Okay.  So if you -- this is -- it includes the

Page 130

1  form as well. So if you look at the attachment,
2  the attachment ends -- it is consecutive, because
3  the attachment starts with 17511, if you look at
4  the first page after the e-mail.
5      MR. MAZZA: Oh, okay. I'm with you.
6      MR. BOWER: And that ends in 17514.
7      MR. MAZZA: Right.
8      MR. BOWER: And then the document attached
9  to that, which I believe is referenced in this
10 attachment, is just a blank Controlled Substance
11 Distribution Monitoring Program form.
12     MR. MAZZA: Okay. So --
13     MR. BOWER: Which I'm going to ask about in
14 context of the attachment.
15     MR. MAZZA: So the second set of Bates was
16 not attached to the e-mail.
17     MR. BOWER: Correct. So I did a composite
18 exhibit for ease of numbering.
19     MR. MAZZA: You want to keep them together?
20     MR. BOWER: Yes.
21     MR. MAZZA: Okay. You can go ahead and
22 start your review.
23     MR. BOWER: I apologize for the confusion. I
24 should have made that clarified.
25     MR. MAZZA: No, no, no. It happens.

Page 131

1      MR. BOWER: Just for the record, I'll note
2  that the first page of the attachment has a link
3  to the forms, and the first form referenced there
4  is an Order of Interest Evaluation Form. And
5  that's why I attached this one, to see if that's
6  the form that's linked there, if the witness
7  knows the answer to that question.
8      MR. MAZZA: Yeah. And if we're clarifying,
9  the document ending in 182 is titled Order of
10 Interest Investigation Form, not evaluation form.
11     MR. BOWER: That's correct.
12     MR. MAZZA: All right.
13 BY MR. BOWER:
14     Q. Sir, the cover of the e-mail which you are
15 currently reviewing is from Theresa Alford to a host
16 of folks, including yourself.
17     Do you see that?
18     A. Yes, sir.
19     Q. So just take your time. I didn't mean to
20 interrupt you. Take your time and review the
21 attachment and just let me know when you've had a
22 chance to do that.
23     Have you had a chance to review the
24 document?
25     A. Yes, sir. I'm ready.

Page 132

1      Q. So I just have a few questions about this,
2  and particularly in light of Exhibit 11, which is
3  the Over 20 Report, which is dated after this, which
4  is the one we just looked at right there.
5      If you will note, that's dated after this
6  e-mail.
7      A. Yes, sir.
8      Q. Okay. So I just -- my first question is:
9  Was this policy that's reflected in Exhibit 12 in
10 place in July of 2014?
11     A. I don't -- I don't think so.
12     Q. Do you know whether this policy was ever
13 implemented at Walmart, 6045?
14     A. I mean, it -- I don't remember seeing this
15 or anything like this. I mean --
16     MR. BOWER: Why don't we just pause and go
17 off the record for a minute and see if we can --
18     MR. MAZZA: There are folks on the line,
19 right?
20     THE VIDEOGRAPHER: We're going off the
21 record. The time is 1:38.
22     (Recess from 1:38 p.m. until 1:43 p.m.)
23     THE VIDEOGRAPHER: Going back on record.
24 Beginning of Media File Number 4. The time is
25 1:43.

Page 133

1  BY MR. BOWER:
2      Q. Mr. Abernathy, right before we went off, I
3  had asked a question about the relationship of
4  Exhibits 12 and 11 and whether the policy reflected
5  in Exhibit 12 was in place at the time the Over 20
6  Report reflected in 11 was created and distributed
7  by yourself.
8      A. I don't remember when this policy was put in
9  place.
10     Q. Do you recall whether it was ever put in
11 place and applicable to DC 6045?
12     MR. MAZZA: Objection; form.
13 BY MR. BOWER:
14     Q. I'll strike that, then.
15     Do you recall whether it was ever put in
16 place?
17     A. I believe it was put in place, but I don't
18 know at what point.
19     Q. Do you know whether it applied to the C2
20 opioids that were distributed by 6045?
21     A. I think it would, yes.
22     Q. Do you know when that application would have
23 taken place or started?
24     A. I believe when we started automated
25 Reddwerks system.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q.   That would have been sometime after August
2  2014, correct?
3    A.   2014, somewhere in that period, yes, sir.
4    Q.   So if you look at Exhibit 11, it's dated
5  August 14, 2014, right?  At that point you were
6  still creating the daily Over 20 Reports, correct?
7    A.   Yes, sir.
8    Q.   So if it -- is it true then that the policy
9  reflected in Exhibit 12 wasn't yet in place by
10 August of 2014?
11   A.   Yes.
12   Q.   Okay.  In connection with the policy
13 reflected in Exhibit 12, which is titled "Pharmacy
14 Manual Evaluating Orders of Interest and Suspicious
15 Order Reporting."
16      Do you see that?
17   A.   Yes, sir.
18   Q.   Did you have any duties or responsibilities
19 in connection with carrying out that policy?
20   A.   My -- all our job was at the DC is once
21 those orders were flagged in the Reddwerks system
22 was for us to electronically send those over to the
23 home office team for whatever they did, evaluate
24 those orders.
25   Q.   So based on your experiences and

Page 135

1  responsibilities at 6045, is it your understanding
2  that this policy was applied to the orders that you
3  would send over to the home office team?
4    A.   That's what I understand.
5    Q.   Okay.  And that the orders of interest under
6  the definitions here -- do you see it has a
7  definition for orders of interest?
8    A.   Yes, sir.
9    Q.   Those would be the orders that you would
10 have sent over in the Over 20 Reports?
11   A.   Yes.
12   Q.   And all of this -- all of these procedures
13 and evaluations would have occurred between the time
14 that we talked about earlier, 1:14 p.m. and the time
15 of shipment, which would have been approximately two
16 hours later, correct?
17   A.   I'm not sure.  I mean, I'm not sure what
18 they had to do with it once they got it.  We sent
19 the report at 1:14 in the afternoon.
20   Q.   Do you see, sir, under the procedures, on
21 page 17511, it goes through the procedures to
22 evaluate an order of interest?
23   A.   Yes, sir.
24   Q.   Do you see that?  In the top of the
25 following page, it states that every order of

Page 136

1  interest will be thoroughly evaluated by the
2  Logistics Compliance Team.
3      Do you see that?
4      MR. MAZZA:  Where are you at, Mr. Bower?
5      MR. BOWER:  Top of page 17152.  Sorry.
6  BY MR. BOWER:
7    Q.   Do you see that, sir?
8    A.   Yes, sir.
9    Q.   And it says:  No order identified as an
10 order of interest will be shipped.
11      Do you see that?
12   A.   Yes, sir.
13   Q.   So why is it that a month later we are
14 shipping all these orders on the Over 20 Report?
15      MR. MAZZA:  Objection; form.
16   A.   Well, I don't -- I don't know who the
17 Logistics Compliance Team is, so -- I know that
18 these are the people I was sending the report to.  I
19 don't know what they were doing with them.
20      The process and direction that I had was we
21 would send them unless they told me what I needed to
22 do with those orders.
23   Q.   Right.
24   A.   So --
25   Q.   I didn't mean to cut you off.  Please

Page 137

1  finish.
2    A.   So that's why I was saying I don't know -- I
3  don't know who the Logistics Compliance Team is.  I
4  don't know if that's -- I was sending them to the
5  people on this e-mail list.  I don't know if they
6  were a part of this team, so -- and, again, like I
7  said, I don't know exactly when this was
8  implemented, so --
9    Q.   Well, sir, if you keep reading on this, on
10 the top of page 512 again:  If an order of interest
11 is not resolved within four business days.
12      Do you see that?
13   A.   Yes, sir.
14   Q.   But you weren't waiting four business
15 days after you sent the Over 20 Report to ship, were
16 you?
17   A.   No, sir.
18   Q.   You were shipping those the same day, right?
19   A.   We were shipping them the same day.
20   Q.   So this policy could not have been being
21 followed as of 8/14/2014, correct?
22   A.   Correct.
23   Q.   Was there ever a time when you were sending
24 Over 20 Reports and waiting four days to ship?
25   A.   No, sir.

Page 138

1    Q.  Are you familiar with any time period, based
2  on your experience at 6045, when an order that
3  showed up on an Over 20 Report had to wait four days
4  before it was shipped?
5    A.  For the Over 20 Report, I don't ever
6  remember holding an order during the time frame we
7  were using that report.
8    Q.  When did you stop using that report?
9    A.  Again, it was 2014, 2015, when we went to
10  the automated Reddwerks.
11    Q.  Okay.  Do you recall as you sit here today
12  what the automated Reddwerks was flagging for a
13  potentially suspicious report?
14    A.  It was looking for -- the criteria it was
15  looking for was based on item and quantity.
16    Q.  Were those items and quantities different
17  than those that were identified in the Over 20
18  Reports?
19    A.  In the -- I don't know what they were in the
20  red -- automated Reddwerks.  I just know they
21  were -- they were looking at item and quantity.
22  That's -- I mean, that's all I know that -- that's
23  what would cause the order to flag.
24    Q.  Do you know who would know what the item and
25  quantity criteria were that were used in Reddwerks?

Page 139

1    A.  I don't know who set those.
2    Q.  Do you know who would know that?
3    A.  I mean, I don't.
4    Q.  Do you know who was involved in working with
5  the Reddwerks and setting that up?
6    A.  I mean, Miranda was part of that team
7  working with ISD and Reddwerks to get that process
8  going.
9    (Abernathy Exhibit 13 was marked for
10  identification.)
11    MR. MAZZA:  Zach, are we done with 12, or
12  you think you're going to need it again?  I'm
13  just going to put it back together if we're done.
14    MR. BOWER:  Let me ask a few more questions.
15  That reminds me of the attachment issue.  I want
16  to clear that up for the record.
17  BY MR. BOWER:
18    Q.  Let's look at Exhibit 12 for another moment.
19  Let me turn back to it.
20    The second attachment which begins with
21  Bates number 19182 is titled "A Controlled Substance
22  Distribution Monitoring Program," and then under
23  that it has "Orders of Interest Investigation Form."
24    Do you see that?
25    A.  Yes, sir.

Page 140

1    Q.  Have you ever seen this form before?
2    A.  No, sir.
3    Q.  So you don't know whether that form is the
4  one that is noted as the link on the first page of
5  the attachment, which is 75111?
6    A.  No, sir.
7    Q.  You've never seen one of these forms filled
8  out; is that correct?
9    A.  Yes, sir.
10    Q.  Okay.  With that, you can probably move that
11  to the side, sir, for a while -- or for now.
12    Let's turn to Exhibit 13, which is another
13  Over 20/50 report dated October 16th, 2014, and the
14  e-mail is ending Bates number 9807.  And I want to
15  use this report to ask you some questions, mostly
16  focused on the addition of hydro as a Controlled 2
17  substance.
18    So with that in mind, take your time to
19  review it if you need to.
20    A.  Okay.
21    Q.  Have you had a chance to review it, sir?
22    A.  Yes, sir.
23    Q.  I have a few lines of questioning on this,
24  so I want to first ask you about your reference to
25  hydro.

Page 141

1    Do you see that, sir?
2    A.  Yes, sir.
3    Q.  What drug does that refer to?
4    A.  Hydrocodone.
5    Q.  And by this date do you know whether
6  hydrocodone had been classified as a Schedule II
7  drug?
8    A.  Yes, sir, it looks like it had been.
9    Q.  And that's why you were including it in your
10  reports, correct?
11    A.  Yes, sir.
12    Q.  Do you know who was responsible for
13  reviewing orders of hydro before you?
14    A.  No, sir.
15    Q.  Do you know whether anybody was doing that?
16    A.  I don't know.
17    Q.  Did you ever ask anybody?
18    A.  No, sir.
19    Q.  When did you first learn that hydro would be
20  reclassified as a Schedule II narcotic?
21    A.  Seems like I heard about it right before it
22  happened.  I think it happened in October.  I think
23  we found out about it sometime in September because
24  we had a very short time to prepare for that.
25    Q.  And did you have concerns that it would

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1  impact your day-to-day reporting?
2    A.  I did have some concerns about that.
3    Q.  And did it, in fact, have an impact in your
4  reporting obligations?
5    A.  I don't think it had an impact.  I think it
6  was just cautious because of the volume that we were
7  taking on, so --
8    Q.  And did you receive any additional guidance
9  or policy or procedure to deal with the orders for
10  hydrocodone?
11    A.  Oh, I'm sure I did.
12    Q.  Were those written policies and procedures?
13    A.  Well, I mean, yes.  I don't recall any off
14  the top of my head, but, I mean, we -- with the
15  change, there were some new rules that came with it.
16    Q.  And do you know what those rules were?
17    A.  You know, just the same policies and
18  procedures we had, just it's with hydro and, you
19  know, make sure you're following those rules with it
20  and that type of thing.
21    Q.  So hydro was to be included on the Over 50
22  Report, correct?
23    A.  Yes.
24    Q.  And any order under 50 would be shipped,
25  correct?

Page 143

1    A.  Yes.
2    Q.  Any order over 50 would be reviewed prior to
3  shipment, correct?
4    A.  Yes.
5    Q.  And who would be doing the reviews for
6  those?
7    A.  I know that we reviewed them, Jimmy and I
8  would review them, and so we were -- we got to the
9  point where if it was over 50, we were told to cut
10  that because they were -- the way they stored them
11  at the store, it would have been too much.
12      So, you know, we were told same thing with
13  oxycodone 30, same way with over 50.  It's just
14  getting to where they didn't have the storage at the
15  store to do that.
16    Q.  Well, if they didn't have the storage at the
17  store to do it, why would they be ordering it?
18  Didn't that raise concerns for you?
19    A.  I don't think that the pharmacists were
20  ordering it.  I think that the system was ordering
21  it.
22    Q.  Well, let me ask you, then:  You say you'll
23  -- I will research all orders over 50 bottles.
24      Those were your words, correct, sir?
25    A.  Yes, sir.

Page 144

1    Q.  What did you do to research orders over 50
2  bottles?
3    A.  So I would have to go back and go back
4  into -- to get the week-by-week of what we sent
5  them, in that tab I was talking about, the
6  historical data, I would have to go back and
7  research and dig through that to get the four-week
8  totals.
9    Q.  Anything else you did to research?
10    A.  I mean, we were, you know, like I said, we
11  were always looking for quantity and, you know,
12  pattern, frequency, those types of things, just
13  anything that looked unusual, we were still doing
14  that.
15    Q.  You were always looking for pattern,
16  frequency and anything unusual?
17    A.  I mean those were things that we were
18  looking at.
19    Q.  Okay.  How were you looking for patterns,
20  what were you looking at?
21    A.  If we noticed a store that maybe showed up,
22  you know, quite a bit, like we would notice it being
23  on there quite a bit or something like that.  Those
24  would be some of the examples.
25    Q.  And what would happen if you noticed a store

Page 145

1  being on there quite a bit, what would you do?
2    A.  I would usually let someone know, say hey,
3  I've seen this store pop up a few times.  Or
4  something like that.
5    Q.  And how would you -- would you do that just
6  based on memory?
7    A.  Most of the time.
8    Q.  So you would review -- how many orders did
9  you review a day?
10    A.  I mean it varied from day-to-day.
11    Q.  Sometimes hundreds of orders, right?
12    A.  It could be.
13    Q.  This was over a period of many years, right?
14    A.  Well, once Hydro became a C2, it became
15  more.
16    Q.  And you were doing this pattern review based
17  on memory?
18    A.  If something struck me, like if I remembered
19  a store, yes.
20    Q.  How often did something strike you as --
21  with respect to a pattern problem?
22    A.  Pattern, not so much, not very often, but --
23    Q.  What about the other issues you researched?
24  You mentioned pattern.  Anything else?
25    A.  Well, like I said, size.  If something --

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  like again, if one of the ladies told us, hey, this
2  looks like this is a large amount, or, you know,
3  that type of thing we would call the store.
4      Q.  But you were running reports on the side
5  weren't you?
6      A.  We were.
7      Q.  So in addition to that you were doing your
8  own size review?
9      A.  No, like in -- like when the ladies were
10 picking and stuff like that.  You know, if a certain
11 item seemed to be picking more than normal, but it
12 wouldn't have triggered on the report, they may come
13 to us and tell us that.
14     Q.  Can you give me, as you sit here today, one
15 example when someone came and alerted you that there
16 was -- they noticed an issue when picking an item,
17 just one?
18     A.  I mean, I remember we had an issue with
19 liquid hydrocodone that was -- it seemed like every
20 store was getting the same amount and they came and
21 contacted us and we turned it over to the home
22 office team and said hey, look, it looks like we
23 have some stores that are just unusual that we would
24 be pulling that amount out of there, so --
25     Q.  So those looked unusual to you?

Page 147

1      A.  Yes, well to --
2      Q.  Did you cut those orders or did you ship
3  them?
4      A.  I don't remember what we did with those
5  orders.  I just remember the incident that it
6  happened and we reported that.
7      Q.  Well if you found -- if you determined them
8  to be unusual, why wouldn't you cut them?
9      A.  I didn't make the decision to cut it.
10 That's why I sent that information over to our home
11 office team and --
12     Q.  Who specifically did you send it to?
13     A.  I don't remember who I would have sent it
14 to.
15     Q.  Who was in the home office team that you
16 would -- you could have sent it to?
17     MR. MAZZA:  Objection as to form.
18     A.  For that particular day and item, I don't
19 know who I would have contacted that day.  I don't
20 remember who I contacted.
21     Q.  What about over the course of the four
22 years, who were the people at the home office team
23 that you contacted when you found something that was
24 suspicious?
25     A.  Again, it would depend on the situation and,

Page 148

1  you know, who I needed to contact.
2      Q.  Okay.  So who are those people?
3      A.  Anybody on our home office team, if it
4  seemed to be a replenishment issue, I might reach
5  out to our replenishment team, so those are
6  generally the two that --
7      Q.  Can you provide us any names today, sir?
8      A.  Ramona Sullins would be the one on our home
9  office team, Linda Wilson on our replenishment team.
10     Q.  Anyone else?
11     A.  No, sir.
12     Q.  So as you sit here today, wouldn't you have
13 reported this issue you found with the hydro liquid
14 to Ramona?
15     A.  I would have reported it to someone over
16 there.  I don't remember who I spoke to.
17     Q.  Who else could you have reported it to other
18 than Ramona?
19     A.  Anybody on our home office team.
20     Q.  Do you know who that was?
21     A.  At the time, I mean, I don't know -- Nick
22 Tallman.
23     Q.  Anyone else?
24     A.  Those would have been the two I would have
25 contacted.

Page 149

1      Q.  And how would you have contacted them, via
2  e-mail or by phone?
3      A.  I probably would have contacted by phone in
4  that situation.
5      Q.  And then would you have held the order and
6  not shipped it until you heard back from them?
7      A.  I'm not sure what I did, but that's why I
8  would have called, so that we could have got
9  resolution as quickly as possible.
10     Q.  Well, did Walmart have a policy in place as
11 to what you should do when you reported a suspicious
12 order, whether you should hold it and not ship it,
13 or whether you should ship it?
14     MR. MAZZA:  Objection as to form.
15     Q.  I'll strike that then.
16     Do you know whether Walmart had a policy in
17 place as to whether you should ship an order that you found
18 to be suspicious?
19     MR. MAZZA:  Same objection.
20     A.  I didn't know of a policy not to ship it.
21     Q.  Other than this one example of the -- is it
22 hydromorphone liquid, is that correct?
23     A.  Yes.
24     Q.  Any other examples over the course of the
25 four to five years where you specifically can recall

Page 150

1  someone alerting you as to a suspicious order?
2   A.  Not specifically.
3   Q.  Just this one time?
4      MR. MAZZA:  Objection as to the form.
5   Q.  Correct?
6   A.  For that item that time.
7   Q.  I'm asking for any other -- any other
8  controlled 2 substance over the entire four or five
9  year time period.  Are there any other examples you
10  can give us where you specifically contacted home
11  office team that you considered an order to be
12  suspicious?
13   A.  Not specifically.
14   Q.  Going back to Exhibit 13, kind of towards
15  the end of your second paragraph there, you state:
16  It takes about one minute without any interruptions
17  to complete one line in the report.
18      Do you see that?
19   A.  Yes, sir.
20   Q.  What does that mean to complete one line
21  item?
22   A.  It would be one of the line items on this
23  report.
24   Q.  What were you doing to complete them?
25   A.  Well, we were having to go back through the

Page 151

1  historical data, find that store and that item, and
2  look at the orders to find out how many were
3  ordered.
4   Q.  So can you give us an example, sir?  Let's
5  look at -- let's just look at the first one there,
6  all right, store 35 -- 3757, Arlington, Washington,
7  do you see that, sir?
8   A.  Yes.
9   Q.  For methadone, do you see that?  They
10  ordered 28.  What would you have reviewed?
11   A.  I mean, I would have gone back and tried to
12  get the four week total and four week average.
13   Q.  Those are absent here, correct?
14   A.  Right.  And it was probably because I was
15  busy and I was trying to do that, so --
16   Q.  Well, you do include the four week average
17  and four week total for all the orders that were
18  cut, correct?
19   A.  Yes.
20   Q.  Did someone specifically tell you to do that
21  to only orders that were cut?
22   A.  I don't recall.  I don't know.  I don't
23  remember that.
24   Q.  Do you have any idea why the four week total
25  and four week average are only included for the

Page 152

1  orders that were cut?
2   A.  I believe because that's what I had time to
3  do.
4   Q.  Did you ask anybody for help?
5   A.  I don't remember if I would have or didn't.
6   Q.  Could you have?
7   A.  I mean, I guess I could have.
8   Q.  Any reason you didn't?
9   A.  I don't remember the day or the
10  circumstances, so --
11   Q.  On this report you cut all the orders that
12  were over 50, correct?
13   A.  Yes, sir.
14   Q.  Did you report those orders to the DEA?
15   A.  I did not.
16   Q.  You reduced the order amount and you shipped
17  them, correct?
18   A.  Yes, sir.
19   Q.  Do you know whether anyone at Walmart
20  reported those orders?
21   A.  I do not.
22   Q.  Do you know whether Walmart should have
23  reported those orders?
24      MR. MAZZA:  Objection as to form.
25   A.  I do not.

Page 153

1   Q.  Do you know whether Wal-Mart had a legal
2  obligation to report those orders?
3      MR. MAZZA:  Same objection.
4   Q.  I'm just asking whether you know.
5   A.  I don't know.
6   Q.  Has anyone since the time you began working
7  at Walmart ever informed you as to what Walmart's
8  legal obligations were with respect to control 2
9  substances?
10   A.  I don't -- I'm not -- I mean, I'm not a
11  lawyer, so I don't know the legal reasoning for --
12  behind that.  When I was hired on to do the pharmacy
13  order monitoring at the home office, I mean, it was
14  explained to me that those orders would be reported
15  at that time.  Before that, I didn't know that.
16   Q.  Who explained that to you?
17   A.  Dena, she was my trainer, she was also on
18  the team.
19   Q.  Did she provide you any written policies and
20  procedures regarding what the legal obligations
21  were?
22   A.  I don't remember -- I don't remember that.
23   Q.  You don't remember ever receiving any
24  written policies and procedures; is that correct?
25   A.  Correct.

Page 154

1   Q.   After your e-mail on this hydro, did you
2   have any follow-up conversations with anyone as to
3   how to deal with hydro going forward?
4   A.   I don't remember.
5   Q.   You don't remember having any follow-up
6   conversations; is that correct?
7   A.   Yes, sir.
8   Q.   Do you recall how you actually treated the
9   hydro orders after 10/6/2014?
10      MR. MAZZA:  Object to form.
11   Q.   Strike that.
12      After 10/6/2014, did the hydro orders
13   continue to appear on your Over 20 reports?
14   A.   After -- yes.  When they moved to a C2, they
15   were on the Over 20 report.
16   Q.   Do you know whether when you were reviewing
17   the hydro orders, did you have access to the order
18   histories from before they were C2s?
19   A.   I don't -- I mean, I don't think so, because
20   the information we used was in the Reddwerks system
21   that we had for our building, so --
22   Q.   Well, wouldn't that have been relevant, for
23   your research -- the prior orders for that store,
24   for hydro?
25   A.   I'm sorry.  Say that again.

Page 155

1   Q.   Wouldn't a store's historical order pattern
2   been relevant and when you state here, you will
3   research orders over a certain threshold, wouldn't
4   you want to know that?
5   A.   I think we were just gathering that data.  I
6   don't know that I was using that data to make
7   decisions on anything.
8   Q.   What data were you using to make decisions
9   then?
10   A.   I was -- I was -- the direction and the
11   policies and procedures given to me is what I was
12   using.
13   Q.   Well, but, sir, you state here "I will
14   research," do you see that:  I will continue to
15   research," do you see that?
16   A.   Yes.
17   Q.   What were you researching?
18   A.   I was researching to find those stores,
19   those items and their orders.
20   Q.   But that information is on the report,
21   correct?
22   A.   Yes.
23   Q.   Anything that's not on the report that you
24   were researching?
25   A.   No.  That's what I was researching.  I was

Page 156

1   having to go back and research that.
2   Q.   By research, you mean review the report?
3   A.   Gather the data for the report, yes, sir.
4   Q.   But this report, for example, doesn't have
5   the data, correct?
6      MR. MAZZA:  Objection as to form.
7   Q.   It has the data for four of the items
8   listed, right?
9   A.   Yes, sir.
10   Q.   It doesn't have the data for all the other
11   items listed, right?
12   A.   Yes, sir.
13   Q.   Which is a lot more than four, right?
14      MR. MAZZA:  Same objection.
15   Q.   Did you research those?
16   A.   I don't know if I did or didn't.
17   Q.   Well, there is no data here, so what other
18   sources of information did you have to research?
19   A.   I guess I don't understand the question.
20   Q.   Well, sir, let's use another example.  Let's
21   look at -- let's go to the one, do you see the three
22   cuts in the row there of over 50 that are shaded?
23   A.   Yes, sir.
24   Q.   Let's go to the one right below that, Store
25   Number 5136 in Marysville, California, do you see

Page 157

1   that?
2   A.   Yes, sir.
3   Q.   They ordered 48, right?  That's 48 bottles,
4   right?
5   A.   Yes, sir.
6   Q.   They shipped 48 bottles, right?
7   A.   Yes.
8   Q.   You approved those for shipment, correct?
9   A.   According to this, I did, yes.
10   Q.   You researched those before you approved
11   that, right?
12   A.   I don't know what research I would have done
13   on that.
14   Q.   Well that's what I'm asking you, sir.  You
15   say you will continue to research, right?  I
16   research.
17   A.   Yes.
18   Q.   Do you only research when it's over 50?
19   A.   For this particular day, I did research the
20   ones that I -- that were over 50.
21   Q.   But for over 50, weren't you instructed to
22   automatically cut?
23   A.   Yes.
24   Q.   So why were you researching them?
25   A.   To provide that data.

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  Q.  So in other words, the research didn't
2  impact whether they were cut or not, is that
3  correct?
4  A.  Correct.
5  Q.  Was anyone at Walmart researching whether an
6  order should be cut or not?
7  A.  The global investigation team, the
8  compliance team, the AP team, and the home office
9  team was -- that was who was making those decisions.
10  Q.  And they were making those decisions after
11  they received the report and before these orders
12  were shipped, correct?
13  A.  Correct.
14  Q.  On that day, correct?
15  A.  Correct.
16  Q.  And in that window of time, correct?
17  A.  Correct.
18  MR. MAZZA:  Zach, we've been going for over
19  an hour 45.  So if you want to -- whenever you
20  are done with --
21  MR. BOWER:  Sure.  That's fine.  We can take
22  a break now.  I think I'm done.
23  THE VIDEOGRAPHER:  Going off the record.
24  The time is 2:20.
25  (Recess from 2:20 p.m. until 2:41 p.m.)

Page 159

1  THE VIDEOGRAPHER:  We're going back on the
2  record the beginning of Media File Number 5.  The
3  time is 2:41.
4  (Abernathy Exhibit 14 was marked for
5  identification.)
6  BY MR. BOWER:
7  Q.  Mr. Abernathy, I'm going to hand you what's
8  been marked as Exhibit 14 to today's deposition.
9  This is an e-mail from Ms. Spruell to yourself and a
10  course of others dated 10/24/2014.  The Bates number
11  ends in 11656 and it includes the attachment.  Take
12  your time to review it.  I can let you know that my
13  questions will be focused on whether, kind of, the
14  process that's reflected in the attachment was being
15  implemented at DC6045 during this time period.
16  MR. MAZZA:  Zach, I assume your copy has
17  like -- the check pattern.
18  MR. BOWER:  In the box, yeah.
19  MR. MAZZA:  Yeah, yeah.  You can -- I
20  mean -- it's just that one on the right-hand side
21  is a little hard but that's fine.
22  MR. BOWER:  I can read them into the record.
23  Mine might be a better copy if you have problems.
24  If I ask questions on that, I will read them --
25  MR. MAZZA:  Perfect.  Yeah, if you have a

Page 160

1  hard time reading that, Jeff, just holler.
2  MR. BOWER:  I think it is probably because
3  whoever created this, created the PDF from a
4  PowerPoint maybe or something and now it's been
5  created into a PDF and copied, so --
6  MR. MAZZA:  Right.
7  Q.  And sir, while you're reviewing that, I'm
8  just trying to get a sense of what the policy was at
9  this time period and if this policy was in place at
10  6045, because the e-mail reflects that:  This is the
11  process that we've created to execute our updated
12  SOM policy.  The plan is to execute the new process
13  on Monday, October 27th.
14  So --
15  A.  Okay.  Can I ask a question?
16  Q.  Sure.
17  A.  It looks like -- is it the same thing twice
18  or --
19  Q.  It looks like -- we can talk about that if
20  you want.  So if you look at the top of the first
21  page of the attachment, it refers to, you know, it
22  starts with orders come into DC, that one looks like
23  it's Reddwerks and the second page looks like it
24  refers to Knapp, K-n-a-p-p, so if that helps.
25  A.  Oh, yes.  Yes.

Page 161

1  Q.  Okay.
2  A.  Okay.
3  Q.  So my first question is whether DC6045
4  started executing this new process on Monday,
5  October 27th?
6  A.  I don't know an exact date we started it.  I
7  mean, I don't know.
8  Q.  Okay.  So you don't recall the exact date
9  but you do recall starting the implementation of
10  this new process; is that correct?
11  A.  Yes, sir.
12  Q.  Okay.  And let's look at then the first page
13  of the attachment, where it refers to -- do you see
14  there is a couple references there to the DC
15  associate, if you look kind of at the second box
16  down from the top and the bottom in parenthesis, it
17  says:  according to DC associate?
18  A.  Yes.
19  Q.  You see it says that.  And three of those
20  boxes there.  Would that have been you at this time
21  period, sir?
22  A.  I -- it would have referred probably to the
23  operations managers, because I didn't do it every
24  day.  One of the -- whichever, like I said,
25  whichever OPs manager was in first, this was part of

Page 162

1  that process, so --
2  Q.  Did you carry out this process on some
3  occasions?
4  A.  Yes.
5  Q.  Okay.  So let's, if we could for a minute,
6  walk through what the process was.  Okay?
7  A.  Okay.
8  Q.  Can you describe just in general terms how
9  this process changed what you were doing up to this
10  point?
11  A.  Yeah.  So as the orders came in, rather than
12  us grabbing those orders and sorting them through an
13  exported excel spreadsheet, this system would flag
14  those orders in a tab on the UI, the user interface,
15  and it would give us options on those items to --
16  I'm trying to remember exactly what they were, but
17  it would give us options as to what we wanted to do
18  with that order, one of those being send to the home
19  office.
20  Q.  Well, sir, where do you see -- let's walk
21  through the process for that, okay?  The first step
22  was orders come into DC Reddwerks, correct?
23  A.  Yes, sir.
24  Q.  And then Reddwerks evaluates orders based on
25  current threshold logic, do you see that?

Page 163

1  A.  Yes, sir.
2  Q.  And then based on that threshold logic, the
3  DC associate reviews order alerts to look for
4  unusual order amounts, do you see that?
5  A.  Yes, sir.
6  Q.  So you mentioned, refers to the home office.
7  Where in this process do you see that?
8  I mean, correct me if I'm wrong, sir, this
9  process calls for the DC associate to do the
10  cutting, isn't that right.
11  MR. MAZZA:  Objection as to form.
12  Q.  Well, sir, let's look at the options.  There
13  is three options presented there?
14  A.  Yes, sir.
15  Q.  Option number one:  Unusual order appears to
16  be an error according to DC associate.
17  Correct?
18  A.  Yes, sir.
19  Q.  If that's the determination, the DC
20  associate cuts the order to the order level
21  associate believes the level to be accurate, right?
22  A.  Yes, sir.
23  Q.  Okay.  When you were carrying out this
24  policy, how would you determine what an accurate
25  order level would be?

Page 164

1  A.  I -- this doesn't look familiar, and the
2  reason I say that is because it -- I mean, I
3  don't -- I just -- I guess I don't -- this is not
4  what I was used to working with when I was in
5  Reddwerks.  Like I said, the orders came in and
6  flagged and we had the option to cut it but we also
7  had an option to send that to the home office and we
8  sent it to the home office for review.
9  Q.  Sir, the cover e-mail says:  Please plan to
10  start executing the new process on Monday, October
11  27th.
12  Do you see that?
13  A.  Yes, sir.
14  Q.  Are you telling the jury this process was
15  never implemented?
16  A.  There was a process implemented.  I don't
17  know the exact day and time it was implemented, and
18  I don't know that this was the one that was
19  implemented, because this doesn't look like what I'm
20  used to seeing.
21  Q.  Well, sir, if you look then at option number
22  2, right, it says:  Unusual order does not appear to
23  be an error and is questionable according to the DC
24  associate.
25  Correct, do you see that?

Page 165

1  A.  Yes, sir.
2  Q.  Was that process ever implemented at 6045?
3  A.  I don't remember us doing that.  That's what
4  I'm saying, I don't remember this.  I don't know if
5  this was -- if it was changed before it was
6  implemented, I don't know if -- I'm just saying
7  this -- what I know in Reddwerks was the orders were
8  flagged, we sent those orders to the home office.
9  Q.  Well, sir but that's not the -- that's not
10  the procedure described here, correct, you would
11  agree with me on that?
12  A.  It doesn't look that way.
13  Q.  Right?  Because it says under option 2:  The
14  DC associate cuts any questionable orders to zero.
15  Did you ever do that, did you ever cut any
16  questionable orders to zero?
17  A.  I don't remember, not without being told to
18  cut them to zero.
19  Q.  You never made the decision yourself to cut
20  them to zero, right?
21  A.  Correct.
22  Q.  So it's your testimony, sir, that this
23  procedure as reflected in Exhibit 14 was never
24  executed at DC6045; is that correct?
25  A.  To the best of my knowledge, it wasn't.

Page 166

1   Q.  And to the best of your knowledge, did the
2   procedure we've been discussing today continue past
3   this date?
4       MR. MAZZA:  Objection as to form.
5   A.  Again, I don't -- I don't know the date that
6   we started the new automated process in Reddwerks,
7   so I don't know what that is.
8   Q.  Well, sir, but that new automated process
9   still required you to send the Over 20 reports,
10  correct?
11  A.  We would have sent those up until that new
12  process took over.
13  Q.  Okay.  And what happened after that new
14  process took over?  Sorry, let me strike that and
15  let me ask a better question.
16      After that new process took over, what were
17  your responsibilities with respect to suspicious
18  order monitoring?
19  A.  The orders that came into Reddwerks as
20  flagged, we sent those to the home office.  They
21  reviewed them.
22  Q.  So your only role in that process was to
23  simply hit send; is that correct?
24  A.  Yes, sir.
25  Q.  And what were you sending at that point?

Page 167

1   A.  Orders that this is --
2       MR. MAZZA:  Objection as to form.  Go ahead.
3   A.  Orders that the system had flagged based on
4   the qualifiers that they had built into that
5   application.
6   Q.  And even under this new procedure, you would
7   still ship those orders the same day, correct?
8       MR. MAZZA:  Same objection.
9   A.  At this -- when the new process rolled in,
10  there were times where we didn't ship it because it
11  would hold that order until the home office
12  responded.
13  Q.  So did the new process require an order that
14  was referred to the home office to be held until the
15  home office approved it for shipment?
16  A.  So all the orders that were flagged were
17  sent to the home office, and unless the home office
18  released those orders, they still -- we still held
19  those orders.
20  Q.  So in other words, those held orders were
21  not shipped until the home office approved them for
22  shipping; is that correct?
23  A.  Yes, sir.
24  Q.  And when was that policy first implemented?
25  A.  Again, I don't -- I don't know the date.  It

Page 168

1   was -- it was in this '14, '15 time frame, when the
2   new --
3   Q.  Well, let's look at some more documents,
4   maybe we can narrow it down.  Okay?
5       Did anyone ever tell you why the process,
6   this new process you've described would require
7   orders that were flagged to be held until they were
8   cleared?
9   A.  I was just told that they were -- we were
10  holding those until the home office had time to
11  review them.  I mean, that's the explanation we were
12  given.
13  Q.  And who told you that?
14  A.  I don't remember who told me that.  When we
15  rolled out the process, it was just part of the
16  discussion we had about, here's the training and
17  here's what you do, so --
18  Q.  Did you receive training on that new
19  process?
20  A.  Yes, sir.
21  Q.  In what form was that training?
22  A.  I believe when we -- when it was turned on
23  and activated and we started using it.  We had
24  different people that were on that team of the
25  people who were building that process were over

Page 169

1   explaining that to us, like this is what you need to
2   do with this, so just normal training with a new
3   process that come out.
4   Q.  Were you provided any training materials,
5   written materials in the context of that new
6   process?
7   A.  I don't remember any written or -- I mean,
8   I'm sure there were, I just don't -- I don't
9   remember if we were handed any or not.
10  Q.  Well, who conducted the training?
11  A.  I really don't remember.
12  Q.  I mean, this was a pretty big change from
13  the way you conducted business, correct?
14      MR. MAZZA:  Objection as to form.
15  A.  It wasn't -- it wasn't a big change.  I
16  mean, it was just more automated.
17  Q.  Well, and now orders are being held for
18  longer, correct?  Well, strike that.
19      Orders are now being held until they are
20  approved for shipment by HO, correct?
21  A.  Well, I mean, before this, we weren't told
22  to hold an order.  We sent the order because, you
23  know, unless we were told to do something with the
24  order, that was the direction we were given, so --
25  Q.  And now you're being told to hold the order

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  until you receive affirmative approval to send it,
2  correct?
3      A.  That's what we were told.
4      Q.  And how long were those orders being held on
5  average?
6      A.  On average, they typically got back to us on
7  the same day.
8      Q.  Were there circumstances when they didn't
9  get back to you on the same day?
10     A.  There were circumstances, yes.
11     Q.  And how often would that occur?
12     A.  Not -- not very often.  I don't -- I mean, I
13  don't know.  It wasn't -- I mean, it wasn't all the
14  time.  It was -- there were some that we would have
15  to hold, but I couldn't tell you, like, how many or
16  how often.  It was just -- I knew we had some.
17     Q.  And was this new process still reliant on
18  the threshold criteria that was implemented before,
19  meaning the Over 20s for Hydro -- I mean for oxy-30s
20  and over 50s for everything else?
21         MR. MAZZA:  Objection to form.
22     A.  I don't -- I don't know what the criteria
23  for when they flagged the orders in the process.  I
24  don't know what the criteria was.  I knew it was
25  item and quantity, so -- if there was anything else,

Page 171

1  I don't know.
2      Q.  Well, would the criteria be reflected on the
3  reports you sent?
4         MR. MAZZA:  Same objection.
5      A.  With the new process, we didn't send any
6  reports.
7      Q.  Sir, before you stated that, when the orders
8  came into Reddwerks as flagged, we sent those to the
9  home office.
10     A.  Yes, sir.
11     Q.  So what were you sending to the home office?
12     A.  So there was a button in the application
13  next to each flagged order that said, send to home
14  office.  So we would click the button.
15  Electronically, it sent that order over to the home
16  office and then we waited for a response from the
17  home office.  They would electronically send that
18  order back to us with what to do with the order.
19     Q.  So is it correct that your only
20  participation in this new process was to click the
21  button?
22     A.  Yes, sir.
23     Q.  So this new process significantly reduced
24  your responsibilities at the DC; is that correct?
25     A.  Well, my responsibility to the product, to

Page 172

1  make sure that it was accurate and safe didn't
2  change, but the process of running the spreadsheet
3  and sending that out changed, yes, sir.
4      Q.  All right.  When you say your responsibility
5  to the product was to make sure that it was accurate
6  and safe, what do you mean?
7      A.  Making sure the orders that we got from the
8  stores, that they got exactly what they ordered in
9  the right -- the right item that they ordered, and
10  then to make sure that that order got to the store
11  safely.
12     Q.  What do you mean by safely?
13     A.  Just to monitor and track that product all
14  the way to the store.
15     Q.  And why were you required to monitor and
16  track that product?
17     A.  Just to make sure that it got to the store.
18  I mean, just to ensure that that product got to the
19  store.
20     Q.  And why was that an important part of your
21  job?
22     A.  I mean, I would think that would be an
23  important part of any job, to make sure if I have
24  product and I'm sending it to somebody, that it got
25  there.

Page 173

1      Q.  Is it particularly important for schedule 2
2  narcotics, sir?
3         MR. MAZZA:  Object to form.
4      Q.  Well, sir, I'm asking you, do you believe
5  it's particularly important for schedule 2 narcotics
6  to arrive at the store?
7      A.  I believe it's important that those -- that
8  those orders get to the store safely, yes, sir.
9      Q.  And particularly so for abusive drugs,
10  correct?
11     A.  I think with -- with this type of product,
12  it's important that it gets to the store safely.
13     Q.  What do you mean by this type of product?
14     A.  Well, there is a lot of controls around this
15  type of drug.
16     Q.  And are you familiar with those controls?
17     A.  I'm familiar with the -- I mean the policies
18  and procedures that I was given to make sure those
19  get there safely.
20     Q.  Are those written policies and procedures?
21     A.  Yes, there are.
22     Q.  And what are those requirements?
23     A.  Off the top of my head, I don't know exactly
24  what they are.  I just -- to make sure we, you know,
25  we sent those to the store and then we tracked

Page 174

1 those -- we had associates that tracked those to
2 make sure that they got there to the store. If
3 there was a -- any kind of a hitch in that, they
4 would call the store, ask if they got it, we would
5 work with the carrier who was taking it to, you
6 know, find out where that product was.
7 Q. And this was important because these were
8 drugs that could be abused, right, and people were
9 dying every day from abusing these drugs, right?
10 MR. MAZZA: Objection as to form.
11 Q. Do you know that, sir, do you know whether
12 people are dying from abusing these drugs?
13 MR. MAZZA: Same objection.
14 A. I mean, what I see on TV, yes, sir.
15 Q. Other than what you've seen on TV and your
16 experience at work, did you know that people were
17 dying in 2007, 2008, 2009 from abusing these
18 schedule 2 narcotics?
19 A. I didn't know.
20 Q. Never -- it was never discussed?
21 A. No, sir.
22 Q. It wasn't part of your consideration in
23 making sure these got to where they were supposed to
24 go?
25 MR. MAZZA: Object as to form.

Page 175

1 A. Making sure those drugs, orders, got to the
2 store safely was part of my job, so that's what I
3 did.
4 Q. Sir, do you understand why these schedule 2
5 opioid products are classified as schedule 2?
6 A. I mean, I understand that C2 drugs are
7 addictive.
8 Q. Highly addictive?
9 A. It's why they are classified that way.
10 Q. You understand they are highly addictive,
11 correct?
12 A. I don't know to what degree. I'm not a
13 pharmacist, but, I mean, I know they are addictive.
14 Q. How do you know that?
15 A. When I came on, I was told that.
16 Q. And who told you that?
17 A. I don't remember the exact person. I just,
18 you know -- you will be dealing with C2s, and they
19 are classified this way because they are classified
20 as addictive.
21 Q. Has the opioid epidemic affected your
22 community at all?
23 A. I mean, I'm sure it has but I don't -- I
24 don't know.
25 Q. You don't know specifically one way or the

Page 176

1 other?
2 A. No, sir.
3 Q. What about your family, has it affected your
4 family at all?
5 A. Not my family, no, sir.
6 Q. Have you ever taken an opioid product?
7 A. No, sir.
8 Q. Do you know anyone who has?
9 A. No, sir.
10 (Abernathy Exhibit 15 was marked for
11 identification.)
12 BY MR. BOWER:
13 Q. Sir, you've been handed what's been marked
14 as Exhibit 15, an e-mail from Nita Mix to yourself
15 and Kristy Spruell, and the Bates number is 16261.
16 And while you're reviewing it, I will tell
17 you, I'm not going to spend too much time on this
18 document, I just have a few general questions, but
19 take your time.
20 A. Okay.
21 MR. MAZZA: While we have a lull in the
22 action, are you guys going to use the same
23 exhibits tomorrow? I mean, not literally the
24 same exhibits but the same ordering sequence? If
25 you haven't decided, that's fine.

Page 177

1 MR. BOWER: We can figure it out. Either
2 way, whatever is easier.
3 MR. INNES: Is your question are we going to
4 pick up from the last digit?
5 MR. MAZZA: Yeah, that, or are you going to
6 refer to, like, Abernathy 10 tomorrow --
7 MR. BOWER: Probably pick up from the last
8 digit. I dont think --
9 MR. MAZZA: If you repeat you repeat?
10 MR. BOWER: I'll try to not do that, but --
11 MR. MAZZA: Good luck.
12 BY MR. BOWER:
13 A. Okay.
14 Q. Are you ready, sir?
15 A. Yes, sir.
16 Q. Okay. This document refers to a web form,
17 correct? Do you see in the subject line it says, RU
18 logistics SOM web form?
19 A. Yes, sir.
20 Q. And SOM refers to suspicious order
21 monitoring, correct?
22 A. Yes, sir.
23 Q. During this time period, in November 2014,
24 was DC6045 filling out a suspicious order monitoring
25 web form in the course of its business?

Page 178

1   A.  I don't remember filling out a suspicious
2 order monitoring web form.
3   Q.  Who is Nita Mix?
4   A.  I don't know.  I don't know who Nita Mix is.
5   Q.  Well, sir, do you see the first line of her
6 e-mail to Kristy Spruell and yourself says:  "Jeff -
7 I adjusted the form to cc you..."
8     Do you see that?
9   A.  Yes.
10   Q.  Do you know why the form would be cc'ing
11 you?
12   A.  No, sir.
13   Q.  Sir, during this time period, late 2014,
14 were you attending meetings discussing the SOM
15 project?
16   A.  I mean, I don't -- during this time frame, I
17 don't know that I was particularly going to meetings
18 about that process.  I mean, I did have some
19 meetings where the new process that we put into
20 Reddwerks, they would ask for input occasionally,
21 but, I mean, I don't know which ones I went to and
22 which ones I didn't.  I don't remember that.
23   Q.  And the new process was still the Reddwerks
24 process we've talked about earlier today?
25   A.  The process where it became more automated,

Page 179

1 yes.
2   Q.  So as of at least late 2014, it still hasn't
3 been implemented, correct?
4   A.  I mean I -- I don't remember the exact day
5 it was implemented.
6     (Abernathy Exhibit 16 was marked for
7 identification.)
8 BY MR. BOWER:
9   Q.  Sir, you've been handed what's been marked
10 Exhibit 16 and it's just a one-page e-mail
11 referencing SOM policy.  Do you see that?
12   A.  Yes, sir.
13   Q.  And do you know who Brian Frank was or is?
14   A.  He is asset protection manager with the
15 logistics system, logistics, Health & Wellness
16 Logistics.
17   Q.  Sorry.  Did you say health and logistics?
18   A.  Health & Wellness Logistics.
19   Q.  So does he work at the home office?
20   A.  Well, according to the e-mail he works out
21 of 6013, DC6013 in Georgia.
22   Q.  Do you have any idea why he would be asking
23 whether the new procedure for monitoring controls
24 has replaced the old procedure?
25   A.  Can I read it?

Page 180

1   Q.  Sure.  Please, take your time.
2   A.  Okay.
3   Q.  So the question is do you have any idea why
4 he would be asking whether the new procedure for
5 monitoring controls has replaced the old procedure?
6   A.  No, sir.
7   Q.  Do you have any idea why Kristy forwards his
8 e-mail to you?
9   A.  No, sir.
10   Q.  No recollection of this?
11   A.  No, sir.
12   Q.  Do you know what the reference to SOM policy
13 is?
14     I mean, she's only sending it to you and
15 Teresa, correct?
16     MR. MAZZA:  Objection as to form.
17   A.  I guess.
18   Q.  And you're telling me you don't know what
19 she's asking about?
20   A.  Well, concerning the e-mail below with the
21 SD405.
22   Q.  Yes, sir.
23   A.  I don't -- I -- that was a process that
24 Jimmy handled in our DC, so I know that Jimmy was
25 our AP manager, so he handled that, so I don't know

Page 181

1 why she would have cc'd me on it, but he's the one
2 who handled that process for us.
3   Q.  And what is the process you're referring to?
4   A.  The SD405, again, like I said, it was
5 something that Jimmy was doing before I came to the
6 DC, and he continued to do it.  Just with
7 conversation with him, it was -- he -- it was a
8 report he ran I think, and we had talked about it
9 earlier, where he ran it once a month and then
10 whatever he did with it, but like I said, I don't --
11 that wasn't part of what I do and I haven't done it.
12   Q.  Okay.
13   A.  And I wouldn't know why she would send that
14 to me unless she thought that that's what I did.  I
15 don't know, but --
16   Q.  Okay.  But it's fair to say then that Jimmy
17 was still running those 405 reports at the end of
18 2014; is that correct?
19   A.  I don't know when Jimmy was running them and
20 not running them.
21   Q.  Did you respond to Kristy, do you recall?
22   A.  I don't recall.
23     (Abernathy Exhibit 17 was marked for
24 identification.)
25 BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1　Q.　Sir, you've been handed what's been marked
2　Exhibit 17.　It's a series of e-mails between
3　Stephanie Adams and yourself and I'm going to ask
4　you some questions on your knowledge of the
5　Reddwerks update, and other issues referenced in
6　your e-mail on Wednesday January 14th at 10:54 a.m.
7　The Bates number of this document ends in 9277.
8　　　It's a one-page e-mail, right, sir?
9　A.　Yes, sir.
10　Q.　Have you had a chance to review it?
11　A.　I just -- I need the top two real quick.
12　Q.　Okay.
13　A.　Okay.
14　Q.　All right, sir.　During this time period,
15　January 2015, did Stephanie Adams have any role in
16　this suspicious order monitoring process?
17　A.　She would have had a role in the DC that she
18　was in for schedule 3 through 5s.
19　Q.　And she's in DC6028?
20　A.　Yes, sir.
21　Q.　Do you have any idea why she's e-mailing
22　you?
23　A.　I mean, not particularly.　Probably just to
24　ask, you know.　I mean, I don't know of a specific
25　reason why she was e-mailing me.

Page 183

1　Q.　Well, she's asking you specifically about
2　the suspicious order monitoring procedure, correct?
3　A.　Yes.
4　Q.　All right.　So she suspects that you know
5　what that procedure is, right?
6　A.　Yes.
7　Q.　Did you in fact know what that procedure
8　was?
9　A.　Well, I knew what we were doing through the
10　Reddwerks system, so --
11　Q.　Well, during this time period, January 2015,
12　other than what was happening through the Reddwerks
13　system, was there any other policy and procedure in
14　place with respect to suspicious order monitoring
15　for schedule 2 narcotics?
16　A.　I mean, that -- I don't think so.　This
17　is -- I mean we were -- we were using the Reddwerks
18　system.
19　Q.　This mentions a four-week threshold.　Do you
20　see that?
21　A.　Yes, sir.
22　Q.　What does that mean?
23　A.　I don't know.　Well, so the four-week
24　threshold must be referring to -- I mean, I don't
25　know.　I'm trying to remember.

Page 184

1　Q.　Well, okay, well, I don't want you to guess.
2　If you don't remember, you know, this is going back
3　to 2015, right?
4　A.　Yes.
5　Q.　Well, let me ask you this.　We looked
6　earlier at an Over 20/50 report that you --
7　Exhibit 13 that you sent in October 2014, right?
8　And now we're about three months later?
9　A.　Yes, sir.
10　Q.　Do you recall there being any change in, you
11　know, a policy for flagged items between October
12　2014 and January 2015?
13　A.　I don't remember any.　I'm --
14　Q.　Well, after you refer to the four-week
15　threshold, you say:　We are in the last stages of
16　the RW update which will allow the manager
17　monitoring the suspicious orders to send that order
18　to the HO compliance team for review.
19　　　Do you see that?
20　A.　Yes.
21　Q.　Do you know who the manager in quotes there
22　refers to?
23　A.　It would be the manager who comes in in the
24　morning to look at the orders.
25　Q.　And that would be either you and Mr. Sherl

Page 185

1　still, sir?
2　A.　Yes.
3　Q.　So it's your belief that even in January
4　2015, you were still performing that function,
5　correct?
6　A.　Yes, sir.
7　　　MR. MAZZA:　Objection as to form.
8　Q.　I'll rephrase.
9　　　Sir, is it your testimony that in January
10　2015 you -- either you or Mr. Sherl were still
11　providing the Over 20 reports to the home office?
12　A.　Yes, sir.
13　　　(Abernathy Exhibit 18 was marked for
14　identification.)
15　　　MR. MAZZA:　You go ahead and I'll do the
16　housekeeping.
17　BY MR. BOWER:
18　Q.　Sir, why don't you take a moment to review
19　Exhibit 18, which you've just been handed.　It's an
20　e-mail from Brooke Leverett to Gregory Beam, George
21　Chapman, Gary Smith, Brenda Johnson and Cc'ing
22　yourself and Kristy Spruell, dated 10/24/14 and the
23　Bates number ends in 42782.　I'll note that this is
24　a -- the attachment appears to be a 405 report which
25　we've discussed a few times today and I just want to

Page 186

1 ask some questions on that.
2    Are you ready, sir?
3    A.  Yes, sir.
4    Q.  So were these reports used at all in
5 suspicious order monitoring?
6    A.  These are the 405 reports that Jimmy used,
7 so --
8    Q.  And were they used in connection with
9 suspicious order monitoring at DC6045?
10    A.  They were used to, I guess, monitor orders,
11 that's what they -- that's when they used them.
12    Q.  Who used them to monitor orders?
13    A.  Jimmy used those.
14    Q.  Do you have any knowledge as to how he used
15 them?
16    A.  No, sir.
17    Q.  Did you yourself use them?
18    A.  No, sir.
19    Q.  Other than seeing it now, do you ever recall
20 seeing one before?
21    A.  Yes, sir, I've seen one before, but I
22 didn't -- it was just a -- more of a knowledge level
23 of Jimmy saying, this is what I do, showed me some
24 stuff, and then moved on.  It wasn't like a, you
25 know, you need to learn this or anything like that.

Page 187

1 It was just a this is the 405 report and it was
2 just -- I mean, that's how I saw it.  Other than
3 that, I didn't.  I knew he kept them on his desk.
4    Q.  Sir, did you ever consider using them in
5 connection with your suspicious order monitoring
6 duties?
7    A.  No, sir.
8    Q.  Why not?
9    A.  I don't know.  I mean, I -- I didn't know to
10 use them in my -- it wasn't part of what I do
11 day-to-day, so --
12    Q.  Sir, this breaks down the report itself
13 provides a store number, right, and then item
14 description and then percent, correct?
15    A.  Yes, sir.
16    Q.  Do you think it would have been useful in
17 your decision whether to cut orders?
18    A.  I don't know.
19    Q.  Sitting here today, do you think it would
20 have been helpful to look at these reports and the
21 store numbers to determine whether the order was
22 suspicious or not?
23    A.  I don't know.
24    Q.  Do you recall receiving these orders on a
25 monthly basis?

Page 188

1    MR. MAZZA:  Objection as to form.
2    A.  I didn't receive these reports.
3    Q.  Do you recall any specific reason why you
4 received this report?
5    A.  I don't know why I would have received this
6 report.
7    Q.  Do you know why Brooke Leverett is running
8 the report?
9    A.  I don't know why she's running it either.
10    Q.  Did you ever ask anybody?
11    A.  No, sir.
12    Q.  Do you recall receiving it in October 2014?
13    A.  I don't remember receiving it.
14    (Abernathy Exhibit 19 was marked for
15 identification.)
16 BY MR. BOWER:
17    Q.  Sir, you've been handed what's been marked
18 Exhibit 19, which is an e-mail from yourself to
19 James Greer Cc'ing Kristy Spruell from November 5th
20 2014.  Referencing again SOM web forms.  Do you see
21 that?
22    A.  Yes, sir.
23    Q.  Does this refresh your recollection
24 regarding what the SOM web forms were?
25    A.  Can I read it?

Page 189

1    Q.  Sure.  Please do.  Sorry.  Okay.  Have you
2 had a chance to review it?
3    A.  Yes, sir.
4    Q.  So let's go back to my question.  Does this
5 refresh your recollection what do SOM web forms
6 refer to?
7    A.  From reading, it's talking about the web
8 forms that the stores submit to us.
9    Q.  What was the purpose of those forms?
10    A.  As I stated earlier, if a store -- so prior
11 to the hydro conversion, stores only got orders once
12 a week.  So if a store needed something, but they
13 couldn't wait until their order hit the next week,
14 they would submit an order -- they would submit a
15 web form to the DC so that we could put that store
16 in the pick batch for the next day, then they would
17 go in and key the order that they needed, we would
18 go and collect that order the next day.  So that was
19 the web form process.
20    Q.  So when it refers to your statement, if 6045
21 wants to fill out the web form and can, what does
22 that mean?
23    A.  It just meant for us to move that order into
24 that pick day.
25    Q.  Does that mean approve the order?  In other

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1　words, does someone have to fill out a web form in
2　order for it to be picked and shipped?
3　　A.　So -- so the order was for -- you could make
4　the web form order for two bottles of three
5　different items.　It just went into the normal
6　process that we would do for picking that order and
7　then we would follow the same, you know, procedure,
8　you know, for monitoring those orders when that
9　order came out.
10　　Q.　Well, what does it mean then to fill out the
11　web form?　I mean, those are your words, correct?
12　　A.　I think by reading it, I think that I asked
13　Kristy those questions and she responded and I just
14　cut those answers out of her e-mail and pasted them
15　in here and sent them to Jim, but we at the DC, we
16　didn't fill out the web form because we didn't have
17　the ability to do that.　That was from the store
18　side.
19　　Q.　Well, sir, your e-mail says if 6045 wants to
20　fill out the web form, it can.
21　　　Are you saying that's not an accurate
22　statement?
23　　A.　It's not an accurate statement.　We couldn't
24　fill it out.　We just -- all we did is take the web
25　form and add that store to the next day's pick.

Page 191

1　That's what the web form was, to notify us to do
2　that.
3　　Q.　And sir, what about the next paragraph
4　there, referencing the error as a reason code for
5　cutting an order.　Do you see that?
6　　A.　Yes, sir.
7　　Q.　So during this time period did you have to
8　enter a reason code when you cut an order?
9　　A.　I don't remember entering a reason.　We
10　did -- there was one where -- I forget what it said
11　but inventory -- I can't remember what the reason
12　code was on the spreadsheet that we sent.
13　　Q.　Well, do you know why you are telling
14　Mr. Greer that you have to select error as a reason
15　code for cutting an order?
16　　A.　I don't remember the question Jim was
17　asking.　I don't remember selecting error.　I don't
18　remember that being something I would enter.
19　　Q.　Sir, you state that:　Such as, due to the
20　change of hydro to a C2, some pharmacists feel they
21　need to stock up.　Do you see that?
22　　　MR. MAZZA:　Objection as to form.
23　　A.　Yes, sir.
24　　Q.　Did you talk to pharmacists yourself who
25　provided you with that explanation?

Page 192

1　　A.　No, sir.
2　　Q.　Are those your words?
3　　A.　Again, I'm -- I think I would have copied
4　and pasted that.　That's -- I think that was what
5　Kristy sent to me, that that's what the answer was.
6　　Q.　Did she send you an e-mail with those
7　answers?
8　　A.　I mean --
9　　Q.　Well, where would you have copied and pasted
10　it from?
11　　A.　If she did, that's what I would have done,
12　so I'm -- I'm trying to remember if that's what
13　happened or not.
14　　Q.　Well, let me ask you a question then.　Why
15　is it an error -- why -- strike that.
16　　　Why would Walmart consider something an
17　error if a pharmacist wanted to stock up?
18　　A.　I think the -- I think the feel was at this
19　time, as I explained before, that stores were
20　getting orders just once a week.　Once we switched
21　to hydro being a C2, the order points changed, order
22　days changed from once a week to twice a week, so my
23　understanding is the feel was that because
24　pharmacists thought they were only going to get
25　orders once a week or less than what they were used

Page 193

1　to receiving that product, they felt a need to stock
2　up on that item.
3　　Q.　Why would that be considered an error?
4　Wouldn't that be an intentional desire to stock up?
5　　A.　I don't know why it would be considered an
6　error.
7　　Q.　Would you agree that wouldn't be an error,
8　right?　It would be an intentional order, right?
9　　　MR. MAZZA:　Objection; form.
10　　A.　I'm sorry.　Could you repeat the question?
11　　Q.　Well, sir, I'll rephrase.　Here you're
12　sending an e-mail to Mr. Greer, correct?
13　　A.　Yes.
14　　Q.　And you're explaining why selecting an error
15　as a reason code for cutting an order, right?
16　　A.　Yes.
17　　Q.　And you're stating that many things could be
18　considered an error other than just miskeying an
19　order, right?　My question to you is, even if it's
20　something you cut and pasted that Ms. Spruell wrote,
21　why would Walmart be considering a pharmacists
22　desire to stock up an error?
23　　　MR. MAZZA:　Same objection.
24　　A.　I think what they were trying to do was, my
25　understanding was that they didn't want the

Page 194

1  pharmacists to feel like they weren't going to get
2  what they needed from the DC just because of the
3  change from C3 to C2, so --
4    Q.  But the pharmacists are placing an order,
5  correct?
6    A.  The pharmacist was placing an order, plus
7  the system was ordering as well, so --
8    Q.  An order was being placed, correct?
9    A.  Yes.
10    Q.  And Walmart is cutting some of those
11  ordered, correct?
12      MR. MAZZA:  Objection; form.
13    A.  I mean, if we were cutting them, we were
14  being told to cut them.
15    Q.  Right.  And you had -- it appears from this,
16  right, you had to provide a reason that you were
17  cutting, correct?
18    A.  Okay.  Yes.
19    Q.  Right?  And you're stating that pharmacists
20  shouldn't stock up, right, thus it's an error in
21  decision-making, right, so the pharmacist just made
22  an error in their decision, not an error in their
23  order, right?
24    A.  Yes.
25    Q.  What was the -- from Walmart's perspective,

Page 195

1  what was the error in the decision?
2      MR. MAZZA:  Objection; lacks foundation.
3    Q.  Well, based on your experience for providing
4  cut 20 orders and reviewing orders for four to five
5  years, why would a desire by pharmacists to stock up
6  be considered an error in decision-making?
7    A.  Because I feel like the reason they were
8  wanting to stock up was because they didn't feel
9  like they were going to be able to get the orders
10  they needed, which we felt like they would be able
11  to get those orders.
12    Q.  Why would -- why do you believe pharmacists
13  felt they wouldn't be able to get the orders?
14  What's the basis for that statement?
15    A.  I don't know.  I don't know the reasoning
16  why.
17    Q.  Well, sir, your testimony was, and I quote:
18  Because I feel like the reason they were wanting to
19  stock up was because they didn't feel like they were
20  going to be able to get the orders they needed.
21      So what's your basis for that statement?
22    A.  Because we moved from a one-day to a two-day
23  process.  They had previously been getting orders,
24  hydro orders every day, so I believe that they felt
25  like I'm only going to get this twice a week, I need

Page 196

1  to order more to make sure I have enough.
2    Q.  Okay.  And what do you mean when you say we
3  moved from a one-day to a two-day process?
4    A.  So at the time we were sending C2s to each
5  store one day a week, four days a week, so once
6  hydro was switched to a C2, because, you know, there
7  were other DCs feeding other stores, the hydro,
8  because it was another -- schedule 3s were in other
9  warehouses, when that all came to warehouse 45,
10  the -- just the volume we were sending out every day
11  was higher based on that because across the network
12  it was the same, but it was all coming out of one
13  warehouse rather than five other warehouses.
14      So in order to make sure the pharmacists
15  could get what they needed, we decided to go to a
16  two-day a week schedule for filling those orders
17  rather than a one-day.
18    Q.  So does that mean it took longer for the
19  orders to fill, or the pharmacists had to order less
20  often, or potentially both?
21    A.  Both.
22    Q.  Okay.  Let's break those down then.  Why
23  would it take the orders longer to fill?
24    A.  Well, we were adding more items to our
25  normal process, so, I mean, it would just -- you

Page 197

1  know, we would have to pick more bottles and put
2  them in an order to ship out, so --
3    Q.  Sir, I'm asking about the policy that was
4  changed from one-day to a two-day.  Okay?
5    A.  Okay.
6    Q.  Did that policy change impact how often a
7  pharmacist could place an order?
8    A.  It -- it made it so that he -- can place an
9  order but we only went out and captured those orders
10  twice a week.
11    Q.  So in other words, it would take the order
12  longer to fill once it was placed; is that correct?
13    A.  Than he was used to with it being the
14  schedule 3, hydro being a schedule 3.
15    Q.  Was this policy change only made with
16  respect to hydro, or was it all schedule 2s?
17    A.  This was changed once hydro became a
18  schedule 2, so it affected all the other drugs we
19  were distributing at the time as well.
20    Q.  And when was the policy change made?
21    A.  Once we found out that it was for sure that
22  hydro was moving to schedule 2.  The home office
23  team and whoever they had involved, you know, made
24  that decision to change that process to if
25  ordering -- to sending out orders to each store

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 twice a week rather than once a week.
2    Q.  But sir, weren't you still preparing the
3 over 20/50 reports on a daily basis once hydro was
4 changed to schedule 2?
5    A.  Yes, sir.
6    Q.  So can you explain why you were doing that
7 on a daily basis if the orders were only picked
8 every two days?
9    A.  Yeah, absolutely.  So just so -- so before,
10 when we were sending once a week, so we would -- a
11 group of stores would be sent on Monday, a different
12 group on Tuesday, a different group on Wednesday and
13 a different group on Thursday.  Once hydro went C2
14 and we changed the process to every store twice a
15 week, groups of stores would get an order on Monday
16 and they would also get an order on Wednesday, and
17 then the other half of the stores would get an order
18 on Tuesday and the order on Thursday.
19    So every day we were doing orders.  So I was
20 running the report each day.
21    MR. MAZZA:  Zach, whenever you are at a good
22 spot.
23    MR. BOWER:  Why don't we do that, I'll
24 digest that answer and see if I have any
25 follow-up questions.

Page 199

1    MR. MAZZA:  I'm not trying to rush you.
2    MR. BOWER:  No.  I think it is a good time
3 because I --
4    MR. MAZZA:  Okay.
5    THE VIDEOGRAPHER:  Going off the record at
6 3:56.
7    (Recess from 3:56 p.m. until 4:14 p.m.)
8    THE VIDEOGRAPHER:  Going back on the record.
9 Beginning media file number 6.  The time is 4:14.
10 BY MR. BOWER:
11    Q.  Mr. Abernathy, I reviewed -- we reviewed
12 your answer over the break and there is still a bit
13 of confusion on our end regarding the switch from
14 the one day to two day, so can you -- can we just
15 take a step back then and can you describe for us
16 what was happening before the switch?
17    A.  So we sent one order to each store one day a
18 week.  Those were set up regionally, a certain area
19 of the country would get orders on a Monday, certain
20 areas Tuesday, Wednesday, and Thursday.
21    Q.  So during that time period a pharmacy would
22 receive one order per week, correct?
23    A.  Correct.
24    Q.  And how often would pharmacies be allowed to
25 make an order during that time period?

Page 200

1    A.  I'm not aware of a limit, but we only went
2 and grabbed the orders for those stores once a week.
3 I'm not aware of how the pharmacy handled going in
4 and placing orders.  I don't know if -- I don't know
5 on that side of it, but as far as the DC, the
6 distribution center, we went and grabbed those
7 orders for this region on a Monday, this region on a
8 Tuesday.  So whatever orders had accumulated up to
9 that point, we pulled.
10    Q.  Okay.  And now after the switch, what was --
11 what change was made?
12    A.  So the big -- well, big change, the change
13 was they were able to get orders twice a week rather
14 than once a week.
15    Q.  So if pharmacies are getting orders now
16 twice a week versus once a week, why are you stating
17 that pharmacists are concerned about having enough
18 hydrocodone if they are getting it more often?  Can
19 you explain that apparent discrepancy, because maybe
20 I'm missing something?
21    A.  I believe it was because they were used to
22 getting those every day, and now they were switching
23 to two days a week, so there were going to be more
24 days they weren't going to get that order, so they
25 were concerned that they -- you know, the orders

Page 201

1 they got would not be enough to get them to the next
2 time their order got there.
3    Q.  So -- so is it a true statement that when
4 hydrocodone was a schedule 3, they were receiving
5 those orders every day?
6    A.  They were receiving orders every day.  I
7 don't know -- I don't know about hydro, if they
8 received a hydro product every day.  It wasn't in my
9 DC, so I don't know.
10    Q.  Well, but your e-mail specifically is about
11 hydro, right?
12    A.  But at that time it had come to the DC to
13 6045.
14    Q.  Right.  But your statement as to why the
15 pharmacists were concerned about the hydro supply
16 was because they had previously been receiving it
17 more often, correct?
18    A.  Yes.
19    Q.  So you must have known they were receiving
20 it every day, correct?
21    A.  I knew that they were receiving orders every
22 day.
23    Q.  Right.
24    A.  For whatever those DCs had schedule 3
25 through 5s and noncontrolled drugs.

Page 202

1   Q.   You knew that pharmacies were receiving
2   hydro orders on a daily basis prior to becoming a
3   schedule 2, correct?
4       MR. MAZZA:   Objection; form.
5   A.   I don't know if the stores were receiving
6   hydro every day.
7   Q.   You do know they were receiving it more
8   often than twice a week, correct?
9   A.   Again, I don't know how often they were
10  receiving it.  I know that they were on a five-day
11  order system when it was a schedule 3 through 5.
12  Q.   But, sir, your statement and your position,
13  correct me if I'm wrong, is that pharmacists were
14  concerned because they were now receiving hydro less
15  often, correct?
16  A.   Yes.
17  Q.   And they were receiving hydro twice a week
18  when it became a schedule 2, correct?
19  A.   Yes.
20  Q.   So isn't it a true statement then that they
21  were receiving it more than twice a week when it was
22  a schedule 3?
23  A.   The ability to receive it was there.
24  Q.   Do you know whether they had the ability to
25  receive it daily?

Page 203

1   A.   If they ordered it daily, I would assume it
2   went daily.
3   Q.   Do you know whether they could submit
4   multiple orders daily?
5   A.   I don't know.
6   Q.   Do you know whether anyone was monitoring
7   the order volume for hydro prior to it becoming a
8   schedule 2?
9   A.   I don't know that.
10  Q.   Do you know who would know that answer?
11  A.   No, sir.
12  Q.   You don't know who was monitoring for
13  schedule 3 prior -- strike that.
14      Do you know who, if anyone, was monitoring
15  hydrocodone orders when it was a schedule 3
16  narcotic?
17  A.   I do not know.
18      (Abernathy Exhibit 20 was marked for
19  identification.)
20  BY MR. MAZZA:
21  Q.   Sir, you've been handed what's been marked
22  as Exhibit 20.  It's an e-mail from Mr. Beam to
23  yourself, dated January 28, 2015, the Bates number
24  is 30175 through 30177.
25      (Abernathy Exhibit 21 was marked for

Page 204

1   identification.)
2   BY MR. BOWER:
3   Q.   I'm going to give you Exhibit 21, which is
4   part of the same e-mail chain but it attaches the
5   Over 20 report which was left off of the other
6   e-mail chain.  So we'll use those together.  Okay?
7       Exhibit 21 is same e-mail string from
8   Gregory Beam, this last one is to Gary Smith, dated
9   January 27, 2015 and that Bates number begins with
10  30184.
11      Sir, my question will be focused on
12  Exhibit 20 and we'll just use the attachment to
13  Exhibit 21 to reference, but I want to include the
14  whole thing for the record.  Okay?
15  A.   Okay.
16      MR. MAZZA:   Zach, just while he's reviewing,
17  the top e-mail on 21 --
18      MR. BOWER:   Top e-mail on 21, yep.
19      MR. MAZZA:   From Jeff at 7:42 a.m., that --
20      MR. BOWER:   Sorry, I'm --
21      MR. MAZZA:   Exhibit 21?  Sorry, the second
22  e-mail on 21.  I apologize.
23      MR. BOWER:   Okay.  Yeah.  Yeah.
24      MR. MAZZA:   The 7:42 a.m., just to orient,
25  that is the e-mail on page 2 of Exhibit 20.

Page 205

1       MR. BOWER:   Correct.  Yeah.
2       MR. MAZZA:   Okay.
3       MR. BOWER:   The only reason the second one,
4   21 is included, is because that one has the
5   attachment.
6       MR. MAZZA:   Yeah.  The reason why I just
7   pointed it out, it looks like there is multiple
8   references to, here's the correct one, here's the
9   attachment, so --
10      MR. BOWER:   I'm not.
11      MR. MAZZA:   If you look at 20, right, the
12  first page of 20 at 11:29 there is another e-mail
13  that says, here is the corrected one.
14      MR. BOWER:   Right.  But the e-mail as
15  Walmart produced it, that didn't have an
16  attachment.  If you see, there is no attachment
17  line from to -- from, sent, to, subject.  There
18  is no --
19      MR. MAZZA:   I'm with you on 20.  Yeah, I'm
20  with you.
21      MR. BOWER:   Okay.
22  Q.   Sir, have you had a chance to review
23  Exhibit 20?
24  A.   Almost.
25  Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    A.  Okay.
2    Q.  Okay.  Sir, these Over 20 reports, they were
3  prepared in connection with the ordinary course of
4  your business, correct?
5    A.  Yes.
6    Q.  They were part of your daily business
7  activities, right?
8    A.  Yes, sir.
9    Q.  And in this e-mail, let's start with your
10  e-mail on Tuesday, January 27th, to Gregory Beam and
11  Scott Peacock, do you see that?
12    A.  Yes, sir.
13    Q.  Do you have any recollection as to why you
14  sent this e-mail to them in January 2015?
15    A.  Well, reading through it, it looked like we
16  were using the new automated Reddwerks system and I
17  was trying to explain that the report we still
18  wanted, there could be some delays in some of that
19  because we were now waiting for the home office team
20  to let us know what to do with those orders.
21    Q.  So one of these individuals had communicated
22  to you that they still wanted you to prepare these
23  reports?
24    A.  Yes, sir.  We had not been told not to
25  produce them anymore.

Page 207

1    Q.  Okay.  And then you describe what the new
2  process is, correct, in that e-mail, in that first
3  paragraph?
4    A.  Yes, sir.
5    Q.  And then you say:  This process could take
6  minutes, hours, and in some cases days, correct?
7    A.  Yes, sir.
8    Q.  And then you go on to describe the current
9  process, which was the process before this new
10  Reddwerks procedure, right?
11    A.  Yes, sir.
12    Q.  That old process or the current process
13  described here but referring to the process that had
14  been ongoing since about 2010, correct?
15    MR. MAZZA:  Objection; form.
16    Q.  Well, let me strike that.
17    Sir, in your e-mail you refer to, in the
18  current process, do you see that?
19    A.  Yes, sir.
20    Q.  Is that the process we've discussed several
21  times today where either you or Mr. Sherl would
22  prepare the Over 20 reports and send them on to HO?
23    A.  Yes, sir.
24    Q.  Okay.  In describing that process, you
25  stated:  We cut the orders at the DC level and could

Page 208

1  determine the disposition of the items immediately
2  to complete the Over 20 report.
3    Do you see that?
4    A.  Yes, sir.
5    Q.  So that e-mail doesn't reflect that the HO
6  would have some time to review the order, does it?
7    A.  Well, I mean, if they told us to cut it, we
8  could go in and cut that and we would know after
9  they gave us those instructions to do that, what the
10  order would be.
11    Q.  But, sir, your e-mail says:  We cut the
12  orders at the DC level and could determine the
13  disposition of the items immediately to complete the
14  Over 20 report.
15    Correct?
16    A.  After they told us what to do with it, we
17  could do those things.
18    Q.  So is it your testimony, sir, that you
19  wouldn't e-mail the Over 20 reports until the -- you
20  determined whether the disposition of the items
21  could be completed?
22    MR. MAZZA:  Objection; form.
23    Q.  I'll strike that, sir.
24    Based on this e-mail, what was the process
25  for the Over 20 reports?

Page 209

1    A.  We would come in, export the order file over
2  to Excel, we would sort it based on the criteria
3  given to us, and then we would send that over to the
4  list of people, global investigations, AP
5  management, compliance, and my general manager, and
6  then we would wait for a response, if anything, we
7  were supposed to do.
8    Now, the ones that we had direction on as
9  far as hydro -- I mean oxycodone 30, over 20, cut it
10  to 20, those directions we had, we did those when
11  those came up.
12    Q.  But, sir, your description here doesn't
13  reflect that you had to wait for a response on the
14  Over 20 report.  It says you could determine the
15  disposition of the items immediately to complete the
16  report, right?  That's what you state here.
17    A.  Well, we wouldn't cut an order until the
18  home office told us what to do with it.
19    Q.  What does it mean to determine the
20  disposition of the items, what does that mean?  Does
21  that mean whether the order should be filled or not?
22    A.  Well, until the home office reviews and
23  decides what the disposition is.
24    Q.  But the home office can't do that until it
25  gets the report, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1   A.   Yes.
2   Q.   Okay.  So again, I'm asking you, you state:
3   We could determine the disposition of the items
4   immediately to complete the report.
5        Were you sending two reports to the home
6   office or one?
7   A.   I was just sending one.
8   Q.   And was that one report the completed report
9   you referenced here?
10  A.   Yes.
11  Q.   So once you sent that order, it was
12  complete, and the -- you had already determined the
13  disposition of the items; is that correct?
14  A.   Well, when I would have sent it, it would
15  have -- I would have either got a response if I had
16  a question or whatever, so --
17  Q.   Sorry.  You would have gotten a response
18  when you sent it?  Is that your testimony?  Sir,
19  this is a critical issue.  I'm trying to understand
20  what the process was at Walmart for clearing these
21  Over 20 Reports.
22       MR. MAZZA:  Objection to form.
23  Q.   And I'm trying to understand whether, in
24  fact, you could determine the disposition of the
25  items immediately to complete the Over 20 Report.

Page 211

1   Is that an accurate statement?
2   A.   So the ones we cleared without sending to
3   the home office would be the ones we were given
4   directions on.  Then we sent the report over, and we
5   would -- again, if the -- if the home office
6   responded to us after looking at it, then we
7   would -- whatever they told us to do, that's what we
8   would do.
9        I believe that there were times I would have
10  to send another report back to Greg and the Global
11  Investigation Team saying, we heard back, here's the
12  corrected amount.  It just seems like -- it seems
13  like that has happened.  But we would not cut an
14  order unless we were given direction to do that.
15  Q.   Sir, do you recall ever being given a
16  specific direction to cut an order by the Home
17  Office Team between 2010 and 2015?
18  A.   I don't remember a specific time.
19  Q.   Do you recall any single time?  As you sit
20  here today, do you recall it ever happening?
21  A.   I don't remember a time where I was given a
22  direction to do that.
23  Q.   So that's a "no," you don't recall it ever
24  happening?  That's a true statement, correct?
25  A.   I don't -- I don't recall.

Page 212

1   Q.   These reports were four times a week every
2   week, right?
3   A.   Yes, sir.
4   Q.   For four to five years, right?
5   A.   Yes, sir.
6   Q.   Never happened, to the best of your
7   recollection?  Home office never cut a single report
8   to the best of your recollection, right?
9        MR. MAZZA:  Objection to form.
10  A.   Not to me.  I mean, there were other people
11  sending a report over, so I don't know -- I can't --
12  I can't answer for them, but --
13  Q.   Well --
14  A.   -- for me, the reports I sent, no one ever
15  told me to cut one.
16  Q.   It was you and Mr. Sherl.  Anybody else that
17  was sending the reports?
18  A.   Just me and Jimmy.
19  Q.   Did Jimmy ever tell you, hey, HO cut a
20  report?
21  A.   No, sir.
22  Q.   Never -- never recall them saying that, do
23  you?
24  A.   No, sir.
25       (Abernathy Exhibit 22 was marked for

Page 213

1   identification.)
2   BY MR. BOWER:
3   Q.   Sir, you've been handed what's been marked
4   Exhibit 22, which is -- begins with a Bates stamp
5   ending in 34340, and ends -- I apologize, this is a
6   native document, so that's the -- that's the Bates
7   stamp.  I believe it's a PowerPoint presentation.
8        Sir, are you familiar with this document?
9   A.   I -- I need to look through it.  I mean,
10  just looking at it.
11  Q.   Well, sir, on the last page -- if I could
12  direct your attention to the last page, it states:
13  POM Alert Guide brought to you by Dena McClamroch --
14  I'm messing up her name.  It's Dena McClamroch?  Is
15  that how you pronounce that?
16       MR. MAZZA:  McClamroch.
17  Q.   McClamroch and Jeff Abernathy.  Do you see
18  that?
19  A.   Yes, sir.
20  Q.   Does that refresh your recollection?
21  A.   No, sir.
22  Q.   So as you sit here today, you have no
23  recollection of preparing this document?
24  A.   As I sit right here today, I don't.  I
25  mean...

Highly Confidential – Subject to Further Confidentiality Review

Page 214

1    Q.  Well, why don't you take a minute to review
2  it, then, but we'll have some questions on it.  Have
3  you had a chance to review the document, sir?  Are
4  you still looking?
5    A.  Yes, sir.
6    Q.  What does POM stand for?
7    A.  Pharmacy order monitoring.
8    Q.  And this document is titled Health &
9  Wellness Pharmacy Order Monitoring Alerts Guide.  Do
10  you see that?
11    A.  Yes, sir.
12    Q.  And it's dated 3/31/2016?
13    A.  Yes, sir.
14    Q.  Do you have any recollection as to why you
15  prepared this document?
16    A.  I don't know why I prepared it.
17    Q.  Do you, as you sit here today, have any
18  knowledge as to what process or procedure is
19  reflected in this document?
20    A.  I mean, it looks like the steps that were
21  taken for the Reddwerks order alerting, and then it
22  moves into the pharmacy order monitoring process at
23  the home office.
24    Q.  Sir, if you could turn to -- and I
25  apologize, the document doesn't have page numbers,

Page 215

1  but the fifth page in the document?
2        MR. MAZZA:  Including the title page?
3        MR. BOWER:  Yeah.  It has -- should have
4  DC/POM at the top.
5        MR. MAZZA:  Say that again.
6        MR. INNES:  Fourth page.
7        MR. BOWER:  Sorry, fourth page?
8        MR. MAZZA:  DC/POM?
9        MR. BOWER:  Yeah.  Sorry, I had a cover page
10  on mine.  I apologize.
11  BY MR. BOWER:
12    Q.  Do you see that?  Are you on that page, sir?
13    A.  Yes, sir.
14    Q.  And that page, the first bullet point says:
15  How an order moves through the review process.
16        Do you see that?
17    A.  Yes, sir.
18    Q.  Okay.  So the DC action, if you go on the
19  left, you have the arrow over the order.
20        Do you see that, sir?
21    A.  Yes, sir.
22    Q.  And then:  DC action needed, review flagged
23  orders.
24        Do you see that?
25    A.  Yes, sir.

Page 216

1    Q.  So is it -- is it your recollection that
2  even during -- even as of March 31st, 2016, the DC
3  was responsible for reviewing flagged orders?
4    A.  Yes, sir.
5    Q.  Okay.  And who at DC6045 was responsible for
6  doing that in March 2016?
7    A.  It would have been one of the operations
8  managers there.  I believe at this time, I had moved
9  to the home office as part of the pharmacy
10  operation -- Pharmacy Order Monitoring Team, so one
11  of the ops managers would have done that.
12    Q.  And if you look at the first dash under the
13  bullet point, it says:  An order is alerted as being
14  over the weekly threshold.
15        Do you see that?
16        THE COURT REPORTER:  Can you say it again?
17        MR. BOWER:  Sure.
18    Q.  An order is alerted as being over the weekly
19  threshold.
20        Do you see that, sir, right under the first
21  bullet point there at the top?
22    A.  Oh.
23    Q.  Sorry about that.
24    A.  Okay.
25    Q.  Did Walmart at some point change its numeric

Page 217

1  thresholds from daily to weekly?
2    A.  I believe at some point we did look at a
3  weekly total.
4    Q.  Well, was this a policy in place in March
5  2016?
6    A.  I believe so.
7    Q.  All right, sir.  At this point, you were at
8  the home office, so you were -- had some
9  responsibility for implementing the policy, correct?
10    A.  I don't understand.
11    Q.  Well, let me -- let me ask it a different
12  way.
13        What were your responsibilities with respect
14  to the monitoring of suspicious orders in March of
15  2016?
16    A.  So once the orders showed up at the DC, and
17  they hit the button to send it to the home office,
18  then that's when I would review those orders.
19    Q.  And during this time period were you
20  responsible for reviewing the orders from DC6045?
21    A.  On some days.  It wasn't my primary
22  responsibility every day.
23    Q.  And other than yourself, who else had that
24  responsibility?
25    A.  Dena McClamroch.  She was on the team, so

Page 218

1　her and I did those in the beginning. There was,
2　like -- there was a guy that was there. His name
3　was Justin, but he wasn't there very long after I
4　got there. So for a majority of the time, it was
5　Dena and I.
6　　Q. Oh, is that Justin Rafiee?
7　　A. Yes, sir.
8　　Q. And during this time period, how would you
9　determine whether it would be Dena or you or Justin
10　to review the orders from 6045?
11　　A. We would alternate the DCs amongst ourself.
12　It was just a -- so on Mondays, you will do these
13　DCs. On Tuesdays, you'll do these DCs. And we just
14　rotated those out.
15　　Q. And what criteria would you use to review
16　the orders that were alerted from 6045?
17　　A. Let's see. Some that I can think of right
18　off the top of my head was we would look at -- my
19　mind went blank.
20　　　We would look at -- let's see. I would go
21　back into Archer, which is the application we keyed
22　notes and those types of things into. One of the
23　things I would do is look to see had that flag --
24　store flagged before, what -- how many times had it
25　flagged.

Page 219

1　　　I would go back and run a query to find out,
2　you know, how many bottles it had ordered over a
3　four-week period and a twelve-week period. I
4　would -- I would call the store, talk to the
5　pharmacy manager.
6　　　Those are some of the things that we did to
7　review the orders.
8　　Q. Anything else that you can recall that you
9　did to review the orders?
10　　A. Right off the top of my head, that's what
11　comes to mind.
12　　Q. Sir, you were one of the three people at
13　Walmart -- Walmart home office to review Schedule II
14　narcotics for the entire country, correct?
15　　A. Yes.
16　　Q. You were reviewing the suspicious orders for
17　opioids, right?
18　　A. For controlled drugs, yes.
19　　Q. Including the opioid -- opioids that were
20　leading to the nationwide epidemic, correct?
21　　A. Yes.
22　　Q. At this point, were you aware of the
23　epidemic, sir?
24　　A. I knew that there was an issue, yes, sir.
25　　Q. What was your understanding of the issue in

Page 220

1　2016?
2　　A. That there was a -- according to the TV,
3　that there was an epidemic.
4　　Q. No one at Walmart was discussing it at this
5　time?
6　　A. We -- I don't know discussing it. We were
7　definitely trying to make sure that we were
8　following the policies and procedures and monitor
9　those.
10　　Q. Sir, while you were at the home office in
11　2016, did you have any written policies or
12　procedures that you referenced when reviewing a
13　suspicious order to determine whether it should be
14　cut?
15　　A. We had some policies and procedures. I
16　don't know that I referenced them every time I had a
17　review. I just -- there was a, you know, work
18　process. Here's what you do. Here's tools you have
19　available to research that, and --
20　　Q. Is that process reflected in this document?
21　If you go two pages further, it has some with -- the
22　page with the title HO Action Needed.
23　　　Did you see that?
24　　A. Yes, sir.
25　　Q. Were you a member of the POM Team?

Page 221

1　　A. Yes, sir.
2　　Q. Who were -- who were the other members of
3　the team in 2016?
4　　A. Dena McClamroch and Justin. I can't
5　pronounce his last name, but he was there.
6　　Q. And it was just you three on the POM Team?
7　　A. Yes.
8　　Q. When was that team formed?
9　　A. I don't -- I don't know when it was formed.
10　I came to it about March of 2016.
11　　Q. Was the team already in existence when you
12　came to it?
13　　A. Yes, sir.
14　　Q. And were those other two individuals already
15　on the team?
16　　A. Yes, sir.
17　　Q. Did you replace anybody?
18　　A. No, sir.
19　　Q. So you mentioned one of the things you would
20　do would -- check Archer to determine whether this
21　store had been flagged in the past, correct?
22　　A. Yes, sir.
23　　Q. What does that mean, whether a store -- a
24　store had been flagged?
25　　A. So we would key every -- for all the stores

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  that were flagged, we would go into an application
2  called Archer, and we would key in specific things
3  that -- Archer, you know, asked for information. We
4  would key that in so that -- to let the store -- or
5  to put in there what we did with that flagged order
6  and what the outcome was, those types of things,
7  just notes about orders that were flagged.
8      Q.  So let me -- let me try to ask it a
9  different way.  What does it mean when a store is
10 flagged?
11     A.  So in the -- in the Reddwerks system,
12 thresholds were set.  Once the store exceeded that
13 threshold, it flagged in the Reddwerks system.
14     Q.  So what do you mean by exceeded the
15 threshold?  Are you talking about something other
16 than oxy-30 orders over 20?
17     A.  Yes.  Whatever thresholds that they set in
18 Reddwerks for that to flag, for each store, for each
19 item.
20     Q.  Other than over 50 orders, and the over
21 30 -- over 20 orders for oxy-30, were there any
22 other thresholds that would cause a store to be
23 flagged?
24     A.  I don't know.  I mean, I didn't set any
25 thresholds.

Page 223

1      Q.  Well, sir, you were one of the three people
2  for all of Walmart to review suspicious orders,
3  correct?
4      A.  I reviewed the orders that were flagged and
5  sent to me.
6      Q.  And you don't even know under what
7  circumstances a store would be flagged?
8      A.  It was flagged based on the store item and
9  quantity.  That's -- that's what I knew.
10     Q.  But you don't know what items would cause a
11 store to be flagged, correct?
12         MR. MAZZA:  Objection; form.
13     Q.  Well, let me ask a different way.  Do you
14 know what items would cause a store to be flagged?
15     A.  What items?
16     Q.  Just using your words, sir.
17     A.  So a store would flag if it went over a
18 threshold that the system had set.  So it would say,
19 hey, this is over the threshold.  You need to review
20 it.
21     Q.  But you don't know what the threshold was,
22 do you?
23     A.  I don't know what the threshold was.
24     Q.  So you don't know why any particular store
25 was flagged, do you?

Page 224

1      A.  I knew it was over whatever the threshold
2  was, so I knew it was over a quantity amount.
3      Q.  And when did -- when did Walmart start
4  flagging orders in -- strike that.
5          When did Walmart start flagging stores in
6  Archer?
7      A.  I don't know -- we didn't flag stores in
8  Archer.  It was just a -- it was just an application
9  that was used that we would enter information into.
10     Q.  Well, sir, you went into Archer to determine
11 whether a store was flagged, correct?
12     A.  I went into Archer to find out -- for a
13 store that had been flagged today, I would go back
14 and look to say, oh, well, it flagged last week or
15 the week before or two days ago.  How many times had
16 it flagged.  That's what I was going back into
17 Archer to look --
18     Q.  And when --
19     A.  -- history.
20     Q.  -- did Walmart start flagging stores for
21 exceeding the thresholds?
22     A.  Whenever we rolled out the Reddwerks, the
23 automated Reddwerks system.
24     Q.  Well, we've looked at that, and that was
25 late two thousand -- I mean, strike that.

Page 225

1          That was sometime in 2015, correct?
2      A.  Yes, sir.
3      Q.  So in your responsibilities in reviewing
4  suspicious orders for Walmart, you could only go
5  back a year to see whether that store had exceeded
6  its threshold; is that correct?
7      A.  I mean, yes, sir.  I mean, that's what was
8  in Archer.
9      Q.  Did you have any concerns that the store may
10 have been ordering too much for that entire year?
11 Did you ever go -- ask to go back further?
12     A.  No.
13     Q.  Well, we were already epidemic proportions,
14 right, sir?  The country is already in the middle of
15 an epidemic, right?  And you are comparing orders
16 that were already part of the epidemic, correct?
17         MR. MAZZA:  Objection; form.
18     A.  I was reviewing orders following the
19 guidelines, the training, the policy and procedures
20 that were given to me inside that format.
21     Q.  Other than reviewing -- strike that.
22         Other than looking at whether a store had
23 been flagged and how many times it had been
24 flagged -- strike that one.  I apologize.
25         In your capacity and responsibility for

Highly Confidential – Subject to Further Confidentiality Review

Page 226

1 reviewing flagged orders, how would you determine
2 whether a store's history impacted whether to cut or
3 suspend an order?
4 A. It wasn't just history alone that would
5 cause me to cut or approve, or whatever, an order.
6 There were several factors that we looked at. It
7 wasn't all based on just one factor.
8 Q. But did you have the sole discretion to make
9 that decision?
10 A. Following the guidelines given to me, yes,
11 but I also had the discretion that if I didn't feel
12 comfortable with that, I could send that on to our
13 Compliance Team for them to review.
14 Q. And how often would you send it on to the
15 Compliance Team?
16 A. I don't know a number. I mean, I did send
17 some to the Compliance Team for review.
18 Q. Approximately how many?
19 A. In the year I was there, for C2s?
20 Q. Yes.
21 A. Approximately 15 to 20. I mean, I -- that's
22 the best of my recollection -- recollection.
23 Q. 15 to 20 orders?
24 A. I think so.
25 Q. And approximately how many C2 orders did you

Page 227

1 review while you were at the home office?
2 A. I don't know.
3 Q. In the hundreds, correct?
4 A. I don't know.
5 Q. Could have been in the thousands?
6 A. Again, I don't know.
7 Q. Could it have been tens of thousands?
8 A. I don't know.
9 Q. Were there written criteria that you were
10 supposed to use to determine whether to cut or
11 suspend an order?
12 A. There were -- there were guidelines and
13 policies and procedures set out there for that,
14 so --
15 Q. Did those guidelines have a name?
16 A. I mean, I don't know a name for it. I
17 wouldn't know the name for it. It's just that's --
18 we just -- I knew we had some, but I don't know what
19 it was called.
20 Q. Do you know whether they produced -- have
21 been produced in this case?
22 A. I don't know.
23 Q. Have you been asked for them in connection
24 with this litigation?
25 A. No, sir.

Page 228

1 Q. Have you seen the document request that went
2 to Walmart in this case?
3 A. No, sir.
4 Q. Has anyone asked you whether you have
5 documents that are relevant to this case?
6 MR. MAZZA: I'm going to -- I'm going to
7 caution the witness not to disclose any
8 communications he had with counsel.
9 MR. BOWER: Well, that's a yes-or-no
10 question. He can answer that question.
11 MR. MAZZA: Let's see what the question is.
12 To the extent you had communications with
13 counsel, I'm going to instruct you not to answer.
14 MR. BOWER: Just for the record, the
15 question is: Has anyone asked you whether you
16 have documents that are relevant to this case?
17 And that's the question you're instructing him
18 not to answer.
19 MR. MAZZA: I'm cautioning him. I
20 understand it's a "yes" or "no." So you can
21 answer the question "yes" or "no."
22 THE WITNESS: Can you repeat the question?
23 (The question was read by the reporter.)
24 A. No.
25 BY MR. BOWER:

Page 229

1 Q. Sir, going back to your PowerPoint, back to
2 the page that has DC/POM for a moment, are you still
3 on that page?
4 A. Yes, sir.
5 Q. Sir, on the second dash there, it says: It
6 appears in DC action needed - flagged order so that
7 the DC can review the order and either release the
8 order to be picked, cut the order, or send to HO for
9 further -- for further review.
10 Do you see that?
11 A. Yes, sir.
12 Q. Then it says: If released to be picked or
13 cut by the DC, no further action is needed.
14 Fair?
15 A. Yes.
16 Q. Does it say anywhere in this policy, sir, or
17 are you aware of any policy that would require the
18 DC to report that to the DEA?
19 A. I don't -- I don't see anything here that
20 says that.
21 Q. Did Walmart have such a policy?
22 A. I'm sure we did.
23 Q. If the DC -- if the DC themselves cut the
24 order, how would that order -- that order that was
25 cut get to the DEA?

Page 230

1    A.  I don't know.

2    Q.  Have you ever seen such a correspondence?

3    A.  No, sir.

4        MR. MAZZA:  Objection; form.

5    Q.  Sir, in your capacity and responsibility to

6    review orders at the home office, did you consider,

7    in determining whether to approve or cut the order,

8    what product was being ordered?

9    A.  No, sir.

10   Q.  It didn't matter whether it was an oxy-30.

11   A.  No, sir.  I mean, I reviewed all the orders

12   the same.

13   Q.  Did you review oxy-80s the same as oxy-5s?

14   A.  I don't remember an oxy-80, but, I mean, I

15   would have reviewed both of them the same.

16   Q.  Would you've reviewed fentanyl the same as

17   OxyContin?

18   A.  Well, we didn't sell OxyContin during this

19   time, but I would have reviewed it the same way.

20   Q.  What do you mean when you say, we didn't

21   sell OxyContin during this time?

22   A.  OxyContin is a brand name.  We distributed

23   oxycodone.

24   Q.  Okay.  So did you sell oxycodone during this

25   time period?

Page 231

1    A.  Yes.

2    Q.  And did you review oxycodone products any

3    differently than any other opioid product?

4    A.  No, sir.  I evaluated them all the same.

5    Q.  Is that part of Walmart's policy, to

6    evaluate them all the same?

7    A.  To follow the guidelines and procedures set

8    before me is what I did, yes, sir.

9    Q.  Right.  Was part of those guidelines and

10   procedures to treat all the products the same?

11   A.  Yes.

12   Q.  Unless it's an oxy-30, correct?

13   Q.  During this time period?

14       MR. MAZZA:  Objection as to form.

15   Q.  Yes, sir, during this time period.  Were

16   oxy-30s still being cut automatically if they

17   exceeded the threshold of more than 20?

18   A.  No, sir.

19   Q.  When did that stop?

20   A.  Once we moved into the new Reddwerks

21   automated system, then we allowed for that process

22   to work.

23   Q.  Was part of that Reddwerks process

24   automatically cutting oxy-30s to 20?

25   A.  No.  The process was to, if it was a flagged

Page 232

1    order, send it to the home office for review.

2    Q.  So at some point in and around January 2015,

3    Walmart stopped cutting any orders of oxy-30 above

4    20; is that correct?

5    A.  I don't know the exact date, but we did stop

6    doing that.

7    Q.  Do you have any understanding as to why that

8    policy was changed?

9    A.  It was my understanding because we were

10   using the new Reddwerks system.

11   Q.  So the new Reddwerks system was the system

12   set up to simply flag oxy-30 orders that exceeded

13   20?

14   A.  It would flag based on the threshold that

15   they set for it.

16   Q.  Do you know who set those thresholds?

17   A.  I don't know who set those thresholds.

18   Q.  Do you know what team or division within

19   Walmart was responsible for that?

20   A.  No, sir.

21   Q.  Do you know who would know?

22   A.  I don't know that.

23   Q.  Were you able to see the thresholds in

24   Reddwerks?

25   A.  I don't think I was able to see them in --

Page 233

1    from the DC side.  I believe when I was reviewing

2    the orders at the home office I was able to see

3    those, but I'm not sure if it was in Reddwerks.

4    Q.  Where else may it have been?

5    A.  I believe it was in Reddwerks, but

6    understand that once -- you know, there was a

7    different -- for the people at the home office who

8    were reviewing those orders in Reddwerks, there was

9    a different -- like, it would allow us from the home

10   office to see that in the same Reddwerks,

11   application, but the people from the DC couldn't see

12   that.

13       I know that may not make sense, but it was

14   a -- it was a level that I had, as a home office POM

15   person, that I could see the threshold when it would

16   flag and they sent it to us.  But on the DC side, I

17   don't think they could see that on their side.  They

18   didn't know what that was.

19   Q.  And you were in your position at the home

20   office through 2016?

21   A.  2016 to 2017.

22   Q.  Do you recall what time period in 2017 you

23   returned to the DC?

24   A.  I think May.

25       MR. MAZZA:  Zach, if we're going to go back

Highly Confidential – Subject to Further Confidentiality Review

Page 234

1   to the DC, now might be a good time to take a --
2      MR. BOWER: Let's just do a little bit
3   longer.
4      MR. MAZZA: Yeah.
5      MR. BOWER: A couple more before I go back
6   to the DC.
7      MR. MAZZA: Are you okay with that?
8      THE WITNESS: I'm fine.
9   BY MR. BOWER:
10    Q. Do you want a break? We can take a break
11   if --
12    A. No, sir. I'm fine.
13    Q. Okay.
14      (Abernathy Exhibit 23 was marked for
15   identification.)
16   BY MR. BOWER:
17    Q. Sir, you've been handed what's been marked
18   Exhibit 23, which is an e-mail from Austin Campbell
19   to yourself and Dena McClamroch ending in 8070.
20   It's just a one-sentence e-mail with an attachment,
21   so just take a moment to review, and then I have a
22   few questions on it.
23    A. Okay.
24      MR. MAZZA: Hey, Zach, just looking at the
25   native, the printout portion of it --

Page 235

1      MR. BOWER: Yeah.
2      MR. MAZZA: -- in the -- I think it's the
3   second column, the item description, it's cut
4   off. I'm sure we all have the same copy, but
5   what I'm looking at is cut off where you can't
6   see what oxy product we're talking about.
7      MR. BOWER: Right.
8      MR. MAZZA: Okay.
9      MR. BOWER: Yeah. I mean, I don't think
10   that's critical. We can certainly correct that,
11   but I don't think -- I'm not going to be
12   questioning on that.
13      MR. MAZZA: Okay. I just want to confirm.
14      MR. BOWER: Yeah. And I think that's right.
15   You know, these are Excel spreadsheets. I didn't
16   want to make it too large. I just wanted to fit
17   it on a few pages. My questions are simply going
18   to be focused on the bottle threshold, which you
19   can see.
20   BY MR. BOWER:
21    Q. And, sir, just my main question is: What --
22   where is this document's attachment coming from? Is
23   this coming from Reddwerks?
24    A. This is coming from the Compliance Team.
25    Q. So Austin Campbell was part of the

Page 236

1   Compliance Team?
2    A. Yes, sir.
3    Q. And he -- did you have access to this sort
4   of information at the home office?
5    A. No, sir.
6    Q. Okay. So it appears to you that this
7   information is not coming from Reddwerks; is that
8   correct?
9    A. I'm sorry?
10    Q. Is it -- I just want to clarify that it
11   appears to you that this information was not pulled
12   from Reddwerks; is that correct?
13    A. Correct.
14    Q. Do you have any idea what database this may
15   have been pulled from?
16    A. No, sir.
17    Q. Do you have any recollection as to why he
18   was sending -- sending this to you and Dena in
19   January of 2017?
20    A. To the -- to the best of -- that I can
21   remember, it looks like that -- it looked like there
22   was a product switch from one brand to another, and
23   he was giving us the updated thresholds for the new
24   item for us to use in our research.
25    Q. And, sir, based on your role at the home

Page 237

1   office, why would a product switch from one brand to
2   another impact the thresholds?
3    A. So the thresholds were set up based on a
4   history and, you know, an item. And the way it was
5   set up was that, you know, if the store had never
6   ordered the new item, the threshold would be low
7   because they've never had that item before.
8      So the Compliance Team would give us the new
9   thresholds so that if an item was flagged, before
10   this information got put into the system to update
11   the thresholds, we would know that that item flagged
12   because it had a lower threshold because that item
13   had never been ordered before, so it was low.
14      So here are the new guidelines that are
15   going to be -- for Store 1, the new threshold for
16   this item will be 20. So we may have an order that
17   flagged, but it may be under 20 because the old --
18   the threshold of the new item had not been
19   corrected.
20    Q. So were the thresholds, at least in part,
21   impacted by the amount of the item previously
22   ordered by that store?
23    A. I believe they were based on a history, but,
24   the -- I don't know the specifics of it.
25    Q. So it's your understanding that if the store

Page 238

1  had routinely ordered, say, 40 bottles per month of
2  product, that its threshold would reflect that
3  ordering history, correct?
4      A.  I don't know that.
5      Q.  You don't know that.  One way or the other?
6      A.  I don't -- I don't -- I don't know how it
7  set those thresholds.
8      Q.  And I'm asking you whether a store's
9  ordering history impacted the threshold level that
10  was applicable to any store.
11      A.  I don't know that it impacted it.  I know
12  that they looked at that, but I don't know how they
13  used that or how it would impact it.
14      Q.  Well, sir, did you look at that in
15  determining whether to approve or cut an order?
16      A.  I looked at their history as far as what
17  they've ordered, yes.
18      Q.  And, sir, if a store had ordered more in the
19  past, you would be more likely to allow it to order
20  more in the future, correct?
21      A.  Based on the procedure and the process we
22  had in place, again, that wasn't the only thing that
23  determined whether I -- or what I did with that
24  order.  It wasn't just what their history was.
25      Q.  It was also whether they had been flagged,

Page 239

1  correct?
2      A.  How many times they had been flagged.
3  Again, I was -- I was going back and looking at
4  size, pattern, and frequency.  I was looking at all
5  of those things.
6      Q.  What patterns were you looking for?
7      A.  I was looking to see if they flagged, when
8  they flagged, was there a pattern there.  I do
9  remember a store that had a liquid hydro that
10  would -- it was, like, the first three days of the
11  month, like a 1st or a 3rd, it would spike.  And
12  then you wouldn't see it alert again until the next
13  month, and it would spike.  And it was, you know,
14  for quite a few bottles.
15          Well, when I called the pharmacy and asked
16  them about it, going back and looking at all the
17  other things, talking to the pharmacy manager, they
18  had a nursing home that they filled their
19  prescriptions.  And those prescriptions renewed at
20  the first of every month, so they had a big order at
21  the first of every month for that item.
22          So they had to place an order for what they
23  knew they were going to have to sell for that -- for
24  that nursing home.  So it would be above the
25  threshold, because the rest of the months it was

Page 240

1  pretty low.  So it would cause it to flag because of
2  that.  So, I mean, that was a pattern that I could
3  see.
4      Q.  And in your review for patterns, was there
5  any criteria you used, or you just simply looked for
6  yourself whether there was a pattern?
7      A.  I mean, I don't know that anyone spelled out
8  this is what a pattern looks like.  I mean, I was
9  just looking for pattern.
10      Q.  And this is another example of a liquid
11  hydro pattern you saw, sir?
12      A.  I believe it was a liquid hydro.
13      Q.  And when you called the pharmacy, you would
14  have had to document that call, correct, in the
15  system?
16      A.  I would have documented it in Archer.
17      Q.  Archer requires you to document it, correct?
18      A.  Sure.
19      Q.  Would you have also verified the
20  pharmacist's representation that, in fact, there was
21  this nursing home that made the orders?
22      A.  I didn't -- no, I wouldn't verify that.
23      Q.  That wasn't part of the process?
24      A.  No, sir.
25      Q.  You would take the pharmacist's word for it,

Page 241

1  correct?
2      A.  I mean, it didn't seem out of the norm, so,
3  yeah.
4      Q.  And what do you mean, it didn't seem out of
5  the norm?
6      A.  It's --
7      Q.  Had you talked to other pharmacists who had
8  experienced the same issue?
9      A.  No, but, I mean, I had seen a pattern with
10  that one, so --
11      Q.  And the explanation sounded reasonable to
12  you, correct?
13      A.  Yes, sir.
14      Q.  So you approved those orders going forward,
15  right?
16      A.  Yes, sir.
17      Q.  Sir, who did you report to when you were at
18  the home office?
19      A.  Chad Ducote.
20      Q.  Did he hire you to come over to the home
21  office?
22      A.  Yes, sir.
23      Q.  Is that -- was that a position you applied
24  for?
25      A.  Yes, sir.

Page 242

1  Q.  Do you know why you returned to the DC?
2  A.  Well, I understood that we were going to
3  move to a -- to a new order monitoring system with
4  Buzzeo.  And I knew that they were working on
5  getting that in place, and that that process was
6  going to move over to the Compliance Team.  During
7  that time, the position that I held at the DC came
8  available, so I just put in an application to move
9  back to the DC.
10 Q.  You applied to move back to the DC?
11 A.  Yes, sir.
12 Q.  When did you submit that application?
13 A.  I think around March, April sometime.
14    MR. MAZZA:  Let's take that break before we
15 do the next document.
16    MR. BOWER:  Can we just do -- I mean, we're
17 taking a lot of breaks.
18    MR. MAZZA:  We've got one hour to go, so --
19 actually, now we have less than an hour to go.
20 And so I thought we'd take a break now and then
21 finish the hour.  So let's take a break before we
22 do that document.
23    MR. BOWER:  I don't know if it's -- we can
24 go off the record.
25    THE VIDEOGRAPHER:  Going off the record, the

Page 243

1  time is 5:20.
2    (Recess from 5:20 p.m. until 5:34 p.m.)
3    THE VIDEOGRAPHER:  We're going back on the
4  record, beginning of Media File Number 7.  The
5  time is 5:34.
6    (Abernathy Exhibit 25 was marked for
7  identification.)
8  BY MR. BOWER:
9  Q.  Sir, you've been handed what's been marked
10 Exhibit 5 -- I'm sorry, 25.
11    MR. MAZZA:  I think it should be 24.
12    MR. BOWER:  Yeah, 24 will be coming.
13    MR. MAZZA:  Oh, this is 25.
14    MR. BOWER:  But I have 24 marked already.
15 BY MR. BOWER:
16 Q.  Sir, do you recall receiving this e-mail?
17 A.  I mean, I don't recall it.
18 Q.  Well, it's a pretty big deal in your world,
19 no, sir?
20    MR. MAZZA:  Objection; form.
21 A.  I don't -- I don't know.  I mean, I don't
22 understand "big deal."  I don't know what you mean.
23 Q.  Well, sir, your primary job responsibility
24 was suspicious order monitoring, correct?
25 A.  Yes.

Page 244

1  Q.  And you're --
2    MR. MAZZA:  Counsel, can you give him time
3  to read the document?
4    MR. BOWER:  Well, sir, I think I've been
5  more than gracious concerning the documents.
6  This is a one-sentence e-mail, right?  He's
7  had -- I offered him all day plenty of time to
8  review documents.  This is a one sentence e-mail.
9    MR. MAZZA:  This is a three-page e-mail.
10    MR. BOWER:  It's a -- it's a one-sentence
11 e-mail attaching a USDA press release regarding
12 McKesson's $150 million fine, and he's already
13 testified it wasn't a big deal to him.
14 BY MR. BOWER:
15 Q.  So, sir, if you want to take a minute, go
16 ahead and read the document.
17    MR. MAZZA:  I think that misstates the
18 record.  Yeah, he said, I don't recall it.
19    And for the record, you have been gracious
20 in letting him read the documents.  That is
21 absolutely true.
22 Q.  Are you done, sir?
23 A.  Yes, sir.
24 Q.  Did you receive tons of questions after this
25 settlement, the McKesson settlement with the DEA?

Page 245

1  A.  I don't remember any questions.
2  Q.  Do you remember being concerned at all about
3  it?
4  A.  I mean, I just remember, you know, the
5  e-mail coming out, and, you know, I do remember Brad
6  saying, hey, there may be questions about this,
7  so --
8  Q.  Is this the first time you had seen this,
9  when you got this e-mail?
10 A.  I mean --
11 Q.  He says:  Just FYI in case you had not seen
12 this yet.  Right?
13 A.  Right.
14 Q.  You hadn't seen this yet?
15 A.  I hadn't seen it.
16 Q.  It's not something you followed in the news?
17 A.  No, sir.
18 Q.  Walmart had -- was doing business with
19 McKesson at the time, right?  Its pharmacies were
20 ordering from McKesson, right?
21 A.  Yes, sir.
22 Q.  And just ask you one question and then in
23 the press release itself, all right, and the
24 paragraph starting "in 2008," first page of the
25 release.

Highly Confidential – Subject to Further Confidentiality Review

Page 246

1    Do you see that?
2    A.  Yes, sir.
3    Q.  Last sentence of that paragraph says:  From
4   2008 until 2013, McKesson supplied various US
5   pharmacies an increasing amount of oxycodone and
6   hydrocodone pills.  Frequently misused products are
7   part of the current epidemic.
8    Do you see that?
9    A.  Yes.
10   Q.  So did you have any concerns that Walmart
11  had also supplied various US pharmacies, from 2008
12  to 2013, increasing amounts of oxycodone and
13  hydrocodone pills?
14   A.  I'm sorry, ask that again.
15    (The question was read by the reporter.)
16   A.  I followed the practices and the policies
17  and the procedures given to me, the guidelines given
18  to me.  So because of that, I felt that what we sent
19  to the stores was okay, I mean, because I was
20  following what was given to me, if that's what
21  you're asking.
22   Q.  No, sir.  So the question is:  Did you have
23  any concerns yourself personally that Walmart had
24  also been supplying its pharmacies with an
25  increasing amount of oxycodone and hydrocodone

Page 247

1   starting in 2008?  Did you have that concern?
2    A.  I didn't have a concern about an increasing
3   amount because I don't know increasing -- I don't --
4   I mean, I didn't think in those terms of that.
5    Q.  You never looked at it, either, right?
6    A.  Looked at this document?
7    Q.  No.  You never went back and looked at
8   whether Walmart had been increasing its supply of
9   these products during this time, did you?
10   A.  Not overall or as a company or anything like
11  that.
12   Q.  Could you have done that if you wanted to?
13   A.  I mean, I -- I mean, I don't know if I could
14  have or not.
15    (Abernathy Exhibit 26 was marked for
16  identification.)
17   Q.  I'm handing you what's been marked as
18  Exhibit 26.
19    MR. BOWER:  I apologize, I only have two
20  copies of this one.
21    MR. MAZZA:  That's all right.  Should we
22  hold 25, Zach?
23    MR. BOWER:  We're done with 25.
24  BY MR. BOWER:
25   Q.  And 26, sir, certainly take your time to

Page 248

1   review it, and it's just a cover e-mail with a
2   flowchart attached.
3    Do you see that, sir?
4    A.  Yes, sir.
5    Q.  And this was received by yourself during the
6   time you were at the home office, correct?
7    A.  Yes.
8    Q.  Sir, do you know whether this -- the flow --
9   and please take your time to review it.  I'll just
10  tell you my first question is whether this process
11  that's illustrated here was implemented in
12  connection with Walmart's suspicious order
13  monitoring program in 2006 or at any time
14  thereafter.
15    MR. MAZZA:  I'll just offer, for the record,
16  some of the type in the black boxes, at least on
17  the top, I don't think you can make it out, on
18  the second page.
19    MR. BOWER:  So the first black box on the
20  top says:  Control drug.  And the second black
21  box says:  Review information about the drug and
22  what it is used for.
23    MR. MAZZA:  What it was used for.
24    MR. BOWER:  Okay?
25  BY MR. BOWER:

Page 249

1    Q.  Do you recognize this process, sir?
2    A.  Hang on just a second.  Okay.
3    Q.  Do you recognize this process reflected on
4   this chart, sir?
5    A.  I don't recognize the process.  I believe --
6   going back and thinking about this, I think this was
7   something that Justin put together because I had
8   just come on the team, and I think he put this
9   together to kind of help show me what he does in the
10  job.
11    So I think this was just an e-mail to me
12  saying, hey, I put this together just to show you
13  kind of what -- you know, what I do, you know, to
14  help you out, so --
15   Q.  Was Justin doing something different than
16  you were brought on to do?
17   A.  I mean, I don't -- I don't know what he was
18  doing.  I mean, like I said, I think he was just
19  trying to help me get acclimated in the new
20  position, and he just sent me this because this is
21  what he does.
22   Q.  And what do you mean when you say this is
23  what he does?  He implemented this procedure?
24   A.  I think this is the process flow that he
25  operated off of.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1   Q.  Okay.  So do you know what these terms
2  reference?  For example, that first diamond on the
3  left:  Send to PC to determine actual threshold.  Do
4  you know what that means?
5   A.  No.
6   Q.  Do you know what actual -- actual threshold
7  refers to?
8   A.  I don't.
9   Q.  Do you know what PC refers to?
10   A.  I mean, I didn't make the document.  I don't
11  know what he meant by PC.
12   Q.  We'd have to talk with Justin, what he meant
13  by that?
14   A.  Yes.
15   Q.  Do you know what default threshold refers
16  to?
17   A.  Again, I don't know what he's referring to.
18   Q.  What about this reference to the McKesson
19  threshold report?  Do you see that?  Do you see it,
20  sir?  There is a third diamond right on the top row,
21  right under that third diamond, that rectangle
22  there.
23   A.  Yes.
24   Q.  It says:  Check McKesson threshold report.
25    Do you see that?

Page 251

1   A.  Yes.
2   Q.  Do you know what that refers to?
3   A.  No.
4   Q.  Sir, in your -- in connection with your
5  duties and responsibilities at the home office to
6  review any of the cut or approved orders, did you
7  ever consider whether the pharmacy had ordered the
8  product from McKesson?
9   A.  No, sir.
10   Q.  Did you have access to McKesson's threshold
11  reports?
12   A.  I don't remember having access to any
13  McKesson threshold reports.
14   Q.  Do you know what a McKesson threshold report
15  is?
16   A.  No, sir.
17   Q.  Do you know what -- if you go -- follow that
18  down, there is the shaded box, and to the left there
19  is another diamond that says:  Is the item dual
20  sourced?
21    Do you see that?
22   A.  Yes, sir.
23   Q.  Do you know what that refers to?
24   A.  Again, since this is what Justin did, I
25  don't know what Justin means by dual sourced.

Page 252

1   Q.  Right.  But during this time period, sir,
2  you were -- you agree you were in charge of
3  approving or cutting orders that were flagged as
4  potentially suspicious, correct?
5   A.  I was not the only person in charge of doing
6  that.  I reviewed the orders, yes.
7   Q.  You were one of the people to make those
8  decisions, right?
9   A.  I was one of them, yes.
10   Q.  Yes.  And in making those decisions, did you
11  ever consider whether an item was dual sourced?
12   A.  Yes.
13   Q.  You considered that, correct?
14   A.  I considered -- yes, sir.
15   Q.  How would you have known whether or not it
16  was dual sourced?  Where would you have looked?
17   A.  Well, my understanding of dual sourced meant
18  that we had two separate vendors that supplied us,
19  so maybe this vendor supplied these stores, and this
20  vendor supplied these stores.
21   Q.  What do you -- what do you mean when you
22  said you had two separate vendors that supplied us?
23  Do you mean the vendors -- Walmart would purchase
24  the Schedule II narcotics from the manufacturers,
25  correct?

Page 253

1   A.  Yes, sir.
2   Q.  And by vendors --
3    MR. MAZZA:  Objection --
4   Q.  -- do you mean manufacturers?
5    MR. MAZZA:  Sorry, interpose to the last
6  question, objection as to form.
7   Q.  When you say vendors, do you -- are you
8  referring to manufacturers?
9   A.  Yes.
10   Q.  So why would it -- why would it have been a
11  factor you considered, whether Walmart acquired
12  product from two different sources in determining
13  whether an order should be cut?
14   A.  I mean, off the top of my head, I mean, when
15  I would consider that, it would be because if you,
16  know, this vendor was serving -- servicing these
17  stores, but for whatever reason, they couldn't, and
18  they moved the -- moved it to another vendor to
19  service those stores, again, the thresholds would
20  have been different because that wasn't their normal
21  treated item.  So that would be the sense in which I
22  would look at that.
23   Q.  But you never considered whether the item
24  may have been sourced from another distributor, did
25  you?

Page 254

1    A.  No, sir.
2    Q.  In deciding whether to cut an order, you
3 never determined whether a pharmacy may have ordered
4 that same product from McKesson, did you?
5    A.  No, sir.
6    Q.  And you never determined whether -- you
7 never considered whether that pharmacy may have
8 ordered that product from AmerisourceBergen, did
9 you?
10    A.  No, sir.
11        (Abernathy Exhibit 24 was marked for
12 identification.)
13 BY MR. BOWER:
14    Q.  Sir, you've been handed what's been marked
15 Exhibit 24.  It's an e-mail from Theresa to
16 Mr. Ducote, Nick Tallman, Ramona Sullins, Dena
17 McClamroch, Kenny King, and yourself, dated February
18 10th, 2017.
19        Do you see that?
20    A.  Yes, sir.
21    Q.  Bates stamp ending in 1004.  Sir, this --
22 February 2017, you were still at the home office,
23 correct?
24    A.  Yes, sir.
25    Q.  And so I don't have many questions on this,

Page 255

1 I just want to focus your attention on the logistics
2 update.
3        Do you see that?  Just on the first page
4 there, it's bolded.
5    A.  Can I read it, please?
6    Q.  Yeah.  I'm just going to -- I'm trying to
7 focus your attention where my questions are going to
8 be.
9    A.  Okay.
10    Q.  It says:  Chad conducted second round
11 interviews for the SOM position.
12        Do you see that?
13    A.  Yes, sir.
14    Q.  Do you know what position that refers to?
15    A.  I believe it was a -- they were going to put
16 another pharmacy order monitoring position in along
17 with Dena and I --
18    Q.  So --
19    A.  -- essentially replacing Justin.
20    Q.  So Justin had left by this time period?
21    A.  Yes, sir.
22    Q.  And about how far after -- when did you
23 leave again, sir?
24    A.  I believe my last day up there was in May
25 sometime.

Page 256

1    Q.  Did they hire someone to replace you?
2    A.  They did, yes, sir.
3    Q.  And do you know who they hired?
4    A.  Lisa.  That's all I know.  I don't -- I
5 don't know who.  They just -- I know they were
6 interviewing a lady named Lisa.
7    Q.  And what was the reason you left your
8 position at the home office?
9    A.  There was an opportunity for me to go back
10 to the DC, and I had suspected that this position
11 was going to go away.  That was just my thoughts.
12 So while the position was opened at the DC, I
13 decided to take that.
14    Q.  Where did those thoughts come from?
15    A.  Well, it came from the talking of moving to
16 Buzzeo, the new order monitoring system, and that --
17 there was talk that the Compliance Team would take
18 that over, so that process would move to the
19 Compliance Team.
20    Q.  Did that, in fact, occur?
21    A.  I believe it did occur.
22    Q.  Do you know when that occurred?
23    A.  I don't remember the date that that
24 occurred.  I had come back to the DC when it took
25 effect, but I don't remember the date.

Page 257

1        MR. BOWER:  All right.  Let's go off the
2 record for a minute.
3        THE VIDEOGRAPHER:  Going off the record.
4 The time is 5:52.
5        (Recess from 5:52 p.m. until 5:57 p.m.)
6        THE VIDEOGRAPHER:  We're back on record, the
7 beginning of Media File Number 8.  The time is
8 5:57.
9        (Abernathy Exhibit 28 was marked for
10 identification.)
11 BY MR. BOWER:
12    Q.  Sir, you've been handed what's been marked
13 as Exhibit Number 28, which is Walmart's Amended and
14 Supplemental Objections and Responses to Plaintiffs'
15 First Set of Interrogatories.
16        Have you seen those before?
17    A.  No, sir.
18    Q.  No, sir.  And I just want to use this
19 document primarily to refresh your recollection
20 about meetings you attend with the DEA.  Okay, sir?
21        Do you recall attending meetings with the
22 DEA regarding suspicious order monitoring?
23    A.  I don't remember.
24    Q.  No?
25    A.  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    Q.  Okay.  Would you turn to Page 19, please?
2        You see there the entry for 9/28/17, the
3    first one on top?
4    A.  Yes, sir.
5    Q.  Walmart employees including David Barlow,
6    Matt Singer, Nick Tallman, Brooke Leverett, Mike
7    Mullin, Jeff Abernathy, and Ray Roe met with the DEA
8    employees.
9        Do you see that, sir?
10   A.  Yes, sir.
11   Q.  Is that an accurate statement?
12   A.  Yes.  I mean, the date, I believe, is right,
13   but -- yes.
14   Q.  Do you recall what was discussed at the
15   meeting, sir?
16   A.  Yes, sir.
17   Q.  What was discussed at that meeting on 9/28?
18   A.  We had set up a meeting with them to discuss
19   using the carriers at Warehouse 1, 6001, to deliver
20   the C2s to the stores for the area -- for the stores
21   that DC6001 serviced.
22   Q.  And then do you see another meeting about
23   halfway down the page, 9/21 through 9/23:  Walmart
24   employees including Nick Tallman, Mike Mullin,
25   yourself, Ramona Sullins, Kristy Spruell, and Sarah

Page 259

1    Eisler met with DEA employees?
2        Do you see that?
3    A.  Yes.
4    Q.  Do you recall that meeting in 2015?
5    A.  Yes.
6    Q.  Do you recall what was discussed at that
7    meeting?
8    A.  I believe that was an audit that they
9    performed.  We had just moved the DC -- DC6045, we
10   had moved it from Bentonville to Rogers and
11   colocated it with the 6001 building just prior to
12   this, and I believe this is when they came and did
13   an audit.
14   Q.  Sir, have you ever seen any correspondence
15   the DEA has sent to Walmart regarding suspicious
16   order monitoring?
17   A.  No, sir, not to my knowledge.
18   Q.  At any of these meetings with the DEA did
19   they provide you with any documents?
20   A.  Well, they didn't provide me with any
21   documents.
22   Q.  Did they provide Walmart with any documents,
23   to your knowledge?
24   A.  Not to my knowledge.
25   Q.  Have you ever been to any seminars or other

Page 260

1    types of meetings or presentations where the DEA
2    discussed suspicious -- suspicious order monitoring?
3    A.  No, sir, not that I know of.
4    Q.  Have you ever attended any conferences or
5    any similar -- similar type of meeting where the
6    opioid epidemic was discussed?
7    A.  No, sir, not that I can remember.
8    Q.  No?  Do you see the meeting on 4/30/15, you
9    were also present at that meeting?
10   A.  Yes.
11   Q.  Do you recall what was discussed at that
12   meeting?
13   A.  This was -- so it looks like this was the
14   meeting where, once we moved the C2 vault over to
15   the new warehouse, they came and inspected it.
16   Q.  Sir, I'm just going to ask you:  The next
17   page is a series of meetings in 2008 and '09 where
18   Mr. Sherl and Mullin and Ms. Hiland met with the
19   DEA.  Do you have any recollection what these
20   meetings were about?
21   A.  No, sir.
22       MR. MAZZA:  I'm sorry, Zach, which entry?
23       MR. BOWER:  This -- I'm just asking about
24   these ones, 2007, 2009, where Jim Sherl, Mike
25   Mullin, and Ms. Hiland met with the DEA.

Page 261

1    Q.  And just given your -- the nature of your
2    job at 6045, I was just wondering if you have any
3    knowledge what those meetings were about.  Like, for
4    example, the 9/1/2009 meeting was at 6045.
5        Do you see that?
6    A.  Yes, sir.
7    Q.  And you were at 6045 at that time, right?
8    A.  I was.  I know that on two occasions, the
9    DEA did come do an audit, but I was on vacation both
10   of those times.
11   Q.  And, sir, if you can turn back to Page 18 --
12   strike that.
13       (Abernathy Exhibit 27 was marked for
14   identification.)
15   BY MR. BOWER:
16   Q.  You might want to keep that out for a
17   minute, but let me just go to Exhibit 27.
18       MR. BOWER:  You know, I need one of those
19   back, sorry.  Those big ones I only brought --
20       MR. MAZZA:  This is 27?
21       MR. BOWER:  27, yeah.
22   BY MR. BOWER:
23   Q.  Sir, you've been handed what's been marked
24   Exhibit 27.  It's a lengthy document.  The first
25   Bates number is 5 -- sorry, 45963, and it ends in

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  46007.
2  And I just have a couple of general
3  questions on this document, sir, but take a moment
4  just to review -- review the document and the
5  information in the -- what appears to be a fax to
6  the DEA.
7  Just -- my first question -- keep reviewing.
8  I just wanted to know if you recall ever seeing this
9  document before.
10  A. No, sir.
11  Q. Okay. Do you see the date of the document,
12  July 23rd, 2010? It's the front page there, sir.
13  A. Okay.
14  Q. Do you see that?
15  A. Yes, sir.
16  Q. Did you have any role in preparing this
17  information, sir?
18  A. No, sir.
19  Q. Okay. Did you ever talk to Mr. Sherl about
20  his correspondence to the DEA?
21  A. No, sir.
22  Q. What about Mr. Mullin?
23  A. No, sir.
24  Q. Okay. Were you aware that Mr. Mullin was --
25  had sent this to the United States Department of

Page 263

1  Justice Drug Enforcement Administration in 2010?
2  A. I'm sorry, I didn't hear the first part of
3  the question.
4  Q. Were you aware that Mr. Mullin had sent this
5  to the United States Department of Justice in 2010?
6  A. No, sir.
7  Q. Do you see on the second page of the
8  document, additional information, it states: The
9  July 2010 review of the June 2010 ordering of C2s by
10  Walmart Pharmacies did not identify any as to being
11  outside the normal ordering practices?
12  Do you see that?
13  A. Yes, sir.
14  Q. Do you agree with that statement, sir?
15  A. Yes, sir.
16  Q. And what's the basis for your agreement?
17  A. I mean, because we were following the
18  policies and procedures, so -- I mean.
19  Q. Well, if Walmart had made any cuts to any
20  orders in 2010, would that statement be true?
21  (Discussion off the record.)
22  A. I mean, but depends on the -- if we did cut
23  one, I mean, it would be why would we cut it and --
24  I mean, I don't know that it would have been outside
25  the normal order -- order -- ordering practices.

Page 264

1  Q. What would be another reason Walmart would
2  cut an order?
3  MR. MAZZA: Sorry, can you repeat that,
4  Zach?
5  MR. BOWER: Sure.
6  Q. What would be another reason Walmart would
7  cut an order?
8  A. Well, if a store meant to order two bottles,
9  but they ordered 20 bottles because they
10  accidentally hit a zero, and we called and asked the
11  store, and they said, no, we only wanted two, we
12  didn't mean to order 20, and we cut that to two, I
13  don't personally consider that outside their normal
14  ordering practices.
15  Q. Okay. Other than a typographical error,
16  what would be any other example for a reason an
17  order would be cut that was not outside the normal
18  ordering practices? Can you think of any?
19  A. I mean, if it was an oxycodone 30 that was
20  over 20, we would have cut it to 20.
21  Q. And it would be your opinion, sir, that that
22  wasn't -- was not outside of the normal ordering
23  practices?
24  A. It was -- I don't know if it was outside
25  their normal ordering practices. I -- that was the

Page 265

1  guidelines we had to do, so --
2  Q. And Walmart --
3  A. -- that's what I did.
4  Q. -- and Walmart imposed those guidelines to
5  comply with the DEA's requirement that it cut
6  suspicious orders, correct?
7  A. I don't know why they gave me that
8  direction. That's just the direction they gave me,
9  so that's what I did.
10  Q. Well, were those guidelines part of
11  Walmart's suspicious order monitoring policy?
12  A. They were part of my policies and procedures
13  for handling C2 drugs.
14  Q. Sir, was the guideline which required you to
15  cut oxy-30s to 20 part of Walmart's suspicious order
16  monitoring policy?
17  A. Well, it was never given to me that this
18  is -- it wasn't -- it wasn't presented to me that
19  way. It was just that if the order is over this,
20  just cut it.
21  Q. Do you know from what database Mr. Mullin or
22  Mr. Sherl may have pulled this data that's reflected
23  in Exhibit 27?
24  A. No, sir.
25  Q. We'd have to -- we'd have to ask them that

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  question?
2   A.  Yes, sir.
3   Q.  Sir, in your experience at Walmart, did
4  Walmart ever conduct internal or external audits of
5  their opioid sales to identify patterns regarding
6  suspicious orders or diversion?
7      MR. MAZZA:  Objection; foundation.
8   A.  I don't know of any audits.
9   Q.  Are you aware of any efforts to identify
10  patterns regarding suspicious orders or diversion
11  made by Walmart?
12   A.  I'm sorry, could you repeat, please?
13   Q.  Sure.  Are you aware of any efforts made by
14  anyone at Walmart to identify suspicious orders or
15  diversion of opioid products?
16   A.  I mean, when I was on the POM Team, that's
17  what I did, was look for orders of interest and send
18  them -- those over to the Compliance Team for
19  review.
20   Q.  Do you agree that Walmart had the duty to
21  report suspicious orders?
22   A.  I mean, I don't know what their duty to do
23  was.
24   Q.  Do you know whether Walmart had any such
25  duty, sir?

Page 267

1   A.  I don't know.
2   Q.  Do you know whether or not Walmart had a
3  duty to report orders that it had cut?
4   A.  I don't know that -- I don't know if they
5  had a duty to do that.
6   Q.  Sir, are you aware of anyone at Walmart ever
7  looking at -- looking at whether there was an
8  increase in opioid sales over the past 10 years?
9   A.  I'm sorry, the first part of that I didn't
10  catch.
11   Q.  Are you aware of anyone at Walmart ever
12  looking at whether there was an increase in opioid
13  sales over the past 10 years?
14   A.  No, sir.
15   Q.  What about over the past 20 years?
16   A.  No, sir.
17   Q.  What about over the past five years?
18   A.  I don't think so.
19   Q.  Okay.  Would you agree that Schedule II
20  drugs have a high potential for abuse?
21   A.  I believe they have -- I believe personally
22  they have a -- they can be abused.
23   Q.  And what's that basis for your personal
24  belief?
25   A.  Just what I hear on TV and, you know,

Page 268

1  knowing that the drug is addictive.
2   Q.  You agree they are considered dangerous,
3  correct?
4   A.  Yes.
5   Q.  Was part of Walmart's suspicious order
6  monitoring program to verify the information it
7  learned when talking to the pharmacist --
8  pharmacists?
9      MR. MAZZA:  Objection; form.
10   Q.  In other words, let me -- let me try to put
11  it in your own words.  Before, you gave us an
12  example when you called the pharmacy and asked about
13  the order that you had considered to be potentially
14  suspicious.  And the pharmacy explained that the
15  reason for the ordering was because there was a
16  nursing home located nearby, correct?
17   A.  Yes.
18   Q.  And that -- you called that pharmacy as part
19  of your duties and responsibilities in monitoring
20  for suspicious orders, correct?
21   A.  Yes, sir.
22      MR. BOWER:  I think I'm done.  Let's just go
23  off the record for a minute.
24      MR. MAZZA:  Sure.
25      THE VIDEOGRAPHER:  Going off the record.

Page 269

1   The time is 6:16.
2   (Recess from 6:16 p.m. until 6:20 p.m.)
3      THE VIDEOGRAPHER:  We're back on record,
4  beginning Media Number 9.  The time is 6:20.
5  BY MR. BOWER:
6   Q.  Sir, I just have a couple more questions for
7  you today.  I appreciate your time.  I realize it's
8  been a long day.
9   Do you recall in March of 2017 giving a tour
10  of DC6045 to a group from Health & Wellness, legal
11  and outside counsel?
12   A.  I don't remember specifically.  I mean, we
13  gave tours regularly to different people.
14   (Abernathy Exhibit 29 was marked for
15  identification.)
16  BY MR. BOWER:
17   Q.  Sir, you've been handed what's been marked
18  Exhibit 29, which is an e-mail chain attaching an
19  Over 20 Report.  And the folks on the chain are
20  yourself, Ramona Sullins, Chad Ducote, and Nick
21  Tallman, and the date is March 30, 2017.  The Bates
22  number is 1126.
23   Do you see that, sir?
24   A.  Yes, sir.
25   Q.  Take a moment to review that.  I'm going to

Page 270

1 have some questions on your e-mail to Chad and the
2 attached document.
3　　My first question, sir -- and keep
4 reviewing, I just want to point you in the direction
5 I'm going -- is: Do you recall what the concerns
6 were that were being raised by Florida and West
7 Virginia? Do you know what the concerns were, sir?
8　A. I don't remember the document, but I
9 don't -- I don't know Florida and West Virginia. I
10 don't understand.
11　Q. Well, this is an e-mail from yourself to
12 Mr. Ducote and Ramona Sullins and Nick Tallman,
13 right, sir?
14　A. Yeah.
15　Q. These are your words, right?
16　A. Yes.
17　Q. You write: Before the SOM program there is
18 an issue with oxycodone 30mg in which Kristy S --
19 that's Kristy Spruell, right?
20　A. Yes.
21　Q. -- had 6045 cut all orders of oxy-30 to 20
22 bottles.
23　　Do you see that?
24　A. Yes, sir.
25　Q. Do you know what the basis for that

Page 271

1 statement was?
2　A. I don't know what the basis was for it.
3　Q. Well, as you sit here today, you have no
4 recollection what the concerns were that were being
5 raised by Florida and West Virginia, do you?
6　A. To the best of my knowledge, I don't.
7　Q. Do you know what the SOM program you're
8 referring to there is? What program is being
9 referred to?
10　A. It looks like the Over 20 Report, where we
11 were cutting the oxycodone 30 from -- anything over
12 20 bottles, we were cutting it to 20.
13　Q. Right. And that program was the result of
14 concerns being raised by Florida and West Virginia,
15 correct?
16　　MR. MAZZA: Objection; form.
17　A. I don't know -- I don't know why we were
18 doing that.
19　Q. Who -- when did you first hear about that
20 SOM program being discussed or that it was going to
21 be implemented?
22　　MR. MAZZA: Same objection.
23　A. I mean, when we got the direction to do
24 that, that's when I found out that that's what we
25 need to do.

Page 272

1　Q. Do you ever recall Ramona having a
2 discussion about why you were doing it?
3　A. No, sir.
4　Q. Do you have any idea why you wrote this
5 e-mail?
6　A. I don't remember why I wrote it.
7　Q. Do you see in the next page, you write:
8 Dena is gathering date from current SOM program for
9 how many alerts, how many sent to DC, how many
10 suspicious?
11　　Do you see that?
12　A. Yes, sir.
13　Q. What does that refer to?
14　A. I'm -- I don't know.
15　Q. Well, do you know what PC refers to, sir?
16　A. Practice compliance.
17　Q. So Dena is gathering data from the current
18 SOM program for how many alerts, right, how many of
19 those alerts were sent practice compliance and how
20 many were suspicious, correct?
21　A. Yes.
22　Q. Where would she look to gather that data?
23　A. She would probably use Archer for that.
24　Q. Okay. How far back does the data in Archer
25 go?

Page 273

1　　MR. MAZZA: Objection; foundation.
2　A. I don't know how far it went back.
3　Q. Do you know who would know the answer to
4 that question?
5　A. I don't know.
6　Q. Do you know whether Dena would know?
7　A. I don't know if she would know or not.
8　Q. Do you know whether Ramona would know?
9　A. I don't know that, either.
10　Q. Do you know any -- whether anyone at Walmart
11 would know?
12　A. I don't -- I don't know. Archer was just an
13 application we used. I don't know who owned it, who
14 created it, where -- the information that they used.
15 It was just an application we used to enter stuff
16 into.
17　Q. But Walmart provided the data to use that
18 application, right?
19　A. Walmart -- the information that I gathered
20 from my research on flagged orders went into Archer,
21 but it was my understanding they used Archer for
22 other things, as well.
23　Q. And --
24　A. It was a compliance tool that they used.
25　Q. Do you have any understanding as to what

Page 274

1 Walmart data was loaded into Archer?
2 A. That's -- all I know is the data that I put
3 into it.
4 Q. What data did you put into it?
5 A. The information that I got from reviewing
6 orders.
7 Q. You put -- you physically put that
8 information into Archer yourself?
9 A. Yes, sir.
10 Q. And how would you do that?
11 A. I would log into the Archer application. I
12 would click on, like, new -- I forget the
13 terminology, but I'd create a new entry, and then I
14 would key information into it.
15 Q. And this was the time you were at the home
16 office?
17 A. Yes, sir.
18 Q. Did you do that at any other time?
19 A. No, sir.
20 Q. Did you do -- did you enter this information
21 for every order you reviewed?
22 A. Yes, sir.
23 Q. Including ordered --
24 A. Well, I'm sorry. For controls --
25 Q. Right.

Page 275

1 A. -- we did.
2 Q. You entered this information for every order
3 that you reviewed for controls?
4 A. Yes.
5 Q. So some days, for example, you would enter
6 this information for many orders, correct?
7 A. However many I had, yes, sir.
8 MR. BOWER: Okay. Nothing further.
9 MR. MAZZA: Okay. We can go -- let's go off
10 the record right now.
11 THE VIDEOGRAPHER: Going off record, the
12 time is 6:30.
13 (Recess from 6:30 p.m. until 6:53 p.m.)
14 THE VIDEOGRAPHER: We are going on record,
15 beginning of Media File Number 10. The time is
16 6:53.
17 CROSS-EXAMINATION
18 BY MR. MAZZA:
19 Q. Mr. Abernathy, just a very few follow-up
20 questions to Mr. Bower's examination.
21 In your time at 6045, did you only
22 distribute controlled substances to Walmart
23 Pharmacies?
24 A. Yes.
25 Q. And I'm showing you what's been marked as

Page 276

1 Exhibit 27, the second page.
2 MR. MAZZA: Can you give me a copy of 27?
3 Thanks.
4 Q. This is the -- a report that Mr. Sherl faxed
5 to the DEA on a monthly basis. Do you see that? Do
6 you remember when Mr. Bower asked you about this?
7 A. Yes.
8 Q. Okay. This one here, if you look at the
9 date, July 23rd, 2010, as you sit here this evening,
10 do you know whether there were any orders cut in
11 July 2010 from DC 45?
12 A. No, sir.
13 Q. Mr. Abernathy, to the best of your
14 knowledge, did any shipment from Walmart lead to the
15 opioid crisis?
16 A. No, sir.
17 MR. BOWER: Objection to form.
18 Q. Did any contribute to the opioid crisis?
19 MR. BOWER: Objection to form.
20 A. No, sir.
21 Q. When you were on the POM Team, we talked
22 about the thresholds under the Reddwerks program?
23 A. Yes, sir.
24 Q. Right. Do you recall that?
25 A. Yes, sir.

Page 277

1 Q. And is it -- was it your testimony that the
2 thresholds were based on the store and item and
3 history?
4 MR. BOWER: Objection to form.
5 A. Yes, sir.
6 Q. And you testified that you didn't have any
7 hand in designing the threshold; is that correct?
8 A. Yes, sir.
9 Q. Do you know the -- the basic nature of the
10 thresholds that were in place in the Reddwerks
11 program when you were on the POM Team?
12 MR. BOWER: Objection to form.
13 A. I'm sorry, can you ask again?
14 Q. Yes. Do you know the basic nature of the
15 thresholds that were in place when you were on the
16 POM Team for the Reddwerks program?
17 MR. BOWER: Same objection.
18 A. I didn't design them. The basics that I
19 knew was store -- it was based on store, item, and
20 they were different for each store.
21 Q. So with that definition, an order for oxy-30
22 from a store in Michigan, could that order have a
23 different threshold than an order for something like
24 hydro 5 from a store in Connecticut?
25 A. Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    MR. MAZZA: Nothing further.
2    MR. BOWER: I just have two questions.
3    MR. MAZZA: You want to just stay there?
4    MR. BOWER: Yeah, I'll just stay here.
5         REDIRECT EXAMINATION
6  BY MR. BOWER:
7    Q.  Mr. Mazza asked you a question about the
8  distribution of 6045, correct, sir?
9    A.  Yes, sir.
10   Q.  Did that distribution also include C2
11 opioids to Sam's Club?
12   A.  For what time period?
13   Q.  For any time period when you were at DC6045.
14   A.  When I first started at 6045, we did ship to
15 Sam's Club.
16   Q.  And when did that shipping to Sam's Club
17 stop?
18   A.  I don't remember the exact date.
19   Q.  Do you remember approximately when?
20   A.  I don't. I don't. I know we stopped
21 shipping to Sam's Club, and they started shipping
22 to -- I mean, getting their stuff from
23 AmerisourceBergen.
24   Q.  And just a couple questions on the POM Team.
25 Who oversaw the POM Team?

Page 279

1    A.  Chad Ducote.
2    Q.  And who did the POM Team report to?
3    A.  Chad Ducote.
4    Q.  Do you know who Mr. Ducote reported to?
5    A.  I do not.
6      MR. MAZZA: All right.
7      THE VIDEOGRAPHER: All right. This
8  concludes today's deposition, we're going off
9  record. The time is 6:58.
10     (Discussion off the record.)
11     MR. MAZZA: We reserve the witness's
12 signature and a pending review, and we ask that
13 it be marked highly confidential, also pending
14 review.
15     (Whereupon, the deposition concluded at
16 6:58 p.m.)
17
18
19
20
21
22
23
24
25

Page 280

1         C E R T I F I C A T E
2    I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter,
4  and Certified Realtime Captioner, do hereby
5  certify that, pursuant to notice, the deposition of
6  JEFF ABERNATHY was duly taken on Thursday,
7  November 15, 2018, at 9:37 a.m, before me.
8    The said JEFF ABERNATHY was duly sworn by me
9  according to law to tell the truth, the whole truth
10 and nothing but the truth and thereupon did testify
11 as set forth in the above transcript of testimony.
12 The testimony was taken down stenographically by me.
13 I do further certify that the above deposition is
14 full, complete, and a true record of all the
15 testimony given by the said witness, and that a
16 review of the transcript was requested.
17
18 _____
19 Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR
20 (The foregoing certification of this transcript does
21 not apply to any reproduction of the same by any
22 means, unless under the direct control and/or
23 supervision of the certifying reporter.)
24
25

Page 281

1      INSTRUCTIONS TO WITNESS
2
3
4    Please read your deposition over carefully
5  and make any necessary corrections. You should
6  state the reason in the appropriate space on the
7  errata sheet for any corrections that are made.
8
9    After doing so, please sign the errata sheet
10 and date it. It will be attached to your
11 deposition.
12
13   It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the deposition
16 transcript by you. If you fail to do so, the
17 deposition transcript may be deemed to be accurate
18 and may be used in court.
19
20
21
22
23
24
25

Highly Confidential – Subject to Further Confidentiality Review

## Page 282

```
 1        ------
 2        E R R A T A
 3        ------
 4  PAGE  LINE  CHANGE
 5  ____ ____ _____
 6    REASON: _____
 7  ____ ____ _____
 8    REASON: _____
 9  ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____
25
```

## Page 284

```
 1
 2        LAWYER'S NOTES
 3  PAGE  LINE
 4  ____ ____ _____
 5  ____ ____ _____
 6  ____ ____ _____
 7  ____ ____ _____
 8  ____ ____ _____
 9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____
```

## Page 283

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3      I, _____, do hereby
 4  acknowledge that I have read the foregoing pages, 1
 5  through 283, and that the same is a correct
 6  transcription of the answers given by me to the
 7  questions therein propounded, except for the
 8  corrections or changes in form or substance, if any,
 9  noted in the attached Errata Sheet.
10
11
12  _____      _____
13  JEFF ABERNATHY            DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  ____ day of _____, 20___.
20  My Commission expires: _____
21
22  _____
23  Notary Public
24
25
```