# EXHIBIT 315

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3   IN RE: NATIONAL           )   MDL No. 2804
     PRESCRIPTION OPIATE       )
 4   LITIGATION,               )   Case No.
                               )   1:17-MD-2804
 5                             )
     THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6   ALL CASES                 )   Polster
                               )
 7
 8              .           _ _ _
 9              Tuesday, January 22, 2019
10                          _ _ _
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11                CONFIDENTIALITY REVIEW
12                          _ _ _
13
14
15         Videotaped 30(b)(6) Deposition of
     Walmart, through the testimony of Susanne
16   Hiland, held at 4206 South J.B. Hunt Drive,
     Rogers, Arkansas, commencing at 8:22 a.m., on
17   the above date, before Debra A. Dibble,
     Certified Court Reporter, Registered
18   Diplomate Reporter, Certified Realtime
     Captioner, Certified Realtime Reporter and
19   Notary Public.
20
                            _ _ _
21
22
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24                 deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for unusual orders of unusual size as the
 2    orders were being processed.
 3              Q.     And how would they determine
 4    whether an order was of unusual size?
 5              A.     These were --
 6                     MS. TABACCHI:  Beyond the
 7          scope.
 8                     THE WITNESS:  These were
 9          long-tenured associates that
10          understood the business and the fact
11          that we were self-distributing.  So
12          they saw the -- they saw the patterns.
13          They worked with it every single day.
14              Q.     (BY MR. BOWER)  They were using
15    their memory?  Is that correct?
16                     MS. TABACCHI:  Object to the
17          form.
18                     THE WITNESS:  They were using
19          their experience.
20              Q.     (BY MR. BOWER)  Were they using
21    any written information to make those
22    judgments?
23                     MS. TABACCHI:  Object to the
24          form.  Beyond the scope.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the policy you're referring to?  Where it
 2    says "From as early as 1994 until 2010,
 3    employees in Walmart's pharmacy distribution
 4    centers reviewed controlled drug stock
 5    exception reports, followed up on orders by
 6    speaking with pharmacists, and escalated
 7    issues to market and/or regional leadership
 8    as needed to investigate orders and to
 9    resolve concerns."
10                Is that the policy you're
11    referring to?
12         A.    Yes.  As well as the bullet
13    that's at the very bottom of the page.  So
14    I'm on my document that, for the entire
15    relevant time period, our distribution
16    associates monitored orders.
17         Q.    Okay.  Now, let's go in 2006,
18    what specifically were the associates doing
19    to monitor orders?
20                MS. TABACCHI:  Object to the
21         form.
22                THE WITNESS:  They were
23         monitoring orders as they came into
24         the distribution center, and again
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    based on their knowledge and
2    experience of the operations.  They
3    were looking for outliers.  Things
4    that were outliers for them -- for
5    their knowledge.
6         Q.    (BY MR. BOWER)  Okay.  And
7    during this time period in 2006, Walmart had
8    approximately 4,000 pharmacies; is that
9    correct?
10              MS. TABACCHI:  Object to the
11        form.  Beyond the scope.
12              THE WITNESS:  That's
13        approximate.
14        Q.    (BY MR. BOWER)  Sounds about
15   right?
16        A.    Sounds good.
17        Q.    And those pharmacies would be
18   placing orders once a week; correct?
19        A.    They had the ability to place
20   orders once a week.  Not every pharmacy
21   ordered every week.
22        Q.    Okay.  And those orders that
23   came in could be for multiple products;
24   correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reviewing orders for controlled substances
 2    any specific training with respect to those
 3    substances?
 4                MS. TABACCHI:  Object to the
 5        form.  Beyond the scope.
 6                THE WITNESS:  There was
 7        training as -- as the associates came
 8        in around what their duties and
 9        responsibilities were.
10        Q.    (BY MR. BOWER)  And what
11    specific training was provided in connection
12    with monitoring for orders of controlled
13    substances?
14                MS. TABACCHI:  Same objections.
15                THE WITNESS:  I don't have
16        specific to that -- to that topic.
17        What they understood was their
18        responsibilities, how to perform their
19        duties in their area of
20        responsibility, and the nature of the
21        items that they were --
22        Q.    (BY MR. BOWER)  Well, how do
23    you --
24        A.    -- handling.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. TABACCHI:  If you would
 2       allow her to complete her answer.
 3            MR. BOWER:  Sorry, go ahead.
 4            THE WITNESS:  I'm done.
 5       Q.   (BY MR. BOWER)  Well, your
 6  testimony is that they understood what their
 7  responsibilities were and how to perform
 8  their duties in the area.  So my question is,
 9  how did they understand what their
10  responsibilities were?
11       A.   I gained that knowledge from
12  speaking to the manager of the distribution
13  centers, Scott, who had responsibility.
14       Q.   And what did Scott tell you
15  with respect to how associates who were
16  reviewing orders of controlled substances --
17  strike that.
18            What did Scott tell you with
19  respect to the training for associates who
20  were reviewing orders of substances in 2007?
21       A.   What he told --
22            MS. TABACCHI:  Object to the
23       form.
24            THE WITNESS:  What he told me
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        was that there were long-tenured
 2        logistics associates that had -- many
 3        of them had been in that building
 4        since the day that it opened.  They
 5        understood their -- they understood
 6        the products that they were
 7        distributing.  They understood their
 8        role.  And they were all engaged in
 9        executing the policies and practices
10        at DC '45.
11     Q.      (BY MR. BOWER)  So is it a fair
12   statement that it was more their experience
13   and specific training that he had relied on
14   in reviewing orders for controlled
15   substances?
16             MS. TABACCHI:  Object to the
17        form.
18             THE WITNESS:  Their -- learning
19        how to do their job would be part of
20        their training.  And Walmart has other
21        training plans.  So to -- but specific
22        to order monitoring, it was part of
23        the job that they were trained to do.
24     Q.      (BY MR. BOWER)  But I just --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   suspicious orders.
 2        Q.    And I understand that they may
 3   not be reports of suspicious orders, but did
 4   Walmart use this information to monitor for
 5   orders that were suspicious?
 6        A.    We used these as a way to
 7   communicate patterns to our partners in
 8   operations, as well as to provide information
 9   that was directly requested from
10   Carolyn Adams at the DEA.
11        Q.    But -- and I -- I understand
12   that's what they were used for.  I'm just
13   trying to confirm that these reports were not
14   used at the DC 6045 to orders -- to review
15   orders for controlled substances as they came
16   in.
17              MS. TABACCHI:  Object to the
18        form.
19              MR. BOWER:  And I'll strike
20        that.  I'll ask a better question.
21        Q.    (BY MR. BOWER)  Were these
22   controlled drug stock exception reports used
23   by the associates at DC 6045 to monitor
24   orders for controlled substances as they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were -- came into the DC?
 2                MS. TABACCHI:  Object to the
 3         form.
 4                THE WITNESS:  No.  These were
 5         monthly reports.
 6                MR. BOWER:  Thank you.
 7         Q.     (BY MR. BOWER)  If we can turn
 8    to bullet point -- going back to a few pages
 9    in Exhibit 1.  Walmart's bullet points there.
10                For its additional policies.
11                Sorry, tab 1 of Exhibit 7.
12    My -- thank you.
13                Are you there, the first bullet
14    point there?
15         A.     Yes.
16         Q.     So when orders were followed up
17    by speaking with pharmacists, were those
18    orders that had been previously flagged as
19    suspicious?
20                MS. TABACCHI:  Object to the
21         form.  I'm sorry, Zach.
22                MR. BOWER:  Sorry.
23                MS. TABACCHI:  Where are you?
24                MR. BOWER:  Bullet point 1
```

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| 1 | Right? |
| 2 | Do you see that written there? |
| 3 | MS. TABACCHI: Object to the |
| 4 | form. |
| 5 | Q. (BY MR. BOWER) "Escalated |
| 6 | issues to market and/or region leadership as |
| 7 | needed to investigate orders." Right? |
| 8 | MS. TABACCHI: Zach, object to |
| 9 | the form. You need to read the entire |
| 10 | bullet and we've been on this bullet |
| 11 | for a long time. |
| 12 | MR. BOWER: We have, but we |
| 13 | haven't got much answer on it, have |
| 14 | we? |
| 15 | MS. TABACCHI: You're just not |
| 16 | satisfied with the answer you have. |
| 17 | MR. BOWER: No, I am satisfied. |
| 18 | I just don't think the witness |
| 19 | understands what I'm asking, and I'm |
| 20 | trying to ask it in a way that she |
| 21 | maybe understands. |
| 22 | Q. (BY MR. BOWER) So my question |
| 23 | is, when these orders are escalated to market |
| 24 | and/or region leadership as needed, what did |

Highly Confidential - Subject to Further Confidentiality Review

```
 1    those folks do?  I'm just trying -- what was
 2    the policy as to what those folks were
 3    supposed to do?
 4                MS. TABACCHI:  Asked and
 5         answered.
 6                THE WITNESS:  They would have a
 7         conversation with the logistics
 8         associate that was reaching out to
 9         them to understand what the question
10         was, and then they would go find
11         whatever information, validate what
12         they had already heard from the
13         pharmacist, or follow up specific to
14         whatever the point of escalation was.
15         It says "as needed."
16    Q.    (BY MR. BOWER) And were there
17    any written policies and procedures that
18    guided what the market managers or region
19    leadership was to do?
20                MS. TABACCHI:  Object to the
21         form.
22                THE WITNESS:  No.  This was a
23         practice of communication, and
24         exchange between logistics and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    In this order, it was item
 2   number SKU, NDC.  That would be --
 3          Q.    So that's one way an order
 4   would be flagged.  Right?  50 bottles or more
 5   by item number; right?  During this time
 6   period, from end of 2011 to 2015; right?
 7          A.    Correct.
 8          Q.    And then the other way an order
 9   is flagged is if it's 30 percent higher than
10   a rolling four-week average for that item;
11   correct?
12          A.    That is correct.
13          Q.    Okay.  For that second flag,
14   with 30 percent higher than a rolling
15   four-week average, were there any minimums
16   that would be required to meet for an order
17   to be flagged?
18          A.    Yes.
19          Q.    And what were those minimums?
20          A.    An order between 0 and 10 items
21   did not flag.
22          Q.    And what's the basis for that
23   statement?
24          A.    It's in the SOP of the document
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that I read.
 2         Q.    And that document is not
 3    referenced in this bullet point 4, is it?
 4         A.    It is -- in bullet point 4 --
 5         Q.    Yes.
 6         A.    -- it is not.
 7         Q.    Well, any order less than ten
 8    items would not be flagged from 2011 to 2015;
 9    is that correct?
10               MS. TABACCHI:  Object to the
11         form.
12               THE WITNESS:  That is correct.
13         Q.    (BY MR. BOWER)  And by -- when
14    you referred to "ten items," you meant --
15    what did you mean by "ten items"?
16         A.    Ten -- ten units of a single
17    item NDC.
18         Q.    And a single item could be a
19    bottle of 100 dosages; correct?
20         A.    Correct.
21         Q.    A single bottle could be a
22    bottle of 500 dosages; correct?
23               MS. TABACCHI:  Object to the
24         form.
```

```
1      Q.     (BY MR. BOWER)  And are you
2   referring now to like the Mike Mullins and
3   Jeff Abernathys?
4               MS. TABACCHI:  Object to the
5         form.
6               THE WITNESS:  Yes.
7      Q.     (BY MR. BOWER)  Okay.  Because
8   I think I understand what you're saying,
9   because Mr. Abernathy, for example, testified
10  that he would do some reports if he was the
11  first one in the office, for example.
12  Correct?
13     A.     Correct.  I read that in his
14  deposition.
15     Q.     So under that circumstance, he
16  would be the one responsible for reporting to
17  the DEA a suspicious order?
18              MS. TABACCHI:  Object to the
19        form.
20              THE WITNESS:  If there was an
21        order that was identified in his
22        shift, he would be responsible for
23        that.
24     Q.     (BY MR. BOWER)  During this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specific order on a specific day would be
 2    identified; is that correct?
 3              MS. TABACCHI:  Object to the
 4        form.
 5              THE WITNESS:  I don't think
 6        I -- I don't think I understand what
 7        you're asking.
 8        Q.    (BY MR. BOWER)  And I
 9    appreciate that.  Bullet point 3 refers to
10    monthly reports; correct?
11        A.    Correct.
12        Q.    Okay.  So those reports
13    wouldn't have been used during this time
14    period, at least, to identify an order that
15    came in on a specific day --
16        A.    Now I understand the question.
17        Q.    -- for you; correct?
18        A.    Correct.
19        Q.    So let's go to the next bullet
20    point.  The 50-bottle.  The 2001-2015,
21    50 bottles and 30 percent higher.
22              Do you see that?
23        A.    Yes.
24        Q.    Under that policy, practice, or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    No.  My question is Reddwerks
 2   enhancements.
 3      A.    The enhanced --
 4      Q.    Yes.
 5      A.    Okay.  Thank you.
 6      Q.    Yeah.  Sorry.
 7      A.    The enhanced thresholds were
 8   calculated using a year's worth of shipment
 9   data, and then applying a formula, which was
10   the average weekly order, plus three standard
11   deviations over that 52-week shipment date.
12      Q.    And when that formula was used,
13   would that provide the enhancements for a
14   particular store?
15            MS. TABACCHI:  Object to the
16      form.
17            THE WITNESS:  It was store and
18      item specific.  And there were
19      additional defaults that were applied
20      to those thresholds as they were
21      calculated.
22      Q.    (BY MR. BOWER) And can you
23   describe for us how those defaults -- let me
24   break that down a little bit.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           either.  It wouldn't have served its
 2           purpose.
 3      Q.        (BY MR. BOWER)  Right.  Well,
 4  did Walmart consider -- strike that.
 5           Would you agree that, in
 6  getting the amount of an order that would
 7  flag right, as Mr. Greer writes, that Walmart
 8  did not want to flag too many orders?
 9           MS. TABACCHI:  Object to the
10           form.  Asked and answered.
11           THE WITNESS:  That's one of the
12           considerations.  It was not the only
13           consideration.
14      Q.        (BY MR. BOWER)  What were the
15  other considerations?
16      A.        Not flagging too few of times.
17      Q.        Okay.  And by -- can you put a
18  more precise number on it what you mean by
19  "not flagging too few of times"?  What would
20  be too few in your mind?
21           MS. TABACCHI:  Object to the
22           form.  Beyond scope.
23           MR. BOWER:  I'll strike that.
24      Q.        (BY MR. BOWER) What did Walmart
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    consider to be too few?
 2                MS. TABACCHI:  Same objections.
 3                THE WITNESS:  It would be
 4        something that didn't make sense for
 5        the business.  That we were reviewing
 6        orders appropriately.
 7                Again, the purpose of the
 8        program is to detect, and so the
 9        purpose -- not having enough alerts
10        would potentially impact our ability
11        to detect.
12        Q.    (BY MR. BOWER)  And I was with
13    you just to the end of that.  So I just -- I
14    didn't follow the end of your statement where
15    you said, "Not having enough alerts would
16    potentially impact our ability to detect."
17    What does that mean?
18        A.    If there was a suspicious
19    order.
20        Q.    So if there's a suspicious
21    order but you don't have enough alerts, it
22    would impact your ability to detect that
23    order; correct?
24                MS. TABACCHI:  Object to the
```