# EXHIBIT 316

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )  MDL No. 2804
      OPIATE LITIGATION       )
 5    _____  )  Case No.
                              )  1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES   )  Hon. Dan A.
 7    TO ALL CASES            )  Polster
 8
                FRIDAY, JANUARY 4, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                      - - -
12          Videotaped deposition of Ramona
13    Sullins, held at the offices of JONES DAY, 77
14    West Wacker Drive, Chicago, Illinois,
15    commencing at 7:31 a.m., on the above date,
16    before Carrie A. Campbell, Registered
17    Diplomate Reporter, Certified Realtime
18    Reporter, Illinois, California & Texas
19    Certified Shorthand Reporter, Missouri &
20    Kansas Certified Court Reporter.
21                      - - -
              GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
25
```

Page 46

1  what Walmart's obligations were at that time?
2        MS. FUMERTON:  Objection.
3     Form.
4  QUESTIONS BY MR. BOWER:
5     Q.    Strike that.
6           Do you recall generally what
7  Walmart's obligations were at that time
8  regarding monitoring of orders for
9  Schedule II narcotics?
10    A.    No, I don't.
11    Q.    At some point did you become
12 aware of Walmart's obligations to monitor
13 orders for Schedule II narcotics?
14    A.    I did.
15    Q.    And when did you become aware
16 of that?
17    A.    I don't recall the year.
18    Q.    Do you recall approximately
19 when?
20    A.    No.
21    Q.    Do you recall how you became
22 aware of Walmart's obligations to monitor
23 orders for Schedule II narcotics?
24    A.    No.  No, not -- no.
25    Q.    So I just want to make sure

Page 47

1  that the record is clear.  So you don't
2  recall either how you became aware or when
3  you became aware of Walmart's obligations to
4  monitor orders of Schedule II narcotics; is
5  that correct?
6        MS. FUMERTON:  Objection.
7     Form.
8        THE WITNESS:  I don't recall.
9  QUESTIONS BY MR. BOWER:
10    Q.    And what about Walmart's
11 obligations to monitor orders of Schedule III
12 narcotics, do you know whether they have any
13 such obligations?
14       MS. FUMERTON:  Objection.
15    Form.
16 QUESTIONS BY MR. BOWER:
17    Q.    I'll strike that.
18          Do you know whether Walmart has
19 any obligations to monitor orders of
20 Schedule III narcotics?
21       MS. FUMERTON:  Objection.
22    Form.
23       THE WITNESS:  Ask the question
24    again.
25

Page 48

1  QUESTIONS BY MR. BOWER:
2     Q.    Sure.
3           Do you know whether Walmart, as
4  a distributor, has any obligations to monitor
5  orders placed by its pharmacies for
6  Schedule III narcotics?
7        MS. FUMERTON:  Objection.
8     Form.
9           Can we get a time period?
10       MR. BOWER:  At any point.
11       MS. FUMERTON:  Okay.
12       MR. BOWER:  Just a question.
13       MS. FUMERTON:  It's a question
14    with a false premise, though.  That's
15    the problem.  You're talking about as
16    a distributor, and as you know,
17    Walmart no longer distributes
18    controlled substances.
19       MR. BOWER:  Okay.
20 QUESTIONS BY MR. BOWER:
21    Q.    Do you know whether Walmart --
22       MS. FUMERTON:  You said
23    "Walmart, as a distributor."  That's
24    why I'm asking, why the question is
25    flawed.

Page 49

1        MR. BOWER:  Okay.  I'll
2     rephrase the question.  I think you
3     understood it, but I'll rephrase.
4  QUESTIONS BY MR. BOWER:
5     Q.    Do you know whether Walmart at
6  any point had any obligation to monitor
7  orders for Schedule II narcotics that were
8  placed by its pharmacy to its distribution
9  centers?
10    A.    Yes.
11    Q.    Okay.  What is your
12 understanding of those obligations?
13    A.    I don't have an understanding
14 of it.  I know that there was policies or
15 procedures related to that.  That wasn't part
16 of my responsibility.
17    Q.    Has it ever been part of your
18 responsibility?
19    A.    No.  No.
20    Q.    Have you ever had any role
21 since you started working at Walmart in
22 connection with Walmart's suspicious order
23 monitoring program?
24       MS. FUMERTON:  Objection.
25    Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  THE WITNESS: I was part of the
2  rollout of that system.
3  QUESTIONS BY MR. BOWER:
4  Q. And when did that occur?
5  A. I don't recall.
6  Q. Approximately?
7  A. The Reddwerks threshold, I
8  believe, was 2010, 2011.
9  Q. And we'll look at some
10 documents in a bit. Maybe that'll help you
11 refresh your recollection. I'm just trying
12 to get a general sense of when you say
13 "rollout of that system," are you referring
14 to the over 20 reports or something else?
15 A. No, that would have -- I don't
16 know if that was during the same time.
17 Q. Okay. So when you say "rollout
18 of that system," what system are you
19 referring to?
20 A. The thresholds.
21 Q. What do you mean by --
22 A. Order alert.
23 Q. What do you mean by thresholds?
24 Order alerts?
25 A. That's what the project was

Page 51

1  called.
2  Q. What project are you referring
3  to?
4  A. So the rollout of Reddwerks
5  order alert.
6  Q. And you believe that occurred
7  sometime in 2010; is that correct?
8  A. '10 or '11. I don't recall.
9  Q. Before that rollout occurred,
10 did Walmart have a monitoring program in
11 place?
12 A. Yes.
13 Q. And what was that program?
14 A. I believe it was a 405 report,
15 and they monitored orders as they came in.
16 Q. Okay. And what do you mean
17 by -- when you say "they monitored orders as
18 they came in," what does that mean?
19 A. So the distribution center did
20 and the associates did.
21 Q. Are the associates at the
22 distribution center?
23 A. Yes.
24 Q. Okay. Anyone other than the
25 associates at the distribution center that

Page 52

1  would monitor orders?
2  MS. FUMERTON: Objection.
3  Form.
4  QUESTIONS BY MR. BOWER:
5  Q. And I'm just trying -- just so
6  the record is clear, I'm just trying to
7  understand your answer.
8  You said "the distribution
9  center did and the associates did." Are
10 those two different things in your mind?
11 A. They're all at the distribution
12 center.
13 Q. And what were the associates
14 doing prior to the rollout of Reddwerks?
15 A. So my understanding is that
16 they would -- they would let their manager
17 know if they saw an order that was out of the
18 ordinary.
19 Q. What do you mean by "out of the
20 ordinary"?
21 A. Like, for example, ReliOn
22 insulin, we had orders that would -- where
23 the pharmacy would think that they were
24 ordering ten vials of insulin, and they
25 actually ordered a hundred of them because

Page 53

1  they were in packs of ten. So those would be
2  examples of what they would bring to their
3  attention.
4  Q. And in fact, Walmart had an
5  automatic cut for those instant orders,
6  correct?
7  MS. FUMERTON: Objection.
8  Form.
9  Go ahead.
10 THE WITNESS: For the what now?
11 QUESTIONS BY MR. BOWER:
12 Q. For those insulin orders that
13 you just -- the example that you just
14 provided, Walmart actually had an automatic
15 cut for those orders, didn't they?
16 MS. FUMERTON: Objection.
17 Form.
18 THE WITNESS: It was a manual
19 cut; it wasn't automatic.
20 QUESTIONS BY MR. BOWER:
21 Q. A manual cut that was
22 automatically applied to insulin orders,
23 correct?
24 MS. FUMERTON: Objection.
25 Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1   THE WITNESS: They would call
2   the store to inform them that they had
3   placed -- if they really wanted a
4   hundred because, I mean, the
5   refrigerator didn't hold a hundred.
6 QUESTIONS BY MR. BOWER:
7   Q.   Right.
8     And that was specific to
9 insulin, correct?
10   A.   That's correct.
11   Q.   Okay. What about with respect
12 to Schedule II narcotics, what were the DCs
13 doing in 2008?
14     MS. FUMERTON: Objection.
15   Form.
16     THE WITNESS: My understanding
17   is they would do the same thing with
18   that.
19 QUESTIONS BY MR. BOWER:
20   Q.   And where does that
21 understanding come from?
22   A.   Just from when I was training
23 in 2008, when I was out at the DCs training.
24   Q.   Okay. So what specifically did
25 you learn in connection with your training

Page 55

1 that the DCs were doing for Schedule II
2 narcotics?
3     MS. FUMERTON: Objection.
4   Form.
5     THE WITNESS: So again, they
6   would look at that paper and let their
7   supervisor or manager know that this
8   appears to be out of the ordinary or
9   unusual.
10 QUESTIONS BY MR. BOWER:
11   Q.   And at that point -- and we're
12 talking 2008, correct?
13   A.   Yes.
14   Q.   At that point, how was DC 6045
15 receiving orders? They were paper, correct?
16   A.   So those would come in
17 electronically. They're printed on paper.
18   Q.   They would come in
19 electronically once a day?
20   A.   That's correct.
21   Q.   And then they would print it on
22 paper at the DC?
23   A.   That's correct.
24   Q.   And then what would happen to
25 those papers?

Page 56

1   A.   Well, first they would print
2 the 222 form, sign those, and then that and
3 the paper order would be put together in a
4 packet, and the associates would fill orders
5 based on that paper order.
6   Q.   And was it the practice for the
7 orders to be filled and shipped the same day
8 they came in?
9   A.   Yes.
10   Q.   And approximately how many
11 orders came in to DC 6045 on a daily basis
12 during this time period?
13   A.   I don't recall how many orders
14 came in.
15   Q.   Would it have been in the
16 hundreds of orders? Could it have been in
17 the hundreds of orders per day?
18   A.   Well, they filled store
19 order -- store only got an order once a week
20 of C-IIs. So if you divide it up, however
21 many stores we had at the time, that's how
22 many orders they would -- processed, four
23 days a week.
24   Q.   That's fine.
25     You said four days a week?

Page 57

1   A.   Yes.
2   Q.   So, for example, if there were
3 4,000 stores, approximately a thousand orders
4 a day, correct?
5   A.   Potentially.
6   Q.   And just so the record's clear,
7 you mentioned a couple reports. I just want
8 to go through just what those reports are.
9     What is a 222?
10   A.   It's a DEA 222 form to move
11 C-II drugs.
12   Q.   Okay. And what is a 405
13 report?
14   A.   So it was a report that the
15 distribution used. I don't know what they --
16 I don't know what all it had on there. I
17 know that they used it.
18   Q.   And how do you know that they
19 used it?
20   A.   Because when it didn't generate
21 one month, they pinged me to help them get it
22 generated.
23   Q.   Do you know why they pinged you
24 to help get them generated?
25   A.   Because of the systems

Page 58

1  background that I had.
2      Q.   And what systems backgrounds do
3  you have?
4      A.   It was mainly knowing how the
5  orders would come in, some of the jobs that
6  were run for certain reports.  So I would
7  partner with maybe my -- I had contacts over
8  in the IT department, so they would ask me to
9  ping somebody over in IT to let them know
10 that a report didn't run.
11     Q.   And I just want to put a time
12 frame on that answer.
13          What time frame would you ping
14 folks in IT to run a report?
15          MS. FUMERTON:  Objection.
16     Form.
17          THE WITNESS:  That happened to
18     be one incident.  I don't know when it
19     occurred.
20 QUESTIONS BY MR. BOWER:
21     Q.   Okay.  Other than the 405
22 reports and the DC associates reviewing the
23 orders, prior to the role of Reddwerks, was
24 Walmart doing anything else to review orders
25 for Schedule II narcotics?

Page 59

1          MS. FUMERTON:  Objection.
2     Form.
3          THE WITNESS:  I don't know.
4  QUESTIONS BY MR. BOWER:
5      Q.   Anything else that you're aware
6  of that was being done?
7          MS. FUMERTON:  Objection.
8     Form.
9          THE WITNESS:  I don't know.
10 QUESTIONS BY MR. BOWER:
11     Q.   Well, you visited DC 6045 in
12 2008, correct?
13     A.   I did.
14     Q.   Okay.  At that point did you
15 see anything else being done in connection
16 with reviewing orders placed by the
17 pharmacies for Schedule II narcotics?
18          MS. FUMERTON:  Objection.
19     Form.
20          THE WITNESS:  Not that I
21     recall.
22 QUESTIONS BY MR. BOWER:
23     Q.   Okay.  And did someone at DC
24 6045 tell you that they would have the
25 associates review the orders on a daily

Page 60

1  basis?
2      A.   That was part of the training
3  that -- when I was learning how to -- they
4  filled orders.  They told me and so did the
5  associates.
6      Q.   Okay.  So who told you that?
7      A.   I don't recall the manager that
8  would have said it.
9      Q.   Was it the manager at 6045 or
10 your manager for the training?
11     A.   No, it was the managers that
12 were supervisors at 6045.
13     Q.   Mike Mullin?
14     A.   He was a general manager.  I
15 don't know.
16     Q.   Okay.  Do you know who had
17 responsibility at 6045 for making sure the
18 associates would review the orders for
19 Schedule II narcotics?
20     A.   I don't know.
21     Q.   Are you aware of any instance
22 where the associates flagged an order for
23 Schedule II narcotics as potentially
24 suspicious?
25          MS. FUMERTON:  Objection.

Page 61

1     Form.
2          THE WITNESS:  I don't know.
3  QUESTIONS BY MR. BOWER:
4      Q.   Was that part of your training?
5      A.   I spent a day there.  I --
6  doing the order filling process.  That day we
7  didn't.  I don't know of anything else that
8  would have been done.
9      Q.   What about since that day?
10          MS. FUMERTON:  Objection.
11     Form.
12          THE WITNESS:  I don't know.  It
13     wouldn't have been anything that would
14     have come to me.
15 QUESTIONS BY MR. BOWER:
16     Q.   So in 2008 you're tagged with
17 responsibility to bring in a system to kind
18 of move beyond this printout and paper
19 system, correct?
20     A.   Correct.
21     Q.   Okay.  And what did you do in
22 connection with those responsibilities?
23     A.   I looked at multiple order
24 filling vendors.  I brought those vendors to
25 my boss at the time, and then they made a

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 decision on which vendor to go with.
2  Q.   And who was your boss at the
3 time?
4  A.   So in 2008 it was Molly Mason.
5  Q.   And which vendor did you end up
6 going with?
7  A.   Reddwerks.
8  Q.   And do you recall why you chose
9 Reddwerks?
10  A.   They had -- they were the only
11 vendor that had a continuous light.
12  Q.   And what do you mean by a
13 continuous light?
14  A.   So the bar in front of the
15 product, it was all lights versus just one
16 light.
17  Q.   And was that something that was
18 important to Walmart?
19  A.   It was important, yes.
20  Q.   And why is that?
21  A.   So that you wouldn't have to
22 have openings if the product -- for that
23 location, the size changed, you wouldn't have
24 to go get maintenance to cut you another
25 plate to move the light over. So then you

Page 63

1 could dedicate light space for that product,
2 and if that product moved somewhere else in a
3 different bay, then -- running a smaller
4 product, then you didn't have to, again, cut
5 the plate and change the backing of it.
6  Q.   Did Walmart's decision to go
7 with Reddwerks impact the ordering process
8 for Schedule II narcotics?
9       MS. FUMERTON:  Objection.
10  Form.
11       THE WITNESS:  No.
12 QUESTIONS BY MR. BOWER:
13  Q.   Those orders still came in to
14 6045, correct?
15  A.   Correct.
16  Q.   They were still printed out on
17 paper on a daily basis?
18  A.   They printed the 222 form.
19  Q.   Okay. Well, let's go back then
20 to before you went with Reddwerks.
21  A.   Uh-huh.
22  Q.   How was Walmart filling orders
23 for Schedule II products at 6045?
24       MS. FUMERTON:  Objection.
25  Form.

Page 64

1       MR. BOWER:  What's the nature
2  of that objection?
3       MS. FUMERTON:  It's an
4  incredibly broad and vague question.
5 QUESTIONS BY MR. BOWER:
6  Q.   Okay. You can answer.
7  A.   So in 2008, they printed the
8 222 forms, and they printed the paper orders.
9  Q.   And what would they do with
10 those paper orders that they printed?
11  A.   They would fill the order from
12 the paper.
13  Q.   Did that process change after
14 Walmart adopted the Reddwerks system?
15  A.   The -- I don't know how to
16 answer that because it's -- the fill process
17 still was the same. I was still getting
18 order at the DC. I'd still sign my 222,
19 just -- I don't print paper. It goes to a
20 light.
21  Q.   Okay. You mentioned the light
22 term a couple times.
23       What do you mean by "light"?
24       It may not be familiar to some
25 of us that aren't in the industry.

Page 65

1  A.   So it truly is a bar of lights,
2 and the light will light up with the quantity
3 that you need to pick for that product.
4  Q.   So there's an associate
5 assigned to each product; is that correct?
6  A.   There's an associate
7 assigned...
8       MS. FUMERTON:  Go ahead.
9  Sorry. I was going to give an
10  objection. Go ahead.
11       THE WITNESS:  There's an
12  associate assigned multiple products.
13 QUESTIONS BY MR. BOWER:
14  Q.   And the light informs the
15 associate of how much of that product is
16 necessary for a particular order; is that
17 correct?
18  A.   That's correct.
19  Q.   And how does the light do that?
20  A.   It's the same thing that went
21 to the paper that goes to the light.
22  Q.   Is the light a screen?
23  A.   Is the light a screen?
24  Q.   Yeah.
25       How does the light convey that

Page 66

1 information to an associate? Is it a number
2 on a screen? Is it --
3   A.  Yes, it's a number on a screen.
4   Q.  And does that number on the
5 screen reflect a product number?
6       MS. FUMERTON: Objection.
7   Form.
8 QUESTIONS BY MR. BOWER:
9   Q.  All right. I'll strike that.
10      The associate's assigned more
11 than one product, correct?
12  A.  Correct.
13  Q.  How does the associate know how
14 many of each product to fill?
15  A.  There's just -- the light in
16 front of that product tells them. So there's
17 a screen there that says "pick one" or
18 whatever.
19  Q.  Okay. And that process applied
20 to order filling at 6045 for Schedule II
21 products; is that correct?
22  A.  It occurred for all buildings.
23  Q.  And when was that process
24 implemented at 6045?
25  A.  I don't know exactly when it

Page 67

1 was implemented in 6045, but we started the
2 project in 2009.
3   Q.  Do you know whether the
4 implementation of Reddwerks impacted
5 Walmart's suspicious order monitoring program
6 at all?
7       MS. FUMERTON: Objection.
8   Form.
9       THE WITNESS: I have no idea.
10 QUESTIONS BY MR. BOWER:
11  Q.  You don't know one way or the
12 other, correct?
13  A.  I have no idea.
14      MS. FUMERTON: Zach, we've been
15  going for about an hour. Would it be
16  okay --
17      MR. BOWER: Can we just have a
18  few minutes just to round out her
19  employment history and then we'll --
20      MS. FUMERTON: Sure.
21      MR. BOWER: I just wanted -- so
22  we can switch topics after the break.
23 QUESTIONS BY MR. BOWER:
24  Q.  So you held this position
25 beginning in 2008 where you were senior

Page 68

1 manager for the pharmacy team.
2       How long did you hold that
3 position?
4   A.  That's what I currently do.
5   Q.  You still have that -- what's
6 your current title?
7   A.  Senior manager, department
8 supply chain. We just changed it from
9 logistics to supply chain.
10      MR. BOWER: It might take a
11  little longer to go through subsequent
12  duties and responsibilities, so why
13  don't we take a break and we can
14  finish up after.
15      MS. FUMERTON: Okay.
16      VIDEOGRAPHER: Going off the
17  record at 8:33 a.m.
18  (Off the record at 8:33 a.m.)
19      VIDEOGRAPHER: We're back on
20  the record at 8:47 a.m.
21 QUESTIONS BY MR. BOWER:
22  Q.  Okay. I just want to finish
23 up, hopefully fairly briefly, your roles at
24 Walmart.
25      So from 2008 to the present,

Page 69

1 you've had the same title, essentially; is
2 that correct?
3   A.  That's correct.
4   Q.  Okay. Other than the system
5 implementation of Reddwerks that we've
6 discussed, what have your other duties and
7 responsibilities been since 2008 in that
8 title?
9   A.  So it's mostly been systems,
10 system enhancements, the rollout of CSOS,
11 some other day-to-day stuff that comes up.
12  Q.  Other than the rollout of CSOS,
13 which stands for controlled substance
14 ordering system -- is that correct?
15  A.  That's correct.
16  Q.  What other systems enhancements
17 did you work on?
18  A.  So we did the order level
19 alerts for Reddwerks. And then we did an
20 enhancement to that later on.
21  Q.  And do you have any
22 understanding as to why Walmart imposed an
23 order level alert for Reddwerks?
24      MS. FUMERTON: Objection.
25  Form.