# EXHIBIT 332

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) ) ) | MDL No. 2804 Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | ) ) | Hon. Dan A. Polster |

TUESDAY, OCTOBER 16, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of Eric Stahmann, held at the offices of BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP, 54 West Hubbard, Suite 300, Chicago, Illinois, commencing at 9:05 a.m., on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri & Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  that there's fields with specific information
2  in them, correct?
3      A.   I do.
4      Q.   And in your intimate work with
5  statistical software and databases, you
6  understand that those fields can be --
7  specific fields can be pulled and reports run
8  to turn data into information, correct, sir?
9           MR. STOFFELMAYR:  Objection to
10      the form.
11          THE WITNESS:  Can you rephrase
12      that for me, please?
13  QUESTIONS BY MR. MOUGEY:
14     Q.   There's a ton of transactional
15  data at Walgreens on a day-to-day basis
16  regarding opiates, correct, sir?
17     A.   There is.
18     Q.   There's a significant amount of
19  data at Walgreens with pharmaceutical
20  transactions in general, correct, sir?
21     A.   Correct.
22     Q.   And the reports were used to
23  pull specific fields to assist Walgreens to
24  identify areas of potential diversion,
25  correct, sir?

Page 31

1      A.   Correct.
2      Q.   And you understand that those
3  reports pulled specific fields of data to
4  assist Walgreens in its job to identify
5  suspicious orders, correct, sir?
6      A.   Correct.
7      Q.   And, sir, would you please
8  explain to me what fields, what information
9  was pulled to populate a report to assist
10 Walgreens with identifying suspicious orders?
11          MR. STOFFELMAYR:  Objection to
12      the form.  Foundation.
13          THE WITNESS:  So I do not know
14      what was actually populated in those
15      Mobius reports.  I just pulled them,
16      burned them on a CD and sent them off
17      to the individual DEA local offices
18      and to our distribution centers.
19 QUESTIONS BY MR. MOUGEY:
20     Q.   So you performed no analysis on
21 any of those reports?
22     A.   That is correct.
23     Q.   You have no earthly idea what
24 was in the reports?
25          MR. STOFFELMAYR:  Objection to

Page 32

1      the form.
2           THE WITNESS:  I don't remember
3       exactly what our -- what was in those
4       reports.
5  QUESTIONS BY MR. MOUGEY:
6       Q.   Do you remember generally what
7  was in those reports?
8       A.   Generally, yes.
9       Q.   What generally was in those
10 reports?
11      A.   Orders of interest and
12 potential suspicious orders.
13      Q.   Define for me what an order of
14 interest was or a potential suspicious order.
15          MR. STOFFELMAYR:  Objection to
16      the form.  Foundation.
17          THE WITNESS:  So I don't -- my
18      definition of an order of interest is
19      an order that could potentially be --
20      based off those -- DEA definition of
21      what's a suspicious order, an order of
22      interest could lead to an order of
23      interest based off of our -- or a
24      suspicious order based off of the DEA
25      definition.

Page 33

1  QUESTIONS BY MR. MOUGEY:
2       Q.   How frequently were you pulling
3  those reports off of Mobius and forwarding
4  them to the DEA?
5       A.   On a monthly basis.
6       Q.   Were you aware if anyone at
7  Walgreens was reviewing those reports that
8  were sent to the DEA?
9       A.   I don't know if anybody from
10 Walgreens were reviewing those reports.
11      Q.   Did anybody come back to you
12 and ask you for additional information on any
13 of those reports from Walgreens?
14      A.   Personally, no.
15      Q.   Did anybody send you an e-mail
16 or ask for any additional information on any
17 of those reports from Walgreens?
18      A.   No.
19      Q.   Okay.  Let's continue down to
20 the paragraph that begins with, "Facilitate
21 activities."
22           Do you see where I am?
23      A.   Yes.
24      Q.   "Facilitate activities and
25 projects for HCLP team leads and analysts,

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  A. I see that.
2  Q. What does that mean?
3  A. I can't recall why -- what that
4  subject means.
5  Q. All right. And the date of
6  this e-mail is August 16, 2017, correct?
7  A. That is correct.
8  Q. And if you would flip the page,
9  does this appear to be the suspicious order
10 report that you were responsible for pulling,
11 burning on a CD and sending to the DEA, along
12 with the distribution centers?
13 A. This does appear to be one of
14 those reports, yes.
15 Q. Okay. Was it -- are there
16 different kinds of reports, or was this the
17 suspicious controlled drug orders that DEA
18 mentions in page 26 of Stahmann 6?
19 A. I believe this is one of the
20 reports. There may have been a -- there
21 may -- the reports may have been broken down
22 by area so we would know who to send to.
23 Q. All right. You see in the
24 bottom left-hand side of this page where it
25 says, "Report available in Mobius."

Page 283

1  A. Yes.
2  Q. And did you in August of 2017
3  go on Mobius and pull this report?
4  A. No.
5  Q. All right. Where do you think
6  you found this report?
7  A. To be complete -- I can't say
8  for certain, but I think I pulled this from
9  an e-mail that I may have sent out in
10 preparation or for -- due to a legal ask.
11 They asked if I could --
12         MR. STOFFELMAYR: Stop.
13     Don't -- don't get into what anyone
14     asked you legally.
15 QUESTIONS BY MR. MOUGEY:
16 Q. Why did you send it to
17 yourself?
18 A. I think that was the only way
19 that I can get that data.
20 Q. Where was the data when you
21 pulled it?
22 A. It was stored -- I don't
23 remember, but the data resides in Mobius.
24 Q. Right.
25     So you had to access Mobius to

Page 284

1  pull the data, correct?
2  A. At one time, yes.
3  Q. And I'm talking about in August
4  of 2017. Did you have to access Mobius to
5  pull the data?
6  A. No, because I was unable to.
7  Q. Okay. So but you tried?
8  A. We definitely looked into it,
9  yes.
10 Q. All right. So where do you
11 believe that you found this report?
12 A. I can't recall exactly how.
13 Q. And you didn't store these
14 reports as you sent them or keep them in a
15 file or anything along those lines?
16 A. No, they were just burned on a
17 CD, so it's possible that I had a copy of a
18 CD and then e-mailed me that -- the data from
19 the CD.
20 Q. Who e-mailed you the data from
21 the CD?
22 A. I could have e-mailed myself,
23 so just -- I don't know exactly, but that's
24 how I'm envisioning this could have went.
25 Q. And I'm sorry if I'm being slow

Page 285

1  here, but -- so you found this report, you
2  believe, in an old e-mail?
3         MR. STOFFELMAYR: Objection to
4     the form.
5         THE WITNESS: I believe I found
6     the report on an old CD and then
7     transferred the file to myself via
8     e-mail.
9  QUESTIONS BY MR. MOUGEY:
10 Q. Okay. So you had no practice
11 of filing or storing the CDs as you burned
12 them and sent them to the DEA?
13 A. No.
14 Q. If you ever wanted to go back
15 and look at historical suspicious orders, how
16 would you do it?
17         MR. STOFFELMAYR: Objection to
18     the form.
19         THE WITNESS: At the time, you
20     can -- we could have went back in
21     Mobius to look at the data that was
22     currently stored or not purged in
23     Mobius.
24 QUESTIONS BY MR. MOUGEY:
25 Q. Okay. So up to what point in

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    time could you access Mobius and pull
2    historical suspicious controlled drug orders?
3        A.   Personally, it was up until the
4    time that I left asset protection.  My access
5    was taken away once I transferred to
6    pharmaceutical integrity.
7        Q.   So you're not saying that the
8    reports were purged, but you just didn't have
9    any access?
10       A.   I personally did not have
11   access, no.
12       Q.   Now, help me to understand
13   that, because you went to and moved to the
14   pharmaceutical integrity department that was
15   responsible for overseeing diversion.
16           Why would you not have access
17   to the platform with the suspicious order
18   reports?
19           MR. STOFFELMAYR:  Objection to
20       the form.  Foundation.
21           THE WITNESS:  When I
22       transferred to RX integrity, we were
23       not reporting suspicious orders via
24       those CDs and Mobius.
25

Page 287

1    QUESTIONS BY MR. MOUGEY:
2        Q.   But if you wanted historical
3    data to go back and look at patterns, would
4    that not have been helpful?
5        A.   Our team did not look at the
6    historical suspicious orders.
7        Q.   Walk me through a couple
8    samples of -- what I've done here is this is
9    an approximately 25,000-page report.
10           Okay?
11           So is that consistent with your
12   recollection of what you were burning onto a
13   CD and sending to the DEA once a month?
14       A.   To be honest, I cannot
15   recollect how large the files were or
16   page-wise.  I just basically burned the data
17   on a CD and sent it off.  I didn't dive into
18   each individual report or CD, so I don't know
19   if this is a --
20       Q.   Did you even look at it?
21       A.   I would look at it briefly, but
22   just to see if the data transferred to the
23   CD, but that's about the extent.
24       Q.   But in order to know if it
25   transferred to the CD, wouldn't you have to

Page 288

1    look at it?  Do I have three pages or 3,000
2    pages or 18?
3            You had no -- you didn't look
4    at it for any content or what was -- what was
5    in the report?
6        A.   I did not look at the content.
7    I may have looked to see -- if only three
8    pages transferred to the CD, then I knew
9    there was something wrong with the data.
10       Q.   What was the scope of
11   nationally where you were pulling these
12   suspicious order reports from?
13       A.   What do you mean by "scope"?
14       Q.   I mean, did you -- was it for
15   every state?  Every region?
16       A.   They were for the chain length.
17   It was for all of Walgreens.
18       Q.   The entire Walgreens?
19       A.   Correct.
20       Q.   And where would you send them?
21   What DEA would you send them to?
22       A.   We would send them to all the
23   local DEA offices that had their office
24   listings on the DEA web page and then also to
25   our individual distribution centers.

Page 289

1        Q.   All right.  So you would send
2    the entire country suspicious controlled drug
3    orders to every DEA field office?
4        A.   That is correct.
5        Q.   And now, let's go back to
6    page 26 of Stahmann 6.
7            Okay?
8            It says, "Respondent's practice
9    with" -- I'm sorry.
10           MR. STOFFELMAYR:  Give me a
11       second.
12           MR. MOUGEY:  Yeah, my bad.
13           MR. STOFFELMAYR:  Got it.  Are
14       you there?
15           MR. MOUGEY:  Are you there?
16           THE WITNESS:  Yep.  Okay.
17   QUESTIONS BY MR. MOUGEY:
18       Q.   Page 626, paragraph 9,
19   "Respondent's practice with regard to
20   suspicious order reporting was to send to the
21   local DEA field office a monthly report
22   labeled 'Suspicious Drug Controlled Orders.'
23   Two reports were provided:  One for
24   suspicious orders of Schedule II drugs;
25   another for suspicious orders of drugs in

73 (Pages 286 to 289)