# EXHIBIT 353

Page 1

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION


    --------------------------    )
    IN RE: NATIONAL               ) MDL No. 2804
    PRESCRIPTION OPIATE           )
    LITIGATION                    ) Case No.
    --------------------------    ) 1:17-MD-2804
                                  )
    THIS DOCUMENT RELATES TO      ) Hon. Dan A. Polster
    ALL CASES                     )
    --------------------------    )


                        HIGHLY CONFIDENTIAL

            SUBJECT TO FURTHER CONFIDENTIALITY REVIEW



                      VIDEOTAPED DEPOSITION OF

                         DOUGLAS PETERSON



                        December 20, 2018



                         Chicago, Illinois






                    GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com

Page 2

```
 1
 2
 3
 4         The videotaped deposition of
 5   DOUGLAS PETERSON, called by the Plaintiffs for
 6   examination, taken pursuant to the Federal Rules of
 7   Civil Procedure of the United States District
 8   Courts pertaining to the taking of depositions,
 9   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,
10   Registered Professional Reporter and a Certified
11   Shorthand Reporter of the State of Illinois, at the
12   offices of Bartlit Beck Herman Palenchar & Scott,
13   Suite 600, 54 West Hubbard Street, Chicago,
14   Illinois, on December 20, 2018, commencing at 9:01
15   a.m.
```

Page 3

```
 1   APPEARANCES:
 2     ON BEHALF OF THE PLAINTIFFS:
 3       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR P.A.
 4       316 South Baylen Street, Suite 600
         Pensacola, Florida  32502
 5       205-396-3982
       BY:  JEFF GADDY, ESQ.
 6          jgaddy@levinlaw.com
            LAURA DUNNING, ESQ.
 7          ldunning@levinlaw.com
               (via livestream)
 8
 9
10   ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
     aka WALGREEN CO. and THE DEPONENT:
11
       BARTLIT BECK LLP
12     54 West Hubbard Street, Suite 300
       Chicago, Illinois  60654
13     312-494-4475
       BY:  MARK LEVINE, ESQ.
14          Mark.Levine@BartlitBeck.com
            SHARON DESH, ESQ.
15          sharon.desh@bartlitbeck.com
16
17   ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
     ENDO PHARMACEUTICALS, INC.,
18   PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
     COMPANIES, INC. (f/k/a Par Pharmaceutical
19   Holdings, Inc.):
20     ARNOLD & PORTER KAYE SCHOLER LLP
       250 West 55th Street
21     New York, New York 10019-9710
       212-836-8000
22     BY:  ZENO HOUSTON, ESQ.
            zeno.houston@arnoldporter.com
23         (via telephone/livestream)
24
```

Page 4

```
 1   APPEARANCES (Continued):
 2     ON BEHALF OF CARDINAL HEALTH, INC.:
 3       WILLIAMS & CONNOLLY LLP
         725 Twelfth Street, N.W.
 4       Washington, DC  20005
         202-434-5686
 5     BY:  MIRANDA PETERSEN, ESQ.
            mpetersen@wc.com
 6          (via telephone/livestream)
 7
     ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
 8   AMERISOURCEBERGEN CORPORATION:
 9       JACKSON KELLY PLLC
         150 Clay Street, Suite 500
10       P.O. Box 619
         Morgantown, West Virginia  26501
11       304-284-4138
       BY:  SYLVIA WINSTON NICHOLS, ESQ.
12          silvia.winston@jacksonkelly.com
13
14   ON BEHALF OF WALMART:
15       JONES DAY
         77 West Wacker Drive
16       Chicago, Illinois  60601-1692
         312-782-3939
17     BY:  JASON Z. ZHOU, ESQ.
            jzhou@jonesday.com
18
19   ON BEHALF OF HBC COMPANY:
20       MARCUS & SHAPIRA LLP
         One Oxford Centre, 35th Floor
21       Pittsburgh, Pennsylvania  15219
         412-338-4383
22     BY:  ZACHARY FENSTEMAKER, ESQ.
            fenstemaker@marcus-shapira.com
23          ELLY HELLER-TOIG, ESQ.
            ehtoig@marcus-shapira.com
24          (via telephone/livestream)
```

Page 5

```
 1   ALSO PRESENT:
 2       KATIE MAYO, Paralegal
         kmayo@levinlaw.com
 3       SARAH MERCED, Paralegal
         smerced@levinlaw.com
 4         Levin Papantonio Thomas Mitchell
           Rafferty & Proctor P.A.
 5
 6
         RODERRICK CONCEPCION, Trial Technician
 7
 8
 9
10
11   VIDEOTAPED BY:  MICHAEL NEWELL
12
13   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Page 26

1  BY THE WITNESS:
2     A.  It's for all items carried in the
3  warehouse, in the Walgreens stores.
4  BY MR. GADDY:
5     Q.  But is it line by line?  Is it product
6  by product that is the -- why don't you explain for
7  me what you meant when you told me that it's for
8  the entire store as opposed to by product?
9     A.  Well, the store can order any product.
10 I mean, we distribute products for most of the
11 items in our Walgreens store.  So, any ordered item
12 it would look at irregardless of what type of item
13 it is.  It could be paper towels.  It could be
14 toilet paper, shampoo.  It will look at any item we
15 have and if it is greater than the value specified,
16 it will appear on the report.
17    Q.  So, the distribution center enters in a
18 quantity or a number for paper towels, correct?
19    A.  No, they're entering a number just --
20 it's not item-specific.  It's just a number and if
21 it's greater than that number, it will display on a
22 report.  So, it's not product-specific.
23    Q.  Okay.  So, it's one number that's
24 entered for all products within the store?

Page 27

1     A.  Yes.
2     Q.  One number whether it's paper towels,
3  whether it's toilet paper, whether it's Claritin,
4  or whether it's OxyContin?
5     A.  Yes.
6     Q.  And that number is chosen by an
7  individual at the distribution center?
8     A.  Yes.  It's chosen by someone at the
9  distribution center.
10    Q.  Do you know the position of the person
11 at the distribution center that makes that
12 determination?
13    A.  No, I do not.
14    Q.  Have you heard the position of SAIL
15 coordinator, S-A-I-L coordinator?
16    A.  Yes.  I know SAIL coordinator.
17    Q.  Do you know whether or not the SAIL
18 coordinator is the person that makes the decision
19 that a certain number is going to be entered as the
20 criteria?
21    A.  I can't say for sure.
22    Q.  Regardless of who it is, that person has
23 discretion to raise or lower that number, correct?
24    A.  That is correct.

Page 28

1     Q.  Is there any approval process that
2  you're aware of for that person to raise or lower
3  that number?
4     A.  Not that I am aware of.
5     Q.  In the 2000s when Walgreens began
6  distributing controlled substances to its own
7  stores, from your understanding, is the excessive
8  order query just as you've been describing it thus
9  far?
10    A.  Yes.
11    Q.  Are you aware of any special practices
12 or procedures or approvals required regarding the
13 excessive order query as it related to controlled
14 substances in the 2000s?
15    A.  No, I am not.
16    Q.  And you were the person that helped
17 implement this program, correct?
18    A.  That is correct.
19    Q.  Were you ever asked to make any changes
20 or amendments to the program over the life of it?
21    A.  Not that I remember.
22    Q.  How often would that excessive query
23 report be run?
24    A.  It's really up to the DCs to determine

Page 29

1  that.  It could be daily.  It could be -- it's up
2  to their decision to how many times they would or
3  when they would run it.
4     Q.  From your understanding, do orders come
5  into the distribution center from -- from stores
6  pretty much on a daily basis?
7     A.  Yes.
8     Q.  It would make sense to run the report
9  daily?
10       Let me ask it this way:  If your goal is
11 to catch orders that might have been entered in
12 error, which I think is what you told us the
13 intention of the report was, it would make sense to
14 run it daily so that you don't ship any product
15 that wasn't intended to be shipped?
16    A.  Yes.
17    Q.  Are you aware of any policy or procedure
18 for what is supposed to be done if there are
19 certain orders that populate on that excessive
20 order query?
21       MR. LEVINE:  Objection; lacks foundation.
22 BY THE WITNESS:
23    A.  I'm not -- I'm not sure.  I don't know
24 of any policies personally, no.

Page 158

1  going to Cardinal. That process resides in the
2  store's system as an all-or-none feature."
3      Do you see that?
4  A.  Yes.
5  Q.  What does that mean to you?
6  A.  I'm not really sure what that means.
7  Q.  The only workaround that you were able
8  to set up as it relates to these 367 red-flagged
9  stores related to the Schedule II controlled
10 substances, correct?
11 A.  Yes.
12 Q.  You weren't able to develop any type of
13 workaround to allow the red-flagged stores to
14 continue ordering Schedules III through V, correct?
15 A.  Correct.
16 Q.  Now, at this point in time when -- that
17 was February 2013, correct?
18 A.  Yes. Yes.
19 Q.  And you recall we've looked at the
20 documents from earlier, particularly the thick
21 document with the Order to Show Cause in it, that
22 it indicated that the controlled substances at
23 Jupiter had been locked up back in September of the
24 previous year, of 2012.

Page 159

1      Do you recall that?
2  MR. LEVINE: Objection; lacks foundation.
3  BY THE WITNESS:
4  A.  I don't recall that, no.
5  BY MR. GADDY:
6  Q.  Okay. Well, regardless, we saw in these
7  e-mails that we just looked at in early 2013 that
8  Walgreens was in the process of stopping to ship
9  Schedule II controlled substances from the
10 Perrysburg distribution center, correct?
11 A.  We were asked to write code to stop
12 some.
13 Q.  And you saw in the meeting notes where
14 the plan was to ship Schedule II controlled
15 substances from Perrysburg until the DEA came in
16 and shut them down. Do you recall that?
17 A.  I recall the e-mail, but I don't recall
18 back from then.
19 Q.  I understand. And what we just looked
20 at was some correspondence from Cardinal Health and
21 then some projects that you were involved with
22 where Cardinal Health had red-flagged several
23 stores, Walgreens stores, that were typically
24 serviced by the Perrysburg distribution center,

Page 160

1  correct?
2  A.  From what I read in the e-mails, yes. I
3  don't recall them from back then.
4  Q.  Okay. Do you recall as you sit here
5  today also dealing with stores that Cardinal Health
6  had red-flagged, meaning refused to distribute
7  controlled substances to, that were typically
8  serviced by the Woodland distribution center?
9  A.  I do not recall any of that, no.
10 Q.  Okay. I'm going to show you what I'm
11 going to mark as Peterson 15. P-WAG-2033.
12     (WHEREUPON, a certain document was
13     marked as Walgreens-Peterson
14     Exhibit No. 15: 4/9/13 e-mail
15     sting; WAGMDL00358578 - 00358580.)
16 BY MR. GADDY:
17 Q.  And do you recognize this document again
18 as a -- as another e-mail chain?
19 A.  Yes.
20 Q.  And it looks like in the first e-mail,
21 that would be the last one in the chain that we'll
22 get to in a minute, it looks like it was ultimately
23 from you, correct, the first page?
24 A.  Oh, the first page? Yes, that is my

Page 161

1  name.
2  Q.  So, this is another e-mail chain,
3  whether or not you're in the first one we are going
4  to look at, ultimately you were involved in this
5  e-mail correspondence, correct?
6  A.  Yes.
7  Q.  So, if you flip the page, do you see a,
8  starting in about halfway down the page, an e-mail
9  from Lisa Penn at Cardinal Health?
10 A.  Yes.
11 Q.  And the date of this e-mail is April 9,
12 2013, correct?
13 A.  Yes, it is.
14 Q.  And, so, this is a month or two after
15 these last e-mails we were looking at where you
16 were developing a workaround for the red-flagged
17 stores out of Perrysburg, right?
18 A.  Yes.
19 Q.  And this e-mail goes to Denny Murray and
20 also Tasha Polster?
21 A.  Yes.
22 Q.  And the subject is "Walgreens Woodland
23 Data - Red Stores."
24     Do you see that?

Page 162

1    A.   Yes, I do.
2    Q.   It goes on to say, "Denny and Tasha, we
3  completed our analysis of the Woodland store data
4  and I have attached the results.  We applied the
5  same analytical framework to these stores as we did
6  for the Perrysburg stores.  Below are the totals in
7  terms of how the classifications were made."
8         Do you see that?
9    A.   Yes.
10   Q.   And then below that do you that there is
11 a chart that Lisa from Cardinal Health has included
12 which identifies which classifications were
13 assigned to how many different Walgreens stores?
14   A.   Yes, I see the chart.
15   Q.   And how many stores does Lisa indicate
16 were classified as red?
17   A.   190.
18   Q.   Okay.  And what percentages -- what
19 percentage of the stores serviced by the Woodland
20 distribution center did that encapsulate?
21   A.   12.29.
22   Q.   And from the earlier documents that
23 we've looked at, do you understand that to mean
24 that Cardinal Health is indicating that they have,

Page 163

1  on objective measures only, flagged 190 Walgreens
2  stores as red and therefore will not ship
3  controlled substances to them?
4    MS. PETERSEN:  Objection; foundation.
5  BY THE WITNESS:
6    A.   I'm -- no, I have no recollection of
7  that.  No.
8  BY MR. GADDY:
9    Q.   Well, let's keep reading.
10        The next e-mail looks like it comes from
11 Denny Murray.  The next e-mail in the chain.  If
12 you flip to the first page.
13   A.   Yes, I see that.
14   Q.   And that e-mail goes to you, John
15 Merritello and Steve Bamberg, correct?
16   A.   Yes.
17   Q.   And it looks like he's forwarded that
18 first e-mail to you that had the number of red,
19 orange, yellow and green stores on it, correct?
20   A.   Yes.
21   Q.   And he writes here, "Cardinal is now
22 restricting the distribution of C-II through V
23 narcotic analgesics for 190 stores out of Woodland
24 starting Friday, April 12."

Page 164

1         Do you see that?
2    A.   Yes.
3    Q.   Do you understand that to mean that
4  Cardinal Health is now refusing to ship controlled
5  substances to those 190 stores?
6    A.   I'm not really sure if that's what that
7  means or not.
8    Q.   Well, when we looked at the stores that
9  were red-flagged in Perrysburg, you understood that
10 Cardinal Health was not going to distribute them
11 controlled substances and therefore you had to come
12 up with a workaround, right?
13   A.   For Perrysburg, correct.
14   Q.   He goes on to say, "I will need you
15 gentlemen to put in place the same restrictions we
16 had for the 225 Perrysburg stores that blocked C-II
17 orders and PFL/OOS for the C-II through V narcotic
18 analgesics."
19        Do you see that?
20   A.   Yes, I see that.
21   Q.   First, when we see narcotic analgesics,
22 C-II through V narcotic analgesics, do you
23 understand that to mean Schedule II through V
24 controlled substances?

Page 165

1    A.   I'd say C-II through V, yes.
2    Q.   So, do you understand that Denny -- let
3  me ask you this.  This e-mail is from five and a
4  half years ago, right?
5    A.   Yes, it is.
6    Q.   As you sit here today, do you recall
7  getting this e-mail from Denny asking you to
8  develop a workaround for Woodland like you had for
9  Perrysburg?
10   A.   No, I do not remember that.
11   Q.   But do you understand from looking at
12 this document that that's what he was asking you to
13 do?
14   A.   Yes.
15   Q.   Okay.  And so then you respond in the
16 top e-mail and you say, "I just want to verify:
17 We're using same list of products" -- excuse me --
18 "same list of items from Perrysburg."  Correct?
19   A.   Yes.
20   Q.   And that would be either that 300 or 500
21 number that we saw in Dave's formula where he was
22 doing number of stores multiplied by number of
23 items?
24   A.   One of those, yes.