# EXHIBIT 356

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

------------------------------) MDL No. 2804

IN RE:  NATIONAL PRESCRIPTION )

OPIATE LITIGATION             )

---------------------------   ) Case No. 17-md-2804

THIS DOCUMENT RELATES TO:     )

ALL CASES                     )

------------------------------) Hon. Dan A. Polster

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF

DEBORAH BISH

February 1, 2019

Toledo, Ohio

Page 2

The videotaped deposition of DEBORAH BISH, called by the Plaintiffs for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JULIANA F. ZAJICEK, a Registered Professional Reporter and a Certified Shorthand Reporter, at the Renaissance Toledo Downtown Hotel, 444 North Summit Street, Toledo, Ohio, on February 1, 2019, at 8:06 a.m.

Page 3

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
   LEVIN PAPANTONIO THOMAS MITCHELL
   RAFFERTY & PROCTOR P.A.
   316 South Baylen Street, Suite 600
   Pensacola, Florida 32502
   205-396-3982
   BY: JEFF GADDY, ESQ.
      jgaddy@levinlaw.com

ON BEHALF OF WALGREEN CO.:
   BARTLIT BECK LLP
   54 West Hubbard Street, Suite 300
   Chicago, Illinois 60654
   312-494-4400
   BY: KATHERINE M. SWIFT, ESQ.
      kate.swift@bartlit-beck.com

ON BEHALF OF AMERISOURCEBERGEN CORPORATION and AMERISOURCEBERGEN DRUG CORPORATION:
   JASZCZUK, P.C.
   311 South Wacker Drive, Suite 3200
   Chicago, Illinois 60606
   312-442-0509
   BY: MARGARET M. SCHUCHARDT, ESQ.
      mschuchardt@jaszczuk.com

ON BEHALF OF McKESSON CORPORATION:
   TABET DIVITO & ROTHSTEIN LLC
   209 South LaSalle Street, 7th Floor
   Chicago, Illinois 60604
   312-762-9461
   BY: KYLE A. COOPER, ESQ. (Telephonically)
      kcooper@tdrlawfirm.com

Page 4

APPEARANCES: (Continued)
ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS INC., PAR PHARMACEUTICAL, INC. AND PAR PHARMACEUTICAL COMPANIES, INC. (FKA PAR PHARMACEUTICAL HOLDINGS, INC.):

   ARNOLD & PORTER KAYE SCHOLER LLP
   70 West Madison Street, Suite 4200
   Chicago, Illinois 60602-4231
   312-583-2435
   BY: CAITLIN MARTINI MIKA, ESQ.
      (Telephonically)
      caitlin.mika@arnoldporter.com

ON BEHALF OF WALMART INC.:
   JONES DAY
   77 West Wacker Drive
   Chicago, Illinois 60601-1692
   312-269-4164
   BY: PATRICK J. BEISELL, ESQ. (Telephonically)
      pbeisell@jonesday.com

ON BEHALF OF HBC SERVICES:
   MARCUS & SHAPIRA LLP
   One Oxford Centre, 35th Floor
   Pittsburgh, Pennsylvania 15219
   412-471-3490
   BY: DARLENE M. NOWAK, ESQ. (Telephonically)
      nowak@marcus-shapira.com

ALSO PRESENT:
   MS. KATIE MAYO,
      Levin Papantonio Thomas Mitchell
      Rafferty & Proctor P.A.
   MR. MICHAEL TOTH, Trial Technician
THE VIDEOGRAPHER:
   MR. MICHAEL NEWELL,
      Golkow Litigation Services.

Page 5

I N D E X

WITNESS:                           PAGE:
DEBORAH BISH
   EXAM BY MR. GADDY.................... 10
   EXAM BY MS. SWIFT: .................. 475
   FURTHER EXAM BY MR. GADDY............ 493

\*\*\*\*\*

E X H I B I T S

WALGREENS - BISH EXHIBIT          MARKED FOR ID
No. 1   4/5/12 E-mail chain, Subject:      16
       Jupiter/Perrysburg C2 Orders;
       WAGMDL00751658 - 659
No. 2   6/28/12 E-mail chain with        19
       attachment, Subject: FW: Czar doc
       from S. Thoss;
       WAGMDL00317097 - 098

No. 3   Deborah Bish LinkedIn page       27

No. 4   Annual Performance Review, 9/1/11  43
       - 8/31/12, Deborah Bish
No. 5   Printout from the DEA website re   65
       Title 21 CFR Part 1301, Section
       1301.74
No. 6   Documents titled "Handling        74
       Suspicious Drug Orders,"
       Originated 9/8/98, Revised 2/15/05
       and "Handling Suspicious Orders
       and Loss of Controlled Drugs,"
       Originated 9/8/98, Revised
       2/15/05; WAG00001910 - 911

Page 70

1  would have occurred to you to do?
2      MS. SWIFT:  Object to the form.
3  BY THE WITNESS:
4      A.  Probably not because we didn't fill the
5  orders that were odd or large.  You know, when I
6  called the store, like I said, there was only one case
7  that I remember that they actually said, Yes, I really
8  want 80 of those or whatever.  So, no, there was -- I
9  wouldn't have thought of calling them.
10 BY MR. GADDY:
11     Q.  Okay.  Well, when you say "orders that
12 were odd or large," I mean, you -- you shipped to -- I
13 think we just saw over 5,000 different stores,
14 correct?
15     A.  Um-hum, um-hum.
16     Q.  And I'm sorry.  You have to say yes or no
17 for her.
18     A.  Oh, yes.  Sorry.
19     Q.  And is it fair to say that -- that those
20 stores are in all different types of markets?
21     A.  Right, that's fair to say, yeah.
22     Q.  For example, there is a Walgreens in
23 Perrysburg, is -- is there?
24     A.  Yes, um-hum.

Page 71

1      Q.  Okay.  There is Walgreens in Cleveland,
2  correct?
3      A.  Yes.
4      Q.  Chicago?
5      A.  Yep.
6      Q.  So there is Walgreens in -- in big cities,
7  Walgreens in small towns, correct?
8      A.  Right, yes.
9      Q.  When you were looking at these orders, did
10 you do any evaluation of the population size that --
11 that these stores were serving?
12     A.  No.
13     Q.  Did you do any evaluation of how far the
14 patients were traveling to get to those stores to have
15 their prescriptions filled?
16     A.  No.
17     Q.  Did you do any evaluation of the numbers
18 and types of doctors that were writing the
19 prescriptions for these C-II drugs?
20     A.  No.
21     Q.  Okay.
22         Every time that an order came in, did
23 you -- did you do an historical analysis on that
24 particular store for every single order that you

Page 72

1  received?
2      A.  No.
3      Q.  So when you say you didn't fill the orders
4  that were odd, that would mean the orders that jumped
5  off the page as being very large and would require a
6  follow-up phone call to the store to make sure that
7  they didn't make an error when they were typing in
8  their order?
9      MS. SWIFT:  Object to the form.
10 BY THE WITNESS:
11     A.  Well, to make sure that they didn't make
12 an error or that they didn't really need it.  But,
13 like I said, again, there was only one case where I
14 recall them actually saying, Yes, that's what I need.
15 BY MR. GADDY:
16     Q.  Okay.  Usually it was, Oh, shoot.  I meant
17 3 and I typed 300?
18     A.  Usually, yeah.
19     Q.  And in those cases you would just delete
20 the 300 and put in a 3?
21     A.  Right.
22     Q.  It goes on to say in paragraph (b), it
23 says:
24         "Suspicious orders include orders of

Page 73

1  unusual size, orders deviating substantially from a
2  normal pattern, and orders of unusual frequency."
3         Do you see that?
4      A.  Um-hum.
5      Q.  Prior to just now, right here today in
6  this deposition, had you ever read that subsection of
7  this regulation before?
8      A.  I don't remember.  I don't remember if I
9  did or not.
10     Q.  Okay.  Do you recall anybody at Walgreens
11 ever giving you any training regarding this topic?
12     A.  Regarding orders deviating substantially
13 all -- from a normal pattern, that -- no, because,
14 again, that's something that I thought was done at
15 corporate.  They have all of the sales history.  In
16 the DCs we don't have that.
17     Q.  Okay.  But you were the C-II function
18 manager at Perrysburg, correct?
19     A.  Yep, yep.
20     Q.  Okay.  And you were the person, I think,
21 that Mr. Joseph said that your knowledge of C-IIs was
22 second to none, correct?
23     A.  Um-hum, yes.
24     Q.  Okay.  Let me show you another policy that

Page 110

1  A. Um-hum.
2  Q. And it talks about training?
3  A. Yes.
4  Q. And it says in No. 1, it says:
5  "The SAIL function manager will be
6  responsible for the training and enforcement of all
7  the procedures."
8  Do you see that?
9  A. Yes.
10 Q. Are -- are you aware of -- of any training
11 ever being provided on this policy to any of the team
12 members at Perrysburg?
13 A. I'm not aware of this written policy being
14 given to anyone, the team members, if that's -- that's
15 what you are asking me.
16 Q. Okay. Do you recall any -- there being
17 any training or guidance given to, whether it's --
18 it's the folks in the computer room or the pickers on
19 what they are supposed to be looking for as far as
20 contacting you about these questionable orders that --
21 that you might need to check for accuracy?
22 A. Well, they just -- they just knew that if
23 it was -- they knew what was high because they picked
24 every day and they picked all stores every week, so

Page 111

1  they knew if something was unusually high. There
2  wasn't really training given to them to identify that.
3  Q. Did you -- I mean, they're -- you are --
4  this is talking about over 5,000 stores, right?
5  A. Um-hum.
6  Q. Would -- would it be safe to say that you,
7  when you see a store number, do you know what store
8  that is?
9  A. No.
10 Q. Okay. So if you see, I want to say the
11 store numbers were five digits?
12 A. Correct.
13 Q. So -- so if you saw Store 12345, that
14 doesn't -- you don't know that -- that, Oh, we're
15 talk -- that's the store in Perrysburg, Ohio, you
16 don't particularly know where that store is or what
17 population it serves or -- or what its typical
18 business is or anything like that, is that correct?
19 A. That's correct.
20 Q. Okay. So when you say the pickers do this
21 every day and they know what they are seeing, you are
22 not telling me that -- that they know exactly how many
23 bottles Store 12345 typically gets on an average
24 order, are you?

Page 112

1  A. No, that's not what I'm telling you.
2  Q. Okay. You are just saying as a whole
3  chain wide they're -- they're aware of what comes in?
4  A. They -- they are aware of what was
5  unusually large.
6  Q. On a chain-wide basis?
7  A. On a chain-wide basis, yes.
8  Q. You -- do you see any -- any potential
9  problems or issues with using a chain-wide basis to
10 evaluate size of -- sizes of orders?
11 MS. SWIFT: Object to the form.
12 BY THE WITNESS:
13 A. Well, I mean, every store would be
14 different based on where it's at. Some were in
15 hospitals, some were in corporate offices, so...
16 BY MR. GADDY:
17 Q. And -- and you would agree with me, it
18 would be fair to say that a -- that a store at a
19 hospital is probably going to need more C-IIs than a
20 store in Perrysburg, Ohio?
21 A. Possibly, that would make sense.
22 Q. And -- and you agree with me that it would
23 be possible that there could be an unusually large
24 number of bottles for Perrysburg, but that might be a

Page 113

1  normal order of bottles for a hospital, is that fair?
2  A. That would be fair, um-hum.
3  Q. Okay. But you didn't have a daily
4  practice of calling all of the Walgreens stores and
5  hospitals, did you?
6  A. No.
7  Q. Okay. So these or -- these orders that
8  were going to hospitals, those weren't popping on a
9  daily basis for you to follow up on, were they?
10 MS. SWIFT: Objection; foundation.
11 BY THE WITNESS:
12 A. No.
13 BY MR. GADDY:
14 Q. Okay. So what you would see is normal
15 orders for stores in a hospital setting were not high
16 enough to flag for you to do any follow-up calls or
17 investigation on, is that correct?
18 MS. SWIFT: Objection; foundation.
19 BY THE WITNESS:
20 A. That would be correct, because what
21 flagged them was, like, triple -- 300 of something.
22 Not even in a hospital do you need 300 of something.
23 I mean, that's what would flag them right away that
24 something was wrong.

29 (Pages 110 to 113)

Page 114

1  BY MR. GADDY:
2     Q.  It had to be something crazy for it to
3  flag on this report for you to do a follow-up?
4     A.  Well, it had to be something large.  I
5  don't know if I would say crazy, but yeah.
6     Q.  Outside of being told by Anaya at some
7  point in time for -- that -- that it -- excuse me --
8  being told by Anaya at some point in time that at some
9  other point in time there was some type of system in
10 place --
11    A.  Uh-huh.
12    Q.  -- did you ever have any interaction with
13 anybody at Walgreens regarding suspicious orders?
14    MS. SWIFT:  Object to the form and foundation.
15 BY THE WITNESS:
16    A.  Just the computer room supervisor,
17 Matt Nye, the one we talked about earlier.
18 BY MR. GADDY:
19    Q.  Okay.
20        And what, if anything, would Matt tell you
21 about -- and -- and -- and I'm not talking about the
22 questionable orders, the -- not -- not about these
23 policies and this procedure here.
24    A.  Okay.

Page 115

1     Q.  But I'm asking specifically about the --
2  the suspicious order report that you said would come
3  into the C-II SAIL --
4     A.  Uh-huh.
5     Q.  -- or -- or the suspicious orders that's
6  handled by internal audit.
7         Did you have -- did you have any
8  conversations with Matt Nye about that suspicious
9  order report or -- or specifically the -- what
10 Walgreens referred to as suspicious orders?
11    MS. SWIFT:  Object to the form of the question.
12 BY THE WITNESS:
13    A.  Suspicious orders would be the query he
14 ran, I -- that's how I understood it, and then I -- he
15 would talk to me about those.  If he couldn't get
16 ahold of the store, he would tell me.
17        Is that what -- the query you are talking
18 about?  No.
19 BY MR. GADDY:
20    Q.  What you are talking about is what we've
21 been talking about for the last hour or so?
22    A.  Um-hum.
23    Q.  Okay.  So no.  I'm talking about something
24 different than that.

Page 116

1     A.  Okay.
2     Q.  I'm talking about what -- well, let me ask
3  you this:  Did Matt refer to those as suspicious
4  orders?
5     A.  I don't recall --
6     Q.  Okay.
7     A.  -- his verbiage, no.
8     Q.  I'm ask -- what I'm trying to ask about,
9  and -- and -- and I'm just going to be sus -- specific
10 to the phrase "suspicious orders."
11    A.  Okay.
12    Q.  Because that's what's used here in this
13 policy as it relates to internal audit and that's what
14 I think you told me was on that report that the
15 C-II -- that -- that Lori --
16    A.  Right.
17    Q.  -- who was the C-II SAIL coordinator,
18 would get, correct?
19    A.  Correct.
20    Q.  Or -- or -- or Brook was the other one,
21 right?
22    A.  Um-hum.
23    Q.  Did you ever have any conversations or
24 interactions with anybody at Walgreens, other than

Page 117

1  this Anaya conversation you told us about, regarding
2  suspicious order reports or suspicious orders, and --
3  and I'm confining it to that -- to that specific term?
4     MS. SWIFT:  Object to the form.
5  BY THE WITNESS:
6     A.  Not that I recall.
7  BY MR. GADDY:
8     Q.  Okay.  Do you know -- do you know a Mark
9  Betterridge?
10    A.  Yes.
11    Q.  Who is Mark and what did he do?
12    A.  He is another function manager at the DC.
13    Q.  Okay.  What is his purview -- what's under
14 his purview?
15    A.  Right now he is in NAKL mod, one of our
16 pick mods.
17    Q.  Okay.  Has he ever had any
18 responsibilities whatsoever for controlled substances?
19    A.  I didn't really follow C-III through V and
20 their activity when I was in receiving as a manager,
21 so I couldn't really answer that.  He may have during
22 that frame.  I don't know.
23    Q.  He never had any responsibilities over
24 C-IIs?

Page 498

1   MS. SWIFT: Object to the form.
2   BY THE WITNESS:
3       A.   I don't recall. I'd have to look, but I
4   take your word for it.
5   BY MR. GADDY:
6       Q.   Well, do you remember it was a year after
7   the Rannazzisi letter from the DEA --
8       A.   Uh-huh. Uh-huh.
9       Q.   -- saying don't do the monthly reports?
10      A.   Right.
11      Q.   And that was December 2007?
12      A.   '7.
13      Q.   Okay. So this Exhibit 14 that you were
14  shown by your attorney where the D -- where you are
15  acknowledging or Walgreens is acknowledging that the
16  DEA believes the suspicious order report is
17  inadequate, that's back in 2006, right?
18      A.   Yes.
19      Q.   And we've looked at documents today from
20  the Walgreens internal audit department in December
21  of 2008, two-and-a-half years after that, where
22  Walgreens is still saying that their suspicious order
23  monitoring program needs work and has risk involved?
24      MS. SWIFT: Objection asked --

Page 499

1   BY MR. GADDY:
2       Q.   Do you recall that?
3       MS. SWIFT: Asked and answered and beyond the
4   scope.
5   BY THE WITNESS:
6       A.   I don't remember the word "risk," but I do
7   remember them saying that they had concerns about it.
8   BY MS. SWIFT:
9       Q.   Do you remember there was a column for
10  risk --
11      A.   Uh-huh.
12      Q.   -- and the whole thing was blacked out so
13  I couldn't ask you about it?
14           Do you remember that?
15      MS. SWIFT: Object to the form.
16  BY THE WITNESS:
17      A.   I remember there were several things
18  blacked out on forms, but not that specific one.
19  BY MR. GADDY:
20      Q.   And then you recall that we've looked at
21  the cover letters of those suspicious orders, of those
22  monthly reports that were sent to the DEA all of the
23  way through, what was it, January of 2012, I believe?
24      A.   Oh, was it '12, '11 or '12, yeah.

Page 500

1       Q.   All right. Now, the other thing I want to
2   touch on just very quickly is the excessive order --
3       A.   Query.
4       Q.   -- report.
5            Query? What would -- what would you like
6   to call it, excessive order query?
7       A.   I don't -- I don't do that. So I just
8   notice in here it is all called the excessive order
9   query, I believe.
10      Q.   Okay. Well, if I say "excessive order
11  query," you know what I'm talking about?
12      A.   Yeah, yeah.
13      Q.   Okay. So when we talked earlier, you only
14  mentioned getting notifications from the computer room
15  occasionally because usually I think you said Matt
16  handled that on his own?
17      A.   Correct.
18      Q.   And that you said you generally got them
19  from the pickers. And just a few minutes ago for the
20  first time I heard you say a third person or position?
21      A.   The auditor.
22      Q.   Of the auditor.
23      A.   Uh-huh.
24      Q.   Okay. Is there any reason you didn't

Page 501

1   mention that before to...?
2       A.   I just didn't think of it, yeah.
3       Q.   Okay. Was there anything that made you
4   think of it?
5       A.   Nothing in particular.
6       Q.   Okay.
7       A.   Well, when she asked me to go
8   step-by-step-by-step what -- what happens when the
9   orders come in, then I was visualizing where it goes
10  and I went, Okay, then it goes to the auditor.
11  What -- I didn't do that before.
12      Q.   Okay. So you told us before, and tell me
13  if I'm wrong, but that you would occasionally get
14  notifications from Matt?
15      A.   Um-hum.
16      Q.   And that you would regularly get
17  notifications from folks that were doing the picking?
18      A.   Well, define regularly. I don't remember
19  saying regularly. I was saying that if something came
20  up unusually large the pickers would bring it to me.
21      Q.   Okay.
22      A.   I don't remember saying how often.
23      Q.   I'm doing a bad job of trying to figure
24  out where the auditors, how frequently you would get

Page 502

```
 1   reports from auditors about --
 2       A.  Not frequently.  It usually came from the
 3   picker.
 4       Q.  Okay.  Would you get them from the
 5   auditors more or less than you would get them from
 6   Matt?
 7       A.  More or less what?
 8       Q.  Than you would get them from Matt in the
 9   computer room?
10       A.  Oh, I would -- it would be about the same.
11       Q.  Okay.  And what you're -- what you're
12   looking for in those situations are orders that were
13   entered by the stores in error, correct?
14       MS. SWIFT:  Object to the form.
15   BY THE WITNESS:
16       A.  Correct.
17   BY MR. GADDY:
18       Q.  Okay.
19       A.  Or with -- or that they needed it but I
20   still need to know why they are ordering so much.
21       Q.  Okay.  And I think that you said that
22   there is only one situation where you remember calling
23   them about what you think was an error --
24       A.  Uh-huh.
```

Page 503

```
 1       Q.  -- and finding out that, in fact, it was
 2   not an error?
 3       A.  Correct.
 4       Q.  So most of the time that you would see one
 5   of these incredibly large numbers flag on this report,
 6   something like 300 where they really meant three --
 7       A.  Uh-huh.
 8       Q.  -- you would call the store and they would
 9   confirm for you that it was an error, correct?
10       A.  Correct.
11       Q.  You weren't doing any analysis of the
12   population size that serviced these stores, correct?
13       A.  No.
14       MS. SWIFT:  Objection asked and answered.
15   BY MS. SWIFT:
16       Q.  You weren't doing any analysis of the
17   geographical locations of the patients or the
18   prescribers as it related to the store, is that
19   correct?
20       MS. SWIFT:  Objection; asked and answered.
21   BY THE WITNESS:
22       A.  No, that's correct, yes.
23   BY MR. GADDY:
24       Q.  Okay.  You weren't doing any analysis of
```

Page 504

```
 1   the doctors that were writing the prescriptions?
 2       MS. SWIFT:  Objection; asked and answered.
 3   BY THE WITNESS:
 4       A.  No.
 5   BY MR. GADDY:
 6       Q.  Okay.  In fact, I think you told us that
 7   you wouldn't have the ability to do any of that -- any
 8   of that type of analysis because you didn't have that
 9   information?
10       A.  That's correct.
11       MS. SWIFT:  Objection; asked and answered.
12   BY MR. GADDY:
13       Q.  Okay.  As far as the number of bottles of
14   controlled substances, and I guess specifically
15   Schedule II controlled substances --
16       A.  Uh-huh.
17       Q.  -- that would require folks in the
18   computer room to do any type of flagging or
19   notification of the stores --
20       A.  Uh-huh.
21       Q.  -- do you recall we saw the e-mail where
22   Matt in the computer room indicated that that number
23   was 100 bottles?
24       MS. SWIFT:  Object to the form.
```

Page 505

```
 1   BY THE WITNESS:
 2       A.  Well, it started -- it started at 35.  I
 3   mean, we saw different quantities in there, but the
 4   most current e-mail indicated that it would be a
 5   hundred, yeah.
 6   BY MR. GADDY:
 7       Q.  Okay.  And so anything under a hundred,
 8   according to Matt, he wasn't doing any phone calls or
 9   any follow-ups on?
10       MS. SWIFT:  Object to the form and the
11   foundation, asked and answered and this is beyond the
12   scope --
13   BY THE WITNESS:
14       A.  I don't know.
15       MS. SWIFT:  -- of the redirect.
16   BY THE WITNESS:
17       A.  I don't know what -- what he was -- he
18   wasn't telling me about it, let's put it that way.  I
19   don't know what else he did with it.
20   BY MS. SWIFT:
21       Q.  Okay.  And so under that system, there
22   could be an order for 90 bottles of a hundred-count
23   pill for a Schedule II controlled substance --
24       A.  Uh-huh.
```