# EXHIBIT 362

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
-------------------------    )
IN RE: NATIONAL              ) MDL No. 2804
PRESCRIPTION OPIATE          )
LITIGATION                   ) Case No.
-------------------------    ) 1:17-MD-2804
                             )
THIS DOCUMENT RELATES TO     ) Hon. Dan A. Polster
ALL CASES                    )
-------------------------    )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


VIDEOTAPED DEPOSITION OF

TASHA POLSTER

January 23, 2019


Chicago, Illinois


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 2

```
 5      The videotaped deposition of TASHA POLSTER,
 6   called by the Plaintiffs for examination, taken
 7   pursuant to the Federal Rules of Civil Procedure of
 8   the United States District Courts pertaining to the
 9   taking of depositions, taken before CORINNE T.
10   MARUT, C.S.R. No. 84-1968, Registered Professional
11   Reporter and a Certified Shorthand Reporter of the
12   State of Illinois, at the offices of Bartlit Beck
13   LLP, Suite 600, 54 West Hubbard Street, Chicago,
14   Illinois, on January 23, 2019, commencing at 9:16
15   a.m.
```

Page 4

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF JOHNSON & JOHNSON,
     JANSSEN PHARMACEUTICALS, INC.,
 3   ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC.
     n/k/a JANSSEN PHARMACEUTICALS, INC.;
 4   JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN
     PHARMACEUTICALS, INC.:
 5
         TUCKER ELLIS LLP
 6       950 Main Avenue, Suite 1100
         Cleveland, Ohio  44113-7213
 7       216-696-3950
         BY:  SAVANNAH M. FOX, ESQ.
 8          s.fox@tuckerellis.com
               (via telephone/livestream)
 9
10   ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
     ENDO PHARMACEUTICALS, INC.,
11   PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
     COMPANIES, INC. (f/k/a Par Pharmaceutical
12   Holdings, Inc.):
13       ARNOLD & PORTER KAYE SCHOLER LLP
         601 Massachusetts Avenue, NW
14       Washington, DC  20001-3743
         202-942-5000
15       BY:  RYAN Z. WATTS, ESQ.
            ryan.watts@arnoldporter.com
16
17   ON BEHALF OF McKESSON CORPORATION:
18       TABET DIVITO & ROTHSTEIN LLC
         209 South LaSalle Street, 7th Floor
19       Chicago, Illinois  60604
         312-762-9461
20       BY:  DANIEL L. STANNER, ESQ.
            dstanner@tdrlawfirm.com
21          KYLE A. COOPER, ESQ.
            kcooper@tdrlawfirm.com
22
23
24
```

Page 3

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFFS:
 3       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY & PROCTOR P.A.
 4       316 South Baylen Street, Suite 600
         Pensacola, Florida  32502
 5       205-396-3982
         BY:  PETER J. MOUGEY, ESQ.
 6          pmougey@levinlaw.com
              -and-
 7          PAGE A. POERSCHKE, ESQ.
            ppoerschke@levinlaw.com
 8          JEFF GADDY, ESQ.
            jgaddy@levinlaw.com
 9          LAURA DUNNING, ESQ.
            ldunning@levinlaw.com
10            (via telephone/livestream)
11
12   ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
     aka WALGREEN CO.:
13
         BARTLIT BECK LLP
14       1801 Wewatta Street, Suite 1200
         Denver, Colorado  80202
15       303-592-3177
         BY:  LESTER C. HOUTZ, ESQ.
16          Lester.Houtz@bartlitbeck.com
17            -and-
18       BARTLIT BECK LLP
         54 West Hubbard Street, Suite 300
19       Chicago, Illinois  60654
         312-494-4475
20       BY:  KASPAR STOFFELMAYR, ESQ.
            kaspar.stoffelmayr@bartlitbeck.com
21
22
23
24
```

Page 5

```
 1   APPEARANCES (Continued):
 2   ON BEHALF OF CARDINAL HEALTH, INC.:
 3       ARMSTRONG TEASDALE LLP
         7700 Forsyth Boulevard, Suite 1800
 4       St. Louis, Missouri  63105
         314-621-5070
 5       BY:  JULIE FIX MEYER, ESQ.
            jfixmeyer@ArmstrongTeasdale.com
 6
 7   ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
 8       JASZCZUK, P.C.
         311 South Wacker Drive, Suite 3200
 9       Chicago, Illinois  60606
         312-442-0509
10       BY:  MARGARET M. SCHUCHARDT, ESQ.
            mschuchardt@jaszczuk.com
11
12
         ON BEHALF OF WALMART:
13
         JONES DAY
14       77 West Wacker Drive
         Chicago, Illinois  60601-1692
15       312-782-3939
         BY:  MIRIAM M. LIABO, ESQ.
16          mliabo@jonesday.com
17
18   ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
19       HAHN LOESER & PARKS LLP
         200 Public Square, Suite 2800
20       Cleveland, Ohio  44114
         216-621-0150
21       BY:  SARAH LEWIS, ESQ.
            slewis@hahnlaw.com
22            (via telephone/livestream)
23
24
```

2 (Pages 2 to 5)

Page 142

1  BY MR. MOUGEY:
2  Q. I'm sure it did. So, under "Cardinal
3  SOM," that stands for suspicious order monitoring,
4  correct?
5  MS. FIX MEYER: Object to form.
6  BY THE WITNESS:
7  A. Yes.
8  BY MR. MOUGEY:
9  Q. On the third bullet down, "About 60% of
10 these orders are legitimate orders that should be
11 canceled."
12 The last sentence says, "These are
13 stores who are over their corporate ceiling." And
14 corporate ceiling is Walgreens' corporate ceiling,
15 correct?
16 A. Yes.
17 Q. Means that they weren't allowed to order
18 any more, correct?
19 A. Without proper documentation, yes.
20 Q. And -- but "they are going to Cardinal
21 to request the product."
22 Do you see that?
23 A. Yep.
24 MS. FIX MEYER: Objection to form.

Page 143

1  BY MR. MOUGEY:
2  Q. So, Walgreens' system, if a store
3  exceeded the ceiling, they were told no more
4  Schedule II or Schedule III controlled substances
5  from us, correct, Walgreens?
6  A. They didn't know. So --
7  Q. They knew they couldn't order any more,
8  correct?
9  A. They wouldn't know because -- they
10 wouldn't know until the order was due to show up.
11 Q. And it didn't show up and they knew they
12 didn't get it, correct?
13 A. Right, but they didn't know why.
14 Q. So, they knew they didn't get the order
15 from Walgreens, correct?
16 A. Correct.
17 Q. And they didn't know why, but they
18 didn't get it from Walgreens but then Walgreens
19 allowed up until a period in time for that store to
20 put it in an order from another vendor, correct?
21 MR. HOUTZ: Object to form and foundation.
22 BY THE WITNESS:
23 A. Walgreens -- any pharmacy has secondary
24 wholesalers if the one wholesaler -- I'm just

Page 144

1  telling you the truth. I mean, you got to take
2  care of the patients. And so --
3  BY MR. MOUGEY:
4  Q. The question I asked you was simple.
5  Does the store have the ability to go to
6  another vendor and order controlled substances
7  after they hit the ceiling at Walgreens?
8  MR. HOUTZ: Next time please let her finish
9  her answer before you interrupt.
10 MR. MOUGEY: The next time I'd like to have an
11 answer to the question that I asked.
12 BY MR. MOUGEY:
13 Q. The vendors --
14 MR. HOUTZ: If you allow her to finish your
15 answer, you may get an answer.
16 BY MR. MOUGEY:
17 Q. The vendors -- I'm sorry.
18 The pharmacies are allowed to order
19 additional controlled substance, highly addictive,
20 like OxyContin that we talked about earlier, once
21 they hit the ceiling, that store can go to Cardinal
22 and order additional oxycodone, correct?
23 MS. FIX MEYER: Objection; form, foundation.
24 MR. HOUTZ: Same objection.

Page 145

1  BY MR. MOUGEY:
2  Q. Yes or no.
3  A. I'm not going to yes or no answer that.
4  I'm going to tell you what happened.
5  Q. No, I want to know if they have the
6  ability. That's all I asked.
7  A. Yes.
8  Q. Do they have the ability to order --
9  A. Yes.
10 Q. -- more oxycodone from another vendor
11 like Cardinal after Walgreens' ceiling has been
12 hit?
13 MS. FIX MEYER: Objection; form, foundation.
14 BY THE WITNESS:
15 A. On this date, yes.
16 BY MR. MOUGEY:
17 Q. Yes. Thank you.
18 MR. MOUGEY: Les, if it's okay with you, it's
19 a good stopping point for me for lunch.
20 MR. HOUTZ: Sure.
21 MR. MOUGEY: I am planning on using the seven
22 hours today. So, I just want to give everybody a
23 heads-up as we go through. I'm happy to take a
24 shorter or longer lunch as you and Ms. Polster

37 (Pages 142 to 145)

Page 154

```
 1    A.   You mean not shipped?
 2    Q.   Yes, ma'am.
 3    A.   What about it?
 4    Q.   That's pre-you, though, wasn't it?
 5    A.   Yes.
 6    Q.   Yes.  When you got there, if an order
 7  was flagged by the Bancroft algorithm, it was -- is
 8  the word "cut"?  Are you okay with that?  Or what's
 9  the right terminology you'd use?
10    A.   It was not shipped at all.
11    Q.   Not shipped?
12    A.   Right.
13    Q.   But the store was allowed to order up to
14  that threshold, correct?  They had to enter a new
15  order in?
16    A.   Yes.
17    Q.   So, it was not shipped, but then the
18  store could reenter an order up to the ceiling
19  level, correct?
20    A.   Yes, but the store didn't have
21  visibility into that ceiling level.
22    Q.   I understand.
23    A.   Okay.
24    Q.   I understand that's your drumbeat.
```

Page 155

```
 1    A.   Yeah.
 2    Q.   But right now if the order wasn't
 3  shipped, they were allowed to ship up to that
 4  ceiling level, correct?
 5    A.   Sure.
 6    Q.   Okay.  Now, your team knew that there
 7  were modifications that needed to be made to the
 8  Bancroft algorithm, correct?
 9         Actually, you corrected me before about
10  the Bancroft.  Let's use your language, whatever
11  you feel comfortable with.
12         So, rather than me saying changing the
13  algorithm, how about your team was aware that there
14  were -- that controls were needed to ensure that
15  all orders were going through the Walgreens
16  suspicious order monitoring system?
17         MR. HOUTZ:  Object to form.
18         BY THE WITNESS:
19    A.   I don't agree when you say they were
20  aware.
21         BY MR. MOUGEY:
22    Q.   Okay.
23    A.   I think as time progressed, things would
24  pop up and then we would ask for a change to be
```

Page 156

```
 1  made based on that new information.
 2    Q.   So, as you learned more and as you got
 3  up to speed, there were a different -- there were
 4  additional controls that needed to be implemented?
 5    A.   There were -- there were changes that
 6  needed to be made, yes.
 7    Q.   All right.  And it didn't all happen at
 8  once --
 9    A.   Right.
10    Q.   -- is what you're saying.  It was over a
11  period of time?
12    A.   Right.
13    Q.   And when -- and I'm trying not to use --
14  I'm trying to use the word you feel comfortable
15  with.  Is control, an additional control?  What
16  term would you use?
17         You didn't like the modification to the
18  algorithm.  So, I'm trying to find a word you're
19  comfortable with.
20    A.   Yeah, controls, that's fine.
21    Q.   Is control okay?
22    A.   Yeah.
23    Q.   That there were issues that your team
24  was identifying along the way, they were trying to
```

Page 157

```
 1  find solutions and then implementing a control to
 2  kind of close --
 3    A.   The goal was to have consistency on how
 4  the stores would order; and as things popped up
 5  that created confusion for patient care and was
 6  happening at store level, then we made adjustments
 7  along the way to, you know, decrease any type of
 8  confusion a store would have in getting a product.
 9    Q.   Would you feel comfortable with the word
10  that when Pharmaceutical Integrity started, that
11  there were loopholes in the system that needed to
12  be closed with additional controls to ensure
13  compliance with Walgreens' duties as a distributor?
14    A.   Those -- I think there were gaps.  I
15  don't know about loopholes.
16    Q.   Let's use the word "gaps."  I'm
17  comfortable with "gaps."
18    A.   Okay.
19    Q.   So, there were gaps in Walgreens'
20  policies and procedures with its distribution of
21  controlled substances that your team was
22  identifying and addressing throughout '13 and early
23  '14?
24    A.   Yes.
```