# EXHIBIT 385

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      -  -  -
 5   IN RE:  NATIONAL      :   MDL NO. 2804
     PRESCRIPTION OPIATE   :
 6   LITIGATION            :
     ----------------------------------------------
 7                         :   CASE NO.
     THIS DOCUMENT         :   1:17-MD-2804
 8   RELATES TO ALL CASES:
                           :   Hon. Dan A.
 9                         :   Polster
10                      -  -  -
              Tuesday November 20, 2018
11                      -  -  -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13
                        -  -  -
14
                Videotaped deposition of
15   MARK VERNAZZA, taken pursuant to notice,
     was held at Zuckerman Spaeder, LLP,
16   1800 M Street NW, Suite 1000, Washington,
     DC 2003, beginning at 9:13 a.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19
                        -  -  -
20
21
             GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23
24
```

Golkow Litigation Services                                    Page 1

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. KENNEDY:
2      Q.   Anywhere on this report.
3      A.   Among the things that we
4  consider in our analysis of pattern is
5  whether or not the particular store is
6  ordering in more than it's dispensing,
7  that remains part of the algorithms that
8  we run today.
9          That is reflected in this
10 report. It's, in fact, the point of this
11 report. So, to some degree, this report
12 could be used to look at pattern.
13         But, again, as I testified,
14 this report was not what we deemed a
15 suspicious order monitoring report. It's
16 relevant to orders and order size and,
17 some degree, order pattern.
18         But the point of this was
19 not to produce results for the purposes
20 of determining whether suspicious orders
21 were made and reporting those to the DEA.
22     Q.   And this PDMR report is
23 printed every three months, true? This
24 is a three-month report? Do you know

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that?
 2         A.    I believe it's -- perhaps
 3    comes out on different cadences over the
 4    course of time.  To the best of my
 5    corporate knowledge, I understood it to
 6    be a monthly report.
 7         Q.    So this isn't -- certainly
 8    isn't looked at before any particular
 9    order for a controlled substance is being
10    shipped out to one of your pharmacies,
11    true?
12         A.    It is not.
13         Q.    You talked about the pickers
14    and the packers.
15               Is it your testimony that
16    the pickers and the packers were
17    responsible for evaluating orders to
18    determine whether or not they are
19    suspicious?
20         A.    The pickers and the packers
21    would be aware of, as part of their job
22    responsibilities, to raise any orders
23    that they considered to be irregular
24    based on their knowledge and experience,
```

1        Q.   And would I be correct to
2   say there were no written policies,
3   procedures and protocols for those
4   pickers and the packers in '06, with
5   respect to their obligations?  Nothing in
6   writing?
7        A.   In 2006, not in writing.  We
8   later have reduced that process to
9   writing, as a part of a policy.
10              And, in fact, on the door to
11  the controlled substances cage today, and
12  I understand it's been there for some
13  period of time, is a poster that actually
14  reminds the pickers and the packers of
15  their obligations with respect to this.
16       Q.   In 2006, did CVS rely upon
17  pickers and packers to have a memory of
18  the frequency of a particular pharmacy's
19  ordering of a controlled substance over
20  the preceding 30, 60, 90 days?
21       A.   The pickers and the packers
22  who I spoke to told me that they were
23  able to identify orders that seemed out
24  of the ordinary, based on their

Highly Confidential - Subject to Further Confidentiality Review

1  experience picking controlled substances
2  in the controlled substances cage.
3      Q.  Can you describe to me the
4  training program that the pickers and the
5  packers went through to identify unusual
6  orders of size, frequency or pattern?
7          MR. DELINSKY:  Object to
8      form.
9          THE WITNESS:  Are you
10     speaking -- in which time period?
11 BY MR. KENNEDY:
12     Q.  In '06.  In '06.
13     A.  To the best of my corporate
14 knowledge, there was no formal training
15 program.  However, the pickers and the
16 packers who I spoke with who worked in
17 that environment in 2006 told me that
18 they were aware of that component of
19 their job responsibilities and had
20 acquired that knowledge in the course of
21 their employment.
22     Q.  And what were the job
23 requirements to be a picker and a packer
24 at a CVS distribution center in 2006?

1          A.    I'm unaware of the formal
2    job requirements.  I have been told that
3    the pickers and the packers in the
4    controlled substances cage were often
5    among the best and most valued employees
6    who performed those types of functions.
7          Q.    From '06 to 2012, did a
8    picker and a packer ever identify an
9    order that was stopped and determined to
10   be suspicious and report it to the DEA,
11   ever?
12         A.    To the best of my --
13               MR. DELINSKY:  Object to
14         form.  Object to scope.  It's
15         outside the scope of the
16         deposition notice and the Special
17         Master's rulings.
18   BY MR. KENNEDY:
19         Q.    Ever?
20         A.    To the best of my corporate
21   knowledge at this point in time, we do
22   not have record of any suspicious order
23   being identified or reported to the DEA
24   in 2006 from the Indianapolis

Highly Confidential - Subject to Further Confidentiality Review

1  had not yet been written, correct?
2        A.   If you'll allow me just to
3  review the document for a minute.
4        Q.   Well, I can direct your
5  attention.  If you want to go to Page
6  25243.
7             MR. DELINSKY:  The witness
8        is already there.  He understands
9        the document.
10 BY MR. KENNEDY:
11       Q.   Do you see Page 25243?
12       A.   Yes, I do.
13            So there is a section here
14 that addresses suspicious order
15 monitoring.
16       Q.   Correct.
17       A.   My understanding is that
18 that was essentially a draft or a
19 placeholder for that section and was not
20 the policy that was necessarily in place
21 at that time.
22       Q.   Well, then, we'll go through
23 this a little bit more carefully.
24            Do you agree with her

1   statement here, We are still in the
2   process of writing the suspicious order
3   monitoring section of this standard
4   operating procedure?
5               As of this date, do you
6   agree that it was still being written, in
7   November of 2007?  Do you agree with that
8   statement?
9       A.   To the best of my corporate
10  knowledge, that is true.
11      Q.   Now, she attaches to this
12  e-mail the standard operating procedures,
13  correct, that she talks about in her
14  e-mail that she is sending out to all
15  these people, true?  She attaches it?
16      A.   That's not evident to me
17  from the face of this document.
18      Q.   Pardon me?
19      A.   That's not evident to me
20  from the face of this document.
21      Q.   Well, her e-mail is Bates
22  number 25204, correct?
23      A.   Sir, you're looking at three
24  e-mails, as we discussed before.

```
 1              placeholder, and not the policy
 2              that was put into place at this
 3              time.
 4   BY MR. KENNEDY:
 5        Q.    All right.  So what we're
 6   seeing in Exhibit-6 is not the suspicious
 7   order monitoring policy that was put into
 8   effect on 12/1/07; is that what you're
 9   saying?
10        A.    What I'm saying is I don't
11   believe that there was a suspicious order
12   monitoring policy put into place as of
13   that date.
14        Q.    Okay.
15        A.    Other than what's reflected
16   here, which is consistent with some of
17   the principles that we discussed --
18        Q.    But it's not in place --
19        A.    -- earlier.
20        Q.    -- and in effect and up and
21   running?
22        A.    What's described here is
23   what was written, to the best of my
24   corporate knowledge, by the Buzzeo Group,
```

Highly Confidential - Subject to Further Confidentiality Review

1 operating procedures -- which was
2 implemented in December of 2007. We have
3 made some recent updates to the SOP.
4 Please note we have updated the record
5 retention period from five years to two
6 years. Also, the SOM -- suspicious order
7 monitoring -- section is still not
8 included in the SOP. In the event of an
9 audit and the question comes up, please
10 direct them to corporate (Frank or
11 myself) for explanation of the program.
12 Please review with your teams and forward
13 to anyone I have missed.
14                We agree, at this point in
15 time now, it's April of '09, and the
16 standard -- or, excuse me, the suspicious
17 order monitoring section is still not
18 included in the standard operating
19 procedures, correct?
20        A.    A final version is not
21 included in the standard operating
22 procedures being referenced by Mrs.
23 Propatier in this e-mail.
24        Q.    And with respect to all of

1 from purchasing excessive or potentially
2 suspicious controlled drug orders.
3 Is that an accurate
4 statement in CVS's suspicious order
5 monitoring policies as printed here? Is
6 that accurate?
7 A. You read it accurately.
8 Q. And do you agree with that
9 statement, on behalf of CVS?
10 A. Based on my preparation for
11 this deposition and the interviews that I
12 have conducted and my corporate
13 knowledge, the IRR report was the report
14 that would flag orders for additional
15 review. And within the logistics
16 function within CVS would be the primary
17 way in which those orders would be
18 elevated for review.
19 The system that we talked
20 about, about the pickers and the packers
21 being aware of potentially unusual
22 orders, also stayed in place.
23 And there were additional
24 resources available to the reviewers of

Highly Confidential - Subject to Further Confidentiality Review

1  was anyone helping Mr. Mortelliti, during
2  this period of time, with the review of
3  the IRR, or was he doing it all himself?
4           MR. DELINSKY:  Object to
5       form.
6           THE WITNESS:  At this point
7       in time, to the best of my
8       corporate knowledge, Mr.
9       Mortelliti was taking the first
10      pass through the IRR himself.  And
11      he would reach out for additional
12      resources to help him conduct his
13      due diligence as appropriate.
14 BY MR. KENNEDY:
15      Q.   All right.  And so tell me
16 the names of the people that were
17 assisting Mr. Mortelliti from this period
18 of mid '09 to the fall of 2010.
19      A.   Well, Mr. Mortelliti would
20 have had available to him data systems --
21      Q.   No.  I asked you the names.
22           Give me the names of the
23 people and their titles that were
24 assisting him in the due diligence after

1    helped him during this period of '09 to
2    '10, correct?
3         A.   Into 2010, yes.
4         Q.   Can you give us the name and
5    the title of any person that you know,
6    that you actually know assisted Mr.
7    Mortelliti during this period of '09 into
8    '10?
9         A.   In the first-pass review,
10   I'm unable to provide additional names of
11   folks who helped Mr. Mortelliti during
12   the period of time when he had primary
13   responsibility for the review of that
14   report.
15        Q.   The review, the due
16   diligence, the investigation after the
17   first pass, can you give us the name and
18   title of any people that you know were
19   assisting him in '09 and '10?
20        A.   I don't believe, based on my
21   preparation for this deposition, I can
22   provide you with specific names.
23        Q.   And what did you do to find
24   the specific names and identify people

```
 1            MR. DELINSKY:  Object to
 2       form.
 3            THE WITNESS:  I'm not aware
 4       of any written policies and
 5       procedures before the ones we just
 6       looked at.
 7  BY MR. KENNEDY:
 8       Q.   Can you tell me unwritten
 9  policies and procedures, what were in
10  place with respect to the required due
11  diligence review of a flagged order on
12  the IRR from '09 to early '10?
13            MR. DELINSKY:  Object to
14       form.
15            THE WITNESS:  I understand
16       that Mr. Mortelliti's practice
17       would have been to review the
18       report on a daily basis and
19       determine whether items on the
20       report warranted further review
21       and due diligence and conduct that
22       review and due diligence as he
23       deemed appropriate.
24  BY MR. KENNEDY:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the grounds that the question
 2            exceeds the scope of the
 3            deposition notice and Special
 4            Master Cohen's discovery rulings.
 5                 You can answer with regard
 6            to the Track 1 jurisdictions.
 7                 THE WITNESS:  I'm not aware,
 8            during that time period, that Mr.
 9            Mortelliti identified any orders
10            that were deemed suspicious and
11            reported to the DEA.
12    BY MR. KENNEDY:
13       Q.    During this period from mid
14    '09 to probably October of 2010, over a
15    year, can you explain why it is that CVS
16    had no suspicious order monitoring
17    policies or standard operating policies
18    and procedures with respect to what Mr.
19    Mortelliti was doing for over a year?
20    Why is that?
21       A.    That's not a point on which
22    I have corporate knowledge.
23       Q.    Let me ask you, from this
24    period of '09 into '10, as part of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. DELINSKY:  Object to
 2        form.
 3                THE WITNESS:  The IRR
 4        contains the drugs that would have
 5        flagged on the algorithms that
 6        were established to identify
 7        potentially suspicious order for
 8        review.
 9   BY MR. KENNEDY:
10        Q.    It was the starting point,
11   correct?
12        A.    It was the starting point.
13        Q.    It was the starting point.
14              If you don't get flagged in
15   the IRR, there's not going to be due
16   diligence of that order, true?
17        A.    Unless it was an order that
18   was identified through the warehouse
19   associates.
20        Q.    Some rare occasion,
21   something might get flagged for some
22   other reason.
23              But if you don't get flagged
24   in the IRR report, there's not going to
```

```
 1   be due diligence, true?
 2              MR. DELINSKY:  Object to
 3        form.
 4              THE WITNESS:  I can't say
 5        that that's universally true.  But
 6        for the most part, that would be
 7        true.
 8   BY MR. KENNEDY:
 9        Q.   The IRR report, how many
10   algorithms -- in 2010, do you know how
11   many different algorithms were evaluating
12   and scoring an order for a hydrocodone
13   drug?
14        A.   At what period of time are
15   you saying?
16        Q.   2010, when this -- when the
17   written policies go into place.
18        A.   I'm not certain as to the
19   number of different algorithms that the
20   Buzzeo system employed.
21             As we talked about, there
22   were several different algorithms.  My
23   understanding, it was based on a
24   progression model, and that it would
```